# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| THE NEW GEORGIA PROJECT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*, <br><br> *Defendants*, <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01229-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the | Civil Action No.: 1:21-cv-01259-JPB |

State of Georgia, *et al.*,

               *Defendants,*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

               *Intervenor-Defendants.*

SIXTH DISTRICT OF THE AFRICAN
METHODIST EPISCOPAL CHURCH,
*et al.*,

               *Plaintiffs,*

        v.

BRIAN KEMP, Governor of the State of Georgia,
in his official capacity, *et al.,*

               *Defendants,*

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

               *Intervenor-Defendants.*

Civil Action No.:

1:21-cv-01284-JPB

## STATE DEFENDANTS' AND DEFENDANT GREGORY W. EDWARDS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................. 3

    A.   Factual background ................................................ 3

    B.   Procedural background ........................................... 6

LEGAL STANDARDS ......................................................... 7

ARGUMENT ..................................................................... 8

I.    Plaintiffs Cannot Meet the Non-Merits Requirements for
Preliminary Injunctive Relief When an Election is Close at Hand. ....... 8

    A.   Plaintiffs "unduly delay[ed]" seeking injunctive relief. ................ 8

    B.   Plaintiffs cannot show they will suffer irreparable injury. ........... 9

    C.   Plaintiffs' requested relief would impose significant cost,
confusion, and hardship before the upcoming election. ............... 10

II.   Plaintiffs Cannot Show That the Merits are "Entirely Clearcut"
in their Favor. ...................................................... 12

    A.   Passing out food and drinks is conduct, not speech, and thus
subject only to rational-basis review, which the
Anti-Solicitation Provision easily passes. ..................... 13

    B.   Even if the Anti-Solicitation Provision implicated expressive
activity, it is content-neutral and reasonable. ............... 20

    C.   The Anti-Solicitation Provision satisfies even the highest
standard of scrutiny. ...................................... 27

    D.   Plaintiffs' expert report does not support their argument. ......... 32

III.  The Balance of Equities and the Public Interest Weigh Heavily
Against an Injunction. .............................................. 34

CONCLUSION ................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla. v. Lee,*
   546 F. Supp. 3d 1096 (N.D. Fla. 2021) ......................................................... 27

*Allison v. McGhan Med.,*
   184 F.3d 1300 (11th Cir. 1999) ................................................................... 34

*Alpha Phi Alpha Fraternity v. Raffensperger,*
   No. 1:21-cv-5337-SCJ, 2021 WL 633312 (N.D. Ga. Feb. 28, 2022) ............. 11

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ................................................................................... 22

*Anderson v. Raffensperger,*
   497 F. Supp. 3d 1300 (N.D. Ga. 2020) ........................................................ 33

*Arizonans for Fair Elections v. Hobbs,*
   335 F.R.D. 261 (D. Ariz. 2020) .................................................................. 34

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2321 (2021) .......................................................................... 18, 30

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ....................................................................................... 27

*Burdick v. Takushi,*
   504 U.S. 428 (1992) ................................................................................... 22

*Burson v. Freeman,*
   504 U.S. 191 (1992) ........................................... 24, 25, 26, 27, 28, 29, 30, 31

*Bush v. Gore,*
   531 U.S. 98 (2000) ..................................................................................... 12

*Citizens for Police Accountability Pol. Comm. v. Browning,*
   572 F.3d 1213 (11th Cir. 2009) .............................................................. 30, 31

*City of Austin v. Reagan National Advertising,*
   142 S. Ct. 1464 (2022) ....................................................................... 20, 21, 22

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ................................................................................... 18

*Clark v. Cmty. for Creative Non-Violence,*
   468 U.S. 288 (1984) ................................................................................... 13

*Coalition for Good Governance v. Kemp,*
   No. 1:21-cv-2070-JPB, 2021 WL 2826094 (N.D. Ga. July 7, 2021).... 8, 11, 12

*Common Cause/Ga. v. Billups,*
   554 F.3d 1340 (11th Cir. 2009) ............................................................. 23, 24

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008) ................................................................................. 23

*Daubert v. Merrill Dow Pharm.,*
   509 U.S. 579 (1993) ................................................................................. 32

*Democratic Party of Hawaii v. Nago,*
   833 F.3d 1119 (9th Cir. 2016) ................................................................. 23

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale,*
   901 F.3d 1235 (11th Cir. 2018) ............................................................... 16

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale,*
   11 F.4th 1266 (11th Cir. 2021) ............................................................... 16

*Hand v. Scott,* 888
   F.3d 1206 (11th Cir. 2018) ...................................................................... 34

*Haves v. City of Miami,*
   52 F.3d 918 (11th Cir. 1995) ................................................................... 18

*Heller v. Doe by Doe,*
   509 U.S. 312 (1993) ................................................................................. 18

*Holloman v. Harland,*
   370 F.3d 1252 (11th Cir. 2004) ......................................................... 14, 15

*Jacobson v. Fla. Sec'y of State,*
   974 F.3d 1236 (11th Cir. 2020) ......................................................... 12, 23

*Johnson v. Robinson,*
   415 U.S. 361 (1974) ................................................................................. 17

*Knox v. Brnovich,*
   907 F.3d 1167 (9th Cir. 2018) ................................................................. 17

*League of Women Voters of Fla. v. Fla. Sec'y of State,*
   32 F.4th 1363 (11th Cir. 2022) ............................................... 7, 10, 11, 12, 20

*Libertarian Party of Fla. v. Florida,*
   710 F.2d 790 (11th Cir. 1983) ................................................................. 18

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ................................................................ 22

*McCutcheon v. FEC,*
  572 U.S. 185 (2014) ................................................................ 27

*McIntyre v. Ohio Elections Comm'n,*
  514 U.S. 334 (1995) ................................................................ 27

*Merrill v. Milligan,*
  142 S. Ct. 879 (2022) ....................................................... 2, 7, 12

*Meyer v. Grant,*
  486 U.S. 414 (1988) ................................................................ 27

*Minn. Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018) ...................................................... 25, 26

*New Ga. Proj. v. Raffensperger,*
  976 F.3d 1278 (11th Cir. 2020) ..................................... 18, 22, 23

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) .................................................................... 12

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................ 21

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ............................................................ 13, 15

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) .................................................. 7

*Texas v. Johnson,*
  491 U.S. 397 (1989) ................................................................ 15

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ................................................................ 23

*United States v. Frazier,*
  387 F.3d 1244 (11th Cir. 2004) ................................................ 32

*Voting for America v. Steen,*
  732 F.3d 382 (5th Cir. 2013) .................................................... 17

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ................................................................ 21

*Wash. State Grange v. Wash. State. Republican Party*,
   552 U.S. 442 (2008) ................................................................. 15

*Williams v. Pryor*,
   240 F.3d 944 (11th Cir. 2001) .................................................. 19

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .................................................................... 10

*Wisconsin Legislature v. Wisconsin Elections Comm'n*,
   142 S. Ct. 1245 (2022) ............................................................ 12

*Wreal, LLC v. Amazon.com*,
   840 F.3d 1244 (11th Cir. 2016) .................................................. 9

## Statutes

MONT. CODE ANN. § 13-35-211 ................................................... 28

N.Y. ELEC. LAW § 17-140 ............................................................ 28

O.C.G.A. § 21-2-263 ..................................................................... 6

O.C.G.A. § 21-2-414 ........................................................... 1, 3, 5, 22

## Other Authorities

Mark Niesse, *Georgia lawmakers under investigation for handing out snacks
   to voters*, ATL. J.-CONST. (May 19, 2021) ...................................... 4

# INTRODUCTION

In 2020, representatives of many third-party organizations approached Georgia voters waiting in line to vote.  And, when they did, they gave voters a wide range of items, including masks, pizza, water, literature, and ponchos. While those groups may have meant well, voters complained that this practice felt intimidating.  Additionally, the presence of so many different organizations and people within the 150-foot buffer zone around polling places made it more difficult for counties to ensure a smooth and efficient election.

These experiences from the 2020 election, combined with activities during other recent elections, showed that Georgia's voting laws needed to be updated to ensure that votes were cast freely and without undue interference. Thus, SB 202 updated the State's existing solicitation ban to make clear that no one may hand out money or gifts—including food or drinks—to voters in the area immediately surrounding a polling place.  O.C.G.A. § 21-2-414 (the "Anti-Solicitation Provision").  At the same time, the State took several steps to reduce lines at polling places.

Now, more than a year later, Plaintiffs belatedly ask the Court to preliminarily enjoin the Anti-Solicitation Provision, notwithstanding the confusion it would inject into the ongoing election cycle. As Justice Kavanaugh recently explained, where, as here, "an election is close at hand," a plaintiff's

"undu[e] delay[]" weighs against granting preliminary injunctive relief. *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring). But there are several other reasons to deny Plaintiffs' motions. For instance, Plaintiffs cannot show any irreparable harm, as confirmed by the fact that they waited more than a year to seek injunctive relief.

Moreover, Plaintiffs cannot come close to carrying their burden of showing that the merits are "entirely clearcut" in their favor. *Id.* at 881. Rather, because the Anti-Solicitation Provision prohibits only conduct—handing out things of value to voters—it has no impact on Plaintiffs' First Amendment rights. But even if it implicated expressive activity, it is a reasonable viewpoint- and content-neutral regulation that easily passes muster under the Supreme Court's *Anderson-Burdick* framework.

In fact, this provision would be constitutional even if the Court were to apply heightened scrutiny: Preventing voter fraud, intimidation, and confusion, as well as ensuring efficient elections, are all compelling state interests. SB 202's narrow prohibition on giving things of value to voters in the final stages of the voting process—even things of small value like water bottles—clearly furthers those interests. And, in doing so, SB 202 still allows Plaintiffs to engage in their preferred conduct and speech in a host of ways. Accordingly, Plaintiffs cannot come close to showing that they are

substantially likely to succeed on the merits.

Plaintiffs fare no better on the remaining factors. Given the lack of irreparable injury to Plaintiffs, and the pronounced injury to the State and its voters if an injunction were granted—especially just three months before in-person voting begins—Plaintiffs cannot show that the balance of equities tips in their favor.

For all those reasons, the Court should deny Plaintiffs' motions.

## BACKGROUND

### A.  Factual background

In Georgia, it has long been illegal to solicit votes in the areas surrounding a polling place. O.C.G.A. § 21-2-414(a). Indeed, before SB 202, it was unlawful to conduct *any* of the following activities either inside a polling place, within 150 feet of the outer edge of the building in which a polling place is established, or within 25 feet of any voter standing in line to vote: (1) solicit votes in any manner or by any means; (2) distribute or display any campaign material; (3) solicit signatures for any petition; or (4) set up any tables or booths on any day when ballots are being cast. *Id.* But confusion remained over what constituted "soliciting" votes around a polling place. *See* R. Germany Decl. ¶ 31 (attached as Ex. 1).

For instance, during the 2020 elections, many third-party groups

circumvented these prohibitions by "approaching electors while they waited in line" with food, drinks, and other goods.  SB 202 at 6:126–27 (Ex. 2).  In fact, during recent elections, "[g]iving away food and water" had "become commonplace."[1] As State Elections Board ("SEB") member Matthew Mashburn explained, "the practice of giving out food and drinks 'got out of hand' in recent years, with taco bars, buffets and snack stands set up at polling places." *Id.*

This was problematic, Mashburn explained, because "[t]here's not supposed to be any interaction between virtually anyone and the voters … so they would be free from intimidation." *Id.*  Indeed, "[t]he voter protection bubble is a serious thing with a very important history, especially in Georgia." *Id.*; *see also* L. Bailey Decl. ¶¶ 7–8 (attached as Ex. 3).  Yet, as retired county elections official Lynn Bailey explained, "there is no practical way for elections officials to ensure that" individuals in this bubble are "not using food or water as a basis to approach a voter and electioneer" or ensure "that the individual is giving the voter accurate information about voting." *Id.* ¶ 12.

Unsurprisingly, these actions around polling places led voters to complain to the Georgia Secretary of State that they felt these individuals were

---

[1] Mark Niesse, *Georgia lawmakers under investigation for handing out snacks to voters*, ATL. J.-CONST. (May 19, 2021), https://tinyurl.com/2p92b7se.

attempting to influence their vote.  Germany Decl. ¶¶ 29–30.  For instance, one voter noted that "[o]lder voters felt intimidated by the presence" of a third-party organization handing out food and water.  *Id.* ¶ 30(a).  Similarly, as a county elections official observed, "[w]hat one voters sees as a benefit another voter might feel is an effort to intimidate or influence them."  *Id.* ¶ 30(e).

In addition to complaints from voters, the increased number of people in the area surrounding polling places created logistical complications for elections officials.  As Ryan Germany, General Counsel for the Georgia Secretary of State, explains, polling locations operate under a complicated set of rules that ensure the voting process is free of outside influence, confusion, or harassment.  Germany Decl. ¶¶ 17–27.  As a voter progresses from arrival at the polling place closer to the enclosed space, the voter enters "more secure" environments "the closer he or she gets to the ballot box."  Bailey Decl. ¶ 15.

But this complex system led to confusion and questions from election officials about who may engage in what activity in the areas surrounding the polling place.  Germany Decl. ¶ 31.  Accordingly, Georgia updated its pre-existing solicitation rules to make clear that the solicitation ban includes: "[G]iv[ing], offer[ing] to give, or participat[ing] in the giving of any money or gifts, including, but not limited to, food or drink, to an elector[.]"  O.C.G.A. § 21-2-414(a).  At the same time, the General Assembly also permitted poll officers

to "make[] available self-service water from an unattended receptacle to an elector waiting in line to vote."  *Id.* § 21-2-414(e).

While these updates to the existing solicitation provisions prohibit *approaching* voters with food or drinks, they do not restrict a voter's ability to bring his or her own food or beverage to consume while waiting in line to vote. Similarly, this provision does not affect a third party's ability to provide food or water outside the buffer zone, provided they are not doing so only to voters or as an inducement to vote.  Germany Decl. ¶ 35.

At the same time, to ensure that voters were not faced with the prospect of waiting in lengthy lines without food or water, SB 202 sought to reduce line length at polling locations.  Under SB 202, Georgia added a mandatory day to early voting, and required that any precinct with more than 2,000 electors where, during the last general election, lines exceeded one hour be "reduce[d] [in] size" or "provide additional voting equipment or poll workers, or both, before the next general election."  O.C.G.A. § 21-2-263(b).  With those provisions in place, there were very few complaints about lines at polling locations during the 2022 primary election.  Germany Decl. ¶ 16.

## B.  Procedural background

Not content to let the legislature resolve these matters, Plaintiffs filed their complaints challenging the Anti-Solicitation Provision well over a year

ago.  Yet, Plaintiffs waited until now—in the middle of the 2022 election cycle—
to file their motions for preliminary injunctions.  [Docs. 171, 185].

## LEGAL STANDARDS

Ordinarily, a plaintiff seeking a preliminary injunction must establish
that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable
injury will be suffered unless the injunction issues; (3) the threatened injury
to the movant outweighs whatever damage the proposed injunction may cause
the opposing party; and (4) if issued, the injunction would not be adverse to the
public interest."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en
banc).  But that standard is even higher if a plaintiff seeks a preliminary
injunction "[w]hen an election is close at hand[.]"  *Milligan*, 142 S. Ct. at 880
(Kavanaugh, J., concurring).  Under those circumstances, the plaintiffs must
also show (1) that the merits are "entirely clearcut" in their favor; (2) that they
*will* suffer irreparable harm absent an injunction; (3) that they did not "unduly
delay[]" in seeking injunctive relief; and (4) that the requested changes are
feasible, without significant cost, confusion or hardship, before the upcoming
election.  *Id.* at 881.  The Eleventh Circuit agrees, having relied on these same
factors when staying a preliminary injunction order issued several months
before an election, including a solicitation provision.  *League of Women Voters
of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371–72 (11th Cir. 2022) (favorably

discussing *Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring)).

## ARGUMENT

**I.     Plaintiffs Cannot Meet the Non-Merits Requirements for Preliminary Injunctive Relief When an Election is Close at Hand.**

As *League of Women Voters* and Justice Kavanaugh's concurrence in *Milligan* show, a plaintiff seeking a preliminary injunction "when an election is close at hand" must satisfy three preliminary requirements in addition to showing that the merits are "clearcut" in their favor.  Plaintiffs cannot do so.

**A.     Plaintiffs "unduly delay[ed]" seeking injunctive relief.**

Here, Plaintiffs filed their complaints within days of SB 202's March 25, 2021 enactment.  Yet they only now—more than a year later and during an election cycle—seek supposedly urgent relief.   The Court should not countenance this attempt to short-circuit the ordinary litigation process.

Indeed, as this Court has held, courts should hesitate to grant election-related injunctive relief "close to an election" where, as here, Plaintiffs "unnecessar[ily] delay[ed] in commencing the suit[.]" *Coalition for Good Governance v. Kemp*, No. 1:21-cv-2070-JPB, 2021 WL 2826094, *2 (N.D. Ga. July 7, 2021) (*CGG*).  In denying the preliminary injunction motion in *CGG*, this Court noted that the plaintiffs had "waited almost three months after SB 202 passed and until the eve before the underlying election to file their

Motion." *Id.* at *3.  The much greater delay here is inexcusable and, as discussed below, increases the likelihood that Plaintiffs' actions will "disrupt[] … the electoral process." *Id.* at *2.  Accordingly, Plaintiffs' dilatory actions weigh heavily against Plaintiffs' motions.

### B.   Plaintiffs cannot show they will suffer irreparable injury.

Plaintiffs' delay also confirms that they will not suffer irreparable injury absent an injunction.  As the Eleventh Circuit holds, "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016).  Indeed, "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* Thus, Plaintiffs' delay of more than a year in filing their motions "necessarily undermines a finding of irreparable harm." *Id.*   And, considering that Plaintiffs have the burden of demonstrating irreparable injury, *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), this is fatal to their motions.

Additionally, the NGP Plaintiffs cannot show irreparable harm for another reason.  They seek to enjoin District Attorney Edwards from enforcing the Anti-Solicitation Provision.  [Doc. 185-1 at 1–2].  But they cite no pending or threatened enforcement of the law.  Thus, any harm absent an injunction

against is entirely speculative and contingent on the possibility of some future action.  As the Supreme Court has repeatedly held, "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent" with the Supreme Court's "characterization of injunctive relief as an extraordinary remedy."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis added).  The NGP Plaintiffs thus cannot satisfy this indispensable requirement for a preliminary injunction.

### C.   Plaintiffs' requested relief would impose significant cost, confusion, and hardship before the upcoming election.

The Court should also deny the motions because the requested injunction would harm the public by inserting chaos into the electoral system on the eve of an election.  The State just completed a primary runoff, and the upcoming months are replete with significant preparation for the general election. Further, in-person voting begins just three months after the hearing on Plaintiffs' motions.  The Eleventh Circuit has already found a similar timeline too short for judicial action.  *League of Women Voters*, 32 F.4th at 1371.[2]

These problems illustrate the wisdom of this Court's prior holding that courts should "exercis[e] judicial restraint where an injunction could hamper

---

[2] The fact that the precise claims underlying *League of Women Voters* and this case differ slightly is irrelevant to the reality that an injunction at this late stage would be harmful.  [Doc. 171-1 at 32].

the electoral process." *CGG*, 2021 WL 2826094, at *2.  That is particularly true here, where an injunction "would have a chaotic and disruptive effect upon the electoral process[.]" *Id.* (cleaned up).  As Judge Jones recently noted, "election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process."  *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337-SCJ, 2021 WL 633312, *74 (N.D. Ga. Feb. 28, 2022).  That is true even where, as the Eleventh Circuit noted, the requested injunction "seem[s] innocuous[.]" *League of Women Voters,* 32 F.4th at 1371.  In those instances, "late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences."  *Id.* (citations omitted).

As the Germany Declaration explains, granting the requested injunction would require "the Secretary of State's office and county elections officials … to update their trainings to educate officials and poll workers about the new rules in place for the general election."  Germany Decl. ¶ 39.  Those changes will pull officials away from the election-related duties they must otherwise accomplish before the November general election.  *Id.* ¶ 41.[3]

---

[3] The NGP Plaintiffs, who seek an injunction against county prosecutors, incorrectly argue (at 19) that enjoining those prosecutors would not affect election administration.  But any such injunction would necessarily call into question any other application of the Anti-Solicitation Provision, thereby

The likely result of an injunction would be "'voter confusion and [the] consequent incentive to remain away from the polls.'" *CGG*, 2021 WL 2826094, *3 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006)).  That is why, "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Milligan*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring).[4]  Accordingly, the Court should avoid these last-minute and confusing changes to election rules.

## II.   Plaintiffs Cannot Show That the Merits are "Entirely Clearcut" in their Favor.

In addition, Plaintiffs have not and cannot come close to showing that the merits are "entirely clearcut" in their favor.  Rather, whatever standard of

---

causing exactly the chaos described in the accompanying declarations. Further, enjoining prosecutors in two counties—but not in others—from enforcing this law would raise serious constitutional issues. *Bush v. Gore*, 531 U.S. 98, 107 (2000) (per curiam) (explaining the dangers of "arbitrary and disparate treatment … in … different counties"); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (declaring a statute unconstitutional does not eliminate "the legal effect of the statute in all contexts").

[4] The AME Plaintiffs read far too much (at 29) into the Supreme Court's silence on *Purcell* in *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245 (2022).  While the Court did not discuss *Purcell* in that decision, Plaintiffs offer no reason why this Court may read into that silence a basis to ignore the Eleventh Circuit's clear statements about *Purcell* in *League of Women Voters*.

scrutiny the Court applies, Plaintiffs' First Amendment claims will likely fail.

### A.   Passing out food and drinks is conduct, not speech, and thus subject only to rational-basis review, which the Anti-Solicitation Provision easily passes.

For example, Plaintiffs' challenge to the Anti-Solicitation Provision is unlikely to succeed because that provision does not restrict speech, but conduct.  Indeed, Plaintiffs have failed to carry their burden to "demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  Rather, at most, Plaintiffs communicate a message *while* they give things to voters waiting in line—pizza, pretzels, ponchos, masks, or other items.  However, as the Supreme Court has explained, conduct cannot be "labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Rumsfeld v. FAIR*, 547 U.S. 47, 65–66 (2006) (cleaned up).[5]  Otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* at 66.  The relevant inquiry is thus not the speaker's *intention*.  Rather, the Court must ask "whether the reasonable person would interpret" the *conduct* at issue "as *some* sort of message." *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th

---

[5] This is fatal to the AME Plaintiffs' attempt (at 11) to characterize giving food as expressive conduct because it would purportedly also require speech to "offer to give" a voter food.

Cir. 2004).  If not, the provision is subject only to rational-basis review.

1.    Plaintiffs' own confusion about what message they are trying to convey underscores that no "reasonable person would interpret" Plaintiffs' conduct as expressing a particular message.  *Id.*  Indeed, like their declarants, Plaintiffs themselves suggest over a dozen different "messages" they purport to convey to voters standing in line, ranging from "a civic expression of unconditional support, gratitude, and shared strength" to "the importance of humanitarian assistance."  [Doc. 171-1 at 1, 7].  Elsewhere, Plaintiffs claim their message could be received as religious, [Doc. 83 ¶ 312] ("living up to the tenet of the Gospel" to feed the hungry), political, [Doc. 171-1 at 1] (citizens "should exercise their hard-earned right to vote"), inspirational, [*id.* at 8] ("receiving the water, in particular, was like receiving hope"), educational, [Doc. 185-1 at 1], patriotic, [*id.* at 10], and even a form of protest, [Doc. 171-1 at 7].  Beyond that muddle of potential messages, there are a host of other messages Plaintiffs' conduct might suggest, from "stay in line," to "thanks for voting," to "you look thirsty," to "come visit our church" or "our business," to "I need to get rid of these extra waters."[6]  Of course, when a voter cannot tell

---

[6] This highlights another defect of Plaintiffs' claims.  Plaintiffs bring facial claims to the Anti-Solicitation Provision, but they cannot plausibly allege that each of these reasons for passing out food or drinks is protected.  And, because the Anti-Solicitation Provision certainly does not violate the First Amendment

what message is being expressed without additional speech, that is a telltale sign that the conduct is "not inherently expressive," *Rumsfeld*, 547 U.S. at 66, and thus not to be treated as speech.[7]

Reaffirming that their conduct is separate from their speech, Plaintiffs argue that providing items to voters is protected by the First Amendment because it *opens the door* to protected speech: "[P]roactively approaching voters facilitates other communication."  [Doc. 171-1 at 9]; *see also* [Doc. 185-1 at 9]. But that just illustrates the futility of Plaintiffs' argument.  If the conduct— passing out food and drinks—*may* open the door to protected speech, it is not *itself* speech, and certainly not the type of conduct that a "reasonable person would interpret … as *some* sort of message."  *Holloman*, 370 F.3d at 1270. Rather, Plaintiffs' argument that handing out items of value is an *avenue* for speech in the future "is strong evidence that the conduct at issue [] is not so inherently expressive that it warrants protection[.]"  *Rumsfeld*, 547 U.S. at 66.

Plaintiffs' reliance ([Doc. 171-1 at 12) on the Eleventh Circuit's decision

---

in "all of its applications," these claims fail.  *Wash. State Grange v. Wash. State. Republican Party*, 552 U.S. 442, 449 (2008).

[7] For that reason, the AME Plaintiffs' reliance (at 11) on *Texas v. Johnson*, 491 U.S. 397, 404 (1989), is misplaced.  Under *Johnson*, even if handing out food is *intended* to convey a message apart from any speech, Plaintiffs cannot demonstrate that their preferred message was "overwhelmingly apparent," and thus their conduct was not "inherently expressive."  *Id.* at 406.

in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018), fares no better.  In that case, the Eleventh Circuit found that the plaintiff's weekly event—sharing free food at a public park known to have a large homeless population—was expressive activity protected by the First Amendment.  *Id.* at 1243.  But, unlike approaching voters in line, these weekly events were intended to convey a singular, specific message: "That society can end hunger and poverty if we redirect our collective resources from the military and war and that food is a human right, not a privilege, which society has a responsibility to provide for all."  *Id.* at 1240 (cleaned up).  And this message was made clear by the plaintiff's "tables and banners (including one with its logo)," which also contained its motto—"Food not bombs."  *Id.* at 1238, 1242.

Here, by contrast, Plaintiffs' conduct communicates no such discernible message.  Thus, Plaintiffs' activity is much more similar to "most social-service food sharing events," which the Eleventh Circuit explained "will not be expressive."  *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021).  Indeed, unlike the plaintiff in *Food Not Bombs*, Plaintiffs here represent several, disparate groups that engage in varying religious, social, and political activity.  And Plaintiffs provided no evidence of signage or other displays that would give the necessary context to interpret Plaintiffs' numerous potential messages.

In fact, Plaintiffs' characterization of their conduct as speech overlooks that other courts have held that much more significant conduct—including helping people vote—does *not* communicate any message.  For instance, the Ninth Circuit held that helping facilitate voting by collecting ballots does not itself communicate a message. *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018).  And, if conduct that actually facilitates voting is not communicative, then handing food or drinks to voters certainly is not.

Accordingly, passing out food and other things of value is *conduct* separate from any message.[8]  It is therefore not protected speech, and the Anti-Solicitation Provision is thus subject only to rational-basis review.[9]  *Voting for America v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013); *Johnson v. Robinson*, 415 U.S. 361, 381–82 (1974).

2.    The Anti-Solicitation Provision easily satisfies rational-basis review, as it is "a rational means to serve a legitimate end."  *City of Cleburne*

---

[8] For the same reason, the NGP Plaintiffs are incorrect when they suggest (at 7) that the Anti-Solicitation Provision violates the speech rights of *voters*. Since giving things to voters in line is not speech, Georgia does not burden the right of voters to *receive* speech from Plaintiffs.  Regardless, any burden the Provision imposes would survive First Amendment scrutiny for the various reasons discussed below.

[9] Because *Food Not Bombs* is entirely inapplicable here, so too is Plaintiffs' passing suggestion that the Anti-Solicitation Provision is subject to intermediate scrutiny.  [Doc. 171-1 at 20–21].

*v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).  As this Circuit holds, "[t]he leniency of rational-basis scrutiny provides the political branches the flexibility to address problems incrementally and to engage in the delicate line-drawing process of legislation without undue interference from the judicial branch." *Haves v. City of Miami*, 52 F.3d 918, 923–24 (11th Cir. 1995).  Moreover, under rational-basis review, courts are "compelled ... to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993).

*First*, preventing voter fraud and confusion, as well as increasing election efficiency, are legitimate and even compelling interests.  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (discussing laws enacted to combat voter fraud); *id.* at 2347 ("preserving the integrity of [a State's] election process" is "compelling" interest (citation omitted)); *Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 792 (11th Cir. 1983) ("avoiding voter confusion" is "compelling" interest); *New Ga. Proj. v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("conducting an efficient election" is "strong" interest).

*Second*, the Anti-Solicitation Provision is rationally related to these legitimate ends.  In SB 202, Georgia updated its solicitation provision to prohibit giving voters in line money or other things of value, including food and drinks, in response to complaints about voter confusion and concerns about

18

harassment and undue influence.  Indeed, voters complained that the actions of third-party organizations were "intimidat[ing]" and "partisan."  Germany Decl. ¶¶ 29–30.  And elections officials stated that these actions were becoming "more aggressive," and led voters to believe that there was "a motive" behind the provision of food and water.  *Id.*  In fact, confirming such motive, one organization stressed that it needed to reach voters in line because it was "our last chance to reach Georgians before they vote" where "[t]he results have the potential to determine control of the U.S. Senate."  *Id.* ¶ 30(c).

Moreover, the Anti-Solicitation Provision is an important part of maintaining efficient elections.  As noted, polling locations are complex, with different rules applying at different places.  *Id.* ¶¶ 17–27.  To avoid adding more confusion, Georgia rationally concluded that excluding certain activities from the buffer zone would help streamline the process.

Thus, the record confirms that voters were concerned about organizations attempting to influence their votes by providing food and drinks.  And the record confirms that allowing additional conduct in the buffer zone creates added confusion.  That is enough: "Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny."  *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001).  This is not such an "exceptional" case, and

Plaintiffs have not come close to carrying their substantial burden of showing a likelihood of success on the merits—much less that the correctness of their position is "entirely clearcut." *League of Women Voters*, 32 F.4th at 1372.

### B. Even if the Anti-Solicitation Provision implicated expressive activity, it is content-neutral and reasonable.

Even if the Anti-Solicitation Provision implicated speech, the Supreme Court's recent decision in *City of Austin v. Reagan National Advertising*, 142 S. Ct. 1464 (2022), confirms that it is content neutral, and therefore subject only to reasonableness review, not heightened scrutiny.  As the Court explained, when a regulation lacks "a content-based purpose," it "is content neutral and does not warrant the application of strict scrutiny." *Id.* at 1471.

1.     Like the sign code provision challenged in *City of Austin*, the Anti-Solicitation Provision "do[es] not single out any topic or subject matter for differential treatment." *Id.* at 1472.  Anyone wishing to approach a voter in line with food or water for *whatever reason* is subject to the same provision.

Plaintiffs thus wrongly contend that the law "targets only one type of expressive conduct: the use of non-partisan line relief to celebrate and affirm the importance of political participation." [Doc. 171-1 at 15; *see also* Doc. 185-1 at 11].  That ignores the Anti-Solicitation Provision's plain text, which is "agnostic as to content" and viewpoint, *City of Austin*, 142 S. Ct. at 1471; it

prohibits "any money or gifts" given for any purpose—religious, political, charitable, commercial, or for no purpose at all.  In short, Plaintiffs' message (if there is one) "is irrelevant[.]"  *City of Austin*, 142 S. Ct. at 1472.

Indeed, it is hard to imagine a more content-neutral rule than one that bans *everyone* from doing the same thing—handing food or drinks to voters.[10] AME Plaintiffs are thus misguided when they argue that the challenged provision is "content based" because it restricts "expression 'because of disagreement with the message it conveys.'"  [Doc. 171-1 at 14–15] (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).[11]  Quite the opposite, the Anti-Solicitation Provision prohibits handing out food by people who wish to express *any view*, whether the State agrees or disagrees with the message.[12]

---

[10] The NGP Plaintiffs confusingly argue (at 11) that the Anti-Solicitation Provision does "not reach other categories of speech, such as commercial solicitation, distribution, and display."  But the provision addresses such speech directly—no one may provide food or drinks to voters, whether for commercial reasons or otherwise.

[11] The NGP Plaintiffs are equally misguided when they suggest (at 11–12) that Georgia conceded that the Anti-Solicitation Provision is content-based because it seeks to limit the risk of electioneering.  Not so.  The Provision applies to *everyone* for a variety of reasons, including the risk of improper influence on voters.  As the Provision applies equally, it cannot be content based.

[12] Here, AME Plaintiffs' reliance (at 14–15) on *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), is also misplaced, as the Supreme Court recently said it is "too extreme an interpretation of this Court's precedent."  *City of Austin*, 142 S. Ct. at 1471.

Plaintiffs largely admit this by arguing that the law is too broad: "The Line Relief Ban expanded this narrower restriction [on bribing or pressuring a person to vote] to a blanket prohibition on providing food and water to voters in line." [Doc. 185-1 at 14]. But a law cannot be both "a blanket prohibition" on giving voters items, and narrowly targeted to restrict their particular views.

Rather, the law is concerned with *where* the gifts are given—near a polling place—and how such gifts confuse and intimidate voters. Plaintiffs may act and speak freely, provided they are more than 150 feet from the polling place, 25 feet from voters in line, and are not engaged in vote buying. O.C.G.A. § 21-2-414(a). Such an "on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions." *City of Austin*, 142 S. Ct. at 1473. And, under that standard, "the government may impose reasonable restrictions on the time, place, or manner of protected speech[.]" *McCullen v. Coakley*, 573 U.S. 464, 477 (2014); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

2.     The Anti-Solicitation Provision easily satisfies this reasonableness standard. Indeed, "[s]tates—not federal courts—are in charge of setting [election] rules." *New Ga. Proj.*, 976 F.3d at 1284. And rules governing voting are "inevitabl[e]," "necessary[y]," and "must be … substantial" to ensure "fair," "honest," and "order[ly]" elections. *Timmons v. Twin Cities Area New Party*,

22

520 U.S. 351, 358 (1997).   Accordingly, the Eleventh Circuit evaluates the reasonableness of a challenged election law by applying the *Anderson-Burdick* approach, *Jacobson*, 974 F.3d at 1261,[13] which has two strict requirements.

*First*, Plaintiffs must show that the Anti-Solicitation Provision inflicts a cognizable burden on their rights.   *Timmons*, 520 U.S. at 358.   For this, the "extent of the burden … is a factual question on which [Plaintiffs] bear the burden of proof."   *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016).   Plaintiffs must therefore "direct th[e] Court to … admissible and reliable evidence that quantifies the extent and scope" of the burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009).

*Second*, after establishing a cognizable burden, Plaintiffs must show that the burden outweighs the State's interests.   *Timmons*, 520 U.S. at 358. Election laws that "impose[] only reasonable, nondiscriminatory restrictions" are "generally" justified by "the State's important regulatory interests," *id.*, as there is no right to be free from "the usual burdens of voting," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (opinion of Stevens, J.).

---

[13] Plaintiffs concede that the *Anderson-Burdick* test applies here because the Anti-Solicitation Provision allegedly "burdens" the ability of voters to vote. [Doc. 171-1 at 3].  Plaintiffs' declarants allege the same thing.  [Doc. 171-4 ¶ 18; 171-10 ¶17].  Claims that a "State's rule imposes" a "burden … on the right to vote" are reviewed under *Anderson-Burdick*.  *New Ga. Proj.*, 976 F.3d at 1280.

On the first requirement, Plaintiffs have not shown any cognizable burden on their rights.  As noted, they remain free to express their message as much as they wish and wherever they wish.  The Anti-Solicitation Provision merely restricts their conduct within a specific area.

But even if the Court finds some minor burden, the State's interest is strong.  In fact, the State need not submit "any record evidence in support of" its interests. *Common Cause/Ga.*, 554 F.3d at 1353.  And, though not required, Georgia has provided substantial evidence showing that the Anti-Solicitation Provision is a "reasonable, nondiscriminatory restriction[.]"  *Timmons*, 520 U.S. at 358.  Indeed, the accompanying declarations detail the complaints that the State received, the complex nature of polling locations, and the need to prevent voter confusion, enhance election efficiency, and increase confidence in the election process.  *See* Germany Decl. ¶¶ 17–32; Bailey Decl. ¶¶ 7–18.

The reasonableness of the Anti-Solicitation Provision is clearer still because the Supreme Court has upheld even stricter regulations on political speech imposed around polling places.  *See Burson v. Freeman*, 504 U.S. 191 (1992).  And, if the State may regulate pure political speech in and around a polling place, it may certainly restrict lesser forms of expression, including the messages Plaintiffs allegedly wish to express.

In *Burson*, for instance, the Supreme Court upheld a Tennessee statute

24

that prohibited voter solicitation and the display of campaign materials within 100 feet of the polling place.  The four-justice plurality held that this provision survived *heightened* scrutiny even though the buffer zone around the polling place was a public forum because it included "streets and sidewalks."  138 S. Ct. at 196; *but see id.* at 216 (Scalia, J., concurring) (concluding that "the portions of streets and sidewalks adjacent to polling places are not public forums *at all times*") (cleaned up).

Then, just a few years ago, in *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018), the Supreme Court addressed the constitutionality of a Minnesota statute prohibiting any person from wearing political insignia inside a polling place.  The *Mansky* Court held that the inside of a polling place was a nonpublic forum, while also noting that *Burson* left open the question of how to classify the area *around* the polling place.  *Id.* at 1886.  But the *Mansky* Court's reasoning confirms that the distinct features of the inside of a polling place equally apply to the areas immediately surrounding the polling place:

> Members of the public are brought together at that place, at the end of what may have been a divisive election season, to reach considered decisions about their government and laws. The State may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most.

*Id.* at 1887–88.  Though the specific statute at issue in *Mansky* ultimately fell

because it was not "capable of reasoned application," *id.* at 1892, the Anti-Solicitation Provision, which applies categorically, is easily capable of such an application, and *Mansky*'s statements about the polling place thus remains instructive. Applied here, the concerns about what follows the voter up to the voting booth starts when the voter gets in line. Bailey Decl. ¶ 15.

Applying these standards, the Anti-Solicitation Provision is a reasonable restriction that serves important interests. Of course, the purpose served by the forum here is peaceful and effective voting—"the essence of a democratic society"—and a State certainly "has a compelling interest in protecting voters from confusion and undue influence." *Burson*, 504 U.S. at 199. It is equally undisputed that "some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206. Thus, a zone that prohibits third parties from providing money, food, or drinks to voters reasonably serves the State's interest in creating "an island of calm in which voters can peacefully contemplate their choices." *Mansky*, 138 S. Ct. at 1887. Considering that the Supreme Court held the 100-foot solicitation limit in *Burson* to withstand much more demanding scrutiny— despite a plurality of the Supreme Court also concluding that the buffer zone was a public forum—the Anti-Solicitation Provision certainly survives the more relaxed *Anderson-Burdick* review.

**C.    The Anti-Solicitation Provision satisfies even the highest standard of scrutiny.**

Even if a higher level of scrutiny is appropriate, Plaintiffs would still be unable to demonstrate that they are substantially likely to succeed—much less that their position is "clearly" correct.[14]

1.    Initially, the highest standard of scrutiny that could *conceivably* apply to the Anti-Solicitation Provision is "exacting scrutiny," not strict scrutiny.  [Doc. 171-1 at 14].  The *Burson* plurality noted that the 100-foot solicitation limit was a "facially content-based restriction on political speech in a public forum."  504 U.S. at 198.  Then, citing the same cases as Plaintiffs, the Court applied exacting, not strict, scrutiny.  *Id.*  There could be no reason to apply even *greater* scrutiny here to a regulation that implicates speech even less clearly than the regulation at issue in *Burson*.

---

[14] Again, the applicable authority does not support application of heightened scrutiny.  Plaintiffs' attempt to analogize the Anti-Solicitation Provision to provisions at issue in cases where the Supreme Court and other courts applied exacting scrutiny for regulations of "election-related expression" falls under its own weight: The Anti-Solicitation Provision, which does not regulate or burden any speech (election-related or otherwise), is nothing like the regulation of yard signs, campaign contributions, payments for petition circulators, or lobbying disclosure requirements to which Plaintiffs point.  [Doc. 171-1 at 18–19] (discussing *Buckley*, *Meyer*, *McCutcheon*, *McIntyre*, *ACLU of Fla.*, and several other cases).  Those regulations directly implicated protected speech.  In contrast, Plaintiffs may still "encourage[e] voter participation[.]"  *Id.* at 19.  They simply may not hand anything of value to a voter.

Even under exacting scrutiny, moreover, the Anti-Solicitation Provision survives.  To meet this standard, a State must assert a compelling interest and "that [the regulation] is narrowly drawn to achieve that end."  *Id.* at 198.  Both requirements are met here.

*First*, as discussed above, the State undoubtedly has a compelling interest in guarding against voter fraud (and the appearance of fraud), confusion, and intimidation, as well as in enhancing election efficiency.  *See supra* at 18.  And these concerns are particularly applicable to polling places.  As the Supreme Court has recognized, our Nation has a lengthy history of voter intimidation and election fraud, which has led "all 50 states [to] limit access to the areas in or around polling places."  *Burson*, 504 U.S. at 206.

Thus, it is unsurprising that other states have also acted on this compelling interest by implementing laws similar (albeit not identical) to the Anti-Solicitation Provision.  In New York, for instance, it is illegal to provide "any meat, drink, tobacco, refreshment, or provision" with a value over one dollar to a voter standing in line to vote.  N.Y. ELEC. LAW § 17-140.  So too in Montana, where anyone affiliated with a campaign is prohibited from providing food or drink to voters in line.  MONT. CODE ANN. § 13-35-211(2).

*Second*, the 150-foot solicitation ban is narrowly drawn to achieve the State's interest in interference-free voting.  As noted, the *Burson* Court upheld

a more stringent restriction on speech in the buffer zone surrounding a polling place. 504 U.S. at 210. And, in doing so, the Court explicitly rejected several of the arguments Plaintiffs make here.  For instance, the *Burson* Court rejected the argument that other criminal laws prohibiting voter interference are sufficient. *Id.* at 206; [Doc 171-1 at 24].  Rather, "[i]ntimidation and interference laws fall short of serving a State's compelling interests," as they "deal with only the most blatant and specific attempts to impede elections." *Id.* at 206–07. The record here demonstrates why those laws are insufficient—they were in place when the conduct detailed in the Germany Declaration occurred.

The *Burson* Court also rejected the argument that the state had insufficient evidence that the law was necessary.  Rather, the Court held that, "because a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State to the burden of demonstrating empirically the objective effects on political stability that are produced by the voting regulation in question." *Id.* at 208 (cleaned up).  As the Court further explained, states do not have to wait until they "sustain some level of damage before the legislature" may "take corrective action." *Id.* at 209 (citation omitted).  Thus, Plaintiffs are incorrect that this is an impermissible "prophylactic rule."  [Doc. 185-1 at 14].  The Supreme Court has made clear that the State may "respond to potential deficiencies in the electoral process

29

with foresight rather than reactively." *Burson*, 504 U.S. at 209 (citation omitted); *see also Brnovich*, 141 S. Ct. at 2348 (a State need not wait to "sustain some level of damage before the legislature [can] take corrective action").

*Burson* is thus fatal to many of Plaintiffs' arguments, and their attempt to distinguish it fails. According to Plaintiffs, *Burson* is inapplicable because it addressed a law that "prohibited 'vote solicitation' within 100 feet of a polling place," whereas the law here covers Plaintiffs' conduct, which they say "does not involve electioneering in any capacity." [Doc. 171-1 at 23 n 7]. That is a distinction without a difference. The compelling interest in prohibiting voter interference is the same, and the buffer zones are nearly identical.

But even if the difference in prohibiting gifts to voters mattered, in *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1218 (11th Cir. 2009), the Eleventh Circuit has already emphasized that "the *Burson* plurality opinion is highly persuasive." And it has extended *Burson* to apply beyond its narrow facts, upholding a regulation of voter solicitation on proposed laws that "related to nothing then on the ballot." *Id.* at 1215. For example, the plaintiffs in *Browning* wished to gather signatures from voters exiting the polls, but Florida's 100-foot solicitation ban prohibited their conduct. *Id.* As in *Burson*, the Eleventh Circuit accepted Florida's compelling interest in "protecting voters from confusion and undue influence" and

"preserving the integrity of the election process." *Id.* at 1218. The court also found that the law was necessary to serve those interests to maintain "peace and order around its polling places," even if many solicitors were not disruptive, and were approaching voters *after* they finished voting to discuss topics unrelated to those on the ballot. *Id.* at 1220. The Eleventh Circuit rejected the plaintiffs' argument that the state needed evidence of interference before it could act: "[T]he State need not wait for actual interference or violence or intimidation to erupt near a polling place for the State to act." *Id.* Rather, "[t]he State may take precautions to protect and to facilitate voting; and the pertinent history [including *Burson*] is broad enough to provide the proof of reasonableness for a zone of order around the polls." *Id.* at 1220–21.

In sum, *Burson* and *Browning* explicitly reject each argument Plaintiffs make and demonstrate that, even under exacting scrutiny, Georgia may proactively ensure that there is peace around the polling place so that voters can vote "freely and effectively." *Burson*, 504 U.S. at 208. And that is exactly what Georgia has done here.

Yet, despite restricting such activity, the State also ensured that Plaintiffs have many ways to communicate their message. They may stand 25 feet from voters in line outside the buffer zone to provide food and drinks to anyone who approaches them, as long as they are not tying it to voting or giving

it only to voters.  Germany Decl. ¶ 35.  And, beyond the polling place itself, Plaintiffs do not allege that they are restricted from engaging in any otherwise lawful expression in support of their mission elsewhere.  The Anti-Solicitation Provision merely institutes a narrow restriction on conduct in the vicinity of a polling location, which is sufficiently tailored for any level of scrutiny.[15]

### D.   Plaintiffs' expert report does not support their argument.

In an attempt to buttress their merits argument, Plaintiffs also rely on the entirely unreliable report of Dr. Pettigrew.  [Doc. 171-1 at 2–4].

At the outset, Plaintiffs "bear the burden to show that" Pettigrew "is qualified to testify competently regarding the matters he intended to address; [] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and the testimony assists the trier of fact." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (cleaned up).  Moreover, the Court must "assess 'whether the reasoning or methodology underlying the testimony is scientifically valid and ... can be applied to the facts in issue.'" *Id.* at 1262 (quoting *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 592–93 (1993)).

---

[15] The NGP Plaintiffs are also incorrect when they suggest (at 14–15) that the Anti-Solicitation Provision lacks narrow tailoring because Georgia could merely prohibit the expression most likely to implicate its interests.  That incorrectly assumes that Georgia's only interest is in preventing electioneering.  As explained, Georgia has multiple compelling interests that are served by a ban on anyone approaching voters with something of value.

Under these standards, Pettigrew's report is entirely unreliable. Plaintiffs use the report only to discuss the length of voting lines in Georgia, which is, at best, marginally relevant to whether the Anti-Solicitation Provision violates Plaintiffs' First Amendment rights. But, as the attached report of Professor Daron Shaw explains, the Pettigrew report also suffers on the merits in several key respects. *First*, that report relies on self-reported data, which can be inaccurate. Shaw Report ¶¶ 17–18 (attached as Ex. 4). *Second*, Pettigrew overstates the precision of his estimates. *Id.* ¶¶ 19–26. *Third*, Pettigrew miscalculates the data to make it appear that Black Georgians recently waited longer than White Georgians to vote. *Id.* ¶ 27. *Fourth*, Pettigrew overstates the times when Georgians did not vote because of line length. *Id.* ¶¶ 30–32. *Fifth*, Pettigrew ignores recent changes to Georgia law that could foreseeably affect line length moving forward. *Id.* ¶¶ 38–41.[16]

But even the two pages of Pettigrew's report that deal with the Anti-Solicitation Provision are unreliable, as they cite only news articles—not scientific works. [Doc. 171-21 at 20–21]; Shaw Report ¶¶ 33–37. Based on no scientific evidence, Pettigrew then concludes that the provision at issue "will

---

[16] Of course, there is little "value" in "predict[ing] long lines … based almost entirely on the existence of long lines in past elections." *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1309 (N.D. Ga. 2020).

have a particular impact on voters who live in areas that already tend to have long lines." *Id.* at 21.  But that does not remotely address the alleged harm to Plaintiffs' First Amendment rights.  It is also insufficient under *Daubert*: Because Pettigrew made no attempt to review evidence in a "genuinely scientific" way, the Court should reject his "unscientific speculation." *Allison v. McGhan Med.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999) (citations omitted).

## III.  The Balance of Equities and the Public Interest Weigh Heavily Against an Injunction.

Finally, the harm a preliminary injunction would cause the State and the public outweighs any harm Plaintiffs might suffer without one.

1. A state is irreparably harmed when it is unable to enforce its statutes. As the Eleventh Circuit has held, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (cleaned up).  By enjoining the challenged provision, the Court would impair the State's ability to address confusion, suspicion, and loss of confidence in Georgia's election processes. *Arizonans for Fair Elections v. Hobbs*, 335 F.R.D. 261, 266 (D. Ariz. 2020) (rejecting injunction against statute "meant to safeguard the integrity of the election process").

2.    Beyond such state interests, the injunction would also harm the

public, as enjoining the Anti-Solicitation Provision would subject Georgia voters to the "interference, political pressure, or intimidation" the provision combats. Ex. 2 at 6:128. And it would harm the public's interest in avoiding confusion about the rules governing polling places. Germany Decl. ¶ 42. Moreover, as discussed above (Part I.C), the injunction would inject confusion and hardships into the current election cycle, causing further harm to voters.

3. Any supposed harm suffered by Plaintiffs is substantially less than the harm to the public and the State. As explained above, the Anti-Solicitation Provision does not implicate, much less violate, Plaintiffs' First Amendment rights. Nor does the provision affect Plaintiffs' ability to communicate their desired message in other ways, most obviously outside the buffer zone. When balanced against the identified harms to the State and the public, Plaintiffs' purported harms pale in comparison, and an injunction is inappropriate.

## CONCLUSION

The Court should deny Plaintiffs' motions and allow this litigation to proceed in the normal course. Plaintiffs have fallen far short of their burden to clearly demonstrate each of the required elements for a preliminary injunction. Plaintiffs' questionable case on the merits, their inexplicable delay, and the balance of interests militate strongly against an injunction.

Respectfully submitted this 24th day of June, 2022.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Joshua J. Prince*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise

36

Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants and*
*Defendant Edwards*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr