**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, <br><br> *Defendants,* <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Secretary of State for the State of Georgia, *et al.*, <br><br> *Defendants,* <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants.* | Civil Action No.: 1:21-cv-01259-JPB |

**AME & GEORGIA NAACP PLAINTIFFS' REPLY BRIEF IN SUPPORT
OF MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

I.    *PURCELL* DOES NOT FORECLOSE RELIEF...........................................2

    A.    *Purcell* Does Not Apply Because Enjoining S.B. 202's Line Relief Ban Raises No Feasibility Or Voter Confusion Concerns ........2

    B.    Plaintiffs Satisfy The *Purcell* Requirements.........................................5

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM....................................................................................6

    A.    Plaintiffs' Line Relief Activities Are Expressive, Protected Conduct......................................................................................6

    B.    Defendants Misstate The Governing Standard For Facial Relief .........9

    C.    The Line Relief Ban Is Subject To Heightened Scrutiny...................10

    D.    SB 202's Line Relief Ban Cannot Survive Heightened Scrutiny .......12

CONCLUSION ....................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011)..........................................................................11

*Burson v. Freeman*,
    504 U.S. 191 (1992)...............................................................7, 11, 14

*Citizens for Police Accountability Political Committee v. Browning*,
    572 F.3d 1213 (11th Cir. 2009) ...................................................7, 13

*Coalition for Good Governance v. Kemp* (*CGG II*),
    558 F. Supp. 3d 1370 (N.D. Ga. 2021)..........................................4, 6

*Democratic Executive Committee of Florida v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ........................................................4

*Federal Election Commission v. Ted Cruz for Senate*,
    142 S. Ct. 1638 (2022).....................................................................14

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* (*FLFNB I*),
    901 F.3d 1235 (11th Cir. 2018) .....................................................7, 8

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) ........................................................6

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)...................................................................6, 8, 9

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,
    32 F.4th 1363 (11th Cir. 2022) .........................................................5

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
    51 F.3d 982 (11th Cir. 1995) ....................................................14, 15

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995)...........................................................................9

*Merrill v. Milligan*,
    142 S. Ct. 879 (2022) (Kavanaugh, J., concurring)......................2, 3

*Meyer v. Grant*,
    486 U.S. 414 (1988)...............................................................................12

*Minnesota Voters Alliance v. Mansky*,
    138 S. Ct. 1876 (2018)..............................................................................7

*New Georgia Project v. Raffensperger*,
    976 F.3d 1278 (11th Cir. 2020) ...............................................................3

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)......................................................................................2

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015).........................................................................10, 11

*Republican National Committee v. Democratic National Committee* (*RNC*),
    140 S. Ct. 1205 (2020).........................................................................2, 3

*Virginia v. Hicks*,
    539 U.S. 113 (2003)..................................................................................9

*VoteAmerica v. Raffensperger*,
    2022 WL 2357395 (N.D. Ga. June 30, 2022) ...................................3, 4, 5

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015)................................................................................11

*Wisconsin Legislature v. Wisconsin Elections Commission*,
    142 S. Ct. 1245 (2022).............................................................................3

## STATUTES, RULES, AND REGULATIONS

O.C.G.A. § 21-2-414(a) ...............................................................................7

## CONSTITUTIONAL AUTHORITIES

U.S. Const. amend. I ...........................................................................*passim*

# INTRODUCTION

S.B. 202 makes it a crime in Georgia to offer water to thirsty voters waiting in long lines to cast their ballots.  Rather than focus on the merits of this indefensible law, State and Intervenor Defendants (collectively, "Defendants") primarily lean on vague and implausible platitudes and out-of-context case cites to claim there is not enough time to implement court-ordered relief.  Yet no one disputes that enjoining the line relief ban would require only modest revisions to trainings that have not yet occurred and a simple return to the practice prior to S.B. 202's recent enactment.

On the merits, Defendants claim that line relief is not communicative because it does not express a particularized message in every conceivable instance.  That doubly misstates the law.  Conduct is expressive if a reasonable viewer would understand it to relay *some* message, and laws that unduly restrict speech in a substantial number of applications violate the First Amendment.  Plaintiffs offered concrete evidence on each point.  Defendants respond with mere speculation.

Otherwise, Defendants largely do not try to justify the line relief ban under the appropriate standards of review, instead arguing it survives rational basis review and the *Anderson*/*Burdick* balancing test.  Neither is at issue.  Preventing improper political pressure and voter intimidation are important interests, but that conduct was already illegal before S.B. 202.  The bulk of Defendants' evidence concerns already-illegal electioneering, and Defendants offer no coherent connection between those

interests and nonpartisan groups' unconditional offer of items of minimal pecuniary value, like food and water, to queuing voters. Defendants cannot violate Plaintiffs' core First Amendment rights based on a theoretical possibility of already-illegal conduct by differently situated individuals. The Court should preliminarily enjoin this unnecessary criminalization of constitutionally protected, core electoral speech.[1]

## I.    *Purcell* Does Not Foreclose Relief

*Purcell v. Gonzalez*, 549 U.S. 1 (2006), does not relieve states of liability whenever an election is remotely near. It stands for the simple principle that courts "should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.* (*RNC*), 140 S. Ct. 1205, 1207 (2020), when it would "result in voter confusion," *Purcell*, 549 U.S. at 4-5, or administrative "chaos," *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Preliminarily enjoining S.B. 202's line relief ban raises none of those concerns.

### A.    *Purcell* Does Not Apply Because Enjoining S.B. 202's Line Relief Ban Raises No Feasibility Or Voter Confusion Concerns

Defendants mischaracterize *Purcell*, claiming it applies automatically whenever an election is in the foreseeable future. *See* Intervenors' Opp. 4; State's Opp. 7. But *Purcell* is not a mere counting exercise; it depends "on the nature of the election law at issue, and how easily the State could make the change without undue

---

[1] The County Defendants renew their claim that Plaintiffs lack standing. This Court has already found that argument to be "without merit." ECF 110 at 12-13.

collateral effects." *Merrill*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring). "[C]ourts must engage with the facts and specific circumstances of the case." *VoteAmerica v. Raffensperger*, 2022 WL 2357395, at *19 (N.D. Ga. June 30, 2022).

Courts invoke *Purcell* when an injunction would present serious, unavoidable feasibility and voter confusion concerns regarding already-underway election processes. *See*, *e.g.*, *RNC*, 140 S. Ct. at 1207 (staying change to absentee ballot deadline where "absentee voting has been underway for many weeks" and "voters have requested and have been sent their absentee ballots"); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283-84 (11th Cir. 2020) (staying injunction affecting "already printed and mailed" ballots).  In *Merrill*, for example, it was the many complex, interceding deadlines in the "seven weeks" before absentee voting that raised concern, not the four months to Election Day.  142 S. Ct. at 879-80 (Kavanaugh, J., concurring).  By contrast, in *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248 (2022), the Court did not apply *Purcell* despite an election being only a few weeks further away because there was "sufficient time" to draw new maps.[2]

Similarly, in *VoteAmerica*, the "election machinery" of printing and distributing absentee ballot applications was "already grinding," and an injunction

---

[2] Intervenors (at 7) argue the court-drawn maps in *Wisconsin Legislature* make it distinguishable, but that was not part of the Court's rationale and is irrelevant to whether the changes could be feasibly completed without voter confusion.

could have led to distribution of different application forms, causing voter confusion. 2022 WL 2357395, at *19.  Yet in *Coalition for Good Governance v. Kemp* (*CGG II*), 558 F. Supp. 3d 1370, 1393 (N.D. Ga. 2021), this Court enjoined a rule against photographing ballots one month before the election because early voting had not begun, and the injunction would not interfere with processes already underway.[3]

The overwhelming weight of the evidence confirms that the narrow injunction sought here does not implicate *Purcell*.  Defendants provide no evidence of potential confusion.  *Cf.* Decl. of S. Lakin dated July 13, 2022 (Lakin Decl.) Ex. 1 (Decl. of D. Benning dated July 11, 2022) ¶ 7; Clarke Decl. ¶ 11.  As to administrability, the declaration of a recent election administrator shows that Georgia already has an infrastructure for efficiently communicating far more complex election-related changes far closer to the beginning of voting than the injunction here would require, including through Official Election Bulletins (OEBs), online training sessions, and supplemental letters.  *See* Lakin Decl. Ex. 2 (Supp. Decl. of D. Brower dated July 11, 2022 (Brower Decl.)) ¶¶ 5-7.  The State's evidence does not suggest otherwise, and in fact shows that officials will train poll workers and issue new guidance before the general election anyway.  *See* ECF 197-2 (Germany Decl.) ¶ 42, 197-4 (Bailey

---

[3] The Eleventh Circuit declined to stay an injunction issued the week *following* the election that mandated a 48-hour cure period for purported signature mismatches because the order "narrowly tailored its relief to home in on … one limited aspect." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1331 (11th Cir. 2019).

Decl.) ¶¶ 24-28; *see also* Germany Decl. Ex. B (October 26, 2020 OEB giving poll workers supplemental instructions just days before the 2020 general election).  The minor burden of slightly modifying future trainings cannot justify denying relief.

Intervenors (at 1, 5) rely heavily on *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 32 F.4th 1363 (11th Cir. 2022).  That case, however, largely "implicate[d] voter registration—which [was] currently underway" and "require[d] the state to take action now" while "local elections were ongoing."  *Id.* at 1371.  Not so here.  To be sure, a line relief restriction was also at issue, but whether *Purcell* applies is a fact-specific inquiry, and the Eleventh Circuit did "not endeavor to articulate *Purcell*'s precise boundaries."  *Id.* at 1371 n.6.  "*Purcell* is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear."  *VoteAmerica*, 2022 WL 2357395, at *19 (cleaned up).

## B.   Plaintiffs Satisfy The *Purcell* Requirements

Even if *Purcell* applies, the preliminary injunction would still be appropriate. Plaintiffs sued within days of S.B. 202's enactment, and the "undue delay" factor "refer[s] to the timing of the complaint."  *VoteAmerica*, 2022 WL 2357395, at *19.  Plaintiffs also moved for this relief more than five months before the 2022 general election and as soon as feasible given discovery schedules.  Moreover, the "key" consideration for *undue* delay is whether Plaintiffs acted early enough to avoid confusion and administrative problems.  *VoteAmerica*, 2022 WL 2357395, at *19;

*see also CGG II*, 558 F. Supp. 3d at 1393.   The record here confirms that the requested injunction would not confuse voters.   And it would require just a single edit to the Poll Worker Manual to use the pre-S.B. 202 version of the law.   *See* Germany Decl. Ex. G at 40.   Even Fulton County could train poll managers on this change in ninety minutes.   *See* Brower Decl. ¶ 9.

As explained below, Plaintiffs are clearly entitled to relief on the merits and would suffer clear irreparable harm absent an injunction.   Defendants cannot hide behind *Purcell* to avoid defending the unconstitutional line relief ban on its merits.

## II.   Plaintiffs Are Likely To Succeed On The Merits Of Their Claim

### A.   Plaintiffs' Line Relief Activities Are Expressive, Protected Conduct

State Defendants' main argument (at 16) is that conduct is only expressive if it "convey[s] a singular, specific" message.   Intervenors (at 11-12) likewise contend it must communicate a "particularized" message.   But controlling precedent makes clear that, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (rejecting argument that only "particularized message[s]" are protected).   Plaintiffs

submitted evidence showing that many recipients of line relief understand it to communicate a core electoral message.  *See* ECF 171-1 (AME Br.) 8, 12, 14.[4]

The "surrounding circumstances," as set out in the governing *FLFNB I* factors, also make clear that, at a minimum, the reasonable voter would understand line relief "as conveying some sort of message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* (*FLFNB I*), 901 F.3d 1235, 1242-43 (11th Cir. 2018). *First*, although unnecessary to render the conduct communicative, line relief is often intertwined with verbal messages of practical support, reinforcing the parallel message communicated by the line relief itself.  AME Br. 9.  *Second*, line relief is "open to everyone," which, "in and of itself, has social implications." *FLFNB I*, 901 F.3d at 1242.  *Third*, it occurs on sidewalks and streets, which are "quintessential public forums." *Burson v. Freeman*, 504 U.S. 191, 196 (1992).[5]  Providers of line relief do not hand out free samples to passersby anywhere at any time.  They provide support on voting days, outside polling places, where voters are waiting in long lines

---

[4] Defendants also ignore that the ban extends to straightforward verbal speech, criminalizing "offer[ing] to give" voters water or food.  O.C.G.A. § 21-2-414(a).

[5] This point is not up for debate.  Intervenors (at 14) mischaracterize *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1886 (2018), which held only that the "interior" of a polling place is not a public forum.  And Defendants ignore that the Eleventh Circuit has already held that the *Burson* plurality's decision that the streets and sidewalks around polling places are public forums is controlling. *See Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1218 n.9 (11th Cir. 2009).  And Defendants do not grapple with the other decisions in this circuit holding that such spaces *are* public forums. *See* AME Br. 17 n.6.

to cast their ballots.  AME Br. 6-8.  *Fourth*, it is "without dispute" that the burden of long lines and the importance of voting—the foundation of line relief—are "issue[s] of concern in the community."  *FLFNB I*, 901 F.3d at 1242-43.[6]  *Fifth*, sharing food has a unique history of symbolizing community and solidarity.  *See id.* at 1243.  That symbolism is even stronger when the food is provided by majority-Black social justice organizations with histories of providing food to communicate support in their neighborhoods.  *See* Jackson Decl. ¶¶ 17-18; Briggins Decl. ¶ 19.

Line relief is thus far more comparable to the food-sharing events in *FLFNB I* than privately mailing a ballot application.  Plaintiffs offer line relief in person to their neighbors.  Those face-to-face offers leave voters fortified, even if they decline food or water.  That is precisely because line relief does not just facilitate voting.  It also conveys a concrete message of solidarity and dignity.  Long lines—particularly disparately long lines—make clear whose voices the State values and whose it does not.  Groups like Plaintiffs use line relief to tell voters that, no matter how the State treats them, they are vital members of our political community.  Their voices matter.[7]

---

[6] In his rebuttal report, Dr. Stephen Pettigrew explains that Defendants' expert Dr. Daron Shaw's declaration "supports [his] claim that Georgia had among the longest wait times in the country."  Lakin Decl. Ex. 4 at 4.  "Georgians, particularly those who are not white, experience some of the worst voting lines in the country," *id.* at 8—further crystallizing the message communicated through line relief.

[7] Contrary to State (at 17) and Intervenor (at 13) Defendants' position, conduct that facilitates voting can be expressive in context.  Dropping off a friend's absentee ballot may not be, but a parade to the drop box is.  *See Hurley*, 515 U.S. at 568.

Rather than grapple with the unique context of line relief, State (at 14-15) and Intervenor (at 12) Defendants contend that line relief communicates *too many* messages to be protected.  But expressive conduct is useful (and protected) precisely because it can communicate many messages at once, often more effectively than mere words.  *See Hurley*, 515 U.S. at 569.  Defendants' position is also untrue.  The messages conveyed and received share a central theme, even if it is expressed in many ways:  Your vote is important, and we support you.  *See* AME Br. 4-8.

State (at 16) and Intervenor (at 12) Defendants submit only their mere say-so that viewers and recipients of line relief do not understand it to communicate *any* message.  That cannot be enough.  The communicative impact of line relief is obvious from context and demonstrated by the evidence Plaintiffs have adduced.[8]

## B.     Defendants Misstate The Governing Standard For Facial Relief

Intervenor (at 15-16) and State (at 14 n.6) Defendants argue against an injunction because they can imagine statutory violations not involving expressive conduct.  But a law violates the First Amendment if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up).  So it does here. Plaintiffs have shown that many non-profits coordinate large efforts to provide

---

[8] Because S.B. 202 restricts expressive conduct rather than merely "control[ling] the mechanics of the electoral process," the *Anderson-Burdick* balancing test does not apply.  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

nonpartisan line relief, which is now undisputedly criminal.  By contrast, Intervenor

(at 16) and State (at 14) Defendants just invented some "commercial promotions" or

people trying to "get rid of … extra waters."  That scattered hypothesizing cannot

overcome Plaintiffs' actual evidence.  Moreover, the ban on electioneering is not at

issue—only the ban on giving nonpartisan aid.  That portion of the law falls largely

if not entirely on groups like Plaintiffs who use line relief to communicate support.

### C.   The Line Relief Ban Is Subject To Heightened Scrutiny

State Defendants (at 21 & n.11) argue that the line relief ban is content neutral

because it "bans *everyone* from doing the same thing."  That "conflates two distinct"

doctrines: viewpoint discrimination and content-based restrictions.  *Reed v. Town of

Gilbert*, 576 U.S. 155, 168-69 (2015).  "[A] speech regulation targeted at specific

subject matter is content based even if it does not discriminate among viewpoints

within that subject matter."  *Id.* (cleaned up).  State Defendants (at 20) also argue

that the ban is content neutral because the "plain text" does not explicitly reference

the message line relief conveys.  But "facially content neutral" laws are still

"content-based regulations of speech" if they "cannot be justified without reference

to the content of the regulated speech" or "were adopted by the government because

of disagreement with the message the speech conveys."  *Id.* at 164 (cleaned up).

This precedent squarely applies here.  The law targets interactions only with

*voters*, making clear its purpose to silences messages that line relief communicates.

Indeed, the State has repeatedly and solely purported to justify the ban by pointing to the content of the message they believe line relief communicates. *See* AME Br. 16; ECF 185-1 (NGP Br.) 11-12. Even now, State Defendants claim (at 18-19) that the ban arose from concern about "organizations attempting to influence … votes by providing food and drinks." Defendants thus expressly attempt to justify the law based on concerns about its communicative content—the supposed potential to influence voters. That is the same purported justification underlying bans on electioneering near polling places, so the law is subject to the same strict scrutiny. *See Burson*, 504 U.S. at 199. Unlike narrowly targeted electioneering bans, indiscriminate criminalization of all line relief cannot survive strict scrutiny.[9]

Separately, the mismatch between the State's purported end and the means selected shows that the State is not "in fact pursuing the interest it invokes" but "rather" attempting to silence a "disfavor[ed]" communicative tool to affirm voters waiting to cast their ballots. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). That justification also turns on the content of the message expressed, and this mismatch "is alone enough to defeat" the challenged restriction. *Id.*

---

[9] State Defendants (at 27) argue that content-based restrictions are subject to only exacting scrutiny, citing *Burson*. Although that opinion used "strict" and "exacting" scrutiny interchangeably, *see* 504 U.S. at 198, 199, 207, 211, the Supreme Court has since clarified that content-based restrictions, like those in *Burson*, are subject to strict scrutiny. *See, e.g.*, *Reed*, 576 U.S. at 163-64; *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015) (describing *Burson* as applying strict scrutiny).

Alternatively, the line relief ban is subject to exacting scrutiny because line relief's message of the importance of voting is core election-related speech. *See* AME Br. 18-20; NGP Br. 12-13. State Defendants (at 27 n.14) argue against exacting scrutiny because "Plaintiffs may still encourage voter participation." But even if that were the only message that line relief conveys—it is not—exacting scrutiny applies to burdens on election-related expression even if there are "other means to disseminate their ideas." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). The First Amendment protects a person's "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.*

### D.     SB 202's Line Relief Ban Cannot Survive Heightened Scrutiny

Plaintiffs are entitled to relief under even intermediate scrutiny, and certainly under the appropriate strict or exacting scrutiny. *See* AME Br. 21-26; NGP Br. 13-15. Offering water to a thirsty voter does not enable intimidation, and non-partisan, unconditional offers of *de minimis* value items does not facilitate bribery. Banning line relief, however, does restrict broad swaths of protected, expressive conduct. The State's ostensible interest could just as easily be served by laws that do not criminalize *all* line relief irrespective of intent and risk of improper influence. *See* Lakin Decl. Ex. 3 (Decl. of S. Flack dated July 11, 2022) ¶¶ 6-10.

Defendants offer no meaningful evidence that line relief is harmful, arguing instead that they need no such evidence. State Defendants (at 28-31) rely almost

exclusively on *Burson*, which upheld a ban on electioneering within 100 feet of a polling place.  They claim (at 30) that *Burson* allows them to impose any speech restriction that might serve the "compelling interest in prohibiting voter interference" where "buffer zones are nearly identical."  That is self-evidently wrong.[10]  *Citizens for Police Accountability Political Committee v. Browning*, 572 F.3d 1213 (11th Cir. 2009), confirms the point.  *Browning* upheld a restriction on soliciting signatures for ballot measures from voters as they exited the polls.  *Id.* at 1215.  In doing so, the Eleventh Circuit expressly distinguished between nonpartisan activities and "advocating for the success of some political proposal or candidate." *Id.* at 1219 n.11.  Permitting activities that demand attention and time from voters— like solicitation in *Browning* and electioneering in *Burson*—means opening the door to parties "competing … for the attention of the same voters … to discuss different issues or different sides of the same issue." *Id*. at 1220.  That is "fundamental[ly] differen[t]" from nonpartisan activities that simply provide voters with support. *Id.* at 1219 n.11.  The Eleventh Circuit has therefore "reject[ed] the comparison" between political and nonpartisan First Amendment activity near polling places. *Id.*

State (at 29-30) and Intervenor (at 18-19) Defendants also rely on *Burson* to claim that they need not show any evidence justifying the line relief ban.  Not so.

---

[10] The buffer zone here is not "nearly identical," but in fact 50% longer no matter where voters are waiting in line and then extending 25 feet from any voter waiting in line, no matter how far the line extends into traditional public forums.

*Burson* held only that Tennessee did not have to provide empirical evidence that a 100-foot buffer zone, as opposed to 25 feet, was necessary.  504 U.S. at 208-10.  It also expressly clarified that "States must come forward with more specific findings to support regulations directed at intangible 'influence,'" rather than when "the First Amendment right threatens to interfere with the act of voting itself." *Id.* at 209 n.11. Defendants nowhere argue that line relief impedes the ability to vote, pointing only to purported intangible influences.  The "modified 'burden of proof'" on which Defendants rely therefore "does not apply." *Id.*  The State must "point to 'record evidence or legislative findings' demonstrating the need to address a special problem." *Fed. Election Comm'n v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1653 (2022) (citations omitted).  "[M]ere conjecture" is inadequate, particularly because the activity is "already regulated" as with anti-electioneering laws. *Id*. at 1652-53.

Defendants must justify the line relief ban to survive even intermediate scrutiny.  They have not done so.  State Defendants point only to the Germany Declaration, which does not help them.  For example, they cite an email from a voter who claimed that other, unidentified "older voters felt intimidated" by Black individuals providing nonpartisan line relief, based solely on a supposed "look of fear on their faces."  Germany Decl. ¶ 30(a) & Ex. F.  This inherently suspect triple hearsay predicated on facial expressions stretches even the relaxed preliminary injunction evidentiary standard beyond its breaking point. *See Levi Strauss & Co.*

*v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (evidence at preliminary injunction stage must be "appropriate" to rely on).

Germany (at ¶¶ 29-31) also repeatedly cites an email chain involving a food truck in which the election official on the ground explained those in the truck were "not campaigning," and that she was "having a hard time justifying why they need to stop doing any of this." Germany Decl. Ex. C. State Defendants' insistence that this was somehow problematic underscores their true purpose: treating nonpartisan speech of which it disapproves as "campaigning" and so targeting it for suppression.

Indeed, much of the Germany declaration simply confirms that narrower options are plentiful, including Georgia's pre-existing ban against campaigning near polling places. Even if a more prophylactic approach were justified, the State itself points to numerous less restrictive options. As it explained in an OEB pre-dating S.B. 202, "[b]ottles of water and crackers or peanuts [are] reasonable" and so could be permitted even if "fancier" refreshments were not. Germany Decl. ¶¶ 22, 30, 31, 36 & Ex. B. The State (at 28) also favorably cites statutes in Montana and New York, calling them merely "not identical" when in fact they are drastically more narrowly tailored. *See* AME Br. 25-26. Georgia's line relief ban is a unique and uniquely unjustifiable restriction on protected expressive conduct. It cannot stand.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted, this 13th day of July, 2022.

/s/ *Pichaya Poy Winichakul*
Bradley E. Heard (Ga. Bar No. 342209)
*bradley.heard@splcenter.org*
Pichaya Poy Winichakul (Ga. Bar 246858)
*poy.winichakul@splcenter.org*
Nancy G. Abudu (Ga. Bar No. 001471)
*nancy.abudu@splcenter.org*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30030
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

/s/ *Adam S. Sieff*
Adam S. Sieff (pro hac vice)
*adamsieff@dwt.com*
Daniel Leigh (pro hac vice pending)
*danielleigh*@dwt.com
Brittni Hamilton (pro hac vice)
*brittnihamilton@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

David M. Gossett (pro hac vice)
*davidgossett@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

Matthew Jedreski (pro hac vice)
*mjedreski@dwt.com*
Grace Thompson (pro hac vice)
*gracethompson@dwt.com*

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan S. Topaz
*jtopaz@aclu.org*
Dale E. Ho (pro hac vice)
*dho@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA,
INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

*Attorneys for Plaintiffs*
*Georgia Muslim Voter Project, Women*
*Watch Afrika, Latino Community Fund*
*Georgia, and The Arc of the United States*

/s/ *Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum (pro hac vice)
Ezra D. Rosenberg (pro hac vice)
Julie M. Houk (pro hac vice)
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights
  Under Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
Neil Oxford (pro hac vice)
Gregory Farrell (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482

/s/ *Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

/s/ *Debo P. Adegbile*
Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE  AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000

Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for Plaintiffs Georgia State*
*Conference of the NAACP, Georgia*
*Coalition for the People's Agenda, Inc.,*
*League of Women Voters of Georgia, Inc.,*
*GALEO Latino Community Development*
*Fund, Inc., Common Cause, and Lower*
*Muskogee Creek Tribe*

Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE  AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs*
*Sixth District of the African Methodist*
*Episcopal Church, Delta Sigma Theta*
*Sorority, Georgia ADAPT, Georgia*
*Advocacy Office, and Southern Christian*
*Leadership Conference*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: July 13, 2022          /s/ *Leah C. Aden*
                              Leah C. Aden
                              *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: July 13, 2022          /s/ *Leah C. Aden*
                              Leah C. Aden
                              *Counsel for Plaintiffs*