THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT. OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED WITH THE COURT.

```
1                   UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4  THE NEW GEORGIA PROJECT, ET AL,)
                                   )
5        PLAINTIFFS,               )
                                   ) DOCKET NO. 1:21-MI-55555-JPB
6        -VS-                      )
                                   )
7  BRAD RAFFENSPERGER, ET AL,      )
                                   )
8        DEFENDANTS.               )

9

10

11          TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
                 BEFORE THE HONORABLE J.P. BOULEE
12                UNITED STATES DISTRICT JUDGE
                          JULY 18, 2022
13

14

15

16

17

18

19
   STENOGRAPHICALLY RECORDED BY:
20

21               PENNY PRITTY COUDRIET, RMR, CRR
                      OFFICIAL COURT REPORTER
22                UNITED STATES DISTRICT COURT
                        ATLANTA, GEORGIA
23

24

25
```

```
 1                  A P P E A R A N C E S

 2

    ON BEHALF OF THE PLAINTIFFS - THE NEW GEORGIA PROJECT, BLACK
 3  VOTERS MATTER FUND, RISE, INC.

 4        JOYCE GIST LEWIS, ESQ.
          TINA YAZHUO MENG, ESQ.
 5        MARCOS MOCINE-MCQUEEN, ESQ.
          UZOMA NKWONTA, ESQ.
 6        JACOB D. SHELLY, ESQ.

 7

 8  ON BEHALF OF THE PLAINTIFFS - SIXTH DISTRICT OF THE AFRICAN
    METHODIST EPISCOPAL CHURCH, GEORGIA MUSLIM VOTER PROJECT
 9
          JOHN SPENCER CUSICK, ESQ.
10        RAHUL GARABADU, ESQ.
          SOPHIA LIN LAKIN, ESQ.
11        DAVIN M. ROSBOROUGH, ESQ.
          GEORGE P. VARGHESE, ESQ.
12        ADAM SIEFF, ESQ.
          PICHAYA POY WINICHAKUL, ESQ.
13

14

15  ON BEHALF OF THE DEFENDANTS - BRAD RAFFENSPERGER, SARA TINDALL
    GHAZAL, JANICE JOHNSTON, GREGORY W. EDWARDS, EDWARD LINDSEY,
    MATTHEW MASHBURN, BRIAN KEMP, THE GEORGIA STATE ELECTION BOARD,
16  THE STATE OF GEORGIA,

17        GENE C. SCHAERR, ESQ.
          H. CHRISTOPHER BARTOLOMUCCI, ESQ.
18        BRIAN FIELD, ESQ.
          BRYAN P. TYSON, ESQ.
19

20

    ON BEHALF OF THE INTERVENOR DEFENDANTS - REPUBLICAN NATIONAL
21  COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL
    REPUBLICAN CONGRESSIONAL COMMITTEE, GEORGIA REPUBLICAN PARTY,
22  INC.,

23        CAMERON T. NORRIS, ESQ.

24

25
```

```
1                        I N D E X

2

3   WITNESS:                                        PAGE:

4   RHONDA BRIGGINS

5        DIRECT EXAMINATION BY MR. CUSICK....................41
         CROSS-EXAMINATION BY MR. BARTOLOMUCCI...............51
6        REDIRECT EXAMINATION BY MR. CUSICK.................61

7

    DWIGHT BROWER
8
         DIRECT EXAMINATION BY MS. WINICHAKUL................63
9        CROSS-EXAMINATION BY MR. BARTOLOMUCCI...............73
         REDIRECT EXAMINATION BY MS. WINICHAKUL.............83
10

11  RYAN GERMANY (VIA ZOOM VIDEO TECHNOLOGY)

12       DIRECT EXAMINATION BY MR. FIELD.....................87
         CROSS-EXAMINATION BY MR. VARGHESE.................114
13       REDIRECT EXAMINATION BY MR. FIELD.................145

14

    LYNN BAILEY
15
         DIRECT EXAMINATION BY MR. TYSON...................149
16       CROSS-EXAMINATION BY MR. GARABADU.................159
         CROSS-EXAMINATION BY MR. SHELLY...................173
17       REDIRECT EXAMINATION BY MR. TYSON.................179
         RECROSS-EXAMINATION BY MR. GARABADU...............181
18

19  MATTHEW MASHBURN

20       DIRECT EXAMINATION BY MR. SCHAERR.................183
         CROSS-EXAMINATION BY MR. SIEFF....................211
21       CROSS-EXAMINATION BY MS. MENG.....................220
         REDIRECT EXAMINATION BY MR. SCHAERR...............223
22

23

24

25
```

1        **(PROCEEDINGS HELD IN OPEN COURT AT 9:03 A.M., ATLANTA)**

2            COURTROOM DEPUTY CLERK:  The Court has set aside time

3   today for the preliminary injunction in the case of The New

4   Georgia Project, et al v. Raffensperger, Case Number

5   1:21-MI-55555-JPB.

6            Counsel, please make your appearances for the record.

7            THE COURT:  And I think on that, we can just have lead

8   counsel that are going to have a speaking role make an appearance.

9            MS. LAKIN:  Good morning, your Honor.  Sophia Lakin for

10  the AME Church plaintiffs.  With me today who will be speaking are

11  Davin Rosborough, Rahul Garabadu, Pichaya Poy Winichakul, John

12  Cusick, George Varghese and Adam Sieff.

13            THE COURT:  Good morning to all of you.

14            MR. SCHAERR:  Good morning, your Honor.  Gene Schaerr

15  for the state defendants.  And with me here is Bryan Tyson, whom

16  you know, and he will be speaking, as well as Brian Field and

17  Chris Bartolomucci.  And we also have one of our clients here,

18  Mr. Matt Mashburn from the State Election Board.

19            THE COURT:  Good to see all of you as well.

20            MR. NORRIS:  Good morning, your Honor.  Cam Norris here

21  for the Republican intervenors.

22            THE COURT:  Hello.

23            MR. NKWONTA:  Good morning, your Honor.  Uzoma Nkwonta

24  here for the NGP plaintiff group.  And I'm joined by colleagues

25  Mr. Jacob Shelly, Ms. Tina Meng, Marcos Mocine-McQueen and Joyce

1  Gist Lewis.

2          THE COURT:  All right.  Again, good to see all of you.

3  Hope everyone is well this morning.

4          I would be happy to hear anything you would like to say

5  in opening before calling witnesses.

6          MS. LAKIN:  Just two quick items before we get started,

7  your Honor.  First as a general preview in terms of general

8  structure for the day, the parties have agreed to split time

9  equally and use it as they seek fit.

10          From the perspective of AME Church plaintiffs, the NAACP

11  plaintiffs, the Concerned Black Clergy plaintiffs and The

12  New Georgia Project plaintiffs, we anticipate the day starting

13  with short opening statements, followed by in-person live

14  testimony from two witnesses that the plaintiffs will call with

15  relevant cross and redirect.  Followed by the defendants'

16  witnesses and relevant cross and redirect.  And we anticipate that

17  that will leave the bulk of time for argument, at least for the

18  purposes of plaintiffs' side, at the end of the hearing.

19          The second item is that the parties have stipulated to

20  the admissibility of all exhibits and declarations that were

21  attached to the preliminary injunction papers that were filed on

22  the docket.  And at this point in time we would like to go ahead

23  and move those into the record.

24          For the plaintiffs' numbering, that's Plaintiffs'

25  Exhibits 1 through 38.

```
 1                THE COURT:  All right.

 2                MR. TYSON:  Your Honor, Ms. Lakin is correct on that.

 3                On the exhibits for the defendants' numbering, that's

 4      Defendants' Exhibit 1 through 37, and then Defendants' 46 through

 5      49 encompass all of those.  And if we want to just move the

 6      defendants', the second half, that's fine, too, which would be

 7      Defendants' 46 through 49 are the exhibits that were attached to

 8      the defendants' pleadings.

 9                THE COURT:  Very well.  If you all agree, all of those

10      are admitted.

11                MS. LAKIN:  I think that's fine.  I think there are a

12      handful of exhibits in the middle that were not --

13                THE COURT:  I had 1 through 37 and 46 through 49.

14                MR. TYSON:  Yes, your Honor.  The others we'll deal with

15      on a witness-by-witness basis.

16                THE COURT:  Very well.  Happy to hear your opening then.

17                MR. ROSBOROUGH:  Good morning, your Honor.  Davin

18      Rosborough for the AME, Georgia NAACP and Concerned Black Clergy

19      plaintiffs.

20                The line relief that plaintiffs provided prior to SB 202

21      continued a tradition, especially of black communities in the

22      south of expressively communicating support for civic

23      participation or protest by providing food and drink.

24                Nonpartisan service-oriented groups like Delta Sigma

25      Theta Sorority, AME Church, Women Watch Afrika, Georgia Muslim
```

1  Voter Project, The Arc Georgia, as well as Georgia NAACP and

2  Common Cause Georgia carried forward that tradition of providing

3  line relief, like water and pretzels, to Georgia voters who face

4  some of the longest lines in the country.  Black voters and other

5  voters of color and many of the communities that these

6  organizations serve confront these hour-long lines

7  disproportionately.

8          You'll hear today from Ms. Rhonda Briggins, a

9  representative of the Deltas, about the significance of that line

10 relief to elders, voters with disabilities and others waiting in

11 long lines to vote.  Her testimony has been echoed in the numerous

12 declarations that have been submitted.

13         The testimony and evidence in the record and that you'll

14 hear today establish four key points that show plaintiffs are

15 entitled to relief and that the criminal ban on line relief

16 violates the First Amendment.

17         First, plaintiffs' line relief is expressive conduct

18 under the First Amendment.  This nonpartisan, non-electioneering

19 expressive conduct shows voters that their participation is

20 important and that their voice in our democracy matters even when

21 facing obstacles like long lines.  But instead of celebrating this

22 support, Georgia has made line relief a crime.  That violates the

23 First Amendment.

24         Conduct is expressive when based on the context a

25 reasonable person receiving line relief would interpret it as some

1   sort of message.  The evidence shows that individuals in the

2   communities receiving line relief understand the expressive and

3   communicative nature of the conduct.

4           (Outside interruption)

5           MR. ROSBOROUGH:  And there can be no genuine dispute

6   that this expressive conduct occurs in public fora.

7           Second, the line-relief ban is a content-based

8   restriction making strict scrutiny the appropriate standard of

9   review.  At a bare minimum, however, intermediate scrutiny applies

10  because this is expressive conduct in a public forum.

11          The justifications by the legislature for the

12  line-relief ban concern improper interference, political pressure

13  and intimidation of voters waiting in line.  The state's own

14  evidence shows the ban is content-based for three independent

15  reasons:

16          First, the state justifies the ban specifically because

17  of its expected impact on the audience.

18          Second, the line-relief ban is solely motivated by the

19  content of the expression.

20          And, third, the ban targets groups like plaintiffs

21  specifically given existing bans on electioneering.

22          Third (sic), defendants have failed to satisfy their

23  burden under strict or even intermediate scrutiny to prove that

24  the ban is the least restrictive means to achieve a compelling

25  interest.

1           Electioneering activity was already illegal.  In cases

2   where nonpartisan, service-oriented groups like plaintiffs sought

3   to provide line relief, there was no showing of any improper

4   pressure or interference with voters.  And mere requests from

5   election officials about what the law permitted and vague,

6   unsubstantiated concerns about influence or intimidation without

7   any actual evidence that it was occurring do not suffice.

8           But even intermediary scrutiny requires the government

9   prove that the means chosen are not substantially broader than

10  necessary to achieve its interests.  There is no evidence SB 202

11  serves the state's interests in preventing improper influence with

12  voters any more than existing law did.

13          If the concern is about people interacting with voters,

14  SB 202 doesn't prohibit this except as to candidates and political

15  and affiliated parties.

16          If the concern is about influencing voters' choices by

17  providing food or drink, the existing law already banned

18  electioneering.

19          And Georgia's line-relief ban is the only of its kind in

20  the country.  The two next closest restrictive laws that it cites

21  show narrower ways to accomplish the same goals.  New York's

22  allowing food and drink of items of minimal value.  And Montana's

23  prohibition of only candidates --

24          THE COURT:  Is minimal value okay, then?

25          MR. ROSBOROUGH:  Minimal value shows that this is a

1    lesser -- there's a lesser restrictive means to accomplish the

2    same --

3            THE COURT: If minimal value were okay, would you be

4    here arguing against this law if it says "minimal value"?

5            MR. ROSBOROUGH: I think, your Honor, that would present

6    a different case because in that case rather than completely --

7            THE COURT: But would you have a case?

8            MR. ROSBOROUGH: Well, that ban is currently being

9    challenged in federal court in New York, so at least some people

10   thought they would have a case. I'm not sure if we would have

11   brought that same case if this allowed items of minimal value

12   specifically like water, pretzels, peanuts and things like that.

13           THE COURT: Who decides what would be minimal value?

14   Me?

15           MR. ROSBOROUGH: Your Honor, I don't think that's

16   the --

17           THE COURT: Would I adjust my order for inflation every

18   year?

19           MR. ROSBOROUGH: No. The New York statute sets a strict

20   dollar limit, your Honor. But we're not asking you to red-line

21   the statute here. The New York statute, which is probably the

22   next closest restrictive in the country, merely shows that even

23   were the Court to credit all of Georgia's interests here, that

24   there are less restrictive means and, therefore, this ban fails

25   strict scrutiny. In that case, the Court should declare it

1  unconstitutional and enjoin the counties from enforcing it.  It's
2  up to the legislature then to decide whether they want to enact a
3  different ban that perhaps provides some limit.

4          THE COURT:  Is there any limit?

5          MR. ROSBOROUGH:  I'm sorry, your Honor, is there --

6          THE COURT:  Is there any limit?

7          MR. ROSBOROUGH:  To the --

8          THE COURT:  Well, so I've got a -- I sometimes fly these
9  budget airlines, and they give you a small bottle of water and a
10 bag of pretzels that maybe has four or five small pretzels in it.
11 Is that the limit or can an organization give out filet mignon to
12 every voter in line?

13         MR. ROSBOROUGH:  I think, your Honor, that would send a
14 very different message than the message that plaintiffs and
15 organizations like it are sending where only items of minimal
16 value are being provided to communicate their support of voters
17 standing in line.

18         Were an organization to provide items like filet mignon,
19 that might express a different message and so there might be an
20 appropriate means to sort of cap that item of value.  Because if
21 you're handing out filet mignon, likely the message is not you're
22 here facing obstacles standing in a long line, we're here to tell
23 you that your voice is important and you should persevere in the
24 face of obstacles, it perhaps sends a different message about
25 influence.

1          THE COURT:  But who sets that cap?  Me?  I can't imagine

2     that I'm deciding whether or not it's pretzels, tacos or filet?

3          MR. ROSBOROUGH:  Not at all, your Honor.  I think in our

4     perspective your task here today is to decide whether the

5     line-relief ban, that aspect of SB 202, is unconstitutional.  And

6     then it's up to the Georgia Legislature to decide do we want to

7     enact a different ban that puts a dollar cap on it.

8          We're not asking your Honor to perform any red-lining of

9     the statute here but merely showing that out of all of the states

10    in this country Georgia's ban stands alone.  And the only other

11    examples they can cite are from Montana, which, again, only

12    applies the ban to candidates, and New York, which even there

13    provides some exception recognizing that there is no real risk of

14    influencing -- improperly influencing voters by providing minimal

15    items of value.

16         So, your Honor, we're not asking you to red-line the

17    statute.  That's a task for the legislature.  It's shown itself

18    to be very active legislating in the area of voting, and I'm sure

19    it's capable of coming back and addressing an order declaring --

20         THE COURT:  I'm not suggesting I would dream of trying

21    to red-line it, but I guess I'm just wondering what you expect the

22    legislature to do.  I mean, it seems that they have decided, well,

23    how do we know if somebody is given a pretzel, a taco or a filet

24    and where that line is, so we're just going to say nothing.

25         MR. ROSBOROUGH:  Your Honor --

 1          THE COURT:  And that's why I asked about New York, well,

 2  what's minimal?

 3          MR. ROSBOROUGH:  The New York statute provides a dollar

 4  amount cap.

 5          THE COURT:  What's the dollar amount?

 6          MR. ROSBOROUGH:  I can double-check on that.  I believe

 7  it's $2 or something like that.  It's certainly under $5.  I can

 8  get back to you on what --

 9          THE COURT:  Does your client think that's okay, that

10  that's narrow enough or too narrow?

11          MR. ROSBOROUGH:  I think that that would at least allow

12  our clients to resume their conduct in participating in line

13  relief.  And I think the record shows that typically the items our

14  clients are providing are things like water, pretzels, coffee,

15  items that would fit under that minimal value.  None of our

16  clients are seeking to provide items of at all substantial value,

17  again, because it's not about the items themselves, it's about

18  communicating the message of support that can't be done with words

19  alone.

20          And in terms of the state's drawing the lines, your

21  Honor, I think what the evidence in the record shows and I think

22  what you'll hear today is that local election officials are

23  already looking -- they're already -- you know, voters are

24  allowed -- individuals are allowed to approach voters in line

25  about anything so long as they're not electioneering.  There's no

1  actual bubble there.  And the state needs to monitor for

2  electioneering.  I'm sorry, not the state, local election

3  officials.  So local election officials are already out there

4  making judgments.  And what was missing before SB 202 was perhaps

5  the lack of clear guidance, not any real problems with improper

6  influence.

7          So, the defendants, your Honor, have failed to satisfy

8  their burden under strict scrutiny or even intermediate scrutiny

9  because less restrictive means would accomplish the same goals.

10          I do want to just address the issue of *Purcell*, your

11  Honor.

12          THE COURT:  Tell me what in your mind those less

13  restrictive means would be.

14          MR. ROSBOROUGH:  Sure.  I can give several examples,

15  your Honor.

16          Number one, the first less restrictive means would be

17  the existing ban.  The record shows that concerns are primarily

18  about actual electioneering.  A number of the state's witnesses

19  in e-mails submitted are -- basically referred to problems with

20  candidates defying the existing bans.  So that's really where the

21  problem is.  There's been no showing that there's been any

22  improper conduct by any groups like plaintiffs.  So that is

23  certainly one.

24          But even going beyond that a bit, an explicit ban, if it

25  were necessary, like Montana's on providing candidates perhaps a

1   di minimis dollar amount, are both less restrictive ways to

2   accomplish the same purported goals.

3           THE COURT:  Let me ask you, you just said there's been

4   no showing there's been any improper conduct by any groups like

5   plaintiffs.  What about the -- and I don't have the group name in

6   front of me.

7           MR. ROSBOROUGH:  Is your Honor thinking of the vote.org

8   food truck --

9           THE COURT:  It's the last chance to reach Georgians

10  before they vote.  And the organization said they wanted to reach

11  voters because the results have the potential to determine control

12  of the US Senate.

13          MR. ROSBOROUGH:  I think, your Honor, that -- I'm not

14  sure what group that was.  I don't believe that's one of our

15  clients but --

16          THE COURT:  It looks like I've got a cite to it here,

17  Defense Exhibit 151-2.  Maybe somebody on this side of the

18  courtroom knows what organization that was offhand.

19          MR. ROSBOROUGH:  I'm sorry, which exhibit was it, your

20  Honor?

21          THE COURT:  Looks like it's DE 151-2, paragraph 30C.

22  And I'm looking at Document 201-1, is The Honest Election

23  Project's brief.

24          MR. ROSBOROUGH:  Oh, it's amici, okay.  Well, I don't

25  have that in front of me, your Honor, and I'm happy to return to

1   that later, but I think if the -- if there is -- what you're

2   talking about is not line relief.  That sounds like it is

3   verbal -- purely verbal conduct that borders on the line of

4   electioneering, and that would already be prohibited under the --

5           THE COURT:  No.  This is one third-party organization

6   stated its food trucks at polling places were being used as a last

7   chance to reach Georgia voters as the results have the potential

8   to determine control of the US Senate.  And that's a third-party

9   nonpartisan organization, but it sounds like their aim is

10  partisan.

11          MR. ROSBOROUGH:  And I think then if your aim is

12  partisan, your Honor, then that would be prohibited under existing

13  law as electioneering.  And the Secretary of State is perfectly

14  capable of putting out guidance to make that clear without

15  infringing on plaintiffs' First Amendment rights.  And I think

16  it's notable that that apparently came in through a dark money

17  funded group in an amicus brief and not from the state or any of

18  the local election officials itself.

19          THE COURT:  No, I think the same evidence -- I just

20  happened to have this one in front of me and that's the place I

21  remember reading it last.  I think it's cited in other briefs as

22  well.

23          MR. ROSBOROUGH:  Right.  But, your Honor, I think the

24  key point here is this is plainly expressive conduct and a

25  content-based restriction.

```
1              THE COURT:  Yes.  Even if it were expressive conduct
2    content-based, and let's say I think you would like me to decide
3    this under strict scrutiny, but what about an organization who has
4    a food truck and they're a third-party organization but they're
5    there, you know, not to make sure that somebody standing in a long
6    line has a drink of water when they're thirsty and support them,
7    but instead they're there to determine control of the US Senate,
8    how does somebody out in DeKalb County know who's who and what
9    that -- is that bottle of water because somebody is thirsty or is
10   that bottle of Gatorade to control the outcome of the US Senate
11   race?
12             MR. ROSBOROUGH:  Sure.
13             THE COURT:  Isn't one way to do that just say how about
14   DeKalb County provides the water?
15             MR. ROSBOROUGH:  I don't think that's right, your Honor,
16   for two reasons.
17             Number one, officials are going to have to make those
18   same judgments with the line-relief ban or not.  The line that
19   we're talking about there is whether this is -- that conduct would
20   be electioneering or not and that's banned under existing law.  So
21   whether or not the -- part of the line-relief ban is implicated,
22   that's a judgment that still has to be made and it's the sort of
23   guidance that the Secretary of State would typically provide in an
24   Official Elections Bulletin.
25             THE COURT:  Well, they're not going to have to make the
```

1  same judgments, are they, because if nobody is giving out food,

2  they don't have to decide -- food and water, they don't have to

3  decide whether that bottle of water versus that bottle of Gatorade

4  is helping somebody because they're thirsty or helping somebody

5  because they want to win the US Senate?  You don't have to decide

6  because nobody is going to be doing it.

7          MR. ROSBOROUGH:  I think that may point, your Honor, if

8  we were under a much lower level of scrutiny of a state's

9  legitimate interest in barring conduct much more broader than

10 necessary to have a sort of clean line.  But when we're looking at

11 strict scrutiny or even intermediate scrutiny -- certainly under

12 strict scrutiny by its definition it's not the least restrictive

13 means of enforcing that.

14          And as the Supreme Court just made clear in *FEC v.*

15 *Cruz*, when we're dealing with First Amendment and strict scrutiny,

16 we can't stack prophylaxis upon prophylaxis and ban conduct that's

17 far broader than needed to address a different problem.  And so

18 under strict scrutiny just saying, well, we don't want election

19 officials to have to make any determination, number one, that

20 doesn't jibe with reality.  Election officials have to make these

21 tough determinations all of the time regardless of the existence

22 of the criminal line-relief ban.

23          And, number two, it's certainly not a narrowly tailored

24 means of doing so.  And I think, your Honor, the fact that Georgia

25 is the only one with such a ban does tell the Court something

1    here.

2             In the case citing *Burson* out of the Eleventh Circuit

3    that's relied upon by defendants a lot, the Court justifies that

4    law under strict scrutiny in part because it's supported --

5    electioneering bans like that are common across the states.  Well,

6    this is not common, this is something far different.  And not only

7    the ban of this but attaching the criminal penalties to this makes

8    this a far different situation and shows that Georgia is not

9    taking the least restrictive or even a lesser restrictive

10   effective means of addressing a problem.

11            Your Honor, I would quickly like -- I want to give my

12   colleague time to give their opening from the NGP Project, but I

13   would like to just quickly address the *Purcell* doctrine unless

14   your Honor has additional questions on the point you raised.

15            THE COURT:  Go ahead.

16            MR. ROSBOROUGH:  Thank you.

17            As your Honor knows that the *Purcell* doctrine featured

18   prominently in the briefing from the defendants and the

19   intervenors, but *Purcell* does not bar relief here.  *Purcell*

20   concerns interference with election processes that are midstream

21   or numerous overly burdensome intermediate steps that must be

22   accomplished imminently and that looks at either whether voter

23   confusion or administrative chaos is likely.

24            Particularly in the Eleventh Circuit decision of *League

25   of Women Voters of Florida* on which defendants rely, that case,

1    number one, implicated voter registration, which was currently

2    underway, but it also required the state to take action at that

3    point while local elections were ongoing.  That's certainly not

4    the case here.

5           This is much more like the Court's decision last year in

6    *Coalition for Good Governance* to grant a preliminary injunction a

7    month before an election allowing the photographing of ballots

8    because implementation would be minimal.  And you'll hear from

9    Mr. Brower, an experienced former elections director, that

10   implementing this preliminary injunction can be done with minimal

11   effort.

12          To close, line relief constitutes core expressive

13   conduct.  Its message is well understood in the communities where

14   plaintiffs provide it.  Because the criminal ban was enacted

15   because of concerns that voters may be influenced by line relief,

16   the ban is content-based.  And this law, the only one of its kind,

17   is not the least restrictive means of achieving the state's

18   interests or even necessary to meet them.

19          Because of this and because the narrow relief sought

20   will not cause voter confusion or administrative chaos, the Court

21   should grant the preliminary injunction and declare the criminal

22   relief ban unconstitutional and enjoin county defendants from

23   enforcing it.

24          Thank you, your Honor.

25          THE COURT:  Thank you, counsel.

```
1              Good morning.

2              MR. NKWONTA:  Good morning, your Honor.  My name is

3    Uzoma Nkwonta, and I'm here on behalf of The NGP plaintiff group,

4    which also includes the organizational plaintiffs Black Voters

5    Matter Fund and Rise, Inc.

6              New Georgia Project, Black Voters Matter Fund and Rise,

7    Inc., they are nonpartisan, community-based and civic

8    organizations.  They are dedicated to helping their communities

9    become more civically engaged.  They work to increase political

10   participation among those communities they serve.  They accomplish

11   this through voter education and voter engagement activities,

12   particularly among black voters and underrepresented populations.

13             When citizens encounter barriers to voting, plaintiffs

14   took action and they help their communities navigate those

15   barriers, and they encouraged engagement in the political process.

16   So when citizens are forced to wait in long polling place lines,

17   these plaintiffs, these organizations, consistent with their

18   mission, they responded with corollary forms of speech and

19   expression, giving water to the thirsty, food to the hungry and

20   comfort to the weary, expressing support and solidarity for those

21   individuals waiting in line.

22             SB 202 makes this a crime.  It attaches criminal

23   penalties --

24             THE COURT:  Let's pause for one second.

25             (Off-the-record discussion)
```

1          THE COURT:  Sorry, counsel.  Sorry for the interruption.

2          MR. NKWONTA:  That's fine, your Honor.

3          As I was mentioning before our brief intermission, when

4    citizens are forced to wait in line, these organizations,

5    New Georgia Project, Black Voters Matter Fund and Rise, Inc., they

6    respond with corollary forms of expression, to give water to the

7    thirsty, food to the hungry and comfort to the weary, to express

8    support and solidarity to those waiting in line.  And SB 202 makes

9    this a crime.  It attaches criminal penalty to these line-relief

10   activities and it silences these organizations' efforts and these

11   expressions of support to voters.  That is why these plaintiffs,

12   the NGP plaintiff group, seeks preliminary injunctive relief

13   against the Fulton County Solicitor General Keith Gammage and the

14   Dougherty County District Attorney Gregory Edwards.

15          These defendants are responsible for prosecuting

16   criminal offenses in their respective counties, including the

17   line-relief ban.  And these counties are where plaintiffs conduct

18   the bulk of their line-relief activities.  And these defendants

19   have also offered very little justification for seeking criminal

20   enforcement of the line-relief ban or for enforcing the

21   line-relief ban's criminal penalties.

22          Defendant Gammage offered no response to NGP plaintiff's

23   motion for preliminary injunction.  Defendant Edwards joined the

24   state defendants' opposition, but he offered no specific argument

25   as to why criminal penalties should be enforced in his county.

1          Counsel for the AME plaintiff group has previewed some

2    of the evidence that the Court is going to hear today and in which

3    the Court has received through our preliminary injunction

4    briefing.  We agree with and join those arguments.

5          And for the reasons that we will address fully through

6    the course of this hearing, we will explain why the line-relief

7    ban is a content-based restriction of speech in a public forum and

8    that is not sufficiently tailored to address a permissible state

9    interest.

10          But one important distinction I wanted to highlight for

11    the Court here is that these defendants, the county prosecutors,

12    they are not election officials.  They cannot complain of

13    prejudice caused by an injunction at this stage of the case, at

14    this stage of the election cycle or at any stage.  That's because

15    their inability to seek criminal enforcement has no impact

16    whatsoever on the voting rules and the voting procedures.  It has

17    no impact on the duties of county officials in the voting process

18    who argue, by the way, that they are not involved in enforcing the

19    line-relief ban.  And that was in the brief filed by the county

20    defendants.

21          And while the parties may offer arguments and evidence

22    about the application of the Purcell principle or the equitable

23    factors affecting an injunction, none of that applies to the

24    county law enforcement officials.  *Purcell*'s reasoning extends

25    only to injunctions affecting the mechanics and procedures of the

1  voting process, not to criminal penalties for distributing food

2  and water on sidewalks and streets.

3          And it cannot be that plaintiffs and their volunteers

4  are subject to the full gauntlet of Georgia's penal system and

5  criminal penalties for exercising First Amendment rights simply

6  because an election is near.  That is a breathtaking expansion of

7  the *Purcell* doctrine well beyond its intended reach and purpose.

8          Plaintiffs are entitled to a preliminary injunction of

9  the enforcement of the line-relief ban by these county prosecutors

10 for the reasons that we will explain at today's hearing and

11 regardless of when in time that injunction may come down.

12          Thank you, your Honor.

13          THE COURT:  Thank you.

14          MR. ROSBOROUGH:  Your Honor, before Mr. Schaerr gets up,

15 I've been informed apparently nobody can hear on the Zoom, that

16 the Court's line is muted now.  Sorry.

17          MR. SCHAERR:  Good morning, your Honor, Gene Schaerr on

18 behalf of the state defendants.

19          As the Court knows, SB 202 was designed to ensure

20 smooth, efficient and secure elections.  And this year's primary

21 strongly suggests that it did that while also increasing voter

22 participation.

23          Now, plaintiffs have already spoken today about

24 providing water and maybe pretzels to those in the line who are in

25 dire need of some nourishment, but their own declarations tell a

1   somewhat different story.  In fact, they are full of statements

2   that these same organizations want to provide not just water and

3   pretzels, but hand warmers, coloring books, adult books,

4   sanitizer, masks, ponchos and other things.

5          And opening the door to these kinds of activities would

6   allow plaintiffs and other groups to create what would amount to a

7   circus atmosphere at polling places, creating massive confusion

8   and distractions for voters who mostly just want to be left alone

9   as they prepare to exercise their sacred right to vote.

10         Now, as we've heard, plaintiffs challenge the provision

11   of SB 202 that responds to the very real risk that these

12   activities present for both the reality and the appearance of

13   election integrity, which has been a huge issue in Georgia of

14   late.  And this provision of SB 202 does that by forbidding anyone

15   from giving anything of value, including food or drinks, to voters

16   who are waiting in line.  As the Court pointed out earlier, it's a

17   bright-line rule, nobody has to decide how much is too much or

18   what kinds of items are acceptable and which are not.

19         And so today the Court will hear substantial evidence

20   that this anti-solicitation provision was designed not only to

21   further these important goals, but also to increase the efficiency

22   of elections, reduce voter confusion, and reduce the risk that

23   voters will feel or be coerced as they wait in line.

24         And with respect to the criminal aspect of the law, one

25   reason that that aspect of the law was important is that it allows

```
 1   the police to enforce this bright-line rule.  If it weren't a
 2   criminal prohibition, it would be more difficult for the police to
 3   be able to come to a polling place and say, look, you just can't
 4   give out anything of value to voters, stop it.
 5          And the anti-solicitation provision does all those
 6   things while also ensuring that the plaintiffs and similar
 7   organizations may fully exercise their First Amendment rights.
 8          So for essentially the same reasons that this Court
 9   denied the preliminary injunction in the VoteAmerica case, the
10   preliminary injunction should be denied here as well.  For one
11   thing, like the VoteAmerica request, this request is subject to
12   heightened legal standards under the Purcell doctrine and, indeed,
13   we are even later in the election process now than we were in the
14   VoteAmerica case.
15          So what this Court said at page 53 in the VoteAmerica
16   opinion applies with full force here, and I quote:  SB 202 is
17   already the law and an injunction would not merely preserve the
18   status quo, it would change the law while the election machinery
19   is already grinding.  And that means that all of the preliminary
20   injunction factors must be not only established but established
21   clearly.
22          And the evidence today will show that the plaintiffs
23   cannot come close to satisfying their especially heavy burden on
24   key elements of their required showing, and so the injunction
25   should be denied for that reason.
```

1        So starting with the likelihood of success, the Court

2   will hear evidence today demonstrating the important state

3   interests at stake here and why this particular provision of

4   SB 202 was enacted.

5        Now, throughout their motions, and we heard some of this

6   today, plaintiffs argue that the anti-solicitation provision lacks

7   evidentiary support.  But, in fact, as I'll discuss in a minute,

8   there's significant evidentiary support for it.  But even so, as

9   the Eleventh Circuit recognized in upholding Florida's buffer

10  zone, even against the clear speech that's inherent in the kind of

11  exit solicitations that were at issue in that case, and this is

12  the *Center (sic) for Police Accountability v. Browning* case, the

13  Eleventh Circuit said, quote:  The state wants peace and order

14  around its polling places, and we accord significant value to that

15  desire for it preserves the integrity and dignity of the voting

16  process and encourages people to come and vote.

17       And the Eleventh Circuit further stated in that case,

18  quote:  The state need not wait for actual interference or

19  violence or intimidation to erupt near a polling place for the

20  state to act.  In other words, even if there were no concrete

21  evidence of past harm, the anti-solicitation provision should

22  still stand under *Browning* and other decisions.  But, in fact, the

23  record is already full of examples of voters who in the past have

24  expressed confusion and concerns stemming from the activities that

25  the anti-solicitation provision now forbids.

1          For example, in 2020 State Election Board member Matt

2    Mashburn, who will testify a little bit later, expressed concerns

3    about the aggressive and sophisticated operations that were being

4    undertaken by some groups within the 150-foot buffer protection

5    zone having to do with food and drink.  And he will testify that

6    those kinds of operations placed enormous stress on the mechanics

7    of the election system by burdening the already limited resources

8    of poll managers, workers and watchers who were unable to

9    adequately monitor third parties as they stood with voters in

10   line, and that those activities undermine voter confidence in

11   election integrity.

12          Ryan Germany, whom the Court met during the *VoteAmerica*

13   case, will also be testifying today.  He's the general counsel for

14   the Secretary of State.  And he will testify that allowing third

15   parties to interact with voters as they wait to vote requires poll

16   workers to divert their attention away from their other duties,

17   which, of course, also results in longer lines.  If poll workers

18   have to deal with issues that are happening outside the polling

19   location, then that takes them away from being able to help voters

20   get through and vote quickly.

21          Mr. Germany will testify that during the recent primary

22   election, which was conducted after SB 202, he saw no complaints

23   about line length, again, despite record turnout, and part of that

24   was the ability of poll workers to focus on getting voters through

25   the voting system.

 1          Mr. Mashburn will likewise explain that the confusion of
 2   voters and poll workers from third-party solicitation in previous
 3   elections was also absent from this most recent primary election,
 4   along with the burden on workers.
 5          So, in short, the evidence will show that the
 6   anti-solicitation provision already serves to prevent voter
 7   confusion and helps Georgia conduct an efficient election and
 8   protects both the reality and the appearance of election
 9   integrity, all interests that are widely acknowledged as
10   legitimate and even compelling interests.
11          Moving onto the issue of tailoring.  The plaintiffs
12   cannot plausibly deny that the anti-solicitation prohibition is
13   tailored to those interests.  Again, it responds directly to
14   complaints and concerns from previous elections that raise
15   questions about election efficiency and integrity.  And in
16   responding to those concerns moreover, the state in this provision
17   of SB 202 took a very narrow approach.
18          For one thing, third parties are not prohibited from
19   talking with voters who approach them.  And they can -- they can
20   set up tables that voters can approach as long as those tables are
21   located outside the buffer zone, and that means they can give
22   drinks and pretzels and whatever else they want to every voter
23   arriving at the polls before they enter the line.
24          And as long as they don't approach voters in line, third
25   parties can also continue to encourage them to stay in line until

1   they voted.  And in a host of ways, they can verbally express to
2   them how valued and important their votes are, which I know is one
3   of the issues that the -- about which concern was expressed in the
4   briefing; how else do we convey to voters that it's important that
5   they be here and that their votes are valued?  Well, they can tell
6   them that directly, they don't have to do it through food and
7   water.  So for all these reasons SB 202 left ample room for third
8   parties to express their messages to Georgia voters as often as
9   they wish, all that this prohibition does is limit the time, place
10  and manner in which they can do that.

11          So because of its narrow tailoring and because of all
12  the speech that the anti-solicitation provision leaves open,
13  irrespective of the level of scrutiny that this Court determines
14  appropriate, plaintiffs cannot show a substantial likelihood that
15  this Court would ultimately invalidate this provision under the
16  First Amendment.

17          But, nevertheless, it's worth pausing briefly to discuss
18  the appropriate level of scrutiny.  Now, as I've mentioned,
19  plaintiffs remain able to engage in speech as long as they don't
20  engage in the prohibited conduct of approaching those in line or
21  giving those in line anything of value.  And so the
22  anti-solicitation provision, like the two provisions at issue in
23  the *VoteAmerica* case, which didn't impede on expression at all,
24  the anti-solicitation provision really regulates only conduct and
25  is, therefore, subject only to rational basis review.

1          Now, to be sure, the plaintiffs claim that they're

2    sending a message when they hand out food and drink, but as this

3    Court recognized at page 22 of the *VoteAmerica* decision:  For such

4    conduct to be protected, First Amendment speech, it must be

5    inherently expressive.  And the Court cited the *Fair v. Rumsfeld*

6    decision on that point.  And what that means is that the message

7    must be clear from the conduct itself without any accompanying

8    speech.

9          And plaintiffs' own filings show why their conduct is

10   not inherently expressive in that sense because their papers

11   assert over a dozen different messages that they're conveying by

12   passing out food and water.  So if plaintiffs themselves can't

13   settle on a single precise message that they're trying to send in

14   distributing food and water or if the same conduct can mean

15   different things depending on the day, voters certainly can't be

16   expected to understand what specific message plaintiffs are

17   intending to convey with their conduct.

18          And, again, to borrow from the *VoteAmerica* opinion,

19   quote:  The necessity of explanatory speech to elucidate why

20   plaintiffs are engaging in their chosen conduct is itself strong

21   evidence that the speech is not so inherently expressive as to

22   qualify for First Amendment protection.  Now, we don't doubt that

23   the message to stay in line is expressive, but the evidence today

24   will confirm that handing out food and drink to those in line does

25   not inherently convey that message.

1           So under the rational basis standard that this Court

2  correctly applied in *VoteAmerica*, the evidence today will

3  demonstrate that the anti-solicitation provision is, in fact, a

4  rational means of serving the legitimate ends of reducing voter

5  confusion, lowering the stress on the mechanics of the election

6  and protecting both the reality and the appearance of election

7  integrity.  So that's likelihood of success.

8           Moving on to irreparable injury and balance of the

9  equities.  The plaintiffs also cannot clearly establish that they

10  will suffer any irreparable injury, especially given their own

11  decision to delay seeking a preliminary injunction for over a year

12  after filing their complaints.

13          As the Eleventh Circuit held in the *Wreal* case and in a

14  number of others, a delay in seeking a preliminary injunction of,

15  quote, even only a few months, militates against a finding of

16  irreparable injury.

17          The plaintiffs also cannot show that the balance of

18  equities clearly favors the preliminary injunction.  It's well

19  established in Eleventh Circuit precedent, such as *Hand v. Scott*,

20  that the state itself suffers irreparable injury whenever a court

21  enjoins a state, quote, from effectuating statutes enacted by

22  representatives of its people, as SB 202 certainly was.  And as

23  we'll see in the evidence today enjoining the anti-solicitation

24  provision would subject Georgia voters and poll workers to the

25  same problems that previously led to significant confusion,

 1  inefficiencies and integrity concerns.

 2          Now, the plaintiffs' harm, if any, pale in comparison to

 3  those that an injunction would inflict on the state and Georgia

 4  voters.  As I've already mentioned, plaintiffs can continue to

 5  communicate their various messages to voters without interruption

 6  as long as they don't approach voters that are currently in line

 7  to vote.  They may even continue to engage in the conduct of

 8  giving water and snacks to voters as long as they do it before a

 9  voter enters a line.  So any harm to the plaintiffs is, at best,

10  miniscule.

11          By contrast, as the evidence will show, allowing

12  third-party groups to provide items of value, even of small value,

13  like a bottle of water or a bag of pretzels, creates a substantial

14  risk of creating voter confusion, imposing added burdens on poll

15  workers and of undermining at least the appearance of election

16  integrity, which, and as the Eleventh Circuit noted in the

17  *Citizens For Police Accountability* case, is important; the

18  appearance of election integrity is important because it

19  encourages people to come to vote.

20          So, in short, because the anti-solicitation provision is

21  subject to and easily passes rational basis review, and because of

22  the many harms an injunction would inflict upon Georgia and

23  voters across the state, the request for a preliminary injunction

24  should be denied.

25          THE COURT:  Let me ask you, on *Purcell*, if I read -- and

1   I think at least one of the plaintiff groups specified this, I'm
2   not sure if they all did, but they're moving for an injunction not
3   only for the upcoming November election and its October early
4   voting, but for an injunction for any and all elections that take
5   place before final trial in this case.  So as I read that to mean
6   perhaps -- I don't know when we'll get to trial.

7            But even if I were to agree with you that *Purcell* is an
8   issue as to the October and November elections, or the November
9   election and the early voting in October, *Purcell* isn't an issue
10  for an election in 2023 to the extent that plaintiffs want me to
11  enjoin not only the November 2022 election but also any elections
12  in 2023 that might happen before the trial.

13           MR. SCHAERR:  I think that's probably right, your Honor,
14  but, of course, there are lots of other reasons to deny the
15  injunction.

16           THE COURT:  I understand.  But if plaintiffs convinced
17  me on everything else except *Purcell*, would you agree that
18  *Purcell*, under your view, would block relief perhaps for October
19  and November but not for 2023?

20           MR. SCHAERR:  I think that's probably right focusing
21  just narrowly on the *Purcell* question.  But, of course, if that
22  were the case, the solution would be just go ahead and have an
23  expedited trial and move to a final decision before the next
24  election after the election season this fall.

25           THE COURT:  All right.  Thank you.

1          Good morning.

2          MR. NORRIS:  Good morning, your Honor.  Just briefly,

3  Cam Norris again for the intervenors.  And just like last time, we

4  plan to join the state's presentation of the evidence.  So I just

5  plan to speak for a few minutes here and a few minutes at the end

6  if that's okay with your Honor.

7          THE COURT:  Of course.

8          MR. NORRIS:  So my friends at the plaintiffs' side I

9  believe have already started to minimize what I think is the

10 elephant in the room in this case, which is the Eleventh Circuit's

11 decision in *League of Women Voters of Florida*.  That decision

12 stayed the same injunction that plaintiffs are asking you to

13 enter.  That case also involved a so-called prohibition on line

14 warming.  It happened four months before the election, which the

15 Eleventh Circuit said easily triggers *Purcell*.  And here we are

16 three months before the election.

17          Now, my friends will point out to you that that's a

18 non-binding decision on you, it's a stay decision.  The Eleventh

19 Circuit has decided that those don't have precedential effect, but

20 there's never a part of their brief where they go on to explain

21 why Judge Newsom, Judge Lagoa and Judge Brasher were incorrect

22 that *Purcell* blocked that sort of injunctive relief.  They weren't

23 incorrect and that case cannot be distinguished.  As I mentioned,

24 we're talking about four months where the Eleventh Circuit said

25 that's easily covered.  Here we are three months before the start

1   of in-person voting.

2          Both injunctions, the Eleventh Circuit highlighted this,

3   would have Georgia, there was Florida, start retraining their poll

4   workers now, which is why *Purcell* applied.  Both laws, as I

5   mentioned, where prohibitions on the type of activities the

6   plaintiffs are discussing here.  And both laws contrary to the

7   *New Georgia Project's* distinction, both were criminal laws.

8          And I don't think there is any distinction that can be

9   drawn from the fact that they seek a PI only against prosecutors.

10  I think that they also need injunctive relief, as the other

11  plaintiffs asked for, against the county officials.  If there is

12  no line warming going on because the county officials are

13  prohibiting it, they do not have standing.  It's really both that

14  are at issue here.

15         So as the Eleventh Circuit said in the *League of Women*

16  *Voters* case, quote:  *Purcell* controls our analysis.

17         In Footnote 7 of that opinion, they said *Purcell* also

18  should have controlled the decision whether to grant the

19  injunction in the first place.  Because *Purcell* controls, the

20  merits have to be entirely clear-cut in the plaintiffs' favor, and

21  they're not.

22         Just to be clear, there's a lot of undertones in this

23  case about the right to vote, voter suppression.  There is no

24  constitutional right to vote claim before you, none has been

25  brought.  There is no argument that voters are unable or even

1  burdened from voting because of this law.

2          There's also no intentional racial discrimination claim

3  in front of you right now.  I believe the United States is

4  probably the lead proponent of that claim, and they are not here,

5  they did not move for a preliminary injunction based on the

6  evidence they've gathered in discovery so far.

7          The only claim before you is a speech claim, that

8  distributing gifts to line in voters is speech that is protected

9  by the First Amendment in and of itself.  And I say "in and of

10 itself" because the only thing that the law prohibits is the

11 giving of gifts, so that is what has to be speech, not the

12 environment surrounding the gift-giving that any particular group

13 might be engaged in.

14          So we know from the law that just because groups intend

15 their conduct to express a message, that doesn't make it speech.

16 It has to communicate a message in and of itself.  And the message

17 cannot be, here's what I'm doing, have water, have food.  It has

18 to be something apart from the conduct itself, otherwise every

19 conduct could be recharacterized as speech, and the First

20 Amendment would regulate wide swaths of society, which we know the

21 law says is not true.

22          So what it does, and I think plaintiffs will admit this,

23 they give food and water to people because the lines are long,

24 they want people to vote.  It facilitates them staying in line

25 because if they're thirsty, they won't leave when they get water,

1   if they're hungry, they won't leave because they got food.

2           But facilitating voting is at least two circuits, the

3   Fifth and the Ninth, have held does not transform conduct into

4   speech.  So those cases, there were groups that were literally

5   delivering people's ballots for them.  They were associating with

6   and taking the ballot and turning it in because they thought

7   voting matters, your vote counts, lines are too long, absentee

8   voting is important, and yet those courts said the only thing that

9   was regulated by the challenged laws there was the actual delivery

10  of the ballot and the application, not the surrounding voter

11  drives and things like that that these groups were engaged in.

12  They said that narrowly is conduct, not speech, it's not protected

13  by the First Amendment.

14          And I think we've already established that distributing

15  filet mignon, your Honor's example, was out.  So the question

16  is not -- really is the speech.  That's not the only question

17  is whether this is speech, at some point it's a line-drawing

18  exercise.  And the Eleventh Circuit's decision in the *Police*

19  *Accountability* case is on point here, that even if you're not

20  electioneering, states have a compelling interest, even assuming

21  strict scrutiny applies, in creating a zone of peace right before

22  people make the very important decision to vote.  They can protect

23  voters from being approached by others in line regardless of

24  whether those people are electioneering or not.

25          And it also goes on to say, which is true and what

1  Georgia has acted upon here, which is:  It's too hard sometimes to

2  just determine who's electioneering and who's not when people are

3  approaching voters without limitation in line.  Georgia can act

4  like other states have, including New York, prophylactically to

5  ban this activity.

6        And my last point would be just a clarification about

7  New York law, which I think really is a telling example.  The

8  New York statute has an exception for food and water under $1.  I

9  don't think food or water under $1 exists in New York, especially

10 not in a world of 9.1 percent inflation.  I think that would cover

11 bottles of water, it would cover pretzels, it would cover the

12 types of things the plaintiffs are talking about here.

13       And that $1 exception wasn't added to the law until

14 1992.  So from 1976 to 1992 New York banned all distribution of

15 food and water in line.  I don't believe there was a

16 constitutional challenge raised to that law at any time.  There's

17 only apparently, according to my friends, a belated challenge

18 that's been raised recently.

19       Thank you.

20       THE COURT:  Well, let me ask you about the same *Purcell*

21 question, the November 2022 election and October early voting

22 versus any election in 2023.

23       MR. NORRIS:  So I think, your Honor, I disagree that

24 that would be permissible to sort of have a preliminary injunction

25 and then skip an election and then go on.  I think that that would

```
1   not -- would be an abuse of discretion because irreparable harm
2   would not be shown for an election so far in advance.  I think it
3   would be pretty speculative to understand the harms to the
4   plaintiffs that far out.  And you would have an intervening
5   election where you saw how this law played out to them.  I think
6   you would gather a lot of information.  I think it would be too
7   future-looking.
8           And I agree with my friends at the state that a
9   preliminary injunction is designed to address a short-term harm
10  that will arise before the trial can happen, that's the goal of
11  it.  Its purpose is to serve that.  If that purpose is not being
12  served, the thing to do instead is to accelerate the proceedings
13  instead of entering coercive relief in the meantime.
14          THE COURT:  Thank you.
15          MR. CUSICK:  Good morning, your Honor.  John Cusick on
16  behalf of the AME plaintiffs.
17          If you have no further questions, your Honor, we would
18  like to call Rhonda Briggins as our first witness on behalf of
19  Delta Sigma Theta Sorority, Incorporated.
20          THE COURT:  Sure.  Go ahead.
21          COURTROOM DEPUTY CLERK:  Can you raise your right hand.
22          _____
23                    RHONDA BRIGGINS
24      a witness herein, being first duly sworn,
25         was examined and testified as follows:
```

 1          COURTROOM DEPUTY CLERK:  Thank you.  You can be seated.

 2          MR. CUSICK:  Your Honor, just one housekeeping item.

 3          THE COURT:  Sure.

 4          MR. CUSICK:  Just to expedite Ms. Briggins' testimony,

 5 we would just direct the Court's attention to Plaintiffs'

 6 Exhibit 8, which is her declaration, for any additional details

 7 about Delta Sigma Theta's organizational background.

 8          THE COURT:  All right.  Thank you.

 9                     DIRECT EXAMINATION

10 BY MR. CUSICK:

11 **Q.**  Good morning, Ms. Briggins.  Thank you for being here with us

12 today.

13 **A.**  Good morning.

14 **Q.**  What do you identify as your race?

15 **A.**  African-American.

16 **Q.**  Where do you live?

17 **A.**  In Doraville, Georgia.

18 **Q.**  How long have you lived in Georgia?

19 **A.**  Twenty-nine years.

20 **Q.**  Are you affiliated with Delta Sigma Theta Sorority,

21 Incorporated?

22 **A.**  Yes.

23 **Q.**  If I refer to it as "the Deltas," is that okay with you?

24 **A.**  It is.

25 **Q.**  What is your position with the Deltas?

**A.**   Currently I'm the chair of Strategic Partnership Task Force.

**Q.**   How long have you been in that position?

**A.**   A couple of months.

**Q.**   Did you hold a position before that one with the Deltas?

**A.**   Yes.  I was previously the co-chair of the National Social
Action Commission.

**Q.**   And, again, if I refer to the Social Action Commission as "the
Commission" for shorthand, that works for you?

**A.**   Yes.

**Q.**   And could you briefly describe for the Court the goals and
objectives of the Commission?

**A.**   Yes.  The Commission is basically where we as an organization
talk about advocacy issues that are pertinent to the
African-American community.  We educate our members about voting,
their rights to vote, community forums, anything dealing with
advocacy is what we do in that area.

**Q.**   What were some of your responsibilities as a Social Action
chair?

**A.**   As Social Action chair, we are responsible to make sure that
we place all of the priorities for our commission, for our policy
positions nationally, again educating our membership about their
right to vote, voter mobilization, education and various
activities such as community forums for all the chapters around
the country.

**Q.**   And in this role did you receive updates from Delta's members

1  and chapters in Georgia?

2  **A.**  Frequently, yes.

3  **Q.**  How long have you been involved with the Deltas?

4  **A.**  I've been a member for 26 years.

5  **Q.**  And is your work paid with the Deltas?

6  **A.**  I wish.  100 percent volunteer.

7  **Q.**  And just if you could briefly describe for the Court, what are

8  the Deltas as an organization?

9  **A.**  Okay.  Delta Sigma Theta was established in 1913 on Howard

10 University campus.  Twenty-two of our founders started the

11 organization.  Our very first act as an organization was the

12 participation in the Women's Suffrage March.

13     Voting has been the primary foundation of our organization for

14 109 years, and we're still on the front lines fighting for our

15 right to vote.

16 **Q.**  Approximately how many Deltas are members in Georgia?

17 **A.**  In Georgia, 7,500.

18 **Q.**  Approximately how many chapters?

19 **A.**  We have 58 chapters.

20 **Q.**  Can you briefly describe the makeup of the chapters in

21 Georgia.

22 **A.**  Yes.  We have chapters all across the State of Georgia.  In

23 areas where we don't have chapters, that work, especially when it

24 comes to voting mobilization, is done by the closest chapter in

25 the area.

1  **Q.**  Who are the people, who are the members that make up the

2  Deltas in Georgia?

3  **A.**  So we have collegiate members.  Those members are actually

4  enrolled students at organizations throughout the State of

5  Georgia.  And then we have our alumni association.  Those are

6  women who have graduated.  All the members of our organizations

7  are college-educated women.  Even on a collegiate level, you can

8  still apply and become members of the organization.

9      Black sororities are different than other sororities in which

10  after we graduate, we're still sorority girls.  Memberships in our

11  organizations are lifetime memberships.

12  **Q.**  Is that a Delta's pin you have on today?

13  **A.**  That says "vote."

14  **Q.**  My last question here for this portion, do Deltas only serve

15  their members?

16  **A.**  Absolutely not.  For 109 years we have been filling the need

17  of the communities all around the country.

18  **Q.**  And I just have a couple of questions, I want to discuss the

19  Delta's activities as they relate to voting rights.

20      Ms. Briggins, briefly describe to the Court what are the

21  activities that Delta members and chapters engage in relating to

22  voting rights?

23  **A.**  Okay.  We hold community forums for different candidates,

24  candidate forums.  We educate the community about their right to

25  vote.  Making sure they understand from early voting days,

1  deadlines, voter registration drives throughout the community,

2  mobilization, making sure people can get to the polls and actually

3  vote.

4      We also do things like line relief on the day of election.  We

5  make sure we're encouraging folks to exercise their right to vote.

6  **Q.**  I want to now focus on the line-relief activities you just

7  mentioned.  What does that phrase mean to Delta's members and

8  chapters in Georgia?

9  **A.**  Line relief is very simple.  It is the process in which during

10 Election Day at the various polls, we go to the polls, we

11 encourage people to stay in line and vote.  If they're hungry, if

12 they're thirsty -- especially during the weather that we see in

13 Georgia, often it's very hot, and so we provide water if they're

14 thirsty.  If they're hungry, we provide a light snack, granola

15 bars, pretzels, things like that.

16 **Q.**  How long have Delta's members in Georgia been involved in

17 line-relief activities?

18 **A.**  We've been doing it for years.

19 **Q.**  Why are line-relief activities necessary for members in

20 Georgia?

21 **A.**  It's to encourage people to stay in line.  It's to -- we're

22 the cheerleaders to make sure that people exercise their right to

23 vote.  More importantly, we want to make sure that voting is done

24 easy, it's not a burden, it's done with dignity and humanity.  So

25 line relief is also a part of that, to encourage people that

1    this -- your right to vote is bigger than you.  It is about the

2    community.  And we encourage them to stay and exercise their right

3    to vote.

4    **Q.**  Based on the Delta's line-relief activities you briefly

5    described to the Court, who is on the receiving end of the work

6    that Delta's members and chapters do in this work?

7    **A.**  It's the entire community.  I mean, we have seniors that can't

8    stand in long lines and they're there, and so we want to encourage

9    them to stay.  We have people with disabilities.  There might be

10   women that are pregnant, people with small children.  It is the

11   entire community.  So we're just there to support them and

12   encourage them to stay and vote.

13   **Q.**  You used the example of providing line relief for children.

14   Why is it important to provide line relief to someone like a child

15   who might not vote?

16   **A.**  Well, the child is tied to the voter?  So, again, to encourage

17   the parents to stay.  If the children are hungry or at a point

18   that they're fatigued, if we can provide some resources to the

19   young people, then the parents will also stay and not forego

20   leaving the line for them.

21   **Q.**  For the Deltas is there a message that you hope to convey in

22   providing line relief?

23   **A.**  Yes.  It's very simple, we want people to stay.  We want to

24   encourage them to stay.  We want them to exercise their right to

25   vote.

1   **Q.**  For the Deltas, why would a voter associate a message with the

2   passing out -- I think you used the term water and pretzels, why

3   would they associate a message with that on Election Day?

4   **A.**  It's easy.  We want to associate the message of staying.  You

5   know, here in Georgia over the last couple of years, especially

6   during the 2020 election, lines were long, four and five hours.

7   People even had to stay until midnight.  And so people had to take

8   off their jobs just to vote.  Voting should be easy, it should not

9   be a burden.  So anything that we could do to help ease that

10  burden is what we were trying to do.

11  **Q.**  You mentioned as one example lines that could be up to four to

12  five hours.  Is there also a need to provide line relief to people

13  waiting in line where the lines might not be that long, up to four

14  or five hours?

15  **A.**  Again, yes.  We're there to encourage people to stay in line.

16  We're there to be cheerleaders.  We're there to motivate folks

17  about the importance of voting.  So if it's 30 minutes or an hour,

18  again, voting should be easy and it should be cheerful, it should

19  be done with dignity and humanity, and so that's what we've been

20  trying to do over the years.

21  **Q.**  You've discussed the message that you hope to convey for

22  the Deltas.  Based on their line-relief activities and your

23  understanding, why would a member of the public associate a

24  message with water, food being given by Delta's members?

25  **A.**  It's just the mere act of giving them the water.  You know, a

1  nod, a pat on the back, an encouragement, that action alone is a

2  part of the message.  It's the part of the process of ensuring

3  that they know they have the support necessary for them to stay in

4  line and exercise their right to vote.

5  Q.  For the Deltas is that message being conveyed even if a person

6  doesn't take the food or pretzels or doesn't ultimately vote?

7  A.  Absolutely.  There's -- at no point are we associating or

8  telling folks who to vote for.  We're not asking you your party

9  affiliation.  We're not only serving a certain group, line relief

10  is for everyone that's there.  And so it's just there to encourage

11  folks to stay.  You can accept it or not.

12  Q.  Can the Delta's members just verbally say that message without

13  giving the food and water?

14  A.  Yes, we can verbally say it, but line relief and the whole

15  purpose around it is the encouragement part.  It is that intimate

16  contact with the voter to encourage them to stay, to know -- the

17  close proximity of that, to know that they have someone there to

18  help lift the burden of them standing in those long lines.

19  Q.  You mentioned in one of the earlier questions about the

20  Delta's line relief being nonpartisan.  Why is that important?

21  A.  It's extremely important.  It is important because we're a

22  501(c)(7) organization, so we're not there to tell people who to

23  vote for, we're not asking them party affiliation.  The Deltas has

24  been, again, serving the community for 109 years, so everyone

25  knows when we're there our main purpose is to serve the community.

**Q.**  Based on Delta's line-relief activities, are you aware of the

Deltas having received any complaints about line-relief activities

being intimidating?

**A.**  As far as I know there's no -- I've never heard of any

complaints for any of the work that we've been doing over the

years.

**Q.**  For my last line of questions, Ms. Briggins, I now want to

talk about what, if any, impact SB 202 has had on the Delta's

line-relief activities.

    Has SB 202 impacted the Delta's line-relief activities?

**A.**  Yes.

**Q.**  How so?

**A.**  With the buffers and the restrictions now with 25 percent

(sic) of the last person in line, 150 upon the entrance, and the

criminalization of line relief now as a part of the activity,

we're no longer doing line relief.  We -- our members -- we cannot

jeopardize our members to be criminalized in that process,

especially when we're there to support the community and trying to

help.

**Q.**  You've referenced a 25-feet number, did I hear you correctly?

**A.**  Excuse me, can you repeat that question.

**Q.**  Did I hear you correctly, you said there's a 25-foot buffer?

**A.**  Yes.

**Q.**  Could you tell the Court how that provision of prohibiting

line-relief activities within 25 feet of a voter impacts the

1  Delta's line-relief message?

2  **A.**   Yes.   As I said earlier, line relief is about being intimate.

3  Line relief, it's about being close to the voter, about you having

4  the opportunity to pat them on the back, to nod, to encourage, to

5  hand them very closely a cup -- a bottle of water or a snack.   And

6  so if you're 25 feet away, then that diminishes the entire process

7  of line relief.   It might be something else at that particular

8  point, and it wouldn't necessarily be line relief.

9  **Q.**   What do long lines mean for the communities that Delta serves?

10  **A.**   Long lines mean a lot of things.   It means individuals not

11  being able to go to work.   It means missing out on different

12  activities that your children might have had.   It means, you know,

13  you missing out on things that you've already planned for your

14  day.

15     A lot of times people come to the polls with the expectation

16  that they will be in and out of the polls in a short amount of

17  time.   So with long lines it just disrupts the entire day for a

18  voter.   So for us being out there encouraging them to stay,

19  encouraging them to exercise their right and not to leave is a

20  critical thing that we need to continue to do for the community.

21  **Q.**   For the communities that Delta serves for when they did

22  conduct line-relief activities, was there any nonverbal message

23  that the members intended to communicate in passing out food or

24  pretzels?

25  **A.**   Yes.   A nod, a pat, an encouragement.   You know, sometimes we

said messages, sometimes we didn't.  We would just hand the water

and pat them on the back and, you know, I think people understood

what that meant.

**Q.**  Can the Deltas still provide line relief with the 150-foot

buffer zone from the polling location?

**A.**  No.  No, I don't think so.

**Q.**  Why not?

**A.**  Again, it's the same as I asked before -- answered before,

that diminished the process of line relief.  It diminished our

voice.  It diminished the intimacy and the encouragement if we're

that far away from the actual voters.

MR. CUSICK:  I have no further questions, Ms. Briggins.

Thank you.

Just before I pass the witness, your Honor, I want to

direct the Court's attention to Plaintiffs' Exhibits 9, 16 and 20

through 23, which have been admitted.  These declarations were

submitted in support of the movant plaintiffs AME Church and

Georgia NAACP.  And they are declarations submitted on behalf of

voters who are also members of Deltas.

THE COURT:  All right.  Thank you.

MR. CUSICK:  Thank you, Ms. Briggins.

CROSS-EXAMINATION

BY MR. BARTOLOMUCCI:

**Q.**  Good morning, Ms. Briggins.

**A.**  Good morning.

1  **Q.**  My name is Chris Bartolomucci, and I represent the state

2  defendants in this case.

3     Delta is a large and successful organization with a long and

4  storied history, is it not?

5  **A.**  Yes.

6  **Q.**  I believe you testified that Delta has over 58 chapters in

7  Georgia and 7,500 members in Georgia, is that right?

8  **A.**  Yes.

9  **Q.**  And globally Delta has over 1,000 chapters and 350,000

10  members, true?

11  **A.**  Yes.

12  **Q.**  One of your members is former US Attorney General Loretta

13  Lynch, right?

14  **A.**  Yes.

15  **Q.**  And Delta has a long history of social action going back to

16  the Suffrage March in 1913, true?

17  **A.**  Yes.

18  **Q.**  And on social media Delta has hundreds of thousands of

19  followers in the aggregate, is that correct?

20  **A.**  Yes.

21  **Q.**  So would you agree with me that Delta is quite well-known,

22  both nationally and in Georgia?

23  **A.**  Yes.

24  **Q.**  Now, before SB 202 Delta members used to hand out free food,

25  water and other items to voters standing in line to vote, correct?

**A.**  Yes.

**Q.**  What did Delta hand out in the past other than food and water?

**A.**  I'm unaware of anything other than the food and water personally.  So we could have participated in other things, but I'm unaware of those right now.  I can --

**Q.**  I ask the question because your declaration referred to food, water and other provisions, so I was wondering what the "other provisions" were.

**A.**  If I could speculate, maybe the other provisions, if it was cold during the wintertime, could have been hand-warmers possibly.

**Q.**  Now, when Delta members engaged in line relief before SB 202, did it offer food and water to all voters or just to some voters?

**A.**  All voters.

**Q.**  All voters.

    Now, in your declaration, in paragraph 17, you said that when Delta members offer line relief to voters, "they," meaning the Delta members, often identify themselves as being from a local chapter of Delta, is that true?

**A.**  Yes.

**Q.**  And would it be fair to say that Delta encouraged its members to identify themselves as Deltans while offering line relief?

**A.**  Yes.

**Q.**  Would it have been common for Delta members engaged in line relief to wear clothing that said "Delta Sigma Theta"?

**A.**  Yes.

1  Q.  Delta, in fact, wants the voter to know that he or she is

2  getting a bottle of water from Delta Sigma Theta, right?

3  A.  Yes.  And that's because people in the communities, they know

4  us.  We've been doing various volunteer work in the communities

5  for 109 years.  So the community knows us, they know that we're

6  there to fill in those gaps.

7  Q.  And because Delta is so well-known, there's a fair chance that

8  when a voter receives a bottle of water from a Deltan, they will

9  know what Delta Sigma Theta stands for, true?

10  A.  Yes.

11  Q.  Now, your members often would speak with voters while offering

12  line relief, correct?

13  A.  Speak to them to encourage them to stay in line.

14  Q.  Is it fair to say that Delta members who participated in line

15  warming felt strongly about elections, candidates and the issues

16  of the day?

17  A.  As I stated before, voting is very important to us.

18  Q.  Is it possible that a voter receiving a bottle of water could

19  start a conversation with a Delta member about the election and

20  candidates?

21  A.  No.  We instruct them to make sure, because we are a 5-0(c)(7)

22  (sic) organization, that we never get into partisan activities.

23  We're there to hand out the water in a very nonpartisan way.

24  Q.  Well, that gets to my next line of questioning, which was

25  going to be about the training that Delta gives to its members

1  before line relief.

2      Is it true that Delta would train its members before engaging

3  in line relief?

4  **A.**   Yes.

5  **Q.**   What would that training consist of?

6  **A.**   The training would consist of -- again, we're a 501(c)(7)

7  organization, so we train all of our members never to participate

8  in nonpartisan -- in to partisan activities because we have to

9  stay in nonpartisan -- doing nonpartisan work.  So we make that

10 very clear.  So we would never be there to endorse candidates.  We

11 are never there to tell you who to vote for.  We're only there to

12 do the act of providing the water and encouraging individuals to

13 stay.

14 **Q.**   Who would perform this training?

15 **A.**   The training is done by different individuals.  As I said, I

16 was the co-chair of the National Social Action Commission, so we

17 would do it from a national level to make sure all of our members

18 are very clear about our status from the IRS.

19     In addition to that, it's done on a regional level, it's done

20 on a state level, as well as chapter level all through the Social

21 Action various levels of governance.

22 **Q.**   Did Delta require that a member go through this training as a

23 precondition to participate in line relief?

24 **A.**   It's not a mandatory requirement, but if you are a part of the

25 Social Action chapters committee, and those usually 100 percent

1  were the members out providing line relief, you participated in

2  those trainings.

3  **Q.**   Did you have any written training materials?

4  **A.**   Yes.

5  **Q.**   Do you still have those materials even though you're not

6  engaging in line relief these days?

7  **A.**   Repeat that question.

8  **Q.**   Do you still have -- does Delta as an organization still have

9  its written training materials?

10  **A.**   The materials, if they were created, they still exist, yes.

11  **Q.**   And you would be willing to produce those materials to the

12  state if the state requested them, right?

13  **A.**   If necessary, yes.

14  **Q.**   Now, is Delta the only organization in Georgia that engaged in

15  line relief before SB 202?

16  **A.**   No.

17  **Q.**   Did many other organizations provide line relief?

18  **A.**   Yes.

19  **Q.**   Do you know whether other organizations provided the same kind

20  of training that Delta provided to its members?

21  **A.**   I don't know.

22  **Q.**   Now, there was a declaration submitted in this case from a

23  Delta member named Monica Kinard.  Did you happen to read that

24  declaration?

25  **A.**   No.

1  **Q.**  Well, let me just represent to you that Ms. Kinard, who,

2  again, was a Delta member -- is a Delta member, said in her

3  declaration, "I remember receiving a bottle of water and a

4  pamphlet while waiting in line to vote."

5      Did Delta have a practice of handing out pamphlets along with

6  water bottles or food items?

7  **A.**  No, not from my knowledge.

8  **Q.**  But apparently other organizations would do that?

9  **A.**  Not -- we as Delta never did that.  I don't know what other

10  organizations did.

11  **Q.**  Would you agree that a voter is more likely to read your

12  literature if you're giving them a gift at the same time?

13  **A.**  I don't know.

14  **Q.**  Now, there was another declaration submitted in this case by

15  Tayleece Paul.  Did you happen to read Tayleece Paul's

16  declaration?

17  **A.**  No.

18  **Q.**  Well, that declaration said, "During the November 2020 general

19  election, the provisions I handed out to voters waiting in line

20  included cards with QR codes that linked to COVID-19 relief

21  resources, like cash funds, personal protective equipment, food

22  and other aid."

23      To your knowledge, did Delta members ever hand out valuable

24  items like that?

25  **A.**  No.

1   **Q.**  But apparently other persons or organizations did, true?

2            MR. CUSICK:  Objection, your Honor.  Calls for

3   speculation.

4   **A.**  I don't know.

5            THE COURT:  Overruled.

6   **Q.**  What was your answer?

7   **A.**  I don't know.  I'm unaware of any of those activities.

8   **Q.**  I just want to ask you about one more declaration.  This was

9   from a Delta member named Janie Robinson.  Did you read that one?

10  **A.**  No.

11  **Q.**  Well, Ms. Robinson talked about during the June 2020 election

12  there was a man who gave an elderly voter water.  And Ms. Robinson

13  in her declaration said, "He was wearing a T-shirt that said

14  'Voting is Your Right.' The shirt was black with white lettering."

15      The message on the shirt apparently made an impression on

16  Ms. Robinson, didn't it?

17  **A.**  I guess.

18  **Q.**  She remembered it two years later, right?

19  **A.**  From what you've just read, yes.

20  **Q.**  Now, other people at an election polling place might wear a

21  T-shirt with a different message, right?

22  **A.**  Yes.

23  **Q.**  Someone might wear a T-shirt with an elephant or a donkey on

24  it, right?

25  **A.**  Yes.

1  **Q.**  Now, since the enactment of SB 202, has Delta sent its members
2  to polling places for any reason other than line relief?
3  **A.**  No.
4  **Q.**  So even though SB 202 allows organizations to engage in
5  activities 150 feet from the polling place and 25 feet from the
6  voters, Delta has not tried to engage in any activities in
7  compliance with that rule, true?
8  **A.**  No.
9  **Q.**  Now, you testified that Delta is a nonpartisan organization,
10 right?
11 **A.**  Yes.
12 **Q.**  Does Delta have an affiliated organization called Delta for
13 Women in Action?
14 **A.**  Yes.
15 **Q.**  Do you hold a position in that organization?
16 **A.**  I do.
17 **Q.**  What is your position?
18 **A.**  I'm secretary/treasurer.
19 **Q.**  And does Delta For Women in Action attempt to influence
20 elections?
21 **A.**  Yes.
22 **Q.**  Do you have a Twitter account?
23 **A.**  Yes.
24 **Q.**  Do you remember sending out a Tweet on October 21, 2020, that
25 said, "Created by Delta Sigma Theta Sorority, D4 Women in Action

1  endorses Vice President Joe Biden and Senator Kamala Harris."  Do

2  you remember sending that out?

3  **A.**  Yes.

4  **Q.**  That same day I believe you sent out another Tweet that said:

5  "Today D4 Women in Action announced its full slate of endorsed

6  candidates for the 2020 election."  Is that true, did you send

7  that out?

8  **A.**  Yes.

9  **Q.**  Now, Delta itself as distinguished from Delta for Women in

10  Action, Delta itself does not endorse candidates, true?

11  **A.**  Correct.

12  **Q.**  But Delta does take a position on issues of the day, including

13  controversial issues, true?

14  **A.**  Yes.

15  **Q.**  And, in fact, over the years Delta has passed hundreds of

16  resolutions taking a stand on public policy issues, is that right?

17  **A.**  Yes.

18  **Q.**  In fact, there's a document on the Delta website called

19  "Codification of Resolutions" that lists all of Delta's

20  resolutions, right?

21  **A.**  Yes.

22  **Q.**  And Delta recently adopted a resolution criticizing the

23  Supreme Court's decision to overturn *Roe v. Wade*, right?

24  **A.**  Yes.

25  **Q.**  Now, I looked at the Codification of Resolutions document, and

```
 1  I saw that Delta adopted one resolution commending Former

 2  President Obama and another one commending Former President

 3  Clinton, is that true?

 4  A.  Yes.

 5  Q.  Has Delta commended any other recent Presidents?

 6  A.  I'm unaware of that; however, in our sorority we have members

 7  who are affiliated with all parties, so...

 8          MR. BARTOLOMUCCI:  Thank you.  No further questions,

 9  your Honor.

10          MR. CUSICK:  Just three questions, your Honor.

11          THE COURT:  Go ahead.

12                      REDIRECT EXAMINATION

13  BY MR. CUSICK:

14  Q.  Thank you again, Ms. Briggins.  Just a couple of questions for

15  you on redirect.

16      Do you recall Mr. Bartolomucci's questions about Tweets that

17  you might have sent in November of 2020?

18  A.  Yes.

19  Q.  Do you conduct line relief via Twitter?

20  A.  No.

21  Q.  Could you briefly explain the difference between Delta Sigma

22  Theta's nonpartisan activities and I think I heard him correctly

23  the D4 committee, could you explain that difference.

24  A.  Yes.  Delta Sigma Theta, again, as I've stated, is a 501(c)(7)

25  organization.  And so in that organization there's nonpartisan
```

1  activities that we do.  We do take positions on various policy

2  issues, but we're nonpartisan in taking those positions.

3     However, D4 Women in Action is a 501(c)(4) organization which

4  allows us to endorse candidates and do a number of partisan

5  activities indirectly with candidates, and so we do that.

6     Our 501(c)(7) organization has symbols and letters, which is

7  Delta Sigma Theta.  And our 501(c)(4) has a logo.  Two separate

8  organizations, no cross-pollination between either organization.

9  **Q.**  And does that D4 organization have any role in line relief

10  efforts in Georgia that were previously conducted?

11  **A.**  No.

12  **Q.**  Just my last question:  Why did the Deltas submit a

13  declaration on behalf of the motion for preliminary injunction?

14  **A.**  We submitted a declaration.  As I stated before, for 109 years

15  Delta's primary focus has been around the right to vote.  And so

16  here in Georgia we see and we're faced with voter suppression laws

17  that are prohibiting individuals in the State of Georgia to

18  exercise that right to vote.  And so we want to do what we've been

19  doing for 109 years, is to make sure that everyone around the

20  country have -- can exercise their fundamental right to vote.

21          MR. CUSICK:  Thank you, Ms. Briggins.

22          No further questions, your Honor.

23          THE COURT:  Thank you.  Ma'am, you can step down.  Thank

24  you.

25          (Witness excused)

```
 1              THE COURT:  Let's take a short comfort break.

 2              (After a recess, the proceedings continued as follows:)

 3              THE COURT:  Please call your next witness.

 4              MS. WINICHAKUL:  Your Honor, I'm Pichaya Poy Winichakul,

 5  counsel on behalf of AME plaintiffs.  And we call Mr. Dwight

 6  Brower as our next witness.

 7              THE COURT:  Good morning.

 8              MR. BROWER:  Good morning.

 9              COURTROOM DEPUTY CLERK:  Mr. Brower, if you'll remain

10  standing and raise your right hand.

11              _____

12                      DWIGHT BROWER

13              a witness herein, being first duly sworn,

14                was examined and testified as follows:

15              _____

16                      DIRECT EXAMINATION

17  BY MS. WINICHAKUL:

18  Q.  Mr. Brower, could you spell your last name for the court

19  reporter, please.

20  A.  My last name is spelled B-R-O-W-E-R.

21              MS. WINICHAKUL:  Couple of housekeeping matters.  To

22  expedite Mr. Brower's testimony, I direct the Court's attention to

23  Mr. Brower's declaration, which has been admitted as Exhibit P1,

24  and Mr. Brower's supplemental declaration, which has been admitted

25  as Exhibit P2 for additional background.
```

```
 1              THE COURT:  Thank you.
 2              MS. WINICHAKUL:  And I've been asked to make sure that
 3   the screens are available and visible to publish exhibits.   Thank
 4   you.
 5   BY MS. WINICHAKUL:
 6   Q.   Good morning, Mr. Brower.
 7   A.   Good morning.
 8   Q.   Mr. Brower, what's your occupation currently?
 9   A.   I'm currently retired.
10   Q.   And when did you retire?
11   A.   I retired in 19 -- 2019.
12   Q.   Where did you work before you retired in 2019?
13   A.   I worked for Fulton County Department of Voter Registration
14   and Elections.
15   Q.   And after retiring in 2019, did you continue to be involved in
16   elections work?
17   A.   I came back to work for approximately six months to fill a
18   temporary vacancy in the Department of Voter Registration and
19   Elections in Fulton County.
20   Q.   What was your position at the Department of Elections in
21   Fulton County?
22   A.   I was the elections division chief.
23   Q.   So just to clarify, which elections did you work during the
24   2020 election cycle?
25   A.   I worked the November general election.
```

1   **Q.**  After the November 2020 general election, did you do any

2   election administration work?

3   **A.**  No.

4   **Q.**  What were your responsibilities when you worked for Fulton

5   County for more than 13 years?

6   **A.**  Again, my responsibilities were -- I was the chief of the

7   elections division, I was responsible for the preparation and

8   resource and planning resources for the conduct of elections, the

9   actual maintenance and -- of the equipment, distribution of the

10  equipment, the training of poll officials, as well as the

11  recruitment of poll officials.

12  **Q.**  Did you have the same responsibilities as a contractor when

13  you worked there for the November 2020 general election?

14  **A.**  I did.  The responsibilities was generally the same.  I was

15  actually backfilled in for the vacancy of the elections chief.

16  **Q.**  Prior to working at Fulton County, did you do any other

17  election work?

18  **A.**  Prior to working at Fulton County, I worked in DeKalb County

19  for about 11 years as an elections coordinator, whose duties were

20  pretty much the same as the title I carried in Fulton County.

21  **Q.**  Given the responsibilities you described for those positions,

22  how many years of experience collectively do you have in the

23  training of polling place staff?

24  **A.**  About 24 years total.

25  **Q.**  And how many years of experience collectively do you have

1 related to the logistics inside or outside of polling places?

2 **A.** About 24 years.

3 **Q.** Given that extensive experience, how familiar are you with

4 training for polling place staff as well as the operations inside

5 and outside of polling places?

6 **A.** I'm fairly familiar with the procedures and training both

7 inside and outside polling places.

8 **Q.** Where did you work before working in election administration?

9 **A.** Prior to working in elections administration, I was a member

10 of the Armed Forces, a 20-year retiree from the military.

11 **Q.** Thank you for your service, Mr. Brower.

12     Now, I want to talk specifically about election administration

13 operations outside of polling places based on your experience in

14 Fulton County and activities that might take place there.

15     Are you familiar with the term "line relief"?

16 **A.** Yes, I've become familiar with the terminology of line relief.

17 **Q.** What does the term "line relief" mean?

18 **A.** The term "line relief" to me means that there is perhaps a

19 civic organization or a group that would like to present

20 themselves at the polling place to provide comfort items of

21 minimal value to those who may be waiting in line to vote.

22 **Q.** As Fulton's election chief, if you received a complaint about

23 line-relief activities, what were the next steps you would take to

24 address that complaint?

25 **A.** We would -- our procedures were we would immediately send a

1  poll member or member of the poll management staff out to

2  investigate.  And if there was something or some infraction

3  occurring, then we would actually report that to the Secretary of

4  State, Elections Division.

5  **Q.**  I want to show you one complaint which is admitted as

6  Plaintiffs' Exhibit 35, and I believe there are copies on the

7  witness stand there.  I'm happy to provide a copy that I have here

8  as well.

9          MS. WINICHAKUL:  But we're going to publish it on the

10  screen, if that's all right, your Honor.

11  **Q.**  Do you see Exhibit 35 on your screen, Mr. Brower?

12  **A.**  I do.

13  **Q.**  What is this document?

14  **A.**  This is a document from the 2020 general election of a

15  complaint -- or notification, if you will, sent to the former

16  director, Mr. Richard Barron, and myself from a state investigator

17  indicating that there was someone out actually providing drinks --

18  I mean refreshment items at a polling place.  We found out that

19  polling place later to be CT Martin Recreation Center.

20  **Q.**  Could you tell me how this complaint was handled.

21  **A.**  We sent the poll manager out, and probably at that time we

22  typically have security at each of our polls, to investigate.  And

23  if that is the case, we ask the person to leave -- then leave from

24  the buffer zone because, as I recall, this person was inside of

25  the buffer zone.  And if he or she didn't immediately cease and

1  desist, pack up and move outside of the buffer zone, we would then

2  report this to the Secretary of State's Elections Division for

3  further action.

4  **Q.**  And if a complaint like this required further investigation,

5  would you have been involved in that?

6  **A.**  No.  Once we report it to the Secretary of State, they make

7  the call, collect statements and decide whether or not to bring it

8  before the Board for appropriate action.

9  **Q.**  And if the Secretary of State decided to advance the

10  investigation, would you have any involvement in that

11  fact-finding?

12  **A.**  No, I would not, other than, you know, what we've already

13  done.  Oftentimes if there is nothing further to -- for the

14  Secretary of State to do or, you know -- if I had been involved, I

15  would have probably been asked to appear before the Board and

16  provide testimony to the fact, et cetera, but...

17  **Q.**  So were you involved in any further investigation of this

18  complaint by the Secretary of State's Office?

19  **A.**  No.  This was during the November 2020 general election, and

20  my tour of duty probably ended shortly after that, this election.

21  **Q.**  What's your understanding of SB 202's changed the law

22  affecting line-relief activities?

23  **A.**  As I understand and -- read and understand the law, it states

24  that any activity of line-relief personnel within the 150-foot

25  buffer or within 25 feet of a person standing in line, waiting in

line to vote, if that line extend beyond 150 feet, it's

prohibited.

**Q.** And that also includes -- you mentioned the 150-foot buffer.

Are there other distance restrictions that you're aware of?

**A.** Yes.  There's an addition of 25 feet from anyone waiting in

line to vote, again, if that line extend beyond 150 feet from the

polling place.

**Q.** How do you know this?

**A.** Well, generally I -- you know, I kind of listen to the news

and generally kind of follow elections, not in any great detail

now.  And I was always kind of interested in -- during the

legislative session what kind of come out concerning the

elections.

**Q.** Have you seen the law and the provision changing -- of SB 202

change the law affecting line-relief activities?

**A.** Yes.

**Q.** Mr. Brower, in your 24 years of election administration

experience in Georgia, have you implemented court-ordered changes

to operations inside or outside of a polling place?

**A.** Yes, I have.

**Q.** Have any of these court-ordered changes occurred close in time

to the start of advance voting period or even Election Day?

**A.** Yes.

**Q.** How does Fulton County implement last-minute court-ordered

changes based on your experience?

**A.**  Usually we have been provided some notification, first of all, of the court-ordered change through the OEBs, Official Election Bulletin.  And once we sat down and analyzed what the change consist of, we actually bring the staff, the poll management staff primarily, into a training session.  And usually we do that virtually if it's close to election and kind of talk about it, the impact of the change, and as well as we prepare the necessary documents if signage is required to post at polls notifying the public of the change, as well as we will submit a -- what we call a supplemental information document to all of our poll officials advising them of the change.

**Q.**  If the Court ordered the line-relief ban to be lifted close to the advance voting period, what would Fulton County have to do based on your experience?

**A.**  Based on my experience -- if the Court was to implement this change that we're talking about, SB --

**Q.**  Yes.

**A.**  Okay.  Yes.  What we would do would actually pretty much be the same thing.  If it was close to election, we will actually have online training, you know, to have some discussion about the change, as well as how it's going to impact the polling place, and allow poll managers to ask any questions that they may have concerning the change.

**Q.**  For the online training you just referenced, how long do you estimate that training class would take based on your experience?

1   **A.**   I estimate that training class would probably -- looking at

2   the -- what would have to be done in terms of implementing this

3   change, probably about 90 minutes.

4   **Q.**   And based on your experience, how many 90-minute online

5   training classes would Fulton County have to host in order to

6   train all poll management staff in advance of an advance voting

7   period?

8   **A.**   This particular change, if it was implemented prior to advance

9   voting, probably would be about three classes.  We don't have as

10  many advance voting sites as we obviously would have on Election

11  Day.  But if it was a requirement that came down right before

12  Election Day, we would probably have to run probably four to five

13  classes.

14  **Q.**   What if a poll manager couldn't make it to one of those online

15  training classes?

16  **A.**   What we would do -- actually, we always require -- pitch this

17  training to not only the poll managers but the poll management

18  staff.  Each poll has a manager and two assistants, so we would

19  make sure at least one of the assistants was in the class.  And

20  then they in return would pass this information down to the poll

21  staff during their huddle on election morning.

22  **Q.**   So, Mr. Brower, how close to the advance voting period could

23  Fulton County implement this change?

24  **A.**   Based on my experience, I'm thinking perhaps closest would

25  probably be one day before the start of advance voting.

1  **Q.**  How close to the start of -- how close to Election Day could

2  Fulton County implement this change?

3  **A.**  Probably about one day as well.

4  **Q.**  And remind me, how does the size of Fulton County's poll

5  worker force compare to other counties?

6  **A.**  Fulton County is the largest county in the State of Georgia.

7  We have about 300 polls, but probably about 275 locations because

8  some of those polls have two polls -- they're split polls, they

9  have two polls, in some cases maybe three polls in there.

10  **Q.**  So how hard would it be for the county with the largest number

11  of poll workers and polling stations to make those changes within

12  one day before advance voting starts or one day before Election

13  Day starts?

14  **A.**  It would not be difficult based on the nature of the change.

15  And, again, I want to make sure everyone understands, I'm talking

16  about this specific change, or we would revert back to the

17  procedures for line warming as they were before.

18  **Q.**  I would like to ask you about one statement that you made in

19  your supplemental declaration, which is Plaintiffs' Exhibit P2.

20  And, again, there are copies on the witness stand, but I'm going

21  to ask that it be published on the screen.  And I see that it has.

22     I'm looking at page five of your supplemental declaration,

23  paragraph eight, where you discuss a citizenship verification

24  process change.  Based on your 24 years of experience in election

25  administration in Georgia, how does the administrative cost and

1  burden of lifting the line-relief ban compare to the cost and

2  burden of having implemented the citizenship verification process

3  change?

4  **A.**  The cost will be negligible in terms of implementing the line

5  warming change, essentially involve notifying the poll officials,

6  poll management staff, if you will, and actually posting --

7  distribution and posting of any requisite signage to notify the

8  public of the change.

9  **Q.**  Mr. Brower, based on your 24 years of experience in election

10 administration in Georgia, how difficult would it be to lift the

11 line-relief ban?

12 **A.**  Not difficult at all.  Again, as I mentioned before, this is a

13 pretty basic change, it would basically be one of reverting back

14 to procedures that were in place prior to SB 202 change concerning

15 line warming.

16              MS. WINICHAKUL:  Thank you, Mr. Brower.

17              No further questions at this time.  I'll pass the

18 witness.

19                         CROSS-EXAMINATION

20 BY MR. BARTOLOMUCCI:

21 **Q.**  Good morning, Mr. Brower.

22 **A.**  Good morning.

23 **Q.**  My name is Chris Bartolomucci, and I represent the state

24 defendants in this case.

25 **A.**  Okay.

1  **Q.**  I just wanted to ask you a few questions.

2      Now, you said that you retired as the Fulton County Election

3  Chief in 2019, right?

4  **A.**  That's correct.

5  **Q.**  Then you came back on a contract in 2020 for about six months,

6  is that right?

7  **A.**  That's correct.

8  **Q.**  So you worked during the November 2020 general elections,

9  right?

10  **A.**  That's correct.

11  **Q.**  But you were not working for Fulton County during the primary

12  elections in June of 2020 or during the Senate runoff elections in

13  January of 2021, right?

14  **A.**  That's correct.

15  **Q.**  Now, you are familiar with the term "the buffer zone," right?

16  **A.**  That's correct.

17  **Q.**  What is the buffer zone?

18  **A.**  The buffer zone is that distance between the polling place and

19  where voters may -- where voters may campaign, et cetera.  It's

20  the buffer zone, the outermost distance, 360 degrees, around a

21  polling facility.

22  **Q.**  And you testified that the buffer zone extends 150 feet from

23  the polling place and 25 feet from any voters standing in line,

24  right?

25  **A.**  That's correct.

**Q.**  Now, outside the buffer zone individuals can do a lot more
than they can do inside the zone, true?

**A.**  That's correct.

**Q.**  So outside the buffer zone a person can hold up a sign that
says, stay in line, cast your vote, right?

**A.**  Yes, they could.

**Q.**  And outside the buffer zone a group could set up a table and
pass out food and water to anyone who comes to the table, right?

**A.**  That's correct.

**Q.**  And outside of the buffer zone, before voters get in line to
vote, an organization could pass out food and water to those
voters before they get in line, right?

**A.**  They could.

**Q.**  And SB 202 allows all of those activities outside of the
buffer zone, right?

**A.**  That's correct.

**Q.**  Now, let's talk about inside the buffer zone.

Am I right that even before SB 202 there were restrictions on
what non-voters could do inside the zone, is that right?

**A.**  That's my understanding, yes.

**Q.**  So even before SB 202, for example, electioneering was not
allowed inside the buffer zone?

**A.**  That's correct.

**Q.**  Now, as a former chief of elections, would you agree with me
that forbidding electioneering within the buffer zone serves

1  important purposes?

2  **A.**   Yes, I agree.

3  **Q.**   And would you agree with me that those important purposes

4  include the orderly and efficient administration of elections?

5  **A.**   Yes.

6  **Q.**   Now, as a former chief of elections, would you agree with me

7  that it would be improper for a non-voter to approach a voter

8  standing in line and hand that person a $20 bill?

9  **A.**   I agree.

10  **Q.**   Why is that improper?

11  **A.**   It's illegal.  It's illegal now.  I don't know, you know --

12  repeat that question again.

13  **Q.**   Yeah.  So let's say a non-voter, someone who is not standing

14  in line to vote, but a non-voter approaches someone who is

15  standing in line to vote and just hands them a $20 bill, is it

16  your testimony that that's unlawful?

17  **A.**   Yes, it is.

18  **Q.**   And is it also your testimony as a former chief of elections

19  that that's improper behavior?

20  **A.**   Yes.

21  **Q.**   Now, if other voters saw that happen, they might think it was

22  vote-buying, right?

23  **A.**   Could be, yes.

24  **Q.**   Now, is it still improper if instead of handing out a $20 bill

25  the voter is given an item of comparable value, let's say a

1  hardback book worth $20, is that also improper?

2  **A.**   Yes.  As I understand the Election Code, that would be

3  improper.

4  **Q.**   Let me change the hypothetical a little bit.  Would you agree

5  with me that it is improper for a non-voter to approach a voter

6  standing in line, hand the voter a bottle of water and say, I hope

7  you will consider voting for Candidate Smith?

8  **A.**   That would be very improper, yes.

9  **Q.**   And that's true even if the voter is standing in a very long

10 line, right?

11 **A.**   Yes.

12 **Q.**   And that's true, meaning it's improper, even if it's a very

13 hot day and the voter is very thirsty, right?

14 **A.**   Yes.

15 **Q.**   Would you agree with me that some voters standing in line

16 to vote don't want strangers coming up to them to start a

17 conversation?

18 **A.**   In my 24 years of experience, I have never had a complaint

19 from someone saying that, you know, someone is harassing me while

20 I'm standing in line to vote.

21 **Q.**   But knowing people and voters, do you think it's likely to be

22 true that some people who are in line to vote don't want people

23 they don't know coming up to them and trying to talk to them about

24 this or that?

25 **A.**   Yes.

1          MS. WINICHAKUL:  Objection, speculation.

2          THE COURT:  Any response?

3          MR. BARTOLOMUCCI:  I think given his 24 years of

4   experience as election chief he has the knowledge to answer the

5   question.

6          THE COURT:  Overruled.

7          THE WITNESS:  That's possible, some people could not.

8   BY MR. BARTOLOMUCCI:

9   **Q.**  Now, if there are a lot of interactions between voters

10  standing in line to vote and non-voters who are coming up to them

11  to say something or to hand them something, an item, that can

12  cause problems from an election administration standpoint, right?

13  **A.**  It could.  However, typically -- and I can't speak for every

14  county, I know in Fulton County we had line monitors, that was

15  part of their job, to constantly walk the lines, to monitor the

16  lines to see what was going on, as well as, you know, some other

17  functions, you know, verify registrations and that type thing.

18  **Q.**  In fact, the need to have line monitors is one of the

19  potential problems that come when you allow these voter/non-voter

20  interactions, right?

21  **A.**  Well, no, we had line monitors, they perform other duties,

22  namely to -- with mobile devices to verify registration of a

23  voter -- potential voter before they stand in line to only get to

24  the entrance to the poll to find out that they're not registered

25  at that poll.

1  **Q.**  How many line monitors would you typically have at a polling

2  location in Fulton County?

3  **A.**  Depending on the size, probably the most would be about four.

4  **Q.**  Four, okay.

5      Would you agree with me that the more interactions there are

6  between voters in line and non-voters coming up to them the

7  greater the chance that some of the interactions will be improper?

8      I need a verbal response, sir.

9  **A.**  Say that in another way, sir.

10  **Q.**  I'll ask the question again.  Would you agree with me that the

11  more interactions there are between voters in line and non-voters

12  coming up to speak with them the greater the chance that some of

13  the intersections will be improper?

14  **A.**  I don't know if I agree with that because typically you see

15  voters standing in line talking to each other, you know.  But you

16  say a non-voter, correct?

17  **Q.**  Non-voter.

18  **A.**  Could be.

19  **Q.**  If there are a lot of interactions between voters standing in

20  line and non-voters coming up to them, that could slow down the

21  line, couldn't it?

22  **A.**  It could.

23  **Q.**  Now, you provided two declarations in this case, right?

24  **A.**  That's correct.

25  **Q.**  Now, in your first declaration, in paragraph nine you said,

1    and I'll quote it, "During my time as senior election

2    administrator in Fulton County, I neither saw nor heard any

3    evidence of volunteers who were providing water or food at a

4    polling location attempted to influence individual's votes."

5    Did you say that?

6    **A.**   Yes.

7    **Q.**   Now, just because you didn't see non-voters attempting to

8    influence voters while handing out water, that doesn't mean it

9    didn't happen, right?

10   **A.**   That is correct.  However, if those type things happened,

11   that's part of the line monitor's duties to let us know.

12   **Q.**   But you can't rule out the possibility that some people

13   handing out water will attempt to influence voters who are

14   standing in line to vote, right?

15   **A.**   I cannot but, again, that's just never been my experience in

16   the 24 years I worked elections.

17   **Q.**   Now, there are more than 300 or 400 polling locations in

18   Fulton County, right?

19   **A.**   That's correct.

20   **Q.**   When you served as election chief, you didn't go to every

21   polling location on Election Day, did you?

22   **A.**   No, I did not, not every poll.

23   **Q.**   And you didn't go to any polling places in other counties, did

24   you?

25   **A.**   No.

1   **Q.**   Do you know how many counties there are in Georgia, sir?

2   **A.**   Yes.

3   **Q.**   How many?

4   **A.**   I think it's 100.

5   **Q.**   Would it surprise you to learn there are 159 counties?

6   **A.**   150, I'm sorry.  159, yes, I'm sorry.

7   **Q.**   And you don't claim to know what happens on Election Day

8   outside of Fulton County, do you?

9   **A.**   Not at every poll, no.

10  **Q.**   And you did not work for Fulton County during the June 2020

11  primary or the January 2021 Senate runoff, right?

12  **A.**   No, sir, I didn't.

13  **Q.**   Are you aware that SB 202 was enacted in part because of what

14  happened in those two elections?

15  **A.**   No, I was not.

16  **Q.**   But you were not the election chief during those two

17  elections?

18  **A.**   I was not, no.

19  **Q.**   Now, poll workers on Election Day, do they spend most of their

20  time inside the polling place or outside doing something else?

21  **A.**   Most of our poll -- the bulk of our polling staff spent most

22  of their time inside the polling place.

23  **Q.**   So while they're inside the poll, they're not watching and

24  they can't watch what's going on in the line outside, right?

25  **A.**   Not on a continuous basis, but part of their requirement is to

1  kind of walk outside and monitor the lines and see what's going on

2  out there.

3  **Q.**  You said in your first declaration that poll workers have a

4  large number of responsibilities, is that right?

5  **A.**  Yes.

6  **Q.**  So keeping an eye on the line is only one of many jobs that

7  they do during an election?

8  **A.**  That's correct.

9  **Q.**  Poll workers can't monitor every verbal interaction between

10  voters in line and people from organizations who are inside the

11  buffer zone, true?

12  **A.**  That's correct.

13  **Q.**  Now, during your direct examination you -- we put up an e-mail

14  from Frances Watson to Mr. Barron and to you on November 3rd,

15  2020, right?

16  **A.**  Yes.

17  **Q.**  And that was a complaint about organizations setting up inside

18  the buffer zone and handing out food and water, right?

19  **A.**  That's correct.

20  **Q.**  Now I think you testified that that complaint would have been

21  addressed or was addressed, is that right?

22  **A.**  Yes.  I think I testified to the fact that -- and typically

23  when we receive a complaint of this nature or as Ms. Watson asked

24  us to follow up to see what was going on and then report back to

25  her, so I'm sure that's what happened.

1  **Q.**  Now, if something improper happens, you can address it, but

2  would you agree with me that it would be better if the activity

3  didn't happen at all?

4  **A.**  Well, I agree, yeah.  We prefer that it not happen.

5           MR. BARTOLOMUCCI:  Thank you, Mr. Brower.

6           No further questions, your Honor.

7           MS. WINICHAKUL:  Just a few more questions, your Honor.

8  Can I have just one minute?

9           THE COURT:  Of course.

10          MS. WINICHAKUL:  Thank you.

11                        REDIRECT EXAMINATION

12 BY MS. WINICHAKUL:

13 **Q.**  Mr. Brower, prior to SB 202 were there laws in place governing

14 the outside of a polling place in that buffer zone that

15 Mr. Bartolomucci mentioned?

16 **A.**  Yes.

17 **Q.**  And what were those laws?

18 **A.**  Those -- there were laws that talked about giving of gifts,

19 you know, to folks waiting in line to vote.  You know, just

20 various things that dealt with enacting (sic) with voters outside

21 the line were illegal, or intimidation was one of those.

22 **Q.**  You mentioned giving gifts.  Can you elaborate on that.

23 **A.**  Well, it -- the law read that it is illegal to give a gift to

24 a voter as a condition for voting for a particular candidate or

25 for a particular measure on the ballot.

1  **Q.**  Do you know if these laws that you mentioned, intimidation I

2  think you mentioned and giving a gift in exchange for a vote, do

3  you know if these laws are still in place after the passage of

4  SB 202?

5  **A.**  It is my understanding that they are still in place.  I think

6  those laws, if I recall correctly, was 21-2-576 and 21-2-570 I do

7  believe.

8  **Q.**  Mr. Bartolomucci mentioned a hypothetical regarding non-voters

9  approaching voters in line.  In your 24 years of election

10  administration experience in two counties and then 13 years of

11  administration -- election administration experience in Fulton,

12  have you ever encountered a complaint in which line relief --

13  excuse me, let me strike that.

14      In your experience of 24 years of election administration in

15  Georgia, 13 years in Fulton, have you ever seen any evidence that

16  amounted to line-relief activities that crossed the line into

17  those impermissible activities you just mentioned?

18  **A.**  I did not.  I have not, no.

19  **Q.**  Are there currently some individuals that can approach voters

20  in the buffer zone?

21  **A.**  Yes.  Poll managers, poll watchers, poll staff, security.  And

22  I think state investigators can.

23  **Q.**  What about the press?

24  **A.**  Yeah, the press can.  We have allowed the press to actually go

25  into the polls or -- and actually just pan, give some footage for

1  news, for the media.

2  **Q.**  What about exit pollsters?

3  **A.**  Exit pollsters are outside of the polling place, supposed to

4  be 25 feet from the place of departure from the building in the

5  polling place.

6  **Q.**  Sorry, can you repeat that again.  25 --

7  **A.**  25 feet at the exit of the polls, the polling place I mean,

8  those folks are permitted, exit pollsters.

9  **Q.**  Has SB 202 and the line-relief ban eliminated the need for

10 line monitors to the best of your knowledge?

11 **A.**  No, the line -- the line monitors would still be -- would

12 still be used at our polling places.

13 **Q.**  And final question for you, Mr. Brower.  You've retired after

14 serving your country for 20 years in the military and then 24 more

15 years administering elections, why did you submit a declaration in

16 this case and come to court today?

17 **A.**  Well, I've always had a love for civic engagement,

18 participation in the election process.  My beginnings with

19 elections really start in the military as a voting assistance

20 officer in 1978, just kind of assisting soldiers within the unit

21 as to how they can request an absentee ballot to participate in

22 the process.

23     So just as a matter of my love for civic engagement and

24 participation in the election process I opted to submit this

25 declaration.

```
 1              MS. WINICHAKUL:  Thank you, Mr. Brower.

 2              No further questions.

 3              THE COURT:  Any recross?

 4              MR. BARTOLOMUCCI:  No, your Honor.  Thank you.

 5              THE COURT:  Sir, you can step down.  Thank you.

 6              (Witness excused)

 7              THE COURT:  Please call your next witness.

 8              MR. SIEFF:  Plaintiffs have no further witnesses, your

 9    Honor.

10              THE COURT:  All right, very well.

11              Does the defense have any witnesses?

12              MR. TYSON:  Yes, your Honor.  We have three witnesses,

13    and I believe Mr. Field will call Mr. Germany to get us started.

14              THE COURT:  All right.  Very well.

15              Good morning.

16              COURTROOM DEPUTY CLERK:  Mr. Germany, if you can hear

17    me, if you can please raise your right hand.

18              (Pause for technical issues with Zoom technology)

19              COURTROOM DEPUTY CLERK: Mr. Germany, can you speak into

20    the microphone.  Mr. Germany, let's see if we can hear you now.

21              MR. GERMANY:  Hello.  Can you hear me now?

22              COURTROOM DEPUTY CLERK: Yes, sir.

23              MR. GERMANY:  Okay.

24              COURTROOM DEPUTY CLERK:  We'll do that one more time.

25    If you don't mind raising your right hand again.
```

```
 1                          RYAN GERMANY

 2            a witness herein, being first duly sworn,

 3       was examined and testified via Zoom technology as follows:

 4                    _____

 5            COURTROOM DEPUTY CLERK:  Thank you.

 6            And anyone who is on the Zoom call just viewing, please

 7   make sure your video is off.  Thank you.

 8                         DIRECT EXAMINATION

 9   BY MR. FIELD:

10   Q.  Good morning, Mr. Germany.  Could you state --

11   A.  Good morning.

12   Q.  Could you state your name and spell your last name for the

13   court reporter, please.

14   A.  Ryan Germany.  Germany is like the country, G-E-R-M-A-N-Y.

15   Q.  Are you currently employed as the general counsel at the

16   Secretary of State's Office?

17   A.  Yes.

18   Q.  How long have you had that role?

19   A.  I started that role in January of 2014.

20   Q.  And speaking generally, what are your election-related

21   responsibilities in that position?

22   A.  My position encompasses every division of the agency, but from

23   an election standpoint I work with our elections division on a

24   daily basis on all kinds of different legal issues, whether it's

25   litigation, questions -- any questions that they may have.  I also
```

1  assist the State Election Board with their duties.  And I also

2  talk to county election officials from time to time when they

3  reach out to me.

4  Q.  I would like to discuss polling locations themselves with you

5  for a bit.  Are you familiar with the term "buffer zone" if I use

6  that?

7  A.  Yes, sir.

8  Q.  Can you describe briefly what you understand that term to

9  mean.

10  A.  Buffer zone is really the 150-foot area around the polling

11  place, and then also 25 feet from voters in line if it extends

12  past 150 feet that -- where no electioneering is allowed, no

13  campaigning, that's the buffer zone.

14     I mean, I would say that generally a line does not go past

15  that 150-foot buffer zone.  In case it does, that's where that

16  kind of 25 foot from voters in line part of it comes up.

17  Q.  And you mentioned electioneering.  Are there any other

18  activities that are prohibited before SB 202 in that buffer zone?

19  A.  Yes.  You know, electioneering I use kind of generally, but

20  campaigning which I think that would encompass.  You're not

21  allowed to seek signatures for any kind of petition.

22     Another change that we made, the General Assembly made in 2017

23  was you're not allowed to set up tables in that buffer zone if

24  you're kind of a third-party group.

25  Q.  What is the purpose of the buffer zone?

**A.** I think it's really to ensure that voters are not bothered
while they're in line. It's meant to be kind of a peaceful, calm
experience when they get there to vote. There's obviously a lot
of campaigning during election season, but it's all meant to stop,
you know, in that buffer zone.

   And then I think it's also to help to ensure kind of a smooth
operation of the polling place, you know, to -- the purpose of the
polling place is to allow voters to cast their vote, you know,
peacefully without being bothered or annoyed. And then to -- and
the poll workers are really meant to -- are really meant to
basically make that process work. And, you know, kind of the less
other things going on in the polling place, the better those two
things can happen.

**Q.** You mentioned line length a moment ago, and I would like to
have you explain briefly line length at polling locations in
Georgia over the last several election cycles.

**A.** I'm sorry, what was the question? About line length I know.

**Q.** Certainly. With respect to line length, can you just describe
generally what the line length has been like to your knowledge
over the last several election cycles.

**A.** Sure. So I would say we definitely see lines in Georgia
really toward the end of early voting. Early voting is kind of a
different animal because you can vote -- a voter can vote at any
early voting location in the county. There's three weeks of early
voting. So toward the last couple days of it especially, it can

1  be pretty heavy.  I think that's kind of an expected thing.  At

2  this point voters seem to understand that aspect of it.

3      On Election Day we have seen some lines in a few places in

4  the past few election cycles, we're talking about 2018 and then in

5  the June 2020 primary.  Line length I think is really -- it's very

6  dependent on the county, and even within the county dependent on

7  the specific location.  So overall I think line length has been

8  pretty good in Georgia with some exceptions that are generally

9  talked about in the news quite a bit.

10 **Q.**  So you mentioned the 2020 primary.  Were there any factors in

11 particular that led to longer lines in certain locations in that

12 primary election?

13 **A.**  Yes.  In the June 2020 primary we saw some long lines,

14 particularly in a few locations in Fulton County, specifically at

15 the Park Tavern location.  Some of the factors that led to that

16 were -- the main factor I think was COVID where polling places --

17 certain polling places were not making themselves available so the

18 county had to find different polling places.  Certainly poll

19 workers, especially elderly ones, were not wanting to participate

20 understandably, and so they had to find new poll workers as well.

21     And then that was also the first election that the counties

22 were utilizing the new election equipment, so that was interesting

23 as well.  One thing we've learned, particularly about Fulton, they

24 were hiring poll workers the weekend before the election and the

25 only training that was happening was online.  So that was a bit

1  frustrating to learn because we had been sending them a lot of

2  poll workers through different recruiting efforts that our office

3  was doing.

4      But I think all those factors contributed to long lines at

5  certain locations in Fulton in June of 2020.

6  **Q.** Let's discuss briefly the division of responsibilities between

7  counties and the state when it comes to some of these decisions.

8      So first what responsibilities fall to counties that may

9  affect line length?

10 **A.** The counties administer elections in Georgia, so most of these

11 things are going to fall to the county.  The county determines

12 how many precincts they have in their county, which that then

13 determines how many registered voters are in each precinct.  They

14 determine the polling places in each precinct.  Of course, they're

15 limited by the actual facilities that are available.

16     Counties determine the amount, the number and amount and who

17 the poll workers are in each polling place.  They also determine

18 the allocation, the number of election equipment in each polling

19 place, whether it's the poll pad check-in devices, ballot marking

20 devices, the scanners, all those fall to the county.

21 **Q.** So if there's a complaint that a county had too few polling

22 locations and that caused long lines, who is responsible for that

23 decision for the number of polling locations?

24 **A.** The county.

25 **Q.** And then next, what responsibilities fall to the state that

may affect line length?

**A.**   Well, one decision that -- one responsibility that does lie with the state is the type of election equipment.  So the General Assembly determined the type of election equipment, the equipment was then provided to the counties.  So, you know, that could affect lines, I'm not sure that it does positively or negatively.

I know one thing we were concerned about with the new equipment as compared to the older DRE machines, now you have to scan your ballot at each polling place, so there's kind of a funnel that each voter now has to go through that they previously didn't, so that was something we were paying a lot of attention to implementing this new election system.

**Q.**   And other than that, are there any other responsibilities that fall to the state?

**A.**   We've taken on some things voluntarily to try to help counties.  One thing that we did was in 2020 and again in this -- we'll be doing it this year, we utilized a tool from MIT that you basically put into the tool how many voters are in the precinct, what kind of turnout you might expect, and then you can put in the number of poll workers, the type of -- the number of election equipment, amount of election equipment that you're planning on deploying.  We got those numbers from the county, ran them through the MIT tool and then shared the results with the counties.  The tool will tell you, okay, hey, this might be a bit of a yellow flag here, you might need to increase your -- some election

1  equipment or something like that.

2      The other thing that we did in 2020, and will be doing it

3  again this year, is we implemented a tool to really give sort of

4  some statewide visibility into line length.  We used a kind of a

5  Geo-Location tool to help visualize the -- the reported line

6  length that was at different polling places.

7  Q.  And based on these tracking tools, approximately how long was

8  the average wait time in Georgia during the 2020 general election?

9  A.  According to that tool the average wait time during the 2020

10 general was about three minutes.

11 Q.  Again, I would like to pause there for just a moment.  Do you

12 have a copy of Dr. Pettigrew's response report with you?

13 A.  Yes, I do.

14      MR. FIELD:  For clarity, that is marked as Defendant's

15 Exhibit 37, it was attached to AME plaintiffs' reply brief.

16 Q.  I would like to direct you to the sentence at the bottom of

17 the first page, it carries over to the second page.  Do you see

18 there where Dr. Pettigrew suggests that his estimate of

19 15.4 minutes of wait time is more accurate than your estimate?

20 A.  Yes, I do.

21 Q.  And I would like to address a few questions that he then asks.

22      So, first, in the middle of page two Dr. Pettigrew says,

23 "First, it is not clear from Mr. Germany's declaration how many

24 precincts utilized this new technology."

25      Dr. Pettigrew continues, "If it was not available in every

1    precinct in the state, then the data could have selection bias if

2    random sampling was not used to determine which precincts would

3    receive it."

4        In how many precincts was this technology made available?

5    **A.**   In all of them.

6    **Q.**   So then next, at the end of that same paragraph, he says that

7    your approach may have been impacted by, "Selection bias resulting

8    from poll workers at busy precincts not having the bandwidth to

9    record this information in a timely or accurate manner."

10       Were the times reported by poll workers?

11   **A.**   No, they were reported by Dominion techs who were in each

12   polling place.  Dominion is the voting system vendor, and they had

13   technical staff available in each polling place for that election

14   because it was the first one.  So this was one of their

15   responsibilities.

16   **Q.**   Then one other question here, in the final sentence on page

17   two Dr. Pettigrew appears to read your declaration as stating that

18   line length was measured just three times each day at the polling

19   location; he says, morning, midday and before the polls closed.

20   Is Dr. Pettigrew correct?

21   **A.**   No.   The instructions for November 2020 were to record every

22   hour.

23   **Q.**   Where do you think he's getting that three times a day

24   statement?

25   **A.**   That comes from a requirement in SB 202 that was passed after

the 2020 election.

**Q.**   And speaking of SB 202, did it include any provisions that address line lengths?

**A.**   Yes.  It includes that provision that we just talked about where counties now have to track line length.  The other thing that they have to do is if there's a line of over an hour at any point during Election Day, they have to take action before the next election, which is either split the precinct, have additional personnel or workers or deploy more equipment.  And the State Election Board regulation requires that tracking at every polling place.

**Q.**   Now, in comparison to the 2020 primary election that we discussed earlier, did the Secretary of State's Office receive any complaints about line length during the recent May 2022 primary?

**A.**   Not that I'm aware of.

**Q.**   Now, are you familiar with the practice of non-governmental entities or third parties handing out food and drinks and other goods to voters in line?

**A.**   Yes.

**Q.**   Can you discuss briefly, how has that practice evolved since you joined the Secretary of State's Office in 2014?

**A.**   That practice wasn't something that was really on my radar, at least during the 2014 election.  And I don't even really remember it during the 2016 election, not to say it wasn't happening, but it certainly didn't seem like a widespread thing.

1    I remember really first hearing about it during the 2018

2 election.  And then in the 2020 election it became very prevalent,

3 and we heard about it quite a bit from county election officials

4 and also from voters.

5 **Q.**  And what types of things were you hearing about, what

6 activities were occurring?

7 **A.**  In 2020 it did seem to be like a much -- kind of larger than

8 it had been previously where there was a lot of -- we were hearing

9 about a lot of food trucks.  There was other types of things being

10 handed out that I think were -- seemed to be more so than just

11 snacks or water or things like that.  The main questions we were

12 getting from county election officials were is this legal, is

13 somebody allowed to hand out food in the buffer zone.

14    The complaints we were getting from voters were generally

15 among the same lines, that they saw somebody handing out food,

16 they thought that looked like campaigning, they didn't think that

17 was allowed.  The other allegation that I think voter complaints

18 kind of touched on is this giving of something of value for

19 voting.

20    And the third I think complaint, the third type of complaint

21 that we received about this sort of thing was sometimes if it's a

22 food truck in particular, it can sort of -- in one instance I can

23 recall the complaint was it was blocking the entrance and exit to

24 the parking lot, so kind of along the voter interference front.

25 **Q.**  And before SB 202 were there any laws that regulated this

1   activity.

2   **A.**   Yes.   Electioneering has always -- or at least as long as I've

3   been around, I think for a pretty long time, has not been allowed

4   in the buffer zone, so no campaigning, no electioneering.   And

5   then also the giving of something of value to vote or to not vote

6   has also long been not allowed.   And that's something that

7   typically comes up, and I think it will continue to come up

8   outside the buffer zone where people giving of things is -- it's

9   something we still get complaints about.   The question that our

10  investigators then have to go try to determine is -- and it's a

11  very factual inquiry, is this tied to voting.

12      The common one is like Krispy Kreme would give a free doughnut

13  to anyone wearing their "I Voted" sticker.   And we had to call and

14  say, hey, you can't do that, you can give free doughnuts to

15  basically everybody that day but you can't tie it to voting.   So

16  that's kind of the inquiry that we have to make.

17  **Q.**   But not withstanding those laws, did I understand your

18  testimony correctly that you said the Secretary of State's Office

19  still received questions about whether or not certain activity in

20  the buffer zone was legal or not, is that right?

21  **A.**   Yes.   Yes.

22  **Q.**   Who in the Secretary of State's Office would those questions

23  typically come to?

24  **A.**   They would typically go to our elections division.   I believe

25  our elections director would eventually receive it, or they would

1  go to our investigations division.

2  **Q.**  And during the 2020 elections, who was the elections director?

3  **A.**  Chris Harvey.

4  **Q.**  I would like to draw your attention to two documents, they're

5  marked as Defendants' Exhibits 40 and 41.  Do you have those in

6  front of you?

7  **A.**  Yes.

8       MR. FIELD:  And these are not yet admitted, your Honor.

9  **Q.**  Mr. Germany, do you recognize these documents?

10  **A.**  Yes.

11  **Q.**  Can you describe briefly what they are.

12  **A.**  Exhibit 40, it's an e-mail from Caroline Williams who is

13  the executive director of the Carroll County Elections and

14  Registration Office, to Chris Harvey asking for him to advise her

15  if it's permissible for organizations and community leaders to

16  distribute water and food to voters waiting in long lines to vote

17  on Election Day, would it be considered as electioneering or not.

18  **Q.**  And then the next one.

19  **A.**  And then Exhibit 41 is an e-mail starting off from Sabrina

20  German to Chris Harvey, this is before the November 2020 election,

21  asking Chris if permissible -- Sabrina is the director of the

22  Chatham County Voter Registration Office, asking Chris if it's

23  permissible for organizations to pass out water and snacks to

24  voters standing in early voting lines.  And then Chris responds

25  with -- explains it can be a tricky proposition, you cannot give

 1  anything in exchange for voting and sort of depends on the factual

 2  scenario.  He says there's simply not a black-and-white answer to

 3  this question.

 4  **Q.**  Are these the types of questions you were referencing that

 5  would come to Elections Director Harvey?

 6  **A.**  Yes.

 7       MR. FIELD:  Your Honor, I move the admission of Exhibits

 8  41 and 41

 9       MR. VARGHESE:  No objection.

10       THE COURT:  They're admitted.

11  BY MR. FIELD:

12  **Q.**  Now, when these types of questions come into the Secretary of

13  State's Office, does it require somebody in that office to spend

14  time reviewing them and answering them?

15  **A.**  Yes.

16  **Q.**  And does it require that individual or official to divert

17  their attention from some other task that they may be charged with

18  handling?

19  **A.**  Yes.

20  **Q.**  You mentioned complaint from voters.  We just talked about

21  questions from county officials.  Can you describe the volume of

22  these questions or complaints that came in, particularly in 2020.

23  **A.**  I can't speak to the exact volume.  I know in 2020 it

24  certainly felt like a pretty prevalent question that we were

25  getting, the question we were getting from county election

1  officials mostly, and then also a kind of persistent complaint

2  that we would get from multiple voters also.  I know we ended up

3  sending out a couple Official Election Bulletins on the topic, and

4  that is something that we really only do in the beginning with

5  kind of persistent questions about something.

6  **Q.**  Who writes -- let me step back.

7      What is an Official Election Bulletin?

8  **A.**  An Official Election Bulletin is something that comes from

9  our office and it goes to every county election director.  That's

10 trying to provide them with some guidance or information or

11 answers to persistent questions that we feel -- especially if it's

12 something that we're hearing from multiple counties, it's not kind

13 of geographically limited to just one or two counties.

14 **Q.**  Would you say that it's time consuming to draft an Official

15 Election Bulletin?

16 **A.**  Yes.

17 **Q.**  Do you recall attaching one such bulletin to your declaration?

18 **A.**  Yes.

19 **Q.**  Do you have a copy of that one with you?

20 **A.**  Yes.

21 **Q.**  If you can take a look at that.

22         MR. FIELD:  And this is an October 26th, 2020, bulletin.

23 It is at Exhibit B within Defendants' Exhibit 46, which is

24 Mr. Germany's declaration.

25 **Q.**  Let me know when you have it.

**A.**   I have it.

**Q.**   Great.  What's the subject line of this particular OEB?

**A.**   "Polling Place Concerns."

**Q.**   And what does it say in the first paragraph regarding why this particular OEB was issued?

**A.**   There have been several persistent questions around several topics --

          (Interruption by the court reporter)

BY MR. FIELD:

**Q.**   Could you read that again, Mr. Germany.

**A.**   There have been several persistent questions around several topics, so I want to give a direction on three topics.

**Q.**   And looking at Section 2 still on that first page, what is the topic addressed in that section?

**A.**   Voters receiving refreshments while in line to vote.

**Q.**   And if you look at the bottom of that page, there's a paragraph that begins with "voters standing in line."  Could you please read that.

**A.**   Voters standing in line even beyond the 150-foot mark are/should, it's meant to say "should," generally be free of approaches from bystanders, even those with good intentions of offering refreshments for at least 25 feet.

**Q.**   Can you continue for the next sentence.

**A.**   A better option would be to have any group who wants to offer refreshments to anyone, not only those voting, set up an area

1   outside of the 150-foot line and 25 feet away from voters in line

2   where voters can approach the group to receive refreshments.

3   **Q.**   Do you agree with that sentiment?

4   **A.**   Yes.

5   **Q.**   Then in the next paragraph, we're on page two of that OEB, it

6   reads, "Also, depending on the organization that is distributing

7   water, there could arise allegations or perceptions of having a

8   political agenda."  Do you see that?

9   **A.**   Yes.

10  **Q.**   Do you agree with that sentiment?

11  **A.**   Yes.

12  **Q.**   Can you explain why is it that a voter might perceive an

13  organization handing out water as having a political agenda?

14  **A.**   We received complaints alleging that very thing following the

15  2020 election, there's a lead up to it and following the 2020

16  election.

17      A lot of the complaints we received I think were from people

18  who weren't necessarily approached themselves but who I think

19  witnessed an interaction and might have been a few people away in

20  line.  So I don't -- they couldn't necessarily hear what was being

21  said, so I think, you know, that interaction itself, it allows

22  people to have that perception.

23  **Q.**   So in addition to the October 26th, 2020, OEB we just

24  discussed, I would like to discuss one other one with you.  There

25  was one issued on December 28th, 2020.  Do you have a copy of

1   that?

2   **A.**   Yes.

3           MR. FIELD:  Your Honor, that is at Defendants'

4   Exhibit 39, it is not yet admitted.

5   **Q.**   Mr. Germany, have you seen this document before?

6   **A.**   Yes.

7   **Q.**   Can you describe briefly what it is?

8   **A.**   This is an Official Election Bulletin that was issued on

9   December 28th, 2020.  The subject matter is "Giving and Receiving

10  Things of Value For Voting and Line Warming."

11          MR. FIELD:  Your Honor, I would move the admission of

12  Defendants' Exhibit 39.

13          MR. VARGHESE:  No objection.

14          THE COURT:  It's admitted.

15  BY MR. FIELD:

16  **Q.**   Why would there be another OEB issued on the same subject we

17  just discussed two months later in December?

18  **A.**   Well, following the November 2020 election, the state went

19  into a very high profile runoff regarding the Senate in January

20  of 2021, and there was a lot of interest in that from across the

21  country.  So I think the reason that we would issue this is

22  because we were still getting questions and getting allegations

23  about this same topic.

24  **Q.**   And in the middle of the first page do you see a paragraph

25  that begins "the appearance of food trucks"?

1 **A.**   Yes.

2 **Q.**   Could you read that paragraph.

3 **A.**   The appearance of food trucks, doughnuts, free coffee, snacks,

4 other items of value given to voters even beyond the 150-foot

5 distance limits have the possibility of being seen as rewarding

6 people to vote in violation of the previously stated law.

7 **Q.**   And do you agree with that sentiment?

8 **A.**   Yes.

9 **Q.**   And then at the top of page two, this bulletin goes on to say,

10 "Offers of anything of value, including food and drinks that could

11 be considered a 'reward' for voting or an inducement to vote in

12 the first place are not proper or legal and do very little to

13 preserve this atmosphere of serenity and non-interference for

14 voters waiting to cast their votes."

15     Do you agree with that sentiment?

16 **A.**   Yes.

17 **Q.**   Here, again, how is it that handing out a drink to a voter

18 could undermine the "serenity" of the buffer zone?

19 **A.**   Any time a voter is being approached in line, it can I think

20 undermine that serenity.  I think the problem is one person's

21 helping is another person's interference.  And the other thing

22 that's happening in the polling place is when voters are in line,

23 you're not just having interaction with that voter, there's other

24 voters in front of or behind that person who are witnessing that

25 interaction and can come to their own conclusions about what they

1  see or hear of what's going on.

2  **Q.**  Now, you've discussed a few times that perception we were just

3  talking about relating to folks handing out food or drinks in

4  line.  Could you take a look at Exhibit C to your declaration.

5  This was an e-mail exchange between you and somebody named Janine

6  Eveler.  Just let me know when you have that.

7        MR. FIELD:  For the record, that is Exhibit C to

8  Mr. Germany's declaration, which is found at Defendants'

9  Exhibit 46.

10  **A.**  I have it.

11  **Q.**  Who is Mrs. -- who is Ms. Eveler?

12  **A.**  Janine Eveler is the director of the Cobb County Elections and

13  Registration Office.

14  **Q.**  Do you interact with her regularly?

15  **A.**  Yes.

16  **Q.**  And you can take a look at the whole exhibit, but if I just

17  summarize it briefly, it seems to me that you were concerned about

18  the underlying e-mail in the voter thread which was sent by

19  vote.org, is that correct?

20  **A.**  Yes.

21  **Q.**  Could you repeat that.

22  **A.**  Yes.

23  **Q.**  Why were you concerned about that underlying e-mail?

24  **A.**  I forget the exact language of the e-mail, but I think the way

25  they were interpreting it is kind of like the last chance to touch

1  Georgia voters before they vote, it really felt like campaigning

2  within that buffer zone.

3  **Q.**  Do you recall that e-mail referencing the results of the

4  election having "the potential to determine control of the US

5  Senate"?

6  **A.**  I see that, yes.

7  **Q.**  So let's turn now to the anti-solicitation provision.  Can you

8  describe your understanding of that portion of SB 202.

9  **A.**  That portion of SB 202 I think basically verifies something

10  that there were a lot of questions about, especially following the

11  2020 election cycle.  And the provision basically says within the

12  buffer zone there's just no -- there's no giving anything of value

13  to voters.  So it basically -- I think it kind of draws a bright

14  line for that conduct in the buffer zone.  It says, you know,

15  whether -- like this is either close enough to -- it either is or

16  close enough to electioneering or, you know, it is or is close

17  enough to giving something of value to vote, because when you're

18  giving something of value to a voter in line, that person is there

19  to vote.

20      The other things that we see about companies trying to, you

21  know, give things of value to voters wearing their "I Voted"

22  sticker, you know, that's not taking place at the polling place,

23  it's taking place outside.  But when you're at the polling place,

24  you are there to deal with voters, you are there to vote.

25  **Q.**  So is it your -- you mentioned that it was a clarification.

1   Is it your understanding that in some counties the folks running

2   the elections didn't allow anyone in the buffer zone?

3   **A.**   Yes.   I think some counties were asked can we do this.   And

4   they said, no, that wasn't allowed in the buffer zone.

5   **Q.**   And other counties allowed people to go up and down the line

6   handing out water -- or drinks and food?

7   **A.**   Yes.

8   **Q.**   But this clarified it with a bright-line rule, is that what

9   you testified to?

10  **A.**   Bright-line rule in the buffer zone.

11  **Q.**   So what's the purpose now of this provision?   In addition to

12  just clarifying, what interest does this serve?

13  **A.**   I think it goes to those two interests that we talked about

14  earlier, which is, one, voters should basically not be bothered

15  while they're in line.   And, again, you know, one person's helping

16  is another person's annoyance, it was just hard to know.

17       And then I think it also goes to the atmosphere around the

18  polling place, which I think should be one of order.   And I think

19  that's going to help the poll workers really focus on their job at

20  issue, which is to check voters in, get them through the process

21  in an efficient manner.

22  **Q.**   In recent years have there been any security concerns around

23  polling locations?

24  **A.**   Yes.   That's something that we have certainly seen rise,

25  especially in the past election cycle, and it's another concern of

1  ours during this election cycle where threats to election workers

2  I think is something that we should all be concerned about.  And I

3  think having an atmosphere in the polling place where there's more

4  people there, where it's less controlled, that's not really

5  conducive to a secure environment either.

6  **Q.**  We've talked about perception a few times.  How, if at all,

7  would this provision affect this perception of election integrity

8  within the state?

9  **A.**  Well, I mean, I think the reason that electioneering has long

10 not been allowed in the buffer zone, the reason that giving

11 something of value to vote or to not vote has long been not

12 allowed is because of the possibility of undue influence and the

13 perception I think certainly of that.

14      And so I think this is basically just taking those existing

15 interests about voters should not be sort of campaigned or

16 attempted to be influenced while they're in line to vote, and then

17 also kind of the giving of something of value in order to vote,

18 this I think draws distinctions within that buffer zone.  There

19 needs to be a bright-line rule that those things are not allowed

20 because it really I think does go to the perception -- like I was

21 saying, a lot of complaints we got were from people who maybe

22 weren't approached themselves but who were witnessed -- witnessed

23 some interaction between a voter and one of these groups, and that

24 leads to the perception I think of the overall process.

25 **Q.**  So plaintiffs in this case, they've suggested in their

1   briefing that the anti-solicitation provision is entirely
2   unnecessary because Georgia already has anti-electioneering laws
3   in place.  So under those laws how do election officials monitor
4   whether a person handing out drinks is electioneering or stating
5   some other message while they hand out the drinks?
6   **A.**  Well, it's very difficult.  It requires a very fact-dependent
7   inquiry.  It requires them to essentially hear what was said
8   because, again, a lot of the complaints are from people who might
9   not have been the direct recipient of the communication, so then
10  you have to be like what did you hear, what was said, and it's a
11  very difficult fact-specific inquiry.
12  **Q.**  And in your opinion do polling locations have the resources to
13  closely monitor those interactions?
14  **A.**  No.
15  **Q.**  And then plaintiffs also suggest that SB 202 could have
16  included a narrower rule, one that banned things only that were
17  more valuable, like nicer, fancier refreshments I believe they
18  say.  So how would election officials determine if people were
19  approaching the line with sufficiently unfancy refreshments?
20  **A.**  I think that would be very difficult, too.  It would basically
21  require prescreening or clearing everything that's going to be
22  handed out, and that would put a lot on election officials.
23  **Q.**  Again, in your opinion, do polling locations have the
24  resources to go outside and monitor the economic value of each
25  thing that's being handed out?

```
 1  A.  No.

 2  Q.  Now, I would like to discuss briefly how in your opinion

 3  organizations like plaintiffs may, in fact, still operate around

 4  polling locations.

 5      So may an organization like plaintiffs set up tables with food

 6  and drinks outside the buffer zone and at least 25 feet from

 7  voters in line?

 8  A.  Yes.

 9  Q.  And if voters approach those tables, may organizations like

10  plaintiffs encourage the voters to stay in line?

11  A.  Yes.

12  Q.  And may they hand them a drink?

13  A.  Yes.

14  Q.  What about in the parking lot or --

15  A.  I should clarify, as long as they are not --

16          (Interruption by the court reporter)

17  BY MR. FIELD:

18  Q.  Can you say that again, Mr. Germany.

19  A.  On the question of can they hand a voter a refreshment outside

20  of the buffer zone, the answer is, yes, as long as they're not

21  tying the handing of that refreshment to voting or to not voting.

22  Q.  Then what about out in the parking lot or on the sidewalk

23  before a voter has actually entered the voting line, may

24  organizations like plaintiffs provide drinks to every voter headed

25  toward the line and encourage the voters to stick it out through
```

1  the lines?

2  **A.**  Yes, as long as they're not tying the handing of something to

3  voting or not voting.

4  **Q.**  Does SB 202 prevent any voter from bringing food or drinks or

5  a book with him or her to the voting line?

6  **A.**  No.

7  **Q.**  So the last thing I would like to address with you is your

8  understanding of what would happen were this Court to enjoin this

9  particular provision of SB 202.

10     So at the outset, in your experience what impact do

11  last-minute changes have on election administration?

12  **A.**  Well, they can have negative and unforeseen consequences.

13  It's something that we try to avoid.  We know that there are going

14  to be last-minute things that come up, that's kind of a reality,

15  but you want to try to have that basically be as little of things

16  as possible.  That's just the reality of elections.  And they're

17  difficult to implement.

18  **Q.**  And in your declaration you discussed the poll worker manual,

19  do you recall that?

20  **A.**  Yes.

21  **Q.**  Do you recall if the poll worker manual specifically addresses

22  the anti-solicitation provision?

23  **A.**  It does.

24  **Q.**  Where is that manual made available?

25  **A.**  It's made available online.  Counties use it as a resource

```
 1  when they train their poll workers.  I think other third-party
 2  groups use it to -- I know that political parties I think use it
 3  as they train their poll watchers.  And then I think other
 4  interested parties use it just so they can understand kind of the
 5  rules in a polling place as well.
 6  Q.  What about members of the public, can they access it?
 7  A.  Yes.
 8  Q.  So is it possible that in addition to county officials,
 9  members of the public may have access to the poll manual and
10  read about what is and is not allowed in the buffer zone?
11  A.  Yes.
12  Q.  And you said that the manual is also used for training,
13  correct?
14  A.  Yes.
15  Q.  And would it have been used for the training in this most
16  recent primary in May?
17  A.  Yes.
18  Q.  And then what would need to happen to the manual if the Court
19  enjoins this provision of SB 202?
20  A.  They would need to revise it.
21  Q.  What about the poll workers who were trained in advance of the
22  most recent primary?
23  A.  They would have to be retrained by their county.
24  Q.  Did you say "retrained"?
25  A.  Retrained, yes, sir.
```

1   **Q.**   Would there be a way for the state to inform members of the

2   public that the manual has been updated and that the rules have

3   changed for the polling locations?

4   **A.**   We would attempt to do that.

5   **Q.**   Is that a difficult process?

6   **A.**   Yes.

7   **Q.**   And then what about third-party organizations --

8   **A.**   I should clarify.  I mean, it's not difficult to send out

9   a press release, but it is difficult to kind of make sure the

10  message gets across to a large number of people.

11  **Q.**   So is it possible that if this Court were to enjoin this

12  provision of SB 202, some organizations may not be aware of that

13  order and they may still believe that handing out food and drink

14  to voters in line in the buffer zone is prohibited, is that

15  correct?

16  **A.**   Yes.

17  **Q.**   And other organization may understand that it's permitted, is

18  that right?

19  **A.**   Correct.

20  **Q.**   And the same is true for the members of the public, some may

21  think it's prohibited, some may think it's permitted, is that

22  right?

23  **A.**   Correct.

24  **Q.**   And would that in your opinion lead to greater confusion on

25  Election Day?

```
 1  A.   Yes.
 2  Q.   And if there were such confusion and questions to the
 3  Secretary of State's Office, would that require additional
 4  resources to respond to those questions?
 5  A.   Yes.
 6          MR. FIELD:  No other questions, your Honor.
 7          MR. VARGHESE:  Good morning, your Honor.  And for the
 8  court reporter, my name is George Varghese.
 9                       CROSS-EXAMINATION
10  BY MR. VARGHESE:
11  Q.   Good morning, Mr. Germany.
12  A.   Good morning.
13  Q.   My name is George Varghese.  I'm from the law firm of Wilmer
14  Hale, and I represent the plaintiffs in this matter.
15      To begin with, Mr. Germany, you're the general counsel for the
16  Secretary of State's Office, correct?
17  A.   Yes, sir.
18  Q.   And so you're not on the ground at polling locations during
19  voting, isn't that right?
20  A.   Correct.
21  Q.   And your job is not to respond directly to voter complaints
22  either, isn't that correct?
23  A.   Correct.
24  Q.   And you're not the lawyer for county election officials,
25  correct?
```

**A.** Correct.

**Q.** And so it's not really your job to provide legal advice to county election officials either, isn't that right?

**A.** I would say that's true and that's often something I have to tell counties that are calling our office.

**Q.** You also -- sorry.

(Interruption by the court reporter)

THE WITNESS: I was just saying we do often get questions from counties that I think are better directed to the county attorney. Of course, we do try to provide assistance where we can. And I often will talk to county attorneys to try to help them think through these issues, too.

BY MR. VARGHESE

**Q.** And you're also not involved in conducting training for county election officials, isn't that right?

**A.** Our office conducts training for county election directors, and then county election directors or the personnel they have for training will then go train their county poll workers.

**Q.** You're not involved in that, right?

**A.** Not primarily. There are other people that are primarily involved, but there are training issues that would be raised to me.

**Q.** And one of the things that you are involved in are these OEBs, right, these Office Election Bulletins, isn't that right?

**A.** I am, kind of the same way where I'm not primarily involved,

1  but I will generally review them before they go out.

2  **Q.**  And the purpose of the OEB is to provide guidance to the

3  county election officials about questions, court orders, new laws,

4  that kind of thing, correct?

5  **A.**  Yes.

6  **Q.**  One of these OEBs you included in your declaration, it's

7  Plaintiffs' Exhibit 35, which we can bring up on the screen

8  hopefully.  And you talked about it on your direct.

9      This was an OEB from October 6th of 2020.  Can you see that,

10  Mr. Germany?

11  **A.**  I have that here.  Hang on.  I can't see it on the screen, but

12  I do have it.

13          MR. VARGHESE:  We would like to eventually be able to

14  share some documents with him, but if you have it in hard copy, I

15  can proceed like that and then eventually --

16          COURTROOM DEPUTY CLERK:  Are you on the Zoom call?

17          MR. VARGHESE:  Yes.

18  BY MR. VARGHESE:

19  **Q.**  For now, Mr. Germany, why don't we proceed with your hard copy

20  version and eventually we'll get this sorted out.

21      This is on October 26th of 2020, so about five months before

22  the passage of SB 202, is that right?

23  **A.**  That sounds right.

24  **Q.**  And Plaintiffs' Exhibit 34 -- or 35, which you also talked

25  about on direct, there's a section about line warming, about

1  voters receiving refreshments, isn't that right?

2  **A.**   Correct.  I can now see it on this.

3  **Q.**   Great.

4     And it's from Chris Harvey, the elections division's director,

5  correct?

6  **A.**   Correct.

7  **Q.**   And if you turn to the second page, the first full paragraph

8  there, Mr. Harvey wrote:  The simpler the better on this subject.

9  Bottles of water and crackers or peanuts is reasonable, but if the

10  refreshments get fancier, the appearance could be that voters are

11  being rewarded for voting with beverages and food.

12     Do you see those two sentences?

13  **A.**   Yes.

14  **Q.**   So it was the position of the Secretary of State's Office in

15  October of 2020 that bottles of water and crackers or peanuts was

16  reasonable, isn't that correct?

17  **A.**   That was our interpretation of the previous law.

18  **Q.**   And back in October of 2020, the Secretary of State's Office

19  had the same interests, to protect the integrity of the election,

20  isn't that correct?

21  **A.**   Yes.

22  **Q.**   And back in October of 2020 the Secretary of State's (sic)

23  wanted to make sure that voters were not being unduly influenced,

24  isn't that correct?

25  **A.**   Correct.

1  **Q.**  And back in October of 2020 the Secretary of State had the
2  same interest in making sure votes were not being bought, correct?
3  **A.**  Correct.
4  **Q.**  And it was the position of the Secretary of State's Office
5  that bottles of water, crackers and peanuts do not implicate those
6  interests, isn't that correct?
7  **A.**  That was our interpretation under the previous law.
8  **Q.**  And under the previous law, which prevented electioneering and
9  prevented vote-buying, it was the Secretary of State's position
10 that bottles of water, crackers and peanuts were perfectly fine,
11 they were perfectly reasonable, isn't that correct?
12 **A.**  Well, it depends on kind of the scenario around the handing --
13 like if you're handing someone water and say vote for so-and-so,
14 that wouldn't be permissible.  So it's still a fact-dependent
15 inquiry.  But I think what Chris was saying is if it's fancier, it
16 becomes even more of a problem.  These things are, of course --
17 you still have to kind of conduct a fact-specific inquiry to be
18 sure it's not being tied to voting, to kind of see what's being
19 said when that interaction is taking place.
20 **Q.**  And we'll get to electioneering, don't worry about that, but I
21 just want to go back.
22     It was your position and the office's position that water,
23 crackers, peanuts, all of that was fine under the law, correct?
24 **A.**  It would depend on the fact-specific inquiry of kind of the
25 specific interaction.

**Q.**   And what Mr. Harvey is saying in his OEB is that if it gets
fancier, that could become a problem.  "Fancier," that's his word,
correct?

**A.**   Correct.

**Q.**   And I think the Court actually posited the hypothetical this
morning, if it's filet mignon, it could be a different story,
correct?

**A.**   That would be -- that would follow, yes.

**Q.**   So one of the ways to protect the state's interest in this
matter in preventing and protecting election integrity would
simply be to put some sort of a limit on how much you can provide,
isn't that correct?

**A.**   That would have been a potential way, but you still would have
had to kind of do that fact-specific inquiry on is it being sort
of tied to voting.  And that wouldn't matter whether or not --
like that wouldn't matter the value of the thing being given.

**Q.**   But with respect to this bulletin, with respect to
Mr. Harvey's advice, one way that would be consistent with
Mr. Harvey's advice would be to provide a limit of the value of
the goods that were being provided, isn't that correct?

**A.**   That would have kind of accomplished one thing.  You still
would have had to look into that fact-specific inquiry no matter
the value.

**Q.**   And I promise you, I'll get to electioneering in a second.
     So with respect to this --

1  **A.**  It's all tied together, that's the issue.

2          (Interruption by the court reporter)

3          THE WITNESS:  I said it's all tied together, that's the

4  problem.

5  BY MR. VARGHESE:

6  **Q.**  And similar to the OEB that we were just discussing here,

7  there are several other OEBs that come close in time to elections,

8  isn't that correct?

9  **A.**  Yes.

10 **Q.**  And I want to pull up, if we can, Plaintiffs' Exhibit 40 and

11 put it on the screen for you.  Do you see that?

12 **A.**  Yes.

13 **Q.**  Do you recognize this is an OEB from November 2nd of 2018,

14 it's about citizen verification at the polls?

15 **A.**  Yes.

16         MR. VARGHESE:  And if we could, can we bring up

17 Plaintiffs' Exhibit 41.

18 **Q.**  This is an OEB from November 29th, 2018, and this is about

19 voter assistance at the polls.  Are you familiar with this one?

20 **A.**  Yes.

21         MR. VARGHESE:  If we could bring up Plaintiffs'

22 Exhibit 42.

23 **Q.**  This one is dated May 1st of 2020.  And these are absentee

24 ballot signature review guidance.  Are you familiar with this one?

25 **A.**  Yes.

1          MR. VARGHESE:  If we could bring up Plaintiffs'

2    Exhibit 43.

3    Q.  This is from December 9th of 2020.  And this is about absentee

4    ballot and ballot application signature verification.  Are you

5    familiar with this one?

6    A.  Yes.

7    Q.  And lastly, Plaintiffs' Exhibit 44, this was on December 18th

8    of 2020.  And this is about absentee ballot signature verification

9    and public observation, isn't that right?

10   A.  Yes.

11   Q.  And you're familiar with this one as well?

12   A.  Yes.

13          MR. VARGHESE:  Your Honor, we would ask that Plaintiffs'

14   Exhibits 40, 41, 42, 43 and 44 be admitted into evidence.

15          MR. FIELD:  No objection.

16          THE COURT:  They're admitted.

17          MR. VARGHESE:  Thank you, your Honor.

18   BY MR. VARGHESE:

19   Q.  Mr. Germany, all of these OEBs that we just discussed, all of

20   them were issued by the Secretary of State's Office in close

21   proximity to elections, isn't that correct?

22   A.  Yes.

23   Q.  Mr. Germany, we also spoke a little bit on your direct about

24   poll worker manuals, is that correct?

25   A.  Yes.

1  **Q.**  And the purpose of a poll worker manual is to provide training

2  to county officials, correct?

3  **A.**  To poll workers specifically.

4  **Q.**  To poll workers specifically.

5      And I believe you provided an excerpt of the poll worker

6  manual in your declaration.  I believe it was Exhibit G, but it

7  was just an excerpt.  So what I want to do is I want to show you

8  Plaintiffs' Exhibit 39, which you should hopefully see on your

9  screen.

10  **A.**  I see it.

11  **Q.**  And do you recognize that?  That's the -- that's the poll

12  worker manual, correct, updated May of 2021?

13  **A.**  I see the first page.

14  **Q.**  And it's about 104 pages.

15          MR. VARGHESE:  If we could, could we just go to the end.

16  **Q.**  This is the end of it.  Thank you for your service to your

17  voters, do you see that?

18  **A.**  Yes.

19  **Q.**  You're familiar with this document?

20  **A.**  Generally.

21          MR. VARGHESE:  Your Honor, we would ask that Plaintiffs'

22  Exhibit 39 be admitted into evidence.

23          MR. FIELD:  No objection.

24          THE COURT:  It's admitted.

25  BY MR. VARGHESE:

1    **Q.**  Mr. Germany, the purpose of this manual is to serve as a guide

2    to county election officials and poll workers about how to

3    administer elections in the State of Georgia, correct?

4    **A.**  The purpose of the poll worker manual is to provide a resource

5    to counties that they can use to help them train their poll

6    workers.

7    **Q.**  And it's 104 pages, it covers all sorts of issues that arise

8    out of administering elections in Georgia, isn't that correct?

9    **A.**  Yes.

10   **Q.**  From how to run a polling location, voter identification,

11   voting machines, absentee ballots, all sorts of issues, isn't that

12   right?

13            (Interruption by the court reporter)

14            THE WITNESS:  It sounds right that all those are in

15   here.

16   BY MR. VARGHESE:

17   **Q.**  And the purpose is to help train them about how to run the

18   system and run it correctly, correct?

19   **A.**  Who is "them"?

20   **Q.**  The county election officials and poll workers.

21   **A.**  Well, this is specifically to be a resource that counties can

22   use to train their poll workers.

23   **Q.**  And in this 104-page document, you're aware that the only

24   page -- there's a single sentence that deals with line warming?

25   **A.**  I would believe you on that.

1  **Q.**  And if we turn to page 40 of the document, and if we could

2  bring up the third bullet -- or I'll direct your attention to the

3  third bullet.  This is the only part in the 104-page document that

4  has anything to do with line warming, isn't that correct,

5  Mr. Germany?

6  **A.**  I can't really speak to that right now, but I don't dispute

7  that.

8  **Q.**  And the language that's included in the manual about line

9  warming is just the statutory text; there's no training, there's

10  no advice, there's no guidance on how to do it, it's just the

11  statutory text, isn't that correct?

12  **A.**  The third bullet point is -- looks to be just statutory text,

13  yes.

14  **Q.**  And so in the State of Georgia there is no training to county

15  officials or election poll workers about line warming other than

16  the statutory text that's included in one sentence in a 104-page

17  document, isn't that correct?

18  **A.**  No, that's not correct.

19  **Q.**  Is there another part of the manual that talks about line

20  warming?

21  **A.**  This manual is meant to be a resource that counties can use.

22  This is certainly not the exclusive thing that counties use to

23  train their poll workers, it's not meant to be that, and I know

24  that it's not that.

25      So in terms of the specific training that they're doing, it's

1   going to be over and above this document.  I can't speak to that,

2   but they are doing that.

3   **Q.**  Again, you're not involved in training of county officials,

4   correct?

5   **A.**  It would be helpful -- because there's county officials and

6   our office is involved in training county directors, and then the

7   county directors go and train their poll workers and their

8   employees.  So the latter we're not involved in.

9   **Q.**  And you're not involved in that, right?  So you are not

10  involved in training county officials, correct?

11  **A.**  Well, what I said earlier, there are things that come from our

12  training that our office kind of provides that I think -- they

13  would have to be about while they're preparing training, that's my

14  involvement.

15  **Q.**  In the drafting of SB 202, you were involved in speaking to

16  county election officials, correct?

17  **A.**  In drafting SB 202 did I speak to county election officials?

18  **Q.**  Yes.  SB 202 in its prior incarnations as well I should say.

19  **A.**  I think I would have, yes.

20  **Q.**  You solicited feedback from county officials on various

21  provisions, correct?

22  **A.**  I can't say that I specifically remember that, but that sounds

23  like something I would have done.

24  **Q.**  And you actually instructed certain county officials to

25  contact certain state legislatures, correct?

1   **A.**   I can't recall.

2           MR. VARGHESE:   Can we pull up Plaintiffs' Exhibit 54.

3   **Q.**   Mr. Germany, do you see that on your screen?

4   **A.**   Yes.

5   **Q.**   This is an e-mail from you to Ms. Eveler at Cobb County,

6   correct?

7   **A.**   Yes.

8   **Q.**   She's the county election official?

9   **A.**   Yes.

10  **Q.**   And in there you said:   Probably would be good to send to

11  senators, too, contact info is below.   Thank for all your work.

12      Does that refresh your recollection that you were reaching out

13  to county officials to contact state legislators?

14  **A.**   Yes.

15  **Q.**   The SB 202 provision that we're discussing today relates to

16  line warming or line relief, and we've been talking about this

17  buffer zone quite a bit.   Now, I just want to understand this

18  state of play.

19      Prior to SB 202's passage, Georgia law prohibited soliciting

20  votes within the buffer zone, correct?

21  **A.**   Correct.

22  **Q.**   And prior to SB 202 it was illegal to display campaign

23  material within the buffer zone, correct?

24  **A.**   Correct.

25  **Q.**   And prior to SB 202 individuals who were not affiliated with

1  candidates were not forbidden to provide food, drinks and masks to

2  voters waiting in line, correct?

3  **A.**  It would really depend on the specific interaction.  We had a

4  lot of complaints that that behavior was prohibited.  So it's just

5  dependent.

6  **Q.**  But as we saw earlier, the OEB on October 26th of 2020

7  explicitly said that bottles of water and crackers and pretzels

8  was reasonable, correct?

9  **A.**  I don't think that should be read to mean that you could hand

10  someone a bottle of water and say vote for so-and-so.

11  **Q.**  Agreed.

12  **A.**  It would really depend on the specific inquiry.

13  **Q.**  Because electioneering was still banned, correct?

14  **A.**  Electioneering was banned.

15  **Q.**  So you couldn't hand a bottle of water and say vote for

16  so-and-so, that was strictly prohibited, correct?

17  **A.**  Correct.

18  **Q.**  But handing a person a bottle of water and saying thank you

19  for voting is not, correct?

20  **A.**  I think our interpretation at the time was that it would not

21  be banned.

22  **Q.**  So there was already in place a law that prohibited

23  electioneering -- electioneering that was already in place that

24  would have prohibited the water-giver to say vote for so-and-so,

25  correct?

1  **A.**   Yes.

2  **Q.**   But that changed when SB 202 came into existence five months

3  later, correct?

4  **A.**   No, that would still be prohibited.

5  **Q.**   Well, sorry, let me rephrase that.

6      When SB 202 came into existence, you couldn't even give out

7  the bottle of water anymore, correct?

8  **A.**   In the buffer zone.

9  **Q.**   So even if you said thank you for voting, you still could not

10  give out the bottle of water, correct?

11  **A.**   One of the problems is that becomes a very fact-specific

12  inquiry on are you giving something and tying it to voting.  You

13  can't give someone something kind of -- and tie it to voting

14  before they vote, you can't give someone something and tie it

15  voting after they vote as a reward.  It's a very kind of

16  fact-specific inquiry is the problem.

17  **Q.**   Let me turn to that a little bit, because Georgia law does not

18  prohibit voters within the buffer zone from having conversations

19  with one another, correct?

20  **A.**   Correct.

21  **Q.**   And Georgia law does not prohibit third parties from coming in

22  and talking to people within the buffer zone, correct?

23  **A.**   Depending on what they were saying.

24  **Q.**   Right.  You could talk about the weather, you could talk about

25  sports, you can even talk about politics, isn't that right?

**A.**   It would depend on the specific thing being said.

**Q.**   Because if at that point you crossed the line and start saying please vote for so-and-so, you would then be electioneering and that's what would be prohibited, correct?

**A.**   The question I think -- the line comes before please vote for so-and-so.  The thing that's banned is not vote for so-and-so, it's also soliciting votes -- just a vote for either candidate or any candidate or also kind of to not vote.  So the line comes before that.  And I think the difficulty was determining exactly where that line was.

**Q.**   But even after SB 202, poll watchers still have to determine where that line is because all of those things can still happen, correct?

**A.**   Poll watchers have to determine that?

**Q.**   We just -- you just testified that voters can speak to each other, correct?

**A.**   You mean poll workers?  That was my confusion.

**Q.**   Poll workers.  Sorry.  Poll workers still have to determine that line, correct?

**A.**   Yes, they would have to.  Poll workers along with kind of other -- you know, that they would probably reach out to our office.  But, yes, there would still be I think kind of fact-specific inquiries.  There are things that are allowed outside of a polling place that would still require that.

**Q.**   So even after SB 202, poll workers have to still monitor

1  what's happening within the buffer zone, correct?

2  **A.**   Yes.

3  **Q.**   They still have to go up and down the line making sure there's

4  not illegal electioneering going on, correct?

5  **A.**   I would say that's not really what they're doing when they're

6  monitoring the line.   That's not sort of the primary purpose of

7  that.

8  **Q.**   Sure, but they still have to make sure there's not

9  electioneering in the line, correct?

10 **A.**   I don't think they're listening to voter's conversations or

11 anything like that.   I think their job is to make sure that voters

12 can get through the line and go vote in an efficient manner.

13 **Q.**   So, Mr. Germany, is it your testimony that electioneering

14 within the buffer zone is being allowed?

15 **A.**   It's not -- it's not allowed.   In terms of is it happening in

16 a polling place, yeah, I think that was sort of the question that

17 led to where we are now.

18 **Q.**   But don't poll workers --

19 **A.**   We opened a lot of investigations last year -- I say last

20 year, during the 2020-cycle about that topic.

21 **Q.**   But a potential voter standing in line can't lobby other

22 voters for a candidate of his or her choice, correct?

23 **A.**   Correct.

24 **Q.**   SB 202 didn't change that, they still can't do that, correct?

25 **A.**   Correct.

1  **Q.** So someone needs to make sure that's not happening, correct?

2  **A.** I mean, that's like saying someone needs to make sure there's

3  no speeding. I mean, speeding is occurring and there are people

4  monitoring it, but they're not monitoring every car at every time.

5  Just like poll workers in the line aren't monitoring every

6  conversation between voters.

7  **Q.** And you would still receive complaints about that, correct, if

8  it was happening?

9  **A.** Perhaps we would.

10 **Q.** Because it's against Georgia law, correct?

11 **A.** Yes. I will say that's never something that I can recall

12 receiving a complaint about, is a voter in line soliciting votes

13 from other voters in line.

14 **Q.** Overall you believe that election officials in Georgia by and

15 large do a good job, correct?

16 **A.** Yes.

17 **Q.** And you've testified that there was no widespread voter fraud

18 in the 2020 elections or the 2021 runoff, correct?

19 **A.** Correct.

20 **Q.** So there's no evidence that line-relief activities that

21 occurred in the 2021 election or the 2021 runoff led to any voter

22 fraud or election integrity issues, correct?

23 **A.** I don't think so, correct.

24 **Q.** And there's no evidence that food or water being offered

25 influenced people's voting in the 2020 election and in the 2021

1  runoff, isn't that right?

2  **A.**   I should amend my previous answer.  I don't think that this

3  sort of handing of food and water led to any voter fraud that I'm

4  aware of.  I do think it led to election integrity issues in terms

5  of the perception that people had in the lines.  We got a lot of

6  complaints about it from people that were raising that issue,

7  saying they think it does not give them sort of confidence that

8  the election was conducted in a way that had integrity.

9  **Q.**   I'm going to get to that in a second, but let me just go back

10  to the facts before we get to the perception.

11      In terms of the facts, the Secretary of State's Office is not

12  aware of a single vote that was changed because of a bottle of

13  water or a bag of pretzels having been provided to a voter in

14  line, isn't that right?

15  **A.**   Correct.

16  **Q.**   Nevertheless, you've talked about the perception, and I want

17  to make sure that we address that.

18      In your declaration you provided examples of the types of

19  complaints that the Secretary of State's Office received about

20  line warming activities.  Do you recall that?

21  **A.**   Yes.

22  **Q.**   And I want you to turn to, if you can, this is Plaintiffs'

23  Exhibit 35, it's Exhibit F to your declaration.  And it's an

24  e-mail from a woman by the name of -- not e-mail, it's a complaint

25  from a woman by the name of Elizabeth Lee Brown.  Do you see that?

1    It's page 50 of your declaration.

2    **A.**   Okay.  I see it on the screen.

3    **Q.**   Okay.  Great.

4        And Ms. Elizabeth Lee Brown submits a complaint to the

5    Secretary of State's Office on October 20th of 2020 it looks like.

6    Do you see that?

7    **A.**   Yes.

8    **Q.**   And it's about a group that was handing out food and water.

9    And she wrote:  Older voters felt intimidated by the presence of

10   this group.  There was a look of fear on their faces.  Handing out

11   food and water can be misconstrued as influencing voters or buying

12   votes.  Do you see that?

13   **A.**   Yes.

14   **Q.**   Is that what you were talking about when you talk about their

15   perception?

16   **A.**   We got complaints like this, of course, but we also got

17   complaints that were more, I think, just saying, hey, this looked

18   like vote-lining to me, this looked like electioneering to me,

19   not -- this person is sort of concerned it could be misconstrued.

20   And I think some other complaints we got were people who were

21   actually interpreting the activity that way.

22   **Q.**   To be clear, this is the only one that you put in your

23   declaration, so let's start with this one.

24       Ms. Brown -- you didn't personally talk to Ms. Lee Brown,

25   isn't that correct?

1  **A.**   Correct.

2  **Q.**   You don't know anything about her, correct?

3  **A.**   Correct.

4  **Q.**   And you didn't personally see anything that this group did?

5  This group that was handing out water and food, you didn't see

6  anything that they were doing in Albany, Georgia, that day,

7  correct?

8  **A.**   I personally didn't, no.

9  **Q.**   And your office didn't conduct any investigation of

10  Ms. Brown's intimidation complaint, isn't that right?

11  **A.**   I'm not sure that's correct.  We did have an investigation

12  into this kind of thing happening, particularly in Dougherty

13  County.  I know that we received multiple complaints from

14  Dougherty County.

15      In terms of did we open an official investigation, I'm not

16  sure that would have -- you know, we would have had a conversation

17  with our investigators to see, okay, what's being alleged here and

18  what's happening before we would have taken that step.

19  **Q.**   Right.  You have investigators at the Secretary of State's

20  Office, right?

21  **A.**   Yes.

22  **Q.**   And they investigate complaints, right?

23  **A.**   Yes.

24  **Q.**   And they write up reports, right?

25  **A.**   Yes.

1  **Q.**  And there's no investigator report of this incident that was

2  done by the Secretary of State's Office, isn't that right?

3  **A.**  I'm not sure.

4  **Q.**  And Ms. Elizabeth Lee Brown is not saying that she felt

5  intimidated, correct?

6  **A.**  It does not seem to be saying that.

7  **Q.**  She's saying she perceives other people, older people are

8  intimidated, right?

9  **A.**  Correct.

10  **Q.**  She doesn't provide any names of these older people?

11  **A.**  Correct.

12  **Q.**  She doesn't even tell you how many older people there were?

13  **A.**  Correct.

14  **Q.**  And when she says that there is fear in their faces, she

15  doesn't explain what she means, isn't that right?

16  **A.**  Right.

17  **Q.**  So beyond these two sentences, which you included in your

18  declaration by the way, you have done nothing to verify the

19  accuracy of this report, isn't that right?

20  **A.**  I did not.

21  **Q.**  And so, in fact, you have no evidence that there was any

22  intimidation or any old people that felt intimidated by the

23  handing out of water and crackers on October 20th in Albany,

24  Georgia, isn't that right?

25  **A.**  I think I said in my declaration that this was an example of

1    the kinds of things we were receiving.  I do remember receiving

2    multiple complaints specifically about Dougherty County.

3    **Q.**  You've talked about that numerous times in your testimony here

4    this morning, about receiving complaints.  And you've said we've

5    received complaints and that was part of the reason why SB 202 was

6    enacted, and I want to ask you about that.

7         After the 2020 election there was a lot of complaints about

8    voter fraud in the election, isn't that right?

9    **A.**  Yes.

10   **Q.**  There were complaints that people with felony convictions had

11   voted, correct?

12   **A.**  Yes.

13   **Q.**  And there were complaints that underaged people had voted,

14   correct?

15   **A.**  Yes.

16   **Q.**  And there were complaints that dead people had voted, correct?

17   **A.**  Yes.

18   **Q.**  And there were complaints that people out of state had voted,

19   correct?

20   **A.**  Yes.

21   **Q.**  And you looked into all that and you didn't find any evidence

22   that supported these complaints, correct?

23   **A.**  Not to the extent that it was alleged.

24   **Q.**  And you have no evidence that Ms. Elizabeth Lee Brown's

25   complaint that older people were intimidated is true either, isn't

1    that correct?

2    **A.**   Correct.

3    **Q.**   Another complaint that the Secretary of State received was

4    about food trucks in the fall of 2020, isn't that correct?

5    **A.**   Yes.

6    **Q.**   And that was about food trucks in the buffer zone, correct?

7    **A.**   Yes.

8    **Q.**   And I believe you were asked about this on direct, and this is

9    your Exhibit B -- oh, no, sorry.  This is your Exhibit C, which is

10   page 26 of your declaration.

11       Do you remember being asked some questions about this?

12   **A.**   Yes.

13   **Q.**   Now, this is a food truck that was being operated by vote.org,

14   is that right?

15   **A.**   Yes.

16   **Q.**   And you said that --

17   **A.**   I should say I don't think that food trucks are operated by

18   vote.org.  I think -- I can't really -- I'm not really sure.

19   **Q.**   That's fine.

20       Earlier in your direct testimony you talked about how they

21   said that this -- there was an e-mail, and I think it begins on

22   page 29 of your declaration, from vote.org and talks about how

23   this was the last time to reach Georgia voters, correct?

24   **A.**   Yes.

25   **Q.**   And it talks about how the results had the potential to

```
 1  determine the control of the US Senate, correct?
 2  A.   Yes.
 3  Q.   There's nothing in this e-mail that talks about who vote.org
 4  wants voters to vote for, correct?
 5  A.   Correct.
 6  Q.   There's nothing in this e-mail that talks about electioneering
 7  or campaigning for a particular candidate, correct?
 8  A.   A particular candidate, no.
 9  Q.   And then following up, if we go back to your exchanges, you
10  have exchanges with Ms. Eveler again.  She was the Cobb County
11  elections official, correct?
12  A.   Correct.
13  Q.   The director, actually, sorry, of the Cobb County Elections
14  and Registration?
15  A.   Correct.
16  Q.   Ms. Eveler was the one who was actually on the ground during
17  this incident, isn't that correct?
18  A.   Well, she's closer than me.  She's generally not at a polling
19  place either, but she's closer than me.
20  Q.   And she has sort of direct responsibility overseeing this,
21  correct?
22  A.   Yes.
23  Q.   And --
24  A.   Well, overseeing what?
25  Q.   Overseeing these polling locations.
```

**A.**   Yes.

**Q.**   And at the bottom of page 26, you wrote:  I think a food truck crosses the line, especially the way they're marketing it.  Do you see that?

**A.**   Yes.

**Q.**   Frances has an open investigation.  You're referring to one of the investigators at the Secretary of State's Office, right?

**A.**   Frances was our chief investigator.

**Q.**   So your conclusion from the Secretary of State's Office was that this crossed the line, is that correct?

**A.**   That was my thought, yes.

**Q.**   If we go to the top of the e-mail, we see what Ms. Eveler, the woman on the ground, had to say about it.  And if you read her first e-mail, she says:  One more thing, as far as we can tell they are not campaigning.  Do you see that?

**A.**   Yes.

**Q.**   She goes on to say:  They have given out napkins with the food that have a QR code to vote.org and has the Election Protection Hotline number on it.  She then goes on to say they give food to everyone, including voters, poll workers, and other employees in the government complex.  I'm having a hard time justifying why they need to stop doing any of this.

    Do you see that?

**A.**   Yes.

**Q.**   Ms. Eveler is a long-time director of the Cobb County

1  Elections Department, right?

2  **A.**   Yes.

3  **Q.**   She's been there since, I believe, 2010, correct?

4  **A.**   I'm not sure, but I don't dispute that.

5  **Q.**   And she doesn't see anything wrong with what the vote.org food

6  truck was doing, isn't that correct?

7  **A.**   Well, I know when we sent an investigator -- I don't know if

8  it was this specific truck, but we did send an investigator to --

9  I believe it was in Cobb County to speak to one of the food

10  trucks.  And the investigator went up and said, hey, is this free?

11  And the food truck operator said, oh, it's for voters.

12              (Interruption by the court reporter)

13              THE WITNESS:  So that initially the food truck operator

14  told our investigator it's for voters, food for voters.  I think

15  after some additional back-and-forth and after our investigator

16  identified himself as an investigator for the Secretary of State,

17  he was told, oh, it's for everybody.  So the first thing would be

18  a problem.

19              The second thing, like Ms. Eveler's describing, you

20  know, perhaps not under the previous interpretation of the law,

21  again, it would be a fact-specific inquiry.  But, you know,

22  policing each of those interactions I think would be very

23  difficult.

24  **Q.**   But to be clear, Ms. Eveler, who is in charge of Cobb County,

25  said they give food to everyone, including voters, poll workers,

1  and other employees in the government complex.  So what she

2  observed or what she knows is that they're giving it to everyone,

3  isn't that correct?

4  **A.**  What she observed is not what our investigator observed in

5  Cobb County.  And I know it might be a different truck.  I think

6  there was more than one truck.  So I think that's the problem.

7  **Q.**  And her conclusion was what they are -- they are not

8  campaigning.  So even though that there was a food truck there,

9  they were giving food to everybody and they were not campaigning,

10 and so she says, I'm having a hard time justifying why they need

11 to stop doing any of this, isn't that correct?

12 **A.**  She says as far as we can tell.  So, again, the problem is

13 each interaction is kind of a potential for something that crossed

14 over that line.

15           THE COURT:  Counsel, let me interrupt you.  I think I've

16 pushed as far into the lunch hour as I can.  As we approach 1:00,

17 it seems like we're not -- for awhile there I thought maybe we

18 would be done with Mr. Germany before lunch, but it seems like

19 we're not.  So let's go ahead and take a lunch break.

20           It's a few minutes before 1:00.  Is 1:45 plenty of time

21 for everyone?  Is 1:30 doable for everyone?

22           MR. VARGHESE:  That's fine for us, your Honor.

23           THE COURT:  Let's shoot for 1:30 to give us a little

24 more time.  See everybody at 1:30.  Thank you.

25           (After a recess, the proceedings continued as follows:)

BY MR. VARGHESE:

**Q.**  Mr. Germany, can you hear me okay?

**A.**  Yes, sir.

**Q.**  I just have a few more questions for you before we wrap up.

Before we broke for the lunch break you mentioned that there was a time where Secretary of State investigators actually went out to investigate an incident involving food trucks.  Do you recall talking about that?

**A.**  Yes.

**Q.**  I believe a copy of their report is included as Exhibit E in your declaration, is that right?  I'm sorry, that begins on page 35.  And we'll put it up on the screen, too, if that's easier.

**A.**  I have them all kind of spread out now.

**Q.**  Do you see that okay?

**A.**  Yes, I see that.

**Q.**  So this was actually a report about food trucks in the Cobb County area during the 2021 runoff election, is that right?

**A.**  I'm not sure if that's the one I was referring to because it was a different investigator.

**Q.**  Okay.

Again, to be clear, this was attached as an exhibit to your declaration in support of SB 202's line-relief ban, is that right?

**A.**  I believe it was attached to my declaration, yes.

**Q.**  Okay.  And it involved various allegations that food trucks from vote.org or World Central Kitchen were violating Georgia law,

1  is that right?

2  **A.**   Yes.

3  **Q.**   And your own investigators from the Secretary of State's

4  Office looked into it, they interviewed people, they talked to the

5  truck drivers, they talked to the poll workers, is that correct?

6  **A.**   I would have to review it to see exactly what they did.

7  **Q.**   But if we just turn to page 12 and 13 of the document, which

8  is pages 46 and 47 of the exhibit, which is just the conclusions,

9  the findings of potential violations, if I could direct you to

10  those two pages.  If we start at the bottom of 46 going into 47.

11       After the investigation that the Secretary of State's Office

12  did, they didn't find a single violation of Georgia law because of

13  these food trucks, isn't that correct?

14  **A.**   It looks like in the first one the investigator highlights the

15  fact that the food trucks voluntarily moved outside the buffer

16  zone.

17  **Q.**   And if you go down through all three of them, each one starts

18  with the name of the person and it says:  No violation, no

19  violation, no violation, no violation.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And nowhere in the course of the investigation into this food

22  truck did any of your investigators conclude that line warming and

23  the activities associated with line warming resulted in

24  intimidation or voting solicitation, isn't that correct?

25  **A.**   Are you talking about in this investigation?

1  **Q.**  I'm talking about in this investigation, that's correct.

2  **A.**  That appears to be correct, yes.

3  **Q.**  And to be clear, you didn't cite any other complaints or

4  instances in your declaration.  We talked about the Ms. Brown

5  e-mail, we talked about Ms. Eveler's e-mail about the vote.org

6  food truck, and we talked about this investigation report.  You

7  didn't cite any other verified complaints of harm from the line

8  relief, isn't that correct?

9  **A.**  I think as I said in my investigation -- my declaration that

10  the attachments were meant to be exemplary and not the complete --

11  not everything that we received about this issue.

12  **Q.**  Of course.  But the three that you talked about -- the three

13  that you've included, we've gone through them, isn't that right?

14  **A.**  The three what?

15  **Q.**  The three examples that you --

16  **A.**  I know that the e-mail from the complaint, that investigation.

17  What's the third thing?

18  **Q.**  The e-mail from Ms. Elizabeth Lee Brown, the e-mail exchange

19  with Janet Elever, and then finally this investigation report from

20  your investigators, which found no violations.

21  **A.**  Yes.

22  **Q.**  And approximately 4.4 Million Georgians voted in the

23  January 2021 special election, isn't that right?

24  **A.**  Well, it was a runoff election, but that sounds right.

25  **Q.**  And out of that 4.4 Million there were about 2 Million that

1  voted in person, isn't that correct?

2  **A.**   I think there would have been more than that.

3  **Q.**   Okay.  And out of all of those millions of folks who voted,

4  you couldn't find a single confirmed instance where line warming

5  was found to have affected any of those votes, isn't that correct?

6  **A.**   I think that's right.

7            MR. VARGHESE:  Thank you, Mr. Germany.  I don't have any

8  further questions for you.

9                         REDIRECT EXAMINATION

10  BY MR. FIELD:

11  **Q.**   Mr. Germany, at the beginning of your cross-examination do you

12  recall speaking with plaintiffs' counsel about water and peanuts?

13  **A.**   Yes.

14  **Q.**   And that was a discussion about the -- I believe it was an

15  October 26th, 2020, OEB, is that right?

16  **A.**   Yes.

17  **Q.**   So that was issued before SB 202 was enacted, is that right?

18  **A.**   Yes.

19  **Q.**   So I think I understood your testimony, but I want to make

20  sure it's clear.  It's your understanding that Elections Director

21  Harvey was opining on the reasonableness of certain activities

22  under the preexisting law, is that right?

23  **A.**   Right.  And even then it would have depended on the specific

24  factual scenario under which the thing was given.

25  **Q.**   Right.  Because you testified earlier that the only laws at

1    issue were those prohibiting vote-buying and electioneering, is

2    that right?

3    **A.**   Electioneering within the buffer zone.

4    **Q.**   That's right.  But am I right that you testified earlier that

5    SB 202, and specifically the anti-solicitation provision,

6    addresses more interests than just vote-buying and electioneering,

7    is that right?

8    **A.**   I think that's right, yes.

9    **Q.**   For instance, you discussed smooth election administration, is

10   that right?

11   **A.**   Yes.

12   **Q.**   And that wasn't covered by the preexisting vote-buying and

13   anti-electioneering laws, right?

14   **A.**   There were other laws that I think attempted to reach that

15   same result, but I think in ensuring that was also part of this

16   provision too.

17   **Q.**   Do you recall also discussing how SB 202 and the

18   anti-solicitation provision specifically addressed bolstering

19   perceptions of election integrity?

20   **A.**   Yes.

21   **Q.**   And there was also a discussion about whether or not county

22   officials can go out and regulate the activity on the line and

23   listen to and observe what people were saying to each other.  Do

24   you remember that part of your testimony?

25   **A.**   Yes.

**Q.**  Is it your opinion that it is no -- it imposes no greater

impact on county officials if they have to go out and monitor for

significantly more conduct?

**A.**  I think it would impose a greater burden.

**Q.**  And then there was plenty of discussions about the exhibits

attached to your declaration.  Do you recall that?

**A.**  Yes.

**Q.**  And do the exhibits attached to your declaration constitute

the entirety or totality of complaints that the Secretary of

State's Office received?

**A.**  No.

**Q.**  Because we're still in discovery, right?

**A.**  Correct.

**Q.**  And did the Secretary of State's Office ever receive questions

by phone on these topics or other topics?

**A.**  Yes.

**Q.**  There was also a discussion of I believe it was Ms. Brown's

complaint.  Do you recall that?

**A.**  Yes.

**Q.**  And I believe plaintiffs' counsel suggested that you couldn't

rely on it, you can't call it evidence because you hadn't

personally investigated it.  Do you recall that part of the

cross-examination?

**A.**  Yes.

**Q.**  But do you have any reason based on the face of that complaint

1  to disbelieve the accuracy of that declaration, which is, of

2  course, itself evidence?

3  **A.**  I mean, I can't really say one way or the other.

4  **Q.**  Then I believe counsel said at the end that he talked with

5  you about three examples, the only three examples I believe he

6  characterized it as, attached to your declaration.  But do you

7  recall the OEB that we discussed from October?

8  **A.**  Yes.

9  **Q.**  And it addressed persistent questions, is that right?

10 **A.**  Yes.

11 **Q.**  And then there was another OEB because there were still more

12 questions, is that right?

13 **A.**  Yes.

14          MR. FIELD:  No other questions, your Honor.

15          THE COURT:  Anything else?

16          MR. VARGHESE:  Nothing further, your Honor.  Thank you.

17          THE COURT:  Thank you, Mr. Germany.

18          (Witness excused)

19          THE COURT:  Please call your next witness.

20          MR. TYSON:  We'll call Lynn Bailey.

21          THE COURT:  Hello.

22          MS. BAILEY:  Hello.

23          COURTROOM DEPUTY CLERK:  Ms. Bailey, if you'll remain

24 standing and raise your right hand.

25                    _____

```
 1                          LYNN BAILEY

 2            a witness herein, being first duly sworn,

 3              was examined and testified as follows:

 4                   _____

 5            COURTROOM DEPUTY CLERK:  Thank you.  You can be seated.

 6            THE WITNESS:  Thank you.

 7                         DIRECT EXAMINATION

 8  BY MR. TYSON:

 9  Q.  Good afternoon, Ms. Bailey.  Thank you for joining us today.

10      We have -- your declaration is in evidence already as

11  Defendants' Exhibit 48, but could you just briefly explain for

12  Judge Boulee your professional background related to elections.

13  A.  Sure.  I am recently retired as elections director from

14  the Richmond County Board of Elections position I held for

15  approximately 29 years.  In addition to that, I am certified by

16  the State of Georgia as an election administrator, also through

17  the Election Center as an election administrator, and served on

18  the United States Standards Board for 13 years.  So...

19  Q.  Thank you.  And in your role were you responsible for the

20  training of people related to the setup of a polling place?

21  A.  Yes.

22  Q.  So what I want to do is just walk through for the Court kind

23  of the different zones that you encounter as a voter approaching

24  your polling place.  So if we can start with you park your car,

25  you're more than 150 feet from the outside of the polling
```

1  location.  What kind of activity is permitted in that zone?

2  **A.**  Outside the 150 feet it's pretty much anything goes within the

3  boundaries of the law I suppose.  But certainly we have active

4  campaigning going on.  People driving up, dropping people off,

5  picking people up, voting, that type of activity.

6  **Q.**  And then I want to talk specifically about before Senate Bill

7  202, so let's not include that.

8     Pre-Senate Bill 202 what would happen -- or who was allowed

9  and what kind of activities were permitted once you got within

10  150 feet of a polling place?

11  **A.**  That 150-foot buffer zone is reserved for voters or people

12  assisting voters, poll officials, safety officers from time to

13  time.  It is a restricted area intended to provide a buffer area

14  for voters for easy voting, uninterrupted voting as they approach

15  the building.

16  **Q.**  Then can you explain for the judge what the enclosed space is

17  when a voter approaches that part of the puzzle?

18  **A.**  I can.  So as voters approach the polling place, they go

19  inside.  And inside the actual facility is an area designated as

20  the enclosed space.  That is the most secure place of a polling

21  site.  The enclosed space is the area that contains the voting

22  equipment, including the check-in devices, the voters -- the

23  machine on which voters cast their ballot and the machines that

24  scan ballots once they're cast.

25  **Q.**  Ms. Bailey, in your personal opinion does it matter that

1  interactions with voters are kept to a minimum within that
2  150-foot buffer zone?
3  **A.**   Yes.   I think it's very important frankly.   In my opinion that
4  buffer zone is designed as a holding area, if you will, for
5  voters, a space where they can queue up to vote with assurances
6  of peace and uninterrupted activities going on in that area.
7  Certainly they should be free from any type of campaigning, any
8  type of offer of anything for vote, those types of things.   It's
9  an area for them to take a moment to perhaps get their thoughts
10  together, review their sample ballot again before they go in,
11  those types of things.
12  **Q.**   And that buffer zone existed before Senate Bill 202?
13  **A.**   It did.
14  **Q.**   So in your experience in Richmond County was there a change in
15  behavior of various groups that wanted to interact with voters in
16  line related to the 2020 elections?
17  **A.**   There was.   We've actually began hearing about this trend, if
18  you will, in 2018.   We saw a little bit of it during the 2018
19  elections.   But by the time 2020 came around, we were -- there
20  were many groups that were interested in voter protection,
21  promoting voting and what have you.   And many of them were
22  offering food and beverage to voters or wanted to bring food
23  trucks in and that type of activity.
24      It did seem to -- as the year went on in 2020, we saw a little
25  bit in June, but we really saw it leading up into November.   And

1    then certainly by the time the January runoff got here, it was

2    wide open in that regard.

3    **Q.**  Ms. Bailey, if you could take the notebook in front of you

4    that says "Defendants' Hearing Exhibits," and turn to Tab 45.

5    **A.**  Yes.

6    **Q.**  And can you just describe, what is this document?

7    **A.**  I can.  This is an e-mail that I sent to then Elections

8    Director Chris Harvey on September 25th, 2020, asking for

9    clarification on whether or not it was permissible to have people

10   come approach voters while they're inside the 150-foot mark to

11   give them food and drinks or chairs or anything else.

12   **Q.**  So the language there from Lynn Bailey to Chris Harvey, these

13   are your words, right?

14   **A.**  Yes.

15          MR. TYSON:  Your Honor, we would move the admission of

16   Defendants' Exhibit 45.

17          MR. GARABADU:  No objection, your Honor.

18          THE COURT:  It's admitted.

19   BY MR. TYSON:

20   **Q.**  Ms. Bailey, can you just read out loud the first paragraph of

21   that e-mail.

22   **A.**  I can.  I've had many groups reach out to me regarding

23   providing refreshments, drinks, chairs to voters waiting in line.

24   I have fumbled it a bit because I'm unsure what to tell them.  I

25   know there is the whole offer of something of value in exchange

1  for a vote law.  I also know that in the Atlanta area back in June

2  that many polling places were visited by citizens offering

3  refreshments to voters.  Can you tell me if the state has taken a

4  position on this.

5  **Q.**  So when you say that you were unsure what to tell these

6  third-party groups, why was that?

7  **A.**  Well, we were sure -- the Board of Elections and our law team

8  was sure -- or confident that they didn't feel it was appropriate

9  to have voters being approached inside of that 150-foot buffer

10 zone, but we couldn't exactly find anything in the law that backed

11 us up in that regard.  You know, absent having monitors on scene

12 ourselves, we really had no way of knowing what the conversations

13 were that might be taking place inside that 150-foot zone, and I

14 think that was our main concern.  This is ensuring that voters

15 could have a peaceful and non-induced path to the voting booth.

16 **Q.**  So in light of the changes made by Senate Bill 202, would you

17 know what to tell those third-party groups today?

18 **A.**  Yes.  Yes.  Clearly the law says today that the offer of food

19 and beverage are excluded under Georgia law, prohibited under

20 Georgia law.

21 **Q.**  So, Ms. Bailey, in your personal opinion then, what was it

22 that changed when Senate Bill 202 was adopted as it related to the

23 buffer zone?

24 **A.**  Well, I think the main thing is the language.  I know a lot of

25 people, including myself, initially thought the language in there

1   was quite egregious quite frankly.  When you look at it, it sounds

2   rather harsh.  But from my own personal experience, and I think

3   from other -- of my colleagues around the state, it was clear that

4   many of us had the same doubts or questions about that.  I think

5   we knew down deep that it was probably not a good thing to do, but

6   we weren't real comfortable enforcing it not knowing -- not

7   feeling as though we had law to back us up.

8      So once it was put down, you know, in Senate Bill 202

9   expressly forbidding those things, I think it served to better

10  streamline that whole process and just take it off the map of

11  something that was a trouble spot on Election Day.

12  **Q.**  So would it be more like a clarification then?

13  **A.**  I think it would be, yes, exactly.

14  **Q.**  So in your personal opinion what would happen if third-party

15  groups were freely able to distribute food and drinks and hand

16  sanitizer and coloring books and things like that to voters in

17  line?

18  **A.**  Well, we didn't experience it firsthand in Richmond County

19  because we were somewhat proactive in that regard, we didn't

20  permit it through either election cycle.  But the reason we didn't

21  permit it was in anticipation of the possible disorder that it

22  could cause with voters being approached in line.

23     And, you know, it's not just -- it was in big part because we

24  didn't know what was being said to voters.  But it was also the

25  perception by other's standing in line of what might be being said

1  to the people standing in line.

2     So all those things were a concern for us.  Certainly in this

3  environment, and even going back to 2020, citizens are generally

4  on fairly red alert when it comes to voting, whether it's concerns

5  of fraud or whether it's concerns of suppression, and we just

6  didn't want to do anything that might add to that general angst.

7  **Q.**  So you mentioned it would lead to disorder in the polling

8  place.  Why would you as an elections director not want to have

9  disorder occurring at a polling place?

10 **A.**  Well, if you have disorder in a polling place, you have to

11 have a way of resolving that disorder.  So for me that meant

12 either having -- we could have additional workers assigned outside

13 to monitor the lines, or either take some of the workers who were

14 inside off of their posts to come outside and monitor that.  And

15 neither one of those we felt were good options, not to mention the

16 fact that I think it all drives back to the idea that you just

17 don't know what people are talking about when they're having a

18 private conversation inside that 150 buffer zone, you just don't

19 know.  And we did feel a strong desire to protect that area for

20 the voters.

21 **Q.**  Ms. Bailey, I want to ask you briefly about just kind of the

22 setup of polling places.  What entity is responsible for choosing

23 staffing and equipment levels and those types of things that go

24 into the setup of a polling place?

25 **A.**  That would be the local county official.

1  **Q.**  And as a county election official would you take a variety of

2  factors into account to determine the proper staffing levels and

3  equipment levels, those types of things?

4  **A.**  Certainly.  You would look at historical turnout and other

5  factors that might be unique to each particular polling place.

6  **Q.**  Did Richmond County use the Secretary of State's polling

7  manual when you were the elections director?

8  **A.**  We did.  While we didn't train directly from the manual, we

9  took that manual and used it to train our poll workers through

10  PowerPoint development and so on.

11  **Q.**  So Richmond County developed its own PowerPoints based on

12  information from the poll worker manual, is that correct?

13  **A.**  That is correct.  And then just to, I guess, further enhance

14  the training we also sent a copy of the state's poll worker manual

15  out to every polling place for their Election Day operations.

16  **Q.**  So if the Court was to make a change regarding what happens

17  within the 150-foot buffer zone, would Richmond County have to

18  update its own training materials?

19  **A.**  Oh, yes.  And I would suspect -- even though I'm not there

20  making those decisions these day, but I suspect they would also

21  reprint the poll worker training manual to accurately reflect the

22  current law.

23  **Q.**  Is it your understanding that Richmond County poll workers

24  have already been trained about the 150-foot buffer zone rules

25  contained in Senate Bill 202?

1   **A.**   Yes, I would think so.  In Richmond County they had a special

2   election in March and another one -- a general primary in May and

3   then a runoff in June, and that law was in effect at that point,

4   so they would have been trained now on three separate training

5   occasions about that.

6   **Q.**   Does Richmond County often use the same individuals for

7   primary and general election poll workers?

8   **A.**   Absolutely.

9   **Q.**   Now, you're aware that there were some changes made in the

10   run-up to the 2018 election by election administration, do you

11   recall that?

12   **A.**   Yes.

13   **Q.**   Did the changes related to citizenship verification involve

14   training only for poll managers or involve training for all poll

15   workers?

16   **A.**   That change, as I recall, was a very, very last-minute change,

17   happening after the majority of our poll worker training had been

18   completed.  So in those circumstances, it would have been our

19   practice to train the poll manager prior to the election and ask

20   them to then take that information back to their polling place and

21   make their workers aware of that change.

22   **Q.**   Would your office ever provide Official Election Bulletins to

23   poll workers?

24   **A.**   By a different name, but yes.  We prepared a document we

25   called "Last-Minute Instructions," but call it what you will, so

1   any type of last-minute changes that might need to be mentioned or

2   worth another mention would be addressed in that document.

3   **Q.**   We've heard a little bit about a candidate withdrawing in

4   close proximity to an election.  Could you just explain for the

5   Court what the difference is with a candidate withdrawal close to

6   the election versus a change in how a precinct or polling place

7   set up close to an election?

8   **A.**   Sure.  So a candidate withdrawal is a fairly simple matter.

9   The law requires us simply to post a notice within the polling

10  place and do our best to notify the voters that that candidate has

11  withdrawn.

12      Changes that happen last minute that involve the election

13  administration are a little more complicated to enact with great

14  confidence.  The problem is we have lost that value at that point

15  of having the poll workers in front of us in training where they

16  have an opportunity to ask questions and whatnot.  So while we

17  would do our best in last-minute situations to make sure the

18  manager is well informed, we aren't able to touch as many people

19  personally as we would be otherwise.

20          MR. TYSON:  If I can have just a moment, your Honor, I

21  may be finished with my questions here.

22          Ms. Bailey, I just want to say thank you on behalf of

23  Georgians for your work on elections.  I know it's a controversial

24  area to work in now.  We appreciate your work over the years in

25  that.  And that's all the questions I have for you.  Thank you.

1          THE WITNESS:  Thank you.

2          THE COURT:  Any cross?

3          MR. GARABADU:  Yes, your Honor.

4          My name is Rahul Garabadu.  I'm with AME plaintiffs.

5                    CROSS-EXAMINATION

6    BY MR. GARABADU:

7    **Q.**  Good afternoon, Ms. Bailey.

8    **A.**  Good afternoon.

9    **Q.**  My name is Rahul Garabadu, and I'm going to be asking you some

10   questions on behalf of the AME plaintiffs.

11       Now, Ms. Bailey, you mentioned on direct examination that you

12   were in charge of Richmond County elections for about 29 years, is

13   that right?

14   **A.**  Yes.

15   **Q.**  So it's safe to say that you oversaw a number of elections in

16   your time heading up Richmond County, right?

17   **A.**  Yes.

18   **Q.**  And you would agree with me that no matter how much you

19   prepared as a county, that there were always changes to elections

20   administration that can happen before an election is actually

21   underway, right?

22   **A.**  It can always happen, yes.

23   **Q.**  Changes can happen because the legislature passes new laws,

24   for example?

25   **A.**  Yes.  Although those typically don't come just prior to an

1    election.  Typically we would have some heads-up on that type of

2    legislative action.

3    **Q.**  And changes can happen because the State Election Board

4    authorizes new rules, right?

5    **A.**  It could.

6    **Q.**  And changes can happen because courts might weigh in on the

7    legality of certain election rules, right?

8    **A.**  Certainly, yes.

9    **Q.**  And at the county level you don't always control when those

10   changes happen, right, Ms. Bailey?

11   **A.**  We seldom control when they happen, yes.

12   **Q.**  That's right.

13       You mentioned on direct that you even have a document called

14   last-minute changes to account for those kinds of last-minute

15   changes, right?

16   **A.**  We call it -- it's "Last-Minute Instructions."  And it would

17   include any changes that might have occurred but also other

18   last-minute instructions that we felt were important enough for a

19   second mention.

20   **Q.**  So you have a process in place to account for those

21   last-minute changes, right?

22   **A.**  Instructions, yes.

23   **Q.**  And when these changes happened while you were in charge of

24   Richmond County, Richmond County always made sure to implement

25   them, right?

**A.**   Of course, yes.

**Q.**   Now, I want to talk to you a little bit about how those changes to election rules are communicated.

Now, when a statewide election rule change comes down the pipeline, one of the ways that it's communicated to counties is through an Official Election Bulletin or an OEB, correct?

**A.**   Yes.

**Q.**   You've received those OEBs while you were in charge of Richmond County, right?

**A.**   Yes.

**Q.**   Those OEBs, sometimes they clarify laws that are already on the books, right?

**A.**   Yes.

**Q.**   Sometimes they announce changes to laws, right?

**A.**   Yes.

**Q.**   They essentially give you additional instructions on how to administer an election, is that right?

**A.**   Correct.

**Q.**   And often these instructions, they need to be shared with poll workers and poll managers, right?

**A.**   Yes.

**Q.**   As with other election rule changes, you don't ever really know when an OEB is going to come down the pipeline, right?

**A.**   Correct.

**Q.**   Now, I want to show you some examples of OEBs.

1          MR. GARABADU:  Your Honor, I'm going to show the witness

2    what's been marked and entered as Plaintiffs' 40.  And we're going

3    to put it up on the screen, if we can.

4    Q.  And, Ms. Bailey, if you would like to look at the paper copy

5    of what I'm about to show you, it should be in one of those

6    binders, but otherwise you can follow along on the screen.

7          So let's start with this OEB from 2018.  And it's labeled in

8    the subject line "Pending Citizenship Registration At Voting

9    Locations," right?

10   A.  Yes.

11   Q.  And this was the OEB that you were talking about on direct

12   examination, right?

13   A.  This is an example of an OEB, yes.

14   Q.  And this was the -- and you were working at Richmond County

15   elections in the 2018 cycle, right?

16   A.  Yes.

17   Q.  So you would have received this OEB at the time, right?

18   A.  Yes.

19   Q.  And you would agree with me that 2018 was a midterm election

20   year with pretty high turnout, right?

21   A.  Yes.

22   Q.  I want to turn your attention to the text of the OEB.  That

23   first sentence says:  District Court Judge Eleanor Ross has just

24   issued an injunction regarding the way voters in pending

25   citizenship status are able to resolve their citizenship

1    verification issue at the polls.

2        Did I read that correctly?

3    **A.**   You did.

4    **Q.**   So this OEB was issued because of a court order, right?

5    **A.**   Yes.

6    **Q.**   Now, the second sentence of this OEB says:  The injunction

7    will require posting information at the polls, additional training

8    for poll managers and a slight change to the procedure for

9    verifying proof of citizenship at polling places.  Did I read that

10   correctly?

11   **A.**   Yes.

12   **Q.**   And then it has three pages of instructions about this change

13   if we want to scroll through.

14       Do you see those three changes, Ms. Bailey?

15   **A.**   I do, yes.

16   **Q.**   On page three it specifically has a section labeled

17   "Instructions For Processing Pending Citizenship Voters on the

18   Express Poll Units," right?

19   **A.**   Yes.

20           MR. GARABADU:  If we could scroll back to the top.

21   **Q.**   So, Ms. Bailey, this OEB is dated November 2nd, 2018, right?

22   **A.**   Yes.

23   **Q.**   So if the election were to be held on November 6th, 2018, that

24   would mean that this was issued four days before that election

25   day, right?

1  **A.**  Correct.

2  **Q.**  And it would have been right as early voting was concluding in

3  that election, right?

4  **A.**  Early voting would have been concluding and Election Day prep

5  would be in its very final stages.

6  **Q.**  But, to your knowledge, Richmond County still implemented the

7  guidance in this document, right?

8  **A.**  Sure.

9  **Q.**  I want to take a look at another OEB.  This one is from 2020.

10        MR. GARABADU:  And, your Honor, I'm going to show the

11  witness what's already been marked and entered as Defense

12  Exhibit 39.  And we're going to publish that on the screen.

13  **Q.**  Now, Ms. Bailey, this OEB is labeled "Giving or Receiving

14  Things of Value For Voting and Line Warming," right?

15  **A.**  Yes.

16  **Q.**  And you were working for Richmond County Elections during the

17  2020 cycle, right?

18  **A.**  Yes.

19  **Q.**  So you would have received this OEB at that time, too, right?

20  **A.**  Yes.

21  **Q.**  And you agree with me that 2020 was a high turnout

22  Presidential election year, right?

23  **A.**  I would, yes.

24  **Q.**  And this OEB was specifically issued on December 28th, 2020,

25  right?

**A.**  Correct.

**Q.**  And that would have been eight days before the January 5th,

2021, runoff election, right?

**A.**  Yes.

**Q.**  And this would have also been while under -- early voting was

already underway, right?

**A.**  Yes.

**Q.**  But, again, Richmond County would have still implemented the

guidance in this OEB, right?

**A.**  Yes.

**Q.**  I want to look at this OEB a little bit more closely.

Now, this OEB would have been issued before SB 202 was

enacted, is that right?

**A.**  Yes.

**Q.**  And this OEB is specifically addressing the practice of giving

out food and water at the polls, right?

**A.**  Yes.  While I can't see the entire content, it would appear so

from the subject.

**Q.**  Okay.  And specifically --

MR. GARABADU:  And if we want to scroll down a little

bit.

**Q.**  This OEB discusses how other laws not related to SB 202 might

prohibit some activities when they're connected to line relief,

right, or line warming?

**A.**  Yes.  It looks like it refers to the offering -- or giving or

1    offering something of value in exchange for a vote.

2    **Q.**   And one of the laws it talks about right at the top there is

3    OCGA 21-2-570, is that right?

4    **A.**   That is correct.

5    **Q.**   And according to this OEB, that law says that:  Any person who

6    gives or receives, offers to give or receive or participates in

7    the giving or receiving of money or gifts for the purposes of

8    registering as a voter, voting or voting for a particular

9    candidate in any primary or election shall be guilty of a felony.

10        Did I read that correctly?

11   **A.**   All of that is not in that heading there but --

12   **Q.**   I'm reading specifically in the italicized portion.

13   **A.**   Got you.  Then yes.

14   **Q.**   Okay.

15        So, Ms. Bailey, that law essentially prohibits vote-buying,

16   right?

17   **A.**   That's correct.

18   **Q.**   Now, the other law that's mentioned in this OEB is

19   OCGA 21-2-414.  Do you see where that is, Ms. Bailey?

20   **A.**   I do.

21   **Q.**   And at the bottom of page one the OEB describes that statute

22   as a prohibition that is, quote, against soliciting votes within

23   150 feet of a polling place or within 25 feet of a voter standing

24   in line to vote.  Did I read that right?

25   **A.**   You did.

1  **Q.**  So that law prohibits electioneering in the 150-foot buffer

2  zone like you were talking about on direct, correct?

3  **A.**  Correct.  Yes.

4  **Q.**  So, Ms. Bailey, even before SB 202, if someone in Richmond

5  County had been using line relief as a way to buy votes or to

6  electioneer within that buffer zone, they wouldn't have been

7  allowed to do that, right?

8  **A.**  That's correct.  It would have been a violation of law, yes.

9  **Q.**  And, to your knowledge, both the law prohibiting vote-buying

10  that we talked about and the law prohibiting electioneering in

11  that 150-foot buffer zone, those are still on the books to this

12  day, right?

13  **A.**  They are, with the addition to 414 to include the exceptions

14  for food and water.

15  **Q.**  Okay.

16        MR. GARABADU:  We can take the exhibit down from the

17  screen for now.

18  **Q.**  Now, Ms. Bailey, we talked a little bit earlier about how you

19  ran Richmond County elections for about 29 years, right?

20  **A.**  Yes.

21  **Q.**  In those 29 years you would have been made aware of when there

22  were major problems at polling locations, right?

23  **A.**  Yes.

24  **Q.**  You would have been made aware of groups or people who are

25  being prosecuted in Richmond County for interfering with

1  elections?

2  **A.**   Should have been, yes.

3  **Q.**   And in those 29 years are you aware of anyone in Richmond

4  County ever being prosecuted for using line-relief activities to

5  buy votes?

6  **A.**   I don't have any -- there were no complaints filed or anything

7  like that, that is a true statement.

8  **Q.**   And in those 29 years are you aware of anyone in Richmond

9  County being prosecuted for using line relief to solicit votes in

10  the buffer zone?

11  **A.**   Not with any firsthand knowledge, no.

12  **Q.**   And in those 29 years are you aware of anyone in Richmond

13  County being prosecuted for using line relief to intimidate voters

14  in any way?

15  **A.**   No.

16  **Q.**   I want to talk about something that you said on direct

17  examination.  You mentioned that within the 150-foot buffer zone

18  around a polling location, I think you called that area a

19  restricted area, is that right?

20  **A.**   Yes.

21  **Q.**   And you said it was a restricted area in your personal

22  opinion, right?

23  **A.**   Yes.

24  **Q.**   But, Ms. Bailey, you would agree with me that as long as

25  someone wasn't being disruptive or electioneering, anyone would be

1  allowed in that 150-foot buffer zone, right?

2  **A.**   I don't know.

3  **Q.**   There's no law that prohibits that, though, right, Ms. Bailey?

4  **A.**   No.  And I think that led to some of the questions that local

5  election officials were sending the state frankly, and it caused

6  the addition or the edits to 414 in Georgia law.  But the fact of

7  the matter is we took the position that it was a restricted area,

8  had been a restricted area, would continue to be a restricted area

9  as long as that 150-foot buffer zone was available.  You know,

10  short of -- I said it earlier but short of being on-site or having

11  boots on the ground there in multiple positions in the voting

12  line, we would have absolutely no way of knowing what

13  conversations are going on or what.

14     So that -- I mean, that's one issue.  But the second issue,

15  and I think the bigger issue, is the distraction and the disorder

16  that we felt would be caused by having additional people in such

17  close proximity to voters who were queuing up to vote.

18  **Q.**   Ms. Bailey, I just want to be clear, though.  You mentioned

19  on direct and you mentioned again that you were restricting

20  line-relief activities before SB 202 was handed down, right?

21  **A.**   Yes.

22  **Q.**   Even though there was no law on the books restricting line

23  relief in that 150-foot buffer zone, Richmond County was not

24  allowing it?

25  **A.**   Well, I guess you could say that.  I guess another way to say

1  it is we strictly enforced the 150-foot safe buffer zone for

2  voters when they're queuing up to vote at the precincts.

3  **Q.**  But, again, I just want to be really clear about this,

4  Ms. Bailey, there was no law on the books at the time that

5  restricted that, this was based on the opinion of Richmond County

6  you said?

7  **A.**  Right, because the prohibition is against electioneering.  We

8  felt like that the mere approach of individuals to voters could

9  culminate in electioneering.  And so it was for that reason that

10  we took a hard stand on that from the outset.

11  **Q.**  But, Ms. Bailey, you would agree that, again, that buffer

12  zone, anyone is allowed to walk in that buffer zone, right,

13  there's no gate that prohibits you to come in?

14  **A.**  No, that's correct, anyone can walk in.  I think it's the

15  interaction with voters where you draw the line with that.

16  **Q.**  But, Ms. Bailey, you would agree with me that there are

17  interactions with voters that happen within that 150-foot buffer

18  zone that are perfectly allowed, right, even before SB 202 --

19  **A.**  Sure, voters talking amongst themselves.  Poll officials that

20  may be outside monitoring the line from time to time.  Sometimes

21  just people wandering around might go and talk to voters in line.

22  So, yes, I would agree that sometimes it does happen.

23  **Q.**  That's right.  And I think in your declaration you mentioned

24  that exit pollsters are often in that 150-foot buffer zone?

25  **A.**  They are allowed.  They have to be 25 feet away from the polls

1  but, yes, they are.

2  **Q.**  And you would agree with me that sometimes the media is within

3  the buffer zone, right?

4  **A.**  They can be sometimes, yes.

5  **Q.**  And like you said, voters can talk to each other in the buffer

6  zone, right?

7  **A.**  Sure.

8  **Q.**  But the only people that you were limiting from entering that

9  buffer zone were folks who were doing line relief, is that right?

10 **A.**  People who were offering or communicating, talking to the

11 voters and offering something to the voters, that's where we saw a

12 clear and distinct line.

13 **Q.**  And, again, you did this even though there was no explicit law

14 on the books before SB 202, right?

15 **A.**  We felt like there was.  We felt like the 150-foot buffer zone

16 was the law that required us to take that stand.

17 **Q.**  But, again, Ms. Bailey, I just want to be clear, that 150-foot

18 buffer zone law, that is about electioneering specifically, right?

19 **A.**  It is, yes.

20 **Q.**  Now, Ms. Bailey, you're aware that the reason we're here is

21 because the Court is deciding whether or not the line-relief ban

22 can go into effect for elections like the November 2022 election,

23 right?

24 **A.**  Right.

25 **Q.**  Now, I want to talk to you about previous court orders that

1  have impacted whether or not you've enforced a statute.  So I'm

2  going to ask you to look at one more OEB from 2018.

3           MR. GARABADU:  Your Honor, I'm showing the witness

4  what's been marked as Plaintiffs' Exhibit 41, and it has also been

5  entered into evidence.

6  **Q.**  Now, Ms. Bailey, I want you to take a look at this OEB.  And

7  it says there that this OEB came out on November 29th, 2018, is

8  that right?

9  **A.**  Yes.

10 **Q.**  And based on that date the OEB would have gone out while you

11 were still in charge of Richmond County Elections, right?

12 **A.**  Yes.

13 **Q.**  And in the very first clause of that very first sentence it

14 says that the OEB is being issued, quote, pursuant to a consent

15 order entered by the United States District Judge Timothy Batten,

16 isn't that right?

17 **A.**  Yes.

18 **Q.**  Towards the end of that first sentence it says that this

19 applied to the December 4th, 2018, runoff election, is that right?

20 **A.**  Yes.

21 **Q.**  Now, in the first sentence of the second paragraph it

22 says that:  This means that the provisions set forth in

23 OCGA 21-2-409(b)(2), which limited assistance in non-federal

24 elections to only relatives and people within the precinct cannot

25 be enforced.  Did I read that right?

**A.**   You did.

**Q.**   So this OEB was also issued because of a court order, right?

**A.**   Correct.

**Q.**   And it required poll workers to not enforce certain provisions in a statute, right?

**A.**   Yes.

**Q.**   And if it was issued on November 29th for a December 4th runoff, that would have been five days before the election, right?

**A.**   Yes.

**Q.**   So, again, advance voting would have already been underway for that election?

**A.**   Uh-huh (affirmative).

**Q.**   And, Ms. Bailey, presumably your office would have followed this directive in 2018, right?

**A.**   Sure.  Yes.

**Q.**   Even if this OEB was issued just five days before an election?

**A.**   Yes.

         MR. GARABADU:  Thank you, Ms. Bailey.  I have no further questions.

         THE WITNESS:  You're welcome.  Thank you.

         MR. SHELLY:  Just very briefly, your Honor.

         Jacob Shelly on behalf of the NGP plaintiffs.

                        CROSS-EXAMINATION

BY MR. SHELLY:

**Q.**   Good afternoon, Ms. Bailey.

**A.**   Hello.  Good afternoon.

**Q.**   I just have a few additional questions.  We can dive right in.

Paragraph 13 of your declaration you say that it was not uncommon for candidates to enter the buffer zone to speak with voters.  Do you recall that?

**A.**   Improperly so obviously, yes.

**Q.**   And you're aware that Georgia law already restricts candidates from approaching polling places?

**A.**   Absolutely.

**Q.**   And you testified that this issue was typically resolved by speaking with the candidates and explaining the rules?

**A.**   Yes.

**Q.**   In paragraph 11 of your declaration you report that outside organizations requested permission to set up stands and tables with food and water in and around voters.  Does that sound right?

**A.**   Yes.

**Q.**   In your experience in Richmond County has a candidate requested permission to set up a food or table (sic)?

**A.**   Not within the 150-foot buffer.  Now, outside of 150 feet, of course, they didn't need to request it, but it certainly was done from time to time.

**Q.**   In paragraph six of your declaration you said that you relied on Georgia law to prepare your testimony.  Does that sound right?

**A.**   Yes.

**Q.**   You're not aware of any section of Georgia law that would

1  prohibit, say, a tourist from approaching a voter in line to ask

2  for directions, is that right?

3  **A.**   I'm sorry, would you repeat that question.

4  **Q.**   You're not aware of any section of Georgia law that would, for

5  example, prohibit a tourist from approaching a voter in line to

6  ask for directions?

7  **A.**   A tourist?  Oh, excuse me, I couldn't understand.

8      No, I'm not aware of that.

9  **Q.**   And similarly there's no section that would prohibit a

10  journalist from approaching a voter in line to interview the voter

11  about what it's like to wait in line?

12  **A.**   I don't think so, although journalists should likely be

13  restricted to perhaps the exit polling rules, so depending on the

14  nature of their conversation with the voters.  But, no, I do not

15  know of anything that prohibits it.

16  **Q.**   And no section that would prohibit a person from approaching a

17  voter in line to verbally encourage them to endure the wait,

18  correct?

19  **A.**   Correct.

20  **Q.**   And Georgia law would not restrict a person from approaching

21  voters in line to distribute pictures of their missing cat, for

22  example?

23  **A.**   Correct.

24  **Q.**   Nor would it restrict a Coca-Cola representative from

25  distributing a brochure listing their new sparkling water flavors,

1  correct?

2  **A.**   Well, we might have to draw the line to any type of

3  solicitation, but I'm not aware of any particular law that would

4  prohibit that.

5  **Q.**   When you refer to "any type of solicitation," would you agree

6  with me that Georgia law prohibits soliciting votes?

7  **A.**   Absolutely.

8  **Q.**   Prior to SB 202 Georgia law already prohibited the

9  distribution of campaign materials within the buffer zone,

10  correct?

11  **A.**   Yes.

12  **Q.**   Ms. Bailey, if I offered you a bottle of water right now, that

13  wouldn't tell you anything about which political campaigns I

14  support, correct?

15  **A.**   That's correct.

16  **Q.**   Your declaration also discusses the new SB 202 provision that

17  requires wait times to be measured three times on Election Day,

18  correct?

19  **A.**   Yes.

20  **Q.**   And that provision requires changes to be made to precincts if

21  wait times of more than one hour were recorded at the previous

22  general election, right?

23  **A.**   Yes.

24  **Q.**   And this November --

25              (Interruption by the court reporter)

1  BY MR. SHELLY:

2  **Q.**  And this November will be the first general election for

3  statewide or federal office since SB 202 was enacted?

4  **A.**  I'm sorry, would you please repeat the question.

5  **Q.**  This November will be the first general election for statewide

6  or federal office since SB 202 was enacted?

7  **A.**  Correct.

8  **Q.**  And so any wait time is measured in this November's election

9  will require changes to precincts for the 2024 elections, correct?

10 **A.**  That is correct.

11 **Q.**  A few more questions.

12    Dealing with election law changes comes with the territory of

13 being an election administrator --

14 **A.**  Absolutely.

15 **Q.**  -- doesn't it?

16 **A.**  Yes.

17 **Q.**  And indeed after SB 202 was enacted, does it sound right that

18 you remarked that election laws are perpetually changing?

19 **A.**  They are.

20 **Q.**  And you said:  As election administrators, our job is to

21 implement and adhere to whatever sets of laws that we have before

22 us and to do so fairly.  Is that your position today?

23 **A.**  Yes, it is.

24 **Q.**  We just discussed this will be the first general election for

25 statewide or federal office where the food and water ban is in

1  effect.  So is it correct, then, that poll workers who have

2  experience from previous election cycles may already be familiar

3  with the prospect that groups might lawfully distribute water

4  bottles and other items?

5  **A.**  You know, it's hard to say.  I have been removed from --

6  directly removed from elections during the entire 2022 election

7  cycle having retired December 31st, so I can't attest to what

8  they've trained on in the time I've been gone.

9      But I would say that poll workers would certainly be trained

10  on and have the knowledge that any type of solicitation in

11  exchange for a vote is strictly prohibited or electioneering

12  inside that 150-foot rule.

13  **Q.**  I believe -- it was maybe in your direct you mentioned that

14  it's often similar groups of poll workers who volunteer election

15  to election?

16  **A.**  Yes.

17  **Q.**  So would it be true that there may be some poll workers for

18  November's elections who would have had experience dealing with

19  elections before SB 202?

20  **A.**  There's no doubt about that, yes.

21  **Q.**  SB 202 does not task polling place officials with enforcing

22  the food and water ban, correct?

23  **A.**  Well, I think it's our responsibility to either make sure --

24  to make sure that the laws are adhered to.  And if they are not,

25  then passing along that information to some type of law

1   enforcement official to make sure that the law is carried out

2   properly.

3   Q.   Before SB 202 the County Board of Elections was responsible

4   for a number of tasks, including -- and this is from paragraph

5   three of your declaration -- overseeing equipment needs for voting

6   precincts, recruiting and hiring poll managers and poll workers,

7   arranging for ballot marking devices for all precincts, securing

8   transportation of equipment to and from polling locations, and

9   supervising elections, is that all correct?

10  A.   Yes.

11  Q.   And if a court enjoins the food and water ban, County Boards

12  of Elections will remain responsible for these same tasks,

13  correct?

14  A.   That's correct.

15          MR. SHELLY:  No further questions.  Thank you.

16          THE WITNESS:  You're welcome.

17          MR. TYSON:  Very briefly, your Honor.

18                    REDIRECT EXAMINATION

19  BY MR. TYSON:

20  Q.   Ms. Bailey, I just want to ask you a couple of clarifying

21  questions.

22      You were asked about a number of Official Election Bulletins

23  that came close to an election.  Do you recall that?

24  A.   I do.

25  Q.   Just because Official Election Bulletins are generated, does

1  that mean it's easy to implement what those changes might be?
2  **A.**   No, it does not.  It's always -- it's a rush thing when it
3  happens close to the election.  And the fact that our poll workers
4  have already been trained in person on one set of procedures and
5  practices, it's disconcerting to put out new rules at the last
6  minute knowing we will not have been able to touch all our poll
7  workers face to face and provide good solid training on whatever
8  the change is.
9  **Q.**   You were asked some questions about allowing people within the
10  buffer zone and solicitation and all those kinds of questions.  Do
11  poll managers have authority to regulate the people who are in and
12  around a polling place?
13  **A.**   They do have the authority and they have the directive to do
14  it.  We ask them on a routine basis to monitor their polling place
15  every hour, and to the extent that it's possible for them to
16  include a lap around outdoors just to make sure everything's on
17  the up-and-up, make sure no one has slipped campaign signs in
18  where they shouldn't be and that kind of thing.  So they would be
19  accustomed to monitoring that to a certain degree and to the
20  extent that they are available to do it.
21  **Q.**   Mr. Shelly asked you about if he handed you a bottle of water
22  right now, you wouldn't know if he was asking you to vote for a
23  candidate.  Do you recall that?
24  **A.**   I do.
25  **Q.**   So you would need to know more information to know if he was

1  trying to communicate a particular message in handing you a bottle

2  of water, right?

3  **A.**  Right.

4          MR. TYSON:  Your Honor, those are all the questions I

5  have.  Thank you.

6          MR. GARABADU:  Your Honor, very brief recross.

7                      RECROSS-EXAMINATION

8  BY MR. GARABADU:

9  **Q.**  Ms. Bailey, Mr. Tyson just came and asked you whether or not

10 poll managers could regulate activities in the buffer zone.  Do

11 you recall that line of questioning?

12 **A.**  I do.

13 **Q.**  Now, poll managers, when they regulate the 150-foot buffer

14 zone, they're regulating whether or not something is causing a

15 disruption, right?

16 **A.**  Correct.

17 **Q.**  So if someone's having a conversation with another person, you

18 wouldn't classify that as a disruption, would you?

19 **A.**  I would not.

20 **Q.**  And if someone is not electioneering, they're allowed to have

21 conversations in that buffer zone like we were talking about

22 before, right?

23 **A.**  They are, although you really have no way of knowing what

24 they're talking about, do you?

25 **Q.**  But, again, you cannot restrict --

```
 1   A.  Of course not.  Of course not.

 2   Q.  -- people from having conversations just because you don't

 3   know what they're talking about?

 4   A.  That's right.

 5            MR. GARABADU:  Thank you, Ms. Bailey.

 6            MR. TYSON:  Nothing further from us, your Honor.

 7            THE COURT:  Ma'am, you can step down.

 8            THE WITNESS:  Thank you, sir.

 9            (Witness excused)

10            MR. SCHAERR:  Do you want to take a break now, your

11   Honor, or shall we go ahead with our next witness?

12            THE COURT:  You can go ahead with your next witness.

13            MR. SCHAERR:  I'm sorry?

14            THE COURT:  You can go ahead.

15            MR. SCHAERR:  State defendants call Mr. Matt Mashburn.

16            THE COURT:  Good afternoon.

17            MR. MASHBURN:  Good afternoon.

18            COURTROOM DEPUTY CLERK:  Mr. Mashburn, if you will

19   remain standing and raise your right hand.

20                 _____

21                      MATTHEW MASHBURN

22             a witness herein, being first duly sworn,

23              was examined and testified as follows:

24                 _____

25            COURTROOM DEPUTY CLERK:  Thank you, you may be seated.
```

```
 1                      DIRECT EXAMINATION
 2   BY MR. SCHAERR:
 3   Q.   Thank you, Mr. Mashburn.
 4        Can you state your full name for the record, sir.
 5   A.   Thomas Matthew, with two Ts, Mashburn, M-A-S-H-B-U-R-N.
 6   Q.   Thank you.
 7        You're currently on the State Election Board, am I right?
 8   A.   That's correct, I'm a member of the State Election Board.
 9   Q.   And how long have you been in that role?
10   A.   I was appointed by the Lieutenant Governor in 2020, in
11   February of 2020 while the legislature was out of session.  And
12   then the next session I got my own term and my own rank.
13   Q.   What was the vote to confirm you in that role?
14   A.   I was -- it was -- it was in the General Assembly, the vote
15   was 49 to 1, it was unanimous among the Democrats, and I lost one
16   Republican.
17   Q.   And in your role as a member of the State Election Board what
18   responsibilities do you have?
19   A.   We will pass general rules and regulations with regard to
20   the conduct of elections within the authority given to us by
21   the statutes.  Sometimes the Governor will give us special
22   authority to respond.  Like with regard to COVID, we'll have that.
23   We are tasked with making rules and regulations to have uniform
24   application throughout the state so that all the voters are having
25   the same rules no matter where they live.
```

1    And we also hear -- complaints of violation of state law will

2  come to us for an administrative resolution, we don't have any

3  criminal power.

4  **Q.**  What do you understand the Board's key purpose to be?

5  **A.**  With regard to the voter experience, we want the voters to

6  have similar experiences throughout the state so that everybody's

7  operating under the same rules.

8  **Q.**  And does the Board have any responsibility for facilitating

9  voting or making it easier or harder?

10 **A.**  The counties think we have that power because we will give

11 them statements and advice when we talk to them about what they

12 can do to make their lines go better, ideas that we have.  And it

13 can be done informally or it can be done formally.

14 **Q.**  And are complaints related to election integrity sometimes

15 brought to the Board's attention?

16 **A.**  Yeah, absolutely.  If there's an allegation of voter fraud,

17 those are very commonly brought to us.

18 **Q.**  And was your position on the Board your first position related

19 to Georgia elections?

20 **A.**  No, I was a poll watcher back in the '90s, so I've been --

21 back when Georgia only had five statewide poll watchers, I was one

22 of the five.  And now we have 25 I think it is.  So I've been a

23 poll watcher since -- and a tabulation monitor since the '90s.

24 **Q.**  And do you still do that, are you still a poll watcher?

25 **A.**  No, I'm in my official capacity as the Board, so it would be

improper for me to be a partisan poll watcher, but I still do a
lot of the same things.  I will go and stand at the tabulation
center and watch what's going on.  I'll go to advance voting sites
and see what's going on.  I'll visit precincts, see what's going
on.  So I do a lot of the same things but it's in a different
capacity and different role.

Q.  What kind of interactions do you typically have with county
election officials?

A.  We have both formal and informal reactions (sic) to them.
When I go to a county, I immediately introduce myself and say who
I am, so they'll usually be very excited.  Some counties will say
we've never had a Board member visit us before.  So they'll take
me on the whole tour and show things they're proud of.

    And they'll also give me feedback on what they're having
problems with.  And sometimes they'll say, we need you guys to
pass a regulation that does this, we're having a problem with
this.

Q.  Do county elections officials sometime relay to the Board
complaints from voters?

A.  Yes.  That will be formally and informally.  Sometimes the
counties will report people, but the counties will also inform us
of -- that they're hearing this from the voters, this is a problem
that they're getting.

Q.  And do county election officials sometimes relay to the Board
their own complaints about how voting is going?

**A.**  Yes, they'll absolutely tell us what they think is working and what's not working.

**Q.**  And is there some kind of formal mechanism for issuing and collecting complaints?

**A.**  They're logged in at the Secretary of State's Office, so here we got to kind of make a distinction between big C complaints and little C complaints.  There's little C complaints, this poll worker was rude to me.  All right, that doesn't get logged in at the Secretary of State's but you heard it, you know what's going on.  And then there's big C complaints where somebody says I'm making a formal complaint that a violation occurred, and those will get logged in.

**Q.**  And do you regularly interact with ordinary Georgia voters?

**A.**  Yeah, especially since the November 2020 election, people have been very free to come up and tell me how they think things are going.

**Q.**  Do they sometimes convey complaints to you about how elections are being run?

**A.**  Yes.  I was accused of treason in the OK Cafe while I was having lunch one day.

**Q.**  Now, earlier you mentioned you were a poll watcher in that capacity.  What did you do on election days?

**A.**  Typical election day, I would start in the county where I live, and I would go to about six or seven precincts close to where I live and observe very quickly what's going on.  And then I

1  would head south down the western third of the state, and I just

2  hit precinct after precinct.  And I would usually end up somewhere

3  near -- either Albany or Americus.  And I would be there around --

4  until about closing time, watch the closing, turn around and come

5  back to Atlanta and then stay usually in Fulton County's

6  tabulation area until they finished, wherever that was.  So we

7  would go through the night and into the next day.

8  **Q.**  On a typical election day how many precincts would you say you

9  had observed?

10  **A.**  Probably average around 50, depending on how many rumors I

11  would have to chase down.  During the day people would call and

12  say this is happening at this precinct, go check it out and tell

13  us what the truth is.  So we take side trips to go handle, chase

14  down rumors.

15  **Q.**  In that connection did you ever see non-voters interacting

16  with voters at polling stations?

17  **A.**  Up until very recently it was very, very, very rare.  You

18  would not -- it's a very recent phenomenon.

19  **Q.**  And tell us about -- tell us about that.

20  **A.**  In the -- the most recent one -- the previous witnesses were

21  talking about 2018 or so, but the most previous one that I

22  remember was 2010 in DeKalb County at early voting at the big

23  precinct on Memorial Drive.  And there were people there

24  campaigning.  So Linda Lattimore, who was the DeKalb County

25  Elections Director at the time, she chased them off.  She said,

1  y'all are campaigning, leave.  And then a little while later they

2  came back with a case of water, and now they're in the line

3  handing out water, doing the same thing that they were just told

4  they couldn't do.  So they used the water as a pretext to get

5  around the rules.

6  **Q.**  So if I mentioned the buffer zone around polling places, do

7  you know what I mean by that?

8  **A.**  Yeah, absolutely.

9  **Q.**  And we've talked about that earlier today.

10     Did some of the interactions that you observed between

11  non-voters and voters actually take place inside that buffer

12  zone --

13  **A.**  Yeah.

14  **Q.**  -- besides the water example that you mentioned?

15  **A.**  The one I just mentioned in DeKalb County was inside the

16  buffer zone.

17     And then in 2012 I was down in Albany and I was at a precinct.

18  And on the way into the precinct very surreptitiously, very under

19  the table the voters were being handed -- it took me about

20  45 minutes to figure out what was going on.  The voters were being

21  handed a voter card to tell them who to vote for.  And then as

22  they came out, they handed the voter card to a different person

23  who gave them a green ticket.  And they would take the green

24  ticket across the street to this big tent outside the 150-foot

25  buffer, and they would turn the ticket in and get a full plate of

1  barbecue with all the fixings in exchange for their ticket.

2  **Q.**  We'll come back to some of that in a minute, but we've heard

3  several times today mention of elderly voters and disabled voters.

4  What's your understanding of what Georgia law currently does to

5  accommodate elderly or disabled voters?

6  **A.**  When you have an elderly voter or disabled voter, we have a

7  law that says that they're allowed to go to the front of the line.

8  So that's always been my first question when the issue gets

9  raised, they're like we want to -- we want to ease suffering of

10  elderly voters.  Well, the first thing you can do to ease their

11  suffering is move them to the front of the line like they're

12  entitled to.  So that's both for elderly and disabled voters have

13  their own line procedure where they can go to the front of the

14  line and get them in and out.

15  **Q.**  Thank you.

16      Let's talk in a little more depth about this practice of

17  giving food and drink to voters.  Now, when you first became a

18  poll watcher, was it common for third parties to give food or

19  drink to voters?

20  **A.**  Very rare.  Unheard of.  You just didn't see it.

21  **Q.**  And you mentioned this 2010 event.  Was that the first time

22  you saw that occur?

23  **A.**  That was the only one that comes to mind.  That's the first

24  time it really came to my mind that this is a change.

25  **Q.**  And then how did the voters respond to that effort to

1  influence them by passing out water in the line?

2  **A.**  Georgia voters -- Georgia has a very sad history of violence

3  at polling places.  And so voters are on -- the tension of an

4  election, they're already on that.  But in Georgia you have

5  particular history of violence against voters at polling places.

6     And so the voters react very strongly and very negatively to

7  strangers with unclear motives at the polling place.  And, in

8  fact, when I'm a poll watcher, I will always lead -- please tell

9  me where the poll manager is, and I will lead with my ID and my

10  letter and say this is exactly who I am, this is exactly why I'm

11  here, you tell me where you want me to sit, because voters react

12  very strongly to strangers with unclear motives, they get really

13  nervous.

14  **Q.**  Now, at any point since this event that you observed in 2010

15  has it become more common for third-party groups to try to pass

16  out food and water at the polling places?

17  **A.**  Yeah.  You didn't see like a graph with a 45-degree angle.  I

18  mean, it just shot up.  2018, 2020 was just -- just shot straight

19  up like a rocket.

20  **Q.**  And as you saw that increase, did you have any concerns about

21  that activity?

22  **A.**  Yeah.  My reaction to that was we've completely lost control

23  of the precincts.  And that's not -- when the voters see that the

24  poll workers have lost control, that makes them very nervous for

25  their own safety, and it makes them nervous that somebody's

1  cheating.

2  **Q.**  What impact does that have on the perception of election

3  integrity?

4  **A.**  Well, the voters -- I get this a lot, you hear this a lot,

5  especially since 2020 with the things that I've been debunking

6  since the election, I spent all my time debunking rumors.  But you

7  hear all these people, they say, well, my vote doesn't count

8  because it's rigged, so I'm not going to vote.  It just breaks my

9  heart when I hear that.

10  **Q.**  So you think that -- you think that when people passing out

11  food and water do that at polling stations, that that creates an

12  impression that there may be fraud going on?

13  **A.**  When they do it as if they had -- if they do it under claim of

14  right, that they're there and it's their job and they've taken

15  over and they're -- and now they're in charge -- and not the

16  polling workers but they're in charge, the voters think the

17  system's rigged.  And they go, that group is in charge of this

18  election now, and if they're in charge on the outside, they're in

19  charge on the inside.

20  **Q.**  Are you personally aware of this kind of activity going on

21  during the 2018 and 2020 elections, did you see it?

22  **A.**  During early voting in the 2020 election I was there in Cobb

23  County at the main Cobb County Center on Whitlock on the first day

24  of early voting when it was really crowded, and I was probably

25  there for about five hours.  And I just stood in one spot and just

1  watched what was going on just to see how things were going on

2  because it was my first big Presidential Election since being on

3  the Board.

4  **Q.**  And you saw some of that activity there.  What kind of effect

5  have you seen these activities have on poll workers?

6  **A.**  Yeah.  The problem is the poll worker doesn't just come out

7  and say, hey, y'all, shoo, leave, and then they leave.  What

8  happens is the poll worker comes out.  And then the group doing it

9  says, no, we have a right to be here.  And the poll worker says,

10  no, you've got to leave.  And they go, go get your supervisor.  So

11  now you've got the poll worker's supervisor who's out, and the

12  people doing it are calling their people.

13      So then the supervisor can't resolve it.  And then the poll

14  manager comes out.  And then you saw earlier -- in the testimony

15  today you saw the chain go all the way up to the Secretary of

16  State's Office and the election directors are now involved.  So

17  everybody here now is not doing their job of moving the line.

18  **Q.**  Do poll workers sometimes have difficulty distinguishing

19  between activities that are properly considered campaigning and

20  electioneering and those that are more altruistic?

21  **A.**  Poll workers have that problem, and the police definitely have

22  that problem.  The police are like, if you don't give us a

23  bright-line, we're not doing anything; it's a poll worker problem,

24  not our problem.

25  **Q.**  And did poll workers ever express to you a concern that those

1  giving food and drink to people in line were campaigning or might

2  be campaigning?

3  **A.**  Yes, especially when they're wearing identifying colors.

4  **Q.**  Can you give us a couple of examples of where that concern was

5  expressed to you?

6  **A.**  Yeah.  In Cobb County when I was there on early voting, at

7  that point kind of social media had told everybody wear your

8  colors for your side to the poll.  And so there was this group in

9  blue shirts, matching blue shirts -- well, matching as much as

10  they could, but they were very similar shirts, so they were

11  clearly working together.  And that color in that election was

12  associated with the Democratic Party.

13     And so a voter came to me and said, why are democrats in

14  charge of the line here in Cobb County, why is the Democratic

15  Party running the line?

16  **Q.**  Was there ever a situation involving a guy giving out pizza?

17  **A.**  Yeah.  We had that -- that was a case that actually came

18  before the Board.  There was a candidate handing out pizza at the

19  Cross Keys precinct in DeKalb County.  And he came before the

20  Board and we sent him off to the Attorney General's Office.  And

21  one of the questions I asked him, I said, why did you do this?  He

22  said, oh, just for altruism, I'm just here for altruistic

23  purposes.  I said, well, did your altruism extend to any precinct

24  other than the one you represent?  He goes, no.  And I was like,

25  okay, you're using it as a pretext.

1  **Q.** So this was a candidate?

2  **A.** In that case it was a candidate.

3  **Q.** And are there any other similar examples that came to mind?

4  **A.** We had another candidate and she posted on the Internet a

5  video of herself and -- it was admitted in the record, and she

6  posted a video of herself and she said, I don't have to wear

7  campaign identifying, you know, shirts or anything because

8  everybody recognizes me by my purple hair. And she goes,

9  everybody knows who I am because they recognize the purple hair.

10  But she had a video of her going to Costco or Sam's and loading up

11  and clearly it was -- she was intending to campaign.

12      We had another lottery case where they were offering lottery

13  tickets for a rifle, it was a rifle if you voted. So when there

14  was kind of earlier testimony that there were no other issues that

15  have come up, there are. And that's just a few right off the top

16  of my head.

17  **Q.** And prior to SB 202, was there any confusion among third-party

18  groups and poll workers about what was and wasn't allowed with

19  respect to line warming?

20  **A.** Yeah. You've heard it today, specifically the two election

21  officers were saying nobody is allowed. And so that is held by a

22  large percentage of the people that are campaigning and they think

23  it's illegal. The election people that you heard today said it

24  was illegal. So there is -- there is one side who thinks it's

25  permissible, and there's another side that thinks it's very

illegal, like the campaign directors -- like the elections
director said today.  So you've got one side doing it, and the
other side afraid of doing it.

So the General Assembly came in and said let's pass a
bright-line test so everybody knows the rule and everybody is
following the same rule.  But if you make that go away, the other
side that's not doing it now because they think it's illegal are
going to engage.  And so you're going to have the circus that
exists outside the 150 feet taking place right next to the line;
who gets the best table, who gets the best spot, you know, who --
so the campaign -- the poll manager is going to have to come out
and resolve all these disputes.

And so these competing parties that used to be outside the
150 feet are now going to be right next to the voters desperately
trying to influence the voters.  And the poll workers and the poll
managers especially is going to have to be mediating disputes all
day long instead of moving the line.

**Q.**  In that regard, Mr. Mashburn, have you reviewed the
declarations that were submitted by the plaintiffs in this case?

**A.**  Some of them, yes, uh-huh (affirmative).

**Q.**  And besides food and water what kinds of items do those
declarations say that these groups would like to be able to
provide?

**A.**  Well, there's one that particularly got my attention and that
was they gave out phone chargers.  I'm like, that has to be a

1  self-contained phone charger because if you just give somebody a

2  plug, that doesn't do any good.  So they wanted to give out phone

3  chargers.  And so I get phone chargers as a speaker's gift when I

4  make a speech sometimes.  And I'm like, that's a good thing to

5  have, I would like to have one of those.

6  **Q.**  It has some value?

7  **A.**  Yeah.  That one specifically got my attention.  But like I

8  said, hats and mittens and this and that.  Well, do they keep the

9  mittens?  Do they give them back?  How nice are they?  There's a

10  million different decisions that the poor poll workers would have

11  to make, so that's why a clear bright-line test that everybody

12  knows the rule is going to be the best in my opinion.

13  **Q.**  Well, let's talk for just a minute about election integrity.

14  As a member of the State Election Board, what importance do you

15  attach to election integrity?

16  **A.**  It's one of the most important things we do is we're in the

17  constant struggle to try and knock down these rumors and these

18  allegations.  And I've been debunking election conspiracy theories

19  it seems like -- every day it feels like since the election.  And

20  it's all toward -- Georgia has had the most looked at, checked,

21  examined, secure election that's ever been possible in its

22  history.  And, what, half the voters don't believe it.  Half the

23  voters think it's the worse.

24      So that's the paradox that you get, that we try to instill

25  that there's integrity in the system because here we had the best,

1  most secure, most checkable election ever and nobody believes it.

2  **Q.**  So is there a difference in your view between actual election

3  integrity and perceived election integrity?

4  **A.**  As far as the voter is concerned what they perceive is

5  reality.  Their perception is reality to them.

6  **Q.**  And does giving food or drink or other items to voters who are

7  standing in line in your view have an impact on the perception of

8  election integrity?

9  **A.**  When it's this organized machine, it's not -- you know, an

10  individual person -- and I've had this come up.  You had an

11  individual person with a literal little red wagon and it had water

12  in it, and they were all by themselves and they handed out a water

13  or two.  And that doesn't hurt anybody's idea of the integrity.

14  But when you have this organized machine that's running the poll,

15  that hurts the voters' impression of who's in charge.

16  **Q.**  Let's take a moment and look at an exhibit.  I think you've

17  got a binder of exhibits there.  If you could turn to Defendants'

18  Exhibit 46 and look at Exhibit A to that exhibit.  It's the first

19  attachment to this brief here.

20  **A.**  I've got it.

21  **Q.**  The first page of that exhibit is an e-mail.  And can you

22  identify that e-mail?

23  **A.**  That's an e-mail that I wrote to Ryan Germany on October 30th

24  about my concern that what I saw in Cobb County on the first day

25  of early voting indicated that the practice of line warming had

```
 1  gotten out of control.
 2  Q.  And do you remember sending that e-mail and drafting it?
 3  A.  Yes.
 4  Q.  And remind me again when you sent it?
 5  A.  I was at the early voting on October 12th, which is the first
 6  day of early voting, but I delayed until October 30th to send it.
 7  I sent it before the election, before Election Day, but I had done
 8  a lot of research and checking and asking people in between.
 9  Q.  And so had any votes been tabulated by the time that you sent
10  this e-mail?
11  A.  No, the outcome of the election was unknown when I raised the
12  issue.
13  Q.  And do you see where you said that the practice of line
14  warming and passing out food and water is getting more aggressive?
15  A.  Yes.
16  Q.  What did you mean by that?
17  A.  You didn't have this person with their little red wagon who
18  you could clearly see was acting compassionately, and it turned
19  into this machine, highly-organized machine that now says we're
20  here and we're here as a matter of right and you can't stop us.
21  Q.  And what did you mean when you said that the practice is
22  getting more sophisticated?
23  A.  It had changed from one little wagon of water into a
24  full-service taco bar in this example.
25  Q.  You already mentioned that you took the first picture here in
```

1  this exhibit on October 12th, right?

2  **A.**   Correct.

3  **Q.**   And if we look at that first picture, can you tell the Court

4  what we are seeing here.

5  **A.**   Yes.  In the right foreground you see the worker, the caterer

6  making adjustments to the taco bar.  And then you see a fellow in

7  a blue shirt and he is standing at the gap between the very long

8  line that was really long, maybe an hour-and-a-half long.  And

9  then on -- behind him to his back there's a separate line that was

10  maybe 30 minutes long.  And then over his right shoulder is like

11  the portico area where you walk into the actual voting place.

12  **Q.**   So as we look at this picture, the actual voting place is to

13  the left of this gentleman in the blue shirt, is that correct?

14  **A.**   Correct.  It's in front of him to the left where that kind of

15  window-looking-like thing is, those are the windows right before

16  you get to the door.

17  **Q.**   And who were those people who were standing directly in front

18  of him?

19  **A.**   The people in the fenced corral are the voters waiting to

20  vote.

21  **Q.**   So they're standing in line --

22  **A.**   Correct.

23  **Q.**   -- waiting to vote.

24      And so he's -- is it fair to say he's kind of in the middle of

25  the line?

**A.**   Yeah.   He was exercising dominion and control over that line.

**Q.**   And do you have any idea who the guy in blue was?

**A.**   Yeah.   There was a lady there who was the representative of the Democratic Party.   And I said, does that guy work for the county?   And she goes, no, he's one of ours.   I said, okay, all right.

**Q.**   "One of ours," meaning what?

**A.**   Working for the Democratic Party or -- not specifically the -- you know, the actual party as an entity, but the Democratic side, consistent with his blue uniform.

**Q.**   And what made you think that he might have some connection to the taco table, the taco bar?

**A.**   Oh, he ended up delivering tacos to people in line.   And I raised it the first time with him, I said, what are y'all doing, you can't have tables here?   And they said, oh, we're only going to give tacos to people going in, on their way in.   No, sorry. I'm sorry.   Excuse me, I messed that up.   I got that wrong.

The very first explanation to me was, oh, we're only going to give tacos to people on their way out.   I said, okay, people have voted, okay, fine, no problem.   And then about a few minutes later, 15, 20 minutes later they're giving tacos to the people on the way in.   And then a little while later they're giving tacos to people in the line.   And then they're making tacos and going up and down the line soliciting people.   So it kept morphing from the original explanation into something more aggressive.

1  **Q.**  Is it fair to say before SB 202 that particular activity would
2  have been at least arguably legal?
3  **A.**  You've heard the -- you've heard the talk today, it was
4  certainly unclear to the counties as to where they draw the line.
5  And you saw a lot of confusion about where do you draw the line.
6  And so the counties were very confused.  And the police especially
7  were like, we don't have any clear instruction, it's a poll worker
8  problem, it's not our problem.
9  **Q.**  Certainly the people who were there handing out tacos thought
10  that they were acting within the law?
11  **A.**  Yeah, they thought that -- they thought that they were doing
12  it under claim of right, absolutely.
13  **Q.**  And there was nothing in the law that clearly said, you can't
14  do this?
15  **A.**  That was what pointed to the need in my e-mail of a
16  bright-line, yes.
17  **Q.**  Now, let's suppose that the facts here were a little different
18  and a person in a red shirt shows up and starts giving things to
19  voters, what impact do you think that would have on the perception
20  of election integrity at this polling station?
21  **A.**  Well, I'll give you an example from the Board in real life.
22  We had a fellow in a MAGA hat and he was wearing it in line, and
23  it just created this tremendous uproar in the line he was in.  And
24  that came before the Board and was a complaint before the Board.
25  And we issued the guy a letter, instruction that said, you didn't

1  know, but no campaigning.  But it caused an incredible disruption,

2  just the appearance of the red and the MAGA hat.

3  **Q.**  And if somebody had shown up in a red hat and appeared to be

4  in control of the line, what impact would that have had on

5  people's perception of the integrity of the election at that

6  polling space?

7  **A.**  They would -- their voters would have asked the same thing,

8  why is MAGA in charge of the precinct here and we're getting

9  ripped off, we're being cheated.

10  **Q.**  In your view is there a connection between what voters see

11  going on outside the precinct and what they think may be going on

12  inside the precinct?

13  **A.**  There's a one-to-one correlation, in my 30 years of

14  experience, that the voters think that what's going on outside is

15  run by the people on the inside, so it's the same.  So whoever is

16  running the outside is running the inside in voters' minds, I'm

17  telling you.

18  **Q.**  Now, let's look at the second picture here, just flip the

19  page.  Did you take that picture?

20  **A.**  I did.

21  **Q.**  What was happening there?

22  **A.**  Now the fellow that was previously doing the tacos, he is now

23  inside the line with the voters and he is handing out the form

24  that the voters sign in order to get in the enclosed space.  So he

25  is now performing the official functions of the county.

**Q.**  And what impact do you think that would have had or might have

had on people's perception of the integrity of that polling

station?

**A.**  Everybody now thinks that that -- that his party is in charge

of the poll, of the polling place.  And you will hear -- the next

thing you'll hear is, yeah, the Democrats were running the poll

and Cobb County flipped to blue for the first time in memory, so,

of course, the fix was in.

          MR. SIEFF:  Objection, your Honor.  Respectfully move to

strike.  We've allowed some speculation for a while now, but it

seems to be getting a bit out of hand.

          THE COURT:  Response?

          MR. SCHAERR:  This is all directly relevant to the

state's interests, your Honor, in ensuring the actual and

perceived integrity of voting processes.

          THE COURT:  The objection wasn't whether or not it was

directly relevant to the government's case, the objection was

speculation.  What's your response to that objection?

          MR. SCHAERR:  Can I ask the witness that question?

          THE COURT:  No, you can answer my question about the

objection.

          MR. SCHAERR:  Okay.  Well, he is speaking from his own

experience, your Honor.  And so it's not speculation, it's based

on observations and conversations that he's had with many people

over his years as an election worker.

```
 1            MR. SIEFF:  Respectfully, your Honor, it's not clear how
 2  his experience observing elections gives him insights into the
 3  specific and detailed thoughts of voters as to conduct taking
 4  place around them and what sorts of broader inferences might be
 5  drawn from that conduct.  We've permitted enough of this already
 6  it would seem.
 7            MR. SCHAERR:  And I would answer that it's based on his
 8  conversations with voters.
 9            THE COURT:  I'm going to sustain the objection, but you
10  can ask him that question.
11            MR. SCHAERR:  I'm sorry?
12            THE COURT:  I'm going to sustain the objection, but you
13  can ask him that last question.
14            MR. SCHAERR:  Okay.  Thank you, your Honor.
15  BY MR. SCHAERR:
16  Q.  Mr. Mashburn, you've expressed some opinions here about the
17  effects of these kinds of activities on the perceptions of
18  election integrity.  What are those views based on?
19  A.  The voters will come up and tell me what their perceptions
20  are, and tell me how they think the elections are running, and
21  tell me whether or not they think their side got ripped off, and
22  they'll come up and freely share that.
23  Q.  In your estimation, how many conversations along those lines
24  have you had with voters in the course of your work in elections?
25  A.  Hundreds.
```

1  **Q.**  Thank you.

2         MR. SCHAERR:  And I'm happy to move on, your Honor, to

3  the next topic.

4  **Q.**  So how, if at all, does the anti-solicitation provision in

5  SB 202 alleviate any of the confusion and the concerns that arose

6  during the elections that we've been discussing?

7  **A.**  The biggest -- the biggest impact it has is it gives the

8  police a bright-line test where now the police can enforce this

9  rather than it being a poll worker issue.  And the poll workers

10 don't have to make this very fine, fact-based decision on each

11 person that wants to hand out water is this so nice.  The police

12 now have a bright-line test.  And the poll workers can work and

13 the police will take care of shooing the people off.  And if they

14 don't comply with the police, the police will take it from there.

15 **Q.**  Are the police typically onsite already at the polling place

16 during elections?

17 **A.**  In big precincts like this one in Cobb, they will be.  In many

18 rural counties, they won't be.  And usually my presence, when I

19 appear, draws a response pretty quickly of who is -- you know, who

20 is this guy and what's he doing will get a police presence pretty

21 quick.  But usually the big precincts you'll have police already

22 onsite.

23 **Q.**  What about the smaller precincts?

24 **A.**  They usually won't have police presence but they'll respond

25 pretty quickly because everybody in Georgia is on heightened alert

1  for things going on at the poll because of Georgia's history.

2  **Q.**  And is it easy or difficult for a poll worker to get the

3  police to show up if they know they have a clear statutory

4  prohibition to enforce?

5  **A.**  Yeah.  My experience has been if it's unclear, the police say

6  it's not our problem.  But if they have a bright line, they will

7  enforce the law very -- without any delay.

8  **Q.**  Mr. Mashburn, did you hear Mr. Brower testify earlier today

9  that the anti-solicitation prohibition doesn't really have much

10  effect on the burdens of poll workers because line monitors are

11  going to be needed with or without SB 202?  Do you recall that

12  testimony?

13  **A.**  I remember that testimony, yes.

14  **Q.**  Now, in your view was the need for line monitors the main

15  issue that this part of SB 202 was designed to address?

16  **A.**  No.  The line monitors are there looking for a disturbance,

17  okay.  That's fairly agreeable.  But this was intended to give a

18  bright-line test to everybody so everybody knows the same rules

19  and everybody now clearly understands what the rules are and you

20  don't have to make these very fine pinpoint decisions on, well, is

21  water in round bottles okay but square bottles is too nice.

22  **Q.**  So are there other poll workers besides line monitors that

23  were affected by these line warming activities before SB 202?

24  **A.**  Yeah.  The line workers will report it up the line and it will

25  run the line to the poll manager who will attempt to resolve it.

1  So you'll have several people involved in addition to the line
2  monitor.
3  **Q.** Now, did SB 202 leave open the possibility that county
4  election officials could provide water themselves --
5  **A.** Yes.
6  **Q.** -- to voters?
7  **A.** Yes.
8  **Q.** And under what circumstances, how does that work?
9  **A.** Yes.  They -- the provision -- SB 202 contains a provision
10 that you can provide water to people in line.  But the counties
11 came to me, to us, and said, we don't have the people, we don't
12 have the people to spare to run a water table.  And so that's
13 where it -- the unattended receptacle comes from is the county
14 said we don't have the people to dedicate somebody to run a water
15 table.
16 **Q.** So how did they deal with that?
17 **A.** They -- the legislature passed a rule or passed part of the
18 statute that says that the counties can provide water if that --
19 to the people who want water in an unattended receptacle, which
20 already -- most polling places I see are in buildings that have
21 water fountains.  So you just walk inside, go to the water
22 fountain, come back out, and get back in line is what I've seen in
23 my experience.
24 **Q.** So is it fair to say even if a county does not have an
25 unmanned water station, a voter who is thirsty can just walk

1  inside the building typically and get a drink?

2  **A.**   That has been my experience.

3  **Q.**   Won't they lose their place in line if they do that?

4  **A.**   That has not been my experience.  I've seen the voters take a

5  very us versus them attitude in that once they're in line together

6  for a bit of time, they all watch out for each other.  And you do

7  have people stirring up trouble, but by and large the voters work

8  very hard to get along in lines.

9      So I've never seen anybody get refused -- I've seen many

10 people in and out of lines, and I've never seen anybody sent back

11 to the back of the line ever.

12 **Q.**   Does SB 202 in your understanding prohibit third parties from

13 encouraging voters to vote?

14 **A.**   No.

15 **Q.**   Does it prohibit third parties from encouraging voters to stay

16 in line once they show up?

17 **A.**   No.

18 **Q.**   Does SB 202 impede the ability of third parties to convey

19 verbally to voters that their votes are important and valued?

20 **A.**   As long as they're not causing a disruption.

21 **Q.**   So they could even maybe have a bullhorn and encouraging

22 people on a hot day, hey, we know it's hot but you ought to stay

23 in line and complete the voting process, they could do that?

24 **A.**   Within the limits of they can't cause a disturbance.

25 **Q.**   Okay.  And does SB 202 allow voters to bring their own food

1  and drink to the polling stations if they're concerned about that?

2  **A.**   Absolutely.

3  **Q.**   Just overall, in your view, did the anti-solicitation

4  provision have any effect on election integrity or on the

5  appearance of election integrity?

6  **A.**   My observing of the elections is that it restored the order

7  back to the precinct.  And what was getting out of hand, clearly

8  out of control has now been pushed back and the buffer is now

9  being used for its original purposes once again.

10  **Q.**   Now, let's talk for just a brief minute about the effect of an

11  injunction.  Would enjoining SB 202's prohibition on giving food

12  and drink within the buffer zone have any effect on the

13  administrability of elections in your view?

14  **A.**   Yeah.  To do that would now eliminate the bright-line test, so

15  the poll workers are back to making the decisions, the police are

16  back to not getting involved, and so now you don't have clarity

17  anymore.  You go back to the original confusion that was the

18  problem that was trying to be solved.

19  **Q.**   And based on your experience is it possible that the problems

20  that led to SB 202, or at least to this provision of SB 202, is it

21  possible that those problems would even increase beyond the 2020

22  levels if the prohibition were enjoined?

23  **A.**   We -- I, myself, without getting into attorney/client

24  privilege, but I, myself, have told people that it's illegal and

25  they can't do it.  And if now they're told that it is legal, an

1  entire group of people that haven't been engaged in doing this are

2  going to now start doing it because heretofore they thought it was

3  illegal and they didn't do it.  So now you're going to have

4  contention going on; where you originally just had one group that

5  was doing it, now you're going to have two groups doing it

6  contending with each other.

7  **Q.**  So is it possible that an injunction could even double the

8  kinds of problems that we've seen in the past?

9  **A.**  You will have an entire population animated that currently

10  thinks it's prohibited.

11  **Q.**  Now, you're aware, Mr. Mashburn, that one group of the

12  plaintiffs here is seeking to enjoin only local prosecutors from

13  enforcing this anti-solicitation provision, are you aware of that?

14  **A.**  Yes, sir.

15  **Q.**  And would a limited injunction of that nature implicate the

16  concerns that you've raised during your testimony today?

17  **A.**  Well, if you take away the enforcement, now it's legal in a

18  lot of people's minds.  The other people are the people who obey

19  the law just because it's right to obey the law regardless of the

20  punishment, and so they're not going to do it.  So what you're

21  going to end up with is a situation where the people who can only

22  be deterred by punishment are going to do it and everybody else is

23  going to not do it.

24  **Q.**  In your experience and observation what impact would that kind

25  of a more limited injunction have on the police and their role in

1  all this?

2  **A.**  My personal experience is that the police -- from police

3  talking to me has been that if they're not going to get a

4  prosecution, they're not going to -- they're not going to do

5  anything.

6  **Q.**  So in that situation, if a poll worker calls the police and

7  that kind of injunction is in effect, what's likely to happen?

8  **A.**  The only enforcement will then be by the Board a year and a

9  half -- whenever we get it, six months, three months, a year and a

10 half later.  The only enforcement will be what the Board can do,

11 you won't have any on-the-spot control.

12         MR. SCHAERR:  Thank you, Mr. Mashburn.  I don't have any

13 other questions for you right now.

14         THE COURT:  Let's take a short comfort break.

15         (After a recess, the proceedings continued as follows:)

16         THE COURT:  Go ahead with your cross, if you would like.

17         MR. SIEFF:  Yes, your Honor.  Thank you.

18                         CROSS-EXAMINATION

19 BY MR. SIEFF:

20 **Q.**  Good afternoon, Mr. Mashburn.

21 **A.**  Hello, hello.

22 **Q.**  My name is Adam Sieff with the law firm of Davis Wright

23 Tremaine, and I'm here with the AME plaintiffs today.

24 **A.**  Nice to meet you.

25 **Q.**  Mr. Mashburn, a moment ago you were discussing an e-mail you

```
 1  sent to Mr. Ryan Germany on October 30th, 2020, is that right?
 2  A.  Yes, sir.
 3        MR. SIEFF:  Let's pull that up.  Your Honor, I would
 4  like to publish what has been previously marked and admitted as
 5  Plaintiffs' 35.
 6  Q.  And starting first on page 18, that is that e-mail, correct,
 7  Mr. Mashburn?  Page 18.
 8  A.  This is back to the defendants' exhibit?
 9  Q.  Sorry.  Plaintiffs' Volume I, Exhibit 35, might be the same
10  document.  It's also on the screen to your right.
11  A.  It looks the same.  Yep.  Okay, I'm with you.
12  Q.  Great.  Turning now to page 21, Mr. Mashburn, in your e-mail
13  to Mr. Germany you ask for his support for a new regulation to
14  begin in January that, quote, only on-duty sworn poll workers
15  should be talking and interacting with voters while they're
16  waiting in line, right?
17  A.  Correct.
18  Q.  Turning back to page 18, as background to support that request
19  you cite as examples that there are people wearing clearly
20  identifiable campaign clothing and setting up tables and food
21  stations within the 150-foot voter protection bubble at polling
22  places, specifically a polling place, according to your testimony,
23  in Cobb County, is that right?
24  A.  Yeah, this involved Cobb County early voting, correct.
25  Q.  That's right.
```

1    Now, Mr. Mashburn, you would agree with me that when you sent

2  this e-mail to Mr. Germany, Georgia law already prohibited both

3  distributing or displaying any campaign material and establishing

4  or setting up any tables or booths within 150 feet of polling

5  places, right?

6  **A.**   Yeah.   Tables were absolutely prohibited, correct.

7  **Q.**   And so is distributing or displaying any campaign material,

8  right?

9  **A.**   Correct.   But it had been argued and had been successfully

10  argued that just merely wearing color was not a prohibited act.

11  **Q.**   That's right.

12    But campaign material and displaying campaign material was a

13  prohibited act?

14  **A.**   Correct.

15  **Q.**   And you were in the courtroom earlier today when an example

16  was raised of someone wearing a T-shirt with a Democratic donkey

17  logo on it or a Republican elephant logo on it, right?   You heard

18  that example?

19  **A.**   I remember that, yes.

20  **Q.**   And you would agree with me that wearing either of those

21  shirts with those logos on them would violate Georgia law as it

22  existed before SB 202 took effect, correct?

23  **A.**   In my opinion, that's correct.

24  **Q.**   That's right.

25    And you were in the courtroom earlier today when you heard

1  someone discuss the hypothetical of handing someone a $20 bill and

2  ask them to vote for Candidate Smith, you would agree that, too,

3  would be illegal under the law as it existed prior to SB 202,

4  right?

5  **A.**  Correct, that would be a direct bribe.

6  **Q.**  That's right.

7      And you testified earlier in fact, just now, that a candidate

8  was handing out pizzas at a polling place?

9  **A.**  I remember that, yes, Cross Keys.

10 **Q.**  And before SB 202 was enacted, that, too, would have been

11 unlawful under the existing Georgia statute, correct?

12 **A.**  Yes.  We determined that it was, correct.

13 **Q.**  And you also mentioned a candidate on a video talking about

14 how they were wearing campaign material showing up to a polling

15 place and campaigning onsite at a polling place.  That, too, would

16 have been illegal under the Election Code as it existed before

17 SB 202 was enacted, right?

18 **A.**  Yes.  She said she didn't need to wear campaign identifying

19 because everybody would recognized her from her purple hair, yes.

20 **Q.**  She was a candidate?

21 **A.**  She was a candidate, that's right.

22 **Q.**  You also testified that candidates in DeKalb County were using

23 the provision of food and beverage as a pretext, your word, to

24 electioneering at a polling site, right?

25 **A.**  Those weren't candidates, those were campaigners.  They

1  weren't candidates.

2  **Q.**  So they were affiliated with a campaign campaigning at a

3  polling site?

4  **A.**  They -- I'm sorry, I didn't mean to interrupt you.

5      Yeah, they initially were wearing logoed jackets and they were

6  told to take those off.

7  **Q.**  That's right.

8      And that was also unlawful pursuant to the law as it existed

9  before SB 202 was enacted?

10 **A.**  They argued that once they went and got the water, it was now

11 not prohibited.

12 **Q.**  But these were individuals who you said wore logos on their

13 person?

14 **A.**  Yeah.  Originally that was the first thing they made them do,

15 is take them off.

16 **Q.**  And you also mentioned that individuals were handing out

17 barbecue tickets at another polling place?

18 **A.**  Yeah.  Those weren't candidates but, yeah, correct,

19 individuals, uh-huh (affirmative).

20 **Q.**  And if individuals were campaigning by handing out green

21 tickets to go get a barbecue coupon or whatever it was, that would

22 have been unlawful pursuant to the statute as it existed before

23 SB 202 was enacted, correct?

24 **A.**  Correct.

25 **Q.**  All right.

1    Mr. Mashburn, you mentioned that as a basis for many of the
2  observations you shared with us, sometimes at length, that
3  hundreds of people had come up to you and told you that the
4  integrity of the Georgia election system was threatened by
5  line-relief conduct, is that right?
6  **A.**  I don't think -- I don't think the answer dealt directly with
7  that, I think it was how many people have talked to you about it,
8  how many voters have expressed to you.  And I said hundreds.  But
9  a good -- a good number of them questioned election integrity,
10 correct.
11 **Q.**  There's a record (sic) of a single one of those voters before
12 the Court today, is that right?
13 **A.**  I didn't understand the question, I'm sorry.
14 **Q.**  Let me rephrase that.
15    There's no record of any of those comments supposedly that
16 was made to you before the Court in the record today, there's no
17 documentary evidence of that, is there?
18 **A.**  No.  They were made to me, but I didn't file anything in the
19 record, no.
20 **Q.**  That's right.
21    And you're relaying these statements that other people made to
22 you?
23 **A.**  Correct.
24 **Q.**  To go back for a moment, in your e-mail to Mr. Germany where
25 you ask his support for a new regulation to take place beginning

1  in January 2021, you don't ask Mr. Germany, for instance, to

2  enforce the existing law as it existed, correct?

3  **A.**  Because the problem was we had a law that people said was

4  confusing.  In between when I was there on October 12th and

5  October 30th I had conversations with people and researched it and

6  everybody was like, we're unclear, we don't know.  So that's why

7  I'm like we need a bright-line test because everybody is confused.

8  **Q.**  But you agree with me that much of the conduct you had

9  described on the stand just now and all of the conduct that you

10  describe in your e-mail would have been prohibited by existing

11  law, and yet you don't ask for enforcement of that law?

12  **A.**  In my opinion a good number of people agree that it's against

13  the law, but you have this -- another group of people who don't

14  think it's against the law.  And so they need --

15  **Q.**  I'm sorry.

16  **A.**  It's okay.

17      But they need instruction as to what the law is.  We've got an

18  ambiguity now to resolve it and figure out everybody -- so

19  everybody can have a bright-line test.

20  **Q.**  You would agree that a simpler way perhaps to arrive at the

21  solution to the problem that you've identified is to simply

22  enforce the law as it exists?

23  **A.**  When half -- not half, but when a good number of people argue

24  that the law is unclear and this is permitted, and a group of

25  people say this is not permitted, then enforcing the law is not

1  going to help because it's ambiguous.  What you've got to do is

2  you've got to write a law that everybody can understand.

3  **Q.**  But you did agree with me a moment ago that -- and why don't

4  we read a moment from page nine of this declaration, which is what

5  Mr. Germany stated.

6           MR. SIEFF:  If we can scroll to page 9, paragraph 26.

7  **Q.**  Mr. Germany stated that:  After 2017, before SB 202, before

8  SB 202, Georgia law prohibited, among other things, distributing

9  or displaying any campaign material or establishing or setting up

10  any tables or booths on any days in which ballots are being cast

11  within 150 feet of a polling place's outer edge, within any

12  polling place, within 25 feet of any voters standing in line to

13  vote at a polling place.  And that's Title 21-2-414(a).

14      You have no reason to disagree with Mr. Germany, do you?

15  **A.**  That was our first crack at trying to clarify the law, and

16  it didn't work, so the law needed additional clarification.

17  **Q.**  But you would agree that pursuant to that language, the

18  conduct would still be legal (sic), correct?

19  **A.**  In my opinion, yes, but I was told that there was a big

20  disagreement about whether or not I was correct or not.

21  **Q.**  So the answer to my question though is, yes, you believe that

22  law provided for the legality of --

23  **A.**  In my opinion, yes.

24  **Q.**  A few last questions, Mr. Mashburn.

25      You testified a moment ago that line relief strains resources

1   at polling places, is that right?

2   **A.**   That sounds right.

3   **Q.**   And your basis for that testimony was feedback that you've

4   received as a member of the State Election Board?

5   **A.**   Correct.

6   **Q.**   But to be clear, as a member of the State Election Board, you

7   do not personally manage any polling places' operations on the

8   ground on election days, including on any advance early voting

9   days, right?

10  **A.**   Correct.  The managers come to me and tell me if they're

11  having problems, correct.

12  **Q.**   That's right.  And they're not here today, is that right?

13  **A.**   I don't see any.

14  **Q.**   That's right.

15       And currently as a member of the State Election Board, you do

16  not personally provide any one-on-one training to poll workers for

17  any elections, right?

18  **A.**   I, myself, no.

19  **Q.**   Currently as a member of the State Election Board you do not

20  currently personally enforce any polling places' buffer zone,

21  that's not your responsibility?

22  **A.**   My responsibility is to observe it but not -- I don't enforce

23  it, no, but I observe whether or not it's being followed and

24  complied with, correct.

25  **Q.**   Nor would the injunction sought today to be granted would it

1  be your responsibility to administer the implementation of that

2  injunction, would it?

3  **A.**   I believe the judge would write what he wanted to enjoin, but

4  we would probably have to pass regulations maybe implementing it

5  if there was still any ambiguity.

6  **Q.**   And the counties and the polling place managers would be the

7  ones to actually implement any such change?

8  **A.**   Yeah.  We have a general duty to oversee it, but they would be

9  the ones to do the implementation, correct.

10          MR. SIEFF:  I have no further questions at this time.

11 Thank you.

12          THE COURT:  Any redirect?

13          MR. SIEFF:  Your Honor, I think there's another...

14          THE COURT:  Okay.  Yes.

15                    CROSS-EXAMINATION

16 BY MS. MENG:

17 **Q.**   Good afternoon, Mr. Mashburn.

18 **A.**   Hello.

19 **Q.**   I just have a few questions for you, Mr. Mashburn.

20      So you testified today that you personally have gone around

21 the state and to Cobb County specifically to observe precincts and

22 voting at those precincts, correct?

23 **A.**   Yes, for many years.  Yes.

24 **Q.**   And presumably you're observing from within that 150-foot

25 barrier, correct?

**A.**   When I was a poll watcher, I could even go inside the enclosed
space.   But as a Board member I will usually be -- I don't step it
off exactly, but I'm very close to the 150 feet.

**Q.**   Now, public observers are also allowed to enter the 150-foot
barrier to observe the polling place, correct?

**A.**   Yes, as long as they don't cause a disturbance, uh-huh
(affirmative).

**Q.**   Right.

     And if there's a group of 20 to 30 poll observers, they can
also enter the 150-foot buffer zone, correct, if they're not
speaking or saying anything, they're just standing there?

**A.**   The poll manager -- that would cause a suspicion as to what's
going on, so the poll manager would probably get involved as to
what's going on.

**Q.**   But if they were just standing there not saying anything, you
think that would still cause a disturbance?

**A.**   In Georgia, yeah.   Unknown people with unknown purposes cause
a disturbance, yes, because of Georgia's history.

**Q.**   Now, let's say there's an individual who walks up to the line
of voters and asks a voter for a fist bump, there's nothing that
prohibits that, correct?

**A.**   Consistent with the poll manager's ability to regulate
disturbances, but that didn't sound particularly disturbing other
than the voters go what's this person doing, what are they doing?

**Q.**   Right.   But if that individual has a smile on their face,

1  still isn't saying anything and just goes down the line and gives

2  every voter a fist bump, would that be prohibited under Georgia

3  law?

4  **A.**   If it didn't cause a disturbance.   If the people in line

5  didn't think what is going on here, why is this person engaged in

6  such odd behavior, what's their purpose?   Is their purpose to

7  cause us harm?   What is this person doing?

8  **Q.**   Right.   But there's no law that would prohibit that individual

9  from trying to give a fist bump regardless of what the voter would

10  perceive that to be, correct?

11  **A.**   If they cause a disturbance, whether they intend to or not,

12  they can't do it.

13  **Q.**   Now, what about someone who walks up to a precinct handing out

14  a flyer advertising for a local comedy show in the neighborhood,

15  would that be allowed or prohibited under the law?

16  **A.**   I would think most managers would say that's a disturbance.

17  **Q.**   And in what way would you say that's a disturbance?

18  **A.**   Because most managers are like -- the reason we're all here is

19  to vote, we're not here to solicit and pass out advertising to a

20  captive audience.   The people in line don't want to be in line,

21  they would rather get their business done and leave.   And so being

22  sensitive to that, you don't want a captive audience that can't

23  leave being barraged by commercial solicitation.

24  **Q.**   Well, I never said anything about a commercial solicitation,

25  I'm simply saying it's an ad about a show -- let's say it's a free

1 show to the neighborhood, right, a community show, would that be

2 prohibited under any Georgia statute and, if so, could you let me

3 know which statute that prohibits?

4 **A.**  I don't know the particular statute, but it's the same poll

5 manager disturbance rules and statutes.

6            MS. MENG:  Thank you.  I have no further questions, your

7 Honor.

8                        REDIRECT EXAMINATION

9 BY MR. SCHAERR:

10 **Q.**  Mr. Mashburn, a couple of minutes ago you were asked some

11 questions about whether Georgia law already prohibited some of

12 the activities that you observed that were of concern to you.

13 And, as I recall, you expressed the opinion that at least some of

14 the line warming activities that concerned you were already

15 illegal under Georgia law.  Do you remember that testimony?

16 **A.**  Yes.

17 **Q.**  Then if you thought those activities were already illegal,

18 why, again, would you recommend that there be a new rule or law

19 passed to deal with line warming?

20 **A.**  Because between October 12th and October 30th I found out that

21 what was absolutely clear in my mind was not clear in everybody

22 else's minds.  So I'm like, okay, if there's confusion here, we

23 need a bright-line rule.  So, you know, what I thought was clearly

24 understandable to everybody, as I investigated it, it was --

25 people told me that wasn't right.

**Q.**  And before this -- the anti-solicitation provision was adopted in SB 202, who would have had to enforce the preexisting law if it was enforced at all?

**A.**  The -- if it was unclear, the police would say it's unclear to us, we don't have a bright-line test, it's the poll worker's problem.  Now you have a bright-line test, you can shift that burden from the poll worker to the police because now the police know what the rule is and the rule is very clear and very understandable by everybody.

**Q.**  And in your opinion what impact would that have on the poll workers in that precinct?

**A.**  They're now back to moving people through the line instead of dealing with all this circus outside.

**Q.**  In your opinion what impact would that change have on the perception of election integrity in Georgia?

**A.**  The county's now back in -- the county's now back in control of the election rather than the third parties being in control of the election.

**Q.**  And what impact would that have on people's perceptions of election integrity?

MR. SIEFF:  Objection, your Honor.  Respectfully, this is the same line of questioning that the Court sustained an objection to previously I believe on speculation grounds.

MR. SCHAERR:  I think the basis for it is the same as he expressed earlier, your Honor.

```
 1              THE COURT:  I'm going to overrule for that question.  Go

 2  ahead.

 3              THE WITNESS:  Can you repeat it?

 4  BY MR. SCHAERR:

 5  Q.  Yes.

 6      And what impact would allowing the police to enforce this

 7  bright-line rule, what impact in your opinion -- based on your

 8  many conversations with Georgia voters and election supervisors,

 9  what impact would that have on perceptions of election integrity?

10  A.  The government is now in control of the poll rather than

11  private parties being in control of the poll.

12  Q.  And why, again, is that important to election integrity?

13  A.  Because the people expressed to me over many, many years

14  whoever is in control on the outside is also in control on the

15  inside.

16              MR. SCHAERR:  Thank you.  No further questions, your

17  Honor.

18              THE COURT:  Any recross from anyone on the plaintiffs'

19  side?

20              MR. SIEFF:  Not from the AME plaintiffs, your Honor, no.

21              MS. MENG:  None, your Honor.

22              THE COURT:  Thank you.  Sir, you can step down.

23              (Witness excused)

24              THE COURT:  Any additional witnesses?

25              MR. SCHAERR:  No, your Honor, not from the defendants.
```

1          THE COURT:  Any rebuttal witnesses?

2          MR. ROSBOROUGH:  No rebuttal witnesses from the AME

3    plaintiffs, your Honor.

4          THE COURT:  All right.  Are you ready to give any

5    additional statements in closing?

6          MR. ROSBOROUGH:  We are, your Honor.  And I think --

7    what my colleague and I would like to do is go ahead and split

8    time, and we would like to reserve five minutes each for rebuttal.

9    So, can I inquire how much time the plaintiffs have left?

10          COURTROOM DEPUTY CLERK:  Did you say five minutes each?

11          MR. ROSBOROUGH:  I think that's right.

12          COURTROOM DEPUTY CLERK:  Both sides have 40 minutes

13    total.

14          MR. ROSBOROUGH:  I'm going to talk for about 15 minutes

15    and answer the Court's questions and pass things over to my

16    colleague.

17          Good afternoon.  Again, Davin Rosborough for the AME

18    plaintiffs.

19          At the beginning of the day the plaintiffs set out four

20    points that the evidence already in the record plus the testimony

21    today would show as to how the criminal line-relief ban violates

22    the First Amendment.  Plaintiffs met that burden.

23          First by conducting line relief, plaintiffs engaged in

24    expressive conduct protected by the First Amendment.  By providing

25    items of minimal value, plaintiffs are carrying on a tradition of

1    expressing support for and solidarity with their community members

2    attempting to vote in the face of acknowledged long lines and

3    other obstacles.

4            Members of the communities who receive this line relief

5    understand that plaintiffs are sending a message.  And contrary to

6    what we heard from defendants, the law does not require that they

7    perceive any particular message.  The Supreme Court made that

8    clear in the *Hurley* case and the Eleventh Circuit in *Holloman*,

9    that the inquiry is whether a reasonable observer would perceive

10   some message being communicated.  And plaintiffs have met that

11   burden here.

12           Second, this expression takes place in a public forum

13   and is a content-based restriction on expressive conduct for

14   multiple independent reasons.  These include that its focus is on

15   the direct impact of the expressive conduct on the audience, it's

16   solely concerned with the content of the expression, influence on

17   voters waiting in line, and that it specifically targets

18   nonpartisan service-oriented groups like plaintiffs.

19           Third, this restriction cannot survive strict scrutiny

20   because the state has not met its burden and indeed has itself

21   identified other laws that are less restrictive means for

22   accomplishing the same purpose of preventing interference or

23   intimidation of voters, including its preexisting electioneering

24   ban.

25           But even under exacting or intermediate scrutiny, the

1   defendants have failed to prove -- meet their burden because

2   there's been no showing that SB 202 serves the state's interests

3   in preventing improper influence with voters any more than

4   existing law did or in ways that can't be just as effectively

5   accomplished without burdening speech.

6           We've heard some more testimony today that have offered

7   even additional less restrictive alternatives.  We've heard from

8   numerous witnesses from the defendants that there's not really

9   procedures in place to police for electioneering conduct, but

10  that's the conduct that's supposedly at the core of the ban here.

11  So, of course, another restrictive alternative would be to expend

12  more resources policing actual electioneering rather than

13  targeting groups who are not engaging in that conduct.

14          Fourth and finally, the *Purcell* doctrine does not bar

15  any relief because as we've heard from witnesses like Mr. Brower

16  and the failure to hear from other counties who are actually the

17  ones who would be mostly implementing any relief, this relief will

18  not cause any administrative chaos or create any voter confusion.

19          When it comes to expressive conduct, first of all as

20  counsel for intervenors I believe admitted and argued in their

21  opening, this is not a constitutional right to vote issue under

22  *Anderson-Burdick*, this is a First Amendment issue.  And when it

23  comes to determining whether conduct is expressive and thus

24  covered by the First Amendment, the Supreme Court in *Hurley* and

25  the Eleventh Circuit in *Holloman* and *Food Not Bombs 1* made clear

1    that a narrow succinctly articulable message is not a condition of

2    constitutional protection.  Rather than determining whether the

3    conduct is expressive, the Court asked whether a reasonable person

4    would interpret it as such.  I'm sorry, as some sort a message,

5    not whether a observer would necessarily infer a specific message

6    and the context is important.

7            So let's consider the evidence here.  The focus of the

8    inquiry is on the listener.  And plaintiffs have submitted a

9    significant amount of unrebutted evidence that the groups and

10   individuals who provide line relief do so to convey messages of

11   support of the importance of voting and solidarity in the face of

12   obstacles.

13           The testimony in the record from those that receive line

14   relief backs this up.  The Exhibits P16 and P21 to 23, DeKalb

15   County voter Hope Sims Sutton talks about how receiving line

16   relief sent her the message that her vote matters and that she has

17   dignity as a voter and that she should keep standing in line.

18           Monica Kinard, a Fulton County voter, testified about

19   how the message she received through line relief was that her

20   voice mattered and that she had an important role to play in the

21   political process.  In fact, the experience of her receiving line

22   relief was the reason she started volunteering and handing out

23   food and water at the polls.  She wanted to make sure that others

24   realized the power in participating in democracy.

25           Now, the Eleventh Circuit has set out in *Food Not Bombs*

1  *1* a number of factors that they looked at in that case in another

2  context of providing food.  And those same factors here point to

3  this being expressive conduct here.

4         First, the Court there pointed to signs which carried

5  the Food Not Bombs label.  And we heard today that the Deltas and

6  the declarations show the AMEs regularly self-identify.

7         Second, like in *Food Not Bombs*, line relief is opened

8  to everyone, which in and of itself has social implications.

9         Third, it occurs in quintessential public forums,

10  they're in parks, here on sidewalks and streets that stretch far

11  beyond the polling place.

12         Fourth, there's no dispute that the burden of long lines

13  and the importance of voting are issues of concern in the

14  community.

15         And, fifth, sharing food has a unique history of

16  symbolizing solidarity and community, particularly and

17  predominately in black communities where line relief often

18  occurs as many of the AME and Deltas' declaration notes.

19         Now, the cases that plaintiffs rely upon, such as

20  *Rumsfeld v. Fair* and this Court's recent decision in *VoteAmerica*

21  don't undercut that showing.  In both *Rumsfeld* and this Court's

22  decision in *VoteAmerica*, the key factor was that the expressive

23  conduct relied upon additional speech to communicate that it was

24  expressive.  And *Rumsfeld* there was military recruiters that the

25  law school sent to a different building.  And the Supreme Court

 1   said, well, there's nothing that shows to the reasonable viewer

 2   that that's a message that's being communicated without a sign

 3   saying we disapprove of the don't ask, don't tell policy, so we're

 4   sending the recruiters to another building.

 5         Similarly, I think this Court found with regard to

 6   sending absentee ballot applications that there was no

 7   interpersonal interaction there and that any reasonable

 8   expectation of expressive message was because of the additional

 9   form that was carried on top.  This case falls within a core line

10   of cases of interpersonal interaction and viewers' understanding

11   that a message is being conveyed.

12         Second, your Honor, this is a content-based restriction

13   for multiple independent reasons.  I think the best case that

14   talks about this context is *Boos v. Barry* from the Supreme Court.

15   And that says that laws that focus, whose purpose is on the direct

16   impact of the speech on the audience due its potential impact are

17   content-based.  That's, frankly, what we've heard today from

18   defendants' own witnesses.  The worry in enacting the restriction

19   is the perception of the speech's impact on the audience, that

20   voters would feel that there was some sort of influence happening.

21   That is an acknowledgment that this is a content-based

22   restriction.

23         Similarly in *Reed* and *City of Austin*, laws that can't be

24   justified without reference to the content of the speech like the

25   one here also are content-based.

1          Finally, we heard specific evidence particularly from

2    the final couple of witnesses that this law was targeted at groups

3    like plaintiffs.  There was an increase in this activity they

4    thought in 2018 and 2012 (sic).  And these were -- this was the

5    sort of conduct that they thought needed to be reigned in to

6    create a bright line.  And that sort of targeting of particular

7    groups and speech also raises a content-based restriction.

8          Regardless, because there's no -- we've shown that this

9    is expressive conduct, there's no real dispute that this occurs in

10   a public forum, intermediate scrutiny is the least possible

11   standard of review that would apply here.  The burden also falls

12   upon the defendants in that case and they've not met their burden.

13   This test, this ban, third, falls under any applicable level of

14   scrutiny that's here, intermediate up to strict scrutiny.

15         Now, I do want to address one thing because I believe

16   over the course of this case and this briefing and now the hearing

17   today we've heard no less than six different interests put forward

18   by defendants as to what they claim supports the ban.

19         Now, in discovery, which we sought -- we waited to bring

20   this so we could receive discovery and understand the state's

21   rationales behind this ban, the response to interrogatory number

22   two from the CBC plaintiffs, the Concerned Black Clergy

23   plaintiffs, Exhibit P24, refers to the text of SB 202 as the best

24   statement of the Bill's purposes.

25         And if you go and turn to the text of SB 202, in

 1  Section 213, it describes only complaints of improper interference
 2  and political pressure.  It doesn't describe election efficiency.
 3  It doesn't describe voter confusion.  It doesn't describe voter
 4  fraud, voter confidence, election integrity.  What we're seeing is
 5  gradually shifting rationales.  And as the Supreme Court has just
 6  explained again in its recent decision in *Kennedy v. Bremerton*
 7  *School District,* the government's justification for interfering
 8  with First Amendment rights must not be hypothesized or invented
 9  pro hoc in response to litigation.  It may be that some of these
10  election officials had these concerns and that was what was
11  motivating them, but in terms of the legislature that enacted this
12  and stated in sworn discovery its reasons for the bill, election
13  efficiency and a bubble of peace and calm was not the rationale.
14          Regardless, turning to the rationales put forward, the
15  state has not cited support for election efficiency in any sort of
16  case law as a compelling interest rather than merely important or
17  legitimate.  But putting that aside, the evidence shows that the
18  line-relief ban will do two things:
19          Number one, monitoring already occurs to some degree in
20  some places.  We heard from Mr. Brower that regardless,
21  post-SB 202, pre-SB 202, they had four people out there in Fulton
22  County checking things.  Ms. Bailey testified even in her
23  jurisdiction, which is smaller, that they would send people out on
24  an hourly basis.
25          But what they testified about is also revealing, and it

```
 1  goes to the fact that this is not -- this full ban on line relief
 2  is not the least restrictive means or even close to it.  In fact,
 3  if the concern here is electioneering, then the state -- the
 4  people have basically admitted that they're not really policing
 5  electioneering, so why not devote resources to policing
 6  electioneering rather than attacking groups like plaintiffs who
 7  are not the real source of the concern here.
 8          THE COURT:  You mentioned least restrictive means there.
 9  Is that in your view the test that controls here as to narrowly
10  tailored?
11          MR. ROSBOROUGH:  It is.
12          THE COURT:  Which case is that from?
13          MR. ROSBOROUGH:  So Burson and Citizens For Police
14  Accountability v. Browning from the Eleventh Circuit.  And those
15  cases are both cases where -- they were electioneering cases, the
16  Court found the First Amendment was implicated, that the conduct
17  occurred in a public forum, and that the bans were content-based.
18  And in those situations, which we believe we are also under strict
19  scrutiny as required and the burden shifts to the defendants to
20  show that they -- they're seeking a compelling government interest
21  and they're doing so using the least restrictive means.
22          THE COURT:  What do you make of the language in Burson
23  and then quoted by the Eleventh Circuit in -- maybe it's easier if
24  I call it Browning --
25          MR. ROSBOROUGH:  Sure.
```

1          THE COURT:  -- to prove that the Florida statute is

2    narrowly tailored, the state must show that the Florida statute

3    is, quote, reasonable and does not significantly impinge on

4    constitutionally protected rights.

5          MR. ROSBOROUGH:  And, I'm sorry, this is from *Browning*?

6          THE COURT:  That's from *Browning*.

7          MR. ROSBOROUGH:  Right.  I think, your Honor, under the

8    test there there's a number of distinctions, and *Burson* and

9    *Browning* are both extremely distinguishable from here.

10         Number one, of course, *Burson* is about electioneering,

11   which is already prohibited and not implicated here.  Unlike the

12   conduct in *Burson*, plaintiffs and groups like it providing line

13   relief don't ask anything of voters.  They do nothing to interfere

14   with them.  They merely make offers of food and water.

15         And *Browning* I think is actually helpful to plaintiffs'

16   case here.  *Browning* made several distinctions that are important

17   here and which put us on the side of the line showing that the

18   state can't meet its burden under strict scrutiny.  So the

19   *Browning* Court distinguished exit solicitation, which it found was

20   justified to ban under strict scrutiny, and exit polling, which is

21   constitutionally protected.  And the line it drew was it said that

22   exit polling does not include advocating for the success of some

23   political proposal or candidate.  And the same is true here for

24   line relief.

25         Additionally, *Browning* distinguishes, quote, charitable

1   and commercial solicitation from forms of political canvassing

2   like exit solicitation.  Again, we are in the former category,

3   it's presumptively permissible.

4           And, finally, *Browning* notes many other state

5   legislatures seemingly share the belief that some

6   solicitation-free zone around polling places is necessary to

7   protect voters.  But here Georgia's law stands entirely alone.  It

8   is the most restrictive law in the country.  It is the only

9   outright ban in the country.

10          A bright-line may be one way to solve a problem, but

11  it's certainly not the least restrictive means to do so or the

12  only appropriate means to do so.  And the issue here isn't whether

13  the legislature perceived a problem, but how they addressed it.

14          And, finally, I do -- before turning to *Purcell* just do

15  want to note that just because voters here may have been fed

16  disinformation, believe conspiracy theories is no reason to

17  restrict the First Amendment activities of groups like plaintiffs.

18  If anything, doing that only encourages that perception and it

19  validates it.

20          Checking the time here.

21          Just going to address *Purcell* quickly, your Honor, and

22  then turn things over to my colleague.

23          I think when your Honor asked a question about relief to

24  the defendants and the intervenors earlier, the intervenors'

25  response was particularly telling.  In the intervenors' view, it's

1    either -- seeking relief before an election, it's either too late

2    under *Purcell* or it's too early because there's not threat of

3    imminent harm, so there's really no appropriate time to seek

4    relief against election law.  But as this Court just recognized,

5    *Purcell* is not a magic wand that can be waved.  It is a

6    case-specific analogy.  And it's notable here that the counties

7    who everyone agrees are the primary individuals responsible for

8    enforcing this, and at least 15 county election boards are

9    defendants in this case, they don't raise *Purcell* arguments.  They

10   don't argue that there's going to be any sort of undue burden,

11   voter confusion or anything like that.

12          And even defendants' own witness, Ms. Bailey, a former

13   election official, did not say specifically that a line-relief

14   ban, implementing it would cause chaos or voter confusion or

15   anything of the like.  Instead the only testimony that goes to

16   this has come from Mr. Brower, former Fulton County and DeKalb

17   County director, who testified about how easy it would be to

18   implement relief here.  We also heard in the declaration from

19   Mr. Benning a very similarly proposition.

20          And so when we're looking at the fact-specific nature of

21   this here, implementing relief of this type where it concerns

22   in-person voting and we're several months before the election is

23   quite simple.  I've litigated, I'm counsel in some of these other

24   cases that have been cited, such as *Merrill*, such as *People*

25   *First v. Alabama*, and this relief is nothing like the relief in

1   those cases.

2           In *Merrill,* candidate filing deadlines had to be

3   enjoined.  Justice Kavanaugh was concerned that in the seven weeks

4   before voting started, not only would lines need to be redrawn,

5   but voters would need to be reassigned to different districts and

6   basically that there would be administrative chaos.

7           *People First* also involved changes to absentee voting

8   procedures and things like that that would require much more

9   extreme implementation.

10          Similarly, your Honor's decision in *VoteAmerica* I think

11  recognized the problems of voter confusion, that there might be

12  two different voter registration forms out there and that

13  registration was ongoing at the time.  We simply don't have those

14  problems here.

15          And if it's true and we take, and I think -- I hope we

16  should, the Supreme Court and the Eleventh Circuit at their word,

17  that *Purcell* is never an absolute ban, it's case specific.  It's

18  hard to think of a case where -- other than this one where *Purcell*

19  would not be implicated.  If *Purcell* is implicated in this case,

20  then *Purcell* is the absolute ban that has been promised otherwise.

21          And so in closing, plaintiffs and other groups like them

22  have been supporting voters and those around the polling place for

23  years by sending the message that their vote matters and to

24  express dignity in the face of hardship.  Rather than celebrating

25  this community involvement, Georgia criminalized it, enacting the

1   broadest ban in the country.

2           The First Amendment forbids this overbroad attempt to

3   silence civic groups like plaintiffs.

4           And, thank you, your Honor.  I'll reserve a bit of time

5   for rebuttal.

6           THE COURT:  Thank you.

7           MR. NKWONTA:  Good afternoon your Honor.  Uzoma Nkwonta

8   on behalf of NGP plaintiff group.

9           Your Honor, I would like to start out actually by

10  responding to a question that you posed to my friend from the AME

11  plaintiffs, which is you asked whether the standard in *Burson* and

12  *Police Accountability*, specifically the reasonableness language,

13  would apply here.  And it would not.

14          And here's why.  That standard that was articulated in

15  *Burson* and that was articulated in the *Police Accountability* case,

16  that standard derived from a long history that the Court

17  recognized of using political candidates, using campaign workers

18  to commit voter intimidation, to solicit votes and to influence

19  voters.  The *Burson* case outlined this long history.  And the

20  *Police Accountability* case cited that long history and noted that

21  it would be odd to require the state to provide additional

22  evidence of such activity or such conduct when we know from our

23  history that it has been occurring.

24          Food and water is different.  And even the *Police*

25  *Accountability* case acknowledged that the history that was traced

1    in *Burson* did not apply to every single type of expression near a

2    polling place.  It didn't apply to, for instance, exit polling.

3    And it didn't apply to other forms of expression that were not

4    excluded in *Burson*.  And so that standard -- what you saw in that

5    standard under *Burson* and in *Police Accountability* was a temporary

6    departure from what is the usual standard, the typical standard

7    and the mandatory standard when there is a content-based

8    restriction on speech, which is strict scrutiny, and at the very

9    least exacting scrutiny.

10           And when you apply strict scrutiny here, there can only

11   be one result, and that's where the least restrictive means

12   language comes from because strict scrutiny applies here because

13   we're not talking about the well-documented history of campaign

14   workers soliciting votes, or the well-documented history of

15   improper influence through vote solicitation.  We're talking about

16   a content-based ban on expressive conduct.

17           So how do we know that the ban is content-based?  We

18   know the ban is content-based because the Supreme Court has

19   already said the ban is content-based, albeit it was a different

20   content, but it's really difficult to disentangle that context

21   from this case.  So in *Burson*, for instance, the Supreme Court

22   said whether individuals may exercise their free speech rights

23   near polling places depends entirely on whether their speech is

24   related to a political campaign.

25           The same is true here.  Whether the NGP plaintiffs or

 1   whether the AME plaintiffs groups can distribute food and water

 2   near a polling place or -- to voters or where they can engage in

 3   line relief, that depends entirely on what they are doing or

 4   distributing.

 5          If -- as you heard through testimony, if they were

 6   passing out flyers for a missing cat, that would be permitted

 7   under the law.  If they were promoting Coca-Cola's new product,

 8   that would be permitted under the law.  If they were giving out

 9   fist bumps, that would be permitted under the law.  Only the

10   distribution of food and water, that expressive conduct is

11   restricted along with solicitation and the other items mentioned

12   in the statute, but that's what makes this law content-based.

13          And because it's content-based and because it also

14   occurs in a public forum, which, again, *Burson* establishes that

15   these streets and sidewalks where this 150-foot barrier and the

16   25-foot buffer from the voter in line, that inevitably extends

17   into public fora, and because it extends into public fora, it is

18   subject to strict scrutiny.

19          And when you look at the rationales, you look at the

20   justifications that have been presented here, it becomes clear

21   that defendants have not established that this law is the least

22   restrictive means of achieving whatever interest that they claim

23   to seek to achieve.

24          You've heard a variety of interests, some of which were

25   expressed in SB 202, and some of which were not as my colleague

1   mentioned.  You've heard interest in preventing congestion at the
2   polling place lines, interest in preventing people from talking to
3   voters in polling place lines.  The problem is even the law as it
4   is written does not prevent voters from -- does not prevent third
5   parties from talking to voters in polling place lines.  In other
6   words, the legislature did not endeavor to foreclose discussion
7   with voters near polling place lines.  The legislature did not
8   endeavor to foreclose anyone from breaching that buffer.  The
9   legislature specifically target a specific form of expressive
10  conduct that alleviates the burden of waiting in line and that
11  expresses compassion, that expresses support, that expresses
12  solidarity.  And that is the expression that has been foreclosed
13  here, not all forms of expression.
14          And intervenors make this point.  Intervenors argue
15  affirmatively that plaintiffs are still able to approach voters
16  and to share their interest in solidarity or share their support,
17  and intervenors make that argument.  The problem is the First
18  Amendment gives plaintiffs and -- the NGP plaintiffs and the AME
19  plaintiffs, the First Amendment affords them the right to engage
20  in expression in the most effective means.  In other words, the
21  availability of some lesser -- or less effective form of
22  expression or some more burdensome form of expression does not
23  protect the plaintiffs' First Amendment rights.
24          And because of that, because the First Amendment
25  protects our rights not only to advocate the cause, but also to

 1  select what plaintiffs believe to be the most effective means, it

 2  doesn't matter that they can still approach voters and -- without

 3  food and water.  It doesn't matter that they can set up outside a

 4  150-foot buffer zone.  You've heard testimony that that dilutes

 5  the message, dilutes the message when a voter has to walk 150 feet

 6  away from the polling place or 25 feet away from their place in

 7  line in order to accept and share food and water.

 8          And going back to the standard here, if the standard is

 9  strict scrutiny, defendants have to demonstrate that this law is

10  the least restrictive means.  If the standard is exacting

11  scrutiny, they have to at least demonstrate that it's narrowly

12  tailored.  And narrow tailoring means it does not foreclose or

13  prohibit more speech than necessary.  And when you look at what

14  this food and water ban does, it prohibits more speech than is

15  necessary and it's certainly not the least restrictive means.

16          The reason for that is because the bill and the actual

17  provisions of this law is prophylactic in nature.  Not only is it

18  prophylactic in nature, there are two levels of prophylaxis here.

19  So, for instance, if the concern is influencing and intimidating

20  voters, the ban from solicitation or the ban against

21  electioneering, that is prophylactic in itself because not all

22  electioneering is going to result in intimidation, and not all

23  electioneering is going to result in undue influence.  But there

24  is a ban on certain forms of electioneering as a prophylactic

25  measure.  And we don't contest that ban on electioneering.

1          What the State of Georgia has done is then imposed

2     another layer, another layer of prophylaxis and imposed a ban on

3     providing food and water because of a fear that sharing of food

4     and water would be used as a means to avoid and negate the first

5     level of prophylaxis.

6          And the Supreme Court has made clear in *McCutcheon v.*

7     *Federal Election Commission* and in other cases that when states

8     impose this prophylaxis-upon-prophylaxis approach and particularly

9     when it implicates the First Amendment, courts must be vigilant

10    and must be vigorous in protecting First Amendment rights.  And

11    that is why these -- this law, this food and water ban

12    specifically, cannot withstand scrutiny in this case.

13         And I want to go back to a question that your Honor

14    asked earlier during the opening arguments.  And I believe the

15    question -- and forgive me if I'm misstating it, but I believe it

16    was along the lines of what is the limit?  Where do you -- what is

17    the threshold?  Where do you draw the line of how much food or

18    what type of food you can offer?  And in response to that, your

19    Honor, I would offer that when it comes to sharing food and water,

20    there doesn't need to be a threshold because the law recognizes

21    that food and water is fundamentally different than the other

22    types of activity that is prescribed in the solicitation ban.

23    Offering and sharing food and water is inherently different from

24    sharing money or sharing other types of valuable gifts.  And this

25    has been recognized in a number of different contexts.

```
 1              If we look at Food Not Bombs Fort Lauderdale for
 2    instance, the Court there, the Eleventh Circuit recognized that
 3    sharing food and water dates back millennia and recognizes all the
 4    different instances in which sharing food and water was, A,
 5    expressive conduct and, B, implicated First Amendment interests.
 6              And when you look at the history of campaign workers
 7    using -- soliciting votes and intimidating voters at polling --
 8              THE COURT:  Let me interrupt you, if I can.  I guess I'm
 9    now getting confused again because now you're back to food and
10    water, but I've heard testimony about hats and mittens and I think
11    even power cords.  So what are you looking to enjoin?  Just food
12    and water or anything?  Hand warmers, mittens, hats, power cords?
13              MR. NKWONTA:  We're looking to enjoin the food and drink
14    ban specifically.
15              THE COURT:  Same with the other plaintiff group?
16              MR. ROSBOROUGH:  Your Honor, I think we were -- we are
17    looking to enjoin the line-relief ban, but I think given the core
18    conduct here is about food and water, we would be perfectly
19    satisfied with an injunction that just address food and water.
20              MR. NKWONTA:  And can I elaborate on that a little bit,
21    your Honor?
22              THE COURT:  Sure.
23              MR. NKWONTA:  So primarily we're looking to enjoin the
24    food and water ban because that is the clearest expression in the
25    statute that prohibits the conduct that our clients engage in.
```

 1          However, when we talk about line relief, what -- the

 2    concept of line relief is providing something that alleviates the

 3    burden and demonstrates solidarity to those currently in line.

 4    And I think there's a distinction between items that provide line

 5    relief and items that are just -- are provided just as gifts or

 6    for whatever other purposes, right?  And that's why we call it

 7    line relief.

 8          So for the most part and in much of the declarations and

 9    testimony, food and water is the most common and clear expression

10    of that.  But when someone's handing out hand warmers for those

11    waiting in line in the cold or providing seats for the elderly who

12    are waiting in long lines or providing umbrellas to people in the

13    rain, those aren't just gifts, they're also forms of line relief.

14          Your Honor has the authority to fashion an injunction in

15    a way that addresses your concerns and can -- also has broad

16    authority, as you know, to fashion an injunction that's even

17    narrower than what plaintiffs have asked.  And if enjoining food

18    and water -- the food and water ban by itself is the type of

19    injunctive relief that your Honor believes would remain true to

20    the First Amendment analysis that we have laid out, that is

21    permissible and that would relieve our clients' injuries as well.

22          THE COURT:  But once we go down that road, then we're

23    down the road of in New York it's $1, and what can you buy for a

24    dollar?  So am I tasked also with deciding if the limit's a dollar

25    or $2 adjusted for inflation, or do I check to see what the fed's

```
1    done last week when I come up with a dollar amount?  I guess that
2    just gets complicated and it doesn't seem like it would be a
3    judge's role.
4            MR. NKWONTA:  Well, when we're talking about food and
5    water, on behalf of the NGP plaintiffs we wouldn't ask you to
6    impose any thresholds for food and water specifically, nor do we
7    believe it's necessary because, as I mentioned before, food and
8    water occupies a different role.
9            Now, I talked about the Food Not Bombs case and the
10   explication of the traditional role of food and water, but we can
11   also look to Georgia law just to understand how Georgia itself
12   distinguishes food and water from the other types of items or
13   materials that may influence a voter.
14           For instance, the criminal bribery statute, OCGA 16-10-2
15   (a)(2)(A), a thing of value does not include food or beverage
16   consumed in a single meal or event.  In other words, even Georgia
17   law recognizes that when you're talking about bribery, when you're
18   talking about vote-buying and when you're talking about some form
19   of corruption, there is a district role or district place that
20   food and water plays that -- you cannot lump food and water in the
21   same category as you do with money or other monetary gifts or
22   other items of value.  And that is what distinguishes this case
23   from the cases that your Honor mentioned.  That is the reason why
24   the Court does not need to endeavor to place a price limit on
25   food.
```

1          I believe there was an example mentioned earlier, what
2  about if it was filet mignon?  Well, there are laws that -- again,
3  that foreclose or prohibit electioneering.  And if a candidate was
4  offering a very expensive food item, then that may raise concerns
5  or raise issues as to whether the candidate is engaging in
6  electioneering as opposed to just providing relief through sharing
7  food and water.  It's a fact-specific inquiry, just as Mr. Germany
8  testified.

9          Regardless, with or without the food and water ban there
10 are no bright-line rules.  There never has been and there won't be
11 regardless of how this Court decides.  And that's because all of
12 the other criminal provisions and the prohibitions that apply here
13 are, as Mr. Germany repeatedly told us, fact-specific inquiry.
14 It's a fact-specific inquiry to know what's electioneering, it's a
15 fact-specific inquiry to know what's soliciting votes.

16         And the fact that officials are going to have to conduct
17 a fact-specific inquiry to apply the law, that is not a flaw, that
18 is a feature of the law, and it's a feature that allows the law to
19 permit First Amendment protected activity while maintaining the
20 state's interests.

21         I will reserve the rest of my time for rebuttal and time
22 to opposing counsel.   Thank you, your Honor.

23         THE COURT:  Hello.

24         MR. NORRIS:  Hello, your Honor.  Mr. Norris for
25 intervenors.

1          Really just going to make a few technical points and

2     then leave the majority of the presentation on the merits to the

3     state.

4          The first is your Honor's initial question about a

5     preliminary injunction that would not kick in until 2023.  I did

6     some research in the interim on that question.  I think that would

7     be inappropriate for a few reasons.

8          The first is that the plaintiffs have not shown they're

9     likely to succeed on the merits with respect to that injunction.

10    The only elections in Georgia in 2023 that we know of would be

11    municipal elections.  There is zero evidence presented today or in

12    any of the record that the plaintiffs intend to do line warming

13    activities for municipal elections in 2023.  There's zero evidence

14    about which elections those even are, where they're held and what

15    offices are involved.  There's no evidence that the lines are long

16    for those elections.  There's no evidence that line warming,

17    absent long lines, has any communicative message at all or what

18    voters would understand that mean in that context.  So I don't

19    think they've made their showing on the merits.

20         I also don't think they could show the necessary harm

21    needed for a preliminary injunction.  There's a case from the

22    en banc Eleventh Circuit, it's called *Siegel*, S-I-E-G-E-L, that is

23    at 234 F.3d 1163.  It is part of the -- what became the *Bush v.*

24    *Gore* saga.  That case says that when the election cycle you're in

25    is not even over yet, you cannot get a preliminary injunction

1  typically for the next election because your harm is not imminent

2  enough to justify that extraordinary relief.

3      And I think it's especially appropriate here not to skip

4  ahead an election because I think your Honor would benefit from

5  seeing what happens with SB 202 in place in the 2022 elections and

6  seeing how and whether that affects the plaintiffs' activities and

7  their speech.

8      And I just want to respond to my friend's point.  This

9  is not some sort of Goldie Locks' problem where it's always too

10 soon or too late.  *Purcell* raises the bar for getting preliminary

11 relief, it does not make it impossible.  It raises the bar.  It

12 means that if you're going to interfere with an election, your

13 claims at least have to be clear.  We submit that the plaintiffs'

14 claims here are not clear enough.

15     They're also not entirety sympathetic to the view that

16 it should be easy for Federal Courts to interfere with state

17 elections and enjoin their laws.

18     And, lastly, on this question, your Honor, I think

19 as a matter of case management, we found another case,

20 *Perry v. Schwarzenegger*, which was part of the false start gay

21 marriage litigation that took place in the Ninth Circuit before

22 that was ultimately resolved in *Obergefell*.  That case is 2009

23 Westlaw 10695876.  And that case essentially says that if you're

24 going to go ahead and enter preliminary relief that doesn't kick

25 in for a long time, the better course typically is to instead just

 1    accelerate the proceedings to get the trial done in that same

 2    period because otherwise you're making a very preliminary decision

 3    based on preliminary facts before discovery has completed and

 4    before the arguments are fully flushed out instead of the decision

 5    you would be making later at trial with a full record.

 6              And I also just note as a practical matter, the Eleventh

 7    Circuit is very likely to decide this exact issue in the *League of*

 8    *Women Voters* case.  That appeal has been expedited.  And we have a

 9    trip booked to Miami on September 15th for oral argument.  So I do

10    think that that decision will also be highly informative about how

11    these claims should be decided.

12              The second highly technical point I wanted to make was

13    that I don't believe the plaintiffs have shown what they would

14    need to show to bring a facial challenge for the gift-giving

15    provision of SB 202.  I was going to make a bunch of points about

16    this but I think my friends just gave up that relief.  But if I'm

17    wrong, it doesn't matter, because they have not put up evidence

18    today to justify that kind of relief.

19              And the reason is to get a facial First Amendment

20    challenge they're probably operating under the overbreadth theory,

21    which says that, unlike most facial challenges where a law has to

22    be unconstitutional in all of its applications under the

23    overbreadth theory, it only has to be unconstitutional in a

24    substantial number of applications, but they haven't shown that

25    at all.  All of the evidence today is about their specific line

1  warming activities only, not what anyone else does or any other

2  application of the statute.  So they haven't shown you that it's

3  facially overbroad.

4        And just to be clear, my friends retreated to maybe only

5  a food and water holding, but Georgia doesn't have a ban on giving

6  voters food and water.  It has a ban on giving gifts, comma,

7  including food and water.  So it's a gift-giving ban.  And there's

8  been no evidence that giving voters cash would be -- a ban on

9  giving voters cash would be unconstitutional, a ban on

10  distributing Bibles, NRA keychains, gift cards, you know,

11  expensive food that your Honor mentioned at the very beginning.

12        Even as to food and water, it's not unconstitutional to

13  ban candidates from doing this or campaigns from doing this.  It's

14  not unconstitutional to ban commercial vendors from distributing

15  their food and water to people.  That's commercial speech, it's at

16  a lower level of scrutiny, even if it is a content-based ban.

17  It's not unconstitutional to regulate this to places where lines

18  aren't long, where the lines are short.  I don't think their

19  message is clear at all in those areas, if that's even something

20  they engage in.

21        It's not unconstitutional inside a polling place, which

22  is another place where this law applies.  And it's not

23  unconstitutional, I would submit, in the buffer zone.  So set

24  aside the 25 feet from voters but in the actual buffer zone.  The

25  Eleventh Circuit's opinion in the *Browning* case is very clear that

1   the state has a lot of ability to regulate and create a peace -- a
2   zone of quiet before voters make the important decision about how
3   they're going to vote.
4          And, lastly, less technical and more just broad ways to
5   think about this case from our perspective, there's a Minnesota
6   statute, it's Section 204C.06.  In Minnesota it is illegal for
7   third parties to even stand in the buffer zone.  That is a much
8   broader ban than what Georgia has done here.  Georgia has instead
9   narrowly regulated an activity that they have seen on the ground
10  that is confusing, pressuring voters, and it's hard to administer
11  from the election official standpoint.  Minnesota goes much
12  farther.  No one's challenged their law.  Georgia shouldn't be
13  punished for doing less and being more speech protective.
14         The other thing is -- the other strange thing about this
15  case is that everyone agrees you can ban telling people who they
16  should and shouldn't vote for while they're in the buffer zone or
17  standing in line, which we know from cases like *Citizens United*
18  that is core political speech, that is the heart of the First
19  Amendment, persuading your fellow citizens how to vote and what
20  they should think and what ideas they should support, and yet that
21  is perfectly fine for Georgia to ban in this same exact space.
22  The fact that now Georgia has extended and covered things that are
23  concededly less protected, they are at best expressive conduct, we
24  think they are pure conduct because they don't -- the mere giving
25  of the gift does not express a message to the average voter, but

1    it is certainly less protected, and yet everyone agrees Georgia

2    can ban what is more protected.

3              Thank you.

4              THE COURT:  Thank you.

5              MR. SCHAERR:  Your Honor, I think we're right where we

6    were at the closing of the *VoteAmerica* preliminary injunction

7    hearing.  As I hope you can see from the evidence we've presented

8    there and here, the state and its officials are committed to

9    ensuring efficient and secure elections, elections that have both

10   the reality and the appearance of integrity.  And that's obviously

11   one of the most important purposes of SB 202.  The official name

12   of which, the very first text in the statute is the "Election

13   Integrity Act of 2021."  That is what the statute was all about to

14   a large extent.

15             And as we addressed here and in the *VoteAmerica* hearing,

16   in the wake of SB 202 voting has, in fact, increased substantially

17   over the last comparable election, and that itself is a suggestion

18   that the statute has improved the appearance of election integrity

19   in Georgia.  So as far as the state is concerned, SB 202 is

20   already achieving its main objectives while protecting its

21   citizens' voting rights and other constitutional rights.

22             Now, as we discussed at the outset, and the plaintiffs

23   haven't disputed, their burden in seeking a mandatory preliminary

24   injunction is extraordinarily high because they're not merely --

25   among other things, they're not merely seeking to maintain the

1   status quo but to change it.

2           As this Court explained in its *VoteAmerica* opinion,

3   SB 202 has already been implemented and incorporated into the

4   state's election system, and for that reason under settled Supreme

5   Court and Eleventh Circuit case law, plaintiffs have the burden of

6   clearly establishing each of the four preliminary injunction

7   factors, putting aside the fact that we're now in the middle of a

8   multi-month election cycle.

9           In addition, because of the pendency of the election,

10  *Purcell* applies, which significantly heightens even further

11  plaintiffs' burden on each of the preliminary injunction factors,

12  and, thus, as the Eleventh Circuit recently explained in the

13  *League of Women Voters* case, and in so doing invoking Justice

14  Kavanaugh's concurrence in *Merrill*, plaintiffs have the burden of

15  establishing at least four specific things.

16          First of all, they have the burden of establishing the

17  correctness of their position on the merits, and they have to show

18  that that position is, quote, entirely clear-cut.

19          Second, they have to establish that they would suffer

20  irreparable harm absent an injunction, not just may but they

21  would.

22          Three, they have to show, and they have the burden on

23  this, they have the burden of showing that they have not unduly

24  delayed bringing their request for relief.

25          And, fourth, they have the affirmative burden of

1  establishing that the changes that they're seeking are feasible

2  before the election and without significant costs, confusion or

3  hardship.

4        Plaintiffs haven't come close to showing any of those

5  things, much less the required general showing on the remaining

6  issue; that is that the balance of the equities and public policy

7  clearly favor preliminary injunction.  And, of course, the Court

8  is obligated to deny the preliminary injunction if the plaintiffs

9  fail to make the requisite clear showing on any one of those five

10  issues.

11        So let's begin with the state interests that the

12  anti-solicitation provision serves.  As we discussed earlier and

13  as the Eleventh Circuit held in *Browning*, the state, and I'm

14  quoting here, need not wait for actual interference or violence or

15  intimidation to erupt near a polling place for the state to act.

16        Georgia, like Florida in the *Browning* case, as the Court

17  put it in that case, reasonably wants peace and order around its

18  polling places.  And the Eleventh Circuit has made clear it

19  affords, quote, significant value to that desire for it preserves

20  the integrity and dignity of the voting process and thereby

21  encourages people to come and vote.

22        Now, the Court today has heard about third parties

23  handing out food and drink to voters in the buffer zone can and

24  did have several adverse effects.  It confuses or intimidates some

25  voters.  It burdens already burdened poll workers.  It has the

1   potential to grind the election machinery to a halt, especially if

2   there are disputes among different third parties as to who gets

3   the best spots for their tables or anything like that.

4        And as Mr. Mashburn emphasized, allowing people to hand

5   out food and drink within the buffer zone creates at least an

6   appearance that election integrity has been compromised because

7   ordinary voters will assume that whoever is controlling the lines

8   outside is also controlling what's going on inside the polling

9   station.

10        As Mr. Germany and Mr. Mashburn testified moreover,

11   solicitations were a serious drag on the election system's limited

12   resources in both 2018 and 2020.  Third parties, poll workers and

13   voters were all unsure of what was permitted and what was not.

14   And the sheer number of complaints led to the state's issuing

15   first an official election bulletin on the subject of food and

16   drink at polling places.

17        Mr. Mashburn testified that he personally witnessed the

18   confusion and stress that the practice imposed on poll workers.

19   And he also testified from his many conversations with voters that

20   they -- that most of them just want to be left alone while they

21   wait to cast their vote.  And, again, he explained how

22   distribution of food and drink to waiting voters can create the

23   perception that one party or the other has taken control of a

24   voting place.

25        With SB 202 in place, however, the Court heard today

1  that the 2022 primary election has proceeded without the long

2  lines that burdened the 2020 election season and with a

3  substantial increase in voter participation compared with the most

4  recent comparable election.  And that kind of increase is what you

5  would expect if voters have greater confidence in the integrity of

6  their elections.

7          So, in short, the anti-solicitation provision directly

8  responded to the confusion of voters, third parties and election

9  workers themselves and to the concerns about election integrity

10  that had arisen from past practices.  And as the Supreme Court

11  in the Eleventh Circuit and other courts have long recognized,

12  preventing confusion, conducting an efficient election and

13  ensuring both election integrity and the appearance thereof are a

14  legitimate and even compelling state interest.  And plaintiffs

15  today have also not shown that the challenged provision are not

16  tailored to those interests.

17          As we've discussed, the anti-solicitation provision

18  responds directly to the complaints and inefficiencies that we

19  saw in prior elections.  And in responding to those issues, the

20  legislature took a very narrow approach by merely clarifying that

21  food and drink and other things of value are -- simply can't be

22  provided within the buffer zone.

23          Unlike the Minnesota statute that we heard about a

24  minute ago, the state didn't prohibit third-party organizations

25  from talking to voters at all who were standing in line.  The

 1  state didn't prohibit them from giving water to voters before they
 2  got into the line.  And as long as the buffer zone is respected
 3  and as long as they're not creating a circus, the state doesn't
 4  prohibit them from encouraging voters to stay in line once they
 5  get there.  So the statute left plenty of room for plaintiffs to
 6  express their pro-voting message, whatever it is exactly, to
 7  Georgia voters.

 8        And so irrespective of the level of scrutiny that this
 9  Court determines is appropriate, plaintiffs have not shown a
10  substantial likelihood of success on the merits.  And that's
11  before we even get to the issue of what exactly are the burdens on
12  First Amendment rights.

13        Now, as we talked about earlier today, the
14  anti-solicitation provision is most appropriately analyzed under
15  rational basis review, and that's because the plaintiffs' entire
16  argument depends on the Orwellian view that their conduct of
17  handing out food and water is actually expressive conduct that's
18  entitled -- triggers the application of the First Amendment.  But
19  as this Court recognized in *VoteAmerica*, conduct that lacks
20  inherent expressiveness or inherent expression is not transformed
21  into protected First Amendment speech merely because it's combined
22  with another activity but does involve protected speech.  And the
23  Court correctly relied on the *FAIR* decision for that proposition.

24        And here, one of the interesting aspects of the
25  plaintiffs' presentation is that they have not identified a clear

message that they're trying to send with their distribution of food and water.  They suggested a myriad of different messages and that exactly is the problem.  The only way a voter standing in line could know exactly which message they are trying to convey is if they told them.  And, of course, once that happens, then under the *Rumsfeld v. FAIR* analysis, the restrictions don't even trigger First Amendment -- don't even impinge on First Amendment rights at all.

Now, the plaintiffs have talked a lot about the *Food Not Bombs* case from the Eleventh Circuit and that provides an interesting counterpoint to this case.  And you can tell from the name of the group that was the plaintiff there that they had a -- they had a pretty clear message that they were trying to convey to people.  They were a group dedicated to ending both war and hunger and their message was we ought to eradicate hunger rather than creating bombs.  A very clear, easily understood message.  And it was a message that was advanced by their passing out food to people, you know, under the banner of their -- of the name of the group.

Here, by contrast, there's no demonstrated symbolic connection between the food and drink the plaintiffs want to give voters and the act of voting or the messages of defiance or celebration or patriotism or inspiration or whatever else they suggested they're spreading.  So the absence of any clear message here contrast sharply with the *Food Not Bombs* decision, and,

1   therefore, just by comparing this case to that one, it's clear

2   that the First Amendment is not triggered at all.

3           In short, the anti-solicitation provision governs

4   conduct, not speech, and, therefore, does not infringe First

5   Amendment rights as in *VoteAmerica* and, therefore, rational basis

6   applies.  And there's no serious dispute that the

7   anti-solicitation provision passes rational basis.

8           But even if the Court were to find that the

9   anti-solicitation provision incidentally burdens speech, it would

10  still only be subject at most to *Anderson-Burdick* type balancing

11  and it would easily pass that standard as well.

12          For one thing, if it burdens speech at all, the

13  provision is not a significant burden on plaintiffs' speech.  And

14  it is, in fact, narrowly tailored.  And it's also content and

15  viewpoint neutral.  I mean, I listened to plaintiffs try to argue

16  that it's content-based, but the statute by itself applies across

17  the board.  Nobody, whatever their views on anything, is allowed

18  to provide food or water or other things of value to voters who

19  were standing in line or who were inside the buffer zone.  It's a

20  completely neutral, you know, content and viewpoint neutral

21  restriction.  I don't know how you could get more neutral than the

22  way the statute is drafted.

23          Part of the problem was that before SB 202 there was

24  enough ambiguity in the law, as Mr. Mashburn indicated, that, you

25  know, arguably there was some content discrimination before the

 1  law was passed.  But once the law was passed, I think it's just

 2  implausible to suggest that it's content-based at all.

 3         But even if the law were somehow considered

 4  content-based, it would still be lawful under *Burson* and other

 5  decisions, and that's because the state has a compelling interest

 6  in preventing voter intimidation and election fraud.  It also has

 7  a compelling interest in protecting both the reality and the

 8  appearance of election integrity and it's narrowly tailored to

 9  those interests and so it would pass constitutional muster under

10  any standard.

11         THE COURT:  How is it narrowly tailored?

12         MR. SCHAERR:  Well, because, you know, as Mr. Mashburn

13  testified, before SB 202 was enacted there was a lot of confusion

14  about what kind of line warming activities were permitted, and

15  especially whether food and drink was permitted.  And the state,

16  in the interests of protecting both the reality and the appearance

17  of election integrity, said we're just going -- we're just going

18  to cut it all off.  And, of course, the state also has a strong

19  interest in the efficiency of elections.  And the legislature

20  determined that if it continued to allow some line warming

21  activities, local poll workers would be in exactly the same kind

22  of line drawing problem that we've discussed earlier, that they

23  would have to decide, you know, how much value is too much value,

24  what kind of products are allowed, what kind of products are not

25  allowed, and that sort of thing.

1          So when you take the state's interests in election

2   integrity and combine it with the need for an efficient election

3   operation, I think it's very closely tailored to the combination

4   of those two interests.

5          So let's move on to irreparable injury and delay.  And

6   the Court will recall the standard that was articulated in Justice

7   Kavanaugh's *Merrill* opinion, that is that the plaintiffs have the

8   burden of establishing that they did not unreasonably delay

9   seeking relief.  And it's true, as the Court noted in the

10  *VoteAmerica* case, that the cases often look to the time of the

11  filing of the complaint, but we think that's just because the

12  complaint and preliminary injunction are typically filed together

13  or in close succession in these kinds of cases and not a year

14  apart.

15         So it can't be that a plaintiff can avoid *Purcell* by

16  filing a complaint immediately and then waiting for a year or

17  longer to file a preliminary injunction motion and then say, oh,

18  well, *Purcell* doesn't apply because I, in fact, filed my complaint

19  right after the statute was passed, you know, but *Purcell* only

20  applies to the complaint, not to when I actually asked for the

21  relief that's at issue.  So we think *Purcell* does apply, the logic

22  of *Purcell* we think applies with full force here.

23         And the whole point of *Purcell*, of course, is to prevent

24  election rules from changing close to an election.  And logically,

25  for that rationale to make sense, you have to look at the time

```
 1   that the relief is sought, not just the time that the complaint is
 2   filed.
 3           So, in any event, plaintiffs haven't really attempted to
 4   establish that they did not unreasonably delay.  They haven't
 5   provided -- unlike the VoteAmerica case, they haven't provided
 6   even any explanation as to why they waited as long as they did to
 7   seek a preliminary injunction.  And so by definition they haven't
 8   met their burden of establishing -- of affirmatively establishing
 9   that they did not unreasonably delay.
10           And, of course, the Court is well aware of the case
11   law in the Eleventh Circuit, especially the Wreal case, where the
12   Eleventh Circuit said that, you know, waiting to file for over
13   five months after filing the complaint greatly undermine the
14   plaintiffs' showing of irreparable injury.  So at a minimum, the
15   Purcell analysis and the plaintiffs' failure to establish
16   affirmatively that they did not delay in seeking relief undermines
17   any claim that they might otherwise have to irreparable injury.
18   And, again, under the Purcell standard, that kind of a delay
19   really precludes a preliminary injunction when the election is
20   near, as it is even now.
21           Finally, the plaintiffs likewise cannot show that they
22   clearly satisfy the requirement in Merrill and League of Women
23   Voters that the relief that they seek be easy and relatively
24   costless to implement.
25           And on the other side of that, Mr. Germany testified
```

 1  that a preliminary injunction would require the state, number one,

 2  to redo training materials for county election workers; for

 3  example, how to respond to questions about solicitations with

 4  food and water and probably things like how much is too much and

 5  whether, you know, filet mignon is okay but you can only pass out

 6  hamburgers or whatever.

 7        Secondly, both state and local officials would have to

 8  train election workers in whatever new rules are adopted as a

 9  result of a preliminary injunction.

10        And, third, election officials would have to try to

11  find every instance where they previously gave guidance on the

12  anti-solicitation provision and change them to avoid confusion.

13        Now, the plaintiffs try to ignore the burden that a

14  preliminary injunction would impose on the counties claiming that

15  it would be just a short training, maybe even just an e-mail that

16  would be enough.  But they ignore the reality, as Mr. Mashburn

17  testified at length, that polling places would need far more

18  workers to police the activities of the new groups that would be

19  allowed to distribute food and drink, including possible conflicts

20  among those groups.

21        As he mentioned, many, many groups that would otherwise

22  want to show up at polling places to encourage people to vote a

23  certain way have been deterred from doing that because they

24  believe line warming activities are not lawful.  But, you know, if

25  the Court issued an injunction, it would be clear that those kinds

1  of activities are lawful, and, you know, not only the groups that

2  have been showing up at polling places in the past would show up

3  and a lot of others as well.

4          And so by enjoining the anti-solicitation provision

5  the Court would, in fact, put Georgians back into the middle of

6  the confusing and intimidating system that existed before SB 202,

7  would likely subject them to longer wait times that result from

8  election workers having to police groups taking up space in the

9  buffer zone.  And unlike the provisions in *VoteAmerica*, which this

10  Court recognized merely regulated back-of-the-house activities,

11  this actually is a front-of-the-house activity that directly

12  burdens the election machinery of the state and its counties, and

13  so the reasoning behind *Purcell* weighs even more strongly against

14  an injunction here than it did in *VoteAmerica*.

15          As Misters Germany and Mashburn testified moreover, an

16  injunction would also impose enormous burdens on state and local

17  election officials for reasons I explained already.  There would

18  be more third parties taking up space in parking lots and

19  entrances than they currently do.

20          With an increase in the number of groups trying to

21  provide line warming activities, things would likely get more

22  unruly than they were before SB 202 was passed.  There would need

23  to be more poll workers to police and regulate all of that.

24          And then there's the confusion among the groups

25  themselves.  Many of them are not planning to give food and drink

1    during this election because of the anti-solicitation provision,

2    and so there would be confusion about, you know, depending on how

3    the injunction were written, why some groups were allowed to do

4    that but others are not.  And, in contrast, the harms alleged by

5    the plaintiffs pale in comparison to those that an injunction

6    would inflict on the state and on Georgia voters.

7         And, again, the plaintiffs can continue communicating

8    their message to voters orally and in writing and any other way

9    they choose without interruption, they just can't engage in the

10   conduct of giving things of value to people who are within the

11   buffer zone.

12        So, finally, as to the public interest, the kind of

13   preliminary injunction sought by the plaintiffs here would be an

14   enormous tension with our federalist system, including the sharp

15   constitutional distinction between the role of state legislatures

16   and federal judges.  As the Eleventh Circuit is -- has recently

17   emphasized, most recently in the 2020 *New Georgia Project*

18   decision, Federal Courts are asked to avoid imposing on states

19   their own views of how to handle state elections, whatever good

20   and sound ideas they may have.

21        And for similar reasons, as the Eleventh Circuit has

22   reminded in a series of decisions going back to *Curry v. Baker*,

23   Federal Courts should strive to avoid getting into the minutiae of

24   state election laws and processes, and especially in situations

25   where, as we've discussed at length, a preliminary injunction

 1  would very likely pose very difficult line-drawing problems of the

 2  sort that we've discussed.

 3          So for all these reasons, we urge the Court to deny

 4  plaintiffs' motion.

 5          THE COURT:  Thank you.

 6          MR. ROSBOROUGH:  Good afternoon.  Davin Rosborough for

 7  the plaintiffs.

 8          A few short points, your Honor, I know the hour is

 9  getting late, in response to the defendants' and the intervenors'

10  arguments.

11          First to address a couple of points by the intervenors

12  citing the fact that there's only municipal elections next year.

13  Regardless of what elections are heard, groups like the plaintiffs

14  should have the option of performing line relief.  There's been no

15  showing that they're not going to perform that line relief, and

16  speculation about that is no reason not to enter an injunction.

17          Second, I want to get to the issue about delay in the

18  municipal elections actually because on one hand we have the

19  intervenors saying, well, there's no evidence that the plaintiffs

20  are going to do line relief at municipal elections; and at the

21  same time they're saying, why did they wait until 2022 to bring

22  this preliminary injunction?  But, of course, all there were were

23  municipal elections in 2021.  So their argument is internally

24  contradictory.

25          But more importantly under Justice Kavanaugh's

1  concurrence in *Merrill*, the fact about unreasonable delay, even if
2  you look at the preliminary injunction itself rather than the
3  filing of the complaint, I think we made quite clear why we needed
4  to wait until the time we did and then filed it at the earliest
5  possible moment.
6          As your Honor knows, discovery was stayed in the case,
7  and it was important to understand what the state's motivations
8  and justifications were to bring a proper preliminary injunction
9  here.  The standard here is unreasonable delay, and that's not at
10  all an unreasonable basis for waiting.  I'm sure if we had done
11  this several months earlier, we would be getting *Purcell* arguments
12  of confusion about the primaries.  A few months before that it
13  would be about the fact that there's no pending elections and
14  there's no harm.  So really these arguments are silly.
15          In terms of the facial challenge, I do want to clarify,
16  we still are bringing a facial challenge here.  We would be happy
17  with a more narrow injunction if that's what the Court thought
18  would be appropriate.  But to address the standard, what the
19  evidence in the record shows is there's really two categories of
20  conduct that are implicated.  There's electioneering, which
21  everyone acknowledges is already banned; and then there's line
22  relief as provided by groups like the plaintiffs.  Speculating
23  about the possibility of some other conduct that's not shown in
24  any of the record doesn't show that this is not -- that the
25  line-relief ban doesn't substantially cover the applications we're

1   talking about here.

2           Quickly on the newly-cited Minnesota law, there is an

3   important point of distinction there.  That law in Minnesota is a

4   ban, it does create a buffer zone, but it's only within 100 feet

5   of the polling place.  And not only is that different from

6   Georgia's longer ban from the polling place but specifically the

7   25 feet within a voter.

8           Now, maybe Minnesota doesn't have Georgia's horrible

9   long line problems and so that's not necessary, but that's an

10  incredibly different standard.  You've seen evidence of the lines.

11  You've heard it from defendants' witnesses.  Mr. Mashburn

12  testified just about the hour-and-a-half, two-hour long lines

13  faced here.  So we're getting further and further away from the

14  polling place, and it's not really that similar to Minnesota's

15  law.

16          I want to address now the points about a mandatory

17  injunction.  That's just simply not the case here.  We're not

18  asking the -- for instance, this is not like the redistricting

19  context where we say it is a mandatory injunction, state

20  legislature, you must draw a new map.  Here we're asking for

21  declaratory relief to say the law is unconstitutional and to tell

22  the counties to refrain from enforcing.  That is not a mandatory

23  injunction, so the standard that we just heard a moment ago does

24  not apply.

25          In terms of irreparable harm, I think the evidence is

1   quite clear, we heard it from Ms. Briggins today, the Deltas and
2   other plaintiffs we've seen in the declarations have stopped their
3   First Amendment expressive conduct in response to the law.  That's
4   the core definition of irreparable harm.

5          In terms of expressive conduct, again, I think we're
6   getting away from what the actual standard here is, determining
7   whether conduct is expressive.  There is no need to communicate a
8   particularized message or have viewers understand a particularized
9   message.

10          In the Boy Scouts v. -- I'm sorry, the -- I want to say
11  *Boy Scouts v. Dell*, that's not the case.  The *Hurley* case, I'm
12  sorry, the *Hurley*, which involved parades in Boston, it shows how
13  the Supreme Court applied a much broader standard.  Basically
14  within a parade there's all sorts of activity going on,
15  multifarious voices.  And what the Court said was, well, we don't
16  need to understand -- much as in art and in music, we don't need
17  to understand a specific message, all we need to understand is
18  that a message is being conveyed here.

19          The only evidence in the record here for actual voters
20  who receive line relief shows that they do understand there's a
21  message being conveyed here.  And they get actually what the
22  message being conveyed is; that they have dignity, that they have
23  support, and they should persevere in the face of obstacles, that
24  it's important to participate.

25          In terms of the content-based restrictions, again, my

1  friend on the other side is talking about that this law is not

2  facially content-based, but the Supreme Court has made clear that

3  there -- content-based restrictions are much broader than merely

4  facially content restrictions.  The *Reed* case, for instance, at

5  576 US at 164, lays this out, that a facially neutral law can be

6  content-based.

7        Similarly in *Boos*, when we talked about that the purpose

8  of the law is the effect -- the expected effect on the audience,

9  that is a content-based law.

10        In terms of the interests just talked about, we, once

11  again, have heard a whole parade of different state's interests.

12  We heard mention of voter confusion or intimidation, but there's

13  no record that somehow line relief creates the type of voter

14  confusion that courts have talked about.

15        In terms of grinding the election machinery to a halt

16  and chaos at the polling place, what we've heard is a lot of

17  speculation, no record evidence, about predictions of chaos.  And,

18  again, it raises questions about how more narrowly tailored relief

19  could be drawn.

20        What we heard in response to your Honor's question about

21  how is this narrowly tailored was it draws a clear line.  Well,

22  that's not narrow tailoring, it might be a clear line but that's

23  not what narrow tailoring is.

24        For instance, another alternative could be requiring

25  groups to preregister, not an approval process, not a permitting

1 process, but merely to say we're going to require that this group

2 informs the election officials this is the group, here's the

3 contact person if there's any trouble, that's another more

4 narrowly tailored way to deal with potential chaos at the polling

5 place.  That's not what the state did here.

6         Again, when we talk about ideas of appearance of

7 election integrity, and of course that's important, but when

8 election integrity concerns are being raised not for real ideas

9 but because of the provision of conspiracy theories and

10 misinformation, the appropriate response is not to burden others'

11 First Amendment rights in response to it, it's to address the

12 facts there.

13        Now, finally, before wrapping up, I just want to address

14 some points on *Purcell*.  And what we hear from the defendants, we

15 hear a lot about Mr. Germany and Mr. Mashburn, who are not local

16 election officials, who are not primarily responsible for

17 enforcing this.

18        We've heard about Mr. Germany and the state's training

19 materials.  We looked at the state training materials, the poll

20 worker manual, it pastes the statute in it.  The fix that is

21 needed is to paste the new version of the statute in.  It's not

22 complicated.

23        And even Ms. Bailey talked about that she has a

24 last-minute instructions memo.  Now, we don't expect -- there's no

25 need to implement this relief in the days before voting starts,

1   there's plenty of time before that, but even in scenarios like

2   that there's already processes built in for minor adjustments like

3   this to the process.

4          And I think to close, I just want to come back to what

5   we've heard is maybe finally the real reason for this ban, that

6   certain groups and individuals spread lies and whipped up

7   conspiracy theories and that, in turn, created some sort of

8   manufactured election integrity crisis.  The state responded to

9   that rather than by validating those concerns and catering to this

10  audience.  And the people that are hurt are the groups like the

11  AMEs, like the Deltas and who provide items of di minimus value to

12  show the importance of voting, of persevering and voting with

13  dignity in the face of some of the worse lines in the country.

14         And for those reasons, your Honor, we respectfully

15  request that the Court grant the preliminary injunction.  And

16  thank you for your time today.

17         THE COURT:  Thank you.

18         MR. NKWONTA:  Just a few quick points on rebuttal, your

19  Honor.

20         First, there's no reason to believe that this issue is

21  going to be resolved in the *League of Women Voters* appeal as

22  intervenors' counsel mentioned.  In that case the issue

23  involves -- or the challenged statute is a solicitation provision

24  that prohibits solicitation with -- solicitation of voters within

25  150 feet of the polling place.  And the District Court held that

1   the definition of solicitation was overbroad.  So it's unclear

2   where the overlap is with this case.  And to the extent there is

3   any overlap, it's not sufficient that it warrants this Court to

4   hold off on any ruling.

5           THE COURT:  What did the statute -- what did the Florida

6   statute do, what was prohibited?

7           MR. NKWONTA:  The Florida statute prohibited soliciting

8   voters within 150 feet of the polling place.  And it defines

9   soliciting voters.  And I don't have the full definition in front

10  of me, but it provided a number of specific definitions, such as

11  seeking contributions or seeking votes.  So a few -- it mentioned

12  a few specific actions.

13          And then there's a catchall provision at the end, which

14  I think it said something along the lines of any activity with the

15  intent to influence an election or -- I'm paraphrasing, but there

16  was a catchall at the end, and it was that catchall that the

17  District Court held was overbroad and vague.

18          And the Eleventh Circuit in the stay order actually said

19  that that ruling was a closer call.  And even though the Court

20  stayed that order, it did find it was a closer call.  Nonetheless,

21  the issues we are dealing with here aren't squarely presented in

22  that case and there's no reason to believe that they will be

23  addressed in that case.

24          Second, after rounds of briefing and a full preliminary

25  injunction hearing, you still have not heard any argument as to

1    why prosecutors should still be permitted to impose criminal

2    penalties on a law that is likely unconstitutional simply because

3    an election is near.  Again, the criminal penalties that

4    prosecutors are imposing and their enforcement of this law does

5    not involve the mechanics of voting.  And *Purcell* principle has

6    typically been applied to the mechanics of voting.

7              We've heard a number of references to confusion and how

8    enforcing this law or not enforcing this law will result in

9    confusion.  That begs the question, confusion about what?  Because

10   *Purcell* is not some automatic reprieve from any form of confusion

11   in any instance that may occur in life near an election.  It's

12   specifically focused on confusion in the voting process and the

13   mechanics of voting.

14             So if a voter is confused about whether a bottle of

15   water comes from NGP or from AME, that's not the type of confusion

16   *Purcell* is concerned about.  *Purcell* is concerned about confusion

17   with voting rules and confusion -- the type of confusion that

18   could prevent voters from exercising the right to vote.  And this

19   is not the type of confusion we're dealing with here.  We're

20   talking about confusion as to who can provide water at polling

21   places or who can provide food.

22             And, lastly, I would point the Court to the Texas

23   District Court's decision in *Longoria v. Paxton.*  In that case,

24   which was stayed on other grounds unrelated to the actual

25   substance of the decision, the Court, similarly to this case,

refused to apply the *Purcell* principle to a statute that imposed

criminal penalties for soliciting individuals to vote by mail.

And the Court found that that criminal provision -- that the

criminal ban and penalties associated with it did not implicate

the mechanics of the voting process.  And the Court issued an

injunction merely weeks before the election, if not less.

And, lastly, I would like to address the facial v.

as-applied distinction that the state defendants raised.  The US

Supreme Court has made clear that the distinction is not so well

defined that it must control the pleadings and disposition in

every constitutional challenge, rather it goes to the breadth of

the remedy that the Court issues.

So if the Court enjoins the enforcement of the

challenged provisions but restricts its injunction to the ban on

food and -- on sharing food and water specifically, that may be

considered an as-applied injunction or an as-applied ban or

challenge.  That still redresses the plaintiffs' injury and the

Court can fashion broader or narrower relief than what plaintiffs

have sought here.

And we would request that the Court issue an injunction

to redress plaintiffs' injuries, whether that be enjoining the

food and water ban specifically or the broader injunction in

plaintiffs' motion.

THE COURT:  Thank you.

MR. NKWONTA:  Thank you, your Honor.

1            THE COURT:  I want to ask another question about *Burson*

2   and *Browning*.

3            The *Burson* court cited by -- cited by *Browning*, and

4   *Burson* talks about strict scrutiny and says that it's applying

5   strict scrutiny, but it seems like these two cases are very

6   similar to what we have here.

7            And let's assume for the sake of this question I have --

8   and just for the sake of this question that I've been persuaded by

9   plaintiffs this is expressive and I'm persuaded by at least one of

10  their arguments about content-based.  It seems like *Burson* and

11  *Browning* are similar to this case; *Burson* does one thing, *Browning*

12  takes an additional step in *Burson* for electioneering to

13  soliciting signatures.  It would seem that this is just an

14  additional step in that direction in that it's the same general

15  fact pattern, it's about a buffer zone.

16           In *Burson* the Supreme Court does engage in a lengthy

17  discussion about this country's history, but at the end of that

18  discussion it talks about in sum in examination of the history of

19  the election regulations this country reveals a persistent battle

20  against two evils, voter intimidation and election fraud.

21           And then it goes on to talk about:  We find this

22  widespread and time-tested consensus demonstrates that some

23  restricted zone is necessary in order to serve the state's

24  compelling interest in preventing voter intimidation and election

25  fraud.

1          And I don't know that I've heard much about election

2    fraud, but I've certainly heard about intimidation.

3          So I guess I'm just still wondering why the test applied

4    in *Burson* and in *Browning*, whether it's reasonable and doesn't

5    significantly impinge on constitutionally protected rights, I'm

6    wondering why that's not the test here given the similarity

7    between those two cases and this case.  And I would be happy to

8    hear from both sides on that.

9          MR. ROSBOROUGH:  Davin Rosborough.

10          I have certainly one answer that I think is a key

11    distinction, and my colleague may have additional thoughts.  The

12    key thing in looking at those cases and comparing it to this one

13    that stuck out, *Browning* really makes the point, they're talking

14    about a solicitation-free zone.  *Burson* is talking about,

15    similarly, electioneering.  So these are cases where there's

16    individuals within this perimeter that are asking things of

17    voters, they're making demands of voters.

18          This is the inverse.  Nobody here in providing line

19    relief is making a single demand on voters.  It is merely an

20    offer, often not even communicated verbally, that voters are free

21    to take or leave.  It doesn't ask anything from them, so it

22    doesn't interfere with anything in the same way.  And I think that

23    that's a key point of distinction between the two cases.

24          Now *Browning* makes some other distinctions, but I think

25    I've already discussed those about the *Browning* court

1  distinguishing that situation from others and why we fall into

2  the other bucket that -- in *Browning* they said, well, you're

3  advocating for the success of some proposal or candidate, we're

4  distinguishing that from exit polling.  Similarly here, there's no

5  ask being made of voters.

6           *Browning*, again, distinguishes charitable and commercial

7  solicitation from forms of political canvassing, like

8  electioneering.  Here we certainly fall in the more charitable

9  side but we're not even engaging in solicitations.  We're even

10 further outside of that category.  Those are the prime

11 distinctions I think.

12          And your Honor is not wrong to recognize that these

13 cases are relevant and you should consider them, but I think those

14 are key distinctions which don't put us in that same zone of

15 people soliciting to voters and making demands.

16          THE COURT:  But don't they talk about just peace, having

17 some peace in that zone and being free from intimidation, whether

18 it's intimidation of electioneering or soliciting or somebody

19 coming up to you and trying to give you a taco to stick around?

20          MR. ROSBOROUGH:  I would love somebody to come up and

21 give me a taco to vote while I'm sitting in line.  But I think

22 what we heard today, your Honor, is that the line relief criminal

23 ban doesn't do that.  People can still approach voters in line for

24 any number of reasons.  Now, election officials might have some

25 different interpretations on that, but it's pretty clear under the

1  text of the law, as I think Mr. Mashburn acknowledged, that

2  Georgia hasn't created some sort of complete buffer zone.  Its

3  targeted one specific type of conduct.  And this type of conduct,

4  which asks nothing of voters, which is -- the record really shows

5  is dealing in di minimis items, we have to -- again, if we go back

6  to the expressive conduct inquiry, I think that's actually useful

7  here because it talks about the sort of objective reasonable

8  viewer.

9        And so would an objective reasonable viewer find any of

10 these activities intimidating?  We've only seen one piece of

11 evidence of anyone talking about intimidation, this account by a

12 voter in I think Albany, Georgia, who believed that she perceived

13 the fear on other older voter's faces because there were

14 individuals wearing a shirt that said "Black Voters Matter"

15 handing out water.  And I don't think that most of us would call

16 that a reasonable fear.  And so I think that that should be taken

17 into account.

18       And I'll let my colleague address any other distinctions

19 there.

20       MR. NKWONTA:  Your Honor, as I alluded to earlier in the

21 argument, that -- I guess what you may call the modified version

22 in *Burson* was, again, informed by the history of solicitation and

23 the impact of solicitation specifically on influencing voters and

24 intimidation.  And *Burson* recognizes that this modified burden is

25 not universal and should not be applied in every instance in which

1    the First Amendment is on a collision course with the electoral

2    process.

3              And I'll direct your Honor to Footnote 11 in *the Burson*

4    opinion.  And that footnote states that this modified burden of

5    proof does not apply to all cases in which there's a conflict

6    between the First Amendment and the electoral process.

7              And it further goes on to state that the states, for

8    example, must come forward with more specific findings to support

9    regulations directed at intangible influence such as a ban on

10   Election Day editorials for instance.

11             In other words, the reason the states did not have to

12   come up with more specific findings in *Burson* was because of the

13   long, recognized history connecting solicitation with influence

14   and connecting solicitation with voter intimidation within that

15   buffer zone, right?

16             But that connection that was already forged in history

17   does not exist when it comes to food and water.  It doesn't exist

18   when it comes to editorials.  It doesn't exist when it comes to

19   charitable and commercial solicitation.  And that's what the

20   Eleventh Circuit in *Police Accountability* said.  The *Police*

21   *Accountability* opinions said that this discussion referred to

22   forms of solicitation other than political canvassing.

23             So in the political accountability (sic) case, the

24   plaintiff that was seeking to conduct a -- or to obtain signatures

25   after voters had already left the polling place attempted to cabin

1   their conduct within this Footnote 11, within the latter half of

2   Footnote 11, which is the regulations that require additional

3   specific findings.

4          And the Eleventh Circuit did not allow the plaintiffs in

5   *Police Accountability* to cabin their conduct within that -- the

6   scope of activity in Footnote 11 because the Eleventh Circuit

7   considered that seeking petitions, even after the voter had

8   already casted a ballot, considered that to be political

9   canvassing.  And that's why the Eleventh Circuit said this

10  statement, referring to this footnote, referred to forms of

11  solicitation other than political canvassing, like charitable and

12  commercial solicitation.

13         Now to go one step further and say that obviously also

14  applies to food and water, right, because we're not talking about

15  a history of solicitation that alleviated or obviated the need of

16  evidence of specific filings.  We're talking about a new type of

17  restriction which is rare across the country, a new -- a food and

18  water ban, a new type of restriction for which there is no

19  longstanding history of voter influence or improper influence or

20  intimidation, and for which the state must come forward with more

21  specific findings to support their regulations.  And they have not

22  done so.  And strict scrutiny still applies.

23         THE COURT:  Wouldn't it, though -- if it's intimidating

24  to be asked for a signature after you've left voting, isn't this

25  before you voted even closer to *Burson* than was *Browning*?  Because

1   in *Browning* it was after you voted, it was when you were leaving.

2   This is -- in this case this is before you've even gotten to the

3   voting booth.

4           MR. NKWONTA:  Yeah.  So two answers to that, your Honor.

5           First, I'm not sure that the *Police Accountability* case

6   referred to that conduct as intimidating.  I believe the case

7   referred to that conduct as solicitation.  And when it comes to

8   solicitation, the state's interests and the findings necessary to

9   demonstrate why that there's a compelling interest in --

10          THE COURT:  And I'm borrowing the intimidation language

11  from *Burson*, not from *Browning*, but go ahead.

12          MR. NKWONTA:  So it's not that that conduct is

13  intimidating, it's that the conduct is solicitation.  And the law

14  itself was -- as I mentioned, is prophylactic.  So, in other

15  words, preventing individuals from gathering signatures outside of

16  a polling place after a citizen has voted, that is not in itself

17  inherently wrongful or inherently intimidating, it's a

18  prophylactic measure to prevent voter intimidation.

19          And because of the history of solicitation, the *Burson*

20  court, just like the *Police Accountability* court, has allowed

21  these types of prophylactic measures to prevent the intimidation

22  or the improper influence that may follow from solicitation.  But

23  no court is actually saying solicitation is intimidation.  They're

24  saying that restrictions against solicitation is going to be a

25  prophylactic measure to help prevent intimidation.

1          But we are two steps removed from that.  So not only is

2   solicitation not intimidation, so it's already prophylactic in

3   nature, but now Georgia has gone one step further and has banned

4   food and water in case someone evades the first layer of

5   prophylaxis and engages in solicitation and uses sharing food and

6   water to engage in solicitation.

7          The problem is using food and water, even if that's

8   true, to engage in solicitation still doesn't get you to

9   intimidation.  And that's why unlike *Burson* and unlike *Police*

10  *Accountability* this case presents two layers of prophylaxis.  And

11  the reasons why the court -- the Supreme Court and the Eleventh

12  Circuit upheld the solicitation activities there are just not

13  present here when we're talking about sharing of food and water.

14          THE COURT:  Thank you.

15          (Off-the-record discussion)

16          MR. SCHAERR:  Your Honor, just three brief comments in

17  response to your question.

18          First of all, we think the Court is obviously correct

19  that even if you view the anti-solicitation provision at issue

20  here as meaningfully impeding the exercise of protected expression

21  rather than conduct, the provision would still be constitutional

22  under those two cases, under *Burson* and *Browning*.

23          Second, the plaintiffs' attempt to distinguish *Burson*

24  and *Browning* we think is not plausible.  Both *Burson* and *Browning*,

25  in fact, involve people who were making offers rather than just --

1  rather than demands of voters.  In the *Burson* case they were

2  offering campaign material to people who were standing in line.

3  And in the *Browning* case they were offering voters after they had

4  already voted opportunities to participate in petition drives and

5  that sort of thing.  But, of course, we think the -- so that

6  distinction doesn't work.

7        You know, we think that to the extent the Court wants to

8  distinguish *Burson* and *Browning*, the most compelling distinction

9  is that -- is that the laws at issue there really did directly

10  regulate core political speech.  In the *Browning* case, of course,

11  I mean, it was acknowledged to be a regulation of political speech

12  to tell people that they couldn't approach voters as they left the

13  polls to engage them in speech on political issues.  It wasn't

14  just conduct that was being prohibited there, it was core

15  political speech.

16        And the same thing was true in *Burson* where people who

17  wanted to interact with voters substantively, who wanted to talk

18  with them about campaigns and that sort of thing and about issues,

19  were prohibited from doing that in *Burson*.

20        So it seems to us that's the far more compelling

21  distinction between this case and those, is that those cases

22  really did involve regulation of core political speech, where the

23  anti-solicitation provision here really just deals with conduct.

24  And it's only through a pretty elaborate reasoning process that

25  you can even conclude that there might be some kind of impact on

1  expression.

2      And so we think -- you know, we think, in fact, that the

3  anti-solicitation provision is subject to rational basis review

4  only.  But even if you decide that *Burson* and *Browning* apply, then

5  it would still be constitutional.

6      THE COURT:  All right.  I'll give plaintiffs the last

7  word, even though it was just a follow-up question.  It's your

8  motion.

9      MR. ROSBOROUGH:  Your Honor, I won't take more than ten

10  seconds.  I realize there's one perhaps fine point, but I think

11  it's one worth making in response to Mr. Schaerr's last point.

12      Expressive conduct is at the core of this case, there's

13  no doubt about that, that's what line relief is.  But the statute

14  also regulates and prohibits offers to give food, not only it

15  specifically says provision of food or offers to provide food,

16  that is pure speech, and that really shows -- it's revealing, it

17  shows what we're dealing with.

18      So is the core of line relief about expressive conduct

19  and not pure speech?  Yes.  But the statute also addresses pure

20  speech, and I think that that's a point worth making, it sort of

21  got lost in the weeds here.

22      Thank you.  Your Honor.

23      THE COURT:  Thank you.  Anything else?

24      MR. SCHAERR:  Nothing further, your Honor.

25      THE COURT:  Thanks, everyone.  I appreciate the thorough

1    briefing and the hearing today.  Everybody take care.

2            (PROCEEDINGS REPORTED WERE CONCLUDED AT 5:40 P.M.)

3                          - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 2nd of August, 2022.

10

11

12

13

14      _____

15              PENNY PRITTY COUDRIET, RMR, CRR
                OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25