**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |

**NON-PARTY LAWMAKERS' BRIEF IN
<u>SUPPORT OF MOTION TO QUASH SUBPOENAS</u>**

COME NOW, the non-party Lawmakers identified below (hereinafter "Lawmakers") and file this, their Brief in Support of Motion to Quash Subpoenas, showing the Court as follows:

## I.     INTRODUCTION

The Georgia Election Integrity Act of 2021, a/k/a Senate Bill 202 ("S.B. 202"), is duly passed legislation. The Georgia General Assembly has the authority to reform Georgia's election laws, and S.B. 202 was introduced, passed out of committee, debated, voted on by the General Assembly in its regular session in 2021, and signed into law by the Governor on March 25, 2021. Plaintiffs immediately attacked S.B. 202,[1] alleging, without evidence, that S.B. 202 was enacted with

---

[1] The first of Plaintiffs' lawsuits was filed on the same day the Governor signed the bill into law.

1

discriminatory intent.  Plaintiffs' allegations regarding the intent behind S.B. 202 are fueled by little more than a politically-based belief that the Republican-controlled General Assembly reformed the state's election laws with the improper intent of disadvantaging minorities.

In their search for evidence to support their legal theory, Plaintiffs have targeted twenty-five Republican members of the General Assembly (including two former members) and the Lieutenant Governor (collectively, the "Lawmakers") with subpoenas.[2] There is no clear logic to explain why these twenty-six non-parties were selected to be "representative" of the General Assembly's intent in passing S.B. 202. Two of the subpoena recipients were not even in the General Assembly when S.B. 202 was introduced, debated, and passed. Plaintiffs' attempt at sweeping and onerous discovery into the legislative sphere, and more particularly, targeted partisan

---

[2] The Members who received both deposition and documents subpoenas are Senators Max Burns, Mike Dugan (Senate Majority Leader), Steve Gooch, Butch Miller (President Pro Tempore of the Senate), Jeff Mullis, Randy Robertson, and Brian Strickland and Representatives Shaw Blackmon, Barry Fleming, Jan Jones (Speaker Pro Tempore of the House), Chuck Martin, Alan Powell, David Ralston (Speaker of the House), and Bonnie Rich. Lieutenant Governor Geoff Duncan and former Senator William Ligon also received deposition and document subpoenas. The members who received document subpoenas only are Senators Dean Burke, Jason Anivitarte, Bo Hatchett, John Kennedy, and Blake Tillery and Representatives Buddy DeLoach, Houston Gaines, Lynn Smith, and Rick Williams.  Former Senator Bill Heath also received a document subpoena.

discovery, to attack duly enacted legislation is the type of misuse of the judicial process that legislative privilege is intended to guard against. *See Tenney v. Brandhove*, 341 U.S. 367, 378 (1951) ("In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies.").

## II.   FACTUAL BACKGROUND

Each of the twenty-six document subpoenas include twenty-two requests for the production of documents related to the proposal, formulation, and passage of S.B. 202 and fifteen other election law reform bills from the 2021-2022 legislative session (hereinafter, the "Other Election Bills").[3] *See* Document Subpoena, attached

---

[3] The term "Predecessor Bills" utilized by Plaintiffs in the subpoenas is an inaccurate way to describe the fifteen stand-alone bills on which the Plaintiffs are seeking discovery in addition to S.B. 202, the bill actually being challenged. The Other Election Bills include: S.B. 67 (identification with absentee ballot applications); S.B. 74 (poll watchers observing the vote counting); S.B. 93 (portable and movable polling facilities); S.B. 141 (counting ballots after close of the polls); S.B. 175 (identification with absentee ballot applications); S.B. 188 (election results reporting system); S.B. 241 (revising election laws comprehensively); H.B. 59 (runoff voting by overseas citizens and military personnel); H.B. 62 (election boards and superintendents accepting private funds); H.B. 227 (identification with absentee ballot applications); H.B. 270 (mailing and issuance of absentee ballots); H.B. 512 (revising times for advance voting); H.B. 531 (election boards and superintendents accepting private funds); H.B. 615 (automatic recount and recanvas); and H.B. 701 (suspending election superintendents).

as Exhibit "A." Plaintiffs served with their deposition subpoenas a "non-exhaustive" letter identifying twenty topics that, directly or indirectly, delve into the legislative acts and motives of the Lawmakers related to the passage of S.B. 202, while reserving "the right to ask any other questions or topics of the witnesses and … to broaden the scope of the deposition as necessary."  *See* Letter dated 8/15/22 from Jasmyn G. Richardson to Alex Khoury, attached as Exhibit "B."

Lawmakers and Plaintiffs have worked together to narrow their dispute over the requested discovery. Prior to filing this motion, Lawmakers have produced a substantial amount of information regarding S.B. 202 and the Other Election Bills.[4] The Lawmakers and Plaintiffs disagree on the discoverability of the Members' email communications, text messages, and other non-public documents involved in the legislative process surrounding S.B. 202 and the fifteen Other Election Bills and on the need for depositions inquiring into the Lawmakers' legislative activities, thus giving rise to this motion.

---

[4] The Lawmakers have produced 2,342 pages of documents, including committee documents (agendas, minutes, exhibits, draft bills, etc.) and more than 346 hours of video capturing relevant committee meetings and floor debates in full.

### III.   SUMMARY OF ARGUMENT

Plaintiffs' subpoenas should be quashed because they intrude upon the Lawmakers' legislative privilege, which absolutely bars discovery into the actions, statements, and motives of members of the General Assembly in the legislative process surrounding S.B. 202 and the Other Election Bills.[5] To the extent Plaintiffs' subpoenas seek information on topics other than the actions, statements, and motives of the Lawmakers related to S.B. 202, that information is neither relevant nor proportional to the needs of the case, and its discovery imposes an undue burden and expense on Lawmakers in violation of Federal Rule of Civil Procedure 45(d)(1). Such undue burden and expense is highlighted by Plaintiffs' pursuit of discovery from former Senators Ligon and Heath, who were not members of the General Assembly during the 2021-2022 legislative session, when S.B. 202 and the Other Election Bills were introduced.

The subpoenas strike at the heart of legislative privilege, a long-established safeguard against the disclosure of material involving legislators' legitimate legislative activities and the motivations therefor. The Lawmakers have asserted the

---

[5] Some of the documents requested by Plaintiffs are subject to both legislative privilege and attorney-client privilege, such as draft bills and communications with the Office of Legislative Counsel regarding S.B. 202 and the Other Election Bills.

privilege not for their personal convenience (although they do want to avoid the unnecessary burdens imposed by the subpoenas), but because the privilege serves a vital role in our representative form of government. Legislative privilege is necessary to secure the independence of the legislature, to defend against overreach by the judicial or executive branches of government, and to ensure that lawmakers can focus on public duties rather than divert attention and resources to compulsory legal process. Simply put, legislative privilege is essential to representative democracy, and its importance cannot be overstated.

Lawmakers ask the Court to issue an order quashing Plaintiffs' deposition subpoenas outright and quashing or limiting Plaintiffs' document subpoenas to the documents already produced relating to the legislative history of S.B. 202 and the Other Election Bills. If the Court determines that it is necessary to order further document production from the Lawmakers, they ask that the Court's order prohibit discovery of legislatively privileged materials, including: (1) the Lawmakers' communications with members and staff of the General Assembly regarding S.B. 202 or the Other Election Bills; (2) the Lawmakers' communications with individuals outside of the General Assembly regarding S.B. 202 or the Other Election Bills to the extent those communications were part of the formulation,

proposal, or passage of those bills, *e.g.*, communications related to fact finding and communications with constituents, lobbyists, or special interest groups regarding the formulation, proposal, or passage of legislation, etc.; (3) draft bills that are not part of the public record for S.B. 202 or the Other Election Bills, *i.e.*, drafts of bills that were not adopted by a committee; and (4) documents comprising the Lawmakers' fact-finding related to S.B. 202 or the Other Election Bills, including research memoranda from legislative staff and others outside of the General Assembly.

## IV.   ARGUMENT AND CITATION TO AUTHORITY

Federal Rule of Civil Procedure 26 permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case …." Fed. R. Civ. P. 26(b)(1). Federal courts "have the authority and duty to recognize claims of privilege that are valid under federal common law." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015). Courts must quash or limit subpoenas that require the disclosure of privileged or other protected matter, provided no exception or waiver applies, or that impose undue burden on non-parties. Fed. R. Civ. P. 45(d)(3)(A)(iii) and (iv). Additionally, Courts may issue an order forbidding or limiting discovery to protect a person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1).

A.  **Plaintiffs' Subpoenas for Testimony and Documents Concerning Legitimate Legislative Activities Are Barred by Legislative Privilege**

1.   The Lawmakers' Legislative Privilege

Legislative privilege arises from the long tradition of legislative independence, dating back to the English Bill of Rights of 1689. *See, e.g.*, *U.S. v. Johnson*, 383 U.S. 169, 177 (1966). The privilege imbues legislators, the peoples' representatives, on all levels of government with two correlative benefits meant to shield them from threat or coercion: (1) immunity from civil and criminal liability for their legislative activities (hereafter "legislative immunity") and (2) an evidentiary "immunity" precluding legislators from being compelled to give testimony or produce documents about their legislative activities (hereafter "legislative privilege"). *See Lindley v. Life Investors Ins. Co. of Am.*, 2009 WL 2245565 (N.D. Okla. July 24, 2009) ("Generally, legislators' immunity from suit is referred to as 'legislative immunity,' and the evidentiary privilege accorded legislators is referred to as the 'legislative privilege'; however, the terms are also used interchangeably."). These intertwined legal doctrines, which existed in common law during Colonial times, were understood by the Framers of the U.S. Constitution to be so essential to our representative form of government that they were enshrined in the Constitution "without discussion and without opposition" at

Article I, Section 6, Clause 1, known as the Speech or Debate Clause. *Johnson*, 383 U.S. at 177. Most states, including Georgia, likewise gave the privilege a constitutional footing.[6]

The Speech or Debate Clause of the U.S. Constitution is limited by its terms to members of Congress and, therefore, is not directly applicable to this case. Nevertheless, the legislative privileges afforded to state legislators persists in federal common law.[7] *Tenney v. Bandhove*, 341 U.S. 367, 376-79 (1951). And because those privileges are "similar in origin and rationale to [the privileges] accorded Congressmen under the Speech or Debate Clause," *In Re Hubbard*, 803 F.3d 1298, 1310, n. 11 (11th Cir. 2015), it is not surprising that they are also similar in "scope

---

[6] Legislative privilege has been recognized in Georgia since the colonial period. The first recorded invocation of the privilege in Georgia occurred on October 14, 1760. *See* Mary Patterson Clarke, Parliamentary Privilege in the American Colonies 95 n. 3 (1943). The people of Georgia have voted to include absolute legislative privilege for members of the General Assembly in every iteration of Georgia's constitution from 1777 to its most recent revision in 1983. *See, e.g.,* Ga. Const. art. III, § IV, para. IX ("The members of both houses shall be free from arrest during sessions of the General Assembly, or committee meetings thereof, and in going thereto or returning therefrom, except for treason, felony, or breach of the peace.  No member shall be liable to answer in any place for anything spoken in either house or in any committee meeting of either house.").

[7] Residing as it does in federal common law, Lawmakers' legislative privilege in this case is interpreted according to Federal Rule of Evidence 501, which provides in pertinent part that "[t]he common law—as interpreted by United States courts in light of reason and experience—governs a claim of privilege …." Fed. R. Evid. 501.

9

and object." *Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009); *see also Johnson*, 383 U.S. at 180 (recognizing that state legislative privilege is "on a parity with the similar federal privilege").

2.   <u>The Scope and Object of Legislative Privilege</u>

Legislative privilege and legislative immunity do not serve to protect legislators' personal or private interests, but rather to preserve the independence and integrity of the legislatures in which they serve. *U.S. v. Brewster*, 408 U.S. 501, 507-08 (1972). "Two related rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence." *U.S. v. Gillock*, 445 U.S. 360, 369 (1980); *see also Powell v. McCormack*, 395 U.S. 486, 503 (1969) (noting that legislative immunity "insures that legislators are free to represent the interests of their constituents without fear that they will later be called to task in the courts for that representation").

Whereas legislative immunity secures the independence of legislators by protecting them from direct liability for their legislative activities, legislative privilege secures their independence by protecting them from the "indirect liability"

of discovery burdens arising from those same activities.[8] *League of Women Voters of Fla., Inc. v. Lee*, 340 F.R.D. 446, 453 (N.D. Fla. 2021) (citing *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011)); *cf. Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (recognizing that Speech or Debate clause privileges protect legislators from the burden of defending themselves in litigation). "This is why the privilege extends to discovery requests, even if the lawmaker is not a named party in the suit: complying with [discovery] requests detracts from the performance of official duties." *In re Hubbard*, 803 F.3d. at 1310.

The scope of legislative privilege is to be broadly interpreted to effectuate its purposes. *See, e.g.*, *Gravel v. United States*, 408 U.S. 606, 624 (1972); *Eastland*, 421 U.S. at 501. The privilege has been described by the Supreme Court as reaching:

- "anything generally done in a session of the House by one of its members in relation to the business before it" – *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881).

---

[8] The importance of the privilege in preserving legislative independence has never been more pronounced due to the ever-expanding presence of electronically stored information ("ESI") in litigation. The time, cost, and invasiveness of electronic discovery cannot be discounted as mere inconveniences, especially for state legislators, many of whom have full-time occupations in addition to their work in the General Assembly. *See* fn. 19, herein.

- actions "within the sphere of legitimate legislative activity" – *Tenney*, 341 U.S. at 376.

- activities that are "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House" – *Gravel*, 408 U.S. at 625; *accord Eastland*, 421 U.S. at 504.

- acts that "occur in the regular course of the legislative process and … the motivations for those acts" – *Brewster*, 408 U.S. at 525.

The Eleventh Circuit Court of Appeals most recently described legislative privilege as encompassing "actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308. It is well-settled that the subjective motivations of legislators are securely guarded by the privilege. *See Brewster*, 408 U.S. at 525; *In re Hubbard*, 803 F.3d at 1310 ("The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments.")

4. <u>Legislative Privilege is Absolute Within its Scope</u>

Plaintiffs and the Lawmakers disagree over whether common law legislative privilege is absolute or qualified in this case. Plaintiffs argue that Lawmakers' legislative privilege is qualified and must give way to important federal interests in this case, namely voting rights. *See* Joint Discovery Statement [Dkt # 265] at p. 7. As shown below, Plaintiffs' argument is inconsistent with Supreme Court and Eleventh Circuit precedent and is instead wholly reliant non-precedential district court opinions that are wrongly decided and distinguishable.

      a. The Supreme Court Fashioned Common Law Legislative Privilege to be Absolute in Civil Cases.

The Eleventh Circuit Court of Appeals has reasoned that federal common law legislative privilege is similar in origin, rationale, scope, and object to the legislative privilege bestowed on members of Congress by the Speech or Debate Clause. *See In re Hubbard*, 803 F.3d at 1310, n. 11; *Bryant*, 575 F.3d at 1304. There is no dispute that the privileges bestowed by the Speech or Debate Clause in the U.S. Constitution are absolute within its scope. *See, e.g.*, *Eastland*, 421 U.S. at 503. If legislative privilege is found to apply, the analysis ends, regardless of the parties, the claims, or the interests at stake in the litigation.

13

The Supreme Court first defined the contours of common law legislative privilege in *Tenney v. Brandhove*, 341 U.S. 367 (1951). Although the Court did not describe common law legislative privilege as "absolute" or "qualified" in its opinion, the opinion shows that the privilege fashioned in *Tenney* is effectively absolute. For example, in determining whether a state legislative committee's actions were privileged, the Court held that "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Tenney*, 341 U.S. at 378. Also consistent with the absolute nature of the privilege, the Court (1) gave no consideration for the competing interests of the plaintiff, who had asserted First Amendment, due process, and equal protection claims, *Id.* at 371, and (2) held that it was for the legislature and the voters to police the state legislators on the committee, not the courts. *Id.* at 378. Moreover, the only limitations on the common law privilege identified in *Tenney* are identical to limitations on Speech or Debate clause privileges, namely, that the privilege is limited to legitimate legislative activity and that court reserved the possibility that a legislator could undertake an act "of an extraordinary character" such that he or she could be "held legally responsible." 341 U.S. at 378-79 (quoting *Kilbourn*, 103 U.S. at 204, in

which the Court said the same thing in reference to a U.S. Congressman whose privileges arose from the Speech or Debate clause).

Simply put, there is nothing in *Tenney* to suggest that the Court intended common law legislative privilege to be more limited in scope or weight than the Speech or Debate clause privileges afforded members of Congress. *See Johnson*, 383 U.S. 180 (observing that the Court in *Tenney* "viewed the state legislative privilege as being on a parity with the similar federal privilege").

> b. Plaintiffs' Argument for a Qualified Legislative Privilege Arises from a Misreading of *United States v. Gillock*

The argument that common law legislative privilege is somehow qualified, and therefore subject to balancing against any federal interests articulated by plaintiffs, finds its genesis almost thirty years after *Tenney* in *United States v. Gillock*, 445 U.S. 360 (1980). But unlike *Tenney*, *Gillock* is a criminal case, and this distinction is important for reasons that will soon become clear. *Gillock* involved the federal prosecution of a state senator who was accused of using his office to commit crimes, specifically, obtaining money under color of official right, distributing bribes, and racketeering. 445 U.S. at 362. The senator moved to suppress evidence that he used his office in furtherance of the crimes alleged against him, citing legislative privilege. *Id.* at 363. The prosecution made a formal offer of proof,

showing substantial evidence of the senator's use of his office to commit the alleged crimes. *Id.* at 363-65. Notwithstanding the prosecution's proffer of substantial evidence of criminal activity, the trial court granted the senator's motion to suppress the evidence, and the Sixth Circuit Court of Appeals, by split vote, affirmed on the basis of legislative privilege. *Id.* at 365-66. The Supreme Court reversed. *Id.* at 374.

Against this factual backdrop, the Supreme Court in *Gillock* wrote one sentence that, while unremarkable when viewed in context, has been used out of context to eviscerate common law legislative privilege, particularly, if not exclusively, in the context of redistricting litigation. Specifically, the Court in *Gillock* stated that common law legislative privilege may yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes…." *Gillock*, 445 U.S. at 373. A thorough reading of *Gillock* clearly shows that the reference to federal criminal statutes in this quote, which is often omitted when *Gillock* is cited in civil cases,[9] is significant. The Court in *Gillock* was intentional about distinguishing between the application of the privilege in civil versus criminal cases. *See* 445 U.S. at 373 ("Thus, in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil

---

[9] *See, e.g.*, Joint Discovery Statement [Dkt. # 265] at p. 7.

16

actions.").[10] Just months after deciding *Gillock*, the Supreme Court reiterated its distinction between civil and criminal cases when evaluating common law legislative privilege. *See Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980) ("Although the separation-of-powers doctrine justifies a broader privilege for Congressmen than for state legislators *in criminal actions*, [citation to *Gillock* omitted] we generally have equated the legislative immunity to which state legislators are entitled under § 1983 to that accorded Congressmen under the Constitution.") (emphasis added). The Eleventh Circuit Court of Appeals has recognized, and echoed, the Supreme Court's civil versus criminal distinction. *See In re Hubbard*, 803 F.3d at 1311-12 ("But the Supreme Court has explained that, for purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal prosecutions by the federal government.").

Viewed in the context of the facts in *Gillock*, the Supreme Court's apparent qualification of common law legislative privilege in criminal cases is unremarkable. The specific question before the Court was whether legislative privilege barred the admission at trial of known evidence of legislative acts in furtherance of criminal

---

[10] There are numerous other instances in *Gillock* where the Court made it clear that the question presented and the holding given addressed legislative privilege in criminal, not civil, cases. *See* 445 U.S. at 366, *passim*.

activity. The Court's answer of that question in the negative is consistent with its prior Speech or Debate Clause jurisprudence.[11] The Supreme Court has been clear that the privilege extends only to conduct within the legitimate legislative sphere, which excludes, *inter alia*, criminal conduct. *See, e.g.*, *Williamson v. United States*, 207 U.S. 425, 446 (1908) (holding that suborning perjury is outside of the privilege's protection); *Brewster*, 408 U.S. at 526 (holding that accepting bribes is not privileged conduct). The Court in *Gillock* was explicit that it did not consider its ruling to be a sea change in its Speech or Debate clause jurisprudence. 445 U.S. at 373, n. 11 ("Of course, even a Member of Congress would not be immune under the Federal Speech or Debate Clause from prosecution for the acts which form the basis of the … [criminal] charges here."). In a case that is still good law in the Eleventh Circuit, the Fifth Circuit Court of Appeals considered *Gillock*, which had been decided only a year earlier, and held that common law legislative privilege, which it

---

[11] By its terms, the Speech or Debate Clause excludes "treason, felon[ies] and breach[es] of the peace," i.e., criminal conduct, from the privilege's purview. *Williamson*, 207 U.S. at 445-46 ("… the terms 'treason, felony, and breach of the peace,' as used in our constitutions, embrace all criminal cases and proceedings whatsoever.").

18

referred to as "Tenney immunity," is "absolute within its scope." *See Cole v. Gray*, 638 F.2d 804, 810 (5th Cir. Mar. 2, 1981).[12]

The Supreme Court's holding in *Gillock* that common law legislative privilege does not bar federal prosecutors from presenting evidence that a state senator was using his office to commit federal crimes does not support Plaintiffs' argument that this court can or should set aside legislative privilege to allow wide-ranging discovery. The discovery sought by Plaintiffs is a reach into the Lawmakers' motivations and legitimate legislative activities based on nothing more than speculative allegations of improper motives that Plaintiffs claim implicate federal interests. It is settled law that allegations of improper motive are not sufficient to overcome the privilege. *E.g.*, *Tenney*, 341 U.S. at 377; *Scott v. Taylor*, 405 F.3d 1251, 1256, n. 7 (2005). Plaintiffs have not alleged any acts of "extraordinary character," *Tenney*, 341 U.S. at 378-79, nor proffered any evidence of crimes committed, *Gillock*, 445 U.S. at 363-65, that *might* justify their investigation into the motives and actions of the Lawmakers concerning S.B. 202 or the Other Election Bills. If allegations of improper motive alone could so easily subvert legislative

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

privilege, the privilege would be rendered ineffective in its purpose to secure the independence of the legislature and protect its members from coercion and harassment. *See Eastland*, 421 U.S. 508-09 ("If the mere allegation that a valid legislative act was taken for an unworthy purpose would lift the protection of the [Speech or Debate] Clause, then the Clause simply would not provide the protection historically undergirding it."); *see also Tenney*, 341 U.S. at 377 (stating that legislative privilege "would be of little value if [state legislators] could be subjected to the cost and inconvenience and distractions of a trial upon the conclusion of the pleader, or to the hazard of a judgment against them based on a jury's speculation as to motives.").

    c. In the Eleventh Circuit, Common Law Legislative Privilege is Absolute in Civil Cases

A brief survey of Eleventh Circuit cases considering common law legislative privilege after the Supreme Court's ruling in *Gillock* is instructive. In addition to its ruling in *In re Hubbard*, cited throughout this brief, the Eleventh Circuit Court of Appeals has considered common law legislative privilege numerous times since *Gillock* was decided, most frequently in the context of the immunity aspect of the privilege. In case after case, the Court of Appeals has held that the privilege afforded state and local legislators in civil cases is absolute. For example, in *Scott v. Taylor*,

the Court of Appeals recognized the "absolute legislative immunity" of state lawmakers, including the Lieutenant Governor, in a civil action in which the plaintiff alleged racial discrimination in violation of 42 U.S.C. § 1983. 405 F.3d at 1257. Relying on *Consumers Union*, the Court of Appeals held that "state legislators who acted in their legislative capacities … are entitled to absolute legislative immunity. This is true regardless of whether a suit seeks damages or prospective relief and regardless of whether the state legislators are named in their individual or official capacity." *Id*. at 1256-57.

Time and again, the Eleventh Circuit Court of Appeals has maintained that the legislative immunity afforded state and local officials acting in their legislative capacity is absolute in civil cases. *See, e.g.*, *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 2005) ("The district court properly ruled that the individual defendants have absolute immunity from any federal suit for damages if their challenged conduct furthers legislative duties."); *Macuba v. Deboer*, 193 F.3d 1316, 1320 (11th Cir. 1999) (holding that county commissioners were entitled to absolute legislative immunity for their legislative acts in a civil action); *Ellis v. Coffee County Bd. of Registrars*, 981 F.2d 1185, 1190

21

(11th Cir. 1993) ("The absolute immunity of legislators, in their legislative functions, ... now is well settled." (internal quotations omitted)).

In short, both the Supreme Court and the Eleventh Circuit Court of Appeals have held the line on absolute legislative privilege for state legislators in civil cases. Accordingly, the Court should respect the absolute privilege of the Lawmakers in this civil case and quash Plaintiffs' deposition and document subpoenas.

### d.  Plaintiffs' Subpoenas Seek Privileged Information

Considering the broad scope of the privilege and its absolute nature within that scope, the dispositive question regarding Plaintiffs' subpoenas is whether they seek privileged information. Plaintiffs discovery efforts directed at Lawmakers have but one purpose: to search for evidence to support their allegation that S.B. 202 was passed with discriminatory intent. To that end, Plaintiffs subpoenas seek, directly and indirectly, information about what Lawmakers knew, said, or did in relation to the proposal, formulation, or passage of S.B. 202 and their motivations for said actions.[13] Such information falls squarely within the scope of legislative privilege.

---

[13] Plaintiffs seek not only privileged information regarding S.B. 202, but also regarding the Other Election Bills introduced during the 2021-2022 session.

Nevertheless, before focusing on the discovery requests still in dispute in this case, it is important to understand what Lawmakers have already produced, namely 2,342 pages of documents containing the legislative history for S.B. 202 and the Other Election Bills, which includes the relevant committee meeting agendas, minutes, exhibits, including factual information considered by the committees, versions of bills considered by the committees, etc., and more than 346 hours of video capturing the relevant committee meetings and floor debates concerning S.B. 202 and the Other Election Bills. Plaintiffs already have relevant comments of members and guests in committee meetings and statements for or against S.B. 202 or the Other Election Bills made during floor debates. Much of the information produced by Lawmakers would traditionally fall within the scope of legislative privilege, but the Lawmakers voluntarily produced this information because it was either available to the public or the type of information they routinely provide to the public when asked.[14]

This is the kind of information from which the Supreme Court held legislative intent could be proved without invading the legislative privilege. *Village of*

---

[14] The fact that this information was publicly available during the 2021 session explains how Plaintiffs were ready to file the first of their lawsuits on the same day S.B. 202 was signed into law.

*Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267-68 (1977). Thus, like *League of Women Voters of Florida, Inc. v. Lee*, 340 F.R.D. 446 (N.D. Fla. 2021), this dispute is not about Lawmakers seeking to withhold the legislative history of the challenged bill. *See* 340 F.R.D. at 458 (quashing deposition subpoenas in part because the state lawmakers produced documents containing the information available to the legislature at the time the decision was made regarding the challenged bill). Instead, this dispute is about Plaintiffs' attempt to discover the Lawmakers' private communications with each other, legislative staff and officials, their constituents, the named defendants, lobbyists, and anyone else with whom the Lawmakers may have communicated regarding S.B. 202, the Other Election Bills, and a myriad of other topics regarding voting and elections. *See* Ex. A & B.

Due to the nature of Plaintiffs' claims and the role the Lawmakers played in relation thereto, the only relevant purpose of Plaintiffs subpoenas is to probe into the subjective motivations of these select Lawmakers regarding S.B. 202.[15] To that end, Plaintiffs' deposition topics 6-18 directly target what the Lawmakers did or said in their investigation, formulation, evaluation, deliberation and passage of S.B. 202 or

---

[15] Even Plaintiffs' discovery into the Other Election Bills is intended to elicit information regarding the Lawmakers' motivations for S.B. 202.

24

the Other Election Bills. *See* Ex. A. Deposition topics 1-5 and 19-20 inquire into the Lawmakers' motivations by asking what they knew about the subject matter encompassed in S.B. 202 and when they knew it. *See id*. Similarly, Plaintiffs' document requests 1-4, 6-9, 11, and 13-14 seek documents showing what the Lawmakers did or said in their investigation, formulation, evaluation, deliberation and passage of S.B. 202 or the Other Election Bills. *See* Ex. B. And document requests 10, 12, and 15-20 seek documents showing what Lawmakers knew about the subject matter encompassed in S.B. 202 and when they knew it. *See id*.

To date, the crux of the parties' document dispute has focused on third party communications. Plaintiffs take the position that the question of whether a communication is privileged depends on with whom the communication was had, and that communications with non-legislators cannot be legislatively privileged. Plaintiffs' argument confuses the purposes of legislative privilege with privileges based on confidential relationships, like the attorney-client privilege. *See Pulte Home Corp. v. Montgomery County, Md*, 2017 WL 2361167 at *8 (D. Md. May 31, 2017) (noting that confidentiality is not the fundamental concern of legislative privilege).

25

Instead, the applicability of legislative privilege depends on the purpose of the communication, specifically, whether the communication is part of a legislator's legitimate legislative activity. If so, the communication is privileged.[16] *See Bruce v. Riddle*, 631 F.2d 272, 279-80 (4th Cir. 1980) (holding that "meeting with "interest" groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider."). This interpretation of legislative privilege more readily effectuates the purposes of the privilege because state legislators necessarily depend on non-legislators to legislate.[17] At least two district courts within the Eleventh Circuit agree. *See Thompson v. Merrill*, No. 2:16-cv-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) ("activity engaged in by legislators is still protected by the legislative privilege even if there are communications with non-legislators, as long as the communications were

---

[16] The Lawmakers assert only that they cannot be compelled to produce communications with non-legislators that were made within the sphere of the Lawmakers legitimate legislative activity. The Lawmakers do not take a position on whether their communications are confidential and/or privileged if sought from the non-legislator.

[17] "Given the fact that the General Assembly may consider 6,000 or more general and local bills and resolutions in a single biennium, many Georgia legislators have come to depend on lobbyists for information on potential legislation." Carl Vinson Institute of Government, Handbook for Georgia Legislators, 83-84 (15th ed. 2020).

pursuant to the proposal, formulation, and passage of legislation."); *see also Dyas v. City of Fairhope*, 2009 WL 3151879, at *8 (S.D. Ala. Sept. 24, 2009) ("[P]rivilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision—such as conversations with constituents … offers a legislator no protection worth having."). The Lawmakers' approach is consistent with the purposes of the legislative privilege, *i.e.*, ensuring legislative independence and preventing the distraction or harassment of legislators. In achieving these purposes, there is no meaningful distinction between communications among legislators and among legislators and non-legislators.

Whether directly or indirectly, all of these requests and topics strike at the heart of legislative privilege because they seek discovery into the subjective motivations of the Lawmakers concerning the legislative process that resulted in the passage of S.B. 202. *See* Exs. A and B; Joint Discovery Statement [Dkt. 265], p. 9 ("The documents sought go to communications informing the drafting and enactment of SB 202 and may well shed light on the purposes behind the law …."). Accordingly, Plaintiffs' subpoenas should be quashed to the extent they seek documents that have not already been produced. *See In re Hubbard*, 803 F.3d at

1310-11. To the extent any of Plaintiffs' requests seek information that is not within the sphere of legislative activity regarding S.B. 202, the sought-after information is either not relevant to Plaintiffs' claims or is merely tangential to their claims, and Plaintiffs' subpoenas should be quashed for lack of relevance and undue burden. *See* Fed. R. Civ. P. 26 and 45.

    5.  <u>The Lieutenant Governor Can Assert Legislative Privilege</u>

The main constitutional role assigned to the Lieutenant Governor is President of the Senate. *See* Ga. Const. of 1983, Art. V, Sec. 1, Par. 3. As an officer of the General Assembly, the Lieutenant Governor, is afforded legislative privilege for his legislative activities. *See Scott v. Taylor*, 405 F.3d 1251 (11th Cir. 2005) (holding that Georgia's Lieutenant Governor, among other lawmakers, was entitled to absolute legislative immunity for claims arising from a redistricting bill).

Plaintiffs miscomprehend the nature of legislative privilege, at least as recognized in the Eleventh Circuit, when they argue that the Lieutenant Governor is not entitled to assert legislative privilege over documents that he "cannot show … are directly related to his enumerated legislative functions." Joint Discovery Statement [Dkt. #265], at p. 8. It is not the office of the official or the branch of government to which he or she is assigned that gives rise to legislative privilege, it

28

is his or her involvement in the legislative process. *In re Hubbard*, 803 F.3d at 1308-09 ("The privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation"); *see also Sup. Ct. of Vir. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734 (1980) (holding that the Supreme Court of Virginia was entitled to legislative immunity when engaged in legislative activities). Because Plaintiffs' subpoenas specifically target the legislative process surrounding S.B. 202 and the Other Election Bills, it should not be surprising that any documents the Lieutenant Governor has or testimony he can give regarding that process is covered by legislative privilege.

### B.    Plaintiffs' Subpoenas Seek Information that is Not Discoverable and Cause the Lawmakers Undue Hardship and Unnecessary Expense

To be discoverable, information must be nonprivileged, relevant to a party's claim or defense, and "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As explained above,

most, if not all, of the information Plaintiffs are demanding from the Lawmakers is privileged and is, therefore, not discoverable under FRCP 26.

Additionally, the information Plaintiffs are seeking through these subpoenas is of limited relevance, if any, such that the burden imposed on the Lawmakers to comply with the subpoenas is disproportional to the needs of the case. The Lawmakers have already produced a substantial trove of documents regarding S.B. 202 that are the best direct evidence of legislative intent. *See Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which "represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation."); *see also Village of Arlington Heights*, 429 U.S. at 267-68 (demonstrating that legislative intent can be inferred from the types of information produced by the Lawmakers).

Considering the information regarding S.B.202 the Lawmakers have already produced in this case, Plaintiffs' desire to obtain even more discovery into the motivations of a select few Republican members of the General Assembly is unjustified and disproportional to the needs of the case. *See Palmer v. Thompson*, 403 U.S. 217, 224 (1971) (observing that "no case in this Court has held that a

legislative act may violate equal protection solely because of the motivations of the men who voted for it."); accord *Greater Birmingham Ministries v. Secretary of State for the State of Ala.*, 992 F.3d 1299 (11th Cir. 2021) (expressing "skepticism that the discriminatory intent could be ascertained from the statements of one legislator . . ."); *U.S. v. O'Brien*, 391 U.S. 367, 384-85 (1968) ("[i]t is entirely a different matter when we are asked to void a statute, that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.").

In light of the dubious value to their case of proving what a handful of Republican lawmakers had to say about S.B. 202 (and a host of other topics that may or may not even relate to S.B. 202), placing the burden of such discovery on a non-party runs afoul of Federal Rule of Civil Procedure 45. As a party, Plaintiffs have a duty to avoid imposing undue burden or expense on non-parties. Fed. R. Civ. P. 45(d)(1); *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden [of discovery] thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").

The sweeping scope of Plaintiffs' subpoenas show that Plaintiffs ignored their duty to avoid imposing undue burden or expense on the non-party Lawmakers, and

instead, sought discovery from the Lawmakers as if there were parties to the litigation. Despite the fact that Plaintiffs are challenging only one bill, S.B. 202, Plaintiffs are seeking expansive discovery from the Lawmakers on sixteen different bills in addition to S.B. 202.[18] *See* Ex. A, Requests 1-4, 6-9, 11, 13, and 14. As shown above, statements about S.B. 202 by a small group of legislators are not very probative of the intent of the General Assembly in passing S.B. 202, but even less probative of that intent are statements by a small group of legislators about bills other than S.B. 202, including one, H.B, 316, that was passed two years before S.B. 202 was introduced.

Even more wide-ranging are subpoena requests 10 and 15-20, which seek the production of "all documents and communications" since January 1, 2020 regarding a number of election and voting related topics without regard for whether the documents somehow relate to the Lawmakers' motives regarding the challenged bill, the Lawmakers' political activities, or the election frenzy following the November 2020 election. *See* Ex. A. In an effort to reduce the number of documents implicated

---

[18] Plaintiffs have essentially demanded that the Lawmakers find and produce every document and communication they have ever had regarding S.B. 202, the fifteen Other Election Bills, and H.B. 316, which is an election law reform bill passed during the 2018-2019 legislative session.

by these overbroad and loosely targeted discovery requests, the Lawmakers requested, and Plaintiffs provided, a list of search terms to help segregate potentially relevant documents from false positives, *i.e.*, documents that contain the same words as relevant documents but are in fact completely irrelevant to this case. *See* Plaintiffs' Search Terms, attached as Ex. C.  The expansive way in which Plaintiffs drafted their subpoena requests yielded a large number of documents that hit on the Plaintiffs' search terms, approximately 499,403, in fact. That is a huge number of documents even for parties to review for their litigation. For non-party's with no stake in the litigation, it's unreasonable.[19]

Plaintiffs deposition subpoenas are no less abusive. Plaintiffs identified twenty topics for the deposition but reserved their "right to ask any other questions or topics of the witnesses and … to broaden the scope of the deposition as necessary." In other words, Plaintiffs want to depose the non-party Lawmakers with no limits other than those set forth in Fed. R. Civ. P. 30 even though the information

---

[19] Reviewing all of the documents that hit on Plaintiffs' search terms would take approximately 9,988 hours (1,248 8-hour days) at the eDiscovery industry standard 50 documents/hour review rate. Even using the lowest cost contract review attorneys available, this equates to a mid-six-figure discovery expense just for a first pass review.

Plaintiffs are truly after, the Lawmakers' motives and actions regarding the legislative process of S.B. 202, is clearly barred by legislative privilege.

Plaintiffs' strategy of "casting a wide net" is improper non-party discovery practice, and it violates Plaintiffs' duty to the non-party Lawmakers under Fed. R. Civ. P. 45. Accordingly, the Court must issue an order quashing or limiting Plaintiffs' subpoenas. Lawmakers respectfully request that Plaintiffs' deposition subpoenas be quashed outright, especially in light of the fact that Lawmakers have produced the legislative history for S.B. 202, which includes hours of debate and deliberation on the reasons for and purposes of S.B. 202 and the Other Election Bills. *See League of Women Voters of Fla., Inc.*, 340 F.R.D. at 458 (quashing the lawmakers' deposition subpoenas where lawmakers had agreed to produce committee documents regarding the Florida's election law reform bill). Lawmakers also request that the Court issue an order declaring that Lawmakers' production of the legislative history of S.B. 202 and the Other Election Bills satisfies the Lawmakers' obligations under Plaintiffs' subpoenas.

## V.  CONCLUSION

The importance of the legislative privilege cannot be overstated. The privilege has existed in America since colonial times to ensure the preservation of our representative form of government. It has been ensconced in our federal Constitution

and in the constitutions of virtually every state, and it continues to reside in its original source, our common law. The purposes served by legislative privilege are just as important today as they were when our nation was founded. It should, therefore, require more than well-pleaded but unsupported allegations of improper motive to pierce the privilege's protections against both direct and indirect liability for legislative activity.

Accordingly, and for the other reasons stated herein, the Lawmakers respectfully ask this Court to quash Plaintiffs' deposition and document subpoenas.

Respectfully submitted this 5th day of October, 2022.

/s/ Alex Khoury
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree Street NE
Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

**CERTIFCATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), I hereby certify that the forgoing brief has been prepared in Time New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

/s/ Alex Khoury
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree Street NE
Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2022, I electronically filed the foregoing

with the clerk of the court using the CM/ECF system, which will send notification

of this filing to counsel of record.

/s/ Alex Khoury_____
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree Street NE
Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

37

# EXHIBIT A

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

|  |  |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No. |
| _____ | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: | Date and Time: |
|---|---|
|  |  |

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

| *CLERK OF COURT* | |
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
       **(i)** is a party or a party's officer; or
       **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
       **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
       **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
       **(i)** fails to allow a reasonable time to comply;
       **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
       **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
       **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
       **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

       **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
       **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
       **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
       **(i)** expressly make the claim; and
       **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

For a statement of your obligations in producing documents under this subpoena see Rule 45(e) and (g) of the Federal Rules of Civil Procedure, which appear on the final page of the subpoena. Documents should be produced on or before June 13, 2022. To make arrangements for electronic production, contact Rahul Garabadu at RGarabadu@acluga.org. Anything that cannot be produced electronically should be produced to Rahul Garabadu, 1100 Spring St. NW, Atlanta, GA 30309. The production should be made pursuant to the Definitions and Instructions below.

## DEFINITIONS

Except as specifically defined below, the terms used in these Requests for Production shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning. The singular includes the plural and vice versa. The masculine includes the feminine and neutral genders. The past tense includes the present tense where the clear meaning is not distorted by change of tense. As used herein, the terms below have the following meaning:

1. "Absentee voting" refers to the processes by which an absentee elector may cast a mail ballot pursuant to Ga. Code Ann. § 21-2-385(a)-(c).

2.  "Communication" means the transmittal of information of any kind, written or oral, by and/or through any means, including, but not limited to, emails, email attachments, calendar invitations, PowerPoint presentations, written reports, letters, and text messages.

3.  "Consolidated Plaintiffs" means the plaintiffs in the following consolidated cases: *New Georgia Project v. Raffensperger*, No. 1:21-cv-01229 (N.D. Ga.); *Georgia State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-01259 (N.D. Ga.); *Sixth District of the African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284 (N.D. Ga.); *Asian Americans Advancing Justice-Atlanta v. Raffensperger*, No. 1:21-cv-01333 (N.D. Ga.); *Concerned Black Clergy of Metropolitan Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-01728 (N.D. Ga.); and *United States of America v. The State of Georgia*, No. 1:21-cv-02575 (N.D. Ga.).

4.  "County" means any county in Georgia, as well as current or former employees, staff, agents, and representatives of the county, including the county boards of registrars or boards of elections offices, county registrars or election supervisors, and/or any other person with responsibility for conducting or supervising elections in the county.

5.  "Date" means the exact day, month, and year, if ascertainable, or, if not, the best available approximation (including relationship to other events).

6. "Defendant(s)" means all of the Defendants in the consolidated cases listed above, including but not limited to Defendants-Intervenors the Republican National Committee, the National Republican Senatorial Committee, the Georgia Republican Party, Inc., and the National Republican Congressional Committee. "Defendants" includes any of Defendants' current or former agents, advisors, employees, representatives, officers, consultants, contractors, or any person or entity acting or purporting to act on Defendants' behalf or subject to Defendants' control.

7. "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Rule 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

8. "Drop box" or "absentee ballot drop box" means a secured box provided by county election officials where voters can physically return an absentee ballot in a sealed envelope, pursuant to Ga. Code. Ann. § 21-2-382(c).

9. "Early, in-person voting" refers to voting at an early voting location in advance of Election Day, as authorized by Ga. Code Ann. § 21-2-385(d).

10. "Georgia General Assembly" means the Georgia Senate and/or the Georgia House of Representatives; any current or former committee, subcommittee,

office, or unit of the Georgia Senate or Georgia House of Representatives; and/or any current or former member, employee, contractor, advisor, agent, or representative of the Georgia Senate, Georgia House of Representatives, or any current or former committee, office, or unit of those entities.

11. "Georgia House of Representatives Special Committee on Election Integrity" refers to the Special Committee that was formed on January 7, 2021 to consider Georgia's election laws, including any subcommittees.

12. "Georgia Republican Party Election Confidence Task Force" means the task force created by the State Executive Committee of the Georgia Republican Party that published the "Report of the Election Confidence Task Force" on or around February 9, 2021.

13. "Predecessor Bills" means Senate Bill 67, Senate Bill 74, Senate Bill 93, Senate Bill 141, Senate Bill 175, Senate Bill 188, Senate Bill 241, House Bill 59, House Bill 62, House Bill 227, House Bill 270, House Bill 512, House Bill 531, House Bill 615, and House Bill 701 from the 2021-2022 Georgia General Assembly legislative session.

14. "S.B. 202" refers to Senate Bill 202 as ratified by the Georgia General Assembly and signed by the Georgia Governor on March 25, 2021, and refers to the bill as

a whole and/or to any provision thereof, as well as prior versions thereof, substitute bills, and/or amendments related to the bill.

15. "Voter" means any registered voter in Georgia and all persons who are eligible to register to vote by the close of discovery in this case.

16. "Voters of color" means anyone who is Black, Hispanic/Latinx, Asian American, Pacific Islander, American Indian, Alaska Native, or is a member of any other racial minority group, who is registered or could be registered to vote in Georgia.

17. "You" or "Your" means Representative Barry A. Fleming, and all employees, aides, agents, representatives, or counsel of his legislative office or any committee or subcommittee on which he serves, and all employees, agents, or representatives of his counsel.

18. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

19. The terms "and" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

20. The term "including" shall mean "including, but not limited to."

21. The terms "regarding," "related to," and "relating to" shall be construed in the broadest sense to mean referring to, describing, concerning, reflecting, alluding

to, responding to, connected with, commenting on, with respect to, about, discussing, showing, analyzing, constituting, and/or evidencing, in any manner, whether directly or indirectly, the subject matter of the Request.

## **INSTRUCTIONS**

1. Each Request shall be answered completely, comprehensively, and separately.

2. The responsive documents should be produced in the manner prescribed by the Federal Rules of Civil Procedure and any applicable laws or rules, and consistent with the parties' agreement on production of electronically stored information or any court order relating to electronically stored information.

3. If any part of the Request is objected to, the objection and the reason for the objection should be stated with particularity.  Any ground not stated will be waived.  If an objection is made to part of a Request, that part should be specified, while complying with the non-objectionable portion of the Request.  No part of a Request may be left unanswered merely because an objection is interposed to another part of the Request.

4. If, in responding to these Requests, You encounter any ambiguities when construing a Request or definition, set forth in Your response what You find ambiguous and the construction You used in responding.

5. Each Request and subparagraph or subdivision thereof shall be construed independently, and no Request shall be construed as creating a limitation upon any other Request.

6. The documents produced in response to these Requests shall include all responsive documents in Your possession, custody, or control, or known to be available to You, regardless of whether such documents are possessed directly by You or Your agents, advisors, employees, representatives, attorneys, consultants, successors-in-interest, or other persons or entities acting on Your behalf or subject to Your control, and whether they are maintained at any of Your locations, offices, or in archives or in any other location or with any persons related in any way to You.

7. A reference to an entity shall be construed to include its current and former officers, directors, partners, members, managers, employees, representatives, agents, consultants, or anyone acting on its behalf.

8. Where a Request calls for information that is not available to You in the form requested but is available in another form or can be obtained, in whole or in part, from other data in Your possession or control, You must state so and either supply the information requested in the form in which it is available or supply the data from which the information requested can be obtained.

9.  In addition to the responsive document, You shall produce all non-identical copies, including all drafts, of each responsive document.

10. If any requested document is not or cannot be produced in full, You shall produce it to the extent possible, indicating what document or portion of such document is not or cannot be produced and the reason why it is not or cannot be produced.

11. Each document produced must include all attachments and enclosures.

12. Documents attached to each other shall not be separated.

13. Documents not otherwise responsive to a Request shall be produced if such documents refer to, concern, or explain the documents called for by any Request and constitute transmittal memoranda or letters, comments, evaluations, or similar documents.

14. All documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the Requests and shall identify the name of the person from whose files the documents were produced.

15. Each Request shall be responded to separately.  In the event that the same document is responsive to more than one Request, the document may be produced for one Request and incorporated by reference in another response, provided that the relevant, corresponding portion is so labeled or marked.

16. If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this lawsuit or unless otherwise permitted by the Court.

17. If any document requested herein was at one time in existence, but has been lost, discarded, destroyed, transferred to others not subject to Your control, or otherwise disposed of, You shall furnish a list identifying each such document and setting forth the following information with respect to each such document: its date, author(s), sender(s), addressee(s) and recipient(s), subject matter, length, attachments, and the location in which it was maintained.  In each instance, explain the circumstances of its loss, discarding, or destruction, including the person(s) responsible for authorizing the disposition and the date thereof, and provide a description of Your efforts to locate the document and copies of it.

18. If You contend that it would be unduly burdensome to obtain and provide all of the documents called for in response to these Requests, or any portion thereof, then in response to each such Request You shall:

   a.  produce all documents and information available to You without undertaking what You contend to be an unreasonable burden; and

b.   set forth the particular grounds on which You contend that additional efforts to obtain such documents and information would be unduly burdensome.

19. If You withhold any document on the claim of privilege, state the specific factual and legal basis for doing so.  Such information should be supplied in sufficient detail to permit the Consolidated Plaintiffs to assess the applicability of the privilege claimed.  If You claim privilege or protection over part of a document, redact that portion which is privileged or protected and produce the remainder of the document to the fullest extent possible.

20. These Requests are continuing in nature, and You shall revise or supplement Your responses, and produce additional documents, whenever You obtain different or additional relevant knowledge, information, or belief from the time of Your initial response through to the end of trial.

21. To the extent that You do not have any documents reflecting the information requested, and/or any means of recording the information requested, please so indicate in Your response to the specific Request.

22. Subject to any ESI protocol that may be entered into by the parties, all documents are to be produced in electronic form.  Documents produced electronically should be produced in native format with all metadata intact.  For any election or voter

data file, please produce in CSV format if available.  If this is not available, please produce in PDF format.  For other documents, to the extent documents can be accurately represented in black and white, they should be produced in single-page Tagged Image File Format ("TIFF"), together with any related field-delimited load files (e.g., Concordance DAT, CSV, OPT, LOG).  Each TIFF document shall be produced with an image load file in standard Opticon (*.log) format that reflects the parent / child relationship and also includes the beginning Bates number; ending Bates number; beginning Attachment Bates number; ending Attachment Bates number; custodian; date sent (for email messages); date modified (for email and non-email messages) where information is available; author (for email and non-email messages); and subject (for email messages). The TIFF images shall also be accompanied by extracted text or, for those files that do not have extracted text upon being processed (such as hard copy documents), optical character recognition ("OCR") text data; such extracted text or OCR text data shall be provided in document level form and named after the TIFF image.  Documents that contain redactions shall be OCR'd after the redaction is applied to the image, and the OCR will be produced in place of extracted text at the document level.  Notwithstanding the foregoing, the parties may negotiate a separate production format (including native format) for any

documents not reasonably producible or readable as standard image files, such as audio files or large spreadsheets.

23. For documents produced in TIFF format that originated in electronic form, metadata shall be included with the data load files described above and shall include (at a minimum) the following information: file name (including extension); original file path; page count; creation date and time; last saved date and time; last modified date and time; author; custodian of the document (that is, the custodian from whom the document was collected or, if collected from a shared drive or server, the name of the shared drive or server); and MD5 hash value. In addition, for email documents, the data load files shall also include the following metadata: sent date; sent time; received date; received time; "to" name(s) and address(es); "from" name and address; "cc" name(s) and address(es); "bcc" name(s) and address(es); subject; name(s) of attachment(s); and attachment(s) count. All images and load files must be named or put in folders in such a manner that all records can be imported without modification of any path or file name information.

## <u>REQUESTS FOR PRODUCTION</u>

1. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present that reflect or discuss the

rationale(s), purpose(s), interpretation(s), or analysis behind S.B. 202 and/or Predecessor Bills, including any proposed amendments to S.B. 202 and/or Predecessor Bills.

2.  All communications from January 1, 2020 through the present between You and any Defendant, including the Defendant's current or former staff or employees, related to S.B. 202 and/or Predecessor Bills, including any proposed amendments to S.B. 202 and/or Predecessor Bills.

3.  All communications from January 1, 2020 through the present between You and any Georgia state agency, including the agency's current or former staff or employees, related to S.B. 202 and/or Predecessor Bills, including any proposed amendments to S.B. 202 and/or Predecessor Bills.

4.  All communications from January 1, 2020 through the present between You and non-legislators (other than the parties referred to in Request Nos. 2 and 3), including Your constituents, regarding any provision in S.B. 202 and/or Predecessor Bills, including any proposed amendments to S.B. 202 and/or Predecessor Bills.

5.  All documents and communications received, created, considered, or sent by You from January 1, 2020 through March 25, 2021 that relate to or discuss election-related lawsuits or judicial opinions in Georgia state or federal courts.

6. Any reports, studies, estimates, or analyses received, created, considered, or sent by You from January 1, 2020 through the present relating to S.B. 202 and/or Predecessor Bills.

7. All documents and communications from November 6, 2020 through the present related to statements by You in support of or opposition to S.B. 202 and/or Predecessor Bills, including any proposed amendments to S.B. 202 and/or Predecessor Bills.

8. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present regarding the impact or potential impact of S.B. 202 and/or Predecessor Bills on voters of color, voters with disabilities, voters with mobility impairments, voters with limited English proficiency, voters aged 18 to 25, and/or voters based on their partisan or political affiliation.

9. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present regarding the impact or potential impact of S.B. 202 and/or Predecessor Bills on:

   a. Voter registration in any federal, state, or local elections to be held in Georgia;

14

b.  Voter turnout in any federal, state, or local elections to be held in Georgia;

c.  Absentee voting (including but not limited to absentee-by-mail applications and absentee ballot drop boxes) or early, in-person voting in Georgia; and/or

d.  The impact or potential impact on wait times at the polls in Georgia.

10. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present regarding the need to require information about a voter's date of birth when the voter applies for and requests an absentee ballot.

11. All documents and communications received, created, considered, or sent by You from November 2018 through March 2021 related to the amendment to House Bill 316, signed into law by the Governor of Georgia on April 2, 2019, removing the requirement that voters provide their date of birth on absentee ballot return envelopes, as well as any consideration of that amendment in the enactment of S.B. 202 and/or Predecessor Bills.

12. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present related to the creation of the

Georgia Republican Party Election Confidence Task Force or related to the "Report of the Election Confidence Task Force."

13. All documents and communications received, created, considered, or sent by You from November 6, 2020 through the present related to oral and written testimony, public comments, and other documents submitted into the record of any legislative hearing, committee meeting, or Georgia House of Representatives or Georgia Senate floor review of S.B. 202 and/or Predecessor Bills, including any amendments to S.B. 202 and/or Predecessor Bills.

14. All documents and communications received, created, considered, or sent by You from November 6, 2020 through the present related to the fiscal impact of S.B. 202 and/or Predecessor Bills.

15. Documents sufficient to show the date and time when draft versions of S.B. 202 and/or Predecessor Bills were publicly posted to any Georgia General Assembly website.

16. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present discussing voter fraud with respect to any elections in Georgia from January 1, 2016 through the present, including any instances of voter fraud in connection with (a) early or absentee

16

voting (including absentee-by-mail applications), (b) drop boxes, (c) mobile voting units, or (d) the provision of food or drink to voters waiting in line by political candidates or campaigns within 150 feet of a polling place or 25 feet of voters standing in line and by poll workers.

17. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present regarding any person or entity offering food, drink, assistance, or general support to voters in line at a polling place in Georgia.

18. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present discussing voter confidence and/or election integrity with respect to any elections in Georgia from January 1, 2016 through the present.

19. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present relating to any data, studies, or statistics on voting patterns, including the methods by which voters register to vote, apply for an absentee ballot, and/or cast a ballot, by partisan or political affiliation in Georgia.

20. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present relating to any data, studies, or

statistics on voting patterns, including the methods by which voters register to vote, apply for an absentee ballot, and/or cast a ballot, by race or ethnic group in Georgia.

21. All documents and communications received, created, considered, or sent by You from January 1, 2020 through the present that reflect the use or consideration of any of the following voting mechanisms or processes by Georgia voters from January 1, 2016 through the present, disaggregated by geographic location (including county, city, or precinct), partisan or political affiliation, racial or ethnic identification, age group, disability, English proficiency, or any other demographic characteristics:

    a. Absentee voting, including but not limited to absentee-by-mail applications and absentee ballot drop boxes;

    b. Early, in-person voting;

    c. Out-of-precinct provisional voting; and/or

    d. Mobile voting units.

22. All copies of Georgia General Assembly rules, including rules for the Georgia House of Representatives Special Committee on Election Integrity and the Georgia Senate Ethics Committee, received, created, considered, or sent by You during the 2021-2022 Legislative Session.

Respectfully submitted May 13, 2022.

/s/ Bryan L. Sells
Bryan L. Sells (Bar 635562)
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN
  SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Telephone: (404) 480-4212

/s/ Ezra D. Rosenberg
Jon Greenbaum*
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg*
erosenberg@lawyerscommittee.org
Julie M. Houk*
jhouk@lawyerscommittee.org
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

/s/ Vilia B. Hayes
Vilia B. Hayes*
vilia.hayes@hugheshubbard.com
Neil Oxford*
neil.oxford@hugheshubbard.com
Gregory Farrell*
gregory.farrell@hugheshubbard.com
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

/s/ Leah C. Aden
Leah C. Aden*
laden@naacpldf.org
John S. Cusick*
jcusick@naacpldf.org
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

/s/ Debo P. Adegbile
Debo P. Adegbile*
debo.adegbile@wilmerhale.com
Ilya Feldsherov*
ilya.feldsherov@wilmerhale.com
WILMER CUTLER PICKERING
  HALE  AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese*
george.varghese@wilmerhale.com
Stephanie Lin*
stephanie.lin@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and Lower Muskogee Creek Tribe*

/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
*unkwonta@elias.law*
Jacob D. Shelly*
*jshelly@elias.law*
Jyoti Jasrasaria*
*jjasrasaria@elias.law*
Tina Meng*
*tmeng@elias.law*
Marcos Mocine-McQueen*
*mmcqueen@elias.law*
Spencer McCandless*
*smccandless@elias.law*
ELIAS LAW GROUP LLP
10 G St. NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490

/s/ *Halsey G. Knapp, Jr.*
Halsey G. Knapp, Jr. (Bar 425320)
*hknapp@khlawfirm.com*
Joyce Gist Lewis (Bar 296261)
*jlewis@khlwafirm.com*
Adam M. Sparks (Bar 341578)
*sparks@khlawfirm.com*
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250

Tania Faransso*
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce*
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
 HALE  AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin*
*slakin@aclu.org*
Davin M. Rosborough*
*drosborough@aclu.org*
Dale E. Ho*
*dho@aclu.org*
Jonathan Topaz*
*jtopaz@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner*
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111

Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577

*Attorneys for The New Georgia
Project, Black Voters Matter Fund,
Rise, Inc., Elbert Solomon, Fannie
Marie Jackson Gibbs, and Jauan
Durbin*

/s/ *Phi Nguyen*
Phi Nguyen (Bar 578019)
*pnguyen@advancingjustice-atlanta.org*
Meredyth L. Yoon (Bar 204566)
*myoon@advancingjustice-atlanta.org*
Laura Murchie
*lmurchie@advancingjustice-
atlanta.org*
ASIAN AMERICANS ADVANCING
  JUSTICE-ATLANTA
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
Telephone: (404) 585-8446
Facsimile: (404) 890-5690

/s/ *Eileen Ma*
Eileen Ma*
*eileenm@advancingjustice-alc.org*
Kimberly Leung*
*kimberlyl@advancingjustice-alc.org*
ASIAN AMERICANS ADVANCING
  JUSTICE-ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

/s/ *Niyati Shah*

Telephone: (415) 343-0781

Brian Dimmick*
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

/s/ *Sean J. Young*
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

*Attorneys for Plaintiffs
Sixth District of the African Methodist
Episcopal Church, Delta Sigma Theta
Sorority, Georgia ADAPT, Georgia Advocacy
Office, and Southern Christian Leadership
Conference*

/s/ *Nancy G. Abudu*
Nancy G. Abudu (Bar 001471)
*nancy.abudu@splcenter.org*
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
SOUTHERN POVERTY LAW
  CENTER
P.O. Box 1287
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Niyati Shah*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis*º
*tminnis@advancingjustice-aajc.org*
ASIAN AMERICANS ADVANCING
  JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
Telephone: (202) 815-1098
Facsimile: (202) 296-2318
*º Not Admitted in DC*

*/s/ R. Adam Lauridsen*
Leo L. Lam*
*llam@keker.com*
R. Adam Lauridsen*
*alauridsen@keker.com*
Connie P. Sung*
*csung@keker.com*
Candice Mai Khanh Nguyen*
*cnguyen@keker.com*
Luis G. Hoyos*
*lhoyos@keker.com*
Rylee Kercher Olm*
*rolm@keker.com*
KEKER, VAN NEST AND
  PETERS LLP
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

*Attorneys for Plaintiffs Asian
Americans Advancing Justice–Atlanta,
Steven J. Paik, Deepum Patel, Nora
Aquino, Thuy Hang Tran, Thao Tran,
and Anjali Enjeti-Sydow*

*/s/ Adam S. Sieff*
Adam S. Sieff*
*adamsieff@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski*
*mjedreski@dwt.com*
Grace Thompson*
*gracethompson@dwt.com*
Brittni Hamilton*
*brittnihamilton@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett*
*davidgossett@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia Muslim Voter
Project, Women Watch Afrika, Latino
Community Fund Georgia, and The Arc of the
United States*

*/s/ Kurt Kastorf*
Kurt Kastorf
*kurt@kastorflaw.com*

Kurt R. Erskine
United States Attorney
Northern District of Georgia

*/s/ Aileen Bell Hughes*
Aileen Bell Hughes (Bar 375505)
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

Pamela S. Karlan
Principal Deputy Assistant
Attorney General

*/s/ Jasmyn G. Richardson*
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS IV
JASMYN G. RICHARDSON
RACHEL R. EVANS
SEJAL JHAVERI
ERNEST A. MCFARLAND
MAURA EILEEN O'CONNOR
ELIZABETH M. RYAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
john.russ@usdoj.gov
jasmyn.richardson@usdoj.gov

KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330

Judith Browne Dianis*
*Jbrowne@advancementproject.org*
Gilda R. Daniels (Bar 762762)
*Gdaniels@advancementproject.org*
Sabrina Khan*
*Skhan@advancementproject.org*
Jess Unger*
*Junger@advancementproject.org*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557

Clifford J. Zatz*
*CZatz@crowell.com*
Justin D. Kingsolver*
*JKingsolver@crowell.com*
William Tucker*
*WTucker@crowell.com*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500

Jordan Ludwig*
*JLudwig@crowell.com*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524

*Attorneys for Plaintiffs The Concerned Black
Clergy of Metropolitan Atlanta, Inc., The*

23

*Admitted pro hac vice

*Justice Initiative, Inc., Samuel Dewitt Proctor Conference, Inc., Mijente, Inc., Sankofa United Church of Christ Limited, Metropolitan Atlanta Baptist Ministers Union, Inc., First Congregational Church, United Church of Christ Incorporated, Georgia Latino Alliance for Human Rights, Inc., Faith in Action Network, Greater Works Ministries Network, Inc., and Exousia Lighthouse International C.M., Inc.*

# EXHIBIT B



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW*
*4CON 8ᵗʰ floor*
*Washington, DC  20530*

August 15, 2022

VIA E-MAIL SERVICE

Alex Khoury
Special Assistant Legislative Counsel
Smith Gambrell Russell
1105 W. Peachtree Street NE, Suite 1000
Atlanta, GA 30309

Re:     *In Re Georgia Senate Bill 202*
         Master Case No. 1:21-MI-55555-JPB

Dear Mr. Khoury,

Enclosed please find subpoenas for depositions served upon the following members of the Georgia General Assembly, in connection with the above-referenced litigation pending in the United States District Court, Northern District of Georgia:

1. Senators Max Burns, Mike Dugan, Steve Gooch, Butch Miller, Jeff Mullis, Randy Robertson, Brian Strickland; and
2. Representatives Shaw Blackmon, Barry Fleming, Jan Jones, Chuck Martin, Alan Powell, David Ralston, Bonnie Rich

As discussed in our phone conversation on August 15, 2022, I understand that you will accept service on behalf of these members via e-mail.

The deponents should be prepared to address at least the following topics to the extent of their personal knowledge:

1. Any reports, studies, or analyses regarding voting patterns—including but not limited to the methods by which Georgia voters register to vote, apply for an absentee ballot, and/or cast a ballot—and changes to those voting patterns in Georgia's most recent elections (January 1, 2020 – present) that the deponent reviewed;

2. Any documents, communications, reports, studies, analyses, or formal recommendations issued by the Georgia General Assembly related to election administration issues in the June 2020 primary;

3. Allegations and any actual evidence of electoral problems, irregularities, or fraud

observed or experienced in Georgia's most recent elections (January 1, 2016 – present);

4. Voter fraud-related hearings and/or meetings held in the Georgia General Assembly, following the November 2020 election;

5. Post-election reports, studies, or analyses available to Georgia General Assembly Members;

6. The formation of the Special Election Integrity Committee;

7. The typical legislative process behind the formulation and passage of election-related bills in the Georgia General Assembly;

8. Oral and written testimony, public comments, and other documents submitted into the public record for any legislative hearing, committee meeting, or Georgia House of Representatives or Georgia Senate floor review of S.B. 202 and/or Predecessor Bills,[1] including any substitute bills or amendments related to S.B. 202 and/or Predecessor Bills;

9. The legislative process behind S.B. 202 and/or Predecessor Bills, including but not limited to the drafting of the bills, posting of the bills to the Georgia General Assembly website, rules governing testimony, and scheduling of Committee hearings related to the bills, including any substitute bills or amendments related to S.B. 202 and/or Predecessor Bills;

10. Any documents, communications, reports, studies, inquiries, or analyses regarding the impact, or potential impact, of S.B. 202 and/or Predecessor Bills, on voters of color, voters with disabilities, voters with mobility impairments, voters with limited English proficiency, voters aged 18 to 25, and/or voters based on their partisan or political affiliation;

11. Any documents, communications, reports, studies, or analyses regarding the fiscal impact, or potential fiscal impact, of S.B. 202 and/or Predecessor Bills;

12. Any documents, communications, reports, studies, or analyses regarding the impact, or potential impact, of S.B. 202 and/or Predecessor Bills, on voter registration, voter turnout, absentee voting or early, in-person voting, and/or wait times at the polls in Georgia elections;

13. Communications between and among members of the Georgia General Assembly regarding S.B. 202 and/or Predecessor Bills;

---

[1] "Predecessor Bills" means Senate Bill 67, Senate Bill 74, Senate Bill 93, Senate Bill 141, Senate Bill 175, Senate Bill 188, Senate Bill 241, House Bill 59, House Bill 62, House Bill 227, House Bill 270, House Bill 512, House Bill 531, House Bill 615, and House Bill 701 from the 2021 Georgia General Assembly legislative session.

14. Communications between and among members of the Georgia General Assembly and Defendants, including but not limited to the Office of the Secretary of State, regarding S.B. 202 and/or Predecessor Bills;

15. Communications between and among members of the Georgia General Assembly and Intervenor-Defendants, including the Georgia Republican Party, Inc., Republican National Committee, and the National Republican Senatorial Committee, regarding S.B. 202 and/or Predecessor Bills;

16. Communications between and among members of the Georgia General Assembly and any other third parties and/or non-legislators, including but not limited to constituents, the Heritage Foundation, and Heritage Action for America, regarding S.B. 202 and/or Predecessor Bills;

17. Public statements made by the deponents regarding S.B. 202, Predecessor Bills, allegations of voter fraud in the November 2020 election in Georgia, and/or allegations of voter fraud in the January 2021 runoff election in Georgia, including but not limited to statements made in media interviews, social media posts, books and/or articles, Congressional hearings, and/or op-eds;

18. Any documents, communications, reports, studies, or analyses regarding requirements under the Americans with Disabilities Act relating to voters with disabilities and S.B. 202 and/or Predecessor Bills;

19. Any documents, communications, reports, studies, inquiries, or analyses regarding disability-based reasonable modifications made during the November 2021 municipal elections and the May 2022 primaries and runoffs, including requests from voters with disabilities and those who assist voters with disabilities; and

20. Communications with voters with disabilities and those who assist voters with disabilities whose absentee ballot applications or absentee ballots were rejected in the November 2021 municipal elections and the May 2022 primaries and runoffs.

Please note that the list of topics included above is non-exhaustive. The Plaintiffs reserve the right to ask any other questions or topics of the witnesses and reserve the right to broaden the scope of the deposition as necessary.

Please do not hesitate to reach out if you have any questions.

Sincerely,

/s/ Jasmyn G. Richardson
Jasmyn G. Richardson

4 Constitution Square
150 M Street NE, Room 8.139
Washington, D.C. 20530
Phone: (202) 598-9612
Fax: (202) 307-3961
jasmyn.richardson@usdoj.gov

Encl.

# EXHIBIT C

*In re Georgia Senate Bill 202*, **Master Case No. 1:21-MI-55555-JPB**

**Proposed search terms for Consolidated Plaintiffs' Subpoenas to Legislators**

**Please note:**

- Wildcard below is denoted as *.
- Each set of search terms is accompanied by a date range, which corresponds to the date range in the subpoena request. For example, "AND DATE > Dec. 31, 2019" means a date range after Dec. 31, 2019.
- Each set of search terms is to be run independently of other searches.
- Searches should be run so that words are returned with or without hyphens, with or without periods, and with or without spaces. For example, a search for "out of precinct" should return the term with or without hyphens (e.g., out-of-precinct, out of precinct, out-of precinct, out of-precinct). Similarly, a search for "S.B. 202" should return any variation of that term (e.g., SB202, SB 202, SB. 202, etc.). And a search for "drop box" should also return "dropbox." Please let us know if this instruction cannot be followed.
- In some instances, abbreviations such as "OP" or "OOP" or "ID" are in quotes. This is to ensure that the search does not return every word that contains those letters.
- We have left "noise words" (e.g., and, the, to, etc.) in these searches. Please let us know how your system treats these words (i.e., will they be skipped or included in the search?).
- If any set of search terms is too long, please let us know promptly and we can break them up into shorter sets of terms.
- If you notice anything that appears to be an error in the search terms, please let us know promptly.

1. ("S.B. 202" OR "Bill 202" OR "Senate B. 202" OR "Election Integrity Act" OR "S.B. 241" OR "Senate B. 241" OR "Bill 241" OR "S.B. 67" OR "Senate B. 67" OR "Bill 67" OR "S.B. 74" OR "Senate B. 74" OR "Bill 74" OR "S.B. 93" OR "Senate B. 93" OR "Bill 93" OR "S.B. 141" OR "Senate B. 141" OR "Bill 141" OR "S.B. 175" OR "Senate B. 175" OR "Bill 175" OR "S.B. 188" OR "Senate B. 188" OR "Bill 188" OR "S.B. 241" OR "Senate B. 241" OR "Bill 241" OR "H.B. 59" OR "House B. 59" OR "Bill 59"  OR  "H.B. 62" OR "House B. 62" OR "Bill 62" OR "H.B. 227" OR "House B. 227" OR "Bill 227" OR "H.B. 270" OR "House B. 270" OR "Bill 270" OR "H.B. 512" OR "House B. 512" OR "Bill 512" OR "H.B. 531" OR "House B. 531" OR "Bill 531" OR "H.B. 615" OR "House B. 615" OR "Bill 615" OR "H.B. 701" OR "House B. 701" OR "Bill 701")

   AND DATE > Dec. 31, 2019

2. (RNC OR "Republican National Committee" OR "Georgia Republican Party" OR "Georgia GOP" OR Kemp OR Raffensperger OR "Georgia State Elections Board" OR (Ed /3 Lindsey) OR Ghazal OR Mashburn OR Johnston OR (Lynn /3 Bailey) OR Eveler OR Anh OR (Rebecca /3 Sullivan) OR Germany OR Sterling OR Tonnie OR (Joseph /3 Kirk) OR (Misty /3 Hampton) OR Presswood OR (Brad /3 Carver))

/10

(elect* OR vot* OR absentee OR ballot OR applic* OR regist* OR assist* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR "out of precinct" OR "OOP" OR "OPP" OR "OP" OR food OR water OR deadline OR fine OR identification OR "ID" OR signature OR photocopy OR unsolicited OR challenge OR ("closing date" /5 regist*) OR "21-2-382" OR "21-2-381" OR "21-2-385" OR "21-2-418" OR "21-2-414" OR "21-2-266")

AND DATE > Dec. 31, 2019

**3.**  ("@law.ga.gov" OR "@sos.ga.gov" OR "@dds.ga.gov")

/10

(elect* OR vot* OR absentee OR ballot OR applic* OR regist* OR assist* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR "out of precinct" OR "OOP" OR "OPP" OR "OP" OR food OR water OR deadline OR fine OR identification OR "ID" OR signature OR photocopy OR unsolicited OR challenge OR ("closing date" /5 regist*) OR "21-2-382" OR "21-2-381" OR "21-2-385" OR "21-2-418" OR "21-2-414" OR "21-2-266")

AND DATE > Dec. 31, 2019

**4.**  (Giuliani OR Trump OR (Sidney /3 Powell) OR (Lin /3 Wood) OR (Ray /3 Smith) OR Cleta OR Heritage OR Waldron OR Epshteyn OR Perdue OR Spakovsky OR "Judicial Watch" OR "Public Interest Legal Foundation" OR "American Civil Rights Union" OR "Voter GA" OR "Garland Favorito" OR "Honest Elections Project" OR "True the Vote" OR "FreedomWorks" OR "American Legislative Exchange Committee" OR "Project Veritas")

/10

(elect* OR vot* OR absentee OR ballot OR applic* OR regist* OR assist* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR "out of precinct" OR "OOP" OR "OPP" OR "OP" OR food OR water OR deadline OR fine OR identification OR "ID" OR signature OR photocopy OR unsolicited OR challenge OR ("closing date" /5 regist*) OR "21-2-382" OR "21-2-381" OR "21-2-385" OR "21-2-418" OR "21-2-414" OR "21-2-266")

AND DATE > Dec. 31, 2019

**5.**  (elect* OR vot* OR absentee OR ballot OR registr* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR ((food OR water OR refreshment OR drink) /5 (poll* OR line)))

/10

(lawsuit OR litigation OR judge OR judicial OR court)

2

AND DATE > Dec. 31, 2019 < March 26, 2020

**6.** (elect* OR vot* OR absentee OR ballot OR registr* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR ((food OR water OR refreshment OR drink) /5 (poll* OR line)))

/10

(oppos* OR support* OR amend* OR sign* OR advoc* OR sponsor*)

AND DATE > Nov. 5, 2020

**7.** (ADA OR (America* /3 Disab*) OR VAEHA OR (voting /3 access*) OR NVRA OR "National Voter Registration Act" OR HAVA OR "Help America Vote Act" OR (standard* /3 accessibility) OR ADAAG OR "accessibility guideline*" OR (reasonabl* /3 accommodat*) OR (reasonabl* /3 modification*) OR (access* /3 (evaluation* OR inspection*) /10 (disab* OR handicap*)) OR ((access* OR modification* OR barrier* OR "grievance procedure*") /7 (disab* OR handicap*)) OR "Rehabilitation Act" OR "Section 504" OR race OR racial* OR ethnic OR demograph* OR Black OR "African American" OR Asian OR Latin* OR Hispanic OR minorit* OR urban OR rural OR ((limited OR unable or "no" or "not") /3 English) OR LEP OR foreign* OR Spanish OR white OR Democrat* OR Republican OR undocumented OR "college student")

/25

(elect* OR vot* OR absentee OR ballot OR applic* OR regist* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR "out of precinct" OR "OOP" OR "OPP" OR "OP" OR food OR water OR deadline OR fine OR identification OR "ID" OR signature OR photocopy OR unsolicited OR challenge OR ("closing date" /5 regist*) OR "21-2-382" OR "21-2-381" OR "21-2-385" OR "21-2-418" OR "21-2-414" OR "21-2-266")

AND DATE > Dec. 31, 2019

**8.** (absentee OR ballot* OR application* OR envelope*)

/15

birth*

AND DATE > Dec. 31, 2019

**9.** ("H.B. 316" OR "House B. 316" OR "Bill 316" OR "Senate B. 202" OR "S.B. 202" OR "Bill 202")

/10

(birth* OR "absentee" OR ballot* OR envelope*)

3

AND DATE > Oct. 31, 2018 < April 1, 2021

**10.** (Elect* /3 Conf* /3 Task /3 Force)

AND

DATE > Dec. 31, 2019

**11.** (chang* OR revis* OR amend* OR fix* OR eliminat* OR ban* OR prohibit* OR assess* OR report* OR testimony OR testif* OR "fiscal note" OR (fiscal /3 impact) OR agenda OR meeting OR bill OR committee OR transcript OR comment OR hearing OR minutes)

/10

(elect* OR vot* OR absentee OR ballot OR applic* OR regist* OR assist* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR "out of precinct" OR "OOP" OR "OPP" OR "OP" OR food OR water OR deadline OR fine OR identification OR "ID" OR signature OR photocopy OR unsolicited OR challenge OR ("closing date" /5 regist*) OR  "21-2-382" OR "21-2-381" OR "21-2-385" OR "21-2-418" OR "21-2-414" OR "21-2-266")

AND DATE > Nov. 5, 2020

**12.** (elect* OR vot* OR absentee OR ballot OR registr* OR "drop box" OR (mobile /3 (vot* OR unit)) OR "line warm*" OR "polling place" OR provisional OR ((food OR water OR refreshment OR drink) /5 (poll* OR line)))

/15

(confidence OR fraud OR integrity OR secur* OR steal* OR cheat* OR illeg* OR double OR impersonat* OR "false alleg*" OR "false claim" OR "poll watcher" OR "flipping-votes" OR "vote flip" OR "stolen" OR "rigged" OR "fake")

AND DATE > Dec. 31, 2019

**13.** (food OR drink OR water OR refreshment OR assist* OR snack OR support)

/5

line*

/10

(poll* OR site OR vot* OR elect*)

AND DATE > Dec. 31, 2019

**14.** (vot* OR regist* OR absentee OR (early /3 vot*) OR "in-person" OR turnout OR ballot)

4

AND

(calc* OR report* OR audit* OR estimat* OR project* OR analy* OR predict* OR data OR stud*)

AND

(race OR racial* OR ethnic OR demograph* OR Black OR "African American" OR Asian OR Latin* OR Hispanic OR minorit* OR urban OR rural OR ((limited OR unable OR "no" or "not") /3 English) OR "LEP" OR foreign* OR Spanish OR white OR Democrat* OR Republican)

AND DATE > Dec. 31, 2019

**15.** (absentee OR (early /3 vot*) OR "in-person" OR "OP" OR "OOP" OR "OPP" OR "out of precinct" OR "wrong precinct" OR "wrong location" OR "wrong poll*" OR "wrong site" OR (mobile /3 (vot* OR unit)) OR "incorrect precinct" OR provisional OR (mail /3 vot*) OR (mail /3 ballot) OR "drop box")

AND

(race OR racial* OR ethnic OR demograph* OR Black OR "African American" OR Asian OR Latin* OR Hispanic OR minorit* OR urban OR rural OR ((limited OR unable OR "no" OR "not") /3 English) OR LEP OR foreign* OR Spanish OR white OR Democrat* OR Republican OR undocumented OR "college student" OR ADA OR (America* /3 Disab*) OR VAEHA OR "Voting Accessibility for the Elderly and Handicapped Act" OR (voting /3 access*) OR NVRA OR "National Voter Registration Act" OR HAVA OR "Help America Vote Act" OR (standard* /3 accessibility) OR ADAAG OR "Americans with Disabilities Act Accessibility Guidelines" OR "accessibility guideline*" OR (reasonabl* /3 accommodat*) OR (reasonabl* /3 modification*) OR (access* /3 (evaluation* OR inspection*) /10 (disab* OR handicap*)) OR ((access* OR modification* OR barrier* OR "grievance procedure*") /7 (disab* OR handicap*)) OR "Rehabilitation Act" OR "Section 504")

AND DATE > Dec. 31, 2019

5