# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |
|---|---|

## CONSOLIDATED PLAINTIFFS' BRIEF IN OPPOSITION TO NON-PARTY LAWMAKERS' MOTION TO QUASH SUBPOENAS AND CONSOLIDATED PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Consolidated Plaintiffs ("Plaintiffs") file this Brief in Opposition to the Non-Party Lawmakers' Motion to Quash Subpoenas and in Support of Plaintiffs' Motion to Compel Production of Documents. Contrary to Lawmakers' assertions, (1) state legislative privilege is qualified; (2) state legislative privilege does not protect communications with third parties; (3) state legislative privilege does not completely bar depositions; and (4) important federal interests like the claims at issue here—discriminatory intent claims under Section 2 of the Voting Rights Act ("VRA") and the U.S. Constitution—overcome state legislative privilege. For these reasons, the Plaintiffs ask this Court to order Lawmakers to produce relevant communications with third parties, *see* Ex. A, and sit for depositions.

## I.    BACKGROUND

In response to ever-growing political participation by voters of color in Georgia, the Georgia legislature enacted Senate Bill 202 (2021) ("SB 202"). As the

1

counting of November 2020 general election ballots finished, baseless accusations of cheating with absentee voting were reported in some media outlets and circulated widely on social media.  Many of the accusations focused on counties with large numbers of voters of color, like Fulton County.  *See, e.g.*, Alan Duke and Hallie Golden, *Fact Check: Video From Georgia Does Not Show Suitcases Filled with Ballots Suspiciously Pulled from Under a Table; Poll Watchers Were Not Told to Leave*, LeadStories (Dec. 3, 2020), https://perma.cc/URV5-YD7Q.

The push to pass these election law changes started with a series of five unusual hearings convened in the Georgia General Assembly to explore allegations of voter fraud in the November 2020 general election.  In the House, the Governmental Affairs Committee held two hearings, on December 10 and December 23.  In the Senate, the Government Oversight Committee, chaired at that time by Senator Bill Heath, convened a hearing on December 3.  Also, the Election Law Study Subcommittee, a study committee authorized by then-Senator Jesse Stone and chaired by then-Senator William Ligon, [1] held two related hearings on December 3 and 30.[2]

---

[1] *See* Georgia General Assembly, *Letter from former Senator Jesse C. Stone to former Senator William Ligon* (November 19, 2020), available at http://www.senate.ga.gov/committees/Documents/2020Minutes80.pdf.

[2] Video of all hearings are archived on the Georgia General Assembly's website.  *See* House Committee on Governmental Affairs, https://www.house.ga.gov/Committees/en-US/CommitteeArchives92.aspx; Senate Committee on Government Oversight, https://vimeo.com/showcase/gasengvto;

The Subcommittee's hearings included repeated allegations of voter fraud that state officials had already debunked.  *See e.g.,* Georgia State Senate, *Committee on Judiciary | Subcommittee-12/3/2020*, Vimeo (Apr. 29, 2022), https://vimeo.com/showcase/8821960/video/704661401 at 12:59 (misleading footage of Fulton County workers bringing out cases of ballots from beneath a table replayed during the December 3rd Senate Judiciary subcommittee hearing).  Despite that, several proposals from Chairman Ligon's report were considered during the 2021 Legislative Session, including requiring photo identification for absentee ballots and banning drop boxes.  *See* Sen. William T. Ligon, The Chairman's Report of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, (December 17, 2020), https://perma.cc/SNZ7-VLGT.

As the legislative session opened in January 2021, a day after Georgia elected its first Black Senator, Georgia House Speaker David Ralston announced a stand-alone Special Committee on Election Integrity rather than referring election-related matters to the Governmental Affairs Committee, which traditionally considered such measures.  *See* Emil Moffatt, *Speaker Ralston Announces Election Integrity Committee That Will Focus on 'Moving Forward'*, WABE (Jan. 7, 2021),

---

Election Law Study Subcommittee of the Standing Senate Judiciary Committee, https://vimeo.com/showcase/gasenjudy.

https://perma.cc/587C-AA7X.  Representative Barry Fleming chaired the committee,

which consisted of ten Republicans and four Democrats for the 2021 Legislative

Session.  *See* Georgia General Assembly, *Special Committee on Election Integrity*

(2021-2022 Legislative Session), https://perma.cc/E9K4-PEKA?type=image.  The

Senate Ethics Committee, which reviews election-related matters, was made up of

nine Republicans and four Democrats.  *See* Georgia General Assembly, *The Senate*

*Committee on Ethics Roster* (2021-2022 Legislative Session), https://perma.cc/R524-

2LFZ.

During the 2021 Legislative Session, numerous election reform bills were

introduced, many of which focused on the absentee voting process.  *See e.g.*, SB 71

(2021) (proposing the end of no-excuse mail-in absentee voting); HB 227 (2021)

(also requiring certain identification to be submitted when applying for absentee

ballots).  The Georgia Senate passed the original version of SB 202, a narrow bill that

only concerned the distribution of absentee ballot applications by third-party groups,

on March 8, 2021.  The House version of SB 202, introduced by Chairman Barry

Fleming on March 17, 2021, differed greatly from the original Senate version.

Although this substitute version had expanded from two pages to ninety pages, it

passed out of Committee on March 22.  Just three days later, on March 25, the Senate

and House passed the bill, and the Governor signed it the same day.  The bill passed

along party lines, and no Black members of the Georgia General Assembly voted in

support of the bill.  *See* Georgia General Assembly, *SB 202* (2021),

https://www.legis.ga.gov/legislation/59827.

SB 202 rested on falsehoods about the integrity of the November 2020 election

and specifically targeted the methods by which voters of color had voted in recent

elections and had encouraged political participation in their communities.  Many of

the bill's provisions sought to restrict the absentee voting process, at a time when

voters of color were using absentee voting at increased rates.  *See* SB 202 §§ 25, 26.

As Lieutenant Governor Geoff Duncan candidly wrote, "[b]ecause they got scared,

GOP leaders became too focused on making voting more difficult."  Geoff Duncan,

*GOP 2.0*: *How the 2020 Election Can Lead to a Better Way Forward for America's*

*Conservative Party* 107 (2021).

The United States and five groups of private plaintiffs brought claims against

Georgia under Section 2 of the VRA and the U.S. Constitution, challenging

provisions of SB 202 that the Plaintiffs allege were adopted with the purpose of

denying or abridging the right to vote because of race.[3]  The intent of the legislature

is at the heart of this litigation.

The Plaintiffs sent targeted document subpoenas to 26 Lawmakers who either

coordinated or supported the December 2020 voter fraud hearings, are major leaders

---

[3] The Plaintiffs in *New Ga. Project v. Raffensperger*, No. 1:21-cv-01229, also
asserted a viewpoint discrimination claim.

in the Georgia House or Senate, or were members of the House Special Committee on Election Integrity or Senate Ethics Committee, who supported SB 202.  The subpoenas sought documents and communications related to SB 202 and to 15 predecessor bills that included provisions eventually rolled into SB 202.[4]  *See* Lawmakers' Br. Ex. A.  Among other things, Plaintiffs sought documents revealing the underlying facts and data received by the Lawmakers from state agencies, communications with constituents and other non-legislative parties regarding purported voter fraud, and other external, third-party input on drafting of the bills.

On June 10, 2022, the Lawmakers responded and objected to many of the document requests based on legislative privilege, relevance, and burden grounds. Plaintiffs worked with Lawmakers to craft search terms that would narrow the scope of relevant, responsive documents.  On June 27, 2022, Lawmakers produced documents that are largely publicly available, including videos of committee and subcommittee hearings, meeting agendas, and draft bills available through the Georgia General Assembly website.  Once it became clear that Plaintiffs and

---

[4]  These 15 bills, *see* Lawmakers' Br. Ex. A at 7, were election-related bills introduced during the 2021 Legislative Session before SB 202 emerged as the principal vehicle for election reform.  Because many of the predecessor bills were ultimately folded into SB 202, legislative evidence related to these bills is relevant to understanding SB 202.  *Compare* SB 202 §25 (requiring identification for absentee ballot applications) *with* SB 67 (requiring same identification for absentee ballot applications).  These predecessor bills are highly relevant to legislative intent.

Lawmakers would not reach agreement on the breadth of legislative privilege,

Plaintiffs worked with Lawmakers to expedite the production of a privilege log by

limiting the scope of the initial log to key third parties and excluding numerous form

emails from domain names that produced large volumes of less relevant information.

The Lawmakers produced the prioritized privilege log on August 26, 2022.[5]

Plaintiffs seek about 200 of those communications under this Motion to Compel.  *See*

Ex. A.  Plaintiffs have tailored this motion to seek documents most relevant to this

litigation and that they are not able to obtain from another source.[6]

Plaintiffs limited their deposition subpoenas to 16 Lawmakers to topics that

include the events leading up to the passage of SB 202, the legislative process behind

SB 202, the likely effects of SB 202, and public statements about SB 202.  As

Lawmakers noted, both sides worked together to narrow the dispute, but ultimately

disagree on the scope of state legislative privilege.  *See* Lawmakers' Br. 4.

---

[5]  Lawmakers note that some of the requested documents also fall under attorney-client privilege.  *See* Lawmakers' Br. 5 n.5.  Lawmakers do not clarify which documents they are referring to in that footnote, but they have not asserted attorney-client privilege in their privilege log.

[6]  Plaintiffs continue to seek the third-party documents identified on the privilege log from other parties and non-parties, but, thus far, have only been able to obtain about 40 documents on the log from those other sources.  Moreover, many of the entries on the Lawmakers' privilege log involve correspondence with only non-parties, which would require Plaintiffs to separately subpoena each non-party.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 45(e)(2)(A) mandates that "a person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must (i) expressly make the claim; and (ii) describe the nature of the withheld documents . . . in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." The party withholding documents has the burden to establish they are privileged. *Hodges, Grant & Kaufmann v. IRS*, 768 F.2d 719, 721 (5th Cir. 1985).  The party seeking to enforce the subpoena has the burden of demonstrating that the request is relevant. *Jenkins v. Koch Foods, Inc.*, 2020 WL 12992000, *2 (M.D. Ala. Mar. 11, 2020).

A party may also serve a subpoena under Rule 45 to "command attendance at a deposition." Fed. R. Civ. P. 45(a)(1)(B).  The recipient of a subpoena may move to quash if the subpoena requires disclosure of privileged or protected matter or subjects a person to undue burden.  Fed. R. Civ. P. 45(d)(3)(A).  The proponent of a motion to quash must meet the heavy burden of establishing that compliance with the subpoena would be unreasonable and oppressive.  *See Pace v. Valmet, Inc.*, 2019 WL 9828532, at *2 (N.D. Ga. Nov. 27, 2019).  The oppressiveness of a subpoena "must be determined according to the facts of the case."  *Jordan v. Comm'r, Miss. Dep't Corr.*, 947 F.3d 1322, 1337 (11th Cir. 2020).

## III.   ARGUMENT

This Court should compel the production of requested documents relating to the passage, motivation, and consideration of SB 202, including documents identified on Exhibit A, pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i).  The Court should also deny Lawmakers' Motion to Quash Deposition Subpoenas because they have not met their burden to show that the subpoenas are unreasonable, and should order Lawmakers to appear for depositions.

### A.   The Discovery Sought, Including the Documents and Depositions, are Relevant and Proportional to the Needs of the Litigation

The documents and depositions that Plaintiffs seek are relevant to the litigation, because they are probative of the intent of the legislature.  *See Jenkins*, 2020 WL 12992000 at *2.  Legislative intent is at the core of Section 2 and constitutional discriminatory intent claims.  *See McMillian v. Escambia Cnty.*, 748 F.2d 1037, 1046 (former 5th Cir. 1984) (holding that an at-large election system maintained for a discriminatory purpose violated Section 2 and the Fourteenth Amendment).  In *Arlington Heights*, the Supreme Court set forth a non-exhaustive list of relevant circumstantial evidentiary factors that courts consider when analyzing a discriminatory intent claim, including (1) whether the impact of the decision bears more heavily on one racial group than another; (2) the historical background preceding the passage of the challenged law; (3) the sequence of events leading up to

passage of the bill; (4) whether passage of the bill departed, either procedurally or substantively, from the normal practice; and (5) the legislative history, including contemporaneous statements and viewpoints held by the decision makers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266-68 (1977); *see also Brnovich,* 141 S. Ct. 2321, 2349 (2021) (applying the "familiar approach outlined in *Arlington Heights*").  In the Eleventh Circuit, courts also consider "(6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Secretary of State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021).  Legislative documents are necessary because "assessing a jurisdiction's motivation in enacting voting changes is a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Parish*, 520 U.S. 471, 488 (1997) (*quoting Arlington Heights*, 429 U.S. at 266).  The Lawmakers' communications and testimony will speak to a variety of the *Arlington Heights* factors, including the legislative process for SB 202 and the sequence of events leading up to its enactment.

Contrary to Lawmakers' assertions, Plaintiffs crafted their document subpoenas to focus on documents probative of intent either through direct or circumstantial evidence.  Lawmakers' Br. Ex. A.  Subpoena document requests 2, 3, 4, 6, 8, 9, 10, 17, 19, 20, and 21 go to the foreseeability of disparate impact and

knowledge of that impact.  *Id.*  Requests 11, 12, 16, and 18 relate to the historical

background of the legislation.  *Id.*  Requests 13, 15, and 22 relate to the

administrative and legislative record.  *Id.*  Requests 11, 13, 14, 15, and 22 are

probative of any departures from normal procedure.  Requests 1, 5, 7, and 16 are

likely to reveal contemporaneous statements regarding SB 202 or its predecessor bills

and/or reveal the motives of individual Lawmakers in supporting SB 202.

Similarly, the deposition topics seek evidence that is highly relevant to the

discriminatory purpose inquiry.  Deposition topics 1, 2, 10, 12, 18, 19, and 20 go to

the foreseeability of disparate impact and knowledge of that impact.  Lawmakers' Br.

Ex. A.  Deposition topics 3, 4, 5, 6, and 16 relate to the historical background of the

legislation.  *Id.*  Deposition topics 7 and 11 are also probative of any departures from

normal procedure.  *Id.*  Deposition topics 8 and 9 relate to the administrative and

legislative record.  *Id.*  Deposition topics 13, 14, and 15 relate to the Lawmakers'

contemporaneous statements and motives for supporting SB 202.  *Id.*

Lawmakers assert three relevance arguments: that (1) because the Lawmakers

have already provided some records, requiring them to produce any additional

evidence would not be proportional; (2) evidence from a "handful" of Lawmakers

does not illuminate the intent of the Legislature; and (3) Plaintiffs' subpoenas are

overbroad.  Lawmakers' Br. 29-34.  Each argument fails as a matter of fact and law.

First, the limited documents that Lawmakers have provided are almost all

publicly available.  Public statements alone often will be insufficient to prove

discriminatory intent, because "officials acting in their official capacities seldom, if

ever, announce on the record that they are pursuing a particular course of action

because of their desire to discriminate against a racial minority."  *Smith v. Town of

Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982).  Second, Lawmakers seek to have it

both ways—to argue that Plaintiffs' subpoenas are not proportional and are overly

burdensome, but also that the type of evidence Plaintiffs seek would be relevant only

if they subpoenaed *even more* Lawmakers.  Lawmakers' Br. 31.  As noted multiple

times, Plaintiffs subpoenaed specific Lawmakers because they led the legislative

process that culminated in the passage of SB 202 or were involved with the events

that led to its passage.  *See supra* I; *see also League of Women Voters of Florida, Inc.

v. Lee*, 340 F.R.D. 446, 457 (N.D. Fla. 2021) (finding requests targeted at uncovering

"the subjective motivations" of a challenged law's "lead sponsors" were "highly

relevant" to discriminatory intent claims).

Lawmakers claim that these lawsuits and these subpoenas are politically

motivated because Plaintiffs subpoenaed only Republican Lawmakers.  Lawmaker

Br. 1-2.  However, Republican Lawmakers ran the legislative process that led to SB

202, no Democratic state legislator voted in favor of SB 202, and Democratic

legislators were often excluded from the actual drafting of the 2021 election bills.

*See, e.g.*, Georgia State Senate, *Senate Committee on Ethics-3/1/21*,Vimeo, at 24:28

(April 29, 2021), https://vimeo.com/showcase/gasenethics?page=2, (noting that Senator Dugan had not provided a copy of the bill for the committee to review over the weekend).  Thus, Plaintiffs directed subpoenas to the legislative leadership who could most likely provide evidence of the intent of the legislature that passed SB 202—Republican members of the Special Committee on Election Integrity and Senate Ethics Committee, proponents of SB 202, Republican General Assembly leadership, and current or former members directly involved in the December 2020 voter fraud hearings that provided the momentum for the 2021 election bills.

Finally, the examples of alleged burden that Lawmakers raise, *see* Lawmakers' Br. 32-34, ignore the fact that Plaintiffs have worked with and will continue to work with counsel for Lawmakers to narrow search terms, remove domain names that are unlikely to produce relevant evidence, and allow for rolling productions on a mutually agreed upon schedule.  Even in this Motion, Plaintiffs have not sought all the documents on the Lawmakers' privilege log, but rather narrowed the scope by seeking only documents that are likely to provide relevant evidence and that Plaintiffs have not obtained through other discovery or investigation in this litigation.  In sum, Plaintiffs' requests are highly relevant to their intentional discrimination claims and proportional to the needs of this case despite imposing some burden on Lawmakers.

B.     State Legislative Privilege is a Qualified Privilege, not an Absolute
       Privilege, in Civil Litigation

State legislative privilege is a narrow, qualified privilege that, when it applies,

affords state legislators a limited evidentiary privilege governed by federal common

law, as applied through Rule 501 of the Federal Rules of Evidence ("FRE").  As with

all privileges under FRE 501, state legislative privilege is strictly construed, *see*

*Trammel v. United States*, 445 U.S. 40, 50 (1980), and applies to communications

among legislators or between legislators and their staff that contain opinions,

motives, recommendations, or advice about legislative decisions, *see Jackson Mun.*

*Airport Auth. v. Bryant*, No. 3:16-cv-246, 2017 WL 6520967, at *7 (S.D. Miss. Dec.

19, 2017).   Unlike the legislative privilege afforded to members of Congress under

the Speech or Debate Clause of the U.S. Constitution, state legislative privilege is not

absolute—it yields in the face of countervailing federal interests.  *Id.*  Lawmakers err

in (1) at times conflating the purposes and scopes of state legislative privilege and the

federal legislative privilege available to members of Congress, (2) misconstruing

*United States v. Gillock*, 445 U.S. 360 (1980), which confirmed the state legislative

privilege's narrow contours and qualified nature, (3) drawing broad parameters on the

state legislative privilege by relying on or analogizing to the separate doctrine of

legislative immunity, and (4) reading *In re Hubbard* beyond the narrow holding in

that case.  These legal errors lead to a far overbroad assertion of legislative privilege

14

here—with Lawmakers arguing it is absolute in civil cases—that is unsupported by law.  *See* Lawmakers' Br. 20.

> i.   *The Breadth of State Legislative Privilege is Narrower than the Protections under the Federal Speech or Debate Clause*

The Lawmakers conflate the state legislative privilege with the broader legislative privilege available to members of Congress under the Constitution's Speech or Debate Clause.  Lawmakers' Br. 10-11.  The Speech or Debate Clause provides that "for any Speech or Debate in either House" of Congress, Senators and Representatives "shall not be questioned in any other place."  U.S. Const. art. I, § 6, cl. 1.  The Supreme Court held in *Gillock* that the Speech or Debate clause "by its terms is confined to federal legislators."  445 U.S. at 374.

State legislative privilege is narrower, because the general purposes of federal legislative privilege do not all apply to state legislators.  *Gillock*, 445 U.S. at 369. The *Gillock* Court held that based on the American experience, the Speech or Debate Clause has two interrelated rationales: (1) separation of powers—avoiding the intrusion of co-equal branches of the federal government into legislative affairs, and (2) protecting legislative independence.  *Id.* at 369.  The Court concluded that only the second of those rationales applies to state legislative privilege where plaintiffs seek to enforce a federal right.  *Id.* at 370.  The Court held that the first rationale does not apply to state legislative privilege because "in those areas where the Constitution

grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." [7]  *Id.*

Therefore, the only purpose for state legislative privilege recognized by the Supreme Court is protecting the independence of the legislature, which can be overcome "where important federal interests are at stake."  *Id.* at 373.  The Court noted that denying state legislators the same breadth of the privilege as federal legislators would have some impact on the exercise of state legislators' function, but it found that an unpersuasive reason to broaden the reach of state legislative privilege. *Id.* at 373.  Thus, state legislative privilege's protections remain narrower than the protections afforded to federal legislators.

      ii.    *Gillock's Holding that Important Federal Interests Overcome State Legislative Privilege is Not Limited to Federal Criminal Law*

In *Gillock*, the Supreme Court held that the state legislative privilege "yield[s]" where "important federal interests are at stake."  445 U.S. at 373.  The fact that *Gillock* involved "enforcement of federal criminal statutes" does not suggest that the privilege is qualified only in federal prosecutions, as the Lawmakers suggest.  Quite the opposite.  *See id.* (holding that "comity must yield" "[w]here important federal

---

[7]  As described in below, the federal rights protected by the Fourteenth and Fifteenth Amendments and statutes like the VRA that enforce those Amendments are exactly the types of important federal interests that *Gillock* refers to here.  *See supra* III.F.

interests are at stake, *as in* the enforcement of federal criminal statutes" (emphasis added)); *cf., e.g., Borden v. United States*, 141 S. Ct. 1817, 1826 (2021) (using "[a]s in" to denote an example).  In *Gillock*, the Court held that the federal structure of our government is the reason why important federal interests can overcome state legislative privilege.  *See infra* III.B.i.  The Court's reasoning applies equally to federal cases brought to enforce federal civil rights statutes that, like the VRA, were specifically designed to restrain state action.  *See, e.g.*,  *LULAC v. Guillen*, No. 22-50407, 2022 WL 2713263 (5th Cir. May 20, 2022) (holding in a federal redistricting case brought by the United States and private parties that state legislative privilege must not be used as a "cudgel to prevent discovery . . . where the federal interests at stake outweigh the interests protected by the privilege"), *stay denied Guillen v. LULAC*, No. 21A756, 142 S. Ct. 2773 (2022); *Lee*, 340 F.R.D. at 456 ("[S]ome civil cases implicate federal interests that are at least as important—if not more important—than the enforcement of federal criminal statutes, where the privilege undoubtedly gives way.").  Nothing in *Gillock*'s language or reasoning supports the Lawmakers' position that the only federal interest that overcomes state legislative privilege is federal enforcement of criminal law.

> iii.    *State Legislative Immunity Is Much Broader Than State Legislative Privilege and Is Not Applicable to the Issues Present Here*

Lawmakers support their extraordinarily overbroad assertions by conflating

17

state legislative privilege with state legislative immunity.  *See* Lawmakers' Br. 20-21.[8]  Legislative immunity affords state legislators immunity from civil liability and is relevant only where a legislator may be a party to litigation and thus subject to liability.  *See* Lawmakers' Br. at 8.  By contrast, state legislative privilege is a qualified evidentiary privilege that can be asserted regardless of whether the legislators themselves faces any liability.  *See In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015) (addressing claims of legislative privilege by non-party lawmakers).  Lawmakers do not cite a single state legislative privilege case to support their argument that the Eleventh Circuit treats state legislative privilege as absolute.

Although cases in these two contexts employ similar language,[9] there is a strong basis for distinguishing between the two doctrines' reach.  Fear of civil liability could severely hamper legislators' ability to act in the best interest of their constituents, but producing relevant evidence or sitting for a deposition does not have

---

[8]  As noted by Lawmakers' own parentheticals and descriptions, each of the cases cited on these pages are state legislative immunity cases (not legislative privilege).  Following those citations, Lawmakers summarily conclude that the "Supreme Court and the Eleventh Circuit Court of Appeals have held the line on absolute legislative privilege for state legislators in civil cases," without citation.  Lawmakers' Br. 22.

[9]  *Tenney v. Brandhove* is a legislative immunity case, despite references to "legislative privilege."  341 U.S. 367, 372 (1951) (discussing the rights of state legislators to be free from arrest or civil liability for what they say in legislative proceedings).

nearly the same coercive effect, and thus does not intrude on the independence of the legislature to nearly the same extent. *See id.* "[T]here is little to no threat to the public good of legislative independence when a legislator is not threatened with individual liability." *Bethune-Hill v. Virginia State Bd. of Elections*, <u>114 F. Supp. 3d 323, 335</u> (E.D. Va. 2015) (internal quotation marks omitted). Because the deterrent effect of civil liability is much stronger than that of mere participation in discovery, Lawmakers' reliance on the legislative immunity cases is misplaced. *See* Lawmakers' Br. at 20-21.

### iv. *In re Hubbard Does Not Support Lawmakers' Extraordinarily Broad Assertion of State Legislative Privilege*

No court of appeals has adopted Lawmakers' sweeping interpretation of the state legislative privilege as invariably applying in all civil litigation, no matter how much its application would frustrate enforcement of federal law. In support of their breathtaking view of the state legislative privilege, Lawmakers rely heavily on *In re Hubbard*'s acknowledgement that there are differences between federal criminal prosecutions and private civil suits, to argue that state legislative privilege applies absolutely to civil actions. Lawmakers' B<u>r. 17</u>. But the fact that federal interests in those two contexts are *different* does not mean that enforcement of federal civil law can *never* overcome privilege. Nor does *In re Hubbard*'s holding support that premise. To the contrary, *In re Hubbard* acknowledged that state legislative privilege

is qualified and must yield to important federal interests. 803 F.3d at 1311. The court held that the privilege should not yield in that case because plaintiffs' First Amendment claim failed as a matter of law and therefore could not "legitimately further an important federal interest." *Id.* at 1312; *see also id.* at 1313 (discussing *United States v. O'Brien*, 391 U.S. 367 (1968)). In other words, because discovery could not make a difference in the case, there was no basis for piercing the legislative privilege. *Id.* at 1312.

The court also emphasized that "[a]n official federal investigation into potential abuses of federal rights," like the United States' case here, is a "far cry from a private lawsuit attacking a facially valid state statute by attempting to discover the subjective motivations of some of the legislative leaders and the governor who supported it." [10] *Id.* at 1309 n.10. To underscore the limited breadth of its holding, the court added that "[o]ur decision should not be read as deciding whether, and to what extent, the legislative privilege would apply to a subpoena in a private civil action based on a different kind of constitutional claim than the one . . . made here." *Id.* at 1312 n.13.

---

[10]   Courts have also found that the importance of voting rights cases is not diminished when private parties, rather than the government, bring such litigation. Indeed, such cases "seek to vindicate public rights" and are therefore "akin to criminal prosecutions." *Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, 2011 WL 4837508, at *6 (N.D. Ill. Oct. 12, 2011), at *6; *id.* at *8 (concluding that the litigation's seriousness favored disclosure).

Yet the Lawmakers attempt to read the case to do just that.  Courts outside of the

Eleventh Circuit similarly acknowledge that the state legislative privilege sometimes

must yield in civil litigation.  *See, e.g.*, *Jefferson Cmty. Health Care Centers, Inc. v.*

*Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (holding that legislative

privilege "must be strictly construed and accepted only to the very limited extent that

permitting a refusal to testify or excluding relevant evidence has a public good

transcending the normally predominant principle of utilizing all rational means for

ascertaining the truth") (*quoting Perez v. Perry*, 2014 WL 106927, at *1 (W.D. TX

Jan. 8, 2014)).

C.    State Legislative Privilege is Limited in Scope and Does Not Cover
      Factual Information or Third-Party Communications

Setting aside the fact that the privilege here should be overcome, *see infra*

III.F, certain of the requested documents are not privileged in the first place.

Lawmakers must produce communications with third parties, because those

communications fall outside the bounds of state legislative privilege.  The state

legislative privilege covers communications that contain or involve "opinions,

motives, recommendations, or advice about legislative decisions between legislators

or between legislators and their staff." *Jackson Mun. Airport Auth.*, 2017 WL

6520967 at *7 (citations omitted).

Although the Eleventh Circuit has not specifically addressed the issue of

whether legislative privilege applies to communications that include third parties, *see Greater Birmingham Ministries v. Merrill,* No. 2:15-cv-02193-LSC, 2017 U.S. Dist. LEXIS 233149, at *29 (N.D. Ala. Mar. 13, 2017), many courts have held that legislative privilege does not apply to communications with third parties outside the legislature.  *See, e.g., Lee v. Virginia State Bd. of Elections,* 2015 WL 9461505, at *7 (E.D. Va. Dec. 23, 2015); *N.C. State Conf. of NAACP v. McCrory,* 2015 WL 12683665, at *7 (M.D.N.C. Feb. 4, 2015) (overruling objections to a magistrate judge's report and recommendation that ordered production of all communications between legislators and third parties, including constituents); *Perez v. Perry,* 2014 WL 106927, at *2 (holding that legislators and their staff waive legislative privilege when they communicate with any outsider)*; Comm. for a Fair & Balanced Map*, 2011 WL 4837508 at *10 (holding that legislative privilege does not apply to communications between legislators and outsiders to the legislative process, like lobbyists); *ACORN v. Cnty. of Nassau*, 2007 WL 2815810, at *6 (E.D.N.Y. Sept. 25, 2007) ("While legislators are certainly free to seek information from outside sources, they may not assume that every such contact is forever shielded.").  This follows from *Gillock's* reasoning, which explained that the privilege should apply to protect the independence of the state legislature by protecting candor in *internal* exchanges. *Gillock*, 445 U.S. at 373 (reasoning by analogy to the executive privilege).

      Lawmakers' extraordinarily broad assertion of privilege exceeds the purpose of

state legislative privilege.  *See* Lawmakers' Br. 20.  Lawmakers claim that any communication made as part of a legitimate legislative activity—regardless of the non-legislator who is party to these communications—are protected from disclosure, including communications with constituents, state executive agencies, and political parties.  *See* Lawmakers' Br. 25-26; Ex. A.  However, common-law privileges should apply only to the extent that permitting a refusal to provide evidence has a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."  *Trammel*, 445 U.S. at 50.  Lawmakers argue that keeping these communications privileged ensures the independence of the legislature and prevents the distraction of legislators, *see* Lawmakers' Br. 26-27, but do not explain why those rationales represent a public good that should prevent Plaintiffs from using traditional discovery tools to ascertain the facts necessary for in this litigation.  Certainly, the time spent on complying with a subpoena is a consideration, but that rationale is minimal for the emails in Exhibit A, because these documents have been reviewed and identified on a privilege log.  *Bethune-Hill*, 114 F. Supp. 3d at 338.

The purpose of state legislative privilege is also not achieved by shielding the factual information that was available to legislators during the legislative process.  *See, e.g.*, *See LULAC v. Abbott*, 2022 WL 2921793, at *3 ("Nor does legislative privilege shield the almost 700 documents listed in the index containing factually based information used in the decision-making process or disseminated to legislators

or committees." (internal quotation marks and citation omitted)); *Lee*, <u>340 F.R.D. at 458</u> (limiting privileged documents to those containing opinions, recommendation, or advice, and allowing production of documents containing factually-based information used in the decision-making process or disseminated to legislators or committees); *League of Women Voters of Michigan v. Johnson*, <u>2018 WL 2335805</u>, at *6 (E.D. Mich. May 23, 2018) ("Fact-based documents and communications are not protected by legislative privilege.").  Neither the candor of internal exchanges nor the non-distraction interest is served by excluding factual information from discovery.

Alternatively, even if this Court does not find that third party communications are *per se* outside of the legislative privilege, it should resolve the issue through the balancing of interests under the qualified privilege analysis below.  *See supra* III. F; *see also Bethune-Hill*, <u>114 F. Supp. 3d at 339</u> (analyzing whether communications with third parties should be disclosed by applying the qualified state legislative balancing analysis rather than with any kind of "per se" rule.).

D.   <u>Legislative Privilege Does Not Bar Depositions of Lawmakers</u>

Legislative privilege is not an absolute evidentiary privilege and does not foreclose deposing Lawmakers altogether.[11]  *See Benisek v. Lamone*, <u>241 F. Supp. 3d</u>

---

[11]   Legislators can also waive legislative privilege for certain topics or communications by, among others, making public statements about ostensibly privileged topics.  In this briefing, Plaintiffs will not raise individual issues of waiver, but may pursue those at depositions.  *Cf. Singleton v. Merrill*, <u>2021 WL 5979516</u>, *6

566, 572 (D. Md. 2017) (finding that legislative privilege did not preclude depositions of legislators and that legislative privilege was overcome as to legislator-to-legislator and legislator-to-staff communications regarding redistricting).  The mere possibility that a deposition may "wander into impermissible terrain is not sufficient reason to halt [an otherwise] permissible inquiry."  *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 183 (4th Cir. 2011); *see also Fla. Ass'n of Rehabilitation Facilities, Inc. v. Florida*, 164 F.R.D. 257, 268 (N.D. Fla. 1995) (permitting depositions while noting narrow issues that may be privileged); *LULAC v. Abbott*, 2022 WL 1410729, *7 (W.D. Tex. May 4, 2022).  Lawmakers' Motion—which comes before any Lawmaker has appeared for a deposition, been asked any questions, or made any assertion of legislative privilege in response to a particular question—is decidedly premature.

Contrary to Lawmakers' argument, *see* Lawmakers' Br. 24, many of the deposition topics identified by Plaintiffs do not implicate legislative privilege, such as "public statements made by deponents regarding S.B. 202," and factual information deponents "reviewed about voting patterns/election patterns in recent elections in Georgia," *see* Lawmakers' Br. Ex. B (Ltr. to Alex Khoury).  *See supra* III.C.; *League*

_____

(N.D. Ala. 2021) ("Although the Supreme Court has not directly decided the question whether legislative immunity can be waived in a civil action, federal jurisprudence reflects no doubt that it can.").

*of Women Voters of Michigan*, 2018 WL 2335805, at *6.  The bases and

considerations behind these public statements cannot be obtained from other sources,

are highly relevant circumstantial evidence of intentional discrimination under

*Arlington Heights*, *see* 429 U.S. at 266-68; *supra* III.A, and do not constitute

protected legislative activity.

 While the evidence obtained pursuant to the *Arlington Heights* framework can

be used to infer improper legislative purpose, such evidence does not necessarily

probe individual Lawmakers' personal motivations or mental impressions such that it

would implicate the narrow state legislative privilege.  For example, deposition

questions probing typical legislative procedure and/or SB 202's particular procedural

history—like questions about when the bill and substitute versions of the bill were

made available to the public—could reveal "departures from the normal procedural

sequence," *Arlington Heights*, 429 U.S. at 267, without delving into individual

lawmakers' subjective motivations.  Similarly, questions regarding the absentee

voting and driver's license data available to state Lawmakers may reveal SB 202's

"substantive departures" from the factors that normally guide Lawmakers' decisions,

*id.*, without treading on legislative privilege.  Lawmakers here are seeking to create

an end-run around obtaining any evidence from legislators that would be probative

under the *Arlington Heights* framework.[12]

Because many of the questions that Plaintiffs will pose in depositions do not fall under state legislative privilege, the only concern that could support quashing the depositions in full is the interest in avoiding distraction. *Bethune-Hill*, 114 F. Supp. 3d at 335. That interest alone does not justify barring depositions. Plaintiffs can work with Lawmakers to find a mutually agreeable date and time for depositions. Plaintiffs also ask this Court to put in place a procedure for managing legislative privilege disputes as they arise in the depositions that would allow Lawmakers to assert their claims of legislative privilege and answer such questions under a protective order, and allow Plaintiffs to move to compel that testimony if they believe the testimony does not fall within the breadth of state legislative privilege. *See infra* IV. This procedure will protect the Lawmakers' interests while allowing depositions to go forward.

    E.    <u>The Lieutenant Governor Cannot Assert Legislative Privilege for All of His Communications</u>

The Lieutenant Governor has not carried his burden in demonstrating that his

---

[12] Lawmakers also cite to *Arlington Heights* to support their claim that depositions should be fully barred; however, in that case, lawmakers were deposed and the dispute focused on whether the district court had abused its discretion in barring specific questions of legislators who testified during trial under "the circumstances of [that] case." 429 U.S. at 270 n. 20; *id.* at 268.

responsive documents are privileged, because he has not shown how the communications are related to the performance of his "official legislative duties." *See* Ex. B (Responses to Request No. 1-14, 16-21).  The Eleventh Circuit has not directly addressed the extent to which the Lieutenant Governor can assert legislative privilege but has made clear that the privilege applies to only "those acting in a legislative capacity." *See In re Hubbard*, 803 F.3d at 1311; *La Union Del Pueblo Entero v. Abbott* ("LUPE"), 2022 WL 1667687, at *5-6 (W.D. Tex. May 25, 2022) (finding legislative privilege does not apply to activities outside the Lieutenant Governor's "enumerated legislative functions") (*stayed by consent*, Order, *LUPE*, No. 5:21-cv-844 (W.D. Tex. May 31, 2022).  The Lieutenant Governor's claims lack merit because he has not explained how his withheld documents or any of the deposition topics relate to actions taken in his legislative function.  Because "[t]he privilege protects the legislative process itself," it "covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation."  *In re Hubbard*, 803 F.3d at 1308.  But communications of the Lieutenant Governor, who does not cast legislative votes or enact or sign legislation, are "not meaningfully different" from "communications between legislators and constituents, lobbyists, or think-tanks," which are not privileged. *LUPE*, 2022 WL 1667687, at *5 (*citing Gilby*, 471 F. Supp. 3d at 768).

    Simply because Plaintiffs' requests are about SB 202 does not mean that the

Lieutenant Governor's actions necessarily stem from his legislative function.  *Contra* Lawmakers' Br. 28-29.  The Lieutenant Governor may try to steer the legislative process as part of his role as a party leader, but his communications with legislators to facilitate those activities are not privileged.[13]  *LUPE*, 2022 WL 1667687, at *5-6.

F.   Even if Legislative Privilege Applies, It Should be Overcome For Third-Party Documents and Lawmaker Depositions[14]

VRA and constitutional claims are the types of federal civil interests that overcome qualified state legislative privilege.  This case, which includes a VRA intentional discrimination claim brought by the United States, is an example of when the "recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government . . . with only speculative benefit to the state legislative process."  *S.C. State Conf. of NAACP v.*

---

[13]  While the Lieutenant Governor can preside as the President of the Senate, *Ga. Cons.* art. V, § 1, ¶ III, and in that role serves as a member of several committees, these committees do not consider, debate, or vote on bills.  *See* Ga. Senate Rules 2-1.1, 2-1.3(a), 2-1.4 (Committee on Assignments); *id.* Rule 2-1.2 (Committee on Administrative Affairs); *see* O.C.G.A. §§ 28-4-1(a); 28-3-24 (Legislative Services Committee).  The Lieutenant Governor also assigns bills to committees, Ga. Senate Rule 4-2.5, and determines whether certain late bills will be considered based on fiscal impact, O.C.G.A. § 28-5-42, but he lacks authority to vote on *any* legislation, even in the event of a tie.  *See* GA Senate Rule 1-1.3.

[14]  Plaintiffs believe these arguments also apply to legislator-to-legislator communications.  For purposes of this motion, Plaintiffs focus on third party communications because, by agreement, the privilege log provided by Lawmakers thus far does not cover legislator-to-legislator documents.

*Alexander*, 2022 WL 2452319 at *4 (finding that the privilege was overcome and legislators were required to sit for depositions).  The Supreme Court has long recognized that the Fourteenth and Fifteenth Amendments "are to a degree restrictions of State power."  *Ex parte Virginia*, 100 U.S. 339, 346 (1879). Accordingly, acting on these Amendments, Congress is empowered to intrude "into legislative spheres of autonomy previously reserved to the States."  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976).  When Congress exercises this power, as it did in enacting Section 2 of the VRA, "a State cannot deny to the [federal] government the right to exercise all its granted powers, though they may interfere with the full enjoyment of rights she would have if those powers had not been thus granted."  *Id.*

To determine whether a federal claim overcomes state legislative privilege, courts "balance the extent to which production of the information sought would chill the . . .  Legislature's deliberations" against (1) the relevance of the evidence sought, (2) the availability of other suitable evidence, (3) the "seriousness" of the litigation and the issues involved, and (4) the role and interests of the government.  *See Rodriguez v. Pataki*, 280 F.Supp.2d 89101 (S.D.N.Y 2003); *see also Lee*, 340 F.R.D. at 456-57 (applying the *Rodriguez* test for overcoming legislative privilege in a vote denial case brought under the VRA).  Here, the factors weigh in favor of disclosure of third-party documents and allowing Lawmaker depositions.

### i.     All the Evidence Sought Is Relevant to the Plaintiffs' Claims

The documents sought here are highly relevant to Plaintiffs' discriminatory purpose claims.  *See Lee*, 340 F.R.D. at 457.  Courts that have evaluated this criterion look at whether the evidence sought is relevant under the broad understanding of relevance applied in the Federal Rules of Civil Procedure.  *See NAACP v. McCrory*, 2014 WL 12526799, *2 (M.D.N.C. Nov. 20, 2014).  As discussed in more depth above, Plaintiffs seek direct and circumstantial evidence of discriminatory purpose under the *Arlington Heights* framework.  *See supra* III.A.

### ii.     Plaintiffs Cannot Obtain the Same Evidence From Other Sources

The unique evidence of intentional discrimination sought through this discovery will be largely unavailable from other sources.  Lawmakers are unlikely to declare their intention to discriminate in public documents or open meetings—the only materials the Lawmakers have turned over to this point.  *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999) ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.").

Despite this, Plaintiffs continue to seek evidence from Defendants, as well as other third parties.  *See Bethune-Hill*, 114 F. Supp. 3d at 341 ("In other words, the availability of alternate evidence will only supplement—not supplant—the evidence sought by the Plaintiffs").  Thus far, Plaintiffs have obtained from other sources— including local county election officials, the State Defendants, and the Georgia

31

GOP—approximately 40 documents that appear on the Lawmakers' privilege log, out of about 500 logged entries all involving communications with outside third parties. Plaintiffs have made significant efforts to obtain these documents from Defendants and non-parties, but are still well short of all those included in Exhibit A.  Equally important, those limited already-obtained documents "may provide only part of the story." *Favors v. Cuomo*, 285 F.R.D. 187, 219 (E.D.N.Y. 2012).  Information from different sources may reveal inconsistencies and/or augment information, revealing true rather than pretextual rationales for SB 202.

Lawmakers' reliance on the district court's decision to quash certain deposition subpoenas in *Lee*, Lawmakers' Br. 24, is distinguishable, because in that case the legislators had largely already agreed to turn over legislative documents and the court quashed the deposition subpoenas as duplicative, considering the breadth of the legislators' document production.  *Lee*, 340 F.R.D. at 457- 458.  Such is not the case here.  The materials that Lawmakers have turned over in this case are almost all publicly available records.  Unlike the legislators in *Lee*, the Lawmakers here have not largely complied with the document subpoenas.  *Id.*

       iii.    *This Voting Rights Litigation Is Especially Serious and Has at Its Core Claims of Intentional Discrimination*

Voting rights litigation is "especially serious," so the third factor also weighs in favor of disclosure.  *Lee,* 340 F.R.D. at 457.  Given the significance of the right to

vote, courts weighing this factor in voting rights cases routinely find such matters sufficiently "serious" to compel discovery from lawmakers. *See, e.g., Benisek v. Lamone*, 263 F. Supp. 3d 551, 555 (D. Md) *aff'd*, 241 F. Supp. 3d 566 (D. Md. 2017) (three-judge court); *Bethune-Hill*, 114 F. Supp. 3d at 341 (stating of voting rights cases that "there is no more foundational right than meaningful representation" and that "[t]his factor weighs heavily in favor of disclosure"); *see also supra* III. F.

iv.   *The Government's Role Weighs in Favor of Disclosure*

Courts have two different methods of examining this factor—and both methods weigh in favor of disclosure: some courts consider the federal government's involvement in the enforcement action, while others consider whether the legislature played a central role in the challenged action.  Here, the role of the federal government is clear: the consolidated cases include a VRA enforcement action filed by the United States against Georgia. *See LULAC v. Abbott*, No. 3:21-cv-259, 2022 WL 2921793, at *4-5 (W.D. Tex. July 25, 2022), *administratively stayed*, No. 22-50662 (5th Cir. July 27, 2022); *S.C. State Conf. of NAACP v. McMaster*, 584 F. Supp. 3d 152, 165 (D.S.C. 2022).  The centrality of the legislature's decision-making in intentional discrimination cases also weighs in favor of overcoming the privilege. *See Bethune-Hill*, 114 F. Supp 3d at 341; *Veasey*, 2014 WL 1340077 at *2.

> v.   *Neither Disclosing Communications with Third Parties Nor Sitting for Depositions Chills the Internal Candor that State Legislative Privilege Was Intended to Protect*

Because of the specific evidence at issue here, disclosure is unlikely to chill Georgia legislators' communication with other legislators.  As noted above, Plaintiffs' seek Lawmakers' communications with third parties outside the legislature, and the deposition topics cover Lawmakers' public statements, facts about legislative procedure, and underlying data.  Therefore, the fifth factor, which seeks to protect the purpose of the legislative privilege, also weighs in favor of disclosure here.  Any theoretical "chill" is modest, especially compared to the importance of the evidence in this serious litigation.

The *Rodriguez* factors weigh strongly in favor of disclosure of all communications with third parties, including those listed in Exhibit A, and requiring Lawmakers to participate in depositions.

## IV.   REMEDY

The Plaintiffs ask this Court to order Lawmakers to produce all communications with third parties, including the documents on Exhibit A.  Should the Court need more information about particular documents on Exhibit A, the Court could conduct an *in camera* review of those documents or request additional detail.

In addition, the Court should deny Lawmakers' Motion to Quash Depositions. Plaintiffs ask this Court to put into place a procedure to handle assertions of

legislative privilege as they arise in the depositions.  Recently, the Fifth Circuit and the Supreme Court declined to stay a Texas three-judge district court's order that allowed plaintiffs in a federal voting rights case to take depositions of state legislators under specialized procedures, such that legislators assert claims of legislative privilege at the depositions but still answer the questions posed, and then have deposition transcripts sealed under a protective order.  *LULAC,* 2022 WL 2713263 at *1.[15]  The plaintiffs then could move under seal to unseal portions of the transcript that they believe were not privileged, and the parties could brief the privilege issues raised.  Plaintiffs believe a similar procedure would facilitate depositions here.

## V.     CONCLUSION

For the reasons described above, the Court should grant the Plaintiffs' Motion to Compel, and deny the Lawmakers' Motion to Quash.

---

[15] The district court found that the dispute was not yet ripe because specific questions had not yet been asked and specific assertions of privilege not yet raised.  *LULAC v. Abbott,* 2022 WL 1570858, at *1 (W.D. Tex. May 18, 2022).

Respectfully submitted this 19th day of October, 2022.

ELISE C. BODDIE
Principal Deputy Assistant Attorney
General

*Attorneys for Plaintiff the United
States of America*

/s/ Sejal Jhaveri
T. Christian Herren, Jr.
John A. Russ IV
Jasmyn G. Richardson
Rachel R. Evans
Ernest A. McFarland
Maura Eileen O'Connor
Elizabeth M. Ryan
Sejal Jhaveri
Attorneys, Voting Section
Civil Rights Division
U.S. DEPARTMENT OF JUSTICE
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
john.russ@usdoj.gov
sejal.jhaveri@usdoj.gov

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

/s/ Aileen Bell Hughes
Aileen Bell Hughes
Georgia Bar No. 375505
Assistant U.S. Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN
SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
Vilia Hayes*
Neil Oxford*
Gregory Farrell*
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Admitted pro hac vice*

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek*

*/s/ Rahul Garabadu*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
drosborough@aclu.org
Jonathan Topaz (pro hac vice)
*jtopaz@aclu.org*
Dale E. Ho (pro hac vice)
*dho@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*

ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP

60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Sixth District
of the African Methodist Episcopal
Church, Delta Sigma Theta Sorority,
Georgia ADAPT, Georgia Advocacy
Office, and Southern Christian
Leadership Conference*

*/s/ Pichaya Poy Winichakul*
Bradley E. Heard (Bar 342209)
*bradley.heard@splcenter.org*
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
Nancy G. Abudu (Bar 001471)
*nancy.abudu@splcenter.org*

SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

*/s/ Adam Sieff*
Adam S. Sieff (pro hac vice)
*adamsieff@dwt.com*
Daniel Leigh (pro hac vice pending)
*danielleigh@dwt.com*
Brittni Hamilton (pro hac vice)
*brittnihamilton@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski (pro hac vice)
*mjedreski@dwt.com*
Grace Thompson (pro hac vice)
*gracethompson@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett (pro hac vice)
*davidgossett@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, and The Arc of the United States*

/s/ Uzoma N. Nkwonta
Uzoma N. Nkwonta*
Jacob D. Shelly*
Jyoti Jasrasaria*
Tina Meng*
Marcos Mocine-McQueen*
Spencer Klein*
ELIAS LAW GROUP LLP
10 G St. NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
jjasrasaria@elias.law
tmeng@elias.law
mmcqueen@elias.law
sklein@elias.law

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlwafirm.com

sparks@khlawfirm.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs The New Georgia Project, Black Voters Matter Fund, Rise, Inc., Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin*

/s/ Meredyth L. Yoon
Meredyth L. Yoon (GA Bar No. 204566)
Laura Murchie*
ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)

myoon@advancingjustice-atlanta.org
lmurchie@advancingjustice-atlanta.org

/s/ Eileen Ma
Eileen Ma*
Kimberly Leung*
ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111

415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*
*kimberlyl@advancingjustice-alc.org*


*/s/ Niyati Shah*
Niyati Shah*
Terry Ao Minnis*º
ASIAN AMERICANS ADVANCING
JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

*/s/ R. Adam Lauridsen*
Leo L. Lam*
R. Adam Lauridsen*
Connie P. Sung*
Candice Mai Khanh Nguyen*
Luis G. Hoyos*
Rylee Kercher Olm*
Emily Hasselberg*
KEKER, VAN NEST AND PETERS
LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400  (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*
*lhoyos@keker.com*
*rolm@keker.com*

*ehasselberg@keker.com*

*\*Admitted pro hac vice*

*Attorneys for Plaintiffs Asian Americans Advancing Justice–Atlanta, Steven J. Paik, Deepum Patel, Nora Aquino, Thuy Hang Tran, Thao Tran, and Anjali Enjeti-Sydow*


*/s/ Kurt Kastorf*
Kurt Kastorf  (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: 404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Miriam Nemeth*
Angela Groves*
Marques Banks*
Jess Unger*
Mahroh Jahangiri*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
Jbrowne@advancementproject.org
Mnemeth@advancementproject.org
Agroves@advancementproject.org
Mbanks@advancementproject.org
Junger@advancementproject.org
Mjahangiri@advancementproject.org

Clifford J. Zatz*
Justin D. Kingsolver*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
CZatz@crowell.com
WTucker@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs The Concerned
Black Clergy of Metropolitan Atlanta,
Inc., The Justice Initiative, Inc.,
Samuel Dewitt Proctor Conference,
Inc., Mijente, Inc., Sankofa United
Church of Christ Limited,
Metropolitan Atlanta Baptist Ministers
Union, Inc., First Congregational
Church, United Church of Christ
Incorporated, Georgia Latino Alliance
for Human Rights, Inc., Faith in
Action Network, Greater Works
Ministries Network, Inc., Exousia
Lighthouse International C.M., Inc.*

## CERTIFCATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), I hereby certify that the foregoing brief has been

prepared in Time New Roman 14, a font and type selection approved by the Court in

L.R. 5.1(C).


*/s/ Sejal Jhaveri*
Sejal Jhaveri

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2022, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Sejal Jhaveri*
SEJAL JHAVERI
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
