## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

### NON-PARTY LAWMAKERS' REPLY IN SUPPORT
### OF THEIR MOTION TO QUASH AND RESPONSE TO
### PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

COME NOW, the non-party Lawmakers identified in their principal Brief in Support of Their Motion to Quash (hereinafter, "Lawmakers") and file this, their Reply in Support of Their Motion to Quash and Response to Plaintiffs' Motion to Compel Production of Documents, showing the Court as follows:

### I.     Introduction

On their face, the Lawmakers' Motion to Quash [Dkt. # 286] and Plaintiffs' Motion to Compel Documents [Dkt. # 303] are straightforward. Plaintiffs are seeking to discover privileged information, and the non-party Lawmakers are asserting their privilege in response to Plaintiffs' discovery efforts, in order to defend the sanctity and integrity of the legislative process, which they, in good faith, believe they have a duty to defend, and also to avoid the significant and undue burden imposed by Plaintiffs' subpoenas. The Lawmakers have otherwise complied with Plaintiffs' subpoenas by producing documents over which they do not claim

1

privilege.[1] The two sides disagree over the scope of the privilege, specifically as it relates to third-party communications and documents containing factual information. The Lawmakers have also moved to quash Plaintiffs' deposition subpoenas on the grounds that Plaintiffs are seeking information that is privileged or redundant to the information contained in the Lawmakers' document production.[2]

## II.    ARGUMENT

While the basic form of Plaintiffs' and the Lawmakers' dispute is not complicated, the substance of the dispute requires a determination of the nature and scope of legislative privilege, a privilege deeply rooted in our history and foundational to our representative democratic government. Legislative privilege is more than an evidentiary privilege. It is conjoined with legislative immunity, and together, these doctrines secure the independence of our elected representatives, freeing them to represent the people without fear of reprisal or coercion. Justice Story considered this bipartite privilege the highest of all privileges, "without which all other privileges would be comparatively unimportant or ineffectual." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

---

[1] The Lawmakers' production of documents to Plaintiffs is continuing.

[2] On November 1, 2022, Plaintiffs notified counsel for the Lawmakers that Plaintiffs are withdrawing their deposition subpoenas directed to Senator Randy Robertson and Senator Steve Gooch.

SGR/41392786.1

## A. Legislative Privilege and Immunity Are Coterminous and Therefore, the Privilege is Absolute in Civil Cases

Like its Constitutional counterpart, common law legislative immunity's twin aspects of evidentiary privilege and immunity are coterminous. If they were not, then common law legislative privilege would fail in its essential purpose, which is to shield legislators from interference with, or reprisal for, their legislative acts, because the potential threat civil litigation poses to legislative independence is the same whether it takes the form of liability or oppressive discovery. *See In re Hubbard*, 803 F.3d. 1298, 1310 (11th Cir. 2015); *Singleton v. Merrill*, 576 F. Supp. 3d 931, 938 (N. D. Ala. 2021); *Wash. Suburban Sanitary Com'n*, 631 F.3d 174, 181 (4th Cir. 2011); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C.Cir. 1988).

In federal civil law, common law legislative immunity is absolute. If legislative privilege and immunity are coterminous, then the privilege is also absolute in civil cases. Thus, Plaintiffs' argument for qualified privilege rises or falls on their argument that common law legislative privilege is different in nature and narrower in scope than legislative immunity.

The Supreme Court has never held or implied that the dual aspects of legislative privilege — immunity and evidentiary privilege — differ in nature or scope, which explains why the Court uses the terms interchangeably. Nor does the

SGR/41392786.1

Supreme Court's opinion in *United States v. Gillock*, 445 U.S. 360 (1980), signal an intent by the Court to distinguish between the scope of the evidentiary privilege vis-à-vis the immunity aspect of legislative privilege. Although *Gillock* involved a state legislator invoking the evidentiary privilege, the Court noted that "even a Congressman would not be immune" from the claims asserted against the state legislator for use of his office to commit a crime. 445 U.S. at 373, n.11. In other words, the Court did not believe the limitation on common law legislative privilege in federal criminal law to be any narrower than the legislative immunity applicable to Congressmen under the Speech or Debate Clause for those same criminal law claims.

The Court's opinion addresses only the evidentiary aspect of the privilege because that was the only question before the Court. The case still shows that both aspects of the privilege are coterminous in federal criminal law; not only was Senator Gillock indicted for crimes committed in office (no immunity), he was not allowed to exclude evidence of those crimes (no privilege).

In *Brown & Williamson Tobacco Corp. v. Williams*, the United States Court of Appeals for the District of Columbia considered and quickly dismissed the same argument Plaintiffs make here, *i.e.*, that legislative immunity is broader than the privilege. 62 F.3d 408, 418 (D.C. Cir. 1995). The appellant in that case argued that

4

the Speech or Debate Clause evidentiary privilege was "weaker" than the immunity arising from the Clause. *Id.* at 418. The court disagreed, stating that, "[Brown & Williamson] has it backwards" as the text of the Speech or Debate Clause demonstrates that the immunity from suit likely derives from the testimonial privilege, "not the other way around." *Id.*

The only argument Plaintiffs make to support their contention that the privilege aspect of legislative privilege should be regarded as narrower than immunity is that the fear of liability is more coercive than the burden of being forced to comply with discovery. Pls.' Br. at 15-16. Plaintiffs' argument ignores the reality of the burdens imposed by civil discovery on nonparties, especially in the era of electronically stored data. A nonparty ensnared in discovery lacks the ability to influence or narrow the litigation and is likely unable to be able to rely on insurance to subsidize the costs of such discovery. Plaintiffs' subpoenas seek all communications of any kind, including emails, text messages, calendar invitations, presentations, reports, and letters "regarding" or "relating to" S.B. 202 and the Other Election Bills and the individual topics addressed therein. Without exaggeration, Plaintiffs' subpoenas implicate nearly a half-a-million documents, even after their search terms have been applied. Such broad discovery targeted at non-party legislators, who are Georgia citizens with full-time jobs outside of their role as

legislators, is intimidating both in terms of invasiveness and expense. It is not reasonable to believe that legislators will feel free to tackle controversial issues when the threat of such discovery, which can be costlier than civil liability, hangs over their heads. To the contrary, the integrity of the legislative process is preserved by the immunity from questioning afforded by the privilege; questioning by an angry executive or hostile judiciary would allow for intimidation just as damaging to legislative independence as the threat of liability. *Tenney*, 341 U.S. at 377; *Pulte Home Corp. v. Montgomery Cty.*, 2017 U.S. Dist. LEXIS 82935 at *20 (2017) ("[D]iscovery procedures can prove just as intrusive" as being named as a party to a suit.") (quoting *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859, (D.C. Cir. 1988)). Such discovery, if allowed, would force the legislators to seriously consider whether to propose legislation, sit on certain committees, or take on a leadership role if doing so might subject them to such extensive discovery not only while serving as a legislator, but, as with former Senators Ligon and Heath in this case, for years after their service has ended.

The Supreme Court's interchangeable use of the terms "legislative privilege" and "legislative immunity" should not be attributed to the Court's carelessness, as Plaintiffs imply. *See* Pls.' Br. at 18, n. 9. The concepts are not distinct legal theories; they are two aspects of the same privilege that undergirds democratic representative

6

government by shielding legislators from coercion, whether by threat of liability or by invasive or expensive discovery. *See, e.g., Gravel*, 408 U.S. at 616 (expressing "no doubt" that legislative privilege protected the senator from being "made to answer-either in terms of questions or in terms of defending himself from prosecution").

### B.   Plaintiffs' Argument that Legislative Privilege is Qualified in Civil Cases is Flawed

Plaintiffs' brief is light on Supreme Court and Eleventh Circuit case law regarding legislative privilege because the law in those courts does not support Plaintiffs' argument either directly or implicitly. The Supreme Court has said that it intended common law legislative privilege to be "on a parity" with Constitutional legislative privilege. *United States v. Johnson*, 383 U.S. 169, 180 (1966) (discussing *Tenney*). It is by necessity that Plaintiffs rest their case on a line of non-controlling cases that deviate from this pronouncement.

Plaintiffs' arguments and the cases on which they rely share one or more of the following flaws: (1) they misread *Gillock* to hold that common law legislative privilege is qualified in civil cases; (2) they misread *Gillock* to bifurcate the conjoined aspects of immunity and evidentiary privilege that make up legislative privilege (discussed above); (3) they misread *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to authorize

7

discovery of legislatively privileged information; or (4) they fail to recognize and give meaning to the differences between legislative privilege and other evidentiary privileges arising in federal common law.

The Supreme Court, the Eleventh Circuit Court of Appeals, and this Court have held the line on absolute legislative privilege in civil cases, and the Court should decline Plaintiffs' invitation to erode legislative privilege in the Northern District of Georgia.

### 1. *Gillock* Does Not Hold that the Privilege is Qualified in Civil Cases

The Lawmakers have already discussed, and will not repeat here, the misreading of *Gillock* that is at the core of Plaintiffs' argument and of *all* of the cases upon which they rely. *See* Lawmaker's Br. at 13-18.

In response to the Lawmakers' argument concerning *Gillock*, Plaintiffs take some liberties with the *Gillock* opinion to avoid its solid footing in federal criminal law. For example, Plaintiffs argue that *Gillock* shows that the breadth of common law legislative privilege is narrower than Constitutional legislative privilege, but as the Seventh Circuit Court of Appeals has pointed out, that is "true only in criminal actions." *Reeder v. Madigan*, 780 F.3d 799, 805 (7th Cir. 2015). The Seventh Circuit's "true only in criminal actions" tag line is true for all of Plaintiffs' pronouncements about the holding in *Gillock*. The Court in *Gillock* did not consider

8

or address the scope or nature of legislative privilege in civil cases because those questions were not before it. If the Court had ruled as Plaintiffs suggest, those pronouncements would be dicta.

> 2. *Village of Arlington Heights* Does Not Hold That Plaintiffs Can Have Discovery of Legislatively Privileged Information

Plaintiffs rely on *Arlington Heights* to argue that the information they seek from the Lawmakers is relevant to legislative intent. Regardless of whether that is true, nothing in *Arlington Heights* supports setting aside legislative privilege to get this information from the Lawmakers. Quite the contrary, *Arlington Heights* enumerates a list of factors for courts to use to determine legislative intent *without* setting aside the privilege. *Vill. of Arlington Heights*, 429 U.S. at 266-68. Plaintiffs' argument that *Arlington Heights* justifies setting aside legislative privilege to seek evidence of alleged discriminatory intent has been soundly rejected. *See Dyas v. City of Fairhope*, 2009 WL 3151879, at *9 (S.D. Ala. Sept. 24, 2009).

> 3. Legislative Privilege is Not Like Other Evidentiary Privileges

It is a mistake to conceptualize legislative privilege as just another evidentiary privilege arising from federal common law. And yet, to advance their argument that legislative privilege is "a narrow, qualified privilege" that must be strictly construed, Plaintiffs cite *Trammel v. United States*, a spousal privilege case that modified the antiquated *Hawkins* privilege, which barred the testimony of one spouse against

9

another without consent of the other spouse. 445 U.S. 40, 46, 53 (1980). *Trammel* is inapposite to the present case because *Trammel* concerned only confidential relationship privileges,[3] which differ from legislative privilege in several fundamental ways that bear on this dispute. Thus, *Trammel*'s call for strict construction of confidential relationship privileges is not instructive for an analysis of legislative privilege, which the Supreme Court has long held should be broadly construed to effect its purpose. *Tenney v. Brandhove*, 341 U.S. 367, 374 (1951) (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)); *Kilbourn*, 103 U.S. at 203.

As discussed in *Trammel*, evidentiary privileges exist because the law recognizes that, in certain circumstances, withholding evidence can serve a "public good" that transcends the need for discovery in litigation. 445 U.S. at 50. The public good justifying the recognition of confidential relationship privileges is the benefit individuals derive from maintaining certain confidential, personal relationships. *See id.* at 51. In contrast, the public good that justifies recognition of legislative privilege is the American people's right to independent and effective representation by their elected representatives. *See Tenney*, 341 U.S. at 373-74; *Wash. Suburban Sanitary Com'n*, 631 F.3d at 181. Unlike confidential relationship privileges, the public good

---

[3] The evidentiary privileges discussed in *Trammel* are spousal privilege, attorney-client privilege, priest-penitent privilege, and physician-patient privilege. There is no mention of legislative privilege in *Trammel*. *See* 445 U.S. at 51.

served by legislative privilege does not depend on confidentiality (although confidentiality may further its purpose in some instances), nor is it narrowly focused on the personal advantages enjoyed by individuals in the maintenance of certain confidential relationships.[4]

Legislative privilege merits absolute deference in civil cases because the public good it exists to preserve is essential to the maintenance of a free, representative democracy. Whereas setting aside a confidential relationship privilege implicates the advantages one person enjoys from his or her confidential relationship, setting aside the privilege of a legislator deprives every member of the public their right to independent representation in the government.

In order to further the public good legislative privilege exists to serve, legislators must be free to represent their constituents in the legislative process without fear of being questioned for their actions by the executive or judiciary, regardless of whether their statements or actions are publicly known or made in

---

[4] Consider that most legislative sessions are open to the public and yet the public good served by legislative privilege is not diminished because legislators might not allow such open access without the protection of the privilege. If a client publicly broadcasts a consultation with his or her lawyer, the attorney-client privilege is waived because the public good served by maintaining the confidentiality of the consultation is no longer preserved by the privilege.

SGR/41392786.1

confidence.[5] Thus, legislative privilege is more correctly considered an evidentiary immunity than an evidentiary privilege of the type discussed in *Trammel*. *See Marylanders for Fair Representation*, 144 F.R.D. 292, 297, 301 (D. Mar. 1992).

### C.   The Scope of Legislative Privilege Can Include Third-Party Communications and Communications Containing Factual Information

To achieve its purpose, legislative privilege must necessarily include both factual information and communications with third parties when the information is obtained, or the communication had, as part of a legislator's legitimate legislative activity. *See Bruce v. Riddle*, 631 F.2d 272, 279-80 (4th Cir. 1980).

### 1.   Lawmakers' Communications With Third Parties That Are Part of the Legislative Process Are Privileged

Plaintiffs contend that the Eleventh Circuit has not directly addressed the application of legislative privilege to third-party communications, such as those shown on Exhibit A to Plaintiffs' brief. That is no longer correct. During the pendency of the Lawmakers' Motion to Quash, a three-judge panel of the Eleventh Circuit court of appeals unanimously affirmed this court's ruling in *In re Subpoena to Non-Party Lindsey O. Graham*, 2022 WL 13692834 (N.D. Ga. Sept. 1, 2022), which held that United States Senator Lindsey Graham could not be questioned

---

[5] To be clear, Lawmakers are not arguing that all of their statements or actions are subject to legislative privilege, only their legislative acts.

SGR/41392786.1

about his communications with Georgia's Secretary of State (a non-legislator, third-party) to the extent the communications were part of Senator Graham's legitimate legislative activity. 2022 WL 13692834, at *3 (aff'd 2022 U.S. App. LEXIS 29349 (11th Cir. 2022)). As the *Graham* case shows, the relevant question is not whether a legislator's communication is with a third party, it is whether the communication constitutes legitimate legislative activity.

Even before the Eleventh Circuit Court of Appeals settled the issue by affirming the *Graham* decision, other district courts within the Eleventh Circuit had weighed in on this issue and ruled consistently with the opinion in the *Graham* case. *See League of Women Voters of Fla. v. Lee*, 340 F.R.D. 446, 454 (2021) (third-party communications that are "part of the formulation of legislation" are privileged); *Thompson v. Merrill*, No. 2:16-cv-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) (holding communications with non-legislators is privileged if a part of the legislative process); *see also Dyas v. City of Fairhope*, 2009 WL 3151879, at *8 (S.D. Ala. Sept. 24, 2009). After *Graham*, Plaintiffs' argument that third party communications cannot be privileged is foreclosed.

The Court of Appeals' ruling in *Graham* correctly interprets legislative privilege broadly to effectuate its purpose, namely, to allow legislators to fulfil their legitimate legislative duties without interference from the executive or judicial

branch. The idea that legislators, especially state legislators who lack full-time staff,[6]

can fulfill their legislative duties without communicating with non-legislators

ignores the reality of legislation at all levels of our government. *See Almonte v. City*

*of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) ("Meeting with persons outside the

legislature" is "a routine and legitimate part of the modern-day legislative process.");

*Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) (observing that "[m]eeting with

'interest' groups, professional or amateur, regardless of their motivation, is a part and

parcel of the modern legislative procedures"). Legislators are not, and cannot be,

experts on every issue they confront in the legislative process, and their reliance on

third-parties to inform them regarding the laws they pass serves the public good.

> 2.     Factual information gathered as part of the legislative process is protected by legislative privilege

It is axiomatic that fact research and information-gathering, and the

communication of such, are part and parcel of the legislative process. Because

Legislators are not subject matter experts, legislative fact-finding and research *must*

"occur in the regular course of the legislative process." *Brewster*, 408 U.S. at 525.

---

[6] *See* Carl Vinson Institute of Government, Handbook for Georgia Legislators, page 83 (15th ed. 2020) ("most legislators must function without aides or professional staff. Some legislators bring outside aides (not paid by the General Assembly) to assist during the legislative session").

SGR/41392786.1

That is not to say that the facts are inherently privileged but, rather, that a legislator's collection, analysis, and use of those facts discloses privileged information about the legislator's thoughts and actions in the legislative process. For example, Plaintiffs can obtain statistics about previous elections from the Secretary of State's office without running afoul of the privilege, but if they try to obtain those facts from a legislator who collected them as part of his or her investigation into S.B. 202, the privilege is triggered because the production of those facts by the legislator conveys privileged information about that legislator's legislative process that cannot be redacted from the document.[7] *See Brown & Williamson*, 62 F.3d at 420; *Eastland,* 421 U.S. at 504.

Plaintiffs assert that the purposes of legislative privilege are not implicated by excluding factual information from discovery.  Pls.' Br. 24.  The Lawmakers beg to differ. Although portrayed as an innocuous "just the facts" request, Plaintiffs are making a direct assault on legislative privilege by seeking to discover what the Lawmakers were thinking when proposing, drafting, and voting on S.B. 202 or the

---

[7] Using an analogy from electronic discovery, when legislators produce "factual" documents they obtained in the legislative process, those documents contain a type of legislative process metadata, revealing what the legislator investigated and when, what the legislator considered and when, and potentially, what the legislator did or intended to do with those facts. Plaintiffs are seeking factual documents from the Lawmakers precisely because they want to discover the legislative process metadata, not because they want to know the facts contained in those documents.

15

Other Election Bills. If Plaintiffs can uncover the Lawmakers' fact-finding efforts, members of the General Assembly will think twice before commissioning a research memo from the Senate Research Office, for example, or about reaching out to the Secretary of State for publicly available information about election laws to help them make informed decisions about election bills.

**D.** ***Rodriguez* Balancing is Inappropriate for Evaluating Legislative Privilege, But Even if the Court Considers the *Rodriguez* Factors, It Should Still Quash Plaintiffs Subpoenas**

Neither the Eleventh Circuit Court of Appeals nor any federal district court in Georgia has endorsed the balancing test articulated in *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003), as a means of weighing federal interests in litigation against the federal, state, and local interests served by the legislative privilege. The test was borrowed from deliberative process privilege jurisprudence and was crafted by the courts to weigh the privilege interests of executive branch employees, not duly elected representatives of the people. *Rodriguez* balancing is ill-suited for weighing legislative privilege against the interests of civil litigants because it does not fairly account for the singular importance of legislative privilege to our society.

Moreover, the use of a subjective balancing test like the one articulated in *Rodriguez* negates the very purpose for which legislative privilege exists because it creates "substantial uncertainty" in the privilege's application. *See Swidler & Berlin*

*v. United States*, 524 U.S. 399, 409 (1998). Legislators cannot have the confidence to act on controversial matters if they have no way of knowing if legislative privilege will shield their conduct until after their conduct has been scrutinized by a court. Because Rodriguez balancing completely negates the purpose of legislative privilege, the court should reject its application here.

Even if the Court applies the *Rodriguez* test in this case, the Court should still deny Plaintiffs' motion to compel because most of the *Rodriguez* factors weigh in favor of the Lawmakers' motion to quash.

### 1. Relevance

Regarding the first factor of the Rodriguez Test, relevance, courts consider the "degree to which the evidence sought is relevant to the issues in the litigation at hand." *Benisek v. Lamone*, 241 F.Supp.3d 566, 576 (D. Md. 2017). Here, the document and deposition requests target individual legislators' underlying motives in proposing, formulating, and voting on S.B. 202 or the Other Election Bills. Discovery of the intent of a select group of legislators is not probative of the intent of the legislature as a body and are therefore only marginally relevant at best. The Supreme Court agrees: "no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971); accord *Greater Birmingham*

17

*Ministries v. Sec. of State for the State of Ala.*, 992 F.3d 1299 (11th Cir. 2021) (expressing "skepticism that the discriminatory intent could be ascertained from the statements of one legislator . . ."); *see also U.S. v. O'Brien*, 391 U.S. 367 (1968). Accordingly, since the subjective motivations of the individual Lawmakers cannot prove the motivations of the General Assembly as a body in passing legislation, the legislative privilege should not be abrogated to allow discovery of evidence that is only of marginal value to Plaintiffs' case.

The Supreme Court has stated that the best evidence of legislative intent is found in the Committee Reports on the bill because they represent the *collective* understanding of the legislators. *See Garcia v. United States*, 469 U.S. 70, 76 (1984); *Village of Arlington Heights*, 429 U.S. at 267-68; *cf. Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2573 (2019) (noting that "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," and that further judicial inquiry "represents a substantial intrusion into the workings of another branch of Government and should normally be avoided."). Plaintiffs already have relevant comments of members and guests in committee meetings and statements for or against S.B. 202 or the Other Election Bills made during floor debates, as well as hours of video of these meetings.

SGR/41392786.1

2. <u>Other Evidence is More Readily Available to Plaintiffs</u>

The second element of the *Rodriguez* test—the availability of other evidence—also weighs in favor of legislative privilege. Plaintiffs have a considerable amount of information regarding the proposal, passage, and formulation of S.B. 202 already available in the public record or that has already been produced by the Lawmakers.

Because the court in *Lee* quashed the plaintiffs' deposition subpoenas in part because the lawmakers in that case produced documents, Plaintiffs try unsuccessfully to distinguish the Lawmakers' production here from the document production in *Lee*. Specifically, Plaintiffs argue that the Lawmakers' have not substantially complied with their document subpoenas because *most* of the documents produced by the Lawmakers were made publicly available on the General Assembly's website. Pls.' Br. at 32. While true, that fact does not necessarily distinguish the document production here from the document production in *Lee*, nor is the public availability of the documents relevant to whether they are responsive to Plaintiffs' subpoenas.[8] The court in *Lee* does not disclose whether the documents

---

[8] Most of the documents requested by Plaintiffs are documents the General Assembly makes public on their website or in open committee meetings. Moreover, Plaintiffs specifically requested "public comments" and documents "submitted into the record," which is public. It is disingenuous for Plaintiffs to argue now that the

19

produced by the lawmakers in that case were publicly available. *See* 340 F.R.D. at 458 (noting only that the lawmakers were in the process of producing "the materials and information available to them at the time a decision was made").[9] The Lawmakers in this case have produced the documents available to the relevant committees at the time decisions were made, plus many more documents, some of which were not available on the General Assembly's website, and video recordings of the relevant committee hearings and floor debates. Plaintiffs' attempt to distinguish *Lee* is meritless.

### 3.   *Seriousness of the Litigation*

The third factor—the seriousness of the litigation—is neutral. Plaintiffs argue that voting rights are "especially serious," and yet they make light of the importance of the legislative privilege, even though it is the privilege that makes voting rights so valuable in America. Justice Story was not exaggerating when he commented that without legislative privilege, "all other privileges would be comparatively unimportant or ineffectual." *Kilbourn*, 103 U.S. at 204 (quoting Joseph Story,

---

Lawmakers failed to comply with their subpoenas because they produced the documents Plaintiffs requested.

[9] Given Florida's Sunshine laws, it is possible, in fact probable, that many of the documents produced by the Lawmakers in *Lee* were publicly available. A quick review of the Florida Legislature's website shows most of the documents described by the court are available on the website.

SGR/41392786.1

Commentaries on the Constitution § 863 (1833)). To value the right to vote over the right for that vote to have meaning is to lose sight of the true value of representative democracy. The Lawmakers do not contend that the right to vote is less valuable than legislative privilege, only that one without the other is of no value. For this reason, this factor favors neither side.

Also, Plaintiffs have not shown that S.B. 202 poses a credible risk to voting rights so as to justify setting aside the privilege. In fact, in the first five days of the current election, 660,139 voters voted early in-person, and an additional 68,892 absentee votes have been recorded.[10] This is nearly twice as many early voters as in the previous gubernatorial election. As of the day before this brief is filed, Georgia is poised to exceed an astounding two million early votes.[11] By every account, Georgia is experiencing record turnout after S.B. 202 election reforms. In light of these facts, the seriousness of Plaintiffs' allegations that S.B. 202 will suppress minority voting is diminished, such that they should not tip the scales in favor of setting aside legislative privilege to allow purely partisan discovery. If allegations contrary to the facts are sufficient to carry this balancing factor, legislators will

---

[10] https://sos.ga.gov/news/georgia-voters-post-strong-numbers-friday-first-saturday-early-voting-commences

[11] https://sos.ga.gov/news/georgias-early-voting-infrastructure-maximizes-voter-turnout

SGR/41392786.1

become subject to taxing discovery with the passage of each new bill under a plaintiff's claims of "seriousness."

     4.    _Government role in the litigation_

The fourth factor, the government's role in the litigation, is inapt in the legislative privilege context. _See Lee_, 340 F.R.D. at 457. It is difficult to imagine any case in which a party is seeking discovery into the legislative process where the government will not be involved on one side or the other, or both. Moreover, the presence of other branches of government seeking to invade the legislative process should not weigh in favor of disclosure, but against it if purposes behind legislative privilege are to be given effect. This factor of the _Rodriguez_ test shows how ill-suited this test is for balancing legislative privilege.

     5.    _Possibility of Chilling the Legislative Process Weighs Strongly in Favor of Privilege_

Finally, the fifth element of the _Rodriguez_ test, the possibility of chilling the legislative process, weighs overwhelmingly against disclosure. _See, e.g._, _Lee_, 340 F.R.D. at 458. Using the courts to chill the legislative process is one of the primary evils legislative privilege exists to prevent. Plaintiffs mischaracterize the documents and testimony they are seeking as involving only third parties, but even a cursory glance at their document requests and deposition topics show that not to be true. _See_ Lawmakers' Principal Br. at Ex. A at Reqs. 1, 5-14, 16-21, and Ex. B. There is

SGR/41392786.1

nothing "modest" about the chill on the legislative process threatened by Plaintiffs' subpoenas. Plaintiffs are seeking the Lawmakers' emails and text communications with *anyone* regarding S.B. 202 or the Other Election Bills.  Such sweeping discovery threatens chill not only the Lawmakers' communications with each other, but also with constituents, who might think twice about speaking freely with their elected representatives about legislation knowing that their communications may be subpoenaed at any time. Additionally, legislators will be dissuaded from seeking or sharing information they need to make decisions about legislation. As other district courts have noted, "the need to encourage frank and honest discussion among lawmakers favors nondisclosure." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8; *Lee*, 340 F.R.D. at 458.

### D.    The Lieutenant Governor's Communications Are Privileged When Acting Within the "Sphere of Legislative Activity"

Plaintiffs' argument against the applicability of legislative privilege to the communications of the Lieutenant Governor are wholly dependent on Fifth Circuit case law that is in clear contradiction with Eleventh Circuit precedent. First, Plaintiffs argue that unless the Lieutenant Governor was acting within his constitutionally enumerated legislative functions, his communications with members of the General Assembly regarding the proposal, formulation, or passage

of S.B. 202 or the Other Election Bills are not privileged. Then, Plaintiffs argue that the Lieutenant Governor's enumerated functions, which they couch as steering the legislative process, are not privileged because he cannot debate or vote on legislation. According to Plaintiffs, then, the Lieutenant Governor can never invoke legislative privilege. The Eleventh Circuit Court of Appeals disagrees. *See Scott v. Taylor*, 405 F.3d 1251 (11th Cir. 2005) (holding that the Lieutenant Governor is entitled to legislative immunity).

More generally, the law is clear that whether the Lieutenant Governor is considered a member of the legislative branch, the executive branch, or a hybrid of both, he is entitled to legislative privilege for his "actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d at 1308–09. That is because the privilege attaches to legislative activity, not to a particular office, branch of government, or job description. *See, e.g., Sup. Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734 (1980); *Bryant v. Jones*, 575 F.3d 1281, 1305 (11th Cir. 2009); *In re Hubbard*, 803 F.3d at 1308-09; *accord Reeder v. Madigan*, 780 F.3d 799, 802 (7th Cir. 2015); *Baraka v. McGreevey*, 481 F.3d 187, 196–97 (3d Cir. 2007). Even if all the Lieutenant Governor does was to shepherd bills through the legislative process, as Plaintiffs' incorrectly assert, he is still entitled to assert

SGR/41392786.1

legislative privilege over his actions and comments that are a legitimate part of the legislative process. *See Reeder*, 780 F.3d at 804.

## VI.    CONCLUSION

Legislative privilege is firmly rooted in our nations' history and is critical to the functioning of government entities at every level. Erosion of this privilege threatens the integrity of the legislative process, and the overburdening of courts as litigants seek to subpoena legislators' emails over every piece of legislation with which they disagree. It is crucial that legislative privilege remain as strong now as it was at our founding. Accordingly, and for the other reasons stated herein, the Lawmakers respectfully ask this Court to deny Plaintiffs' Motion to Compel Production of Documents and quash Plaintiffs' deposition and document subpoenas. Respectfully submitted this 2nd day of November, 2022.

/s/ Alex Khoury_____
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree St. NE, Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

SGR/41392786.1

## CERTIFCATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), I hereby certify that the forgoing Non-Party Lawmakers' Reply in Support of Their Motion to Quash and Response to Plaintiffs' Motion to Compel Production of Documents has been prepared in Time New Roman 14, a font and type selection approved by the Court in L.R. 5.1(C).

/s/ Alex Khoury
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree Street NE
Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

SGR/41392786.1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |
|---|---|

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2022, I electronically filed the foregoing Non-Party Lawmakers' Reply in Support of Their Motion to Quash and Response to Plaintiffs' Motion to Compel Production of Documents with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Alex Khoury_____
Alex Khoury
Special Assistant Legislative Counsel
SMITH, GAMBRELL & RUSSELL, LLP
Georgia Bar No. 416978
Attorney for the Lawmakers
1105 West Peachtree Street NE
Suite 1000
Atlanta, Georgia 30309
(404) 815-3526 – telephone
(404) 685-6826 – facsimile
akhoury@sgrlaw.com

SGR/41392786.1