Ex. P

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*, | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, | |
| *Defendants.* | |

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

     *Defendants.*

Case No. 1:21-CV-01728-JPB

<u>Expert Report of Dr. Stephen Pettigrew</u>

Dr. Stephen Pettigrew
University of Pennsylvania
Program on Opinion Research and Election Studies
Ronald O. Perelman Center for Political Science and Economics, Suite 406
133 S. 36th Street
Philadelphia, PA 19104

On behalf of Plaintiffs in the three above captioned cases.

# Table of Contents

**Introduction and summary of findings**                                              **iii**

**Qualifications**                                                                     **v**

**1  Introduction**                                                                    **1**

**2  Data and methods**                                                                **3**

2.1  Converting survey responses to minutes waited . . . . . . . . . . . . . . . .     4

2.2  Self-reported versus verified voters . . . . . . . . . . . . . . . . . . . . .    7

**3  Wait times in recent elections in Georgia**                                       **11**

3.1  Georgia voters are more likely to face longer than 30 minute waits to vote . .    11

3.2  Georgia voters spend more time in line than voters in nearly every other state    13

3.3  Non-white voters in Georgia wait significantly longer to vote . . . . . . . .     17

    3.3.1  Accounting for other disparities between white and non-white voters .   20

**4  Impact of SB202's line relief ban on wait times**                                 **26**

4.1  SB202 places new burdens on voters waiting in line . . . . . . . . . . . . . .    26

    4.1.1  Ban on providing food or water to voters in line . . . . . . . . . . .   26

4.2  SB202 will negatively affect wait times . . . . . . . . . . . . . . . . . . .     28

    4.2.1  Mail voting restrictions will push voters toward voting in-person or not

         voting at all . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

    4.2.2  Shortening the runoff election schedule will increase line length or

         decrease turnout . . . . . . . . . . . . . . . . . . . . . . . . . .    33

    4.2.3  Changes to early voting hours will not solve Georgia's long line problem  36

    4.2.4  Shrinking precincts will not shorten lines . . . . . . . . . . . . . .   40

**5  Consequences of long lines**                                                      **42**

5.1  Long lines decrease voter turnout in future elections . . . . . . . . . . . . .   42

5.2  Long lines diminish voter confidence in the integrity of elections . . . . . . .  44

**A  Supplemental material for analyses**                                              **47**

A.1  Sample sizes of CCES data . . . . . . . . . . . . . . . . . . . . . . . . . .     47

A.2  Analysis of SPAE data . . . . . . . . . . . . . . . . . . . . . . . . . . . .     48

A.3  Voters waiting more than 60 minutes . . . . . . . . . . . . . . . . . . . . .     49

A.4  Wait times in each state . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

A.5  Differences in line length between Georgia and other states, using regression

     with demographic controls . . . . . . . . . . . . . . . . . . . . . . . . .  55

A.6  Relationship between race and line length  . . . . . . . . . . . . . . . . . . . . .  57

**B  Curriculum Vitae**                                                                    **61**

# Introduction and summary of findings

My name is Dr. Stephen Pettigrew. I have been retained as an expert witness by the AME, GA NAACP, and CBC Plaintiffs in this case to provide my analysis and opinions concerning long lines to vote in Georgia and their consequences, racial disparities in wait times, and the likely impact of SB202 on wait times. I reserve the right to continue to supplement my declaration/report in light of additional facts, testimony and/or materials that may come to light and reserve the right to address a broader scope of issues in any future report. I hereby declare as follows.

- Georgia voters spend more time waiting to vote than voters in almost every other state. In midterm elections, the average early in-person or Election Day voter in Georgia waited more than twice as long as voters in other states (12.6 minutes versus 6.2 minutes), even after accounting for demographic differences like education, age, or race. In presidential elections, Georgia voters waited 1.6 times longer (22.3 minutes versus 14.2).

- The 2012 Presidential Commission on Election Administration recommends that no voter should have to wait longer than 30 minutes to vote. This recommendation was the result of consultation with researchers and practioners and has become the standard by which lines are deemed "within reason." The percentage of voters in Georgia waiting more than 30 minutes to vote in recent midterm elections (8.8%) is higher than all but one other state. Georgia's rate in recent presidential elections (22.0%) is the third-highest in the country.

- Non-white voters in Georgia wait in significantly longer lines than white Georgia voters. This difference remains even after accounting for differences in population density and demographics, like education and age. This finding is consistent with political science literature on the topic.

- Black voters face significantly longer wait times than white voters in Georgia, even when comparing white and non-white voters who live within the same county. In the November 2020 election, Black voters waited more than 10 minutes longer to vote than white voters. Comparable data from the 2022 election is not yet available.

- Precincts in predominantly non-white neighborhoods tend to function much closer to their operational capacity than precincts in predominantly white neighborhoods. This

means that applying equal strain to all precincts (like a small, uniform increase in the number of in-person voters) will have substantially bigger impacts on line length in non-white precincts.

- SB202 is likely to have a negative impact on the length of lines throughout Georgia, particularly in precincts that serve racial minorities. While other administrative changes (separate from those in SB202) may have a positive impact on the line length, the provisions in SB202 will lessen or negate the potential impact of those changes.

- Although SB202 requires an expansion of early voting hours, that change will have almost no impact on long lines. Prior to SB202, most counties already offered at least as many hours as required by SB202. The Georgia counties with the longest lines already offered the most hours of early voting, and will not be required to add hours under the new law.

- Waiting in a long line makes a voter less likely to vote in subsequent elections. Policies that make election lines longer reshape the electorate and put a thumb on the electoral scale. In Georgia, this means discouraging Black and other racial minority voters from turning out, while having a smaller impact on white voters' turnout.

- Voters who experience a long wait to vote are less confident in the integrity of the electoral system as a whole. They are less likely to believe their and others' votes were accurately recorded in the final vote count.

# Qualifications

I have been the Director of Data Science in the Program on Opinion Research and Election Studies at the University of Pennsylvania and the Deputy Executive Director of the Robert A. Fox Leadership Program at UPenn since December of 2017.

I hold a PhD in Political Science from Harvard University, conferred in May 2017. I received a Masters Degree in Statistics from Harvard in March 2014. I am a proud alum of the University of Georgia. In May of 2011, I received a Masters in Political Science and International Affairs and a Bachelor of Arts as a political science and history double major from UGA.

Prior to starting at UPenn, I worked as a data scientist and project manager at the MIT Election Data and Sciences Lab, where my research focused on issues related to election administration, particularly long lines. In addition to my academic work, I am a consultant for the NBC News Decision Desk. As a Senior Analyst, I help produce statistical models and apply them to determine NBC's projections of winning candidates on election nights.

I have published nine peer-reviewed articles in journals such as *Science*, *Electoral Studies*, the *Election Law Journal*, and *Political Science Quarterly*. I have published research about the differences in election day wait times between white and non-white voters. My published work has also demonstrated that waiting in a long line makes voters less likely to vote in subsequent elections. Some of my other work has focused on voter registration list maintenance and the processes in place to secure the vote-reporting system on Election Night. More recently, I have published work on changes to mail ballot rules during the COVID-19 pandemic and shifts in public opinion about those rules. My research has been covered by a variety of media outlets including the *New York Times*, *Washington Post*, *FiveThirtyEight*, and the *Chronicle of Higher Education*.

I have also contributed to reports on election administration by non-profit organizations such as *The Pew Charitable Trusts* and the *Bipartisan Policy Center*. I was responsible for a large proportion of the statistical work that went into the early versions of Pew and MIT's Election Performance Index,[1] which has become the go-to source for evaluating the efficacy of states' election administration processes. I conducted the main statistical analysis and was a co-author on a report about long lines and polling place resources in the 2016 General Election For the *Bipartisan Policy Center*.[2]

---

[1] https://elections.mit.edu

[2] "Improving the Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources." *Bipartisan Policy Center*. April 2018. With John Fortier, Tim Harper, Charles

In June 2021, I testified before the Congressional Subcommittee on Elections for the United States House of Representatives about the causes and effects of long lines at election polling places.[3] I was invited as an expert witness to comment on the problem of long lines to vote in the United States and the legal changes that could help to alleviate the problem.

I have been asked by above-mentioned plaintiffs to provide a report about long lines to vote in Georgia. In particular, I was asked to address several questions in this declaration:

- How long have Georgia voters had to wait in line to vote in recent elections? How does this compare to wait times of voters in other states?

- Are there differences in wait times between white and non-white voters in Georgia? Are there particular minority racial or ethnic groups that tend experience noticeably longer waits?

- What impact might SB202 have on election wait times for Georgia voters? How might these impacts differ across racial groups?

- What are the impacts that long lines have on voters? How do long wait times impact voter turnout in subsequent elections? How do they impact voter confidence in the electoral system as a whole?

The conclusions, analyses, and opinions of this report are my own. I am being compensated at a rate of $350 per hour for my work. This compensation is not in any way contingent on the nature of my findings or the outcome of this litigations. I have not previously testified as an expert at trial or by deposition. I have provided a copy of my full Curriculum Vitae at the end of this report.

---

Stewart, and Matthew Weil.

[3]My written testimony can be found here: https://www.congress.gov/117/meeting/house/112747/witnesses/HHRG-117-HA08-Wstate-PettigrewS-20210611.pdf.

# Section 1:   Introduction

The experience that a voter has at their polling place is an important, yet often understated, part of the democratic process. Voters who have a positive experience at their precinct are more likely to have high confidence in the integrity of the electoral system as a whole and are more likely to continue to turn out in future elections. One factor that significantly impacts voters' evaluations of their polling place experience is how long they had to wait in line to cast their ballot. Because of this, managing the length of lines during early voting and on Election Day is one of the most important tasks that state and local election administrators must take on.

Since at least 2006, election wait times for voters in Georgia have consistently been some of the worst in the nation.[4] Communities of color, particularly Black Georgians, have been disproportionately affected by the problem. In the 2020 election, non-white voters spent nearly 50% longer in line than white voters. Across all federal general elections since 2006–the earliest data available–non-white voters in Georgia have experienced significantly longer lines to vote than white Georgia voters.

Based on my analysis of the SB202, I understand that SB202 makes it illegal for non-partisan groups to distribute provisions like water to people standing in line. This will make the voting experience worse for people who live in areas afflicted with long lines to vote.

My analysis also finds that SB202's restrictions on mail voting will have a significant impact on the number of people showing up to vote in-person. This will have a negative impact on the length of lines to vote in Georgia, and will counteract any positive gains made by other changes to election procedure separate from SB202. The potential impact of SB202 will be larger in precincts with significant minority populations that already function near their operational capacity. Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202.

The effect of SB202 on long lines will be strongest in runoff elections. Because the period between a primary or general election and the subsequent runoff election has been shortened by SB202 from 9 weeks to 4 weeks, there will be considerably less time for early voting to occur. SB202 changed the early voting requirements for runoffs, mandating that early voting

---

[4]This pattern has been comprehensively noted in the Elections Performance Index. The Pew Charitable Trusts launched the EPI in 2013, and in 2017 the MIT Election Data and Science Lab took over administration of the project. More information about the EPI is available at: https://elections-blog.mit.edu/about.

begin "as soon as possible. . . but no later than the second Monday immediately prior to such runoff." Because early voting must conclude by the Friday before a runoff, this leaves just five required days for early voting and zero required weekend days. Prior to SB202, Georgia required 16 days of early voting for a runoff election.

These changes will have one of three consequences on line length and turnout during runoffs. Voters may continue voting the same way they would in the absence of this law, and the lines during early voting will be dramatically longer because the same number of people will try to vote during a shortened early voting period. Alternatively, voters may switch from voting early to voting on Election Day, and Election Day lines will be longer. Or, third, voters will not vote and turnout will go down, even if line length stays the same. As I will show later in this report, the limited data available from the December 2022 Senate runoff election suggests that the first scenario played out, and lines were catastrophically long during the shortened early voting period.

Because of all these changes, SB202 will make exacerbate the problems that it purports to address. Section 2, paragraph 4 of SB202 states that the purpose of the legislation is to "address the lack of elector confidence in the election system." Yet researchers who study confidence in electoral system have consistently found that voter confidence is closely tied together with the quality of the experience they have at the polling place. Research by political scientists suggests that by adding to the length of lines, SB202 will actually make voters less confident in the electoral system as a whole, less likely to believe that their vote was counted correctly, and less likely to believe that the contents of their ballot will be kept secret.

SB202 also has the potential to diminish turnout. My research, and that of others, has found that voters who encounter long lines are less likely to turn out to vote in future elections. All other things equal, roughly one out of every hundred voters who waits at least 30 minutes to vote will not turn out in the next election. Because the effects of the law will be felt more strongly by Black and other racial minority groups, SB202 puts a thumb on the electoral scale and makes it more difficult for people of color to vote.

This report provides analyses that made me reach each of these conclusions. After providing more detail about the data and analysis used in this report, I describe the current state of election lines in Georgia, including the differences between racial groups. I then analyze the impact that SB202 may have on election lines. I conclude with a discussion of the academic literature that focuses on the consequences of waiting in a long line.

# Section 2:   Data and methods

Political scientists have been studying the problem of long lines for nearly two decades. One of the important early questions that they grappled with is how many minutes is an unreasonably long wait. The answer that has become a benchmark for researchers and election officials was provided by the bipartisan Presidential Commission on Election Administration (PCEA). The Commission, convened in 2013 by President Obama, was chaired by Benjamin Ginsberg, the chief lawyer for Mitt Romney's 2012 presidential campaign, and Robert Bauer, the White House Counsel and chief lawyer for the 2008 Obama campaign. Other commissioners were former State Directors of Elections, county election officials, and business leaders. The commission's final report was informed by testimony and research from academics and other experts on election administration and other related fields.

One of the charges given to the PCEA was to study the problem of lines at polling places and provide a set of best practices for election administrators to deal with the problem. The Final Report of the PCEA recommended in January 2014 that "as a general rule, no voter should have to wait more than half an hour in order to have an opportunity to vote."[5] They arrived at this standard through consultation with practitioners who had on-the-ground expertise in the operation of polling places and researchers who had studied Americans' opinions about the voting experience. Therefore throughout the analyses of this expert report, I utilize this 30-minute threshold as a benchmark for assessing the areas and types of voters who are most affected by election lines.

To evaluate the percentage of voters waiting longer than the 30-minute benchmark, as well as the average wait time of voters overall, I draw from several data sources and use analysis techniques that have become standard practice to researchers who study the topic. In particular, the analysis utilizes survey responses to the Cooperative Election Study (formerly the Cooperative Congressional Election Study from 2006 to 2019).[6] The CES is one of the largest academic surveys focused on public opinion and elections, and has been supported financially by the National Science Foundation. In 2020, the CES included a nationally

---

[5]"The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration." January 2014. Quotation from page 14. Emphasis in the original report. At writing of this testimony, the PCEA Report is available through the U.S. Election Assistance Commission's website: https://www.eac.gov/election-officials/pcea.

[6]A full archive of these data are available at https://cces.gov.harvard.edu/.

representative sample of 61,000 American adults, including 2,002 Georgians.[78] The 2022 version of this study is not yet available.

Data from the CES is a standard tool for helping political scientists to understand and study American elections.[9] The data are also an invaluable tool for understanding polling place wait times at the state and sometimes local level. In each even-year study since 2006,[10] in-person voters have been asked, "Approximately how long did you have to wait in line to vote?" Voters are given the option to respond: "Not at all", "Less than 10 minutes", "10 - 30 minutes", "31 minutes - 1 hour", or "More than 1 hour". Respondents who indicate that they waited more than an hour are asked a follow-up question where they can type in the amount of time they waited.

## 2.1   Converting survey responses to minutes waited

For the analysis in this report, I analyzed these data in two ways. First, I considered the proportion of voters who waited more than 30 minutes to cast their ballot. This follows the benchmark set by the PCEA Report, which indicated that states and localities should work to get this percentage to zero. The second way that I analyzed the CES data was by converting the responses to the survey question into minutes and hours. Following the convention used throughout the literature,[11] the wait time of each respondent was coded based on the midpoint of their response to the survey question. Those who responded "Not at all" were coded as having waited 0 minutes; those responding "Less than 10 minutes" were coded with a 5 minute wait; "10 - 30 minutes" became 20 minutes; and "31 minutes - 1 hour" was 45 minutes. For respondents who indicated they waited "More than 1 hour", I recorded their response to the open-ended follow-up question.[12]

This approach of substituting the mid-point of each category to represent a voter's wait time has an important consequence for the analyses throughout this report. When comparing

---

[7]The principle investigators for the 2020 study were Dr. Stephen Ansolabehere (Harvard University), Dr. Brian Schaffner (Tufts University), and Sam Luks (YouGov). Researchers from over 50 universities and colleges across the country and world participated in the creation and analysis of the study.

[8]The appendix includes a table of the CES national and Georgia sample size in all years

[9]The website for the study includes a list of over 100 peer-reviewed academic studies that have utilized this CCES. There are even more published papers than are included on this list: https://cces.gov.harvard.edu/publications.

[10]The one exception is 2010. The wait time question was not asked in this year, and thus omitted from my analyses.

[11]See, for example, Stephen Pettigrew. 2017. "The Race Gap in Precinct Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132.

[12]Following the convention in the literature, anybody who said they waited more than an hour, but did not answer the follow-up, was assigned the average of the wait times of other people in their state who waited more than an hour and did answer the follow-up.

the average wait time of two groups, this midpoint imputation strategy is likely to understate how big of a gap exists between their wait times. To understand why, imagine that group A had a higher percentage of people who selected the "More than 1 hour" category than group B. It follows, then, that the (true, but unknown) average wait time of the people in group A who selected "31 minutes - 1 hour" was higher than the average wait time of people in group B who selected that option. This is because if group A had more people who waited longer than 1 hour, then they also would have a higher percentage of people who waited (for example) between 55 and 60 minutes.

Figure 2.1: Distribution of simulated wait times for two hypothetical groups



Figure 2.1 illustrates this point. The graph shows the distribution of simulated wait times from two hypothetical groups of 1000 people. Because the data were simulated, I can calculate the actual average wait time for people in group A to be 25.2 minutes, and the average in group B is 13.0 minutes–a gap of 12.2 minutes. When grouping the data into bins using the vertical lines in the graph, and then apply the midpoint imputation approach described above, the estimate of the average wait time for group A is 26.2 and group B's is 14.4–a gap of 11.8 minutes.[13]

---

[13]This simulation analysis highlights that in some cases, the midpoint imputation approach may estimate group average wait times that are too high. For this reason, throughout this report I focus on comparisons of average wait times between groups, rather than focusing on the precise estimate of the average wait for an

Table 2.1: Actual average wait times within each response category (simulated data)

| Response | Group A | Group B |
|----------|---------|---------|
| Not at all | 0 min | 0 min |
| Less than 10 min | 6.4 min | 5 min |
| 10 to 30 min | 19.4 min | 17.3 min |
| 30 to 60 min | 41.1 min | 39.8 min |
| More than 1 hr | 73.2 min | 70.2 min |

This imputation approach underestimated the true gap between the groups. Table 2.1 shows that this is because within the "Less than 10", "10 to 30 min", "30 to 60 min", and "More than 1 hr" categories, the actual average wait time of people in group A was higher than the actual average for people in group B.[14]

The fact that this midpoint imputation approach underestimates gaps between groups has big implications for the analyses throughout this report. For example, in the next section, I compare Georgia's average wait time to the average wait in all other states, finding a large and statistically significant gap. The difference is meaningful, even without accounting for the likelihood that the true difference is probably higher than my estimate. Similarly, when I find that non-white Georgians wait significantly longer to vote than white Georgians, my estimates are probably underestimating the racial gap we would find if we knew the exact number of minutes and seconds that every Georgia voter waited.

When the CCES was first conducted about 15 years ago, there were questions about the validity of using the data to study election lines. In the time since, several studies have solidified the case for its use. Research using other survey data sources, particularly the Survey of the Performance of American Elections (SPAE), reach similar conclusions to research using the CES.[15] Other non-survey-based studies have also validated the survey-based estimation approach. One such study was conducted in North Carolina, where election officials reported wait times during the 2014 election. These reports had a statistically significant correlation[16] with the survey-based reports of wait times by voters throughout the

---

individual group. By always having a reference group as a point of comparison, I ensure that even if the exact estimate of an individual group is too high, I am drawing conclusions based on differences between group estimates that are likely to be too low.

[14]This does not apply to the "Not at all" category, where everybody had a wait time of exactly 0 minutes.

[15]Charles Stewart III. 2020. "How We Voted in 2020: A Topical Look at the Survey of the Performance of American Elections." MIT Election Data and Science Lab. http://electionlab.mit.edu/sites/default/files/2021-03/HowWeVotedIn2020-March2021.pdf

[16]A statistically significant correlation is one that is unlikely to have arisen due to purely random chance.

state.[17]  Other studies have used wait time reports by polling place observers,[18] line length reports from poll workers,[19] and even cell phone tracking data[20] to help understand wait times at polling places. In each case, these other methodologies reach similar conclusions as research which uses survey-based measures.

## 2.2   Self-reported versus verified voters

There is one other methodological consideration to using survey data. Political scientists have long noted that survey respondents tend to report having turned out to vote at rates that are higher than the true turnout rate. This means that in a survey like the CES, there are some respondents who say that they voted (and perhaps even report how long they waited to vote) even though they did not actually vote. We see this in the 2020 CES, where 91% of respondents who indicated that they had voted. The turn turnout in Georgia in that election was 68%.[21].

One solution to this problem is a process called voter verification. To do vote verification, the company or organization administering the survey attempts to match the people who replied to the survey with publicly available voter file information from states.  Survey respondents are thus categorized as a "verified voter" (i.e. successfully matched to the voter registration file, which indicates that they voted), a "verified non-voter" (successfully matched to the voter registration file, which indicates that they did not vote), and a "non-verified voter" (not successfully matched to the voter file).

Ideally, all survey respondents who actually voted would be matched to the voter file, and the turnout rate calculated would be exactly the same as the true turnout rate (based on total ballots cast). Unfortunately, the vote verification process is not close to ideal.  The vote

---

[17]MIT Election Data and Science Lab. August 2018. "Elections Performance Index Methodology Report." https://elections-blog.mit.edu/sites/default/files/2020-08/2016-epi-methodology.pdf, pp 79-81.

[18]Stein, et. al. 2019. "Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-County Study." *Political Research Quarterly* 73(2).
Douglas M. Spencer and Zachary S. Markovits. 2010. "Long Lines at Polling Stations? Observations from an Election Day Field Study." *Election Law Journal: Rules, Politics, and Policy* 9.

[19]Matthew Weil, Tim Harper, Charles Stewart III, and Christopher Thomas. 2019. "The 2018 Voting Experience: Polling Place Lines." Bipartisan Policy Center.
John C. Fortier, Matthew Weil, Charles Stewart III, Tim Harper, and Stephen Pettigrew. 2018. "Improving the Voter Experience. Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources." Bipartisan Policy Center.
United States Government Accountability Office. "Observations on Wait Times for Voters on Election Day 2012."GAO-14-850.

[20]M. Keith Chen, Kareem Haggag, Devin G. Pope, and Ryne Rohla. 2021. "Racial Disparities in Voting Wait Times: Evidence from Smartphone Data." Conditionally accepted at *The Review of Economics and Statistics*.

[21]See: http://www.electproject.org/2020g

verification process in the 2020 CES suggests that Georgia's turnout rate was just 51%. This is almost as far away from the true turnout of 68% as the estimate based on self-reported turnout. This presents a difficult choice between analyzing the wait times of all self-reported voters, or only analyzing the wait times of verified voters. Throughout this report I chose to analyze self-reported voters, for reasons that I will explain here.

The biggest consideration is that restricting the analysis to verified voters would needlessly diminish the sample size of the analysis. This may not be a big deal when analyzing the country as a whole, but for this report, I'm restricting my focus to Georgia, where there were only 2002 people who responded to the CES in 2020. Restricting to verified Georgia voters cuts this number to 1,160, the sample diminishes further when we consider that only 290 of those verified voters were Black.

The loss of sample size from restricting the analysis to verified voters could be justified if it provided an unbiased picture of the electorate. Unfortunately, political science research has found that the vote verification process produces results that are biased in several ways. More than one-in-ten Americans are not listed in the commercial databases used for vote verificatoin, and another 12% of people have errors in their records.[22] More importantly, certain demographic groups are more difficult to identify in the vote verification process.[23] Voters who tend to move more often–like young people and poor people–are also more difficult to identify in voter registration records.[24] Together, these sources of imprecision and bias in a verified voter-based analysis tarnishes the reliability of its results, and add the additional cost of a smaller sample.

With all that in mind, the question is whether the choice of analyzing self-reported or verified voters could change the results. In the case of the CES survey, the answer is no. The two panels in figure 2.2 show estimates of wait times for all self-reported voters (on the horizontal axis) and all verified voters (on the vertical axis). When estimating the percent of voters who waited over 30 minutes (top panel) or the average wait time (bottom panel), there is an extremely high correlation between the estimates based on self-reported voters and those based on verified voters. The correlation coefficients are 0.98 for both graphs.[25]

Going a step further, I divided the survey respondents between those with a verified record of voting (same as the vertical axis in Figure 2.2) and those who said they voted, but did not have a verified record (similar to the horizontal axis of Figure 2.2, but removing

---

[22]Simon Jackman and Bradley Spahn. 2021. "Politically Invisible in America." *PS: Political Science and Politics.* 54(4).

[23]Ruth Igielnik, Scott Keeter, Courtney Kennedy, and Bradley Spahn. 2018. "Commercial Voter Files and the Study of U.S. Politics." *Pew Research Center.*

[24]Ansolabehere S, Hersh E, Shepsle K. 2012. "Movers, Stayers, and Registration: Why Age is Correlated with Registration in the U.S." *Quarterly Journal of Political Science.* 17 (4).

[25]Regression shows that each of these correlations are statistically significant (p<0.001).

those with a verified vote record). Even this more difficult statistical test finds very strong correlations. The correlation in the percent of each group waiting over 30 minutes is 0.81, and the correlation in average wait times is 0.84.[26]

What these strong correlations tell us is that there are not big differences between the self-reported voters with and without a verified voting record. For the results throughout this report to be caused by the choice of analyzing self-reported voters, there must be systematic differences between the wait times reported by verified voters and those reported by non-verified, but self-reported voters. Furthermore, for this analysis choice to affect estimates of the gap between white and non-white voters, at least one of two things would have to be true. Non-white respondents who did not vote (even though they said they did) would have to report wait times that were higher than what they would have experienced had they voted. Or alternatively, white respondents who inaccurately claimed to have voted would have to report wait times that were lower than they would have experienced had they voted. In other words, their responses would have to be systematically out-of-sync with the experience of other people in their neighborhood with a similar demographic profile. The results above suggest that these systematic differences do not exist in the data. Analyzing self-reported voters does not create bias, and it provides a larger sample size for the analysis.

---

[26]Both of these correlations are statistically significant (p<0.001).

Figure 2.2:

Percent of voters waiting at least 30 minutes

Each dot is a state-year (GA in red)



Average wait time (in minutes)

Each dot is a state-year (GA in red)



10

# Section 3:   Wait times in recent elections in Georgia

Since at least the 2006 general election,[27] voters in Georgia have experienced polling place lines that are significantly longer than voters throughout the rest of the country. In the November 2020 election, over 900,000 Georgia voters waited longer than 30 minutes to cast their ballot. In all, 24.6% of early in-person and Election Day voters in Georgia waited in a line for longer than the PCEA-recommended 30 minute maximum. This percentage is significantly higher ($p < 0.01$) than the percentage of in-person and Election Day voters in all other states – 17.2%.

In terms of minutes, the average Georgia voter in 2020 waited 27.4 minutes to cast their ballot. This means that the *average* wait time experienced by Georgians was nearly as long as the PCEA's recommendation for the *maximum* wait time. For non-white voters, the average wait was even longer–34.2 minutes–while white Georgia voters waited on average 24.3 minutes.[28] While lines in 2020 tended to be longer in parts of the country, in-person voters outside of Georgia only waited an average of 17.8 minutes.[29]

## 3.1   Georgia voters are more likely to face longer than 30 minute waits to vote

This pattern of election wait times being signficantly longer in Georgia than elsewhere is not a uniquely 2020 phenomenon. My analysis of past CES data finds that, on average, Georgia voters are nearly twice as likely to experience an unacceptably long wait to vote and spend more than 50 percent more minutes in line than voters elsewhere. Figure 3.1 shows the percentage of voters who waited more than 30 minutes to vote in Georgia and in all other states. The left side of the graph shows that in the 2006, 2014, and 2018 midterm elections, 3.8% of in-person voters outside of Georgia waited more than a half hour, while 8.8% of in-person Georgia voters waited this long ($p < 0.01$ for this difference).[30] Similarly, in presidential elections between 2008 and 2020, 22.0% of Georgia voters waited 30 minutes,

---

[27]This is the first year these data were collected.

[28]This difference in average wait times between white and non-white Georgians is statistically significant ($p > 0.01$)

[29]This difference of 9.5 minutes between wait times inside and outside of Georgia is statistically significant ($p < 0.01$).

[30]I also replicated all the analyses in this section on data from the 2008 through 2020 Survey of the Performance of American Elections (SPAE). These results yield nearly identical conclusions to the CES data, and are provided in appendix section A.2.

Figure 3.1: Voters waiting more than 30 minutes in recent elections



while just 12.9% of non-Georgia voters did.[31]

Figure 3.2 highlights the extent to which Georgia stands out from other states. In midterm elections, the percentage of Georgia voters experiencing a 30 minute wait was higher than every state except one. And in presidential years, this percentage was higher in Georgia than every state except two. When I pull apart the data even further, I find that in years with available data, Georgia has never been better than eighth worst among its peers in presidential elections, and tenth worst in midterms.[32]

One feature of Georgia elections that could account for these long wait times is the fact that Georgia typically has large numbers of voters who cast ballots during the early voting period. Across the country, wait times tend to be longer during early voting than on Election Day, so this could potentially explain why Georgia's lines are longer than nearly all other states.

Figure 3.3 shows that this does not explain away the long line problem in Georgia. While early voters do tend to wait longer than their Election Day counterparts, Georgians still tend to be significantly more likely to face a long line than non-Georgians. Roughly 1-in-5 early voters in Georgia (20.1%) waited more than 30 minutes, while only 13.2% of early voters

---

[31]The figures in Appendix section A.3 shows that these patterns are not unique to drawing the line at 30 minutes. Georgia voters are also significantly more likely to wait longer than 60 minutes to vote as well.

[32]Figures showing the results in each state are found in appendix section A.4.

Figure 3.2: Voters waiting more than 30 minutes, by state



outside of Georgia waited that long. And on Election Day, 14.2% of Georgia voters faced an unreasonably long wait, compared to just 8.4% of voters from other states.

## 3.2   Georgia voters spend more time in line than voters in nearly every other state

Another standard approach that political scientists use to study election lines is by considering the average number of minutes that voters waited. After converting the survey responses into hours and minutes (following the methodological approach described in section 2), I considered whether the patterns identified in the prior sub-section hold up using this different measure of line length.

Figure 3.4 underscores that no matter the approach used to measure line length, Georgia stands out as having particularly lengthy wait times. The left side of the graph shows that Georgia voters have average wait times that are significantly longer ($p < 0.01$) than non-Georgians. It's particularly striking that in midterm elections, the average Georgia voter waits nearly twice as long as voters in other states – 12.4 minutes compared to 6.4 minutes.

13

Figure 3.3: Voters waiting more than 30 minutes, by mode of vote



Figure 3.4: Average wait time of voters in recent elections



The right side of the graph shows that breaking down the data by mode of vote (i.e. early in-person or Election Day in-person) reveals a similar pattern of Georgia voters experiencing particularly long waits.

14

Figure 3.5: Average wait time of voters, by state



In midterm elections, the average wait time of voters (see Figure 3.5) in Georgia is longer than every state except South Carolina. And in presidential elections, Georgians wait longer than voters in all but three states. When the data are broken down into individual years, Georgia still fares no better than fifth worst in midterms and seventh worst in presidential elections (see appendix section A.4).

The consistency of these results paints a clear picture, and raises the question of whether the differences between Georgia and other states is simply because the demographic profile of Georgia voters is meaningfully different from other states. To test this possibility, I follow the convention of the academic literature and use linear regression (OLS) to control for demographic factors like age, education, race, and gender.[33] Each of these attributes are known in the political science literature to be strong predictors of voter turnout and line length, so controlling for them in a regression allows me to test whether Georgia's long lines are attributable to something more than these factors.

Table 1 shows the results of nine separate regressions using different subsets of the data

---

[33]In the regressions, I operationalize race as whether or not the voter is white and education as whether or not she has a bachelors degree. Age is coded in years, and gender is coded as a dichotomous variable.

Table 3.1: Voters waiting over 30 minutes, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|------|--------|-------------|---------|-----------|---------|
| All | All in-person | 9.5% (0.1) | 16.7% (0.4) | 7.1pp. (0.4) | <0.01 |
| Midterms | All in-person | 3.8% (0.1) | 9.3% (0.4) | 5.6pp. (0.4) | <0.01 |
| Presidential | All in-person | 12.9% (0.1) | 21.3% (0.5) | 8.5pp. (0.6) | <0.01 |
| All | Early in-person | 13.2% (0.2) | 19.8% (0.6) | 6.6pp. (0.6) | <0.01 |
| Midterms | Early in-person | 4.8% (0.2) | 9.4% (0.7) | 4.6pp. (0.7) | <0.01 |
| Presidential | Early in-person | 16.9% (0.2) | 25.3% (0.8) | 8.4pp. (0.8) | <0.01 |
| All | Election Day | 8.2% (0.1) | 13.2% (0.5) | 5.0pp. (0.5) | <0.01 |
| Midterms | Election Day | 3.5% (0.1) | 9.2% (0.6) | 5.8pp. (0.6) | <0.01 |
| Presidential | Election Day | 11.1% (0.1) | 16.3% (0.8) | 5.2pp. (0.8) | <0.01 |

Table 3.2: Average wait time, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|------|--------|-------------|---------|-----------|---------|
| All | All in-person | 11.3 (0.1) | 18.5 (0.3) | 7.3min. (0.3) | <0.01 |
| Midterms | All in-person | 6.2 (0.1) | 12.6 (0.3) | 6.4min. (0.3) | <0.01 |
| Presidential | All in-person | 14.2 (0.1) | 22.3 (0.4) | 8.1min. (0.4) | <0.01 |
| All | Early in-person | 14.8 (0.1) | 22.5 (0.5) | 7.7min. (0.5) | <0.01 |
| Midterms | Early in-person | 7.0 (0.1) | 12.7 (0.5) | 5.6min. (0.5) | <0.01 |
| Presidential | Early in-person | 18.2 (0.2) | 27.8 (0.7) | 9.6min. (0.7) | <0.01 |
| All | Election Day | 9.9 (0.1) | 14.0 (0.4) | 4.1min. (0.4) | <0.01 |
| Midterms | Election Day | 6.0 (0.1) | 12.5 (0.4) | 6.5min. (0.4) | <0.01 |
| Presidential | Election Day | 12.4 (0.1) | 15.3 (0.6) | 2.8min. (0.6) | <0.01 |

based on election type (midterm, presidential, all years) and vote mode (early in-person, Election Day, or both). No matter how the data are sliced, Georgia consistently has a higher percentage of voters who waited more than 30 minutes to cast their ballot. These differences, which are statistically significant in every regression ($p < 0.01$), range from Georgians being 4.6 to 8.5 percentage points more likely to encounter a line that is longer than the PCEA's 30-minute ceiling of acceptability. This pattern persists when we look at each individual election year. In every year for which we have data, there is a consistent pattern of Georgians waiting significantly longer to vote (whether on Election Day or early) than voters in other states.[34]

Table 2 presents similar results, this time using average wait time as the outcome variable in the regression. Like before, Georgians wait significantly ($p < 0.01$) longer than

---

[34]There are 15 instances where Georgians waited significantly longer than non-Georgians. I find zero cases where the average wait for Georgians is significantly shorter than elsewhere. There were three cases (2012 early voters and 2012 and 2020 Election Day voters) where there was not a significant difference in waiting times between Georgians and non-Georgians. These results are found in appendix section A.5.

non-Georgians. The biggest of these discrepencies occurs in presidential elections among early in-person voters, who wait 9.6 minutes longer in Georgia (27.8 minutes) than in other states (18.2 minutes).

## 3.3  Non-white voters in Georgia wait significantly longer to vote

One major concern about long lines being a chronic problem is that some voters must budget a lengthy portion of their day every time they want to cast a ballot, while other voters may go years without ever standing in a line. As I discuss in this section, non-white voters are more likely to be in the first category, and white voters are more likely to be in the second.

Political science researchers have noted this consistent relationship between race and wait times. It is one of the most robust findings to emerge from these studies. Researchers have found that non-white voters tend to wait longer than white voters by using survey data,[35] leveraging poll closing times,[36] stationing observers outside of polling places to record information about the flow of voters,[37] partnering with local officials to have poll workers record information about line lengths throughout the day,[38] and using cell phone tracking data.[39] Every one of these research approaches has shown that lines tend to be shorter in precincts with higher proportions of white voters and longer in precincts with higher proportions of non-white voters.

Figure 3.6 illustrates that this trend holds in Georgia. This bar graph shows percentage of Georgia voters who waited at least 30 minute to vote,[40] broken down by whether the voter

---

[35]Pettigrew 2017.

Charles Stewart III. 2013. "Waiting to Vote in 2012." *Journal of Law & Politics* 28(4).

Charles Stewart III and Stephen Ansolabehere. 2015. "Waiting to Vote." *Election Law Journal: Rules, Politics, and Policy* 14(1).

[36]Stephen Pettigrew. 2021. "The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout." *Electoral Studies* 71.

Michael C. Herron and Daniel A. Smith. 2015. "Precinct Closing Times in Florida During the 2012 General Election." *Election Law Journal: Rules, Politics, and Policy* 14(3).

Christopher Famighetti, Amanda Melillo, and Myrna Pérez. 2014. "Election Day Long Lines: Resource Allocation." Brennan Center for Justice.

[37]Stein, et al. 2020.

Spencer and Markovits 2010.

[38]Weil, Harper, Stewart, and Thomas 2019.

Fortier, Weil, Stewart, Harper, and Pettigrew 2018.

United States Government Accountability Office. 2013.

[39]Chen, Haggag, Pope, and Rohla 2021.

[40]The black bars are 95% confidence intervals around the estimate. A confidence interval is similar to a margin of error. In this instance, our best estimate of the true percentage is the top of each colored bar, and the black bars signify the margin of error around that best estimate.

Figure 3.6: Percentage of white and non-white voters waiting 30+ minutes



was white or a person of color.[41] As these results show, white voters are less likely than voters of color to have to wait at least 30 minutes to vote, particularly in presidential elections.[42]

For presidential elections, non-white voters are about 7.2 percentage points more likely to experience a 30 minute wait during the early voting period than white voters.[43] And they are 5.3 percentage points more likely to experience a 30 minute line on a presidential Election Day.[44]

Lines tend to be shorter for everybody during midterm elections, so the discrepancy between white and non-white voters is smaller. Still, my analysis estimates that people of color are slightly more likely to experience a long line during early and Election Day voting for a midterm. As I discuss in Section 4 this makes polling places in areas resided in predominantly by people of color much more susceptible to dramatic increases in wait times as a result of SB202.

Digging a little more closely into the data, Figure A.10 separates voters of color into

---

[41]Throughout this section, I will use "people of color" to denote anybody who is not both white and non-Hispanic.

[42]I also replicated this analysis using the average wait time (in minutes) as the outcome of interest. This analysis also found that non-white voters' average wait was significantly longer than white voters. The figure with these results can be found in Figure A.9 in Appendix Section A.6.

[43]Statistically significant at $p < 0.001$

[44]Statistically significant at $p < 0.01$.

Figure 3.7: Percent waiting over 30 minutes, by race



three categories: Black, Hispanic, and all other racial groups.[45] The patterns here are most clear for Black voters, who are consistently more likely than white voters to experience a long line. With the exception of Election Day voting during midterms, the average wait time for Black voters is significantly longer than those of white voters. I also find that Hispanic voters wait significantly longer than white voters on Election Day during presidential elections. They also reported longer average wait times in presidential early voting and midterm Election Day voting, although those results are not statistically significant, owing to the fact that Hispanic voters are a much smaller group of Georgians than white or Black voters, so data about them were limited.

Figure 3.8 shows that these patterns are not driven by just one or two elections. In every general election where data exist, I find that people of color in Georgia have an average wait time that is longer than the average for white Georgia voters. In 2020, this difference was nearly ten minutes ($p < 0.01$). Comparing the changes from 2016 to 2020 illustrates that the added strain of pandemic-related protocols in precincts had dramatically different impacts on areas with significant minority populations, compared to areas predominantly with predominantly white residents. Even though the race gap in wait times was relatively small in 2016, compared to 2012 and 2008, the gap ballooned in 2020. The average wait

---

[45]The analogous graph showing these results for the percent waiting more than 30 minutes is in Figure 3.7 in the appendix.

Figure 3.8: Average wait time of white and non-white voters, by year



time among people of color increased by 100% from 2016 to 2020, while it only increased by 60% for white voters. This is further evidence that predominantly non-white polling places operate much closer to their operational capacity than white precincts, meaning that added strain from administrative changes due to the pandemic or from SB202 will have a much bigger impact on them.

### 3.3.1    Accounting for other disparities between white and non-white voters

What explains these racial disparities in wait times for Georgia voters? One possible explanation for these differences by race could be that white voters tend to live in very different types of places than non-white voters. If, for example, Black voters are more likely to live in urban areas, and the logistics of voting are more complicated in urban areas, then that could provide an explanation for the results shown in the previous graphs. Similarly, researchers have found that education is strongly predictive of whether somebody turns out to vote,[46] and there are significant differences in the rates of college education between white and non-white voters. Higher turnout rates can also create longer lines–particularly if local

---

[46]See, for example Rachel Milstein Sondheimer and Donald P. Green.  2009.  "Using Experiments to Estimate the Effects of Education on Voter Turnout." *American Journal of Political Science* 54(1).

election officials do not anticipate or have the resources to deal with the extra congestion at polling places.

My research, published in *Political Science Quarterly*, answers the question of whether the racial gap in wait times is driven by factors like these.[47] To do that study, I used regression and other statistical techniques to compare white and non-white voters who lived in similar contexts to each other. In essence, I compared (for example) white voters in Fulton County to voters of color in Fulton County, and college-educated white voters to college-educated voters of color. Using data from across the US, I find that although factors like these do explain a small piece of the racial gap in wait times, they do not provide a full explanation. Even after controlling for these other factors, I still find that precincts resided in predominantly by people of color have an average wait time that is twice as long as precincts with residents who are predominantly white. And I find that minority voters are six times more likely than white voters to wait longer than 60 minutes to vote. In my analysis of data from Georgia, I utilized these same statistical techniques to assess whether the racial differences in Georgia wait times is attributed to, for example, an urban-rural divide.

Figure 3.9 provides a preliminary indication that the patterns in Georgia are not simply a consequence of population density. The figure shows the average wait time of white voters across all available years (on the x-axis) and the average wait of people of color (on the y-axis). Each dot represents a county in Georgia. Because Georgia is divided into 159 counties, data were extremely thin in many of them. The graph here presents data from only the 47 counties with data from at least five white voters and five people of color, across all the years of responses.[48]

Although the sample size of individual counties are small, this graph provides some initial evidence that within counties, where differences in population density tend to be much smaller than density differences between counties, people of color are more likely to wait in a longer line to vote. In two-thirds of these counties non-white voters reported a longer average wait time than the white voters in their county.[49]

---

[47]Stephen Pettigrew. 2017. "The Race Gap in Precinct Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132.

[48]Out of the 112 "missing" counties, 41 counties had either zero white survey respondents or zero non-white respondents, 30 counties had just one white or non-white respondent, and 20 counties had just two white or non-white respondents. I am constrained by the small sample sizes in most Georgia counties from choosing a threshold higher than 5. Research suggests, however, that line lengths are highly correlated within small geographic regions like counties. This means that estimating a county's average wait time requires a smaller sample size than if this geographic correlation did not exist. For further analysis on this point, see Appendix 2 in my research in "The Downstream Consequences of Long Waits." *Electoral Studies.* 71. June 2021.

[49]When I calculate this statistic using all 112 counties where we have at least one white and one non-white respondent, the value is 58.5%, although nearly half of the counties included in that calculation have just one or two white or non-white survey-takers.



Figure 3.9: Average wait times in recent elections, by county

To further analyze this relationship using a larger sample, I estimated regressions that simultaneously control for race, age, education, and early versus Election Day voters, while comparing voters within the same county and same election (using county and year fixed-effects). In one set of these regressions, race was coded as white/people of color, while in another set of these regressions I used four racial categories: white, Black, Hispanic, and other race.

Figure 3.10 presents the main results for these two regression. Each bar represents the average difference in wait times for each racial group, as compared to white voters, after

Figure 3.10: Wait times in all election years since 2006



controlling for all the factors listed above. In the regression comparing white voters to all people of color, I find that people of color tend to wait 2.79 minutes longer than white voters, and this difference is statistically significantly different from a difference of zero ($p < 0.01$).[50] In the second regression, I find that Black Georgia voters wait significantly longer ($p < 0.01$) than white voters by 3.64 minutes. I do not find that Hispanic voters and voters of other races/ethnicities have significant differences in average wait times than white voters, but this is this is attributable to small sample sizes resulting in large margins of error around the wait time estimates for those groups.[51]

The results from pooling all election years does find evidence of a significant racial gap in wait times, although the magnitude of this effect is not enormous. This owes largely to the fact that midterm elections often can have shorter lines, so this makes for a smaller potential racial gap. When I separate out the data and only look at presidential election years, in Figure 3.11, I find that the sizes of the effects grow.[52] Non-white voters wait 5.05 minutes longer than white ones ($p < 0.01$) and Black Georgians wait 5.29 minutes longer ($p < 0.01$). Also, after disentangling presidential and midterm elections, I find that voters in other racial

---

[50]A full table of these regression results is available in Table A.4 in Appendix Section A.6.

[51]For context, the 2020 CES study had only 83 Hispanic respondents in Georgia. Only 47 of them voted and only 25 voted in person. For this type of statistical test where we're comparing voters from across the state, a sample size of 25 is unlikely to be big enough to draw conclusions.

[52]A full table of these regression results is available in Table A.5 in Appendix Section A.6.

Figure 3.11: Wait times in presidential election years



groups (primarily Asian-Americans and Native Americans) wait 6.95 minutes longer than white voters in presidential elections ($p < 0.05$). I do not find a statistlcally significant result for Hispanic voters, although this seems to be in part driven by the fact that there are only 170 Hispanic voters in this specific subset of the data, compared to 2,589 white voters.

Lastly, I analyzed what these differences looked like in the November 2020 election. Based on Figure 3.12, voters of color waited 10.45 minutes longer, on average, than white voters in 2020 ($p < 0.01$).[53] Black voters waited 10.49 minutes longer ($p < 0.05$), and voters of other races waited 14.35 longer ($p < 0.05$).

These findings are particularly relevant when we consider the potential impact of SB202 on election lines. As I will describe in the next section, researchers have found that applying equal amounts of additional strain on two precincts can have dramatically different effects on the length of lines in those precincts, depending on the amount of strain those precincts were under prior to the new strain being applied. Precincts in predominantly Black neighborhoods tend to already be under more strain and closer to operating capacity than precincts in predominantly white neighborhoods, so the changes in SB202 will have substantially larger impacts on line length in precincts that serve mostly Black voters, even if white and non-white voters react to SB202 in similar ways.

---

[53]A full table of these regression results is available in Table A.6 in Appendix Section A.6.

Figure 3.12: Wait times in November 2020



# Section 4:   Impact of SB202's line relief ban on wait times

There are several provisions in SB202 that will have an impact on whether voters experience long lines to vote. Broadly speaking, these provisions fall into one of two categories. First, there are sections of the law that increase the burden on voters who are experiencing a long line. Second, there are changes that will increase the length of lines, particularly in areas with high concentrations of racial minority voters. The most impactful of these changes are the alterations to the vote-by-mail process and the runoff election schedule. These changes will have the consequence of either decreasing turnout overall or pushing more voters toward voting in-person, thereby increasing the length of lines.

It is also worth noting here that SB202 is not the only factor that may increase or decrease the length of lines in Georgia elections. The state or individual counties may alter their administrative procedures or voting technology, and those changes may have an impact on length length. But even if those changes have a positive impact on line length, that does not mean that SB202 does not have a net-negative impact on lines. And in fact, the money and effort spent by the state or counties on those line mitigation efforts may not be as necessary if SB202 were not the law.

## 4.1   SB202 places new burdens on voters waiting in line

### 4.1.1   Ban on providing food or water to voters in line

One of the changes that most directly pertains to voters waiting in line is Section 33 of SB202. This section amends Code Section 21-2-414(a) by banning any person from giving or offering any food or drink to a voter standing in line. The section further prohibits any person, including all non-profit, non-partisan groups from setting up water or snack stations that are within 150 feet of a polling place or within 25 feet of any voter standing in line.

These new rules mean that if an organization wanted to set up such a table under those guidelines, voters would be required to leave line and travel at least 25 feet to retrieve a cup or bottle of water, potentially risking their place in line. This is especially problematic after polls have closed, because leaving the line to get water makes it possible that the voter would lose their chance to vote at all. This is particularly concern during statewide primary and primary run-off elections, which tend to be scheduled in the hot months of May or June in

Georgia.

The language of the law is absolute in describing this ban on offering food or water to anybody in line. It makes it a crime for a voter to share their water bottle with another voter in line. If an organization sets up a table for distributing water that is in compliance with this law, and a voter leaves the line to go to that table, that voter could face criminal penalties for bringing a second cup or bottle to another person who stayed in line. The law does allow for (but does not mandate) poll workers to set up self-service water stations, but voters are still required to leave the line to use it. And those voters could face criminal penalties for retrieving extra water bottles for others in line.

This provision of SB202 has been described as a way to cut down on vote buying or other types of corruption. Georgia's Election Code already makes it a felony for somebody to "offer to give or receive. . . money or gifts for the purpose of. . . voting for a particular candidate in any primary or election."[54] And I know of no research that shows that this type of vote buying or corruption has ever occurred at polling places in Georgia in modern elections.

I am similarly unaware of any other state that has banned all food or beverage distributions no matter the distance from the polling place, irrespective of intent or the minimal value of such items. Given this, and given the fact that Georgia's election law already has an explicit ban on vote buying, the consequence of including this provision in SB202 is that is will make the voting experience worse for voters in areas with chronically long lines, while having no impact on vote buying.

I also know of no other state that defines the boundary line for electioneering or campaigning near a polling place using a movable reference point-the location of voters in line. It is not uncommon for polling places in some areas of Georgia to have lines that extend well beyond 600 feet. In the 2020 general election, for example, journalists documented lines that extended more than a thousand feet from the polling place.[55]

The impact that this restriction has on Georgia voters is clear. Imagine that a non-profit organization sets up a water station at the beginning of the day that is 300 feet away from a polling place—fully in compliance with Georgia's election code. As the line of voters grows and shrinks throughout the day, this water station could oscillate inside or outside of the 25-foot boundary defined by SB202, despite the station never changing its physical location. This makes it virtually impossible for organizations to remain in compliance with the law, particularly because they are most likely to set up refreshment stations at polling places

---

[54] O.C.G.A. 21-2-570

[55] See: https://www.theguardian.com/us-news/2020/oct/13/more-than-10-hour-wait-and-long-lines-as-early-voting-starts-in-georgia; https://www.independent.co.uk/news/world/americas/us-election/georgia-election-early-voting-long-lines-2020-election-b1041310.html; https://www.nbcnews.com/politics/2020-election/early-voting-begins-georgia-long-lines-high-turnout-n1242995

where lines are expected to be the longest. This discourages those organizations from setting up these relief stations at all, making the experience of waiting in a long line even worse for Georgia voters.

In the absence of relief stations, SB202 sets up a realistic scenario of a voter being denied the ability to cast a ballot. At the time of polls closing, any voter that is in line can cast a ballot as long as they do not get out of line. A voter at the end of the day could be denied the right to vote if they step out of line to use a water fountain or to retrieve water from a line relief station that is set up in accordance with SB202's restrictions. This was not a problem prior to SB202 because line relief organizations could bring water bottles to voters standing in line.

This concern does not just apply to voters in line at the end of the day. When voting lines extend a long distance from the precinct building, a voter returning to the line after retrieving water are at the mercy of those around them in line to let them back in. Otherwise, they may have to join the end of the line or may leave entirely and not vote at all. None of this was a concern prior to SB202, because line relief organizations could provide water and snacks to voters while they stayed in line.

Lastly, SB202's strict rules about line relief make simple, helpful acts illegal. Imagine a voter who wishes to get water and those around them in line assure them that they can hold their spot in the line. If that voter returns with a second bottle of water for the person who held their spot, or even shared their water bottle with a family member, they would be committing a crime under SB202. The law is clear on this point: "nor shall any person give...any money or gifts, including, but not limited to, food or drink, to an elector." SB202 criminalizes getting out of line to refill a bottle of water at a water fountain and then sharing it with a family member or anybody else in line.

The line relief provisions in SB202 will have the largest impact on voters who live in areas that already tend to have long lines. As I showed in my earlier analysis, racial minority (particularly Black) voters in Georgia tend to face longer wait times than white voters. Any law that makes waiting in a long line more difficult or uncomfortable will disproportionately impact on people who are most likely to encounter such a line. In Georgia, those voters tend to be non-white.

## 4.2   SB202 will negatively affect wait times

There are several provisions in SB202 that will have an impact on the logistics and flow of voters through polling places. Political scientists who study election lines have relied on the findings of queueing theory to help understand the impact that policy changes can have

on lines. Queueing theory is a branch of mathematics and operations research that provides explanations for how and why lines or queues form. The principles of queueing theory have been applied to the understanding of traffic on a highway, lines in grocery stores, computer processor efficiency, and in recent years, lines at polling places.

When it comes to election lines, queueing theory shows that one of the biggest things that can impact how long voters wait to vote is the number of voters who show up. Just as bottlenecks on the highway are more likely to occur when more cars are on the road at rush-hour, bottlenecks are more likely to occur a polling place when too many voters show up at once. Poll workers can only check-in so many voters per hour and there are a finite number of voting machines on which to cast a ballot. When the number of arrivals push past the logistical capacity of the polling place, lines form. As the number of arrivals grows linearly, wait times grow exponentially.

These principles are closely related to another idea in queueing theory: the "elbow of death." Researchers have coloquially used this term to describe when a polling place has reached its operational capacity and new voters arriving to vote cause wait times to grow exponentially.[Jacob Jaffe, Charles Stewart III, and Jacob Coblentz. 2018 "Modeling Voting Service Times with Machine Logs." Available at: https://dx.doi.org/10.2139/ssrn.3216178] Adding just a few dozen voters to a precinct that has a reasonable average wait time (say, 10 minutes) can cause its average wait time to cascade to 30 or 45 minutes. As I show in the rest of this section, SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color.

### 4.2.1   Mail voting restrictions will push voters toward voting in-person or not voting at all

Many of the election administration changes made by SB202 impact the way that voters cast ballots by mail.[56] While it may not seem that these changes would impact wait times for in-person voters, queueing theory and political science research on voter behavior suggest otherwise. Put simply, increasing accessibility of mail voting is one of the most effective ways to shorten lines at polling places. As you increase the number of voters mailing in a ballot, you decrease the congestion at polling places, thereby decreasing the chances of a long line. SB202, however, adds several provisions that could make it less likely that voters will cast ballots by mail. The consequence of these changes is that it will either push more voters toward voting in-person (thereby increasing the length of lines) or being turned off from

---

[56]Throughout this section I refer to "mail ballots" or "voting by mail." I use these terms as synonyms to "absentee ballots" or "absentee voting," and as contrasts to Election Day, early/advanced/absentee in-person voting.

voting at all.

Several major changes in SB202 impact the way in which voters can apply for and return a mail ballot. The law limits mail balloting by adding multiple restrictions on mail ballot applications. Amendments to Code Section 21-2-382(3)(A) place bans on any organization from sending mail ballot applications to any voter who has already requested one. Similarly, the law restricts any government officials from distributing mail ballot applications without prior request by a voter. Organizations are also banned from distributing pre-filled mail ballot applications. The law adds limits the number of dropboxes a county may set up for returning mail ballots.

Any provision that tightens the rules for casting a mail ballot removes a critical tool available to local government for combating congestion at polling places. While it is beyond the scope of this report to estimate the exact impact that these changes will have on how many voters cast a mail ballot, it is reasonable to assume that these changes will not *increase* the rates of voting by mail, and are much more likely to decrease mail voting rates.

Even if these changes have a small impact on mail ballot rates in Georgia, they could have substantial impact on line length, particularly in areas with high concentrations of racial minorities where lines tend to already be long. To illustrate this, I used queueing theory principles to estimate how wait times are impacted by adding in-person voters who otherwise would have voted by mail. The idea of the simulations is to take two hypothetical precincts–one with short lines and one with long lines–and assess the impact that voters switching from mail to in-person voting would have on the wait times for people in those precincts.

In the first of these simulated precincts, I began with 200 voters arriving throughout the 12 hours that the polling place was open. To account for the queueing principle that clustered arrivals can impact wait times, roughly half of these voters arrived alone, one-third arrived with another person, and the remaining voters arrived in groups of three, four, or five. I calibrated number of seconds it takes to check-in a voter so that across simulations, the average wait time for voters was just 10 minutes. I then re-ran the simulation, each time increasing the number of in-person voters by 5 percentage points (i.e. from 200 voters, to 210, to 220, etc.).

The top of Figure 4.1 shows the average number of minutes voters waited to check-in across 1000 simulations of each scenario. There is a slight increase in the average wait time as the number of voters increases from 200 in increments of 5 percentage points. The bottom of the figure shows the percentage of voters who waited longer than 30 minutes. Again, while there is a slight increase in these percentages as the number of in-person voters increases, the changes are not dramatic.

30

Figure 4.1: Precinct A: 10 minute wait time when there are 200 voters



The scenarios presented in Figure 4.1 show the distribution of wait times and percent of voters experiencing a 30+ minute wait in Precinct A, depending on how many voters switch from voting by mail to voting in-person. Voters in this polling place can expect to see modest increases in the amount of time they wait in line, but even a 20 percentage point increase in the number of in-person voters (resulting from people switching away from mail voting) will not dramatically impact the experience of voters at polling places. When the number of in-person voters jumps from 200 to 240, the average wait time increase from 9.8 minutes to 17.6, while the percentage of voters experiencing a 30+ minute wait goes from 6.4% to 19.9%.

The scenarios in Precinct A are a sharp contrast to the simulations presented in Figure 4.2. In these simulations, I calibrated the model to mimic a precinct in Georgia that struggles to keep up with the volume of voters. In this case, 200 in-person voters puts the polling place at tremendous strain, with average wait times of approximately 30 minutes and about 40% of voters waiting more than half-an-hour to vote.

Table 4.1: Precinct A (standard errors in parentheses)

| Number of Voters | Avg. wait in minutes | Voters waiting more than 30min. |
| --- | --- | --- |
| 200 | 9.8 (3.9) | 6.4% (8.1) |
| 210 | 11.2 (4.7) | 8.5% (10.0) |
| 220 | 13.0 (5.7) | 11.5% (12.1) |
| 230 | 14.9 (6.7) | 15.0% (13.9) |
| 240 | 17.6 (8.7) | 19.9% (16.5) |

Figure 4.2: Precinct B: 30 minute wait time when there are 200 voters



What Figure 4.2 and Table 4.2 illustrate is how dramatic an impact even a small increase in the number of voters can have. If just ten voters switch from casting a mail ballot to voting in-person, the expected percentage of voters at this precinct experiencing a 30-minute wait would jump from about 40% to nearly 50%. If the impact of SB202 on mail voting is even larger, then the downstream effect on polling place lines becomes catastrophic. An

32

Table 4.2: Precinct B (standard errors in parentheses)

| Number of Voters | Avg. wait in minutes | Voters waiting more than 30min. |
|---|---|---|
| 200 | 29.6 (14.7) | 39.7% (21.2) |
| 210 | 36.2 (17.2) | 49.0% (21.0) |
| 220 | 46.2 (21.8) | 58.8% (21.1) |
| 230 | 55.3 (24.7) | 65.8% (19.8) |
| 240 | 67.9 (27.0) | 72.9% (16.6) |

average wait time of 30 minutes becomes more than an hour when 40 additional voters show up at the polling place, and nearly three-quarters (72.9%) of voters will end up waiting in a line that is longer than 30 minutes.

The results in these graphs and tables highlight the principle of the "elbow of death." Even small changes to a precinct (like ten additional voters) can have significantly larger impacts on places that are already near their capacity. When we take into account the fact that Black and other non-white Georgia voters already experience longer wait times than white Georgia voters, the implication becomes clear. Even if white and non-white Georgia voters switch from mail voting to in-person voting at the exact same rates, the impact of these switches will be much larger in non-white areas of the state, where precincts are already operating under strain.

My research on long lines also suggests another potential impact of tightening mail voting rules on voters experiencing long lines to vote. I have found that voters who live in an area with a long line in one election are significantly more likely to turn to voting-by-mail in subsequent elections.[57] This research shows that wide accessibility to mail voting can be a useful approach for combating long lines. SB202 makes this conversion from in-person voters into mail voters less likely by adding administrative barriers to voting by mail. The consequence is that those voters will either remain in-person voters in subsequent elections (making it more likely that long lines will persist) or they will abstain from voting entirely, thereby dropping overall turnout.

### 4.2.2  Shortening the runoff election schedule will increase line length or decrease turnout

Another major change in SB202 is that it changes the state's runoff elections to be 4 weeks after a general or primary election, instead of the nine weeks it had been through 2020. This 28 day window between preliminary and runoff election makes the schedule for early

---

[57]Pettigrew 2021.

in-person and mail voting extremely tight. First, the 28 day window is shortened by the fact that the results of the preliminary election are never known instantly.

Imagine that just one Georgia county does not complete its vote count and certification process until the Thursday after Election Day. In this scenario, a candidate could potentially request a recount, which they have two business days (Friday and the following Monday) to do. This would delay any preparation for a potential runoff election until just 21 days before the runoff. If the recount is granted, it would further cut into this 21 day window by at least a day or two.

Without knowing the results of the preliminary general or primary election, election clerks may not know which races will appear on the runoff ballot, making it impossible to send out mail ballots or prepare voting equipment for early voting. Voters may also not know whether a runoff will actually be held or (possibly) which candidates qualified, pending the results of the recount.

This leaves, at absolute most, 19 or 20 days to prepare for the runoff. Voters who wish to vote by mail must have their mail ballot application "received by the board of registrars or absentee ballot clerk no later than 11 days prior to the...runoff" (Section 25 (a)(1)(A)) Accounting for postal delivery time, this means they would have to submit the application by about 13 days before the runoff. This leaves less than a week for a voter to decide they want to vote by mail.

In the December 2022 Senate runoff, the biggest dropoff in turnout (compared to the November general election) was in the mail ballot counts. While the total number of ballots of all types in the runoff was about 90% of the ballot count in the general election, the number of runoff mail ballots was only 78% of the general election mail ballot count. This works out to be 54,821 fewer mail ballots counted in the Senate runoff than in the Senate general election.[58]

The situation for early in-person voting is even worse. Prior to SB202, early in-person voting for runoff elections followed the same schedule as general and primary elections–16 mandated days of early voting. Under SB202, the early voting period for a runoff is now required to begin "no later than the second Monday immediately prior to such runoff" (Section 28 (d)(1)(B)). Because early voting ends on the Friday before the election, this leaves only 5 days of mandated early voting for a runoff. The lack of mandated weekend voting will have a bigger impact on racial minority voters (compared to white voters) because they tend to be more likely to vote on weekends than weekdays.[59] Counties have the option to begin early

---

[58]These statistics were calculated by using the certified vote counts that are provided by the Georgia Secretary of State's office: https://results.enr.clarityelections.com/GA/.

[59]See, for example, Herron and Smith. 2014. "Race, Party, and Consequences of Restricted Early Voting in Florida in the 2012 General Election." *Political Research Quarterly*. 67 (3).

voting earlier, but in 2022 only a handful of counties provided more than the 5 required days.

It is difficult to overstate the impact that these changes could have on line length for runoff elections. Fewer mail voters means either more in-person voters. Fewer days of early voting means either longer lines on the remaining early voting days or longer lines on Election Day. The only way that decreased mail voting and fewer early voting days does not impact the length of lines is if voter turnout goes down.

Although more comprehensive data were not available, I collected information about wait times during the runoff early voting period in a few counties where it was available in real time. Five counties–Clayton, Cobb, DeKalb, Fulton, and Gwinnett–displayed the current wait time at all their early voting locations. These counties are five of the six most populous counties in the state, making up more than a third (36%) of all the registered voters in the state.

On the Friday during the early voting period, I recorded every instance where a voting location updated the current wait time that displayed in each county's public dashboard. In all, I collected 742 wait time reports from the 66 early voting locations in these 5 counties. The data presented a clear picture that lines were catastrophically long on this day of early voting.

Of the 742 reports, 703 of them (94.7%) indicated that the wait time at the early voting location was currently at least 30 minutes. 496 reports (66.8%) indicated the line was longer than an hour. Of the 66 locations, 60 had a line of at least 30 minutes during the afternoon and evening that I captured the data. 48 locations had an hour-long line at some point on that day. And nearly a quarter of early voting sites (15) had a line that exceeded two hours.

Figure 4.3 provides a full picture of these 742 wait time reports. Each dot on the graph represents one of these reports. The all the reports from an specific early voting location are grouped vertically, with a bar extending from the shortest to the longest reported wait time at that location.

The figure shows that Fulton and Gwinnett Counties had the longest lines on this early voting day. Every single one of Fulton's 24 early voting locations had a line of at least 30 minutes at some point, and 21 of 24 had a line at least over 60 minutes. In Gwinnett County, all 11 early voting sites reported a wait of at least 45 minutes. Early voting sites in DeKalb County avoided lines in excess of two hours, but still have 11 of their 16 sites report a line over 1 hour. Lines in Cobb County were the best of these five counties, and yet 8 of their 12 early voting locations reported a line longer than 30 minutes.

If the wait times in these counties on Friday are indicative of what they were throughout the rest of the week, the 658,690 early voters in these five counties waited, on average, about 61 minutes to cast their ballot. These voters made up roughly 38% of all the early voters in

Figure 4.3: Wait times during early voting on Friday before runoff



the state. If you make the extremely generous assumption that early voters in the remaining 154 Georgia counties waited exactly 0 minutes to vote, you still end up with a statewide average wait time of over 23 minutes–nearly at the maximum reasonable wait time threshold prescribed by the PCEA Report.

### 4.2.3   Changes to early voting hours will not solve Georgia's long line problem

Another major administrative change in SB202 is its rules on when early voting sites must be open. Previously, local election officials had more discretion in the days and hours that voters could cast a ballot prior to Election Day. Under SB202, counties are now required to offer early voting on every weekday and Saturday, beginning 22 days prior to Election Day and ending on the Friday before Election Day. During these days, advanced voting locations must be open from 9:00am through 5:00pm, and officials have the option to have them open

36

from 7:00am through 7:00pm. Sunday voting is not required under SB202, although county officials have the option of opening polling places on Sundays during the early voting period.

The bill claims that these changes in scheduling requirements will "dramatically increase the total voting hours" for Georgia voters. If it were the case that the law will have a dramatic impact on early voting hours, then it could have a positive impact on line length and wait times. However, my analysis below shows that these rules will have a minimal impact on line length for two reasons. First, most Georgia voters (and disproportionately white voters) live in a county that–prior to SB202–already offered at least as many hours of early voting as are required by SB202. Second, counties where lines were the longest in recent elections already tend to offer the most hours of early voting; the counties that will expand early voting hours under SB202 already had short lines.

Figure 4.4: Total early voting hours in Georgia counties



Figure 4.4 illustrates the first point. In it, each dot represents one Georgia county in the November 2020 election.[60] On the horizontal axis is the total number of registered

---

[60]The data provided by the State did not include early voting hours for Cook County in 2020.

voters, and on the vertical axis is the total number of hours of early voting, adding up the number of hours each early voting site was open on each day. The black horizontal line at 136 represents the minimum number of hours of early voting required by SB202 (8-hours of voting on 15 weekdays, plus 8 hours of voting on 2 Saturdays). It is worth pointing out that SB202 provides guidance on the minimum number of early polling places a county must have open–only that they must have at least one site that is open during the 136 hours specified in the law.[61] Of course, many large counties provide for many more than one early voting site. Fulton County, for example, had 37 early voting sites that were open about 8 hours a day for all 21 days of early voting–over 6,200 hours of early voting.

The clear take-away from Figure 4.4 is that counties that had fewer than 136 early voting hours in 2020 tended to be much smaller than the counties that met the requirements of SB202 before it was even adopted. 98 counties met the 136-hour standard, while 60 fell below that bar. Of those 60 counties, 20 of them had at least 134 hours and in most cases those counties needed to extend their Saturday closing time from 4:00pm to 5:00pm. The clear upward trend in this graph shows that larger counties are less likely to have to make changes to their early voting hours to comply with SB202.[62]

One possibility with this analysis is that by multiplying the available voting hours across all polling places, the graph may be masking counties that have lots of early voting sites but not many hours that they are open. Figure 4.5 assuages this concern. This graph is similar to the previous one, except this time the vertical axis shows the total number of early voting hours available in at least one location. If a county has five early voting sites open for 8 hours on the Friday before Election Day, that will only count as 8 hours in this graph, rather than 40 (as with the previous graph). The take-away from this graph is similar to the previous one. Counties with fewer voters are significantly more likely to fall below the 136-hour threshold, and thus require an expansion of early voting hours.

The reason this relationship between county size and hours of early voting is important is because it directly impacts how much SB202's changes can affect wait times. Table 4.4 provides an idea of how many voters will be affected by requiring every county to offer 136 hours of early voting. The 6.0 million voters represented in the top row of the table live in the 98 counties that will not have to add early voting hours to comply with SB202. The middle row represents the 483k Georgia voters who live in a county that will have to add less

---

[61]It is worth pointing out that while most Georgia counties will not have to add hours to comply with SB202, some will have to shift their opening/closing times on particular days to comply with the 9-to-5:00 requirement of SB202. Coweta County provides the most common example of this. In November 2020, the weekdays hours in Coweta were 8:30am to 4:30pm. In the May 2022 primary election, Coweta shifted its early voting hours to 9:00am to 5:00pm to comply with SB202.

[62]This positive correlation between registered voters and total early voting hours is statistically significant ($p < 0.01$).

Figure 4.5: Available early voting hours in Georgia counties



than two hours to comply with the law. And the bottom row shows the 481k voters living in a county that will add more than two hours. This means that the wait times of 86.2% of Georgia's registered voters cannot be affected by the early voting provisions of SB202, since they live in a county that will not be required to expand early hours. Half of the remaining 13.8% of voters live in a county that will only be required to add a couple hours of early voting.

Georgia's voter registration data also makes it clear that whatever positive impacts will come from expanding early voting hours in these 60 counties will disproportionately

Table 4.3: How many voters will be impacted by expanded early voting requirements?

| 2020 early hours | sample | Reg. voters | Percent white | Percent Black |
|---|---|---|---|---|
| 136+ | 783 | 6,029,607 | 50.6% | 30.8% |
| 134-135.5 | 62 | 482,977 | 69.4% | 18.7% |
| <134 | 52 | 480,864 | 66.7% | 22.6% |

Table 4.4: How much can expanded early voting requirements help fix long lines?

| 2020 early hours | Avg. 2020 wait | Pct >30min in 2020 |
|---|---|---|
| 136+ | 28.8 min. | 26.7% |
| 134-135.5 | 19.2 min. | 15.5% |
| <134 | 19.5 min. | 10.1% |

benefit white voters. Of the voters who live in counties that will not have to expand early voting, 50.6% are white and 30.8% are Black. The other two groups of voters are considerably more white–nearly 70%–and less Black–around 20%. This means that the group with that experiences the longest wait times to vote–Black voters–also has the least potential to be positively impacted by this provision in SB202.

The final reason that SB202's expanded early voting requirements are unlikely to alleviate long lines is that the counties most affected already have the shortest lines. Table 4.4 shows the 2020 wait time statistics for voters who live in counties that will or will not be affected by expanded early voting hours. As the table makes clear, voters who live in counties that had least 136 hours of early voting in 2020 experienced longer lines than those in counties that will expand early voting under SB202. Voters in the first category were 11.2 percentage points more likely to wait longer than 30 minutes to vote than voters who will experience a small increase in early voting hours.[63] And they were 16.6 percentage points more likely to experience a long wait than those in counties with larger expansions of early voting.[64].

While setting minimum thresholds for early voting hours in Georgia is a welcome change to the law, I see no evidence in the data to suggest that this change will make a noticeable dent in the long wait times experienced by Georgia voters. The vast majority of voters live in counties that will not be required to change their early voting hours to comply with SB202. These voters also live in areas that tend to be afflicted by longer lines to vote–a problem that this provision of SB202 will not solve. Moreover, to the extent that the changes could have a small impact on wait times in some counties, that impact is more likely to be felt by white Georgia voters, who make up a significantly larger proportion of the voters impacted by this provision.

### 4.2.4   Shrinking precincts will not shorten lines

Another provision of SB202 that relates to line length is the requirement that a precinct be split apart if it had more than 2,000 voters and a line that persisted at least one hour past

---

[63]Statistically significant at $p < 0.01$

[64]Statistically significant at $p < 0.01$

poll closing time. While it seems logical that smaller polling places translate into shorter lines, this provision is unlikely to have the desired effect on line length, and may actually exacerbate the problem.

To understand why this is the case, it is important to understand that long wait times arise because the ratio of voters-to-resources (like poll workers, check-in machines, or vote-casting machines) is too high. My research (Pettigrew 2016) finds that under-resourced precincts is one of the biggest drivers of long lines. A precinct with 2,000 voters and 50 vote-casting machines is likely to have shorter lines than a precinct with 200 voters, but only 3 vote-casting machines.

Without requiring or providing money to counties to acquire additional resources for these problematic precincts, SB202 runs the risk of making the line problem worse for more voters. If you split a precinct in half and divvy the voting machines equally between then, you have not improved the voters-per-machine ratio. Lines are just as likely to develop. Even worse, if the resources cannot be equally divided (if, for example, there were 7 check-in stations in the old precinct), then the new precinct that received fewer resources is likely to experience lines that are even longer than before. And because lines grow non-linearly, the result could be that the average wait time across all voters in both precincts is actually worse than it would have been if the precincts had been kept as one. On top of all of that, research has shown that drawing new precinct boundaries can create voter confusion. A voter who finds out they are at the wrong location when they check-in to vote make the line longer for everybody behind them. SB202 also limits that voter's ability to vote by disallowing them from casting an out-of-precinct provisional ballot if it is earlier than 5:00pm.

Lastly, this change would not impact the vast majority of voters. In the November 2020 general election, only about 1-in-5 Georgia voters voted on Election Day. The other 80% of voters would not be affected by this change. And even among the 20% of Election Day voters, the majority of them do not live in a precinct that exceeds the 2,000 voters minimum for this provision to apply.

41

# Section 5:   Consequences of long lines

I turn now to the consequences that long lines have on voters. The most basic impact of waiting in a line is the time burden placed upon the voter—what has been referred to as a "time tax."[65] Compared to those who live in areas with consistently short lines, voters who live in areas with chronically long lines must sacrifice more of their time to exercise their right to vote. This can be a particular burden for people who have less flexibility in their schedule, whether because they have constraints in their work schedule or because they have childcare or eldercare responsibilities.

In addition to these direct consequences of long lines, political scientists have considered two ways that lines can impact voters. First, they have estimated the impact that lines have on voter turnout in the current or future election. Second, they have considered the impact that lines have on voters' confidence in the integrity of the electoral system as a whole.

## 5.1   Long lines decrease voter turnout in future elections

Perhaps the most impactful consequence of long lines is the effect that they have on voter turnout. There are two ways in which lines can have an impact on turnout. The first occurs when a voter joins the line but leaves before casting their ballot. This is referred to in queueing theory as "reneging." Although it is difficult to collect data on reneging, the studies that do exist find, perhaps unsurprisingly, that longer lines tend to have higher numbers of people who renege by leaving the line.[66] Lines with as few as five people in them can significantly increase the chance that somebody will leave the line before voting.[67] Some of these voters may return at another time to cast a ballot, but limiting voting hours or early voting opportunities diminishes their opportunities to do so.

The second, and more significant, way in which long lines can impact voter turnout is by deterring voters from ever joining the line at all–referred to in queueing theory as "balking." I have found in my own research, published in *Electoral Studies*, that the longer a voter waits in a line in one election, the less likely they are to vote in the next election.[68] Voters who

---

[65]Elora Mukherjee. 2013. "Abolishing the Time Tax on Voting." *Notre Dame Law Review* 85(1).
Donald L. Davison and Michael Krassa. 2019. "Time Taxes and Voting Queues: The Voting Rights Act after Shelby County, Alabama v. Holder (2013)." *National Political Science Review* 20(1).

[66]Spencer and Markovits. 2010.

[67]Stein, et al. 2020.

[68]Stephen Pettigrew. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral Studies* 71.

waited more than one hour were 1.6 percentage points less likely to turnout in future elections than voters who waited less than 15 minutes. And those who waited between 31 and 60 minutes were one percentage point less likely compared to those where lines were short.

To arrive at these estimates, I used several different data sources and statistical approaches. Using demographic and turnout history information, I paired voters who lived in neighborhoods with long lines to voters in neighborhoods with short lines. This approach allowed me to conclude that, "When selecting two voters from the same state, who are the same race and similar age, have the identical turnout history, and live in neighborhoods with nearly identical demographic profiles, the voter who lives in the neighborhood with an average wait of more than an hour was 1.6 percentage points less likely to vote... than their counterpart in a neighborhood with an average wait of less than 15 minutes."[69]

Other researchers have found similar results using different data sources and empirical approaches. Cottrell, Herron and Smith (2020) using precinct-level data in Florida to compare voters in polling places with short lines to those with long lines.[70] They find that each hour an in-person voter spends waiting in line to vote is associated with a one percentage point drop in the likelihood of future turnout. They characterize this finding as "qualitatively similar" to the result in my own work.

While these effect sizes may seem small, it is important to remember the large number of people affected by long lines in Georgia. In the 2020 presidential election, 8.7 percent of in-person voters in Georgia waited more than 60 minutes to vote and another 15.9 percent waited between 31 and 60 minutes. There were over 3.67 million ballots cast in-person in the presidential race, meaning that approximately 319,000 Georgians waited longer than an hour and another 583,000 waited between 31 and 60 minutes.

Based on the estimates of the effects of long lines on turnout, this translates into nearly 9,000 voters who would not have turned out in 2022, due to their experience in a long line in 2020. In a state as closely divided as Georgia–President Biden won the state by just under 12,000 votes in 2020–a drop-off of several thousand voters can be hugely consequential on electoral outcomes. Even more consequently, I showed in Section 3.3 that long lines tend to afflict voters of color more than white voters. Because of this, dropoff in future turnout due to long lines will more heavily affect those communities of racial minorities. Policies, like SB202, that increase the length of lines diminish the political power of racial minorities.

---

[69]Pettigrew, 2021.

[70]David Cottrell, Michael C. Herron, and Daniel A. Smith. 2021. "Voting Lines, Equal Treatment, and Early Voting Check-In Times in Florida." *State Politics & Policy Quarterly.* 21(2), pp 109-138.

## 5.2   Long lines diminish voter confidence in the integrity of elections

One of the main justifications provided in SB202 for changing Georgia's election administration laws was that it would help improve confidence in the electoral system as a whole. The bill, which is titled the "Electoral Integrity Act of 2021," alludes to a "significant lack of confidence in Georgia election systems" and suggests that the legislation is meant to "address the lack of elector confidence in the election system." Political science research on the topic of voter confidence has found that one of the biggest drivers of a person's confidence in the accuracy of an election's results is whether or not their preferred candidate won.[71] Voters who supported a winning presidential candidate are about 22 percentage points more likely to believe that their own vote was properly counted and 32 percentage points more likely to trust in the vote count in their county. This provides some explanation for why some Republican voters in 2020 were open to the message that the election had been stolen. Thinking specifically about Georgia, political science research would predict that voter confidence among Georgia Republicans–which was extremely low following Republican losses in most statewide races in 2020–should bounce back in 2022 after the Republicans won elections for all eight statewide Constitutional offices. This bounce-back in confidence would have happened regardless of whether SB202 existed or not.

Although it is not possible to have a democratic system in which every voter's preferred candidate wins, research has found that there are some ways in which legislators and policymakers can have an impact on voters' perceptions of electoral integrity. The key way to do this is by improving the quality of the voting process, particularly when it comes to what might be referred to as the "customer service" aspect of elections. Voters who feel like they received good customer service at the polling place are more confident that poll workers will properly count their vote and that the final results are accurate.

Research has found that long lines are one of the biggest ways to erode voter confidence. My own research[72] has found that the longer somebody waits in line to vote, the less confident they are that their vote was counted correctly. Figure 5.1 reproduces Figure A1 from that research. It shows that of voters who did not wait at all, 71% reported being "very confident" that their vote was counted properly. Only 61% of voters who waited between 31 and 60 minutes and just 58% of those who waited more than an hour had that confidence. These dropoffs, which are statistically significant ($p < 0.01$), demonstrate the important role that the precinct experience can have on voters' overall beliefs about election integrity.

---

[71]Sances, Michael W. and Charles Stewart III. 2015. "Partisanship and confidence in the vote count: Evidence from US national elections since 2000." *Electoral Studies* 40. 176-188.

[72]Pettigrew, Stephen. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral Studies* 71.

Figure 5.1: Voter confidence in the electoral system, by wait time



Other researchers have studied the issue of long lines and voter confidence and reached similar conclusions. Herron, Smith, Serra, and Bafumi find in their 2017 article that voters who waited in a long line were significantly less confident that their ballot would be counted properly.[73] They also find that those voters were also significantly less confidence that the contents of their ballot would remain a secret. The authors summarize their findings by saying, "voters who experience long lines may be disproportionately skeptical that their votes will be kept secret or will be counted" and that this finding, "should be a concern to all local election administrators."

These findings suggest that SB202 has the potential to have a net-negative impact on voters' confidence in the electoral system. As Georgia voters find it more difficult to vote by mail, they will either not vote at all or opt to vote in-person. If they choose the latter

---

[73]Michael C. Herron, Daniel A. Smith, Wendy Serra, and Joseph Bafumi. 2017. "Wait Times and Voter Confidence. A Study of the 2014 Midterm Election in Miami-Dade County." From *Races, Reforms, & Policy: Implications of the 2014 Midterm Elections.* Edited by Christopher J. Galdieri, et al. University of Akron Press.

approach, my analysis suggests that they make it more likely that all voters in their precinct will encounter long lines, casting doubt upon the integrity of the electoral system in the minds of those voters.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to light. Executed on January 13, 2023 in Philadelphia, Pennsylvania.

Stephen Pettigrew, PhD

# Appendix A:   Supplemental material for analyses

## A.1   Sample sizes of CCES data

Table A.1: Total number of respondents in the CCES/CES surveys

| Year | Nationwide | Georgians |
|------|-----------|-----------|
| 2006 | 36,421 | 1,188 |
| 2008 | 32,800 | 889 |
| 2012 | 54,535 | 1,759 |
| 2014 | 56,200 | 1,732 |
| 2016 | 64,600 | 2,062 |
| 2018 | 60,000 | 1,925 |
| 2020 | 61,000 | 2,002 |

## A.2   Analysis of SPAE data

Figure A.1: Voters waiting more than 30 minutes (SPAE data)



Figure A.2: Average wait time (SPAE data)



48

## A.3   Voters waiting more than 60 minutes



Figure A.3: Voters waiting more than 60 minutes



Figure A.4: Voters waiting more than 60 minutes, by vote mode

## A.4   Wait times in each state



Figure A.5: Voters waiting more than 30 minutes in presidential elections, by state



Figure A.6: Voters waiting more than 30 minutes in midterm elections, by state



Figure A.7: Average wait time in presidential elections, by state



Figure A.8: Average wait time in midterm elections, by state

Table A.2: Voters waiting over 30 minutes, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|---|---|---|---|---|---|
| 2008 | All in-person | 14.4% (0.3) | 34.3% (1.5) | 19.9pp. (1.5) | <0.01 |
| 2012 | All in-person | 11.8% (0.2) | 17.4% (1.0) | 5.5pp. (1.0) | <0.01 |
| 2014 | All in-person | 2.1% (0.1) | 2.6% (0.5) | 0.6pp. (0.5) | 0.254 |
| 2016 | All in-person | 9.1% (0.2) | 15.4% (0.9) | 6.3pp. (0.9) | <0.01 |
| 2018 | All in-person | 5.4% (0.1) | 16.2% (0.7) | 10.8pp. (0.7) | <0.01 |
| 2020 | All in-person | 17.4% (0.3) | 24.5% (1.2) | 7.1pp. (1.2) | <0.01 |
| 2008 | Early in-person | 19.9% (0.7) | 38.6% (2.2) | 18.7pp. (2.3) | <0.01 |
| 2012 | Early in-person | 16.7% (0.5) | 21.3% (1.6) | 4.6pp. (1.7) | <0.01 |
| 2014 | Early in-person | 2.5% (0.2) | 4.4% (0.8) | 1.9pp. (0.8) | 0.017 |
| 2016 | Early in-person | 11.2% (0.4) | 17.4% (1.2) | 6.2pp. (1.3) | <0.01 |
| 2018 | Early in-person | 6.3% (0.3) | 13.0% (1.0) | 6.6pp. (1.0) | <0.01 |
| 2020 | Early in-person | 19.5% (0.4) | 27.8% (1.5) | 8.3pp. (1.6) | <0.01 |
| 2008 | Election Day | 12.8% (0.3) | 28.0% (2.2) | 15.2pp. (2.2) | <0.01 |
| 2012 | Election Day | 10.3% (0.2) | 14.4% (1.3) | 4.0pp. (1.3) | <0.01 |
| 2014 | Election Day | 2.0% (0.1) | 1.6% (0.6) | -0.4pp. (0.6) | 0.510 |
| 2016 | Election Day | 8.3% (0.2) | 12.6% (1.2) | 4.3pp. (1.3) | <0.01 |
| 2018 | Election Day | 5.0% (0.2) | 20.2% (1.0) | 15.2pp. (1.0) | <0.01 |
| 2020 | Election Day | 15.4% (0.3) | 17.0% (2.2) | 1.6pp. (2.2) | 0.473 |

## A.5  Differences in line length between Georgia and other states, using regression with demographic controls

Table A.3: Average wait time, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|------|--------|--------------|---------|------------|---------|
| 2008 | All in-person | 15.1 (0.2) | 39.8 (1.3) | 24.7min. (1.3) | <0.01 |
| 2012 | All in-person | 13.6 (0.2) | 15.9 (0.9) | 2.3min. (0.9) | <0.01 |
| 2014 | All in-person | 4.4 (0.1) | 7.5 (0.3) | 3.1min. (0.3) | <0.01 |
| 2016 | All in-person | 10.9 (0.1) | 15.2 (0.6) | 4.3min. (0.6) | <0.01 |
| 2018 | All in-person | 8.0 (0.1) | 17.9 (0.4) | 9.9min. (0.5) | <0.01 |
| 2020 | All in-person | 17.9 (0.2) | 27.1 (1.0) | 9.2min. (1.0) | <0.01 |
| 2008 | Early in-person | 21.2 (0.6) | 49.6 (2.2) | 28.4min. (2.3) | <0.01 |
| 2012 | Early in-person | 18.2 (0.5) | 18.9 (1.6) | 0.7min. (1.6) | 0.668 |
| 2014 | Early in-person | 4.6 (0.2) | 7.1 (0.6) | 2.5min. (0.6) | <0.01 |
| 2016 | Early in-person | 12.6 (0.2) | 17.1 (0.8) | 4.4min. (0.9) | <0.01 |
| 2018 | Early in-person | 8.6 (0.2) | 16.5 (0.6) | 7.9min. (0.7) | <0.01 |
| 2020 | Early in-person | 20.5 (0.3) | 32.2 (1.3) | 11.7min. (1.4) | <0.01 |
| 2008 | Election Day | 13.3 (0.2) | 24.9 (1.7) | 11.6min. (1.7) | <0.01 |
| 2012 | Election Day | 12.2 (0.2) | 13.5 (1.0) | 1.3min. (1.1) | 0.214 |
| 2014 | Election Day | 4.4 (0.1) | 7.6 (0.4) | 3.2min. (0.4) | <0.01 |
| 2016 | Election Day | 10.3 (0.1) | 12.7 (0.8) | 2.4min. (0.8) | <0.01 |
| 2018 | Election Day | 7.8 (0.1) | 19.5 (0.6) | 11.7min. (0.7) | <0.01 |
| 2020 | Election Day | 15.6 (0.2) | 15.4 (1.6) | -0.2min. (1.6) | 0.898 |

## A.6   Relationship between race and line length

Figure A.9: Average wait time of white and non-white voters



Figure A.10: Average wait time, by race



Regression results that corresponds with Figure 3.10:

Table A.4: Wait times since 2006

| | DV: Minutes waiting to vote | |
|---|---|---|
| | (1) | (2) |
| People of color | 2.79** (0.97) | |
| Black | | 3.64*** (1.06) |
| Hispanic | | −1.59 (2.45) |
| Other race | | 1.37 (2.15) |
| Age | −0.07** (0.03) | −0.07** (0.03) |
| Bachelors | 1.07 (0.92) | 1.22 (0.92) |
| EDay voters | −7.50*** (0.88) | −7.43*** (0.88) |
| Intercept | 29.96 (63.87) | 34.51 (63.89) |
| Observations | 5,884 | 5,884 |
| $R^2$ | 0.17 | 0.18 |

*Note:*    County and year fixed effects included
\* p<0.05; \*\* p<0.01; \*\*\* p<0.001

Regression results that corresponds with Figure 3.11:

Table A.5: Wait times in presidential elections

| | DV: Minutes waiting to vote | |
|---|---|---|
| | (1) | (2) |
| People of color | 5.05*** (1.45) | |
| Black | | 5.29*** (1.59) |
| Hispanic | | 0.34 (3.68) |
| Other race | | 6.95* (3.17) |
| Age | −0.07 (0.04) | −0.08 (0.04) |
| Bachelors | 0.89 (1.39) | 0.82 (1.40) |
| EDay voters | −15.06*** (1.30) | −15.05*** (1.30) |
| Intercept | 2.54 (74.79) | 7.34 (74.86) |
| Observations | 3,755 | 3,755 |
| $R^2$ | 0.14 | 0.14 |

*Note:*    County and year fixed effects included
\* p<0.05; \*\* p<0.01; \*\*\* p<0.001

Regression results that corresponds with Figure 3.12:

Table A.6: Wait times in November 2020

|  | DV: Minutes waiting to vote | |
|---|---|---|
|  | (1) | (2) |
| People of color | 10.45** (3.64) |  |
| Black |  | 10.49* (4.14) |
| Hispanic |  | 3.66 (8.76) |
| Other race |  | 14.35* (7.23) |
| Age | 0.26* (0.11) | 0.25* (0.11) |
| Bachelors | 3.09 (3.40) | 3.05 (3.42) |
| EDay voters | −17.00*** (3.64) | −17.04*** (3.66) |
| Intercept | 8.05 (60.38) | 8.25 (60.42) |
| Observations | 897 | 897 |
| $R^2$ | 0.23 | 0.23 |

*Note:*  County and year fixed effects included
* p<0.05; ** p<0.01; *** p<0.001

60

# Appendix B:   Curriculum Vitae

# Stephen S. Pettigrew

University of Pennsylvania

pettigr@sas.upenn.edu

stephenpettigrew.com

## Work Experience

**University of Pennsylvania**                                          Philadelphia, PA
    Deputy Executive Director: Robert A. Fox Leadership Program          Dec. 2017–pres.
    Director of Data Sciences: Program on Opinion Research          Dec. 2017–pres.
        and Electoral Studies

**NBC News**                                                                    New York, NY
    Senior Analyst: Decision Desk and Data Analytics Lab          Dec. 2017–pres.

**MIT Election Data and Science Lab**                                Cambridge, MA
    Project Manager                                             Apr. 2017–Nov. 2017
    Data Scientist                                             Sept. 2011–Apr. 2017

## Education

**Harvard University**                                               Cambridge, MA
    PhD: Political Science                                              May 2017
    Dissertation: *Long Lines and Voter Purges: The Logistics of Running Elections in America*
    Master of Arts: Statistics                                          Mar. 2014

**University of Georgia**                                                 Athens, GA
    Master of Arts: Political Science and International Affairs          May 2011
    Bachelor of Arts: Political Science & History (Double Major)          May 2011

## Peer-Reviewed Publications

"Trumped by Trump? Public Support for Vote By Mail During the COVID-19 Pandemic." *Election Law Journal.* Forthcoming.

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout." *Electoral Studies* 71. June 2021.

"Protecting the Perilous Path of Election Returns: From the Precinct to the News." with Charles Stewart. *Ohio State Technology Law Journal.* 15: (2). Summer 2020.

"Abstention, Protest, and Residual Votes in the 2016 Election." with Michael Alvarez, Charles Stewart, and Cameron Wimpy. *Social Science Quarterly.* 101: (3). March 2020.

"The Race Gap in Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132: (3). Fall 2017. pp 527-547.

"Comment on 'Estimating the Reproducibility of Psychological Science'" with Daniel Gilbert, Gary King, and Tim Wilson. *Science* 351: (6277). March 4, 2016.

"Hosting the Olympic Games: An Overstated Advantage in Sports History." with Danyel Reiche. *International Journal of the History of Sport* 33: (6-7). March-April 2016. pp 635-647.

"How the West will be Won: Using Monte Carlo Simulations to Estimate the Effects of NHL Realignment." *Journal of Quantitative Analysis in Sports* 10 (3). September 2014. pp 345-356.

"Strategic Politicians, Partisan Roll Calls, and the Tea Party: Evaluating the 2010 Midterm Elections." with Jamie Carson. *Electoral Studies* 32: (1). March 2013. pp 26-36.

## Other Political Science Publications

"Uncertainty over a blue wave: NBC News finds Democratic and GOP voter registrations at same level as past election cycles" *NBC News*. Oct. 16, 2018. With John Lapinski, Stephanie Perry, and Rezwana Uddin.

"Improving the Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources" *Bipartisan Policy Center*. April 2018. With John Fortier, Tim Harper, Charles Stewart, and Matthew Weil.

"The United States is Getting Better at Running Elections." *The Monkey Cage*. August 9, 2016. With Charles Stewart

"Elections Performance Index: Methodology 2014" *The Pew Charitable Trusts*. August 2016.

"These are the Two Pivotal Senators if There's a Vote to Replace Scalia." *The Monkey Cage*. February 14, 2016.

"The 2014 Elections that Ended in a Tie." *FiveThirtyEight*. December 5, 2014.

"Elections Performance Index: Methodology 2012" *The Pew Charitable Trusts*. April 2014.

"Republican Advantages in Candidate Recruitment in 2014 have Led to an Increasingly Polarized House of Representatives." with Jamie Carson. *London School of Economics American Politics and Policy Blog*. September 17, 2013.

"Elections Performance Index: Methodology 2008-2010" *The Pew Center for the States*. February 2013.

## Professional Talks and Testimony

Testimony before the Subcommittee on Elections for the Committee on House Administration of the United States House of Representatives. Hearing on "Voting in America: The Potential for Polling Place Quality and Restrictions on Opportunities to Vote to Interfere with Free and Fair Access to the Ballot." June 11, 2021. Link to written testimony.

Panel on Efficiency, Security and Equity. Georgia College and State University. Election Integrity Symposium. Spring 2021.

"What Happens Behind the Scenes on Election Night."
University of Texas at Tyler. March 2021.
University of Pennsylvania (Wharton). December 2021.
New York University. October 2019.
Columbia University. October 2019.
University of Georgia. October 2019.
Dartmouth College. May 2019.
Second Measure. August 2018.

## Stephen Pettigrew

"Everything is Data: How to Use Numbers to Answer the Questions You've Always Had." University of Georgia Honors Program. October 2015.

Guest lecturer in "Election Law and Participation" seminar. Bates College. May 2015.

## Teaching Experience

**PSCI207: Applied Data Science (UPenn)**                    S2018, S2019, F2019, S2021
    with Dr. John Lapinski and Samantha Sangenito
      *Topics*: R programming • Survey research • Experiments

**PSCI107: Introduction to Data Science (UPenn)**                    Fall 2020
    with Dr. Marc Trussler
      *Topics*: R programming • Data science

**17.20: Introduction to the American Political Process (MIT)**                    Spring 2016
    with Dr. Devin Caughey
      *Topics*: American political institutions • Mass opinion and behavior

**Gov2002: Causal Inference**                    Fall 2015
    with Dr. Matt Blackwell
      *Topics*: Experimental design • Instrumental variables • Regression discontinuity • Matching
    Harvard University Certificate of Distinction in Teaching (2015)

**Gov2001: Advanced Quantitative Research Methodology**                    Spring 2014, 2015
    with Dr. Gary King
      *Topics*: Maximum likelihood estimation • Predictive modeling • Missing data
    Harvard University Certificate of Distinction in Teaching (2014, 2015)

**Gov1540: The American Presidency**                    Fall 2013, 2014, 2015
    with Dr. Roger Porter
      *Topics*: Presidential power • Interbranch relations • Elections • Presidential decision making
    Harvard University Certificate of Distinction in Teaching (2015)

**Harvard Government Math Pre-fresher**                    Aug. 2013, 2014
      *Topics*: Probability • Matrix algebra • Calculus • Optimization • R programming

## Conference Presentations

"Protecting the Perilous Path of Election Returns: From the Precinct to the News." Symposium on Elections in the Era of Technological Threats and Opportunities. Moritz College of Law. Ohio State University. January 2020. Columbus, OH. With Charles Stewart.

"Education Weighting in the National Exit Poll" *American Association of Public Opinion Researchers Annual Conference.* May 2019. Toronto, ON.

"Moved Out, Moved On: Assessing the Effectiveness of Registration List Maintenance" *Election Sciences, Reform, & Administration Conference.* July 2016. Portland, OR.

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout" *American Political Science Annual Meeting.* September 2016. Philadelphia, PA.

"How Long Lines Affect Turnout." *Society for Political Methodology Annual Meeting.* July 2016. Houston, TX.

"Home Advantage at the Olympics: Will Brazil Win More Medals than Usual?" *Who Will Win in Rio? Conference.* July 2016. Cambridge, MA.

### Stephen Pettigrew

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout" *Yale Center for the Study of American Politics Conference*. June 2016. New Haven, CT.

"The Downstream Effects of Long Lines: How Long Waits at the Precinct Depress Future Turnout" *Midwest Political Science Association Annual Meeting*. April 2016. Chicago, IL.

"A Population Model of Voter Registration and Deadwood" *Midwest Political Science Association Annual Meeting*. April 2016. Chicago, IL. With Charles Stewart.

"Why the Home Advantage at the Olympic Games is Overrated: Relating Host Medals to Increased Participation" *World Congress on Elite Sport Policy*. November 2015. Melbourne, Australia. With Danyel Reiche.

"A Population Model of Voter Registration and Deadwood" *New Research on Election Administration and Reform*. June 2015. Cambridge, MA. With Charles Stewart.

"Time Tax: Which Groups Wait in the Longest Lines on Election Day?" *Western Political Science Association Annual Meeting*. April 2015. Las Vegas, NV.

"Assessing the Offensive Productivity of NHL Players using In-game Win Probabilities." *MIT Sloan Sports Analytics Conference*. February 2015. Boston, MA.
   Best research paper award finalist

"How the West will be Won: Using Monte Carlo Simulations to Estimate the Effects of NHL Realignment." *New England Symposium on Statistics in Sports*. September 2013. Cambridge, MA.

"Evaluating New Representatives: How Redistricting Disrupts Congressional Representation" *American Political Science Association Annual Meeting*. August 2013. Chicago, IL. With Brian Schaffner and Stephen Ansolabehere.

"Redistricting and the Personal Vote in 2012" *2013 CCES Sundance Conference*. May 2013. Sundance, UT. With Stephen Ansolabehere.

"The Electoral Value of Seniority: Does Incumbent Tenure Affect the Attitudes of Voters?" *Midwest Political Science Association Annual Meeting*. April 2013. Chicago, IL. With Stephen Ansolabehere.

"Competition and Candidate Emergence Decisions in U.S. House Primaries, 2000-2010" *Midwest Political Science Association Annual Meeting*. April 2012. Chicago, IL.

"Strategic Politicians, the Great Recession, and the Tea Party Movement: Evaluating the 2010 Midterm Elections." *Midwest Political Science Association Annual Meeting*. March 2011. Chicago, IL. With Jamie Carson.

## Sports Analytics Research and Publications

**Winners View**: Data analytics consultant                          April 2016–June 2016
**Philadelphia 76ers**: Basketball analytics consultant              July 2014–November 2014
**Rink Stats**: My hockey analytics blog                             June 2013–Present
**Wall Street Journal**

   The Madness Machine                                              March 16, 2015
   As NBA Playoffs Begin, Odds of Beating the Heat                  April 19, 2014

## Stephen Pettigrew

| | |
|---|---|
| The Stanley Cup: What are the Odds? | April 16, 2014 |
| NCAA Tournament: Our Sorry, Broken Brackets | April 7, 2014 |
| 2014 Sochi Olympics: Why Canada will Rule (Again) in Hockey | February 7, 2014 |

**FiveThirtyEight**

| | |
|---|---|
| Is There Home-Field Advantage At The Olympics? With Danyel Reiche. | August 9, 2016 |
| Playoff Hockey is 36 Percent More Bone-Crushing | April 15, 2015 |
| How To Tell If A March Madness Underdog is Going to Win | March 19, 2015 |
| After Signing Day, Wisconsin Makes The Best Of Its Recruits | February 4, 2015 |

**Deadspin**

| | |
|---|---|
| How Those 3-on-3 Overtime Rules Would Cut Down NHL Shootouts | March 18, 2015 |
| Are Outdoor Hockey Games Really Sloppier? | February 19, 2015 |
| Are Teams Better or Worse in Must-Score Shootout Situations? | December 22, 2014 |
| The *College Gameday* Curse is Real...For Some Teams With Lucas Puente. | September 5, 2014 |
| 11 Million Brackets vs. ESPN, CBS, and FOX Experts: Who was Better? | April 10, 2014 |
| How the Long-Change OT Could Cut NHL Shootouts by a Third | March 12, 2014 |

## Awards and Distinctions

APSA Elections, Public Opinion, and Voting Behavior Graduate Student Travel Award - Sept. 2016

Best Research Paper Finalist - 2015 Sloan Sports Analytics Conference

Harvard University Certificate of Distinction in Teaching (four times)

Phi Beta Kappa

University of Georgia Honors International Studies Scholar

University of Georgia Charter Scholar

Eagle Scout

## Professional Service

**Theses Advised**

Bayley Tuch. 2020-2021. "Vote Mirages in the 2020 Election: How Vote-by-Mail Policies Impact the Reporting of Election Results." Undergraduate senior thesis. University of Pennsylvania. Winner of Philo Bennett Prize for best thesis in American politics and/or political theory.

**Conferences Organized**

*Election Sciences, Reform, and Administration Conference*. University of Pennsylvania. July 2019.

*Political Analytics Conference*. Harvard University. April 2016, March 2017, November 2018.

*Who Will Win in Rio? Understanding Political, Economic, and Athletic Success at the 2016 Olympic Games*. Harvard University. July 2016.

**Publicly Available Datasets**

November 2018 General Election Results (county level)

November 2016 General Election Results (county level)

U.S. House Primary Election Results (1956-2010)

Cumulative CCES Common Content (2006-2012)

Essential Files to Generate Pew Elections Performance Index

Cleaned 2014 Election Administration and Voting Survey Data

**Stephen Pettigrew**

Cleaned 2012 Election Administration and Voting Survey Data
Cleaned 2010 Election Administration and Voting Survey Data
Cleaned 2008 Election Administration and Voting Survey Data