UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:  GEORGIA SENATE BILL 202

No. 1:21-MI-55555-JPB
ALL CASES

## ORDER

This matter is before the Court on Non-Party Lawmakers'[1] ("Lawmakers")

Motion to Quash Subpoenas [Doc. 286] and Plaintiffs' Motion to Compel

Production of Documents [Doc. 303].  This Court finds as follows:

## BACKGROUND

In this consolidated action, Plaintiffs challenge certain provisions of Georgia

Senate Bill 202 ("SB 202"),[2] bringing, among others, claims under Section 2 of the

Voting Rights Act ("VRA") and the Fourteenth Amendment of the United States

Constitution.  As to these claims, Plaintiffs contend that the Georgia Legislature

(the "Legislature," comprised of the Georgia General Assembly and the Georgia

---

[1] Lawmakers are identified as follows:  Senators Max Burns, Mike Dugan, Steve Gooch, Butch Miller, Jeff Mullis, Randy Robertson, Brian Strickland, Dean Burke, Jason Anivitarte, Bo Hatchett, John Kennedy and Blake Tillery; Representatives Shaw Blackmon, Barry Fleming, Jan Jones, Chuck Martin, Alan Powell, David Ralston, Bonnie Rich, Buddy DeLoach, Houston Gaines, Lynn Smith and Rick Williams; former Lieutenant Governor Geoff Duncan; and former Senators William Ligon and Bill Heath.

[2] SB 202 governs election-related processes and was signed into law by Governor Brian Kemp on March 25, 2021.

Senate) passed SB 202 with the intent to discriminate based on race.  Discovery is ongoing.

Plaintiffs have issued deposition and document subpoenas to Lawmakers. Plaintiffs seek to depose Lawmakers about twenty different topics, which include, but are not limited to, the events leading to the passage of SB 202, the legislative process behind SB 202 and in the Legislature more generally, the likely impacts of SB 202 and various communications and public statements concerning SB 202.  As to the document subpoenas, Plaintiffs originally sought documents responsive to twenty-two different topics.  Following discussions between the parties, however, Plaintiffs narrowed their request for documents to 200 items.  According to Plaintiffs, these documents consist of the underlying facts and data received by Lawmakers from state agencies, communications with constituents and other non-legislative parties regarding purported voter fraud and other external, third-party input concerning the drafting of SB 202 and its predecessor bills.  The Court has reviewed the documents *in camera*.

The parties primarily disagree about whether the legislative privilege protects Lawmakers from providing documents and testimony.  As a result, Lawmakers filed a motion to quash.  [Doc. 286].  Plaintiffs thereafter filed a

motion to compel production of documents.  [Doc. 303].  The motions are ripe for review.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 45, a party may subpoena information from a nonparty to litigation.  Jordan v. Comm'r, Miss. Dep't of Corr., 947 F.3d 1322, 1329 (11th Cir. 2020).  The subpoena may be quashed, however, if the subpoena "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden."[3]  Fed. R. Civ. P. 45(d)(3).

## DISCUSSION

In the analysis that follows, the Court will analyze whether Lawmakers must produce responsive documents and whether Lawmakers should be compelled to sit for depositions.

## 1.   The Document Subpoenas

Lawmakers argue that the subpoenaed documents are protected by the legislative privilege.  "The legislative privilege is important" and "has deep roots in federal common law."  In re Hubbard, 803 F.3d 1298, 1307 (11th Cir. 2015).  Even though Lawmakers are not named as parties in this action, the "privilege

---

[3] Lawmakers argue that the subpoenas should be quashed both because of the legislative privilege and because the subpoenas subject them to an undue burden.  Because the legislative privilege applies and is dispositive, the undue burden argument will not be addressed.

extends to discovery requests" because "complying with such requests detracts from the performance of official duties." Id. at 1310.  Importantly, the Supreme Court of the United States has indicated that "the legislative privilege [should] be read broadly to effectuate its purposes." United States v. Johnson, 383 U.S. 169, 180 (1966).  Indeed, the Eleventh Circuit Court of Appeals has interpreted the privilege broadly by holding that "[t]he privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation."[4] Hubbard, 803 F.3d at 1308.  In sum, the legislative privilege "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." Id. at 1310 (emphasis omitted).

The parties have three primary disagreements as to the applicability of the legislative privilege in this case:  (1) whether the privilege applies to communications between Lawmakers and third parties; (2) whether the privilege applies to factual information that was available to Lawmakers; and (3) to the

---

[4] Lawmakers and Plaintiffs dispute the application of the legislative privilege to former Lieutenant Governor Geoff Duncan.  Lawmakers contend that Duncan can invoke the legislative privilege for his legislative activities, while Plaintiffs contend that Duncan failed to show that his communications concern his official legislative duties.  The Eleventh Circuit has unambiguously extended the legislative privilege to governors. See Hubbard, 803 F.3d at 1308.  The Court's analysis of the legislative privilege as to Lawmakers thus applies with equal force as to Duncan.

extent that the privilege applies, whether the privilege should be abrogated.  The Court discusses these issues in turn.[5]

### A.    Communications with Third Parties

Lawmakers and Plaintiffs dispute whether the legislative privilege applies to Lawmakers' communications with third parties about legislative matters. Lawmakers argue that the privilege applies, while Plaintiffs assert that third-party communications about legislation are not protected by the privilege.  The Court disagrees with Plaintiffs.

As stated above, the Eleventh Circuit has determined that the legislative privilege protects the legislative process itself and covers actions related to the proposal, formulation and passage of legislation.  See Hubbard, 803 F.3d at 1308. Consequently, unlike other forms of privilege, "the maintenance of confidentiality is not the fundamental concern."  League of Women Voters of Fla., Inc. v. Lee, 340 F.R.D. 446, 454 (N.D. Fla. 2021) (quoting Pulte Home Corp. v. Montgomery County, No. 14-3955, 2017 WL 2361167, at *8 (D. Md. May 31, 2017)).  Because the legislative privilege focuses on process rather than confidentiality, many district courts within this circuit have concluded that the legislative privilege

---

[5] "The burden of establishing the existence of a privilege justifying non-disclosure rests with the party asserting that privilege."  Alig-Mielcarek v. Jackson, 286 F.R.D. 521, 525 (N.D. Ga. 2012).  As such, Lawmakers bear the burden of persuasion.

applies to a legislator's communications with third parties if the communication was part of the formulation of legislation.[6]

This Court is persuaded by the reasoning of these cases and finds that "activity engaged in by legislators" is protected by the legislative privilege "even if there are communications with non-legislators, as long as the communications were pursuant to the proposal, formulation, and passage of legislation." Thompson, 2020 WL 2545317, at *3.  This conclusion makes sense because "'[m]eeting with persons outside the legislature' is 'a routine and legitimate part of the modern-day legislative process.'"  League of Women Voters, 340 F.R.D. at 454 (alteration in original) (quoting Almonte v. City of Long Beach, 478 F.2d 100, 107 (2d Cir. 2007)).  Thus, to the extent that Lawmakers communicated with third parties regarding the formulation and passage of SB 202, the communications are

---

[6] See, e.g., League of Women Voters, 340 F.R.D. at 454 ("[T]his [c]ourt finds that communications with third parties are subject to legislative privilege so long as those communications were part of the formulation of legislation."); Thompson v. Merrill, No. 2:16-cv-783, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) (citing cases from the Eleventh Circuit and concluding that "the legislative privilege is not waived simply because a legislator has communicated with third parties, if the communication was part of the formulation of legislation"); Greater Birmingham Ministries v. Merrill, No. 2:15-cv-2193, slip op. at 22 (N.D. Ala. Mar. 13, 2017) (concluding that the legislative privilege should "protect legislators from having to produce documents shared with third parties or communications between themselves and third parties where they engaged in such sharing or communications for the purpose of exploring and formulating legislation" because "such discussions aid legislators in the discharge of their legislative duty" (emphasis omitted)).

protected by the legislative privilege.  Therefore, Plaintiffs' argument that the legislative privilege does not apply because Lawmakers communicated with third parties fails.

### B.    Factual Information Available to Lawmakers

Lawmakers and Plaintiffs disagree about whether the legislative privilege covers factual information that was available to Lawmakers during the formulation and passage of SB 202.  Lawmakers contend that the privilege covers such information.  Plaintiffs, on the other hand, argue that purely factual information falls outside the scope of the legislative privilege and that shielding such information from disclosure does not achieve the privilege's intended ends.  The Court is unpersuaded by Plaintiffs' arguments.

As stated throughout this order, the function of the legislative privilege is to protect the legislative process, Hubbard, 803 F.3d at 1308, and as such, the privilege encompasses "the sphere of legislative activity," Tenney v. Brandhove, 341 U.S. 367, 376 (1951).  "One of the privilege's [principal] purposes is to ensure that lawmakers are allowed to 'focus on their public duties.'"  Hubbard, 803 F.3d at 1310 (quoting EEOC v. Wash. Suburban Sanitary Comm'n, 631 F.3d 174, 181 (4th Cir. 2011)).

Many courts have held that factfinding efforts fall within the "the sphere of legislative activity" and that, consequently, any related materials are covered by the legislative privilege.  Indeed, in Eastland v. United States Servicemen's Fund, the Supreme Court held that activities within the "legitimate legislative sphere" included "[t]he power to investigate." 421 U.S. 491, 504 (1975).[7]  The Court explained that "the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'"  Id. (quoting McGrain v. Daugherty, 273 U.S. 135, 175 (1927)); see also, e.g., Brown & Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 416 (D.C. Cir. 1995) ("Closely related—indeed a corollary—to this right to pursue investigations is Congress' privilege to use materials in its possession without judicial interference."); Gov't of Virgin Islands v. Lee, 775 F.2d 514, 521 (3d Cir. 1985) ("[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over

---

[7] Eastland concerned the Speech or Debate Clause of the United States Constitution, which is the source of the legislative privilege for federal legislators.  This Court relies on Eastland and other cases like it as persuasive authority for the issue of the legislative privilege enjoyed by state legislators.  According to the Eleventh Circuit, "it is well-established that state lawmakers possess a legislative privilege that is 'similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.'" Hubbard, 803 F.3d at 1310 n.11 (quoting Sup. Ct. of Va. v. Consumers Union of U.S., Inc., 446 U.S. 719, 732 (1980)).

proposed legislation.  As such, fact-finding occupies a position of sufficient

importance in the legislative process to justify the protection afforded by

legislative immunity.").  Thus, as part of the legislative process, factual

information falls well within the purview of the legislative privilege.  See Citizens

Union of City of New York v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 151

(S.D.N.Y. 2017) ("The legislative privilege . . . protects Congressional fact- and

information-gathering activities about the subject of potential legislation, as well as

documents regarding or reflecting the fruits of this research.").

    Moreover, exempting from the legislative privilege select information based

on its content (i.e., as factual in nature) seems to thwart, rather than serve, the

privilege's purposes of protecting the legislative process and allowing lawmakers

to focus on their public duties.  Producing factual information is no less

burdensome, or potentially distracting, than producing information reflecting a

legislator's subjective motivations.  In other words,

> [a] privilege that prohibits a plaintiff from asking a legislator
> what was said in the decisive meeting but allows questions
> concerning any potential influences on his or her decision—
> such as conversations with constituents, review of documents
> and other information-gathering, as well as potential bias—
> offers a legislator no protection worth having.

Dyas v. City of Fairhope, No. CIV.A. 08-0232, 2009 WL 3151879, at *8 (S.D.

Ala. Sept. 24, 2009); see also Knights of Columbus v. Town of Lexington, 138 F.

Supp. 2d 136, 139–40 (D. Mass. 2001) ("[S]ince one of the purposes of the

doctrine [of legislative immunity] is to safeguard legislators from being burdened

with the demands of discovery, the objective facts which can be used to challenge

regulations should, if at all possible, come from sources other than the testimony of

legislators.").[8]  As one court explained, "[r]equiring testimony about

communications that reflect objective facts related to legislation subjects

legislators to the same burden and inconvenience as requiring them to testify about

subjective motivations—the 'why' questions.  Creating an 'objective facts'

exception to the legislative process privilege thus undermines its central purpose."

Kay v. City of Rancho Palos Verdes, No. CV 02-03922, 2003 WL 25294710, at

*11 (C.D. Cal. Oct. 10, 2003) (internal quotation marks omitted).

---

[8] Knights of Columbus concerned the doctrine of legislative immunity.  "[L]egislative
immunity shields legislators from direct liability for actions taken during legislative
proceedings; legislative privilege shields legislators from indirect liability through the
costs of litigation."  League of Women Voters, 340 F.R.D. at 453.  The legislative
privilege "furthers the policy goals behind legislative immunity by preventing parties
from using third-party discovery requests as an end-run around legislative immunity—
harassing legislators through burdensome discovery requests."  Id.; see also Singleton v.
Merrill, 576 F. Supp. 3d 931, 938 (N.D. Ala. 2021) ("[L]egislative immunity comprises
both immunity from civil liability and an evidentiary privilege to be free from
compulsory process in civil litigation.").  Because legislative immunity and the
legislative privilege are "parallel concept[s]," Wash. Suburban Sanitary Comm'n, 631
F.3d at 180, the Court views legal authority on the issue of legislative immunity to be
instructive on the issue of the legislative privilege.

Admittedly, some courts have determined that factfinding and factual information fall outside the legislative privilege.  For instance, at least one court within this circuit has determined that "purely factual documents, including bill drafts, bill analyses, white papers, studies, and news reports provided by or to the Legislators and their staff members, do not fall within the scope of this privilege." Pernell v. Lamb, No. 4:22-cv-304, 2023 WL 234787, at *3 (N.D. Fla. Feb. 22, 2023), appeal filed, No. 23-10616 (11th Cir. Mar. 1, 2023).  Even though this type of evidence usually concerns the formulation of legislation, the court determined that the evidence was nevertheless discoverable because it contained no "mental impressions, opinions, or commentary regarding the legislation."  Id.  In a prior case, that same court concluded that "'limiting privileged documents [or testimony] to those that contain opinions, recommendations or advice' and allowing the production of 'documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings'" was the proper approach.  League of Women Voters, 340 F.R.D. at 458 (alteration in original) (quoting Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, No. 11 C 5065, 2011 WL 4837508, at *9 (N.D. Ill. Oct. 12, 2011)).

This Court, of course, is not "bound to follow any other district court's determination." Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004). It is, however, bound by Hubbard.  And in that case, the Eleventh Circuit was clear that the legislative privilege functions specifically to "'protect[] against inquiry into acts that occur in the regular course of the legislative process.'"  803 F.3d at 1310 (quoting United States v. Brewster, 408 U.S. 501, 525 (1972)).  Factfinding is one such act, and the purposes of the legislative privilege are not served by exempting purely "factual" information from its reach.  Ultimately, the court in Hubbard did not draw lines between "facts" and "opinions," and this Court will not do so either.  To the extent that Plaintiffs seek to compel the production of factual information that was available to Lawmakers during the legislative process, that request is due to be denied on the basis of the legislative privilege.

## C.    **Important Federal Interest**

Both the Eleventh Circuit and the Supreme Court have held that "a state lawmaker's legislative privilege must yield in some circumstances where necessary to vindicate important federal interests." Hubbard, 803 F.3d at 1311; see also United States v. Gillock, 445 U.S. 360, 373 (1980).  Lawmakers and Plaintiffs disagree about whether this case is one of those circumstances.  Specifically, Plaintiffs argue that if the documents are privileged, the privilege must yield to

vindicate the right to vote.  Conversely, Lawmakers claim that the legislative privilege is absolute in civil cases.

Whether "'the privilege must yield to the need for a decision maker's testimony'" is a "thorny issue."  League of Women Voters, 340 F.R.D. at 455 (quoting Lee v. City of Los Angeles, 908 F.3d 1175, 1187 (9th Cir. 2018)).  What is clear, however, is that the circumstances in which the legislative privilege yields to an "important federal interest" are few and far between.  Only two circumstances—one recognized by the Supreme Court and another by a collection of district courts—have emerged as instances in which the legislative privilege might yield to the vindication of an important federal interest.

The first is in the enforcement of federal criminal statutes.  Specifically, in Gillock, the Supreme Court held that a state legislator could not invoke the legislative privilege in his criminal prosecution for violating a federal criminal statute.  445 U.S. at 361–62.  The Court reasoned that

> although principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields. . . .  [R]ecognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.

13

Id. at 373.  Significantly, the Supreme Court recognized that, for purposes of the legislative privilege, a fundamental difference exists between civil actions by private plaintiffs and criminal prosecutions by the federal government.  Id.

The second circumstance is in legislative redistricting cases.  Relying on Gillock, some district courts have found that cases involving claims of gerrymandering may warrant abrogating the legislative privilege.  See Bethune-Hill v. Va. State Bd. of Elections, 114 F. Supp. 3d 323, 336–37 (E.D. Va. 2015); see also Marylanders for Fair Representation Inc. v. Schaefer, 144 F.R.D. 292, 304 (D. Md. 1992).  These courts have reasoned that redistricting cases are different from other cases invoking federal interests because

> [l]egislative redistricting is a *sui generis* process.  While it is an exercise of legislative power, it is not a routine exercise of that power.  The enactment of statutes ordinarily involves the implementation of public policy by a duly constituted legislative body.  Redistricting involves the establishment of the electoral structure by which the legislative body becomes duly constituted.  Inevitably, it directly involves the self-interest of the legislators themselves.

Schaefer, 144 F.R.D. at 304.

The instant case is not a redistricting case, nor is it a criminal prosecution.  This Court need not decide, however, whether it should extend Gillock to a case such as this one, because abrogating Lawmakers' legislative privilege is not

"necessary" in this context.  See Hubbard, 803 F.3d at 1311.  The Court explains this conclusion below.

The federal interest in this case, the right to vote, is certainly a significant one.[9]  To vindicate that interest and prevail on their claims under the Fourteenth Amendment, Plaintiffs must show, among other things, that SB 202 was passed with discriminatory intent.  Greater Birmingham Ministries v. Sec'y of State for the State of Ala., 992 F.3d 1299, 1321 (11th Cir. 2021).  In Village of Arlington Heights v. Metropolitan Housing Development Corp., the Supreme Court held that determining the intent of the legislature "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  429 U.S. 252, 266 (1977).  The Supreme Court identified the following as examples of the types of evidence that may show intent:  (1) "the historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "the specific sequence of events leading up to the challenged decision"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures, . . . particularly if the factors usually considered

---

[9] As noted previously, the Court need not—and does not—decide the discrete issue of whether a case bringing claims under the VRA and the Fourteenth Amendment falls in the same category as criminal prosecutions or gerrymandering.  The Court's analysis hinges on the *necessity* of abrogating the legislative privilege rather than on the importance of the federal interest at stake.

important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 266–68. Importantly, the Supreme Court recognized that even if a legislator were called to the stand to testify "concerning the purpose of the official action," the testimony would "frequently" be barred by privilege. Id. at 268.

As stated above, abrogating Lawmakers' legislative privilege requires this Court to find that doing so is "necessary" to vindicate the federal interest at issue in this case. But Lawmakers have already produced a substantial amount of evidence pertaining to the Arlington Heights factors.[10] Specifically, Lawmakers have produced 2,342 pages of documents, including committee documents (agendas, minutes, exhibits, draft bills, etc.) and more than 346 hours of video capturing relevant committee meetings and floor debates in full. Furthermore, Plaintiffs are not limited to the evidence that they have already received from Lawmakers. As part of the instant dispute, Plaintiffs have asked the Court to compel the production

---

[10] Plaintiffs argue that the bulk of the evidence that Lawmakers produced was already publicly available. While the Court recognizes that legislators are unlikely to make public statements indicating an improper motive for legislation, the fact that the documents are publicly available makes them no less relevant to the factors at issue.

of communications between Lawmakers and third parties.  As Plaintiffs recognize, this information may be obtained from those third parties.[11]  [Doc. 307, p. 7 n.6]. In fact, the Court notes that a substantial amount, if not the majority, of the 200 documents that Plaintiffs seek involve third parties from whom Plaintiffs may subpoena relevant testimony or documents.  Ultimately, where evidence of legislative purpose can be gathered from non-privileged sources, as it can be here, the Court is not willing to find that it is necessary to breach the legislative privilege.

In sum, Lawmakers have already provided Plaintiffs with a plethora of evidence pertaining to the Arlington Heights factors.  Further, many of the communications Plaintiffs seek from Lawmakers are available to Plaintiffs from non-legislator third parties who may not invoke any legislative privilege.  The Court is not convinced that Plaintiffs' need for the requested discovery is so great as to justify contravening "principles of comity."  Gillock, 445 U.S. at 373. Consequently, "applying the legislative privilege to block the subpoenas" would not "impede[]" a "strong federal interest" in this case.  Hubbard, 803 F.3d at 1314.

---

[11] "[B]ecause confidentiality is not the legislative privilege's animating concern, the privilege would not prevent Plaintiffs from asking the third parties with which [Lawmakers] communicated about those communications."  League of Women Voters, 340 F.R.D. at 454 n.2.

For these reasons, this Court declines to abrogate Lawmakers' legislative

privilege.[12]

## 2.     **The Deposition Subpoenas**

According to Lawmakers, Plaintiffs' deposition subpoenas must be quashed

because the legislative privilege precludes inquiry into Plaintiffs' proposed

deposition topics.  As the Court has discussed extensively, the legislative privilege

"protects the legislative process itself" and "covers both governors' and legislators'

actions in the proposal, formulation, and passage of legislation."  Hubbard, 803

F.3d at 1308.

As an initial matter, it is important to note that the legislative privilege

exists, in part, because "complying with [discovery] requests detracts from the

performance of official duties."  Id. at 1310.  Particularly relevant here, the

Supreme Court has held that because "judicial inquiries into legislative . . .

motivation represent a substantial intrusion into workings of other branches of

---

[12] In redistricting cases, some courts have applied a five-factor balancing test to
determine whether, and to what extent, the legislative privilege should be abrogated.  See,
e.g., Bethune-Hill, 114 F. Supp. 3d at 339.  These factors include the following:  (1) the
relevance of the evidence sought; (2) the availability of other evidence; (3) the
seriousness of the litigation; (4) the role of the government in the litigation; and (5) the
extent to which the discovery would impede legislative action.  See Rodriguez v. Pataki,
280 F. Supp. 2d 89, 100–01 (S.D.N.Y. 2003).  The Court notes that even if it were to
adopt and apply this balancing test, the ultimate result would not change, in large part
because the second factor—the availability of other evidence—weighs heavily in favor of
Lawmakers.

government," compelling a legislator to testify is "usually to be avoided."

Arlington Heights, 429 U.S. at 268 n.18 (quoting Citizens to Preserve Overton

Park v. Volpe, 401 U.S. 402, 420 (1971)).

Plaintiffs' proposed deposition topics fall into the following broad

categories:

(1) reports, studies, analyses, communications or other evidence about voting patterns, voting irregularities, election administration issues and the impact of SB 202;

(2) the legislative process behind SB 202 and election-related bills more generally in the Georgia General Assembly, including any hearings on voter fraud and the formation of related committees;

(3) communications between and among members of the Georgia General Assembly, the Georgia Secretary of State and various other entities regarding SB 202; and

(4) public statements made by Lawmakers regarding SB 202 and allegations of voter fraud in recent Georgia elections.

See [Doc. 265-4].  Lawmakers contend that these topics either "directly target what

Lawmakers did or said in their investigation, formulation, evaluation, deliberation

and passage of [SB] 202" or "inquire into [their] motivations by asking what they

knew about the subject matter and when they knew it."  [Doc. 286-1, pp. 24–25].

Plaintiffs respond that many of these topics "are highly relevant circumstantial

evidence of intentional discrimination under Arlington Heights" and do not "probe

individual Lawmakers' personal motivations or mental impressions such that [they] would implicate the narrow state legislative privilege." [Doc. 307, p. 26].

A recent decision from another court in this district is instructive here. In In re Graham, United States Senator Lindsey Graham sought to quash a subpoena issued to him as part of the Fulton County Special Purpose Grand Jury's investigation into attempts to disrupt the lawful administration of Georgia's 2020 elections.[13] No. 1:22-CV-03027, 2022 WL 13692834, at *1 (N.D. Ga. Sept. 1, 2022), opinion vacated, appeal dismissed sub nom. Fulton Cnty. Special Purpose Grand Jury v. Graham, No. 22-12696, 2022 WL 17881577 (11th Cir. Dec. 20, 2022). Similar to Lawmakers' arguments in this case, Senator Graham asserted that he should not be required to answer questions about phone calls that he made to Georgia election officials because the phone calls were investigatory inquiries about whether to certify the election results, which constituted "legitimate legislative activity." Id. at *2.

The court determined that it must "objectively assess the activity at issue (without considerations of intent and motive) to determine whether it is legislative." Id. at *3. The court recognized that phone calls made by an

---

[13] Graham, of course, concerned the Speech or Debate Clause. As this Court previously noted, such cases remain informative for the analysis of state legislative privilege. See supra note 7.

individual U.S. senator to Georgia state election officials are not "manifestly legislative on their face." Id. at *2.  Ultimately, the court concluded that Senator Graham could be deposed about "whether he in fact implied, suggested, or otherwise indicated that [Georgia Secretary of State Brad] Raffensperger (or other Georgia election officials) throw out ballots or otherwise alter their election procedures (including in ways that would alter election results)" because these activities were not, on their face, "legislative fact-finding." Id. at *4.  Senator Graham, however, could not "be asked about the portions of the calls that were legislative fact-finding." Id. at *3.

This Court has reviewed the twenty deposition topics, "objectively" and "without considerations of intent and motive," id., to determine whether they address manifestly legislative activities or pertain to some other issue.  The Court finds that Plaintiffs' proposed topics entirely concern legitimate legislative activity.[14]  Careful review of the deposition topics reveals that every topic directly explores how SB 202 became law.  For instance, Plaintiffs want to ask Lawmakers about reports that they analyzed relating to voting patterns, the legislative process

---

[14] Plaintiffs do not meaningfully argue that the deposition topics do not pertain to legitimate legislative activity.  Instead, they repeat many of their arguments that they made regarding the subpoenaed documents.  Specifically, Plaintiffs argue that the case involves an important federal interest and that communications involving third parties and fact-finding inquiries are not protected.  The Court addressed these arguments earlier, see supra Part 1, and was unpersuaded.  That reasoning applies here.

behind SB 202 and communications among members of the Georgia General Assembly regarding SB 202.  Significantly, most of the topics concern investigatory fact-finding efforts related to the impetus and formulation of SB 202. Notably absent from this case are any allegations such as those in <u>Graham</u>—that Lawmakers engaged in activities that are clearly not legislative in nature.  In other words, there are no allegations that Lawmakers' conduct was "in no way related to the due functioning of the legislative process."  <u>Id.</u> at *4.  After careful consideration, this Court thus finds that the legislative privilege precludes inquiry into any of Plaintiff's deposition topics.

## CONCLUSION

For the reasons explained above, Lawmakers' Motion to Quash Subpoenas [Doc. 286] is **GRANTED**.  Plaintiffs' Motion to Compel Production of Documents [Doc. 303] is **DENIED**.

**SO ORDERED** this 27th day of April, 2023.

J. P. BOULEE
United States District Judge