**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*,<br><br>*Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>*Intervenor-Defendants*. | Civil Action No.: 1:21-cv-01284-JPB<br><br>HEARING REQUESTED |

## AME PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................1

STATEMENT OF FACTS ..................................................................2

ARGUMENT ....................................................................................9

    I.      Preliminary Injunction Standard ...........................................9

    II.     Plaintiffs Are Likely to Succeed on the Merits of Their ADA and Section 504 Claims......................................................10

          A.     S.B. 202's Felony Provision Denies Equal Access to Disabled Voters.......................................................13

          B.     S.B. 202's Drop Box Restrictions Deny Equal Access to Disabled Voters.......................................................16

          C.     Plaintiffs' Proposed Modifications Are Reasonable and Necessary, and Impose No Undue Financial or Administrative Burden............................................18

    III.    THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH HEAVILY IN FAVOR OF PLAINTIFFS ........21

          A.     Plaintiffs and Their Constituents and Members Are Likely to Suffer Irreparable Harm Absent Preliminary Relief........................................................................21

          B.     The Balance of Hardships Weighs in Favor of Plaintiffs.........24

          C.     A Preliminary Injunction is in the Public Interest. ...................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ABC Charters, Inc. v. Bronson*,
  591 F. Supp. 2d 1272 (S.D. Fla. 2008)............................................................24

*Action NC v. Strach*,
  216 F. Supp. 3d 597 (M.D.N.C. 2016)............................................................23

*Alexander v. Choate*,
  469 U.S. 287 (1985)........................................................................................11

*Bartell v. Grifols Shared Services NA, Inc.*,
  618 F. Supp. 3d 275 (M.D.N.C. 2022)............................................................21

*Carey v. Wisconsin Elections Commission*,
  2022 WL 3910457 (W.D. Wis. Aug. 31, 2022) ..............................................19

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ......................................................................25

*Civic Association of the Deaf of New York City, Inc. v. Giuliani*,
  915 F. Supp. 622 (S.D.N.Y. 1996) .................................................................18

*Common Cause Georgia v. Kemp*,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018)............................................................22

*Cunningham v. Adams*,
  808 F.2d 815 (11th Cir. 1987) ........................................................................21

*D.R. ex rel. Courtney R. v. Antelope Valley Union High School
  District*,
  746 F. Supp. 2d 1132 (C.D. Cal. 2010)...........................................................17

*Disability Rights North Carolina v. North Carolina State Board of
  Elections*,
  2022 WL 2678884 (E.D.N.C. July 11, 2022)..................................................19

*Floria Democratic Party v. Scott*,
    215 F. Supp. 3d 1250 (N.D. Fla. 2016) ....................................................22, 24

*Georgia Coalition for People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 (N.D. Ga. 2018)..........................................................23

*Georgia Latino Alliance for Human Rights v. Governor of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) ......................................................................24

*Georgia State Conference NAACP v. Georgia*,
    2017 WL 9435558 (N.D. Ga. May 4, 2017) .....................................22, 24, 25

*Indiana State Conference of NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018), *aff'd sub nom. Common*
    *Cause Indiana v. Lawson*, 937 F.3d 944 (7th Cir. 2019) ........................23, 24

*Karantsalis v. City of Miami Springs*,
    17 F.4th 1316 (11th Cir. 2021) .......................................................................12

*L.E. ex rel. Cavorley v. Superintendent of Cobb County School*
    *District*,
    55 F.4th 1296 (11th Cir. 2022) .......................................................................10

*League of Women Voters of Florida v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) .........................................................24

*Madera v. Detzner*,
    325 F. Supp. 3d 1269 (N.D. Fla. 2018) .........................................................25

*National Federation of the Blind v. Lamone*,
    813 F.3d 494 (4th Cir. 2016) ................................................10, 11, 13, 18, 20

*New Georgia Project v. Raffensperger*,
    484 F. Supp. 3d 1265 (N.D. Ga. 2020)..........................................................21

*Obama for America v. Husted*,
    697 F.3d 423 (6th Cir. 2012) .........................................................................25

*People First of Alabama v. Merrill*,
    491 F. Supp. 3d 1076 (N.D. Ala. 2020) ...........................................13, 18, 20

*Shotz v. Cates*,
    256 F.3d 1077 (11th Cir. 2001) ....................................................17

*Tennessee v. Lane*,
    541 U.S. 509 (2004)......................................................................11

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ....................................................25

*United States v. Georgia*,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012)..........................................24

*Westchester Disabled on the Move, Inc. v. County of Westchester*,
    346 F. Supp. 2d 473 (S.D.N.Y. 2004) ...........................................22

## STATUTES

29 U.S.C. § 794(a) .................................................................................10

42 U.S.C.
    § 12101(a)(3) ................................................................................11
    § 12131(1)(A) ...............................................................................13
    § 12131(2).....................................................................................12
    § 12132 .........................................................................................10

52 U.S.C. § 10508 .................................................................................15

Ga. Code Ann.
    § 21-2-382(c)(1)..............................................................................7
    § 21-2-385(a) ...........................................................................5, 13
    § 21-2-568(a)(5)........................................................................5, 13

## REGULATIONS

28 C.F.R.
    § 35.104 .........................................................................................12
    § 35.108 .........................................................................................12
    § 35.130(b)(1)(ii) ..........................................................................12
    § 35.130(b)(7)(i) ...........................................................................18

# LEGISLATIVE MATERIALS

Senate Bill 202 (enrolled Mar. 25, 2021) ...................................................................1

# ATTORNEY GENERAL OPINIONS

1984 Ga. Op. Att'y Gen. 34 (1984) ..........................................................15

2016 Ga. Op. Att'y Gen. 02 (2016) .........................................................15

# INTRODUCTION

Georgia voters with disabilities rely heavily and disproportionately on absentee voting. Some voters with disabilities have no accessible transportation to the polls. For some, standing in line to vote in person is too strenuous. And for many, simply leaving the house is an extraordinary effort. But Senate Bill 202 (enrolled Mar. 25, 2021) ("S.B. 202") made absentee voting less accessible to Georgians with disabilities in two key ways. First, S.B. 202 adds felony penalties to a state law that purports to prohibit anyone from returning an absentee ballot for a voter with disabilities unless that person is a family or household member or the voter's "caregiver," a term that is undefined in the statute. S.B. 202 makes this assistance a felony even though prior state legal guidance confirms that federal law allows voters with disabilities to choose their assistors, with narrow exceptions. Second, S.B. 202 requires counties to both move absentee ballot drop boxes from outdoor locations to less accessible inside locations, and also restrict their hours of operation.

These S.B. 202 provisions violate the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") by unjustly burdening—and in some cases completely disenfranchising—Georgians with disabilities and denying them full and equal opportunity to access and participate in the State's absentee voting program. By imposing felony penalties on

help from, for example, friends, neighbors, or institutional staff, Defendants make the absentee voting program less accessible—and sometimes entirely inaccessible—to thousands of voters with disabilities who depend on others for assistance to return a ballot. By mandating that counties place drop boxes inside buildings and restricting their availability to certain times, Defendants make absentee voting an onerous ordeal for some voters with disabilities and completely impossible for others.

Plaintiffs move for a preliminary injunction to ensure these provisions do not deny voters with disabilities equal access to Georgia's absentee voting program in the 2024 elections. Plaintiffs' request is simple: that the Court return Georgia's absentee voting program to the pre-S.B. 202 status quo for these two challenged provisions. Such an order would protect disabled voters from irreparable harm, promote the public interest, and pose minimal, if any, burdens to Defendants.

## STATEMENT OF FACTS

Citizens with disabilities in Georgia and nationwide face "myriad barriers" to accessing the ballot. Ex. 1 (Expert Report of Dr. Lisa A. Schur ("Schur") 3, 13, 24-26). Georgia voters include people with a range of disabilities, including older adults[1] with physical impairments such as arthritis and other mobility difficulties; as

---

[1] In Georgia, the disability rate climbs dramatically with age, from 8% of the population among those ages 18-34 to 26.4% among those ages 65-74, 43.7% among those ages 75-84, and 70.5% among those ages 85 or older. Ex. 1 (Schur 16, 55).

well as people with blindness and deafness; cerebral palsy; and intellectual, developmental, and mental disabilities. *See, e.g.*, Ex. 2 (Decl. of Empish Thomas ("Thomas") ¶¶ 4-5); Ex. 3 (Decl. of Patricia Chicoine ("Chicoine") ¶ 3); Ex. 4 (Decl. of Shannon Mattox ("Mattox") ¶¶ 5, 21(a)); Ex. 5A (Decl. of Devon Orland ("Orland") ¶ 6); Ex. 6 (Decl. of Matt Hargroves ("Hargroves") ¶ 5); Ex. 7 (Decl. of Suzanne "Zan" Thornton ("Thornton") ¶¶ 8-9). These voters face voting barriers, including difficulty leaving the home, lacking accessible transportation, a need for assistance, and high rates of poverty, social isolation, and stigma. Ex. 1 (Schur 13-14). Voting in person is particularly burdensome. Even if disabled citizens are able to overcome difficulties leaving the house, they may not be able to stand in line at the polls, potentially for hours and without the ability to receive food and water from others (which S.B. 202's line relief ban prohibits). And people with disabilities frequently face accessibility obstacles at polls. *Id.* 26-33. Because of these obstacles, in 2020, the voter turnout rate of eligible Georgians with disabilities was almost four percent less than that of eligible nondisabled voters. *Id.* 24. This turnout gap means that 28,600 Georgians with disabilities who were eligible to vote—more than the margin of victory in many significant elections—did not cast a ballot. *See id.*

Because of the many barriers to voting in person, access to absentee voting is particularly important for Georgia voters with disabilities. Indeed, disabled voters

rely upon absentee voting in much greater proportion than the rest of the voting population. Ex. 1 (Schur 27). Even in 2016—before the COVID-19 pandemic introduced new risks associated with in-person voting—Georgia voters with disabilities were more than twice as likely as nondisabled voters to use absentee voting. *Id*. More than half of voters nationwide with mobility, hearing, cognitive, or vision impairments, and almost two-thirds of voters who have difficulty bathing or dressing independently or going outside alone, voted by mail in 2020. *Id.* 61.

When using absentee voting, many citizens with disabilities need assistance applying for, completing, sealing, and/or returning their ballots. Ex. 1 (Schur 61). Among citizens who voted by mail in 2020, 10.5% of voters with disabilities required assistance in doing so, compared to 1.1% of voters without disabilities. *Id.* 36. That assistance will often be needed from non-family members: as a reference, an estimated 168,800 voting-eligible Georgians with disabilities rely on friends, neighbors, and other non-relatives for assistance in their daily lives. *Id.* 5, 40. In 2020, 14% of Georgia voters with disabilities who needed assistance with mail ballots received help from such individuals. *Id.* 36.

In addition, being able to return their ballots using drop boxes affords disabled voters the same opportunity to return their ballots closer to Election Day as nondisabled voters can, offers the assurance of knowing that their ballots have been

received without the uncertainties and expense of U.S. mail, and enables them to avoid the burden and risk of in-person voting. *E.g.*, Ex. 8 (Decl. of Wendell Halsell ("Halsell") ¶ 7); Ex. 3 (Chicoine ¶¶ 3-5). Close to one-sixth of voters with disabilities in the United States used a drop box in 2020. Ex. 1 (Schur 46).

Despite the importance of absentee voting and voting assistance to disabled voters, S.B. 202 Section 47 (the "felony provision") makes it a felony to assist voters with disabilities in returning their absentee ballots unless the assistor is a designated family or household member, or a "caregiver." Ga. Code Ann. §§ 21-2-568(a)(5), 21-2-385(a). The statute does not define the term "caregiver," and State Defendants have given no guidance on, or definition of, the term. *See* Ex. 9 (Georgia Secretary of State's Office ("SOS") Dep. 195:8-198:12, 200:11-201:6).[2]

The felony provision, along with the lack of clarity as to who is authorized as a "caregiver," chills potential assistors from returning ballots and deters voters from asking them to do so. Ex. 4 (Mattox ¶ 21(a)); Ex. 5A (Orland ¶¶ 24-25); Ex. 6 (Hargroves ¶¶ 7-14). And it requires many Georgia voters with disabilities to endure additional burdens to find an assistor. These burdens can include asking family

---

[2] *See also* Ex. 10 (Hall Cnty. Bd. of Elections and Registration ("Hall") Dep. 155:3-22, 157:7-10); Ex. 11 (Columbia Cnty. Bd. of Elections ("Columbia") Dep. 161:10-17); Ex. 12 (DeKalb Cnty. Bd. of Elections ("DeKalb") Dep. 226:7-229:6); Ex. 13 (Marie Frances Watson ("Watson") Dep. 183:6-15).

members to travel or miss work to return their ballots, relying on someone they do not trust, or needing to ask a favor of a family member with whom they are not in close contact. Consequently, some voters with disabilities are shut out of the absentee voting program or prevented from voting altogether. *See, e.g.*, Ex. 6 (Hargroves ¶¶ 7-14); Ex. 2 (Thomas ¶¶ 10-16 (describing inability to vote by absentee ballot due to lack of family member or "caregiver" available)); Ex. 4 (Mattox ¶ 21(a)); Ex. 14B (Suzanne "Zan" Thornton ("Thornton") Dep. Day 2 40:5-23). Voters with disabilities even avoid asking clearly eligible assistors—such as family members—to assist because of confusion and fear of felony prosecution. Ex. 8 (Halsell ¶ 8). Importantly, the fear of felony penalty under this state law also deters nursing facility workers, homeless shelter staff, and personal assistants, among others, from assisting—even though federal law permits all of these individuals to assist voters with disabilities. *See, e.g.*, Ex. 4 (Mattox ¶¶ 16, 21(a)); Ex. 5A (Orland ¶¶ 24-25); Ex. 6 (Hargroves ¶¶ 7-14); Ex. 2 (Thomas ¶ 14); *see infra* at 15-16.

For example:

- A member of The Arc, an individual with cerebral palsy who lives in a nursing facility and relies on assistance for daily activities such as dressing, bathing, and leaving the facility, cannot vote in person and therefore relies on absentee voting. Ex. 4 (Mattox ¶ 21(a)). Due to the felony provision, he is unsure whether facility staff will be willing to assist him in mailing his ballot. *Id*. Without this assistance from facility staff, he will not be able to vote. *Id*.

- Matt Hargroves, a worker at a homeless shelter, is unsure whether shelter staff qualify as "caregivers"; the shelter staff have not aided with ballot return since S.B. 202 added the felony provision. Ex. 6 (Hargroves ¶ 11). Many individuals with disabilities living at the shelter have no one else available to assist with voting. *Id*. ¶¶ 12-14.

- For Empish Thomas, a voter who is completely blind, absentee voting is now entirely inaccessible because she has no family members or caregivers to return her ballot and believes she would be asking someone to commit a crime if she sought help elsewhere. Ex. 2 (Thomas ¶¶ 5, 9, 11-16). She has no way to know whether her personal assistant, who occasionally helps her with day-to-day tasks, counts as a "caregiver" under the felony provision. *Id*. ¶ 15. To vote in 2022, Ms. Thomas had to vote in person but faced several obstacles when doing so: In November 2022, poll workers denied her assistance. In December 2022, she had to travel 45 minutes to an hour on the bus to an early voting location. *Id*. ¶¶ 24-27, 37-38.

S.B. 202 Section 26 (the "drop box restrictions") restricts drop boxes—which before S.B. 202 were typically located outdoors and made accessible 24 hours a day—in two key ways: (1) requiring that they be located indoors at an election office or early voting location (with exceptions only in declared emergencies), and (2) limiting their hours of operation to those locations' business hours. Ga. Code Ann. § 21-2-382(c)(1). For many citizens with disabilities, these restrictions render drop boxes difficult to impossible to use. In turn, this interferes with their access to absentee voting. In 2022, some voters with disabilities arrived at drop box locations but could not physically access them because they had been moved indoors. *E.g.*, Ex. 15 (Athens-Clarke Cnty. Bd. of Elections and Voter Registration ("Athens-

Clarke") Dep. 124:6-17); Ex. 10 (Hall Dep. 65:22-66:11, 68:8-12, 70:6-18, 132:9-16, 151:23-153:6); Ex. 5A (Orland ¶ 17). For instance:

- Patricia Chicoine, a voter who has difficulty walking and standing for long periods of time, was forced to navigate an extremely long hall to access a drop box located opposite the building's entrance in October 2021. The hallway had no handrails, so she had to hold onto chairs and desks and take many breaks. Ex. 3 (Chicoine ¶¶ 5-10). In all, it took Ms. Chicoine well over an hour to access the drop box. Because of those burdens, she opted to vote in person in May and November 2022, enduring the difficulty of standing in line for approximately 20 minutes because poll workers did not offer that she skip the line. *Id.* ¶¶ 10-12.

- Wendell Halsell, a voter who has lost use of his right leg and experiences difficulty standing, breathing, and walking, voted via drop box in 2022. The process of entering the building to drop off his ballot was exhausting and he had to stop to take multiple breaks to rest. Ex. 8 (Halsell ¶¶ 8-10).

- A Georgia Advocacy Office ("GAO") constituent went to a drop box location, but was unable to reach the drop box. While he can ambulate about 10 yards, the indoor drop box was farther away than that. Ex. 5A (Orland ¶ 17). He was refused help from poll workers with dropping his ballot in the box. *Id.*

Restricting drop boxes to certain hours also limits their accessibility to disabled voters, who face transportation difficulties and disproportionately need rides from others or public transportation or paratransit services to reach drop boxes.[3] Ex. 1 (Schur 21-23). The added flexibility of being able to use a drop box in the evening or on the weekend makes it easier to use these transportation methods,

---

[3] Also, people with disabilities are two to three times more likely to have to travel an hour or more to access a drop box than those without disabilities. Ex. 16 (Chatman ¶¶ 29-30, 32, 35-37).

which are often unreliable or unavailable. *See, e.g.*, Ex. 16 (Expert Report of Dr. Daniel G. Chatman ("Chatman") ¶¶ 2-3, 27-29, 35-38); Ex. 2 (Thomas ¶ 18).

Plaintiff organizations GAO, ADAPT, and The Arc—which represent Georgians with disabilities seeking full political participation and vindication of their rights to equal access to Georgia's voting programs—rallied to support voters with disabilities in the wake of S.B. 202's passage. Ex. 7 (Thornton ¶ 5); Ex. 5A (Orland ¶ 9); Ex. 4 (Mattox ¶¶ 7-10). Among other measures, ADAPT drove to the polls an increased number of voters who found absentee voting inaccessible; GAO helped voters with disabilities understand and comply with the new restrictions; and The Arc conducted trainings and outreach among its members. Doing so took resources away from their other disability rights work, like supporting disabled individuals in accessing Medicaid services, reducing the institutionalization of people with disabilities, and investigating conditions in nursing homes. Ex. 7 (Thornton ¶¶ 11-26); Ex. 5A (Orland ¶¶ 19, 27); Ex. 4 (Mattox ¶¶ 18-20).

## ARGUMENT

### I.   Preliminary Injunction Standard

A preliminary injunction issues when the moving party demonstrates: (1) a likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) injury to the movant that outweighs whatever damage the proposed injunction might

cause the non-moving party; and (4) the injunction would not be adverse to the public interest. *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299 (11th Cir. 2022). Each factor decisively favors an injunction here.

## II.  Plaintiffs Are Likely to Succeed on the Merits of Their ADA and Section 504 Claims.

Plaintiffs have a substantial likelihood of success on the merits of their ADA and Section 504 claims challenging (1) the felony provision and (2) the drop box restrictions. Both provisions deny Georgians with disabilities an equal opportunity to participate in or benefit from the absentee voting program.

Title II of the ADA ("Title II") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[4] "Congress

---

[4] Section 504 similarly provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," which Defendants do. 29 U.S.C. § 794(a); *see also* Ex. 9 (SOS Dep. 111:1-114:20, 213:9-13); Ex. 17 (Joseph Blake Evans ("Evans") Dep. 215:9-24). Because "ADA and Section 504 claims are governed by the same legal standard," Plaintiffs focus their analysis on their ADA claims for simplicity. *L.E. ex rel. Cavorley*, 55 F.4th at 1301 n.2; *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 n.4 (4th Cir. 2016) (analysis under Title II and Section 504 are "substantially the same" and may be combined).

enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights" such as voting. *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). The ADA applies to voting services, programs, or activities because "[v]oting is a quintessential public activity." *Nat'l Fed'n of the Blind v. Lamone ("NFB")*, 813 F.3d 494, 507 (4th Cir. 2016) (citing *Lane*, 541 U.S. at 516); *see also* 42 U.S.C. § 12101(a)(3) ("[D]iscrimination against individuals with disabilities persists in such critical areas as . . . voting[.]"); Order on Motion to Dismiss ("Order"), ECF No. 110 35-36 (allegations of restricted access to absentee voting programs sufficed to state an ADA claim).

Under the ADA, exclusions from participation in or denial of the benefits of a public entity's services, programs, or activities need not be absolute. The ADA is violated when a disabled person cannot readily access the program, service, or benefit at issue. *See* Order 36 ("Plaintiffs need not show that the voting access allegedly denied here is absolute."). Plaintiffs also need not show discriminatory intent. *See, e.g.*, *NFB*, 813 F.3d at 510. Indeed, courts have long recognized that disability discrimination is seldom intentional, but "most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985).

To establish a Title II violation, Plaintiffs must demonstrate:

(1) that [their members or constituents] [are] qualified individual[s] with … disabilit[ies]; (2) that [they] w[ere] either excluded from participation in or denied the benefits of a public entity's services, programs, activities, or otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the[ir] disabilit[ies].

*Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021) (per curiam) (citations omitted). Plaintiffs meet all three elements. First, Plaintiffs' members or constituents are people with disabilities because they have "impairment[s] that substantially limit" their "major life activities." 28 C.F.R. § 35.108(a)(1)(i); *see also, e.g.*, Ex. 2 (Thomas ¶¶ 4-5); Ex. 3 (Chicoine ¶¶ 3); Ex. 4 (Mattox ¶¶ 5, 20); Ex. 5A (Orland ¶ 6); Ex. 7 (Thornton ¶¶ 8-9). These individuals are also "qualified" because they meet the essential eligibility requirements to participate in the State's absentee voting program—*i.e.*, they are registered to vote in Georgia. 28 C.F.R. § 35.104; 42 U.S.C. § 12131(2); *see also, e.g.*, Ex. 2 (Thomas ¶ 1); Ex. 3 (Chicoine ¶ 1); Ex. 4 (Mattox ¶¶ 9, 12, 18, 21(a)); Ex. 18 (Decl. of Jacqueline Wiley ("Wiley") ¶¶ 1-3, 6-10); Ex. 5A (Orland ¶¶ 6-7, 9).

Second, Plaintiffs' members or constituents have been and will continue to be excluded from or denied "an [equal] opportunity to participate in or benefit from the aid, benefit, or service" of absentee voting by a public entity. 28 C.F.R. § 35.130(b)(1)(ii). Equal access is denied "when a disabled person cannot readily

access the program, service, or benefit at issue."[5] *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1155 (N.D. Ala. 2020). Defendants are public entities under the ADA responsible for administering Georgia's elections and ensuring equal access to voters with disabilities. *See* 42 U.S.C. § 12131(1)(A). Absentee voting is the relevant "service, program, or activity" the Court must analyze for equal accessibility. *See, e.g.*, *NFB*, 813 F.3d at 503-05; *People First*, 491 F. Supp. 3d at 1158-59; *see also* Order at 36. As discussed below, the felony provision and drop box restrictions deny voters with disabilities equal access to the absentee voting program.

Finally, Plaintiffs' exclusion from, denial of the benefits of, or discrimination in Georgia's absentee voting program is due to their disabilities, as discussed below. *People First*, 491 F. Supp. 3d at 1155.

**A. S.B. 202's Felony Provision Denies Equal Access to Disabled Voters.**

S.B. 202 makes it a felony for people not permitted to provide assistance under the state statute—such as neighbors, friends, or nursing facility staff—to assist a person with a disability in casting an absentee ballot. Ga. Code Ann. §§ 21-2-568(a)(5), 21-2-385(a). For disabled voters who need this help, adding felony

---

[5] Some courts use the language "meaningful access" to a service, program, or activity in discussing the standard for a Title II violation. *See, e.g.*, *NFB*, 813 F.3d at 504, 507. To the extent that "meaningful access" imposes a different standard than "equal access" or "readily accessible," the challenged provisions of S.B. 202 violate Title II under either standard.

consequences to such assistance unlawfully denies them equal access to absentee voting. Laws preventing or restricting individuals with disabilities from accessing needed assistance in absentee voting—like S.B. 202's felony provision—violate Title II. In *Democracy North Carolina v. North Carolina State Board of Elections*, the court issued an injunction under the ADA against a state law that prohibited nursing home employees from assisting disabled voters in completing or returning absentee ballots. 476 F. Supp. 3d 158, 231-32, 238 (M.D.N.C. 2020). Similarly, in *American Council of the Blind of Indiana v. Indiana Election Commission*, the court enjoined a state law that restricted who could assist disabled voters in completing and returning their absentee ballots because it violated the ADA and the Rehabilitation Act. 2022 WL 702257, at *8, *11 (S.D. Ind. Mar. 9, 2022).

In Georgia, multiple voters with disabilities have reported that the felony provision interfered with—or denied them—access to absentee voting. Some voters needed, but could not find, an eligible assistor willing to return their absentee ballots. They were denied access to absentee voting altogether. *See, e.g.*, Ex. 2 (Thomas ¶¶ 9-16); Ex. 6 (Hargroves ¶¶ 5, 10-14); Ex. 19 (Devon Orland Christopher ("Orland") Dep. 161:25-162:11); Ex. 14B (Thornton Dep. Day 2 40:5-23). This was especially true for people who must rely on help from institutional staff or neighbors, who may not be a "caregiver" under the statute's vague, undefined term. *See* Ex. 2

(Thomas ¶¶ 9-16); Ex. 6 (Hargroves ¶¶ 5, 10-14); Ex. 4 (Mattox ¶ 21(a)); Ex. 19 (Orland Dep. 161:25-162:11). Other voters could find people to help under S.B. 202's restrictions, but only by incurring additional and unreasonable burdens, such as asking people they do not trust to assist, or asking family members to travel long distances just to return their ballots. *See, e.g.*, Ex. 2 (Thomas ¶¶ 10-16). Further, the State's failure to define "caregiver" sows confusion and fear among would-be assistors and the voters who want to ask for their assistance. *Supra* pp. 5-7. The risk of prosecution chills eligible, willing assistors and harms voters who need assistance. Ex. 5A (Orland ¶¶ 21-25).

Remarkably, the felony provision penalizes actions that federal law explicitly protects. Section 208 of the Voting Rights Act ("VRA") provides that voters "who require[] assistance to vote by reason of blindness, disability, or inability to read or write *may be given assistance by a person of the voter[s'] choice*, other than the voter[s'] employer or agent of that employer or officer or agent of the voter[s'] union." 52 U.S.C. § 10508 (emphasis added). The Georgia Attorney General has concluded that Section 208 supersedes state ballot return assistance restrictions.[6]

---

[6] *See* 2016 Ga. Op. Att'y Gen. 02 (2016) (finding similar restrictions on who may assist a voter with a disability in Georgia law "cannot be construed to prevent voters from receiving assistance, including assistance in mailing or delivering an absentee ballot, from anyone of their choosing and not otherwise prohibited by Section 208");

Imposing felony penalties on assistors who are not family, household members, or "caregivers" denies many voters with disabilities their rights under federal law to choose those they most trust to provide assistance. *E.g.*, Ex. 2 (Thomas ¶¶ 9-16); Ex. 6 (Hargroves ¶¶ 5, 10-14); Ex. 4 (Mattox ¶ 21(a)).

### B.  S.B. 202's Drop Box Restrictions Deny Equal Access to Disabled Voters.

S.B. 202 limits drop boxes to indoor locations and limits the hours during which drop boxes are available. This is no mere inconvenience for voters with mobility or sensory disabilities, many of whom can no longer access drop boxes. The restriction denies disabled voters equal access to drop boxes and absentee voting on the basis of their disabilities in violation of Title II and Section 504.

Disabled voters who could previously return their ballots to outdoor drop boxes now find it difficult or impossible to physically get to these indoor drop boxes. *See, e.g.*, Ex. 8 (Halsell ¶¶ 8-10); Ex. 3 (Chicoine ¶¶ 5-10); Ex. 18 (Wiley ¶¶ 2, 8-10); Ex. 5A (Orland ¶¶ 17, 26); Ex. 15 (Athens-Clarke Dep. 124:6-17); Ex. 10 (Hall Dep. 65:22-66:11, 68:8-12, 70:6-18, 132:9-16, 151:23-153:6). And the reduced hours of operation, combined with S.B. 202's limit on the number of drop boxes per county, make absentee voting via drop box difficult or impossible to access for many

---

1984 Ga. Op. Att'y Gen. 34 (1984) (finding Section 208 takes precedence over other state law provisions as to voting assistance).

disabled voters who face transportation barriers. *See, e.g.*, Ex. 16 (Chatman ¶¶ 7, 38); Ex. 1 (Schur 5, 33-34, 46-47); Ex. 5A (Orland ¶¶ 17, 26); Ex. 2 (Thomas ¶¶ 5-6, 17-18, 21-22, 24, 37-39); Ex. 3 (Chicoine ¶¶ 4-6, 10-13); Ex. 18 (Wiley ¶¶ 2, 8-10).[7] Returning absentee ballots via mail is an insufficient alternative to the drop box program as it reduces the time and certainty available to voters with disabilities as opposed to nondisabled voters, as discussed *supra* pp. 4-5.

The increased time and/or burden needed to access a program or service violates Title II, even if individuals with disabilities were ultimately able to access or use the program or service. In *Shotz v. Cates*, for example, the Eleventh Circuit held that plaintiffs stated an ADA claim where a courthouse's wheelchair ramps and bathrooms impeded their ability to attend trials, even though they were ultimately able to "manage[] in some fashion to attend the trial." 256 F.3d 1077, 1080 (11th Cir. 2001); *see also D.R. ex rel. Courtney R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1137-38, 1145-46 (C.D. Cal. 2010) (student was likely to succeed on ADA claims challenging the school's denial of her request for an elevator key, making her frequently miss class time and restricting access to the library and other functions on the second floor); *Civic Ass'n of the Deaf of N.Y.C.,*

---

[7] *See also* Ex. 14A-B (Thornton Dep. Day 1 28:7-21, 89:7-14, 108:13-110:10, 113:2-17, Day 2 10:16-11:3, 19:9-15, 33:2-34:17, 40:5-23); Ex. 20 (Shannon Mattox ("Mattox") Dep. 90:23-91:11).

*Inc. v. Giuliani*, 915 F. Supp. 622, 635-37 (S.D.N.Y. 1996) (plan to replace emergency street alarm boxes with notification systems inaccessible to the deaf violated Title II because it denied those individuals the ability to report emergencies *from the street* specifically).

### C. Plaintiffs' Proposed Modifications Are Reasonable and Necessary, and Impose No Undue Financial or Administrative Burden.

Plaintiffs' proposed relief—to return to the status quo ante for two S.B. 202 provisions—is reasonable. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7)(i). A proposed modification is reasonable if it would not impose an undue financial or administrative burden. *See, e.g.*, *People First*, 491 F. Supp. 3d at 1155. The burden of showing that a modification is reasonable is not "heavy." Rather, "[i]t is enough for the plaintiff[s] to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* (alterations in original) (internal quotation marks omitted); *see also NFB*, 813 F.3d at 507-08.

First, enjoining enforcement of the felony provision is a reasonable modification necessary to prevent discrimination against Georgia voters with disabilities. Previously, Georgia correctly interpreted state and federal law, determining that Section 208 of the VRA "takes precedence" over the more

restrictive state law and allows voters with disabilities to obtain assistance from the person of their choice to return their absentee ballots.[8] Removing the felony penalty would simply prevent the State from imposing felony penalties on behavior that is already explicitly allowed by federal law. An accommodation to comply with federal law is reasonable under the ADA. *Cf. Carey v. Wis. Elections Comm'n*, 2022 WL 3910457, at *2 (W.D. Wis. Aug. 31, 2022) ("Voters shouldn't have to choose between exercising their federal rights and complying with state law."). The change would require no administrative burden, as Defendants admit. Ex. 17 (Evans Dep. 228:4-12 (Elections Director in SOS's Office testifying that he was unaware of any changes the office would need to make if the felony provision were removed)); Ex. 15 (Athens-Clarke Dep. 127:19-128:4 ("very minimal changes" would be required if felony provision were removed)).

Second, enjoining the requirements that drop boxes be located inside an election office or early voting location and accessible only during the office's

---

[8] *See supra* pp. 15-16; Ex. 5A (Orland ¶¶ 21-24); *see also, e.g.*, *Carey v. Wis. Elections Comm'n*, 2022 WL 3910457, at *9 (W.D. Wis. Aug. 31, 2022) (concluding that "the VRA requires that plaintiffs be allowed to choose a person to assist them with mailing or delivering their absentee ballot," and that the VRA preempted a state law prohibiting voters with disabilities from receiving such assistance); *Disability Rts. N.C. v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *6 (E.D.N.C. July 11, 2022) (concluding that VRA preempted statute that "impermissibly narrows the right to assistance by a person of the voter's choice by prohibiting the mailing or delivery of a voter's ballot by anyone except a near relative or legal guardian").

business hours is a reasonable modification that ensures Georgia voters with disabilities have equal access to an important component of absentee voting. *See, e.g.*, Ex. 21 (Robert Gabriel Sterling ("Sterling") Dep. 157:16-158:19 (Chief Operating Officer in SOS's Office testifying that "the whole point of the drop box is to have it outside")). This, too, would require no undue burden, as Defendants likewise admit. *Id.* 72:2-73:20, 162:8-11, 223:3-7 (pre-S.B. 202 drop boxes were secure); Ex. 10 (Hall Dep. 69:16-22, 72:6-12 (same)); Ex. 15 (Athens-Clarke Dep. 114:23-116:11, 121:9-122:21 (same)); *id.* 123:5-17 (would take only "about two days" to return drop boxes to pre-S.B. 202 locations).

The fact that the State has already successfully administered elections without the felony provision in place and while permitting drop boxes to be located outside and accessible 24 hours a day shows that these modifications are plausible and not unduly burdensome. *See, e.g.*, *NFB*, 813 F.3d at 507-08 (proposed voting modification was reasonable where previously implemented). Moreover, courts find that general, program-wide accommodations like the ones proposed are reasonable and appropriate for Title II violations. *See, e.g.*, *id.* at 507-10 (implementing online ballot marking tool for voters with disabilities); *People First*, 491 F. Supp. 3d at 1161-62 (lifting ban on curbside voting); *Am. Council of Blind of Ind.*, 2022 WL 702257, at *8, *11 (lifting prohibition on voters with disabilities completing and

returning absentee ballots with assistance from an individual of their choice).

Accordingly, Plaintiffs demonstrate a substantial likelihood of success on the merits of their challenge to S.B. 202's felony provision and drop box restrictions.

## III. THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH HEAVILY IN FAVOR OF PLAINTIFFS

### A. Plaintiffs and Their Constituents and Members Are Likely to Suffer Irreparable Harm Absent Preliminary Relief.

Plaintiffs risk irreparable harm absent an injunction, as do their constituents and members. An injury is "irreparable" where "it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). "[W]hen a defendant violates a civil rights statute, such as the ADA, irreparable injury is presumed." *Bartell v. Grifols Shared Servs. NA, Inc.*, 618 F. Supp. 3d 275, 289 (M.D.N.C. 2022). It is "well-settled that an infringement on the fundamental right to vote amounts in an irreparable injury." *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1306 (N.D. Ga. 2020).

The provisions at issue threaten Plaintiffs' members' and constituents' rights to vote in the 2024 elections on account of their disabilities. *See, e.g.*, Ex. 4 (Mattox ¶ 21(a)); Ex. 6 (Hargroves ¶ 14). The loss of the right to vote is quintessential irreparable harm because "[o]nce the election occurs, there can be no do-over and no redress." *Ga. State Conf. NAACP v. Georgia*, 2017 WL 9435558, at *4 (N.D. Ga.

May 4, 2017); *see also Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016). The burdens that disabled voters will bear absent an injunction, even if they ultimately find a way to vote, also constitute irreparable harm. *See Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 477-78 (S.D.N.Y. 2004) (denying disabled voters access to in-person voting "den[ies] them as much time as other voters to consider their choice" of candidate and requires them to undergo extra steps to vote absentee that create "hassle"). Irreparable harm exists where, as here, voting is so burdensome for citizens with disabilities that they may be "dissuaded from attempting to vote at all." *Id*.; *see also* Ex. 1 (Schur 25-26, 45 (accessibility obstacles faced by disabled voters discourage voting)). As discussed in Section II, *supra*, S.B. 202 imposes unique barriers to absentee voting for voters with disabilities that others are spared, and those harms cannot be remedied.

Plaintiffs face three main types of irreparable harm. First, the harms to Plaintiffs' members or constituents constitute irreparable harm to the organizations. *See Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018) (harm to voting organizations is "coterminous with the harms suffered by its citizen members"); *see also Democracy N.C.*, 476 F. Supp. 3d at 236-37 (similar); *supra* p. 9 (describing Plaintiffs' organizational interest in voting).

Second, Plaintiffs have diverted resources to respond to the felony provision and drop box restrictions, including by helping voters go to the polls where absentee voting is no longer accessible, and by advising them as to the assistors they are allowed to use. *Supra* p. 9 (describing how Plaintiffs redid voter education materials and educate voters about new restrictions). As a result, Plaintiffs gave up time-sensitive opportunities that are lost forever, such as advocating for improved benefits programs and conditions in long-term care during a legislative session, advocating for time-sensitive needs for care, or investigating real-time allegations of abuse. Ex. 7 (Thornton ¶ 25); Ex. 4 (Mattox ¶ 22); Ex. 5A (Orland ¶ 27). Such diversion of resources constitutes irreparable harm. *See Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018); *Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016).

Finally, ADAPT lost opportunities to assist voters because the felony provision has chilled its members from providing assistance. *See* Ex. 7 (Thornton ¶ 22 (describing organizational policy change to no longer help with absentee ballots)). Such lost opportunities to engage voters constitutes irreparable harm. *Ind. State Conf. of NAACP v. Lawson*, 326 F. Supp. 3d 646, 664 (S.D. Ind. 2018), *aff'd sub nom. Common Cause Ind. v. Lawson*, 937 F.3d 944 (7th Cir. 2019); *League of*

*Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).[9]

**B.  The Balance of Hardships Weighs in Favor of Plaintiffs.**

The balance of hardships weighs heavily in Plaintiffs' favor. The hardship to Plaintiffs is severe: the potential loss of their members' fundamental rights to vote, burdens on their members who must take extraordinary measures to vote, and inability to carry out their missions. Defendants face no hardship, as Plaintiffs seek no complex, burdensome changes to election administration. All they ask is a return to the pre-S.B. 202 status quo for two narrow provisions. *See supra* Section II.C.

Even if those changes posed a hardship to Defendants (they do not), it would be nothing more than a matter of "administrative convenience," which cannot outweigh the fundamental right to vote. *Fla. Democratic Party*, 215 F. Supp. 3d at 1258. Plaintiffs risk losing the right to vote which is a "fundamental right and … preservative of all other rights," while Defendants risk only "inconvenience and [minimal] expense." *Ga. State Conf. NAACP*, 2017 WL 9435558, at *5; *see also United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012).

---

[9] The fear of prosecution assistors face for assisting with voting also constitutes irreparable harm. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1269 (11th Cir. 2012); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008).

### C.  A Preliminary Injunction is in the Public Interest.

Injunctive relief is necessarily in the public interest because it ensures that all citizens, including those with disabilities, have an equal opportunity to participate in Georgia's absentee voting process. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[P]rotection of the Plaintiffs' franchise-related rights is without question in the public interest."). "By definition, the public interest favors permitting as many qualified voters to vote as possible." *Ga. State Conf. NAACP*, 2017 WL 9435558, at *5; *see also Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018); *Obama for Am. v. Husted*, 697 F.3d 423, 436-37 (6th Cir. 2012) ("[T]he public has a strong interest in exercising the fundamental political right to vote." (internal quotation marks and citations omitted)). By contrast, limiting citizens' ability to cast a ballot is not in the public interest. *Cox*, 408 F.3d at 1355. Moreover, the State has no interest in defending provisions that violate federal law. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

### CONCLUSION

Plaintiffs' motion for a preliminary injunction as to the felony provision and the drop box restrictions should be granted.

Respectfully submitted, this 17th day of May, 2023.

*/s/ Caitlin May*

Caitlin May (Ga. Bar No. 602081)
*cmay@acluga.org*
Rahul Garabadu (Ga. Bar No. 553777)
*rgarabadu@acluga.org*
Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
Alaizah Koorji (pro hac vice)
*akoorji@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan Topaz (pro hac vice)
*jtopaz@aclu.org*
Dayton Campbell-Harris (pro hac vice)
*dcampbell-harris@aclu.org*
Casey Smith (pro hac vice)
*csmith@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt (pro hac vice)
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Anuja Thatte (pro hac vice)
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Washington, DC 20005
Telephone: (202) 682-1300

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla C. Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Arjun Jaikumar (pro hac vice)
*arjun.jaikumar@wilmerhale.com*
Sofia Brooks (pro hac vice)
*sophie.brooks@wilmerhale.com*
Lucas Fortier* (pro hac vice)
*lucas.fortier@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

*Attorneys for Plaintiffs Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, and Southern Christian Leadership Conference*

*\* Pro hac vice forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: May 17, 2023                                   */s/ Caitlin May*

                                                                Caitlin May

                                                                *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2023, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: May 17, 2023                    */s/ Caitlin May*

                                       Caitlin May

                                       *Counsel for Plaintiffs*