EXHIBIT 5A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, <br><br> *Defendants*, <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> *Intervenor-Defendants*. | Civil Action No.: 1:21-cv-01284-JPB |

## DECLARATION OF DEVON ORLAND IN SUPPORT OF AME PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. I, Devon Orland,[1] am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based upon my personal knowledge:

**Background on Georgia Advocacy Office (GAO)**

2. I have been the Litigation Director at Georgia Advocacy Office ("GAO") since May 2017. In this role, I lead the legislative and educational teams and work with our program managers to facilitate legal issues, set priorities, and determine workload and case load. I work closely with our Executive Director in ensuring GAO carries out activities in conformity with applicable laws, regulations, grants and contractual requirements, and for ensuring that the organization is responsive to the advocacy needs of people with disabilities in Georgia. I am an attorney, licensed to practice in Georgia.
3. GAO is incorporated as a non-profit organization in the State of Georgia.
4. GAO has been designated by the State of Georgia since 1977 as the State's protection and advocacy system ("P&A") to protect the legal and human rights of individuals with disabilities in the state of Georgia. This designation is currently pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 et seq., the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041 et seq., and the Protection and Advocacy for Individual Rights Program of the Rehabilitation Act, 29 U.S.C. § 794e.
5. As the designated P&A, GAO is authorized to pursue administrative, legal, and other appropriate remedies to protect and advocate for the legal rights of individuals with disabilities and to redress incidents of discrimination in the state. Central to our mission is empowering Georgians with disabilities to participate fully and independently as active and engaged citizens. GAO has the authority to prosecute actions in its own name and on behalf of its constituents. 42 U.S.C. § 15043(a)(2)(A)(i).
6. GAO's constituents are residents of Georgia with disabilities, as that population is defined by federal and/or state law.

---

[1] Legally my full name is Devon Orland Christopher, but professionally I use Devon Orland.

7. GAO represents the interests of, and is accountable to, members of the Georgia disability community, and its funding is dependent on compliance with a governance structure that ensures oversight and control by the disability community.
    a. GAO has a multi-member governing board, which is responsible for the planning, design, implementation, and functioning of the protection and advocacy system. This Board of Directors annually establishes GAO's advocacy priorities. Over 80 percent of GAO's Board of Directors are individuals with disabilities and family members of individuals with disabilities.
    b. GAO has a statutorily mandated PAIMI Advisory Council, whose responsibility is to provide GAO with independent advice and recommendations about people with psychiatric disabilities. One hundred percent of GAO's PAIMI Advisory Council members are people with psychiatric disabilities.
    c. GAO regularly seeks public inputon the direction of its work. This information is obtained through its Board of Directors, public meetings, and the PAIMI Advisory Council, public forums, presentations, and advocacy.
    d. Members of the disability community have the right to file grievances if they disagree with actions taken by GAO or believe they were wrongly denied services by GAO.
8. GAO has been an organizational plaintiff in a number of cases. For example:
    - *GAO v. Jackson*: In 2019, a federal district court found that GAO has associational standing on behalf of women with mental illness in a case involving jail conditions at the South Fulton Jail (*Georgia Advoc. Off. v. Jackson*, No. 1:19-CV-1634-WMR-JFK, 2019 WL 12498011, at *2 n.1 (N.D. Ga. Sept. 23, 2019), *modified on other grounds*, No. 1:19-CV-1634-WMR-RDC, 2020 WL 1883877 (N.D. Ga. Feb. 26, 2020), and *order vacated, appeal dismissed on other grounds*, 4 F.4th 1200 (11th Cir. 2021), *vacated on other grounds*, 33 F.4th 1325 (11th Cir. 2022)).
    - *GAO v. State of Georgia*: GAO's assertion of associational standing has not been challenged in a lawsuit filed in 2017 involving students with disabilities being placed in segregated educational settings. The court denied Defendants' motion to dismiss and subsequent motion for

3

judgment on the pleadings on other grounds and the case is ongoing. Case No. 1:17-CV-3999-MLB (N.D. Ga.).
- *GAO v. Reese*: In a case filed in 2015, GAO was granted summary judgment and permanent injunction against Defendant Department of Community Health for failure to provide mental health records pursuant to GAO access authority. GAO's standing was not challenged. Case No. 1:15-cv-03372 (N.D. Ga.).

**GAO's Voting Work**

9. GAO is the designated agency in Georgia to receive an annual grant, called Protection and Advocacy for Voting Access ("PAVA") pursuant to the Help America Vote Act ("HAVA"), requiring GAO to promote access and engagement in the electoral process for voters with disabilities. Based on our work under this grant, we know that our constituents have an interest in voting as a way to elevate their political interests and take a role in their communities. They are uniquely impacted by many laws that affect their ability to live independently and access education, among other rights, and they understand that their vote matters to their priorities. Our constituents frequently express an interest in voting and concerns about barriers in the voting process. GAO's current workplan goals for the PAVA program are:
    a. To ensure full participation in the electoral process for individuals with disabilities.
    b. To train and educate election officials, poll workers, , and service providers regarding the rights of voters with disabilities and best practices in supporting individuals with disabilities.
    c. To provide education, training, and assistance to individuals with disabilities, promoting participation in the electoral and complaint processes, self-advocacy, and self-determination.
10. GAO's constituents for our voting program include all voters with disabilities throughout Georgia, including people who are in institutions, such as nursing facilities, psychiatric hospitals, group homes, and other congregate settings.
11. GAO participates in this action on behalf of its constituents who are qualified voters with disabilities throughout the state, pursuant to the Americans with Disabilities Act.

12. Ensuring and promoting access to voting by people with disabilities is germane to GAO's purpose and is directly in keeping with GAO's overarching purpose: the protection of, and advocacy for, the rights of Georgians with disabilities.
13. GAO's funding for its voting work comes, in large part, from the federal PAVA grant. Under this formula grant, GAO receives a set amount of funding each year to conduct voting advocacy. This grant is relatively small but enables us to employ a PAVA Coordinator who also has other, nonvoting, responsibilities, and enables us to allocate PAVA funds to our advocates who work on voting, as well as other issues. We do not have anyone working full-time on PAVA or other voting work. We do not generate income under this grant. Time spent by our staff on one voting issue, such as assisting people to navigate the changes in voting due to Senate Bill 202 directly diminishes the time that can be spent on other work.
14. Prior to the passage of Senate Bill 202, GAO's PAVA work was specifically geared towards protecting the disability vote using a combination of supporting self-advocacy, citizen involvement, staff advocacy, and legal advocacy to protect and advocate for the rights of Georgians with disabilities. Among other efforts during the absentee voting period, early voting and on Election Day, GAO has:
    a. Educated voters with disabilities about their rights in the voting process through webinars and in-person events, often in collaboration with other non-partisan disability rights and voting organizations;
    b. Responded to violations of voting rights of Georgians with disabilities and educated voters with disabilities, including those who are in congregate care facilities;
    c. Conducted voter outreach to individuals in nursing facilities and psychiatric hospitals, which includes talking to residents about their rights in the voting process and providing absentee ballot applications to residents who find it challenging or impossible to vote at the polls;
    d. Created and shared educational videos and written guidance, answered voter questions, and provided information about voting processes and voting rights to all individuals with disabilities, including people in nursing homes or psychiatric facilities;

e. Contributed funds to Get Out the Vote programs operated by Plaintiff The Arc;

f. Run a nonpartisan election protection hotline to support voters with disabilities who experience problems while voting and, when necessary, escalated complaints to the Secretary of State or testified before the state legislature about the problems reported by voters with disabilities; and

g. Collaborated with the Secretary of State's office on voter education, including hosting a "We Vote Education" day in our office in which we invited voters with disabilities to try out new voting machines provided by the Georgia Secretary of State's office.

**Impact of Senate Bill 202 on GAO's Constituents and Work**

15. GAO was aware of, and monitored, the legislative process that led to the passage of Senate Bill 202. We were concerned about its provisions affecting voters with disabilities and those who assist them, as well as the way it was rushed through the legislative process. We met with other advocacy organizations regarding concerning provisions of Senate Bill 202 and other voting bills in the same legislative session and joined with other organizations to submit comments about various proposals.

16. Senate Bill 202, and specifically the assistance and drop box provisions, have had a significant impact on the ability of Georgians with disabilities to exercise their right to vote. Specifically, they might need to rely on people other than family members to assist them with absentee ballots. We have received reports of people who could not get rides to the polls and people whose staff at their nursing facility refused to help them vote. Those barriers compound upon other new issues Senate Bill 202 created; for instance, the requirement that individuals provide an ID number to apply for an absentee ballot, or alternatively a photocopy of other documentation. This negatively impacts many people who face poverty and mobility limitations, and especially people in institutions, including group homes, nursing facilities, psychiatric hospitals, or other congregate settings.

17. In one case, a disabled individual who had previously been able to drive to a drop box and submit his absentee ballot without leaving his car was surprised in November 2022 to find that the drop box was no longer

accessible to him. He can ambulate about 10 yards, using either a manual wheelchair or a walker, but he could not see where the drop box was located, and believed that the distance to enter the building and locate the drop box would be too great for him given his mobility limitations. He asked a poll worker for assistance and was told that poll workers had been instructed not to touch anyone's ballot, so the poll worker refused to help him. He was frustrated that he was put in that situation because of the lack of disability access to the drop box. This individual is a proud voter and prefers to vote independently. He cannot rely on family, so with the limitations on assistance and the inaccessible drop boxes, he will be forced to go to great lengths to vote in person or return his absentee ballot, and possibly be disenfranchised if he is not able to overcome all of these barriers, due to his disabilities.

18. Since the passage of Senate Bill 202, our voter outreach and education work has changed significantly. Historically, this work involved educating Georgians with disabilities about their right to vote, especially people in institutions, and providing generic information about accessibility requirements. This involved conducting trainings and meeting with people to talk about the importance of voting and informing them about their right to vote even though they have a disability or live in a facility or group home. Now, the work has shifted more to educating Georgians with disabilities about how to vote, understanding the new limitations, and navigating the changed requirements in the voting process. Some of the particular impacts on people with disabilities that we try to address include navigating the absentee ballot process and difficulties getting needed assistance, and barriers in obtaining and providing copies of acceptable ID.

19. Since Senate Bill 202 was passed, GAO has:
    a. Modified and expanded our voter education program, including updating a detailed PowerPoint presentation entitled *Reminding You to Vote*. A true and correct copy of this presentation is attached hereto as Exhibit A;
    b. Spent additional time during visits to nursing homes, psychiatric facilities, and day programs to educate voters about the burdens imposed by Senate Bill 202 and assisted them in formulating and executing a plan to vote, which has reduced the amount of time our

      staff can spend advising people about their other rights and monitoring conditions in those settings;

    c. Responded to reports of problems that voters with disabilities face so we can troubleshoot for the future;

    d. Hosted webinars and educational events specifically to help explain the changes to the voting process for Georgians with disabilities due to Senate Bill 202, including new ID requirements and limitations and penalties for violations of voter assistance provisions;

    e. Called nursing facilities and attempted to speak to staff about voting access and practices for assisting residents, in light of the changes in Senate Bill 202;

    f. Paid almost $20,000 to rewrite and reshoot a pre-planned educational video and modify and expand a voting forum due to Senate Bill 202's significant changes to Georgia's voting processes for people with disabilities; and

    g. Discontinued some voter support efforts including providing absentee ballot applications to voters with disabilities, including nursing facility residents, for fear of being charged with criminal penalties.

20. In 2021, the United States Senate Committee on Rules and Administration with oversight over federal elections and campaign finance law held its first field hearing in over twenty years. The hearing was held in Atlanta, to hear testimony from witnesses about Senate Bill 202 and the need for basic federal standards to protect the freedom to vote. GAO submitted comments to the Committee, outlining several issues affecting voters with disabilities, including: new strict identification requirements for absentee ballots; reduction in time to request absentee ballots; and lack of access to drop boxes to cast their absentee ballots due to new restrictions.

Felony Prosecution for Ballot Return Assistance

21. With respect to the new criminal penalties for ballot return assistance contained in Senate Bill 202, the confusion and potential risks to even authorized assistors have made our work of educating voters with disabilities about their rights, and helping them get the assistance they need to vote, significantly more difficult. Specifically, Georgia Code section 21-2-568, as modified by Senate Bill 202, now provides that anyone other than a voter's

family or household member, or the "caregiver" of a voter with a disability, who knowingly "[a]ccepts an absentee ballot from an elector for delivery or return to the board of registrars … shall be guilty of a felony." GA Code § 21-2-568(a)(5). The term "caregiver" is not defined in the law, nor has the Secretary of State's office provided any definition.

22. Prior to the enactment of Senate Bill 202, the same limited categories of people were authorized in state law to return the ballots of disabled voters (GA Code § 21-2-385(a)); however, our understanding of the law pre-Senate Bill 202 is that these limitations did not apply. Specifically, our understanding of Section 208 of the federal Voting Rights Act (52 U.S.C. § 10508) is that it permits voters with disabilities to use the assistor of their choice in all aspects of the voting process, including ballot return, except for their employer or union representative.

23. Two Georgia Attorney General opinions affirm that the Voting Rights Act "takes precedence" over state law restrictions on assistance for voters with disabilities, enabling us to provide information, education, and advice to voters with disabilities and those who assist them without fear that even well-intentioned assistors might face prosecution. A true and correct copy of 2016 Ga. Op. Att'y Gen. 02 (2016) is attached hereto as Exhibit B. A true and correct copy of 1984 Ga. Op. Att'y. Gen. 34 (1984) is attached hereto as Exhibit C. Our understanding of the right to voter assistance and the applicability of Section 208 with respect to state law restrictions is consistent with these opinions.

24. Since Senate Bill 202 was passed, the new felony punishment for voter assistance that is not authorized by section 21-2-385(a) will chill voters with disabilities from asking for assistance even from authorized assistors, even though Section 208 of the Voting Rights Act should still apply. It will also deter individuals otherwise willing and eligible to assist from helping people with disabilities to vote. This means that commonly chosen assistors, such as nursing facility staff, neighbors, and trusted friends, will not be asked or agree to help people with disabilities to vote. We cannot confidently assure them that they can help without fear of felony prosecution for several reasons:

    a. First, GA Code § 21-2-568(a)(5), added in Senate Bill 202, contains no exception to felony punishment for ballot return assistance that is

9

permitted by federal law. The risk of potential prosecution, even if someone is ultimately exonerated, is too great. (In contrast, the pre-existing misdemeanor penalty for violation of the election code generally contains an exception, which gave us assurance that chosen assistors who were qualified pursuant to the Voting Rights Act section 208 would not be subject to prosecution. *See* Ga Code § 21-2-598 ("Except as otherwise provided by law, any person who violates any provision of this chapter shall be guilty of a misdemeanor.")

b. Second, Senate Bill 202 added a requirement that uniform instructions "shall include a list of authorized persons who may deliver or return the voted ballot to the board of registrars on behalf of the elector as provided in subsection (a) of Code Section 21-2-385." GA Code § 21-2-384(b). Instructions put out by the Secretary of State on March 30, 2022 list the limited categories of authorized assistors for ballot return, without any exception, on page 6. The instructions do not define the term "caregiver." I accessed these instructions on May 3, 2023 at: https://sos.ga.gov/sites/default/files/forms/Absentee_Voting_In_Georgia_Rev_3-30-22.pdf. A true and correct copy of these instructions is attached hereto as Exhibit D.

c. Third, Senate Bill 202 added a provision to the oath that voters must sign saying that they "will not give or transfer this ballot to any person not authorized by law to deliver or return absentee ballots." GA Code § 21-2-384(c)(1). Without clear instructions about who is authorized to deliver or return their ballots, it adds a layer of complexity and risk that will deter people from asking for needed help to vote, or from voting at all.

25. Since Senate Bill 202 was enacted, our work has become significantly more difficult, because of the lack of information about when the state limitations on ballot return assistance do and do not apply, the failure to include exceptions in the law and in information disseminated to the public, no clear or official definition of "caregiver," and the threat of felony punishment for violations of these requirements. The combined effect of the vague, misleading, and punitive ballot return assistance provisions of Senate Bill 202 have affected our work in ways that include:

10

    a. We have fielded queries and complaints from individuals who couldn't get the people of their choosing to help them vote, and have assisted them to understand and comply with the new rules;

    b. We have addressed complaints that poll workers are not well-trained and are not able or willing to assist voters with disabilities because the workers mistakenly felt it to be a violation of the law, and we have provided education to help voters and poll workers understand the rules and their rights;

    c. We have educated individual residents in nursing facilities about assistance requirements as well as steps in the absentee voting process, and helped them formulate and execute plans to vote, which means spending less time advising them about their other rights;

    d. We have discontinued informing nursing facility staff about their obligations to assist, or help find a caregiver to assist, residents in the absentee voting process because of the lack of clarity about the new rules and the potential risks; and

    e. We no longer take absentee ballot applications to residents of congregate living environments as a result of the inability to facilitate returning or mailing them.

<u>Drop Box Restrictions</u>

26. With respect to Senate Bill 202's new restrictions on outdoor drop boxes, GAO is aware that many registrar's offices where drop boxes may be located are physically inaccessible, and accessible routes may be poorly marked or otherwise difficult to locate. In addition, the limitations on hours of availability of drop boxes have adversely affected voters with disabilities because of their limited access to public transportation and/or inability to get a ride during business hours.

**Diversion of Resources Due to Senate Bill 202**

27. The time and resources GAO has expended ensuring that voters are not denied their access to the franchise because of Senate Bill 202 has directly reduced our other advocacy and will continue to do so unless there is a change in the law. These burdens have forced, and will continue to force GAO to divert resources, including employee time, effort, and attention,

from our other core activities including investigating and addressing allegations of abuse and neglect, advocating for appropriate assistive technology, and providing information and resources related to employment, inclusive education and other civil rights for Georgians with disabilities. As a result, due to Senate Bill 202, GAO is and will continue to be limited in the resources it can devote to its other core organizational goals.

I declare under penalty of perjury that the statements above are true.

This the __3rd__ day of __May__, 2023.

_____
Devon Orland