# Exhibit 1

Case 1:20-cv-05155-JPB Document 544-3 Filed 10/24/23 Page 2 of 10
Case 1:20-cv-04651-SDG Document 43 Filed 11/24/20 Page 1 of 120

1

```
                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
                            ATLANTA DIVISION


L. LIN WOOD, JR.                    )
                                    )    Docket Number
               Plaintiff,           )    1:20-CV-4651-SDG
                                    )
          v.                        )
                                    )    Atlanta, Georgia
BRAD RAFFENSPERGER, in his          )    November 19, 2020
Official Capacity as Secretary of   )
State of the State of Georgia;      )
REBECCA N. SULLIVAN, in her         )
Capacity as Vice Chair of the       )
Georgia State Election Board;       )
DAVID J. WORLEY, in his Capacity    )
as a Member of the Georgia State    )
Election Board; MATTHEW MASHBURN,   )
in his Official Capacity as a       )
Member of the Georgia State         )
Election Board; ANH LE, in her      )
Official Capacity as a Member of    )
the Georgia Election Board          )
                                    )
                                    )
               Defendants           )
                                    )
          v.                        )
                                    )
DEMOCRATIC PARTY OF GEORGIA, INC.,  )
Democratic Party of Georgia; DSCC;  )
DCCC; GEORGIA STATE CONFERENCE OF   )
THE NAACP; GEORGIA COALITION FOR    )
THE PEOPLES' AGENDA, INC.; HELEN    )
BUTLER; JAMES WOODALL; and MELVIN   )
IVEY                                )
                                    )
          Intervenor Defendants     )


        TRANSCRIPT OF PLAINTIFF'S EMERGENCY MOTION FOR
                 TEMPORARY RESTRAINING ORDER
           BEFORE THE HONORABLE STEVEN D. GRIMBERG
                  UNITED STATES DISTRICT JUDGE
```

1  A.   We were never given envelopes.  We never had them.  Those
2  were already separated before we got the batch.
3  Q.   You never saw any envelopes?
4  A.   We never saw any envelopes.
5  Q.   So you don't know if those pristine ballots were
6  provisional?
7               MR. HAMILTON:  Objection; leading.
8               THE COURT:  Overruled.
9               THE WITNESS:  I do not know whether they were
10 provisionals or absentees.  But either way, they would have been
11 folded, whether they were provisional or absentee, because the
12 absentee ballots have a white inner envelope and a yellow inner
13 envelope.
14              MR. SMITH:  Nothing further, Your Honor.
15              THE COURT:  All right.  Mr. Smith, is that your only
16 witness?
17              MR. SMITH:  Yes, Your Honor.  Our only live witness,
18 Your Honor.
19              THE COURT:  All right.  And what other declarations
20 are you submitting or you propose to submit in support of your
21 motion or is it all of them?
22              MR. SMITH:  I have a declaration that I submitted for
23 myself, Your Honor, and I'll read that.  I filed it with the
24 Court earlier today.  This is my analysis based on information
25 from the Secretary of State's website.  It's publicly available

1  so anyone could replicate my analysis.  This information I
2  reviewed was State-compiled mail-in ballot data from 2016, 2018,
3  and 2020.
4       My analysis shows that Georgia's rate of rejection
5  for mail-in ballots average 3.06 percent and 3.58 percent for the
6  2016 and 2018 general elections, Your Honor.  For the 2020
7  primary elections, however, this rejection rate dropped from
8  1.02 percent and for the 2020 general election that rate dropped
9  to .32 percent, .0.32 percent.  Your Honor, that's a 90-percent
10 decrease in the rate of mail-in-ballot rejections compared to the
11 2016 and 2018 elections.  And that's with a huge increase in the
12 number of absentee ballots going from several hundred thousand to
13 1.2, 1.3 million.
14      The number of mail-in ballots cast in Georgia, on the
15 other hand, has increased nearly 500 percent from the 2016 and
16 2018 elections to the 2020 general election.  We would expect to
17 see between 40,000 and 45,000 ballots rejected based on the
18 Georgia historical average rejection rate, but instead only 4,196
19 votes were rejected.  Given how close the number of votes are
20 separating President Trump and Vice President Joe Biden, the
21 historical rejection rates were improper and illegal ballots
22 could have changed the outcome of the race here in Georgia.
23      I would also add, Your Honor -- and then I'll save
24 the rest for my closing -- Your Honor had asked about due
25 process.  The *Baker vs. Carr* case, 369 US 186, "A citizen's right

1   to vote free of arbitrary impairment by State action has been
2   judicially recognized as a right secured by the Constitution of
3   the United States, when such impairment resulted from dilution by
4   a false tally."  The plaintiffs there were voters who sued on
5   behalf of themselves, as Mr. Wood has here, Your Honor.
6              THE COURT:  All right.  Anything further?
7              MR. SMITH:  Yes.
8              And Mr. Wood didn't vote in the other two elections.
9   Only in the 11-3 election.  So as to why this is an emergency,
10  the plaintiff's rights as an individual voter, they weren't ripe
11  until 11-3, Your Honor, November 3rd election.  So his vote
12  wasn't diluted before then.  I'll save the rest of my -- but
13  that's our case, Your Honor.  I'll save the rest of my argument
14  until my closing.
15             THE COURT:  That information that you just gave about
16  Mr. Wood, is that in a declaration or in any sworn testimony?
17             MR. SMITH:  No.  No, Your Honor.
18             THE COURT:  All right.  Ms. McGowan.
19             MS. McGOWAN:  Your Honor, Mr. Willard from our office
20  is going to do the argument but the State would first like to
21  object to Mr. Smith's affidavit.  Mr. Smith is serving as counsel
22  for plaintiff and it's improper for him to act also in the
23  capacity as a fact witness and much of his testimony involves
24  statistical analysis, providing factual evidence, and I believe
25  the last part of his affidavit is even highly argumentative so we

```
 1   object to the admissibility of that evidence.
 2              THE COURT:  Well, I don't have the declaration in
 3   front of me.  Those percentages that you read off, Mr. Smith, are
 4   those straight from the Secretary of State's website or did you
 5   have to run calculations?
 6              MR. SMITH:  No.  That was just a calculation from --
 7   it was like an advanced spreadsheet, Your Honor.
 8              MS. McGOWAN:  The issue, though, Your Honor, is that
 9   the reason for rejection --
10              MR. SMITH:  Anybody can do that with a calculation
11   based on the information at the Secretary of State website.
12              THE COURT:  Ms. McGowan, go ahead.
13              MS. McGOWAN:  The rejection rates vary from
14   year-to-year because there were different requirements for the
15   absentee ballots verified that had changed over time and so it's
16   sort of an apples-to-oranges comparison, but I believe my
17   co-counsel is going to address that in our argument.
18              THE COURT:  Okay.  I'll allow the admission of the
19   declaration, but I'm happy to hear argument as to its weight.
20   Mr. Willard.
21              MR. WILLARD:  Thank you, Your Honor.
22              As Ms. McGowan said -- and just a couple of
23   housekeeping matters before we get started to really clear up
24   some of the confusing and leading terms that plaintiff has
25   bandied about, just to bring the Court back to what we actually
```

```
 1  have in front of us.
 2            First, he continually interchanges a hand recount
 3  with the manual tabulation and the audit process.  Just to be
 4  clear, and as our response that we filed today sets out, what has
 5  just been conducted is the audit that is called for as part of
 6  the State's move to this new election system.  It is not a hand
 7  recount or a recount of the race as the Georgia Code set out.
 8  That is not a process that is triggered until after the
 9  certification and Mr. Smith and his client, Mr. Wood, have no
10  role in that process.  The only people who can request a recount
11  in a particular race is a losing candidate for that particular
12  office and we haven't gotten to that point yet because the
13  Secretary is not scheduled to certify the election results until
14  tomorrow at which point a recount does not become ripe until
15  after that fact.
16            He has also thrown out today - it is not briefed in
17  either his emergency motion or any of his pleadings - a
18  vote-dilution claim.  He has failed to sufficiently allege that.
19  If the Court would like us to go into that despite the fact that
20  he has not pled it, we will be happy to do that post-hearing, but
21  I won't be getting into that today because he has not established
22  the elements of a vote-dilution claim.
23            Further, he threw out today for really the first time
24  an allegation that the signature-match process was either not
25  done or was done improperly, but he has provided no evidence to
```

```
 1   the Court supporting that, nor any cognizable argument that that
 2   has happened.
 3              And, finally, as Ms. McGowan said, in terms of the
 4   plaintiff's apples-to-oranges comparison, he's comparing the
 5   totality of the absentee-ballot rejections from 2018.  As our
 6   brief response makes clear, the General Assembly made a policy
 7   decision following the 2018 election to change the evaluation of
 8   absentee ballots partially due to identity theft concerns and the
 9   fact that voters felt uncomfortable putting their date of birth
10   on the outside of the envelope.  The General Assembly took that
11   off the outer envelope where it was no longer visible to anyone
12   during the mail transmission.  That resulted in a significant
13   decrease in the percentage of absentee ballots that were rejected
14   at the outset.  There were quite a number in 2018 that were
15   rejected for that missing information.
16              In terms of when you actually do an apples-to-apples
17   comparison - and it is referenced in Chris Harvey's affidavit
18   that we will be moving into evidence, it's an exhibit in our
19   brief response - when you actually look at ballots from 2018 that
20   were rejected signature match and you look at ballots from 2020,
21   after the cure period, those numbers are identical in terms of --
22              MR. SMITH:  Your Honor, if he continues on he's going
23   to become a fact witness.
24              MR. WILLARD:  I am referencing what is in our
25   affidavit, Your Honor.  It is in our brief response, as well.  I
```

```
 1   will point the Court to both of those and, like I said, we'll be
 2   moving Mr. Harvey's affidavit into evidence at the conclusion of
 3   our argument in chief.
 4             THE COURT:  Now, you said that the numbers of
 5   absentee ballots that were rejected in this election as compared
 6   to 2018 was the result of the change in the requirement of the
 7   date of birth being placed on the outside of the envelope.  Did I
 8   understand that correctly?
 9             MR. WILLARD:  Your Honor, when you look at the 2018
10   numbers that were rejected for signature mismatch and compare
11   them with the rejected numbers of absentee ballots in 2020 that
12   were rejected for signature mismatch, the percentage of rejection
13   is identical to what it was in 2018.  And that is after you take
14   out the oranges that Mr. Smith was talking about because the
15   numbers that he's using from 2018 to arrive at the percentage of
16   rejection incorporates the date-of-birth rejections from 2018,
17   the missing information.  In addition, at the outset the initial
18   rate of rejection in 2020 was higher than it was in 2018.
19             MR. SMITH:  Excuse me, Your Honor.
20             MR. WILLARD:  But the General Assembly had made the
21   policy argument --
22             THE COURT:  Mr. Smith, let him finish.  I'll give you
23   an opportunity to respond.
24             MR. SMITH:  Okay.
25             MR. WILLARD:  The General Assembly had made the
```

1   policy determination to allow voters the opportunity to cure a
2   signature mismatch or missing signature.  And so it's only after
3   that cure process reduced the number of rejected ballots down
4   that you arrive at the final number for 2020 and even with that
5   reduced number the rejection rate for signature mismatch in 2020
6   is practically identical to what it was in 2018 as a percentage
7   of the rejected ballots.
8              THE COURT:  How do you know and what evidence have
9   you submitted that tethers the difference to be because of the
10  date-of-birth requirement?
11             MR. WILLARD:  We have the 2018 numbers based on --
12  they had a registrar -- the county officials have to note in the
13  system the reason for an absentee-ballot rejection and what
14  Mr. Smith is apparently relying on is the totality, all the
15  little codes that county election officials put in in 2018 for
16  rejecting the ballot.  The Secretary of State's office did an
17  analysis of only the 2018 ballots that were rejected for
18  signature mismatch based on the coding that county officials put
19  in, compared that with the 2020 rejection rate, and determined
20  that the percentages were practically identical between the 2018
21  general election rejection for signature mismatch and the 2020
22  rejection rates for signature mismatch.
23             THE COURT:  All right.  Anything more you want to
24  say, Mr. Willard?
25             MR. WILLARD:  Yes, Your Honor.  That was just the