# Exhibit 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, ET AL. <br><br> v. <br><br> BRAD RAFFENSPERGER, ET AL. | Civil Action No. 1:21-cv-1259-JPB |

**DECLARATION OF HELEN BUTLER**

Pursuant to 28 U.S.C. § 1746, I, Helen Butler, declare as follows:

1.      I am the Executive Director of the Georgia Coalition for the People's Agenda (the "People's Agenda"). I have served in that role since roughly 2006 and, before that, I was State Coordinator from the time I started working for the People's Agenda in 2003. Based on my position and job responsibilities, I am familiar with, and can attest to, the effect that SB 202 has had on the organization's work and mission. I am over 18 years of age and am competent to make this declaration. I have personal knowledge of the facts stated in this declaration and would testify to those facts if called as a witness before this Court.

2.      Founded in 1998, the People's Agenda is an umbrella organization for

many different human rights, civil rights, labor, women's, youth, and peace and justice groups that perform advocacy work in the State of Georgia.  The People's Agenda and its coalition partners focus on a broad range of issues, including voting rights protection, elimination of barriers to the ballot box, criminal justice reform, quality education, affordable housing, economic development, and equal participation in the political process for Georgians of color and underrepresented communities.  Its overall mission is to improve the quality of governance in Georgia, help create a more informed and active electorate, and have responsive and accountable elected officials.  Towards that end, it performs a variety of civic engagement work and conducts issue campaigns.

3.     The People's Agenda constituents include over 30 different advocacy groups, which collectively have more than 5,000 individual members.  In addition, individuals can sign up directly for an annual membership to the People's Agenda by paying a membership fee and submitting an application.

4.     The People's Agenda operates seven offices across the State of Georgia: its main office in Atlanta, and additional offices in Athens, Augusta, Albany, Savannah, Macon, and LaGrange.  Each office serves roughly 10 to 12 surrounding counties on a regular basis. The People's Agenda has limited resources to cover all this work, with seven paid full-time staff members working in the main Atlanta office, and six coordinators, each assigned to a particular area of Georgia.

The coordinators are responsible for organizing the People's Agenda activities in the communities they serve, including civic engagement activities, voter registration drives, voter mobilization efforts, and the organization's educations and coalition work.  The People's Agenda also has a couple hundred volunteers that work with its offices across the State of Georgia, including in Atlanta.

5.     With SB 202, the Georgia State Legislature instituted sweeping changes to the elections process, including new restrictions on requesting, assisting with, and casting absentee ballots such as a requirement that voters print their full date of birth on the return envelope for an absentee ballot (the "Birthdate Requirement"), limitations on the availability of dropboxes, etc.  The People's Agenda had to make significant changes to its programs and divert resources to address SB 202's restrictions, including its absentee voting provisions.

6.     Given the scope and volume of SB 202's changes to the voting process, there was a much greater need for the People's Agenda to engage in voter education activities than it had over my time.  In my experience, there had not been any changes in Georgia's voting laws as extensive and disruptive as those under SB 202. Moreover, SB 202 contained severe punishments for those that misunderstood its requirements; these included, in the case of the Birthdate Requirement, completely rejecting ballots of otherwise eligible voters or, in some cases, imposing criminal penalties for those that engaged in conduct that had previously been permitted, such

as assisting with absentee ballot applications or providing line relief.

7.      As a result, the People's Agenda's staff has had to invest much more of their time and effort in educating voters about SB 202's changes and how SB 202 would impact them as they went to vote.  For example, around the summer of 2021, following the passage of SB 202, we organized and led a virtual voter education tour in five counties in Georgia to educate members and the public about changes they needed to be aware of as a result of SB 202.  Then, beginning around the summer of 2022, we organized and led the Your Vote Your Voice tour, during which we made seven in-person stops to different counties in the state to again educate members and the public about the changes wrought by SB 202.  In both of these tours, we educated attendees about the changes to the Absentee Ballot process and the new requirements for requesting absentee ballot applications and returning the absentee ballots.

8.      In addition, the People's Agenda could not continue other programmatic activities that it would typically conduct, and many of the People Agenda's usual areas of focus were left unattended.  For instance, in normal times, the People's Agenda typically performs a lot of work on matters outside of the voting process—namely, criminal justice reform, equity in education, economic empowerment for Black-owned businesses, environmental justice, and elder issues. The People's Agenda seeks to balance its limited time and resources between these areas.  But, due to the extensive changes to absentee voting and election laws more

broadly under SB 202, the People's Agenda had to divert attention of its staff and membership away from these areas and focus instead on voter education.

9.     Indeed, the People's Agenda had specifically hired Cynthia Battles, its Director of Policy and Engagement, fulltime in February 2021 to address and deepen its work in these non-voting subject matter areas, including initiatives to create citizen oversight boards in the criminal justice system, to collaborate with community school boards to improve education quality in underperforming schools, to obtain better access to state and local contracts for Black-owned businesses, and to negotiate utility bills for seniors.  Because of the disruption caused by SB 202, however, Ms. Battles could not engage in this policy work and instead dedicated the vast majority of her time to voter education issues; in some cases, as with the project to get fairer utility bills for seniors, the People's Agenda's work stopped altogether.

10.     SB 202's restrictions on the absentee ballot process, including the Birthdate Requirement, raised obstacles and uncertainties about whether voting by mail would be effective.  And its limitations on out of precinct voting further exacerbated the issue, making it more difficult for eligible voters to cast a ballot. The compound effect of these restrictions forced the People's Agenda to change its Get Out the Vote ("GOTV") efforts, so they could better serve for seniors and other vulnerable communities who had difficulty getting to the ballot box.  In particular, the People's Agenda had to invest in and expand its "Rides to the Polls" initiative.

11.    I personally had to dedicate substantial time to voter outreach and education activities, helping Georgia voters and our coalition partners understand SB 202's myriad restrictions.  This work included preparing and giving many presentations about SB 202 and its requirements, including the Birthdate Requirement and its absentee voting process.  In addition to voter education activities, I also had to engage extensively with government officials and legislatures to clarify SB 202's requirement and address the problems that it created.  These efforts including preparing and giving testimony about SB 202's absentee voting restrictions to the United States House Judiciary Committee on January 20, 2022. **Exhibit A** to this declaration is a printout of my written testimony to the United States House of Representatives.  These activities diverted my efforts from advancing the People's Agenda's non-voting-related initiatives and distracted from my broader responsibilities and duties as Executive Director.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May at Atlanta, Georgia.

Helen Butler

6



**TESTIMONY OF HELEN BUTLER**

**EXECUTIVE DIRECTOR, GEORGIA COALITION FOR THE PEOPLE'S AGENDA**

**UNITED STATES HOUSE OF REPRESENTATIVES, JUDICIARY COMMITTEE
SUBCOMMITTEE ON THE CONSTITUTION, CIVIL RIGHTS, AND CIVIL LIBERTIES**

**HEARING ON**

**"VOTER SUPPRESSION AND CONTINUING THREATS TO DEMOCRACY"**

**VIA ZOOM VIDEO WEBINAR**

**JANUARY 20, 2022 - 10:00 A.M.**

GCPA00004788

## I. Introduction

Chair Cohen, Vice Chair Ross, Ranking Member Johnson, and Members of the Committee, my name is Helen Butler and I am the Executive Director of the Georgia Coalition for the People's Agenda ("PEOPLE'S AGENDA").

The PEOPLE'S AGENDA is a non-partisan, non-profit organization founded by the late Reverend Dr. Joseph E. Lowery. It is comprised of a coalition of representatives from civil rights, human rights, peace and justice organizations, and concerned citizens of the State of Georgia. The PEOPLE'S AGENDA is based in the greater Atlanta metro area, but we have members located throughout the entire State of Georgia who help to advance our mission and achieve our organizational goals.

Our mission is to improve the quality of governance in Georgia, create a more informed and active electorate, and ensure responsive and accountable elected officials. A significant focus of our work is on voter empowerment and ensuring equal access to the ballot for eligible Black Georgians, other Georgians of color, and under-represented communities.

The PEOPLE'S AGENDA'S voter empowerment work includes providing voter registration assistance with a focus on education and mobilization, at Historically Black Colleges and Universities (HBCUs), high schools, naturalization ceremonies, and community events. The PEOPLE'S AGENDA also conducts town hall meetings and candidate forums to provide opportunities for Georgia voters to learn about candidate positions and to engage in dialogues. We also operate a "Get Out the Vote" campaign in central locations throughout the state to encourage voter turnout; conduct our Election Protection Project which informs voters of their rights and provides immediate relief for problems encountered on or before Election Day; and manage our "Vote Connection Center" which provides training and technical assistance to nonprofit organizations and individuals through effective issue campaign organizing and civic engagement.

The PEOPLE'S AGENDA has always been dedicated to fighting for the voting rights of Georgia's citizens through public education, training, advocacy, and litigation. However, we have been forced to spend even more time and limited resources fighting discriminatory voting laws, policies, and practices at the state and local levels in Georgia in the wake of the Supreme Court's 2013 decision in *Shelby County v. Holder* due to the lack of the preclearance process and consequent loss of advance notice of voting changes that discriminate against Black voters and other voters of color.

## II. Georgia's Increasing Racial and Ethnic Diversity Fueled Efforts by Georgia's Majority Party to Enact Voter Suppression Laws

According to the 2020 Census, Georgia was among the top five States gaining population in the past decade, with the addition of 1,024,255 residents since 2010—a 10.6% increase.[1]

---

[1] *See* U.S. Census Bureau, Georgia: 2020 Census, August 24, 2021, available at: https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.

Confidential

GCPA00004789

People of color account for nearly all of Georgia's population growth since 2010, with Georgia's Black population increasing by 12.5%, Latinx population by 31.6% and AAPI population by 52.3%. By contrast, Georgia's White population decreased by 4%.[2]

In the last two decades, the Georgia electorate has undergone significant demographic changes, with increases in the percentage of Black Georgians and other Georgians of color registering to vote, participating in elections, and utilizing mail voting and early voting for casting their ballots.

These demographic changes and voting patterns have resulted in corresponding political changes in the state, including during the 2020 election cycle when Georgia elected its first Democratic presidential candidate since 1996, Joseph R. Biden, and its first Black United States Senator, Reverend Raphael Warnock.

Instead of embracing the increasing racial and ethnic diversity of Georgia's electorate and attempting to appeal to Black voters and other voters of color through public policies and legislation which support these voters' interests, the response by the majority party and Governor Kemp to these political changes was to enact new voter suppression laws during the 2021 regular legislative session to make it more difficult for Georgia's Black voters and other voters of color to vote.

These new laws also came on the heels of unprecedented efforts by the former President and his allies to overturn the presidential election results in Georgia and in other battleground states based upon patently false assertions of widespread voter fraud - which were particularly aimed at jurisdictions having large populations of Black and Brown voters, such as Georgia in general and Fulton County in particular - and false claims that the state's Dominion voting machines flipped votes for President Trump to Joe Biden.

Notwithstanding the fact that Georgia Secretary of State, Brad Raffensperger, repeatedly rejected the notion that there had been widespread voter fraud in the 2020 election cycle or that Georgia's voting machines switched votes following audits and hand counts of the ballots,[3] the former President and his allies nevertheless have continued to make false claims of voter fraud and voting machine interference, inspiring legislators in Georgia to enact laws that suppress the votes of Black and Brown Georgians and will undermine free and fair elections in our state.

.

---

[2] *Id.*

[3] David Wickert and Greg Bluestein, *Georgia election chief to Trump: Drop the fraud allegations*, Atlanta Journal-Constitution, December 2, 2020 (available online at: https://www.ajc.com/politics/election/georgia-election-chief-to-trump-drop-the-fraud-allegations/PDNVA3RTQJC5XG5O5QYQ6ZG5MY/).; Alison Durkee, *Georgia Election Official: No Voter Fraud In Runoffs Except In Trump's 'Fertile Mind,'* Forbes, January 26, 2021 (available online at: https://www.forbes.com/sites/alisondurkee/2021/01/06/georgia-election-official-no-voter-fraud-in-runoffs-except-in-trump-fertile-mind/?sh=521736b2424a); *Georgia Election Audit Completed: Biden Victory, Finds No Widespread Fraud*, CBS Atlanta, November 20, 2020; (available online at: https://atlanta.cbslocal.com/2020/11/20/georgia-election-audit-completed-biden-victory-finds-no-widespread-fraud.

Confidential

GCPA00004790

As a result of these false claims, election officials in Georgia and other battleground states have faced terrorizing death threats to themselves and their families[4] and a number of Georgia's election officials have resigned from their jobs since the 2020 election cycle, including the directors of election in Macon-Bibb,[5] Fulton,[6] Gwinnett,[7] and Augusta-Richmond[8] counties, as well as in other states.[9]

Shortly after Governor Brian Kemp signed SB 202, Georgia's omnibus voter suppression bill into law, Georgia's Republican Lieutenant Governor, Geoff Duncan, told CNN that the law was the fallout from a 10 week misinformation campaign by the former president and his allies, including by his personal attorney, Rudy Giuliani, who "showed up in a couple of committee rooms and spent hours spreading misinformation and sowing doubt across, you know, hours of testimony."[10]

### a. Georgia Senate Bill 202 (Enacted on March 25, 2021)

SB 202 was enacted by Governor Kemp after it was passed along party lines during the 2021 regular legislative session. The bills were rushed through committees in the Georgia House and Senate, often with little or no time for the minority party's members on the committees - much less the general public - to have an opportunity to review the final versions of the bills before they were voted upon. This process, with virtually no real transparency nor bipartisan support, culminated in the passage of an omnibus voter suppression bill, Senate Bill 202, the "Election Integrity Act of 2021" ("SB 202"), on March 25, 2021.[11]

---

[4] Linda So, *Trump-inspired death threats are terrorizing election workers*, Reuters, June 11, 2021 (available online at: https://www.reuters.com/investigates/special-report/usa-trump-georgia-threats/).

[5] Liz Fabian, *Macon-Bibb elections supervisor resigns, cites stress, workload, new election laws,* GPB, January 11, 2022, available at: https://www.gpb.org/news/2022/01/10/macon-bibb-elections-supervisor-resigns-cites-stress-workload-new-election-laws.

[6] Fredreka Shouten, *Embattled election chief in Fulton County resigns*, CNN, November 3, 2021, available at: https://www.cnn.com/2021/11/03/politics/fulton-county-election-chief-resigns/index.html

[7] Arielle Kass, *Gwinnett elections director is stepping down,* AJC, March 5, 2021, available at https://www.ajc.com/news/atlanta-news/gwinnett-elections-director-is-stepping-down/VNT6DZIA3NDBDDIXGUALZNN44I/.

[8] Susan McCord, *Lynn Bailey, Richmond County elections chief, announces retirement after 28 years*, Augusta Chronicle, June 15, 2021, available at: https://www.augustachronicle.com/story/news/local/2021/06/15/lynn-bailey-director-elections-richmond-county-augusta-ga-to-retire/7698364002/.

[9] Michael Wines, *After a Nightmare Year, Election Officials Are Quitting,* NYT, July 2, 2021, available at: https://www.nytimes.com/2021/07/02/us/politics/2020-election-voting-officials.html.

[10] Sara Murry, *Georgia's GOP lieutenant governor says Giuliani's false fraud claims helped lead to restrictive voting law,* CNN, April 8, 2021 (online at https://www.cnn.com/2021/04/07/politics/geoff-duncan-voter-fraud-cnntv/index.html).

[11] Georgia SB 202 as passed on March 25, 2021: https://www.legis.ga.gov/api/legislation/document/20212022/201498.

Confidential

GCPA00004791

The very same day the General Assembly passed SB 202, Governor Brian Kemp swiftly signed the bill into law in the presence of a group of six White men[12] and in front of a painting of the Callaway Plantation - the site of a former cotton plantation where over one hundred enslaved Black people served its owners.[13]

The preamble of SB 202 clearly indicates it was crafted with the former President's misrepresentations and disinformation about the 2020 election being "stolen" from him in mind. Among other things, the preamble indicates that the overhaul of Georgia's election procedures was necessary due to a significant "lack of confidence" in Georgia election systems, with many electors purportedly concerned about allegations of "rampant voter suppression" and about allegations of "rampant voter fraud."[14] The preamble also asserts the law was designed to "address the lack of elector confidence in the election system," reduce the burden on election officials, and streamline the process of conducting elections by promoting uniformity in voting.[15] The law does nothing of the kind.

Instead, SB 202 substantially increased burdens on voters, targeting methods of voting increasingly being used by Black Georgia voters and voters of color with arbitrary and unnecessarily burdensome requirements that will disenfranchise voters and potentially expose non-profit civic engagement organizations, such as the PEOPLE'S AGENDA, to large fines and criminal penalties for providing assistance to voters who will now need to navigate the law's complicated procedures. SB 202's discriminatory changes include:

(1) Onerous and arbitrary absentee ballot application and ballot ID requirements that weigh more heavily on Black voters, other votes of color and lower income voters who do not have a Georgia driver's license or state ID number. If a voter does not have a Georgia driver's license or state ID number to put onto their absentee ballot applications, they must include a copy of another form of acceptable ID with the absentee ballot application and, if they do not have a Social Security number, they must include a copy of the ID when returning the voted ballot.[16] And this must be done for *each election* in an election cycle, including each primary, general, special, and runoff election.

Since voters cannot use an identification number from the so-called "free" voter ID card that Georgia voters may apply for if they do not have a Georgia driver's license or state

---

[12] Stephen Fowler, *Kemp Signs 98-Page Omnibus Elections Bill,* Georgia Public Broadcasting, March 25, 2021, available at: https://www.gpb.org/news/2021/03/25/kemp-signs-98-page-omnibus-elections-bill.

[13] Will Bunch, *Georgia governor signed a voter suppression law under a painting of a slave plantation*, Philadelphia Inquirer, March 26, 2021, available at: https://www.inquirer.com/opinion/georgia-governor-brian-kemp-painting-slave-plantation-20210326.html.

[14] SB 202, Section 2.

[15] *Id.*

[16] *See* SB 202, Sections 25, 27 and 28.

Confidential                                                                                           GCPA00004792

ID card when applying for an absentee ballot or returning the ballot under the new law, voters would even have to submit copies of the "free" voter ID under the law when applying for an absentee ballot or when returning their voted ballot.

Black voters and other voters of color are proportionately less likely to have computers in their homes and suffer from significantly higher rates of poverty than White voters. Without the technology to scan, print, fax or email these multiple copies of ID documents in the home, these voters will face undue and disparate burdens on their ability to vote by mail. This burden is amplified because the law also criminalizes the "handling" of absentee ballot applications by third parties with few exceptions for people who assist voters in navigating these new requirements, including if they help the voter scan or copy the completed application and ID documents or try to help them fax or email the application and ID documents to election officials.[17]

If voters without a Georgia driver's license or state ID card do not include copies of alternative ID documents with their absentee ballot applications, the applications will be rejected. If the voters fail to provide the copies of the ID documents when they return the voted ballot, they will be required to produce a form of acceptable ID to the county registrar within three days of the election for their absentee ballot to count.[18]

(2) Prohibiting public agencies and public employees from sending unsolicited absentee ballot applications to voters - something that the Georgia Secretary of State did when he sent unsolicited absentee ballot applications to all of Georgia's active voters ahead of the June 2020 primary elections - and which a number of County Registrars offices did in previous election cycles to encourage absentee voting and voter turnout.[19]

(3) Criminalizing the "handling" of any completed absentee ballot application by anyone other than the voter (with a few exceptions), which would even prevent a voter who does not have access to a fax machine or scanner from receiving help from the PEOPLE'S AGENDA or other non-profit civic engagement groups in faxing or scanning the completed application, so that it can be submitted electronically to election officials unless we are providing assistance to a disabled voter.[20]

(4) Subjecting private individuals and non-public entities, including the PEOPLE'S AGENDA and other non-profit civic engagement organizations attempting to assist voters with absentee voting, to potentially large fines for sending absentee ballot applications to voters unless we check the Secretary of State's data files in advance to determine whether a voter has already requested an absentee ballot application, returned

---

[17] *Id.*

[18] *Id.*

[19] *See* SB 202, Section 25.

[20] *Id.*

Confidential

GCPA00004793

the application or voted an absentee ballot.[21]

Even if the voter requested an absentee ballot application from their county registrar and it was never received or the voter submitted an application and never received their ballot, PEOPLE'S AGENDA and other non-profit civic engagement organizations would run the risk of being fined if we sent another application to that voter.  The law also requires the PEOPLE'S AGENDA and other groups and individuals to use the official absentee ballot application from the Secretary of State's office when sending ballot applications to voters, but we must provide a confusing disclaimer that the application was not being sent by a public entity or public official.[22]

(5) Prohibiting persons other than the voter from touching or handling a completed absentee ballot applications unless the voter is disabled, which would even preclude a voter asking the PEOPLE'S AGENDA, a friend, neighbor or other non-profit civic engagement organizations to fax their application to the registrar's office because they do not have access to a fax machine and limits the return of ballot applications, as well as absentee ballots, to close relatives, housemates or, in the case of disabled voters, a potential caretaker.[23]

(6) Delaying and compressing the time during which a voter can request or submit an absentee ballot and shortening the time when a runoff election takes place to 28 days after the original election, which will substantially shorten the voter registration period and early voting period for runoff elections.[24]

(7) Giving county registrars unfettered discretion to limit early voting hours from 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting,[25] thereby making is difficult for voters who work, go to school or have other obligations during the workday to be able to access early voting, and leading to the elimination of Sunday early voting in some counties despite its popularity with Black voters and other voters of color who conduct "Souls to the Polls" get out the vote campaigns involving Black Churches and other faith organizations following Sunday services.[26]

(8) Severely restricting the number of, and access to, absentee ballot drop boxes, which

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See* SB 202, Section 42.

[25] See SB 202, Section 28.

[26] In 2018, conservatives in the legislature attempted to eliminate Sunday early voting in House Bill 363. However HB 363 died in the wake of negative media attention and advocacy by the PEOPLE'S AGENDA and other civic engagement and civil rights organizations. See Kira Lerner, UPDATED: Georgia bill that would eliminate Sunday voting and suppress black turnout fails, Think Progress, March 16, 2018, available at: https://thinkprogress.org/georgia-sunday-voting-cut-9c1c2ffafd18/.

Confidential

GCPA00004794

were heavily used by Georgians in the 2020 election cycle and were a more secure and reliable method of returning absentee by mail ballots than through the U.S.P.S. mail boxes. Under the new law, drop boxes must be inside early voting locations and will be available only during the days and hours when early voting is taking place, thereby making them unavailable to voters who cannot vote during early voting hours due to work, school, or other obligations during the day. Additionally, counties are limited to having one drop box per 100,000 registered, voters, which substantially limits the total number of drop boxes for each county.[27]

(9) Disenfranchising out-of-precinct voters by arbitrarily prohibiting any out-of-precinct voting before 5:00 p.m. on Election Day and allowing only limited out-of-precinct voting after 5:00 p.m. for voters who go to the incorrect polling place in the county where they are registered to vote and swear out an affidavit that they cannot get to their correct polling location before the close of the polls at 7:00 p.m.[28] This change penalizes voters who do not receive timely or adequate notification of their polling locations and ignores the fact that Black voters and other voters of color have been disproportionately impacted by polling place closures and change in the wake of the *Shelby County* decision that often result in voters going to the wrong polling place on Election Day.[29]

(10) Targeting jurisdictions with large populations of Black voters and other voters of color by stripping the Secretary of State of his vote on the State Election Board, replacing the Secretary of State with a voting member appointed by the General Assembly, and granting the State Election Board the power to effectively take over county Boards of Election.[30]

(11) Encouraging "unlimited" voter challenges on the eve of elections by other electors in the same county as the challenged voters.[31] True the Vote, along with Republican party operatives, led a campaign in numerous Georgia counties to challenge more than 364,000 registered Georgia voters for alleged address changes ahead of the January 2021 U.S. Senate runoff elections with little to no evidence showing the voters were not eligible to vote, substantially burdening election officials who were in the midst of preparing for and administering the elections.[32] SB 202 now codifies these types of

---

[27] *See* SB 202, Section 26.

[28] *See* SB 202, Section 34.

[29] Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For Hours? Too Few Polling Places*, Georgia Public Broadcasting, October 17, 2020, https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl.

[30] *See* SB 202, Sections 3, 5-7, 12.

[31] *See* SB 202, Section 15.

[32] Mark Niesse, *Eligibility of 364,000 Georgia voters challenged before Senate runoff*, Atlanta Journal-Constitution, December 22, 2020, https://www.ajc.com/politics/eligibility-of-364000-georgia-voters-challenged-before-senate-runoff/3UIMDOVRFVERXOJ3IBHYWZBWYI/.

Confidential

GCPA00004795

mass voter challenges into Georgia law, regardless if there is any evidence supporting them, and forces elections officials to conduct hearings within ten days of every challenge, with only three days' notice by mail of the hearings to challenged voters.

(12) Criminalizing the act of providing water and food to persons within 150 feet of a polling place or within 25 feet of any voters waiting in line waiting in line to vote,[33] despite Georgia's history of forcing voters to wait in hours' long lines at polling locations - particularly in areas serving Black voters and voters of color, which have been disproportionately impacted by polling place closures.[34]

(13) Prohibiting the use of mobile voting units,[35] such as the two mobile units purchased by Fulton County for $750,000 and deployed to alleviate overcrowded polling places and long lines, unless the Governor declares an emergency and they are used to supplement the capacity of the polling place where the emergency circumstance occurred.[36]

Due to the gutting of Section 5 of the Voting Rights Act as a result of the Supreme Court's decision in *Shelby County v. Holder*, there is no longer the notice and preclearance process available to ensure that laws like SB 202 do not retrogress the voting strength of Georgia's Black and Brown voters.

As a result, the PEOPLE'S AGENDA was one of numerous nonprofit civil rights and civic engagement organizations which were forced to commence litigation challenging the law under the 14th and 15th Amendments and under Section 2 of the Voting Rights Act of 1965. But even though the PEOPLE'S AGENDA and other nonprofit civic engagement and civil rights organizations are challenging SB 202 in federal court, the controlling party in the General Assembly has made it crystal clear that it will continue to find new ways to suppress the votes of Black and Brown people by introducing even more voter suppression bills during the 2022 legislative session.

For example, President pro tempore of the Senate, Senator Butch Miller, has already introduced SB 325 to abolish absentee ballot drop boxes - notwithstanding the popularity of the drop boxes among voters and election officials alike - and the fact that they are more secure and dependable than United States Post Office delivery of the ballots, as well as a bill, SB 71, to end no-excuse absentee voting in the state.

**b.  Legislative Reconstitution of County Boards of Election and the**

---

[33] *See* SB 202, Section 33.

[34] Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For Hours? Too Few Polling Places,* Georgia Public Broadcasting, *supra.*

[35] *See* SB 202, Section 20.

[36] Ben Brasch, *Want to vote in Fulton's fancy new mobile voting bus? See the schedule,* https://www.ajc.com/news/atlanta-news/want-to-vote-in-fultons-fancy-new-mobile-voting-bus-see-the-schedule/OXPVK4Y3ENAIRKOMYA43673ZLM/, Atlanta Journal-Constitution, October 19, 2020.

Confidential

GCPA00004796

**Removal of Black Board Members**

During the 2021 legislative session, conservative members of the General Assembly also waged war against selected counties' Boards of Elections in an effort to purge Black board members and other board members they knew would not support their unprecedented usurpation of free and fair elections in our state.

Morgan County, where I had served as a member of the Board of Elections since 2010 and was a staunch advocate for voting rights and fair elections, is one of the Boards of Election that the majority party reconstituted by giving control over all appointments to the Republican controlled Board of County Commissioners. This resulted in my removal as a Board Member, along with a second Black Board Member, Avery Jackson.[37] *See* HB 162.[38]

The General Assembly also targeted the Troup County Board of Elections, which was reconstituted with the enactment of HB 684.[39] As a result of this bill, long-time Black Board Member, Ms. Lonnie Hollis was ousted. Ms. Hollis advocated for Sunday voting as well as a new precinct location at a Black church in a nearby town before her removal from the Board of Elections.[40]

The Lincoln County Board of Elections was also reconstituted with the enactment of SB 282 and 283.[41] The new law ends the bipartisan appointment process for the nomination of the board members and gives the majority Republican Lincoln County Commission the power to appoint a majority of the board members (3 of 5) with the City of Lincolnton and Lincoln County School Board having the authority to appoint one board member each.

Shortly after the reconstitution of the Lincoln County Board of Elections, the Board Chair, Jim Allen, began to implement a plan to close all of the county's existing polling places and to create a single polling place for the county's more than 6,000 active registered[42] voters at a gymnasium located outside of the central business district in a county with no generally

---

[37] Nick Corasaniti and Reid J. Epstein, *How Republican States Are Expanding Their Power Over Elections,* New York Times, June 19, 2021, https://www.nytimes.com/2021/06/19/us/politics/republican-states.html

[38] Georgia House Bill 165, https://www.legis.ga.gov/api/legislation/document/20212022/197812.

[39] Georgia House Bill 684 (2021): https://www.legis.ga.gov/api/legislation/document/20212022/200601

[40] *How Republican States Are Expanding Their Power Over Elections, supra.*

[41] Georgia Senate Bill 282, https://www.legis.ga.gov/legislation/60327 and Senate Bill 283: https://www.legis.ga.gov/legislation/60329.

[42] Georgia Secretary of State, Active Voters by Race and Gender (By County with Statewide Totals), available at: https://sos.ga.gov/index.php/Elections/voter_registration_statistics.

Confidential

GCPA00004797

available public transit system in a county spanning some 257 square miles.[43]  If this plan is implemented it will undoubtedly reduce turnout in upcoming elections, particularly for those who lack access to a vehicle and are unable to walk 10 or more miles to get to the only polling place in the entire county.

With the start of the 2022 legislative session on January 10, 2022, the majority party has already introduced a bill, SB 284, targeting the Randolph County Board of Elections for a takeover of the Board of Elections to ensure that the administration of the elections will be controlled by the majority party. The Randolph County Board of Elections had previously been involved in a controversial, and ultimately unsuccessful, attempt to close polling places in majority Black areas of the County.[44]

The closure and consolidation of more polling places in Georgia will have an even greater negative impact on Black and Brown voters, particularly in rural areas, where they have less or no access to public transportation to get to and from more distant polling locations and many lack access to broadband internet, and to computers and printers in their homes which are needed to download the Secretary of State's absentee ballot application form and to copy the newly required ID documents to submit with the forms. Moreover, if the majority party is successful in enacting SB 71 in the current legislative session, it will end no-excuse absentee voting in the state and force even more voters to cast ballots in person.[45]

In the absence of preclearance under Section 5 of the Voting Rights Act and the stalled federal legislation to ensure free and fair elections, I am extremely alarmed at the majority party's agenda for the 2022 Georgia legislative session and the majority party's shameless efforts to undermine our democracy by continuing to press forward with legislation premised upon the false election fraud narratives by the former President and his supporters.

The time is now to enact voting rights laws to ensure equal access to the ballot box and to prevent the former President and his wing of the Republican party from undermining our democracy and freedom to elect our candidates of choice in Georgia's elections.

### c. The Enactment of Georgia's Discriminatory Redistricting Maps

The 2021 redistricting cycle in Georgia was the first redistricting cycle in decades where Georgians did not have the benefit of the Section 5 preclearance process in place for the review of Georgia's redistricting maps by the Department of Justice (DOJ) before their enactment. As a

---

[43] Sharon McCord, *A 'test case' for disenfranchisement? Lincoln County takes on effort to shutter polling places,* Augusta Chronicle, January 17, 2022, available at: https://www.augustachronicle.com/story/news/2022/01/17/georgia-voting-elections-polling-places-closed-lincoln-county/6524324001/.

[44] *See* Georgia Senate Bill 284: https://www.legis.ga.gov/legislation/60350; Johnny Kauffman, *Georgia County Votes To Keep Polling Places Open After Intense Scrutiny,* NPR, August 24, 2018, available at: https://www.npr.org/2018/08/24/641556969/georgia-county-votes-to-keep-polling-places-open-after-intense-scruitney.

[45] *See,* Senate Bill 71: https://www.legis.ga.gov/legislation/59224.

Confidential

GCPA00004798

result, the majority party drew plans which dilute the voting strength of Black voters and other voters of color, and which discriminate against them on the basis of race. Governor Kemp signed these discriminatory redistricting maps into law on December 30, 2021.

The majority party's map drawers (1) strategically removed Black, Latinx, and AAPI voters from existing and performing majority-minority districts and dispersed them into White majority districts in rural and/or suburban areas where they will no longer have the ability to elect the candidates of their choice, and (2) packed Black voters and other voters of color into districts with high minority populations. The Controlling Party's legislators could have had only one motive for passing such illegal plans: the desire to limit the voting strength of voters of color statewide.

In the absence of preclearance and the gutting of Section 5 of the Voting Rights Act, the PEOPLE'S AGENDA and other nonprofit civic engagement and civil rights organizations have been forced to commence litigation to enjoin the use of these new redistricting plans.

### d.   Polling Place Closures and Changes

In the aftermath of the *Shelby County* decision in 2013, many of Georgia's county boards of election proposed or took action to close, consolidate or move polling locations—oftentimes in areas primarily serving voters of color and in underrepresented communities.

In fact, while Georgia added almost 2 million voters to its voter registration rolls since 2013, the total amount of polling places statewide decreased by 10 percent according to a joint report by Georgia Public Broadcasting, National Public Radio and ProPublica.[46] By June 2020, the report found "Georgia voters had 331 fewer polling places than in November 2012, a 13% reduction."[47] This report also found stark racial disparities in the decrease in polling locations in Black neighborhoods which have translated into long lines and delays at the polls. The report found that approximately two-thirds of the polling locations that had to stay open past the 7:00 p.m. poll closing time in the June 9, 2020 primary were in majority Black neighborhoods.[48]

The PEOPLE'S AGENDA anticipates that the efforts to close and change polling locations is likely to continue, especially in light of the campaign by the legislature in 2021 and in the 2022 session to reconstitute and take over county Boards of Election to remove Black Board members and others who have opposed such efforts in the past.

Since the *Shelby County* decision, the PEOPLE'S AGENDA and other civic engagement organizations have been forced to devote a significant amount of time and resources to monitoring proposals to close, consolidate or move polling locations across the state's 159 counties. Our work dealing with these polling place changes has included issuing public records

---

[46] *Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Too Few Polling Places,* Georgia Public Broadcasting, *supra.*

[47] *Id.*

[48] *Id.*

Confidential

GCPA00004799

requests for county boards of election minutes and agendas, sending staff and coalition members to observe and make comments at board of election meetings, submitting written objections to proposals to close or change polling locations, and organizing rapid response actions with community members who are impacted by these changes.

In the aftermath of the *Shelby County* decision and in the absence of preclearance, we often have little or no reasonable advance notice of these polling place changes, and there has been a lack of transparency in the stated rationales for these changes in communities of color. We are often forced to turn our attention toward organizing a rapid response in an attempt to stop or ameliorate these changes while juggling our other important organizational initiatives and priorities.

Prior to the *Shelby County* decision, county boards of election were required to submit polling place and voting precinct changes to DOJ for preclearance to ensure that the changes did not retrogress the ability of people of color to elect candidates of their choice, or discriminate against Black voters and other voters of color. The preclearance process prevented many of these changes from taking effect and acted as a deterrent to the adoption of such changes.

While the PEOPLE'S AGENDA and our state partners have achieved some success in stopping or ameliorating the scope of some polling place changes post-*Shelby*, we have been unable to prevent them all from taking effect. Some of the additional post-*Shelby* efforts to close, consolidate or move poll locations by county boards of elections in Georgia have included, but are not limited to:

- A proposal to close all seven existing polling places in rural Lincoln County and create a single polling place for more than 6,000 registered voters outside of the downtown district and residential centers in the county with virtually no available public transit.

- A proposal to close all but two polling places in Randolph County, which would have disproportionately impacted voters of color and suppressed the vote of people of color in this economically challenged, rural county, was tabled after the PEOPLE'S AGENDA and other advocacy groups organized community opposition to the plan;

- A proposal to eliminate all but one of the City of Fairburn polling places, even though the number of polling places had been increased in recent years because of long lines on Election Day, was rescinded following advocacy efforts by the PEOPLE'S AGENDA and other groups;

- A proposal to eliminate all but one of Elbert County precincts and polling locations to the detriment of voters of color in a rural county with no robust public transit service was rescinded after opposition by advocacy groups and voters;

13

GCPA00004800

- The PEOPLE'S AGENDA and other groups have led advocacy efforts to oppose polling place and precinct changes in Fulton County in the wake of *Shelby* with some success;

- A proposal to close 2 of 7 precincts and polling places in Morgan County after the county previously reduced the number of polling locations from 11 to 7 in 2012, was rejected after the board considered opposition to the plan by the PEOPLE'S AGENDA.

- A proposal to reduce the number of precincts and polling locations from 36 to 19 in Fayette County was tabled in the face of opposition by the PEOPLE'S AGENDA, other civic engagement groups and voters;

- A proposal to consolidate all polling locations to a single location in Hancock County, a majority-Black, economically challenged, rural county with no regularly scheduled public transit, was tabled after the PEOPLE'S AGENDA, other civic engagement groups and voters organized against the proposal;

- A proposal to eliminate 20 of 40 precincts and polling locations in majority-Black and economically challenged neighborhoods in Macon-Bibb County was scaled back as a result of advocacy efforts by the PEOPLE'S AGENDA and other civic engagement groups; and,

- A proposal by the Macon-Bibb County Board of Elections to move a polling location in a majority-Black precinct from a public gymnasium to a Sheriff's Office was defeated only after 20% of the registered voters in the precinct signed a petition opposing the move.

Consequently, we often have to devote even more time and resources to assist voters impacted by these changes. Since polling place closures and relocations are not always widely publicized by county boards of election, voters often show up to vote on Election Day at their former polling place and are surprised to learn that the poll has moved. In light of the changes made to out-of-precinct voting by SB 202, voters who show up to the incorrect polling location on Election Day before 5 p.m. will be disenfranchised if they cannot vote at their correct polling location before it closes. Voters who arrive after 5 p.m. will have to sign a sworn statement that they cannot get to their correct polling location by close of the poll or will be required to go to their correct polling location to cast their ballot.

Voters who are used to walking to their polling place and learn on Election Day that the poll has been moved several or even more miles away may be unable to travel to the new polling location that day, especially if there is no accessible public transit. Some voters may have other commitments with their jobs, childcare, or other responsibilities which prevent them from spending more time traveling to the new polling location and, as a result, it is foreseeable that eligible voters will be disenfranchised by such poll closures.

14

Therefore, it is critically important that Congress restore the preclearance provisions of the Voting Rights Act to ensure that the increasingly partisan Boards of Election are not allowed to close and change polling locations to disenfranchise voters in order to achieve a partisan result.

### e. Georgia's Flawed Voter Registration Citizenship Match

The PEOPLE'S AGENDA, voters, and advocates were forced to litigate multiple lawsuits for more than a decade challenging various iterations of the state's "exact match" voter registration process that was demonstrated to prevent Georgia's eligible people of color from completing the voter registration process.[49] In fact, just prior to the 2018 mid-term election, the Associated Press reported that there were more than 53,000 voter registration applications on hold because of Georgia's "exact match" process—the vast majority of which had been submitted by Georgians of color.[50]

While the legislature and Governor Kemp finally abandoned the exact identity match requirement, which prevented applicants from completing the registration process unless there was an exact match of their name, date of birth, and Georgia driver's license or Social Security number listed on their voter registration form with the state's Department of Driver's Services or Social Security records, they have done nothing to remedy the routine flagging of Georgia's United States citizens as potential non-citizens because of the state's continued use of outdated citizenship records in the voter registration process. The PEOPLE'S AGENDA and other civic engagement organizations believe that the state's refusal to reform the deficient citizenship match process has more to do with the current anti-immigrant mood within certain segments of Georgia's state government and legislature than with any legitimate rationale that this process is warranted to prevent non-citizens from registering to vote—particularly when the process relies on outdated citizenship data that does not reflect current information about the citizenship of the applicants.

As a result, the deficient and discriminatory citizenship match process has been allowed to continue, delaying or preventing Georgians who are United States citizens from completing the voter registration process. The PEOPLE'S AGENDA will be forced to continue to divert time and scarce resources to the litigation challenging this process for the foreseeable future in the absence of preclearance.

### III. Conclusion

Despite these wide-ranging efforts to suppress the votes of Black and Brown Georgians through the enactment of SB 202; the adoption of discriminatory Congressional, State House and State Senate redistricting maps; and the new undemocratic challenges posed by legislation

---

[49] See *Morales v. Handel*, Civil Action No. 1:08–CV–3172, 2008 WL 9401054 (N.D.Ga. 2008); *Georgia State Conference of the NAACP v. Kemp*, Civil Action No. 2:16-cv-00219-WCO (N.D.Ga. 2016); *Georgia Coalition for the People's Agenda v. Kemp*, 1:18-CV-04727-ELR (N.D. Ga. 2018).

[50] Ben Nadler, Voting rights become a flashpoint in Georgia governor's race, AP, October 9, 2018. (online at https://www.apnews.com/fb011f39af3b40518b572c8cce6e906c.)

Confidential

GCPA00004802

allowing for the take-over and reconstitution of County Boards of Election by the majority party, the PEOPLE'S AGENDA and our sister organizations will continue our important work to protect the vote, eliminate barriers to the ballot box, and to ensure equal participation in the political process for Georgians of color and underrepresented communities.

However, we are extremely concerned about these alarming developments which have the potential of undermining the very foundations of our democratic principles of governing, free and fair elections, and equal access to the ballot box for Black voters and other voters of color in in Georgia and in other states across the country. We implore Congress to act now to pass meaningful voting rights legislation.

Confidential                                                                                     GCPA00004803