IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>THE STATE OF GEORGIA, *et al.*,<br><br>Defendants | Civil Action No. 1:21-CV-2575-JPB<br><br>EVIDENTIARY HEARING REQUESTED |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>Plaintiffs<br><br>v.<br><br>BRIAN KEMP; *et al.*,<br><br>Defendants | Civil Action No. 1:21-CV-01284-JPB |
| THE NEW GEORGIA PROJECT, *et al.*,<br><br>Plaintiffs | Civil Action No. 1:21-CV-01229-JPB |

v.

BRAD RAFFENSPERGER, *et al.*,

Defendants

GEORGIA STATE CONFERENCE OF
THE NAACP*, et al.*,

Plaintiffs

v.

BRAD RAFFENSPERGER, *et al.*,

Defendants

Civil Action No.
1:21-CV-01259-JPB

THE CONCERNED BLACK CLERGY OF
METROPOLITAN ATLANTA, INC., *et al.*,

Plaintiffs

v.

BRAD RAFFENSPERGER, *et al.*,

Defendants

Civil Action No.
1:21-CV-01728-JPB

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

## **Table of Contents**

I.     INTRODUCTION..........................................................................................1

II.    STATEMENT OF FACTS ............................................................................4

      A.    Black Voters Changed the Ways that They Vote, Thereby Triggering a Response from the Majority Party in the Legislature..............................4

      B.    Changes in Election Law Following the Adoption of SB 202 ..............18

III.   ARGUMENT .............................................................................................26

      A.    Plaintiffs Are Likely to Succeed on the Merits .....................................27

      B.    Without a Preliminary Injunction, Black Voters Will Suffer Irreparable Harm .....................................................................................................61

      C.    The Balance of Equities and the Public Interest Weigh in Favor of Issuing a Preliminary Injunction.........................................................62

      D.    The *Purcell* Doctrine Does Not Preclude the Requested Relief............64

IV.   THE SCOPE OF RELIEF SOUGHT.............................................................65

V.    CONCLUSION .........................................................................................65

## Table of Authorities

**Cases**

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ...........................................................28

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321 (2021) ......................................................... 29, 35, 55

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) ...........................................................63

*Chisom v. Roemer*,
501 U.S. 380 (1991) ............................................................... 28, 32

*Clingman v. Beaver*,
544 U.S. 581 (2005) ...........................................................33

*Curling v. Raffensperger*,
491 F. Supp. 3d 1289 (N.D. Ga. 2020) .................................................61

*Dillard v. Crenshaw Cnty.*,
640 F. Supp. 1347 (M.D. Ala. 1986)....................................................64

*Ferrill v. Parker Grp., Inc.*,
168 F.3d 468 (11th Cir. 1999).............................................................30

*Fla. State Conf. of Branches & Youth Units of the NAACP v. Lee*,
568 F. Supp. 3d 1301 (S.D. Fla. 2021)....................................................51

*Georgia Coal. For People's Agenda, Inc. v. Kemp*,
347 F. Supp. 3d 1251 (N.D. Ga. 2018) .................................................64

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
992 F.3d 1299 (11th Cir. 2021)................................................... 30, 31

*Hall v. Holder*,
117 F.3d 1222 (11th Cir. 1997)...........................................................58

*Harris v. Graddick*,
   593 F. Supp. 128 (M.D. Ala. 1984) ...................................................................63

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ............................................................................. 44, 65

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ........................................................................................31

*I.L. v. Alabama*,
   739 F.3d 1273 (11th Cir. 2014) ......................................................................51

*Jacksonville Branch of NAACP v. City of Jacksonville*,
   2022 WL 7089087 (M.D. Fla. Oct. 12, 2022) ................................................63

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
   72 F.3d 1556 (11th Cir. 1996) ........................................................................31

*Jones v. Governor of Fla.*,
   950 F.3d 795 (11th Cir. 2020) ........................................................................61

*League of Women Voters v. Lee*,
   66 F.4th 905 (11th Cir. 2023) ................................................................ passim

*League of Women Voters v. North Carolina*,
   769 F.3d 224 (2014) ............................................................................. 44, 61

*Lodge v. Buxton*,
   639 F.2d 1358 (5th Cir. 1981) ........................................................................30

*LULAC v. Perry*,
   548 U.S. 399 (2006) ................................................................... 2, 7, 60, 62

*McDonald's Corp. v. Robertson*,
   147 F.3d 1301 (11th Cir. 1998) ......................................................................27

*McMillan v. Escambia County, Fla.*,
   748 F.2d 1037 (Former 5th Cir. 1984) ...................................................... 28, 32

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ........................................................................................31

*N.C. State Conf. of the NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ........................................................................ passim

*Personnel Adm'r of Mass.* v. *Feeney*,
442 U.S. 256 (1979) .........................................................................................29

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .............................................................................................64

*Reno v. Bossier Par. Sch. Bd.*,
520 U.S. 471 (1997) .........................................................................................27

*Reynolds v. Sims*,
377 U.S. 533 (1964) .........................................................................................61

*Rogers v. Lodge*,
458 U.S. 613 (1982) ..................................................................... 27, 29, 30, 58

*Rose v. Raffensperger*,
619 F. Supp. 3d 1241 (N.D. Ga. 2022) .............................................................59

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .......................................................................61

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ...........................................................................................58

*United States v. Berks Cnty., Pa.*,
250 F. Supp. 2d 525 (E.D. Pa. 2003) ...............................................................62

*United States v. Brown*,
561 F.3d 420 (5th Cir. 2009) ...........................................................................58

*United States v. Georgia*,
574 F. Supp. 3d 1245 (N.D. Ga. 2021) .............................................................28

*United States v. Marengo Cnty. Comm'n*,
731 F.2d 1546 (11th Cir. 1984) ............................................................. 28, 32, 59

*United States v. Metro. Dade Cnty.*,
815 F. Supp. 1475 (S.D. Fla. 1993) ..................................................................62

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ........................................................ 29, 30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................ passim

*Vote.org v. Georgia State Election Board*,
   2023 WL 2432011 (N.D. Ga. March 9, 2023) ....................................... 1

*Washington v. Davis*,
   426 U.S. 229 (1976) ......................................................................29

*White v. Regester*,
   412 U.S. 755 (1973) ......................................................................58

*Whitest v. Crisp Cnty. Georgia Bd. Of Educ.*,
   2021 WL 4483802 (M.D. Ga. Aug. 20, 2021) ......................................59

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   301 F. Supp. 3d 1297 (M.D. Ga. 2018) ...........................................5, 59

*Wright v. Sumter Cnty. Bd. Of Elections & Registration*,
   979 F.3d 1282 (11th Cir. 2020) .......................................................59

## Statutes & Legislation

52 U.S.C. § 10301 ................................................................. 1, 27, 43

52 U.S.C. § 10303 ......................................................................27

52 U.S.C. § 10308 ......................................................................63

O.C.G.A. § 21-2-381 (2023) ....................................................... 19, 36

O.C.G.A. § 21-2-385 (2020) ..........................................................22

O.C.G.A. § 21-2-414 (2023) ..........................................................22

O.C.G.A. § 21-2-419 (2020) ..........................................................24

O.C.G.A. § 21-2-500 (2023) ..........................................................41

O.C.G.A. § 21-2-570 (2023) ........................................................................22

U.S. Const. amend. XIV ............................................................................27

U.S. Const. amend. XV .............................................................................27

**Other Authorities**

H.R. Rep. No. 109-478 (2006) ...................................................................50

S. Rep. No. 97-417 (1982) ................................................................. 28, 58

## I.    INTRODUCTION

Plaintiff United States of America ("United States") and Private Plaintiffs from four cases submit this memorandum in support of their motion for a preliminary injunction on the grounds that challenged provisions of Georgia Senate Bill 202 (2021) (SB 202) violate Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, and the Fourteenth and Fifteenth Amendments to the U.S. Constitution, by intentionally discriminating against Black voters.[1] These provisions include dramatic cuts and limitations on the availability of drop boxes, new identification (ID) requirements for absentee ballots, shortened deadlines for requesting absentee ballots, bans on providing food and water relief to voters in long lines, and a ban on counting out-of-precinct provisional (OP) ballots cast before 5:00 p.m. on Election Day.

During recent election cycles, Black Georgians, especially during 2018 and

---

[1]  Plaintiffs in *Sixth District of the African Methodist Episcopal Church, et al. v. Kemp, et al.*, 1:21-CV-01284; *The New Georgia Project, et al., v. Raffensperger, et al.*, 1:21-CV-01229; *Georgia State Conference of the NAACP, et al. v. Raffensperger, et al.*, 1:21-CV-01259; and *The Concerned Black Clergy of Metropolitan Atlanta, Inc., et al. v. Raffensperger*, et al., 1:21-CV-01728, allege these provisions are intentionally discriminatory under both Section 2 and the Fourteenth and Fifteenth Amendments. The United States brings a statutory claim under Section 2. *See United States v. State of Georgia, et al.*, 1:21-cv-2575. Private Plaintiffs note that they have organizational and associational standing, as established by the evidentiary submissions of record. *See, e.g.*, *Vote.org v. Georgia State Election Board*, 2023 WL 2432011 at *2-5 (N.D. Ga. March 9, 2023); *see also, e.g.*, Exs. 10, 11 (Calhoun Decl.; Cotton Decl.); ECF Nos. 171-4, 171-10, 185-3, 185-5, 185-6, 185-7, 185-8, 535-10, 535-11, 548-12, 548-15, 548-16, 548-19.

2020, made concerted efforts to mobilize their vote, such as using absentee voting and providing support to Black voters facing long lines. These changes represented growing political participation by Black voters in Georgia and racial demographic changes in the State. These efforts saw the historic success of Black-preferred statewide candidates, including the election of the first Black United States Senator from Georgia and the first Black Vice President.

In response, the majority party in the Georgia legislature convened a series of hearings that aired unsubstantiated voter fraud claims and racially-charged attacks on Black poll workers. The false accusations of rampant voter fraud sought to cast doubt on historic Black voter participation by targeting counties in Georgia with the largest Black populations. Those hearings laid the groundwork for SB 202, targeting the ways Black voters had successfully mobilized. As the Supreme Court has held, taking away minority voters' "opportunity because [they] were about to exercise it . . . bears the mark of intentional discrimination." *LULAC v. Perry*, 548 U.S. 399, 440 (2006).

SB 202 negatively and disproportionately impacts Black voters in several specific ways, starting with absentee voting. In November 2020, for example, 28.9% of Black voters cast absentee ballots compared to 24% of white voters—a dramatic reversal from many prior years when absentee voters were disproportionately white.

Ex. 40 (Burden 11 Tbl. 5).[2] SB 202 imposed an ID requirement for absentee voting, where 5.6% of all Black registrants still do not have an ID that matches their voter registration record (compared to only 2% of white registrants). Ex. 42 (Meredith 37 Tbl. VI.A.1 (all registrants by race) & 53 Tbl. VI.F.1 (registrants with ID problems by race). SB 202 severely cut the number of drop boxes in the State, principally in counties with larger Black populations. Ex. 40 (Burden 27-28 & Tbl. 11). About 75% of Black registered voters saw a decrease in the number of drop boxes in their county, compared to 54% of white voters. Ex. 44 (Fraga ¶¶ 148-150). SB 202 also moved the deadline for voters to request absentee ballots from four days to 11 days before Election Day, despite opposition from local election officials. *See infra* § II.B.5, III.A.1.a. If the 11-day deadline had been in place in November 2020, over 30,000 mail ballot requests, including over 12,000 requests from Black voters, would have been rejected as untimely, Ex. 44 (Fraga 49 Tbl. 10)—about the same number needed for a different outcome in the 2020 presidential election, Ex. 109 (USA-04281 at 37:49-38:05).

SB 202's restrictions on absentee voting mean that more voters, and particularly Black voters, will be pushed from absentee voting to in-person voting, in a State with some of the longest lines in the country. Ex. 46 (Pettigrew 30). Black

---

[2] A series of exhibits accompanies the Plaintiffs' motion. *See* Richardson Decl.

voters in Georgia face longer lines than white voters. Ex. 40 (Burden 20-22 & n.33). SB 202 now bans the successful line relief efforts that previously encouraged Black voters to remain in line. And for Election Day voters who reach the front of the line and discover that they are not in the correct precinct, SB 202 now prohibits counties from counting OP ballots cast before 5:00 p.m. Here, too, Black voters were more likely to cast OP ballots than white voters. *Id.* (Burden 36 Tbl. 13).

The justifications offered for these provisions were often steeped in a racialized narrative that linked the supposed lack of voter integrity in Georgia to Black people and communities with large Black populations. In a State marked by racially polarized voting and now close statewide elections, legislators adopted a suite of changes specifically targeted at voting methods Black voters disproportionately relied on, to their electoral success, and coupled it with increased burdens on in-person voting borne disproportionately by Black voters. By enacting SB 202, the General Assembly sought to recalibrate elections by limiting Black voter participation.

## II.  STATEMENT OF FACTS

### A.  Black Voters Changed the Ways that They Vote, Thereby Triggering a Response from the Majority Party in the Legislature.

#### 1.  Increased Absentee Voting by Black Georgians and Other Mobilization Efforts Changed Elections in Georgia

Despite Georgia's well-documented history of discrimination against Black voters, *see*, *e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp.

3d 1297, 1323-24 (M.D. Ga. 2018); *see also* Ex. 47 (Anderson 19-45, 57-63), Black Georgians have mobilized to exercise their right to vote, *see, e.g.*, Exs. 10, 11, 8 (Calhoun Decl. ¶¶ 9-21; Cotton Decl. ¶¶ 7-25; Briggins Decl. ¶¶ 8-10). In 2018, these efforts intensified with the gubernatorial campaign of Stacey Abrams, which increased registration and turnout among voters of color in dramatic ways, including a concerted push to encourage absentee voting. Exs. 40, 1 (Burden 9; Burnough Decl. ¶ 12). Black Georgians began using absentee voting in far greater numbers than in previous cycles, and at a higher rate than white voters. Ex. 40 (Burden 11 & Tbl. 5). Ms. Abrams—a Black candidate overwhelmingly preferred among Black voters— garnered almost 54,000 more absentee votes than her opponent and came close to winning. Exs. 104, 40 (2018 SOS Election Results; Burden 6 at Tbl. 1 (93% of Black voters supported Abrams, compared to just 25% of white voters)).

During the 2020 election cycle, Black voter mobilization efforts continued to grow. Exs. 26, 10, 11 (GA NAACP Dep. 169:3-170:10; Calhoun Decl. ¶¶ 9-21; Cotton Decl. ¶¶ 13-25). Black-led organizations hosted celebrations around voting that included food, music, drinks, and other line relief efforts. Exs. 26, 10, 11 (GA NAACP Dep. 48:13-49:14; Calhoun Decl. ¶¶ 17-18; Cotton Decl. ¶¶ 9-12, 23-24) For years, many Georgia voters, particularly Black voters, had faced extremely long lines to vote. Exs. 40, 46 (Burden 20-22; Pettigrew 17-20); *see infra* § III.A.1.b.

Organizations responded by offering food and water to encourage people to stay in line, often at voting precincts with significant Black turnout. Exs. 26, 8 (GA NAACP Dep. 48:13-50:4; Briggins Decl. ¶¶ 8-10). These efforts fortified Black voters to stay in long lines. *See, e.g.*, Exs. 18, 19 (Scott Decl. ¶¶ 6-11; Sutton Decl. ¶¶ 5-9). In 2020, third party groups also continued to encourage mail-in voting among Black voters. Exs. 20, 10 (Woodall Decl. ¶ 14; Calhoun Decl. ¶ 14). These collective efforts were often concentrated in counties with significant Black electorates and were most pronounced in the metro-Atlanta area, with growing communities of color.[3] Exs. 26, 10, 11 (GA NAACP Dep. 40:12-41:7; Calhoun Decl. ¶¶ 13-18; Cotton Decl. ¶¶ 9, 21, 23).

The net effect of these mobilization efforts was increased Black voter participation, which went from a turnout rate of 35% in the 2014 midterm election to over 49% in November 2018. In presidential elections, it jumped from a rate of about 52% in 2016 to over 57% in 2020. Ex. 40 (Burden 11 at Tbl. 4). Although white voters continued to vote at higher rates than Black voters, *id.*, the white share of registered voters declined conspicuously during this period, *id.* (Burden 9 at Tbl. 3) (from about 58% in 2014 to under 53% in 2020). By 2020, these demographic shifts,

---

[3] The four most populous counties in Georgia—Fulton, Cobb, DeKalb, and Gwinnett Counties—account for almost 40% of the State's Black population, but only 27% of the State's white residents. Ex. 40 (Burden 4).

coupled with Black voters' mobilization efforts, created an opportunity for Black voters to exercise growing political power in the State. Exs. 40, 1 (Burden 9-10; Burnough Decl. ¶ 14); *see also LULAC*, 548 U.S. at 427-28.

Because of persistent differences in candidate preferences of Black and white voters (*i.e.*, racial polarization) in Georgia elections, combined with growing participation by Black voters, these changes posed a threat to the majority party in the legislature, which does not enjoy support from most Black voters. *See, e.g.*, Exs. 1, 5, 40, 48 (Burnough Decl. ¶ 15; Jones Decl. ¶ 12; Burden 4-7 & Tbls. 1-2; Palmer ¶¶ 23-28 & Figs. 1-2). Accordingly, legislators would have known that growing Black turnout and increased reliance on absentee voting contributed to statewide wins by Black-supported Democratic candidates in 2020. *See* Exs. 1, 2, 114 (Burnough Decl. ¶ 15; Hugley Decl. ¶¶ 20, 23; CDR00063983-86 (SOS' breakdown of presidential results sent to Republican legislators)).

## 2.  2020 Election Procedures

The COVID-19 pandemic marshaled many changes to in-person and absentee voting that expanded access to the ballot box, particularly in Black communities. First, the Office of the Georgia Secretary of State (SOS) sent all of Georgia's 6.9 million active voters absentee ballot request forms for the June 2020 primary election. Ex. 33 (Germany Dep. 57:12-20). This move paved the way for a dramatic

uptick in absentee voting by making it easier for voters to get their ballot at home during the pandemic. Ex. 31 (Bailey Dep. 119:16-120:6). The process was safe and secure and did not result in voter fraud. *See, e.g.*, Ex. 33 (Germany Dep. 57:17-20).

The Georgia State Elections Board (SEB) also enacted an emergency rule in April 2020 to regularize counties' use of absentee ballot drop boxes, which was permitted under existing state law, with protections to ensure a safe and secure process. Ex. 100, 101 (USA-04333-USA-04334 (SEB rule); USA-00681:5-USA-00686:13 (rule passed unanimously after explanation of security measures)); *see also* Ex. 131 (CDR00070695-96 (Georgia law already authorized drop boxes)). The SEB unanimously extended that rule governing drop box use through the January 2021 runoff election. *See* Exs. 102, 103 (USA-00765:13-USA-00769:6 (July 2021 SEB Hearing); CDR00107194-95 (November 23, 2020 SEB Hearing)).

Counties had discretion as to the number of drop boxes used. Some counties used drop boxes to increase absentee voting options, reduce long lines, limit COVID spread, and address concerns about delays with the Postal Service. *See, e.g.*, Exs. 22, 23, 35, 41 (DeKalb Cnty. Dep. 52:4-53:17; Fulton Cnty. Dep. 71:8-24; Kidd Dep. 33:21-36:4; Burden Sur-Rebuttal 2-4).

For the November 2020 election, however, the SOS opted not to send unsolicited absentee ballot applications, following criticism from then-Georgia House

Speaker David Ralston, who warned in an April 2020 interview that such efforts would "drive up turnout" in 2020 and lead to electoral outcomes he did not favor. Exs. 33, 110 (Germany Dep. 60:1-60:4; USA-04145 at 19:55-21:44 (Rep. David Ralston Interview)); *see also* Ex. 38 (Sterling Dep. 60:16-61:11). Still, counties with significant Black populations, like Douglas, DeKalb, and Richmond Counties, sent unsolicited absentee ballot applications to registrants for the November 2020 election, encouraging absentee ballot use. *See* Exs. 35, 22, 31 (Kidd Dep. 49:6-25; DeKalb Cnty. Dep. 63:16-23, 65:10-16; Bailey Dep. 49:7-21, 118:19-119:15).

### 3. The Historic Successes of Black-Preferred Candidates in the November 2020 Election and January 2021 Runoff Election

The November 2020 general and January 2021 runoff elections in Georgia resulted in historic firsts that reflected significant racial demographic and political participation shifts in the state, including the election of President Joe Biden, who had the support of most Black voters, Exs. 40, 48 (Burden 6 Tbl. 1; Palmer ¶ 28 Fig. 2), and the election of Vice President Kamala Harris, the first Black Vice President. Reverend Raphael Warnock, a Black pastor, advanced to a special runoff on January 5, 2021, which he eventually won, becoming the State's first Black Senator, Ex. 49 (Clark 33).

In the November 2020 election, few results were final on election night. The delayed results, particularly for the presidential election, garnered significant

attention. Although initial partial returns showed then-President Donald Trump ahead, ultimately Joe Biden won the State by over 12,000 votes.[4] Multiple recounts confirmed the results, and State officials considered the November 2020 election the most secure in Georgia's history. *See, e.g.*, Ex. 108 (USA-04141 at 3:42 (Secretary Raffensperger recertifying election results and dismissing voter fraud allegations because "the evidence, the actual evidence, [and] the facts tell us a different story.")); Exs. 38, 47 (Sterling Dep. 118:16-119:6; Anderson 107, 111, 130-31 (cataloging repeated statements by various election officials that Georgia's elections were safe and secure)).

### 4.  The Legislature Swiftly Convened Hearings About the 2020 Elections Marked by False Allegations and Racial Appeals

As the counting of November 2020 ballots finished, accusations of absentee ballot fraud erupted, focusing on areas with large numbers of Black voters, like Fulton County.[5] Ex. 34 (Harvey Dep. 76:17-77:9). Although State and local election

---

[4] Ga. Sec'y of State, *November 3, 2020 General Election*, available at https://results.enr.clarityelections.com/GA/105369/web.264614/#/summary.

[5] Fulton County is majority-minority, and Black Georgians are the largest racial group in the County, at over 44% of the population. *See* U.S. Census Bureau, *QuickFacts, Fulton Cnty., Ga.*, census.gov, https://perma.cc/Q77W-57FP (captured May 24, 2023) (showing the Black population at 44.7% and non-Hispanic white population at 39%). The frequent and unsupported allegations of fraud in "Fulton County" in these legislative hearings were often a shorthand for talking about race. *See* Ex. 47 (Anderson 15).

officials in Georgia consistently debunked allegations of widespread voter fraud, the misinformation continued and even resulted in threats to election workers, particularly in metro-Atlanta counties. *See, e.g.*, Exs. 113, 37, 107 ((CDR00146327-44); McCloud Dep. 79:12-84:9 (FAQs from the SOS to state legislators providing information related to voter fraud accusations); USA-04144 at 9:03-9:52 (Sterling describes a GIF with a slow-swinging noose aimed at a Gwinnett County elections worker)). In early 2021, then-President Trump pressured the Secretary of State to try to find an additional 11,780 votes to overturn the election. Ex. 109 (USA-04281 at 37:49-38:05). Following the November 2020 election, numerous unsuccessful lawsuits alleging voter fraud or other purported irregularities were filed in Georgia.[6]

The Legislature held at least five hearings in December 2020 purportedly related to voter fraud. Exs. 90, 91, 92, 93, 94 (USA-03298; USA-03299; USA-03323; USA-03183; USA-03185 (hearing notices)). During some of the hearings, some of the same attorneys involved in the unsuccessful voter fraud lawsuits, like Rudy Giuliani and Ray Smith, brought forth witnesses and alleged experts, often from their ongoing lawsuits, to testify. Exs. 7, 6, 3 (Parent ¶¶ 15-21; Jordan ¶¶ 30-36; Nguyen

---

[6] *See, e.g.*, *Trump v. Raffensperger*, No. 2020-CV-343255 (Ga. Super. Ct., Fulton Cnty. 2020) (plaintiffs voluntarily dismiss lawsuit alleging that state officials and several counties violated elections code by sending unsolicited absentee ballot applications).

¶¶ 17-24); *see also* Ex. 115 (CDR00059322 (approved public statement from the SOS)). Misinformation spread rapidly, and the voter fraud accusations were steeped in racial undertones. *Infra* § III.A.2. As the then-Lieutenant Governor conceded, those hearings provided the momentum for voting laws in the 2021 Legislative Session. *See* Ex. 111 (USA-04134 at 2:17-2:38).

The Senate's newly formed Election Law Study Subcommittee, chaired by outgoing Senator William Ligon, held two hearings, on December 3 and 30. Exs. 91, 92 (USA-03299; USA-03323). During the December 3 hearing, there was a relentless focus on areas like Fulton and DeKalb Counties, where Black residents outnumber white residents, as a part of then-President Trump's nationwide media campaign alleging fraud in areas with large Black populations.[7] *See, e.g.*, Ex. 85 (USA-04100 at 5:12:02-5:13:15 (reference to mail-in ballots in Philadelphia and other cities with Black majorities or pluralities); 2:49:18-2:50:07 (reference to poll watchers' access at State Farm Arena, in Fulton County, and DeKalb County)). Trump campaign lawyers replayed misleading footage of Black Fulton County election workers at State Farm Arena on election night bringing out cases of ballots from beneath a table and argued that fraudulent behavior was occurring. Exs. 85, 7 (USA-04100 at 13:00-29:55;

---

[7] *See supra* p.10 n.5; *see also* U.S. Census Bureau, *QuickFacts, DeKalb Cnty., Ga.*, census.gov, https://perma.cc/94RC-93XV (captured May 24, 2023) (showing DeKalb County is 54.6% Black)).

Parent Decl. ¶ 22). Fulton County officials had debunked that claim earlier that morning in a hearing held by the Senate Government Oversight Committee. Ex. 86 (USA-04099 at 2:51:19-2:54:15).

The Georgia House Governmental Affairs Committee also held two hearings related to voter fraud accusations—on December 10 and December 23. Exs. 93, 94 (USA-03183; USA-03185). The SOS refused to attend the Committee's December 10 hearing. *See, e.g.*, Ex. 115 (CDR00059322 (SOS draft statement noting "it was apparent that [the December 10, 2020] hearing would be the same circus spreading ridiculous disinformation, and indeed it was.")). The December 10 hearing allowed Trump campaign members to once again stoke conspiracy theories, which were often race-based and focused on mail-in ballots. For example, Trump campaign attorney Rudy Giuliani described the same State Farm Arena footage, saying election officials looked like they were scurrying around and hiding ballots like they were "passing out dope." Ex. 87 (USA-04097 at 1:50:28-1:51:52). He later described Black election workers, who subsequently received death threats, as "passing around USB ports as if they're vials of heroin or cocaine." *Id.* (USA-04097 at 2:10:53-2:11:07). Proposals offered, during the December 10th hearing, to address the alleged election irregularities resembled many of the legislative proposals later offered by proponents of SB 202. *Compare, e.g.*, *id.* (USA-04097 at 32:45-33:25 (testimony advocating ID

numbers for absentee ballot applications and ballots)) *with* Ex. 57 (SB 202 §§ 25, 27-28 (new ID requirements for absentee ballot applications and ballots)).

This planting of ideas for election bills also occurred during the second Governmental Affairs Committee hearing on December 23, 2020. While the SOS dismissed allegations of fraud, its General Counsel Ryan Germany (who would later help draft SB 202) referenced SOS investigations of third-party groups sending mailers to registered voters to encourage absentee voting. Ex. 88 (USA-04098 at 34:40-35:01); *but see* Ex. 33 (Germany Dep. 92:2-94:19 (unable to provide details about groups being investigated for third-party mailings)). Provisions aimed at curbing these practices later appeared in SB 202. *See* Ex. 57 (SB 202 § 25 (fines for duplicative absentee ballot applications from third parties)).

### 5. The Passage of SB 202

Relying on the racialized narrative around voter fraud in absentee voting, the Georgia General Assembly, starting on January 11, 2021, began introducing over 100 election-related bills, many containing restrictive measures. *See* Ex. 125 (CDR00466539-62 (SOS March 2021 Summary of Bills)). As the then-Lieutenant Governor noted, the legislative majority's leaders believed that increased turnout was harmful, "got scared," and became "too focused on making voting more difficult." *See* Ex. 117 (Lt. Gov. Geoff Duncan, *GOP 2.0* 107 (2021)). Legislators and the

public struggled to keep up with all of the election bills. Ex. 31 (Bailey Dep. 62:11-

63:2 ("[T]he volume of bills coming through, there were more than usual, more than I

can recall in a long time, if perhaps ever.")).

On January 7, 2021—only two days after the general election runoff that

resulted in the election of the State's first Black U.S. Senator—legislators formed the

House Special Election Integrity Committee (EIC) to assess election related bills.

Exs. 1, 3 (Burnough Decl. ¶¶ 23-29; Nguyen Decl. ¶ 38).[8] Representative Barry

Fleming chaired the EIC. He made his intentions for election changes clear in a

November 15, 2020 op-ed, where he invoked racially-coded language, comparing the

"always-suspect absentee balloting process," to the "shady part of town down near

the docks you do not want to wander into because the chance of being shanghaied is

significant." Exs. 112, 47 (USA-04158-USA-04162; Anderson 100). In the Senate,

bills were referred to the Ethics Committee, which considered numerous restrictive

bills in reaction to the November 2020 election. Exs. 4, 5 (Harrell Decl. ¶¶ 3-4; Jones

Decl. ¶¶ 7-8). Legislators often received bill drafts shortly before or at committee

hearings. Exs. 1, 5 (Burnough Decl. ¶¶ 29-30; Jones Decl. ¶¶ 18-19). Instead, Rep.

Barry Fleming and other sponsoring legislators worked with Ryan Germany, and

---

[8] The House's Governmental Affairs Committee would normally consider election bills. Ex. 1 (Burnough Decl. ¶ 24).

outside counsel Bryan Tyson and Javier Pico Prats, to craft many election-related bills. *See, e.g.*, Exs. 33, 121, 127 (Germany Dep. 33:1-35:11; CDR00062772-74; CDR00157637-40). SOS staff met privately with Republican members of the EIC before the election bills' introduction in the Committee, but not with Democratic members of the EIC (who are all Black). Exs. 33, 96 (Germany Dep. 36:3-38:12; USA-03187 (listing Democratic Representatives Alexander, Burnough, Douglas, and Smyre as members)).

In the lead up to SB 202, both the EIC and Senate Ethics Committee considered omnibus bills such as House Bill 531 (HB 531) and Senate Bill 241 (SB 241), which served as templates for SB 202. HB 531 contained significant new changes that later appeared in SB 202, like ID requirements for absentee voting and the limitation of drop box hours and locations. Ex. 64 (HB 531 Committee Substitute-LC 28 0264S §§ 15, 17-19 (ID), 16 (drop boxes)). SB 241 also had ID requirements for absentee voting and limited mobile voting units, which only Fulton County had used in 2020. *See* Ex. 70 (SB 241 as passed in the Senate §§ 8 (ID), 5 (mobile voting)); *see also* Ex. 21 (Cobb Cnty. Dep. 240:18-241:13 (Eveler recalled Germany explaining the mobile voting provision was directly targeted at Fulton County's mobile voting unit)).

On March 3, 2021, the Senate Ethics Committee held a hearing on a three-page

version of SB 202. Exs. 95, 74 (USA-03256 (Notice); AME_000845:24-AME_000873:21 (hearing transcript)). Chairman Max Burns introduced it as a "straightforward bill" to address alleged confusion from multiple absentee ballot applications being sent to voters. Ex. 74 (AME_000846:10-18). The bill subsequently passed the Senate with minimal floor debate; no Black legislators supported it. Exs. 75, 59 (AME_001227:4-AME_001231:17; USA-03970).

On March 17, after SB 202 landed in the House, however, Chairman Barry Fleming introduced a substitute version at a hearing of the EIC. With this substitute bill, SB 202 had morphed into an over 90-page bill. Ex. 53 (LC 28 0325S, LEGIS00002127-2219 (House Committee substitute introduced on March 17, 2021). Black members of the EIC received the new version of the bill shortly before the hearing. *See* Ex. 1 (Burnough Decl. ¶ 43); *see also* Ex. 76 (AME_001472:4-8 (Smyre)). Witnesses had minimal time to read or comment on the new bill. Ex. 76 (AME_001475:3-11 (Kevin Joachin), AME_001476:15-77:1 (Rev. James Woodall), AME_001484:16-AME_001485:12 (Cynthia Battles)); *see also* Ex. 24 (Battles Dep. 28:22-30:20). Another hearing was held on March 18, where witnesses testified against the bill and talked about the bill's harmful impact on voters of color. *See, e.g.*, Ex. 77 (AME_001514:18-AME_001517:24, AME_001521:22-AME_001523:14, AME_001531:3-AME_001533:23).

On March 22, the Committee voted favorably on SB 202, after a very short debate. The House voted to adopt the bill on March 25, as did the Senate. Ex. 58 (USA-03971 (SB 202 Votes Senate Passage by Substitute)). No Black legislators in either chamber supported the bill. Exs. 60, 61 (USA-03968 (House vote); USA-03969 (Senate Agreement to House Substitute on March 25)). The Governor signed the bill the same day. Ex. 58 (USA-03972).

**B.  Changes in Election Law Following the Adoption of SB 202**

**1.  ID Requirements for Requesting Absentee Ballots**

Since 2005, voters casting ballots in-person in Georgia have been required to show a photo ID. *See* Ex. 73 (House Bill 244 (2005)). It was well-known among State legislators, however, that at that time, most absentee voters were white voters. *See* Ex. 2 (Hugley Decl. ¶¶ 19-20); *see also* Ex. 47 (Anderson 99). The ID requirements added in 2005 did not apply to absentee voters. Instead, election officials would compare signatures on a voter's absentee ballot envelope with their signature on file. Ex. 29 (Gwinnett Cnty. (Williams) Dep. 78:20-79:1).

SB 202 now requires ID at two stages of the absentee voting process. First, when a voter requests an absentee ballot, they must include the ID number from their Georgia driver's license or state ID card issued by the Georgia Department of Driver Services (collectively DDS ID). If they do not have DDS ID, they must provide a copy of another form of ID. Ex. 57 (SB 202 § 25). Voters must again provide ID

when they return their absentee ballots. Voters without a DDS ID, however, may write the last four digits of their Social Security number (SSN4) to confirm their identity, an option not available to voters applying for an absentee ballot. *Id.* (SB 202 § 28). If a voter fails to provide the required ID, or if the ID number provided does not match the information in the voter registration system, voters must take additional steps before voting.[9]

The SOS analyzed voter registration records during the 2021 Legislative Session to determine how many registered voters had a driver's license or SSN associated with their voter record. The SOS shared with legislators that 97% of registered voters have a driver's license or state ID number associated with their record, and 99% of registered voters had either a driver's license number or SSN. *See, e.g.*, Exs. 120, 119 (USA-04202 (Feb. 25, 2021 Gabriel Sterling tweet); CDR01369683 (SOS email to Senator Max Burns containing these statistics)). An analysis of the voter registration records as of April 2021, shortly after SB 202 was enacted, revealed that about 272,700 registered voters did not have a DDS ID associated with their voter registration record. These voters were disproportionately

---

[9] In these circumstances, county election officials would typically issue a provisional absentee ballot and, in a separate mailing, a cure notice instructing the voter to submit a copy of acceptable ID along with a sworn affidavit to cure the deficiency in the application. O.C.G.A. § 21-2-381(b)(3); Exs. 32, 21, 130 (Evans Dep. 148:15-149:25; Cobb Cnty. Dep. 250:18-251:18; DEKALB022118).

Black voters. Ex. 42 (Meredith ¶ 37 & Tbl. IV.B.6). Only after the legislative session ended did the SOS work with the Department of Driver Services to identify those voters who have a DDS ID not associated with their voter registration record. Ex. 33 (Germany Dep. 141:11-142:4). By November 2022, there remained 243,000 registered voters who do not have an ID or have the wrong ID number in their voter registration file, and over 53% of those registrants are Black.[10] Ex. 42 (Meredith ¶ 91 Tbl. VI.F.1 (registrants with ID problems by race)); *infra* § III.A.1.a.

During the legislative debates, supporters of the new requirement claimed that imposing an ID requirement for absentee voting would increase election security. Ex. 77 (AME_001588:25-AME_001589:4 (Rep. Chuck Martin claiming that by-mail voting is the portion of the voting process "most open to foolishness")). However, legislators never explained why providing one's SSN4 is sufficient to confirm identity when a voter mails in their ballot but is not sufficient when the voter applies for a ballot. Senator Mike Dugan, during the Senate floor debates on SB 241, said that the bill would be modified in the House to allow for voters to use the SSN4 and birth date to request a ballot, Ex. 83 (AME_001041:19-AME_001042:10), but that never happened.

---

[10] By comparison, Black voters were 30.0% of all registrants in Georgia in 2020 and 29.5% in 2022.  Ex. 40 (Burden 9 at Tbl. 3).

### 2. Dramatic Cuts to Drop Box Availability in Metro Atlanta

Used extensively during the 2020 election cycle, drop boxes were extremely popular with voters. *See* Ex. 80 (AME_000207:12-15 (Lynn Bailey noting, "Our voters loved it.")). Using the most conservative estimate, over 50% of absentee ballots were returned via drop box in November 2020, totaling over 550,000 ballots. Ex. 41 (Burden Sur-Rebuttal 6); Steven Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GBP.org, Sept. 2, 2022, https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-the-2020-presidential-election. Most drop boxes were located outside and available to voters 24-hours a day, seven days a week (including weekends). Ex. 38 (Sterling Dep. 68:2-11, 69:1-6). With drop boxes available 24-hours a day until the close of the polls on Election Day, the rejection rate for absentee ballots declined substantially in 2020 compared to prior elections. Exs. 40, 44 (Burden 12 Tbl. 6; Fraga 53 Tbl. 11).

SB 202 changed all of that. Although it requires at least one drop box in every county, it dramatically limits the number of additional drop boxes to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county." Ex. 57 (SB 202 § 26). Drop boxes may be located only indoors at early voting sites or registrar's offices. They are available only during early voting hours, which means they are no longer available

when early voting is closed, including the three days before Election Day and Election Day itself. They must now be under constant surveillance by a person, not a security camera. *Id.* (SB 202 § 26).

Supporters insisted this provision would put "another obstacle in the way of ballot harvesting[,]"[11] Ex. 79 (AME_001878:25-AME_001879:23 (Rep. Alan Powell)), although there was no evidence of widespread ballot harvesting in the 2020 elections. *See, e.g.*, Exs. 122, 36 (SOS Admission No. 16; Mashburn Dep. 76:6-76:11, 201:15-201:19). The new provisions resulted in a dramatic cut in the number of drop boxes available in counties with large minority populations, in particular in metro Atlanta, and resulted in 75% of Black registered voters seeing a decrease in the number of drop boxes in their county compared to 54% of white voters. Ex. 44 (Fraga ¶¶ 148-150 & Tbl. 15); *infra* § III.A.1.a.

### 3. Ban on Food and Water Relief

Existing Georgia law already forbids improper campaigning at polling locations or attempting to buy a person's vote. O.C.G.A. §§ 21-2-414; 21-2-570. Despite the existing law, SB 202 imposes criminal penalties on persons who give or

---

[11] The term "ballot harvesting" is commonly understood as groups or individuals returning large numbers of absentee ballots in an unlawful manner. Georgia law pre-SB 202 already prohibited ballot harvesting by restricting who can return another person's absentee ballot. *See* O.C.G.A. § 21-2-385(a) (2020).

offer food or drink to an elector within 150 feet of the outer edge of a polling place or 25 feet of any voter standing in line, no matter how long. Ex. 57 (SB 202 § 33).

Prior to SB 202, Black voters faced extremely long lines at a number of polling places, and organizations began offering food and water to encourage people to stay in line. *Supra* § II.A.1. Voters' and state officials' complaints about these line relief efforts in the 2020 election cycle often centered around precincts with many Black voters, in areas with significant Black populations, or precincts where Black-led organizations distributed food and water. *See, e.g.*, Ex. 13 (Germany PI Decl. Ex. D (Nov. 2020 email chain including Frances Watson and Rick Barron regarding complaints near the CT Martin Recreation Center, located on MLK Jr. Drive in southwest Atlanta), Ex. E (SOS Investigation report about food trucks located at the East Cobb Government Center in Marietta during early voting for Jan. 2021 runoff, including Nakia Harris' On the Move Catering Truck), Ex. F (Complaint on behalf of "older voters" who felt intimidated by the "presence" of the group Black Voters Matter at Nov. 2020 early voting site in Albany, GA)). These voters and officials often voiced concerns about the perception of political influence, *see* Ex. 33 (Germany Dep. 97:10-22), but many of those concerns were unsubstantiated, *see, e.g.*, *id.* (Germany Dep. 103:11-104:12 (admitting that Exhibit D does not specify the number of complaints received, who the complaints were coming from, or whether

23

any of the groups were talking to voters at the polling place)), 108:24-109:17

(investigation in Exhibit E resulted in insufficient evidence to suggest violation of

GA law)); *see also* Exs. 106, 105 (Summary of SEB Meeting, Case No. 2020-122

(Feb. 7, 2023), https://www.sos.ga.gov/sites/default/files/forms/Summary_0.pdf);

Mercer University, *Georgia State Election Board | February 7, 2023 | Livestream*,

YouTube (Feb. 7, 2023) at 4:54:45, https://www.youtube.com/

watch?v=wsEAvuvxmZ0 (Black Voters Matter (BVM) cleared of wrongdoing, while

older white voter who brandished a gun and claimed that she felt intimidated by

BVM and their "hip hop music" was referred to the Attorney General's office).

### 4. A Ban on Counting OP Provisional Ballots Cast Before 5 p.m.

For almost 20 years, voters who appeared at a precinct in their county other

than the one to which they were assigned could cast a provisional ballot, with

officials counting only those contests for which the voter was eligible to vote

(including statewide offices). *See* O.C.G.A. § 21-2-419(c)(2) (2020). SB 202,

however, prohibits the counting of these provisional ballots if they are cast before

5:00 p.m. on Election Day. Ex. 57 (SB 202 § 34). Supporters of the bill claimed

incorrectly that the number of OP voters had sharply increased. Ex. 77

(AME_001518:20-24 (Fleming claims that in 2016 there were 200-300 OP voters and

by 2020 there were 20,000)). But State-produced data show only about 8,200 OP

votes cast in 2020, a decline from 2018 and a moderate increase from 2016, when about 6,100 OP votes were cast. *See* Ex. 128 (CDR00044731-32). Supporters also claimed without any concrete evidence that there was active encouragement of voters to vote in the wrong precinct. *See* Ex. 77 (AME_001518:25-AME_001519:7 (Fleming testimony during the March 18, 2021 EIC Hearing); *see also* Ex. 33 (Germany Dep. 163:12-164:14, 165:12-18 (Germany stating that Stacey Abrams encouraged voters to vote OP, via email)); *but see id.* (Germany Dep.165:13-168:16). Data show that Black voters are more likely than white voters to use OP provisional ballots. Ex. 40 (Burden 36); *infra* § III.A.1.b. Further, Black voters are more likely to face burdens in going to another polling place, because of lack of transportation and other challenges. *See infra* § III.A.1.c. SB 202's new OP rule places Black voters at greater risk of not being able to cast ballots that will count.

### 5.  Narrowing of the Absentee Ballot Request Window

SB 202 moves the absentee ballot request deadline from 4 days to 11 days before Election Day. Ex. 57 (SB 202 § 25). Because of other changes to the election calendar under SB 202, *see id.* (SB 202 § 42) (only 28 days between a primary or general election and the runoff), the new deadline results in a particularly short period for requesting absentee ballots for runoff elections. Exs. 21, 28 (Cobb Cnty. Dep. 91:16-94:2; Gwinnett Cnty (Manifold) Dep. 140:5-142:6 (explaining challenges of

compressed runoff period given other SB 202 provisions)). In November 2020 and January 2021, Black voters were more likely than white voters to request absentee ballots during the eliminated period. Ex. 44 (Fraga ¶¶ 109-110 & Tbls. 9-10). If SB 202's early deadline had been in effect in November 2020, over 30,000 mail ballot requests, including over 12,000 from Black voters, would have been rejected as untimely.[12] *Id.* (Fraga ¶ 110 & Tbl. 10).

Sponsors said that the previous absentee ballot request deadline did not afford voters enough time to return absentee ballots. Ex. 79 (AME_001903:7-13 (Rep. Jan Jones)). But election officials confirmed that having drop boxes available—as they were immediately prior to SB 202—mitigated that risk and allowed for more absentee ballots to be received by Election Day, even if they were requested closer to Election Day, *see, e.g.*, Ex. 31 (Bailey Dep. 88:14-18). Some election officials said that the 11-day cutoff for requesting absentee ballots was excessive and could hurt voters.[13] *See e.g.*, Ex. 80 (AME_000204:20-AME_000205:19 (Lynn Bailey)).

## III.   ARGUMENT

A preliminary injunction is warranted—

---

[12] The 12,000 represent 40% of these requests; Black registrants were 30% of all registrants for the November 2020 election. Ex 40 (Burden 9 at Tbl. 3).

[13] SB 202 also prohibits state and local governments from mailing absentee ballot request forms to all registered voters, and it imposes onerous fines on private groups that send out duplicate requests for absentee ballots. *See* Ex. 57 (SB 202 § 25).

> if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). For the reasons discussed below, Plaintiffs meet each of these requirements for relief.

### A.  Plaintiffs Are Likely to Succeed on the Merits

The Fourteenth and Fifteenth Amendments to the U.S. Constitution prohibit intentionally discriminatory voting practices on the basis of race. U.S. Const. amend. XIV; U.S. Const. amend. XV; *see Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982). In addition, Section 2 of the VRA prohibits any law or practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2). A violation of Section 2—

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

To succeed under Section 2, "Plaintiffs must either prove [discriminatory]

27

intent, or, alternatively, must show that the challenged system or practice, in the

context of all the circumstances in the jurisdiction in question, results in minorities

being denied equal access to the political process." *Chisom v. Roemer*, 501 U.S. 380,

394 n.21 (1991) (quoting S. Rep. No. 97-417, at 27 (1982)); *see also United States v.*

*Georgia*, 574 F. Supp. 3d 1245 (N.D. Ga. 2021). A showing of discriminatory intent

that is "sufficient to constitute a violation of the [F]ourteenth [A]mendment" is also

"sufficient to constitute a violation of [S]ection 2." *McMillan v. Escambia County,*

*Fla.*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984)[14]; *see also United States v.*

*Marengo Cnty. Comm'n*, 731 F.2d 1546, 1553 (11th Cir. 1984) (Section 2 forbids

"not only those voting practices directly prohibited by the Fifteenth Amendment" but

also practices that have a discriminatory result).

Thus, when considering discriminatory purpose claims under Section 2, courts

typically apply the "familiar approach" outlined in *Village of Arlington Heights v.*

*Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977), for cases

arising under the U.S. Constitution. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct.

---

[14] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent
former Fifth Circuit decisions handed down by September 30, 1981. 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc). *McMillan* was filed in 1977 over a voting practice in
Florida, *see* 748 F.2d at 1039; the 1984 decision is treated as a former Fifth Circuit
case given prior proceedings in the case but also is binding Eleventh Circuit
precedent. *See Bonner*, 661 F.2d at 1207-08 (describing rules governing such cases).

2321, 2349 (2021) (approving of district court's application of *Arlington Heights* to

Section 2 intent claim); *see also Veasey v. Abbott*, 830 F.3d 216, 229-30 (5th Cir.

2016) (en banc) (applying *Arlington Heights* to Section 2 intent claim).

To establish discriminatory intent, a plaintiff must show that race was a

motivating factor for the official action. Mere "awareness of consequences" is not

enough; rather, discriminatory intent requires that the legislature acted at least in part

"because of," and not "in spite of," a law's "adverse effects upon an identifiable

group." *Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 279 (1979). The

evidence need not show "that the challenged action rested solely on racially

discriminatory purposes" or even that the discriminatory purpose "was the 'dominant'

or 'primary' one." *Arlington Heights*, 429 U.S. at 265 ("Rarely can it be said that a

legislature or administrative body operating under a broad mandate made a decision

motivated solely by a single concern . . .").

Analyzing whether a government action was motivated by a discriminatory

purpose under the Fourteenth and Fifteenth Amendments, as well as Section 2,

requires a fact-intensive analysis of "the totality of the relevant facts," *Washington v.*

*Davis*, 426 U.S. 229, 242 (1976), including direct or circumstantial evidence of

intent. *Rogers*, 458 U.S. at 618. Indeed, the "true purpose" behind a challenged

scheme may be "cleverly cloaked in the guise of propriety," and "[t]he existence of a

right to redress does not turn on the degree of subtlety with which a discriminatory plan is effectuated." *Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), *aff'd sub nom. Rogers*, 458 U.S. 613 (1982); *see also Veasey*, 830 F.3d at 235-36 ("[W]e rarely have legislators announcing an intent to discriminate based on race.").

In *Arlington Heights*, the Supreme Court set forth a non-exhaustive list of evidentiary factors that may inform the intent analysis, including (1) whether the impact of the decision bears more heavily on one racial group than another; (2) the historical background preceding the passage of the challenged law; (3) the sequence of events leading up to passage of the bill; (4) whether passage of the bill departed, either procedurally or substantively, from the normal practice; and (5) the legislative history, including contemporaneous statements and viewpoints held by the decision-makers. 429 U.S. at 266-68. In the Eleventh Circuit, courts also consider "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (hereinafter *GBM*).

Establishing proof of discriminatory purpose does not require proof of invidious racial animus, but rather an intent to disadvantage minority citizens, for whatever reason. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional

discrimination."). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also GBM*, 992 F.3d at 1321.

The Eleventh Circuit's recent decision in *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) (hereinafter, *LWV*), does not upend this long-standing approach to Section 2 claims. In *LWV*, a case challenging an election bill in Florida, the court of appeals rejected the idea that "a finding of discriminatory impact was unnecessary" if a court found "discriminatory intent." 66 F.4th at 942 (relying on *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556, 1563 (11th Cir. 1996)). The court had already concluded that none of the challenged provisions of the Florida statute were enacted with a discriminatory purpose, and most would not "have a disparate impact on black voters." *Id.* at 942-44. There, the totality of circumstances did not establish that the political process in Florida was not "equally open to black voters." *Id.* at 943-44.

Defendants here argue in their separate motion for judgment on the pleadings that *LWV* should be read to mean "[t]here is no such thing as a purpose-only (or intent-only) Section 2 suit." Mot. for J. on the Pleadings, ECF 549 at 2. *LWV*,

however, did not eliminate Section 2's purpose claim, nor should it be read to require Section 2 intent plaintiffs to prove that a challenged practice would separately violate Section 2's discriminatory results test. Such a requirement is foreclosed by Supreme Court and earlier circuit precedent. *See Chisom*, 501 U.S. at 394 n.21; *Marengo Cnty. Comm'n*, 731 F.2d at 1553; *McMillan*, 748 F.2d at 1046. And of course, Private Plaintiffs here raise constitutional *and* statutory intentional discrimination claims, and *LWV* does not change the standard for review of claims under the Constitution.

In this case, the record of discriminatory purpose and impact satisfies the standard articulated in *LWV*. *See* 66 F.4th 905. For example, in terms of discriminatory impact, unlike in *LWV*, Black voters used absentee voting in greater numbers than white voters in the leadup to SB 202's enactment. *Compare* Ex. 40 (Burden 11 Tbl. 5) *with LWV*, 66 F.4th at 924-25. Also, unlike in *LWV*, a racialized narrative around non-existent voter fraud was created and aired during legislative hearings in December 2020 that led to the eventual passage of SB 202 a few months later. *See supra* § II.A.4; *infra* § III.A.3.b. That racialized narrative sought to undermine increased Black voter participation *immediately after* Black voters used the existing voting systems to finally elect candidates of choice statewide. *See, e.g.*, Exs. 112, 2, 116 (USA-04158 - USA-04162) (Rep. Fleming comparing the "always-suspect absentee balloting process," to the "shady part of town" where you are likely

32

to be "shanghaied"); Hugley Decl. ¶ 11 (decrying Rep. Fleming's "racially

derogatory statement"); CDR00216111 (legislator describing Fulton and DeKalb

counties as "the two counties where there is at least a perception of greatest fraud")).

Voters and election officials likened the mere presence of Black non-partisan

volunteers passing out water to voters waiting in long lines to criminality in the lead

up to SB 202 criminalizing it. *See supra* § II.B.3.

The relevant standard here remains whether race was *a* motivating factor under

*Arlington Height*s. Here, the mosaic of evidence under the *Arlington Heights*

framework shows that the Georgia legislature enacted SB 202 with a discriminatory

purpose: to minimize the opportunity of Black voters to participate.

### 1. The impact of the challenged provisions in SB 202 bears more heavily on Black voters

Each of the challenged provisions, both standing alone and taken together, bear

more heavily on Black voters as a group than on white voters—an important starting

point for an intent inquiry. *See Arlington Heights*, 429 U.S. at 266. "A panoply of

regulations, each apparently defensible when considered alone, may nevertheless

have the combined effect of severely restricting participation and competition."

*Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring in part

and concurring in the judgment).

Once it was clear that Black voters had begun using absentee voting at higher

rates than white voters, and using it to great electoral effect, *see supra* § II.A.1, SB 202 made the absentee voting process more cumbersome, pushing Black voters to vote in-person, *see infra* § III.A.1.a. Then, the State made the experience of in-person voting more onerous by banning groups from providing food and water to voters facing long lines and eliminating most OP voting. *See infra* § III.A.1.b. Driven largely by pretextual claims, many of SB 202's legislative changes collectively targeted the voting power of Black Georgians.[15]

### a. Black voters are more likely than white voters to be impacted by SB 202's restrictions on absentee voting

**Voter ID for Absentee Voting.** In April 2021, shortly after SB 202 was enacted, the State's own data showed that the voters who did not have a DDS ID associated with their voter registration were disproportionately Black voters. Ex. 42 (Meredith ¶ 37 & Tbl. IV.B.6). That disparity has not changed in the ensuing months.

Requiring voters to write a DDS ID number that matches the ID number in the voter registration system impacts at least two categories of voters: those without a DDS ID, and those whose DDS ID number is not in their voter registration record,

---

[15] These increased burdens in voting, rather than raw turnout, are the touchstones of discrimination. Still, it bears noting that, after the passage of SB 202, the gap between white turnout and Black turnout increased markedly, from 6.2 percentage points in the November 2018 midterm to 9.7 percentage points in November 2022. Ex 45 (Fraga Sur-Rebuttal ¶ 32 Tbl. 1).

either because their voter record does not include a DDS ID number or includes an inaccurate DDS ID number.[16] *Id.* (Meredith ¶¶ 21-23). Even now, nearly 243,000 registered voters fall into those categories. *Id.* (Meredith ¶ 90 & Tbl. VI.F.1). Although Black registrants constitute about 30% of all registered voters, over 53% of registrants with either no DDS ID number or an inaccurate DDS ID number in the voter registration system are Black—nearly 130,000, or 5.6% of all Black registrants. In contrast, white registrants constitute about 51% of all registered voters but are just 33% of registrants with an ID problem in the voter registration system (about 80,000, or 2% of white registrants). *Id.* (Meredith ¶ 65 Tbl. VI.A.1 (all registrants by race) & ¶ 91 Tbl. VI.F.1 (registrants with ID problems by race)). In a state where the most recent presidential election was decided by 12,000 votes and voting is racially polarized, these are not small numbers or "small differences." *Brnovich*, 141 S. Ct. at 2339.

Over 171,000 registered voters have no DDS ID number in the voter registration system. Ex. 42 (Meredith ¶ 90 & Tbl. VI.F.1). Some of these 171,000 registrants likely do not possess a DDS ID and will have to obtain one or provide a copy of an alternative accepted ID with their absentee ballot application. *Id.*

---

[16] Inaccurate DDS ID numbers are usually a result of data entry errors or out-of-date information in the registrant's record. Ex. 42 (Meredith ¶¶ 60, 68).

(Meredith ¶ 75 & Tbl. VI.C.2). Even those who do have a DDS ID will be shunted into the provisional absentee ballot process when their DDS ID number is not correctly reflected in the voter registration system. *See* O.C.G.A. § 21-2-381(b)(3); Exs. 32, 35 (Evans Dep. 148:15-149:25; Kidd Dep. 99:23-100:5); *see also* Exs. 16, 12, 43 (Lockette Decl. ¶¶ 14-15; Daniel Decl. ¶¶ 8-14 (describing additional steps required to overcome ID problems in 2022 election cycle); Meredith Supp. Decl. ¶¶ 1-2 (describing inaccuracies in Mrs. Lockette's and Mr. Daniel's voter registration records)).[17]

State voter records show that allowing voters to list their SSN4 on absentee ballot applications would significantly reduce the number of voters impacted by SB 202's ID provision. Over 95% of voters who do not have a DDS ID number associated with their voter record do have SSN4 on file. Ex. 42 (Meredith ¶ 66 & Tbl. VI.A.2). Legislators never explained why using SSN4 to confirm identity for absentee ballot requests was insufficient, while it was acceptable for sending in the actual ballot. *See supra* § II.B.1 at p. 20. They instead left in place an ID requirement that disproportionately burdens Black voters.

---

[17] In some counties, voters with ID issues may struggle to even receive a provisional absentee ballot. For example, in Cobb County, voters who fail to include ID with their mail ballot application are not sent a ballot until they cure the deficiency in their application. Ex. 21 (Cobb Cnty. Dep. 249:24-251:18).

**Reduction in drop box availability.** SB 202 sharply limits the utility of drop boxes by reducing the total possible number statewide by a third, moving drop boxes indoors, and allowing their use only during early voting. Exs. 57, 38 (SB 202 § 26; Sterling Dep. 157:11-159:5). SB 202's limitations on drop boxes disproportionately affect Black voters in several ways. First, many Black voters now have access to far fewer drop boxes than they did in 2020. SB 202 forced counties where Black residents comprise more of the population to make the largest cuts in drop boxes. Ex. 40 (Burden 27-28 & Tbl. 11). One third of all Black Georgians live in the three counties with the largest reductions by far: in 2020, Fulton, DeKalb, and Gwinnett had 37, 33, and 24 drop boxes, respectively. SB 202 reduced that to 8, 5, and 6 drop boxes, a reduction of roughly 80%. *Id.* (Burden 41-42 Tbl. A1). Conversely, the 29 counties that did not use a drop box in 2020 but now must use one have mostly white residents. *Id.* (Burden 29).

Second, the elimination of drop boxes in the final four days of the election cycle removes a widely-used method for return of absentee ballots on days during which Black voters, prior to SB 202, were significantly more likely to cast absentee ballots. *Id.* (Burden 13-18 & Figs. 1-5). In federal general elections from November 2014-2022, including the January 2021 runoff, Black voters were almost always over-represented among voters who returned absentee ballots in the final four days of

the election. *Id.* (Burden 13-18 & Figs. 1-6). In November 2020, during the last four days of the election, 69% of absentee ballots were returned via drop box. Ex. 41 (Burden Sur-Rebuttal 6). Given these patterns, the elimination of drop boxes in the final four days of the election cycle, coupled with the sharp reductions in the number of drop boxes and hours they are available, will disrupt the voting habits of a larger share of Black voters compared to white voters. Ex. 40 (Burden 19-20).

**Early deadline for submitting mail ballot applications.** Black voters are also more likely to be impacted by SB 202's early deadline to submit mail ballot applications—because they use absentee voting more than white voters and because they have been more likely to submit mail ballot requests late in the election cycle. State election data show that in November general elections before and after SB 202, Black voters' mail ballot applications were more likely than white voters' to be rejected for arriving too late. Ex. 44 (Fraga ¶ 99 Tbl. 7). In 2022, with SB 202's 11-day deadline in effect, the share of mail ballot applications rejected for arriving too late jumped significantly for all voters, but the increase was greatest for Black voters. *Id.*

### b. SB 202 makes in-person voting more onerous in ways that disproportionately impact Black voters

**Line relief ban.** The line relief ban disparately impacts Black voters because (1) Black voters in Georgia already face longer lines to vote and line relief

encourages voters to stay in line, *see, e.g.*, Exs. 40, 46, 10, 11 (Burden 20-22; Pettigrew 17-20; Calhoun Decl. ¶¶ 17-18; Cotton Decl. ¶¶ 9-12, 23-24), and (2) obstacles to voting by mail that disparately impact Black voters are likely to discourage some voters from casting absentee ballots, resulting in more in-person voters. *See* Ex. 40 (Burden 19-20); *cf.* Exs. 34, 46, 23 (Harvey Dep. 61:15-25; Pettigrew 30; Fulton Cnty. Dep. 71:16-24). Because it is widely known that long lines have plagued predominantly Black precincts, Ex. 40 (Burden 22 n. 33), and organized efforts to provide food and water have sprung up to support those voters, *supra* § II.A.1, this provision transparently targets Black political participation, Ex. 2 (Hugley Decl. ¶ 17).

Georgia voters wait in longer lines than voters in almost every other state. Ex. 46 (Pettigrew 13-16). In presidential elections between 2008 and 2020, 22% of Georgia voters waited more than 30 minutes to vote, whereas 12.9% of non-Georgia voters did. *See id.* (Pettigrew 11-12). In midterm elections during the same time, Georgia had a higher percentage of voters who waited more than 30 minutes than every other state but one. *See id.* (Pettigrew 12).

All Georgians do not experience these long lines evenly. In federal general elections from 2014 to 2020, Black voters generally experienced longer wait times, with substantial disparities in some cases. Exs. 40, 46 (Burden 21; Pettigrew 17-20).

In the November 2020 election, Black voters waited on average more than 10 minutes longer to vote than white voters. Ex. 46 (Pettigrew 24). In all four general elections from 2014 to 2020, white voters were more likely to experience no wait at all, and in three of the four elections, Black voters were more likely to wait over 60 minutes to vote. Ex. 40 (Burden 21 Tbl. 7). Long lines also plagued early voting locations in metro-Atlanta during the December 2022 runoff election. Exs. 23, 21, 46 (Fulton Cnty. Dep. 206:22-25 (wait times over one hour); Cobb Cnty. Dep. 169:23-170:3 (wait times over two hours); Pettigrew 35-36 (48 of 66 locations on Friday before runoff had an hour or longer line)). And from preliminary 2022 general election survey data, the racial gap in wait times was the largest of the last three midterm election cycles. Ex. 39 (Pettigrew Dep. 133:17-134:7).

Prior to SB 202, line relief efforts facilitated a more open political process for Black voters by alleviating some of the burdens of waiting in long lines, combatting generations of exclusion. *See, e.g.*, Exs. 8, 18 (Briggins Decl. ¶¶ 12-16 (line relief efforts "re-affirm the dignity of Black Voters" waiting in long lines); Scott Decl. ¶¶ 6-11 (describing staying in a 4-hour line after receiving food and water and the feeling of solidarity it engendered)). Line relief also encouraged Black voters to stay in long lines. *See* Exs. 10, 11 (Calhoun Decl. ¶¶ 17-18; Cotton Decl. ¶¶ 9-12, 23-24).

**Out-of-precinct provisional voting.** The prohibition on counting OP

provisional ballots cast before 5:00 p.m. will disproportionately harm Black voters

because they are more likely than white voters to cast such ballots. Complete county-

level data on OP ballots are available from 13 counties—covering about 27% of the

State's population—for November 2020 and January 2021. Ex. 40 (Burden 36-38).

These data show that in November 2020, in counties where data are available and

Black voters made up more than 10% of the electorate, rates of OP voting for Black

voters exceeded their overall share of the vote in 9 out of 10 counties. *Id.* (Burden 36

Tbl. 13). In January 2021, the share of Black voters who cast OP ballots exceeded

their share of all voters in 8 of 11 such counties. *Id.* (Burden 37 Tbl. 14).[18] Black

voters in Georgia are substantially more likely to cast OP ballots than their white

neighbors. *Id.* (Burden 36-37, 53-55); *see, e.g.*, Exs. 17, 15, 9 (Mason Decl. ¶¶ 3-8;

Jumper Decl. ¶¶ 3-8; Burns Decl. ¶¶ 9-21)). The prohibition on counting OP ballots

cast before 5:00 p.m. disproportionately impacts Black Georgians.

> ### c. The challenged provisions, when combined with existing socioeconomic disparities, disproportionately impact Black voters

The legacy of Georgia's history of discrimination, evident in the disparities

---

[18] Data collected from dozens of additional counties confirm that Black voters across the State were much more likely than white voters to cast OP provisional ballots. Ex. 40 (Burden 54-55). Because counties must retain election records for only 24 months, *see* O.C.G.A. § 21-2-500(c), most county records showing provisional ballots cast before 2020 are not available.

between Black and white Georgians on multiple socioeconomic factors, exacerbate

the disparate impacts of SB 202 on Black voters. Black Georgians experience higher

rates of poverty, lower levels of formal education, and worse health conditions than

their white peers, among other disparities. Exs. 40, 48 (Burden 23-25; Palmer 12-13

& Fig. 3). These factors are linked to the history of official race discrimination in

Georgia and have well-established impacts on voter participation. Exs. 49, 47 (Clark

2-14 (disparities and links to voter participation); Anderson 19-45, 57-63 (historical

discrimination)).

 "Given the degree that demographic characteristics are correlated with race in

Georgia, even a facially neutral election requirement or limitation can be more

challenging for Black voters than for white voters." Ex. 40 (Burden 22). For example,

many Black Georgians struggle to obtain DDS ID. Ex. 14 (Johnson Decl. ¶ 9). The

process involves visiting one of 67 DDS locations in-person; providing documentary

proof of identity, citizenship, and residency; and usually paying a $32 fee.[19] Exs. 14,

25 (Johnson Decl. ¶ 11; DDS Dep. 37:1-39:9, 57:2-17, 131:13-132:20). Obtaining the

necessary underlying documents can be costly, and the process itself presents many

challenges for voters with limited resources. Ex. 14 (Johnson Decl. ¶¶ 13, 19-22).

---

[19] DDS will waive the $32 fee for individuals who swear they are registered to vote and lack required ID for voting, but all other requirements are the same. Exs. 25, 129 (DDS Dep. 85:18-86:7, 87:8-89:19; DDS Field Operations Manager's Bulletin).

Because Black Georgians are less likely than white Georgians to possess a printer, scanner, photocopier, or smart phone, providing a copy of an alternative ID, as required for voters who lack DDS ID or whose DDS ID does not match their voter record, will also be more burdensome. Exs. 14, 42 (Johnson Decl. ¶ 9; Meredith ¶¶ 45-47). Previously, absentee voting provided voters with ID issues an opportunity to "participate in the political process" without encountering these burdens. 52 U.S.C. § 10301(b). SB 202 removes this possibility, rendering the State's system of voting less open for these voters.

Similarly, because Black voters are less likely to have access to a vehicle,[20] and thus, more likely to rely on public transportation than white voters, they are more likely than white Georgians to face excessive travel times to one of the few drop boxes remaining under SB 202. Such limited resources also mean that Black voters who find themselves at the wrong precinct on Election Day will, on average, face greater obstacles to traveling to their assigned precinct. Exs. 40, 9 (Burden 37-38; Burns Decl. ¶¶ 9-20).

Cumulatively, SB 202's "panoply of restrictions" exacerbates the

---

[20] *See* American Community Survey, 2015 5-Year Estimates, Table B25044, *Tenure by Vehicles Available*, https://perma.cc/BYU2-M8E6 (captured May 24, 2023) (showing that 12.9% of Black households in Georgia lack access to a vehicle, compared to 3.9% of white non-Hispanic households).

disproportionate impact on Black voters as the various provisions build upon each other. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016). Notably, after SB 202, although absentee voting declined among all voters in the 2022 election cycle, the drop was more pronounced among Black voters than white voters. Ex. 44 (Fraga ¶ 55 Tbl. 2 (decline in voted absentee ballots) & ¶ 68 Tbl. 3 (decline in absentee ballot requests)). And of course, measuring impact by turnout alone would not account for Black voters who took extra steps to overcome obstacles placed in their way by SB 202. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 243 (4th Cir. 2014) ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance.").

### 2. The Sequence of Events Leading to the Passage of SB 202 Show the Legislature Used Race to Achieve Political Ends

Recognizing that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence[,]" *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999), the Supreme Court has "instruct[ed] courts to consider the broader context surrounding the passage of legislation." *McCrory*, 831 F.3d at 221 (citing *Cromartie*, 526 U.S. at 553). SB 202, of course, did not arrive in a vacuum. It followed both long-standing and recent discrimination that had long suppressed political participation among Black residents, compared to white residents. *Infra* § III.A.4; *see, e.g.*, Ex. 47 (Anderson 19-45, 57-63). That pattern of discrimination

continued when supporters of SB 202 restricted election activities associated with Black communities, Black-led organizations, and counties with significant Black populations to justify the need for restored voter "confidence" following the 2020 election. *See* Exs. 57, 117 (SB 202 § 2; Lt. Gov. Geoff Duncan, *GOP 2.0* 110 (2021) (dismissing the voter confidence rationale for election reform legislation in 2021)). The bill did not need to result in significant loss of turnout to impact future Georgia elections—"11,780 votes" would be enough, *supra* § II.A.4—by chipping away at Black voting and mobilization methods that helped elect Black-preferred candidates.

Many aspects of the record and sequence of events point to "the obvious inference" of discriminatory intent, with the legislature adopting SB 202 "in the immediate aftermath of unprecedented African American voter participation in a state with a troubled racial history and racially polarized voting." *McCrory*, 831 F.3d at 226-27. First, SB 202 passed alongside increasingly successful, Black-led efforts in Georgia to mobilize voters of color, including with the promotion of absentee voting. *Supra* § II.A.1. Second, the bill was passed after historic wins by candidates preferred by Black voters, in a state where voting remains highly racially polarized. Exs. 40, 48 (Burden 4-7; Palmer 7-11). While courts cannot conflate discrimination on the basis of party with discrimination based on race, "intentionally targeting a particular race's access to the franchise because its members vote for a particular party" is unlawful.

*LWV*, 66 F.4th at 924. SB 202's restrictions directly affect many of the ways in which Black-led groups had mobilized Black voters in recent years, including absentee voting and celebratory line relief efforts. For example, after fifteen years of exempting absentee voting from the State's voter ID requirement, the legislature made an about-face only after Black voters began using absentee voting disproportionately—and to great effect. *See Arlington Heights*, 429 U.S. at 267 (noting that a sudden change in policy tied to a race-related change in use would suggest a discriminatory purpose); *see also supra* §§ II.A.1, 5.

Finally, the bill grew out of a tenuous and racialized voter fraud context. SB 202's discriminatory intent is not revealed merely from the lack of voter fraud in Georgia's 2020 election, *see LWV,* 66 F.4th at 924, but legislators' insistence that this fraud occurred primarily with mail-in voting in areas with the largest numbers of Black voters is highly probative that the purported fraud justification is a pretext for discrimination, *supra* §§ II.A.4-5. Likewise, the majority party did not raise any such concerns about fraud with mail-in voting until the 2020 election, when Black voters used it disproportionately to white voters, who had previously been dominating its use. *See, e.g.*, Exs. 40, 2, 47 (Burden 11 & Tbl. 5; Hugley Decl. ¶¶ 19-21; Anderson 99).

As the SOS recognized, some of the General Assembly's voter fraud hearings

46

in December 2020 were "circuses." *See* Ex. 115 (CDR00059322 (draft SOS statement)). The hearings also focused on racialized allegations of voter fraud. *See supra* § II.A.4. The hearings included false racial tropes that portrayed Black poll workers as drug dealers and centered on Fulton County. Ex. 87 (USA-04097 at 1:50:28-1:51:52). Despite that discriminatory, unsupported foundation, solutions presented during the hearings became the seeds for SB 202. *Supra* §§ II.A.4-5. Thus, the recent history and sequence of events leading to the passage of SB 202 supports a finding of discriminatory intent.

### 3. The Legislative Process Also Points to an Impermissible Racial Motivation Behind SB 202

#### a. Procedural and Substantive Departures from Normal Legislative Practice

SB 202's legislative record was marked by a lack of transparency and a rushed process that excluded Black participation from legislators and the public alike—all of which point to discriminatory intent. *See Arlington Heights*, 429 U.S. at 267. "[A] legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228. Further, the voter fraud hearings—the "momentum" for SB 202, as then-Lieutenant Governor Duncan said, Ex. 111 (USA-04134 at 2:17-2:38)—aired the racialized falsehood linking historic participation of Black voters to massive voter fraud. They were organized by select legislators in tandem with Trump campaign members who often presented one-sided, erroneous information. Other legislators

were not given adequate notice, lists of witnesses, or the same opportunities to question witnesses. *See, e.g.*, Exs. 3, 7 (Nguyen Decl. ¶¶ 20-23, 28 (legislators forbidden from questioning Giuliani); Parent Decl. ¶¶ 17-21).

This lack of transparency continued in the 2021 Legislative Session. The Georgia General Assembly considered around 100 election bills in the 2021 Legislative Session, *see* Ex. 125 (CDR00466539-62 (SOS March 2021 Summary of election bills)), an atypical amount of bills for one session, *see* Ex. 31 (Bailey Dep. 62:11-63:2). Lawmakers often received drafts of the bill either just before or at committee hearings. Exs. 1, 5, 47 (Burnough Decl. ¶¶ 29-30; Jones Decl. ¶¶ 18-19; Anderson 169 n.556). SB 202 grew from 3 pages to over 90 pages. EIC members of the minority party, who were all Black, were not included at meetings to discuss election bill provisions with some members of the SOS and outside counsel hired by the General Assembly. *See supra* § II.A.5; Ex. 33 (Germany Dep. 36:14-38:12).

The testimony from election officials who would have to implement these dramatic changes to Georgia election law was often limited to the "good ones" selected by Germany and Fleming. *See* Exs. 132 (Germany Text Messages, lines 15-18, 191). Even so, those few election officials who testified opposed certain provisions that ended up in SB 202. Bailey had followed the SOS's "strict (security) guidelines" for drop boxes, and she testified that voters in her county "loved it"—*i.e.*,

voting with drop boxes. Ex. 80 (AME_000207:12-19). She implored the Committee to let the drop boxes remain outdoors. *Id.* (AME_000207:19-AME_000208:6). Bailey also acknowledged the hardship an 11-day absentee ballot request deadline would impose on some voters and asked the Committee to consider moving to 7 or 8 days before Election Day. *Id.* (AME_000204:20-AME_000205:19).

Several county election officials lamented the lack of input they had in the bill. Bailey said that "[S]ome of the (election) proposals make me sick . . . it is apparent that little or no research has been done . . ."). Ex. 123 (COBB032414); *see also* Exs. 118, 124 (COBB023362 (Rick Barron, former Fulton County Elections Director, asks, "[W]ill any legislator listen to us?"); COBB032406 (Lynn Ledford, former Gwinnett County Elections Director, notes "[i]t's all knee jerk with no thought whatsoever to administration, including budgets")). Tonnie Adams, the Legislative Committee Chairman for the Georgia Association of Voter Registration and Election Officials (GAVREO), took the unprecedented step of surveying numerous county election officials regarding the proposed election law changes and sharing that survey feedback with members of the Georgia General Assembly. Exs. 126, 30 (USA-Adams-000026.0001-000027.0016; Adams Dep. 146:13-147:10). Adams received minimal response from legislators regarding the survey points. Ex. 30 (Adams Dep. 148:10-149:12) (receiving mostly automated replies)). Adams also testified during

the hearings on SB 202 that the bill rendered drop boxes "useless." Ex. 77

(AME_001627:11-19 (Tonnie Adams)).

The EIC held three hearings on SB 202 but passed it after short debate. Ex. 1

(Burnough Decl. ¶ 49). During the floor debate, Representative Alexander again

reminded the body that officials from the Association of County Commissioners of

Georgia testified that more time was needed to understand the fiscal and logistical

impacts. Ex. 79 (AME_001840:8-AME_001841:3). Legislators voted along party

lines in both the House and Senate; no Black legislators voted for SB 202.

### b. Contemporaneous Statements

In a case where plaintiffs allege that the legislature imposed barriers to

minority voting, a "holistic approach is particularly important, for '[d]iscrimination

today is more subtle than the visible methods used in 1965.'" *McCrory*, 831 F.3d at

221 (quoting H.R. Rep. No. 109-478, at 6 (2006)); *see also* Order, ECF No. 539 at 16

n.10 (recognizing that "legislators are unlikely to make public statements indicating

an improper motive for legislation"). Still, the public record behind SB 202 reflects

an intent to target and delegitimize absentee voting at a time when Black voters were

increasingly using it. *See Arlington Heights*, 429 U.S. at 267 (noting that a sudden

change in longstanding policy in the face of shifting racial demographics may suggest

a discriminatory purpose). Former Speaker Ralston denounced the SOS' plan to send

absentee ballot applications to all registered voters for the 2020 primary because it would drive up turnout. *Supra* § II.A.2. Following the November 2020 election, as baseless voter fraud allegation swirled, bill sponsor and EIC chair Rep. Fleming invoked racialized language to garner support for SB 202, by characterizing absentee balloting as the "shady part of town down near the docks" where you risked getting "shanghaied." Ex. 112 (USA-04161); *see also* Ex. 2 (Hugley Decl. ¶ 11 (describing perceived racial undertones)). During the 2021 Legislative session, other legislators like Representative Chuck Martin suggested that the absentee process had become susceptible to "foolishness." *Supra* § II.B.1. For decades, the legislature saw no need to impose an ID requirement on absentee voting, yet after Black voters started voting by absentee more than white voters and electing candidates of choice statewide, the legislature dramatically changed directions.[21]

### c.  Foreseeability and Knowledge of the Disparate Impact

The General Assembly, and specifically sponsors of SB 202, intended and

---

[21] Witness statements during the legislature's voter fraud hearings in December 2020 also played on racial stereotypes, including Giuliani's comparison of Black poll workers doing their jobs to drug dealers committing crimes. *See supra* § II.A.4*; see also* Ex. 87 (USA-04097 at 1:50:28-1:51:52). Giuliani's lobbying efforts can provide circumstantial evidence of the Legislature's intent, *see I.L. v. Alabama*, 739 F.3d 1273, 1287 (11th Cir. 2014); *see also Fla. State Conf. of Branches & Youth Units of the NAACP v. Lee*, 568 F. Supp. 3d 1301, 1305 (S.D. Fla. 2021), as these hearings featured false, racialized allegations of voter fraud that led directly to the legislature's efforts to pass comprehensive election changes.

could have foreseen, the discriminatory impact of SB 202 because several witnesses discussed these impacts during hearings on SB 202 or its predecessor bills. Reverend James Woodall, then President of the GA NAACP, and Poy Winichakul, counsel at the Southern Poverty Law Center, referenced specific burdens an ID requirement poses for voters of color. Exs. 81, 80 (AME_000332:14-AME_000335:13 (Woodall); AME_000109:2-AME_000111:1 (Winichakul)). Aunna Dennis, Executive Director of Common Cause Georgia, criticized the restrictions on OP voting and cited a study showing that voters of color are more likely to move within their county, increasing the chance they will vote in the wrong precinct. Ex. 77 (AME_001517:2-5, 12-24).

Legislators also discussed how the bill would disparately impact Black voters. During the EIC's Hearing on SB 202, Rep. Burnough objected to SB 202's cap on the number of drop boxes, noting that Clayton County (with a 73% Black population[22]), would likely see a reduction from nine drop boxes to one. Ex. 78 (AME_001717:24-AME_001718:5). During the House floor debates on SB 202, Rep. Burnough noted that many Georgians, disproportionately Black, cast OP provisional ballots on Election Day, for a number of reasons. Ex. 79 (AME_001885:19-AME_001886:2).[23]

---

[22] *See* U.S. Census Bureau, *QuickFacts, Clayton Cnty., Ga.*, census.gov, https://perma.cc/5A75-YHVU (captured May 30, 2023).

[23] Despite these references to the impact on Black voters, key drafters of SB 202—including Representative Fleming, Ryan Germany, Bryan Tyson and Javier Pico-Prats—dismissed the harms that would affect Black and other minority voters. For

### d. Less Discriminatory Alternatives.

In addition, the legislature had available less discriminatory alternatives to achieve its purported ends. During the legislative hearings, election officials, including the state's own expert, Lynn Bailey, supported modifying SB 202's proposed absentee ballot request deadline from 11 days to 7 or 8 days before Election Day, thereby allowing for emergency situations and an extra weekend to receive absentee ballot requests. Exs. 31, 30 (Bailey Dep. 111:25-113:13; Adams Dep. 163:3-164:11, 164:12-165:19 (11-day change opposed by election officials)); *see also* Ex. 21 (Cobb Cnty. Dep. 104:9-106:5).

Senator Dugan had announced plans to modify SB 241 to allow for voters to use SSN4 and birth date to request an absentee ballot, but this never occurred. *Supra* § II.B.1. Allowing voters to request absentee ballots using the SSN4 would have mitigated the substantial burdens imposed by the ID requirement for most of the

---

example, when Rep. Fleming asked the other drafters about statistics indicating that a significant percentage of those without ID in Georgia may be persons of color, Tyson characterized the possibility as just how "they try to spin these things," *see* Ex. 132 (Germany Text Messages, Lines 140-146). Germany texted Rep. Fleming, Tyson, and Pico-Prats as certain Democratic legislators testified during the House floor debate on HB 531. *Compare id.* (Lines 163-174 (comments about Democratic legislators)) *with* Ex. 82 (AME_000721:18-AME_000742:19 (same legislators testifying about HB 531)). Germany noted "[y]ou are forgetting that their [Democrats'] complaints are virtuous and Republican complaints are racist." Ex. 132 (Line 177). Tyson responded "Ah yes. I completely forgot about that[.] I'm a white male landowner, so that's probably why I forgot[.]" *Id.* (Lines 178-79).

243,000 voters (the majority of whom are Black) who do not have the correct DDS

ID number (if they have a number) linked to their registration. Ex. 42 (Meredith

¶ 49). Allowing SSN4 on absentee ballot requests would still allow election officials

to confirm the voter's identity. *See supra* § II.B.1; *see also* Exs. 27 (GA SOS Dep.

277:19-278:2 (county officials could use a voter's SSN to verify the identity of a

voter requesting an absentee ballot)).

Further, Section 26's drop box rule could have been modified to resemble the

original SEB emergency rule from 2020. This alternative would offer counties the

flexibility to determine how many drop boxes they needed, given population size and

the rate of absentee voting—an alternative once again supported by election officials.

*See, e.g.*, Ex. 80 (AME_000207:12-AME_000208:9). This flexibility, along with

continuing availability beyond early voting hours, would have mitigated concerns

expressed by election officials and community leaders that the changes rendered drop

boxes virtually "useless." Exs. 77, 20, 84 (AME_001627:11-19 (Adams); Woodall

Decl. ¶ 16; AME_001354:9-18). It also would have stopped the significant

elimination of drop boxes in metro-Atlanta counties, where 40% of the State's Black

population lives. Ex. 40 (Burden 4).

### d. Tenuousness and Pretext

Although States can have an interest in adopting laws to prevent voter fraud,

*see Brnovich*, 141 S. Ct. at 2348, it cannot be used as a pretext to achieve racial ends. *LWV*, 66 F.4th at 924. The debate in Georgia about alleged voter fraud in the 2020 election was racialized from the beginning and was unsupported by the facts on the ground. The legislature moved to address unfounded and racialized allegations of absentee voter fraud only after Black voters began using vote by mail more than white voters, threatening the electoral prospects of the majority party. Justifications regarding absentee voting restrictions were often "solution[s] in search of a problem," *see* Ex. 117 (Lt. Gov. Geoff Duncan, *GOP 2.0* 110 (2021)), and based on false stereotypes of voter fraud in the Black community, *supra* § II.A.4.

Drop boxes are a case in point. The proponents justified reducing the number as furthering uniformity and even "expansion" of drop box access by requiring them in every county. *See, e.g.*, Ex 79 (AME_001903:14-AME_001904:9 (Rep. Jan Jones)). But that is pretextual when juxtaposed with the decimation of drop boxes in predominantly Black counties and redirection to predominantly white ones. *See McCrory*, 831 F.3d at 226 (finding legislature's uniformity justification pretextual, where legislators admitted that the practice they restricted was offered predominantly in counties that "were disproportionately [B]lack and disproportionately Democratic" (internal quotation marks omitted)). The State's justification for limiting drop boxes to inside early voting places and hours—to make them "even more secure"—rings

equally hollow. Ex 79 (AME_001903:14-AME_001904:9). Despite hundreds of thousands of ballots cast in 2020 and 2021, the drop box rules that the SEB put in place provided a high level of security. *See, e.g.*, Ex. 34 (Harvey Dep. 75:4-19, 76:7-16 (Harvey did not have security concerns about the chain of custody process for moving ballots from drop boxes; the process "was sound and was, for the most part, well executed")). The weak rationales for targeting access of Black voting populations supports the inference of intent to disadvantage Black voters. *See McCrory*, 831 F.3d at 214 (concluding that a state's "meager justifications" for provisions that "target African Americans with almost surgical precision . . . cannot and do not conceal the State's true motivation").

SB 202's other justifications also had a racial overlay. For example, the State insisted that the ban on food and water within the 150-foot zone restored the "sanctity" of the precinct, with many worried about the "perception" of intimidation and undue, or even partisan, influence. *See, e.g.*, Exs. 57, 82, 33 (SB 202 § 2; AME_000691:8-17 (Chairman Barry Fleming); Germany Dep. 97:10-22). But this perception centered on line relief efforts in areas with significant Black populations, or precincts where Black-led organizations distributed food and water. *Supra* § II.B.3. What was a "celebration" to Black voters—voters historically excluded from the political process—became an act of perceived intimidation to the State. For instance,

the State relied on complaints from voters who saw the mere "presence" of members of Black Voters Matters (BVM) at an early voting site in Dougherty County as evidence of undue influence. *See* Ex. 13 (Germany PI Decl. Ex. F.); *supra* § II.B.3.

In addition, despite the legislature claiming SB 202 benefited election administration, *see, e.g.*, Ex. 57 (SB 202 § 2, line 4), county election officials were often left out of the drafting process, *supra* § III.A.3.d. Election officials' testimony was pre-arranged, often through Ryan Germany, and only some election officials were contacted to testify. *Supra* § III.A.3.d. When officials' opinions contradicted those of the sponsors of SB 202, the officials' opinions went ignored. *See supra* § III.A.3.d. (election officials' requests for a 7- to 8-day deadline; concerns about drop boxes' usefulness when they are only placed inside). Most notably, when Tonnie Adams of GAVREO took the unprecedented step of collecting and sharing with legislators county election officials' distinct concerns about many of the election proposals, these too went unheeded. *Supra* § III.A.3.a.

Some of supporters' justifications were also based on incorrect data. Supporters frequently claimed that the number of OP voters had sharply increased. *See, e.g.*, Exs. 57, 77 (SB 202 § 2, lines 131-32 (SB 202 preamble states, "The number of duplicated ballots has continued to rise dramatically from 2016 through 2020 . . ."); AME_001518:20-24). But State-produced data show only about 8,200

OP votes cast in 2020, an actual decline from 2018. *See* Ex. 128 (Pls. Dep. Ex. 168).

### 4. The Totality of Circumstances Confirm that the Challenged Provisions of SB 202 Violate Section 2 of the VRA

As discussed above, the record of racially discriminatory intent here is well beyond that recognized in *LWV*. *See* 66 F.4th 905. Although not necessary to prove a constitutional claim, courts have recognized that, for an intent claim under Section 2 of the VRA, the "Senate Factors" can be relevant. *See, e.g., United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). These factors were identified in the Senate Report accompanying the 1982 VRA amendments and draw upon constitutional cases such as *White v. Regester*, 412 U.S. 755 (1973). S. Rep. No. 97-417 at 27-30; *see also Hall v. Holder*, 117 F.3d 1222, 1226 n.5 (11th Cir. 1997) ("The evidence relevant to determining whether a discriminatory impact exists under § 2 overlaps substantially with the evidence deemed important in *Lodge*[, 458 U.S. 613.]"). They are typically cited in proving Section 2 results claims. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986). Several Senate Factors apply to the facts of this case, and overlap with the *Arlington Heights* factors, including Georgia's history of official discrimination in voting (Senate Factor 1); the presence of racially polarized voting (Senate Factor 2); socioeconomic disparities in education, employment, and health borne by the minority community (Senate Factor 5); and the tenuousness of the justifications provided for the challenged provisions (Senate Factor 9). *See id.*

Georgia's history of discrimination against Black Georgians is long-standing, well documented, and judicially-recognized. *See, e.g.*, *Wright*, 301 F. Supp. 3d at 1323-24. Even in recent years, discriminatory electoral systems have continued to impede equal political participation. *See, e.g.*, *Rose v. Raffensperger*, 619 F. Supp. 3d 1241, 1268 (N.D. Ga. 2022) (finding "Georgia's statewide, at-large system for electing [Public Service Commission] members dilutes the votes of Black Georgians in violation of the VRA."); *Whitest v. Crisp Cnty. Ga. Bd. of Educ.*, 2021 WL 4483802, at *5 (M.D. Ga. Aug. 20, 2021), *appeal dismissed sub nom. Whitest v. Crisp Cnty. Sch. Dist.*, 2022 WL 892534 (11th Cir. Feb. 3, 2022) (finding "Black voters in Crisp County have less opportunity than white voters to elect candidates of their choice to the Board of Education"). This history of official discrimination is relevant under Section 2 of the VRA because of its lasting effects on socioeconomic conditions and political participation. *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1307 (11th Cir. 2020) (citing *Marengo Cnty. Comm'n*, 731 F.2d at 1569); *see also* Ex. 49 (Clark 2-14) (describing interrelation between historical discrimination, socioeconomic variables, and political participation in Georgia)). Even after *de jure* prohibitions on registration and voting were removed, Black Georgians have voted at substantially lower rates than white Georgians. Ex. 40 (Burden 10 Tbl. 4).

As to other Senate factors covered previously in this brief, voting in Georgia is polarized along racial lines, with Black voters overwhelmingly supporting candidates not preferred by white voters, often with 90% or more of their vote. *See, e.g.*, Exs. 40, 48 (Burden 6 Tbl. 1; Palmer 7-11 & Figs. 1-2); *supra* § III.A.1.a. The existence of racially polarized voting provides the motive for the majority party in the Georgia legislature to target the ways in which Black voters cast ballots. *See McCrory*, 831 F.3d at 222 (recognizing that racially polarized voting "does provide an incentive for intentional discrimination in the regulation of elections"); *see also LULAC*, 548 U.S. at 427-28 (in a vote dilution case, explaining how racially polarized voting, coupled with an "increase in Latino voter registration and . . . the concomitant rise in Latino voting power . . . were the very reasons that led the State to redraw the district lines").

Disparities in economic and educational opportunities for Black Georgians, rooted in the State's history of discrimination, mean the burdens of SB 202 will fall more heavily on Black voters. *See supra* § III.A.1. And the tenuousness of SB 202's justifications ("a solution in search of a problem," Ex. 117 (Lt. Gov. Geoff Duncan, *GOP 2.0* 110 (2021))) indicate that a racial motivation was the real motive behind the bill, particularly in light of the December 2020 hearings. *See supra* § III.A.3.d.

All relevant evidence, considered together, leads to one conclusion: that the challenged provisions of SB 202 were adopted with a discriminatory purpose to

impede Black voters because those voters were exercising growing electoral power in Georgia, and that SB 202's challenged provisions have a discriminatory impact on Black voters in violation of Section 2 of the VRA and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Plaintiffs are likely to succeed on the merits.

### B.   Without a Preliminary Injunction, Black Voters Will Suffer Irreparable Harm

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). It is well-settled in the Eleventh Circuit that an infringement on the fundamental right to vote constitutes an irreparable injury. *See Jones v. Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020); *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1320 (N.D. Ga. 2020). Here, the risk of irreparable injury were SB 202's challenged provisions to remain in place is "actual and imminent," and in many ways has already occurred. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

As set forth at length in Section III.A.1, *supra*, Black voters have suffered substantial and disproportionate impairment to the right to vote due to SB 202. Further, Plaintiffs need not show that Black voters are completely denied access to the ballot, or that SB 202 makes it "impossible" for them to vote. *See LWV of N.C.*, 769 F.3d at 243. Section 2 prohibits both denial and *abridgement* of the right to vote,

52 U.S.C. § 10301(a), and the burdens imposed by SB 202 will bear more heavily on Black voters. Moreover, any impairment is likely to have a ripple effect, because "denial of equal access to the electoral process discourages future participation by voters." *United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003). Particularly when minority voters have been "becoming more politically active," *LULAC*, 548 U.S. at 438-39, it violates Section 2 and the Constitution for a state to alter the very elements of the election system they rely on and to place new obstacles in their way. Plaintiffs satisfy the irreparable injury prong of the preliminary injunction test.

### C.   The Balance of Equities and the Public Interest Weigh in Favor of Issuing a Preliminary Injunction

The balance of equities and public interest prongs weigh in favor of issuing a preliminary injunction. On balance, the Plaintiffs' interest in protecting the voting rights of eligible Black citizens and prohibiting the use of voting practices or procedures that will violate the Constitution and VRA outweighs Defendants' interests in maintaining the discriminatory provisions of SB 202 challenged here. *See United States v. Metropolitan Dade Cnty.*, 815 F. Supp. 1475, 1478 (S.D. Fla. 1993) (finding that the harm to voters outweighed the harm to the county in complying with court-ordered relief and injunction was in the public interest).

Because Defendants' articulated interest in the "integrity" of their elections is

based on a faulty premise of election fraud by Black voters, *supra* § III.A.3, and is

not significantly advanced by the challenged provisions without significant burdens

to voters, *supra* § III.A.1, the State's interests must yield to Plaintiffs' and the

public's overriding interest in preventing the use of racially discriminatory electoral

mechanisms and procedures. *Arlington Heights*, 429 U.S. at 265 ("racial

discrimination is not just another competing consideration"); *see Jacksonville Branch

of NAACP v. City of Jacksonville*, 2022 WL 7089087, at *53 (M.D. Fla. Oct. 12,

2022) (finding that administrative burdens of redistricting do not "outweigh the

grievous constitutional harm to the voters of Jacksonville"). Indeed, the State could

have achieved its purported ends without imposing the racially discriminatory harms

visited by the challenged provisions of SB 202, and the targeted relief sought by

Plaintiffs will mitigate those harms.

   The protection of the fundamental right to vote "is without question in the

public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355

(11th Cir. 2005). To that end, "Section 2 is a national public directive for immediate

removal of all barriers to equal participation in the political process." *Harris v.

Graddick*, 593 F. Supp. 128, 136 (M.D. Ala. 1984); *see also* 52 U.S.C. § 10308(d).

As detailed above, SB 202 was adopted with a racially discriminatory purpose and

will result in Black voters having less opportunity to participate equally in the

political process. Granting an injunction would advance the public interest by preventing the continued implementation of a law that violates Section 2 and the Constitution. *See Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (granting preliminary injunction because "when Section 2 is violated the public as a whole suffers irreparable injury [and] . . . [t]he public interest, therefore, mandates the relief afforded").

Permitting Georgia's 2024 election cycle and elections thereafter to occur under the challenged provisions would place the burdens intentionally on those Congress sought to protect under the VRA: citizens subject to a long history of racial discrimination in voting. *See, e.g.*, *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (finding that the administrative and financial burdens on defendant were minimal, especially weighed against "the potential loss of [the] right to vote").

### D.    The *Purcell* Doctrine Does Not Preclude the Requested Relief

The next statewide federal election will be the March 12, 2024 presidential preference primary. With the election many months away, the *Purcell* doctrine does not preclude granting the relief sought. *See generally Purcell v. Gonzalez*, 549 U.S. 1 (2006); Order, ECF No. 241 at 62-73. Because trial in this case has not been set, and because summary judgment is not the appropriate vehicle to address factually

intensive intent-based claims, *see Cromartie*, 526 U.S. at 549, Plaintiffs bring this motion now, before *Purcell* considerations could even arguably come into play, to ensure that relief can be implemented in time for the 2024 election cycle.

## IV.   THE SCOPE OF RELIEF SOUGHT

For the reasons outlined above, and to address the race-based harms caused by SB 202, Plaintiffs seek the following targeted injunctive relief to: (1) enjoin SB 202's limitations on the number of drop boxes a county may use to collect absentee ballots and other limitations on the use of drop boxes outdoors and during non-early voting hours (Section 26 of SB 202); (2) enjoin the enforcement of provisions criminalizing non-partisan line relief of food and water to voters waiting in line (Section 33); (3) enjoin the provisions that prohibit voters from requesting absentee ballots up to four days before Election Day (Section 25); (4) enjoin the prohibition on counting out-of-precinct provisional ballots cast before 5:00 p.m. on Election Day (Section 34); and (5) permit voters who request an absentee ballot to confirm their identity using SSN4, in lieu of a DDS ID (Section 25). The last provision allows the State to maintain most of its current system for confirming the identity of absentee voters while mitigating the harm caused by SB 202's ID requirements.

## V.   CONCLUSION

Plaintiffs respectfully request an evidentiary hearing on this motion and that their Motion for Preliminary Injunction be granted.

Date: May 30, 2023

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

/s/ Aileen Bell Hughes
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

KRISTEN CLARKE
Assistant Attorney General

ELISE BODDIE
Principal Deputy Assistant
Attorney General
Civil Rights Division

/s/ Jasmyn G. Richardson
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS IV
JASMYN G. RICHARDSON
RACHEL R. EVANS
ERNEST A. MCFARLAND
MAURA EILEEN O'CONNOR
ELIZABETH M. RYAN
SEJAL JHAVERI
J. ERIC RICH
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.139
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
jasmyn.richardson@usdoj.gov

Attorneys for the United States of
America

/s/ Pichaya Poy Winichakul
Bradley E. Heard (Bar No. 342209)
bradley.heard@splcenter.org

/s/ Leah C. Aden
Leah C. Aden*
laden@naacpldf.org

66

Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
Matletha N. Bennette*
*matletha.bennette@splcenter.org*
SOUTHERN POVERTY
LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Jess Unger*
*jess.unger@splcenter.org*
Sabrina S. Khan*
*sabrina.khan@splcenter.org*
SOUTHERN POVERTY
LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

/s/ Adam S. Sieff
Adam S. Sieff*
*adamsieff@dwt.com*
Daniel Leigh**
*danielleigh@dwt.com*
Brittni A. Hamilton*
*brittnihamilton@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew R. Jedreski*
*mjedreski@dwt.com*
Grace Thompson*
*gracethompson@dwt.com*

Alaizah Koorji*
*akoorji@naacpldf.org*
John S. Cusick*
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte*
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Washington, DC 20005
Telephone: (202) 682-1300

/s/ Debo P. Adegbile
Debo P. Adegbile*
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt*
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese*
*george.varghese@wilmerhale.com*
Stephanie Lin*
*stephanie.lin@wilmerhale.com*
Arjun K. Jaikumar*
*arjun.jaikumar@wilmerhale.com*
Mikayla C. Foster*

Danielle E. Kim*
daniellekim@dwt.com
Kate Kennedy*
katekennedy@dwt.com
Shontee Pant*
ShonteePant@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett*
davidgossett@dwt.com
Courtney DeThomas*
courtneydethomas@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

mikayla.foster@wilmerhale.com
Sofia C. Brooks*
sofie.brooks@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania C. Faransso*
tania.faransso@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce*
nana.wilberforce@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, and The Arc of the United States*
*Admitted pro hac vice        **Application to be admitted pro hac vice forthcoming*

/s/ Sophia Lin Lakin
Sophia Lin Lakin*
slakin@aclu.org
Davin M. Rosborough*
drosborough@aclu.org
Jonathan Topaz*

/s/ Rahul Garabadu
Rahul Garabadu (Bar 553777)
rgarabadu@acluga.org
Caitlin May (Bar 602081)
cmay@acluga.org
Cory Isaacson (Bar 983797)

jtopaz@aclu.org
Dayton Campbell-Harris*
dcampbell-harris@aclu.org
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner*
smizner@aclu.org
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick*
bdimmick@aclu.org
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

cisaacson@acluga.org
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

*Attorneys for Plaintiffs*
*Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, and Southern Christian Leadership Conference*

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Laurence F. Pulgram (pro hac vice)
lpulgram@fenwick.com
Molly Melcher (pro hac vice)
mmelcher@fenwick.com
Armen Nercessian (pro hac vice)
Anercessian@fenwick.com
Ethan Thomas (pro hac vice)
EThomas@fenwick.com

Jon Greenbaum (pro hac vice)
*jgreenbaum@lawyerscommittee.org*
Ezra D. Rosenberg (pro hac vice)
*erosenberg@lawyerscommittee.org*
Julie M. Houk (pro hac vice)
*jhouk@lawyerscommittee.org*
Jennifer Nwachukwu (pro hac vice)
*jnwachukwu@lawyerscommittee.org*
Heather Szilagyi (pro hac vice)
*hszilagyi@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
Neil Oxford (pro hac vice)
Gregory Farrell (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
Telephone: 415.875.2300

Joseph S. Belichick (pro hac vice)
jbelichick@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone: 650-988-8500

Catherine McCord (pro hac vice)
cmccord@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: (212) 430-2690

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia
Coalition for the People's Agenda, Inc., League of Women Voters of Georgia,
Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and
Lower Muskogee Creek Tribe*

*/s/ Kurt Kastorf*
Kurt Kastorf (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: 404-900-0330
kurt@kastorflaw.com

Clifford J. Zatz*
Justin D. Kingsolver*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004

Judith Browne Dianis*
Matthew A. Fogelson*
Angela Groves*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
JBrowne@advancementproject.org
AGroves@advancementproject.org
MFogelson@advancementproject.org

Telephone: (202) 624-2500
CZatz@crowell.com
JKingsolver@crowell.com
WTucker@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted *pro hac vice*
Attorneys for Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta,
Inc., The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union,
Inc., First Congregational Church, United Church of Christ Incorporated,
Georgia Latino Alliance for Human Rights, Inc.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Jacob D. Shelly*
Spencer Klein*
Melinda K. Johnson*
Tina Meng Morrison*
Marcos Mocine-McQueen*
Samuel T. Ward-Packard*
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
sklein@elias.law
mjohnson@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
swardpackard@elias.law

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com

*Admitted *pro hac vice*
*Attorneys for New Georgia Project Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)**

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was

prepared in Times New Roman 14-point font in compliance with Local

Rule 5.1(C).

*/s/ Jasmyn G. Richardson*
JASMYN G. RICHARDSON
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Jasmyn G. Richardson*
JASMYN G. RICHARDSON
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice