EXHIBIT
1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |

## Declaration of Representative Rhonda Burnough

I, Rhonda Burnough, hereby declare as follows:

1.  I am a resident of Clayton County, a registered voter, and the elected representative of Georgia's House District 77, which includes portions of Clayton County.  House District 77 is comprised of a majority of Black voters.

2.  I was first elected into the Georgia House of Representatives in 2016 and have served three two-year terms in office.

3.  I am also the Chair of the Clayton County Delegation in the Georgia General Assembly.  All of the members of that Delegation are Black Democrats.

4.  I currently serve on the following committees in the Georgia House of Representatives: Special Committee on Election Integrity; Governmental Affairs; Economic Development & Tourism; Higher Education; and Small Business Development.

1

**Background**

5.    I have lived in Georgia for over twenty years. I began representing and advocating on behalf of Clayton County long before being elected to the Georgia General Assembly. As a dedicated public-school administrator, I created and implemented a number of programs that have enriched the quality of education received by students in the state. I spearheaded the DAY ONE initiative, which promotes the importance of beginning the academic year with a positive attitude and a willingness to learn, and the Celebrity Reader program, where community leaders read to students.

6.    I have always strived to serve my community, including the large Black community in Clayton County. I founded several community organizations, including 500 Men Standing in the GAP, a volunteer program that encourages fathers and men to become actively involved in the lives of their children and others in the community. I am also a member of Delta Sigma Theta Sorority, Inc., a historically Black sorority dedicated to public service, particularly in our local Black community.

7.    During my time as Representative, District 77 has remained a majority-Black legislative district.

8. Since becoming a Representative, I have served on the two House committees that consider election-related bills—the Governmental Affairs Committee and the recently formed Special Election Integrity Committee.

9. Given all of these roles, including House Representative, public school administrator, community leader, as well as my specific consideration of Georgia's election-related bills on both the Governmental Affairs and Special Election Integrity Committees, I am able to discuss the racial discrimination motivating the passage of Senate Bill 202 (SB 202) and the disproportionate harm on Black voters in and around Clayton County.

**Black Political Mobilization in Georgia**

10. As the home of many civil rights heroes, Georgia has always been a center for voter mobilization; but Black Georgians really increased and expanded their voter engagement efforts over the last decade. Many Black-led organizations and leaders have helped to turn out voters of color in diversifying areas of Georgia, like the metro-Atlanta area. These organizations have created a celebration around in-person voting by offering food, water, and music at the polling places, particularly those with long lines and in communities of color.

3

11.  For example, in June 2020, a few black community leaders organized a
     March to the Polls.  Carrying signs, the participants marched from the
     Board of Commissioners Headquarters in Jonesboro to the Historic
     Clayton Courthouse, an early voting site.  The participants cheered as
     voters exited the Courthouse after casting their ballot.  During the
     November 2020 election cycle, members of the Clayton County chapter of
     Alpha Phi Alpha Fraternity, Inc. stood on busy street corners with signs
     encouraging voters to early vote and handed out complimentary snacks and
     water to voters waiting in line.  I even remember an adorable Black Girl
     Scout Troop passing out drinks at the polls in November 2020.

12.  At the same time, Black candidates have coordinated major political
     campaign efforts in Georgia.  The Obama Presidential campaign, in 2008
     and 2012, and Stacey Abrams' gubernatorial campaign, in 2018, really
     turned out Black voters, as well as other voters of color and young voters.
     Stacey Abrams, our former House Democratic leader, had a major
     grassroots campaign in 2018 that focused on knocking on doors and
     sending absentee ballot applications to voters.

13.  These third-party groups, and Democratic campaigns, recently shifted their
     focus to mail-in absentee voting.  During the COVID-19 pandemic, many

4

Black Americans, particularly older Black Americans, were concerned

about being exposed to the virus by voting in-person. So, they opted to

vote by mail. In June 2020, the Secretary of State sent absentee ballot

applications to all active voters. That incentivized many Black voters, who

had traditionally preferred to vote in person, to mail in their ballots. Many

continued to vote by mail in the November 2020 election and January 2021

runoff election.

14. These efforts led to strong turnout, especially for Black voters. I believe

that all of those voter engagement efforts and events led to the big victories

in November 2020, including the election of our first Black and Asian-

American Vice President, Kamala Harris, and Reverend Warnock, the first

Black Senator in Georgia.

15. These were huge Democratic wins, but those victories were not just about

the Party. Because most Black voters in Georgia support Democrats, the

increased voter efforts in the Black community have unsurprisingly

benefitted and been supported by the Democratic Party. Even so, the wins

in 2020 were tied to a coalition of legislators, voters, and social justice

groups that mobilized Black voters, voters of color, and young voters in

Georgia. We were proud of what we had accomplished as a community.

5

Political attacks on the legitimacy of our votes immediately followed the November 2020 election.

**Aftermath of the 2020 Election**

16. Following the November 2020 election, the former President, members of the President's campaign team, and some Republican legislators and voters in Georgia insisted that there had been widespread election and voter fraud in the election. They alleged that Democrats cheated, and in doing so, implied that Black voters cheated by focusing on areas with high Black populations and concentrations of Black voters. They focused on Fulton County and other areas where there are significant number of Black voters, and blamed mail-in voting, which we as a community had started using more and more.

17. The Secretary of State conducted recounts and audits that disproved the allegations, but the madness continued. State officials received death threats over the voter fraud accusations. Law enforcement remained stationed around my home at the same time Republican legislators coordinated voter fraud-related hearings in the state legislature.

18. The Governmental Affairs Committee held two hearings in December 2020 that were related to these voter fraud accusations. I attended both of

6

those hearings.  The first hearing, on December 10, actually included members of the Trump campaign, like Rudy Giuliani.  Although I suspected they would attend, the official notice for the hearing, which we received a few days before the hearing, did not list any specific speakers.

19. The December 10, 2020 Governmental Affairs Committee hearing was a circus and seemed staged.  The speakers speculated about different ways mail-in ballots could have been fraudulently casted and told stories of voting machines being manipulated.

20. The Secretary of State, who had certified the results of the Nov. 2020 election through multiple recounts, did not attend.  The Committee members were given little time to ask questions.  I do not recall receiving any materials related to the hearing.  To this day, I do not know how the hearing was organized.

21. On December 23, 2020, the Governmental Affairs Committee held another hearing to discuss alleged irregularities in the November 2020 election.  This hearing was attended by the Secretary of State (SOS) and other leaders from his office.  To my surprise, the SOS officials suggested that an excuse should be required for absentee ballot voting because not requiring one could open the door to illegal voting.

7

22. To me, these hearings were about stopping Democratic wins by implying that absentee voters—that included more and more Black voters, Asian voters, and voters of color —had cheated, and election reform was needed. Republican leaders wanted to change the rules of the game just when we had learned how to win.

## Special Election Integrity Committee

23. From the start of the 2021-2022 Georgia General Assembly Legislative Session, Republican leaders used unusual legislative tactics to change the election code and pass restrictive voting bills. The formation of the Special Election Integrity Committee was the first step.

24. In 2021, the Speaker of the House organized a special committee to address election security, accessibility, and confidence, even though the Governmental Affairs Committee already addressed those same issues.

25. Proponents of SB 202 have said that this bill seeks to resolve some of the voter suppression issues highlighted in the 2018 election. However, I do not recall a select special committee being assembled following the real election-day problems like long lines that occurred in 2018 and other concerns about voter access that community members, especially Black voters, had raised with the General Assembly for years. Only after strong

8

turnout by Black voters and other voters of color, and the historic wins in November 2020 and January 2021, was this special committee convened.

26. Representative Barry Fleming was named as Chair of the Special Election Integrity Committee and not Shaw Blackmon, the current Chair of the Governmental Affairs Committee.

27. In total, fourteen Representatives served on the Special Election Integrity Committee during the 2021-2022 Legislative Session—ten Republicans and four Democrats.

28. The Speaker placed multiple Republican members from the Governmental Affairs Committee on the Special Election Integrity Committee, but none of my Democratic colleagues from the Governmental Affairs Committee, who would have experience with election-related bills, were selected to serve on the special committee with me. Representative Fleming told me that I was selected because I would hold my position but be respectful.

29. The Special Election Integrity Committee considered nearly fifty bills during the 2021-2022 Legislative Session, a significant increase in the amount of election-related bills introduced in a single legislative session. Many of the bills were lengthy and proposed major changes to the election code—from removing the Secretary of the State as a voting member of the

State Election Board to new identification requirements for absentee voting. Vetting these bills was difficult, especially since the Democrats on the Special Election Integrity Committee were outnumbered and largely shut out of the drafting process. At one point during the legislative session, Cobb County Elections Director Janine Eveler reached out to the Democratic members of the Special Election Integrity Committee with a question about a proposed election bill that we had not even received yet.

30. The Republican leaders were intent on passing sweeping election bills that legitimized the voter fraud narrative from the November 2020 election. Without the votes, access to the drafting process, and substantial time to study and vet the proposed changes to the election code, my Democratic colleagues and I were at a disadvantage in examining and suggesting changes to these proposals. Equally important, this prevented us from ensuring meaningful public dialogue during committee hearings. Nevertheless, we, alongside many organizations that represent voters of color, continued to point out the disparate impact posed by many of the bills.

**HB 531**

31. Before SB 202 was passed by the Senate and heard by our committee, we had to contend with House Bill 531 (HB 531). This major election bill,

which started as 48 pages and ended with 66 pages, was introduced to the Special Election Integrity Committee on February 18, 2021 and with little notice. HB 531 took multiple portions of other bills and created one omnibus bill. HB 531 instituted new identification requirements for mail-in voting, prevented county election offices from receiving private grants, and required that drop boxes be located indoors at early voting sites and that they could only be used during voting hours. All of these provisions would be incorporated into SB 202.

32. One very controversial provision in HB 531 mandated that counties have the same early voting dates and times, with one mandatory Saturday and only one additional Saturday or Sunday during the first weekend. That provision effectively eliminated one Sunday of early voting, which would have hurt Black voters' Souls to the Polls efforts. This "uniformity" measure also ignored the fact that each County's early voting needs differ based on population and election resources. Fulton County and other metropolitan counties would probably need more early voting hours than smaller rural

areas, a point I recall Tonnie Adams, Heard County Elections Director, making during the hearings on HB 531.[1]

33. HB 531 also eliminated out-of-precinct voting.

34. The overall legislative process surrounding HB 531 was rushed and non-transparent, similar to SB 202.  First, to my knowledge, no Democrats were involved in the drafting of this significant bill.  Second, the bill was not made publicly available until the day of the hearing.  In fact, the bill was filed in the House Hopper on the same day it was introduced in Committee.  Third, as I mentioned during the February 18th hearing on the bill,[2] it was unclear which election officials Chairman Fleming and other supporters of the bill had spoken with to devise this bill.  Yet many of the justifications for the bill's provisions were based, allegedly, on correcting election administration issues.   Fourth, the rules for virtual testimony, during the pandemic, remained unclear and Chairman Fleming provided what appeared to be inconsistent guidance.  During the Feb. 19th hearing on the bill, Chairman

---

[1]  Georgia General Assembly, *House Special Committee on Election Integrity*, https://livestream.com/accounts/25225474/events/8729747/videos/217751717 (Feb. 19, 2021) at 5:02:14.

[2]  Georgia General Assembly, *House Special Committee on Election Integrity*, https://livestream.com/accounts/25225474/events/8737135/videos/217721873 (Feb. 18, 2021) at 45:20.

Fleming featured guests, like former Richmond County Board of Elections Director Lynn Bailey, via Zoom. However, the speakers from local community groups did not know how or if other members of the public could testify in the same manner.

35. Finally, the Chairman was constantly introducing substitute bills for HB 531 and did not make these substitute bills available in a timely manner, causing confusion for Democratic colleagues and members of the public. Often, the substitute bill would contain significant new provisions that were taken from smaller election bills that may or may not have been discussed by a member's subcommittee.

36. The Special Election Integrity Committee had two subcommittees, and Committee members served on one of the two subcommittees; both subcommittees met a few times in February and March of the Legislative Session. In subcommittee, we considered smaller election bills that often were subsequently merged into the larger election bills considered by the full Special Election Integrity Committee. Those smaller bills were not always presented to the full Committee, which was not typical and prevented members of one subcommittee from fully vetting bills heard in the other subcommittee.

37. Sometimes, Chairman Fleming would even describe the changes that we could *expect* to see in a substitute bill without actually providing the bill, and then ask us if we had any questions, even though the bill was not before us. So, for example, Chairman Fleming first introduced HB 531 during the February 18 Committee hearing. The Committee met again on February 19th to discuss HB 531 and heard testimony from several members of the public. Only after that hearing occurred was a substitute bill circulated, and, as I recall, it was not made publicly available on the General Assembly website until the day of the next hearing on February 22nd. The Chairman started the February 22nd hearing by jumping around the substitute bill to explain the new provisions,[3] and then describing even more changes to come in another substitute bill that we could expect to receive later that evening.[4]

38. In total, the Special Election Integrity Committee met five times to discuss HB 531 (February 18, 19, 22, 23, and 24). However, the bill was continuously changing. Even during the last hearing, Representative

---

[3] Georgia General Assembly, *House Special Committee on Election Integrity*, https://livestream.com/accounts/25225474/events/8729747/videos/217887713 (Feb. 22, 2021) at 1:42.

[4] Georgia General Assembly, *House Special Committee on Election* Integrity, https://livestream.com/accounts/25225474/events/8729747/videos/217887713 (Feb. 22, 2021) at 9:47.

Blackmon presented major new provisions, including removing the Secretary of State as a voting member of the State Election Board, in a substitute bill.[5]

39. During the hearings on HB 531, several witnesses discussed the burdens and discriminatory impact behind by the bill.  For example, Cindy Battles, Policy and Engagement Director for Georgia Coalition for the People's Agenda, discussed how the bill's reduction of early voting hours, the narrowing of the time frame to request absentee ballots, and changes to drop box availability would make it harder for voters, especially those who work, to vote and likely make lines longer on election day, a problem that had been corrected later in 2020.  She added that the prohibiting, or restricting, of Sunday voting seemed like a direct attack on the Black community.[6]

40. It is true that HB 531, as well as SB 202, included some provisions and ideas that were typically supported by Democrats, like the provision that required more staff, equipment, or polling places in large precincts with long lines

---

[5] Georgia General Assembly, *House Special Committee on Election* Integrity, https://livestream.com/accounts/25225474/events/8737135/videos/217977595 (Feb. 24, 2021) at 3:54.

[6] Georgia General Assembly, *House Special Committee on Election Integrity*, https://livestream.com/accounts/25225474/events/8729747/videos/217751717 (Feb. 19, 2021) at 15:12.

during the preceding general election.  However, these omnibus bills added so many restrictive measures that the bills as a whole no longer reflected Democratic ideals, like increasing voter access.

41. To me, those Democratic provisions were inserted into the major Republican-sponsored election bills so that the Republicans could claim these bills were bipartisan measures.  They were not bipartisan measures because Democrats were blocked from the drafting process.  The bills' foundation was not bipartisan.

42. I, alongside every Black Representative of the Georgia General Assembly, voted against HB 531 when it passed out of the House on March 1, 2021, before Crossover Day.

**S.B. 202**

43. Senate Bill 202 was introduced in the Special Election Integrity Committee on March 17, and I do not recall receiving the bill's text until about an hour before the hearing.  During the March 17 hearing, I noted that Senator Max Burns, the sponsor of the initial version of SB 202, did not present the bill, as is typically done.  Instead, Chairman Fleming discussed the bill, while Senator Burns sat in seats reserved for the public.  Questions about the bill

were directed to Chairman Fleming instead of Senator Burns. Traditionally, questions would have been directed to the sponsoring legislator.

44. As Chairman Fleming reviewed the new version of SB 202, it became apparent that Republican members of our Committee had taken Senator Burns' three-page bill, which established a fine system for third-party groups that mail duplicative absentee ballot applications, and loaded it up with various election restrictions, to create a ninety-page election bill. The fuller version of SB 202 contained provisions from HB 531, and new election provisions—like the limiting of the ability of the State Election Board and the Secretary of State to enter into certain consent agreements, settlements, and consent orders, as well as the ability of individuals to bring an unlimited number of challenges to voter registrations or eligibilities.

45. Members of the public who attended that first hearing on SB 202 also appeared to be caught off guard. They were there to discuss Senate Bill 241, the Senate's version of HB 531. The fuller version of SB 202 had not been posted on the Georgia General's website by that time, and still had not been posted on the website by the next Committee hearing on March 18.

46. I believe the fuller version of SB 202 deserved more vetting, even if many provisions in the bill had appeared in HB 531. First, I do not believe that

17

we had substantially vetted HB 531 before it was passed out of Committee. Second, nearly fifty election bills had been introduced during the 2021-2022 Legislative Session, which lasts just 40 legislative days, and many of those bills were lengthy election reforms. We were trying to track many moving pieces. So, knowing that many provisions from HB 531 were put into SB 202 did not change my concerns about the new provisions within or modifications to the bill and getting the time to review those changes.

47. As with SB 202, many speakers during the hearings emphasized the negative impact the bill would have on voters of color. For example, Aunna Dennis, Executive Director of Common Cause Georgia, discussed how voters of color and low-income voters are more likely to move within their county, which increases the likelihood that they will vote in the incorrect precinct.[7] SB 202's restriction of out-of-precinct voting would disproportionately impact those voters.

48. I objected to SB 202's cap on the number of drop boxes. I noted that in Clayton County, nine drop boxes were used in 2020. SB 202 would reduce the number of permissible drop boxes to one drop box in our County. A

---

[7] Georgia General Assembly, *House Special Committee on Election Integrity*, https://livestream.com/accounts/25225474/events/8729747/videos/218933436 (Mar. 18, 2021) at 29:14.

similar reduction would occur in large counties, like Fulton County. For years, Fulton County had been the "whipping boy" of the Governmental Affairs Committee. Members of that Committee focused on constant election-day issues like long lines in Fulton County. Drop boxes had helped to reduce long lines in November 2020 and January 2021. Without adequate drop box options, long lines would resume and voting access would worsen.

49. In total, only three hearings were held on Senate Bill 202, starting with the hearing on March 17. The bill passed out of Committee on March 22nd and was debated on the floor and passed by the House on March 25. Similar to the hearings for HB 531, we received substitute bills containing new provisions for SB 202 at the last minute.

50. Like HB 531, SB 202 passed along Party lines and no Black Representative voted for the bill.

51. The changes in SB 202 had clear political motivations. After Democrats won big in November 2020 and January 2021, the Republican Party implemented huge election changes that focused on mail-in voting.

52. To me, there was also a racial motivation behind the bill. The types of changes that were being emphasized or considered—drop box reductions that impacted larger counties in and around Atlanta, more restrictions around

the absentee voting process, reducing early voting periods, including Sunday voting, restricting food and water distribution around the polling place, and even eliminating Fulton County's mobile voting—reveal the racial intent. These changes were focused on the ways that community leaders, Democrats, and the counties with diverse populations had increased Black, Asian, and Hispanic voter turnout in November 2020.

53. The administrative justifications for many of these changes seemed too convenient. I do not recall, for example, hearing from my local election officials about the burdens of processing out-of-precinct ballots, or the concerns about "ballot harvesting" around drop boxes. During the hearings, we heard from just a few election officials. I think the real reason for many of the provisions of SB 202 was to carry on the myth of widespread voter fraud and make it harder to vote for Black voters and voters of color.

54. This declaration is not intended to capture all of my knowledge or experiences that may be related to this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 2, 2022.


Representative Rhonda Burnough