# EXHIBIT 40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF GEORGIA; *et al.*, <br><br> Defendants, <br><br> THE REPUBLICAN NATIONAL COMMITTEE; *et al.*, <br><br> Intervenor-Defendants. | Civil Action No. 1:21-CV-2575-JPB |

**DECLARATION OF DR. BARRY C. BURDEN**

## I.     Purpose of the Report

I was asked by counsel representing the U.S. in this case to consider the potential effects of several challenged provisions of Georgia Senate Bill 202 (2021) ("SB 202") on Black and white voters in Georgia.

The provisions of SB 202 the United States challenges include: a ban on proactive mailing of absentee ballot application by governmental agencies, limits placed on mailing of absentee ballot applications by private parties, new identification requirements for requesting an absentee ballot, a narrowed window of time to request an absentee ballot, restrictions on usage of drop boxes to collect ballots, a ban on the distribution of food and drink to voters waiting in line to vote, and a ban on counting ballots that are cast out of precinct but within the proper county prior to 5:00 p.m. on Election Day. In this report I address several of the challenged provisions, focusing on ones where highly reliable data are available and/or on which other experts involved in this case are not opining.

My report is organized as follows.

1

In Section II, I provide information about my background and materials used in this case.

In Section III, I describe the role of race in the electoral environment in Georgia before SB 202 was enacted. I show that racially polarized voting is prevalent and that eligible Black residents of Georgia have registered and voted at lower rates than their white counterparts.

In Section IV, I investigate patterns of absentee voting by mail. I show that SB 202 was enacted soon after Black voters became more likely than white voters to cast absentee ballots and that Black voters have suffered from higher absentee ballot rejection rates before and after SB 202.

In Section V, I provide a detailed study of the timing of when voters returned absentee ballots. The data again show that Black voters were disproportionately likely to submit absentee ballots in the elections that preceded enactment of SB 202 and were more likely than white voters to return absentee ballots in the final four days before election day when drop boxes are now outlawed.

In Section VI, I document that Black voters in Georgia have experienced longer waiting times to vote than have white voters, a disparity that may be worsened now that absentee voting is more difficult.

In Section VII, I describe sociodemographic differences between Black and white voters that bear on the ability to navigate additional burdens on the voting process imposed by SB 202. I show that Black Georgians generally have fewer resources than do white Georgians to facilitate voter participation and experience more residential instability.

In Section VIII, I investigate the racial impacts of SB 202's limits on drop boxes. SB 202 depletes drop boxes of their most useful qualities, targets reductions in drop box locations at more populous counties with larger Black populations, and eliminates days of usage when Black voters were more likely to submit absentee ballots.

In section IX, I analyze the near ban of counting out-of-precinct provisional ballots, a practice used more by Black voters. In combination with the resource disparities and greater residential mobility of Black voters, the severe limits on counting out-of-precinct ballots will present more difficulties for Black voters than white voters.

Section X summarizes my opinions.

## II.     Background, Preparation, and Materials Reviewed

I am a Professor of Political Science and hold the Lyons Family Chair in Electoral Politics at the University of Wisconsin-Madison, where I have been employed since 2006. I earned my Ph.D. in Political Science at The Ohio State University in 1998. From 1999 to 2006, I was a faculty member in the Department of Government at Harvard University. A copy of my curriculum vitae is attached.

My expertise lies generally in American politics with a focus on elections and voting, public opinion, representation, political parties, and research methodology. I teach courses on these topics at both the undergraduate and graduate levels. I am the author of *Personal Roots of Representation* (Princeton University Press), co-author of *Why Americans Split Their Tickets* (University of Michigan Press), and co-editor of *The Measure of American Elections* (Cambridge University Press). I have also published articles in scholarly peer-reviewed journals such as the *American Political Science Review*, *American Journal of Political Science*, *Electoral Studies*, *Public Opinion Quarterly*, *Legislative Studies Quarterly*, *Public Administration Review*, *Election Law Journal*, and *Political Analysis*. I serve on the editorial boards of *Electoral Studies* and *Election Law Journal*. I am a member of the American Political Science Association and have been active in the profession, giving presentations at many conferences and universities.

I have particular expertise in elections and election administration. I am Director of the Elections Research Center at the University of Wisconsin-Madison, a nonpartisan institute that provides rigorous analysis of elections in the U.S. and other countries. One of the Center's key areas of focus is election administration. I have testified before state officials and the bipartisan Presidential Commission on Election Administration and provided expert advice to the U.S. Government Accountability Office. I serve on the advisory board of the MIT Election Data and Science Lab. I am frequently contacted by journalists and civic organizations to speak about election administration and have been quoted in several national media outlets.

For purposes of this report I reviewed and relied upon a variety of materials. Those materials include SB 202, data and documents available publicly through the Georgia Secretary of State, data and documents publicly available through the U.S. Census Bureau, data and documentation acquired from the State of Georgia through counsel, data and documentation acquired by counsel from counties in Georgia, data and documentation from independent sources such as academic surveys of Georgia voters, and scholarly research on relevant election administration issues available mostly in academic books and journals. I also considered general media coverage and election analysis focus on Georgia. For my work in this case, I am being compensated at a rate of $300 per hour.

In the past four years I testified as an expert at deposition in the case of *North Carolina State Conference of the NAACP et al. v. Roy Asberry Cooper III et al.* (U.S. District Court, Central District of North Carolina) and testified at trial in the case of *League of United Latin American Citizens of Iowa et al. v Iowa Secretary of State Paul Pate* (Polk County District and Supreme Court of Iowa).

## III.     Race and the Electoral Environment that Preceded SB 202

I begin with an overview of the racial and electoral environment in Georgia as it stood before the enactment of SB 202. Because the complaint in this case alleges that Georgia General Assembly enacted SB 202 with intent to discriminate on the basis of race, it is important to understand the context in which the law was created. In this section of the report, I consider the recent electoral environment in Georgia and trends in Black and white voter participation in particular.

Patterns of political participation by race are best understood relative to the overall racial composition of the State and trends in political competition. Recent population estimates from the U.S. Census Bureau indicate a statewide population of 10,912,876, of which 59.4% identify as white alone (not Hispanic or Latino), 33.0% identify as Black alone, 10.2% identify as Hispanic or Latino, and the remainder identify as Asian, Native American, Pacific Islander, or two or more races.[1]

However, Georgia's population is distributed quite unevenly across the State. Nearly one-third of Georgia residents (3,554,400) live in just four of the State's 159 counties: Cobb, DeKalb, Fulton, and Gwinnett.[2] Importantly, those four metro-Atlanta counties account for a disproportionate share of the State's Black population. The four counties comprise only 27.0% of the State's white residents but 39.8% of the State's Black residents. As a result, the four counties are politically noteworthy and influential in State politics because they hold so much of the population and because of their large Black populations.

It should be noted that partisan control of the Georgia General Assembly shifted in a dramatic fashion in the early 2000s, creating a new political environment in the State. After decades of Democratic majorities in both the State House of Representatives and Senate, Republicans won control of the first chamber in 2002 and the second chamber in 2004. Republican dominance in the General Assembly reached its zenith in 2016 when the party held 119 of 180 seats in the House and 39 of 56 seats in the Senate. Those majorities have shrunk slowly but steadily since then, raising the prospect that Democrats might at some point win back control of the lawmaking process in Georgia. As the party in power, the GOP would benefit from laws that make voting more difficult for Democratic voters than Republican voters. As I demonstrate below, voting patterns in Georgia are sharply divided by race whereby Black voters support Democratic candidates at high rates. As a result, prospects for Democratic success in state elections depend heavily on the participation of Black voters.

### A. Racially Polarized Voting

Georgia elections are conducted in an environment of sizable and enduring differences in the political preferences of Black and white voters. The racial identities of Georgia voters are strongly related to their political preferences, a phenomenon commonly described as "racially polarized voting." Following the standard established by the U.S. Supreme Court in *Thornburg v. Gingles* (1986), racial polarization may be defined as a "consistent relationship between [the] race of the voter and the way in which the voter votes."

Racial polarization in voting patterns in Georgia is readily apparent and would certainly be a highly salient fact to legislators and other political insiders. Indeed, the greater competitiveness of recent elections in Georgia is widely understood to be a reflection of the growing participation

---

[1] Data described in this section of the report are available at https://www.census.gov/quickfacts/GA (last visited December 28, 2022).

[2] These data are based on U.S. Census county population estimates as of July 1, 2021, available at https://www.census.gov/quickfacts/fact/table/fultoncountygeorgia,cobbcountygeorgia,dekalbcountygeorgia,gwinnettcountygeorgia,GA/PST045221 (last visited December 28, 2022).

of Black voters, who strongly favor Democratic candidates, compared to whites, who tend to favor Republican candidates.[3]

Evidence about racially polarized voting in Georgia is presented in Table 1. The table shows the stated voting choices of Black and white voters in recent federal elections, using exit polls conducted by a consortium of national media outlets.[4] The racial differences are stark and durable. Black voters in presidential, gubernatorial, and senatorial elections from 2014 and 2020 report favoring the Democratic candidate by margins between 77 percentage points and 87 percentage points, with only about one in ten voting for the Republican candidate in any contest. In contrast, majorities of white voters in every election support Republican candidates, providing margins of between 39 and 54 percentage points for the GOP.

---

[3] See Bill Barrow, "Georgia Takeaways: Black Turnout Fuels Warnock Victory," Associated Press, January 6, 2021 and Greg Bluestein (2022), *Flipped: How Georgia Turned Purple and Broke the Monopoly on Republican Power*, Viking Press. See also footnote 7.

[4] Exit polls are conducted by the National Election Poll (NEP), a consortium of the three major television networks, CNN, and (until 2018) the Associated Press and Fox News, all of whom report the same results on their web sites. Hispanic voters are not presented to avoid making the tables unintelligible due to excessive information and comparisons. Hispanic voting preferences are generally much closer to those of Black voters than white voters. Political scientists have found exit polls to be generally accurate in estimating the preferences of racial groups; these findings can be confirmed by statistical analysis of precinct-level vote totals and demographics.

**Table 1**
**Racially Polarized Voting in Georgia General Elections**

| | Black Voters | | White Voters | |
|---|---|---|---|---|
| 2014 Gubernatorial Election | 89% Carter (D) 10% Deal (R) | +79D | 23% Carter (D) 73% Deal (R) | +50R |
| 2014 Senatorial Election | 92% Nunn (D) 7% Perdue (R) | +85D | 23% Nunn (D) 74% Perdue (R) | +51R |
| 2016 Presidential Election | 89% Clinton (D) 9% Trump (R) | +80D | 21% Clinton (D) 75% Trump (R) | +54R |
| 2018 Gubernatorial Election | 93% Abrams (D) 6% Kemp (R) | +87D | 25% Abrams (D) 74% Kemp (R) | +49R |
| 2020 Presidential Election | 88% Biden (D) 11% Trump (R) | +77D | 30% Biden (D) 69% Trump (R) | +39R |
| 2020 Senatorial Election | 87% Ossoff (D) 11% Perdue (R) | +76D | 29% Ossoff (D) 69% Perdue (R) | +40R |
| 2020 Senatorial Special Election[5] | 69% Warnock (D) 6% Loeffler (R) | +63D | 22% Warnock (D) 42% Loeffler (R) | +20R |
| 2021 Senatorial Runoff Election | 92% Ossoff (D) 8% Perdue (R) | +84D | 29% Ossoff (D) 71% Perdue (R) | +42R |
| 2021 Senatorial Special Runoff Election | 93% Warnock (D) 7% Loeffler (R) | +86D | 29% Warnock (D) 71% Loeffler (R) | +42R |
| 2022 Gubernatorial Election | 90% Abrams (D) 9% Kemp (R) | +81D | 25% Abrams (D) 74% Kemp (R) | +49R |
| 2022 Senatorial Election | 90% Warnock (D) 8% Walker (R) | +82D | 29% Warnock (D) 70% Walker (R) | +41R |

Note: Exit polls from Georgia were not released in 2012.
I am not aware of exit polls for the December 2022 Senate runoff election.

Although racial polarization continued to be extensive, the 2020 elections and 2022 senatorial elections are notable because of the larger share of white voters who "crossed over" to vote for the Democratic candidate. That higher percentage of support coupled with continued strong support from Black voters and a shrinking share of the electorate that is what makes it possible for Democrats to win statewide elections in Georgia. As a result, the elections immediately preceding the passage of SB 202 (most notably the 2020 presidential election and the 2020 Senate and Senate runoff elections) were narrow loses for Republican statewide candidates, after years of Republican victories.

Racially polarized voting in Georgia has a strong partisan component, yet it also reflects political preferences of racial groups in ways that go beyond partisanship. Again drawing upon exit poll

---

[5] The U.S. Senate special election allowed multiple candidates from the same political party to run on the same ballot. Because of the unusual field of candidates that included multiple individuals within each major party, differences in the voting patterns of demographic groups will appear smaller than in traditional two-party elections. The table only lists the leading Democratic and Republican candidates who advanced to the runoff election.

data, the evidence from Democratic presidential primary elections in Table 2 below shows this.[6] Despite participating in the same party's primary, the voting choices of Black and white voters differed significantly in all three contests. In two of the three cases, majorities of Black voters and white voters supported opposing candidates. Even when the two racial groups generally favored the same candidate in 2016, Black voters supported Clinton by 71 percentage points while white voters supported her by a margin of only 17 points. Even in settings where candidates belong to the same party, the choices of Black and white voters are nonetheless starkly different.

**Table 2**
**Racially Polarized Voting in Georgia Democratic Presidential Primary Elections**

|  | Black Voters | | White Voters | |
| --- | --- | --- | --- | --- |
| 2004 Presidential Primary Election | 61% Kerry 25% Edwards | +36 Kerry | 32% Kerry 59% Edwards | +27 Edwards |
| 2008 Presidential Primary Election | 88% Obama 11% Clinton | +77 Obama | 43% Obama 53% Clinton | +10 Clinton |
| 2016 Presidential Primary Election | 85% Clinton 14% Sanders | +71 Clinton | 58% Clinton 41% Sanders | +17 Clinton |

It is clear from these data that the candidate preferences of Black and white voters in Georgia diverge in a substantial and durable fashion. This would be widely known among those who are active in state politics, including those who crafted and enacted SB 202. Pre-election analysis in Georgia media outlets has frequently highlighted how voting preferences differ by racial group; Election night reporting and post-election analysis has used exit polls and other data from Georgia to demonstrate how Black and white voter choices diverge.[7]

### B.  Registration and Turnout Rates

The electoral environment in Georgia also reflects the rates at which eligible Black and white residents register to vote and cast ballots. To calculate relative voter registration and voter turnout rates by race for elections from 2014 to 2020, I used "reapportionment reports" acquired from the State by counsel. For the November 2022 election, I used a similarly structured file

---

[6] Not enough Black voters participated in the Republican primaries to make an analysis of racially polarization in Republican primary voting reliable.

[7] See the following examples: Greg Bluestein and Maya T. Prabhu, "AJC Poll Shows Deadlocked Races for President, Senate Seats in Georgia," *Atlanta Journal-Constitution*, October 26, 2020. Curtis Bunn, "Black Georgia Voters Celebrate Warnock's Win and Efforts to Beat Voter Suppression," NBC News, December 8, 2022. Cheyanne M. Daniels, "Georgia Runoff Underscores GOP Struggles with Black Voters," The Hill, December 5, 2022. Mini Racker, "Black Voters Helped Turn Georgia Blue in 2020. Now They're Feeling Frustrated," *Time*, November 7, 2022. Laura Santhanam, "Georgia's Black Voters Overwhelmingly Supported Democratic Senate Candidates," PBS News Hour, January 6, 2021. Ross Williams, "Record Turnout among Black Voters Could Help Georgia Reshape the Nation," Georgia Public Broadcasting, January 11, 2021.

provided by the State to counsel following that election.[8] These reports list how many people of specific race and gender combinations were registered and voted in a given general election in each precinct.[9] I aggregated the results to the statewide level for white, Black, and Hispanic voters.

Table 3 reports voter <u>registration</u> totals in Georgia by race and ethnicity in federal general elections from 2014 to 2022.[10] The numbers of active registered voters in all groups have been generally trending upward. This reflects several factors. First, the overall population of Georgia has grown. Second, there was a step increase in 2016 when "automatic" voter registration (AVR) was implemented in September 2016;[11] that increase is apparent from the November 2016 election onward. Third, the more intense political competition that has taken place in Georgia in recent years may have led to greater voter registration. From 2000 to 2016, Republicans dominated Georgia statewide elections, winning all five presidential contests held in the State during that time by between five and 16.6 percentage points. Elections became noticeably more competitive beginning in 2018, when the governor's race was decided in favor of the Republican candidate by only 1.4 percentage points. It tightened further in 2020 when Democrats won the presidential race in Georgia by only .24 percentage points. Two months later Democrats won two simultaneous 2021 U.S. Senate runoff elections by 1.2 points and 2.0 points.

---

[8] The spreadsheet is titled "SSVRZ422 Voter Registration System Secretary of State, Active/Inactive Voters by Race/Gender/District, General Election Voting History Summary."

[9] Applications for voter registration in Georgia ask applicants to select their race/ethnicity from among six options: Black, White, Hispanic/Latino, Asian/Pacific Islander, American Indian, and Other. More than 90% of applicants generally select one of these options, leaving the remainder as "Unknown." On December 23, 2022, I was made aware of communications from the State indicating that the racial identities of at least 17,000 non-white Georgians with current driver's licenses who registered to vote through the Department of Driver Services mobile app were erroneously defined as being "white." An unknown number of Georgians who no longer have driver's licenses were also misclassified in this way. I am unable to correct these errors, but the relatively small number of incorrect race codes compared to the large total population of non-white registrants in the state – currently more than 3.8 million according to the Secretary of State's election Data Hub – means that my opinions are unlikely to be affected.

[10] In the tables in this section of the report, the 2022 election refers to the general election held on November 8, 2022 and not the U.S. Senate runoff election that took place on December 6, 2022.

[11] The version of AVR implemented in Georgia uses data provided on driver's licenses forms submitted to the Department of Driver Services to automatically register individuals to vote unless they opt out from being registered.

**Table 3**
**Voter Registration Totals by Race in Georgia 2014-2022**

|                | 2014      | 2016      | 2018      | 2020      | 2022      |
|----------------|-----------|-----------|-----------|-----------|-----------|
| White total    | 3,012,608 | 3,724,026 | 3,720,947 | 4,028,381 | 4,048,728 |
| Black total    | 1,562,076 | 2,042,030 | 2,113,890 | 2,287,312 | 2,312,592 |
| Hispanic total | 95,241    | 164,784   | 299,382   | 274,524   | 306,380   |
| Other total    | 530,026   | 765,183   | 839,963   | 1,046,676 | 1,117,828 |
| White share    | 57.9%     | 55.6%     | 53.4%     | 52.7%     | 51.6%     |
| Black share    | 30.0%     | 30.5%     | 30.3%     | 30.0%     | 29.5%     |
| Other share    | 12.0%     | 13.9%     | 16.3%     | 17.3%     | 15.0%     |

The 2018 contests in particular featured an emphasis by Democrat Stacy Abrams' campaign on registering non-white Georgians to vote, the culmination of several years' work by her New Georgia Project.[12] That effort plausibly contributed to the rise in registration totals among all of the non-white voter groups. The net result is that the white share of the pool of registered voters has been steadily falling, decreasing by more than five points since 2014. Other evidence has confirmed that the increase in registration in Georgia has been driven mostly by increases among Black residents and in the Atlanta metro area.[13] This increasing diversity of registered voters has facilitated a more competitive political environment in the State.[14]

Table 4 reports voter <u>turnout</u> rates by race for the same set of elections as in the previous table, this time focused just on Black and white individuals. The turnout rate is computed as the number of individuals of a particular race who voted divided by the total citizen voting age population (CVAP) of that race in Georgia, as estimated by the U.S. Census Bureau.[15] The table

---

[12] For example, see Austa Somvichian-Clausen, "How Stacy Abrams Helped Get Out the Black Vote in Georgia," *The Hill*, November 10, 2020.

[13] Pew Research Center, "Black, Latino, and Asian Americans Have Been Key to Georgia's Registered Voter Growth Since 2016," available at https://www.pewresearch.org/fact-tank/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/ (last visited May 10, 2022).

[14] For example, see Mark Niesse and Jennifer Peebles, "Georgia Made More Competitive by 1 Million New Voters Since '16 Election," *The Atlanta Journal-Constitution*, October 22, 2020.

[15] Specifically, I relied on CVAP estimates for Georgia residents identifying as "Black or African American Alone" or "White Alone" based on the American Community Survey (ACS) 5-year estimates leading up to and including the election year being analyzed. For example, the 2020 election is based on the 2016-2020 ACS. Data for the 2022 election rely on the 2017-2021 5-year estimates for white CVAP but 2021 1-year estimates for Black CVAP because the 5-year estimates for that racial group did not appear to be available yet when this report was written. The state of Georgia reports race in a slightly different fashion based on the categories available on the State's voter registration form, which does not explicitly allow for multiple racial or ethnic identities. These differences in how the Census and the State record race – in addition to the sampling error that accompanies ACS estimates – may result in minor discrepancies in a single election year but should nonetheless allow for detection of trends over time. Although CVAP is a commonly used metric for estimating turnout rates of demographic groups, some analysts compute voter turnout rates based on the number of eligible voters rather than the CVAP. This is because the CVAP may include some citizens who are not eligible to vote due to factors such as denial of

shows that turnout rates are consistently higher for white citizens than for Black citizens. Although the racial disparity has been persistent, it widened after the implementation of SB 202. The gap between Black and white voter turnout rates was 7.1 percentage points in 2016, 4.2 points in 2018, 9.9 points in 2020, and 12.0 points in 2022. In 2022, after the passage of SB 202, Black turnout fell compared to the previous midterm election even though white turnout rose over that same time period. In 2022, the share of voters who were Black fell to its lowest point since 2014.[16]

**Table 4**
**Voter Turnout Rates by Race in Georgia 2014-2022 (as a Share of CVAP)**

|  | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|
| White turnout rate | 38.8% | 58.9% | 53.6% | 67.1% | 54.5% |
| Black turnout rate | 35.0% | 51.8% | 49.4% | 57.2% | 42.5% |

As is the case with voter registration totals, white voters have seen their share of the electorate slip in recent years, a trend that has contributed to less dominance by Republican candidates. Due to the presence of substantial racial polarization in voting, shifts in the relative turnout rates of Black and white residents impact the partisan outcomes of state elections. Because the Black voter turnout rate is consistently lower than that of whites, there is more capacity for it to increase. This potential would put the recent dominance of Republican candidates backed mostly by white voters at further risk.

## IV.   Absentee Voting by Mail in Georgia

This case challenges several limits on absentee voting imposed by SB 202.[17] In this section of the report, I investigate whether these limits affect Black and white voters differently.

### A.   Rates of Absentee Voting and Ballot Rejection

In addition to turning out to vote at different <u>rates</u>, Black voters and white voters have also been voting by different <u>methods</u>. This is particularly true as it pertains to voting absentee by mail, a method that became especially popular and salient in the 2020 elections.

---

voting rights to people serving felony sentences. Because Black residents are more likely to be disenfranchised than are white residents due to these restrictions (see https://www.reformgeorgia.org/platform/restore-voting-rights/2019-report-on-felony-disenfranchisement-in-georgia/, last visited November 29, 2022), the CVAP is not a perfect measure of disparities in turnout between racial groups. However, I am not aware of a data source that provides citizenship and felony sentence status by race in Georgia.

[16] Nationally the 2014 elections had the lowest voter turnout rate in a midterm election since 1942 (see https://www.electproject.org/national-1789-present, last visited December 28, 2022). None of the statewide contests Georgia that year were decided by a margin of less than seven percentage points.

[17] In the remainder of this report, I use the term absentee voting as a shorthand for absentee ballots that are issued to voters by mail.

Because the State of Georgia collects the racial and ethnic identities of individuals who register to vote, I was able to combine data on absentee voting with the statewide voter file to determine the usage of absentee voting by Black and white voters and the disposition of their ballots. Appendix A to this report describes in more detail how the data were linked and prepared for this analysis.

Table 5 reports the rates at which Black and white voters in Georgia used absentee ballots in the five federal general elections between 2014 and 2022, as well as the U.S. Senate runoff election in January 2021. Most relevant to this case is how the underline rates of absentee ballot usage by Black and white voters have changed over time. In 2014 and 2016, white voters were more likely to use absentee voting.[18] That changed in the 2018 midterm elections when Black voters began casting absentee ballots at higher rates than white voters. That reversal continued through the November 2020 election and January 2021 runoff election even as the pandemic resulted in higher overall usage of absentee ballots.

It is noteworthy that the legislature and governor chose to impose new restrictions on absentee voting via SB 202 only after two recent election cycles in which Black voters' usage of absentee voting surpassed that of white voters.[19] The November 2022 elections saw a sharp decline in absentee voting back to pre-pandemic levels but nonetheless continued the pattern of higher rates of absentee voting among Black voters compared to white voters.

**Table 5**
**Rates of Absentee Voting by Race 2014-2022**

|  | 2014 | 2016 | 2018 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Black voters | 3.33% | 3.92% | 7.02% | 28.9% | 27.6% | 7.44% |
| White voters | 4.49% | 5.33% | 4.65% | 24.0% | 21.7% | 5.60% |

Despite changes in the relative usage rates of absentee ballots, Black voters have consistently experienced greater rates of rejection of those ballots. Table 6 below displays the rates at which absentee ballots were rejected in major elections between 2014 and 2022. I determined these rates using the "ballotstatus" field in the State's Absentee Voter Files to identify accepted and

---

[18] The web site for the Georgia Secretary of State does not provide absentee voter files before 2013. However, official State statistics from the November 2012 election show that absentee ballots by mail accounted for 5.9% of votes cast for Republican presidential candidate Mitt Romney and 4.9% of vote cast for Democrat Barack Obama (see https://results.enr.clarityelections.com/GA/42277/113204/en/vts.html?cid=5000, last visited November 29, 2022). Because of established patterns of racial polarization in voting patterns, this partisan disparity would be consistent with white voters making greater use of absentee voting in 2012. A breakdown of absentee voting by party is not available from the Georgia Secretary of State's web site before 2012.

[19] Later in this report, I show that even in elections before 2018 where white voters were more likely to vote by absentee, Black voters were more likely to vote by absentee in the last few days before election day.

rejected ballots.[20] The table shows that Black absentee voters have consistently experienced higher rates of ballot rejection than have white absentee voters.

The rejection rates for both groups dropped dramatically between 2018 and 2020, remained low in 2021, and then increased somewhat in 2022. A number of factors likely contributed to this decline, including judicial decisions, legislation, and a court settlement that collectively altered what was required of absentee ballots to be accepted and provided additional time to cure such ballots. These factors were generally public knowledge.[21]

**Table 6**
**Rates of Absentee Ballot Rejection by Race 2014-2022**

|  | 2014 | 2016 | 2018 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Black voters | 6.04% | 3.96% | 4.30% | .45% | .63% | 1.22% |
| White voters | 3.09% | 2.21% | 2.46% | .24% | .47% | 1.06% |

Perhaps a more important factor behind lower rates of ballot rejection in 2020 and 2021 was the availability of drop boxes. The State Elections Board issued an emergency rule ahead of the 2020 general election allowing for use of drop boxes to collect absentee ballots for up to 49 days leading to election day. Under the rule, the drop boxes could be available 24 hours a day, could be located outside, and could be used until 7:00 PM on election day. That rule was extended through the January 5, 2021 runoff elections but did not apply in the 2022 elections when SB 202 was in effect.

As I explain in a later section of the report, drop boxes were an important contributor to lower rejection rates. A voter using a drop box to return an absentee ballot by election day is guaranteed that it will be received on time to be counted, whereas a voter returning a ballot via the postal service cannot be certain that it will be delivered by the election day deadline.

## V.      Racial Differences in Absentee Voting by Day

Additional materials from the State make it possible to establish more direct evidence about how changes in absentee and drop box policies would affect Black and white voters. I again make use of public data provided by the Georgia Secretary of State in the "Voter Absentee File" to examine the relative rates of absentee voting and the timing of the return of absentee ballots by Black and white voters. The absentee file notes the date on which each absentee ballot was

---

[20] The field has four codes: "A," "C," "R," and "S." I computed the rejection rate as the share of both accepted (A) ballots and rejected (R) ballots that were rejected. Ballots marked a C code were cancelled, while ballots marked with an S code were spoiled. In the 2014 file, it appears that the C and R codes were erroneously swapped. I verified this by examining the reasons for ballot rejections, which only existed for those coded as C. In addition, the number of C ballots (4,299) is quite close to the total of 4,325 preliminarily reported as rejected by the State to the U.S. Election Assistance Commission (EAC) as part of the Election Administration and Voting Survey (EAVS).

[21] See Mark Niesse, "Fewer Absentee Ballots Rejected after Georgia Laws Change," *The Atlanta Journal-Constitution*, September 16, 2020.

returned, as determined by county election offices. By using voter registration numbers to link it with the statewide voter file, the combined dataset is able to show conclusively whether Black voters or white voters are more likely to use absentee ballots and whether this tendency varies over the days leading up to election day. The exact method used to return the ballot is not indicated in the State's data files, although later in the report I will assess what share of ballots mailed to voters were returned via drop boxes rather than by mail.

I examine absentee voting in general elections from November 2014 to November 2022 as well as the runoff election held in January 2021. I limit the analysis to voters who identified as either non-Hispanic Black or non-Hispanic white, momentarily setting aside other groups. This captures the two main racial groups in Georgia who together comprised 86% of voters in November 2020 and similar percentages in other recent elections. This focus makes the following presentation more intelligible.

Figure 1 below shows the percentage of absentee ballots that were returned each day by Black voters in the 2014 election. As a baseline reference point, the horizontal line at 31.1% represents the share of all voters in that election who identified as Black (again as a share of Black voters and white voters together). Points below this line indicate Black voters are using absentee voting at a rate below their share in the electorate; points above the line indicate Black voters are disproportionate users of absentee voting. The figure shows that Black voters were generally less likely than white voters to return absentee ballots on most days, a pattern consistent with the higher rates of absentee voting by white voters in the election, as shown above in Table 5. While the dominant pattern in 2014 was white voters voting absentee at higher rates, Black voters did rely on absentee voting more in several of the final days of election cycle.[22]

---

[22] Three extreme values in the early part of the time series are the result of low numbers of absentee ballots being collected on September 27 (eight ballots), October 4 (two ballots), and October 5 (five ballots).

**Figure 1**
**Share of Absentee Ballots Returned by Black Voters by Day in the November 2014 Election**



Figure 2 shows analogous data on absentee voting by Black and white voters in the 2016 general election. In that election the greater tendency among white voters to vote by absentee is even clearer. Aside from three days at the end of the election cycle and one early outlier, white voters were more likely than Black voters to vote absentee.[23] This is shown by the large majority of points falling below the reference line of 31.3%, the overall share of voters in the election who were Black.

---

[23] The outlier occurred on October 9 when only eight absentee ballots were recorded.

**Figure 2**
**Share of Absentee Ballots Returned by Black Voters by Day in the November 2016 Election**



Moving ahead in time the next election cycle, Figure 3 shows data from the 2018 general election, running from September 24 through election day, November 6. Consistent with Table 5, the balance of absentee voting by racial groups first reversed direction in this election. Black voters were more likely than white voters to submit absentee ballots on all but one day, as shown by nearly every point falling above the reference line of 33.0%.

15

**Figure 3**
**Share of Absentee Ballots Returned by Black Voters by Day in the November 2018 Election**



Figure 4 shows similar data for the 2020 election. The figure shows that absentee voting was used more by Black voters than white voters. Black voters were overrepresented on 41 of the 44 days in this time period. On average, Black voters comprised 42% of absentee votes returned each day despite accounting for only 32% of those who actually voted. By the 2020 election, it would be apparent that any new limitations placed on absentee voting procedures – whether it be requirements to request ballots or ways in which such ballots can be returned – will disrupt the voting habits of Black voters in Georgia substantially more than those of white voters, imposing greater costs on Black voters relative to white voters.

**Figure 4**
**Share of Absentee Ballots Returned by Black Voters by Day in the November 2020 Election**



Verifying the new pattern first established in 2018, Figure 5 shows the share of Black voters submitting absentee ballots on each day leading up to the January 2021 runoff elections. Black voters are substantially more likely than white voters to return absentee ballots, particularly in the most intense period of voting in the final three weeks leading to election day.

**Figure 5**
**Share of Absentee Ballots Returned by Black Voters by Day in the January 2021 Election**



Finally, Figure 6 presents data on the racial makeup of voters submitting absentee ballots in the November 8, 2022 elections. This figure differs from the others because of changes in voting rules imposed by SB 202 after the Senate runoffs in early 2021. Compared to the graphs above, the timeline is shorter because SB 202 shortened the period for circulation of absentee ballots. Under SB 202, election officials should begin mailing absentee ballots to voters no earlier than 29 days before the election.[24] The figure displays data beginning on that date (October 10) even though it is unlikely that many domestic absentee ballots were returned on that date.[25]

---

[24] This timing applies to traditional domestic absentee voters. Military and overseas voters covered by the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) must be issued ballots at least 45 days before election day.

[25] The absentee files indicate small numbers of ballots returned on each day until later that week. Ballots returned before that time were probably mostly from overseas and military voters, who were to be mailed ballots no earlier than 49 days before election day. Although the figure ends on election day, the absentee voter file indicates that ballots continued to arrive after election day in nontrivial amounts. Those arrivals might include ballots from overseas and military voters who were permitted to return ballots until November 14. A judicial order also allowed hundreds of domestic voters in Cobb County who were hindered by administrative errors to return ballots as late as November 14.

In some contrast to the 2018 and 2020 general and the 2021 runoff elections, Black voters were not consistently more likely to submit absentee ballots in 2022, the first general election after enactment of SB 202. Compared to the overall racial composition of voters who took part in the November 2022 election, Black voters were significantly more likely than white voters to return absentee ballots on Saturdays and especially Sundays, as indicated by the spikes in the trend line. However, on weekdays the racial makeup of voters deviates less from the overall balance and on multiple days actually overrepresented white voters.

**Figure 6**
**Share of Absentee Ballots Returned by Black Voters by Day in the November 2022 Election**



Figures 1 through 6 provide evidence along two lines as to the likely impact on Black voters of the challenged provisions of SB 202 that place limitations on absentee voting.

First, the graphs show that SB 202 was adopted after voter behavior in Georgia shifted such that Black voters became more likely than white voters to cast absentee ballots in 2018, 2020, and 2021. Challenged provisions of SB 202 in this case include limits on mailing of absentee ballot applications by government and private entities, new identification requirements for absentee ballot requests, and fewer days on which absentee ballot requests may be submitted. These limits were only imposed after absentee voting rates of Black voters surpassed those of white voters and the limits will thus disrupt the voting habits of a larger share of Black voters than white voters.

Second, the graphs show that even before 2018, Black voters were more likely to cast absentee ballots in the final four days of the election cycle. The elimination of drop boxes on the final four days of the election cycle, coupled with sharp reductions in the availability and usefulness of drop boxes on other days, will disproportionately burden Black voters compared to white voters.

A larger share of Black voters will need to modify their voting habits to act earlier and rely on the mail for returning ballots, or opt to vote in person—where wait times are some of the longest in the country and are even longer for Black voters than white voters. On average, as I will show, Black Georgians have fewer resources to assist them in navigating the hurdles that these disruptions create, thus magnifying the disparate burdens of SB 202.

## VI.    Waiting Times

The time it takes to vote is a normatively important concern. Waiting times are often considered to be "time taxes" that make it more costly – both figuratively and literally – to vote.[26] In many cases, the "tax" associated with waiting to vote requires a financial expense because of lost wages or childcare costs that must be incurred. Thus, unlike historic poll taxes, the time tax of waiting to vote is literally more expensive for some voters than for others. The impact of wait times is even more problematic if the wait times are longer for voters who are less able to pay the financial and time costs needed to cast ballots.

The cost is also not paid just once: bad experiences waiting to vote or even hearing from others about their bad experiences may deter voters from participating in subsequent elections. Peer-reviewed research by Bridgett King finds that longer wait times make voters less confident about their own ballots being counted correctly and the administration of elections in their communities.[27] Research by Stephen Pettigrew shows that waiting longer to vote in the 2012 election made people less likely to vote in the 2014 midterm election, and these effects were experienced at a greater rate by Black voters than white voters.[28]

Georgia consistently has some of the longest voter wait times in the country. According to analysis of national survey data by the MIT Election Data and Science Lab as part of the Elections Performance Index (EPI), between 2008 and 2020, average wait times for voters in Georgia ranked between 42nd longest to dead last.[29] Georgia has ranked in the bottom four states

---

[26] Elora Mukherjee (2009-2010), "Abolishing the Time Tax on Voting," *Notre Dame Law Review* 85:177-246.

[27] Bridgett King (2021), "Waiting to Vote: The Effect of Administrative Irregularities at Polling Locations and Voter Confidence," *Policy Studies* 41:230-248.

[28] Stephen Pettigrew (2021), "The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout," *Electoral Studies* 71:102188.

[29] Data cover the elections of 2008, 2012, 2014, 2016, 2018, and 2020. Because the District of Columbia is included, a state's ranking may range from 1st (shortest wait time) to 51st (longest wait time). Available at https://elections.mit.edu/#/data/indicators?view=indicator-profile&indicator=WTV&year=2020 (last visited April 18, 2022).

in the past four federal elections in terms of how long the average voter had to wait to cast a ballot.

Most relevant for this case is whether the unusually long wait times in Georgia are more severe for Black or white voters. I address this question with data from the Cooperative Election Study (CES), a collaborative academic research project that surveys representative samples of registered voters in each state following federal general elections. I examine data from the 2014, 2016, 2018, and 2020 elections, all years in which the CES included adequate numbers of Georgia voters (whose turnout was validated with official records) and a question asking about the time it took to vote.[30] In each case the survey asks the voter whether they waited "not at all," "less than 10 minutes," "10-30 minutes," "30 minutes-1 hour," or "more than 1 hour."

Table 7 below shows that Black voters have generally experienced longer wait times in Georgia, examining elections from 2014 to 2020. In some cases, the disparities are substantial. In all four elections, white voters were more likely to experience no wait at all. In all four elections, Black voters were more likely than white voters to experience wait times of more than ten minutes.[31]

**Table 7**
**Reported Wait Times to Vote in Georgia by Race 2014-2020**

|  | 2014 | | 2016 | | 2018 | | 2020 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Wait Time | Black | White | Black | White | Black | White | Black | White |
| Not at all | 31% | 42% | 16% | 31% | 20% | 27% | 16% | 24% |
| Under 10 minutes | 31% | 34% | 33% | 35% | 37% | 32% | 15% | 33% |
| 10 to 30 minutes | 33% | 22% | 37% | 18% | 25% | 24% | 34% | 21% |
| 31 to 60 minutes | 5% | 1% | 11% | 11% | 12% | 12% | 22% | 14% |
| Over 60 minutes | .5% | .4% | 3% | 5% | 7% | 5% | 12% | 8% |
| Don't know | .1% | .1% | -- | -- | -- | -- | 2% | .2% |
| N | 283 | 637 | 367 | 752 | 276 | 572 | 176 | 449 |

Stephen Pettigrew's report submitted in support of a motion related to this case confirms that voters of color in Georgia have endured longer waits than have white voters in every federal election from 2008 to 2020.[32] His analysis shows that Black voters in particular experienced longer waiting times than white voters in recent Georgia elections.

---

[30] I apply the standard post-election survey weights provided in each CES dataset for analyzing validated voters.

[31] Too few respondents reported waits of longer than 60 minutes to make racial comparisons for those wait times reliable.

[32] Dr. Stephen Pettigrew, "An Evaluation of SB202's Impact on Election Wait Times in Georgia," May 13, 2022 report. ECF No. 171-21.

The longer wait times faced by Black voters has been the subject of media coverage and public discourse in recent years.[33] Even with this public awareness, SB 202 limits the provision of food and water to people waiting in line to vote, people who are disproportionally Black.

To my knowledge, data on wait times in the November 2022 election have not yet been made publicly available via the CES or other reliable academic surveys. However, media coverage of that election and the December 6 runoff election suggests that long wait times, in some cases lasting hours, were experienced in Atlanta-area communities with large shares of Black voters.[34]

Hearing about or experiencing long waits at polling places would naturally cause some voters to consider voting by absentee to avoid lines. Shifting one's vote mode in this way ought to be more attractive to Black voters because they experience longer wait times. As I discuss later in the report, the new limitations placed on absentee voting by SB 202 will make it more difficult for Black voters in particular to shift away from voting in person to avoid the "time tax" of long wait times.

## VII.    Relevant Demographic Factors

Sociodemographic disparities between Black and white adult residents in Georgia are highly relevant to the challenged provisions in this case. Decades of social science research have demonstrated the substantial differences in voter turnout rates between advantaged and disadvantaged groups in the electorate.[35] Given the degree that demographic characteristics are correlated with race in Georgia, even a facially neutral election requirement or limitation can be more challenging for Black voters than for white voters.

Consider several of the most prominent demographic correlates of voter turnout.

Numerous studies have shown that an individual's level of formal educational attainment is strongly related to whether the person votes.[36] This is because education lowers the "costs" of voting in several ways by providing (1) literacy and language skills that make it easier to understand and complete voting-related forms, (2) information about the electoral process itself, (3) access to social networks comprised of fellow voters who provide political information and

---

[33] For example, see Stephen Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Too Few Polling Places," National Public Radio and Georgia Public Broadcasting, October 17, 2020, and Jim Galloway, "The Data Says People of Color Are Waiting Longest to Vote in Georgia," *Atlanta Journal-Constitution*, October 20, 2020.

[34] For example, see Patricia Murphy, Greg Bluestein, and Tia Mitchell, "The Jolt: Finger-Pointing Starts over Long Waits for Georgia Voters," *Atlanta Journal-Constitution*, December 1, 2022.

[35] For example, see Jan E. Leighley and Jonathan Nagler (2003), *Who Votes Now? Demographics, Issues, Inequality, and Turnout in the United States*, Princeton University Press.

[36] Steven J. Rosenstone and John Mark Hansen (1993), *Mobilization, Participation and Democracy in America*, Macmillan. Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Harvard University Press. Rachel Milstein Sondheimer and Donald P. Green (2010), "Using Experiments to Estimate the Effects of Education on Voter Turnout," *American Journal of Political Science* 54:174-89.

normative pressure get involved in elections, and (4) a sense of confidence and efficacy that facilitate participation even when the rules are changed.[37] For these reasons, educational attainment is an important marker of a voter's ability to cast a ballot.

As Table 8 below illustrates, recent data show significant disparities in formal educational attainment between white and Black residents in Georgia. Hispanic residents are also included to provide a more complete context for assessing group differences. Using data from the 2016-2020 American Community Survey (ACS) conducted by the U.S. Census Bureau, the table shows that white residents are somewhat more likely than Black residents to have obtained a high school diploma and to have obtained a bachelor's degree.[38] College degree obtainment is particularly important because it is a stronger marker than high school graduation of who votes and who does not.[39] For example, in the 2020 presidential election, Census data indicate that nationwide voter turnout was 56% among high school graduates, 73% among those with at least some college and 83% among those with post-graduate degrees.[40]

**Table 8**
**Formal Education Attainment Rates in Georgia**

|          | High School Graduate | Bachelor's Degree |
|----------|----------------------|-------------------|
| Black    | 88%                  | 25%               |
| Hispanic | 64%                  | 19%               |
| White    | 91%                  | 36%               |

Voter participation is also affected by a person's income. Individuals with lower household incomes are significantly less likely to vote for several reasons. One reason is that individuals with higher income have more capacity to outsource time-consuming tasks such as childcare, errands, or home maintenance. Another reason is that individuals with lower income are more likely to be paid on an hourly basis rather than on a fixed salary. This places a burden on employees who would suffer financial loss if they missed work to participate in an election.

---

[37] For example, see Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Harvard University Press.

[38] Unless otherwise noted, statistics presented in this section of the report are drawn from the 2016-2020 ACS. Educational attainment is based on the population that is 25 years of age or older. In this table and the other that follow in this section of the report, I define "white" as people who identify as white alone and are not Hispanic. I define "Black" as people who identify as Black or African American alone and are not Hispanic.

[39] Barry C. Burden (2009), "The Dynamic Effects of Education on Voter Turnout," *Electoral Studies* 28:540-549.

[40] These percentages are based on computations by Professor Michael McDonald in which the Census Bureau's Current Population Survey (November 2020 Voting and Registration Supplement) data are adjusted for reporting errors. *Available at* https://docs.google.com/spreadsheets/d/1l5fpK7ysQhQbZPv9hnZ_-PO1J1zBVPXSSQjNejTXecY/edit#gid=701789019 (last visited April 15, 2022).

Workers with higher incomes are more likely to be salaried employees who do not suffer an immediate loss of wages for taking time during the workday to vote.

Georgia law requires employers to provide employees with up to two hours total of leave for voting purposes. But those hours are provided unpaid, meaning that they are lost income for hourly employees. And there are no penalties in the law for employees who fail to provide the required time for voting.

Table 9 below shows that the personal financial situations of white residents in Georgia are dramatically better than those of Black residents. Median annual household incomes for Black Georgians were only two-thirds of those reported by white Georgians. Black Georgians were twice as likely to fall below the poverty level over the past 12 months as defined by the Census Bureau. It is also extremely likely that Black Georgians have substantially less accumulated wealth than do white Georgians.[41]

**Table 9**
**Financial Circumstances in Georgia**

|  | Median Household Income | Below the Poverty Level |
|---|---|---|
| Black | $46,964 | 20% |
| Hispanic | $52,784 | 21% |
| White | $70,784 | 10% |

Other determinants of voter participation are correlated with formal education and income, as well as race. Research demonstrates that mental and physical health influence whether a person votes.[42] For example, one study finds that a disability makes the average person approximately 20 percentage points less likely to vote, mostly because it increases the burdens and costs associated with voting.[43] Independent reports show that, compared to their white counterparts, Black residents of Georgia are less likely to see doctors because of the cost, suffer higher mortality rates, and are more likely to suffer from negative health conditions.[44]

Even more directly related to the voting process, residential mobility tends to inhibit voter participation. Research shows that people who have moved from one residence to another

---

[41] Although I have been unable to locate data specific to Georgia, national studies reveal tremendous differences in wealth between Black and white Americans. The U.S. Census Bureau's 2019 Survey of Income and Program Participation estimated median net worth to be $187,300 for white non-Hispanic households, $14,100 for Black households, and $31,700 for Hispanic households.

[42] Barry C. Burden, Jason M. Fletcher, Pamela Herd, Bradley M. Jones, and Donald Moynihan (2017), "How Different Forms of Health Matter to Political Participation," *Journal of Politics* 79:166-178.

[43] Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner (2002), "Enabling Democracy: Disability and Voter Turnout," *Political Research Quarterly* 55:167-90.

[44] Kaiser Family Foundation, State Health Facts, Georgia: Disparities, available at https://www.kff.org/state-category/disparities/?state=GA (last visited May 11, 2022).

recently are significantly less likely to vote, in part because moving entails updating or initiating a new voter registration.[45] However, the disruption of moving hinders voters less who have higher levels of educational attainment, again demonstrating that greater resources aid voters in overcoming administrative burdens.[46]

Table 10 uses the same U.S. Census Bureau data as above to document patterns of residential relocation in Georgia over a one-year period. The data show the share of each racial and ethnic group that moved within a county in Georgia, between counties in Georgia, and from outside of the State to Georgia. The table shows that Black Georgians (and Hispanic Georgians) are more likely to move over a 12-month period than are white Georgians. Black residents are particularly more likely to move within their home counties compared to white residents. This kind of residential mobility shares many of the disruptive qualities related to voting as a longer distance move because it entails new costs such as reregistering to vote and finding one's newly assigned polling place. The greater frequency of within-county moves among Black residents can introduce additional uncertainty about which polling place in the county is the right one, which can lead to a higher rate of voting out-of-precinct. Having lower levels of key resources such as educational attainment makes it more difficult for Black residents to overcome the burdens of residential relocation.

**Table 10**
**Residential Mobility in Georgia**

|  | Moved within County in Georgia | Moved between Counties in Georgia | Moved from Outside of State to Georgia | Total Moved |
|---|---|---|---|---|
| Black | 8.2% | 5.2% | 2.6% | 16.0% |
| Hispanic | 6.5% | 3.5% | 3.0% | 19.5% |
| White | 5.5% | 4.7% | 2.5% | 12.7% |

In summary, data from the U.S. Census Bureau show that, relative to their white counterparts, Black Georgians possess fewer of the resources that have been identified as the most consistent and valuable assets to support voter participation. Demographic factors such as educational attainment and income make it easier to navigate hurdles in the voting process and facilitate higher levels of participation among white Georgians.

As I show below, the restrictions imposed by SB 202 fall harder on Black voters than white voters in the first place precisely because they affect voting habits that are more common among Black Georgians. The new regulations on absentee voting, use of drop boxes, and out-of-precinct provisional ballots generally disrupt practices used more by Black voter than white voters. The resources to navigate these disruptions are less available to Black voters, making the burden on

---

[45] Richard J. Timpone (1998), "Structure, Behavior, and Voter Turnout in the United States," *American Political Science Review* 92:145-58.

[46] Peverill Squire, Raymond E. Wolfinger, and David P. Glass (1987), "Residential Mobility and Voter Turnout," *American Political Science Review* 81:45-65.

Black voters even greater. In the follow sections, I examine the racial impact of new limits on drop boxes and out-of-precinct voting.

## VIII.   Analysis of Effects of SB 202's Limits on Drop Boxes

One of the challenged provisions of SB 202 imposes substantial limitations on the availability of drop boxes for voters to return absentee ballots. The terms "absentee voting" or "vote-by-mail" fairly describe the ways that such ballots are <u>issued</u> to voters, but it does not convey the variety of ways they are <u>returned</u>, including via drop boxes. Although a recent innovation in Georgia, drop boxes have been used elsewhere around the United States for decades. In some states, they have become an essential part of the ballot return process.

When given the choice, many voters receiving ballots by mail prefer to return them using drop boxes rather the postal mail. A national survey conducted by the Pew Research Election after the 2020 election found that 41% of Americans who received ballots by mail returned them via drop boxes.[47] As the federal Cybersecurity and Infrastructure Security Agency (CISA) explained in a recent report:

> These voters may be motivated by lack of trust in the postal process, fear that their ballot could be tampered with, or concern that their signature will be exposed. Voters may also be concerned about meeting the postmark deadline and ensuring that their ballot is returned in time to be counted.[48]

For voters who receive ballots by mail, returning them via drop boxes is more trustworthy than mail because it immediately puts the ballot into the custody of local election officials rather than an intermediary. Reductions in drop box access could easily deter voters from using absentee ballots or make them less confident about the election process.

### A.  Limits on the Number of Drop Boxes under S.B. 202

SB 202 mandates that each county board of registrars or absentee ballot clerk "shall establish at least one drop box." Counties "may establish additional drop boxes . . . totaling the lesser of either one drop box for every 100,000 active registration voters in the county or the number of advance voting locations in the county." This language does not specify the timeframe for determining the number of active voter registrations in each county.[49]

---

[47] https://www.pewresearch.org/politics/2020/11/20/the-voting-experience-in-2020/ (last visited April 18, 2022).

[48] https://www.eac.gov/sites/default/files/electionofficials/vbm/Ballot_Drop_Box.pdf (last visited April 18, 2022).

[49] SB 202 further states that drop boxes "shall be evenly geographically distributed by population in the county." It is not clear how this is achieved or assessed, especially because the law also requires that drop boxes only be placed "at the office of the board or registrars or absentee ballot clerk or inside locations at which advance voting . . . is conducted."

Compared to usage in November 2020, caps imposed by SB 202 for the November 2022 election represent a loss of approximately 100 drop boxes, or one-third of the statewide total. The numbers for each county are provided in the Appendix B to this report. The appendix also lists the number of actual drop box locations in November 2022. The actual deployments closely resemble the maximum numbers allowed.[50]

A question in this case is whether the dramatic reduction in availability of drop boxes has a racially disparate impact. To evaluate this question, I compare the maximum number of drop boxes in a county permitted in the November 2022 elections under SB 202 to the number that existed in the November 2020 election. To this listing, I appended data on the racial makeup of each county using the U.S. Census Bureau's ACS 2020 five-year estimates. I divided the number of Black residents by the total number of residents in each county to compute the percentage of individuals in each county who were Black. This comparison makes it possible to determine if the reduction in drop boxes is concentrated in parts of the state where Black residents and voters comprise larger shares of the population.

The decline in drop boxes required under SB 202 is not random. The decreases are systematically related to the size of the Black population in a county. Table 11 shows that counties experiencing bigger cuts in the number of drop boxes are those where the share of the population that is Black tends to be larger. The correlation between the anticipated change in drop boxes (again assuming counties use the maximum number of drop boxes allowed) and the Black share of the population is negative, indicating <u>larger</u> declines in the number of drop boxes will take place in counties where Black residents comprise <u>more</u> of the population. A linear regression analysis of the same two variables shows that, on average, a county with a Black population 10 percentage points greater than another county will see a decrease of 3.4 more drop boxes.[51]

---

[50] Only nine counties of 159 did not use the maximum number of drop box locations allowed by SB 202. Eight of those nine counties used one drop box rather than the two allowed. In addition, Clayton County appeared to use three drop boxes even through the number of registered voters on election day was only sufficient to allow a maximum of two drop boxes.

[51] The regression coefficient of -.034 is statistically significant by conventional standards ($p < .05$, two-tailed test.)

**Table 11**
**County Black Population and Changes in Numbers of Drop Boxes**

| Change in Drop Boxes between 2020 and 2022 | Number of Counties | Mean Black Population | Number of Black Residents | Share of State Black Population |
|---|---|---|---|---|
| Increase of 2 | 1 | 16.8% | 25,908 | .8% |
| Increase of 1 | 33 | 31.6% | 274,093 | 8.3% |
| No Change | 99 | 25.6% | 848,486 | 25.6% |
| Decrease of 1 | 13 | 30.4% | 237,152 | 7.1% |
| Decrease of 2 | 2 | 39.3% | 29,850 | .9% |
| Decrease of 3 | 2 | 40.1% | 141,352 | 4.3% |
| Decrease of 4 | 2 | 18.8% | 219,273 | 6.6% |
| Decrease of 5 | 1 | 28.2% | 35,829 | 1.1% |
| Decrease of 6 | 1 | 69.8% | 200,776 | 6.0% |
| Decrease of 8 | 1 | 40.3% | 116,658 | 3.5% |
| Decrease of 9 | 1 | 47.6% | 69,022 | 2.1% |
| Decrease of 18 | 1 | 28.1% | 260,366 | 7.8% |
| Decrease of 28 | 1 | 53.3% | 402,410 | 12.1% |
| Decrease of 29 | 1 | 43.6% | 458,669 | 13.8% |

The table also shows that the biggest reductions in the number of drop boxes allowed occur in counties with large numbers of Black residents. The three counties experiencing the largest reductions by far – Fulton, DeKalb, and Gwinnett, all in the Atlanta metro area – together account for one-third of all Black Georgians.

Figure 7 below shows the data graphically with each circle representing a county in Georgia. The circles are scaled proportionally so that the size of the circle represents the size of the Black population in the county. This figure makes clear that while many counties will experience no change (and are thus found along horizontal line at zero), several counties with large Black populations are targeted for the most substantial reductions. The two largest circles at the bottom of the figure represent the counties of Fulton (losing 29 drop boxes) and Gwinnett (losing 28 drop boxes). Both have large Black populations, both in terms of raw numbers and as percentages of the population. Together they account for more than half of all of the reductions in drop boxes statewide that must occur under SB 202. Altogether, the three counties forced to reduce the number of drop box locations most dramatically account for more than 800,000 Black citizens of voting age.

28

**Figure 7**
**County Black Population and Changes in Numbers of Drop Boxes**



Because SB 202 requires each county to establish at least one drop box, 29 counties that did not use any drop boxes in the 2020 election would now be required to offer one. These mandated increases do little to serve the state's Black voters. Together the counties represent only 4% of the statewide Black population. To put this in perspective, Fulton County is required by SB 202 to eliminate at least 29 drop boxes, the same number gained in the counties that will be going from zero to one. Yet Fulton County holds 14% of the state's Black population. The addition of a drop box in some of the smallest counties is no remedy for the dramatic reductions in the states most populous counties where a large share of the state's Black voter reside. Because of the prominence of these counties in statewide politics, lawmakers would have been well aware that SB 202's limits on drop boxes would be more disruptive to the voting experience in the metro-Atlanta counties containing a substantial number of Black residents.

### B.  Limits on the Location, Days, and Hours of Operation of Drop Boxes under SB 202

The sharp decrease in the number of drop boxes allowed is not the only way that SB 202 inhibits use of drop boxes. The sites for drop boxes are limited to early voting locations, the boxes must be located indoors, and the boxes are not available for use outside of early voting hours or after early voting ends, which is typically on the Friday before election day.

These limitations render the smaller number of drop boxes that are established far less useful than they were in past elections. A voter who is able to travel to an early voting location during operating hours might find it slightly more convenient to use the drop box at that site rather than get in line to vote. But the real benefits of drop boxes for voters prior to SB 202 were that they offered more locations and times (up to 24 hours a day) than polling places could accommodate. Under SB 202, not only is the number of drop boxes reduced sharply, but so is the utility of those that remain. The following sections examine how restrictions on drop boxes are likely to affect overall usage and Black and white voters differentially.

In this section of the report I analyze daily usage of drop boxes using reliable data from the vast majority of Georgia's counties that offered drop boxes in recent elections. A detailed description of how I acquired and managed the data is provided in Appendix C.

Because of the uniqueness of the data collection, it is helpful to put the subsequent analysis in context by providing a summary of the general daily drop box usage by Georgia voters. Focusing on the November 2020 election, I limit this analysis to ballot collection on the days from September 1 to election day on November 3. The data show evidence of at least 677,618 ballots being collected from drop boxes in the November 2020 election cycle. Drop box usage by Georgia voters was widespread: the ballots represent over <u>half</u> of all absentee ballots cast in the counties who provided information about drop box collections.[52]

Figure 8 below shows daily collection counts from drop boxes in the November 3, 2020 election. The figure shows that drop box usage generally rose over the course of the election campaign and was heavier in the final days leading to election day. In the final four days from October 30 through November 3 (days after the vertical dotted line in the figure), 120,841 of the ballots in the dataset were collected. The sum for the final four days of the 2020 election cycle – days during which drop boxes are no longer available under SB 202 – accounts for 12% of the total number of absentee ballots placed in drop boxes. This is important for understanding the likely effects of SB 202 because the law now bans usage of drop boxes in the three days immediately before election day, as well as on election day itself. Election day was the heaviest day of usage, with more than 61,000 ballots collected on November 3, 2020 across the 101 counties represented in the figure.[53]

---

[52] To compute this figure, I downloaded the "Voter Absentee File" for the November 2020 election from the Georgia Secretary of State's web site. Dividing the number of drop box ballots collected by the number of accepted absentee ballots in the same counties produces a drop box voting rate of 56.7%.

[53] Appendix D to this report demonstrates that these general patterns hold even when accounting for times of day that drop box ballots were collected.

**Figure 8**
**Number of Absentee Ballots Collected in Drop Boxes by Day in the November 3, 2020 Election**



Voters who used drop boxes on these final four days in 2020 are not able to use them during those days in elections after the passage of SB 202. Voters possessing completed ballots on those days are also not able to take advantage of early voting, and would likely not have sufficient time to return their ballots by mail. The alternative is to appear in person at a county elections office or other location with an authorized deputy registrar, or get in line and vote in person on election day. As I have already shown, waiting times are long in Georgia and noticeably more so for Black voters.

Similar patterns are apparent in the 2021 U.S. Senate runoff elections, as shown in Figure 9, which displays daily data on collections from 93 counties. In the January 2021 runoff election, drop box usage generally increased as election day approached, although lower usage around the Christmas and New Year's Day holidays is evident. More than 17% of drop box ballots were collected on the final five days that would not be available to voters under SB 202.[54]

---

[54] Under SB 202, drop boxes may not be used after the early voting period ends. Early voting normally ends on the Friday before a Tuesday election, thus leaving four days, including election day, during which drop boxes are unavailable. However, because the Friday before the January 5, 2021 runoff election was a federal and state holiday (New Year's Day), early voting ended no later than Thursday, December 31, 2020, leaving five days, including election day, after the early voting period ended and before the polls closed.

**Figure 9**
**Number of Absentee Ballots Collected in Drop Boxes by Day in the January 5, 2021 Runoff Election**



The June 9, 2020 presidential primary election was the first in which drop boxes were used in Georgia. Although voter turnout was much lower in that election than in the high-profile November 2020 and January 2021 elections, a similar pattern of rising usage of drop boxes up through election day is evident. Fewer drop boxes were available in the primary election and data were available on drop box collections from only 34 counties. Even with these limitations, Figure 10 shows that election day was the highest usage day, as it was in the other two elections. Nearly half (47%) of all absentee ballots were returned via drop boxes in the counties I had available for analysis.

**Figure 10**
**Number of Absentee Ballots Collected in Drop Boxes by Day in the June 9, 2020 Election**



This section of the report has already demonstrated that:

- drop boxes were prevalent and widely used in Georgia elections prior to the enactment of SB 202,
- drop box usage tended to increase closer to election day and, in particular, during the final four days of the election cycle days now prohibited by SB 202,
- SB 202 severely reduced the usefulness of drop boxes by limiting their number, locations, and times of availability,
- reductions in drop box locations mandated by SB 202 are largest in counties with the largest Black populations.

One limitation of the drop box analysis to this point is that the racial identities of <u>specific individuals</u> who used drop boxes was not possible because election officials generally do not collect such information. The following section of the report rectifies this limitation using individual-level data from one county that did.

### C.  Analysis of Drop Box Usage by Black and White Voters in Douglas County

As a final piece of analysis to support these conclusions, I draw on a unique dataset from one Georgia county where it is possible to demonstrate in exact fashion the race of each voter who returned absentee ballots via drop boxes. In Douglas County, election officials recorded the voter

registration number associated with each drop box ballot they collected in the November 2020 general election and January 2021 runoff election. Records from the county provided to counsel in this case include the date on which each ballot was collected. By linking the county's records with the statewide voter file, which includes the race of each resident, it is possible to determine precisely who used drop boxes. Details about the data analysis are provided in Appendix E.

As the 18th most populous county in the state, Douglas County provides a useful window into patterns of drop box usage in recent Georgia elections more generally. Like other larger-population counties with substantial Black populations, Douglas County was required to reduce the number and general availability of drop boxes following the passage of SB 202. The County went from 10 drop boxes in the November 2020 election to just one drop box for the November 2022 election. As required by SB 202, that drop box was only available during the early voting period and was located indoors, a tremendous reduction in availability from what the county offered before the change in State law.

Table 12 shows that Black voters were more likely than white voters to use drop boxes in Douglas County. There is no ambiguity about this pattern because the race of each drop box user is known. In the November 2020 election, Black voters were 4.1 percentage points more likely than other voters to return absentee ballots via drop boxes. In January 2021 the difference widened to 6.0 percentage points.

**Table 12**
**Relative Usage of Drop Boxes by Black Voters in Douglas County**

| Election | Black Share of All Voters | Black Share of Drop Box Voters | Difference in Percentage Points |
|---|---|---|---|
| November 2020 | 45.6% | 49.7% | 4.1 more Black |
| January 2021 | 46.8% | 52.8% | 6.0 more Black |

The patterns in Douglas County confirm the patterns suggested by the other analysis of drop boxes in this report with an even higher level of confidence. The patterns indicate that the restrictions on drop boxes imposed by SB 202 will have a substantial, disproportionate burden on Black voters, a larger share of whom will be required to alter the times, places, and methods of voting than will white voters.

## IX.   Analysis of Effects of SB 202's Ban on Counting Out-of-Precinct Provisional Ballots Returned Before 5:00 p.m.

In this section I analyze the use of out-of-precinct provisional ballots by Black and white voters in Georgia in the November 2020 election and the January 2021 runoff election. As discussed in detail below, although complete data on out-of-precinct provisional ballots is not available, the data provided to me is sufficient to conclude that Black voters are more likely to be impacted by SB 202's change in the law than white voters.

For almost two decades before the implementation of SB 202, voters in Georgia were allowed to cast in-person ballots at polling places outside of their precincts and have those ballots counted as long as the polling place was in the same county. Such ballots were treated as out-of-precinct provisional ballots. Votes cast in contests on the provisional ballots that also appeared on ballots in the voter's home precinct were counted. For example, a vote for president or governor would be common to both polling places because the race is countywide but a vote for a city council member might not.[55] Under SB 202, such ballots are not counted unless the vote is cast after 5:00 p.m. on election day and the voter submits a sworn statement witnessed by election official that explains why the voter could not use their assigned polling place.

A report from the Pew Center on the States suggests that voters who cast ballots outside their regular precincts might have done so because they lacked necessary information about their registration, assigned precinct, and polling place; voters could have even been provided with incorrect information from election officials or other sources.[56] The "out-of-precinct" failsafe may also be used by voters to cast ballots at polling places closer to employment, childcare, familial responsibilities, medical appointments, or other obligations than their home address, especially if they were unsure or incorrect about which was their assigned precinct polling place.

These contributors to out-of-precinct voting would be more likely in dense urban areas where polling places are often in closer proximity and where polling places may be more prone to relocation from one election to the next. Residential mobility – which I have shown is greater among Black residents than white residents – might also make it more difficult to determine one's assigned polling place. The following sections describe the prevalence of out-of-precinct provisional ballots in Georgia before SB 202 and how usage is related to the racial identities of voters.

### A.  Racial Breakdown in Submission of Out-of-Precinct Provisional Ballots

Counsel requested data from every county in Georgia about which voters had cast out-of-precinct provisional ballots and whether or not they were counted. In this section of the report, I focus on the highest quality data from counties who provided listings of individuals who cast provisional ballots along with their voter registration numbers, thus facilitating highly reliable linkage to the statewide voter file providing each individual's race. The counties providing data in this way also represent some of the most populous counties in Georgia in the metro-Atlanta areas including Cobb, Fulton, and Gwinnett. In Appendix F to this report, I describe how the data in this section were acquired, managed, and linked to other data sources to produce reliable analysis.

Some counties provided information about usage of provisional ballots in less useful formats. Many of these documents were hand-written and lacked voter registration numbers. Nonetheless,

---

[55] For many voters, being prohibited from making selections in down-ballot contests is not a concern. This is because many voters "roll-off" as they move down the ballot, abstaining from lower-level contests.

[56] Pew Center on the States (July 2009), "Provisional Ballots: An Imperfect Solution." Washington, DC: Pew Charitable Trusts.

I worked with the firm CDS to hand-enter the information and make as much of it useful as possible. Because of their limitations, these data are presented separately in auxiliary analysis in Appendix G to this report. This auxiliary analysis provides similar conclusions about racial disparities in the use of out-of-precinct provisional ballots.

Table 13 below provides summary evidence on whether Black voters were disproportionately likely to cast out-of-precinct provisional ballots in the November 2020 election. The counties are sorted by their population sizes. The second data column in the table shows what share of all voters in the election in the county were Black. The next data column shows what percentage of out-of-precinct provisional ballots were cast by Black voters. If these two percentages were equal, then there would be no racial disparity in out-of-precinct voting and less concern about the ban on such ballots having a racially disparate impact. This is rarely the case: the table shows that Black voters were substantially more likely than white voters to cast such ballots.

**Table 13**
**Racial Breakdown of Out-of-Precinct Provisional Ballots in 13 Georgia Counties in 2020 Using Exact Matching of Voter Registration Numbers**

| County | County Population | Number of Matched Out-of-Precinct Voters | Share of Black Voters Among: | | Difference (in percentage points) |
|---|---|---|---|---|---|
| | | | All Voters | Out-of-Precinct Voters | |
| Fannin | 25,817 | 12 | .07% | 0% | .07 more white |
| Gilmer | 32,026 | 10 | .3% | 0% | .3 more white |
| Gordon | 58,237 | 16 | 3.3% | 12.5% | 9.2 more Black |
| Rockdale | 94,082 | 31 | 55.3% | 58.1% | 2.8 more Black |
| Walton | 99,853 | 36 | 12.8% | 50.0% | 37.2 more Black |
| Carroll | 121,968 | 63 | 14.5% | 31.8% | 17.3 more Black |
| Newton | 155,355 | 27 | 44.1% | 40.7% | 3.4 more white |
| Columbia | 159,639 | 31 | 16.6% | 22.6% | 6.0 more Black |
| Houston | 166,829 | 82 | 28.9% | 32.9% | 4.0 more Black |
| Henry | 245,235 | 143 | 45.2% | 55.2% | 10.0 more Black |
| Cobb | 766,802 | 353 | 24.5% | 42.2% | 17.7 more Black |
| Gwinnett | 964,546 | 509 | 27.7% | 31.4% | 3.7 more Black |
| Fulton | 1,065,334 | 339 | 35.6% | 47.5% | 11.9 more Black |

In 10 of out of the 13 counties, Black voters were overrepresented among the out-of-precinct voters. In five counties, the heavier usage by Black voters was substantial, 10 percentage points or more. In only three counties did white voters use out-of-precinct ballots more than Black voters, but two of those were trivial differences in counties where Black voters comprised only a tiny share of the electorate and the overall county populations are rather small (Fannin County and Gilmer County, both differences of less than half a percentage point). The clear conclusion from this analysis of a wide range of counties is that Black voters were much more likely to have cast out-of-precinct ballots in Georgia in November 2020.

Table 14 provides the same kind of analysis for the 2021 runoff elections. Of the 13 counties that provided voter registration numbers in their lists of voters who cast a provisional ballot, and where more than five matches could be made, only four saw a higher rate of out-of-precinct provisional voting by whites, and two of those (Fannin and Walton) were trivial differences of less than one percentage point. In nine of the thirteen counties, Black voters were disproportionately likely to cast and have accepted out-of-precinct provisional ballots.

**Table 14**
**Racial Breakdown of Out-of-Precinct Provisional Ballots in 13 Georgia Counties in the January 2021 Election Using Exact Matching of Voter Registration Numbers**

| County | County Population | Number of Matched Out-of-Precinct Voters | Share of Black Voters Among: | | Difference (in percentage points) |
| | | | All Voters | Out-of-Precinct Voters | |
| --- | --- | --- | --- | --- | --- |
| Fannin | 25,817 | 12 | .07% | 0.0% | .07 more white |
| Gordon | 58,237 | 19 | 3.4% | 10.5% | 7.1 more Black |
| Glynn | 84,739 | 62 | 16.3% | 19.4% | 2.9 more Black |
| Rockdale | 94,082 | 37 | 56.3% | 46.0% | 10.3 more white |
| Walton | 99,853 | 16 | 13.3% | 12.5% | .8 more white |
| Carroll | 121,968 | 38 | 14.4% | 15.8% | 1.4 more Black |
| Newton | 155,355 | 9 | 46.3% | 88.9% | 42.6 more Black |
| Columbia | 159,639 | 11 | 16.9% | 9.1% | 7.8 more white |
| Houston | 166,829 | 51 | 29.7% | 31.4% | 1.7 more Black |
| Henry | 245,235 | 171 | 47.6% | 50.9% | 3.3 more Black |
| Cobb | 766,802 | 427 | 24.1% | 40.5% | 16.4 more Black |
| Gwinnett | 964,546 | 643 | 28.6% | 36.4% | 7.8 more Black |
| Fulton | 1,065,334 | 179 | 35.3% | 39.1% | 3.8 more Black |

The evidence from Tables 13 and 14 as well as the auxiliary analysis of other counties provided in the Appendix yields a clear conclusion: the elimination of out-of-precinct balloting will disproportionately harm Black voters in Georgia. Across a variety of counties in both the 2020 and 2021 elections, Black registered voters were more likely to cast ballots within their counties but not at their assigned precincts, a practice that SB 202 generally makes impermissible.

Depending on the person's circumstance, the effect on out-of-precinct voters will range from mild inconvenience to outright disenfranchisement. Under SB 202, voters who learn that their out-of-precinct ballots will not be counted might be able to get themselves to their assigned polling places before 5:00 p.m. on election day. The ability to do so depends on having a sense of efficacy that one can successfully navigate the system, resources such as access to an automobile to drive elsewhere in the county, and lack of constraints such as hourly employment, childcare, or other responsibilities that would inhibit changing voting behavior. In addition, because they experience longer wait times to vote, Black voters are more likely to be discouraged from traveling to a different voting location after being informed after waiting in line that they are not able to submit out-of-precinct provisional ballots that will count.

37

The end of almost all out-of-precinct voting simply affects Black voters at a higher rate, thus creating a racially disparate effect. The disparate burden is exacerbated in two ways. First, I have shown that Black voters are more likely to move from one residence to another between elections. That creates more risk for confusion or challenges for Black voters who are more likely than white voters to find themselves living in different precincts over time. Second, I have also shown that Black voters in Georgia also tend have fewer resources and face greater difficulty in overcoming the costs of voting. Even if the severe limits on out-of-precinct provisional voting were equally likely to impinge Black voters and white voters (which they do not), they would be more consequential for Black voters because of differential resources that aid the voting process.

## X.    Summary Opinions

In this report I examined tendencies in the voting patterns of Black voters and white voters in Georgia, the waiting times experienced by both racial groups, absentee voting, the usage of absentee ballot drop boxes, and out-of-precinct provisional ballots. The analyses persuasively demonstrate that the challenged provisions of SB 202 target practices used more by Black voters than by white voters. Drop boxes and out-of-precinct voting have been more heavily used by Black voters and are sharply curtailed to the point of near uselessness by SB 202. Beyond rendering drop boxes far less useful, absentee voting, also used more heavily by Black voters, has been limited in important ways by SB 202. These practices are largely recent phenomena, mostly dating only to the November 2018 elections and accelerating in the 2020 election when higher rates of absentee voting, drop box usage, and out-of-precinct voting by Black voters compared to white voters were apparent and politically consequential. By inhibiting or fully outlawing these practices, SB 202 will disrupt and burden the participation of Black voters disproportionately. Because Black voters have fewer resources to overcome the new costs imposed on them by these changes in law, SB 202 is nearly certain to impede the voting rights of Black Georgians more than white Georgians.

 Respectfully submitted, this 30th day of December 2022,

Dr. Barry C. Burden

**Appendix A:  Description of Data on Absentee Voting**

To determine the rates at which Black and white voters used absentee voting between 2014 and 2021, I combined several datasets. First, I began with a recent version of the statewide voter file provided to counsel by the State and dated as having been created on May 3, 2022. To that, I appended a list of cancelled voters dating back to 2001 that was acquired from the same source and created on the same day. Because "canceled" voters are removed from the statewide voter file over time, it is necessary to add them back to the file to generate a complete list of registered voters in a particular past election. The statewide voter file and the canceled list provide, among other things, the self-identified race of each registered voter up through the January 2021 runoff elections. To analyze the November 2022 election, I combined a new version of statewide voter file created by the State for counsel on November 8, 2022.

To create a list of every voter who cast an absentee ballot in each of these elections, as well as the racial identity of each voter and the date on which they submitted the absentee ballot, I merged each election dataset with the "Voter Absentee File" that is provided for each election on the website of the Georgia Secretary of State. To execute this merge, I linked the files using the voter's registration number, which is included in both datasets. This allows for effective one-to-one matching for the overwhelming number of records in both files.[57] To determine which ballots were absentees issued by mail, I limited the analysis to records marked as "MAILED" as the "ballot style" in the absentee file. In addition, I only included "accepted" ballots that were marked by a "ballot status" of "A." To compute the absentee voting rate, the numbers of Black and white absentee voters were divided by the total numbers of Black and white voters indicated in the State voter history file.

---

[57] The absentee file contains an extremely small proportion of duplicate records. I de-duplicated the file by removing the second incidence of any repeated values of the registration number.

**Appendix B:  Data on Drop Boxes Locations in November 2020 and November 2022 Elections**

To estimate how many drop boxes would be allowed after the implementation of SB 202, I calculated the maximum number of drop boxes in each county that would be permitted based on the number of active registrants listed in the state voter file from May 3, 2022.[58] Using a listing of early voting locations from the November 2020 election,[59] it appears that the maximum number of drop boxes allowed based on the number of active registrants is lower than or equal to the number based on early voting locations in every county.

The overwhelming majority of counties – 142 out of the 159 – have fewer than 100,000 active registrants and would be required to establish exactly one drop box as mandated by SB 202. Thirteen counties would be permitted to establish up to two drop boxes, one would be permitted to establish five, two would be permitted to establish six, and one would be permitted to establish eight. The result is a maximum of 193 drop boxes statewide. Between the May primary and the November general election two additional counties (Chatham and DeKalb) gained enough registered voters to cross thresholds allowing each and extra drop box location. These two additions bring the total to 195 drop boxes statewide.

To assess how this maximum number of drop boxes now permitted compares to actual usage before the limitations imposed by SB 202 were in effect, several sequential steps were necessary to determine the number of drop boxes that were in place for the November 2020 election. First, I began with information about drop box locations in the 2020 election as catalogued on the web site maintained by the advocacy group Georgia Peanut Gallery.[60] Second, I compared that listing against a listing provided by Atlanta-based NBC television affiliate WXIA.[61] Third, those sources were compared against documents acquired directly from counties by counsel, as described in Appendix C. Based on this analysis, I estimate that 292 drop boxes were used in Georgia for the November 2020 election.

---

[58] SB 202 does not specific when voter registration records should be consulted to determine how many multiples of 100,000 active voters reside in a county. The number of registrants is constantly changing as individuals are added to and removed from the rolls.

[59] https://georgiapeanutgallery.org/2020/10/09/early-voting-locations-for-november-3-elections-in-georgia/ (last visited April 18, 2022).

[60] https://georgiapeanutgallery.org/2020/09/28/drop-box-locations-for-november-3-2020-election/ (last visited April 18, 2022).

[61] https://www.11alive.com/article/news/politics/elections/absentee-ballot-drop-boxes-in-metro-atlanta/85-3ba1e3fc-9421-4b29-9210-c48713cad083 (last visited April 18, 2022).

**Table A1**
**Ballot Drop Boxes in Use in the November 2020 Election**
**and Allowed by SB 202 for the November 2022 Election**
**Based on May 2022 Voter Registration Data**

| County | Drop Boxes Used in 2020 | Drop Boxes Allowed in 2022 | Drop Boxes Used in 2022 |
|---|---|---|---|
| Appling | 2 | 1 | 1 |
| Atkinson | 1 | 1 | 1 |
| Bacon | 1 | 1 | 1 |
| Baker | 1 | 1 | 1 |
| Baldwin | 2 | 1 | 1 |
| Banks | 1 | 1 | 1 |
| Barrow | 1 | 1 | 1 |
| Bartow | 5 | 1 | 1 |
| Ben Hill | 0 | 1 | 1 |
| Berrien | 1 | 1 | 1 |
| Bibb | 2 | 2 | 1 |
| Bleckley | 1 | 1 | 1 |
| Brantley | 1 | 1 | 1 |
| Brooks | 1 | 1 | 1 |
| Bryan | 2 | 1 | 1 |
| Bulloch | 1 | 1 | 1 |
| Burke | 0 | 1 | 1 |
| Butts | 1 | 1 | 1 |
| Calhoun | 1 | 1 | 1 |
| Camden | 0 | 1 | 1 |
| Candler | 0 | 1 | 1 |
| Carroll | 2 | 1 | 1 |
| Catoosa | 1 | 1 | 1 |
| Charlton | 0 | 1 | 1 |
| Chatham | 10 | 2* | 3 |
| Chattahoochee | 2 | 1 | 1 |
| Chattooga | 0 | 1 | 1 |
| Cherokee | 3 | 2 | 2 |
| Clarke | 6 | 1 | 1 |
| Clay | 1 | 1 | 1 |
| Clayton | 8 | 2 | 3** |
| Clinch | 0 | 1 | 1 |
| Cobb | 10 | 6 | 6 |
| Coffee | 1 | 1 | 1 |
| Colquitt | 1 | 1 | 1 |
| Columbia | 0 | 2 | 2 |
| Cook | 1 | 1 | 1 |
| Coweta | 1 | 2 | 1 |
| Crawford | 1 | 1 | 1 |

| County | Drop Boxes Used in 2020 | Drop Boxes Allowed in 2022 | Drop Boxes Used in 2022 |
|---|---|---|---|
| Crisp | 1 | 1 | 1 |
| Dade | 1 | 1 | 1 |
| Dawson | 1 | 1 | 1 |
| DeKalb | 33 | 5* | 6 |
| Decatur | 1 | 1 | 1 |
| Dodge | 0 | 1 | 1 |
| Dooly | 1 | 1 | 1 |
| Dougherty | 1 | 1 | 1 |
| Douglas | 10 | 1 | 1 |
| Early | 1 | 1 | 1 |
| Echols | 1 | 1 | 1 |
| Effingham | 1 | 1 | 1 |
| Elbert | 1 | 1 | 1 |
| Emanuel | 0 | 1 | 1 |
| Evans | 1 | 1 | 1 |
| Fannin | 1 | 1 | 1 |
| Fayette | 4 | 1 | 1 |
| Floyd | 2 | 1 | 1 |
| Forsyth | 1 | 2 | 1 |
| Franklin | 1 | 1 | 1 |
| Fulton | 37 | 8 | 7 |
| Gilmer | 1 | 1 | 1 |
| Glascock | 0 | 1 | 1 |
| Glynn | 3 | 1 | 1 |
| Gordon | 1 | 1 | 1 |
| Grady | 1 | 1 | 1 |
| Greene | 0 | 1 | 1 |
| Gwinnett | 24 | 6 | 6 |
| Habersham | 0 | 1 | 1 |
| Hall | 1 | 2 | 1 |
| Hancock | 1 | 1 | 1 |
| Haralson | 1 | 1 | 1 |
| Harris | 1 | 1 | 1 |
| Hart | 1 | 1 | 1 |
| Heard | 0 | 1 | 1 |
| Henry | 1 | 2 | 1 |
| Houston | 2 | 2 | 2 |
| Irwin | 1 | 1 | 1 |
| Jackson | 1 | 1 | 1 |
| Jasper | 1 | 1 | 1 |
| Jeff Davis | 1 | 1 | 1 |
| Jefferson | 3 | 1 | 1 |
| Jenkins | 0 | 1 | 1 |
| Johnson | 0 | 1 | 1 |

| County | Drop Boxes Used in 2020 | Drop Boxes Allowed in 2022 | Drop Boxes Used in 2022 |
|---|---|---|---|
| Jones | 1 | 1 | 1 |
| Lamar | 1 | 1 | 1 |
| Lanier | 1 | 1 | 1 |
| Laurens | 1 | 1 | 1 |
| Lee | 1 | 1 | 1 |
| Liberty | 2 | 1 | 1 |
| Lincoln | 1 | 1 | 1 |
| Long | 1 | 1 | 1 |
| Lowndes | 1 | 1 | 1 |
| Lumpkin | 1 | 1 | 1 |
| Macon | 1 | 1 | 1 |
| Madison | 1 | 1 | 1 |
| Marion | 1 | 1 | 1 |
| McDuffie | 2 | 1 | 1 |
| McIntosh | 1 | 1 | 1 |
| Meriwether | 0 | 1 | 1 |
| Miller | 0 | 1 | 1 |
| Mitchell | 1 | 1 | 1 |
| Monroe | 1 | 1 | 1 |
| Montgomery | 0 | 1 | 1 |
| Morgan | 1 | 1 | 1 |
| Murray | 1 | 1 | 1 |
| Muscogee | 3 | 2 | 1 |
| Newton | 1 | 1 | 1 |
| Oconee | 1 | 1 | 1 |
| Oglethorpe | 1 | 1 | 1 |
| Paulding | 2 | 2 | 1 |
| Peach | 2 | 1 | 1 |
| Pickens | 1 | 1 | 1 |
| Pierce | 1 | 1 | 1 |
| Pike | 1 | 1 | 1 |
| Polk | 1 | 1 | 1 |
| Pulaski | 1 | 1 | 1 |
| Putnam | 1 | 1 | 1 |
| Quitman | 1 | 1 | 1 |
| Rabun | 1 | 1 | 1 |
| Randolph | 0 | 1 | 1 |
| Richmond | 5 | 2 | 1 |
| Rockdale | 1 | 1 | 1 |
| Schley | 1 | 1 | 1 |
| Screven | 1 | 1 | 1 |
| Seminole | 0 | 1 | 1 |
| Spalding | 1 | 1 | 1 |
| Stephens | 1 | 1 | 1 |

| County | Drop Boxes Used in 2020 | Drop Boxes Allowed in 2022 | Drop Boxes Used in 2022 |
|---|---|---|---|
| Stewart | 0 | 1 | 1 |
| Sumter | 1 | 1 | 1 |
| Talbot | 2 | 1 | 1 |
| Taliaferro | 0 | 1 | 1 |
| Tattnall | 1 | 1 | 1 |
| Taylor | 1 | 1 | 1 |
| Telfair | 1 | 1 | 1 |
| Terrell | 1 | 1 | 1 |
| Thomas | 1 | 1 | 1 |
| Tift | 2 | 1 | 1 |
| Toombs | 0 | 1 | 1 |
| Towns | 1 | 1 | 1 |
| Treutlen | 0 | 1 | 1 |
| Troup | 1 | 1 | 1 |
| Turner | 1 | 1 | 1 |
| Twiggs | 0 | 1 | 1 |
| Union | 1 | 1 | 1 |
| Upson | 1 | 1 | 1 |
| Walker | 1 | 1 | 1 |
| Walton | 1 | 1 | 1 |
| Ware | 1 | 1 | 1 |
| Warren | 0 | 1 | 1 |
| Washington | 0 | 1 | 1 |
| Wayne | 1 | 1 | 1 |
| Webster | 0 | 1 | 1 |
| Wheeler | 1 | 1 | 1 |
| White | 1 | 1 | 1 |
| Whitfield | 1 | 1 | 1 |
| Wilcox | 0 | 1 | 1 |
| Wilkes | 1 | 1 | 1 |
| Wilkinson | 1 | 1 | 1 |
| Worth | 1 | 1 | 1 |

*As noted in the report, Chatham County and DeKalb County experienced an increased number of active registrants such that they each became eligible for an additional drop box under SB 202 at some point before election day in November.

**Clayton County appeared to use more drop boxes than allowed by SB 202.

**Appendix C:  Description of Data on Daily Drop Box Collections**

County election officials were asked by counsel for the United States to provide detailed data on usage of drop boxes, including copies of completed "Drop Box Ballot Transfer Forms" used in recent elections. The transfer forms are used by election officials to record dates, times, and locations that specific numbers of absentee ballots were collected from drop boxes. The data collection is extensive: 107 of the 129 counties in Georgia that used drop boxes provided information on at least one of the three federal elections from June 2020 to January 2021. While there might be cases where some county reports are missing collection data from particular times or dates, the 107 counties that provided information on at least one of the election cycles captures the vast majority of the State's population.[62]

Because the Drop Box Ballot Transfer Forms were required to be completed at least daily in each county in each election cycle, the counties produced thousands of scans of hand-written drop box collection information. To make the data amenable to quantitative analysis in this case, counsel contracted with a private firm, Complete Discovery Source (CDS), to hand-enter the data into a master spreadsheet. This data entry process took place following my instructions and supervision, following an iterative process in which I identified and corrected apparent errors (e.g, a date is entered as "10/22/0020" instead of "10/22/2020") and irregularities, and I removed duplicate entries. The data entry project represents the most comprehensive accounting of how Georgia voters used absentee ballot drop boxes in recent statewide elections.

---

[62] The 52 counties missing drop box information from all three of the elections account for only 18% of the ballots cast in Georgia in the November 2020 elections and many of those counties did not use drop boxes at all.

**Appendix D:  Alternative Counting of Drop Box Ballots by Day Using Time Stamps of Collections**

One uncertain aspect of the data on drop boxes is the degree to which the collection date recorded by election workers on drop box transfer forms captures the date on which ballots were actually deposited in a drop box. Although there is no way to determine precisely when a ballot was deposited, an early morning collection probably includes some ballots put into the box after the final collection that took place the previous night. To examine the potential miscounting of previous-day ballots in the morning collections, I reanalyzed the data from the November 3, 2020 election after setting aside ballots collected early in the day where election workers recorded the times of collections. I did this by excluding any ballots collected up through 12:00 p.m. (i.e., Noon). This is a conservative approach that almost certainly errs in the other direction by excluding some ballots deposited early in the day, but it provides an approximate way to reveal if the patterns described in Section VIII of the report are an artifact of inaccurate accounting on a daily basis. (The total number of drop box ballots is of course unaffected by any misassigned dates.). Data from ballots collected after Noon are displayed in Figure A1. Even using this approach, the large number of ballots collected on election day is apparent and a substantial share of ballots (11%) were collected in the final four days that are not permitted under SB 202.

**Figure A1**
**Number of Absentee Ballots Collected in Drop Boxes by Day in the November 3, 2020 Election**
**(Time Stamped after 12:00 PM)**



**Appendix E:  Data on Drop Box Usage in Douglas County**

Douglas County officials provided the registration numbers of voters who returned absentee ballots using drop boxes in the November 2020 and January 2021 elections. After removing duplicate entries, I was able to link those registration numbers to the combined statewide voter file described elsewhere in the report with high levels of confidence and completeness.

For the November 2020 election in Douglas County, I was able to link 7,197 out of 7,202 drop box ballots to the combined voter file described earlier in report. I analyzed collections at all county drop box locations on a daily basis, setting aside ballots marked as UOCAVA or spoiled. Of those ballots, 49.7% were cast by Black voters while 35.4% were cast by white voters, with other racial and ethnic groups making up the remining 14.9%.

Limiting the analysis to only Black and white voters, Figure A2 below shows the racial composition of voters whose drop box ballots were collected each day in the November 2020 election. As with other figures in this section of the report, a vertical line is included to mark the time after which drop boxes are no longer available under SB 202. A horizontal line is included to mark the overall share of November 2020 election voters in Douglas County who were Black. The graph shows clearly that drop box users in Douglas County were disproportionately Black on every day of drop box ballot collections from October 7 through election day. Of those who returned ballots via drop boxes, 58.4% (of the Black-white pool) were Black voters even though 53.3 % of voters in Douglas County in the 2020 election were Black.

**Figure A2**
**Share of Drop Box Ballots Returned by Black Voters by Day in the November 2020
Election in Douglas County**



For the January 2021 runoff election, I was able to link 7,910 drop box ballots out of 7,918 such ballots reported by Douglas County to the combined voter file. The racial mix of voters who returned ballots via drop boxes was 52.8% Black and 32.7% white. Thus, in terms of the two major racial groups, 61.8% of drop box ballots were returned by Black voters.

Figure A3 below the share of Black and white drop box voters who were Black on each day of ballot collection. On every day but one between December 7 and January 5, the share of voters who returned ballots via drop boxes was comprised of more Black individuals than the overall share of Black voters (55.1%) who participated in the election. This makes the second of the two most recent statewide elections before the passage of SB 202 in which drop boxes were used significantly more by Black voters in Douglas County.

**Figure A3**
**Share of Drop Box Ballots Returned by Black Voters by Day in the January 2021 Election in Douglas County**



**Appendix F:  Description of Data on Out-of-Precinct Provisional Voting**

As explained in the body of my report, some counties provided spreadsheets listing the voters who cast provisional ballots, in many cases along with their voter registration numbers. These spreadsheets were analyzed individually. In contrast, other counties produced a variety of documents—usually handwritten—listing voters who cast provisional ballots, less frequently including their voter registration numbers. Because of their differing formats and information included, I analyzed these two types of files separately.

As an example of how the two types of county data compare, for the November 2020 election I received individual files from 20 counties and a summary file covering another 64 counties. (The process for constructing this summary file is described in Appendix G.) When combined, these 84 counties reported 6,332 provisional ballots that were cast out-of-precinct.[63] Such ballots thus represent a large share of provisional voters. Provisional ballots of all kinds – not just for out-of-precinct voters – totaled 9,347 for the entire state of Georgia in that election (including counties not covered in the data available to me).[64]

The counties providing digital spreadsheets are analyzed individually in the main body of the report in Tables 13 and 14 in Section IX. These data on provisional ballots from these counties are most reliable because they generally provide voter registration numbers to facilitate linkage with the statewide voter registration file. Data from counties that was provided in other formats required a more complex process to examine. The auxiliary analysis of these data is described in Appendix G.

Because spreadsheets provided by the counties did not include demographic information about voters who cast provisional ballots, I used the unique voter registration number assigned to each voter to link the spreadsheets to the statewide voter file, which does include the self-reported race of the registrant. To create a voter file that reflects the individuals who were actually registered to vote at the time of a specific elections, I began with a statewide voter file that was created on May 3, 2022. To that, I appended a list of cancelled voters created by the State on the same day. The list of cancelled voters reaches back to January 2, 2001 and thus includes all individuals who would have been removed from the statewide database since that date. The combined file I created encompasses over 11 million individuals who were actively registered to vote in federal elections analyzed in this report. Each spreadsheet listing a county's provisional voters was standardized in format and merged with the combined voter file using the voter registration number where it existed.

---

[63] Restrictions on out-of-precinct provisional voting do not affect low population counties that have only one precinct each. Election results reported by the Georgia Secretary of State indicate that 16 such counties existed in the November 2020 election.

[64] See "Overview Table 3" on page 38 of the U.S. Election Assistance Commission's "Election Administration and Voting Survey 2020 Comprehensive Report," available at https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf (last visited December 13, 2022).

Not all of the spreadsheets provided are suitable for this analysis. Two counties did not report the registration number of the voter (Union and Washington). Some counties reported so few out-of-precinct provisional ballots that analysis would not be sufficiently reliable for reporting racial group differences. I chose to omit analysis of five additional counties that reported five or fewer out-of-precinct ballots that could be matched to the statewide voter file (Camden, Long, Madison, Twiggs, and White). This leaves 13 stand-alone counties for analysis, in addition to the summary file covering many more counties (described in Appendix G).

Because of the conservative approach I used in linking files and limitations in data provided to me, I did not identify the races of all voters who cast out-of-precinct ballots. For example, for the November 2020 elections, I identified the races of 2,454 out of 6,332 voters covered by the data. Although not a full accounting of out-of-precinct voting across the entire state, the purpose of the analysis is not necessarily to report on every voter but instead to provide a window into the frequency that out-of-precinct voting is used by Black and white voters. The counties included in the analysis in Section IX are varied in terms of their population sizes, racial composition, and the number of provisional ballots issued. Together the counties account for 27% of the State's population. This sample of counties thus provides for a useful examination of general patterns across a variety of jurisdictions in Georgia.

**Appendix G:  Auxiliary Analysis of Hand-Entered Data on Provisional Ballots from Additional Counties**

Having examined individual counties that provided digital data in spreadsheet form, I now turn to an auxiliary analysis of other counties around the State that provided information about provisional ballot voters in different formats.

The data contained in county documents were hand-entered into a combined spreadsheet by the data management firm CDS. I provided CDS employees with a set of instructions for hand-entering data from county documents. To the degree they were provided, the data included the county, precinct, election date, voter name, voter registration number, type of provisional ballot (to identify those cast out-of-precinct), and whether the ballot was accepted for counting. This was a challenging task that revealed problems such as illegible handwriting, apparent errors, missing data fields, and duplicate material. My analysis eliminated duplicates and corrected obvious errors, but necessarily omits records that are lacking essential information.

As noted in the previous section, the completeness, accuracy, and format of out-of-precinct voter information provided by counties varies tremendously. The inclusion of voter registration numbers in some of the county provisional ballot data is extremely helpful because it allows for linkage to the statewide voter file to determine the racial identities of voters who cast provisional ballots. For individuals missing registration numbers, linkage must be based on other data fields. To take advantage of both kinds of information in the dataset, I chose to link the individuals who cast out-of-precinct ballots to the statewide voter file in two different ways.

First, I linked voters using the voter registration number where it exists. This approach mimics the analysis in Table 13 and 14 in the report.  It excludes records that lack registration numbers, but in doing so produces results that are extremely reliable due to the presence of the voter registration number as a unique identifier.

Second, I have opted for separate a "deterministic" or "exact" linkage based on matching first names, middle initials, last names, and counties of residence. Deterministic record matching of voter registration data can be highly successful, especially if the files being linked both contain multiple identifying fields that make unique matches highly likely.[65] Because of the limited information provided on county-provided documents – sometimes only the name of the provisional voter – I had to link files based on a small number of fields. I adopted a conservative approach of linking files only when the four fields named above matched exactly. This approach results in some records not being successfully linked and thus an undercount of the total numbers of provisional ballots cast. However, the benefit is a high level of confidence in the records that are linked. My approach to this challenge is thus to prioritize certainty of the linkages over completeness of the final datasets. The resulting matches provide a reliable and valuable window

---

[65] Stephen Ansolabehere and Eitan D. Hersh (2017), "ADGN: An Algorithm for Record Linkage Using Address, Date of Birth, Gender, and Name," *Statistics and Public Policy* 4:1-10.

into the breakdown of out-of-precinct provisional voting by racial group and are not intended to be a full count of the total numbers of such ballots.[66]

A full accounting of every provisional ballot in the State of Georgia is not possible but, fortunately, is also not necessary to reach firm conclusions about racial differences in casting of out-of-precinct provisional ballots. Separate from the 13 counties in Tables 13 and 14, these data in this auxiliary analysis cover 19 counties for the 2018 election, 64 counties for the 2020 election, and 54 counties for the 2021 election.

I begin with an analysis parallel to that in Tables 13 and 14 by linking the hand-entered data to the combined statewide voter file using voter registration numbers. Table A2 provides the racial breakdown of voters who cast out-of-precinct ballots that were accepted in the November 2018, November 2020, and January 2021 runoff elections based on individuals identified by their voter registration numbers.[67] Those percentages are compared to the share of Black voters in the same counties.[67] The final column indicates how much Black or white voters are overrepresented among those who cast accepted out-of-precinct provisional ballots. In one of the election years (2020), out-of-precinct provisional voters who were matched using this method were slightly more likely to be white than the overall set of people who voted in those counties, but in the other two years (2018 and 2021) Black voters were much more likely to cast such ballots.

**Table A2**
**Racial Breakdown of Out-of-Precinct Provisional Ballots in Selected Georgia Counties in the November 2020 Election Using Exact Matching of Voter Registration Numbers**

| Election | Sum of County Populations | Number of Matched Out-of-Precinct Voters | Share of Black Voters Among: | | Difference (in percentage points) |
|---|---|---|---|---|---|
| | | | All Voters | Out-of-Precinct Voters | |
| 2018 | 1,558,341 | 1,808 | 22.4% | 34.5% | 12.1 more Black |
| 2020 | 4,500,039 | 802 | 28.6% | 26.1% | 2.5 more white |
| 2021 | 3,394,599 | 380 | 30.4% | 48.7% | 18.3 more Black |

Because registration numbers are not available for many of the out-of-precinct provisional voters listed in documents provided by the counties, I conducted a separate deterministic record linkage using data fields that were available for a different set of voters. To link the State voter file and the CDS-entered data, I first standardized four fields in each file: first name, middle name initial, last name, and county. Each field was put into lower case text and extraneous punctuation was removed. I then linked the two files by requiring that all four fields matched exactly. This approach is conservative and will fail to link legitimate records that do not match because of minor typographical inconsistencies resulting from use of nicknames, data entry errors, and the like. I chose to accept those "false negatives" in exchange for high certainty in the matches and

---

[66] Because the two methods of linkage were done separately, some individuals will be represented in both analyses.

[67] For reference the table also includes the sum of the populations of the covered counties using the July 1, 2021 population estimates provided by the U.S. Census Bureau.

thus fewer "false positives." As with the record linkage above based on registration numbers, the result is a small but highly reliable set of matched records that serve as a window into the larger but not fully observable patterns of out-of-precinct provisional ballot usage.

Using this approach, Table A3 reports the shares of accepted out-of-precinct provisional ballots voters who were Black compared to the share of all voters in the same counties who were Black based on individuals identified by their names and counties of residence. For all three elections, out-of-precinct provisional ballots were cast disproportionately by Black voters. Across the three election cycles, Black voters are overrepresented among out-of-precinct voters by between 6.8 and 24.9 percentage points.

**Table A3**
**Racial Breakdown of Out-of-Precinct Provisional Ballots in Selected Georgia Counties Using Exact Matching of Voter Names and Counties**

| Election | Sum of County Populations | Number of Matched Out-of-Precinct Voters | Share of Black Voters Among: | | Difference (in percentage points) |
|---|---|---|---|---|---|
| | | | All Voters | Out-of-Precinct Voters | |
| 2018 | 1,558,341 | 620 | 22.4% | 29.2% | 6.8 more Black |
| 2020 | 4,500,039 | 709 | 28.6% | 37.5% | 8.9 more Black |
| 2021 | 3,394,599 | 939 | 30.4% | 54.9% | 24.9 more Black |

Using two different methods of record linkage, the analysis presented here shows that individuals who cast out-of-precinct provisional ballots that were accepted for counting in recent Georgia elections were disproportionately Black voters. Examining three elections, the data demonstrate that Black voters were overrepresented among out-of-precinct voters in five out of six cases, and in several instances the overrepresentation was quite substantial. These results confirm the analyses of individual counties in Tables 13 and 14 in Section IX of the report in which Black voters were found to be more likely than white voters to cast out-of-precinct provisional ballots in the vast majority of cases.