# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*,<br><br>*Defendants*<br><br>v.<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>*Intervenor Defendants* | Civil Action No. 1:21-CV-01284-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>*Defendants* | Civil Action No. 1:21-CV-01259-JPB |

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

    *Plaintiffs,*

            v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*

Civil Action No.
1:21-CV-01728-JPB

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................1

FACTUAL BACKGROUND................................................................3

    A.    Georgia's Growing Black Population and Voter Participation.............3

    B.    The Legislature's Response to Growing Black Voter Participation.....7

    C.    Changes in Election Law Following SB 202's Enactment ................10

ARGUMENT ...............................................................................11

    A.    Plaintiffs Are Likely To Succeed on The Merits Of Their Claims.....12

        1.    The Runoff Restrictions Have A Discriminatory Impact on Black Voters........................................................14

        2.    The Legislature Knew the Foreseeable Racial Impact of the Runoff Restrictions ......................................16

        3.    The Sequence of Events Reveals the Legislature Failed to Lessen the Runoff Restrictions' Known Discriminatory Impact.........................................................18

        4.    The Legislature Hid its Efforts to Suppress Black Political Participation Behind Tenuous Justifications .............20

        5.    The Legislature Enacted the Runoff Restrictions In A Rushed and Flawed Legislative Process...................................21

        6.    The Runoff Restrictions Build Upon Georgia's History of Voting Discrimination ............................................22

    B.    The Remaining Factors Weigh in Plaintiffs' Favor ...........................23

    C.    The *Purcell* Doctrine Is Not Implicated Because There is a Year or More Before Any Runoff Election......................................24

CONCLUSION.............................................................................25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Charles H. Wesley Education Foundation, Inc. v. Cox*, 408 F.3d 1349
(11th Cir. 2005) ...........................................................................24

*Clingman v. Beaver*, 544 U.S. 581 (2005)..............................................14

*Curling v. Raffensperger*, 491 F. Supp. 3d 1289 (N.D. Ga. 2020)........................24

*Foster v. Chatman*, 578 U.S. 488 (2016)................................................13

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020) ......................11

*Greater Birmingham Ministries v. Secretary of State for Alabama*,
992 F.3d 1299 (11th Cir. 2021) ....................................................12

*Hunter v. Underwood*, 471 U.S. 222 (1985)........................................13, 14

*In re Employment Discrimination Litigation Against State of
Alabama*, 198 F.3d 1305 (11th Cir. 1999)....................................14

*Jacksonville Branch of NAACP v. City of Jacksonville*,
No. 22 Civ. 493, 2022 WL 7089087 (M.D. Fla. Oct. 12, 2022).................25

*Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020) ..............................24

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) ....................................11

*League of United Latin American Citizens v. Perry*, 548 U.S. 399
(2006)...........................................................................13

*League of Women Voters of Florida Inc. v. Florida Secretary of State*,
66 F.4th 905 (11th Cir. 2023).........................................................13

*Mt. Healthy City School District Board of Education v. Doyle*,
429 U.S. 274 (1977)........................................................14

*NAACP v. Gadsden County School Board*, 691 F.2d 978
(11th Cir. 1982) ...........................................................13

*North Carolina State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ....................................................................16, 21

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ...........................................................12, 25

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997).............................12, 14

*Rogers v. Lodge*, 458 U.S. 613 (1982).......................................................................12

*Rose v. Raffensperger*, 619 F. Supp. 3d 1241 (N.D. Ga. 2022) ..............................23

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) ...........................................13

*United States v. Dallas County Commission*, 739 F.2d 1529
(11th Cir. 1984) ......................................................................................13

*Village of Arlington Heights v. Metropolitan Housing
Development Corp.*, 429 U.S. 252 (1977)...................... 12, 13, 14, 15, 19, 21

*Washington v. Davis*, 426 U.S. 229 (1976) .......................................................12, 18

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ................23

*Wisconsin Legislature v. Wisconsin Elections Commission*,
142 S. Ct. 1245 (2022).........................................................................25

*Wright v. Sumter County Board of Elections & Registration*,
301 F. Supp. 3d 1297 (M.D. Ga. 2018) .............................................4, 19, 23

## STATUTES AND LEGISLATIVE MATERIALS

Ga. Code Ann. § 21-2-150........................................................................25

Senate Bill 202 (enrolled Mar. 25, 2021) ...........................................................2, 10

# OTHER AUTHORITIES

Budiman, Abby & Luis Noe-Bustamante, *Black eligible voters have accounted for nearly half of Georgia electorate's growth since 2000*, Pew Research Center (Dec. 15, 2020), https://www.pewresearch.org/short-reads/2020/12/15/black-eligible-voters-have-accounted-for-nearly-half-of-georgia-electorates-growth-since-2000/ .......................................................................4

Georgia Secretary of State, *Georgia Election Results: November 8, 2016 General Election*, https://results.enr.clarityelections.com/GA/63991/184321/en/summary.html.........................................................6

Georgia Secretary of State, *November 3, 2020 General Election*, https://results.enr.clarityelections.com/GA/105369/web.264614/#/summary .................................................................5, 6, 18

Georgia Secretary of State, *November 3, 2020 Presidential Recount*, https://results.enr.clarityelections.com/GA/107231/web.264614/#/detail/5000 ......................................................................7

Georgia Secretary of State, *January 5, 2021 Federal Runoff Election*, https://results.enr.clarityelections.com/GA/107556/web.274956/#/summary .................................................................5, 7, 18

Georgia Secretary of State, *May 24, 2022 General Primary/Special Election*, https://results.enr.clarityelections.com/GA/113667/web.285569/#/summary ..................................................................24

Noe-Bustamante, Luis & Abby Budiman, *Black, Latino and Asian Americans have been key to Georgia's registered voter growth since 2016*, Pew Research Center (Dec. 21, 2020), https://www.pewresearch.org/short-reads/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/.........................................................................4

## **INTRODUCTION**

Over the past decade, Georgia's Black population has grown at significantly higher rates than its white population.  These racial demographic shifts have been concentrated in the State's six largest counties, including Fulton, Gwinnett, Cobb, and DeKalb—and have altered the electorate with Black voters accounting for nearly half of Georgia's electoral growth since 2000.  In more recent elections, Black Georgia voters have made concentrated efforts to mobilize their voting, including by increasingly relying on absentee voting.

These efforts, coupled with the ever-growing political participation of Black voters in Georgia, led to historic turnout during the November 2020 general and 2021 runoff elections.  For the 2021 runoff election, as during the general election, Black voters relied significantly on absentee voting as well as on early in-person voting, including on weekend days.  In addition, voters who registered between the general and runoff elections—a disproportionate number of whom were Black people—were able to cast their ballot in the runoff.  These new voters, along with absentee voting opportunities, were instrumental to the record-breaking Black voter turnout during that runoff and secured historic successes of Black-preferred candidates—including the election of Georgia's first Black U.S. Senator.

The Georgia General Assembly perceived these historic successes and growing Black political participation as a threat and enacted Senate Bill ("SB") 202 (enrolled Mar. 25, 2021) in response.  Through a rushed and opaque legislative session, the General Assembly laid the groundwork for SB 202, targeting various ways that Black voters had successfully mobilized, including during the runoff election.  In particular, SB 202 reduces the timeline for holding runoff elections from nine to four weeks after the general elections.  This time reduction eliminates the ability to register after the general election and then vote in the runoff.  SB 202 also reduces the early voting period from three weeks to only one week, with no mandatory voting on weekend days.  Each of these restrictions disproportionately impacts Black voters and is rooted in tenuous and unsupported justifications.

Plaintiffs[1] submit this memorandum in support of their motion to preliminarily enjoin two runoff-related provisions of SB 202 that (1) compress the timeframe for holding runoff elections from nine weeks to only four weeks after the general election, and (2) truncate the early voting period during runoff elections from three weeks to only one week, with no mandatory weekend voting (the "Runoff

---

[1] Plaintiffs in *Sixth District of the African Methodist Episcopal Church, et al. v. Kemp, et al.*, 1:21-CV-01284; *Georgia State Conference of the NAACP, et al. v. Raffensperger, et al.*, 1:21-CV-01259; and *The Concerned Black Clergy of Metropolitan Atlanta, Inc., et al. v. Raffensperger, et al.*, 1:21-CV-01728, join this motion.

Restrictions"). Ex. 1 (SB 202 §§ 28, 42). The Runoff Restrictions were enacted with a purpose to discriminate against Black voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. The record is replete with evidence showing that such restrictions will have a discriminatory impact on Black voters if they remain in place for a potential 2024 runoff and beyond. The Runoff Restrictions must, therefore, be enjoined. Alternatively, Plaintiffs request any other and further relief the Court deems just and proper under these circumstances.

## FACTUAL BACKGROUND

### A.    Georgia's Growing Black Population and Voter Participation

From 2010 to 2020, Georgia experienced significant population growth and racial demographic changes, driven by people of color. Ex. 2 (Palmer Report 5). Per U.S. census data, the population growth rate of people of color during this period exceeded that of the white population in 132 of Georgia's 159 counties. *Id.* at 6. More than half of people of color in Georgia reside in the State's six largest counties (Fulton, Gwinnett, Cobb, DeKalb, Clayton, and Chatham). *Id.* Within these six counties, population rates grew at a faster pace than the statewide rate: where the white population shrank by 1.7%, the population of people of color grew by more than 25%. *Id.* If these population trends continue, Georgia's largest counties will continue to grow rapidly because of population growth of people of color.

These population shifts are mirrored in Georgia's electorate. *Id.* at 7. Voters of color—particularly Black voters—now comprise a larger portion of Georgia's growing electorate and will continue to do so. Based on 2019 American Community Survey and 2010 U.S. census data, Black eligible voters accounted for nearly half (48%) of Georgia's electoral growth since 2000.[2] Georgia Secretary of State data show that Black voter registration has increased 25% since 2016, the largest increase among eligible racial demographic groups.[3] And while white voters continued to vote at higher rates than Black voters, *id.*, the white share of registered voters declined from 58% in 2014 to under 53% in 2020, Ex. 3 (Burden Report 9, Tbl. 3).

Despite Georgia's well-documented history of discrimination against Black voters,[4] Black voters have mobilized to exercise their rights to vote in recent years. Ex. 4 (Anderson Report 65-66, 93, 95-96); Ex. 5 (Kelley Decl. ¶ 2); Ex. 6 (Robinson Decl. ¶ 2). Black-led civil rights organizations have spearheaded voter engagement

---

[2] Budiman & Noe-Bustamante, *Black eligible voters have accounted for nearly half of Georgia electorate's growth since 2000*, Pew Research Center (Dec. 15, 2020), https://www.pewresearch.org/short-reads/2020/12/15/black-eligible-voters-have-accounted-for-nearly-half-of-georgia-electorates-growth-since-2000/.

[3] Noe-Bustamante & Budiman, *Black, Latino and Asian Americans have been key to Georgia's registered voter growth since 2016*, Pew Research Center (Dec. 21, 2020), https://www.pewresearch.org/short-reads/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/.

[4] *See*, *e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018); *see also* Ex. 4 (Anderson Report 19-45, 57-63).

efforts, increasing Black voter turnout, which rose from 35% in the 2014 midterm election to over 49% in November 2018.  Ex. 7 (Dennis Decl. ¶ 5); Ex. 8 (Kinard Decl. ¶ 4); Ex. 3 (Burden Report 10, Tbl. 4).  In presidential elections, it jumped from about 52% in 2016 to over 57% in 2020.  Ex. 3 (Burden Report 10, Tbl. 4).

Rising Black political participation continued during the 2020 election cycle. A record-breaking number of Black voters made their voices heard during the November 2020 general and January 2021 runoff elections.  Ex. 4 (Anderson Report 140, 172).  Black voters were consequential in historic election outcomes, such as the election of the first Black Vice President, Kamala Harris.  Reverend Raphael Warnock won a special runoff on January 5, 2021, becoming Georgia's first Black Senator.[5]  Ex. 9 (Clark Report 33).

Turnout typically declines significantly for runoff elections, especially for Black voters and when a presidential election is not on the ballot.  But this was not true for the 2021 runoff, in which more than 4.4 million Georgians returned to the polls to cast votes, compared to just under 5 million in the 2020 general election.[6] In addition, between the 2020 general and 2021 runoff elections, a historic number

---

[5] *See* Ga. Sec'y of State, *November 3, 2020 General Election*, https://results.enr.clarityelections.com/GA/105369/web.264614/#/summary; Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, https://results.enr.clarityelections.com/GA/107556/web.274956/#/summary.
[6] *See* Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, *supra* note 5.

of Georgians registered to vote for the first time, with Black people accounting for a disproportionately large share of these newly eligible voters. Ex. 10 (Fraga Report 77-78); Ex. 4 (Anderson Report 140). Black voter turnout in the runoff was 91.8% of that in November's general election, a higher percentage than for white voters. Ex. 4 (Anderson Report 174). And even though turnout declined somewhat between the November general and January runoff elections, the drop was much larger among white voters than Black voters. Ex. 10 (Fraga Report 15, Tbl. 1).

This record-breaking turnout is largely attributable to higher rates of absentee voting. In the general election, more than 1.3 million absentee ballots were cast,[7] marking a five-fold increase from 2016.[8] Whereas white voters were more likely to use absentee voting in the 2014 and 2016 elections, Black voters started casting absentee ballots at higher rates than white voters in 2018. Ex. 3 (Burden Report 11, Tbl. 5). Black voters continued to use absentee voting at higher rates than white voters for the 2020 and 2021 elections. *Id.* Nearly 30% of Black voters cast their ballots by mail in the 2020 general election, compared to only 24% of white voters. *Id.* And candidates preferred by Black voters received a higher percentage of

---

[7] *See* Ga. Sec'y of State, *November 3, 2020 General Election*, *supra* note 5.
[8] *See* Ga. Sec'y of State, *Georgia Election Results: November 8, 2016 General Election*, https://results.enr.clarityelections.com/GA/63991/184321/ en/summary.html.

absentee votes relative to their overall percentage of the final vote count.  *See, e.g.*, Ex. 11 (2018 SOS Election Results); Ex. 3 (Burden Report 6, Tbl. 1).[9]

Early in-person voting also drove the increased turnout for the 2020 general and 2021 runoff elections.  Approximately 2.68 million Georgians voted early in-person in the general election.[10]  More than 2 million voters cast early in-person ballots in the runoff election.[11]  Among this group of voters, Black voters are more likely to vote on weekends, Ex. 4 (Anderson Report 142); weekend voting is of particular importance for Black communities and churches that encourage "Souls to the Polls" events on Sundays, Ex. 12 (Briggins Dep. 75:11-76:3); Ex. 13 (Malone Sr. Dep. 101:9-102:5).

### B.     The Legislature's Response to Growing Black Voter Participation

The changing racial demographics, growing participation of Black voters, and increased reliance on absentee ballots by Black voters created a perception that Black voters were a challenge to the status quo.  Ex. 4 (Anderson Report 171-73).  That perceived threat was further heightened by persistent differences in candidate preferences of Black and white voters in Georgia elections—that is, racially

---

[9] Ga. Sec'y of State, *November 3, 2020 Presidential Recount*, https://results.enr.clarityelections.com/GA/107231/web.264614/#/detail/5000; Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, *supra* note 5.
[10] Ga. Sec'y of State, *November 3, 2020 Presidential Recount*, *supra* note 9.
[11] Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, *supra* note 5.

polarized voting.  Ex. 2 (Palmer Report 23-28).  The majority party in the General Assembly—which did not enjoy support from most Black voters—responded by enacting SB 202, a voting bill specifically designed to limit Black voter participation.  Ex. 4 (Anderson Report 171-73).

As set forth in the Joint Brief in Support of Motion for Preliminary Injunction ("Joint Brief"), *see* Dkt. 566-1 at 47-50, the General Assembly enacted SB 202 through a flawed, irregular, and rushed legislative process.  Beginning on January 11, 2021, over 50 election-related bills were introduced, many of which contained restrictive measures.  *See* Ex. 14 (CDR00466539-62 (SOS March 2021 Summary of Bills)); Ex. 4 (Anderson Report 133).  Legislators and the public struggled to keep up with the sheer volume of such bills.  *Id.*; Ex. 15 (Bailey Dep. 62:11-63:2 ("[T]he volume of bills coming through, there were more than usual, more than I can recall in a long time, if perhaps ever.")).

On January 7, 2021—only two days after the runoff that resulted in the election of Georgia's first Black U.S. Senator—legislators formed the House Special Election Integrity Committee ("EIC") to assess election-related bills.  Ex. 4 (Anderson Report 132-33).  Legislators and the public often received bill drafts only shortly before or even at committee hearings.  Ex. 16 (Burnough Decl. ¶¶ 29-30); Ex. 17 (Harrell Decl. ¶¶ 15-16).  Georgia Secretary of State staff met privately with

certain EIC members before the bills' introduction in the Committee, but not with opponents (including no Black legislators).  Ex. 18 (Germany Dep. 36:14-38:13).

In the Senate, bills were referred to the Ethics Committee, which considered many of the proposed restrictive bills.  Ex. 17 (Harrell Decl. ¶ 4); Ex. 19 (Jones Decl. ¶¶ 7-8).  On March 3, 2021, the Senate Ethics Committee held a hearing on a three-page version of SB 202.  Ex. 20 (USA-03256 (Agenda)); Ex. 21 (AME 000845:24 - AME 000873:21 (March 3, 2021 SB Senate Ethics Hearing Transcript)).  The bill subsequently passed the Senate with minimal floor debate, though no Black legislators were in support.  Ex. 22 (USA-03970); Ex. 23 (AME_ 001228:5 - AME_001231:17 (March 8, 2021 Senate Floor Debate Transcript)).

On March 17, Chairman Barry Fleming introduced a substitute version of SB 202 before the House, which in two weeks had morphed into a 90-plus page bill spanning multiple areas of election law.  Ex. 24 (LC 28 0325S, LEGIS00002127-2219 (House Committee substitute introduced on March 17, 2021)).  Black legislators received the new version only one hour before the hearing.  Ex. 16 (Burnough Decl. ¶ 43); *see also* Ex. 25 (AME_001472:4-8 (March 17, 2021 House Special Committee on Election Integrity Hearing Transcript); (AME 001475:3-11 (March 17, 2021 House Special Committee on Election Integrity Hearing Transcript); AME 001476:14-22 (March 17, 2021 House Special Committee on

Election Integrity Hearing Transcript) ("We literally just got this an hour ago.")); Ex. 4 (Anderson Report 169 n.556).

The House and Senate voted to adopt SB 202 on March 25, without support from a single Black legislator in either chamber.  Ex. 26 (USA-03971 (SB 202 Votes Senate Passage by Substitute)); Ex. 27 (USA-03968 (House vote)); Ex. 28 (USA-03969 (Senate Agreement to House Substitute on March 25)).  The Governor signed the bill the same day.  Ex. 26 (USA-03971).

### C.    Changes in Election Law Following SB 202's Enactment

Before SB 202, runoff elections were held on the Tuesday of the ninth week following a general election.  Ex. 1 (SB 202 § 42).  The early voting period for the runoff election lasted for three weeks, consistent with the timeframe for general elections, and mandated at least one Saturday of early voting.  *Id.* § 28.  But SB 202 made two changes to these runoff election timelines.  *Id.*  First, it forces runoff elections to take place four weeks (28 days), instead of nine weeks, after a general or primary election.  *Id.* § 42.  Second, it reduces the runoff early voting period to just one week, with no mandatory weekend voting days, including Sunday voting. *Id.* § 28.

Along with publicly available evidence forewarning about the racial impact of these new restrictions, *see* Ex. 3 (Burden Report 11, Tbl. 5), election

administrators cautioned that the restrictions would hinder, rather than help, election administration.  During a February 19, 2021 EIC hearing, Tonnie Adams, Chief Registrar of Heard County, testified that having only four weeks to prepare for a runoff would strain election administration.  Ex. 29 (Bailey Report, Ex. A (Tr. of Feb. 19, 2021 Hrg. Of Special Committee on Election Integrity 161:1-162:12)).  These concerns were echoed by Gabriel Sterling, Chief Operating Officer for the Georgia Secretary of State.  Ex. 30 (Sterling Dep. 186:17-187:24).  Similarly, Janine Eveler, Cobb County Director of Elections & Registration, warned that reduced early voting opportunities would lengthen Election Day lines significantly.  Ex. 31 (CDR00009771-773).

## ARGUMENT

A preliminary injunction may issue when the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) imminent irreparable injury absent an injunction; (3) injury that outweighs whatever damage the proposed injunction might cause the non-movant; and (4) the injunction would not be adverse to the public interest.  *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011).  The third and fourth factors merge when the government opposes injunctive relief.  *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020).  With fact discovery closed, the evidence here decisively supports Plaintiffs on all factors.

Moreover, the *Purcell* doctrine regarding injunctive relief close to an election is not yet implicated as any runoff elections will not occur for more than a year from now. *See generally Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).

### A.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims

The Fourteenth and Fifteenth Amendments prohibit voting practices enacted with a racially discriminatory purpose. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481-82 (1997); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).  In analyzing whether a government action was motivated by a discriminatory purpose, courts apply the framework set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977).  *Arlington Heights* specifies that "an important starting point" is whether the official impact "bears more heavily on one race than another."  *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Additional evidentiary sources include (1) historical background of the decision; (2) the specific sequence of events leading up to the challenged decision; (3) procedural and substantive departures from the normal sequence; (4) legislative or administrative history, including contemporary statements; (5) foreseeability of discriminatory impact; (6) knowledge of discriminatory impact; and (7) the availability of less discriminatory alternatives.  *Id.* at 267-68; *Greater Birmingham Ministries v. Sec. of State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021).

To show a racially discriminatory purpose, Plaintiffs "do[] not have to prove that racial discrimination was a 'dominant' or 'primary' motive, only that it was a motive." *United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1541 (11th Cir. 1984) (quoting *Arlington Heights*, 429 U.S. at 265-66). And an intent to disadvantage minority citizens to gain a perceived political or partisan benefit qualifies as discriminatory intent. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (taking away a political opportunity just as minorities were about to exercise it "bears the mark of intentional discrimination"); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023) (citation omitted) (similar).

Courts must consider "all of the circumstances that bear upon the issue of [discriminatory intent]," *Foster v. Chatman*, 578 U.S. 488, 501 (2016), "including the normal inferences to be drawn from the foreseeability of defendant's actions," *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Expert evidence is also highly relevant. *See Hunter v. Underwood*, 471 U.S. 222, 229-30 (1985); *NAACP v. Gadsden Cnty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."

*Hunter*, 471 U.S. at 228 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  For the reasons discussed below, the Runoff Restrictions were motivated, at least in part, by an intent to minimize the opportunity of Black voters to participate in the political process.

> 1.   *The Runoff Restrictions Have a Discriminatory Impact on Black Voters*

An "important starting point" for this Court's analysis is whether the Runoff Restrictions "bear[] more heavily" on Black voters than on white voters.  *Arlington Heights*, 429 U.S. at 266.  "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."  *Reno*, 520 U.S. at 487.  Impact can be the "most probative evidence of intent" because it offers "objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor."  *In re Emp. Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1321-22 (11th Cir. 1999) (citation omitted).

The Runoff Restrictions, both standing alone and taken together, bear more heavily on Black voters than on white voters.  *Arlington Heights*, 429 U.S. at 266; *see also Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring in part and concurring in the judgment) ("A panoply of regulations, each apparently

14

defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition.").

First, the compression of runoff elections from nine to four weeks after the general election bears more heavily on Black voters by eliminating the window for voters to register after the general election and then vote in the runoff. *See* Ex. 10 (Fraga Report ¶¶ 18, 162-73). Had SB 202's restrictions been in place during the 2021 runoff, none of the myriad new registrants who voted in the runoff, and who helped spur the historic election of Georgia's first Black U.S. Senator, would have been eligible to vote at that time. *See id.*; Ex. 4 (Anderson Report 141-42).

Second, the reduced timeline of early voting from three weeks to one week also disproportionately impacts Black voters. Early voting is of particular importance for Black voter turnout given that Black voters in Georgia are disproportionately likely to vote early, and particularly on weekend days, which are no longer required during early voting. Ex. 12 (Briggins Dep. 75:11-76:3); Ex. 13 (Malone Sr. Dep. 101:9-102:5). Further, this provision will naturally result in increased voting on Election Day—meaning longer lines, particularly in urban areas, which disproportionately affect Black voters, who already face longer lines on average. Ex. 32 (Pettigrew Report 1, 20, 33-34); Ex. 33 (Pettigrew Dep. 160:10-162:9, 171:10-173:9, 177:12-178:1, 196:9-197:8, 205:9-208:9); Ex. 3 (Burden

Report 20-22 & n.33).  The State's own witnesses concede that increased voting on individual days results in longer lines.  *See, e.g.*, Ex. 34 (Harvey Dep. 117:2-14). The State's expert acknowledges that the inverse is also true: additional time for early voting expands voting opportunities.  Ex. 29 (Bailey Report ¶¶ 58-60).  As the State's expert confirms, the elimination of weekend early voting will have a disproportionate effect on Black voters, who vote in particularly large numbers on Sundays and on weekends generally.  Ex. 35 (Grimmer Report ¶ 184, Tbls. 31-32).

Individually, these restrictions curtail every stage of the process for runoff elections in a way that disproportionately and negatively impacts Black voters.  And cumulatively, SB 202's "panoply of restrictions" has a compounding effect— erecting impermissible barriers to Black voters' participation in runoffs.  *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016).   The cumulative impact of these provisions is only magnified by existing limitations imposed on Black voters.  *See* Joint Brief, Dkt. 566-1 at 41-44 (cataloguing evidence regarding disproportionate impact on Black voters from other SB 202 restrictions during the early-voting period and on Election Day, in combination with existing socioeconomic limitations).

2.      *The Legislature Knew the Foreseeable Racial Impact of the Runoff Restrictions*

16

The likely impact of SB 202's condensed runoff period was not lost on the Legislature.  Indeed, the impact was reasonably foreseeable to the Legislature and other SB 202 drafters, as they knew or were told directly about the impact.  Georgia election officials acknowledged to the Legislature that more early voting increases opportunities to vote and reduces the likelihood of long lines on Election Day.  But the Legislature elected to instate one week of early voting only, with *no* required weekend days.  Legislators, as well as members of the Secretary of State's Office who participated in the drafting of SB 202, were warned by county election officials that "allowing only 28 days will not work for a runoff with federal races.  You are eliminating all but a few days of early voting [in runoffs] which will mean that lines on election day will be untenable" in major urban and suburban counties with significant Black populations.  Ex. 31 (CDR00009771-773 (Email from Janine Eveler, Cobb County Director, to House EIC and Senate Ethics Committee, Ryan Germany, and Chris Harvey, March 11, 2021)).  A former member of the Secretary of State's Office likewise confirmed the axiomatic principle that reduced early voting could result in more voters on Election Day.  Ex. 34 (Harvey Dep. 117:2-14).

Election officials also had information about the racial impact of shortening the timeframe of runoff elections.  It was national news that Black voters had higher turn-out in recent high-profile elections, including that of Reverend Raphael

Warnock as U.S. Senator.[12]  Publicly available data from the Secretary of State's Office documented this trend in the 2021 runoff election, even without a presidential candidate on the ballot.[13]  It was also publicly known that much of this turnout was via absentee ballots.[14]  *See* Ex. 3 (Burden Report 11, Tbl. 5).  Indeed, a member of the Secretary of State's front office staff testified that a four-week runoff makes it difficult to build and produce an absentee ballot in time, and that he would have preferred a longer period for election administration purposes.  Ex. 30 (Sterling Dep. 185:1-187:24).

"[N]ormally the actor is presumed to have intended the natural consequences of his deeds."  *Washington*, 426 U.S. at 253 (Stevens, J., concurring).  Given the Legislature's knowledge about the likely impact of SB 202's truncated runoff period and its likely effects on early and Election Day voting, the Legislature must have intended the consequences that naturally followed.

### 3.    *The Sequence of Events Reveals the Legislature Failed to Lessen the Runoff Restrictions' Known Discriminatory Impact*

"The specific sequence of events leading up to" the passage of SB 202 "also may shed some light on a decisionmaker's purposes."  *Arlington Heights*, 429 U.S.

---

[12] *See* Ga. Sec'y of State, *November 3, 2020 General Election*, *supra* note 5; Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, *supra* note 5.

[13] *See* Ga. Sec'y of State, *January 5, 2021 Federal Runoff Election*, *supra* note 5.

[14] *See* Ga. Sec'y of State, *November 3, 2020 General Election*, *supra* note 5.

at 267.   As set forth in the Joint Brief, II.A.1 and *supra* at Factual Background Section A (pp. 3-7), the recent electoral history of Georgia proves that Black voters have become an increasingly influential electoral force in the State, and legislators would have known that growing Black voter turnout and increased reliance on absentee voting contributed to statewide wins by Black-preferred candidates in 2020.  *See, e.g.*, Ex. 3 (Burden Report 4-5 & Tbls. 1-2); Ex. 2 (Palmer Report 23-28).  Likewise, in recent years, Black voters have voted early or absentee in larger proportions than white voters.  Ex. 3 (Burden Report 11 & Tbl. 5).

Both historical and more recent examples of discrimination have hampered Black political participation in Georgia, as compared to that of white residents.  *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018); *see also* Ex. 4 (Anderson Report 19-45, 57-63).

SB 202 was passed immediately after a groundswell of Black voter turnout resulting in the election of Georgia's first Black U.S. Senator.  During the preceding nine-week runoff period in 2021, almost 70,000 Georgians registered to vote, concentrated in Georgia's four largest counties home to a significant bloc of Black voters.  Ex. 4 (Anderson Report 141).  As a response, SB 202 was passed in the very next legislative session, functionally eliminating the possibility for any person who registered after a general election to vote in a runoff.  Ex. 4 (Anderson Report 142).

It also targeted Black electoral participation by reducing the early voting window and eliminating mandatory weekend early voting.

###### 4. The Legislature Hid Its Efforts to Suppress Black Political Participation Behind Tenuous Justifications

The tenuousness of the Legislature's stated interests underlying the Runoff Restrictions is further probative of discriminatory intent. The Runoff Restrictions were purportedly enacted to address the "onerous" nine-week runoff period. Ex. 4 (Anderson Report 140 (citing Representative Wes Cantrell)). But as county administrators themselves testified, SB 202's requirement to hold runoffs within four weeks would impose significant administrative burdens and hamper voting opportunities. As Cobb County Election Director Janine Eveler confirmed, "28 days will not work for a runoff with federal races," Ex. 31 (CDR00009771-773), and adding even an extra week or two would have been preferable from an administrative standpoint, Ex. 36 (CDR00526646). Heard County Chief Registrar Tonnie Adams testified that even providing for runoffs "five weeks after the election, it is a very big rush for all of us to prepare for an election in three weeks or in two-and-a-half weeks depending on how quickly we get databases for the runoff." Ex. 29 (Bailey Report, Ex. A (Tr. of Feb. 19, 2021 Hrg. Of Special Committee on Election Integrity 161:1-162:12)). Gabriel Sterling testified that he would have preferred a longer runoff statewide for "election administration purposes." Ex. 30 (Sterling Dep. 185-

86).  The pretext that the Runoff Restrictions were designed to *alleviate* the burden on election officials simply does not hold water.  Even if this were the justification, there were less discriminatory alternatives that would have had the additional benefit of actually addressing the county election officials' concerns.    Indeed, the Legislature was advised by election officials that a longer runoff lead time of even five or six weeks would improve election administration and early voting.  *See supra* Factual Background Section C (p. 11).

### 5. *The Legislature Enacted the Runoff Restrictions in a Rushed and Flawed Legislative Process*

SB 202's legislative record shows a lack of transparency, a rushed process, and procedural departures, all of which evince intent to discriminate.  *Arlington Heights*, 429 U.S. at 267.  "[A] legislature need not break its own rules to engage in unusual procedures."  *McCrory*, 831 F.3d at 228.  As set forth in the Joint Brief at III.A.3.a and *supra* at Factual Background Section B, SB 202 was rushed through the Legislature amid an atypical flurry of election bills—largely behind closed doors.

Legislators and the public often received election bill drafts shortly before or even at committee hearings.  Ex. 16 (Burnough Decl. ¶¶ 29-30); Ex. 17 (Harrell Decl. ¶¶ 15-16).  Black legislators were excluded from meetings with the Secretary of State's Office and drafters of SB 202, *see, e.g.*, Ex. 18 (Germany Dep. 36:14-38:13); Ex. 16 (Burnough Decl. ¶¶ 43-45), seeing many of the challenged provisions

only one hour before the hearing, Ex. 16 (Burnough Decl. ¶ 43); *see also* Ex. 25 (AME_001472:4-8 (March 17, 2021 House Special Committee on Election Integrity Hearing Transcript)).   The bill's passage was no less frantic.   The EIC voted favorably on SB 202, after a very short debate, and both the House and Senate adopted the bill only three days later, Ex. 26 (USA-03971 (SB 202 Votes Senate Passage by Substitute)), notwithstanding the expressed concerns of election administrators and lack of support from any Black legislators, *see supra* Factual Background Section B (pp. 7-10); Ex. 27 (USA-03968 (House vote)); Ex. 28 (USA-03969 (Senate Agreement to House Substitute on March 25)).   The Governor signed the bill the same day.   Ex. 26 (USA-03971).

In addition, sponsoring legislators coordinated closely with counsel, shielding those conversations.   *See, e.g.*, Ex. 18 (Germany Dep. 33:1-35:11); Ex. 37 (CDR00062772-74).   And rather than open debate, the Georgia Secretary of State staff met privately with certain EIC members before the bill's introduction in the Committee, but not with opponents (including no Black legislators).   Ex. 18 (Germany Dep. 36:14-38:13).

> ### 6.   *The Runoff Restrictions Build Upon Georgia's History of Voting Discrimination*

Finally, it is notable that the Runoff Restrictions come against the backdrop of Georgia's ongoing history of discrimination against Black Georgians, and Black

voters specifically.  *See, e.g.*, Ex. 4 (Anderson Report 9-79).  Courts have recognized that this history continues to permeate Georgia's elections.  *See, e.g.*, *Wright*, 301 F. Supp. 3d at 1323-24; *Rose v. Raffensperger*, 619 F. Supp. 3d 1241, 1268 (N.D. Ga. 2022) (finding "Georgia's statewide, at-large system for electing [Public Service Commission] members dilutes the votes of Black Georgians in violation of the VRA").

* * *

Application of the *Arlington Heights* factors leads to the inexorable conclusion that SB 202's Runoff Restrictions were adopted, at least in part, with a discriminatory purpose to reduce Black political power.  Plaintiffs are therefore likely to succeed on the merits of their Fourteenth and Fifteenth Amendment claims.

### B.    The Remaining Factors Weigh in Plaintiffs' Favor

Each remaining factor also decidedly favors granting a preliminary injunction, as Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [their] favor," and "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As detailed in the Joint Brief, Plaintiffs will suffer irreparable injury absent relief. Indeed, Plaintiffs have already suffered irreparable injury as SB 202 infringed on the right to vote in the 2022 U.S. Senate runoff election.  Joint Brief at 61-62; *Jones v.*

*Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020); *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1320 (N.D. Ga. 2020).  Risk of the same, irreparable harm is imminent given the frequency of runoff elections in the State, with Senator Warnock's election and recent congressional primaries that resulted in runoffs as examples.   Joint Brief at 61-62.[15]   Relief is warranted now as upcoming 2024 congressional races carry the possibility of runoff elections.  Further, it is not feasible for Plaintiffs to wait until the next runoff to seek relief as to do so would afford, at most, one month for adjudication before the scheduled election—which would present logistical challenges for this Court as well as concerns under *Purcell*. Plaintiffs' interest in protecting eligible Black Georgians' Constitutional rights to vote far outweighs any interest Defendants have in maintaining a discriminatory practice that hinders rather than helps election administration.  Finally, protecting the fundamental right to vote is no doubt in the public interest.  *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005).

### C.    The *Purcell* Doctrine Is Not Implicated Because There Is a Year or More Before Any Runoff Election

With the next runoff at least a year away, the *Purcell* doctrine is not applicable.  *See generally Purcell*, 549 U.S. 1 (per curiam); *see also* ECF No. 241 at

---

[15] *See* Ga. Sec'y of State, *May 24, 2022 General Primary/Special Election*, https://results.enr.clarityelections.com/GA/113667/web.285569/#/summary.

62-73.  The next possible runoff election would be four weeks after the primary on May 20, 2024, *see* Ga. Code Ann. § 21-2-150, meaning the earliest possible runoff would be in late June 2024.  The State has ample time to adjust its election procedures according to this Court's orders.  *Wisc. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam) (ordering new maps just under five months before the election); *Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22 Civ. 493, 2022 WL 7089087, at *4 (M.D. Fla. Oct. 12, 2022) ("application of the *Purcell* principle is not warranted" where "the election itself is over five months away" and neither the "Eleventh Circuit or the Supreme Court has applied *Purcell* under similar timeframes").  Moreover, Plaintiffs simply request that the State revert to its earlier runoff procedures: providing for nine weeks after the general election for any runoff and the permissible number of early-voting days allowed during a general election period for runoff voting.  These changes pose little to no burden on Defendants to implement—and, as discussed above, Defendants' witnesses have testified that these changes would actually ease election administration.

## CONCLUSION

For these reasons, Plaintiffs' motion for a preliminary injunction should be granted.

Date: June 9, 2023

Respectfully submitted,

*/s/ Pichaya Poy Winichakul*
Bradley E. Heard (Bar No. 342209)
*bradley.heard@splcenter.org*
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
Matletha N. Bennette*
*matletha.bennette@splcenter.org*
SOUTHERN POVERTY
LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Jess Unger*
*jess.unger@splcenter.org*
Sabrina S. Khan*
*sabrina.khan@splcenter.org*
SOUTHERN POVERTY
LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

*/s/ Adam S. Sieff*
Adam S. Sieff*
*adamsieff@dwt.com*
Daniel Leigh**
*danielleigh@dwt.com*
Brittni A. Hamilton*
*brittnihamilton@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566

*/s/ Leah C. Aden*
Leah C. Aden*
*laden@naacpldf.org*
Alaizah Koorji*
*akoorji@naacpldf.org*
John S. Cusick*
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte*
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Washington, DC 20005
Telephone: (202) 682-1300

*/s/ Debo P. Adegbile*
Debo P. Adegbile*
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt*
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew R. Jedreski*
*mjedreski@dwt.com*
Grace Thompson*
*gracethompson@dwt.com*
Danielle E. Kim*
*daniellekim@dwt.com*
Kate Kennedy*
*katekennedy@dwt.com*
Shontee Pant*
*ShonteePant@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett*
*davidgossett@dwt.com*
Courtney DeThomas*
*courtneydethomas@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C.  20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia
Muslim Voter Project, Women Watch
Afrika, Latino Community Fund
Georgia, and The Arc of the United
States*

George P. Varghese*
*george.varghese@wilmerhale.com*
Stephanie Lin*
*stephanie.lin@wilmerhale.com*
Arjun K. Jaikumar*
*arjun.jaikumar@wilmerhale.com*
Mikayla C. Foster*
*mikayla.foster@wilmerhale.com*
Sofia C. Brooks*
*sofie.brooks@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania C. Faransso*
*tania.faransso@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce*
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Admitted pro hac vice
**Application to be admitted pro hac vice forthcoming


/s/ Sophia Lin Lakin
Sophia Lin Lakin*
slakin@aclu.org
Davin M. Rosborough*
drosborough@aclu.org
Jonathan Topaz*
jtopaz@aclu.org
Dayton Campbell-Harris*
dcampbell-harris@aclu.org
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner*
smizner@aclu.org
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick*
bdimmick@aclu.org
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

/s/ Rahul Garabadu
Rahul Garabadu (Bar 553777)
rgarabadu@acluga.org
Caitlin May (Bar 602081)
cmay@acluga.org
Cory Isaacson (Bar 983797)
cisaacson@acluga.org
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Attorneys for Plaintiffs
Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta
Sorority, Georgia ADAPT, Georgia Advocacy Office, and Southern Christian
Leadership Conference

*Admitted *pro hac vice*

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: *bryan@bryansellslaw.com*

Jon Greenbaum (pro hac vice)
*jgreenbaum@lawyerscommittee.org*

Ezra D. Rosenberg (pro hac vice)
*erosenberg@lawyerscommittee.org*
Julie M. Houk (pro hac vice)
*jhouk@lawyerscommittee.org*
Jennifer Nwachukwu (pro hac vice)
*jnwachukwu@lawyerscommittee.org*
Heather Szilagyi (pro hac vice)
*hszilagyi@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
Neil Oxford (pro hac vice)
Gregory Farrell (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Laurence F. Pulgram (pro hac vice)
*lpulgram@fenwick.com*
Molly Melcher (pro hac vice)
*mmelcher@fenwick.com*
Armen Nercession (pro hac vice)
*Anercessian@fenwick.com*
Ethan Thomas (pro hac vice)
*EThomas@fenwick.com*
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
Telephone: 415.875.2300

Joseph S. Belichick (pro hac vice)
*jbelichick@fenwick.com*
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone: 650-988-8500

Catherine McCord (pro hac vice)
*cmccord@fenwick.com*
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: (212) 430-2690

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and Lower Muskogee Creek Tribe*

<u>/s/ Kurt Kastorf</u>

Kurt Kastorf (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: 404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Matthew A. Fogelson*
Angela Groves*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
JBrowne@advancementproject.org
MFogelson@advancementproject.org
AGroves@advancementproject.org

Clifford J. Zatz*
Justin D. Kingsolver*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
CZatz@crowell.com
JKingsolver@crowell.com
WTucker@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta, Inc., The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union, Inc., First Congregational Church, United Church of Christ Incorporated, Georgia Latino Alliance for Human Rights, Inc.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was prepared in Times New Roman 14-point font in compliance with Local Rule 5.1(C).

/s/ Leah C. Aden
Leah C. Aden

Date: June 9, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Leah C. Aden*
Leah C. Aden