# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

IN RE:                    )
                          )
GEORGIA SENATE BILL 202   )
                          )
        Plaintiff,        )
  vs.                     ) Civil Action No.
                          ) 1:21:MI-55555-JPB
                          )
        Defendants.       )
                          )
- - - - - - - - - - - - - -)

VIDEOTAPE DEPOSITION OF

C. RYAN GERMANY

Tuesday, March 7, 2023, 9:01 a.m.(EST)

HELD AT:

  Taylor English Duma LLP
  1600 Parkwood Circle, Suite 200
  Atlanta, Georgia  30339

---------------------------------------------
  WANDA L. ROBINSON, CRR, CCR, No. B-1973
Certified Shorthand Reporter/Notary Public

APPEARANCES OF COUNSEL

Appearing on Behalf of the Plaintiff United States:

JASMYN RICHARDSON, ESQUIRE
EILEEN O'CONNOR, ESQUIRE
LAUREN PUTMAN, Paralegal
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Room 7273 NWB
Washington, D.C.  20530
T:  202.305.2526  F:  202.307.3961
E-mail:  jasymyn.richardson@usdoj.gov
            eileen.oconnor@usdoj.gov
            laura.putman@usdoj.gov

Appearing on Behalf of the Sixth District AME
Plaintiffs:

WILLIAM BEAUSOLEIL, ESQUIRE
  Hughes Hubbard & Reed
One Battery Park Plaza
  New York, New York  10004
T:  212.837.6000   F:  212.422.4726
  E-mail:  james.henseler@hugheshubbard.com

Appearing on Behalf of the Defendants and The
Witness:

BRYAN TYSON, ESQUIRE
Taylor English Duma LLP
  1600 Parkwood Circle, Suite 200
Atlanta, Georgia  30339
  T:  770.434.6868   F:  770.434.7376
E-mail:  btyson@taylorenglish.com
        - and -
BRIAN FIELD, ESQUIRE
  Schaerr Jaffe LLP
1717 K Street, N.W., Suite 900
  Washington, DC  20006
T:  202.787.1060
  E-mail:  bfield@schaerr-jaffe.com

C. RYAN GERMANY
IN RE: GEORGIA SENATE BILL 202

March 07, 2023
3

APPEARANCES OF COUNSEL (BY ZOOM)

Appearing on Behalf of the Sixth District AME Plaintiffs:

ARJUN JAIKUMAR, ESQUIRE
 WilmerHale
60 State Street
 Boston, Massachusetts  02109
T:  617.526.6427   F:  617.526.5000
 E-mail:  Arjun.jaikumar@wilmerhale.com

Appearing on Behalf of the Asian Americans Advancing Justice Plaintiffs:

EMILY WANG, ESQUIRE
 Keker, Van Nest & Peters LLP
633 Battery Street
 San Francisco, California  94111
T:  415.391.5400
 E-mail:  EWang@keker.com

Appearing on Behalf of the Concerned Black Clergy Plaintiffs:

CLIFFORD J. ZATZ, ESQUIRE
 Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
 Washington, D.C.  20004
T:  703.216.1608
 E-mail:  CZatz@crowell.com

Appearing on Behalf of the GA NAACP Plaintiffs:

 JAMES HENSELER, ESQUIRE
MANA AMERI, ESQUIRE
 Hughes Hubbard & Reed
One Battery Park Plaza
 New York, New York  10004
T:  212.837.6000   F:  212.422.4726
 E-mail:  james.henseler@hugheshubbard.com
        mana.ameri@hugheshubbard.com

C. RYAN GERMANY                                     March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                 4

APPEARANCES OF COUNSEL (BY ZOOM)

Appearing on Behalf of the New Georgia Project Plaintiffs:

JACOB SHELLY, ESQUIRE
Elias Law Group LLP
250 Massachusettes Avenue, N.W., Suite 400
Washington, D.C.  20001
Email:  jshelly@elias.law

Appearing on Behalf of the AME Southern Povery Law Group Plaintiffs:

POY WINICHAKUL, ESQUIRE
Southern Poverty Law Group
150 East Ponce de Leon Avenue, Suite 340
Decatur, Georgia  30030
T:  470.597.3010
Email:  poy.winichakul@splcenter.org

Appearing on Behalf of Athens-Clarke County Defendants:

JAMES BANTER, ESQUIRE
James Bates Brannan Groover LLP
231 Riverside Drive
Macon, Georgia  31201
T:  478.742.4280
Email:  jbanter@jamesbatesllp.com

Appearing on Behalf of DeKalb County Defendants:

SHELLEY D. MOMO, ESQUIRE
DeKalb County Law Department
1300 Commerce Drive, 5th Floor
Decatur, Georgia  30030
T:  404.371.3011   F:  404.371.3024
Email:  sdmomo@dekalbcountyga.gov

APPEARANCES OF COUNSEL (BY ZOOM)

Appearing on Behalf of Gwinnett County Defendants:

MELANIE F. WILSON, ESQUIRE
Law Department - Gwinnett County Government
75 Langley Drive
Lawrenceville, Georgia  30046
T:  770.822.8713
E-mail:  Melanie.Wilson@gwinnettcounty.com

Appearing on Behalf of Hall County
Defendants:

JUSTIN LAWHON, ESQUIRE
  Assistant County Attorney
Hall County Law Department
  2875 Browns Bridge Road
Gainesville, Georgia
  T:  770.297.2692
Email:  jrlawhon@hallcounty.org

Appearing on Behalf of Macon-Bibb County
Defendants:

GRACE SIMMS MARTIN, ESQUIRE
  Noland Law Firm, LLC
5400 Riverside Drive, Suite 205
  Macon, Georgia  31210
T:  478.621.4980   F:  478.621.4982
  Email:  grace@nolandlawfirmllc.com

Appearing on Behalf of Spalding County
Defendants:

DAVID PENLAND, ESQUIRE
Beck Owen & Murray
  One Griffin Center, Suite 600
100 South Hill Street
  Griffin, Georgia  30223
T:  770.227.4000   F:  770.229.8524
  Email:  dpenland@beckowen.com

INDEX OF EXAMINATIONS


C. RYAN GERMANY

By Ms. Richardson                Page 11, 230

By Mr. Beausoleil                Page 189

By Ms. Winichakul                Page 225



INDEX OF EXHIBITS

NO.              DESCRIPTION              PAGE

PLAINTIFFS'

Exhibit 208   Consolidated Plaintiffs' First Set  20
              Of Requests For Production of
                 Documents To State Defendants

Exhibit 209   Test Messages Log              42
              CDR01369556

Exhibit 210   2/14/2021 Email Thread From Javier  46
              Pico-Prats To Barry Fleming
              CDR01369642 - CDR01369645

Exhibit 211   11/13/2020 Email From Abbye        71
              Conrad To Raffensperger
              CDR00065019 - CDR00065020

Exhibit 212   Transcript of Committee Meeting    72
              Sixth District of the African
              Methodist Epsicopal vs Brian Kemp
                AME_001918 - AME_001919
                AME_001931 - AME_002043

Exhibit 213   12/21/2020 Email Thread From Ryan   82
              Germany To Chris Harvey
              CDR00043663 - CDR00043678

INDEX OF EXHIBITS (Continued)

NO.                 DESCRIPTION              PAGE

PLAINTIFFS'

Exhibit 214   12/10/2020 Email Thread From Jordan 85
              Fuchs To Raffensperger
               CDR00059322 - CDR00059323

Exhibit 215   December 23, 2020 Governmental      87
              Affairs Transcript
               Sixth District of the African
              Methodist Epsicopal Church vs
               Brian Kemp, et al.
              AME_002726, AME_002729 - AME_002735

Exhibit 216   December 23, 2020 Governmental      91
               Affairs Transcript
              Sixth District of the African
               Methodist Epsicopal Church vs
              Brian Kemp, et al.
               AME_002726, AME_002735 - AME_002866

Exhibit 217   Defendants' Opposition To          95
              Plaintiffs' Motions for Preliminary
               Injunction - Exhibit 1
              Declaration of C. Ryan Germany

Exhibit 218   February 7, 2023 State Election    112
               Board Meeting Summary

Exhibit 219   2/28/2021 Email Thread From Ryan   122
               Germany To Bryan Tyson
               CDR00480949 - CDR00480953

Exhibit 220   1/11/2021 Email Thread From Ryan   127
              Germany To Harvey Chris, et al.
               CDR00509009 - CDR0050911

Exhibit 221   Transcript of March 22, 2021       136
              Special Committee On Election
               Integrity Hearing
              SOS0002026 - SOS0002079

C. RYAN GERMANY                                        March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                    8

INDEX OF EXHIBITS (Continued)

NO.                 DESCRIPTION                PAGE

PLAINTIFFS'

Exhibit 222   2/18/2021 Email Thread From Hayley 152
        McCloud To Germany Ryan, et al.
         CDR00043461 - CDR00043462

Exhibit 223   2/1/2021 Email Thread From Barry   158
        Fleming To Germany Ryan
         CDR00519838 - CDR00519839


Exhibit 224   Transcript Excerpts of March 18,   168
         2021 Special Committee On
        Election Integrity Hearing
          SOS0002080, SOS0002108 - SOS0002110

Exhibit 225   3/12/2021 Email Thread From Jeff   177
        Lanier To Fleming, Pico-Prats,
         Germany
        Attached LC 28 0313S
          CDR00157528 - CDR00157619

Exhibit 226   3/15/2021 Email Thread From Jeff   177
        Lanier To Fleming, Germany
         Attached SB 202
        CDR00157637 - CDR00157734

Exhibit 227   Summary of LC 28 0334S            194
          CDR00061983 - CDR00061989

Exhibit 228   7/8/2021 Email Thread From Ryan    195
        Germany To Sarah Beck, et al.
         With Attachment
        CDR01320317 - CDR01320318
         CDR00023251 - CDR00023258
        CDR01320319 - CDR01320326


Exhibit 229   Firefly/Buzz Posts                201

Exhibit 230   6/21/2021 Email Thread From Ryan   203
        Germany To Walter Jones, et al.
          CDR00050377 - CDR00050379

C. RYAN GERMANY                                                   March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                                9

INDEX OF EXHIBITS (Continued)

NO.              DESCRIPTION              PAGE

PLAINTIFFS'

Exhibit 231   9/8/2021 Email Thread From Ryan    213
        Germany To Beck, Sullivan
         CDR00025182 - CDR00025184

INDEX OF EXHIBITS (PREVIOUSLY MARKED)

NO.              DESCRIPTION              PAGE

PLAINTIFF'S

Exhibit 85    1/12/2021 Email From Abigail        128
        Horvath To Recipients
          CDR00459897

THE VIDEOGRAPHER:  This is the video deposition of Ryan Germany, in the matter of United States of America v. the State of Georgia, et al., the Republican National Committee, et al.

Today's date is March 7, 2023.  The time on the record is 9:01.

My name is Todd Parker.  I'm the videographer.  The court reporter is Wanda Robinson.

Counsel, please introduce yourselves, state whom you represent, after which the court reporter will swear in the witness.

MS. RICHARDSON:  Good morning.

Jasmyn Richardson for the United States.

MS. O'CONNOR:  Eileen O'Connor for the United States.

MR. BEAUSOLEIL:  Bill Beausoleil for Georgia NAACP.

MR. FIELD:  Good morning.

Brian Field on behalf of the State defendants.

MR. TYSON:  Bryan Tyson on behalf of the State defendants.

- - - - - - -

C. RYAN GERMANY,

being duly sworn, was examined and testified as

follows:

- - - - - - -

MS. RICHARDSON:  We are here today for the

deposition of Ryan Germany In Re Georgia Senate

Bill 202, U.S. District Court for the Northern

District of Georgia, Docket No.

1:21-MI-55555-JPB.

EXAMINATION

BY MS. RICHARDSON:

Q    Please state your name for the record.

A    Charles Ryan Germany.

Q    Mr. Germany, again, my name is Jasmyn

Richardson.  I represent the United States in this

matter.  I'm a trial attorney at the U.S. Department

of Justice, Civil Rights Division, Voting Section.

Joining me today are my colleagues, Eileen

O'Connor, who is also a trial attorney and in the

Voting Section, and Lauren Putnam, a paralegal in

the Voting Section.

We're also joined here today by Bill

Beausoleiu, who is representing the Georgia NAACP

plaintiffs.

You'll see that we're also joined by some attorneys via Zoom for other plaintiff groups in this consolidated case, the defendants, and the defendant intervenors, I believe.

MS. RICHARDSON: We're going to have everyone make an appearance for the record so you know who's in attendance. We're going to try to do this in an efficient way.

Let's start with counsel for the plaintiffs.

Concerned Black Clergy plaintiff group counsel?

MR. ZATZ: Yes. Cliff Zatz, Crowell Moring, representing the CBC plaintiffs.

MS. RICHARDSON: New Georgia Project plaintiff group?

MR. SHELLY: Good morning. I'm Jacob Shelly with Elias Law Group on behalf of the New Georgia Project plaintiffs.

MS. RICHARDSON: Sixth District AME plaintiff group?

MR. JAIKUMAR: Good morning. Arjun Jaikumar, from Wilmer Cutler Pickering Hale and Dorr, on behalf the Sixth District AME plaintiffs.

MS. RICHARDSON:  And Asian Americans Advancing Justice plaintiff group?

MS. WANG:  Good morning.  This is Emily Wang from Keker Van Nest & Peters, representing the Asian Americans Advancing for Justice.

MS. RICHARDSON:  Thank you, Emily.

Counsel for the defendants, would you like to make an appearance again?

MR. FIELD:  Brian Field for the State defendants.

MR. TYSON:  And Bryan Tyson for the State defendants.

MS. RICHARDSON:  Do we have counsel for the Defendant Intervenors?

(No Response.)

MS. RICHARDSON:  We'll go on to counsel for any of county defendants.

I'll read the county defendants in alphabetical order.

Starting with Athens-Clarke County.  Counsel?

(No Response.)

MS. RICHARDSON:  Brooks County?

(No Response.)

MS. RICHARDSON:  Chatham County?

(No Response.)

MS. RICHARDSON:  Clayton County?

(No Response.)

MS. RICHARDSON:  Cobb County?

(No Response.)

MS. RICHARDSON:  Columbia County?

(No Response.)

MS. RICHARDSON:  DeKalb County?

MS. MOMO:  Good morning.

Shelley Momo on behalf the DeKalb County defendants.

MS. RICHARDSON:  Dougherty County?

(No Response.)

MS. RICHARDSON:  Forsyth County?

(No Response.)

MS. RICHARDSON:  Fulton County?

(No Response.)

MS. RICHARDSON:  Gwinnett County?

(No Response.)

MS. RICHARDSON:  Hall County.

(No Response.)

MS. RICHARDSON:  Macon-Bibb County?

MS. MARTIN:  Grace Martin on behalf of the Macon-Bibb County defendants.

MS. RICHARDSON:  Richmond County?

(No Response.)

MS. RICHARDSON:  Spalding County?

MR. PENLAND:  David Penland on behalf Spalding County defendants.

MS. RICHARDSON:  Did I miss any counsel?

(No Response.)

MS. RICHARDSON:  All right.

BY MS. RICHARDSON:

Q   Let's get started, Mr. Germany.  I'm going to go through some ground rules to start, ground rules that you're probably familiar with.

This is a question and answer.  The court reporter will prepare a transcript of everything that is said today.

We'd like you to speak up and answer questions.  Please no gestures like uh-hum; instead use yes or okay.

Do you understand?

A   Yes.

Q   I may ask a question that I don't state very well or that you don't understand.  If you don't understand my question, will you let me know?

A   Yes, I'll try to.

Q   If you don't understand a question, please ask me rather than your counsel for clarifications,

definitions or explanations of any words, questions or documents presented during this deposition.

Do you understand?

A   Yes.

Q   If an attorney makes an objection, still answer, unless your attorney instructs you not to answer.  Do you understand?

A   Yes.

Q   If you need a break at any time, please tell me or your attorney.  We will finish your answer.  If we are in the middle of it, and then we can see what we can do about a break.

Do you understand?

A   Yes.

Q   If you would like to talk to your attorneys, that's fine, but if there's a question pending or you're in the middle of an answer, finish that up first.

Do you understand?

A   Yes.

Q   Sometimes you may remember things later in the day.  If that happens, will you let me know while it's on your mind and we'll add it to the record?

A   Yes.

Q   Sometimes after we've been taking -- or talking for a while, you realize a prior answer was not entirely accurate.  If you realize that, will you let me know so that we can correct the record?

A   Yes.

Q   Sometimes while you're answering you may think of a document that would help you remember or help you answer more accurately.  If you do remember a document that may help you, will you let me know?

A   Yes.

Q   Is there any reason you can think of why you will not be able to answer my questions fully and accurately today?

A   I mean depending on -- I don't know what your questions will be.

Q   Will you try to answer the questions fully and accurately today?

A   Yes.

Q   If you don't understand my question, will you let me know?

A   Yes.

Q   Any other questions so far?

A   No.

Q   Are you represented by a lawyer here today?

A    Yes.

Q    Who is that?

A    Brian Field and Bryan Tyson.

Q    To your knowledge, when was Mr. Field retained as your attorney?

A    He's been retained -- I can't remember exactly but, you know, close to the outset of this litigation.

Q    When was Mr. Tyson retained as your attorney in this matter?

A    In this litigation matter, I think very close to the, you know -- as soon as the litigation was filed.

Q    Was Bryan Tyson your lawyer in any capacity during the 2021 legislative session?

A    Yes.

Q    He was your lawyer in your capacity as general counsel for the Secretary of State?

A    Yes.  So he was the lawyer for the Secretary of State's Office.

Q    Mr. Germany, what did do you to prepare for this deposition today?

A    I had a few meetings with our lawyers.

Q    When you said a few meetings, about how many meetings?

A    Two.  I should say two -- I believe it was two, at least two.

Q    Those lawyers included Mr. Field and Mr. Tyson?

A    Yes.

Q    Was anyone else present at those meetings?

A    Josh Prince was present at one of them.

Q    Who is Josh Prince?

A    He's a lawyer with Brian Field's firm.

Q    Did you review any documents when you prepared for this testimony today?

A    Yes.

Q    Which documents did you review?

A    I reviewed some documents that the lawyers gave me.  I believe they were documents that had been produced in this case.  Not all the documents produced in this case.

Q    Did any of those documents refresh your memory concerning election bills that were passed during the 2021 legislative session?

A    I don't know.  I would say they refreshed my memory in the sense that I then recalled something I hadn't recalled.

Q    Did you specifically review any election bills that were considered during the 2021

legislative session in preparing for your testimony today?

A   Not that I can recall.

MS. RICHARDSON:  Please mark this.

(WHEREUPON, Plaintiffs' Exhibit-208 was marked for identification.)

BY MS. RICHARDSON:

Q   Mr. Germany, I'm handing you what has been marked by our court reporter as Plaintiffs' Exhibit No. 208.

Please take a look.

(Witness reviews exhibit.)

Q   Do you recall reviewing this document?

A   I know that I did review this document.  I don't know that I specifically recall doing that.

Q   Would you agree that these are requests for production from the consolidated plaintiffs in this litigation?

A   Yes.

Q   Did you ever assist attorneys in this case in determining which documents may be responsive to these requests from the consolidated plaintiffs?

MR. FIELD:  I'm just going to object to the extent it calls for any inquiry into privileged matters and direct the witness not

to answer with respect to any privileged communications.

Outside of that, you can answer.

A   Could you ask that again?  I'm sorry.

Q   Did you ever assist attorneys in this case in determining where to search for documents that might be responsive to these requests for production?

A   I think I did assist in determining where to look for potentially responsive documents.

Q   Do you know if your Secretary of State's email account was searched?

A   It was, I believe.

Q   Do you know if the entire email account was searched?  So sent mails, the inbox, drafts, et cetera.

A   I don't know that specifically.

Q   Have you ever sent or received any correspondence in your official capacity at the Georgia Secretary of State's Office from a personal email account?

A   I know that I try to send all emails from my SOS account, and I tell anybody if they're emailing me for work it needs to be to the SOS account.

I think there are some occasions where I have received something to my Gmail account. If that's the case, generally -- and I need to respond, I would generally respond from my SOS account if somebody sent me something that I think they should have sent to SOS, but there have been occasions I have responded from my Gmail account.

I don't know in terms of like -- you asked in my official capacity. So I'd have to review to see exactly what -- I'm not thinking of anything in particular, so I'd really have to review to see exactly what, what occurred.

Q   Do you recall on which occasions you would receive emails in your personal email account that were about official work related to your job at the Secretary of State's Office?

A   I can recall one instance I know when we had a -- and it wasn't related to this case, but I think we were having like an email problem and we had something else that I had to do I think from a court deadline perspective, so I asked our lawyers to send them to my Gmail account when our email was down.

And there are times where somebody might email -- they might have my personal email and email

me something that I don't know if they thought it was work related or not.

Q   Which personal email account are you referring to?

A   Ryangermany@gmail.com.

Q   Do you have any other personal email accounts?

A   I have, I have a Yahoo account that I don't really use.

Q   The personal email account, ryangermany@gmail.com, did you search that account for documents that may have been responsive to the consolidated plaintiffs' request for production?

A   I did search that email for certain documents.

Q   You said certain documents.  Which documents?

A   I know I had to discuss with the attorneys, and that was how it was determined which -- what I should search for.

Q   What did you search for?

A   I searched for communications with Barry Fleming.  Other communications regarding SB 202 or its predecessor bills.

Q   Let's start with the first search.  You

said you searched for communications with Representative Barry Fleming.  Why did you search for communications specifically with Representative Fleming?

A    Because I knew I would have corresponded with him regarding what became SB 202, and I think at some point in this litigation it became apparent he had sent some stuff to my Gmail account.

Q    Did you search for communications with any other legislators of the Georgia General Assembly?

A    Not specifically.

Q    Would you have had any communications with other members of the Georgia General Assembly?

A    No, I don't believe so.  I guess -- sorry. To clarify, sent to my Gmail account.

Q    Yes.  Thank you.

When did you do this search for communications with Barry Fleming in your Gmail account?

A    I don't recall exactly, but it's been within the past month or so.

Q    I think you said that you also did a search for other communications.  What other communications did you do a search for?

A    I searched for, to the best of my

recollection, SB 202 has a term, and then the predecessor bill I believe was HB 531, and I searched for that as well.

MS. RICHARDSON:  We've had some counsel join the Zoom.  If you joined in the last five to 10 minutes, could you please introduce yourself for the record.

Justin Lawhon, could you please introduce yourself for the record?

(No Response.)

MS. RICHARDSON:  All right.

BY MS. RICHARDSON:

Q   Did you search your text messages for any communications that might have been responsive to the plaintiffs' request for production?

A   I did search my text messages for -- I think the search was -- for instance, I didn't review the plaintiffs' response for request for production.  The search was based on something that came up with our lawyers.

Q   Did you specifically search for a text with any members of the Georgia General Assembly?

A   I searched for texts with Barry Fleming.

Q   Would you have had any texts with other members of the Georgia General Assembly?

A    I don't know.  I can't specifically recall.  On this bill, I mean it would have probably been with Barry Fleming.  It's possible that someone else texted me but I can't recall that.

Q    Would any democratic members of the Georgia General Assembly have texted you about this bill?

A    I don't think so.

Q    Would any democratic members of the Georgia General Assembly have texted you about any other election bill considered during the 2021 legislative session?

A    I'm not sure.  I don't believe so.

Q    Did you speak with Representative Barry Fleming about your deposition today?

A    No.

Q    Did you speak with any members of the Georgia General Assembly about your deposition today?

A    No.

Q    You previously served as general counsel for the Georgia Secretary of State's Office; is that correct?

A    Yes.

Q    Did any of your duties as general counsel

for the Secretary of State's Office include drafting election-related legislation for the Georgia General Assembly?

A    My duties did include drafting legislation, including election-related legislation.

Q    Did you ever draft election-related legislation with members of the Georgia General Assembly?

A    Can you explain what you mean by with?

Q    Were they ever --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q    Can you describe the legislative process behind drafting election-related bills in your role as general counsel at the Georgia Secretary of State's Office?

A    So it was not unusual for members of the General Assembly to approach the Secretary of State's Office if they're working on something that is related to what the Secretary of State's Office office does.  It might be elections, it might be professional licensing, or one of the other things the Secretary of State's Office does as well.

And usually it happened kind of a few different ways:  One, they could come with an idea

of something they were working on.  Sometimes they might come with something they already had drafted and ask our thoughts on it.

But that was not unusual for that to happen.

Q   First you said it was not unusual for legislators to come with an idea for changing election-related -- or changing election law; is that right?

A   Well, I was referring to a little bit broader than that, but including -- yes, they would -- that would be correct.

Q   When would a legislator typically come with an idea for election-related matter?

A   It can vary.  It could happen well outside the legislative session, depending if that legislator might have had something specifically come up.

It could happen sort of in the lead up to the legislative session, or it could happen kind of during legislative session, generally more toward the beginning of that session.

Q   When you said well outside of legislative session, what did you mean by that?

A   So the legislative session generally goes

from January to about April every year, and so what I was referring to with that is we might get something in the summer or someone has had a question asked or something come up, where they would then come to our office.

I would say more typically it happens in the lead-up or the very beginning of the legislative session.

Q    Would the Secretary of State's Office ever bring a proposal for election reform first to a legislator and then start drafting a bill with the legislator?

A    Yes, I think that would occur, too, in the sense that we -- Secretary of State's Office would have some ideas of what we think would be a good, a good idea.  We might discuss that with a legislator.

Q    When would that typically happen, that you would come first with a proposal to a legislator?

A    Typically in the lead-up -- I shouldn't say first.  We might not come with a proposal.  It might just be kind of a conversation.  But that would probably be in the lead-up to or in the very beginning of a legislative session.

Q    In your experience as general counsel for the Secretary of State, were there specific

legislators that you might have this conversation, to use your words with -- use your word, about election reform?

A   Can you ask that again?  I'm sorry.

Q   Were there specific legislators that you would go to to have a conversation about election reform for the upcoming legislative session?

A   It depends on maybe what the issue is.

I know we did work with Representative Fleming on a few different things across different sessions.  But then we would also approach potentially other legislators, especially if we knew they had -- it was something that might interest them specifically.

Q   Fair to say you had some role in drafting election bills considered during the 2021 legislative session?

A   Yes.

Q   Did your role in drafting election-related legislation for the 2021 legislative session differ in any way from your role in drafting bills in prior legislative sessions?

A   So no -- I would say no two sessions are exactly alike, but generally it was similar.

Q   Besides Representative Barry Fleming, who

were some of the legislators you worked with to draft election bills introduced during the 2021 legislative session in the Georgia General Assembly?

A    Could you ask that again?  Something about --

Q    Besides Barry Fleming, who were some of the other legislators that you may have worked with to draft election-related bills during the 2021 legislative session?

A    The phrase, the phrase "worked with to draft" is giving me a little bit of -- I'm not quite sure how to answer.

Q    Did you draft any election-related bills alongside other legislators during the 2021 legislative session?

MR. FIELD:  I'm going to object to form.

A    I'm not exactly sure how to answer that. I think -- the way that the process worked is I basically drafted something, and it might have been based off of a -- an idea, say like they brought to me.  It might have been something that I was trying to bring to a legislator.  But it wasn't really like alongside or with them necessarily.

Q    Let's start with the first one.

Who were some of the legislators that

brought an idea to you during the 2021 legislative session, an idea related to elections?

A    Barry Fleming.

Q    Uh-hum.

A    Jan Jones.

I believe I -- I think I can recall Bonnie Rich as well, although that might have been kind of a similar idea of Jan Jones.  I think Jan and Bonnie came together.

And there may have been other ones that I can't specifically recall.

Q    Did you bring ideas to any legislators during the 2021 legislative session, ideas related to elections?

A    I think that I did.

Q    Which legislators do you recall bringing an idea related to elections to?

A    Barry Fleming, Jan Jones, Bonnie Rich.

I can't recall any other ones specifically but it wouldn't be unusual if I'm having a conversation with a legislator for me to take the opportunity to suggest something I thought was a good idea if they were -- especially if I thought it could kind of relate to something that they were trying to do.

Q   Okay.  Let's start with Barry Fleming. Which ideas related to elections do you remember discussing with Barry Fleming during the 2021 legislative session?

A   So I worked closely with Barry on what became SB 202.  I think it was in the House, a bill he introduced was HB 531, and I worked closely with him on that.

So I don't know if I could say that we discussed every idea in there, if it was his legislation, but, you know, I'm comfortable saying we discussed probably most of them, of the ideas in that legislation.

Q   When you worked closely with Representative Barry Fleming on House Bill 531, do you recall anyone else that worked with the two of you on that bill?

A   Yes.

Q   Who?

A   I worked with Bryan Tyson and Javi Pico-Prats, and with Jeff Lanier, who was legislative counsel -- he worked in the legislative counsel's office.

Q   When you worked with this group, including Bryan Tyson, Javier Pico-Prats, Jeff Lanier, and

Representative Fleming, did you all meet in person to discuss these bills -- this bill?

A   I don't know there was an occasion that all five of us met in person.  I think Jeff -- Jeff, to my recollection, was primarily working from home, I believe.

I think he's kind of retired, and then brought back on to help during the legislative session.

Q   But there were some in-person meetings among a few of you from that group, that group consisting of Bryan Tyson, Javier Pico-Prats, Jeff Lanier, and Representative Fleming?

A   Not -- I don't know that I recall an in-person meeting with Jeff Lanier, where he was present.

Q   How often did you meet in person with Representative Fleming about House Bill 531?

A   We met -- depending on what was occurring, I would say we met multiple times a week.

Q   Where would you typically meet?

A   In Barry Fleming's office.

Q   Were any of Representative Fleming's staff members present typically at this meeting?

A   Not that I recall.

Q   Let's go to Representative Jan Jones. Which election-related ideas did you discuss with Representative Jan Jones during the 2021 legislative session?

A   I recall discussing with Representative Jones, Speaker Pro-Tem Jones.  I don't know what her -- the -- when, when an absentee ballot -- initially when it should be allowed to be made, for the start date for when absentee ballot requests began for an election.  And I recall discussing Sunday voting with her as well.

Q   Did you also discuss any kind of absentee ballot request deadline with Representative Jan Jones?

A   I don't recall one way or the other.

Q   What did you discuss regarding Sunday voting with Representative Jan Jones?

A   I don't remember specifically.  I recall that I think Jan Jones was the person who wanted to allow what became, you know, the final law where Sunday voting was allowed at the option of the counties.

Q   Did you ever meet in person with Representative Jan Jones about any of these election-related ideas during the 2021 legislative

session?

A   Yes.

Q   How often did you meet with Representative Jan Jones?

A   I can recall one meeting with her.  And I guess I should say I recall one meeting with her specifically.  I think her and Bonnie Rich came.

There were other times where she -- where we met with the members of the -- republican members of the Election Integrity Committee.  That was kind of more when the legislative process was -- was a little further down, after bills had been introduced and were in committee and things like that.

Q   How many other times did you meet with republican members of the Election Integrity Committee?

A   I can't recall specifically, but I would say probably five or six.

Q   What was typically discussed at those meetings with the republican members of the Election Integrity Committee?

A   Those meetings were generally before a committee hearing, and Barry and I would have worked on a bill, and others.  So it would be explaining, hey, here's what -- here's what's in this bill,

here's what you're about to hear about.  Before it gets where the committee meeting was when the bill would be maybe presented, for instance.

Q   Did they typically ask questions during those meetings?

A   Yes, I would say there were some questions.

Q   Would you answer those questions typically?

A   It might not be me who answered.

Q   Were any democratic members of the Election Integrity Committee present at any of these meetings that you had with the republican members of the Election Integrity Committee?

A   So I think the answer is no, but just to clarify, so there were meeting -- I wasn't counting the meetings like the public sort of committee meetings, so.

Q   At any of these -- we can call them private meetings -- with the republican members of the Election Integrity Committees -- committee --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Were there ever any democratic members of the Election Integrity Committee present at these

public -- private, excuse me, meetings with the republican members of the Election Integrity Committee?

A    No.

Q    Do you know why not?

A    No.

Q    Do you know if Representative Fleming or any of the other republican members of the Election Integrity Committee ever invited democratic members of the Election Integrity Committee to these private meetings?

A    I don't know.

Q    Just returning to the list of legislators you discussed election-related ideas with, Representative Bonnie Rich, what election-related ideas do you remember discussing with Representative Bonnie Rich during the 2021 legislative session?

A    I recall Representative Rich coming in with Speaker Jones, Speaker Pro-Tem Jones, to discuss when absentee ballots should begin being requested for an election.

Q    Last question on the --

A    I'm sorry.

Q    Go ahead.

A    And then I think, I think this is the 2021

session also, where there was a different bill.  It was not part of kind of the bills we're discussing, that dealt with citizenship language on driver's licenses, and I think Representative Rich chaired the subcommittee that that was presented to, to my recollection, and that bill did not advance, but I believe that I discussed that with Representative Rich as well.

Q   Going back to those private meetings with the republican members of the Election Integrity Committee, were any members of the Georgia --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Were any leaders with the Georgia GOP party ever present in those private meetings with the republican members of the Election Integrity Committee?

MR. FIELD:  Object to form.

A   No.  I should -- I probably should -- I think I know what you mean by leaders.

Q   I can be more specific if you like.

Was Brad Carver ever present at any one of these private meetings with the republican members of the Election Integrity Committee?

A   No, not that I can recall.

And I should say not any meeting where I was present.

Q    Are you aware of any private meetings between republican members of the Election Integrity Committee and Brad Carver regarding election bills during the 2021 legislative session?

A    No.

Q    Fair to say that you were communicating more with republican legislators than democratic legislators about election-related ideas in the 2021 legislative session?

MR. FIELD:  Object to form.

A    I don't know that I would agree with communicating more is accurate, but if we were working with -- I should say I was working with republican legislators on the bills.  The bills I was working on were primarily bills that were introduced and sponsored by republican legislators. I say primarily, I believe -- I don't think I specifically worked on any other bill.

Q    Did you ever work on an election bill with democratic legislators during the 2021 legislative session?

A    Worked on is kind of broad, so I don't -- I don't know -- I mean the bills that were being --

sort of moved through the legislative process were bills where Republicans were the sponsors.

Q   Did you ever discuss any election-related ideas with democratic legislators during the 2021 legislative session?

MR. FIELD:  Object to form.

A   That is certainly something I've done before, discuss ideas.  I don't know that I specifically recall during the 2021 legislative session or not.  I don't know if I can specifically place those conversations.

Q   During the 2021 legislative session, did you ever seek input on election bills from county election officials?

A   Yes.

Q   Which county election officials?

A   I don't know that I can recall specifically.  I do recall emails with kind of a group of county election officials.  Lynn Bailey would have been part of that, I believe Janine Evler in Cobb County, Joseph Kirk in Bartow County, and some others as well, who I can't specifically recall.

Q   Do you recall referring to county election officials as the good ones in your text messages

that were produced in this litigation?

A   I don't recall that.

(Whereupon, Plaintiffs' Exhibit-209 was

marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 209.

The Bates number for this document is CDR01369556.

Can you take a look at that document?

(Witness reviews exhibits.)

BY MS. RICHARDSON:

Q   Mr. Germany, if you'd like, you can look at specifically Page 29, Line 191.

A   I see that.

Q   Would you agree this text was sent on March 11, 2021, which appears under the Timestamp column -- or in the Timestamp column?

A   And this document looks like a kind of a compilation.

Q   The specific text message at Line 191, would you agree that it was sent, according to this document, on March 11, 2021, at 9:32:04?

A   That's what this document says.  I see that.

Q    And read with me in the body column for Line 191, starting at:  "I'm hearing a couple of things from county election officials.  They really dislike the county takeover language.  The good ones know it's not aimed at them, but they are still raising some good points."

What did you mean by "the good ones"?

A    In Georgia we have 159 counties, each of whom have an elections office and an elections staff.  In my experience at the Secretary of State's Office there are some offices that I believe do a better job than others.  So I think I meant like the ones who are -- that essentially do a better job with those duties.

Q    Would you also look with me in the same document on Page 3, starting at Line 15.

Would you read with me, from the Body column:  "Y'all start without me.  I'm going to call some election directors."

Response:  "10-4.  I'm here."

Then Line 17:  "Would we want them to testify today or tomorrow?

"Yes tomorrow, maybe today if you have a good one."

Would you agree that last part, "Yes

tomorrow, maybe today if you have a good one," was sent from Representative Barry Fleming?

A   That's what this document makes it appear like.  I don't, I don't have any reason to dispute that.

Q   What did you take that to mean, "a good one," there?

A   My recollection here is that -- I know I wanted to have kind of election directors involved in the process of election legislation because that's kind of primarily who it affects.

So that's why I was sending -- seeking feedback from county election officials and I wanted to make sure legislators heard feedback from county election officials.

The way I interpreted that is someone who would essentially be a good, competent witness to speak to -- from the county election perspective in the -- everyone is to testify in a committee hearing on legislation.

Q   I noticed you said you wanted to have county election officials involved.  Were there any legislators that didn't want to have county election officials involved?

A   There, there were -- none that didn't want

to have county elections directors involved, but sometimes, because they're not necessarily there at the Capitol, they're not as involved as -- you know, I was reaching out to kind of specifically get them involved. But, no, I don't recall any kind of pushback on or opposition to that.

Q   When you said they're not necessarily involved, you mean the county election officials are not necessarily involved?

A   In the legislative process, yes.

Q   Have you ever donated money to a political candidate in Georgia, Mr. Germany?

A   Yes.

Q   Who?

A   I've donated to Governor Kemp.

I can't recall any other donations. I think I -- I think I can recall a small donation to Governor Deal.

Q   Do you recall ever donating to any democratic candidates?

A   No.

Q   Would you say that your position as general counsel --

MS. RICHARDSON:  Strike that.

C. RYAN GERMANY                                    March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                    46

BY MS. RICHARDSON:

Q    Would you say that your former position as general counsel at the Georgia Secretary of State's Office was a nonpartisan position?

MR. FIELD:  Object to form.

A    Can you be more specific?

Q    In your position as general counsel for Secretary of State, were you to work on behalf of both republican and democratic voters?

A    Yes.

(WHEREUPON, Plaintiff's Exhibit-210 was marked for identification.)

MS. RICHARDSON:  Thank you.

BY MS. RICHARDSON:

Q    Mr. Germany, I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 210.

The Bates numbers for these documents are CDR01369642 through CDR01369645.

(Witness reviews exhibit.)

Q    Do you recall receiving this document, Mr. Germany?

A    I don't recall receiving it, no.

Q    What does this document appear to be?

A    This looks like an email from Javier

Pico-Prats to Barry Fleming, but copies Bryan Tyson and myself.

Q   To confirm, this was sent to your personal email account?

A   Yes.  That's what it says.

Q   Would you agree that this is a document from Javier Pico-Prats to Barry Fleming containing a GOP wish list comparison?

A   It looks like that's what the attachment is titled.

Q   Did you typically receive documents like this in your role as general counsel for the Secretary of State?

MR. FIELD:  Object to form.

A   Could you be more specific about documents like what?

Q   Documents containing a GOP wish list, borrowed from the document name.

MR. FIELD:  Same objection.

A   It would not be unusual for us to receive something from either party regarding -- now, I don't think that's what this is.  I think this is something Javi put together based on something -- based on something else.

But, no, it would not be unusual for us to

receive kind of an agenda from a political party or other stakeholder of election reform ideas.

Q   Did you ever receive an agenda of political ideas directly from a Georgia General Assembly member?

MR. FIELD:  Object to form.

A   Can you ask that again?

Q   Sure.  Do recall receiving any documents like this from any other Georgia General Assembly members during the 2021 legislative session?

MR. FIELD:  Object to form.

A   Can you, can you -- I think documents like this, I'm a little bit --

Q   Let's look at the document.

A   Yeah.

Q   What does the attachment include?

A   Could you ask a little more specific question?

Q   Would you agree that this document includes wish list items, looking specifically at the page with the Bates No. CDR01369643.

A   So I recall following the 2020 election the GOP did some type of -- I think they called it a task force or something, where they came up with what they wanted to see from an election policy.

At some point they released that.  So I -- I don't recall that it was kind of released publicly or -- I think it was.  I think that's how it sort of became -- or I don't know if -- I don't know if they sent it to -- I don't know.

But I think what this is is basically Javi looking at what they had requested, the GOP.  I think they called it the tasks force following the 2020 election versus what was in the legislation that we had been working on and have a comparison of the two.

Q   Would it be typical to receive some type of comparison between what was in --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Would it be typical to receive a comparison of a party, political party, platform ideas to election-related bills?

MR. FIELD:  Object to form.

A   It would be -- so it kind of depends.  I think following the 2020 election -- I'm not familiar with the GOP having done something like their task force other than, other than that.  But it would be -- it was not atypical for a legislator to want to say, hey, this encompasses this idea from

this person or this person or this group when they're explaining their bill to other legislators.

Q   Do you recall ever receiving a similar comparison from a democratic legislator during the 2021 legislative session?

A   No.

Q   Let's look back at Exhibit 209, the text message strings, specifically at Page 26, Line 169.

The body of the text reads:  "Where did all these guys stand when Abrams was spreading disinformation about our voting system?"

Next, Line 170:  "Agreed.  They all stood with her."

Do you recall who you were talking about in Line 169 when you said "all these guys"?

A   Looking at sort of the text around there, it seems like -- so I don't specifically recall, I guess I should say.

Q   Were you talking about democratic legislators?

A   It looks like I was talking about -- I think there was something happening on the floor of the legislature, and people were standing up, legislators were standing up and saying certain things.

Q   What certain things?

A   I don't recall.

Q   Does Abrams in that same line refer to Stacey Abrams?

A   Yes.

Q   And in the Line 170, when you said, "They all stood with her," were you talking about Stacey Abrams again?

MR. TYSON:  Object.

A   It doesn't look like I said that.

MR. FIELD:  Objection.

Q   Thank you for pointing that out.

In Line 170, when Bryan Tyson responded: "Agreed.  They all stood with her," what did you take that to mean?

A   I took the "her" to mean Abrams, Stacey Abrams.

Q   Let's go to the next line, 171.  The body reads:  "Are we scheming white supremacists or cowards?  I can't keep up."

Next line in 172:  "She's trying to go viral with her own hashtags."

Do you remember --

MS. RICHARDSON:  Strike that.

Q   Who does "she" refer to?

A    I don't know.

Q    Do you know if "she" refers to Representative McLeod, M-C-L-E-O-D, a representative in the Georgia General Assembly?

A    I don't know.

Q    Let's go to Line 173:  "Can't say there is no voter fraud in Georgia.

Dreyer is -- Line 174:  "Dreyer is wrong on that point."

Does Dryer refer to David Dryer?

A    I think so, yes.

Q    A democratic legislator?  Right?  He is a democratic legislator?

A    I believe he was at the time.

Q    Next line, 175:  "In 2018 or 2020?"

Going on to Line 176:  "What about the dozens of failed democratic lawsuits?"

Line 177:  "You are forgetting that their complaints are virtuous and Republican complaints are racists."

Did you send the text message in Line 177?

A    Yes.

Q    What did you mean by "their complaints"?

A    I was making I think the overall point going back to my -- the previous text message, that

to me, from where I had sat, there was a lot of similarities in the post-2018 election as there was in the post-2020 election with people saying things that were not true, people saying people were not accepting the results of the election.

Of course, the difference was in Georgia, in 2018, it was largely democrats who were doing that in 2018. And in 2020 it was Trump affiliated republicans.

And what struck me was how similar both of the things they were saying, not just like their overall sort of similarity of, okay, false things, that had not to do with the election, but they're really complaining about very similar things. For instance, voting machines were a common complaint post-2018. Voting machines were a common complaint post-2020.

And even some of the things that -- when they talked about -- when democrats talked about voter suppression, republicans talked about voter fraud. But from our experience, my experience, Secretary of State's Office, they were really quite similar actual things. They're referring to things, okay, we want no one to have at all a bad experience when they go vote. The reality is when you have 4

million people voting or 5 million people voting, they are going to have some -- there are going to be some people that don't have a great experience for one reason or the other.  That's why there's things in place to try to deal with those.

And so I think what I am referring to here was a lot of the complaints were similar, I think, but then the side that is not complaining then completely sort of dismisses the side that is complaining, and it just -- the sides can kind of switch sides depending on whether or not their preferred candidate won the election.

Q   So here in Line 177, "their complaints" refers to democratic complaints?

A   Yes.

Q   Let's go to Page 10.

A   And I think what it refers to, the one before talks about the lawsuits.  So I think I'm talking about -- well, I shouldn't say that.  I can't recall if I mean like complaint as in a lawsuit or compliant as in a more general.  So grievance.

Q   Grievances of the Democratic Party?

A   I would say grievances of people -- because really in both -- in both the situations I

would say it was a much more limited subset than that. Than people -- I wouldn't say it would encompass a whole party.

Q   Members of the Democratic Party?

A   I guess what I could really say is it was people who were really supportive of the candidate who lost. In 2018, that would have been supporters of Stacey Abrams. In 2020, it would have been supporters of Donald Trump.

Q   On Page 10, at Line 65, it reads:

"Amazing how Stacey didn't accept the facts and was celebrated."

Stacey refers to Stacey Abrams?

MR. FIELD:  You're on Line 65?

MS. RICHARDSON:  That's right.

Q   Page 10, Line 65, Mr. Germany. Take your time.

A   Yes, I think that would refer to Stacey Abrams.

Q   On Line 66, it reads:  "Wow - she is really trashing Stacey Abrams right now."

Line 67, Bryan Tyson:  "Laughed at 'Wow - she is really trashing Stacey Abrams right now.'"

Was this a joke about Stacey Abrams?

A   I think it was more of a joke about the

person -- I don't recall who it's talking about, but I think I was making -- trying to make the point that whoever was speaking was saying things that -- I think probably meaning to sort of talk about Donald Trump but in my opinion would have referred to Stacey Abrams as well in terms of how they both handled their -- the elections they lost.

Q   Let's go on to 2020, unless you need a break, Mr. Germany?

A   I'll take a quick break if you don't mind.

MS. RICHARDSON:  Okay.  We'll go off the record for 10 minutes.

THE VIDEOGRAPHER:  Going off the record at 10:20.

(A recess was taken.)

THE VIDEOGRAPHER:  We are back on the record at 10:30.

BY MS. RICHARDSON:

Q   Turning now to the 2020 election, Mr. --

A   Can I clarify one thing?

Q   Absolutely.

A   Regarding searching my Gmails, I did search kind of through the relevant time from November 2020 through I believe it was April 2020, and just scanned through all may Gmails to see if

there was anything kind of relevant to this.

So I did do that as well.

Q   Okay.  Thank you.

Would you agree that absentee voting use increased significantly in 2020?

A   Yes.  In Georgia we kind of have two types of absentee.  Like absentee, we call early voting is sort of technically absentee in person.  You know, when most people say absentee, they mean absentee by mail.  But, yes, that absentee by mail increased significant in 2020.

Q   Do you recall that the Georgia Secretary of State's Office sent unsolicited absentee ballot applications to all active registered voters for the June 2020 primary?

A   Yes.

Q   To your knowledge, did that effort result in any widespread voter fraud in the June 2020 primary election?

A   No.

Q   Despite those security measures around mail-in absentee voting, would you agree that some republican legislators in the Georgia General Assembly opposed The Secretary of State's decision to send unsolicited absentee ballot applications in

the June 2020 primary?

A    Could you clarify what you mean by those security measures?

Q    Good question.

Were there security measures in place around the distribution of unsolicited absentee ballot applications by the Secretary of State's Office in the June 2020 primary?

A    The reason that the Secretary of State's Office sent out the absentee ballot applications for the primary was we had heard that certain counties were going to do that, sort of on their own, to their voters, and we knew that sort of outside groups would be doing that as well, to -- you know, and they generally take a more targeted approach to voters who they specifically want to target.

Our concern was that that can lead to some I think unfairness based on maybe what county you lived in.  And one thing that -- and we were really concerned about what would happen from a county election official standpoint.  So what we decided to do was really see if we could kind of make it more uniform.  Not just uniform for all voters, but also uniform for -- like a uniform application that then elections officials could deal with, including a

barcode that would allow the people to -- the elections officials to look a voter directly up.  We were using information directly from the voter registration system.

So I think those are -- those are I think the security measures that, that we put in place. Also along with just the, the -- the regular ones of -- for instance, you have to verify signature at that time for all applications.

Q   It's your testimony that one of the reasons the Secretary of State's Office sent unsolicited absentee ballot applications in the June 2020 primary is to make sure there was uniformity among counties?  Is that what you're saying?

A   Yes, that was one of the reasons.

Q   Was that rationale ever explained publicly?

A   I feel like I've talked about it publicly. I don't know -- I don't know if it was otherwise.

Q   Where would you have discussed that publicly?

A   Like legislative -- well, I mean I guess by publicly, I don't know -- I don't know.  It's something that -- I mean I haven't discussed it on TV or anything.

Q   In November of 2020, the Secretary of State's Office didn't send unsolicited absentee ballot applications; is that right?

A   Yes.

Q   At that time, there was a chance then that some counties would send unsolicited absentee ballot applications and others wouldn't, right?

A   Yes.

Q   So did you not have that same concern about uniformity in the November 2020 election?

A   I would say it was a different sort of time period from -- especially from a COVID perspective.

Q   How was it different?

A   In May -- or kind of April, May, June -- I don't exactly remember when we sent out those applications -- there were a lot more questions about what, what was -- what COVID meant from especially an in-person voting perspective.

It seemed like -- and from a -- by the time we got to November, there was a higher comfort level with returning to in-person voting.

Q   Would you agree that there were some republican legislators in the Georgia General Assembly that opposed The Secretary of State's

decision to send unsolicited absentee ballot applications?

A   I can't, I can't recall that specifically.

Q   Do you recall former House Speaker David Ralston doing an interview in April 2020 to discuss Secretary Raffensperger plan to send unsolicited absentee ballot applications to voters in Georgia?

A   I don't recall that.

Q   At this time, we're going to play a portion of a video that has been turned over in this litigation.  The Bates number is USA_04145.

We can start around 17:05.

(Video played.)

BY MS. RICHARDSON:

Q   Mr. Germany, to the best of your knowledge, did Speaker Ralston ever discuss any of these concerns with the Secretary of State's Office?

A   Not that I can recall.

Q   Do you recall any legislators reaching out to the Secretary of State's Office with concerns about the Secretary of State's decision to send unsolicited absentee ballot applications in the June 2020 primary?

A   I recall there being where some people who, who were -- who didn't like that decision.  I

can't recall specifically who reached out to our office about it.

Q   Who are some of the people that you recall that didn't like that decision?

A   I can't recall kind of anybody specifically.

Q   Did any staff member in Speaker Ralston's office, former Speaker Ralston's office, ever reach out to you about concerns that the Secretary of State's decision to send out unsolicited absentee ballot applications?

A   I do not recall them reaching out to me.

Q   Do you know if any staff member at former Speaker Ralston's office ever reached out to anyone at the Georgia Secretary of State office about the decision to send unsolicited absentee ballot applications?

A   Not that I'm aware of.  I really should say I don't know one way or the other.

Q   Are you aware of any conversation between Secretary Raffensperger and former Speaker David Ralston related to the Secretary's decision to send unsolicited ballot applications in the June 2020 primary?

A   I'm not aware of any.

Q   Do you have reason to believe there would have been conversations between former Speaker David Ralston and the Secretary about his decision, The Secretary of State's decision, to send unsolicited absentee ballot applications in the June 2020 primary?

MR. FIELD:  Object to form.

A   I don't have any specific reason to believe that.  But I do know that occasionally we'll -- the Secretary of State's Office will talk to the Speaker's office, and vice versa, but I'm not aware of any of those specific conversations regarding that matter specifically.

Q   Would you agree that mail in absentee voting was higher in the November 2020 General Election than other general elections?

A   Yes.

MR. FIELD:  Object to form.

A   Well -- yes.  Yes, I agree with that.  It was lower, for instance, than like in the general primary in 2020, but kind of -- you said general elections.  So compared to like past November general elections?

Q   Right.

A   Yes, I would -- mail in ballot -- mail in

voting was higher in the November 2020.

Q   Would you agree that the Secretary of State's Office responded to numerous allegations of voter fraud in the November 2020 general election cycle?

MR. FIELD:  Object to form.

A   Yes.

Q   Would you agree that many of those allegations focused on mail in voting?

MR. FIELD:  Object to form.

A   I feel like we got allegations about pretty much every aspect of the voting, the voting system.  So...

Q   Of the allegations of voter fraud in the 2020 General Election that you recall, were most of them focused on mail in voting, mail in absentee voting?

A   I don't know that I can say most of them were.

Q   Many?

A   I think I can say -- I think many.  Like certainly some, but there was a lot, a lot about voting machines, a lot about -- I mean I think pretty much everything.  So it's hard for me to, to -- it was certainly a component of what we were

hearing post-2020.

Q    Based on your experiences in the Secretary of State's Office, was there widespread voter fraud that occurred in the November 2020 election?

A    No, there was not.

Q    During the November 2020 election cycle, do you recall any state legislators reaching out to you with specific questions related to allegations of voter fraud in the November 2020 General Election?

A    Can you ask that again?  I'm sorry.

Q    Uh-hum.

During the November 2020 election, do you recall any state legislators reaching out to you with specific questions related to allegations of voter fraud?

A    I think one thing -- I probably should have said this earlier, but when you're saying voter fraud, we had people reach out to us and they might have been making an allegation of sort of voter fraud.  They might have been making an allegation of some type of discrepancy, like other, other issue that -- I don't know.

So I was just trying to clarify what you're asking, like about -- are you asking like

about a more limited question or more, more -- you know, kind of broad issue with the 2020 election?

Q   Let's go through a list.

Do you recall any legislators reaching out to you during the November 2020 election about the security of drop boxes?

A   I don't recall that specifically.

Q   Do you recall any legislators reaching out to you about a settlement agreement related to the signature match process?

A   I don't recall any legislators reaching out about that.

Q   Okay.

A   That's not to say that didn't happen.  I don't recall that.

Q   Do you recall any legislators reaching out to you about security of the election machines used in the November 2020 election?

A   I recall hearing about all those issues you asked about.  I don't recall legislators like reach out specifically about them or not.

Q   At that same time, in November 2020, did any legislators reach out to you about potential election-related legislation for the upcoming legislative session?

A    In what time frame?

Q    During the November 2020 election.

A    What time frame is that?

Q    Early voting Election Day.

A    I don't recall any legislators reaching out specifically about that until -- what we've discussed earlier with Representative Fleming.

Q    When did Representative Fleming first reach out to you about potential election-related legislation for the 2021 legislative session?

A    I can't recall specifically. I think it would have been around the time of the beginning of the legislative session.

Q    Following the November 2020 election, but before the legislative -- the 2021 legislative session began, do you recall meeting with Representative Fleming?

A    I don't recall that.

Q    Do you recall talking with him by phone during that same period about potential election-related legislation?

A    No.

Q    Do you recall any staff with the Governor's Office reaching out to you about election-related legislation following the November

2020 election but before the 2021 legislative session?

A    No.

Q    Is it fair to say --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q    Would you agree that there was some political backlash from members of the Republican Party in response to The Secretary of State's rejection of certain voter fraud allegations from the November 2020 election?

MR. FIELD:  Object to form.

A    Could you explain what you mean by political backlash?

Q    Do you recall members of the Republican Party being concerned with the Secretary of State's Office response to voter fraud allegations from the November 2020 election?

A    To my recollection -- I certainly recall there being a lot of claims, you know, made after the 2020 election.  My, my impression was these were certainly, you know, people who were supporters of President Trump.  And, yes, our office I think tried to say, here's what we are actually seeing.  And most times it was not what those people were saying.

So -- and so, yes.  And then people wouldn't necessarily like that we were agreeing with what they were saying.

Is there -- is there more to the question? I'm sorry.

Q   When you say people didn't necessarily like, were those people legislators?

A   My sense is that, yes, some legislators didn't like, didn't like that, but -- didn't like what we were saying.  But my -- really, it didn't feel like that was kind of the brunt of who we were hearing from, and we were kind of trying to focus on responding to what we were hearing.  It might be media, it might be some other -- and so in terms of exactly who wasn't happy was hard, hard to keep up with.

Q   Okay, we're going to play another video. This was produced by the United States at USA-04141.

(Video played.)

BY MS. RICHARDSON:

Q   Do you recall what elections bill the Secretary was referring to in that video when he said "we will have our elections bill brought forward"?

A   I do not.

Q   Do you know if the Secretary at that time was speaking with any legislators about election-related legislation for the upcoming legislative session?

A   I don't know that specifically.

Q   Do you and the Secretary discuss, typically discuss, election-related legislation that's being considered during the legislative session?

MR. FIELD:  Object to form.

A   We discuss it -- yes, we would certainly discuss that during the session and outside of the session as well.

Q   Do you recall some voter fraud related hearings and meetings held in December of 2020 that were organized by members of the Georgia General Assembly?

A   I recall a, a meeting or a hearing held -- you said December.  I can't remember if it was, it was in between November and December.

I recall a Senate Government Affairs hearing that was held, that we participated in. "We" meaning the Secretary of State's Office.

I testified there.  I recall that there was a -- Senator Ligon had a subcommittee, the one

where Giuliani testified and all of that, that we did not take part in.

And I recall there -- I believe there were some House committee hearings as well.  I don't recall the exact timing of, of those.

Q   Let's start on the Senate side first.

(Whereupon, Plaintiffs' Exhibit-211 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Exhibit No. 211, Bates No. CDR00065019 through CDR00065020.

Take a look at that if you would.

(Witness reviews exhibit.)

Q   Do you recall this hearing held by the Senate Government Oversight Committee?

A   I recall a hearing held by that committee where I testified.  I believe this would be that one.

Q   Did any members of the Secretary of State's Office have a role in organizing this hearing?

A   No.  Not to my knowledge.

Q   Did you receive any materials from Senator Heath's office prior to this hearing?

A    No, not to my knowledge.

Q    Let's look at some of your remarks from that hearing.

(Whereupon, Plaintiffs' Exhibit-212 was marked for identification.)

BY MS. RICHARDSON:

Q    I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 212.  AME -- the Bates number is AME_001918.  That's the cover page.

The next page starts at AME_001931, and continues through AME_002043.

Mr. Germany, I would direct you to AME_001948 in this document.

That was AME_001948.

(Witness reviews exhibit.)

A    Okay.

Q    And specifically starting at Line 6.

It reads:  "In Georgia, we've had no excuse absentee voting for -- since 2005, but up until this year, you know, the preference of Georgians has really seemed to be to vote in person either on election day or in our three weeks of -- of early in-person voting.  And in 2018, I think less than 5 percent of people chose to vote absentee

C. RYAN GERMANY                                            March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                        73

by mail even though, you known, we still had no excuse absentee voting.  This year it went up and I think in the general election about 25 percent of ballots.  1.3 million ballots were cast by mail."

It continues:  "And I think what our -- what we've found working with election officials in each county, it's a lot to ask of them to process all of those absentee ballots while doing three weeks of early voting and then while getting ready for -- for election day.  So, I think that's something we need to think about going forward."

Here were you proposing that no excuse absentee voting be modified or eliminated?

A    No.  I don't think so.  That was not my intent, I don't think.

Q    Do you recall in a subsequent hearing held by the House Governmental Affairs Committee that the Secretary of State also testified?

A    I don't recall that.

Q    At this point in time, in December of 2020, do you recall the Secretary of State's Office discussing the idea of eliminating no excuse absentee voting?

A    I certainly recall that topic coming up, of kind of no excuse absentee voting.

Q    Where did it come up, the topic?

A    Well, just in discussions about -- kind of the voting system in general, basically.  That's a component of it.

Q    Was there a concern about no excuse absentee voting during these discussions?

A    There was concern expressed I think throughout the 2020 cycle, and I recall hearing from county election officials as well, but they were essentially being asked to run like three different systems at one time.  When you have no excuse absentee, election day precinct based, and then early in-person voting.

Especially given what, what occurred with COVID, where what had been a relatively small participation became a very large part, and became a large part, you know, unexpectedly and in a way where kind of just weren't really able to prepare for that, I think.  Especially in the primary.

So that, that was a concern, that that ask of basically running three sort of simultaneous election systems was, was a lot to ask of county election officials.

Q    Did any county election officials specifically discuss with you the elimination of no

excuse absentee voting during the 2020 election cycle?

A   Not that I can recall.

Q   Let's go to AME_001950, starting at Lines -- Line 24.  Excuse me.

It reads:  "Secretary Raffensperger has already said that he does not believe signature match is the best way to verify absentee ballot applications or ballots.  And we -- we're looking at what other states do to see, you know, if there's a better way to do that utilizing technology.  We've seen one example of that in our absentee ballot portal that is the state election board" -- "that the state election board authorized us to make, and using similar results with that kind of like with online voter registration a few years ago where what we do with that is the voter has to -- if the voter's first name, last name, date of birth, and driver's license number matches what's on file, they can request an absentee ballot through that portal. It really helps -- it's easier for the voter, it's -- we think it's more secure because it has that driver's license check, and it makes sure there's no data entry or other types of entries at the county level so that it's it going to" -- "it's

going to the address of the voter -- that the voter confirms."

Fair to say at this point in time, during this hearing, the Secretary of State's Office was considering moving away from the signature match requirement for mail in absentee voting?

A   Yes.  Well, and I would say, fair to say we were sort of -- Secretary was supportive of that.

I don't know -- we couldn't really move away from it without a law change.

Q   Do you recall whether the Secretary of State's Office was considering moving specifically to some type of photo ID requirement for mail in voting?

A   I think we were supportive of that. Again, we couldn't -- that would have required a law change to that, that our office would have been supportive of.

Q   Would you agree that in 2005, when Georgia passes voter ID law, there was no voter ID requirement for absentee voting?

A   I know that kind of at the end of the law that was in place prior to -- when I was at Secretary of State's Office, that was true, that there was no photo ID requirement for in-person.

I can't remember if there was a change in the law at some point.  So I don't know exactly how photo ID started, but I know where it ended, was there was not a photo ID requirement for absentee by mail voting.

Q   Do you recall at any time during your tenure as general counsel for the Secretary of State's Office a proposal by the Georgia General Assembly to move away from the signature match requirement before the 2021 legislative session?

A   No, I do not.

Q   So am I correct that the Secretary of State's Office had not considered moving away from the signature match requirement for mail in absentee voting until after the November 2020 election?

A   I don't know if that's true.  Again, we couldn't really like move away from it if that's what the law required.  In terms of had we discussed or proposed a different way, I know that we were sued over signature match prior -- kind of starting in -- I believe that came late 2019.

So we were, I think -- there were certainly discussions about signature match in general prior to the 2020 election.

Q   Were there discussions about eliminating

MS. RICHARDSON:  Strike that.

Q   Do you recall discussions about eliminating the signature match with legislators prior to the 2020 election cycle?

A   No.

Q   Let's look at AME_001953.  AME.

Starting at Line 6, it reads:  "And the other thing I think we need to look at is -- is the state intervention into consistently failing election boards similar to there's a process where the state can intervene consistently failing school boards.  You know, we have a few counties that seem to always be coming up on the state election board, and -- and we've seen it with the audit and the recount where we can kind of know what kinds we're going to have issues.  And, you know, as I mentioned earlier, they're run by bipartisan boards who have higher, higher authority.  We don't have that at the secretary of state's office.  The Election Board doesn't have that.  I think it's a good thing that the counties are -- that elections are run locally, but I do think there should be a process where the state can intervene in consistently failing counties."

Were there particular counties that you thought the State should have the power to intervene in --

MS. RICHARDSON:  Strike that.

Q   Were there specific counties that you were referring to here?

A   I don't know that I was referring to specific counties there.  I know that in my time at Secretary of State's Office it did feel like oftentimes we were getting blamed or kind of being asked to respond to things that were really county responsibilities, and, and really taking, sometimes I felt like, kind of the brunt of the heat for failures at what really was a county responsibility.

So it certainly -- we certainly thought that if we're going to take the sort of blame for something, then there needs to be some mechanism where the State can intervene in, in counties.

Q   So that you thought you needed to intervene because you had taken the blame for issues in counties?

A   That was part of it, yes.

Q   Specifically the blame for issues in Fulton County?

A   Fulton, among others.  Fulton is almost

always on that list, yes.

Q   So this was about Fulton County?

A   Among others.

MR. FIELD:  Objection.

Q   What others?

A   There's certainly other counties I would put on that list.  Like I said earlier, there were counties that ran good elections, and it's not really a partisan thing.  Like there's some democrat counties that run good elections, there are some republican counties that run good elections.  And then vice versa, there's some democrat counties that run bad elections and some republican counties that run bad elections.

Fulton is I think pretty well-known for not running good elections.  And we see that, Secretary of State's Office just comparing them to other, other counties.  But there's other counties on that list as well.

Q   Am I correct that the SEB appointed a Performance Review Board recently to investigate Fulton's -- Fulton County's election processes?

A   Yes.

Q   What was the outcome of that review process?

A   So I was on that review process, and the recommendation that the Performance Review Board made to the State Election Board was not to institute kind of the takeover proceedings, but that one we did see improvement in Fulton from 2020 until -- through 2022, but also that we saw things that continued to need to improve to get I think where they probably really want to be.

Q   So there was no recommendation to take over the Fulton County election process, for the State to take over the Fulton County election processes?

A   Well, the recommendation would have been, is it to -- essentially like replace the Fulton County Board of Elections, and the recommendation from the Performance Review Board was not to do that, that that would not be helpful.

Q   Do you recall that later that same day -- we're talking about December 3rd, 2020 -- the Senate Judiciary Election Law Study Subcommittee, chaired by Senator Ligon, held a hearing?

A   I do recall that.  I don't recall like when -- I know I didn't know about that before it happened, and at some point, I don't remember if it was that same day, or later, when I learned that it

was occurring.

I think it -- it probably would have been -- we were in this committee hearing for a pretty long time, I recall, from the morning, and then at some point we heard something else was going on, the -- Senator Ligon's subcommittee.  But no one from the Secretary of State's Office was part of that.

Q   Do you recall referring to that hearing as a Giuliani show hearing?

A   I do not recall that.

(Whereupon, Plaintiffs' Exhibit-213 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 213, Bates numbered CDR00043663 through CDR00043678.

Would you take a look at the first page of that document.

(Witness reviews exhibit.)

A   Yes, I see that.

Q   Do you see where you wrote:  "FYI.  From the Giuliani show hearing that the Senate had"?

A   Yes.

Q   When you say "Giuliani show hearing," are

you referring to that December 3rd, 2020 hearing that was held by the Senate Judiciary Election Law Study Subcommittee?

A   Yes.

Q   Why did you call it a Giuliani show hearing?

A   I can't recall specifically.  I know Rudy Giuliani was present at that hearing, and I think I would have called it a show hearing because in my opinion it wasn't a very good sort of hearing or method in terms of actually investigating the types of things that they were talking about.  It was more just one side saying -- one group of people saying what they thought.

Q   What side?

A   Giuliani and his team.  I believe at that time he was on the -- on President Trump's legal team.

Q   Do you believe any misinformation was spread at that hearing?

A   I believe that the -- it's hard to say because sometimes like what we really hear about after a hearing is more what is -- after this hearing specifically -- and it was a hearing more in the sense of not like we think about in court.  It

was more like legislators just let Giuliani and his team come speak.

I don't recall if I -- typically, what they said or what was reported of what they said from -- especially like sympathetic media. And so, yeah, I believe that a lot of what came out of that hearing, whether it was something someone said in that hearing or the insinuation of it, was, was false.

Q   Do you recall that a week later, on December 10th, the House Governmental Affairs Committee held a hearing that included members of the Trump campaign team?

A   I recall they had a hearing. I remember Matt Braynard testified. Is that one?

Q   Uh-hum.

A   Yes.

Q   And Matt Braynard was an expert that worked with the Trump campaign?

A   I know he was a reported expert in the election contests that President Trump filed following the November 2020 election.

Q   Okay.

A   He included -- that case included an affidavit from him stating his opinions.

(Whereupon, Plaintiffs' Exhibit-214 was

marked for identification.)

BY MS. RICHARDSON:

Q    I'm handing you what has been marked as

Plaintiffs' Exhibit 214, Bates No. CDR00059322

through CDR00059323.

Take a look at that document.

(Witness reviews exhibit.)

Q    Looking at the second paragraph in the

email from you to various Secretary of State

members, it reads:  "When the House first approached

us about holding a hearing, they assured us that

they did not want the hearing to devolve into the

circus that the Senate Judiciary hearing was.  Once

we were made aware of their witness list yesterday,

it was apparent that their hearing would be the same

circus spreading ridiculous disinformation, and

indeed it was.  We look forward to prevailing over

these specious claims in court."

Let me back up.  Do you remember this

draft statement that was being prepared here?

A    I don't remember it.

Q    The first sentence of the second

paragraph, where it reads:  "When the House first

approached us about holding a hearing," do you know

what that's referring to?

A   I recall that the House -- I believe it was Chairman Shaw Blackmon had reached out to our office, asking for our participation in a hearing, and that's something we generally try to do and need to do for the legislature.

I do think I would have expressed concerns to him about what, what that hearing would have -- would have looked like considering we were in litigation with, with the people -- people regarding the 2020 election at that time.

Q   When it says in the next sentence, "Once we were made of the" -- excuse me.  "Once we were made aware of their witness list yesterday," does that mean that you were sent a witness list by legislators holding this hearing?

A   I don't know if it would have been sent, one, or if they would have told us who are the witnesses.

Q   And who would have told you who the witnesses were for that hearing?

A   I can't recall specifically.  It would have been maybe Chairman Blackmon or someone working with him, one of his staff members.

Q   So the Secretary of State's Office did not

end up attending this hearing of the House Governmental Affairs Committee on December 10th?

A   I think we did attend a later hearing that they had, but we were concerned specifically about -- so, yeah, I think the answer is no to this -- to the hearing that -- was it on that day?  To the hearing where we were concerned about who else was on their witness list, we did not attend that.

Q   Let's do a few more questions on the hearing that happened after that, the December 23rd Governmental Affairs Committee hearing that I think you just mentioned.

Do you recall that the Secretary of State, Brad Raffensperger, actually spoke at the beginning of that hearing before the House Governmental Affairs Committee?

A   I do not recall that.

Q   Let's look at his specific remarks.

(Whereupon, Plaintiffs' Exhibit-215 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' 215.  The cover page is Bates No. AME_002726, followed by AME_002729 through AME_002735.

I'll point your attention specifically to AME_002732, Page 7, Line 11.

It reads:  "First, we need to voter ID, not signature match as the verification for absentee mailing.  With the absentee portal I built out, it is the first time we have multiple points of verification for absentee requests that have no subjective measures.  And driver's licenses and the date of birth are required to receive a ballot and that has been used by 75 percent of absentee voter requesting new ballots for the January 20 -- "January 5th runoff.  It's simple, it's fast, and it's secure."

Looking at these comments, do you remember the Secretary's remarks now?

A    I do not.

Q    So you don't recall helping him with these remarks?

A    I do not.

Q    Do you recall if at this time the Secretary of State's Office was considering moving from signature match to voter ID for mail in absentee voting?

A    Yes, I think that is something that we would -- we were considering, yes.

Q   Do you recall if at that time anyone from the Secretary of State's Office was in discussion with legislators about moving from signature match to photo ID for mail in absentee voting?

A   I don't know.  I mean other than this in front of me.

Q   Yes.

Let's go to AME_002732, Line 21.

It reads:  "Second, this cycle has shown we need to move to an excuse-based system for absentee voting.  The no-excuse system voted into law in 2005 long before most of you, if not all of you -- long before I was in the general assembly, it makes no sense when we have three weeks of in-person early voting available.  It opens the door for potential illegal voting, especially in light of the Federal Rules that deny us the ability to keep voter list registration files clean.  And from a logistical challenge, it's a tremendous burden on our counties and in Georgia, as you know, because counties run elections."

Looking at this, would you agree that the Secretary was proposing moving -- eliminating no excuse absentee voting?

A   Yes.

Q   How might no excuse absentee voting open the door to potential illegal voting, as the Secretary said?

A   So I do think that the risk of fraud is much higher with absentee by mail than with in-person voting.

Q   Am I correct that the State of Georgia had no excuse absentee voting since 2005?

A   Yes.

Q   Was that risk there since 2005?

A   Yes.

Q   Do you recall legislation being proposed at any time during your tenure as general counsel that proposed to eliminate no excuse absentee voting?

A   I don't recall that.

Q   Do you recall any discussions with legislators, in your time as general counsel for the Secretary of State's Office, about eliminating no excuse absentee voting prior to the 2021 legislative session?

A   I don't recall that.

Q   The last part we'll look at, same page, AME_002733, starting at Line 8:  "Third, my office needs (unintelligible) remove and probably I need to

state it a little more bluntly, I need to have the ability to fire election officials and boards that consistently fail their voters. For years, this office accused of problems and elections where we have zero authority and no control. Only through a direct ability to hold people accountable can we improve election accountability and transparency and thus improve voter confidence."

Is it fair to say these remarks are similar to the remarks you made in the prior hearing we were discussing about the Secretary of State's Office being able to intervene in county elections?

MR. FIELD: Object to form.

A   I wouldn't say -- I wouldn't agree with intervene in county elections.

Q   Was this about Fulton County?

A   I think among others it would include Fulton County, yes.

Q   Let's go to your remarks in the same hearing, specifically AME_002749, Lines -- oh, it's not there.

Excuse me. We have a continuation.

MS. RICHARDSON: One moment.

(Whereupon, Plaintiffs' Exhibit-216 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter has Plaintiffs' Exhibit 216.  The Bates numbers for this document, cover page AME_002726, and then AME_002735 through AME_002866.

I'd ask that you look at page -- the page with the Bates No. AME_002749, specifically starting at Line 5.

It reads:  "And frankly, what we are seeing is kind of both sides really pushing the envelope on what's allowed.  We have many investigations into third party groups with the increase in absentee voting.  I think third party groups, particularly the ones that are aligned with Democrats, are sending a lot of mail to people including people who no longer live here."

Which third-party groups were you referring to here?

A   I don't know that I was really aware of the identity of the specific groups that were doing that.

Q   So what was the basis of your remark that there are third-party groups, particularly ones that are aligned with democrats, who are sending a lot of email to people, including people who no longer

living here?

A    I knew that third-party groups were doing that, but it can be -- there's some of them -- I mean the one that's kind of the most prevalent I think is the Voter Participation Center, but there's also I think -- like slightly different names that do similar work.

Q    So am I correct at this time you didn't actually know that groups that were aligned with the Democratic Party were being investigated?

MR. FIELD:  Object to form.

A    I think I did know that, but I couldn't have told you the specific names of the groups, without referring to like the specific complaints.

Q    Then how did you know they were aligned with the Democratic Party?

A    That was certainly my sense.

Q    What gave you that sense?

A    My general knowledge of kind of basically the activities we had seen throughout the election cycle in terms of what third-party groups were doing what in terms of reaching out to voters.

My sense in 2020 was that, frankly, the democratic-aligned groups -- and that's my phrasing because I think some of these groups are

501(c)(3)'s -- but were doing much more of that kind of the outreach regarding absentee by mail voting than republican-aligned groups.

Q   So at that time you didn't know the specific names of the groups?

A   I think what I'm saying --

MR. FIELD:  Object to form.

A   -- is there were a lot of different groups, and so -- and the names of them weren't necessarily what I was primarily concerned about.

Q   Were you concerned about which party they were aligned with?

A   No, but in my time in the Secretary of State's Office I think that was kind of an easier way to break down, okay, who are these people. Generally, people who are interested in elections, there's going to be a sort of political bent one way or the other, and so I think it was kind of a, a way that I thought about it.

MS. RICHARDSON:  Do we want to take a break for lunch there?

MR. TYSON:  I'm not sure lunch is here yet.

THE VIDEOGRAPHER:  Off the record at 11:42.

(A recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 11:51.

BY MS. RICHARDSON:

Q Mr. Germany, last year did you submit a declaration in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction?

Do you recall submitting a declaration?

MR. FIELD: Object to form. Which case?

A In what case?

Q In this matter.

MS. RICHARDSON: Thank you for the clarification.

A I don't doubt -- I don't doubt that I did that.

(Whereupon, Plaintiffs' Exhibit-217 was marked for identification.)

BY MS. RICHARDSON:

Q I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 217, is your declaration, and that was submitted for Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

If we could go to Paragraph 35.

Let's actually start at Paragraph 34, Mr.

Germany.

It reads:  "However, SB 202 also provided that this provision" --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q    Let's start at Paragraph 35.

"Under these updated ant-solicitation provisions, third-party organizations may not send representatives to approach voters waiting in line with money, food, or drink.  But these organizations may provide food and drink outside the buffer zone as long as they are not providing it only to voters or as an inducement to vote.

"This struck the same balance that Director Harvey suggested when he said 'the simpler, the better on this subject,' as 'the appearance could be that voters are being rewarded for voting with beverages and food.'  As 'polling place are meant to be a sanctuary from political influence,' Director Harvey explained, 'it is better to sacrifice some refreshments than to allow a perception of political influence from any group if it comes to that.'"

What did you mean by "a perception of political influence"?

A    I was --

MR. FIELD:  Object to --

A    -- I was quoting from what I think was an Official Election Bulletin that the Secretary of State's Office had sent.  I don't recall if it was before the November 2020 or before the January 2021 runoff election, but that dealt with this -- the issue of kind of handing out food and drink at polling places.

Q    Fair to say the Secretary of State's Office was concerned about a perception of political influence from groups that were handing out food and drink around the polling place?

A    I know that the complaints that we received about it, that seemed to be driving some of the complaints.  So, yes.

Q    The political influence was driving some of the complaints?

A    No.  I think what was driving the complaints was there was a perception that, hey, this group is, is here and they are, you know, partisan motivated more so than anything else.

Q    Anything else driving those complaints?

MR. FIELD:  Object to form.

A    The complaints that we got from voters?

Q   Yes.

A   I think -- there seemed to be some confusion that, like, hey, I thought -- I think to the voters it seemed to feel like campaigning, which they knew, hey, this is not allowed.

So I don't know, you know -- I don't know -- there might have been a perception of -- I think part of it was a perception of this is a partisan group, and part of it was this -- I didn't think this was allowed.

Q   Let's look at the actual complaints, starting with Exhibit A.

Would you agree this is an email from SEB member Matt Mashburn, Matthew Mashburn, to you, regarding intrusions into the 150 foot bubble?

A   Yes.

Q   It starts:  "To Ryan first:  Dear Secretary Raffensperger, fellow Board Members and Counsel Germany:  As always, the bad people take advantage what was once was a good thing and ruin it for everybody."

Who were the bad people?  What did you take that to mean?

A   I took that to mean that the people are doing things that, if not intentionally, it kind of

-- should have been known, hey, this is going to cause some blowback in terms of pushing the envelope on the rules.

Q   On the next page is a photo.  Was this a photo that SEB member Matthew Mashburn sent along with that email?

A   That's what it appears to be.

Q   Would you agree that in this photo there are several black voters?

A   Um, assuming that people who are kind of waiting are waiting in line to vote, then, yes, there would be black and white voters there.

Q   Do you know who the man in the blue shirt with the camera is?

A   I see a man kind of on -- I'm not sure that I see him holding a camera.  Is this -- the man standing on kind of a sidewalk?

Q   Uh-hum.  Yes.

A   It does look like he's holding something. I can't tell what it is.

Q   Do you know who that is?

A   No.

Q   Did you know when you submitted this declaration?

A   Who the person in that photo was?

Q    Yeah.

A    No.

Q    Did you ever ask Mr. Mashburn who that was?

A    No.

Q    Do you know if that's a member of the Democratic Party?

A    I have no idea who that is.

Q    Do you see the African-American gentleman standing at the forefront of the photo?

A    Yes.

Q    Does it look like he's preparing some food?

A    It looks like he's setting up some, some food, yes.

Q    Would you agree that he is away, standing away from the voters in line?

MR. FIELD:  Object to form.

A    Um, I'm not sure what -- I mean it's hard to -- what do you mean by away?  I don't know.  I think, you know, historically what away has been considered as 150 feet away from the polling place, and I'm not sure if he's that far away or not.

There's usually a sign that says -- at every polling place that says, hey, here is where

150 feet is and is not.  So it's meant to be apparent to people where that line is.

Q   So he's not talking to voters, is he?

MR. FIELD:  Object to form.

A   Well, this photograph does not appear to be like that.

Q   And it doesn't appear like he's compaigning?

MR. FIELD:  Object to form.

A   I can't say that from a photograph.

Q   Did you know when you wrote this declaration that you relied on this exhibit?

A   Did I know what?

MR. FIELD:  Object to form.

Q   Whether or not he was talking to voters, campaigning, what he was doing there?

MR. FIELD:  Object to form.

A   I know nothing about this photograph other than what -- than what it shows.

Q   Let's turn the page and look at the next photo that was included in your declaration.

Do you know what's going on here in this photo?

A   I do not.

Q   Would you agree that many of the voters --

excuse me.

Would you agree that many of the people standing in the line are African American?

A   Yes.  I'd say these are people of -- looks like white and black people standing in line.

Q   Am I correct that the Secretary of State's Office did not launch an investigation following this incident --

MS. RICHARDSON:  Strike that.

Q   Do you know if the Secretary of State's Office launched any kind of investigation following this incident that SEB member Matt Mashburn sent you?

A   I know we had investigations into groups handing out food and water in line.  I don't know if Matt Mashburn made -- ended up making a specific complaint or not.

Q   Would you agree that you cited to this exhibit, Exhibit A, in Paragraph 28 of your declaration?

A   In Paragraph 28 in my declaration it looks like I quoted from some of what Matt Mashburn said in that email to me.

Q   And yet you didn't know what was going on in this photo that Matt Mashburn included, right?

MR. FIELD:  Object to form.

A    I cited to the statement that Matt said that "it's impossible for the poll managers, workers and watchers to monitor what is being said by these groups as they performed their 'line warming.'"

Q    But you don't know what was being said to these voters, if anything, that were standing in line, do you?

MR. FIELD:  Object to form.

A    I do not know specifically.

Q    Let's go to Exhibit B -- I'm sorry.

Exhibit D.

Do you agree this is an email chain, including Frances Watson and Rick Barron regarding complaints near the CT Martin Recreation Center during the November 2020 election?

A    Yes.

Q    Down at the bottom, in the email from Frances Watson to Rick Barron, it reads:  "We are getting complaints that organizations are setting up outside the poll within 150 feet to provide coffee, water, crackers, food boxes.  This is contrary to 21-2-414(a).  Please advise the poll managers to request that they monitor the outside of the poll and advise any organization to move outside 150

feet. It does not matter if they are offering to everyone."

Q    Did this specify, this email specify the number of complaints?

A    No.

Q    Did it specify who the complaints were coming from?

A    No.

Q    Did it specify whether any of the groups were talking to voters at the polling place?

A    This email does not say anything about that.

Q    Do you know where the CT Martin Recreation Center is located in Fulton County?

A    No.

Q    Do you have any reason to disagree that the address for the recreation center is 3201 Martin Luther King Jr. Drive?

A    I don't know one way or the other.

Q    Do you know whether it's located in Southwest Atlanta?

A    I don't know one way or the other.

Q    Let's look at Exhibit E.

Would you agree that this is an investigation report based on a complaint from Dana

Schulp by a food truck located at the East Cobb Government Center in Cobb County, Georgia?

And you can review it for a moment, if you like.

(Witness reviews exhibit.)

A   Okay.

Q   Were you agree that this was -- this incident was thoroughly investigated?

MR. FIELD:  Object to form.

A   I would agree that it looks like we had -- the Secretary of State's Office assigned an investigator and that there were multiple investigators involved who seemed to investigate this allegation, yes.

Q   Those investigators spoke with poll managers, right?

As you'll see on Page 37 through 38.

A   I see that the investigators got statements -- it seems to me written statements from poll managers.

Q   Does it seem that there were written statements from law enforcement, looking at Pages 38 through 39?

(Witness reviews exhibit.)

A   It seems to refer to some written

statements from the -- looks to be the Cobb County Sheriff's Office.

Q   And would you agree that some of the investigators spoke with owners of food trucks? Looking at Page 43 to 44.

(Witness reviews exhibit.)

A   It looks like the investigator spoke with a Mr. Murphy, who was the owner of a food truck.

Q   Uh-hum.

A   And spoke to someone else who said he's the owner of On the Move Catering.

Q   Do you know who that owner of On the Move Catering is?

A   It says Nikia Harris.

Q   Do you know whether she's African American?

A   I don't know.

Q   Let's look at her statement, specifically starting in the middle, with the sentence that begins "This investigator asked."

MR. FIELD:  Which page are you on, for the record.

MS. RICHARDSON:  Page 44.  Thank you.

Q   Do you see where I am, Mr. Germany?

A   "This Investigator asked Mrs. Harris if

they would provide a notarized statement"?

Q   Yes.

A   Yes, I see.

Q   It reads:  "This Investigator asked Mrs. Harris if she would provide a notarized statement. Mrs. Harris said she would not provide a notarized statement about her food truck.  Mrs. Harris said she did not want to participate in this and would only provide the information requested because of all the negative -- "negativity about the community. Mrs. Harris said that this" -- "said this was unsettling and the way things were negative in the newspaper and toward the community.  Mrs. Harris said she is not WCK," stands for World Central Kitchen, "and does not take any side on any issues. Mrs. Harris said she was thinking about obtaining legal representation because of aggression towards her and her food truck by Trump supporters.  Mrs. Harris explained the personal aggression towards her was from Trump supporters with signage, and that they knew her name, knew her company name, and asked her who (candidate) she supported."

     Did you read this when you submitted your declaration, Mr. Germany?

A   I don't know that I read all of it.  I

think the point of the -- of this in my declaration was to show that these were the types of issues that we were receiving complaints about and investigating. And what you just read to me, I mean, shows a good reason why this sort of thing just doesn't need to be happening at a polling place because when you have that perception of kind of partisan influence, then the other party, you know, tries to taking action on that, and then it can lead to aggression and things like that, that we don't need happening at polling places.

Q   So it was Ms. Harris' fault that there was aggression from the Trump campaign towards her at the Cobb County polling site?

MR. FIELD:  Objection.

A   I'm not saying that. What we did see was that there was certainly I think a -- what I would describe as a pushing of the envelope in terms of what was allowed at polling places and what was done at polling places, and when that's done in an election context it's going to generate a response from the supporters of the other parties, and that's what we saw certainly in 2020.

Q   Am I right that ultimately this investigation found insufficient evidence to suggest

any violation of Georgia Law?

A    Yes.

Q    Can you look --

So no violation by Ms. Harris; is that right?

A    That was the recommendation by our investigator.

Q    No violation by Christopher Murphy; is that right?

A    That was the recommendation by our investigators.

Q    No violation by Janine Evler; is that right?

A    And I guess I should clarify.  What it says is there is insufficient evidence to suggest a violation on, on all of those, was the recommendation of our investigators.

Q    Was the Trump campaign investigated here in connection with this incident?

A    No.

Q    Let's go to the next --

A    I guess I should say not that I, not that I know of.

Q    Let's go to complaints -- excuse me.  Exhibit F, another complaint.

A    I will say, too, just the example that we just read through in that complaint just shows all the work that was required by election officials and poll managers to deal with that complaint and those issues, and frankly that's not really something that, that I think they should be doing or should be required to do.  It takes them away from their duties as -- really as poll workers, to try to kind of be a referee.  And that's why that term -- whether it's kind of overt campaigning or activity that's sort of seen as campaigning really seems to be done away from the polling place.

Q    Let's go to Exhibit F.

Would you agree that this --

MS. RICHARDSON:  Strike that.

Q    Would you agree that this complaint was made by Elizabeth Lee Brown, who early voted in October 20 at a city government office in Albany, Georgia?

A    That's what it says, yes.

Q    Her complaint was about the group black votes matter; is that right?

Excuse me.  That's Black Voters Matter.

A    She says the Black Voters Matter group was present handing out food and water.  There was also

a lady leaning against the door of the Candy Room where voting takes place and she was handing out plastic bracelets.

So I'm not sure if that lady was part of Black Voters Matter or separate.

Q   Is it your understanding, though, Black Voters Matter was present at this polling place; is that right?

A   That's what this complaint says.

Q   And according to this complaint, Black Voters Matter was handing out food and water at this polling place, correct?

A   That's what it says, yes.

Q   It also reads, in the fourth line, first full sentence:  "Older voters felt intimidated by the presence of this group.  There was a look of fear on their faces.  Handing out food and water can be misconstrued as influencing voters or buying votes."

Based on this complaint, did you know -- do you know whether the black -- members of Black Voters Matter were actually saying anything to the voters at the polling place?

MR. FIELD:  Object to form.

A   Based on this email, I don't know that.  I

mean I think this would have led to an investigation where -- where that would have been attempted to be determined if it could be.  Because that would be relevant to, you know, whether or not someone is campaigning or not, what they're saying at the polling place, and that can be really difficult to determine kind of after the fact, which is where our investigations come in generally after the fact.

Q   So based on this complaint, it was the presence of this group that was intimidating; is that right?

MR. FIELD:  Object to form.

A   She says, "Older voters felt intimidated by the presence of this group"

Q   Was an investigation subsequently launched?

A   I don't know.

Q   Would you agree that the group, Black Voters Matter, was accused of illegal campaigning but cleared of all charges by the State Election Board?

A   I don't know that.

(Whereupon, Plaintiffs' Exhibit-218 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit No. 218.

Take a look at that.

(Witness reviews exhibit.)

MS. RICHARDSON:  Let's go off the record for a moment.

THE VIDEOGRAPHER:  Going off the record at 12:25.

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 12:26.

BY MS. RICHARDSON:

Q   Mr. Germany, before we went off the record I handed you what was marked as Plaintiffs' Exhibit No. 218.

To the best of your knowledge, is this a summary of the State Election Board meeting that was held on February 7, 2023?

A   That's what it looks to be, yes.

Q   Do you see on the first page under Report on the Fulton County Performance Review, it states: "Mr. Ryan Germany, Stephen Day, and Ricky Kittle provided background and a summary of the report?"

A   Yes.

Q   Does that mean you were present at this meeting?

A   I was present for that portion of it.

Q   I see.  Looking at the next page, under C, "Violation Cases Recommended for Referral to the Attorney General's Office, Case No. 2020-122 Dougherty County (Illegal Campaigning.)"

To the best of your knowledge, is that case related to this incident involving Black Voters Matter?

A   I'm sorry, where is that?

Q   Under C.  I'm sorry.  C, Case No. 2020-122 is the third one.

A   Yes, yes.

I don't know if it relates to that complaint or not.

Q   Does this case number relate --

MS. RICHARDSON:  Strike that.

Q   Does this case number involve the group Black Voters Matter?

A   I don't know.

Q   Did you --

A   Just to clarify, I was not present for when that, when that part of the meeting was occurring.

Q   Do you know whether there was any follow-up, perhaps an investigation, after this complaint was made by Elizabeth Lee Brown in Exhibit F?

A   I don't know specifically.

MS. RICHARDSON:  We're ready to go into the next topic, so if this is a good time, we'll go --

MR. FIELD:  Off the record.

MS. RICHARDSON:  -- off the record.

THE VIDEOGRAPHER:  Going off the record at 12:29.

(A luncheon recess was taken.)

THE VIDEOGRAPHER:  We're back on the record at 1:05.

BY MS. RICHARDSON:

Q   Mr. Germany, let's turn next to the 2021 legislative session.

Do you recall about how many election bills were considered during the 2021 legislative session?

A   No, and it kind of depends on what you mean by considered.

Q   Do you recall about how many election bills were introduced during the 2021 legislative

session?

A    No.

Q    Would you say that many election bills were introduced during the 2021 legislative session?

MR. FIELD:  Objection.

A    I don't know how it would compare to previous legislative sessions.  I would say there was always a decent number of election bills that are, that are introduced.

Q    What is a decent number?

A    I would say 10, 10 or so.

Q    Do you think there were more than 10 election bills introduced during the 2021 legislative session?

A    I don't know.  I would say there was at least -- there was at least 10.

Q    Would you say that in the 2021 legislative session a typical amount of election bills were introduced?

A    From an amount perspective, I don't -- I don't know that I can say one way or the other.

Q    You testified previously that you met with some legislators to discuss election-related bills during the 2021 legislative session, right?

A    Yes.

Q   How did the amount of meetings that you had with those legislators compare to previous years?

A   2021 I would say was pretty similar to 2019, both of which there was a big election bills that, you know, ended up becoming law.  So both of those years my involvement was pretty heavy.

Q   You said in both of which, 2018 and 2020, there was a big election bill that was passed?

A   2019 and 2021.

Q   Thank you.  2019 and 2021.

A   Yes.

Q   The bill that you're speaking of in 2019 was House Bill 316; is that right?

A   Yes.

Q   The bill that you're talking about in 2021 is Senate Bill 202?

A   Yes.

Q   Isn't it true there were other big election bills considered during the 2021 legislative session, like Senate Bill 241 or House Bill 531?

A   House Bill 531, from my perspective, kind of became SB 202.  I don't recall the other one you said.

Q   So in 2019, was there a big bill that then became House Bill 316?

A   I think House Bill 316 was kind of -- it remained House Bill 316 throughout the process.

Q   So there were some differences in the amount of election bills that were introduced between the 2019 and 2021 legislative session?

A   In both of them -- so I think that's probably true.  I would doubt it was the exact same number, but in both of those sessions I do feel like there were bills that were introduced that were added to HB 316.  And the same thing for HB 531, that became SB 202.

Q   Did House Bill 316 start as a three-page bill, like Senate Bill 202, and then grow into a bigger bill?

A   I don't think so.  And I think House Bill 316 was more like -- was more like kind of the HB 531, meant to be a little bit more inclusive.

Q   Were there some election changes within the election bills that were considered during the 2021 legislative session that the office of Secretary of State did not support?

A   Yes.

Q   Which ones?

A    I know one change we did not support was removing the Secretary of State from the State Election Board.

Another one that I know I personally testified against in my capacity as General Counsel was about -- I don't recall the bill number, but it was about citizenship language on driver's licenses. I believe that was in 2021 as well.

And there was probably other things as well that I can't recall specifically.

Q    What did you understand to be the reason for an election law change that would remove the Secretary of State from the State Election Board?

A    I don't think I can speak to what the legislature reasoning was on that.

Q    Did you ever discuss a bill that included this specific change, removing the Secretary of State from the State Election Board with any legislators?

A    Yes.

Q    When did you discuss that change?

A    I don't recall specifically when, but I know I discussed it with Barry Fleming.

Q    What was the nature of that decision?

A    I told him that I thought it was a bad

idea and that our office was opposed to it.

Q   What was his response?

A   He understood that -- our position.

Q   But that change was still included in the full version of SB 202; is that right?

A   Yes.

Q   Do you know whether that change was supported by any of the political parties in Georgia?

A   I don't know.

Q   Do you know where the idea for that change came from?

A   I don't know.

Q   Do you think that change had anything to do with the November 2020 election?

A   So I think that that -- if I'm not mistaken, I think that was introduced as a separate bill, and so -- I think that was introduced by Shaw Blackmon, so I don't know.  I can't speak to his rationale.

Q   You never spoke to Representative Shaw Blackmon about what I think was Senate Bill 89, but a bill that would have made this change, removing the Secretary of State from the State Election Board?

A   Well, if it was Blackmon, it would have been a house bill.  So I don't know.  No, I did not speak to him about that that I can recall.

Q   Did you speak to any senators about Senate Bill 89?  If you can remember.

A   Not that I can recall.

Q   Did you speak with any senators about this specific election law change, removing the Secretary of State from the State Election Board?

A   I don't recall specifically.  I may have in terms of going through, you know, what was SB 202 with senators, but I would have said the same thing, that I didn't like that idea.

Q   You also mentioned that you opposed the idea to include citizenship language on driver's licenses; is that right?

A   Yes.

Q   That was an idea that Representative Bonnie Rich discussed with you?

A   I remember discussing that with Bonnie Rich.  I don't think it was her idea, but I remember she chaired the subcommittee where they considered that bill.

Q   Do you recall the justification for that bill, one that would have included citizenship

language on driver's licenses?

A    That was one where the representative who introduced it, I don't know that she spoke to our office, the Secretary of State's Office, about it. So I don't think I can speak to the justification.

(Plaintiffs' Exhibit-219 was marked for identification.)

BY MS. RICHARDSON:

Q    I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 219, Bates numbers CDR00480949 through CDR00480953.

Mr. Germany, looking at this, would you agree that this is an email communication about an excuse only bill or a no excuse only bill?

(Witness reviews exhibit.)

A    It looks to me like this is an email exchange regarding what Ethan Stiles and the Senate majority leader's office calls a senate omnibus bill, and is one that has -- that takes out no excuse only absentee and one that does not.

Q    Can you look on the second page of the document, Bates No. CDR00480950, and the first email on that page from Ryan Germany to Bryan Tyson, "Subject:  Re:  Edits to LC 28 0224."

It reads:  "I'm looking at it too.  I'm

not as concerned about the stupid ideas (no consent agreements, for example, which is pretty obviously unconstitutional).  I'm most concerned about the things that have to happen in elections (like absentee ballots) and making sure those process work."

What exactly were the stupid ideas in this bill?

A   I don't recall -- I mentioned no consent agreements, but other than that, I don't recall.

Q   What did that refer to, no consent agreements?

A   I know there were people who were upset about a settlement agreement that we did with the -- regarding signature matching, and so I think there was basically ideas to not allow that type of thing going forward.

Q   Were some of the people that were upset with those ideas republican legislators?

A   Given that -- I think this was in a bill that seems to have been introduced in the legislature.  I would agree -- I think I would agree with that but I can't recall specifically.

Q   Did you feel like there were bills that were reactive to the results of the November 2020

election?

A   I think the results of the 2020 election I think drove a lot of -- I believe the complaints that legislators were probably hearing.

Q   Those complaints were coming from where?

A   From their constituents, I assume.

Q   Constituents of usually republican legislators?

A   I'm sorry?

Q   You said that they were coming from constituents, the complaints.

A   So the -- okay, hang on.  Let me it back up.

Can you ask it again, kind of like the --

Q   I believe you testified that some of the complaints were coming from constituents.  Is that what you said?

A   I think the complaints the legislators were hearing, yeah, I testified that I think those were driven by -- in part at least by the results of the election.

And we've seen that in the past, too, where the differences in 2018, where somebody might have had an experience in early voting, a few weeks ago, but it didn't really strike them as a problem

until after the results of the election and then they complained about it.

And I think we saw some of that same stuff in 2020, where people had some experience and maybe it didn't even strike them at the time and then after the results of the election, they said, oh, wait a second, this might be a problem. And might have even brought a complaint with the Secretary of State's Office or sent something to their legislators.

So that's what I meant by constituent.

Q   Do you feel like the response to those complaints from after the 2018 election, at least in the Georgia General Assembly, was the same as the response of the complaints that came after the November 2020 election?

A   Well, I know following 2018 election, like from my involvement, it was similar, where we had -- we did a big sort of omnibus election bill, that I think was in part driven by complaints made following the 2018 election. And I think that kind of raised the -- maybe attention level that elections was getting.

And then I would say the same thing following 2020, that I think, I think the complaints

that, that legislators were hearing, I think it kind of raised the level of election legislation in their minds in terms of something they needed to deal with.

Q   Following the November 2018 election but before the 2019 legislative session, were voter suppression related hearings held in the Georgia General Assembly, from what you can recall?

A   I don't recall.

Q   Following the November 2018 election was a special committee on voter suppression established by the Georgia General Assembly, similar to a Special Committee on Election Integrity?

A   I believe there -- there was not a special committee.  I think there was a -- like a caucus that was formed about it.

Q   What caucus was that?

A   I can't recall the name but some type of voting caucus.

Q   Following the November 2018 election, were you in contact with democratic legislators to discuss complaints about voter suppression?

A   I can't recall.

Q   Following the November 2018 election and the 2019 legislative session, were over 10 bills

introduced to address voter suppression?

A   I can't recall.  I don't know.  I would not be surprised if they were.

Q   But sitting here today you can't name any of those bills that were introduced in the 2019 legislative session?

A   I can't name them sitting here today, no.

(WHEREUPON, Plaintiffs' Exhibit-220 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what's been marked by the court reporter as Plaintiffs' Exhibit No. 220, Bates No. CDR00509009 through CDR00509011.

Take a look at the document.

(Witness reviews exhibit.)

Q   Would you agree this document is about a meeting that was being set up within the Secretary of State's Office to discuss election updates/improvements?

A   Yes.  Yes.

Q   If you turn to the first email in the email chain, it's at the bottom of the second page.

A   Okay.

Q   This is an email from Gabriel Sterling to Secretary of State staff, on Monday, January 11,

2021.

It says:  "We'd like to have a meeting in the front office or the 8th floor conference room tomorrow.  Several goals:  1) This will be for us to list out the changes we know internally need to be made for better election administration, like tightening up the rules around party questions at the county level (which adds complexity with no actual benefit to anyone.)"

Let me back up.

Do you recall this meeting?

A   No.

Q   Do know what Mr. Sterling was referring to there when he says one of the goals "will be for us to list out the changes we know internally need to be made for better election administration"?

A   I don't know specifically what, what changes he's referring to, other than the ones -- the one that he mentions.

(WHEREUPON, Plaintiffs' Exhibit-85 was previously marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has previously been marked Plaintiffs' Exhibit 85, an email from Abigail Horvath to Secretary of State's Office members.

Subject:  Notes for election -- legislation election reform.

It reads:  "Good afternoon.  The meeting we had today and the notes that were discussed for election reform legislation," and then there's notes.

Looking at this document, does it appear to be a reflection of ideas that were discussed during the meeting that Gabriel Sterling was setting up that we were just discussing?

(Witness reviews exhibit.)

A   Yes.

Q   Okay.  Let's start with the first, I'd say, bullet point:  "Absentee ballot application deadlines to 18 days."

Do you recall discussing this?

A   I don't recall this meeting.  I don't recall specifically discussing that topic.

Q   Did you know what this topic may be referring to?

A   I think it's referring to the issue where up in -- prior to SB 202, the deadline to receive an application at the county level was the Friday before the election, and we were seeing and hearing from counties that that's just too close to the

election to allow the application to be received and verified, the absentee ballot package to be mailed, received by the voter, voted, returned in time for it to be -- for it to be counted.

Q   Do you recall which specific counties or county election officials thought this deadline was too close to the election?

A   I don't recall specifically but I think -- I think it would be fair to say almost all of them.

Q   All 159 county election directors thought this deadline was too close to the election?

MR. TYSON:  Object to form.

A   I guess I should say I've never spoken to one who has said, oh, yeah, that's a good deadline for that.  It seems like any time that's come up, it's been, hey, that was too close.

Q   Do you recall any of the county election officials specifically requesting a legislative change to the absentee ballot request deadline?

A   I don't recall that.

Q   Was 18 days for the absentee ballot application deadline your suggestion?

A   I don't recall.

Q   Do you recall the basis for that suggestion of 18 days?

A   No.

Q   Let's go to the fourth bullet:  "Collapse absentee ballot request from 180 days to 90 days."

Do you recall discussing this?

A   I do recall discussing that in the meeting we talked about earlier with Jan Jones and Bonnie Rich.  I don't recall this meeting.

Q   Let's go to that meeting with Jan Jones and Bonnie Rich.

Do you think that that happened around the same time as this meeting, within the Secretary of State's Office?

A   I think around -- generally, yes.  I think that meeting with Jan Jones and Bonnie Rich would have occurred close to the beginning of the legislative session, maybe not like right at the beginning but more on the front end of it.  Probably after this meeting, but I can't specifically recall that.

Q   Do you recall if there were any other legislators in attendance at that meeting?

A   I do not.

Q   Do you recall if there were any other members of the Secretary of State's Office present at that meeting, besides you?

A    The meeting with Jan Jones and Bonnie Rich?

Q    Jan Jones and Bonnie Rich, yes.

A    I believe Blake Evans was present, and I believe Chris Harvey was present.

I can't recall -- I would not be surprised if there were other members of our -- the Secretary of State's Office present, but I can't recall.

Q    Do you recall discussing any other subject related to elections besides collapsing the absentee ballot request from 180 days to 90 days?

MR. FIELD:  Object to form.

A    I do not.

Q    What did you discuss in that meeting with Jan Jones and Bonnie Rich?

A    My recollection is they, they thought that the 180 days was too long before the election, and we had found that, too.  That it seemed that sometimes people were maybe forgetting that they had requested an absentee ballot.  They thought that might be related to the fact that if they requested it a long time ago, even before, for instance, a primary election, it could have led to some confusion.

So I think we had -- so my general

recollection is we were like, oh, we agree with that, and we were thinking it should be 90 days. I think they were thinking 60 days. It ended up 78 days.

Q   This was an idea that came from Representative Bonnie Rich and Jan Jones; is that right?

A   I don't know -- I don't think it came from them. Like to our office. I think it was something that -- I think it was something that we would have had that idea kind of independently of them, but I can't specifically recall that.

Q   So you just happened to both be having the same ideas, the Secretary of State's Office and Representative Bonnie Rich and Jan Jones?

A   To the best of my -- that's kind of what -- that's what I think, yeah. I can't specifically recall.

Q   Following the November 2020 election, you both had these ideas?

A   I know that we saw in the 2020 election a problem that we hadn't seen before of people showing up to vote who had requested an absentee ballot and seemed to not recall that they had requested an absentee ballot. And so that led to a lot of

allegations and complaints and that was something that the Secretary of State's Office wanted to try to alleviate.

I don't think that -- that the initial -- I'm sure the initial, like the problem we had to alleviate, that did not come from Jan Jones or Bonnie Rich.

Q    Did you ever provide data to Representative Jan Jones regarding absentee ballot requests in Georgia in the November 2020 election?

MR. FIELD:  Objection to form.

A    I don't recall that, but we would -- it would not be unusual for us to get a data request from a legislator.

Q    Do you recall getting any data request from legislators during --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q    Do you recall getting any election-related data requests from legislators during the 2021 legislative session?

A    The one -- the one thing that I can recall is I know there was some -- Sunday voting was an issue that was being debated, and I don't recall if a request came from the legislature or if it was

something we wanted to look into independently, but there were kind of allegations being made, oh, Sunday voting is heavier African-American turnout, and I remember at least I was curious, is that really true?  And so we looked at some data about that, and I do recall sharing that with legislators, but I don't remember if the request for that -- I don't think the request for that came from legislators, but I can't -- I'm not sure.

Q   So what data did you look at regarding Sunday voting?

A   We looked at -- when Sunday voting became kind of an issue in the legislative session, it was alleged -- I feel like kind of in the media somehow is how I heard this, that that was -- African Americans vote heavier on Sunday than other days, and -- or something like that.

And I remember being curious if that was actually true, and I think what we found was it's really not true when you look at it with counties that are -- that offer Sunday voting like compared to other days in the early voting period.

Q   Did you look at data specific to the November 2020 election only?

A   I don't recall.

(WHEREUPON, Plaintiffs' Exhibit-221 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked as Plaintiffs' Exhibit No. 221.  This is a transcript provided by the State for the Special Committee on Election Integrity Hearing for March 22nd, 2021.

Would you please turn with me to the page marked SOS0002042, specifically at Line 2.

For the record, I'll also point out that this is a remark by Representative Jan Jones, which is demonstrated by looking back at SOS0002040.

Okay.  Turning to Line 2 on SOS0002042, the first sentence starts:  "But in those 16 counties, I will point out of that it was really quite balanced among black voters, white voters, and other races.  But among black voters in those 16 counties only, if you look at the race of the voters that voted early voting on Sunday, they expressly voted at a lower percentage on Sunday than they did the other six days a week.  So, it would be inaccurate to say that it is a preferred day at least to date.  I don't know what will happen in future elections.  It is not the preferred day of the week for African American voters."

Do you recall providing Representative Jan Jones with the data that would have supported this point?

A    I think that our office did that.  I don't specifically recall it.

Q    When would that --

MS. RICHARDSON:  Strike that.

Q    When was that data analysis done?

A    I can't -- I can't say.  Some time before this.

Q    During the 2021 legislative session?

A    Yes.

Q    Do you know how that data regarding Sunday voting was recall -- was compiled?  Excuse me.

A    I remember first we had to figure out which counties offered Sunday voting, and then we basically looked at the -- we have something called the absentee voter file, who shows everyone who voted absentee, and that includes in-person, early voting, and, um, absentee by mail.

And it includes when they -- the day that they -- their ballot was received, which for in-person voting would be the day they went in and voted.

So we took that list and looked at the

voter registration list as well, and that's how you can see basically when certain people chose to vote within the early voting period.

Q   Do you recall running the same type of analysis for elections prior to 2020?

A   No.

Q   And isn't it true in 2020 mail in absentee voting use was at -- was significant?

MR. FIELD:  Object to form.

A   Yes, that's true.

Q   So isn't it true that 2020 --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   So in 2020, isn't it possible that African-American voters were voting less on Sunday because they were voting by mail more often?

A   I suppose that's possible.

Q   Did you look at the absentee voter file for any other type of data analysis related to election bills introduced during the 2021 legislative session?

A   And just to clarify, it's not me looking at it specifically.

Q   Okay.  Well, who was looking at it specifically?

A    I would, I would -- when I got a request for a data or if I had something that I was interested to see what data would show, I would make a request to our Elections Division, and then there are people over there who would kind of pull the data.

Q    Which people would pull the data?

A    I would send it to -- I would send my request to Blake Evans.  I'm not sure he's the actual person who would pull it himself, but he would then work with the people who would.

Q    Any other folks that you can recall that were pulling the data besides Blake Evans?

MR. FIELD:  Object.

A    I don't know specifically who would have pulled the data.  I would send a request, I think, to Blake, and probably got a response from Blake, but I'm not exactly sure.

Oh, the other person I would ask questions to is Keval Patel, who is -- he's a -- he's a vendor who would work more within the voter registration system that could run those types of queries.

Q    Would you ever email Keval Patel for these data requests?

A    Yes.

Q    Where does he work, if you recall?

A    I don't recall the name of the company. He did work for a company called PCC, which was who developed the voter registration system, but then he left there and became -- and now has his own company but still does work with us.

Q    PCC that was?

A    PCC Technology -- like Papa, Charlie, Charlie -- was the company that developed the voter registration system.

Q    Got it.

A    And just to -- sorry.  To clarify --

Q    Go ahead.

A    They developed E-Net, which was the voter registration system at the time, and I think we've now moved and are still in the process of moving to a new system.

Q    Let's just briefly go back to Plaintiffs' Exhibit 85, which is in front of you.

Do you see the bullet point that reads: "Photo ID for absentee applications and ballots and removing signature match"?

A    Yes.

Q    Do you recall discussing that idea with Secretary of State staff?

A    I recall that idea coming up.  I think it was one that came up fairly quickly after the 2020 election, given the success of the absentee ballot portal, but I don't recall specific conversations.

Q    At this point was there any discussion within the Secretary of State's Office about how voters might be impacted by an ID requirement for mail in absentee voting?

MR. FIELD:  Object to form.

A    I don't recall any specific discussions.

Q    When, if ever, did you start looking at the percentage of voters in Georgia who may not have a driver's license?

A    I know that we did look at that, but I can't say when.

And I should clarify, too.  Because we wanted to -- we were able to look at what percentage of voters have a driver's license number or state ID number, it could be either one associated with their voter registration record.

So that's what we were looking at.  We did surmise and actually worked with DDS later on to see, okay, are there people who are registered to vote who do have a driver's license or state ID but who that number is not associated with their voter

registration record for some reason. And we worked with DDS to basically fill those numbers in, but that work with DDS wouldn't have been until after SB 202 was passed.

Q   Before SB 202 was passed, were you aware that there may be voters who have a driver's license that's not affiliated with their voter registration record?

A   Yes.

Q   You were one of those folks; is that correct?

A   Yes.

Q   So you knew that that was a possibility. Why was that not looked into before SB 202 was passed?

A   Before SB 202 was passed, the driver's license number wasn't utilized as a verification. So I guess it wasn't in some voter registration portals, and also in the absentee ballot portal, but it became kind of the -- after SB 202 was passed, when it became the primary method of verification for absentee ballot applications and absentee ballots, we wanted to make sure that as many people as possible had that number associated with their voter record.

Q   Let me ask it a different way.  Would it have been possible to do an analysis of the number, percentage of voters who have a driver's license that's not affiliated with their voter registration record prior to SB 202 being passed?

A   Yes, I think it would have been possible.

Q   But it was not performed?

A   Correct.

Q   By the Secretary of State's Office?

A   Correct.

Q   Going back to the analysis that I think you said you had done of what percentage of voters have a driver's license or a state ID associated with their vote registration record, can you talk to me a little bit about that process?  How would that analysis have been done?

A   So basically the way that that would have been done is we have a voter registration database that has voters and all their information.  And so we would look and see which ones kind of out of the total have a driver's license number present.

I say driver's license number, but it could be a driver's license or a state ID issued by DDS, which is the Department of Driver Services.

Q   Am I correct that you also looked at which

voters have a social security number attached to their voter registration record?

A   Yes, we did look at that also.

Q   To perform this analysis did you have to look in E-Net?

A   Yes, kind of that's my understanding of it.

Q   To your understanding, does E-Net reflect the race of voters?

A   Yes.  I mean it has a field for that, assuming that we are given that information by the voter.

Q   So it would have been possible to do some type of race-based analysis of those who have a driver's license number attached to their voter registration record?

A   Race is a field in E-Net, so, yes, that can be kind of part of a query.

Q   Was any such query done, to your knowledge?

A   I don't know.

Q   Do you think it would have been important to look at a race-based analysis of who does not have a driver's license attached to their voter registration record?

A    Well, I know which -- kind of going through SB 202, or kind of the policy, the idea of moving toward a driver's license-based verification, we knew there would be some voters who did not have -- who weren't able to utilize that form of verification.

So as part of the policy, and it did end up like this, fortunately, we wanted to make sure there were other ways also to verify who you are, and that included a lot of different other ways, including -- including even non-photo ID.

One thing I felt strongly about, too, was not -- requiring the minimum number of people to have to submit some type of piece of paper with their actual ballot, because that would be, you know, a real issue on the processing the absentee ballot side.

And so we were able to get to that where you could look at -- verify with your driver's license and date of birth or if you don't have it, your last four of social and date of birth on your actual ballot.

So I think, you know, the way that -- the way that I approached it more was, okay, there's going to be some, you know, small percent of people

that don't have a driver's license or state ID number, so how is the system going to work for them, and wanted to make sure it worked for those people as well.

Q   Did you discuss with legislators how it would have worked for those people?

MR. FIELD:  Object to form.

A   Yes.  I recall discussing, okay, here's how this entire sort of system is going to work in terms of the -- you can start with the driver's license number.  We did know that, you know, fortunately -- fortunately because of Georgia's automatic voter registration, I think we do have a very high percent of people who registered to vote who have a driver's license number associated with their record.  And we have a good current driver's license numbers, too, because of that system.

So I think that worked well to be kind of the primary way and is going to work for, you know -- I mean I think the numbers we saw were in the high 90 percents of how many voters we think that could work for of the overall active registered voters.

But, yeah, we would have discussed with legislators, or I would have, and, okay, here's the

other options for how you can verify an application, and then a ballot as well.

Q One of those other options was requiring -- was called a HAVA ID; is that right?

A Yes.

Q Wouldn't that have required providing more paper, more paperwork?

A So that's why -- so the HAVA ID is an option for on the application, but the way it's set up, if you provide that HAVA ID with your application, and we did set it up afterwards with on the form, on the application itself -- we actually got this idea from -- I don't know if it was a Democratic Party but one of those groups, when they were doing cure affidavits. The idea of kind of have a place where you can put the ID on the application itself and you can submit electronically.

So you can submit the application electronically, but you can't submit a ballot electronically. So if you, if you verify with a HAVA ID, like a utility bill, for instance, or any other -- or like an election office issued kind of voter ID on the application, on your ballot all you need to do is put in -- put on your last four social

and your date of birth, and you wouldn't have to submit a piece of paper with your ballot.

Q   When you're submitting absentee ballot applications now under SB 202, can you use your social security number?

A   On the application?  I'm sorry.

Q   On the -- when you're submitting your absentee ballot.

A   So, yes, you can.  As long as -- at that point you would verify with some type of ID on your application, and so then on the ballot itself you can use your, your social and last four if you don't have a driver's license number.

I'm sorry, your last four of social and your date of birth if you don't have a driver's license number on the ballot itself.

Q   And for requesting an absentee ballot application?

A   For requesting, you do have to submit an ID, but that was kind of the -- that was I think one of the things that was -- that I think got legislators comfortable with the idea of not requiring it on a ballot because we are requiring it on the application stage.

Q   I see.  So if I'm correct, which I may not

be, the reason that it's okay to ask --

MS. RICHARDSON:  Well, strike that.

BY MS. RICHARDSON:

Q   Why is there a difference between what is acceptable for requesting an absentee ballot application and what is acceptable ID for requesting an absentee ballot application and submitting an absentee ballot?

A   Well, it's two separate processes, and one big difference on the application is it can be submitted electronically.  Like, for instance, you can have an application and you can email it to your county elections office.  You can't do that with your ballot.

So on the application phase, if you are -- and I would say most of applications probably are submitted electronically, either through email or through the State's absentee ballot portal.  I don't know that specific number, but my sense is most of them are submitted -- or at least a large number are submitted electronically.

So if you are one of the small group of people that don't have a driver's license number and you do have to submit some piece of paper along with your application, we were thinking it's a little bit

easier to do that electronically, especially with the idea of kind of -- the way the format is set up, to try to get you to put whatever your ID -- using your ID right here in this section. A lot of people were able to take a picture with their phone and then send it on via email, send that picture on essentially.

With the ballot, of course you can't, you can't do that. You have to send it in physically and in person.

And also, you know, we don't want county election officials having to open up that ballot and find an ID. We want them to be able to verify the voter without ever having to open the envelope, because then if there's a problem, they can -- you know, they could send the voter a cure notice and get it taken care of without, you know, risking separating the ballot from the envelope that says whose ballot it is.

Q    Would it be possible to have the same set of ID requirements for both requesting and casting an absentee -- requesting an absentee ballot and casting an absentee ballot?

A    Are you asking if it would be possible?

Q    Yes. Could the ID -- the requirements for

verifying your identity be the same?

A    Well, I don't know.  I don't know.  That would require -- like would that proposal have passed the Georgia legislature?  I don't know.

Q    That wasn't my question.

Is it possible -- would it be possible for the Secretary of State's Office to administer such a process of having the same set of ID verification for both requesting an absentee ballot and casting an absentee ballot?

A    Well, we don't -- the Secretary of State's Office does not administer that.  That's a county -- that's a -- that's all at the county level.  So the Secretary of State's Office does not see that.

I mean that would, that would require a different law.

Q    What would that law look like?

A    The law would have to be what you're, what you're saying.

Q    Could counties carry that out, having the same set of ID verification for both requesting an absentee ballot and cast -- submitting an -- requesting an absentee ballot and submitting an absentee ballot?

MR. FIELD:  Object to form.

A   You're saying if that was the law --

Q   Yes.

A   -- could they carry it out?

MR. FIELD:  Same objection.

A   I believe so.

(Whereupon, Plaintiffs' Exhibit-222 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 222, Bates No. CDR00043461 through CDR00043462.

MS. RICHARDSON:  One moment.

(Witness reviews exhibit.)

BY MS. RICHARDSON:

Q   Do you recall receiving this email from Hayley McCloud regarding Chairman Max Burns's question?

A   No.

Q   The second email from the top on the first page, Ryan Germany to Hayley McCloud, it reads:  97% of registered voters have a driver's license or state ID number associated with their record.  99.9 of registered voters have either a driver's license number or social security number.

Did those percentages, 97 and 99.9

percent, come from the data analysis that we were discussing before, the one that could be done looking at E-Net?

A   Yes, I think so.

Q   Let's turn to House Bill 531.

I think you've testified that you helped to draft House Bill 531; is that right?

A   Yes.

Q   Who, to your knowledge, also helped to draft House Bill 531?

A   I think that would be Jeff Lanier, Bryan Tyson, and Javier Pico-Prats.

Q   Which legislators helped to draft House Bill 531?

A   I know that was a bill that was -- I think the primary sponsor was Barry Fleming.  I don't, I don't know how much he -- depends on what you mean helped to draft.  I think -- I think the other people that I mentioned are doing the actual drafting more so.  Might be -- he might be talking about what he wants it to say.

Q   Were any other legislators saying what they wanted the bill to say?

A   I don't recall that.  Not to me, I should say.

Q   Do you recall about how far in advance you started working on House Bill 531 before it dropped in the House or was introduced in the House?

A   I don't recall specifically.  My recollection is it was a fairly large bill I think from the outset, and I do recall that Barry wanted me to hurry up and finish it so he could drop it, but I don't remember when exactly that took place.

Q   And when you were just drafting it, were there any members of the Secretary of State's Office that helped you with the language behind the bill?

A   I don't know if anyone would have helped me specifically with language.  There are people that I might have talked to about an issue I was working on, and that would be if I was -- and again I can't say specifically but if I had to -- if I was working on an elections thing, I would generally talk to Chris Harvey and probably Blake Evans as well.

Q   Do you recall that House Bill 531 required drop boxes to be placed inside early voting locations and limited their use to advance voting hours?

A   Yes.

Q   Did the Office of Secretary of State

support this drop box provision in House Bill 531?

A    I don't know if I can say that specifically with the office -- if the office specifically supported that.

Q    Was this an idea that Representative Fleming came to the Secretary of State's Office with, or did you go to Representative Fleming with this idea?  How did it come about?

A    So I know that following 2020 the SEB emergency rules that authorized -- SEB, State Election Board, emergency rules authorizing drop boxes had expired, and so I think we -- Secretary of State's Office did know that was going to be a -- kind of the point of controversy in the legislative session.  It had been a point of controversy among the complaints we received regarding absentee ballots and regarding ballot harvesting specifically complaints.

So it was kind of a -- so I guess the answer to your question is I don't know exactly -- our office -- and I knew it was going to be an issue.  I don't know specifically -- I will say that I do recall -- I think one thing I wish we had thought of in 2020 was shutting drop boxes earlier than 7:00 p.m. on Election Day because that did

become a difficulty in the, in the 2020 elections.

Q   But during 2020, when drop boxes were being used under the SEB rule, did you ever consider requiring them to be placed inside early voting locations?

A   No, I don't think so.

Q   Did you ever consider requiring --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Did you every consider limiting their use to advance voting hours?

A   I did not consider that.  Again, looking back I wish we had considered -- I specifically had considered do we want to have drop boxes closed the same time as the polls.  I think, I think that led to some difficulties.

Q   So where was this idea coming from of placing drop boxes inside early voting locations, limiting their use to early voting hours?

A   I can't say specifically.

Q   Do you recall this idea being mentioned on that GOP wish list document that we looked at earlier in the deposition?

A   No.

Q   That's fair.

A    I never saw that wish list while I was drafting SB 202.

Q    Did you see it at any point?

A    I recall it came up kind of at some point in the legislative session and, you know, and I remember thinking, well, we've already been working on this bill, so.

Q    And part of that bill -- which bill are you talking about?

A    We had already been working on HB 531, what became SB 202.  I wasn't aware of what they were working on at GOP.

Q    Do you have any reason to believe that this election idea of limiting drop box -- do you have any reason to believe that requiring drop boxes to be placed inside early voting locations and limiting their use to advance voting hours came from the GOP?

A    I don't think so.  I don't think that's where our office would have gotten the idea, if it came from office.  If it came from a legislator, I can't say where they would have gotten it from.

Q    You mentioned the Georgia GOP Confidence Task -- Election Confidence Task Force report earlier in this deposition.

Do you remember when you first reviewed that document?

A    I remember that it came up at some point in the 2021 legislative session, and I remember thinking at the time, well, this is late, like this -- we've already been working on the, the election bills for this session, and this is -- that wasn't part of what we had been -- of what we were considering, but I don't recall when exactly it came up during that session.

(Whereupon, Plaintiffs' Exhibit-223 was marked for identification.)

BY MS. RICHARDSON:

Q    I'm showing you what has been marked as Plaintiffs Exhibit No. 223, Bates No. CDR00519838 through CDR00519839.

Take a look at that.

(Witness reviews exhibit.)

BY MS. RICHARDSON:

Q    Do you recall receiving this email from Representative Barry Fleming?

A    I do not.

Q    To your knowledge, was the provision of House Bill 531 that required drop boxes to be placed inside early voting locations that limited their use

to advance voting hours modeled after similar Florida law?

A   I don't know that I recall that specifically, but I guess I can say it's not unusual I think to look at other state laws to see what they have.

Not -- I don't know that I can say I now remember this, but -- yes, this may very well be where it came from.

Q   Do you recall that House Bill 531 also required each county to provide at least one drop box but limited additional drop boxes to the lesser of either one drop box for every 100,000 active registered voters in the county, or the number of advance locating -- advance voting locations in the county?

A   Yes.

Q   What was your understanding of the rationale for that election law change?

A   I don't know that I can speak to the legislators' rationale.

Q   Did you discuss this election law change with Representative Barry Fleming?

A   I think we would have discussed it.  I can't recall specific discussions.

Q   Did you ever provide drop box related data from the November 2020 election to Representative Barry Fleming?

A   I don't recall doing that.

Q   If you still have hopefully the text message stream, let's look at that.

A   Which number?

Q   209.

The last text, Line 137, this is a text from you to Barry Fleming, Javier Pico-Prats, and Bryan Tyson on February 25th, 2021.  Is that right?

A   I'm sorry, which -- where are you?

Q   We are on Page 20, Line 137.

A   Yes.

Q   Okay.

A   I'm sorry.  I see that.  Could you repeat the question?

Q   Sure.  Is this a text message from you to Barry Fleming, Javier Pico-Prats, and Bryan Tyson on February 25th, 2021, according to the document?

A   Yes, that's what it looks like.

Q   It reads, in the column marked Body:  "38 counties didn't have a Dropbox this past year.  All the rest already have one.  Only about 20 counties had more than one drop box."

Do you recall where you got those figures from?

A   I don't recall.  If I had to get those, I would have asked our Elections Division for that information.

I know we did require -- the SEB emergency rule required -- I think it required sending information to the Secretary of State's Office about drop box locations.  So I think our Elections Division would have had that information.

Q   So would your Elections Division have a summary of drop box use for Georgia counties in the November 2020 election cycle?

A   I think we would have had -- or the Elections Division would have had where drop boxes were, but they would not have had sort of the, um -- counties had to keep forms -- had reconciliation forms on numbers of ballots and things like that, but we did not as a matter of course get those documents in the Secretary of State's Office.

Q   How would you have compiled the -- it sounds like there were some summary documents.  How would you have compiled those?  Were would that have come from, that information?

A   What do you mean by summary?

Q   Was there some type of compilation of drop box locations for all counties in Georgia in the November 2020 election?

A   I think there was something like that for locations.

Q   For locations.  Do you know if that compilation has been turned over in this litigation?

A   I don't know.  I guess what I should say is -- I guess I should say I don't know if there was a compilation.

Q   Okay.

A   I think that was kind of data that, that the Secretary of State's Office had.  I don't know if it was ever put into a compilation.

I think the counties had to provide that data to the Secretary of State's Office as part of the SEB emergency rule.

But as I say that, I really -- I'm not even sure I am stating that correctly, to be perfectly honest.

Q   Do you recall that House Bill 531 effectively eliminated out-of-precinct voting?

A   I know -- I can't remember -- I know the final passage of SB 202 had a, a limitation on out-of-precinct voting, but then kind of an

exception if you were -- if it was 5:00 to 7:00 p.m., and I can't recall if that piece was in HB 531 or not.

Q   Do you recall discussing the idea of limiting out-of-precinct voting with legislators of the Georgia General Assembly, with the Georgia General Assembly?

A   I don't recall that specifically.  I mean I think that I would have discussed that with Barry Fleming as part of this -- the process of working on these bills.

Q   Do you recall the reasons for limiting out-of-precinct voting?

A   I know one thing that we had started to see at the Secretary of State's Office, in the fairly like recent past, probably starting in 2018, was a real increase in out-of-precinct voting.

I think 2018 I remember I personally got kind of a email saying, hey, you can go vote at -- even if you don't -- even if this is not your polling place, you can go vote there if you live in Fulton County.  So, no, that's not how that's supposed to work.

And so it did seem like there was kind of beginning to be active sort of, by campaigns and

third party groups, telling people you can go vote at any precinct in your county, which was true from a -- if you did that, you could vote a provisional ballot and your statewide votes would count.

So I think it was kind of driven by maybe some of those people who were more worried about those races, but that -- it became a -- it became an issue because that's just not how the system is built. You need to go to your polling place. That's how things are kind of organized and numbers are thought of and how counties think about how, you know, how to basically prepare their polling places and number of provisional ballots and things like that.

And I just -- when you have your provisional ballot at the polling place, it takes more time. That can increase line length. It can kind of disrupt efficient operations. It makes closing procedures more difficult, which are already difficult.

And then more provisional ballots, particularly out-of-precinct ones, mean more duplicating of those ballots. That's a process where election officials have to duplicate a ballot so it can be counted correctly. And that process is

a perfectly legal process but it generates a lot of complaints when election officials are seen filling out ballots. They have to be really careful with, you know, the optics of that and how they're doing that.

And, frankly, we really want that to happen as little as possible, because that's a big job, too, to do kind of post-election.

So those were the reasons that we really -- that I know I saw as, hey, this is something that we need to look at from a policy perspective.

Q   Let's discuss some points you made there.

First, I believe you said you received some type of email that said, hey, you can go vote at any polling place. Do you remember who that email came from?

A   I think it came from the Stacey Abrams campaign. This would have been back in 2018.

Q   Do you still have a copy of that email?

A   I don't know.

Q   Isn't it true that you can go vote at any early voting site in your county during the early voting period?

A   Yes. That's not what this is referring to. Specifically, this was for a location that was

actually kept open late on Election Day past 7:00 p.m., and the email said anyone who lives in Fulton County, if you have not voted yet, you can go vote at this location even if that's not your polling place.

Q   But you don't still have a copy of this email?

A   I don't think so.

Q   Do you remember receiving any other emails like that following the 2018 election, or during the 2018 election?

A   No, I do not.

Q   Do you remember receiving any emails like that during the 2020 election?

A   I do not.

I do recall there was a sense -- I heard from county election officials about -- especially when people would show up -- because, like you mentioned, you can vote at any early voting location.  So sometimes that does lead to confusion and you might show up in an early voting location on Election Day that's not your polling place.

Generally when that happens -- and frankly I did that before when Fulton County was moving around polling places due to construction.  They

said, oh, your polling place is this other place. Usually it's pretty close to where you are. And you can go there and vote and it's no problem.

What I heard from county election officials was that when poll workers were telling voters that, the voter would say, okay, I'll do that. They would then get turned around by somebody outside the polling place saying, hey, you go in there, you vote a provisional ballot.

And, again, that's not really -- that causes a lot of kind of down the line things that then have to be done that can disrupt other processes that should not be disrupted to have a smooth election.

Q   Is it possible that those people outside of the polling place are telling voters that they can vote a provisional ballot if they believe they are registered to vote at that polling place?

A   From my understanding of how it's been relayed to me, that was not really what -- how that was being portrayed.

Q   This is secondhand information, information you learned from the county officials, that the county officials heard from --

A   True.

Q   -- people outside the polling place?

A   It's really third-hand information, but yes.

Q   And under federal law a voter is entitled to vote at a polling place in a federal election if they believe they are registered to vote in that polling place; is that right?

A   I think that last part of it, if they believe, was not really being -- because that's still the case in Georgia, you know.  But I think that last part was not really being relayed accurately, was my impression.

Q   But you don't know what these people were saying to the voters in that instance, right?

A   I didn't -- I did not -- I was not party to those conversations, correct.

Q   Did you ever provide out-of-precinct related data to Representative Barry Fleming?

A   I don't recall.

MR. FIELD:  If we can take a break whenever you get to a breaking point.

MS. RICHARDSON:  Right after this question.  Absolutely.

(WHEREUPON, Plaintiff's Exhibit-224 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 224, Bates No. SOS0002080.  That's the cover page.  Then SOS0002108 through SOS0002110.

Mr. Germany, this is an excerpt of Representative Barry Fleming's testimony December -- excuse me.  This is an excerpt of Representative Barry Fleming's remarks during the Special Committee on Election Integrity Hearing in March -- on March 18, 2021.

Would you look with me on the second page of the document, at Line 13.  Representative Barry Fleming says:  "We've discussed in our hearings that the amount of out-of-precinct voting has dramatically increased.  In 2016, it was 200 or 300 people all the way across the state.  And in 2020, we're talking about 20,000 people, an incredible increase."

Did you provide the data -- any data related to these particular figures to Representative Barry Fleming?

A   I don't recall that.

Q   Do you agree with these numbers?

A   I don't know if those numbers are right.

I think it is right that we saw -- we generally saw an increasing number of out-of-precinct voting.

Q   How would you pull the number of out-of-precinct voters in a specific election?

A   The Secretary of State's Office gets provisional ballot reports from each county at some point after the election.  It's not, it's not that close to the election, unfortunately, but maybe in the 30 or 60 days following the election we'll get a provisional ballot report, that would include how many provisional ballots that they had and what type of provisional ballot.

So there's four or five types of provisional ballots, and out-of-precinct is one of them.

Q   To your knowledge, is any type of report put together that would reflect specifically the number of out-of-precinct voters in each election by the Secretary of -- is any report by the Secretary of State's Office put together that would reflect the number of out-of-precinct voters in each election?

A   I think we provide that data to the EAC, for the report that they -- but I'm not sure if it's broken down by type or not in that, in that report.

Q    Do you think that Representative Barry Fleming might have been referring to the number of provisional voters here, not specifically out-of-precinct votes?

A    I don't know.

MS. RICHARDSON:  We can take a break.

We'll go off the record.

THE VIDEOGRAPHER:  Going off the record at 2:38.

(A recess was taken.)

THE VIDEOGRAPHER:  We're back on the record at 2:51.

BY MS. RICHARDSON:

Q    I want to turn to one more provision from House Bill 531.

Do you recall that in House Bill 531 there was a provision to eliminate mobile voting?

A    I would describe it as mobile voting unit.

Q    Mobile voting units?

A    Yes.

Q    To your knowledge, were mobile voting units only used by Fulton County in the November 2020 election?

A    I believe they were only used by Fulton. I'm not even sure if they were used in November

2020.  I know they were used in the January --
really for early voting, I should say, for the
January 2021 runoff.

Q   Was there anything unlawful about Fulton
County's use of mobile voting units?

A   I don't know that that's something I can
answer sitting here.  I know that we got a lot of
complaints about it at the Secretary of State's
Office.  We got so many that I actually went and
voted on one of the mobile voting units in the
runoff for early voting to check it out.

Because there are -- like in terms of was
there anything unlawful about it, you would have to
do -- I don't know that there's anything
specifically unlawful about kind of using a bus or
an RV, or however you want to describe it, as a
polling place, assuming it met kind of other
requirements.

You then have to follow kind of all, all
the other requirements as well for, for voting.

Q   To your knowledge, did Fulton County
follow all of those other requirements for voting?

A   I can't speak to that.

Q   But you testified you went to one of these
mobile voting units, right?

A    Yes.

Q    Did you find anything wrong with the mobile voting unit while you were there?

MR. FIELD:  Object to form.

A    I would not say I was specifically looking for that.  I do know that -- I did note that they had kind of the correct signage out in the parking lot, and I didn't notice -- I did not have a negative experience or anything like that when I voted.

Q    You said that you received complaints about the mobile voting units.  What was the nature of those complaints?

A    The main one that I can recall is there seemed to be questions about, okay, where are these mobile voting units going to be and when.

And to my recollection, I think people were having trouble getting that information from Fulton County.

Q    Oh.  So these complaints were about a lack of information regarding where they were located?

A    I think it was more -- I think there was concern kind of when and where are these going to be, and if we can't get that information clearly, then that suggested -- people complaining that there

might be some type of unfairness in how they're allocated.

Q   Okay.  Who are these complaints coming from, generally?

A   I don't recall.

Q   How many complaints did you receive? About how many complaints did you receive?

A   I don't recall.

Q   Do you recall if any of these complaints came from legislators?

A   I try -- I don't know.  I don't know that I can say that.

Q   Did you ever speak to former director Rick Barron about these complaints?

A   I don't recall doing that.

Q   Do you have any reason to believe that House Bill 531's proposal to eliminate mobile voting units was about Fulton County?

A   Fulton County, to my knowledge, was the only one that had used mobile voting units previously.  I think that -- I can't really speak I think to the legislators' rationale.

Q   Do you recall earlier in the deposition when we were looking at two versions of SB 241, one version with no excuse absentee voting and one

without?

A   I recall the emails discussing that -- an email discussing that.

Q   Do you recall there being two versions of SB 241, one version with no excuse absentee voting and one without?

A   I mean I don't recall that.  I know it from that email we looked at earlier.  I don't recall it independently from that.

Q   Do you recall viewing two versions of that bill at any point?

A   No.

Q   Do you know why there might have been two versions, one with no excuse absentee voting and one without?

A   I don't know.

Q   Do you recall Senator Brian Strickland not supporting the elimination of no excuse absentee voting in Georgia?

A   I don't recall that.

Q   Okay, turning to Senate Bill 202, you testified earlier today that you helped to draft Senate Bill 202; is that right?

A   Yes.

Q   Did you help to draft the initial version

of SB 202 that was passed in the Senate?

A   No.  I don't believe so.

Q   Do you know who was part of that drafting process behind the initial version of Senate Bill 202 in the Senate?

A   No.

Q   After SB 202 passed in the Senate, do you recall working on some combined omnibus election bill with Bryan Tyson and Javier Pico-Prats?

A   I think the way I would describe it is more so after HB 531 passed in the House, and then went to the Senate, I remember working on kind of a combined election bill in the Senate with -- I would have worked with Barry Fleming and with Bryan and Javi as well.

And I would -- I should also say I believe Jeff Lanier would have been involved, too, as well.

Q   Why did you start drafting a combined omnibus election bill?

A   That's what -- that's really what I think HB 531 was.  I think HB 531 was a combined -- maybe not combined.  It was an omnibus election bill.

Q   Do you remember working on a potential substitute version to Senate Bill 241?

A   No.  I -- no.

(Whereupon, Plaintiffs' Exhibit-225 was marked for identification.)

(Whereupon, Plaintiffs' Exhibit-226 was marked for identification.)

BY MS. RICHARDSON:

Q   I'm handing you what has been marked by the court reporter as Plaintiffs' Exhibit 225, Bates Nos. CDR00157528 through CDR00157619.

As well as what has been marked Plaintiffs' Exhibit 226, which has Bates Nos. CDR00157637 through CDR00157734.

Let's start with the first, starting with Exhibit No. 225.  This is an email from Jeff Lanier to Barry Fleming, Javier Pico-Prats, and Ryan Germany, Subject:  "Latest edited version of the omnibus bill."

The email reads:  "This is the latest edited draft of the ominous bill."

And then if you turn to the next page, there's an underline that says, "Offers the following substitute to link."

Which bill do you believe this was a substitute to?

A   So my recollection of, of what occurred is that HB 5 -- what was largely HB 531 was initially

offered as a substitute to SB 202.

Q   I see.  So it's your recollection that House Bill 531 and Senate Bill 202 were going to be combined in some way?

A   I don't know that that was like the plan.

Q   Okay.

A   I know when -- so HB 531 passed the House, and then that was -- and so then I think -- and then I don't know how I can -- I can't really speak definitively on sort of the legislative happenings, whatever they did.  But my understanding was that HB 531 -- and I think they might have even put -- I don't remember before it passed or after they kind of put some -- before it past the House, I mean, they put some Senate bills in it, or that might have been something that -- bills that past the Senate kind of were combined, put into HB 531, and then that was offered as a substitute to SB 202, is kind of my understanding of what occurred.

Q   Do you know why --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Why did legislators in the House decide to make Senate Bill 202, which came over from the Senate as a three-page bill, the omnibus --

ultimately the omnibus election bill?

MR. FIELD:  Object to form.

A   I don't think I can speak to that.  I don't know.  And I don't know if that's exactly what happened or not.

Q   Well, Senate Bill 241 came over to the House, correct?

A   I don't recall that.

Q   So you did start working on some kind of combined omnibus election bill at least as early as March 12, 2021?

A   When you say combined, what do you mean by that?

Q   Some bill that would have modified another omnibus election bill.

So if you look at Exhibit 225, this bill, it appears on the second document to be offered as the following substitute to blank.

And then fair to say this is a pretty large election bill?

A   Yes.

Q   90 pages.

So from what you can remember, were the ideas in this omnibus election bill combining ideas from Senate Bill 241 and House Bill 531?

A   To my recollection, it basically took House Bill 531, and I know Barry didn't want to -- Barry Fleming didn't want look and say, okay, what can we put in here that the Senate has already passed. And I don't recall where those portions -- I don't remember if they came from SB 241 or other Senate bills.

Q   Just one provision on SB 202. Do you recall that SB 202, both the initial version from the Senate and the fuller substitute version in the House, created fines for private groups who sent out duplicative requests for absentee ballots?

A   As you say that, I do recall that SB 202, the initial one dealt with kind of the duplicate -- duplicate application for absentee ballots.

Q   Based on your experience as general counsel at the Secretary of State's Office, were there some third-party organizations that significantly increased their absentee ballot application efforts over the last few years?

MR. FIELD:  Object to form.

Q   I can rephrase.

A   Please.  Sorry.

Q   No problem.

Based on your experience and observations

as general counsel of the Secretary of State's Office, were there some third-party groups that were doing more absentee ballot application drives over the last few years?

MR. FIELD:  Object to form.

A   I don't know -- I know in COVID, of course, absentee ballots -- absentee ballots and absentee ballot applications increased a lot.  I don't know if I can say that the third-party groups were doing more or less of that than they were previously.

Q   I want to go back to what was marked as Plaintiffs' Exhibit 212.  These were actually remarks that you made during the December 3rd, 2020 Senate Government Oversight Committee Hearing.

We can all take a moment to find it. That's Plaintiffs' Exhibit 212.

Specifically, if you could go to the page marked AME_001949, Line 12.  That was 001949.

You said there:  "But I think another reason it went up" -- I believe you were talking about absentee voting, mail in absentee voting -- "is campaigns and third-party groups were really treating absentee by mail as kind of a first bite at the apple, not as, hey, this is a resource you can

use if you need it, but as a first bite of the apple to try to get everyone to do that.  And then if they can't do that, get everyone to vote early and then -- and then do that."

Do you recall which campaigns and third-party groups were, as you said, "kind of treating absentee by mail as sort of a first bite at the apple"?

A   I don't recall like specific groups that were doing it.  One of the main ones that does absentee ballot application mail-ins is the Voter Participation Center.  But my sense is there was other groups as well.

And, yes, I did have that sense that almost -- in kind of differing from past elections that, that there was -- there was a sense of almost utilizing different periods for, for each type of election -- for each election -- for each type of voting, I should say.  Kind of in ways that hadn't really been utilized.

Q   Was there anything wrong with what they were doing?

A   Well, we did see -- I think it led to some confusion.  We did see -- we saw people who received a lot of duplicate absentee ballot applications and

were confused by it.

We saw people who -- because sometimes if you have -- I remember hearing stories about voters who had received a duplicate absentee ballot application and they would think there was some problem with their first one, so they would fill that one out, and then they would receive another one and they would fill that one out, too, and thinking there was some problem.

And I feel like there was also a sense sometimes that it was something they got that they had to fill out, and then if that's -- if you do but then you don't actually vote absentee, you vote in person, that's going to cause a bit of a delay for you at the polls when you go vote in person.

So there did seem to be some confusion that, that it caused, and then that confusion then caused extra work for election officials and it caused things to not go as smoothly as it really could and as we want it to when people go vote in person.

Q   Did it result ever, to your knowledge, in duplicate ballots being sent to these voters?

A   So -- could you ask that again? Especially, what's the "it"?

C. RYAN GERMANY                                          March 07, 2023
IN RE: GEORGIA SENATE BILL 202                                       184

Q   Did the groups' distribution of duplicative absentee ballot applications result in more than one absentee ballot being sent to voters -- to a voter?

A   I think the answer to that is no.

Q   What did you mean here when you said "first bite at the apple"?

A   What I meant was -- because the absentee voting period started a pretty good bit before the early voting period, that it was kind of used as, okay, let's try to get everyone we can to vote in this period. And I think that sometimes caused some of confusion between people who were planning on voting in person.

Q   Did it sometimes cause people to learn about mail in absentee voting?

A   I don't know. I don't think we ever had anyone say that to us.

Q   Did it cause more people to vote by mail in absentee voting?

A   I couldn't say that.

Q   This group Voter Participation Center, to your knowledge, were they sending these absentee ballot applications to more democratic voters than republican voters?

A    I couldn't say that.  I don't know who they were sending them to.

Q    You've described several times during this deposition some groups as democratic side, republican side.  Which side was Voter Participation Center on?

MR. FIELD:  Object to form.

A    In, in my opinion, I think they were more aligned with the democratic side.

Q    One provision in SB 202:  "Senders of absentee ballot applications must compare their mail distribution list with the most recent information available about which voters have already requested, been issued, or voted an absentee ballot."

Would you agree, that there's a provision that says that?

A    Yes.

Q    What is your understanding of how a group would compare their mail distribution list with the most recent information available about which voters have already requested, been issued, or voted an absentee ballot?

A    So they would use the absentee voter file that's -- we talked about it earlier, but it's a file that's publicly available.  It's updated every

day during the voting period.  It's something campaigns are well -- are familiar with in Georgia and utilize quite a bit, from my understanding.

Q   You said it's updated every day during the voting period.  So early voting and election day?

A   It's updated every day -- I believe once absentee ballots start being issued.

Q   What is that belief based on, the belief that they're -- the absentee voter file is updated every day once absentee ballots start being issued?

A   That's based on my experience at the Secretary of State's Office.

Q   Who would upload that information?

A   It's a file, from my understanding, that's generated automatically by the voter registration system.

Q   Would it be updated every day during --

MS. RICHARDSON:  Strike that.

BY MS. RICHARDSON:

Q   Would it be updated every day that absentee ballots are being issued for every election happening in Georgia, or just general elections?

A   For every election, even special elections.  We get calls about it for small special elections, too.

I should say every -- like state or county -- I believe it would include county elections as well, but certainly for every state election.

Q   Since SB 202 was passed, before you left the Secretary of State's Office, did you receive any inqueries related to this absentee voter file that individuals would check under SB 202's provision, about comparing the mail distribution list with the most recent information available?

MR. FIELD:  Object to form.

A   Not that I can recall.

Q   When we spoke about ID requirements --

MS. RICHARDSON:  Strike that.

Q   When we spoke about creating ID requirements for mail in absentee voting, I believe you testified that you thought it was important for as few voters as possible to have to submit ID by paper; is that right?

A   Yes.

Q   And you believe it's important for as few voters as possible to have to submit ID by paper because that's a more burdensome process?

MR. FIELD:  Objection.

A   I don't know that it's more burdensome. We want one to make it kind of -- the idea was to

make it kind of as non-burdensome as possible.

It's -- it's a different -- it's a different process.

Q   Was there a concern that it would require more work from the voter?

MR. FIELD:  Object to form.

A   As I was thinking about it, I wanted to make sure that whichever sort of path the voter needed to go down to verify their, their absentee ballot application and their ballot was not burdensome.  I mean obviously one path is not going to work for every single voter.  So you want to have one that is going to work for every single, but it's not going to be the same.  You're going to have to have different ones.

And then the other, the other thing that I was thinking about is what's it like on the county election official side for them to do the work they have to do to verify the -- both the application and the, and the ballot.  And I think the big thing that I was concerned about was when the ballot comes in, we need to minimize the number of -- the number of people to submit some type of piece of paper with that ballot.

MS. RICHARDSON:  Mr. Germany, I'm going to

let some of the other private Plaintiffs ask you questions before I run up against seven hours.

So let me turn it over to Bill for a moment.

THE VIDEOGRAPHER:  Going off the record --

MS. RICHARDSON:  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 3:25.

(A recess was taken.)

THE VIDEOGRAPHER:  We're back on the record at 3:34.

EXAMINATION

BY MR. BEAUSOLEIL:

Q   Good afternoon, Mr. Germany.  My name is Bill Beausoleil.  I'm here on behalf of the Georgia NAACP.  I'm going to ask you some questions.

Same ground rules as for the DOJ questions.  I'm going to endeavor not to go over topics or specific documents they went over before, and thank you for your patience and a long day.

So I'd like to start by asking you about the sections of SB 202 that deal with voter challenges.  Does that have significance to you?

MR. FIELD:  Object to form.

A   I'm not sure what you mean.

Q   So sections 15 and 16 of the SB 202 is enacted to deal with voter challenges.  Do you have an understanding of how voter challenges were addressed in SB 202, specifically those sections?

A   Yes.

Q   What is that understanding?

A   It would be helpful if -- so my basic understanding, without having the bill in front of me, is that those -- SB 202 basically clarified that there's not a limit on the number of challenges that a person can file.

My impression was there was not a limit beforehand, but SB 202 did make -- express there was not a limit, and I think it did -- it also put some time lines on how quickly a county had to have a hearing in the sense -- or if they did kind of -- if the county board of registrars or Election Board did sustain a probable cause for a challenge.

Q   Did it grant the State Election Board some ability to sanction counties relating to voter challenges?

A   I don't recall that specifically.

Q   Did you have any direct involvement in drafting that section of SB 202?

A    That section I recall that it did, it did come up from the, the Georgia GOP wish list as something that -- and my impression was it didn't really change anything.

Q    Did you -- do you recall having discussions with any legislators about those provisions and about the wish list -- actually, let me break that down.

Do you have any recollection of having conversations with legislators before SB 202 was enacted about, about those specific provisions that were contemplated?

A    Are you asking about during the 2021 session?

Q    Yes.

A    Like before?

Q    Yes.

A    Could you ask it again?  I'm sorry.

Q    Sure.  Do you have any recollection sitting here of specific discussions with legislators prior to SB 202 being enacted about the voter challenge provisions?

A    I don't have any specific recollections. To the best of my recollection, I recall -- basically it coming up I think with, with Barry

Fleming on is there anything in this GOP document that we could do, and I remember my impression was, well, that voter challenge stuff doesn't really change anything from existing law.  So that was I think something we thought we could do without really -- without really changing anything.

Q   Did you -- do you remember any response, if it didn't really change anything, as to why it was needed?

A   Any response from?

Q   From Barry or anybody else.

Let me take it in steps.

Do you recall telling Barry Fleming that you didn't think it was really needed because that was already allowed for under Georgia Law?

A   I don't recall if I said it wasn't needed. I do think I said it doesn't -- it doesn't really change anything.

Q   After you said it wouldn't really change anything, was there any response --

A   And I guess I should say -- I'm sorry. I don't know if I said that or not, but that was my sense of what I tried to kind of get across.

Q   Did Barry Fleming or any other legislator

explain why they thought it was needed?

A    Not to my recollection.

Q    Prior to the enactment of SB 202, do you remember while at SOS any complaints about counties limiting the number of voter challenges?

A    The complaints that I remember were not really about limiting.  I do recall complaints about counties basically just kind of tabling essentially and not dealing with voter challenges in a timely fashion.

Q    The sanctions provisions of SB 202, to your mind, was that in addition to existing Georgia law?

A    I'd have to review that to answer that.  I don't recall those specifically.

Q    Prior to SB 202 being enacted, do you remember any conversations, discussions, correspondence surrounding potential effect on voters if they found out they were going to be challenged or they --

MR. BEAUSOLEIL:  Strike that.

Q    Prior to the enactment of SB 202, do you remember any conversations, discussions, communications regarding the notion that voters who were told that they were challenged, it could have a

quelling effect on their willingness to vote?

A   I do not.

Q   Do you recall after the enactment of SB 202 whether there was an increase in the number of voter challenges?

A   I don't -- I don't think I can say that. There was a lot of challenges prior to SB 202, specifically in the January 20 -- in the lead-up to the January 2021 runoff.

(Whereupon, Plaintiffs' Exhibit-227 was marked for identification.)

BY MR. BEAUSOLEIL:

Q   I'm going to show you what we've marked as Plaintiffs Exhibit 227, Bates-stamped CDR61983 to 61989

I'll let you take a look at that.

(Witness reviews exhibit.)

Q   You're welcome to read the entire -- or review the entire document.  I'm going to direct you to some things on the second page, if it helps.

First, do you recognize this document?

A   I recognize it from -- I think it was shown to me in preparation for this deposition.

Q   Okay.  What do you remember this document to be?

A   It looks like -- it's entitled, "Summary of LC 280334S," which is a -- how do you describe it?  It's kind of how a bill in the legislative session might be labeled.

Q   Okay.  Other than having seen it during your preparation for this deposition, do you have -- do you have a recollection of how you came to possess this document?

And I'll represent this was found in your files.

A   No.

Q   If you keep that document, I'm going to show you a longer document.

MR. BEAUSOLEIL:  I unfortunately only have a couple of copies of this, because I just found it this morning.

(WHEREUPON, Plaintiffs' Exhibit-228 was marked for identification.)

BY MS. RICHARDSON:

Q   This is Plaintiffs' 228.

And for the record, Plaintiffs' 228 is CDR1320317 through 18.

Then it's 23251 through 23258.

Then it's 320319 through 320326.

I'll represent that the metadata we have

that produced this document suggests that it was one document. It was a document that came together.

Mr. Germany, have you had a chance to review the new exhibit?

A   Not all of it.

Q   Okay. So let's start with the email at the cover.

There are three emails here, and I'll start with the first in time to the second page, 318, from you, Ryan Germany, to Javier Pico-Prats and Bryan Tyson, and it says: "Do you guys have any summaries of SB 202 that could you share with me? We are putting together some content for a webpage. I know I saw some doctor the session, but can't put my finger on them."

Do remember sending this email?

A   No.

Q   Do you know, looking at this email now -- did you review this email with -- during your preparation?

A   No.

Q   Looking at the email I just read, it says, "We are putting together some content for a webpage."

Who is "we" and what is the webpage?

A    "We" would refer to the Secretary of State's Office.  I'm not sure what the webpage is.

Q    So this was information you were looking for that could be put up on the Secretary of State website?

A    I can't recall.

Q    Would there be another webpage, webpage, website, that you could potentially be using it for?

A    No, no.  It would be the Secretary of State web -- website.  I'm not sure what information we were thinking about putting up.

Q    Mr. Tyson responds:  "Here are the last summaries I have.  Not sure if they fully match the final version or they were one version before, but hopefully gives you what you need."

Then there are two documents attached to it, including what I previously marked?

It's 327.

So after you've had a chance to review it, I'm not going to ask you about the Q&A.  I want to ask what I was asking you about before, the section in 15 and 16 language, in both 327 and 328.

A    327?

Q    So in the 327 document and the 328 document.  If you want to look at 328, it's fine.

MR. FIELD:  227 and 228?

MR. BEAUSOLEIL:  227, I'm sorry.  I'm trying to read this.  I need new glasses.

Q   So the Section 15 and 16 language.  Yes, you can use 227.

Do you see there where it states, in Section 15:  "Clarify there are no limits in timeline on challenges to voter registrations," and then it says, "Brad Carver language"?

A   Yes.

Q   Do you know what that means?

A   I think what that's referring to is Brad Carver I believe -- I don't know if he was kind of chair -- he was somehow involved in that GOP task force.  And this was -- those two things were something that came I think from that.  So I think that's what that's referring to.

Q   So you think it's the summary that came from Mr. Carver, the one-sentence summaries in 15 and 16?

A   No.  I think -- I'm sorry.  Could you ask your initial question again?

Q   Sure.  Why don't I open it up.

What does that mean, "Brad Carver language"?  What is that referring to?

A   So I think my understanding is that Brad Carver either over -- chaired or was somehow involved in that GOP task force, that then came with suggestions that I testified earlier that I felt were kind of late in the process.

I think that -- my recollection is the legislature did add the language that they suggested from that task force on voter challenges.

I think Brad Carver -- and so I think what that's referring to when it says Brad Carver -- I don't know who put this summary together -- is, is saying it came from that GOP post-election task force.

Q   So the language in the final SB 202 relating to voter challenges in Section 15 and 16 came from Brad Carver?

A   My understanding is that it came from that GOP election task force.

Q   Do you know if any changes at the legislature level or the Secretary of State level were made to the language that came from GOP, the Brad Carver language in 15 and 16?

A   I'm not sure what you mean.

Q   The language you believe came from the GOP task force of Section 15 and 16?  I think that's

what you testified to.

A   I'm sorry.

Q   Sure.

A   What are you --

I feel like I -- I feel like I just answered the question you just asked.  So maybe I'm misunderstanding then.

Q   Sure.  I just have a simple question.

The language that would have come from the GOP regarding voter challenges in 15 and 16, did the Secretary of State or the legislature make any changes to that that you can recall?

A   I don't know.

Q   Do you know if this document that you said might be good for the webpage ever went up on the Secretary of State website?  And I apologize if I already asked that.

MR. FIELD:  Object to form.

A   It looks like what I said is that when I forwarded that these could be helpful in putting together the SB 202 presentations for conference, that's referring to -- I know we did some training at the county election official conference on updates in the law, which is something we typically do.  So that I forward them along for that purpose.

(Whereupon, Plaintiffs' Exhibit-229 was marked for identification.)

BY MR. BEAUSOLEIU:

Q   Move on from those exhibits, I'm going to show you an exhibit that appears to be 2 point font, marked Plaintiffs' 229.

I couldn't read the big printing in 227 and 228, so I might not stand the chance here.

I'll represent this was produced to us as a Firefly Buzz post.  First, what generally is Firefly?

A   Firefly is -- I guess I would call it an application that the Secretary of State's Office maintains, that we use to communicate with county election officials, and county elections officials also communicate with each other.  So we'll post training documents on there and Official Election Bulletins.

There's also a thing called the Buzz, which is kind of a chat room where county election officials and our office can communicate with each other.

And I say -- I mean Secretary of State's Office can communicate with each other.

Q   Can you read that document?

A    Yes.

Q    Okay.  I direct you specifically to Row 219 from Anita Tucker, dated 4/29/22.  I'll read it into the record:  "I am new to the Forsyth County BRE.  We are seeing an escalation in the number of voters being challenged.  Does anyone have a policy or procedure for processing voter challenges?  Both the 229's and the 230's."  And gives her contact information.

Do you remember Ms. Tucker making this request -- or making this statement rather?

A    No.

Q    Do you remember generally after the enactment of SB 202 that counties saying they were seeing an increase in the number of voters being challenged?

A    I know that voter challenges were definitely something that we dealt with in the 2022 cycle.

And I don't really recall challenges being much of a thing before the 2021 runoff, for the January 2021 runoffs.  They were in the law but I don't really recall them being used.

They were actually used most often, in my recollection, before that in municipal elections,

really about if people live in the municipality still, and that's where we saw them used kind of most often.

So I don't know -- because there were so many -- there was like a large number of people challenged in the lead-up to the January 2021 runoff. I don't know if I can say there was more people challenged, but I -- there might have been more people doing the challenging. I'm not sure I can say one way or the other, though.

Q   The Secretary of State didn't make any efforts that you can recall to check after the enactment of SB 202 whether there were more challenges?

A   Not that -- not that I know of.

Q   And anecdotally, you don't remember a substantial increase from the prior election cycle in the number of challenges?

A   Again, the issue is there was such a large number of people challenged in the Senate runoff that it's hard for me to say that.

(Whereupon, Plaintiffs' Exhibit-230 was marked for identification.)

BY MR. BEAUSOLEIL:

Q   I'm going to show you what we marked as

Plaintiffs' 230.

I'll give you a chance to review it.

(Witness reviews exhibit.)

Q   Do you recall this document?

A   No.

Q   Do you know sitting here today who Rhonda Schwartz is?

A   No.

Q   How about Walter Jones?

A   Walter used to work for the Secretary of State's Office.  So I know him.

Q   What group did he work in the Secretary of State's Office in?

A   He was our public information director for voter education.

Q   And I'm going to read his email to you dated Monday, June 21st -- I don't know that I've got for the record this is CDR50377 through 379.

He says:  "Ryan, a producer working with Greg Palast asks the status of a challenge to 32,000 Cobb voters and whether any other mass challenges have taken under SB 202.  I assume she needs to ask the counties because they are the decision makers, right?"

Do you remember Walter Jones making this

request to you?

A    No.

Q    Your response was, and I want to ask you a few questions about it, so I'll read it quickly: "Is the Pam Reardon challenge new or was it from the last election cycle?  Pre-SB 202.  That's really a question for the county, but I know that True the Vote did a lot of 'mass challenges' based off of NCOA (National Change of Address) data.  We told them at the time that was not the best way to do it because it let the counties get off by saying 'no probable cause.'

"What if we did a statement like," and this is in quotes, "Because federal law drastically and unnecessarily restricts states from keeping voter rolls up to date, voter challenges are an important part of secure elections.  There have never been limits and voter challenges, and SB 202 simple clarifies that."

I want to pick up after you refer the question to the county.  You say that:  "I know that True the Vote did a lot of 'mass challenges' based on NCOA data."

Who is True the Vote?

A    They're a third-party group that does a

bunch of different election stuff. They did -- they did the mass challenges. They did -- they made ballot harvesting allegations. They're just kind of one of those third-party groups.

Q   Are they generally democratic or republican, left or right?

A   I will say they are on the right.

Q   Significantly right?

A   I get confused when it gets to that.

Q   You say: "We told them at the time that was not the best way to do it."

What did you mean by "we told them at the time"?

A   I remember our office had a meeting with True to Vote. They asked to come in and said they were going to do a bunch of voter challenges, and we told them that's not -- that's not really a good way to do it.

Q   When was the meeting?

A   I feel like it was after the November 2020 election, before the runoff.

Q   Who came in from True the Vote?

A   To my recollection, Catherine Englebrect, and I believe Greg Phillips.

Q   Did you know these individuals from

anywhere else?

MR. BEAUSOLEIL:  Strike that.

Q    Did you know these individuals?

A    No.  I think I maybe heard Catherine Englebrect's name, but I had never met them before.

Q    True the Vote asked for a meeting with you about voter challenges?

A    They asked for a meeting with Secretary of State's Office, and I was present at that meeting. I don't know kind of -- they didn't reach out to me. I'm not sure who they reached out to.

Q    Who else was present at the meeting from the Secretary of State's Office?

A    I was there.  I believe Jordan Fuchs, the deputy secretary, was there.

I'm not sure if Secretary Raffensperger was there.  He may have been.

And similar to Gabriel Sterling, he might have been there as well.

Q    Your own words here, you say:  "We told them at the time that was not the best way to do."

What does "not the best way to do it" mean?

A    Well, to me what I think I meant was voter challenges have always been in -- been in the law,

and that really meant to be like individualized.

If someone has specific data based on specific information, then there is a mechanism to basically ensure that that person who is not an eligible voter is not able to vote, while at the same time giving that person, you know, the due process they need before that determination is made.

So that's I think how voter challenges are envisioned.  And when people come and do mass challenges, I think that's not really what's envisioned.

Q   Did you -- during that meeting do you recall telling them a better way to challenge voters?

A   I don't recall.  If I did, I would have said something like what I just said.  Like, hey, it needs to be an individualized inquiry.

Q   When you say it let the counties off, what does that mean, let the counties off?

A   It allowed -- by that what I mean is it allows the counties -- if you don't actually present I think individualized evidence of what you're asserting, I think the counties can just say, hey, you didn't, you didn't present probable cause, so we don't have to do anything.

Q   Going to the statement you proposed, do you know if that statement ever issued?

A   I don't know.

Q   What did you mean when you said "Because federal law drastically and unnecessarily restricts states from keeping voter rolls up to date"?

A   I'm talking about the restrictions in the NVRA about what we have to do from a list maintenance process when someone has moved.

Q   Do you recall any subsequent meetings with --

A   And, I'm sorry.  I say "we."  I mean the Secretary of State's Office, and I should probably include county election officials as well.

Q   Do you recall any subsequent meetings with True the Vote after this meeting you had in the window period between the election and runoff?

A   I do recall a meeting where they brought forward all of their allegations about ballot harvesting.

Q   That was after this?

A   That was after this, I think.

Q   Roughly when was that?

A   Well, wait.  That was after that first meeting I talked about.  I don't know if it was

after -- when these emails occurred.

Q   It was after the November 2020 election?

A   Yes.  That would have been even after the January runoff, I believe.

Q   What do you --

A   So that second meeting.

Q   What do you remember them telling you about their allegations of ballot harvesting?

A   I remember that they had been doing a bunch of open records requests to get video, drop box surveillance videos from counties.

I remember them also saying that they had done what they called -- I think like GEO tracking, basically using cell phone data to track different people who had -- and what they said was this showed people who had 10 or more sort of interactions or at least were around the same drop box 10 or more times, and then also went to these kind of liberal third-party groups six or more times.

They had done something and they thought that indicated that these were, you know, people doing ballot harvesting operations.

They also showed some video that they had, and I remember my impression was those videos don't show anything, really.  So --

Q   Okay.

A   That was -- that's what I recall from that meeting.

Q   I want to switch topics.

The DOJ asked you about the absentee ballot application, new ID requirements, so I don't want to go over ground they already covered.

I do want to talk about implementation of those, of those new requirements.

Did the Secretary of State do anything with respect to implementation of the new absentee ballot application and ID requirement?

A   Yes.

Q   What was that?

A   One of the first things I know we did was we had to design a new absentee ballot application. So we did that, and that was an iterative process where we had a bunch of different -- we worked with a company called the Center For Civic Design, that kind of helps governments create what are meant to be like usable, clear forms.

So we worked on that.  And we did the same thing with the absentee ballot oath envelope.  So we wanted to -- we had to recreate that, in a couple different ways.  One, just based on the language.

We worked for Center for Civic Design on that as well to try to make sure we had clear language and clear layout.

And then we had to -- we worked with some other -- I don't remember what specifically, but we wanted to have a way to -- where a voter could cover up their driver's license number or -- and date of birth they were putting on the outside of the envelope. We wanted to do it without adding an additional envelope. So we were able to -- I think we got some examples from other states to see -- I think there were some states that had done something like that. So we worked -- we did that.

There was also some State Election Board regulations that we worked with the State Election Board on in terms of implementing SB 202.

Oh, and then we also had to come up with a new absentee application portal to allow people to submit their applications, their absentee ballots through that.

Q   Did you hear complaints from the counties about the instructions that were being given about the implementation of these rules?

A   Which instructions? I'm sorry.

Q   Sorry. The instructions -- let me ask a

new question.

Did you hear any complaints from the counties that they didn't fully understand what the new ID requirements were relating to absentee ballots?

A   I don't know that I recall -- I don't recall that specifically.

(Whereupon, Plaintiffs' Exhibit-231 was marked for identification.)

BY MR. BEAUSOLEIL:

Q   Let me show you what we've marked as Plaintiffs' 231.

While you review it, in the interest -- and that's Bates-stamped CDR25182 to 25184.

In the interest of time, the first email is from Rebecca Sullivan -- I'm sorry.  From Robin Webb to Rebecca Sullivan.

Do you know who Robin Webb is?

A   It looks like she is the elections coordinator in Hart County.

Q   She says, in the first paragraph -- I won't read the full thing into the record but -- "The Secretary of State has provided training on the subject, but even that is conflicting."

Would you agree with her sentiment there?

A    No.

Q    The email you sent after --

A    I guess I should clarify that.

Q    Go ahead.

A    I don't know every training that we provided.  I know that we would -- Secretary of State's Office would try very hard to make sure they're not doing any conflicting training.

Q    There's an email from Sarah Beck which loops into the conversation, and then you send an email on September 8, 2021:  "I talked to her at the conference."

Can you tell from the content that "her" is Robin --

A    I do -- I do recall this after seeing -- I, I talked -- Robin Webb, I met her at GAVREO, Georgia Voter -- Association and Voter Registration Election Officials.  I met her that at that conference in 2021, and I recall her asking me that question about so do you still have to check signatures.

And the impression I got was that her -- one criticism of SB 202 was that, oh, so this means like if there's a forged signature, there's really nothing a county can to about it.  And I think that

was the -- my impression was that was sort of the question she was getting from her board.  So if we see a forged signature, do we just have to accept that ballot if the other things matched.

Q    What -- go ahead.

A    What I recall telling her was, I was like, you know, what I think you guys should do is similar to the same thing you would do on a voter registration application, because we sometimes get complaints about voter registration applications that might include forged signatures.

And of course when a county gets that -- sees that, or suspects it, it's not because of a signature match issue, it's because of there's just something kind of suspicious about, about the application or the form itself, at the county election officials.

So I say, look, if you see something that is suspicious that you think reflects this is not the voter who has signed it, then what I would do is basically do some research, reach out to the voter. Because that's kind of how they figured out on voter registration applications, is to reach out to the voter and say, hey, did you send this in?  And the voter will sometimes say, no, I didn't.  That's when

sort of it might get raised to the Secretary of State's Office. If the voter can say, no, I did, then that would, that would clear it up.

So I think the problem was it's a situation where a county has to utilize the judgment that they are given under the law, and sometimes that gives them a little bit of -- they're not quite sure how to do that, especially it's hard in terms of a hypothetical.

I don't think she had seen this situation. I think it was a hypothetical discussion.

Q   I mean it wasn't just Ms. Webb who was expressing concerns. You say: "Based on the types of questions I received at conference, it does seem like we will need a rule giving them some guidance," right?

A   That's what I said, yes.

Q   What do you mean by "the types of questions I received at conference"?

A   I think she was not the only person who asked me. So what do I do -- seems like there's obviously some kind of forged signature.

Q   I mean isn't SB 202 itself a rule?

A   When I said rule there, I was referring to kind of like the formal rule promulgation process

through the State Election Board.  So SB 202 is a statute as opposed to a rule.

Q   So, so what you're saying is that you need a rule to give guidance on the statute because it was being interpreted differently, they didn't understand it, all those things?

A   It's not -- it's not unusual after a statute is enacted to kind of do enabling rulemaking, that seeks to provide kind of a -- maybe a more level of detail or clarification.

Q   Were there other provisions of SB 202 beyond the one dealing with the ID check and the absentee ballots where you, where you thought that you would need a rule to give guidance after the fact?

A   There were some things that we did.  The State Election Board promulgated rules on -- as part of kind of implementing SB 202.

One of them was about absentee ballot applications and like electronic -- using electronic forms for that, I recall.

Q   Okay.

A   I can't remember what else was, was part of that.

Q   Was the absentee ballot implementation and

ID requirements, was that the area where you were hearing the most confusion from the counties after the enactment of SB 202?

A   Um, I would say -- you know, I don't know that I would say we were hearing a lot of confusion.

It's not unusual for us to get questions. I received questions about the signature, what do you do with the signature at this point.

I can't recall -- I get a lot of questions at that conference, so I can't recall all of them. And usually it's their kind of informal -- like in the hall or, you know, in the -- hey, Ryan, what do you think about this.

Q   Was this -- was the number of questions you were getting at that conference sort of unprecedented when you consider how other voting laws had been adopted?

A   No.

MR. FIELD:  Object to form.

A   I would say it was typical.

These are -- I don't get to see these people a lot and they don't get to see me in person a lot, so a lot of it could be some pent-up questions.

Q   Do you remember anything specific beyond

the absentee ballot and voter ID issue where you were getting a lot of questions about implementation, like any other issues?

A   So the questions that I remember are, like I said, what do we do about this signature.  So I don't know if I would agree with that characterization that they were about the voter ID.  I think they were clear on that part, but there was a question about what do we do about the signature now.

Q   I wasn't trying to characterize it.  I was asking if there were other issues that you remember that were subject to significant questions?

A   Not that I can recall.

Q   I have some other questions on topics, but they've been covered by DOJ.  So I think I'll just -- I'm going to end and turn it over.  I think some other Plaintiffs have questions and potentially the DOJ.  I'm not sure if they're done.

So turn it over for now, but I do want to ask one -- a couple of final questions about the text messages you testified about earlier.

Did you personally run the searches of your, of your phone for the text messages?

A   No.

Q   Did you turn your phone over to a third party?

A   I turned -- I worked with the discovery vendor in this case, and they -- so I didn't turn the physical phone over, but I plugged it in and they --

Q   Okay.

A   Someone did basically an image of the phone.

Q   Okay.  Did you have a phone while you worked at the Secretary of State?  Were you carrying two phones or just your personal phone?

A   I was carrying two phones.

Q   You were carrying two phones.

So the searches they ran were on your personal phone?

A   The only sort of responsive stuff was on my personal phone, because they really, they really came -- they came in as iMessages, and so I guess it was more a part of my Apple account as opposed to tied to a specific phone.

Q   So you were getting the same messages on your work phone that you were getting on your personal phone?

A   Sometimes, if they were an iMessage, I

would.

Q    Did you turn back your Secretary of State phone when you left the Secretary of State's Office?

A    I, I actually have it.  I need to do that.

Q    Have you searched that -- have you turned that phone over to for searching?

A    So that phone, I, I searched.  It has a -- it only keeps messages for 30 days.  So I didn't have any responsive messages on that phone.

Q    Okay.  Do you know what program it is that -- is it a setting or something that destroys messages after 30 days?

A    I think so, yes.

Q    Is that for all Secretary of State government phones?

A    I'm not sure.

Q    Did you put that setting on the phone?

A    I think I did, yes.

Q    Did somebody ask you to put that setting on the phone?

A    No.  But I needed to so it could be essentially utilized and not full of messages.

Q    You were limited on how much data you could use for the Secretary of State phone?

A    I think it's more of like the size of the

-- you know, the memory of the phone.

Q   Okay.  Is the Secretary of State phone an iPhone?

A   Yes.

Q   Okay.  So the question I had on the text, if we can turn to -- I think it was one of the earlier exhibits, 229.

MR. TYSON:  209.

MR. BEAUSOLEIL:  209.  Thank you.

BY MR. BEAUSOLEIL:

Q   I wanted to ask you -- if you turn to Page 8, I want to ask you about entries 51, 52 and 53.

This is time-stamped February 19th.  Can you tell looking at this, was this your commentary during a hearing?

A   It looks like it was discussion during a -- during a hearing, yes.

Q   Do you remember what hearing that was?

A   I think it was a hearing where -- well, I -- I don't, I don't know.

Q   That's fine.

You say in the entry 51:  "The election officials are doing a good job pushing back on the county cost angles Dems are pushing."

52, Mr. Tyson says:  "Agreed.  They're

really helping to make the case overall as well."

And then Mr. Pico-Prats says: "Yes. This would actually save them money since it's reducing days."

And then shortly after, it says:

"Creating uniformity," with an asterisk.

Do you agree with him that SB O2 -- SB 202, if we assume that's what he was talking about, would actually reduce voting days?

A    I'm not sure what he's saying.

Q    Do you know what the creating uniformity means?

A    No.

Q    Do you remember being involved in this texting?

A    No.

MR. BEAUSOLEIL:  That's what I have for now.  Thank you very much for your time.

We can go off.

THE VIDEOGRAPHER:  Going off the record at 4:26.

(A recess was taken.)

THE VIDEOGRAPHER:  We're back on the record at 4:32.

MS. RICHARDSON:  Thank you.

At this time, Mr. Germany, I'm going to allow the other plaintiff groups to ask questions, if they have any.

Just so the counsel for plaintiff groups on Zoom know, we're at six hours and nine minutes.

I'll start with counsel for Asian Americans Advancing Justice.  Any questions for Mr. Germany?

(No Response.)

MS. RICHARDSON:  Hearing none, we'll go to counsel for Concerned Black Clergy.  Any questions for Mr. Germany?

MR. ZATZ:  I don't have any questions.

MS. RICHARDSON:  Thanks, Cliff.

Let's go to counsel for the New Georgia Project plaintiff group.  Any questions for Mr. Germany?

MR. SHELLY:  No questions from us.

MS. RICHARDSON:  Finally, counsel Sixth District AME Plaintiffs, any questions for Mr. Germany?

MS. WINICHAKUL:  Hi.  Can you hear me?

MS. RICHARDSON:  We can, Poy.

MS. WINICHAKUL:  Great.  Thank you.

EXAMINATION

BY MS. WINICHAKUL:

Q   Just a few questions.  This is Pichaya Poy Winichakul for the AME Plaintiffs.

Mr. Germany, I just have a few questions related to voters with disabilities.

Are you familiar with the Americans with Disabilities Act?

A   Yes, generally.

Q   And if I refer to that law as the ADA, you'll know what I'm talking about?

A   Yes.

Q   Are you familiar with Section 504 of the Rehabilitation Act?

A   Um, I'm familiar with it and kind of its existence.  I probably shouldn't say I'm familiar with its contents.

Q   Okay.  Would you agree that The Secretary of State's Office has legal obligations under the ADA and Section 504 of the rehab act -- Rehabilitation Act?

MR. FIELD:  Object to form.

Go ahead.

A   Yes.

Q   Are you aware whether The Secretary of

State's Office receives federal funds for administering elections?

A   We do receive federal funds, yes.

Q   And do you know the particular sources of those federal funds?

A   We receive federal funds through HAVA.  We receive some federal funds through the CARES Act.

I believe those are the two sources.

Q   And let's just take those one at a time.

What are the HAVA funds used for?

A   And they're used for different things. There were some HAVA funds that I believe are, are tied to election security that we have to use for election security.

There are some that are used for voter education.  And that we also provide grants to counties with those HAVA funds, and I know some of those grants would include ADA accessibility issues in terms of helping counties make sure their polling places are accessible.

Q   And what about the CARES Act fund, what are those used for?

A   So those I know were kind of a COVID specific thing.  So they were used for a COVID response.  We provided grants to counties for

different COVID-related things.

I can't -- because I think we provided personal protective gear to counties directly, but I believe that they could also purchase it and then receive a grant for that.

We used it for absentee ballot fulfillment, I believe, by bringing in a vendor. Traditionally, it was something that was handled at the county level. The volume in 2020 made it so that we needed to utilize an outside vendor to handle the volume. So we made that available to counties.

And we also used it for voter education, PSAs as well.

Q   Okay.

A   And there's probably some other things that I didn't mention.

Q   Okay. Did the Secretary of State's Office conduct or commission any studies or reports about the impact of SB 202 or its predecessor bills on voters with disabilities?

A   No.

Q   Did the Secretary of State's Office prepare any written memoranda or analyses about the impact of SB 202 with voters with disabilities?

A    I don't believe so, no.

Q    Did the Secretary of State's Office produce anything else in writing related to the impact of SB 202 on voters with disabilities?

A    I don't believe so.

Q    Did the Secretary of State's Office conduct or commission any studies about the impact of SB 202's provisions on voters who reside in nursing homes?

A    No, not specifically.

Q    Just a couple of questions here about ID requirements.  Hopefully they are different than those that were already asked here.

In the run-up to the passage of SB 202, did the Secretary of State's Office have any written studies, memoranda or analyses about the effect of the photo ID requirement to request absentee ballots on voters with disabilities?

A    I'm sorry, I missed the first part of the question.  Could you ask it again?

Q    Sure.  So this pertains to the period of time in the run-up to the passage of SB 202.  And during this time did the Secretary of State's Office produce any written studies, memoranda, analyses about the effect of the photo ID requirement to

apply for an absentee ballot on voters with disabilities?

A   No.

Q   In the run-up to the passage of SB 202, the Secretary of State's Office also supported the expansion of the ability to challenge voters on the voter rolls; is that right?

A   I would not agree with that characterization.

Q   How would you characterize it?

A   How would I characterize what?

Q   How would you characterize the Secretary's position related to the -- what resulted in the expansion of the ability for challenges to voters on the voter rolls in SB 202?

A   I wouldn't agree that SB 202 expanded the ability to challenge voters.

Q   Okay.  Did the Secretary of State's Office produce any written studies, memoranda or analyses about the effect of SB 202's voter challenge provisions on voters with disabilities?

A   No.

Q   Okay.

MS. WINICHAKUL:  I have no further questions at this time.  Thank you.

MS. RICHARDSON:  I believe that's all of the attorneys for Plaintiffs' counsel.

Did I miss anyone?

(No Response.)

FURTHER EXAMINATION

BY MS. RICHARDSON:

Q   Okay.  Mr. Germany, we've reached the end of your deposition.  Some final questions for you that are wrap-up questions.

A   It should be the other way around.

Q   Do you want to change any of the answers you provided today?

A   Not that I can -- not that I'm aware of.

Q   Is there any information that you recall now that you did not recall earlier today?

A   No.

MS. RICHARDSON:  I have no additional questions for you.  Thank you so much for your time today.

MR. FIELD:  We have no questions.

THE VIDEOGRAPHER:  Going off the record at 4:41.

This concludes the deposition.

(Whereupon, the deposition was concluded at 4:41 p.m.)

C E R T I F I C A T E

STATE OF GEORGIA:

FULTON COUNTY:

I hereby certify that the foregoing transcript of C. RYAN GERMANY was taken down, as stated in the caption, and the questions and answers thereto were reduced by stenographic means under my direction;

That the foregoing Pages 1 through 230 represent a true and correct transcript of the evidence given upon said hearing;

And I further certify that I am not of kin or counsel to the parties in this case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 17th day of March, 2023.

_____

Wanda L. Robinson, CRR, CCR No. B-1973
My Commission Expires 10/11/2023

D I S C L O S U R E

STATE OF GEORGIA ) VIDEOTAPE DEPOSITION OF
FULTON COUNTY       C. RYAN GERMANY - 3/07/23
        Pursuant to Article 10.B of the Rules and

Regulations of the Board of Court Reporting

of the Judicial Council of Georgia, I make the

following disclosure:

        I am a Georgia certified court reporter.

I am here as a representative of Esquire Deposition

Solutions, LLC, and Esquire Deposition Solutions,

LLC was contacted by the offices of U.S. Department

of Justice to provide court reporter services for

this deposition.  Esquire Deposition Solutions, LLC

will not be taking this deposition under any

contract that is prohibited by O.C.G.A. 9-11-28 (c).

        Esquire Deposition Solutions, LLC has no

contract/agreement to provide court reporter

services with any party to the case, or any counsel

in the case, or any reporter or reporting agency

from whom a referral might have been made to cover

this deposition.

        Esquire Deposition Solutions, LLC will

charge the usual and customary rates to all parties

in the case, and a financial discount will not be

given to any party to this litigation.

ERRATA SHEET FOR THE TRANSCRIPT OF:

Deponent Name:  C. RYAN GERMANY

Case Caption:   In Re: Georgia Senate Bill 202

Case No. :  1:21:MI-55555-JPB

I do hereby certify that I have read all questions propounded to me and all answers given by me on the 7th day of March, 2023, taken before Wanda L. Robinson, and that:

_____1) There are no changes noted.

_____2) The following changes are noted:

Pursuant to state rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part:  Any changes in form or substance which you desire to make shall be entered upon the deposition with a statement of the reason given for making them.
Accordingly, to assist you in effecting corrections, please use the form below:

CORRECTIONS:

_____

Page     Line        Change      Reason For Change

_____

_____

_____

_____

_____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_____

Signature of Deponent

I hereby certify that the individual representing himself/herself to be the above-named individual, appeared before me this _____ day of _____, 2023, and executed the above certificate in my presence.

_____

NOTARY PUBLIC

MY COMMISSION EXPIRES: