# Exhibit 34

**In the Matter Of:**

IN RE: GEORGIA SENATE BILL 202

1:21:MI-55555-JPB

**CHRIS HARVEY**

*March 10, 2023*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

IN RE:                    )
GEORGIA SENATE BILL 202,       )
                          )
                          )
                          )
                          )
                          ) CASE NUMBER:
                          ) 1:21:MI-55555-JPB
                          )
                          )

**************

The following deposition of Chris Harvey was taken pursuant to stipulations contained herein, the reading and signing of the deposition reserved, before Stephen Mahoney, Certified Court Reporter, 4921-4880-0199-0656, in the State of Georgia, at 1600 Parkwood Circle, Suite 200, Atlanta, Georgia 30339 on March 10, 2023 at 10:00 a.m.

Stephen Mahoney, CVR, CCR
Esquire Deposition Solutions
1500 Centre Parkway,
Suite 100
Atlanta, GA 30344
(404)495-0777

APPEARANCES

ON BEHALF OF THE PLAINTIFF, THE UNITED STATES:

ELIZABETH RYAN, ESQUIRE    (VIA ZOOM)
U.S. DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE, N.W.,
ROOM 7273 NWB
WASHINGTON, D.C. 20530
ELIZABETH.RYAN@USDOJ.GOV

ON BEHALF OF THE AME PLAINTIFFS:

JOHN CUSICK, ESQUIRE
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 RECTOR STREET,
FLOOR 5
NEW YORK, NEW YORK 10006
JCUSICK@NAACPLDF.ORG

MELISSA MOREL, ESQUIRE
WILMERHALE
60 STATE STREET
BOSTON, MASSACHUSETTS 02109
MELISSA.MOREL@WILMERHALE.COM

ON BEHALF OF THE CONCERNED BLACK CLERGY PLAINTIFFS:

CLIFFORD J. ZATZ, ESQUIRE    (VIA ZOOM)
CROWELL & MORING, LLP
1001 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004
CZATZ@CROWELL.COM

MATT FOGELSON, ESQUIRE    (VIA ZOOM)
ADVANCEMENT PROJECT
1220 L. STREET, N.W.,
SUITE 850
WASHINGTON, D.C. 20005
MFOGELSON@ADVANCEMENTPROJECT.ORG

CHRIS HARVEY                                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                            3

APPEARANCES CONTINUED

ON BEHALF OF THE GEORGIA NAACP PLAINTIFFS:

MANA AMERI, ESQUIRE    (VIA ZOOM)
HUGHES HUBBARD & REED, LLP
1 BATTERY PARK PLAZA,
FLOOR 11
NEW YORK, NEW YORK 10004
MANA.AMERI@HUGHESHUBBARD.COM

ON BEHALF OF THE STATE OF GEORGIA DEFENDANTS:

BRIAN FIELD, ESQUIRE
SCHAEER JAFFE, LLP
1717 K STREET, N.W.,
SUITE 900
WASHINGTON, D.C. 20006
BFIELD@SCHAEER-JAFFE.COM

BRYAN TYSON, ESQUIRE    (VIA ZOOM)
DIANE LAROSS            (VIA ZOOM)
TAYLOR ENGLISH DUMA, LLP
1600 PARKWOOD CIRCLE,
SUITE 200
ATLANTA, GEORGIA 30339
BTYSON@TAYLORENGLISH.COM
DLAROSS@TAYLORENGLISH.COM

ON BEHALF OF THE ASIAN AMERICANS ADVANCING JUSTICE PLAINTIFFS:

NIYATI SHAH, ESQUIRE    (VIA ZOOM)
DIRECTOR OF LITIGATION
1620 L STREET,
SUITE 1050
WASHINGTON, D.C. 20036
NSHAH@ADVANCINGJUSTICE-AAJC.ORG

ON BEHALF OF THE ASIAN AMERICANS ADVANCING JUSTICE -
ASIAN LAW CAUCUS PLAINTIFFS:

KIMBERLY LEUNG, ESQUIRE   (VIA ZOOM)
ASIAN LAW CAUCUS
55 COLUMBUS AVENUE
SAN FRANCISCO, CALIFORNIA 94111
KIMBERLYL@ADVANCINGJUSTICE-ALC.ORG

APPEARANCES CONTINUED

ON BEHALF OF THE ASIAN AMERICANS ADVANCING JUSTICE - ATLANTA PLAINTIFFS:

ZAINAB O. RAMAHI, ESQUIRE    (VIA ZOOM)
KEKER VAN NEST & PETERS, LLP
633 BATTERY STREET
SAN FRANCISCO, CALIFORNIA 94111
ZRAMAHI@KEKER.COM

ON BEHALF OF ATHENS-CLARKE COUNTY:

MAGGIE MARTIN, ESQUIRE    (VIA ZOOM)
JAMES BATES BRANNAN GROOVER, LLP
231 RIVERSIDE DRIVE
MACON, GEORGIA 31201
MMARTIN@JAMESBATESLLP.COM

ON BEHALF OF THE COLUMBIA COUNTY:

JORDAN BELL, ESQUIRE    (VIA ZOOM)
HULL BARRETT, P.C.
801 BROAD STREET,
7TH FLOOR
AUGUSTA, GEORGIA 30901
JBELL@HULLBARRETT.COM

ON BEHALF OF DEKALB COUNTY:

SHELLEY MOMO, ESQUIRE    (VIA ZOOM)
IRENE VANDER ELS, ESQUIRE
DEKALB COUNTY LAW DEPARTMENT
1300 COMMERCE DRIVE,
5TH FLOOR
DECATUR, GEORGIA 30030
SDMOMO@DEKALBCOUNTYGA.GOV
IVANDERELS@DEKALBCOUNTYGA.GOV

CHRIS HARVEY
IN RE: GEORGIA SENATE BILL 202

March 10, 2023

APPEARANCES CONTINUED

ON BEHALF OF FULTON COUNTY SOLICITOR KEITH GAMMAGE:

SANDY MILORD, ESQUIRE   (VIA ZOOM)
OFFICE OF THE FULTON COUNTY ATTORNEY
141 PRYOR STREET, S.W.,
SUITE 4038
ATLANTA, GEORGIA 30303
SANDY.MILORD@FULTONCOUNTYGA.GOV

ON BEHALF OF MACON-BIBB COUNTY:

GRACE SIMMS MARTIN, ESQUIRE   (VIA ZOOM)
NOLAND LAW FIRM, LLC
5400 RIVERSIDE DRIVE,
SUITE 205
MACON, GEORGIA 31210
GRACE@NOLANDLAWFIRMLLC.COM

ON BEHALF OF RICHMOND COUNTY:

RACHEL MACK, ESQUIRE    (VIA ZOOM)
AUGUSTA LAW DEPARTMENT
535 TELFAIR STREET,
BUILDING 3000
AUGUSTA, GEORGIA 30901
RMACK@AUGUSTAGA.GOV

TRANSCRIPT LEGEND

-- Cross-talk/interruption/change of thought
(ph) Phonetically spelled
[sic] Written as spoken
(unintelligible) Not capable of being understood

CHRIS HARVEY                                             March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                        6

INDEX TO PROCEEDINGS

EXAMINATION OF CHRIS HARVEY                    PAGE

    CROSS BY MR. CUSICK............................09

    FURTHER CROSS BY MS. RYAN.......................164

    FURTHER CROSS BY MR. ZATZ.......................205

    FURTHER CROSS BY MS. AMERI......................209

DISCLOSURE.........................................212

CERTIFICATE OF REPORTER............................213

ERRATA SHEET.......................................214


INDEX TO EXHIBITS

IDENTIFIED                               PAGE

EXHIBIT NO. 234 - E-MAIL CHAIN, CDR00009771-773......140

EXHIBIT NO. 235 - E-MAIL CHAIN, CDR00018227-229......156

EXHIBIT NO. 236 - E-MAIL CHAIN, CDR00016942-943......202

P R O C E E D I N G S

MR. CUSICK:  We are here today for the deposition of Chris Harvey for the case In Re Georgia Senate Bill 202, U.S. District Court for the District -- Northern District of Georgia, Docket Number 1:21:MI-55555-JPB.

Could you please state your full name for the record?

THE WITNESS:  My name is Chris Harvey.

MR. CUSICK:  Good morning --

THE WITNESS:  Good morning.

MR. CUSICK:  -- Mr. Harvey. My name is John Cusick. I'm an attorney with the Legal Defense Fund on behalf of AME Plaintiffs in this matter. Could you swear in the witness?

THE COURT REPORTER:  Would you raise your right hand, sir? Do you swear or affirm that the testimony you're about to give would be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

MR. CUSICK:  Okay. My name is John Cusick. I'm with the AME plaintiffs here, which are one of the plaintiffs in this consolidated case for discovery purposes. I'm here with my colleague,

Melissa Morel, in the law firm of WilmerHale.

And so there are a few different cases that have been consolidated for discovery purposes. We're joined here by some attorneys, mostly on Zoom for the Defendant Intervenors, County Defendants, and some Plaintiff groups. I'll ask right now, just for a moment, for everyone planning to make an appearance to introduce themselves on Zoom, and I'll begin with the Plaintiffs, starting with the Asian Americans Advancing Justice Plaintiffs.

MS. LEUNG:  Good morning, Mr. Harvey. My name is Kimberly Leung, representing the Asian American Advancing Justice, plaintiff.

MR. CUSICK:  How about for the Concerned Black Clergy plaintiffs?

MR. ZATZ:  Good morning. Cliff Zatz for the Concerned Black Clergy of Metropolitan Atlanta plaintiffs.

MR. CUSICK:  The Georgia NAACP plaintiffs, if anyone is on.

MS. AMERI:  Hi, this is Mana Ameri representing the Georgia NAACP plaintiffs.

MR. CUSICK:  The New Georgia project plaintiffs, if anyone is on. And then for the

CHRIS HARVEY                                          March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                    9

United States Department of Justice.

MS. RYAN:  Good morning, Mr. Harvey. My name is Liz Ryan. I represent the United States.

MR. CUSICK:  And anyone on behalf of County Defendants who plans to make an appearance?

MS. VANDER:  Good morning. This is Irene Vander. I'm here on behalf of the Cobb County defendants.

MS. MARTIN:  Grace Martin, on behalf of the Macon-Bibb County defendants.

MS. MACK:  Rachel Mack, on behalf of the Richmond County defendants.

MS. MARTIN:  Maggie Martin, on behalf of the Athens Clark County defendants.

MR. CUSICK:  And then anyone else on behalf of the State Defendants or Intervener Defendants.

MR. FIELD:  Brian Field, on behalf of the State Defendants.

MR. CUSICK:  With that, I think we can proceed.

CROSS-EXAMINATION

BY MR. CUSICK:

Q.   And so have you been deposed before, Mr. Harvey?

A.   I have.

Q.   Sure. I'll just go over some very basic ground rules so that we're on the same page for throughout today. You testified -- you understand that you're testifying under oath today?

A.   I do.

Q.   A court reporter is transcribing the deposition. With that in mind, if you could please answer audibly and refrain from head nodding or head shaking.

A.   Understood.

Q.   I'll try to do my best to not talk over you after I ask you a question, and hopefully, you can do the same and wait until I'm finished answering if that works.

A.   I'll do my best.

Q.   If a question is unclear, please let me know. I'll try to rephrase to make sure that you understand it, but if you begin answering a question, I'll assume that you understood the question; does that work?

A.   Sure.

Q.   Your attorney, Mr. Field, may object to

some questions today. Unless he instructs you not to answer the question, you can feel free to do so and answer the question.

A.   Understood.

Q.   This deposition isn't an endurance contest, so if you need a break at all, just let me know. We'll try to do breaks every 60 minutes or so, but if I'm in the middle of a question, all I ask is that you just finish answering the question until -- and then we can take a break if that works.

A.   Sure.

Q.   And then finally, as you could hear from the introductions, there's quite a few plaintiff teams in this case. We will try to do our best to consolidate and streamline questions. So that -- mostly, I'll be asking questions today, but at the end of the deposition, there could be somebody from one of the other Plaintiff groups who might ask questions, just to make you aware of that.

A.   I understand.

Q.   Anything that might impair your ability to testify truthfully today?

A.   No.

Q.   Did you bring -- I was going to say, did you bring any documents, but I don't see any in

front of you.

A.   I did not.

Q.   Are you represented by counsel?

A.   I am.

Q.   And who is that?

A.   Brian Field.

Q.   Okay. What -- do you know what his law firm is?

A.   I don't know the name of it, sir.

Q.   And how -- how long -- when did you retain Mr. Field's law firm?

A.   I didn't retain him. I think he was retained by the -- my understanding is retained by the state on my behalf.

Q.   In addition to Mr. Field, and without going into the content of any discussions, have you sought any other legal advice about this case from other attorneys?

A.   I met with Mr. Field and Bryan Tyson on Wednesday of this week.

Q.   Okay.

No one outside of Mr. Tyson and Mr. Field for -- for legal advice?

A.   Correct.

Q.   And so you briefly talked about a -- I

assume, a deposition prep session?

A. That's correct.

Q. Did you only meet once?

A. We met Wednesday afternoon, and I got here about 8:30 this morning, and we've been speaking during that time until now.

Q. Was anyone else present within those prep sessions besides your two attorneys?

A. Ryan Germany was present for maybe 30 minutes or 45 minutes, the second -- the -- the second half of my meeting on Wednesday with Mr. Tyson and Mr. Field.

Q. Okay.

Did you speak to anyone else about your deposition today outside of Mr. Field, Mr. Tyson, or Mr. Germany?

A. Just to tell them that it was happening.

Q. And did you review any documents?

A. I reread SB 202 the -- the law, but that's the only document I reviewed.

Q. And so I assume no -- no expert reports in this case?

A. No.

Q. Other deposition transcripts?

A. No.

Q.   Anything else outside of that prep that you recall doing?

A.   No, that's it.

Q.   And I won't hold you to a specific answer, but do you have a general understanding of what the case is about here?

A.   Generally.

Q.   And what's your understanding?

A.   There are -- my understanding is that -- although I don't think I've read the complaint in -- in talking, its -- concerns about some of the provisions of SB 2O2 and how they affect voting in Georgia.

Q.   Are you aware of any of the types of claims that have been brought?

A.   I'm aware of some of the issues. I'm not sure if that's the same as claims.

Q.   And what are some of the issues you, again, generally understand to be?

A.   Concerns about the -- some of the -- the changing timeframes, the -- the time to request an absentee ballot, the absentee ballot application deadline, the -- the -- the change or the -- the Dropbox provisions in the law, the -- what's called line warming provisions. I think those are the main

ones that I'm aware of.

Q.   Before we get into talking a little bit more about the case, I just want to do a little background -- a few background questions. You testified earlier you've been deposed before.

A.   Yes.

Q.   I assume that was in your election director capacity, some of those?

A.   Most of them. Maybe, once or twice in my law enforcement capacity.

Q.   And do you recall what those -- in the law enforcement capacity, what those depositions were about, generally?

A.   I think -- one I know was about an -- an auto accident that I worked on as a patrol officer. That may have been the only one. There -- there may have been one more, but it was -- it was -- it would have been about reports I had written, I believe, involving vehicle accidents. Not -- not -- not that I was involved in, but I wrote the reports about.

Q.   Any in your personal capacity?

A.   No, I mean, I've been just a -- I've been a 30(b)(6) witness, and I've been a -- I guess, to some extent -- is -- is this in my personal capacity or is this as -- but -- but not in my personal life,

I guess, if that's what you're making.

Q. Sure, yeah. And so you referenced the 30(b)(6). Is that as a 30(b)(6) on behalf of the Secretary of State's Office?

A. Yes, several times.

Q. Do you recall, generally, some of the more recent ones, what they -- what the issues were? Maybe, let's take the -- the last 30(b)(6) you were a deponent in.

A. I think that was in the Fair Fight lawsuit that was resolved last summer -- or it was tried last summer, resolved, I guess, in the fall. I -- I think they've all been -- I believe all the 30(b)(6)s have been for the Secretary of State's Office. I think it's been two or three times, but I honestly don't remember specifically what all of them were.

Q. Did they deal with challenges to election law or implementation of law?

A. Yeah, I think so, or practices of the Secretary of State, that kind of stuff.

Q. In the Fair Fight litigation, did you testify at a trial?

A. I did.

Q. Do you remember, generally, what your

testimony focused on? That might have been long.

A.   It was -- it was at least 25 hours on the stand, so I -- I remember many topics.

Q.   Sure. Outside of the Fair Fight litigation, any other times you testified in court in your role on behalf of the Secretary of State's Office?

A.   I've testified in many hearings, in temporary injunctive hearings. I don't think I've testified in another trial for the Secretary of State's Office. I believe they've all -- except for Fair Fight, I believe they've all been hearings for injunctions or pretrial hearings or something like that.

Q.   And have you ever provided testimony either to a congressional hearing or on the -- on -- to the Georgia General Assembly?

A.   I have spoken to them. It wasn't sworn testimony, but I have appeared in front of House and Senate Committees. I just -- matter of fact, about two weeks ago, in my current capacity. As the election's director, I think, maybe two times, maybe -- maybe more.

Q.   Any related to SP 202?

A.   I remember -- I think the last time I did

it, it was -- it was shortly after the primary in 2020, so SB 202 wasn't in existence. So I don't think I've done it on election stuff since 2020 since SB 202 has come out.

Q.   What about to Congress? Did you ever have to -- be asked either to testify or to speak to members of Congress related to Georgia -- Georgia election law or elections?

A.   I was -- I was asked, and then did not.

Q.   Do you recall who or what committee asked you to?

A.   It was the Senate -- I think, Senate Judiciary Committee. And they asked me to come and talk, and the timing didn't work out. I was -- I think I had to actually -- I had to be in court testifying in the Fair Fight case when that came up.

Q.   Do you recall what the topic was they wanted you to testify about?

A.   I believe it was mostly about threats faced by election officials and response to that.

Q.   Any testimony -- or any written correspondence that was shared with that -- that committee?

A.   You know, I wrote some stuff out. I don't -- I don't believe I sent it to them, but I'm not

100 percent sure.

Q.   I'll now turn just with a few background questions. Could you briefly walk me through your educational background, starting with college?

A.   Sure. I -- in 1989, I graduated from The Citadel in Charleston, South Carolina, with a BA in political science and a specialization in criminal justice. I -- in 1991, I think, I attended Catholic University Graduate Theology School. I was in the seminary. I did that for a year, and I left that program in mid '92, I think.

I moved to -- I taught high school in Charleston, South Carolina, and as part of that, I had to take, I think, 12 hours of education classes. So I took, I guess, probably three or four classes at the College of Charleston just to meet that kind of certification requirement.

And that's my -- I -- but I just to be clear, I didn't get a degree from Catholic University, and I didn't get a degree from College of Charleston.

Q.   And I know you talked a little bit about some specializations. Any certifications that you had during the course of your career?

A.   I'm currently a certified law enforcement

officer in the state of Georgia. I think that's probably -- that's probably the only one.

Q.   Are you a member of any community groups?

A.   I'm a member of the Knights of Columbus at our church in Decatur, Georgia. We're -- we're involved in, like, the fine arts program at my kids' high school at St. Pius. I mean, I don't know if that counts as a community group, but I -- I think that's about it.

Q.   How long have you lived in Decatur?

A.   Since '94.

Q.   Have you lived in Georgia most of your life, except for that --

A.   I -- I grew up in -- in Dunwoody, Georgia, and I was actually born in Indianapolis, Indiana, but moved here when I was, I think, six months old. And except for college and the -- the years I was in the seminary, I spent pretty much my whole life in Georgia.

Q.   And we'll talk just briefly about your employment. What's your current position?

A.   I'm currently the deputy executive director of the Georgia Peace Officer Standards and Training Council.

Q.   How long have you been in that position?

A.   Since July of 2021.

Q.   And who were you employed by? Is it the Council or --

A.   The Council, it's -- it's part of the executive branch of state government.

Q.   And generally, just some of -- what are some of your responsibilities in that role?

A.   As the deputy executive director -- the Council itself is responsible for certifying and setting training standards for all the peace officers in Georgia. And that includes police officers, sheriff deputies, state troopers, corrections agents, Department of Juvenile Justice, 9-1-1 operators, about 55,000 post-certified people in Georgia. We set the training standards for basic training.

We approve training that takes place that gets post-credit. We handle disciplinary investigations for officers that violate the -- the posted standards. Those are the -- those are the main things we do.

Q.   Before that position, you were elections director at the Secretary of State's office. How long were you -- did you hold that position?

A.   July -- I think it was -- the actual date

was July 15th, 2015, until, I guess, the formal date would have been the -- the last day of June in 2021.

Q.   Generally, could you describe some of your roles and responsibilities during that time frame?

A.   Yeah, I -- the -- the job of the state elections director was to basically coordinate all the activities that the state did with the counties in order to do everything from qualifying candidates to registering voters or assisting with counties registering voters. You know, the -- one part of the Secretary of State, although it wasn't really my division, worked with the -- the hardware and the software to produce ballots, ballot images, things like that.

We worked closely with them. We did a lot of education. We did a lot of community outreach. We did a lot of voter education. And -- and essentially, created the environment in which the 159 counties could conduct their -- the election.

We -- you know, we -- we provided training. We provided updates. When things changed, or odd situations came up, we would inform the counties. We would respond to a lot of questions from the counties.

If they had a confusion or a problem that

that they hadn't -- they didn't know what to do about, they would call. We assisted them with their training conferences. Yeah, we -- basically, I -- I describe it as sort of creating the atmosphere in which the counties could conduct the elections.

Q.   So would it be fair to say if a county had a question about something related to election law or something that came up, you or someone within your office would be the primary liaison in the first instance?

A.   Primary -- probably. Each county had a designated liaison. They would sometimes call their liaison. They sometimes call me directly. It's -- it's important to point out we didn't give them legal advice, and we were always careful to say, you know, this is what the -- here's the law that applies to whatever scenario you're dealing with.

And would often tell them, if you've got a question about the legal interpretation, contact your county attorney and proceed with that, but I would spend a lot of time talking to county election directors and -- and pointing out the laws or the state election board rules that applied to whatever it was they were dealing with and -- and kind of helping them suss out what are the -- you know, how

does this apply to the situation that I'm dealing with.

Q.   Okay.

Were there any county officials or elections directors that you worked with primarily, like a core set of folks?

A.   All of them. I mean, some called much more than others, and there were some that -- that we would -- like when we did the pilot program with the new equipment in 2019, we selected, I think, six or seven counties to -- to do that, so we worked more closely with them, but there wasn't a -- a designated inner circle or anything.

We worked with the -- the leadership of the -- of GAVREO, which is the Georgia Association of Voter Registrars and Election Officials, I think, in preparing their training for the conferences, would sometimes talk with them, but they didn't often call, like, as a group, but representatives would call. And you know, sometimes they would talk about big things. Sometimes they'd ask about little things.

Q.   Mm-hmm.

A.   But I probably talked to maybe three or four different county election officials every day.

Q.   And then as an elections director, was there anyone who you supervised or reported to you?

A.   Yes. We had, I want to say, about 16 or 17 people in the elections division, and it changed a little bit over time, but when I started, in the basic form was -- I was the division director, and I had a deputy, and then we had a lawyer. We had a systems manager who basically ran the voter registration system.

We had four liaisons that divided up the 159 counties. We had a military and overseas voter liaison. We had a couple a -- we had one support specialist that sort of assisted the systems manager with a lot of the technical voter registration system stuff. We had an operations director who basically helped coordinate a lot of the materials that the county got.

She ran our warehouse, so if a county needed, you know, extra absentee ballot envelopes, they would -- they would contact her, and she would make sure the warehouse would get them out there. And when the counties would send in documents after an election, she would coordinate that. And a couple other people that did kind of support role.

There was a receptionist, and I'm -- I'm

probably leaving somebody out, but that's the --
kind of the core of it.

Q.    Did you ever work with the state voter
registration system?

A.    Well, yes, I mean, the Secretary of
State's Office ran the state voter registration
system, and that was primarily the job of the
systems manager and our IT -- the Secretary of
State's IT department.

Q.    Did anyone in your office ever -- was
responsible for entering data into that system?

A.    Most of the data that was entered, was
entered by the counties, but there were times that
we would enter data into the system for various
reasons. I didn't personally do it, but when there
would be like a system update, the system manager
would generally handle that.

Q.    And generally, did you, in your role,
provide feedback on proposed election bills during
your time there in that role?

A.    Some. I -- I would have a lot of
conversations with Ryan Germany, who was general
counsel during that time. And we would -- sometimes
we would just talk hypothetically about, hey, if --
if this happens, what kind of effect would it have

on the counties? Or the system -- could the system handle if this came into effect? So yeah, but I would say it was -- it was -- it was probably more informal than formal.

Q.   What -- what was the primary method of a with Mr. Germany? E-mail? Text?

A.   Face to face.

Q.   Face to face?

A.   Yeah, his office was -- was about six doors down from mine, and we spoke multiple times a day in most days.

Q.   As elections director, did you ever interface or have conversations directly with legislators for election-related bills?

A.   Usually not for election-related bills. I would sometimes have legislators call me, asking me about some situation. One of their constituents would say, hey, they -- you know, she didn't get her absentee ballot. Can you look into this? I don't think I had many -- I won't say I didn't have any.

I don't recall any direct communication, like private communication with legislators. They -- they just wouldn't call me directly very often.

Q.   Would that be someone else in the Secretary of State's Office who would initiate the

first inquiry or request for feedback on an election bill?

MR. FIELD:  Object to form.

THE WITNESS:  Yeah, could you ask that again? I'm not sure I understand.

BY MR. CUSICK:

Q.    Would there have been -- who would have been the primary person as a liaison with legislators for election-related bills?

A.    I would think that would either be Ryan Germany, the Secretary himself, or maybe Jordan Fusch.

Q.    And then from 2019 until 2021, could you describe the general process if you did receive a request to provide input on a bill, how that would work between you and other members of the Secretary of State's Office?

A.    I -- I'm trying to think -- again, most of my interactions with legislators were usually about like some problem that one of their constituents was having. I -- I -- I don't recall any specific communications I had with legislators, say one meeting in either December or January of -- December of '20 or January of 2021 that we -- that I was part of with some legislators, but most of the

communication would have been with either Ryan Germany, Jordan Fusch, maybe Gabe Sterling.

And -- and sort of as an intermediary, again, the typical scenario might be, hey, if the legislature were to do this, would that have an effect -- what effect would that have on the counties, or the system, or something like that.

Q.   Did you ever propose legislation in response from inquiries from legislators?

A.   I -- I certainly never formally proposed any legislation. You know, we talked about -- I talked a lot with counties about things that they would like to see happen or -- or -- or -- or change. I mean, there's 159 different views of how the election law should be, so I certainly talked with counties about some of their -- some of their issues, and concerns, and preferences. I don't -- I don't know if I ever -- certainly, I don't think in a formal way I proposed anything, but I would have had a lot of conversations with different people about legislation.

Q.   As part of your contact with counties would you field inquiries that they had on proposed legislation?

A.   On -- I -- I probably did. You know, when

-- when -- a lot of times -- I think, specifically, with -- with 202, when it was introduced and the -- you know, it -- it -- it was a different bill than when it was -- was passed, so when -- and there's all sorts of legislation that get -- that gets introduced that never sees the light of day or never becomes law. So yeah, I'm -- I'm sure I would have spoken with counties about concerns with proposed legislation, or potential legislation, or evolving legislation.

Q. Did you ever interface or correspond with the Georgia State Election Board?

A. Yes.

Q. And about any proposed legislation?

A. I don't think so. The closest, I think, would be writing rules in response to legislation, so I would have helped them with that. I don't -- I don't recall speaking with them about pending legislation.

Q. As one scenario, do you recall the State Election Board's emergency rules over drop boxes?

A. Yes.

Q. Would that have been an example where you might have had contact or been part of the rule drafting process?

A.   I -- I feel like I would have had contact. I don't specifically remember, but that -- that probably would have taken place with Ryan Germany. Yeah, I just -- so I -- I -- I feel like I would have been in the conversation. I don't specifically remember specific conversations about that.

Q.   And before we get into some more questions about the case, just to close the loop on your work history, did you hold any other positions within the Secretary of State's Office?

A.   Yes, from August of 2007 until July of 2015, I was the chief investigator for the Secretary of State. So I had a different title, I was the deputy inspector general when I started in 2010, then Secretary Kemp changed that title to the chief investigator, but it was -- it was basically the same job.

Q.   Just generally, some of the roles and responsibilities you had in that?

A.   From 2007 to 2010, I was -- Shawn LaGrua was the inspector general, so I was essentially her deputy, and our job was to consolidate the investigations unit of the Secretary of State. When we started, there were about five different little investigative groups, one that just worked on

CHRIS HARVEY                                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                              32

securities and one that just worked on charities and one that just worked on licensing, and one that just worked on elections. And it was very fragmented and inefficient.

And so we basically created one investigation division in which all the investigators and inspectors -- there were business inspectors too, came together into one division and got cross-trained across a variety of -- of -- of types of investigation because we had a bunch of licensing investigators who didn't know anything about elections or didn't know anything about securities and we had two election investigators, and the demand was higher in elections, and so we got everyone cross-trained.

But -- so we -- in -- in all those investigative scenarios, there were different bodies they would respond to. So you had the professional licensing boards that would regulate things like funeral homes and private detectives and all that stuff. Of course, you had the State Election Board that would receive election investigation reports.

And that was probably my -- my biggest area of focus was on election investigations. And so when an election complaint came in, an investigation

CHRIS HARVEY                                          March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                    33

was opened, it would be concluded, and then we would either -- now Justice LaGrua or I would present the cases to the State Election Board at one of their meetings, and they would then make a determination as to what should happen with that.

Q.   And then before that chief investigator position, you don't have to go into all, but I think you said you had a general law enforcement background.

A.   Yes, I -- I started -- I started the police academy in DeKalb County in late 1994 and worked in law enforcement, mostly in homicide death investigation with the DeKalb Police Department and the DeKalb DAs office and the County DAs office.

Q.   And so I want to talk just a little bit about some of the documents you might have produced or created as elections director. Were you ever provided a legal hold or litigation hold letter to preserve all the documents that you created or sent during the 2020 legislative session?

A.   I remember getting several holds for different cases. I -- I don't specifically remember getting one for the -- the 2020 legislation or the 2020 election, but I -- I just don't remember.

Q.   And to the best of your recollection, are

all the documents that would have been responsive, did you comply with preserving documents?

A. Yes.

MR. FIELD: Object to form.

BY MR. CUSICK:

Q. Were you asked at all by your counsel to produce documents in this case?

MR. FIELD: Objection and direct the witness not to explain what -- give any testimony about what Counsel may have said, so directing the witness not to answer any question that gets that, asking him what counsel told him.

MR. CUSICK: Yes, my -- my question was just if -- if you -- if you -- if you were asked by counsel at all to produce stuff, just a yes or no, not the content of it.

MR. FIELD: Okay. That's fine.

THE WITNESS: I don't believe so. I don't believe so.

BY MR. CUSICK:

Q. Do you recall producing any documents related to this litigation?

A. I don't think so. I mean, producing documents for legislation -- litigation other than

documents that I created would be responsive to this, but I don't believe I produced documents personally for this litigation.

Q.   As elections director, did you -- what e-mail account did you use primarily?

A.   The -- the Secretary of State e-mail. I think it was charvey@sos.ga.gov.

Q.   Did you ever use a personal e-mail to conduct any duties related to your election director title?

A.   No, not that I'm -- not that I recall. That certainly would not have been my practice.

Q.   Did you have a work cell phone?

A.   I did.

Q.   And was that the primary method of communications that you used in relation to your election director role?

A.   Yes.

Q.   Did you ever use a personal cell phone to communicate any official duties or communications?

A.   I -- again, that would not have been my practice. I don't know that -- that I may have not -- may or may not have received a phone call from time to time, but that was certainly not my primary way of communicating.

CHRIS HARVEY                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                            36

Q.   And even if it wasn't your primary, do you recall any instances?

A.   I don't specifically.

Q.   On your work phone, did you primarily use for -- for messaging purposes, text message, or did you use other apps like Signal or WhatsApp?

A.   No, I think only text, only the -- the basic text. I didn't have it -- I don't think I had any other apps like that.

Q.   Was -- in -- in the election division, was there any document retention policy that you recall?

A.   I don't -- if there was one, I don't recall what it -- what it was.

Q.   Were there any other mediums like Teams or Slack or other ways that you communicated with members of your staff?

A.   There was a -- a -- a part of the voter registration system called, the Buzz, which was sort of like a bulletin board, I guess, that we used to communicate primarily with the counties, but it was sometimes used -- I mean, it would have been unusual for somebody on my team to send me a message on that. I guess it -- it -- it potentially could have happened.

And then when we're implementing the new

voter registration -- or not voter registration, the new election system -- the new election equipment, we had some type of app that we used to communicate with that. It was not Slack, but it was -- it -- it was something like that. It was an app like that. I don't recall what it was.

Q.   And for -- did you say it was Buzz? The dashboard?

A.   The -- the Buzz was the online Secretary of State's kind of bulletin board and that -- we used that primarily for the counties and us to -- to go back and forth or for the counties to communicate with each other, but it was more like a bulletin board. So you didn't do -- if you posted something to the Buzz, then everyone would see it, so it wasn't like a direct -- direct messaging system.

Q.   And do you recall, would that include folks like election directors and any -- would that -- I guess from the counties who would have -- who would have been communicating or reviewing bulletins?

A.   It would have been primarily the -- the upper staff at each county. So the county election director, or maybe their assistant or deputy or -- or kind of high-ranking people in that. In some --

in some counties, maybe everybody would have it. It just depended.

Q.   Did you respond directly to bulletins in that dashboard?

A.   Occasionally, if it was a -- if it was a question that was sort of addressed to everyone. Like, for example, you know, when does advance voting start for this election? I would type, you know, it starts August 1st at whatever, but normally, if somebody asked a question and it was kind of a specific question to them, I would generally reach out to them directly or -- or the liaison would respond to them, or somebody else might chime up and say, hey, here's the answer to your question. It just depends.

Q.   Do you recall any other Secretary of State staff members who also corresponded on Buzz?

A.   The liaison certainly would have. Yeah, I -- I think -- I mean every -- I think everyone had access to it. The systems director would certainly -- that's where he would communicate like changes to the system.

If there was some kind of update, he would put out a -- what was called a Buzz post. And then the -- the operations person who did all the -- the

supplies and stuff, she would reply and post

messages, hey, you're -- we're sending out the,

whatever it was, to everyone starting on this day,

but it was primarily people in the elections

division that would do that.

Q.   And I think you -- you mentioned the other

Slack thing that -- or a system like Slack for 20 --

it was a 2019 implementation?

A.   Yeah, I thought --

Q.   Sorry, you can answer.

A.   I don't remember exactly when it was --

when it was set up, but it was -- it was to deal

with the -- with the -- the acquisition and

distribution of the -- the new voting system.

Q.   Were there any systems that allowed

similar like to the county legislators to put up

bulletins, or do you know if legislators had access

to that Buzz system?

MR. FIELD:  Object to form.

THE WITNESS:  Legislators would not have

had access to the Buzz. It was -- it was pretty

much Secretary of State and county election

officials.

BY MR. CUSICK:

Q.   Anyone from the Governor's Office, would

they have had access?

A.   I don't believe they would have access.

Q.   You talked a little bit about some of the training that you've -- in your role -- as when you were elections director, some of it you conducted. Are you familiar with the Americans with Disabilities Act?

A.   Generally, yes.

Q.   And if I refer to it as the ADA, does that work?

A.   I'll -- I recognize that, yes.

Q.   What about any familiarity with Section 504 of the Rehabilitation Act?

A.   I can't say I'm specifically familiar with that.

Q.   And during your time as elections director, were you aware of whether the Secretary of State's Office received any federal funding for administering elections?

A.   We -- I -- my understanding is we did.

Q.   Do you recall any of the sources of that funding that you might have been involved in or had discussions about?

A.   Yeah, the -- when Secretary Raffensperger took over, Gabe Sterling basically handled all that,

but I understood we got HAVA funds from the Help America Vote Act, the sort of the second distribution of that. And then there are also the -- I believe it's called the CARES Act, which I think was a -- in response to COVID-19. Those are the two that I'm aware of.

Q.   Okay.

For the HAVA funding, do you recall what they might have been used for?

A.   Yes, to some extent. Again, we had -- we had a program where we would reimburse counties for anything that had to do with, like, accessibility or ADA enhancements, security enhancements, PPP (sic) or health sanitation enhancements in response to COVID, or just general more equipment they needed specifically in response to COVID. And whether it was more tables so that you could create more spacing.

So we had a -- like a grant reimbursement program where -- and I -- there was some type of reimbursement formula that -- that Gabe Sterling set up so the counties would -- would get what they needed, they would send their receipts into us, and then we would reimburse them for that. But those two sources were the -- the main that -- the main things

that I was aware of, but I really didn't have anything to do with the distribution of that money.

Gabe Sterling would determine -- he was up to speed on, well, you can use this money for this, but you can't use it for this, and so he was responsible for directing all that money.

Q.   Was there anyone within the elections division that you supervised who was an ADA coordinator or had ADA-related responsibilities as a -- that would fall under an ADA coordinator?

A.   The -- all the liaisons were certainly aware of the requirements that voting had to be ADA accessible or had to be responsive to -- to needs or questions about -- the counties would have with that. And -- and frankly, I would say just about everyone in the division knew that that was a -- a requirement of the voting system that you couldn't -- you -- you had to respect and respond to ADA issues if they came up.

Q.   Would those liaisons kind of be the first contact for any concerns that were raised about ADA or administration related to ADA compliance?

A.   Often, they would be. Sometimes counties would call me directly.

Q.   And from 2019 to 2021, how many liaisons

were there?

A.   There were four and then one there -- so there were four regular county liaisons and then one military and overseas liaison, so five total.

Q.   Do you recall any of their names?

A.   Yeah, they -- they -- they jumped around a lot.

Q.   Again, from the 2019 to 2021 period.

A.   Yeah, they still jumped around. I can -- I can give you most of them, I think.

Q.   Okay.

A.   Lee Combs, Amika Pitts. Oh, gosh, I can see all their faces. Breanna Thomas for a while. Oh, I think it's Dave Carbone (ph). I may be getting -- I can again. I can see his face.

His last name was Carbone. I think it was Dave or Dan Carbone. And -- and again, I -- I can't recall other names, but it -- it shouldn't be hard to get a list of who they were.

Q.   And if there were requests at all by voters or counties for dealing with reasonable accommodations, would those liaisons, again, been kind of the first contact for responding to those?

A.   In -- in the perfect world, they would have been. I mean, we -- we tried to get the

counties to -- to filter things through a liaison, and then if a liaison had a question or issue, they were, you know, to elevate it to -- to me or to the deputy or something like that. But again, sometimes counties would just call me directly and -- and you know I would sometimes try to get them back to their liaison, but sometimes, if it was an easy question to answer or something to handle, I would just talk -- talk -- you know, talk with them about right then and there.

Q.   And then so -- again, would either you or those liaisons kind of in the first contact for any complaints or grievances from voters with disabilities who might have shared them with counties?

A.   Not so much voters. If -- it depends on how a voter would have a complaint. If a voter sent an e-mail complaint, that would generally come to a -- a mailbox that was overseen by me and the deputy. And then we would -- excuse me, we would look at those as they came in, and often we would forward them to a liaison if it was a -- if it was liaison issue, but the public didn't generally have access to the liaisons.

But if it was a county question about ADA

or something like that, they would ideally call their liaison first and then work up the chain, but sometimes they -- they called me directly.

Q.   And during that 2019 to 2021 period, your deputy would have been Mr. Blake Evans?

A.   No. Well, for the -- Blake started, I think, in July of 2020.

Q.   Okay.

A.   Prior to that, it was Kevin Rayburn. He was there from, I want to say, 2016 until I think -- I think he left in the summer of -- of 2020. And then Blake became the deputy, but it was Kevin Rayburn for a pretty long time.

Now, for a time, there was also a gentleman named Ted Koval who was working in -- he was brought in by Jordan Fusch, and we kind of divided -- Ted, he was sort of over the operation side working with liaisons. Kevin was more on the voter registration side. Kevin was also an attorney, and so he -- a lot of the voter registration stuff had more legal questions, so we did that for about, I want to say, maybe six months or a year. And then Ted Koval left, and we kind of went back to the one deputy.

Q.   You mentioned there was a general e-mail

inbox that complaints might have been -- or grievances filtered through; is that right?

A.   There were actually -- the one that came to us there was a separate e-mail for -- for complaints about voter fraud, but there was a -- a general e-mail that you got to through the -- the Secretary of State's web page. There was a form you filled in, and it would generate an e-mail that that we would get.

Q.   And then if you -- you or someone in your office responded to that, would you have used your -- your state e-mails, or would you have continued to use that -- a more general e-mail?

MR. FIELD:  Object to form.

THE WITNESS:  Well, it would -- it would -- what would happen is, when an e-mail came into that box, it would send me an e-mail saying there's a message -- here's the message that came in. So I could respond -- I would respond or forward it from my state e-mail to --however I dealt with, it would be through my state e-mail.

BY MR. CUSICK:

Q.   In the guidance your office was given to counties, do you recall that including instructions

CHRIS HARVEY                                          March 10, 2023
IN RE: GEORGIA SENATE BILL 202                              47

or guidance on providing reasonable accommodations or modifications throughout your time?

A.   I know that we talked about -- about being responsive to ADA issues. Again, I can't specifically recall specific -- but we would send out training bulletins and election bulletins and updates and have conference calls, so I know the topic came up.

Q.   And so now I want to talk a little bit more about the 2020 election cycle and 2021 legislative session. You were at the Secretary of State's Office, at least from 2015 was your first role, and then when was the -- when did you first start as chief investigator?

A.   2007.

Q.   2007. In that time frame, you'd agree that use of absentee voting significantly increased for the 2020 election cycle?

A.   In -- can you ask the question again?

Q.   For the 2020 election cycle, did you see a significant increase in the use of the absentee voting?

A.   Over previous elections? Certainly, I think over 2016, there was certainly a -- there was a big increase in 2020, yes.

Q.   And do you recall some election administrative issues that happened during the 2020 general election cycle?

MR. FIELD:  Object to form.

THE WITNESS:  Election administrative issues. Could you be more specific?

BY MR. CUSICK:

Q.   Do recall any election administrative issues that happened during the 2020 general election cycle?

MR. FIELD:  Same objection.

THE WITNESS:  There were a lot of challenges in 2020, if that's -- if that's what you mean by administrative issues, then I would -- I would say yes.

BY MR. CUSICK:

Q.   What were some of those challenges?

A.   Well, we had a pandemic. We had new voting equipment. We lost most of our poll worker -- the counties lost most of their poll workers. Had to reschedule elections, which you know, heretofore had been, you know -- you know, never -- never really contemplated.

It was always the election is this date, and it's -- it's written in stone, and you got to

work around it, but we moved it twice. So I would say those were the -- those were the main challenges. And then of course, the-- the whole election ecosystem is -- is very delicate and that any changes to almost anything is going to have a downstream effect on everything else.

You know, the elections are set up kind of like a -- a railroad. They're designed to go one direction, make very controlled turns and changes, and then when you throw in something like COVID, and you throw in moving election dates, everything downstream gets affected by that.

Q.   That you mentioned the rollout of new voting Machines. What were some of the issues that happened with that?

A.   Well, one, it was a pretty tight timeline to get everything. So we physically had to get all the equipment into the state. When it got into the state, it had to be tested by our office to make sure that it was acceptance-tested, make sure that everything was set up properly. Then it had to be prepared for the counties.

Then it had to be sent to the counties. And while all this is going on, because of the -- of another court order, all the counties had to have

CHRIS HARVEY

March 10, 2023

IN RE: GEORGIA SENATE BILL 202

50

their old equipment secured and stored by the Secretary of State's Office. So we had to get all the stuff that was out there.

So go to 159 counties, get all their old equipment, move it to a -- a storage facility, make room for all this new equipment. The new equipment was much more space intensive.

There were more components to it. It was -- it was new. It required a lot more space to store. It was -- it required -- the old system was built like a big suitcase, and each voting machine was like having a big suitcase. This had -- this new system had a separate screen, a separate printer, a separate external power source, cables, all this kind of stuff.

So whereas, in the past, you could pick up a voting machine like a suitcase and carry it around, now you had to create a whole new system for transporting and storing this stuff. You had to develop -- we had to develop procedures for how they're going to operate this equipment -- we had to train them all on how to use this equipment. We had to provide, like I said, different ideas for how to use it, you know, how are you going to set up polling places.

We had to -- in some cases, the counties had to reconfigure polling places or find new polling places because this equipment was much more energy intensive. And so you had some polling places that -- that electrical grid couldn't support the system. So counties had to then go out and find new polling places.

We actually had an audit team go out and inspect every polling place and do an electrical survey and ADA survey, security survey and they reported back to the counties and said, hey, this -- this polling place is -- can only support three machines or whatever it was. And so the county would then have to decide, are we going to keep this polling place or do we need to get a bigger place? How do we respond to that?

So -- and -- and that would have all had to happen without the pandemic. And then you had the pandemic come in. And that, of course, generated a tremendous amount of -- of uncertainty, a tremendous amount of fear. The -- you know, the -- most of the poll workers in Georgia tend to be elderly or senior citizens.

And that was the group that was told to stay away, stay inside, don't go in crowded places.

Well, you know, do you want to go sit at the table and have, you know, 300 people walk up in your face and exchange driver's licenses and voting cards?

So the counties lost a lot of their poll workers. The counties lost some of their key employees. I mean, we had -- we had county election officials die and had family members. And so -- and then we moved the election, and then we moved the election again.

And we had voters that, you know, needed -- we needed outreach on how to use the new system. We made the decision to send out absentee ballot applications to all voters. Again, this was in March or April of 2000 when people were talking about, you know, tens of thousands dead.

You know, Fulton County was buying -- you know, renting refrigerated trucks to store -- more to deal with what they were hoping to see -- what they were fearing to see. You know, that's -- all that stuff I would call an administrative issue in 2020.

Q.   It would be fair to say to some -- some poll workers just had unfamiliarity with the new systems despite trainings or with the in and out of people having to be recruited?

MR. FIELD:  Object to form.

THE WITNESS:  Well, I would say the -- in cases where poll workers were -- were able to be sufficiently trained, it was new. So there's always going to be a learning curve, but in most counties where training was able to be accomplished, there weren't -- there weren't a lot of problems. In places where training wasn't sufficient or wasn't available because they were getting people at the last minute, they had -- they had problems.

BY MR. CUSICK:

Q.   And I think you testified before about a downstream effect. If one election administration issue happens, it could have impacted other aspects of the system; is that right?

A.   Correct.

Q.   Would it be fair to say some of these election administrative issues, challenges impacted wait times that voters experience for the June 2020 Primary?

MR. FIELD:  Object to form.

THE WITNESS:  Yes, I would say that's -- in -- in some places. Most places, no, but in some places, yes.

BY MR. CUSICK:

Q.   And despite the -- the election administrative issues or challenges, you weren't aware of any allegations of election fraud or voter fraud that impacted the June of 2020 Primary?

MR. FIELD:  Object -- object to form.

THE WITNESS:  I didn't handle those. Those complaints or allegations would go to the investigations division, but -- and I can't say that -- that none came in, but I wasn't aware of any significance -- or any --any findings that that happened, but I -- I don't know exactly what came in, but I -- no -- no, I don't think there was any fraud the primary election.

BY MR. CUSICK:

Q.   And so none of the election administration issues that you talked about before had any impact on leading to election or voter fraud?

MR. FIELD:  Object to form.

THE WITNESS:  Ask that again.

BY MR. CUSICK:

Q.   Yeah, none of the challenges you described about election administration for the June 2020 Primary were actually related to voter or election

fraud?

MR. FIELD:  Same objection.

THE WITNESS:  They were -- I -- I think the -- the thing I would say that created the most problem was the absentee ballot applications that were sent out to -- to voters because they just -- a lot of voters didn't understand what they were getting. And when they sent them back in, that they would then go try to vote at a polling place and be told no, you had an absentee ballot.

Sometimes, that would generate concerns that, oh, they say somebody has already voted for me, or I never voted absentee ballot. And understanding how the system works, and I could see that being kind of the primary cause, but as far as I'm aware, none of that was ever substantiated.

BY MR. CUSICK:

Q.   And if -- we'll -- we'll focus on just that example of absentee ballots familiarity. One solution would just be better training for voters; right? To address the unfamiliarity with requesting and receiving the absentee ballot request.

MR. FIELD:  Object to form.

THE WITNESS: I -- I would -- I would say that -- that's always a good idea. I mean, the more voters learn and understand the voting system, that's better for everyone.

BY MR. CUSICK:

Q. Do you recall then-House Speaker Ralston asking for any investigation into the June 2020 Primaries related to election administration?

A. I remember some comments that the -- the late speaker made. I -- and I think there were investigations opened in the Secretary of State's Office on different things. I don't -- I don't specifically recall him calling for an investigation. I remember him talking about the election.

Q. Do you recall the House Governmental Affairs Committee at all conducting hearings related to the June 2020 Primary?

A. I think -- yeah, I think I testified, or I think I spoke at that. I didn't -- I don't think I was under oath. I didn't testify.

Q. Do you recall if that was with Mr. Germany and Mr. Sterling, the testimony?

A. I believe so.

Q. And that was on behalf of the Secretary of

State's Office?

A.   Yes.

Q.   Do you recall generally, what -- what you provided or were asked to speak about?

A.   I remember -- I think Mr. Germany, Mr. Sterling spoke mostly -- yeah, I remember speaking at the end, trying to get -- impress upon the legislators, how difficult it was for the counties and -- and frankly, how well they responded given the circumstances they were in. And -- and frankly, that they -- they responded heroically, I thought. It was -- that's what I remember saying most.

Q.   After the June 2020 Primary, but before the November 2020 General Election, were you at all involved in any discussions about legislative solutions, potentially, to issues that arose during the June 2020 Primary?

A.   Between -- between the June and November election?

Q.   Yeah, in that period, were you -- any discussions within the Secretary of State's Office that you recall?

A.   I don't recall.

Q.   Recall any proposals by member of

legislators or county officials who reached out to you with thoughts about legislative solutions, again, during that same time?

A.  I mean, I -- I talked to so many people every day. I -- I don't recall specifically any -- any of those conversations or if they -- if they happened. I just don't know.

Q.  Did you have any -- any thoughts at that time, again, the same time frame, after the June 2020 Primary but before the November 2020 election, on legislative solutions you thought would be helpful for election administration?

MR. FIELD:  Object to form.

THE WITNESS:  I don't know when the -- I don't know when the -- the -- like the State Election Board rules came into effect. I don't know if that was during that time. I was focused much more on making sure that we could conduct the election in 2020. I don't know -- I don't think anybody was looking at -- for legislative solutions at that point.

We were trying to keep our head above the water and -- and making sure that people could vote in November, but -- but again, could there have been conversations? I -- I don't recall if

there were.

BY MR. CUSICK:

Q.   Who would be a -- the core team of folks within the Secretary of State's Office talking through or dealing with legislative solutions?

MR. FIELD:  Object to form.

THE WITNESS:  I would say that would be Ryan Germany, Jordan Fusch, Gabe Sterling, Sam Teasley, and the Secretary.

BY MR. CUSICK:

Q.   Anyone else?

A.   I don't think so, but I don't know. I -- I wasn't really involved in a lot of legislative discussions.

MR. CUSICK:  We can go off record for one moment.

(A break was taken.)

BY MR. CUSICK:

Q.   We just talked about the June 2020 Primary, and I want to talk about the 2020 General Election a little bit.

A.   Okay.

Q.   You talked about some of the administrative election challenges. Did you observe any during the 2020 General Election?

CHRIS HARVEY                                                                March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                                          60

MR. FIELD: Object to form.

THE WITNESS: Observe any? We had -- we had gotten a lot of stuff kind of resolved after the -- the primary. The 2020 General Election, generally, went very smoothly. Did not see long wait lines. Did not see major issues.

There are a couple of counties that, you know, had, again, an issue with the poll pad, creating cards that they were able to resolve, but by and large, it was a very different story in November. It went -- went very smoothly.

BY MR. CUSICK:

Q. What are some of the reasons that you think it went smoother?

A. I think there were several. One, they had two under their belt. They had done the -- the June, and then they had done the runoff. So they had -- everyone had had two goes with the equipment, and I think they were able to iron out a lot of kinks that way. We -- the Secretary of State's Office had worked with the counties and other groups to provide poll workers -- to provide some skilled poll workers.

We had more time to do education and

outreach. People had been through the system before. People understood a little bit more about absentee ballots. The counties had been able to adapt to the higher volume of absentee ballots that were coming in. So I think a lot of it had to do with experience and familiarity.

Q.   Would the use of drop boxes been another reason that would have helped?

A.   Yeah, I think drop boxes helped.

Q.   Do you think the increase in absentee voting for the 2020 General Election helped reduce long lines in certain counties?

A.   I'm sorry. Can you ask that again? I missed the first part of that.

Q.   Do you think the increase in absentee voting for the 2020 General Election helped to decrease line wait times in counties?

MR. FIELD:  Object to form.

THE WITNESS:  Well, it always does. I mean, the -- the more people that vote in advance, the fewer that you're going to have on Election Day, and -- and the shorter the line. So that's -- so, yeah, whenever you have high advanced voting, it generally makes election day go more smoothly.

CHRIS HARVEY                                            March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                      62

BY MR. CUSICK:

Q.   Is that similar to the -- the downstream effects that you were talking about before, where if you provide more options, one downstream effect would be shorter lines?

MR. FIELD:  Object to form.

THE WITNESS:  Yes, the more people that vote advance make the -- the Election Day process go more smoothly.

BY MR. CUSICK:

Q.   Were there any other measures that the Secretary of State's Office took affirmatively to assist in addressing some of the issues during the 2020 June Primary?

A.   During the June Primary?

Q.   Were there -- there any other issues that the state took in advance of the 2020 General Election to help address issues?

MR. FIELD:  Object to form.

THE WITNESS:  I don't remember the entire chronology of when things happened. So I don't know if -- if everything happened in between those two times, but I know that throughout the year, we worked very, very hard to make sure that counties got what they needed. Got extra

equipment, got supplies, got PPE for their -- their poll workers.

And -- and so I think probably a lot of that did happen after the general -- and it certainly had started before the general, but I think -- I'm sorry, after the -- the primary. So after the primary, we continued the work to try to clear the way of obstacles, get more poll workers, get more groups involved for providing poll workers, get more PPE, get more equipment if they needed it.

So that was a -- that was -- you know, that started basically before, you know we're -- we were intent on getting all the equipment before the pandemic became a thing, so we were in sort of support mode. And -- and then when the pandemic hit, we kind of went into overdrive, so it was throughout the course of the year, I don't remember exactly when -- when things happened.

BY MR. CUSICK:

Q.   Are you aware of any counties that used what's been referred to as mobile voting units?

A.   Yes, I'm aware of county that had them. Fulton County had a bus or two buses. I don't know

if they were deployed. I think they were, but --
yeah, because I remember talking to -- I remember
talking with Rick Barron about it. I don't know to
what extent they were used. I don't remember that.

Q.   If they were -- they if they were using
Fulton County, would that be another one of the
examples of more opportunities for voters to -- to
vote early?

MR. FIELD:  Object to form.

THE WITNESS:  It could be.

BY MR. CUSICK:

Q.   And the downstream effect could be less --
less people voting on Election Day?

A.   Fewer lines, yeah. When you say less
people vote on Election Day, that -- yeah -- yes,
but people -- a lot of people still voting, but just
fewer on Election Day.

Q.   And again, for the November 2020 General
Election, significant increase in reliance on
absentee ballots by voters?

A.   Yes.

Q.   And even compared to the previous
elections?

A.   Yes, I believe so. Yes.

Q.   And so after elections, let's say the June

Primary or the November General Election of 2020, do you, as elections director, review election results data?

MR. FIELD:  Object to form.

THE WITNESS:  What do you mean by elections result data?

BY MR. CUSICK:

Q.   Do you review any data looking at who turned out? What the results were?

MR. FIELD:  Object to form.

THE WITNESS:  I remember looking at -- at, like, the turnout with absentee versus in-person versus mail versus Election Day. I remember -- I remember seeing some of those numbers. I couldn't tell you what they are right now, but -- and of course, I see the -- the results of the races.

BY MR. CUSICK:

Q.   And so some of that -- what you mentioned, it might have been the mechanism that voters used to cast their ballot, that type of data?

A.   Yeah, versus absentee by mail, absentee in person, or election day.

Q.   And was there any breakdown, or did you review data related to how many people use drop

boxes from -- for example, to -- to return their absentee ballot?

A.   I don't know if I saw that specific data or not. I just don't remember.

Q.   Would that have been a question -- or would that have been data other members of your office might have reviewed or looked at?

MR. FIELD:  Object to form.

THE WITNESS:  Possibly.

BY MR. CUSICK:

Q.   Do you know who, if anyone, would have been responsible for looking at that data?

A.   I don't know that anybody would be responsible for it. I think that Michael Barnes, generally, would produce a report that would talk -- it would just sort of show the breakdown of the different ways people voted, whether by mail, by absentee, in person, or on election day. I'm not saying I didn't see it.

I just don't remember if I saw it. I may have seen it. I just don't recall.

Q.   Would it have been typical for you to review it or talk about election data with other members of the Secretary of State's Office after an election? Like Mr. Germany? Mr. Sterling? Ms. Fuchs?

MR. FIELD:  Object to form.

THE WITNESS:  Not in a formal way usually, but -- and we talked all the time, multiple times a day, about different things. So I know that Gabriel Sterling was -- he's very much into data and statistics and stuff like that. He -- he likely would have been somebody who would have requested that data on -- if -- if somebody did request that on drop boxes versus mail versus hand deliver, he was -- he was very much in the -- the data mindset.

BY MR. CUSICK:

Q.   Would those requests have gone to -- to the elections division, or would someone else have pulled data requests from Mr. Sterling or someone else in the Secretary's office?

MR. FIELD:  Object to form.

THE WITNESS:  I don't understand the question.

What -- what requests are you talking about?

BY MR. CUSICK:

Q.   Let's say that Mr. Sterling wanted to pull data on a breakdown of how -- how voters cast their ballot, could he do that himself, or would that have

to come through someone in the elections division to pull that data?

A.   He certainly could have gotten absentee by mail, advanced, and election day. Because it was the first time we used drop boxes, I don't -- he probably would have had to get that either from the liaisons or from the counties themselves. I don't recall what type of reporting the counties did on the drop boxes.

Q.   Putting drop boxes down aside, just election results data in the three categories you mentioned. Did you ever look at breakdowns by -- turnout by political affiliation of voters?

MR. FIELD:  Object to form.

THE WITNESS:  I -- I don't recall.

BY MR. CUSICK:

Q.   Were there any reports that were produced or you were aware of that showed the breakdown of political affiliation with election results that the Secretary of State's Office reviewed?

A.   I don't think -- I don't recall anything by political results. We -- I don't -- I don't remember ever seeing reports in the Secretary of State's Office that had political elements attached to -- you know, they sometimes have age or geography

or something. I don't recall any political reports that -- that we generated or that I saw.

Maybe other groups may have done it, but I don't recall any politically themed reports that we generated.

Q.   What about breakdown of racial demographic groups?

MR. FIELD:  Object to form.

THE WITNESS:  I -- whether that was done or not, I don't know.

BY MR. CUSICK:

Q.   You don't recall any conversations following the 2020 General Election about election results data by racial groups?

A.   I don't recall any of that.

Q.   During your time, did you ever look to data that showed racial demographic breakdowns for how people voted or voting patterns?

A.   I know that -- I know you could look at voter registration. That's available on the website by different demographics. So at -- at -- would you ask the question again? I'm sorry, I think I lost it.

Q.   No, it was just -- just a general question, if during your time you ever looked at

voting pattern data that showed breakdowns by racial demographic groups.

A.   You know, I -- I looked at so many reports over the years and so many trial preparations and exhibits, I -- I couldn't tell you whether I did or I didn't.

Q.   Probably, yeah, I could sharpen that question a little bit to make it easier. As elections director, did you ever engage in conversations about voting patterns related to racial group breakdowns?

MR. FIELD:  Object to form.

THE WITNESS:  Voting patterns by racial --

BY MR. CUSICK:

Q.   Racial demographic groups?

MR. FIELD:  Same objection.

THE WITNESS:  I don't believe so unless it was in response to litigation or something like that. If -- if -- if somebody made an allegation or something, but that -- that certainly wasn't something that I would normally do.

BY MR. CUSICK:

Q.   After the November 2020 General Election, did you become aware of any claims that black voters

CHRIS HARVEY                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                          71

or other racial demographic groups were disproportionately relying on absentee voting compared to white voters?

A.   I don't know if I -- that doesn't sound familiar. I know that everybody -- there were a lot more absentee voting in general. I don't know that I saw a breakdown by -- by different groups.

Q.   Would -- would your office have been able to produce a breakdown of that sort?

MR. FIELD:  Object to form.

THE WITNESS:  Probably.

BY MR. CUSICK:

Q.   If a request was made for such, would that have been to you first, or could that have gone to someone else within your office?

MR. FIELD:  Object to form.

THE WITNESS:  It -- I don't remember ever getting a report like that. If a request was made, it would have ultimately probably gone to our system administrator because they would be the ones that would -- that would pull reports from the system. And sometimes those -- I -- I just don't know.

They -- they could have come in, and somebody could have gone to him directly and

generated it. I -- I -- I don't have any

knowledge of that.

BY MR. CUSICK:

Q.   Putting reports aside, did you have any conversations with other members of the Secretary of State's Office about certain racial demographic groups and any increases in voting patterns for their reliance on absentee ballot voting?

MR. FIELD:  Object to form.

THE WITNESS:  Not that I recall.

BY MR. CUSICK:

Q.   Were there any discussions of voting patterns following the November 2020 General Election you had with members of the Secretary of State's Office?

A.   Well, we certainly recognize the -- the mail-in absentee in light of the -- the pandemic, so that was certainly a -- a -- a very noticeable change from the --the normal pattern. I -- I don't recall any conversations with people about voting patterns beyond the absentee by mail increase.

Q.   Based on your experience as elections director, was there widespread election or voting fraud during the 2020 General Election cycle?

MR. FIELD:  Object to form.

THE WITNESS: No.

BY MR. CUSICK:

Q. What's your basis?

A. I haven't seen evidence of fraud.

Q. Before -- for the 2020 general election cycle, where there's safeguards in place to prevent election voting fraud?

A. Yes.

Q. What were just some of those processes and -- for absentee voting, let's say?

A. Well, they -- they were in place before 2020. You had to -- in 2020, in order to -- for absentee voting, for example, you had to sign a voter registration application, send it in, your signature had to be matched to your voter registration. And if it was, you were mailed to ballot.

And then when you returned it, the signature on the outer envelope had to match the application and the registration in order to be approved, so that's one safeguard. Everybody was checked for voter registration status before they cast a vote or we issued a ballot. We had extensive security on the voter registration system to prevent tampering or interfering with that.

The equipment had been tested. There were seals. There were procedures in place to safeguard the equipment from -- from intrusion. There was testing that's done before every election of the equipment to make sure that it's producing accurate results and that the ballots are being read correctly and properly.

The -- the digital information that's the basis for the ballots is transferred securely from the Secretary of State's Office to the counties once it's generated by Michael Barnes's group. There -- we did a lot of -- prior to 2020, mostly probably 2019 and after 2016, there was a heavy focus on cyber security and concerns about hacking or -- or infiltration or cyber infiltration. So the counties had -- they -- the state installed some sensors on the network that would -- it would alert if something happened.

I believe every county in Georgia had a physical security assessment done by Department of Homeland Security where they came in and they assessed their physical locations. Hey, do you need more lighting? Do you need some cameras? Do you need better locks? You need better doors?

Do you need some barriers? So every county

was evaluated and had opportunities to make improvements. So there was a lot of security in place and -- and frankly, has been for years.

Q.   We talked a little bit earlier about the State Election Board temporarily putting in place drop boxes for the 2020 election, and did you have any concerns about security for the safeguards that were put in place for drop box use during the 2020 election cycle?

MR. FIELD:  Object to form.

THE WITNESS:  So are you -- concerns after the rules were established and they were put in place or upon consideration?

BY MR. CUSICK:

Q.   Once the rules were put in place.

MR. FIELD:  Same objection.

THE WITNESS:  I thought the rules that were put in place provided a high level of security.

BY MR. CUSICK:

Q.   And some of the -- do you recall if they -- they might have changed from the 2020 primary to the general election? Were there any additions?

MR. FIELD:  Object to form.

THE WITNESS:  I -- I don't -- I don't

CHRIS HARVEY                                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                            76

recall. I -- I mean, there was so much change going on and -- and so much I just don't recall. What if -- I don't -- I don't believe there are any significant changes, if there were any changes, but I don't recall.

BY MR. CUSICK:

Q.   Did you have any security concerns about chain of custody issues of moving ballots from drop boxes to where they needed to be?

A.   Not if it was done properly. We -- I think, the -- the chain of custody is -- was -- the -- the process was in place to show chain of custody and it always comes down to the execution. If people don't follow the process, then it -- it breaks down, but the process by itself, I think, was sound and was, for the most part, well executed.

Q.   Even though I know the answer to this, I have to ask it. Did the Secretary of State's Office receive any allegations of widespread election fraud or voter fraud for the 2020 General Election?

A.   We did receive some allegations.

Q.   What were some of those allegations?

A.   Some allegations were that many people that were under the age of 18 voted. Many people that didn't live in the state voted. Dead people

voted. There were allegations that counties were -- well, Fulton County was doing something with absentee ballots at State Farm.

And just got a lot of calls from people who just thought that something had happened. They -- they weren't always specific, but they -- they couldn't believe the results, or they didn't believe the results and so they were concerned that something happened.

Q. And when you talk about results, you mean the -- the outcome of the 2020 General Election?

A. Correct. For -- for president.

Q. And the runoff in 2021 for the Senate?

A. More so with the presidential election in 2020. It was -- it was -- I don't know about -- I don't know that there were a lot of new allegations after the runoff in January. There may have been some, but it was largely a continuation of many of the allegations that were made in -- in the -- about the general election.

Q. As elections director, did you have a role in investigating any of the allegations for the -- for the 2020 general election?

A. I didn't have a role in investigating them. I had a role in channeling a lot of them to

the investigations because they would come to me. And so I would generally get them to the investigation division. I spent a fair amount of time talking with people in the investigations division about some of the concerns or some of the issues that they would need to look at to investigate some of these allegations, but I wouldn't say I investigated in that sense, but I was aware of a lot of them.

Q.   The Secretary of State responded and took some investigatory steps, do you recall, to some of the allegations?

MR. FIELD:  Object to form.

THE WITNESS:  Yes, the investigation division responded to -- to those through -- I guess, the Secretary through his investigative division.

BY MR. CUSICK:

Q.   And do you recall, as the Secretary of State Office, any recounts?

A.   I do.

Q.   And audits?

A.   I do.

Q.   Any other responses do you recall that the Secretary of State's Office did to allegations that

might have happened for election and voting fraud?

MR. FIELD:  Object to form.

THE WITNESS:  In addition to those?

BY MR. CUSICK:

Q.  Yeah.

A.  There was a -- there was a specific review in Cobb County of the absentee ballots where they reviewed all the absentee ballots by GBI agents and came to a conclusion that there were, I think, one or two signatures that were questionable, but they eventually -- my understanding is they cleared that up. And they also did an audit of, I want to say, about 10 or 15 counties on their server to make sure that the -- the code -- the hash code was the same, in, I want to say, 10 or 15 counties.

I wasn't aware they were doing that, but I found out after that -- that they did that in some counties. And they did a -- they commissioned a report or a study, I believe, from a group called MITRE, that, again, I -- I found out about after the fact. And I don't know that I ever saw the final -- I remember seeing some type of preliminary report.

I don't know that I've ever seen a final report. Those are the -- those are the main things that come to mind.

CHRIS HARVEY
IN RE: GEORGIA SENATE BILL 202

March 10, 2023
80

Q. So you talked about some of the allegations, people under the age of 18, dead -- dead people voting, allegations at State Farm Arena. What did you make of the allegations of election voting fraud for the 2020 General Election cycle?

MR. FIELD: Object to form.

THE WITNESS: What did I make of them?

BY MR. CUSICK:

Q. Yeah.

A. Well, in cases where numbers of people were given, if they if -- if the allegation was that X number of people under the age of 18 voted, my question was who are they? Let's -- let's check because I knew that you could print out a list of every single person that cast a ballot in the state of Georgia, and you could see their year of birth on that list, and you could easily identify anybody who was under -- under that age. So to me, that was the most obvious thing.

If that's true, tell us who these people are. I never saw any -- any names. Same with out-of-state. Same with dead people. I heard numbers but never got names.

Which, again -- goes back to my answer earlier about not seeing evidence. I certainly heard

a lot of allegations. I didn't see evidence presented saying these people, you know, are 13 years old and they -- they're on record as having cast -- but none of that -- none of that came forward. So I -- I simply didn't see evidence presented.

Q.   Despite the lack of evidence you saw, is it fair to say that those allegations continued into the 2020 election cycle?

A.   I thought we were talking about the 2020 election?

Q.   I'm sorry, 2021. Into -- into the 2021 runoff that the -- they still continued?

A.   Certainly, the -- the -- the sentiments -- now, I don't know that similar allegations were made, but certainly the -- the -- I think the -- the allegations that there were problems continued into the 2021 runoff, which was in January of 2021.

Q.   As election -- when you were elections director, did you think the allegations of election or voter fraud were tied to any misinformation?

MR. FIELD:  Object to form.

THE WITNESS:  What are -- I'm not sure -- tied to any misinformation? Well, I thought the -- the allegations themselves were -- were

false. I mean, I'm not sure the difference

between a -- a -- an unfounded allegation and

misinformation.

BY MR. CUSICK:

Q.   Do you recall any sources of the numbers

that you were hearing or the allegations that people

were voting who were dead or issues at State Farm

Arena?

A.   I think most of it came from a lawsuit

that was filed against -- I'm not sure -- I think

the Secretary of State was named not too long after

the election.

Q.   Do you recall any candidates or political

parties mentioning that there were -- there was

widespread fraud?

A.   I do.

Q.   And what did you make of those allegations

and the sources that they were relying on to make

them?

　　　MR. FIELD:  Object to form.

　　　THE WITNESS:  Ask that again, please.

BY MR. CUSICK:

Q.   What did you make of the allegations by

political parties or candidates about widespread

election and voting fraud?

CHRIS HARVEY                                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                                            83

MR. FIELD: Same objection.

THE WITNESS: Well, I -- my response was always, where's the evidence? I -- I mean, my -- my whole career in law enforcement has been based on evidence to -- to, you know, make charges or -- or solve cases. And for somebody to -- to make broad claims without any specific evidence, I -- I really question the -- I didn't have any reason to -- to believe something if they couldn't back it up with some evidence.

BY MR. CUSICK:

Q.    Do you recall Rudy Giuliani making any such allegations?

A.    I remember hearing reports of his. You know, I never -- I only saw clips of some things that were on the news, so I want to be careful in saying what I heard him say, but I know it's been reported about what he said, if that makes sense.

Q.    What about Former President Trump and allegations of widespread voting fraud?

A.    I've heard him say, in general terms, yes.

Q.    Do you recall any Georgia legislators making allegations of election or voting fraud?

A.    I don't remember anybody making

allegations of election fraud. I remember some expressing concern about some of the allegations. I -- but I don't -- I don't recall hearing specific legislators saying voting fraud happened.

Q.   Do you think some of the allegations about election or voting fraud resulted from people not fully understanding voting processes in Georgia?

MR. FIELD:  Object to form.

THE WITNESS:  Ask that again.

BY MR. CUSICK:

Q.   For example, with -- you know, if you requested an -- you know, affirmatively mailing out an absentee ballot, which the Secretary of State's Office did for the primary, might one source of a misinformation saying there was fraud, but someone didn't understand that that was a step the Secretary of State's Office did?

MR. FIELD:  Object to form.

THE WITNESS:  Yeah, without getting, you know, into the mind of somebody, my experience has been that the more people understand the election system, the less likely they are to believe that there's widespread fraud.

BY MR. CUSICK:

Q.   So what do you -- what do you make of

allegations that despite not being -- not having seen any evidence in the 2020 General Election cycle, what do you make of allegations of people who continue to assert that?

MR. FIELD:  Object to form.

THE WITNESS:  What do I make of it?

BY MR. CUSICK:

Q.   Yeah, what do you -- what -- yeah.

A.   I guess, in -- in general, I say accusations without evidence are not very persuasive.

Q.   Do you think some of those accusations, as an elections administrator, might create confusion among voters?

A.   Yes.

Q.   Do you think -- you talked earlier about the heroic efforts of poll workers and volunteers. Do you think some of those allegations increased stress and pressure that they faced during the 2020 General Election cycle?

A.   Well, the -- the allegations didn't really come until after the election. So the -- like I said, the -- the -- the November election was pretty smooth. And most of the allegations came about a week after when the results were becoming

clear.

I think they were -- you know, I commented on their -- their -- their dedication and their work because -- and this is the -- the county officials and the -- the poll workers. I mean, they put in tremendous hours at -- at tremendous expense to them and their families to -- to keep the doors open, to keep people who registered, to keep absentee ballots going out and coming back in, so without question, they were the heroes of the -- the 2020 election issue in -- in Georgia.

The -- what effect they may have had after, in the -- the runoff, I think may have -- that may have -- have come in, but I think by that time, I don't think it had -- I don't think it had reached quite a fever pitch at that point. It was -- because you've got to keep in mind after the -- the election, then you had the recount, then you had the audit, and then they had to turn around and get ready for the runoff election.

So while everybody else had the -- the luxury of after November being done, Georgia got to do it all again on a whole statewide basis. So they were -- they were head down, focused on, you know, finishing up the process for the -- the -- the

general election. And they had to immediately turn around, do a full hand audit, which had never been done. And then turn around and get ready to run two Senate races that were going to -- you know, have national and international attention with this stuff on top of it now.

So -- but I -- to answer your question, I think it really became an issue more in the runoff, than in the general election.

Q.   Do you recall any state legislators reaching out to you to ask for data or field any inquiries about allegations of election or voting fraud?

A.   Reaching out to me personally?

Q.   Or the elections division.

A.   I remember I attended a hearing; I think it was a Senate hearing. I believe it was the same day that -- that Rudy Giuliani spoke to the Senate with Ryan Germany and maybe Gabe Sterling. I don't believe I spoke, but -- but we fielded questions then. It wasn't unusual for us to get requests for data after an election. I don't recall if -- if I got any from legislators or not. I -- I may have, I may not have.

Q.   And requests for data ahead of that

hearing, would that have been something you would have been responsible for addressing, or would that have gone to someone else within the office?

A.   Probably would have gone to Ryan Germany, who probably would have gotten directly with the system administrator. He may have mentioned that, hey, we need to pull this, but he -- he may have gone directly to the system administrator to get it too.

Q.   And if Mr. Germany went right to the systems administrator, would you have been copied or told about it, or could he do -- do that -- ask for that data without any -- without going to you?

A.   Oh, he could certainly do it without going to me. He would -- he would often tell me what was going on, but it certainly wasn't a -- a requirement that he go through me.

Q.   Do you recall any actual requests from state legislators that you became aware of for data?

A.   I don't specifically, no.

Q.   What about any requests from the Governor's Office?

A.   I don't recall any.

Q.   Did you have any conversations about the 2020 general election with any members of the

CHRIS HARVEY                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                              89

Governor's office or -- or his staff?

A.   About the 2020 election, I don't believe -- I don't believe so. I mean, I've had conversations with them since then about other things. I saw the Governor maybe a couple -- couple of weeks after the election, and saw him, and shook his hand, and said hello to him, but -- but not -- no, I don't believe so. I don't believe I had any conversations with him.

Q.   Not in your role as elections director.

A.   Not that I recall. I didn't -- I didn't talk a lot with them directly, but if -- if I had come across one of them you know, it wouldn't -- it was certainly nothing formal. If I had passed them in the hall and said how's it going? Say -- you know, had a chat and gone on.

Q.   Would that have been something maybe Mr. Germany and Mr. Sterling or Ms. Fuchs might have been the liaison to the Governor's Office?

A.   I would --

MR. FIELD:  Object to form.

THE WITNESS:  -- I would think so.

BY MR. CUSICK:

Q.   Could third parties reach out to you -- to the elections division for data request?

A.   They could.

Q.   Do you recall any asking for 2020 General Election data?

A.   We -- we always get tons of requests for data after an election. I -- I didn't -- they didn't generally come to me. I mean, they may come to me in an e-mail, but I would forward them to somebody else.

Probably the system administrator or maybe somebody in the IT department, depending on what they're asking. Maybe to Michael Barnes's team. Again, it kind of depends on what you're asking for.

Of course, most of the results are online, so they can -- I may direct them to that themselves.

Q.   We briefly touched base about the -- do you recall the December 2020 hearings that were held, one of which Mr. Giuliani testified in that?

A.   I -- yeah, I remember being in that hearing where I think Mr. Germany did most of the talking. And then we left, and then I found out later about Mr. Giuliani.

Q.   Do you recall if it might have been the Senate Government -- Government Oversight Committee?

A.   It very likely could have been.

Q.   Did you have any involvement in assisting

Mr. Germany in the testimony provided?

A.   I don't recall. I mean, we -- we spoke a lot together. If he had asked me for data, I would have gotten him some. I don't -- I don't recall doing that, but it's possible.

Q.   And do you recall those hearings dealt with addressing allegations of election and voting fraud?

A.   Yes.

Q.   Did you have to produce any materials that you recall in advance of that hearing to any -- any members of the legislature?

A.   I don't recall.

Q.   Do you recall any discussions after the hearing with Mr. Germany or other members of the Secretary of State's Office about it?

A.   I --

MR. FIELD:  Object to form.

THE WITNESS:  I don't recall any.

BY MR. CUSICK:

Q.   All right.

For the other hearing that happened that same day on December 3rd, 2020, do you recall any discussions about Mr. Giuliani or anyone else who testified at that hearing with you and any members

of the Secretary of State's Office?

A.   I remember it being a topic of -- of interest about this video that he was playing from State Farm. So I'm sure I had conversations with somebody about it. I don't remember -- I mean, just because it was all over the news, but I don't remember who, what, or -- or how.

Q.   What did you make of the video -- the State Farm video that -- that you referenced?

MR. FIELD:  Object to form.

THE WITNESS:  What did I make of it?

BY MR. CUSICK:

Q.   Yeah.

A.   I knew the -- I knew the -- the story behind it. I didn't hear all of his version, but I had known what had happened in those events. So when I heard his characterization of what happened, I thought it was false.

Q.   Do you think his characterization of -- his -- his -- as to your -- your term, the false characterization, you think that was misinformation that he was spreading?

MR. FIELD:  Object to form.

THE WITNESS:  Well, again, that gets back to what's -- what's false and what's

misinformation. I don't know the -- the definition of -- of misinformation, but if somebody -- and I don't know the basis of his -- for him believing what he's saying. Maybe he thought it was real, I don't know.

I just know what the circumstances were behind that video. So I knew it wasn't accurate. Now, what he knew about it when he said it, I don't have any idea, but I knew it was not accurate. It was not an accurate story that was being told.

BY MR. CUSICK:

Q.   As elections director, did you have any understanding of -- or any -- any role in -- in assessing misinformation?

A.   Any role in assessing misinformation? We talked -- you know, we talked with the counties about you know, being aware of false claims, misinformation, just in general because it had been a big -- it had been a big part of the whole cyber security sort of motif that they had been on prior to 2020. And we focused with them on verifying everything.

Hey, if something comes across and -- and seems strange, you know, verify, double check,

mostly with regards to like cyber stuff. And so I'm -- ask -- ask the question again about --

Q. I think it might be helpful here. Do you -- is a false claim, is that synonymous with misinformation for you?

A. Yes.

Q. Okay.

So if I use false claim, we can -- we can do that? Yeah.

A. Yes.

Q. For the false claims that were being spread about the 2020 General Election, did you have a concern that it would impact the counties and their ability to conduct elections?

A. Yes.

Q. Did you have any role yourself in helping to address false claims or providing guidance on false claims about the 2020 General Election?

A. Not -- I would say not really. You know, keep in mind that -- like I said before, the counties were -- were trying to do all this stuff after the election, then they're trying to get ready for the next election. Counties were getting bombarded with open record requests and -- and having to respond to that.

That was really -- I think that was sort of Gabe Sterling's job to respond to -- to that. And -- and so after the election, we kind of shifted, and I shifted to really working with the counties and making sure they stayed on track. And I didn't really get into the -- the politics and the press of -- of dealing with that. So I -- Gabe Sterling kind of took that over.

Q.   So based on what you're saying, Mr. Sterling or someone else would have been responsible for actually addressing false claims as -- as a representative of the Secretary of State's Office?

A.   Yeah, Gabe Sterling gave, I think, two press conferences a day for -- in the weeks after the election. And he -- he talked specifically about allegations and things that he could report in contrast to what had been reported, that kind of stuff.

Q.   Did you have any concerns from an election administrative perspective that the false claims might have negatively impacted proposed legislation?

MR. FIELD:  Object to form.

THE WITNESS:  False claims may have negatively affected proposed legislation?

BY MR. CUSICK:

Q. Or do you think false claims might have impacted what legislators were -- were considering?

A. I don't know what the legislators were considering. I just don't -- I don't know where that came from.

Q. I won't hold you to the dates, but do you remember any other hearings in December? There's one on December 10th and December 23rd.

A. I -- I don't remember.

Q. Before the legislative session started in 2021, did you or other members of the Secretary of State's team discuss how to respond or -- to false claims moving into the 2021 election year?

A. Not that I was involved in. How to -- how to -- specifically, how to respond to false claims. Now, that's -- that gets back to what I said before about Gabe Sterling kind of being the -- the spokesperson for the office, and sort of on the public front doing that. I was much more focused on working with the counties and keeping them on -- online, and -- and supported.

Q. Did you follow at all the 2020 legislative agenda or initial proposals that were happening?

A. The 2020?

Q.   2021.

A.   I was aware of a lot of this stuff. I didn't -- I wouldn't say I followed it meticulously because things would get introduced, and things would get changed, and I didn't really tend to start following it until it got done. I was certainly aware of things that were going on.

Q.   Do you think those December hearings at all impacted the 2021 legislative session?

A.   I don't know. I don't know.

Q.   We'll now talk about the 2021 legislative session which began on January 11th, 2021. Before that first day, were you at all involved in discussing priorities or recommendations that the Secretary of State's Office might want to see for that session?

A.   With the exception of one meeting I remember -- again, other than kind of side conversations that I might have with Gabe Sterling or Ryan Germany in an informal setting, like, they step in my office and say, hey, what do you think about this, not in a -- not in a formal way, save one meeting that I remember.

Q.   And what -- what were some of the informal conversations you had with Mr. Sterling, for

CHRIS HARVEY                                    March 10, 2023
IN RE: GEORGIA SENATE BILL 202                           98

example?

A.   Oh, gosh. I -- I couldn't even tell you. I mean, I'd have four or five a day. He'd pop over into my office. He was a -- he tended to not sit still for very long and would come over and have something to say or ask a question.

Again, not specifically like on a legislative issue, just where are you hearing from the counties? What's going on with this? But -- but again, I would have four or five conversations a day with Ryan, and Gabriel, and other people. And it may be -- but it -- it wasn't usually about legislative stuff.

Q.   Did Mr. Sterling, and Mr. -- Mr. Germany, and Ms. -- Ms. Fuchs, did they rely on you as a -- as a source of information for -- for input from counties on legislative priorities?

A.   Sometimes. Mostly -- mostly Ryan Germany would. Occasionally, Gabe Sterling. I -- I didn't have a -- after the election, I didn't have a tremendous amount of contact with -- with Ms. Fuchs, not on a -- a direct basis.

Some, but -- but much more -- her office was across the street at the capitol, and Ryan's office was right down the hall from mine, and Gabe's

was just down the hall, too.

So we -- we met and spoke all the time, sometimes about election stuff, sometimes about other things. But if they did have a question about how the counties would respond to something, they would probably ask me because I kind of had my finger on the pulse of -- of what the counties were up against.

Q.   And I know you -- you -- you were having conversations with many county election officials, but were there any for the 2021 legislative session? Were there any -- any election directors that you gave greater weight to input or have more frequency in talking through legislative items?

A.   I would say so.

Q.   And who -- who were some of those?

A.   One is Tonnie Adams who's the election director, I believe, in Heard County. Joseph Kirk, who's in Bartow County. Lynn Bailey in Richmond County. Nancy Boren in Muscogee County would be somebody.

Those were -- you know, Lynn and Nancy were sort of the -- some of the senior people in elections. Janine Eveler, maybe, in Cobb. And then you know, other people would just call and say, hey,

we need -- you know -- and what I did is I

encouraged them to -- to you know, make their own

voices heard. And say, you know -- hey, you know,

you can speak on this -- on these issues too, if you

have a concern.

Q.   Were there any -- did you -- did you send

any surveys or any -- any kind of formal mechanisms

to gather input?

MR. FIELD:  Object to form.

THE WITNESS:  I think we did a survey on

line wait times. I don't remember if that was

for the general or for the -- or the primary

election. I think Jessica Simmons did that. I

don't think we did.

I don't recall doing formal surveys. I

don't -- I don't think -- other than the line

survey.

BY MR. CUSICK:

Q.   And so for the 2021 legislative session,

who did you consider the primary, I don't know if

legislative team or -- or core set of folks who were

considering and assessing bills, who -- who would

that have been?

MR. FIELD:  Object to form.

THE WITNESS:  In the Secretary of State's

Office? I would say it's Sam Teasley. That was his job. He was like the legislative liaison.

Ryan Germany, Jordan Fuchs, and Gabe Sterling.

BY MR. CUSICK:

Q.   Outside of feedback that you might have offered from counties, what did you consider your role, if any, related to legislative input?

A.   Very little.

Q.   And what -- what other input might you have given outside of feedback you were hearing from counties?

A.   I don't recall giving any feedback, except sort of -- again, through those -- those interactions mostly with Ryan and Gabe about issues that would come up or concerns that they would have. I -- just -- just to give you an example, I -- we talked about the -- the funds before and the funds going to the counties.

So Gabe would pop his head in my door and say, hey, what about -- how about if we do this grant thing where we can do it for this, this, and this, and they send in a receipt, and then we reimburse them at this rate? Is that -- is that -- do you think the counties would like that? I'd say yeah, they do, and boom, he'd be off and doing. So

they were those kinds of conversations. They weren't really in-depth legislative conversations.

Q.   And if -- I guess, how would you weigh -- I assume not all counties agreed on certain legislative proposals. How -- how would you -- would you say that there was a split of a difference, or would you -- if there was like a numerical threshold where most of the folks you were -- you were speaking to would be given greater weight and recommendations or feedback?

A.   You know, it really -- I don't think I ever called the counties and said, hey, what do you think about this? I think it was more -- I'll give you an example. The -- the absentee ballot application deadline.

Almost every county wanted that because they were getting buried by absentee ballot applications that were coming in on Friday before the election. So almost -- I would -- I would guess near a hundred percent would say we want something. Now, what that is, they may -- they may differ on, but that was something that I would think would have been almost universal among the counties.

But it's not like I went out and asked them, hey, who wants this or who wants that? I would

-- I would sort of -- sort of the vox populi, you know, I would hear from a bunch of people and -- but you're right, sometimes they wouldn't agree on something. And really my -- my report to somebody that would ask is -- you know, what are the counties going to think about this?

I'd -- I'd tell them what I thought. I'd say well, it's -- you know, the -- the big counties might like it, and the little counties are -- are not going to like it, or -- or vice versa.

Q. Did you at all ever review actual draft bills or pieces of draft bills during the -- the secession?

A. I think it -- in that one meeting, I mentioned, I -- I believe there was a draft. If there wasn't a draft, they were -- they were certainly talking about things.

Q. I assume this -- this is similar to the consistency otherwise, but did you have any conversations directly with legislators during the 2021 legislative session?

A. In that meeting that I'm talking about, there was at least one legislator in there. You know, I don't -- I certainly didn't have any, what I would consider substantive conversations with

legislators. I mean, I don't -- again, they may have called and asked about something, but -- but really not legislative issues.

I -- I didn't have a lot of contact with -- with legislators. I would sometimes get an e-mail from like their secretaries or something maybe asking for something that I would -- I would get to them, but I -- I really didn't have a lot of conversations with legislators.

Q.   If you did, did you ever have phone calls, or would it have been mostly in person or face-to-face?

A.   If it was on a -- like a constituent issue, I -- they would probably call me. The -- the meeting I'm talking about was an in-person meeting and I'm not sure -- I'm not sure I ever had like a face-to-face, like direct -- again, running into somebody in a hallway and shaking their hand or something. I don't know that I ever really had a -- a big meeting with -- or even a meeting at all with legislators to talk about legislative stuff.

Q.   Would any of the county officials, like Mr. Adams or Ms. Bailey, would any of those folks have reached out to you for input on bills that they were reviewing?

A.   Yes, well, I -- I'm not sure about input. They would -- I know Tonnie Adams, I think he was the legislative chairman of the -- the -- the voter registration -- GAVREO Association. So he would sometimes e-mail me, or I think we had a -- maybe a -- one or two conference calls.

Either when stuff was pending -- I know after 202 was passed, we had some conference calls to talk about what it's going to mean for them in terms of implementing, but I -- I believe I recall a phone call or e-mail from him about some concerns with the -- with some legislation. I couldn't tell you what they are, but that's about the only time I'd hear from Tonnie would be around legislative issues.

Q.   Any other county officials, again, tied specifically to propose their draft legislation for the 2021 legislative session?

A.   I would say the -- basically, the ones I mentioned before. Joseph Kirk. Now, Lynn Bailey retired at some point in 2021. I'm not sure -- I -- I remember going into her retirement party, but -- so I'm not sure how long she stayed in the game, but she was always a source for our office and for the legislature, and somebody that was -- was very, very

highly respected across party lines.

As was Nancy Boren, but it was -- it was usually those -- those people that would contact me about -- with -- with -- with legislative questions or concerns about legislation.

Q.   Would Janine Eveler have been on that list, too?

A.   Yeah, she -- she -- maybe a little bit less so, but she was certainly an authority that was -- was often asked to -- to, I think, speak to the legislature or speak to committees about her experience. She's very well respected also.

Q.   Did you have any interactions with the Association County Commissioners of Georgia related to pending or proposed legislative bills?

A.   You know, I think we did in 2019 about the machines, and the cost of the machines, and the -- because there were questions about like printing costs and paper versus ballot marking devices. And I would sometimes, I guess, get e-mails and maybe talk to -- and I can't recall the guy's name. I can see -- again, I see his face, but the -- their -- their legislative liaison.

Q.   Todd Edwards?

A.   Todd Edwards. There you go.

Q.   I didn't want to interrupt.

A.   No. So I would see him fairly frequently. I don't know that we had a lot of in-depth conversations. I -- I recall talking to him more in, like 2019 about the machine issue more than 2021.

Q.   Did you have any conversations with third parties, like political parties, about any bills or pending legislation during that session?

A.   Not that I recall, but if -- if it -- if I did, it was probably because they called me. You know, my phone would ring, I'd answer it, and -- but I didn't really -- it wasn't my -- it wasn't my practice to -- to talk about pending legislation very much. I would usually forward that on to Sam or somebody else like that. So I don't recall any conversations, but like I said, I -- I -- I spent the day with my phone to my ear and on e-mail.

Q.   Do you recall who that might have been? Who might have reached out to you from the Georgia GOP, for example?

A.   I -- you know, I -- I probably had much more conversation with -- with Democrats than with the Republicans. I don't -- I don't recall speaking with anybody at the Republican Party. I don't -- I don't think I recall speaking with anybody in the

Democratic Party, but they would -- they would call me about -- about ten times more than the Republicans would.

Q.   What about any third parties, groups like non-profit organizations?

A.   We're talking in the 2021 time frame? I don't recall. I -- I could have. I just don't -- I just don't recall.

Q.   Do you know who Javier Pico-Prats is?

A.   I don't think so. I don't recognize that name.

Q.   Crosses out some questions on -- on this, if you -- if you did. You talked about a lot of potential people you've spoken with, is there anyone else that you can recall that you might have had a conversation with or talked about for the 2021 legislative session about bills outside of counties, outside of the Secretary of State's Office, and any legislative members, or political party members?

A.   No, and I -- I -- I feel that if -- if I did, it was probably in response to somebody calling me. We could have -- could have generated a conversation, but I don't recall talking to -- I -- most of the people I talked to in 2021 were people that were upset about, you know, the election. They

were calling with, you know, concerns about the election.

MR. CUSICK: We can go off record for a moment.

(Off the record discussion.)

BY MR. CUSICK:

Q. So Mr. Harvey, we're going to switch gears now and talk about any discussions, I think some of the meetings you were -- you -- you referenced before about legislative stuff. I'm going to -- what has already been marked as Plaintiff's Exhibit 161. This is an e-mail thread initially with Gabriel Sterling, and you, Mr. Germany, and Ms. Fuchs respond on it.

If you want to take a moment just to review it. And this is Bates Stamp Number ending in CD400509009. And this, again, is Plaintiff's Exhibit 161 from a previous deposition.

A. Okay.

Q. Do you recognize this document, Mr. Harvey?

A. I recognize the -- the e-mail address. I don't have an -- an independent recollection of it, but it -- it looks like an e-mail that I --

Q. Yeah.

A.    -- I would have seen.

Q.    Yeah, and I think in -- on the first page there is a response from you saying, "Good for me. Please provide a call-in number for this meeting." Do you see that?

A.    I see that, yes.

Q.    It took place, the meeting, on January 12th, 2021. Do you recall if you attended it?

A.    I remember attending a meeting that was kind of around that time. I -- I don't recall if this is the meeting that I remember.

Q.    Now, I'll represent to you, based on another deposition, I think this was mostly just the Secretary of State's Office staff. Is that the one you're thinking of, or are you thinking of meeting with folks outside of the Secretary of Staff's (sic) Office?

A.    I'm thinking of a meeting with -- with at least one legislator.

Q.    Okay.
      And so I'll have just a few questions just on this e-mail thread. If you go to the -- the first e-mail that begins on the next page and Bates Stamp ending in 9010. It's an initial e-mail from Gabriel

Sterling on January 11; do you see that?

A.   I do.

Q.   And within it, Mr. Sterling outlines what he says are several goals. Do you see some of those?

A.   I do.

Q.   And if you could take a moment just to review that -- the first one he -- he outlines there.

A.   Okay.

Q.   Do you have any sense what he's referring to when he says, "Which adds complexity with no actual benefits to anyone?" in -- in reference to the -- the suggestion here?

A.   I know what he's talking about, party questions on primary ballots, where the parties ask their members, you know, would you support a bill that does X, Y, and Z? And it -- it often creates like a longer ballot and more difficulty building ballots.

I guess, it's his interpretation. It doesn't benefit anyone. I -- that's his characterization, I guess, but I think -- I -- that's what I take he's talking about.

Q.   Fair to say Mr. Sterling is pretty candid?

A.   I -- generally, yes.

Q.   And so the second one here, if you take a moment to review that, beginning with "to download."

A.   Mm-hmm. Okay.

Q.   So at the -- at the end of the -- you see, he's suggesting that some legislators who might have the best of intentions but may not understand the unintended consequences of some of their changes. Do you recall any discussion about that or what he might be referring to here?

A.   Not specifically, but I know that there are -- are times when people say hey, we'll just do this, and then when you talk about the complexity of -- of all the downstream effects of -- it's -- you can't just do that. The system may be -- not allow that to happen. So you have to kind of reign in people that -- that may not understand the complexity of the system.

Q.   In the next page with Bates Stamp 9011, Number 3 says, "Look for big improvements that may be able to gain support." Any recollection there what he might be referring to?

A.   No.

Q.   I think I might know the answer to the next question, but for Number 4, do you at all recall any of the questions that the legislative

affairs team might have been getting in reference to his sentence there?

A.   I think a lot of that -- the -- the questions they're getting had to do with you know, concerns about some of the false claims out there about election fraud, is -- is my -- what I believe that's about. And -- and frankly, a lot of the legislature -- a lot of the legislators didn't understand the specifics of -- of -- or the -- the complexity of the voting system either. So they may have an idea, hey, let's just have everyone do this, not realizing that that may create a lot of problems or be undoable.

Q.   And so I'm going to now show you what has been Plaintiff's Exhibit -- or marked as Plaintiff's Exhibit 85 already. And this is Bates Stamp Number ending in -- or CDR00459897. If you just want to take a moment to review that, Mr. Harvey.

A.   Okay. Okay.

Q.   Do you recall receiving this document, or this e-mail, or reviewing it at any time?

A.   I -- I don't recall. I see that I'm on the -- who it was sent to. I don't have any independent memory of it.

Q.   Do you recall if these were some of the

priorities the Secretary of State's Office wanted to have for the 2021 legislative session?

A.   Most of this stuff looks like stuff I remember having conversations about in various forms or fashions, some -- some more than others.

Q.   And so we'll take just a couple of questions about the bullet points here. For that first one, absentee ballot application deadline to 18 days, do you know who, among the staff or you, supported or might have suggested that change?

A.   I don't know specifically who did. Are you asking if I supported it?

Q.   Or if you knew who first suggested this change?

A.   That was something that -- that, as I said previously, was something that all the counties had -- had complained about. We recognized that it was a big problem. So I think that was something that if -- if all these people were sitting around in a room, I suspect most everyone there would have said we've got to do something about application deadlines, but I don't know specifically.

Q.   And then if -- if you go to the third bullet point, it says, "Fixing the schedule for state and federal runoffs for 2022." Do you see

that?

A.   I do.

Q.   Was there any discussion about reducing the time frame -- the early voting time frame during runoff elections in relation to that suggestion?

MR. FIELD:  Object to form.

THE WITNESS:  At that meeting or in general?

BY MR. CUSICK:

Q.   At that meeting, first.

A.   I -- I don't -- I don't remember the meeting, so I can't -- I can't say at the meeting. My -- my recollection about that issue is that with the -- the 45 days that were required to send out the Yucaipa ballots, that put -- the problem is you would have a state runoff in four weeks, and you have a federal runoff five weeks later.

And you know, in terms of voter confusion, and voter, you know, turn out, you know, going to all -- that was a big problem. And it was a logistical problem, too, with absentee ballots crossing back and forth. It was, I want to say, impossible -- I'm not sure it was completely impossible to run two elections at the same time in eNet for the same group of voters. It would -- that

would have been a -- a huge logistical challenge.

Q.   And do you recall, in reference to this, forwarding an e-mail from Janine -- Janine Eveler to the Secretary of State asking to have them -- asking to have the 2021 Runoff -- federal one later than the December 1st one, for the -- for the -- for the runoff for the general election?

A.   Ask that again.

Q.   Do you remember forwarding anything for timeline purposes from Janine Eveler to the Secretary about the runoff election following the November 2020 General Election?

A.   I don't remember anything from Janine Eveler, but I -- I remember that that was a -- a big concern because we were going to have just that scenario --

Q.   Yeah.

A.   -- and -- and they were going to have to do two statewide elections in very short order, and it would have been just a nightmare.

Q.   Do you recall any discussions at this meeting about the number of days for early voting that should be for a runoff election?

A.   I don't. I -- I don't -- I'm not sure I remember this meeting, but -- so -- and I think the

answer is no.

Q. From an election administrative standpoint regarding downstream effects, if you reduce the number of early voting days, does that downstream increase the potential for more folks to have to vote on election day if there were fewer early voting days?

A. Usually, yes.

Q. And from I guess, an election administrative standpoint, is providing more early voting days to the extent permissible under law helpful in reducing lines that may happen on election day?

A. Yes.

Q. And I don't know what my math would be here, it is -- I think it's the ninth one down. It says, "It seeks to amend the code for eligibility for out-of-precinct ballots." Do you see that?

A. I do.

Q. Was that -- do you know who recommended or who was in support of that provision?

MR. FIELD: Object to form.

THE WITNESS: Again, in this meeting, I don't. I know that -- that we had had conversations, and I -- I think they're talking

about provisional ballots --

BY MR. CUSICK:

Q.   That's right.

A.   -- in -- in that thing. And I know that had been an area of concern. That people had -- had generally gotten to the point where they thought, well, I'll just go anywhere and vote. And it was creating a lot of provisional ballots that create -- again, downstream effect created a lot of work on the back end and -- and -- and actually ended up disenfranchising voters who didn't get a vote for races that were in their actual precinct.

So that was -- and the counties had -- had been concerned about provisional ballots because the -- the rules and the law were a little bit unclear as to what exactly they should do. The -- the State Election Board rule talked about, you know, they can direct the people to their precinct.

You know -- okay, did that mean they should, or they must? If there's enough time -- if there's not enough time, well, okay, what's enough time? How -- how far do they have to go? There was a lot of ambiguity with absentee ballots.

And so counties had expressed an interest in -- in clearing that up. I don't know specifically

at this meeting who -- who may have proposed it or supported it, but that was another one of those. Not quite as much as the absentee ballot deadline, but it was -- was it was probably in the top five of county complaints.

Q.   I'm now -- what are we going to show? This should be Plaintiff's Exhibit 234, that's already been previously marked. It's Bates Stamp ending in CDR00518378. If you want to take a moment to review that.

A.   Okay.

Q.   Now, is this a calendar invite for the meeting you might have been thinking of with members of the Secretary of State's Office and any members of the legislature?

A.   I don't think this is the one I'm thinking of. And I notice I'm not on this e-mail, so -- but this -- this -- no, this is not the -- the one that I recall.

Q.   Okay.

I'll ask you, just before we -- you can flip to the next page and let me take a step back actually. Do you -- you don't recall attending any meeting with any of the representatives listed here, Kay Kirkpatrick, Shaw Blackmon, Mark Newton, or Rick

Jasperse?

A. Jasperse. I don't believe I attended this meeting.

Q. And on the back, in Point 5, there's a question that says, "What are your ideas for how we can restore voter confidence in the Dominion machines?" Do you see that?

A. I do.

Q. Would it be fair to say that there were false claims made about the safety and security of the Dominion machines?

A. Yes.

Q. Would an unintended consequence of legislation aim to address that false claim would that have potentially added complexities without any benefit?

MR. FIELD: Object to form.

THE WITNESS: I object because I can't understand it.

BY MR. CUSICK:

Q. That's a bad question and that's what you should --

A. If you could say it again or rephrase it a little bit.

Q. And so we agree that there was false

claims made about Dominion machines.

A.   Agree.

Q.   And here there's a legislator proposing to restore confidence to address what I assume to be some of those false claims?

A.   Apparently so, yes.

Q.   And so would a recommendation like that, if there isn't actually a problem, might that create complexities from an election administration standpoint without any actual real benefits?

MR. FIELD:  Object to form.

THE WITNESS:  I think it creates -- I think it doesn't help confidence in the -- the machines. Again, I -- I go back to the -- the fact that if somebody makes a claim, I want evidence to -- to support it. I don't think it adds to the complexity of the election administration beyond the fact that you're going to have more skeptical people out there in the -- among the electorate who may cause problems, but from the -- from the -- sort of the inside, from the -- the Secretary of State and the county side, I don't think there was much concern about the security of the Dominion machines.

I think -- I think the people that were -- that were running them understood how they worked, and that they were, in fact, secure, and that the allegation -- many of the allegations that were made were just -- just -- they knew to not be true, but I think it -- it doesn't help if -- if that -- if somebody is saying the machines are not secure without evidence, that makes it harder for everyone to -- to do their jobs and -- and makes the -- the public may be more skeptical.

BY MR. CUSICK:

Q.   Would that be true in the same scenario for false claims about the security of drop boxes?

A.   If there were false claims about drop boxes then, yeah, I would say that would be a -- a similar situation. If there are false claims about any part of the voting system, that's going to be -- you know, you have -- you have things where -- where people have preferences.

Hey, I -- a lot of people prefer to vote in person. They don't -- they may not trust mail-in ballots, or advance in-person, or whatever, but there's a difference between a preference and a -- a false claim about how something happens.

Q.   And so do you think some of the false claims -- or let me take a step back. Are you aware about any false claims about the security of drop boxes for the 2020 General Election, that they weren't safe and secure, for example?

A.   I know -- I don't know of specific allegations. I know there's -- there's been some general skepticism about ballot drop boxes. I -- I -- I think there may have been some issues in some places where maybe the chain of custody form wasn't completed properly, that may give rise to -- to concerns, but it -- it -- my impression is it's more of just a general mistrust of -- of ballot drop boxes than anything specific.

I don't think there were -- yeah, I think that's -- that's where I'd -- that's where I'd stand.

Q.   And so in -- in a -- in a scenario like that, you were hearing from county officials who thought access to drop boxes were helpful for them during the 2020 general election; fair to say?

A.   Yes, that's accurate.

Q.   And in some counties, multiple drop boxes were helpful, especially ones that had big voting age populations?

A.   Yeah, they -- you know, they -- it was -- in some cases, it was kind of a love-hate because they -- they -- you know, you put them out there and then you've got to go get them, and -- and -- and empty them, and count for them, and stuff like that, but generally, they -- the counties responded pretty positively to drop boxes.

Q.   In terms of a greater discretion or flexibility to allow counties to use them in a way that they might see fit?

A.   I'm sorry. Ask that again, please.

Q.   In the sense that the drop boxes or -- for the 2020 General Election, the rules allowed them discretion to use drop boxes in a way that they saw fit?

A.   Within certain guidelines, but they -- yeah, they -- they had the -- the emergency SEB rule, State Election Board rule set some restrictions on use, but -- but within those restrictions they could -- they could use them how they saw a need. And some -- some counties used them more than others, and some counties got more benefit than others.

Q.   Except for the chain of custody form that you referenced, were you aware of any actual

sustained findings of voter election fraud related to drop boxes in Georgia for the 2020 General Election?

A.   I'm not aware of any claims of fraud. I think there may have been an incident or two where maybe a ballot was -- may have been left behind or -- I -- I'm not sure if that would have been -- I think that -- that may have happened once or twice. More of a -- again, just a -- a human error.

I think there was one case where a drop box may have been left unlocked. It wasn't locked properly. It was little things like that, but nothing on any significant scale.

Q.   And it would be fair to say those are more either execution or implementation --

MR. FIELD:  Object to form.

MR. CUSICK:  -- fixes?

MR. FIELD:  Object to form.

THE WITNESS:  Yeah, I would -- they -- they were -- they were basically failure to follow the -- the procedure.

BY MR. CUSICK:

Q.   Not something that there was concern about the actual security of the drop boxes themselves?

A.   I would agree with that.

Q.  And so I guess I'll just ask the question. The -- the meeting that you've talked about with legislators, do you recall when that happened?

A.  I don't recall exactly when it happened. I want to say it was January-ish (sic) of 2021. It was certainly after the -- the runoff. Whether it was mid, late January, I -- I just -- I don't recall.

Q.  And so we'll -- we'll start in order. Who, from the Secretary's Office, do you recall attended?

A.  I was there. Gabe Sterling was there. I believe Ryan Germany was there. Although, I have to say I don't -- I -- I remember some things Gabe said specifically, so I know he was there.

I believe that the -- Jordan Fuchs was there. I don't recall if the Secretary was there. He may have been there. I don't know if Blake Evans would have been there or not.

And -- and they're -- I suspect -- so of -- those are -- those are the people -- and that's -- I know Gabe Sterling was there. I know I was there. I believe Jordan was there. I believe Ryan was there.

I'm not sure about Blake. I would expect for Sam Teasley to be there, although I have to say, I don't have any independent recollection of him

being there. And -- and that's -- that's -- that's

about as far as I can go.

Q.   And then outside of the Secretary's

Office, who else attended that meeting?

A.   I remember specifically Senator Jan Jones

was there.

Q.   Anyone else?

A.   I believe there were one or two other

legislators. I don't know for certain.

Q.   Could Bonnie Rich?

A.   I don't believe so. I don't think I know

who that is so --

Q.   Any -- any legislators who might have been

involved with SB 202, like Representative Fleming?

A.   I'm -- I'm -- I think Representative

Fleming was there, but I'm not positive. He -- I --

I kind of have him and Ryan Germany on the second

lines of confidence that I -- I -- I believe they

were there, but I'm not sure I could swear that they

were there.

Q.   Sure. Do you know who convened or called

that meeting?

A.   I don't. I know I didn't.

Q.   Do you recall what was discussed?

A.   A lot of what we discussed were the -- the

timeline for absentee ballots, the applications, the deadline for submission of -- of absentee ballot applications. I know specifically, those things were talked about. I want to say it lasted maybe 45 minutes or an hour or so.

I don't think it went into everything that was in 202. I don't think there was enough time to -- to go line by line. I remember specifically talking about absentee ballots.

Q. And mainly in relation to when you -- when you could request one, the time frame?

A. Right. The -- the -- the -- when you could -- the earliest you could request one and then the deadline for submitting an application.

Q. Do you recall if this was in reference to a -- an actual bill that was -- you were working at? Or was this more of a discussion of suggestions?

A. I think we were looking at the current law --

Q. Okay.

A. -- and -- and were talking about changes to that. I -- I think. I'm not a hundred percent -- I know we were looking at something. And the -- the -- I remember us coming up with the numbers. A lot of the numbers that ended up in -- in SB 202. So I

suspect it was not -- we weren't looking at a proposed SB 202. I think we were looking at the current law.

Q.   Do you recall who made some of the suggestions for the actual time frame?

A.   I do.

Q.   Who was that?

A.   Gabe Sterling.

Q.   Gabe Sterling. Do you know if there were any notes that were taken or if -- was -- I guess as a general practice, was that -- was that -- would anyone have been taking notes?

A.   Not -- not taking notes for like the -- the whole group -- no. I don't recall taking any notes. It was -- it was more of a -- I -- I got the -- I -- I have the -- the memory that it was more of sort of a first cut at this and -- and okay, we want to do something about this. Let's -- let's start with some ideas.

So I don't remember people taking notes. I -- we -- we normally did not have a note taker like a stenographer or something like that in those kinds of meetings.

Q.   Was there any follow-up afterwards if -- with anyone who attended, if you recall?

A.   Not that I can recall. I -- that's the only meeting of that kind that I believe I participated in. That's -- I have -- I have a very good memory of -- of some of the things at that meeting and I have no independent memory of other similar types of meetings.

And I -- the -- just to clarify when you asked a minute ago about who suggested the -- the -- the -- the -- the number change, I remember the -- the number change that Gabe Sterling suggested is what's in here. I don't know if he was the only one that mentioned a -- a -- a number for the absentee ballot change and request date and stuff like that, but I specifically remember him talking about it. There may have been other people, too.

Q.   Pivoting back to some data questions. Would the elections division -- or I think you said the systems manager who was looking at data, would you have all had access to voting by day and a breakdown -- a racial breakdown of demographic groups, say, for example, the number of -- of black voters versus white voters who voted on a day?

A.   We certainly didn't ever look at that. As far as I know, we never looked at that. I -- if the question -- is the question could you generate a

report that showed that? I don't know is -- is the answer. I don't think nobody ever -- nobody ever brought that up, as far as I know.

Q.   And in -- in this context, when you say we, do you -- you refer to the elections division?

A.   Yeah, the -- yeah, the elections division and people like Ryan Germany, or Gabe Sterling, or -- or something like that. I mean, you could query the system for a whole lot. I mean, it's a big database so you could -- there are a lot of different reports you can run.

I never heard anyone ask about that kind of report. And whether you could run it or not, I don't know. I'm not a -- a database expert, certainly.

Q.   Would there have been a record if such reports were generated and could be generated?

A.   I suspect there would be, but I -- again, I'm not -- I'm not sure. I know that -- that everything -- I say everything, just about everything that you did in the system was -- left an audit trail. I never asked specifically about generating reports, but everything else that was done generated an audit trail.

If somebody went in and changed, you know,

my middle initial from C to -- to V, there would be an audit trail that showed which user did it, what date and time, and -- and people could generate reports. So I don't know for certain that it -- it would leave a record, but that's certainly possible, I suppose.

Q.   As elections director, did you ever consider the potential race -- racial impact of a proposed change or legislation on voters?

A.   Did I ever consider a racial impact? I think -- I think all of my calculations were -- well, I guess you're talking about a legal challenge. Again, I -- I always focused on following the law. And so when you're talking about -- I -- I don't know that I ever made that calculation.

I -- I generally thought of it a little bit more in terms of how is the county going to execute this change? You know, if you were to add three weeks of advance voting to three weeks, okay, what -- that's going to have a huge impact on the county.

That would be my first consideration. Is okay, they're going to need a lot more people, they're going to lot more places, they're going to need more machines, whatever. I don't -- I don't

think -- unless it was something that was just patently, absurdly obvious that -- that I really considered that a lot.

Q. Do you recall discussions at all during the legislative session that ultimately didn't make it into SB 202 but to cabin the amount of weekend voting during a general election to one or two days? For example, a Saturday and a Sunday as opposed to both Saturdays and Sundays?

A. I recall a lot of different variations of what was possible. So I -- I'm not sure I've heard the term cabining before, but yeah, I -- yeah, I remember hearing different variations of weekend voting.

Q. Are you familiar with the term souls to the polls?

A. Yes, I -- yes, I am.

Q. And so -- you know, an example of that -- you know, if -- if a Sunday voting was, you know, for whatever reason changed, do you recall any discussions among the Secretary of State's Office or with county officials about how weekend voting changes or the early voting might have impacted certain demographic groups?

A. I don't -- I don't think I recall any

conversations with anyone about that. And a -- a lot of times because it was the -- the bill was changing so often that, I think, my general approach was let's -- let's wait and see what happens, and then we'll deal with -- we'll deal with that.

I don't recall any conversations with the -- the Secretary of State's Office about that. And I don't think I had any conversations with counties unless they would call to say, hey, I'm hearing this. Is this true? Is -- are they going to do this? And I would tell them the best information I had.

Q.   Would it be fair to say that your input for proposed legislation was really dealing with election administration, to the extent you gave any?

A.   Dealing with election -- what do you mean? I -- could you --

Q.   Providing input from an election administrative standpoint.

A.   Yes. Yeah, that was -- that was my -- that was kind of my charge was to, you know, keep 159 counties moving in the same direction, doing the same thing. I -- I didn't -- I really didn't get involved in politics or stuff like that.

And that's why -- that's why for example the -- the deadline for absentee ballots

applications, I had heard that from so many counties that I knew that was a big concern, but as far as -- as political stuff, I had very little to do with that.

Q.   From an election administrative standpoint, were there any studies or assessments that your office created about the impact of proposed changes in any -- in any way they might impact voters?

MR. FIELD:  Object to form.

THE WITNESS:  I don't -- I'm not -- I don't recall any studies or things like that that we did. I don't recall any.

BY MR. CUSICK:

Q.   Do you recall any discussions about a -- at one point, a photo ID requirement to absentee voting to replace signature -- signature match?

A.   I -- I do remember conversations about that, again, in the mix of everything else.

Q.   And does the elections division have access to data for driver's license numbers or ID numbers?

A.   Yes, that -- that gets sent over from the Department of Driver Services. So we maintain that ourselves, we don't have access to it from the --

but we get it from them.

Q.   And do you know if that data shows a -- a breakdown by racial demographic groups, or it's possible to do so?

A.   If -- if the driver's license data shows that?

Q.   Yeah, shows the race.

A.   I believe driver's license information has that, but I don't know if we get -- I'm not exactly -- what -- sure what we got from DDS, and what we get from counties, but I believe it normally would have race.

Q.   And did you have discussions about who might have and who might not have a photo ID or identification card?

A.   No, I -- the -- I remember at some point, it was probably pre-2021 for some other litigation hearing that, approximately 97, 98 percent of people that were registered voters had either -- who were registered to vote, either had a driver's license or state ID card, but I never -- I don't think I heard any -- any specific racial breakdown of that.

Q.   Okay.

Any studies or assessments of how any of the legislation might impact voters with

disabilities that you recall?

A.   I -- I don't think so. I'm -- I'm trying to think. I -- I -- I don't recall any studies or -- that's what you asked; right? If there were studies to see how it affects people with disabilities? I don't -- I don't believe -- I don't recall any studies like that.

Q.   So would it be fair to say from -- from the elections division that you're not aware of any reports that assessed any impact of SB 202's provision on voters?

MR. FIELD:  Object to form.

THE WITNESS:  I'm not aware of -- I -- I think my answer is no, I'm not aware of any of that. I know I didn't as -- as far as I recall, I never commissioned a study or anything like that. If -- if somebody else had gotten data from -- from IT or from the elections division, they may have generated something. I -- but I'm not -- I don't believe I'm aware of that.

BY MR. CUSICK:

Q.   And even if you -- you know, the elections division didn't commission it, do you recall reviewing or seeing any of those types of reports or analyses?

A.   I don't recall seeing anything like that.

Q.   If there were, would -- who, within the Secretary of State's Office might be or is responsible for commissioning studies that assess a bill's impact?

A.   The only -- the only people that I can think of would either be Ryan Germany, maybe Gabriel Sterling, maybe Sam Teasley because he dealt with the -- the legislature.

Q.   Were you at all involved in any -- do you recall some of the voter challenges that occurred during the -- the -- you know, 2020 General Election, but also during the runoff?

A.   I'm -- I'm aware of some of them taking place. I wasn't involved in them, per se.

Q.   Sure. Were you at all involved in any conversations about SB 202 and any changes for voter challenges or how -- how it might be impacted?

A.   I don't believe so. And so -- so you're talking about conversations with legislators about voting challenges -- changes in SB 202? I don't -- I don't recall any of those conversations.

Q.   Any within the Secretary of State's Office?

A.   No, the only -- the only thing I recall

are some specific counties contacted me with concerns about some challenges they got and being able to conduct them before the election. So I -- I remember having communication with a couple -- couple or a few counties that said, hey, we just got these challenges. You know, what do we do? And my response was, generally, do them.

I mean, the law says you've got to -- you've got to handle them.

Q. But do you -- do you remember some of the basis for some of the challenges? For example, national change of address lists that were used?

A. You know, I -- I don't -- I -- I don't specifically remember, but -- what the individual counties got, but I would get an -- either a phone call or an e-mail from the county director and say, hey, we just got you know, 2,000 challenges. You know, what do we do? And I said you follow the law regarding voter challenges.

I don't -- I don't think we really got into details about what the challenges were for.

Q. As a response, did -- did the elections division issue any guidance written to counties on how they should handle or consider these moving forward before SB 202?

A.   I say -- I -- I may have responded via e-mail to people that asked specifically about it, so that would be in writing. You know, I would issue election bulletins or election updates from time to time on issues. I -- I don't have independent memory of -- of sending one out on that, but it's -- if I did, it would probably be that -- in that form, but I -- I don't recall doing that.

Because it wasn't -- it wasn't a big problem. It was just a relatively small number of counties that had a big number of challenges.

Q.   Now, going to -- now, going to mark as Plaintiff's Exhibit 234 ending in Bates Stamp CDR0009771. And so if you can take a moment just to review this document, Mr. Harvey.

MR. FIELD:  What was the exhibit number?

MR. CUSICK:  234.

THE WITNESS:  Okay.

(Exhibit 234 marked for identification.)

BY MR. CUSICK:

Q.   Okay.

And so at top of this, it's a -- it's an e-mail from -- the last one on March 11th, 2021, from Ryan Germany to -- to Janine Eveler, and you're

copied on this. The title is a substitute bill for SB 241 and HB 531. Were you at all involved in discussions about this substitute bill with either Mr. Germany or Ms. Eveler?

A.   I'm not sure what those bills are. I can -- in reading what Ms. Eveler wrote, I -- I can kind of get a feel for some of it. Again, I don't recall any conversations I had with them about this. Again, Ryan and I spoke all the time about different things.

Q.   Sure. And just to the extent it's helpful, I'll represent that HB 531 refers to House Bill 531 which was introduced to the General Assembly on February 18th, 2021, and this was initially sponsored -- this was Representative Fleming's bill in the House. And then SB 241 was the one that came from the Senate side and was sponsored by Senator Dugan, and those are --

A.   That could have made 202.

Q.   Yeah. Again, just for descriptive purposes.

A.   Okay. I --

Q.   Just to the extent it's helpful, but --

A.   Okay.

Q.   -- I didn't know if that might -- does

that at all refresh your recollection about what this substitute bill might have been?

A.  No, I -- I -- I don't recall any substantive conversations about -- about this with either Janine or Ryan, but -- I -- I just don't have any memory of that.

Q.  Now, turning to -- to SB 202, do you have any sense if anyone in the Secretary's Office was involved in the drafting of SB 202?

A.  I don't know. I -- I don't have any -- I mean, I -- as I mentioned before, in the -- the meeting when we were talking about numbers to put on -- with absentee that ended up in the bill, is that what you mean by drafting? So to that extent, that conversation -- that meeting we were in with Senator Jones, if that means drafting the bill, then I would say yes, I suppose, but not typing it out and coming up with the ideas for it, I don't know.

Q.  Would that have been -- the actual drafting, physically, of the bill, would that have been someone like a Mr. Germany, Mr. Sterling, someone else outside of the elections division?

MR. FIELD:  Object to form.

THE WITNESS:  My understanding is that's done by the Office Of Legislative Council in

the -- in the capital. Now, as far as where ideas come from, that could be, I suppose, any number of sources. So when you say drafting the bill, I'm not exactly sure what you mean by drafting. If you mean physically typing it up, or coming up with ideas to go into it, or both.

BY MR. CUSICK:

Q. Let's start with ideas.

A. I mean the -- the e-mail that -- in the meeting that you presented earlier with the -- the bullet points of -- of things to propose, those are certainly ideas to consider in a -- in a legislative bill. How those were communicated and to what extent they were communicated, I don't -- I don't think I know. Like I said, the -- the meeting I remember -- I remember there were some specific things that were mentioned that ended up in the bill.

Q. We talked earlier about SB 202 and the change to mobile voting units; do you recall that?

A. Well, we talked about mobile voting units. I don't know that we talked about changes to mobile voting units.

Q. Do you know if SB 202 made any changes to a county's ability to use mobile voting units?

A. It did. My answer -- yes, and I believe it

did.

Q.   Okay. And what -- what's your understanding?

A.   That they can only be used in a declared emergency by the Governor under a code section that I can't recall.

Q.   And you mentioned earlier about Fulton County's use of them. Were you aware of any other counties in your conversations that were considering mobile voting units, either for that 2020 General Election or for -- into future elections?

A.   I don't -- I don't think I was aware of anybody else considering it. As I recall, they were very expensive. I don't -- I don't recall. Now -- no, I don't think anybody else. If -- if -- if they're considering, I don't think they shared it with me.

Q.   From an election administrative standpoint, did you have any concerns about mobile voting units' security?

A.   I talked to -- I talked to Rick Barron about this, I think, on one occasion. I think there's a general concern about security when you're talking about something that can be driven away. It's hard to drive away a courthouse. It's easier to

drive away something that has wheels.

So I think I would generally be more concerned about the security of a mobile voting unit than I would be of a stationary building, but I don't think -- I don't think security was -- was really a -- a major issue that I talked to him about.

Q.  You're not aware of any sustained claims of election or voter fraud relating to -- the Fulton County's use of mobile voting units?

A.  No, I'm not.

Q.  I want to -- this will -- this is Plaintiff's Exhibit 217. This is Mr. Germany's declaration that he submitted in this case for the PI. I'm only using it because it references a bulletin on line relief that you -- you had authored, and I'll refer you to those page -- pages --

A.  Okay.

Q.  -- in a moment, but just the reason why it's coming in a declaration in this. And if you could go to -- unfortunately, the pages are not -- it's -- if you look on the top --

A.  Mm-hmm.

Q.  -- it's on Page 23 of 59 in blue.

A.   Okay.

Q.   All the way up. And if you just want to take a moment to review that. This is an official election bulletin October 25th --

A.   26.

Q.   -- 2021.

A.   26th.

Q.   Yes, you're right.

A.   Okay.

Q.   And so from a process point, would issuing this election bulletin have been a decision by you as elections director or would have this been a -- a decision by someone else in the Secretary of State's Office?

A.   It would normally be me.

Q.   And what prompted you to issue this specific bulletin?

A.   As I -- as I read it, and as I go back to my memory, I know that there were a lot of concerns and questions coming in about -- there were food trucks at polling places and what had -- everything seemed to be sort of compounding. There were -- fortunately, we didn't have the issue, number one with militias and armed groups. There had been concerns about that happening.

And there had been a lot of questions about offering things for -- to vote or giving people food and drinks in line to vote. And food trucks showing up, and pizzas being delivered, and -- and all that kind of stuff. And countries were really struggling to figure out what -- to what extent they were responsible for making sure that did or didn't happen.

And then of course, COVID -- COVID-19 was always a -- a recurring theme through the year.

Q.   When you issued this bulletin, were you aware of any sustained findings that somebody had violated any prohibitions on election influencing, voter intimidation related to line relief, or line warming efforts?

MR. FIELD:  Object to form.

THE WITNESS:  We had gotten a lot of concerns from -- from counties. I had gotten phone calls and e-mails that it was getting more and more difficult to sort of keep order in the lines. And as -- as I wrote in here, I mean, you know, at some point if you're giving away meals for people that show up to vote, it goes beyond what had been really the practice of, you know, giving out a cracker, or a bottle

of water, or some peanuts, something like that.

That had been sort of the standard that -- that election officials had -- had sort of allowed. And then you started to have food trucks, and pizza delivery, and stuff that -- that a lot of the local election officials felt like was crossing the line into giving people food in exchange for voting.

BY MR. CUSICK:

Q.   Do you recall any of the specific election officials who expressed that concern?

A.   I think Henry County called with a concern. Now, that would be Amika Pitts. I may -- I may not be a hundred percent right on who that is. I don't remember specifically who the other ones were.

Q.   Would any complaints have been in -- in writing to you from counties?

A.   Not -- no. Oh, they could be by e-mail. If counties had a complaint, they would just send me an e-mail, or they would call me directly, or they would call their liaison who would then come to me and say, hey, you know, this -- this county called about this thing.

Q.   Something like a -- a complaint though, would there had been some paper trail, rather than

just a phone call?

MR. FIELD:  Object to form.

THE WITNESS:  It depends on what the --
what the -- which -- you're talking about
complaint from a county?

BY MR. CUSICK:

Q.   Right. Like, for example, let's say Henry County, if they had a specific complaint, would they have to put that at least in writing?

A.   Not necessarily. They may -- she may just picked up the phone and call me and said, hey, you know, I think this is a problem. What do I do about it? I may talk to her over the phone.

And like I said, my memory is that there -- I got enough of these calls and inquiries from different sources that people were really unclear as to what was acceptable practice for people being given stuff in line to vote.

Q.   Do you recall, even if it's not election director or any counties outside of Henry?

A.   I think Cobb had a bunch of pizzas delivered that they were concerned about. Again, I'm not positive. Now, as I sit here today, I can't -- I just -- I just -- my memory is that I got multiple calls. And you know, generally, to go on an election

bulletin it would be something that would -- more than just one -- one call or one -- one issue.

Q.   At the top of Page 24, the -- the next page over, the first full paragraph --

A.   Mm-hmm.

Q.   -- says the simpler, the better or the simpler, the better on this subject, and then it says bottles of water and crackers or peanuts is reasonable. I think I heard you say that once it gets, I don't know if fancier is the right term, but once it gets -- once the -- it gets beyond that, that that's really a concern from an election administration standpoint, not so much if its water, crackers or peanuts?

A.   Yeah, I'm not sure --

MR. FIELD:  Object to form.

THE WITNESS:  I'm not sure that fancier is my best pros I've ever written, but that's I was -- I was talking about kind of drawing a distinction between a bottle of water, a bag of peanuts, some crackers or something, versus you know, pulling up a barbecue truck and -- and -- and doing that.

So that was -- that was my -- and as you know, the election bulletins are generally

meant to be guidance. It's kind of telling them, hey, this is something, you know, be aware of.

BY MR. CUSICK:

Q.   Would you have had any concerns if, moving forward, the ultimate decision was just if -- if just bottles of water, crackers, and peanuts, just to use these examples, if those were the only things being given out, would you have any -- have had any concerns about voter confusion or concerns of voter intimidation?

MR. FIELD:  Object to form.

THE WITNESS:  I mean that's near what there was down. Now, there's water you can get, peanuts or crackers. That's a -- that's kind of a judgment call for the legislature. I -- I'm not aware of anyone ever, you know, suffering ill effects from not having peanuts or crackers in line to vote.

The wait times in Georgia have been really reduced in most cases so -- but that's a call for the legislature. If they want to do that it -- it wouldn't hurt my feelings if -- if that -- if they did have peanuts and crackers, but I don't think it's really that significant an

issue.

BY MR. CUSICK:

Q.   From an election administrative standpoint, if members of the -- let's say the elections division were giving out waters and crackers to folks standing in line, any concerns with that?

MR. FIELD:  Object to form.

THE WITNESS:  I would -- I would have less concerns with that. If -- again, if everyone was being treated the same, I would have -- I would have fewer concerns with that. I don't have major concerns with anybody doing it.

BY MR. CUSICK:

Q.   Mind relief activities?

A.   Well, again, on a very, very, very limited scale. And that's -- that was the issue is, like I said, the previous practice had been, you know, bottles of water and not a big deal. And -- and then it just kind of blew up into, you know, creating -- you know, creating traffic concerns.

Creating more work for election officials, trying to keep lines straight and keep -- so the -- the less -- less is more, I think. That's my opinion for the election administration.

Q.   And then towards the -- I guess, the middle of the -- of the paragraph, there's a sentence starting with polling places, do you see that? Are meant --

A.   Yes.

Q.   -- to be a sanctuary from political influence, and I think it's better sacrificed some refreshments than to allow perception of political influence from any group. Did I read that right?

A.   Yes.

Q.   And so here, did you have any specific groups in mind or any specific political influencing that was happening when you -- in relation to this statement?

A.   No, any group.

Q.   You'd agree that at the time of the general election and still today, that there are laws in place to prevent political influence at the polling place?

A.   Yes. Yes.

Q.   And what are some of those?

A.   There's no campaigning within 150 feet. You can't wear shirts or stickers with candidates' names, political parties, questions on referendum. There are laws against intimidation, specifically.

There are prohibitions against candidates appearing at polling places after they voted, those -- those -- those kinds of things.

Q.   Were those sufficient safeguards to deter any undue influence at polling locations?

MR. FIELD:  Object to form.

THE WITNESS:  Ask that again, please.

BY MR. CUSICK:

Q.   Were those safeguards that are in place, were those sufficient to prevent undue political influence at polling locations?

A.   In a lot of cases, they were. There's also the -- the no giving or receiving something in exchange for voting, registering to vote, or something like that.

Q.   In crafting -- in -- in drafting this up, did you have any conversations with the Secretary of State's other -- other members of the Secretary of State's team?

A.   I don't recall, but my -- I can tell you what my normal practice would be. Normally, on something like this, I'd probably run it by Ryan Germany and get -- get his thoughts on it. I can't say for certain that I did in the case, but that would -- normally, I had somebody else look at it,

but I -- I don't have an independent memory of doing that in this case.

Q. Would you have consulted or sought feedback from the State Election Board on bulletins or ask them an opinion on it before being issued?

A. Generally, no.

Q. Do you recall doing so for this one?

A. I'm -- I'm all but positive I didn't in this -- this one.

Q. Were you at all involved in discussions during the 2021 legislative session about anything to -- related to line relief or line warming proposed legislation?

A. Not that I recall. You know, when you go back to these points that were on this meeting that I don't remember, it -- it -- it may have been a subject. I -- I don't recall whether I have anything to do with discussions on that.

Q. I'm going to mark as Exhibit -- Plaintiff's Exhibit 235. It's a document ending in Bates Stamp Number CDR00018227. Plaintiff's Exhibit 235.

If you want to take a moment to review that, Mr. Harvey.

A. Okay.

(Exhibit 235 marked for

identification.)

BY MR. CUSICK:

Q.   Do you recognize this document?

A.   I -- I -- I -- yes, I recognize that.

Q.   And is it fair to say you're the last e-mail on that?

A.   Yes, it came from me.

Q.   And so I want to talk a little bit about -- I know that you've talked about your role in provide -- the elections division providing guidance to counties. Is it fair to say the elections division was also the primary department in terms of implementing language to the Secretary of State's Office for new bills or election-related changes?

A.   Say that second part again.

Q.   Would it be fair to -- what role I guess would the elections division have had in hoping to implement a bill like SB 202?

A.   It would really be going over it with the counties, kind of explaining it to the counties. In some cases, breaking it down. I mean, they get a 98-page law with all these things they have to change.

Get it organized. You know, put all the stuff about the different topics in different training -- training events that we for them, but it's really just to, you know, keep them, one, from freaking out, and two, making it a manageable -- something they can -- they can begin to absorb.

Q.   Would it be fair to say that in your time within the Secretary of State's Office, SB 202 was the largest or complex election bill that counties had to implement or comply with?

MR. FIELD:  Object to form.

THE WITNESS:  I would -- as -- as far as legislation goes, probably, I think a -- a more dynamic change actually was the change in the voting -- voting system, which was also a -- a legislative change. It switched from the DREs to the ballot marking devices back in 2019.

The legislation that switched that -- that had much more -- that was like fundamentally changing everything so -- but in terms of -- of stuff that had to do with substance of election law, I would -- I would tend to agree 202 was -- was pretty big.

BY MR. CUSICK:

Q.   Because of how big it was, is that why, in

the second to last paragraph, it says, "We will have a lot of guidance and trainings forthcoming, but it will be taking some time." Is that because SB 202 did create a lot of different changes in election code in Georgia?

A.   Well, it covered a lot of different topics. And a lot of times, you'd have in -- in some counties you'd have different -- you have different boards. And so you'd have issues that a registrar is going to have to deal with that are different than what the Board of Elections is going to have to deal with, or you've got a probate judge and a board of registrars.

So you're going to have to get the right people in the right seats at the right meetings because a probate judge doesn't do anything with absentee ballots except count them. It's the Board of Registrars that does the absentee ballot stuff. So we had to -- we knew it would take time with 159 counties with a big bill to break it down to a point where they could -- they could really understand it.

Q.   Would the elections division have been the primary department conducting trainings for county officials within the Secretary of State's Office?

A.   I would say so, yeah.

Q.   Did you conduct any trainings or would that -- I know, I think you left you said in June of 2021?

A.   Yeah, my last day in the -- in the office was actually the last day of -- of May of 2021, and then I took -- I was technically employed, but I was taking vacation. I remember at least one conference call on SB 202. I don't remember if it was just with the -- it may have been with just the -- the legislative committee of the -- the -- the registrars association, but I had -- I remember at least one phone call kind of going over SB 202.

Again, in -- in sort of general terms with them -- I don't think it was a state-wide call.

Q.   We've talked a little about this in the beginning about voter confidence -- election administration confidence. Could you describe as elections director how, if at all, you took any steps to promote voter confidence within Georgia's election system?

A.   I think the -- the best thing I could do for voter confidence is help the counties perform well. When counties perform well, when they're following the law, when they're following the State Election Board rules, when they're producing results

without a lot of errors, that's what -- that's going to do more for voter confidence than anything I say.

So that was, you know, before the -- before the --the general election, I did some press and talked about voting system and stuff like that. After 2020 General Election, I was pretty much totally inward-facing to the counties and trying to support them, trying to get them what they needed, trying to shepherd them through the runoff and the recounts and the audits and -- and keep -- trying to keep them all from quitting.

So I think that's -- that was the best thing I could do for voter confidence, is help the counties be good at what they do. And they're -- they're generally pretty good.

Q.   Would it be fair to say for some of the false -- false claims we've talked about, that it -- the counties looked to the Secretary of State's Office to address those, as opposed to they, themselves?

A.   To some extent I would say, and that's what Gabe Sterling did, mostly. That was mostly -- he was the -- he was really the spokesperson for the Secretary of State's Office. They still had to deal with a lot, you know, open record requests and

inquiries on their own, but they would look to us. And -- and I got a lot of phone calls from a lot of people about a lot of different things.

Q. Would it be fair to say that showing those claims to be false is a way to promote voter confidence from an election administration standpoint?

A. I -- I -- I think they are a couple different ways of looking at it. You know, that -- that really wasn't my -- you know, that wasn't my mission, that wasn't my focus. Like I said, I was internal. Gabe Sterling was -- and the Secretary were the ones that were -- that were talking to the press and the public of the voters about that.

So I -- I mean, I certainly wouldn't -- wouldn't -- not debunk him if that came up, but it wasn't really a problem with the counties because the counties knew what they had done. They knew had the election had gone. So I wouldn't happen to -- to debunk to the counties the fact that it was a good election.

Q. From an election administrative standpoint, did you notice any decrease in voter confidence due to some of the false claims?

A. I don't think there's a way to measure

voter confidence. I think it's -- it's, you know, stick your finger in the air and see which way the wind blows. I know that just recently, they -- I saw a study that UGA did that said, you know, something like 98 percent of voters are -- now, are confident in the -- the voting system. I don't remember any -- other studies that were done in -- at other points in the -- in the past.

So I don't know how you measure voter confidence, but this latest one that I mentioned is -- is certainly indicative, but again, my focus was trying to keep the counties moving in the right direction, keep their heads up and -- and adapt to -- to what they were -- what they were being handed, which is really the tone of this e-mail. And this -- this is just with the liaisons.

Q.   And even if you can't measure it, as -- from an election administrative standpoint, would you agree that a -- a voter's in-person voting experience can affect their confidence one way or another?

A.   Oh, yes, I -- I would agree with that.

Q.   Would it be fair to say that long lines might decrease voter confidence?

A.   You know, I would somehow agree with that,

but it's -- this is sort of anecdotal, but I was talking with a friend of mine at the Y who went vote who said, I miss the lines. I miss the sense of comraderies. Like, I was in and out in 30 seconds. I didn't get a chance to talk to anybody.

Completely anecdotal scenario, but a -- a six-hour line is certainly is not going to increase voter confidence. The times I voted in the last two elections, I probably waited 15 minutes, maybe 20 minutes. I voted during advanced voting and everyone seemed fine with it.

So I think there's point where you -- where you start to lose confidence when you're -- and -- and I don't know exactly what that point is. Generally, an hour is kind of what the -- 30 minutes to an hour is, depending on the nature of what you're doing. And it's different for advanced voting versus election day voting because if you vote in advance, you're kind of -- you're kind of take what you can get when you show up.

If you go to your polling place, it's probably going to be faster, so it's -- it's -- it's a mix.

MR. CUSICK:  Can we go off record for a moment?

(A break was taken.)

MR. CUSICK:  Thank you so much for your testimony today, Mr. Harvey. The AME Plaintiffs do not have any -- have any further questions. I will turn it to Liz Ryan from the U.S. Department of Justice who, I believe, has some -- some questions.

FURTHER CROSS-EXAMINATION

BY MS. RYAN:

Q.   Hi, Mr. Harvey. Can you hear me okay?

A.   Yes, ma'am. I can.

Q.   Okay.

Good. Sorry it's a bit awkward to be asking you questions over the Zoom, and I'll try to keep it brief. I really appreciate your time here today and hearing -- hearing so much about the work you did in the Secretary of State's Office.

I want to start by asking you just a couple more questions about drop boxes during the 2020 election cycle.

A.   Okay.

Q.   And we talked about it a little bit earlier --

(Off the record discussion.)

THE WITNESS:  I'm sorry I -- I didn't know

if I should face the camera or should -- it feels weird to not be facing you, but I -- then I realized I'm not --

MS. RYAN:  I --

THE WITNESS:  -- looking into --

MS. RYAN:  -- know.

THE WITNESS:  -- the camera.

MS. RYAN:  I know. That's part of the awkwardness that I'm -- I apologize I wasn't able to be there in person. I know -- could you look in both directions at the same time; do you think? You're doing a great job.

THE COURT REPORTER:  It doesn't really matter. I'll just leave it now.

THE WITNESS:  Okay.

MS. RYAN:  You should do whatever is most comfortable to you.

THE WITNESS:  Okay.

BY MS. RYAN:

Q.   So drop boxes in the 2020 elections cycle, do --do you know whether the Secretary of State's Office provided any guidance to the counties on -- on where to locate their drop boxes?

A.   I remember having some discussions. We -- I -- I don't remember any specific advice. I think

it was the -- the general principle is that the counties know best where they -- they'll be most effective. Certainly, somebody in -- in, you know, Early County, Georgia knows where a drop box is going to be much better than somebody sitting on the eighth floor in a building in Atlanta knows.

So I -- I think if any -- if we gave them any direction, it would have been along the lines of -- of trying to distribute them as evenly as possible. In a lot of cases, you -- you only had maybe one, or -- or maybe no drop boxes in a lot of rural counties. I -- I -- but I don't remember any specific guidance about that.

Q.   Okay.

I can't remember whether Mr. Cusick covered this earlier. Do you remember if there were drop box ballot transfer forms in use during the 2020 elections cycle?

A.   Yes. Yes, ma'am.

Q.   Okay.

And I -- I -- Mr. Cusick has a copy of one in the room there in case you would like to look at it, but I don't -- it may not be necessary.

A.   I've not seen them before, but --

MR. CUSICK:  This is Plaintiff --

THE WITNESS:  Okay.

BY MS. RYAN:

Q.   I just wanted to ask a couple of questions about that form, specifically. Do you recall whether you had any role in -- in developing the form?

A.   I probably -- I -- I don't specifically remember. I suspect I would have been involved in the discussion some, but as far as designing it, I don't -- I don't know how to do this so I wouldn't have gone too deep into it, but I probably would've talked about what -- what should be included.

Q.   Understood. I wouldn't know how to do it either, frankly. Do you know someone at the Secretary of State's Office designed that form or decided what to -- what would go on it?

A.   I -- I believe -- I believe somebody at the Secretary of State's Office did. I don't know who.

Q.   Okay.

And do you recall whether it -- it was in use before the June Primary or in time for the June Primary?

A.   I don't remember. I know we had -- we had started talking about it in, like the March-April time frame. Whether they would have gotten any

deployed by June, I don't remember.

Q.   Okay.

What was your understanding of what the -- the point of the drop box transfer forms was?

A.   The -- the point of them was to keep track of -- of ballots. I mean, whenever a ballot is -- is out in the wild, out in the public, you want to -- you want to make sure that you don't have just odd numbers coming back. You know, you've just got -- well, we brought back 300 ballots.

Well, with absentee ballots, you always have an application that corresponds to it. So you got to make sure that all of your numbers reconcile. Now, not -- of course, not every absentee ballot is returned, so there are always some outstanding absentee ballots that are not returned, but you want to make sure that you can at least numbers-wise, have as many applications as you have ballots back.

And -- and because there -- this is the first time we had done anything like this, we figured the more precise they are, the better it's going to be.

Q.   Okay.

Do you know whether the Secretary of State's Office collected copies of the drop box

ballot transfer forms from the counties?

A.   I don't -- I don't remember. Nor -- we had a -- a list of things that they were always returned with their -- their stuff at the end of an election. And because this was the first time we had done it, I -- my best memory is maybe we did not.

And then subsequently, I think, we may have asked for them after -- sometime after the election. I don't think that they automatically returned them to us, but I'm about 70 percent confident in that answer.

Q.   I know it was a long time ago now. You just said you thought perhaps you asked about -- asked for them after the fact. Do you have any memory of when that might have been?

A.   I think it would have been relatively soon after the November election because I think, there were some -- I think there was a question as to -- to whether they were public records which, you know, my understanding is they would be. And -- and so I think we wanted to -- I think we wanted to look at them.

So I would have -- would have thought it probably would have been pretty soon after the election. I mean, I -- I don't think we're talking,

you know, February or March. I think we're probably talking, probably December, January.

Q.   And I realize this may be a long shot, but do you know whether you ever thought of -- of comprehensive collection of the drop box ballot transfer forms back from the counties?

A.   I would be -- I would be surprised if we ever got a hundred percent back from every county. I -- but as I recall, we usually got -- got good -- good returns of stuff like that. I think in some counties -- I -- I seem to recall some counties either didn't use them properly or, in maybe, on some occasions, didn't use them. And so we may be short some, but I -- I think we got -- I think we got back the ones that were existent.

Q.   Okay.

And I think you said a minute ago something like, I'd be surprised if we got a hundred percent back, something along those lines. What makes you say that that would be surprising to get a hundred percent of the forms back?

A.   Well, I think it's because -- I think there was some cases where counties may not have used them, or some -- some teams may have gone out and done it and not used them on a particular case.

So I -- my memory --

Q.   Okay.

A.   -- is that there may have been a few circumstances where somebody got the ballots and maybe didn't complete a form.

Q.   Got it. I understand. And I think we've been talking about the November 2020 election. Do you recall whether you asked for the -- whether you or someone in your office asked for the drop box ballot transfer forms after the January 2021 runoff?

A.   I -- I don't -- I don't remember. I simply don't remember.

Q.   Okay.

     For the drop box ballot transfer forms that you think you got back following the November 2020 election, do you know whether the information from those forms was ever compiled into some other format?

A.   I don't believe it was. I certainly didn't, and I don't believe I saw ever -- I saw anybody in our office that ever compiled that.

Q.   Okay.

     I want to ask you a few questions about provisional ballots.

A.   Okay.

Q.   And how they're -- the sort of record keeping of the provisional voting during the time when you were elections director.

A.   Okay.

Q.   When you were elections director, did the counties keep track of voters who voted provisionally?

A.   Yes.

Q.   How did they do that?

A.   They had a -- each polling place had a list of provisional voters, so if somebody came in and cast a provisional ballot, they would write their names on a list. And they would turn that in and compile them at the -- they should have been compiled at the registrar's office who was -- who is responsible for determining whether a provisional ballot would be accepted.

Q.   Okay.

So this was a -- a hand-written list at each ballot place?

A.   Correct.

Q.   Okay.

And is this the -- the form that's called the numbered list of challenge who are provisional voters?

A.   Yes, I believe so.

Q.   Okay.

Who would fill out that -- that list at the polling place?

A.   Whichever poll worker was manning the provisional ballot station.

Q.   Okay.

A.   And it -- it may -- it may vary from time to time depending on who is working there.

Q.   Okay.

But -- so generally, it was one of the poll workers would fill this out during the day?

A.   Yes.

Q.   Do you recall whether that the list of provisional voters included the reason a voter is issued a provisional -- a provisional ballot?

A.   I know the voter certificate had the reason on it. I -- I'm not positive, but I believe it did list a code for the reason for the provisional ballot, but I'm not a thousand percent positive about that.

Q.   Sure. What's the voter certificate that you just referred to?

A.   It's a provisional voter certificate. You know, voter -- prior to the poll pads, the voter

would -- would come in and especially on election day, they would be about a half sheet of paper. They would fill out their name, their address. They would sign the oath, and -- and that's what they would use to verify their eligibility.

And that would be retained as the -- the voter certificate. Usually, on the back of that form was a -- no. I'm sorry, on the -- I think on the back of that was the handicap affidavit. There was a separate provisional voter certificate, and it was salmon colored. It -- it wasn't pink, it was salmon.

Q.   It's an important distinction --

A.   Apparently so.

Q.   -- in some contexts. Okay. And so that was a separate document from the numbered list of provisional voters; is that right?

A.   That's correct. And on that reason, it would be noted the -- the -- the code or the reason they were voting a provisional ballot.

Q.   So the -- the numbered list of provisional voters, I think you said you were -- you were pretty sure, but not a hundred percent confident it included the -- the reason for the provisional ballot?

A.   I believe so.

Q.   Okay.

And as far as you remember this -- the process you just described with the numbered list, was that the process in place for the whole that you were the elections director or at least for the -- I guess the first federal elections probably in 2016 after you took over?

A.   Yes, the -- the process was -- was unchanged and -- and I think for all the elections that I was the election director for.

Q.   Okay.

When you were elections director, did the counties provide copies of the number of lists to the Secretary of State's Office?

A.   I'm not sure, but I think so.

Q.   Okay.

Well, my next question may be also -- and I'm not sure given that I was going to ask -- do you, if all of the counties -- did you get a hundred percent compliance in -- in getting copies back?

A.   You know, I -- that was a -- that was a little bit hard to tell because some polling places wouldn't have any provisional voters. And so they wouldn't return an empty list so you -- you kind of

don't know, but we generally got -- got good compliance from the counties.

We had a list of everything they had to return. They returned them in these secure bags, and before every election, we sent them a list of everything that should be in that bag. From memory cards to copies of voter -- whatever it was that had to be in there, they would -- they just had a checklist they went down and -- and I believe they were on that list.

Q.   Okay.

But for -- I think you said, if a polling place didn't have any provisional voters, they might not return a blank form?

A.   Correct.

Q.   I see. And so it's a little bit hard to know whether you actually got every single one.

A.   Right, or if they -- if they left one off, you wouldn't know because you just got the ones that they -- they returned.

Q.   Got it. Okay. I want to also go back and just follow up on a couple of things that you and Mr. Cusick talked about earlier. You discussed a meeting that you participated in, I -- I think it was in early 2021, where there was at least one

legislator and a couple of other people from your office, where you talked about some ideas for election legislation.

A.   Yes, ma'am.

Q.   Is that right? Okay.

A.   I believe -- I believe it was sometime in earlier to mid-January.

Q.   Okay. Of 2021?

A.   Yes, ma'am.

Q.   I think when earlier when you were talking about this, you mentioned specifically you remember talking about the -- the deadline for requesting an absentee ballot, that that was something that was discussed in that meeting; is that right?

A.   That's correct.

Q.   Do you remember anything -- any other topics that were specifically discussed in the meeting?

A.   The -- well, the -- the -- the -- I remember the time that you could request an absentee ballot and the deadline for receiving an absentee ballot application were two things that were talked about. The -- the -- the theme of the meeting that I recall was that the sense that elections had -- had gotten too -- too, I guess, long for lack of a

better word.

You had 180 days before where you could request ballots. And then we talked specifically about how some voters wouldn't even remember requesting absentee ballot. And then would show up to vote and then be told that they had an absentee ballot outstanding.

They said, I never got one -- I never requested an absentee ballot. Somebody requested an absentee ballot in my name. This is fraud. So the -- the general theme of that meeting at least at that point, was to talk about how can we -- and I use the term tighten up, not -- not in a restrictive sense, but -- but put a little bit more definition around the election.

Because the fact was there were -- there were more cases than I would believe of people that, for example, voted on the first day of advanced voting, three weeks before the election, and then showed up on election day forgetting -- having forgotten that they voted three weeks before.

So if people were requesting an absentee ballot 180 days before, what are the chances that they're going to remember doing that or want -- so the whole idea was, let's -- let's make the -- the

election a little bit more contained in time. And that therefore -- that was the idea why -- the thought was 180 days is -- is just too long.

And then where do you end it? I think they ended up with 78. You know, they talked about 90. They talked about different numbers. And -- and that was -- that was kind of behind that.

And the -- the -- the deadline for the receiving the absentee ballot application is, as I -- I had said before several times in the course of this deposition, that had been kind of a universal request from the -- from the counties that they were just getting -- their -- you know, it would be 5:00 on the Friday before the election, and they'd get three trays of mail from the post office with absentee ballot applications, that they knew would go -- wouldn't go out in the mail until Monday, would probably be received by the voter Wednesday or Thursday.

And then if the voter shows up, now, they're going to be told they have absentee ballot outstanding, and it's going to slow down the lines and -- and create a lot of confusion. So the idea was space things out in a reasonable way so that everybody can actually accomplish what they're

trying to do.

So if somebody wants to vote by absentee ballot, have your application in by that Friday of the week before the election. They felt confident that they could definitely get their ballot back in three or four days, and have enough time to return it in time to be counted.

Q.   Got it. So I think you said earlier that Mr. -- for the -- the -- the time frame that ended up in SB 202, that Mr. Sterling suggested that time frame. Did I get that right?

A.   Yes, and I remember that specifically because I think, originally, somebody had talked about 90 days. And then he pointed out that well if it's 78 days, it will always be on like, a Monday or a Friday. So you know, I remember him making the point at a time that somebody is going to say 78 is a weird number. Why is it 78 days?

And it was because it would always be on, I think either the Friday or a Monday, which -- which kind of made sense, but it makes -- it makes an odd number for elections. You don't usually see numbers that don't end at zero or five.

Q.   Okay.

And what about the deadline for the

absentee ballot applications sending out at 11 days before the election? Was that something Mr. Sterling recommended as well?

A.   You know, I don't -- I don't remember who came up with that. I think -- I think most people were thinking the Friday of the -- of the week before the election, or the Monday of the -- the -- of -- of -- I'm sorry, the -- the second Monday before for the election or the -- the -- the following Friday.

And the thought was, if you end on a Friday, then that gives the county that weekend to get it all out. So all the ballots should be going out by Monday and it's -- it's kind of done at that point. And that way, they can turn their focus to getting ready for election day, to processing the absentee ballots that have already come in that are allowed to be processed early.

And -- and not have election officials, the last week of -- of advanced voting before the election, chasing their tails, handing all these late absentee ballots. I don't know specifically that he came up with 11 days, but I know that was -- that was -- that seemed to be a pretty good consensus.

Q.   I think when you were talking about it earlier, you mentioned -- well, as you know, there are 159 counties in Georgia. Each with their own election officials, and I -- I think you said earlier that sometimes you got lots of different ideas from the county election officials; does that sound right?

A.   That sounds very right.

Q.   Do you remember whether you -- what county election officials had to say about this particular question? The question of, you know, when -- when the deadline for absentee ballot applications should be in their view?

A.   I remember what some of them said after the -- the 11 days came out. There were some that -- that wanted it a little bit -- a little bit later, like the -- maybe the Monday or Tuesday of the following week.

Q.   Mm-hmm.

A.   And -- and there were some that were happy with where it was, but there was general agreement that there had to be something. And generally speaking, the -- as my recollection is, the smaller counties were comfortable with a -- a little later deadline. The larger counties were more comfortable

with the slightly earlier deadline.

Q.   Okay.

So still talking about this -- the meeting with -- the one meeting that you remember with the legislator or legislators possibly, we talked about the -- the time frame for requesting an absentee ballot, and the deadline for requesting an absentee ballot. Were there any other topics that you remember -- topics of discussion that you remember from that meeting?

A.   Not specifically. No, ma'am. I don't.

Q.   Okay.

I'd like to go back to an exhibit that you already looked at today, Exhibit Number 85, if you still have that in front of you.

A.   I have the exhibits, but I don't have them numbers, so if you can describe --

Q.   Oh, sure. Yes, it is -- would you like the Bates number on the bottom, or do you want me to describe it? What's easier?

A.   Bates number is fine.

Q.   Okay. It ends in 897.

A.   Okay. I've got it.

Q.   Okay.

So this is the Abigail Horvath's notes

from the meeting that happened within the Secretary's office around January 12th. Does that look right to you?

A.   Yes, ma'am.

Q.   Okay.

    And I remember -- I think you said you don't have specific memory of this meeting; is that right?

A.   That's right. And in the -- I noticed, I think on the -- I think on -- one of the e-mails about a meeting on that date, I asked for a call-in number. Is that this e-mail?

Q.   Yeah, I think that was Exhibit 121 --

A.   Yeah, it says --

Q.   Do you want it?

A.   It's good for me. Please provide a call-in number, which -- which leads to me to believe that I had -- I was -- I was calling in, so I -- I don't have a specific memory of it, but --

Q.   That is fine. I actually -- I'm just referring you back to this exhibit just as a jumping off --

A.   Okay.

Q.   -- point really. There are a couple of topics from Ms. Horvath's notes I wanted to ask you.

You talked about with Mr. Cusack, and I just wanted to ask a couple of follow questions. So the first one I wanted to ask about is, about halfway down the list of purple points, there is the bullet point about requiring photo ID for absentee applications and ballots and removing the signature match.

A.   Yes, ma'am.

Q.   Okay.

I just want to ask as couple -- a couple more questions about that particular suggestion. Did -- do you recall whether county election officials requested this change?

A.   I don't -- I don't know specifically on photo ID. I know that a number of county officials had expressed sort of frustration with the signature match because it seemed so subjective. And they were getting, you know, they were getting a lot of questions about that.

Whether photo ID was specifically asked for by the counties, I don't know. I don't -- I don't recall a lot of specific requests for photo ID, but I do remember hearing from -- from multiple people that the signature match was problematic.

Q.   Okay.

Do you -- do you remember having

discussion with anybody during the 2021 legislative sessions, so just in that time period, about whether voters would be able to use their Social Security Number on an absentee ballot application in lieu of a driver's license?

A.   Yeah, I think that was -- I think that was -- I -- I -- well, let me back up. I don't remember specifically having a conversation about Social Security Numbers, but I remember the -- the -- the topic generally, of what could we use instead of a signature.

What is something that we could use instead of a signature? And -- and my understanding is that you can't use your Social Security -- last four of your Social Security if you don't have a driver's licence number, but I -- I don't remember specific conversations along those lines.

Q.   Okay.

Do you remember whether -- when you said you remember conversations about what -- what could we use instead of a signature, do you remember whether Social Security Number was among the -- the possibilities that you discussed?

A.   I -- I don't -- I don't remember. I mean, I don't even remember those specific conversations.

I just remember, kind of, coming to the conclusion or having conversations of saying, we got to do something besides a signature and -- and what could some of those things be?

And given -- given that I know those conversations happened, it -- it's my strong suspicion that there was some idea of Social Security Number, driver's license number, some -- recognizing that not everybody has everything. We've got to have provisions for people that don't have a driver's license, people that don't have a Social Security Number, and -- and we had to deal with those contingencies.

But again, that wasn't a -- a specific conversation I remember. I know -- just remember those are -- those are problems that we have to overcome.

Q.   Okay.

I think there's one more bullet point I wanted to ask about relating to provisional voting -- that is maybe three more below the photo ID. It says, "Seek to amend the code for eligibility for out-of-precinct ballots."

A.   Yes.

Q.   And I think you -- you said earlier, you

understand that to be talking about out of our precinct provisional ballots; right?

A.  Correct.

Q.  And I think when you were talking with Mr. Cusick earlier, you mentioned that some county election officials had raised concerns with you about -- was it the volume of out-of-precinct provisional ballots they were processing?

A.  There were -- there were kind of two issues. One issue is that, especially in more -- larger counties, people had sort of adopted the practice of, you know, well, I'll just go anywhere and vote on election day because I know that I get a provisional ballot, and I don't really care about who is my city Councilman or whatever. I just want to vote for president, or senator, or governor, whatever.

And so that had become much more common. That used to be the exception, and that -- now, that had become sort of common. And the other thing was that the -- the State Election Board rules that were in existence the -- the whole time I was there were a little vague about what -- what you had to do, what you couldn't do, what you must do.

And different counties sometimes came to

different conclusions on what it meant to allow somebody to vote a provisional ballot. It wasn't even clear if -- if they had to offer a provisional ballot or if the voter had to ask for one. So if -- if somebody showed up at the -- in a wrong polling place, did the poll worker have the obligation to tell them, you can vote a provisional ballot here, but it won't count down ballot race, blah, blah blah, blah, blah.

        And so there was a -- those two things, the fact that it was happening more and more, and the fact that there wasn't really a lot of specific guidance, really caused a lot of frustration among the county election officials.

Q.   Okay.

        Do you remember specifically which county election officials or from which counties you have heard either of these categories of complaints about out-of-precinct voting?

A.   Over the years, I know Gwinnett County had a big problem with it. Fulton County had problems with it. Those are the two biggest counties that I recall in, but even smaller counties because they did -- they didn't want to do anything wrong. They were -- they -- they wanted a definite answer.

They wanted me to tell them, okay, do I have to offer them a provisional ballot? And -- and some -- some counties would take the position that if the voter didn't say the words, I want a provisional ballot, they didn't have to offer it. And other places were -- were offering provisional ballots when the voter would likely have gone to their proper precinct and voted their -- their whole ballot.

I'll give you -- I'll give you another example. And I think this was in the 2020 election, although it may have been 2018. A State Election Board Member called me up pretty early in election day and was complaining that students, I believe, at the University of Georgia who went to vote were being told, no, you're still registered in your home county.

You have to go home to vote and were not being offered provisional ballots. And a little bit later that day, he called about a different campus and said that -- that students were going to vote and were being given provisional ballots even though they were registered in another county. And -- and they -- that's not going to count.

So if you give some -- if I give somebody

a provisional ballot in DeKalb County and they're registered in Gwinnett County, that ballot is not going to count. And so I said -- this is the same State Election Board Member, I said, well, which -- which one do you want? You called to complain that they weren't getting the provisional ballots in the first one, and you complain that they are getting them in the second one. So that's -- that's part of that whole confusion that -- that really kind of reigns supreme with provisional ballots.

Q.   That makes sense. And when your -- what's your memory of when you started hearing these concerns about confusion from county election officials, like which elections cycle?

A.   Oh, I remember hearing that as -- as early as 2016. And I remember -- frankly, I remember hearing it when I was in investigations -- when I was the chief investigator. I would have -- we would have cases like that where somebody would not be given a provisional ballot, or they would be given a provisional ballot and they would complain about what happened to it, or they were given a provisional ballot and their complaint was, well, they should have told me it's not going to count if I'm voting in the wrong county.

Instead, they just gave me a provisional ballot. I voted it and assumed that it would count, but I found out after the election that it didn't count at all. And so that -- that's -- that's been a persistent theme. The -- the guidance around -- or the rules around provisional ballots have been a problem for years.

Q.   Do you remember talking with any of the counties who had these concerns about whether an amendment to the rules -- the SEB rules would help address their concerns?

A.   I -- I do remember -- I -- I don't have specific memories, but I remember at a -- at a conference with the election officials, probably, pretty early in my tenure, maybe 2015 or 2016, having a -- a sort of roundtable discussion with them about their different ideas for provisional ballots. And -- and really a desire for more guidance of what to do -- specifically, what to do.

I'll tell you -- from -- from our perspective, what I told them and what every secretary that I've known has told them, the -- the phrase was when in doubt, give it out. If somebody is asking for a provisional ballot and they're -- they're asserting that they want one, you give it

them, even if you know it's not going to count. They're registered in Savannah, and they're voting in Atlanta, and they ask for a provisional ballot, you give it to them.

Q.   Do you know whether the State Election Board ever took up the matter of trying to revise the -- the rules to address these concerns -- concerns?

A.   I don't recall them ever taking it up, but they -- they had several -- almost -- I would say several plus cases that were brought to them of counties, you know, doing it and then being found to have done it wrong. So I think they were aware that it was -- it was a -- a gray situation, and -- and they -- they never decided to -- to do anything with the rules.

Q.   And based on the -- the kinds of concerns or confusion that the counties were describing to you, do you think a revision to the rules -- the SEB rules would have clarified what the county should have been doing?

MR. FIELD:  Object to form.

THE WITNESS:  If they wrote it clearly, it would. If they -- I mean, the -- the rules that they -- they provided, I think were -- were

confusing and -- and not clear. So if they provided clear rules then -- you know, language like, if there's enough time for the voter to get to their polling place.

Well, what does that mean? If -- if you have a car, you may be able to drive five miles in -- in three minutes. If you don't have a car, five miles is something you don't have enough time to -- if it's noon, much less 5:30.

So if -- if they wrote good rules, it would help. If they wrote unclear rules, it wouldn't help.

BY MS. RYAN:

Q. Mm-hmm. Okay. And I -- I'm sorry to repeat myself. I think -- didn't you just say that you -- they did not attempt to -- the State Election Board did not attempt to revise the rules around out-of-precinct voting while you were elections director --

MR. FIELD: Object to form.

BY MS. RYAN:

Q. -- as far as you know?

A. As far as I know, they did not.

Q. I think the other topic that you mentioned -- other sort of area of concern around

out-of-precinct voting, in addition to the -- the county election officials being a little bit confused about when -- when to offer and when not, was that you had the impression that, at some point, voters started to think they could just go anywhere to vote on election day. Is that -- am I paraphrasing accurately?

A.  Yes, that was -- that was becoming a growing -- a growing trend. Especially in -- in some of the larger counties.

Q.  Okay.

Do you remember when -- like, what election cycles your -- you -- you were talking about when you identified this -- this issue?

A.  I know it was a problem in 2018 -- in the 2018 election. And that was, I want to say, primarily, in Fulton -- Fulton County and Gwinnett County, and maybe DeKalb County.

Q.  Okay.

A.  And then it was -- I'm trying to think. I don't know -- I don't remember how big a problem it was in 2020. I mean, I -- I can't really quantify how big it was, but there seemed to be -- again, hearing from the counties, it seemed to much more common for people to -- to go to the polling place

knowing it wasn't their polling place and -- and really not caring.

And I think some of that may have had to do with the fact that during advanced voting, you could go to any place in the county and vote. You don't have to go -- you to have an assigned polling place for advanced voting if there are more than one in the county.

And so people think, well, if I can go anywhere and vote in the county during advanced voting, I can go anywhere to vote on election day. And -- and so it -- it was just some kind of -- something that -- that people had started doing more and more.

And it really creates a -- a problem on the -- on the back-end in terms of reconciling all this stuff, and it takes longer to get results. Like I said, it -- it often sort of unintentionally disenfranchises voters if they're not aware that they're not going to -- their vote isn't going to count if they're registered in a different county, or they're not going to get their full down ballot votes in.

Q.   You mentioned it can create a problem, I think you put it on the back end. Are you referring

to when the counties then have to process the provisional ballots?

A.   Yes, ma'am. It take -- because depending on the -- the -- what the issue of -- so if it's an out-of-precinct, they're going to have to duplicate that ballot. They're going to have to get, you know, a team of people to -- to research it, find out where this person should have voted, get a copy of that -- their actual ballot, and then duplicate the ballot as far down as -- as possible.

And it -- it takes time. People seeing people filling out ballots after the election, you know, not understanding that, hey, they're duplicating an out-of-precinct provisional ballot. All -- all an observer knows is I saw them marking ballots, you know, the day after the election, there, in the warehouse.

It -- and it just takes a lot of -- a lot more time. It delays results, all of which tends to decrease voter confidence.

Q.   And do you remember specifically, any -- any particular counties that raised that concern about the -- the -- the time and work on the back-end in the 2018 or 2020 election cycles?

A.   I know I -- I -- I want to say Fulton

County, in 2018, had a lot -- there was a -- a polling place, I think it was -- I want to say it was the -- somewhere downtown. The Clark Atlanta polling place, I think, which is the Clark University, that was -- that was given extended hours because they had had some problems.

And -- and people were just saying, go there and cast a provisional ballot. Just -- just get in there, and get a provisional ballot, regardless of -- of where you are. You know, these are two extra hours of voting.

I remember, they -- we had to -- we had to help them send state troopers over with more provisional ballots because people were just flooding in there, casting provisional ballots, kind of -- I know it's not illegal from willy-nilly, just sort of getting them in there. So I know that was a problem at Fulton County in 2018.

In -- and Fulton County has -- has had other problems with provisional ballots. I mean, to go back as far as 2012, they had a major problem with provisional ballots. I know that's kind of out of the time frame.

I believe Gwinnett, in 2020, had some -- had fair number of provisional ballots that -- that

caused issues.

I mean, they are always some provisional ballots. That's going to happen anytime, but given all the stuff they had to do after the election in 2020, with the recount, with the audit, provisional ballots are just one more thing on top of that.

And now, audits are required after -- after general elections, anyway, so now that's -- that's going to be a permanent feature. That was -- 2020 was the first time they had done it, and nobody expected to do a full hand recount because of audit, but -- but that's what we got.

Q. Mm-hmm. Okay. Do you know whether the -- the number of voters casting out-of-precinct provisional ballots had actually increased over the time you were elections director or whether it had?

A. I -- I don't know that I ever saw a report. My -- my sense is that it had.

Q. Do you remember whether you -- you went to look for any data that -- to confirm the sense?

A. No, ma'am. I --I don't think I saw any data. I did -- that's -- that's my sense in -- in talking to election officials.

Q. Okay.

Do you remember any conversations during

the early part of 2021, during the legislative session, about how voters would be impacted if out-of-precinct ballots were no longer counted?

A.   I don't -- I don't believe I was part of any conversation about that. I -- I don't think I was part of anyone. I -- I don't recall any conversations with people about that.

Q.   Going back to the records on provisional ballots, I -- when we were talking about the numbered lists earlier, I realized I had another question I forgot to ask you. So I think you said you are pretty sure that counties would provide copies of their numbered lists to the Secretary of State's Office; is that right?

A.   I believe so.

Q.   Do you remember any other ways that the counties provided information about out-of-precinct provisional voting, specifically to the Secretary's Office?

A.   Not -- not that I can think of. I don't --

Q.   I --

A.   I -- I'm going trying -- I'm trying to remember if it's -- if it's noted in the voter registration system. I think it's -- I think a -- a ballot is voted -- who is accepted provisional is --

is noted that it's a provisional ballot, but I don't know that it contains the code for why -- why they're voting provisional ballot.

Q.   Got it. Do -- are you familiar with the -- I think they're called the provisional ballot surveys that counties complete? Does that ring a bell?

A.   I think that -- I think that started -- I think that started with the advent of SB 202. I don't -- I remember -- I -- I don't think they had to do that in 2020 or 2021. Maybe it's just a different term. I -- that doesn't -- that -- it rings something of a bell, but I -- I can't put my finger on it.

Q.   That is absolutely fine. So other than the -- the numbered lists of provisional voters and then you know, when somebody gets credit for voting provisional ballot, noting that on eNet, do you recall any other -- any other sort of formats in which the counties report to the Secretary's Office on out-of-precinct provisional ballots?

A.   No, with the exception of I -- I think it may have been by court order after 2018. For that specific election, I think a judge ordered that they had to put a list on their website. Maybe it was

2020.

I think it was 2018, where, for that election, they had to create a public list -- publicly -- I think a public list on their website of all their provisional ballots, but I think that was one court order for one election.

Q.   Okay.

I'd like to -- if I could get Mr. Cusick to show you a document that I would introduce as an exhibit.

MS. RYAN:  This is John, the one where the Bates label ends in 16942.

MR. CUSICK:  Yeah, this will be Plaintiff's Exhibit 236.

THE WITNESS:  Okay.

BY MS. RYAN:

Q.   So let's see, do you -- do you recognize the document, Exhibit 236?

A.   I -- I -- I recognize it as -- as being -- having my e-mail on it. I don't -- I don't have independent memory of it, but I -- I recognize it.

(Exhibit 236 marked for identification.)

BY MS. RYAN:

Q.   It's -- it's an e-mail from you dated

February 17, 2021, to Mr. Evans and Mr. Sterling; is that right?

A. Yes, ma'am.

Q. And you're responding to an e-mail that Mr. Evans had -- had sent where he -- it looks like provided some comments in the response to a draft legislation to -- to you and Mr. Sterling; is that fair?

A. Yes, ma'am.

Q. And in your e-mail, you wrote that you -- you agreed with Blake's analysis, especially about accounting for provisional ballots, and then there is a parenthesis in which you said, "Provisional ballots aren't really a problem that needs to be solved, in my opinion." Do you remember what -- what you were talking about or what you meant by that -- that comment?

A. Yes, ma'am. I'm talking about the reporting of provisional ballots on -- immediately on election night. The -- the question is -- is about a -- a provision -- a proposed provision of the law that would put a -- it would put a big burden on the election officials and slow down the -- the election returns on election night.

And -- and so that's what I meant by,

they're not a problem that needs to be solved on election night.

Because they're -- you know, they're usually a very small part of the total vote, and except in the closest of closest races, aren't really going to make that much difference. Doesn't mean to say they're not important, but given the -- the focus on getting election returns accurate and quick, they weren't part of the problem -- they -- provisional ballots weren't part of that problem.

Q.   Got it. When Mr. Evans testified a week or two ago, he talked a little about the election night reporting system. Is that what you're referring to, that they're -- the reporting on election night?

A.   Yes, and -- and -- and also the -- they were talking about having to post those numbers on the websites after -- like by the next day. And you know, one of my concerns was that, while it's really important to get accurate results.

What I think the legislature didn't understand was, you had people that have been working since 4:00 in the morning on election day, three weeks -- and for the three weeks before, every day, probably 16 to 18 hour days and you know, they want everything done that night and available, you

know, before you have your coffee the next morning, and realizing that that might put more of a strain on the election's votes than they could do.

And as you get more tired, may be more prone to make errors. And so I was -- well, I -- I agree that it's important to get accurate results quickly, I think you also have to be realistic about the demands on people. And if you push too hard, you're going to you -- you increase the likelihood of mistakes, which are going to do nothing for voter confidence. So that -- that was, I think, the nature of this -- this e-mail and this proposal.

MS. RYAN: Got it. Okay. Thank you very much. I think those are all of my questions. I would appreciate if you guys would just give me two minutes to look through my notes.

I don't know if anybody else from the Plaintiff groups wanted to ask any questions.

MR. ZATZ: I've got just a few questions I could ask very quickly while you're finishing your notes, Liz.

FURTHER CROSS-EXAMINATION

BY MR. ZATZ:

Q. Hi, Mr. Harvey. My name is Cliff Zatz. I'm here on behalf of the Concerned Black Clergy of

Metropolitan Atlanta Plaintiffs, and I wanted to ask just a few follow-up questions about drop boxes.

A.   Yes, sir.

Q.   You told Ms. Ryan that if the Secretary of State's Office gave any advice to the counties about locating drop boxes, it would have been to locate them as evenly as possible. What did you mean when you used the word evenly?

A.   Evenly in a way that would be -- wouldn't show any preference to particular region, particular population center, anything like that. Something that you could -- the same way that the -- one of the requirements of the law is that you have poll workers that represent the -- the community, that you just use them in a way that doesn't advantage or disadvantage any one group.

Q.   And did you mean evenly well to include -- evenly as to rational -- racial, or ethnic, or other demographic groups?

A.   Not specifically. Just to consider everything. As I said, when the counties are putting -- they're studying polling places, they're -- they're making all these decisions, they know where they'll be most valuable. And if it -- if it happens to be that, you know, 90 percent of -- of a group

lives in this area, that's where they're going to be most valuable, so we -- we generally left it up to the counties.

Q.   Was it your experience as an election director that proximity of drop boxes to voters' homes or workplaces was an important consideration to them in -- whether they used drop boxes to vote?

A.   Well, I didn't have that much experience. I mean, we just -- we just did this in 2020. I, actually, after we did this, was working with a group from the University of Southern California that had done some -- some studies, and they had a lot of data, and they were interested in working with Georgia. And they had done everything from traffic patterns to -- I mean, they had -- they had more maps and overlays that showed how they could -- they could pinpoint where drop boxes would be the most effective.

And it didn't -- as I recall, it didn't necessarily have to do with where you lived as much as how you traveled. So we really had the experience in -- in one or two elections. And so I don't really have a -- a -- a really good feel for how well or poorly they were placed or -- or what would make the difference, but I know there are people out there

that -- that know a lot more about it then I do.

Q.   When you say how you traveled, do you mean, for example, whether a voter had a car or had to use public transportation?

A.   In this analysis, the University of Southern California, they -- they combined all that stuff. I mean, they had pedestrian traffic, they had public transportation traffic, they had private traffic, and they were able to pinpoint -- they had businesses that were in the area, restaurants, businesses, whatever.

And they, through some very complex analysis, would say, this corner right here is going to get the most traffic, and this is where you should put a -- a drop box. Again, I didn't really get too far into it with them. We were just having discussions with them, and -- and then I left the office in -- in May of 2021, so I don't know if that conversation has continued or not.

Q.   Did you ever see any evidence that locating drop boxes outdoors resulted in voter fraud?

A.   No, I did not.

Q.   Did you ever see any evidence that making drop boxes available 24 hours a day resulted in any

voter fraud?

A.   Not that I'm aware of. No, sir.

Q.   Did you ever see any evidence that making drop boxes available seven days a week resulted in any voter fraud?

A.   No, sir.

Q.   Did you ever see any evidence that keeping drop boxes under video surveillance as opposed to in-person surveillance resulted in any voter fraud?

MR. FIELD:  Object to form.

THE WITNESS:  I'm not aware of any voter fraud involving any drop boxes under -- whether under video or human surveillance. I don't know. Does that answer your question?

MR. ZATZ:  Yes, it does. Thank you, Mr. Harvey. That's all I have. Back to you, Liz.

MS. RYAN:  Thank you for giving me those few minutes. I don't have any more questions. I really appreciate your time, Mr. Harvey.

THE WITNESS:  You're welcome.

MS. AMERI:  If there's enough time, I -- I'd love it to ask just two questions.

FURTHER CROSS-EXAMINATION

BY MS. AMERI:

Q.   Hi, Mr. Harvey. How are you?

A.   Hello.

Q.   My name is Mana Ameri. I'm here for the Georgia NAACP Plaintiffs.

A.   Okay.

Q.   During -- during the 2020 elections cycle as elections director, do you recall having any concerns about how counties were addressing voter challenges?

A.   No, I don't think so.

Q.   During the 2020 elections cycle, were you aware of any instances where counties were limiting the number of challenges an elector could make?

A.   No.

Q.   And so for the elections that took place after SB 202 was passed, do you recall whether counties reached out to you or their county liaisons about any issues they were experiencing with addressing voter challenges?

A.   I don't -- I don't think I was -- I think I had left the office before they actually had any elections under SB 202. I left --

Q.   Got it. I understand.

A.   I left in May. I -- there may have been an odd special election somewhere --

Q.   Okay.

A.   -- but I don't think they're any state elections.

MS. AMERI:  Right. Okay. And that's it for me, then. Thank you.

MR. FIELD:  Nothing from us.

MR. ZATZ:  Nothing from us.

THE COURT REPORTER:  What would you like to do about signature?

MR. FIELD:  Oh, we'll read and sign, and I think there's a standing order, but we'll order the transcript.

THE COURT REPORTER:  Okay. Would you like the transcript, as well?

MR. CUSICK:  Yes.

(Deposition concluded at 3:36 p.m.)

D I S C L O S U R E

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Esquire Deposition Solutions.  I am not disqualified for a relationship of interest under the provisions of O.C.G.A. 9-11-28(c).

I was contacted by the offices of Esquire Deposition Solutions to provide court reporting services for these proceedings.  I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-34 (a) or (b).

I have no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

I will charge my usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

DATED: March 22, 2023

_____
Stephen Mahoney
 Certified Court Reporter
4921-4880-0199-0656

CERTIFICATE

STATE OF GEORGIA

COUNTY OF COBB

I hereby certify that the foregoing deposition was reported as stated in the caption and the questions and answers thereto were reduced to writing by me; that the foregoing pages represent a true, correct, and complete transcript of the evidence given on March 10, 2023 by the witness, Chris Harvey, who was first duly sworn by me.

I further certify that I am not of kin or counsel to the parties in the case; I am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case. The witness did reserve the right to read and sign the transcript.

DATED: March 22, 2023


_____
Stephen Mahoney
 Certified Court Reporter
4921-4880-0199-0656

In Re Georgia Senate Bill 202
Esquire Job No. J9374144

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the_____day of _____2023.

_____
Chris Harvey

CHRIS HARVEY
IN RE: GEORGIA SENATE BILL 202

March 10, 2023
215

DEPOSITION ERRATA SHEET
J9374144

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

SIGNATURE:_____ DATE:_____

      Chris Harvey

# DEPOSITION ERRATA SHEET

## J9374144

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

Page No.___Line No.___Change to:_____

_____

SIGNATURE:_____ DATE:_____

Chris Harvey

CHRIS HARVEY
IN RE: GEORGIA SENATE BILL 202

**Exhibits**

**9374144 Chris. Harvey PLAINTIFF. EXHIBIT234**
6:13
119:7
140:13,19

**9374144 Chris. Harvey PLAINTIFF. EXHIBIT235**
6:14
155:20,22
156:2

**9374144 Chris. Harvey PLAINTIFF. EXHIBIT236**
6:15
202:14, 18,22

**-**

**--any**
54:11

**--do**
165:21

**--however**
46:21

**--I**
199:21

**--the**
72:19
160:4

**1**

**10**
79:13,15

**100**
19:1

**10th**
96:9

**11**
111:1
181:1,23
182:15

**11th**
97:12
140:24

**12**
19:14

**121**
184:13

**12th**
110:8
184:2

**13**
81:3

**15**
79:13,15
163:9

**150**
153:22

**159**
22:19
25:11
29:14
50:4
134:20
158:19
182:3

**15th**
22:1

**16**
25:3
204:24

**161**
109:11,18

**16942**
202:12

**17**
25:3
203:1

**18**
76:24
80:2,12
114:9
204:24

**180**
178:2,23
179:3

**18th**
141:14

**1989**
19:5

**1991**
19:8

**1994**
33:11

**1:21:MI-55555-JPB**
7:6

**1st**
38:9
116:6

**2**

**2,000**
139:17

**20**
28:24
39:7

163:10

**2000**
52:14

**2007**
31:11,20
47:15,16

**2010**
31:14,20

**2012**
198:21

**2015**
22:1
31:12
47:12
192:15

**2016**
45:10
47:24
74:13
175:6
191:16
192:15

**2018**
190:12
195:15,16
197:24
198:1,18
201:23
202:2

**2019**
24:10
28:13
39:8
42:25
43:8 45:4
74:13
106:16
107:5
157:17

**202**
7:4 13:19
17:24
18:2,4

30:2
105:8
127:14
128:7,25
129:2
133:6
138:17,21
139:25
141:19
142:7,9
143:18,23
156:20
157:8,22
158:3
159:8,12
180:10
201:9
210:16,22

**202's**
137:10

**2020**
18:2,3
33:20,23, 24 45:7,
11 47:10,
18,20,25
48:2,9,13
52:21
53:20
54:5,24
56:7,18
57:14,15,
18 58:10,
19 59:19,
20,25
60:4
61:11,16
62:14,17
64:18
65:1
69:13
70:24
72:13,24
73:5,12
74:12
75:6,8,22

76:20
77:11,15,
23 80:5
81:9,10
85:2,19
86:10
88:25
89:2
90:2,16
91:23
93:22
94:12,18
96:23,25
116:12
123:4,21
124:13
125:2
138:12
144:10
160:6
164:20
165:20
166:18
171:7,16
190:11
195:22
197:24
198:24
199:5,10
201:11
202:1
207:9
210:6,11

**2021**
21:1 22:2
28:13,24
42:25
43:8 45:4
47:10
77:13
81:12,18
96:12,14
97:1,9,
11,12
99:11
100:19

103:21
105:18,21
107:5
108:6,16,
24 110:8
114:2
116:5
126:5
140:24
141:14
146:6
155:11
159:3,5
171:10
176:25
177:8
186:1
200:1
201:11
203:1
208:18

**2022**
114:25

**217**
145:13

**23**
145:25

**234**
119:7
140:13,
17,19

**235**
155:20,22
156:2

**236**
202:14,
18,22

**23rd**
96:9

**24**
150:3
208:25

**241**
141:2,16

**25**
17:2

**25th**
146:4

**26**
146:5

**26th**
146:7

**2O2**
14:12

_____

**3**
_____

**3**
112:19

**30**
13:10
163:4,15

**30(b)(6)**
15:23
16:3,8

**30(b)(6)s**
16:14

**300**
52:2
168:10

**3:36**
211:16

**3rd**
91:23

_____

**4**
_____

**4**
112:24

**45**
13:10
115:14

128:5

**4:00**
204:22

_____

**5**
_____

**5**
120:4

**504**
40:13

**531**
141:2,12

**55,000**
21:14

**59**
145:25

**5:00**
179:13

**5:30**
194:9

_____

**6**
_____

**60**
11:7

_____

**7**
_____

**70**
169:10

**78**
179:5
180:15,
17,18

_____

**8**
_____

**85**
113:16
183:14

**897**
183:22

**8:30**
13:5

_____

**9**
_____

**9-1-1**
21:14

**90**
179:5
180:14
206:25

**9010**
110:25

**9011**
112:18

**92**
19:11

**94**
20:11

**97**
136:18

**98**
136:18
162:5

**98-page**
156:24

_____

**A**
_____

**Abigail**
183:25

**ability**
11:21
94:14
143:24

**absentee**
14:22
25:19

27:19
47:17,21
52:12
55:5,11,
14,21,24
61:2,4,
10,15
64:20
65:12,22
66:2,18
68:3
71:2,6
72:8,17,
21 73:10,
13 77:3
79:7,8
84:13
86:8
102:14,17
114:8
115:21
118:23
119:3
128:1,2,9
130:12
134:25
135:16
142:13
158:17,18
168:11,
14,16
177:13,
20,21
178:5,6,
9,10,22
179:9,16,
21 180:2
181:1,17,
22 182:12
183:6,7
185:5
186:4

**absolutely**
201:15

**absorb**
157:6

**absurdly**
133:2

**academy**
33:11

**acceptable**
149:17

**acceptance-tested**
49:20

**accepted**
172:17
200:25

**access**
38:20
39:17,21
40:1,2
44:23
123:20
130:19
135:21,25

**accessibility**
41:12

**accessible**
42:13

**accident**
15:15

**accidents**
15:19

**accommodations**
43:22
47:1

**accomplish**
179:25

**accomplished**
53:7

**account**
35:5

**accounting**
203:12

**accurate**
74:5
93:8,10
123:22
204:8,19
205:6

**accurately**
195:7

**accusations**
85:10,12

**acquisition**
39:13

**Act**
40:7,13
41:2,4

**activities**
22:7
152:15

**actual**
21:25
88:18
103:11
111:12
118:12
121:10
124:25
125:24
128:16
129:5
142:19
197:9

**ADA**
40:9
41:13
42:8,10,
12,18,21,
22 44:25
47:4
51:10

**ADA-RELATED**
42:9

**Adams**
99:17
104:23
105:2

**adapt**
61:3
162:13

**add**
132:18

**added**
120:15

**addition**
12:15
79:3
195:1

**additions**
75:23

**address**
55:23
62:18
94:17
109:22
120:14
121:4
139:12
160:19
174:3
192:11
193:7

**addressed**
38:6

**addressing**
62:13
88:2 91:7
95:11
210:8,19

**adds**
111:11
121:17

**administering**
40:19

**administration**
42:22
53:14
54:17,24
56:8
58:12
121:9,18
134:14
150:13
152:25
159:17
161:6

**administrative**
48:2,5,8,
14 52:20
53:19
54:3
59:24
95:21
117:2,10
134:18
135:5
144:18
152:3
161:22
162:18

**administrator**
71:20
85:13
88:6,8,11
90:9

**adopted**
188:11

**advance**
38:7
61:21
62:8,17
91:11
122:23
132:19
163:19

advanced
  61:24
  68:4
  163:10,17
  178:18
  181:20
  196:4,7,
  10

Advancing
  8:11,14

advantage
  206:15

advent
  201:9

advice
  12:17,23
  23:15
  165:25
  206:5

affairs
  56:17
  113:1

affect
  14:12
  162:20

affected
  49:12
  95:25

affects
  137:5

affidavit
  174:9

affiliation
  68:13,19

affirm
  7:17

affirmatively
  62:12
  84:12

afternoon

13:4

age
  68:25
  76:24
  80:2,12,
  18 123:25

agenda
  96:24

agents
  21:13
  79:8

agree
  47:16
  103:3
  120:25
  121:2
  125:25
  153:16
  157:22
  162:19,
  22,25
  205:6

agreed
  102:4
  203:11

agreement
  182:21

ahead
  87:25

aim
  120:14

air
  162:2

alert
  74:17

allegation
  70:20
  80:11
  82:2
  122:4

allegations

54:4,8
76:19,21,
22,23
77:1,16,
19,22
78:7,12,
25 80:2,
3,4 81:1,
8,15,17,
20,25
82:6,17,
23 83:14,
21,24
84:1,2,5
85:1,3,
18,21,24
87:12
91:7
95:17
122:5
123:7

allowed
  39:15
  124:13
  148:4
  181:18

ambiguity
  118:23

AME
  7:14,23
  164:3

amend
  117:17
  187:22

amendment
  192:10

Ameri
  8:22
  209:22,25
  210:3
  211:4

America
  41:2

American
  8:14

Americans
  8:11 40:6

Amika
  43:12
  148:13

amount
  51:20,21
  78:3
  98:21
  133:6

analyses
  137:25

analysis
  203:11
  208:5,13

anecdotal
  163:1,6

answering
  10:17,21
  11:9

anytime
  199:3

apologize
  165:9

app
  37:3,5

Apparently
  121:6
  174:13

appearance
  8:8 9:7

appeared
  17:19

appearing
  154:2

application
  14:22
  73:14,20

102:15
114:8,21
128:14
168:12
177:22
179:9
180:3
186:4

applications
  52:13
  55:6
  102:18
  128:1,3
  135:1
  168:18
  179:16
  181:1
  182:12
  185:5

applied
  23:23

applies
  23:17

apply
  24:1

approach
  134:3

approve
  21:17

approved
  73:21

approximately
  136:18

apps
  36:6,9

April
  52:14

area
  32:24
  118:5

194:25
207:1
208:10

**Arena**
80:3 82:8

**armed**
146:24

**arose**
57:17

**arts**
20:6

**Asian**
8:10,13

**aspects**
53:15

**Assembly**
17:17
141:13

**assert**
85:4

**asserting**
192:25

**assess**
138:4

**assessed**
74:22
137:10

**assessing**
93:15,16
100:22

**assessment**
74:20

**assessments**
135:6
136:24

**assigned**
196:6

**assist**
62:13

**assistant**
37:24

**assisted**
23:2
25:13

**assisting**
22:9
90:25

**association**
24:15
105:4
106:14
159:11

**assume**
10:22
13:1,21
15:7
102:4
103:18
121:4

**assumed**
192:2

**Athens**
9:16

**Atlanta**
8:19
166:6
193:3
198:3
206:1

**atmosphere**
23:4

**attached**
68:24

**attempt**
194:16,17

**attended**
19:8
87:16
110:8
120:2
126:9

127:4
129:25

**attending**
110:10
119:23

**attention**
87:5

**attorney**
7:13
10:25
23:20
45:19

**attorneys**
8:4 12:18
13:8

**audibly**
10:11

**audit**
51:8
79:12
86:19
87:2
131:22,24
132:2
199:5,11

**audits**
78:22
160:10
199:7

**August**
31:11
38:9

**authored**
145:17

**authority**
106:9

**auto**
15:15

**automatically**
169:9

**aware**
11:19
14:14,16
15:1
40:17
41:6
42:1,12
54:4,10
55:17
63:22,24
68:18
70:25
78:9
79:16
88:19
93:18
97:2,7
123:2
124:25
125:4
137:9,13,
14,20
138:14
144:8,12
145:8
147:12
151:3,17
193:13
196:19
209:2,11
210:12

**awkward**
164:13

**awkwardness**
165:9

**B**

**BA**
19:6

**back**
37:12
44:6
45:23

51:11
55:9
80:24
83:10
86:9
92:24
96:17
115:22
118:10
119:22
120:4
121:14
123:2
130:16
146:18
155:15
157:17
168:9,10,
18 170:6,
8,15,19,
21 171:15
174:7,9
175:21
176:21
180:5
183:13
184:21
186:7
196:25
198:21
200:8
209:16

**back-end**
196:16
197:24

**background**
15:4
19:2,4
33:9

**bad**
120:21

**bag**
150:20
176:6

**bags**
176:4

**Bailey**
99:19
104:23
105:20

**ballot**
14:22
22:13
25:19
27:19
52:12
55:5,11,
14,24
65:21
66:2
67:25
72:8
73:17,23
80:15
84:13
102:14,17
106:19
111:18
114:8
119:3
123:8,13
125:6
128:2
130:13
157:17
158:18
166:17
168:6,14
169:1
170:5
171:10,14
172:12,
17,20
173:6,16,
20
174:19,24
177:13,
21,22
178:5,7,
9,10,23

179:9,16,
21 180:3,
5 181:1
182:12
183:7,8
186:4
188:14
189:2,4,
7,8
190:2,5,9
191:1,2,
20,21,23
192:2,24
193:3
196:22
197:6,9,
10,14
198:8,9
200:25
201:1,3,
5,18

**ballots**
22:13
55:21
61:3,4
64:20
74:6,9
76:8 77:3
79:7,8
86:8
111:15,19
115:15,21
117:18
118:1,8,
14,23
122:23
128:1,9
134:25
158:17
168:6,10,
11,16,18
171:4,24
178:3
181:13,
17,22
185:6

187:23
188:2,8
190:7,19,
22 191:6,
10 192:6,
18 197:2,
12,16
198:14,
15,20,22,
25 199:3,
6,15
200:3,9
201:21
202:5
203:12,
14,19
204:10

**barbecue**
150:22

**Barnes**
66:14

**Barnes's**
74:11
90:11

**barriers**
74:25

**Barron**
64:3
144:21

**Bartow**
99:19

**base**
90:15

**based**
72:22
83:5 95:9
110:13
193:17

**basic**
10:4
21:15
25:6 36:8

**basically**
22:6 23:3
25:8,16
31:16
32:5
40:25
63:13
105:19
125:20

**basis**
73:3 74:9
86:23
93:3
98:22
139:11

**Bates**
109:16
110:24
112:18
113:16
119:8
140:13
155:21
183:19,21
202:12

**began**
97:12

**begin**
8:9 10:21
157:6

**beginning**
112:2
159:16

**begins**
110:24

**behalf**
7:14 9:5,
9,11,13,
15,18,20
12:14
16:3 17:6
56:25
205:25

**believing**
93:4

**bell**
201:7,13

**belt**
60:17

**benefit**
111:21
120:16
124:22

**benefits**
111:12
121:10

**big**
24:21
47:25
50:11,12
93:20
103:8
104:20
112:19
114:18
115:20
116:14
123:24
131:9
135:2
140:9,11
152:19
157:23,25
158:20
189:21
195:21,23
203:22

**bigger**
51:15

**biggest**
32:23
189:22

**bill**
7:4 28:2,
15 30:3
111:16

128:16
134:2
141:1,3,
12,15
142:2,13,
16,20
143:4,13,
17 156:20
157:9
158:20

**bill's**
138:5

**bills**
26:19
27:14,15
28:9
100:22
103:12
104:24
106:15
107:7
108:17
141:5
156:16

**birth**
80:16

**bit**
15:2
19:22
25:5
33:15
40:3 47:9
59:21
61:2 70:8
75:4
106:8
118:15
120:24
132:17
156:10
164:13,22
175:23
176:16
178:14
179:1

182:16
190:19
195:2

**black**
8:16,18
70:25
130:21
205:25

**Blackmon**
119:25

**blah**
189:8,9

**Blake**
45:5,6,12
126:16,23

**Blake's**
203:11

**blank**
176:14

**blew**
152:20

**blows**
162:3

**blue**
145:25

**board**
23:23
30:12
32:21
33:3
36:19
37:10,14
58:16
75:5
118:17
124:18
155:4
158:11,
12,17
159:25
188:21
190:13

191:4
193:6
194:16

**Board's**
30:21

**boards**
32:19
158:9

**bodies**
32:17

**bombarded**
94:24

**Bonnie**
127:10

**boom**
101:25

**Boren**
99:20
106:2

**born**
20:15

**bottle**
147:25
150:20

**bottles**
150:8
151:7
152:19

**bottom**
183:19

**box**
46:17
75:8
125:11
166:4,17
168:4,25
170:5
171:9,14
208:15

**boxes**
30:21

61:7,9
66:1 67:9
68:5,9,10
75:6 76:9
122:14,16
123:4,8,
14,20,23
124:7,12,
14 125:2,
24 164:19
165:20,23
166:11
206:2,6
207:5,7,
17
208:21,25
209:4,8,
12

**branch**
21:5

**break**
11:6,10
59:17
158:20
164:1

**breakdown**
65:24
66:16
67:24
68:18
69:6
71:7,9
130:20
136:3,22

**breakdowns**
68:12
69:17
70:1,11

**breaking**
156:23

**breaks**
11:7
76:14

**Breanna**
43:13

**Brian**
9:20 12:6

**briefly**
12:25
19:3
20:20
90:15

**bring**
11:24,25

**broad**
83:7

**brought**
14:15
45:16
131:3
168:10
193:11

**Bryan**
12:19

**building**
111:18
145:4
166:6

**built**
50:11

**bullet**
114:7,24
143:11
185:4
187:19

**bulletin**
36:19
37:10,13
145:16
146:4,11,
17 147:11
150:1

**bulletins**
37:21
38:3

39:17
47:6
140:4
150:25
155:4

**bunch**
32:10
103:2
149:21

**burden**
203:23

**buried**
102:17

**bus**
63:25

**buses**
63:25

**business**
32:7

**businesses**
208:10,11

**buying**
52:16

**Buzz**
36:18
37:7,9,15
38:17,24
39:18,21

───────────

C

───────────

**cabin**
133:6

**cabining**
133:12

**cables**
50:14

**calculation**
132:15

**calculations**
132:11

**calendar**
119:12

**California**
207:11
208:6

**call**
23:2,12,
13 24:19,
20 27:16,
23 35:23
42:24
44:5 45:1
52:20
99:25
104:14
105:11
108:1
134:9
139:16
148:20,21
149:1,11
150:2
151:16,21
159:8,12,
14

**call-in**
110:4
184:11,16

**called**
14:24
24:7
36:18
38:24
41:4 45:3
79:19
102:12
104:2
107:10
127:21
148:12,22
172:23

190:13,20
191:5
201:5

**calling**
56:13
108:21
109:1
184:18

**calls**
47:7 77:4
104:10
105:6,8
147:19
149:15,25
161:2

**camera**
165:1,7

**cameras**
74:23

**campaigning**
153:22

**campus**
190:20

**candid**
111:24

**candidates**
22:8
82:13,24
154:1

**candidates'**
153:23

**capacity**
15:8,10,
12,21,24
17:21

**capital**
143:1

**capitol**
98:24

**car**
194:6,8

208:3

**Carbone**
43:14,16,
17

**card**
136:15,21

**cards**
52:3
60:10
176:7

**care**
188:14

**career**
19:24
83:4

**careful**
23:15
83:17

**CARES**
41:4

**caring**
196:2

**Carolina**
19:6,13

**carry**
50:17

**case**
7:3,24
11:14
12:17
13:22
14:6 15:3
18:16
31:8 34:7
125:10
145:14
154:24
155:2
166:22
170:25

**cases**

8:2 33:3,
22 51:1
53:3
80:10
83:6
124:2
151:21
154:12
156:23
166:10
170:23
178:17
191:19
193:11

**cast**
65:21
67:24
73:23
80:15
81:4
172:12
198:8

**casting**
198:15
199:14

**categories**
68:11
189:18

**Catholic**
19:8,19

**caused**
189:13
199:1

**CD400509009**
109:17

**CDR00018227**
155:21

**CDR0009771**
140:14

**CDR00459897**
113:17

**CDR00518378**

119:9

**cell**
35:13,19

**center**
206:11

**certificate**
173:17,
22,24
174:7,10

**certification**
19:17

**certifications**
19:23

**certified**
19:25

**certifying**
21:9

**chain**
45:2
76:8,11,
12 123:10
124:24

**chairman**
105:3

**challenge**
116:1
132:13
172:24

**challenges**
16:18
48:13,17
49:3
53:19
54:3,23
59:24
138:11,
18,21
139:2,6,
11,17,19,
21 140:11

210:9,13,
19

**chance**
163:5

**chances**
178:23

**change**
14:23
29:14
72:19
76:1
114:10,14
130:9,10,
13 132:9,
18 139:12
143:19
156:25
157:14,16
185:12

**changed**
22:21
25:4
31:15
75:22
97:5
131:25
133:20

**changing**
14:21
134:2
157:20

**channeling**
77:25

**characterization**
92:17,19,
21 111:22

**charge**
134:20

**charges**
83:6

**charities**

32:1

**Charleston**
19:6,13,
16,21

**charvey@
sos.ga.gov.**
35:7

**chasing**
181:21

**chat**
89:16

**check**
80:13
93:25

**checked**
73:22

**checklist**
176:9

**chief**
31:12,15
33:6
47:14
191:18

**chime**
38:14

**Chris**
7:3,9

**chronology**
62:21

**church**
20:5

**circle**
24:13

**circumstances**
57:10
93:6
171:4

**Citadel**
19:6

**citizens**
51:23

**city**
188:15

**claim**
94:4,8
120:14
121:15
122:25

**claims**
14:15,17
70:25
83:7
93:18
94:11,17,
18 95:11,
21,24
96:2,14,
16 113:5
120:10
121:1,5
122:14,
15,17
123:2,3
125:4
145:8
160:17
161:5,24

**clarified**
193:20

**clarify**
130:7

**Clark**
9:16
198:3,4

**classes**
19:14,15

**clear**
19:19
63:8 86:1
189:3
194:1,2

**cleared**
79:11

**clearing**
118:25

**Clergy**
8:16,18
205:25

**Cliff**
8:17
205:24

**clips**
83:16

**close**
31:8

**closely**
22:15
24:12

**closest**
30:15
204:5

**Cobb**
9:9 79:7
99:24
149:21

**code**
79:14
117:17
144:5
158:5
173:19
174:18
187:22
201:2

**coffee**
205:1

**colleague**
7:25

**collected**
168:25

**collection**
170:5

college
  19:4,16,
  20 20:17

colored
  174:11

Columbus
  20:4

combined
  208:6

Combs
  43:12

comfortable
  165:17
  182:24,25

comment
  203:17

commented
  86:2

comments
  56:9
  203:6

commission
  137:23

commissioned
  79:18
  137:16

Commissioners
  106:14

commissioning
  138:4

committee
  18:10,13,
  23 56:17
  90:23
  159:10

committees
  17:20

106:11

common
  188:18,20
  195:25

communicate
  35:20
  36:20
  37:3,12
  38:21

communicated
  36:15
  143:13,14

communicating
  35:25
  37:20

communication
  27:21,22
  29:1
  139:4

communications
  28:22
  35:16,20

community
  20:3,8
  22:16
  206:14

compared
  64:22
  71:3

compile
  172:14

compiled
  171:17,21
  172:15

complain
  191:5,7,
  21

complained
  114:17

complaining
  190:14

complaint
  14:10
  32:25
  44:17,18
  148:19,24
  149:5,8
  191:23

complaints
  44:13
  46:1,5
  54:8
  119:5
  148:16
  189:18

complete
  171:5
  201:6

completed
  123:11

completely
  115:23
  163:6

complex
  157:9
  208:12

complexities
  120:15
  121:9

complexity
  111:11
  112:12,17
  113:10
  121:17

compliance
  42:22
  175:20
  176:2

comply
  34:2
  157:10

components
  50:8

compounding
  146:22

comprehensive
  170:5

comraderies
  163:4

concern
  84:2
  94:13
  100:5
  116:15
  118:5
  121:24
  125:23
  135:2
  144:23
  148:11,13
  150:12
  194:25
  197:22

concerned
  8:15,18
  77:8
  118:14
  145:3
  149:22
  205:25

concerns
  14:11,20
  29:17
  30:8
  42:21
  55:12
  74:14
  75:7,11
  76:7 78:5
  95:20
  101:15

105:11
106:5
109:1
113:5
123:12
139:2
144:19
146:19,25
147:18
151:5,10
152:6,10,
12,13,21
188:6
191:13
192:9,11
193:7,8,
17 204:18
210:8

concluded
  33:1
  211:16

conclusion
  79:9
  187:1

conclusions
  189:1

conduct
  22:19
  23:5 35:9
  58:19
  94:14
  139:3
  159:1

conducted
  40:5

conducting
  56:17
  158:23

conference
  47:7
  105:6,8
  159:7
  192:14

conferences
  23:3
  24:17
  95:15

confidence
  120:6
  121:4,13
  127:18
  159:16,
  17,19,22
  160:2,13
  161:6,24
  162:1,10,
  20,24
  163:8,13
  197:20
  205:11

confident
  162:5
  169:11
  174:22
  180:4

confirm
  199:20

confused
  195:3

confusing
  194:1

confusion
  22:25
  85:13
  115:18
  151:10
  179:23
  191:9,13
  193:18

Congress
  18:5,7

congression
al
  17:16

consensus
  181:25

consequence
  120:13

consequence
s
  112:7

considerati
on
  75:13
  132:22
  207:6

considered
  133:3

consistency
  103:19

consolidate
  11:15
  31:22

consolidate
d
  7:24 8:3

constituent
  104:13

constituent
s
  27:17
  28:20

consulted
  155:3

contact
  23:19
  25:20
  29:22
  30:24
  31:1
  42:21
  43:23
  44:12
  98:21
  104:4
  106:3

contacted
  139:1

contained
  179:1

contemplate
d
  48:23

content
  12:16
  34:17

contest
  11:6

context
  131:4

contexts
  174:14

contingenci
es
  187:13

continuatio
n
  77:18

continue
  85:4

continued
  46:12
  63:7
  81:8,13,
  17 208:19

contrast
  95:18

controlled
  49:9

convened
  127:21

conversatio
n
  31:5
  107:22
  108:16,23
  142:15
  186:8
  187:15

200:5
208:19

conversatio
ns
  26:22
  27:13
  29:20
  31:6
  58:6,25
  69:12
  70:10
  72:5,20
  88:24
  89:4,9
  92:4
  97:19,25
  98:10
  99:10
  102:1,2
  103:20,25
  104:9
  107:4,6,
  16 114:4
  117:25
  134:1,6,8
  135:18
  138:17,
  20,22
  141:8
  142:4
  144:9
  154:17
  186:17,
  20,25
  187:2,6
  199:25
  200:7

coordinate
  22:6
  25:16,23

coordinator
  42:9,10

copied
  88:11
  141:1

copies
  168:25
  175:13,20
  176:7
  200:13

copy
  166:21
  197:8

core
  24:6 26:2
  59:3
  100:21

corner
  208:13

correct
  12:24
  13:2
  53:17
  77:12
  172:21
  174:17
  176:15
  177:15
  188:3

corrections
  21:13

correctly
  74:7

correspond
  30:11

corresponde
d
  38:17

corresponde
nce
  18:22

corresponds
  168:12

cost
  106:17

costs

106:19

**Council**
20:24
21:3,4,9
142:25

**Councilman**
188:15

**counsel**
12:3
26:23
34:6,10,
13,16

**count**
124:5
158:17
189:8
190:24
191:3,24
192:2,4
193:1
196:21

**counted**
180:7
200:3

**counties**
22:7,9,
19,23,24
23:5
24:11
25:11,22
26:13
27:1
29:7,12,
16,22
30:8
36:20
37:11,12,
19 38:1
41:11,22
42:14,23
43:21
44:1,5,15
46:25
48:20

49:22,23,
25 50:4
51:1,6,11
52:4,5
53:6 57:9
60:8,22
61:3,12,
17 62:25
63:22
68:7,8
74:10,15
77:1
79:13,15,
18 93:17
94:13,21,
23 95:4
96:21
98:9,17
99:5,7
101:6,11,
18,24
102:4,12,
23 103:5,
8,9
108:17
114:16
118:13,24
123:23
124:6,9,
21,22
134:8,21
135:1
136:11
139:1,5,
15,23
140:11
144:9
147:18
148:17,19
149:20
156:13,22
157:9
158:8,20
159:22,23
160:7,14,
18
161:17,

18,20
162:12
165:22
166:2,12
169:1
170:6,11,
23 172:6
175:13,19
176:2
179:12
182:3,24,
25 185:20
188:11,25
189:17,
22,23
190:3
192:9
193:12,18
195:10,24
197:1,22
200:12,17
201:6,20
206:5,21
207:3
210:8,12,
17

**countries**
147:5

**counts**
20:8

**county**
8:6 9:6,
9,12,14,
16 23:6,
11,20,21
24:4,25
25:17,18
33:11,14
37:23
39:16,22
43:3
44:25
51:13
52:6,16
58:1

63:24,25
64:6
74:19,25
77:2 79:7
86:4
99:10,18,
19,20
102:16
104:22
105:16
106:14
119:5
121:23
123:19
132:17,21
133:22
139:16
148:12,22
149:5,8
158:23
166:4
170:8
181:12
182:6,9
185:11,14
188:5
189:14,
16,20,21
190:17,23
191:1,2,
13,25
193:20
195:2,17,
18 196:5,
8,10,21
198:1,18,
19 210:17

**county's**
143:24
144:8
145:10

**couple**
25:12,23
60:8 89:5
114:6
139:4,5

161:8
164:19
167:3
176:22
177:1
184:24
185:2,9

**court**
7:4,16
10:9 17:5
18:15
49:25
165:13
201:23
202:6
211:8,13

**courthouse**
144:25

**covered**
158:6
166:16

**COVID**
41:15,16
49:10
147:9

**COVID-19**
41:5
147:9

**cracker**
147:25

**crackers**
150:8,14,
21 151:7,
15,18,24
152:6

**crafting**
154:16

**create**
41:17
50:18
85:13
113:12
118:8

121:8
158:4
179:23
196:24
202:3

**created**
22:18
32:5
33:17,19
35:1 55:4
118:9
135:7

**creates**
111:17
121:12
196:15

**creating**
23:4
60:10
118:8
152:20,
21,22

**credit**
201:17

**criminal**
19:7

**CROSS-
EXAMINATION**
9:24
164:8
205:22
209:24

**cross-
trained**
32:9,15

**Crosses**
108:12

**crossing**
115:22
148:7

**crowded**
51:25

**current**
17:21
20:21
128:18
129:3

**curve**
53:5

**Cusack**
185:1

**Cusick**
7:2,10,
12,13,22
8:15,20,
24 9:5,
17,22,25
28:6
34:5,14,
21 39:24
46:23
48:7,16
53:12
54:1,16,
22 55:19
56:5
59:2,10,
15,18
60:13
62:1,10
63:21
64:11
65:7,18
66:10
67:12,22
68:16
69:11
70:14,23
71:12
72:3,11
73:2
75:14,20
76:6
78:18
79:4 80:8
82:4,22
83:12

84:10,24
85:7
89:23
91:20
92:12
93:12
96:1
100:18
101:4
109:3,6
115:9
118:2
120:20
122:12
125:17,22
135:14
137:21
140:17,21
143:7
148:9
149:6
151:4
152:2,14
154:8
156:4
157:24
163:24
164:2
166:15,
21,25
176:23
188:5
202:8,13
211:15

**custody**
76:8,11,
12 123:10
124:24

**cut**
129:17

**cyber**
74:14,15
93:20
94:1

**cycle**
47:10,18,
20 48:3,
10 72:24
73:6 75:9
80:5 81:9
85:3,20
164:20
165:20
166:18
191:14
210:6,11

**cycles**
195:13
197:24

—————————

**D**

—————————

**Dan**
43:17

**DAS**
33:14

**dashboard**
37:8 38:4

**data**
26:11,12,
14 65:3,
6,8,21,25
66:3,6,
12,23
67:6,8,
11,15,24
68:2,11
69:14,17
70:1
87:11,22,
25 88:13,
19 89:25
90:3,5
91:3
130:16,18
135:21
136:2,5
137:17

199:20,22
207:13

**database**
131:10,14

**date**
21:25
22:1
48:24
130:13
132:3
184:11

**dated**
202:25

**dates**
49:11
96:7

**Dave**
43:14,17

**day**
22:2
24:25
27:11
30:6 39:3
58:5
61:22,25
62:8
64:13,15,
17 65:13,
23 66:18
67:4 68:4
87:18
91:23
95:15
97:13
98:3,10
107:17
117:6,13
130:19,22
159:4,5
163:18
173:12
174:2
178:18,20
181:16

188:13
190:14,20
195:6
196:11
197:16
204:17,
22,24
208:25

**days**
27:11
114:9
115:14
116:22
117:4,7,
11 133:7
178:2,23
179:3
180:6,14,
15,18
181:1,23
182:15
204:24
209:4

**DDS**
136:10

**dead**
52:15
76:25
80:2,3,22
82:7

**deadline**
14:23
102:15
114:8
119:3
128:2,14
134:25
177:12,21
179:8
180:25
182:12,25
183:1,7

**deadlines**
114:22

**deal**
16:18
39:12
52:18
134:5
152:19
158:10,11
160:24
187:12

**dealing**
23:17,24
24:1
43:21
59:5 95:7
134:13,15

**dealt**
46:21
91:6
138:8

**death**
33:12

**debunk**
161:16,20

**Decatur**
20:5,10

**December**
28:23,24
90:16
91:23
96:8,9
97:8
116:6
170:2

**decide**
51:14

**decided**
167:15
193:15

**decision**
52:12
146:11,13
151:6

**decisions**
206:23

**declaration**
145:14,21

**declared**
144:4

**decrease**
61:17
161:23
162:24
197:20

**dedication**
86:3

**deep**
167:10

**Defendant**
8:5

**defendants**
8:6 9:6,
10,12,14,
16,18,19,
21

**Defense**
7:14

**definite**
189:25

**definition**
93:2
178:14

**degree**
19:19,20

**Dekalb**
33:11,13,
14 191:1
195:18

**delays**
197:19

**delicate**
49:4

**deliver**

67:10

**delivered**
147:4
149:22

**delivery**
148:5

**demand**
32:14

**demands**
205:8

**Democratic**
108:1

**Democrats**
107:22

**demographic**
69:6,17
70:2,15
71:1 72:6
130:20
133:24
136:3
206:19

**demographics**
69:21

**department**
9:1 21:13
26:9
33:13
74:20
90:10
135:24
156:14
158:23
164:6

**depended**
38:2

**depending**
90:10
163:16
173:9
197:3

**depends**
38:15
44:16
90:12
149:3

**deployed**
64:1
168:1

**deponent**
16:9

**deposed**
10:1 15:5

**deposition**
7:3 10:10
11:5,17
13:1,15,
24 109:18
110:14
179:11
211:16

**depositions**
15:12

**deputies**
21:12

**deputy**
20:22
21:8 25:7
31:14,22
37:24
44:4,19
45:5,12,
24

**describe**
22:3 23:4
28:14
159:17
183:17,20

**describing**
193:18

**descriptive**
141:20

designated
  23:12
  24:13

designed
  49:8
  167:14

designing
  167:8

desire
  192:18

details
  139:21

detectives
  32:20

deter
  154:4

determination
  33:4

determine
  42:3

determining
  172:16

develop
  50:20

developing
  167:5

devices
  106:19
  157:17

die
  52:7

differ
  102:21

difference
  82:1
  102:6
  122:24
  204:6
  207:25

difficult
  57:8
  147:20

difficulty
  111:18

digital
  74:8

direct
  27:21
  34:8
  37:16
  90:14
  98:22
  104:17
  118:18

directing
  34:11
  42:6

direction
  49:9
  134:21
  162:13
  166:8

directions
  165:11

directly
  23:13
  27:13,23
  38:3,12
  42:24
  44:5 45:3
  71:25
  88:5,8
  89:12
  103:20
  148:20

director
  15:8
  17:22
  20:23
  21:8,23
  22:6
  25:1,6,15

27:12
33:17
35:4,9,17
37:24
38:20
40:5,17
65:2 70:9
72:23
77:21
81:20
89:10
93:13
99:18
132:7
139:16
146:12
149:20
159:18
172:3,5
175:5,10,
12 194:19
199:16
207:5
210:7

directors
  23:22
  24:5
  37:18
  99:12

disabilities
  40:7
  44:14
  137:1,5

disadvantage
  206:16

disciplinary
  21:18

discovery
  7:25 8:3

discretion
  124:8,14

discuss
  96:13

discussed
  127:24,25
  176:23
  177:14,17
  186:23

discussing
  97:14

discussion
  109:5
  112:8
  115:3
  128:17
  164:24
  167:8
  183:9
  186:1
  192:16

discussions
  12:16
  40:23
  57:16,22
  59:14
  72:12
  91:14,24
  109:8
  116:21
  133:4,21
  135:15
  136:13
  141:3
  155:10,18
  165:24
  208:17

disenfranchises
  196:19

disenfranchising
  118:11

disproportionately
  71:2

distinction
  150:20
  174:12

distribute
  166:9

distribution
  39:14
  41:3 42:2

District
  7:4,5

divided
  25:10
  45:17

division
  22:12
  25:4,6
  32:6,8
  36:10
  39:5
  42:8,16
  54:9
  67:14
  68:1
  78:3,5,
  15,17
  87:15
  89:25
  130:17
  131:5,6
  135:20
  137:9,18,
  23 139:23
  142:22
  152:5
  156:12,
  14,19
  158:22

Docket
  7:6

document
  13:20
  36:11
  109:20

113:20
140:15
155:20
156:5
174:15
202:9,18

**documents**
11:25
13:18
25:22
33:16,19
34:1,2,7,
22,25
35:1,2

**Dominion**
120:6,11
121:1,24

**door**
101:19

**doors**
27:10
74:24
86:7

**double**
93:25

**doubt**
192:23

**download**
112:2

**downstream**
49:6,12
53:14
62:2,4
64:12
112:13
117:3,4
118:9

**downtown**
198:3

**draft**
103:11,
12,15,16

105:17
203:6

**drafting**
30:25
142:9,14,
16,20
143:3,5
154:16

**drawing**
150:19

**DRES**
157:16

**drinks**
147:3

**drive**
144:25
145:1
194:6

**driven**
144:24

**Driver**
135:24

**driver's**
52:3
135:21
136:5,8,
20 186:5,
16 187:8,
11

**drop**
30:21
61:7,9
65:25
67:9
68:5,9,10
75:6,8
76:8
122:14,15
123:3,8,
13,20,23
124:7,12,
14 125:2,
10,24

164:19
165:20,23
166:4,11,
17 168:4,
25 170:5
171:9,14
206:2,6
207:5,7,
17
208:15,
21,25
209:4,8,
12

**Dropbox**
14:24

**due**
161:24

**Dugan**
141:18

**Dunwoody**
20:14

**duplicate**
197:5,9

**duplicating**
197:14

**duties**
35:9,20

**dynamic**
157:14

———————

**E**

———————

**e-mail**
27:6
35:5,6,8
44:18
45:25
46:4,6,8,
13,16,17,
20,22
90:7
104:5

105:5,11
107:17
109:12,
22,24
110:23,
24,25
113:21
116:3
119:17
139:16
140:2,24
143:9
148:18,20
156:8
162:15
184:12
202:20,25
203:4,10
205:12

**e-mails**
46:12
106:20
147:19
184:10

**ear**
107:17

**earlier**
15:5 75:4
80:25
85:16
143:10,18
144:7
164:23
166:16
176:23
177:7,10
180:8
182:2,5
183:1
187:25
188:5
200:10

**earliest**
128:13

**early**
64:8
115:4
116:22
117:4,6,
10 133:23
166:4
176:25
181:18
190:13
191:15
192:15
200:1

**easier**
70:8
144:25
183:20

**easily**
80:17

**easy**
44:7

**ecosystem**
49:4

**education**
19:14
22:16,17
60:25

**educational**
19:4

**Edwards**
106:24,25

**effect**
26:25
27:2 29:6
49:6
53:14
58:16
62:4
64:12
86:12
118:9

**effective**
166:3

207:18

**effects**
62:3
112:13
117:3
151:18

**efforts**
85:17
147:15

**eighth**
166:6

**elderly**
51:22

**election**
15:7
16:18
18:3,8,20
22:19
23:7,21,
23 24:16,
25 25:23
26:19
28:1
29:15
30:12,21
32:13,21,
22,24,25
33:3,24
35:9,17
36:10
37:2,18,
23 38:8
39:22
47:6,10,
18,20
48:1,3,5,
8,10,24
49:4,11
52:6,8,9
53:14,19
54:2,4,
15,17,19,
24,25
56:8,15

57:15,20
58:10,12,
16,19
59:21,24,
25 60:5
61:11,16,
22,24
62:8,18
64:13,15,
17,19
65:1,2,
13,23
66:18,23,
25 68:4,
11,19
69:13
70:24
72:14,23,
24 73:5,7
74:4
75:5,6,9,
23 76:19,
20 77:11,
14,20,23
79:1
80:4,5
81:9,11,
19,20
82:12,25
83:24
84:1,6,22
85:2,20,
22,23
86:10,18,
20 87:1,
9,12,22
88:25
89:2,6
90:3,5
91:7
94:12,18,
22,23
95:3,16,
20 96:14
98:20
99:3,10,
12,17

100:13
102:19
108:25
109:2
113:6
116:7,11,
12,23
117:2,6,
9,13
118:17
121:9,17
123:4,21
124:13,18
125:1,3
133:7
134:14,
15,17
135:5
138:13
139:3
140:4
144:11,18
145:9
146:4,11
147:13
148:3,6,
10
149:19,25
150:12,25
152:3,22,
25 153:17
155:4
157:9,21
158:4
159:16,
20,25
160:4,6
161:6,19,
21,22
162:18
163:18
164:20
169:4,9,
17,25
171:7,16
174:1
175:10

176:5
177:3
178:15,
19,20
179:1,14
180:4
181:2,7,
9,16,19,
21 182:4,
6,10
185:11
188:6,13,
21
189:14,17
190:11,
12,13
191:4,13
192:3,14
193:5
194:16
195:2,6,
13,16
196:11
197:12,
16,24
199:4,23
201:24
202:3,6
203:20,
23,24
204:2,8,
12,14,22
207:4
210:25

**election's**
17:22
205:3

**election-
related**
27:14,15
28:9
156:16

**elections**
18:8
21:22

22:6 23:5
24:5
25:1,4
27:12
32:3,12,
14 33:17
35:4 39:4
40:5,16,
19 42:7
47:23
48:21
49:7
64:23,25
65:2,6
67:14
68:1 70:9
72:22
77:21
81:19
85:13
87:15
89:10,25
93:13
94:14
99:24
115:5,24
116:19
130:17
131:5,6
132:7
135:20
137:9,18,
22 139:22
142:22
144:11
146:12
152:5
156:12,
13,19
158:11,22
159:18
163:9
165:20
166:18
172:3,5
175:5,6,
9,12

177:24
180:22
191:14
194:18
199:8,16
207:22
210:6,7,
11,15,22
211:3

**elector**
210:13

**electorate**
121:20

**electrical**
51:5,9

**elements**
68:24

**elevate**
44:3

**eligibility**
117:17
174:5
187:22

**emergency**
30:21
124:17
144:5

**employed**
21:2
159:6

**employees**
52:6

**employment**
20:21

**empty**
124:5
175:25

**encouraged**
100:2

**end**
11:17

57:7
112:4
118:10
169:4
179:4
180:23
181:11
196:25

**ended**
118:10
128:25
142:13
143:17
179:5
180:9

**ending**
109:16
110:25
113:17
119:8
140:13
155:20

**ends**
183:22
202:12

**endurance**
11:5

**energy**
51:4

**enet**
115:25
201:18

**enforcement**
15:10,12
19:25
33:8,12
83:4

**engage**
70:9

**enhancement
s**
41:13,14

**enter**
26:14

**entered**
26:12,13

**entering**
26:11

**entire**
62:20

**envelope**
73:19

**envelopes**
25:19

**environment**
22:18

**equipment**
24:10
37:2
41:15
48:19
49:18
50:1,5,6,
21,22
51:3
60:19
63:1,11,
14 74:1,
3,5

**error**
125:9

**errors**
160:1
205:5

**essentially**
22:18
31:21

**established**
75:12

**ethnic**
206:18

**evaluated**
75:1

**Evans**
45:5
126:16
203:1,5
204:11

**Eveler**
99:24
106:6
116:3,10,
14 140:25
141:4,6

**evenly**
166:9
206:7,8,
9,17,18

**events**
92:16
157:3

**eventually**
79:11

**evidence**
73:4
80:25
81:1,5,7
83:3,5,8,
11 85:2,
10 121:16
122:9
208:20,24
209:3,7

**evolving**
30:9

**examples**
64:7
151:8

**exception**
97:17
188:19
201:22

**exchange**
52:3
148:8
154:14

**excuse**
44:20

**execute**
132:18

**executed**
76:16

**execution**
76:13
125:15

**executive**
20:22
21:5,8

**exhibit**
109:11,18
113:15,16
119:7
140:13,
16,19
145:13
155:19,
20,22
156:2
183:13,14
184:13,21
202:10,
14,18,22

**exhibits**
70:5
183:16

**existence**
18:2
188:22

**existent**
170:15

**expect**
126:23

**expected**
199:11

**expense**
86:6

**expensive**

144:14

**experience**
53:20
61:5
72:22
84:20
106:12
162:20
207:4,8,
21

**experiencing**
210:18

**expert**
13:21
131:14

**explain**
34:9

**explaining**
156:22

**expressed**
118:24
148:11
185:15

**expressing**
84:2

**extended**
198:6

**extensive**
73:23

**extent**
15:24
41:10
64:4
117:11
134:14
141:11,23
142:14
143:13
147:7
160:21

**external**
50:14

**extra**
25:19
62:25
198:11

_____

**F**
_____

**face**
27:7,8
43:15
52:2
106:22
165:1

**face-to-face**
104:12,17

**faced**
18:20
85:19

**faces**
43:13

**facility**
50:5

**facing**
165:2

**fact**
17:20
79:21
121:15,18
122:3
161:20
169:14
178:16
189:11,12
196:4

**failure**
125:20

**fair**
16:10,22
17:4,12

18:16
23:6
52:22
53:18
78:3 81:8
111:24
120:9
123:21
125:14
134:12
137:8
156:7,13,
18 157:7
160:16
161:4
162:23
198:25
203:8

**fairly**
107:2

**fall**
16:12
42:10

**false**
82:1
92:18,20,
25 93:18
94:4,8,
11,17,18
95:11,21,
24 96:2,
13,16
113:5
120:10,
14,25
121:5
122:14,
15,17,25
123:1,3
160:17
161:5,24

**familiar**
40:6,14
71:5
133:15

201:4

**familiarity**
40:12
55:21
61:6

**families**
86:7

**family**
52:7

**fancier**
150:10,17

**Farm**
77:3 80:3
82:7
92:4,9

**fashions**
114:5

**faster**
163:22

**fear**
51:21

**fearing**
52:19

**feature**
199:9

**February**
141:14
170:1
203:1

**federal**
40:18
114:25
115:17
116:5
175:6

**feedback**
26:19
28:1
101:5,10,
12 102:10
155:4

**feel**
11:2
31:1,4
108:20
141:7
207:23

**feelings**
151:23

**feels**
165:2

**feet**
153:22

**felt**
148:6
180:4

**fever**
86:16

**fewer**
61:21
64:14,17
117:6
152:12

**field**
9:20
10:25
12:6,15,
19,22
13:12,15
28:3
29:23
34:4,8,18
39:19
46:14
48:4,11
53:1,22
54:6,20
55:2,25
58:13
59:6 60:1
61:18
62:6,19
64:9
65:4,10
66:8

67:1,17
68:14
69:8
70:12,16
71:10,16
72:9,25
75:10,16,
24 78:13
79:2 80:6
81:22
82:20
83:1
84:8,18
85:5
87:11
89:21
91:18
92:10,23
95:23
100:9,24
115:6
117:22
120:17
121:11
125:16,18
135:10
137:12
140:16
142:23
147:16
149:2
150:16
151:12
152:8
154:6
157:11
193:22
194:20
209:10
211:6,10

**Field's**
12:11

**fielded**
87:20

**Fight**

16:10,22
17:4,12
18:16

**figure**
147:6

**figured**
168:21

**filed**
82:10

**fill**
173:3,12
174:3

**filled**
46:8

**filling**
197:12

**filter**
44:1

**filtered**
46:2

**final**
79:21,23

**finally**
11:12

**find**
51:2,6
197:7

**findings**
54:11
125:1
147:12

**fine**
20:6
34:18
163:11
183:21
184:20
201:15

**finger**
99:7

162:2
201:14

**finish**
11:9

**finished**
10:16

**finishing**
86:25
205:20

**firm**
8:1 12:8,
11

**fit**
124:10,15

**fixes**
125:17

**Fixing**
114:24

**Fleming**
127:14,16

**Fleming's**
141:15

**flexibility**
124:9

**flip**
119:22

**flooding**
198:15

**floor**
166:6

**focus**
32:24
55:20
74:13
161:11
162:11
181:15
204:8

**focused**
17:1

58:18
86:24
93:22
96:20
132:13

**folks**
24:6
37:18
59:3
100:21
102:8
104:23
110:17
117:5
152:6

**follow**
76:14
96:23
125:21
139:18
176:22
185:2

**follow-up**
129:24
206:2

**food**
146:20
147:3
148:4,8

**forgetting**
178:20

**forgot**
200:11

**forgotten**
178:21

**form**
25:6 28:3
34:4
39:19
46:7,14
48:4
53:1,22
54:6,20

55:25
58:13
59:6 60:1
61:18
62:6,19
64:9
65:4,10
66:8
67:1,17
68:14
69:8
70:12
71:10,16
72:9,25
75:10,24
78:13
79:2 80:6
81:22
82:20
84:8,18
85:5
89:21
91:18
92:10,23
95:23
100:9,24
115:6
117:22
120:17
121:11
123:10
124:24
125:16,18
135:10
137:12
140:7
142:23
147:16
149:2
150:16
151:12
152:8
154:6
157:11
167:4,5,
14 171:5
172:23

174:7
176:14
193:22
194:20
209:10

**formal**
22:1 27:4
29:19
67:2
89:14
97:22
100:7,15

**formally**
29:10

**format**
171:18

**formats**
201:19

**forms**
114:4
166:17
168:4
169:1
170:6,21
171:10,
14,17

**formula**
41:21

**forthcoming**
158:2

**fortunately**
146:23

**forward**
44:21
46:20
81:5 90:7
107:14
139:25
151:6

**forwarding**
116:3,9

**found**
79:17,20
90:20
192:3
193:12

**fragmented**
32:3

**frame**
22:4
47:16
58:9
108:6
115:4
128:11
129:5
167:25
180:9,11
183:6
198:23

**frankly**
42:15
57:9,11
75:3
113:7
167:13
191:16

**fraud**
46:5
54:4,5,
14,19
55:1
72:24
73:4,7
76:19,20
79:1 80:5
81:21
82:15,25
83:21,24
84:1,4,6,
15,23
87:13
91:8
113:6
125:1,4
145:9

178:10
208:22
209:1,5,
9,12

**freaking**
157:5

**free**
11:2

**frequency**
99:13

**frequently**
107:2

**Friday**
102:18
179:14
180:3,16,
20 181:6,
10,12

**friend**
163:2

**front**
12:1
17:19
96:20
183:15

**frustration**
185:15
189:13

**Fuchs**
66:25
89:18
98:15,21
101:3
109:13
126:14

**full**
7:7 87:2
150:4
196:22
199:11

**fully**
84:7

**Fulton**
52:16
63:25
64:6 77:2
144:7
145:9
189:21
195:17
197:25
198:18,19

**Fund**
7:14

**fundamental
ly**
157:19

**funding**
40:18,22
41:8

**funds**
41:1
101:17

**funeral**
32:20

**Fusch**
28:12
29:2
45:16
59:8

**future**
144:11

──────────

G

──────────

**Gabe**
29:2
40:25
41:21
42:3 59:8
87:19
95:2,7,14
96:18
97:19
98:19

101:3,14,
19
126:10,
12,20
129:8,9
130:10
131:7
160:22
161:12

**Gabe's**
98:25

**Gabriel**
67:5
98:11
109:12
110:25
138:7

**gain**
112:20

**game**
105:23

**gather**
100:8

**gave**
95:14
99:13
134:14
166:7
192:1
206:5

**GAVREO**
24:15
105:4

**GBI**
79:8

**gears**
109:7

**general**
14:5
17:17
26:22
28:14

31:14,21
33:8
41:15
45:25
46:6,13
48:3,9
57:15
59:20,25
60:4
61:11,16
62:17
63:4,5
64:18
65:1
69:13,24
70:24
71:6
72:13,24
73:5
75:23
76:20
77:11,20,
23 80:5
83:22
85:2,9,20
87:1,9
88:25
90:2
93:19
94:12,18
100:12
115:8
116:7,12
123:4,8,
13,21
124:13
125:2
129:11
133:7
134:3
138:12
141:13
144:10,23
153:17
159:13
160:4,6
166:1

178:11
182:21
199:8

**generally**
14:7,19
15:13
16:6,25
21:6 22:3
26:17,18
31:18
38:12
40:8
44:18,23
57:3 60:5
61:24
66:15
78:2 90:6
111:25
118:6
124:6
132:16
139:7
145:2
149:25
150:25
155:6
160:15
163:15
173:11
176:1
182:22
186:10
207:2

**generate**
46:8
55:12
130:25
132:3

**generated**
51:19
69:2,5
72:1
74:11
108:22
131:17,24

137:19

**generating**
131:23

**gentleman**
45:15

**geography**
68:25

**Georgia**
7:4,6
8:20,23,
24 14:13
17:17
18:7
20:1,5,
12,14,19,
23 21:11,
15 24:15
30:12
51:22
74:19
80:16
83:23
84:7
86:11,22
106:14
107:19
125:2
151:20
158:5
166:4
182:3
190:15
207:14
210:4

**Georgia's**
159:19

**Germany**
13:9,16
26:22
27:6
28:11
29:2 31:3
56:22
57:5 59:8

66:25
87:19
88:4,10
89:18
90:19
91:1,15
97:20
98:14,18
101:3
109:13
126:11
127:17
131:7
138:7
140:25
141:4
142:21
154:23

**Germany's**
145:13

**get all**
49:17
50:2,4

**Giuliani**
83:13
87:18
90:17,21
91:24

**give**
7:18
23:14
34:9
43:10
101:16
102:13
123:11
190:10,25
192:23,25
193:4
205:15

**giving**
101:12
147:2,22,
25 148:7

152:5
154:13
209:18

**goals**
111:4

**good**
7:10,11
8:12,17
9:2,8
56:2
110:3
130:4
160:14,15
161:20
164:13
170:9,10
176:1
181:24
184:16
194:10
207:23

**GOP**
107:20

**gosh**
43:12
98:2

**government**
21:5
90:23

**Governmental**
56:16

**governor**
89:5
144:5
188:16

**Governor's**
39:25
88:22
89:1,19

**Grace**
9:11

Graduate
  19:9

graduated
  19:5

grant
  41:19
  101:21

gray
  193:14

great
  165:12

greater
  99:13
  102:9
  124:8

grew
  20:14

grid
  51:5

grievances
  44:13
  46:2

ground
  10:5

group
  20:8
  24:19
  51:24
  70:11
  74:11
  79:19
  115:25
  129:14
  153:9,15
  206:16,25
  207:11

groups
  8:6 11:18
  20:3
  31:25
  60:22
  63:9

69:3,7,14
70:2,15
71:1,7
72:7
108:4
130:21
133:24
136:3
146:24
153:12
205:18
206:19

growing
  195:9

guess
  15:23
  16:1,12
  19:15
  22:1
  36:19,23
  37:19
  78:16
  85:9
  102:3,19
  106:20
  111:20,22
  117:9
  126:1
  129:10
  132:12
  153:1
  156:18
  175:6
  177:25

guidance
  46:24
  47:1
  94:17
  139:23
  151:1
  156:12
  158:2
  165:22
  166:13
  189:13

192:5,19

guidelines
  124:16

guy's
  106:21

guys
  205:15

Gwinnett
  189:20
  191:2
  195:17
  198:24

—————————

H

—————————

hacking
  74:14

half
  13:11
  174:2

halfway
  185:3

hall
  89:15
  98:25
  99:1

hallway
  104:18

hand
  7:17
  67:10
  87:2 89:7
  104:18
  199:11

hand-
written
  172:19

handed
  162:14

handicap

174:9

handing
  181:21

handle
  21:18
  26:17
  27:2 44:8
  54:7
  139:9,24

handled
  40:25

happen
  29:13
  33:5
  46:16
  51:18
  63:4
  112:15
  117:12
  147:8
  161:19
  199:3

happened
  36:24
  48:2,9
  49:15
  54:12
  58:7
  62:21,22
  63:20
  74:18
  77:5,9
  79:1 84:4
  91:22
  92:16,17
  125:8
  126:3,4
  184:1
  187:6
  191:22

happening
  13:17
  96:24
  146:25

153:13
189:11

happy
  182:20

hard
  43:18
  62:24
  144:25
  175:23
  176:16
  205:8

harder
  122:9

hardware
  22:12

Harvey
  7:3,9,12
  8:12 9:2
  10:2
  109:7,21
  113:18
  140:15
  155:24
  164:3,10
  205:24
  209:16,20
  210:1

hash
  79:14

HAVA
  41:1,8

HB
  141:2,12

head
  10:11
  58:22
  86:24
  101:19

heads
  162:13

health
  41:14

**hear**
11:12
92:15
103:2
105:14
164:10

**heard**
80:22,25
83:18,22
92:17
99:18
100:3
131:12
133:11
135:1
136:21
150:9
189:18

**hearing**
17:16
82:6
83:15
84:3
87:16,17
88:1
90:19
91:11,15,
22,25
98:8
101:10
123:19
133:13
134:9
136:18
164:16
185:22
191:12,
15,17
195:24

**hearings**
17:8,9,
12,13
56:17
90:16
91:6  96:8

97:8

**heavy**
74:13

**held**
90:17

**helped**
25:16
30:17
61:8,9,
11,16

**helpful**
58:12
94:3
117:12
123:20,24
141:11,23

**helping**
23:25
94:16

**Henry**
148:12
149:7,20

**heretofore**
48:21

**heroes**
86:10

**heroic**
85:17

**heroically**
57:11

**hey**
26:24
27:18
29:4
38:14
39:2
51:11
74:22
88:7
93:24
97:21
99:25

100:3
101:20
102:12,25
112:11
113:11
122:21
134:9
139:5,17
148:22
149:11
151:2
197:13

**high**
19:12
20:7
61:23
75:18

**high-ranking**
37:25

**higher**
32:14
61:4

**highly**
106:1

**history**
31:9

**hit**
63:17

**hold**
14:4
21:24
31:9
33:18
96:7

**holds**
33:21

**home**
190:16,18

**Homeland**
74:21

**homes**
32:20
207:6

**homicide**
33:12

**honestly**
16:16

**hoping**
52:18
156:19

**Horvath's**
183:25
184:25

**hour**
128:5
163:15,16
204:24

**hours**
17:2
19:14
86:6
198:6,11
208:25

**House**
17:19
56:16
141:12,16

**how's**
89:15

**huge**
116:1
132:20

**human**
125:9
209:13

**hundred**
102:20
128:22
148:14
170:8,19,
21 174:22
175:20

**hurt**
151:23

**hypothetically**
26:24

_____

**I**

_____

**ID**
135:16,21
136:14,21
185:5,14,
19,22
187:21

**idea**
56:2  93:9
113:11
178:25
179:2,23
187:7

**ideally**
45:1

**ideas**
50:23
120:5
129:19
142:18
143:2,6,
8,12
177:2
182:6
192:17

**identification**
136:15
140:20
156:3
202:23

**identified**
195:14

**identify**
80:17

ill
  151:18

illegal
  198:16

images
  22:13

immediately
  87:1
  203:19

impact
  54:18
  94:13
  132:8,10,
  20 135:7,
  9 136:25
  137:10
  138:5

impacted
  53:15,19
  54:5
  95:22
  96:3 97:9
  133:23
  138:18
  200:2

impair
  11:21

implement
  156:20
  157:10

implementat
ion
  16:19
  39:8
  125:15

implementin
g
  36:25
  105:10
  156:15

important
  23:14

174:12
204:7,19
205:6
207:6

impossible
  115:23,24

impress
  57:7

impression
  123:12
  195:4

improvement
s
  75:2
  112:19

in-depth
  102:2
  107:3

in-person
  65:13
  104:15
  122:23
  162:19
  209:9

inbox
  46:1

incident
  125:5

include
  37:17
  206:17

included
  167:11
  173:15
  174:23

includes
  21:11

including
  46:25

increase
  47:21,25

61:10,15
64:19
72:21
117:5
163:7
205:9

increased
  47:17
  85:18
  199:15

increases
  72:7

independent
  109:23
  113:23
  126:25
  130:5
  140:5
  155:1
  202:21

Indiana
  20:15

Indianapoli
s
  20:15

indicative
  162:11

individual
  139:14

inefficient
  32:4

infiltratio
n
  74:15

influence
  153:7,9,
  18 154:5,
  11

influencing
  147:13
  153:12

inform
  22:22

informal
  27:4
  97:20,24

information
  74:8
  98:16
  134:11
  136:8
  171:16
  200:17

initial
  96:24
  110:25
  132:1

initially
  109:12
  141:14

initiate
  27:25

injunctions
  17:13

injunctive
  17:9

input
  28:15
  98:16
  99:13
  100:8
  101:7,9
  104:24
  105:1
  134:12,17

inquiries
  29:9,23
  87:12
  149:15
  161:1

inquiry
  28:1

inside
  51:25
  121:22

inspect
  51:9

inspector
  31:14,21

inspectors
  32:7,8

installed
  74:16

instance
  23:10

instances
  36:2
  210:12

instruction
s
  46:25

instructs
  11:1

intensive
  50:7 51:4

intent
  63:14

intentions
  112:6

interaction
s
  28:19
  101:14
  106:13

interest
  92:3
  118:24

interested
  207:13

interface
  27:13
  30:11

interfering
  73:25
intermediary
  29:3
internal
  161:12
international
  87:5
interpretation
  23:19
  111:20
interrupt
  107:1
Intervener
  9:18
Intervenors
  8:5
intimidation
  147:14
  151:11
  153:25
introduce
  8:9 202:9
introduced
  30:2,6
  97:4
  141:13
introductions
  11:13
intrusion
  74:3
investigate
  78:7
investigated

78:8
investigating
  77:22,24
investigation
  32:6,10,
  22,25
  33:13
  56:7,14
  78:3,14
investigations
  21:19
  31:23
  32:24
  54:9
  56:11
  78:1,4
  191:17
investigative
  31:25
  32:17
  78:16
investigator
  31:12,16
  33:6
  47:14
  191:18
investigators
  32:7,11,
  13
investigatory
  78:11
invite
  119:12
involved
  15:20
  20:6

40:22
57:16
59:13
63:9
96:15
97:13
127:14
134:23
138:10,
15,16
141:2
142:9
155:10
167:7
involvement
  90:25
involving
  15:19
  209:12
inward-
facing
  160:7
Irene
  9:8
iron
  60:20
issue
  44:2,23
  52:20
  53:15
  60:9
  86:11
  87:8 98:8
  104:14
  107:5
  115:13
  139:23
  140:3
  145:6
  146:16,23
  150:2
  152:1,17
  188:10
  195:14

197:4
issued
  73:23
  147:11
  155:5
  173:16
issues
  14:16,18
  16:7
  29:17
  42:19
  47:4
  48:2,6,9,
  14 49:14
  53:19
  54:3,18
  57:17
  60:7
  62:13,16,
  18 76:8
  78:6 82:7
  100:4
  101:14
  104:3
  105:15
  123:9
  140:5
  158:9
  188:10
  199:1
  210:18
issuing
  146:10
items
  99:14

_____

J

_____

Jan
  127:5
Janine
  99:24
  106:6
  116:3,10,

13 140:25
  142:5
January
  28:23,24
  77:17
  81:18
  97:12
  110:8
  111:1
  126:7
  170:2
  171:10
  184:2
January-ish
  126:5
Jasperse
  120:1,2
Javier
  108:9
Jessica
  100:13
job
  22:5 26:7
  31:17,22
  95:2
  101:2
  165:12
jobs
  122:10
John
  7:13,22
  202:11
joined
  8:4
Jones
  127:5
  142:16
Jordan
  28:11
  29:2
  45:16
  59:8

101:3
126:14,21

**Joseph**
99:18
105:20

**judge**
158:12,16
201:24

**judgment**
151:16

**Judiciary**
18:13

**July**
21:1,25
22:1
31:11
45:7

**jumped**
43:6,9

**jumping**
184:21

**June**
22:2
53:20
54:5,24
56:7,18
57:14,18,
19 58:9
59:19
60:17
62:14,15
64:25
159:2
167:21
168:1

**justice**
8:11,14
9:1 19:8
21:13
33:2
164:6

**Juvenile**

21:13

—————————

**K**

—————————

**Kay**
119:25

**keeping**
96:21
172:2
209:7

**Kemp**
31:15

**Kevin**
45:9,12,
18,19

**key**
52:5

**kids'**
20:6

**Kimberly**
8:13

**kind**
16:21
19:16
23:24
25:24
26:2,25
37:10,25
38:11,23
42:20
43:23
44:12
45:16,23
49:7
50:15
55:16
60:3
63:17
90:12
95:3,7,18
96:18
97:18
99:6

100:7
110:11
112:15
124:2
127:17
130:2
131:12
134:20
141:6
147:5
150:19
151:1,15
152:20
156:22
159:12
163:15,19
175:25
179:7,11
180:21
181:14
187:1
188:9
191:9
196:12
198:15,22

**kinds**
102:1
129:22
154:3
193:17

**kinks**
60:20

**Kirk**
99:18
105:20

**Kirkpatrick**
119:25

**knew**
42:16
80:14
92:14
93:7,8,9
114:13
122:6

135:2
158:19
161:18
179:16

**Knights**
20:4

**knowing**
196:1

**knowledge**
72:2

**Koval**
45:15,23

—————————

**L**

—————————

**label**
202:12

**lack**
81:7
177:25

**Lagrua**
31:20
33:2

**language**
156:15
194:2

**large**
60:11

**largely**
77:18

**larger**
182:25
188:11
195:10

**largest**
157:9

**lasted**
128:4

**late**
33:11

56:10
126:7
181:22

**latest**
162:10

**law**
8:1 12:7,
11 13:19
14:24
15:10,11
16:19
18:8
19:25
23:7,16
29:15
30:7
33:8,12
83:4
117:11
118:15
128:18
129:3
132:14
139:8,18
156:24
157:22
159:24
203:22
206:13

**laws**
23:22
153:18,25

**lawsuit**
16:10
82:9

**lawyer**
25:7

**leadership**
24:14

**leading**
54:19

**leads**
184:17

learn
  56:3

learning
  53:5

leave
  132:5
  165:14

leaving
  26:1

Lee
  43:12

left
  19:10
  45:11,23
  90:20
  125:6,11
  131:21
  159:2
  176:18
  207:2
  208:17
  210:21,
  22,24

legal
  7:13
  12:17,23
  23:15,19
  33:18
  45:21
  132:12

legislation
  29:8,11,
  21,24
  30:5,9,
  10,14,16,
  19 33:23
  34:25
  95:22,25
  105:12,17
  106:5
  107:8,13
  120:14
  132:9
  134:13

136:25
155:13
157:13,18
177:3
203:7

legislative
  33:20
  47:11
  57:16
  58:2,11,
  21 59:5,
  13 96:11,
  23 97:9,
  11 98:8,
  12,17
  99:11,14
  100:19,21
  101:2,7
  102:2,5
  103:21
  104:3,21
  105:3,14,
  18 106:4,
  15,23
  108:17,19
  109:10
  112:25
  114:2
  133:5
  142:25
  143:12
  155:11
  157:16
  159:10
  186:1
  200:1

legislator
  103:23
  110:20
  121:3
  177:1
  183:5

legislators
  27:14,16,
  22 28:9,

19,22,25
29:9
39:16,17,
20 57:8
58:1
83:23
84:4
87:10,23
88:19
96:3,4
103:20
104:1,5,
9,21
112:5
113:8
126:3
127:9,13
138:20
183:5

legislature
  29:5
  91:12
  105:25
  106:11
  113:8
  119:15
  138:9
  151:16,22
  204:20

letter
  33:18

Leung
  8:12,13

level
  75:18

liaison
  23:9,12,
  13 25:12
  28:8
  38:13,18
  43:4
  44:1,2,7,
  22 45:2
  89:19

101:2
106:23
148:21

liaisons
  25:10
  42:11,20,
  25 43:3,
  22 44:12,
  24 45:18
  68:7
  162:16
  210:17

licence
  186:16

license
  135:21
  136:5,8,
  20 186:5
  187:8,11

licenses
  52:3

licensing
  32:2,11,
  19

lieu
  186:4

life
  15:25
  20:13,18

light
  30:6
  72:17

lighting
  74:23

likelihood
  205:9

limited
  152:16

limiting
  210:12

lines

60:6
61:12
62:5
64:14
106:1
117:12
127:18
147:21
152:23
162:23
163:3
166:8
170:19
179:22
186:17

list
  43:19
  80:14,17
  106:7
  169:3
  172:11,
  13,19,24
  173:3,14,
  19
  174:15,20
  175:3,25
  176:3,5,
  10 185:4
  201:25
  202:3,4

listed
  119:24

lists
  139:12
  175:13
  200:10,13
  201:16

litigation
  16:22
  17:5
  33:18
  34:23,25
  35:3
  70:18
  136:17

live
76:25

lived
20:10,12
207:20

lives
207:1

Liz
9:3 164:5
205:21
209:17

local
148:6

locate
165:23
206:6

locating
206:6
208:21

locations
74:22
154:5,11

locked
125:11

locks
74:24

logistical
115:21
116:1

long
12:10
17:1
20:10,25
21:24
45:13
60:6
61:12
82:11
98:5
105:23
162:23
169:12

170:3
177:25
179:3

longer
111:18
196:17
200:3

looked
66:7
69:25
70:3
130:24
160:18
183:14

loop
31:8

lose
163:13

lost
48:19,20
52:4,5
69:22

lot
22:15,16,
17,23
23:21
25:14,16
26:21
29:12,20
30:1 43:7
45:20
48:12
50:9 52:4
53:8 55:7
59:13
60:3,20
61:5 63:3
64:16
71:5
74:12
75:2
77:4,16,
25 78:9
81:1

89:12
91:3 97:2
104:4,8
107:3
108:13
113:3,7,
8,12
118:8,9,
23 122:21
127:25
128:24
131:9,10
132:23,24
133:3,10
134:1
146:19
147:1,17
148:6
154:12
158:2,4,
6,7
160:1,25
161:2,3
166:10,11
179:23
185:17,21
189:12,13
197:18
198:1
207:13
208:1

lots
182:5

love
209:23

love-hate
124:2

luxury
86:22

Lynn
99:19,22
105:20

——————————
        M
——————————

machine
50:11,17
107:5

machines
49:14
51:13
106:17
120:7,11
121:1,14,
25 122:8
132:25

Mack
9:13

Macon-bibb
9:12

made
52:12
56:10
70:19
71:13,19
77:19
81:16
120:10
121:1
122:5
129:4
132:15
141:19
143:23
180:21

Maggie
9:15

mail
65:13,22
66:17
67:10
68:4
72:21
179:15,17

mail-in

72:17
122:22

mailbox
44:19

mailed
73:16

mailing
84:12

main
14:25
21:21
41:25
49:2
79:24

maintain
135:24

major
60:6
145:6
152:13
198:21

make
8:8 9:6
10:20
11:19
25:21
33:4
49:9,19,
20 50:5
62:8,24
70:8 74:5
75:1
79:13
80:4,7
82:17,18,
23 83:5,7
84:25
85:3,6
92:8,11
100:2
133:5
168:8,13,
17 178:25
204:6

205:5
207:24
210:13

**makes**
61:24
83:19
121:15
122:9,10
170:20
180:21
191:11

**making**
16:1
58:18,23
83:13,24,
25  95:5
147:7
157:5
180:16
206:23
208:24
209:3

**Mana**
8:22
210:3

**manageable**
157:5

**manager**
25:8,13
26:8,16
130:18

**manning**
173:5

**maps**
207:16

**March**
52:13
140:24
170:1

**March-april**
167:24

**mark**

119:25
140:12
155:19

**marked**
109:11
113:15
119:8
140:19
156:2
202:22

**marking**
106:19
157:17
197:15

**Martin**
9:11,15

**match**
73:19
135:17
185:6,16,
23

**matched**
73:15

**materials**
25:16
91:10

**math**
117:15

**matter**
7:15
17:20
165:14
193:6

**meals**
147:23

**means**
142:16

**meant**
151:1
153:4
189:1
203:16,25

**measure**
161:25
162:9,17

**measures**
62:11

**mechanism**
65:20

**mechanisms**
100:7

**mediums**
36:14

**meet**
13:3
19:16

**meeting**
13:11
28:23
97:17,23
103:14,22
104:15,20
110:4,7,
10,12,16,
19  115:7,
10,12
116:22,25
117:23
119:1,13,
24  120:3
126:2
127:4,22
130:2,5
142:12,15
143:10,15
155:15
176:24
177:14,
18,23
178:11
183:3,4,
10  184:1,
7,11

**meetings**
33:4
109:9

129:23
130:6
158:15

**Melissa**
8:1

**member**
20:3,4
57:25
190:13
191:4

**members**
18:7
28:16
36:16
38:17
52:7
66:6,24
72:5,14
88:25
91:12,15,
25  96:12
108:19
111:16
119:13,14
152:4
154:18

**memories**
192:13

**memory**
113:24
129:16
130:4,5
140:5
142:6
146:19
149:14,24
155:1
169:6,15
171:1
176:6
184:7,19
191:12
202:21

**mentioned**

39:6
45:25
49:13
65:19
68:12
88:6
103:15
105:20
130:12
142:11
143:17
144:7
162:10
177:11
182:2
188:5
194:24
196:24

**mentioning**
82:14

**message**
36:5,22
46:18

**messages**
39:2

**messaging**
36:5
37:16

**met**
12:19
13:4  99:2

**method**
27:5
35:15

**meticulously**
97:3

**Metropolitan**
8:18
206:1

**Michael**
66:14

74:11
90:11

**mid**
19:11
126:7

**mid-january**
177:7

**middle**
11:8
132:1
153:2

**miles**
194:6,8

**military**
25:11
43:4

**militias**
146:24

**mind**
10:10
79:25
84:20
86:17
94:20
152:15
153:12

**mindset**
67:11

**mine**
27:10
98:25
163:2

**minute**
53:10
130:8
170:17

**minutes**
11:7
13:10
128:5
163:9,10,
15 194:7

205:16
209:19

**misinformat
ion**
81:21,24
82:3
84:15
92:21
93:1,2,
15,16,19
94:5

**missed**
61:14

**mission**
161:11

**mistakes**
205:10

**mistrust**
123:13

**MITRE**
79:20

**mix**
135:19
163:23

**Mm-hmm**
24:23
112:3
145:24
150:5
182:19
194:14
199:13

**mobile**
63:23
143:19,
20,21,24
144:10,19
145:3,10

**mode**
63:16

**modificatio
ns**

47:2

**moment**
8:7 59:16
109:4,15
111:6
112:2
113:18
119:9
140:14
145:20
146:3
155:23
163:25

**Monday**
179:17
180:15,20
181:7,8,
14 182:17

**money**
42:2,4,6

**months**
20:16
45:22

**Morel**
8:1

**morning**
7:10,11
8:12,17
9:2,8
13:5
204:22
205:1

**motif**
93:21

**move**
50:5

**moved**
19:12
20:16
49:1 52:8

**moving**
49:11

76:8
96:14
134:21
139:24
151:5
162:12

**multiple**
27:10
67:3
123:23
149:24
185:22

**Muscogee**
99:20

_____

**N**
_____

**NAACP**
8:20,23
210:4

**named**
45:15
82:11

**names**
43:5,18
80:21,23
153:24
172:13

**Nancy**
99:20,22
106:2

**national**
87:5
139:12

**nature**
163:16
205:11

**necessarily**
149:10
207:20

**needed**
25:19

41:15,23
52:10,11
62:25
63:11
76:9
160:8

**negatively**
95:22,25

**network**
74:17

**news**
83:17
92:6

**Newton**
119:25

**night**
203:20,24
204:2,12,
14,25

**nightmare**
116:20

**ninth**
117:16

**nodding**
10:11

**non-profit**
108:5

**noon**
194:9

**normal**
72:19
154:21

**Northern**
7:5

**note**
129:21

**noted**
174:18
200:23
201:1

**notes**
129:10,
12,13,15,
20 183:25
184:25
205:16,21

**notice**
119:17
161:23

**noticeable**
72:18

**noticed**
184:9

**noting**
201:18

**November**
57:15,19
58:10,24
60:12
64:18
65:1
70:24
72:13
85:23
86:22
116:12
169:17
171:7,15

**number**
7:6 80:12
109:16
110:4
112:19,24
113:17
116:22
117:4
130:9,10,
12,21
140:10,
11,16
143:3
146:23
155:21
175:13

180:18,22
183:14,
19,21
184:12,17
185:14
186:4,16,
22 187:8,
12 198:25
199:14
210:13

**numbered**
172:24
174:15,20
175:3
200:10,13
201:16

**numbers**
65:15
80:10,22
82:5
128:24,25
135:21,22
142:12
168:9,13
179:6
180:23
183:17
186:9
204:16

**numbers-
wise**
168:17

**numerical**
102:7

———————

**O**

———————

**oath**
10:7
56:21
174:4

**object**
10:25
28:3 34:4

39:19
46:14
48:4
53:1,22
54:6,20
55:25
58:13
59:6 60:1
61:18
62:6,19
64:9
65:4,10
66:8
67:1,17
68:14
69:8
70:12
71:10,16
72:9,25
75:10,24
78:13
79:2 80:6
81:22
82:20
84:8,18
85:5
89:21
91:18
92:10,23
95:23
100:9,24
115:6
117:22
120:17,18
121:11
125:16,18
135:10
137:12
142:23
147:16
149:2
150:16
151:12
152:8
154:6
157:11
193:22

194:20
209:10

**objection**
34:8
48:11
55:2
70:16
75:16
83:1

**obligation**
189:6

**observe**
59:24
60:2

**observer**
197:15

**obstacles**
63:8

**obvious**
80:19
133:2

**occasion**
144:22

**Occasionall
y**
38:5
98:19

**occasions**
170:13

**occurred**
138:11

**October**
146:4

**odd**
22:22
168:8
180:22
210:25

**offer**
189:3
190:2,5

195:3

**offered**
101:6
190:19

**offering**
147:2
190:6

**office**
16:4,15
17:7,11
21:23
23:9
26:6,10
27:9,25
28:17
31:10
33:14
39:25
40:18
46:11,24
47:12
49:19
50:2
56:12
57:1,22
59:4
60:21
62:12
66:7,24
67:16
68:20,24
71:8,15
72:6,15
74:10
76:18
78:20,25
84:14,17
88:3,22
89:1,19
91:16
92:1
95:13
96:19
97:15,21
98:4,23,

25 101:1
105:24
108:18
110:15,18
114:1
119:14
126:9
127:4
133:21
134:7
135:7
138:3,24
142:8,25
146:14
156:16
157:8
158:24
159:4
160:19,24
164:17
165:22
167:14,17
168:25
171:9,21
172:15
175:14
177:2
179:15
184:2
200:14,19
201:20
206:5
208:18
210:21

**officer**
15:15
20:1,23

**officers**
21:11,12,
19

**official**
35:20
146:3

**officials**
18:20

24:4,16,
25 39:23
52:7 58:1
86:4
99:10
104:22
105:16
123:19
133:22
148:3,6,
11 152:22
158:24
181:19
182:4,6,
10
185:11,14
188:6
189:14,17
191:14
192:14
195:2
199:23
203:23

**online**
37:9
90:13
96:22

**open**
86:7
94:24
160:25

**opened**
33:1
56:11

**operate**
50:21

**operation**
45:17

**operations**
25:15
38:25

**operators**
21:14

**opinion**
152:24
155:5
203:15

**opportunities**
64:7 75:1

**opposed**
133:8
160:19
209:8

**options**
62:4

**order**
22:8
49:25
73:12,20
116:19
126:8
147:20
201:23
202:6
211:11

**ordered**
201:24

**organizations**
108:5

**organized**
157:1

**originally**
180:13

**out-of-precinct**
117:18
187:23
188:7
189:19
194:18
195:1
197:5,14
199:14
200:3,17

201:21

**out-of-state**
80:22

**outcome**
77:11

**outdoors**
208:21

**outer**
73:19

**outlines**
111:3,7

**outreach**
22:16
52:11
61:1

**outstanding**
168:15
178:7
179:22

**overcome**
187:17

**overdrive**
63:18

**overlays**
207:16

**overseas**
25:11
43:4

**overseen**
44:19

**Oversight**
90:23

——————

—— **P** ——

——————

**p.m.**
211:16

**pad**
60:9

**pads**
173:25

**pages**
145:17,22

**pandemic**
48:18
51:18,19
63:15,17
72:17

**paper**
106:19
148:25
174:2

**paragraph**
150:4
153:2
158:1

**paraphrasing**
195:7

**parenthesis**
203:13

**part**
19:13
21:4
22:10
28:25
29:22
30:24
36:17
61:14
76:16
93:20
122:18
156:17
165:8
191:8
200:1,4,6
204:4,9,
10

**participated**
130:3

176:24

**parties**
82:14,24
89:24
107:7
108:4
111:15
153:24

**party**
105:22
106:1
107:24
108:1,19
111:14

**passed**
30:4
89:14
105:8
210:16

**past**
50:16
162:8

**patently**
133:2

**patrol**
15:15

**pattern**
70:1
72:19

**patterns**
69:18
70:10,13
72:7,13,
21 207:15

**peace**
20:23
21:10

**peanuts**
148:1
150:8,14,
21 151:7,
15,18,24

**pedestrian**
208:7

**pending**
30:18
105:7
106:15
107:8,13

**people**
21:14
25:4,24
29:20
37:25
39:4
52:2,14,
25 53:10
58:4,23
61:1,2,20
62:7
64:13,15,
16 65:25
66:17
69:18
72:20
76:13,23,
24,25
77:4 78:4
80:2,3,
10,12,20,
22 81:2
82:6
84:6,21
85:3 86:8
98:11
99:23,25
103:2
106:3
108:14,24
112:11,16
114:19
118:5,18
121:19
122:1,20,
21 126:19
129:20
130:15
131:7

132:3,23
136:18
137:5
138:6
140:2
147:3,23
148:7
149:16,17
158:15
161:3
177:1
178:17,22
181:5
185:23
187:10,11
188:11
195:25
196:9,13
197:7,11,
12 198:7,
14 200:7
204:21
205:8
207:25

**percent**
19:1
102:20
128:22
136:18
148:14
162:5
169:10
170:8,19,
21 173:20
174:22
175:20
206:25

**perception**
153:8

**perfect**
43:24

**perform**
159:22,23

**period**

43:8 45:4
57:21
186:2

**permanent**
199:9

**permissible**
117:11

**persistent**
192:5

**person**
28:8
38:25
65:23
66:18
80:15
104:11
122:22
165:10
197:8

**personal**
15:21,24,
25 35:8,
19

**personally**
26:15
35:3
87:14

**perspective**
95:21
192:21

**persuasive**
85:11

**ph**
43:14

**phone**
35:13,19,
23 36:4
104:10
105:11
107:11,17
139:15
147:19

149:1,11,
13 159:12
161:2

**photo**
135:16
136:14
185:5,14,
19,21
187:21

**phrase**
192:23

**physical**
74:20,22

**physically**
49:17
142:20
143:5

**PI**
145:15

**pick**
50:16

**picked**
149:11

**Pico-prats**
108:9

**pieces**
103:12

**pilot**
24:9

**pink**
174:11

**pinpoint**
207:17
208:9

**pitch**
86:16

**Pitts**
43:12
148:13

**Pius**

20:7

**Pivoting**
130:16

**pizza**
148:5

**pizzas**
147:4
149:21

**place**
21:17
31:3
51:9,12,
15 55:10
73:6,11
74:2
75:3,5,8,
13,15,18
76:12
110:7
138:15
153:18,19
154:9
163:21
172:10,20
173:4
175:4
176:13
189:6
194:4
195:25
196:1,5,7
198:2,4
210:15

**places**
50:25
51:2,3,4,
7,25
53:8,24,
25 123:10
132:24
146:21
153:3
154:2
175:23

190:6
206:22

**plaintiff**
8:6,14
11:13,18
166:25
205:18

**Plaintiff's**
109:11,17
113:15
119:7
140:13
145:13
155:20,21
202:14

**plaintiffs**
7:14,23,
24 8:10,
11,16,19,
20,23,25
164:3
206:1
210:4

**planning**
8:8

**plans**
9:6

**playing**
92:3

**point**
23:14
58:21
86:16
105:21
114:24
118:6
120:4
135:16
136:16
146:10
147:22
158:20
163:12,14
168:4,5

178:12
180:17
181:15
184:24
185:4
187:19
195:4

**pointed**
180:14

**pointing**
23:22

**points**
114:7
143:11
155:15
162:7
185:4

**police**
21:11
33:11,13

**policy**
36:11

**political**
19:7
68:13,19,
22,24
69:1
82:13,24
107:7
108:19
135:3
153:6,8,
12,18,24
154:10

**politically**
69:4

**politics**
95:6
134:23

**poll**
48:19,20
51:22
52:4,23

53:3
60:9,23
63:2,9,10
85:17
86:5
173:5,12,
25 189:6
206:13

**polling**
50:25
51:2,3,4,
7,9,12,15
55:10
146:21
153:3,19
154:2,5,
11 163:21
172:10
173:4
175:23
176:12
189:5
194:4
195:25
196:1,6
198:2,4
206:22

**polls**
133:16

**poorly**
207:24

**pop**
98:3
101:19

**population**
206:11

**populations**
123:25

**populi**
103:1

**position**
20:21,25
21:22,24

33:7
190:3

**positions**
31:9

**positive**
127:16
149:23
155:8
173:18,21

**positively**
124:7

**possibiliti
es**
186:23

**possibly**
66:9
183:5

**post**
38:24
39:1
179:15
204:16

**post-
certified**
21:14

**post-credit**
21:18

**posted**
21:20
37:14

**potential**
30:9
108:14
117:5
132:8

**potentially**
36:23
57:17
120:15

**power**
50:14

PPE
63:1,10

PPP
41:13

practice
35:12,22
107:13
129:11
147:24
149:17
152:18
154:21
188:12

practices
16:20

pre-2021
136:17

precinct
118:12,18
188:2
190:8

precise
168:21

prefer
122:21

preference
122:24
206:10

preferences
29:17
122:20

preliminary
79:22

prep
13:1,7
14:1

preparations
70:4

prepared
49:22

preparing
24:17

present
13:7,9
33:2

presented
81:2,6
143:10

preserve
33:19

preserving
34:2

president
77:12
83:20
188:16

presidential
77:14

press
95:6,15
160:4
161:14

pressure
85:19

pretrial
17:13

pretty
20:18
39:21
45:13
49:16
85:24
111:24
124:6
157:23
160:6,15
169:24
174:21
181:24
190:13
192:15

200:12

prevent
73:6,24
153:18
154:10

previous
47:23
64:22
109:18
152:18

previously
114:16
119:8

Primaries
56:8

primarily
24:5 26:7
35:5
36:4,20
37:11,22
39:4
195:17

primary
18:1
23:9,11
27:5 28:8
35:15,24
36:1
53:21
54:5,14,
25 55:16
56:18
57:14,18
58:10
59:20
60:4
62:14,15
63:6,7
65:1
75:22
84:14
100:12,20
111:15
156:14

158:23
167:21,22

principle
166:1

print
80:14

printer
50:13

printing
106:18

prior
45:9
74:12
93:21
173:25

priorities
97:14
98:17
114:1

private
27:22
32:20
208:8

probate
158:12,16

problem
22:25
28:20
55:5
114:18
115:15,
20,21
121:8
140:10
149:12
161:17
189:21
192:7
195:15,21
196:15,24
198:18,21
203:14
204:1,9,

10

problematic
185:23

problems
53:8,11
81:17
113:12
121:21
187:16
189:21
198:6,20

procedure
125:21

procedures
50:20
74:2

proceed
9:23
23:20

process
28:14
30:25
62:9
76:12,14,
15 86:25
146:10
175:3,4,8
197:1

processed
181:18

processes
73:9 84:7

processing
181:16
188:8

produce
22:13
34:7,16
66:15
71:9
91:10

produced
   33:16
   35:2
   68:17

producing
   34:22,24
   74:5
   159:25

professional
   32:18

program
   19:11
   20:6 24:9
   41:11,20

prohibitions
   147:13
   154:1

project
   8:24

promote
   159:19
   161:5

prompted
   146:16

prone
   205:5

proper
   190:8

properly
   49:21
   74:7
   76:10
   123:11
   125:12
   170:12

proposal
   205:12

proposals
   57:25

96:24
102:5

propose
   29:8
   105:17
   143:11

proposed
   26:19
   29:10,19,
   23 30:8,
   14 95:22,
   25 106:15
   119:1
   129:2
   132:9
   134:13
   135:8
   155:13
   203:21

proposing
   121:3

pros
   150:18

provide
   26:19
   28:15
   50:23
   60:22,23
   62:4
   110:4
   156:12
   175:13
   184:16
   200:12

provided
   17:15
   22:20,21
   33:18
   57:4
   75:18
   91:1
   165:22
   193:25
   194:2

200:17
203:6

providing
   47:1
   63:10
   94:17
   117:10
   134:17
   156:12

provision
   117:21
   137:11
   203:21

provisional
   118:1,8,
   14 171:24
   172:2,11,
   12,16,24
   173:6,15,
   16,20,24
   174:10,
   16,19,20,
   23 175:24
   176:13
   187:20
   188:2,8,
   14 189:2,
   3,7
   190:2,5,
   6,19,22
   191:1,6,
   10,20,21,
   23 192:1,
   6,17,24
   193:3
   197:2,14
   198:8,9,
   14,15,20,
   22,25
   199:2,5,
   15 200:8,
   18,25
   201:1,3,
   5,16,18,
   21 202:5

203:12,
13,19
204:10

provisional
ly
   172:7

provisions
   14:12,24,
   25 187:10

proximity
   207:5

public
   44:23
   96:20
   122:11
   161:14
   168:7
   169:19
   202:3,4
   208:4,8

publicly
   202:4

pull
   67:23
   68:2
   71:21
   88:7

pulled
   67:15

pulling
   150:22

pulse
   99:7

purple
   185:4

purposes
   7:25 8:4
   36:5
   116:10
   141:21

push

205:8

put
   38:24
   39:16
   75:8,12,
   15,18
   86:5
   115:15
   124:3
   142:12
   149:9
   157:1
   178:14
   196:25
   201:13,25
   203:22
   205:2
   208:15

putting
   68:10
   72:4 75:5
   206:21

―――――――

Q

―――――――

qualifying
   22:8

quantify
   195:22

query
   131:8

question
   10:15,19,
   22,23
   11:2,3,8,
   9 23:7,19
   34:12,14
   38:6,10,
   11,15
   44:2,7,25
   47:19
   66:5
   67:19
   69:22,25

70:8
80:13
83:8 86:9
87:7 94:2
98:6 99:4
112:24
120:5,21
126:1
130:25
169:18
175:17
182:11
200:11
203:20
209:14

**questionable**
79:10

**questions**
11:1,15,
16,19
15:4 19:3
22:23
31:7
42:14
45:21
87:20
106:4,18
108:12
110:22
111:15
112:25
113:4
114:7
130:16
146:20
147:1
153:24
164:4,7,
14,19
167:3
171:23
185:2,10,
18
205:14,
18,19

206:2
209:19,23

**quick**
204:9

**quickly**
205:7,20

**quitting**
160:11

—————————

**R**

—————————

**race**
132:8
136:7,12
189:8

**races**
65:17
87:4
118:12
204:5

**Rachel**
9:13

**racial**
69:6,14,
17 70:1,
11,13,15
71:1 72:6
130:20
132:8,10
136:3,22
206:18

**Raffensperger**
40:24

**railroad**
49:8

**raise**
7:16

**raised**
42:21
188:6

197:22

**Ralston**
56:6

**ran**
25:8,18
26:6

**rate**
101:23

**rational**
206:18

**Rayburn**
45:9,13

**reach**
38:12
89:24

**reached**
58:1
86:16
104:24
107:19
210:17

**reaching**
87:11,14

**read**
14:10
74:6
146:18
153:9
211:10

**reading**
141:6

**ready**
86:20
87:3
94:22
181:16

**real**
93:5
121:10

**realistic**
205:7

**realize**
170:3

**realized**
165:3
200:10

**realizing**
113:12
205:2

**reason**
61:8 83:9
133:20
145:20
173:15,
18,19
174:17,
18,23

**reasonable**
43:21
47:1
150:9
179:24

**reasons**
26:15
60:14

**recall**
14:2
15:11
16:6
18:10,17
27:21
28:21
30:18,20
34:22
35:11
36:2,11,
13 37:6,
17 38:16
40:21
41:8
43:5,18
46:25
47:5
48:1,8
56:6,13,

16,22
57:3,23,
24,25
58:5,25
66:21
68:8,15,
21 69:1,
4,12,15
72:10,20
75:21
76:1,3,5
78:11,19,
24 82:5,
13 83:13,
23 84:3
87:10,22
88:18,23
89:11
90:2,16,
22 91:2,
4,6,11,
13,14,19,
23 100:15
101:12
105:10
106:21
107:4,9,
15,18,23,
25 108:7,
8,15,23
110:8,11
112:8,25
113:20,
22,25
116:2,21
119:19,23
126:3,4,
7,9,15
127:24
128:15
129:4,14,
25 130:1
133:4,10,
20,25
134:6
135:12,
13,15

137:1,3, 6,15,23
138:1,11, 22,25
140:8
141:7
142:3
143:19
144:6,13, 14 148:10
149:19
154:20
155:7,14, 17 167:4, 20 170:9, 11 171:8
173:14
177:24
185:11,21
189:23
193:9
200:6
201:19
207:19
210:7,16

**receipt**
101:22

**receipts**
41:23

**receive**
28:14
32:22
76:19,21

**received**
35:23
40:18
179:18

**receiving**
55:24
113:20
154:13
177:21
179:9

**recent**

16:7

**recently**
162:3

**receptionist**
25:25

**recognize**
40:11
72:16
108:10
109:20,22
156:5,6
202:17, 19,21

**recognized**
114:17

**recognizing**
187:9

**recollection**
33:25
109:23
112:20
115:13
126:25
142:1
182:23

**recommendation**
121:7

**recommendations**
97:14
102:10

**recommended**
117:20
181:3

**reconcile**
168:13

**reconciling**
196:16

**reconfigure**
51:2

**record**
7:8 59:15
81:3
94:24
109:3,5
131:16
132:5
160:25
163:24
164:24
172:1

**records**
169:19
200:8

**recount**
86:18
199:5,11

**recounts**
78:20
160:10

**recruited**
52:25

**recurring**
147:10

**reduce**
61:11
117:3

**reduced**
151:21

**reducing**
115:3
117:12

**refer**
40:9
131:5
145:17

**reference**
111:12
113:1
116:2

128:15

**referenced**
16:2 92:9
109:9
124:25

**references**
145:15

**referendum**
153:24

**referred**
63:23
173:23

**referring**
111:10
112:9,21
184:21
196:25
204:13

**refers**
141:12

**refrain**
10:11

**refresh**
142:1

**refreshments**
153:8

**refrigerated**
52:17

**region**
206:10

**registered**
86:8
136:19,20
190:16,23
191:2
193:2
196:21

**registering**
22:9,10

154:14

**registrar**
158:9

**registrar's**
172:15

**registrars**
24:16
158:13,18
159:11

**registration**
25:9,14
26:4,6
36:18
37:1
45:19,20
69:20
73:14,16, 20,22,24
105:4
200:24

**regular**
43:3

**regulate**
32:19

**Rehabilitation**
40:13

**reign**
112:15

**reigns**
191:10

**reimburse**
41:11,24
101:23

**reimbursement**
41:19,21

**related**
17:24
18:7 23:7

34:23
35:9
42:22
54:25
56:8,17
65:25
70:10
101:7
106:14
125:1
147:14
155:12

**relating**
145:9
187:20

**relation**
35:16
115:5
128:10
153:13

**reliance**
64:19
72:8

**relief**
145:16
147:14
152:15
155:12

**rely**
98:15

**relying**
71:2
82:18

**remember**
16:16,25
17:3,25
31:2,6
33:21,22,
24 39:11
56:9,14
57:5,6,12
62:20
63:19
64:2,4

65:11,14
66:4,20
68:23
71:17
79:22
83:15,25
84:1
87:16
90:18
92:2,5,7
96:8,10
97:18,23
100:11
105:22
110:10,12
114:4
115:11
116:9,13,
14,25
126:12
127:5
128:8,24
129:20
130:9,14
133:13
135:18
136:16
139:4,10,
14
143:15,16
148:15
155:16
159:7,8,
11 162:6
165:24,25
166:12,
15,16
167:7,23
168:1
169:2
171:11,12
175:2
177:11,
16,20
178:4,24
180:12,16
181:4

182:9,14
183:4,9
184:6
185:22,25
186:7,9,
16,19,20,
21,24,25
187:1,15
189:16
191:15,16
192:8,12,
13
195:12,21
197:21
198:12
199:19,25
200:16,23
201:10
203:15

**removing**
185:6

**renting**
52:17

**repeat**
194:14

**rephrase**
10:20
120:23

**replace**
135:17

**reply**
39:1

**report**
66:15
71:18
79:19,22,
24 95:17
103:4
131:1,13
199:18
201:20

**reported**
25:2

51:11
83:19
95:18

**reporter**
7:16 10:9
165:13
211:8,13

**reporting**
68:8
203:19
204:13,14

**reports**
13:21
15:18,20
32:22
68:17,23
69:1,4
70:3
71:21
72:4
83:15
131:11,
17,23
132:4
137:10,24

**represent**
9:3
110:13
141:12
206:14

**representative**
95:12
127:14,15
141:15

**representatives**
24:19
119:24

**represented**
12:3

**representing**

8:13,23

**Republican**
107:24

**Republicans**
107:23
108:3

**request**
14:21
28:1,15
55:24
67:9
71:13,18
89:25
128:11,13
130:13
177:20
178:3
179:12

**requested**
67:8
84:12
178:9
185:12

**requesting**
55:23
177:12
178:5,22
183:6,7

**requests**
43:20
67:13,15,
20 87:21,
25 88:18,
21 90:4
94:24
160:25
185:21

**required**
50:9,10
115:14
199:7

**requirement**
19:17

42:17
88:16
135:16

**requirements**
42:12
206:13

**requiring**
185:5

**reread**
13:19

**reschedule**
48:21

**research**
197:7

**resolve**
60:10

**resolved**
16:11,12
60:3

**respect**
42:18

**respected**
106:1,12

**respond**
22:23
32:18
38:3,13
42:18
46:19,20
51:16
94:25
95:2
96:13,16
99:5
109:14

**responded**
46:11
57:9,11
78:10,15
124:6
140:1

**responding**
43:23
203:4

**response**
18:20
29:9
30:16
41:5,14,
16 70:18
83:2
108:21
110:3
139:7,22
203:6

**responses**
78:24

**responsibilities**
21:7 22:4
31:19
42:9

**responsible**
21:9
26:11
42:6
66:12,14
88:2
95:11
138:4
147:7
172:16

**responsive**
34:1 35:1
42:13
47:4

**restaurants**
208:10

**restore**
120:6
121:4

**restrictions**
124:19,20

**restrictive**
178:13

**result**
65:6

**resulted**
84:6
208:21,25
209:4,9

**results**
65:2,9,17
68:11,19,
22 69:14
74:6
77:7,8,10
85:25
90:13
159:25
196:17
197:19
204:19
205:6

**retain**
12:10,12

**retained**
12:13
174:6

**retention**
36:11

**retired**
105:21

**retirement**
105:22

**return**
66:1
175:25
176:4,14
180:6

**returned**
73:18
168:15,16
169:3,10
176:4,20

**returns**
170:10
203:24
204:8

**review**
13:18
65:2,8,25
66:23
79:6
103:11
109:16
111:7
112:2
113:18
119:9
140:15
146:3
155:23

**reviewed**
13:20
66:7
68:20
79:8

**reviewing**
37:20
104:25
113:21
137:24

**revise**
193:6
194:17

**revision**
193:19

**Rich**
127:10

**Richmond**
9:14
99:19

**Rick**
64:3
119:25
144:21

**ring**
107:11
201:6

**rings**
201:13

**rise**
123:11

**role**
17:6 21:7
25:24
26:18,20
35:17
40:4
47:13
77:21,24,
25 89:10
93:14,16
94:16
101:7
156:11,18
167:5

**roles**
22:4
31:18

**rollout**
49:13

**room**
50:6
114:20
166:22

**roundtable**
192:16

**Rudy**
83:13
87:18

**rule**
30:24
118:17
124:18

**rules**
10:5
23:23

30:16,21
58:16
75:12,15,
17 118:15
124:13
159:25
188:21
192:6,10
193:7,16,
19,20,24
194:2,10,
11,17

**run**
87:3
115:24
131:11,13
154:22

**running**
104:17
122:2

**runoff**
60:18
77:13,17
81:13,18
86:13,20
87:8
115:5,16,
17 116:5,
7,11,23
126:6
138:13
160:9
171:10

**runoffs**
114:25

**rural**
166:12

**Ryan**
9:2,3
13:9
26:22
28:10
29:1 31:3
59:8

87:19
88:4
97:20
98:11,18
101:3,14
126:11,21
127:17
131:7
138:7
140:25
141:9
142:5
154:22
164:5,9
165:4,6,
8,16,19
167:2
194:13,21
202:11,
16,24
205:13
206:4
209:18

**Ryan's**
98:24

———————

**S**

———————

**sacrificed**
153:7

**safe**
123:5

**safeguard**
73:21
74:2

**safeguards**
73:6 75:7
154:4,9

**safety**
120:10

**salmon**
174:11

**Sam**
59:8
101:1
107:14
126:24
138:8

**sanctuary**
153:6

**sanitation**
41:14

**Saturday**
133:8

**Saturdays**
133:9

**Savannah**
193:2

**save**
97:22

**SB**
13:19
14:12
18:2,4
127:14
128:25
129:2
133:6
137:10
138:17,21
139:25
141:2,16
142:7,9
143:18,23
156:20
157:8
158:3
159:8,12
180:10
201:9
210:16,22

**scale**
125:13
152:17

**scenario**
23:17
29:4
30:20
116:16
122:13
123:18
163:6

**scenarios**
32:17

**schedule**
114:24

**school**
19:9,12
20:7

**science**
19:7

**screen**
50:13

**seals**
74:2

**seats**
158:15

**SEB**
124:17
192:10
193:19

**secession**
103:13

**seconds**
163:4

**secretaries**
104:6

**secretary**
16:4,14,
21 17:6,
10 21:23
22:11
26:5,8
27:25
28:11,16

31:10,12,
15,23
35:6 37:9
38:16
39:22
40:17,24
46:7
47:11
50:2
56:11,25
57:22
59:4,9
60:21
62:12
66:24
68:20,23
72:5,14
74:10
76:18
78:10,16,
19,25
82:11
84:13,16
91:16
92:1
95:12
96:12
97:15
100:25
108:18
110:15,17
114:1
116:4,11
119:14
121:22
126:15
133:21
134:7
138:3,23
146:13
154:17,18
156:15
157:8
158:24
160:18,24
161:12
164:17

165:21
167:14,17
168:24
175:14
192:22
200:13
206:4

**Secretary's**
67:16
126:9
127:3
142:8
184:2
200:18
201:20

**section**
40:13
144:5

**secure**
122:3,8
123:5
176:4

**secured**
50:1

**securely**
74:9

**securities**
32:1,13

**security**
41:13
51:10
73:24
74:14,20,
21 75:2,
7,19 76:7
93:21
120:10
121:24
122:14
123:3
125:24
144:20,23
145:3,5
186:3,9,

14,15,22
187:8,12

**Seek**
187:22

**seeks**
117:17

**sees**
30:6

**selected**
24:10

**seminary**
19:10
20:18

**Senate**
7:4 17:20
18:12
77:13
87:4,17,
18 90:23
141:17

**senator**
127:5
141:17
142:15
188:16

**send**
25:22
36:22
41:23
46:17
47:5
52:12
73:14
100:6
101:22
115:14
148:19
198:13

**sending**
39:2
140:6
181:1

**senior**
51:22
99:23

**sense**
78:8
83:19
111:10
124:12
142:8
163:3
177:24
178:13
180:21
191:11
199:18,
20,22

**sensors**
74:16

**sentence**
113:2
153:3

**sentiments**
81:14

**separate**
46:4
50:13,14
174:10,15

**server**
79:13

**Services**
135:24

**session**
13:1
33:20
47:11
96:11
97:9,12,
16 99:11
100:19
103:21
105:18
107:8
108:17

114:2
133:5
155:11
200:2

**sessions**
13:8
186:2

**set**
21:15
24:6
39:12
41:21
49:7,21
50:24
100:21
124:18

**setting**
21:10
97:20

**shaking**
10:12
104:18

**shared**
18:22
44:14
144:16

**sharpen**
70:7

**Shaw**
119:25

**Shawn**
31:20

**sheet**
174:2

**shepherd**
160:9

**sheriff**
21:12

**shifted**
95:3,4

**shirts**

153:23

**shook**
89:6

**short**
116:19
170:14

**shorter**
61:22
62:5

**shortly**
18:1

**shot**
170:3

**show**
66:16
76:12
113:14
119:6
147:23
163:20
178:5
202:9
206:10

**showed**
68:18
69:17
70:1
131:1
132:2
178:20
189:5
207:16

**showing**
147:4
161:4

**shows**
136:2,5,7
179:20

**sic**
41:13
110:17
126:5

side
  45:18,19
  97:18
  121:23
  141:17

sign
  73:13
  174:4
  211:10

Signal
  36:6

signature
  73:15,19
  135:17
  185:6,15,
  23
  186:11,
  13,21
  187:3
  211:9

signatures
  79:10

significanc
e
  54:11

significant
  47:21
  64:19
  76:4
  125:13
  151:25

significant
ly
  47:17

similar
  39:16
  62:2
  81:15
  103:18
  122:17
  130:6

Simmons
  100:13

simpler
  150:6,7

simply
  81:5
  171:11

single
  80:15
  176:17

sir
  7:17 12:9
  206:3
  209:2,6

sit
  52:1 98:4
  149:23

sitting
  114:19
  166:5

situation
  24:1
  27:17
  122:17
  193:14

situations
  22:22

six-hour
  163:7

skeptical
  121:19
  122:11

skepticism
  123:8

skilled
  60:23

Slack
  36:15
  37:4 39:7

slightly
  183:1

slow

179:22
203:23

small
  140:10
  204:4

smaller
  182:23
  189:23

smooth
  85:24

smoother
  60:15

smoothly
  60:5,12
  61:25
  62:9

Social
  186:3,8,
  14,15,22
  187:7,11

software
  22:13

solution
  55:22

solutions
  57:17
  58:2,11,
  21 59:5

solve
  83:6

solved
  203:15
  204:1

sort
  23:4
  25:13
  29:3
  36:18
  38:6 41:2
  45:17
  63:16

66:16
71:9
93:21
95:1
96:19
99:23
101:13
103:1
121:21
129:17
146:22
147:20
148:2,3
159:13
163:1
172:1
185:15
188:11,20
192:16
194:25
196:18
198:17
201:19

sorts
  30:5

sought
  12:17
  155:3

souls
  133:15

sound
  71:4
  76:15
  182:7

sounds
  182:8

source
  50:14
  84:14
  98:16
  105:24

sources
  40:21
  41:25

82:5,18
143:3
149:16

South
  19:6,13

Southern
  207:11
  208:6

SP
  17:24

space
  50:7,9
  179:24

spacing
  41:18

speak
  13:14
  18:6 57:4
  100:4
  106:10,11

speaker
  56:6,10

speaking
  13:5
  30:18
  57:7
  102:9
  107:23,25
  182:23

special
  210:25

specialist
  25:13

specializat
ion
  19:7

specializat
ions
  19:23

specific
  14:4

28:21
31:6
38:11
47:5 48:6
66:3 77:6
79:6 83:7
84:3
123:6,14
136:22
139:1
143:16
146:17
148:10
149:8
153:11,12
165:25
166:13
184:7,19
185:21
186:17,25
187:14
189:12
192:13
201:24

**specifically**
16:16
30:1
31:2,5
33:22
36:3
40:14
41:16
47:5
56:13
58:5
88:20
95:16
96:16
98:7
105:17
112:10
114:11,22
118:25
126:13
127:5

128:3,8
130:14
131:22
139:14
140:2
148:15
153:25
167:4,6
177:11,17
178:3
180:12
181:22
183:11
185:13,19
186:8
189:16
192:19
197:21
200:18
206:20

**specifics**
113:9

**speed**
42:4

**spend**
23:21

**spent**
20:18
78:3
107:16

**split**
102:6

**spoke**
27:10
56:20
57:6
87:18,20
91:2 99:2
141:9

**spoken**
17:18
30:8
108:14

**spokesperson**
96:19
160:23

**sponsored**
141:15,17

**spread**
94:12

**spreading**
92:22

**St**
20:7

**staff**
36:16
37:23
38:17
89:1
110:15
114:9

**Staff's**
110:17

**Stamp**
109:16
110:24
112:18
113:16
119:8
140:13
155:21

**stand**
17:3
123:17

**standard**
148:2

**standards**
20:23
21:10,15,
20

**standing**
152:6
211:11

**standpoint**
117:2,10
121:10
134:18
135:6
144:19
150:13
152:4
161:7,23
162:18

**start**
38:8
47:14
97:5
126:8
129:18
143:8
163:13
164:18

**started**
25:5
31:14,24
33:10
45:6
63:5,13
96:11
148:4
167:24
191:12
195:5
196:13
201:8,9

**starting**
8:10 19:4
39:3
153:3

**starts**
38:9

**state**
7:7 9:18,
21 12:14
16:21
20:1
21:5,12

22:5,7,11
23:23
26:3,6
30:12,20
31:13,23
32:21
33:3 35:6
38:16
39:22
46:12,20,
22 49:18,
19 58:15
62:17
74:16
75:5
76:25
77:3
78:10,20
80:3,15
82:7,11
87:10
88:19
92:4,9
114:25
115:16
116:4
118:16
121:22
124:18
136:21
155:4
159:24
188:21
190:12
191:4
193:5
194:16
198:13
211:2

**State's**
16:4,14
17:6,11
21:23
26:6,9
27:25
28:17

31:10
37:10
40:18
46:7
47:12
50:2
56:11
57:1,22
59:4
60:21
62:12
66:24
68:20,24
72:6,15
74:10
76:18
78:25
84:13,17
91:16
92:1
95:12
96:13
97:15
100:25
108:18
110:15
114:1
119:14
133:21
134:7
138:3,23
146:13
154:18,19
156:15
157:8
158:24
160:18,24
164:17
165:21
167:14,17
168:25
175:14
200:14
206:5

**state-wide**
159:14

**statement**
153:14

**States**
9:1,4

**statewide**
86:23
116:19

**station**
173:6

**stationary**
145:4

**statistics**
67:6

**status**
73:22

**stay**
51:25

**stayed**
95:5
105:23

**stenographer**
129:22

**step**
84:16
97:21
119:22
123:2

**steps**
78:11
159:19

**Sterling**
29:2
40:25
41:21
42:3
56:23
57:6  59:8
66:25
67:5,15,
23  87:19

89:18
95:7,10,
14  96:18
97:19,25
98:14,19
101:3
109:13
111:1,3,
24
126:10,20
129:8,9
130:10
131:7
138:8
142:21
160:22
161:12
180:10
181:2
203:1,7

**Sterling's**
95:2

**stick**
162:2

**stickers**
153:23

**stone**
48:25

**storage**
50:5

**store**
50:10
52:17

**stored**
50:1

**storing**
50:19

**story**
60:11
92:14
93:10

**straight**

152:23

**strain**
205:2

**strange**
93:25

**streamline**
11:15

**street**
98:24

**stress**
85:19

**strong**
187:6

**struggling**
147:6

**students**
190:14,21

**studies**
135:6,12
136:24
137:3,4,7
138:4
162:7
207:12

**study**
79:19
137:16
162:4

**studying**
206:22

**stuff**
16:21
18:3,24
25:15
32:21
34:16
39:1
45:20
50:3,15,
19  52:20
60:3  67:6

87:5
94:1,21
95:19
97:2
98:13
99:3
104:21
105:7
109:10
114:3
124:5
130:13
134:23
135:3
147:5
148:5
149:18
157:2,21
158:18
160:5
169:4
170:10
196:17
199:4
208:7

**subject**
150:7
155:17

**subjective**
185:16

**submission**
128:2

**submitted**
145:14

**submitting**
128:14

**subsequently**
169:7

**substance**
157:21

**substantiated**

55:18

**substantive**
103:25
142:4

**substitute**
141:1,3
142:2

**suffering**
151:17

**sufficient**
53:9
154:4,10

**sufficiently**
53:4

**suggested**
114:10,13
130:8,10
180:10

**suggesting**
112:5

**suggestion**
111:13
115:5
185:10

**suggestions**
128:17
129:5

**suitcase**
50:11,12,
17

**summer**
16:11,12
45:11

**Sunday**
133:8,19

**Sundays**
133:9

**supervised**
25:2 42:8

**supplies**
39:1 63:1

**support**
25:12,24
51:5,12
63:16
111:16
112:20
117:21
121:16
160:8

**supported**
96:22
114:10,12
119:2

**suppose**
132:6
142:17
143:2

**supreme**
191:10

**surprised**
170:7,18

**surprising**
170:20

**surveillance**
209:8,9,
13

**survey**
51:10
100:10,17

**surveys**
100:7,15
201:6

**suspect**
114:20
126:18
129:1
131:18
167:7

**suspicion**
187:7

**suss**
23:25

**sustained**
125:1
145:8
147:12

**swear**
7:15,17
127:19

**switch**
109:7

**switched**
157:16,18

**sworn**
17:18

**synonymous**
94:4

**system**
25:9,15
26:4,7,
11,14,16
27:1 29:7
36:18
37:2,16
38:22
39:7,14,
18 42:17
50:10,13,
18 51:6
52:11
53:16
55:15
56:4 61:1
71:20,22
73:24
84:22
88:6,8
90:9
112:14,17
113:10
122:18

131:9,21
157:15
159:20
160:5
162:6
200:24
204:13

**systems**
25:8,13
26:8
38:20
39:15
52:24
88:11
130:18

―――――――

**T**

―――――――

**table**
52:1

**tables**
41:17

**tails**
181:21

**taker**
129:21

**takes**
21:17
196:17
197:11,18

**taking**
129:12,
13,14,20
138:14
158:3
159:7
193:9

**talk**
10:14
18:14
20:20
24:18,20
26:24

33:15
44:8,9
47:9
59:20
66:15,23
77:10
89:12
97:11
104:21
105:9
106:20
107:13
109:8
112:12
149:13
156:10
163:5
178:12

**talked**
12:25
19:22
24:24
29:11,12,
15 40:3
47:3
54:18
58:4
59:19,23
67:3 75:4
80:1
85:16
93:17
95:16
101:17
108:13,
16,24
118:17
126:2
128:4
143:18,
20,21
144:21
145:6
156:11
159:15
160:5,17

164:22
167:11
176:23
177:2,22
178:3
179:5,6
180:13
183:5
185:1
204:12

**talking**
14:11
15:2
23:21
52:14
56:14
59:4 62:3
64:2,3
67:20
78:4
81:10
90:20
99:14
103:17,22
104:15
107:4
108:6,23
111:14,23
117:25
128:9,21
130:14
132:12,14
138:20
142:12
144:24
149:4
150:19
161:13
163:2
167:24
169:25
170:2
171:7
177:10,12
182:1
183:3

188:1,4
192:8
195:13
199:23
200:9
203:16,18
204:16

**tampering**
73:25

**taught**
19:12

**team**
36:22
51:8 59:3
90:11
96:13
100:21
113:1
154:19
197:7

**teams**
11:14
36:14
170:24

**Teasley**
59:9
101:1
126:24
138:8

**technical**
25:14

**technically**
159:6

**Ted**
45:15,17,
23

**telling**
151:1

**temporarily**
75:5

**temporary**
17:9

**ten**
108:2

**tend**
51:22
97:5
157:22

**tended**
98:4

**tens**
52:15

**tenure**
192:15

**term**
92:20
133:12,15
150:10
178:13
201:12

**terms**
83:22
105:10
115:18
124:8
132:17
156:14
157:20
159:13
196:16

**tested**
49:19
74:1

**testified**
10:6 15:5
17:5,8,10
53:13
56:19
90:17
91:25
204:11

**testify**
11:22
16:23
18:6,18

56:21

**testifying**
10:7
18:16

**testimony**
7:18
17:1,15,
19 18:21
34:10
56:23
91:1
164:3

**testing**
74:4

**text**
27:6
36:5,7,8

**the--**
49:3

**theme**
147:10
177:23
178:11
192:5

**themed**
69:4

**then-house**
56:6

**Theology**
19:9

**thing**
39:7 55:4
63:15
80:19
101:21
118:4
134:22
138:25
148:23
159:21
160:13
188:20

199:6

**things**
21:21
22:13,21
24:21,22
29:12
32:19
41:25
44:1
56:12
62:21
63:20
67:4
79:24
83:16
89:5
95:17
97:4,7
99:4
103:17
122:19
125:12
126:12
128:3
130:4
135:12
141:10
143:11,16
147:2
151:8
154:3
156:24
161:3
169:3
176:22
177:22
179:24
187:4
189:10

**thinking**
110:16,19
119:13,16
181:6

**Thomas**
43:13

CHRIS HARVEY
IN RE: GEORGIA SENATE BILL 202

March 10, 2023
Index: thought..transcribing

**thought**
39:9
57:12
58:11
75:17
77:5
81:10,24
92:18
93:5
103:7
118:6
123:20
132:16
169:13,23
170:4
179:3
181:11

**thoughts**
58:2,8
154:23

**thousand**
173:20

**thousands**
52:15

**thread**
109:12
110:23

**threats**
18:19

**threshold**
102:7

**throw**
49:10,11

**Thursday**
179:19

**tied**
81:21,24
105:16

**tight**
49:16

**tighten**
178:13

**time**
13:6
14:21
17:25
22:4
23:21
25:5
26:20,23
35:24
40:16
45:13,14
47:2,16
58:3,9,17
60:25
67:3 68:5
69:16,25
78:4
86:15
99:2
105:13
108:6
110:11
113:21
115:4,24
118:20,
21,22
128:7,11
129:5
132:3
140:4,5
141:9
153:16
157:7
158:3,19
164:15
165:11
167:21,25
168:20
169:5,12
172:2
173:8,9
177:20
179:1
180:6,7,
9,10,17
183:6
186:2

188:22
194:3,9
197:11,
19,23
198:23
199:10,16
209:20,22

**timeframes**
14:21

**timeline**
49:16
116:10
128:1

**times**
16:5,15
17:5,22
26:13
27:10
30:1
53:20
61:17
62:23
67:4
100:11
108:2
112:11
134:2
151:20
158:7
163:8
179:10

**timing**
18:14

**tired**
205:4

**title**
31:13,15
35:10
141:1

**today**
7:2 10:6,
7 11:1,
16,22
13:15

149:23
153:17
164:3,16
183:14

**Todd**
106:24,25

**told**
34:13
51:24
55:10
88:12
93:11
178:6
179:21
190:16
191:24
192:21,22
206:4

**tone**
162:15

**Tonnie**
99:17
105:2,14

**tons**
90:4

**top**
87:6
119:4
140:23
145:23
150:3
199:6

**topic**
18:17
47:8 92:2
186:10
194:24

**topics**
17:3
157:2
158:7
177:17
183:8,9

184:25

**total**
43:4
204:4

**totally**
160:7

**touched**
90:15

**track**
95:5
168:5
172:6

**traffic**
152:21
207:15
208:7,8,
9,14

**trail**
131:22,24
132:2
148:25

**train**
50:22

**trained**
53:4

**training**
20:24
21:10,15,
16,17
22:21
23:3
24:17
40:4 47:6
53:6,8
55:22
157:3

**trainings**
52:24
158:2,23
159:1

**transcribin
g**

10:9

**transcript**
211:12,14

**transcripts**
13:24

**transfer**
166:17
168:4
169:1
170:6
171:10,14

**transferred**
74:9

**transportation**
208:4,8

**transporting**
50:19

**traveled**
207:21
208:2

**trays**
179:15

**treated**
152:11

**tremendous**
51:20
86:6
98:21

**trend**
195:9

**trial**
16:23
17:10
70:4

**troopers**
21:12
198:13

**truck**

150:22

**trucks**
52:17
146:21
147:4
148:5

**true**
80:20
122:6,13
134:10

**Trump**
83:20

**trust**
122:22

**truth**
7:19,20

**truthfully**
11:22

**Tuesday**
182:17

**turn**
19:2
86:19
87:1,3
115:19
164:5
172:13
181:15

**turned**
65:9

**turning**
142:7

**turnout**
65:12
68:13

**turns**
49:9

**type**
37:3 38:8
41:20
65:21

68:8
79:22

**types**
14:14
32:10
130:6
137:24

**typical**
29:4
66:22

**typing**
142:17
143:5

**Tyson**
12:19,22
13:12,15

—————————

**U**

—————————

**U.S.**
7:4 164:5

**UGA**
162:4

**ultimate**
151:6

**ultimately**
71:19
133:5

**uncertainty**
51:20

**unchanged**
175:9

**unclear**
10:19
118:15
149:16
194:11

**understand**
10:6,21
11:20
14:19

28:5 55:8
56:3
67:18
84:16,21
112:6,16
113:9
120:19
158:21
171:6
188:1
204:21
210:23

**understanding**
12:13
14:5,8,9
40:20
55:15
79:11
84:7
93:14
142:24
144:3
168:3
169:20
186:13
197:13

**understood**
10:13,22
11:4 41:1
61:2
122:2
167:12

**undoable**
113:13

**undue**
154:5,10

**unfamiliarity**
52:23
55:23

**unfounded**
82:2

**unintended**
112:7
120:13

**unintentionally**
196:18

**unit**
31:23
145:3

**United**
9:1,3

**units**
63:23
143:19,
20,22,24
144:10
145:10

**units'**
144:20

**universal**
102:23
179:11

**University**
19:9,20
190:15
198:5
207:11
208:5

**unlocked**
125:11

**unusual**
36:21
87:21

**update**
26:16
38:23

**updates**
22:21
47:7
140:4

**upper**

37:23

**upset**
108:25

**user**
132:2

———————

**V**

———————

**vacation**
159:7

**vague**
188:23

**valuable**
206:24
207:2

**Vander**
9:8,9

**variations**
133:10,13

**variety**
32:9

**vary**
173:8

**vehicle**
15:19

**verify**
93:25
174:5

**verifying**
93:22

**versa**
103:10

**version**
92:15

**versus**
65:12,13,
22 67:9,
10 106:19
130:22
150:21

163:18

**vice**
103:10

**video**
92:3,8,9
93:7
209:8,13

**view**
182:13

**views**
29:14

**violate**
21:19

**violated**
147:13

**voices**
100:3

**volume**
61:4
188:7

**volunteers**
85:17

**vote**
41:2
55:10
58:24
61:20
62:8
64:8,15
73:23
117:6
118:7,11
122:21
136:20
147:2,3,
23 149:18
151:19
154:14
163:2,18
178:6
180:2
188:13,16

189:2,7
190:15,
18,21
195:6
196:5,10,
11,20
204:4
207:7

**voted**
55:13,14
66:17
69:18
76:24,25
77:1
80:12
130:22
154:2
163:8,10
172:6
178:18,21
190:8
192:2
197:8
200:25

**voter**
22:17
24:16
25:8,11,
14 26:3,6
36:17
37:1
44:17
45:19,20
46:5
54:4,19,
25 69:20
73:14,15,
22,24
76:20
81:21
105:3
115:18,19
120:6
125:1
138:11,17
139:19

145:9
147:14
151:10
159:16,
19,22
160:2,13
161:5,23
162:1,9,
24 163:8
173:15,
17,22,24,
25 174:7,
10 176:7
179:18,20
189:4
190:4,7
194:3
197:20
200:23
205:10
208:3,21
209:1,5,
9,11
210:8,19

**voter's**
162:19

**voters**
22:9,10
43:21
44:13,16
52:10,13
53:20
55:6,7,22
56:3
64:7,20
65:20
67:24
68:13
70:25
71:3
85:14
115:25
118:11
130:22
132:9
135:9

136:19,25
137:11
161:14
162:5
172:6,11,
25 173:15
174:16,21
175:24
176:13
178:4
186:3
195:5
196:19
199:14
200:2
201:16

**voters'**
207:5

**votes**
196:23
205:3

**voting**
14:12
38:8
39:14
42:12,17
47:17,22
48:18
49:14
50:11,17
52:3 56:3
61:11,16,
24 63:23
64:13,16
69:18
70:1,10,
13 71:2,6
72:7,8,
12,20,23
73:7,10,
13 79:1
80:3,5
82:7,25
83:21,24
84:4,6,7

87:12
91:7
113:10
115:4
116:22
117:4,7,
11 122:18
123:24
130:19
132:19
133:7,14,
19,22,23
135:17
138:21
143:19,
20,22,24
144:10,20
145:3,10
148:8
154:14
157:15
160:5
162:6,19
163:10,
17,18
172:2
174:19
178:19
181:20
187:20
189:19
191:25
193:2
194:18
195:1
196:4,7,
11 198:11
200:18
201:3,17

**vox**
103:1

——————————
W
——————————

**wait**

10:16
53:20
60:6
61:17
100:11
134:4
151:20

**waited**
163:9

**walk**
19:3 52:2

**wanted**
18:18
67:23
102:16
114:1
167:3
169:21
182:16
184:25
185:1,3
187:20
189:25
190:1
205:18
206:1

**warehouse**
25:18,21
197:17

**warming**
14:25
147:15
155:12

**water**
58:23
148:1
150:8,13,
20 151:7,
14 152:19

**waters**
152:5

**ways**
36:15

66:17
161:9
200:16

**wear**
153:23

**web**
46:7

**website**
69:20
201:25
202:4

**websites**
204:17

**Wednesday**
12:20
13:4,11
179:18

**week**
12:20
85:25
180:4
181:6,20
182:18
204:11
209:4

**weekend**
133:6,13,
22 181:12

**weeks**
17:21
89:6
95:15
115:16,17
132:19
178:19,21
204:23

**weigh**
102:3

**weight**
99:13
102:9

**weird**
165:2
180:18

**Whatsapp**
36:6

**wheels**
145:1

**Whichever**
173:5

**white**
71:3
130:22

**widespread**
72:23
76:19
82:15,24
83:21
84:23

**wild**
168:7

**willy-nilly**
198:16

**Wilmerhale**
8:1

**wind**
162:3

**word**
178:1
206:8

**words**
190:4

**work**
10:23
18:14
26:3
28:16
31:8
35:13
36:4
40:10
45:2 49:1

63:7 86:3
118:9
152:22
164:16
197:23

**worked**
15:15
22:12,15
24:5,11,
14 31:25
32:1,2,3
33:12
60:22
62:24
122:3

**worker**
48:19
173:5
189:6

**workers**
48:20
51:22
52:5,23
53:3
60:23,24
63:2,9,10
85:17
86:5
173:12
206:14

**working**
45:15,18
95:4
96:21
128:16
173:9
204:22
207:10,13

**workplaces**
207:6

**works**
10:17
11:10
55:15

**world**
43:24

**would've**
167:10

**write**
172:12

**writing**
30:16
140:3
148:17
149:9

**written**
15:18
18:21
48:25
139:23
150:18

**wrong**
189:5,24
191:25
193:13

**wrote**
15:20
18:24
141:6
147:21
193:23
194:10,11
203:10

---

**Y**

**year**
19:10
45:22
62:24
63:19
80:16
96:14
147:10

**years**
20:17
70:4  75:3

81:3
189:20
192:7

**Yucaipa**
115:15

---

**Z**

**Zatz**
8:17
205:19,
23,24
209:15
211:7

**Zoom**
8:5,9
164:14