**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION
ON SB 202'S ANTI-SOLICITATION SAFEGUARD**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

BACKGROUND ......................................................................................... 4

    A.   Factual background ........................................................... 4

    B.   Procedural background ...................................................... 7

ARGUMENT ............................................................................................. 8

I.   Plaintiffs Fail to Show That They are Likely to Succeed on the Merits of Their Claims ............................................................ 9

    A.   The Anti-Solicitation Provision serves important state interests. ............................................................................. 9

    B.   The Anti-Solicitation Provision regulates only conduct and is reasonable. .................................................................... 12

    C.   Even if the Anti-Solicitation Provision implicates expressive activity, it is content neutral and reasonable. ................... 16

    D.   The Anti-Solicitation Provision satisfies even the highest standard of scrutiny. ...................................................... 24

II.   Plaintiffs Also Fail to Satisfy the Non-Merits Requirements for Preliminary-Injunctive Relief. ................................................ 28

    A.   Plaintiffs cannot show irreparable injury ......................... 28

    B.   Plaintiffs' requested relief would impose significant cost, confusion, and hardship before the upcoming election. ............... 32

    C.   The balance of equities and the public interest weigh heavily against an injunction. ..................................................... 34

CONCLUSION ........................................................................................ 35

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Spear*,
356 F.3d 651 (6th Cir. 2004) ........................................................................ 20

*Boos v. Barry*,
485 U.S. 312 (1988) ............................................................................... 16, 17

*Burson v. Freeman*,
504 U.S. 191 (1992) .................................................. 20, 22, 23, 24, 25

*Bush v. Gore*,
531 U.S. 98 (2000) ........................................................................................ 32

*Citizens for Police Accountability Pol. Comm. v. Browning*,
572 F.3d 1213 (11th Cir. 2009) .................................................................. 22

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ..................................................................................... 14

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ..................................................... 12, 19, 22

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) ..................................................................................... 21

*Curling v. Raffensperger*,
50 F.4th 1114 (11th Cir. 2022) .................................................................. 19

*Democratic Party of Haw. v. Nago*,
833 F.3d 1119 (9th Cir. 2016) .................................................................... 19

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
11 F.4th 1266 (11th Cir. 2021) .................................................................. 14

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .................................................................. 14

*Hand v. Scott*,
888 F.3d 1206 (11th Cir. 2018) .................................................................. 34

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) .................................................................. 13

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
66 F.4th 905 (11th Cir. 2023) ....................................................... 24, 25, 26

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,*
  32 F.4th 1363 (11th Cir. 2022) .................................................. 32

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ................................................................. 18

*Minn. Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018) ............................................................. 23

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ..................................................................... 34

*Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ............................................................. 16, 17

*Rosario v. Rockefeller,*
  410 U.S. 752 (1973) ................................................................. 12

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ............................................................. 13, 14

*Russell v. Lundergan-Grimes,*
  784 F.3d 1037 (6th Cir. 2015) ................................................. 20

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) .............................. 8, 28, 31, 35

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ..................................................... 19, 21, 22

*Voting for Am., Inc. v. Steen,*
  732 F.3d 382 (5th Cir. 2013) ................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................. 8, 30, 31

*Wreal, LLC v. Amazon.com,*
  840 F.3d 1244 (11th Cir. 2016) ............................................... 30

## Statutes

O.C.G.A. § 21-2-263 ............................................................. 7, 29

O.C.G.A. § 21-2-414 ......................................................... 1, 2, 6

O.C.G.A. § 21-2-414 (2016) ....................................................... 1

O.C.G.A. § 21-2-570 ......................................................... 1, 4, 5

**Other Authorities**

Div. of Elections, Ga. Sec'y of State,
   *2023 Election Cycle Comprehensive Calendar* ............................................. 32

Mark Niesse, *Georgia lawmakers under investigation
   for handing out snacks to voters*, Atl. J.-Const. (May 19, 2021) .................... 4

## INTRODUCTION

In Georgia, it has long been unlawful to provide something of value for the "purpose of … voting." O.C.G.A. § 21-2-570. And, even before Georgia enacted Senate Bill 202 ("SB 202"), Georgia law protected voters in line from electioneering and soliciting, irrespective of the line's length. *Id*. § 21-2-414(a), (d). Yet, before SB 202, the law did not directly address certain activities that many voters felt were intended to influence votes, or that caused unwanted interactions inside the protected space around the voting line. As these activities continued to grow, with significant voter complaints during the 2020 elections, the General Assembly responded by clarifying the rules around polling places to clearly prohibit anyone from providing something of value to voters anywhere in line. *Id*. § 21-2-414 (the "Anti-Solicitation Provision").

To do so, the General Assembly applied this new law to the same areas already protected by the State's anti-electioneering law, which applies to voters *anywhere* in line. Indeed, before SB 202, Georgia law recognized a 150-foot Buffer Zone around a polling place where various activities, like electioneering and soliciting, are prohibited. O.C.G.A. § 21-2-414 (2016). And, before SB 202, Georgia law extended those same protections to any voting line that extended beyond the Buffer Zone into the Supplemental Zone, where the same activities are prohibited within 25 feet of voters standing in line. *Id*. In the Anti-

Solicitation Provision, SB 202 simply clarified that, in these same areas, it is unlawful to give voters anything of value.  O.C.G.A. § 21-2-414(a).  Through this provision, the General Assembly increased the protections for voters waiting in line to vote, while also ensuring that third-party organizations may still offer food and water at polling places, provided that those organizations stay a few steps away from voters in line.

In their motions [Docs. 535, 537, 547], Plaintiffs ask the Court to preliminarily enjoin the application of the Anti-Solicitation Provision to voters in line more than 150 feet from the outside of a polling location.  In Plaintiffs' estimation, voters lose their interest in avoiding coerced (and often intimidating) interactions if they are standing in line more than 150 feet from the outside of the polling place.  That is wrong for a host of reasons, both factual and legal.  However, this debate is largely academic because long lines are now rare in Georgia, with an average wait time of approximately two minutes in recent elections.  Thus, Plaintiffs cannot come close to satisfying their burden of showing any irreparable harm warranting a preliminary injunction.

Even in the rare instance, however, where a line extends more than 150 feet from the edge of the polling place, the Anti-Solicitation Provision is supported by many compelling State interests.  As this Court previously recognized, the Anti-Solicitation Provision protects voters from undue

2

influence, promotes voter confidence, and increases election efficiency by establishing a bright-line rule that county officials can easily implement. [Doc. 241 at 52–53]. And those interests do not change as the voting line gets longer.

Rather than challenge these important interests, Plaintiffs largely rely on the mistaken belief that this Court already resolved their First Amendment claims related to the Supplemental Zone in their favor. However, the Court's decision on Plaintiffs' earlier motion only held that Plaintiffs *appeared* likely to succeed on the merits of their claims because "Defendants ha[d] not addressed" the application of this law to the portion of a voting line that is more than 150 feet from the outside of a polling place. [Doc. 241 at 56 n.23]. Here, State Defendants fill that gap.

Through this opposition, and the cited portions of the record, State Defendants confirm that the State's interests supporting the Anti-Solicitation Provision apply equally to the voting line whether it extends five or 200 feet from a polling place. And Plaintiffs, who carry the burden at this stage, have not identified any evidence showing otherwise. Accordingly, the Court should deny Plaintiffs' motions because they have not demonstrated a likelihood of success on the merits of their claims. Moreover, the Court should deny Plaintiffs' motions because of their unreasonable delay, lack of irreparable injury, and failure to show that the balance of equities tips in their favor.

## BACKGROUND

### A.    Factual background

In Georgia, it is illegal to solicit votes in the areas surrounding a polling place or to give anything of value to voters for the "purpose of … voting" in any location.  O.C.G.A. § 21-2-570.  However, until SB 202, there was confusion about whether giving something of value to a voter waiting in line constituted giving something of value for the purpose of voting.  *See* 1st Germany Decl. ¶ 28 (Ex. A).  That confusion came to a head when, during the 2020 elections, many third-party organizations approached voters in line with food, drinks, and other things of value.  SB 202 at 6:126–27 [Doc. 566-59]; [Doc. 241 at 8 ("ponchos, umbrellas, fans, books")].  As State Election Board ("SEB") member Matt Mashburn explained, "the practice of giving out food and drinks 'got out of hand' in recent years, with taco bars, buffets and snack stands set up at polling places," even though "[t]here's not supposed to be any interaction between virtually anyone and the voters and poll workers so they would be free from intimidation."[1]

These actions led voters to complain to the Georgia Secretary of State that they felt these third-party organizations were attempting to influence

---

[1] Mark Niesse, *Georgia lawmakers under investigation for handing out snacks to voters*, Atl. J.-Const. (May 19, 2021), https://tinyurl.com/2p92b7se.

their vote.  1st Germany Decl. ¶¶ 26–27.  For instance, many voters felt "intimidated by the presence" of third-party organizations handing out food and water. *Id.* ¶ 30(a).  Others complained that the organizations had partisan motives. *Id.* ¶ 30(a).  And none of these complaints suggested that the concerns diminished when a voting line extends more than 150 feet from the polling place.  2nd Germany Decl. ¶ 22 (Ex. B).

Additionally, the increased number of organizations providing things of value to voters in line presented logistical obstacles to running efficient elections.  Polling locations operate under complicated rules that ensure the voting process is free of outside influence, confusion, or harassment. 1st Germany Decl. ¶¶ 17–24. Before SB 202, however, the law was "very confusing" to county officials who were unsure what to do when these activities took place in the Supplemental Zone. 2nd Germany Decl. ¶ 24. Indeed, while it was unlawful to provide something of value for the "purpose of … voting," O.C.G.A. § 21-2-570, it was difficult to apply that rule to the handing out of food and other goods to voters waiting in line, 2nd Germany Decl. ¶ 24.

SB 202 thus created a single rule that prohibits providing things of value to voters anywhere in line. *Id.* ¶ 25.  It also updated Georgia's pre-existing solicitation ban to make clear that the ban includes "giv[ing], offer[ing] to give, or participat[ing] in the giving of any money or gifts, including, but not limited

5

to, food and drink, to an elector" while voters are waiting in line.  O.C.G.A. § 21-2-414(a). As the General Assembly explained, this update protects voters "from improper interference, political pressure, or intimidation while waiting in line[.]" SB 202 at 6:127–28.   And it protects against the *appearance* of improper interference, pressure, or intimidation.  Mashburn Decl. ¶ 19 (Ex. C).

At the same time, the General Assembly permitted poll officers to "make[] available self-service water from an unattended receptacle to an elector waiting in line to vote." O.C.G.A. § 21-2-414(e).  And SB 202 did not prohibit voters from bringing their own food or drinks to consume while waiting in line to vote.  Further, SB 202 did not alter the ability of third-party organizations to provide food or water to voters in the Supplemental Zone, provided they stand at least 25 feet from any voter in line.  2nd Germany Decl. ¶ 28.  This gives the voter a chance to temporarily leave the line and approach the third-party organization.  *Id.* ¶ 29.  By doing so, the General Assembly ensured that "a voter [will] have control over whether to interact with a third party during the voting process," and it thereby "protect[s] voters from unwanted pressure" and intimidation.  *Id.*

Given the compelling interests that the Anti-Solicitation Provision serves, Georgia enacted this rule even though lines are unlikely to extend into the Supplemental Zone in Georgia.  Indeed, several aspects of SB 202 were

6

designed to reduce line length at polling locations, such as adding required days of early voting and requiring a precinct that experiences a long line to "reduce [its] size" or "provide additional voting equipment or poll workers, or both, before the next general election." O.C.G.A. § 21-2-263.  In fact, data from the 2022 elections show that lines are largely non-existent in Georgia elections following SB 202, with an average wait time of approximately 2 minutes.[2]  2nd Germany Decl. ¶¶ 10–11.

But even in the rare instance where there is a longer line, it is unlikely to extend to the Supplemental Zone as many polling places start lines inside the building and "down several hallways" before extending outside.  Mashburn Decl. ¶ 14.  And, even when a line extends outside the building, many polling places snake the lines inside the 150-foot Buffer Zone.  *Id.* ¶ 15.

## B.   Procedural background

As noted, Plaintiffs previously requested a similar preliminary injunction, [Docs. 172, 185], which this Court denied after a hearing, [Doc. 241].   As to the Buffer Zone, the Court held that "Plaintiffs are not substantially likely to succeed on the merits of their claim that the [Anti-Solicitation Provision] is unconstitutional within the Buffer Zone[.]"  *Id.* at 56.

---

[2] A recent MIT study confirmed that fewer than 10% of all Georgia voters waited more than 30 minutes in line to vote in 2022. 2nd Germany Decl., Ex. 1.

But as to the Supplemental Zone, the Court held that Plaintiffs were likely to succeed on the merits of their claim, noting that State Defendants had not provided separate evidence regarding the Supplemental Zone. *Id.* However, the Court held that the "policy considerations under the *Purcell* doctrine weigh against issuing an injunction at [that] time." *Id.* at 74.

Rather than renewing their motions at that time for future elections, Plaintiffs waited several months to file renewed motions, where one set of motions seeks to enjoin State Defendants' enforcement of the Anti-Solicitation Provision in the Supplemental Zone, [Doc. 535-1; Doc. 537], and another motion seeks to enjoin two prosecutors from bringing any charges for violations of the Anti-Solicitation Provision, [Doc. 547-1].

## ARGUMENT

Plaintiffs fail to carry their burden of showing that the "extraordinary remedy" of a preliminary injunction is appropriate. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In fact, Plaintiffs fail to satisfy each requirement for obtaining preliminary injunctive relief: (1) they have not shown a substantial likelihood of success on the merits; (2) they have not demonstrated any irreparable injury; and (3) they have not shown that any threatened injury outweighs the harm that an injunction would cause the State and the public. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)

(en banc).  For all those reasons, the motions should be denied.

## I.   Plaintiffs Fail to Show That They are Likely to Succeed on the Merits of Their Claims.

As this Court already recognized, the Anti-Solicitation Provision serves important state interests.  [Doc. 241 at 52].  And it does so by only regulating conduct.  The provision is thus subject to rational-basis review, which it easily satisfies.  However, even if the Court concludes that a higher standard of review is appropriate, the provision satisfies the highest standard of scrutiny. Thus, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims, and the Court should deny Plaintiffs' motions.

### A.   The Anti-Solicitation Provision serves important state interests.

Plaintiffs' motions largely ignore the compelling interests the Anti-Solicitation Provision serves.[3]  Indeed, the record is replete with evidence showing that the State has important interests in protecting voters standing *anywhere* in line, that the Provision protects voters from both undue influence and its appearance at all points of the voting line,[4] and that it does so by

---

[3] State Defendants incorporate their previous briefing and testimony demonstrating how this provision serves important State interests.

[4] Although State Defendants' witnesses frequently discussed the Buffer Zone during their depositions, as shown here, the interests they discussed apply equally to voters anywhere in line.

providing a clear rule for county election officials to implement.

*First*, the Anti-Solicitation Provision ensures that voters are protected from intimidation and activities that undermine their confidence in elections. For instance, when third-party organizations approach voters in line, there is a "real risk that a voter will feel unwanted pressure and even harassment and not want to vote in future elections." Mashburn Decl. ¶ 19. That risk does not diminish when the line extends into the Supplemental Zone, as voters everywhere in line have "the same interest in being left alone." *Id.* ¶ 22; Bailey 3/21/23 Tr. 172:20–73:8 (wherever the voter is found, the "same principles" animate the Anti-Solicitation Provision) (Ex. D).

Indeed, as this Court recognized, Plaintiffs describe their activities as "political activism," which is "capable of intimidating and confusing the electorate and interfering with the act of voting." [Doc. 241 at 50]. And Plaintiffs do not limit their activism to the Buffer Zone. Rather, a voter *anywhere* in line is "captive" to someone approaching them and is left with just two options: "forgo his or her place in line and return another time," or be "subject[ed] … to the solicitation." Mashburn Decl. ¶ 21.

As former General Counsel for the Office of the Secretary of State Ryan Germany explains, moreover, voters "always suspect the motives are partisan" when they see organizations approaching voters in line with something of

10

value.  1st Germany Decl. ¶ 30(a).  Those concerns are understandable, as third-party groups rarely offer their items of value to non-voters in the area.[5] Mashburn Decl. ¶ 24.  Accordingly, the concerns about undue influence and intimidation are amply demonstrated by the record, and the Anti-Solicitation Provision responds to those concerns.

*Second*, the Anti-Solicitation Provision also serves the important interest of ensuring that elections run efficiently.  Before SB 202, there was confusion about what activities were permitted around polling places.  As Mr. Germany explains, poll workers were unsure a whether handing out things of value violated the prohibition on giving individuals something for the purpose of voting.  1st Germany Decl. ¶ 31(a).  And these officials frequently called the Secretary of State's Office with questions about these issues, which substantially slowed down the process of running the election.  *Id.* ¶¶ 29–31.

SB 202 addressed this by creating a clear rule that completely prohibited approaching voters anywhere in line to give them anything of value.  Such clarity is "important when conducting elections," as county officials undertake "hundreds of tasks" each day during an election.  2nd Germany Decl. ¶ 26.  The

---

[5] Indeed, the Court recognized that "the distinction between nonpartisan line relief and partisan engagement in the voting process is a blurry one."  [Doc. 241 at 49].  That line is no less blurry in the Supplemental Zone.

Anti-Solicitation Provision's clear rule thus ensures that a county official or poll worker is not required to "stop[] what he or she is doing to contact the Secretary of State's office with a question," a process that can create the very lines Plaintiffs claim are present in Georgia. *Id.* ¶ 26. And, once again, this is true irrespective of where a voter is standing in line.

As noted, this Court already concluded that these are "compelling" interests. [Doc. 241 at 52]. And the Supreme Court and the Eleventh Circuit confirm that these are precisely the types of state interests that may support election laws. *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) ("It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal."); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009). Accordingly, there can be no serious debate that the Anti-Solicitation Provision furthers important state interests.

### B. The Anti-Solicitation Provision regulates only conduct and is reasonable.

To further these important interests, the Anti-Solicitation Provision only restricts Plaintiffs' conduct. Plaintiffs may still say anything they wish in the areas around a polling location, subject to the limitations found in other laws Plaintiffs do not challenge. They simply may not also hand something of value to a voter who has stepped into the voting line. Thus, the Anti-Solicitation

Provision is subject only to rational-basis review, which it easily satisfies.

1. As the Eleventh Circuit explains, to qualify as "expressive conduct" covered by the First Amendment, courts ask "whether the reasonable person would interpret" the *conduct* as expressing "*some* sort of message." *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).  And, as the Supreme Court explains, "a regulated party [cannot] transform conduct into 'speech' simply by talking about it." *Rumsfeld v. FAIR*, 547 U.S. 47, 65–66 (2006).

The record confirms that no "reasonable person would interpret" Plaintiffs' conduct of giving voters things of value to be expressing a message. Rather, the record suggests a muddle of potential messages Plaintiffs may be trying to communicate.  [Doc. 197 at 14].  And, given those multiple messages, there is no basis to conclude that voters would understand being handed something of value in line to impart *any* message.  Rather, this is a prime example of where additional speech is necessary to convey a message.  And, as noted, that is a telltale sign that the conduct is "not so *inherently* expressive," and thus not speech.  *Rumsfeld*, 547 U.S. at 66 (emphasis added).

To be sure, this Court earlier found that Plaintiffs were engaged in speech.  [Doc. 241 at 31].  But that conclusion was based on perceived similarity to the activity the Eleventh Circuit addressed in *Food Not Bombs*.  *Id.* at 30–31 (discussing *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901

13

F.3d 1235, 1242 (11th Cir. 2018)).   However, a subsequent panel of the Eleventh Circuit in that case emphasized its fact-bound nature, explaining that "most social-service food sharing events will *not* be expressive."  *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (emphasis added).  Thus, the default conclusion remains that "food sharing," like Plaintiffs do here, is not expressive.

Here, Plaintiffs' words, which the Anti-Solicitation Provision does not regulate, are the only things that convey a message.   Indeed, as one of Plaintiffs' declarants explains, he received "encouragement and support" from the organizations that *also* provided him "water and snacks." Durbin Decl. ¶ 6 [Doc. 547-9].  That underscores that a voter's experience of receiving something of value from Plaintiffs does not directly tie the conduct to a message.  And, because a separate statement is required to communicate Plaintiffs' message, "the conduct … is not so inherently expressive that it warrants protection." *Rumsfeld*, 547 U.S. at 66.  Accordingly, the Anti-Solicitation Provision only regulates conduct, and it is thus subject to rational-basis review.  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013).

2.    Under that review standard, the Anti-Solicitation Provision survives because it is "a rational means to serve a legitimate end." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).  Indeed, this Court

already confirmed that the State's interests of "restoring peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity" are "compelling." [Doc. 241 at 51–52].

And that is true irrespective of a line's length, as voters previously complained that the actions of third-party organizations were intimidating and partisan. 2nd Germany Decl. ¶¶ 22, 29. Election officials stated that these actions were becoming "more aggressive," and had led voters to believe that there was "a motive" behind the provision of food and water. 1st Germany Decl. ¶ 29. Yet none of these concerns was limited to the first 150 feet outside a polling place, and Plaintiffs fail to cite any evidence showing that the State's concerns, or voter's complaints, dissipate as a line grows longer.

Moreover, the rule Plaintiffs propose here, where there would be different protections for voters depending on where they are in line, would only increase the confusion surrounding polling locations. Indeed, Plaintiffs would be permitted to impose on some voters the very harms the Anti-Solicitation Provision seeks to prevent, while they are prohibited from imposing those same harms on other voters who are slightly farther ahead in line. Without the Anti-Solicitation Provision's clarity, some voters would be left captive to unwanted interactions with third parties they believe are trying to influence their vote, while other voters are protected from such interactions. Mashburn Decl. ¶ 18.

Creating a bright-line rule allows county officials to implement the rule efficiently, and it ensures that *all* voters in line are protected in the same way from unwanted interactions with people attempting to hand them things of value. Thus, the Anti-Solicitation Provision is rationally related to the State's interest in preventing such intimidation, increasing voter confidence, enhancing election efficiency, and doing so uniformly throughout the State.

### C. Even if the Anti-Solicitation Provision implicates expressive activity, it is content neutral and reasonable.

But even if the Court concludes that the Anti-Solicitation Provision affects speech, the expanded record confirms that the Provision is both content neutral and reasonable.

1. In its prior order, the Court concluded that the Anti-Solicitation Provision is content based. [Doc. 241 at 39]. In reaching that conclusion, the Court addressed differences between *Boos v. Barry*, 485 U.S. 312 (1988), a case finding a statute content based when it "prohibited the display of a sign that was offensive to a foreign government within 500 feet of that government's embassy," and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), a case finding that a zoning ordinance "that prohibited adult motion picture theaters within 1,000 feet of residences and certain establishments" was not content based because it aimed at the "secondary effects" such theaters have on society.

[Doc. 241 at 37–38]. The Court then concluded that the Anti-Solicitation Provision was more like the law in *Boos* than the ordinance in *Renton*. *Id.*

The full record now confirms, however, that *Renton* is the closer case. The ordinance in *Renton* did not target the content of the films being shown, but rather the secondary societal effects "of such theaters on the surrounding community." 475 U.S. at 47. So too here, as the Anti-Solicitation Provision does not target the content of any message Plaintiffs wish to convey. Instead, it is a content-neutral time, place, and manner restriction aimed only at the secondary effects of soliciting voters, which include undermining the efficiency of elections, creating a perception of voter intimidation, and forcing voters to accept unwanted interactions while waiting to vote. Those effects are caused by *anyone* handing out things of value to voters for *any reason*. 2nd Germany Decl. ¶¶ 21–22. And the Anti-Solicitation Provision targets only those secondary effects of Plaintiffs' actions. *Id.* ¶ 28 (discussing activity Plaintiffs' may still undertake). Thus, if secondary effects could render the zoning ordinance in *Renton* content neutral, despite its regulating adult, but not traditional, theaters, the Anti-Solicitation Provisions' targeting of the harms, but not the message, of third-party gift giving is similarly content neutral.

In contrast, the ordinance in *Boos* directly regulated what could and could not be said within 500 feet of an embassy. 485 U.S. at 315. That

prohibition applied even if there was no guarantee that the embassy would see the sign.  The Anti-Solicitation Provision, however, comes nowhere close to such a restriction.  Plaintiffs may still say whatever they wish to voters, even voters in line, provided they do not also offer those voters anything of value. 2nd Germany Decl. ¶ 28.

Thus, as the Supreme Court confirms, Georgia "may impose reasonable restrictions on the time, place, or manner" of Plaintiffs' conduct—even if it conveys some sort of message.  *McCullen v. Coakley*, 573 U.S. 464, 477 (2014). And, like the Court's previous conclusion about the Buffer Zone, the record confirms that there are "alternative avenues for expression" throughout the Supplemental Zone.  [Doc. 241 at 54].

2.    Applying that standard, the record confirms that the Anti-Solicitation Provision easily satisfies the reasonableness requirements. Indeed, as this Court concluded for the Buffer Zone, it is equally true that applying the Anti-Solicitation Provision to just the voting line in the Supplemental Zone is "a reasonable resolution of the tension between the right to free speech and the right to cast a ballot without improper influence."  *Id.* As the Supreme Court has explained, rules governing the voting process are "inevitabl[e]" and "necessary," and "substantial" to ensure that elections are "fair and honest" and "order[ly]."  *Timmons v. Twin Cities Area New Party*, 520

U.S. 351, 358 (1997).  And, as the Eleventh Circuit confirms, this Court evaluates a challenged election law under "the *Anderson-Burdick* test." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022).  Each prong of that test imposes a heavy burden that Plaintiffs cannot satisfy.

*First*, Plaintiffs must show that the Anti-Solicitation Provision inflicts a cognizable burden on their rights. *Timmons*, 520 U.S. at 358. For this, the "extent of the burden … is a factual question on which [Plaintiffs] bear the burden of proof." *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1124 (9th Cir. 2016).  The Eleventh Circuit confirms that Plaintiffs must therefore "direct th[e] Court to … admissible and reliable evidence that quantifies the extent and the scope" of the burden.  *Billups*, 554 F.3d at 1354.

Plaintiffs have not done so.  Rather, Plaintiffs remain free to express their message to *every voter* in the Supplemental Zone.  The Anti-Solicitation Provision does not limit their ability to approach and speak with voters, provided they do not also attempt to give them something of value.  Mashburn Decl. ¶ 24.  And, if the voting line extends beyond the Buffer Zone, Plaintiffs may stand mere steps from a voter in the Supplemental Zone and offer food or drinks to any voter who voluntarily approaches them.  *Id*.  Additionally, Plaintiffs may hand food and drinks to voters as they are headed toward the voting line, as some groups do.  ADAPT 2/20/23 Tr. 29:15–21 (Ex. E).  It is thus

clear that Plaintiffs will not suffer a cognizable burden on their rights.

Moreover, Plaintiffs rely, [Doc. 547 at 6–7], on inapposite authority to suggest their rights are burdened.  Indeed, both *Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004), and *Russell v. Lundergan-Grimes*, 784 F.3d 1037 (6th Cir. 2015), addressed a much more restrictive ban: Kentucky's very different 300-foot buffer zone.  *Russell*, 784 at 1053–55.  Under that law, third-party organizations would still need to stand 150 feet away from voters who were *themselves* standing more than 150 feet from the polling place.  And the Kentucky law prohibited all electioneering—including displaying any signs or distributing campaign literature—within that large 300-foot buffer zone.  *Id.* at 1043.  Thus, the Kentucky law restricted a substantial amount of protected speech in a large area.[6]  In Georgia, by contrast, outside of the much smaller Buffer Zone, third parties complying with the Anti-Solicitation Provision must be just 25 feet away from the voter, allowing a voter to momentarily leave the

---

[6] Accordingly, the Kentucky provision may implicate the Court's previous concern that "a restricted zone becomes unconstitutional at some measurable distance from the polls."  [Doc. 214 at 55] (discussing *Burson v. Freeman*, 504 U.S. 191 (1992)).  But *Burson* addressed a buffer zone around a polling place. 504 U.S. at 210–11.  Whether such a buffer zone becomes unconstitutional at some distance has no bearing here, where the Supplemental Zone only protects the line itself and the areas immediately around it.

line to receive campaign literature or even acceptable items of value.[7]

Just as this Court recognized that the Buffer Zone is "just a few extra seconds-walk" from the polling place, third parties must remain only "a few extra seconds" away from voters to comply with the Anti-Solicitation Provision. [Doc. No. 241 at 53].[8]  Unlike the challenged Kentucky law, Plaintiffs cannot identify any meaningful burden on their rights—much less the requisite significant burden.  Thus, any burden that may exist is slight.

*Second*, even if Plaintiffs could identify a significant burden on their rights, they must still show that the burden outweighs the State's interests. *Timmons*, 520 U.S. at 358.  But, as the Supreme Court explains, election laws that impose only "reasonable, nondiscriminatory restrictions" are "generally" justified by the "State's important regulatory interests," *id.* (cleaned up), as there is no constitutional right to be free from "the usual burdens of voting," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008).

As already demonstrated, Georgia's interests in the Anti-Solicitation

---

[7] *Russell* also has very different facts from this case. In *Russell*, the challenge was brought by a business that was located 150 feet from a polling place that was prohibited from posting any signs during the election, regardless of whether it was directly interacting with voters. 784 F.3d at 1043–44.

[8] As noted in *Burson,* "it takes approximately 15 seconds to walk 75 feet."  504 U.S. at 210 (quotation marks omitted).  Thus, third-party organizations here need to stand approximately a 5-second walk away from the voting line.

Provision are "compelling." [Doc. 241 at 52]. And, although the Eleventh Circuit confirms that the State need not submit "any record evidence in support of" its interests, *Billups* 554 F.3d at 1353, Georgia has provided substantial evidence showing that the provision is a "reasonable, nondiscriminatory restriction," *Timmons*, 520 U.S. at 358 (citation omitted). Indeed, this provision protects voters from unwelcome outside influence once the voter has entered the voting line.  Mashburn Decl. ¶ 22.  And this interest is unchanged at any point in the voting line. *Id.* ¶ 18.  Moreover, this provision substantially increases the efficiency of election administration.  *Id.* ¶ 26.

The reasonableness of the Anti-Solicitation Provision is clearer still because the Supreme Court has upheld even stricter regulations that directly limit core political speech around polling places.  For example, in *Burson*, the Supreme Court upheld a 100-foot solicitation ban, despite the plurality's also concluding that the challenged buffer zone was a public forum.  504 U.S. at 198–99.  Moreover, as this Court recognized, the Eleventh Circuit has upheld such bans even if they apply "*after* voters had already voted." [Doc. 241 at 45 (discussing *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009) (per curiam))]. Thus, if a state may regulate pure political speech—even after a voter has voted—around a polling place that is also a public forum, it may certainly restrict lesser forms of expression,

including any expressive message this Court concludes accompanies Plaintiffs' approaching voters in line with items of value *before* the voters have voted.

3. Applying these standards, the Anti-Solicitation Provision is a reasonable restriction aimed at serving important state interests in protecting voters in line. Of course, the purpose served by the forum here is peaceful and effective voting—"the essence of a democratic society"—and there is no dispute that "a State has a compelling interest in protecting voters from confusion and undue influence." *Burson*, 504 U.S. at 199 (citation omitted). It is equally undisputed that "some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206. Creating a zone that protects the line by prohibiting third parties from providing money, food, or drinks to voters as they wait in line to vote is a reasonable way to serve the State's interest in protecting the voters by creating "an island of calm in which voters can peacefully contemplate their choices." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018) (citation omitted). And, unless a voter voluntarily approaches a third-party organization, that same peace accompanies voters from the time they enter the voting line until after they have voted and walked 150 feet from the voting place. Accordingly, the Anti-Solicitation Provision easily survives *Anderson/Burdick* review.

**D.     The Anti-Solicitation Provision satisfies even the highest standard of scrutiny.**

Finally, even if the Court concludes that a still higher level of scrutiny is appropriate, Plaintiffs are still unable to demonstrate that they are substantially likely to succeed.

This Court previously held that, even if the Anti-Solicitation Provision is a content-based regulation of speech, a modified form of strict scrutiny applies with a "lowered … narrow tailoring requirement." [Doc. 241 at 43]. Under that standard, the State must assert a compelling interest and "demonstrate that its law is necessary to serve the asserted interest." *Burson*, 504 U.S. at 199. State Defendants satisfy both requirements here, and Plaintiffs have not shown otherwise.

1.  As to the compelling interests, the Eleventh Circuit's recent decision in *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) (*LWV*), *pet. for reh'g filed* (11th Cir. May 18, 2023), is instructive.  In that case, the Eleventh Circuit upheld Florida's 150-foot buffer zone, explaining that the Eleventh Circuit and "the Supreme Court … have acknowledged that states have an interest in protecting voters from unwanted interactions with third parties as they enter or exit the polling place." *Id.* at 929.  And, the Court held, a "broad prohibition on soliciting voters serves the

State's interest in preserving order at polling places." *Id.* at 930.[9]

Even before *LWV*, this Court recognized that, although "evidence of necessity is not essential under the modified *Burson* analysis," the State has "made the requisite showing" that these provisions are supported by compelling interests. [Doc. 241 at 52 & n.20]. Those interests, this Court noted, include "restoring peace and order around the polls; protecting voters from political pressure and intimidation; and supporting election integrity." *Id.* at 51–52. The Court further held that, at least as to the Buffer Zone, the Anti-Solicitation Provision is *necessary* to further those interests. *Id.* at 52–53.

That conclusion aligns with the Supreme Court's recognition that there is a lengthy history of voter intimidation and election fraud, a history that has led "all 50 States [to] limit access to the areas in or around polling places." *Burson*, 504 U.S. at 206. And, when the Supreme Court held "that *some* restricted zone around the voting area is necessary to secure the State's compelling interest," *id.* at 208, it did not address whether the "voting area" meant only the polling place, or instead the line as a whole. But the Supreme

---

[9] The NGP Plaintiffs suggest (at 6–8) that Georgia's Buffer Zone stands in stark contrast to all the zones addressed by courts previously. But they noticeably fail to discuss, or even cite, the *League of Women Voters* decision. Perhaps they ignored it because it is fundamentally at odds with their preferred narrative. But binding authority is not so easily ignored.

Court clarified that a state can properly "respond to potential deficiencies in the electoral process with foresight rather than reactively," *id.* at 209 (citation omitted), and that states need not wait until they "sustain some level of damage before the legislature" can "take corrective action." *Id.*

As described in detail above, that is precisely what the Anti-Solicitation Provision does by protecting the *entire* voting line from interference and unwanted influences. In light of this ample authority confirming that a state may respond to deficiencies in the process by protecting all voters in line from "unwanted interactions with third parties," *LWV*, 66 F.4th at 929, the Anti-Solicitation Provision easily satisfies the compelling-interest requirement.

2. As to tailoring, the Plaintiffs recognize the various ways that Georgia narrowly tailored the Anti-Solicitation Provision in the Supplemental Zone. As Plaintiffs acknowledge, "Georgia law, including the [Anti-Solicitation Provision], does not actually prohibit anyone from approaching a voter in line, or engaging a voter in conversation while they stand in line, as long as that individual is not engaged in behavior otherwise prohibited by law." [Doc. 547-1 at 4]. Both Mr. Mashburn and Mr. Germany agree. *See* Mashburn Decl. ¶ 24; 2nd Germany Decl. ¶ 28. And these organizations can even provide food and water to voters if they do not get within 25 feet of voters in line and if they make those "goods available to members of the public." Mashburn Decl. ¶ 24.

Just as this Court recognized previously regarding the Buffer Zone, "[t]hese facts show alternative avenues for expression" and "represent[] a reasonable resolution of the tension between [any] right to free speech and the right to cast a ballot without improper influence." [Doc. 241 at 54]. Plaintiffs now effectively concede that the Anti-Solicitation Provision—even in the Supplemental Zone—is narrowly tailored to target only the conduct that most seriously undermines the State's compelling interests.  And there is ample evidence showing that Plaintiffs are able to comply with this tailored rule. Black Voters Matter Tr. 84:3–7 (admitting they can provide food or water nearby) (Ex. F); CBC Tr. 125:6–10 (explaining that it had a team out supporting people from behind the buffer line) (Ex. G); ADAPT Tr. 29:15–21 (admitting they give food or water to people out of the van when they drop them off).  Furthermore, rather than extending the Buffer Zone to cover the *entire* line, irrespective of length, Georgia stopped that zone at 150 feet and limited restrictions thereafter (in the Supplemental Zone) only to the areas immediately surrounding the voting line.

In sum, because the Anti-Solicitation Provision merely institutes a narrow restriction on conduct in the immediate vicinity of a polling location, it is sufficiently tailored to satisfy any level of scrutiny.  Accordingly, Plaintiffs cannot show a likelihood of success on the merits of their claims.

27

## II.  Plaintiffs Also Fail to Satisfy the Non-Merits Requirements for Preliminary-Injunctive Relief.

Even if the Court concludes that Plaintiffs are likely to succeed on the merits of their claims, the Court should nonetheless deny their motions because Plaintiffs fail to satisfy the other requirements for preliminary-injunctive relief:  irreparable injury; timeliness; and balance of the equities.

### A.  Plaintiffs cannot show irreparable injury.

Plaintiffs fail to carry their burden of showing irreparable injury for at least three reasons: there is no likelihood of long lines at polling places in Georgia in the future, they unreasonably delayed filing their motions, and the NGP Plaintiffs rely exclusively on impermissible conjecture.

1. Although Plaintiffs resist the facts, they cannot show irreparable injury because they claim a need to provide things of value to voters in lines that are almost certain not to exist.  Rather, the record confirms that there are few instances when a voting line will extend more than 150 feet from a polling place in Georgia.  And, if there are no such lines, Plaintiffs' inability to approach voters in those non-existent portions of line cannot cause any irreparable injury.  *Siegel*, 234 F.3d at 1176 ("[T]he asserted irreparable injury must be neither remote nor speculative.") (cleaned up).

Indeed, the lines for the 2022 midterm election were exceedingly short,

with an average wait time of approximately two minutes.  2nd Germany Decl.

¶¶ 10–11; Shaw Rebuttal Rep. ¶ 38 (stating that the average wait time "varies

from 0 minutes to approximately 10 minutes") (Ex. H).  And such a short line

is certainly not going to stretch more than 150 feet from a polling place.  2nd

Germany Decl. ¶ 9.  Indeed, many polling places start lines inside the building

and "down several hallways" before extending outside, where the Buffer Zone

begins.  Mashburn Decl. ¶ 14.  Even then, many polling places snake the lines

inside the Buffer Zone.  *Id.* ¶ 15.  Thus, even in the rare circumstances where

a line is long, it is still unlikely to extend out of the Buffer Zone.   Thus,

Plaintiffs have not come close to satisfying their burden of showing that they

face an irreparable injury that a preliminary injunction would redress.

However, even if some precincts recently experienced longer lines at

some points during the day, Plaintiffs provide no evidence that these limited

precincts will have long lines in the future.  Rather, SB 202 provides that, if

any precinct with more than 2,000 voters experiences a voting line that exceeds

one hour at any point on Election Day, that precinct must either split or add

more equipment or poll workers for the next election.  O.C.G.A. § 21-2-263(b).

Because these provisions have now governed for an election and because SEB

regulations now require that poll officials track line length for all elections, line

length should continue to be minimal in Georgia and should not extend into

the Supplemental Zone.   And thus, Plaintiffs fail to show that they are irreparably harmed by a prohibition on approaching voters in a line that will almost certainly not exist.   Rather, Plaintiffs rely on speculation about potential future harm.   But, as the Supreme Court confirms, the mere "*possibility* of irreparable harm is inconsistent" with the "characterization of injunctive relief as an extraordinary remedy."   *Winter*, 555 U.S. at 22 (emphasis added).   Thus, Plaintiffs have failed to demonstrate that they are likely to suffer irreparable injury absent an injunction.

2.   Similarly, the Court should deny Plaintiffs' motions because their delay undermines any claim of irreparable injury.   This Court denied Plaintiffs' initial attempt to enjoin the Anti-Solicitation Provision last August.   After waiting nearly nine months, Plaintiffs seek another injunction.   But their clear coordination with other Plaintiffs to file these preliminary-injunction motions at the same time as other motions confirms that Plaintiffs are more interested in litigation tactics than in preventing any real irreparable harm.

In this Circuit, such dilatory actions weigh heavily against finding that Plaintiffs face irreparable harm: "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016).  Indeed, "the very idea of a *preliminary* injunction is premised

30

on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.*  Plaintiffs' delay of more than eight months confirms that they do not have a "need for speedy and urgent action."[10] And, considering that irreparable harm is "the sine qua non of injunctive relief," *Siegel*, 234 F.3d at 1176, this is fatal to Plaintiffs' motions.

3.  Finally, the NGP Plaintiffs' reliance on speculative harm dooms their attempt to show any irreparable injury.  The NGP Plaintiffs seek (at 1–2) to enjoin two prosecutors from enforcing the Anti-Solicitation Provision.  But they fail to identify any pending or threatened enforcement of the law.  Rather, NGP relies on hypothetical concerns, which do not suffice.  *Winter*, 555 U.S. at 22. To grant a pre-enforcement preliminary injunction, the Court must assume that, because Defendant Edwards cannot rule out prosecuting a violation of the Anti-Solicitation Provision at some point, such a prosecution is not only likely, but also causes irreparable harm.  Such assumptions and accompanying speculation are not evidence, and the NGP Plaintiffs have failed to demonstrate any irreparable injury.[11]

---

[10] Any suggestion that Plaintiffs needed to wait until the end of discovery is belied by the dearth of discovery material appended to Plaintiffs' motions.

[11] Additionally, the NGP Plaintiffs' motion fails for requesting entirely untenable relief.  Enjoining prosecutors in two counties, but not in others, from

### B.    Plaintiffs' requested relief would impose significant cost, confusion, and hardship before the upcoming election.

The Court should also deny the motions because the requested injunction would harm the public by inserting chaos and confusion into the electoral system before the upcoming presidential primaries—the very harm that *Purcell* exists to prevent. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).[12]

As already demonstrated, the pre-SB 202 rules were confusing and difficult to administer.  Election officials were left with a "grey area" about when and how anti-solicitation principles applied.  2nd Germany Decl. ¶ 24. SB 202 responded to these concerns by creating a clear rule, and election officials have been trained on these new requirements for several years and

---

enforcing this law would raise serious constitutional issues. *Bush v. Gore*, 531 U.S. 98, 107 (2000) (per curiam) (explaining the dangers of "arbitrary and disparate treatment … in … different counties").

[12] There are also many elections close at hand that Plaintiffs ignore, including a June 20 special election, a possible July 18th runoff, a September 19th special election, and a November 7th election, but lines are even less likely to extend beyond 150 feet in those elections than they are in the general elections.  Div. of Elections, Ga. Sec'y of State, *2023 Election Cycle Comprehensive Calendar* 14, 16, 23, 32 https://tinyurl.com/mr4adr2m.  While true that Plaintiffs may not plan to provide things of value to voters in line during these elections, it is nonetheless true that each of these elections requires the State and counties to provide training regarding election rules, which will include training about the Anti-Solicitation Provision.  *See* 2nd Germany Decl. ¶ 32.

have implemented them in several elections. *Id.* ¶¶ 25, 31. Further engraining these new rules into Georgia's election system, this Court denied the Plaintiffs' previous motion for a preliminary injunction, allowing all training for the 2022 election to include training about the Anti-Solicitation Provision. *Id.* To enjoin the Anti-Solicitation Provision now would be to strip Georgia elections of the clarity that has governed for two years and multiple elections.

In fact, an injunction for the 2024 elections would cause substantial confusion because it would mean that a different standard will govern upcoming elections in 2023 than will be in place for elections in 2024. *Id.* ¶ 32. Thus, training materials for 2023 elections will include the Anti-Solicitation Provision, and then, if the requested injunction is entered, the State and counties will be required to change those materials for 2024. *Id.* This will no doubt cause the Secretary of State's Office to field a larger number of inquiries from county officials about what activities are permitted at polling places because of the whipsaw changes in rules about permissible activities around voting lines from 2020 through the present. *Id.* Such questions and training requirements will pull State officials away from the election-related duties they must otherwise accomplish. 1st Germany Decl. ¶¶ 41–44.

Accordingly, the Court should avoid such last-minute and confusing changes to Georgia's elections processes. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5

(2006) (per curiam).  Rather, the Court should address these claims through the upcoming dispositive motions and, if necessary, a trial on the merits.

### C.   The balance of equities and the public interest weigh heavily against an injunction.

Finally, the harm a preliminary injunction would cause the State and the public outweighs any harm Plaintiffs might suffer without one.

Indeed, it is undisputed that the requested injunction would irreparably harm the State.  As the Eleventh Circuit has held, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (cleaned up).  Thus, the requested injunction would necessarily impair the State's ability to address confusion, suspicion, and loss of confidence in Georgia's election processes resulting from Plaintiffs' actions.

The requested injunction would also harm the public, as enjoining the Anti-Solicitation Provision would subject Georgia voters to the very "improper interference, political pressure, or intimidation" that the Anti-Solicitation Provision aims to combat. SB 202 at 6:127–28.  In fact, it may *increase* the interference and intimidation that the public experiences, as an injunction would likely lead to organizations from "all political persuasions" approaching voters in line with things of value, which would likely lead to increased

conflicts at polling places.  2nd Germany Decl. ¶ 33.  The public, moreover, has a strong interest in the electoral process's clarity, integrity, and appearance of integrity.  And enjoining the Anti-Solicitation Provision in 2024, but leaving it in place for the remaining 2023 elections, would inject greater confusion and hardships into the current election cycles, causing further harm to voters.

In contrast, any harm Plaintiffs suffer would be substantially less.  As explained above, the Anti-Solicitation Provision does not implicate or violate Plaintiffs' First Amendment rights.  Nor does its application in the Supplemental Zone affect Plaintiffs' ability to communicate their desired message in other ways.  *Id.* ¶ 28.  When balanced against the identified harms to the State and the public, Plaintiffs' purported harms pale in comparison, and it becomes clear that Plaintiffs have not satisfied their burden for showing that they are entitled to a preliminary injunction.  *Siegel*, 234 F.3d at 1176.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions and allow this litigation to proceed in the normal course, particularly as summary-judgment briefing will soon begin.  Plaintiffs have failed to demonstrate that they satisfy any of the requirements for a preliminary injunction, let alone that they satisfy *all* those requirements.  Accordingly, the Court should deny Plaintiffs' motions.

Respectfully submitted this 15th day of June, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Edward H. Trent*
Cristina Martinez Squiers*
Joshua J. Prince*
Annika Boone Barkdull*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com

36

Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

_/s/ Gene C. Schaerr_
Gene C. Schaerr