# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |
| GEORGIA STATE CONF. OF THE NAACP, *et al.*,<br><br>    *Plaintiffs*,<br><br>       v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>    *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    *Intervenor-Defendants.* | Civil Action No.:<br>1:21-CV-01259-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>    *Plaintiffs*,<br><br>       v.<br><br>BRIAN KEMP, *et al.*,<br><br>    *Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    *Intervenor-Defendants.* | Civil Action No.:<br>1:21-CV-01284-JPB |

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION BASED ON IMMATERIAL VOTING REQUIREMENTS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ADDITIONAL FACTUAL BACKGROUND ........................................ 2

I.   Past absentee-ballot litigation and changes............................. 2

II.   The current absentee-voting process (post-SB 202)...................... 4

III.   County processing of absentee ballots.......................................... 7

IV.   Plaintiffs' evidence on standing. .................................................. 9

ARGUMENT AND CITATION OF AUTHORITIES ................................. 10

I.   Legal standard for preliminary injunction. ................................. 10

II.   Plaintiffs do not have standing against State Defendants on their sole claim. ......................................................................... 10

     A.   Organizational standing is not sufficient to challenge the absentee voter verification provisions. ..................................................... 11

     B.   Associational standing is not sufficient to challenge the absentee voter verification provision....................................................... 13

     C.   There is no traceability or redressability because county officials, not State Defendants, process absentee ballots. .................... 14

III.   The Materiality Provision creates no private right of action... 16

IV.   Even if Plaintiffs have standing, they are not likely to succeed on the merits of their claim. ...................................................... 17

V.   Plaintiffs have not adequately shown an irreparable harm. .... 23

VI.   The equities and public interest do not favor an injunction. ... 25

CONCLUSION ................................................................................ 25

**INTRODUCTION**

Despite challenging every aspect of Georgia's verification process for absentee-by-mail ballots in their complaints, including the use of a voter's driver's license number, last four digits of a Social Security Number, and date of birth, Plaintiffs' motion for a preliminary injunction [Doc. 548] challenges only the requirement that voters include their date of birth on the absentee-ballot envelope when they return their ballot to their county registrar.[1] *Compare* Ga. NAACP Doc. 35 ¶¶ 134-140; Sixth AME Doc. 83 ¶¶ 255-259, 278-285 *with* [Doc. 548-20, p. 2]. Plaintiffs' motion is based on their claim that county registrars are rejecting absentee ballots because of missing or incorrect dates of birth and that this violates the "Materiality Provisions" of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B).

As discussed below, Plaintiffs lack standing against State Defendants to obtain an injunction against them. But even if they have standing, Plaintiffs cannot show a likelihood of success on the merits because they withhold evidence from the Court that undermines their claims about county rejections based on a missing or incorrect birthdate alone, misstate the role of the

---

[1] For purposes of this brief, the provisions of Georgia law regarding placing a date of birth on an absentee-ballot return envelope and the processing of those envelopes in O.C.G.A. §§ 21-2-384, -385, and -386 are referred to collectively as the "absentee voter verification provisions."

Secretary, and seek relief that is prohibited by binding law. Plaintiffs also cannot show that any rejections for missing or incorrect birth years violate the Materiality Provisions. Further, Plaintiffs delayed bringing this motion and cannot show that the equities or public interest favor their motion at this stage of the case. This Court should deny the emergency relief sought, or at the very least, deny Plaintiffs' motion as to State Defendants.

## ADDITIONAL FACTUAL BACKGROUND

### I.     Past absentee-ballot litigation and changes.

Prior to SB 202, county election officials verified the identity of the voter returning an absentee ballot by matching the signature on the ballot envelope with the signature on file with the registrar. O.C.G.A. § 21-2-386(a)(1)(B) (eff. July 1, 2012). As the 2018 election approached, Georgia and its counties faced several lawsuits about rejections of absentee ballots under this signature-matching approach to processing absentee ballots. Those lawsuits first resulted in an injunction about the process county officials had to follow before rejecting absentee ballots based on a signature mismatch. *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018). Following the November 2018 election, the plaintiffs filed new motions and this Court entered an injunction against a single Georgia county requiring the counting of absentee ballots that were

rejected for missing or incorrect birth years.[2] *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1311 (N.D. Ga. 2018). This Court then expanded the injunction about birth-year rejections to all Georgia counties by issuing an injunction in *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1347 (N.D. Ga. 2018). Both cases were later dismissed before discovery.

In the next legislative session, the General Assembly passed House Bill 316 (2019), which removed the requirement that birth years be included as part of the oath on outer envelopes, otherwise retaining the signature-matching process. But that change did not stop the litigation over how county officials process absentee ballots. Before the 2020 election, in *Democratic Party of Georgia v. Raffensperger*, Case No. 1:19-cv-05028-WMR (N.D. Ga.) (*DPG II*), Georgia faced a constitutional claim that county officials were rejecting *too many* absentee ballots for signature mismatches without a sufficient review process (*DPG II* Doc. 1, p. 37). Plaintiffs dismissed that lawsuit after a new State Election Board rule and a recommendation from the Secretary through an Official Election Bulletin (OEB)[3] that counties have multiple reviewers

---

[2] Due to a change made in 2017, Georgia required the year of birth, not the full date of birth, as part of the oath of the elector on the absentee-ballot envelope at that time. O.C.G.A. § 21-2-384(c)(1) (2017).

[3] OEBs are not binding, but provide an update or guidance to county officials on an issue related to elections. Secretary of State 30(b)(6) Deposition, 133:10-135:8, attached as Ex. A.

check signatures before a rejection, a process already largely in place in many counties in Georgia (*DPG II* Doc. 56-1). Following the 2020 election, Georgia faced another constitutional claim that county officials were rejecting *too few* absentee ballots for signature mismatches.[4] *Ga. Republican Party v. Raffensperger*, Case No. 1:20-cv-05018-ELR (N.D. Ga.) (Doc. 1, ¶ 4).

In the 2021 legislative session, SB 202 overhauled the entire absentee structure, eliminating the signature-match process and replacing it with a process utilizing the voter's state-issued identification card number (or other form of identification) and the voter's date of birth—two sets of numbers easily available to the voter but not to others—in order to verify a voter's identity.

## II.   The current absentee-voting process (post-SB 202).

For a Georgia voter to apply for an absentee ballot after SB 202, the voter fills out a standard form made available by the Secretary—the only role the Secretary plays in the entire absentee-ballot process. O.C.G.A. § 21-2-381(a)(1)(A)–(C). In order to "confirm the identity of the voter," the application

---

[4] While Plaintiffs rely on statements made in other post-2020 cases for the concept that the elimination of the birth-year requirement alone caused a decrease in absentee-ballot rejections, [Doc. 548-1, p. 11], the context of that quote demonstrates that the discussion was about the *overall* rejection rate decreasing as a result of *both* the elimination of the birth year and the institution of a cure process as opposed to the rejection rate for mismatched signatures being virtually identical to prior elections. [Doc. 548-3, 52:9-53:22].

requires a variety of personal information, including "name, date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card" or one of several alternatives if the individual lacks an identification number that can be used on the form. O.C.G.A. § 21-2-381(a)(1)(C)(i). After the voter timely returns this form, the registrar takes steps to "verify the identity of the applicant" by comparing the "name, date of birth, and number of . . . driver's license or identification card" with the "information on file in the registrar's office." O.C.G.A. § 21-2-381(b)(1). If the voter lacks an identification card, the registrar must verify the identification provided identifies the applicant. *Id*. After this verification, the registrar mails an official absentee ballot to the voter in the time permitted by statute. O.C.G.A. § 21-2-384(a)(2). Significantly, after the changes in 2019, if the identifying information on the application does not match what is on file, the registrar *still issues a ballot* to the voter—it is a provisional absentee ballot with information on how to cure the mismatch or missing information. O.C.G.A. § 21-2-381(b)(3).

After the voter fills out their absentee ballot and seals it in both the inner security envelope and the outer return envelope, the voter signs the oath on the outer envelope. O.C.G.A. § 21-2-385(a). Then, "to verify that the absentee ballot was voted by the elector who requested the ballot," the voter prints their

Georgia identification card number. *Id*. The voter "shall also print his or her date of birth." *Id*. That portion of the absentee-ballot return envelope specifically advises voters how the information will be used:



**Voter Identification**
Print carefully. This information will be used to verify your identity before counting your ballot.

My date of birth *(MM/DD/YYYY)* _____

Number of my Georgia driver's license or state identification card issued by the Department of Driver Services

☐ ☐ ☐ ☐ ☐ ☐ ☐

**OR** ☐ I do not have a Georgia driver's license or ID.
The last 4 digits of my
Social Security No. are ☐ ☐ ☐ ☐

**OR** ☐ I do not have a Georgia driver's license or ID
or a Social Security Number **AND**
I have placed in this envelope a copy of one of
the forms of identification listed in the absentee
ballot instructions.

***Figure 1: Return portion of absentee ballot return envelope***, attached as Ex. B (CDR01322538).

When the registrar or clerk receives the returned absentee ballot, he or she writes the date and hour of receipt on the ballot, and then compares the identification number and date of birth provided (or other identifying information if the voter lacks an ID) with the information in the voter registration records. O.C.G.A. § 21-2-386(a)(1)(B). The registrar also confirms the voter signed the oath and any person assisting the voter signed the required oath. *Id*. If all required information is present and matches, the clerk certifies and adds the voter's name to the numbered list of voters so the ballot can be counted. *Id*.

If any information on the envelope is missing or incorrect, the registrar rejects the ballot. O.C.G.A. § 21-2-386(a)(1)(C). But if a ballot is rejected, the registrar must notify the voter by the next business day[5] if the registrar has a phone number or email address and the ballot is rejected within 11 days of election day, providing an opportunity to cure the incorrect information. O.C.G.A. § 21-2-386(a)(1)(C); Ga. Comp. R. & Regs. r. 183-1-14-.13. Voters then have from the time they receive the notice (which could be substantially before the election) through three days *after* the election to cure the problem. O.C.G.A. § 21-2-386(a)(1)(C).

## III.   County processing of absentee ballots.

County officials are responsible for the processing of absentee ballots. O.C.G.A. § 21-2-386(a)(1)(B). The Secretary and State Election Board (SEB) members do not appoint county officials and only enforce the Election Code through civil penalties[6] and judicial proceedings following allegations of

---

[5] Multiple county election officials testified that they contact the voter by phone or email prior to a rejection to verify information if there is a mismatch on the envelope. Sosebee Dep. (Athens-Clarke), 68:17-21, 71:9-74:3, 111:25-112:6, attached as Ex. C; N. Williams Dep. (Fulton), 125:15-126:2, 202:16-203:4, attached as Ex. D; Gay Dep. (Columbia), 46:15-47:18, attached as Ex. E.

[6] While the SEB can impose civil penalties, it is limited in how much it can impose per each violation and can only do so after notice and a hearing. O.C.G.A. § 21-2-33.1(a)(2), (b). The new provisions from SB 202 regarding oversight of county officials only allow suspension, not removal, and only after multiple years of county problems. O.C.G.A. § 21-2-33.2(c) (requiring clear and

violations. *See* O.C.G.A. § 21-2-33.1.

Plaintiffs present a chart in their brief that reflects responses from just six counties to discovery requests in this case, apparently attempting to show that counties are regularly rejecting absentee ballots for missing or incorrect birth dates. [Doc. 548-1, p. 13]. But Plaintiffs intentionally exclude the discovery responses of five additional County Defendants. The additional five county responses, which are attached as Exs. F through J, are as follows:

| County | Pre- SB 202 | | Post-SB 202 | |
|---|---|---|---|---|
| | Nov. 2020 | Jan. 2021 | Nov. 2022 | Dec. 2022 |
| **Bibb** | 0 | 0 | 0 | 0 |
| **Clayton** | 0 | 0 | 0 | 0 |
| **Columbia** | 0 | 0 | 0 | 0 |
| **DeKalb** | 0 | 0 | 0 | 0 |
| **Gwinnett** | 0 | 0 | 0 | 0 |

Further, multiple counties testified that they use the date of birth information to verify the voter is the one returning the ballot, as the absentee-ballot envelope advises. K. Williams Dep. (Gwinnett County), 48:6-9, attached as Ex. K; Manifold Dep. (Gwinnett County) 112:22-113:2, 116:24-117:1, attached as Ex. L; Ex. E, 46:11-14, 80:3-5; Wurtz Dep. (Hall) 48:5-8, attached as Ex. M. And a voter's registration is not cancelled or affected if they fail to put their birthdate on the form or put an incorrect date. Ex. L, 116:17-23.

---

convincing evidence the county or municipal superintendent has, for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections).

## IV.   Plaintiffs' evidence on standing.

To bring their motion, Plaintiffs rely on a subset of the plaintiff parties in these cases. Georgia NAACP Plaintiffs only include declarations from (1) Ga. State Conference of the NAACP [Doc. 548-12], (2) Ga. Coalition for the People's Agenda [Doc. 548-16], (3) League of Women Voters of Georgia [Doc. 548-13], (4) GALEO Latino Community Development Fund [Doc. 548-14], and (5) Common Cause Georgia [Doc. 548-15]. AME Plaintiffs only submit a declaration from the Georgia Muslim Voter Project (GMVP) [Doc. 548-19]. Each declaration claims a diversion of resources related to the voter verification provisions. But each declaration that discusses these diversions places it only in the realm of voter education.

AME Plaintiffs offer no declarations or evidence about the membership of GMVP. And while each of the Georgia NAACP Plaintiffs mentions their number of members, the declarations are focused exclusively on the alleged diversions of resources as a result of SB 202.

Further, the Georgia NAACP Plaintiffs only name Cobb, Gwinnett, and Fulton counties as defendants (Doc. 35 on NAACP docket). The AME Plaintiffs name 11 counties as defendants, specifically Bibb, Chatham, Clarke, Clayton, Cobb, Columbia, DeKalb, Fulton, Gwinnett, Hall, and Richmond. (Doc. 83 on AME docket). But neither case names all counties in Georgia as defendants.

## ARGUMENT AND CITATION OF AUTHORITIES

## I.   Legal standard for preliminary injunction.

For a preliminary injunction, Plaintiffs must clearly establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that granting the relief would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Preliminary injunctions are designed "to maintain the status quo" pending final resolution. *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1341 (N.D. Ga. 2017). A mandatory injunction, which Plaintiffs seek here, "is particularly disfavored." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

## II.   Plaintiffs do not have standing against State Defendants on their sole claim.

"Federal courts are not constituted as free-wheeling enforcers of the Constitution and laws." *Wood v. Raffensperger*, 981 F.3d 1307, 1313 (11th Cir. 2020) (cleaned up). Instead, Article III limits the subject-matter jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. "To have a case or controversy, a litigant must establish that he has

standing." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

To show standing sufficient to obtain a preliminary injunction, Plaintiffs must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Id.* And a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). An injury cannot be speculative but must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

### A. Organizational standing is not sufficient to challenge the absentee voter verification provisions.

All of the evidence before this Court from Plaintiffs on standing focuses on the alleged diversion of resources by Plaintiffs. And because organizations do not vote, Plaintiffs are only seeking to vindicate the rights of third parties in this action through a federal statute—specifically, the Civil Rights Act.

The Supreme Court looks upon third-party standing with disfavor. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (stating that, beyond specific examples discussed herein, "we have not looked favorably upon third-party standing"). For a plaintiff to have standing to assert the rights of others not before the Court, the plaintiff must establish (1) "a 'close' relationship" between

a plaintiff and supposedly represented third parties, and (2) a "'hindrance' to [the third parties'] ability to protect [their] own interests." *Id.* at 130. Plaintiffs, moreover, must allege and *prove* those elements as a factual matter, and must maintain standing throughout the pendency of the case. *See Elk Grove Unified Sch. Dist.* v. *Newdow*, 542 U.S. 1, 9, 15 (2004) (holding third-party standing lacking based on facts raised after decision). Under these well-established principles, Plaintiffs lack standing.

In an analogous case, the Fifth Circuit recently found it likely that a plaintiff organization lacked third-party standing to challenge a provision of Texas voter-registration law under the Civil Rights Act. *Vote.org v. Callanen*, 39 F.4th 297, 305 (5th Cir. 2022). While Plaintiffs may attempt to claim that their future education efforts provide a close relationship with Georgia voters, even a future, unspecified attorney-client relationship was "no relationship at all." *Kowalski*, 543 U.S. at 130–31. Further, Plaintiffs do not claim they fill out or return absentee ballots in Georgia, meaning that individual voters are the proper individuals to serve as plaintiffs, not the organizations.

As to the second *Kowalski* factor, nothing in Plaintiffs' brief or declarations even attempts to show why Georgia voters cannot challenge the absentee voter verification provisions themselves. That is in sharp contrast to the cases they rely on, when individual voters and candidates challenged the

prior signature-matching regime. *Martin*, 347 F. Supp. 3d at 1311; *Dem. Party of Ga.*, 347 F. Supp. 3d at 1347.

As a result, none of the Plaintiffs have third-party standing to challenge the absentee voter verification provisions in SB 202 because—at most—they are educating voters about the requirements of Georgia law on voting absentee. Any resources that they spend fighting the provisions are self-inflicted budgetary and resource-allocation choices that cannot manufacture standing.[7]

### B.   Associational standing is not sufficient to challenge the absentee voter verification provision.

While Plaintiffs mention associational standing in their brief, they rely solely on the *number* of members for each organization. [Doc. 548-1, pp. 17-18]. The declarations do not "identify any of [their] members, much less one who will be injured by the" absentee voter verification provisions. *Jacobson*, 974 F.3d at 1249. And reliance on *Dem. Party of Ga.*, 347 F. Supp. 3d at 1337, does not save Plaintiffs' claims because there is no indication that the plaintiffs failed to establish a member who would be injured, as *Jacobson* requires.

But even if Plaintiffs have provided a sufficient member for associational standing, they have not established the counties in which they have members.

---

[7] Plaintiffs cannot rely on budgetary changes for any injury because they are not relying on diversion of financial resources for standing in this case. *See* 30(b)(6) excerpts attached as Exhibits O, P, Q, R, S, and T.

And, as indicated above, the evidence Plaintiffs obtained from at least five defendant counties shows that those counties are not rejecting *any* absentee ballots based on a missing or incorrect date of birth, which means any members in those counties are completely uninjured even if Plaintiffs' theory of the Materiality Provisions is correct—and it is not.

### C.   There is no traceability or redressability because county officials, not State Defendants, process absentee ballots.

Plaintiffs wave away the requirements of traceability and redressability in less than a page. [Doc. 548-1, p. 18]. But in so doing, Plaintiffs ignore binding precedent that the processing of absentee ballots has nothing to do with State Defendants, eliminating any claim against State Defendants for an injunction related to the absentee voter verification provisions. Simply put, any alleged injury by Plaintiffs is not the result of conduct of State Defendants nor of any action that this Court can order State Defendants to take.

Georgia law commits the processing and verification of absentee ballots solely to county officials. O.C.G.A. § 21-2-386(a)(1)(B). Multiple courts in this district have dismissed claims against State Defendants when the sole responsibility for a challenged election procedure was committed to counties. *See, e.g.*, *Fair Fight Action v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 U.S. Dist. LEXIS 261571, at *80-81 (N.D. Ga. Mar. 31, 2021) ("As counties are

statutorily responsible for counting the absentee ballots (see O.C.G.A. §§ 21-2-381, 386), Plaintiffs' 'misconduct in overseeing' the rejection of the absentee ballots claims are subject to dismissal for lack of standing in light of the Eleventh Circuit's recent holding in *Jacobson*, 974 F.3d 1256."); *see also, Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1329 (N.D. Ga. 2020) (dismissing claims when "[n]o Georgia law allows State Defendants to reach down into the county precincts and demand the relief Plaintiffs seek.").

And not only is this the view of this Court—it is also the law of the Eleventh Circuit, which upheld the dismissal of a case against State Defendants regarding the processing of absentee ballots in the 2021 runoff: "But, just as in *Jacobson*, the absentee ballot statute puts the duty to 'compare the signature' and accept or reject a ballot on the 'registrar or clerk'—not the Secretary of State." *Ga. Republican Party, Inc. v. Ga. Sec'y of State*, No. 20-14741-RR, 2020 U.S. App. LEXIS 39969, at *5-6 (11th Cir. Dec. 20, 2020).

Plaintiffs' request for an order that State Defendants provide "guidance" on the absentee voter verification provisions also fails. [Doc. 548-20, p. 2].

> [The] 'notice' theory of redressability contravenes the 'settled principle[]' that 'it must be the *effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury.' Any persuasive effect a judicial order might have upon the [county] Supervisors, as absent nonparties who are not under the Secretary's control, cannot suffice to establish redressability.

15

*Jacobson*, 974 F.3d at 1253 (quoting *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1305 (11th Cir. 2019) (citations omitted and emphasis original).

Unlike the cases involving the 2018 election that were decided in a pre-*Lewis* and pre-*Jacobson* world, this Court may not bind non-party county officials by enjoining State Defendants to provide guidance, stop certification, or take other action. As with the supervisors in *Jacobson*, State Defendants do not appoint the county registrars, they are not part of state government, and State Defendants can only resort to "coercive judicial process" to enforce the Election Code if county registrars do not follow the law. *Compare* O.C.G.A. §§ 21-2-32, 21-2-33.1, 21-2-33.2, 21-2-40, 21-2-70, 21-2-71 *with* 974 F.3d at 1253. Thus, this Court must deny any injunction against State Defendants related to the absentee voter verification provisions for lack of standing.

## III.   The Materiality Provision creates no private right of action.

Plaintiffs seek relief only under 52 U.S.C. § 10101(a)(2)(B) and 42 U.S.C. § 1983. State Defendants assert that the Civil Rights Act provisions on which Plaintiffs rely do not provide an implied right of action. *See Vote.org v. Callanen*, 39 F.4th 297, 305 n.5 (5th Cir. 2022). Recent Supreme Court decisions confirm that the Eleventh Circuit's decision to the contrary in *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), was incorrect because

"Section 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 n.6 (2022) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005)) (cleaned up).

And even if *Schwier* were correctly decided, Plaintiffs' attempt to invoke a private right of action under 52 U.S.C. § 10101(a)(2)(B) through 42 U.S.C. § 1983 still fails. In order "to sustain a § 1983 action, the plaintiff must demonstrate that the [underlying] federal statute creates an individually enforceable right in the class of beneficiaries *to which he belongs*." *City of Rancho Palos Verdes*, 544 U.S. at 120 (emphasis added). Thus, "even if § 1971 provides an enforceable private right to *individuals* [through a § 1983 suit,] that does not mean [an organization] may invoke that right." *Vote.org*, 39 F.4th at 305 n.5 (emphasis added). The beneficiaries of 52 U.S.C. § 10101(a)(2)(B) are *individuals* who have been *denied the right to vote* because of an immaterial error or omission of the sort described in the statute. Unlike the plaintiffs in *Schwier,* who were individual voters, 340 F.3d at 1286, Plaintiffs are not. Plaintiffs have not been denied the right to vote because they cannot vote— they are organizations and have no private right of action to invoke.

## IV. Even if Plaintiffs had standing, they are not likely to succeed on the merits of their claim.

Even if Plaintiffs have standing, this Court still must deny their

requested mandatory injunction. Beginning with the text, 52 U.S.C. § 10101(a)(2)(B) has five elements:

> (1) the proscribed conduct must be engaged in by a person who is acting under color of law; (2) it must have the effect of denying an individual the right to vote; (3) this denial must be attributable to an error or omission on a record or paper; (4) the record or paper must be related to an application, registration, or other act requisite to voting; and (5) the error or omission must not be material in determining whether such individual is qualified under State law to vote in such election.

*Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from the denial of the application for stay) (cleaned up). In *Ritter*, the Third Circuit determined that the failure to include the date an absentee ballot was filled out was immaterial and required the counting of ballots missing that information. *Id*. But Justices Alito, Thomas, and Gorsuch (without objection) noted that several of these five statutory factors were missing. *Id*.

The same failure infects Plaintiffs' claim here, demonstrating they cannot succeed on the merits. If a registrar rejects an absentee ballot based on a missing or incorrect date of birth, the voter has not been denied their right to vote (element 2)—instead their absentee ballot was not counted because they did not follow the process outlined in Georgia law for casting an absentee-by-mail ballot. And "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with

certain rules." *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). As Justice Alito explained, "the failure to follow those rules constitutes the *forfeiture* of the right to vote, not the *denial* of that right." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting) (emphasis added).

It is also wrong to suggest that the date-of-birth requirement implicates the fourth element, that the "record or paper relates to any application, registration, or other act requisite to voting." Something is "requisite" if it is "required" or "necessary." *Requisite, Black's Law Dictionary* (11th ed. 2019). Providing a date of birth on an absentee-ballot envelope is not required or necessary for *voting*. It is required or necessary to properly return an *absentee ballot,* and Georgia voters have a number of ways to cast their ballot apart from returning an absentee ballot. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020); *see also Vote.org*, 39 F.4th at 306.

Finally, a date of birth on an absentee-ballot envelope does not determine the voter's *qualifications* to vote in the election. 52 U.S.C. § 10101(a)(2)(B) (element 5). The date of birth is used, as the envelope advises voters, to *verify* the identity of the person who voted the ballot (and who is not physically present). Ex. B; O.C.G.A. § 21-2-386(a)(1)(B). Thus, county registrars "may consider" exactly this type of information when processing absentee ballots. *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1214 (S.D. Fla. 2006) (checkboxes that

duplicated oath information were material); *see also Howlette v. Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978) (individual notarization of signatures was material).

The prior decisions in *Martin* and *Democratic Party* are inapposite here because those cases were decided under Georgia's previous method of absentee voter verification. Following those cases, the Georgia General Assembly removed the year of birth from the signature-matching absentee-ballot verification process. But in SB 202, following claims from both political parties that signature-matching was a subjective, untrustworthy mechanism for verifying voters, the General Assembly moved to an objective standard that included both identification number and date of birth. SB 202, § 2, ¶ 2. As a result, cases evaluating Georgia's old system of absentee voter-verification are not helpful to evaluating the current system. And Georgia's new system of absentee voter verification performed well in the 2022 election for voters and election officials, with some observers noting that the new methodology of voter verification was much more efficient than the previous methodology.[8]

Plaintiffs also attempt to confuse the *qualifications* to vote listed in

---

[8] *2022 General Election Observation: Fulton County, Georgia* (The Carter Center), attached as Ex. N, p. 16 ("Election law changes in SB202 . . . [have] streamlined the process and made it easier for election officials since they can simply check that all the necessary information is present and correct.").

O.C.G.A. § 21-2-216(a) with the *requirements* to vote, but those things cannot be the same. For example, to vote in person on Election Day, a voter must go to the correct precinct on the correct day between the hours of 7am and 7pm, present photo identification, follow the instructions on the voting machine, and place her ballot in the scanner. That voter could not claim that, merely because she possesses the correct qualifications, she can vote in whatever manner she chooses—just as an absentee voter does not have his or her *qualifications* to vote improperly determined for an immaterial reason when he or she fails to follow the *instructions* on how to properly return an absentee-ballot envelope. *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissenting).

This is also why State Defendants' discovery responses correctly identify that the date of birth is not used to determine whether a voter is *qualified*. [Doc. 548-5, p. 4]. And multiple county election officials testified that they use the date of birth for the purpose listed on the envelope and in the statute— *verifying* the voter's identity for purposes of counting their ballot, not determining their qualifications to vote. Ex. K, 48:6-9; Ex. L, 112:22-113:2, 116:24-117:1; Ex. E, 46:11-14, 80:3-5; Ex. M, 48:5-8.

Plaintiffs' reliance on the prior signature-matching cases, including *Jones v. Jessup*, 279 Ga. 531, 533 n.5 (2005), fails to recognize that Georgia did not merely "reinstate" a date-of-birth requirement while maintaining

signature matching—SB 202 completely overhauled the method of verifying a voter's identity on a returned absentee ballot. Without a signature match, the legislature concluded that another method of verification was needed.[9] And states may always take action to avoid potential fraud in the election process— especially in the absentee-voting process. *Brnovich*, 141 S. Ct. at 2340, 2347.

Both the Supreme Court and the Eleventh Circuit have "unambiguously held that the right to vote *absentee* is not a fundamental interest that triggers Fourteenth Amendment protections." *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring). To interpret 52 U.S.C. § 10101(a)(2)(B) so that it applies to a verification requirement that is part of the process for properly returning an absentee ballot would be to allow Congress to legislate in areas far beyond enforcing the right to vote and would essentially create the right to vote *absentee*. The Georgia General Assembly has chosen to continue offering absentee voting to all voters without a reason. But if federal law dictates how

_____

[9] Indeed, other states require much more on an absentee ballot envelope. Several require witness signatures and others require the voter to send back a *notarized* signature—more steps than writing a date of birth that appears on the same driver's license used by most voters. *See* Ala. Code §§ 17-11-7(b), 17-11-10(b)(2) (Alabama: two witnesses or notary); A.S. § 15.20.203 (Alaska: witness or notary); LSA-R.S. § 18:1306(E)(2) (Louisiana: witness); Miss. Code. Ann. §§ 23-15-633, -635, -639, -641 (Mississippi: witness signature); V.A.M.S. §§ 115.283, 115.295 (Missouri: notary); N.C.G.S.A. § 163-231(a)(6) (North Carolina: two witnesses or notary); 26 Okl. St. §§ 14-108, -108.1, -123 (Oklahoma: notary); S.C. Code §§ 7-15-220, -230 (South Carolina: witness).

absentee by mail ballots can be verified, it is entirely likely the legislature may make further changes to the absentee-voting process. For all these reasons, Plaintiffs have not shown they are likely to succeed on the merits of their claim, and their motion should be denied for this reason alone.

## V.    Plaintiffs have not adequately shown an irreparable harm.

In addition to Plaintiffs' failure to demonstrate a likelihood of success on the merits, Plaintiffs cannot demonstrate any irreparable harm. Plaintiffs only claim that they will have a continuing frustration of purpose and diversion of resources. [Doc. 548-1, p. 24]. Plaintiffs also attempt to bootstrap their associational-standing claims into a purported irreparable harm, but the restrictions challenged do not threaten the right to vote, but rather the right to vote by absentee ballot in a particular manner.[10] And because there is sufficient time to properly submit an absentee ballot (by filling in the correct date of birth) or voting through other means, Plaintiffs are not irreparably harmed. *New Ga. Project*, 976 F.3d at 1283-84. This is even more true when any voter who has their ballot rejected due to failure to include a date of birth is given notice and an opportunity to cure that defect. O.C.G.A. § 21-2-

---

[10] Plaintiffs' sole appellate citation for the proposition that irreparable harm is presumed when the right to vote is involved is to a dissenting opinion involving the 2000 presidential election. *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000) (Birch, J., dissenting).

386(a)(1)(C).

Moreover, Plaintiffs cannot demonstrate irreparable injury because they have waited for more than two years after filing this case to seek a preliminary injunction. *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016). Indeed, "the very idea of a *preliminary* injunction is premised on the need for speedy and *urgent* action to protect a plaintiff's rights before a case can be resolved on the merits." *Id.* (emphasis added). Thus, "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* (citations omitted).

SB 202 was enacted on March 25, 2021, and Plaintiffs filed their complaints on March 28 and 29, 2021, making the same claims as in the currently pending motion. *Ga. NAACP* Case No. 1:21-cv-01259-JPB [Doc. 1] (March 28, 2021); *Sixth District AME* Case No. 1:21-cv-01284-JPB [Doc. 1] (March 29, 2021). While Plaintiffs put forward some evidence from counties in their brief, they make primarily legal arguments, relying on discovery responses from nearly six months ago, [Doc. 548-2, ¶¶ 5-10], and a single county deposition from April 2023, [Doc. 548-2, ¶ 3]. By failing to act "with speed and urgency," Plaintiffs have not shown a likelihood of irreparable harm. *Wreal*, 840 F.3d at 1248; *Siegel*, 234 F.3d at 1176.

## VI.    The equities and public interest do not favor an injunction.

The Court should also deny Plaintiffs' motion because the harm it would cause the State and the public outweighs any harm Plaintiffs might face absent an injunction. First, a state is irreparably harmed when it is unable to enforce its statutes. *New Ga. Project*, 976 F.3d at 1283; *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

Second, even if Plaintiffs have shown some harm, the impact on the public and the State weighs against an injunction. Eliminating a tool for verifying the identity of voters who cast absentee ballots lowers the overall integrity of the election and risks introducing fraudulent ballots that would dilute lawful votes cast by Georgia voters, in addition to the necessity of making significant revisions to forms. *Brnovich*, 141 S. Ct. at 2340, 2347.

Third, removing a portion of the verification tools from county election officials undermines the confidence in elections that is desperately needed and could prompt the legislature to take further efforts to add security measures to absentee ballots. *Id.*

### CONCLUSION

In short, Plaintiffs have failed to establish any of the requirements for a preliminary injunction. Accordingly, this Court should deny Plaintiffs' motion and allow Georgia's absentee voter verification provisions to remain in effect.

Respectfully submitted this 22nd day of June, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Joshua J. Prince*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

26

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson