State Defendants' Opposition to
Plaintiffs' Motion for Preliminary Injunction
on Discriminatory-Intent Claims [Doc. 566]

# EXHIBIT E

*In re Georgia Senate Bill 202*
No. 1:21-mi-55555-JPB
July 27, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202          Master Case No:
                                       1:21-MI-55555-JPB

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

30(B)(6) VIDEOTAPED DEPOSITION OF

COBB COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION

(MS. JANINE EVELER)

November 29, 2022

10:02 a.m.

995 Roswell Street

Marietta, Georgia 30060

Marcella Daughtry, RPR, RMR

Georgia License No. 6595-1471-3597-5424

California CSR No. 14315



separate, in various forms and several different sponsors, but then in the end, many of them were incorporated into SB 202.

Q   Do you have an understanding of where those efforts arose from?

A   I do.  As stated in the preamble to the -- what is known as the Election Integrity Act, the legislature described the reasons for enacting the law.

Q   At the time -- step back to before SB 202 was enacted and you were first starting to see some of the separate pieces of legislation, some of which in whole or in part were incorporated into SB 202.  What was your understanding at the time of why they were being proposed?

A   My understanding was in reaction to some of the things that happened in the 2020 election cycle; that, obviously, the 2020 cycle was an anomaly because of COVID, and so many actions took place on an emergency basis that many groups had issue with, and so the reaction was to codify either some of the things that were good into the code and modify some of the other things that other people didn't want them, legislators didn't want those things that happened.

Q   I think you mentioned that part of your job is monitoring elections and voter-related legislation.  Is



that correct?

A    That's correct.

Q    Do you provide input on some occasions to members of the legislature?

A    I do.  I have spoken at subcommittee meetings and submitted letters with recommendations as an election administrator.

Q    Do you provide input at times to the Secretary of State's office as well on voting-related legislation?

A    Yes, I do.

Q    Would it be fair to say that you are sought out by the Secretary of State's office because of your experience and expertise?

A    At times, yes.

Q    Would the same be true with respect to certain legislators?

A    There have been a few who have contacted me, yes.

Q    Do you have any ballpark estimate of how many voting or election-related bills have been enacted since you have been director here in Cobb?

A    Almost every session there is something related to elections.

Q    How many would you consider to be major changes to voting or election laws?



A   There have been several in the past.  For instance, when voter ID was implemented and then was challenged in court several times right after that, and we were waiting for courts to decide it on the eve of the election almost on what to do.

Q   Have you -- can you think of any other -- before SB 202, any other major changes to election or voting laws in your time here?

A   Yes.  I believe it was called House Bill 316, which implemented the new voting system.  That was a major change.  Also, like I said, in, I believe it was 2008, when voter ID was implemented -- it may have been before that -- that was a major change.  There was another one that escapes me, but there have been several that have been big changes.

Q   Would you consider SB 202 to be a major change in voting and election-related laws?

A   Yes, I would.

Q   To the best of your recollection, did the process for enacting SB 202 differ from those previous major efforts in any notable way?

A   I can't think of anything that would be different, no.

Q   Do you recall if there was a use of a special committee for those previous voting -- major



that that would be illegal for them.

Q   I'm going to hand you what we will mark as Exhibit 42.  This is the document with a Bates number COBB 23391.

(Deposition Exhibit 42 was marked for identification.)

Q   BY MR. ROSBOROUGH:  After you have a minute to look at this, can you just tell me if you recognize this e-mail exchange?

A   I do recognize it, yes.

Q   Okay.  And what is the topic of the e-mail exchange?

A   It was a food truck at our main election office on Whitlock.

Q   Okay.  Was this during the early voting period for the Senate runoffs in 2020?

A   Yes, it was.

Q   Okay.

A   I think.  It's December 2020, so that would be between the general election and the runoff.

Q   What do you recall about this interaction?

A   It was not a single interaction.  There were -- there were many groups that were out line warming, line relief, and we had a food truck at several locations, and it -- it was difficult on our part to determine whether



that was okay or not okay.  It was -- it was difficult to determine whether they had a message that they were trying to portray.  We were looking at the materials they were giving out to see if there was anything written on them.  We had to kind of monitor the -- the food giveaway to see if there was a message that was being, you know, provided to people.  We were measuring distances away from the building to determine how far away they were.

It -- it took a lot of energy to, you know, monitor, and we had people on both sides complaining.  You know, one side was saying they were advocating a certain position.  It was too close.  You know, everybody knows this group is for this thing.  You know, it was just a lot of back and forth.

Q   In the top -- in your last response on this e-mail here, you ultimately state that you are having a hard time justifying why they need to stop doing any of this, correct?

A   Right.  And that's what I mean, is, the rules weren't really defined, so it was hard to say if -- you know, like I said, there were a lot of complaints.  It felt disruptive, but yet there was nothing political on their materials.  So it was -- it was a line we didn't know where the line was, basically.

Q   And -- and when you were talking about



Q   Okay.  Are there any reasonable modifications or accommodations your office provides to voters with disabilities who need line relief while voting?

A   Well, we allow those with disabilities to go to the front of the line.

Q   If the ban on line relief activities as enacted in SB 202 were lifted reverting to the previous policy, what would your office have to do to undertake any changes?

A   Well, again, at that time, it was -- it was difficult as an election administrator to -- to know what needed to be enforced as far as campaign material.  You know, electioneering, when there is lots of outside people that are talking to voters, you know, giving them things, it's -- that part of SB 202 has made it simpler for us.

Q   Does your office monitor the line for electioneering activities after SB 202?

A   We monitor the lines in the same way.  It's just that people are not approaching voters like they were, and so there is not as much back and forth and wondering what's going on.  We don't get as many complaints from people saying somebody said something, somebody is trying to influence people.  So -- and that way it is simpler.  I guess that's the answer.



Q   Do you recall getting any complaints about line relief prior to the 2020 election cycle?

A   Yes, I think we did, but I think, like I said earlier, it became very popular in 2020.  Because there were long lines, we -- we had, you know, pizzas being delivered to voters.  There was all kinds of, you know, bands set up to entertain people.  It was just a lot of things going on, and that made it a little chaotic.

Q   If the criminal line relief ban as enacted in SB 202 were struck down and you were to revert to your previous policy as we just discussed, what would that take in terms of implementation for your office?

MS. LaROSS:  Objection as to form.

THE WITNESS:  Well, we wouldn't have to implement anything.  It would -- it would be the same situation, I assume, as before, where we had lots more activity out in the line, and I'm not sure whether there is electioneering or if there is materials with campaign information.  It -- it would just be more -- more workers that were out there, you know, watching the line.

Q   BY MR. ROSBOROUGH:  So how long prior to an election -- or prior to a day of voting, I should say, would you need to feel like you could properly implement the change back to the previous state of the law?

A   Well, again, we wouldn't do anything to



implement.  I mean, we would just be on the defensive, basically, you know, watching to see how the situation came up, to see what -- what was going on, to monitor what's going on in the line and -- and take any action for reminding -- as I said earlier, reminding people this isn't allowed.  You know, you can't give this to them because it has this on it.  There would be more of questions, complaints, and that sort of thing to -- to react to.

Q    What are the last-minute instructions?

A    That is something that we give the poll managers on the day that they pick up their supplies to -- to give them last-minute reminders about things and to take care of anything that has developed since their training classes.

Q    Have you used last-minute instructions to provide guidance as to changes in any voting or elections-related policy?

A    Yes.

Q    Okay.  Do you recall we previously discussed the large volume of voter challenges leading up to the 2020 runoff?

A    Yes.

Q    Okay.  What were the consequences of those challenges for your office?



ask, did the top e-mail, is that -- was that -- did you write that e-mail?

A   I did.

Q   Okay.  And who are you writing it to?

A   I was responding to a media query from Christina Almeida Cassidy, and she's with the Associated Press.

Q   Okay.  And does this reflect your drop of the 16 drop boxes you mentioned pre SB 202 to being allowed to have 5 due to SB 202?

A   Yes.

Q   What other changes did SB 202 have on the time availability of the drop boxes?

A   They were only allowed to be open when advance voting locations were also open for voting, so if -- if we were voting the minimum hours of 9:00 to 5:00, they could only be open 9:00 to 5:00.  We generally had -- most of our locations opened later than that, earlier than that, but that would be the time parameters.

Q   Okay.  And what types of locations did you have them located at?

A   As stated here, they were libraries, rec centers, fire and police stations, other county buildings, government centers.

Q   And from an election administration standpoint,



did you feel -- what was your opinion of the drop boxes pre SB 202?

A    I thought it worked well.  It was -- as far as election administration, it was a lot of work to send out teams of two to gather ballots, and, you know, bringing them back in.  We had to hire people to do that.  One of the worst things was on the -- on -- in -- in 2020, we had them open on Election Day, all the way up to Election Day, and so we had to close the boxes at 7:00 p.m. on Election Day and had to have 16 teams of two, like one, two, three, go; everybody stop, close the box.  And that was a challenge because of so many boxes.  I don't know how a bigger county did it, but...

Q    Do you -- does this e-mail reflect the number of ballots that Cobb County received by drop box in the November 2020 and January 2021 elections?

A    I'm just reading here what I wrote.  In November we received 89,445 ballots by drop box out of the 148,911 returned ballots.  And similarly, in January, it was 79,715 out of the 127,789.  So it was very popular.

Q    Okay.  What impact do you think that the drop boxes had on the 2020 election and including the runoff in January 2021?

MR. WHITE:  Object to the form.



know, we have a lot of churn either way.

The part that has been difficult, though, is the change of when we can start mailing the ballots, and that's 22 to 28 days, I believe now, 22 to 29.  You probably remember.  And we used to be able to mail them out around 45 days, right, for a federal election.  And so there was more -- it was more time for people to get their ballots -- irregardless of the runoff; this would be in the regular election -- more time for people to get their ballots, turn them around, and mail them back.

And now we are doing advanced voting at the same time we are trying to get the ballots mailed out, and everybody that we could have used for mailing ballots is out at voting locations, and we don't have enough staff to really fully staff both operations.  So that has been the more difficult timing problem with absentee ballots.

Q   And has the moving back to eleven days before the Election Day of the request period also affected that at all?

A   Not so much.  It is good to have a deadline. As I said, that was something we advocated for so that there is time for us to stop processing applications and concentrate on getting the last mails -- mailed ballots out, and also to work on cures and rejections and that



sort of thing.

I probably initially wanted the seven or eight days.  Eleven days has not had any adverse impact on us.

Q   Are you aware if it's had any adverse impact on voters?

A   I've had only a couple of calls, two or three, from voters who -- who want to use the hospital provision, where in the last ten days, if they request a ballot.  So that is the exception to taking a new application within those eleven days.  And so we have been able to process those.

But again, at like in the -- in the materials that we went over earlier, I was advocating for some -- something -- some provision to help those people who have an emergency in those eleven days, and that has -- has happened, and that's worked.

Q   Now, are you familiar with the absentee voter file that the Secretary of State's office compiles?

A   I am.

Q   And do you recall there was a column that says "Application Status"?

A   Yes.

Q   And that there is another one that says "Ballot Status"?

A   Yes.



voters?

A    Yes.

Q    And am I correct that it required allowing affected voters to vote by a federal right an absentee ballot?

A    That was part of the order, yes.

Q    Okay.  And it also required extending the ballot receipt deadline for effective voters to the UOCAVA date of November 14th?

A    Correct.

Q    Okay.  And it required notifying affected voters by e-mail and text, if you had that information; is that correct?

A    We didn't text anybody.  We called if we had their phone number, and we e-mailed.

Q    Okay.  Were you able to complete these steps between November 7th and November 8th, which was Election Day?

A    There was some of the ballots that we were not able to get to UPS in time for them to be overnighted, so they were hand-delivered on Election Day.

Q    If the portion of SB 202 condensing the absentee ballot request period were struck down, what actions would your office need to take to implement the change?



MS. LaROSS:  Objection as to form.

THE WITNESS:  So you're saying if we go back to 180 days to the Friday before the election is the application period?

Q   BY MR. ROSBOROUGH:  Correct.

A   We would have to change our training and our -- our procedures.  We would again have to deal with ballots changing or applications changing in midstream.  We would be issuing ballots on the Friday before the election, knowing that they wouldn't make it to the voter.

Q   Okay.  Just give me one second.

I have no further questions at the this time. I thank you very much for your time.  I'm gonna -- this might be -- I don't know if folks want to take a break now, and then I will let my colleague, Ms. Olm, resume the questioning.

A   Okay.  Sounds fine.

THE VIDEOGRAPHER:  The time is 3:40 p.m., and we are off the record.

(The deposition was at recess from 3:40 p.m. to 3:53 p.m.)

THE VIDEOGRAPHER:  The time is 3:53 p.m., and we are on the record.

>>>

>>>



Again, that whole assessment on my part was incorrect.

Q   Okay.  And having the correct assessment, would you still say that you anticipated having to notify voters of more rejected applications?

A   No, because the code section they -- they quoted, 21-2-417(c), I understood that to be just the additional for IDs for first-time voters, which would be the utility bill, government check, that sort of thing.

But the way it was eventually explained to me, is that the whole 21-2-417, including the four, would be allowable.  So the military ID, the passport, they could all be provided.

Q   Okay.  Turning back to the new verification requirements that we talked about earlier, before SB 202 passed, were you in favor of changing the rules regarding verification of the identity of a person who submits an absentee by mail ballot application?

A   It really didn't matter to me either way.  We just wanted clear rules of what to check.  Signature verification is subjective, and we were always being challenged as far as how do we train people on signature verification.  How are they -- you know, how are they determining whether it's a good signature or a bad signature?  What resources are we using as far as



these, the one that is the master signature that we are comparing it against?  Signatures change over time.

So that had its drawbacks, as well, and so having a more objective number to -- to compare to was somewhat easier to implement.  But workers still have some issues about, you know, what do we do if the registration address is different, that they put down a different address?  Well, that's not a rejectable field if it doesn't match.

So there is still questions about how to implement the new -- the new rules.

Q   Okay.  And the new voter ID requirements include that a -- the applicant include their date of birth; is that correct?

A   Yes.

Q   And do you review the date of birth to assess voter qualifications?

A   We compare the date of birth on the application with the date of birth on their registration record.

Q   Okay.  But you do not -- you are not looking at the date of birth to determine whether a voter is qualified to vote; is that correct?

MS. LaROSS:  Objection as to form.

Q   BY MS. OLM:  Beyond the verification?

A   I'm not sure I understand what your question



didn't realize that the absentee ballot kind of locks your record and you can't proceed with an in-person voting until you cancel that one.  So that took time to cancel those ballots.

Q  And did your office receive complaints from voters in -- in 2020, that they had been approached by third parties while they were in line waiting to vote?

A  Mostly what we got complaints were people that were complaining about somebody approaching somebody else.  So that the person being approached wasn't really offended or, you know, they were fine with getting whatever the person was providing or talking to the person, but then their neighbor was mad about somebody approaching somebody else.  So that was the type of complaints that we got.

Q  And was that something that -- those kind of complaints, did you also receive them in 2018?  I think you mentioned that during that election there was quite a bit of, I think what counsel referred to as line warming, or, you know, those kind of circumstances?

A  In 2018 it kind of had a different flavor.  It was people who were advocating for voters not really giving them things, but they were making sure that -- you know, that everybody was treated fairly; that there wasn't any intimidation going on.  There was election



protection-type people.  There was people in the line and around the line that sort of made some people nervous, that there were these outside people.  Why are they here? What are they doing?  What are they saying?

But -- but it really did change a little bit more in 2020 to be more of things being given out. That -- that was newer.  The food trucks, the -- people were giving out, you know, mittens and beanie caps when it was cold and, you know, hand-knitted things and fans, and just everything you can imagine.  Granola bars, candy, you know.  And that -- that was new in the 2020 cycle.

Q   And am I -- am I correct to understand your testimony that because of the array of things that were given to voters, it was -- it made it more difficult for your office to determine whether or not what was happening was okay or not, you know, permissible, and caused more work on your office to have to try and figure those things out?

A   Yes.  We really did appreciate the buffer zone of, you know, knowing that our jurisdiction was this 150 feet, or 25 from the last voter in line.  That is like a no-influence zone.  A no, let me say shenanigans or whatever.  And not knowing, you know, who these people are, what they represent, if they have -- if they're



discussing the candidates or the parties or any -- it was just no -- it was a free-for-all.  There was no way to differentiate between someone just altruistically giving a granola bar and somebody that maybe had, you know, more of a campaigning motive to sway somebody or, you know, just have a conversation that was really inappropriate in a line of voters who were waiting to vote.

So having -- having that all back off, you know, and be part of that 150-foot zone, behind that zone made it simpler for us.  We didn't have to, you know, decide.  I -- we didn't want to be the decider.  Like, you're okay but you're not, because you are doing this and you are doing that.  It's easier if nobody is doing anything.

Q   And you mentioned -- okay.  So you mentioned that those -- we'll call it shenanigans, which is a word that you used, but just in general, what you just described, that you all didn't have to make decisions when the buffer -- the 150-foot buffer was enforced, as well as the 25 supplemental zone.

Would that also include that your poll workers and other staff weren't necessarily distracted because of those things going on and that they could attend to the job required -- that they were required to do?

MS. O'CONNOR:  Objection to form.



CERTIFICATE OF REPORTER

STATE OF GEORGIA      )
                      )
COUNTY OF DEKALB      )


        I, Marcella Daughtry, a Certified Reporter in the State of Georgia and State of California, do hereby certify that the foregoing deposition was taken before me in the County of DeKalb, State of Georgia; that an oath or affirmation was duly administered to the witness, JANINE EVELER; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting; that the transcript is a full, true and accurate record of the proceeding, all done to the best of my skill and ability;

        The witness herein, JANINE EVELER, has requested signature.

        I FURTHER CERTIFY that I am in no way related to any of the parties nor am I in any way interested in the outcome hereof.

        IN WITNESS WHEREOF, I have set my hand in my office in the County of DeKalb, State of Georgia, this 9th day of December, 2022.




_____
Marcella Daughtry, RPR, RMR
GA License No. 6595-1471-3597-5424
California CSR No. 14315