1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4

5                                    Master Case No:

6    IN RE GEORGIA SENATE BILL 202        1:21-MI-55555-JPB

7    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

8

9

10

11           30(B)(6) VIDEOTAPED DEPOSITION OF

12   COBB COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION

13                  (MS. JANINE EVELER)

14                   November 29, 2022

15                     10:02 a.m.

16                  995 Roswell Street

17               Marietta, Georgia 30060

18

19

20

21

22

23          Marcella Daughtry, RPR, RMR

24      Georgia License No. 6595-1471-3597-5424

25            California CSR No. 14315



```
 1                 APPEARANCES OF COUNSEL

 2     For the AME Plaintiffs:

 3         ACLU GEORGIA
           MR. RAHUL GARABADU
 4         MR. DAVIN ROSBOROUGH
           MR. DAYTON CAMPBELL-HARRIS (via Zoom)
 5         MR. BRIAN DIMMICK (via Zoom)
           P.O. Box 77208
 6         Atlanta, Georgia 30357
           404.643.3071
 7         rgarabadu@acluga.org
           drosborough@aclu.org
 8         dcampbell-harris@aclu.org
           bdimmick@aclu.org

 9

10     For the Plaintiff GA NAACP:

11         LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
           MS. JENNIFER NWACHUKWU (via Zoom)
12         MS. JULIE HOUK (via Zoom)
           1500 K Street NW, Suite 900
13         Washington, D.C. 20005
           202.662.8329
14         jnwachukwu@lawyerscommittee.org
           jhouk@lawyerscommittee.org

15

16     For the USA Plaintiff:

17         U.S. DEPARTMENT OF JUSTICE
           MS. EILEEN O'CONNOR
18         MR. ERNEST MCFARLAND (via Zoom)
           MS. LAUREN PUTNAM (via Zoom)
19         950 Pennsylvania Avenue, NW, Room 7273 NWB
           Washington, D.C. 20530
20         202.598.5262
           eileen.o'connor2@usdoj.gov
21         ernest.a.mcfarland@usdoj.gov

22

23

24

25
```



```
 1   For the Plaintiffs Asian Americans Advancing
     Justice-Atlanta:
 2
         KEKER VAN NEST & PETERS
 3       MS. RYLEE KERCHER OLM
         633 Battery Street
 4       San Francisco, California 94111
         415.962.8879
 5       rolm@keker.com

 6       And

 7       ASIAN AMERICANS ADVANCING JUSTICE -
         ASIAN LAW CAUCUS
 8       MS. KIMBERLY LEUNG (via Zoom)
         55 Columbus Avenue
 9       San Francisco, CA 94111
         kimberlyl@advancingjustice-alc.org
10

11   For the New Georgia Project Plaintiffs:

12       ELIAS LAW GROUP
         MR. MARCOS MOCINE-McQUEEN (via Zoom)
13       10 G Street, NE
         Washington, D.C. 20002
14       202.968.4490
         mmcqueen@elias.law
15

16   For the Concerned Black Clergy Plaintiffs:

17       ADVANCEMENT PROJECT
         MR. JESS UNGER (via Zoom)
18       MR. MATT FOGELSON (via Zoom)
         1220 L. Street NW, Suite 850
19       Washington, D.C. 20005
         junger@advancementproject.org
20       mfogelson@advancementproject.org

21       And

22       WARDENSKI P.C.
         MR. JOSEPH WARDENSKI (via Zoom)
23       195 Plymouth Street, Suite 519
         Brooklyn, New York 11201
24       347.227.2500
         joe@wardenskilaw.com

25
```



```
 1   For the State of Georgia Defendants:

 2        TAYLOR ENGLISH DUMA LLP
          MS. DIANE FESTIN LaROSS
 3        MR. BRYAN F. JACOUTOT (via Zoom)
          MR. BRYAN TYSON (via Zoom)
 4        1600 Parkwood Circle, Suite 200
          Atlanta, Georgia 30339
 5        678.336.7228
          dlaross@taylorenglish.com
 6        bjacoutot@taylorenglish.com

 7
     For the Defendant Cobb County Board of Elections and
 8   the witness Janine Eveler:

 9        HAYNIE LITCHFIELD & WHITE, P.C.
          MR. DANIEL WHITE
10        222 Washington Avenue NE
          Marietta, Georgia 30060
11        770.422.8901
          dwhite@hlw-law.com

12

13   For the Macon-Bibb County Defendants:

14        NOLAND LAW FIRM, LLC
          MS. GRACE SIMMS MARTIN (via Zoom)
15        5400 Riverside Drive, Suite 205
          Macon, Georgia 31210
16        478.621.4980
          grace@nolandlawfirmllc.com

17

18   For the Clayton and Chatham County Defendants:

19        FREEMAN MATHIS & GARY, LLP
          MR. A. ALI SABZEVARI (via Zoom)
20        MS. CHANDLER EMMONS (via Zoom)
          100 Galleria Parkway, Suite 1600
21        Atlanta, Georgia 30339
          770.303.8633
22        asabzevari@fmglaw.com
          chandler.emmons@fmglaw.com
23

24

25
```



```
1    For the Defendant Hall County:

2         HALL COUNTY LAW DEPARTMENT
          MR. JUSTIN LAWHON (via Zoom)
3         2875 Browns Bridge Road
          Gainesville, Georgia 30504
4         770.297.2692
          jrlawhon@hallcounty.org

5

6    For the Defendants RNC, NRSC, NRCC and State GOP:

7         HALL BOOTH SMITH, P.C.
          MR. BRAD CARVER (via Zoom)
8         191 Peachtree Street, Suite 2900
          Atlanta, Georgia 30303
9         404.954.5000
          bcarver@hallboothsmith.com

10

11   For the Defendant Spalding County:

12        BECK, OWEN & MURRAY
          MR. DAVID E. PENLAND (via Zoom)
13        100 S. Hill Street, Suite 600
          Griffin, Georgia 30223
14        770-227-4000
          dpenland@beckowen.com

15

16   For the Athens-Clarke County Defendants:

17        JAMES BATES BRANNAN GROOVER, LLP
          MR. JAMES F. BANTER (via Zoom)
18        231 Riverside Drive
          Macon, Georgia 31201
19        478.749.9992
          jbanter@jamesbatesllp.com

20

21   For the DeKalb County Defendants:

22        DEKALB COUNTY LAW DEPARTMENT
          MS. SHELLEY D. MOMO (via Zoom)
23        MS. IRENE VANDER ELS (via Zoom)
          1300 Commerce Drive, 5th Floor
24        Decatur, Georgia 30030
          sdmomo@dekalbcountyga.gov
25        ivanderels@dekalbcountyga.gov
```



```
 1    For the Columbia County Defendants:

 2         HULL BARRETT
           MR. JORDAN BELL (via Zoom)
 3         801 Broad Street
           Augusta, Georgia 30901
 4         706.722.4481
           jbell@hullbarrett.com
 5

 6    For the Gwinnett County Defendants:

 7         GWINNETT COUNTY GOVERNMENT, LAW DEPARTMENT
           MS. MELANIE F. WILSON (via Zoom)
 8         75 Langley Drive
           Lawrenceville, Georgia 30046
 9         770.822.8713
           melanie.wilson@gwinnettcounty.com
10

11    For the Fulton County Defendants:

12         FULTON COUNTY GOVERNMENT, LAW DEPARTMENT
           MR. BRAD BOWMAN (via Zoom)
13         MR. CHAD ALEXIS (via Zoom)
           141 Pryor Street, SW
14         Atlanta, Georgia 30303
           chad.alexis@fultoncountyga.gov
15         Brad.bowman@fultoncountyga.gov

16
      Also Present:
17
           Valerie Chu (via Zoom)
18         Maya Carter, videographer
           Casey Smith (via Zoom)
19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXAMINATION

 2   WITNESS:  JANINE EVELER

 3

 4   EXAMINATION                                    PAGE

 5   BY MR. ROSBOROUGH                               14

 6   BY MS. OLM                                     183

 7   BY MS. O'CONNOR                                218

 8   BY MR. MOCINE-McQUEEN                          254

 9   BY MS. NWACHUKWU                               259

10   BY MR. UNGER                                   265

11   BY MS. LaROSS                                  276

12

13

14

15                      *   *   *

16

17

18

19

20

21

22

23

24

25
```



1                          INDEX TO EXHIBITS

2      EXHIBITS                                            PAGE

3      Exhibit 26        Notice of Deposition               17

4      Exhibit 27        Chairman's Report of the           55
                         Election Law Study Subcommittee
5                        CDR00000660 to 674

6      Exhibit 28        E-mail chain from Cynthia          60
                         Willingham to Kristi Royston,
7                        et al., "Subject: Re: Post Election
                         Audit"
8                        COBB022709 to 22711

9      Exhibit 29        Letter to Chris Harvey from        65
                         Janine Eveler dated 4/6/21
10                       CDR00133335

11     Exhibit 30        E-mail from Janine Eveler to       70
                         Jennifer Jordan, et al.
12                       "Subject: Comments on HB 531"
                         COBB024021 to 024023
13
       Exhibit 31        E-mail chain from Joseph Kirk      80
14                       to Janine Eveler 3/19/21
                         "Subject: RE: LC 28 0300S -
15                       Substitute for SB 241"
                         COBB024273 to 024275
16
       Exhibit 32        E-mail chain from Veronica         83
17                       Johnson to Janine Eveler
                         3/19/21, "Subject: RE: Latest
18                       Version of SB 202"
                         COBB056901_1 to COBB056901_2
19
       Exhibit 33        E-mail from Janine Eveler to       87
20                       Barry Fleming, et al., "Subject:
                         SB 202 additional comments"
21                       CDR00062616 to 62618

22     Exhibit 34        E-mail chain from Tonnie Adams     94
                         to Janine Eveler 3/16/21
23                       "Subject: Re(2): Help, please"
                         COBB024234 to 235

24

25



```
 1                 INDEX TO EXHIBITS, CONT'D

 2    EXHIBITS                                           PAGE

 3    Exhibit 35      E-mail chain from Janine Eveler      96
                      to Paige Alexander 3/3/21
 4                    "Subject: RE: Follow-up to
                      todays Task Force meeting"
 5                    COBB048993_1 to _5

 6    Exhibit 36      E-mail from Janine Eveler to        100
                      Tonnie Adams 3/4/21
 7                    "Subject: FW: Regional
                      facilitator letter"
 8                    COBB063624_1 to _4

 9    Exhibit 37      E-mail chain from Joseph Kirk       107
                      to Janine Eveler 3/16/21
10                    "Subject: RE: Second draft"
                      COBB054143_1 to _5
11
      Exhibit 38      Information on Georgia's Voting     118
12                    System and Assistance When Voting
                      COBB037943
13
      Exhibit 39      Precinct Requirements for           121
14                    Disabled Voter Accessibility
                      COBB037944_1 to _5
15
      Exhibit 40      November 6 General Election         125
16                    Polling Place Line Survey
                      CDR00030220 to 221
17
      Exhibit 41      E-mail from William Tanks to        128
18                    Lisa Cupid 6/9/20
                      "Subject: Re: Elections concern
19                    from Cobb business leader"
                      COBB037852 to 852_1
20
      Exhibit 42      E-mail chain from Janine Eveler     137
21                    to Ryan Germany 12/16/20
                      "Subject: RE: Cobb County
22                    Food Truck"
                      COBB023391 to 23395
23
      Exhibit 43      Prohibitions on Election Day        140
24                    COBB027515

25
```



1                    INDEX TO EXHIBITS, CONT'D

2    EXHIBITS                                              PAGE

3    Exhibit 44      E-mail chain from Janine Eveler       147
                     to Brunessa Drayton 4/13/21
4                    "Subject: RE: SB 202"
                     COBB025640 to 025649
5
     Exhibit 45      E-mail chain from Janine Eveler       151
6                    to Sachin Varghese, et al., 1/5/21
                     "Subject: RE: Cobb - Denial
7                    of Provisional Ballots"
                     COBB023161 to 23168
8
     Exhibit 46      E-mail from Janine Eveler to          155
9                    Almeida Cassidy 4/5/21
                     "Subject: RE: AP story on
10                   drop boxes"
                     COBB025490 to 025491
11
     Exhibit 47      E-mail from Deidre Holden to          159
12                   Janine Eveler 3/23/21
                     "Subject: RE: Drop box
13                   limitations"
                     COBB024345 to 243346
14
     Exhibit 48      E-mail chain from Janine Eveler       164
15                   to Sara Tindall Ghazal 3/18/21
                     "Subject: Re: SB 202"
16                   COBB024256 to 257

17   Exhibit 49      E-mail chain from Janine Eveler       166
                     to Kay Kirkpatrick 4/15/21
18                   "Subject: RE: Senate District
                     #32 questions"
19                   COBB025658 to 025660

20   Exhibit 50      E-mail chain from Janine Eveler       186
                     to Kendra Reed 3/19/20
21                   "Subject: Re: Cost for mailing
                     absentee apps"
22                   COBB048145

23   Exhibit 51      E-mail chain from Janine Eveler       188
                     to David Wilkerson 6/25/20
24                   "Subject: Re: SB 463"
                     COBB052289
25



```
 1                    INDEX TO EXHIBITS, CONT'D

 2   EXHIBITS                                         PAGE

 3   Exhibit 52      E-mail chain from Todd Edwards     189
                     to Lynn Bailey 5/18/20
 4                   "Subject: RE: ACCG Q&A w
                     SOS Office"
 5                   COBB039710

 6   Exhibit 53      E-mail chain from Janine Eveler    211
                     to Chris Harvey 4/16/21
 7                   "Subject: Re: Buzz Post - FAQs
                     on New Election Law"
 8                   COBB053918

 9   Exhibit 54      E-mail from Lynn Bailey to         211
                     Janine Eveler, et al., 6/11/21
10                   "Subject: Rules for SB 202"
                     COBB058913
11
     Exhibit 55      E-mail chain from Janine Eveler    223
12                   to Jimmy Gisi 1/30/21
                     "Subject: FW: SB 0026 Assigned"
13                   COBB023240 to 023242

14   Exhibit 56      Text messages                      227

15   Exhibit 57      E-mail from Engagifii to           229
                     Janine Eveler 2/17/21
16                   "Subject: SB 0184 Assigned"
                     COBB023417
17
     Exhibit 58      E-mail chain from Janine Eveler    231
18                   to Lynn Bailey, et al., 3/18/21
                     "Subject: RE: Statement"
19                   COBB033465 to 033472

20   Exhibit 59      E-mail chain from Jemison to       238
                     Janine Eveler 2/19/21
21                   "Subject: RE: Draft legislation"

22   Exhibit 60      E-mail chain from Janine Eveler    241
                     to Ryan Germany 2/19/21
23                   "Subject: Re: Legislative
                     Committee hearing"
24                   COBB032121 to 032122

25
```



1                    INDEX TO EXHIBITS, CONT'D

2   EXHIBITS                                              PAGE

3   Exhibit 61      Special Committee on Election           242
                    Integrity partial transcript
4                   dated 2/19/21

5   Exhibit 62      E-mail from Janine Eveler to            247
                    Barry Fleming, et al., 3/11/21
6                   "Subject: LC 28 03005 –
                    substitute for SB 241 & HB 531"
7                   CDR 00062463 to 62464 (Confidential)

8

9
            PREVIOUSLY MARKED AND REFERENCED EXHIBITS
10
                             1
11                          16
                            17
12                          19

13

14
                          *   *   *
15

16

17

18

19

20

21

22

23

24

25



1           THE VIDEOGRAPHER:  Today's date is November

2    29th, 2022, and the time is 10:02 a.m.  This will be the

3    30(b)(6) video deposition of Cobb County Board of

4    Elections & Voter Registration given by Janine Eveler in

5    the matter of United States of America versus the State

6    of Georgia, et al., and the Republican National

7    Committee, et al., taken at 995 Roswell Street in

8    Marietta, Georgia.

9           Would counsel please identify themselves for

10   the record.

11          MR. ROSBOROUGH:  I'm going to suggest that we

12   do the introduction of the people in the room here, and

13   then we'll have a record of via e-mail, and -- and for

14   folks that didn't e-mail, Rahul or I will put it into the

15   Zoom chat, and we can make sure that everyone is recorded

16   there rather than going through the full list of people

17   on Zoom now.  And then whenever later on in the

18   deposition anyone wants to ask questions who is on Zoom,

19   just introduce yourself and your affiliation.

20          And I'll start.  I'm Davin Rosborough with the

21   ACLU Voting Rights Project.  I'm an attorney for the AME

22   plaintiffs.

23          MR. GARABADU:  I am Rahul Garabadu.  I am with

24   the ACLU of Georgia, also representing the AME

25   plaintiffs.



1           MS. O'CONNOR:  I'm Eileen O'Connor

2     representing the United States.

3           MS. LaROSS:  Diane LaRoss for the State

4     defendants.

5           MS. OLM:  I am Rylee Kercher Olm with Keker,

6     Van Nest & Peters representing Asian Americans Advancing

7     Justice-Atlanta.

8           MR. WHITE:  And I am Daniel White representing

9     Cobb County Board of Elections and Registration and

10    Janine Eveler, and I will be defending today.

11          THE VIDEOGRAPHER:  Would the court reporter

12    please swear in the witness.

13

14                     JANINE EVELER,

15    called as a witness herein, having been first duly sworn

16    by the shorthand reporter to speak the truth and nothing

17    but the truth, was examined and testified as follows:

18

19                     EXAMINATION

20    BY MR. ROSBOROUGH:

21       Q   Good morning, Ms. Eveler.  I'm Davin Rosborough

22    with the ACLU representing the AME plaintiffs.  We met

23    earlier, but nice to meet you again.  Thanks for being

24    here today.

25       A   Sure.



1    Q   Have you been deposed before?

2    A   Not to my recollection.

3    Q   Okay.  I'm going to go through some basic

4  ground rules just to make sure we're on the same page.

5  Starting with, is there any reason why you can't give

6  your true and complete testimony today?

7    A   No.

8    Q   Okay.  So the court reporter is going to

9  prepare a transcript of everything that's said today.

10  Because of that, even though we are looking at each other

11  and I can see your head nod, we'll just need you to give

12  verbal responses to every question that's asked.

13       Is that okay?

14    A   Yes, I understand.

15    Q   Okay.  And just because we want a clean record

16  here, I will do my best not to talk over you.  If -- if

17  you can do the same, just so we have a clear record.

18       Does that sound okay?

19    A   Yes.

20    Q   Great.  If you don't understand any question

21  that I ask or any counsel asks, please ask for

22  clarifications.

23       Does that sound okay?

24    A   Yes.

25    Q   Great.  If your attorney or any attorney makes



1  an objection, just wait for that objection to be stated,

2  and you'll still answer the question unless your attorney

3  instructs you not to answer the question.

4          Does that make sense?

5      A   Yes.

6      Q   Okay.  Please let us know if you need a break

7  at any point.  We will definitely take some breaks, but

8  if you need a break at any point when we haven't offered

9  one up, just say so.  Completely understand.  The only

10 thing I ask is that you not ask for a break while there

11 is a question pending.

12         Does that make sense?

13     A   Yes.

14     Q   Okay.  So, obviously, you've met the people in

15 the room today.  There is a number of people on Zoom.  We

16 are just going to ask that the people on Zoom stay muted

17 throughout the day until -- unless and until those who

18 are going to ask questions later want to come on and ask

19 questions.

20         Does that sound okay?

21     A   Okay.

22     Q   All right.  And so for the -- for the benefit

23 of those on Zoom, obviously there is a number of

24 different cases that have been consolidated here and a

25 number of different attorneys representing a number of



1  different clients.  So the -- those of us here in person

2  are probably going to be asking most of the questions

3  today, but we're going to leave some time for those on

4  Zoom to ask questions at the end.

5       Does that make sense?

6    A   Yes.

7    Q   Okay.  All right.  Do you have any questions

8  for me before we get started?

9    A   No, I don't.

10   Q   Okay.  So you understand that you are being

11 deposed today in your capacity as a representative of the

12 Cobb County Board of Elections and Voter Registration?

13   A   Yes.

14   Q   You also understand that we may ask you some

15 questions in your individual capacity as elections

16 director?

17   A   Yes.

18   Q   Okay.  I'm going to hand you what we will mark

19 as Exhibit 26, since we're going to be trying to be

20 sequential from the previous depositions in this case.

21       (Deposition Exhibit 26 was marked for

22 identification.)

23   Q   BY MR. ROSBOROUGH:  Have you seen this document

24 before?

25   A   I probably have.



1       Q    Okay.

2       A    But I don't recall exactly.

3       Q    Okay.  Do you understand this to be the notice

4   of deposition for your testimony in this case?

5       A    It appears to be, yes.

6       Q    Okay.  If you flip to page --

7            MR. WHITE:  Do you have one more copy?

8            MR. ROSBOROUGH:  Oh, sure.

9            MR. WHITE:  I thought there was an extra.

10  Sorry.

11           MR. ROSBOROUGH:  Oh, no.  That's fine.  Here.

12      Q    BY MR. ROSBOROUGH:  If you flip to page 9, do

13  you understand that these are the lists of topics on

14  which we may ask you questions today?

15      A    Yes.

16      Q    Okay.  Are you prepared to answer questions on

17  all of these topics to the best of your ability?

18      A    I will answer it to the best of my ability --

19      Q    Okay.

20      A    -- yes.

21      Q    And how did you prepare for your deposition

22  today?

23      A    All I did was review the SB 202, the documents

24  that we prepared here that indicate how they would affect

25  us.



1    Q   Okay.  Do you have a personal e-mail address,
2  such as a Gmail account?
3    A   Yes.
4    Q   Okay.  Have you used that e-mail account to
5  send any work-related correspondence?
6    A   No.
7    Q   Okay.  To the best of your knowledge, have you
8  received any work-related correspondence on your personal
9  e-mail account?
10   A   I have not.
11   Q   Okay.  Have you sent text messages related to
12 any of the topics identified in the deposition notice, to
13 the best of your knowledge?
14   A   Most likely, but I don't -- I don't have a
15 record that I can confirm that with.
16   Q   Okay.
17   A   This was a while ago.
18   Q   Okay.
19   A   Yeah.
20   Q   To the best of your knowledge, have your text
21 messages been searched and produced for purposes of this
22 litigation?
23   A   I don't believe they have, no.
24   Q   Okay.  Where do you live, Ms. Eveler?  I don't
25 need a street address, just generally.



1        A    I live in unincorporated Cobb County, near

2    Marietta.

3        Q    Okay.  And how long have you lived in Cobb

4    County?

5        A    I have lived in Cobb County since 2003.

6        Q    Okay.  And where did you live before that?

7        A    In California.

8        Q    What's your educational background?

9        A    I have a bachelor's degree in business

10   administration recently acquired through an online

11   school.

12       Q    Okay.  And what's the name of the school,

13   please?

14       A    Columbia Southern.

15       Q    Okay.  And do you have any other degrees

16   post-high school?

17       A    An associate's degree.

18       Q    Okay.  And what was that in?

19       A    Liberal arts.

20       Q    Okay.  And where did you receive that from?

21       A    A school in California.

22       Q    Okay.  Where do you currently work?

23       A    I work at Cobb County Board of Elections.

24       Q    Okay.  And what is your title?

25       A    Director of elections.



1      Q   How long have you been in that position?

2      A   12 years.

3      Q   Have you held any other positions with the Cobb

4   County Board before that, before you became director?

5      A   Yes.  I was the elections manager, and before

6   that I was an administrative specialist.

7      Q   Okay.  And what were the time periods in which

8   you held those jobs, to the best of your recollection?

9      A   I became first employed as a part-time clerk in

10   2004.  In 2005, I became a full-time administrative

11   specialist.  In 2008, I became the elections manager, and

12   then 2010 as the director.

13      Q   Can you describe your current job duties as

14   director?

15      A   Overseeing all of the day-to-day operations,

16   advising the board on those day-to-day operations,

17   general employment duties with those that are employed

18   here in Cobb County, budget for the department, various

19   other -- other things to run the elections.

20      Q   Okay.  Do you report to the board in -- in your

21   capacity as director?

22      A   I am appointed by the board, so yes.

23      Q   Okay.  And what are the duty of the board

24   members?

25      A   The board members are the superintendent of



1  elections as far as stated in the law.  All the duties

2  associated with being the superintendent and the Board of

3  Registrars falls on the board.  Although, they delegate

4  most of those day-to-day operations to me and the -- and

5  the staff.

6      Q   Okay.  Are there any -- did --

7          (Zoom interruption.)

8      Q   BY MR. ROSBOROUGH:  Are there any duties that

9  you can think of of the board relating to the

10  administration of elections which they have not delegated

11  to you and which the board itself holds?

12     A   Certainly.  Setting policy for things like how

13  much advanced voting we are going to provide, whether

14  we're going to do optional programs, such as this last

15  election we did collect absentee ballots at different

16  libraries in the county.  That's a discretionary thing.

17  Basically, you know, overseeing what we do, and if there

18  is a direction that they don't approve of us going in,

19  they will rein us back or give us further direction.

20         So they are the policy board.  They are setting

21  our -- our parameters as far as things that we have

22  discretion over, and -- and really just oversight of what

23  we are doing.

24     Q   Okay.  And how would you describe the major

25  duties that the board has delegated to you?



1     A    Again, day-to-day operations, so making sure

2   that we are meeting our goals, making sure that we are on

3   track for required activities, that we are making sure

4   the absentee ballots are processed in the times that are

5   required.  You know, all of the -- as I said, all of the

6   purchasing, budgeting, that sort of thing through the

7   county, that's all on me.  All the employment issues are

8   all delegated to me.

9          As far as the running of elections, they

10  basically delegate most things to me and the staff,

11  unless there is, again, something that interests them or

12  isn't going the way that they would like, then they get

13  more involved in solving issues.

14    Q    On the issues in which the board has not

15  delegated their power to you, such as policy making, for

16  instance, do -- as a matter of practice, do they still

17  tend to seek your advice on those matters?

18    A    Most of the time, yes.

19    Q    Okay.  For issues, for instance, such as the

20  provision of early voting, do they seek your advice

21  typically?

22    A    I usually will present the staff's recommended

23  schedule for early voting, given the time frames for any

24  particular election and the resources that we have been

25  able to secure, and they will either approve that,



1  suggest other -- other additional locations or time

2  frames and that sort of thing.

3      Q   Okay.  Are you a member of any professional

4  associations?

5      A   I'm a member of what is called GAVREO, the

6  Georgia Voter Registration and Election Officials

7  association.

8      Q   How long have you been a member of GAVREO?

9      A   Since I was an election manager.  It was

10  actually two organizations prior to becoming a

11  consolidated organization.  It was a voter registration

12  association and an election official association

13  separately.  And that was since 2008, I have been a

14  member of those.

15      Q   Okay.  Do you know when GAVREO became -- when

16  those two branches of the voter registration and the

17  election officials merged and became GAVREO in its

18  current form?

19      A   I don't know exactly, but it was two or three

20  years ago.

21      Q   Okay.  What is your -- what -- what, if any, is

22  your role with GAVREO at the present time?

23      A   I have been a speaker at the conference, the

24  training conferences.  I have been part of a group that

25  tried to influence legislation.  I wrote a resolution



 1  presented to the legislation and was signed off by the

 2  association.  I believe it was two years ago.  Maybe it

 3  was last session.  I think it was last session.

 4           I haven't held any offices in the organization

 5  but am sometimes brought into advisory roles into certain

 6  groups that are discussing issues.

 7      Q    Do you have an understanding of why you are

 8  sometimes brought into an advising role in GAVREO?

 9      A    I have been doing this for quite a while, and

10  there are a lot of newer elections directors and

11  supervisors of elections, so I believe that I have some

12  experience that people are asking for.

13      Q    Okay.  Have you previously held any other sort

14  of role with GAVREO that you haven't already mentioned?

15      A    No.  Huh-uh.

16      Q    You mentioned that you were a part of a group

17  with GAVREO that sought to try to influence legislation.

18  Can you tell me a little bit more about that group?

19      A    It was a group of us, the leadership of the

20  organization and several others, that were interested in

21  influencing legislation about the -- the holding of the

22  primary this year, the 2022 primary, and the effect that

23  redistricting had on that time frame.

24           So a group of us got together and put together

25  our thoughts about what we would like to see.  We wanted



1   to have -- with the redistricting calendars being pushed

2   forward, there was very little time to complete that

3   before the primary, so we were looking for relief in

4   that.  We were looking for the primary to be moved

5   forward into June.  I think it was only by a week or two,

6   but it was something that we were looking to do.  And it

7   would affect qualifying, which was held in March of this

8   year, and we wanted that to be in April.

9          So that was put together in a resolution and

10  signed off by the organization, I believe in the

11  December meeting of last year.

12     Q   Have you ever been a part of any other group,

13  whether formal or informal, within GAVREO that's tried to

14  influence legislation?

15     A   Just e-mails back and forth with other

16  directors, but nothing formal.

17     Q   Okay.  I think you also mentioned that you

18  wrote a resolution that was adopted by GAVREO; is that

19  correct?

20     A   Correct.

21     Q   And what was the topic of that resolution?

22     A   Again, it was with the redistricting impacts

23  and the short time frames on conducting the primary.

24     Q   Okay.  Were you a member of any other -- let me

25  rephrase.



 1          Are you currently a member of any other

 2     professional associations?

 3          A    No.

 4          Q    Okay.  Have you been in the past a member of

 5     any other professional associations?

 6          A    Just like I said, the separated organizations

 7     when they were called something different.

 8          Q    Have you been a member of any election task

 9     forces, to the best of your knowledge?

10          A    I was -- I'm sorry, I'm trying to search my

11     memory.  I participated on -- actually, I am still

12     participating on a working group with the Secretary of

13     State's office with regard to system improvements.

14          Q    Can you tell me a little bit more about that

15     working group?

16          A    Yes.  So this was part of a -- a group led by

17     the systems group at the Secretary of State's office,

18     primarily Nic Northen, who was seeking advice from

19     counties about what the pain points are in the use of the

20     registration system and the election systems.  Voting

21     systems not primarily, but the poll pad for one, which we

22     did implement part of the first pilot in this last

23     election.  So that was all part of this working group, to

24     get to that point where we could pilot a new system.

25               We are part of improvements related to the



1  voter registration system, which is going to migrate to

2  what's called GARVIS, and it's currently eNet.  So there

3  is discussions of even further out in the future some of

4  the system improvements that they are looking at, as

5  well.

6      Q   Can you tell me a little bit more about the

7  pilot you just mentioned?

8      A   Yes.  So we, in the advanced voting area, for

9  advanced voting, the primary way of doing advanced voting

10  so that it is like a vote center, and they are all

11  connected and we know that everybody -- that no one is

12  voting twice at two centers.  The primary way is to have

13  everybody check in the voters on a laptop, and the laptop

14  is logged into the voter registration system eNet.

15        With this pilot we are using cellular

16  connected -- by cellular network, the poll pad.  It's the

17  newer version of the poll pad, and so there is no longer

18  a need to use the voter registration system directly

19  because the poll pads are connected to a central location

20  that has a copy of the voter registration database.

21        So they will then sync together.  When a person

22  votes on that poll pad, it will show on all the poll pads

23  throughout the county that that person has voted at that

24  location, and so they won't be able to vote twice.

25        So previously you had to use the voter



1   registration system to do that, and then you had to go to

2   the poll pad to encode their voter access card.  That

3   caused issues where the worker would maybe transpose

4   something, give them the wrong card, do the wrong

5   precincts because of that separate systems.

6           So the cellular poll pad allows everything to

7   be connected countywide and allows them to do it on one

8   device, and there is no chance for error in encoding the

9   card.  It also has a printer stand attached to it, so the

10  voter signs on the screen just like on election day, and

11  then that eliminates the paper form that previously they

12  had to fill out, because now you have their signature on

13  the oath on the screen, and it prints out that voter

14  certificate or record of their -- of their oath

15  signature.

16          So all in one device.  We -- we eliminated the

17  extra laptop and the paper application, so it was much

18  faster to check in.

19      Q   So how would you characterize the success of

20  the pilot with your experience in Cobb County?

21      A   It was extremely successful.  I think it

22  contributed to how many people we were able to vote.

23      Q   Would you say that it helped speed up line

24  waiting times on -- for early voters?

25      A   Absolutely.



1    Q   Do you have any sort of assessment of like to

2  what extent that helped speed up lines for early voters

3  this cycle?

4    A   Yes.  Because they are all connected, we have

5  access to what is called ePulse, which is the central

6  place where all the data goes, and it showed that our

7  average check-in time was one minute, 13 seconds.  It's

8  now in the runoff.  It's reduced even further, now that

9  they are used to using it, and it's right around a

10  minute.  Whereas before, when you consider the -- the

11  filling out of the form, the signing the form, and using

12  the two different devices to check in and then encode the

13  card, the time frame for check-in was between two and

14  five minutes, depending on how accurate the clerk was,

15  how -- how much talking they did.

16    Q   Sure.  Sure.

17        Would it be fair to say that the previous

18  system with the two to five minutes could have some sort

19  of cascading effect in terms of line length?

20    A   I would think, yes, because if you take longer

21  to check someone in, then the line to get to that

22  check-in point would obviously increase.

23    Q   Yeah.  Whose idea was the -- this pilot

24  improvement plan?

25    A   Well, I first heard about it from Nic Northen



1   in the working group that I'm a part of.  My

2   understanding is that it is how the poll pad is used in

3   other states, and Georgia implemented it in a very

4   conservative way in the first round, being cautious about

5   any kind of cellular connections.  They did it, you know,

6   in a more cautious way.  But it seemed to have really

7   improved the situation.

8       Q   Do you have any idea of why you were asked to

9   be part of that working group?

10      A   I -- I just think that because I've been doing

11  this a long time, and that's about it.

12      Q   Are you a member of any other election advisory

13  groups or task forces that we haven't discussed?

14      A   I don't think so.

15      Q   Okay.

16      A   Unless it's a long time ago that I am just not

17  remembering.

18      Q   Okay.  Turning to the topic of the interaction

19  between the counties and the Secretary of State's office

20  with regard to election administration, does the

21  Secretary of State's office provide you with any

22  information about how to administer elections?

23      A   Yes.

24      Q   What type of information, broadly speaking,

25  does the Secretary of State's office provide to -- to the



1  county's boards and to you?

2      A   Most -- yes.  I'm sorry.  Most of it comes in

3  the form of Official Election Bulletins, or OEBs, as they

4  call them, that we receive notice of through e-mail, and

5  then we log into the -- the election portal, which is

6  called Firefly, and retrieve those OEBs, which they are

7  mostly reminders of processes and policies and procedures

8  that are in place and haven't changed; that we just need

9  to remember this deadline is coming up, be sure that you

10  do this; remember the process that you need to go to is

11  here and that sort of thing.  But sometimes also when

12  systems change, policies change, the law changes, they

13  will announce those kinds of changes in -- in those

14  bulletins.

15      Q   I want to come back to the OEBs in a -- in a

16  minute, but are there other types of information that the

17  Secretary of State's office provides to the counties

18  about administering elections apart from OEBs?

19      A   There are frequent training webinars that

20  counties are invited to attend.  They are also recorded

21  so that we can review them later.  There is quite a bit

22  of training documentation on the Firefly site that is

23  available for us to retrieve if we need it.

24      Q   Okay.  How frequent -- how frequently would you

25  say you receive OEBs?



1      A    When we're in the middle of this time period,

2   very frequently.  Probably two or three times a week.

3      Q    How frequently would you say you receive OEBs

4   that reflect a change of policy or procedure as opposed

5   to a reminder?

6      A    Less often than reminders.  Probably once or

7   twice a month.

8      Q    Can you think of any times when you've received

9   OEBs reflecting a change in policy or procedure in the

10  days or weeks running up to voting?

11     A    I can think of an example, and I'm not sure of

12  when it was received.  But when there were questions

13  about campaign materials and what constituted a campaign

14  item at the polls, there were several things in court,

15  you know, during those times.  There was one issue about

16  an NRA hat that appeared in a Georgia proceeding.  There

17  was something in a Midwestern state that I don't recall

18  the name of about signage and whether it was promoting a

19  slogan of a candidate or the candidate itself.

20         So those, as they work through the court

21  process and were decided one way or the other, the OEB

22  would come out telling us about the proceeding and how it

23  impacted us here in Georgia and how we should proceed to

24  enforce electioneering laws, you know, here in Georgia

25  and interpret those.

1      Q   When you've received an OEB that concerns
2   changes to elections' policies and procedures, do you
3   have a sense of how quickly your office has been able to
4   receive and implement that?
5      A   Well, we try and implement it as soon as we
6   receive it.  Especially if it's something that changes a
7   current procedure, we would, you know, attempt to -- to
8   retract what we were doing that didn't meet those new
9   guidelines and put in place something that would meet the
10   new guideline.
11      Q   When there is a new law that affects election
12   administration in Georgia, how do you learn about it?
13      A   Well, generally, I try and keep up on those
14   kinds of things, and I will probably hear about it in
15   news feeds first, but the -- the Secretary of State's
16   office does inform all of the counties in their
17   directives as well.
18      Q   So this would be the Secretary of State's
19   office would inform your office via an OEB --
20      A   Right.
21      Q   -- about a change in law?
22      A   Yes.
23      Q   Has that process changed at all from before and
24   after the 2020 election?
25      A   I don't think so.  I'm trying to remember what



 1 | it was before.  I think now there's -- there are a great
 2 | deal more training webinars.  I think they're -- they get
 3 | people online more.  They will sometimes have a chat
 4 | session where they just have an open line for four hours,
 5 | where you could pop in and ask questions about something
 6 | that's new.  We didn't usually have that before.  That
 7 | may be something new.
 8 |     Q   Who from the Secretary of State's office is
 9 | typically participating in -- in that chat?
10 |     A   Blake Evans, the elections director; Jesse
11 | Harris, the deputy directory; Nic Northen, the systems
12 | manager, I believe.  And Nic has some support staff that
13 | usually will log on but not actively participate.
14 |     Q   And I think you referred to this, but does the
15 | Secretary of State's office provide training to county
16 | officials about changes in the voting-related laws?
17 |     A   They do.
18 |     Q   And who typically administers those trainings?
19 |     A   It has been several different people over the
20 | years because the training position has changed quite a
21 | bit.  I think most recently it has been Jesse Harris, and
22 | even Blake himself sometimes will provide us information.
23 |         We recently had a risk-limiting audit for --
24 | actually, the first time that we implemented it as a
25 | risk-limiting audit and not a full recount, and there



1  were quite a few training sessions on that that were

2  given by -- by Blake, and they were using the VotingWorks

3  nonprofit group to provide that training directly to us.

4      Q   Has the Secretary of State's office provided

5  your office with any guidance about serving the needs of

6  voters with disabilities?

7      A   I don't believe so.

8      Q   Has the Secretary of State's office provided

9  your office any guidance about the Americans with

10  Disabilities Act?

11     A   Well, we have that information, and we have a

12  person on staff that's quite fluent in that and does our

13  facilities' surveys.  So we haven't sought out any

14  information on that, and maybe that's -- again, a lot of

15  the training is you have to seek it out.  You have to go

16  look for the information, or you have to participate in

17  the webinars that are not mandatory.

18     Q   Who is the person on your staff that you

19  mentioned that's relatively fluent in disability issues?

20     A   Her name is Denise Ivey.

21     Q   And what is her position?

22     A   She's the site survey supervisor.

23     Q   And she works full-time in your office?

24     A   Yes.

25     Q   Okay.  Do you have a sense of the number or



1  frequency of trainings that -- you mentioned the optional

2  trainings that the Secretary of State's office provides

3  relating to voters with disabilities?

4      A   I do not.

5      Q   Are you familiar with Senate Bill 202 as

6  ratified by the Georgia General Assembly and signed by

7  the governor on March 25th, 2021, I think also known as

8  the Election Integrity Act of 2021?

9      A   Yes, I am.

10     Q   If I refer to that as "SB 202," will you

11  understand that that's the law I am referring to?

12     A   Yes.

13     Q   Okay.  I'm going to mark -- actually, this

14  exhibit is already marked from previous depositions as

15  Exhibit 1.  Do you recognize this document?

16     A   I do.

17     Q   What is it?

18     A   This is the bill that was passed by the

19  legislature, as you said in March of 2021, and changed

20  the -- a lot of the election code.

21     Q   So this is what we referred to as SB 202?

22     A   Yes.

23     Q   Okay.  With regard to provisions concerning

24  identification requirements for absentee ballot

25  applications, what is the Board of Elections' role in



1  enforcing and executing those provisions in Cobb County?

2      A   The board itself or their designees in our

3  office?

4      Q   Both I was going to ask you.  So let's start

5  with the board itself, and then we'll go to you and your

6  office.

7      A   Okay.  So again, the board doesn't have an

8  active part in -- in working with the ID on absentee

9  ballots, with the exception of a few members have

10  assisted us as clerks, basically, to help with the

11  workload.

12      Q   And then as delegated to you in your role as

13  director and to your office by the board, what is -- what

14  is your role concerning enforcing and executing the

15  identification requirements for absentee ballot

16  applications?

17      A   So my role and that of my manager in that area

18  would be to help the workers understand the differences

19  in validating an absentee ballot or an application for an

20  absentee ballot.  Based on the changes in SB 202, we

21  moved from verifying signatures as our authoritative

22  piece of information, to using the -- the birth date and

23  the driver's license or state ID number.

24      Q   Who makes the determination as to whether the

25  requirements for that -- a particular application is met



1  with respect to ID?

2      A   Can you rephrase that?

3      Q   Yeah.  Who makes the ultimate determination

4  about whether to accept the absentee ballot application

5  based on the identifying information that's been

6  submitted?

7      A   So to accept the application or the -- the

8  ballot, it goes through a verify process where one clerk

9  will review the information against the voter

10 registration system, determine if the data is a match,

11 and pass it on to another worker who does the actual

12 accepting in the voter registration system and again

13 looks at the data to see if it's a match, and then does

14 the actual accepting of the -- of the application or of

15 the ballot.

16     Q   You mentioned the switch from using signature

17 matching to using certain identifying information.  Does

18 signature matching still play a role in your decision of

19 whether to accept an absentee ballot application?

20     A   Not at this time.  Initially, when we were

21 transitioning to the new criteria, because the code says

22 that the application has to be signed by the elector,

23 there were workers who would check that it was the

24 signature of the elector.

25         We have now moved to, is it signed by somebody



1  with a signature that says that name?  Is it signed by

2  the wife of that person?  Is it signed by -- I mean, what

3  does the name say?

4          So there -- there are some workers that have a

5  problem with that.  They think that we should be

6  verifying signatures.  So it's been a tough transition to

7  get the workers to understand that it's the very

8  objective pieces of data that we're looking at and not

9  the subjective comparison of the signature.

10     Q   And is it your understanding that that change

11  is because of SB 202?

12     A   Yes.

13     Q   So with regard to identification requirements

14  for absentee ballots, who makes the determination of

15  whether or not the ballot meets the requirements and is

16  accepted?

17     A   Again, it would be two of our clerical workers.

18  One would do the verifying, and then one would do the

19  accepting.

20     Q   And what is the verifying that they would do?

21     A   That is looking in the voter registration

22  system to verify that the date, the birth date matches,

23  and the driver's license or last four of the Social, if

24  they don't have a driver's license, or if it's not a

25  driver's license, it's a state ID card, that those



1   numbers match.  And they initial it that they have

2   verified those two items, and they pass it on to the

3   other person who does a second check and then accepts it

4   in the system.

5        Q   And does the voter's signature play a role at

6   all in that determination at this time?

7        A   The signature has -- it has to be signed.  It

8   has to be in a pen wet signature, as we call it, pen

9   signature, and not an electronic signature of any kind,

10  not a stamp, nothing like that.  And we are looking for

11  that it is signed with a name or what appears to be the

12  name of the person that is submitting the ballot.

13       Q   In terms of notifying voters who your office

14  determines do not meet the requirements either due to a

15  missing field or incorrect information, how is that voter

16  notified?

17       A   So for missing information, the -- first of

18  all, let me ask you if you are talking about applications

19  or ballots?

20       Q   Let's start with applications.

21       A   Okay.  So an application that is missing

22  information is rejected, and the voter is notified by

23  letter, also by if they were to look on the absentee

24  voter file in the Secretary of State's office or on their

25  MVP, it would say "rejected" in that way.



1          So if the -- if the information is mismatched,

2     it's there but it doesn't match their voter registration

3     record, then the voter is sent a provisional ballot, that

4     they then have to cure with an affidavit to cure that

5     mismatched information on their application.

6          Q    And what about with regard to absentee ballots

7     themselves when there's missing or a mismatch of

8     information; how does the cure process work?

9          A    So the ballot is, again, rejected if there is

10    missing information, mismatched information, and the

11    voter is notified by letter, again by they're checking

12    their MVP, if they were to do that, and they were sent a

13    cure affidavit for the ballot.  There is an application

14    cure affidavit and a ballot cure affidavit.  And if they

15    get those cures in by the three days after the election,

16    then the ballot can count.

17         Q    Who has responsibility in terms of the board or

18    your office for determining whether to accept or reject

19    absentee ballot applications as timely or untimely?

20         A    It's the -- the workers that are reviewing the

21    applications, if they determine that it should be

22    rejected either due to one of these mismatched reasons or

23    missing data information or it's received too late or too

24    early, they are supposed to get their supervisor to okay

25    it.  And they sign off that, yes, I agree this should be

1  rejected and notification sent to the voter.

2      Q   Is the same -- does the same process hold true

3  for absentee ballots themselves?

4      A   Yes.

5      Q   With regard to establishing secure drop boxes

6  and collecting ballots from them, whose responsibility is

7  that?

8      A   The drop boxes that are at the advanced

9  locations, we here in Cobb have one here in our main

10  office, and we have five out at various advanced voting

11  satellites.  And we have teams that open the box at 7:00

12  in the morning if it's -- or whatever time the advanced

13  voting begins.  In our case, it's 7:00, and close it at

14  7:00 p.m.

15          Retrieve the ballots nightly, and a team of two

16  counts the ballots, fills out a chain of custody, and the

17  poll manager at that location releases custody to the

18  team that is taking the ballots from the box.  And then

19  they bring the -- the ballots here to our office every

20  night.

21      Q   And with respect to deciding where to place

22  drop boxes, who makes that decision?

23      A   That was proposed to our board, in our board

24  meeting where we were determining our advanced voting

25  locations.  We also included where we proposed putting



1  the drop boxes to geographically disperse them throughout

2  the county, and the board agreed to that.

3      Q   And who makes the determination about how many

4  drop boxes to place?

5      A   Well, in the SB 202, it indicates one

6  additional drop box for 100,000 voters.  Besides the one

7  in the main office, we have a little over 500,000 voters

8  here in Cobb.

9      Q   With regard to operating in-person polling

10  places for early voting and on election day, who has that

11  responsibility within Cobb County?

12      A   For operating those?

13      Q   Yes.

14      A   Well, we have an elections manager who is over

15  that division for election day, and then we have a

16  registration manager who is over advanced voting

17  locations.

18      Q   Okay.  And are those responsibilities that are

19  delegated to your office by the board?

20      A   Yes, they are, and I delegate much of that to

21  the managers.

22      Q   With regard to receiving and adjudicating voter

23  challenges, who has that responsibility within Cobb

24  County?

25      A   That would be the Board of Elections and



1  Registration.

2      Q   Do you have any role in that?  Is your -- in

3  your role as director?

4      A   We would be receiving the challenge from the

5  challenger through our election office e-mail.  Usually

6  that's how it's submitted, through e-mail.  And then

7  making sure that the board is forwarded that information

8  and any attachments that are submitted.  And then we

9  would determine with our attorney when to hold the

10  hearing, and the board then hears from the challenger.

11      Q   And with regard to whether to accept or reject

12  out-of-precinct provisional ballots, who has that

13  responsibility within Cobb County?

14      A   In Cobb County, that's delegated to me and my

15  staff, and there aren't really -- except if it's across a

16  county, the person is registered in another county, there

17  is really not a reason to reject an out-of-precinct

18  provisional.

19      Q   With regard to the prohibition in SB 202 on

20  providing what I'll call line relief, so food or

21  beverages to people waiting in line to vote, what

22  responsibility does the board or your office have for

23  enforcing those provisions?

24      A   What our policy is, is to tell a person that

25  may be participating in something that we determine is



1  against the law, that it is -- what the law is, what it

2  says they can and can't do, and to warn them that what

3  they are doing is not allowed.

4       Q    And what role would you have if that person or

5  organization does not desist in the conduct?

6       A    Well, we haven't had that happen, but we do

7  have deputy -- sheriff's deputies here usually at all of

8  our voting locations or nearby, as their constitutional

9  duty is to protect the sanctity of the election and the

10  election polling places.  They usually would respond to

11  help the person understand.

12       Q    I understand.

13            So if -- if you had that situation and the

14  person refused to desist, would you request that the --

15  the sheriff deputies remove the person?

16       A    We could do that, but we -- we had an incident

17  in -- in our South Cobb location, South Cobb Regional

18  Library, during the last early voting, where a person

19  assaulted a poll worker and they were arrested.  But

20  that -- that's not -- I mean, it started out with an

21  infraction of taking a picture but that escalated to

22  physical violence.  So in that case, yes, the person

23  would be removed.

24       Q    Okay.  How would you describe the demographics

25  of Cobb County?



1       A    As far as racial demo --

2       Q    Sure.

3       A    -- demographics?

4            I think we are still mostly white.  And all

5  other races, if I can remember my demographics on my

6  chart, primarily it's getting to 50-50, but I think it's

7  still primarily white, and then all other racial

8  breakdowns on the other 50 percent.

9       Q    Has the minority or nonwhite share of the

10 population increased over time, over the last decade,

11 say?

12      A    Yes.

13      Q    To what extent?

14      A    I don't have that data in front of me.

15      Q    That's fine.

16           Are there some precincts that serve

17 significantly more voters of color, and by which I mean

18 black or Asian American, Pacific Islander or Latino?

19      A    I'm sure there are, but again, I don't have

20 that data in front of me.

21      Q    Okay.  At what point did you first become aware

22 of efforts to enact significant changes to Georgia's

23 voting laws following the 2020 general election?

24      A    Well, I do follow the legislative session, so I

25 did see a lot of bills coming out that were at first very

1  separate, in various forms and several different

2  sponsors, but then in the end, many of them were

3  incorporated into SB 202.

4      Q   Do you have an understanding of where those

5  efforts arose from?

6      A   I do.  As stated in the preamble to the -- what

7  is known as the Election Integrity Act, the legislature

8  described the reasons for enacting the law.

9      Q   At the time -- step back to before SB 202 was

10  enacted and you were first starting to see some of the

11  separate pieces of legislation, some of which in whole or

12  in part were incorporated into SB 202.  What was your

13  understanding at the time of why they were being

14  proposed?

15      A   My understanding was in reaction to some of the

16  things that happened in the 2020 election cycle; that,

17  obviously, the 2020 cycle was an anomaly because of

18  COVID, and so many actions took place on an emergency

19  basis that many groups had issue with, and so the

20  reaction was to codify either some of the things that

21  were good into the code and modify some of the other

22  things that other people didn't want them, legislators

23  didn't want those things that happened.

24      Q   I think you mentioned that part of your job is

25  monitoring elections and voter-related legislation.  Is



1  that correct?

2       A    That's correct.

3       Q    Do you provide input on some occasions to

4  members of the legislature?

5       A    I do.  I have spoken at subcommittee meetings

6  and submitted letters with recommendations as an election

7  administrator.

8       Q    Do you provide input at times to the Secretary

9  of State's office as well on voting-related legislation?

10      A    Yes, I do.

11      Q    Would it be fair to say that you are sought out

12  by the Secretary of State's office because of your

13  experience and expertise?

14      A    At times, yes.

15      Q    Would the same be true with respect to certain

16  legislators?

17      A    There have been a few who have contacted me,

18  yes.

19      Q    Do you have any ballpark estimate of how many

20  voting or election-related bills have been enacted since

21  you have been director here in Cobb?

22      A    Almost every session there is something related

23  to elections.

24      Q    How many would you consider to be major changes

25  to voting or election laws?



1      A    There have been several in the past.  For

2    instance, when voter ID was implemented and then was

3    challenged in court several times right after that, and

4    we were waiting for courts to decide it on the eve of the

5    election almost on what to do.

6      Q    Have you -- can you think of any other --

7    before SB 202, any other major changes to election or

8    voting laws in your time here?

9      A    Yes.  I believe it was called House Bill 316,

10   which implemented the new voting system.  That was a

11   major change.  Also, like I said, in, I believe it was

12   2008, when voter ID was implemented -- it may have been

13   before that -- that was a major change.  There was

14   another one that escapes me, but there have been several

15   that have been big changes.

16     Q    Would you consider SB 202 to be a major change

17   in voting and election-related laws?

18     A    Yes, I would.

19     Q    To the best of your recollection, did the

20   process for enacting SB 202 differ from those previous

21   major efforts in any notable way?

22     A    I can't think of anything that would be

23   different, no.

24     Q    Do you recall if there was a use of a special

25   committee for those previous voting -- major



1 | voting-related changes in either the House or Senate?

2 |     A   I don't recall if there was a special

3 | committee, but my recollection is that every legislation

4 | goes through a committee.

5 |     Q   Can you think of another time other than SB 202

6 | when a special committee was formed to deal with changes

7 | to election or voting-related administration, to the best

8 | of your knowledge?

9 |     A   No, I cannot recall anything.

10 |     Q   Okay.  Would it be fair to say that absentee

11 | voting has been on the rise in Georgia in recent years?

12 |     A   I would say that absentee voting rose in the

13 | 2020 cycle, but I would not say that it is a trend from

14 | before that.

15 |     Q   Have you -- other than a rise in the 2020

16 | cycle, have you witnessed any other trends regarding

17 | absentee voting from when you started your position to

18 | the present?

19 |     A   I have noticed that in previous years it was

20 | primarily used by elderly and disabled voters or those

21 | who were out of town.  Even though they did not have to

22 | have a reason, they usually had a reason, and it wasn't

23 | just for convenience.  And I think it has -- that changed

24 | drastically in 2020, that it became a method of

25 | convenience and as a reaction to the pandemic.  And now



1  it has come back to being primarily for people who -- who

2  need a reason, basically, even though they don't have to

3  have a reason.

4      Q   In the last couple of election cycles, have you

5  noticed any demographic trends in absentee voting and

6  who's using it?

7      A   I have anecdotally, let me say that.  It

8  appeared in previous years to be primarily used by, as I

9  said, elderly people who tended to vote Republican, and

10 it seems to be more used by younger people now, and

11 again, people who are voting by -- for convenience, and

12 maybe is used -- it's maybe promoted more, I should say,

13 by people who are voting Democrat or by the Democratic

14 Party as a promotion.

15     Q   Would it be fair to say that voters of color

16 have used absentee voting in an increased manner since

17 2020?

18     A   I do not have statistics about that.

19     Q   Okay.  Coming into the general election in

20 November of 2020, what were the biggest challenges you

21 faced?

22     A   The biggest challenge was the pandemic.  I was

23 trying to do all of the work that we had to do in

24 confined spaces, to get enough workers who would come to

25 work.  It's not something you can work from home and do.



1  So the great -- the great number of absentee ballots,

2  absentee balloting is very labor intensive, a lot of

3  paper, and you need a lot of space to manage all that

4  paper.

5         So the -- the biggest challenges for us were

6  finding space, having enough space for all the people to

7  spread out and not give each other COVID, and to process

8  all of the paper.

9         We ended up using the Jim Miller Event Center

10  here in Marietta, which was a large, large space.  So we

11  spread everybody out and used that.

12    Q   Did you hear from voters more than usual with

13  questions or concerns about the voting process leading up

14  to the 2020 election?

15    A   Leading up to it, I would say no.

16    Q   Okay.  What about -- well, let me -- let me --

17  actually, yes, let me ask that.  So what about after the

18  2020 general election?

19    A   Yes.

20    Q   Did you hear from voters more than usual?

21    A   Yes.  After the 2020 election, we heard from

22  voters.  We heard from legislators.  We heard from

23  parties.  We heard from everybody.  We heard from out of

24  state people across the nation.  Everybody had an opinion

25  about whether the election was conducted correctly, who



1   had won.  It was a very different story after the

2   election.

3        Q    Did you have an impression that some or most of

4   the people contacting you had been misled by candidates

5   or public officials as to the voting process here?

6        A    Well, let me just say that most of the public

7   doesn't know how we really conduct elections, and they

8   don't know the details of the security processes, the

9   chains of custody.  So it wasn't a stretch to say they

10  had been misled, because they already didn't understand

11  it.

12       Q    Given that people already generally didn't

13  understand the election process in previous cycles and in

14  this one, what was different about this one, in your

15  experience in hearing from people?

16       A    Well, of course, we all know that there were

17  election deniers, people who felt that there was

18  something funny going on, that people were influencing

19  the election or changing results.  We've had in the past

20  elections people who thought that the old voting system

21  would flip votes.  I mean, there has already been that

22  kind of a mindset for many years.

23            When the old voting system was first

24  implemented, I wasn't even here, but I heard many stories

25  about people who said that as soon as you touch the



1  thing, it's going to, you know, eat your vote.  It's not

2  going to record it correctly.

3         So it's -- as I said, it's something that has

4  been a part of election administration for many years,

5  but there were -- after the 2020 election, there were a

6  lot more people.  There was social media that was not a

7  part of our lives previously, that those things were

8  spread much faster, and people believed a lot of things

9  that were not true.

10     Q   Are you aware of members of the Georgia

11  legislature that were spreading what you consider to be

12  misinformation?

13     A   I can't think of one exactly, no.

14     Q   Let's go ahead and mark as Exhibit 27 this

15  document which I will hand over.

16         (Deposition Exhibit 27 was marked for

17  identification.)

18     Q   BY MR. ROSBOROUGH:  It's with the Bates stamp

19  CDR 660.

20         Are you familiar with this document?  And feel

21  free to take a moment to look at it, if you need.

22     A   I don't believe I have ever seen this document,

23  no.

24     Q   Okay.  What is the document titled?

25     A   The Chairman's Report of the Election Law Study



1  Subcommittee of the Standing Senate Judiciary Committee.

2       Q   Okay.  And does that have a date on it?

3       A   Summary of testimony from December 3, 2020

4  hearing.

5       Q   And to your recollection, is that shortly after

6  the general election and before the runoffs?

7       A   It is.

8       Q   Is this the time period in which you were

9  hearing a lot of concerns from voters in an unusual

10  amount about the elections process?

11      A   Yes, it is.  I actually may have watched this

12  hearing on the broadcast from the legislature, but --

13      Q   Do you have any recollections of watching the

14  hearing?

15      A   I do.  I -- I have recollection of some of

16  these items that are in here, but I don't think I have

17  ever seen the report.

18      Q   Okay.  Who is William Ligon, if I am saying it

19  correctly?

20      A   I think it was Ligon.

21      Q   Ligon?

22      A   Yes.

23      Q   Thank you.  William Ligon.

24      A   Yes.  He was chairman of the standing committee

25  and conducted several of the subcommittee hearings, and



1  the committee heard testimony from various witnesses.

2      Q   Okay.  Do you understand if he had any role

3  with regard to proposing voting-related legislation in

4  the aftermath of the 2020 election?

5      A   I believe he did, but I don't have any direct

6  knowledge of that.

7      Q   Okay.  If you could flip to page 12 of the

8  document, please.

9      A   Okay.

10     Q   And can you read under "Findings," the first --

11  what's marked as number 1?

12     A   It says, "The November 3, 2020 election was

13  chaotic and the results cannot be trusted."

14     Q   Okay.  Do you agree with that statement?

15     A   No, I do not.

16     Q   And why not?

17     A   As I said, it was conducted in a little bit

18  different way because of the pandemic, but it was not

19  chaotic in any way, and the results were accurate.

20     Q   If you could flip back to page 2.

21     A   Yes.

22     Q   Under "Executive Summary," if you go a few

23  sentences down, do you see where it says, "The

24  Subcommittee heard testimony that it was possible or even

25  likely that large numbers of fraudulent ballots were



1  introduced into the pool of ballots that were counted as
2  voted"?
3      A   I do see that.
4      Q   Okay.  Do you agree with that statement?
5      A   No, I do not.
6      Q   And why not?
7      A   The ballots are held under strict seal, and
8  they are transported with chain of custody forms.  There
9  is no way that it could be -- you could introduce large
10 numbers of fraudulent ballots into the pool of ballots.
11 They are accounted for the number of people that have
12 checked in as voters or the numbers of -- yes, check-ins.
13 Even absentee ballots would have a check-in.
14         So the number of voters that were credited to
15 have voted is compared to the number of ballots that are
16 tallied in the machine, and if you had a large number of
17 ballots that were not credited to any voter, then that
18 would be obvious.
19     Q   Flipping back toward the back of the document,
20 let's go to page 13.
21     A   Yes.
22     Q   Do you see at the top of that, it's Roman
23 numeral VI, "Recommendations"?
24     A   Yes.
25     Q   And do you see sub point A, "Absentee Ballots"?



1      A   Yes.

2      Q   Do you see the second paragraph, it reads, "At

3  a minimum, these recommendations include requiring photo

4  identification, following signature match procedures

5  faithfully, allowing absentee ballots to be used only

6  upon demonstration of need, mailing absentee ballots out

7  only on -- upon the request of the registered voter, and

8  although already illegal, expressly prohibiting drop

9  boxes."

10         Did I read that correctly?

11     A   You did.

12     Q   Were these recommendations introduced in some

13  of the predecessor bills to SB 202?

14     A   I believe some of them were, yes.

15     Q   And were -- to the best of your understanding,

16  did SB 202 change -- let me strike that.

17         Did SB 202 limit the use of drop boxes?

18     A   This statement says "expressly prohibiting drop

19  boxes," which it did not do.  But there were limitations

20  placed on them as -- as you compare it to what had been

21  in place in 2020 under emergency provisions and the State

22  Election Board rules.

23     Q   Okay.  You can put that document down.

24     A   Uh-huh.

25     Q   I think I'd like to just talk through -- I



1  don't think it will take too long -- a couple more

2  documents, and then maybe we can take a break.

3       A   Sounds great.

4       Q   Okay.  So I'm going to hand over what we will

5  mark as Exhibit 28.

6            (Deposition Exhibit 28 was marked for

7  identification.)

8       Q   BY MR. ROSBOROUGH:  Okay.  And this is a

9  document marked with the Bates numbers COBB 22709.

10           Have you seen this e-mail and attachment

11  before?

12      A   Let me look for just a moment.

13      Q   Of course.

14      A   I vaguely recall.  Obviously, my name is on

15  here so I did receive it, but it's -- I don't recall

16  really taking any action on this, but I may have seen it

17  before.

18      Q   Okay.  And it appears that you received this

19  e-mail, along with the letter that's attached?

20      A   If this is the attachment that's attached to

21  this, yes.  I mean, I can see my name is on this e-mail

22  string, so I received this e-mail.  I don't recall if

23  this was attached to this e-mail.

24      Q   Okay.  And I'll just refer you to the

25  attachments list on -- right under the "Subject" line,



1   "Final Letter to NCOA Electors.pdf."

2        A   Okay.

3        Q   Does that appear to represent that there was an

4   attachment to the e-mail, which is the letter presented

5   here?

6        A   It would appear that, yes.

7        Q   Okay.

8        A   Yes.

9        Q   Who is Cynthia Willingham?

10       A   She's the elections supervisor or director of

11  elections in Rockdale County.

12       Q   Okay.  And she's the person that sent you

13  the -- this e-mail, along with a number of other

14  recipients.  Does that appear to be correct?

15       A   Yes, it appears to be correct.

16       Q   Okay.  Have there been a number of mass voter

17  challenges in the lead-up to the 2020 election?

18           MS. LaROSS:  Objection as to form.

19       Q   BY MR. ROSBOROUGH:  Let me rephrase that for

20  you.

21           Do you understand if I refer to a "voter

22  challenge" what I am referring to?

23       A   Yes, I believe so.

24       Q   Okay.  And what is that understanding?

25       A   That one voter has challenged one or more other



1  voter's right to be registered or right to cast a vote in

2  an upcoming election.

3      Q   Okay.  And do you recall if there were either

4  individuals or groups who challenged a large number of

5  voters together in a single challenge with a spreadsheet

6  in the lead-up to the 2020 election?

7      A   I recall challenges between the 2020 election

8  and the 2021 runoff.

9      Q   Okay.

10     A   It's possible that some of those were before,

11 but my recollection is between the two.

12     Q   And do you recall -- do you have any

13 recollection of the -- the approximate number of voters

14 challenged in that period?

15     A   I know that one of the challenges came in two

16 large boxes, and they were paper records.

17     Q   And do you recall if the National Change of

18 Address registry database was used as a basis for some or

19 all of those challenges?

20     A   I don't recall that specifically, but most of

21 them have been based on National Change of Address with

22 very little other evidence.

23     Q   Okay.  Was the amount of voters challenged in

24 that period unusual compared to previous elections?

25     A   Yes.



1    Q   How so?

2    A   I don't recall ever really dealing with any

3   challenges prior to that.

4    Q   Do you have an understanding of where these

5   challenges were coming from in the 2020 general election

6   and runoff cycle?

7    A   There was a group in Texas called True the

8   Vote.  They, of course, had to have a Cobb County voter

9   to actually be the person sending the challenge, and

10   they -- and the one I'm thinking of that came with quite

11   a bit of -- probably 30,000 names or so, they had a Cobb

12   County voter submit them, but they obviously came from

13   that group.

14    Q   If you could turn to the letter itself, the

15   attachment --

16    A   Uh-huh.

17    Q   -- the page marked COBB022711.  What is your

18   under -- what is the date of that letter?

19    A   Excuse me.  Can you -- can you say what -- oh,

20   this one?  I gotcha.

21    Q   Yes.

22    A   I was looking for the number.

23    Q   Sorry.

24    A   Okay.  Go ahead.

25    Q   What is the date of that letter?



1        A    December 15th, 2020.

2        Q    And do you understand it to come from the

3   Georgia Secretary of State's office?

4        A    It is signed by Chris Harvey, Elections

5   Director, yes.

6        Q    Okay.  Do you have an understanding of the

7   topic of this letter?

8        A    Not at this time.

9        Q    Okay.  Can you read the first two sentences of

10  the letter?

11       A    "You have been identified as a voter who has

12  filed a National Change of Address notice with the United

13  States Post Office indicating that you currently live

14  out-of-state and have also requested an absentee ballot

15  for the January 5, 2021 Runoff Election in the state of

16  Georgia.  This correspondence is to remind you that in

17  order to vote in upcoming January 5, 2021 Runoff

18  Election, Georgia law requires all voters to be a current

19  resident of Georgia and of the county in which you are

20  registered."

21       Q    Is this the -- was this letter sent during the

22  time period in which your office was receiving a large

23  number of voter challenges that you just mentioned?

24       A    Yes.  This time frame would be between the

25  general and the general runoff.



1     Q   Okay.  Do you have any understanding of why

2  this letter was sent?

3     A   No.

4         MS. LaROSS:  Object as to form.

5         THE WITNESS:  I don't recall receiving this

6  directly.  It's possible I did.  I don't recall -- it

7  doesn't say here what directions we are to proceed with

8  this letter.  It is attached by Ms. Willingham with a

9  question, that I don't recall from this what the answer

10 was.

11    Q   BY MR. ROSBOROUGH:  And what was

12 Ms. Willingham's question to you and the other recipients

13 in the e-mail?

14    A   The question states, "Did you all receive this

15 letter from the SOS, along with a list of your voters?  I

16 have never seen this done before."

17    Q   Could you recall -- can you recall getting

18 another similar letter from the Secretary of State's

19 office in the past?

20    A   I don't have any recollection of that.

21    Q   Okay.  Okay.  I'm going to hand over one more

22 document to you, and then we will take a break.  This is

23 marked as Exhibit 29.

24        (Deposition Exhibit 29 was marked for

25 identification.)



1     Q   BY MR. ROSBOROUGH:  It has Bates number

2   CDR00133335.

3         Do you recognize this document?

4     A   Yes, I do.

5     Q   And what is it?

6     A   This is a letter that I wrote to the -- to

7   Chris Harvey, the elections director, after -- after we

8   received direction to conduct a signature audit -- I'm

9   trying to remember because I'm reading through what this

10  was.

11    Q   Sure.

12    A   There were two signature audit events.  There

13  was one where the GBI came in and did a signature audit

14  of our absentee ballots, but there was also a time where

15  the Secretary's Office wanted us to unseal records and

16  provide some of the records that were under seal to the

17  University of Georgia.  And this may have been during

18  that time, which would have meant that we had to petition

19  the court and use our resources to go through the records

20  and obtain what was being requested.

21         And so I felt that it was -- and our office

22  felt like that was not something that was our

23  responsibility to do, so I wrote this letter to say that

24  if that was something they wanted to move forward with,

25  that they should use their resources to obtain the court



1   order and search the records and give them to whatever

2   entity they wanted to conduct the audit.

3        Q   And it's correct you sent the letter on

4   April 6, 2021?

5        A   That is the date on this letter, so I would

6   assume, yes.

7        Q   Okay.  And that's your signature on the bottom?

8        A   It is.

9        Q   Okay.  And in this letter, the second sentence

10  from the bottom you say, "Considering that over 15,000 of

11  Cobb's absentee signatures for the November 3rd, 2020

12  election have already been audited by the Georgia Bureau

13  of Investigation, we submit that it is redundant for

14  University of Georgia to conduct another audit on the

15  same records."  Is that correct?

16       A   Yes.

17       Q   And what did you mean by that?

18       A   Again, there was a signature audit conducted on

19  15,000 of Cobb's absentee ballot envelopes, conducted by

20  the Georgia Bureau of Investigation, ostensibly because

21  there was a complaint that we were not checking

22  signatures.  The complaint originated from the

23  June primary, but the opportunity for an audit after the

24  general election was attractive to the Secretary of

25  State's office because they would then show that the

 1  audit, hopefully, would be correct and there would be no

 2  anomalies.

 3         So that was conducted on the November absentee

 4  ballot records.

 5     Q   And this letter, you sent this letter shortly

 6  after the passage of SB 202; is that correct?

 7     A   It would appear, yes.

 8     Q   Okay.  Was -- was this request for an audit

 9  unusual in your experience as an elections director?

10     A   This would be -- have been the first time that

11  a signature audit was conducted.  I believe the audit

12  that was done on our records was, to my knowledge, the

13  first time that had been done, and then this was the

14  state's attempt to roll that out to other counties and

15  audit those other records.  But, again, we had already

16  participated in that, and so we didn't feel that we

17  should use our resources for another second audit.

18     Q   Do you recall what the outcome of this letter

19  was with respect to the audit?

20     A   The response I got from Mr. Harvey was the

21  letter had been received, thank you.  And that was, I

22  think, all the response that I got.

23     Q   Okay.  Are you aware of whether the Secretary

24  of State's office proceeded with this audit on their own?

25     A   Not to my knowledge.



```
 1              MR. ROSBOROUGH:  Okay.  I think now is a good
 2   time to take a break.  Does that work for everyone?
 3              THE WITNESS:  That works for me.
 4              MR. ROSBOROUGH:  Should we say ten minutes?
 5              THE WITNESS:  Okay.
 6              THE VIDEOGRAPHER:  The time is 11:29 a.m., and
 7   we are off the record.
 8              (The deposition was at recess from 11:29 a.m.
 9   to 11:46 a.m.)
10              THE VIDEOGRAPHER:  The time is 11:46 a.m., and
11   we are on the record.
12       Q   BY MR. ROSBOROUGH:  Welcome back, Ms. Eveler.
13       A   Thank you.
14       Q   Do you recall when you first saw drafts of
15   bills to reform voting in elections in Georgia following
16   the 2020 election?
17       A   They were during the first part of the session.
18   There are some that are prefiled that I may have seen
19   prior to the session starting, but right around the
20   beginning of the session.
21       Q   Do you recall when the session -- the
22   legislative session began?
23       A   No, I don't.  No.
24       Q   Would it be fair to say January 2021?
25       A   Yes.  Uh-huh.
```



1    Q   Okay.  Do you recall that some of these bills
2  included provisions that were ultimately adopted either
3  in whole or in part in SB 202?
4    A   Yes, there were some that were adopted.
5    Q   And were -- did it also include some provisions
6  that were proposed that were not ultimately adopted, such
7  as banning no excuse absentee voting?
8    A   Yes, I do.
9    Q   Do you recall when you were first asked to
10  provide any feedback to either legislators or the
11  Secretary of State's office about any bills in
12  circulation?
13    A   I do not recall, no.
14    Q   Okay.  I'm going to hand over what we've marked
15  as Exhibit 30.
16        (Deposition Exhibit 30 was marked for
17  identification.)
18    Q   BY MR. ROSBOROUGH:  This is COBB024021 Bates
19  number.
20        Do you recognize this document?
21    A   Yes.
22    Q   And what is it?
23    A   This is an e-mail that I sent to, I believe
24  committee members.  It may have been my legislative
25  delegation and committee members as well.  No, it looks



1   like just the legislative delegation, regarding some of

2   the items that I had read in House Bill 531 and some

3   comments that I was making on as election administration

4   help, that things that would be better for us as election

5   administrators.

6        Q   Okay.  When did you send this e-mail?

7        A   It was dated February 26, 2021.

8        Q   Do you recall whether HB 531, which you are

9   providing on the comments of, whether some of the

10  provisions of that bill were ultimately incorporated into

11  SB 202?

12       A   Yes, some of them were.

13       Q   Okay.  Why did you decide to write to the

14  legislators here?

15       A   The Cobb County delegation would be the

16  senators and representatives that represent at least a

17  part of Cobb County; and as the Cobb County elections

18  administrator, I wanted them to be aware of how some of

19  the provisions in the pending legislation would affect

20  how we do our work, and so making an effort to see that

21  they could make changes to the bill that might be more

22  suitable for us.

23       Q   Okay.  Did anyone request that you write to the

24  delegation?

25       A   Not that I recall.  Although, like I said, many



1   different county elections directors do collaborate and

2   talk about, you know, different actions that we could do

3   individually and as a group, so there may have been a

4   conversation with other directors about how we could

5   effect change in legislation.

6        Q    Okay.  If you can flip to the second page of

7   the document.

8        A    Uh-huh.

9        Q    Do you see at the top -- near the top of the

10  page there is a header.  It looks like, "Some concerns

11  with this bill include"?

12       A    Yes.

13       Q    Okay.  Can you read out what you've written

14  there in paragraph 8.

15       A    "Although we're glad to have some use of drop

16  boxes, we prefer them to be outside at advance voting

17  locations and that there be no limits to the number we

18  can establish.  Having drop boxes inside would be a

19  disruption in the polling place.  Using either human

20  surveillance or cameras would be better and as long as

21  they are open only when voting is being conducted, there

22  shouldn't be anything nefarious."

23       Q    Did you -- do you recall whether you received

24  any reaction to this statement?

25       A    I don't recall.  Some of the legislators in our



1 | delegation do respond more frequently than others.  So if

2 | I received any response, it would probably be just,

3 | thanks, we'll take these things into consideration.

4 |     Q   How did your feedback compare to what was

5 | ultimately enacted regarding drop boxes with SB 202?

6 |     A   Drop boxes were moved inside advanced voting

7 | locations, and my predictions as to the disruption, not

8 | necessarily a disruption, although there is confusion

9 | sometimes as to people waiting in line to vote and people

10 | waiting to insert their ballot in the drop box.

11 |     Q   Okay.  And what about as to your preference

12 | stated there that there be no limits to the number of

13 | drop boxes that we can establish?

14 |     A   As?

15 |     Q   How was that ultimately reflected or not in

16 | SB 202?

17 |     A   SB 202 defined limits of one drop box in the

18 | main office and then one additional drop box for every

19 | 100,000 registered voters.

20 |     Q   Okay.  So would it be fair to say there that

21 | the legislators did not ultimately take your advice

22 | regarding drop boxes, in those who voted for SB 202?

23 |     A   Yes, that's true.

24 |     Q   Okay.  I'm going to hand over what we've marked

25 | as -- I'm sorry, what's already been marked from a



 1  previous deposition as Exhibit 19.  This is COBB 32432.

 2       And there -- there is several e-mails in this

 3  chain here, so feel free to take a moment --

 4       A   I have to start at the beginning.

 5       Q   -- to scroll through.

 6           Sure.  So do you recognize this e-mail chain?

 7       A   Yes, vaguely.  It's similar to many that we

 8  exchanged.

 9       Q   And is it fair to say that most of the people

10  sending and receiving these e-mails are similarly county

11  elections directors?

12       A   Correct, yes.

13       Q   Okay.  In the first e-mail that was sent to

14  several people, the sender is Todd Edwards; is that

15  correct?

16       A   Todd Edwards is a lobbyist, I believe, for

17  ACCG, the Association of the County Commissioners Group.

18       Q   And how do you work with Mr. Edwards, if at

19  all?

20       A   I don't work with him at all.

21       Q   Okay.  Do you -- have you had any conversations

22  with -- with Todd Edwards relating to voting or

23  election-related bills in the past?

24       A   Yes, I have seen him out at the capitol

25  conducting his lobbyist duties, and he's contacted me



1  several times about various legislative bills, to get

2  information about how they might affect election

3  administration.

4       Q   Okay.  Do you have any understanding of what

5  role Todd Edwards played in respect to SB 202 or its

6  predecessor bills?

7       A   His focus as a representative for ACCG was

8  protecting the revenues of the counties and protecting

9  against unfunded mandates, primarily.

10      Q   Okay.  So if you flip to -- I guess it's the

11 bottom of page 2 and top of page 3.  It's the pages with

12 the -- marked COBB 32433 and 434.

13      A   Uh-huh.

14      Q   Do you recognize this as when you were first

15 added to the e-mail chain by Lynn Bailey?

16      A   Yes.

17      Q   Okay.  And who is Lynn Bailey?

18      A   Lynn Bailey is the former elections director in

19 Augusta, Richmond County, who is now retired from that

20 position.

21      Q   Okay.  And she sent this to you on March 9th,

22 2021, correct?

23      A   Yes.

24      Q   Which is a couple of weeks, give or take,

25 before SB 202 was passed.



1    A   Okay.

2    Q   You replied to that e-mail on March 9th, "Is

3  anyone else just tired of fighting?  Most of the senate

4  bills seem as if they haven't researched anything about

5  how we do things already or what their changes will do to

6  us."

7        Did I read that correctly?

8    A   You did.

9    Q   Do you have any doubt that you wrote that?

10    A   I have no doubt --

11    Q   Okay.

12    A   -- that I wrote that.

13    Q   What did you mean by that?

14    A   By that time, we had been -- many of the

15  elections directors had appeared at subcommittee hearings

16  and presented for the committees some of the challenges

17  in -- in the bills, and I was expressing my frustration

18  that we didn't appear to be listened to at -- at that

19  time.

20    Q   And when you are referring to the "senate

21  bills," are those bills in which ultimately components of

22  them became parts of SB 202?

23    A   I don't recall which parts of which bills

24  became part of SB 202.  That -- from what I recollect,

25  202 was a very minor bill at the beginning and wasn't



 1  really even that much on the radar.  And House Bill 3 --

 2       Q   531?

 3       A   531, yes.  That was the big bill, and that

 4  really became 202.

 5       Q   Do you have an understanding that when you are

 6  referring to "senate bills," these concerned some of the

 7  provisions, though, that were being debated and some of

 8  which were ultimately passed in the final SB 202?

 9       A   Again, I don't recall which provisions were in

10  these senate bills.  Many of them -- not many.  At least

11  some of them did not get incorporated at all.  They were

12  kind of very out on left field, or right field, whichever

13  way.

14       Q   Would it be fair to say this was part of the

15  debate process that ultimately led to SB 202?  These are

16  election -- let me strike that.

17           These are related to bills to reform the voting

18  and election system in Georgia, correct?

19       A   I would not have been included on these bills

20  if they were not part of elections bills, so I would say

21  that's fair to say.

22       Q   Okay.  When you say, "Is anyone else just tired

23  of fighting," who are you referring to?

24       A   The other elections directors.

25       Q   And fighting with who?



1        A     Fighting for -- to be listened to about what

2    impact some of these bills would have on our jobs.

3        Q     What made it seem -- you stated in this e-mail

4    that, "Most of the senate bills seem as if they haven't

5    been researched."  What -- what did you mean by that

6    specifically?

7        A     There were quite a few senate bills that were

8    out there that were advocating for one particular issue.

9    They were not, you know, comprehensive.  The bill that

10   finally came out was quite comprehensive, but there were

11   some pet bills, if you will, that certain senators had --

12   had drafted and put forward, that they really didn't

13   understand.

14           Like I said earlier in this deposition, there

15   is a lot of people that just don't understand how things

16   happen today and that there are security measures in

17   place.  And so we would go to these subcommittee meetings

18   and talk about those things, and that was not considered,

19   really, or our view of them not being considered because

20   the bill just kept going, and it still was uninformed.

21       Q     Would it be fair to say that some of those

22   provisions were not adopted in SB 202?

23       A     Yes.

24       Q     Would it be fair to say that some of those

25   provisions were adopted in SB 202?



1      A   Yes.

2      Q   The e-mail above, am I correct that Lynn Bailey

3  is replying to you and the -- the chain of elections

4  directors there to your e-mail?

5      A   Yes, it appears she is.

6      Q   And she says, "Janine, I think your assessment

7  is spot on.  It is apparent that little or no research

8  has been done.  I don't understand the rush."

9          What did you understand her to mean by, "I

10  don't understand the rush"?

11          MS. LaROSS:  Objection to form.

12          THE WITNESS:  Yeah.  I couldn't speculate on

13  what she meant.

14      Q   BY MR. ROSBOROUGH:  Do you believe -- did you

15  believe at the time that the process which ultimately led

16  to SB 202 was unnecessarily rushed?

17      A   It's a very short session.  The 40 days goes

18  very fast, so it always feels like it's rushing through.

19  But this was a large bill.  It ended up being a large

20  bill, and it began with several smaller bills that were

21  at various stages of movement through the assembly.  And

22  then it all seemed to come together into the large bill

23  quite quickly.

24      Q   Okay.  I'm going to hand over an exhibit that

25  we will mark as 31.  This is COBB 24273.




1            (Deposition Exhibit 31 was marked for
2     identification.)
3        Q    BY MR. ROSBOROUGH:  Do you recognize this
4     e-mail chain?
5        A    Yes, I do.
6        Q    Okay.  What is the first e-mail on that chain
7     that was sent?
8        A    The first e-mail is from me to committee
9     members regarding, it looks like, HB 531 and Senate Bill
10    241.
11       Q    And when you say "committee members," which
12    committee; do you recall?
13       A    It appears to be a senate committee.  I don't
14    know what committee it was, unless I can see it in the
15    body of the message, which I don't.
16       Q    And you state in the beginning of that e-mail,
17    "In reviewing LC 28 0300S, which I understand is the
18    first draft of a combined senate/house election bill, I
19    have the following major concerns"; is that correct?
20       A    Yes.
21       Q    Is this -- and you sent that on March 11th?
22       A    Yes.
23       Q    Is this your understanding of the first
24    combined draft bill that ultimately in some part became
25    SB 202?



1      A   I don't have any recollection of it, but based

2   on this e-mail, I would say that's probably true.

3      Q   Okay.  And then you forward your e-mail to

4   several other individuals.  Who -- you don't need to name

5   each one, but who are -- who, in general, are the

6   recipients there?

7      A   They are other elections directors.

8      Q   Okay.  Do you recall why you were forwarding

9   that along to them?

10      A   I don't recall it.  I'm just reading that I was

11   listening to a committee meeting and they reference this

12   e-mail, and so I was forwarding it to my counterparts so

13   that they would know what the reference was.

14      Q   And do you say in that e-mail -- which you sent

15   on March 17th, correct?

16      A   Yes.

17      Q   -- that, "I sent this to both committees

18   without realizing that the committee members had not

19   received this version of the bill.  Some members were

20   pretty upset about that, but I think the comments I made

21   are still valid in the latest version."

22          Did I read that correctly?

23      A   Yes, you did.

24      Q   What is your recollection of what happened

25   there?



1      A   I don't -- I don't have any recollection.  I am

2   reading the words here.  And this LC version, apparently,

3   was not widespread among the committee members.

4      Q   Is it your understanding that you received this

5   draft before some members of the committees?

6      A   I think that's probably what happened.

7      Q   Okay.  Do you recall how you would have

8   received this draft?

9      A   I do not.  Sorry.

10     Q   Okay.  Is it possible it came from one of the

11  legislators on the committee?

12     A   No, I don't think so.

13     Q   Is it possible it came from the Secretary of

14  State's office?

15         MS. LaROSS:  Objection as to form.

16         THE WITNESS:  I -- I don't know.

17     Q   BY MR. ROSBOROUGH:  Okay.

18     A   I don't know how I got it.

19     Q   And then do you see the top e-mail from Joseph

20  Kirk?

21     A   Yes.

22     Q   Who is Joseph Kirk?

23     A   He's the director in Bartow County.

24     Q   Okay.  And what did he say to you there?

25     A   He says, "I think those are great comments.  If



1  they weren't being so secretive about what they are doing

2  it would be easier to work on the right LC number."

3      Q   Did -- did you share his apparent view that the

4  committee was being secretive about their work on these

5  bills?

6      A   I don't have any recollection of that.

7      Q   Okay.  Okay.  We can -- I'm going to hand over

8  what we have marked as Exhibit 32.  This is COBB 56901.

9          (Deposition Exhibit 32 was marked for

10  identification.)

11          MR. WHITE:  Can I ask what -- what --

12  plaintiff's what now?

13          MR. ROSBOROUGH:  Oh, I'm sorry.  She's got it

14  on the -- it should be stamped there.

15          MR. WHITE:  32.

16          MR. ROSBOROUGH:  32.  Exhibit 32.

17          MR. WHITE:  I wanted to make sure I had the

18  right one.

19          MR. ROSBOROUGH:  No, thank you.

20      Q   BY MR. ROSBOROUGH:  Do you recognize this

21  e-mail chain?

22      A   I recognize the people on it.

23      Q   Okay.  Do you appear to be included on this

24  e-mail chain?

25      A   Yes, I am.



1      Q   Okay.  And what is the initial e-mail on the

2   chain in which you are a recipient?

3      A   The initial e-mail is from Lynn Bailey, again

4   the Richmond County director, and she is sending, it

5   looks like, the latest version of SB 202, the version

6   number 330S.

7      Q   Okay.  And what is the date on which she sent

8   that?

9      A   March 19th.

10     Q   Okay.  And then you replied to that e-mail,

11   correct?

12     A   Yes.

13     Q   And what did you say in your reply, in your

14   initial reply?

15     A   I said, "I just sent my missile off.  I doubt

16   anyone will listen though."

17     Q   What -- do you know what you were referring to?

18     A   I don't, because this is after this other one.

19     Q   If you look further up on the e-mail, does that

20   refresh your recollection as to what you were referring

21   to when you said "I sent -- "I just sent my missile off"?

22     A   It then says from Veronica Johnson, "Who did

23   you send your missile to?  Committee members, your local

24   delegations, or both?"

25          And I wrote, "It should show on the attachment.



1   I sent it to the House SCEI committee and copied the

2   Senate Ethics committee and then threw in a copy to a

3   couple of others in my delegation and my Board.  I also

4   blind copied Ryan Germany."

5       Q   Okay.  So it is your understanding that you are

6   referring to an e-mail you sent here regarding feedback

7   to a version of SB 202?

8       A   I don't know what it's referring to.

9       Q   Okay.  The first e-mail in the chain refers to

10  a version of SB 202, correct?

11      A   Yes, it does.

12      Q   Okay.  When you say, "I doubt anyone will

13  listen though" --

14      A   Uh-huh.

15      Q   -- do you know what you are referring to there?

16      A   Well, if I read forward, it does say I am

17  sending it to the committee, House committee and the

18  Senate ethics committee.  I'm probably referring to those

19  entities.

20      Q   Were you doubtful that those committees would

21  consider your feedback on this version of SB 202?

22      A   Well, by this time, again, we had been speaking

23  to committees, going downtown, you know, getting --

24  signing up for our time, and the bills just kept

25  progressing.  So it was at a point where we were like,



1  what else can we say to -- to talk to them?

2      Q   Did you feel that your feedback was not being

3  listened to?

4      A   Probably I felt that way, yeah, because the

5  bills were progressing in the same format.

6      Q   Okay.  You mention in the further up e-mail

7  that you blind copied Ryan Germany, correct?

8      A   I did.

9      Q   Who is Ryan Germany?

10     A   He is the attorney in the Secretary of State's

11 office.  I'm not sure at this point what his position

12 was.

13     Q   Do you recall why you would have blind copied

14 Ryan Germany?

15     A   Ryan is part of -- it would include all of us,

16 many of these same people, in discussions about State

17 Election Board rules that were being proposed and how

18 those rules might affect what we do in administration,

19 and had been a sounding board for a lot of legislation

20 proposals.

21     Q   Does being a sounding board on legislative

22 proposals include SB 202?

23     A   Probably, but I don't have any direct

24 recollection of that.

25     Q   Do you recall if you received any response from



1   Ryan Germany to your e-mail where he was bcc'd?

2       A   I don't recall, no.

3       Q   We're gonna pull up what has been marked as

4   Exhibit 33.  This is CDR 62616.

5           (Deposition Exhibit 33 was marked for

6   identification.)

7           MS. LaROSS:  This will be Exhibit 33?

8           MR. ROSBOROUGH:  Yes, that's correct.

9       Q   BY MR. ROSBOROUGH:  Do you recognize this

10  e-mail?

11      A   Yes.

12      Q   And what is it?

13      A   It looks like similar to the Exhibit 31.  This

14  is comments that I made, sent -- sending to the House

15  committee with a copy to the Senate committee.

16      Q   Okay.  And who is Chairman Fleming?

17      A   He was a chair -- the chair of whatever House

18  committee was in charge of reviewing the election --

19  election bills.

20      Q   Okay.  And what date and time did you send this

21  e-mail?

22      A   This is dated March 19th, 2021.

23      Q   Does this refresh your recollection that this

24  is the e-mail you were likely referring to when you said,

25  "I just sent my missile off"?



 1        A    It -- the timing is right, so it could very

 2   well be.

 3        Q    Okay.  So it appears that you sent this e-mail

 4   on March 19th, with the subject line "SB 202 additional

 5   comments"; is that correct?

 6        A    Yes, it is.

 7        Q    Do you recall what the topic of this e-mail

 8   was?

 9        A    And these appear to be, again, my comments as

10   to how the bill in its form, LC 28 0330S, would affect

11   election administration.

12        Q    Do you recall why you decided to send this

13   e-mail?

14        A    I believe that this was related to the

15   original -- this Exhibit 32 where Lynn Bailey sent a

16   number of us the -- the current version, the 330S, and we

17   probably talked offline about sending comments to the

18   committee members.

19        Q    Okay.  And is it your understanding that you

20   are reacting to a version of SB 202 in approximately six

21   days before it was signed?

22        A    I don't remember when it was signed, but I will

23   take your word for it.

24        Q    Okay.  If you could flip over to the second

25   page, do you see where it says "Section 25"?



1    A   Yes.

2    Q   And you wrote here, "Please allow drop boxes

3  outside the advance voting locations as long as they are

4  under the required direct supervision."

5    A   Yes.

6    Q   Do you recall what you were referring to here?

7    A   I was referring to the part on SB 202 that

8  moved drop boxes inside advance voting locations.

9    Q   Okay.  Was your suggestion taken in the

10  ultimate bill?

11    A   No, it was not.

12    Q   Do you see further down in that section, a

13  couple of sentences later, you say, "This has nothing to

14  do with it being an emergency situation or not, this is

15  for the best management of the polling place"?

16    A   Yes.

17    Q   Did I read that correctly?

18    A   Yes.

19    Q   Do you understand what you were referring to

20  there?

21    A   I don't recall what I was referring to on the

22  emergency situation.  But as far as the best management

23  of the polling place, this goes back to my comments about

24  the flow of voters intermingling with absentee mail drop

25  boxes.



1     Q   Okay.  And if you scroll down to the bottom of

2   that page, do you see where it says "Section 41"?

3     A   Yes.

4     Q   You wrote in that first sentence -- can you

5   just read that first sentence there?

6     A   "I have serious concerns about a 28-day runoff

7   for a federal office.  We will have to certify the first

8   election, perhaps have any necessary recounts and/or

9   audits, and then recertify, work all the registration

10  applications and updates received from the previous

11  deadline to the new deadline, finalize the new runoff

12  ballot, order the ballots from a printer, mail the

13  ballots, test the equipment, deliver equipment

14  county-wide and hold early voting."

15        Do you want me to continue?

16    Q   No, we can pause there.

17        So what did you mean there?

18    A   There is a lot of work that goes into preparing

19  for the runoff, and reducing the time frame to 28 days is

20  a real struggle for us.  And again, I'm speaking in terms

21  of election administration.  That's my focus.  And we did

22  a lot of work, including the -- the resolution that I

23  talked about earlier where we were trying to move the May

24  primary.  We were also trying to get the legislature to

25  make it an extra week so that this is basically four



 1  weeks, and we were looking for five weeks, at least,

 2  between the election and the runoff.

 3       Q   Did the ultimate version of SB 202 reflect your

 4  feedback as to the early voting period?

 5       A   The early -- well, the --

 6       Q   I'm sorry.  I'm sorry, not the early voting,

 7  the runoff period?

 8       A   Yeah.  The runoff is codified as 28 days.

 9       Q   Okay.  So it's fair to say that they did not

10  accept your suggestion here in the ultimate version of SB

11  202?

12       MS. LaROSS:  Objection as to form.

13       Q   BY MR. ROSBOROUGH:  You can answer.

14       A   They did not.  They did not take my suggestion,

15  no.

16       Q   Okay.  Right after you -- where you finished

17  reading, you said, "The early voting will be no more than

18  5 days, most likely 3 days considering November holidays,

19  and mail ballots will likely be mailed no earlier than 12

20  to 15 days before the election, causing many to not be

21  received and returned on time, especially with the

22  limitations on drop boxes.  As a result, election day

23  voting will be enormous."

24       What did you mean here when you wrote that?

25       A   So compressing the time frame from the previous



1  nine weeks to four weeks means that a lot of things are

2  going at the same time, and there aren't a lot of days to

3  get everything done.  By the time you certify the

4  original election, there's -- there is very little time

5  to get all the mail ballots out and to get prepared for

6  early voting.

7          And so my comments were that it's going to push

8  everything to election day.  And we had gotten to the

9  point where resources were distributed amongst the three

10  types of voting, with the absentee mail and early voting

11  and election day; and with this time frame, the two early

12  forms will be compressed and people won't have an

13  opportunity to utilize them fully.  And so the third type

14  is election day, and our resources will be compromised at

15  that point.

16     Q   So is it fair to say that one of your concerns

17  here with the compression of the early voting period to

18  28 days was that it would make lines longer on election

19  day of the runoff?

20     A   In part.  But my concern, again, was that we

21  would have to reallocate our resources from -- from the

22  early types of voting into election day and change the

23  way we have structured our divisions.  And that resulting

24  line, or having most people have to vote on election day

25  meant, again, that it impacted our administration.



1    Q    And with respect to your comments about mail

2    ballots, were -- and drop boxes where you said, "And mail

3    ballots will likely be mailed no earlier than 12 to 15

4    days before the election, causing many to not be received

5    and returned on time, especially with the limitations on

6    drop boxes," what specifically did you mean there?

7    A    Because we had just come from the time period

8    of 2020 when drop boxes were not codified at all, and so

9    we were going by rules of the State Election Board in an

10   emergency situation where the drop boxes were unlimited;

11   but by county resources, it was up to each county to

12   determine their numbers, and they could be placed out --

13   outside under video surveillance and open 24 hours.

14        And so that -- that availability was going to

15   be compressed to only during the advanced voting hours

16   and inside those locations.  And they would be closed

17   once advanced voting ended, leaving the last weekend and

18   Monday and election day, actually, for us to only receive

19   them at the main office with hand delivery.

20   Q    Would it be fair to say that you were concerned

21   here about the compounding effects of the tighter runoff

22   period and the limitations of drop box period on the

23   number of voters who will have their absentee ballots

24   accepted?

25   A    In part.  But again, my focus was on our



 1  administrative duties and how that would push everything

 2  to election day.

 3      Q   Okay.  I'm going to hand over what's marked as

 4  Exhibit 34.  This is COBB 24234, Exhibit 34.

 5          (Deposition Exhibit 34 was marked for

 6  identification.)

 7      Q   BY MR. ROSBOROUGH:  Do you recognize this

 8  e-mail?

 9      A   Obviously I'm on it, but I don't recognize it.

10  It doesn't -- I don't remember it.

11      Q   Okay.  Do you have any reason to doubt that

12  this is an e-mail you received, at the bottom, from

13  Tonnie Adams on March 16th, 2021?

14      A   I do not have any reason to doubt that.

15      Q   Okay.  And any reason to doubt that you replied

16  to that e-mail on the same date?

17      A   Right.  I do not.

18      Q   Okay.  Do you understand what this e-mail is

19  referring to?  And I am talking about the initial e-mail

20  from Tonnie Adams.

21      A   Yeah.  I -- that's the part I don't -- I don't

22  recall what the document is that it's referring to, and

23  Tonnie is asking for us to edit something that Joseph

24  drafted.

25      Q   Okay.  Is it possible that this is related to a



1    statement that GAVREO was considering putting out?

2         A    It's possible.  I don't recall if GAVREO ever

3    did anything.  I don't think so, because I think the

4    leadership did not want to take a position.

5         Q    Okay.  In your -- I'm sorry, who is Tonnie

6    Adams?

7         A    He is the director in Heard County.

8         Q    Does Tonnie Adams have a role in GAVREO?

9         A    I believe he's the legislative committee chair.

10        Q    Okay.  In your reply, you say, "I will look

11   thru it.  Did you hear Barry Fleming in the Senate"

12   sub -- sorry.  "Did you hear Barry Fleming in the Senate

13   committee say that the majority of election officials are

14   in favor of 4-week runoffs?"

15             Did I read that correctly?

16        A    You did.

17        Q    Were the majority of election officials in

18   favor of four-week runoffs?

19             MR. WHITE:  Objection to form.

20             MS. LaROSS:  Objection as to form.

21             THE WITNESS:  I don't have knowledge of the

22   majority.

23        Q    BY MR. ROSBOROUGH:  Do you recall why you made

24   that statement?

25        A    The -- the friends and colleagues that I



 1  collaborate with in the e-mails that you're -- that you
 2  have, we were not in favor of it.
 3      Q    Okay.  Would it be fair to say that you did not
 4  believe the statement at the time, that the majority of
 5  election officials were in favor of four-week runoffs?
 6      A    That --
 7           MS. LaROSS:  Objection as to form.
 8           THE WITNESS:  That would be fair to say.
 9      Q    BY MR. ROSBOROUGH:  Okay.  I'm going to hand
10  over what has been marked as Exhibit 35.  It's COBB
11  48993.
12           (Deposition Exhibit 35 was marked for
13  identification.)
14      Q    BY MR. ROSBOROUGH:  Do you recognize this
15  e-mail exchange?
16      A    Again, I don't remember it, but I'm sure it's
17  accurate.
18      Q    Okay.  Are you -- did you send -- I'm sorry.
19  Are you a -- both a sender and recipient of e-mails on
20  this e-mail chain?
21      A    It would appear so, yes.
22      Q    Okay.  What's the time frame of these e-mails?
23      A    The -- the first e-mail seems to be March 1st,
24  2021.
25      Q    Okay.  The subject line of the e-mail refers to



 1  a task force meeting; is that correct?

 2       A   It does.

 3       Q   Do you understand what that is referring to?

 4       A   I do not recall that.  I'm sorry.

 5       Q   Do you have a recollection of why you were on

 6  this e-mail chain, given the other senders and recipients

 7  here?

 8       A   I'm sorry, I do recall now.  Paige Alexander, I

 9  remember her.  There were a group of people from various

10  groups that were including one or two -- probably two or

11  three elections directors.  It was a wide-reaching group

12  with some advocates for elections, various community

13  groups, but I don't recall who was leading that group.

14       Q   Do you recall how you became a part of that

15  group?

16       A   I believe I was asked to be part of that by

17  somebody at the Secretary of State's office.

18       Q   Okay.

19       A   Oh, Sam Teasley.

20       Q   Okay.  Who is Sam Teasley?

21       A   He, I think, is the legislative liaison for the

22  Secretary of State.

23       Q   Do you recall what the purpose of this group

24  was?

25       A   To make improvements to elections, to -- to



1    talk about how the community can work together with

2    election officials and the legislation that's put forth

3    so that we can serve everybody's needs, to the best of my

4    recollection.

5         Q   Do you recall -- or let me rephrase that.

6             Does this e-mail appear to reflect -- this

7    e-mail chain appear to reflect that this group was

8    working on some sort of a public statement?

9         A   Yes, I believe so.

10        Q   And do you believe that that statement had

11   related to the elections bills that were being proposed,

12   some of which eventually became part of SB 202?

13        A   Honestly, I don't remember.  I am looking at

14   the original message on here from Paige Alexander at the

15   Carter Center.  I think there might have been an

16   attachment.  It's not here.  But she does mention that --

17   that we remain concerned about these bills, and so I

18   imagine it's referring to the bills that were currently

19   going through the legislature --

20        Q   Okay.

21        A   -- on March 1st.

22        Q   And if you see that there's a -- an e-mail that

23   begins at the bottom of the page that's 48993_2 and goes

24   over to the -- so basically page 2 to 3.

25        A   Uh-huh.



1      Q    And it says, "Hello folks, here's an attempt at
2   reconciling the various edits," and then there is what
3   appears to be four paragraphs following there.
4      A    Uh-huh.
5      Q    Does this appear to reflect the statement that
6   this group was working on?
7      A    It appears to, yes.
8      Q    Okay.  And do you see two e-mails up, you say,
9   "My only concern is that this statement is unlikely"?
10  And then you quote, "When we see proposals that properly
11  balance voter access with integrity, we will voice
12  support."
13          Do you see where it says that?
14     A    Uh-huh.  I do.
15     Q    Do you understand what you meant there?
16     A    I don't recall what I meant there, and I don't
17  want to speculate.
18     Q    Okay.  Do you see in the second paragraph of
19  the -- of that four paragraph draft statement --
20     A    Uh-huh.
21     Q    -- where it says, "Georgia has made great
22  strides, from the implementation of an Automatic Voter
23  Registration system that helped bring a record number of
24  Georgians to the polls, to the recent GBI signature match
25  audit in one of Georgia's largest counties that revealed



1   no fraudulent absentee ballots"?

2        A   Yes.

3        Q   Is that -- do you believe that to refer to --

4   the "GBI signature match audit in one of Georgia's

5   largest counties," do you believe that to refer to Cobb

6   County?

7        A   Yes.

8        Q   And do you agree that that audit revealed no

9   fraudulent absentee ballots?

10       A   Yes.

11       Q   Okay.  And ultimately, you at the -- I guess

12  the very top e-mail, the last e-mail on this chain, you

13  appear to sign on to the statement as revised; is that

14  correct?

15       A   Okay.  Yes, I did.

16       Q   Okay.  So it's fair to say that you had

17  confidence in the integrity of the election process as it

18  was functioning in November of 2020?

19       A   I have confidence, yes.

20       Q   Okay.  I'm going to pull up what we will mark

21  as Exhibit 36.  This is COBB 63624.

22       (Deposition Exhibit 36 was marked for

23  identification.)

24       Q   BY MR. ROSBOROUGH:  Do you recognize these

25  e-mails?



1      A    Yes.

2      Q    And what are they?

3      A    It was originally from Tonnie Adams from Heard

4  County.  He, again, was a legislative liaison from GAVREO

5  to watch over legislation, and he was proposing to make a

6  statement from GAVREO on various pieces of legislation

7  and was asking for comment on some questions he had to

8  several of us.

9      Q    Okay.  And did you respond by providing

10  feedback to those questions in the red text?

11      A    I did.

12      Q    And that was on March 4th, 2021?

13      A    Yes.

14      Q    Okay.  Looking at the provisions here that you

15  are reacting to, are some of these provisions ones that

16  were ultimately incorporated into SB 202 as signed?

17      A    Yes.

18      Q    Okay.  Looking on the second page of the

19  e-mail, the second page of your responses, do you see the

20  sort of third paragraph from the bottom of your e-mail,

21  the question, "Should someone have a reason to request an

22  absentee ballot by mail?"  And your reply, "No.  This is

23  more data for us to track and we cannot enforce.

24  Limiting ABM just puts more people in line."

25      A    Yes.



1    Q   What did you mean by that?

2    A   The first sentence, again, is related to

3  election administration.  And if we were requesting or

4  requiring a person to have a reason to cast an absentee

5  ballot, then we would have -- we would, again, go back to

6  reason codes, which would be you're out of town or you're

7  elderly or you're disabled, or whatever the reasons that

8  they would decide are adequate.  And then we would have

9  more data to track as far as those reasons and no way to

10  enforce if somebody is making up a reason.  So to me, it

11  was pointless.

12         And then if you -- if you limit absentee mail,

13  which is the ABM, to only people with reasons, then more

14  people would have to vote in person, if they are

15  following the law, and that would be more people to

16  manage in person.

17    Q   A couple of paragraphs up, do you see there's a

18  reference to the length of the runoff period?  And I will

19  say specifically the paragraph where the question posed

20  to you, I think is, "If the state can go back to a normal

21  runoff, should that runoff be four weeks after the

22  election?"  That's where it starts.

23    A   Yes.

24    Q   And then you say, "Not sure what you mean by

25  normal, but if runoffs are combined, I would like to see



1  6 weeks at least"?

2      A    Yes.

3      Q    Does that reflect your opinion that runoffs

4  should be ideally at least a six-week period after the

5  general election?

6      A    Yes.  I was advocating for at least five, but

7  six weeks would be preferred.

8      Q    Okay.  And in the paragraph right above there,

9  there's a question posed, "What is your opinion on out of

10  precinct provisional ballots?  Do you think they should

11  be allowed in the first place?"

12          And you reply, "Some are necessary.  Perhaps an

13  Affidavit that the voter cannot get to their precinct and

14  why."

15          What did you mean there?

16      A    That is basically what was enacted with the

17  out-of-precinct affidavit, where the voter decides if

18  they can get to their precinct or not and signs off,

19  basically under false swearing laws, that they are

20  swearing that they truly can't get to their precinct and

21  then they should be allowed to vote.

22      Q    Is there a time limitation on that, on using

23  that option in the ultimate bill?

24      A    There is.

25      Q    And what is that limitation?



1      A    The affidavit can be accepted from a voter if

2    they are at the wrong precinct after 5:00 p.m.

3      Q    Okay.  So if a voter under the enacted SB 202,

4    if a voter arrived at, say, 4:30 to vote, and they

5    believed they could not get to their proper polling

6    place, the affidavit option would not be available to

7    them under the enacted version, correct?

8      A    Correct.

9      Q    Okay.  Going back to the first page, three

10   paragraphs down into the answers and opinions, do you see

11   where it says, "VERY IMPORTANT - The change in the last

12   day for absentee by mail to the second Friday before the

13   election.  What is your opinion on this change?  Do you

14   think it should be changed (to, say 7 days prior)?

15   Should it be changed at all?  If it is left at 11 days,

16   should further emergency contingencies be allowed?"

17         Do you see that?

18     A    Yes.

19     Q    And what was your response?

20     A    My response was, "My preference is for a

21   deadline on the second Monday before the election, with

22   an Oath/Affidavit attesting an unforeseen emergency for

23   applications made after the deadline, but before the last

24   Friday."

25     Q    Is it fair so say the second Monday before the



1  elections would be eight days before, in most cases?

2      A    Yes.

3      Q    Okay.  So why was your preference for eight

4  days rather than eleven days?  Well, let me back up.

5           What is this change referring to when we are

6  saying the last day for absentee by mail?

7      A    So SB 202 enacted a deadline for voters to

8  apply for an absentee ballot, and it was -- it is eleven

9  days prior to the election, in the code.

10     Q    Why did you believe that it should -- why did

11 you have a preference for it being eight days or the

12 second Monday before the election, as you stated?

13     A    So we definitely felt that a deadline was

14 necessary, because voters were applying on the Friday

15 before the election, and there was just no way to get the

16 ballot to them and have them get it back.

17          So the debate was as to which date would be the

18 deadline.  And I thought eight days was a good -- a good

19 halfway point or a good number of days which still left

20 enough time for the mail back and forth to the voter and

21 back -- mailing the ballot back, but didn't -- didn't go

22 too far in the other direction where people who, you

23 know, had a trip come up that they didn't know about or

24 they got sick or something like that where they couldn't

25 go vote in person, that there would be a way to manage



1  those people as well.

2      Q   And it's fair to say that you believed 11 days

3  before the election was too far back?

4      A   I thought there was a better -- a better date

5  at eight days, yes.

6      Q   Okay.  Just turning really quickly, before we

7  move on, back to the -- the provisions about

8  out-of-precinct provisional ballots that we were

9  discussing --

10      A   Yes.

11      Q   -- your opinion there.

12          Do you think that the restriction on

13  out-of-precinct provisional ballots being accepted to

14  those last hours affects any particular groups more than

15  others?

16          MS. LaROSS:  Objection as to form.

17          THE WITNESS:  Yeah, I don't have any way of

18  speculating that.

19      Q   BY MR. ROSBOROUGH:  What about voters with

20  physical disabilities?  Might they have a -- in your

21  experience, have a -- a harder time accessing their

22  correct polling place?

23          MS. LaROSS:  Objection as to form.

24          THE WITNESS:  Again, it's -- it's sort of

25  speculation.  I haven't -- I don't know of direct -- have



1  direct knowledge of people with disabilities who, you

2  know, show up at the wrong place and then can't get to

3  the correct place.  Generally speaking, people with

4  disabilities are voting absentee in -- you know, in the

5  majority.

6      Q   BY MR. ROSBOROUGH:  That's -- that's been -- so

7  your experience has been that the majority of people with

8  disabilities use the absentee voting process in Cobb

9  County?

10     A   And early voting.  As you can see, we have an

11  area out here in our lobby that caters to elderly and

12  disabled voters, and it's been very popular.  So they --

13  they generally want to vote early, and either that or

14  vote from home.

15     Q   Okay.  I'm going to hand over what's marked as

16  Exhibit 37.  It's COBB 54143.

17         (Deposition Exhibit 37 was marked for

18  identification.)

19     Q   BY MR. ROSBOROUGH:  Do you recognize this

20  e-mail and the attachment?

21     A   Yes.

22     Q   And what is it?

23     A   This is from Tonnie Adams from Heard County

24  again, taking some of the opinions that others, like

25  myself, had given him and trying to put together a



1  statement from the organization as to support for

2  objection to various provisions in the law.

3      Q   And when you say "the law," are you referring

4  to SB 202?

5      A   I think it is either -- it looks like it was

6  either HB 531 at this point.

7      Q   And HB 531, you said that was a bill that large

8  parts of which were incorporated into SB 202?

9      A   Yes.

10     Q   Okay.  And when you are saying -- I think you

11 mentioned the organization.  Are you referring to GAVREO?

12     A   Yes.

13     Q   If you want to flip over to the attachment,

14 does this appear to be the draft of the statement that

15 you all were working on on behalf of GAVREO?

16     A   I believe so.  As far as I know, there was

17 no -- never any statement sent.

18     Q   The first sentence of the second paragraph

19 says -- actually, strike that.

20         The second -- second and third sentences of the

21 paragraph, could you read those sentences?  I'm sorry,

22 the second paragraph starting with "However."

23     A   Okay.  "However, after observing the bills

24 moving through the legislative process, we feel we must

25 speak with one voice to address the proposed changes to



 1  election administration in the state of Georgia.  While

 2  some of the changes are positive and in fact necessary,

 3  we believe that others are in -- are at best unproductive

 4  and at worst will undermine the very public confidence

 5  that the bills seek to regain."

 6      Q    What did -- what did you mean by that?

 7      A    I did not write that.

 8      Q    Okay.  Do you agree with that statement?

 9      A    I don't know what I felt at the time.  I'm

10  trying to see if I reacted to it here.

11      Q    Does it appear from the top e-mail from

12  Mr. Kirk, that the attachment incorporates changes that

13  you've suggested at this point?

14      A    Well, I don't think so, because at 2:48, Tonnie

15  sent this document; and at 2:55, I was sending something

16  that said these are my edits and suggestions.  I don't --

17  I don't know if I would have made -- I don't know where

18  the suggestions are, but...

19      Q    Do you -- do you recall having the view that

20  some provisions of SB 202 were, at best, unproductive?

21          MS. LaROSS:  Objection as to form.

22          THE WITNESS:  They -- I don't know that that's

23  the word that I would have used.  I think some things

24  made our jobs harder.  Some things were good, that we

25  advocated for.  But, I mean, unproductive would be



1   assuming what the product they were trying to reach is.

2          I assume they were trying to reach for election

3   integrity, so if it was unproductive for election

4   integrity, I don't -- I don't think that's the word I

5   would have used.

6      Q   BY MR. ROSBOROUGH:  What aspects of the bill do

7   you believe are unhelpful as an elections official?

8      A   Again, some of the things we've talked about.

9   The drop boxes being inside, I think that's a waste of

10  our resources to put a box in the same place where voters

11  could just hand it to the poll manager.  I thought that

12  that was wasting resources, as I said, to put the boxes

13  out there, to go get them every day, when we were already

14  sending couriers to each advanced voting location for

15  other purposes.  So that I thought was useless.

16         Again, I was advocating for the runoff time

17  period to be different.  There were things that we were

18  hopeful would be in the -- in the bill about what we call

19  the 1 to 250 rule, where you have to have 1 voting unit

20  for every 250 registered voters.  We were trying to have

21  that changed to allow us to take into consideration the

22  number of people that were -- that advanced voted, to

23  take into consideration the type of election.

24         And so, I mean, there were lots of things in

25  the bill.  It was so comprehensive, and there were things



 1   that we were in support of and other things that would

 2   make it more difficult for us.

 3        Q    The following paragraph, right below from where

 4   we were just looking at, it says, "Some of the issues

 5   described below are complex and will require study and

 6   discussion to properly address.  We propose that the

 7   General Assembly establish a study committee for these

 8   issues with the goal of introducing legislation in the

 9   2022 Legislative Session to be implemented before the

10   next statewide primary election."

11        Did I read that correctly?

12        A    You did.

13        Q    Okay.  Did you support that proposal?

14        A    This proposal really didn't ever go anywhere,

15   as far as I recall.  Tonnie has a good heart in what he's

16   trying to accomplish, but the committee -- I mean, not

17   the committee, the organization, the GAVREO organization

18   was hesitant to do a consolidated statement.

19        Q    Do you -- do you believe it would have been

20   beneficial for the General Assembly to establish a study

21   committee before enacting a legislation?

22        A    I would have liked that, because at the time it

23   felt like a lot of those smaller bills were all rolling

24   forward and getting lumped into the larger bill, and it

25   felt like it was a consolidation of things that were



1  disparate ideas that just kind of Frankensteined into one

2  bill conglomeration, and I felt like we needed to look at

3  it more wholistically instead.

4       Q   Okay.  Switching gears a little, maybe we will

5  take just -- sort of run through -- I want to talk a

6  little bit about the Americans with Disabilities Act and

7  voters with disabilities, and then maybe we take a lunch

8  break after we get through that?

9       A   Sure.

10      Q   Okay.  Are you familiar with the Americans with

11 Disabilities Act?

12      A   Yes.

13      Q   Okay.  And if I refer to the ADA, you

14 understand --

15      A   Yes.

16      Q   -- that that's what I mean?

17      A   Yes.

18      Q   Okay.  Do you have an understanding of whether

19 the ADA applies to your office's work in administering

20 elections?

21      A   Yes, it does.

22      Q   Okay.  Does your office have written ADA

23 policies, practices, or procedures?

24      A   We do.

25      Q   What is your general understanding of your



1  office's responsibilities with regard to the ADA?

2      A   To provide equal access to those with

3  disability in voting and in accessing polling places

4  and -- and voting on the equipment.

5      Q   Does your office have an ADA coordinator?

6      A   We have an ADA coordinator for the county.

7  Like I said, we have -- our polling site survey

8  supervisor is our local elections department person

9  that -- that looks at ADA compliance.  She sometimes

10 refers to the county's ADA coordinator, but she doesn't

11 have that title.  She hasn't had the ADA coordinator

12 training to become that.

13     Q   Okay.  And is her work -- and I'm referring

14 to -- and, I'm sorry, what is her name again?

15     A   Denise.

16     Q   Denise's work limited to in-person voting sites

17 with regard to people with disabilities?

18     A   Yes.

19     Q   Okay.  What role does the county ADA

20 coordinator play in your work, if at all?

21     A   Because we have our in-house person, we usually

22 just refer to her, as far as the resources that she has,

23 and we haven't really used the county's ADA coordinator.

24     Q   Does your office ever communicate with the ADA

25 coordinator?



1        A    Occasionally, not often.

2        Q    Okay.  What sort of issues would you --

3   typically, if you were to communicate with the ADA

4   coordinator, what issues might that encompass?

5        A    Normally, it's when we get an open records

6   request, and they are requesting something that our ADA

7   coordinator has -- has jurisdiction over.

8        Q    Okay.  Who in your office is responsible for

9   monitoring compliance with the ADA?

10        A    We -- again, it's Denise Ivey in our office.

11   And we had --- we have in the past hired vendors to do

12   compliance reviews.  We have also been subject to a DOJ

13   compliance review, I believe in 2016, and had to make

14   some adjustments based on their report, and so we've

15   become very familiar with it.

16        Q    Okay.  Do you understand what your office's

17   obligations are with respect to reasonable modifications

18   for people with disabilities?

19        A    Yes.

20        Q    And -- and what is that understanding?

21        A    So anything that we can do to make it more

22   accessible to a voter that are, like you say, reasonable,

23   that are not an undue burden on our operations, that we

24   should do that.

25        Q    Okay.  What are your office's policies,



1   practices, or procedures for reviewing and responding to

2   requests for reasonable modifications for voters with

3   disabilities?

4       A    Usually we receive -- we don't receive anything

5   like a request for reasonable modification.  We really

6   haven't had that.  But sometimes we will receive after an

7   election feedback from a voter with disabilities about

8   something that was difficult for them, and so we will

9   make those modifications on the next one.

10      Q    Are there any specific policies or practices or

11  procedures that you have in place with regard to any

12  requests that come for reasonable modifications?

13      A    Well, as -- as I said, I haven't really

14  received any.

15      Q    Okay.

16      A    Unless you -- I mean, I guess, a post-election

17  feedback or complaint about something that was difficult,

18  that may be considered a request for modification.  Not

19  in those -- they didn't use those terms.  But again, we

20  would look at what we could do that would be reasonable

21  to implement in the next election to make that easier.

22      Q    What type of reasonable modifications can be

23  provided to voters?

24      A    A lot of times it is looking at the disabled

25  entrance to a building, maybe looking for a parking area



 1  that's closer to that entrance; if there's a sidewalk

 2  that has an uneven surface, having the facility make

 3  changes or moving the facility, the polling place to a

 4  different facility.  That type of thing.

 5      Q   Are there election rules that cannot be

 6  modified for qualified persons with disabilities?

 7      A   I don't understand the question.

 8      Q   So, for instance, could a rule that comes from

 9  state law be modified for a person with a disability?

10          MR. WHITE:  Object to form.

11          THE WITNESS:  I would have to look at it and

12  see.  I don't -- I think that's kind of broad.

13      Q   BY MR. ROSBOROUGH:  Can you think of any

14  instances where you've received a request for reasonable

15  modification or one that you've taken as such that you've

16  had to say no to?

17      A   I cannot think of anything, no.

18      Q   Okay.  Who receives any requests for

19  modifications, reasonable modifications?

20      A   It's usually me, but it could be our elections

21  manager or the advanced voting supervisors, depending on

22  where -- where the modification comes from.

23      Q   Are there modifications you've made for the --

24  well, let me strike that.

25          How quickly does your office typically receive,



 1   evaluate, and provide a reasonable modification that's

 2   requested?

 3        A    Again, it would be if we receive a feedback

 4   from a voter, it would be the next time we have an

 5   election, we would change whatever was causing that

 6   difficulty.

 7        Q    Has your office modified any policies,

 8   practices, or procedures regarding voters with

 9   disabilities since the enactment of SB 202?

10        A    I don't believe so.

11        Q    Have you considered modifying these policies at

12   all in light of the changes made by SB 202?

13        A    I don't know of anything in SB 202 that would

14   be necessary.

15        Q    Has your office received requests for

16   reasonable modifications or changes to voting rules from

17   voters with disabilities following the enactment of SB

18   202?

19        A    I don't know.

20        Q    Has your office put out any notices or other

21   communications to the public pertaining to the impact of

22   SB 202 on voters with disabilities?

23        A    We have not.

24        Q    Okay.  I think you stated earlier, if I'm

25   correct, that in your experience, the majority of the



1   voters with disabilities use absentee balloting as the

2   accessible method of voting for them?

3        A    Quite a few do.  We had a -- in this election

4   cycle, we had over 15,000 elderly and disabled who rolled

5   over, what we call the rollover list for those who have

6   selected to receive an absentee ballot throughout the

7   election cycle.

8        Q    And do you have any understanding based on your

9   experience of why a disproportionate amount of voters

10  with disabilities use the absentee balloting process

11  rather than voting in person?

12            MR. WHITE:  Objection to the form.

13            MS. LaROSS:  Objection as to form.

14            THE WITNESS:  Yeah, I mean, I can only

15  speculate that it's easier to vote from home or to have

16  family members assist in a quieter environment.

17            (Deposition Exhibit 38 was marked for

18  identification.)

19       Q    BY MR. ROSBOROUGH:  I'm going to hand over what

20  we have marked as Exhibit 38.  It's COBB 37943.

21            MS. LaROSS:  What exhibit number are we on?

22            MR. ROSBOROUGH:  That is 38.

23       Q    BY MR. ROSBOROUGH:  Do you recognize this

24  document?

25       A    Yes.  This is a printout from our website, I



1   believe.

2       Q   Okay.  Are you aware of whether the website

3   language mentions the availability of reasonable

4   accommodations or modifications?

5       A   I believe the Cobb County website does.  I

6   don't know that we do on our elections website.

7       Q   Okay.  Are you aware of whether this language

8   on the website has been updated since SB 202 was

9   implemented?

10      A   I don't believe it has, but it may have been

11  just for the time frames, if those are on here.

12      Q   Okay.

13      A   They don't appear to be.

14      Q   Your office does not conduct any outreach to

15  nursing homes or assisted living facilities regarding

16  voting, correct?

17      A   I would have to defer to another member of my

18  staff.  I believe there is an outreach to nursing homes.

19      Q   Okay.  Are you aware of when that began?

20      A   It's been for many years, from previous

21  administrations before me.

22      Q   Okay.  How does your office choose locations

23  for early voting sites and election day polling sites?

24      A   We look at distribution around the county for

25  advanced voting sites, mainly looking for county or



1  municipal buildings.  We look at availability to be --

2  allow us to be there for three weeks during early voting.

3          And then for election day polls, we are looking

4  for near -- you know, being near to the precinct

5  boundaries, preferably inside the precinct boundaries;

6  facilities that have enough parking; they have adequate

7  electrical capacity; space and accessibility to disabled

8  and other voters as well.

9      Q   So are the needs of people with disabilities

10  accounted for then when choosing these sites?

11      A   Yes.  We do a full assessment of the ADA -- the

12  document that they put out for polling sites to see if,

13  for instance, the slope is too great or we need to have a

14  special disabled entrance, if we need to create another

15  disabled parking place on a temporary basis, and

16  everything else that's recommended.

17      Q   Are you aware of a document called Precinct

18  Requirements for Voters with Disabilities?

19      A   That's the one I was referring to.

20      Q   Okay.  And what is that, generally?

21      A   That's put out by ADA, and it has the

22  recommended modifications.  You have it in front of you.

23      Q   I will let you finish.

24      A   Yeah, the recommended requirements for each of

25  the polling places based on what's needed at that



1    particular place.

2            (Deposition Exhibit 39 was marked for

3    identification.)

4        Q   BY MR. ROSBOROUGH:  Okay.  I'm going to hand

5    you what we have marked as Exhibit 39.

6        A   Yes.

7        Q   Is this the Precinct Requirements for voters

8    with disabilities document --

9        A   This --

10       Q   -- that we were referring to in part?

11       A   In part, yes.  This is just a few of the

12   precincts.  Each precinct receives their page of the

13   larger document, and they have specific instructions --

14   they have general instructions about keeping the pathway

15   to the -- to the entrance clear of debris, et cetera, and

16   signage, and then they have specific modifications that

17   have to be made at that particular precinct to be

18   compliant.

19       Q   And who drafts these?

20       A   Ms. Ivey.

21       Q   Are they based on site inspections?

22       A   Yes.

23       Q   And does Ms. Ivey conduct those inspections?

24       A   She does, and she has two site surveyor

25   employees that work under her.  One of the positions is



 1  vacant right now, but she has two positions under her.

 2       Q    How often are facilities inspected?

 3       A    They have a schedule.  I don't know what that

 4  schedule is, but they -- they do a few each -- each time.

 5  And they -- you know, if there is a need based on a

 6  complaint or something else, they will move one of them

 7  up as necessary.

 8       Q    Who updates these as polling sites are changed?

 9       A    Ms. Ivey and her team.

10       Q    Okay.  And how are these used in practice?

11       A    So as I said, each poll receives their

12  document.  We have a section in the poll manager's

13  notebook for ADA requirements.  They get a lot of general

14  information about ADA requirements, how to set up their

15  table with the voting unit on it.

16            And then they -- I'm sorry.  And then they get

17  this specific document as well that tells them for that

18  particular poll, as you will see, that there's

19  sometimes -- like the first one has a requirement for a

20  disabled voter entrance sign that the second one doesn't

21  require because the disabled can use the same entrance as

22  the other voters.  And there's one in here on the fourth

23  page that has quite a few different accommodations to

24  create another ADA compliant parking space.

25            So they all are unique.



1      Q    Okay.  And what you're seeing here is just a

2   sample of the full --

3      A    Correct.

4      Q    -- list of precincts, correct?

5      A    Uh-huh.

6      Q    And I will just represent, I just provided a

7   sample for length purposes.

8      A    Right.  That's fine.

9      Q    What training, if any, is provided to your

10  staff about voters with disabilities?

11     A    So to the staff at large, again, Ms. Ivey

12  provides written documentation.  We have -- this is in

13  our poll worker training module as well, about what the

14  requirements are for accommodating those with

15  disabilities.

16          In their poll manual, they have a section about

17  things like not to touch somebody when you are assisting

18  them.  You know, to -- how to work the device on the

19  voting unit so that they can assist the person.  How to

20  talk to somebody with disabilities so as not to offend

21  them.  Various things like that.

22     Q    And you said this training is provided to both

23  staff and poll managers and poll workers?

24     A    Primarily poll managers and poll workers, but

25  they also work early voting as well.  As far as regular



1    staff, you know, Denise will, you know, provide these --

2    this information and the accompanying documents that are

3    not given here but that have information about clearance

4    and height of the tables, knee clearance for wheelchairs

5    and that sort of thing, so that the facilities here can

6    be compliant as well.

7         Q   Okay.  Does the training address -- excuse me.

8    Does the training address the needs of voters with

9    disabilities who use absentee voting?

10        A   It does not.

11        Q   Okay.  Has the training been modified since SB

12   202 has passed?

13        A   It has not.

14             MR. ROSBOROUGH:  This is a good time for a

15   lunch break if that works for others.

16             THE WITNESS:  That's fine.

17             MR. ROSBOROUGH:  How long -- I don't want to

18   like -- I want to give people enough time to eat without

19   unnecessarily prolonging.  What do you -- what do you

20   think?

21             THE REPORTER:  Do you want to go off the

22   record?

23             THE VIDEOGRAPHER:  The time is 1:13 p.m., and

24   we are off the record.

25             (The deposition was at recess from 1:13 p.m. to



1   2:08 p.m.)

2          THE VIDEOGRAPHER:  The time is 2:08 p.m., and

3   we are on the record.

4      Q   BY MR. ROSBOROUGH:  Ms. Eveler, would you agree

5   that Cobb County over the last decade has dealt with long

6   wait times at certain polling places and certain

7   elections?

8      A   Sure.

9      Q   Okay.  Let's -- I'm going to hand over a

10  document marked as Exhibit 40.  This is CDR 30220.

11         (Deposition Exhibit 40 was marked for

12  identification.)

13     Q   BY MR. ROSBOROUGH:  And it's got a front, and

14  it's a little on the back as well.

15         Do you recognize this document?

16     A   No.

17     Q   Do you recall filling out a survey concerning

18  wait times after the November 2018 election?

19     A   I do not.

20     Q   Do you -- do you doubt that you did so, or you

21  just have no recollection?

22     A   I have no recollection of it.

23     Q   Okay.  Is your -- if you look at this, question

24  1, provide your name and the county that represents; do

25  you see that?



1        A    Yes.

2        Q    And do you see your name there?

3        A    Yes.

4        Q    Okay.  Question 2 asks about advance voting

5    locations that have lines longer than 30 minutes.  In the

6    response, it says, "During week one we only had one

7    location open and lines averaged two to three hours."

8        A    Yes.

9        Q    Does that fit with your recollection of 2018,

10   the first week of early voting?

11       A    It does.

12       Q    Okay.  "In the second week we had two locations

13   open, but voters tended to come to the main office for 2

14   hour lines even though the line was shorter and at -- at

15   the larger event center 5 miles away."

16            Does that fit with your memory about lines in

17   2018 as well?

18       A    Yes.

19       Q    Okay.  "In the third week we had 11 locations

20   open and some had over an hour line whereas others were

21   less than 15 minutes."

22            Does that reflect your memory --

23       A    Sure.

24       Q    -- of 2018?

25       A    Probably.



800.211.DEPO (3376)
EsquireSolutions.com

1      Q    Okay.  And is it your recollection that there

2   were roughly similar length lines in 2016 as well?

3      A    I don't know.

4      Q    Okay.  If you scroll down to question 4, it

5   says, do -- "Did any of your Election Day polling places

6   have lines longer than 30 minutes?"  And the response

7   says, "23 out of 141 polling places had lines of over 30

8   minutes at closing.  The longest was 55 minutes."

9           Does that reflect your memory of the 2018

10  Election Day?

11     A    Well, I have no memory of it, but if I fill

12  this out, we do do tracking of what the closing time is,

13  the actual closing time of last voters.

14     Q    Okay.

15     A    Yeah, that's probably true.

16     Q    All right.  And that just reflected lines at

17  closing time, correct?

18     A    Correct.  Right.

19     Q    Lines may have been longer at other points

20  during the day at certain locations?

21     A    Longer or shorter.

22     Q    Yes.

23     A    Sure.

24     Q    Okay.  In 2020, particularly in the primary

25  election, there continue to be some very long lines,



1  correct?

2      A   The June primary, absolutely.

3      Q   Okay.

4      A   Yes.

5      Q   I'm going to hand over what's marked Exhibit

6  41.  This is COBB 37852.

7          (Deposition Exhibit 41 was marked for

8  identification.)

9      Q   BY MR. ROSBOROUGH:  Do you recognize this

10  e-mail exchange?

11     A   It was a long time ago, so no.

12     Q   Okay.  Does this appear to be an e-mail that --

13  I'm sorry.  Give me one second.

14         Does this appear to be an e-mail that Lisa

15  Cupid sent to William Tanks, copying you, on June 9th,

16  2020?

17     A   I see that Lisa Cupid wrote an e-mail, and then

18  Tanks responded and cc'd me.  I don't know if I got the

19  original.

20     Q   Okay.  And who is William Tanks?

21     A   He used to be the public services director,

22  agency director.  He is over several departments,

23  including the elections group in Cobb County.

24     Q   Okay.  And who is Lisa Cupid?

25     A   I believe at that time, she may have been the



1   chairwoman.  She's the chairwoman now of Cobb County

2   Commission.  She may have been the District 4

3   commissioner at that time.

4       Q   Okay.  If you scroll down in the initial

5   e-mail, it says --

6       A   Oh, she's district.

7       Q   Oh.

8       A   Sorry.

9       Q   No, you're fine.

10          She refers to a friend who lives in Mableton

11  and waited in the line at the South Cobb Community Center

12  for five-plus hours this morning.

13          Do -- do you recall there being lines of that

14  magnitude at South Cobb Community Center on June 9th,

15  2020?

16      A   Not -- not particularly, but the June 9th, 2020

17  primary had many problems.  And the new equipment was one

18  of them, delivery times one of them, COVID, low staffing.

19  So I would not be surprised.

20      Q   Okay.  And there's a reference also to friends

21  in Inman Park, Summerhill, Mableton, who are all

22  experiencing five -- four- to five-hour waits and voter

23  machine technical issues.

24      A   And Inman Park and Summerhill are not part of

25  our county.



1    Q    Okay.  There is a question there about the
2  giant elephant in the room, as why is this happening
3  disproportionately in areas with more minority voters.
4         Do you recall that in 2020, with the
5  June primary, that areas with disproportionately large
6  amount of minority voters seemed to be experiencing
7  longer wait times?
8    A    I recall that there were allegations of that,
9  but we had issues throughout the county.
10   Q    Okay.  Okay.  Concerning some of the issues
11 regarding the 2020 primary that you mentioned, what --
12 what are those -- what were the big issues, to the best
13 of your recollection, that caused the long lines?
14   A    This was the first election that we had
15 utilized the new voting system, the current system.  It
16 had been a delayed primary.  It had originally been
17 scheduled in May, and it was combining the presidential
18 primary from March into the May, and then the May was
19 canceled -- or postponed into June.
20        So there were many issues about timeline and
21 scheduling, and the amount of equipment that we had was
22 unprecedented.  We were in the midst of the pandemic, and
23 we had trouble getting poll workers and staff to do
24 deliveries.  Learning curve on new equipment.  It was
25 just a perfect storm.



1        Q    In your role as elections director, do you

2    believe any of the provisions of SB 202 address those

3    issues you had with the June primary in a positive way?

4        A    Nothing that comes to mind.

5        Q    And similarly, in your -- based on your

6    experience, do any of the provisions of SB 202 address

7    any other wait time problems that you've had in the past

8    in any positive way?

9        A    I can't think of anything, no.

10       Q    Beginning in 2020, did the county participate

11   in efforts to systematically track wait times?

12       A    We had always done a report on -- after every

13   general election that tracked the last time -- the

14   last -- time the last voter voted, so it was the closing

15   wait time, and we only did that after every general

16   election.

17            Of course, starting after SB 202, we're

18   tracking it three times a day for every election.

19       Q    Do you recall in 2020 representatives from

20   Dominion or other company polling places to help monitor

21   wait times?

22       A    Yeah, I believe they did.

23       Q    Okay.  And do you have any understanding of

24   what that process was?

25       A    I know they used some kind of tablets and some



 1  kind of app, but we never saw any of it, so I don't know.

 2       Q    Okay.  Do you know who it was provided to?

 3       A    The state.

 4       Q    And by "the state," do you mean the Secretary

 5  of State's office?

 6       A    Correct.

 7       Q    Okay.  You mentioned a change as a result of SB

 8  202.  What was that change in terms of tracking wait

 9  times?

10       A    So SB 202 requires us to check three times a

11  day the wait time and report that to the Secretary of

12  State's office at the end of the election.

13       Q    And how do you go about carrying that out in

14  the elections so far that that -- to which --

15       A    Right.

16       Q    -- that's applied?

17       A    So we have one of the recaps, and the one that

18  we have put it on is on the poll pad recap.  And the

19  recap is a form that we collect all the numbers at

20  opening and closing, and they have a place to record the

21  number of minutes that the line is at morning, afternoon,

22  and late afternoon, basically midday and late afternoon.

23            And they don't -- they didn't at first

24  understand it quite well enough, and sometimes they put

25  other numbers.  Like it wasn't the number of minutes; it



1  was the time that they checked it.  You know, so that

2  data wasn't exactly accurate on the first couple of

3  times, but I think they've got it now.

4      Q   Okay.  Are there designated specific times at

5  which the wait time is checked?

6      A   There are now.  The Secretary of State has

7  given us guidance on what those time frames are, and so

8  we've modified the form to have the actual time ranges.

9  It was really up to us at first to do morning, midday,

10  and afternoon.

11      Q   And at what point was the guidance given as to

12  the specific times?

13      A   It was this year, but I don't recall exactly

14  when.

15      Q   Okay.  Do you understand how that figure is

16  arrived upon, for how long the wait time is?  In other

17  words, how is wait time measured at those points?

18      A   How is it measured?  So our direction to the

19  poll workers is to record the current time on a piece of

20  paper and give it to the last person in line; and then

21  when they get to the check-in station, the check-in

22  worker writes the current time at that time and gives it

23  to the manager.  And they record the number of elapsed

24  minutes as the time.

25      Q   And is this done only on the actual day of the



1  election, or is it also done during the early voting?

2      A   It's done only on the day of election.

3      Q   Do you engage in any sort of other effort to

4  track wait time for early voting?

5      A   We do.  We have a map on our website that has

6  wait times for the early voting locations.  Each poll

7  manager at each satellite location updates their own wait

8  times, and they may be giving a ballpark.  They may be

9  using that same method with a piece of paper.

10      Q   Is that data retained anywhere, or is it only

11  reported in real-time?

12      A   It's only reported in real-time.

13      Q   Early voting has now started for -- in Cobb

14  County for the Senatorial runoff election.  Is that

15  correct?

16      A   Correct.

17      Q   The first day of early voting was -- in Cobb

18  County was Saturday?

19      A   Yes.

20      Q   Is that correct?

21      A   Uh-huh.

22      Q   And you also had early voting on Sunday in Cobb

23  County?

24      A   We did.

25      Q   And yesterday as well?



1        A    Yes.   Monday through Friday this week, uh-huh.

2        Q    What have -- to the best of your knowledge,

3    what have the line lengths been thus far into the voting

4    period for the different days?

5        A    At -- at some locations we had up to two hours,

6    but most of the time it's been 30 minutes.

7        Q    Do you allow people with disabilities who have

8    difficulty waiting in lines to go to the front of the

9    line?

10       A    We do.

11       Q    And how does a person with a disability request

12   this?

13       A    They have to state their request to a poll

14   worker.

15       Q    Is there any signage or other printed

16   information informing voters with disabilities about that

17   ability?

18       A    There is.

19       Q    And where is that generally posted?

20       A    It's near where the line would form.  Sometimes

21   the line gets longer than that point, and the practice is

22   to put a poll worker at the end of the line and to help

23   direct people.

24       Q    Prior to the passage of SB 202, did volunteers

25   sometimes pass out food or water or other refreshments to



1  voters waiting in line?

2      A   Yes.

3      Q   If I refer to these activities as "line

4  relief," will you understand what I mean?

5      A   I do.

6      Q   Okay.  Do you recall when that started

7  occurring in Cobb County?

8      A   That seemed to start -- I'm not sure about

9  start, but I would say became very popular in 2020.

10      Q   Were there certain polling places or areas of

11  the county where the line relief activities seemed to

12  take place disproportionately?

13      A   I was only at one location, at our main office.

14  We have moved from our previous location to here, but we

15  did see a lot of it at our main office, just because it

16  was the headquarters.

17      Q   Do you recall any specific organizations that

18  conducted line relief prior to SB 202?

19      A   I do not.

20      Q   Prior to SB 202, was it your understanding that

21  it was already illegal for candidates or political

22  parties to provide line relief?

23      A   It's not legal for the candidate to enter the

24  poll, and then they have to leave once they vote.  But I

25  don't have an understanding about a candidate's campaign,



1  that that would be illegal for them.

2      Q   I'm going to hand you what we will mark as

3  Exhibit 42.  This is the document with a Bates number

4  COBB 23391.

5          (Deposition Exhibit 42 was marked for

6  identification.)

7      Q   BY MR. ROSBOROUGH:  After you have a minute to

8  look at this, can you just tell me if you recognize this

9  e-mail exchange?

10     A   I do recognize it, yes.

11     Q   Okay.  And what is the topic of the e-mail

12  exchange?

13     A   It was a food truck at our main election office

14  on Whitlock.

15     Q   Okay.  Was this during the early voting period

16  for the Senate runoffs in 2020?

17     A   Yes, it was.

18     Q   Okay.

19     A   I think.  It's December 2020, so that would be

20  between the general election and the runoff.

21     Q   What do you recall about this interaction?

22     A   It was not a single interaction.  There were --

23  there were many groups that were out line warming, line

24  relief, and we had a food truck at several locations, and

25  it -- it was difficult on our part to determine whether



1   that was okay or not okay.  It was -- it was difficult to

2   determine whether they had a message that they were

3   trying to portray.  We were looking at the materials they

4   were giving out to see if there was anything written on

5   them.  We had to kind of monitor the -- the food giveaway

6   to see if there was a message that was being, you know,

7   provided to people.  We were measuring distances away

8   from the building to determine how far away they were.

9          It -- it took a lot of energy to, you know,

10  monitor, and we had people on both sides complaining.

11  You know, one side was saying they were advocating a

12  certain position.  It was too close.  You know, everybody

13  knows this group is for this thing.  You know, it was

14  just a lot of back and forth.

15     Q   In the top -- in your last response on this

16  e-mail here, you ultimately state that you are having a

17  hard time justifying why they need to stop doing any of

18  this, correct?

19     A   Right.  And that's what I mean, is, the rules

20  weren't really defined, so it was hard to say if -- you

21  know, like I said, there were a lot of complaints.  It

22  felt disruptive, but yet there was nothing political on

23  their materials.  So it was -- it was a line we didn't

24  know where the line was, basically.

25     Q   And -- and when you were talking about



 1  monitoring, as far as any -- whether any sort of message

 2  was being conveyed, your understanding at the time was

 3  that the only types of messages that would be prohibited

 4  were those that you'd consider electioneering, correct?

 5      A   Correct.

 6      Q   Ultimately, do you recall that this -- the

 7  Vote.org food truck was -- there was an investigation

 8  about whether this was proper under current law?

 9      A   There was an investigation at the State

10  Election Board level.  I don't recall what happened with

11  that.

12      Q   Would it surprise you that to find that there

13  was a finding of no violation ultimately?

14      A   No, it wouldn't surprise me at all.

15      Q   Was it your understanding that some of the

16  groups that were providing line relief wanted the contact

17  with voters rather than having an election official hand

18  the food or drink out for them?

19      A   I would say --

20          MR. WHITE:  Object to the form.

21          THE WITNESS:  I would say based on reactions

22  from offers to take the items to the voters for our poll

23  workers, for them to leave them with the poll workers and

24  the poll workers would distribute and that they didn't

25  want to do that, that that would indicate that they



 1  wanted that contact, yes.

 2       Q   BY MR. ROSBOROUGH:  Okay.  Do you have any

 3  understanding of why they wanted that contact?

 4       A   I can't speculate.

 5       Q   Okay.  I'm going to hand over what we will mark

 6  as Exhibit 43.  This is COBB 27515.

 7           (Deposition Exhibit 43 was marked for

 8  identification.)

 9       Q   BY MR. ROSBOROUGH:  Do you recognize this

10  document?

11       A   Not really.

12       Q   Do you recognize this as a guidance regarding

13  line relief prior -- from February 2020?

14       A   I recognize Elizabeth Monyak as a -- as

15  Associate County Attorney in our County Attorney's

16  Office, and the date says 2/24/2020.

17       Q   Okay.  And I'm just going to read the -- so

18  the -- this document is titled "Prohibitions on Election

19  Day (Reference O.C.G.A. Section 21-2-414)"; is that

20  correct?

21       A   Yes.

22       Q   And it reads at the top, "Georgia's election

23  law bars the following four activities in a designated

24  zone near polling places on any day when ballots are

25  being cast:  Solicitation of votes in any manner or by



1  any means or method; two, distribution or display of

2  campaign material; three, solicitation of signatures for

3  a petition; and four, setting up any tables or booths."

4        Does that -- first of all, did I read that

5  correctly?

6        A   Yes, you did.

7        Q   Does this reflect your understanding of how

8  Cobb County made decisions regarding line relief prior to

9  SB 202?

10        A   Yes.

11        Q   Did you, in your role as elections

12  administrator, understand the basic parameters of this

13  policy?

14        A   Yes.  I also think that part of this may have

15  been related to groups that asked to conduct bake sales

16  or things for their organization to earn money, and --

17  and Ms. Monyak, I think, was also addressing that.

18        Q   In your experience, is there a difference for

19  line management purposes if an individual is providing

20  line relief inside the 150-foot zone from the polls

21  versus outside of that zone but 25 feet with any -- from

22  any voter?

23        A   Yes.  The prohibitions would be only within

24  that buffer zone of 150 and 25 feet from anyone in line.

25        Q   From an elections management perspective, are



 1  those two parameters different to you in any meaningful

 2  way?

 3       A    "Two parameters" being?

 4       Q    Being on one hand the what I can refer to as

 5  the buffer zone, so 150 feet from the polls versus to

 6  beyond the 150 feet but within 25 feet --

 7       A    Yeah.

 8       Q    -- of any voter?

 9       A    Yeah.  I think that has recently been referred

10  to as the buffer zone and the supplemental zone.

11       Q    Sure.  So between the buffer zone and the

12  supplemental zone, from your purposes as an elections

13  administrator, does the line relief ban have any greater

14  purpose in one zone versus the other zone?

15            MS. LaROSS:  Objection as to form.

16            THE WITNESS:  Yeah, I don't have an opinion on

17  that.

18       Q    BY MR. ROSBOROUGH:  Do you agree that it's not

19  uncommon for lines to extend past the 150-foot buffer

20  zone?

21       A    It's not common, but it does happen, and that's

22  the reason for the supplemental zone.

23       Q    Does Cobb County provide self-service water

24  receptacles at any or all polling places?

25       A    We do not.



 1      Q    Okay.  Are there any reasonable modifications
 2  or accommodations your office provides to voters with
 3  disabilities who need line relief while voting?
 4      A    Well, we allow those with disabilities to go to
 5  the front of the line.
 6      Q    If the ban on line relief activities as enacted
 7  in SB 202 were lifted reverting to the previous policy,
 8  what would your office have to do to undertake any
 9  changes?
10      A    Well, again, at that time, it was -- it was
11  difficult as an election administrator to -- to know what
12  needed to be enforced as far as campaign material.  You
13  know, electioneering, when there is lots of outside
14  people that are talking to voters, you know, giving them
15  things, it's -- that part of SB 202 has made it simpler
16  for us.
17      Q    Does your office monitor the line for
18  electioneering activities after SB 202?
19      A    We monitor the lines in the same way.  It's
20  just that people are not approaching voters like they
21  were, and so there is not as much back and forth and
22  wondering what's going on.  We don't get as many
23  complaints from people saying somebody said something,
24  somebody is trying to influence people.  So -- and that
25  way it is simpler.  I guess that's the answer.



1      Q   Do you recall getting any complaints about line

2   relief prior to the 2020 election cycle?

3      A   Yes, I think we did, but I think, like I said

4   earlier, it became very popular in 2020.  Because there

5   were long lines, we -- we had, you know, pizzas being

6   delivered to voters.  There was all kinds of, you know,

7   bands set up to entertain people.  It was just a lot of

8   things going on, and that made it a little chaotic.

9      Q   If the criminal line relief ban as enacted in

10  SB 202 were struck down and you were to revert to your

11  previous policy as we just discussed, what would that

12  take in terms of implementation for your office?

13          MS. LaROSS:  Objection as to form.

14          THE WITNESS:  Well, we wouldn't have to

15  implement anything.  It would -- it would be the same

16  situation, I assume, as before, where we had lots more

17  activity out in the line, and I'm not sure whether there

18  is electioneering or if there is materials with campaign

19  information.  It -- it would just be more -- more workers

20  that were out there, you know, watching the line.

21      Q   BY MR. ROSBOROUGH:  So how long prior to an

22  election -- or prior to a day of voting, I should say,

23  would you need to feel like you could properly implement

24  the change back to the previous state of the law?

25      A   Well, again, we wouldn't do anything to



1    implement.  I mean, we would just be on the defensive,

2    basically, you know, watching to see how the situation

3    came up, to see what -- what was going on, to monitor

4    what's going on in the line and -- and take any action

5    for reminding -- as I said earlier, reminding people this

6    isn't allowed.  You know, you can't give this to them

7    because it has this on it.  There would be more of

8    questions, complaints, and that sort of thing to -- to

9    react to.

10        Q   What are the last-minute instructions?

11        A   That is something that we give the poll

12   managers on the day that they pick up their supplies

13   to -- to give them last-minute reminders about things and

14   to take care of anything that has developed since their

15   training classes.

16        Q   Have you used last-minute instructions to

17   provide guidance as to changes in any voting or

18   elections-related policy?

19        A   Yes.

20        Q   Okay.  Do you recall we previously discussed

21   the large volume of voter challenges leading up to the

22   2020 runoff?

23        A   Yes.

24        Q   Okay.  What were the consequences of those

25   challenges for your office?



1        A    Do you mean that how they were resolved?

2        Q    Yeah.  Let me rephrase that.  In terms of --

3   I'm going to move on there.  Forget the -- forget the

4   last question.

5             What is your understanding of how SB 202 has

6   changed the law in terms of voter challenges?

7        A    A very minor change was made to the existing

8   code.  The statement that there -- there is no limit to

9   the number of challenges that a person can make was

10  added.  Those challenges already could have been made and

11  could have been made in any numbers, to my knowledge,

12  before SB 202, but there was a positive statement made in

13  the -- in the new code.

14       Q    Is it your understanding that SB 202 also

15  allows the State Election Board to sanction counties that

16  don't follow the legal requirements related to voter

17  challenges?

18       A    I think they already could have done that.

19       Q    Okay.  You would agree that there have been an

20  increasing number of voter challenges starting in late

21  2020?

22       A    Yes.

23       Q    Have your department operations been affected

24  by that increase in voter challenges?

25       A    Not a lot.  We, of course, have to look up the



1   voters and see what their current status is and present

2   that to the board, but our board has not sustained very

3   many of those challenges, this current board, nor the

4   previous board that entertained some challenges in 2020.

5   So the -- the final action of maybe implementing the

6   challenges, we haven't had to do that because they

7   haven't been sustained in most cases.

8       Q   I'm going to hand you what we will mark as

9   Exhibit 44.  This is the document with the Bates label

10  COBB 2560.  I'm sorry, I misread it.  25640.

11          (Deposition Exhibit 44 was marked for

12  identification.)

13      Q   BY MR. ROSBOROUGH:  Do you recognize this

14  e-mail and the attachment?

15      A   Yes.  In fact, this is one of the documents I

16  was reviewing before this meeting.

17      Q   Okay.  And so what is it?

18      A   So I put together a couple of different

19  summaries of the different sections in SB 202, one for my

20  staff.  This particular one is for the commission

21  chairwoman related to some things that she was looking

22  for as far as cost to the county, you know, things that

23  were positive, negative, additional cost, unknown impact,

24  et cetera.

25      Q   Okay.  And if you can flip to the attachment



1   itself.

2        A    Yes.

3        Q    Page 2 of the attachment, I guess the second

4   and third rows referring to 21-2-229 and -230.

5        A    Yes.

6        Q    Do these refer to the provisions in SB 202

7   concerning the provision there's -- there's no limit to

8   the number of voter challenges to either registration or

9   to votes in an election?

10       A    Yes, it does.

11       Q    And what was your assessment of those

12  provisions?

13       A    My assessment was that this was a negative

14  change, in that they -- they sort of highlighted the fact

15  that these challenges were -- that multiple challenges

16  were allowed, even though it was never prohibited before.

17  The fact that it was added into this bill sort of gave it

18  legs, I guess, and made it more enticing for people to

19  make those challenges.

20       Q    Have -- did you -- did the board continue to

21  receive large number of voter challenges in the -- since

22  the enactment of SB 202, to the extent you know?

23       A    Well, the biggest challenges we got were prior

24  to 2000 -- or to SB 202.  And we have received challenges

25  since then that were less than a thousand, but, you know,



1  several of them from several voters.

2      Q   Do you understand whether these challenges were

3  affiliated with any groups this time around?

4      A   We didn't ever get that from the challenges,

5  that they were part of a group.

6      Q   The SB 202 also institutes a requirement to

7  hear challenges within ten days; is that correct?

8      A   Yes, that is correct.

9      Q   Has -- sorry.

10      A   I was just going to say that that is difficult

11  to -- to turn it around that quickly.

12      Q   If there were changes made to strike the

13  changes to the voter challenges provisions made in SB

14  202, what difficulty, if any, would that have on the

15  board's implementation?

16          Sorry, that was poorly stated.  Let me restate

17  that.

18          If the changes to the voter challenge provision

19  from SB 202 were struck down, what is your understanding

20  of the implementation process for reverting to the old

21  policy?

22      A   Again, we -- this is similar to the other

23  answer.  There's -- there isn't anything proactive that

24  we would have to do if that change were made.  It would

25  be reactive on our part that, you know, we would



1   potentially still receive large challenges because that

2   was not prohibited before.  The ten days, if that were

3   struck, that would just give us more time to react.

4        Q   Okay.  I want to move on and just touch again

5   briefly on the out-of-precinct provisional ballot changes

6   from SB 202.  Are you familiar with the changes that SB

7   202 made to voting out of precinct?

8        A   That was to implement the affidavit for those

9   who were arriving after 5:00 p.m. at the wrong precinct.

10       Q   Do you have any sense of whether there had been

11  an increase in out-of-precinct voting from 2016 to 2020?

12       A   In my sense of it, I don't have any statistics,

13  but they did seem to be increasing.  We always encouraged

14  people to go to the right precinct, especially in major

15  elections where there are distinct races, so that they

16  could vote for their district representatives where they

17  live or where they are registered.  They may have moved.

18           So not being able to duplicate the district

19  races, if they were to vote out of precinct, we felt it

20  was better to encourage them to go to their correct

21  precinct.  But a lot of people only vote the top of the

22  ballot, and they are only interested in that in their

23  statewide races, so they had no problem voting out of

24  precinct.  Of course, that requires us to duplicate the

25  ballots anyway onto the correct one.



1          So it was becoming burdensome because it was --

2     it was popular and acceptable in a lot of voters' minds

3     to vote at the wrong precinct.

4          Q   There were -- well, do you recall there being

5     issues regarding provisional ballots in the January 2021

6     runoff?

7          A   I don't recall.

8          Q   All right.  I'm going to mark Exhibit 45, which

9     is COBB 23161.

10         (Deposition Exhibit 45 was marked for

11    identification.)

12         Q   BY MR. ROSBOROUGH:  Do you recognize this

13    e-mail chain?

14         A   Not particularly.

15         Q   Okay.  Do you recall any of the issues, in

16    looking this over, from the 2020 -- January 2021 runoff

17    regarding provisional ballots at certain polling places?

18         A   We often get complaints from Election

19    Protection or other groups that are out there observing

20    at the polls, and I try to respond to them either on the

21    phone or when I can in an e-mail and correct -- make

22    corrections if any are necessary.

23         Q   Is it your understanding that some of the

24    demand for provisional ballots arises because of a

25    voter's confusion about their precinct?



1    A    Yeah, voters are sometimes confused about where

2    they should vote.  We've been trying to get people

3    acclimated to the My Voter page, which is the state's

4    registration system.  And over the years that that's been

5    in place, more and more voters are aware of it and using

6    it.

7    Q    And for some voters, a polling place can change

8    from one election to the next; is that correct?

9    A    Sure.  And especially if they only vote every

10   two or four years, they almost certainly will change in

11   that time frame.

12   Q    What is the difference pre and post SB 202 in

13   terms of a voter who shows up to vote at the wrong

14   precinct before 5:00 p.m.?

15   A    Well, before 5:00 p.m., even before SB 202, we

16   would inform them of their correct poll and inform them

17   that they want to have the opportunity to vote for their

18   district representatives, if they can get there, and then

19   we tell our poll managers to let the voter decide.

20        And pre 202, they didn't have to tell them

21   that, but if you decide to vote here and it's not yet 5

22   o'clock, we won't be able to count it, so.

23   Q    Am I correct, though, that you had testified a

24   few minutes ago that there were a number of voters who

25   chose, nonetheless, to stay and vote at the wrong



1  precinct because their ballots for certain races would be

2  counted?

3       A    That's correct, pre 202.

4       Q    And how is that different now post 202?

5       A    So post 202, we are not allowed to count the

6  out-of-precinct ballot until -- unless it is cast after

7  5:00 and it's accompanied by the affidavit that they

8  couldn't get to their correct polling place.

9       Q    If the SB 202 -- well, let me just ask.

10  Does -- does your office provide any reasonable

11  modifications or accommodations to voters with disability

12  who may have difficulty completing their -- getting to

13  the correct polling place in time?

14       A    We don't have any way to get them to their

15  poll, if that's what you mean.

16       Q    Or -- or any other modifications or

17  accommodations that you can think of?

18       A    I don't know what those would be.

19       Q    Okay.  If the SB 202 provisions regarding

20  out-of-precinct provisional ballots were overturned and

21  the law reverted to pre SB 202, would your office have to

22  undertake any changes?

23       A    Just educating the poll workers.

24       Q    How long would that take, in your estimation?

25       A    If it were -- it could be communicated in the



 1   last-minute instructions.  I would say that probably

 2   wouldn't be very effective.  It might get to some people

 3   that actually understood what the direction was, but it's

 4   usually a more iterative change, where we have to go

 5   through a couple of elections and train them in their

 6   classes of a -- a change like this.  Otherwise, they tend

 7   to revert back to their old -- the old learnings that

 8   they have.

 9       Q   Has that been a challenge with the provisions

10   of SB 202?

11       A   Yes, it has.  We have been trying to get them

12   to remember to sign the affidavits, because it does say,

13   you know, that it has to be a witnessed affidavit, and

14   there are times when we get one back but it only has the

15   voter's information and not the signature from the poll

16   worker.

17       Q   Okay.  I want to switch topics and come back

18   briefly to drop boxes.

19       A   Okay.

20       Q   Am I correct that in the November 2020

21   election, Cobb County had 16 drop boxes?

22       A   Correct.

23       Q   Who decided where to put the drop boxes?

24       A   It was kind of collaborative between myself and

25   my IT department and other department directors in Cobb



1  County, depending on the locations that they suggested

2  were available.

3      Q   Were there any specific criteria you all used?

4      A   It was mainly that it was well lit, that we

5  could install cameras.  It was a county building.  That

6  was basically it, and that it was geographically

7  dispersed.

8      Q   Okay.  Did your office account for the needs of

9  qualified persons with disabilities in placement of drop

10  boxes?

11      A   Well, all of the county buildings are compliant

12  with ADA, so that was one of the considerations as well.

13      Q   Could voters drive up and drop their ballot

14  from their car?

15      A   On some of them they could.

16      Q   Okay.  I'm going to hand over what we will mark

17  as Exhibit 46.  This is COBB 25490.

18          (Deposition Exhibit 46 was marked for

19  identification.)

20      Q   BY MR. ROSBOROUGH:  Do you recognize this

21  e-mail?

22      A   Sure, yeah.

23      Q   And is this an exchange on April 5th, 2021?

24      A   It is.

25      Q   And who are you writing to?  Well, let me first



1  ask, did the top e-mail, is that -- was that -- did you

2  write that e-mail?

3      A   I did.

4      Q   Okay.  And who are you writing it to?

5      A   I was responding to a media query from

6  Christina Almeida Cassidy, and she's with the Associated

7  Press.

8      Q   Okay.  And does this reflect your drop of the

9  16 drop boxes you mentioned pre SB 202 to being allowed

10 to have 5 due to SB 202?

11     A   Yes.

12     Q   What other changes did SB 202 have on the time

13 availability of the drop boxes?

14     A   They were only allowed to be open when advance

15 voting locations were also open for voting, so if -- if

16 we were voting the minimum hours of 9:00 to 5:00, they

17 could only be open 9:00 to 5:00.  We generally had --

18 most of our locations opened later than that, earlier

19 than that, but that would be the time parameters.

20     Q   Okay.  And what types of locations did you have

21 them located at?

22     A   As stated here, they were libraries, rec

23 centers, fire and police stations, other county

24 buildings, government centers.

25     Q   And from an election administration standpoint,



1  did you feel -- what was your opinion of the drop boxes

2  pre SB 202?

3      A   I thought it worked well.  It was -- as far as

4  election administration, it was a lot of work to send out

5  teams of two to gather ballots, and, you know, bringing

6  them back in.  We had to hire people to do that.  One of

7  the worst things was on the -- on -- in -- in 2020, we

8  had them open on Election Day, all the way up to Election

9  Day, and so we had to close the boxes at 7:00 p.m. on

10  Election Day and had to have 16 teams of two, like one,

11  two, three, go; everybody stop, close the box.  And that

12  was a challenge because of so many boxes.  I don't know

13  how a bigger county did it, but...

14      Q   Do you -- does this e-mail reflect the number

15  of ballots that Cobb County received by drop box in the

16  November 2020 and January 2021 elections?

17      A   I'm just reading here what I wrote.  In

18  November we received 89,445 ballots by drop box out of

19  the 148,911 returned ballots.  And similarly, in January,

20  it was 79,715 out of the 127,789.  So it was very

21  popular.

22      Q   Okay.  What impact do you think that the drop

23  boxes had on the 2020 election and including the runoff

24  in January 2021?

25          MR. WHITE:  Object to the form.



1            THE WITNESS:  Again, that was an anomaly year

2     because of the applications that were sent out to every

3     Georgia voter.  There were a lot more people voting

4     absentee, that and because of the pandemic.  For

5     instance, the 148,911 returned ballots in -- in

6     November of 2020, for the November '22 election, we only

7     issued 30 something thousand total.  I don't know how

8     many we got back, but it was a completely different

9     number.  And prior to 2020, we would issue similarly

10    around, you know, 28- to 30,000 ballots.  A vast

11    difference.

12        Q   BY MR. ROSBOROUGH:  Do you recall when you

13    first heard about legislative efforts to either restrict

14    or eliminate drop boxes?

15        A   Actually, what I recall is that we were

16    advocating for drop boxes to be codified so that we could

17    continue to use it, because by then, they had -- the

18    emergency powers that enabled them to start with had

19    ended.  So we didn't know if we would ever be able to use

20    a drop box again.  We did advocate for a more open use,

21    similar to what we had in 2020, but obviously didn't get

22    that.

23        Q   Do you have any understanding from your work

24    on, you know, providing advice during the legislative

25    process that led to SB 202, what was motivating the



1  desire to restrict drop box use?

2      A   I don't know what the motivations were.

3      Q   I'm going to hand you what we will mark as

4  Exhibit 47.  This is COBB 24345.

5          (Deposition Exhibit 47 was marked for

6  identification.)

7      Q   BY MR. ROSBOROUGH:  Do you recall this e-mail

8  exchange?

9      A   I recall similar exchanges.  I have no doubt

10 this is my exchange.

11     Q   Okay.  And what was the subject of this e-mail

12 exchange?

13     A   I think this was -- this was an idea that I was

14 bouncing off of several other county directors about

15 having absentee ballot clerks or deputy registrars accept

16 absentee ballots at various county locations after the

17 advanced voting period had ended.

18     Q   Why was that something that you were

19 considering?

20     A   Because after the advanced voting period ends,

21 the only way that people can return their ballots is by

22 postal mail or hand delivery to the main office.  And at

23 that point in time, it's unlikely that a postal mail

24 would get here if they put it in the mail.  So we were

25 looking at trying to expand the hand delivery from just



1  our main office to other parts of the county as well.

2      Q   The subject line of the e-mail is "Drop box

3  limitations," correct?

4      A   It is.

5      Q   And is it your understanding that this -- you

6  sent that e-mail two days before SB 202 was signed into

7  law?

8      A   Again, I don't remember when it was signed into

9  law, but it -- this is sent March 23rd, 2021.

10     Q   Okay.  Is it your recollection that you were

11 talking about setting up this program of absentee ballot

12 clerks accepting by hand because of the limitations that

13 were about to go into effect in SB 202 due to drop boxes?

14         MS. LaROSS:  Objection as to form.

15         THE WITNESS:  Yeah, because again, drop boxes

16 had been eliminated at this point, and so we were looking

17 for something similar in the time period at the end of

18 the -- right next to the election, right before the

19 election, that we could offer voters, and it was looking

20 like the legislation wasn't going to enable that.

21     Q   BY MR. ROSBOROUGH:  And did you end up

22 implementing any sort of program like that?

23     A   We did.  We implemented a pilot program at

24 three different libraries in November of 2021, and then

25 we fully implemented that in November of this year at



 1  seven libraries.

 2      Q   In terms of -- let's start with voter access.

 3  How would you characterize the success of that program?

 4      A   I think it was -- it was a good way to provide

 5  access.  Maybe it needed some more promotion, because

 6  this last one in at this November election in 2022, there

 7  was 736, I believe, ballots that were returned in the two

 8  days that we -- that we did it.

 9      Q   If SB 202 hadn't enacted the restrictions on

10  drop boxes, is this a program you would have likely

11  implemented?

12          MS. LaROSS:  Objection as to form.

13          THE WITNESS:  No.

14      Q   BY MR. ROSBOROUGH:  Do you see on the top

15  e-mail, there's an e-mail responding to you from Deidre

16  Holden?

17      A   Yes.

18      Q   Who is Deidre Holden?

19      A   She's the director in Paulding County.

20      Q   Okay.  And can you just read the first

21  paragraph of her response there?

22      A   She states, "I have all but stood on my head

23  concerning the drop boxes.  I told my delegation that the

24  drop box at the election offices needed to stay open

25  until 7:00 p.m. on election night.  I think that is only



 1  right since we are the election office.  I do not think

 2  they understand the impact that the drop boxes had for

 3  ALL voters.  We received nothing but great comments about

 4  offering them."

 5      Q   Does her assessment of the impact of drop boxes

 6  connect with your own assessment?

 7          MS. LaROSS:  Objection as to form.

 8          THE WITNESS:  Her comment about drop boxes

 9  staying open until 7:00 p.m. on election night, I don't

10  think it's necessary, because if people are coming to the

11  election office, they can hand-deliver to a person at

12  the -- at the desk.

13          But drop boxes were well received by voters

14  during 2020 when most voters voted absentee.

15      Q   BY MR. ROSBOROUGH:  If the rules concerning

16  drop boxes enacted in SB 202 were struck down, would you

17  consider recommending changes to your current drop box

18  arrangement?

19      A   That would be up to my board.

20      Q   Would you provide them recommendation?

21      A   I would have to look at the impacts.  I don't

22  know.

23      Q   Switching topics, prior to the adoption --

24  well, let me -- let me step back.

25          Are you familiar with the changes in SB 202



1  making it a felony for someone to knowingly accept a

2  ballot for delivery or return unless they are a family

3  member or a caregiver?

4       A   I thought that was in the law before SB 202.

5       Q   What is your understanding of the changes that

6  SB 202 made to the -- to the provisions there, as it --

7  in regards to what I'll call third-party ballot returns?

8       A   I -- I couldn't state that at the top of my

9  head.

10      Q   Okay.  Are you aware of whether it was a felony

11 before the provision -- before SB 202 was enacted to

12 return the ballot of someone besides a family member or

13 caregiver?

14      A   No, I am not.  We are not the enforcement arm

15 of government, so we would not really do anything with

16 that anyway.

17      Q   Has the Secretary of State provided any

18 guidance on this topic since the enactment of SB 202?

19      A   I don't --

20          MS. LaROSS:  Objection as to form.

21          THE WITNESS:  I don't know.

22      Q   BY MR. ROSBOROUGH:  Okay.  Okay.  We talked a

23 little bit about -- previously about the shortening of

24 the runoff election period, correct?

25      A   Yes.



1      Q   And am I correct that your under -- your

2   understanding is that that also shortened the early

3   voting period --

4      A   Yes.

5      Q   -- available?

6      A   Yes.

7      Q   Okay.  I'm going to hand you what we will mark

8   as Exhibit 48.  This is COBB 24256.

9          (Deposition Exhibit 48 was marked for

10  identification.)

11     Q   BY MR. ROSBOROUGH:  Do you recall this e-mail

12  exchange?

13     A   Yes.

14     Q   And what is it?

15     A   So it looks like it was initiated by Sara

16  Tindall Ghazal.

17     Q   And who is she?

18     A   She currently is a member of the State Election

19  Board.  At this time she was just an advocate for voter

20  protection.

21     Q   Okay.  And what's the subject line of this

22  e-mail?

23     A   SB 202.

24     Q   Okay.  Does this -- does this e-mail chain

25  refer to the restricted -- to shortening the runoff



 1  period to 28 days in SB 202?

 2       A   Yes, it does.

 3       Q   Now, do you see the e-mail, the second from the

 4  top, that Sara Tindall Ghazal sends to you on March 18th,

 5  11:11 a.m.?

 6       A   Yes.

 7       Q   She says, "My only guess on sticking so hard to

 8  the 28-day runoff calendar is that Fleming and others

 9  believe that will prevent any new voters from being

10  registered for a runoff."

11           Did I read that correctly?

12       A   Yes, you did.

13       Q   Okay.  Do you -- did you have that same

14  understanding one way or the other?

15           MS. LaROSS:  Objection as to form.

16           THE WITNESS:  Yeah, I don't know what the

17  motivation would have been.  I was frustrated by not

18  getting responses, positive responses or interrogatory

19  responses or anything about all of this, election

20  officials, you know, needing more time, asking for more

21  time.  It went basically nowhere.  But again, I don't

22  know the reason for that.

23       Q   BY MR. ROSBOROUGH:  And do you understand who

24  Fleming is that she refers to?

25       A   That would be Barry Fleming.



1    Q   And what's your understanding of his role

2    regarding the SB 202 legislation?

3    A   So if I remember correctly, he was the chairman

4    of the committee or subcommittee that was passing the --

5    the bill through the House.

6    Q   Okay.

7    A   At the time that it was a House Bill.

8    Q   And you responded to her in part, "We

9    desperately need then to consider five to six weeks for a

10   federal runoff.  We had a conference call with about 40

11   counties and that was unanimous."

12       Did I read that correctly?

13   A   Yes, you did.

14   Q   Was that your recollection of both your --

15   well, of your position at the time?

16   A   It was.

17   Q   And does it also sound right to you that the 40

18   counties or so that you were on a conference call with

19   also held that same view?

20   A   Yes.

21   Q   I am -- yeah.  I'm going to hand you what we

22   will mark as Exhibit 49.  This is COBB 25658.

23       (Deposition Exhibit 49 was marked for

24   identification.)

25   Q   BY MR. ROSBOROUGH:  Do you recognize this



1  e-mail exchange?

2        A    Yes.

3        Q    And what is it?

4        A    This is an exchange with Senator Kay

5  Kirkpatrick, where she was asking questions about the

6  impacts of some of the -- the new law.

7        Q    Okay.  And who -- who is Senator Kirkpatrick?

8        A    She is, I think, district -- here it says

9  Senate District 32, and she was the senator.

10       Q    Do you see in your response to her where you

11  said, "With just 4 weeks, we will have to scramble to get

12  everything done.  There will be no time to conduct much

13  advance voting, so election day voting will be much

14  busier"?

15       A    Yes.

16       Q    What did you mean by that?

17       A    Well, when you have three weeks of advance

18  voting, plus absentee balloting, it takes the pressure

19  off Election Day because you don't have as many voters

20  left to go to polls.

21       Q    And then a little further down, you say, "There

22  will be little time to get the ballot ready, print and

23  mail ballots, so if we have a large number of elderly and

24  disabled voters on our rollover list, it will be

25  difficult to get them out in time to vote them."



1        Did I read that correctly?

2    A    Yes, you did.

3    Q    And what did you mean by that?

4    A    So the rollover list, like I said, for this

5    2022 runoff, is -- was 15,000 or so, and so all those

6    ballots have to be the first batch that goes out as soon

7    as ballots are ready.  With the time it takes to certify

8    the original election and create the database for the

9    runoff, working with a print vendor, we are lucky here

10   because we have a mobile ballot printer that we can

11   program and print our own.  Some counties don't.  It

12   still, even so, takes a long time to print the ballots

13   and pack all of the envelopes with the voting

14   instructions and both of the envelopes that the voter

15   returns, to get postage on them and get them out into the

16   mail.

17        So, for instance, with this election, we began

18   mailing on the 21st, last Monday, and that's not a whole

19   lot of time, especially with Thanksgiving holidays, for

20   them to pass through the U.S. Postal Service and get to

21   the voters and then for them to vote it; and if they have

22   to mail it back, there is a risk that they wouldn't be

23   able to do it.

24        By that time, though, what happens, and what I

25   mention here is, people then have the option of early



1  voting has started, and they get their ballot -- or they

2  haven't gotten their ballot yet and they decide they are

3  going to go vote in person early, then that increases the

4  lines on early voting because you have to cancel the

5  absentee ballot that's been issued to them before they

6  can vote in person.  And it just creates a lot of churn,

7  because there's such a compressed time frame.

8      Q   And have you seen that play out to at least

9  some extent with the long lines for early voting thus far

10  in the runoff?

11     A   Because we've only -- we only have a few days

12  for early voting in this runoff, actually, there's more

13  voting for this runoff than I had predicted in some of

14  these e-mails, because if it happened to have

15  Thanksgiving in the -- the weekend before the actual

16  election, which we have had before, then you only have

17  Monday through Wednesday, and if you are lucky, you know,

18  now we can do maybe Saturday before and Sunday before,

19  but that would be a total of five days.

20         And so we've -- we've got seven days this time,

21  so, you know, we'll -- we'll do more early voting this

22  time than it possibly could be in another calendar year.

23     Q   So even with this being a -- the largest,

24  really, amount of early voting that you could have under

25  this shortened runoff period, there has still been



1   two-hour waits at early voting sites on multiple days so

2   far, correct?

3       A   Yes, because there is a high demand.

4       Q   Okay.  If the provision of SB 202 shortening

5   the early voting period -- shortening the runoff period

6   were struck down, how much time would your office need to

7   prepare for an expanded early voting window?

8       A   There would be no extra preparation.  It would

9   just go back to our regular schedule of preparation for

10  the nine-week runoff that we had previously.

11      Q   Really, the last topic I have before passing,

12  we will discuss -- and probably take a break, and I will

13  stop asking you questions and let somebody else have a

14  chance -- is the compression of the absentee ballot

15  request period in SB 202.

16          So are you familiar with the changes that

17  SB 202 made to the period in which voters can request an

18  absentee ballot?

19      A   I am.

20      Q   And what are those changes?

21      A   They cannot request it more than 78 days before

22  the election, and the deadline to request it is eleven

23  days before the election.

24      Q   And am I correct that we discussed earlier that

25  you would have preferred the deadline being seven to



1  eight days before the election?

2      A    Yes.

3      Q    How, if at all, has this shortened time period

4  for voters to request an absentee ballot affected your

5  office's operations?

6      A    So we talked about the -- the eleven days, but

7  let me talk about the 78 days.  That was a very odd

8  number that came up in the legislation.  And, you know,

9  previously, it had been 180 days before the election.  We

10 were thinking that they were going to go somewhere around

11 90, a better round number, but it was 78.  And we

12 actually approved of that shortening, maybe not all the

13 way to 78.  That's where I was thinking about 90.

14 Because when you get an application at 180 days before

15 the election, you go through all of the processing, and

16 then the voter sends you another one because they have

17 moved, or they are now going to be away from town so they

18 have another address.

19          So it's a lot of churn again.  A lot can happen

20 in 180 days.  People change jobs and take off for

21 whatever.

22          So the shortening of the time period to start

23 processing the ballots has been good, but they're -- on

24 the back end, it requires a lot of rejections if they

25 send it in too early.  So that's kind of a wash.  You



1    know, we have a lot of churn either way.

2         The part that has been difficult, though, is

3    the change of when we can start mailing the ballots, and

4    that's 22 to 28 days, I believe now, 22 to 29.  You

5    probably remember.  And we used to be able to mail them

6    out around 45 days, right, for a federal election.  And

7    so there was more -- it was more time for people to get

8    their ballots -- irregardless of the runoff; this would

9    be in the regular election -- more time for people to get

10   their ballots, turn them around, and mail them back.

11        And now we are doing advanced voting at the

12   same time we are trying to get the ballots mailed out,

13   and everybody that we could have used for mailing ballots

14   is out at voting locations, and we don't have enough

15   staff to really fully staff both operations.  So that has

16   been the more difficult timing problem with absentee

17   ballots.

18     Q   And has the moving back to eleven days before

19   the Election Day of the request period also affected that

20   at all?

21     A   Not so much.  It is good to have a deadline.

22   As I said, that was something we advocated for so that

23   there is time for us to stop processing applications and

24   concentrate on getting the last mails -- mailed ballots

25   out, and also to work on cures and rejections and that



```
 1   sort of thing.
 2          I probably initially wanted the seven or eight
 3   days.  Eleven days has not had any adverse impact on us.
 4      Q   Are you aware if it's had any adverse impact on
 5   voters?
 6      A   I've had only a couple of calls, two or three,
 7   from voters who -- who want to use the hospital
 8   provision, where in the last ten days, if they request a
 9   ballot.  So that is the exception to taking a new
10   application within those eleven days.  And so we have
11   been able to process those.
12          But again, at like in the -- in the materials
13   that we went over earlier, I was advocating for some --
14   something -- some provision to help those people who have
15   an emergency in those eleven days, and that has -- has
16   happened, and that's worked.
17      Q   Now, are you familiar with the absentee voter
18   file that the Secretary of State's office compiles?
19      A   I am.
20      Q   And do you recall there was a column that says
21   "Application Status"?
22      A   Yes.
23      Q   And that there is another one that says "Ballot
24   Status"?
25      A   Yes.
```



1        Q    And then there is one following both of those

2   that says "Status Reason"?

3        A    Right.

4        Q    Do you or your staff fill in the information

5   that -- that goes into that spreadsheet?

6        A    Yes, we enter it into eNet, the voter

7   registration system.  And there are some drop-downs in

8   the -- in the activities that you are putting in the

9   system, but most of them are "other," and then you have

10  free form.

11       Q    Do you believe that the data entered into there

12  accurately reflects the individual's application and

13  ballot status?

14            MS. LaROSS:  Objection as to form.

15            THE WITNESS:  I haven't actually done an audit

16  on those, so I'm sure there are some errors.  I wouldn't

17  say it's 100 percent.

18       Q    BY MR. ROSBOROUGH:  Do you believe there are

19  systemic problems with the data that's being entered into

20  there?

21            MS. LaROSS:  Objection as to form.

22            THE WITNESS:  I don't think there is systemic

23  issues, no.

24       Q    BY MR. ROSBOROUGH:  Okay.  Are you familiar

25  with a column that says "Provisional/Challenged"?



1       A    Yes.

2       Q    What does that mean?

3       A    That is if you send out a provisional ballot,

4  then it would be marked as that voter is challenged due

5  to some missing information, mismatched information on

6  their application, or if they are under a voter

7  challenge.

8       Q    So that would encompass both of those

9  categories; is that correct?

10      A    I believe so, yes.

11      Q    Okay.  Would it surprise you if the absentee

12  voter file for Cobb County for the 2018 general election

13  reflected that only .004 percent of applications for

14  absentee ballots were rejected?

15      A    No, because my staff did not enter rejected

16  applications then.

17      Q    Ah.  When did your staff start entering

18  rejected applications?

19      A    I would say probably 2020.  We received

20  guidance from Ryan Germany at the Secretary of State's

21  office that showing rejected in that voter file was

22  another way of notifying voters.  So instead of just

23  sending them the e-mail or the letter, that by rejecting

24  it, it was another communication device, and so we began

25  to do that, and for tracking purposes.



1      Q   So you believe you began doing that for the

2   2020 general election?

3      A   I believe so.  I think that is about the time

4   that we received that guidance.

5      Q   Would it surprise you that the amount of

6   applications rejected in Cobb County rose from .26

7   percent in 2020 to .55 percent in the 2022 general

8   election?

9      A   Then it's possible that it was later than that.

10   It may have been 2021 when we received that guidance.  I

11   don't -- I don't know that that is a statistic that is

12   relative to SB 202.  I think it was a change in

13   procedures.

14      Q   What was the change in procedures?

15      A   By entering the rejected applications instead

16   of just putting them in the file.

17      Q   Uh-huh.  If the 2020 file reflects voters with

18   rejected applications and status reasons, would that

19   change your view?

20      A   Well, I'm sure some of them are -- are in there

21   entered.  I just don't know when -- when we received that

22   guidance and when we started doing that.

23      Q   But your recollection is that you started doing

24   that shortly after you received that guidance?

25      A   Yes.



1      Q   Okay.  Okay.  You are aware, though, in 2022,

2   some of the applications rejected were rejected because

3   they were received more than -- closer than eleven days

4   to the election, including in the eight- to eleven-day

5   period?

6      A   Yes, I'm aware of that.

7          MR. WHITE:  Object to the form.

8      Q   BY MR. ROSBOROUGH:  Okay.  And you also

9   mentioned that some were rejected as being received too

10  early?

11     A   Correct.

12     Q   In the run-up to the November 2022 election, do

13  you recall an instance where your office failed to send

14  out absentee ballots to approximately 1,036 voters?

15     A   Yes, I am.

16     Q   Can you explain your understanding of how that

17  occurred?

18     A   My understanding is an employee was given the

19  flash drive that had the file that was supposed to be

20  sent out on two occasions.  The first one were those

21  issued -- there was 836 that were issued, issue dates on

22  10/13.  The employee failed to complete the task, to put

23  the flash drive into the packing machine and pack the

24  ballots and had not implemented any kind of a tracking

25  review process on the back end to make sure that had been



1  done.  And then it happened again on another day, and
2  there were the remaining on that day.
3      Q   Was October 22nd the other day?
4      A   October 22nd, yes.
5      Q   Okay.  Do you know of any other dates where a
6  similar error might have occurred?
7      A   I do not.
8      Q   To the best of your understanding, is that
9  1,036 the full universe of affected voters?
10     A   Yes.
11     Q   Are there any other errors that resulted in
12 someone not getting a ballot other than the ones you
13 mentioned?
14         MS. LaROSS:  Objection as to form.
15         THE WITNESS:  I am not aware of any other
16 errors that would have resulted in that.
17     Q   BY MR. ROSBOROUGH:  Okay.  Ultimately, the Cobb
18 board was sued because of that error; is that correct?
19     A   Yes.
20     Q   And a consent order was issued by a judge to
21 correct the situation; is that correct?
22     A   Yes.
23     Q   Do you know how many of the 1,036 voters who
24 were affected did not cast a ballot in the November 2022
25 election?



1        A    No, I do not.

2        Q    Do you have any awareness of the demographics

3    of the individuals affected by that --

4        A    No.

5        Q    -- error?

6        A    No, I don't.

7        Q    Okay.  You -- am I correct that you noted in a

8    public statement that part of the reason this error

9    happened was because many of the absentee staff have been

10   averaging 80 or more hours a week and they were

11   exhausted?

12       A    Yes.

13       Q    Do you believe that today?

14       A    Do I believe that?

15       Q    Do you continue to believe that?

16       A    Yes, it happened.

17       Q    Okay.  Do you believe that SB 202's compression

18   of the absentee ballot request period played a role in

19   that error?

20            MS. LaROSS:  Objection as to form.

21            THE WITNESS:  I don't know that I would

22   conclude that.  I mean, there were a lot of factors.  The

23   compressed time frame, you know, was difficult.  Staffing

24   problems, new staff, not having correct procedures

25   implemented.  Lots of things contributed to that.

1    Q   BY MR. ROSBOROUGH:  Do you believe that the

2    compression of the absentee ballot request period

3    contributed to the longer hours that staff were working?

4        MS. LaROSS:  Objection as to form.

5        THE WITNESS:  Yes, but that's the law, and

6    that's what we have to implement.

7    Q   BY MR. ROSBOROUGH:  Sure.  Who is Tori Silas?

8    A   She's the chairwoman for the Cobb Board of

9    Elections and Registration.

10   Q   Okay.  Are you aware that she stated, "While

11   human error was clearly a factor, I believe reduced time

12   frames for the receipt of requests for and processing of

13   absentee ballots provided under SB 202, as well as the

14   turnover in the elections office, are also significant

15   factors"?

16   A   I'm aware she said that, yes.

17   Q   Do you disagree with that statement?

18   A   No.

19   Q   When the Cobb County Superior Court issued an

20   order about the voters who had not received an absentee

21   ballot, that order was issued on the day before election

22   night, correct?

23   A   Yes.

24   Q   Okay.  And that order involved ensuring that

25   your office overnight absentee ballots to hundreds of



1  voters?

2      A   Yes.

3      Q   And am I correct that it required allowing

4  affected voters to vote by a federal right an absentee

5  ballot?

6      A   That was part of the order, yes.

7      Q   Okay.  And it also required extending the

8  ballot receipt deadline for effective voters to the

9  UOCAVA date of November 14th?

10     A   Correct.

11     Q   Okay.  And it required notifying affected

12  voters by e-mail and text, if you had that information;

13  is that correct?

14     A   We didn't text anybody.  We called if we had

15  their phone number, and we e-mailed.

16     Q   Okay.  Were you able to complete these steps

17  between November 7th and November 8th, which was Election

18  Day?

19     A   There was some of the ballots that we were not

20  able to get to UPS in time for them to be overnighted, so

21  they were hand-delivered on Election Day.

22     Q   If the portion of SB 202 condensing the

23  absentee ballot request period were struck down, what

24  actions would your office need to take to implement the

25  change?



1          MS. LaROSS:  Objection as to form.

2          THE WITNESS:  So you're saying if we go back to

3     180 days to the Friday before the election is the

4     application period?

5          Q    BY MR. ROSBOROUGH:  Correct.

6          A    We would have to change our training and our --

7     our procedures.  We would again have to deal with ballots

8     changing or applications changing in midstream.  We would

9     be issuing ballots on the Friday before the election,

10    knowing that they wouldn't make it to the voter.

11         Q    Okay.  Just give me one second.

12              I have no further questions at the this time.

13    I thank you very much for your time.  I'm gonna -- this

14    might be -- I don't know if folks want to take a break

15    now, and then I will let my colleague, Ms. Olm, resume

16    the questioning.

17         A    Okay.  Sounds fine.

18         THE VIDEOGRAPHER:  The time is 3:40 p.m., and

19    we are off the record.

20         (The deposition was at recess from 3:40 p.m. to

21    3:53 p.m.)

22         THE VIDEOGRAPHER:  The time is 3:53 p.m., and

23    we are on the record.

24    >>>

25    >>>



```
 1                          EXAMINATION
 2    BY MS. OLM:
 3         Q    Hi, Ms. Eveler.
 4         A    Hello.
 5         Q    I'm Rylee Olm with Keker, Van Nest & Peters.
 6    I'm representing Asian Americans Advancing Justice today.
 7         A    Okay.
 8         Q    I'd like to continue where my colleague left
 9    off, talking about some of the provisions of SB 202.
10              Are you familiar with the provision of SB 202
11    that prohibits government entities from sending absentee
12    ballot applications directly to voters except upon
13    request of the voter or an authorized relative?
14         A    Yes.
15         Q    During your tenure in Cobb County, has Cobb
16    County ever sent absentee ballot applications to voters
17    without requiring the voter to submit an absentee ballot
18    application?
19         A    We did one time.  This was prior to the 2020
20    primary.  We were trying to send applications to elderly
21    and disabled.  I think we did voters over 65, I believe.
22    And by the time we had made that decision and had that
23    program underway, the state had determined that they were
24    going to send an application to every voter.  So our
25    voters actually got two applications, one from the state
```

1  and one from us, if they were in that age group.

2      Q   And who made the decision to send out these

3  absentee ballot applications in Cobb County?

4      A   The staff and our board.

5      Q   And how did you decide what population to

6  target?

7      A   We were trying to target the population that

8  might be less likely to go out and vote in person during

9  the pandemic.

10      Q   And why did you decide to send out the

11  applications after even though the state was going to as

12  well?

13      A   By that time, it was too late to pull it back.

14      Q   And did you observe whether sending these

15  absentee ballot applications had any effect on absentee

16  voting?

17      A   Absentee voting was gigantic in that election;

18  and going forward in the November election, it was higher

19  than we had ever seen before.

20      Q   And what role do you think these unsolicited

21  applications played?

22      A   I think that and the pandemic, the convenience

23  of having it mailed to them created more response, and

24  the fact that it was dangerous to go vote in person

25  during that time period gave people the opportunity that



1  they maybe wouldn't have sought out on their own.

2      Q    And did you receive any feedback from voters in

3  Cobb County as to the mailing of these unsolicited

4  applications?

5      A    Well, actually, we received a lot of negative

6  feedback because we had sent two different types.  If

7  they had only received the one from the state, perhaps

8  that wouldn't have happened, but voters were confused to

9  receive more than one.  They also were probably receiving

10  them from third-party groups, and that was confusing to

11  voters.

12      Q    To your knowledge, did the county's mailing of

13  these applications result in the county sending more than

14  one ballot to any voter?

15      A    No.

16      Q    And are you aware of any voter fraud that

17  resulted from the mailing of unsolicited ballot

18  applications?

19      A    I am not aware of any.

20      Q    Did you receive any guidance from the Secretary

21  of State on mailing absentee ballot applications to

22  voters?

23      A    No.

24      Q    Do you recall how far in advance of Election

25  Day Cobb County sent these unsolicited ballot



 1  applications?

 2       A    I do not recall.

 3       Q    Did you provide any instructions or directions

 4  to voters along with the applications?

 5       A    I don't recall if we did or not.  I know we did

 6  some outreach on social media and on our website, and I

 7  believe probably in the local newspaper.

 8       Q    What languages were the -- was the outreach

 9  provided in?

10       A    English.

11       Q    Do you know how much it ultimately cost Cobb

12  County to send absentee ballot applications?

13       A    I don't.

14       Q    Okay.  I'm going to introduce this one.

15            (Deposition Exhibit 50 was marked for

16  identification.)

17       Q    BY MS. OLM:  Okay.  On the last page of this

18  exhibit --

19            MS. LaROSS:  What exhibit number is this one?

20            MS. OLM:  Sorry.  It's Exhibit 50.

21       Q    BY MS. OLM:  You can take a second to

22  familiarize yourself with it.  Do you recognize this

23  e-mail -- e-mail chain?

24       A    Not specifically, but I know there were

25  discussions of along these lines.



1        Q    Okay.  And at the last -- or the first e-mail

2   on the last page is discussing the cost for sending out

3   these voter absentee ballot applications to the

4   vulnerable population you mentioned in the June 2020

5   primary election; is that correct?

6        A    Yes.

7        Q    And it sounds like the figures were -- the

8   estimate was 87,000; is that correct?

9        A    That's what's written here, yes.

10       Q    Does that seem about accurate for how much you

11  ultimately spent?

12       A    I don't recall what the actual cost was.

13       Q    Do you recall how many voters you sent it to?

14       A    It's probably in here somewhere.  It looks like

15  on the front page, it says 129,218.

16       Q    Okay.  And does that sound correct as to how

17  many were ultimately sent --

18       A    Yeah.

19       Q    -- the application?

20       A    I'm just going by what's written here.

21       Q    Okay.

22       A    I don't have any other knowledge.

23       Q    Did Cobb County send absentee ballot

24  applications in any other elections past the June 2020

25  primaries?



1        A    No.  This is the only time we sent them.

2        Q    And why did you not send them in the

3   November 2020 election?

4        A    By then the Secretary of State had sent them,

5   and we had a big rollover list of people that had opted

6   to receive them for the whole cycle.

7        Q    What about the January 2021 runoff election?

8        A    No, we've only done it this one time.

9        Q    I'd like to introduce exhibit Bates stamped

10  52289, and that will be, let's see, Exhibit 51.

11            (Deposition Exhibit 51 was marked for

12  identification.)

13       Q    BY MS. OLM:  Feel free to take a second to

14  review it.  The -- on the last page of this e-mail, it's

15  an e-mail from David Wilkerson, and he says, "The

16  legislature has a bill that would forbid local

17  governments from sending absentee ballot applications.

18  Senate Bill 463 passed committee this morning."

19            Is that correct?

20       A    Uh-huh.

21       Q    And who is David Wilkerson?

22       A    He's a representative in the Georgia State

23  House.

24       Q    Is this the first time you heard about the

25  legislature's interest in forbidding local governments



1   from sending out absentee ballot applications?

2        A   I don't know if it was the first time.

3        Q   Did anyone ask -- do you recall if anyone asked

4   for your input on this legislation?

5        A   I don't recall that they did.  I really had no

6   opinion whatsoever on that part of the bill.

7        Q   And I'd like to introduce COBB 39710.  This is

8   Exhibit 52.

9            (Deposition Exhibit 52 was marked for

10  identification.)

11       Q   BY MS. OLM:  Do you recognize this e-mail

12  chain?

13       A   Not specifically.

14       Q   Can you read the May 14th, 2020 e-mail you sent

15  to Todd Edwards, Lynn Bailey, and Joseph Kirk?

16       A   I said, "We would like to know if the State

17  would consider sending out ballots to all voters in

18  November (not applications).  Since there is only one

19  ballot type, an application seems unnecessary.  It would

20  alleviate a lot of work for the counties and likely

21  increase turnout.

22           "We would also like to know if ballot drop

23  boxes will be continued into the future.  Are they

24  working on a permanent rule?"

25       Q   Regarding the first request you made about the



1  sending out ballots, why did you make that request?

2      A   I don't recall at the time why I made that

3  request.

4      Q   What was the state's response to this request?

5      A   I don't think I got a response.  I actually

6  don't know if I made that response to the state -- or

7  made that comment to the state at all.  They are not

8  attached to this.

9      Q   Is this something you remain in favor of,

10  sending out ballots to all voters in certain elections?

11      A   No, that was more of a reaction, I'm sure, to

12  the time that this happened, to the pandemic, and the

13  postponing of -- of the elections and the runoff being

14  delayed.

15      Q   If permitted by law, would Cobb County have

16  sent any absentee ballot applications to voters in the

17  most recent election in November 2022?

18      A   No.

19          MS. LaROSS:  Objection as to form.

20          THE WITNESS:  No.

21      Q   BY MS. OLM:  If Cobb County were to send out

22  absentee ballot applications and this provision was

23  removed, how far in advance of the election would you

24  want to send those applications?

25          MR. WHITE:  Object to the form.



1          MS. LaROSS:  Object as to form.

2          THE WITNESS:  We wouldn't be sending

3     applications.

4     Q   BY MS. OLM:  Okay.  Are you familiar with the

5     SB 202 provision that fines private groups who send out

6     duplicate requests for absentee ballots?

7     A   Yes.

8     Q   What's your understanding of that provision?

9     A   That if they do, that they have to make sure

10    they haven't already voted, and there has to be a

11    disclaimer on the application indicating who it's from

12    and that they cannot be prefilled.

13    Q   Do you recall when you first heard of

14    legislative efforts to fine private groups who send out

15    duplicate requests?

16    A   During --

17         MS. LaROSS:  Objection as to form.  Excuse me.

18         THE WITNESS:  That's all right.  During the

19    legislative session, that came up.

20    Q   BY MS. OLM:  Do you recall who these proposals

21    were made by?

22    A   I do not.

23    Q   During your tenure in Cobb County, has there

24    been an increase in private groups sending unsolicited

25    absentee ballot applications?



1      A   Until SB 202, yes.  But not now.

2      Q   In the 2020 election cycle, is that when you

3   would say the increase was in absentee ballot --

4   third-party absentee ballot applications?

5      A   They started predominantly in 2018 to be a

6   popular thing, and then increased in 2020.

7      Q   And do you know what share of applications that

8   you received from voters originated from third-party

9   groups in 2018 or 2020?

10     A   I didn't do any statistical analysis.  I know

11  that they often came in the form of small postcards that

12  were returned and were extremely difficult to deal with.

13  We had to copy them onto 8 and a half by 11 pieces of

14  paper so that they would not get lost.

15         So we -- we were not unhappy when the change

16  took place.

17     Q   Are you aware of any voter fraud in Cobb County

18  that resulted from private groups sending absentee ballot

19  applications?

20     A   I don't know of any.

21     Q   I'd like to go back to -- yeah, I'd like to go

22  to Exhibit 36.  On the second page, towards the bottom --

23     A   Yes.

24     Q   -- in response to the question, "How should the

25  state regulate unsolicited absentee ballots being sent to



1   voters?  Should they be allowed at all?  If so, how

2   should they be marked to identify the center -- sender?"

3        You responded, "I think you must mean

4   applications.  I think they should be allowed with

5   identification that they are not sent from state/county

6   government and the form should be the same as the state

7   form."

8        Is that correct?

9   A   Yes.

10  Q   Is that still your opinion?

11  A   Again, our problem with the third-party

12  applications was that they came in all different sizes

13  and they were all different formats, so I don't -- I

14  don't really have an opinion as to whether they should be

15  allowed or not; but if they are allowed, they should be

16  on the same form.  And that basically is what was

17  implemented.

18  Q   When you say "that basically is what was

19  implemented," what do you mean by that?

20  A   In the SB 202, there is a uniform application

21  now that is the state form, and then the -- the

22  additional identifier that says it's from a third party,

23  which that, to me, was not something I really had an

24  opinion on, whether it had an identifier or not.

25       My issue was the different sizes and formats of



1  the forms that we were receiving.  So if it came from

2  another third party, we wanted it to be on the same

3  format.

4       Q   So to the extent that there was a burden on

5  your office on the nonstandardized --

6       A   Yes.

7       Q   -- sizing, that provision of SB 202 resolves

8  your concerns related to third-party absentee ballot

9  applications?

10      A   Yes.

11      Q   Okay.  I'd like to turn back to Exhibit 44.

12 And if you could turn to page 3 of the chart.

13      A   Uh-huh.

14      Q   Towards the bottom there's a -- the third

15 column says, "Third party applications can only be mailed

16 to those who have not already requested a ballot or

17 voted.  Must compare mailing list to absentee voter file.

18 Any group in violation can be fined $100 per duplicate

19 application."

20          Is that correct?

21      A   That's correct.

22      Q   And can you read what you wrote in response to

23 this provision?

24      A   I wrote, "Neutral - that this doesn't affect

25 our office, but it is a significant burden to advocacy



 1  groups.  We do not intend to track duplicate applications

 2  to enforce this fine."

 3       Q    What did you mean by your statement that it

 4  would be a significant burden to advocacy groups?

 5       A    Because they would have to check the absentee

 6  voter file before they provided their mailing list to a

 7  vendor to send that information out.

 8       Q    Have you heard from advocacy groups concerning

 9  this provision?

10       A    No.

11       Q    And you also stated, "We do not intend to track

12  duplicate applications to enforce this fine."

13            Can you explain what you meant by this?

14       A    The code was saying that there would be a fine

15  of $100 per duplicate application, and the only way that

16  anybody would know that there was a duplicate application

17  is if a voter complained that they received two

18  applications; or if they filled out two applications,

19  then we tracked that we got one from one type of form and

20  another from another advocacy group.  We didn't intend to

21  be in the business of making that kind of a track and

22  reporting it to the SEB.

23       Q    Since SB 202 has passed, has Cobb County

24  tracked duplicate applications to enforce this fine?

25       A    We don't track that they came from different



1   original vendors or groups, but we do get duplicate

2   applications from a single voter who forgets that they

3   applied already, because maybe they applied at the 78th

4   day and now it's the 30th day and they want to apply

5   again.  So we have that kind of information, but that's

6   not -- not exactly what this is.

7        Q   So is there a record of when an absentee -- a

8   voter sends in more than one application?

9        A   Yes, but we don't record where that disclaimer

10  came from, you know, that this one came from New Georgia

11  Project, and this one came from the Democratic Party, and

12  this one came from the Republican Party.  We don't have

13  that kind of tracking.

14       Q   Have you received any comments or feedback

15  regarding Cobb County's decision not to track that

16  information?

17       A   No.

18       Q   Okay.  On this same page, above the one we were

19  just -- provision we were just looking at, there is a

20  provision that says, "Any applications sent by a third

21  party must be the SOS form with a disclaimer that it is

22  not provided by the government and not a ballot.  Must

23  identify the distributing entity."

24           Is that correct?

25       A   Yes.



 1      Q   And can you read what you wrote in response to
 2  that?
 3      A   I wrote, "Positive - Applications sent by third
 4  parties confuse and alarm voters, who then contact our
 5  office.  They often think the form -- the mailing is from
 6  us."
 7      Q   Okay.  And do you think that this provision of
 8  SB 202 would adequately address concerns about voter
 9  confusion from third-party applications?
10      A   I would say that the phone calls and
11  communications have decreased.  I don't know if it's
12  because the third-party groups have stopped mailings or
13  if the disclaimer has educated voters on this.  I don't
14  know.
15      Q   And do you provide absentee by mail
16  applications in a language other than English?
17      A   No.
18      Q   Do you have anyone on staff that provides
19  assistance in a language other than English for people
20  who need -- need assistance with applications?
21      A   Yes, we do.
22      Q   We've talked about this a little bit, but are
23  you familiar with the provision of SB 202 that added an
24  additional ID requirement for absentee by mail ballot
25  applications?

 1       A   Are you talking about the driver's license or

 2   state ID --

 3       Q   Yes.

 4       A   -- number?

 5           Yes, I am aware of that.

 6       Q   Do you recall when you first heard of

 7   legislative efforts to add this ID requirement?

 8           MS. LaROSS:  Objection as to form.

 9           THE WITNESS:  I don't recall when I first heard

10   about it, no.

11       Q   BY MS. OLM:  Before SB 202, when you received a

12   request for an absentee by mail ballot, what did you do

13   to verify the voter's identity?

14       A   We would verify the signature against the

15   signature on file.

16       Q   Is that the only identification point you

17   relied on?

18       A   The other information on the application had to

19   match the voter registration, as well.

20       Q   And before SB 202 passed, what did you do if

21   you were unable to verify the identity of the person who

22   submitted the request?

23       A   I don't actually recall.  I'm sorry.

24       Q   Before SB 202 passed, were you aware of any

25   absentee by mail ballot applications in Cobb County that



1  were submitted fraudulently?

2      A    I'm not aware of it, no.

3      Q    Okay.  Turning back to Exhibit 44, again on

4  page 3 of the chart, about midway down, the column

5  states -- the third column states, "Applications must

6  include voter name, date of birth, address as registered,

7  address for ballot mailing, and GA DL number or GA state

8  ID number.  If voter affirms he/she has no ID number,

9  shall include a copy of ID listed in 21-2-417(c).

10  Applications shall also include the election or primary

11  and Oath."

12          Is that correct?

13      A    Yes.

14      Q    And can you read what you responded to that?

15      A    "Negative - Does not allow voters to attach

16  other forms of ID such as government employee cards,

17  passports, military, tribal IDs, or voter ID cards used

18  for voting in-person."

19          That actually was my misunderstanding of that

20  provision.

21          "If no state DL number or state ID number, the

22  voter must offer a copy of current utility bill, bank

23  statement, government check or other government document.

24  We anticipate having to notify voters of more rejected

25  applications."



1        Again, that whole assessment on my part was

2   incorrect.

3        Q    Okay.  And having the correct assessment, would

4   you still say that you anticipated having to notify

5   voters of more rejected applications?

6        A    No, because the code section they -- they

7   quoted, 21-2-417(c), I understood that to be just the

8   additional for IDs for first-time voters, which would be

9   the utility bill, government check, that sort of thing.

10        But the way it was eventually explained to me,

11   is that the whole 21-2-417, including the four, would be

12   allowable.  So the military ID, the passport, they could

13   all be provided.

14        Q    Okay.  Turning back to the new verification

15   requirements that we talked about earlier, before SB 202

16   passed, were you in favor of changing the rules regarding

17   verification of the identity of a person who submits an

18   absentee by mail ballot application?

19        A    It really didn't matter to me either way.  We

20   just wanted clear rules of what to check.  Signature

21   verification is subjective, and we were always being

22   challenged as far as how do we train people on signature

23   verification.  How are they -- you know, how are they

24   determining whether it's a good signature or a bad

25   signature?  What resources are we using as far as



1    these, the one that is the master signature that we are

2    comparing it against?  Signatures change over time.

3           So that had its drawbacks, as well, and so

4    having a more objective number to -- to compare to was

5    somewhat easier to implement.  But workers still have

6    some issues about, you know, what do we do if the

7    registration address is different, that they put down a

8    different address?  Well, that's not a rejectable field

9    if it doesn't match.

10          So there is still questions about how to

11   implement the new -- the new rules.

12   Q    Okay.  And the new voter ID requirements

13   include that a -- the applicant include their date of

14   birth; is that correct?

15   A    Yes.

16   Q    And do you review the date of birth to assess

17   voter qualifications?

18   A    We compare the date of birth on the application

19   with the date of birth on their registration record.

20   Q    Okay.  But you do not -- you are not looking at

21   the date of birth to determine whether a voter is

22   qualified to vote; is that correct?

23          MS. LaROSS:  Objection as to form.

24   Q    BY MS. OLM:  Beyond the verification?

25   A    I'm not sure I understand what your question



1   is.

2        Q    Okay.  We can scratch -- strike that.

3             Where do you go to check the information the

4   voter provided when you are verifying?

5        A    We go to eNet, which is the voter registration

6   system, and that has their registration record.

7        Q    Is there anywhere else you ever look at?

8        A    No.

9        Q    Do you have access to the driver's license

10  database?

11       A    We do in the -- in the active registering

12  voters, or in implementing their or investigating their

13  provisional ballot, we might look into the driver

14  services records to see if they -- they really did submit

15  an application to register as part of their driver's

16  license, but it's not a regular part of our -- our work

17  process flow.

18       Q    When you do check eNet, do you have access to

19  information about registered voters statewide or just

20  those who are registered in your county?

21       A    We do have statewide database, but we don't

22  really have a reason to look up voters in other counties.

23       Q    If a registered voter had moved between

24  counties and submitted an absentee ballot application,

25  would you be able to check that person's driver's license



 1  if the eNet showed them as residing in a different

 2  county?

 3      A   Yes.

 4      Q   Okay.  Turning back to Exhibit 44, on page 4 of

 5  the chart, the top one, top column says, "If the

 6  information on the application does not match, we send a

 7  provisional ballot and cure affidavit.  If it is not

 8  completed or not signed, we ask for more information or a

 9  signed oath."

10          Can you read what you wrote in response to

11  that?

12      A   I wrote, "Negative - There will be more

13  communication necessary to get all the correct

14  documentation and cure the provisional ballots."

15      Q   Can you explain what you meant by that?

16      A   At this time, we understood that we would have

17  to contact the voter to get complete information on an

18  application that didn't have all of the fields filled.

19  Since that time, we've been told we can reject it as

20  incomplete and notify the voter that they need to submit

21  a new application.

22      Q   And is that the process that Cobb County does?

23      A   Yes, if there is incomplete information on the

24  application.

25      Q   Okay.  And can you explain the process for



1   rejecting an absentee ballot application request?  We

2   talked about it a little bit earlier.

3        A    Yeah.  So if the application is incomplete,

4   then it is -- or if there is an electronic signature, no

5   signature, if there's missing information, the

6   application is rejected and the voter is sent a new

7   application to complete.

8        Q    In what language is this information provided?

9        A    English.

10        Q    And if you receive an application for an

11   absentee ballot outside of the allowed time period, do

12   you notify the voter of that?

13        A    It is rejected, and then they're sent a new

14   application with information about the time frame.

15        Q    And how long after an application is rejected

16   is a voter typically given notice?

17        A    We have three days to respond and give notice.

18        Q    And all of those notices are provided in

19   English?

20        A    Yes.

21        Q    And there is no other languages the notices are

22   provided in?

23        A    Not in our county, no.

24        Q    Are you aware of certain voters who might not

25   have access to their driver's license or Georgia



1   identification card?

2           MR. WHITE:  Object to the form.

3           THE WITNESS:  I don't know of anyone in

4   particular.

5       Q   BY MS. OLM:  Are you aware of certain

6   demographic groups that might have less access to a

7   license or identification card?

8           MS. LaROSS:  Objection as to form.

9           THE WITNESS:  I am not aware of any group, no.

10      Q   BY MS. OLM:  How would someone without access

11  to an ID card vote absentee?

12      A   Okay.  So you are talking about the Social

13  Security card?

14      Q   Without access to a -- sorry, let me rephrase.

15          How would someone without access to a Georgia

16  state driver's license or Georgia identification card

17  vote absentee?

18      A   So they have to provide -- they have to state

19  that they don't have either of those documents, and they

20  provide the last four digits of their Social Security

21  number, along with their birth date.

22      Q   And is that before SB 202?

23      A   No, that's with SB 202.

24      Q   Are you aware that SB 202 -- under SB 202, you

25  are not permitted to use the last four digits of the



1   Social Security number?

2         MS. LaROSS:  Objection as to form.

3         THE WITNESS:  For?

4      Q   BY MS. OLM:  For absentee ballot application.

5      A   Okay.  Maybe I'm thinking of the ballot itself.

6   I don't recall then what's on the application.

7      Q   Okay.  If the new ID requirements for

8   requesting an absentee by mail ballot were lifted and we

9   went back to the pre SB 202 universe where you relied on

10  signature match, how long would it take your office to

11  undertake any changes?

12        MS. LaROSS:  Objection as to form.

13        THE WITNESS:  I can't answer that.  I don't

14  know.

15     Q   BY MS. OLM:  Okay.  Turning to the return of

16  absentee ballots themselves, are you familiar with

17  SB 202's new requirement that absentee ballots include

18  voter identification information on the outside of the

19  envelope?

20     A   Yes.

21     Q   What's your understanding of that requirement?

22     A   The requirement is that the ID number be there,

23  state ID number, the birth date, the oath has to be

24  signed, and if there is no state ID number, then the last

25  four digits of the Social Security number.



1    Q   Okay.  If I refer to these requirements as the

2   envelope ID requirements, do you understand what I'm

3   referencing?

4    A   Yes.

5    Q   Do you recall when you first heard of

6   legislative efforts to add envelope ID requirements?

7    A   When I first heard about it, I thought it was

8   on the outside of the envelope, and that didn't seem like

9   it would be possible to do.  And then it was talked about

10  as inside the envelope, and then how would we open it to

11  verify it.  So it was later in the game when the flap

12  envelope was suggested.  Then it made more -- a little

13  more sense.

14   Q   In what ways does the requirement not make

15  sense to you?

16   A   Again, because I didn't understand how the

17  envelope was going to change.

18   Q   Okay.  And what was your understanding of what

19  was motivating the desire to add these envelope ID

20  requirements?

21   A   I can't --

22       MS. LaROSS:  Objection as to form.

23       THE WITNESS:  -- speculate as to that.

24   Q   BY MS. OLM:  And when you talked about there

25  being concerns of it going inside the envelope, what were



1    those concerns?

2        A    Because you have to validate it before you can

3    open it, and if the information is inside the envelope --

4    there was talk at one time about putting the copy of the

5    ID inside the envelope.

6        Q    Okay.  And why do you need to verify it before

7    you open it?

8        A    That's the law.

9        Q    Okay.  Okay.  Looking back at Exhibit 44.

10       A    Uh-huh.

11       Q    On page 5, towards the bottom, the third

12   column, the second from the bottom reads, "If the voter

13   failed to sign the oath, the voter has failed to provide

14   required information, or if the information on the

15   envelope does not match, the ballot shall be rejected.

16   The voter will be notified and can cure the rejected

17   ballot."

18           Can you read what you wrote in response to

19   that?

20       A    "Negative - There will be more communication

21   necessary to get all the correct documentation and we

22   will be sending out more cure affidavits."

23       Q    Can you explain what you meant by that?

24       A    We had been sending out cure affidavits for

25   signature mismatches, and we had very few of those, so we



1  anticipated that it would increase the number of cures

2  that would be necessary.

3       Q   Did the number increase since SB 202 has been

4  enacted?

5       A   I don't have those statistics.

6       Q   Based on your experience, do you believe there

7  has been an increase?

8       A   I haven't looked at that.  I don't know.

9       Q   And if the envelope ID requirements were

10  lifted, would your office need to undertake any changes

11  to make that change effective?

12       A   We would have to change our procedures.

13       Q   And what -- how -- what would be involved in

14  that change?

15       A   I would have to see what the new requirement

16  would be.

17       Q   If it was lifted to pre SB 202?

18       A   Then we would have to go back to our old

19  procedures.

20       Q   And how long would it take to implement that

21  change?

22       A   I don't know.

23       Q   Okay.  We've now talked about absentee voting

24  for a bit, and you've answered a few questions on it.

25            Have you heard concerns from Cobb County voters



1  about SB 202's limits on absentee voting?

2      A   I don't -- I mean, I get a lot of conversations

3  and comments and feedback and complaints and compliments.

4  I -- I can't tell you if they were specific to that or

5  not.  I don't -- I don't know how to answer that.

6      Q   In terms of SB 202's provisions that relate to

7  absentee voting in particular, do you recall any

8  conversations you've had with voters about those

9  provisions?

10     A   No, I don't.

11     Q   Would you agree that certain provisions of

12 SB 202 may lead to more rejections of absentee ballot

13 applications or ballots based on typographical or

14 spelling errors?

15         MS. LaROSS:  Objection as to form.

16         THE WITNESS:  The rejections are on missing

17 information, mostly.  So the voter has not completed the

18 information that's required.

19     Q   BY MS. OLM:  Because you issue provisional

20 ballots if it's --

21     A   If it's mismatched.

22     Q   Do you agree that the SB 202 may lead to more

23 provisional ballots being issued based on typographical

24 or spelling errors?

25     A   I don't know if it's based on spelling errors



1   or typographical information or if the voter's

2   information actually has changed and what they are

3   writing is correct.  They just haven't changed their

4   voter registration.

5       Q   Okay.  Let's turn to COBB 53918.  This will be

6   Exhibit 53.

7           (Deposition Exhibit 53 was marked for

8   identification.)

9       Q   BY MS. OLM:  Do you recognize this e-mail

10  chain?

11      A   Yes.

12      Q   Can you explain what it is?

13      A   It looks like the Secretary of State's office

14  was inviting questions about the new law, and these were

15  my -- my questions that I submitted.

16      Q   And you are submitting these to C. Harvey.  Who

17  is that?

18      A   Chris Harvey, the former elections director.

19      Q   And did you have these questions answered?

20      A   He -- I don't -- I don't see an answer.  It may

21  have been in some future webinar.  I don't know.

22      Q   Okay.  Let's look at another document called

23  058913.  This will be Exhibit 54.

24          (Deposition Exhibit 54 was marked for

25  identification.)



1      Q   BY MS. OLM:  Do you recognize this e-mail and

2   its attachment?

3      A   Not specifically, no.

4      Q   Do you agree you are on the list of people who

5   received this e-mail?

6      A   Yes.

7      Q   Okay.  Can you read the first paragraph of the

8   e-mail from Ms. Bailey?

9      A   She says, "I received the attached document

10  this morning from the State.  It is an outline of the

11  code sections that they have identified as needing a

12  clarifying Rule from -- for the changes made in SB 202.

13  They fully expect that they could have missed something

14  important or have not quite hit the nail on the head, so

15  any input that we can give them will be valuable to them,

16  and most importantly, to us."

17     Q   And do you recall receiving this e-mail?

18     A   Not specifically, no.

19     Q   Do you recognize the provisions that are

20  discussed in the e-mail as ones that needed

21  clarification?

22     A   It's just an e-mail.  I don't have any

23  recollection of it.

24     Q   The chart that was attached to the e-mail, do

25  you agree that that's laying out the different provisions



1  of SB 202 that Ms. Bailey was referring to as needing

2  clarification?

3      A    This is what was provided to her by the state,

4  it sounds like.

5      Q    And would you consider this a large number of

6  code sections that needed clarification?

7      A    There are -- when there is a big election bill

8  like this one or when the -- the previous large bill that

9  implemented the new state's voting system, there are

10  always a lot of rules that need to be written to clarify

11  code sections.

12     Q    Okay.  Okay.  Turning away from this, I'd like

13  to just talk a little bit about voters with limited

14  English proficiency.

15     A    Uh-huh.

16     Q    And then I will turn it -- then we can take a

17  break, if that's okay with you?

18     A    Sure.

19     Q    Okay.  Great.  I may refer to the limited

20  English proficiency voters as LEP voters.  Is that --

21     A    Okay.

22     Q    Would you understand that?

23     A    Yes.

24     Q    Okay.  Are you familiar with the needs of

25  voters with limited English proficiency?



1      A   Yes.

2      Q   Can you explain your understanding of the

3  challenges LEP voters face?

4      A   Just not understanding the English language.

5      Q   And have you been made aware of language access

6  barriers to voting?

7          MR. WHITE:  Object to the form.

8          THE WITNESS:  I have discussed language

9  assistance with several groups that have contacted me,

10  and we've -- we implemented a sample ballot in Korean and

11  Spanish one election.  I can't remember which one it was.

12  But we don't have a program for language assistance other

13  than a hotline.  We do provide a hotline number for a

14  group that does translation at our Election Day polls and

15  advanced voting polls, but we don't have a program for

16  translation of materials into other languages.

17      Q   BY MS. OLM:  And you mentioned Korean and

18  Spanish.  Are there any other language groups that you

19  are aware of that require assistance in Cobb County?

20      A   I am not aware of any particular groups at all,

21  but DeKalb had already translated the ballot, and it was

22  a ballot -- I think it was the January 5, 2021.  It was

23  the same ballot as ours.  Everybody had the same ballot,

24  so we used their translation.

25      Q   And are you aware of the disparities in voter



1  registration for LEP voters?

2      A   I am not.

3      Q   Okay.  Is the Korean and Spanish ballot you

4  provided for the January 2021 runoff, is that the only

5  time you have provided a ballot in a language other than

6  English?

7      A   Yes.

8      Q   And do you provide any notifications of polling

9  location changes in a language other than English?

10     A   No.

11     Q   How would a limited English proficiency voter

12 learn of a change in polling locations in Cobb County?

13     A   They would have to have the English translated

14 if they couldn't understand the English.

15     Q   Other than providing access to the flier about

16 the translation hotline, does Cobb County provide any

17 other in-person language assistance at the polls during

18 early voting or on election day?

19     A   We do have employees that speak Spanish, and

20 there is a Chinese-speaking employee as well, and so we

21 could translate.  They could call us from the poll.

22 Generally, that doesn't happen.  They -- if there is a

23 need, there's usually a family member that they bring

24 along with them.

25     Q   How would a voter be aware of this availability



 1  of Spanish- and Chinese-speaking employees?

 2       A   The voter wouldn't be aware, but the poll

 3  workers would be aware that they could call if they need

 4  to.

 5       Q   Does Cobb County guarantee bilingual poll

 6  workers in any language?

 7       A   No.  We recruit asking what languages they

 8  speak, and we have records of that in our database, but

 9  we don't specifically put people in areas based on their

10  language proficiency.

11       Q   How did SB 202 change the -- any language

12  assistance Cobb County was offering?

13       A   It did not.

14       Q   Are you aware of the provision of SB 202 that

15  requires voter assisters to sign an oath?

16       A   Yes.

17       Q   What's your understanding of this requirement?

18       A   My understanding is whenever anybody had

19  assisted a voter at any time, they had to sign an oath.

20  If there was a provision in SB 202 that changed that, I

21  am not specifically aware of that.

22       Q   Does your understanding of the oath requirement

23  as it's worded in SB 202, does it preclude voter

24  assisters from helping on the hotline for people who are

25  casting their ballot in person?



1        A    I don't believe so.

2        Q    So you don't have any issue with people getting

3   assistance over the hotline even if they are not able to

4   sign the oath?

5        A    Right.  They are just translating.

6        Q    Okay.

7        A    They are not assisting with the voting of the

8   ballot.

9        Q    Okay.  So you view the translation of the

10  ballot as separate from the assistance?

11       A    The translation assistance is more in the

12  conversation with the poll worker.

13       Q    Uh-huh.

14       A    Or with the assister that is actually assisting

15  the voter.

16       Q    Has Cobb County conducted any voter outreach or

17  education related to SB 202 in non-English languages?

18       A    No.

19       Q    And as we discussed earlier, rejection notices

20  or notices to cure are only provided in English; is that

21  correct?

22       A    That's correct.

23            MS. OLM:  That is all the questions I have.

24            Do we want to do a break briefly and then

25  switch it over?  I think we can go off the record.



```
 1              THE VIDEOGRAPHER:  The time is 4:48 p.m., and
 2    we are off the record.
 3              (The deposition was at recess from 4:48 p.m. to
 4    5:01 p.m.)
 5              THE VIDEOGRAPHER:  The time is 5:01 p.m., and
 6    we are on the record.
 7
 8                          EXAMINATION
 9    BY MS. O'CONNOR:
10       Q   Hi, Ms. Eveler.  My name is Eileen O'Connor.  I
11    represent the United States.  I will try to be as
12    efficient as possible here.
13              I have a few follow-up questions from your
14    testimony earlier.  Do you know -- you mentioned that
15    Cobb County has piloted these cellular poll pads?
16       A   Yes.
17       Q   Is that right?
18       A   Uh-huh.
19       Q   Do you know if any other counties in Georgia
20    have used those?
21       A   There were 18 counties all together.  We were
22    the largest of those 18 that did the pilot.
23       Q   Do you know some of those 18?
24       A   I don't have that off the top of my head,
25    sorry.
```



1        Q    Do you have any documentation that would have

2    those counties listed in them somewhere?

3        A    I do, yes.

4        Q    If requested, would you be able to provide that

5    documentation?

6        A    I would.

7        Q    At the beginning of your testimony, I believe

8    you also said that you reviewed documents in order to

9    prepare for this testimony, that indicated how SB 202

10   would affect us.  Is that accurate?

11       A    Yes.

12       Q    Have all of those documents been provided to

13   your counsel in this case to produce?

14       A    One of them was the chart that we were going

15   through.  There were several versions of that chart.  I

16   think they probably got them all.

17       Q    And other than that chart, were there other

18   documents you reviewed?

19       A    That was the documents that I reviewed prior to

20   this morning's hearing.

21       Q    You also mentioned earlier that a few members

22   of the General Assembly have contacted you in the past to

23   seek your expertise on voting; is that accurate?

24       A    Yes.  More likely to just ask me if what they

25   want is going to affect me or how it's going to affect



```
 1    me, not so much asking my advice.

 2        Q   Can you recall who those members of the General

 3    Assembly were who contacted you?

 4        A   I receive communication quite often from David

 5    Wilkerson, Erick Allen, and Ed Setzler.  Those are the

 6    primary ones that contact me.  Teri Anulewicz sometimes.

 7        Q   Are those members of the General Assembly all

 8    part of the Cobb County delegation?

 9        A   Yes.

10        Q   Do those four members of the General Assembly

11    tend to contact you every legislative session about

12    election-related issues?

13        A   No, just when there's a question that maybe a

14    constituent has asked them about, and then they want to

15    find out, you know, how -- what the process is that we

16    use for that particular scenario.  There is something in

17    these documents from Kay Kirkpatrick, so that's another

18    one as well.

19        Q   She's also a member of the Cobb County

20    delegation?

21        A   Yes.  Uh-huh.

22        Q   I want to go back in time to the 2020 election

23    cycle.

24        A   Uh-huh.

25        Q   During the 2020 election cycle, do you recall
```



1  discussing any potential or proposed changes to Georgia

2  election law with any members of the Georgia General

3  Assembly?

4      A    Probably not so much at that time.  It's

5  usually during the session that they ask questions or ask

6  my comment on certain things.  And that was a crazy time

7  during that session, so I think they -- they left the

8  Capitol.  They shut it down.

9      Q    In the -- you mean in the January --

10     A    Yeah.

11     Q    -- to March, suspended --

12     A    Sometime in there --

13     Q    -- then to June?

14     A    -- they had a suspended session.

15     Q    Right.

16     A    Yeah.

17     Q    So then let's switch to the 2021 legislative

18  session.

19     A    Uh-huh.

20     Q    Were you contacted by a member of the Georgia

21  General Assembly or their staff about a potential or

22  proposed change to Georgia election law during that

23  legislative session?

24     A    I don't know if they contacted me.  I know I

25  was advocating for changes in bills, as I have said





1   earlier today, and contacting my delegation with my

2   thoughts.  So I think there were times when they would

3   respond.  I'm not sure they initiated much at that time.

4        Q   And when you say that you contacted members of

5   the General Assembly to advocate for changes, do the

6   e-mails that have -- that you have already discussed

7   today cover those communications?

8        A   They appear to, yes.

9        Q   Would you ever -- would you have called any

10  members of the General Assembly --

11       A   No.

12       Q   -- to discuss potential changes?

13       A   Yeah, I don't -- I don't normally reach out by

14  phone.

15       Q   Did you have any in-person meetings with

16  members of the General Assembly during the 2021

17  legislative session about potential changes to the

18  election code?

19       A   I do not recall.  I have in the past, but I

20  don't know if it was that -- that session or not.

21       Q   I want to ask more generally about how you and

22  others in the Cobb County government communicate with

23  members of the General Assembly.

24           Does Cobb County have a legislative lobbyist?

25       A   They do.  It's the deputy county manager.



```
 1       Q    Is that Jimmy Gisi?

 2       A    Jimmy Gisi, uh-huh.

 3       Q    And did he hold that position during the 2021

 4  legislative session?

 5       A    I believe that was Dr. Jackie McMorris at that

 6  time.  She's now the county manager, and Mr. Gisi is the

 7  deputy.

 8       Q    Just to -- because this isn't a memory test,

 9  let's mark this.

10            MS. O'CONNOR:  What number are we on now?

11            MR. GARABADU:  55.

12            MS. O'CONNOR:  55.

13            (Deposition Exhibit 55 was marked for

14  identification.)

15       Q    BY MS. O'CONNOR:  I am handing you what's been

16  marked Exhibit 55, which is Bates labeled COBB 23240

17  through 23242.  Let me know when you've had a chance to

18  take a look at it.

19       A    Uh-huh.  Yes, go ahead.

20       Q    So this is an e-mail to Jimmy Gisi?

21       A    Gisi.

22       Q    Gisi?

23       A    Uh-huh.

24       Q    From January 30th, 2021, with the subject

25  matter, "SB 26 Assigned."  And the e-mail below is from
```



1  Engagifii.  Can you tell me what Engagifii is?

2      A   It's a software application that the county

3  uses to track legislation, and they assign it to the

4  various county departments that it affects.  And so it

5  sends me an e-mail saying that I've been assigned to a

6  bill and gives me the summary, and then I can go into the

7  system and read the bill itself.

8          And then we're supposed to -- to notate whether

9  we oppose or approve or if we are neutral on it.  And

10  then, as in this case, I had put "negotiating," because

11  that was another option, thinking that the bill was going

12  to be changing and that there were parts that were good

13  and parts that were bad, so that was still an unknown to

14  me at that time.

15      Q   And what's your understanding of what, if

16  anything, would happen with the feedback you provide in

17  this system?

18      A   It's just used so that Jimmy can lobby at the

19  Capitol and have some information from the county

20  departments as to how that would affect our operations.

21      Q   When you indicate that you are negotiating

22  this, or whatever status you assign to it, do you also

23  include notes?

24      A   Yes, in some cases.  Within the system, the

25  Engagifii system, it has a place for notes.



1    Q   And those notes would still be there now in the

2  system?

3    A   I don't know if it's saved that long.  It's not

4  something that I am the owner of.

5    Q   And what's your understanding of what Mr. --

6  let me start over.

7        When you provide feedback on bills that are

8  assigned to you, is it your understanding that Mr. Gisi

9  then communicates your views to members of the General

10  Assembly?

11    A   I don't think in all cases he does.  I think

12  it's just to give him information if he's -- for the

13  county leadership to determine if it's something they

14  want to go forward to lobby.  In -- in my case for

15  elections, they usually defer to either me or my board or

16  the Secretary of State to lobby for what elections needs.

17        The county lobbyist is more -- deals with

18  things that affect the bottom line for the county, so

19  they are looking more for things that are unfunded

20  mandates or are new programs that the county has to fund.

21  And that's primarily what they are looking for, but I

22  respond to them anyway as to how we see the bill.

23    Q   So is it accurate to say that Cobb County's

24  views on election-related legislation would be -- if they

25  are communicated to the General Assembly, would go



 1   through you?

 2       A    Primarily --

 3            MR. WHITE:  Object to the form.

 4            THE WITNESS:  Primarily, yes.

 5       Q    BY MS. O'CONNOR:  You can set that aside.

 6            You mentioned earlier today that you know Todd

 7   Edwards?

 8       A    Uh-huh.

 9       Q    Who is -- what is his position at the

10   Association of County Commissioners?

11       A    My understanding is he's their lobbyist.

12       Q    Do you recall having text message exchanges

13   with Mr. Edwards in February of 2021?

14       A    I don't specifically recall that, no.

15       Q    This is not a memory test.  I will show you the

16   text messages.  Just to explain to everyone here, in

17   response to a subpoena for documents to Todd Edwards in

18   this case, Mr. Edwards produced, among other documents, a

19   large Excel file of all responsive text messages, and

20   those documents have been -- that Mr. Edwards produced to

21   the United States have been provided to all the parties

22   in this case.

23            The Excel file with the text messages that I am

24   going to show you in a moment was produced with the Bates

25   label USA-EDWARDS-208.  That document contained thousands



 1  of text messages, so I have filtered them for text

 2  exchanges only between Ms. Eveler and Mr. Edwards, but I

 3  provide that Bates label so you can go back and look at

 4  the original document.

 5          So this is going to be marked Exhibit 56.

 6          (Deposition Exhibit 56 was marked for

 7  identification.)

 8          MR. WHITE:  Just the one?  Or how many pages is

 9  it?

10          MS. O'CONNOR:  It's three pages.  Did I hand

11  you one that hasn't been stapled?

12          MR. WHITE:  Yes.

13          MS. LaROSS:  Maybe the back.

14          MR. WHITE:  There's one set that's not stapled.

15          MS. O'CONNOR:  Sorry about that.

16          MR. WHITE:  How about if I do that?

17          MS. O'CONNOR:  Yeah, it's one page front and

18  back, and then another page front.

19          MS. LaROSS:  Is there an e-mail on the back of

20  it?

21          MS. O'CONNOR:  No, that's -- what is that?

22  That was just something on Daniel's.

23          MR. WHITE:  Oh, yes.  That's me picking up

24  documents and trying to sort this out.

25          MS. O'CONNOR:  That's all right.  Sorry about



1  that.  I thought these had been stapled.

2      Q   BY MS. O'CONNOR:  Let me know when you've had a

3  chance to review these.

4      A   Yes, I have reviewed.

5      Q   So you can see the first page of text messages,

6  and going to the first entry on the second page --

7      A   Okay.

8      Q   -- are texts from February 18th, 2021; is that

9  correct?

10      A   It appears to be.

11      Q   And just you can read to yourself, down to the

12  entry that says, "I am pissed off."

13      A   Right.

14      Q   Is it correct that you were watching the Senate

15  ethics committee testimony while you were having this

16  text message exchange?

17      A   It would appear so.

18      Q   And can you explain why you liked Mr. Edwards'

19  text, "I am pissed off"?

20      A   I thought it was funny.

21      Q   What was your understanding of what he was

22  pissed off about?

23      A   Something that was going on in the session, but

24  I don't know what it was.

25      Q   And a few entries below, you wrote, "They are



1  confused about SB 184.  They think it will do something

2  for absentee, but has nothing to do with that."

3          Do you remember what you meant there?

4      A   I don't even remember what 184 was.

5      Q   Let me show you something that hopefully can

6  refresh your memory --

7      A   Okay.

8      Q   -- on that.

9          (Deposition Exhibit 57 was marked for

10  identification.)

11     Q   BY MS. O'CONNOR:  I'm going to hand you what's

12  been marked Exhibit 57.  Let me know when you've had a

13  chance to review it.

14     A   I have read the summary, but I am not sure what

15  this actually was.  It doesn't help me remember what --

16  what I thought of it at the time.

17     Q   You can set that aside.

18         I want to ask a few more questions about the

19  legislative session in 2021 and the input that you

20  provided to members of the General Assembly.

21     A   Okay.

22     Q   First, just generally, I think you've already

23  testified today that in the years that you've been the

24  director of Cobb County elections, you have monitored

25  election-related bills as they are going through the



1    General Assembly; is that accurate?

2         A    Yes.

3         Q    And so about how many years have you been

4    monitoring this process?

5         A    Well, I started in 2010 as being the director,

6    so for 12 years.

7         Q    And do you recall how many election bills were

8    considered during the 2021 legislative session?

9         A    There were quite a number of them.  I don't

10   have a count, but from both sides of the assembly there

11   were quite a few bills.

12        Q    Was it more than usual in the years that you've

13   monitored election-related bills in the General Assembly?

14        A    I would say yes.

15        Q    And why do you think so many election bills

16   were introduced during the 2021 legislative session?

17        A    Well, I think probably there are a lot of

18   legislators that had, you know, single issues that they

19   were trying to resolve from what they witnessed in the

20   2020 election cycle, and then there were others that

21   wanted a more comprehensive bill, and so they did roll

22   some of those smaller bills into -- into the large one

23   eventually.

24        Q    I am going to show you another e-mail.  This

25   will be Exhibit 58, which goes from COBB 33465 through



1   COBB 33471.

2          (Deposition Exhibit 58 was marked for

3   identification.)

4       Q   BY MS. O'CONNOR:  Let me know when you've had a

5   chance to review it.

6       A   Okay.  Go ahead.

7       Q   And I want to draw your attention to the e-mail

8   you sent on the second page of this document.  On

9   Thursday, March 18 at 2:57 p.m., you said, "Thanks

10  Tonnie.  As fast as I can read one, they have a new one."

11         What did you mean by that?

12      A   They -- they were introducing new legislation

13  quickly, and as soon as we would get a copy of one, there

14  would be a change and there would be a new version.  So

15  it -- it was a lot of different bills and a lot of

16  changes to the bills that were moving very fast through

17  the -- through the session.

18      Q   And in the years that you've monitored

19  election-related legislation in the General Assembly,

20  that was typical that it would be hard to keep up?

21      A   I think there are times when it -- it did move

22  fast and there were a lot of versions, but there were so

23  many small bills that were also changing, and then the

24  large group, you know, grouped bill, conglomerate bill,

25  that also had many different versions.



1           It appeared that sometimes that they would be

2     discussing in one of the sessions a version that hadn't

3     been posted on the -- on the website yet, so we were

4     listening to comments about things we didn't have a copy

5     of yet.  So I think that was unusual.

6           Q   It was --

7           A   Not typical.

8           Q   -- unusual not to be able to find on the

9     website --

10          A   Right.

11          Q   -- what was being discussed in committee?

12          A   Right.

13          Q   You can set that aside.

14          A   Uh-huh.

15          Q   I would like you to find Exhibit 27, please, in

16    front of you.

17          A   Okay.

18          Q   And you testified earlier, I think, that you

19    hadn't seen this report previously but that you recalled

20    watching the December 3rd hearing.

21          A   I believe that --

22          Q   Is that accurate?

23          A   -- some of the things that I read in here

24    briefly as I was skimming it seem familiar, but I don't

25    recall having this document before.  But I think I did



1  see some of the testimony.

2      Q   Why did you watch that hearing?

3      A   Oh, I always try and watch the committee

4  hearings when this is going on, so -- so you know, you

5  know, as it's happening, what the discussion is.  And

6  that that was just -- you can see on some of the other

7  documents, are you listening?  Do you have the audio?

8  You know, so we're all watching it.

9      Q   And did you watch the whole hearing; do you

10  remember?

11     A   I don't recall, no.

12     Q   Did you watch the other election-related

13  hearings held in the General Assembly during December of

14  2020?

15     A   I think I probably watched most of them, yeah.

16     Q   Do you recall anything unusual about this

17  December 3rd hearing compared to other election-related

18  hearings you have observed?

19     A   I remember that there was a lot of -- and I

20  don't know if it was this hearing or not, actually, but

21  what caught my eye in here is the discussion of pristine

22  ballots and the discussion of testimony from a poll

23  worker at the State Farm Arena, all of the -- all of the

24  discussion of ballots being hidden during the -- the

25  counting of the ballot.  So I think some of that



1   testimony was in this -- this hearing, and that's what

2   caught my eye on reading this.

3       Q    Can you explain why that particular section

4   caught your eye?

5       A    It just -- it was familiar, and I recall

6   hearing that on this -- on the audio video recording.

7       Q    Did that -- do you recall hearing that because

8   it was unusual?

9       A    No.  I mean, the whole thing was unusual,

10  honestly.  But the reason I said I think I probably

11  listened to this is because when I opened this and I

12  heard and I read, you know, suitcases full of ballots,

13  pristine ballots, this was all a pretty familiar theme

14  during testimony of this subcommittee.  And there was a

15  lot of -- you know, there was a video of the State Farm

16  Arena, and there were people that testified to what they

17  witnessed during the audit, that there were ballots that

18  didn't appear to be real ballots.  So it was just an

19  ongoing theme of doubters.

20      Q    You can set that aside now.

21      A    Okay.

22      Q    Going back to the time period mid to late

23  February of 2021, I want to ask you a few questions about

24  your February 19th testimony before the Special Election

25  Integrity Committee.



1      A    Okay.

2      Q    Do you recall testifying in front of the House

3  Special Election Integrity Committee about H Bill 531 on

4  February 19, 2021?

5      A    Yes.

6      Q    I am going to hand you an exhibit that has

7  already been marked as Plaintiff's Deposition Exhibit 16.

8  This exhibit goes from COBB 23443 to COBB 23492.

9          Let me know when you've had a chance to review

10  it.

11     A    I'm not going to review the whole thing, but

12  there's no bill number on it.  Do you know what bill it

13  was?

14     Q    This is a draft of HB 531.

15     A    531, okay.

16     Q    So you can see on here, this e-mail from Ryan

17  Germany to you and Lynn Bailey and Nancy Boren says, "Can

18  I discuss with you guys at 9 to give an introduction?

19  Barry Fleming asked us for our input on this one."

20          Do you recall if this was the first time you

21  received a draft of HB 531?

22     A    I don't recall.  I don't know if this was the

23  first time seeing this or this was a later version of it.

24  I don't know.

25     Q    Do you recall meeting, probably by phone or



1    virtually --

2         A    Yeah.

3         Q    -- with Ryan Germany to discuss this?

4         A    I don't.  There were lots of discussions

5    between election officials, and Mr. Germany was trying to

6    feed us legislation and get our input on lots of

7    different bills that were coming out.  So I don't

8    remember any specific meeting on this one.

9         Q    I'm going to hand you what's been previously

10   marked as Deposition Exhibit 17, which goes from COBB

11   23493 to COBB 23542.

12        A    Okay.  Go ahead.

13        Q    So this e-mail looks like was sent a few hours

14   after the e-mail we just reviewed asking, "Can I discuss

15   with you guys at 9 to give an introduction."

16        A    Okay.

17        Q    And it starts with Brian Germany saying,

18   "Thanks for y'all's time and input this morning."

19             Is it accurate that this was sent after you had

20   a meeting with Ryan Germany?

21        A    Apparently so, yes.

22        Q    Do you recall if Nancy Boren and Lynn Bailey

23   participated in that meeting as well?

24        A    I don't recall.

25        Q    Do you recall anyone else who participated in



1  it, in that meeting?

2      A   I don't specifically recall the discussion at

3  all, but this evidence seems to suggest there was one.

4      Q   Okay.  So the second sentence of this e-mail

5  says, "I have attached a new version that incorporates

6  the changes that we had previously sent to Jeff."

7          Do you know who Jeff is?

8      A   I think there was a legislative counsel named

9  Jeff, but I don't know his last name.

10     Q   And when Mr. Germany says, "I have attached a

11  new version that incorporates the changes that we had

12  previously sent to Jeff," do you know who "we" is?

13     A   No, I don't.

14     Q   In the third line of Mr. Germany's e-mail, it

15  begins, "The attached version was apparently dropped this

16  morning while we were talking, but Barry has stressed

17  that he realizes there are likely edits that need to be

18  made in the committee process."

19         There "Barry" is Representative Fleming, right?

20     A   I believe so, yes.

21     Q   And so it's fair to say at this point that

22  HB 531 was rapidly changing?

23     A   Yes.

24     Q   Did you have any role in drafting any of the

25  provisions that are in any of these versions of HB 531?



1     A   No, I would not be drafting legislation.  I

2  would maybe be giving input as to the impacts that

3  legislation as drafted would have on us.

4     Q   So your input would be after the legislation is

5  already drafted?

6     A   Right.  And so if these two taken together,

7  this is the version that he had at the time, what do you

8  guys think, what are your issues, what section gives you

9  pain?  Then, oh, here's a new version; it just dropped

10  this morning.  This is how it was going, fast.  And

11  the -- the things that we gave him in the 9 o'clock

12  meeting presumably aren't even in this one.  This is the

13  new version as of -- that came out as we were talking,

14  and then he's going to give our discussions to them for

15  presumably a new version, if they took our suggestions.

16         But as fast as we could make comment on what

17  was drafted, there would be something new.

18     Q   You can set that to the side.

19     A   Okay.

20     Q   I'm going to hand you another e-mail from the

21  same time period.  This was produced to us without Bates

22  labels.  Exhibit 59.

23         (Deposition Exhibit 59 was marked for

24  identification.)

25     Q   BY MS. O'CONNOR:  It starts at the top with an



 1  e-mail from Brenda Jemison to you and Beau Gunn and Gerry

 2  Miller on Friday, February 19, 2021, at 1:39 a.m.

 3          And if you flip all the way to the back, the

 4  original e-mail on this chain is the one from Ryan

 5  Germany --

 6      A   Right.

 7      Q   -- that we just reviewed that says, "I want to

 8  discuss with you guys at 9 to give an introduction."

 9          So I'd like to ask you some questions about the

10  multicolored e-mail, at the bottom --

11      A   Okay.

12      Q   -- that goes over to the second page.  Do you

13  recall sending this e-mail on Thursday, February 18, that

14  says, "Here are some explanations as Ryan Germany told

15  us"?

16      A   I don't specifically recall it, but it -- it's

17  my e-mail, so yes.

18      Q   And who are the other people on this e-mail

19  chain?

20      A   These were my division managers at the time,

21  none of whom are here anymore.

22      Q   And then looking at the multicolored e-mail

23  from Beau Gunn, is the red text what you wrote that were

24  the explanations Ryan Germany told you?

25      A   It would appear so, yes.



1    Q   Okay.  I'd like to draw your attention to the
2    line that begins, "Section 5(b)."
3    A   Okay.
4    Q   It's very close to the bottom.  It says -- and
5    I think -- so the black text, is that Beau Gunn's e-mail?
6    A   I think so.
7    Q   All right.  And then I will refer you to the
8    very top of this e-mail that says, "I have included my
9    comments below in blue."
10   A   Okay.
11   Q   So I think then the blue text in the e-mail at
12   the bottom is from --
13   A   Right.
14   Q   -- Ms. Jemison?
15   A   Yes.
16   Q   Okay.  So then you wrote what was in the red?
17   A   Right.
18   Q   Okay.  So the Section 5 question, you
19   responded, "This is directly targeted at Fulton's bus."
20       What did you mean by that?
21   A   Fulton County bought mobile voting units,
22   buses, that were outfitted as polling places, and the
23   provision in the SB 202 about that they have to be
24   buildings, polling places have to be buildings, it was my
25   impression that based on discussion in the committee



1  meetings and just hearsay that they didn't like the --

2  the idea that there was a polling place that had -- that

3  was transportable, that it could be moved to various

4  different locations with -- without structure.

5        So that part of the SB 202, I -- I felt was

6  targeted to the mobile voting unit.  Fulton -- I found

7  out later that Douglas County also had a bus, but at the

8  time everyone just knew about Fulton's.

9     Q   And when you say "they didn't like the mobile

10  voting," who do you mean by "they"?

11     A   The legislators, specifically Republican

12  legislators that were -- that were advocating for these

13  bills.

14     Q   So now we're going to go just to the next day,

15  February 19th.

16        You can set that aside.

17     A   Okay.

18        (Deposition Exhibit 60 was marked for

19  identification.)

20     Q   BY MS. O'CONNOR:  I will show you what's been

21  marked as Exhibit 60, which is COBB 32121 to 32122.

22     A   Thank you.  Yes.

23     Q   Do you recognize this e-mail?

24     A   And I'm sure, it's my e-mail, yes.

25     Q   And so is it accurate that this e-mail is Ryan



1  Germany arranging a time for you to testify?

2      A   Yes.

3      Q   Do you recall who first asked you to testify

4  before the House Special Election Integrity Committee on

5  February 19?

6      A   I don't recall who -- who did.

7      Q   Do you remember if a member of the General

8  Assembly reached out to you to seek your testimony?

9      A   I would highly doubt that.  It was probably

10 Mr. Germany, or those of us who are in this group as

11 election directors approached him to testify.  I don't

12 really remember, but it was certainly not a legislator.

13     Q   Okay.  I'd like to ask you a few questions

14 about your testimony, which I will show you because it's

15 not a --

16     A   Yes, because I don't remember that.

17     Q   -- not a memory test.  Not a memory test.

18         (Deposition Exhibit 61 was marked for

19 identification.)

20     Q   BY MS. O'CONNOR:  I am handing you what's been

21 marked Exhibit 61.

22     A   Okay.

23     Q   And the cover page is Bates labeled SOS 2742.

24 And then to save trees, this just contains your

25 testimony.



```
 1        A    Okay.

 2        Q    Which is SOS 2882 through SOS 2891.

 3        A    Okay.  Yes.

 4        Q    One of the topics that you testified about was

 5   House Bill 531's new identification requirements for

 6   mail-in absentee ballot applications; is that correct?

 7        A    Yes.

 8        Q    And I will draw your attention to page 143,

 9   lines 13 to 16.

10        A    Where's the page numbers?

11        Q    Oh, top right.

12        A    Oh, okay.

13        Q    It's also SOS 2884.

14        A    Yes.

15        Q    You testified, "The DDS ID or the last four

16   digits of the Social" -- "of the Social are already

17   stored in our e-net system, and they're already available

18   for us to use."

19             Is it your understanding that the new

20   identification requirements for requesting absentee

21   ballots allow the use of the last four digits of the

22   Social?

23        A    I don't recall that right now.  I would have to

24   look at the application.

25        Q    I can show you the code instead.  Is that --
```



1    A   Sure.

2    Q   Would that be helpful?

3    A   Sure.

4    Q   If you just pull out Exhibit 1 that's in front

5  of you, SB 202, page 38 at the bottom, line 944.

6    A   Yes.  So the application does not have the

7  Social Security number but allows for other -- copies of

8  other types of photo ID and non-photo ID as well.

9    Q   So it's accurate to say you were in favor of

10  allowing the DDS ID or the last four digits of the Social

11  for requesting an absentee ballot?

12    A   No, I think that was my misunderstanding of the

13  current bill at the time.

14    Q   Do you know if legislators ever considered

15  allowing a voter to use the last four digits of their

16  Social Security number when requesting an absentee

17  ballot?

18    A   I do not know that for sure.  Things were

19  changing very quickly.

20    Q   On the topic of drop boxes, if you want to turn

21  in your testimony to page 145.

22    A   Okay.

23    Q   At the bottom begins where you testified about

24  the drop boxes, and it continues to page 146.

25        You have already testified that you believed



1  drop boxes should not have to be located inside.  That's

2  right?

3       A   That's correct.

4       Q   And you shared that view here in your testimony

5  on February 19th; is that correct?

6       A   Correct.

7       Q   Do you recall if you had shared that opinion

8  with proponents of this bill prior to this February 19

9  hearing?

10      A   I don't recall.

11      Q   And you are aware that the committee substitute

12 version of the bill, of HB 531, limited additional drop

13 boxes to the lesser of either one drop box for every

14 100,000 active registered voters in the county or the

15 number of advanced voting locations in the county?

16      A   I'm aware of that in the -- in the final

17 SB 202.  I don't remember what it was at 531.

18      Q   Do you know why the formula based on the

19 100,000 active registered voters for determining the

20 number of drop boxes was included in SB 202?

21      A   No, I do not.

22      Q   Did you or do you know of anyone who

23 recommended that formula --

24      A   I do not.

25      Q   -- be used?



1      A    No.

2      Q    Now that SB 202 has passed, at what point in

3  time do you calculate the number of drop boxes that your

4  county could use based on the number of active registered

5  voters?

6      A    Well, we've been over 500,000 since the bill

7  has passed but not 600,000.  So we've had the five

8  additional boxes the entire time.

9      Q    If Cobb County gets, you know, 600,000 active

10 registered voters but it doesn't happen until you are in

11 advanced voting, would you then recalculate that number

12 or just stick with what happened, with what the number

13 was at the beginning of advanced voting?

14     A    That would be up to the board to decide, but I

15 would probably recommend not changing in the middle of

16 the advanced voting process.

17     Q    About a week after your February 19th

18 testimony, you sent an e-mail that you've already

19 reviewed today.  It's Exhibit 30.  If you can pull that

20 up in front of you.  I want to draw your attention to

21 paragraph 9 on the second page of this exhibit.

22     A    Uh-huh.

23     Q    This paragraph relates to your concern with

24 eliminating all provisional out of precinct; is that

25 right?



1     A    Yes.  Although, I'm reading, "Rather than

2  eliminate this entirely, there should be a way to help

3  voters who truly cannot get to their correct precinct."

4          So that's when I suggested the affidavit.

5     Q    Suggesting, yeah.  You suggested maybe we can

6  have them sign an affidavit stipulating that they cannot

7  get to their poll by 7:00 p.m.?

8     A    Uh-huh.

9     Q    Your suggestion of the affidavit doesn't

10  mention offering it only after 5:00 p.m. on Election Day,

11  does it?

12     A    No, it does not.

13     Q    But the final version of SB 202 does limit

14  out-of-precinct provisional voting to voters who signed

15  this affidavit after 5:00 p.m.; is that correct?

16     A    That's correct.

17     Q    You can put that to the side.

18          Can you get Exhibit 31 in front of you, please?

19     A    Okay.

20     Q    So the bottom of Exhibit 31 is an e-mail from

21  you to various members of the Senate.  It's -- has the

22  opening, "Chairman Burns and Committee members."  Is that

23  right?

24     A    Yes.

25          (Deposition Exhibit 62 was marked for



 1   identification.)

 2        Q    BY MS. O'CONNOR:  I'm going to show you what's

 3   now been marked as Exhibit 62, which is Bates labeled CDR

 4   62463 to 62464.

 5        A    Okay.

 6        Q    Do you recognize this e-mail?

 7        A    This appears to be the same e-mail sent to the

 8   Senate committee but now sent to the House committee.

 9        Q    And it looks like you sent this e-mail to the

10   House committee before you sent the e-mail in Exhibit 31

11   to the Senate committee; is that right?

12        A    I would have to check it again.

13             It looks to be, yes.

14        Q    Do you recall why you sent the same e-mail to

15   both groups?

16        A    Because it was a -- they were combining the

17   bills into one bill that was going to move forward, so I

18   wanted to reach both -- both the House and the Senate

19   committees.

20        Q    You can put that to the side.

21             Earlier today you were asked about trends in

22   absentee voting, and correct me if I'm wrong, but I

23   believe you said that the Democratic Party had been

24   encouraging voters to take advantage of absentee voting;

25   is that right?



1      A    Yes.   That kind of started in the 2018

2    governor's election.   The Abrams' campaign pushed

3    absentee voting more so than they had in the past.   And

4    so, like I said, prior to that it was primarily

5    Republicans that used it, really.   The results would, you

6    know, show that especially in primaries, that that was

7    the group that was using absentee mail the most.

8      Q    Do you know if there were any other groups who

9    were advocating for an increased use in absentee voting

10   other than the Democratic Party?

11     A    Well, that's -- that's what I remember from

12   that, that cycle; that we got a lot of -- again, the

13   applications that were sent out by the Abrams' campaign,

14   the Democratic Party, the small postcards that came back,

15   they said, you know, what group was -- or we knew from

16   actually receiving it in our own mails what groups were

17   sending those out, and we got a lot of those little

18   postcards.   So that's when it seemed to be a different

19   strategy of campaign than we had seen in the past.

20     Q    I have a couple of questions about processing

21   absentee ballot applications now that SB 202 has been

22   enacted.

23     A    Uh-huh.

24     Q    I believe you testified earlier -- and please

25   correct me if I am wrong -- if any information such as a



1   DDS ID number is missing from an absentee ballot

2   application, the application is rejected.  Is that right?

3        A    Correct.

4        Q    If the application does not include an ID -- if

5   an absentee ballot application does not include a

6   DDS-issued ID number but the voter has a DDS-issued ID

7   number in the eNet system that you can see, do you still

8   just reject the application?

9        A    Yes, because the -- they have to write down the

10  driver's license number that we can verify.  But what we

11  see a lot is they'll take a copy of their driver's

12  license and affix it to the application, even though they

13  have left the -- the boxes that are supposed to be

14  written in with the driver's license number, they have

15  attached a copy of their actual license, and so we are

16  not rejecting those even though they didn't actually

17  complete the field with the -- the numbers.

18       Q    And if an absentee ballot application includes

19  an ID number that doesn't match -- it includes a

20  DDS-issued ID number that does not match what's in the

21  voter's record --

22       A    Uh-huh.

23       Q    -- what do you do?

24       A    So that is a provisional ballot that's issued

25  for any mismatched information.  We issue it as a



1  provisional ballot with an application cure document.

2      Q   Does that application cure document include --

3  does that include a ballot, or is the voter just required

4  to reapply, send a new application to your office, and

5  then get the ballot back?

6      A   Yeah, they are actually mailed the ballot in a

7  regular ballot envelope, and we stamp the envelope with

8  PROV.  We have a stamp that's PROV.  So, and then the --

9  the record is notated that that voter is challenged,

10  provisional challenged.

11         And then they separately are sent the cure

12  affidavit and notified that, you know, the whatever was

13  mismatched.  I think it's actually general.  I think it

14  just says:  Information on your application did not match

15  your record on file.  Complete this with a copy of your

16  ID.  And if they send it back, the provisional challenge

17  is removed from their record, and when the ballot comes

18  back, it's treated normally.

19      Q   For voters who do not have a DDS-issued ID

20  number associated with their voter registration record,

21  is there a way for your office to add a DDS-issued ID

22  number if the voter has one?

23      A   I do not know how that's being processed.  I

24  would have to ask my staff what they are doing with that.

25      Q   And I assume the answer would be the same for



1   if the -- for a correction, if the wrong number, if, say,

2   numbers are transposed in the voter record?

3        A    Well, I do know that there have been some

4   investigations into the DDS file on some of the -- the

5   questions, the problem applications.  If there is

6   information that is incorrect in our system, I know we

7   have investigated through the DDS portal what they have

8   on record, but I don't specifically know what the final

9   process is.

10       Q    When you say you've investigated, can you

11  describe what you mean?

12       A    So we have access to the driver services

13  information and the records that they have on file, so we

14  can look back and see what driver's license number they

15  have in their system.  Maybe there was a clerical error

16  inputting it or something like that.  So we go back to

17  the source, which would be the driver services.

18       Q    And then if you find there seems to be an

19  error, like numbers transposed, you're not sure what the

20  next step is in terms of how that's processed?

21       A    Yeah, I would not want to state what that is

22  without checking further.

23       Q    If you will allow me a moment, I think I am

24  done, but I just want to make sure there is not something

25  I missed.



1            Just a couple of questions about your office.

2    How many people work in the elections division in Cobb

3    County on a permanent basis?

4        A    I have 29 full-time positions, 18 regular

5    part-time positions, and about 100 seasonal positions

6    that come and go depending on the season, not to mention

7    the poll workers and all those other temporaries.

8        Q    So the 100 seasonal workers would not include

9    poll place workers?

10       A    Right.  They're office workers.

11       Q    And what sort of tasks are those seasonal

12   workers dealing with?

13       A    So we would bring them in when we're starting

14   absentee mail processing near an election, and they also

15   staff the advanced voting locations.  They become

16   managers and assistant managers for the advanced voting

17   locations.

18            MS. O'CONNOR:  That's all I have.  Thank you.

19            Do you want to go off the record?  All right.

20   One of our fellow plaintiffs is on the Zoom --

21            THE WITNESS:  Okay.

22            MS. O'CONNOR:  -- and will ask a couple of

23   questions.

24            MR. MOCINE-McQUEEN:  Is that the cue for me?

25   This is Marcos from NGP.



1              MS. O'CONNOR:  We can hear you.

2              MR. MOCINE-McQUEEN:  Okay.  And was that the

3    cue for me to go ahead and ask --

4              MS. O'CONNOR:  Yes, go ahead.

5              MR. MOCINE-McQUEEN:  -- a couple of follow-up

6    questions?

7              MS. O'CONNOR:  Yes, yes, please go ahead.

8              MR. MOCINE-McQUEEN:  Okay.

9

10                        EXAMINATION

11   BY MR. MOCINE-McQUEEN:

12       Q   Good evening, ma'am.

13       A   Good evening.

14       Q   I didn't know if there were others besides

15   myself.  Thank you.  I think these will be a couple of

16   quick questions.

17              What is -- let me turn on my camera.  That's

18   not fair for you to not be able to see me there.

19              My first question is just, what happens with a

20   defective absentee ballot that you receive on the last

21   day for absentee ballots?

22       A   By defective, do you mean?

23       Q   I'm sorry.  I'm sorry.  I misspoke.

24              What happens to -- what do you do with the

25   defective absentee ballot applications received on the



1  last day for absentee ballot applications?

2       A    The same as every other day.  If there is

3  something that needs to be cured, then, you know, we send

4  the provisional and the cure.  If it is missing

5  information, it -- it is rejected.

6       Q    Okay.  So in that second scenario where it's

7  missing information and the deadline is that day, is

8  there going to be any opportunity for that voter to cure

9  that application?

10      A    Once it's rejected, there is no opportunity to

11  cure.  The only cures are for those that have mismatched

12  information, and the provisional ballot is sent out.

13      Q    Okay.  And you mentioned a cure period.  I just

14  want to make sure I understand that.  There is a cure

15  period for the provisional ballot itself; is that

16  correct?

17      A    Well, there are two kinds of cures.  There is

18  an application cure and a ballot cure, and the same voter

19  could actually have two cures out.

20           If their application is mismatched, they will

21  be sent a provisional ballot and an application cure.  If

22  we receive the ballot back and there is still mismatched

23  information or it's incomplete or something like that,

24  then that ballot is rejected with a ballot cure sent out.

25           If the ballot is fine but they still have not



1  cured their application, then the ballot stays.  Until we

2  get the application cure, it can't be counted.

3      Q   Okay.  Great.  And this is the last of these

4  questions, but I just want to make sure I understand

5  this.

6          If an application is missing information, and

7  so it is rejected and is received on -- on the deadline,

8  that is not something -- unless the voter happens to call

9  or happens to see some notification and has rushed to the

10 office, that is not something that they will have an

11 opportunity to cure, for example, the following day if an

12 absentee ballot application is missing information?

13     A   Right.  You are correct.  If we -- if we get --

14 have an e-mail address or a phone number on that

15 application, then we would try and contact that voter,

16 because it is the last day, and see if they can get

17 another one in that day if there is still time.

18     Q   Great.  Okay.  Thank you for clarifying that

19 for me.

20         And the other questions, couple questions I

21 have, are similarly just clarifying.

22         The date of birth that you discussed early on,

23 am I correct in understanding that it serves a different

24 function on a voter's initial registration than it does

25 on an absentee ballot application?



1        A    I don't know if I understand that question.

2        Q    Let me try to rephrase that.

3             When you receive an initial registration

4    application from a voter and it contains the date of

5    birth, how does your office use that date of birth?

6        A    Well, the record is updated, and so they -- if

7    they are a new registrant, new or transfer over from

8    another county, their registration is either created or

9    updated.  And it contains their birth date in the record.

10   So it is just --

11       Q    Okay.

12       A    -- that is the initial information that we get

13   about that voter.

14       Q    Is it used in any way to determine their --

15   their eligibility?  So, for example, to determine if they

16   are of an appropriate age?

17       A    Yes.  They can register at 17 and a half, but

18   then that record is flagged that they are not yet 18.

19   And so then it -- the flag is removed as soon as they

20   become 18.

21       Q    And so to make sure I understand correctly,

22   when the clerk receives that application, either the

23   clerk or computer does what -- what I would consider

24   higher math and calculates the age of the person; is that

25   correct?



1      A   Yes.  The system does that and flags the -- the

2   record.

3      Q   Okay.

4      A   And so it's a -- it's a very apparent flag.

5   And then as soon as it -- they become 18, the flag is

6   removed.

7      Q   Okay.  And is that same calculation performed

8   when a -- when your office processes an absentee ballot

9   application?

10      A   No, because we're comparing it to the record,

11   the registration record, which if it is flagged, then the

12   application can't proceed unless that person is going to

13   be 18, you know, for the election.

14          MR. MOCINE-McQUEEN:  Okay.  I think that is all

15   of the questions I have.  Thank you very much, ma'am.

16          THE WITNESS:  Sure.

17          MR. GARABADU:  I think the CBC and the Georgia

18   NAACP plaintiffs just indicated in the chat they have

19   some questions.

20          MR. WHITE:  How much -- what time are we at?

21          THE VIDEOGRAPHER:  So our total is -- we are at

22   6 hours and 50 minutes.  50, five zero.

23          MR. GARABADU:  It looks like in the chat

24   Georgia NAACP wants -- can go first.  Ten minutes we have

25   left.



1           MS. NWACHUKWU:  Thank you.

2           MS. LaROSS:  I also have some questions.  Would

3    you -- would you be willing to let me ask my questions as

4    well?

5           MR. WHITE:  I'm assuming you would rather just

6    get them done today.

7           But how much -- how long are we talking?

8           MS. LaROSS:  It would be short.

9           MR. WHITE:  Okay.

10          MS. LaROSS:  Maybe 10, 15 minutes.

11          THE WITNESS:  Okay.

12          MR. WHITE:  All right.

13

14                         EXAMINATION

15   BY MS. NWACHUKWU:

16     Q   I -- this is Jennifer Nwachukwu with the

17   Lawyers' Committee for Civil Rights on -- Under Law on

18   behalf of the Georgia NAACP plaintiffs.

19          Thank you so much, Ms. Eveler.  I know it has

20   been a very long day, so I will try to move as quickly as

21   I possibly can.

22          The first set of questions I had is about the

23   time frame for mailing absentee ballots.  So prior to the

24   enactment of SB 202, the time frame for mailing absentee

25   ballots to UOCAVA voters was 49 to 45 days; is that



1    right?

2        A    Correct.

3        Q    And that time period also applies to runoffs as

4    well?

5        A    Yes.

6        Q    Okay.  And under SB 202, for non-UOCAVA voters,

7    the time period is 29 to 25 days?

8        A    Yes.

9        Q    And that also applies to runoffs as well?

10       A    No.  Runoffs are as soon as possible.

11       Q    Okay.  And what does that mean, "as soon as

12   possible"?

13       A    As I testified earlier, in this runoff, we were

14   able to get the ballots mailed out beginning on the 21st,

15   which was last Monday.  Given all of the other things

16   that have to happen to get the rollover ballots prepared,

17   to create the database, create the ballots, pack the

18   ballots, that's the "as soon as possible."

19       Q    Okay.  And earlier you testified about your

20   involvement in reviewing and analyzing bills and

21   providing feedback.  To your knowledge, is there any

22   reason why there's a difference in the time frame for

23   UOCAVA voters versus non-UOCAVA voters?

24       A    The UOCAVA voters get theirs on that time frame

25   based on federal law, that requires that; and then the



 1  non-UOCAVA voters are based on the current state law.

 2      Q   Let me keep moving quickly.

 3          Ms. Eveler, has your office had challenged

 4  voters appear to vote at the polls since SB 202 was

 5  enacted?

 6      A   Not to my knowledge.

 7      Q   Okay.  Let me shift quickly to a couple of

 8  questions about absentee ID requirements.

 9          Ms. Eveler, are you familiar with what is

10  called a free voter ID?

11      A   Yes.  The voter ID card, yes.

12      Q   Yes.  And can you explain what that is?

13      A   So that's issued at all the county election

14  offices.  It's a photo ID that a voter who doesn't have a

15  driver's license can request, and it's used for voting

16  purposes only.

17      Q   And under SB 202, is it right that Georgians

18  who have the free voter ID card have to include a copy of

19  their ID with their absentee ballot application to

20  receive an absentee ballot?

21      A   If they don't have a driver's license number or

22  a state ID number, which these voters would not, then

23  they are allowed to provide a copy of whatever other --

24  copy of whatever other ID that they use, that they can

25  use for voting.  And there's a list of -- of various



1  other forms.  Presumably, they don't have any of those

2  other photo IDs, which is why they got the voter ID, and

3  that would be able to be copied and put on the

4  application.

5     Q   And to your knowledge, why aren't voters who

6  have the free voter ID allowed to use that ID to apply

7  for an absentee ballot without providing a copy of their

8  application, compared to voters who have their driver's

9  license?

10         MR. WHITE:  Object to the form.

11         THE WITNESS:  I'm not sure I understand the

12  question.

13     Q   BY MS. NWACHUKWU:  Let me try to rephrase that.

14         To the best of your knowledge, do you know why

15  voters who have the free voter ID card are -- are able to

16  use that ID to apply for an absentee ballot, but other

17  voters who have the driver's license or Georgia state ID

18  do not have to provide a copy of that identification with

19  their absentee ballot application?

20     A   That's my understanding of how the law is

21  written, that they can provide the number of those two

22  things, the driver's license number or the state ID

23  number; or if they don't have those two numbers, then

24  they have to provide a copy of whatever other ID is in

25  21-2-417.  That would also be available to use at a



1   in-person polling location if they didn't have a driver's

2   license or a state ID.

3       Q   Okay.  And then also with respect to absentee

4   ID requirements, what happens if there is a voter that

5   does not have a Social Security number to include on

6   their absentee ballot application?

7       A   Actually, the Social Security number, as was

8   corrected in the testimony here, is used on the ballot

9   itself, not the application.  So the voters that don't

10  have a driver's license number or state ID number on

11  their ballot, they can write their birth date and their

12  last four of their Social Security number.

13      Q   Okay.  And a couple of other quick questions

14  about out-of-precinct provisional ballots.

15          First, does Cobb County keep track in any way

16  of the voters who go to the wrong polling location before

17  5:00 p.m., and if they stay at that polling location or

18  if they go to the correct polling location?

19      A   No, we do not.

20      Q   And does Cobb County keep track in any way of

21  the voters who go to the wrong polling location after

22  5:00 p.m. and cannot get to their proper polling location

23  on time?

24      A   Yes.  That is tracked, because they will vote a

25  provisional out-of-precinct ballot, presumably, if they



1  agree to that, and we do keep track of the various types

2  of provisional ballots, and we do have to provide that

3  tracking to the Secretary of State's office.

4      Q   And what -- what format would that be in, the

5  tracking of the provisional ballots --

6      A   So --

7      Q   -- as provided to the Secretary of State's

8  office?

9      A   There is a report that they ask us to complete.

10  They keep changing the format, so I can't really answer

11  the format.

12     Q   Okay.  And you said that this -- these are

13  records that you provide to the Secretary of State's

14  office?

15     A   Yes.

16     Q   Okay.  Would this be reflected at all in the

17  poll pad?

18     A   No.

19         MS. NWACHUKWU:  Okay.  I believe those are all

20  of the questions I have.  Thank you so much for your

21  time.

22         THE WITNESS:  You're welcome.

23  >>>

24  >>>

25  >>>



```
 1                        EXAMINATION
 2   BY MR. UNGER:
 3       Q   All right.  I know our time is limited, so I
 4   will try to be as expeditious as I can.
 5            Ms. Eveler, good evening.  My name is Jess
 6   Unger.  I am an attorney at Advancement Project.  I
 7   represent the Concerned Black Clergy plaintiffs in this
 8   action.
 9            You mentioned earlier in your testimony that
10   the majority of people with a disability in Cobb County
11   that you are aware of use absentee voting or early
12   voting; is that right?
13            MR. WHITE:  Object to the form.
14            THE WITNESS:  I don't have any statistics to
15   that, but I know there are a large number of people who
16   are on our rollover list and vote absentee mail over and
17   over again throughout the cycle.  And then -- excuse
18   me -- going by the numbers of voters that we are seeing
19   just in our early voting location here at the main office
20   that we have dedicated to helping elderly and disabled
21   voters, it's quite popular.  So I know there are quite a
22   few that vote that way as well.
23       Q   BY MR. UNGER:  Is it -- so is it fair to say
24   that between your own observations and the observations
25   of your staff, that you've -- you've come to be familiar
```



1   with and the -- the rollover list information, that you

2   have some familiarity with the voting patterns of people

3   with disabilities in Cobb County?

4        A   Yes.

5        Q   And for those voters returning their absentee

6   ballots to a drop box, based on that familiarity that you

7   have, would voters with disabilities find it easier to

8   return their ballot to an outdoor drop box as opposed to

9   an indoor drop box?

10       A   I really can't speculate on people's

11  disabilities and what might be easy or hard for them.

12       Q   From your own perspective, exactly how are

13  indoor drop boxes different from outdoor drop boxes?

14       A   They are not different at all.  They are just

15  in an indoor location, and you would have to walk to it

16  or use a wheelchair or whatever method to get inside the

17  polling location to drop it off.

18       Q   Thank you.

19           And Ms. Eveler, you also mentioned earlier in

20  your testimony today that you observed some voter

21  confusion with indoor box -- indoor drop boxes, not --

22  not among exclusively voters with disabilities, but among

23  voters generally.  Can you describe -- is that right?

24       A   Yes.  There is some confusion because there is

25  two different activities happening at the same time.



1  There is -- early voting is going on.  People are lined

2  up to process the early voting voters, and then there are

3  other people coming in with their ballots.  And it's sort

4  of a cross flow of -- of people for different purposes.

5      Q   Okay.  In that cross flow, can you describe the

6  process for voters who are arriving to -- to drop off a

7  ballot that they have completed at a drop box and see,

8  you know, a long line outside the early voting site,

9  what's the process for them to navigate this?

10     A   So we try to have poll workers out monitoring

11  the line and assisting people who are walking up to

12  either enter the line or to go to direct them to where

13  the door is so that they can go in with their ballot.

14  They do look for people who are walking up with the

15  yellow envelopes, that they can say, oh, are you here to

16  drop off a ballot?  Just go right in.  But it's -- they

17  need assistance to know where to go.

18     Q   And that assistance that voters need to help --

19  help navigate the physical space at the early voting

20  site, is that currently only being provided by poll

21  workers who may be stationed outside the facility?

22     A   Yes.

23     Q   There is no -- if a poll worker is called away

24  or unable to -- to be outside, there is no signage?

25     A   We have signage here at our main office



1   location, but the satellite early voting locations don't

2   really have signage similar to what we have here.

3        Q    Okay.  And is it ever the case that there are

4   multiple lines, a line for voters to drop off at a drop

5   box, and a line for voters to vote in person?

6        A    The voters dropping off their ballots, it's

7   usually just two or three people that might arrive at the

8   same time, so there might be a very short line to drop

9   off.

10       Q    Got it.

11            Is it possible that a voter could join a wrong

12  line and become frustrated, leave without reaching a drop

13  box?

14            MS. LaROSS:  Objection as to form.

15            THE WITNESS:  Yeah, I don't have any complaints

16  about that.  I suppose it's possible, but I haven't heard

17  anything happening like that.

18       Q    BY MR. UNGER:  Okay.  Thank you.

19            Shifting gears a little bit, you talked a

20  little bit earlier about how Cobb County decides where to

21  site early voting locations.  In that consideration

22  process of where to place early voting locations and the

23  satellites specifically, is proximity to nursing homes or

24  assisted living facilities a factor?

25       A    No, it's not.



1     Q   The same for Election Day polling places.  Is

2  considering where to site Election Day polling places, is

3  proximity to nursing homes or assisted living facilities

4  a factor?

5     A   No, it's not.

6     Q   Okay.  I believe I heard you mention earlier in

7  your testimony that the Department of Justice, the ADA,

8  did a compliance review of Cobb County's election

9  procedures; is that right?

10     A   That's correct.

11     Q   Did that review process produce any

12  recommendations for changes in the way that Cobb County

13  is administering its elections?

14     A   There were some recommendations.  There were

15  several polling places that had deficiencies that we were

16  ordered to correct, but the documents that we produced as

17  far as how we manage our compliance and what we are

18  taking our information from in order to be compliant was

19  acceptable to the department.

20     Q   Okay.  Around that same time, did Cobb County

21  make any other changes in its election administration

22  processes to better accommodate voters with disabilities?

23     A   No, I don't think we made any administrative

24  changes.  We did have to make some corrections at some

25  particular facilities that they found deficiencies with.



1      Q   Okay.  Thank you.

2      A   Uh-huh.

3      Q   One question on mail ballots, and then I will

4  transition to my last topic.

5          Isn't it true that before the enactment of

6  SB 202, the time frame for sending absentee ballots out

7  to non-UOCAVA and also UOCAVA voters was the same time

8  frame, that 49- to 45-day time frame?

9      A   Yes, that's my recollection.

10     Q   Okay.  And is it right that in SB 202, the

11 legislature shortened the time only for non-UOCAVA

12 voters?

13     A   That's true.

14     Q   Okay.  From -- based on your experience as an

15 election administrator in Cobb County, is it -- would it

16 be beneficial for -- from an election administration

17 standpoint to have the same ballot issue deadline for all

18 voters instead of a bifurcated schedule?

19     A   In my opinion, yes.  But that's, again, just my

20 opinion.  I think compressing the mailing in the 29 to 25

21 days, that that time frame is very difficult to get the

22 ballots out in enough time for the voters to vote them

23 and get them back.

24     Q   Okay.  I'm going to move on to my last topic,

25 and hopefully, we'll get you out of here before it's



 1  tomorrow.

 2          I have a few questions about the provisions in

 3  SB 202 that relate to the State Election Board.  Are you

 4  familiar with those provisions?

 5      A   Yes.

 6      Q   Specifically, are you familiar with the change

 7  in the role of the Secretary of State on the State

 8  Election Board?

 9      A   Yes, I am.

10      Q   Are you aware that the -- the bill changes the

11  secretary from chair of the board to an ex officio

12  member, nonvoting?

13      A   Yes, I am.

14      Q   In your view, was that change necessary to

15  improve the functioning of the State Election Board?

16      A   I don't have an opinion on that.

17      Q   Can you describe the ways that -- I'm sorry,

18  changing gears to the other -- another provision relating

19  to the State Election Board.

20          Are you familiar with the sections 6 and 7 of

21  SB 202 which affect the supervision and performance

22  review of county election supervisors by the State

23  Election Board?

24      A   Yes.

25      Q   Can you describe, from your experience as an



1  election administrator, whether, or if at all, staffing

2  levels or staff experience or fatigue can impact a number

3  of mistakes any county might make during its

4  administration of an election cycle?

5      A   I think those factors would affect almost

6  everybody in their performance of their job, so yes.

7      Q   And can you -- can you tell me if prior to the

8  adoption of SB 202, whether in your opinion as an -- as

9  election administrator and an expert on election

10  administration, there was ever a need to change the

11  disciplinary procedures for election supervisors in

12  Georgia?

13          MS. LaROSS:  Objection as to form.

14          THE WITNESS:  The discipline that's in SB 202

15  is related not to election supervisors but to election

16  superintendents.

17      Q   BY MR. UNGER:  Thank you.

18          In your view, prior to SB 202, was there a need

19  to change the available -- supervision and discipline

20  mechanisms available applying to election

21  superintendents?

22      A   I don't know if there was or wasn't.  As far as

23  I know, the State Election Board had authority to review

24  performance and create sanctions on problems that they --

25  that they perceive were going on at various county



 1  levels.  So I think that what was implemented was just

 2  another way of assessment.

 3      Q   And Ms. Eveler, are you familiar with the

 4  provision in SB 202 which -- by which the State Election

 5  Board may suspend an election superintendent and replace

 6  them with a different individual?

 7      A   Yes.

 8      Q   During the consideration of SB 202 and its

 9  predecessors in the legislature, did you express an

10  opinion about that, that provision, when it was being

11  considered to the legislature?

12      A   I believe my opinion, whether it was expressed

13  to the legislature or not, but at the time, I felt that

14  replacing, say in our case, a five-member bipartisan

15  board with an individual appointed was a risky way to

16  handle it and not the best way to run an election office

17  with a single person in the governing body.

18      Q   What makes it risky?

19      A   I think having a board of individuals who have

20  different perspectives and have to vote in a majority is

21  a safer way to make decisions for elections than to put

22  one person in charge.  That's, again, just my opinion.

23      Q   Okay.  Are you aware that the standard for this

24  suspension under SB 202 is, by clear and convincing

25  evidence, that the county or municipal superintendent has



1    for at least two elections within a two-year period

2    demonstrated nonfeasance, malfeasance, or gross

3    negligence of the administration of an election?

4        A    That sounds familiar.

5        Q    As a professional election administrator and

6    based on your years of experience running an election

7    office, what is your understanding of what might

8    constitute nonfeasance, malfeasance, or gross negligence

9    in the administration of elections?

10       A    I really don't know.  That would be up to the

11   State Election Board, I would think, to determine how

12   they define that.

13           MR. WHITE:  Hey, Jess?

14       Q    BY MR UNGER:  Is it fair to say that as of

15   today, it's unclear to you what those terms, nonfeasance,

16   malfeasance, and gross negligence mean in the election

17   administration context?

18       A    It is unclear to me.

19           MR. WHITE:  Jess, I want to jump in.  It's

20   6:40, and we are now kind of well past the seven-hour

21   limit for the -- at least for the plaintiffs that called

22   this.

23           Just as a courtesy to the State, I wanted to

24   give the State counsel a chance to just ask a few

25   questions, but, I mean, I've got to -- I've got to at



1   some point cut it off here for Janine's sake and for the

2   reporter and the videographer.

3            MR. UNGER:  That's -- that's totally all right,

4   and thanks for the -- thanks for the time check.  Is that

5   Mr. White?

6            MR. WHITE:  Yes, it's Daniel.

7            MR. UNGER:  Thank you.  I -- how about I ask --

8   I've got about three more questions, is that all right,

9   and then we can -- we can transition?

10            MR. WHITE:  Sure, that's fine.  Yeah, as long

11   as they are not -- as long it doesn't lead down another

12   rabbit hole.

13            MR. UNGER:  Yes, sir.

14       Q   BY MR. UNGER:  Ms. Eveler, is it your

15   understanding that the SEB could initiate a review, a

16   performance review under this -- this bill, if your

17   office or the local board ignored a policy or a directive

18   or an OEB, for example, issued by the secretary?

19       A   Yeah, I don't know if that's true or not.

20       Q   Okay.  Do you believe your office is free to

21   ignore advice or policies or directives coming from the

22   SEB or the secretary?

23       A   No.

24       Q   Okay.  If these provisions of SB 202 were

25   overturned, the -- the SEB-related provisions that we've



1   been discussing just now, what would a county office --

2   county election office like yours need to undertake to

3   implement and make the -- that change effective?

4        A   We are used to the law changing or court orders

5   changing our procedures.  We will just do whatever is the

6   current -- the current law.

7        Q   Would a change to these SEB provisions in

8   SB 202 require additional training for county election

9   workers?

10       A   Yes, of course.

11       Q   How much training?  How -- how far in advance

12  of the election would you need to carry out that

13  training?

14       A   We conduct training of poll workers six weeks

15  before the election.

16            MR. UNGER:  Okay.  Thank you so much.  I have

17  no further questions, and I appreciate your time.

18            THE WITNESS:  Sure.

19

20                     EXAMINATION

21  BY MS. LaROSS:

22       Q   Thank you, Ms. Eveler.  I so appreciate your

23  time, and I know it's been a long day, and not to mention

24  the fact that you are running a runoff election as we

25  speak, so -- and we very much appreciate your service to



1  the state and elections.

2        A    Thank you.

3        Q    And I'm going to be as quick as I possibly can.

4             So just a couple of general questions.  So Cobb

5  County received absentee ballots -- I think you testified

6  to this earlier -- received absentee ballots at multiple

7  locations the weekend before November 2022, the general

8  election.  Is that correct?

9        A    Yes.

10       Q    And the drop box limitations didn't prevent

11  your office from taking that action, did it?

12       A    No.

13       Q    And you'd agree that the legislature did accept

14  some of your recommendations on elections or changing the

15  election law and for election legislation; is that right?

16       A    Yes.  They -- they did take some of our

17  recommendations.

18       Q    And, in fact, some of those recommendations

19  actually made it into the final version of SB 202?

20       A    I think so.  I don't honestly --

21       Q    As far as you know.  I know you are tired.

22  Okay.  Fair enough.

23             And then I wanted to also ask you, so I know

24  that you've been working in elections in Cobb County, I

25  think you said since 2008; is that right?



```
 1        A    2004 is my first year.

 2        Q    Oh, 2004.  Excuse me.  Sorry about that.

 3        A    That's okay.

 4        Q    Okay.  So since that time, Georgia has had

 5   four-week runoffs before in all elections, correct?

 6        A    Yes.  The state runoff was four weeks, but

 7   federal runoffs were nine weeks.

 8        Q    Okay.  And did -- do you know when the state

 9   runoffs, the four-week runoffs ended or when that time

10   period changed?

11        A    That would be with the -- well, actually --

12   excuse me, my stomach.  The 2020, the December 2020 state

13   runoff was combined with the January 5th, 2021 runoff --

14        Q    Right.

15        A    -- federal runoff.  That was done kind of on an

16   emergency measure at the time.  And then with SB 202,

17   that -- that changed it in the code.

18        Q    Okay.  So during the time when Georgia had

19   four-week runoffs in the state elections, as you

20   mentioned, did your office -- were you able to conduct

21   four-week runoffs without significant problem?

22        A    No.  They -- they're always around the

23   holidays, right, and because they happen from the general

24   election to the state's general runoff.  Because the

25   primary runoff was always nine weeks.  That was not a
```



1  four-week runoff.

2          So, in other words, they combined the state and

3  federal runoffs for the primary but not for the

4  November general to the general runoff.

5      Q   Are you referring to 2020, the 2020 cycle --

6      A   No.

7      Q   -- when those were combined?  That happened --

8      A   Yeah, it's been --

9      Q   -- also happened before?

10     A   It's been several cycles now where the -- the

11 May primary, there was -- there's not a state runoff at

12 four weeks.  Both state and federal runoffs were at nine

13 weeks.  So that's been for quite a few cycles now, and I

14 think that was related to a court -- court case that

15 changed that.

16         And then the general election and general

17 runoff, that's where we had a four-week and then a

18 nine-week.  And it's always been difficult to -- to

19 conduct the state runoff in four weeks.

20     Q   Do you feel that in the past, though, Cobb

21 County has been successful in conducting the runoff in

22 four weeks?

23     A   I would say yes, but it's been long hours and a

24 lot of hard work, and we would advocate for more time

25 than four weeks.



1      Q    Okay.  And I've noticed coming in and out of

2   the office today with the election workers here and the

3   election, the runoff going on, it -- it appears to be

4   running smoothly.  Does -- is --

5           MS. O'CONNOR:  Objection to form.

6      Q    BY MS. LaROSS:  Is -- is -- would you -- would

7   you say that it's running smoothly, that advanced voting

8   thus far is running smoothly for the runoff?

9      A    Yes, advanced voting is running smoothly.

10     Q    And you mentioned, also, that there is some

11  wait times in advanced voting during the runoff for --

12  there was two-hour wait times at certain places.

13          There were also locations where there was very

14  little wait times, too, correct?

15     A    Yes.

16     Q    So it wouldn't be completely off the charts

17  that when I voted this morning, it was -- it took less

18  then a few minutes?

19          MR. GARABADU:  Objection to form.

20          MS. O'CONNOR:  Objection to form.

21     Q    BY MS. LaROSS:  But that wouldn't be unusual if

22  someone had an experience of voting in this advanced

23  voting period that you are running now, the senatorial

24  runoff, that there was virtually no wait time?

25     A    Correct.  I mean, there is varying wait time



1    depending on the demand from the voters, and there are

2    busy times and not as busy times.  There are busier

3    locations than others.

4           Why people don't leave a busy location and go

5    to a not busy location, I don't know.  We do post the

6    wait times on our website, but they have their favorites.

7        Q   You've mentioned here that at this location,

8    voting location, and there is an area that's designated

9    for elderly and disabled voters, for them to come in and

10   cast their ballots; is that right?

11       A   Yes.

12       Q   And how long has Cobb County had that area

13   designated for those particular voters?

14       A   Just since we moved our operations to this

15   building, and the November election was the first

16   election that we conducted here.

17       Q   So this past November 2022 election was the

18   first time that you had the area that we've described?

19       A   Yes.

20       Q   And I think you mentioned that it's popular

21   amongst those groups?

22       A   Yes.

23       Q   It's worked out well, in your opinion?

24       A   It has.  And it's an area that gives them

25   seated voting units, and we've made sure that there is



1  room for wheelchairs to navigate the units, and they can

2  take longer, as they usually do.  It's just a more

3  comfortable environment for not being pressured with

4  other people waiting for them.

5          They could still go to the other line.  We are

6  not preventing anybody from going to any line if they

7  want to, but it's just something that has been well

8  received.

9     Q   I'm going to ask you about -- you testified

10  already about some complaints that you received from

11  voters, and I'm going to ask you a few questions about

12  those as quickly as I can.

13    A   Sure.

14    Q   So just when a voter has a complaint about

15  their experience in voting in general, what is the Cobb

16  County's procedure once a complaint of that nature comes

17  into the office?

18    A   Usually someone will either try and resolve it

19  with the voter, say they'll write it down and give it to

20  a manager.  Sometimes I get the staff's written

21  description of the complaint with a callback number.

22  Sometimes they -- that's not good enough, and they really

23  want to speak to me, so they pass the message on to me,

24  and I sometimes just get the phone call transferred.

25  I'll also get e-mails that come in through our general

1   e-mail line or to me personally with a description of

2   what's -- what the problem is.

3       Q   Okay.  So some complaints then can be handled

4   by poll workers or someone initially, if the voter

5   complains to them, and then others end up coming to your

6   desk if they are not quite satisfied with the response

7   they have received.  Is that right?

8       A   That's correct.  Yes.

9       Q   Okay.  And those complaints, are they recorded

10  or documented in any way?  Do you have a log?  Do you

11  retain written e-mails?  Is there any way that you all

12  might track the voter complaints about their experience

13  voting?

14      A   We do retain the e-mails, if they come in by

15  e-mail.  If the staff member has recorded it on a

16  complaint sheet, those are retained as well.  But phone

17  calls, you know, unless I've made notes on my notepad,

18  no.

19      Q   Right.  Okay.  So that documentation that you

20  have just described that -- and there's been documents

21  produced in this lawsuit, were those -- written

22  documentation of voter complaints, were those included in

23  the documents that you produced?

24      A   Whatever was requested, we produced.

25      Q   Okay.  So you don't recall one way or another



1  if the voter complaints were included there?

2      A   I do not.

3      Q   Okay.  And the documents that were collected,

4  were they collected by you?

5      A   I think most of the e-mail communications would

6  have been searched by keyword from our IT department, and

7  then I wouldn't have reviewed them.  They would just be

8  turned over.

9      Q   Okay.  So I'm going to ask you about some of

10  the complaints.  I think -- did you receive complaints

11  from Cobb County voters who stated that they had received

12  multiple absentee ballot applications in the mail,

13  particularly in 2020?

14      A   Yes.

15      Q   And what actions did Cobb County take in

16  response to those complaints?

17      A   Well, let me just say that they are often

18  confused and say things like, I received three ballots,

19  when they are really applications.  So finding out what

20  the real problem is can take some digging.

21          But our response is really, you know, you can

22  use one of them and throw the others away.  They're not,

23  you know, valuable in any way.  If they have your name

24  preprinted on it, you can just tear them up or shred

25  them.  You know, we always encourage them to use the



1    official form because that's easier, as I stated earlier.

2         Q   Did those complainants that were referencing

3    receipt of multiple ballot applications, did anyone

4    complain that they had a concern about voter fraud?

5         A   In some cases they did, because they were also

6    receiving applications that were preprinted with names of

7    former residents of their home, or even relatives that

8    had lived with them once and were long gone.  So their

9    concern was that somebody was sending an extra ballot or

10   somebody was going to apply for a ballot in a fraudulent

11   name.

12        Q   Let's see.  You have answered a whole bunch of

13   these questions.

14            Were there instances when voters contacted your

15   office stating that they had received an absentee ballot

16   or a ballot application, yet they stated that they had

17   already voted?

18        A   I don't recall that specific scenario.

19        Q   Okay.  And I think you testified before that

20   your office received questions about absentee ballot

21   applications received from third parties or

22   nongovernmental entities.  Do I have that correct?

23        A   Yes.

24        Q   And -- and that -- did they also report that

25   that caused them to be confused as to what to do with the



1  multiple ballots and where they came -- ballot

2  applications and where they came from?

3      A   Yes.  They -- again, they would confuse ballot

4  and application quite a bit and think that we were going

5  to be sending a ballot in all these people's names.  And

6  sometimes if they weren't regular absentee voters, they

7  didn't really understand the process of having to apply

8  for it before we are going to send you a ballot.  And so

9  their questions were related to, so all these people are

10 going to vote from my house?  I don't -- these people

11 don't live here.

12         So there was a lot of education that went on,

13 especially in 2020 when they were receiving so many

14 applications, even including our office and the Secretary

15 of State's office.  They weren't regular absentee ballot

16 voters, and we had a learning curve for a lot of those

17 people that were trying it for the first time.

18     Q   And were there instances where voters arrived

19 at a polling location in Cobb County, to your knowledge,

20 but the election records showed that the voter was

21 already issued an absentee ballot?

22     A   Yes, there -- there are records like that,

23 where they either forgot that they applied or they

24 responded to an application that was sent to them and

25 then went ahead and voted -- went to vote in person and

1  didn't realize that the absentee ballot kind of locks

2  your record and you can't proceed with an in-person

3  voting until you cancel that one.  So that took time to

4  cancel those ballots.

5       Q   And did your office receive complaints from

6  voters in -- in 2020, that they had been approached by

7  third parties while they were in line waiting to vote?

8       A   Mostly what we got complaints were people that

9  were complaining about somebody approaching somebody

10  else.  So that the person being approached wasn't really

11  offended or, you know, they were fine with getting

12  whatever the person was providing or talking to the

13  person, but then their neighbor was mad about somebody

14  approaching somebody else.  So that was the type of

15  complaints that we got.

16       Q   And was that something that -- those kind of

17  complaints, did you also receive them in 2018?  I think

18  you mentioned that during that election there was quite a

19  bit of, I think what counsel referred to as line warming,

20  or, you know, those kind of circumstances?

21       A   In 2018 it kind of had a different flavor.  It

22  was people who were advocating for voters not really

23  giving them things, but they were making sure that -- you

24  know, that everybody was treated fairly; that there

25  wasn't any intimidation going on.  There was election



1   protection-type people.  There was people in the line and

2   around the line that sort of made some people nervous,

3   that there were these outside people.  Why are they here?

4   What are they doing?  What are they saying?

5          But -- but it really did change a little bit

6   more in 2020 to be more of things being given out.

7   That -- that was newer.  The food trucks, the -- people

8   were giving out, you know, mittens and beanie caps when

9   it was cold and, you know, hand-knitted things and fans,

10  and just everything you can imagine.  Granola bars,

11  candy, you know.  And that -- that was new in the 2020

12  cycle.

13     Q    And am I -- am I correct to understand your

14  testimony that because of the array of things that were

15  given to voters, it was -- it made it more difficult for

16  your office to determine whether or not what was

17  happening was okay or not, you know, permissible, and

18  caused more work on your office to have to try and figure

19  those things out?

20     A    Yes.  We really did appreciate the buffer zone

21  of, you know, knowing that our jurisdiction was this 150

22  feet, or 25 from the last voter in line.  That is like a

23  no-influence zone.  A no, let me say shenanigans or

24  whatever.  And not knowing, you know, who these people

25  are, what they represent, if they have -- if they're



1   discussing the candidates or the parties or any -- it was

2   just no -- it was a free-for-all.  There was no way to

3   differentiate between someone just altruistically giving

4   a granola bar and somebody that maybe had, you know, more

5   of a campaigning motive to sway somebody or, you know,

6   just have a conversation that was really inappropriate in

7   a line of voters who were waiting to vote.

8           So having -- having that all back off, you

9   know, and be part of that 150-foot zone, behind that zone

10  made it simpler for us.  We didn't have to, you know,

11  decide.  I -- we didn't want to be the decider.  Like,

12  you're okay but you're not, because you are doing this

13  and you are doing that.  It's easier if nobody is doing

14  anything.

15      Q   And you mentioned -- okay.  So you mentioned

16  that those -- we'll call it shenanigans, which is a word

17  that you used, but just in general, what you just

18  described, that you all didn't have to make decisions

19  when the buffer -- the 150-foot buffer was enforced, as

20  well as the 25 supplemental zone.

21          Would that also include that your poll workers

22  and other staff weren't necessarily distracted because of

23  those things going on and that they could attend to the

24  job required -- that they were required to do?

25          MS. O'CONNOR:  Objection to form.



1          THE WITNESS:  Yes, the poll watcher -- or
2    excuse me, the poll workers, you know, they -- they know
3    what their job is, but they also know enough about
4    election law to know, oh, that doesn't look right.  But
5    sometimes they don't make the right decisions.  You know,
6    that might be fine, but they get very agitated about
7    something that they perceive might not be fine.  And so
8    then we have to deal with, you know, supplemental
9    training.  Oh, you know, that person is fine.  Don't
10   worry about it.  That's a poll watcher, or whatever the
11   scenario is.

12          But yes, having them not have to make those
13   decisions not to report something that's really fine,
14   it's just simpler.

15      Q   BY MS. LaROSS:  It's simpler.  And you're
16   saying that it's simpler because then there's either --
17   you don't have to train them differently if they've made
18   the wrong decision?  That's a part of the -- what makes
19   it simpler?

20      A   Yes.  As an election administrator, it's one
21   less thing we have to train.  They train for five hours,
22   you know, on all the equipment and, you know, how to
23   enforce the laws that, you know, we want them to be
24   looking out for, how to treat people and all of that.
25   And if you add more things, they have to differentiate,



1  you know, what constitutes campaigning.  Is this shirt

2  okay or is that shirt okay?  That's -- the nuances of

3  that are -- are difficult to explain to somebody that

4  works for one day for you.  So the -- the fewer things

5  that you have to have them make decisions on, the better.

6         MS. LaROSS:  Thank you.  Those are all the

7  questions I have.  Thanks again for your time.  We

8  appreciate it very much.

9         And thank you for the courtesy.

10        MR. WHITE:  Yes.  No, I wanted to make sure.

11        MS. LaROSS:  I really appreciate that, yes.

12        MR. WHITE:  I'm sure she'd rather take the time

13  tonight rather than come back another day.

14        MS. LaROSS:  Than do it again, yes.

15        THE VIDEOGRAPHER:  This concludes this video

16  deposition.  The time is 7:03 p.m., and we are off the

17  record.

18        THE COURT REPORTER:  Read and sign?

19        MR. WHITE:  Yes, we would like to read and

20  sign, please.

21        THE REPORTER:  Does anybody need a copy, in the

22  room, of the transcript?

23        MS. O'CONNOR:  Yeah, I'd like to request a

24  rough, in addition to the final.

25        Ms. LaROSS:  Yeah, I do want a copy of the



 1  transcript.  I'll find out if I need a rough.  I don't

 2  think we do.

 3          MR. GARABADU:  Yeah.  We'd like a rough as

 4  well.

 5          MR. WHITE:  Regular copy.  Read and sign.

 6          MR. UNGER:  It would be great to have a regular

 7  copy.  I don't think we need a rough.

 8          MS. NWACHUKWU:  This is Jennifer Nwachukwu with

 9  the Georgia NAACP plaintiffs.  I think you said a rough

10  transcript and what else?

11          THE REPORTER:  Did you need a rough or regular

12  copy of the transcript?

13          MS. NWACHUKWU:  If it's possible to get both,

14  that would be appreciated.

15          MR. MOCINE-McQUEEN:  This is Marcos

16  Mocine-McQueen from the New Georgia Project.  I would

17  also just like a regular copy of the transcript, a

18  regular transcript, please.

19          (The deposition concluded at 7:03 p.m.)

20

21

22

23

24

25



1                        CERTIFICATE OF REPORTER

2    STATE OF GEORGIA     )
                          )
3    COUNTY OF DEKALB     )

4

5            I, Marcella Daughtry, a Certified Reporter in
     the State of Georgia and State of California, do hereby
6    certify that the foregoing deposition was taken before me
     in the County of DeKalb, State of Georgia; that an oath
7    or affirmation was duly administered to the witness,
     JANINE EVELER; that the questions propounded to the
8    witness and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
9    typewriting; that the transcript is a full, true and
     accurate record of the proceeding, all done to the best
10   of my skill and ability;

11           The witness herein, JANINE EVELER, has
     requested signature.
12
             I FURTHER CERTIFY that I am in no way related
13   to any of the parties nor am I in any way interested in
     the outcome hereof.
14

15           IN WITNESS WHEREOF, I have set my hand in my
     office in the County of DeKalb, State of Georgia, this
16   9th day of December, 2022.

17

18

19           _____
                 Marcella Daughtry
20               Marcella Daughtry, RPR, RMR
                 GA License No. 6595-1471-3597-5424
21               California CSR No. 14315

22

23

24

25



1   In Re Georgia Senate Bill 202
    J8885618
2

3               DECLARATION UNDER PENALTY OF PERJURY

4

5                    I declare under penalty of perjury that I

6   have read the entire transcript of my deposition taken in

7   the above-captioned matter or the same has been read to

8   me, and the same is true and accurate, save and except

9   for changes and/or corrections, if any, as indicated by

10  me on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13

14  Signed on the_____day

15  of _____20__.

16

17

18

19  _____

    JANINE EVELER
20

21

22

23

24

25



```
 1                    DEPOSITION ERRATA SHEET
                            J8885618
 2

 3     Page No.____Line No.____Change to:_____

 4     _____

 5     Page No.____Line No.____Change to:_____

 6     _____

 7     Page No.____Line No.____Change to:_____

 8     _____

 9     Page No.____Line No.____Change to:_____

10     _____

11     Page No.____Line No.____Change to:_____

12     _____

13     Page No.____Line No.____Change to:_____

14     _____

15     Page No.____Line No.____Change to:_____

16     _____

17     Page No.____Line No.____Change to:_____

18     _____

19     Page No.____Line No.____Change to:_____

20     _____

21     Page No.____Line No.____Change to:_____

22     _____

23     Page No.____Line No.____Change to:_____

24     JANINE EVELER

25     Signature:_____
```



JANINE EVELER  30b6                                    November 29, 2022
UNITED STATES vs THE STATE OF GEORGIA                            296

```
 1                    DEPOSITION ERRATA SHEET

 2                         J8885618

 3    Page No.____Line No.____Change to:_____

 4    _____

 5    Page No.____Line No.____Change to:_____

 6    _____

 7    Page No.____Line No.____Change to:_____

 8    _____

 9    Page No.____Line No.____Change to:_____

10    _____

11    Page No.____Line No.____Change to:_____

12    _____

13    Page No.____Line No.____Change to:_____

14    _____

15    Page No.____Line No.____Change to:_____

16    _____

17    Page No.____Line No.____Change to:_____

18    _____

19    Page No.____Line No.____Change to:_____

20    _____

21    Page No.____Line No.____Change to:_____

22    _____

23    Page No.____Line No.____Change to:_____

24    JANINE EVELER

25    Signature:_____
```

