Page 1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF GEORGIA

2                        ATLANTA GEORGIA

3

       IN RE:                          )

4                                      )

       GEORGIA SENATE BILL 202         )   Master Case No.:

5                                      )

                                       )   1:21-MI-55555-JPB

6                                      )

       _____

7

8

9              VIDEOTAPED 30(B)(6) DEPOSITION OF

10        THE GEORGIA STATE CONFERENCE OF THE NAACP

11              GERALD GRIGGS, Representative

12                   February 21, 2023

13                      9:39 a.m.

14

15              Taylor English Duma, LLP

16

17              1600 Parkwood Circle, SE

18

19                     Suite 200

20

21                 Atlanta, Georgia

22

23

24

25         Reported by:  Marsi Koehl, CCR-B-2424

1                  C O N T E N T S
2                E X A M I N A T I O N
3
4                                               Page
5   Examination by Mr. Falk...........................6
6   Examination by Mr. Pulgram.....................159
7   Further examination by Mr. Falk................174
8   Further examination by Mr. Pulgram.............176
9
10                   E X H I B I T S
11  Defendant's
    Exhibit No.          Description            Page
12
13  Exhibit 1            Notice                  11
14  Exhibit 2            Complaint               18
15  Exhibit 3            Responses and Objections  18
                         to First Set of
16                       Interrogatories, Requests
                         for Production and Requests
17                       for Admissions
18  Exhibit 4            NAACPGA00000039         23
                         Bylaws for Units NAACP
19
    Exhibit 5            NAACPGA00000001         24
20                       Constitution of the NAACP
21  Exhibit 6            NAACPGA00006309         33
                         Instagram Posts
22
    Exhibit 7            NAACPGA00007083         115
23                       National Voter
                         Registration Act Notice
24                       Letter - 9/28/22
25

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 3

1                            E X H I B I T S

2        Defendant's

         Exhibit No.              Description                  Page

3

4        Exhibit 8              NAACPGA00004384                132

                                Official Statement of

5                               Georgia NAACP

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 4

1    APPEARANCES OF COUNSEL
2    On behalf of Plaintiff:
3         LAURENCE F. PULGRAM
4         Attorney at Law
5         FENWICK & WEST, LLP
6         555 California Street
7         San Francisco, California  94104
8         (415) 875-2390
9         lpulgram@fenwick.com
10   On behalf of Defendants:
11        DONALD M. FALK
12        Attorney at Law
13        SCHAERR JAFFE, LLP
14        Four Embarcadero Center
15        Suite 1400
16        San Francisco, California  94111
17        (415) 562-4942
18        dfalk@schaerr-jaffe.com
19   Also present:
          Cheniece Rayford, Videographer
20        Julie Houk, Esq.
          Ernest McFarland, Esq.
21        Abigail Young
          Catherine McCord, Esq.
22
23        (Pursuant to OGCA 15-14-37 (a) and (b) a
24   written disclosure statement was submitted by the
25   court reporter and is attached hereto.)

Page 5

```
 1                P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  Today's date is
 3      February 21st, 2023, and the time is now
 4      9:39 a.m.  This will be the 30(b)(6)
 5      deposition of Georgia State Conference of
 6      the NAACP given by Gerald Griggs.
 7          Would counsel please introduce
 8      themselves for the record.
 9          MR. FALK:  Yeah.  Donald Falk,
10      representing defendants Secretary of State
11      Brad Raffensperger and State Election Board
12      members Rebecca Ann Sullivan,
13      David J. Worley, Matthew Mashburn and Anh
14      Le.
15          MR. PULGRAM:  Laurence Pulgram
16      representing Plaintiff Georgia State
17      Conference of the NAACP and the other
18      plaintiffs in Civil Action 21-CV1259.
19          THE VIDEOGRAPHER:  Would the court
20      reporter please swear in the witness.
21                   GERALD GRIGGS,
22  having been first duly sworn, was examined and
23  testified as follows:
24                   EXAMINATION
25  BY MR. FALK:
```

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

                                                        Page 6

1           Q.   Good morning, Mr. Griggs.

2           A.   Good morning.   How are you doing?

3           Q.   Good.   I'm going -- we're going to go

4      through a number of questions and my purpose is not

5      to confuse you, so if I say something that you don't

6      understand, just stop me and we'll go over and make

7      sure you do.

8                I know you've done this before.   But

9      remember to speak as clearly and loud enough that the

10     court reporter and the Zoom people can all hear you.

11          A.   Okay.

12          Q.   And try to say "yes" and "no" as opposed to

13     "mm-hmm" and the things that we normally say in

14     conversation, or nodding your head.

15               If you need a break, let me know.   I'll ask

16     you to answer the last question if there's something

17     on the table before a break.   Just say after a

18     question whenever you need a break, we'll do it and,

19     of course, we'll break for lunch.

20               Let's get started.   What's your name?

21          A.   Gerald Griggs.

22          Q.   And your address?

23          A.   For the purposes of my home address or the

24     address of the State Conference?

25               MR. PULGRAM:   I think the State

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 7

1        Conference should be sufficient; shouldn't

2        it, Counsel?

3    BY MR. FALK:

4        Q.  Yeah, I think so.  I mean, even the county

5    you live in would be good, but just -- yeah, I think

6    the address of the State Conference is fine.

7        A.  Okay.  I live in DeKalb -- DeKalb County.

8        Q.  You live in DeKalb, yeah?

9        A.  The State Conference address is 1691 Phoenix

10   Boulevard, Suite 150, which is in College Park,

11   Georgia.

12       Q.  Are there any -- are you taking any

13   medications or do you have any medical conditions or

14   any other reason you can't fully and truthfully

15   participate this morning?

16       A.  None that I know of.  And I feel like I'm of

17   sound mind and understand what's happening.

18       Q.  Sounds good.  And have you given testimony

19   in the past, either at deposition or at trial?

20       A.  Many times.

21       Q.  Do you know how many times?

22       A.  Deposition about five.  Motions hearings and

23   trials, probably about 50.

24       Q.  Fifty?

25       A.  Yeah.

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 8

1        Q.  I'm not going to ask you each one of those

2    cases.

3            Do you recall any of the case names, any of

4    those matters?

5        A.  Previous one was the redistricting case for

6    the State Conference.  Many of the other cases have

7    been criminal cases in nature.  I'm a practicing

8    lawyer, so motions for a new trial, habeas cases,

9    stuff like that.

10       Q.  Oh, okay.  Those are ones where you've

11   appeared, but --

12       A.  No.  I've testified.

13       Q.  You testified as a witness?

14       A.  Yes.

15       Q.  Oh, okay.  I understand.

16           So I think I know the answers to these, but

17   have you ever been arrested or charged with a crime?

18       A.  No.  I have not.

19       Q.  Have you discussed the case -- this case

20   with anyone other than your lawyers?

21       A.  Yes.  A couple of people, yes.

22       Q.  Who were they?

23       A.  Vivian Moore.  Ed Dubose.  Reverend David

24   Walker, James Woodall and Tequeria Barrett.

25       Q.  And who are they?  Are they --

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

                                        Page 9

```
 1          A.  Members of the State Conference.
 2          Q.  -- members of the State Conference?
 3              Yeah, I recognize -- was it -- Reverend
 4      Woodall was your predecessor; is that right?
 5          A.  He was a president before President Pierce.
 6      I succeeded President Pierce, so he's two presidents
 7      ago.
 8          Q.  Oh, okay.  What's the highest level of
 9      education you obtained?
10          A.  Juris Doctorate.
11          Q.  Where was that from?
12          A.  University of Cincinnati.
13          Q.  When was that?
14          A.  2004.
15          Q.  Where did you go to college?
16          A.  Emory.
17          Q.  Emory?
18          A.  Yes.
19          Q.  When was that?
20          A.  '96 to 2000.
21          Q.  2000.
22              And what was your major or concentration?
23          A.  Political science and anthropology.
24          Q.  Do you have any other education or training
25      besides the college degree and the law degree?
```

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 10

```
 1          A.  High school.

 2               MR. PULGRAM:  Objection.  Vague.

 3               THE WITNESS:  Yeah, high school.  But

 4          other than --

 5     BY MR. FALK:

 6          Q.  Anything after --

 7               (Overlapping speakers.)

 8               (Reporter asks participants to speak one

 9          at a time.)

10               MR. FALK:  Counsel, let me just rephrase

11          the question.

12     BY MR. FALK:

13          Q.  Have you had any -- after law school, have

14     you had any additional formal education or training?

15          A.  No.

16          Q.  Do you have any publications?

17          A.  No.

18          Q.  Let's start at the end of law school.

19               What was your first job out of law school?

20          A.  Rockdale County Public Defender's Office.

21          Q.  And how -- your duties were -- what were

22     your duties in that case?

23          A.  Practicing criminal defense attorney.

24          Q.  When -- when were you doing that?

25          A.  2004 to 2005.
```

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 11

1        Q.  Why did you leave?

2        A.  I got hired at the DeKalb County Public

3    Defender's Office.

4        Q.  And how long were you there?

5        A.  2005 to 2007.

6        Q.  Why did you leave there?

7        A.  I opened my own practice.

8        Q.  Are you still -- is that still --

9        A.  I'm currently still in private practice.

10       Q.  Congratulations.  Sixteen years now?

11       A.  Yes.  Thank you.  Long time.

12           MR. FALK:  That's a good long time.

13           Now, let's -- we'll mark Exhibit 1 if

14       this is the right one.

15           (Defendants' Exhibit 1 was marked for

16       identification.)

17           MR. FALK:  I'm marking as Exhibit 1 the

18       Notice of this 30 (b)(6) deposition.

19           MR. PULGRAM:  Do you have a copy,

20       Counsel?

21           MR. FALK:  Yeah, I think Mr. Griggs got

22       all four copies, so --

23    BY MR. FALK:

24       Q.  Mr. Griggs, have you seen this document

25    before?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 12

1          A.   Yes.   I've seen this document before.

2          Q.   And did you read it?

3          A.   Yes.

4          Q.   If you could look at the third paragraph,

5     which I guess is on Page 2, where it says that:  The

6     person must be -- person designated shall be prepared

7     to testify as to matters within their knowledge and

8     matters known by or reasonably available to the

9     organization, which is the Georgia State Conference.

10               Are you that person?

11          A.   I am that person.

12               MR. PULGRAM:  And I should note, as you

13          know, Counsel, we have served objections to

14          the Notice.  And so Mr. Griggs, exactly as

15          he testified, is that person subject to the

16          objections.

17     BY MR. FALK:

18          Q.   That was my next question.

19               Are you designated a witness for every topic

20     apart from those that we have -- there are

21     objections -- parts of those that your counsel's

22     objected to.  And I think we've agreed not to talk

23     about any financial -- the financial aspects, which

24     takes several topics and parts of topics off the

25     table.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 13

1          Are you designated to everything else?

2      A.   Subject to the objection, yes.

3      Q.   Of course.

4          MR. PULGRAM:  Counsel, if you'd like, we

5      can mark the objections, but you have them.

6          MR. FALK:  I have the objections and I'm

7      going to ask the questions and some may

8      or may -- I mean, some I'm just not going to

9      ask.

10         I think that we've agreed there's no

11     reason to get into them.  And some of them

12     you'll object to and I think we'll just --

13     we'll just work from there.  But we have the

14     objections and my questions will be

15     calculated either to avoid them or to get

16     them on the record.

17  BY MR. FALK:

18     Q.   Now, you understand as the -- I'm going

19  to -- if it's okay with you, I'm going to probably

20  call the organization either NAA Georgia or the State

21  Conference.  Is that --

22     A.   Either one is fine.

23     Q.   Either one?  Okay.

24         As the designee for the State Conference,

25  you're testifying about what information is known or

Page 14

1    reasonably available to the State Conference?

2        A.   That's correct.

3        Q.   And you're aware that when the Notice refers

4    to organization, that's the State Conference?

5        A.   Yes.  I'm aware.

6        Q.   When did you first learn about this

7    deposition?

8        A.   When I got the Notice from my attorneys.  I

9    can't remember the exact date.

10       Q.   Do you know approximately?

11       A.   Several months ago.

12       Q.   And when did you learn that you were going

13   to be the witness?

14       A.   Probably about two -- two to three months

15   ago, I think.

16       Q.   Who told you you would be the witness?

17            MR. PULGRAM:  Objection.  You should not

18            reveal attorney-client communications.  If

19            there were communications with

20            non-attorneys, you may reveal those.

21            MR. FALK:  Well, he can tell me who

22            told him, he just can't tell me what he

23            told.

24            MR. PULGRAM:  You supplied what he told

25            them, which was that he was going to be the

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 15

1           witness.  So you've already provided content

2           to a communication.

3                If you have information other than from

4           an attorney, you can answer that question.

5                THE WITNESS:  The information I have is

6           from an attorney.

7      BY MR. FALK:

8           Q.  When did you start preparing for this

9      deposition?

10          A.  A few months ago.

11          Q.  And what did you understand were your

12     obligations for this deposition?

13          A.  To answer the questions as best as I know or

14     should be reasonably available to the State

15     Conference.

16          Q.  Let's talk about how you got ready for

17     today, generally, what you did to prepare.

18               Did you look at paper documents?

19          A.  Yes.  I looked at the complaint and Notice

20     of Deposition.

21          Q.  Did you look at E-mails?

22          A.  The E-mails that I did look at were provided

23     by my attorneys.

24          Q.  Did you look at documents addressing any of

25     Georgia's efforts to assist voters?

Page 16

1          A.   Yes.

2          Q.   What documents were those?

3          A.   Some of them were E-mails.  Some of them

4     were flyers.  Some of them was -- most of it was

5     conversations either that I had with those

6     individuals I named earlier or that I remember from

7     my recollection as I was in the State Conference when

8     we were preparing to mobilize voters.

9          Q.   Anything else that you reviewed?

10         A.   Not that I can think of right now, no.

11         Q.   Did you bring any of the documents you

12    reviewed to the deposition today?

13         A.   No.  I did not.

14         Q.   Did you review any prior testimony?

15         A.   Not for this -- not for this deposition

16    even -- well, yes, I referred to my previous

17    testimony in the redistricting case, yes.

18         Q.   Okay.  Sorry.  I'm just trying to make sure

19    I don't ask something you've already answered.

20              You mentioned that you spoke to the four or

21    five people you identified within the organization

22    earlier.

23              Which topics did you discuss with them to

24    prepare for the deposition?

25         A.   I didn't specifically discuss a topic.  I

Page 17

1    discussed their experience with SB 202 and mobilizing

2    the voters.  And I was -- I attempted to speak to

3    Reverend Woodall but was unsuccessful.

4         Q.  Apart from the topics that are subject to

5    objections, are there -- is there any topic within

6    that Notice that you're not prepared to testify to

7    today?

8         A.  Subject to the objections, no.  I'm prepared

9    to testify to the other topics.

10        Q.  Okay.  Thanks.  All right.  We've finished

11   the background.  We'll move on to the topics.

12        A.  Okay.

13        Q.  I'm going to go more or less in order but a

14   lot of things fall under more than one category.  And

15   I'm going try to consolidate some of these topics, so

16   this conversation is a little less tedious than it

17   might otherwise be.

18             I know you know the drill here.  And I want

19   to begin with basically topics 1 through 8 in

20   Exhibit A apart from the ones that -- there are a

21   couple that are totally off the table there and parts

22   of others that are off the table.  We're not covering

23   topic 2 or any of the financial aspects of the other

24   topics.

25             Basically, I want to begin by talking about

Page 18

1   what NAA Georgia is, what it does and how things have

2   changed since SB 202.

3           So, I guess, what's the relationship between

4   NAA Georgia and the National?

5       A.   So the National NAACP is a civil rights

6   organization that has thousands of units across the

7   state -- across the country.  The State Conference is

8   the subsidiary of the National NAACP responsible for

9   overseeing 180 units in Georgia.

10          So we are the State Conference of the

11  Georgia NAACP, meaning we're responsible for

12  reporting to National the activities of the units in

13  the state and overseeing them.

14          MR. FALK:  I realize I wanted to mark a

15          couple of exhibits.  I just want to have --

16          I want them to be handy in case we need to

17          refer to them as we go through these topics.

18          That would be the -- Exhibit 2 would be

19          the first amended complaint.  And then

20          Exhibit 3 will be the responses and

21          objections of the State Conference to the

22          discovery.

23          THE WITNESS:  Okay.

24          (Defendants' Exhibit 2 and Exhibit 3

25          were marked for identification.)

30(b)(6) Gerald Griggs                          February 21, 2023
Georgia Senate Bill 202, In Re

                                              Page 19

 1            THE REPORTER:  This is 3 here?

 2            MR. FALK:  That's -- yeah, this is 2 and

 3       that's 3.  I just want Mr. Griggs to -- to

 4       have those.  I don't even right this --

 5       right this minute, but at some point I'm

 6       going to want you to -- I want you to be

 7       able to refer to those.

 8   BY MR. FALK:

 9       Q.  I'll direct you to particular -- don't worry

10   about going through that.

11       A.  Okay.

12       Q.  I have a couple of questions that refer to

13   specific things, but I wanted to get that part out of

14   the way.

15            So what work does the State Conference

16   engage in?

17       A.  Primarily the State Conference engages in

18   the protection of the rights of African-Americans and

19   other people of color from discrimination.  We move

20   and our mission is to social, political and economic

21   uplift of African-Americans and people of color.

22       Q.  Now, does the State Conference run its

23   affairs independent of the National, or do you have

24   to clear things with the National?  How does that --

25   how does that all work?

Page 20

1        A.  The State Conference is governed by the

2    bylaws of the National Association for the

3    Advancement for Colored People.  According to the

4    bylaws, we have to abide by the rules and decisions

5    of the National board.

6            So everything the State Conference does is

7    governed by National NAACP.

8        Q.  Does NAA Georgia have staff of its own?

9        A.  Yes.  It does.

10       Q.  And how many, approximately?

11       A.  Currently, we have one administrative

12   assistant and everybody else is volunteers.

13       Q.  Volunteers.  Approximately, how --

14           (Interruption.)

15           MR. FALK:   All right then.

16           MR. PULGRAM:  We're not going to guess

17       what that sound was.

18           (Discussion ensued off the record.)

19   BY MR. FALK:

20       Q.  Approximately, how many volunteers are

21   working within the NAA Georgia?

22       A.  At the current moment probably about seven

23   to eight.

24       Q.  Okay.

25       A.  But they are not like full-time volunteers.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 21

1    They volunteer their services.

2         Q.   What area of responsibility -- what areas of

3    responsibilities do those seven or eight --

4         A.   Housing, political action, environmental

5    justice.  That's pretty much how they are organized

6    right now.

7         Q.   What does the State Conference do in Georgia

8    that pertains specifically to the provisions of SB

9    202 that are challenged in this lawsuit?

10        A.   Okay.  We are one of the leading voting

11   rights organizations in the state.  We lead a robust

12   voter mobilization, voter education and voter

13   advocacy activities within the state.

14        Q.   Does the State Conference have staff of its

15   own in these areas?

16        A.   They used to.  We used to.

17        Q.   What happened to that staffing?

18        A.   Currently, we're not in voter mobilization

19   mode, so that particular staff member now works for

20   the National NAACP.

21        Q.   So you have one dedicated staff member?

22        A.   We have a state director.

23        Q.   State director for --

24        A.   Yes.

25        Q.   Does that just happen during election

Page 22

1    cycles?

2            MR. PULGRAM:  Objection.  Vague.

3    BY MR. FALK:

4        Q.  Do you -- do you have a state director only

5    during election cycles?

6        A.  No.  We had a state director in response to

7    SB 202.

8        Q.  I understand.  Does the State Conference

9    have its own staffing or other presence within the

10   individual counties?

11       A.  Not the State Conference, no.

12       Q.  I think you mentioned 180 --

13       A.  We have 180 units.

14       Q.  Different units?

15       A.  Yes.

16       Q.  Are those organized on the county level?

17       A.  Some are organized by the county level.

18   Some are organized by the city level.  And then you

19   have youth councils as well, which are youth units

20   and college chapters, as well.

21       Q.  I understand.  So -- but those are not the

22   State Conference?  Those units are not part of the

23   State Conference?

24       A.  Yes.  They are part of the State Conference.

25   So the organization of the National Association for

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 23

1      the Advancement of Colored People is national which

2      has its own staff and the board of directors.

3              And then you have the State Conference,

4      which is over the top of the units.  And so we

5      provide resources to the units.  Some of the units

6      have paid staff.  But your question was about the

7      State Conference.

8          Q.  No.  That's exactly what I was trying to

9      understand.  Thank you.

10         A.  Mm-hmm.

11         Q.  So what resources does the State Conference

12     provide to the county units?

13         A.  We provide support.  We provide education.

14     We provide training.  We provide resources, meaning

15     monetary GOTV grants.  And then we provide

16     supervision and mobilization for the units.

17             (Defendants' Exhibit 4 was marked for

18             identification.)

19     BY MR. FALK:

20         Q.  I'm going to mark Exhibit 4, which would be

21     the bylaws for units of the National Association for

22     the Advancement of Colored People.

23             On Exhibit 4, Mr. Griggs, if you turn to

24     Bates number 45 -- which I believe is Page 3 of the

25     document.

Page 24

1          A.  Mm-hmm.  I have it.

2          Q.  If you could review the objectives of the

3     state area conferences, which I guess is sub B.

4          A.  I've reviewed it.

5          Q.  Does that accurately articulate the mission

6     of the State Conference, of the Georgia State

7     Conference?

8          A.  It correctly articulates the purpose and

9     aims of the Georgia State -- well, of the state

10    conferences.

11         Q.  What -- is there -- are there additional

12    aspects of the mission of the State Conference?

13         A.  I think the mission should be in the first

14    part -- oh, the mission is actually in the

15    constitution of the National Association for the

16    Advancement of Colored People.

17              MR. FALK:  I think we'll mark this,

18         although, I don't think we'll linger on it,

19         as Exhibit 5.  Thanks for clarifying the

20         terminology.  This will be Exhibit 5.

21              (Defendants' Exhibit 5 was marked for

22         identification.)

23    BY MR. FALK:

24         Q.  Then, I think, if you turn to Bates

25    numbers -- well, Bates numbers 4 and 5, document 1

Page 25

1    and 2, it mentions -- oh, I see.  It's a mission

2    statement; it's separate.

3          A.  Mm-hmm.

4          Q.  Now I understand -- now I understand the

5    terminology.

6              So it says on -- this is Exhibit 5 -- on

7    Bates number 4, Page 1:  The mission of the National

8    Association for the Advancement of Colored People is

9    to ensure the political, educational, social and

10   economic quality of rights of all persons and to

11   eliminate racial hatred and racial discrimination.

12             Would you agree that that accurately states

13   the mission?

14         A.  Yes.  That's the mission of the NAACP.

15         Q.  And a little bit lower down there it states,

16   The objectives and terms are quite similar to the

17   objectives of the branches.

18             Do you see that -- where it says that?

19         A.  Yes.  I see Article II, Objectives.

20         Q.  Are they -- my understanding is, except for

21   the parts of the branch objectives which say you have

22   to be in accord with the National -- it's in

23   substance the same objectives of the State

24   Conference?

25             MR. PULGRAM:  Objection.  Documents

Page 26

1          speak for themselves.

2     BY MR. FALK:

3          Q.  Do you agree that those are -- you can

4     answer the question.  Do you agree that the

5     objectives are --

6          A.  They are substantially similar.

7          Q.  -- substantially the same?

8          A.  Mm-hmm.

9          Q.  I'll ask you to refer to the bylaws --

10          MR. PULGRAM:  Just for housekeeping, in

11     a situation like that where I've made an

12     objection, unless there's an instruction,

13     the witness will answer the question.  But

14     if you repeat the question, obviously, it'll

15     still be subject to my objection.

16          MR. FALK:  Yes.  Of course.

17          MR. PULGRAM:  I just -- so I don't have

18     to say objection every time you re-ask it.

19          MR. FALK:  Right.  Right.  But I'm going

20     to repeat the question sometimes if there's

21     something that's come in between.  But the

22     objection is preserved.

23          MR. PULGRAM:  That's all we wanted so I

24     don't have to worry about that anymore.

25          MR. FALK:  No, no, no.  If you've

30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

Page 27

1          objected, sometimes I'll repeat the

2          question, sometimes I won't repeat the

3          question.

4     BY MR. FALK:

5          Q.  If you can refer to the bylaws Exhibit 4,

6     Mr. Griggs?

7          A.  Yes.

8          Q.  And this would be Bates Page 50 and Page 8

9     of the document.

10              Under the sub -- sub B, it refers to

11     litigation?

12          A.  Mm-hmm.  Yes.  It does.

13          Q.  And it says:  No unit of the Association

14     shall have the authority to initiate, endorse or

15     participate in legal action including, but not

16     limited to, pre-suit discussions, negotiations, court

17     litigations or post-suit matters on behalf or in the

18     name of the Association or any unit of the

19     association without the express written authorization

20     of the president and CEO and general counsel.

21              Did you receive that written

22     authorization -- did you receive written

23     authorization from the president and CEO and general

24     counsel of the National NAACP to initiate this

25     lawsuit?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 28

1          A.   As far as I know -- I wasn't the president

2     at the time.  But as far as I know, authorization was

3     given by the Office of General Counsel and the

4     president and CEO, as far as I know.

5          Q.   Do you know when that authorization was

6     given?

7          A.   It would have been before the filing of the

8     lawsuit.

9          Q.   What's the -- what is the process for

10    obtaining approval from the National to initiate

11    pre-suit discussions or litigation?

12          MR. PULGRAM:  I'm going to let you

13          answer generally, but I don't want to get

14          into issues around strategy for First

15          Amendment advocacy.  But asked generally,

16          that's a question that's fine for you to

17          answer.

18          THE WITNESS:  You would make contact

19          with the Office of General Counsel

20          Janette Wallace; make her aware of the

21          issues and would proceed from whatever

22          advice she gives.  And she is the general

23          counsel for the National Association for the

24          Advancement of Colored People.

25    BY MR. FALK:

Page 29

1          Q.   On the next page, Page 9 of the document,

2     Bates Page 51, it states under:   Coalition

3     affiliation with other organizations.

4               Do you see that?   It's sub 3 there, sub 3A?

5          A.   Yes.   I see it.

6          Q.   And the last sentence says:   Prior written

7     permission for such affiliation and/or cooperation by

8     units must be granted by the president and CEO.

9               Does that limit on coalition or affiliation

10    apply to bringing litigation with other

11    organizations?

12         A.   If it's not expressly written in the bylaws,

13    it does not -- with regard to litigation.   The

14    litigation section is B.

15         Q.   So to your knowledge, it doesn't require a

16    separate approval to -- if you're approved for

17    litigation --

18         A.   You're approved for litigation.

19         Q.   -- you're approved for litigation in

20    whatever form you bring it.

21         A.   And per the bylaws, you have to get that

22    approval from the CEO and the general counsel.   So

23    the CEO would already know about whatever parties we

24    potentially could be engaging in litigation with and

25    have given authorization.

Page 30

1          Q.  Has the State Conference -- has the State --
2      let me start again.
3                 Has the State Conference joined a coalition
4      or affiliation with any other organizations to
5      address SB 202?
6                 MR. PULGRAM:  Objection to the extent
7               that such coalitions -- strike that.
8                 To the extent that there are
9               participants in the litigation, you may
10              answer that question to the extent that
11              there are nonpublic combined activities.
12              That would be within the First Amendment
13              protection.
14                THE WITNESS:  So for the purpose of
15              answering the question, the approved
16              coalition for the purpose of this lawsuit
17              are named in the lawsuit.
18      BY MR. FALK:
19          Q.  So they are in the caption of this
20      particular lawsuit here?
21          A.  Yes.
22                MR. FALK:  So am I understanding your
23              objection that you are instructing him not
24              to answer about any other groups within the
25              State Conference that has addressed SB 202

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 31

1          in the form of a coalition that has been

2          approved?

3               MR. PULGRAM:  I agree with your

4          characterization, that is, that the First

5          Amendment protection would extend to the

6          formation and pursuit of coalitions and

7          advancing advocacy with respect to SB 202.

8               If there are particular questions that

9          you had that you thought were outside of

10         that privilege, I think you should ask them

11         and we can address them.

12              MR. FALK:  No.  I'm just getting on the

13         record to make clear that even if it's a

14         public coalition, that that is still in some

15         theory privileged.  I want that to be on the

16         record.

17              I'm looking forward -- I don't think

18         it's that pertinent here.  I don't know yet.

19         But if it is, I'm looking forward to it.

20              MR. PULGRAM:  Right.  To the extent that

21         it's something that is public, then it would

22         be outside the privilege by virtue of its

23         public existence.

24              So if you are going to ask him, Is it

25         true that, as reflected here, you're in

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 32

1          coalition with X, Y or Z, a fact that is

2          public, that is certainly something that can

3          be confirmed.  To the extent where it's not

4          public, that would be where the First

5          Amendment protection is implemented.

6               So if you have questions about aspects

7          of public cooperation, feel free to ask

8          those.

9               MR. FALK:  No.  I mean, I think I -- I

10          may be at the end of this.  I wanted to know

11          what -- I don't have anything beyond this

12          litigation in mind except I wanted to know

13          about whatever --

14     BY MR. FALK:

15          Q.  Let me ask another question and I think this

16     will solve the problem.

17               Has the NAA Georgia entered into a public

18     coalition apart from this litigation to address

19     SB 202 with any other organizations?

20          A.  Yes.  Several.

21          Q.  Which would -- could you tell me which

22     organizations those are?

23          A.  We've had press conferences and media events

24     with Black Voters Matter, FaithWorks, Protect the

25     Vote GA, several others that I can't remember, but

Page 33

1      it's been publicly reported throughout the state.

2            Q.   Referring again to Exhibit 4, the bylaws --

3            A.   Mm-hmm.

4            Q.   -- again on Page 9 of the document it's

5      Bates Page 51.  Under political action, I think it is

6      the second-to-last sentence it reads, All political

7      action shall be nonpartisan and shall not endorse

8      candidates for public office.

9                 Do you see that in sub part D --

10           A.   Yes.

11           Q.   -- under political action?

12           A.   Yes.  I see it under political action.

13           Q.   Does that limitation apply to the State

14     Conference?

15           A.   Yes.  It does.

16                MR. FALK:  Is this Exhibit 6?  I thought

17           I had gotten rid of the junk pages on this.

18                (Defendants' Exhibit 6 was marked for

19           identification.)

20                (Discussion ensued off the record.)

21     BY MR. FALK:

22           Q.   This is -- this is Bates numbers 6309 to

23     6311.  If you could just review those for a second.

24     It's not a lot of content there.

25           A.   Okay.  I've reviewed it.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 34

1          Q.  Yeah.  No, I'm just looking to see what... I
2     apologize for how hard this is to read.  It's on
3     6311.  It's the -- you may need a magnifying glass.
4     I'm not sure my arms are long enough.
5               There is the -- there is some content there
6     that is identified as the Georgia NAACP.
7               Do you see that --
8          A.  I see it.
9          Q.  -- this white 3-point type?
10         A.  Yes.  I see it.
11         Q.  And it says:  We've weighed in on our two
12    sitting senators for the upcoming election.  Now it's
13    your turn, Georgia.
14              Am I reading that correctly in that tiny
15    type?
16         A.  Mm-hmm.  I see it.
17         Q.  And above that, there are graphics with the
18    former senators from Georgia?
19         A.  Mm-hmm.
20         Q.  How does this fit with the nonpartisan
21    mission of the --
22         A.  So --
23         Q.  Explain how it fits with the nonpartisan
24    mission of the State Conference.
25         A.  So two administrations ago we created grade

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 35

1    sheets for all the elected officials in the state,

2    both Democrats and Republicans.  And we graded them

3    based on their agendas for people of color.

4            This was a grade that former senator Purdue

5    got and the grade that former senator Loeffler got.

6    It's nonpartisan because we graded every single

7    elected official on the state level in Georgia.

8            Some Democrats got Fs, some Republicans got

9    Fs.  It was nonpartisan because we were simply

10   grading the sitting individuals who occupy the seat

11   regardless of political affiliation, which is part of

12   our mission.

13       Q.  Okay.  I want to kind of move over to

14   election-related work.

15       A.  Mm-hmm.

16       Q.  And the time frame that we asked for is

17   January 1st, 2019, to the present.

18       A.  Okay.

19       Q.  So you don't have to go back beyond that.

20       A.  So don't go back to the '40s.

21       Q.  You don't have to go back to the '40s.  We

22   could sit here forever talking about what the NAA

23   Georgia was doing in prior decades.  But right now

24   we're just looking for 2019 to now.

25       A.  Mm-hmm.

Page 36

1      Q.  What activities has the State Conference

2      undertaken involving election protection?

3          A.  Okay.  Involving election protection, we run

4      a hotline for people to call in for any issues that

5      they have with voting.  It's 1-86-OUR-VOTE [sic].

6      That is manned by lawyers from -- that work in

7      partnership with the State Conference and the rest of

8      the National Association for the Advancement of

9      Colored People.

10              So we run a command center that responds to

11     election issues to protect the vote.

12         Q.  So there's a hotline and a command center?

13         A.  Mm-hmm, yes.

14         Q.  What does the command center do?

15         A.  It fields questions and concerns from around

16     the state in relation to election issues.

17         Q.  Are we -- just a second to formulate this

18     right.

19              Is the hotline and command center operative

20     only during an election itself, or when do they --

21     when -- let me start that over again.

22              When do you bring hotline and command center

23     online in an election cycle?

24         A.  It's typically online the entire time but

25     it's sufficiently manned once we start the primaries

Page 37

1    all the way up to a general election or in municipal

2    elections as well.

3              And of course the hotline is online as well.

4    So it's 1866ourvote.com as well.

5         Q.  Have those functions changed since

6    January 1st, 2019?

7         A.  Since January 1st, 2019, yes, it has

8    changed.

9         Q.  How have they changed?

10        A.  We had to ramp up our resources after the

11   passage of SB 202 to bring on more lawyers to make

12   sure we had more volunteers to staff the calls

13   because we were fielding calls -- the call volume

14   increased.

15        Q.  So that would be early 2021?

16        A.  Early 2021, definitely 2022.  Yes, the call

17   volume increased.

18        Q.  Right.  Since these are live only during the

19   election cycles?

20        A.  Yes.

21        Q.  And how many more lawyers did you --

22              (Technical interruption.)

23              (Discussion ensued off the record.)

24   BY MR. FALK:

25        Q.  In fact, I'm going to ask a different

Page 38

1    question, then I'll ask the same question again.

2              Did you add personnel to the hotlines?

3         A.   I believe we did.  I can think of at least

4    two lawyers who have joined us specifically for the

5    state since 2019.

6         Q.   Those are volunteers?

7         A.   Yes.  They are provided from National.

8         Q.   And what personnel, if any, did you add to

9    the command center?

10             (Technical interruption.)

11             THE REPORTER:  I don't know what you-all

12        want to do about that.

13             (Discussion ensued off the record.)

14   BY MR. FALK:

15        Q.   What personnel, if any, did you -- did the

16   State Conference add to the command center?

17        A.   Well, we specifically added a state director

18   who was in charge of election protection -- who was

19   in charge of election protection, voter mobilization

20   and voter education.  So that's what the State

21   Conference added.

22        Q.   And was that state director a volunteer?

23        A.   No.  She was paid.

24        Q.   And was she provided by the National?

25        A.   Yeah.  She was.

Page 39

1        Q.  You mentioned voter mobilization.  What do

2    you mean by that?

3            (Technical interruption.)

4            (Discussion ensued off the record.)

5            MR. PULGRAM:  Off the record --

6            THE VIDEOGRAPHER:  The time is now

7    10:29 a.m. and we are off the record.

8            (Recess from 10:29 a.m. to 10:48 a.m.)

9            THE VIDEOGRAPHER:  The time is now

10    10:48 a.m. and we are on the record.

11    BY MR. FALK:

12        Q.  Mr. Griggs, you mentioned that the lawyers

13    that were added to the hotline and the state director

14    that was added for election protection purposes in

15    response to SB 202 came from the National.

16            Did I understand that correctly?

17        A.  Yes.  That's correct.

18        Q.  And were those -- I think you said they

19    were -- they were not volunteers, they were paid --

20        A.  They were paid staff, yes, sir.

21        Q.  They were paid?  Who paid them?

22        A.  National.

23        Q.  The National.

24            Now, back to my last question, which was you

25    mentioned voter mobilization and what did you mean by

30(b)(6) Gerald Griggs

February 21, 2023

Georgia Senate Bill 202, In Re

Page 40

1    that?  What do you mean by that?

2         A.  Voter mobilization is the program that we go

3    through to mobilize voters throughout Georgia.  It

4    consists of a lot of moving parts.

5              Some of them are like the tour, the 22-city

6    tour we went on.  Of course, communicating with the

7    branches on the events that they throw, whether those

8    are town halls or parties to the polls, there's a lot

9    that goes into voter mobilization.

10             But that's a program that we kick off both

11   for the primary election and the general.

12        Q.  What activities has the Georgia State

13   Conference undertaken since January 2019 regarding

14   voter education?

15        A.  We've done a lot of initiatives to educate

16   voters since 2019.  Specifically, again, we've kicked

17   off our program to educate the entire state of the

18   rules with regard to the voting and how we want to

19   engage moving forward.

20             Specifically, since 2019 a lot has changed

21   because we had to adjust to SB 202 and the changing

22   rules.  But, specifically, we've done a lot of robust

23   interaction with the units since 20 -- so 2019 to

24   2021 we had a 12-county strategy, which covered

25   probably about 75 percent of the African-American

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 41

1    vote.  So we were educating about 75 percent.

2            After SB 202, we increased that from

3    12 counties -- almost 13 counties to 59 counties,

4    which encompasses about 90 percent of the

5    African-American vote because we want to drill down

6    deeper to make sure we were able to mobilize the

7    vote.

8        Q.  Exactly what activities does the State

9    Conference engage in when it engages in voter

10   education?  What exactly do you do?

11           MR. PULGRAM:  Vague as to time.

12           MR. FALK:  2019 to the present.

13           MR. PULGRAM:  Still overbroad.

14   BY MR. FALK:

15       Q.  You can answer.

16       A.  Okay.  So we have political action -- we

17   have a political action committee for the state and

18   then we have the political action committees for the

19   units.  The political action chair for the state

20   engages with the units to figure out a mobilization

21   plan, an educational plan.

22           It's changed from 2019 to 2021-2022 because,

23   one, there's been a new political action chair but,

24   two, the changing landscape of Georgia voting has

25   changed.  But specifically what we do:  Town halls,

Page 42

1    civic engagement events, church events.  Recently,

2    22-county tours after SB 202.

3              We make sure that we engage with the local

4    election boards to make sure we understand what the

5    rules are, where the polling precincts will be so we

6    can educate the voters as to any potential changes or

7    issues.

8              So it's a robust program that's run from the

9    state through the political action chairs in the

10   units.  And it has a lot of programming aspects.  I

11   mean, there are at least 15 to 20 different sub

12   programs in doing the education and mobilization.

13        Q.  And are these -- how are these sub programs

14   developed?

15        A.  From the political action chair.  So they

16   figure out what the target mobilization goal is and

17   then they build out from that.  So whether there's

18   Vivian Moore, who I told you I spoke to, or the new

19   political action chair, they get together now in Zoom

20   calls -- before it would be in person -- to speak to

21   the entire state's political action chairs to figure

22   out from the regions and the cities what's the best

23   strategy to engage those voters and mobilize them and

24   educate them.

25        Q.  When you spoke of the political action chair

Page 43

1    in your last answer, you mean the political action

2    chair for the State Conference?

3         A.  Yes.

4         Q.  Again, continuing with the time frame,

5    January 1st, 2019, to the present, what activities

6    does the State Conference undertake involving voter

7    registration?

8         A.  So we participate on the pro-Georgia table,

9    which is a program by which we hit -- we have a

10   target number of voter registrations.  We fan out

11   throughout the state through the units to hit those

12   target numbers and each year the targets increase.

13          So, basically, the program starts whenever

14   the previous election ends through that targeted date

15   of the end of voter registration, which we get from

16   the Secretary of State and the Secretary of State's

17   website.

18          So we have a certain number of cards that we

19   have to hit and we organize through the units to hit

20   those targets.  And we've been doing it -- we've been

21   doing it well before 2019, but we really ramped it

22   from 2019 to 2021.  And then from 2021 we went into

23   overdrive to make sure that we registered voters in

24   anticipation of mobilizing them.

25        Q.  What activities in the same time frame,

Page 44

1     January 1st, 2019, to the present has the State

2     Conference undertaken with respect to

3     get-out-the-vote activities?

4              MR. PULGRAM:  Same objection.  Vague as

5         to time.  It's a three-year period -- four

6         years.

7              THE WITNESS:  Similar activities from

8         voter -- because it's a complete strategy,

9         so it's not just one aspect.

10             So it's voter mobilization, voter

11        education and then GOTV.  So they all work

12        hand-in-hand together.

13             And we have had to shift resources from

14        2019 and to 2020 to the 2020 -- after 2021

15        to 2022 to re-educate people and to make

16        sure people understand the changes and the

17        changes in their polling precincts, the

18        attempts to purge individuals and challenge

19        individuals and then also the takeovers of

20        local election boards.

21             So it's really the GOTV has shifted over

22        from 2019 to the present because of the

23        effects of SB 202.

24     BY MR. FALK:

25        Q.  And then what activities has the State

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 45

1     Conference undertaken within the same time frame,

2     January 1st, 2019, to the present responding to voter

3     queries or assisting with problems in voting?

4         A.  Similar.  The 866-OUR-VOTE program had been

5     in existence well before 2019.  But we have, again,

6     brought on new lawyers.  We've brought on more

7     volunteer staff to cover that to make sure we are

8     doing a robust election protection, which increased

9     after 2021 in response to SB 202.

10        Q.  What activities has the State Conference

11    undertaken, again, in the same time frame,

12    January 1st, 2019, to the present, to transport

13    voters to vote at a polling place?

14        A.  So we do run a program.  So rides to the

15    polls with Lyft and other entities including the

16    churches, including some civic organizations.

17            From 2019 to the present, like I said, we

18    partnered with Lyft.  We partnered with Uber.  We

19    partnered with churches to make sure we had church

20    vans and church buses.

21            We had -- after SB 202 went into effect in

22    2021-2022, we had the 22-city tour where we were

23    engaging directly with civic organizations and more

24    churches to get rides to the polls and made sure

25    people had options to get to the polls.  So we've

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 46

1    been doing that.

2         Q.  And then what activities -- again, keeping

3    the same time period, January 1st, 2019, to the

4    present, has -- let me start that over.

5              In the same time period, January 1st, 2019,

6    to the present, what activities has the State

7    Conference engaged in that involved transporting

8    voters to vote at other sites, drop boxes, mailboxes,

9    other than the polling?

10             MR. PULGRAM:  Same objection as to the

11        overbroad time category.

12             THE WITNESS:  From 2019 to 2020 we

13        really didn't transport individuals to the

14        drop boxes.  We would provide information

15        about access to drop boxes and support

16        people using the drop boxes.

17             After 2021, we shifted our strategy --

18        again, we weren't taking people to the drop

19        boxes but we shifted our strategy entirely

20        to get people to early vote or vote on

21        election day because of the issues that SB

22        202 created about drop boxes, like drop box

23        access, the times upon which the drop boxes

24        would be open.

25             And then of course issues of people

Page 47

1          having limitations of getting to the drop

2          boxes.  As you know, the drop boxes moved

3          from inside -- from outside to inside during

4          the same time as early vote.

5               So our strategy was if people are going

6          to use the drop boxes, they might as well

7          early vote because the drop boxes are inside

8          of the polling precinct.

9               So just go use the machines and not deal

10         with the issues of ballot rejection that

11         were going to be caused by SB 202 using the

12         drop boxes.

13    BY MR. FALK:

14         Q.  Let me see if I understood that answer.

15              I believe, is it correct, that before SB

16    202, you didn't -- the State Conference did not

17    transport voters to drop boxes?

18         A.  To the best of my knowledge and information,

19    no.  The State Conference did not transport people to

20    drop boxes.  Units may have transported them, but the

21    State Conference did not.

22         Q.  And, again, I'm just trying to make sure I

23    understood your answer.

24              I believe you said after SB 202 you would --

25    the State Conference was involved in transporting

Page 48

1    people to early voting centers -- to -- and encourage

2    them to vote early on the machines rather than the

3    drop boxes.

4           Is that correct?  I just want --

5        A.  We shifted our strategy from pushing people

6    to use the drop boxes.  Again, we never transported

7    anybody to drop boxes nor did we transport them after

8    SB 202 to the early vote locations for the purpose of

9    using drop boxes.

10          What I actually said was we've always had

11   rides-to-the-polls programs that we ramped up even

12   more after SB 202.

13       Q.  Okay.  And then what activities has the

14   State Conference undertaken in the period January

15   1st, 2019, to the present that involved providing

16   food or water to voters at polling places?

17          MR. PULGRAM:  Same objection.

18          THE WITNESS:  We've had line relief

19          programs since 2019 and before 2019.  What

20          we would do is have parties-to-the-polls or

21          some sort of voter relief programs because

22          of the extensive lines that have been

23          created from 2019 to the present.

24          After SB 202 -- and, of course, we

25          always did this not just for voters, we did

Case 1:21-mi-55555-JPB  Document 731  Filed 10/29/23  Page 49 of 466
30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page  49

1         this for the entire community.  This was an

2         event to bring the community together to

3         make sure, one, they knew about the

4         election; and, two, that they had sufficient

5         resources to stand in the long lines, which

6         disproportionately affect African-American

7         communities in the state.

8              But after SB 202, of course we abided by

9         the 150-feet buffer by moving to a 200-feet

10        buffer and providing necessary resources for

11        the individuals, not only the ones that were

12        in line to vote but the other members of the

13        community that would come to bring

14        awareness.

15             And so we would conduct those line

16        relief events throughout the state.  And

17        after SB 202, again, we ramped it up even

18        more because we were concerned that one,

19        there would be even longer lines -- and

20        there were -- that affected the ability for

21        people to access the franchise because of

22        the shortening of the early voting period,

23        the removal of the ability for certain

24        communities to have "souls to the polls"

25        based on the vote of the local election

Page 50

 1          board or the county board.

 2              And so those were things we undertook to

 3          make sure we got people out and they had

 4          line relief.

 5     BY MR. FALK:

 6          Q.  When you say remove the ability of people to

 7     have "souls to the polls," can you explain what you

 8     meant by that?

 9          A.  So SB 202 provides that local boards of

10     elections and counties can decide whether or not they

11     would have Sunday voting.  And Sunday voting has

12     historically been "souls to the polls."

13              And so certain communities decided against

14     having early vote on Sundays.  They would move it to

15     Saturdays but they wouldn't have it on Sundays.  So

16     it severally limited us to continue to have the

17     "souls to the polls."

18              So we had to shift our resources to have

19     more Saturday -- or more -- depending on when the

20     early voting ended -- events that connect it to

21     church community, which is a vast community, an

22     African-American community to mobilize folks to go

23     vote.

24          Q.  Before SB 202, what percentage of the State

25     Conference's work was dedicated to voter education?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 51

1        A.  I don't know if I could give a percentage.

2   I know we were dedicated to voter education, but I

3   think that we were more focused on voter mobilization

4   and GOTV.  But I can't give you a percentage.

5        Q.  Can you give me a percentage after SB 202?

6        A.  I can't give you a percentage but I can tell

7   you that our strategy shifted to making sure that

8   voters were educated on the new rules, the attempts

9   to close certain polling precincts and take over

10  certain local election boards, the unlimited voter

11  challenges.

12        So I would say our resources shifted.  So it

13  was more focused on voter education than it was

14  before.  But I can't give you a percentage.

15        Q.  Let me try to save some time here.

16        Can you give me a percentage before SB 202

17  as to any of the other aspects of -- that we just

18  discussed, voter registration drives, Get Out the

19  Vote or are you unable to do a percentage?

20        MR. PULGRAM:  Vague as to two ways.  One

21        is percentage of what?  And the other is --

22        you did have a list of things, which is fair

23        to put together if you want to --

24        MR. FALK:  I mean, I can go -- I can go

25        down the list and you can tell me if you can

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 52

1        or cannot do a percentage.  Maybe I'll just

2        do it that way.  It may be quicker and very

3        fewer objections.

4             MR. PULGRAM:  I'm not trying to get in

5        the way of it, but if you said one, two,

6        three, four and five, can you give me a

7        percentage of whatever --

8             MR. FALK:  Yeah.  Let me just -- we'll

9        just do that and you tell me one way or the

10        other and that's fine.  I was trying -- the

11        shortcut turned into a long cut, so let's

12        just get it done.

13   BY MR. FALK:

14        Q.  Can you tell me what percentage of the State

15   Conference's work was dedicated to voter mobilization

16   before SB 202?

17        A.  I can't give you a percentage.

18        Q.  What about -- what about after SB 202?

19        A.  After SB 202 we spent a substantially

20   greater amount of time on voter education around the

21   limitations that were now placed on us and

22   African-American voters.  But I still can't give you

23   a hard percentage, no.

24        Q.  I understand.  We'll just run down the list

25   here.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 53

1          Can you give me a percentage before SB

2     202 -- a percentage of the State Conference's work

3     that was dedicated to voter registration drives?

4          A.  I can't give you a percentage.  I know we

5     spent a lot of our time in the run-up to elections

6     focused on voter registration.  But I can't give you

7     a percentage both before or after SB 202.

8               But I do know we were focused on after SB

9     202 making sure people understood the changes and how

10    it would vastly affect African-Americans and people

11    of color.

12         Q.  Same question before SB 202, can you give me

13    a percentage of the State Conference's work that was

14    dedicated to get-out-the-vote campaigns?

15         A.  Before SB 202, we ran a very robust

16    campaign.  I can't give you a percentage.  After SB

17    202, we had to focus a majority of the time on voter

18    education.  But once we got into the election cycle,

19    we had to increase the number of counties that we

20    would be doing GOTV to try to blunt the effects of SB

21    202.

22              So we increased it from 12 to 13 counties to

23    59 counties.  And then we did the bus tours and all

24    the other things to make sure we got the vote out.

25    Again, I can't give you a percentage.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 54

1      Q.  Can you give me a percentage of the State

2   Conference's work before SB 202 that was devoted to

3   responding to voter queries or assisting with

4   problems in voting?

5      A.  I can't give you a percentage.  I know we

6   did spend a lot of time in 2019 and 2020 on

7   complaints.  But I can tell you after SB 202, that

8   went up tremendously.

9      Q.  By "tremendously," can you --

10     A.  We had to bring on new staff to deal with

11  the voter calls and to respond to the issues.  We had

12  to -- we had to respond to voter challenges like we

13  did in Gwinnett County when 30,000 individuals were

14  attempted to be removed and challenged.  And we had

15  to educate people that these particular challenges

16  would occur.

17     Q.  When you say you had to add people, were

18  these the people that we discussed earlier or were

19  they additional people?

20     A.  The two lawyers and the state director, yes.

21     Q.  Did the State Conference devote resources to

22  voter challenges before the SB 202 --

23     A.  Not to my -- not to my knowledge, no.

24     Q.  Before SB 202, what percentage of Georgia

25  State Conference's activities were devoted to

Page 55

1    transporting voters to vote at a polling place, which

2    I believe was the only place you said that you were

3    involved in?

4         A.   I can't give you a percentage.  I know that

5    we ran a robust program to mobilize people

6    partnership with Lyft and Uber and churches, civic

7    organizations.  After SB 202, we had to ramp that up

8    and add more churches, more civic organizations, but

9    I can't give you a percentage.

10        Q.   Why did you have to add more people to

11   transportation after SB 202?

12        A.   To make sure that we made up for the amount

13   of people that we believe would be affected by SB

14   202.

15             So in going from a 12- to 13-county strategy

16   to a 59-county strategy, we needed to be able to

17   mobilize the people effectively.  So we had to bring

18   in more -- more partners, as well as more resources.

19        Q.   I guess what I'm trying to understand is:

20   How did SB 202 increase the transportation -- I

21   believe -- let me back up little bit.

22             I believe you said that the State Conference

23   had to increase its transportation programs after

24   SB 202; is that correct?

25        A.   That's correct.

30(b)(6) Gerald Griggs                     February 21, 2023
Georgia Senate Bill 202, In Re

Page 56

1        Q.   How did SB 202 increase the need for the

2   State Conference's transportation programs?

3        A.   There were no more mobile voting units in

4   the big counties.  They were moving the drop boxes

5   inside of the polling precincts, which means people

6   had less of an opportunity to actually use them.

7             Particularly, the drop boxes were available

8   all the way up to the election.  Under SB 202, the

9   drop boxes ended on that Friday before the election

10   and  were not available Saturday, Sunday, Monday.

11             So we had to make sure that the people that

12   were using the drop boxes had rides to get to the

13   polls to actually use their -- their abilities to

14   exercise the right to vote.

15             So we had to have more partners with more

16   buses, with more Lyft codes to make sure those

17   individuals didn't get disenfranchised by the law.

18        Q.   Before 2020, were there mobile voting

19   stations?

20        A.   I don't -- I don't think so.  No.

21        Q.   Before 2020, were there drop boxes?

22        A.   No.  There were -- not that I know of.

23   There were no drop boxes.  There were also -- before

24   2020 there were unlimited voter challenges.

25        Q.   I understand.  We'll talk about the voter

Page 57

1    challenges.  I definitely want to get into that a

2    little bit and how that played out with the State

3    Conference.

4          A.  Mm-hmm.

5          Q.  And then my last question -- I think I know

6    the answer -- can you provide a percentage of the --

7    can you provide a percentage of the Georgia State

8    Conference's activity that was devoted to providing

9    food and water to voters at polling places before

10   SB 202?

11         A.  I can't give a percentage.  We again ran a

12   program "parties to the polls" and other events to

13   provide line relief.

14              After SB 202 we had to change that strategy,

15   move it.  In some areas it went down because there

16   are certain communities in Georgia where it would be

17   a risk for units to provide line relief even within

18   the confines of the law because there are individuals

19   who believe that, you know, criminalizing giving

20   people comfort is a smart strategy when people are

21   simply trying to exercise their right to vote.

22              So in certain communities it went down.

23   Other communities it went up.  So I definitely can't

24   give you a percentage.

25         Q.  Does the State Conference claim that it has

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 58

1    had to divert nonfinancial resources as a result of

2    what it alleges are the unconstitutional or otherwise

3    unlawful provisions of SB 202 or the acts of the

4    defendants in this case?

5         A.  Yes.  We do.

6         Q.  Are there activities or projects in which

7    the State Conference was unable to continue as a

8    result of the diversion of resources prompted by SB

9    202 and the implementation of it?

10        A.  I wouldn't say discontinue.  I would say

11   that we had to reduce our attention on certain things

12   to combat the effects of SB 202.

13             Like I said before, we had to run a robust

14   voter education program to make sure people

15   understood what was coming and what actually

16   happened.  And so it shifted our focus away from, you

17   know, housing and other things that we normally do to

18   focus on that, so yes.  And we had to bring on new

19   staff.

20        Q.  Right.  I understand that.

21             So I -- for the next few questions I want to

22   focus on -- you started to get into this in your last

23   answer -- what State Conference activities are

24   getting fewer resources as a result of SB 202.  And

25   they can be, you know, mentioned things --

Page 59

1      A.   Yeah.   Housing, environmental justice, some

2   of our discrimination work, economic development.   I

3   mean, membership.   We haven't been focused on

4   membership.   We've been focused on protecting

5   people's right to vote.

6           So those are just a few of the areas.   And,

7   of course, we had to shift our GOTV strategy, which

8   means we didn't dedicate as much time on actual GOTV

9   strategy; we focused on voter education.   And then,

10  you know, once the election started, we focused on a

11  robust 59-county strategy to blunt the effects of

12  SB 202.

13     Q.   Did you -- did the State Conference shift

14  personnel away from your housing initiatives?

15     A.   No.   We didn't shift personnel.   We added

16  new personnel to deal with voter education and voter

17  election protection because, remember, we have all

18  volunteers.

19          Now, there are members of the state housing

20  committee who worked on GOTV specifically in Gwinnett

21  County.   So, no, we didn't shift the number of

22  volunteers.   We shifted the focus of the volunteers

23  towards voter education and election protection.

24     Q.   I guess my question is this -- let me ask

25  two questions.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 60

1          First, among your staff members --

2          A.  Yes.

3          Q.  -- seven or eight I think you said that were

4     staff members, and they deal -- I didn't write down

5     all of them but housing, environmental justice --

6          A.  Housing, environmental justice, membership,

7     discrimination, several other --

8          Q.  I thought there was discrimination in there

9     somewhere.

10          Were any -- were any of those staff members

11     shifted -- did their responsibilities change as a

12     result of SB 202?

13          A.  No.  Their focus changed.

14          Q.  And when you say "their focus changed," I

15     mean, let's just take housing for an example and you

16     can say how it's the same or different with the

17     others and maybe it's just the same.  Maybe it's not.

18          How did -- you know, the person in charge of

19     housing, how did her or his -- when you say "the

20     focus changed," how did that affect her or his

21     activities?

22          A.  So the housing chair went from responding to

23     issues of housing discrimination to actually have to

24     respond to voter challenges at Gwinnett County,

25     30,000.  She had to go testify before local education

Case 1:21-mi-55555-JPB Document 731 Filed 10/29/23 Page 61 of 466
30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 61

```
 1    boards to keep polling precincts open.  She had to

 2    actually partner with churches to make sure there

 3    were effective GOTV in Gwinnett County.

 4            So her responsibilities shifted -- I mean,

 5    she literally is just now getting back to her housing

 6    responsibilities as of last month from the runoff.

 7            So her responsibilities have drastically

 8    changed.  But her -- like her -- her focus has

 9    drastically changed, her responsibilities didn't

10    change.  And so she had to -- it's sort of like a

11    firefighter.

12            If there's a one-alarm fire blazing over

13    there but there is a five-alarm fire over there,

14    we're going to have to go over there to deal with the

15    five-alarm fire and then get back to one-alarm.

16    That's how her focus changed.

17        Q.  So I think I'm getting a clearer picture

18    here.

19            So you're saying she -- the housing person

20    ended up spending a percentage of her time -- can you

21    tell me how much of her time was spent on voter

22    issues instead of housing during this period?

23        A.  I mean, it would be -- it would be me

24    speculating if I gave you a number.

25        Q.  I don't want you to speculate but give me
```

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 62 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 62

1    the best -- give me the best answer you can give me

2    with respect to -- as I understand it -- let me back

3    up.

4              As I understand it, you said they changed

5    their focus and I think what you mean is that they

6    spent time --

7         A.   Yes.

8         Q.   -- doing --

9         A.   They spent large amounts of time --

10        Q.   -- voter related --

11        A.   -- large amounts of time doing voter related

12   voter education, voter challenges.

13             I mean, she -- she went to like four or five

14   local election board meetings instead of dealing

15   with, you know, housing discrimination.

16             So, I mean, she's a perfect example of what

17   we had to shift to do.  I mean, she -- you know, she

18   was actually in contact with some of her local

19   elected officials to address these issues that she

20   wouldn't have had to have been in contact with except

21   for the purpose of SB 202.

22        Q.   What was the name of your housing person

23   again?

24        A.   Penny Poole.

25        Q.   With respect to the other State Conference

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 63

1    staff, did they also -- to your knowledge, did they

2    also spend time engaging in SB 202-related

3    activities --

4            A.  Yes.  They did.  They did.

5            Q.  Can you explain who did -- who did what, to

6    the best of your knowledge --

7            A.  So --

8                MR. PULGRAM:  I want to just caution as

9            to information that may not be public.  If

10           the identity of the person is public, then

11           we're going to not worry about the First

12           Amendment intrusion due to the threat of

13           reprisals.  But if they were a nonpublic

14           person, there could be issues there.  I

15           think he can answer the question.

16               MR. FALK:  Yeah.  It sounds like it.

17   BY MR. FALK:

18           Q.  Let me explain.  I'm mostly interested in

19   who -- what position did what and to the extent the

20   person -- anybody that could be a witness, I want the

21   name.  And if you're going to object, then there

22   can't be a witness.

23               But we can go -- we can go through them one

24   by one.  I'm mainly interested in the same sort of

25   information you gave me about the housing person.

Page 64

1          A.   Okay.

2          Q.   You said she had to do X, Y and Z.  You

3     can't give me a percentage but she had to do X, Y, Z

4     instead of doing housing.

5               MR. PULGRAM:  And she was public in her

6          appearances, so I didn't object to that.

7               MR. FALK:  And she was public in her

8          appearances.  And, you know, if there is

9          someone who is not public, we can deal with

10         them by function instead of name.

11              MR. PULGRAM:  That sounds great.

12              MR. FALK:  But let's --

13    BY MR. FALK:

14         Q.   Can you explain -- go down the list as best

15    you can and explain who got involved -- who -- you

16    know, each person -- aside from the election person,

17    who had -- who was pursuing other projects before

18    SB 202 that --

19         A.   Other election-related projects.  If we're

20    talking about the political action chair, yes.  Other

21    election-related --

22         Q.   The political action chair we know got

23    shifted to SB 202.  I want to talk about other people

24    like the housing person and anybody else -- the

25    environmental justice or anybody else, that instead

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 65

1    of doing their job that their title went along with,

2    had to do stuff related to 202 and to the extent you

3    can describe that --

4         A.  Let me --

5         Q.  -- start.  And then I'll ask follow-ups if

6    there are any.

7         A.   I mean, there are several -- most of them

8    weren't as highly public as the housing chair.  But

9    for the most part, all of the volunteers and many of

10   the committee chairs had to shift their focus to

11   respond to SB 202, whether that was, you know, the

12   protest before the bill passed, some of the

13   conversations that went on as the bill was

14   matriculating through both houses, and then after it

15   passed, our attempts to blunt its effects.

16        So it was quite a few of them that were

17   focused solely on, okay, this bill is coming.  We

18   have to respond to this bill and how we respond.

19        Q.  Can you be more specific as to particular

20   individuals?  Let's start with the description and

21   then we'll worry about the identity later.

22        But can you be more specific about what the

23   people at the State Conference level, besides the

24   housing person and political action person, what

25   activities they engaged in that were not their

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 66 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 66

1    normal --

2         A.  Yeah.  So for the most part, each committee

3    has its own responsibilities like the education

4    committee has responsibilities, health committee,

5    veterans affairs committee.

6         But as SB 202 was matriculating, they had to

7    shift to help the political action chair and then to

8    also go into their own community -- because we're a

9    state conference --

10        Q.  Right.

11        A.  -- so they are in their own communities

12   addressing these issues, whether it's voter

13   education, whether that's voting challenges, whether

14   that's eventually GOTV.

15        So they all shifted their focus.  You know,

16   they may not have been dealing with specifically

17   veterans affairs, they would be dealing with the

18   effects of SB 202 on veterans who may be overseas,

19   who may not be able to address the issues with

20   absentee balloting and can't fly back here to vote in

21   person.

22        If it's the education chair, I've got to

23   deal with the HBCUs and some of the students who

24   would not be able to vote because they are off to

25   college or they don't have access to the ability to

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 67

1    do absentee ballots.

2              So all of these things, they took parts of

3    their main focus and adjusted them to respond to

4    SB 202 in a voting rights concept.

5         Q.  And so which activities were these that

6    were -- the focus was changed?  We mentioned housing,

7    veterans affairs.  What other activities were hours

8    devoted to SB 202 instead of --

9         A.  So housing, veterans affairs, education,

10   membership.  And those are the ones that come to top

11   of mind.  Those weren't all of them, but I can't

12   recall the rest.  But those are the ones top of mind.

13        Q.  And this change in hours spent occurred at

14   the State Conference level?

15        A.  And the branch level.

16        Q.  And the branch level?

17        A.  Yes.  Or units --

18        Q.  Right.  I wanted to make -- it's both at the

19   State Conference -- the individuals that are in your

20   office?

21        A.  Yes.

22        Q.  And then the committees -- the broader

23   membership --

24        A.  Yes, yes.  That's correct.

25        Q.  How are the decisions made to divert the

Page 68

```
 1    State Conference resources to --

 2         A.  Typically, the decisions --

 3         Q.  Sorry, Mr. Griggs.  Let me finish the

 4    question.

 5         A.  Oh, I'm sorry.  I thought you were finished.

 6         Q.  No.  I understand.  I was just trying to

 7    finish --  let me finish the sentence so it comes out

 8    a little bit cleaner.

 9         How are decisions made to divert resources

10    from the previous responsibilities of the State

11    Conference employees to responses to SB 202?

12         A.  So based on the constitution and bylaws, the

13    president is the decisionmaker.

14         What would happen is I would have a

15    conversation with the committee chairs and the

16    volunteers to see which issues we need to address.

17    And then in consultation with the administrators, we

18    would make a decision on where to divert our

19    attention or our resources to have the broadest

20    impact.

21         And that conversation typically happened and

22    it would shift.  So, again, I wasn't the president at

23    the time.

24         Q.  Sure.  That was my other question.  When did

25    you become president again?  I should have asked.
```

Page 69

1       A.   I became president in April of 2022.

2       Q.   Okay.   Thanks.

3            So you weren't the president before then, so

4       you don't know what happened before then.  But since

5       then --

6       A.   I know some of what happened because, again,

7       you know, I was supposed to have consultation with

8       others who had the information.

9       Q.   Right.

10      A.   Now, I wasn't able to speak directly to

11      President Woodall about how things occurred.  But

12      having been the third vice president of the State

13      Conference before President Woodall, I do know the

14      inner workings of the association.

15      Q.   And you mentioned administrators.  What did

16      you mean by that?

17      A.   So the State Conference is under

18      administration.  So National board members have to be

19      consulted before anything happens within the State

20      Conference.

21      Q.   When you say "under administration," what do

22      you mean by that?

23      A.   Meaning that the National board has some

24      more hands-on input into the day-to-day action of the

25      State Conference.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 70

1          Q.  More than what?

2          A.  More than normal.

3          Q.  More than normal?

4          A.  More than what's by the bylaws.

5          Q.  Why was that?

6          A.  There was concern about the functioning of

7     the State Conference from the National board.

8          Q.  Did those concerns -- when did those

9     concerns arise, if you know?

10         A.  During President Woodall's administration.

11         Q.  What were the times of --

12         A.  20 -- let me get -- so President Johnson was

13    2017 to 2019.  President Woodall -- no.  Wait.  No.

14    President Johnson would have been 2016 to 2018.  Then

15    President Blake -- okay.  So Johnson, Blake, Woodall,

16    Pierce, me.

17              President Johnson 2016 to 2018.  President

18    Blake from 2018 to 2019 or so.  And President Woodall

19    was 2019 to 2021.  And then President Pierce for

20    about eight months and then me.

21         Q.  Is there any documentation of your decision

22    to divert resources from the activities in which

23    State Conference employees were engaging before SB

24    202 toward activities responding to SB 202?

25         A.  There may be.  I haven't seen any but there

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 71

1    may be.
2         Q.  But you haven't seen documents --
3         A.  No.
4         Q.  And with respect to the decisions that were
5    made after you became the president, you're unaware
6    of any documents --
7         A.  Rephrase that question.
8         Q.  Yeah.  With respect to the decisions that
9    you were involved in, which would be April 2022 to
10   the present --
11        A.  Yes.
12        Q.  -- if I have that correct, you're not aware
13   of any documents that reflect the decisions that you
14   made to divert resources; is that correct?
15        A.  Yeah.  I am aware of documents that reflect
16   the decisions that I made.
17        Q.  All right.  We'll -- and what sorts of
18   documents would those be?
19        A.  Those would be E-mails.
20        Q.  Okay.
21        A.  Yeah.
22            MR. FALK:  Sorry.  I thought I had an
23        exhibit here, but I'm not sure that we need
24        it.  I think we can just ask... we'll just
25        ask the question.  And if we need an

Page 72

1        exhibit, we'll get it after lunch.

2   BY MR. FALK:

3        Q.  Did the State Conference -- strike that.  I

4   don't have that question.

5             Isn't it correct at the 2022 election there

6   was record turnout?

7        A.  That's true.  Yes.

8        Q.  Does the Georgia State Conference plan to

9   resume its allocation of resources before SB 202 in

10  the face of that record turnout?

11       A.  Because of the reallocation of the Georgia

12  State Conference's resources, you had record turnout.

13       Q.  So is the allocation -- is not -- no current

14  plans -- are there no current plans to change the

15  allocation of resources?

16       A.  We're not going back to 2019 or 2020.  We're

17  going to build off of 2021 and 2022 so SB 202 does

18  not have an effect on people of color.  And that's

19  why you had record turnout for African-Americans in

20  this state because of the work of the Georgia State

21  Conference.

22       Q.  Let's turn to --

23            MR. FALK:  Let me see what the exhibit

24       was.  The responses and objections, was that

25       Exhibit 3 or 2?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 73

1            THE REPORTER:  I think that's 3.

2            THE WITNESS:  Yeah.  3.

3            MR. FALK:  I just want to look at a

4        couple of things real quickly.

5     BY MR. FALK:

6        Q.  And that would be -- yeah.  I think it's

7     just on Page 17 of the responses and objections of

8     the State Conference to the various discovery

9     requests.

10        A.  Okay.

11        Q.  Page 17, response to Interrogatory No. 5.

12        A.  Okay.

13        Q.  We already discussed the changes to line

14     relief activities.

15            Is there anything else that you can talk

16     about in the changes beyond what you already

17     testified to?

18        A.  Not that I can think of.

19        Q.  And then the next paragraph -- the next

20     paragraph says, Plaintiff will also not assist voters

21     who need help copying, scanning or digitizing

22     completed absentee ballot applications and ID

23     documents to the extent such assistance would require

24     the handling of completed absentee ballot application

25     forms.

Page 74

1          I guess my question to you is, I understand

2     completed absentee ballot applications you're not

3     going to be handling.  But why would you not assist

4     with the copying, scanning or digitizing of ID

5     documents which I understand need to be provided with

6     an application?

7          A.   I think the interrogatory answers the

8     question because SB 202 criminalizes the handling of

9     absentee applications.  And further, since SB 202,

10    the Georgia Bureau of Investigation has now been

11    deputized as an arm of the political -- I'm sorry --

12    the election policing arm.

13         So we are afraid to have continued

14    criminalization of anything involving the handling of

15    these applications.  And we don't want to put our

16    members nor anyone else in potential criminal

17    jeopardy.

18         Q.   But with respect to ID documents, scanning

19    an ID document, do you view that as a completed

20    application that's criminalized?

21              MR. PULGRAM:  Objection to the extent it

22         calls for legal conclusion.  You can

23         answer --

24              MR. FALK:  I'm just asking for his

25         views.  It can be right or wrong.

Page 75

```
 1              THE WITNESS:  I think I come to this
 2         question in a different perspective than
 3         anybody else being a practicing criminal
 4         defense attorney for 20 years.  We don't
 5         need anybody even remotely close to the
 6         interpretation of the law that's open.  So
 7         we don't want to put anybody in criminal
 8         jeopardy at all.
 9    BY MR. FALK:
10         Q.  I want to drill down a little bit more on
11    what we've already discussed in pretty broad terms,
12    which is what you've increased, what you diverted
13    resources to.
14         A.  Okay.
15         Q.  Actually, one last question:  We talked
16    about the diversion of resources among the -- what
17    I'd call the employees.  I don't know if I have that
18    right, of --
19         A.  Well, three of them are employees.  The
20    others are volunteers.  But, I mean, they are
21    committee chair, so, I mean, they do work for the
22    State Conference.  They are just not paid.
23         Q.  I gotcha.  That level, there were seven or
24    eight, I think you said --
25         A.  Yes.
```

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 76

1           Q.  -- that we've -- were volunteers at the
2      State Conference level, apart from those people,
3      apart from the seven or eight that we've talked
4      about --
5           A.  Yes.
6           Q.  I guess, first, are there other volunteers
7      at the State Conference level that work under those
8      people?
9           A.  They don't work under the people; they work
10     with them.  But, yes, there are others.
11          Q.  At the State Conference level?
12          A.  Yes.
13          Q.  Not the community level?
14          A.  Yes.
15          Q.  Can you tell me how many of those State
16     Conference level volunteers that we haven't discussed
17     yet changed their activities as a result of SB 202?
18          A.  I would say probably about three, aside from
19     the other seven.
20          Q.  Mm-hmm.  And can you please explain what
21     those changes were and what they stopped doing and
22     what they started doing instead as a result of SB
23     202?
24          A.  Okay.  So the State Conference runs a very
25     robust communications committee.  You showed me a

Page 77

 1    couple of exhibits of some of the things that were

 2    done by them.

 3              They had to change their messaging.  So

 4    instead of responding to climate issues,

 5    environmental issues, they had to focus all of their

 6    messaging on SB 202 as putting together press

 7    releases, press conferences, digital information to

 8    make sure that the messaging got out.  That's one --

 9    excuse me -- one example.

10              I mean, legal redress and criminal justice,

11    they shifted a little bit.  They were still

12    responding to issues that happened in the community

13    around criminal justice issues and legal redress

14    issues.  But they did assist, especially the legal

15    readdress, in helping the election protection lawyers

16    because both of them are lawyers.

17              The election protection lawyers, in

18    responding to issues that may deal with voter

19    challenges or may respond to, you know, polling

20    precinct changes and issues that happened at the

21    local election board.

22         Q.  Can you quantify what proportion of their

23    time had to be shifted in this way?

24         A.  No.  As I answered previously, I can't give

25    you a percentage.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 78

1          Q.   So among the increased efforts that have

2     resulted from SB 202, why don't we -- again, looking

3     at -- was Exhibit 4 the discovery responses?

4          A.   3.

5          Q.   3.   I looked at -- I guess Page 11 is

6     probably the best place to look and to go down and

7     figure out what -- what the increased activity has

8     been here.

9          A.   Okay.

10         Q.   The first -- the first long answer is -- has

11    to do with voter education about particular aspects

12    of SB 202; is that correct?

13         A.   That's correct.

14         Q.   And these responses you signed -- you were

15    the witness signing these responses; is that correct?

16         A.   That's correct.

17         Q.   You signed them back in --

18         A.   -- May of --

19         Q.   -- May --

20         A.   -- 2022 --

21         Q.   -- something like that?

22         A.   Yes.

23         Q.   So that was before the last -- before the

24    voting days, I guess the election cycle had started?

25         A.   Yes.   I think the primary had happened or

Page 79

1    was about to happen --

2         Q.   About to happen.  I see.

3         A.   -- and then the general was coming,

4    midterms.

5         Q.   So what were the -- what resources -- what

6    people -- which I think were the resources we're

7    talking about here -- were shifted to the new

8    education initiatives that you describe on Page 11

9    and 12?

10        A.   Pretty much all of the ones we just talked

11   about but particularly housing, comms, the two

12   lawyers and our office assistant particularly were

13   focused on this as well as the units.

14             So they were supporting the units in this

15   voter education on absentee -- new blurbs on absentee

16   voting and by mail and a lot of other things.

17        Q.   With respect to voter registration --

18        A.   Mm-hmm.

19        Q.   Let me back up.

20             On voter education, your answer points out

21   what was different.

22             Was the volume more -- the volume of voter

23   education efforts by the State Conference, did that

24   increase?

25        A.   Yes.  It did.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 80

1        Q.   In terms of personnel, can you say by how

2    much?

3        A.   I can't give you a percentage, but I know it

4    increased substantially.

5        Q.   Were there additional people you used for

6    voter education?

7             MR. PULGRAM:   I think this is asked and

8        answered.  You've gone through this before.

9             MR. FALK:   He's talked about the shifts.

10       I'm asking if --

11   BY MR. FALK:

12       Q.   Did you add people to do this?

13       A.   By hiring people or just add people to those

14   tasks?

15       Q.   Add people to the tasks -- I mean, let's

16   back up.

17            I think you mentioned that there were, I

18   think, three people that were hired.

19       A.   Yes.

20       Q.   And but they were -- I thought if I

21   understand correctly, that was the hotline and then

22   the state director, I guess.

23       A.   That's correct.  And that's why I was

24   asking.

25       Q.   Right.  I guess what I'm asking is, were --

Page 81

1    did the State Conference shift additional

2    volunteer -- apart from the people we've already

3    discussed, additional volunteer resources at the

4    state level to voter education?

5         A.  Not aside from the people we've already

6    named and the conversations -- the questions you've

7    already asked.

8         Q.  How about what personnel -- were any

9    personnel shifted to voter registration as a result

10   of SB 202?

11        A.  No.  No personnel was shifted to voter

12   registration.  As I stated before, we run a program

13   with ProGeorgia that we didn't get to do as much as

14   we normally do because we were focused on voter

15   education.

16        Q.  So voter registration would be in the

17   category that went down as a result of SB 202; is

18   that correct or did I misunderstand the answer?

19        A.  That's correct.  It did go down.

20        Q.  With respect to Get Out the Vote programs,

21   was there an increase after SB 202 in personnel

22   resources devoted to that?  Or the same?  Or

23   decrease?  What -- what was the change, if any?

24             MR. PULGRAM:  Objection.  Asked and

25        answered.

Page 82

1    BY MR. FALK:

2         Q.  You can answer.

3         A.  Okay.  Initially it went down.  And then

4    once we shifted from, you know, the voter

5    registration that we did do and, of course, the

6    continuing voter education -- once we got into --

7    more into the general, then it went up because we

8    added the 59 counties.

9              So, yes, resources were diverted to a robust

10   voter mobilization plan.

11        Q.  We discussed the two lawyers that you added

12   to respond to voter query or assisting with voter

13   problems in voting?

14        A.  Yes.

15        Q.  Were there other State Conference resources

16   that were diverted to respond to voter queries or

17   assisting with problems in the face of SB 202?

18        A.  Yes.  Some of the committee chairs were

19   shifted.  Like I said, housing was.  And then, of

20   course, one step down, the units definitely shifted

21   to responding to the challenges because we have to

22   get the complaints from the units in order to

23   mobilize from the State.

24              So, of course, we got complaints from

25   Gwinnett.  We fielded queries from Cobb, Coffee

Page 83

1    County, and a couple of others that I can't remember

2    off the top of my head.  But we definitely shifted

3    resources both at the state and the unit level.

4          Q.  At the state level, which persons -- and you

5    can describe their function.  And depending on the

6    answer, I will or will not ask their identity.

7              Which persons -- personnel shifted the

8    responsibilities to respond to voter queries or

9    assist with voter problems after SB 202 in addition

10   to the people that were added?

11         A.  So, again, the housing -- housing committee

12   chair, the comms committee chair, the two lawyers

13   that were added were primarily focused on that.  The

14   administrative assistant who was fielding the calls,

15   both from the community and from the units, were all

16   focused on responding.

17             And then, of course, at the unit level, the

18   political action chairs, the presidents were all

19   focused on the challenges because they were getting

20   the lion's share of the calls.

21         Q.  Is the communications committee chair -- is

22   that person's identity public?

23         A.  Yes.

24         Q.  Who is that?

25         A.  Dontaye Carter.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 84

1          Q.   Thank you.

2          A.   Mm-hmm.

3          Q.   With respect to voter transportation, I

4     think I understood your testimony to be that the

5     State Conference extended its -- increased the size

6     of its city tour, I think you said from 22 cities to

7     59 cities.  Do I have that right?

8          A.   No.  That was the voter mobilization plan

9     from 12 to 13 to 59.

10         The tour was 22 cities and that was the

11    first time the State Conference had ever done

12    anything like that.  And that was in response to SB

13    202.  We had to be on the ground.

14         Q.   And the tour involved -- making sure I have

15    this straight.

16         Did the tour involve voter transportation to

17    the polls?

18         A.   The bus didn't.  The Lyft codes and the --

19    from Lyft and Uber and the church mobilization, they

20    had buses.  But there was an actual State Conference

21    bus that drove around the 22 different cities in

22    Georgia to make sure we were educating the voters.

23         They had a mobilization plan.  And they

24    understood where their polling precincts were, so

25    they were prepared both for early vote and for

Page 85

1    election day.

2         Q.  So is it correct that that tour was

3    educational -- a variety of educational missions but

4    did not directly provide transportation resources to

5    voters?

6         A.  No.  The bus didn't.  The Lyft codes did.

7         Q.  Right.

8         A.  And the church -- so we had partners,

9    churches that we were partnering with that would

10   provide their buses for seniors and other individuals

11   that were disabled to ride to the polls.  But our

12   bus, which is the actual tour bus, did not provide

13   transportation to the polls to anybody.

14        Q.  Were the Lyft codes and other ride codes --

15   sorry, did the volume of Lyft codes and ride codes

16   increase as a result of SB 202 or the same, do you

17   know?

18        A.  I don't know because I didn't get that back

19   end information, so I don't know.

20        Q.  Did the State Conference's line relief

21   activities increase in volume as a result of SB 202?

22             MR. PULGRAM:  Objection.  Overbroad.

23        Compound.  And it's asked and answered.

24             THE WITNESS:  So the State Conference's

25        did but some of the units did not.  So

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 86

1          again, part of the 22-city tour was

2          parties-to-the-polls.  But again, we have

3          180 units, so all of them did not

4          participate.

5               And we did get reports directly from the

6          ground that some people cancelled their line

7          relief efforts for fear of reprisal by local

8          law enforcement.

9     BY MR. FALK:

10          Q.  I just want to be clear that the change at

11     the State Conference level with respect to line

12     relief was confined to the 22-city tour or was there

13     more?

14          A.  It was confined to the 20-city tour.

15          Q.  That piece?  Just that piece?

16          A.  Yes.

17               THE REPORTER:  When we get to a good

18          stopping point -- we're coming up to two

19          hours.  I need a break.  My legs need to

20          stretch.

21               (Discussion ensued off the record.)

22               THE VIDEOGRAPHER:  The time is now

23          12:09 p.m. and we are off the record.

24               (Discussion ensued off the record.)

25               THE VIDEOGRAPHER:  The time is now

Page 87

1           12:10 p.m. and we are on the record.

2                MR. FALK:  Okay?

3                THE VIDEOGRAPHER:  The time is now

4      12:10 p.m. and we are on the record.

5                MR. FALK:  For real?

6      BY MR. FALK:

7           Q.  There are substantial changes to election

8      procedures in 2020; is that correct?

9           A.  That's correct.

10          Q.  Among these were the first use or at least

11     widespread use of drop boxes?

12          A.  Yes.  That's correct.

13          Q.  And there were certainly much greater use of

14     absentee and mail ballots than there were before?

15          A.  That's correct.

16          Q.  There were mobile voting units for the first

17     time?

18          A.  To my knowledge, yes.

19          Q.  And at least greater use of early voting; is

20     that correct?

21          A.  That's correct.

22          Q.  Did the State Conference undertake efforts

23     to educate voters about those changes?

24          A.  Yes.  We did.

25          Q.  You would agree those were pretty

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 88

1    substantial changes during the pandemic 2020?

2         A.  Yes.  During the pandemic, they were, yes.

3         Q.  With respect to the quantity of resources,

4    nonfinancial resources -- the quantity of

5    nonfinancial resources, how did those efforts relate

6    to the efforts that were made after SB 202?  How much

7    smaller?  Bigger?

8         A.  As far as voter education or in general?

9         Q.  When voter education is a -- we'll -- we'll

10   do voter education and voter transportation, I think

11   were the things that would seem to be the bigger

12   deltas there.

13        A.  It paled in comparison to what we did in

14   response to SB 202.

15        Q.  So you're saying much less than?

16        A.  For 2020, yes.  As compared to post 2021,

17   yes.

18        Q.  What about the changes after SB 202 required

19   so much more education than the big changes in 2020?

20        A.  Because the big changes in 2020 seemed

21   reasonable to provide access to the ballot.  The 2021

22   were in response to a belief that was going around

23   the country that the 2020 election had been stolen

24   and that there was widespread election fraud going

25   on.

Page 89

1              So we needed to, one, ease the minds of the

2      concerned voters but also explain to them what these

3      new limitations would actually do and how we could

4      make sure that the voices of, you know, 2.2 million

5      African-Americans and people of color would still be

6      heard at the ballot box at the same level or greater

7      than 2020.

8              MR. FALK:  I think this is a good time

9         to break.

10             THE VIDEOGRAPHER:  The time is now

11        12:14 p.m. and we are off the record.

12             (Recess from 12:14 p.m. to 1:14 p.m.)

13             THE VIDEOGRAPHER:  The time is now

14        1:14 p.m. and we are on the record.

15     BY MR. FALK:

16        Q.  Mr. Griggs, I'm going to ask you a few

17     questions now about whether you know the basis or

18     what your understanding is of the basis of your

19     lawsuit here, the State Conference's lawsuit here.

20             Just answer the best you can and I'm sure

21     your counsel will step in if there's something over

22     the line.

23             MR. PULGRAM:  I do have this question:

24        Is there a particular topic of the

25        deposition that you're asking this under?

Page 90

 1            MR. FALK:  Yeah.  I'm sorry.  We've

 2        moved on to topic 9.

 3            MR. PULGRAM:  We do have objections to

 4        those but go ahead and start your questions.

 5            MR. FALK:  Yeah.  I know there's

 6        objections in some parts.  And we'll get

 7        those on the record and, you know, we'll

 8        proceed accordingly.

 9    BY MR. FALK:

10        Q.  What is your understanding of the basis for

11    the claim that the ID requirements in order to apply

12    for or return an absentee ballot are illegal?

13            MR. PULGRAM:  So I'm going to object to

14        that as beyond the scope of the deposition.

15        The deposition in topic 9 does refer to the

16        laws, policies and protocols alleged to be

17        unconstitutional.  It does not include this

18        particular area and subject matter --

19            MR. FALK:  This was -- go ahead.

20            MR. PULGRAM:  I'm going to allow the

21        witness to answer the questions, but I don't

22        believe that it's appropriate in this

23        deposition to be inquiring about them on --

24        as the representative or as the spokesman

25        for all information available to the

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 91

1          organization.
2              I'm also going to object to the question
3          as -- to the extent it calls for a legal
4          conclusion in asking this witness to
5          identify what the basis is for a legal
6          claim.
7              Subject to that -- and I would have that
8          standing objection to all of your
9          questions --
10             MR. FALK:  Right.  Yeah.  I tell you
11         what, I'm -- you've challenged I think 11
12         separate -- it's going to get -- we're going
13         to go through 11 things a few different ways
14         here.  And there will be objections to some
15         and no objections to others, I think.
16             So you can have a standing objection
17         definitely.
18             MR. PULGRAM:  Okay.  Yeah.  That's what
19         I wanted to make clear.
20             MR. FALK:  You can have a standing
21         objection.  And to be clear --
22      BY MR. FALK:
23         Q.  And this is for your benefit, Mr. Griggs, so
24      you know what I'm asking.  I mean, you or your
25      predecessor authorized this lawsuit.

Page 92

1          And when you bring a lawsuit, I want to know

2     what your understanding was, why you're suing over

3     this, that, the 11 things you're suing over.  We'll

4     worry about if there's anything -- all the questions

5     are going to sound exactly the same.

6          And your counsel has a standing objection

7     and if you can -- I will repeat -- can you just read

8     back that last question --

9          MR. PULGRAM:  Before we get there, so we

10         are clear on the record, I will have a

11         standing objection to questions about the

12         organization or attempting the 30 (b)(6)

13         bind the organization with respect to the

14         questions that you're asking about the basis

15         for the particular contentions.

16         I'm going to allow the witness to answer

17         the questions and reserve that objection

18         that it's beyond the scope of this Notice

19         and to the extent it calls for a legal

20         conclusion.  But I'm going to let the

21         witness answer the questions subject to

22         those objections.

23    BY MR. FALK:

24         Q.  All right.  So what is your understanding of

25    the basis for the claim that the ID requirements in

Page 93

1    order to apply for or return absentee ballots are

2    illegal?

3         A.  My understanding is this:  That the -- the

4    ID requirements for returning the absentee ballots

5    are an undue --

6              (Technical interruption.)

7              THE WITNESS:  -- undue burden on the

8         voter, particularly African-American voters

9         in violative of the Voting Rights Act, the

10        Fourteenth Amendment to the Constitution.

11        And we believe that they are akin to

12        literacy tests or poll taxes.

13   BY MR. FALK:

14        Q.  What is your understanding of the basis for

15   the claim that prohibiting public employees and

16   public entities from sending out unsolicited absentee

17   ballot applications, that that prohibition is

18   illegal?

19        A.  We believe that that places an undue burden

20   on the individuals who are attempting to assist

21   voters in having access to the franchise and is

22   violative of the Voting Rights Act and all the

23   federal protections around voting, including the

24   Constitutional amendments, meaning the First, the

25   Fourteen and the Fifteenth Amendments.

Page 94

1      Q.  Thank you.  And what's your understanding of

2   the basis that the limits and fines for private

3   parties sending absentee ballot applications in

4   certain circumstances is illegal?

5      A.  It would be the same contention as violative

6   of the Voting Rights Act, that the Fourteenth and

7   Fifteenth Amendments and all the protections for

8   voting as it's an undue restraint similar to a poll

9   tax or literacy test.

10     Q.  What is your understanding of the basis for

11  the claim that the delayed start and compressed time

12  for requesting or submitting an absentee ballot is

13  illegal?

14     A.  Similar to the previous answers.  It's

15  violative of the Voting Rights Act.  It's violative

16  of the Fourteenth and Fifteenth Amendments to the

17  Constitution and it disproportionately affects the

18  African-Americans in the access of the franchise, and

19  other minorities.

20     Q.  What is your understanding of the basis that

21  giving county registrar's discretion to limit early

22  voting to 9:00 to 5:00 -- 9:00 a.m. to 5:00 p.m. and

23  the discretion not to have early voting hours on

24  Sunday is illegal?

25     A.  It's definitely clearly violative of the

Page 95

1    Voting Rights Act, the Fourteenth and Fifteenth

2    Amendments to the United States Constitution as it

3    severely impacts the ability of African-Americans,

4    who particularly vote on Sundays, from having access

5    to the franchise.

6            It's definitely similar in consideration to

7    the literacy test and the poll taxes and counting the

8    amount of bubbles in a bar of soap.

9            So we believe it's violative of the

10   protections against undue impediments on the right to

11   vote.

12       Q.   What is your understanding of the basis that

13   restricting the number of and the access to absentee

14   drop boxes is illegal?

15       A.   Similar to our arguments on the other

16   provisions, it's violative of the Voting Rights Act.

17   It's violative of the Fourteenth and Fifteenth

18   Amendments.  It's restraints on access to the

19   franchise based on race.

20           And we would argue that it serves no

21   legitimate purpose solely except for limiting the

22   ability of African-Americans and people of color from

23   exercising the right to the franchise.

24           The reduction of the number of drop boxes

25   specifically targeted heavily minority areas and thus

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 96 of 466
30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 96

1    disproportionally disenfranchised black voters and

2    voters of color.

3        Q.  What is your understanding of the basis that

4    the restrictions on out-of-precinct voting are

5    illegal?

6        A.  The same arguments that have been made and

7    reasonings have been made.  It's violative of the

8    Voting Rights Act.  It's violative of the Fourteenth

9    and Fifteenth Amendments because it disproportionally

10   affects the ability of African Americans and other

11   people of color from having access to the franchise

12   because many of them live in areas where the polling

13   precinct lines are so long that it's almost

14   impossible for them to vote in a reasonable amount of

15   time.

16           So it would be easier for them to go to

17   other parts of the county that have no lines or very

18   limited lines because the Secretary of State and

19   others provide the requisite number of voting

20   machines in those areas than they do in the other

21   areas.

22       Q.  What is your understanding of the basis

23   that -- for the claim that replacing the Secretary of

24   State with -- on the state election board with a

25   member appointed by the general assembly is illegal?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 97

1        A.   It's illegal.   It's violative of the Georgia

2     Constitution as well as the Voting Rights Act, the

3     Fourteenth and Fifteenth Amendments to the United

4     States Constitution as it disenfranchises

5     African-Americans' election of a constitutional

6     officer and places that discretion in the general

7     assembly and, thus, dilutes their electoral power or

8     their ability to control their own local elections by

9     removing the presiding officer from the state

10    election board.

11            So similar to the other reasons listed for

12    all of the other issues with SB 202, this one removes

13    the ability of African-American voters and people of

14    color from being able to elect the person who's

15    responsible for the elections that they are now being

16    disenfranchised from.

17        Q.   And what is your understanding of the basis

18    for the claim that giving the state election board

19    the power to, in some circumstances, take over for

20    county boards of elections or registrars is illegal?

21        A.   It would be the same argument as made for

22    the previous parts of SB 202.   It violates the Voting

23    Rights Act.   It violates the Fourteenth and Fifteen

24    Amendments to the United States Constitution and

25    disproportionately affects the ability of

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 98 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 98

1      African-American and people of color to have a

2      substantial voice in their own local elections and

3      allows a state takeover from the state from

4      individuals who do not participate or are not elected

5      by those individuals who are affected by this

6      decision.

7            Q.   Getting close to the end here.

8                 What is your basis for the -- what is your

9      understanding of the basis for the claim that the

10     changes to the voter challenge procedure are illegal?

11           A.   The changes to the voter challenge

12     procedures are violative of the Voting Rights Act.

13     It's violative of the Fourteenth and -- Fourteenth

14     and Fifteenth Amendments to the United States

15     Constitution.

16                They are exactly akin to poll taxes,

17     literacy tests, grandfather clauses and all of the

18     other tools that we used prior to the passage of the

19     Voting Rights Act and prior to the passage of the

20     Thirteenth Amendment, the Fourteenth Amendment and

21     the Fifteenth Amendment.

22                They are the attempts to disenfranchise

23     black voters and people of color by allowing citizens

24     to challenge their ability to vote unlimited amounts

25     of times.

Page 99

1      Q.  What is your understanding of the basis for

2   the claim that the limitations on providing food and

3   water to people waiting in line to vote are illegal?

4      A.  Similar to the other arguments that have

5   been made.  It's violative of the Voting Rights Act,

6   violative of the Fourteenth Amendment and the

7   Fifteenth Amendment.

8          It has an unduly oppressive chilling effect

9   on providing the necessary needs of voters and other

10  people in the community who have to stand in these

11  ridiculously long lines because of the lack of

12  resources put in those particular polling precincts

13  which are disproportionately African-American and

14  people of color.  It stands as an impediment, a

15  direct impediment to the ability of people to

16  exercise the franchise.

17     Q.  And, finally, what is your understanding of

18  the basis that -- of prohibiting the use of mobile

19  voting units is illegal?

20     A.  Again, it's violative of the Voting Rights

21  Act, the Fourteenth Amendment, the Fifteenth

22  Amendment, as it disproportionately affects the

23  ability of African-Americans and people of color to

24  have reasonable accommodations made for these long

25  voting lines that disproportionately happen in

Page 100

1      African-American and minority communities because of

2      the lack of resources.

3              And, thus, they don't have mobile voting

4      units that can pull up to a precinct that's

5      overcrowded because of the lack of resources and have

6      access to the franchise.  And it would also

7      incorporate all the other reasons that were given in

8      the complaint that I didn't list for all of the

9      questions.

10        Q.  Other than communications with your

11     attorneys, how did the Georgia State Conference

12     evaluate SB 202 to determine which policies and

13     protocols it believes are unconstitutional or violate

14     federal law?

15              MR. PULGRAM:  So I appreciate you

16          excluding the communications with attorneys.

17          If there were any other communications,

18          internal deliberations as to strategies

19          would generally be within the First

20          Amendment protection.

21              So I think if there were communications

22          with others and attorneys in that process,

23          then we could have issues about that

24          question.  But I don't know the answer that

25          the witness would give to whether there are

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 101

1          any communications other than with attorneys
2          about that subject.
3              MR. FALK:  Fair enough.  Let's hear the
4          answer first whether there were any.  And
5          then the main thing that I'm asking is what
6          the process was.
7              THE WITNESS:  So the previous president,
8          in consultation with the executive committee
9          and the political action chair, reviewed the
10          clauses of SB 202.  And in that consultation
11          determined the potential effect of SB 202 on
12          African-Americans' ability and other
13          minorities' ability to exercise the right to
14          the franchise and made the decision on which
15          elements of SB 202 we believe should be
16          challenged.
17     BY MR. FALK:
18          Q.  What steps did the State Conference take to
19     become involved in this action?
20              MR. PULGRAM:  Objection.  Asked and
21          answered.  Vague.  And to the extent that it
22          involves the strategic considerations of how
23          to advocate with respect to the civil rights
24          of its members, we're going to ask you not
25          to answer.  If there's any other answer you

                                                    Page 102

1           can give to that question, then you're free
2           to answer it.
3                  THE WITNESS:  Yeah.  I think it involves
4           strategy, so I'm not going to answer it.
5    BY MR. FALK:
6           Q.  How did the State Conference decide to go
7    forward with this litigation?
8                  MR. PULGRAM:  Asked and answered.  As to
9           process, if there's any further information
10          that wouldn't reveal strategies, you can
11          describe the process.
12                 THE WITNESS:  The process was, after the
13          internal decision was made, to make contact
14          with the general counsel and the president
15          and the CEO to get approval and then make
16          contact with our attorneys and then file a
17          suit.
18   BY MR. FALK:
19          Q.  So when you say the president and CEO and
20   general counsel, you're talking about those officers
21   at the National and NAA; is that correct?
22          A.  Yes.
23          Q.  And so who at the State Conference or what
24   was the process, if there was a process or more than
25   one individual at the State Conference, who approved

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 103

1    that decision to take that step and go to the

2    National?

3        A.   That would be President Woodall.

4        Q.   Now, I want to ask you with specific

5    references to these particular practices to sort of

6    tie up -- I realize we're covering some ground that

7    we've addressed in part before, but I want to tie it

8    up with specific practices and I think --

9        A.   Okay.

10       Q.   Just to tell you what I'm doing here.

11           Now, I'm going to ask you what the State

12   Conference has done, other than its involvement with

13   this litigation, to address what actions you've taken

14   addressed these particular aspects that you

15   challenged?

16       A.   Okay.

17       Q.   Like I say, there's going to be some overlap

18   but some of these we haven't talked about yet.

19           So besides your involvement in the

20   litigation, what steps has the State Conference taken

21   to address the absentee ballot ID requirements?

22           MR. PULGRAM:  So you may answer the

23           question to the extent that it does not

24           reveal or concern the strategies for

25           advocacy of the group.

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 104

1           THE WITNESS:  Okay.

2           MR. PULGRAM:  If there are particular

3       steps that were not strategic conduct by the

4       group, then that I believe would be a

5       question that you could answer.  But I'm not

6       sure exactly what it means -- I guess

7       there's another concern here over the

8       vagueness of the term "address."

9           MR. FALK:  Let me try to make it

10      clearer.

11  BY MR. FALK:

12      Q.  I'm not actually looking for your strategic

13  discussions.  We've talked about on these questions

14  and we've talked about some of the -- I'm talking

15  about the outward-facing actions that the Georgia

16  State Conference has taken, not the internal

17  deliberations.

18          I'm just trying to tie the types of

19  actions --

20          (Phone interruption.)

21          THE WITNESS:  Sorry.  Let me cut this

22      off.

23          I'm listening.  Sorry.

24  BY MR. FALK:

25      Q.  I'm looking at the outward-facing actions of

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 105

1    the NAA Georgia with respect to -- starting with the

2    ID requirements for absentee ballots, not the

3    internal discussions.  I've moved on from how you got

4    here on the lawsuit and trying to -- we've talked

5    about some of the things that the NAA has been doing

6    and I'm trying to tie them to the particulars -- the

7    particular challenges.

8              So of the public-facing, the outward-facing

9    actions of the NAA, what steps address or what

10   responses address the ID requirements for absentee

11   ballots?

12       A.  So we launched a robust voter education

13   program to make sure that the public and our members

14   were informed of what the new requirements would be

15   and get that information out.

16             And, of course, we then launched a --

17   shifted gears and launched a voter mobilization plan

18   whereby we did mobilize in respect to that aspect.

19       Q.  And when you say mobilize with respect to

20   the ID requirement, what do you mean?

21       A.  I mean that after we educated our

22   constituency and our members, we made sure that they

23   exercised the new information that they had and how

24   to effectively use the new voter required -- voter ID

25   requirements for the absentee ballots.  But we pretty

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 106

1    much pushed people to vote early as opposed to voting

2    absentee.

3         Q.  And, again, other than your involvement in

4    this litigation, what public-facing actions, if any,

5    did the State Conference undertake to address the

6    prohibition on public employees and public entities

7    from sending out unsolicited absentee ballot

8    applications?

9         A.  For the most part, we ceased sending out or

10   responding to requests for absentee ballots just to

11   be safe.  So we ceased that.

12        Q.  I think that answers what was my next

13   question, the limitations on private entities.  I

14   think you just explained.

15        A.  Mm-hmm.

16        Q.  Was -- did the State Conference take any

17   action and response to the prohibition on sending --

18   public entities sending out unsolicited ballot

19   applications?

20        A.  Yeah.  We ceased any type of activities

21   sending out even solicited ones, just to be safe in

22   response to SB 202.

23        Q.  Other than your involvement in the

24   litigation, what public-facing actions did the State

25   Conference take to address the changed time limits

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 107

1    for requesting or submitting an absentee ballot?

2         A.  We responded with voter education on that

3    topic.

4         Q.  What did that voter education consist of?

5         A.  Making sure people understood the new rules

6    and requirements.

7         Q.  Was there -- did the State Conference engage

8    in public-facing communications, identifying and

9    warning people of the deadlines, for example?

10        A.  Yes.  We did.  As part of our comm strategy,

11   as far as our text banking and phone banking

12   strategies, we did that, yes.

13        Q.  So this voter education -- I'm just trying

14   to get a sense of the modalities that you used on

15   this.  And I will ask you if it applies to other

16   voter education.  But I take it -- I think you

17   referred to some meetings and public sort of events

18   of different kinds.

19             You just referred to phone banking.

20        A.  Mm-hmm.

21        Q.  Does that mean calling up voters and

22   informing them --

23        A.  Calling up voters, members, people that will

24   be affected in the constituency that we serve.

25        Q.  Right.

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 108

1          A.   So in total, in the voter education process,

2     we had in-person meetings, so town halls,

3     community -- civic organizations, churches.

4               We had a digital component, which would have

5     been the social media pushing that out.   E-mails.

6     And then we had a direct person contact, text

7     banking, phone banking, attempts to reach people

8     through the different sources of communication.

9          Q.   And then, again, apart from your involvement

10    in this litigation, what public-facing actions did

11    the State Conference take in response to limitations

12    on early voting hours and the absence in some areas

13    at least of Sunday early voting?

14         A.   Similar to what I just stated.   Through our

15    voter education program with in-person, with town

16    halls, with church meetings, with the digital -- the

17    digital component and, of course, through the text

18    banking and the phone banking.

19               And that arm, we attempted to get that

20    information out as best we could through our voter

21    education program.

22         Q.   And then again, other than your involvement

23    in this litigation, what public-facing action did the

24    State Conference take in response to the changes in

25    the number and access to absentee ballot drop boxes?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

                                              Page 109

1        A.   Through the education, we informed people of

2     the limited access.   Through the voter mobilization,

3     we pushed people to vote early instead of using drop

4     boxes.

5             Because by moving them inside and through

6     the 9:00 to 5:00 hours, they effectively banned drop

7     boxes because why would you go inside a polling

8     precinct, drop in a drop box when you just go over to

9     a machine and vote.

10       Q.   Isn't it true that if you had an absentee

11    ballot, a completed absentee ballot, it would take

12    less time to drop it off than to vote in person on a

13    machine?

14       A.   Some -- some jurisdictions, yes.   Others

15    maybe not.   It depends on how many drop boxes you

16    have.   Before 2020, yeah, it would have been a lot

17    more efficient to just put it in the drop boxes and

18    go about your business.

19            After 2020, when you had the drop boxes

20    moved inside, 9:00 to 5:00, the hours being limited,

21    some places where you have 20 machines and no wait,

22    it would be easier to go to the machine and vote as

23    opposed to the line that was for the drop boxes.

24       Q.   You're challenging the statute that

25    authorizes drop boxes --

Page 110

1          A.  Yes.

2          Q.  -- is that correct?

3          A.  Yes.  We are.

4          Q.  If you succeed on that claim, there won't be

5     any drop boxes in Georgia; is that correct?

6               MR. PULGRAM:  So I want to object to the

7          question on which this is based as

8          mischaracterizing the law and calling for a

9          legal conclusion, that is, that the law

10         authorized drop boxes.

11              And subject to that objection, I'm going

12         to allow you to go forward with this

13         question to the witness.

14              MR. FALK:  We can argue about what

15         authority, statutory authority there is for

16         drop boxes.  I know the answer and I know

17         the practice before 2020 but -- so just read

18         back the question, please.

19              MR. PULGRAM:  Well --

20              MR. FALK:  That's a legal argument, so

21         we can talk about that.

22              MR. PULGRAM:  It is a legal argument but

23         I believe you've mischaracterized the law in

24         the way that you phrased the question.  And

25         on that basis, object to it.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 111

1              MR. FALK:  I mean, you can -- let's just

2       go forward with the question.

3              MR. PULGRAM:  It calls for a legal

4       conclusion in any event.  But you don't

5       want that from this witness because you know

6       his lawyers are going to make those

7       arguments --

8              MR. FALK:  I don't want a legal

9       conclusion from this witness.  I thought it

10      was undisputed that there was no prior

11      statutory authority for drop boxes.

12             But, okay, if that's in dispute, then

13      that's in dispute.  My understanding and the

14      witness' understanding are that there are no

15      drop boxes before 2020.

16             MR. PULGRAM:  Before 2020.

17             MR. FALK:  Emergency orders but there

18      were no -- which have since expired.

19             So my question is -- actually, can you

20      read that, my last question from whenever

21      that was at this point.

22             (Whereupon, the record was read as

23      follows:

24             Q.  If you succeed on that claim, there

25      won't be any drop boxes in Georgia; is that

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 112

1        correct?)

2              THE WITNESS:  And my answer was yes.

3    BY MR. FALK:

4        Q.  Was your -- sorry.  Wrong set of questions.

5              Other than your involvement in this

6    litigation, what public-facing actions did -- has the

7    NAA taken -- NAA Georgia taken to address the changes

8    in rules applying to out-of-precinct voting?

9        A.  Voter -- voter education or re-educated our

10   constituency on the changes.  Voter mobilization to

11   make sure they had a voting plan.  And in some

12   aspects, communication with elected officials about

13   revisiting the changes.

14       Q.  Other than your involvement in litigation,

15   what public-facing actions has the State Conference

16   taken with respect to replacing the Secretary of

17   State on the state election board with a member

18   appointed by the General Assembly?

19       A.  Not much.  I do know that President Woodall

20   served on the Secretary of State's committee for

21   election integrity, so I do know he did some

22   lobbying.  But, again, I wasn't able to speak

23   directly to him about that.

24             So all I know is that would have been his

25   responsibility and so I think that he spoke to

Page 113

1    certain lawmakers, as I mentioned in the last

2    question, but other than that, nothing that I know

3    of.

4          Q.   And, again, other than in this litigation,

5    what public-facing actions has the State Conference

6    taken in response to the grant of authority of the

7    state election board to take over county boards in

8    certain circumstances?

9          A.   Voter education on that particular change

10   and how detrimental it could be to local control over

11   elections.  And then when we mobilized, again, making

12   people aware and then some of the lobbying work that

13   President Woodall did to try to change that aspect.

14             MR. PULGRAM:  Can I ask the court

15             reporter -- I'm going to want to come back

16             to that interchange about drop boxes that

17             was about five pages ago.  I'm telling you

18             know so we can find it easily later in the

19             deposition.

20             (Reporter replies with request by

21             counsel.)

22   BY MR. FALK:

23         Q.   Other than your involvement in this

24   litigation, has the State Conference -- let me -- has

25   the State Conference addressed the actual takeover of

Page 114

1     a county board since SB 202?

2          A.  Yes.  We -- so there was an attempted

3     takeover of a local election board by -- in Lincoln

4     County, I think it was in Lincolnton.  We partnered

5     with the local branch -- and of course, this is

6     public record -- and the Georgia Coalition For the

7     People's Agenda to prevent that.

8          Q.  Was that successful?

9          A.  I believe it was.  I think public reporting

10    says -- I believe it was.  I may be mistaken, though.

11    No.  I think it was successful, yes.

12               MR. PULGRAM:  To --

13    BY MR. FALK:

14          Q.  By "successful," I mean you successfully

15    stopped the takeover?

16          A.  I believe so.

17          Q.  I just want to make sure you're -- we're

18    thinking the same thing there.

19               And what -- other than involvement in this

20    litigation, what actions has the State Conference

21    taken to address the changes in the voter challenge

22    procedure that were enacted in SB 202?

23          A.  So voter education to make sure people

24    understood that there are unlimited challenges now

25    that SB 202 has become a law.  The voter mobilization

Page 115

1    to make sure that they are prepared for any type of

2    challenge.

3             And then we responded to several potential

4    challenges.  And one challenge that actually happened

5    that was 30,000 voters in Gwinnett County that the

6    housing committee chair actually participated in and

7    was successful in preventing the removal of 30,000

8    people that were challenged by one entity in Gwinnett

9    County.

10            But there was also information that there

11   were other challenges that we know of that we found

12   out from public reporting.

13            MR. FALK:  Can we just mark this as

14       Exhibit -- whatever?

15            THE REPORTER:  7

16            MR. FALK:  This is Bates number --

17            THE REPORTER:  Hold on.

18            MR. FALK:  This is yours -- the Bates

19       numbers starting with Bates No. 7083.

20            THE WITNESS:  Yes.

21            MR. PULGRAM:  For the people online, can

22       you identify what document --

23            MR. FALK:  I am about to do that.

24            (Defendants' Exhibit 7 was marked for

25       identification.)

Page 116

1    MR. FALK:

2         Q.  This is Bates number 7083 and it is

3    captioned -- it is from the Lawyers Committee For

4    Civil Rights Under Law.  It's captioned National

5    Voter Registration Act, notice letter pursuant to

6    52 USC Section 20510(b)(2).

7              Mr. Griggs, do you --

8              THE REPORTER:  Hold on, hold on.

9              MR. FALK:  Oh, he doesn't have...

10             (Discussion ensued off the record.)

11   BY MR. FALK:

12        Q.  Do you recognize this document?

13        A.  Yes.

14        Q.  Is this the challenge to Gwinnett County

15   that you were -- or is this the Notice letter

16   relating to the challenge?

17        A.  Yes.

18        Q.  And you said that challenge was successful?

19        A.  Yes.

20             MR. PULGRAM:  There may be confusion

21        about challenge successful, notice

22        successful.

23             MR. FALK:  Yes.  Sorry.

24   BY MR. FALK:

25        Q.  This could be ambiguous.

Page 117

1        A.  Yes.  Sorry.

2        Q.  Mr. Griggs, was the NAA's objection to the

3    challenge process successful in preventing the

4    removal or disqualification of the challenged

5    voters --

6        A.  Yes.  We sent the NVRA notice letter to

7    Gwinnett County.  And Gwinnett County had a hearing

8    and none of the challenged voters were removed.  So

9    we didn't have to actually file an action.

10       So, of course, when we say, Was the notice

11   successful, no.  Was the action stopped?  Yes.  So we

12   didn't have to file an actual action, yeah.

13       Q.  You were successful in your communication --

14   was the State Conference's, with its partners'

15   involvement, successful in preventing the removal of

16   the voters at issue --

17       A.  Yes.  That's correct.  It was successful.

18       Q.  -- in Gwinnett County?

19       A.  Preventing the removal of voters in

20   Gwinnett County.

21       Q.  And you said, if I correctly understood, you

22   said the State Conference was also active with

23   respect to challenges to voter qualifications in

24   other counties other than Gwinnett County?

25       A.  We were notified of other challenges in

Page 118

```
 1    other counties.  We didn't take the same action as we

 2    took in Gwinnett County simply because it was not the

 3    large number as in Gwinnett.

 4          But we got reports in Cobb.  Members in Cobb

 5    went to the local election board.  The challenges

 6    were not -- the challenges were not successful.  So

 7    the unit was successful but there were numerous

 8    around the state.

 9      Q.  But the State Conference was not directly

10    involved in those other --

11      A.  No.  The State Conference did not need to

12    get involved because it wasn't to the level of

13    Gwinnett County.  The local units did.

14      Q.  And other than your involvement in this

15    litigation, what public-facing actions did the

16    Conference take with respect to the changes in the

17    ability to provide people waiting in line to vote

18    with food and water?

19      A.  Aside from the voter education program and

20    the voter mobilization program, we launched a

21    22-county tour where we participated with the local

22    units and parties-to-the-polls that were further than

23    the lawfully prescribed limitations.  So it was

24    150 feet.  We were 200 feet away.  We did things like

25    that.
```

Page 119

1          But there were other units outside of the

2     22 cities that did not participate in line relief

3     type activities for fear of reprisal in those

4     jurisdictions.

5          Q.  And, finally, what -- other than your

6     involvement in this litigation, what public-facing

7     actions did the NAA Georgia take in response to the

8     prohibition on the use of mobile voting units, if

9     any?

10         A.  The education to the affected communities,

11    the mobilization efforts to try to blunt that by

12    getting people to go to their respective polling

13    precincts; and, of course, note where their

14    respective polling precincts are.

15         And then some communications with elected

16    officials through the lobbying that President Woodall

17    was doing; and specifically in the two affected

18    jurisdictions, the units making contact with local

19    election boards to see how they could make sure there

20    would be open precincts in the areas where that would

21    be affected.

22         Because the reason for the mobile voting

23    units was because of the long lines.  So it was only

24    really two mobile voting units in the state.

25         Fulton County had one that was operational,

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 120

1    so the Atlanta branch reached out.  And then Douglas

2    has purchased one, but they didn't get a chance to

3    use it.

4            So the west Metro branch reached out to the

5    local election boards in Paulding and Douglas County;

6    make sure there were enough precincts to deal with

7    the potential overflow.

8       Q.  How -- what process did the State Conference

9    use to decide which responses to make to which

10   aspects of SB 202?

11           MR. PULGRAM:  So I'll allow you to

12       answer as to the process without disclosing

13       strategies of the group.

14           THE WITNESS:  Yeah.  I think that's

15       strategy.  The answer would be strategy,

16       internal strategy.  Nothing outward-facing.

17   BY MR. FALK:

18      Q.  Well, I'll ask this question and we'll see

19   if there's an objection.

20           Who makes the decisions as to what steps to

21   take?

22      A.  It would be the president in consultation

23   with the executive committee, and then at that point

24   the administrators.

25           (Videographer motions to witness.)

30(b)(6) Gerald Griggs                 February 21, 2023
Georgia Senate Bill 202, In Re

                                           Page 121

1            THE WITNESS:  What?  It's rubbing?

2            (Discussion ensued off the record.)

3     BY MR. FALK:

4        Q.  Did the State Conference send communications

5     to its members or partner organizations about the

6     provisions challenged in this action?

7            MR. PULGRAM:  That's a yes or no.

8            THE WITNESS:  Yes.

9     BY MR. FALK:

10       Q.  What communications were those?

11       A.  E-mails, social media postings, and I want

12    to say letters that were attached to the E-mails.  I

13    mean, President Woodall was a prolific writer, so if

14    he sent E-mails, he sent letters.

15       Q.  And who were those E-mails directed to?

16       A.  The membership, the units and then the

17    greater constituency.  Oh, and press, press and media

18    advisors.

19       Q.  And what was the content of those

20    communications, if you know?

21           MR. PULGRAM:  You can discuss the

22       subject matter.

23           THE WITNESS:  I don't know if I saw any

24       of them, so I would be speculating.

25    BY MR. FALK:

Page 122

```
 1        Q.  Did the State Conference communicate with

 2     other organizations about the provision --

 3     challenging this action other than discussions about

 4     filing this lawsuit?

 5             MR. PULGRAM:  I'm sorry.  Could you

 6          reread the question?

 7             (Whereupon, the record was read by the

 8          reporter as requested.)

 9             MR. PULGRAM:  I'm confused by the

10          question.

11             THE REPORTER:  Yeah, that was a

12          little --

13     BY MR. FALK:

14        Q.  Other than communications with the

15     organizations prefatory to filing this lawsuit --

16        A.  Mm-hmm.  Yes.

17        Q.  -- did the State Conference send

18     communications to other partner organizations about

19     the provisions of SB 202 that are challenged in this

20     action?

21             MR. PULGRAM:  We're going to object on

22          the basis of protection of First Amendment

23          activities and the common interest privilege

24          as it relates to the potential filing of an

25          action.
```

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 123

1          MR. FALK:  Well, we excluded the

2     communications with respect to the filing of

3     the action.  That was the question; it was

4     intended to, and I thought it did exclude

5     those communications.  And I don't think

6     there's a common interest privilege

7     otherwise.

8          MR. PULGRAM:  So if it's not connected

9     to the filing of this action, then it would

10    be combined First Amendment protected

11    advocacy that would be the subject of those

12    communications and, therefore, it would be

13    subject to protection under the First

14    Amendment.

15         MR. FALK:  Are you instructing him not

16    to answer?

17         MR. PULGRAM:  I am going to allow him to

18    answer that question "yes" or "no," but then

19    I believe I'm going to instruct him not to

20    answer as to the content of any, if there

21    were any.

22         MR. FALK:  All right.  I just want the

23    objection on the record.  I want the line on

24    the record.

25         MR. PULGRAM:  That's fine.

                                                    Page 124

1              MR. FALK:  So I guess we're back to

2         the -- I'll try it again and see if I have

3         accounted for the objections that we're

4         not -- that we're not trying to --

5    BY MR. FALK:

6         Q.  Did the State Conference send communications

7    to partner organizations about the provisions

8    challenge in this action, apart from communications

9    with the organizations that joined within filing this

10   action?

11        A.  By "send communications," what do you mean?

12        Q.  E-mails, letters, phone calls.  Any

13   communication that you know of?

14        A.  Yes.

15        Q.  To whom were those communications sent?

16             MR. PULGRAM:  And I'm going to object to

17        that as asked on the basis of the First

18        Amendment.

19   BY MR. FALK:

20        Q.  Did the State Conference receive any

21   communications from any of the members about the

22   laws, policies and protocols that the challenge is

23   unconstitutional in this action or is violative of

24   federal law?

25             MR. PULGRAM:  That's a yes-or-no

Page 125

1            question.

2                 THE WITNESS:  Yes.

3      BY MR. FALK:

4            Q.  What were those communications?

5                 MR. PULGRAM:  I'm going to allow you

6            generally to describe the types of

7            communications that you received but not to

8            reveal any information about the strategies

9            or the persons who transmitted them.

10                THE WITNESS:  E-mails and phone calls,

11           in-person conversations about the effect of

12           SB 202 on voting in Georgia and particularly

13           for black people.

14     BY MR. FALK:

15           Q.  And what did those communications say about

16     the effects of SB 202 on voting in Georgia especially

17     for black people?

18           A.  It would be devastating if we don't respond.

19           Q.  Is there documentation of those

20     communications?

21           A.  Some of them, yes.

22           Q.  Where would they be?

23           A.  E-mails.

24           Q.  Would that be the State Conference E-mail

25     server or E-mail account?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 126

1              A.   Yes.

2              Q.   Moving on to topic 10, if this lawsuit is

3      unsuccessful, what activities does the State

4      Conference plan to undertake to address provisions

5      that it claims are unconstitutional or otherwise

6      illegal?

7                   And I'll ask you to limit the answer, for

8      the sake of all of us, to any changes from what

9      you're already doing, what we just discussed and --

10     so we don't -- so we'll take that as a given.

11                  Is it true that you will continue those

12     actions?  You expect -- is it true that you expect to

13     continue the same actions if you don't succeed in

14     this lawsuit?

15                  MR. PULGRAM:  I'm going to object to the

16          extent it calls for speculation.  Don't

17          speculate, but you can answer the question

18          as best you can without doing that.

19                  THE WITNESS:  We will continue the

20          actions that we're doing and increase them.

21     BY MR. FALK:

22             Q.   Will that be an increase in quantity?

23             A.   Yes.

24             Q.   Are there additional actions that you would

25     take -- do you contemplate -- do you currently

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 127

1    contemplate taking additional actions, apart from

2    those you already described, if this lawsuit is

3    unsuccessful?

4              MR. PULGRAM:  Again, without

5         speculating, you can answer that question.

6              THE WITNESS:  Yes.  We do contemplate

7         additional actions, some of which would be

8         increasing our 59-county strategy to more,

9         so we cover all of the minority population

10        in Georgia and mobilize them.

11             And, of course, we will continue our

12        work down at the Gold Dome with elected

13        officials to make them understand under no

14        uncertain terms that if you continue to play

15        with the voting rights of black people in

16        this state, you will hear from black people

17        in this state.

18   BY MR. FALK:

19        Q.   Anything else?

20        A.   I mean, we always have outside-the-box novel

21   ideas.  They are still in the planning stages right

22   now.  We're hopeful the lawsuit will be successful.

23        Q.   Moving on to topic 12, I think this will be

24   pretty quick.

25             How do people become members of the Georgia

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 128

1    State Conference?

2         A.  You can pay a $30 membership fee to become

3    an annual member and that's open to anyone.  You can

4    pay $750 to be a life member, a bronze life member

5    that will cover your admission for life.

6              Silver life member, $1,500.  Gold member is

7    2,500, I believe.  And then there's platinum life

8    member that's more than that.

9              And that entitles you to be a member of the

10   National Association for the Advancement of Colored

11   People, to come to the public and private meetings

12   with the exception of the executive board meetings.

13   And to be a civil rights fighter and freedom fighter.

14        Q.  Are there any -- you mentioned a number of

15   things, benefits that one gets from membership.

16             Are there any more that the State Conference

17   offers to its members?

18        A.  No.  I think I covered most -- all of them,

19   actually.

20        Q.  And what, if any, obligations do members of

21   the State Conference have?

22        A.  Just abide by the constitution and bylaws

23   for the National Association for the Advancement of

24   Colored People.

25        Q.  Moving on to topic 15, I just refer you to

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 129

1    paragraph 16 of the complaint.

2         A.   Paragraph 16?

3         Q.   Paragraph 16, yeah, where I believe it says

4    that the State Conference has been involved in voting

5    rights litigation in Georgia to vindicate their

6    rights from January 1st, 2018, to the present.

7              What laws, policies or regulations,

8    election-related laws, policies or regulations in the

9    state of Georgia has the State Conference challenged

10   other than SB 202?

11        A.   So 16 and 17 is where we are?

12        Q.   We're 15.

13        A.   15.

14        Q.   16 is other states, but I bet that's a short

15   answer, too.

16        A.   Okay.

17        Q.   This is just Georgia, just 2018 to the

18   present.

19        A.   Okay.  So from 2018 to the present --

20        Q.   Just election-related -- election laws.

21        A.   Okay.  I know we sued the Secretary of State

22   six times.  This would be seven.  So at least seven

23   lawsuits.  Actually, it might be eight because I

24   forgot the redistricting lawsuit.  So eight.

25        Q.   So you were involved in the redistricting

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 130

1    lawsuit that is across the way here?

2         A.  Yes.

3         Q.  Across the hall?

4         A.  Yes.

5         Q.  What were the other challenges?

6         A.  Exact match.

7         Q.  What does that mean?

8         A.  They were trying to match the names of the

9    voting rolls exactly through the cross-check system,

10   which is called "exact match" in Georgia.  So I

11   believe at that point we sued Brian Kemp when he was

12   Secretary of State for that one.

13            And then we sued Secretary Raffensperger for

14   removing 55,000 names off the roll in violation of

15   the National Voter Registration Act.

16            And the redistricting lawsuit -- it's been a

17   host of issues that we've sued for.

18        Q.  Do you recall any of the others?

19        A.  I don't recall all the others.  I know I was

20   involved in the four I just mentioned.

21            MR. PULGRAM:  And just for the record, I

22        know we have an objection to this as being a

23        topic that would not be appropriate for

24        (30)(b)(6) deposition.

25            I let you ask the questions consistent

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 131

1           with our agreement.  But that's something I

2           think we should be clear about, that,

3           obviously, there are other lawsuits.  This

4           witness doesn't here have chapter or verse

5           about them because it's outside the scope.

6                MR. FALK:  I don't expect chapter and

7           verse, I expect --

8                MR. PULGRAM:  -- the kind of good faith

9           answers he's given you.

10               MR. FALK:  Good faith answers.  Exactly.

11          What he knows and what's out there.

12     BY MR. FALK:

13          Q.  Have those -- the litigation you're aware

14     of, have any of those been completed?

15          A.  Everything but the redistricting and this is

16     one.

17          Q.  And this one?

18          A.  Yes.

19          Q.  Do you know the outcomes?

20          A.  We won half, lost half.  It's about 50/50.

21          Q.  Has the State Conference made any efforts

22     to -- I have one other question.

23               MR. FALK:  This is Bates number 4384.

24          It's a social media post, official statement

25          of the Georgia NAACP on federal court

Page 132

1          decision on the PSC election case.

2               (Defendants' Exhibit 8 was marked for

3          identification.)

4     BY MR. FALK:

5          Q.  This is a statement from you, Mr. Griggs?

6          A.  Mm-hmm.

7          Q.  Is that right?

8          A.  Yes.  That's right.  Mm-hum.

9          Q.  Then what is on our copies, the backside, it

10    has the caption of the lawsuit, which is Rose versus

11    Raffensperger.

12         A.  Yes.

13         Q.  And it involves Public Service Commission of

14    Georgia; is that correct?

15         A.  The Public Service Commission election.

16         Q.  Election?

17         A.  Mm-hmm.

18         Q.  Now, was this a State Conference lawsuit or

19    was the State Conference involved in this lawsuit?

20    It's not --

21         A.  The State Conference wasn't but two of their

22    members was.  So Richard Rose was president of the

23    Atlanta branch of the NAACP, and former state

24    president James Woodall were involved.

25         Q.  Has the -- this is moving on to topic 16.

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

Page 133

1              Has the State Conference made any efforts to

2       challenge laws, policies and regulations in other

3       states related to voting?

4              A.  Not the State Conference of Georgia, no.

5              Q.  That's what I figured.

6              How did the State Conference evaluate the

7       impact that SB 202 would have on its members' ability

8       to vote?

9              A.  We launched an internal investigation to try

10      to determine that by speaking with units and members.

11      And --

12             MR. PULGRAM:  I want to caution you not

13             to reveal strategies in the course of

14             answering the process question here.  But

15             you are free to answer the process question.

16             THE WITNESS:  So we launched an

17             investigation contacting units and members

18             to gauge the impact -- or attempt to gauge

19             the impact of SB 202.

20      BY MR. FALK:

21             Q.  What were the results of that investigation?

22             A.  The investigation is still ongoing.  We

23      don't have access to Secretary of State's complete

24      voter files to determine whether or not members had,

25      in fact, been limited from voting.  So it would be

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 134

1    anecdotal at this point.

2         Q.  Turning to paragraph 22 of the complaint,

3    one of the allegations is that many Georgia NAACP

4    members are at risk of being disenfranchised by the

5    changes in SB 202.

6              What was the basis for that statement?

7              MR. PULGRAM:  Objection.  That is

8         consistent with my prior objections about

9         asking the witness for the basis of a legal

10        allegation and complaint.  I'm going to

11        allow the witness to answer as to any

12        knowledge that he has about it.

13             MR. FALK:  That's all I'm looking for.

14             THE WITNESS:  So many of the members of

15        the NAACP were still concerned with the

16        ongoing pandemic.  Many of them are over the

17        age of 50.  And so from what we knew, they

18        voted by mail and would be affected by not

19        being able to vote by mail.  And so that was

20        the basis of this statement.

21   BY MR. FALK:

22        Q.  Has the State Conference determined if any

23   of its individual members were, in fact, unable to

24   vote because of the changes in SB 202?

25        A.  Currently, no because we don't have access

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 135

1       to the actual voter file to see if somebody actually

2       voted.  I believe we were precluded by law from

3       knowing if somebody actually voted.

4               So we -- we have anecdotal information but

5       we don't have definitive proof that we can name this

6       person attempted to vote or this person was

7       prohibited from voting.  We don't have that

8       information.

9           Q.  Okay.  What is the anecdotal information you

10      have that you explained is not -- is not -- let me

11      rephrase this.

12              Let me see if I have this right first and

13      then I'll ask a question.

14              I think I understood you to say that you

15      have anecdotal information but that information does

16      not tell you whether a particular individual was

17      unable to vote.  Do I have that right?

18          A.  You've got that right.

19          Q.  Okay.  So what is that -- what is that

20      anecdotal information about that relates to whether

21      individual members were unable to vote?

22          A.  So public reporting of the impact on

23      minority voting in Georgia as well as conversations

24      with members about the difficulty they had in voting

25      and their concern as to whether other members were

Page 136

1    even able to vote at all.

2          Q.  So at this time you have no information

3    about individual members who were unable to vote as a

4    result of the challenge provisions of SB 202; is that

5    correct?

6                MR. PULGRAM:  Objection.  Asked and

7          answered.

8    BY MR. FALK:

9          Q.  You can answer.

10         A.  The answer is we have anecdotal information

11   that it is highly likely that members of the State

12   Conference were prevented from voting, based on the

13   provisions of SB 202.

14         Q.  So if I understood you, you said the

15   anecdotal information referred to difficulties that

16   other members had because of SB 202.

17               Do I have that correct?

18         A.  You've got that correct as well as if they

19   had difficulty and they are sufficiently able to go

20   vote, we have other members who are disabled or are

21   of advanced age that would have difficulty even

22   getting to the ability to vote, given the limitations

23   that have now been placed by SB 202.

24               MR. FALK:  Just give me a second here.

25         I think we've already answered a number of

Page 137

```
 1         these.
 2              (Brief pause.)
 3     BY MR. FALK:
 4         Q.  With respect to the anecdotal information, I
 5     believe you said -- apart from the public reports --
 6     that that information -- did that information come
 7     from members?  Did I get you correct on that?
 8         A.  The public reporting?
 9         Q.  No.  I'm sorry.  Apart from the public
10     reporting -- the other anecdotal --
11         A.  Yes.
12         Q.  Did I hear you correctly that information or
13     at least some of that information came from members?
14         A.  Yeah.  Some of the information came from
15     members.
16         Q.  Do you know approximately how many
17     communications of that type -- the State Conference
18     has received?
19         A.  I'll definitely say in the hundreds.
20         Q.  And are those communications documented?
21         A.  Most of those --
22              MR. PULGRAM:  Calls for speculation.
23         Sorry.  Go ahead.
24              THE WITNESS:  Most of those were phone
25         conversations.  Some may be documented in
```

Page 138

1          E-mails.  I haven't seen those E-mails,

2          though.

3     BY MR. FALK:

4          Q.  I understand.  Just asking what you know.

5          A.  Sure.

6          Q.  What provisions of SB 202 did those

7     anecdotal communications identify as presenting the

8     type of obstacle that may have been sufficient to

9     preclude others from voting?

10         A.  So the limitations now placed on no excuse,

11    drop box -- advanced voting through the drop box.

12    The shortening of the early vote periods was another

13    one.  Some people indicated the inability to use the

14    mobile vote precincts because there was a robust use

15    of early vote locations in Fulton County in 2020

16    including the mobile voting precincts, which could

17    pull up to affected units -- not affected units,

18    precincts to provide overflow were some of the ones

19    that were mentioned.

20              And then, of course, the attempts at the

21    unlimited voter challenges.  Some discussed voter

22    challenges that we did not know about that happened

23    in outer counties and more rural areas were some of

24    the complaints that they highlighted potentially

25    caused limitations in access by members who were less

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 139

1      sufficiently able than they were.

2          Q.  Were there any other provisions that you

3      recall that were identified in these communications?

4          A.  Not that were identified in the

5      communications.

6          Q.  Did the State Conference receive any

7      communications saying that -- from members saying

8      that their ability to vote was not impaired or

9      affected?

10         A.  Yeah.  We had a few that said they didn't

11     have any issues voting.  We did.

12         Q.  Are those communications documented?

13         A.  I don't recall if I saw them in E-mail.  I

14     know there were phone conversations.

15             MR. FALK:  How are you doing?

16             THE WITNESS:  I'm great.

17             (Discussion ensued off the record.)

18             THE VIDEOGRAPHER:  The time is 2:33 p.m.

19         and we are off the record.

20             (Recess from 2:33 p.m. to 2:52 p.m.)

21             THE VIDEOGRAPHER:  The time is now

22         2:52 p.m. and we are on the record.

23     BY MR. FALK:

24         Q.  Okay.  We're moving on to topic 19.

25             Outside of this litigation, has the State

Page 140

1    Conference made a complaint to the Georgia Secretary

2    of State or the Georgia State elections board

3    concerning the challenge provisions of SB 202?

4        A.  I think they have.  I think President

5    Woodall brought it to the attention of the Secretary

6    of State.  But he did resign from the committee, so

7    I'm not sure but I think so.

8        Q.  Has it filed -- has the State Conference

9    filed any other litigation related to SB 202 against

10   the Secretary of State or the state elections board?

11       A.  Not that I'm aware of.  Just this action.

12       Q.  Are you aware of the role played by county

13   officials in enforcing SB 202?

14       A.  Yes.

15       Q.  Is it your understanding that it's the

16   county officials who decide whether to close polling

17   locations and early voting sites?

18       A.  I'm aware.  I'm also aware of the provisions

19   of SB 202 that allows for the takeover of local

20   election boards if they don't do the will of the

21   state.

22       Q.  But isn't it the county officials that

23   decide what locations are open and how long they are

24   open?

25           MR. PULGRAM:  Objection.  Argumentative.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 141

1    BY MR. FALK:

2         Q.  Is it the county officials that decide?

3         A.  To the best of any knowledge, that's

4    correct.

5         Q.  Is it the county officials who hear

6    challenges to voters registration status?

7         A.  Yes.  It is the county officials that hear

8    challenges.

9         Q.  And is it the county officials that enforce

10   the prohibition on providing food or water to voters

11   waiting in line?

12        A.  Yes.  They would enforce state laws passed

13   by the state.

14        Q.  Has the State Conference communicated with

15   county government officers or personnel concerning

16   their implementation of the challenge provisions of

17   SB 202?

18        A.  The State Conference hasn't.  The units

19   have.

20        Q.  Do you know the -- what those communications

21   involved?

22        A.  E-mails, phone calls, in-person advocacy,

23   appearing at county commission meetings and local

24   election board meetings.

25             Those types of communication.

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 142

1          Q.  Do you know what the subject matter of those
2     communications was?
3          A.  To attempt to convince local officials of
4     the need to advocate against certain provisions of SB
5     202, which would have a disproportional impact on
6     African-Americans and people of color.
7          Q.  When you say "advocate," do you mean
8     communicate to other government officials?
9          A.  Yes.
10         Q.  Did those communications address the --
11    address how county officials enforce the state laws
12    for those provisions where there's discretion such as
13    opening voting sites?
14         A.  Some of them did address the discretion
15    that's given to county officials.
16         Q.  There are county officials who are
17    defendants in the present lawsuit; is that correct?
18         A.  There may be.  I'm not sure.  Yes.
19         Q.  Has this State Conference filed any other
20    litigation related to SB 202 against any county
21    government in Georgia?
22              MR. PULGRAM:  Other than the pending
23         action?
24    BY MR. FALK:
25         Q.  Other than the pending action.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

                                              Page 143

1          A.   Not to my knowledge, no.  I don't think so.

2          Q.   Moving on to topic 21, I recognize there are

3     objections here, so we'll get those on the record.

4               I'm not asking for any communications where

5     counsel was present, but has the State Conference

6     communicated about the statute, the policies and

7     protocols relating to SB 202 with any other plaintiff

8     in the consolidated action?

9               MR. PULGRAM:  One moment.  And forgive

10          me but could you reread the question so I

11          have the right words in there.

12                    (Whereupon, the record was read by

13          the reporter as requested.)

14               MR. PULGRAM:  To the extent that those

15          are not privileged as attorney-client and

16          common interest privilege, then I believe

17          they would be privileged as First Amendment

18          advocacy, so I'll instruct the witness not

19          to answer.

20     BY MR. FALK:

21          Q.   Did the State Conference communicate with

22     any organizations not plaintiffs in this action about

23     the statutes, policies and protocols relating to SB

24     202?

25               MR. PULGRAM:  Same instruction as

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 144

1      phrased.

2  BY MR. FALK:

3      Q.  Does the State Conference partner with other

4  organizations that are not plaintiffs in this action

5  in its election protection efforts?

6          MR. PULGRAM:  That's a yes-or-no

7      question and you can also refer to public

8      combinations.

9          THE WITNESS:  Yes.

10 BY MR. FALK:

11     Q.  What groups are those?

12     A.  From the publicly available information,

13 that would be Black Voters Matter, New Georgia

14 Project, Protect the Vote GA, FaithWorks.

15         Those are the top ones that come to mind,

16 but there are a few others that are publicly

17 available.  It would be on our social media.

18     Q.  With which -- any others that you're aware

19 of, any other organizations that the State Conference

20 partners with in its public voter protection efforts?

21     A.  That are not listed in the complaint?

22     Q.  Right.  That are not --

23     A.  Those are the ones that come to the top of

24 mind, but I may be -- one may be slipping my mind.

25 But those are the ones that I can remember.

Page 145

1          Oh, Georgia STAND-UP.

2          Q.   What voter protection efforts does the State

3     Conference engage in in partnership with those

4     groups?

5          A.   1-866-OUR-VOTE, the voter protection

6     hotline, of course the mobilization of lawyers

7     through hotline manning the hotline, responding to

8     precinct issues, early vote and election day.

9          Some of those organizations also do poll

10    monitoring.  We don't typically do that.  And then

11    some of them do ballot-curing activities, but we

12    don't typically do that.

13         Q.   Moving on to the next topic, does the State

14    Conference know of any person in the state of Georgia

15    that was not able to vote as a result of the laws,

16    policies and protocols in SB 202 that are complained

17    of in this action?

18         A.   By name?

19         Q.   Well -- do you know of anybody?  And then

20    we'll explore what you know or what the Conference

21    knows.

22         A.   Not directly but from anecdotal information,

23    yes.

24         Q.   What was that anecdotal -- what was the

25    nature of that anecdotal information?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 146

1        A.   Public reporting.  Members reporting.

2   Organizations that we partner with reporting.  But we

3   can't confirm any of that because we don't have

4   access to the voter files to confirm whether or not

5   somebody did or did not vote.

6        Q.   Do you know who those persons were that

7   could not vote or that reported -- do you know the

8   persons that reported they could not vote?  Now we're

9   asking -- we already went through the members, so

10  we're asking for anybody else.

11       A.   Anybody else?

12       Q.   Yeah.

13       A.   I know we got complaints.  I don't know if

14  the complaints were of the nature we were prevented

15  from voting.  I think most of the complaints we got

16  were:  I had a problem voting and I need your help in

17  making -- like making sure that I get access.  So we

18  were trying to get them access.

19       Q.   I understand.

20       A.   I don't know, to my direct knowledge, if

21  someone called -- it may have happened because,

22  again, it goes to the lawyers, somebody called and

23  said "I wasn't able to vote," but I don't have that

24  information.

25       Q.   So that information would go to a hotline --

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 147

1          A.   It goes to a hotline.

2          Q.   And is there -- are there records of those

3     complaints?

4          A.   It should be.  And typically the hotline

5     responds by sending them either to the polling

6     precinct, getting in contact with the polling

7     precinct, getting in contact with the unit.  So the

8     information wouldn't come to the state, it would go

9     to the unit.  And the unit would try to cure the

10    problem.

11         Q.   Apart from the public reports and the

12    hotline, are there any other sources by which the

13    Conference learned of persons who claim they were

14    unable to report?

15              MR. PULGRAM:  You include here things

16         like published reports and newspapers or

17         stuff like that?  What are you asking --

18              MR. FALK:  No.  I said apart from public

19         reports.  But is there another channel --

20    BY MR. FALK:

21         Q.   I'm asking if there's another channel

22    besides the hotline by which these -- by which

23    complaints --

24         A.   By which complaints can be generated?

25         Q.   -- of an individual's inability to vote.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 148

1          Is there another source besides the

2     hotlines?  Would those complaints go anywhere else?

3          A.  No.  The complaints would go to the unit.

4     The unit would push them to the hotline or the

5     hotline would push the complaints to the unit.  So it

6     would be in that loop.

7          Q.  So it would be in that loop --

8          A.  Yes.

9          Q.  -- one way or another it would go through

10    the hotline?

11         A.  Yes.

12         Q.  What investigation, if any, did the State

13    Conference conduct to determine whether an individual

14    was unable to vote?

15              MR. PULGRAM:  Asked and answered.

16    BY MR. FALK:

17         Q.  You can answer.

18         A.  Okay.  We would, through the unit, inquire

19    as to the access to the ability to vote.  Sometimes

20    they would interview the person to see if, in fact,

21    they were or were not able to vote.  But we weren't

22    able to verify through an independent source because

23    we don't have access to voter files, whether or not

24    that person was able to vote.

25              But, again, it would be in that loop from

30(b)(6) Gerald Griggs                 February 21, 2023
Georgia Senate Bill 202, In Re

Page 149

1    the unit to the hotline and the hotline to the unit,

2    the outcome and all the particulars.

3         Q.  So I may have misunderstood the prior

4    answer.

5              I understood the prior answer to say that

6    you are aware of complaints that people have been

7    impaired but not prevented from voting.

8              Were there also complaints that someone

9    actually could not vote?

10        A.  I don't know directly because I didn't get

11   that information.  But if there was a complaint that

12   someone actually could not vote, it would be in

13   that --

14        Q.  In the hotline?

15        A.  Yes.

16        Q.  That sounds as far as we can get with that.

17             And then the follow-up on these complaints,

18   if I understood correctly, so I don't have to ask

19   again, those would go through the county --

20        A.  Yes.

21        Q.  -- the local unit and then would go to the

22   county?

23        A.  Yes.

24        Q.  Would the State Conference have further

25   involvement in the follow-up with the Secretary of

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 150

1    State?

2         A.   No.   The State Conference would not have

3    follow-up with the Secretary of State.

4         Q.   Turning to Page 52 of your discovery

5    responses -- there we are.   Just trying to find the

6    page to direct you to.

7              The middle of the page, almost the dead

8    center, there's a reference to voters who are unable

9    to endure long lines and delays at the polls because

10   of lack of access to food or water and have to leave

11   the line and cannot return before the close of polls

12   on election days -- election day.

13        A.   Mm-hmm.

14        Q.   Are you aware of -- is the Conference

15   aware -- was the Conference made aware of any voter

16   who had to leave a line at the polling place because

17   of the lack of food and water in 2022, this last

18   cycle?

19        A.   No.   The Conference is not aware of any

20   person that had to leave the line because of lack of

21   food and water and could not return because the

22   Conference had set up attempts to provide line relief

23   to the locations where we knew there was a

24   possibility that that could happen.

25        Q.   Turning to the complaint at paragraph 158 --

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

                                                        Page 151

1        A.   Okay.

2        Q.   158 -- it's the -- that allegation states

3    that the requirement that drop boxes be under

4    surveillance by an election official, security guard

5    or law enforcement official, quote, presents serious

6    concerns regarding voter intimidation for voters of

7    color who are frequently and unfairly the targets of

8    law enforcement.

9             Do you see that part?

10       A.   I see it.

11       Q.   Is the Conference aware of any voter that

12   was, in fact, intimidated by the presence of an

13   election official or law enforcement official or a

14   security guard at a drop box and did not vote as a

15   result?

16       A.   We're aware of people that called in because

17   of the presence of law enforcement and licensed,

18   quote, security guards and they felt intimidated.

19   Now, we don't know for a fact whether or not they did

20   not vote, but they definitely called it in.

21       Q.   Were those calls documented in any way?

22       A.   They should have been.  They came into the

23   1-866-OUR-VOTE.  Specifically, we got one call during

24   early vote in South Fulton.  I remember that because

25   I was there when the call was received.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

                                              Page 152

1          Q.  Yeah.

2          A.  We responded out to South Fulton.

3          Q.  What was the -- what was the response, the

4     State Conference's response to that call or any other

5     calls of that kind?

6          A.  We wanted to confirm whether or not law

7     enforcement was preventing people from voting.  We

8     went out to the scene.  Turned out the law

9     enforcement officer was there to vote.  So --

10         Q.  Are you aware of any other follow-up from

11    any of the other calls that came in relating to the

12    presence of law enforcement or other officials at the

13    drop box?

14         A.  No.  Not personal knowledge, no.

15         Q.  Turning to the relief that the State

16    Conference asked for on Pages -- Pages 84 and 85 of

17    the complaint, if the State Conference obtained the

18    first six items -- five declarations and the

19    injunction, would it be able to stop diverting

20    resources in the way that you described this morning?

21         A.  If we were granted an injunction and

22    declaratory relief?

23         Q.  Correct.

24         A.  Yes.  We would be able to divert resources

25    back to what we normally do and not have to continue

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 153

1     to respond to the adverse effects of SB 202.

2          Q.  Move on to topic 24.  I know there are some

3     objections here, but I think there's an area we can

4     inquire into, but we'll find out.

5               Okay.  So who prepared the document

6     production in this case?

7               MR. PULGRAM:  So you should not reveal

8          information received from your counsel, but

9          I don't know that you have to answer that

10         question at a high level.

11              MR. FALK:  Yeah.  It can -- I'm asking

12         at a high level, I think.  I think I know

13         what the answer is, so I'm --

14              THE WITNESS:  At a high level, the

15         answer would be lawyers.

16    BY MR. FALK:

17         Q.  Okay.  Your lawyers prepared your document

18    production.

19              Did the State Conference provide access to

20    the documents to your attorneys?

21         A.  Yes.

22         Q.  My understanding is that past that point,

23    the State Conference didn't search -- do the searches

24    itself?

25         A.  No.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 154

1          Q.  Just answer that part.  I'm not going to ask

2     the part that's going to get an objection.

3               What -- does the State Conference keep a

4     central server where documents -- electronic

5     documents are stored?

6          A.  Yes.

7          Q.  Where is that?

8          A.  The secretary keeps that.  She's the

9     official repository of all documents.

10         Q.  Was that part of the documents to which you

11    gave your attorneys access?

12         A.  They had access to all the documents the

13    secretary could retrieve.

14         Q.  Does the State Conference staff have E-mail

15    addresses that are maintained and kept by the State

16    Conference?

17         A.  Yes.

18         Q.  Were those -- was that E-mail database

19    turned over to your attorneys for them to respond to

20    the document request?

21              MR. PULGRAM:  Objection.

22         Mischaracterizes his answer, I think, by

23         using the word "database."

24    BY MR. FALK:

25         Q.  Okay.  Were your attorneys given access to

Page 155

1    the E-mails that are maintained by the State

2    Conference in order to comply with the discovery

3    requests?

4            A.  Yes.

5            Q.  Does the State Conference have other

6    locations at its office or digitally where documents

7    are stored on the behalf of the State Conference,

8    besides the document server that we talked about and

9    the E-mail --

10           A.  Oh, okay.  No.  No.  Just that one.

11           Q.  Just the documents and the E-mail?

12           A.  Yes.

13           Q.  Does the State Conference have a database of

14   phone, text and voice messages?

15           A.  I don't think we have a database of phone,

16   text and voice messages.  I think we have access to

17   all of those.

18           Q.  Okay.  Let me -- database is probably --

19   does the State Conference store text and voice

20   messages?

21           A.  Yes.

22           Q.  Were your attorneys given access to those?

23           A.  Yes.

24           Q.  To your knowledge, was there any other

25   source of documents or communications that was

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 156

1      provided to your lawyers as part of the --

2            A.  Not to my knowledge, no.

3            Q.  -- discovery request?

4                 Were individual employees' phones searched?

5      To your knowledge, were they turned over for search

6      as part of this process?

7            A.  I don't know.  I don't think so, no.

8                 MR. PULGRAM:  You're talking about their

9            personal phones?

10                MR. FALK:  Yeah.  Some -- some

11           organizations have dedicated business

12           phones.

13                THE WITNESS:  Okay.  No.  We don't have

14           dedicated business phones.  So, no, not

15           their personal phones.

16     BY MR. FALK:

17           Q.  Not their personal phones.  That's...

18                Are you paying your attorneys in this case?

19           A.  No.

20           Q.  We're very close to the end.

21           A.  Okay.

22           Q.  Other than anything -- any product by your

23     attorneys, what studies, analysis and data, however

24     informal or rough or nonfinal, are you aware of that

25     address the extent to which the portions of SB 202

Page 157

1    have impaired the State Conference's ability to carry

2    out its complete mission or reduce the State

3    Conference's effectiveness?

4         MR. PULGRAM:  So I'm going to object to

5              the extent it calls for expert testimony.

6              Also asked and answered.  I think we've

7              pretty much been through this under other

8              topics already.

9         MR. FALK:  Well, we've covered a lot of

10             the same ground for sure, but I'm looking

11             for a document other than an attorney-client

12             privileged document, a study, analysis or

13             data of some kind, if there is such a thing,

14             that pulled together the things that we

15             talked about earlier, about the impediment

16             to certain aspects of the Conference's

17             ability to carry out its mission as a result

18             of SB 202.

19        MR. PULGRAM:  If there's anything you

20             haven't testified to already --

21        MR. FALK:  Yeah.  If there's any -- in

22             particular this question goes to:  Has

23             somebody looked and done an analysis of any

24             kind of how this all shakes out?

25        MR. PULGRAM:  And that's not privileged.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 158

```
 1              MR. FALK:  That's not privileged.
 2              THE WITNESS:  Well, no, short of the
 3         privilege information.
 4    BY MR. FALK:
 5         Q.  What studies, analyses or data, however
 6    informal, rough or nonfinal, are you aware that
 7    concern the extent to which the challenge portions of
 8    SB 202 have created confusion among voters?
 9         A.  Just publicly available reports such as the
10    Brennan Center's reports and reports like that.
11         Q.  So no internal -- no internal studies by the
12    NAA Georgia?
13         A.  Short of the --
14         Q.  Short of the -- apart from the privilege --
15         A.  Yeah.  Apart from privilege, no.
16         Q.  -- on voter confusion.
17              MR. PULGRAM:  Just give me a minute here
18         and I think I'll be ready to turn you over
19         to Mr. Pulgram.
20              (Brief pause.)
21              MR. FALK:  That's all from our end.
22         Thank you.
23              MR. PULGRAM:  If you are good
24         continuing, I'll go on.
25                              EXAMINATION
```

Page 159

1    BY MR. PULGRAM:

2         Q.  Mr. Griggs, good to talk to you.  Thank you

3    for being here today.

4              I want to ask you a few questions on

5    redirect --

6         A.  Okay.

7         Q.  -- or cross, I guess.

8              Since -- since I'm your attorney, I

9    appreciate you answering these after counsel for the

10   state and I appreciate your clarifying some of these

11   matters.

12             First, I want to talk a little bit about the

13   turnout in the 2022 elections.

14        A.  Okay.

15        Q.  And as counsel asked you, you noted that

16   this was high turnout.  It was the highest turnout in

17   history, as counsel asked the question as you

18   answered it.

19        A.  That's correct.

20        Q.  Was that true for all voters, white and

21   people of color?

22        A.  It was correct for all voters.  But the

23   overall percentage of African-American voters as

24   compared to white voters went down.

25        Q.  You say it went down compared to when?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 160

1        A.   Compared to 2020 and dates before that.

2        Q.   What is your basis for that information?

3        A.   The Brennan Center's report on the breakout

4   of the demographics of the 2022 election.

5        Q.   And what is your information there about the

6   difference between turnout for white voters and

7   people of color in 2018 compared to white voters and

8   people of color in 2022?

9        A.   The overall percentage of voter turnout from

10  2018 to -- to 2022, the percentage of white voters

11  went up whereas the percentage of black voters and

12  voters of color went down.

13       Q.   The gap widened?

14       A.   The gap widened, yeah.

15       Q.   And do you believe that SB 202 impacted that

16  differential between increase in white voter turnout

17  in comparison to black and people of color turnout?

18       A.   Yes.  I do.

19       Q.   Why do you believe that SB 202 impacted that

20  gap?

21       A.   Because the targeted measure -- the targeted

22  measures of SB 202 I believe -- and we believe -- was

23  sufficient to cause a reduction in the overall

24  percentage of African-American and people of color

25  voters as opposed to the overall turnout numbers.

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 161

1          So lessening the drop box availability, the

2     unlimited voter challenges, the changes in shortening

3     of the early vote period, the attempts to ban

4     souls-to-the-polls, which we call souls-to-the-polls

5     but Sunday voting.

6          Of course the temps and in some places the

7     takeover of local election board so they can change

8     the accessibility to polling precincts within local

9     jurisdictions to move them and attempts that were

10    made in other places to do that.  I think all of that

11    taken together widened that gap, which I think was

12    the exact purpose of SB 202.

13         Q.  Was there anything about the election in

14    2022 that might have caused everyone go to the polls

15    more in Georgia?

16         A.  There was a lot of conversation in Georgia

17    about a stolen election and the need to make sure

18    that all Georgian voters were engaged.

19         So the pouring in of extra resources from

20    national organizations, the international attention

21    allowed for a cauldron effect to push people to the

22    polls.

23         And, of course, the State Conference wanted

24    to make sure that African-Americans and people of

25    color understood that they needed to go to the polls

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 162

1    as well.  And that's why we launched those new

2    initiatives to make sure we attempted to blunt the

3    effects of SB 202.

4         Q.  So the Georgia chapter made these efforts to

5    make sure that black and people of color turnout

6    stayed as high as possible, correct?

7         A.  Exactly.  Yes, sir.

8         Q.  But you weren't able to keep up with the

9    increase in the white voter turnout during that

10   election?

11        A.  No.  We weren't.

12        Q.  I'd like to talk about drop boxes for a

13   moment.

14             You were asked whether this lawsuit is

15   challenging the statute that authorized drop boxes.

16   Do you remember that question?

17        A.  I remember that question.

18        Q.  Prior to 2000 -- prior to the enactment of

19   SB 202, were drop boxes permitted?

20        A.  Yes.  They were.

21        Q.  Are you aware of any statute prior to SB 202

22   that prohibited the state election boards or other

23   authorized -- or other authorities from allowing drop

24   boxes?

25        A.  Not to my knowledge, no.

Page 163

1        Q.  In the effort here to overturn SB 202, is

2    the goal of the Georgia chapter to create some limit

3    on drop boxes?

4        A.  No.  It's not our goal to create a limit on

5    the number of drop boxes.

6        Q.  Is the goal to return to the status quo

7    before SB 202, which would potentially permit drop

8    boxes?

9        A.  That's absolutely the goal.

10        Q.  I'd like to talk a little bit about Lincoln

11    County --

12            MR. PULGRAM:  And I don't know, Counsel,

13        if you ever got my E-mail.

14            MR. FALK:  I don't know.  I got your

15        bounceback, but I never got your E-mail.  I

16        got your out-of-town one.  I E-mailed you

17        again, but --

18            (Discussion ensued off the record.)

19            MR. PULGRAM:  For the record, I had

20        attempted to send a document so we could

21        enter it into the record and have been

22        unsuccessful in doing so.

23            So I'm going to show the witness a PDF

24        on my computer of an article.  It is from

25        the January 19th Augusta Chronicle.

Page 164

1              And I don't know if you've ever seen

2         this document before but please take a look

3         at it.  It's entitled, Presented with

4         Petition, Lincoln Elections Board Takes No

5         Action on Polling Place Closures.

6              THE WITNESS:  Mm-hmm.

7              MR. PULGRAM:  And if you want to take a

8         read of it, feel free.

9              (Witness reviews document.)

10    BY MR. PULGRAM:

11         Q.  I'll read a little from it if I can get my

12    computer to work well.  It says, Starting in November

13    a group that includes the Georgia Coalition For the

14    People's Agenda, Black Voters Matter, Common Cause

15    Lawyers Committee For Civil Rights and the Augusta

16    Interfaith Coalition have worked on the effort and

17    canvassed the rural county for signatures from

18    Lincoln voters opposed to changes.

19              And the changes described are to close all

20    but one polling place in Lincoln County.

21         A.  That's correct.

22         Q.  So I want to ask if that refreshes your

23    recollection as to the activities in Lincoln County

24    that the Georgia chapter was involved in?

25         A.  That does refresh my recollection.

30(b)(6) Gerald Griggs                      February 21, 2023
Georgia Senate Bill 202, In Re

Page 165

1          Q.   This was dated January 19th, 2022.  That was

2     before you were president?

3          A.   That's correct.  Yes.

4          Q.   And in your testimony you referred to other

5     types of activity, specifically takeovers of voting

6     authorities.

7               Does this refresh your recollection that the

8     actual activities in Lincoln County was with respect

9     to the closing of polling places?

10         A.   Yes.  But they also tried to take over the

11    local election board to make sure that -- because

12    they were successful in removing several members of

13    the election board and in trying to enact this.  But,

14    yes.

15         Q.   "They" being --

16         A.   The state election board was able to take

17    over the local election board, remove some of the

18    members, put new members on there and then try to

19    close polling precincts.

20         Q.   Ultimately, was it a petition from the

21    people that prevented closing of those precincts?

22         A.   Yes.  Absolutely.

23         Q.   We discussed -- or you discussed information

24    about persons who may not have been able to vote in

25    the last election.

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 166

1          A.  I recall that.

2          Q.  I want to ask you about some public

3    investigation about that because counsel's questions

4    excluded public information about people who were

5    unable to vote.

6          A.  Yes.

7          Q.  Are you familiar with published reports

8    about persons voting outside of their precinct, a

9    provisional ballot, and then those votes not being

10   counted?

11         A.  I recall reports of that in Gwinnett County.

12         Q.  What do you recall, just generally, about

13   whether or not everybody who voted a provisional was

14   allowed to cast their vote in -- outside of their

15   precinct?

16         A.  Yeah, I recall several individuals were not

17   allowed to cast provisional ballots outside their

18   precinct.  At least one or two of them were

19   prohibited from voting.

20         Q.  In your testimony, you refer to the fact

21   that the NAACP doesn't have all the voting records

22   for individuals, correct?

23         A.  That's correct.

24         Q.  Do you know if the NAACP has requested that

25   information from the counties and from the state?

Page 167

1          A.  I know the NAACP, through the units, have

2     requested that information from the counties.  I

3     don't think the State Conference has requested it

4     from the state because, again, all of the work of the

5     NAACP is usually done in the unit.  And the unit is

6     in the county, and the county controls the elections.

7          Q.  So this information would be available to

8     the counties?

9          A.  Yes.

10         Q.  You mentioned that there had been 35,000 --

11    30,000 challenges in Gwinnett County that the Georgia

12    chapter had successfully resisted, correct?

13         A.  Yes.  Through the work of the Gwinnett

14    County NAACP.

15         Q.  Were you aware of other incidents, earlier

16    incidents in which challenges brought in Gwinnett

17    County actually struck voters off the roll?

18         A.  I am aware of that.  Yes.

19         Q.  How are you aware of that?

20         A.  From reports from Gwinnett County and NAACP,

21    which is the reason why we heard about the second

22    round -- actually, might have been the third round

23    but the next round of challenges we included our

24    coalition partners and our lawyers to make sure it

25    didn't happen.

Page 168

1      Q.  Do you remember any of the reasons that

2  challenged voters were stricken from the rolls in

3  Gwinnett prior to the second set of challenges?

4      A.  There were allegations of people not living

5  at the address they provided, allegations that they

6  lived at commercial properties, allegations that they

7  lived in condemned properties, things like that.

8      Q.  Are you knowledgeable about whether or not

9  the state of Georgia permits a registration at a --

10 of a voter -- to continue when it is deemed to be a

11 commercial property or a condemned property?

12     A.  My understanding is they can still use that

13 address because many of our citizens are unhoused or

14 are staying at extended stays or motels.  And so my

15 understanding of the law -- and, again, it's not the

16 area that I practice the most but you can use those

17 addresses if that's where you reside or the last

18 place you resided.

19     Q.  So to the extent that those persons were

20 stricken from the rolls, is that a potential incident

21 of individuals being denied the right to vote due to

22 challenges permitted for the first time under SB 202?

23     A.  Absolutely it is.

24     Q.  You refer to parties-to-the-polls bus tours

25 and discussed them sometimes along with line relief

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 169

1       in your answers today?

2             A.  Yes.  I have.

3             Q.  Can you tell me if there are differences or

4       ways to categorize those types of activities, line

5       relief, parties-to-the-polls, and bus tours?

6             A.  Yes.  So the bus tour was an actual tour

7       implemented after SB 202 by the State Conference to

8       travel to different locations throughout the state of

9       Georgia that we had concerns about or that had a high

10      African-American population to mobilize and educate

11      the voters.  So that was separate from the

12      parties-to-the-polls, even though the bus did go to

13      some of the parties-to-the-polls.

14             Parties-to-the-polls were events that

15      happened either in early vote or on election day that

16      were to galvanize voters to get excited about voting.

17             So it was concerts.  It was gospel events.

18      One group had a 5K.  It was like a homecoming event,

19      a party, you know, near the poll, not actually at the

20      poll because that would violate SB 202.  So that was

21      that event.

22             And then the actual line relief was separate

23      from the parties-to-the-polls.  Now, some units did

24      have the parties-to-the-polls with food trucks and

25      other community events to provide for line relief.

Page 170

1              But the majority of the units, actually

2       outside of the 150-foot barrier, would just set up

3       tables and supplies and just provide it not only to

4       the people that were in line but other community

5       members to have food and sustenance while elections

6       were going on.

7              These were three separate programs. Some of

8       the programs like the bus tour went to the

9       parties-to-the-polls, then went to certain line

10      reliefs, but they were separate and apart.

11             And I did forget there was another

12      initiative that the State Conference did which was

13      micro grants.  It was funding provided directly to

14      the units to host the party-to-the-polls as well as

15      the line relief, to provide those resources so they

16      could have those events, which we had never done

17      before.  And we did it specifically for SB 202 --

18      after SB 202 to make sure we mobilized the black vote

19      and people of color.

20         Q.  So let me focus just on line relief separate

21      from those situations which could have had parties --

22      first of all, parties-to-the-polls, were you able to

23      get those to more 10 or 20 percent of the precincts?

24         A.  Oh, no.  It was maybe -- we had 159

25      counties, so you may have gotten parties-to-the-polls

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 171

1    to two to three percent of the precincts in Georgia.

2          Q.  So focusing on those that didn't have that?

3          A.  Yeah.  That's where the attempts to line

4    relief were happening.  But again, we only have 180

5    units.  Some of the units -- some of the counties

6    have multiple units where other counties don't have

7    any.

8              So you have 159 counties but the strategy

9    was 59 counties which covered 90 percent of the

10   African-American vote.  So you still had 10 percent

11   of the African-American vote that wasn't covered.

12             And then you have our Latino brothers and

13   sisters and our Asian brothers and sisters who, for

14   the most part, do live in three or four counties.

15   But some of those counties like Forsyth, there was

16   no -- first of all, there was no unit in Forsyth.  So

17   that would be the North Fulton unit that would have

18   to cover North Fulton and Forsyth.

19             MR. FALK:  Slow down just a little for

20        the court reporter.

21             THE WITNESS:  Sorry.

22             MR. FALK:  Are you with us?

23             (The reporter nods affirmatively.)

24   BY MR. PULGRAM:

25        Q.  So back to question and answer.

Page 172

1            So did SB 202 --

2       A.  Yes.

3       Q.  -- make effective communication of the

4   Chapter's message through line relief more difficult?

5       A.  It made it absolutely more difficult.

6       Q.  So tell me how that was.

7       A.  Because, again, we have a large population

8   that we have to message to, that we have to provide

9   resources to.  And we're -- we're one state

10  conference with 180 branches.  We only have so much

11  bandwidth to cover the entire state of Georgia.

12            And so when you add barriers to the ability

13  to respond and provide resources, when you limit the

14  number of early vote precincts, you limit the time

15  upon which you can early vote and the runoff; you try

16  to limit all weekend voting.

17            So these were things that we had to

18  overcome.  And to a certain extent we were successful

19  in overcoming it.  But we should never have had to

20  overcome these things simply to get people access to

21  the franchise.

22            And so those barriers that SB 202 created

23  problems in messaging.  It created problems in

24  mobilization.  It created problems in education.

25  And, ultimately, it caused a disproportionate

Page 173

1      percentage of the African-American vote not to be

2      able to actually have access, which is shown in that

3      Brennan report.

4          Q.  Did the 25-foot and 150-feet limitations --

5      did those particular limits affect the ability to

6      successfully provide line relief?

7          A.  Absolutely.  Because in certain areas where

8      there are less resources, meaning less machines, some

9      places don't have sidewalks, you know, you cannot be

10     within 25 feet of a voter.

11             But if the line is more than 150 feet from

12     the poll and now those lines are wrapping around

13     things, you have to constantly move the tables and

14     the items back to make sure you're within the

15     confines of the law.

16             Or in certain cases if you're in

17     jurisdictions that are not friendly to these types of

18     lawful events, it had a chilling effect on any of

19     those units, even remotely doing any of it, which, of

20     course, would have -- now you have long lines.

21     People don't have food.  They don't have sustenance.

22     They are getting rained on.  Some areas it was cold.

23     It's highly likely people either didn't come or got

24     out of line and didn't vote.

25             MR. PULGRAM:  That's all the questions

Page 174

```
 1        we have.
 2             MR. FALK:  I have a couple of
 3        follow-ups.
 4                   FURTHER EXAMINATION
 5   BY MR. FALK:
 6        Q.  You discussed the state board intervening
 7   and taking over the Lincoln County board; is that
 8   correct?
 9        A.  That's correct.
10        Q.  What other counties did the state board take
11   over?
12             MR. PULGRAM:  Objection.  Assumes facts
13        not in evidence.
14   BY MR. FALK:
15        Q.  Are you aware of any other counties that the
16   state board took over?
17        A.  I'm aware of the attempts to take over
18   several other counties.  I'm aware of the attempt to
19   terminate the chair of the Fulton County board.
20             Others, I can't specifically remember the
21   exact names of the counties, but I know there were at
22   least two or three other attempts.  Whether they were
23   successful or not, I don't know.
24        Q.  With respect -- you discussed briefly
25   out-of-precinct voters that were unable to cast
```

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 175

1    provisional ballots --

2         A.  Yes.

3         Q.  -- did I understand that correctly?  They

4    were unable to cast, or was it that they were not

5    counted?

6         A.  They weren't able to cast.

7         Q.  Were they at the incorrect precinct before

8    5:00 p.m.?

9         A.  I think some of them were the correct

10   precinct and they didn't get the affidavit signed in

11   time; or there was some confusion from the poll

12   worker as to when the affidavit was signed is my

13   understanding.

14        Q.  Do you mean whether the affidavit was signed

15   before or after 5:00?

16        A.  Yes, the times when the affidavit was

17   signed.  But I know they were at the precinct before

18   the cutoff time, the right precinct.

19        Q.  They were at the correct precinct?

20        A.  I thought so.  Yes.

21        Q.  So what was your understanding as to why

22   they needed a provisional ballot at the correct

23   precinct?

24        A.  I'm not sure.

25        Q.  With respect to the earlier voter

30(b)(6) Gerald Griggs          February 21, 2023
Georgia Senate Bill 202, In Re

Page 176

1     challenges -- challenges to voters in Gwinnett

2     County, not the one that you challenged?

3          A.  Yes.

4               MR. PULGRAM:  Not the one that he --

5               MR. FALK:  Not the one that -- the file

6          of Notice about the -- not the one we

7          discussed earlier that involved the 30,000.

8               THE WITNESS:  Yes.

9     BY MR. FALK:

10         Q.  What knowledge do you have of -- about

11    whether the challenged voters actually lived at or

12    near the addresses they gave?

13         A.  I don't.  I just have the reporting that I

14    received, both public reporting and from the Gwinnett

15    County NAACP.  That's why they wanted to get the

16    State Conference involved in the next round because

17    we didn't know whether or not those particular

18    challenges were appropriate or not.

19              MR. FALK:  That's all I have.

20                    FURTHER EXAMINATION

21    BY MR. PULGRAM:

22         Q.  So just to put a final note on the

23    provisional ballots, whether they were filed, counted

24    or not counted, your information about that comes

25    from a published report?

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 177

1          A.   Yes.   Published report.

2          Q.   In Gwinnett newspapers?

3          A.   Correct.

4               MR. PULGRAM:  All right.

5               MR. FALK:  No further questions here.

6               MR. PULGRAM:  We're done.

7               THE VIDEOGRAPHER:  This concludes this

8      video deposition.  The time is now 3:55 p.m.

9      and we are off the record.

10              THE REPORTER:  Okay.  So I have an

11     E-mail here, so I say that they're

12     purchasing a copy.

13              MR. PULGRAM:  Okay.

14              THE REPORTER:  Mr. Falk, did you say I

15     could send everything to you and you would

16     forward everything to Taylor English --

17              MR. FALK:  I will just give you Bryan's

18     information --

19              THE REPORTER:  Yeah.

20              (Deposition concluded at 3:58 p.m.)

21              (Signature reserved.)

22

23

24

25

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 178

1                        CERTIFICATE

2

3      STATE OF GEORGIA:

4      COUNTY OF FULTON:

5

6              I hereby certify that the foregoing

7      transcript was taken down, as stated in the caption,

8      and the colloquies, questions, and answers were

9      reduced to typewriting under my direction; that the

10     transcript is a true and correct record of the

11     evidence given upon said proceeding.

12             I further certify that I am not a relative

13     or employee or attorney of any party, nor am I

14     financially interested in the outcome of this action.

15             This the 7th day of March, 2023.

16

17

18

19

20              Marsi Koehl, CCR-B-2424

21

22

23

24

25

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

Page 179

1                    DISCLOSURE
2
3    STATE OF GEORGIA:
4    COUNTY OF GWINNETT:
5            Deposition of GERALD GRIGGS.
6            Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Counsel of Georgia, I make the following
     disclosure:
8
             I am a Georgia Certified Court Reporter
9    acting as an agent of Veritext - Georgia, who was
     contacted by the offices of Taylor English Duma, to
10   provide court reporting services for this deposition.
     I will not be taking this deposition under any
11   contract that is prohibited by O.C.G.A. 15-14-37 (a)
     and (b).
12
             Veritext - Georgia, has no contract to
13   provide reporting services with any party to the case,
     any counsel in the case, or any reporter or reporting
14   agency from whom a referral might have been made to
     report this deposition.  Veritext - Georgia, will
15   charge its usual and customary rate to all parties in
     the case, and a financial discount will not be given
16   to any party to this litigation.
17
18
19
20   *Marsi Koehl*
21    Marsi Koehl, CCR-B-2424          Date: 3/7/23
22
23
24
25

Page 180

1    LAURENCE F. PULGRAM, ESQ.

2    lpulgram@fenwick.com

3              March 8, 2023

4    RE: Georgia Senate Bill 202, In Re v.

5        2/21/2023, 30(b)(6) Gerald Griggs (#5774618)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25

Page 181

1    Georgia Senate Bill 202, In Re v.

2    30(b)(6) Gerald Griggs (#5774618)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   30(b)(6) Gerald Griggs                          Date

25

30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

                                              Page 182

1    Georgia Senate Bill 202, In Re v.

2    30(b)(6) Gerald Griggs (#5774618)

3                 ACKNOWLEDGEMENT OF DEPONENT

4        I, 30(b)(6) Gerald Griggs, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   30(b)(6) Gerald Griggs                         Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

**[& - 202]**

| & | 15-14-37   4:23 | 2 | 46:3,5,12 |
|---|---|---|---|
| **&**   4:5 | 179:11 | **2**   2:14 12:5 | 48:15,19,19,23 |
| **1** | **150**   7:10 49:9 | 17:23 18:18,24 | 54:6 70:13,18 |
| | 118:24 170:2 | 19:2 25:1 | 70:19 72:16 |

& 

**&**   4:5

**1**

**1**   2:13 11:13,15
11:17 17:19
24:25 25:7
**1,500**   128:6
**1-86**   36:5
**1-866**   145:5
151:23
**10**   126:2
170:23 171:10
**10:29**   39:7,8
**10:48**   39:8,10
**11**   2:13 78:5
79:8 91:11,13
92:3
**115**   2:22
**12**   40:24 41:3
53:22 55:15
79:9 84:9
127:23
**12038**   178:19
179:20
**12:09**   86:23
**12:10**   87:1,4
**12:14**   89:11,12
**13**   41:3 53:22
55:15 84:9
**132**   3:4
**1400**   4:15
**15**   42:11
128:25 129:12
129:13

**15-14-37**   4:23
179:11
**150**   7:10 49:9
118:24 170:2
173:4,11
**158**   150:25
151:2
**159**   2:6 170:24
171:8
**16**   129:1,2,3,11
129:14 132:25
**1600**   1:17
**1691**   7:9
**17**   73:7,11
129:11
**174**   2:7
**176**   2:8
**18**   2:14,15
**180**   18:9 22:12
22:13 86:3
171:4 172:10
**1866ourvote....**
37:4
**19**   139:24
**19th**   163:25
165:1
**1:14**   89:12,14
**1:21**   1:5
**1st**   35:17 37:6,7
43:5 44:1 45:2
45:12 46:3,5
48:15 129:6

**2**

**2**   2:14 12:5
17:23 18:18,24
19:2 25:1
72:25 116:6
**2,500**   128:7
**2.2**   89:4
**2/21/2023**
180:5
**20**   40:23 42:11
70:12 75:4
86:14 109:21
170:23 182:15
**200**   1:19 49:9
118:24
**2000**   9:20,21
162:18
**2004**   9:14
10:25
**2005**   10:25
11:5
**2007**   11:5
**2016**   70:14,17
**2017**   70:13
**2018**   70:14,17
70:18 129:6,17
129:19 160:7
160:10
**2019**   35:17,24
37:6,7 38:5
40:13,16,20,23
41:12,22 43:5
43:21,22 44:1
44:14,22 45:2
45:5,12,17

46:3,5,12
48:15,19,19,23
54:6 70:13,18
70:19 72:16
**202**   1:4 17:1
18:2 21:9 22:7
30:5,25 31:7
32:19 37:11
39:15 40:21
41:2 42:2
44:23 45:9,21
46:22 47:11,16
47:24 48:8,12
48:24 49:8,17
50:9,24 51:5
51:16 52:16,18
52:19 53:2,7,9
53:12,15,17,21
54:2,7,22,24
55:7,11,14,20
55:24 56:1,8
57:10,14 58:3
58:9,12,24
59:12 60:12
62:21 63:2
64:18,23 65:2
65:11 66:6,18
67:4,8 68:11
70:24,24 72:9
72:17 74:8,9
76:17,23 77:6
78:2,12 81:10
81:17,21 82:17
83:9 84:13
85:16,21 88:6

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 184 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[202 - 7083]

Page 2

88:14,18 97:12
97:22 100:12
101:10,11,15
106:22 114:1
114:22,25
120:10 122:19
125:12,16
129:10 133:7
133:19 134:5
134:24 136:4
136:13,16,23
138:6 140:3,9
140:13,19
141:17 142:5
142:20 143:7
143:24 145:16
153:1 156:25
157:18 158:8
160:15,19,22
161:12 162:3
162:19,21
163:1,7 168:22
169:7,20
170:17,18
172:1,22 180:4
181:1 182:1
**2020**   44:14,14
46:12 54:6
56:18,21,24
72:16 87:8
88:1,16,19,20
88:23 89:7
109:16,19
110:17 111:15
111:16 138:15

160:1
**2021**   37:15,16
40:24 43:22,22
44:14 45:9
46:17 70:19
72:17 88:16,21
**2021-2022**
41:22 45:22
**2022**   37:16
44:15 69:1
71:9 72:5,17
78:20 150:17
159:13 160:4,8
160:10 161:14
165:1
**2023**   1:12 5:3
178:15 180:3
**20510**   116:6
**21**   1:12 5:18
143:2
**21st**   5:3
**22**   40:5 42:2
45:22 84:6,10
84:21 86:1,12
118:21 119:2
134:2
**23**   2:18
**24**   2:19 153:2
**2424**   1:25
178:20 179:21
**25**   173:4,10
**2:33**   139:18,20
**2:52**   139:20,22

**3**

**3**   2:15 18:20,24
19:1,3 23:24
29:4 34:9
72:25 73:1,2
78:4,5
**3/7/23**   179:21
**30**   1:9 5:4
11:18 92:12
128:2 130:24
180:5,17 181:2
181:24 182:2,4
182:12
**30,000**   54:13
60:25 115:5,7
167:11 176:7
**33**   2:21
**35,000**   167:10
**3:55**   177:8
**3:58**   177:20
**3a**   29:4

**4**

**4**   2:18 23:17,20
23:23 24:25
25:7 27:5 33:2
78:3
**40s**   35:20,21
**415**   4:8,17
**4384**   131:23
**45**   23:24

**5**

**5**   2:19 24:19,20
24:21,25 25:6
73:11

**50**   7:23 27:8
134:17
**50/50**   131:20
**51**   29:2 33:5
**52**   116:6 150:4
**55,000**   130:14
**555**   4:6
**55555**   1:5
**562-4942**   4:17
**5774618**   180:5
181:2 182:2
**59**   41:3 53:23
55:16 59:11
82:8 84:7,9
127:8 171:9
**5:00**   94:22,22
109:6,20 175:8
175:15
**5k**   169:18

**6**

**6**   1:9 2:5,21 5:4
11:18 33:16,18
92:12 130:24
180:5 181:2,24
182:2,4,12
**6309**   33:22
**6311**   33:23
34:3

**7**

**7**   2:22 115:15
115:24
**7083**   115:19
116:2

**[75 - actions]**                                        Page 3

**75**  40:25 41:1
**750**  128:4
**7th**  178:15

**8**

**8**  3:4 17:19
27:8 132:2
180:3
**8.b.**  179:6
**84**  152:16
**85**  152:16
**866**  45:4
**875-2390**  4:8

**9**

**9**  29:1 33:4
90:2,15
**9/28/22**  2:24
**90**  41:4 171:9
**94104**  4:7
**94111**  4:16
**96**  9:20
**9:00**  94:22,22
109:6,20
**9:39**  1:13 5:4

**a**

**a.m.**  1:13 5:4
39:7,8,8,10
94:22
**abide**  20:4
128:22
**abided**  49:8
**abigail**  4:21
**abilities**  56:13
**ability**  49:20,23
50:6 66:25

95:3,22 96:10
97:8,13,25
98:24 99:15,23
101:12,13
118:17 133:7
136:22 139:8
148:19 157:1
157:17 172:12
173:5
**able**  19:7 41:6
55:16 66:19,24
69:10 97:14
112:22 134:19
136:1,19 139:1
145:15 146:23
148:21,22,24
152:19,24
162:8 165:16
165:24 170:22
173:2 175:6
**above**  34:17
180:6 182:7
**absence**  108:12
**absentee**  66:20
67:1 73:22,24
74:2,9 79:15
79:15 87:14
90:12 93:1,4
93:16 94:3,12
95:13 103:21
105:2,10,25
106:2,7,10
107:1 108:25
109:10,11

**absolutely**
163:9 165:22
168:23 172:5
173:7
**access**  46:15,23
49:21 66:25
88:21 93:21
94:18 95:4,13
95:18 96:11
100:6 108:25
109:2 133:23
134:25 138:25
146:4,17,18
148:19,23
150:10 153:19
154:11,12,25
155:16,22
172:20 173:2
**accessibility**
161:8
**accommodati...**
99:24
**accord**  25:22
**account**  125:25
**accounted**
124:3
**accuracy**  180:9
**accurately**  24:5
25:12
**acknowledge...**
182:3
**acknowledg...**
180:12
**act**  2:23 93:9
93:22 94:6,15

95:1,16 96:8
97:2,23 98:12
98:19 99:5,21
116:5 130:15
**acting**  179:9
**action**  5:18
21:4 27:15
33:5,7,11,12
41:16,17,18,19
41:23 42:9,15
42:19,21,25
43:1 64:20,22
65:24 66:7
69:24 83:18
101:9,19
106:17 108:23
117:9,11,12
118:1 121:6
122:3,20,25
123:3,9 124:8
124:10,23
140:11 142:23
142:25 143:8
143:22 144:4
145:17 164:5
178:14
**actions**  103:13
104:15,19,25
105:9 106:4,24
108:10 112:6
112:15 113:5
114:20 118:15
119:7 126:12
126:13,20,24
127:1,7

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 186 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

[active - african]                                                    Page 4

**active** 117:22
**activities** 18:12
21:13 30:11
36:1 40:12
41:8 43:5,25
44:3,7,25
45:10 46:2,6
48:13 54:25
58:6,23 60:21
63:3 65:25
67:5,7 70:22
70:24 73:14
76:17 85:21
106:20 119:3
122:23 126:3
145:11 164:23
165:8 169:4
**activity** 57:8
78:7 165:5
**acts** 58:3
**actual** 59:8
84:20 85:12
113:25 117:12
135:1 165:8
169:6,22
**actually** 24:14
48:10 56:6,13
58:15 60:23
61:2 62:18
75:15 89:3
104:12 111:19
115:4,6 117:9
128:19 129:23
135:1,3 149:9
149:12 167:17

167:22 169:19
170:1 173:2
176:11
**add** 38:2,8,16
54:17 55:8,10
80:12,13,15
172:12
**added** 38:17,21
39:13,14 59:15
82:8,11 83:10
83:13
**addition** 83:9
**additional**
10:14 24:11
54:19 80:5
81:1,3 126:24
127:1,7
**additions** 182:6
**address** 6:22,23
6:24 7:6,9 30:5
31:11 32:18
62:19 66:19
68:16 103:13
103:21 104:8
105:9,10 106:5
106:25 112:7
114:21 126:4
142:10,11,14
156:25 168:5
168:13
**addressed**
30:25 103:7,14
113:25
**addresses**
154:15 168:17

176:12
**addressing**
15:24 66:12
**adjust** 40:21
**adjusted** 67:3
**administration**
69:18,21 70:10
**administrations**
34:25
**administrative**
20:11 83:14
**administrators**
68:17 69:15
120:24
**admission**
128:5
**admissions**
2:17
**advanced**
136:21 138:11
**advancement**
20:3 23:1,22
24:16 25:8
28:24 36:8
128:10,23
**advancing** 31:7
**adverse** 153:1
**advice** 28:22
**advisors**
121:18
**advocacy** 21:13
28:15 31:7
103:25 123:11
141:22 143:18

**advocate**
101:23 142:4,7
**affairs** 19:23
66:5,17 67:7,9
**affect** 49:6
53:10 60:20
173:5
**affected** 49:20
55:13 98:5
107:24 119:10
119:17,21
134:18 138:17
138:17 139:9
**affects** 94:17
96:10 97:25
99:22
**affidavit**
175:10,12,14
175:16
**affiliation** 29:3
29:7,9 30:4
35:11
**affirmatively**
171:23
**afraid** 74:13
**african** 19:18
19:21 40:25
41:5 49:6
50:22 52:22
53:10 72:19
89:5 93:8
94:18 95:3,22
96:10 97:5,13
98:1 99:13,23
100:1 101:12

**[african - answers]** Page 5

| | | | |
|---|---|---|---|
| 142:6 159:23 | **alleges** 58:2 | 98:1 99:13 | 62:1 63:15 |
| 160:24 161:24 | **allocation** 72:9 | 100:1 159:23 | 74:23 78:10 |
| 169:10 171:10 | 72:13,15 | 160:24 169:10 | 79:20 81:18 |
| 171:11 173:1 | **allotted** 180:20 | 171:10,11 | 82:2 83:6 |
| **age** 134:17 | **allow** 90:20 | 173:1 | 89:20 90:21 |
| 136:21 | 92:16 110:12 | **americans** | 92:16,21 |
| **agency** 179:14 | 120:11 123:17 | 19:18,21 53:10 | 100:24 101:4 |
| **agenda** 114:7 | 125:5 134:11 | 72:19 89:5 | 101:25,25 |
| 164:14 | **allowed** 161:21 | 94:18 95:3,22 | 102:2,4 103:22 |
| **agendas** 35:3 | 166:14,17 | 96:10 97:5 | 104:5 110:16 |
| **agent** 179:9 | **allowing** 98:23 | 99:23 101:12 | 112:2 120:12 |
| **ago** 9:7 14:11 | 162:23 | 142:6 161:24 | 120:15 123:16 |
| 14:15 15:10 | **allows** 98:3 | **amount** 52:20 | 123:18,20 |
| 34:25 113:17 | 140:19 | 55:12 95:8 | 126:7,17 127:5 |
| **agree** 25:12 | **ambiguous** | 96:14 | 129:15 133:15 |
| 26:3,4 31:3 | 116:25 | **amounts** 62:9 | 134:11 136:9 |
| 87:25 | **amended** 18:19 | 62:11 98:24 | 136:10 143:19 |
| **agreed** 12:22 | **amendment** | **analyses** 158:5 | 148:17 149:4,5 |
| 13:10 | 28:15 30:12 | **analysis** 156:23 | 153:9,13,15 |
| **agreement** | 31:5 32:5 | 157:12,23 | 154:1,22 |
| 131:1 | 63:12 93:10 | **anecdotal** | 171:25 |
| **ahead** 90:4,19 | 98:20,20,21 | 134:1 135:4,9 | **answered** |
| 137:23 | 99:6,7,21,22 | 135:15,20 | 16:19 77:24 |
| **aims** 24:9 | 100:20 122:22 | 136:10,15 | 80:8 81:25 |
| **akin** 93:11 | 123:10,14 | 137:4,10 138:7 | 85:23 101:21 |
| 98:16 | 124:18 143:17 | 145:22,24,25 | 102:8 136:7,25 |
| **alarm** 61:12,13 | **amendments** | **anh** 5:13 | 148:15 157:6 |
| 61:15,15 | 93:24,25 94:7 | **ann** 5:12 | 159:18 |
| **allegation** | 94:16 95:2,18 | **annual** 128:3 | **answering** |
| 134:10 151:2 | 96:9 97:3,24 | **answer** 6:16 | 30:15 133:14 |
| **allegations** | 98:14 | 15:4,13 26:4 | 159:9 |
| 134:3 168:4,5 | **american** 40:25 | 26:13 28:13,17 | **answers** 8:16 |
| 168:6 | 41:5 49:6 | 30:10,24 41:15 | 74:7 94:14 |
| **alleged** 90:16 | 50:22 52:22 | 43:1 47:14,23 | 106:12 131:9 |
| | 93:8 97:13 | 57:6 58:23 | 131:10 169:1 |

[answers - attached]                                    Page 6

178:8
**anthropology**
9:23
**anticipation**
43:24
**anybody**  48:7
63:20 64:24,25
75:3,5,7 85:13
145:19 146:10
146:11
**anymore**  26:24
**apart**  12:20
17:4,20 32:18
76:2,3 81:2
108:9 124:8
127:1 137:5,9
147:11,18
158:14,15
170:10
**apologize**  34:2
**appearances**
4:1 64:6,8
**appeared**  8:11
**appearing**
141:23
**appended**
182:7
**applicable**
180:8
**application**
73:24 74:6,20
**applications**
73:22 74:2,9
74:15 93:17
94:3 106:8,19

**applies**  107:15
**apply**  29:10
33:13 90:11
93:1
**applying**  112:8
**appointed**
96:25 112:18
**appreciate**
100:15 159:9
159:10
**appropriate**
90:22 130:23
176:18
**approval**  28:10
29:16,22
102:15
**approved**
29:16,18,19
30:15 31:2
102:25
**approximately**
14:10 20:10,13
20:20 137:16
**april**  69:1 71:9
**area**  21:2 24:3
90:18 153:3
168:16
**areas**  21:2,15
57:15 59:6
95:25 96:12,20
96:21 108:12
119:20 138:23
173:7,22
**argue**  95:20
110:14

**argument**
97:21 110:20
110:22
**argumentative**
140:25
**arguments**
95:15 96:6
99:4 111:7
**arm**  74:11,12
108:19
**arms**  34:4
**arrested**  8:17
**article**  25:19
163:24 179:6
**articulate**  24:5
**articulates**  24:8
**asian**  171:13
**aside**  64:16
76:18 81:5
118:19
**asked**  28:15
35:16 68:25
80:7 81:7,24
85:23 101:20
102:8 124:17
136:6 148:15
152:16 157:6
159:15,17
162:14
**asking**  74:24
80:10,24,25
89:25 91:4,24
92:14 101:5
134:9 138:4
143:4 146:9,10

147:17,21
153:11
**asks**  10:8
**aspect**  44:9
105:18 113:13
**aspects**  12:23
17:23 24:12
32:6 42:10
51:17 78:11
103:14 112:12
120:10 157:16
**assembly**  96:25
97:7 112:18
**assist**  15:25
73:20 74:3
77:14 83:9
93:20
**assistance**
73:23
**assistant**  20:12
79:12 83:14
**assisting**  45:3
54:3 82:12,17
**association**
20:2 22:25
23:21 24:15
25:8 27:13,18
27:19 28:23
36:8 69:14
128:10,23
**assumes**  174:12
**atlanta**  1:2,21
120:1 132:23
**attached**  4:25
121:12 180:11

**[attempt - bates]** Page 7

| | | | |
|---|---|---|---|
| **attempt** 133:18 142:3 174:18 **attempted** 17:2 54:14 108:19 114:2 135:6 162:2 163:20 **attempting** 92:12 93:20 **attempts** 44:18 51:8 65:15 98:22 108:7 138:20 150:22 161:3,9 171:3 174:17,22 **attention** 58:11 68:19 140:5 161:20 **attorney** 4:4,12 10:23 14:18 15:4,6 75:4 143:15 157:11 159:8 178:13 180:13 **attorneys** 14:8 14:20 15:23 100:11,16,22 101:1 102:16 153:20 154:11 154:19,25 155:22 156:18 156:23 **augusta** 163:25 164:15 **authorities** 162:23 165:6 | **authority** 27:14 110:15,15 111:11 113:6 **authorization** 27:19,22,23 28:2,5 29:25 **authorized** 91:25 110:10 162:15,23 **authorizes** 109:25 **availability** 161:1 **available** 12:8 14:1 15:14 56:7,10 90:25 144:12,17 158:9 167:7 180:6 **avoid** 13:15 **aware** 14:3,5 28:20 71:12,15 113:12 131:13 140:11,12,18 140:18 144:18 149:6 150:14 150:15,15,19 151:11,16 152:10 156:24 158:6 162:21 167:15,18,19 174:15,17,18 **awareness** 49:14 | **b** **b** 1:9,25 2:10 3:1 4:23 5:4 11:18 24:3 27:10 29:14 92:12 116:6 130:24 178:20 179:11,21 180:5 181:2,24 182:2,4,12 **back** 35:19,20 35:21 39:24 55:21 61:5,15 62:2 66:20 72:16 78:17 79:19 80:16 85:18 92:8 110:18 113:15 124:1 152:25 171:25 173:14 **background** 17:11 **backside** 132:9 **ballot** 47:10 73:22,24 74:2 88:21 89:6 90:12 93:17 94:3,12 103:21 106:7,18 107:1 108:25 109:11 109:11 145:11 166:9 175:22 **balloting** 66:20 **ballots** 67:1 87:14 93:1,4 | 105:2,11,25 106:10 166:17 175:1 176:23 **ban** 161:3 **bandwidth** 172:11 **banking** 107:11 107:11,19 108:7,7,18,18 **banned** 109:6 **bar** 95:8 **barrett** 8:24 **barrier** 170:2 **barriers** 172:12 172:22 **based** 35:3 49:25 68:12 95:19 110:7 136:12 **basically** 17:19 17:25 43:13 **basis** 89:17,18 90:10 91:5 92:14,25 93:14 94:2,10,20 95:12 96:3,22 97:17 98:8,9 99:1,18 110:25 122:22 124:17 134:6,9,20 160:2 **bates** 23:24 24:24,25 25:7 27:8 29:2 33:5 33:22 115:16 |

[bates - build]                                                    Page 8

115:18,19
116:2 131:23
**behalf**  4:2,10
27:17 155:7
**belief**  88:22
**believe**  23:24
38:3 47:15,24
55:2,13,21,22
57:19 90:22
93:11,19 95:9
101:15 104:4
110:23 114:9
114:10,16
123:19 128:7
129:3 130:11
135:2 137:5
143:16 160:15
160:19,22,22
**believes**  100:13
**benefit**  91:23
**benefits**  128:15
**best**  15:13
42:22 47:18
62:1,1 63:6
64:14 78:6
89:20 108:20
126:18 141:3
**bet**  129:14
**beyond**  32:11
35:19 73:16
90:14 92:18
**big**  56:4 88:19
88:20
**bigger**  88:7,11

**bill**  1:4 65:12
65:13,17,18
180:4 181:1
182:1
**bind**  92:13
**bit**  25:15 55:21
57:2 68:8
75:10 77:11
159:12 163:10
**black**  32:24
96:1 98:23
125:13,17
127:15,16
144:13 160:11
160:17 162:5
164:14 170:18
**blake**  70:15,15
70:18
**blazing**  61:12
**blunt**  53:20
59:11 65:15
119:11 162:2
**blurbs**  79:15
**board**  5:11
20:5 23:2 50:1
50:1 62:14
69:18,23 70:7
77:21 96:24
97:10,18
112:17 113:7
114:1,3 118:5
128:12 140:2
140:10 141:24
161:7 164:4
165:11,13,16

165:17 174:6,7
174:10,16,19
179:6
**boards**  42:4
44:20 50:9
51:10 61:1
97:20 113:7
119:19 120:5
140:20 162:22
**boulevard**  7:10
**bounceback**
163:15
**box**  46:22 89:6
109:8 127:20
138:11,11
151:14 152:13
161:1
**boxes**  46:8,14
46:15,16,19,22
46:23 47:2,2,6
47:7,12,17,20
48:3,6,7,9 56:4
56:7,9,12,21,23
87:11 95:14,24
108:25 109:4,7
109:15,17,19
109:23,25
110:5,10,16
111:11,15,25
113:16 151:3
162:12,15,19
162:24 163:3,5
163:8
**brad**  5:11

**branch**  25:21
67:15,16 114:5
120:1,4 132:23
**branches**  25:17
40:7 172:10
**break**  6:15,17
6:18,19 86:19
89:9
**breakout**  160:3
**brennan**
158:10 160:3
173:3
**brian**  130:11
**brief**  137:2
158:20
**briefly**  174:24
**bring**  16:11
29:20 36:22
37:11 49:2,13
54:10 55:17
58:18 92:1
**bringing**  29:10
**broad**  75:11
**broader**  67:22
**broadest**  68:19
**bronze**  128:4
**brothers**
171:12,13
**brought**  45:6,6
140:5 167:16
**bryan's**  177:17
**bubbles**  95:8
**buffer**  49:9,10
**build**  42:17
72:17

**[burden - challenged]**                                          Page 9

**burden** 93:7,19
**bureau** 74:10
**bus** 53:23
  84:18,21 85:6
  85:12,12
  168:24 169:5,6
  169:12 170:8
**buses** 45:20
  56:16 84:20
  85:10
**business**
  109:18 156:11
  156:14
**bylaws** 2:18
  20:2,4 23:21
  26:9 27:5
  29:12,21 33:2
  68:12 70:4
  128:22

**c**

**c** 2:1 5:1
**calculated**
  13:15
**california** 4:6,7
  4:16
**call** 13:20 36:4
  37:13,16 75:17
  151:23,25
  152:4 161:4
**called** 130:10
  146:21,22
  151:16,20
**calling** 107:21
  107:23 110:8

**calls** 37:12,13
  42:20 54:11
  74:22 83:14,20
  91:3 92:19
  111:3 124:12
  125:10 126:16
  137:22 141:22
  151:21 152:5
  152:11 157:5
**campaign**
  53:16
**campaigns**
  53:14
**cancelled** 86:6
**candidates**
  33:8
**canvassed**
  164:17
**caption** 30:19
  132:10 178:7
**captioned**
  116:3,4
**cards** 43:18
**carry** 157:1,17
**carter** 83:25
**case** 1:4 8:3,5
  8:19,19 10:22
  16:17 18:16
  58:4 132:1
  153:6 156:18
  179:13,13,15
**cases** 8:2,6,7,8
  173:16
**cast** 166:14,17
  174:25 175:4,6

**categorize**
  169:4
**category** 17:14
  46:11 81:17
**catherine** 4:21
**cauldron**
  161:21
**cause** 160:23
  164:14
**caused** 47:11
  138:25 161:14
  172:25
**caution** 63:8
  133:12
**ccr** 1:25 178:20
  179:21
**ceased** 106:9,11
  106:20
**center** 4:14
  36:10,12,14,19
  36:22 38:9,16
  150:8
**center's** 158:10
  160:3
**centers** 48:1
**central** 154:4
**ceo** 27:20,23
  28:4 29:8,22
  29:23 102:15
  102:19
**certain** 43:18
  49:23 50:13
  51:9,10 57:16
  57:22 58:11
  94:4 113:1,8

  142:4 157:16
  170:9 172:18
  173:7,16
**certainly** 32:2
  87:13
**certificate**
  178:1
**certified** 179:8
**certify** 178:6,12
**chair** 41:19,23
  42:15,19,25
  43:2 60:22
  64:20,22 65:8
  66:7,22 75:21
  83:12,12,21
  101:9 115:6
  174:19
**chairs** 42:9,21
  65:10 68:15
  82:18 83:18
**challenge** 44:18
  98:10,11,24
  114:21 115:2,4
  116:14,16,18
  116:21 117:3
  124:8,22 133:2
  136:4 140:3
  141:16 158:7
**challenged**
  21:9 54:14
  91:11 101:16
  103:15 115:8
  117:4,8 121:6
  122:19 129:9
  168:2 176:2,11

Case 1:21-mi-55555-JPB  Document 731  Filed 10/29/23  Page 192 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[challenges - codes]                                                    Page 10

**challenges**
51:11 54:12,15
54:22 56:24
57:1 60:24
62:12 66:13
77:19 82:21
83:19 105:7
114:24 115:4
115:11 117:23
117:25 118:5,6
130:5 138:21
138:22 141:6,8
161:2 167:11
167:16,23
168:3,22 176:1
176:1,18
**challenging**
109:24 122:3
162:15
**chance** 120:2
**change** 57:14
60:11 61:10
67:13 72:14
77:3 81:23
86:10 113:9,13
161:7 181:4,7
181:10,13,16
181:19
**changed** 18:2
37:5,8,9 40:20
41:22,25 60:13
60:14,20 61:8
61:9,16 62:4
67:6 76:17
106:25

**changes** 42:6
44:16,17 53:9
73:13,16 76:21
77:20 87:7,23
88:1,18,19,20
98:10,11
108:24 112:7
112:10,13
114:21 118:16
126:8 134:5,24
161:2 164:18
164:19 180:10
182:6
**changing** 40:21
41:24
**channel** 147:19
147:21
**chapter** 131:4,6
162:4 163:2
164:24 167:12
**chapter's** 172:4
**chapters** 22:20
**characterizati...**
31:4
**charge** 38:18
38:19 60:18
179:15
**charged** 8:17
**check** 130:9
**cheniece** 4:19
**chilling** 99:8
173:18
**chronicle**
163:25

**church** 42:1
45:19,20 50:21
84:19 85:8
108:16
**churches** 45:16
45:19,24 55:6
55:8 61:2 85:9
108:3
**cincinnati** 9:12
**circle** 1:17
**circumstances**
94:4 97:19
113:8
**cities** 42:22
84:6,7,10,21
119:2
**citizens** 98:23
168:13
**city** 22:18 40:5
45:22 84:6
86:1,12,14
**civic** 42:1 45:16
45:23 55:6,8
108:3
**civil** 5:18 18:5
101:23 116:4
128:13 164:15
**claim** 57:25
90:11 91:6
92:25 93:15
94:11 96:23
97:18 98:9
99:2 110:4
111:24 147:13

**claims** 126:5
**clarifying**
24:19 159:10
**clauses** 98:17
101:10
**cleaner** 68:8
**clear** 19:24
31:13 86:10
91:19,21 92:10
131:2
**clearer** 61:17
104:10
**clearly** 6:9
94:25
**client** 14:18
143:15 157:11
**climate** 77:4
**close** 51:9 75:5
98:7 140:16
150:11 156:20
164:19 165:19
**closing** 165:9
165:21
**closures** 164:5
**coalition** 29:2,9
30:3,16 31:1
31:14 32:1,18
114:6 164:13
164:16 167:24
**coalitions** 30:7
31:6
**cobb** 82:25
118:4,4
**codes** 56:16
84:18 85:6,14

**[codes - compound]**                                          Page 11

| | | | |
|---|---|---|---|
| 85:14,15,15 | **comfort** 57:20 | **communicating** | 99:10 108:3 |
| **coffee** 82:25 | **coming** 58:15 | 40:6 | 169:25 170:4 |
| **cold** 173:22 | 65:17 79:3 | **communication** | **compared** |
| **college** 7:10 | 86:18 | 15:2 108:8 | 88:16 159:24 |
| 9:15,25 22:20 | **comm** 107:10 | 112:12 117:13 | 159:25 160:1,7 |
| 66:25 | **command** | 124:13 141:25 | **comparison** |
| **colloquies** | 36:10,12,14,19 | 172:3 | 88:13 160:17 |
| 178:8 | 36:22 38:9,16 | **communicati...** | **complained** |
| **color** 19:19,21 | **commercial** | 14:18,19 76:25 | 145:16 |
| 35:3 53:11 | 168:6,11 | 83:21 100:10 | **complaint** 2:14 |
| 72:18 89:5 | **commission** | 100:16,17,21 | 15:19 18:19 |
| 95:22 96:2,11 | 132:13,15 | 101:1 107:8 | 100:8 129:1 |
| 97:14 98:1,23 | 141:23 | 119:15 121:4 | 134:2,10 140:1 |
| 99:14,23 142:6 | **committee** | 121:10,20 | 144:21 149:11 |
| 151:7 159:21 | 41:17 59:20 | 122:14,18 | 150:25 152:17 |
| 160:7,8,12,17 | 65:10 66:2,4,4 | 123:2,5,12 | **complaints** |
| 160:24 161:25 | 66:5 68:15 | 124:6,8,11,15 | 54:7 82:22,24 |
| 162:5 170:19 | 75:21 76:25 | 124:21 125:4,7 | 138:24 146:13 |
| **colored** 20:3 | 82:18 83:11,12 | 125:15,20 | 146:14,15 |
| 23:1,22 24:16 | 83:21 101:8 | 137:17,20 | 147:3,23,24 |
| 25:8 28:24 | 112:20 115:6 | 138:7 139:3,5 | 148:2,3,5 |
| 36:9 128:10,24 | 116:3 120:23 | 139:7,12 | 149:6,8,17 |
| **combat** 58:12 | 140:6 164:15 | 141:20 142:2 | **complete** 44:8 |
| **combinations** | **committees** | 142:10 143:4 | 133:23 157:2 |
| 144:8 | 41:18 67:22 | 155:25 | 182:8 |
| **combined** | **common** | **communities** | **completed** |
| 30:11 123:10 | 122:23 123:6 | 49:7,24 50:13 | 73:22,24 74:2 |
| **come** 26:21 | 143:16 164:14 | 57:16,22,23 | 74:19 109:11 |
| 49:13 67:10 | **comms** 79:11 | 66:11 100:1 | 131:14 180:17 |
| 75:1 113:15 | 83:12 | 119:10 | **comply** 155:2 |
| 128:11 137:6 | **communicate** | **community** | **component** |
| 144:15,23 | 122:1 142:8 | 49:1,2,13 | 108:4,17 |
| 147:8 173:23 | 143:21 | 50:21,21,22 | **compound** |
| **comes** 68:7 | **communicated** | 66:8 76:13 | 85:23 |
| 176:24 | 141:14 143:6 | 77:12 83:15 | |

**[compressed - consistent]**                                    Page 12

| | | | |
|---|---|---|---|
| **compressed** | 6:24 7:1,6,9 | 102:23,25 | **conference's** |
| 94:11 | 8:6 9:1,2 12:9 | 103:12,20 | 50:25 52:15 |
| **computer** | 13:21,24 14:1 | 104:16 106:5 | 53:2,13 54:2 |
| 163:24 164:12 | 14:4 15:15 | 106:16,25 | 54:25 56:2 |
| **concentration** | 16:7 18:7,10 | 107:7 108:11 | 57:8 72:12 |
| 9:22 | 18:21 19:15,17 | 108:24 112:15 | 85:20,24 89:19 |
| **concept**   67:4 | 19:22 20:1,6 | 113:5,24,25 | 117:14 152:4 |
| **concern**   70:6 | 21:7,14 22:8 | 114:20 117:22 | 157:1,3,16 |
| 103:24 104:7 | 22:11,22,23,24 | 118:9,11,16 | **conferences** |
| 135:25 158:7 | 23:3,7,11 24:6 | 120:8 121:4 | 24:3,10 32:23 |
| **concerned** | 24:7,12 25:24 | 122:1,17 124:6 | 77:7 |
| 49:18 89:2 | 30:1,3,25 | 124:20 125:24 | **confined**   86:12 |
| 134:15 | 33:14 34:24 | 126:4 128:1,16 | 86:14 |
| **concerning** | 36:1,7 38:16 | 128:21 129:4,9 | **confines**   57:18 |
| 140:3 141:15 | 38:21 40:13 | 131:21 132:18 | 173:15 |
| **concerns**   36:15 | 41:9 43:2,6 | 132:19,21 | **confirm**   146:3 |
| 70:8,9 151:6 | 44:2 45:1,10 | 133:1,4,6 | 146:4 152:6 |
| 169:9 | 46:7 47:16,19 | 134:22 136:12 | **confirmed**   32:3 |
| **concerts** | 47:21,25 48:14 | 137:17 139:6 | **confuse**   6:5 |
| 169:17 | 54:21 55:22 | 140:1,8 141:14 | **confused**   122:9 |
| **concluded** | 57:3,25 58:7 | 141:18 142:19 | **confusion** |
| 177:20 | 58:23 59:13 | 143:5,21 144:3 | 116:20 158:8 |
| **concludes** | 62:25 65:23 | 144:19 145:3 | 158:16 175:11 |
| 177:7 | 66:9 67:14,19 | 145:14,20 | **congratulations** |
| **conclusion** | 68:1,11 69:13 | 147:13 148:13 | 11:10 |
| 74:22 91:4 | 69:17,20,25 | 149:24 150:2 | **connect**   50:20 |
| 92:20 110:9 | 70:7,23 72:3,8 | 150:14,15,19 | **connected** |
| 111:4,9 | 72:21 73:8 | 150:22 151:11 | 123:8 |
| **condemned** | 75:22 76:2,7 | 152:16,17 | **consideration** |
| 168:7,11 | 76:11,16,24 | 153:19,23 | 95:6 |
| **conditions**   7:13 | 79:23 81:1 | 154:3,14,16 | **considerations** |
| **conduct**   49:15 | 82:15 84:5,11 | 155:2,5,7,13,19 | 101:22 |
| 104:3 148:13 | 84:20 86:11 | 161:23 167:3 | **consist**   107:4 |
| **conference** | 87:22 100:11 | 169:7 170:12 | **consistent** |
| 1:10 5:5,17 | 101:18 102:6 | 172:10 176:16 | 130:25 134:8 |

Case 1:21-mi-55555-JPB Document 731 Filed 10/29/23 Page 195 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[consists - county]

Page 13

consists 40:4
consolidate
17:15
consolidated
143:8
constantly
173:13
constituency
105:22 107:24
112:10 121:17
constitution
2:20 24:15
68:12 93:10
94:17 95:2
97:2,4,24
98:15 128:22
constitutional
93:24 97:5
consultation
68:17 69:7
101:8,10
120:22
consulted
69:19
contact 28:18
62:18,20
102:13,16
108:6 119:18
147:6,7
contacted
179:9
contacting
133:17
contemplate
126:25 127:1,6

content 15:1
33:24 34:5
121:19 123:20
contention 94:5
contentions
92:15
continue 50:16
58:7 126:11,13
126:19 127:11
127:14 152:25
168:10
continued
74:13
continuing
43:4 82:6
158:24
contract
179:11,12
control 97:8
113:10
controls 167:6
conversation
6:14 17:16
68:15,21
161:16
conversations
16:5 65:13
81:6 125:11
135:23 137:25
139:14
convince 142:3
cooperation
29:7 32:7
copies 11:22
132:9 180:14

copy 11:19
177:12
copying 73:21
74:4
correct 14:2
39:17 47:15
48:4 55:24,25
67:24 71:12,14
72:5 78:12,13
78:15,16 80:23
81:18,19 85:2
87:8,9,12,15,20
87:21 102:21
110:2,5 112:1
117:17 132:14
136:5,17,18
137:7 141:4
142:17 152:23
159:19,22
162:6 164:21
165:3 166:22
166:23 167:12
174:8,9 175:9
175:19,22
177:3 178:10
182:8
corrections
182:6
correctly 24:8
34:14 39:16
80:21 117:21
137:12 149:18
175:3
councils 22:19

counsel 4:1 5:7
7:2 10:10
11:20 12:13
13:4 27:20,24
28:3,19,23
29:22 89:21
92:6 102:14,20
113:21 143:5
153:8 159:9,15
159:17 163:12
179:7,13
180:14
counsel's 12:21
166:3
counted 166:10
175:5 176:23
176:24
counties 22:10
41:3,3,3 50:10
53:19,22,23
56:4 82:8
117:24 118:1
138:23 166:25
167:2,8 170:25
171:5,6,8,9,14
171:15 174:10
174:15,18,21
counting 95:7
country 18:7
88:23
county 7:4,7
10:20 11:2
22:16,17 23:12
40:24 42:2
50:1 54:13

30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re

February 21, 2023

[county - decisions]

Page 14

55:15,16 59:11
59:21 60:24
61:3 83:1
94:21 96:17
97:20 113:7
114:1,4 115:5
115:9 116:14
117:7,7,18,20
117:24 118:2
118:13,21
119:25 120:5
127:8 138:15
140:12,16,22
141:2,5,7,9,15
141:23 142:11
142:15,16,20
149:19,22
163:11 164:17
164:20,23
165:8 166:11
167:6,6,11,14
167:17,20
174:7,19 176:2
176:15 178:4
179:4
**couple** 8:21
17:21 18:15
19:12 73:4
77:1 83:1
174:2
**course** 6:19
13:3 26:16
37:3 40:6
46:25 48:24
49:8 59:7 82:5

82:20,24 83:17
105:16 108:17
114:5 117:10
119:13 127:11
133:13 138:20
145:6 161:6,23
173:20
**court** 1:1 4:25
5:19 6:10
27:16 113:14
131:25 171:20
179:6,8,10
**cover** 45:7
127:9 128:5
171:18 172:11
**covered** 40:24
128:18 157:9
171:9,11
**covering** 17:22
103:6
**create** 163:2,4
**created** 34:25
46:22 48:23
158:8 172:22
172:23,24
**crime** 8:17
**criminal** 8:7
10:23 74:16
75:3,7 77:10
77:13
**criminalization**
74:14
**criminalized**
74:20

**criminalizes**
74:8
**criminalizing**
57:19
**cross** 130:9
159:7
**cs** 180:15
**cure** 147:9
**curing** 145:11
**current** 20:22
72:13,14
**currently** 11:9
20:11 21:18
126:25 134:25
**customary**
179:15
**cut** 52:11
104:21
**cutoff** 175:18
**cv1259** 5:18
**cycle** 36:23
53:18 78:24
150:18
**cycles** 22:1,5
37:19

**d**

**d** 5:1 33:9
**data** 156:23
157:13 158:5
**database**
154:18,23
155:13,15,18
**date** 5:2 14:9
43:14 179:21
181:24 182:12

**dated** 165:1
**dates** 160:1
**david** 5:13 8:23
**day** 46:21
69:24,24 85:1
145:8 150:12
169:15 178:15
182:15
**days** 78:24
150:12 180:17
**dead** 150:7
**deadlines** 107:9
**deal** 47:9 54:10
59:16 60:4
61:14 64:9
66:23 77:18
120:6
**dealing** 62:14
66:16,17
**decades** 35:23
**decide** 50:10
102:6 120:9
140:16,23
141:2
**decided** 50:13
**decision** 68:18
70:21 98:6
101:14 102:13
103:1 132:1
**decisionmaker**
68:13
**decisions** 20:4
67:25 68:2,9
71:4,8,13,16
120:20

**[declarations - disclosing]**  Page 15

declarations
152:18
declaratory
152:22
declare  182:4
decrease  81:23
dedicate  59:8
dedicated
21:21 50:25
51:2 52:15
53:3,14 156:11
156:14
deemed  168:10
182:6
deeper  41:6
defendant's
2:11 3:2
defendants
4:10 5:10
11:15 18:24
23:17 24:21
33:18 58:4
115:24 132:2
142:17
defender's
10:20 11:3
defense  10:23
75:4
definitely  37:16
57:1,23 82:20
83:2 91:17
94:25 95:6
137:19 151:20
definitive  135:5

degree  9:25,25
dekalb  7:7,7,8
11:2
delayed  94:11
delays  150:9
deliberations
100:18 104:17
deltas  88:12
democrats  35:2
35:8
demographics
160:4
denied  168:21
depending
50:19 83:5
depends  109:15
deponent
180:13 182:3
deposing
180:13
deposition  1:9
5:5 7:19,22
11:18 14:7
15:9,12,20
16:12,15,24
89:25 90:14,15
90:23 113:19
130:24 177:8
177:20 179:5
179:10,10,14
deputized
74:11
describe  65:3
79:8 83:5
102:11 125:6

described
127:2 152:20
164:19
description
2:11 3:2 65:20
designated
12:6,19 13:1
designee  13:24
determine
100:12 133:10
133:24 148:13
determined
101:11 134:22
detrimental
113:10
devastating
125:18
developed
42:14
development
59:2
devote  54:21
devoted  54:2
54:25 57:8
67:8 81:22
dfalk  4:18
difference
160:6
differences
169:3
different  22:14
37:25 42:11
60:16 75:2
79:21 84:21
91:13 107:18

108:8 169:8
differential
160:16
difficult  172:4
172:5
difficulties
136:15
difficulty
135:24 136:19
136:21
digital  77:7
108:4,16,17
digitally  155:6
digitizing  73:21
74:4
dilutes  97:7
direct  19:9
99:15 108:6
146:20 150:6
directed  121:15
direction  178:9
directly  45:23
69:10 85:4
86:5 112:23
118:9 145:22
149:10 170:13
director  21:22
21:23 22:4,6
38:17,22 39:13
54:20 80:22
directors  23:2
disabled  85:11
136:20
disclosing
120:12

[disclosure - drove]                                                                   Page 16

**disclosure** 4:24
179:1,7
**discontinue**
58:10
**discount**
179:15
**discovery**
18:22 73:8
78:3 150:4
155:2 156:3
**discretion**
94:21,23 97:6
142:12,14
**discrimination**
19:19 25:11
59:2 60:7,8,23
62:15
**discuss** 16:23
16:25 121:21
**discussed** 8:19
17:1 51:18
54:18 73:13
75:11 76:16
81:3 82:11
126:9 138:21
165:23,23
168:25 174:6
174:24 176:7
**discussion**
20:18 33:20
37:23 38:13
39:4 86:21,24
116:10 121:2
139:17 163:18

**discussions**
27:16 28:11
104:13 105:3
122:3
**disenfranchise**
98:22
**disenfranchis...**
56:17 96:1
97:16 134:4
**disenfranchises**
97:4
**disproportional**
142:5
**disproportion...**
96:1,9
**disproportion...**
172:25
**disproportion...**
49:6 94:17
97:25 99:13,22
99:25
**dispute** 111:12
111:13
**disqualificati...**
117:4
**district** 1:1,1
**diversion** 58:8
75:16
**divert** 58:1
67:25 68:9,18
70:22 71:14
152:24
**diverted** 75:12
82:9,16

**diverting**
152:19
**doctorate** 9:10
**document**
11:24 12:1
23:25 24:25
27:9 29:1 33:4
74:19 115:22
116:12 153:5
153:17 154:20
155:8 157:11
157:12 163:20
164:2,9
**documentation**
70:21 125:19
**documented**
137:20,25
139:12 151:21
**documents**
15:18,24 16:2
16:11 25:25
71:2,6,13,15,18
73:23 74:5,18
153:20 154:4,5
154:9,10,12
155:6,11,25
**doing** 6:2 10:24
35:23 42:12
43:20,21 45:8
46:1 53:20
62:8,11 64:4
65:1 76:21,22
103:10 105:5
119:17 126:9
126:18,20

139:15 163:22
173:19
**dome** 127:12
**donald** 4:11 5:9
**dontaye** 83:25
**douglas** 120:1
120:5
**drastically** 61:7
61:9
**drill** 17:18 41:5
75:10
**drives** 51:18
53:3
**drop** 46:8,14
46:15,16,18,22
46:22,23 47:1
47:2,6,7,12,17
47:20 48:3,6,7
48:9 56:4,7,9
56:12,21,23
87:11 95:14,24
108:25 109:3,6
109:8,8,12,15
109:17,19,23
109:25 110:5
110:10,16
111:11,15,25
113:16 138:11
138:11 151:3
151:14 152:13
161:1 162:12
162:15,19,23
163:3,5,7
**drove** 84:21

[dubose - election]                                                          Page 17

**dubose** 8:23
**due** 63:12
  168:21
**duly** 5:22
**duma** 1:15
  179:9
**duties** 10:21,22

**e**

**e** 2:1,2,10 3:1
  5:1,1 15:21,22
  16:3 71:19
  108:5 121:11
  121:12,14,15
  124:12 125:10
  125:23,24,25
  138:1,1 139:13
  141:22 154:14
  154:18 155:1,9
  155:11 163:13
  163:15,16
  177:11 181:3,3
  181:3
**earlier** 16:6,22
  54:18 157:15
  167:15 175:25
  176:7
**early** 37:15,16
  46:20 47:4,7
  48:1,2,8 49:22
  50:14,20 84:25
  87:19 94:21,23
  106:1 108:12
  108:13 109:3
  138:12,15
  140:17 145:8

  151:24 161:3
  169:15 172:14
  172:15
**ease** 89:1
**easier** 96:16
  109:22
**easily** 113:18
**economic** 19:20
  25:10 59:2
**ed** 8:23
**educate** 40:15
  40:17 42:6,24
  44:15 54:15
  87:23 169:10
**educated** 51:8
  105:21 112:9
**educating** 41:1
  84:22
**education** 9:9
  9:24 10:14
  21:12 23:13
  38:20 40:14
  41:10 42:12
  44:11 50:25
  51:2,13 52:20
  53:18 58:14
  59:9,16,23
  60:25 62:12
  66:3,13,22
  67:9 78:11
  79:8,15,20,23
  80:6 81:4,15
  82:6 88:8,9,10
  88:19 105:12
  107:2,4,13,16

  108:1,15,21
  109:1 112:9
  113:9 114:23
  118:19 119:10
  172:24
**educational**
  25:9 41:21
  85:3,3
**effect** 45:21
  72:18 99:8
  101:11 125:11
  161:21 173:18
**effective** 61:3
  172:3
**effectively**
  55:17 105:24
  109:6
**effectiveness**
  157:3
**effects** 44:23
  53:20 58:12
  59:11 65:15
  66:18 125:16
  153:1 162:3
**efficient** 109:17
**effort** 163:1
  164:16
**efforts** 15:25
  78:1 79:23
  86:7 87:22
  88:5,6 119:11
  131:21 133:1
  144:5,20 145:2
  162:4

**eight** 20:23
  21:3 60:3
  70:20 75:24
  76:3 129:23,24
**either** 7:19
  13:15,20,22,23
  16:5 147:5
  169:15 173:23
**elect** 97:14
**elected** 35:1,7
  62:19 98:4
  112:12 119:15
  127:12
**election** 5:11
  21:25 22:5
  34:12 35:14
  36:2,3,11,16,20
  36:23 37:1,19
  38:18,19 39:14
  40:11 42:4
  43:14 44:20
  45:8 46:21
  49:4,25 51:10
  53:18 56:8,9
  59:10,17,23
  62:14 64:16,19
  64:21 72:5
  74:12 77:15,17
  77:21 78:24
  85:1 87:7
  88:23,24 96:24
  97:5,10,18
  112:17,21
  113:7 114:3
  118:5 119:19

120:5 129:8,20
129:20 132:1
132:15,16
140:20 141:24
144:5 145:8
150:12,12
151:4,13 160:4
161:7,13,17
162:10,22
165:11,13,16
165:17,25
169:15
**elections** 37:2
50:10 53:5
97:8,15,20
98:2 113:11
140:2,10
159:13 164:4
167:6 170:5
**electoral** 97:7
**electronic**
154:4
**elements**
101:15
**eliminate** 25:11
**embarcadero**
4:14
**emergency**
111:17
**emory** 9:16,17
**employee**
178:13
**employees**
68:11 70:23
75:17,19 93:15

106:6 156:4
**enact** 165:13
**enacted** 114:22
**enactment**
162:18
**encompasses**
41:4
**encourage** 48:1
**ended** 50:20
56:9 61:20
**endorse** 27:14
33:7
**ends** 43:14
**endure** 150:9
**enforce** 141:9
141:12 142:11
**enforcement**
86:8 151:5,8
151:13,17
152:7,9,12
**enforcing**
140:13
**engage** 19:16
40:19 41:9
42:3,23 107:7
145:3
**engaged** 46:7
65:25 161:18
**engagement**
42:1
**engages** 19:17
41:9,20
**engaging** 29:24
45:23 63:2
70:23

**english** 1:15
177:16 179:9
**ensued** 20:18
33:20 37:23
38:13 39:4
86:21,24
116:10 121:2
139:17 163:18
**ensure** 25:9
**enter** 163:21
**entered** 32:17
**entire** 36:24
40:17 42:21
49:1 172:11
**entirely** 46:19
**entities** 45:15
93:16 106:6,13
106:18
**entitled** 164:3
**entitles** 128:9
**entity** 115:8
**environmental**
21:4 59:1 60:5
60:6 64:25
77:5
**ernest** 4:20
**errata** 180:11
180:13,17
**especially**
77:14 125:16
**esq** 4:20,20,21
180:1
**evaluate**
100:12 133:6

**event** 49:2
111:4 169:18
169:21
**events** 32:23
40:7 42:1,1
49:16 50:20
57:12 107:17
169:14,17,25
170:16 173:18
**eventually**
66:14
**everybody**
20:12 166:13
**evidence**
174:13 178:11
**exact** 14:9
130:6,10
161:12 174:21
**exactly** 12:14
23:8 41:8,10
92:5 98:16
104:6 130:9
131:10 162:7
**examination**
2:5,6,7,8 5:24
158:25 174:4
176:20
**examined** 5:22
**example** 60:15
62:16 77:9
107:9
**except** 25:20
32:12 62:20
95:21

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 201 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[exception - falk]                                                      Page 19

exception
  128:12
excited   169:16
exclude   123:4
excluded   123:1
  166:4
excluding
  100:16
excuse   77:9
  138:10
executive   101:8
  120:23 128:12
exercise   56:14
  57:21 99:16
  101:13
exercised
  105:23
exercising
  95:23
exhibit   2:11,13
  2:14,15,18,19
  2:21,22 3:2,4
  11:13,15,17
  17:20 18:18,20
  18:24,24 23:17
  23:20,23 24:19
  24:20,21 25:6
  27:5 33:2,16
  33:18 71:23
  72:1,23,25
  78:3 115:14,24
  132:2
exhibits   18:15
  77:1

existence   31:23
  45:5
expect   126:12
  126:12 131:6,7
experience   17:1
expert   157:5
expired   111:18
explain   34:23
  50:7 63:5,18
  64:14,15 76:20
  89:2
explained
  106:14 135:10
explore   145:20
express   27:19
expressly   29:12
extend   31:5
extended   84:5
  168:14
extensive   48:22
extent   30:6,8
  30:10 31:20
  32:3 63:19
  65:2 73:23
  74:21 91:3
  92:19 101:21
  103:23 126:16
  143:14 156:25
  157:5 158:7
  168:19 172:18
extra   161:19

f

f   4:3 180:1
face   72:10
  82:17

facing   104:15
  104:25 105:8,8
  106:4,24 107:8
  108:10,23
  112:6,15 113:5
  118:15 119:6
  120:16
fact   32:1 37:25
  133:25 134:23
  148:20 151:12
  151:19 166:20
facts   174:12
fails   180:19
fair   51:22
  101:3
faith   131:8,10
faithworks
  32:24 144:14
falk   2:5,7 4:11
  5:9,9,25 7:3
  10:5,10,12
  11:12,17,21,23
  12:17 13:6,17
  14:21 15:7
  18:14 19:2,8
  20:15,19 22:3
  23:19 24:17,23
  26:2,16,19,25
  27:4 28:25
  30:18,22 31:12
  32:9,14 33:16
  33:21 37:24
  38:14 39:11
  41:12,14 44:24
  47:13 50:5

51:24 52:8,13
  63:16,17 64:7
  64:12,13 71:22
  72:2,23 73:3,5
  74:24 75:9
  80:9,11 82:1
  86:9 87:2,5,6
  89:8,15 90:1,5
  90:9,19 91:10
  91:20,22 92:23
  93:13 101:3,17
  102:5,18 104:9
  104:11,24
  110:14,20
  111:1,8,17
  112:3 113:22
  114:13 115:13
  115:16,18,23
  116:1,9,11,23
  116:24 120:17
  121:3,9,25
  122:13 123:1
  123:15,22
  124:1,5,19
  125:3,14
  126:21 127:18
  131:6,10,12,23
  132:4 133:20
  134:13,21
  136:8,24 137:3
  138:3 139:15
  139:23 141:1
  142:24 143:20
  144:2,10
  147:18,20

**[falk - forget]**                                    Page 20

148:16 153:11
153:16 154:24
156:10,16
157:9,21 158:1
158:4,21
163:14 171:19
171:22 174:2,5
174:14 176:5,9
176:19 177:5
177:14,17
**fall** 17:14
**familiar** 166:7
**fan** 43:10
**far** 28:1,2,4
88:8 107:11
149:16
**fear** 86:7 119:3
**february** 1:12
5:3
**federal** 93:23
100:14 124:24
131:25
**fee** 128:2
**feel** 7:16 32:7
164:8
**feet** 49:9,9
118:24,24
173:4,10,11
**felt** 151:18
**fenwick** 4:5
**fenwick.com**
4:9 180:2
**fewer** 52:3
58:24

**fielded** 82:25
**fielding** 37:13
83:14
**fields** 36:15
**fifteen** 97:23
**fifteenth** 93:25
94:7,16 95:1
95:17 96:9
97:3 98:14,21
99:7,21
**fifty** 7:24
**fighter** 128:13
128:13
**figure** 41:20
42:16,21 78:7
**figured** 133:5
**file** 102:16
117:9,12 135:1
176:5
**filed** 140:8,9
142:19 176:23
**files** 133:24
146:4 148:23
**filing** 28:7
122:4,15,24
123:2,9 124:9
**final** 176:22
**finally** 99:17
119:5
**financial** 12:23
12:23 17:23
179:15
**financially**
178:14

**find** 113:18
150:5 153:4
**fine** 7:6 13:22
28:16 52:10
123:25
**fines** 94:2
**finish** 68:3,7,7
**finished** 17:10
68:5
**fire** 61:12,13,15
**firefighter**
61:11
**first** 2:15 5:22
10:19 14:6
18:19 24:13
28:14 30:12
31:4 32:4 60:1
63:11 76:6
78:10,10 84:11
87:10,16 93:24
100:19 101:4
122:22 123:10
123:13 124:17
135:12 143:17
152:18 159:12
168:22 170:22
171:16
**fit** 34:20
**fits** 34:23
**five** 7:22 16:21
52:6 61:13,15
62:13 113:17
152:18
**fly** 66:20

**flyers** 16:4
**focus** 53:17
58:16,18,22
59:22 60:13,14
60:20 61:8,16
62:5 65:10
66:15 67:3,6
77:5 170:20
**focused** 51:3,13
53:6,8 59:3,4,9
59:10 65:17
79:13 81:14
83:13,16,19
**focusing** 171:2
**folks** 50:22
**follow** 65:5
149:17,25
150:3 152:10
174:3
**following** 179:7
**follows** 5:23
111:23
**food** 48:16 57:9
99:2 118:18
141:10 150:10
150:17,21
169:24 170:5
173:21
**foot** 170:2
173:4
**foregoing**
178:6 182:5
**forever** 35:22
**forget** 170:11

30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[forgive - getting]                                                Page 21

| | | **g** | 57:7,16 72:8 |
|---|---|---|---|

**forgive** 143:9
**forgot** 129:24
**form** 29:20
  31:1
**formal** 10:14
**formation** 31:6
**former** 34:18
  35:4,5 132:23
**forms** 73:25
**formulate**
  36:17
**forsyth** 171:15
  171:16,18
**forward** 31:17
  31:19 40:19
  102:7 110:12
  111:2 177:16
**found** 115:11
**four** 4:14 11:22
  16:20 44:5
  52:6 62:13
  130:20 171:14
**fourteen** 93:25
**fourteenth**
  93:10 94:6,16
  95:1,17 96:8
  97:3,23 98:13
  98:13,20 99:6
  99:21
**frame** 35:16
  43:4,25 45:1
  45:11
**franchise** 49:21
  93:21 94:18
  95:5,19,23

96:11 99:16
100:6 101:14
172:21
**francisco** 4:7
  4:16
**fraud** 88:24
**free** 32:7 102:1
  133:15 164:8
**freedom** 128:13
**frequently**
  151:7
**friday** 56:9
**friendly** 173:17
**fs** 35:8,9
**full** 20:25
**fully** 7:14
**fulton** 119:25
  138:15 151:24
  152:2 171:17
  171:18 174:19
  178:4
**function** 64:10
  83:5
**functioning**
  70:6
**functions** 37:5
**funding** 170:13
**further** 2:7,8
  74:9 102:9
  118:22 149:24
  174:4 176:20
  177:5 178:12

**g**

**g** 5:1
**ga** 32:25
  144:14
**galvanize**
  169:16
**gap** 160:13,14
  160:20 161:11
**gauge** 133:18
  133:18
**gears** 105:17
**general** 27:20
  27:23 28:3,19
  28:22 29:22
  37:1 40:11
  79:3 82:7 88:8
  96:25 97:6
  102:14,20
  112:18
**generally** 15:17
  28:13,15
  100:19 125:6
  166:12
**generated**
  147:24
**georgia** 1:1,2,4
  1:10,21 3:5 5:5
  5:16 7:11 12:9
  13:20 18:1,4,9
  18:11 20:8,21
  21:7 24:6,9
  32:17 34:6,13
  34:18 35:7,23
  40:3,12 41:24
  43:8 54:24

57:7,16 72:8
72:11,20 74:10
84:22 97:1
100:11 104:15
105:1 110:5
111:25 112:7
114:6 119:7
125:12,16
127:10,25
129:5,9,17
130:10 131:25
132:14 133:4
134:3 135:23
140:1,2 142:21
144:13 145:1
145:14 158:12
161:15,16
162:4 163:2
164:13,24
167:11 168:9
169:9 171:1
172:11 178:3
179:3,7,8,9,12
179:14 180:4
181:1 182:1
**georgia's** 15:25
**georgian**
  161:18
**gerald** 1:11 5:6
  5:21 6:21
  179:5 180:5
  181:2,24 182:2
  182:4,12
**getting** 31:12
  47:1 58:24

**[getting - guess]**                                                      Page 22

61:5,17 83:19
98:7 119:12
136:22 147:6,7
173:22
**give** 51:1,4,5,6
51:14,16 52:6
52:17,22 53:1
53:4,6,12,16,25
54:1,5 55:4,9
57:11,24 61:25
62:1,1 64:3
77:24 80:3
100:25 102:1
136:24 158:17
177:17
**given** 5:6 7:18
28:3,6 29:25
100:7 126:10
131:9 136:22
142:15 154:25
155:22 178:11
179:15 182:9
**gives** 28:22
**giving** 57:19
94:21 97:18
**glass** 34:3
**go** 6:3,6 9:15
17:13 18:17
35:19,20,21
40:2 47:9
50:22 51:24,24
60:25 61:14
63:23,23 64:14
66:8 78:6
81:19 90:4,19

91:13 96:16
102:6 103:1
109:7,8,18,22
110:12 111:2
119:12 136:19
137:23 146:25
147:8 148:2,3
148:9 149:19
149:21 158:24
161:14,25
169:12
**goal** 42:16
163:2,4,6,9
**goes** 40:9
146:22 147:1
157:22
**going** 6:3,3 8:1
13:7,8,18,19
14:12,25 17:13
17:15 19:6,10
20:16 23:20
26:19 28:12
31:24 37:25
47:5,11 55:15
61:14 63:11,21
72:16,17 74:3
88:22,24 89:16
90:13,20 91:2
91:12,12 92:5
92:16,20
101:24 102:4
103:11,17
110:11 111:6
113:15 122:21
123:17,19

124:16 125:5
126:15 134:10
154:1,2 157:4
163:23 170:6
**gold** 127:12
128:6
**good** 6:1,2,3
7:5,18 11:12
86:17 89:8
131:8,10
158:23 159:2
**gospel** 169:17
**gotcha** 75:23
**gotten** 33:17
170:25
**gotv** 23:15
44:11,21 51:4
53:20 59:7,8
59:20 61:3
66:14
**governed** 20:1
20:7
**government**
141:15 142:8
142:21
**grade** 34:25
35:4,5
**graded** 35:2,6
**grading** 35:10
**grandfather**
98:17
**grant** 113:6
**granted** 29:8
152:21

**grants** 23:15
170:13
**graphics** 34:17
**great** 64:11
139:16
**greater** 52:20
87:13,19 89:6
121:17
**griggs** 1:11 5:6
5:21 6:1,21
11:21,24 12:14
19:3 23:23
27:6 39:12
68:3 89:16
91:23 116:7
117:2 132:5
159:2 179:5
180:5 181:2,24
182:2,4,12
**ground** 84:13
86:6 103:6
157:10
**group** 103:25
104:4 120:13
164:13 169:18
**groups** 30:24
144:11 145:4
**guard** 151:4,14
**guards** 151:18
**guess** 12:5 18:3
20:16 24:3
55:19 59:24
74:1 76:6 78:5
78:24 80:22,25
104:6 124:1

**[guess - identify]**                                              Page 23

159:7
**gwinnett** 54:13
   59:20 60:24
   61:3 82:25
   115:5,8 116:14
   117:7,7,18,20
   117:24 118:2,3
   118:13 166:11
   167:11,13,16
   167:20 168:3
   176:1,14 177:2
   179:4

**h**

**h** 2:10 3:1
   181:3
**habeas** 8:8
**half** 131:20,20
**hall** 130:3
**halls** 40:8
   41:25 108:2,16
**hand** 44:12,12
**handling** 73:24
   74:3,8,14
**hands** 69:24
**handy** 18:16
**happen** 21:25
   68:14 79:1,2
   99:25 150:24
   167:25
**happened**
   21:17 58:16
   68:21 69:4,6
   77:12,20 78:25
   115:4 138:22
   146:21 169:15

**happening** 7:17
   171:4
**happens** 69:19
**hard** 34:2
   52:23
**hatred** 25:11
**hbcus** 66:23
**head** 6:14 83:2
**health** 66:4
**hear** 6:10 101:3
   127:16 137:12
   141:5,7
**heard** 89:6
   167:21
**hearing** 117:7
**hearings** 7:22
**heavily** 95:25
**help** 66:7 73:21
   146:16
**helping** 77:15
**hereto** 4:25
   182:7
**high** 10:1,3
   153:10,12,14
   159:16 162:6
   169:9
**highest** 9:8
   159:16
**highlighted**
   138:24
**highly** 65:8
   136:11 173:23
**hired** 11:2
   80:18

**hiring** 80:13
**historically**
   50:12
**history** 159:17
**hit** 43:9,11,19
   43:19
**hmm** 6:13
   23:10 24:1
   25:3 26:8
   27:12 33:3
   34:16,19 35:15
   35:25 36:13
   57:4 76:20
   79:18 84:2
   106:15 107:20
   122:16 132:6
   132:17 150:13
   164:6
**hold** 115:17
   116:8,8
**home** 6:23
**homecoming**
   169:18
**hopeful** 127:22
**host** 130:17
   170:14
**hotline** 36:4,12
   36:19,22 37:3
   39:13 80:21
   145:6,7,7
   146:25 147:1,4
   147:12,22
   148:4,5,10
   149:1,1,14

**hotlines** 38:2
   148:2
**houk** 4:20
**hours** 67:7,13
   86:19 94:23
   108:12 109:6
   109:20
**housekeeping**
   26:10
**houses** 65:14
**housing** 21:4
   58:17 59:1,14
   59:19 60:5,6
   60:15,19,22,23
   61:5,19,22
   62:15,22 63:25
   64:4,24 65:8
   65:24 67:6,9
   79:11 82:19
   83:11,11 115:6
**hum** 132:8
**hundreds**
   137:19

**i**

**ideas** 127:21
**identification**
   11:16 18:25
   23:18 24:22
   33:19 115:25
   132:3
**identified**
   16:21 34:6
   139:3,4
**identify** 91:5
   115:22 138:7

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

**[identifying - interchange]**                                    Page 24

**identifying**
107:8
**identity** 63:10
65:21 83:6,22
**ii** 25:19
**illegal** 90:12
93:2,18 94:4
94:13,24 95:14
96:5,25 97:1
97:20 98:10
99:3,19 126:6
**impact** 68:20
133:7,18,19
135:22 142:5
**impacted**
160:15,19
**impacts** 95:3
**impaired** 139:8
149:7 157:1
**impediment**
99:14,15
157:15
**impediments**
95:10
**implementati...**
58:9 141:16
**implemented**
32:5 169:7
**impossible**
96:14
**inability**
138:13 147:25
**incident** 168:20
**incidents**
167:15,16

**include** 90:17
147:15
**included**
167:23
**includes** 164:13
**including** 27:15
45:15,16 93:23
138:16
**incorporate**
100:7
**incorrect** 175:7
**increase** 43:12
53:19 55:20,23
56:1 79:24
81:21 85:16,21
126:20,22
160:16 162:9
**increased**
37:14,17 41:2
45:8 53:22
75:12 78:1,7
80:4 84:5
**increasing**
127:8
**independent**
19:23 148:22
**indicated**
138:13
**individual**
22:10 102:25
134:23 135:16
135:21 136:3
148:13 156:4
**individual's**
147:25

**individuals**
16:6 35:10
44:18,19 46:13
49:11 54:13
56:17 57:18
65:20 67:19
85:10 93:20
98:4,5 166:16
166:22 168:21
**informal**
156:24 158:6
**information**
13:25 15:3,5
46:14 47:18
63:9,25 69:8
77:7 85:19
90:25 102:9
105:15,23
108:20 115:10
125:8 135:4,8
135:9,15,15,20
136:2,10,15
137:4,6,6,12,13
137:14 144:12
145:22,25
146:24,25
147:8 149:11
153:8 158:3
160:2,5 165:23
166:4,25 167:2
167:7 176:24
177:18
**informed**
105:14 109:1

**informing**
107:22
**initially** 82:3
**initiate** 27:14
27:24 28:10
**initiative**
170:12
**initiatives**
40:15 59:14
79:8 162:2
**injunction**
152:19,21
**inner** 69:14
**input** 69:24
**inquire** 148:18
153:4
**inquiring** 90:23
**inside** 47:3,3,7
56:5 109:5,7
109:20
**instagram** 2:21
**instruct** 123:19
143:18
**instructing**
30:23 123:15
**instruction**
26:12 143:25
**integrity**
112:21
**intended** 123:4
**interaction**
40:23
**interchange**
113:16

[interest - know]                                                    Page 25

**interest** 122:23
123:6 143:16
**interested**
63:18,24
178:14
**interfaith**
164:16
**internal** 100:18
102:13 104:16
105:3 120:16
133:9 158:11
158:11
**international**
161:20
**interpretation**
75:6
**interrogatories**
2:16
**interrogatory**
73:11 74:7
**interruption**
20:14 37:22
38:10 39:3
93:6 104:20
**intervening**
174:6
**interview**
148:20
**intimidated**
151:12,18
**intimidation**
151:6
**introduce** 5:7
**intrusion** 63:12

**investigation**
74:10 133:9,17
133:21,22
148:12 166:3
**involve** 84:16
**involved** 46:7
47:25 48:15
55:3 64:15
71:9 84:14
101:19 118:10
118:12 129:4
129:25 130:20
132:19,24
141:21 164:24
176:7,16
**involvement**
103:12,19
106:3,23 108:9
108:22 112:5
112:14 113:23
114:19 117:15
118:14 119:6
149:25
**involves** 101:22
102:3 132:13
**involving** 36:2
36:3 43:6
74:14
**issue** 117:16
**issues** 28:14,21
36:4,11,16
42:7 46:21,25
47:10 54:11
60:23 61:22
62:19 63:14

66:12,19 68:16
77:4,5,12,13,14
77:18,20 97:12
100:23 130:17
139:11 145:8
**it'll** 26:14
**items** 152:18
173:14

**j**

**j** 5:13
**jaffe** 4:13
**jaffe.com** 4:18
**james** 8:24
132:24
**janette** 28:20
**january** 35:17
37:6,7 40:13
43:5 44:1 45:2
45:12 46:3,5
48:14 129:6
163:25 165:1
**jeopardy** 74:17
75:8
**job** 10:19 65:1
**johnson** 70:12
70:14,15,17
**joined** 30:3
38:4 124:9
**jpb** 1:5
**judicial** 179:7
**julie** 4:20
**junk** 33:17
**juris** 9:10
**jurisdictions**
109:14 119:4

119:18 161:9
173:17
**justice** 21:5
59:1 60:5,6
64:25 77:10,13

**k**

**keep** 61:1 154:3
162:8
**keeping** 46:2
**keeps** 154:8
**kemp** 130:11
**kept** 154:15
**kick** 40:10
**kicked** 40:16
**kind** 35:13
131:8 152:5
157:13,24
**kinds** 107:18
**knew** 49:3
134:17 150:23
**know** 6:8,15
7:16,21 8:16
12:13 14:10
15:13 17:18,18
28:1,2,4,5
29:23 31:18
32:10,12 38:11
47:2 51:1,2
53:4,8 54:5
55:4 56:22
57:5,19 58:17
58:25 59:10
60:18 62:15,17
64:8,16,22
65:11 66:15

**[know - life]**                                                   Page 26

69:4,6,7,13
70:9 75:17
77:19 80:3
82:4 85:17,18
85:19 89:4,17
90:5,7 91:24
92:1 100:24
110:16,16
111:5 112:19
112:21,24
113:2,18
115:11 121:20
121:23 124:13
129:21 130:19
130:22 131:19
137:16 138:4
138:22 139:14
141:20 142:1
145:14,19,20
146:6,7,13,13
146:20 149:10
151:19 153:2,9
153:12 156:7
163:12,14
164:1 166:24
167:1 169:19
173:9 174:21
174:23 175:17
176:17
**knowing** 135:3
**knowledge**
12:7 29:15
47:18 54:23
63:1,6 87:18
134:12 141:3

143:1 146:20
152:14 155:24
156:2,5 162:25
176:10
**knowledgeable**
168:8
**known** 12:8
13:25
**knows** 131:11
145:21
**koehl** 1:25
178:20 179:21

**l**

**lack** 99:11
100:2,5 150:10
150:17,20
**landscape**
41:24
**large** 62:9,11
118:3 172:7
**latino** 171:12
**launched**
105:12,16,17
118:20 133:9
133:16 162:1
**laurence** 4:3
5:15 180:1
**law** 4:4,12 9:25
10:13,18,19
56:17 57:18
75:6 86:8
100:14 110:8,9
110:23 114:25
116:4 124:24
135:2 151:5,8

151:13,17
152:6,8,12
168:15 173:15
**lawful** 173:18
**lawfully** 118:23
**lawmakers**
113:1
**laws** 90:16
124:22 129:7,8
129:20 133:2
141:12 142:11
145:15
**lawsuit** 21:9
27:25 28:8
30:16,17,20
89:19,19 91:25
92:1 105:4
122:4,15 126:2
126:14 127:2
127:22 129:24
130:1,16
132:10,18,19
142:17 162:14
**lawsuits** 129:23
131:3
**lawyer** 8:8
**lawyers** 8:20
36:6 37:11,21
38:4 39:12
45:6 54:20
77:15,16,17
79:12 82:11
83:12 111:6
116:3 145:6
146:22 153:15

153:17 156:1
164:15 167:24
**le** 5:14
**lead** 21:11
**leading** 21:10
**learn** 14:6,12
**learned** 147:13
**leave** 11:1,6
150:10,16,20
**legal** 27:15
74:22 77:10,13
77:14 91:3,5
92:19 110:9,20
110:22 111:3,8
134:9 180:23
**legitimate**
95:21
**legs** 86:19
**lessening** 161:1
**letter** 2:24
116:5,15 117:6
**letters** 121:12
121:14 124:12
**level** 9:8 22:16
22:17,18 35:7
65:23 67:14,15
67:16 75:23
76:2,7,11,13,16
81:4 83:3,4,17
86:11 89:6
118:12 153:10
153:12,14
**licensed** 151:17
**life** 128:4,4,5,6
128:7

**[likely - loud]**                                    Page 27

**likely** 136:11
173:23
**limit** 29:9 94:21
126:7 163:2,4
172:13,14,16
**limitation**
33:13
**limitations**
47:1 52:21
89:3 99:2
106:13 108:11
118:23 136:22
138:10,25
173:4
**limited** 27:16
50:16 96:18
109:2,20
133:25
**limiting** 95:21
**limits** 94:2
106:25 173:5
**lincoln** 114:3
163:10 164:4
164:18,20,23
165:8 174:7
**lincolnton**
114:4
**line** 48:18
49:12,15 50:4
57:13,17 73:13
85:20 86:6,11
89:22 99:3
109:23 118:17
119:2 123:23
141:11 150:11

150:16,20,22
168:25 169:4
169:22,25
170:4,9,15,20
171:3 172:4
173:6,11,24
181:4,7,10,13
181:16,19
**lines** 48:22 49:5
49:19 96:13,17
96:18 99:11,25
119:23 150:9
173:12,20
**linger** 24:18
**lion's** 83:20
**list** 51:22,25
52:24 64:14
100:8
**listed** 97:11
144:21
**listening**
104:23
**literacy** 93:12
94:9 95:7
98:17
**literally** 61:5
**litigation** 27:11
28:11 29:10,13
29:14,17,18,19
29:24 30:9
32:12,18 102:7
103:13,20
106:4,24
108:10,23
112:6,14 113:4

113:24 114:20
118:15 119:6
129:5 131:13
139:25 140:9
142:20 179:16
**litigations**
27:17
**little** 17:16
25:15 55:21
57:2 68:8
75:10 77:11
122:12 159:12
163:10 164:11
171:19
**live** 7:5,7,8
37:18 96:12
171:14
**lived** 168:6,7
176:11
**living** 168:4
**llp** 1:15 4:5,13
**lobbying**
112:22 113:12
119:16
**local** 42:3
44:20 49:25
50:9 51:10
60:25 62:14,18
77:21 86:7
97:8 98:2
113:10 114:3,5
118:5,13,21
119:18 120:5
140:19 141:23
142:3 149:21

161:7,8 165:11
165:17
**locations** 48:8
138:15 140:17
140:23 150:23
155:6 169:8
**loeffler** 35:5
**long** 11:4,11,12
34:4 49:5
52:11 78:10
96:13 99:11,24
119:23 140:23
150:9 173:20
**longer** 49:19
**look** 12:4 15:18
15:21,22,24
73:3 78:6
164:2
**looked** 15:19
78:5 157:23
**looking** 31:17
31:19 34:1
35:24 78:2
104:12,25
134:13 157:10
**loop** 148:6,7,25
**lost** 131:20
**lot** 17:14 33:24
40:4,8,15,20,22
42:10 53:5
54:6 79:16
109:16 157:9
161:16
**loud** 6:9

30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[lower - measure]

Page 28

**lower** 25:15
**lpulgram** 4:9
180:2
**lunch** 6:19 72:1
**lyft** 45:15,18
55:6 56:16
84:18,19 85:6
85:14,15

**m**

**m** 2:2 4:11
**machine** 109:9
109:13,22
**machines** 47:9
48:2 96:20
109:21 173:8
**made** 26:11
45:24 55:12
67:25 68:9
71:5,14,16
88:6 96:6,7
97:21 99:5,24
101:14 102:13
105:22 131:21
133:1 140:1
150:15 161:10
162:4 172:5
179:14 182:5
**magnifying**
34:3
**mail** 79:16
87:14 125:24
125:25 134:18
134:19 139:13
154:14,18
155:9,11

163:13,15
177:11
**mailboxes** 46:8
**mailed** 163:16
**mails** 15:21,22
16:3 71:19
108:5 121:11
121:12,14,15
124:12 125:10
125:23 138:1,1
141:22 155:1
**main** 67:3
101:5
**maintained**
154:15 155:1
**major** 9:22
**majority** 53:17
170:1
**make** 6:6 16:18
28:18,20 31:13
37:11 41:6
42:3,4 43:23
44:15 45:7,19
47:22 49:3
50:3 53:24
55:12 56:11,16
58:14 61:2
67:18 68:18
77:8 84:22
89:4 91:19
102:13,15
104:9 105:13
111:6 112:11
114:17,23
115:1 119:19

120:6,9 127:13
161:17,24
162:2,5 165:11
167:24 170:18
172:3 173:14
179:7
**makes** 120:20
**making** 51:7
53:9 84:14
107:5 113:11
119:18 146:17
146:17
**manned** 36:6
36:25
**manning** 145:7
**march** 178:15
180:3
**mark** 11:13
13:5 18:14
23:20 24:17
115:13
**marked** 11:15
18:25 23:17
24:21 33:18
115:24 132:2
**marking** 11:17
**marsi** 1:25
178:20 179:21
**mashburn** 5:13
**master** 1:4
**match** 130:6,8
130:10
**matriculating**
65:14 66:6

**matter** 32:24
90:18 121:22
142:1 144:13
164:14
**matters** 8:4
12:7,8 27:17
159:11
**matthew** 5:13
**mccord** 4:21
**mcfarland** 4:20
**mean** 7:4 13:8
32:9 39:2,25
40:1 42:11
43:1 51:24
59:3 60:15
61:4,23 62:5
62:13,16,17
65:7 69:16,22
75:20,21 77:10
80:15 91:24
105:20,21
107:21 111:1
114:14 121:13
124:11 127:20
130:7 142:7
175:14
**meaning** 18:11
23:14 69:23
93:24 173:8
**means** 56:5
59:8 104:6
**meant** 50:8
**measure**
160:21

**[measures - monetary]**                                    Page 29

**measures**
  160:22
**media**  32:23
  108:5 121:11
  121:17 131:24
  144:17
**medical**  7:13
**medications**
  7:13
**meetings**  62:14
  107:17 108:2
  108:16 128:11
  128:12 141:23
  141:24
**member**  21:19
  21:21 96:25
  112:17 128:3,4
  128:4,6,6,8,9
**members**  5:12
  9:1,2 49:12
  59:19 60:1,4
  60:10 69:18
  74:16 101:24
  105:13,22
  107:23 118:4
  121:5 124:21
  127:25 128:17
  128:20 132:22
  133:7,10,17,24
  134:4,14,23
  135:21,24,25
  136:3,11,16,20
  137:7,13,15
  138:25 139:7
  146:1,9 165:12

  165:18,18
  170:5
**membership**
  59:3,4 60:6
  67:10,23
  121:16 128:2
  128:15
**mentioned**
  16:20 22:12
  39:1,12,25
  58:25 67:6
  69:15 80:17
  113:1 128:14
  130:20 138:19
  167:10
**mentions**  25:1
**message**  172:4
  172:8
**messages**
  155:14,16,20
**messaging**  77:3
  77:6,8 172:23
**metro**  120:4
**mi**  1:5
**micro**  170:13
**middle**  150:7
**midterms**  79:4
**million**  89:4
**mind**  7:17
  32:12 67:11,12
  144:15,24,24
**minds**  89:1
**minorities**
  94:19 101:13

**minority**  95:25
  100:1 127:9
  135:23
**minute**  19:5
  158:17
**mischaracteri...**
  110:23
**mischaracteri...**
  154:22
**mischaracteri...**
  110:8
**mission**  19:20
  24:5,12,13,14
  25:1,7,13,14
  34:21,24 35:12
  157:2,17
**missions**  85:3
**mistaken**
  114:10
**misunderstand**
  81:18
**misunderstood**
  149:3
**mm**  6:13 23:10
  24:1 25:3 26:8
  27:12 33:3
  34:16,19 35:15
  35:25 36:13
  57:4 76:20
  79:18 84:2
  106:15 107:20
  122:16 132:6,8
  132:17 150:13
  164:6

**mobile**  56:3,18
  87:16 99:18
  100:3 119:8,22
  119:24 138:14
  138:16
**mobilization**
  21:12,18 23:16
  38:19 39:1,25
  40:2,9 41:20
  42:12,16 44:10
  51:3 52:15
  82:10 84:8,19
  84:23 105:17
  109:2 112:10
  114:25 118:20
  119:11 145:6
  172:24
**mobilize**  16:8
  40:3 41:6
  42:23 50:22
  55:5,17 82:23
  105:18,19
  127:10 169:10
**mobilized**
  113:11 170:18
**mobilizing**  17:1
  43:24
**modalities**
  107:14
**mode**  21:19
**moment**  20:22
  143:9 162:13
**monday**  56:10
**monetary**
  23:15

**[monitoring - note]**                                              Page 30

**monitoring**
  145:10
**month**  61:6
**months**  14:11
  14:14 15:10
  70:20
**moore**  8:23
  42:18
**morning**  6:1,2
  7:15 152:20
**motels**  168:14
**motions**  7:22
  8:8 120:25
**move**  17:11
  19:19 35:13
  50:14 57:15
  153:2 161:9
  173:13
**moved**  47:2
  90:2 105:3
  109:20
**moving**  40:4,19
  49:9 56:4
  109:5 126:2
  127:23 128:25
  132:25 139:24
  143:2 145:13
**multiple**  171:6
**municipal**  37:1

**n**

**n**  2:1,1,2,2 5:1
**naa**  13:20 18:1
  18:4 20:8,21
  32:17 35:22
  102:21 105:1,5

105:9 112:7,7
119:7 158:12
**naa's**  117:2
**naacp**  1:10
  2:18,20 3:5 5:6
  5:17 18:5,8,11
  20:7 21:20
  25:14 27:24
  34:6 131:25
  132:23 134:3
  134:15 166:21
  166:24 167:1,5
  167:14,20
  176:15
**naacpga0000...**
  2:19
**naacpga0000...**
  2:18
**naacpga0000...**
  3:4
**naacpga0000...**
  2:21
**naacpga0000...**
  2:22
**name**  6:20
  27:18 62:22
  63:21 64:10
  135:5 145:18
**named**  16:6
  30:17 81:6
**names**  8:3
  130:8,14
  174:21
**national**  2:23
  18:4,5,8,12

19:23,24 20:2
20:5,7 21:20
22:25 23:1,21
24:15 25:7,22
27:24 28:10,23
36:8 38:7,24
39:15,22,23
69:18,23 70:7
102:21 103:2
116:4 128:10
128:23 130:15
161:20
**nature**  8:7
  145:25 146:14
**near**  169:19
  176:12
**necessary**
  49:10 99:9
  182:6
**need**  6:15,18
  18:16 34:3
  56:1 68:16
  71:23,25 73:21
  74:5 75:5
  86:19,19
  118:11 142:4
  146:16 161:17
**needed**  55:16
  89:1 161:25
  175:22
**needs**  99:9
**negotiations**
  27:16
**never**  48:6
  163:15 170:16

172:19
**new**  8:8 41:23
  42:18 45:6
  51:8 54:10
  58:18 59:16
  79:7,15 89:3
  105:14,23,24
  107:5 144:13
  162:1 165:18
**newspapers**
  147:16 177:2
**nodding**  6:14
**nods**  171:23
**non**  14:20
**nonfinal**
  156:24 158:6
**nonfinancial**
  58:1 88:4,5
**nonpartisan**
  33:7 34:20,23
  35:6,9
**nonpublic**
  30:11 63:13
**normal**  66:1
  70:2,3
**normally**  6:13
  58:17 81:14
  152:25
**north**  171:17
  171:18
**northern**  1:1
**notary**  182:13
  182:19
**note**  12:12
  119:13 176:22

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 213 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

[note - ones]                                             Page 31

180:10
**noted** 159:15
182:7
**notice** 2:13,23
11:18 12:14
14:3,8 15:19
17:6 92:18
116:5,15,21
117:6,10 176:6
**notified** 117:25
**novel** 127:20
**november**
164:12
**number** 6:4
23:24 25:7
43:10,18 53:19
59:21 61:24
95:13,24 96:19
108:25 115:16
116:2 118:3
128:14 131:23
136:25 163:5
172:14
**numbers** 24:25
24:25 33:22
43:12 115:19
160:25
**numerous**
118:7
**nvra** 117:6

**o**

**o** 2:1,2 5:1
**o.c.g.a.** 179:11
**object** 13:12
63:21 64:6

90:13 91:2
110:6,25
122:21 124:16
126:15 157:4
**objected** 12:22
27:1
**objection** 10:2
13:2 14:17
22:2 25:25
26:12,15,18,22
30:6,23 44:4
46:10 48:17
74:21 81:24
85:22 91:8,16
91:21 92:6,11
92:17 101:20
110:11 117:2
120:19 123:23
130:22 134:7
136:6 140:25
154:2,21
174:12
**objections** 2:15
12:13,16,21
13:5,6,14 17:5
17:8 18:21
52:3 72:24
73:7 90:3,6
91:14,15 92:22
124:3 134:8
143:3 153:3
**objectives** 24:2
25:16,17,19,21
25:23 26:5

**obligations**
15:12 128:20
**obstacle** 138:8
**obtained** 9:9
152:17
**obtaining**
28:10
**obviously**
26:14 131:3
**occupy** 35:10
**occur** 54:16
**occurred** 67:13
69:11
**offers** 128:17
**office** 10:20
11:3 28:3,19
33:8 67:20
79:12 155:6
**officer** 97:6,9
152:9
**officers** 102:20
141:15
**offices** 179:9
**official** 3:4 35:7
131:24 151:4,5
151:13,13
154:9
**officials** 35:1
62:19 112:12
119:16 127:13
140:13,16,22
141:2,5,7,9
142:3,8,11,15
142:16 152:12

**ogca** 4:23
**oh** 8:10,15 9:8
24:14 25:1
68:5 116:9
121:17 145:1
155:10 170:24
**okay** 6:11 7:7
8:10,15 9:8
13:19,23 16:18
17:10,12 18:23
19:11 20:24
21:10 33:25
35:13,18 36:3
41:16 48:13
64:1 65:17
69:2 70:15
71:20 73:10,12
75:14 76:24
78:9 82:3 87:2
91:18 103:9,16
104:1 111:12
129:16,19,21
135:9,19
139:24 148:18
151:1 153:5,17
154:25 155:10
155:18 156:13
156:21 159:6
159:14 177:10
177:13
**once** 36:25
53:18 59:10
82:4,6
**ones** 8:10 17:20
49:11 67:10,12

30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

[ones - particular]                                    Page 32

79:10 106:21
138:18 144:15
144:23,25
**ongoing** 133:22
134:16
**online** 36:23,24
37:3 115:21
**open** 46:24
61:1 75:6
119:20 128:3
140:23,24
**opened** 11:7
**opening** 142:13
**operational**
119:25
**operative** 36:19
**opportunity**
56:6
**opposed** 6:12
106:1 109:23
160:25 164:18
**oppressive** 99:8
**options** 45:25
**order** 17:13
82:22 90:11
93:1 155:2
**orders** 111:17
**organization**
12:9 13:20
14:4 16:21
18:6 22:25
91:1 92:12,13
**organizations**
21:11 29:3,11
30:4 32:19,22

45:16,23 55:7
55:8 108:3
121:5 122:2,15
122:18 124:7,9
143:22 144:4
144:19 145:9
146:2 156:11
161:20
**organize** 43:19
**organized** 21:5
22:16,17,18
**outcome** 149:2
178:14
**outcomes**
131:19
**outer** 138:23
**outside** 31:9,22
47:3 119:1
127:20 131:5
139:25 166:8
166:14,17
170:2
**outward**
104:15,25
105:8 120:16
**overall** 159:23
160:9,23,25
**overbroad**
41:13 46:11
85:22
**overcome**
172:18,20
**overcoming**
172:19

**overcrowded**
100:5
**overdrive**
43:23
**overflow** 120:7
138:18
**overlap** 103:17
**overlapping**
10:7
**overseas** 66:18
**overseeing** 18:9
18:13
**overturn** 163:1
**own** 11:7 20:8
21:15 22:9
23:2 66:3,8,11
97:8 98:2

**p**

**p** 5:1
**p.m.** 86:23 87:1
87:4 89:11,12
89:12,14 94:22
139:18,20,20
139:22 175:8
177:8,20
**page** 2:4,11 3:2
12:5 23:24
25:7 27:8,8
29:1,1,2 33:4,5
73:7,11 78:5
79:8 150:4,6,7
181:4,7,10,13
181:16,19
**pages** 33:17
113:17 152:16

152:16
**paid** 23:6 38:23
39:19,20,21,21
75:22
**paled** 88:13
**pandemic** 88:1
88:2 134:16
**paper** 15:18
**paragraph**
12:4 73:19,20
129:1,2,3
134:2 150:25
**park** 7:10
**parkwood** 1:17
**part** 19:13
22:22,24 24:14
33:9 35:11
65:9 66:2 86:1
103:7 106:9
107:10 151:9
154:1,2,10
156:1,6 171:14
**participants**
10:8 30:9
**participate**
7:15 27:15
43:8 86:4 98:4
119:2
**participated**
115:6 118:21
**particular** 19:9
21:19 30:20
31:8 54:15
65:19 78:11
89:24 90:18

**[particular - person]** Page 33

92:15 99:12
103:5,14 104:2
105:7 113:9
135:16 157:22
173:5 176:17
**particularly**
56:7 79:11,12
93:8 95:4
125:12
**particulars**
105:6 149:2
**parties** 29:23
40:8 48:20
57:12 86:2
94:3 118:22
168:24 169:5
169:12,13,14
169:23,24
170:9,21,22,25
179:15
**partner** 61:2
121:5 122:18
124:7 144:3
146:2
**partnered**
45:18,18,19
114:4
**partnering**
85:9
**partners** 55:18
56:15 85:8
117:14 144:20
167:24
**partnership**
36:7 55:6

145:3
**parts** 12:21,24
17:21 25:21
40:4 67:2 90:6
96:17 97:22
**party** 169:19
170:14 178:13
179:13,16
**passage** 37:11
98:18,19
**passed** 65:12
65:15 141:12
**past** 7:19
153:22
**paulding** 120:5
**pause** 137:2
158:20
**pay** 128:2,4
**paying** 156:18
**pdf** 163:23
**pending** 142:22
142:25
**penny** 62:24
**people** 6:10
8:21 16:21
19:19,21 20:3
23:1,22 24:16
25:8 28:24
35:3 36:4,9
44:15,16 45:25
46:16,18,20,25
47:5,19 48:1,5
49:21 50:3,6
53:9,10 54:15
54:17,18,19

55:5,10,13,17
56:5,11 57:20
57:20 58:14
64:23 65:23
72:18 76:2,8,9
79:6 80:5,12
80:13,13,15,18
81:2,5 83:10
86:6 89:5
95:22 96:11
97:13 98:1,23
99:3,10,14,15
99:23 106:1
107:5,9,23
108:7 109:1,3
113:12 114:23
115:8,21
118:17 119:12
125:13,17
127:15,16,25
128:11,24
138:13 142:6
149:6 151:16
152:7 159:21
160:7,8,17,24
161:21,24
162:5 165:21
166:4 168:4
170:4,19
172:20 173:21
173:23
**people's** 59:5
114:7 164:14
**percent** 40:25
41:1,4 170:23

171:1,9,10
**percentage**
50:24 51:1,4,5
51:6,14,16,19
51:21 52:1,7
52:14,17,23
53:1,2,4,7,13
53:16,25 54:1
54:5,24 55:4,9
57:6,7,11,24
61:20 64:3
77:25 80:3
159:23 160:9
160:10,11,24
173:1
**perfect** 62:16
**period** 44:5
46:3,5 48:14
49:22 61:22
161:3
**periods** 138:12
**permission**
29:7
**permit** 163:7
**permits** 168:9
**permitted**
162:19 168:22
**person** 12:6,6
12:10,11,15
42:20 60:18
61:19 62:22
63:10,14,20,25
64:16,16,24
65:24,24 66:21
97:14 108:2,6

**[person - postings]**                                              Page 34

| | | | |
|---|---|---|---|
| 108:15 109:12 | 156:17 | **please** 5:7,20 | 61:1 77:19 |
| 125:11 135:6,6 | **phrased** 110:24 | 76:20 110:18 | 84:24 96:12 |
| 141:22 145:14 | 144:1 | 164:2 | 99:12 109:7 |
| 148:20,24 | **picture** 61:17 | **point** 19:5 34:9 | 119:12,14 |
| 150:20 | **piece** 86:15,15 | 86:18 111:21 | 140:16 147:5,6 |
| **person's** 83:22 | **pierce** 9:5,6 | 120:23 130:11 | 150:16 161:8 |
| **personal** | 70:16,19 | 134:1 153:22 | 164:5,20 165:9 |
| 152:14 156:9 | **place** 45:13 | **points** 79:20 | 165:19 |
| 156:15,17 | 55:1,2 78:6 | **policies** 90:16 | **polls** 40:8 |
| **personnel** 38:2 | 150:16 164:5 | 100:12 124:22 | 45:15,24,25 |
| 38:8,15 59:14 | 164:20 168:18 | 129:7,8 133:2 | 48:11,20 49:24 |
| 59:15,16 80:1 | **placed** 52:21 | 143:6,23 | 50:7,12,17 |
| 81:8,9,11,21 | 136:23 138:10 | 145:16 | 56:13 57:12 |
| 83:7 141:15 | **places** 48:16 | **policing** 74:12 | 84:17 85:11,13 |
| **persons** 25:10 | 57:9 93:19 | **political** 9:23 | 86:2 118:22 |
| 83:4,7 125:9 | 97:6 109:21 | 19:20 21:4 | 150:9,11 161:4 |
| 146:6,8 147:13 | 161:6,10 165:9 | 25:9 33:5,6,11 | 161:4,14,22,25 |
| 165:24 166:8 | 173:9 | 33:12 35:11 | 168:24 169:5 |
| 168:19 | **plaintiff** 4:2 | 41:16,17,18,19 | 169:12,13,14 |
| **perspective** | 5:16 73:20 | 41:23 42:9,15 | 169:23,24 |
| 75:2 | 143:7 | 42:19,21,25 | 170:9,14,22,25 |
| **pertains** 21:8 | **plaintiffs** 5:18 | 43:1 64:20,22 | **poole** 62:24 |
| **pertinent** 31:18 | 143:22 144:4 | 65:24 66:7 | **population** |
| **petition** 164:4 | **plan** 41:21,21 | 74:11 83:18 | 127:9 169:10 |
| 165:20 | 72:8 82:10 | 101:9 | 172:7 |
| **phoenix** 7:9 | 84:8,23 105:17 | **poll** 93:12 94:8 | **portions** |
| **phone** 104:20 | 112:11 126:4 | 95:7 98:16 | 156:25 158:7 |
| 107:11,19 | **planning** | 145:9 169:19 | **position** 63:19 |
| 108:7,18 | 127:21 | 169:20 173:12 | **possibility** |
| 124:12 125:10 | **plans** 72:14,14 | 175:11 | 150:24 |
| 137:24 139:14 | **platinum** 128:7 | **polling** 42:5 | **possible** 162:6 |
| 141:22 155:14 | **play** 127:14 | 44:17 45:13 | **post** 27:17 |
| 155:15 | **played** 57:2 | 46:9 47:8 | 88:16 131:24 |
| **phones** 156:4,9 | 140:12 | 48:16 51:9 | **postings** 121:11 |
| 156:12,14,15 | | 55:1 56:5 57:9 | |

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 217 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

[posts - problem]                                                Page 35

posts 2:21
potential 42:6
74:16 101:11
115:3 120:7
122:24 168:20
potentially
29:24 138:24
163:7
pouring 161:19
power 97:7,19
practice 11:7,9
110:17 168:16
practices 103:5
103:8
practicing 8:7
10:23 75:3
pre 27:16 28:11
precinct 47:8
77:20 96:4,13
100:4 109:8
112:8 145:8
147:6,7 166:8
166:15,18
174:25 175:7
175:10,17,18
175:19,23
precincts 42:5
44:17 51:9
56:5 61:1
84:24 99:12
119:13,14,20
120:6 138:14
138:16,18
161:8 165:19
165:21 170:23

171:1 172:14
preclude 138:9
precluded
135:2
predecessor 9:4
91:25
prefatory
122:15
prepare 15:17
16:24
prepared 12:6
17:6,8 84:25
115:1 153:5,17
preparing 15:8
16:8
prescribed
118:23
presence 22:9
151:12,17
152:12
present 4:19
35:17 41:12
43:5 44:1,22
45:2,12,17
46:4,6 48:15
48:23 71:10
129:6,18,19
142:17 143:5
presented
164:3
presenting
138:7
presents 151:5
preserved
26:22

president 9:5,5
9:6 27:20,23
28:1,4 29:8
68:13,22,25
69:1,3,11,12,13
70:10,12,13,14
70:15,17,17,18
70:19 71:5
101:7 102:14
102:19 103:3
112:19 113:13
119:16 120:22
121:13 132:22
132:24 140:4
165:2
presidents 9:6
83:18
presiding 97:9
press 32:23
77:6,7 121:17
121:17
pretty 21:5
75:11 79:10
87:25 105:25
127:24 157:7
prevent 114:7
prevented
136:12 146:14
149:7 165:21
preventing
115:7 117:3,15
117:19 152:7
previous 8:5
16:16 43:14
68:10 94:14

97:22 101:7
previously
77:24
primaries
36:25
primarily
19:17 83:13
primary 40:11
78:25
prior 16:14
29:6 35:23
98:18,19
111:10 134:8
149:3,5 162:18
162:18,21
168:3
private 11:9
94:2 106:13
128:11
privilege 31:10
31:22 122:23
123:6 143:16
158:3,14,15
privileged
31:15 143:15
143:17 157:12
157:25 158:1
pro 43:8
probably 7:23
13:19 14:14
20:22 40:25
76:18 78:6
155:18
problem 32:16
146:16 147:10

**problems** 45:3
54:4 82:13,17
83:9 172:23,23
172:24
**procedure**
98:10 114:22
**procedures**
87:8 98:12
**proceed** 28:21
90:8
**proceeding**
178:11
**process** 28:9
100:22 101:6
102:9,11,12,24
102:24 108:1
117:3 120:8,12
133:14,15
156:6
**product** 156:22
**production**
2:16 153:6,18
**progeorgia**
81:13
**program** 40:2
40:10,17 42:8
43:9,13 45:4
45:14 55:5
57:12 58:14
81:12 105:13
108:15,21
118:19,20
**programming**
42:10

**programs**
42:12,13 48:11
48:19,21 55:23
56:2 81:20
170:7,8
**prohibited**
135:7 162:22
166:19 179:11
**prohibiting**
93:15 99:18
**prohibition**
93:17 106:6,17
119:8 141:10
**project** 144:14
**projects** 58:6
64:17,19
**prolific** 121:13
**prompted** 58:8
**proof** 135:5
**properties**
168:6,7
**property**
168:11,11
**proportion**
77:22
**protect** 32:24
36:11 144:14
**protected**
123:10
**protecting** 59:4
**protection**
19:18 30:13
31:5 32:5 36:2
36:3 38:18,19
39:14 45:8

59:17,23 77:15
77:17 100:20
122:22 123:13
144:5,20 145:2
145:5
**protections**
93:23 94:7
95:10
**protest** 65:12
**protocols** 90:16
100:13 124:22
143:7,23
145:16
**provide** 23:5,12
23:13,13,14,14
23:15 46:14
57:6,7,13,17
85:4,10,12
88:21 96:19
118:17 138:18
150:22 153:19
169:25 170:3
170:15 172:8
172:13 173:6
179:10,13
**provided** 15:1
15:22 38:7,24
74:5 156:1
168:5 170:13
**provides** 50:9
**providing**
48:15 49:10
57:8 99:2,9
141:10

**provision** 122:2
**provisional**
166:9,13,17
175:1,22
176:23
**provisions** 21:8
58:3 95:16
121:6 122:19
124:7 126:4
136:4,13 138:6
139:2 140:3,18
141:16 142:4
142:12
**psc** 132:1
**public** 10:20
11:2 31:14,21
31:23 32:2,4,7
32:17 33:8
63:9,10 64:5,7
64:9 65:8
83:22 93:15,16
105:8,13 106:4
106:6,6,18,24
107:8,17
108:10,23
112:6,15 113:5
114:6,9 115:12
118:15 119:6
128:11 132:13
132:15 135:22
137:5,8,9
144:7,20 146:1
147:11,18
166:2,4 176:14
182:19

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 219 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[publications - quick]                                                        Page 37

**publications**
10:16
**publicly** 33:1
144:12,16
158:9
**published**
147:16 166:7
176:25 177:1
**pulgram** 2:6,8
4:3 5:15,15
6:25 10:2
11:19 12:12
13:4 14:17,24
20:16 22:2
25:25 26:10,17
26:23 28:12
30:6 31:3,20
39:5 41:11,13
44:4 46:10
48:17 51:20
52:4 63:8 64:5
64:11 74:21
80:7 81:24
85:22 89:23
90:3,13,20
91:18 92:9
100:15 101:20
102:8 103:22
104:2 110:6,19
110:22 111:3
111:16 113:14
114:12 115:21
116:20 120:11
121:7,21 122:5
122:9,21 123:8

123:17,25
124:16,25
125:5 126:15
127:4 130:21
131:8 133:12
134:7 136:6
137:22 140:25
142:22 143:9
143:14,25
144:6 147:15
148:15 153:7
154:21 156:8
157:4,19,25
158:17,19,23
159:1 163:12
163:19 164:7
164:10 171:24
173:25 174:12
176:4,21 177:4
177:6,13 180:1
**pull** 100:4
138:17
**pulled** 157:14
**purchased**
120:2
**purchasing**
177:12
**purdue** 35:4
**purge** 44:18
**purpose** 6:4
24:8 30:14,16
48:8 62:21
95:21 161:12
**purposes** 6:23
39:14

**pursuant** 4:23
116:5 179:6
**pursuing** 64:17
**pursuit** 31:6
**push** 148:4,5
161:21
**pushed** 106:1
109:3
**pushing** 48:5
108:5
**put** 51:23 74:15
75:7 99:12
109:17 165:18
176:22
**putting** 77:6

**q**

**qualifications**
117:23
**quality** 25:10
**quantify** 77:22
**quantity** 88:3,4
126:22
**queries** 45:3
54:3 82:16,25
83:8
**query** 82:12
**question** 6:16
6:18 10:11
12:18 15:4
23:6 26:4,13
26:14,20 27:2
27:3 28:16
30:10,15 32:15
38:1,1 39:24
53:12 57:5

59:24 63:15
68:4,24 71:7
71:25 72:4
74:1,8 75:2,15
89:23 91:2
92:8 100:24
102:1 103:23
104:5 106:13
110:7,13,18,24
111:2,19,20
113:2 120:18
122:6,10 123:3
123:18 125:1
126:17 127:5
131:22 133:14
133:15 135:13
143:10 144:7
153:10 157:22
159:17 162:16
162:17 171:25
**questions** 6:4
13:7,14 15:13
19:12 31:8
32:6 36:15
58:21 59:25
81:6 89:17
90:4,21 91:9
92:4,11,14,17
92:21 100:9
104:13 112:4
130:25 159:4
166:3 173:25
177:5 178:8
**quick** 127:24

**quicker** 52:2
**quickly** 73:4
**quite** 25:16
  65:16
**quo** 163:6
**quote** 151:5,18

**r**

**r** 5:1 181:3,3
**race** 95:19
**racial** 25:11,11
**raffensperger**
  5:11 130:13
  132:11
**rained** 173:22
**ramp** 37:10
  55:7
**ramped** 43:21
  48:11 49:17
**ran** 53:15 55:5
  57:11
**rate** 179:15
**rather** 48:2
**rayford** 4:19
**reach** 108:7
**reached** 120:1
  120:4
**read** 12:2 34:2
  92:7 110:17
  111:20,22
  122:7 143:12
  164:8,11 180:9
  182:5
**readdress**
  77:15

**reading** 34:14
**reads** 33:6
**ready** 15:16
  158:18
**real** 73:4 87:5
**realize** 18:14
  103:6
**reallocation**
  72:11
**really** 43:21
  44:21 46:13
  119:24
**reason** 7:14
  13:11 119:22
  167:21 180:11
  181:6,9,12,15
  181:18,21
**reasonable**
  88:21 96:14
  99:24
**reasonably**
  12:8 14:1
  15:14
**reasonings**
  96:7
**reasons** 97:11
  100:7 168:1
**rebecca** 5:12
**recall** 8:3 67:12
  130:18,19
  139:3,13 166:1
  166:11,12,16
**receipt** 180:18
**receive** 27:21
  27:22 124:20

139:6
**received** 125:7
  137:18 151:25
  153:8 176:14
**recently** 42:1
**recess** 39:8
  89:12 139:20
**recognize** 9:3
  116:12 143:2
**recollection**
  16:7 164:23,25
  165:7
**record** 5:8
  13:16 20:18
  31:13,16 33:20
  37:23 38:13
  39:4,5,7,10
  72:6,10,12,19
  86:21,23,24
  87:1,4 89:11
  89:14 90:7
  92:10 111:22
  114:6 116:10
  121:2 122:7
  123:23,24
  130:21 139:17
  139:19,22
  143:3,12
  163:18,19,21
  177:9 178:10
**records** 147:2
  166:21
**redirect** 159:5
**redistricting**
  8:5 16:17

129:24,25
  130:16 131:15
**redress** 77:10
  77:13
**reduce** 58:11
  157:2
**reduced** 178:9
**reduction**
  95:24 160:23
**refer** 18:17
  19:7,12 26:9
  27:5 90:15
  128:25 144:7
  166:20 168:24
**reference** 150:8
**referenced**
  180:6
**references**
  103:5
**referral** 179:14
**referred** 16:16
  107:17,19
  136:15 165:4
**referring** 33:2
**refers** 14:3
  27:10
**reflect** 71:13,15
**reflected** 31:25
**refresh** 164:25
  165:7
**refreshes**
  164:22
**regard** 29:13
  40:18

**regarding**
40:13 151:6
**regardless**
35:11
**regions** 42:22
**registered**
43:23
**registrar's**
94:21
**registrars**
97:20
**registration**
2:23 43:7,15
51:18 53:3,6
79:17 81:9,12
81:16 82:5
116:5 130:15
141:6 168:9
**registrations**
43:10
**regulations**
129:7,8 133:2
179:6
**rejection** 47:10
**relate** 88:5
**related** 35:14
62:10,11 63:2
64:19,21 65:2
129:8,20 133:3
140:9 142:20
**relates** 122:24
135:20
**relating** 116:16
143:7,23
152:11

**relation** 36:16
**relationship**
18:3
**relative** 178:12
**releases** 77:7
**relief** 48:18,21
49:16 50:4
57:13,17 73:14
85:20 86:7,12
119:2 150:22
152:15,22
168:25 169:5
169:22,25
170:15,20
171:4 172:4
173:6
**reliefs** 170:10
**remember** 6:9
14:9 16:6
32:25 59:17
83:1 144:25
151:24 162:16
162:17 168:1
174:20
**remotely** 75:5
173:19
**removal** 49:23
115:7 117:4,15
117:19
**remove** 50:6
165:17
**removed** 54:14
117:8
**removes** 97:12

**removing** 97:9
130:14 165:12
**repeat** 26:14,20
27:1,2 92:7
**rephrase** 10:10
71:7 135:11
**replacing** 96:23
112:16
**replies** 113:20
**report** 147:14
160:3 173:3
176:25 177:1
179:14
**reported** 1:25
33:1 146:7,8
**reporter** 4:25
5:20 6:10 10:8
19:1 38:11
73:1 86:17
113:15,20
115:15,17
116:8 122:8,11
143:13 171:20
171:23 177:10
177:14,19
179:8,13
**reporting**
18:12 114:9
115:12 135:22
137:8,10 146:1
146:1,2 176:13
176:14 179:6
179:10,13,13
**reports** 86:5
118:4 137:5

147:11,16,19
158:9,10,10
166:7,11
167:20
**repository**
154:9
**representative**
1:11 90:24
**representing**
5:10,16
**reprisal** 86:7
119:3
**reprisals** 63:13
**republicans**
35:2,8
**request** 113:20
154:20 156:3
**requested**
122:8 143:13
166:24 167:2,3
**requesting**
94:12 107:1
**requests** 2:16
2:16 73:9
106:10 155:3
**require** 29:15
73:23
**required** 88:18
105:24 182:13
**requirement**
105:20 151:3
**requirements**
90:11 92:25
93:4 103:21
105:2,10,14,25

Case 1:21-mi-55555-JPB  Document 731  Filed 10/29/23  Page 222 of 466
30(b)(6) Gerald Griggs                February 21, 2023
Georgia Senate Bill 202, In Re

[requirements - right]                                        Page 40

107:6
requisite  96:19
reread  122:6
  143:10
reserve  92:17
reserved
  177:21
reside  168:17
resided  168:18
resign  140:6
resisted  167:12
resources  23:5
  23:11,14 37:10
  44:13 49:5,10
  50:18 51:12
  54:21 55:18
  58:1,8,24 68:1
  68:9,19 70:22
  71:14 72:9,12
  72:15 75:13,16
  79:5,6 81:3,22
  82:9,15 83:3
  85:4 88:3,4,5
  99:12 100:2,5
  152:20,24
  161:19 170:15
  172:9,13 173:8
respect  31:7
  44:2 62:2,25
  71:4,8 74:18
  79:17 81:20
  84:3 86:11
  88:3 92:13
  101:23 105:1
  105:18,19

112:16 117:23
118:16 123:2
137:4 165:8
174:24 175:25
respective
  119:12,14
respond  54:11
  54:12 60:24
  65:11,18,18
  67:3 77:19
  82:12,16 83:8
  125:18 153:1
  154:19 172:13
responded
  107:2 115:3
  152:2
responding
  45:2 54:3
  60:22 70:24
  77:4,12,18
  82:21 83:16
  106:10 145:7
responds  36:10
  147:5
response  22:6
  39:15 45:9
  73:11 84:12
  88:14,22
  106:17,22
  108:11,24
  113:6 119:7
  152:3,4
responses  2:15
  18:20 68:11
  72:24 73:7

78:3,14,15
105:10 120:9
150:5
responsibilities
  21:3 60:11
  61:4,6,7,9 66:3
  66:4 68:10
  83:8
responsibility
  21:2 112:25
responsible
  18:8,11 97:15
rest  36:7 67:12
restraint  94:8
restraints
  95:18
restricting
  95:13
restrictions
  96:4
result  58:1,8,24
  60:12 76:17,22
  81:9,17 85:16
  85:21 136:4
  145:15 151:15
  157:17
resulted  78:2
results  133:21
resume  72:9
retrieve  154:13
return  90:12
  93:1 150:11,21
  163:6 180:13
  180:17

returning  93:4
reveal  14:18,20
  102:10 103:24
  125:8 133:13
  153:7
reverend  8:23
  9:3 17:3
review  16:14
  24:2 33:23
  180:7
reviewed  16:9
  16:12 24:4
  33:25 101:9
reviews  164:9
revisiting
  112:13
richard  132:22
rid  33:17
ride  85:11,14
  85:15
rides  45:14,24
  48:11 56:12
ridiculously
  99:11
right  9:4 11:14
  16:10 17:10
  19:4,5 20:15
  21:6 26:19,19
  31:20 35:23
  36:18 37:18
  56:14 57:21
  58:20 59:5
  66:10 67:18
  69:9 71:17
  74:25 75:18

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 223 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[right - school]

Page 41

80:25 84:7
85:7 91:10
92:24 95:10,23
101:13 107:25
123:22 127:21
132:7,8 135:12
135:17,18
143:11 144:22
168:21 175:18
177:4
**rights** 18:5
19:18 21:11
25:10 67:4
93:9,22 94:6
94:15 95:1,16
96:8 97:2,23
98:12,19 99:5
99:20 101:23
116:4 127:15
128:13 129:5,6
164:15
**risk** 57:17
134:4
**robust** 21:11
40:22 42:8
45:8 53:15
55:5 58:13
59:11 76:25
82:9 105:12
138:14
**rockdale** 10:20
**role** 140:12
**roll** 130:14
167:17

**rolls** 130:9
168:2,20
**rose** 132:10,22
**rough** 156:24
158:6
**round** 167:22
167:22,23
176:16
**rubbing** 121:1
**rules** 20:4
40:18,22 42:5
51:8 107:5
112:8 179:6
**run** 19:22 36:3
36:10 42:8
45:14 52:24
53:5 58:13
81:12
**runoff** 61:6
172:15
**runs** 76:24
**rural** 138:23
164:17

**s**

**s** 2:1,10 3:1 5:1
181:3
**safe** 106:11,21
**sake** 126:8
**san** 4:7,16
**saturday** 50:19
56:10
**saturdays**
50:15
**save** 51:15

**saw** 121:23
139:13
**saying** 61:19
88:15 139:7,7
**says** 12:5 25:6
25:18 27:13
29:6 34:11
73:20 114:10
129:3 164:12
**sb** 17:1 18:2
21:8 22:7 30:5
30:25 31:7
32:19 37:11
39:15 40:21
41:2 42:2
44:23 45:9,21
46:21 47:11,15
47:24 48:8,12
48:24 49:8,17
50:9,24 51:5
51:16 52:16,18
52:19 53:1,7,8
53:12,15,16,20
54:2,7,22,24
55:7,11,13,20
55:24 56:1,8
57:10,14 58:3
58:8,12,24
59:12 60:12
62:21 63:2
64:18,23 65:11
66:6,18 67:4,8
68:11 70:23,24
72:9,17 74:8,9
76:17,22 77:6

78:2,12 81:10
81:17,21 82:17
83:9 84:12
85:16,21 88:6
88:14,18 97:12
97:22 100:12
101:10,11,15
106:22 114:1
114:22,25
120:10 122:19
125:12,16
129:10 133:7
133:19 134:5
134:24 136:4
136:13,16,23
138:6 140:3,9
140:13,19
141:17 142:4
142:20 143:7
143:23 145:16
153:1 156:25
157:18 158:8
160:15,19,22
161:12 162:3
162:19,21
163:1,7 168:22
169:7,20
170:17,18
172:1,22
**scanning** 73:21
74:4,18
**scene** 152:8
**schaerr** 4:13,18
**school** 10:1,3
10:13,18,19

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 224 of 466
30(b)(6) Gerald Griggs
Georgia Senate Bill 202, In Re
February 21, 2023

[science - simply]                                          Page 42

science 9:23
scope 90:14
  92:18 131:5
se 1:17
search 153:23
  156:5
searched 156:4
searches
  153:23
seat 35:10
second 33:6,23
  36:17 136:24
  167:21 168:3
secretary 5:10
  43:16,16 96:18
  96:23 112:16
  112:20 129:21
  130:12,13
  133:23 140:1,5
  140:10 149:25
  150:3 154:8,13
section 29:14
  116:6
security 151:4
  151:14,18
see 25:1,18,19
  29:4,5 33:9,12
  34:1,7,8,10,16
  47:14 68:16
  72:23 79:2
  119:19 120:18
  124:2 135:1,12
  148:20 151:9
  151:10

seem 88:11
seemed 88:20
seen 11:24 12:1
  70:25 71:2
  138:1 164:1
senate 1:4
  180:4 181:1
  182:1
senator 35:4,5
senators 34:12
  34:18
send 121:4
  122:17 124:6
  124:11 163:20
  177:15
sending 93:16
  94:3 106:7,9
  106:17,18,21
  147:5
seniors 85:10
sense 107:14
sent 117:6
  121:14,14
  124:15 180:14
sentence 29:6
  33:6 68:7
separate 25:2
  29:16 91:12
  169:11,22
  170:7,10,20
serious 151:5
serve 107:24
served 12:13
  112:20

server 125:25
  154:4 155:8
serves 95:20
service 132:13
  132:15
services 21:1
  179:10,13
set 2:15 112:4
  150:22 168:3
  170:2
seven 20:22
  21:3 60:3
  75:23 76:3,19
  129:22,22
several 12:24
  14:11 32:20,25
  60:7 65:7
  115:3 165:12
  166:16 174:18
severally 50:16
severely 95:3
shakes 157:24
share 83:20
sheet 180:11
sheets 35:1
shift 44:13
  50:18 59:7,13
  59:15,21 62:17
  65:10 66:7
  68:22 81:1
shifted 44:21
  46:17,19 48:5
  51:7,12 58:16
  59:22 60:11
  61:4 64:23

66:15 77:11,23
  79:7 81:9,11
  82:4,19,20
  83:2,7 105:17
shifts 80:9
short 129:14
  158:2,13,14
shortcut 52:11
shortening
  49:22 138:12
  161:2
show 163:23
showed 76:25
shown 173:2
sic 36:5
sidewalks
  173:9
sign 180:12
signature
  177:21 178:19
  179:20
signatures
  164:17
signed 78:14,17
  175:10,12,14
  175:17 180:20
signing 78:15
silver 128:6
similar 25:16
  26:6 44:7 45:4
  94:8,14 95:6
  95:15 97:11
  99:4 108:14
simply 35:9
  57:21 118:2

**[simply - state]**                                                    Page 43

172:20

**single**  35:6
**sir**  39:20 162:7
**sisters**  171:13
   171:13
**sit**  35:22
**sites**  46:8
   140:17 142:13
**sitting**  34:12
   35:10
**situation**  26:11
**situations**
   170:21
**six**  129:22
   152:18
**sixteen**  11:10
**size**  84:5
**slipping**  144:24
**slow**  171:19
**smaller**  88:7
**smart**  57:20
**soap**  95:8
**social**  19:20
   25:9 108:5
   121:11 131:24
   144:17
**solely**  65:17
   95:21
**solicited**  106:21
**solutions**
   180:23
**solve**  32:16
**somebody**
   135:1,3 146:5
   146:22 157:23

**sorry**  16:18
   68:3,5 71:22
   74:11 85:15
   90:1 104:21,23
   112:4 116:23
   117:1 122:5
   137:9,23
   171:21
**sort**  48:21
   61:10 63:24
   103:5 107:17
**sorts**  71:17
**souls**  49:24
   50:7,12,17
   161:4,4
**sound**  7:17
   20:17 92:5
**sounds**  7:18
   63:16 64:11
   149:16
**source**  148:1,22
   155:25
**sources**  108:8
   147:12
**south**  151:24
   152:2
**southeast**
   180:15
**speak**  6:9 10:8
   17:2 26:1
   42:20 69:10
   112:22
**speakers**  10:7
**speaking**
   133:10

**specific**  19:13
   65:19,22 103:4
   103:8
**specifically**
   16:25 21:8
   38:4,17 40:16
   40:20,22 41:25
   59:20 66:16
   95:25 119:17
   151:23 165:5
   170:17 174:20
**speculate**  61:25
   126:17
**speculating**
   61:24 121:24
   127:5
**speculation**
   126:16 137:22
**spend**  54:6
   63:2
**spending**  61:20
**spent**  52:19
   53:5 61:21
   62:6,9 67:13
**spoke**  16:20
   42:18,25
   112:25
**spokesman**
   90:24
**staff**  20:8 21:14
   21:19,21 23:2
   23:6 37:12
   39:20 45:7
   54:10 58:19
   60:1,4,10 63:1

154:14

**staffing**  21:17
   22:9
**stages**  127:21
**stand**  49:5
   99:10 145:1
**standing**  91:8
   91:16,20 92:6
   92:11
**stands**  99:14
**start**  10:18
   15:8 30:2
   36:21,25 46:4
   65:5,20 90:4
   94:11
**started**  6:20
   58:22 59:10
   76:22 78:24
**starting**  105:1
   115:19 164:12
**starts**  43:13
**state**  1:10 5:5
   5:10,11,16
   6:24,25 7:6,9
   8:6 9:1,2 12:9
   13:20,24 14:1
   14:4 15:14
   16:7 18:7,7,10
   18:13,21 19:15
   19:17,22 20:1
   20:6 21:7,11
   21:13,14,22,23
   22:4,6,8,11,22
   22:23,24 23:3
   23:7,11 24:3,6

**[state - strategy]**                                                    Page 44

| | | | |
|---|---|---|---|
| 24:6,9,9,12 | 100:11 101:18 | 152:17 153:19 | **statutory** |
| 25:23 30:1,1,3 | 102:6,23,25 | 153:23 154:3 | 110:15 111:11 |
| 30:25 33:1,13 | 103:11,20 | 154:14,15 | **stayed** 162:6 |
| 34:24 35:1,7 | 104:16 106:5 | 155:1,5,7,13,19 | **staying** 168:14 |
| 36:1,7,16 38:5 | 106:16,24 | 157:1,2 159:10 | **stays** 168:14 |
| 38:16,17,20,22 | 107:7 108:11 | 161:23 162:22 | **step** 82:20 |
| 39:13 40:12,17 | 108:24 112:15 | 165:16 166:25 | 89:21 103:1 |
| 41:8,17,19 | 112:17,17 | 167:3,4 168:9 | **steps** 101:18 |
| 42:9 43:2,6,11 | 113:5,7,24,25 | 169:7,8 170:12 | 103:20 104:3 |
| 43:16 44:1,25 | 114:20 117:14 | 172:9,11 174:6 | 105:9 120:20 |
| 45:10 46:6 | 117:22 118:8,9 | 174:10,16 | **stolen** 88:23 |
| 47:16,19,21,25 | 118:11 119:24 | 176:16 178:3 | 161:17 |
| 48:14 49:7,16 | 120:8 121:4 | 179:3 | **stop** 6:6 152:19 |
| 50:24 52:14 | 122:1,17 124:6 | **state's** 42:21 | **stopped** 76:21 |
| 53:2,13 54:1 | 124:20 125:24 | 43:16 112:20 | 114:15 117:11 |
| 54:20,21,25 | 126:3 127:16 | 133:23 | **stopping** 86:18 |
| 55:22 56:2 | 127:17 128:1 | **stated** 81:12 | **store** 155:19 |
| 57:2,7,25 58:7 | 128:16,21 | 108:14 178:7 | **stored** 154:5 |
| 58:23 59:13,19 | 129:4,9,9,21 | **statement** 3:4 | 155:7 |
| 62:25 65:23 | 130:12 131:21 | 4:24 25:2 | **straight** 84:15 |
| 66:9 67:14,19 | 132:18,19,21 | 131:24 132:5 | **strategic** |
| 68:1,10 69:12 | 132:23 133:1,4 | 134:6,20 | 101:22 104:3 |
| 69:17,19,25 | 133:6 134:22 | **states** 1:1 25:12 | 104:12 |
| 70:7,23 72:3,8 | 136:11 137:17 | 25:15 29:2 | **strategies** |
| 72:12,20,20 | 139:6,25 140:2 | 95:2 97:4,24 | 100:18 102:10 |
| 73:8 75:22 | 140:2,6,8,10,10 | 98:14 129:14 | 103:24 107:12 |
| 76:2,7,11,15,24 | 140:21 141:12 | 133:3 151:2 | 120:13 125:8 |
| 79:23 80:22 | 141:13,14,18 | **stations** 56:19 | 133:13 |
| 81:1,4 82:15 | 142:11,19 | **status** 141:6 | **strategy** 28:14 |
| 82:23 83:3,4 | 143:5,21 144:3 | 163:6 | 40:24 42:23 |
| 84:5,11,20 | 144:19 145:2 | **statute** 109:24 | 44:8 46:17,19 |
| 85:20,24 86:11 | 145:13,14 | 143:6 162:15 | 47:5 48:5 51:7 |
| 87:22 89:19 | 147:8 148:12 | 162:21 | 55:15,16 57:14 |
| 96:18,24,24 | 149:24 150:1,2 | **statutes** 143:23 | 57:20 59:7,9 |
| 97:9,18 98:3,3 | 150:3 152:4,15 | | 59:11 102:4 |

[strategy - takeover]                                                Page 45

107:10 120:15
120:15,16
127:8 171:8
**street**  4:6
**stretch**  86:20
**stricken**  168:2
168:20
**strike**  30:7 72:3
**struck**  167:17
**students**  66:23
**studies**  156:23
158:5,11
**study**  157:12
**stuff**  8:9 65:2
147:17
**sub**  24:3 27:10
27:10 29:4,4
33:9 42:11,13
**subject**  12:15
13:2 17:4,8
26:15 90:18
91:7 92:21
101:2 110:11
121:22 123:11
123:13 142:1
**submitted**  4:24
**submitting**
94:12 107:1
**subscribed**
182:14
**subsidiary**  18:8
**substance**
25:23
**substantial**
87:7 88:1 98:2

**substantially**
26:6,7 52:19
80:4
**succeed**  110:4
111:24 126:13
**succeeded**  9:6
**successful**
114:8,11,14
115:7 116:18
116:21,22
117:3,11,13,15
117:17 118:6,7
127:22 165:12
172:18 174:23
**successfully**
114:14 167:12
173:6
**sued**  129:21
130:11,13,17
**sufficient**  7:1
49:4 138:8
160:23
**sufficiently**
36:25 136:19
139:1
**suing**  92:2,3
**suit**  27:16,17
28:11 102:17
**suite**  1:19 4:15
7:10
**sullivan**  5:12
**sunday**  50:11
50:11 56:10
94:24 108:13
161:5

**sundays**  50:14
50:15 95:4
**supervision**
23:16
**supplied**  14:24
**supplies**  170:3
**support**  23:13
46:15
**supporting**
79:14
**supposed**  69:7
**sure**  6:7 16:18
34:4 37:12
41:6 42:3,4
43:23 44:16
45:7,19,24
47:22 49:3
50:3 51:7 53:9
53:24 55:12
56:11,16 58:14
61:2 68:24
71:23 77:8
84:14,22 89:4
89:20 104:6
105:13,22
107:5 112:11
114:17,23
115:1 119:19
120:6 138:5
140:7 142:18
146:17 157:10
161:17,24
162:2,5 165:11
167:24 170:18
173:14 175:24

**surveillance**
151:4
**sustenance**
170:5 173:21
**swear**  5:20
**sworn**  5:22
182:14
**system**  130:9

**t**

**t**  2:1,1,2,10 3:1
181:3,3
**table**  6:17
12:25 17:21,22
43:8
**tables**  170:3
173:13
**take**  51:9 60:15
97:19 101:18
103:1 106:16
106:25 107:16
108:11,24
109:11 113:7
118:1,16 119:7
120:21 126:10
126:25 164:2,7
165:10,16
174:10,17
**taken**  103:13
103:20 104:16
112:7,7,16
113:6 114:21
161:11 178:7
**takeover**  98:3
113:25 114:3
114:15 140:19

Case 1:21-mi-55555-JPB   Document 731   Filed 10/29/23   Page 228 of 466
30(b)(6) Gerald Griggs                    February 21, 2023
Georgia Senate Bill 202, In Re

[takeover - thought]                                    Page 46

161:7
**takeovers**
  44:19 165:5
**takes** 12:24
  164:4
**talk** 12:22
  15:16 56:25
  64:23 73:15
  110:21 159:2
  159:12 162:12
  163:10
**talked** 75:15
  76:3 79:10
  80:9 103:18
  104:13,14
  105:4 155:8
  157:15
**talking** 17:25
  35:22 64:20
  79:7 102:20
  104:14 156:8
**target** 42:16
  43:10,12
**targeted** 43:14
  95:25 160:21
  160:21
**targets** 43:12
  43:20 151:7
**tasks** 80:14,15
**tax** 94:9
**taxes** 93:12
  95:7 98:16
**taylor** 1:15
  177:16 179:9

**technical** 37:22
  38:10 39:3
  93:6
**tedious** 17:16
**tell** 14:21,22
  32:21 51:6,25
  52:9,14 54:7
  61:21 76:15
  91:10 103:10
  135:16 169:3
  172:6
**telling** 113:17
**temps** 161:6
**tequeria** 8:24
**term** 104:8
**terminate**
  174:19
**terminology**
  24:20 25:5
**terms** 25:16
  75:11 80:1
  127:14
**test** 94:9 95:7
**testified** 5:23
  8:12,13 12:15
  73:17 157:20
**testify** 12:7
  17:6,9 60:25
**testifying** 13:25
**testimony** 7:18
  16:14,17 84:4
  157:5 165:4
  166:20 180:9
  180:18 182:8

**tests** 93:12
  98:17
**text** 107:11
  108:6,17
  155:14,16,19
**thank** 11:11
  23:9 84:1 94:1
  158:22 159:2
**thanks** 17:10
  24:19 69:2
**theory** 31:15
**thing** 101:5
  114:18 157:13
**things** 6:13
  17:14 18:1
  19:13,24 50:2
  51:22 53:24
  58:11,17,25
  67:2 69:11
  73:4 77:1
  79:16 88:11
  91:13 92:3
  105:5 118:24
  128:15 147:15
  157:14 168:7
  172:17,20
  173:13
**think** 6:25 7:4
  7:5 8:16 11:21
  12:22 13:10,12
  14:15 16:10
  22:12 24:13,17
  24:18,24 31:10
  31:17 32:9,15
  33:5 38:3

39:18 51:3
56:20 57:5
60:3 61:17
62:5 63:15
71:24 73:1,6
73:18 74:7
75:1,24 78:25
79:6 80:7,17
80:18 84:4,6
88:10 89:8
91:11,15
100:21 102:3
103:8 106:12
106:14 107:16
112:25 114:4,9
114:11 120:14
123:5 127:23
128:18 131:2
135:14 136:25
140:4,4,7
143:1 146:15
153:3,12,12
154:22 155:15
155:16 156:7
157:6 158:18
161:10,11
167:3 175:9
**thinking**
  114:18
**third** 12:4
  69:12 167:22
**thirteenth**
  98:20
**thought** 31:9
  33:16 60:8

[thought - turned]                                                    Page 47

68:5 71:22
80:20 111:9
123:4 175:20
**thousands**  18:6
**threat**  63:12
**three**  14:14
44:5 52:6
75:19 76:18
80:18 170:7
171:1,14
174:22
**throw**  40:7
**tie**  103:6,7
104:18 105:6
**time**  5:3 10:9
11:11,12 20:25
26:18 28:2
35:16 36:24
39:6,9 41:11
43:4,25 44:5
45:1,11 46:3,5
46:11 47:4
51:15 52:20
53:5,17 54:6
59:8 61:20,21
62:6,9,11 63:2
68:23 77:23
84:11 86:22,25
87:3,17 89:8
89:10,13 94:11
96:15 106:25
109:12 136:2
139:18,21
168:22 172:14
175:11,18

177:8 180:19
**timeframe**
180:8
**times**  7:20,21
46:23 70:11
98:25 129:22
175:16
**tiny**  34:14
**title**  65:1
**today**  15:17
16:12 17:7
159:3 169:1
**today's**  5:2
**together**  42:19
44:12 49:2
51:23 77:6
157:14 161:11
**told**  14:16,22
14:23,24 42:18
**took**  67:2 118:2
174:16
**tools**  98:18
**top**  23:4 67:10
67:12 83:2
144:15,23
**topic**  12:19
16:25 17:5,23
89:24 90:2,15
107:3 126:2
127:23 128:25
130:23 132:25
139:24 143:2
145:13 153:2
**topics**  12:24,24
16:23 17:4,9

17:11,15,19,24
18:17 157:8
**total**  108:1
**totally**  17:21
**tour**  40:5,6
45:22 84:6,10
84:14,16 85:2
85:12 86:1,12
86:14 118:21
169:6,6 170:8
**tours**  42:2
53:23 168:24
169:5
**toward**  70:24
**towards**  59:23
**town**  40:8
41:25 108:2,15
163:16
**training**  9:24
10:14 23:14
**transcript**
178:7,10 180:6
180:20 182:5,8
**transmitted**
125:9
**transport**
45:12 46:13
47:17,19 48:7
**transportation**
55:11,20,23
56:2 84:3,16
85:4,13 88:10
**transported**
47:20 48:6

**transporting**
46:7 47:25
55:1
**travel**  169:8
**tremendously**
54:8,9
**trial**  7:19 8:8
**trials**  7:23
**tried**  165:10
**trucks**  169:24
**true**  31:25 72:7
109:10 126:11
126:12 159:20
178:10 182:8
**truthfully**  7:14
**try**  6:12 17:15
51:15 53:20
104:9 113:13
119:11 124:2
133:9 147:9
165:18 172:15
**trying**  16:18
23:8 47:22
52:4,10 55:19
57:21 68:6
104:18 105:4,6
107:13 124:4
130:8 146:18
150:5 165:13
**turn**  23:23
24:24 34:13
72:22 158:18
**turned**  52:11
152:8 154:19
156:5

**[turning - units]**                                              Page 48

**turning** 134:2
150:4,25
152:15
**turnout** 72:6
72:10,12,19
159:13,16,16
160:6,9,16,17
160:25 162:5,9
**two** 9:6 14:14
14:14 34:11,25
38:4 41:24
49:4 51:20
52:5 54:20
59:25 79:11
82:11 83:12
86:18 119:17
119:24 132:21
166:18 171:1
174:22
**type** 34:9,15
106:20 115:1
119:3 137:17
138:8
**types** 104:18
125:6 141:25
165:5 169:4
173:17
**typewriting**
178:9
**typically** 36:24
68:2,21 145:10
145:12 147:4

**u**

**uber** 45:18 55:6
84:19
**ultimately**
165:20 172:25
**unable** 51:19
58:7 134:23
135:17,21
136:3 147:14
148:14 150:8
166:5 174:25
175:4
**unaware** 71:5
**uncertain**
127:14
**unconstitutio...**
58:2 90:17
100:13 124:23
126:5
**under** 17:14
27:10 29:2
33:5,11,12
56:8 69:17,21
76:7,9 89:25
116:4 123:13
127:13 151:3
157:7 168:22
178:9 179:10
**understand** 6:6
7:17 8:15
13:18 15:11
22:8,21 23:9
25:4,4 39:16
42:4 44:16
52:24 55:19

56:25 58:20
62:2,4 68:6
74:1,5 80:21
127:13 138:4
146:19 175:3
**understanding**
25:20 30:22
89:18 90:10
92:2,24 93:3
93:14 94:1,10
94:20 95:12
96:3,22 97:17
98:9 99:1,17
111:13,14
140:15 153:22
168:12,15
175:13,21
**understood**
47:14,23 53:9
58:15 84:4,24
107:5 114:24
117:21 135:14
136:14 149:5
149:18 161:25
**undertake** 43:6
87:22 106:5
126:4
**undertaken**
36:2 40:13
44:2 45:1,11
48:14
**undertook** 50:2
**undisputed**
111:10

**undue** 93:5,7
93:19 94:8
95:10
**unduly** 99:8
**unfairly** 151:7
**unhoused**
168:13
**unit** 27:13,18
83:3,17 118:7
147:7,9,9
148:3,4,5,18
149:1,1,21
167:5,5 171:16
171:17
**united** 1:1 95:2
97:3,24 98:14
**units** 2:18 18:6
18:9,12 22:13
22:14,19,22
23:4,5,5,12,16
23:21 29:8
40:23 41:19,20
42:10 43:11,19
47:20 56:3
57:17 67:17
79:13,14 82:20
82:22 83:15
85:25 86:3
87:16 99:19
100:4 118:13
118:22 119:1,8
119:18,23,24
121:16 133:10
133:17 138:17
138:17 141:18

**[units - vote]**                                                     Page 49

167:1 169:23
170:1,14 171:5
171:5,6 173:19
**university** 9:12
**unlawful** 58:3
**unlimited**
51:10 56:24
98:24 114:24
138:21 161:2
**unsolicited**
93:16 106:7,18
**unsuccessful**
17:3 126:3
127:3 163:22
**upcoming**
34:12
**uplift** 19:21
**ups** 65:5 174:3
**usc** 116:6
**use** 47:6,9 48:6
56:6,13 87:10
87:11,13,19
99:18 105:24
119:8 120:3,9
138:13,14
168:12,16
**used** 21:16,16
80:5 98:18
107:14 180:20
**using** 46:16
47:11 48:9
56:12 109:3
154:23
**usual** 179:15

**usually** 167:5

**v**

**v** 180:4 181:1
182:1
**vague** 10:2
22:2 41:11
44:4 51:20
101:21
**vagueness**
104:8
**vans** 45:20
**variety** 85:3
**various** 73:8
**vast** 50:21
**vastly** 53:10
**verify** 148:22
180:9
**veritext** 179:9
179:12,14
180:14,23
**veritext.com.**
180:15
**verse** 131:4,7
**versus** 132:10
**veterans** 66:5
66:17,18 67:7
67:9
**vice** 69:12
**video** 177:8
**videographer**
4:19 5:2,19
39:6,9 86:22
86:25 87:3
89:10,13
120:25 139:18

139:21 177:7
**videotaped** 1:9
**view** 74:19
**views** 74:25
**vindicate** 129:5
**violate** 100:13
169:20
**violates** 97:22
97:23
**violation**
130:14
**violative** 93:9
93:22 94:5,15
94:15,25 95:9
95:16,17 96:7
96:8 97:1
98:12,13 99:5
99:6,20 124:23
**virtue** 31:22
**vivian** 8:23
42:18
**voice** 98:2
155:14,16,19
**voices** 89:4
**volume** 37:13
37:17 79:22,22
85:15,21
**volunteer** 21:1
38:22 45:7
81:2,3
**volunteers**
20:12,13,20,25
37:12 38:6
39:19 59:18,22
59:22 65:9

68:16 75:20
76:1,6,16
**vote** 32:25 36:5
36:11 41:1,5,7
44:3 45:4,13
46:8,20,20
47:4,7 48:2,8
49:12,25 50:14
50:23 51:19
53:14,24 55:1
56:14 57:21
59:5 66:20,24
81:20 84:25
95:4,11 96:14
98:24 99:3
106:1 109:3,9
109:12,22
118:17 133:8
134:19,24
135:6,17,21
136:1,3,20,22
138:12,14,15
139:8 144:14
145:5,8,15
146:5,7,8,23
147:25 148:14
148:19,21,24
149:9,12
151:14,20,23
151:24 152:9
161:3 165:24
166:5,14
168:21 169:15
170:18 171:10
171:11 172:14

[vote - wanted]                                    Page 50

172:15 173:1
173:24
**voted**   134:18
135:2,3 166:13
**voter**   2:23
21:12,12,12,18
38:19,20 39:1
39:25 40:2,9
40:14 41:9
43:6,10,15
44:8,10,10
45:2 48:21
50:25 51:2,3
51:10,13,18
52:15,20 53:3
53:6,17 54:3
54:11,12,22
56:24,25 58:14
59:9,16,16,23
60:24 61:21
62:10,11,12,12
66:12 77:18
78:11 79:15,17
79:20,22 80:6
81:4,9,11,14,16
82:4,6,10,12,12
82:16 83:8,9
84:3,8,16 88:8
88:9,10,10
93:8 98:10,11
105:12,17,24
105:24 107:2,4
107:13,16
108:1,15,20
109:2 112:9,9

112:10 113:9
114:21,23,25
116:5 117:23
118:19,20
130:15 133:24
135:1 138:21
138:21 144:20
145:2,5 146:4
148:23 150:15
151:6,11
158:16 160:9
160:16 161:2
162:9 168:10
173:10 175:25
**voters**   15:25
16:8 17:2
32:24 40:3,16
42:6,23 43:23
45:13 46:8
47:17 48:16,25
51:8 52:22
55:1 57:9
73:20 84:22
85:5 87:23
89:2 93:8,21
96:1,2 97:13
98:23 99:9
107:21,23
115:5 117:5,8
117:16,19
141:6,10
144:13 150:8
151:6 158:8
159:20,22,23
159:24 160:6,7

160:10,11,12
160:25 161:18
164:14,18
167:17 168:2
169:11,16
174:25 176:1
176:11
**votes**   166:9
**voting**   21:10
36:5 40:18
41:24 45:3
48:1 49:22
50:11,11,20
54:4 56:3,18
66:13 67:4
78:24 79:16
82:13 87:16,19
93:9,22,23
94:6,8,15,22,23
95:1,16 96:4,8
96:19 97:2,22
98:12,19 99:5
99:19,20,25
100:3 106:1
108:12,13
112:8,11 119:8
119:22,24
125:12,16
127:15 129:4
130:9 133:3,25
135:7,23,24
136:12 138:9
138:11,16
139:11 140:17
142:13 146:15

146:16 149:7
152:7 161:5
165:5 166:8,19
166:21 169:16
172:16

**w**

**wait**   70:13
109:21
**waiting**   99:3
118:17 141:11
**walker**   8:24
**wallace**   28:20
**want**   17:18,25
18:15,16 19:3
19:6,6 28:13
31:15 35:13
38:12 40:18
41:5 48:4
51:23 57:1
58:21 61:25
63:8,20 64:23
73:3 74:15
75:7,10 86:10
92:1 103:4,7
110:6 111:5,8
113:15 114:17
121:11 123:22
123:23 133:12
159:4,12 164:7
164:22 166:2
**wanted**   18:14
19:13 26:23
32:10,12 67:18
91:19 152:6
161:23 176:15

| | | | |
|---|---|---|---|
| **warning**  107:9 | 152:8 159:24 | 134:11,14 | **works**  21:19 |
| **water**  48:16 | 159:25 160:11 | 137:24 139:16 | **worley**  5:13 |
| 57:9 99:3 | 160:12 170:8,9 | 143:18 144:9 | **worry**  19:9 |
| 118:18 141:10 | **west**  4:5 120:4 | 153:14 156:13 | 26:24 63:11 |
| 150:10,17,21 | **white**  34:9 | 158:2 163:23 | 65:21 92:4 |
| **way**  19:14 37:1 | 159:20,24 | 164:6,9 171:21 | **wrapping** |
| 52:2,5,9 56:8 | 160:6,7,10,16 | 176:8 180:8,10 | 173:12 |
| 77:23 110:24 | 162:9 | 180:12,19 | **write**  60:4 |
| 130:1 148:9 | **widened** | **won**  131:20 | **writer**  121:13 |
| 151:21 152:20 | 160:13,14 | **woodall**  8:24 | **written**  4:24 |
| **ways**  51:20 | 161:11 | 9:4 17:3 69:11 | 27:19,21,22 |
| 91:13 169:4 | **widespread** | 69:13 70:13,15 | 29:6,12 |
| **we've**  12:22 | 87:11 88:24 | 70:18 103:3 | **wrong**  74:25 |
| 13:10 17:10 | **witness**  5:20 | 112:19 113:13 | 112:4 |

| | |
|---|---|
| | **x** |

| | |
|---|---|
| **x**  2:2,10 3:1 | |
| 32:1 64:2,3 | |

| |
|---|
| **y** |

| | | | |
|---|---|---|---|
| 32:23 34:11 | 12:19 14:13,16 | 119:16 121:13 | **y**  32:1 64:2,3 |
| 40:15,16,22 | 15:1,5 18:23 | 132:24 140:5 | **yeah**  5:9 7:4,5,8 |
| 43:20,20 45:6 | 26:13 28:18 | **woodall's**  70:10 | 7:25 9:3 10:3 |
| 45:25 48:10,18 | 30:14 44:7 | **word**  154:23 | 11:21 19:2 |
| 59:4 75:11 | 46:12 48:18 | **words**  143:11 | 34:1 38:25 |
| 76:1,3 81:2,5 | 63:20,22 73:2 | **work**  13:13 | 52:8 59:1 |
| 90:1 103:7 | 75:1 78:15 | 19:15,25 35:14 | 63:16 66:2 |
| 104:13,14 | 85:24 90:21 | 36:6 44:11 | 71:8,15,21 |
| 105:4 130:17 | 91:4 92:16,21 | 50:25 52:15 | 73:2,6 90:1,5 |
| 136:25 157:6,9 | 93:7 100:25 | 53:2,13 54:2 | 91:10,18 102:3 |
| **website**  43:17 | 101:7 102:3,12 | 59:2 72:20 | 106:20 109:16 |
| **weekend** | 104:1,21 | 75:21 76:7,9,9 | 117:12 120:14 |
| 172:16 | 110:13 111:5,9 | 113:12 127:12 | 122:11 129:3 |
| **weighed**  34:11 | 111:14 112:2 | 164:12 167:4 | 137:14 139:10 |
| **went**  40:6 | 115:20 120:14 | 167:13 | 146:12 152:1 |
| 43:22 45:21 | 120:25 121:1,8 | **worked**  59:20 | 153:11 156:10 |
| 54:8 57:15,22 | 121:23 125:2 | 164:16 | |
| 57:23 60:22 | 125:10 126:19 | **worker**  175:12 | |
| 62:13 65:1,13 | 127:6 131:4 | **working**  20:21 | |
| 81:17 82:3,7 | 133:16 134:9 | **workings**  69:14 | |
| 118:5 146:9 | | | |

**[yeah - zoom]**                                              Page 52

| | |
|---|---|
| | 157:21 158:15 |
| | 160:14 166:16 |
| | 171:3 177:19 |
| **year** | 43:12 44:5 |
| **years** | 11:10 |
| | 44:6 75:4 |
| **young** | 4:21 |
| **youth** | 22:19,19 |

**z**

| | |
|---|---|
| **z** | 32:1 64:2,3 |
| **zoom** | 6:10 |
| | 42:19 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

DEPOSITION ERRATA SHEET

Deposition of:          Gerald Griggs

Date of Deposition:     February 21, 2023

Case Name:              *In Re Georgia Senate Bill 202*

Case Number:            Master Case No. 1:21-MI55555-JPB

Reporter:               Marsi Koehl, CCR-B-2424

Assignment:             #5774618

---

Pursuant to Rule 30(7)(e) of the Federal Rules of 7 Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.

| Page No. | Line No. | Change From | Change To | Reason |
|---|---|---|---|---|
| 9 | 5 | "a president" | "the president" | Transcription |
| 13 | 2 | "objection," | "objections," | Transcription |
| 16 | 4 | "was" | "were" | Transcription |
| 19 | 19 | "We move and" | "And" | Transcription |
| 20 | 12 | "is volunteers." | "is a volunteer." | Transcription |
| 21 | 11 | "lead a robust" | "lead robust" | Transcription |
| 36 | 5 | "1-86-OUR-VOTE [sic]" | "1-866-OUR-VOTE" | Transcription |
| 55 | 13 | "believe" | "believed" | Transcription |
| 56 | 24 | "were unlimited" | "were no unlimited" | Transcription |
| 75 | 6 | "law that's open" | "law" | Transcription |
| 77 | 15 | "readdress," | "redress," | Transcription |
| 86 | 14 | "20-city" | "22-city" | Transcription |
| 95 | 18 | "It's" | "It puts" | Transcription |
| 96 | 7 | "have" | "that have" | Transcription |
| 98 | 18 | "we" | "were" | Transcription |
| 105 | 18 | "that aspect." | "the ID requirement." | Clarification |
| 105 | 23 | "exercised" | "utilized" | Transcription |

| 109 | 16 | "2020," | "2021," | Transcription |
|---|---|---|---|---|
| 109 | 19 | "2020," | "2021," | Transcription |
| 113 | 18 | "know" | "now" | Transcription |
| 131 | 15 | "this is" | "this" | Transcription |
| 132 | 22 | "was." | "were." | Transcription |
| 136 | 22 | "getting to" | "having" | Transcription |
| 158 | 3 | "privilege" | "privileged" | Transcription |
| 160 | 22 | "was" | "were" | Transcription |
| 161 | 6 | "temps" | "attempts" | Transcription |
| 161 | 18 | "Georgian" | "Georgia" | Transcription |
| 167 | 1 | "have" | "has" | Transcription |
| 169 | 15 | "vote" | "voting" | Transcription |

Signature: _Gerald Griggs_                                      Date: May 4, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |

## NOTICE OF RULE 30(b)(6) DEPOSITION OF THE GEORGIA STATE CONFERENCE OF THE NAACP

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for the State Defendants in the above-captioned action will take the deposition of one or more representative person(s) designated by the Georgia State Conference of the NAACP (the "Organization") to testify on its behalf, concerning matters listed in Exhibit A to this Notice.

The deposition will be taken upon oral examination before an official authorized by law to administer oaths under the Federal Rules of Civil Procedure and will be recorded by videographic means and/or stenographic means. The examination will be held at Taylor English Duma, LLP at 1600 Parkwood Circle, Suite 200, Atlanta, Georgia 30339, and will commence at 9:30 a.m. on February 21, 2023, and continuing thereafter until completed. The deposition will also be available to attend via Zoom videoconferencing through



DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

Veritext Legal Solutions.   Details regarding the videoconferencing will be emailed to those participating once all arrangements are finalized.

Pursuant to Rule 30(b)(6), the person(s) designated as deponent(s) shall be prepared to testify as to matters within their knowledge and as to matters known by or reasonably available to the Organization.   This notice serves to inform the Organization that it has a duty to make such designation.

February 9, 2023                              Respectfully submitted,

                                       Christopher M. Carr
                                       Attorney General
                                       Georgia Bar No. 112505
                                       Bryan K. Webb
                                       Deputy Attorney General
                                       Georgia Bar No. 743580
                                       Russell D. Willard
                                       Senior Assistant Attorney General
                                       Georgia Bar No. 760280
                                       Charlene McGowan
                                       Assistant Attorney General
                                       Georgia Bar No. 697316
                                       **State Law Department**
                                       40 Capitol Square, S.W.
                                       Atlanta, Georgia 30334

                                       */s/ Gene C. Schaerr*
                                       Gene C. Schaerr*
                                       Special Assistant Attorney General
                                       Erik Jaffe*
                                       H. Christopher Bartolomucci*
                                       Brian J. Field*
                                       Nicholas P. Miller*
                                       Joshua J. Prince*
                                       Annika B. Barkdull*

                                       2

SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com.
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## Exhibit A

### INSTRUCTIONS AND DEFINITIONS

1. Pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs shall produce persons to give sworn testimony on all information known or reasonably available to them concerning the topics set forth below.

2. Unless otherwise specified, each topic below shall be construed to apply to the time period from January 1, 2019, to the present.

3. All definitions set forth below shall be construed broadly to the fullest extent of their meaning.

4. The term "communication" shall mean all methods of transmitting information, including, but not limited to, verbal communications, telephone calls, electronic mail, social media messages, postal mail, text messages, and any other means of transmitting information.

5. The term "concerning" means regarding, relating to, referring to, or describing.

6. The terms "You," "Your," "Plaintiff," "Plaintiffs," or "Organization" shall mean the Georgia State Conference of the NAACP, including any of its past and present agents, advisors, employees, representatives, attorneys, consultants, contractors, or other persons or entities acting on Plaintiffs' behalf or subject to their control.

7. The term "SB 202" means Georgia's Election Integrity Act of 2021.

## RULE 30(b)(6) TOPICS

1.   The Organization's allocation of resources and budgetary decisions from January 1, 2019, through the present that reflect the diversion of funds and resources the Organization alleges it has undertaken in ¶¶ 13-27 of its First Amended Complaint in *Georgia State Conference of the NAACP v. Raffensperger*, No. 1:21-cv-1259-JPB.

2.   The changes made to the Organization's budgets – as well as any contemporaneous rationale for such changes – during its budget years from January 1, 2019, through the present related to the laws, policies, or protocols challenged in this action.

3.   A comparison of the Organization's resources, expenditures, and activities related to the provisions it challenges in this action, compared to the Organization's overall resources, expenditures, and activities.

4.   The Organization's mission and exempt purpose and activities it undertakes in accordance with its mission and exempt purpose since the Organization's inception, including any other entities related to the Organization doing work in Georgia currently or in the last five years.

5.   The Organization's organizational structure, including individuals who have the authority to make funding and resource-allocation decisions for the Organization from January 1, 2021, through the present.

6.   The specific ways in which the actions of the State Defendants that form the basis of the complaints in this action caused the Organization to divert resources away from its organizational activities to activities in which the Organization had not previously engaged, and the identification of the overall amount of the diverted resources.

7.   The specific activities and projects the Organization was unable to engage in due to the diversion of resources to activities necessitated by such actions.

8.    Information about any investigation that the Organization conducted into the costs and/or feasibility of continuing to engage in any activities that the Organization discontinued because of SB 202.

9.    The specific laws, policies, and protocols the Organization alleges are unconstitutional or violate federal law as asserted in this action and the specific steps the Organization took to address its understanding of those laws, policies, and protocols.

   a.    The specific steps the Organization has taken to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law in its involvement in this action and the process by which those steps were determined.

   b.    The specific steps the Organization took to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law other than its involvement in this action and the process by which those steps were determined.

   c.    All communications that the Organization sent to any of the Organization's members about the laws, policies, and protocols it advocates in this action are unconstitutional or violate federal law.

   d.    All communications that the Organization received from any of its members about the laws, policies, and protocols it advocates in this action are unconstitutional or violate federal law.

10.   The activities or expenditures the Organization plans to undertake in the future related to the laws, policies, and protocols challenged in this action if it is unsuccessful in achieving relief through this action.

11.   The total expenditures of the Organization on activities related to this action since the Organization began participating in this litigation.

12.   The nature of membership of the Organization, including how individuals become members, any obligations of members, and any benefits offered by the Organization to its members.

13.     Any increase or decrease in funds raised by the Organization as a result of this litigation or the provisions of SB 202 the Organization is challenging.

14.     Fundraising strategies and tactics undertaken by the Organization between January 1, 2021, and the present as they relate to the laws, policies, and protocols challenged by the Organization in this action.

15.     Other laws, policies, or regulations challenged by the Organization in the state of Georgia from January 1, 2018, to the present that are not challenged in this action.

16.     The Organization's efforts in other states to challenge laws, policies, and regulations of those states related to voting.

17.     Whether and how the Organization determined if any of its individual members are impacted by the laws, policies, and protocols challenged in this action and how the Organization tracks the impact on its members.

18.     Any communications from individual members about whether the challenged laws, policies, and protocols impact the member's ability to cast a ballot in Georgia.

19.     The Organization's communications with the Office of Secretary of State and/or the State Election Board regarding the laws, policies, and protocols it challenges in this action, from January 1, 2019, to the present, including any other litigation filed against the Secretary or his office during that time that included a challenge to any of the laws, policies, and protocols challenged in this action.

20.     The Organization's communications with any county government regarding the laws, policies, and protocols it challenges in this action, from January 1, 2019, to the present, including any other litigation filed against a county entity during that time regarding the laws, policies, and protocols challenged in this action.

21.     Communications between the Organization and any of the co-Plaintiffs, its individual member plaintiffs, its other members, and other advocates and advocacy organizations, concerning this

4

litigation or concerns regarding the laws, policies and protocols challenged in this action.

22.   The Organization's knowledge of any person in the State of Georgia that was not able to vote as a result of the laws, policies, and protocols complained of in this action.

23.   The specific relief the Organization seeks that will cause it to cease diverting resources to address the laws, policies, or protocols challenged in this action.

24.   The process by which the Organization searched for and identified documents responsive to discovery requests served in this case.

25.   The documents produced in this litigation by Plaintiffs and the information contained in the documents.

26.   The Organization's discovery responses and document production in this action.

27.   All attorneys' fees that the Organization claims in this action.

28.   The Organization's terms of engagement with any attorney whose fees the Organization seeks to recover in this action, including but not limited to the hourly rates, flat fees, or contingency fees that the Organization has agreed to pay its attorneys, billing statements that the Organization has received from its attorneys, and the amounts that the Organization has actually paid its attorneys.

29.   All studies, analysis, and data, however informal, rough, or non-final, of which You are aware concerning the extent to which the challenged portions of SB 202 have impaired the Organization's ability to carry out its mission or reduced the Organization's effectiveness.

30.   All studies, analyses, and data, however informal, rough, or non-final, of which You are aware concerning the extent to which the challenged portions of SB 202 have created confusion among voters.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIA STATE CONFERENCE OF THE )
NAACP, as an organization; GEORGIA )
COALITION FOR THE PEOPLE'S )
AGENDA, INC., as an organization; LEAGUE )
OF WOMEN VOTERS OF GEORGIA, INC., )
as an organization; GALEO LATINO )
COMMUNITY DEVELOPMENT FUND, )
INC., as an organization; COMMON CAUSE, )
as an organization; LOWER MUSKOGEE )
CREEK TRIBE; THE URBAN LEAGUE OF )
GREATER ATLANTA, INC., as an )
organization, )
)
Plaintiffs, )
)
v. )
)
BRAD RAFFENSPERGER, in his official )
capacity of the Secretary of State for the )
State of Georgia, REBECCA N. )
SULLIVAN, DAVID J. WORLEY, )
MATTHEW MASHBURN, and ANH LE, in )
their official capacities as members of the )
State Election Board, ALEX WAN, in his )
official capacity as Chairman of the )
FULTON County Registration and Elections )
Board, MARK WINGATE, KATHLEEN )
RUTH, VERNETTA KEITH NURIDDIN, )
and AARON JOHNSON, in their official )
capacities as Members of the FULTON )
County Registration and Elections Board, )
ALICE O'LENICK, in her official capacity )

Civil Action
Case No. 1:21-cv-1259-JPB

**FIRST AMENDED
COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF**

**52 U.S.C. § 10301, 42 U.S.C.
§ 1983; First, Fourteenth
and Fifteenth Amendments
to the United States
Constitution**


DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

as Chairman of the GWINNETT County )
Board of Registrations and Elections, )
WANDY TAYLOR, STEPHEN W. DAY, )
and GEORGE AWUKU, in their official )
capacities as Members of the GWINNETT )
County Board of Registrations and Elections, )
PHIL DANIELL, in his official capacity as )
Chairman of the COBB County Board of )
Elections and Registration, FRED AIKEN, )
PAT GARTLAND, JESSICA M. BROOKS, )
and DARRYL O. WILSON, JR., in their )
official capacities as Members of the COBB )
County Board of Elections and Registration, )
)
Defendants. )
)
)

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## PRELIMINARY STATEMENT

1.    This is a voting rights lawsuit filed pursuant to Section 2 of the Voting

Rights Act of 1965 (52 U.S.C. § 10301) and 42 U.S.C. § 1983[1] to protect

fundamental rights protected by the First, Fourteenth, and Fifteenth Amendments

to the United States Constitution.  Plaintiffs seek prospective declaratory and

injunctive relief against Brad Raffensperger, in his official capacity as the Georgia

Secretary of State; Rebecca N. Sullivan, David J. Worley, Matthew Mashburn, and

Anh Le in their official capacities as members of the State Election Board; Alex

Wan, in his official capacity as Chairman of the Fulton County Registration and

Elections Board; Mark Wingate, Kathleen Ruth, Vernetta Keith Nuriddin, and

Aaron Johnson, in their official capacities as Members of the Fulton County

Registration and Elections Board; Alice O'Lenick, in her official capacity as

Chairman of the Gwinnett County Board of Registrations and Elections; Wandy

Taylor, Stephen W. Day, and George Awuku, in their official capacities as

Members of the Gwinnett County Board of Registrations and Elections; Phil

---

1. Plaintiffs' counsel served a 90-day notice letter pursuant to Section 8 of the
   National Voter Registration Act of 1993 (52 U.S.C. § 20507, 20510) ("NVRA")
   on Defendants Raffensperger and members of the State Election Board.  Once
   the 90-day notice period expires, Plaintiffs anticipate supplementing their
   claims with the NVRA claim.

Daniell, in his official capacity as Chairman of the Cobb County Board of
Elections and Registration; and Fred Aiken, Pat Gatland; Jessica M. Brooks, and
Darryl O. Wilson, Jr. in their official capacities as Members of the Cobb County
Board of Elections and Registration, enjoining the enforcement and
implementation of Georgia Senate Bill 202 ("SB 202"), an omnibus voter
suppression bill passed by the Georgia General Assembly on March 25, 2021 and
signed into law the same day by Georgia Governor, Brian Kemp.[2]

  2. SB 202 is the culmination of a concerted effort to suppress the
participation of Black, Latinx, Asian American, members of indigenous
populations and other voters of color by the Republican State Senate, State House,
and Governor. In the last two decades, Georgia has undergone demographic
change, namely the increasingly large percentage of the electorate comprised of
Black voters and other voters of color. As demonstrated by election analyses,
Black voters and voters of color usually provide strong support to Democratic
candidates. These demographic changes and voting patterns have resulted in
corresponding political changes in Georgia. After several cycles of Republican

---

2. A copy of SB 202 as passed by the Georgia General Assembly on March 25,
2021 ("SB 202/AP") is available on the Georgia General Assembly's website at
this link: https://www.legis.ga.gov/api/legislation/document/20212022/201498
(last checked 5/20/21).

4

dominance, Democratic statewide candidates almost prevailed in 2018; Democrats
then won the race for President in 2020 and two Senatorial contests in 2021.
Republican legislators' immediate response was a legislative attempt to suppress
the vote of Black voters and other voters of color in order to maintain the tenuous
hold that the Republican Party has in Georgia.  In other words, these officials are
using racial discrimination as a means of achieving a partisan end.  This is
intentional discrimination in violation of the United States Constitution and
Section 2 of the Voting Rights Act.

   3. SB 202's restrictions include: (1) onerous and unnecessary ID
requirements in order to apply for or return absentee ballots; (2) prohibiting public
employees and public entities from sending out unsolicited absentee ballot
applications to voters; (3) threatening private individuals and non-public entities
with potentially large fines for sending absentee ballot applications; (4) delaying
and compressing the time during which a voter can request or submit an absentee
ballot; (5) giving county registrars unfettered discretion to limit early voting hours
to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting; (6) restricting the
number of and access to absentee ballot drop boxes; (7) disenfranchising out-of-
precinct voters; (8) targeting jurisdictions with large populations of Black voters
and other voters of color by stripping the Secretary of State of his vote on the State

Election Board, replacing the Secretary of State with a voting member appointed by the General Assembly, and granting the State Election Board the power to effectively take over county boards; (9) encouraging the submission of "unlimited" numbers of voter challenges; (10) criminalizing the act of providing people waiting in line to vote with food and water; and (11) prohibiting the use of mobile voting units.

4.      These changes to Georgia voting laws are intended to suppress the vote of Black voters and other voters of color. In the most recent elections in 2020 and 2021, voters of color used methods such as absentee and Sunday voting in numbers not seen before. In response, the Georgia General Assembly enacted SB 202 to target and limit the means of voting that have been increasingly used by Black voters and other voters of color.

5.      Many of these provisions will inevitably lengthen and compound the problem of long lines and delays at polling locations by making absentee mail voting and in-person early voting harder. SB 202 then further burdens and discourages voters from waiting in these long lines to vote by criminalizing the simple act of providing water or snacks to voters while they wait in line. Black voters and other voters of color are disproportionately impacted by long lines and delays at the polls and stand to suffer most (and be disproportionately discouraged

6

from voting) when charitable organizations can no longer provide even water or snacks to those waiting to vote.

6.     SB 202 also threatens the right of voters of color to participate equally in the political process by encroaching on and threatening to eviscerate the power of county election boards—the very boards responsible for protecting that right.

7.     The provisions of SB 202, viewed individually and collectively, threaten the fundamental right to vote of all Georgians, but their impact will be felt most intensely by persons of color, which is precisely what the legislature intended.

8.     This Court should declare SB 202 unlawful and unconstitutional, and permanently enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(a) and 52 U.S.C. § 10308(f) because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the First, Fourteenth and Fifteenth Amendments to the United States Constitution, the Voting Rights Act of 1965 (52 U.S.C. § 10301), 42 U.S.C. § 1983, and the Civil Rights Act of 1964.  This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

7

10. This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

11. This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and under Local Rule 3.1 because, *inter alia*, several defendants reside in this district and this division and a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

## PARTIES

13. Plaintiff GEORGIA STATE CONFERENCE OF THE NAACP ("Georgia NAACP") is a non-partisan, interracial, nonprofit membership organization that was founded in 1941. Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African Americans. It is headquartered in Atlanta and currently has approximately 10,000 members.

14. The Georgia NAACP works to protect voting rights through litigation, advocacy, legislation, communication, and outreach, including work to promote

8

voter registration, voter education, get out the vote ("GOTV") efforts, election protection, and census participation.

15.    The Georgia NAACP has branches in counties across the state of Georgia that are involved in voter registration, voter assistance, voter education, election protection, grassroots mobilization, and GOTV efforts, including Sunday early voting events, such as "Souls to the Polls."

16.    The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

17.    The Georgia NAACP engages in voter outreach efforts, including voter education on voting in-person during early voting, voting by mail and voting in person on election day.

18.    The Georgia NAACP has engaged in GOTV campaigns.  One of the key components of these campaigns is providing accurate information regarding mail-in ballots to the Georgia NAACP's membership and the rest of the public.

19.    The Georgia NAACP has developed materials and worked with local NAACP branches to educate its members and the public about voting by mail, including providing information concerning the availability and location of mail ballot drop boxes during the 2020 general election and 2021 runoff election cycle.

9

The Georgia NAACP also developed messaging and materials regarding mail
ballot drop box locations in particular counties.

20.    The Georgia NAACP has conducted text and phone banking programs
and reached out to voters throughout Georgia to encourage voter participation and
to educate the public about the voting process, including about voting by mail.

21.    The Georgia NAACP has supported in-person voting by providing
food and/or drinks to voters who request such while waiting in long lines to vote.
This sustenance is provided without regard to political affiliation and without
engaging in any speech or conduct that supports a particular candidate while
providing food and/or drinks.  The Georgia NAACP members provide this
sustenance as an expression of their appreciation for voter participation and often
accompany their non-verbal acts with a verbal appreciation for voting generally.
They seek to do so in future elections cycles, but are chilled by provisions of SB
202.

22.    Many of the Georgia NAACP's members have voted by mail in the
past and stand to be negatively impacted by the substantial changes to Georgia's
vote by mail procedures that have been enacted as part of SB 202.  Many more will
be impacted by the changes to the availability of absentee ballot drop boxes,
changes to early voting times and days and the requirement of a sworn affidavit for

10

voters who go to the wrong precinct to vote prior to 5 p.m., as set forth in SB 202. Many Georgia NAACP members are at risk of being disenfranchised by the changes in SB 202.

23.    The Georgia NAACP has an interest in preventing the disenfranchisement of eligible voters, including its members and voters it may have assisted with navigating the voting process.

24.    Due to the substantial changes in absentee voting procedures, absentee ballot drop boxes, early voting periods, restrictions on out-of-precinct voting, criminalization of the expressive act of "line warming" activities such as supplying water and snacks to voters in line and the other changes caused by the enactment of SB 202, the Georgia NAACP will not only have to change its messaging to voters of color about these changes, but the Georgia NAACP will also have to divert considerable resources from its ongoing election protection, advocacy, and GOTV efforts to educate and assist eligible voters.

25.    The Georgia NAACP will also have to divert its resources to educate voters about the substantial changes to the mail voting process, and will have to respond to questions from voters who used a mail ballot drop box in the November 2020 election and will be confused by the fact that they are not available outside early voting locations in the future.

11

26.    The Georgia NAACP has traditionally provided transportation to the

polls for voters on election day. The Georgia NAACP will have to divert resources

to physically transport voters to the county board of elections to drop off their mail

ballots or to polling places or early voting locations to vote in person if they cannot

vote by absentee ballot. The nature and scope of the Georgia NAACP's voter

assistance efforts will need to change if voters do not have access to a drop box or

mail ballots are rejected due to the burdensome ID requirements and complicated

changes for completing absentee ballot applications and returning absentee ballots.

27.    The Georgia NAACP's additional efforts to educate voters whose

mail ballots are rejected due to the new ID requirements and other procedures will

force the Georgia NAACP to have to divert substantial resources away from core

activities such as voter registration and other efforts such as criminal justice work.

This is due to the fact that the Georgia NAACP's resources are limited.

28.    Plaintiff THE GEORGIA COALITION FOR THE PEOPLE'S

AGENDA, INC. ("GCPA") is a Georgia nonprofit corporation with its principal

place of business located in Atlanta, Georgia. The GCPA is a coalition of more

than 30 organizations, which collectively have more than 5,000 individual

members.

12

29.    In addition to its main office in Atlanta, the GCPA has field offices in Athens, Albany, Augusta, Macon, Savannah, and LaGrange, Georgia where it is able to provide outreach and support to voters and prospective voters of color and underserved communities outside of the Metro Atlanta area.

30.    During the 2020 elections and the January 5, 2021 runoff cycle, the GCPA's voter outreach efforts were conducted in the greater Metro Atlanta region as well as throughout other areas of Georgia from the aforementioned field offices and covered approximately 88 counties in the state.

31.    The GCPA encourages voter registration and participation, particularly among Black and other underrepresented communities of color in Georgia.  The GCPA's support of voting rights is central to its mission.  The organization has committed, and continues to commit, time and resources to protecting voting rights through advocacy, legislation, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, census participation and litigation.

32.    The GCPA conducts voter registration drives, voter ID assistance, "Souls to the Polls" GOTV events during Sunday early voting and other GOTV efforts in Georgia that seek to encourage voter participation among Black and Brown voters and voters in historically underserved communities of color.  The

13

GCPA in coalition with other civic engagement organizations in Georgia also participates in voter education and voter empowerment programs.

33. GCPA's voter education and empowerment programs have included, but were not limited to, educating prospective voters about how to register to vote and to confirm their registration status; educating voters about the options to vote in-person during advanced voting, in-person on election day and by mail via absentee ballot; providing information to voters about accessing absentee ballot drop boxes to cast their absentee ballots safely and securely, and helping voters to understand the new voting system implemented for the first-time during the 2020 election cycle statewide.

34. The GCPA has also distributed civic education materials to voters and prospective voters; arranged for rides to the polls for voters; and supported the Georgia Election Protection field program in order to assist voters on the ground near polling sites.

35. GCPA also participates in media interviews, sponsors Public Service Announcements (PSAs), places billboard ads, conducts phone banking, and engages in text message campaigns to educate voters and to encourage participation.

14

36.   GCPA has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote.  This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. GCPA members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.  They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

37.   The GCPA has an interest in preventing the disenfranchisement of eligible voters who now run the risk of becoming disenfranchised as a result of the new restrictions imposed by SB 202, including substantial and burdensome ID requirements for absentee by mail voting; limitations on early voting days and hours, including Sunday early voting; diminished availability of absentee ballot drop boxes except inside early voting locations during early voting hours, the lack of 24/7 hour access to absentee ballot drop boxes which renders them essentially useless to many voters; the criminalization of "line warming," activities, i.e., providing water and snacks to people in line to vote and other persons in the vicinity of polling locations; and other unreasonably burdensome restrictions imposed by these new voting changes on voters and election officials alike.

15

38.    SB 202 will substantially and negatively impact the GCPA's advocacy efforts now and in the future. This law will inevitably cause Black voters and other voters of color negatively impacted by these new restrictions to lose faith that their votes will be counted on an equal basis as white voters. This sense of futility will likely depress turnout in the future and make it more difficult for the GCPA to carry out its mission of encouraging Black voters, other voters of color and voters in underserved communities to register to vote, vote, and to help protect the rights of other Georgians to vote.

39.    Due to the substantial changes in existing Georgia election law and procedures, including the potential imposition of new criminal penalties and significant fines and fees, SB 202 has caused, and will continue to cause, the GCPA to divert a portion of its financial and other organizational resources to educating voters about these changes and assisting voters facing these new restrictions and burdens.

40.    As a result of the enactment of these new restrictions on voting in Georgia, the GCPA has, and will continue to have, fewer resources to dedicate to its other organizational activities, including voter registration drives, GOTV efforts and other projects, unless the Court enjoins implementation and enforcement of these new laws.

16

41.    Plaintiff LEAGUE OF WOMEN VOTERS OF GEORGIA, INC.

("League") is a nonpartisan political organization that has worked for the last 101

years to ensure that every person has the desire, the right, the knowledge and the

confidence to participate in our democracy.  The League's 13 local organizations

and nearly 700 members are dedicated to their mission of empowering voters and

defending democracy.

42.    From the League's inception, members have worked for good

government by studying issues, advocating for reforms, and, through the League's

Observer Corps, observing and reporting on the work of all levels of government.

The League is committed to registering voters, regardless of their political

affiliation, and is particularly proud of its work, with community partners, in

registering new American citizens at citizenship ceremonies.  The League is also

dedicated to voter education, through both candidate forums and the Vote411.org

voter guide.  Many League members also assist with GOTV efforts, poll watching,

and serving as vote review panelists.

43.    As part of its mission, the League advocates for expansion of voting

opportunities, including through absentee by mail voting, early in-person voting

and election day voting.  The League expends significant resources in furtherance

of its mission, including by organizing voter registration drives, educating the

17

public about the voting process, and assisting voters who have questions or need help navigating the voting process. The League has seen a substantial increase in the number of its members and other individuals who turned out to vote by mail and during early in-person voting during the 2020 election cycle and January 5, 2021 Senate runoff elections.

44. The League has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote. This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. The League members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally. They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

45. As a result of the risk of disenfranchisement due to new ID requirements for absentee by mail voting, the League must divert more resources toward educating voters about these new requirements, including, but not limited to, warning them of the risk of disenfranchisement if they fail to provide the required ID and other required information when applying or absentee ballots and when returning the ballots; answering questions from members of the public about

18

these new voting restrictions; and explaining how they impact their right to

vote. The League will need to devote significant staff time and funds to update

standard training materials and informational booklets to reflect these sweeping

changes.

46.    The League must divert these resources away from its regular

advocacy, voter registration, fundraising, and other activities, affecting its ability to

operate and function with respect to its normal activities.

47.    Plaintiff GALEO LATINO COMMUNITY DEVELOPMENT FUND,

INC. ("GALEO LCDF"); is a non-partisan, nonprofit corporation.  GALEO LCDF

is one of the oldest, largest, and most significant organizations promoting and

protecting the civil rights of Georgia's Latinx community.  GALEO LCDF has

approximately 165 members across Georgia.

48.    GALEO LCDF's headquarters is located in Norcross, which is in

Gwinnett County, and a substantial amount of GALEO LCDF's civic engagement,

voter registration and GOTV work takes place in Gwinnett County and other

Georgia counties.  This work includes organizing voter education, civic

engagement, voter empowerment and GOTV events and conducting voter

registration drives.  After Gwinnett County became a covered jurisdiction for

Spanish under Section 203 in December 2016, GALEO LCDF has worked also

19

with the Gwinnett County Board of Registration and Elections in an effort to bring

its procedures and election materials into compliance with the law's requirements.

49.     During the 2020 election cycle, GALEO LCDF also worked to

address challenges facing Gwinnett County's Limited English Proficiency ("LEP")

Spanish speaking voters as a result of the impact of the COVID-19 pandemic.

50.     GALEO LCDF sent bilingual mailers to Latinx Gwinnett County

voters with information about the presidential primary as well as additional mailers

after the primary was postponed due to COVID-19.

51.     GALEO LCDF also sent several rounds of bilingual mailers to all

Latinx Georgia voters for both the General Election and the January 5, 2021

runoffs.  GALEO LCDF also ran paid advertisements on Spanish media (radio &

TV) to promote voting and educate voters about voting for both elections.

52.     Due to the sweeping changes to many facets of voting that stand to

disenfranchise Latinx, language minority voters and voters of color, GALEO

LCDF will be forced to divert resources from its voter registration, existing voter

education programs, GOTV activities and other programs to assist voters,

particularly LEP voters and new Americans, in being able to navigate the many

changes and challenges of SB 202 that will make it more burdensome for them to

vote by absentee ballot, during early voting and in person on Election Day.

20

53.     Plaintiff COMMON CAUSE is a nonprofit corporation organized and existing under the laws of the District of Columbia. It is one of the nation's leading grassroots democracy-focused organizations and has over 1.2 million members nationwide and chapters in 35 states, including 18,785 members and supporters in Georgia. Since its founding in 1970, COMMON CAUSE has been dedicated to the promotion and protection of the democratic process, including the right of all citizens to vote in fair, open, and honest elections. COMMON CAUSE, at the national level and in Georgia, conducts significant nonpartisan voter-protection, advocacy, education, and outreach activities to ensure that voters are registered and have their ballots counted as cast.

54.     In Georgia, COMMON CAUSE has increased its efforts in the areas of election protection, voter education, and grassroots mobilization around voting rights in the state. COMMON CAUSE works on election administration issues with its coalition, much of which is represented by the other plaintiffs in the instant lawsuit.

55.     COMMON CAUSE, alongside other partners in Georgia, created a program to help recruit volunteers to monitor local board of elections meetings. COMMON CAUSE also works with these partners in election protection efforts during both midterm and presidential elections. Through its volunteer recruitment

for poll monitors, COMMON CAUSE in Georgia monitors an average of five polling locations in 22 counties for a total of 110 polling places. COMMON CAUSE in Georgia additionally engages in online petition drives, soliciting signatures from its members and supporters urging government officials to take certain actions.

56.     COMMON CAUSE in Georgia also works directly with voters who cast provisional ballots to help ensure their ballots can be counted.

57.     COMMON CAUSE has supported voting by providing food and/or drinks to voters who request such while waiting in long lines to vote. This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate while providing food and/or drinks. COMMON CAUSE members provide this sustenance as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally. They seek to do so in future elections cycles, but are chilled by provisions of SB 202.

58.     During the 2020 election cycle, COMMON CAUSE in Georgia assisted some 6,000 voters who cast provisional ballots to cure those ballots so they could be counted—most were cast because the voter appeared at the wrong precinct. As a result of the enactment of SB 202, COMMON CAUSE will divert

resources that it would have applied to other organizational and programmatic resources toward helping voters resolve provisional ballot issues, including provisional ballots cast due to voters appearing at the wrong precinct, often through no fault of their own.

59.   Plaintiff LOWER MUSKOGEE CREEK TRIBE is a state-recognized tribe located in Grady County on the southwest border of Georgia.  The tribal government is located in the old tribal town of Tama, which is located in Whigham, Georgia.  The tribe has an enrollment of approximately 2,700 members, most of whom live in rural southwest Georgia and northern Florida within a 150-mile radius to Whigham.  The tribe operates a civics education program for its members to encourage them to participate in the political process.  The tribe's members are disproportionately poor and likely to be affected by SB 202's cutback on voting by mail and criminalization of providing food and water to voters in line at the polls.

60.   The United States Census Bureau's 2019 Five-Year American Community Survey (ACS) estimates indicate that 41.6% of American Indians in Georgia do not have a computer at home and that American Indians in Georgia are 155% less likely than white Georgians to have a computer at home.  This makes it more likely that Georgia's American Indian voters, including members of the

23

LOWER MUSKOGEE CREEK TRIBE, will face significantly higher burdens complying with SB 202's absentee ballot provisions than white voters because they are less likely to have a computer, printer scanner or internet access at home. These resources are needed to obtain and print an absentee ballot application from the websites of the Secretary of State or county registrar and to print necessary ID documentation for the absentee ballot application and to include when returning a voted absentee ballot to their county registrar's office.

61.    Plaintiff, THE URBAN LEAGUE OF GREATER ATLANTA, INC. ("ULGA"), began operations in Atlanta in 1920 as an affiliate of the National Urban League which had been founded 10 years earlier as a multi-racial nonprofit organization working to promote civil rights and justice for people of color.  The mission of the ULGA was originally focused upon ending segregation and the oppression of African Americans through securing voting rights and equal access to education and economic opportunity for all people.

62.    Building on that legacy, the ULGA now helps citizens work toward economic stability through programs in education, entrepreneurship, jobs and training, housing, and community support and it has continued to strengthen its advocacy efforts for racial equity in the political process and in criminal justice.

24

63.  For many years, the ULGA and its public-private partners have sustained a robust effort to promote and protect access to the ballot box in Georgia. In 2020, the ULGA ramped up its GOTV initiatives through advocacy, mass communications, and direct outreach to citizens to encourage voter registration, voter education, election protection, and census participation.

64.  In tandem with its Young Professionals group and a variety of corporate and nonprofit partners, the ULGA conducted GOTV information drives on Georgia's options for in-person early voting, voting by mail and drop-box, and voting on election day. This included widespread print and broadcast PSAs, social media outreach, phone banking, and interviews with media targeted to various audiences.

65.  Having the ability to vote by mail and via secure drop boxes markedly increased voter participation overall, and especially among younger Georgians, seniors and those working jobs that limited their options for early in-person or day of elections voting. These measures also proved to increase voting among communities of color.

66.  However, SB 202 purposefully makes it harder for Black Georgians and other Georgians of color served by the ULGA's civic engagement, voter education and GOTV initiatives to cast ballots that will count as votes.

25

67.   As a result, the ULGA's work to re-educate voters about the new voting changes mandated by SB 202 will require a massive undertaking in order to assist voters in navigating the new restrictions, including those impacting drop box availability, ID requirements for absentee voting, and the new limitations on out of precinct voting, among other changes brought about with the enactment of SB 202.

68.   The ULGA will be forced to divert resources from its regular and emergency programs to find ways to reach voters who have the right to participate in democracy but cannot overcome the barriers placed by SB 202.  The ULGA will need to apply additional resources to identify those who need IDs, transportation, and absentee ballots along with ways to help voters ensure that their absentee ballots are counted.

69.   Further, the ULGA will have to determine how it can offer comfort to voters standing in the long lines (possibly in inclement or hot weather) without violating SB 202.  SB 202 will undoubtedly create long lines in urban enclaves or rural areas with limited polling places, which can discourage voter participation.

70.   In fact, SB 202 recreates many of the very impediments that elections officials successfully dismantled to make the 2020 fall elections and 2021 runoffs so well executed.

26

71.   Defendant BRAD RAFFENSPERGER is the Secretary of State of the

State of Georgia and a non-voting *ex officio* member of the State Election Board.

Pursuant to O.C.G.A. § 21-2-50, Secretary Raffensperger has broad authority as

the state's chief election official in the administration and implementation of

Georgia's election laws and regulations. These duties include, but are not limited

to, training county registrars and superintendents; receiving, computing and

certifying election returns; providing information to citizens regarding voter

registration and voting; maintaining the state's active and inactive voter

registration lists; certifying candidates as required by law; preparing and

publishing all notices and advertisements as required by Georgia law regarding the

conducting of elections; providing blank election forms to superintendents as other

supplies; creating and programming ballots; and other duties as required by law.

Secretary Raffensperger is also responsible for coordinating Georgia's compliance

with the National Voter Registration Act of 1993 (52 U.S.C. § 20507, *et seq*).  SB

202 specifically tasks the Secretary of State with numerous responsibilities,

including responsibility for making available Georgia's absentee ballot application

form, which requires the voter to provide their date of birth, a Georgia driver's

license or identification card (or copies of other specified documents).  Secretary

Raffensperger is sued in his official capacity.

27

72.   Defendants REBECCA N. SULLIVAN, DAVID J. WORLEY,
MATTHEW MASHBURN, AND ANH LE are voting members of the State
Election Board and are named herein in their official capacities.

73.   The duties of members of the State Election Board include:
promulgating rules and regulations to "obtain uniformity" in the practices and
proceedings of elections officials, "as well as the legality and purity in all . . .
elections"; "formulating, adopting, an orderly conduct of primaries and elections";
promulgating rules and regulations to "define uniform and nondiscriminatory
standards concerning what constitutes a vote and what will be counted as a vote";
and investigating frauds and irregularities in elections. *See* O.C.G.A. § 21-2-31.
SB 202 specifically tasks the State Election Board with numerous responsibilities,
including enforcing compliance with the new voter challenge provisions.  SB 202,
§§ 15 & 16.

74.   Defendant ALEX WAN is the Chairman of the FULTON County
Registration and Elections Board and is named herein in his official capacity.
Defendants MARK WINGATE, KATHLEEN RUTH, VERNETTA KEITH
NURIDDIN, and AARON JOHNSON are members of the FULTON County
Registration and Elections Board and are named herein in their official capacities.

28

75.    The FULTON County Registration and Elections Board is responsible for administering elections in Fulton County. *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id.* § 21-2-70 (describing the powers and duties of superintendents); *id.* § 21-2-381 (describing duties in relation to absentee ballot applications); *id.* § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots). SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16, 25.

76.    Defendant ALICE O'LENICK is the Chairman of the GWINNETT County Board of Registrations and Elections and is named herein in her official capacity.  Defendants WANDY TAYLOR, STEPHEN W. DAY, and GEORGE AWUKU are Members of the GWINNETT County Board of Registrations and Elections and is named herein in their official capacities.

77.    The GWINNETT County Board of Registrations and Elections is responsible for administering elections in Gwinnett County.  *See, e.g.*, O.C.G.A

29

§ 21-2-40(b) (designating boards of elections and registration with powers and duties of election superintendent and board of registrars and assigning it powers related to conduct of primaries and elections, voter registration, and absentee-balloting procedures); *id.* § 21-2-70 (describing the powers and duties of superintendents); *id.* § 21-2-381 (describing duties in relation to absentee ballot applications); *id.* § 21-2-384 (describing duties in relation to preparing and delivering absentee mail-in ballots). SB 202 specifically tasks county election officials with numerous responsibilities, including enforcing the new identification requirements for voting by absentee ballot, issuing absentee ballots during the compressed distribution periods, and holding hearings on voter registration challenges. SB 202 §§ 15, 16, 25.

78. Defendant PHIL DANIELL is the Chairman of the COBB County Board of Elections and Registration and is named herein in his official capacity. Defendants FRED AIKEN, PAT GARTLAND, JESSICA M. BROOKS, and DARRYL O. WILSON, JR. are Members of the COBB County Board of Elections and Registration and are named herein in their official capacities.

79. The COBB County Board of Registrations and Elections is responsible for administering elections in Cobb County. *See, e.g.*, O.C.G.A § 21-2-40(b) (designating boards of elections and registration with powers and duties of

30

election superintendent and board of registrars and assigning it powers related to

conduct of primaries and elections, voter registration, and absentee-balloting

procedures); *id.* § 21-2-70 (describing the powers and duties of superintendents);

*id.* § 21-2-381 (describing duties in relation to absentee ballot applications); *id.* §

21-2-384 (describing duties in relation to preparing and delivering absentee mail-in

ballots).  SB 202 specifically tasks county election officials with numerous

responsibilities, including enforcing the new identification requirements for voting

by absentee ballot, issuing absentee ballots during the compressed distribution

periods, and holding hearings on voter registration challenges.  SB 202 §§ 15, 16,

25.

## STATEMENT OF FACTS

### Georgia's History of Racial Discrimination in Voting

80.    Georgia has a long history of racially discriminatory voting practices.

As one federal judge has found:

> The history of the states [sic] of segregation practice and
> laws at all levels has been rehashed so many times that the
> Court can all but take judicial notice thereof.  Generally,
> Georgia has a history chocked full of racial discrimination
> at all levels.  This discrimination was ratified into state
> constitutions, enacted into state statutes, and promulgated
> in state policy.  Racism and race discrimination were
> apparent and conspicuous realities, the norm rather than
> the exception.

31

*Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994). *See also, e.g.*, *Georgia State Conference of the NAACP v. Fayette County Bd. of Comm'rs*, 950 F.Supp.2d 1294, 1314-16 (N.D. Ga. 2013); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) (noting that "we have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases").

81.    As a result of this extensive and well-documented history of discrimination against racial minorities, Georgia was a "covered jurisdiction" under Section 5 of the Voting Rights Act, which required Georgia to get approval by the federal government for any changes to its election practices or procedures. This approval process allowed the federal government to review the proposed change to determine that it "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304.

82.    During the time that Section 5 of the Voting Rights Act applied, the federal government was required to intervene in Georgia's racially discriminatory voting practices 187 times. And, as the U.S. Commission on Civil Rights, a bipartisan, independent agency found, among the states subject to preclearance under the Voting Rights Act, Georgia was the only state that had implemented

voting restrictions in *every category* the Commission examined: strict requirements for voter identification; documentary proof of U.S. citizenship; purges of voters from voter registration rolls; cuts to early voting; and a raft of closed or relocated polling locations.

83.     After the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), invalidated the coverage provision that subjected Georgia to the preclearance requirement of the Voting Rights Act, Georgia immediately began to impose restrictions on voting rights designed to suppress Black votes and votes by other people of color.  Some examples of the many such restrictions are as follows.

84.     ***Exact Match Registration Requirements:***  Starting shortly before the 2008 election, the Georgia Secretary of State's office began implementing a policy where information on voter registration forms was compared to records on file with the Georgia Department of Drivers Services or Social Security Administration.  If the information did not match exactly—*e.g.*, if even a hyphen or apostrophe were different or an extra space was added—the registration was not accepted and the burden passed to the applicant to cure the "problem."  The U.S. Department of Justice objected to this "exact match" protocol, concluding that the "flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly,

33

erroneous burdens on the right to register to vote." In 2010, despite repeated warnings that the protocol would disproportionately burden eligible minority applicants, the Georgia Secretary of State's office implemented a revised version of the "exact match" system. This revised system was codified into law by H.B. 268 and remained in effect until civil rights and other groups brought extensive litigation that largely ended the practice in 2019.

85.   ***Photo Identification Requirements and Barriers:***  In 2005, Georgia adopted a strict photo identification requirement for voting. The 2005 photo ID law required individuals lacking photo ID to pay $20 for a photo ID card or to sign an affidavit declaring indigency. Only after a federal court enjoined its original photo ID bill did the Georgia Legislature revise its photo ID law in 2006 to allow for more equal access to the necessary photo ID.

86.   While Georgia state law now allows for a "free" state-issued ID for those who do not have one, driver's license offices in Georgia's Black Belt—21 contiguous and predominantly Black rural counties—are open two days per week or fewer. Additionally, studies show that the actual cost for "free IDs" typically ranges from $75 to $175 after factoring in documentation, travel and waiting time.

87.   ***Voter Purges:***  Georgia aggressively purges registered voters from the voter rolls at a rate much higher than most other states. For example, Georgia

purged approximately 1.5 *million* voters between the 2012 and 2016 elections alone. And in 2019 alone, more than 313 voters were removed on the grounds that they had moved—despite a subsequent analysis that showed that over 60% of the purged voters had not moved, and that the purges predominately impacted non-white voters in the Atlanta metropolitan region. Voters are frequently removed merely because they did not manage to vote in prior elections, and these purges disproportionately affect Black voters and voters of color.

88. *Criminal Investigations:* Georgia has launched numerous criminal investigations against voting organizers, focusing on those who register Black voters and other voters of color. For example, in 2010, the Georgia Secretary of State's office aggressively pursued an investigation of a dozen Black voting organizers in Brooks County that led to a criminal prosecution. The investigation followed the election of the county's first ever majority-Black school board, which was catalyzed by GOTV activists. None of the organizers was convicted even though they were initially charged with more than 100 election law violations carrying penalties of more than 1,000 combined years in prison. The Georgia Attorney General subsequently issued an opinion saying that the organizers' alleged crime—mailing absentee ballots by a third party—was permissible under state law (although SB 202 now tries to criminalize similar actions).

35

89. ***Closures and Relocations of Polling Places, and Long Lines to Vote:***
Counties throughout Georgia have aggressively closed and relocated polling
locations despite an overall increase in registered voters. One study found that
10% of Georgia's polling locations have closed since 2013. Such closures and
relocations have disproportionately occurred in communities of color.

90. As a result in part of these closures, Black voters and other voters of
color have been forced to wait in increasingly long lines in order to vote. *See, e.g.*,
Stephen Fowler, *Why Do Nonwhite Georgia Voters Have To Wait In Line For
Hours? Too Few Polling Places*, Georgia Public Broadcasting, Oct. 17, 2020,
*accessible at* https://www.npr.org/2020/10/17/924527679/why-do-nonwhite-
georgia-voters-have-to-wait-in-line-for-hours-too-few-polling-pl. According to
one study, Black voters are likely to wait 45% longer in line to vote than white
voters, with Black Georgians waiting an average of nearly one hour to vote while
white voters wait only six minutes. In 2020, Black voters in Fulton County waited
over five hours to vote in primary elections, and some Fulton County voters waited
more than ten hours to cast a ballot during early voting for the general election.
Numerous studies have consistently shown that long lines deter people from
voting.

91.    SB 202 is the most recent incarnation of this long history of discriminatory voting practices in Georgia.

## Racial and Ethnic Demographics of Voting in Georgia

92.    The Secretary of State of Georgia maintains detailed records as to the racial demographics of voting. As a result, the Georgia legislature and its elected officials are well aware of the implications of making decisions as to voting on racial and ethnic minorities.

93.    In every presidential election since 2004, the share of registered voters who are white has decreased in Georgia: from 68% in 2004, to 63% in 2008, to 59% in 2012, to 56% in 2016, to 53% in 2020. During that same period, the cumulative share of registered Black, Latinx and Asian American/Pacific Islander ("AAPI") voters and voters who are members of indigenous tribes has increased.

94.    The percentage of the vote that the Republican Presidential candidate has received in Georgia has decreased in every election since 2004 with the exception of 2012.

95.    The 2018 statewide election in Georgia demonstrated how fragile the Republican Party's hold on the state was. While Republican candidates won the races for Governor, Lieutenant Governor, Secretary of State, and Attorney

37

General, all of the winners received less than 52% of the vote and the Secretary of State election went to a run-off.

96. In 2020, a Democratic candidate won the presidential election for the first time in Georgia since 1992, and two senatorial races were sent to run-offs, with both Democratic candidates winning in January 2021. This was the first time a Democrat had won a United States Senate race in Georgia since 1996.

97. Between 2016 and 2020, the share of registered voters who are white decreased from 56% to 53% and the percentage of voters who turned out who were white decreased from 61% to 58%. These percentages stayed the same for the January 2021 run-off elections. These 3 percentage point drops were determinative in who won the 2020 and 2021 elections.

98. Election analysis demonstrates that Black voters and other voters of color usually provide strong support to Democratic candidates. Members of the Georgia General Assembly are aware of this fact.

99. As seen in the following graphs, even before the pandemic, Black, Latinx, AAPI and American Indian Alaska Native voters (referred to as "AIAN") in Georgia had made increasing use of voting by mail and early voting. This trend increased significantly during the 2020 and 2021 elections because of the pandemic.

38











100. Between the 2016 and 2018 general elections in Georgia, the
percentage of Black, Latinx, AAPI and indigenous tribe voters choosing to vote by
mail increased, while the percentage of White voters choosing to vote by mail
decreased somewhat. White, Black, Latinx, AAPI, and indigenous voters all chose
to vote by mail at larger percentages during the 2020 and 2021 elections because of
the pandemic, with a greater percentage of Black and Asian voters choosing to
vote by mail than White voters.

101.  Mail ballots of voters of color are substantially more likely to be rejected than mail ballots by white voters.  According to one study, in Georgia's June 2020 primary, 0.9% of mail ballots cast by white voters were rejected, but mail ballots cast by Black, Latinx, and AAPI voters were rejected at a rate of 1.6%, 1.9%, and 2.4%, respectively.

102.  The significant use of early voting opportunities by persons of color in Georgia, and particularly Black voters, is due in substantial part to in-person early voting on Sunday where, because of "Souls to the Polls" programs, Black voters, who in the 2020 general election comprised approximately 30% of all registered voters in Georgia, accounted for 36.5% of early in-person Sunday voters, compared to 26.8% of early in-person voters on other days.  In comparison, 60% of voters who voted early on days other than Sunday were white; but whites comprised only 47% of in-person early voters on Sundays, despite comprising 53% of Georgia's registered voters.

103.  Black residents of Georgia are 88% more likely than white Georgians to be below the poverty level and 58% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter

44

technology access issues that would render the printing and copying requirements of SB 202 more burdensome on them.

104. Latinx residents of Georgia are 91% more likely than white Georgia residents to be below the poverty level and 74% more likely than white Georgians to lack computer access in their homes, and, upon information and belief, as a result are less likely to possess the IDs required by SB 202, and more likely to encounter technology access issues that would make the printing and copying requirements of SB 202 more burdensome.

105. Native Hawaiian Pacific Islanders are 100% more likely than white Georgians to lack computer access in their homes.

106. Upon information and belief, Black and Latinx voters and other persons of color in Georgia are more likely than white voters in Georgia to hold jobs that do not give them the flexibility to take off from work during the time that early voting and drop boxes are available under the new restrictions of SB 202.

107. Black and Latinx households in Georgia are substantially less likely than white households to own a vehicle, and Black and Latinx residents are more likely to have to use public transportation than white residents. Upon information and belief, this means that Black and Latinx Georgia voters rely more heavily than white voters on easily accessible polling places.

45

108.  Since 2013, Georgia has experienced polling place closures, consolidations, and changing of locations of polling places, often in communities of persons of color.

109.  Persons of color are more likely than white voters to confront long lines to vote in Georgia when they vote in person.  Long lines are well-known to depress voter turnout.

110.  Voting in Georgia is highly racially polarized, with Black voters and other voters of color voting for Democratic candidates at far greater rates than white voters.

### The 2020 and 2021 Elections

111.  In 2020, Georgians voted for President, two U.S. Senators, and numerous other federal and state positions.  After none of the U.S. Senate candidates received the more than 50% vote necessary to avoid a runoff, Senate runoff elections were held in January 2021.

112.  The 2020 and 2021 elections saw record turnout among Georgia voters, as well as unprecedented enthusiasm for absentee, early, and drop box voting.

113.  To the apparent horror of politicians who had long sought to suppress Black and minority voters, this surge in voting was most pronounced in these exact

46

communities. For example, there was a 25% increase in Black voter registration compared to 2016, and Black voters—who historically turned out for runoff elections at much lower rates than general elections—returned to vote in the runoff elections at a higher rate than white voters.

114. Many of these Black and other minority votes came in the form of absentee and early voting. In fact, nearly 30% of Black voters cast their ballot by mail, with Black voters accounting for almost 32% of absentee ballot requests. In contrast, only roughly 24% of white voters voted through the mail. Although white voters still made up a majority of mail voters in the 2020 general election, their share of the vote-by-mail electorate dropped from 67% in 2016 to 54% in 2020; the Black share, meanwhile, surged from 23% to 31%.

115. Ultimately, the 2020 and 2021 elections resulted in, among other things, the election of the President preferred by Black Georgians, as well as the election of the first Black person to represent Georgia in the United States Senate, Reverend Raphael Warnock.

116. Following these results there was a widespread effort to attack the integrity of Georgia's elections, including by repeated, baseless allegations of fraud and falsely casting doubts as to the integrity of mail-in votes and those that were received in drop boxes. Many of these groundless allegations came from

47

former President Trump and his supporters, in an effort to overturn the results of the election. However, while numerous plaintiffs brought litigation echoing these allegations, the results of this litigation consistently demonstrated that mail-in and drop box voting were safe and secure. In fact, Secretary Raffensperger's office conducted a thorough investigation and audit into these claims of wrongdoing, ultimately finding no evidence to support the allegations. As Secretary Raffensperger explained to the U.S. Congress, "there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia," and his office did not "see[] anything out of the ordinary scope of regular post-election issues."

### The Legislative History of SB 202

117. In response to the record participation in the 2020 and 2021 elections—and, in particular, the record participation of Black voters and other voters of color—Republican legislators introduced a wave of proposed legislation in 2021, including SB 202. This proposed legislation was grounded in baseless and often racially tinged claims of voter fraud and election irregularities. Eleven such bills were proposed in Georgia itself.

118. The procedure leading up to the passage of SB 202 was rushed and irregular. Bills covering the same subjects, but with slightly conflicting provisions

were introduced in both houses of the Georgia legislature, sometimes in the same house. Committee hearings were scheduled on the bills, but without posted agendas, and without ample notice to the public or opportunity for the public to view the proceedings without attending them in person.

119. Throughout the hearings held on these bills, the legislators were repeatedly warned by community members and organizations that these bills, including SB 202 and predecessor bills with similar provisions, would adversely and disproportionately impact populations of persons of color.

120. For example, at a February 19, 2021 hearing on a related bill that contained many of the same provisions that ultimately were incorporated into SB 202, representatives of the Georgia Coalition for the People's Agenda noted that "prohibiting of early voting on Sundays, and therefore the elimination of the Souls to Polls, feels like a direct attack on certain communities."

121. At this same hearing, representatives from the Southern Poverty Law Center Action Fund warned legislators that these bills represented calculated attempts to adversely impact minority groups, and that provisions such as the photo ID requirement for absentee ballots would disproportionately impact racial minorities.

49

122. There was a brief hearing on SB 202 during the first week of March, 2021 before the Senate Ethics Committee. At this time, SB 202 was a scant two-pages long, and limited to the issue of distribution of absentee ballot applications. At that hearing, representatives of community groups alerted the Committee to the potential negative impact on such community groups of the civil penalties for distributing absentee ballot applications to certain voters.

123. On March 17, 2021, at a hearing of the House Special Committee on Election Integrity, SB 202 was discussed, despite no agenda for the hearing being provided to the public until two hours before the hearing.

124. At this March 17, 2021 hearing, community organizations and civil rights organizations, including from the Georgia Coalition for the People's Agenda, expressed multiple concerns to lawmakers about SB 202, including the lack of transparency and irregular process, as well as concerns about the bill taking local authority away from county election officials.

125. On March 18, 2021—the very next day—SB 202 was amended, with a new substitute replacing it. Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, conducted a hearing of the House Special Committee on Election Integrity, despite not having a substitute bill ready to distribute, and instead described the changes to the bill without releasing new

50

language to the public. Despite the fact that there were changes from the prior day, Chairman Fleming also prohibited comment from organizations that had provided comments on March 17, 2021.

126. On March 19, 2021, two further substitutions to the bill were made and released to the public.

127. On March 22, 2021, an hour before a scheduled hearing of the House Special Committee on Election Integrity on that same day, House leadership shared the new 90-plus page version of SB 202 with Democratic members of the Committee. Chairman Fleming refused to take additional comment on the bill, despite the substantial changes and the two additional March 19 substitutions.

128. To recap the amendments: when SB 202 was first passed over from the Senate to the House on March 9, 2021, it was a 2-page bill that dealt only with restrictions concerning individuals and third-party groups sending absentee ballot applications to prospective voters. In a matter of two weeks, the bill had grown to over 90 pages covering a host of additional topics.

129. During the debates on the House and Senate floors on SB 202, Black legislators alerted their colleagues to the discriminatory impact SB 202 would have on Black voters and other voters of color.

130. The bill was put up for a full vote on March 25, 2021.

51

Case 1:21-cv-01259-JPB   Document 35   Filed 05/28/21   Page 52 of 87

131.   Despite the requirements of Georgia law that bills having either a significant impact on expenditures of a state agency or at least a $5 million cost to local agencies must have a fiscal note attached, SB 202 contains no fiscal note. The failure to attach a fiscal note to the bill was raised on the Senate floor, but was summarily rejected by the President of the Senate.

132.   Throughout the debate on SB 202, its supporters used the pretextual—and self-created—disproven myth of voter fraud and non-existent election irregularities in the 2020 Georgia general election to attempt to justify their actions.   For example, Chairman Fleming of the House Special Committee on Election Integrity publicly likened absentee ballots to the "shady part of town down near the docks" where the "chance of being shanghaied" is significant.

### The Challenged Provisions of SB 202

133.   The final version of SB 202 is a 98-page omnibus bill which constitutes a major overhaul of Georgia's Election Code and voting procedures. These changes are summarized below.

134.   *New Burdens on Requesting and Casting an Absentee Ballot (Sections 25, 27, and 28):*   Georgia voters have cast absentee ballots by mail for decades.   Voting by mail provides significant benefits to voters, including those who work multiple jobs, are unable to get time off or arrange child care to vote, or

have difficulties arranging transit to polling places. It also can alleviate some of the barriers to voting such as those caused by long lines at the polls and confusing changes to voting locations. SB 202 adds a new and complicated absentee ballot application process, as well as burdensome new mandatory ID requirements when requesting and casting an absentee ballot.

135. Under these new requirements, voters must include a Georgia driver's license number or Georgia State ID number on their absentee ballot application. If they have neither, voters are required to provide a copy of a current utility bill, bank statement, government check, paycheck or other government document that shows the name and address of the voter. These documents, along with other required identifying information, must be attached to their absentee ballot applications.

136. Likewise, in order to actually cast an absentee ballot, a voter must now provide additional personal ID information on the absentee ballot mailing envelope. This information includes their Georgia driver's license number or Georgia State ID number. If the voter does not have a Georgia driver's license or Georgia State ID, they must provide the last four digits of their social security number or a copy of a current utility bill, bank statement, government check,

Case 1:21-mi-55555-JPB Document 731 Filed 10/29/23 Page 300 of 466
Case 1:21-cv-01259-JPB Document 35 Filed 05/28/21 Page 54 of 87

paycheck or other government document that shows the name and address of the voter.

137. SB 202 also mandates voters provide their date of birth on absentee ballot applications and absentee ballot return envelopes, even though the date of birth of a voter is not "material to determining the eligibility of an absentee voter." *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018).

138. Nevertheless, SB 202 mandates penalizing voters who fail to include this immaterial information on their absentee ballot applications or when returning their voted ballot to the county registrars, leading to the disenfranchisement of voters who fail to cure this omission. This disenfranchisement violates 52 U.S.C. § 10101(a)(2)(B), which prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

139. Because voters, except those over the age of 65 or disabled, must make a new application for an absentee ballot for each election in an election cycle, voters are now required to provide this ID and date of birth information multiple times each and every election cycle.

54

140.  These provisions will disproportionately affect voters from minority communities, who are less likely to possess a current and valid form of government issued photo ID and who have less access to state offices that issue such IDs.  Compounding these issues, voters from minority communities are also less likely to have access to computers and internet in order to print out proof of identification.  These increased burdens will lead to a further increase in the rate at which the ballots of Black and other voters of color are rejected.  Moreover, these requirements expose absentee ballot applicants to potential fraud or identity theft.

141.  ***Prohibitions on the Proactive Mailing of Ballot Applications (Section 25):***  As discussed above, voters must file complicated and burdensome applications for every single election in order to receive an absentee ballot.  During the 2020 and 2021 elections, election officials in Fulton and DeKalb Counties sought to lessen some of these burdens by mailing absentee ballot applications to all eligible voters within county lines.  This proactive mailing of absentee ballot applications allowed voters, and particularly Black voters and other voters of color, better access to the voting process.  Likewise, private individuals and groups, such as the Plaintiffs, also assisted voters in obtaining absentee ballot applications.

142.  Now, SB 202 further compounds the burden on voting by prohibiting public employees and agencies from sending unsolicited absentee ballot

55

applications to voters.  Instead, voters must now specifically request an absentee ballot application through the website of the Secretary of State, election superintendent, or registrar.

143.  To further compound the issue, SB 202 also threatens private individuals and non-public entities, such as the Plaintiffs, with a substantial risk of incurring hefty criminal sanctions if they attempt to help voters request absentee ballots.  If a person or entity sends an absentee ballot application to someone who has already requested an absentee ballot or voted absentee, they can be fined— despite the fact that many voters reported not receiving their absentee ballots after making an initial request for one in the 2020 election cycle.

144.  SB 202 also creates additional, unreasonable burdens on organizations and individuals who provide assistance to voters who wish to vote by absentee ballots, including by: (1) prohibiting them from pre-filling the voter's information on an absentee ballot application, even if the voter provides that information to the person or organization sending the application; (2) prohibiting them from viewing or handling completed absentee ballot applications, including by assisting a voter to print, copy or fax a completed application in order to send the completed application form to election officials; and (3) requiring individuals or organizations to use the official absentee ballot application produced by the Secretary of State's

office when sending the application to voters, but compelling them to include a confusing disclosure on the form stating that the form was not sent by a government entity.

145. These burdensome and baseless restrictions will disproportionately impact Black voters and other voters of color. These voters are more likely to seek to vote by mail—and are more likely to face disparate burdens if they are forced to vote in person—but face heightened challenges accessing computers, the internet, and other resources that will now be necessary to successfully request, complete, and return absentee ballot applications.

146. *Delaying and Compressing Time Periods (Sections 27 and 28):* SB 202 also delays and compresses multiple time periods related to voting that will disproportionately impact Black voters and other voters of color.

147. *First*, while a voter could previously request an absentee ballot 180 days prior to the election in question, SB 202 limits the earliest that a voter can now request an absentee ballot to 79 days prior to the election. Likewise, while the board of registrars was previously required to mail absentee ballots to eligible applicants between 45 to 49 days prior to many elections, SB 202 delays the issuance of absentee ballots to 25 to 29 days prior to a qualifying election. And voters now must submit this absentee ballot request no later than 11 days prior to

57

the date of the election (instead of the previous deadline of the Friday immediately prior to an election).

148. *Second*, SB 202 shortens the runoff period to four weeks following the election that led to the runoff for stateside voters. This change significantly limits the ability of Georgians to register to vote or update their voter registration information before a runoff election and also significantly limits access to in-person early voting for runoff elections. For example, voters may only have a three-day early voting period if a runoff occurs during Thanksgiving week following a November general election. The ability to apply for and cast an absentee mail-in ballot during this reduced time period will also be challenging, if not impossible, for some voters—particularly lower income or hourly wage Black voters and other voters of color who are less able to take time off during their workday.

149. *Third*, SB 202 gives unlimited discretion to election boards to limit early voting hours to 9 a.m. to 5 p.m., and to two Saturdays before the election. And even if election boards want to expand those hours, they are prohibited from opening early voting before 7 a.m. or after 7 p.m., or for more than two Sundays. County boards of election are given unfettered discretion with no guidelines in determining whether to eliminate all Sunday early voting days.

150. The compressed periods for requesting and submitting an absentee ballot will leave voters who become ill or have to travel out of the area in the lurch if they cannot vote during early voting and are unable to meet the earlier deadline to apply for a ballot. It will disproportionately affect Georgian Black voters, who vote absentee at a higher rate than white voters, face longer lines and higher burdens if they are forced to vote in person, and have increased difficulty obtaining the necessary documentation and overcoming the other barriers to apply for an absentee ballot. And, as Black and other minority voters' mail-in ballots are rejected at significantly higher rates than those of white voters, this shortened period to cure ballot issues will likewise disproportionately impact Black and other minority voters.

151. The limitations on early voting hours similarly disproportionately affect Black and other minority voters. These voters are more likely to have inflexible work, school, child care, or similar obligations that prevent them from voting between 9 a.m. and 5 p.m. Likewise, Georgia Secretary of State statistics demonstrate that Black voters and other voters of color utilize Sunday early voting hours significantly more than white voters. Black voters and other voters of color take part in GOTV efforts focused on Sunday early voting, including "Souls to the Polls" events hosted by Black churches and other faith-based organizations that

59

provide rides to the polls following church services or as part of their church fellowship activities.  As a result, the elimination or reduction of Sunday early voting under SB 202 discriminates against Black voters and other voters of color who utilize Sunday early voting hours at higher rates than white voters.  In contrast, while SB 202 adds a second required Saturday of early voting, most of the large, metropolitan counties that contain significant Black and other minority voters already offered multiple weekend days of early voting.  The counties that did not, and that therefore will increase voting access, are largely rural, predominately white counties.

152.  The provisions of SB 202 imposing new burdens on voting by absentee ballots and limiting access to early voting also will result in longer lines and delays at the polls on election day, particularly for Black voters and voters of color in Georgia who are more often than white voters impacted by lines and delays when voting on election day.

153.  ***Drop Box Limitations (Section 26):***  During the 2020 election, there were 330 drop boxes in Georgia—including 94 across the core Atlanta counties of Fulton, Cobb, DeKalb, and Gwinnett—where voters could securely vote.  These drop boxes were heavily used by Black and other minority voters; for example,

counties containing large Black populations averaged significantly more drop boxes than those with majority-white populations.

154. Many of these drop boxes were outside of buildings, and county election administrators had discretion to keep drop boxes open after business hours and up until the polls closed. These drop boxes were monitored via video surveillance to ensure that they were secure and safe. The accessibility of these drop boxes provided meaningful voting access to voters who otherwise would have been deterred by long lines (which are particularly prevalent in majority Black and Brown precincts), prevented from accessing polling places while open due to work or other restrictions, or subject to other impediments. As a result, in part, of the availability of these drop boxes, the rate of absentee ballots rejected for lateness decreased significantly. The drop boxes were safe and effective, and there is no evidence that they were susceptible to voter fraud.

155. SB 202 significantly limits the availability and accessibility of absentee ballot drop boxes in several ways. Each of these new restrictions on the availability of drop boxes will disproportionately impact Black voters and other voters of color, as well as senior and physically disabled voters, who used absentee ballot drop boxes in large numbers to avoid having to wait in long lines and face unreasonable delays during in-person early voting and election day voting.

61

156. *First*, while all counties would be required to have at least one drop box, the number of drop boxes per county would be limited to the lesser of one per every 100,000 "active registered voters" or one per advance voting location in the county. This restriction will disproportionately and discriminatorily impact Black voters and other voters of color. For example, the four core Atlanta counties, which contain a large percentage of the total Black population in Georgia, will go from 94 drop boxes in 2020 to no more than roughly 23 drop boxes in future elections.

157. *Second*, SB 202 limits the placement of drop boxes to the interior of early voting locations and prohibits access to drop boxes outside of the hours that early voting is taking place. SB 202 likewise limits the hours during which early voting can take place (and thus drop boxes can be open). These limitations effectively render drop boxes useless to anyone other than voters who could already participate in early voting and eliminate virtually all benefits of drop boxes *vis a vis* normal early voting. As Black voters are more likely to work multiple jobs or jobs with inflexible hours, they gained the most benefit from the previous flexibility of drop box hours and locations, and therefore will be disproportionately burdened by these restrictions.

158. *Third*, SB 202 requires that drop boxes be under constant surveillance by an election official, licensed security guard, or law enforcement official. This requirement presents serious concerns regarding voter intimidation for voters of color, who are frequently and unfairly the targets of law enforcement.

159. ***Disenfranchisement of Out-of-Precinct Voters (Sections 34 & 35):*** Over the last decade, Georgia shuttered hundreds of voting precincts, many in predominantly Black or other minority neighborhoods. These closures, as well as numerous other changes to voting locales, have confused voters and caused many to attempt to vote at the wrong precinct. Prior to the enactment of SB 202, a voter who attempted to vote at the incorrect precinct within the same county where they were registered to vote could cast a provisional ballot, which would be counted for every race on that ballot in which the voter was qualified to vote. SB 202 essentially disenfranchises these voters.

160. Under SB 202, only voters who arrive to vote after 5 p.m. and sign an affidavit under penalty of perjury that they cannot get to their home precinct before the close of the polls will be able to cast a provisional ballot which will count with respect to the same contests on the voter's home precinct ballot. All other voters who arrive at the incorrect precinct before 5 p.m. can cast a provisional ballot at the incorrect precinct, but none of their votes will count. In order for their votes to

63

count, they will be required to vote at their home precinct, even if they cannot get to their home precinct by the time polls close. The Board of Elections is tasked with reviewing the sworn statements submitted by the voters who cast provisional out-of-precinct ballots after 5 p.m., but it is unclear what the purpose of that review would be.

161. Upon information and belief, the out-of-precinct voting prohibitions of SB 202 are more likely to disproportionately and negatively impact Black voters and other voters of color who are more frequently impacted by polling place closures and consolidations in majority-minority precincts than white voters in majority-white precincts, which often leads to voters being confused about the location of their correct precinct on election day.

162. **Punishments for Officials Who Defend Voters' Rights (Sections 5, 6, and 7):** Apparently in retaliation for Secretary Raffensperger's defense of the integrity of the Georgia election system, SB 202 removes election-related powers from the Secretary of State. The Secretary of State will no longer serve as the Chair or have a vote as a member of the State Election Board.

163. Another provision of SB 202 allows the State Election Board and members of the General Assembly to take over county election offices. Similarly, the county commissioner or members of the General Assembly could take action to

commence a performance review of election supervisors that could lead to their suspension. Up to four election supervisors could be suspended at one time. It is foreseeable that the takeover provision of SB 202 will disproportionately and negatively impact Black voters and other voters of color residing in counties with large percentages of minority voters, such as Fulton, DeKalb, Gwinnett, Clayton, Chatham, and others where the Republican members of the legislature fear the erosion of the tenuous hold on their majority party status and may use this procedure to challenge and reject legitimate ballots and disqualify eligible voters.

164. ***Unlimited Challenges to Voters (Sections 15 and 16):*** SB 202 also encourages large-scale voter challenges and purges—including on the eve of elections when county registrars are otherwise focused on administering early voting and preparing for election day—by allowing for unlimited numbers of challenges to be made to the eligibility of voters by other registered electors in a county and mandating that county registrars conduct hearings on such challenges within ten days of receipt and allowing for the immediate removal of voters from the statewide voter registration list.

165. SB 202 also provides that challenged voters be given only three days' written notice by mail of the hearings on the challenges, thereby making it difficult, if not impossible, for lower income and hourly wage Black voters, other

65

voters of color, senior voters, physically disabled voters and other voters who have other obligations during the hearing days and times to attend these hastily arranged hearings.  The minimal notice provisions authorized by SB 202, combined with the burden presented of unlimited challenges, also makes it unlikely that voters will actually receive the written notice prior to the hearing or be able to prepare adequately to rebut unfounded challenges and increases the likelihood that eligible voters will be disenfranchised on the eve of elections.

166. ***Criminalization of Line Warming (Section 33):*** SB 202 also criminalizes "line warming," the expression of well-meaning individuals and organizations to support and encourage the act of voting in a non-partisan way by handing out water or snacks to ease the burden on voters standing in line for protracted periods to vote.  SB 202 bars such assistance within 25 feet of any voter standing in line to vote at any polling place, thereby restricting line warming expression for hundreds of feet outside of the entrances to polling places.

167. These line warming restrictions will disproportionately affect Black and Brown voters, who are more likely to experience long lines and delays at the polls.  These provisions also subject individuals and organizations to criminal sanctions for engaging in the Constitutionally protected expressive conduct of distributing food and beverages to voters in line.

168. ***Ban on Mobile Voting Facilities (Sections 20 & 26):*** Prior to SB 202, Georgia county election administrators were permitted to provide "mobile voting units," or movable or portable polling facilities used as supplemental polling locations both during early voting and on election day. In 2020, two such mobile voting units were used in Fulton County, which is more than 44% Black and which has a history of long lines to vote and difficulties in obtaining an absentee ballot. These two mobile voting units allowed more than 11,200 people to vote. There is no evidence that the mobile voting units used in the 2020 election posed election security risks or created any additional administrative issues.

169. SB 202 effectively bars such mobile voting units. This prohibition was unmistakably intended to target the large Black population of Fulton County, and its enforcement will disproportionately harm Black and Brown voters.

## CLAIMS FOR RELIEF

### COUNT I

**42 U.S.C. § 1983 and 52 U.S.C. § 10301**
**(Discriminatory Purpose in Violation of the**
**Fourteenth and Fifteenth Amendments to the United States Constitution and**
**Section 2 of the Voting Rights Act, Against all Defendants)**

170. Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

171. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

172. Both the Fourteenth and Fifteenth Amendments to the United States Constitution prohibit intentional racial discrimination by state actors.

173. Specifically, Section 1 of the Fourteenth Amendment provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

174. Section 1 of the Fifteenth Amendment provides that:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

175. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, in relevant part, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].

> (b) A violation of subsection (a) of this section is
> established if, based on the totality of circumstances, it is
> shown that the political processes leading to nomination
> or election in the State or political subdivision are not
> equally open to participation by members of a class of
> citizens protected by subsection (a) of this section in that
> its members have less opportunity than other members of
> the electorate to participate in the political process and to
> elect representatives of their choice.

176. A violation of Section 2 of the Voting Rights Act may be based either
on a finding of a discriminatory purpose behind the challenged governmental
action or a finding of a discriminatory result from the challenged governmental
action.

177. SB 202 was enacted with a racially discriminatory purpose in
violation of Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth
Amendments.

178. Discriminatory intent may be established by proof that the defendants
used race as a motivating factor in their decisions. *Village of Arlington Heights v.
Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

179. The burdens of SB 202 are intended to, and will have, the effect of
disproportionately and adversely affecting the right to vote of Black voters and
other voters of color, including, but not limited to:

1)     Imposing onerous and unnecessary ID requirements on voters who submit applications for absentee ballots and when they return voted absentee ballots;

2)     Prohibiting public employees and public entities from sending out unsolicited absentee ballot applications to voters;

3)     Threatening private individuals and non-public entities with potentially large fines for sending absentee ballot applications with voter information filled in, without confusing and misleading statements, or to voters who are not currently registered to vote or who have already requested a ballot, received a ballot or voted a ballot;

4)     Delaying and compressing the time during which a voter can request or submit an absentee ballot;

5)     Giving county registrars unfettered discretion to limit early voting hours to 9 a.m. to 5 p.m. and to entirely eliminate Sunday early voting;

6)     Limiting the number of absentee ballot drop boxes and limiting access to absentee ballot drop boxes to locations inside early voting sites when advance in-person voting is taking place, rendering the drop

boxes virtually useless since voters can vote early in person at these
locations;

7) Prohibiting out of precinct voting before 5 p.m. without recognizing
the confusion and negative impact experienced by Black voters and
other voters of color from hundreds of polling place changes in
Georgia since the Supreme Court's decision in *Shelby County v.
Holder*;

8) Removing the voting power of the Secretary of State on the State
Elections Board, coupled with granting power to the State Election
Board to take over county election boards and targeting jurisdictions
with large populations of Black voters and other voters of color;

9) Encouraging the submission of large numbers of voter challenges by
using the term, "unlimited," in referring to elector challenges in
SB 202, and requiring the setting of hearings on the challenges within
ten days of their submission, with only three days mandatory written
notice of the challenge hearings to voters—making it difficult, if not
impossible, for voters to adequately prepare for the challenge
hearings—assuming voters even receive the written notice within
three days of the mailing of the hearing notices;

71

    10)    Criminalizing "line warming," which provides relief for voters forced to wait in long lines because of the other discriminatory voting changes imposed by SB 202; and

    11)    Prohibiting the use of mobile voting units.

    180.  Race was a motivating factor behind the enactment of SB 202.

    181.  SB 202 was enacted at a time when Black voters and other voters of color were making increasing use of means of voting that are being limited and restricted in SB 2020.

    182.  SB 202 was enacted immediately following elections in which the size of the population of Black voters and other voters of color, particularly when compared to the diminishing share of the white vote, had become larger in statewide elections.

    183.  In passing SB 202, the Georgia legislature deviated from procedural norms in its rushing the bill to passage, in its failure to provide adequate notice and opportunity to be heard and to view committee proceedings; in its speedy replacement of a 2-page bill with a 95-page bill without sufficient notice; and in its failure to include the required fiscal statement.

    184.  The purported justification for SB 202 was pretextual.

185.  The Chair of the House Committee on Public Integrity made culturally insensitive statements in connection with the passage of SB 202.

186.  The supporters of SB 202 were on notice of the foreseeability of the disparate impact of SB 202.

187.  There are less discriminatory alternatives to every aspect of SB 202, including simply maintaining the status quo, particularly given the complete lack of evidence of significant voter fraud.

188.  Defendants will be unable to prove that, SB 202 would have been enacted without race as a motivating factor.

189.  Implementation of SB 202 will irreparably harm Plaintiffs as well as Black voters and other voters of color by denying or abridging their right to vote.

190.  WHEREFORE, Plaintiffs pray for relief as set forth hereafter.

### COUNT II

### (Violation of Section 2 of the Voting Rights Act of 1965 52 U.S.C. § 10301, *et seq.*)

191.  Plaintiffs repeat and re-allege and incorporate by reference all prior paragraphs as if fully set forth herein.

192.  Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

193. In determining whether a challenged voting practice violates the results prong of Section 2 of the Voting Rights Act, courts examine the "totality of the circumstances" and determine whether "the political processes … are [] equally open to participation by [members of a protected class] … in that its members have less opportunity than other members of the electorate to participate in the political process." *See e.g.*, *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1228 n.26 (11th Cir. 2005); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-98 (11th Cir. 1999).

194. The challenged provisions of SB 202 violate the rights of Plaintiffs because they were adopted for the purpose of denying voters of color full and equal access to the political process.

195. The disproportionate impact of these provisions, individually and collectively, is caused by present and past discrimination on account of race and ethnicity by the state of Georgia, as shown by the totality of the circumstances, including factors deemed relevant by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 36 (1986).

196. Georgia has a long history of official discrimination in the jurisdiction that touched the right of minorities to register, vote, or otherwise participate in the electoral process, and the history of voting discrimination against Black residents in Georgia is well documented. Georgia's history of racial discrimination in voting

74

is so long and deep that courts have taken judicial notice of it. *Johnson v. Miller*, 864 F. Supp. 1354, 1379-80 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995); *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F.Supp. 3d 1297, 1310 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020).

197. Voters of color in Georgia bear the effects of discrimination in education, employment, and health that hinder their ability to participate effectively in the political process.

198. The policy behind the use of the voting practices in question is tenuous and pretextual.

199. As a result of SB 202's requirements and prohibitions described above, individually and collectively, under the totality of the circumstances, the political process in Georgia is not equally open to participation to Black voters and other voters of color in that such citizens have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

200. The requirements and prohibitions of SB 202 described above constitute qualifications or prerequisites to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of U.S. citizens who are residents of Georgia on account of their race or color,

75

or membership in a language minority group, in violation of Section 2 of the
Voting Rights Act.

201.  Implementation of SB 202 will irreparably harm Black voters and
other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### COUNT III

**42 U.S.C. § 1983**
**(Burden On The Fundamental Right To Vote**
**First And Fourteenth Amendments)**

202.  Plaintiffs repeat and re-allege each and every allegation contained in
all prior paragraphs, as if fully set forth herein.

203.  42 U.S.C. § 1983 authorizes suits for the deprivation of a right
secured by the Constitution or the laws of the United States caused by a person
acting under the color of state law.

204.  The First and Fourteenth Amendments of the United States
Constitution protect the right to vote as a fundamental right.  The First
Amendment's guarantees of freedom of speech and association protect the right to
vote and to participate in the political process.

205. SB 202 violates the First and Fourteenth Amendments' protection of rights to vote, thus giving Plaintiffs an actionable claim for the deprivation of those rights under 42 U.S.C. § 1983.

206. The right to vote is a fundamental constitutional right also protected by both the due process and equal protection clauses of the Fourteenth Amendment. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 (1983).

207. "A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'" *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

208. Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply

77

when examining that law. *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

209.  The challenged provisions of SB 202 inflict substantial burdens on Georgia's voters, both through the individual restrictions and provisions and collectively through the combined effect of all of the restrictions and barriers.

210.  The burdens caused by these provisions, individually and collectively, are serious and substantial, and in some cases cause voters to risk being completely disenfranchised.

211.  No legitimate state interest justifies these significant restrictions and burdens.

212.  The purported goals of increasing confidence in elections or encouraging uniformity are pretextual at best, and in fact would be harmed by imposing the restrictions and requirements of SB 202.

213.  These restrictions could undermine, not restore, confidence in Georgia's elections, and would do so at the expense of imposing undue burdens on voters.

214.  The requirements and prohibitions in SB 202, individually and collectively, impose a substantial burden on the fundamental right to vote of Georgia citizens, and are neither justified by, nor necessary to promote, interests

put forward by the State that were not already being adequately protected by pre-existing criminal laws and election procedures.

215. These provisions will irreparably harm Black voters and other voters of color.

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## COUNT IV

### 42 U.S.C. § 1983
### (Freedom of Speech and Association
### First And Fourteenth Amendments)

216. Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

217. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

218. The First Amendment to the United States Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech.

219. SB 202 violates Plaintiffs' First and Fourteenth Amendment rights by restricting Plaintiffs' and their members' core political speech and expressive conduct—namely, encouraging voting through the distribution of absentee ballot applications in an effort to engage the public and voters and encourage them to

vote. Plaintiffs therefore have an actionable claim under 42 U.S.C. § 1983 for the deprivation of those rights.

220. By penalizing innocent errors in the distribution of absentee ballot applications, SB 202 will have a chilling effect on Plaintiffs' and their members' core political speech, without being narrowly tailored to meet a compelling state interest.

221. As a result of SB 202, Plaintiff organizations will not be able to carry out a key aspect of their organizational mission.

222. Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## COUNT V

### 42 U.S.C. § 1983
### (Freedom of Expressive Conduct and Speech in Providing Food and Drink First And Fourteenth Amendments)

223. Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

224. The First Amendment to the Constitution, as applied by the Fourteenth Amendment, prohibits abridgement of freedom of speech and expression.

225. The provision of SB 202 that criminalizes "line warming activities" will chill protected expressive conduct and speech that supports of the act of voting by exposing to criminal prosecution those who provide sustenance to voters waiting in long lines.

226. The Plaintiffs who have supported in-person voting in past elections by providing food and/or drinks to voters who request such while waiting in long lines to vote have done so without complaint or incident. This sustenance is provided without regard to political affiliation and without engaging in any speech or conduct that supports a particular candidate or political party while providing such food and/or drinks.

227. The Plaintiffs who provide this sustenance have done so as an expression of their appreciation for voter participation and often accompany their non-verbal acts with a verbal appreciation for voting generally.

228. SB 202 restricts Plaintiffs' and their members' core political speech and expressive conduct in "line warming activities" and the restrictions on these acts of kindness are content based restrictions on speech and expression about a

81

particular subject matter (expressive support for voting) in a public forum. It is also not supported by either a compelling (or even reasonable) governmental interest and is not narrowly tailored to any legitimate or compelling governmental interests.

229. The kindness of providing food and drink in a non-partisan way to anyone who requests sustenance while waiting in a long line to vote does not exact political pressure or intimidation on voters. Moreover, existing state and federal laws already prohibit improper interference, political pressure or intimidation of voters engaged in in-person voting.

230. As a result of SB 202, the Plaintiff organizations who have engaged in "line warming" activities will not be able to carry out a key aspect of their organizational mission in supporting voters who wait in long lines to vote.

231. Plaintiffs who seek to continue "line warming" in future elections cycles are chilled by the specter of criminal prosecution under the provisions of SB 202.

232. Because the restrictions in SB 202 and the potential penalties extend to Plaintiff organizations' members, their members' right of association is also jeopardized.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## COUNT VI

### 52 U.S.C. § 10101, 42 U.S.C. § 1983
### (Immaterial Voting Requirement)

233.  Plaintiffs repeat and re-allege each and every allegation contained in all prior paragraphs, as if fully set forth herein.

234.  52 U.S.C. § 10101(a)(2)(B) prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

235.  Section 25 of SB 202 provides that "[i]n order to confirm the identity of the voter, such [absentee ballot application] shall require the elector to provide his or her . . . date of birth," among other information, and that registrars or absentee ballot clerks "shall compare the applicant's . . . date of birth . . . with the information on file in the registrar's office."

236.  Section 27 of SB 202 mandates that absentee ballot envelopes require absentee voters to provide their date of birth, and Section 29 of SB 202 provides that the registrar or clerk "shall then compare the . . . date of birth entered on the absentee ballot envelope with the same information contained in the elector's voter registration records."  Section 29 of SB 202 also provides that the registrar or clerk

83

must reject the absentee ballot envelope "if the identifying information entered on the absentee ballot envelope does not match the same information appearing in the elector's information appearing in the elector's voter registration record, or if the elector has failed to furnish required information."

237.   SB 202 violates Plaintiffs' rights under 52 U.S.C. § 10101(a)(2)(B). It mandates that Georgians provide information—and requires county election officials to reject absentee ballot applications and absentee ballots based on a failure to provide exactly matching information—that is not material to determining whether individuals are qualified to vote and not a unique voter identifier in order to successfully apply for and cast an absentee ballot.

238.   **WHEREFORE**, Plaintiffs pray for relief as set forth herein.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.      Declare that the challenged provisions in SB 202 violate the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act's prohibitions on discriminatory purpose;

2.      Declare that the challenged provisions in SB 202 violate the results prong of Section 2 of the Voting Rights Act;

3.    Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to vote;

4.    Declare that the challenged provisions of SB 202 violate the First and Fourteenth Amendments to the United States Constitution as undue burdens on the right to free speech and freedom of association;

5.    Declare that the challenged provisions of SB 202 violate the Civil Rights Act;

6.    Enjoin Defendants, their agents, officers, employees, successors, and all persons acting in concert with them from enforcing any of the challenged provisions of SB 202;

7.    Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10301 and other applicable laws; and

8.    Order any other relief that this Court deems just and proper.

Dated: May 28, 2021

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
The Law Office of Bryan Sells, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jhouk@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under
Law
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes*
Neil Oxford*
Gregory Farrell*
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Admitted pro hac vice

Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE AND OF SERVICE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing

FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY

RELIEF has been prepared in Times New Roman 14, a font and type selection

approved by the Court in L.R. 5.1(C), and that I provided notice and a copy of the

foregoing using the CM/ECF system which will automatically send e-mail

notification of such filing to all attorneys of record.

Respectfully submitted this 28th day of May, 2021.

> */s/ Bryan L. Sells*
> Bryan L. Sells
> Georgia Bar No. 635562
> The Law Office of Bryan Sells, LLC.
> P.O. Box 5493
> Atlanta, GA 31107
> Tel: (404) 480-4212
> Email: bryan@bryansellslaw.com
>
> *Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: |
| GEORGIA STATE CONFERENCE OF THE NAACP, et al., | 1:21-MI-55555-JPB |
| Plaintiffs, | |
| v. | Civil Action No.: |
| | 1:21-CV-07159-JPB |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., | |
| Defendants, | |
| REPUBLICAN NATIONAL COMMITTEE, et al., | |
| Intervenor-Defendants. | |

## RESPONSES AND OBJECTIONS OF PLAINTIFF GEORGIA STATE CONFERENCE OF THE NAACP, as an ORGANIZATION, TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSIONS



DEFENDANT'S EXHIBIT
PENGAD 800-631-6989

Pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Northern District of Georgia, Plaintiff, the Georgia State Conference of the NAACP, as an organization ("Georgia NAACP") as an organization ("Plaintiff"), through its undersigned counsel, hereby responds and objects to the First Sets of Interrogatories, Requests for Production of Documents, and Requests for Admission dated March 9, 2022 ("Requests"), propounded by Defendants Brad Raffensperger, in his official capacity as Georgia Secretary of State; and Sara Ghazal, Matthew Mashburn, Edward Lindsey, and Janice Johnston, in their official capacities as members of the Georgia State Election Board (collectively, "State Defendants").

## PRELIMINARY STATEMENT

The Requests propounded by State Defendants are phrased in a way to suggest that Plaintiff is required to respond not only on its own behalf to the Requests, but on behalf of other Plaintiffs in this action which is not required under the Federal Rules of Civil Procedure or Local Rules.  Thus, Plaintiff responds and objects to these Requests on its own behalf and not on behalf of any other party, person, or entity.

The Response to any particular Request is not an admission of the relevance or the admissibility into evidence of such Response or any documents produced

pursuant thereto, except with respect to any response to a Request for Admission where the Plaintiff's response is an unequivocal, express admission.

No statement contained in these Responses shall be deemed to constitute an admission that any statement or characterization in the Requests is complete or accurate. Plaintiff reserves the right to supplement or correct these Responses and to raise any additional objections deemed necessary and appropriate in light of the results of any further review.

Nor does Plaintiff waive the attorney-client privilege, the protection of attorney work product, the First Amendment privilege or any other privileges or protections with respect to the information called for in the Requests.

The inadvertent production of any document that is confidential, privileged, or protected shall not constitute a waiver of any privilege or any other ground for objecting to discovery with respect to such document, the subject matter thereof or the information contained therein; nor shall such inadvertent production constitute a waiver of Plaintiff's right to demand that such documents be returned or to object to the use of the document or the information contained therein during this proceeding.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

Plaintiff objects to the general date range covered by the Requests of January 1, 2018 through the present, and in some instances from 2014 to the present, to the

extent that such Requests seek information not relevant to any party's claims or defenses in this action, are unduly burdensome, and are disproportionate to the needs of this case.

Plaintiff objects to the definition of "COMMUNICATIONS" as used in these Request to the extent it seeks emails, electronic communications such as text messages, and private social media postings from individuals as unduly burdensome, wherein the burden of such collection would greatly outweigh any potential evidentiary value. Plaintiff further objects to the definition to the extent that it imposes obligations that exceed those imposed by theFederal Rules of Civil Procedure and Local Rules in that the definition includes phrases such as "electronic utterance" and "statement of any nature whatsoever" which are not part of the definition of "document" pursuant to Fed. R. Civ. Pro. 34(a)(1)(A).

Plaintiff objects to the definitions of "IDENTIFY," or "IDENTITY" as used in these Requests is overbroad, vague, compound, and unduly burdensome and imposing obligations that exceed those imposed by the Federal Rules of Civil Procedure and the Local Rules.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify the nature of each Plaintiff's election-related organizational resources, efforts, outreach, and activities implemented *prior to* SB 202. The

response to this Interrogatory should explain how those resources, efforts, outreach, and activities compare as a percentage of each Plaintiff's overall resources, efforts, outreach, and other activities.

## OBJECTIONS TO INTERROGATORY NO. 1:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that the terms, "election-related organizational resources;" "efforts," "outreach," and "activities" are vague and ambiguous.as used in the Interrogatory.

Plaintiff also objects to this Interrogatory on the grounds that it asks Plaintiff to calculate a "percentage of each Plaintiff's overall resources, efforts, outreach, and other activities," for its "election-related organizational resources, efforts, outreach, and activities," when Plaintiff has not made such a calculation heretofore and does not specifically track or categorize its resources, activities, and efforts in a manner that would permit Plaintiff to accurately calculate such a percentage and make the comparison requested in this Interrogatory.

Plaintiff also objects to this Interrogatory on the grounds that the Plaintiff is not seeking monetary relief and, as a result, such a calculation is not relevant to any party's claim or defense.

5

Plaintiff further objects that this Interrogatory calls for information protected by the attorney-client privilege, attorney work product doctrine and/or other applicable privilege.

Plaintiff further objects to this Interrogatory on the grounds that it seeks to compel the disclosure of information that would unduly burden Plaintiff's associational rights protected by the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *NAACP v. Button*, 371 U.S. 415, 429 (1963); *Buckley v. Valeo*, 424 U.S. 1, 64–68 (1976); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1142 & fn. 9 (9th Cir. 2009); *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C.Cir. 2003); *Black Panther Party v. Smith*, 661 F.2d 1243, 1264 (D.C.Cir.1981), *cert. granted and vacated as moot*, 458 U.S. 1118 (1982); *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985).

Plaintiff further objects that this Interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case.

Plaintiff further objects that this Interrogatory is improperly compound.

## RESPONSE TO INTERROGATORY NO. 1:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Prior to the enactment of SB 202, the Georgia NAACP's support of voting rights was central to its mission. The Georgia NAACP has sought to prevent efforts to suppress or disenfranchise African American voters and has been involved in voting rights litigation in Georgia to vindicate their rights.

The Georgia NAACP committed resources to protecting voting rights through legislative advocacy, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, census participation and impact litigation involving voting rights issues prior to the enactment of SB 202. Some of the examples of the non-partisan work of the Georgia NAACP prior to the enactment of SB 202 included without limitation:

- Voter outreach efforts, including voter education on voting in-person during Advance voting, voting by mail and voting in-person on election day; information about the availability of absentee ballot drop boxes during the 2020 election cycle and 2021 Senate runoffs; and information about curing provisional ballot issues.

- GOTV campaigns;

- Text and phone banking programs, including reaching out to voters in Georgia to encourage voter participation and to educate voters and prospective voters about the voting process, including about voting by mail;

7

- Participating in line-relief activities, including by providing food and/or drinks to voters who request such while waiting in long lines to vote and to other persons in the area outside of polling locations during voting;

- Assisting voters who need transportation to the polls for voters on election day; and

- Other programmatic work in support of voting rights in Georgia.

## INTERROGATORY NO. 2:

Identify the nature of each Plaintiff's election-related organizational resources, efforts, outreach, and activities implemented *after* SB 202. The response to this Interrogatory should explain how those resources, efforts, outreach, and activitiescompare as a percentage of each Plaintiff's overall resources, efforts, outreach, and other activities.

## OBJECTIONS TO INTERROGATORY NO. 2:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that the terms, "election-related organizational resources;" "efforts," "outreach," and "activities" are vague and ambiguous.as used in the Interrogatory.

Plaintiff further objects to this Interrogatory on the grounds that it asks Plaintiff to calculate a "percentage of each Plaintiff's overall resources, efforts,

outreach, and other activities," for its "election-related organizational resources, efforts, outreach, and activities," when Plaintiff has not made such a calculation heretofore and does specifically track its resources, activities, and efforts in a manner that would permit Plaintiff to accurately calculate such a percentage and make the comparison requested in this Interrogatory.

Plaintiff also objects to this Interrogatory on the grounds that the Plaintiff is not seeking monetary relief and, as a result, such a calculation is not relevant to any party's claim or defense.

Plaintiff also objects that this Interrogatory calls for information protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff further objects to this Interrogatory on the grounds that it seeks to compel the disclosure of information that would unduly burden Plaintiff's associational rights protected by the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.  WL 315, at *8 (S.D.N.Y. Feb. 28, 1985).

Plaintiff further objects that this Interrogatory is overbroad, unduly burdensome, and not proportional to the needs of the case.

Plaintiff further objects that this Interrogatory is improperly compound.

## RESPONSE TO INTERROGATORY NO. 2:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Since the enactment of SB 202, the Georgia NAACP's support of voting rights continues to be central to its mission and the Georgia NAACP continues to commit resources to protecting voting rights through legislative advocacy, communication, and outreach, including work to promote voter registration, voter education, GOTV efforts, election protection, and impact litigation involving voting rights issues.

However, the enactment of SB 202 has made it more difficult for the Georgia NAACP to carry out its mission of encouraging Black voters, other voters of color and voters in underserved communities to register to vote, vote, and to help protect the rights of other Georgians to vote.

Due to the substantial changes in existing Georgia election law and procedures resulting from the enactment of SB 202, the Georgia NAACP has been forced, and will continue to be forced, to divert resources to educating voters about the negative impacts of SB 202's new changes and restrictions and assisting voters

who encounter these new barriers to the ballot box when attempting to cast their ballots in Georgia's elections.

This new work has included, and will likely continue to include, educating voters about the new substantial burdens on voting by mail, including, but not limited to, the onerous ID requirements for absentee by mail voting, the shortening of the time frame in which voters can apply for an absentee ballot, new restrictions on third parties "handling" completed application forms, new restrictions and prohibitions on third parties and government entities and their employees sending absentee ballot applications to voters; and the revival of the date of birth requirement on return absentee ballot envelopes; the shortening of the time frame between an election and runoff which will make it challenging for voters to vote absentee by mail for runoffs and to register to vote if they did not register prior to the original election that led to the runoff; new limits on the availability of absentee ballot drop boxes which render them essentially useless to voters who cannot access early voting locations during early voting days and times when the drop boxes are available; changes to Advance voting days and hours; the criminalization of line relief activities; new changes to out of precinct voting which arbitrarily disenfranchise voters who go to the wrong precinct before 5:00 pm and cannot get to their correct precinct before the close of polls at 7:00 p.m., advocacy about and assistance to eligible voters negatively impacted by the "unlimited"

11

voter challenges and new voter challenge procedures that have encouraged, and will continue to encourage, unfounded challenges to the eligibility of eligible voters immediately prior to primaries, general elections and runoffs, and other changes to voting procedures and laws as a result of the enactment of SB 202 which have had, and will continue to have, a negative impact on Black voters and voters of color served by the GEORGIA NAACP's programmatic voting rights work and initiatives.

As a result of the changes imposed by SB 202, the Georgia NAACP has, and will continue to have, fewer resources to dedicate its other initiatives, including voter registration drives, GOTV efforts and other projects.

Since the negative impacts and consequences of SB 202 are continuing to emerge with each election cycle, Plaintiff reserves the right to supplement this response as these impacts become known or as circumstances continue to change.

**INTERROGATORY NO. 3:**

Identify each vendor with whom each Plaintiff has contracted since January 1, 2019, for advertisements, Solicitations, electronic communications, or physical mailings.

**OBJECTIONS TO INTERROGATORY NO. 3:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

12

Plaintiff also objects to this Interrogatory on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff further objects to this Interrogatory on the grounds that seeks information about any "vendor" with whom Plaintiff has contracted with since January 1, 2019 which is not relevant to any party's claim or defense, nor is it proportional to the needs of this case.

Plaintiff also objects to this Interrogatory on the grounds that the Interrogatory is overbroad and unduly burdensome.

**INTERROGATORY NO. 4:**

Explain in detail the basis for the claim that each Plaintiff has been and will be required to divert resources because of SB 202's modifications to Georgia's election laws. *See, e.g.*, Compl. ¶¶ 24-27, 39, 40, 45, 46, 52, 58 and 68. In responding to this Interrogatory, please include a list of each activity from which each Plaintiff has diverted resources or will divert resources from because of SB 202, and how SB 202 impacts each Plaintiff's mission such that it cannot fulfill

13

certain aspects of its mission. *See, e.g.*, Compl. ¶¶ 24-27, 39, 40, 43, 45, 46, 52, 58, 68, 221 and 230.

## OBJECTIONS TO INTERROGATORY NO. 4:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff further objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome.

Plaintiff further objects to this Interrogatory on the grounds that the terms, "required," and "each activity or effort" are vague and ambiguous.

Plaintiff also objects to this Interrogatory because it is compound, contains multiple subparts, and purports to impose an obligation on the Plaintiff to prepare a "list" which does not already exist and which is greater or more burdensome than the requirements of the Federal Rules of Civil Procedure and the Local Rules.

Plaintiff also objects to this Interrogatory as duplicative of the information sought by propounding party in Interrogatory No. 2, above. As such, Plaintiff incorporates by reference its response to Interrogatory No. 2 above, as though fully set forth herein.

Plaintiff also objects that this Interrogatory calls for information protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff also objects to this Interrogatory on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff objects to this Interrogatory as premature as discovery is ongoing and the negative consequences and impacts from the enactment of SB 202 are continuing to emerge as this is the first mid-term election since the enactment of the new law and the changes resulting from the enactment of SB 202 will likely impact significantly more voters than in the 2021 municipal and special elections. As such, Plaintiff reserves the right to supplement this response.

## RESPONSE TO INTERROGATORY NO. 4:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Please see the allegations of the First Amended Complaint referred to in Interrogatory No. 4 and Plaintiff's response to Interrogatory No. 2, above, which are incorporated herein by reference as though fully set forth herein.

Additionally, Plaintiff has been forced to allocate more of its resources to the work undertaken in response to the enactment of SB 202, including, but not limited to, staff and volunteer time, from its other initiatives such as voter registration, GOTV and non-election related work.

Since the negative impacts from the enactment of SB 202 are ongoing, Plaintiff anticipates that it will continue to be forced to divert resources in response to the enactment of SB 202 in the future.

**INTERROGATORY NO. 5:**

Identify each and every election-related activity that each Plaintiff has discontinued since SB 202's passage, including an explanation of why Plaintiff can no longer continue that activity, the costs associated with continuing that activity, and all alternatives that each Plaintiff considered in order to continue that election-related activity.

**OBJECTIONS TO INTERROGATORY NO. 5:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that it is compound and overbroad, consists of multiple subparts and as calling for speculation as to future events that have not yet occurred.

16

Plaintiff also objects that this Interrogatory calls for information protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff also objects to this Interrogatory on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at \*8.

## RESPONSE TO INTERROGATORY NO. 5:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Plaintiff will not participate in line-relief activities within the 150-foot electioneering boundary or within 25 feet of voters standing in line due to the criminalization of line-relief activities with the enactment of SB 202.

Plaintiff will also not assist voters who need help copying, scanning, or digitizing completed absentee ballot applications and ID documents to the extent such assistance would require the "handling" of completed absentee ballot application forms for voters who are not disabled or illiterate because

17

SB 202 criminalizes the "handling" of absentee ballot applications by third parties, except for a few limited exceptions.

Since the negative impacts and consequences of the implementation of SB 202 are ongoing, Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 6:**

Identify by name each and every voter (or category of voter) you contend will be disenfranchised by SB 202. For this response, describe in detail how each Challenged Provision of SB 202 will disenfranchise each such voter, and describe every alternative means available for each such voter to cast a vote.

**OBJECTIONS TO INTERROGATORY NO. 6:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff further objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it is a premature request for disclosure of expert witness information prior to the time set for disclosure of expert reports and expert discovery by the Court.

Plaintiff also objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome and calls for responding party to speculate as to future events which have not yet occurred.

Plaintiff also objects to this Interrogatory on the grounds that it requests information in the possession, custody, or control of the defendants, including State and County Defendants, or third parties who are in a better position than Plaintiff to provide the responsive information.

Additionally, Plaintiff objects to this Interrogatory on the grounds that it asks the Plaintiff to speculate about whether and to what extent particular voters or classes of voters are able to vote through unspecified alternative means without knowing the particular circumstances of each such voter.

Plaintiff also objects to this Interrogatory because it improperly includes subparts and is overbroad and unduly burdensome.

Plaintiff also objects that this Interrogatory calls for information protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff also objects to this Interrogatory on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v.*

*Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff further objects to this Interrogatory because the terms, "category of voter" and "every alternative means available" are vague, ambiguous, and overbroad.

**RESPONSE TO INTERROGATORY NO. 6:**

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Plaintiff contends that categories of voters likely to be disenfranchised by SB 202 include, but may not be limited to: voters of color; younger voters; older voters; students; voters at the lower end of the socio-economic scale; voters without internet access, printers, scanners and digital imaging devices and software in their homes or that are otherwise not accessible to them; unhoused voters; voters without a Georgia driver's license, state ID number or Social Security number; rural voters and other voters without access it broadband internet access; and other categories of voters to be determined.

Due to the numerous changes to voting and elections procedures mandated by SB 202, it is impossible at this time to identify every voter or class of voters who has been or will be disenfranchised as a result of the changes brought about by

20

SB 202. These are just some examples of the negative impacts of SB 202 on voters and the potential for disenfranchisement of eligible voters as a result.

Among the changes resulting from the enactment of SB 202 which will likely disenfranchise, or may disenfranchise voters in the future, are:

- The arbitrary and onerous ID requirements for absentee ballot applications and absentee ballot return envelopes;

- The arbitrary and onerous out of precinct voting restrictions;

- The arbitrary and onerous prohibitions on the "handling" of completed absentee ballot applications, particularly for voters needing assistance with printing, copying, and attaching ID documents to the completed application form;

- The arbitrary and unreasonable restrictions on access to absentee ballot drop boxes;

- The arbitrary limitations on the days and times for Advance in-person voting;

- The onerous voter challenge provisions which encourage "unlimited" voter challenges to be submitted, including on the eve of and during elections, with procedures that not only make it difficult for election officials to administer elections while simultaneously having the conduct challenge hearings on shortened notice, but which make it

21

almost impossible for challenged voters to receive adequate notice of the challenges and any reasonable opportunity to respond to them

- The prohibitions on line-relief by non-partisan organizations which disproportionately impact communities of color that more frequently experience long lines and delays at the polls;

- The arbitrary and unreasonable restrictions on the sending of absentee ballot applications to voters by public entities, public officials and third parties;

- The shortening of the period to apply for absentee ballots;

- The shortening of the time between an election and a runoff;

- And other provisions of SB 202 to be determined.

Because the negative impacts and consequences of SB 202 are continuing to emerge, Plaintiff reserves the right to supplement this response as additional facts become known.

**INTERROGATORY NO. 7:**

Identify the nature of each Plaintiff's organizational resources, efforts, outreach, and activities implemented prior to SB 202 to provide food, water or other items to voters waiting in line. The response to this Interrogatory should include an explanation of the frequency with which Plaintiffs provided food and water and an explanation of how such food and water was distributed to voters.

22

## OBJECTIONS TO INTERROGATORY NO. 7:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff further objects to this Interrogatory on the grounds that the terms "election-related organizational resources;" "efforts," "outreach," and "activities" are vague and ambiguous as used in the Interrogatory.

Plaintiff also objects that this Interrogatory calls for information protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff also objects to this Interrogatory on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama,* 357 U.S. at 462; *NAACP v. Button,* 371 U.S. at 429; *Buckley v. Valeo,* 424 U.S. at 64–68; *Perry v. Schwarzenegger,* 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC,* 333 F.3d at 175; *Black Panther Party v. Smith,* 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee,* 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

## RESPONSE TO INTERROGATORY NO. 7:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

23

Prior to the 2020 election cycle, Plaintiff participated in line-relief involving the provision and food and/or drink to voters and other individuals in the area outside polling locations predominantly at precincts in communities of color. The frequency of this activity varied, depending upon a number of factors, such as the length of the lines at a polling location; weather conditions; availability of volunteers and staff to participate in this activity; and other factors.

Plaintiff's line-relief activities were carried out primarily in 19 counties in 2020 which, collectively, had about 80% of the Black voter population in Georgia.

The Georgia State Conference of the NAACP's non-partisan line relief efforts were offered to the recipients without regard to status as voters and without regard to the political affiliation of the voters.

**INTERROGATORY NO. 8:**

Explain in detail the legislative process that Plaintiffs contend should have governed SB 202's consideration and passage and all evidence supporting Plaintiffs' contention that such legislative process is more typical than the legislative process that applied to SB 202." *See* Compl. ¶¶ 118-132.

**OBJECTIONS TO INTERROGATORY NO. 8:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the date set for disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects to this Interrogatory on the grounds that the information sought is within the possession, custody and control of Defendants, Defendant-Intervenors, members of the Georgia General Assembly, their staff, and third parties who likely have better and less burdensome access to the information than does responding party.

Plaintiff objects to the Interrogatory on grounds that it is a premature contention Interrogatory that seeks a comprehensive identification of relevant facts before the close of discovery. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff also objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome.

Plaintiff also objects to this Interrogatory on the grounds that the inclusion of multiple paragraphs of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraphs, is vague and ambiguous.

25

Plaintiff further objects to this Interrogatory on the grounds that it contains improper subparts.

## RESPONSE TO INTERROGATORY NO. 8:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Paragraphs 118-132 of the Amended Complaint, which are incorporated herein by reference, allege facts supporting Plaintiff's contention that the why the legislative process applied to SB 202 was "irregular."

Additionally, the Georgia House created a new, "Special Committee on Election Integrity," in the wake of false claims that the 2020 presidential election in Georgia was "stolen" and plagued with massive "voter fraud" to marshal SB 202 and other voting and election bills through the legislative process.

After SB 202, initially received by the House Special Committee on Election Integrity as a two-page bill when it passed out of the Senate, the bill was rushed through the House committee with little opportunity for the committee members and general public to review it before it rapidly evolved into the 98-page final version that was voted out of the House. Other voting and election bills introduced during the 2021 session, including SB 241 and HB 531, were subjected to similarly irregular processes.

26

The written record of the legislative history, the General Assembly's video recordings of the committee hearings, and the floor debates on SB 202, indicate that any meaningful review of the bills by members of the General Assembly and the public, as well as proposed amendments and their impacts, was challenging at best. In fact, in some instances, amendments and proposed substitute bills were not made available to legislative committee members or the general public prior to the commencement of hearings on the bills.

Additionally, the hearings on SB 202, SB 241, HB 531, and other voting-related bills were designed to limit public participation. Some hearings were held as early as 7:00 a.m. or continued after 5:00 p.m., a significant departure from typical hearing times for legislative sessions.

Some of the hearings were not broadcast on the General Assembly's live stream or recorded, preventing members of the public from watching remotely, despite the ongoing COVID-19 pandemic. It was also unclear what procedures or accommodations would be made to allow participation by members of the public at the hearings in person or remotely. Those who were able to speak during some of the hearings were often given little time to do so, despite the large number of provisions of SB 202.

Moreover, SB 202 was rushed through committee hearings and to final votes by each chamber without any kind of fiscal analysis of its impact. In fact, no fiscal

analysis was conducted on SB 202 or on any of the other voting-related bills that were considered during the 2021 legislative session, even though some legislators and members of the public raised this issue during hearings on the bills.

Since discovery has just recently commenced and relevant information is within the possession, custody and control of Defendants, members of the General Assembly, Defendant-Intervenors, their staff and third parties, Plaintiff reserves the right to supplement and amend its response to this Interrogatory through the close of discovery.

**INTERROGATORY NO. 9:**

Explain in detail the basis for claiming that voter fraud is a "disproven myth". Compl. ¶ 132.

**OBJECTIONS TO INTERROGATORY NO. 9:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that propounding parties have access to ample evidence dispelling the myth that the 2020 election in Georgia was "stolen" as a result of "voter fraud" and that propounding party, Defendant Raffensperger, has repeatedly so admitted.

Plaintiff objects to the Interrogatory on grounds that it is a premature contention Interrogatory that seeks a comprehensive identification of relevant facts before the close of discovery. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that there is also ample evidence in the public domain supporting the Plaintiff's contention in this regard which is equally available to propounding parties as well as evidence in the possession, custody, and control of propounding parties regarding the audits and investigations conducted after the 2020 general election which also dispel the myth that the election was "stolen" and that the results were the product of voter fraud.

Plaintiff also objects to this Interrogatory on the grounds that it calls for the premature disclosure of expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

## RESPONSE TO INTERROGATORY NO. 9:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

There is ample evidence that allegations of Georgia's 2020 presidential election being "stolen" and that the outcome of the election was the product of "voter fraud," have been dispelled by many credible sources, including by propounding party, Defendant Brad Raffensperger, and other Georgia officials, including, but not limited to, Lt. Governor, Geoff Duncan, Gabriel Sterling, Chris

29

Harvey, and others. *See, e.g.,* Alison Durkee, *Georgia Recertifies Biden's Win After Trump-Ordered Recount Fails Again,* December 7, 2020, Forbes, available at: https://www.forbes.com/sites/alisondurkee/2020/12/07/georgia-to-recertify-biden-win-election-results-after-trump-ordered-recount-fails-again/?sh=3da3b050679a (last checked May 14, 2022); New Day, *Georgia's Lt. governor says elections law was a result of Trump's misinformation,* CNN, April 7, 2021, available at: https://www.cnn.com/videos/politics/2021/04/07/lieutenant-governor-geoff-duncan-georgia-elections-law-newday-vpx.cnn (last checked May 14, 2022); CNN Politics, *We've got an HR problem': Lieutenant governor on Trump's influence on GOP*, CNN, September 21, 2021, available at: https://www.cnn.com/videos/politics/2021/09/25/geoff-duncan-donald-trump-republican-party-sot-vpx-nr.cnn (last checked May 14, 2022); Miles Parks, "Georgia Election Official: Don't Let Misinformation 'Suppress Your Own Vote, National Public Radio, January 4, 2021, available at: 'https://www.npr.org/2021/01/04/953321408/georgia-election-official-dont-let-misinformation-suppress-your-own-vote (last checked, May 14, 2022); Deposition of Christopher Harvey as the F.R.Civ.P. 30(b)(6) witness for the office of the Georgia Secretary of State in *Georgia Coalition for the People's Agenda, Inc. v. Raffensperger*, U.S. District Court for the Northern District of Georgia, Case No. 1:18-CV-04727-ELR, April 30, 2021, including, but not limited to, pages 160-162.

Former United States Attorney General, William Barr, conceded that the Department of Justice found no evidence of widespread election fraud in the 2020 presidential election. Katie Benner and Michael S. Schmidt, *Barr Acknowledges Justice Dept. Has Found No Widespread Voter Fraud*, NYT, updated December 14, 2020, available at: https://www.nytimes.com/2020/12/01/us/politics/william-barr-voter-fraud.html (last checked May 14, 2022).

Officials with the United States Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, Election Assistance Commission, National Association of Secretaries of State, and others issued a joint statement on November 12, 2020, stating, *inter alia*, that "[t]he November 3rd election was the most secure in American history "and "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." *See* Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees, November 12, 2020, available at: https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (last checked, May 14, 2022).

Since the November 3, 2020 general election and January 5, 2021 Senate runoff elections, numerous reports and articles have debunked the myth that Georgia's elections were "stolen" and that the outcomes of these elections were the

31

product of massive voter fraud.  *See*, e.g., The Brennan Center for Justice, *Refuting the Myth of Voter Fraud Yet Again*, January 6, 2021, available at:

https://www.brennancenter.org/our-work/research-reports/refuting-myth-voter-fraud-yet-again (last checked, May 14, 2022); David Wickert,  *Judge: Perdue's election fraud claims are 'conjecture and paranoia,'* Atlanta Journal Constitution, May 12, 2022, available at:  https://www.ajc.com/politics/election/judge-perdues-election-fraud-claims-are-conjecture-and-paranoia/NDHMOFOZO5AM5LNWJULAAEZJUY/ (last checked May 14, 2022);

Jim Rutenberg, Nick Corasaniti and Alan Feuer, *Trump's Fraud Claims Died in Court, but the Myth of Stolen Elections Lives On*, NYT, updated October 11, 2021, available at:

https://www.nytimes.com/2020/12/26/us/politics/republicans-voter-fraud.html; Aaron Blake, *A conservative group debunks Trump's voter-fraud claims (yet again)*, Washington Post, December 9, 2021, available at:

https://www.washingtonpost.com/politics/2021/12/09/trumps-voter-fraud-myth-dies-another-death-conservative-group-debunks-it-again/ (last checked May 14, 2022); Ronald Brownstein, *The 'urban myth' behind the GOP claims of voter fraud*, CNN, December 15, 2020, available at:

https://www.cnn.com/2020/12/15/politics/voter-fraud-urban-myth/index.html (last

checked May 14, 2022); William Vaillancourt, *OAN Finally Admits 'No Widespread Voter Fraud' After Settling Defamation Suit, The* Daily Beast, May 10, 2022, available at: https://www.thedailybeast.com/oan-finally-admits-no-widespread-voter-fraud-by-georgia-election-workers-after-settling-defamation-lawsuit (last checked May 14, 2022).

There are numerous other reports and articles in the public domain equally available to propounding party which dispel the myth of voter fraud in the 2020 Georgia presidential election. Plaintiff reserves the right to supplement and amend this response with additional evidence and information dispelling the myth of voter fraud in Georgia elections, including expert analysis.

**INTERROGATORY NO. 10:**

Identify each organization and individual prohibited from commenting as described in Compl. ¶ 125, 127.  For each such organization and individual, identify the specific reason why he or she was not allowed to comment.

**OBJECTIONS TO INTERROGATORY NO. 10:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that it calls for information within the possession, custody and control of propounding party,

members of the Georgia General Assembly and/or third parties who have equal or better access to this information.

Plaintiff further objects to this Interrogatory on the grounds that it calls for responding party to speculate as to all the persons who were denied the opportunity to offer testimony about SB 202 because of the Chair's position that virtual testimony by members of the public would require an invitation from a member of the committee.

Plaintiff also objects to this Interrogatory on the grounds that it contains improper subparts.

**RESPONSE TO INTERROGATORY NO. 10:**

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

During the Special Committee on Election Integrity meeting on March 18, 2021, while the COVID-19 pandemic was continuing to impact Georgia, Chair Barry Fleming, stated that in order for members of the public to virtually comment in SB 202 via Zoom would require a request from a committee member, even though there was no public notice informing members of the public that virtual testimony would only be allowed if requested by a member of the committee.

Responding party is informed and believes that a member or members of the public would have offered comment at this hearing remotely but were denied the

34

opportunity to do so because of the unwritten procedure that the Chair of the committee stated would be required for virtual testimony. See the official video recording of the March 18, 2021 Special Committee on Election Integrity: https://www.youtube.com/watch?v=Ato_5LqkBG8&list=PLIgKJe7_xdLV_T8Uko YPYEmdWjOBYZDEq&index=378.

During the March 22, 2021, Special Committee on Election Integrity, Chair Barry Fleming, refused to take public comment on a substitute and amendments to SB 202 that were introduced after the previous March 18, 2021 committee meeting. See the official video recording of the March 22, 2021 Special Committee on Election Integrity: https://www.youtube.com/watch?v=kpDX4kpJ3NQ&list=PLIgKJe7_xdLV_T8Uk oYPYEmdWjOBYZDEq&index=379.

Since the Chair refused to permit any member of the public to comment on SB 202 during the March 22, 2021 meeting, it would require responding party to speculate as to all of the members of the general public who would have offered public comment, in-person or virtually, but for the refusal of the Chair to take public comment at this meeting. As a result of the Chair's refusal to permit public comment at this meeting, none of the Plaintiffs were allowed to present public testimony at this meeting.

Plaintiff reserves the right to amend and/or supplement this answer as additional information becomes available to responding party.

## INTERROGATORY NO. 11:

Explain in detail the roles and responsibilities of each State Defendant named in this lawsuit with respect to each of the Challenged Provisions outlined in the Complaint.

## OBJECTIONS TO INTERROGATORY NO. 11:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff also objects to this Interrogatory because it seeks information that is within State Defendants' possession and is equally (if not more) accessible to State Defendants.

Plaintiff objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff objects to this Interrogatory on the grounds that the phrase "detail the roles and responsibilities of each State Defendant named in this lawsuit with respect to each of the Challenged Provisions outlined in the Complaint" is vague, ambiguous, and overbroad.

## RESPONSE TO INTERROGATORY NO. 11:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Georgia sets forth the duties of the State Election Board as follows:

(1) To promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections;

(2) To formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent;

(3) To publish in print or electronically and furnish to primary and election officials, from time to time, a sufficient number of indexed copies of all primary and election laws and pertinent rules and regulations then in force;

(4) To publish in print or electronically and distribute such explanatory pamphlets regarding the interpretation and application of primary and election laws as in the opinion of the board should be distributed to the electorate;

(5) To investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds

and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution. Nothing in this paragraph shall be so construed as to require any complaining party to request an investigation by the board before such party might proceed to seek any other remedy available to that party under this chapter or any other provision of law;

(6) To make such recommendations to the General Assembly as it may deem advisable relative to the conduct and administration of primaries and elections;

(7) To promulgate rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state;

(8) To employ such assistants as may be necessary;

(9) Subject to funds being specifically appropriated by the General Assembly, to formulate and conduct a voter education program concerning voting procedures for voting by absentee ballot and at the polls with particular emphasis on the proper types of identification required for voting; and

(10) To take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections.

O.C.G.A. § 21-2-31.

38

Georgia law also identifies Defendant Raffensperger as the State's "chief elections official" (O.C.G.A. § 210) and provides that the Secretary of State is responsible for the administration and implementation of election laws in Georgia, including SB 202. O.C.G.A. §§ 21-2-50.

Georgia law also provides that the SEB has the authority to issue administrative orders directing local election officials to comply with Georgia election law and penalizing violations thereof, including by suspending and replacing the noncomplying official. *See*, e.g., O.C.G.A. §§ 21-2-33.1(a), (f); 21-2-33.2.

The SEB also has the authority under Georgia law to commence litigation itself or by referral of the Georgia Attorney General to compel local election officials' compliance with state election law. *See*, e.g., O.C.G.A. §§ 21-2-32, 21-2-33.1(c).

SB 202 also gives enforcement power SEB to compel county compliance with the new voter challenge provisions. SB 202, §§ 15, 16.

Additionally, certain provisions of SB 202 refer to specific duties and responsibilities of the State Election Board or the Secretary of State, including without limitation SB 202 Sections 5, 6, 7, 8, 9, 10, 12, 15, 16, 17, 18, 21, 21A, 23A, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 38B, 41, 42, 50.

Subject to continuing discovery, some or all of the duties and roles of Defendant Raffensperger and/or Defendant members of the State Election Board, may impact the Challenged Provisions alleged in Plaintiffs' Amended Complaint, including, but not limited to, the challenges concerning absentee ballots and absentee ballot applications; absentee ballot drop boxes changes; out of precinct voting changes; early voting changes; runoff election changes; and takeover provisions concerning county election boards and supervisors of elections.

**INTERROGATORY NO. 12:**

Explain in detail the roles and responsibilities of each State Defendant that you contend has resulted or will result in long lines at polling locations in the Complaint.

**OBJECTIONS TO INTERROGATORY NO. 12:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff also objects to this Interrogatory because it calls for information known to propounding parties and because it is equally, if not more so, accessible to them.

Plaintiff further objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts

before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the time for disclosure of expert witness reports and expert discovery set by the Court.

Plaintiff also objects to this Interrogatory on the grounds that it is vague and ambiguous to the extent that it demands that Plaintiff "explain" the "roles and responsibilities" of the propounding parties that have or will result at some future unspecified time in long lines at polling locations.

Plaintiff also objects to this Interrogatory on the grounds that it calls for Plaintiff to speculate about future events which have not yet occurred.

## RESPONSE TO INTERROGATORY NO. 12:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Plaintiff incorporates herein by reference its response to propounding parties' Interrogatory No. 11, above, which describes, *inter alia*, the State Defendants' roles and responsibility in the fair and legal administration of elections.

the roles and responsibilities of the State Election Board members and Secretary of State in the enforcement of certain provisions of SB 202 will make it

41

more likely more voters will vote in-person and contribute to more longer lines and delays, including:

- Changes to the absentee ballot application process and deadlines;

- Changes to the return envelope and instructions for voting absentee by mail ballots;

- Changes to the availability of absentee ballot drop boxes;

- Changes to Advance voting times and dates;

- Changes to out of precinct voting rules which will likely result in long lines at the polls as poll officials are forced to spend more time with voters arriving both before and after 5:00 p.m. and need additional instructions about having to go to their correct poll location or when persons arriving after 5:00 p.m. must sign a sworn statement attesting that they cannot get to their correct poll;

- Changes to the procedures for extending poll hours which will likely force voters to remain in long lines while county officials attempt to secure court orders extending voting hours;

- SB 202's changes to voter challenges are also likely to lead to or contribute to long lines at the polls when poll officials are forced to spend otherwise unnecessary time having to adjudicate more challenges to the qualifications of voters at the polls.

42

- SB 202's limitations on mobile voting units are also likely to lead or contribute to long lines in Fulton and Douglas Counties (the two counties which have acquired mobile voting units to date) because they cannot be used for their intended purposes of ameliorating problems at the polls which contribute to long lines and delays, including, but not limited to, the loss of power or other problems at polling sites; insufficient staff or voting machines at polling sited; voting machine, poll pad or other equipment malfunctions; ballot coding errors; and other events that have occurred and may continue to occur in the future at polling sites.

Because the impacts of SB 202 on voters and Georgia election administrators are continuing to emerge, Plaintiff reserves the right to amend or supplement this response as additional information becomes known.

**INTERROGATORY NO. 13:**

Explain in detail the basis for claiming that Black voters and voters of color will be "negatively impacted" by the Challenged Provisions of SB 202. Compl. ¶¶ 22, 161 and 163.

**OBJECTIONS TO INTERROGATORY NO. 13:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff also objects to this Interrogatory because it calls for information known to propounding parties and because it is equally, if not more so, accessible to them.

Plaintiff also objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the time set for disclosure of expert reports and expert discovery by the Court.

Plaintiff also objects to this Interrogatory on the grounds that the inclusion of multiple paragraphs of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraphs is vague and ambiguous.

Plaintiff further objects to this Interrogatory on the grounds that it contains multiple, improper subparts.

Plaintiff also objects to this Interrogatory on the grounds that it calls for Plaintiff to speculate about future events which have not yet occurred.

## RESPONSE TO INTERROGATORY NO. 13:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

Throughout the Amended Complaint, Plaintiff has explained how Black voters and voters of color will be negatively impacted by Challenged Provisions of SB 202. *See*, e.g., without limitation: allegations of the Amended Complaint concerning changes to procedures for absentee by mail voting; changes to the availability of drop boxes; changes to early voting times and days; the compressed time for voters to apply for absentee ballots; the compressed time for Advance in-person and mail voting between an election and a runoff when a candidate does not receive over 50% of the vote share; changes to the law regarding out of precinct voting; changes to the law on mobile voting units; criminalization of line-relief; removal of the voting power of the Secretary of State on the State Election Board and the provisions which allow for the take-over of county election boards and county supervisors of election roles which have been, and will likely be in the future, focused upon jurisdictions which large percentages of voters of color, such as Fulton County; unlimited voter challenges and changes to the procedures governing such challenges.

The specific paragraphs of the Amended Complaint cited in the Interrogatory also explain how Black voters and voters of color will be negatively impacted by Challenged Provisions of SB 202, including ¶¶ 22 (changes to mail

voting procedures, absentee ballot drop boxes access, changes to early voting dates and times, and out of precinct voting); 161 (referring to communities of color being subjected to more frequent polling location changes and consolidations and making such voters more likely to be impacted by the changes to out of precinct voting under SB 202); and 163 (referring to take-over provisions of SB 202 more likely to negatively impact voters of color because of the likelihood such takeover provisions will target counties with larger percentages of voters of color, such Fulton County, which is currently under review pursuant to the take-over provisions.

Because the negative impacts of SB 202 on Black voters and voters of color are continuing to emerge, Plaintiff reserves the right to amend or supplement this response as additional information becomes known.

## INTERROGATORY NO. 14:

Explain in detail how each Challenged Provision results in the denial of "voters of color full and equal access to the political process." Compl. ¶ 194.

## OBJECTIONS TO INTERROGATORY NO. 14:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory because it misrepresents the allegations of paragraph 194 of the Amended Complaint.

46

Plaintiff also objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the time set for disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects to this Interrogatory on the grounds that the inclusion of a reference to a paragraph of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraph, is vague and ambiguous.

Plaintiff also objects to this Interrogatory on the grounds that it calls for Plaintiff to speculate about future events which have not yet occurred.

**RESPONSE TO INTERROGATORY NO. 14:**

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

The specific allegation of paragraph 194 of the Amended Complaint states: "The challenged provisions of SB 202 violate the rights of Plaintiffs because they were adopted for the purpose of denying voters of color full and equal access to the political process."

47

This specific paragraph is directed at the legislative purpose, not does not allege as stated in the Interrogatory that each Challenged Provision of SB 202 "results in the denial of "voters of color full and equal access to the political process." Therefore, Plaintiff cannot respond to this Interrogatory as phrased because it misrepresents the allegations of paragraph 194 of the Complaint.

Notwithstanding propounding party's misrepresentation of the allegations of paragraph 194, Plaintiff notes that throughout the Amended Complaint, including, but not limited to, in paragraphs 133-189 and in Counts I and II, Plaintiff has explained how voters of color will be negatively impacted by Challenged Provisions of SB 202 and, as a result, will not have full and equal access to the political process in Georgia. *See*, e.g., without limitation: allegations of the Amended Complaint concerning changes to procedures for absentee by mail voting; changes to the availability of drop boxes; changes to early voting times and days; the compressed time for voters to apply for absentee ballots; the compressed time for Advance in-person and mail voting between an election and a runoff when a candidate does not receive over 50% of the vote share; changes to the law regarding out of precinct voting; changes to the law on mobile voting units; criminalization of line-relief; removal of the voting power of the Secretary of State on the State Election Board and the provisions which allow for the take-over of county election boards and county supervisors of election roles which have been,

48

and will likely be in the future, focused upon jurisdictions which large percentages of voters of color, such as Fulton County; unlimited voter challenges and changes to the procedures governing such challenges.

Because the negative impacts of SB 202 on voters of color are continuing to emerge, Plaintiff reserves the right to amend or supplement this response as additional information becomes known.

**INTERROGATORY NO. 15:**

Explain in detail how each Challenged Provision will disproportionately affect Black voters and voters of color. For each Challenged Provision, the response to this Interrogatory should explain in detail why each "disproportionately" affected voter may not vote by other available means. *See*, e.g., Compl. ¶¶ 5, 140, 145, 146, 150, 151, 155, 156, 157, 161, 163, 167, 169, 195.

**OBJECTIONS TO INTERROGATORY NO. 15:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that the phrase, "explain in detail why each "disproportionately" affected voter may not vote by other available means," is vague, ambiguous, and overbroad.

Plaintiff also objects to this Interrogatory on the grounds that it is asking Plaintiff to speculate about future events that have not yet occurred.

Plaintiff objects to this Interrogatory because the paragraphs of the Amended Complaint referred to in the Interrogatory do not specifically allege that voters will in all cases be prevented from voting by alternative means.

Plaintiff also objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it is a premature request for expert witness information prior to the time set for disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects to this Interrogatory on the grounds that the inclusion of multiple paragraphs of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraphs is vague and ambiguous.

Further, Plaintiff objects to this Interrogatory on the grounds that it contains multiple improper subparts.

**RESPONSE TO INTERROGATORY NO. 15:**

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

50

Throughout the Amended Complaint, Plaintiff explains how Black voters and other voters of color are impacted by challenged provisions of SB 202. For example, in paragraph 5, Plaintiff alleges that Black votes and other voters of color stand to be disproportionately impacted by the criminalization of line-relief because they are more frequently impacted by long lines and delays at the polls. In paragraphs 140 and 145 of the Amended Complaint, and in preceding and subsequent paragraphs of the Amended Complaint, Plaintiff explains how Black voters and voters of color are likely to be disproportionally impacted by SB 202's changes concerning absentee by mail voting.

In paragraphs 145-160 of the Amended Complaint, Plaintiff explains how Black voters and voters of color are likely to be disproportionately impacted by SB 202's changes to procedures concerning absentee ballot applications and the return of mail ballots; changes which compress the time for voters to apply for absentee ballots and between an election and runoff; changes to Advance in-person times and days; changes to the accessibility of absentee ballot drop boxes; and out of precinct voting procedures. Also see, paragraphs 133-189 and Counts I and II of the Amended Complaint which explain how SB 202's changes have affected, or are likely to, effect Black voters and other voters of color.

Plaintiff has not specifically alleged in the Amended Complaint that the disproportionately affected voters may not vote by other available means.

51

Additionally, Plaintiff would have to speculate as to the specific circumstances of each disproportionately affected voters as to and to what extent they would be unable vote by "other available means."

Plaintiff does note, however, that voters who are faced with certain challenges, such as being unable to vote in person on election day or during Advance voting (including being unable to access absentee ballot drop boxes during Advance voting dates and times); voters who are unable to endure long lines and delays at the polls because of lack of access to food or water and have to leave the line and cannot return before the close of polls on election day; voters who are unable to cure alleged deficiencies with their absentee ballot applications or ballots within three days of the election; voters who are disenfranchised because they go to the incorrect precinct before 5:00 p.m. and cannot get to their correct precinct before the close of polls on election day; and for other reasons may not have viable alternative means to vote and will be disenfranchised.

Because the negative impacts of SB 202 on voters of color are continuing to emerge, Plaintiff reserves the right to amend or supplement this response as additional information becomes known.

**INTERROGATORY NO. 16:**

Identify in detail all First Amendment activity that you contend is restricted by SB 202 on "Plaintiffs' and their members' core political speech and expressive

conduct". *See* Compl. ¶¶ 219, 225. The response to this Interrogatory should identify in detail the types of speech that Plaintiffs (or their representatives) engage in with voters. *See* Compl. ¶¶ 219, 225.

## OBJECTIONS TO INTERROGATORY NO. 16:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds that the inclusion of multiple paragraphs of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraphs is vague and ambiguous.

Plaintiff also objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it contains improper subparts.

Plaintiff further objects to this Interrogatory on the grounds that it calls for the premature disclosure of expert witness information prior to the time set for disclosure of expert reports and expert testimony by the Court.

Plaintiff also objects to this Interrogatory on the grounds that the paragraphs of the Amended Complaint referenced in the Interrogatory are incomplete excerpts of those paragraphs and the additional allegations of the paragraphs explain the bases of Plaintiff's claims.

For example, paragraphs 219 and 225 of the Amended Complaint allege respectively, "SB 202 violates Plaintiffs' First and Fourteenth Amendment rights by restricting Plaintiffs' and their members' core political speech and expressive conduct—namely, encouraging voting through the distribution of absentee ballot applications in an effort to engage the public and voters and encourage them to vote" and "[t]he provision of SB 202 that criminalizes "line warming activities" will chill protected expressive conduct and speech that supports of the act of voting by exposing to criminal prosecution those who provide sustenance to voters waiting in long lines."

**RESPONSE TO INTERROGATORY NO. 16:**

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

In paragraphs 219 and 225 of the Amended Complaint, Plaintiff alleges respectively, "SB 202 violates Plaintiffs' First and Fourteenth Amendment rights by restricting Plaintiffs' and their members' core political speech and expressive conduct—namely, encouraging voting through the distribution of absentee ballot

applications in an effort to engage the public and voters and encourage them to vote" and "[t]he provision of SB 202 that criminalizes "line warming activities" will chill protected expressive conduct and speech that supports of the act of voting by exposing to criminal prosecution those who provide sustenance to voters waiting in long lines."

Because the negative impacts of SB 202 are continuing to emerge, Plaintiff reserves the right to amend this response as additional information and discovery becomes available.

## INTERROGATORY NO. 17:

Identify in detail all First Amendment activity that you contend is restricted by SB 202's prohibition on providing items of value to individuals waiting in line to vote or conducting "line warming activities". *See* Compl. ¶ 228. The response to this Interrogatory should identify in detail the types of speech that Plaintiffs (or then· representatives) engage in with voters in line while conducting "line warming activities." *See* Compl. ¶ 228.

## OBJECTIONS TO INTERROGATORY NO. 17:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Interrogatory on the grounds propounding party misrepresents the allegations of ¶ 228 of the Amended Complaint. Specifically, ¶228 does not refer to "providing items of value" as stated in this Interrogatory.

Plaintiff further objects to this Interrogatory on the grounds that it is argumentative with the addition of this language.

Plaintiff also objects to this Interrogatory on the grounds that the phrase, "types of speech" as used in this Interrogatory is vague and ambiguous.

Plaintiff objects to this Interrogatory on the grounds that the inclusion of a paragraph of the Amended Complaint, without referencing what is specifically being asked of Plaintiff with respect to said paragraph is vague and ambiguous.

Plaintiff also objects to this Interrogatory on the grounds that it is a premature contention interrogatory which seeks a comprehensive statement of facts before the close of discovery and when discovery is ongoing. *See*, Fed. R. Civ. P. 33(a)(2).

Plaintiff further objects to this Interrogatory on the grounds that it contains improper subparts.

## RESPONSE TO INTERROGATORY NO. 17:

Subject to the Objections to Instructions and Definitions and the specific objections to this Interrogatory set forth above, Plaintiff responds as follows:

By its terms, SB 202 targets both speech ("offering" to give) and expressive conduct (providing sustenance to voters waiting in long lines that voters would understand as a message of support to all voters who are exercising their right to vote). Under the threat of criminal penalties, SB 202 prohibits donations of water, food, PPE, or other comfort items to persons within the 150-foot electioneering boundary outside of a polling location as well as within 25 feet of a voter standing in line, regardless of whether those persons are voters or not, by non-partisan organizations and individuals who are not engaged in electioneering activities on behalf of a candidate or campaign.

**INTERROGATORY NO. 18:**

Explain in detail the method by which the Lower Muskogee Creek Tribe determined that its members "are likely to be affected by SB 202's cutback on voting by mail and criminalization of providing food and water to voters in line at the polls." Compl. ¶ 59.

**OBJECTION TO INTERROGATORY NO. 18:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff also objects to this Interrogatory on the grounds that it lacks sufficient knowledge to respond to this Interrogatory which is directed at a different Plaintiff in this action.

57

## RESPONSES TO REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1:

All documents referenced in the responses to the foregoing interrogatories.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "referenced" is vague, ambiguous, and potentially overbroad. Plaintiff also incorporates the Objections to Interrogatories.

Plaintiff will construe the request to seek those documents specifically identified in Plaintiff's responses to the foregoing interrogatories to the extent that they are in the possession, custody, or control of Plaintiff, with the exception of documents which are hyperlinked in the Responses and therefore available to the propounding party, and Plaintiff will produce such documents.

## REQUEST FOR PRODUCTION NO. 2:

All documents reflecting Plaintiffs' corporate by-laws.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the time frame for the request, which precedes the events leading to and following the enactment of SB

58

202, seeks documents which are not relevant to any of the claims or defenses of the parties in this action.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents reflecting" Plaintiff's corporate by-laws.

Plaintiff also objects to this Request on the grounds that the phrase, "reflecting Plaintiffs' corporate by-laws" is vague and ambiguous. Plaintiff will interpret the request to seek only documents about its own corporate by-laws and not the corporate by-laws of other Plaintiffs.

Plaintiff will produce its corporate by-laws in effect as of the date of these responses. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 3:**

All documents reflecting each Plaintiff's articles of incorporation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the phrase, "reflecting each Plaintiff's articles of incorporation," is vague and ambiguous.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents reflecting" Plaintiff's articles of incorporation.

Plaintiff also objects to this Request on the grounds that the time frame for the request, which precedes the events leading to and following the enactment of SB 202, seeks documents which are not relevant to any of the claims or defenses of the parties in this action.

Plaintiff will produce a copy of its articles of incorporation in effect as of the date of these responses.  Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 4:**

All documents that reflect corporate resolutions approved by each Plaintiff's board of directors or similar authorizing entity, that relate in any way to this litigation or to determining how each Plaintiff will allocate its resources for activities related to each of the Challenged Provisions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

60

Plaintiff objects to the phrase "relate in any way to this    litigation or to determining how each Plaintiff will allocate is resources for activities related to each of the Challenged Provisions" because it is vague and ambiguous.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents . . . that relate in any way."

Plaintiff also objects to this Request on the ground that by seeking documents that "relate in any way to . . . this litigation" the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

61

Plaintiff will produce final corporate resolutions that reflect any diversion of resources as a result of SB 202.  Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 5:**

All documents that reflect minutes of each Plaintiff's corporate meetings and meetings of each Plaintiff's board of directors or similar authorizing entity that relate in anyway to this litigation or to determining how each Plaintiff will allocate its resources for activities related to each of the Challenged Provisions.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to the phrase "relate in any way to this litigation or to determining how each Plaintiff will allocate is resources for activities related to each of the Challenged Provisions," because it is vague and ambiguous.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents . . . that reflect."

62

Plaintiff also objects to this Request on the ground that by seeking documents that "relate in any way to . . . this litigation" the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 6:**

All documents that describe the roles of each corporate office position of Plaintiff (e.g., chairman, president).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the phrase "all documents that describe the roles…" is vague and ambiguous.

Plaintiff also objects to this Request on the grounds that the time frame for the request, which precedes the events leading to and following the enactment of SB 202, seeks documents which are not relevant to any of the claims or defenses of the parties in this action.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce its Constitution in effect as of the date of these responses.  Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states

that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 7:**

All documents that reflect each Plaintiff's Form 990 tax returns for every year from 2014 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the time frame for the Request (from 2014 to the present), precedes the events leading to and following the enactment of SB 202 and seeks documents which are not relevant to any of the claims or defenses of the parties in this action.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents that reflect Plaintiff's Form 990 tax returns."

Plaintiff will produce publicly available IRS Form 990's for the tax years of 2018 through 2021 to the extent that they have been filed by responding party and are not subject to a filing extension. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 8:**

All documents reflecting the amount of each Plaintiff's annual budget or expenditures that supports each Plaintiff's election-related initiatives in Georgia for every year from 2014 to the present.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request because the terms, "all documents reflecting the amount," and "annual budget and expenditures that supports each Plaintiff's election-related initiatives" are vague and ambiguous.

Plaintiff also objects to this Request on the grounds that the time-frame for the Request (2014 to the present) is overbroad, unduly burdensome and seeks documents not relevant to the claims or defenses of the parties in this action.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and

donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee, 75 CIV. 5388 (MJL), 1985 WL 315, at \*8.*

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 9:

All documents identifying how each Plaintiff, prior to SB 202, used its resources to assist eligible voters in Georgia to comply with Georgia's election laws.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to the term "used its resources to assist eligible voters in Georgia to comply with Georgia's election laws" because it is vague, and ambiguous.

Plaintiff also objects to this Request on the grounds that is overbroad, unduly burdensome and seeks documents not relevant to the claims or defenses of the parties in this action in that it is not limited in time.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 10:

All documents that demonstrate the amount and types of resources each Plaintiff has been diverting or will be required to divert because of the Challenged Provisions.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to the phrase "demonstrate the amount and types of resources" because it is vague and ambiguous.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce documents that show how the Challenged Provisions have burdened and will continue to burden Plaintiff's work, initiatives, and programs identified after a review of documents from a mutually agreed number of custodians hitting on agreed search terms. Pursuant to Federal Rule of Civil

Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

## REQUEST FOR PRODUCTION NO. 11:

All documents supporting the allegation that Plaintiffs have distributed food, water, and other items to persons waiting in line to vote in Georgia.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 11:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff further objects to the phrase "waiting in line to vote" because it is vague, ambiguous, and overbroad in reference to the specific location(s) of the voters referred to.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it is not limited in time.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and

70

donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce responsive documents identified after a review of documents from a mutually agreed number of custodians hitting on agreed search terms. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 12:**

All communications with entities, organizations, groups, or individuals outside Plaintiffs' organizations relating to experience with distributing food and water to persons waiting in line to vote.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to the terms, "relating to experience with distributing food and water to persons waiting in line to vote" because it is vague, ambiguous, and

overbroad, including in reference to the specific location(s) of the persons referred to.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it is not limited in time.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:**

All documents reflecting whether any Georgia voter would have failed to vote, by either not going to a polling location or by abandoning a line at a polling location, but for the provision of food and/or water at the polling location.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 13:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it is not limited in time.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects to this Request in that it seeks to prematurely compel expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at

1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 14:

All documents that reflect the amount of money each Plaintiff raised for each of the three years before March 25, 2021.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 14:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at

1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce publicly available IRS Form 990's for the tax years of 2018 through 2021 to the extent that they have been filed by responding party and are not subject to a filing extension. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

## REQUEST FOR PRODUCTION NO. 15:

All documents that reflect the amount of money each Plaintiff raised since March 25, 2021.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 15:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 16:

All documents that reflect fundraising Solicitations that each Plaintiff has sent, which mention or refer to this litigation or any of the Challenged Provisions of SB 202.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 16:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

76

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 17:

All documents that reflect each Plaintiff's expenditures made on Solicitations for the two years prior to March 25, 2021.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 17:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 18:

All documents that reflect each Plaintiff's expenditures made on Solicitations from March 25, 2021, through the present.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 18:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 19:**

All documents that reflect each Plaintiff's income derived from selling or renting a contact list, whether that list included e-mail addresses, phone numbers, addresses, or any other methods of contacting individuals.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "contact list" is vague and ambiguous.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 20:

For any Solicitation that referred to SB 202 in any way, all documents that reflect the amount of money each Plaintiff received through such Solicitations.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 20:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 21:**

For any Solicitation that referred to SB 202 in any way, all documents that reflect the number of new donors who contributed to each Plaintiff through such Solicitations.

81

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 22:**

For each Solicitation sent by or on behalf of each Plaintiff, all documents that reflect any location or demographic information used to determine who should receive such Solicitation.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 22:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 23:**

All documents that reflect the amount of money each Plaintiff spent to rent or purchase lists for Solicitations over the two years before March 25, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 24:**

All documents that reflect the amount of money each Plaintiff spent to rent or purchase lists for Solicitations since March 25, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All public statements made by each Plaintiff, or Plaintiff's representative, concerning SB 202. In responding to this request, such statements should include public testimony, e-mail messages, text messages, social media posts, speeches, or other similar statements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects that the terms "any Plaintiff's representative" and "similar statements" as used in this Request are vague, ambiguous, and overbroad.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce final press releases and public testimony about SB 202. Plaintiff will also provide access to its third party, public facing web content vendor, where copies of Plaintiff's social media accounts and posts are archived. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

## REQUEST FOR PRODUCTION NO. 26:

All public statements made each by Plaintiff, or any Plaintiff's representative, since January 1, 2018, regarding the election laws in the State of Georgia. For this request, responsive records should include any statements proposing changes to the electionl laws in Georgia. In responding to this request, such statements should include public testimony, e-mail messages, text messages, social media posts, speeches, or other similar statements.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 26:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects that the phrases "the election laws in the State of Georgia" and "any Plaintiffs representative" as used in this Request, are vague, ambiguous, and overbroad.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

87

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce final press releases and public testimony about Georgia election laws. Plaintiff will also provide access to its third party, public facing web content vendor, where copies of Plaintiff social media accounts and posts are archived. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

## REQUEST FOR PRODUCTION NO. 27:

All statements made by each Plaintiff, or any Plaintiff's representative, relating to the 2018 gubernatorial election, and how absentee ballots were requested, completed, submitted, or counted.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 27:

Plaintiff objects to this Request on the grounds that the terms "any Plaintiffs representative," "statements," "relating to the 2018 gubernatorial election," and

"how absentee ballots were requested, completed, submitted or counted" are vague, ambiguous, and overbroad. In particular, it is impossible to discern from the Request whether propounding party is seeking only public "statements" or non-public statements.

Plaintiff also objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 28:**

89

All documents supporting the allegations contained in Compl.¶ 140 that "voters from minority communities" "are less likely to possess" or have access to "government issued photo ID" or "computers and internet" and that such "requirements expose absentee ballot applicants to potential fraud and identity theft."

## RESPONSE TO REQUEST FOR PRODUCTION NO. 28:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it is vague, ambiguous, and unintelligible in that it includes only some of the allegations of Paragraph 140 of the Complaint and ignores that this paragraph must be read in context with the previous paragraphs discussing the new ID requirements for absentee ballot applications and for the absentee ballot return envelopes.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects to this Request on the grounds that propounding party is likely to have better and more direct access to the documents sought in this Request, including, but not limited to, records identifying Georgia voters and prospective voters who have a Georgia driver's license, state ID card number or

last four digits of their Social Security number in their voter registration files, the racial identification of these individuals if they disclosed their racial identification on their voter registration applications, and whether absentee ballot applications or absentee ballots have been or will be rejected because of SB 202's new absentee ballot application and return envelope ID requirements.

Additionally, propounding party has objected to producing the files containing the Georgia driver's license number, state ID number and Social Security numbers present in the voter registration files to the nonpartisan Plaintiff groups and their counsel in response to discovery requests calling for the production of these records.

Plaintiff also objects to this Request because propounding party has equal access to the publicly available records from the U.S. Census Bureau and other public sources which include socio-economic and racial demographic data which show that Black and other voters of color disproportionately impacted by poverty, have lower levels of academic achievement, less access to computers and other technology, and are more likely to be disproportionately and negatively impacted by SB 202's new ID requirements for absentee ballot applications and absentee ballot return envelopes and by the "wet" signature requirement for absentee ballot applications submitted on the Secretary of State's online absentee ballot application portal.

91

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 29:

All documents supporting the allegations contained in Compl. ¶ 144 that SB 202 "creates additional, unreasonable burdens on" Plaintiffs and each item enumerated in ¶ 144 relating to the "assistance to voters who wish to vote by absentee ballots."

## RESPONSE TO REQUEST FOR PRODUCTION NO. 29:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it is vague, ambiguous, and unintelligible. Paragraph 144 of the Amended Complaint does not allege that all of the Plaintiffs provide absentee ballot assistance to voters.

Additionally, the items enumerated in Paragraph 144 are the changes imposed by SB 202. Thus, it is impossible for Responding party to interpret what categories of documents are being requested by propounding party with respect to "each item enumerated in ¶144 relating to the "assistance to voters who wish to vote by absentee ballots" in this Request.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request on the grounds that propounding party is likely to have better and more direct access to the documents sought in this

93

Request, including documents which Plaintiff has requested from Defendants but which Defendants have not yet produced.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 30:**

All documents demonstrating that voters who could request an absentee ballot 180 days before an election, cannot do so within "79 days prior to the election". Compl. ¶ 147.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense because the Request misconstrues the factual allegations set forth in paragraph 147 of the First Amended Complaint. Plaintiff did not allege in this paragraph that voters who had previously been able to request absentee ballots within the 180-day period would

be unable to request absentee ballots under the shorter deadline imposed by SB 202 as the Request appears to imply.

Plaintiff also objects to this Request on the grounds that documents and evidence comparing the number of voters who applied for ballots before and after the imposition of the new deadline under SB 202 are likely to be in the possession, custody, and control of the State Defendants and County Defendants, and as such, propounding party has better access to these records than responding party.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 31:

All documents demonstrating that voters who could return an absentee ballot application the Friday before an election will be unable to return an application 11 days before an election. Compl. ¶ 147.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 31:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense because the Request misconstrues the factual allegations set forth in paragraph 147 of the First Amended Complaint. Plaintiff did not allege in this paragraph that voters who had previously been able to request absentee ballots by the Friday prior to an election would not be able to meet the new 11-day deadline following the enactment of SB 202 as the Request appears to imply.

Plaintiff also objects to this Request on the grounds that documents and evidence comparing the number of voters who applied for absentee ballots before and after the new 11-day deadline set forth in SB are likely to be in the possession,

custody and control of the State Defendants and County Defendants, and as such, propounding party has better access to these records than responding party.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 32:

All documents demonstrating the number of eligible Georgia voters who wish to return an absentee ballot to a drop box but are unable to do so, including all

97

documents explaining why each voter is unable to return the ballot to the drop boxes provided for under SB 202.  Compl. ¶¶ 155-157.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 32:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff further objects to this Request on the grounds that documents and evidence showing comparing the number of voters who cast ballots in drop boxes before and after the enactment of SB 202 are likely to be in the possession, custody and control of the State Defendants and County Defendants, and as such, propounding party has better access to these records than responding party.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and

donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 33:

All documents demonstrating the number of eligible Georgia voters who were able to vote during a 3-week early voting period for runoff elections, but who cannot vote during a 1-week early voting period for runoff elections. Compl. ¶ 148.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 33:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff further objects to this Request on the grounds that documents and evidence comparing the number of voters who cast ballots in drop boxes before and after the enactment of SB 202 are likely to be in the possession, custody and

control of the State Defendants and County Defendants, and as such, propounding party has better access to these records than responding party.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 34:

All documents that Plaintiffs contend demonstrate best practices for requesting and/or casting absentee ballots.

100

## RESPONSE TO REQUEST FOR PRODUCTION NO. 34:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 35:

All documents that Plaintiffs contend demonstrate best practices for use of mobile voting.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 35:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*,

661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 36:

All documents that Plaintiffs contend demonstrate best practices for using drop boxes to collect completed ballots.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 36:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 37:

All documents that Plaintiffs contend demonstrate best practices for early voting.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 37:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 38:

All documents that Plaintiffs contend demonstrate best practices for providing food, water, or other refreshments at polling locations.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 38:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 39:

All documents that Plaintiffs contend demonstrate best practices for use of provisional ballots.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 39:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that the term "best practices" is vague and ambiguous.

Plaintiff also objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 40:

All documents that reflect communications since November 1, 2020, between Plaintiffs in this action and any plaintiffs in any other civil action challenging SB 202.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 40:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S.

at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 41:

All documents since November 1, 2020, that reflect communications between Plaintiffs in this action and any campaign for individuals running for elected office.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 41:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S.

at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at

1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*,

661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388

(MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any

documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 42:

All documents that reflect any agreements entered into with any Plaintiff in

any of the other civil actions challenging SB 202.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 42:

Plaintiff incorporates herein by reference its Objections to Instructions and

Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks

documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents

protected by attorney-client privilege, attorney work product doctrine, and/or other

applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its

associational rights under the First Amendment and the rights of its members and

donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S.

at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 43:

All documents that reflect any agreements entered into by any Plaintiffs and Fair Fight Action, Inc. or Fair Fight, Inc.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 43:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that the Request seeks documents not relevant to any party's claim or defense.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S.

at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Based upon the foregoing objections, Plaintiff will not be producing any documents responsive to this Request.

## REQUEST FOR PRODUCTION NO. 44:

All documents reflecting communications between Plaintiffs, or their officers, employees, or agents, on the one hand, and members and/or staff of the United States House of Representatives, the United States Senate, or the Georgia General Assembly, on the other hand. This request is limited to communications regarding SB 202, the State of Georgia, Governor Brian Kemp (in his capacity as Governor or his former capacity as Secretary of State), Secretary of State Raffensperger, or this litigation.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 44:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to the term "the State of Georgia" as used in this Request as vague and ambiguous.

Plaintiff further objects to the demand for communications regarding "the State of Georgia, Governor Brian Kemp (in his capacity as Governor or his former capacity as Secretary of State), [and] Secretary of State Raffensperger" to the extent they do not relate to SB 202 as overbroad, unduly burdensome, not relevant to any claim or defense in this case, and not proportionate to the needs of this litigation.

Plaintiff also objects to the extent that this Request seeks documents in the possession of, or equally available to, the State Defendants.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce communications between Plaintiffs or their officers with members of the United States House of Representatives, the United States

113

Senate, or the Georgia General Assembly about SB 202 which are identified after a review of documents from a mutually agreed number of custodians hitting on agreed search terms. Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 45:**

All documents that provide factual support for the information contained in paragraphs 93 through 110 of the Complaint including the graphs set forth on pages 39 through 43 of the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 45:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the ground that it is overbroad and not proportional to the needs of the case in that it seeks "all documents."

Plaintiff also objects to this Request in that it is a premature request for expert witness information prior to the date set for the disclosure of expert witness reports and expert discovery by the Court.

Plaintiff also objects to this Request to the extent that evidence supporting these allegations of the Complaint is not within the possession, custody, and control of the State Defendants, including, but not limited to, records of election

114

results, voter registration data; voter turnout data; socio-economic data from the United States Census Bureau; and other publicly available sources.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama, 357 U.S. at 462; NAACP v. Button, 371 U.S. at 429; Buckley v. Valeo, 424 U.S. at 64–68; Perry v. Schwarzenegger, 591 F.3d at 1142 & fn. 9; AFL-CIO v. FEC, 333 F.3d at 175; Black Panther Party v. Smith, 661 F.2d at 1264; Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce documents sufficient to show the factual support for the graphs contained in paragraphs 93 through 110 of the Complaint.  Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

**REQUEST FOR PRODUCTION NO. 46:**

All documents that support Plaintiffs' denial of any of State Defendants' requests for admission.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request because it is overbroad, unduly burdensome, is improperly compound and contains multiple subparts in that it requests documents supporting each of the State Defendants' requests for admissions that Plaintiff denied.

Plaintiff also objects that this Request calls for the production of documents protected by attorney-client privilege, attorney work product doctrine, and/or other applicable privileges.

Plaintiff also objects to this Request on the ground that it unduly burdens its associational rights under the First Amendment and the rights of its members and donors. *See, e.g., NAACP v. Alabama*, 357 U.S. at 462; *NAACP v. Button*, 371 U.S. at 429; *Buckley v. Valeo*, 424 U.S. at 64–68; *Perry v. Schwarzenegger*, 591 F.3d at 1142 & fn. 9; *AFL-CIO v. FEC*, 333 F.3d at 175; *Black Panther Party v. Smith*, 661 F.2d at 1264; *Intl. Socy. for Krishna Consciousness, Inc. v. Lee*, 75 CIV. 5388 (MJL), 1985 WL 315, at *8.

Plaintiff will produce documents which are identified after a review of documents from a mutually agreed number of custodians hitting on agreed search terms.

116

Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Plaintiff states that it is not producing other arguably responsive documents on the basis of its objections.

## RESPONSES TO REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1:

Admit that before SB 202 was enacted, each Plaintiff expended resources on election-related activities.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it is vague and ambiguous, including with respect to the meaning of the terms, "expended resources," and "election-related activities" as used in this Request.  Subject to and without waiving these objections, Plaintiff responds as follows:

Admit as to Plaintiff Georgia NAACP only.

### REQUEST FOR ADMISSION NO. 2:

Admit that after SB 202 was enacted, each Plaintiff expended resources on election-related activities.

### RESPONSE TO REQUEST FOR ADMISSION NO. 2:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it is vague and ambiguous, including with respect to the meaning of the terms, "expended resources," and "election-related activities." Subject to and without waiving these objections, Plaintiff responds as follows:

Admit as to Plaintiff Georgia NAACP only.

**REQUEST FOR ADMISSION NO. 3:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Admit that no Plaintiff has discontinued any previous election-related activities since SB 202's enactment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that this request is vague and ambiguous, including with respect to the meaning of the term, "previous election-related activities." Subject to and without waiving these objections, Plaintiff responds as follows:

Denied as to Plaintiff Georgia State Conference of the NAACP.

**REQUEST FOR ADMISSION NO. 4:**

Admit that after SB 202 was enacted, individuals in Georgia have several options for exercising their constitutional right to vote.

## RESPONSE TO REQUEST FOR ADMISSION NO. 4:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it improperly calls for a legal conclusion. *See In re Tobkin*, 578 F. App'x 962, 964 (11th Cir. 2014) ("A party may not request an admission of a legal conclusion ...."); *McCrimmon v. Georgia Community Support & Sols., Inc.,* 1:08-CV-3919-ODE, 2010 WL 11507675, *3 (N.D. Ga. Jan. 19, 2010) (Requests for admissions of bare legal conclusions are improper under F.R.Civ.P. 36).

Plaintiff further objects to this Request because the terms, "individuals in Georgia," and "have several options" as used in the Request are vague, ambiguous, and overbroad.

Subject to and without waiving these objections, Plaintiff responds as follows:

After making a reasonable inquiry, Plaintiff lacks sufficient information to admit or deny this Request due to the lack of specificity of the terms, "individuals in Georgia" and "several options" referred to in the Request.

## REQUEST FOR ADMISSION NO. 5:

119

Admit that SB 202 does not prohibit any voter from bringing his or her own water or food to consume while waiting in line to vote at a polling location.

### RESPONSE TO REQUEST FOR ADMISSION NO. 5:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it improperly calls for a legal conclusion. *See In re Tobkin*, 578 F. App'x 962, 964 (11th Cir. 2014) ("A party may not request an admission of a legal conclusion ….); *McCrimmon v. Georgia Community Support & Sols., Inc.,* 1:08-CV-3919-ODE, 2010 WL 11507675, **\*3** (N.D. Ga. Jan. 19, 2010) (Requests for admissions of bare legal conclusions are improper under F.R.Civ.P. 36). Subject to and without waiving these objections, Plaintiff responds as follows:

Subject to and without waiving these objections, Plaintiff responds as follows:

After making a reasonable inquiry, Plaintiff lacks sufficient knowledge or information to admit or deny this Request due to the lack of specificity as to the location(s) of voters standing in line, i.e., whether a voter could consume their own food or water while standing in line inside all polling locations in Georgia.

120

**REQUEST FOR ADMISSION NO. 6:**

Admit that SB 202 permits polling locations to provide water to voters.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it improperly calls for a legal conclusion. *See In re Tobkin*, 578 F. App'x 962, 964 (11th Cir. 2014) ("A party may not request an admission of a legal conclusion ….); *McCrimmon v. Georgia Community Support & Sols., Inc.,* 1:08-CV-3919-ODE, 2010 WL 11507675, *3 (N.D. Ga. Jan. 19, 2010) (Requests for admissions of bare legal conclusions are improper under F.R.Civ.P. 36). Plaintiff further objects to this Request on the grounds that it seeks information which is not relevant to the subject matter of this action.

Plaintiff further objects to this Request on the grounds that it seeks information which is not relevant to the subject matter of this action.

Subject to and without waiving these objections, Plaintiff responds as follows:

Denied in part, admitted in part as to Plaintiff Georgia NAACP only. SB 202 permits poll officials to establish a stand-alone, self-service water station outside of a polling location, but does not mandate that poll officials

121

directly "provide water to voters" and does not mandate the placement of said stand-alone, self-serve water stations at every polling place. Further, SB 202 does not specify how voters who are standing in line to vote outside of polling locations are able to access these stand-alone, self-service water stations and whether they may potentially lose their place in line if they leave the line to access said water station.

## REQUEST FOR ADMISSION NO. 7:

Admit that before SB 202, no statute in Georgia provided for drop boxes to be made available for voters returning absentee ballots.

## RESPONSE TO REQUEST FOR ADMISSION NO. 7:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it improperly calls for a legal conclusion. *See In re Tobkin*, 578 F. App'x 962, 964 (11th Cir. 2014) ("A party may not request an admission of a legal conclusion ...."); *McCrimmon v. Georgia Community Support & Sols., Inc.,* 1:08-CV-3919-ODE, 2010 WL 11507675, *3 (N.D. Ga. Jan. 19, 2010) (Requests for admissions of bare legal conclusions are improper under F.R.Civ.P. 36).

Subject to this objection, Plaintiff responds to this Request as follows: Admit as to Georgia NAACP only.

## REQUEST FOR ADMISSION NO. 8:

Admit that before SB 202, no statute in Georgia provided for use of mobile voting units.

## RESPONSE TO REQUEST FOR ADMISSION NO. 8:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it improperly calls for a legal conclusion. *See In re Tobkin*, 578 F. App'x 962, 964 (11th Cir. 2014) ("A party may not request an admission of a legal conclusion ….); *McCrimmon v. Georgia Community Support & Sols., Inc.,* 1:08-CV-3919-ODE, 2010 WL 11507675, *3 (N.D. Ga. Jan. 19, 2010) (Requests for admissions of bare legal conclusions are improper under F.R.Civ.P. 36).

Plaintiff further objects to this Request on the grounds that the term, "mobile voting unit" is vague, ambiguous, and overbroad because O.C.G.A. § 21-2-269 allows for the construction of a "temporary" polling location and it is unclear whether this law would include the construction of "temporary" mobile polling units.

Subject to and without waiving these objections, Plaintiff responds as follows:

123

After making a reasonable inquiry, Plaintiff, Georgia NAACP, cannot admit or deny this request due to the ambiguity of the term, "mobile voting unit" as used this Request.

## REQUEST FOR ADMISSION NO. 9:

Admit that Plaintiffs may still encourage their members to participate in advance voting in counties that choose not to hold advance voting on Sundays.

## RESPONSE TO REQUEST FOR ADMISSION NO. 9:

Plaintiff incorporates herein by reference its Objections to Instructions and Definitions above as though fully set forth herein.

Plaintiff objects to this Request on the grounds that it asks Plaintiff to speculate about whether it may take certain action in the future in response to events which may or may not occur. Plaintiff also objects to this Request on the grounds that it is vague and ambiguous as to the meaning of the term, "encourage," as used in this Request. Plaintiff also objects to this Request on the grounds that it assumes without a factual basis that Plaintiff encouraged its members to participate in advance voting in the past in all counties which do not offer Sunday advance voting. Plaintiff further objects to this Request on the grounds that it asks the Plaintiff to admit to facts which are not relevant to the subject matter of this litigation.

Subject to and without waiving these objections, Plaintiff responds as follows:

Admit as to Georgia NAACP only.

**REQUEST FOR ADMISSION NO. 10:**

Admit that before 2020, mobile voting units were not used in Georgia elections.

**RESPONSE TO REQUEST FOR ADMISSION NO. 10:**

Following a reasonable inquiry, Plaintiff Georgia NAACP cannot admit or deny this Request due to the ambiguity of the term, "mobile voting unit" as used in this Request.

## VERIFICATION OF RESPONSES TO INTERROGATORIES AND REQUESTS FOR ADMISSIONS

I, Gerald Griggs, am over the age of 18 years and am competent to execute this verification on behalf of the Georgia State Conference of the NAACP, an organization, as its President.

I believe, based on reasonable inquiry, that the foregoing responses are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

Gerald Griggs, President
Georgia State Conference of the NAACP

Dated this _20_ day of May, 2022

Respectfully submitted this 20th day of May, 2022.

As to all objections,

/s/ Bryan L. Sells
Bryan L. Sells
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN
SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

/s/ Julie M. Houk
Jon Greenbaum*
Ezra D. Rosenberg*
Julie M. Houk*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*Admitted pro hac vice

/s/ Vilia Hayes
Vilia Hayes*
Neil Oxford*
Gregory Farrell*
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for Plaintiff

**BYLAWS FOR UNITS
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE**

**TABLE OF CONTENTS**

Page

ARTICLE I     NAME AND JURISDICTION ........................................................1

    1.    (Name of Units) ..............................................................................1
    2.    (Jurisdiction) ...................................................................................2

ARTICLE II     OBJECTIVES ..............................................................................2

    1.    (Purpose of Units) ..........................................................................2
    2.    (Methods)........................................................................................7
    3.    (Coalition/Affiliation with other Organizations) .............................9

ARTICLE III     ORGANIZATIONAL STRUCTURE ..........................................10

    1.    (Unit Status)..................................................................................10
    2.    (Units of the Association) ..............................................................10
    3.    (Charter)........................................................................................10
    4.    (Assessments) ...............................................................................13
    5.    (Per Capita Assessment for State/State-Area Conferences) ..........14
    6.    (Real Property)..............................................................................14
    7.    (Intellectual Property; NAACP Trademarks) .................................15

ARTICLE IV     MEMBERSHIP.............................................................................15

    1.    (Membership Prerequisites)...........................................................15
    2.    (Effective Date of Membership in the Branches, Youth
       Units and Authorized Committees) ...............................................15
    3.    (Membership in the State/State-Area Conference).........................16
    4.    (Membership in the Branch) ..........................................................16
    5.    (Membership in the Prison Branch)................................................17
    6.    (College Chapter Membership)......................................................17
    7.    (Youth Council
       Membership)..................................................................................18
    8.    (High School Chapters)..................................................................18

[Adopted Effective March 2019]

i

DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

*Bylaws for Units of the NAACP*

| | | |
|---|---|---|
| 9. | (Junior Youth Councils) | 19 |
| 10. | (Dues) | 19 |
| 11. | (Division of Regular Membership Dues) | 19 |
| 12. | (Annual Corporate Membership) | 20 |
| 13. | (Division of Life Membership Dues) | 20 |

**ARTICLE V**      GOVERNANCE ............................................. 21

| | | |
|---|---|---|
| 1. | (Meetings of Units) | 21 |
| 2. | (Meetings of the State/State-Area Conference) | 21 |
| 3. | (Annual Meeting of Units) | 22 |
| 4. | (Notice of Annual Meeting) | 23 |
| 5. | (Special Meetings of Branches, Youth Units and Authorized Committees) | 23 |
| 6. | (Meetings of the Executive Committee of Branches, Prison Branches and Youth Units) | 24 |
| 7. | (Meetings of Standing Committees) | 24 |
| 8. | (Quorum) | 24 |
| 9. | (Order of Business) | 24 |
| 10. | (Faculty Advisor) | 25 |
| 11. | (Selection of a Youth Council Advisor) | 25 |
| 12. | (High School Chapter Advisors) | 26 |
| 13. | (Junior Youth Council Advisors) | 27 |
| 14. | (Controversies Between Branch and Youth Units) | 27 |
| 15. | (Indebtedness for State/State-Area Conferences, Branches, Prison Branches and Authorized Committees) | 27 |
| 16. | (Indebtedness for Youth Units) | 27 |
| 17. | (Fiscal Business Year) | 28 |
| 18. | (Unit Bookkeeping System) | 28 |
| 19. | (Audits) | 28 |

**ARTICLE VI**      OFFICERS OF UNITS AND STAFF ............................................. 28

| | | |
|---|---|---|
| 1. | (Officers and Staff) | 28 |
| 2. | (Qualifications) | 29 |
| 3. | (Term of Office) | 31 |

**ARTICLE VII**      DUTIES OF OFFICERS OF UNITS ............................................. 33

| | | |
|---|---|---|
| 1. | (President) | 33 |
| 2. | (Vice President) | 34 |
| 3. | (Secretary) | 34 |

NAACPGA00000040

*Bylaws for Units of the NAACP*

| | | |
|---|---|---|
| 4. | (Treasurer) | 36 |
| 5. | (Assistant Secretary) | 37 |
| 6. | (Assistant Treasurer) | 37 |
| 7. | (Executive Director) | 37 |

**ARTICLE VIII**  COMMITTEES OF UNITS ... 38

| | | |
|---|---|---|
| 1. | (Executive Committee) | 38 |
| 2. | (Duties of the Executive Committee) | 40 |
| 3. | (Quorum) | 41 |
| 4. | (Standing Committees and Special Committees of Units) | 41 |
| 5. | (Duties of the Standing Committees) | 43 |
| 6. | (Distinctive Duties of Prison Branch Standing Committees) | 48 |
| 7. | (Distinctive Duties of College Chapter Standing Committees) | 49 |
| 8. | (Distinctive Duties of Youth Council Standing Committees) | 52 |
| 9. | (Tenure) | 54 |
| 10. | (Removal Procedure) | 54 |

**ARTICLE IX**  ELECTION OF OFFICERS AND EXECUTIVE COMMITTEE AND DELEGATES ... 55

| | | |
|---|---|---|
| 1. | (Procedure for State/State-Area Conference Elections) | 55 |
| 2. | (Election of Officers and Executive Committees for Branches) | 61 |
| 3. | (Procedure for Prison Branch Elections) | 67 |
| 4. | (Procedure for College Chapter Elections) | 72 |
| 5. | (Procedure for Youth Council, High School  Chapter and Junior Youth Council Elections) | 75 |
| 6. | (Voting for Members of the Board of Directors at Large) | 79 |

**ARTICLE X**  EXPULSION, SUSPENSION OR REMOVAL OF OFFICERS AND MEMBERS ... 79

| | | |
|---|---|---|
| 1. | (Units Failing to Report) | 79 |
| 2. | (Grounds for Suspension or Other Disciplinary Action) | 79 |
| 3. | (Complaints) | 80 |
| 4. | (Authority of National President and CEO) | 80 |
| 5. | (Notice of Complaint and Right to Answer) | 80 |
| 6. | (National Office Review and Investigation) | 80 |
| 7. | (Hearing Procedure) | 81 |
| 8. | (Notice of Findings and Action of the Board) | 81 |

[Adopted Effective March 2019]                    iii

*Bylaws for Units of the NAACP*

ARTICLE XI           SUSPENSION AND REVOCATION OF CHARTER.................82

ARTICLE XII          INDEMNIFICATION...................................................................82

          1.         (Persons Covered)..........................................................................82
          2.         (Limitation; Notice) ......................................................................82

ARTICLE XIII         AMENDMENTS TO LOCAL BYLAWS.....................................83

ARTICLE XIV          RATIFICATION OF BYLAWS...................................................83


ADDENDUM            YOUTH AND COLLEGE DIVISION GUIDELINES (see tab)

[Adopted Effective March 2019]                iv

NAACPGA00000042

## BYLAWS FOR UNITS

These Bylaws for Units pertain to all Units of the National Association for the Advancement of Colored People and should be read in conjunction with the Constitution of the National Association for the Advancement of Colored People.

### ARTICLE I
### NAME AND JURISDICTION

1.   *(Name of Units)*

a.   *State/State-Area Conference.* The name of this organization shall be the _____ State or _____ State-Area Conference of the National Association for the Advancement of Colored People. Each State/State-Area Conference shall have a Youth and College Division.

b.   *Branch.* The name of this organization shall be the _____ Branch of the National Association for the Advancement of Colored People.

c.   *Prison Branch.* The name of this organization shall be the _____ Prison Branch of the National Association for the Advancement of Colored People.

d.   *College Chapter.* The name of this organization shall be the _____ College Chapter of the National Association for the Advancement of Colored People.

e.   *Youth Council.* The name of this organization shall be the _____ Youth Council of the National Association for the Advancement of Colored People.

f.   *Junior Youth Council.* The name of this organization shall be the _____ Junior Youth Council of the National Association for the Advancement of Colored People.

NAACPGA00000043