# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

## STATE DEFENDANTS' CONSOLIDATED STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

State Defendants, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submit this Statement of Material Facts as to Which There is No Genuine Issue to be Tried.

1.     Plaintiffs who challenge mobile voting units freely admit they have only ever been used in Georgia in a single county during the 2020 pandemic-election cycle. [NAACP Doc. 35, ¶ 168].

2.     Plaintiffs who challenge drop boxes acknowledge that they, too, have only been used since the 2020 election cycle following the promulgation of an emergency SEB rule at the height of the COVID-19 pandemic. [NGP Doc. 39, ¶ 85], [NAACP Doc. 35, ¶ 153], [AME Doc. 83, ¶¶ 264–267], [AAAJ Doc. 27, ¶¶ 97–99], [CBC Doc. 1, ¶¶ 125, 127–129].

3.     New Georgia Project is not a membership organization and thus can rely solely on organizational standing. Deposition of New Georgia Project [Doc. 733] ("NGP Dep.") 21:25–22:3.

4.     The only diversion-of-resources injury that NGP could identify is an increase in an existing program to provide voters with free rides to the polls. NGP Dep. 125:2–12.

5.     NGP has not been harmed by SB 202, but actually has more resources today because its funding has increased since the adoption of SB 202. NGP Dep. 63:10–19; 66:7–10.

6.     Black Voters Matter Fund (BVMF) has not eliminated any projects as a result of SB 202. Deposition of Black Voters Matter Fund [Doc. 696] ("BVMF Dep.") 88:21–89:8.

7.     It is still engaged in the same organizational development, training, and voter education programs it was engaged in prior to SB 202. BVMF Dep. 69:6–9, 72:4–24.

8.     BVMF agreed that it can continue to encourage voters to stay in line to vote by coordinating distribution of food and water outside the restricted area at the polls after SB 202 or if the voters approach BVMF. BVMF Dep. 83:17–84:7, 86:22–87:3.

9.     Ultimately, BVMF would be engaged in voter outreach programs even if SB 202 did not exist. BVMF Dep. 55:3–9.

10.     During the deposition of Rise, it could not identify any cuts in any budget as a result of SB 202 nor could it establish any quantifiable amount of

diverted funds as a result of SB 202. Deposition of Rise [Doc. 734] ("Rise Dep.") 47:3–8; 65:10–12.

11.     Rise has continued to provide training on requesting and casting of absentee ballots and encouraging voters to check their voter status and voting location, as it was doing before SB 202. Rise Dep. 39:25–41:3.

12.     Mr. Solomon was unable to identify any situation where he was prevented from voting. In fact, the only challenge Mr. Solomon could identify after the adoption of SB 202 was that he would have preferred to vote in Sunday in 2022 (a decision in the hands of county officials). Deposition of Elbert Solomon [Doc. 742] ("Solomon Dep.") 40:19–41:2, 44:18–45:1.

13.      Mr. Solomon was still able to vote in that election. Solomon Dep. 40:19–41:2, 44:18–45:1.

14.     While Mr. Solomon complained he had difficulty turning in voter-registration applications for other voters—not himself—those applications were all accepted. Solomon Dep. 27:16–29:10.

15.     Despite claiming injury from SB 202, Ms. Gibbs has voted in every election since SB 202 took effect, without difficulty. Deposition of Fannie Marie Jackson Gibbs [Doc. 744] ("Gibbs Dep.") 59:12–24; 59:25–60:5.

16.     The only change in Mr. Durbin's voting experience since the enactment of SB 202 is that he says he votes on Election Day, but voted early

in the 2022 primary elections and the November 2022 general election. Deposition of Jauan Durbin [Doc. 746] ("Durbin Dep.") 16:19–23, 37:3–9.

17.     The wait Mr. Durbin encountered in November 2022 was about 15 minutes long. Durbin Dep. 38:7–9.

18.     There were no activities or projects the Ga. NAACP was unable to continue as a result of the implementation of SB 202. Deposition of Ga. State Conf. of the NAACP [Doc. 731] ("Ga. NAACP Dep.") 58:6–10.

19.     None of the Ga. NAACP's staff members' responsibilities changed as a result of SB 202. Ga. NAACP Dep. 60:10–13.

20.     The Ga. NAACP only employs one administrative assistant and relies on volunteers for the remainder of its activities. Ga. NAACP Dep. 20:10–12.

21.     But it is unable to quantify the amount of time any volunteers spent on other activities as a result of SB 202. Ga. NAACP Dep. 76:15–77:25.

22.     Further, the Ga. NAACP was unable to identify any members who were limited in voting in any way. Ga. NAACP Dep. 133:6–135:8.

23.      At most, Ga. NAACP was only able to speculate about whether members were affected by SB 202 and had members contact them to say they had no issues voting after SB 202. Ga. NAACP Dep. 136:2–23, 139:6–11.

24.     The Ga. Coalition for the People's Agenda (GCPA) claims it diverted resources related to its efforts to educate voters. Deposition of Ga.

Coalition for the People's Agenda (Butler) [Doc. 724] ("GCPA Dep.") 36:12–37:7, 87:3–8.

25.     But it always provides education when laws related to voting change. GCPA Dep. 103:7–18.

26.     Further, GCPA did not dismiss or hire any staff members as a result of SB 202. GCPA Dep. 105:17–23.

27.     Regarding any impact on its members, GCPA was unable to identify any members who lack government-issued photo identification. GCPA Dep. 110:12–21.

28.     It is also not aware of any voter who was unable to vote as a result of the changes to absentee-ballot applications and timelines for those applications in SB 202. GCPA Dep. 113:3–115:13, 119:22–120:6, 120:16–121:10.

29.     GCPA is unaware of any voters who was unable to vote because of being unable to get time off of work, the drop box changes, or out of precinct voting provisions of SB 202. GCPA Dep. 125:4–7, 130:6–20, 130:22–131:2, 131:16–132:1.

30.     Nor has GCPA taken any steps to determine if any of its members waited in line in 2022. GCPA Dep. 138:14–139:6.

31.     The League of Women Voters of Georgia (LWV) has increased its work in advocacy as a result of SB 202 but has also been affected by

decreased activity of its local league partners in its resource-allocation decisions. Deposition of League of Women Voters of Georgia [Doc. 732] ("LWV Dep.") 61:6–62:11.

32.     Regarding any impact on its members, LWV was unable to identify any members who lack government-issued photo identification. LWV Dep. 73:5–8.

33.     It is also not aware of any voter who was unable to vote as a result of the changes to absentee-ballot applications and timelines for those applications in SB 202. LWV Dep. 73:23–74:2, 75:1–5, 75:19–76:25.

34.     LWV also has no knowledge of any voter or member being harmed by the voter-challenge provisions or the takeover provisions of SB 202. LWV Dep. 78:5–20, 78:21–79:4.

35.     GALEO Latino Community Development Fund (GALEO) has been engaged in voter education before and after SB 202. Deposition of GALEO Latino Community Development Fund [Doc. 723] ("GALEO Dep.") 101:14–18.

36.     GALEO cannot identify any projects related to voter registration that it took resources away from to address the impact of SB 202. GALEO Dep. 98:8–12.

37.     GALEO did not hire or dismiss any staff members as a result of SB 202, GALEO Dep. 109:3–8

38.   There have been no projects that GALEO has been unable to engage in as a result of SB 202. GALEO Dep. 109:17–21.

39.   GALEO has no knowledge of any voter or member who was unable to vote because of SB 202's requirements related to government-issued identification, absentee-ballot applications and deadlines, early voting, drop boxes, out-of-precinct voting, suspension provisions, or waiting in line. GALEO Dep. 117:15–118:6, 121:3–6, 113:3–115:13, 132:14–19, 133:4–18, 138:1–5, 143:9–11, 146:9–147:4, 148:17–21, 150:3–14, 155:8–12.

40.   Common Cause is not claiming any diversion of financial resources as a basis for its standing in the case. Deposition of Common Cause [Doc. 697] ("Common Cause Dep.") 7:10–19.

41.   Common Cause provided information about legislative changes, legislative debriefs, grassroots mobilization, pollworker recruitment, provisional ballot programs before and after SB 202. Common Cause Dep. 106:4–107:12.

42.   While Common Cause identified some programs it wished to engage in for future events, it only identified the sheriff accountability program as an existing program it stopped engaging in. Common Cause Dep. 107:13–108:11.

43.     But this program was a program funded by the national organization and Common Cause simply chose to prioritize election projects over the sheriff projects. Common Cause Dep. 108:22–113:6.

44.     The only other reasons Common Cause could identify for not engaging in certain projects was due to a lack of funding from its national organization, about which Defendants were not permitted to inquire. Common Cause Dep. 108:22–113:6, 113:13–116:10.

45.     The only areas where Common Cause claims it diverted resources to projects were in the areas of provisional ballot curing programs and voter education programs, both of which it engaged in prior to SB 202. Common Cause Dep. 117:16–121:4.

46.     Common Cause has no knowledge of any voter or member who was unable to vote because of SB 202's requirements related to government-issued identification, absentee-ballot applications and deadlines, early voting, drop boxes, out-of-precinct voting, suspension provisions, or voter challenge provisions. Common Cause Dep. 124:14–125:4, 139:18–22, 140:14–141:23, 147:9–17, 155:24–156:15, 161:4–162:20, 163:20–166:3, 166:4–165:19.

47.     Lower Muskogee Creek Tribe (LMCT) is not relying on a diversion of resources. Deposition of Lower Muskogee Creek Tribe [Doc. 730] ("LMCT Dep.") 48:3–9, 53:8–12.

48.     LMCT is relying on associational standing on behalf of its members. LMCT Dep. 48:3–9, 53:8–12.

49.     The only types of injuries that LMCT could identify are members not getting off work until 6:00 or 7:00 and being unable to utilize early voting hours LMCT Dep. 63:22–64:10.

50.     LMCT was unable to identify any member who was prevented from voting since the enactment of SB 202. LMCT Dep. 67:14–19, 76:18–25, 77:6–78:8.

51.     Since 2016, the Sixth District of the African Methodist Episcopal Church (Sixth District AME) has been very engaged in voter registration, voter education, voter mobilization, and voter organization for every election. Deposition of Sixth District of the African Method Episcopal Church [Doc. 691] ("Sixth District AME Dep.") 27:9-19.

52.     What the Sixth District claims are its efforts combatting SB 202 can more accurately be described as generalized voter-education efforts that include making sure people have ID and making a plan to vote, all of which the Church undertakes as a normal practice. Sixth District AME Dep. 93:24-94:16.

53.     Although the Sixth District claims to have spent more time on voting and voting education efforts in 2022 than in 2018, it could not identify

how these efforts were related to combatting the challenged provisions of SB 202. Sixth District AME Dep. 43:3-6.

54.     The Sixth District has member churches, but not individual members, and has no control of how the ministers function in each local church. Sixth District AME Dep. 21:4-9, 22:16-18.

55.     Thus, despite claiming that the Sixth District has had to divert time and resources allegedly combatting the challenged provisions of SB 202, the activities they identified like Get Out the Vote efforts, food programs, after-school programs, and senior/shut-in ministries, are all conducted at the local level by member churches and not at the district level. Sixth District AME Dep. 40:2-41:3, 43:3-6, 46:4-20.

56.     While claiming intentional racial discrimination, the Sixth District based its conclusions about the purpose behind SB 202 based solely on the timeline of it being passed after the 2020 election. Sixth District AME Dep. 63:24-64:4; 9-11, 66:7-14.

57.     The only basis for the Sixth District's claims that SB 202 was passed to marginalize and disenfranchise black and minority voters was that SB 202 was enacted after the Shelby County case involving the Voting Rights Act and Gov. Kemp's alleged statements that he was not happy with the results of the 2020 election. Sixth District AME Dep. 86:2-21.

58.     The primary purpose of the Georgia Muslim Voter Project ("GMVP") is to educate minorities about the political process, to build voter turnout in elections, and to promote civic responsibility among local communities. Deposition of Ga. Muslim Voter Project [Doc. 725] ("GMVP Dep.") 35:20-36:5.

59.     The organization has always done voter education events and maintained an active voter engagement campaign for the 2020 election cycle. GMVP Dep. 37:8-10, 38:22-23, 39:1-3.

60.     Those voter education efforts were in effect before SB 202 and after its passage. [AME Doc. 83, ¶ 40], GMVP Dep. 62:8-11, 63:22-64:5, 67:8-12.

61.     Regardless of whether they agree with a law, GMVP continually updates their communications, trainings, and workshops to make sure that they are always providing updates on changes in election laws.  GMVP Dep. 128:4-10, 65:6-11.

62.     GMVP had never actually started those programs and just "wished" they could be implementing those programs. GMVP Dep. 107:8-11.

63.     Similarly, expanding translation for workshops and services and materials and gathering data and data research studies on the Muslim community are other goals of the organization which have not yet been launched. GMVP Dep. 98:1-2, 106:11-16, 98:14-17, 100:5-6.

64.     Rather, "it was really about, I guess, more so taking away from the things that we wish we could be doing." GMVP Dep. 104:21-25.

65.     GMVP moved staff from part-time to full-time for voter registration, GOTV and voter education work when they saw the "slew of voting right bills that were being passed," but that action was not tied specifically to SB 202 and GMVP did not create an individual membership program until after the passage of SB 202. GMVP Dep. 45:20-25, 121:11–16.

66.     And GMVP does not have any specific information to base its claim that fewer people are able to vote in Georgia as a result of the eight challenged provisions of SB 202. GMVP Dep. 165:8-10, 15-24, 166:1-3, 171:4-7, 172:14-23, 174:8-15, 178:14-17, 184:1-3.

67.     GMVP has not determined whether any member of the community who lacks an ID is also lacking a utility bill, bank statement or other forms of ID permitted under SB 202. GMVP Dep. 169:15-20.

68.     GMVP does not know of anyone who could not vote because of the absentee ballot requirements in SB 202. GMVP Dep. 169:21-23, 170:5.

69.     The information GVMP has is based on hearsay and may not even concern members of their community, let alone their organization's membership. GMVP Dep. 187:16-22.

70.    Women Watch Afrika ("WAA") does not have any members, and thus cannot claim associational standing. Deposition of Women Watch Afrika [Doc. 738] ("WAA Dep.") 125:11-12.

71.    Instead, they are a community service provider that conducts civic engagements, voter registration and voter education ongoingly for residents becoming citizens working with them through their first time voting. WAA Dep. 16:16-25, 17:8, 125:13-16.

72.    They have been doing this kind of work since 2013.  WAA Dep. 18:8-13.

73.    WAA regularly keeps apprised of all changes with election laws to educate individuals talking with citizens. WAA Dep. 19:8-17, 27:23-28:9.

74.    WAA does not address obtaining state-issued identification in its voter registration education so it could not have diverted any resources regarding provisions of SB 202 related to IDs. WAA Dep. 52:12-16.

75.    WAA continued to engage in activities after the passage of SB 202 that it did before the law, including encouraging voters to check early voting locations and their own voting records, providing information on requesting and returning absentee ballots, and providing language assistance. WAA Dep. 40:18-23, 40:24-41:2, 202 41:3-10, 41:11-17, 41:41:18-42:2, 43:12-15, 54:18-55:1.

76.    The only new activity WAA could identify was coordinating with taxi services for rides to the polls for individuals, which it was unable to tie to any provision of SB 202. WAA Dep. 68:25-69:13, 69:25-70:4.

77.    WAA had no knowledge of any voter that used a mobile voting unit, that was unable to request an absentee ballot in the shorter period, was unable to use pen and ink to apply for an absentee ballot, that was unable to use a drop box, or affected by the food-and-drink in line provisions or the out-of-precinct provisions of SB 202. WAA Dep. 102:4-8, 103:14-17, 105:24-106:2, 107:23-108:1, 110:19-23, 111:1-5, 111:8-12.

78.    WAA only knew of one individual who allegedly did not receive her absentee ballot, but knew nothing about why and had no idea if it had anything to do with SB 202. WAA Dep. 129:18-22, 130:2-6.

79.    The Latino Community Fund of Georgia ("LCF") was incorporated in 2018 and has been involved in civic education and civic participation efforts including election protection, training volunteers on Georgia law and Spanish language assistance. Deposition of Latino Community Fund of Georgia [Doc. 728] ("LCF Dep." 36:1-21.

80.    The civic participation education program includes education, voter registration, mobilization and election protection, all of which predates SB 202. LCF Dep. 36:25-37:3.

81.     LCF does not have individual members, and thus cannot claim associational standing. LCF Dep. 50:1-7.

82.     Regarding any potential diversion of resources, LCF claims to receive information about voters who had difficult finding the correct precinct, but does not keep records of such instances and does not have specific information of any particular occurrences. LCF Dep. 50:1-7, 51:9-14.

83.     The only work LCF did related to SB 202 involving communicating about the requirements of Georgia law to other organizations, updating training and digital campaigns and training the community on the changes. LCF Dep. 61:17-62:6.

84.     Consistent with SB 202, LCF provided voter education on the use of drop boxes during the early voting or election day at the polls and encouraging voters not to use absentee voting by mail. LCF Dep. 64:20-65:9.

85.     LCF does not know of anyone specifically who has not been able to vote because of the challenged provisions of SB 202. LCF Dep. 94:19-23.

86.     LCF has knowledge of a man who was unable to vote because he was in the wrong precinct in the last election in 2022 but does not know if he actually voted or not and any other specifics about his experience. LCF Dep. 84:23-85:2.

87.     Delta Sigma Theta Sorority (DST) is a member organization that provides voter education in Georgia. Deposition of Delta Sigma Theta Sorority [Doc. 698] ("DST Dep.") 49:6-21.

88.     The organization regularly conducts voter education in its newsletters as it focuses on local elections every two years. DST Dep. 50:6-18, 51:2-14.

89.     DST was unable to identify any members who were unable to vote as a result of the provisions of SB 202. DST Dep. 42:24–44:10.

90.     Any diversion of resources involve either members taking time off work to volunteer on election day generally—unrelated to SB 202—or time spent on this litigation, which cannot be the basis for a diversion of resources. DST Dep. 85:10-14, 86:1-20, 87:5-8.

91.     The ARC of the United States (ARC) has been engaged in voter education, assisting in registration, and getting out the vote prior to the passage of SB 202. Deposition of the ARC of the United States [Doc. 695] ("ARC Dep.") 118:9-15.

92.     The only purported diversion the ARC could identify was that it decided to include information about SB 202 in its usual advocacy related meetings and training documents. ARC Dep. 27:16–28:19.

93.     The ARC could not identify any member who could not vote and could not identify and specific examples of members who had trouble voting. ARC Dep. 31:25–33:17.

94.     The ARC also could not identify any activities prior to the adoption of SB 202 for any activities they would have diverted resources from as a result of SB 202. ARC Dep. 51:16-18, 52:20-23.

95.     Further, the ARC could not identify any particular member who was burdened or was unable to vote as a result of SB 202. ARC Dep. 88:14-18, 101:15-21.

96.     And while it provided some examples of concerns of the organization about potential burdens on members, it was unable to give any specific examples of these potential problems. ARC Dep. 88:22-90:3.

97.     Georgia ADAPT uses civil resistance and principled nonviolence to end bias against Georgians with disabilities and it works to empower the disabled community in Georgia. Deposition of Georgia ADAPT Vol. I [Doc. 726] ("ADAPT Dep. Vol I") 48:12–49:9.

98.     Georgia ADAPT is not relying on financial diversion of resources for standing purposes. ADAPT Dep. Vol. I 17:23–18:8.

99.     Prior to the adoption of SB 202, ADAPT provided rides to the polls and educational activities, including handing out snacks and water in

the 2020-2021 election cycle only. ADAPT Dep. Vol. I 24:2–15, 83:17–84:15, 85:20–86:8.

100. ADAPT would also provide interpreters for some voters with disabilities. ADAPT Dep. Vol. I 87:17–88:3.

101. Of these activities, ADAPT has only stopped providing interpreter services. ADAPT Dep. Vol. I 88:1–3.

102. ADAPT still provides water and a snack to voters to whom it gives rides. ADAPT Dep. Vol. I 29:11–21.

103. ADAPT still provides rides for voters. ADAPT Dep. Vol. I 34:1–11, 68:21–69:2.

104. ADAPT was not able to identify specific programs it ceased engaging in aside from interpreter services for deaf voters. ADAPT Dep. Vol. I 88:10–22, 116:18–117:1.

105. ADAPT is also unaware of any members who were unable to vote by absentee ballot and could only identify one person who had difficulty voting because of a car battery issue. ADAPT Dep. Vol. I 103:2–104:2, 105:25–106:11.

106. While it knew of some members who had issues voting due to identification or other challenged provisions, it was not sure details about those events. Deposition of Georgia ADAPT Vol. II [Doc. 729] ("ADAPT Dep. Vol. II") 20:9–21:20, 34:2–36:13, 36:25–39:2. 40:5–25.

107.   It also was not aware of the situations for individuals who did not receive absentee ballots but for which it later provided rides. ADAPT Dep. Vol. II 29:20–31:16.

108.   ADAPT also does not maintain a membership roster, so it cannot say for certain who its members are. ADAPT Dep. Vol. II, 8:9–14.

109.   The majority of funding for the Georgia Advocacy Office (GAO) comes from federal grants. Deposition of Georgia Advocacy Office [Doc. 739] ("GAO Dep.") 27:10-18.

110.   One of GAO's goals is "to ensure full participation in the electoral process for individuals with individuals residing in facilities and congregate settings." GAO Dep. 48:09-19.

111.   And this was the organization's goal prior to enactment of SB 202. *Id*.

112.   GAO's primary mission is to advocate for people with disabilities, GAO Dep. 50:16-25.

113.   A large portion of the work GAO involves voter education specific to individuals with disabilities or those that are housed in a psychiatric facility. GAO Dep. 51:16-52:01.

114.   And much of this education revolves around changes in voting laws as they occur: for example, GAO updated training materials in response

to the change in voting machines Georgia implemented in 2019. GAO Dep. 56:21-57:05.

115.   GAO could not explain changes in its voter education-related work after the passage of SB 202: "[O]verwhelmingly, before SB202, our concentration was telling people to exercise their right to vote. And now it's more about helping to facilitate them to vote and how to vote." GAO Dep. 60:14-17.

116.   And as a practical matter, the GAO said it continued its earlier process of occasionally escalating complaints the organization received from individuals with disabilities related to voting to the Secretary of State's office, "a couple times a year, maybe." GAO Dep. 150:05-11.

117.   But since the passage of SB 202, GAO could not recall escalating any such complaints. GAO Dep. 150:12-16.

118.   Another of GAO's primary examples of purported resource diversion involved the creation of a videotape the organization had made related to voting which, "we had planned to use for years," that had to be remade after SB 202 Ga Dep. 150:22-151:010.

119.   But GAO could not explain why the video redo was ordered and paid for before SB 202 was passed. GAO Dep. 172:13-174:09.

120.   Other purported "expenses" resulting from SB 202 involved thousands of dollars allocated to banquet halls and hotels. GAO Dep. 174:10–177:01.

121.   Asian Americans Advancing Justice – Atlanta (AAAJ) does not assert any standing based on a diversion of financial resources or based on associational standing. Deposition of Asian Americans Advancing Justice – Atlanta [Doc. 694] ("AAAJ Dep.") 7:14–8:5.

122.   Its sole basis for standing is diversion of non-financial resources because it is not a membership organization. *Id.*, AAAJ Dep. at 7:24–8:5.

123.   AAAJ has long engaged in voter engagement and voter education, including get-out-the-vote activities and policy advocacy as part of its mission of encouraging voters to participate in the political process. AAAJ Dep. 41:22–24:24, 82:13–17.

124.   That includes updating materials and training staff when laws related to elections change. AAAJ Dep. 55:16–56:2; 68:25–69:6.

125.   While claiming it was unable to engage in some immigrant detention issues, AAAJ does not have any documents reflecting those changes in resource allocation it claims occurred. AAAJ Dep. 60:7–61:11, 61:23–62:2.

126.   Ultimately, the types of decisions made by AAAJ were related to resource allocation as opposed to discontinuing all of certain categories of its work. AAAJ Dep. 97:3–98:8.

127.   AAAJ's advocacy often changes, so it could not say for sure whether particular activities it chose not to engage in were actually planned activities it could not engage in as a result of SB 202. AAAJ Dep. 93:23–95:7.

128.   Ultimately, AAAJ is unaware of any specific individuals who were unable to vote as a result of SB 202. AAAJ Dep. 119:20–120:8.

129.   Despite making a number of claims about his concerns about the voting process, Mr. Paik was able to successfully vote by absentee ballot in the 2021 and 2022 elections. Deposition of Steven Paik [Doc. 751] ("Paik Dep.") 24:7–25:1.

130.   In fact, Mr. Paik used a dropbox when voting in the 2022 election. Paik Dep. 26:10–16, 40:9–17, 40:24–41:19.

131.   Mr. Paik agreed that the changes in Georgia law in SB 202 did not personally impact him, but he had only "heard it is going to get difficult" to vote. Paik Dep. 42:3–43:3.

132.   Ms. Aquino voted using a drop box in 2020, but could not remember whether the drop box was still there when she voted in 2022. Aquino Dep. 49:25–50:21.

133.   Ms. Aquino testified that SB 202 did not make it more difficult for her to vote and that she has not had trouble voting since SB 202. Aquino Dep. 29:9–14, 51:20–24.

134.   Ms. Uddallah says her preference is to vote by mail, but only voted absentee by mail in the January 2021 runoff election. Deposition of Angelina Thuy Uddallah [Doc. 740] ("Uddallah Dep.") 35:19–36:2, 36:17–37:10.

135.   Ms. Uddallah has only used a drop box in the January 2021 runoff and in no other election. Uddallah Dep. 42:21–43:1.

136.   Ms. Uddallah voted in person using early voting in the 2022 general election. Uddallah Dep. 36:3–36:12.

137.   Ms. Uddallah was able to vote in the general election and runoff in 2022. Uddallah Dep. 42:13–16.

138.   Ms. Enjeti-Sydow has not attempted to vote by absentee ballot since SB 202, but has instead opted to voted early in person. Deposition of Anjali Enjeti-Sydow [Doc. 741] ("Enjeti-Sydow Dep.") 43:20–44:2, 48:21–49:3.

139.   Ms. Enjeti-Sydow chose not to vote using a drop box after the passage of SB 202, even though she had never used a drop box except in the 2020 election cycle. Enjeti-Sydow Dep. 40:23–14.

140.   Ms. Enjeti-Sydow did successfully deliver her daughters' absentee ballots to a drop box in a process that took 30-45 seconds after she arrived. Enjeti-Sydow Dep. 104:21–105:14, 106:20–107:5.

141.   Ms. Enjeti-Sydow does not know of any voters who could not vote as a result of SB 202. Enjeti-Sydow Dep. 119:15–20.

142.   Ms. Enjeti-Sydow has not waited in a line to vote that was longer than 25 minutes after the passage of SB 202.[1] Enjeti-Sydow Dep. 63:23–64:11, 64:18–65:14, 66:10–67:22.

143.   The Concerned Black Clergy of Metropolitan Atlanta (CBC) explained that while 30-40 percent of CBC's time centered on election activities prior to the passage of SB 202, once the law was passed "it began to really be the focus of our organization." Deposition of the Concerned Black Clergy of Metropolitan Atlanta [Doc. 692] ("CBC Dep.") 64:07-08.

144.   But this change in focus resulted not necessarily from the passage of SB 202, but due to the "great deal of hysteria" surrounding its passage and the high degree of "misinformation and disinformation circulating." CBC Dep. 63:12-64:13.

145.   So while CBC says it "moved away from health issues, and you know, all of the other issues that we would talk about in the community," in order to focus on SB 202, this move was ultimately the result of a speculative hysteria about what the law meant as distinct from the provisions of the law itself. *Id.*

---

[1] Ms. Enjeti-Sydow lacks confidence in Georgia's Dominion voting equipment. Enjeti-Sydow Dep. 88:21–90:3.

146.   Moreover, any changes were not diversions but were only increases in voter-related activities, that "went from a grass fire to a house fire to neighborhood fire to a five-alarm fire." CBC Dep. 73:21-23.

147.   Rev. Jones admitted that CBC has not "surveyed or polled its members to determine if the challenged provisions in this lawsuit have impaired members' ability to vote." CBC Dep. 138:18-22.

148.   The Justice Initiative (JI) is not claiming a financial diversion of resources in this action, so they are relying on the diversion of the organization's time and personnel to establish organizational standing. Deposition of the Justice Initiative [Doc. 727] ("JI Dep.") 21:14–17.

149.   JI could only point to doing "more" of its usual practices as a result of the passage of SB 202. JI Dep. 29:07-09 ("[B]asically… we went into a more intense training of citizens because of the effects of SB 202.").

150.   When describing that "more intense training," JI stated that, usually, the organization "may have done caravans to empower people to go and vote and get out the polls," and "we may have actually been in five counties a day." JI Dep. 31:12-20.

151.   Since SB 202, however, these caravans are "covering one county a day" and the Justice Initiative considers this as "non-financial diversion of resources" essentially because "we're hitting one county a day versus four counties a day." JI Dep. 31:12-20, 32:07-08.

152.   JI provided a slew of apparent changes in the organization dealing with issues entirely distinct from SB 202, including Get Out the Vote Efforts, List Maintenance, and Voter ID, but could not identify specifically what aspects or provisions of SB 202 resulted in the organization's diversion of resources as to these widely varying election topics that are required by a variety of different election laws. JI Dep. 37:11-38:14.

153.   JI insisted that its already-existing voter-education efforts were "increased and… more individualized" due to SB 202 but it had no documentation reflecting whatever increase it claimed occurred. JI Dep. 40:15-19, 54:18-24.

154.   There are no fees associated with membership and once a person shows up at a meeting and that person becomes a member, with all non-financial resources allocated based on volunteer choices. JI Dep. 66:1-67:06, 53:13-20.

155.   There are no benefits of membership that JI could identify apart from "the general sense of having participated [in] activities and action that brings justice and particular voice to the voiceless." *Id*.

156.   In order to determine the extent of any injury to The Justice Initiative's members, the organization simply solicited reports. JI Dep. 70:24-71:2.

157.   But it could only identify one individual who purportedly experiencing harm as a result of SB 202, who was not named or otherwise identified by JI, reported that a poll worker intimidated her while voting and asked her for whom she was voting. JI Dep. 71:04-16.

158.   JI could not connect how this action by the poll worker, which was itself against the law, was the result of SB 202 except by the unsupported non sequitur that "Georgia law empowers the poll worker to be illegal." JI Dep. 72:15-16.

159.   JI ultimately admitted that any explanation for the poll worker's actions was entirely speculative, saying "I can't say what caused the poll worker to do that." JI Dep. 73:14-22.

160.   The Metropolitan Atlanta Baptist Ministers Union ("Union") could not identify any legally significant diversion of resources for purposes of establishing Article III standing.

161.   The Union had an "in-house" member, named Darrell Elligan, who generally provides reports on "political and voter registration issues," "political empowerment," "political education," and "political encouragement." Deposition of Metropolitan Atlanta Baptist Ministers' Union [Doc. 736] ("Union Dep.") 30:13-31:07.

162.   Mr. Elligan has performed this task on a weekly basis for its designee's entire tenure at the Union. Union Dep. 31:01-09.

163.   As part of his pre-SB 202 duties, Mr. Elligan would periodically create voter-education-related materials, and these materials increased after the passage of SB 202. Union Dep. 51:05-52:04; 53:07-11.

164.   The Union also discussed SB 202 in conjunction with its preexisting voter coordinating hub, claiming that SB 202 required more activity around the efforts of the hub and that SB 202 necessitated "more activity," "longer meetings," and "more discussions." Union Dep. 58:01-60:01.

165.   Moreover, most of the informational material that the Union disseminated to its members was created not by the Union, but by other organizations including the Secretary of State's office. Union Dep. 60:04-09.

166.   In addition to the purported lengthening of meetings at the Union and the general increase in material provided as a result of SB 202, the Union claimed its voter transportation schedule undertaken was also affected by SB 202. But in support of this, the Union only identified transportation efforts undertaken by other organizations that the Union would join, such as Souls to the Pools. Union Dep. 88-07-13.

167.   Moreover the Union engaged in transportation services, if informally, at least since 2018. Union Dep. 79:09-25.

168.   Even on the issue of food and drink in line, the Union admitted that it is possible it was encouraging people to have a snack and remain in

line before SB 202, but that "it was more important in 2022" due to SB 202. Union Dep. 93:13-20, 93:21-25.

169.   Due do the drop box provisions of SB 202, the Union's designee reported that members decreased giving rides to seniors to drop off ballots "because of intimidation." Union Dep. 119:21-120:04.

170.   The First Congregational Church, United Church of Christ ("UCOC") based its claims of purported resource diversion on the fact that the organization needed to "ramp up" its usual voter education efforts in the wake of SB 202. Deposition of First Congregational Church [Doc. 735] ("UCOC Dep.") 25:02-13.

171.   It claimed that "we took time away from other things to make sure that our members were properly prepared to vote," UCOC Dep. 25:14-16, but did not delve into those projects that had resources taken away in any detail.

172.   Moreover, UCOC admitted that it "can't quantify the hours of time" the organization apparently diverted in response to SB 202. UCOC Dep. 27:02-13.

173.   Beyond that, UCOC has "no documents… that quantify the number of additional hours or redirected hours." UCOC Dep. 27:14-21.

174.   Finally, with respect to activities or initiatives that UCOC is unable to engage in due to its purported resource diversion on account of SB

202, it admitted that, "the way in which the church operates, it's impossible to answer that…" UCOC Dep. 44:06-12.

175.   With respect to injury to UCOC's members, it only "know[s] of one member particularly, who was actually did not vote because of SB 202, only one." UCOC Dep. 23:15-21.

176.   But the reason the individual was unable to vote was because "they were in the wrong – at the wrong precinct and could not [get to the correct precinct] because they were dependent on mass transportation…" UCOC Dep. 23:22-24:06.

177.   UCOC has no documentation evidencing this story. UCOC Dep. 24:14-18.

178.   The Georgia Latino Alliance for Human Rights' ("Alliance") mission is "educate voters about how to vote… and to encourage them to vote… and to give them information about where and when they can vote." Deposition of Georgia Latino Alliance for Human Rights [Doc. 693] ("Alliance Dep.") 34:08-19.

179.   While the Alliance identified several areas where it claimed a conflict with its mission, it was unable to explain how educating voters about the changes in SB 202 were in conflict with their overall purpose. Alliance Dep. 33:03-25, 34:05-07.

180.    To the extent the Alliance described how it "diverted" resources in response to SB 202, it is more accurately described as simply doing more of the same things it usually did. Alliance Dep. 39:12-25.

181.    While the Alliance's purpose is to educate voters, its designee explained the difference in education after SB 202 was one of degree. "[W]e did it before… the difference, the amount of, number of people canvassing on the streets. Materials, increase in staff, and also all the time-consuming for all of us…" Alliance Dep. 41:23-42:02.

182.    And when asked what the Alliance would be doing today but for the passage of SB 202, its designee could only speculate, saying, the Alliance "probably would create more digital contents," instead of responding to SB 202. Alliance Dep. 48: 20-25.

183.    Each Plaintiff group of the five consolidated cases considered in this motion raises challenges to the timing of various election procedures. Specifically, the various plaintiff groups challenge the deadlines related to mailing absentee ballots, [NGP Doc. 39, ¶ 76]; [NAACP Doc. 35, ¶ 147]; [AME Doc. 83, ¶¶ 254]; [AAAJ Doc. 27, ¶¶ 85–86].

184.    They also challenge the shortened time period for runoff elections, [NGP Doc. 39, ¶ 108]; [NAACP Doc. 35, ¶ 148], [AME Doc. 83, ¶ 268]; [CBC Doc. 1, ¶ 138].

185.   Finally, the Ga. NAACP Plaintiffs challenge the provisions of SB 202 related to the timeline for early voting, [NAACP Doc. 35, ¶ 149].

186.   During the 2020 election, the timeline was so long that some voters were confused, forgetting they voted by absentee ballot by the time the election arrived. Deposition of Ryan Germany (March 7, 2023) [Doc. 707] ("Germany Dep. (3/7)") 132:9–133:4.

187.   Further, a number of late-requested absentee ballots were never returned. Declaration of C. Ryan Germany (July 27, 2023) [Doc. 601-3], attached as Ex. C ("Germany 7/27/23 Dec."), ¶ 99.

188.   And instead of four days before an election being the deadline, the legislature added a week, setting 11 days as the deadline prior to an election—a timeline that will still ensure a full week of early voting is available for any voter who does not return an application before 11 days prior to the election. Germany 7/27/2023 Dec. ¶¶ 94–95.

189.   Importantly, SB 202 retained Georgia's no-excuse absentee voting. Expert Report of Dr. Justin Grimmer, attached as Ex. DDDD ("Grimmer Report"), ¶ 71.

190.   In 2018 election, 88.4% of all mail-in absentee ballot applications were requested within the new deadlines in set forth in SB 202. Grimmer Report, ¶ 76.

191.   For the 2020 election, 93.8% of all mail-in absentee-ballot applications complied with the SB 202 deadlines. Grimmer Report, ¶ 78.

192.   While there are slight variations in the racial data about the return of absentee ballots, there is no consistent patten across different racial groups. Grimmer Report, ¶¶ 79–80.

193.   The data also confirms the legislature's analysis—that applications that arrived outside of the SB 202 deadlines in prior elections were more likely not to be voted or to be cancelled. Grimmer Report, ¶ 85.

194.   From 2014 through 2019, the only general-election runoffs took place in 2018 for the state offices of Secretary of State and Public Service Commissioner and both were held four weeks after election day. Declaration of Ryan Germany (Aug. 10, 2023) [Doc. 610-1], attached as Ex. IIII ("Germany Dec. [Doc. 610-1]"), ¶¶ 57–58.

195.   In 2020, three statewide general-election races required runoffs: both U.S. Senate seats and a Public Service Commission seat and those were combined due to insurmountable logistical difficulties. *Id*. at ¶¶ 59–60.

196.   By allowing military and overseas voters to vote in runoffs without requiring another round trip for an absentee ballot, the 45-day requirement of the MOVE Act no longer applied. Germany Dec. [Doc. 610-1] ¶ 62.

197. In the 2018 general election, 61.4% of registered voters voted (approximately 3.9 million votes). Germany Dec. [Doc. 610-1], ¶ 72.

198. But in the 2018 runoff election, only 22.9% of voters voted (almost 1.5 million votes). Germany Dec. [Doc. 610-1], ¶ 73.

199. That changed in 2020, with 69.6% of active voters voting, or nearly 5 million votes cast, in the 2020 general election, and then 61% of active voters voting, or approximately 4.4 million votes cast, in the January 2021 runoff election. *Id.* at ¶ 74.

200. The 2022 runoff showed a similar pattern, when 57.02% of voters voted, or 3.9 million votes cast, in the 2022 general election, and 50.58% of voters voted, or 3.5 million votes cast, in the December 2022 runoff election—even when control of the U.S. Senate was not on the line as it was in 2020. Germany Dec. [Doc. 610-1] ¶ 75.

201. In other words, the December 2022 runoff resulted in a smaller decrease in turnout rate when compared with the general election than the January 2021 runoff even with the shorter timeline. Grimmer Report ¶ 30.

202. In addition, more voters used weekend voting in the December 2022 runoff than in the January 2021 runoff, with a 58.6% increase in weekend voting in the four-week runoff over the nine-week runoff. *Id.* at ¶¶ 18, 184–185.

203.   In fact, voter turnout in Georgia has been increasing for years, even in midterm elections that usually have lower turnout than Presidential election years. *Id*. at ¶¶ 27–28.

204.   Turnout in both the 2022 general election and 2022 general runoff election was very high, with the turnout rate for the 2022 midterm approximately 81% higher than the turnout rate for the 2014 midterm, which is larger than the increase of the 2020 general election turnout rate over the 2016 general election turnout rate. *Id*.

205.   Further, Georgia voter turnout in mid-term elections remains higher than other comparable states after SB 202. *Id*. at ¶¶ 41–42, 44–45.

206.   And the decreases in Black voter turnout in Georgia from 2018 to 2022 that Plaintiffs point to are smaller than in other states that track similar data. *Id*. at ¶¶ 48–50.

207.   In 2022, four-week runoffs were held in June for the May primary, then again in December after the November general election. Germany Dec. [Doc. 610-1], ¶ 63.

208.   Black candidates regularly were successful in those four-week runoffs in 2022, with Black candidates winning the Democratic nominations for Insurance Commissioner and Labor Commissioner in June and a Black candidate winning the U.S. Senate race in December 2022 in a race with another Black candidate. *Id*. at ¶ 64–65.

209.   With these increases in access to early voting, Georgia offers more early voting days than Arkansas, Connecticut, Delaware, Florida, Kentucky, Maryland, Massachusetts, Michigan, New Jersey, and New York. *See* NCSL, *States and Territories with Early In-Person Voting*, https://www.ncsl.org/elections-and-campaigns/early-in-person-voting (updated June 13, 2023).

210.   The 2022 election resulted in the continued increase in the use of early in-person voting by Georgia voters. Grimmer Report, ¶¶ 54–55.

211.   That is true of each racial group in the state, with early in-person voting the most-used voting method for Black and white voters in 2020 and 2022. Grimmer Report, ¶¶ 57, 60.

212.   In 2022, Black voters cast the largest share of their votes using absentee voting methods. Grimmer Report, ¶ 63.

213.   Three Plaintiff groups challenge the changes made to out-of-precinct voting as violations of Section 2 of the VRA, the fundamental right to vote, and violations of the Americans with Disabilities Act: [NGP Doc. 39, ¶ 101], [NAACP Doc. 35, ¶ 159], [AME Doc. 83, ¶ 273].

214.   Likewise, three Plaintiff groups challenge the processes regulating voter challenges as violations of Section 2 of the VRA and the fundamental right to vote: [NGP Doc. 39, ¶ 106], [NAACP Doc. 35, ¶ 164], [CBC Doc. 1, ¶ 163].

215.   And two Plaintiff groups challenge the process for temporarily suspending county officials who have a pattern of not following state law: [NAACP Doc. 35, ¶ 163], [CBC Doc. 1, ¶ 167].

216.   Beginning with the 2018 election, county and state officials saw an increase in the number of out-of-precinct provisional ballots, which led to substantial burdens on election officials. Germany 7/27/2023 Dec., ¶ 108.

217.   Processing provisional ballots for voters who vote in the wrong precinct requires manual duplication for contests in which the voter is eligible to vote, which is time consuming and impedes the ability of officials to carry out other important tasks. *Id*.

218.   Out of precinct provisional ballots also slow down voting on election day and increases concerns about the potential for fraud. *Id*. at ¶¶ 110–11.

219.   Unlike other states, it did not ban out of precinct provisional ballots outright, but instead provided a process for directing voters to the correct precinct until 5:00pm, and then allowing voters to vote out of precinct if they were unable to get to their correct polling place after that point. Germany 7/27/2023 Dec. ¶ 114.

220.   Less than half of the states in the United States partially count provisional ballots cast in the wrong precinct. 2022 EAVS Report (attached as Ex. QQQQ), U.S. Election Assistance Commission, p. 84.

221.   About half of all states reject out of precinct provisional ballots entirely. *Id.*

222.   During the runup to the 2021 runoff, electors attempted to use the processes in both statutes to challenge electors. Germany Dep. (3/7) 194:3–9.

223.   Counties handled the processes inconsistently, with some counties placing numerical limits on the number of challenges and others refusing to hear the challenges filed by voters. Germany Dep. (3/7) 190:2–19, 193:3–10.

224.   This process is the only statutory option, even when county officials decided to blatantly violate Georgia law. Deposition of Matthew Mashburn (March 7, 2023) [Doc. 709] ("Mashburn (3/7)") at 215:15–23.

225.   The only other options for SEB enforcement are administrative, such as a fine for violations of the Election Code. Mashburn (3/7) at 215:15–23.

226.   Since the adoption of SB 202 in 2021, the only county election officials who have undergone a performance review are the members of the Fulton County Board of Elections and Registration and staff. Declaration of Ryan Germany (July 17, 2023) [CGG Doc. 123-3], attached as Ex. HHHH ("Germany CGG Dec."), ¶¶ 4–6; Fulton Performance Review Board Report ("Fulton Report"), attached as Ex. 1 to Germany CGG Dec.

227.   The Fulton County Performance Review was initiated by members of the General Assembly in the local legislative delegation. Fulton Report, p. 5.

228.   The three-member Review Board personally observed "pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections." Fulton Report at 6.

229.   Those observations included at least four visits to the Fulton County Election Processing Center and at least 16 visits to different election day polling place and advance-voting locations. Fulton Report at 6.

230.   The Review Board also worked with the Carter Center to observe Fulton County elections in November 2022 to assist with its review. Fulton Report at 6.

231.   Finally, the Review Board conducted formal interviews with staff and members of the Fulton County Board of Elections, reviewed procedures, and coordinated with the Secretary's office for its review. Fulton Report at 7.

232.   When it issued its report, the Review Board confirmed that, in prior years, "disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections." Fulton Report at 1.

233.   But the Review Board also recognized the improvement in election administration in Fulton County from 2020 through 2022, at least in

part because of the incentives created by the Performance Review itself and Fulton County's voluntary adoption of many of the Board's recommendations. Fulton Report at 18.

234.   As a result, the Review Board did not recommend any Fulton officials be suspended under the Suspension Rule. Fulton Report at 18–19.

235.   The SEB did not suspend the Fulton officials, has not announced any plans for conducting additional performance reviews, and is not considering suspension of additional county election officials, including the Board Member Plaintiffs here. Germany CGG Dec., ¶¶ 7–8.

236.   Thus, the SEB has not suspended any county officials, nor has it announced any plans to do so or to investigate any other county at this point. Germany CGG Dec., ¶ 8.

237.   Out of precinct voting likely disenfranchises voters from participating in local elections Germany 7/27/2023 Dec. ¶¶ 108–13.

238.   The evidence also demonstrates no burden on the right to vote— thus far, the SEB has suspended *zero* county officials, to say nothing of failing to replace an official that was suspended after a thorough investigative procedure. Germany CGG Dec., ¶¶ 6–8.

239.   The evidence demonstrates the suspension processes have resulted in improved elections. Fulton Report, pp. 18–19.

240.   SB 202's Food, Drink, and Gift ban is the latest in a line of Georgia laws aimed at increasing electoral efficiency, preventing voter intimidation, and enhancing voter confidence.  Mashburn (3/7) at 104:7–105:7

241.   In 2010, the General Assembly passed a bill establishing a 150-foot "Buffer Zone" around buildings used as polling places, with an additional 25-foot "Supplemental Zone" around any voter waiting in line at a polling place.  O.C.G.A. § 21-2-414(a) (2010); H.B. 540, 150th Gen. Assemb., Reg. Sess. (Ga. 2010).

242.   Before 2017, third parties began setting up tables within the Buffer Zone, which became a distraction for voters and officials. Deposition of Matthew Mashburn (March 14, 2023) [Doc. 710] ("Mashburn 3/14") 124:7–17.

243.   In 2017, after the legislature responded by prohibiting the setting up of tables and booths within either protective zone, third parties began sending representatives to polling places to hand things of value to voters waiting in line to vote.  This led state and county officials to receive many complaints and questions.  Germany (3/7) Dep. 107:4–108:11; Deposition of Gregory Edwards [Doc. 754] ("Edwards") 50:4–50:8.

244.   For instance, poll workers were "inundated with questions" about whether this activity was acceptable.   Mashburn 3/14 93:17–94:25.

245.   Officials often had difficulty determining what activities qualified as "campaign activities." Deposition of Janine Eveler [Doc. 700] ("Eveler") 143:6–16.

246.   Voters repeatedly complained that these activities seemed unlawful and intimidating. Declaration of Ryan Germany (6/24/22) [Doc. 197-2], attached as Ex. F ("Germany Decl. 197-2") ¶¶ 29–30.

247.   Given the subjective nature of the law, county officials often struggled to determine whether certain activities were lawful. Deposition of Gabriel Sterling [Doc. 721] ("Sterling") 204:10–205:13; Mashburn 3/14 126:12–127:3; Deposition of Lynn Bailey (October 6, 2022) [Doc. 715] ("Bailey 10/6") 147:6–18; Eveler 138:15–24.

248.   Confusion often led to delays while officials corresponded with supervisors about whether the activity around lines was permissible. Mashburn 3/14 152:20–153:14.

249.   As Ryan Germany, General Counsel for the Georgia Secretary of State, explains, polling locations operate under a complicated set of rules that ensure the voting process is free of outside influence, confusion, or harassment. Germany Decl. 197-2 ¶¶ 17–27.

250.   This complex system led to confusion and questions from election officials about who may engage in what activity in the areas surrounding the polling place.  Germany Decl. 197-2 ¶ 31.

251.   Sometimes disagreements led to police involvement. Mashburn 3/14 152:20–153:14; Mashburn 3/14 138:10–13.

252.   As time progressed, the third parties increased their line-warming activities by providing voters with more valuable items, like phone chargers, candy, clothing, fans, and homemade knitted items.  Mashburn 3/14 143:22–144:6; Eveler 288:5–12; Deposition of Chris Harvey [Doc. 719] ("Harvey") 149:19–25; Mashburn 3/7 104:12–105:7.

253.   Along with the increased value of these items, the third parties also began creating more chaotic atmospheres around polling locations by playing loud music, bringing in performers, and otherwise creating a "circus" environment.  Bailey 10/6 140:25–141:5; Mashburn 3/7 104:12–105:7, 109:7–13; Deposition of Lynn Bailey (March 21, 2023) [Doc. 716] ("Bailey 3/21") 217:3–5; Mashburn 3/14 107:24–108:2, 128:1–5, 198:3–11.

254.   In addition to causing confusion and distractions, these activities gave the appearance that political parties were "running the line."  Mashburn 3/14 111:23–113:1; *see also* Mashburn 3/7 101:15–102:16.

255.   State Elections Board ("SEB") member Matthew Mashburn explained that "the practice of giving out food and drinks 'got out of hand' in recent years, with taco bars, buffets and snack stands set up at polling places."  Mark Niesse, Georgia lawmakers under investigation for handing

out snacks to voters, ATL. J.-CONST. (May 19, 2021),

https://tinyurl.com/2p92b7se.

256.   Yet, as retired county elections official Lynn Bailey explained, "there is no practical way for elections officials to ensure that" individuals in this bubble are "not using food or water as a basis to approach a voter and electioneer" or ensure "that the individual is giving the voter accurate information about voting." Expert Report of Lynn Bailey, attached as Ex. AAAA ("Bailey Rep.") ¶¶ 12.

257.   One such organization stated its activities were the "last chance to reach Georgians before they vote" in an election that could "determine control of the U.S. Senate."  Germany 6/24/22 Decl. ¶ 30(c).

258.   These activities led to complaints, confusion, and concerns about potential confrontations.  Germany 3/7 97:10–22, 98:2–10, 107:25–108:11; Deposition of Ryan Germany (April 13, 2023) [Doc. 706] ("Germany 4/13") 235:25–240:7; Mashburn 3/14 110:12–19, 114:20–25; Deposition of Nadine Williams [Doc. 704] ("N. Williams") 154:7–155:2; Bailey 10/06 59:25–60:14; Mashburn 3/7 109:7–13.

259.   Rather, as the record confirms, this practice was very rare in Georgia before 2018, and even then, it occurred at a much lower level than in 2020.  Mashburn 3/7 104:11–105:7; Eveler 287:16–25; Deposition of Shafina

Kabani [Doc. 725] ("Kabani") 111:20–23; Deposition of Keisha Smith [Doc. 702] ("Smith") 149:16–150:4; Griggs Dep. 48:13–23.

260.   In 2020, officials were unclear if handing things of value to voters violated the law against providing items of value for the "purpose of … voting." Mashburn 3/14 94:15–25 ("poll managers were getting confused," and "inundated with questions" about the legality of these activities); Eveler 138:15–24 ("we didn't know where the line was, basically").

261.   Indeed, when third-party organizations approach voters in line, there is a "real risk that a voter will feel unwanted pressure and even harassment and not want to vote in future elections."  Declaration of Matthew Mashburn (June 13, 2023) [Doc. 578-4], attached as Ex. M ("Mashburn Decl.") ¶ 19.

262.   These problems could occur anywhere in the voting line as all voters in line are "captive" to someone approaching them and are left with just two options: "forgo his or her place in line and return another time," or be "subject[ed] … to the solicitation."   Mashburn Decl. ¶ 21; Bailey 3/21 172:12–173:8.

263.   Voters always suspect "always suspect the motives are partisan" when they see organizations approaching voters in line with something of value.  Germany 6/24/22 Decl. ¶ 29(d).

264.   Voter concerns are understandable, as third-party groups rarely offer their items of value to non-voters in the area.  Mashburn Decl. ¶ 24.

265.   State election officials also received complaints from counties that these unregulated activities made it "more and more difficult to sort of keep order in the lines."  Harvey 147:11–21; Bailey 3/21 128:7–15.

266.   Candidates distributed pizza and other items to voters in line. Mashburn 3/7 104:13–14.

267.   This chaos caused state election officials to worry that voters could "misunderstand interaction with outside individuals that are approaching voters in line, and that it can cause confrontation even amongst the voters themselves standing in line."  Bailey 3/21 128:21–129:2; Germany 3/7 107:25–108:11; Mashburn 3/14 114:20–25.

268.   Valid concerns of intimidation and the appearance of partisanship persist regardless of the line's length.  Germany 6/24/22 Decl. ¶¶ 30–31; Declaration of Ryan Germany (June 15, 2023) [Doc. 578-3], attached as Ex. E ("Germany 6/15/23 Decl.") ¶¶ 22, 29

269.   Voters apparently interpreted the conduct in a muddle of ways, including partisanship, electioneering, and bribing voters.  Germany 6/24/22 Decl. ¶¶ 29–30.

270.   Even those voters who enjoyed the provided items differentiated the "encouragement and support" from the items provided. Declaration of Jauan Durbin [Doc. 547-9], attached as Ex. K ("Durbin Decl.") ¶ 6.

271.   The 150-foot bubble had lost its "original purpose of keeping [voters] safe and limiting the opportunities for harassment and intimidation." Mashburn 3/7 117:20-23.

272.   SB 202's line-warming rules sought to prevent intimidation and undue influence -on voters. Sterling 204:6–24, 205:17–206:2.

273.   These measures sought to give voters a "safe spot to be in." Bailey 3/21 127:15–128:6.

274.   And it responded to poll worker confusion by creating a bright-line, easily administrable rule.  Mashburn 3/14 93:17–22, 181:17–182:2; Sterling 204:25–205:13; Harvey 148:16–149:18.

275.   Additionally, this provision sought to preserve order around the polls and end the "chaotic atmosphere" caused by disruptive activities. Bailey 3/21 128:7–129:4; Mashburn 3/14 198:8–11.

276.   Moreover, this provision sought to increase voter confidence by making it easier to prevent electioneering by decreasing voter interactions with outside groups.  Mashburn 3/14 112:1–2, 112:16–18; Mashburn 3/7 101:15–102:16; Germany 3/7 107:25–108:11; Germany 6/24/22 Decl. ¶¶ 32–33, 35–36; Eveler 288:13–289:14.

277.   SB 202 identified the following interests in enacting the Food, Drink, and Gift Ban: increasing voter confidence after accusations of fraud, reducing the burden on election officials, streamlining the elections process, and promoting uniformity in voting.  Georgia Senate Bill 202 (2021), attached as Ex. A ("SB 202") at 4:70–82, 6:126–29.

278.   SB 202 responded by creating a clear rule that completely prohibited approaching voters anywhere in line to give them anything of value.  Germany 6/15/23 Decl. ¶ 25.

279.   Clarity is "important when conducting elections," as county officials undertake "hundreds of tasks" each day during an election. Germany 6/15/23 Decl. ¶ 26.

280.   This clear rule thus ensures that a county official or poll worker is not required to "stop[] what he or she is doing to contact the Secretary of State's office with a question," a process that can create the very lines Plaintiffs claim are present in Georgia. Germany 6/15/23 Decl. ¶ 26.

281.   This provision allows every polling location to provide a self-serve water container.  Mashburn 3/14 95:7–25.

282.   And it allows third parties to provide food and drinks just a few feet from the line.  Mashburn 3/14 128:6–10.

283.   And voters may bring their own food and drinks.  Deposition of Lori Wurtz [Doc. 713] ("Wurtz") 133:15–23.

284.   The law targets voter intimidation and the appearance of corruption, that result from anyone handing out items of value to voters in line for any reason.  Germany 6/15/23 Decl. ¶¶ 21–22, 28.

285.   The law allows multiple avenues to reach voters with any message—including speaking without giving out items, or giving out items a few feet away from the protective zones. *See* Mashburn Decl. ¶ 24; Germany 6/15/23 Decl. ¶ 28.

286.   SB 202 also addressed the length of lines in tandem with the Food, Drink, and Gift ban, by ensuring that that there were provisions in place for tracking line length and, where necessary, reducing precinct sizes to reduce lines.  Germany 6/24/22 Decl. ¶¶ 10–12.

287.   Indeed, contrary to Plaintiffs' claims, turnout in 2022 was near record highs for a midterm election.  Supplemental Report of Daron Shaw, attached as Ex. KKKK ("Shaw Suppl. Rep.") ¶¶ 10, 12, 17, 23.

288.   Recent data also show that only about 4.7% of black or white voters waited more than 30 minutes. Grimmer Report ¶ 218.

289.   In the 2022 elections, the State did not receive the complaints about this provision they had received following the 2020 election cycle. Deposition of Marie Watson [Doc. 722] ("Watson") 185:13–19.

290.   Georgia voters of all races reported "high levels of satisfaction" with the electoral process.  Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ.

of Ga., 2022 Georgia Post-Election Survey 252 (2023), attached as Ex. YYYY ("SPIA Survey").

291.   All precincts are now required to measure line wait times at least three times.  Germany 6/24/22 Decl. ¶¶ 10–11.

292.   All precincts with any reported wait time greater than one hour and more than 2,000 electors in the last general election must now take corrective action, such as providing more voting equipment or more poll workers, or reducing precinct size.  Germany 6/24/22 Decl. ¶ 12.

293.   Considering other provisions of SB 202, lines have been substantially reduced in Georgia.  Grimmer Report ¶ 218.

294.   Voters returning absentee ballots to drop boxes do not have to wait in line with those seeking to vote in person.  ADAPT Dep. Vol. I 31:8–17; 108:21–109:2.

295.   Disabled voters, like all voters, may obtain water from a self-serve receptacle at the polling location, or from third-party organizations standing just feet from the voting line. Mashburn 3/14 95:7–25, 128:6–10.

296.   Before 2020, no statute or regulation authorized the use of drop boxes in Georgia elections.  Mashburn 3/7 73:18–75:5.

297.   There was no evidence that ballot drop boxes had been used in the State before 2020.  Mashburn 3/7 73:18–75:5.

298.   Only 8 states had explicit statutory authorization for drop boxes before 2020.  Nat'l Conf. of State Legislatures, The Evolution of Absentee/Mail Voting Laws, 2020 through 2022, tbl. 8 (updated Oct. 3, 2023), https://tinyurl.com/emwd67uy, attached as Ex. EEEEE.

299.   In 2020 the SEB, acting under emergency authorization, issued an emergency rule authorizing the use of absentee ballot drop boxes.  Ga. Comp. R. & Regs. 183-1-14-0.8 to.14 (Ex. VVVV).

300.   The 2020 elections took place under COVID-19's temporary emergency rules.  SB 202 at 5:113–118 (Ex. A); Ga. Comp. R. & Regs. 183-1-14-0.8 to .14 (Ex. VVVV).

301.   There is no evidence that any voter was deterred from voting because drop boxes were not available in the last four days of the 2022 elections.  Deposition of Barry Burden [Doc. 743] ("Burden") 161:22–162:2.

302.   Collecting ballots daily from numerous drop boxes in 2020 imposed burdens on local election officials.   Germany 7/27/2023 Decl. ¶ 76; Eveler 156:25–157:13; Declaration of Ryan Germany [Doc. 592-2], attached as Ex. D ("Germany 6/29/23 Decl.") ¶ 18; Harvey 123:23–124:7.

303.   There also reports of vigilantes stationed at drop boxes and following election workers who were transporting ballots.  Germany 6/29/23 Decl. ¶ 18.

304. The SEB and Georgia Secretary of State (SOS) received numerous complaints of ballot harvesting—the gathering and deposit of multiple ballots by unauthorized persons—associated with the emergency drop boxes. Mashburn 3/7 73:18–77:25, 81:16–83:9; Germany 3/7 209:15–211:3; Deposition of Milton Kidd [Doc. 703] ("Kidd") 118:8–21; Germany 6/29/23 Decl. ¶¶ 7, 13.

305. Because drop box ballots could not be collected and taken to the county election office until after the polls were closed, the perception arose that the ballots delivered after polls closed were "late ballots." Germany 4/13 282:1–20; Bailey Rep. 26–28.

306. Counties received complaints about drop boxes. Germany 3/7 209:10–211:3; Germany 4/13 283:24–284:7; Deposition of Kelvin Williams [Doc. 711] ("K. Williams") 69:21–70:2.

307. Counties received public records requests for the surveillance video related to the drop boxes. Germany 3/7 209:10–211:3; Germany 4/13 283:24–284:7; K. Williams 69:21–70:2; Germany 6/29/23 Decl. ¶ 16.

308. In many cases, drop box surveillance video quality was too poor to be useful in evaluating the complaints. Mashburn 3/7 77:18–25; Germany 7/27/23 Decl. ¶ 66.

309. Some voters viewed drop boxes as susceptible to abuse because they could be placed unattended, and not properly monitored, in remote

locations.  Germany 4/13 55:19–56:2; Mashburn 3/7 76:18–24, 167:2–170:7; Mashburn 3/14 81:2–83:15; Watson 194:14–24.

310.   Several counties did not properly secure drop boxes.  Mashburn 3/14 75:8–13, 77:17–25; Mashburn 3/7 81:16–83:9, 76:12–18, 82:13–18; Germany 7/27/23 Decl. ¶ 66.

311.   One county left a key in the drop box.  Mashburn 3/14 76:12–18.

312.   One county used an unsecured cardboard box as a drop box. Mashburn 3/7 82:13–18.

313.   Fulton County placed some drop boxes outside without the required video surveillance.  Mashburn 3/7 82:15–18; Germany 7/27/23 Decl. ¶ 66; Mashburn 3/14 77:17-24.

314.   People put materials other than ballots into drop boxes.  Germany 7/27/23 Decl. ¶ 66.

315.   The emergency authorization allowing drop boxes expired after the January 2021 runoff.  Mashburn 3/14 72:14–73:24; Mashburn 3/7 74:11–14.

316.   The emergency authority merely permitted drop boxes, but SB 202 required each county to have at least one drop box, with larger counties having additional drop boxes in proportion to the county's population.  Mashburn 3/14 72:14–73:24; Mashburn 3/7 74:11–14; O.C.G.A. § 21-2-382(c).

317.   During 2020, concerns were raised about political influences on the selection of drop box locations.  Germany 7/27/23 Decl. ¶ 78 (Ex. C).

318.   Placing unattended drop boxes outdoors prompted voter concerns about election security.  Germany 7/27/23 Decl. ¶ 68 (Ex. C); Mashburn 3/7 76:18–24 (Ex. JJ).

319.   Placing drop boxes indoors and under the surveillance of a live person increases actual and perceived security.  Mashburn 3/7 76:18–24 (Ex. JJ); Germany 7/27/23 Decl. ¶ 78 (Ex. C).

320.   The ability to begin processing (though not counting) all drop box ballots before election day reduces delays in results.  Bailey 10/6 155:23–156:7 (Ex. FFF); Germany 7/27/23 Decl. ¶ 73; Bailey 3/21 157:9–158:11.

321.   The only data encompassing more than one Georgia county shows that Black voters used drop boxes less frequently or no more frequently than White voters in 2020 and 2022.  Grimmer Rep. ¶ 149 (Ex. DDDD); Updated Report of Dr. Justin, attached as Ex. EEEEE ("Grimmer Updated Rep.") 3–4, 7–11; Grimmer 184:14–24 (Ex. OOO); Transcript of Preliminary Injunction Hearing, attached as Ex. YYY ("PI Hr'g Tr.") 233:20–234:14; 10/11/23 Order at 34 [Doc. 686].

322.   In the 2022 elections, the SEB and SOS did not receive the complaints about drop boxes they had received following the 2020 election cycle.  Germany 6/29/23 Decl. ¶ 21 (Ex. D); Mashburn 3/7 83:18–21 (Ex. JJ).

323.   In 133 counties comprising 34.7% of Georgia's black population, there were the same number or more drop boxes in 2022 than in 2020.  10/11/23

Order at 14, 32–33 [Doc. 686-1]; Report of Dr. Barry Burden, attached as Ex. TTTT ("Burden Rep.") at 28–29.

324.   There is no consistent pattern when racial groups return mail-in absentee ballots.  *See* Grimmer Rep. ¶¶ 81–85 (Ex. DDDD); PI Hr'g Tr. 236:22–238:5 (Ex. YYY).

325.   There is at most a barely one-point difference between white and black voters' proportion of ballots received in the last four days before the 2020 and 2022 general elections. See Grimmer Rep. ¶¶ 81, 84–85 (Ex. DDDD).

326.   In 2020, there were approximately 300 drop boxes statewide. Burden Rep. at 28 (Ex. TTTT).

327.   There are many more mailboxes and post offices in Georgia than there were drop boxes in 2020.   Grimmer Rep. ¶ 106 (Ex. DDDD); *e.g.*, https://mailboxlocate.com/states/GA/cities/ATLANTA.

328.   Counties put drop boxes in "handicapped accessible" locations.  N. Williams 258:10–24; K. Williams 65:13–18.

329.   Voters returning absentee ballots to drop boxes do not have to wait in line with those seeking to vote in person.  *See* ADAPT Dep. 2/20/23 31:8–17; 108:25–109:2 (Ex. CC).

330.   Plaintiffs' witnesses who experienced trouble personally accessing a drop box had alternative means of returning their ballot or assistance clearly available under the statute.  *See* Declaration of Wendell Halsell [Doc. 546-14],

attached as Ex. AAAAA ("Halsell Decl.") ¶ 8; Declaration of Jacqueline Wiley

[Doc. 546-25], attached as Ex. BBBBB ("Wiley Decl.") ¶ 7; AME PI Order [Doc.

615] at 18.

331.   Halsell's nephew, who drove him to the drop box, could return the

ballot for him.  See Halsell Decl. ¶ 8 [Doc. 546-14] (Ex. AAAAA); AME PI Order

at 18 [Doc. 615].

332.   Wiley could and did return her son's ballot.  *See* Wiley Decl. ¶ 7

[Doc. 546-25] (Ex. BBBBB); AME PI Order at 18 [Doc. 615].

333.   Anyone could have helped Papadopoulos open a mailbox so that he

could mail his own ballot.  AME PI Order at 18 [Doc. 615].

334.   There is no evidence that mobile voting units were ever used for

the benefit of voters with disabilities.  N. Williams 177:23–178:3, 178:22–25,

267:19–268:8 (Ex. AA).

335.   Mobile Voting Units could not serve residential facilities for the

elderly in 2020.  N. Williams 177:23–178:3, 178:22–25, 267:19–268:8 (Ex. AA).

336.   Mobile Voting Units were less accessible to persons with

disabilities than ADA-compliant stationary polling places.   N. Williams

177:23–178:3, 178:22–25, 267:19–268:8 (Ex. AA).

337.   There is no evidence that mobile voting units increased turnout

among people with disabilities.  Deposition of Lisa Schur [Doc. 749] ("Schur")

189:21–25 (Ex. UUU).

338.  Mailboxes are often accessible without getting out of a vehicle. Burden 146:17-20 (Ex. HHH).

339.  No Georgia county used mobile polling places in modified buses until Fall 2020, when Fulton County used two units.  N. Williams 174:11–175:2 (Ex. AA); Mashburn 3/14/23 194:14–20 (Ex. KK); Germany 3/7 171:21–172:3 (Ex. HH).

340.  Mobile voting units on buses or similar vehicles were unknown in the United States until 2010.  Report of Kevin Kennedy, attached as Ex. FFFF ("Kennedy Rep.") 39.

341.  Mobile voting units on buses or similar vehicles not widespread in the United States.  Kennedy Rep. 18 (Ex. FFFF).

342.  Mobile voting units generated many complaints that they might be allocated unfairly, and that county officials would place the units in politically favorable precincts while avoiding unfavorable ones.  Germany 3/7/23 172:4–11, 172:6–11, 173:11–175:2 (Ex. HH); Mashburn 3/14 38:23–39:19, 173:14–175:2 (Ex. KK).

343.  There were concerns that mobile units gave an advantage to counties that could afford them.  Mashburn 3/14/23 51:12–52:3 (Ex. KK).

344.  Voters had less notice where mobile voting units would be located on a given day than was available with stationary polling places.  Germany 3/7/23 173:11–174:2 (Ex. HH).

345.   There is no evidence on how many voters with disabilities used the absentee ballot drop boxes in 2020/2021 "after hours."   *See* Schur 75:16–25, 103:15–18 (Ex. UUU).

346.   There was no evidence that any voters with disabilities were prevented from voting absentee in 2022 due to the location and hours of the drop boxes.   See Schur 75:16–25, 103:15–18 (Ex. UUU).

347.   There is no evidence respecting how many, if any, drop boxes in 2020 were placed where a voter could drive up and put a ballot in the drop box without leaving the vehicle.   See Schur 75:16–25 (Ex. UUU).

348.   More votes were cast in the 2022 midterm election than in any other midterm.   Ga. Sec'y of State, *Georgia Voters Lead Southeast in Engagement, Turnout* (May 17, 2023), https://tinyurl.com/2huchh3h, attached as Ex. FFFFF.

349.   The 2022 midterm also reflected the most votes ever cast by mail in a Georgia midterm.   Ga. Sec'y of State, *Georgia Voters Lead Southeast in Engagement, Turnout* (May 17, 2023), https://tinyurl.com/2huchh3h, attached as Ex. FFFFF.

350.   The 2022 midterm election had the highest share of early in-person ballots in Georgia's history.   Supplemental Report of Daron Shaw, attached as Ex. KKKK ("Shaw 2/14/23 Rep.") 15–16 & tbl. 7.

351.  Georgia turnout in the 2022 midterm election was several percentage points higher than the average in other states.  Grimmer Rep. ¶¶ 42, 44 (Ex. DDDD).

352.  In 2022, the turnout gap between black and white voters increased slightly to 9.7% in the general and decreased slightly to 6.7% in the runoff. Sur-Rebuttal Report of Bernard Fraga [Doc. 566-47], attached as Ex. CCCC ("Fraga Sur-Rebuttal Rep.") 15 tbl. 1.

353.  Black turnout in 2022 dropped less in Georgia than in most other states.  Rebuttal Report of Daron Shaw, attached as Ex. LLLL ("Shaw 2/24 Rep.") ¶¶ 46-52.

354.  In 2022, voter participation of both Black and white voters remained near record highs for a midterm election.  Shaw 2/24 Rep. ¶¶ 21-22; Shaw 2/14 Rep. ¶¶ 10, 12, 17, 23; Grimmer Rep. ¶¶ 8, 158-64.

355.  In 2022, Georgia saw an increase in the percentage of both Black and white voters choosing to vote absentee by mail.  Grimmer Rep. ¶¶ 8, 52-54, 60, 62; Shaw 2/14 Rep. ¶¶ 24-25; Shaw 2/24 Rep. ¶ 20; Grimmer 102:24 – 103:5.

356.  Indeed, a higher percentage of Black voters voted absentee by mail in 2022 than in any prior midterm election.  Shaw 2/24 Rep. ¶ 20.

357.  A survey performed by the University of Georgia's School of Public & International Affairs ("SPIA") found that more than 90% of black voters and

nearly 85% of other minority voters found voting in 2022 to be either just as easy or easier than in previous elections.  Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga., 2022 Georgia Post-Election Survey 13 (2023), attached as Ex. YYYY ("SPIA Survey"); Shaw 2/14 Rep. ¶ 73; Shaw 2/24 Rep. ¶ 31.

358.   The SPIA survey reported that 99.5% of black voters reported no problem when voting, and not black voters reported poor experiences when voting.  SPIA Survey 13 (Ex. YYYY); Order at 31–32 [Doc. 686-1]; PI Hr'g Tr. 116:10–22, 251:2–9 (Ex. YYY); Shaw 2/24 Rep. ¶ 30; Shaw 2/14 Rep. ¶ 74.

359.   The SPIA survey reported that 97% of Black voters and 96% of white voters rated their experience as either "excellent" or "good" and no Black voters rated their experience as "poor."  SPIA Survey 8 (Ex. YYYY); Shaw 2/14 Rep. ¶ 74; Shaw 2/24 Rep. ¶ 74; PI Hr'g Tr. 250-51.

360.   The SPIA survey reported that, in November 2022, more than 95 percent of Georgia voters who voted in person reported waiting in line for fewer than 30 minutes.  SPIA Survey 5 (Ex. YYYY); Grimmer 196:19-23.

361.   Secretary of State data for the 2022 midterm election shows an "average wait time on Election Day" varying from "0 minutes to approximately 10 minutes."  Shaw Rebuttal Rep. ¶ 38 (Ex. LLLL).

362.   Secretary of State data for the 2022 midterm election show that the average wait time in the November election statewide was 2 minutes and 19 seconds, and that the average wait time for the December 2022 runoff was

1 minute and 45 seconds.   Germany 6/15/23 Decl. ¶¶ 10–11 (Ex. E); *see* Deposition of Zachary Manifold [Doc. 712] *(*"Manifold Dep.") 30:11–17 (Ex. MM); Wurtz 59:15–19 (Ex. NN).

363.   Voters in 2022 were more likely to vote by mail than in the non-pandemic, midterm election of 2018.  Grimmer Rep. 42 tbl. 7 (Ex. DDDD).

364.   Since before enactment of SB 202, Georgia has maintained a system of automatic voter registration via the State's Department of Driver Services.  Germany 7/27/23 Decl. ¶ 122.

365.   In the wake of the 2018 gubernatorial election, multiple lawsuits were filed challenging Georgia's electoral laws.  Germany 7/27/23 Decl. ¶ 5.

366.   In response to concerns about the 2018 election in Georgia, the State's General Assembly considered dozens of bills related to elections and held at least ten hearings during the 2019 legislative session.   Germany 7/27/23 Decl. ¶ 9.

367.   At the end of the 2019 legislative session, the General Assembly passed an omnibus election statute, HB 316, which was sent to the governor 32 days after the measure was introduced in the Assembly.  Germany 7/27/23 Decl. ¶ 11.

368.   In the wake of the 2020 general election, multiple lawsuits were filed by supporters of the losing presidential candidate that challenged various aspects of Georgia's election administration.  Germany 7/27/23 Decl. ¶ 18.

369.   Before 2020, there was no Georgia statute or regulation that expressly authorized use of absentee-ballot dropboxes.  Mashburn 3/7 74:20–75:2.

370.   In response to the COVID pandemic, the State Election Board (SEB) issued an emergency rule authorizing use of absentee-ballot dropboxes by counties, but by the time of SB 202's enactment, the emergency rule had expired.  Germany 7/27/23 Decl. ¶ 15; Mashburn 3/7 74:11–14.

371.   During the 2020 election cycle, there were instances of counties failing to properly secure their dropboxes—namely, by using carboard boxes, leaving the keys in the box, failing to use the required chain of custody procedures for returned ballots, and using video surveillance that did not produce clear footage of dropboxes.  Mashburn 3/7 75:8–14, 82:9–18; Mashburn 3/14 76:15–19; Germany 7/27/23 Decl. ¶ 66.

372.   During the 2020 election cycle, the SEB and Georgia Secretary of State received multiple complaints from voters who were concerned that dropboxes were being used in unlawful ballot-harvesting activities.  Kidd 118:5–21.

373.   Although officials were not able to confirm these voters' complaints regarding unlawful ballot harvesting using dropboxes, the complaints still required officials to devote time and resources to investigating voters' concerns. Germany 7/27/23 Decl. ¶ 74.

374. Some counties opted not to use dropboxes in the 2020 election cycle. Germany 7/27/23 Decl. ¶ 75.

375. In pre-SB-202 elections Georgia, there were instances of third-party groups giving things of value to voters waiting in line—including food, drinks, phone chargers. Eveler 288:5–12.

376. Prior to SB 202's enactment, there were incidents in which party operatives and candidates for office were handing out things of value to voters waiting in line. Mashburn 3/7 101:15–102:16, 118:12–17, 185:20–186:7.

377. The practice of third-party groups giving out things of value to voters waiting in line prompted multiple complaints to State and county officials from voters who saw these activities as a form of improper influence. Germany 3/7 96:7–98:10, 103:11–104:2; Watson 185:20–24; K. Williams 30:22–31:1; Eveler 138:9–24.

378. Prior to SB 202, poll officials had to monitor attempts by third-party groups to give things of value to voters waiting in line, so that the officials could identify unlawful attempts at influence peddling by such groups. Eveler 138:9–14, 288:13–289:14; Germany 3/7 102:24–103:5; Sterling 204:10–205:13.

379. During the 2020 election cycle, Georgia experienced a sharp increase in absentee voting, but rates of absentee voting in the State have declined somewhat in subsequent elections. Germany 7/27/23 Decl. ¶ 93.

380.   Prior to enactment of SB 202, voters could apply for absentee ballots as late as the Friday before election day, but ballots requested the week before election day were usually not voted in time to be counted.  Bailey 3/21 98:8–21, 109:19–110:1; Germany 4/13 77:17–78:7; Germany 3/7 129:22–130:4; Germany 7/27/23 Decl. ¶ 99; Harvey 179:8–180:7; Eveler 182:2–10; Deposition of Charles Adams [Doc. 714] ("Adams") 102:5–103:10.

381.   The week before election day is the busiest time for early voting in Georgia.  Germany 7/27/23 Decl. ¶ 95.

382.   Prior to SB 202's enactment, many voters who requested absentee ballots during the week before election day nonetheless turned out to vote in person on election day, requiring poll workers to cancel each of those voters' applications for an absentee ballot.  Germany 7/27/23 Decl. ¶ 102; Kidd 191:25–193:5.

383.   Prior to SB 202's enactment, Georgia law permitted voters who arrived at the incorrect precinct to vote a provisional ballot that would count for certain races.  Germany 7/27/23 Decl. ¶¶ 108, 111.

384.   Of the last five elections in Georgia, 2018's had the highest overall share of votes (0.22%) classified as provisional for any reason.  Grimmer Rep. ¶ 66.

385.   During the 2018 election, 0.34% of Black Georgia voters cast a provisional ballot, compared to 0.13% of White Georgia voters.   Grimmer Rep. ¶¶ 67–68.

386.   For each ballot cast out of precinct during the pre-SB-202 era in Georgia, a group of election officials manually duplicated the provisional ballot onto another ballot, meaning the act of processing an out-of-precinct voter took between 15 and 20 minutes.   Germany 7/27/23 Decl. ¶¶ 108, 111; Manifold 95:11–18.

387.   Some voters who observed the pre-SB-202 process of manually duplicating out-of-precinct ballots lodged complaints on the mistaken belief that officials copying ballots were involved in election meddling.   Germany 7/27/23 Decl. ¶¶ 108, 111.

388.   A voter who casts an out-of-precinct ballot is, for that reason, unable to vote in some down-ballot races.   Bailey 3/21 43:1–23, 134:1–10, 132:14–23, 135:2–136:16; Mashburn 3/14 88:3–20; Deposition of Joseph Blake Evans [Doc. 717] ("Evans") 88:7–16.

389.   Prior to SB 202's enactment, Georgia's method of verifying the identities of voters requesting or voting absentee ballots was by comparing the voter's signature on the request form or ballot with an image of the voter's signature in a database.   Bailey 3/21 123:24–125:25. If it was unclear whether the signatures matched, the county official would then have another official

compare the signatures.  *Id*. 125:5–13.  And sometimes a third official would need to make a final determination.  *Id*. 125:13–15.

390.   Georgia had been sued over its signature-matching method of confirming absentee voters' identities.  Sterling 95:22–96:16.

391.   While the previous absentee identification method of signature matching took three to four minutes per voter, objective identification methods (i.e., using a driver's license or other identification document allowed under SB 202) takes less than one minute.  Bailey 3/21 125:22–126:12.

392.   96.5% of Georgia voters have either a State driver's license or identification number associated with their voter file.  Report of Dr. Marc Meredith, attached as Ex. HHHH ("Meredith Rep.") ¶ 2(g) (identifying roughly 243,000 such voters); Ga. Sec'y of State, Georgia Active Voters, https://sos.ga.gov/georgia-active-voters-report (identifying 7,004,034 active voters).

393.   99% of registered Georgia voters have either a driver's license number or a social security number.  Pls.' PI Mot. at 19 [Doc. 566-1], attached as Ex. NNNN.

394.   During the 2020 election cycle, Georgia election officials received multiple complaints from voters regarding absentee-ballot applications sent by third-party groups—including 1) complaints from voters who mistook these applications for actual ballots, 2) complaints that these applications would

facilitate fraud, and 3) complaints that the applications were pre-filled with incorrect information.  Declaration of Ryan Germany in VoteAmerica, attached as Ex. G ("Germany VoteAmerica Decl.") ¶¶ 13, 22–23, 41, 49–50; Kidd 190:6–22; Bailey 10/6 50:3–24, 126:8–127:1; Watson 127:25–128:8.

395.  Many voters who received multiple absentee-ballot applications in the mail then returned multiple absentee-ballot applications, even if those voters did not intend to vote absentee.  Germany 4/13 51:2–18; Germany VoteAmerica Decl. ¶ 43.

396.  In the June 2020 primaries, the Georgia Secretary of State sent absentee-ballot applications to all registered voters to help facilitate absentee by mail voting given the global COVID-19 pandemic.  Harvey 52:10–15; Sterling 52:5–12.

397.  After June 2020, the Georgia Secretary of State did not send absentee-ballot applications to all registered voters, though some Georgia counties opted to do so.  Germany 3/7 60:15–22; Smith 63:16–23.

398.  In the 2020 general election, there was a higher rate (about 15%) of voters cancelling their requested absentee ballots and chose to vote in person than the corresponding rates in 2018 and 2022 (4.3% and 3.6%, respectively). Grimmer Rep. ¶¶ 98–99.

399.  During the 2020 election cycle, mobile voting units were used, but not widely so, with only two counties (Fulton and Douglas) even having buses

outfitted for use as mobile voting units.  Mashburn 3/14 194:14–18; Eveler 240:18–241:8; Germany 3/7 171:21–172:3.

400.  Election officials received multiple complaints from voters who were concerned that mobile voting units could be strategically placed in a way that could affect electoral outcomes.  Mashburn 3/14 39:2–19, 51:16–52:3; Germany 3/7 173:11–174:22.

401.  During the 2020 election cycle, there was no way for the SEB to ensure uniform distribution of mobile voting units across the State, given that the SEB does not have the funds in its budget to fund use of mobile voting units.  Mashburn 3/14 195:9.

402.  Originally, Georgia held its runoffs for both State and federal offices according to a four-week schedule (i.e., four weeks between the general election and the runoff), but a 2017 court order required the State to change the federal runoff schedule to nine weeks to accommodate overseas voters. Sterling 184:4–15; Eveler 278:4–7.

403.  The nine-week timetable for federal runoffs that was created by the 2017 court order gave Georgia counties discretion over how many days of early voting to mandate, with most counties having days available for voting that they chose not to utilize.  Sterling 198:25–199:8.

404.  Prior to SB 202's enactment, Georgia law did not expressly authorize counties to hold advance voting on Sundays.  Sterling 150:15–25.

405.   Prior to SB 202's enactment, Georgia law did not establish limits on the number of challenges that electors could bring to qualifications of other electors.   Germany 3/7 229:4–9; Germany 4/13 223:14–24; Sterling 231:17–232:4.

406.   During the 2020 election cycle, there were mass challenges to voters' qualifications based on the National Change of Address database, but these challenges were dismissed for lack of probable cause by election officials. Deposition of Charlotte Sosebee [Doc. 699] ("Sosebee") 218:13–18; Watson 207:2–5; Germany 4/13 226:20–227:8; Germany 3/7 208:18–25.

407.   Each of Georgia's 159 counties has its own elections office and staff.  Germany 3/7 43:8–14.

408.   Georgia election officials received numerous complaints from voters regarding unlawful ballot harvesting during the 2020 election cycle. Watson 131:5–12, 203:20–204:10, 174:5–176:19; Sterling 161:21–24.

409.   In an April 2020 interview, Speaker of the Georgia House of Representatives David Ralston stated that sending out absentee-ballot applications to all registered voters "will be extremely devastating to Republicans and conservatives in Georgia."  Pls.' PI Mot. at 9 [Doc. 566-1] (Ex. NNNN); Mark Niesse, *Ralston says his concern that mail vote hurts GOP is about fraud*, Atl. J.-Const. (Apr. 20, 2020), https://tinyurl.com/fac6r9v2.

410.   In an op-ed published on November 15, 2020, Georgia House of Representatives member Barry Fleming wrote that, "[i]f elections were like coastal cities, absentee balloting would be the shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant."  Pls.' PI Mot. at 16 [Doc. 566-1] (Ex. NNNN).

411.   Chairman Barry Fleming, appointed to head the Georgia House's Special Committee on Election Integrity, held the first committee meeting on February 4, 2021, adopting committee rules and amending the draft rules at the suggestion of a Democratic member.  Germany 7/27/23 Decl. ¶ 22.

412.   More than ten special committees and special working groups have been used in the Georgia House on particular topics since 2017.  Germany 7/27/23 Decl. ¶ 23.

413.   During the 2021 session when SB 202 was considered, four of the 14 members (almost 30%) of the Special Committee on Election Integrity were Black representatives.  Germany 7/27/23 Decl. ¶ 24.

414.   A democratic member of the House Special Committee on Election Integrity during the 2021 legislative session called the changes that were made to the initial bill based on Democrats' input a "good faith effort" to improve election administration in Georga.  Germany 7/27/23 Decl. ¶¶ 26–27.

415.   During the 2021 legislative session, the Georgia House of Representatives held twelve full hearings and meetings and four subcommittee

hearings regarding election-related issues, and the State Senate held thirteen such hearings or meetings during the same period.  Hearings & Meetings of H. Special Comm. on Election Integrity, 2021 Leg., Reg. Sess. (Ga. 2021) [videotape archive available at https://tinyurl.com/y2cc262t], attached as Ex. SSSS; Hearings Before the S. Comm. on Ethics, 2021 Leg., Reg. Sess. (Ga. 2021) [videotape archive available at https://tinyurl.com/3zw27wzm]; Germany 7/27/23 Decl. ¶ 56.

416.  Of the various election bills introduced and debated at the conclusion of the 2021 regular session, SB 202 was the only election bill to pass the Georgia General Assembly.   Germany 7/27/23 Decl. ¶ 52.

417.  The Georgia Senate heard testimony from over 60 witnesses regarding the Senate's version of HB 531, which served as a template for SB 202.  Germany 7/27/23 Decl. ¶ 40; Pls.' PI Mot. at 16 [Doc. 566-1] (Ex. NNNN).

418.   After nearly two hours of questions and debate, the Georgia House of Representatives voted 100-75 to pass the revised version of SB 202. Germany 7/27/23 Decl. ¶ 52.

419.   The Georgia Senate passed the same legislation by a vote of 34–20, and SB 202 was signed by the governor later that day.  Germany 7/27/23 Decl. ¶¶ 54–55.

420.   Even as debate in the Georgia Senate regarding SB 202 wrapped up, a Democratic Senator acknowledged "that the majority leader did do

substantial research on voting laws before bringing pieces of this bill and other bills forward."  Germany 7/27/23 Decl. ¶ 47.

421.  A survey by the University of Georgia's School of Public & International Affairs found that 99.5% of black voters reported no problem when voting, and no black voters reported poor experiences when voting. Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga., 2022 Georgia Post-Election Survey 6, 8 (2023) ("SPIA Survey"), https://tinyurl.com/4kxeb373 (Ex. YYYY); Shaw Rebuttal Rep. ¶ 38 (showing wait times averaged "0 minutes to approximately 10 minutes"); Germany 6/15/23 Decl. ¶¶ 10–11 (average wait of 1 minute 45 seconds); Manifold 30:11–17 (stating that "we don't have lines nearly as much as they used to have in the past[.]").

422.  Georgia's voter turnout rate (among the population of eligible voters) was 3.2% higher than the national average during the 2018 election cycle and 5.6% higher than the national average during the 2022 election cycle. Grimmer Rep. ¶¶ 42, 44.

423.  According to a recent study published by the MIT Election Data & Science Lab, During the 2022 election, fewer than 10% of Georgia voters reporting waiting in line for more than 30 minutes in order to vote.  Germany 6/15/23 Decl. ¶ 13.

424.  Georgia election officials processed a record number of absentee-ballot applications (compared with past midterms) during the 2022 election

cycle. The Carter Ctr. for Fulton Cnty. Bd. of Elections & Reg. and Performance Rev. Bd., *2022 General Election Observation: Fulton County, Georgia* 16 (2022), https://tinyurl.com/346s8tdy, Ex. 34 to Germany 7/27/2023 Decl.

425.    During the 2022 election cycle, Georgia voters voted early at a higher rate than in any previous midterm election. Grimmer Rep. at 42 tbl. 7.

426.    During the 2022 election cycle in Georgia, 99.75% of absentee-ballot applications arrived before SB 202's deadline—with 0.27% of Black voters' applications and 0.25% of White voters' applications arriving after that deadline. Grimmer Rep. ¶¶ 89–90.

427.    The State received complaints from Democrats about the election process following 2018 election. PI Hr'g Tr. 183:1-5, 11-17; Declaration of Ryan Germany (October 30, 2023), attached as Ex. B ("Germany 10/30/23 Decl.") ¶ 5-8; Mashburn 3/7 62:3-7.

428.    Some of the 2018 Complaints concerned signature matching on absentee ballot applications, including claims it was subjective, slow, and the election officials were not properly qualified to conduct a signature match. Mashburn 3/14 196:23-24, 197:2-4; Sterling 95:25 – 96:16; PI Hr'g Tr. 191:11-20; Germany 10/30/23 Decl. ¶ 17, 71-76.

429.    There were also complaints in 2018 about election integrity. Germany 10/30/23 Decl. ¶ 5.

430.   Following the 2020 elections, Georgia received complaints from Republicans. PI Hr'g Tr. 190:17-21; Germany 10/30/23 Decl. ¶ 18.

431.   In Georgia, there was significant criticism of the signature match process for absentee voting. Germany 10/30/23 Decl. ¶ 17-18; Mashburn 3/14 196:23-24 (lawsuits over signature match) 197:2-4 (lack of expertise on signature match); Sterling 95:25–96:16.

432.   Signature matching was seen as too subjective and, in 2020, with the sheer volume of absentee ballot applications, many claimed that ballots were being sent to individuals without proper verification of their identity. Sterling 95:25-96:16 (subjectivity makes it difficult to train workers); Bailey 10/6/22 90:21-91:5; Harvey 186:14-23; Bailey 10/6/22 90:21-91:5 (subjectivity causes concerns of fraud); Germany 10/30/23 Decl. ¶ 73.

433.   In 2020, some questioned whether counties were spending sufficient time per application to adequately conduct thorough signature matching.  Germany 10/30/23 Decl. ¶ 18, 74–75.

434.   In June 2020, the Secretary of State had sent absentee ballot applications to all registered voters in Georgia in response to reports that some counties were sending out unsolicited absentee ballot applications so that the process would be fair to all voters. Harvey 52:10-15; Sterling 52:5-9; Germany 10/30/23 Decl. ¶ 24.

435.   The Secretary of State chose not to send out unsolicited absentee ballot applications for the November 2020 general election, although some Georgia counties chose to do so. Germany 3/7 60:1–22; Smith 63:16–23; Bailey 10/6 126:12 – 127:1; Germany 3/7 58:5-23.

436.   There was a significant increase in Georgia voters using the absentee option in 2020 due to the pandemic, resulting in numerous duplicate applications for the same voters. Grimmer Rep. ¶ 8, 54; Sterling 53:3-20, 54:7-9; Germany 3/7 183:3-9, 183:16-21.

437.   Voters who *received* multiple applications often returned multiple applications. Deposition of Ryan Germany in VoteAmerica, attached Ex. II ("Germany VoteAmerica") 49:20-21; Germany 10/30/23 Decl. ¶¶ 59-61.

438.   In some instances, they did so even though they did not intend to vote by absentee ballot. Germany 10/30/23 Decl. ¶ ¶ 59, 61; Transcript of Hearing in VoteAmerica Prelim. Inj. (June 10, 2022), attached as Ex. ZZZ ("VoteAmerica Hr'g Tr.") 28:12–16, 42:16–22; Germany VoteAmerica 199:13–25; Declaration of Ryan Germany in VoteAmerica (May 20, 2022), attached as Ex. G ("Germany 5/20/22 VoteAmerica Decl.") ¶ 43.

439.   This required election officials to divert their finite resources to processing many unnecessary absentee-ballot applications. VoteAmerica Hr'g Tr. 28:16–21; Germany 10/30/23 Decl. ¶¶ 60-61.

440.  Then, on Election Day, officials were required to process many absentee-ballot cancellations when voters who had submitted absentee-ballot applications arrived to vote in person, leading to longer lines. VoteAmerica Hr'g Tr. 29:25–30:4; Germany VoteAmerica 199:13–200:7; Germany 10/30/23 Decl. ¶ 47–48, 89.

441.  In 2020, Georgia voters also complained about receiving multiple absentee-ballot applications, including from Democratic organizations who again made significant outreach efforts to encourage voters to utilize the vote by mail system during the pandemic.  Germany 5/20/22 VoteAmerica Decl. ¶¶ 39, 41–42; 3/18/21 Tr. at 21:1–23:7, *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021); VoteAmerica Hr'g Tr. 19:23–20:5, 22:4–14; Germany 3/7 92:13 – 94:7.

442.  Voters were worried that these applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the *applications* themselves were actually *ballots*.  Germany 5/20/22 VoteAmerica Decl. ¶ 42; VoteAmerica Hr'g Tr. 20:3–5; Kidd 190:6–22; Bailey 10/6 50:3–24.

443.  Having received multiple absentee ballot applications led some voters submitting duplicate applications when they weren't sure of the status of their initial applications and to numerous reports of voters showing up to vote in person having forgotten that they had submitted a request for absentee ballot, which requires the time-consuming process of cancelling absentee

ballots discussed below and led to complaints of fraud.  Germany 10/30/23 Decl. ¶ 47–48, 89; Bailey 10/6 124:23–126:7 (2020–9,700 duplicate absentee ballot applications); Eveler 185:2–11; Smith 66:13–67:2; Kidd 188:24–91:5; Germany 3/7 183:3–9.

444.   Election officials also received numerous calls and complaints where voters seemed to be confusing absentee ballot applications with actual absentee ballots.  Germany 10/30/23 Decl. ¶ 58; Watson 178:6–179:4, 200:18–201:13; Mashburn 3/7 62:3–9.

445.   Similarly, throughout the 2020 cycle, the number of requested and subsequently cancelled absentee ballots was extremely large—upwards of 15% of all absentee ballots requested were subsequently cancelled so the voter could instead vote in person compared to 4.3% in 2018 and only 3.6% in 2022. Grimmer Rep. ¶ 98-99.

446.   For the 2020 general election, for instance, there were 289,050 absentee-ballot applications cancelled by voters when they arrived to vote in person, either during Early Voting (260,085) or on Election Day (28,965) compared with only 16,072 such cancelled applications during the 2018 general election (with 12,000 during Early Voting and 4,072 on Election Day), and 11,659 cancelled applications during the 2022 general election (with 10,067 during Early Voting and 1,592 on Election Day).  Grimmer Rep. ¶¶ 94–99, tbls. 14, 16.

447.   Before SB 202, some organizations increased their use of pre-filled absentee-ballot applications.   Germany 5/20/22 VoteAmerica Decl. ¶¶ 20; Bailey 10/6 131:3–24 (issues with pre-filled applications); Watson 127:13–128:8 (lots of complaints about wrong addressees and concerns about fraud).

448.   Pre-filled information by third parties was often incorrect. Germany 5/20/22 VoteAmerica Decl. ¶ 21.

449.   For instance, many voters complained that the pre-filled applications listed individuals who no longer (or never) lived at the address, who no longer (or never) lived in Georgia at all, were minors, or were deceased and even pet names.  Watson 127:13–128:8; Bailey 10/6 126:8–127:1, 131:3-24.

450.   Other voters complained to the State that the applications were pre-filled with incorrect information.  Watson 127:13–128:8; Bailey 10/6 126:8–127:1; Germany 10/30/23 Decl. ¶¶ 32–35, 38–42.

451.   These errors caused many Georgia voters to contact the Secretary of State's office with questions and concerns about potential fraud.  Watson 127:13–128:8; Bailey 10/6 126:8–127:1; Germany 5/20/22 VoteAmerica Decl. ¶ 22; 3/18/21 Tr. at 22:2–9, *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021) (Ex. SSSS); VoteAmerica Hr'g Tr. 22:4–14; Deposition of Matthew Mashburn in VoteAmerica, attached as Ex. SSS ("Mashburn VoteAmerica") 83:20–84:4.

452. Voters submitting an absentee ballot application with incorrect information (including pre-filled information) results in either the application being denied, the local election officials sending a cure notice and the voter being required to submit the correct information, or potentially an absentee ballot being mailed to an incorrect location or voter.  Germany 4/13 89:11–90:19; Germany 10/30/23 Decl. ¶ 50.

453. The large number of absentee ballot applications, duplicate applications and cancelled absentee ballots created extreme burdens on election administrators and raised questions and confusion from voters.  Evans 102:18–103:21; Germany 10/30/23 Decl. ¶ 49, 88; VoteAmerica Hr'g Tr. 28:5–30:4.

454. Indeed, many voters simply forgot they had applied for absentee ballots, which again caused administrative burdens and cast doubt on the election process.  Bailey 3/21 99:25–101:1; Germany 10/30/23 Decl. ¶ 45.

455. In addition to administrative burdens and costs to the state sending out unrequested absentee ballot applications to 6.9 million registered voters, this process resulted in many questions regarding the integrity and legitimacy of the 2020 election results.  Bailey 3/21 100:3–12; Sterling 38:16-39:2; 54:13–18; Watson 200:18–201:13; Germany 10/30/23 Decl. ¶ 25–27.

456. Before SB202, Georgia voters often complained to the State about absentee-ballot applications they received from third-party organizations,

which did not have a consistent, required form prior to 2020. *See* Germany 10/30/23 Decl. ¶ 32–34; Germany 5/20/22 VoteAmerica Decl. ¶¶ 13, 23, 41, 49–51; Germany VoteAmerica 181:7–12; Mashburn VoteAmerica 90:11–23, 91:2–13; Bailey 10/6 126:8–127:1.

457.   In 2020, voters also complained about receiving applications that were pre-filled with incorrect information. K. Williams 103:24–104:17; Bailey 10/6 126:13–127:1.

458.   Voters also complained about receiving duplicate applications. Germany 3/7 182:23–183:9; Germany 10/30/23 Decl. ¶ 57.

459.   Further, voters called telling election officials they were confused about who was sending them an application and why. K. Williams 105:20–106:14; Germany 10/30/23 Decl. ¶ 32, 54–58; Bailey 10/6 126:8 – 127:1, 127:7-13, 129:4-16; Mashburn 3/7 62:3-15.

460.   In many instances, voters thought they came from the State, and thus they contacted election officials with questions. Germany 10/30/23 Decl. ¶ 64–67; Mashburn VoteAmerica 90:11–23; Germany 5/20/22 VoteAmerica Decl. ¶ 49 (Noting that one county election supervisor explained that the misimpression that each such application was sent by the State would lead "people [to] feel the need to complete and sign [the] form without really paying attention to what it is for.").

461.   Georgia voters also complained about receiving multiple absentee-ballot applications from third party organizations. Germany 5/20/22 VoteAmerica Decl. ¶¶39-42; VoteAmerica Hr'g Tr. 19:25–20:5, 22:4–14.

462.   Election officials received duplicate absentee ballot applications from voters. Germany 3/7 183:3-9, 183:17-21; Sterling 53:18-20; Germany 10/30/23 Decl. ¶ 59–60.

463.   Local election officials were inundated with duplicate applications from the same voters in 2020. Germany 10/30/23 Decl. ¶ 59-60; Bailey 10/6 124:23 – 126:6 (2020 – 9,700 duplicate absentee ballot applications); Eveler 185:5-11; Smith 66:16-20; Kidd 30(b)(6) 189-90; Germany 3/7 183:3-9.

464.   Local election officials received lots of calls and complaints in 2020 believing the later applications were actually ballots. Germany 10/30/23 Decl. ¶ 58, 67; Watson 178:11–179:4, 200:23–201:13.

465.   Voters were worried that these applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the *applications* themselves were actually *ballots*. Germany 5/20/22 VoteAmerica Decl. ¶ 42; VoteAmerica Hr'g Tr. 20:3–5; Kidd 190:8-22; Bailey 10/6 50:3-24.

466.   In trying to keep up with the volume and address the large number of duplicate applications resulting from so many different groups sending out absentee ballots indiscriminately, voting officials were overwhelmed. Sosebee 167:6-10, 170:2-3 (overwhelmed administrators with so many applications in

2020); Williams 107:10-20 (ton of applications received in 2020, but lots of duplicates).

467. One county even admitted that approximately 20 voters received duplicate *ballots* based on duplicate applications. Watson 3/14/23 201:14 – 202:9 (20 people got duplicate ballots because of duplicate applications); Sosebee 169:16-19 (few times when voter got more than one ballot – count first one to return).

468. One man attempted to sell his 2nd ballot (not application) received on the internet. Mashburn 3/7 63:5-7.

469. Fulton County sent 10 ballots (not applications) to one house. Mashburn 3/7 62:21-63:4.

470. The large number of duplicate applications and then cancelled absentee ballots in 2020 created extreme burdens on election administrators having to collect the canceled ballot or affidavits from voters who no longer had the ballot and raised questions about what happened to official ballots that were no longer accounted for. Evans 102:21-103:21; Germany 10/30/23 Decl. ¶¶ 27 (time consuming to cancel, can lead to longer lines), 46-48, 88.

471. There were also concerns about ballot harvesting with so many vote by mail ballots and the use of drop boxes to return those ballots which the State had to investigate even if there was no evidence presented to support the allegations. Watson 3/14/23 203:24 – 204:10 (investigated claims of ballot

harvesting in 2020); Sterling 161:21-24 (referring to the file "2000 Mules); Germany 10/30/23 Decl. ¶ 95.

472.   The area of the voting process that has long been considered the most susceptible to fraud, and that was the source of a large portion of the complaints from voters and activists from both political parties, is the absentee voting process.  Germany 10/30/23 Decl. ¶ 17, 23; The Carter Ctr., *2022 General Election Observation: Fulton County, Georgia* 16 (2022) (Germany 7/27/23 Decl., Ex. 34 (Ex. C)); U.S. Election Assistance Comm'n, *Election Crimes: An Initial Review and Recommendations for Future Study* 8, 10, 12, 18–19 (Dec. 2006), attached as Ex. ZZZZ; Germany 3/7 90:1–11; Sterling 102:11–18.

473.   A voter may obtain a copy of an absentee ballot application by downloading it from the Secretary of State or county election official's website (or numerous other websites), picking it up in person at the county election office, or by calling the local election office and asking for one to be mailed to the voter.  Germany 10/30/23 Decl. ¶ 31.

474.   Sending 6.9 million unsolicited absentee ballot applications in 2020 created a large expense for the State and confusion for voters. Germany 10/30/23 Decl. ¶ 25 (substantial cost); Sterling 38:21-22 (6.9 million sent).

475.   In addition to administrative burdens and costs to the state sending out unrequested absentee ballot applications to 6.9 million registered voters, this process resulted in many questions regarding the integrity and

legitimacy of the 2020 election results. Germany 3/7 182:23-183:3; Bailey 3/21 100:3-12; Sterling 54:13-18; Watson 200:23-201:13; Germany 10/30/23 Decl. ¶¶ 26-27.

476.   The General Assembly confirmed when passing SB 202, these provisions addressed "some outside groups" sending "multiple absentee ballot applications," often "with incorrectly filled-in voter information," leading to "significant confusion by electors." SB 202 at 5:102–106.

477.   There was a "giant wave of complaints" from voters who received applications "for people that used to live" at their homes but no longer do, applications that had women's "maiden name[s]," or applications "for [a] dead relative[.]" Mashburn VoteAmerica 88:16–89:15.

478.   The misimpression that each such application was sent by the State would lead "people [to] feel the need to complete and sign [the] form without really paying attention to what it is for." Germany 10/30/23 Decl. ¶ 65.

479.   Georgia law identifies who is permitted to return another voter's ballot to minimize the risk of voter intimidation and fraud. Germany 6/29/23 Decl. ¶¶ 2, 8, 21, 26.

480.   SB 202 merely strengthened Georgia's existing prohibition on ballot harvesting by make a violation of that prohibition a felony rather than a misdemeanor. Germany 10/30/23 Decl. ¶ 96–98.

481.   By requiring an unregistered voter to complete a new absentee ballot application after registering to vote alleviates the administrative burden on local election officials of having to match new voter registrations with pending absentee ballot applications. Eveler 171:9-18; Deposition of Nancy Gay [Doc. 701] ("Gay") 168:8-9.

482.   It also conforms to the responsibility of election officials to confirm eligibility to vote *before* issuing a ballot, which requires that the person be properly registered at the time the absentee ballot application is received. Germany 10/30/23 Decl. ¶ 70.

483.   An unregistered voter is not eligible to vote until registered. O.C.G.A. § 21-2-216 (a).

484.   Georgia chose to utilize similar voter identification requirements applicable to in-person voting and require one of the same forms of identification that Georgia voters have had to provide since 2005, while also allowing for other identification documents for people who might not have a Georgia driver's license or state identification card.   O.C.G.A. § 21-2-381(a)(1)(C)(i); O.C.G.A. § 21-2-417 (c); Mashburn 3/7 60:5–21; Germany 10/30/23 Decl. ¶ 77–78; PI Hr'g Tr. 192:5 – 193:1.

485.   Eliminating the signature match process was of particular benefit to voters with disabilities, whose signature may not be uniform due to their disability.  ADAPT 2/20 79:20–24, 99:2–10 (Ex. CC).

486.    Over 97% of all registered voters had either a Georgia driver's license or state identification number associated with their voter file.  Sterling 239:8–20 (2020 98.6% have DL or state ID numbers and 99.2% who voted in 2020 had one or the other); Evans 79:6–80:4 (97 to 99 percent have DL or ID number in record) (Ex. KKK).

487.    In 2020, 98.6% had either a Georgia driver's license or state identification card and 99.2% of those who actually voted in 2022 has one of these forms of identification.  Sterling 239:8–20.

488.    For those who had neither form of identification, a series of alternate forms of identification would be accepted.  Sosebee 74:4–14; Germany 4/13 87:17–89:2 (Ex. GG).

489.    SB 202 replaced the inaccurate and problematic signature match requirement with a more objective system.  *See* O.C.G.A. § 21-2-381(a) (1)(C)(i); Mashburn 3/7 60:5–21; Mashburn 3/14 67:25–68:20.

490.    It took approximately 3 to 4 minutes to process a single application when relying on a signature match.  Bailey 3/21 122:14–123:4, 125:22–126:12 (Ex. GGG).

491.    When considered in light of the more than 1,700,000 applications received in 2020, some questioned whether counties were spending sufficient time per application to adequately conduct thorough signature matching.  Germany 10/30/23 Decl. ¶ 18, 29, 71–76.

492.   When an application was rejected for a signature mismatch, it highlights the same concerns of the subjective nature of signature match and the fact that election officials are not handwriting experts highlighted a potential vulnerability of signature matching.  Germany 10/30/23 Decl. ¶ 76.

493.   The General Assembly chose to modify the absentee voting system, among other changes, while leaving in place its accessibility to all Georgia voters for any reason.   Bailey 3/21 189:20–190:12; Germany 10/30/23 Decl. ¶ 23.

494.   The voter identification process was objective and took about one minute to verify the person's identity and eligibility to vote, a marked decrease from the time it took to conduct signature match verification.  Bailey 3/21 126:6–12.

495.   The voter would merely list their name, date of birth, address, and provide their driver's license number or other acceptable identification.  By signing the oath, the voter verified that the information was true and correct and the voter was otherwise qualified to vote.  *See* Germany 10/30/23 Decl. ¶ 78–80.

496.   Getting an acceptable photo ID is not difficult in Georgia. Deposition of Angelique McClendon [Doc. 705] ("McClendon") 21:7 – 22:11, 76:4-5, 80:22 – 81:24 (explaining the process for obtaining a free voter ID).

497. There was also very low rejection rate for lack of proper identification. Grimmer Rep. ¶¶ 16, 158-68, 171-72.

498. Voters in Georgia have long been required to sign an oath as part of the absentee ballot application process. Germany 10/30/23 Decl. ¶ 87; Sterling 60:7–15 (the oath "still is" on the envelope).

499. By signing the oath, the voter verified that the information was true and correct and the voter was otherwise qualified to vote. Germany 10/30/23 Decl. ¶ 89.

500. A pen and ink signature helps to confirm that the person filling out the application is the voter themselves or an authorized applicant on behalf of a voter. Germany 10/30/23 Decl. ¶ 89.

501. It also helps to confirm, should any question arise (as many did following the 2020 election cycle), that the voter or authorized applicant did actually request the ballot. Germany 10/30/23 Decl. ¶ 89.

502. A pen and ink signature also helps to ensure that the applicant carefully reads the oath and recognizes the importance of confirming that the information the applicant is swearing to/affirming is correct. Germany 10/30/23 Decl. ¶ 89.

503. Taking the oath seriously is important because providing false information on an absentee ballot application violates Georgia law and is a crime. Germany 10/30/23 Decl. ¶ 89.

504.   Requiring a voter to sign, in his/her own hand with pen and ink, ensures the voter takes the oath seriously, deters fraud, and verifies the information being provided to confirm the voter's eligibility and identity. Germany 10/30/23 Decl. ¶¶ 89, 92–93.

505.   Requiring a voter to sign, in his/her own hand with pen and ink, ensures the voter takes the oath seriously, deters fraud, and verifies the information being provided to confirm the voter's eligibility and identity. Germany 10/30/23 Decl. ¶ 89, 92–93; Eileen Chou, *Paperless and Soulless: E-signatures Diminish the Signer's Presence and Decrease Acceptance*, 6 Soc. Psych. & Personality Scis. 343 (2015); *id.* at 348 (noting the discrepancy between customary use of e-signatures and the mind's interpretation could "foster negativity and skepticism"); s*ee also* Eileen Chou, *What's in a name? The toll e-signatures take on individual honesty*, 61 J. Experimental Soc. Psych. 84 (2015).

506.   Use of ink can maintain legibility and avoid tampering.  Mashburn 3/7 58:22–59:14; Germany 10/30/23 Decl. ¶ 89.

507.   Once a voter's qualifications are verified based on information submitted on the absentee ballot application, a ballot is mailed to the voter. Germany 10/30/23 Decl. ¶ 84–85.

508.   Once the absentee ballot was mailed, county officials no longer have control over the ballot that was issued to a specific voter. Germany 10/30/23 Decl. ¶ 84.

509.   When that ballot is returned, whether in the mail or in a dropbox, the voter is not present for local election officials to verify the person's identity. Germany 10/30/23 Decl. ¶ 84.

510.   When returning the completed ballot, for those 2-3% who may not have a driver's license or state identification number, virtually all have the last four digits of their social security number on file (approximately 99.9% of all voters).  Sterling 239:8–20 (99.9% have ID or SSN); PI Hr'g Tr. 193:2–20.

511.   For the very few who did not, they could still use the same alternate identification used to request their ballot.   Sosebee 74:4–14; Germany 4/13 87:17–89:2; Germany 10/30/23 Decl. ¶ 82, 84 n.1.

512.   The voter's identification number or, if applicable, last four of the voter's social security number, along with the voter's name and date of birth, verified their identity to process their ballot, very similar to the process for in-person voting.  Germany 10/30/23 Decl. ¶ 81, 84–85.

513.   Virtually all registered voters (99 to 99.9%) have the last four digits of their social security number associated with their voter file. Sterling 239:8-20.

514.   Verifying voter identification on the absentee ballot return envelope protects against fraud, promote the actual and perceived integrity of the election process, and create a uniform and objective means of verifying a voter's identity. Germany 10/30/23 Decl. ¶ 81, 84–86; Sterling 102:11-18, 104:17-105:2, 194:17-105:2; Bailey 10/6/22 91:21-92:5; Bailey 3/21 111:1-15.

515.   Only a tiny number of absentee ballots were rejected due to identification issues associated with the absentee ballot return envelope. Grimmer Rep. ¶ 171–72.

516.   It is the absentee ballot application (which includes the individual's date of birth) that is used to determine a voter's qualifications, not the absentee ballot *return* envelope. Germany 10/30/23 Decl. ¶ 77, 82–84.

517.   The date of birth on the absentee ballot return envelope is used to determine the voter's identity when returning a completed absentee ballot and is part of every voter's voter file. Germany 10/30/23 Decl. ¶ 83.

518.   Date of birth also distinguishes between people of the same name living in the same house, such as a father and son. Bailey 3/21 178:15-25.

519.   County poll workers routinely use a voter's date of birth as part of the verification process. Bailey 10/6 197:6-15 (DOB one of things to consider when verify identity); Williams 48:6-9; Manifold 112:22-113:2, 116:24-117:1; Wurtz 48:5-8.

520.   Georgia voters have long been required to sign an oath when returning their ballot. Germany 10/30/23 Decl. ¶ 90.

521.   The voter would then sign the oath that the ballot was completed consistent with the State's secret ballot provisions. Germany 10/30/23 Decl. ¶ 91–93.

522.   Very few ballots were rejected for signature issues. Grimmer Rep. ¶¶ 16, 165, 171.

523.   When enacting SB 202, the General Assembly decided there were sufficient concerns, even absent direct evidence of widespread fraud, to justify taking action to secure the integrity of the election process.  Germany 10/30/23 Decl. ¶ 21–23.

524.   Georgia addressed the concerns expressed after the 2020 election with a comprehensive review of its absentee voting process, electing to keep no-excuse absentee voting, replacing subjective signature matching with an objective photo ID based verification method, and putting in place other reforms to improve and streamline the absentee voting process.  Germany 10/30/23 Decl. ¶ 23.

525.   SB 202 addressed the large amount of duplicate absentee ballot applications from the same voter by prohibiting third-party organizations from sending applications to those who had already requested an absentee ballot (lists of who had requested such a ballot is updated daily), by prohibiting the

pre-filling of the application (to avoid the numerous errors being reported and resulting confusion and claims of potential fraud), and by requiring a disclaimer that clearly told the voter who was sending the application and that it was not a ballot.  Germany 10/30/23 Decl. ¶¶ 53, 62, 68.

526.   The General Assembly reinforced its anti-ballot harvesting rules by establishing that, although improperly handling a completed absentee ballot *application* was a misdemeanor, improper handling of a completed *ballot* would now be a felony, when previously it was only a misdemeanor.  Germany 10/30/23 Decl. ¶ 96–98.

527.   Following SB 202, there was a significant drop in the percentage of duplicate absentee ballot applications. Grimmer Rep. ¶¶ 179–180.

528.   The State did not receive the same complaints after the 2022 elections that it received after the 2018 and 2020 elections.  Eveler 197:7–14 (complaints re: duplicate applications stopped in 2022); Germany 10/30/23 Decl. ¶ 99.

529.   To ensure uniformity across counties (which is important for perceptions of a fair election process) and address voter confusion from the receipt of an unsolicited absentee ballot application, the General Assembly decided to prohibit election officials from sending unsolicited absentee ballot applications.  Germany 10/30/23 Decl. ¶¶ 26–28, 31.

530.  SB 202 prohibits distributing duplicate applications once a voter has requested an absentee ballot but does *not* prohibit organizations like Plaintiffs from sending multiple applications *before* a voter requests a ballot nor does it limit Plaintiffs' ability to communicate any message they want— just not an actual application to those who have already submitted one. Germany 10/30/23 Decl. ¶ 62.

531.  To reduce errors, any unsolicited absentee ballot application sent by third parties must not be pre-filled.  *See* Germany 5/20/22 VoteAmerica Decl. ¶ 22; 3/18/21 Tr. at 22:10–23:12, *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021); VoteAmerica Hr'g Tr.  22:4–14; Mashburn VoteAmerica 83:20–84:19.

532.  When it comes to voters, the third-party solicitation provisions actually *decreases* the burden on voters who will no longer receive an unsolicited absentee ballot application after having already submitted such an application to local election officials and on local election officials who do not have to process duplicate absentee ballot applications, informs voters who is sending them the applications, ensuring the voter knows the form is not a ballot, and alleviates errors in pre-filled information. Germany 5/20/22 VoteAmerica Decl. ¶ 48; Germany 10/30/23 Decl. ¶¶ 52–53, 62, 67–68.

533.   Any errors in the pre-filling either makes the application worthless to the voter or results in the application's being rejected if submitted, benefiting no one.  Germany 10/30/23 Decl. ¶ 50.

534.   The State has a compelling interest in regulating who may handle a completed absentee ballot application to protect a voter's private information and prevent fraud and criminalizing violations of this prohibition.  *See* Germany 10/30/23 Decl. ¶ 96–98.

535.   Local election officials did not receive complaints about the third party ballot return provisions following the 2022 elections.  Watson 179:10–14, 183:3–5 (no issues with ballot return provisions after SB 202).

536.   While a voter's eligibility is determined when the voter submits an absentee ballot application, the State also has a compelling interest in verifying the identity of the person returning that ballot.  *See* Germany 10/30/23 Decl. ¶ 84–86.

537.   The oath on the ballot return envelope protects the integrity of the ballot and reduces the risk of fraud, undue influence or pressure on the voter, and vote buying.  *See* Germany 10/30/23 Decl. ¶ 91–93.

538.   Each of the challenged provision of SB 202 furthers important— even compelling—governmental interests and works as part of the entirety of Georgia's voting system to ensure a process that is accessible, has necessary

checks and balances, and leads to results that all Georgians can have confidence in.  Germany 10/30/23 Decl. ¶ 23.

539.   Through SB 202, the State sought to increase electoral efficiency, while also promoting voter access, preventing fraud or the appearance of fraud, protecting the integrity of the voting process and its results, reducing the risks of voter confusion, promoting the efficient administration of elections in a fair and uniform manner for all eligible voters, and enhance the confidence voters can have in Georgia elections.  Germany 10/30/23 Decl. ¶ 22.

540.   Georgia voters tend to return their ballots to a few drop boxes within each county, while many other drop boxes receive a smaller share of ballots.  Grimmer Rep. ¶ 14; PI Hr'g Tr. 274:23–276:12.

541.   Many voters who used drop boxes did not return their ballots to the drop box nearest their home.  Grimmer Rep. 122 tbl. 22; Deposition of Bernard Fraga [Doc. 745] ("Fraga") 151:8–152:20 (Ex. MMM)); Report of Allan Lichtman, attached as Ex. GGGG ("Lichtman Rep.") 21.

542.   Only 62% of voters used a drop box "near work, school, home, or the location of an errand."  Lichtman Rep. 21.

543.   45% of drop box voters simply used the county elections office.  Grimmer Updated Rep. 6 (Ex. EEEE).

544.  The average voter lived more than three miles from the nearest drop box in 2020.  Report of Bernard Fraga, attached as Ex. BBBB ("Fraga Rep.") 68.

545.  By requiring drop boxes to be placed indoors in the election office or advance voting locations, which were staffed with county officials or election workers, SB 202 ensured that no additional personnel were needed to monitor drop boxes or to collect ballots.  Germany 7/27/23 Decl. ¶ 72 (Ex. C).

546.  When officials receive complaints about election security, they must devote time and resources to addressing those concerns.  Germany 4/13 283:10–284:11.

547.  Every form of voting creates burdens on voters with disabilities.  Report of Lisa Schur, attached as Ex. JJJJ ("Schur Rep.") ¶¶ 72, 75, 83 [Doc. 546-3].

548.  Indoor and outdoor drop boxes "are not different at all."  Eveler 266:12–17.

549.  There was no requirement that drop boxes be accessible to voters without leaving their car.  K. Williams 3/1/23 65:19–25.

550.  Georgia faced an onslaught of litigation leading up to the 2020 general election about how that election would be conducted.  Germany 7/27/23 Decl. ¶ 17.

551.  SB 202 requires dropboxes to be placed indoors at certain election-administration locations during business hours because those locations are already staffed with election workers, and thus no additional personnel would be needed.  Germany 7/27/23 Decl. ¶ 72.

552.  Processing absentee-ballot applications is time consuming, and it places a heavy burden on election officials.  Germany 7/27/23 Decl. ¶ 95.

553.  Following the 2020 elections, just as it had done after the 2018 elections, the General Assembly used the next legislative session to consider how to respond to the various concerns.  Germany 3/7 125:12–126:4; Sterling 123:3–125:17.

554.  County officials were spending significant time trying to monitor what was happening in the voting line. Eveler 143:17–25; Sosebee 148:15–25.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Statement was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson