**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON ADDITIONAL PROVISIONS**

## INTRODUCTION

Among the various challenges to SB 202, a handful of Plaintiffs challenge the rules for out-of-precinct provisional voting, voter challenges, and the SEB's power to suspend local superintendents. Like the other provisions of SB 202 challenged by Plaintiffs, these are reasonable regulations of election processes in Georgia that do not violate the law or U.S. Constitution. Plaintiffs cannot present sufficient evidence to establish a material issue of fact on whether the provisions they challenge are discriminatory or that they unconstitutionally burden the right to vote of any Georgia voter. Now that evidence is closed, State Defendants are entitled to summary judgment on each of the challenged provisions.

## FACTUAL BACKGROUND

### I.     Claims covered by this Motion.

Each Plaintiff group of the four consolidated cases considered in this motion challenges a handful of additional election procedures codified in SB 202. Specifically, three Plaintiff groups challenge the changes made to out of precinct voting as violations of Section 2 of the VRA, the fundamental right to vote, and violations of the Americans with Disabilities Act: SMF[1] ¶ 213 ([NGP

---

[1] As required by this Court's instructions, III. m., all citations to the record are included in the brief and in the accompanying combined Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes

Doc. 39, ¶ 101], [NAACP Doc. 35, ¶ 159], [AME Doc. 83, ¶ 273]). Likewise, three Plaintiff groups challenge the processes regulating voter challenges as violations of Section 2 of the VRA and the fundamental right to vote: SMF ¶ 214 ([NGP Doc. 39, ¶ 106], [NAACP Doc. 35, ¶ 164], [CBC Doc. 1, ¶ 163]). And two Plaintiff groups challenge the process for temporarily suspending county officials who have a pattern of not following state law: SMF ¶ 215 ([NAACP Doc. 35, ¶ 163], [CBC Doc. 1, ¶ 167]).

## II.    Georgia law on out of precinct voting.

### A.    Georgia out of precinct voting before SB 202.

Georgia law first authorized provisional ballots for voters appearing at the wrong precinct in 2002, following updates to federal law. Ga. L. 2002, p. 598, §§ 1–5. The general provisions remained largely unchanged, with some minor alterations to require notice of the opportunity to cure. *See, e.g.*, Ga. L. 2019, p. 7, § 37.

Beginning with the 2018 election, county and state officials saw an increase in the number of out-of-precinct provisional ballots, which led to substantial burdens on election officials. SMF ¶ 216 (Germany Dec. ¶ 108). Processing provisional ballots for voters who vote in the wrong precinct requires manual duplication for contests in which the voter is eligible to vote,

---

the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

which is time-consuming and impedes the ability of officials to carry out other important tasks. SMF, ¶ 217 (*Id.*). Out of precinct provisional ballots also slow down voting on Election Day and increase concerns about the potential for fraud. SMF, ¶ 218 (*Id.* ¶¶ 110–11).

### B.     Changes to out of precinct voting in SB 202.

In SB 202, the legislature recognized that voters "voting out of precinct add to the burden on election officials and lines for other electors because of the length of time it takes to process a provisional ballot in a precinct. Electors should be directed to the correct precinct on Election Day to ensure that they are able to vote in all elections for which they are eligible." SB 202, Section 2, Paragraph 15. As a result, SB 202 struck a balance. Unlike other states, it did not ban out of precinct provisional ballots outright, but instead provided a process for directing voters to the correct precinct until 5:00pm, and then allowing voters to vote out of precinct if they were unable to get to their correct polling place after that point. SMF ¶ 219 (Germany Dec. ¶ 114).

### C.     Results of changes in out of precinct provisional ballots.

Less than half of the states in the United States partially count provisional ballots cast in the wrong precinct. SMF ¶ 220 (2022 EAVS Report, p. 84). About half of all states reject out-of-precinct provisional ballots entirely. SMF ¶ 221 (*Id.*). As a result, Georgia is more permissive than half of the states that completely reject out-of-precinct provisional ballots.

### III.   Georgia law on voter challenges.

#### A.   Georgia voter challenges before SB 202.

Georgia law has long provided for two methods of challenges to voter eligibility. One statutory method, codified at O.C.G.A. § 21-2-229, provides a process for one elector to challenge the registration of another elector before an election. Another method, provided under O.C.G.A. § 21-2-230, creates a process for one elector to challenge another elector's right to vote in a particular election. Both processes have been part of Georgia law since at least 1994. Ga. L. 1994, p. 1443 § 3. Both statutes are carried out and enforced by county election officials, who evaluate the particular challenges and determine the eligibility of the elector.

During the runup to the 2021 runoff, electors attempted to use the processes in both statutes to challenge electors. SMF ¶ 222 (Germany Dep. (3/7) 194:3–9). Counties handled the processes inconsistently, with some counties tabling challenges filed by voters or not dealing with challenges in a timely fashion. SMF ¶ 223 (Germany Dep. (3/7) 190:2–19, 193:3–10).

#### B.   Changes to voter challenge provisions in SB 202.

In SB 202, the legislature clarified two specific issues about challenges under O.C.G.A. §§ 21-2-229 and 21-2-230. First, it clarified that there is no numerical limit on the number of challenges under either statute. O.C.G.A. §§ 21-2-229(a); -230(a). Second, it clarified that challenges must be heard within

a certain number of business days after the challenge is filed under O.C.G.A. §
21-2-229(b). The legislature did not change other requirements about the
process. For example, the statute continued to require that the challenge must
be in writing and must specify the grounds for the challenge "distinctly."
O.C.G.A. §§ 21-2-229(a); -230(a).

## IV.   Georgia law on county election officials.

### A.   Options for underperforming county election officials prior to SB 202.

Prior to SB 202, the State Election Board (SEB) and Secretary of State
had few options when county officials consistently underperformed in the
administration of elections. The SEB could order civil penalties and publicly
reprimand counties, but was required to utilize superior court proceedings to
enforce any injunctive relief. O.C.G.A. § 21-2-33.1(a) and (c). This process is
the only statutory option, even when county officials decided to blatantly
violate Georgia law. The only other options for SEB enforcement are
administrative, such as a fine for violations of the Election Code. SMF ¶ 225
(Mashburn Dep. (3/7) at 215:15–23).

### B.   SB 202 created a process for temporary suspension of underperforming county election officials.

Under the procedures outlined in SB 202, the SEB now has the ability,
after notice and a hearing, to *temporarily* suspend election superintendents,
but only after they commit multiple violations of the law over multiple election

cycles. O.C.G.A. § 21-2-33.2. The General Assembly explained why it took this step: "Ensuring there is a mechanism to address local election problems will promote voter confidence and meet the goal of uniformity" because of the lack of accountability of local elections officials under pre-existing law. Senate Bill 202 at 5:96–101.

To temporarily suspend county officials, the SEB must respond to a petition or conduct an investigation, provide notice and a hearing, and then determine whether the county official in question has (1) "committed at least three violations of this title or of State Election Board rules and regulations, in the last two general election cycles; and the county or municipal superintendent has not sufficiently remedied the violations" or (2) "for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections." O.C.G.A. § 21-2-33.2(c). Even under these provisions, the suspension can last no longer than nine months. O.C.G.A. § 21-2-33.2(e).

**C.      Result of the SB 202 changes involving county officials.**

Since the adoption of SB 202 in 2021, the only county election officials who have even undergone a performance review, which is an initial step to the State Election Board's own preliminary investigation and notice and hearing process, are the members of the Fulton County Board of Elections and

6

Registration and staff. SMF ¶ 226 (Germany CGG Dec., ¶¶ 4–6; Fulton Report).

The Fulton County Performance Review was initiated by members of the General Assembly in the local legislative delegation. SMF ¶ 227 (Fulton Report, p. 5). The three-member Review Board personally observed "pre-election, Election Day, and post-election processes at Fulton County in both the 2021 municipal elections and the 2022 general and runoff elections." SMF ¶ 228 (Fulton Report at 6). Those observations included at least four visits to the Fulton County Election Processing Center and at least 16 visits to different Election Day polling place and advance-voting locations. SMF ¶ 229 (Fulton Report at 6). The Review Board also worked with the Carter Center to observe Fulton County elections in November 2022 to assist with its review. SMF ¶ 230 (Fulton Report at 6). Finally, the Review Board conducted formal interviews with staff and members of the Fulton County Board of Elections, reviewed procedures, and coordinated with the Secretary's office for its review. SMF ¶ 231 (Fulton Report at 7).

When it issued its report, the Review Board confirmed that, in prior years, "disorganization and a lack of a sense of urgency in resolving issues plagued Fulton County elections." SMF ¶ 232 (Fulton Report at 1). But the Review Board also recognized the improvement in election administration in Fulton County from 2020 through 2022, at least in part because of the

incentives created by the Performance Review itself and Fulton County's voluntary adoption of many of the Board's recommendations. SMF ¶ 233 (Fulton Report at 18). As a result, the Review Board did not recommend that any Fulton officials be suspended under the Suspension Rule. SMF ¶ 234 (Fulton Report at 18–19).

For its part, after receiving the Performance Review Board's report, the SEB did not move forward with proceedings that could have resulted in suspension of the Fulton officials, has not announced any plans for conducting additional performance reviews, and is not considering suspension of additional county election officials. SMF ¶ 235 (Germany CGG Dec., ¶¶ 7–8). Thus, the SEB has not suspended any county officials, nor has it announced any plans to do so or to investigate any other county at this point. SMF ¶ 236 (Germany CGG Dec., ¶ 8). Rather, SB 202's performance review process has resulted in positive improvements in the administration of Fulton County elections without any official losing their job.

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but need not disprove the opposing party's claims. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Instead, the moving party may point out the absence of

evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb County, Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The non-moving party "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)); *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (holding "there must be enough of a showing that the jury could reasonably find for that party").

I.   **SB 202's changes to out-of-precinct provisional voting, voter challenges, and suspension of local superintendents does not unconstitutionally burden the right to vote.**

A.  **Legal standards on fundamental right to vote claims.**

Claims brought under the fundamental right to vote and the Equal Protection Clause related to elections are evaluated "under what is known as the *Anderson-Burdick* test, weighing 'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S.

780, 789 (1983) (internal quotation marks omitted)).” *Curling v. Raffensperger*,

50 F.4th 1114, 1121 (11th Cir. 2022).

> That inquiry is a sliding scale:

> If we conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny—meaning that the rule survives only if it is narrowly tailored to serve a compelling state interest. *New Georgia Project*, 976 F.3d at 1280. When the burden is more modest, though, so is the inquiry. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008). So long as a policy is "reasonable and nondiscriminatory," the State's "important regulatory interests in conducting orderly elections" will generally be enough to justify it. *Grizzle v. Kemp*, 634 F.3d 1314, 1322 (11th Cir. 2011) (quotations omitted); *Indep. Party of Florida v. Sec'y, State of Florida*, 967 F.3d 1277, 1281 (11th Cir. 2020) (quotation omitted).

*Id*. This balancing test is important because there is "no license for 'second-

guessing and interfering with' state decisions; *the Constitution charges States,*

*not federal courts, with designing election rules*." *Id*. (citing *New Georgia*

*Project*, 976 F.3d at 1284) (emphasis added).

It is not enough to show a burden on the right to vote. Plaintiffs "must

show, at the very least, that the burdens imposed 'represent a significant

increase over the usual burdens of voting.'" *Id*. (quoting *Crawford v. Marion*

*Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)).

## B.    The out-of-precinct provisions do not unconstitutionally burden the right to vote.

Plaintiffs cannot demonstrate that the changes in out-of-precinct voting

impose an unconstitutional burden on the right to vote. As the Eleventh Circuit

has held, "States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). Complying with rules related to the administration of elections is necessary to have a functioning election system. *Curling*, 50 F.4th at 1121.

Georgia, like many states, requires voters to vote at their assigned precincts on Election Day. Precincts have certain minimum requirements related to voting machines that are determined based on the number of assigned electors. O.C.G.A. § 21-2-367(b)(1). Requiring voters to go to their correct precinct, while still providing a "safety valve" for voters who cannot get to the right precinct by the close of the polls, does not impose any more than a minimal burden on the right to vote—especially when voters have no-excuse absentee voting available and three weeks of early voting.

Whenever this provision of SB 202 imposes a minimal burden, the state's regulatory interests are sufficient to justify the election regulation. But even if Plaintiffs are able to establish some cases in which the burden is more severe, the fact remains that, when electors vote out of their precinct, that process places burdens on the election officials involved and, just as importantly, likely disenfranchises those voters from voting in local elections because when a voter receives a provisional ballot in a precinct different from their own, it will likely not include all of the local races that the voter would be eligible to vote in, and

only votes in races that a voter is eligible to vote are counted. SMF ¶ 237 (Germany Dec. ¶¶ 108–13). Accordingly, the State has compelling interests in requiring voters to appear at the right precinct—along with the fact that "[a] State indisputably has a compelling interest in preserving the integrity of its election process," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam), that outweighs any burden on voting.

In short, Georgia's out of precinct processes do not unconstitutionally burden the right to vote. And Plaintiffs cannot establish a material issue of fact on that point.

## C.   The voter challenge provisions do not unconstitutionally burden the right to vote.

The same is true of SB 202's voter challenge provisions. Part of the operation of elections includes the provisions governing "'registration and qualifications of voters.'" *Burdick*, 504 U.S. at 433 (quoting *Anderson*, 460 U.S. at 788). The voter-challenge provisions of Georgia law are directly related to the obligations of registrars to manage the election—registrars must determine the eligibility of each person applying to register to vote. O.C.G.A. § 21-2-226. That includes the duty of examining "from time to time" the qualifications of all electors. O.C.G.A. § 21-2-228. And that includes hearing challenges to qualifications filed by other electors through a defined process. O.C.G.A. §§ 21-2-229, -230. Providing evidence of eligibility to vote if

challenged in a specific challenge has long been part of Georgia law and thus is not more than a minimal burden to comply with the registration requirements. *Burdick*, 504 U.S. at 433.

Because the burden is so minimal, the regulatory interests of the State are more than sufficient to justify the processes in the statute. And the State also has a compelling interest in maintaining a reliable list of eligible voters and applying its election laws as written. *Fair Fight Action v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 U.S. Dist. LEXIS 261571, at *63–*64 (N.D. Ga. Mar. 31, 2021).

### D.   The suspension provisions do not unconstitutionally burden the right to vote.

The suspension provisions also do not impose any unconstitutional burden on the right to vote. Plaintiffs cannot put forward evidence that a suspended superintendent will impact the right to vote in any way, because the statutory structure provides for a temporary superintendent to continue to operate elections after the prior superintendent is suspended. O.C.G.A. § 21-2-33.2(e)(1). The evidence also demonstrates no burden on the right to vote—thus far, the SEB has suspended *zero* county officials, to say nothing of failing to replace an official that was suspended after a thorough investigative procedure. SMF ¶ 238 (Germany CGG Dec. ¶¶ 6–8). Plaintiffs can offer no evidence otherwise.

Weighed against this non-existent burden, the State's interests are especially strong. The General Assembly adopted the suspension provisions specifically to protect voters and provide remedies for "counties with dysfunctional election systems." SB 202, Section 2, Paragraph 7. And the evidence demonstrates the suspension processes have resulted in improved elections. SMF ¶ 239 (Fulton Report at 18–19). The government interests in uniformity and a well-run election system, including ensuring opportunities for all voters to vote, more than justify the suspension provisions providing the State a way to remedy ongoing violations of state law by local election officials. *Burdick*, 504 U.S. at 434.

Thus, the suspension provisions do not violate the fundamental right to vote of any Georgia voter. And Plaintiffs cannot establish a material issue of fact on that conclusion, either.

### E.    Plaintiffs' claims on their fundamental right to vote claims fall short.

Because Plaintiffs can offer no evidence of any burden on the right to vote beyond the usual burdens of voting as a result of the out-of-precinct provisions, the voter challenge changes, and the suspension provisions in SB 202, State Defendants are entitled to summary judgment on all constitutional claims related to these provisions challenged in Plaintiffs' complaints.

## II.    The changes to out-of-precinct provisional voting, voter challenges, and suspending local superintendents do not violate Section 2 of the Voting Rights Act.

The same is true of Plaintiffs' challenges to these provisions under Section 2 of the Voting Rights Act (VRA).

### A.    Legal standards regarding Section 2.

As amended in 1982, Section 2(a) of the VRA prohibits any state or political subdivision from imposing or applying any "qualification or prerequisite" to voting or any "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Section 2 prohibits "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" which "is established if" the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(a) and (b). A "totality of circumstances" must show the challenged process is "not equally open" because a minority group has "less opportunity . . . to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Section 2 prohibits all forms of voting discrimination that "result in the denial of equal access to any phase of the electoral process for minority group

members." S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205. It also protects voters from election practices "which operate, designedly or otherwise" to deny them the same opportunity to participate in the political process as other citizens enjoy. *Id*. at 28. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433–34 (2006).

Vote-denial claims relating to particular election practices under Section 2 of the VRA are analyzed under the framework set forth in *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). *Brnovich* provides "certain guideposts" that courts must apply when considering a vote-denial claim based on rules "like those at issue here, that specify the time, place, or manner for casting ballots." *Id.* at 2336.

*Brnovich* involved a vote-denial Section 2 challenge to two aspects of Arizona law: (1) an anti-ballot-harvesting provision that limited who could return absentee ballots for voters; and (2) a requirement that voters who vote on Election Day do so from their assigned precinct. *Id.* at 2334. The Court's analysis began with the statutory text and led to the holding that the "key requirement [of a Section 2 vote-denial claim] is that the political process leading to the nomination and election (here, the process of voting) must be

16

equally open to minority and non-minority groups alike." *Id.* at 2337. For purposes of Section 2, "equally open" looks to equal opportunity to participate, but the "equal openness remains the touchstone." *Id.* at 2338.

        1.     Brnovich *guideposts.*

Equal openness under Section 2 is determined by looking at a series of factors, all involving a review of the entirety of the voting system in a jurisdiction. First, courts must consider the "size of the burden imposed by a challenged voting rule." *Id.* at 2338. Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort." *Id.*

Second, courts should consider the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982." *Id.* The analysis must take into account the court's "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Id.* at 2339.

Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id.* This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may well result in some predicable disparities … [b]ut the mere fact there is some disparity in impact does not necessarily mean that

a *system* is not equally open or that it does not give everyone an equal opportunity to vote." *Id.* (emphasis added). For this reason, a "meaningful comparison is essential." *Id.*

In *Brnovich*, that meaningful comparison focused on racial disparities in "absolute terms." *Id.* at 2344–45. It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." *Id.* The majority looked to the numbers in the aggregate and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[2] *Id.*

> ### 2.   *Disparate impact is not the measure of a Section 2 violation.*

The Supreme Court also addressed what does *not* constitute proper analysis under a Section 2 vote-denial claim. For example, disparate impact is not the metric to use when considering Section 2. *Id.* at 2340. Adopting such a standard would lead to impermissible federal micromanaging of state elections. *Id.* The Court also rejected the "cat's paw" theory of liability when

---

[2] The Court also opined on how the "use of statistics [can be] highly misleading." *Brnovich*, 141 S. Ct. at 2345. For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID ($0.3 \div 0.1 = 3$), but such a statement would mask the fact that the populations were effectively identical." *Id.* (quoting *Frank v. Walker*, 768 F.3d 744, 752, n. 3 (7th Cir. 2014)) (internal quotation marks omitted).

looking to questions of intentional discrimination. *Id.* at 2349–50. That theory is typically used in employment contests where a plaintiff "seeks to hold the plaintiff's employer liable for the 'animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Id.* at 2350 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). Thus, in Section 2 cases, that one policymaker may have acted with improper intent does not mean that other legislators did; indeed "it is insulting to suggest that they are mere dupes or tools." *Id.*

**B.     The out-of-precinct provisions do not violate the VRA.**

The out-of-precinct provisions altered by SB 202 easily meet the *Brnovich* guideposts. As an initial matter, *Brnovich* itself involved a complete ban on out of precinct voting as opposed to Georgia's more-permissive option for voters late in the day. 141 S. Ct. at 2334. Like Arizona's more-restrictive law, Georgia's out of precinct rules after SB 202 easily pass the *Brnovich* guideposts.

Requiring a voter to go to their assigned precinct is "requiring compliance with certain rules," which is necessary for voting. *Id.* at 2338. Thus, for purposes of Section 2, there is no burden arising from mere inconvenience. *Id.* Further, the opportunity to vote out-of-precinct after 5:00pm is an expansion of what was available in 1982, when out-of-precinct voting was not permitted. Finally, there is no evidence of any outsized racial impact of the out-

of-precinct provisions, especially when considered in the context of all the opportunities to vote Georgia provides generally.

For all these reasons, and because of the high degree of openness of Georgia's election system when compared with other states, the out-of-precinct changes in SB 202 do not violate Section 2.

## C.     The voter challenge provisions do not violate the VRA.

The same is true of SB 202's voter challenge provisions. The burden of maintaining qualifications to vote is a normal burden associated with voting, and establishing those facts when asked simply constitutes compliance with the rules of voting. *Id*. The voter-challenge provisions were not in effect in 1982, but ensuring voter eligibility has long been the responsibility of registrars in Georgia. And the expanded number of ways to register makes registration so easy as to be a minimal burden. *Fair Fight Action*, 2021 U.S. Dist. LEXIS 261571, at *61. Finally, there is no outsized racial impact of the voter-challenge provisions, especially because registrars are required to hear challenges on a case-by-case basis.

## D.     Plaintiffs' VRA claims should be dismissed.

In short, State Defendants are entitled to summary judgment on all of Plaintiffs' VRA claims related to SB 202's changes involving out of precinct voting and voter challenges.

### III.   The out-of-precinct provisions of SB 202 do not violate the Americans with Disabilities (ADA) or the Rehabilitation Act.

The same is true of Plaintiffs' claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

### A.   Legal standards regarding ADA and Rehabilitation Act.

Plaintiffs' claims under Title II of the ADA[3] and Section 504 of the Rehabilitation Act,[4] are evaluated under the same standard. *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301 n.2 (11th Cir. 2022); [Doc. 546 p. 10]. To state a Title II claim, "a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated

---

[3] Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

> 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a).

[4] Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)) provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami–Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). To determine if a person was excluded from a public service or activity, the ADA focuses on the program *as a whole* to determine if voters with disabilities have meaningful access to the program. 28 C.F.R. § 35.150(a). The Supreme Court has explained that, to "assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Courts in this circuit recognize that mere "[d]ifficulty in accessing a benefit . . . does not by itself establish a lack of meaningful access." *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1329 (N.D. Ga. 2017). Nor are qualified individuals "entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). Thus, meaningful access does not "require the governmental entity to provide *every* requested accommodation." *Medina v. City of Cape Coral, Fla.*, 72 F.Supp.3d 1274, 1278 (M.D. Fla. 2014) (emphasis in original; citations omitted); *accord Todd,* 236 F. Supp. 3d at 1334 ("a reasonable accommodation need not be 'perfect' or the one 'most strongly preferred' by the plaintiff, but it still must be 'effective'"). "Instead, when an individual already has 'meaningful access' to a benefit to which he or she is

entitled, no additional accommodation, 'reasonable' or not, need be provided by the governmental entity." *Medina*, 72 F. Supp. 3d at 1278.

**B.    The out-of-precinct provisional ballot procedures do not violate the ADA or Rehabilitation Act.**

The changes to out-of-precinct voting processes do not deny voters with disabilities meaningful access to in-person voting in the State of Georgia. There are multiple ways for voters with disabilities to participate in in-person and absentee voting and to do so on equal footing with other voters. Title II requires nothing more. *Democracy N.C. v. N.C. Sate Bd. of Elections*, 476 F. Supp. 3d 158, 233 (M.D.N.C. 2020) (finding that even though North Carolina law specifically prohibited nursing home staff from assisting a disabled resident from returning an absentee ballot, because the disabled could still return the ballot by U.S. Mail, there was no violation of Title II of the ADA).

Further, Plaintiffs cannot present evidence that requiring voters to vote in their assigned precincts (with limited exceptions at the end of the day on Election Day) somehow results in a denial of an opportunity to vote based on a disability. Voters with disabilities have the same rights as all other voters to participate in in-person voting and they have every opportunity to utilize the accessible voting machines during the week of early voting as long as they vote in their county. Nothing in the ADA requires that *every* voter be able to use *every* means of returning a ballot in precisely the timeline they choose, or that

*every* "obstacle" be removed, only that the voter with a disability have "meaningful access" to the program. *Medina*, 72 F. Supp. 3d at 1279. As a result, the out of precinct provisions of SB 202 do not violate the ADA or the Rehabilitation Act.

In short, Plaintiffs do not have evidence sufficient to create a material issue of fact with respect to the lawfulness of these provisions under the ADA and Rehabilitation Act. Accordingly, State Defendants are entitled to summary judgment on those claims.

## CONCLUSION

Plaintiffs made sweeping allegations of massive burdens on the right to vote—including for racial reasons—in their complaints. But the evidence demonstrates no such reality. Georgia's system does not burden the right to vote. There are multiple opportunities for every voter to participate across a variety of methods of voting available in Georgia. There is no violation of the law or Constitution as a result of the changes to out of precinct voting, voter challenges, or the suspension provision of SB 202 that are challenged by Plaintiffs.  As a result, Plaintiffs' claims fail as a matter of law, and State Defendants are entitled to summary judgment on all those claims.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

25

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ *Bryan P. Tyson*
Bryan P. Tyson