**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR**
**SUMMARY JUDGMENT ON CHANGES IN TIMING**

## INTRODUCTION

In SB 202, the General Assembly updated the timing for deadlines related to requesting, mailing, and submitting absentee-ballot applications, the timeline for runoff elections, and the changes to early voting made by SB 202. As a valid exercise of their legislative authority, Georgia legislators regularly update the timing of various election processes as part of necessary revisions to the Election Code and SB 202 was no different. All of Georgia's new election deadlines are well within the mainstream of other state election practices.  Plaintiffs cannot present evidence that the provisions they challenge are discriminatory or unconstitutionally burden the right to vote of any Georgia voter. Now that the evidence is closed, State Defendants are entitled to judgment as a matter of law on each of the challenged provisions.

## FACTUAL BACKGROUND

### I.   Claims covered by this Motion.

Each Plaintiff group of the five consolidated cases considered in this motion raises challenges to the timing of various election procedures. Specifically, the various plaintiff groups challenge the deadlines related to mailing absentee ballots: SMF ¶ 183 ([NGP Doc. 39, ¶ 76]; [NAACP Doc. 35, ¶ 147]; [AME Doc. 83, ¶¶ 254]; [AAAJ Doc. 27, ¶¶ 85–86]). They also challenge

the shortened time period for runoff elections: SMF[1] ¶ 184 ([NGP Doc. 39, ¶

108]; [NAACP Doc. 35, ¶ 148], [AME Doc. 83, ¶ 268]; [CBC Doc. 1, ¶ 138]).

Finally, the Ga. NAACP Plaintiffs challenge the provisions of SB 202 related

to the timeline for early voting, SMF ¶ 185 ([NAACP Doc. 35, ¶ 149]). Each of

these claims is considered in this motion.

## II.   Georgia law on absentee ballot timelines.

### A.   Georgia absentee ballot timelines before SB 202.

Before SB 202, voters had between 180 days (six months) before an

election and up through four days before the election to apply for an absentee

ballot.[2] O.C.G.A. § 21-2-381(a)(1)(A) (2019). During the 2020 election, the

timeline was so long that some voters were confused, forgetting they had

requested an absentee ballot or even already voted by absentee ballot in some

cases by the time the election arrived. SMF ¶ 186 (Germany Dep. (3/7) 132:9–

133:4). Further, a number of late-requested absentee ballots were not able to

be successfully returned by the voter prior to the Election Day deadline for

receiving absentee ballots. SMF ¶ 187 (Germany Dec. [Doc. 601-3], ¶ 99).

---

[1] As required by this Court's instructions, III. m., all citations to the record are included in the brief and in the accompanying combined Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

[2] Before SB 202, absentee ballots could not be issued on the day before the election, O.C.G.A. § 21-2-384(a)(2) (2019), making the last business day to issue ballots the Friday prior to the election.

This led the legislature to conclude that "[c]reating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, Section 2, Paragraph 9.

### B.     Changes to absentee-ballot timelines in SB 202.

SB 202 placed clear limits on the absentee-ballot process. Instead of six months to request an absentee ballot, the legislature set 78 days as the outer limit. O.C.G.A. § 21-2-381(a)(1)(A). And instead of four days before an election being the deadline, the legislature added a week, setting 11 days as the deadline prior to an election—a timeline that will still ensure a full week of early voting is available for any voter who does not return an application before 11 days prior to the election. *Id*., SMF ¶ 188 (Germany Dec. ¶¶ 94–95). Importantly, SB 202 retained Georgia's no-excuse absentee voting process. SMF ¶ 189 (Grimmer Report, ¶ 71).

The limits put in place by SB 202 are consistent with other state practices related to absentee ballots. Many states use the same eleven-day deadline as Georgia: Ariz. Rev. Stat. § 16-542; Idaho Code § 34-1002; Neb. Rev. St. § 32-941; S.C. Code § 7-15-330; V.T.C.A., Election Code §§ 84.0041, 84.007 (Texas); VA Code Ann. § 24.2-701 (Virginia). Others use longer periods: D.C. Mun. Regs. Tit. 3, § 720 (District of Columbia: 15 days); Ind. Code § 3-11-4-2,

§ 3-11-4-3 (Indiana: 12 days); Iowa Code § 53.2 (15 days); KRS § 117.085 (Kentucky: 14 days); McKinney's Election Law § 8-400 (New York: 15 days); R.I. Gen. Laws §17-20-2.1 (Rhode Island: 21 days).

### C.    Result of changes to absentee ballot timelines.

The submission of absentee ballot applications in Georgia has generally fallen within the timeline set by SB 202.  In 2018 election, 88.4% of all mail-in absentee ballot applications were requested within the new deadlines is set forth in SB 202. SMF ¶ 190 (Grimmer Report, ¶ 76). For the 2020 election, 93.8% of all mail-in absentee-ballot applications complied with the SB 202 deadlines. SMF ¶ 191 (Grimmer Report, ¶ 78). While there are slight variations in the racial data about the return of absentee ballots, there is no consistent patten across different racial groups. SMF ¶ 192 (Grimmer Report, ¶¶ 79–80). The data also confirms the legislature's analysis—that applications that arrived outside of the SB 202 deadlines in prior elections were more likely not to be voted or to be cancelled. SMF ¶ 193 (Grimmer Report, ¶ 85).

## III.   Georgia law on runoff elections.

### A.    Georgia runoffs before SB 202.

Before 2013, Georgia held runoffs for all elected offices three weeks after a primary or four weeks after a general election when no candidate received a majority of the vote. O.C.G.A. § 21-2-501(a) (2012); *United States v. Georgia*, 952 F. Supp. 2d 1318, 1322 (N.D. Ga. 2013). Following 2013 litigation involving

the Uniformed Overseas Citizens Absentee Voting Act (UOCAVA) and the Military and Overseas Voting Empowerment Act (MOVE Act), Georgia was ordered to hold *federal* runoff elections at least 45 days after a primary or general election to allow time for military and overseas ballots under the MOVE Act. *Id*. at 1333–34. To comply, the legislature amended the statute in 2014 to use two different runoff schedules for general elections—a four-week schedule for non-federal runoffs and a nine-week schedule for federal runoffs. *See* O.C.G.A. § 21-2-501(a) (2017); *United States v. Georgia*, 778 F.3d 1202, 1204 (11th Cir. 2015) (discussing HB 310); 2014 Ga. Laws 343.

From 2014 through 2019, the only general-election runoffs that occurred were in 2018 for the state offices of Secretary of State and Public Service Commissioner ("PSC"). SMF ¶ 194 (Germany Dec. [Doc. 610-1], ¶¶ 57–58). Both runoffs were held four weeks after election day. *Id*. In 2020, three statewide general-election races required runoffs: both U.S. Senate seats and a PSC seat. SMF ¶ 195 (*Id*. at ¶ 59). After this first-ever nine-week general-election runoff, the legislature determined that the timeline that prolonged the election process through Thanksgiving, Chanukah, Christmas, and into the new year was "exhausting for candidates, donors, and electors," and of course, election officials. SB 202, Section 2, Paragraph 11. Having two separate schedules for federal and state general election runoffs raised insurmountable logistical difficulties, forcing the Secretary of State to combine all three runoffs

5

into the January 5, 2021, runoff election. SMF ¶ 195 (Germany Dec. [Doc. 610-1], ¶ 60). This was the first time the situation of having both federal and state general election runoffs arose since the law changed in 2014, and it was clear that it was not a sustainable course. SMF ¶ 194 (Germany Dec [Doc. 610-1], ¶ 57).

### B.   Changes to runoff provisions in SB 202.

In SB 202, the legislature undertook a comprehensive overhaul of the runoff process. SB 202 created the ranked-choice system for military and overseas voters in Section 27.[3] O.C.G.A. § 21-2-384(e)(5), (6); SB 202, Section 2, Paragraph 11. By allowing military and overseas voters to vote in runoffs without requiring another round trip for an absentee ballot, the 45-day requirement of the MOVE Act no longer applied. *Id.*, *see also* 52 U.S.C. § 20302(a)(9) (written plan for runoff elections); SMF ¶ 196 (Germany Decl. ¶ 62).

SB 202 created the ranked-choice system for overseas voters in Section 27 and established the process for the "special absentee run-off ballot." O.C.G.A. § 21-2-384(e)(5), (6). It then revised the timeline to move all runoffs, both federal and non-federal to match the pre-existing schedule for non-federal

---

[3] Ranked-choice or instant runoff voting is also used by several other states to hold shorter runoffs when federal candidates are involved. *See, e.g.*, Ala. Code § 17-13-8.1; S.C. Code Ann. § 7-15-650.

runoffs, which necessitated updating the advance voting timeline and absentee-ballot processing rules (including early scanning) to match the existing timeline for non-federal runoffs.

States use a variety of timelines for runoffs. Those dates range from two weeks (S.C. Code Ann. § 7-13-50) to three weeks (Miss. Code Ann. § 23-15-191), four weeks (Ala. Code § 17-13-3(a); Ark. Code Ann. § 7-5-106(a)(1); La. Rev. Stat. Ann. § 18:402 (jungle primary system)), or more than six weeks (Tex. Elec. Code § 41.007; N.C. Gen. Stat. § 163-111(e); S. D. Codified Laws § 12-6-51.1). After the experiences of runoffs in 2020 and 2021, the Georgia legislature decided nine weeks was too long and chose the four weeks used for state runoffs—and for federal runoffs until 2014.

### C.   Voter turnout in runoff elections has increased.

A review of the facts shows that voter participation in Georgia runoffs has been increasing, not decreasing, since SB 202. In the 2018 general election, 61.4% of registered voters voted (approximately 3.9 million votes). SMF ¶ 197 (Germany Dec. ¶ 72). But in the 2018 runoff election, only 22.9% of voters voted (almost 1.5 million votes). SMF ¶ 198 (*Id*. at ¶ 73). That changed in 2020, with 69.6% of active voters voting, or nearly 5 million votes cast, in the 2020 general election, and then 61% of active voters voting, or approximately 4.4 million votes cast, in the January 2021 runoff election. SMF ¶ 199 (*Id*. at ¶ 74). The 2022 runoff showed a similar pattern, when 57.02% of voters voted, or 3.9

million votes cast, in the 2022 general election, and 50.58% of voters voted, or 3.5 million votes cast, in the December 2022 runoff election—even when control of the U.S. Senate was not on the line as it was in 2020. SMF ¶ 200 (*Id*. at ¶ 75). In other words, the December 2022 runoff resulted in a smaller decrease in turnout rate when compared with the general election than the January 2021 runoff even with the shorter timeline. SMF ¶ 201 (Grimmer Report ¶ 30). In addition, more voters used weekend voting in the December 2022 runoff than in the January 2021 runoff, with a 58.6% increase in weekend voting in the four-week runoff over the nine-week runoff. SMF ¶ 202 (*Id*. at ¶¶ 18, 184–185).

In fact, voter turnout in Georgia has been increasing for years, even in midterm elections that usually have lower turnout than Presidential election years. SMF ¶ 203 (*Id*. at ¶¶ 27–28). Turnout in both the 2022 general election and 2022 general runoff election was very high, with the turnout rate for the 2022 midterm approximately 81% higher than the turnout rate for the 2014 midterm, which is larger than the increase of the 2020 general election turnout rate over the 2016 general election turnout rate. SMF ¶ 204 (*Id*.). Further, Georgia voter turnout in mid-term elections remains higher than other comparable states after SB 202. SMF ¶ 205 (*Id*. at ¶¶ 41–42, 44–45). And the decreases in Black voter turnout in Georgia from 2018 to 2022 that Plaintiffs

point to are smaller than in other states that track similar data. SMF ¶ 206 (*Id*. at ¶¶ 48–50).

In 2022, four-week runoffs were held in June for the May primary, then again in December after the November general election. SMF ¶ 207 (Germany Dec. [610-1] ¶ 63). Black candidates regularly were successful in those four-week runoffs in 2022, with Black candidates winning the Democratic nominations for Insurance Commissioner and Labor Commissioner in June and a Black candidate winning the U.S. Senate race in December 2022.[4] SMF ¶ 208 (*Id*. at ¶ 64).

## IV.  Georgia law on early voting.

### A.  Early voting in Georgia prior to SB 202.

Prior to SB 202, Georgia had a three-week period of early voting with one required Saturday and optional additional weekend days. O.C.G.A. § 21-2-385(d)(1). Early voting was required to take place during "normal business hours," which was not necessarily a full working day. This broad discretion for local officials to set timelines for early voting "led to significant variations across the state in total number of hours of advance voting, depending on the

---

[4] Regardless of the outcome of the December 2022 runoff, a Black candidate would represent Georgia in the U.S. Senate because both Republicans and Democrats had nominated Black candidates in their primary elections and those candidates progressed to the runoff election. SMF ¶ 208 (Germany Dec. [Doc. 610-1] ¶ 65).

county. More than 100 counties have never offered voting on Sunday and many counties offered only a single day of weekend voting." SB 202, Section 2, Paragraph 5.

**B.     Changes to early voting in SB 202.**

In SB 202, the legislature added a required Saturday and made explicit that counties can offer Sunday voting, in addition to setting minimum and maximum hours during which early voting must take place. O.C.G.A. § 21-2-385(d)(1). The legislature determined that "[r]equiring two Saturday voting days and two optional Sunday voting days will dramatically increase the total voting hours for voters across the State of Georgia, and all electors in Georgia will have access to multiple opportunities to vote in person on the weekend for the first time." SB 202, Section 2, Paragraph 5.

With these increases in access to early voting, Georgia offers more early voting days than Arkansas, Connecticut, Delaware, Florida, Kentucky, Maryland, Massachusetts, Michigan, New Jersey, and New York. SMF ¶ 209 (NCSL, *States and Territories with Early In-Person Voting*, https://www.ncsl.org/elections-and-campaigns/early-in-person-voting (updated June 13, 2023)).

**C.     Result of changes to early voting.**

The 2022 election resulted in the continued increase in the use of early in-person voting by Georgia voters. SMF ¶ 210 (Grimmer Report, ¶¶ 54–55).

That is true of each racial group in the state, with early in-person voting the most-used voting method for Black and white voters in 2020 and 2022. SMF ¶ 211 (Grimmer Report, ¶¶ 57, 60). In 2022, Black voters cast the largest share of their votes using absentee voting methods, including early voting. SMF ¶ 212 (Grimmer Report, ¶ 63).

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but need not disprove the opposing party's claims. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb Cty., Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The non-moving party "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)); *see also*

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("there must be enough of a showing that the jury could reasonably find for that party").

## I.  The changes in election timelines do not unconstitutionally burden the right to vote.

### A.  Legal standards on fundamental right to vote claims.

Claims brought under the fundamental right to vote and the Equal Protection Clause related to elections are evaluated "under what is known as the *Anderson-Burdick* test, weighing 'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.' *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983) (internal quotation marks omitted))." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022).

That inquiry is a sliding scale:

> If we conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny—meaning that the rule survives only if it is narrowly tailored to serve a compelling state interest. *New Georgia Project*, 976 F.3d at 1280. When the burden is more modest, though, so is the inquiry. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008). So long as a policy is "reasonable and nondiscriminatory," the State's "important regulatory interests in conducting orderly elections" will generally be enough to justify it. *Grizzle v. Kemp*, 634 F.3d 1314, 1322 (11th Cir. 2011) (quotations omitted); *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1281 (11th Cir. 2020) (quotation omitted).

*Id.* at 1121. This balancing test is important because there is "no license for 'second-guessing and interfering with' state decisions; ***the Constitution charges States, not federal courts, with designing election rules***." *Id.* (citing *New Georgia Project*, 976 F.3d at 1284) (emphasis added).

It is not enough to show a burden on the right to vote. Plaintiffs "must show, at the very least, that the burdens imposed 'represent a significant increase over the usual burdens of voting.'" *Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)).

## B. The absentee deadlines do not unconstitutionally burden the right to vote.

Plaintiffs cannot demonstrate that the changes in absentee deadlines impose an unconstitutional burden on the right to vote. Complying with deadlines designed by states is necessary to have a functioning election system. *Curling*, 50 F.4th at 1121. Plaintiffs cannot identify a burden on the right to vote from absentee deadlines that goes beyond the usual burdens of voting— especially when more than 90% of absentee ballots cast in 2020 already complied with the deadlines before they were put in place. Thus, the burden on voters is slight at best, meaning the regulatory interests of the state is sufficient to justify the burden. But even if the burden is elevated, State Defendants have extremely strong interests in reducing and avoiding fraud and accusations of fraud, especially when voters in 2020 sometimes forgot that

13

they had requested absentee ballots in the first place. SB 202, Section 2, Paragraph 9. Thus, the state's interests in a shortened absentee ballot timeframe would more than justify an even more severe burden and Plaintiffs' claims still fail.

### C. The runoff calendar does not unconstitutionally burden the right to vote.

Plaintiffs likewise cannot demonstrate that the changes in the runoff schedule impose an unconstitutional burden on the right to vote. Georgia has only ever had one nine-week general-election runoff that voters, legislators, and election officials found "exhausting." Georgia has continued to use four-week runoffs for state offices, and voters were able to vote at nearly identical rates in the 2022 general election runoff as compared to past elections, meaning that any burden from aligning all runoff schedules to match is slight at best, justified by the state's regulatory interests. But State Defendants also have an extremely strong interest in avoiding drawn-out elections, protecting election officials and voters alike. Again, the state's interests would amply justify an even more severe burden and Plaintiffs' claims still fail.

### D. The early voting timelines do not unconstitutionally burden the right to vote.

Adding early voting hours and required weekend voting days is literally the opposite of burdening the right to vote—it is expanding opportunities.

Thus, Plaintiffs cannot show any burden from adding additional voting days and the state's regulatory interests are sufficient to justify these changes.

### E.    Plaintiffs' claims about the constitutionality of the timeline changes fall short.

Because there is no burden more than the usual burdens of voting from the timeline changes contained in SB 202, State Defendants are entitled to judgment as a matter of law on all constitutional claims related to timeline changes in SB 202 challenged in Plaintiffs' complaints.

## II.    The changes in election timelines do not violate Section 2 of the Voting Rights Act.

### A.    Legal standards regarding Section 2.

As amended in 1982, Section 2(a) of the VRA prohibits any state or political subdivision from imposing or applying any "qualification or prerequisite" to voting or any "standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Section 2 prohibits "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" which "is established if" the members "of a class of citizens . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(a) and (b). A "totality of

circumstances" must show the challenged process is "not equally open" because a minority group has "less opportunity . . . to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Section 2 prohibits all forms of voting discrimination that "result in the denial of equal access to any phase of the electoral process for minority group members." S. Rep. No. 97-417, at 30 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 205. It also protects voters from election practices "which operate, designedly or otherwise" to deny them the same opportunity to participate in the political process as other citizens enjoy. *Id.* at 28. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433–34 (2006).

Vote-denial claims relate to particular election practices under Section 2 of the VRA are analyzed under the framework set forth in *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321 (2021). *Brnovich* provides "certain guideposts" that courts must apply when considering a vote-denial claim based on rules "like those at issue here, that specify the time, place, or manner for casting ballots." 141 S. Ct. at 2336.

*Brnovich* involved a vote-denial Section 2 challenge to two aspects of Arizona law: (1) an anti-ballot-harvesting provision that limited who could

return absentee ballots for voters; and (2) a requirement that voters who vote on Election Day do so from their assigned precinct. 141 S. Ct. at 2334. The Court's analysis began with the statutory text and led to the holding that the "key requirement [of a Section 2 vote denial claim] is that the political process leading to the nomination and election (here, the process of voting) must be equally open to minority and non-minority groups alike." 141 S. Ct. at 2337. For purposes of Section 2, "equally open" looks to equal opportunity to participate, but the "equal openness remains the touchstone." *Id.* at 2338.

### 1.  Brnovich *guideposts.*

Equal openness under Section 2 is determined by looking at a series of factors, all involving a review of the entirety of the voting system in a jurisdiction. First, Court must consider the "size of the burden imposed by a challenged voting rule." *Brnovich*, 141 S. Ct. at 2338. Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort." *Id.*

Second, courts should consider the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982." *Brnovich*, 141 S. Ct. at 2338. The analysis must take into account the Court's "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Id.* at 2339.

17

Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Brnovich*, 141 S. Ct. at 2339. This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may well result in some predicable disparities … [b]ut the mere fact there is some disparity in impact does not necessarily mean that a *system* is not equally open or that it does not give everyone an equal opportunity to vote." *Id.* (emphasis added). For this reason, a "meaningful comparison is essential." *Id.*

In *Brnovich*, that meaningful comparison focused on racial disparities in "absolute terms." 141 S. Ct. at 2344-45. It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." *Id.* The majority looked to the numbers in the aggregate and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[5]  *Id.*

---

[5] The Court also opined on how the "use of statistics [can be] highly misleading." *Brnovich*, 141 S. Ct. at 2345. For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." *Id.* (quoting *Frank v. Walker*, 768 F.3d 744, 752, n. 3 (7th Cir.  2014)) (internal quotation marks omitted).

>    2.    *Disparate impact is not the measure of a Section 2 violation.*

The Supreme Court also addressed what does *not* constitute proper analysis under a Section 2 vote denial claim. For example, disparate impact is not the metric to use when considering Section 2. *Id.* at 2340. Adopting such a standard would lead to impermissible federal micromanaging of State elections. *Id.* The Court also rejected the "cat's paw" theory of liability when looking to questions of intentional discrimination. *Id.* at 2349-50. That theory is typically used in employment contests where a plaintiff "seeks to hold the plaintiff's employer liable for the 'animus of a supervisor who was not charged with making the ultimate [adverse] employment decision.'" *Id.* at 2350 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). Thus, in Section 2 cases, that one policymaker may have acted with improper intent does not mean that other legislators did; indeed "it is insulting to suggest that they are mere dupes or tools." *Id.*

## B.   The absentee deadlines do not violate the VRA.

Turning to the absentee-ballot deadlines altered by SB 202, they easily meet the *Brnovich* guideposts. They do not place a burden on voters—indeed, the dates are well within the mainstream and more than 90% of voters of all races were already requesting and returning applications and ballots within those deadlines. SMF ¶ 191 (Grimmer Report, ¶ 78). Further, the multiple opportunities to vote, especially using no-excuse absentee voting, which was

not available in 1982, demonstrates the openness of the system with the reasonable deadlines imposed by SB 202. The evidence does not demonstrate any outsized impact on any racial group, especially when considered in absolute terms.

For all of these reasons and because of the openness of Georgia's election system when compared with other states, the absentee-ballot deadline changes in SB 202 do not violate Section 2.

### C.    The runoff calendar does not violate the VRA.

The same holds true with the four-week runoff calendar. The evidence demonstrates a lack of any burden on the right to vote—in fact, voters of all races are able to vote easily using the four-week period. The four-week runoff was utilized back in the 1990s and three-week runoffs were in place in the 1980s, making the four-week runoff with the option of early voting a system that is improved over what was available in 1982. Finally, Plaintiffs cannot show any disparity in racial voting in a four-week runoff period, with Black voters able to vote at similar rates as in a nine-week runoff timeframe.

Like with the absentee timelines, the four-week runoff process is part of an equally open election system that does not violate Section 2.

### D.    The early voting timelines do not violate the VRA.

Finally, Plaintiffs have no grounds to question the early voting days. Not only is early voting used by an increasing number of voters of all races, it was

not even available in 1982 and is now dramatically expanded. Georgia offers more early-voting days than many other states and Plaintiffs cannot show a racially adverse impact from ***adding*** early voting dates. As a result, the expansion of early voting in SB 202 complies with Section 2.

### E.    Plaintiffs' VRA claims about timelines should be dismissed.

State Defendants are entitled to judgment as a matter of law on all of Plaintiffs' VRA claims related to SB 202's timeline changes in the administration of Georgia's elections.

## III.   The changes in election timelines do not violate the Americans with Disabilities (ADA) or the Rehabilitation Act.

### A.    Legal standards regarding ADA and Rehabilitation Act.

Plaintiffs' claims under Title II of the ADA[6] and Section 504 of the Rehabilitation Act,[7] are evaluated under the same standard. *L.E. ex rel.*

---

[6] Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

> 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a).

[7] Section 504 of the Rehabilitation Act (29 U.S. Code § 794(a)) provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

*Cavorley v. Superintendent of Cobb Cty. Sch. Dist.*, 55 F.4th 1296, 1301 n.2 (11th Cir. 2022); [Doc. 546 p. 10]. To state a Title II claim, "a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami– Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). To determine if a person was excluded from a public service or activity, the ADA focuses on the program *as a whole* to determine if voters with disabilities have meaningful access to the program. 28 C.F.R. § 35.150(a). The Supreme Court has explained that, to "assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Courts in this circuit recognize that mere "[d]ifficulty in accessing a benefit . . . does not by itself establish a lack of meaningful access." *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1329 (N.D. Ga. 2017). Nor are qualified individuals "entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). Thus, meaningful access does not "require the governmental entity to provide *every* requested accommodation."

*Medina v. City of Cape Coral, Fla.*, 72 F.Supp.3d 1274, 1278 (M.D. Fla. 2014)
(emphasis in original; citations omitted); *accord Todd,* 236 F. Supp. 3d at 1334
("a reasonable accommodation need not be 'perfect' or the one 'most strongly
preferred' by the plaintiff, but it still must be 'effective'"). "Instead, when an
individual already has 'meaningful access' to a benefit to which he or she is
entitled, no additional accommodation, 'reasonable' or not, need be provided by
the governmental entity." *Medina*, 72 F. Supp. 3d at 1278.

## B.   The absentee deadlines do not violate the ADA or Rehab Act.

The changes to the timeline for submitting absentee ballot applications
and casting absentee ballots does not deny voters with disabilities meaningful
access to the absentee vote-by-mail program in the State of Georgia. There are
multiple ways for voters with disabilities to participate in the absentee vote-
by-mail program and to do so on equal footing with other voters. Title II
requires nothing more. *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.
Supp. 3d 158, 233 (M.D.N.C. 2020) (finding that even though North Carolina
law specifically prohibited nursing home staff from assisting a disabled
resident from returning an absentee ballot, because the disabled could still
return the ballot by U.S. Mail, there was no violation of Title II of the ADA).

But Plaintiffs cannot present evidence that the change in deadlines (from
180 days to 78 days and from four days to 11 days) somehow results in a denial

of an opportunity to vote based on a disability. Voters with disabilities have the same rights as all other voters to participate in the absentee-by-mail program and they have every opportunity to utilize the accessible voting machines during the week of early voting or on election day. Nothing in the ADA requires that *every* voter be able to use *every* means of returning a ballot in precisely the timeline they choose, or that *every* "obstacle" be removed, only that the voter with a disability have "meaningful access" to the program. *Medina*, 72 F. Supp. 3d at 1279. As a result, the absentee timelines in SB 202 do not violate the ADA or the Rehab Act.

### C.      The runoff calendar does not violate the ADA or Rehab Act.

As discussed previously, the four-week runoff has long been the norm in Georgia elections, with the single nine-week runoff in 2020 being the extremely rare exception. Thus, voters with disabilities like all Georgia voters have been voting in four-week runoffs for state offices for decades.

Nothing about the changes in SB 202 related to runoffs denies meaningful access to the voting process for voters with disabilities. They still have the same opportunities to vote in multiple ways, either in-person or absentee by mail without an excuse. Thus, voters with disabilities still have meaningful access to voting over a period of weeks, just as they did before the changes in SB 202. *Medina*, 72 F. Supp. 3d at 1279. The standardizing of the runoff calendar does not violate the ADA or the Rehab Act.

### D. The early voting changes do not violate the ADA or the Rehab Act.

Finally, as also discussed above, the changes to early voting result in more opportunities—not less—for early voting by all voters, including voters with disabilities. This is not a denial of meaningful access, but is instead an open system where all voters can participate, including voters with disabilities. The additional early-voting days does not violate the ADA or the Rehab Act.

## CONCLUSION

Plaintiffs made sweeping allegations of massive burdens on the right to vote—including for racial reasons—in their complaints. But the evidence demonstrates no such reality. Georgia's system does not burden the right to vote. There are multiple opportunities for every voter to participate across a variety of methods of voting available in Georgia. There is no violation of the law or Constitution as a result of the changes in the timing of election procedures made by SB 202 and challenged by Plaintiffs. As a result, Plaintiffs' claims fail as a matter of law.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson