**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON**
**DISCRIMINATORY-INTENT CLAIMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

BACKGROUND ....................................................................................... 2

    A.    Elections in Georgia Before SB 202 ..................................................... 2

           1.    The 2018 gubernatorial election leads to litigation and a legislative response. ................................................................... 3

           2.    The 2020 elections lead to similar litigation and legislation. .................................................................................... 4

    B.    Georgia's General Assembly Responds to Lessons Learned. ............. 4

           1.    There is growing concern about third-party organizations approaching voters in line with things of value. ....................... 8

           2.    Increased absentee voting reveals problems with existing rules governing absentee-ballot applications. ........................... 9

           3.    Out-of-precinct voting proves increasingly problematic. ......... 12

           4.    Complaints about signature-match verification increase. ..... 13

    C.    Georgia passes SB 202 to address the foregoing issues. .................. 23

    D.    Voter Access Increases in Elections After SB 202. ........................... 25

ARGUMENT .......................................................................................... 27

    I.    Plaintiffs Cannot Establish a Material Dispute of Fact That Race was a Motivating Factor Behind Any Challenged Provision. .......................................................................................... 29

           A.    Plaintiffs have not identified any meaningful irregularity in the legislative process leading to SB 202. ........................... 30

           B.    Plaintiffs have not identified any evidence that the true purpose of any of SB 202's provisions was racial bias. ........... 33

           C.    Plaintiffs have failed to demonstrate that any disparate impact was foreseeable. ........................................................... 40

D.    Plaintiffs' arguments about alternative measures do not show discriminatory intent. ...................................................... 43

II.    The Record Further Confirms that SB 202 does not Impose a Burden, Discriminatory or Otherwise, on the Right to Vote. .......... 44

III.    SB 202 was Undeniably Enacted to Further Important State Interests. ................................................................................. 49

CONCLUSION ................................................................................. 50

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) .......................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................................................... 33

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) .......................................................................... *passim*

*Brooks v. Miller,*
    158 F.3d 1230 (11th Cir. 1998) .................................................................. 40

*Burton v. City of Belle Glade,*
    178 F.3d 1175 (11th Cir. 1999) ............................................................ 28, 35

*Crawford v. Bd. of Educ. of Los Angeles,*
    458 U.S. 527 (1982) ..................................................................................... 34

*Curling v. Raffensperger,*
    50 F.4th 1114 (11th Cir. 2022) ................................................................... 50

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ..................................................................................... 41

*Greater Birmingham Ministries v. Sec'y of State of Ala.,*
    992 F.3d 1299 (11th Cir. 2021) ............................................................ *passim*

*Hallmark Devs., Inc. v. Fulton Cnty.,*
    466 F.3d 1276 (11th Cir. 2006) .................................................................. 38

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
    66 F.4th 905 (11th Cir. 2023) ............................................................... *passim*

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,*
    32 F.4th 1363 (11th Cir. 2022) ................................................................... 39

*N.C. State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ...................................................................... 32

*Nat'l Amusements, Inc. v. Town of Dedham,*
  43 F.3d 731 (1st Cir. 1995) ............................................................... 39

*Personnel Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ........................................................................ 49

*Riley v. Birmingham Bd. of Educ.,*
  154 F. App'x 114 (11th Cir. 2005) ................................................... 38

*Roy v. Ivy,*
  53 F.4th 1338 (11th Cir. 2022) ........................................................ 28

*Twymon v. Wells Fargo & Co.,*
  462 F.3d 925 (8th Cir. 2006) ........................................................... 39

*United States v. Clary,*
  34 F.3d 709 (8th Cir. 1994) ............................................................. 33

*United States v. Marengo Cnty. Comm'n,*
  731 F.2d 1546 (11th Cir. 1984) ....................................................... 49

*Vill. of Arlington Heights v. Metro. Housing. Dev. Corp.,*
  429 U.S. 252 (1977) .................................................................. 30, 35

## Constitutional Provision

Ga. Const. art. 3, § 4, para. 1 ............................................................. 3

## Statutes

O.C.G.A. § 21-2-106 ....................................................................... 22

O.C.G.A. § 21-2-229 ....................................................................... 21

O.C.G.A. § 21-2-230 ....................................................................... 21

O.C.G.A. § 21-2-263 ....................................................................... 48

O.C.G.A. § 21-2-266 ....................................................................... 19

O.C.G.A. § 21-2-30 ......................................................................... 22

O.C.G.A. § 21-2-33.2 ...................................................................... 22

O.C.G.A. § 21-2-380 ......................................................................... 2

iv

O.C.G.A. § 21-2-381 ................................................................ *passim*

O.C.G.A. § 21-2-382 ................................................................ 6, 7

O.C.G.A. § 21-2-385 ................................................................ 20

O.C.G.A. § 21-2-386 ................................................................ 45

O.C.G.A. § 21-2-414 ................................................................ 9

O.C.G.A. § 21-2-414 (2017) ..................................................... 9

O.C.G.A. § 21-2-417 ................................................................ 14

O.C.G.A. § 21-2-418 ................................................................ 13

O.C.G.A. § 21-2-501 ................................................................ 20

O.C.G.A. §§ 21-2-384 .............................................................. 20

**Rule**

Fed. R. Civ. P. 56 ................................................................... 28

**Other Authorities**

The Carter Ctr. for Fulton Cnty. Bd. of Elections & Reg.
  and Performance Rev. Bd., 2022 General Election Observation:
  Fulton County, Georgia (2022) .............................................. 26

Jacob Fabina,
  *Voter Registration in 2022 Highest in 20 Years for
  Congressional Elections*, U.S. Census Bureau (May 2, 2023) .................... 25

Ga. Sec'y of State, *Georgia Active Voters* ........................................... 45

Ga. Sec'y of State,
  *Georgia Voters Lead Southeast in Engagement, Turnout*
  (May 17, 2023) ...................................................................... 25

*Hearings & Meetings of H. Special Comm. on Election Integrity*,
  2021 Leg., Reg. Sess. (Ga. 2021) ................................................ 30

*Hearings Before the S. Comm. on Ethics*,
  2021 Leg., Reg. Sess. (Ga. 2021) ................................................ 30

Johnny Kauffman,
    *Election Bill Brings Out Angst and Distrust After*
    *Georgia's 2018 Midterms*, WABE (Feb. 22, 2019)........................................... 3

*Merriam-Webster Online Dictionary* (2023) ..................................................... 37

Mark Niesse,
    *Georgia records highest voter turnout in the South*,
    Atl. J.-Const. (May 23, 2023) ......................................................................... 25

Mark Niesse,
    *Ralston says his concern that mail vote hurts GOP is*
    *about fraud*, Atl. J.-Const. (Apr. 20, 2020).................................................... 37

Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga.,
    *2022 Georgia Post-Election* Survey (2023) ............................................. 26, 42

## INTRODUCTION

Plaintiffs' hyperbolic rhetoric about SB 202 was obviously incorrect from the outset.  Far from being "Jim Crow in the 21st Century," as Plaintiffs claimed, it was clear from the beginning that SB 202 sought to *expand* voter access by such things as increasing early voting, reducing voting lines, statutorily authorizing dropboxes, and enhancing Georgians' voting experience in many other ways.  And recent elections have confirmed that Georgia voters have had overwhelmingly positive experiences voting.

Yet Plaintiffs persisted in their effort to undermine these enhancements, likely hoping to find some evidence to support their rhetoric.  The record is now closed, and Plaintiffs failed to do so.  Thus, State Defendants are entitled to summary judgment on Plaintiffs' claims that twelve SB 202 provisions were enacted with discriminatory intent: (1) the statutory authorization for dropboxes; (2) the limitations on providing things of value to voters in line; (3) updates to the deadline for submitting absentee-ballot applications; (4) limits on when out-of-precinct provisional ballots will be counted; (5) identification requirement for absentee voting; (6) prohibiting duplicate absentee-ballot applications; (7) restricting the State and counties from sending unsolicited absentee-ballot applications; (8) restricting the use of mobile voting units; (9) updating the timeline for federal runoff elections to align with the state runoff election timeline; (10) confirming pre-existing law

to allow unlimited voter challenges; (11) providing for the State Election Board ("SEB") to replace local election superintendents in certain circumstances and replacing the Secretary of State as SEB chair with a nonpartisan chair; and (12) banning absentee-ballot application harvesting ("Challenged Provisions").

Each of these provisions serves important State interests. And Plaintiffs have not identified any evidence remotely suggesting that the General Assembly acted for discriminatory reasons. Thus, there are no material facts in dispute, and, as a matter of law, Plaintiffs' arguments are meritless.

## BACKGROUND

### A.   Elections in Georgia Before SB 202

Compared with many other states, Georgia has long made it easy to vote, including through no-excuse absentee voting, O.C.G.A. § 21-2-380(b), a robust automatic voter registration system via the Georgia Department of Driver Services, SOF ¶ 364 (Germany 7/27/23 Decl. ¶ 122), and many other voter-friendly provisions.

Still, like many other states, Georgia routinely receives complaints about its electoral system. As this Court recognized, the 2018 and 2020 elections were no different. 10/11/23 Order at 7 (Doc. 686-1) ("10/11/23 Order") ("Similar to the aftermath of the 2018 election, complaints and lawsuits pertaining to the 2020 election arose almost immediately."). After both elections, the General Assembly responded by enacting legislation to respond to those complaints by

2

amending the State's statutes governing elections.

### 1. The 2018 gubernatorial election leads to litigation and a legislative response.

In 2018, Democrats and other interest groups lodged many complaints after the election (when a Democrat, Stacey Abrams, lost). And those complaints led to multiple lawsuits challenging the State's electoral system. *See* SOF ¶ 365 (Germany 7/27/23 Decl. ¶ 5).

In response, the General Assembly considered dozens of bills related to elections and held at least ten hearings during the 2019 legislative session. SOF ¶ 366 (*Id.* ¶ 9). During those hearings, Democrats emphasized the importance of enacting legislation to increase voter confidence, noting that "it seems that there's a common theme of public mistrust."[1] Many such concerns were rooted in "inaccurate and misleading descriptions." *Id.* ¶ 8.

At the end of the 2019 legislative session, the Legislature addressed those concerns by passing an omnibus election update bill, HB 316. SOF ¶ 367 (*Id.* ¶¶ 10–11 (summarizing HB 316's provisions)). In the end, HB 316 was sent to the Governor 32 days after it was introduced.[2] SOF ¶ 367 (*Id.* ¶ 11).

---

[1] *See* Johnny Kauffman, *Election Bill Brings Out Angst and Distrust After Georgia's 2018 Midterms*, WABE (Feb. 22, 2019), https://tinyurl.com/4rtskdj5.

[2] Because the Georgia Constitution limits regular legislative sessions to 40 legislative days per year, Ga. Const. art. 3, § 4, para. 1, a bill considered for 32 days spans much of the legislative session.

> **2.     The 2020 elections lead to similar litigation and legislation.**

The State received many similar complaints during the 2020 election. Germany 3/7 52:23–53:5.   However, that election also presented unique challenges from conducting an election during the worldwide COVID-19 pandemic.   Those unique circumstances led to many complaints.

And Georgia faced an onslaught of litigation leading up to the 2020 general election about how that election would be conducted.   Germany 7/27/23 Decl. ¶ 17. And the litigation did not stop after the 2020 general election. Rather, like the supporters of the losing candidate in 2018, supporters of the losing presidential candidate in 2020 filed a series of lawsuits alleging improper counting of absentee ballots, seeking inspection of voting machines, alleging wide-ranging violations of the Election Code, and seeking changes to the verification of absentee ballots.   SOF ¶ 368 (*Id*. ¶ 18).

It was in this context that the Georgia Legislature took the opportunity to address many longstanding as well as recent problems that the State faced in election administration.   Each provision of SB 202 addressed complaints that State officials had received from voters and county officials.

**B.     Georgia's General Assembly Responds to Lessons Learned.**

> **1.     The 2020 elections gave Georgia voters their first opportunity to use dropboxes.**

Before 2020, there was no express statutory or regulatory authorization

for the use of dropboxes in Georgia elections. SOF ¶ 369 (Mashburn 3/7 74:20–75:2). However, with the onset of the COVID-19 pandemic, the SEB issued an emergency rule in 2020 permitting counties to use dropboxes during the COVID-19 pandemic to ensure that voters could cast ballots while maintaining social distance. SOF ¶ 370 (Germany 7/27/23 Decl. ¶ 15; Mashburn 3/7 74:11–14). But the SEB rule left it to each county's discretion whether to use dropboxes. SOF ¶¶ 316, 374 (Germany 7/27/23 Decl. ¶ 75; Mashburn 3/7 73:25–74:14).

Based on that experience, the State concluded that dropboxes were a useful way for voters to return absentee ballots. That way, "every voter in the State [has] a place to drop off their ballot, postage free, in an environment that is secure, and that will guarantee that the ballot makes its way into the election officials' hands." Bailey 3/21 121:7–15.

But this experience also showed that certain additional protections were needed to ensure that dropboxes allow for secure ballot return and to promote electoral confidence and efficiency. *See, e.g.*, Germany 4/13 55:19–56:2; Mashburn 3/7 75:6–18, 77:10–25, 82:9–83:1, 168:1–169:21. For instance, it was time consuming for county officials to collect ballots daily from numerous dropboxes. SOF ¶ 302 (Germany 7/27/23 Decl. ¶ 76; Eveler 156:25–157:13). And some voters were wary of dropboxes. SOF ¶¶ 309, 372 (Kidd 118:5–21; Germany 4/13 55:19–56:2; Mashburn 3/7 168:1–169:21).

5

While there was no evidence of widespread voter fraud using dropboxes, there were troubling instances of counties not properly securing dropboxes. SOF ¶ 371 (Mashburn 3/7 75:8–14). For instance, one county left a key in the dropbox, so anyone who passed by could access it. *Id.* (Mashburn 3/14 76:15–19). Another county used an unsecured cardboard box as a dropbox. *Id.* (Mashburn 3/7 82:9–18). In another instance, the video surveillance did not produce a clear and usable record for monitoring the dropbox. *Id.* (Germany 7/27/23 Decl. ¶ 66). Elsewhere still, DeKalb County was found not to be using the required chain of custody procedures for ballots returned from dropboxes. *Id.* (*Id.*) Additionally, following the November 2020 general election and January 2021 runoff election, the SEB and Secretary of State received numerous complaints regarding claims of unlawful ballot harvesting involving dropboxes.[3] SOF ¶ 372 (Kidd 118:5–21).

In response, SB 202 established rules governing the number and locations of dropboxes. Dropboxes must be located indoors under the surveillance of an individual, and they must be available during normal business hours. O.C.G.A. § 21-2-382(c)(1). Every county is required to have a dropbox and may have an additional dropbox for each additional 100,000

---

[3] Although these concerns were ultimately determined to be unsubstantiated, the system in place nonetheless allowed for such concerns to be raised, which required substantial time to investigate and address. SOF ¶ 373 (Germany 7/27/23 Decl. ¶ 74).

voters, and such dropboxes must be distributed evenly throughout the county. *Id.* § 21-2-382(b), (c)(1). Finally, to ensure compliance with chain-of-custody protocols, collection must be made by two people who must sign a ballot transfer form. *Id.* § 21-2-382(c)(1)(3).

These requirements were a direct response to the State's experience with dropboxes in 2020. SB 202 requires dropboxes to be placed indoors at certain election-administration locations during business hours because those locations are already staffed with election workers, and thus no additional personnel would be needed. Germany 7/27/23 Decl. ¶ 72. Moreover, the location requirements ensure that officials could monitor the dropboxes without periodically leaving their posts and going outside to observe them. *Id.* And, limiting dropbox availability to early voting times ensures that there is sufficient time after early voting, but before Election Day, for the counties to process all ballots returned and to update the voting list accordingly. *Id.* ¶ 73.

Additionally, these provisions addressed uneven use of dropboxes in 2020. SOF ¶ 374 (*Id.* ¶ 75). Considering that some counties did not use dropboxes during the 2020 elections, *id.*, SB 202 ensured that *every* county would now have at least one dropbox available, O.C.G.A. § 21-2-382(c). But SB 202 also ensured that counties would not add an unmanageable number of dropboxes. Harvey 123:23–124:7; Eveler 156:25–157:13; Germany 7/27/23 Decl. ¶ 76.

7

### 1.   There is growing concern about third-party organizations approaching voters in line with things of value.

In addition to dropboxes, SB 202 addressed the growing practice of third parties handing things of value to voters in line, including food, drinks, phone chargers, and many other items.  SOF ¶ 375 (Eveler 288:5–12).  That practice undermines Georgia's interest in a controlled experience for voters around voting locations.  SOF ¶ 253 (Mashburn 3/7 104:7–105:7).  Indeed, polling places turned into "celebration[s]."  *Id.*; *see also* Eveler 144:1–8 (describing this as "chaotic").  As SEB member Matt Mashburn explained, these events even included party operatives and candidates handing goods out to voters.  SOF ¶ 376 (Mashburn 3/7 101:15–102:16, 118:12–17, 185:20–186:7).

These activities led to State and county officials receiving complaints from voters who believed such actions violated election laws or were intended to illegally influence voters.  SOF ¶ 377 (Germany 3/7 96:7–98:10, 103:11–104:2; Watson 185:20–24; K. Williams 30:22–31:1; Eveler 138:9–24); *see also* Adams 227:23–228:6 (noting that providing "food and drink" "could be construed as an influence").  Voters, advocacy groups, and county officials were also unclear about whether certain line activities were lawful.  SOF ¶ 247 (Sterling 204:10–205:13; Mashburn 3/14 126:12–127:3; Bailey 10/6 147:6–18; Eveler 137:21–138:24).  And county officials were uncertain about their responsibility to monitor such activities, or how to restore order as these

activities continued to grow.  SOF ¶ 265 (Harvey 146:16–152:23; Bailey 3/21 128:7–15); Mashburn 3/14 94:22–95:3; Eveler 288:13–289:14.  Addressing those questions added another task for election officials, which diverted their attention away from other necessary duties.  SOF ¶ 378 (Eveler 138:9–14, 288:13–289:14; Germany 3/7 102:24–103:5; Sterling 204:10–205:13).

SB 202 thus established an important objective standard.  Rather than banning these activities altogether, the law bars third parties from giving food, drink, or any other items of value to voters while they are within 150 feet of the polling place or 25 feet from a voter standing in a line that extends more than 150 feet from a polling place.  O.C.G.A. § 21-2-414(a).  In doing so, the General Assembly relied on existing rules governing polling locations, which already prohibited certain activity within 150 feet of a polling location, or within 25 feet of the voting line, should the line extend more than 150 feet from the polling location. O.C.G.A. § 21-2-414(a) (2017).  This bright-line rule gives county officials clear guidance, and it "help[s] ensure a more efficient and secure voting process." SOF ¶¶ 272–75 (Bailey 3/21 127:16–20, 128:2–129:2).

## 2. Increased absentee voting reveals problems with existing rules governing absentee-ballot applications.

SB 202 also refined Georgia's rules about returning absentee-ballot applications.  During the COVID-19 pandemic, Georgia experienced a substantial increase in absentee voting.  SOF ¶ 379 (Germany 7/27/23 Decl.

¶ 93).  But that was an aberration, rather than a new norm.  *Id.* (*Id.*)  However, the 2020 election highlighted several areas where Georgia's absentee-voting system could be updated.

Processing absentee-ballot applications is time consuming, and it places a heavy burden on election officials.  *Id.* ¶ 95.  Before SB 202, voters could apply for an absentee ballot until the Friday before the election, leaving just four days for the counties to process the application, send the voter a ballot, and receive the completed ballot from the voter.[4]  SOF ¶ 380 (Bailey 3/21 98:8–21, 109:19–110:1; Germany 4/13 77:17–78:7).  Such ballots were not usually voted.  *Id.* (Harvey 179:8–180:7; Germany 3/7 129:22–130:4; Eveler 182:2–10; Adams 102:5–103:10).  And such a system "set up [voters and election officials] to fail because there's no way to get the ballot back in time ... and so then voters [were] being disenfranchised because their vote was late."  Mashburn 3/7 54:7–55:10; *see also* Eveler 172:18–173:3; Wurtz 79:5–15.

Thus, before SB 202, in the final days before the election, county officials were required to spend time reviewing applications and mailing absentee ballots that were almost certain not to be voted.  SOF ¶¶ 380, 382 (Germany 7/27/23 Decl. ¶ 99).  And this coincided with the busiest time for early voting.

---

[4] This was extraordinarily inefficient, which is likely why so many other States, including many where Democrats control the legislatures and governorships, require applications to be submitted much earlier.  *See* State Defs.' Opp'n to PI Mot. at 53 n.20 [Doc. 601].

SOF ¶ 381 (*Id.* ¶ 95).   Having to dedicate staff to process absentee-ballot applications that were almost certain not to be voted meant that staff were not available to assist with other activities, such as assisting with early-voting, preparing for Election Day, or assisting with the early processing of absentee ballots, all of which help ensure a smooth election.  *Id.*  ¶ 100.

Similarly, on Election Day, these applications slowed down voting lines, as many voters who had submitted applications—either at the beginning or the end of the previous lengthy period for requesting applications—showed up to vote in person, which required county officials to take additional time-consuming steps to cancel each such application before a voter could vote in person.  SOF ¶ 382 (*Id.* ¶ 102; Kidd 191:25–193:5).  This imposed a substantial burden on county officials and led to frequent complaints from those officials.

SB 202 addressed this by shortening the timeline for requesting absentee ballots: such requests must be submitted no earlier than 78 days prior to an election and received no more than 11 days prior to the election.  O.C.G.A. § 21-2-381(a)(1)(A).   These reforms balance voter convenience while avoiding unnecessary use of limited resources—by expanding the time between the absentee-ballot application deadline and Election Day.   Sosebee 88:8–89:4 (Ex. R) (SB 202's deadlines have "been very beneficial to our office because it allows us time to put focus on advanced voting.").

3.      **Out-of-precinct voting proves increasingly problematic.**

Another recent trend undermining election efficiency in Georgia has been the use of out-of-precinct provisional voting. SOF ¶ 383 (Germany 7/27/23 Decl. ¶ 108). Before SB 202, Georgia law permitted voters who arrived at the incorrect precinct to vote a provisional ballot that would count for certain races. SOF ¶ 383 (*Id.* ¶¶ 108, 111). This imposed substantial burdens on county officials, and it prevented voters from being able to cast votes in every race.

Indeed, for each out-of-precinct provisional ballot cast, a group of election officials manually duplicated the provisional ballot onto another ballot. SOF ¶ 386 (*Id.*) This time-consuming process prevented officials from completing the other important tasks that need to be accomplished after the polls close. SOF ¶ 386 (Manifold 95:11–18 (processing an out-of-precinct voter takes 15– 20 minutes); Kidd 145:4–16). In addition, manual duplication—where county officials manually fill out ballots—led to complaints about election integrity. SOF ¶ 387 (Germany 7/27/23 Decl. ¶¶ 108, 111). Finally, reliance on out-of-precinct provisional ballots partially disenfranchises voters: When a voter casts an out-of-precinct provisional ballot, they are unable to vote for many "down-ballot" races. SOF ¶ 388 (Bailey 3/21 43:1–23, 134:1–10, 132:14–23, 135:2–136:16; Mashburn 3/14 88:3–20; Evans 88:7–16).

Although the State could have responded by requiring all voters to vote at their assigned precincts, *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct.

2321, 2344 (2021), SB 202 instead allows for out-of-precinct voting under some circumstances.  SB 202 mandates that out-of-precinct voters who arrive to vote before 5:00 p.m. be redirected to their proper polling place, so that they have an opportunity to vote in down-ballot races.  O.C.G.A. § 21-2-418(a).  If voters arrive at the incorrect polling place after 5:00 p.m., they are permitted to cast a provisional ballot, as long as they execute a sworn statement that they are unable to vote at their correct precinct prior to the closure of the polls.  *Id.*

### 4.  Complaints about signature-match verification increase.

Prior to SB 202, Georgia's method for confirming the identity of a voter requesting and voting an absentee ballot also led to substantial complaints. County officials were required to undertake a time-consuming and subjective comparison of signatures to confirm a voter's identity.  SOF ¶ 389 (Bailey 3/21 123:24–125:25).  This required an official to compare the signature on the application to signatures stored in a separate system containing images of the voter's signatures.  SOF ¶ 389 (*Id*. 124:15–125:3). If it was unclear whether the signatures matched, the county official would then have another official compare the signatures.  *Id*. 125:5–13.  And sometimes a third official would need to make a final determination.  *Id*. 125:13–15.  This process was time-consuming and highly subjective.  SOF ¶ 432 (Sterling 95:25-96:16 (subjectivity makes it difficult to train workers); Bailey 10/6/22 90:21-91:5; Harvey 186:14-23); Germany 7/27/23 Decl. ¶¶ 115–16.  And the subjective

nature also threatened to create the appearance of fraud and undermine voter confidence. SOF ¶ 432 (Sterling 95:22–96:16; Harvey 185:13–186:23). Thus, before SB 202, counties were "always being challenged" about "how do we train people on signature verification." Eveler 200:14–201:5. The efficiency gap between relying on signatures versus identification is substantial: While the signature-match process took three to four minutes per voter, objective identification verification takes less than one minute. SOF ¶ 391 (Bailey 3/21 125:22–126:12). These issues were crystalized with the significant increase in absentee voting during the 2020 elections. Germany 7/27/23 Decl. ¶ 115.

To make the process more objective, SB 202 extends Georgia's preexisting identification requirements for in-person voting to absentee voting. O.C.G.A. § 21-2-381(a)(1)(C)(i); O.C.G.A. § 21-2-417(c) (effective 2016). As Plaintiffs note, 96.5% of Georgia voters have either a State driver's license or identification number associated with their voter file. State Defs.' Opp'n to PI Mot. 64 n.21 [Doc. 601]. And any voter who does not have any of these forms of identification may instead use "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector." O.C.G.A. § 21-2-417(c).

SB 202 also requires verification of a voter's identity when the ballot is returned. This time, the few voters who do not have a driver's license or identification number associated with their voter file (which Plaintiffs estimate

14

at 3.5% of voters, SOF ¶ 392 (State Defs.' Opp'n to PI Mot. 64 n.21 [Doc. 601] (citing Meredith Rep. ¶ 2(g))) may provide the last four digits of their social security numbers, which covers all but a very small number of voters.  SOF ¶ 393 (Pls.' PI Mot. at 19 [Doc. 566-1] (not disputing that 99% of registered voters have either a DDS ID or an SSN)).  For the less than 1% who have neither a state-issued driver's license or voter ID card nor social security number associated with their voter file, the same forms of identification provided with the application can be provided when returning their ballot. This safeguards the integrity of the election process and establishes objective criteria for verifying identity.  SOF ¶ 514 (Sterling 102:11–18, 104:12–105:2, 194:5–195:2; Bailey 10/6 91:21–92:5; Bailey 3/21 110:15–111:15).

## 5. Outside groups sending multiple absentee-ballot applications caused voter confusion.

Georgia voters also complained during recent elections about the absentee-ballot applications they were receiving from third-party organizations. SOF ¶ 394 (Germany Decl. ¶¶ 13, 23, 41, 49–50, *VoteAmerica v. Raffensperger*, No.1:21-cv-1390 [Doc. 159-23] ("Germany VA Decl."); Germany 3/7 181:6–12; Bailey 10/6 126:8–127:1).  In particular, voters complained about: (1) receiving applications that were pre-filled with incorrect information, SOF ¶ 394 (K. Williams 103:2–5; Bailey 10/6 126:8–127:1); (2) receiving duplicate applications, SOF ¶ 394 (Germany 3/7 182:22–183:12); and (3) receiving

15

applications that were not sent by the State, SOF ¶ 394 (K. Williams 103:24–108:6).  SB 202 addresses each of these complaints.

Georgia voters complained about receiving multiple absentee-ballot applications from outside organizations. SOF ¶ 441 (Germany VA Decl. ¶ 39; 6/10/22 Hr'g Tr. 19:25–20:5, 22:4–14, *VoteAmerica v. Raffensperger*, No.1:21-cv-1390 ("VA Hr'g Tr.")). Voters were worried that such applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the *applications* themselves were actually *ballots*. SOF ¶ 394 (Germany VA Decl. ¶ 42; VA Hr'g Tr. 19:25–20:5; Kidd 190:6–22; Bailey 10/6 50:3–24). Similarly, many voters complained that the pre-filled applications listed individuals who no longer (or never) lived at the address, who no longer (or never) lived in Georgia at all, were minors, or were deceased.  SOF ¶ 449 (Watson 127:25–128:8; Bailey 10/6 126:8–127:1).  Other voters complained to the State that the applications were pre-filled with incorrect information.  SOF ¶ 394 (*Id.*)  These errors caused many Georgia voters to contact the Secretary of State's office with questions and concerns about potential fraud.  SOF ¶ 394 (*Id.*; Germany VA Decl. ¶ 22; VA Hr'g Tr. 22:4–14).

Moreover, voters who received multiple applications often returned multiple applications.  SOF ¶ 395 (Germany 4/13 51:2–18). And, in some instances, they did so even though they did not intend to vote by absentee ballot.  SOF ¶ 395 (Germany VA Decl. ¶ 43; VA Hr'g Tr. 28:5–16, 42:7–22;

199:11–25 (Germany testimony)). This required election officials to divert their finite resources to processing many unnecessary absentee-ballot applications. SOF ¶ 439 (VA Hr'g Tr. 28:5–21). Then, on Election Day, officials were required to process many absentee-ballot cancellations when voters who had submitted absentee-ballot applications arrived to vote in person, leading to longer lines. SOF ¶ 440 (VA Hr'g Tr. 29:25–30:4; 199:11–200:8 (Germany testimony)).

In response to these concerns, SB 202 prohibits third-party persons or entities from distributing pre-filled or duplicate applications after a voter has requested, received, or voted an absentee ballot. O.C.G.A. § 21-2-381(a)(3)(A). It also establishes a "safe harbor": a person or entity may avoid liability for sending duplicate applications if such person or entity relied upon information made available by the State within five business days before their mailing. *Id.*

### 6. Counties and the State sending unsolicited absentee-ballot applications in 2020 also created confusion.

Another salient issue was unsolicited absentee-ballot applications. In June 2020, the Secretary of State sent applications to all registered voters to help facilitate absentee by mail voting given the global COVID-19 pandemic. SOF ¶ 396 (Harvey 52:10–15; Sterling 52:5–12). The Secretary of State chose not to do so again, although some Georgia counties chose to do so. SOF ¶ 397 (Germany 3/7 60:15–22; Smith 63:16–23). Given these automatic mailings, the number of requested and subsequently cancelled absentee ballots in 2020 was

17

large—upwards of 15% of all absentee ballots requested were cancelled so the voter could instead vote in person.  SOF ¶ 398 (Grimmer Rep. ¶ 98).

The enormous number of cancelled absentee ballots created extreme burdens on election administration having to collect the canceled ballot or affidavits from voters who no longer had the ballot and raised questions about what happened to official ballots that were no longer accounted for.  SOF ¶ 453 (Evans 102:18–103:21).  Indeed, many voters simply forgot they had applied for absentee ballots, which again caused administrative burdens and cast doubt on the election process.  SOF ¶ 454 (Bailey 3/21 100:3–12).  In addition to administrative costs to the State of sending out unrequested absentee ballot applications to 6.5 million registered voters, this process resulted in many questions regarding the integrity and legitimacy of the 2020 election results.  SOF ¶ 455 (Germany 3/7 182:21–183:21; Bailey 3/21 100:3–12; Sterling 54:7–18; Watson 200:18–201:13).  And, of course, if some counties send out applications, while others do not, there is less uniformity across the state.

Accordingly, SB 202 prohibits election officials from sending unsolicited absentee-ballot applications.  Of course, absentee ballot applications are "available online by the Secretary of State and each election superintendent and registrar."  O.C.G.A. § 21-2-381(a)(1)(C)(ii).

### 7.    Use of mobile voting units presents challenges.

Mobile voting units had also become an issue during this period.  In the

2020 election, mobile voting units were not widely employed; only one county (Fulton) used such a voting unit. SOF ¶ 399 (Mashburn 3/14 194:14–18; Eveler 240:18–241:8; Germany 3/7 171:21–172:3). The uneven allocation and distribution of mobile voting units raised concerns because some counties could get a benefit that others would not be able to enjoy. SOF ¶ 400 (Mashburn 3/14 39:2–19, 51:16–52:3; Germany 3/7 173:11–174:22. Voters also expressed concerns that county commissioners could abusively place mobile voting units in areas to boost turnout for their own elections or to benefit favored candidates. SOF ¶ 400 (Mashburn 3/14 39:6–11). Also, given that the SEB lacks a budget to assist counties in purchasing buses, there was no way to ensure uniform distribution. SOF ¶ 401 (*Id.* at 195:9). There were concerns, too, about the security of mobile voting units because a bus is less secure than a building. Harvey 144:18–145:1.

Accordingly, SB 202 restricted the use of mobile voting units to emergencies declared by the governor. O.C.G.A. § 21-2-266(b). SB 202 thus addressed parity concerns while reserving the ability to use mobile voting units as an emergency measure. Mashburn 3/14 48:5–16.

### 8. The runoff schedule in federal elections proved difficult.

Additional issues surrounded runoff elections. Originally, both state and federal runoff elections were on a four-week schedule, but the law was changed after a court order required a nine-week runoff for federal runoffs to

accommodate overseas voters, while keeping four-week state runoffs. SOF ¶ 402 (Sterling 184:4–15; Eveler 278:4–7). This dual-track timeline for state and federal runoffs created voter confusion because there were separate timelines and election days for federal and state runoffs following a general election. Harvey 115:3–116:1. This dual-track timeline for state and federal runoffs created voter confusion because there were separate timelines and election days for federal and state runoffs. Harvey 115:3–116:1. The timeline also posed logistical challenges, as state officials had to run two separate elections at the same time and send out two separate batches of absentee ballots—all while using the same software. *Id.* The nine-week runoff also led to widespread fatigue among voters, officials, donors, and even candidates. Mashburn 3/14 84:1–10, 85:10–18.

In response, SB 202 re-aligned the federal and state runoff timelines by reducing the federal timeline to four weeks, while accommodating overseas voters by introducing ranked choice voting. O.C.G.A. §§ 21-2-384(e), 21-2-501(a)(1). The law also mandated a minimum period of advance voting in a runoff. *Id.* § 21-2-385(d)(1)(B). SB 202 further allowed counties to add additional advance voting days to that required minimum, including Saturdays and Sundays, if it is possible for the county to do so. *Id.* SB 202 thus served to clarify that counties could allow Sunday voting, when previously the law was silent on that point. SOF ¶ 404 (Sterling 150:15–25).

20

**9.    Elector challenges have long been part of Georgia law.**

Another issue of concern was elector challenges to the qualifications of other electors, which have long been permitted in Georgia with no limits on the number of challenges.   SOF ¶ 405 (Germany 3/7 229:4–9; Germany 4/13 223:14–24; Sterling 231:17–232:4).  In 2020, there were mass challenges filed against voters based on the National Change of Address database, which were dismissed for lack of probable cause by county election officials. SOF ¶ 406 (Sosebee 218:13–18; Watson 207:2–5; Germany 4/13 226:20–227:8; Germany 3/7 208:18–25).   These challenges prompted many concerns from all sides. Germany 4/13 225:2–14, 226:1–8.

SB 202 confirmed the pre-existing law by making it explicit that electors could file an unlimited number of challenges to other electors' qualifications to register or to vote.  O.C.G.A. §§ 21-2-229(a), 21-2-230(a).  But SB 202 also set a uniform timeline for counties to hold hearing on such challenges and established uniform procedures, requiring counties to give notice to the elector whose qualifications have been challenged and establishing a right of appeal. *Id.* §§ 21-2-229(b)–(e), 21-2-230(b)–(g).

**10.    Failures in county election administration prompted renewed push for oversight.**

Serious concerns were also raised about county election administration. Georgia has 159 counties, each of which has its elections office and staff.  SOF

¶ 407 (Germany 3/7 43:8–14).   Problems with election administration cut across partisan lines: both Republican- and Democrat-leaning counties that have experienced issues running elections.   Germany 3/7 43:8–14, 80:6–19. The Secretary of State's Office also received blame for failures of local election administration, even though it lacked the power to remedy them or hold local officials accountable for misfeasance. *Id.* 79:5–18.

In response, the legislature granted the SEB the power to appoint an independent performance review board to review the performance of a local election board.   O.C.G.A.   § 21-2-106(a).   Such a review only happens at the request of the governing authority of the same jurisdiction and by state legislature members who represent the County in question.   *Id.* § 21-2-106(a)(1)–(3).   SB 202 further specifies that, upon consideration of the review board's report, the SEB "may suspend a county or municipal superintendent," if, after a notice and hearing, the Board finds either that the superintendent has committed at least three violations of state election law or Board rules and regulation *and* has failed to remedy the violations; or "for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections." *Id.* § 21-2-33.2(c).   Lastly, SB 202 sought to decrease partisan influences, making the Secretary of State a non-voting ex-officio member and replacing the Secretary as board chair with a "nonpartisan" "chairperson elected by the General Assembly." *Id.* § 21-2-30.

**11.     Prohibition on harvesting absentee-ballot applications.**

Ballot harvesting was yet another source of concern, owing in part to numerous complaints of ballot harvesting following the 2020 election. SOF ¶ 408 (Watson 131:5–12, 203:20–204:10, 174:5–176:19; Sterling 161:21–24). To better ensure that voters were not subject to intimidation, the General Assembly increased the penalties for violating the ballot-harvesting provision—which covers actual ballots—to make it more consonant with regulations of other prohibited conduct that affects the security and integrity of Georgia's elections.  For these same reasons, SB 202, for the first time, made it a misdemeanor to harvest absentee-ballot applications, especially given the fact that due to the changes in how applications are verified, they now contain additional personal identifying information of the voter (*i.e.*, driver's license card number). O.C.G.A. § 21-2-381(a)(1)(C)(ii).

**C.     Georgia passes SB 202 to address the foregoing issues.**

As noted above, each Challenged Provision directly addresses a concern raised during recent elections. Indeed, following the 2020 elections, just as it had done after the 2018 elections, the Legislature used the next legislative session to consider how to respond to the various concerns. SOF ¶ 553 (Germany 3/7 125:12–126:4; Sterling 123:3–125:17). The process for doing so in 2021 was similar to the General Assembly's 2019 legislative process.

For instance, on the House side, Chair Barry Fleming was appointed to

23

head the House Special Committee on Election Integrity,[5] which held many hearings to consider various legislative proposals.  SOF ¶¶ 411–17 (Germany 7/27/23 Decl. ¶¶ 22–28 (detailing hearings and bipartisan participation). And this Committee considered various legislative proposals aimed at improving voter confidence.  *Id.*  ¶¶ 29–31 (such as proposed changes to ID requirements, drop boxes, etc.).   In doing so, Chair Fleming noted that many legislative proposals addressed issues that arose in 2018.  Germany 7/27/23 Decl. ¶ 29. Because Georgia's legislative session is short, this legislative process moved very quickly.  *Id.*  ¶ 44; Eveler 79:14–23 ("It's a very short session. The 40 days go very fast, so it always feels like it's rushing through."); Fuchs 102:19–104:6 (explaining that due to the 40-day session "everything is going to be rushed").

Meanwhile, the State Senate also considered various legislative proposals and held many hearings.  SOF ¶ 415 (Germany 7/27/23 Decl. ¶ 56); Germany 7/27/23 Decl. ¶ 37 (ranging from an omnibus bill to multiple standalone bills).  Once the Senate enacted its omnibus election bill, there were only three days left in the legislative session and the House and Senate Committees had passed slightly different bills.  *Id.*  ¶ 49.

Of the various election bills introduced and debated at the conclusion of the 2021 regular session, SB 202 was the only election bill to pass the General

---

[5] There have been many such special committees. SOF ¶ 412 (Germany 7/27/23 Decl. ¶ 23).

Assembly. SOF ¶ 416 (*Id.* ¶ 52). After nearly two hours of questions and debate, the House voted 100–75 to pass the revised version of SB 202.  SOF ¶ 418 (*Id.*) On the Senate side, Senators considered the same legislation, which passed by a vote of 34–20.  SOF ¶ 419 (*Id.* ¶ 54).  In the end, SB 202 followed a similar path as HB 316, which had responded to the 2018 elections.  *Id.* ¶ 56.

## D.   Voter Access Increases in Elections After SB 202.

With SB 202 in place, the 2022 elections confirmed that Georgians can vote easily and securely no matter their race.  Indeed, voter turnout has been high in each election since SB 202's enactment.  Numerous reports recognize that Georgia had "the highest turnout in the [South]"[6] and the "13th-highest in the nation."[7]  SOF ¶ 422 (Grimmer Rep. ¶¶ 42, 44 (noting that turnout was "5.6 percentage points higher than the average in other states.")).

Additionally, the 2022 midterm election saw "more votes cast than any other midterm," "record breaking midterm Early Voting turnout," and the highest number of votes by mail *ever* cast in a midterm.[8]  Similarly, a survey

---

[6] Jacob Fabina, *Voter Registration in 2022 Highest in 20 Years for Congressional Elections*, U.S. Census Bureau (May 2, 2023), https://tinyurl.com/2023CensusArticle.

[7] Mark Niesse, *Georgia records highest voter turnout in the South*, Atl. J.-Const. (May 23, 2023) (citing figures compiled by University of Florida's U.S. Elections Project).

[8] Ga. Sec'y of State, *Georgia Voters Lead Southeast in Engagement, Turnout* (May 17, 2023), https://tinyurl.com/2huchh3h.

by the University of Georgia's School of Public & International Affairs ("SPIA")

found that 99.5% of Black voters reported no problem when voting, and no

Black voters reported poor experiences when voting.  *See* SOF ¶ 421 (Survey

Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga., *2022 Georgia Post-Election*

Survey 6, 8 (2023) ("SPIA Survey"), https://tinyurl.com/4kxeb373); *see also id.*

at 5 (detailing amount of time voters waited in line in the 2022 midterm

election); Shaw Rebuttal Rep. ¶ 38 (showing wait times averaged "0 minutes

to approximately 10 minutes"); Germany 6/15/23 Decl. ¶¶ 10–11 (average wait

of 1 minute 45 seconds); Manifold 30:11–17 (stating that "we don't have lines

nearly as much as they used to have in the past[.]").

SB 202 also succeeded in easing administrative burdens.  Indeed, the

nonpartisan Carter Center recognized that SB 202's provision for streamlining

the identification-verification process for absentee voting has "streamlined the

process" and "made it easier for election officials" to process a record number

of absentee-ballot applications for a midterm election.[9]

The 2022 elections further showed both that SB 202 allowed voters to

continue to vote before Election Day and that voters took advantage of those

opportunities at higher rates than in any prior midterm election.  SOF ¶ 425

[9] SOF ¶ 424 (The Carter Ctr. for Fulton Cnty. Bd. of Elections & Reg. and
Performance Rev. Bd., 2022 General Election Observation: Fulton County,
Georgia 16 (2022), https://tinyurl.com/346s8tdy.

(Grimmer Rep. at 42 tbl. 7).   Since SB 202's enactment, voters are also increasingly voting early.   SOF ¶ 425 (*Id.* at 42 tbl. 7 (record early ballots in 2022 midterm election)); Sterling 200:2–8 (record turnouts for the 2022 Senate runoff); K. Smith 97:10–20 (same). Across racial groups, Georgians like and use the various voting methods available to them.

## ARGUMENT

Despite the fury with which Plaintiffs try to impugn the motives of the Georgia legislators who passed SB 202, Plaintiffs have not even begun to carry their burden of overcoming the presumption of legislative good faith.  *See, e.g., League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 942 (11th Cir.) ("*LWV II*"), *reh'g denied*, 81 F.4th 1328 (11th Cir. 2023). For one thing, as State Defendants have previously shown, as a matter of law, there is no cognizable stand-alone, discriminatory intent claim under either the Voting Rights Act or the Constitution.[10] And, to prevail on a claim under the

---

[10] As State Defendants have shown, Docs. 549, 601, an intent-only claim is not cognizable under the Voting Rights Act ("VRA") or the Fourteenth or Fifteenth Amendment. And DOJ's standalone discriminatory-intent claim fails for the reasons State Defendants demonstrated in their Motion for Judgment on the Pleadings—namely that neither the Supreme Court nor the Eleventh Circuit permit intent-only claims under the VRA. [Doc. 549].  Indeed, "[a] finding of discriminatory impact is necessary and sufficient to establish a section 2 violation." *LWV II*, 66 F.4th at 942.   But, as State Defendants have demonstrated in their other contemporaneously filed summary judgment motions, none of the Challenged Provisions has any discriminatory effect. Thus, all of Plaintiffs' VRA claims must fail as well.

Constitution, Plaintiffs must show *both* discriminatory intent and effect.[11]

However, as demonstrated below, there is no evidence that SB 202 was motivated by racial animus or that the statute renders the process of voting not equally open to all eligible voters.  Indeed, this Court, in its recent order denying Plaintiffs' motion for a preliminary injunction, considered Plaintiffs' purported evidence of discriminatory intent and found it lacking.  No new information has come to light that undermines this Court's finding to that effect.  Nor, to the extent it is relevant, can Plaintiffs create a material issue of fact as to whether any of the Challenged Provisions created a racially discriminatory impact on the ability of Black voters to exercise their franchise rights.  And there can be no serious question that each of those provisions was enacted to further important—and even compelling—state interests.  Thus, the Court should enter summary judgment for State Defendants because, on all of Plaintiffs' discriminatory-intent claims, there simply "are no genuine disputes of material fact[.]"  *Roy v. Ivy*, 53 F.4th 1338, 1346 (11th Cir. 2022) (citing Fed. R. Civ. P. 56(a)).

---

[11] For instance, "[a] successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("*GBM*").  Similarly, "to establish a violation of … the Fifteenth Amendment," Plaintiffs "must show that the [challenged] … act had a discriminatory purpose and effect." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188–89 (11th Cir. 1999).

## I.   Plaintiffs Cannot Establish a Material Dispute of Fact That Race was a Motivating Factor Behind Any Challenged Provision.

Summary judgment is appropriate for State Defendants because, after months of discovery, Plaintiffs are unable to identify any evidence, let alone *sufficient* evidence, showing that racial bias was a motivating factor for any of SB 202's provisions.  Rather, contrary to Plaintiffs' suggestion, SB 202 was the product of a routine legislative process and manifestly serves legitimate government interests.  That is particularly true given that legislative acts— like SB 202's enactment—are presumed to be taken in good faith.  *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).  Plaintiffs have hardly even tried to overcome that strong presumption.  Instead, they have used smear tactics to hide their paucity of evidence.  That will not do.

Rather, "[w]henever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State."  *Id.*  Courts "review an alleged violation of equal-protection rights" or of the Fifteenth Amendment "using a two-step burden-shifting test.  First, the plaintiffs must prove both that the law … was adopted with discriminatory intent.  Second, 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this racial discrimination factor.'"  *LWV II*, 66 F.4th at 922 (quoting *GBM*, 992 F.3d at 1321).  "In determining whether a 'law has … a discriminatory intent,'" courts "consider[] several

29

factors …: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.'" *Id.* (internal alterations omitted) (quoting *GBM*, 992 F.3d at 1321–22) (citing *Vill. of Arlington Heights v. Metro. Housing. Dev. Corp.*, 429 U.S. 252 (1977)).  Here, none of these factors suggests that SB 202 was motivated by racial bias.

### A.   Plaintiffs have not identified any meaningful irregularity in the legislative process leading to SB 202.

First, there was nothing irregular about the process by which SB 202 was enacted.  As the record shows in detail, the legislative process involved deep consideration of election-related issues throughout 2021.  The House Committee held twelve full hearings and meetings and four subcommittee hearings during the 2021 session over more than six weeks before the passage of SB 202.[12]  Likewise, the Senate Committee held 13 hearing and meetings over the same period.[13]

---

[12] *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021) [videotape archive available at https://tinyurl.com/y2cc262t].

[13] *Hearings Before the S. Comm. on Ethics*, 2021 Leg., Reg. Sess. (Ga. 2021) [videotape archive available at https://tinyurl.com/3zw27wzm]. As Plaintiffs have recognized, this analysis must include time spent on the various

In arguing otherwise, Plaintiffs rely on Dr. Anderson's report for the suggestion that the legislative process was irregular.  *See* Pls.' PI Mot. at 44, 48 [Doc. 566-1].  But Dr. Anderson conceded that she never studied the process of how a bill becomes a law in Georgia, and she does not consider herself an expert on the Georgia legislative process.  Anderson 4/18 Vol. II 203:20–204:1. Furthermore, Dr. Anderson stated that, although she reviewed hearings on SB 202 and concluded that there was "chaos" in the process, she never reviewed hearings of any other election legislation in any other years as a comparison.  *Id.* 204:18–205:1. In fact, Dr. Anderson relied solely on the public comments and the meeting notices for her conclusions.  *Id.* 247:14–248:16, 248:17–249:5; *but see* Eveler 48:24–49:18, 50:19–23 (stating that the General Assembly did not depart from normal processes in enacting SB 202). Her unsupported opinion cannot create the requisite dispute of material fact.

Nor is there anything in the record to suggest that the General Assembly departed from the normal legislative process.  While Plaintiffs claim that there were departures from the typical process and a "lack of transparency," the record demonstrates that the legislature gave careful and close consideration to election bills in the 2021 session—with several Democratic members acknowledging the work of sponsors.  *See* SOF ¶¶ 414, 420 (Germany 7/27/23

---

predecessor bills that "served as templates for SB 202."  Pls.' PI Mot. at 16 [Doc. 566-1].

Decl. ¶¶ 27, 47).  And testimony from election officials was not limited, as *many* witnesses were offered the opportunity to provide comments.  *See* SOF ¶ 417 (*Id.* ¶¶ 33, 40).  Plaintiffs have nevertheless continued to spin the history of the legislation by making short shrift of "three hearings on SB 202."  Pls.' PI Mot at 50 [Doc. 566-1].  But Plaintiffs ignore the dozens of hearings and meetings on the same topics over the weeks before final passage.  *See* SOF ¶ 415 (Germany 7/27/23 Decl. ¶ 56); Germany 7/27/23 Decl. ¶¶ 25–46).  Thus, it is Plaintiffs who ignore the "broader context surrounding the passage of legislation," *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016), by painting a one-sided picture that ignores the context of the aftermath of the 2018 and 2020 elections and the extensive work of legislators to address the lack of confidence from voters from all political persuasions.

Indeed, this Court has already considered and rejected Plaintiffs' purported evidence of "departures from the ordinary legislative procedure" in enacting SB 202.  10/11/23 Order at 49–51.  For instance, the Court rejected Plaintiffs' focus on the start times for the hearings, Plaintiffs' suggestion that the 2020 legislative process was unique, and the notion that there was an unusually small number of hearings leading to SB 202.  *Id.*  Moreover, the Court correctly recognized that there were many hearings held to consider election-related legislation during the 2021 legislative session.  *Id.* at 49–50.

All told, even if Plaintiffs could identify any irregularities in SB 202's

legislative process (they can't), those irregularities were at most minor—no more than a "mere … scintilla of evidence"—and thus not evidence of racial animus sufficient to overcome a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, Plaintiffs' arguments mirror those that the Supreme Court recently rejected, including the argument that a court should "infer bad faith because [a] Legislature 'pushed the [challenged] bills through quickly in a special session.'" *Abbott*, 138 S. Ct. at 2328. Rather, as the Supreme Court explained, "we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith[.]" *Id.* at 2328–29. So too here: any "brevity" in the process of enacting SB 202 was a product of Georgia's legislative calendar, not racial bias. Additionally, "the evidence of the haste with which [the legislature] acted and the action it took is as easily explained by the seriousness of the perceived problem as by racial animus." *United States v. Clary*, 34 F.3d 709, 713 (8th Cir. 1994).

Thus, Plaintiff cannot come close to identifying any meaningful departure from the normal legislative process to suggest discriminatory intent.

## B. Plaintiffs have not identified any evidence that the true purpose of any of SB 202's provisions was racial bias.

Nor have Plaintiffs identified any evidence demonstrating that the

33

Challenged Provisions were enacted with a discriminatory purpose.  In fact, Plaintiffs ignore the best source of SB 202's purpose: its text, which declares that the statute is meant "to address the lack of elector confidence in the election system on all sides of the political spectrum, to reduce the burden on election officials, and to streamline the process of conducting elections in Georgia by promoting uniformity in voting." SB 202 at 4:79–82. This statement is far more representative of SB 202's purpose than anything on which Plaintiffs fixate. Where "[t]he purposes of" a measure "are stated in its text and are legitimate, nondiscriminatory objectives," a court ought "not … impugn the motives" of those who enacted it.  *Crawford v. Bd. of Educ. of Los Angeles*, 458 U.S. 527, 545 (1982). Indeed, that is *all* Plaintiffs' arguments do:  each of them fails on the facts and the law.

1.  For instance, Plaintiffs have repeatedly argued that the Court should impute a discriminatory, racist intent to the General Assembly based on Georgia's "history of discrimination."  Pls.' PI Mot. at 4, 41, 59–60 [Doc. 566-1]. But the Supreme Court has rejected this exact argument, holding that "the presumption of legislative good faith [is] not changed by a finding of past discrimination."  *Abbott*, 138 S. Ct. at 2324.  Indeed, the "historical background" analysis in *Arlington Heights* does "not provid[e] an unlimited look-back to past discrimination," but instead "focus[es] … on the 'specific sequence of events leading up to the challenged decision.'"  *GBM*, 992 F.3d

34

at 1325 (quoting *Arlington Heights*, 429 U.S. at 267).  Plaintiffs' extended discussion of Georgia's history ignores this authority and invites the Court to take the "danger[ous]" step of "allowing the old, outdated intentions of previous generations to taint [Georgia's] legislative action forevermore on certain topics." *Id.*; *accord Burton*, 178 F.3d at 1195.

Plaintiffs' reliance on Georgia's recent history also fails. According to Plaintiffs, the fact that SB 202 was passed after an increase in Black turnout in Georgia (and increased reliance by Black Georgians on absentee voting) and "historic wins" by candidates preferred by Black voters suggests that the statute was motivated by racial animus. This inference is wholly unwarranted.

First, the Eleventh Circuit has squarely rejected the argument that, because a statute regulating the absentee voting process is enacted following an increase in Black turnout or Black voters' use of absentee voting, the timing "suggest[s] that black voters' increased reliance on vote by mail prompted the election reforms." *LWV II*, 66 F.4th at 924.  A much simpler (and accurate) explanation is that SB 202 was the General Assembly's response to controversy surrounding the administration of the 2020 elections more generally. To instead credit Plaintiffs' far-fetched inference of racial bias over this more plausible explanation would be contrary to the required "presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2324.

Second, as this Court has already explained, one "cannot ignore what

appears to be the Legislature's legitimate justifications for passing the law."
10/11/23 Order at 45–46. Thus, "[t]he Legislature's reaction to both actual
issues and voter perceptions pertaining to the 2020 election (after Trump, a
white Republican, lost) is even less suspect given that the Legislature reacted
similarly and amended voting laws after the disputed 2018 election (when
Abrams, a black Democrat, lost)." *Id.* at 47.

And, sure enough, consistent with the General Assembly's legitimate,
stated aims in passing SB 202 (and inconsistent with Plaintiffs' speculation),
voters in the 2022 midterm elections again elected Senator Warnock—a Black
lawmaker whose 2020 victory was one of the "historic wins" of Black-preferred
candidates cited by Plaintiffs.

2. Plaintiffs are also misguided when they infer a discriminatory intent
based on their mischaracterization of statements from legislators and others
outside Georgia. Again, Plaintiffs find no support in the facts or the law.

As to the facts: Plaintiffs' evidence of "contemporaneous statements" is
very thin, consisting of one statement by Speaker Ralston and one by Rep.
Fleming. *See* Pls. PI Mot. at 50–51 [Doc. 566-1]. Fleming, in a November 2020
op-ed, wrote that, "[i]f elections were like coastal cities, absentee balloting
would be the shady part of town down near the docks you do not want to
wander into because the chance of being shanghaied is significant." Plaintiffs

36

call this "racialized language," but it is not.[14]  As this Court noted, Fleming's statement does not "show[] racial animus towards black voters."  10/11/23 Order at 51.  He merely expressed the commonly shared concerns about absentee voting, which are hardly surprising, given that "[f]raud is a real risk that accompanies mail-in voting[.]"  *Brnovich*, 141 S. Ct. at 2348; *see also* Sterling 102:11–18 (similar).

At any rate, Rep. Fleming's "isolated statement does not inform the Court about the *Legislature's* motivations as a whole."  10/11/23 Order at 51 (emphasis added).   The intent inquiry is properly "confined to an analysis of discriminatory intent as it relates to [the challenged law], and the statement[] Plaintiffs identify w[as] not made about the law at issue in this case and thus do[es] not evidence discriminatory intent behind it."  *GBM*, 992 F.3d at 1323.

As for the comment by Speaker Ralston on which Plaintiffs rely, he simply expressed concern that sending absentee-ballot applications to all voters "will be extremely devastating to Republicans and conservatives in Georgia."[15]  As with "Representative Fleming's comments, th[is] Court [wa]s

---

[14] To "shanghai" means "to put aboard a ship by force often with the help of liquor or a drug," or "to put by trickery into an undesirable position"; the word is derived from "the former use of this method to secure sailors for voyages to eastern Asia."  *Shanghai, Merriam-Webster Online Dictionary* (2023), https://www.merriam-webster.com/dictionary/shanghai.  It has nothing to do with race.

[15] Mark Niesse, *Ralston says his concern that mail vote hurts GOP is about fraud*, Atl. J.-Const. (Apr. 20, 2020), https://tinyurl.com/fac6r9v2 (quoting an

not persuaded that this statement contains an animus towards black voters" but rather "suggests that Speaker Ralston was motivated by a partisan purpose since he said that increased turnout would be negative to Republicans." 10/11/23 Order at 52. And it is settled that "[a] connection between race and partisan voting patterns is not enough to transform evidence of partisan purpose into evidence of racially discriminatory intent." *LWV II*, 66 F.4th at 931.

In sum, neither Fleming's nor Ralston's statement referenced race. Plaintiffs simply inject race into each statement without any support. But as the Eleventh Circuit has held, a plaintiff's reliance on facially non-racial comments alleged to be "'subtle' statements of bias" is "not sufficient to overcome summary judgment. … [A]mbiguous remarks … rarely will suffice to conceive an issue of material fact when none otherwise exists." *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284–85 (11th Cir. 2006) (cleaned up); *see also Riley v. Birmingham Bd. of Educ.*, 154 F. App'x 114, 116 (11th Cir. 2005) ("[An official's] statement about 'taking care of our own' is not direct evidence of discrimination.… An inferential step would have to be made before concluding the statement was race-based.").[16]

---

interview by Fetch Your News with then-Georgia House Speaker David Ralston).

[16] Other courts of appeals are in accord: "Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker.…

Rather, "[a]pplying the presumption of good faith—as a court must—[a] statement by a single legislator is not fairly read to demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) ("*LWV I*"); *accord LWV II*, 66 F.4th at 932.  Indeed, "[i]t stretches logic to deem" even "a sponsor's 'intent' … *the* legally dispositive intent of the entire body of the … legislature on that law." *GBM*, 992 F.3d at 1324–25.

What is more, the statements Plaintiffs highlight are race-neutral and made by a miniscule number of representatives in a General Assembly made up of 236 members.  SB 202 passed the House by a vote of 100 to 75, and the Senate by a vote of 34 to 20.  SOF ¶¶ 418–19 (Germany 7/27/23 Decl. ¶¶ 52, 54).   And in this Circuit, the limited, race-neutral statements of a few legislators that Plaintiffs muster—even those that came from SB 202's sponsor—are of "little … significance." *LWV II*, 66 F.4th at 932.[17]

---

While [courts] are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, [they] do so without resort to speculation." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).  Indeed, "asking a court to infer, based on nothing more than … a handful of arguably ambiguous statements, that a deliberative body of several hundred members acted out of a race-based animus in passing a facially neutral law is simply too much of a stretch." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 744 (1st Cir. 1995).

[17] Even less relevant is Plaintiffs' reliance on Rudy Giuliani's comments during the December 2020 hearings held months before SB 202's enactment. This Court has rightly rejected this argument: "Because statements of individual legislators have limited probative value, this isolated statement by a non-

3.   Finally, Plaintiffs have looked to dicta in *Arlington Heights* for the claim that changing longstanding policy can be evidence of a discriminatory purpose.  *See* Pls.' PI Mot. at 50 [Doc. 566-1].  Taken to its logical conclusion, this argument would lock into place old election procedures that no longer work in contemporary elections.  Unsurprisingly, *Arlington Heights* does not go that far.  And where, as here, changes to election procedures are supported by compelling state interests, the presumption of legislative good faith requires courts to presume that the changes were brought about to further those state interests and not motivated by any discriminatory purpose—particularly when, as here, Plaintiffs cannot offer anything to rebut that presumption.  *See generally Abbott*, 138 S. Ct. at 2324.

In short, Plaintiffs have utterly failed to show—through the legislative history—that any of SB 202 was motivated by a discriminatory intent.

## C.   Plaintiffs have failed to demonstrate that any disparate impact was foreseeable.

Plaintiffs also fail to show that the Challenged Provisions had a foreseeably disparate impact.  For one, as this Court remarked in its recent

---

legislator has even less probative value."  10/11/23 Order at 46 n.23 (citing *LWV II,* 66 F.4th at 932). Furthermore, this focus on Mr. Guiliani's statements misses the mark as his testimony did not, as Plaintiffs suggest, "la[y] the groundwork for SB 202."  Pls.' PI Mot. at 2 [Doc. 566-1]. His statements do not even concern the challenged statute and hence are not evidence that the legislation was motivated by racial bias.  *See GBM*, 992 F.3d at 1323; *Brooks v. Miller*, 158 F.3d 1230, 1237 (11th Cir. 1998).

Order, "Plaintiffs have not shown, at least at this stage of the proceedings, that any of the provisions have a disparate impact on black voters.  Without this showing, the Court questions whether the Legislature could have foreseen or known about a disparate impact."  10/11/23 Order at 53.

At any rate, even assuming Plaintiffs' disparate-impact allegations are true—and they are not, for reasons explained in Section II below—Plaintiffs cannot show that the disparities were foreseeable to the General Assembly. Thus far, Plaintiffs' entire argument here relies on statements from witnesses and legislators who *opposed* SB 202.  *See* Pls.' PI Mot. at 51–52 [Doc. 566-1]. But statements from a bill's opponents are weak evidence of a bill's motivations or likely impact.   The Supreme Court has repeatedly admonished that "[r]emarks … made in the course of legislative debate or hearings … are entitled to little weight.  This is especially so with regard to the statements of legislative opponents who in their zeal to defeat a bill understandably tend to overstate its reach." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 n.24 (1976) (cleaned up). Similarly, the Eleventh Circuit recently explained that "concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent."  *LWV II*, 66 F.4th at 940.  Were it otherwise, any legislative detractor could doom a statute simply by interjecting hyperbole into the record.

As the Court recently concluded, statements by non-legislators who

opposed SB 202 are even less probative, since "th[eir] testimony … concerning any potential disparate impact on black voters was general in nature," and "was not supported by evidence or statistics.…   [W]ithout corroborating evidence to support a witness's generalized assertion of disparate impact, this is weak evidence of foreseeability."  10/11/23 Order at 54.

Other facts also refute Plaintiffs' claims that a disparate impact was both foreseeable and foreseen. For example, the 2022 elections in Georgia had record turnout for a midterm, and the *LWV II* court expressed skepticism that a disparate impact that fails to materialize could have been foreseeable.  66 F.4th at 938.   The midterm's high turnout dispels the fiction that it was foreseeable that SB 202 would have a racially disparate impact.

Additionally, as this Court remarked, "in [the] survey conducted by [SPIA] concerning the November 2022 election—after S.B. 202 was implemented—voters reported high levels of satisfaction.  Indeed, 99.5% of black voters reported no problem when voting, and no black voters reported poor experiences when voting." 10/11/23 Order at 31–32.  The same SPIA data also suggest that one reason is that lines were shorter following many of SB 202's key reforms: in the November 2022 midterm election, more than 95 percent of Georgia voters who voted in person reported waiting in line for fewer than 30 minutes.  SPIA Survey, *supra,* at 26.

Accordingly, Plaintiffs cannot identify any evidence showing a disparate

impact from SB 202—foreseeable or otherwise.

### D. Plaintiffs' arguments about alternative measures do not show discriminatory intent.

Straining to identify evidence of discrimination, Plaintiffs have also argued that Georgia should have advanced its interests in less discriminatory ways. *See* Pls.' PI Mot. at 53–54 [Doc. 566-1]. This argument fails for several reasons, not least of which is that none of SB 202's challenged provisions had a disparate impact on Black voters. *See infra* Section II. Moreover, following *Brnovich*, the "less-discriminatory-means" factor is of negligible (if any) importance to analysis of claims under the VRA § 2. In that case, the Supreme Court squarely held that "Section 2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives." *Brnovich,* 141 S. Ct. at 2345–46.

Plaintiffs' alternative-measures argument, which boils down to policy disagreements, also does little for their constitutional claims. The fact that the General Assembly "'did not include the alternative options that Plaintiffs would have preferred' is not evidence of discriminatory intent." *LWV II*, 66 F.4th at 940 (quoting *GBM*, 992 F.3d at 1327). Indeed, "[t]he legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it." *Id.* Plaintiffs are thus wrong to treat the availability of what they consider more palatable options as evidence of

discriminatory intent.

Nevertheless, as this Court already noted, "in regard to other portions of S.B. 202, … alternatives were considered and even implemented."  10/11/23 Order at 58. Additionally, SB 202 "includes … ideas that were typically supported by Democrats, including provisions that required more staff, equipment and polling places in large precincts with long lines," and provisions "to ensure that pretrial detainees in jails could access their driver's licenses for purposes of voting."  *Id.*  Thus, even if this argument were not of "negligible" importance, the record cuts against Plaintiffs.

In short, Plaintiffs simply lack the evidence to establish a material dispute of fact on their claim of discriminatory intent.

## II.   The Record Further Confirms that SB 202 does not Impose a Burden, Discriminatory or Otherwise, on the Right to Vote.

The lack of discriminatory intent is underscored by the lack of any real burden imposed by SB 202 overall. Contrary to Plaintiffs' suggestion, these provisions do not "bear more heavily on Black voters[.]"  Pls.' PI Mot. at 33–41 [Doc. 566-1].   Rather, there are many voting "opportunities provided by [Georgia's] entire system of voting"—and where, as here, "a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means."  *Brnovich*, 141 S. Ct. at 2339.

44

However, even assuming Plaintiffs were correct that the Challenged Provisions impose a burden, any such burden on voters is slight, irrespective of race. And State Defendants do not share Plaintiffs' pessimistic view that any Black voters affected by SB 202's modest changes will be unable to comply with the updated requirements. Rather, as the 2022 elections showed, Black voters were able to vote with minimal interruption. Indeed, although Plaintiffs focus on the "success of Black-preferred statewide candidates" in 2020, Pls. PI Mot. at 2 [Doc. 566-1], they overlook the fact that, during the 2022 elections, voters again elected Senator Warnock. As discussed below, it is thus clear that no part of SB 202 imposes a burden on voting, by racial group or otherwise.

Regarding SB 202's identification requirement for absentee voting, nearly every voter already has a qualifying ID.[18] And, as Plaintiffs recognize, *id.* at 42 n.19, those who do not have a qualifying ID may obtain a free state ID or may use a host of other forms of identification to vote absentee. O.C.G.A. § 21-2-386(a)(1)(D). There can be no serious argument that this requirement imposes a meaningful burden—and certainly no burden greater than the usual burdens of voting. *Brnovich*, 141 S. Ct. at 2344.

---

[18] By Plaintiffs' own data, only about 3.5% of all voters lack DDS ID or have an incorrect DDS ID in the voter file. *See* SOF ¶ 392 (Meredith Rep. ¶ 2(g) (Ex. HHHH) (identifying roughly 243,000 such voters); Ga. Sec'y of State, *Georgia Active Voters*, https://sos.ga.gov/georgia-active-voters-report (identifying 7,004,034 active voters)).

SB 202's dropbox provision also does not disparately impact Black voters. For one, Black voters in 2020 and 2022 used dropboxes less frequently than white voters.   Grimmer Rep. ¶ 149; Grimmer 184:12–24.   Moreover, that several counties have fewer dropboxes now than they had in 2020 is not evidence of any burden on Black voters.   In Georgia, "voters tend to return their ballots to a few drop boxes within each county, while many other dropboxes receive a smaller share of ballots returned via drop box."   Grimmer Rep. ¶ 14.   And only *some* voters returned their ballots to the dropbox nearest their house.   Grimmer Rep. 122 tbl. 22.   Plaintiffs' claim that changes in the number of dropboxes will disparately impact Black voters is mere speculation.

Plaintiffs also have no evidence to support their claim that Black voters will be unable to return absentee-ballot applications within SB 202's updated timeline.   Indeed, Dr. Fraga's table 7 does not actually show that 30.6% of ballots were rejected for being too late.   SOF ¶ 426 (Grimmer Rep. ¶¶ 89–90). Rather, in 2022, 99.75% of absentee-ballot applications arrived *before* SB 202's deadline, and of the thousands of applications submitted in 2022, only 706 were rejected for arriving late.   SOF ¶ 426 (*Id.*)   Of these, 0.27% of Black applications arrived after SB 202's deadline, compared with 0.25% of White applications. SOF ¶ 426 (*Id.*)   This policy, which works for almost everyone "to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open." *Brnovich*, 141 S. Ct. at 2345.

The same issues undermine Plaintiffs' attempts to show that the restrictions on out-of-precinct voting disparately impact Black voters. The mere fact that someone may have voted by provisional ballot previously does not demonstrate that he or she will need to do so in the future. Here again, State Defendants have confidence in voters' abilities to vote in the correct precinct, which the Supreme Court has held is a "quintessential example[] of the usual burdens of voting" that impose "unremarkable burdens." *Id.* at 2344.

In any event, the data also refute any claim that the new out-of-precinct rules impose a disparate impact on voters. Of the last five elections, 2018 had the highest share of overall votes classified as provisional *for any reason*. That year, only 0.22% of all votes were provisional. SOF ¶ 384 (Grimmer Rep. 53 tbl. 8). And, in those elections, less than 1% of Black and white voters alike cast a provisional ballot. SOF ¶ 385 (*Id.*) Because out-of-precinct provisional ballots are only a small subset of provisional ballots overall, the share of out-of-precinct provisional ballots—the relevant inquiry here—is necessarily lower. Grimmer 250:23–251:1. In *Brnovich*, the Supreme Court held that a more restrictive out-of-precinct policy did not violate Section 2, even though out-of-precinct votes were cast at *higher* rates than they are in Georgia. *Brnovich*, 141 S. Ct. at 2345, 2350.

Plaintiffs also cannot show any disparate impact on Black voters from SB 202's restrictions on where third-party organizations may hand out things

of value to voters.  Fewer than 10% of all Georgia voters waited more than 30 minutes in the 2022 elections.   SOF ¶ 423 (Germany 6/15/23 Decl. ¶ 13). Further, if any large precinct in 2022 experienced lines on Election Day of an hour or more, those precincts will need to split, hire more poll workers, or obtain more equipment in subsequent elections.  O.C.G.A. § 21-2-263(b).  SB 202's express efforts to address issues with long lines shows that SB 202 was designed to improve Georgia's elections, not harm voters based on their race.

Moreover, "even if the evidence established that black voters were more likely to wait in lines at the polls," Plaintiffs have not shown that, "by restricting the ability of third parties to hand out water bottles and snacks, the solicitation provision makes it harder for voters waiting in line to cast their ballots," or, put differently, "that a bottle of water will convince them to stay in line." *LWV II*, 66 F.4th at 937.  To be sure, Plaintiffs claim that "[s]everal" unidentified "voters" told one group that they would not have remained in line but for their "encouragement and support."  Calhoun Decl. ¶ 18.  But Plaintiffs make no attempt to explain exactly what activities motivated those voters to remain in line.  Nor do Plaintiffs show that those voters would have left the line if they had to get their water from an unmanned table provided by the county or if they had to walk 25 feet to a third-party group.

The same is true of the various other provisions Plaintiffs challenge, where Plaintiffs cannot come close to identifying any burden on the right to

48

vote.   Plaintiffs have thus failed to show that SB 202 has a disparate impact on voters by race or that the law results in Georgia elections being not "open."

## III.   SB 202 was Undeniably Enacted to Further Important State Interests.

In contrast to Plaintiffs' thin-to-non-existent evidence, the record is replete with evidence that the Challenged Provisions were enacted to further important, non-discriminatory state interests.   At the outset, though, State Defendants do not have the burden to show conclusively that SB 202 is justifiable as a policy measure.  Regardless of whether one agrees with Plaintiffs' charge that the statute's reforms are "undemocratic and unwise," "the Fourteenth Amendment cannot be made a refuge from ill-advised … laws." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 280–81 (1979) (quotation marks omitted).   With that said, "a strong state policy in favor of [the challenged practice], for reasons other than race, is evidence that the [practice] does not have a discriminatory intent." *GBM*, 992 F.3d at 1323 (quoting *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984)).  And SB 202 is supported by many "strong state polic[ies]."

As the extensive record evidence discussed above confirms, *see supra*, Background, SB 202 was enacted to increase voter access, electoral system efficiency, and voter confidence. These are legitimate and important state interests. *See Brnovich*, 141 S. Ct. at 2340 ("One strong and entirely legitimate

state interest is the prevention of fraud"); *id.* at 2345 ("orderly administration tends to decrease voter confusion and increase voter confidence in elections"); *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022) (A state has "important regulatory interests in conducting orderly elections") (quotation marks omitted).  SB 202 clearly served these objectives by responding directly to various concerns that were raised by voters and election officials.  And the record thus confirms that Plaintiffs cannot identify any discriminatory intent behind the Challenged Provisions.

## CONCLUSION

It was clear when Plaintiffs filed their complaints that SB 202 was not motivated by an intent to harm Black voters.  Rather, the General Assembly sought to update Georgia's electoral system with lessons learned from the 2018 and 2020 elections.  This has been confirmed by the 2022 elections, which saw record turnout compared to past midterms, short lines, and overwhelmingly positive voting experiences for voters of all races.

For that and the other reasons explained above, Plaintiffs have not come close to carrying their burden of establishing a genuine dispute of material fact as to whether SB 202 was enacted with discriminatory intent.  The Court should thus grant Defendants' motion for summary judgment.

Respectfully submitted this 30th day of October 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Edward H. Trent*
Cristina Martinez Squiers*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com

51

Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr