**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**ON SB 202'S PROVISIONS FOR DROP BOXES**
**AND MOBILE VOTING UNITS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iii

INTRODUCTION ............................................................................ 1

FACTUAL BACKGROUND ............................................................... 3

    A.    Drop boxes and portable voting facilities before SB 202. .................. 3

    B.    Concerns about drop boxes and mobile voting units. ........................ 4

    C.    The drop box and mobile voting unit provisions in SB 202................ 6

    D.    Voter participation after SB 202.......................................... 7

ARGUMENT AND CITATION OF AUTHORITIES ........................................ 9

    I.    Under the Undisputed Facts, the Drop Box Provisions Are Lawful......................................................................... 10

        A.    These provisions do not violate the Voting Rights Act. .......... 10

            1.    The drop box provisions, which provide greater opportunity to vote than was standard practice when § 2 was amended in 1982, do not impose a cognizable burden on voting......................................... 12

            2.    Given the ample alternative opportunities afforded by Georgia's entire system of voting, the drop box provisions create negligible, if any, disparities in impact on members of different racial groups. ............ 14

            3.    The provisions serve important State interests........... 18

            4.    The provisions pass muster under Section 2's "results test.".............................................. 21

        B.    These Provisions do not violate the Constitution. ................. 22

        C.    These provisions do not violate the disability laws. .............. 25

II.    Under the Undisputed Facts, the Mobile Facility Provision Is
       Lawful. ............................................................................................. 30

       A.    The provision does not violate the Voting Rights Act............. 31

       B.    The provision does not violate the Constitution. .................... 32

       C.    The  provision  does  not  violate  the  ADA  or  the
             Rehabilitation Act. .................................................................... 33

CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Choate,*
  469 U.S. 287 (1985) ..................................................................... 25

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ..................................................................... 23

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ........................................................ *passim*

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ..................................................... 18, 23, 24

*Burson v. Freeman,*
  504 U.S. 191 (1992) ..................................................................... 19

*Chisom v. Roemer,*
  501 U.S. 380 (1991) ..................................................................... 12

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ...................................... 23, 24, 33

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ...................................................... 2, 20, 24, 25

*Democracy N.C. v. N.C. State Bd. of Elections,*
  476 F. Supp. 3d 158 (M.D.N.C. 2020).......................................... 27

*Greater Birmingham Ministries v. Sec'y of State of Ala.,*
  992 F.3d 1299(11th Cir. 2021) ........................................... *passim*

*Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of*
  *Registration & Elections*, 446 F. Supp. 3d 1111 (N.D. Ga. 2020) ............... 33

*Karantsalis v. City of Miami Springs,*
  17 F.4th 1316 (11th Cir. 2021)..................................................... 25

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.,*
  55 F.4th 1296 (11th Cir. 2022)..................................................... 25

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
66 F.4th 905 (11th Cir. 2023)................................................................ *passim*

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
81 F.4th 1328 (11th Cir. 2023)................................................. 1, 10

*Lewis v. Zilog, Inc.*,
908 F. Supp. 931 (N.D. Ga. 1995) ........................................ 26

*McDonald v. Bd. of Election Comm'rs of Chi.*,
394 U.S. 802 (1969) ...................................................... 13, 24

*Medina v. City of Cape Coral*,
72 F. Supp. 3d 1274 (M.D. Fla. 2014)............................... 26

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986) ...................................................... 19, 24

*New Ga. Project v. Raffensperger*,
976 F.3d 1281 (11th Cir. 2020) ...................................... 17, 18

*Ohio Democratic Party v. Husted*,
834 F.3d 620 (6th Cir. 2016) ........................................ 24

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ............................................................ 18

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
117 F.3d 1278 (11th Cir. 1997) ...................................... 26

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997) ...................................................... 23

*Todd v. Carstarphen*,
236 F. Supp. 3d 1311 (N.D. Ga. 2017)............................ 29

*Walker v. Life Ins. Co. of N. Am.*,
59 F.4th 1176 (11th Cir. 2023).................................... 9

**Statutes**

29 U.S.C. § 794(a) ............................................................. 2

42 U.S.C. § 12132............................................................. 2

iv

52 U.S.C. § 10301 .................................................................... *passim*

O.C.G.A. § 21-2-266(b) ........................................................ 2, 4, 7, 32

O.C.G.A. § 21-2-380(b) .................................................................. 16

O.C.G.A. § 21-2-382(c) ........................................................... 1, 7, 21

O.C.G.A. § 21-2-382(c)(1) ............................................................. 16

O.C.G.A. § 21-2-384(a)(2) ............................................................. 16

O.C.G.A. § 21-2-385(a) .................................................................. 17

O.C.G.A. § 21-2-385(d)(1) ......................................................... 16, 27

O.C.G.A. § 50-13-4 ........................................................................ 13

## Regulations

28 C.F.R. § 35.150 ........................................................................ 26

Ga. Comp. R. & Regs. 183-1-14-0.8 to .14 .................................... 4, 13

## Other Authorities

Christina A. Cassidy & Susan Haigh,
*Drop boxes have become key to election conspiracy theories.*
*Two Democrats just fueled those claims*, AP News (Oct. 7, 2023) .............. 19

Ga. Sec'y of State,
*Georgia Voters Lead Southeast in Engagement, Turnout*
(May 17, 2023) ............................................................................... 7

Nat'l Conf. of State Legislatures,
*The Evolution of Absentee/Mail Voting Laws, 2020*
*through 2022* (updated Oct. 3, 2023) ............................................. 13

Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs., Univ. of Ga.,
*2022 Georgia Post-Election Survey* (2023) ...................................... 8

Tr. of All Things Considered,
*Election Workers Are Already Being Threatened.*
*They're Worried About 2024*, NPR (June 20, 2023, 4:39 PM) ................... 19

## INTRODUCTION

State Defendants respectfully move for summary judgment on all claims pertaining to absentee ballot drop boxes and mobile voting units in modified buses.  Plaintiffs claim statutory and constitutional rights to force Georgia to provide permanent, unlimited authority for those two emergency practices first undertaken during the 2020 pandemic.  But there are no such rights.  Because Plaintiffs cannot muster a dispute of material fact sufficient to sustain a claim under any of their legal theories, State Defendants are entitled to summary judgment on all claims addressing the drop box and mobile facility provisions of SB 202.

SB 202's drop box provisions for the first time provide statutory authority permitting voters to use drop boxes to return absentee ballots. O.C.G.A. § 21-2-382(c).  The provisions require that each county provide at least one drop box, which must be placed inside a voting location monitored by government employees, and must be accessible only during early voting hours. Counties may provide an additional drop box for every 100,000 registered voters.  These provisions are equivalent to those approved in *League of Women Voters of Florida Inc. v. Florida Secretary of State*, 66 F.4th 905, 920, 934–36 (11th Cir.) ("*LWV I*"), *reh'g denied*, 81 F.4th 1328 (11th Cir. 2023) ("*LWV II*"). They should be approved here.

The Georgia Code also authorizes "portable or movable polling facilities."

*See* O.C.G.A. § 21-2-266(b).  For the first time in Georgia, a single county used modified buses as polling facilities during the pandemic election of 2020.  SB 202 makes clear that "buses and other readily movable facilities" may be used only in "emergencies declared by the Governor" and only "to supplement the capacity of the polling place where the emergency circumstance occurred."  *Id*.

Plaintiffs claim that these provisions violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301; Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132;  Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a); and the First, Fourteenth, and Fifteenth Amendments to the Constitution.  Plaintiffs maintain Georgia must authorize unlimited 24-hour outdoor drop boxes, and that no limits should apply to mobile voting units.

But the drop box and mobile facility provisions do not discriminate against minority voters or voters with disabilities.  Both provisions are facially neutral, and the undisputed material facts show that the burdens of both provisions are minimal to nonexistent.  As the Supreme Court recently observed, "voting necessarily requires some effort and compliance with some rules," so that voters—and federal law—"must tolerate the 'usual burdens of voting.'"  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008)).  Yet Plaintiffs insist on extraordinary relief from those usual burdens.

Even if the drop box and mobile facility provisions imposed cognizable

burdens, there are no disputes of material fact that could support a finding of discriminatory effects.  Adding drop box authority where there was none is not rendered discriminatory simply because the State could have provided more drop boxes.  Plaintiffs' arguments, moreover, ignore the well-established option to vote absentee by mail because there are many more mailboxes than drop boxes, and mailboxes are available 24 hours a day.  And the mobile facility provisions provide uniform standards for the emergency use of one type of alternative voting facility.

The drop box provisions also serve the State's compelling interests, including those in ballot security, voter confidence, efficient administration, and fair distribution of alternate means of voting.  And the mobile facility provision serves the State's compelling interest in preserving state-wide uniformity in voter access while removing the opportunity for local election officials to favor some localities over others.  Again, no dispute of material fact can disturb these conclusions.

In short, the drop box and mobile facility provisions do not cognizably harm anyone's right to vote, or discriminate against anyone.  Defendants are entitled to summary judgment on these claims.

## FACTUAL BACKGROUND

### A.   Drop boxes and portable voting facilities before SB 202.

Before 2020, no statute or regulation authorized the use of drop boxes in Georgia elections, and there was no evidence they had been used in the State.

SOF ¶ 296 (Mashburn 3/7 73:18–75:5 (Ex. JJ)).  In 2020, in response to the COVID-19 pandemic, the Georgia State Election Board (SEB), acting under emergency authorization, issued an emergency rule authorizing the use of absentee ballot drop boxes. SOF ¶ 299; Ga. State Election Bd., Ga. Comp. R. & Regs. 183-1-14-0.8 to.14 (Ex. VVVV).  This allowed voters an additional way to deliver their completed absentee ballots without face-to-face interaction with election officials.  Counties had discretion whether to use drop boxes, but any drop boxes had to be placed subject to specific security measures.  *Id.*

The Georgia Code also authorizes the use of "portable or movable polling facilities."  *See* O.C.G.A. § 21-2-266(b).  But no county used mobile polling places in modified buses until 2020, when Fulton County used two units.  SOF ¶ 339 (N. Williams 30(b)(6) 174:11–175:2 (Ex. AA); Mashburn 3/14 194:14–20 (Ex. KK)).

## B.  Concerns about drop boxes and mobile voting units.

The unprecedented use of drop boxes and mobile voting units in 2020 raised several concerns among voters and election officials.  For example, collecting ballots daily from numerous drop boxes imposed significant burdens on local election officials.  SOF ¶ 302 (Germany 7/27/23 Decl. ¶ 76 (Ex. C); Eveler 156:25–157:13 (Ex. T)).  There also were reports of vigilantes stationed at drop boxes and following election workers who were transporting ballots.  SOF ¶ 303 (Germany 6/29/23 Decl. ¶ 18 (Ex. D)).  In addition, the SEB and

4

Georgia Secretary of State (SOS) received numerous complaints of ballot harvesting—the gathering and deposit of multiple ballots by unauthorized persons—associated with the emergency drop boxes.  SOF ¶ 304 (Mashburn 3/7 73:18–77:25, 81:16–83:9 (Ex. JJ); Germany 3/7 209:15–211:3 (Ex. HH); Kidd 118:8–21 (Ex. Y); Germany 6/29/23 Decl. ¶¶ 7, 13 (Ex. D)).  And, because drop box ballots could not be collected and taken to the county election office until after the polls were closed, the perception arose that the ballots were "late ballots."  SOF ¶ 305 (Germany 4/13 282:1–20 (Ex. GG); Bailey Rep. 26–28 (Ex. AAAA)).

Counties also received complaints—and some received burdensome public records requests for the surveillance video related to the drop boxes. SOF ¶ 306 (Germany 3/7 209:10–211:3 (Ex. HH); Germany 4/13 283:24–284:7 (Ex. GG); K. Williams 30(b)(6) 69:21–70:2 (Ex. LL); Germany 6/29/23 Decl. ¶ 16 (Ex. D)).  In many cases, the video's quality was so poor that it was effectively useless in evaluating the complaints.  SOF ¶ 308 (Mashburn 3/7 77:18–25 (Ex. JJ); Germany 7/27/23 Decl. ¶ 66 (Ex. C)).  Many voters were wary of drop boxes, perceiving them as susceptible to abuse since they could be placed unattended, and not properly monitored, in remote locations.  *See* SOF ¶ 309 (Germany 4/13 55:19–56:2 (Ex. GG); Mashburn 3/7 76:18–24, 167:2–170:7 (Ex. JJ); Mashburn 3/14 81:2–83:15 (Ex. KK); Watson 194:14–24 (Ex. XXX)).

In addition, investigations revealed several counties' failures to properly

secure drop boxes. SOF ¶¶ 310–14 (Mashburn 3/14 75:8–13 (Ex. KK); Mashburn 3/7 81:16–83:9 (Ex. JJ)). One county left a key in the drop box, SOF ¶ 311 (Mashburn 3/14 76:12–18 (Ex. KK)), another used an unsecured cardboard box, SOF ¶ 312 (Mashburn 3/7 82:13–18 (Ex. JJ)), and Fulton County placed some drop boxes outside without the required video surveillance. SOF ¶ 313 (Germany 7/27/23 Decl. ¶ 66 (Ex. C)). In addition, "people would put stuff in the drop boxes that wasn't supposed to be there." SOF ¶ 314 (Mashburn 3/14 77:17–25 (Ex. KK)).

Mobile voting units also generated many complaints. SOF ¶¶ 342–43 (Germany 3/7 172:4–11 (Ex. HH)). Some were concerned that mobile voting units might be allocated unfairly, and that county officials would place the units in politically favorable precincts while avoiding unfavorable ones. SOF ¶ 342 (Germany 3/7 173:11–175:2; Mashburn 3/14 38:23–39:19 (Ex. KK)). There were also concerns that mobile units gave an advantage to counties that could afford them. SOF ¶ 343 (Mashburn 3/14 51:12–52:3). Further, mobile voting units by their nature moved around a county, so that voters had less notice where the units would be located on a given day. SOF ¶ 344 (Germany 3/7 173:11–174:2 (Ex. HH)).

**C.   The drop box and mobile voting unit provisions in SB 202.**

The emergency authorization allowing drop boxes expired after the January 2021 runoff. SOF ¶ 315 (Mashburn 3/7 74:11–14 (Ex. JJ)). Yet the

General Assembly concluded that drop boxes provided a useful alternative for voters to return absentee ballots.  Accordingly, while the emergency authority merely *permitted* drop boxes, SB 202 *required* each county to have at least one drop box, with larger counties having additional drop boxes in proportion to the county's population.  SOF ¶ 316 (Mashburn 3/14 72:14–73:24 (Ex. KK); Mashburn 3/7 74:11–14 (Ex. JJ); O.C.G.A. § 21-2-382(c).  Responding to the issues encountered in the 2020 election cycle, however, the legislature authorized drop boxes only inside the county election office or early voting locations, accessible during in-person early voting hours, and under constant human surveillance.  O.C.G.A. § 21-2-382(c).

SB 202 also limited the use of "buses and other readily movable facilities" to "emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred." O.C.G.A. § 21-2-266(b).

### D.   Voter participation after SB 202.

With SB 202 in place, Georgians voted easily and securely regardless of race.  The 2022 midterm election saw "more votes cast than any other midterm," "record breaking midterm Early Voting turnout," and the most votes by mail ever cast in a midterm.[1]  "Georgia turnout, relative to other states,

---

[1] SOF ¶¶ 348–50 (Ga. Sec'y of State, *Georgia Voters Lead Southeast in Engagement, Turnout* (May 17, 2023), https://tinyurl.com/2huchh3h (Ex. FFFFF)).

remained high," and was "5.6 percentage points higher than the average in other states." SOF ¶ 351 (Grimmer Rep. ¶¶ 42, 44 (Ex. DDDD)).

The difference between white and black turnout remained essentially the same after SB 202. In the 2020 elections, the turnout gap between black and white voters in the general election was 9.4% and in the runoff was 6.9%. By 2022, the turnout gap increased slightly to 9.7% in the general and decreased slightly to 6.7% in the runoff. SOF ¶ 352 (Fraga Sur-Rebuttal Rep. 15 tbl. 1 [Doc. 566-47] (Ex. CCCC)). A survey performed by the University of Georgia's School of Public & International Affairs ("SPIA") found that more than 90% of black voters and nearly 85% of other minority voters found voting in 2022 to be either just as easy or easier than in previous elections. SOF ¶ 357 (Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs., Univ. of Ga., *2022 Georgia Post-Election Survey* 13 (2023) (Ex. YYYY) ("SPIA Survey")). And, as this Court has recognized, "99.5% of black voters reported no problem when voting, and no black voters reported poor experiences when voting." Order at 31–32 [Doc. 686-1]; *see* SOF ¶ 358 (PI Hr'g Tr. 116:10–22, 251:2–9 (Ex. YYY); SPIA Survey 6 (Ex. YYYY)).

Voting was easy in part because lines in 2022 were shorter following SB 202's reforms. The SPIA survey reported that, in November 2022, more than 95 percent of Georgia voters who voted in person reported waiting in line for fewer than 30 minutes. SOF ¶ 360 (SPIA Survey 5). Secretary of State data

show an "average wait time on Election Day" varying from "0 minutes to approximately 10 minutes."  SOF ¶ 361 (Shaw Rebuttal Rep. ¶ 38 [Doc. 601-18] (Ex. LLLL)).  Indeed, the average wait time in November 2022 statewide was 2 minutes and 19 seconds, dropping to 1 minute and 45 seconds in December 2022.  SOF ¶ 362 (Germany 6/15/23 Decl. ¶¶ 10–11 (Ex. E); *see* Manifold 30:11–17 (Ex. MM); Wurtz 59:15–19 (Ex. NN)).

Voters also were more likely to vote by mail than in the non-pandemic, midterm election of 2018, continuing the 2014–2018 trend, while the trend away from Election Day voting accelerated.  SOF ¶ 363 (Grimmer Rep. 42 tbl. 7 (Ex. DDDD)).  The 2022 election also saw the highest share of early in-person ballots in Georgia's history.  SOF ¶ 350 (Shaw 2/14/23 Rep. 15–16 & tbl. 7 (Ex. KKKK)).

## ARGUMENT AND CITATION OF AUTHORITIES

"Summary judgment is proper when the evidence, viewed [in the light most favorable to the non-moving party], presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1185–86 (11th Cir. 2023) (quotation marks omitted). Here, Plaintiffs cannot raise a genuine issue of material fact that could carry their burden under any of their legal theories.

## I.   Under the Undisputed Facts, the Drop Box Provisions Are Lawful.

First, the drop box provisions of SB 202 mirror those the Eleventh Circuit approved in *LWV I*, 66 F.4th at 934–36; *see also LWV II*, 81 F.4th at 1331.  And Plaintiffs can offer no set of facts under which the same result would not be warranted here, whether under the Voting Rights Act, the Constitution, or federal disability laws.

### A.   These provisions do not violate the Voting Rights Act.

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  52 U.S.C. § 10301(a).  "This analysis turns on whether, based on the totality of the circumstances, the challenged law … deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice."  *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021) ("*GBM*").  To state a valid vote-denial claim, a plaintiff must establish: (1) proof of disparate impact (a denial or abridgement) resulting from the law or policy in question; and (2)

that the disparate impact is caused by racial bias.  *See id.* at 1328–30.[2]

Such claims must be assessed under the "totality of circumstances." *Brnovich*, 141 S. Ct. at 2338 (quoting 52 U.S.C. § 10301(b)).  Although "[a]ny circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered," *id.*, the *Brnovich* Court listed five circumstances:  (1) "the size of the burden imposed by a challenged voting rule"; (2) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982"; (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups"; (4) "the opportunities provided by a State's entire system of voting"; and (5) "the strength of the state interests served by a challenged voting rule."  *Id.* at 2338–39.  The "touchstone" is whether the voting system as a whole is equally open to voters.  *Id.* at 2338.  A state law that imposes "modest burdens" and with a "small … disparate impact" complies with Section 2 so long as it is based on valid governmental interests.  *Id.* at 2346.

Here, the undisputed material facts demonstrate that there are no cognizable burdens or disparities.  Plaintiffs' proposed alternative schemes are irrelevant to the constitutionality of the drop box provisions: "Section 2 does not require a State to show that its chosen policy is absolutely necessary or

---

[2] State Defendants reassert and preserve their argument that there is no implied cause of action under Section 2.  *See* State Defs.' Br. in Support of Mot. for Summ. J. on Jurisdiction, Point IV (filed contemporaneously).

that a less restrictive means would not adequately serve the State's objectives." *Id.* at 2345–46. Because Plaintiffs cannot prove that the drop box provisions afford any group meaningfully "less opportunity than other members of the electorate to participate in the political process," *Chisom v. Roemer*, 501 U.S. 380, 388 (1991) (quoting 42 U.S.C. § 1973(b) (now 52 U.S.C. § 10301(b)), under the undisputed (and indisputable) facts, there is no violation.

1. **The drop box provisions, which provide greater opportunity to vote than was standard practice when § 2 was amended in 1982, do not impose a cognizable burden on voting.**

The undisputed material facts show that the drop box provisions do not burden voting in any meaningful way, but merely place sensible limits on a novel means of voting. Plaintiffs assume that States must remove any possible burden on voting. Yet voters must "tolerate the usual burdens of voting," *Brnovich*, 141 S. Ct. at 2338; "[m]ere inconvenience" is not enough to "demonstrate a violation of § 2." *Id.* Indeed, *Brnovich* upheld a rule requiring voters to vote in their correct precinct, largely because the burden of voting in the correct precinct was long-established as one of the usual burdens of voting. *See id.* at 2350; *see also id.* at 2345–46.

The "usual burdens of voting" include travel to a polling place or "a nearby mailbox." *Id.* at 2338. Drop boxes are conveniences that were unknown in Georgia before the pandemic elections of 2020—and, as far as the record reflects, were unknown anywhere in the country when Section 2 was amended

12

in 1982.  As late as January 2020, only eight states expressly authorized drop box voting.[3]  Just as there is no right to vote absentee at all, *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969), there can be no right to force States to provide additional ways to vote absentee.

Plaintiffs and their experts incorrectly treat the 2020 Presidential elections as a baseline to analyze voting in Georgia.  *See*, *e.g.*, Rodden Rep. 15–16 (Ex. IIII); Schur 79:2–10 (Ex. UUU); AME First Am. Compl. ¶¶ 247–48, 260–64, 277, 288–90 [No. 21-01284, Doc. 83]; NAACP First Am. Compl. ¶¶ 153–58, 168 [No. 21-01259, Doc. 35].  But those elections took place under COVID-19's temporary emergency rules, rather than the pre-SB 202 statutory regime, which did not allow outdoor drop boxes at all.  SB 202's drop box provisions thus *expanded* Georgians' statutory ability to vote under ordinary, non-emergency circumstances.  SB 202 at 5:113–118 (Ex. A); Ga. Comp. R. & Regs. 183-1-14-0.8 to .14 (Ex. VVVV); O.C.G.A. § 50-13-4(b).

Section 2 does not require States to add voting conveniences, let alone conveniences unknown when the statute was last amended in 1982.  That is enough reason to reject Plaintiffs' claims here.

---

[3] *See* SOF ¶ 298 (Nat'l Conf. of State Legislatures, *The Evolution of Absentee/Mail Voting Laws, 2020 through 2022*, tbl. 8 (updated Oct. 3, 2023), https://tinyurl.com/emwd67uy (Ex. EEEEE)).

**2.**  **Given the ample alternative opportunities afforded by Georgia's entire system of voting, the drop box provisions create negligible, if any, disparities in impact on members of different racial groups.**

Plaintiffs also cannot "clear the hurdle of demonstrating that minority voters are less likely than white voters" to be able to vote due to the drop box provisions. *GBM*, 992 F.3d at 1329. Indeed, the undisputed material facts show that black voters statewide in 2020 and 2022 used drop boxes less frequently or no more frequently than white voters. SOF ¶ 321 (Grimmer Rep. ¶ 149 (Ex. DDDD); Grimmer Updated Rep. 3–4, 7–11 (Ex. EEEE); Grimmer 184:14–24 (Ex. OOO); PI Hr'g Tr. 233:20–234:14 (Ex. YYY)). Plaintiffs' only putatively contrary evidence applies solely to one county, which is not a sufficient basis to infer a state-wide pattern. Order at 34 [Doc. 686-1], citing *LWV I*, 66 F.4th at 933–34. That several counties have fewer drop boxes now than they had in 2020 is not evidence of a discriminatory burden on black voters. In Georgia, "voters tend to return their ballots to a few drop boxes within each county, while many other drop boxes receive a smaller share of ballots returned via drop box." SOF ¶ 540 (Grimmer Rep. ¶ 14 (Ex. DDDD); PI Hr'g Tr. 274:23–276:12 (Ex. YYY)).

And calculations of the distance from voters' residences to the nearest drop box overlook the fact that many voters did not return their ballots to the drop box nearest their home. SOF ¶ 541 (Grimmer Rep. 122 tbl. 22 (Ex. DDDD); Fraga 151:8–152:20 (Ex. MMM)). Indeed, one of Plaintiffs' experts

14

conceded that 62% of voters used a drop box "near work, school, home, or the location of an errand." SOF ¶ 542 (Lichtman Rep. 21 (Ex. GGGG)). That is, many use drop boxes that are convenient to three destinations *other* than their home, and 38% used a location near none of these; indeed, other data show that 45% of drop box voters simply used the county elections office. *See* SOF ¶ 543 (Grimmer Updated Rep. 6 (Ex. EEEE)). This pattern of drop box use is not surprising, given that the average voter lived more than three miles from the nearest drop box in 2020. SOF ¶¶ 544 (Fraga Rep. 68 (Ex. BBBB)).

It is not enough to speculate that removing a particular drop box will disparately impact black voters. Indeed, this Court has recognized that many black voters live in counties that have as many or *more* drop boxes than in 2020 as live in counties with fewer. Order at 14, 32–33 [Doc. 686-1]; SOF ¶ 323 (Burden Rep. 28–29 (Ex. TTTT)). And, while Plaintiffs assert that the unavailability of drop boxes in the last four days before an election disproportionately injures minority voters, the data are sparse and inconclusive, Order at 14, 33–34 [Doc. 686-1], at most showing barely a one-point difference in the 2020 and 2022 general elections. *See* SOF ¶ 325 (Grimmer Rep. 84–85 (Ex. DDDD); PI Hr'g Tr. 236:22–238:5 (Ex. YYY)). That would be too small to support a disparate impact claim. *Brnovich,* 141 S. Ct at 2339, 2345; *LWV I,* 66 F.4th at 933–35.

15

Plaintiffs' witnesses have nevertheless maintained that disparate impact from the drop box provisions may be inferred from lower vehicle ownership patterns among some minorities compared to whites, or from what they say (without supporting data) are less flexible work patterns. Yet any statistical disparities in the general life circumstances of African Americans or other minorities in Georgia result in "predictable disparities" that are unrelated to voting, *Brnovich*, 141 S. Ct. at 2339—and thus immaterial. If African American voters' living conditions make drop boxes less useful when available only during advance voting hours, numerous other available voting options fill the gap, most notably the mailbox. But Plaintiffs and their experts simply ignore those options. *E.g.*, Chatman 35:11–16 (Ex. III).

Where, as here, "a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *Brnovich*, 141 S. Ct. at 2339. Georgia laws as a whole "make[] it very easy to vote." *Id.* at 2330. In addition to normal, election-day polling, Georgia allows for no-excuse absentee voting, O.C.G.A. § 21-2-380(b), 17 mandatory days of early voting with optional Sundays (for a total of up to 19 early voting days), *id.* § 21-2-385(d)(1), drop boxes in every county, *id.* § 21-2-382(c)(1), and weeks of early voting through the mail, *id.* § 21-2-384(a)(2). Given the proliferation of mailboxes, *see* SOF ¶ 327 (Grimmer Rep. 106 (Ex. DDDD), the principal option

16

for returning absentee ballots, *see* O.C.G.A. § 21-2-385(a), SB 202 does not eliminate or meaningfully limit any access.  Where a voter may select among multiple options, there is no interference with the right to vote.  *See*, *e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (*NGP*).  Plaintiffs cannot prove that the drop box provisions "actually make[] voting harder for African Americans," *GBM*, 992 F.3d at 1330 (cleaned up), and thus cannot succeed on their Section 2 claim.

This conclusion is not undermined by Plaintiffs' allegations that minority voters will be deterred from using drop boxes inside registrars' offices or early voting locations by the presence of election officials or law enforcement officers.  *E.g.*, [AME Am. Compl. ¶¶ 288–90, Doc. 83 (No. 21-cv-01284)].  The notion that minority voters will turn away from the polls because of the intimidating aspect of election officials strains credulity past the breaking point.  In any event, the presence of government officials at polling places is not only a usual, but a necessary and nearly universal burden of voting.

Plaintiffs' false premise is that, although Black and other minority voters swiftly adapted to the emergency regime of 2020, they cannot adapt to any changes from that regime.  Under the "'totality of circumstances,'" however, the undisputed material facts show that Georgia's electoral system is "'equally open'" and "gives everyone an equal 'opportunity' to vote." *Brnovich*, 141 S. Ct. at 2341 (quoting 52 U.S.C. § 10301(b)).

### 3.    The provisions serve important State interests.

Moreover, "[e]ven if the plaintiffs had shown a disparate burden" arising from the drop box provisions, which they cannot do, "the State's justifications would suffice to avoid § 2 liability." *Brnovich*, 141 S. Ct. at 2347.  Georgia's interests in enacting the drop box provisions are not subject to material factual dispute.   Those interests include: "deterring and detecting voter fraud," "improv[ing] … election procedures," "safeguarding voter confidence," *GBM*, 992 F.3d at 1319, and running an efficient and orderly election.  *Brnovich* 141 S. Ct. at 2345; *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *NGP*, 976 F.3d at 1282.  This list overlaps with the interests identified in SB 202—increasing voter confidence after accusations of fraud, reducing the burden on election officials, streamlining the elections process, and promoting uniformity in voting.  SB 202 at 4:70–90, 5:113–118 (Ex. A).  Here, as in *LWV I*, "[t]he record … establishes that concerns respecting unmanned drop boxes were valid and were expressed by persons other than [SB 202]'s sponsors."  66 F.4th at 928.

**Security, integrity, and fraud prevention.**  Actual election integrity is one such interest.  As the Supreme Court has recently reminded, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Brnovich*, 141 S. Ct. at 2347 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)); *see id.* at 2340 (discussing laws enacted to combat voter fraud).  As explained above (at 4–7), the drop box provisions in part responded

to allegations of improper ballot harvesting that led to multiple investigations and burdensome open records requests to counties, and reports of stalkers following election workers at drop boxes.[4]  Security and video surveillance were inconsistent and sometimes inadequate.  And "evidence that items other than ballots can be, and have been, deposited in drop boxes … suggests that ballots could be damaged or destroyed as a result."  *LWV I*, 66 F.4th at 928.  The location and hours requirements, along with monitoring provisions, further the State's compelling interest in ballot security and integrity.

It remains true, moreover, that "[f]raud is a real risk that accompanies mail-in voting even if [Georgia] had the good fortune to avoid it," a risk that "has had serious consequences in other States."  *Brnovich*, 141 S. Ct. at 2348.[5] Georgia need not "sustain some level of damage before the legislature [can] take corrective action."  *Id*. at 2348  (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)).  Instead, the State may "respond to potential deficiencies in the electoral process with foresight rather than reactively." *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (quoting *Munro*, 479 U.S. at 195).

---

[4] Such threats to election workers are only increasing around the country.  *See* Tr. of All Things Considered, *Election Workers Are Already Being Threatened. They're Worried About 2024*, NPR (June 20, 2023, 4:39 PM), https://tinyurl.com/yns77es6.

[5] Drop boxes in particular pose this risk.  Christina A. Cassidy & Susan Haigh, *Drop boxes have become key to election conspiracy theories. Two Democrats just fueled those claims*, AP News (Oct. 7, 2023), https://tinyurl.com/ypeas552.

And that is what SB 202 does.

**Efficiency.**  The drop box provisions also serve the State's interest in efficient and orderly election administration.  By requiring drop boxes to be placed indoors in the election office or advance voting locations—locations already staffed with county officials or election workers—SB 202 ensured that no additional personnel were needed to monitor drop boxes or to collect ballots. SOF ¶ 545 (Germany 7/27/23 Decl. ¶ 72 (Ex. C)).  SB 202 thus avoided the problems that arose during the 2020 elections, when election officials had to spend significant time each day going to various locations to collect ballots. SOF ¶ 302 (Germany 7/27/23 Decl. ¶ 76 (Ex. C); Harvey 123:23–124:7 (Ex. PPP); Eveler 157:3–13 (Ex. T)).

And, by limiting drop box availability to early voting hours, SB 202 ensured that there is sufficient time after early voting, but before Election Day, for the counties to process all ballots returned, avoiding a late influx of ballots that could delay vote counts.  SOF ¶ 320 (Germany 7/27/23 Decl. ¶ 73 (Ex. C); Bailey 3/21 157:9–158:11 (Ex. FFF)).

**Voter confidence.**  SB 202's regulation of drop boxes also enhances "public confidence in the integrity of the electoral process," which "has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197.  Voter confidence is also critical to efficient election administration: When officials are bombarded with

20

complaints about election security, they must devote time and resources to addressing those concerns. SOF ¶ 546 (Germany 4/13 283:10–284:11 (Ex. GG)).

The drop box provisions enhance voter confidence. During 2020, concerns were raised about political influences on the selection of drop box locations. SOF ¶ 317 (Germany 7/27/23 Decl. ¶ 78 (Ex. C)). And placing unattended drop boxes outdoors prompted voter concerns about election security. SOF ¶ 318 (Germany 7/27/23 Decl. ¶ 68; Mashburn 3/7 76:18–24 (Ex. JJ)). Placing drop boxes indoors and under the surveillance of a live person— as SB 202 requires—increases actual and perceived security. And the ability to begin processing (though not counting) all drop box ballots before election day reduces delays in results, further increasing voter confidence. SOF ¶ 319 (Bailey 3/21 155:23–156:7 (Ex. FFF)).

**Uniform access.** SB 202 also serves the State's interest in uniform access to voting by (a) requiring each county to use drop boxes and (b) tying the number of drop boxes to the number of voters. O.C.G.A. § 21-2-382(c). Indeed, by setting rules for the number of drop boxes used in each county, SB 202 promotes equal access for voters, regardless of where they live. *See* Bailey 3/21 117:21–118:1, 150:1–7 (Ex. FFF); Sterling 163:7–12 (Ex. VVV).

### 4. The provisions pass muster under Section 2's "results test."

For similar reasons, SB 202's drop box provisions survive analysis under

Section 2's "results test."  First, the provisions do not impose a cognizable burden.  Between mailboxes, post offices, registrar's offices, and early voting locations, absentee voters have ample options to return their ballots in addition to the newly added option of drop boxes.  And the trip to any of these locations "—much like traveling to an assigned polling place—falls squarely within the heartland of the 'usual burdens of voting.'"  *Brnovich*, 141 S. Ct. at 2346.  Nor do any differences in drop box use amount to a disparate impact.  And the many valid state interests supporting those provisions doom Plaintiffs' claims under this analysis as well.  *See id.* at 2347.

Subsequent experience also demonstrates that the drop box provisions served the interests they were designed to serve:  In the 2022 elections, the SEB and SOS did not receive the complaints about drop boxes they had received following the 2020 election cycle.  SOF ¶ 322 (Germany 6/29/23 Decl. ¶ 21 (Ex. D); Mashburn 3/7 83:18–21 (Ex. JJ)).  That is enough to sustain the law against a background of no material disputes of fact.

## B.   These Provisions do not violate the Constitution.

Plaintiffs' constitutional claims under the First, Fourteenth, and Fifteenth Amendments fail for similar reasons:  the undisputed material facts show that the drop box provisions impose no cognizable burden on voting; any impact is not discriminatory; and strong state interests make clear that the provisions would have been enacted regardless of any marginal "racial

discrimination factor." *GBM*, 992 F.3d at 1321 (cleaned up); *LWV I*, 66 F.4th at 922. (State Defendants' motion for summary judgment on discriminatory purpose and intent addresses the intent factors.).

In resolving an undue burden on voting claim, a court must: (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see Burdick*, 504 U.S. at 433–34. The analysis is not a "litmus-paper test" and instead requires a "flexible" approach. *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). If a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance. But when [the law] imposes only reasonable, nondiscriminatory restrictions …, the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (cleaned up); *see Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434). And ordinary burdens (such as going to a polling place or mailbox to vote) that "aris[e] from life's vagaries" fall into the latter,

non-severe category. *Crawford*, 553 U.S. at 191, 197–98 (controlling opinion). For such burdens, advancing sufficient justifications places no "evidentiary burden on the state." *Common Cause*, 554 F.3d at 1353; *see also Munro*, 479 U.S. at 195.

Here, the burden associated with SB 202's drop box provisions is slight to nonexistent. There is no right to an absentee ballot, *McDonald*, 394 U.S. at 807–08, let alone to a particular method of returning it, as there is no right to vote in any particular manner, *see Burdick*, 504 U.S. at 433. Changing aspects of one novel means of voting access, while retaining mailing and personal delivery (along with in-person voting), is a minimal burden, if any at all. *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016). And adding drop boxes as another means of returning a ballot does not constitute a burden simply because a plaintiff wishes the added means were even more robust or convenient. The Constitution does not "demand[] recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public." *Id.*

Given this minimal burden, any reasonable justification is sufficient. "Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest[.]" *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). This is not such an "exceptional" case. As explained above, the

drop box provisions serve a slew of neutral and valid state interests, and therefore are constitutional.  *See Crawford*, 553 U.S. at 204.

### C.    These provisions do not violate the disability laws.

The undisputed material facts also make clear that Plaintiffs cannot prove that the drop box provisions deny voters with disabilities meaningful access to absentee voting under Title II of the Americans with Disabilities Act or Section 504 of the Rehabilitation Act.  Claims under those two provisions are evaluated under the same standard.   *See L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.,* 55 F.4th 1296, 1301 n.2 (11th Cir. 2022); AME Pls.' PI Br. at 10 [Doc. 546-1].  A plaintiff must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, activities, or otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."  *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021).   To "assure meaningful access, *reasonable* accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (emphasis added).

As this Court has recognized, mere "[d]ifficulty in accessing a benefit … does not by itself establish a lack of meaningful access."  AME PI Order at 15 [Doc. 615].  Individuals are not "entitled to the accommodation of [their] choice,

but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995)).  "[W]hen an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided[.]"  *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014) (cleaned up).

As *Brnovich* held, "courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision."  141 S. Ct. at 2339.  ADA regulations likewise state that a public entity must make its services, programs, or activities—"when viewed in [their] entirety"—"readily accessible" to disabled individuals.  28 C.F.R. § 35.150.

Because Georgia had *no* drop boxes before the 2020 emergency, the implication of Plaintiffs' claim is that the Georgia election system has always violated the ADA and Rehabilitation Act.  That cannot be right.

Voters with mobility impairments may face impediments to any mode of voting.  But those difficulties do not make the drop box provisions into ADA or Rehabilitation Act violations.  *See* AME PI Order at 17–18 [Doc. 615].  Voters with disabilities have access to drop boxes on the same basis as other voters.  Counties put drop boxes in "handicapped accessible" locations.  SOF ¶ 328 (N. Williams 30(b)(6) 258:10–24 (Ex. AA); K. Williams 30(b)(6) 65:13–18 (Ex.

LL)).  Voters returning absentee ballots to drop boxes do not have to wait in line with those seeking to vote in person.  *See* SOF ¶ 294 (ADAPT 30(b)(6) 2/20/23 31:8–17; 108:25–109:2 (Ex. CC)).  And all voters may return their completed absentee ballots by mail.

Perhaps recognizing that these undisputed facts foreclose their claims, Plaintiffs have identified transportation barriers as a burden for accessing drop boxes available only during early voting hours.  But transportation issues are not created "because of … disability," and it would be wrong to find a violation of Title II related to the drop boxes on that basis.  *See Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 232–33 (M.D.N.C. 2020).  Travel to a polling location is the quintessential "usual burden[] of voting." *Brnovich*, 141 S. Ct. at 2338.  Moreover, early voting is available for several weeks, including on certain Saturdays and an optional one or two Sundays. O.C.G.A.  § 21-2-385(d)(1).  And, for voters who struggle to obtain transportation, the U.S. mail is also available.  Voters with and without disabilities have the same options for participating in absentee voting, and the location and hours of drop box availability do not deny voters with disabilities meaningful access to the vote.

Plaintiffs have nevertheless asserted that having absentee ballot drop boxes inside and accessible only during early voting hours makes it "difficult or impossible" for voters with disabilities to access the drop boxes.  AME Pls.'

27

PI Br. at 16 [Doc. 546-1]. Yet each of Plaintiffs' witnesses was able to vote and, if they chose, to use a drop box. As Plaintiffs' expert Dr. Schur notes, every form of voting inherently creates burdens on voters with disabilities, *see* SOF ¶ 547 (Schur Rep. ¶¶ 72, 75, 83 [Doc. 546-3] (Ex. JJJJ)), but there is no evidence that the location and hours of absentee ballot drop boxes denies voters with disabilities *meaningful* access to absentee voting (much less voting generally) or limits their access.

Indeed, Plaintiffs' witnesses who experienced trouble personally accessing a drop box had alternative means of returning their ballot or assistance clearly available under the statute. For example, Mr. Halsell discussed how it took so long for him to walk to drop boxes in 2022. Halsell Decl. ¶¶ 7–10 [Doc. 546-14] (Ex. AAAAA). Yet under Georgia law, his nephew, who drove him to the drop box, could return the ballot for him. SOF ¶ 331 (*Id.* ¶ 8); *see* AME PI Order at 18 [Doc. 615]. Ms. Wiley similarly claims the room where the drop box was located at her polling location was too narrow for her son's powered wheelchair (an issue not fairly attributable to SB 202). Wiley Decl. ¶ 7 [Doc. 546-25] (Ex. BBBBB). But she could and did return her son's ballot. SUF ¶ 332 (*Id.*; AME PI Order at 18 [Doc. 615]). No part of SB 202 "prevent[ed] anyone from helping Papadopoulos open a mailbox so that he can mail his own ballot." SUF ¶ 333 (AME PI Order at 18 [Doc. 615]). And, while Ms. Chicoine prefers a drop box because she does not "trust the mail," Chicoine

28

Decl. ¶ 12 [Doc. 546-5] (Ex. J), her distrust of the mail does not create a violation of the ADA. *See Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1333 (N.D. Ga. 2017). Nor can SB 202 be charged with her negative experience using a drop box in October 2021—after a local election official moved the absentee ballot drop box further from the library's entrance. Chicoine Decl. ¶¶ 7–9 [Doc. 546-5] (Ex. J).

In short, as this Court has recognized, "[a] mere preference for one method of absentee voting over another is not enough to show a denial of meaningful access to absentee voting," AME PI Order at 18 [Doc. 615], much less voting generally. Plaintiffs cannot show that the drop box provisions make access to absentee voting so burdensome that they dissuade voters with disabilities from even trying to vote. *See* AME Pls.' PI Br. at 22 [Doc. 546-1].

Moreover, while Plaintiffs want absentee drop boxes placed outdoors and available 24 hours, they cannot provide any evidence on how many voters with disabilities used the absentee ballot drop boxes in 2020/2021 "after hours" or if any were prevented from voting absentee in 2022 due to the location and hours of the drop boxes. Schur 103:15–18 (Ex. UUU). Plaintiffs cannot even say how many drop boxes in 2020 were placed where a voter could drive up and put a ballot in the drop box. *See id.* at 75:16–25 (expert was aware only that some drop boxes were *not* accessible). Indoor and outdoor drop boxes "are not different at all." SOF ¶ 548 (Eveler 266:12–17 (Ex. T)). At most, "there may

29

have been some boxes that voters would have been able to deposit a ballot without leaving their car, but it was not a requirement." SOF ¶ 549 (K. Williams 3/1/23 65:19–25 (Ex. LL)). Yet, as Plaintiff's expert admitted, mailboxes are often accessible from a vehicle. SOF ¶ 338 (Burden 146:12–20 (Ex. HHH)).

Plaintiffs' core position is simply "the more options the better." Schur 77:17–18 (Ex. UUU); *see id.* at 225:19–22. However, as this Court has observed, AME PI Order at 20–21 [Doc. 615], Plaintiffs have not produced evidence that any denial of access was "by reason of" disability. Nothing in the State's first statutory authorization of drop boxes arose from a discriminatory motivation, or has a disparate impact upon persons with disabilities, or amounted to a failure to provide a reasonable accommodation. *See id.* Because Plaintiffs seek to invalidate the drop box provisions in full, rather than tailoring relief to persons with disabilities, they do not and cannot propose a reasonable modification. *See id.* at 23–25.

In short, the drop box provisions are lawful, and Plaintiffs cannot create any material issue of fact that could undermine that conclusion.

## II. Under the Undisputed Facts, the Mobile Facility Provision Is Lawful.

Plaintiffs also attack SB 202's limitations on fully mobile voting facilities, which were used for the first time in Georgia history by a single county in the 2020 elections to mitigate the effects of the COVID-19 pandemic.

SOF ¶ 339 (N. Williams 174:12–16 (Ex. AA); Germany 3/7 171:21–172:3 (Ex. HH)).  SB 202 allows mobile voting units, but only when needed in declared emergencies, SB 202 at 31:774–778 (Ex. A), a limit that is consistent with the requirement of specific advance notice of the location of a precinct.  *Id.*  at 30:741–757 (posted notice of change), 60:1525–1535 (notice of early-voting location).  Again, State Defendants are entitled to summary judgment in light of the absence of genuine dispute over any material fact that might sustain Plaintiffs' challenges.

## A.    The provision does not violate the Voting Rights Act.

Mobile voting units indisputably are "not widespread," SOF ¶ 341 (Kennedy Rep. 18 (Ex. FFFF)), and there is no consensus on whether they should be used.  Kennedy 99:10–100:21 (Ex. RRR).  As a result, the need for voters to rely on stationary polling places or mailboxes is a "usual burden[] of voting."  *Brnovich*, 141 S. Ct. at 2338.  The record does not reflect any use of mobile voting units anywhere when the Voting Rights Act was amended in 1982. *See id.* at 2338–39.  On the contrary, Plaintiffs' expert testified that they were first used in 2010.  SOF ¶ 340 (Kennedy Rep. 39 (Ex. FFFF)).  Limiting their use after they popped up during an emergency does not deny or abridge the right to vote.

Plaintiffs have not seriously disputed this conclusion.  Apart from a conclusory allegation that limiting mobile units will "unduly and especially

burden[] voters of color"—apparently based on the demographic makeup of Fulton County, [AME Am. Compl. ¶ 277, Doc. 83 (No. 21-cv-01284)]—Plaintiffs do not identify any disparate impact or burden imposed by limiting an optional system that one county used in an unusual election.  That is no "denial or abridgement of the right to vote on account of race."  *GBM*, 992 F.3d at 1329.

In addition, restricting the use of easily movable polling places to declared emergencies serves important government interests.  The prior understanding of the authority to use portable polling locations was as an emergency option.  Mashburn 3/14 48:5–12 (Ex. KK).  SB 202 makes this limitation explicit only as to "buses or other readily movable" facilities. O.C.G.A. § 21-2-266(b).  That limitation serves the government interest in uniformity, so that some counties don't have options unavailable to others.  *See* SOF ¶ 343 (Mashburn 3/14 39:12–19, 51:24–52:3, 195:10–19 (Ex. KK)).  And it serves the State's interests in the voter confidence and election integrity, by removing the opportunity for local election officials to direct mobile voting units to their politically preferred neighborhoods or constituencies.  *See* SOF ¶ 342 (*Id.* at 43:6–44:21).

In short, on the undisputed record here, this modest restriction does not violate the Voting Rights Act.

## B.    The provision does not violate the Constitution.

For related reasons, Plaintiffs' constitutional claims fail at the threshold.

Limiting the use of mobile voting units—never used in Georgia before the 2020 emergency—is not a cognizable burden on the right to vote. There are many other ways to vote in Georgia, ways that are available equally to all citizens rather than only to those targeted by a particular county election department.

Moreover, because the mobile facility provisions aren't severe, they can be justified by minimal government interests. And here, the State's compelling interests in orderly election administration, uniformity, precinct predictability, and voter confidence justify any slight burden on the right to vote by limits placed on an option that only one county has previously used in one election. *Common Cause*, 554 F.3d at 1354; *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020).

## C.    The provision does not violate the ADA or the Rehabilitation Act.

Plaintiffs' claims under the ADA and Rehabilitation Act founder for similar reasons. Declining to add a rare convenience like a mobile voting unit (MVU) does not deny anyone access to voting. And there is no evidence that such units were *ever* used for the benefit of voters with disabilities. On the contrary, the record shows that MVUs could not serve residential facilities for the elderly in 2020, SOF ¶ 335 (N. Williams 177:23–178:3, 178:22–25 (Ex. AA)), and that MVUs were *less* accessible to persons with disabilities than ADA-compliant stationary polling places. SOF ¶ 336 (*Id.* at 267:19–268:8). There is no evidence that MVUs increased turnout among people with disabilities.

33

SOF ¶ 337 (Schur 189:21–25 (Ex. UUU)).  And, as with Plaintiffs' other claims, strong government interests support this restriction on the use of drive-away polling places.  *See supra* 31–32.

As with Plaintiffs' drop box challenge, no evidence supports the "by reason of" factor required for a claim challenging SB 202's restriction on MVUs under the ADA and other disability laws.  *See supra* 26–29.  This limit is unrelated to persons with disabilities and does not disparately impact them.  And again, no reasonable modification is in play here.

Given the absence of genuine disputes over any material fact, summary judgment should be entered on these claims as well.

## CONCLUSION

All of Plaintiffs' claims because the undisputed material facts make clear that SB 202's drop box and mobile facility provisions do not burden anyone's right to vote.  Plaintiffs simply prefer more extensive access to two relatively novel means of voting, atop the many nondiscriminatory options available to Georgia voters.  But no law requires the State to fulfill Plaintiffs' wish list.

For all these reasons, summary judgment should be granted, and all claims addressing drop boxes and mobile voting units dismissed.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

_s/ Gene C. Schaerr_
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr