# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-mi-55555-JPB |

## INTERVENORS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Gilbert C. Dickey*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423

Tyler R. Green*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

*admitted pro hac vice

John E. Hall, Jr.
  Georgia Bar No. 319090
William Bradley Carver, Sr.
  Georgia Bar No. 115529
Baxter D. Drennon
  Georgia Bar No. 241446
HALL BOOTH SMITH, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303
(404) 954-5000
(404) 954-5020 (Fax)

*Counsel for Intervenors*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ...............................................................................1

LEGAL STANDARDS.........................................................................2

ARGUMENT ......................................................................................2

I.    Plaintiffs cannot show that the challenged laws unduly burden the right to vote.................................................................................2

    A.   There is no right to vote absentee. ......................................3

    B.   Plaintiffs cannot rely on idiosyncratic burdens on some voters. ......5

    C.   The State's significant interests justify any ordinary, minimal burdens of the challenged laws. ...........................................8

II.   Plaintiffs have no evidence of racial discrimination..............................11

    A.   Plaintiffs cannot show the legislature acted with racially discriminatory intent. ..........................................................12

    B.   Plaintiffs cannot show that S.B. 202 has a racially discriminatory impact. ........................................................14

    C.   S.B. 202 furthers many legitimate state interests..........................16

III.  Plaintiffs cannot prevail on their disability-discrimination claims. .....18

    A.   S.B. 202 does not exclude anyone from the activity of voting.........19

    B.   Plaintiffs cannot show that any exclusion was caused by their members' disability. ...........................................................21

IV.  The gift-giving ban is constitutional. .....................................................22

    A.   The gift-giving ban does not regulate expressive conduct. .............23

    B.   The gift-giving ban is not subject to strict scrutiny. ........................28

    C.  The gift-giving ban is narrowly tailored to protect voters and polling places.......................................................................32

V.  Plaintiffs cannot show a violation of the materiality provision of the Civil Rights Act. ...........................................................35

    A.  The materiality provision governs voter qualifications, not rules for casting a valid ballot.............................................35

    B.  The birthdate requirement doesn't deny anyone the right to vote.......................................................................................38

    C.  The materiality provision does not displace state law. ..................40

    D.  Plaintiffs have no evidence that the birthdate requirement discriminates on the basis of race.......................................42

CONCLUSION .......................................................................47

CERTIFICATE OF COMPLIANCE .......................................48

CERTIFICATE OF SERVICE..................................................48

## TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of People with Disabilities v. Harris,*
  647 F.3d 1093 (11th Cir. 2011) ..........................................................................20

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ............................................................... 3, 7, 11, 31

*Ball v. Chapman,*
  289 A.3d 1 (Pa. 2023) ..................................................................36

*BarNavon v. Brevard Cnty. Sch. Bd.,*
  290 F. App'x 273 (11th Cir. 2008) ..................................................24

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) ............................................................................24

*Bircoll v. Miami-Dade Cnty.,*
  480 F.3d 1072 (11th Cir. 2007) ......................................................22

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ...........................................................passim

*Brown v. Electrolux Home Prod., Inc.,*
  817 F.3d 1225 (11th Cir. 2016) ......................................................42

*Broyles v. Texas,*
  618 F. Supp. 2d 661 (S.D. Tex. 2009) .......................................... 43, 44

*Burdick v. Takushi,*
  504 U.S. 428 (1992) .................................................................. 3, 7, 9, 31

*Burns v. Town of Palm Beach,*
  999 F.3d 1317 (11th Cir. 2021) ......................................................24

*Burson v. Freeman,*
  504 U.S. 191 (1992) ...........................................................passim

*Citizens for Police Accountability Pol. Comm. v. Browning,*
  572 F.3d 1213 (11th Cir. 2009) ......................................................33

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ......................................................................44

*City of Mobile v. Bolden,*
  446 U.S. 55 (1980) ................................................................. 12, 45

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ......................................................................29

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ............................................................... 29, 30

*Common Cause v. Thomsen,*
  574 F. Supp. 3d 634 (W.D. Wis. 2021) ...........................................41

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ............................................... passim

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ......................................................... passim

*Czyzewski v. Jevic Holding Corp.,*
  580 U.S. 451 (2017) ....................................................................37

*D'Onofrio v. Costco Wholesale Corp.,*
  964 F.3d 1014 (11th Cir. 2020) ......................................................22

*Democratic Exec. Comm. of Fla. v. Lee,*
  915 F.3d 1312 (11th Cir. 2019) ......................................................10

*Democratic Party of Georgia, Inc. v. Crittenden,*
  347 F. Supp. 3d 1324 (N.D. Ga. 2018) ...........................................42

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council,*
  485 U.S. 568 (1988) ....................................................................45

*Feldman v. Ariz. Sec'y of State's Off.,*
  840 F.3d 1057 (9th Cir. 2016) ......................................................25

*First Vagabonds Church of God v. City of Orlando,*
  638 F.3d 756 (11th Cir. 2011) .................................................. 29, 30

*Fla. State Conf. of N.A.A.C.P. v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) .................................... 38, 42, 43, 45

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*
   (*Food Not Bombs I*), 901 F.3d 1235 (11th Cir. 2018) ........................ 25, 26, 27

*Frank v. Lee,*
   ___ F.4th ___, 2023 WL 6966156 (10th Cir. Oct. 23, 2023) ...........................34

*Friedman v. Snipes,*
   345 F. Supp. 2d 1356 (S.D. Fla. 2004) .............................................................37

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*
   (*Food Not Bombs II*), 11 F.4th 1266 (11th Cir. 2021) ...................................27

*Fulani v. Krivanek,*
   973 F.2d 1539 (11th Cir. 1992) .................................................................. 3, 10

*Ganstine v. Sec'y, Fla. Dep't of Corr.,*
   502 F. App'x 905 (11th Cir. 2012) ...................................................................19

*Gay Lesbian Bisexual All. v. Pryor,*
   110 F.3d 1543 (11th Cir. 1997) ................................................................. 27, 34

*Giboney v. Empire Storage & Ice Co.,*
   336 U.S. 490 (1949)............................................................................................24

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.,*
   992 F.3d 1299 (11th Cir. 2021) .................................................................passim

*Green v. Mortham,*
   155 F.3d 1332 (11th Cir. 1998) .........................................................................9

*Hand v. Scott,*
   888 F.3d 1206 (11th Cir. 2018) .......................................................................11

*Hodge v. Talkin,*
   799 F.3d 1145 (D.C. Cir. 2015) .......................................................................34

*Ind. Democratic Party v. Rokita,*
   458 F. Supp. 2d 775 (S.D. Ind. 2006) .............................................................43

*Jacobson v. Fla. Sec'y of State,*
   974 F.3d 1236 (11th Cir. 2020).............................................................. 6, 9, 31

*Jones v. Jessup*,
   615 S.E.2d 529 (Ga. 2005) ..................................................................41

*Karantsalis v. City of Miami Springs*,
   17 F.4th 1316 (11th Cir. 2021) ......................................... 19, 20, 21

*Kerrigan v. Phil. Bd. of Election*,
   No. 2:7-cv-687, 2008 WL 3562521 (E.D. Pa. Aug. 14) ............. 19, 21

*Knox v. Brnovich*,
   907 F.3d 1167 (9th Cir. 2018) ..........................................................26

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State* (*LWV II*),
   66 F.4th 905 (11th Cir. 2023) ................................................passim

*League of Women Voters of Fla. v. Lee*,
   595 F. Supp. 3d 1042 (N.D. Fla. 2022) ...........................................21

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* (*LWV I*),
   32 F.4th 1363 (11th Cir. 2022) ........................................................28

*Lichtenstein v. Hargett*,
   489 F. Supp. 3d 742 (M.D. Tenn. 2020) ...........................................24

*Martin v. Crittenden*,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018) .............................................41

*Mays v. LaRose*,
   951 F.3d 775 (6th Cir. 2020) ...............................................................4

*Mazo v. N.J. Sec'y of State*,
   54 F.4th 124 (3d Cir. 2022) ..............................................................11

*McDonald v. Bd. of Election Comm'rs of Chi.*,
   394 U.S. 802 (1969) ...................................................................... 4, 19

*Medina v. City of Cape Coral*,
   72 F. Supp. 3d 1274 (M.D. Fla. 2014) .............................................19

*Migliori v. Cohen*,
   36 F.4th 153 (3d Cir. 2022) ..............................................................46

*Minn. Voters All. v. Mansky,*
 138 S. Ct. 1876 (2018) ..................................................................... 25, 26, 33

*Nev. Comm'n on Ethics v. Carrigan,*
 564 U.S. 117 (2011)................................................................................25

*New Ga. Project v. Raffensperger,*
 976 F.3d 1278 (11th Cir. 2020) ..............................................................passim

*O'Brien v. Skinner,*
 414 U.S. 524 (1974).................................................................................5

*Org. for Black Struggle v. Ashcroft,*
 493 F. Supp. 3d 790 (W.D. Mo. 2020) .................................................42

*Org. for Black Struggle v. Ashcroft,*
 978 F.3d 603 (8th Cir. 2020) ....................................................................4

*Ossmann v. Meredith Corp.,*
 82 F.4th 1007 (11th Cir. 2023) .................................................................2

*People First of Ala. v. Merrill,*
 491 F. Supp. 3d 1076 (N.D. Ala. 2020) ..............................................22

*Pers. Adm'r of Mass. v. Feeney,*
 442 U.S. 256 (1979)...............................................................................12

*Purcell v. Gonzalez,*
 549 U.S. 1 (2006).....................................................................................8

*Ritter v. Migliori,*
 142 S. Ct. 1824 (2022) ...........................................................35, 38, 39, 40

*Ritter v. Migliori,*
 143 S. Ct. 297 (2022) .............................................................................46

*Rumsfeld v. FAIR,*
 547 U.S. 47 (2006)............................................................................. 23, 24

*Russell v. Lundergan-Grimes,*
 784 F.3d 1037, 1043 (6th Cir. 2015)..................................................34

*Santa Monica Food Not Bombs v. City of Santa Monica*,
   450 F.3d 1022 (9th Cir. 2006) ........................................................................27

*Schirmer v. Edwards*,
   2 F.3d 117 (5th Cir. 1993) ....................................................................... 32, 34

*Schwarz v. City of Treasure Island*,
   544 F.3d 1201 (11th Cir. 2008) ....................................................................21

*Schwier v. Cox*,
   340 F.3d 1284 (11th Cir. 2003) ....................................................................36

*Schwier v. Cox*,
   412 F. Supp. 2d 1266 (N.D. Ga. 2005) ..........................................................40

*Shelby Cnty. v. Holder*,
   570 U.S. 529 (2013).............................................................................. 44, 45

*Shotz v. Cates*,
   256 F.3d 1077 (11th Cir. 2001) ....................................................................20

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) .........................................................................11

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966)......................................................................................45

*Stein v. Ala. Sec'y of State*,
   774 F.3d 689 (11th Cir. 2014) ......................................................................31

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
   117 F.3d 1278 (11th Cir. 1997) ....................................................................22

*Tex. Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) ............................................................... 4, 5, 10

*Texas v. Johnson*,
   491 U.S. 397 (1989)......................................................................................24

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ................................................................................ 12, 17

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997)...................................................................... 3, 5, 31

*Todd v. Carstarphen*,
  236 F. Supp. 3d 1311 (N.D. Ga. 2017) ...........................................19

*Tully v. Okeson*,
  977 F.3d 608 (7th Cir. 2020) ...........................................................4

*UFCW v. City of Sidney*,
  364 F.3d 738 (6th Cir. 2004) .........................................................25

*United States v. Martinez*,
  736 F.3d 981 (11th Cir. 2013) .......................................................27

*United States v. Mississippi*,
  380 U.S. 128 (1965)................................................................. 43, 44

*United States v. O'Brien*,
  391 U.S. 367 (1968).......................................................................29

*United States v. Williams*,
  553 U.S. 285 (2008).......................................................................26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)................................................................. 13, 16

*Vote.Org v. Callanen*,
  39 F.4th 297 (5th Cir. 2022) ..................................................... 39, 40

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) .........................................................26

*Williams v. Rhodes*,
  393 U.S. 23 (1968).........................................................................11

*Wis. Legis. v. Wis. Elections Comm'n*,
  595 U.S. 398 (2022).......................................................................14

**Statutes**

29 U.S.C. §794 ..................................................................................21

42 U.S.C. §12132 ........................................................................ 18, 21

52 U.S.C. §10101 .......................................................................passim

Ga. Code §21-2-220 ...........................................................................20

Ga. Code §21-2-379.21 ......................................................................21

Ga. Code §21-2-380 ...................................................................... 1, 20

Ga. Code §21-2-381 ...........................................................................20

Ga. Code §21-2-382 ...................................................................... 1, 20

Ga. Code §21-2-385 .....................................................................passim

Ga. Code §21-2-386 .................................................................... 41, 42

Ga. Code §21-2-403 ...................................................................... 1, 20

Ga. Code §21-2-409 ...........................................................................21

Ga. Code §21-2-409.1 ........................................................................21

Ga. Code §21-2-414 ...........................................................................23

Ga. Code §21-2-431 ...........................................................................22

Ga. Code §21-2-451 ...........................................................................22

Ga. Code §21-2-452 ...........................................................................21

**Rules**

Fed. R. Civ. P. 56 ................................................................................2

**Regulations**

28 C.F.R. §35.130 ..............................................................................19

45 C.F.R. §84.4 ..................................................................................19

## INTRODUCTION

Georgia makes it easy for its citizens to vote. Georgians can vote in person on election day from at least 7:00 AM to 7:00 PM, and later if the poll hours are extended. Ga. Code §21-2-403. They can vote early in person for at least a month before election day. *See id.* §21-2-385(d)(1). All Georgians can vote early by absentee ballot with no excuse, and they can submit that ballot by mailing it, delivering it to the county registrar or absentee ballot clerk, or dropping it in one of the designated drop boxes. *Id.* §§21-2-380, 21-2-385. S.B. 202 requires counties to have those drop boxes. *Id.* §21-2-382(c)(1).

Despite these and other easy-to-follow election procedures, Plaintiffs claim that Georgia burdens the right of its citizens to vote. It doesn't. Plaintiffs say those burdens are discriminatory. They aren't. Most of their claims fail as a matter of law because Plaintiffs complain of nothing more than the "usual burdens of voting." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2344 (2021). But "voting necessarily requires some effort and compliance with some rules" such as filling out ballots, meeting deadlines, and traveling to polls. *Id.* at 2338. These ordinary burdens do not violate federal law.

Moreover, courts cannot analyze a voting provision or effect in isolation. That principle applies throughout this case, from the due process claims to the disability discrimination claims. This Court must instead look to Georgia's entire scheme. And Georgia provides endless exemptions, accommodations, and options even for those rules, even for its minimally burdensome rules. Courts must also credit a State's many "strong" interests in election regulation.

*Id.* at 2340. S.B. 202 is supported by many of those interests, which are sufficient to justify any relatively minimal burdens they impose.

Intervenors join the State Defendants' summary judgment arguments on the merits and the supporting statement of facts. This brief calls attention to some of the dispositive legal issues that warrant summary judgment.

## LEGAL STANDARDS

In election cases, "[i]t is irrefutable that a motion for summary judgment can—and should—be granted when the conditions of Rule 56 are met." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021) (affirming the district court's summary judgment ruling in favor of the State). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only "reasonable inferences" must be drawn in favor of the nonmoving party. *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1013-14 (11th Cir. 2023). And where, as here, many of the parties' disputes are about "the materiality and relevance of various facts," resolution on summary judgment is appropriate. *Greater Birmingham Ministries*, 992 F.3d at 1317.

## ARGUMENT

### I. Plaintiffs cannot show that the challenged laws unduly burden the right to vote.

Plaintiffs did not include their *Anderson-Burdick* claims in their five preliminary injunction motions, and for good reason: they cannot show that S.B. 202 burdens the right to vote, or that the State lacks legitimate interests in passing and enforcing those provisions.

The *Anderson-Burdick* test requires courts to "weigh the 'character and magnitude of the burden the State's rule imposes' on the right to vote 'against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.'" *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). Only regulations that impose "severe" burdens must be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But as is most often the case, election regulations that are "reasonable, nondiscriminatory restrictions" and impose minimal burdens are justified by "the State's important regulatory interests." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). "The approach used by the *Anderson* Court can be described as a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending on the circumstances." *Fulani v. Krivanek*, 973 F.2d 1539, 1543 (11th Cir. 1992). Plaintiffs' *Anderson-Burdick* claims fall on the rational-basis side of that range, and they fail for at least three reasons.

### A.   There is no right to vote absentee.

Many of the challenged provisions regulate only absentee voting—either by mail or early in person.[1] But for the bulk of our history, States provided nearly all voters with only one method of voting: in person on election day. *Brnovich*, 141 S. Ct. at 2339. That history confirms "there is no constitutional

---

[1] Those provisions include ID requirements for casting and requesting absentee ballots; drop box regulations; the early-voting timeline for runoff elections; the time to return absentee ballots; the ban on election officials distributing absentee ballot applications; and restrictions on election officials returning absentee ballot applications. *See* AME 1st Am. Compl., Doc. 83 at 119-22, No. 1:21-cv-1284; NGP 1st Am. Compl., Doc. 39 at 53-56, No. 1:21-cv-1229; AAAJ Compl., Doc. 27 at 42-44, No. 1:21-cv-1333.

right to an absentee ballot." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020); *see also Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) ("As other courts have stated, 'as long as the state allows voting in person, there is no constitutional right to vote by mail.'" (collecting cases)). When plaintiffs challenge absentee voting procedures under *Anderson-Burdick*, "[i]t is thus not the right to vote that is at stake … but a claimed right to receive absentee ballots" and cast them according to personal preferences. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969); *see also Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020) ("[T]he Supreme Court told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot….").

And because in-person voting remains fully available, "the right to vote is not 'at stake.'" *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 807). "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots," which means that regulations on absentee voting (such as "Georgia's Election Day deadline") do "not implicate the right to vote at all." *New Ga. Project*, 976 F.3d at 1281. In-person voting in Georgia is far easier now than it was at the height of the COVID pandemic in 2020, when the Eleventh Circuit rejected a nearly identical *Anderson-Burdick* challenge to Georgia's absentee ballot procedures. *Id.* (describing the "numerous avenues" Georgia provides "to mitigate chances that voters will be unable to cast their ballots").

S.B. 202 did not eliminate in-person voting, or even make it meaningfully more difficult. Indeed, when denying Plaintiffs' preliminary injunction motion

4

based on disability claims, the Court found that Plaintiffs' members with even the most limited voting options "each had alternative ways to return their ballots." Doc. 615 at 18. That's fatal to Plaintiffs' claims against absentee procedures, as many "avenues" to vote "remain open to any and all voters." *New Ga. Project*, 976 F.3d at 1281. Plaintiffs again suffer "[t]he very same 'failure[s] of proof,'" as "there is no evidence that [Georgia] has prevented the plaintiffs from voting by all other means." *Tex. Democratic Party*, 961 F.3d at 404 (second alteration in original) (quoting *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974)).

In sum, S.B. 202's regulations of absentee voting are not burdens on the right to vote, much less *undue burdens*. Since voters in Georgia have a variety of voting options, the absentee-voting regulations do "not implicate the right to vote at all." *New Ga. Project*, 976 F.3d at 1281. That means "a compelling state interest is not required," and "Georgia's regulatory interest is more than enough" to justify its "reasonable" regulations of the absentee voting process. *Id.* at 1282 (citing *Timmons*, 520 U.S. at 359). The Court should thus grant summary judgment in favor of Defendants on the claims that Georgia's absentee voting procedures unduly burden the right to vote.[2]

## B. Plaintiffs cannot rely on idiosyncratic burdens on some voters.

Plaintiffs' undue-burden claims fail for another, independent reason: they rely on idiosyncratic burdens to certain voters, not categorical burdens on "the right to vote." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1262 (11th

---

[2] *See* AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 3); NGP 1st Am. Compl., Doc. 39, No. 1:21-cv-1229 (Count 1); AAAJ Compl., Doc. 27, No. 1:21-cv-1333 (Count 3).

Cir. 2020). The Court must "identify a burden before [the Court] can weigh it." *Id.* at 1261 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring)). For Plaintiffs to prevail, the burden must impose a "significant increase over the usual burdens of voting" for "most voters." *Crawford*, 553 U.S. at 198 (plurality op.). But many of the burdens that Plaintiffs assert are "irrelevant" because they are "'special burden[s] on' some voters," not categorical burdens on all voters. *Id.* at 204 (Scalia, J., concurring) (citation omitted).

*First*, many of the challenged provisions regulate election officials, not voters.[3] *Cf. id.* at 198 (plurality op.) (photo-ID law); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1345 (11th Cir. 2009) (same). They also don't limit "access to the ballot" or the "ability to freely associate with voters and candidates," nor do they "create the risk that some votes will go uncounted or be improperly counted." *Jacobson*, 974 F.3d at 1261-62 (collecting cases). In other words, what Plaintiffs "view as the law's several light and heavy burdens are no more than the different *impacts*" of the uniform regulations of election procedures. *Crawford*, 553 U.S. at 205 (Scalia, J., concurring). "There is no doubt that the [Georgia] election laws, like all election regulations, have an *impact* on the right to vote," but the laws Plaintiffs challenge do not "unconstitutionally limit access to the ballot by party or independent

---

[3] Those provisions include restrictions on election officials distributing and returning absentee ballot applications; the elimination of mobile voting units; the powers of the State Election Board; and the regulations of drop boxes require nothing of voters. *See* AME 1st Am. Compl., Doc. 83 at 119-22, No. 1:21-cv-1284; NGP 1st Am. Compl., Doc. 39 at 53-56, No. 1:21-cv-1229; AAAJ 1st Am. Compl., Doc. 27 at 42-44, No. 1:21-cv-1333; NAACP 1st Am. Compl., Doc. 35 at 70-72, 76-79, No. 1:21-cv-1259; CBC Compl., Doc. 1. at 57-59, No. 1:21-cv-1728.

candidates or unreasonably interfere with the right of voters to associate and have candidates of their choice placed on the ballot." *Burdick*, 504 U.S. at 434 (emphasis added).

*Second*, of the provisions that arguably apply to Plaintiffs' conduct,[4] Plaintiffs rely on evidence of idiosyncratic circumstances of certain voters, not categorical burdens on the right to vote. But what Plaintiffs must show—yet cannot—is that "the statute's broad application to *all* [Georgia] voters" unconstitutionally burdens their right to vote. *Crawford*, 553 U.S. at 202-03 (plurality op.) (emphasis added). The Court rejected the claims in *Burdick* for the same deficiency, upholding "Hawaii's prohibition on write-in voting despite the fact that it prevented a significant number of 'voters from participating in Hawaii elections in a meaningful manner.'" *Id.* at 190 (quoting *Burdick*, 504 U.S. at 443 (Kennedy, J., dissenting)); *see also New Ga. Project*, 976 F.3d at 1281 ("[I]t is just not enough to conclude that if some ballots are likely to be rejected because of a rule, 'the burden on many voters will be severe.'"). Likewise, "[t]he ordinary burdens of producing a photo identification to vote, which the Supreme Court described as 'arising from life's vagaries,' do not 'raise any question about the constitutionality of' the Georgia statute." *Common Cause/Ga.*, 554 F.3d at 1354 (quoting *Crawford*, 553 U.S. at 197). So, too, ballot deadlines "impose[] only a reasonable burden even on absentee

---

[4] These include ID requirements for requesting and casting absentee ballots, the early voting timeline for runoff elections, the gift-giving prohibition, restrictions on counting out-of-precinct provisional ballots, the time to return absentee ballot, and unlimited voter challenges. *See* AME 1st Am. Compl., Doc. 83 at 119-22, No. 1:21-cv-1284; NGP 1st Am. Compl., Doc. 39 at 53-56, No. 1:21-cv-1229; AAAJ Compl., Doc. 27 at 42-44, No. 1:21-cv-1333; NAACP Compl., Doc. 35 at 70-72, 76-79, No. 1:21-cv-1259; CBC Compl., Doc. 1. at 57-59, No. 1:21-cv-1728.

voters" who face unusual circumstances, such as those "who receive their ballots later than usual." *New Ga. Project*, 976 F.3d at 1282. In other words, Plaintiffs' claim is not that S.B. 202 burdens voters, but that S.B. 202 doesn't adequately remedy certain unusual difficulties some voters might face. The *Anderson-Burdick* standard does not demand such perfection.

### C. The State's significant interests justify any ordinary, minimal burdens of the challenged laws.

Even if Plaintiffs had evidence that S.B. 202 categorically burdens the right to vote of all Georgians, those minimal burdens are justified by the State's many legitimate interests. Plaintiffs challenge "neutral, nondiscriminatory regulation[s]" of the voting process, *Crawford*, 553 U.S. at 203, under which "[v]oters must simply take reasonable steps and exert some effort," *New Ga. Project*, 976 F.3d at 1282. Plaintiffs cannot show that minimal effort is unjustified by the State's interests.

To begin, "Georgia [has] invoked weighty interests" justifying S.B. 202. *Common Cause/Ga.*, 554 F.3d at 1353. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). Security measures such as "photo identification" are "designed to curb voting fraud" as well as "serve[] the related interests of correcting the maladministration of voter rolls and promoting voter confidence." *Common Cause/Ga.*, 554 F.3d at 1353 (citation omitted). The State need not present evidence that a given provision "is an effective remedy," as States can take prophylactic measures "in detecting and deterring voter fraud." *Id*. The State also has interests in "conducting an efficient election, maintaining order, [and] quickly certifying election results." *New Ga. Project*,

976 F.3d at 1282. Georgia's interests "need not be 'compelling.'" *Common Cause/Ga.*, 554 F.3d at 1354 (quoting *Burdick*, 504 U.S. at 439). But they are anyway. *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) ("The states' compelling interests include maintaining fairness, honesty, and order, minimizing frivolous candidacies, and 'avoiding confusion, deception, and even frustration of the democratic process.'" (citations omitted)).

These compelling interests are "more than enough" to justify any burdens of the provisions. *New Ga. Project*, 976 F.3d at 1282. The Eleventh Circuit has already rejected claims that ID requirements and ballot deadlines impose significant burdens on Georgian voters. *Id.*; *Common Cause/Ga.*, 554 F.3d at 1353. Plaintiffs fare no better. Indeed, given the "slightness of their burden," it's no surprise these cases often begin by questioning whether Plaintiffs suffer any injury at all. *Common Cause/Ga.*, 554 F.3d at 1351; *e.g.*, *Jacobson*, 974 F.3d at 1246 (holding that the plaintiff lacked standing because she "failed to identify any difficulty in voting for her preferred candidate or otherwise participating in the political process"). To the extent Plaintiffs can show an injury, the provisions they challenge impose nothing more than the "ordinary burdens" of voting, "which the Supreme Court described as 'arising from life's vagaries,' [and] do not 'raise any question about the constitutionality of' the Georgia statute." *Common Cause/Ga.*, 554 F.3d at 1354 (quoting *Crawford*, 553 U.S. at 197). And at the end of the day, "the availability of the right to cast a provisional ballot provides an adequate remedy" for many of the unforeseeable difficulties voters might face. *Crawford*, 553 U.S. at 197-98.

\*     \*     \*

9

In the "range[] from strict scrutiny to a rational-basis analysis" under *Anderson-Burdick*, the provisions Plaintiffs challenge are subject to nothing more stringent than rational basis. *Fulani*, 973 F.2d at 1543. The absentee provisions do "not implicate the right to vote at all," *New Ga. Project*, 976 F.3d at 1281, and thus require only a "rational basis," *Tex. Democratic Party*, 961 F.3d at 406. Even if the absentee provisions did implicate the right to vote, Plaintiffs cannot show those or the other provisions impose a "significant increase over the usual burdens of voting" for "most voters," rather than circumstantial difficulties for "some" voters. *Crawford*, 553 U.S. at 198. And even if they could show that, Plaintiffs cannot show that those minimal burdens are unjustified by the State's "weighty interests." *Common Cause/Ga.*, 554 F.3d at 1353. Plaintiffs cannot prevail on their claims that any provision of S.B. 202 unconstitutionally burdens the right to vote. The Court should thus grant summary judgment in favor of Defendants on those claims.[5]

In addition to their *Anderson-Burdick* claims, the NGP Plaintiffs allege that S.B. 202 violates the First Amendment because it was "enacted … with the purpose of restricting … voters' ability to cast ballots for their preferred candidates in future elections on the basis of their viewpoint." NGP 1st Am. Compl., Doc. 39 at 61, No. 1:21-cv-1229. But that's just an *Anderson-Burdick* claim, restated. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (applying *Anderson-Burdick* to the "First Amendment right 'to associate for the advancement of political beliefs'" (quoting *Williams v. Rhodes*,

---

[5] AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 3); NGP 1st Am. Compl., Doc. 39, No. 1:21-cv-1229 (Counts 1 and 3); AAAJ 1st Am. Compl., Doc. 27, No. 1:21-cv-1333 (Count 3); NAACP 1st Am. Compl., Doc. 35, No. 1:21-cv-1259 (Count 3); CBC Compl., Doc. 1, No. 1:21-cv-1728 (Count 4).

10

393 U.S. 23, 30-31 (1968))). "[T]he First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment." *Hand v. Scott*, 888 F.3d 1206, 1211 (11th Cir. 2018). And to the extent the claim rests on allegations of discrimination, the *Anderson-Burdick* test already takes that into account. *Anderson*, 460 U.S. at 788. The Court should thus analyze the NGP Plaintiffs' viewpoint discrimination claim under *Anderson-Burdick*, as other courts have. *E.g.*, *Mazo v. N.J. Sec'y of State*, 54 F.4th 124 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, No. 22-1033, 2023 WL 6377826 (U.S. Oct. 2, 2023); *Soltysik v. Padilla*, 910 F.3d 438, 449 (9th Cir. 2018). Under that standard, their claim fails.

## II.    Plaintiffs have no evidence of racial discrimination.

The bulk of Plaintiffs' claims allege that certain provisions of S.B. 202 discriminate on the basis of race.[6] The Court ruled that Plaintiffs are unlikely to prevail on their claims that the Georgia Legislature acted with discriminatory intent in passing key provisions of S.B. 202. *See* Doc. 686. In rejecting Plaintiffs' preliminary injunction motion, the Court also explained why those provisions do not have a racially discriminatory impact. Plaintiffs

---

[6] Those provisions include the elimination of mobile voting units; ID requirements for requesting and casting absentee ballots; drop box regulations; the time to request and return absentee ballots; the early-voting timeline for runoff elections; the line-warming ban; restrictions on counting out-of-precinct provisional ballots; the ban on election officials distributing absentee ballot applications; restrictions on distributing prefilled absentee ballot applications; local discretion on early voting hours; the independence and powers of the State Election Board; unlimited voter challenges; fines for third-parties distributing duplicate absentee ballot applications; and criminal penalties for ballot harvesting. *See* DOJ Compl., Doc. 1 at 42-44, No. 1:21-cv-2575; AME 1st Am. Compl., Doc. 83 at 119-21, No. 1:21-cv-1284; NGP 1st Am. Compl., Doc. 39 at 57-60, No. 1:21-cv-1229; AAAJ 1st Am. Compl., Doc. 27 at 39-42, No. 1:21-cv-1333; NAACP 1st Am. Compl., Doc. 35 at 67-76, No. 1:21-cv-1259; CBC Compl., Doc. 1 at 53-56, No. 1:21-cv-1728.

presented their best evidence in that motion, and it failed to show even a hint of racial discrimination. Their discrimination claims fail.

### A. Plaintiffs cannot show the legislature acted with racially discriminatory intent.

To prevail on their Constitutional claims and Section 2 intent claims (to the extent their Section 2 intent claims are cognizable[7]), Plaintiffs must show, among other things, that the challenged provisions were enacted with a discriminatory intent. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State* (*LWV II*), 66 F.4th 905, 922 (11th Cir. 2023). This showing requires "more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs must prove that the Georgia Legislature enacted the challenged provisions "because of" their discriminatory effect. *Id*. To do this, they must overcome the presumption that the Georgia Legislature acted in good faith when it passed S.B. 202. *See Greater Birmingham Ministries*, 992 F.3d at 1325-26. That presumption still applies at summary judgment, notwithstanding the general rule that reasonable inferences are drawn in favor of the nonmoving party. *See id.*

"From the start, the district court erred" in *League of Women Voters* by relying on the State's history of racial discrimination. *LWV II*, 66 F.4th at 923. That's because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980), *superseded by statute on other grounds as stated in Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). The "old, outdated intentions of previous generations" cannot ban Georgia's "legislature from ever enacting

---

[7] *See* Doc. 549 (motion for judgment on the pleadings).

otherwise constitutional laws about voting." *Greater Birmingham Ministries*, 992 F.3d at 1325. Instead, the Court must presume the legislature acted in good faith "even in the light of 'a finding of past discrimination.'" *LWV II*, 66 F.4th at 923 (citation omitted).

Georgia's outdated history is no more relevant under the *Arlington Heights* factors. That test does not provide "an unlimited look-back to past discrimination." *Greater Birmingham Ministries*, 992 F.3d at 1325. Rather, the *Arlington Heights* analysis must focus on the "specific sequence of events leading up to the challenged decision." *Id.* (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). Plaintiffs can't smuggle in outdated history through socioeconomic evidence, either. *LWV II*, 66 F.4th at 923 ("Evidence of historical discrimination imported through socioeconomic data is no exception" to the rule that courts cannot rely on a State's outdated history). Socioeconomic differences might result in "predictable disparities in rates of voting and noncompliance with voting rules," but that "does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Brnovich*, 141 S. Ct. at 2339.

For these reasons, the Court has already rejected Plaintiffs' best attempts at proving intent. Their expert Dr. Carol Anderson inappropriately focuses on Georgia's "distant history." Doc. 686 at 44-45 n.21 (quoting *LWV II*, 66 F.4th at 923). As for the events leading up to S.B. 202 itself, there were no "significant departures from the normal procedure." Doc. 686 at 50. Plaintiffs have been unable to point to statements by individual legislators that suggest racial animus. *See* Doc. 686 at 51-53. Even if they could, such statements are

poor evidence of the intent of the entire legislature. *Greater Birmingham Ministries*, 992 F.3d at 1324-25. And the statements of non-legislators such as Rudy Giuliani have "even less probative value." Doc. 686 at 46 n.23. Plaintiffs' caricatured evidence of "racially-tinged" comments, "partisan motives," or "far-fetched allegations of ballot collection fraud," are likewise not enough to condemn the law. *Brnovich*, 141 S. Ct. at 2349-50. In the end, Plaintiffs' evidence does not overcome the presumption of legislative good faith, so Defendants are entitled to summary judgment. *Greater Birmingham Ministries*, 992 F.3d at 1325-26.

### B. Plaintiffs cannot show that S.B. 202 has a racially discriminatory impact.

To prevail on their Constitutional and Section 2 claims, Plaintiffs must show, among other things, that the challenged provisions resulted in a racially discriminatory impact. *See LWV II*, 66 F.4th at 922, 942-43. Under Section 2, Plaintiffs must show that "because of" certain provisions of S.B. 202, "political processes leading to ... election in [Georgia] ... are not equally open to" certain races "in that [they] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022) (quoting 52 U.S.C. §10301(b)). Merely showing "disparate inconveniences," "statistical disparities," and "disparate outcome[s]" is not enough. *Greater Birmingham Ministries*, 992 F.3d at 1330 (citations omitted). Section 2 "requires a causal connection between the challenged regulation and the disparate impact" to show that the challenged laws "resulted in" the abridgement of the right to

vote and that the abridgement was "on account of race or color." *Id*. Plaintiffs can't satisfy that "high standard." *LWV II*, 66 F.4th at 943.

*First*, many of Plaintiffs' claimed burdens "are quintessential examples of the usual burdens of voting." *Brnovich*, 141 S. Ct. at 2344. For example, even if "some counties will offer fewer drop boxes in the future," Doc. 686 at 32, the resulting burden, if any, is merely "some travel" to a mailbox, polling place, or different drop box. *Brnovich*, 141 S. Ct. at 2338. But "[m]aking any of these trips … falls squarely within the heartland of the 'usual burdens of voting'" that cannot support a Section 2 violation. *Id*. at 2346 (quoting *Crawford*, 553 U.S. at 198). The provisions Plaintiffs challenge impose at most "modest burdens," particularly when viewed alongside the many "easy ways to vote." *Id*. at 2344, 2346. "[T]he size of the burden imposed by a challenged voting rule is highly relevant" to a Section 2 claim, and the Supreme Court has already characterized many of the burdens that Plaintiffs claim here as "modest" and "unremarkable." *Id*. at 2338.

*Second*, even if Plaintiffs faced more than "the usual burdens of voting," *id*. at 2344, this Court has already recognized that Plaintiffs' best evidence of disparate burdens is not enough. Plaintiffs' cherry-picked evidence from individual counties is not "representative of voter behavior across the State." *LWV II*, 66 F.4th at 933; *see also* Doc. 686 at 33 (doubting that "evidence from only three Georgia counties is sufficient to support a finding of disparate impact"). And minute "statistical differences of 0.1%, 2%, 2% and 4%" are also not "statistically significant enough" to support a finding of discrimination. Doc. 686 at 33-34; *see also LWV II*, 66 F.4th at 935. Finally, that some races

15

disproportionately use certain services (such as absentee voting) does not "necessarily mean[] that black voters will be disparately impacted by a provision" governing those services. Doc. 686 at 36. Plaintiffs' evidence suffers from the same flaws that doomed similar claims in Alabama, Arizona, and Florida. They thus cannot demonstrate that Georgia's "political processes are not equally open." *Brnovich*, 141 S. Ct. at 2345.

### C.   S.B. 202 furthers many legitimate state interests.

Finally, Plaintiffs cannot rebut the many legitimate justifications for S.B. 202. *See Arlington Heights*, 429 U.S. at 271. Section 1 of S.B. 202 lays out extensive legislative findings and purposes that courts have repeatedly found are legitimate. Many of those justifications require no evidence and are compelling as a matter of law. Among them, a State's "interests in modernizing election procedures, combating voter fraud, and protecting public confidence in the integrity of the electoral process are legitimate." *Greater Birmingham Ministries*, 992 F.3d at 1320. Indeed, the "the prevention of fraud" is a particularly "strong" interest because, among other things, fraud can "undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich*, 141 S. Ct. at 2340. Even "the appearance of fraud" can damage the democratic process. Doc. 686 at 46. And because "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders," Georgia doesn't need evidence of fraud to justify its interests in preventing it. *Brnovich*, 141 S. Ct. at 2348.

In any event, the "prevention of fraud is not the only legitimate interest served by" S.B. 202. *Id.* "[P]rotecting voter privacy is also a valid state

interest," as is "preserving order at polling places." *LWV II*, 66 F.4th at 929-30. Georgia's interests in passing S.B. 202 are "strong" as a matter of law. *Brnovich*, 141 S. Ct. at 2340; *see also supra* Section I.C. And "[r]ules that are supported by strong state interests are less likely to violate § 2." *Brnovich*, 141 S. Ct. at 2340.

*    *    *

Plaintiffs cannot prevail on their claims that S.B. 202 discriminates on the basis of race. The Court should thus grant summary judgment in favor of Defendants on Plaintiffs' claims alleging racial discrimination under the Constitution[8] and the Voting Rights Act.[9]

To the extent Plaintiffs bring Section 2 vote-dilution claims,[10] those also fail. To prevail under a vote-dilution claim under *Thornburg v. Gingles*, 478 U.S. 30 (1986), Plaintiffs "must first show the existence of three preconditions for multimember districts to impair minority voting": (1) geographical compactness and numerosity, (2) political cohesiveness, and (3) racially polarized voting. *Greater Birmingham Ministries*, 992 F.3d at 1331. Even if they could meet those preconditions, Plaintiffs must then show that the

---

[8] AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 2); AAAJ 1st Am. Compl., Doc. 27, No. 1:21-cv-1333 (Count 2); NAACP 1st Am. Compl., Doc. 35, No. 1:21-cv-1259 (Count 1); CBC Compl., Doc. 1, No. 1:21-cv-1728 (Counts 2 & 3).

[9] DOJ Compl., Doc. 1, No. 1:21-cv-2575 (Count 1); AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 1); NGP 1st Am. Compl., Doc. 39, No. 1:21-cv-1229 (Count 2); AAAJ 1st Am. Compl., Doc. 27, No. 1:21-cv-1333 (Count 1); NAACP 1st Am. Compl., Doc. 35, No. 1:21-cv-1259 (Counts 1 & 2); CBC Compl., Doc. 1, No. 1:21-cv-1728 (Count 1).

[10] *See* AME 1st Am. Compl., Doc. 83 at 67, No. 1:21-cv-1284; NGP 1st Am. Compl., Doc. 39 at 58-59, No. 1:21-cv-1229; AAAJ 1st Am. Compl., Doc. 27 at 39-40, No. 1:21-cv-1333; NAACP 1st Am. Compl., Doc. 35 at 74, No. 1:21-cv-1259; CBC Compl., Doc. 1 at 54, No. 1:21-cv-1728.

*Gingles* factors weigh in their favor. The problem for Plaintiffs is that "the *Gingles* factors are inapplicable" to claims that voting procedures result in a "denial" of the right to vote. *Id.* at 1332. As in *Greater Birmingham*, "the *Gingles* factors themselves bear no resemblance to the facts of this case." *Id.* To the extent Plaintiffs rely on them, the Court should reject those arguments. "[E]ven if the *Gingles* factors did apply," they rely on much of the same failed arguments and evidence as Plaintiffs' vote-denial claims, and thus do not show "that minority voters … had 'less opportunity than other members of the electorate to participate in the political process.'" *Id.* at 1334 (quoting 52 U.S.C. §10301(b)).

### III.   Plaintiffs cannot prevail on their disability-discrimination claims.

This Court concluded that Plaintiffs are unlikely to prevail on their claims that S.B. 202's third-party assistance provision and drop box regulations discriminate against disabled voters. Doc. 615. Plaintiffs have no better evidence on their other disability-related claims. The Court should thus dismiss their claims that certain provisions of S.B. 202 violate the Americans with Disabilities Act (ADA) and the Rehabilitation Act.[11]

S.B. 202 does not "exclude[]" disabled persons from the "activity[]" of voting "by reason of [their] disability." 42 U.S.C. §12132. A plaintiff claiming an ADA or Rehabilitation Act violation must show "(1) that he is a qualified

---

[11] Those provisions include the time to request absentee ballots; ID requirements for requesting and casting absentee ballots; restrictions on counting out-of-precinct provisional ballots; criminal penalties on ballot harvesting; and drop box regulations. *See* AME 1st Am. Compl., Doc. 83 at 124-30, No. 1:21-cv-1284 (Counts 5 and 6); CBC Compl., Doc. 1 at 60-62, No. 1:21-cv-1728 (Count 6).

individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, activities, or otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021) (citation omitted). Plaintiffs cannot show either that they were excluded from voting or that any exclusion was caused by their disability.

### A.   S.B. 202 does not exclude anyone from the activity of voting.

Absentee voting is an accommodation that "make[s] voting more available to some groups who cannot easily get to the polls." *McDonald*, 394 U.S. at 807-08. The ADA does not mandate the use of any particular technology or any specific accommodation, so long as every individual has "an opportunity to participate in or benefit from the aid, benefit, or service … equal to that afforded others." 28 C.F.R. §35.130(b)(1)(ii)-(iii); *see also* 45 C.F.R. §84.4(b)(1)(ii)-(iii).

Said differently, Plaintiffs must show that they lack "meaningful access" to Georgia's voting system. *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1328 (N.D. Ga. 2017). But "meaningful access does not mean 'equal access' or preferential treatment." *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1279 (M.D. Fla. 2014) (cleaned up); *accord Ganstine v. Sec'y, Fla. Dep't of Corr.*, 502 F. App'x 905, 910 (11th Cir. 2012). It also doesn't mean access to a preferred method of voting—courts evaluate a jurisdiction's "entire program of voting," which includes "all of its polling locations … as well as its alternative and absentee ballot programs." *Kerrigan v. Phil. Bd. of Election*, No. 2:7-cv-

19

687, 2008 WL 3562521, at *11-13 (E.D. Pa. Aug. 14) (citing 28 C.F.R. §35.150 and cases); *accord Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1107 (11th Cir. 2011) (voting machines and polling facilities are part of a county's "voting program").

Georgia provides ample opportunity for its citizens (disabled or not) to vote. Georgians have twelve hours (or more) to vote on election day. Ga. Code §21-2-403. They can vote early in person for at least a month before that. *Id.* §21-2-385(d)(1). They can vote early by absentee ballot, and they can submit that ballot by mail, delivery, or the now-required drop box. *Id.* §§21-2-380, 21-2-385, 21-2-382(c)(1). A voter who requires assistance can "receive assistance in preparing his or her ballot from any person of the elector's choice," other than the elector's employer, union, or agents of either. *Id.* §21-2-385(b). Friends and family can help disabled voters register, apply for a mail ballot, assemble the necessary documents, prepare their ballot, and mail or drop off their ballot. *Id.* §§21-2-220(f), 21-2-381(a)(1), 21-2-385(a)-(b).

"[W]hen viewed in [their] entirety," these options make voting "readily accessible" to disabled voters, who can vote at a time and in a manner that is convenient to them. *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001). Plaintiffs cannot show that Georgia's many options "exclude[]" anyone "from participation in" the voting process. *Karantsalis*, 17 F.4th at 1322. This Court rejected Plaintiffs' preliminary injunction motion in part because "absentee voting remains readily accessible through alternative, feasible methods of returning absentee ballots." Doc. 615 at 18. The law hasn't changed. Those options remain just as accessible now as they were then, so Plaintiffs' claims

fail as a matter of law. Indeed, where even "absentee voting remains readily accessible," Doc. 615 at 18, Plaintiffs are far from being able to show that they lack access to the State's "entire program of voting," *Kerrigan*, 2008 WL 3562521, at *11-13. Their disability claims fail as a matter of law.

## B. Plaintiffs cannot show that any exclusion was caused by their members' disability.

Even if Plaintiffs could show that S.B. 202 excludes disabled voters from the voting process, they cannot show that those voters are denied access "by reason of [their] disability." 42 U.S.C. §12132. A State does not exclude someone "by reason of" their disability if the State supplies reasonable accommodations. *See League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1157 (N.D. Fla. 2022), *aff'd in part, rev'd in part on other grounds*, *LWV II*, 66 F.4th 905. Although "[c]laims for discrimination under the Rehabilitation Act 'are governed by the same standards' as the ADA," the burden of proof to establish causation differs between the acts. *Karantsalis*, 17 F.4th at 1321. The Rehabilitation Act requires proof that the individual was discriminated against "*solely* by reason of [their] disability," 29 U.S.C. §794(a) (emphasis added), while the ADA requires only the lesser "but for" standard of causation, *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). "Plaintiffs cannot establish causation under either standard." Doc. 615 at 20.

Georgia provides a variety of accommodations to *include* disabled voters in the activity of voting. *See* Ga. Code §21-2-409.1 (allowing disabled voters to skip the line); §21-2-385.1 (same); §21-2-409 (allowing disabled voters to receive assistance in the voting booth); §21-2-379.21 (requiring electronic ballot markers be accessible to disabled voters); §21-2-452 (requiring paper

ballots and privacy accommodations for disabled voters who cannot vote electronically); §21-2-451(b) (requiring accommodations for disabled voters who cannot sign their name); §21-2-431(b) (same).

Given these numerous accommodations, it is unsurprising that Plaintiffs have not identified even a single person who was unable to vote because of the provisions they challenge. Some of their members might have faced some difficulty while voting, but "mere difficulty in accessing a benefit is not, by itself, a violation of the ADA." *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1155 (N.D. Ala. 2020) (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088 (11th Cir. 2007)). Others might not have been able to use their preferred method of voting, but the ADA does not demand compliance with any "preferred mode" of accommodation. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1026 (11th Cir. 2020). The statute requires only a "reasonable accommodation," not "the maximum accommodation or every conceivable accommodation possible." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). At most, the evidence shows nothing more than the "usual burdens of voting," *Brnovich*, 141 S. Ct. at 2338, which do not establish an ADA violation, *Bircoll*, 480 F.3d at 1088. The Court should thus grant summary judgment in favor of Defendants on Plaintiffs' disability discrimination claims.[12]

## IV. The gift-giving ban is constitutional.

The First Amendment does not prohibit States from protecting voters and the places where they vote. Georgia's gift-giving prohibition states that

---

[12] AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Counts 5 & 6); CBC Compl., Doc. 1, No. 1:21-cv-1728 (Count 6).

"[n]o person shall … give, offer to give, or participate in the giving of any money or gifts, including, but not limited to food and drink, to an elector" within 150 feet of a polling place 25 feet of someone standing in line to vote. Ga. Code §21-2-414(a). The State has a compelling interest in "restoring peace and order around the polls, protecting voters from political pressure and intimidation, and supporting election integrity." Doc. 241 at 51-52. Both the 150-foot ban and the 25-foot ban are constitutionally tailored to further those compelling interests.

This Court found that the 150-foot ban around polling places is a "reasonable resolution of the tension between the right to free speech and the right to cast a ballot without improper influence." Doc. 241 at 54. Plaintiffs were thus unlikely to prevail on their claim that the 150-foot ban violates the First Amendment. Later, the Court held that Plaintiffs were likely to prevail on their claim that the 25-foot ban violates the First Amendment. Doc. 614. Defendants appealed that order. *See* Docs. 639, 644. The Court should withhold a ruling on the merits of the 25-foot ban until the Eleventh Circuit resolves those appeals. In any event, the gift-giving ban is constitutional for at least four reasons: (1) it does not regulate expressive conduct, (2) it is subject to relaxed scrutiny, (3) it is narrowly tailored to further the State's compelling interests, and (4) Plaintiffs cannot show it is unconstitutional in a substantial number of its applications.

### A.    The gift-giving ban does not regulate expressive conduct.

The First Amendment does not protect conduct simply because "the person engaging in [it] intends thereby to express an idea." *Rumsfeld v. FAIR*,

547 U.S. 47, 65-66 (2006). Such an "expansive" definition of expressive conduct would allow a "limitless variety of conduct" to be labeled speech, since it's "possible to find some kernel of expression in almost every activity a person undertakes." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991) (cleaned up). Most conduct is "in part initiated, evidenced, or carried out by means of language." *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). But that is not enough.

Conduct is protected only when it is "inherently expressive." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct is inherently expressive when the expressive actor "inten[ds] to convey a particularized message" *and* "the likelihood [is] great that the message would be understood by those who viewed it." *Id.* Such conduct must be "sufficiently imbued with elements of communication." *Id.* at 406. The message must be "identifiable," although not every message will be succinctly articulable. *BarNavon v. Brevard Cnty. Sch. Bd.*, 290 F. App'x 273, 276 (11th Cir. 2008). There must be a "great likelihood" that "the particular conduct" conveys a message to the average viewer. *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1347 (11th Cir. 2021). That message must be "overwhelmingly apparent." *FAIR*, 547 U.S. at 66.

Distributing gifts near a polling place is not inherently expressive. It conveys no "particularized message," *Johnson*, 491 U.S. at 404, or least none that is discernible without additional speech—a telltale sign that the conduct is "not … inherently expressive." *FAIR*, 547 U.S. at 66. Without some accompanying speech, a recipient can only "speculate" what "discernible message" is being expressed by the "mere act" of distributing food and drink.

*Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 767-68 (M.D. Tenn. 2020). That accompanying speech is unaffected by the gift-giving ban. Plaintiffs remain free to protest long lines, express gratitude, reassure voters, and celebrate the Civil Rights Movement.

While Plaintiffs believe that their gift-giving conduct facilitates voting, "facilitating voting" is "not … communicating a message." *Feldman v. Ariz. Sec'y of State's Off.*, 840 F.3d 1057, 1084 (9th Cir. 2016), *rehearing en banc granted*, 841 F.3d 791. That's true even if Plaintiffs' conduct is "the product of deeply held personal belief," has "social consequences," or "discloses" their approval of voting (or their disapproval of lines). *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126-27 (2011). Giving each voter a $100 bill also facilitates voting and discloses approval of the franchise (probably better than food and drink), but Plaintiffs do not claim to have a First Amendment right to hand out cash to voters.

This Court applied the Eleventh Circuit's opinion in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* (*Food Not Bombs I*), 901 F.3d 1235 (11th Cir. 2018). *See* Doc. 241 at 29-30. But *Food Not Bombs I* distinguishes itself. The Eleventh Circuit emphasized the importance of the "factual context and environment" to its holding that a hunger-awareness group engaged in expressive activity when it provided food at its weekly events at a public park to bring attention to its message about "end[ing] hunger and poverty." *Food Not Bombs I*, 901 F.3d at 1238, 1245. But unlike a public park, a polling place is far from a traditional public forum. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1886-88, 1883 (2018); *UFCW v. City of Sidney*, 364 F.3d 738, 750 (6th

Cir. 2004) (on election day, "the parking lots and walkways leading to the polling places are nonpublic forums"). In addition, "the sharing of food" was directly related to the group's message of "end[ing] hunger." *Food Not Bombs I*, 901 F.3d at 1238, 1242-43. Plaintiffs cannot show that close relationship between giving gifts and voting.

In reality, Plaintiffs are not communicating a message, they're providing consideration. Giving gifts is a way to *induce* voters to vote (or vote a particular way). That's a bargain, not a message. For the same reasons, courts have held that collecting and returning absentee ballots is not speech. *See Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018). Neither is collecting and returning voter-registration applications. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 391 & n.4 (5th Cir. 2013). Plaintiffs cannot explain why providing gifts to people waiting in line communicates this message but helping people vote directly does not.

The gift-giving ban is a conventional regulation of conduct, no less subject to First Amendment scrutiny than hundreds of other laws that regulate the distribution of everything from food to cash. Of course, many laws prohibiting conduct impose "incidental" burdens on speech, but that "hardly means that the law[s] should be analyzed as one[s] regulating … speech rather than conduct." *Minn. Voters All.*, 138 S. Ct. at 1886-88; *see United States v. Williams*, 553 U.S. 285, 298 (2008) (laws regulating offers and conspiracies to engage in unlawful acts regulate conduct, not speech). Plaintiffs' attempt to constitutionalize all their activities—and effectively remove them from reasonable state regulation—should be rejected.

In any event, even if some of Plaintiffs' conduct is expressive, Plaintiffs cannot show that the gift-giving ban regulates expressive conduct in all applications. Because Plaintiffs seek facial invalidation of the gift-giving ban, they must prove that the gift-giving ban is unconstitutional in "all possible applications." *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997). In other words, they must demonstrate that "no set of circumstances exists under which the Act would be valid." *United States v. Martinez*, 736 F.3d 981, 991 (11th Cir. 2013), *cert. granted, judgment vacated*, 135 S. Ct. 2798 (2015).

But in many circumstances, the gift-giving ban is indisputably valid. Indeed, "most social-service food sharing events will not be expressive." *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale* (*Food Not Bombs II*), 11 F.4th 1266, 1292 (11th Cir. 2021). In fact, the expressive nature of "food distribution" can be "decided in an as-applied challenge" only. *Food Not Bombs I*, 901 F.3d at 1241 (quoting *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006)). That's because food distribution is not "on its face an expressive activity." *Santa Monica Food Not Bombs*, 450 F.3d at 1032; *accord Food Not Bombs I*, 901 F.3d at 1242-43 ("a picnic" and "simply eating together in the park" are not expressive). And the broader practice of gift-giving might include commercial promotions, casual sharing, or just the disposal of unwanted things. The Eleventh Circuit has explained that "the provision of clothing [or] shelter," both of which would be covered by the gift-giving ban, "usually do[es] not involve expressive conduct." *Food Not Bombs II*, 11 F.4th at 1292. Because Plaintiffs cannot prove that all of these

activities constitute protected expression, they cannot prove that the gift-giving ban is unconstitutional in all applications, and their facial challenge fails. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* (*LWV I*), 32 F.4th 1363, 1374 (11th Cir. 2022) (staying injunction because the district court "arguably failed to balance [the law's] legitimate applications against its potentially unconstitutional applications").

### B.   The gift-giving ban is not subject to strict scrutiny.

If the gift-giving ban implicates the First Amendment at all, it is content-neutral, does not target a public forum, and is thus not subject to strict scrutiny. This Court previously applied *Burson v. Freeman*, 504 U.S. 191 (1992), because *Burson* also concerned "a law restricting speech around a polling place." Doc. 614 at 8. But that wasn't why the law was content-based in *Burson*. Rather, the law was content-based because it prohibited only speech "related to a political campaign" and did "not reach other categories of speech, such as commercial solicitation, distribution, and display." *Burson*, 504 U.S. at 197 (plurality op.). Georgia's law, however, bans giving any kind of gift, not just those related to campaigns or some other type of content.

This Court also found that "the government's purpose" in enacting the gift-giving ban shows that the ban is content-based. Doc. 614 at 8-9. The State's purpose was, in part, to "protect[] the election system and ensur[e] elector confidence" by "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line to vote." S.B. 202, §2(13). That is, the gift-giving ban protects voters from undue influence, as well as protecting the "election system" from even the *appearance* of undue influence. *Id.* The gift-giving ban is thus "aimed not at the content" of any message

28

conveyed by a gift, "but rather at the *secondary effects*" on voters and observers. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). For these reasons, the gift-giving ban is content-neutral and triggers only a relaxed standard of scrutiny: either a reasonable time, place, or manner restriction; a restriction of expressive conduct under *United States v. O'Brien*, 391 U.S. 367 (1968); or an election regulation under the *Anderson-Burdick* test. It passes all three.

*First*, "[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). In *First Vagabonds Church*, the Eleventh Circuit assumed that the plaintiff group was engaged in expressive activity when it conducted group food-sharing events at parks to address the plight of the homeless. *First Vagabonds Church of God v. City of Orlando*, 638 F.3d 756, 758 (11th Cir. 2011) (en banc). It explained that if that activity constituted protected expression at all, then a city law limiting it was not subject to strict scrutiny. Instead, it was a valid time, place, and manner restriction so long as it was "reasonable." *Id.* The city law in that case restricted the plaintiff group to only two such activities per year, which the Court held was a reasonable restriction. *Id.* at 759-61 (citing *Clark*, 468 U.S. at 297).

Georgia's gift-giving ban is a reasonable time, place, and manner restriction. Food and drink can be distributed, just not at a certain place (near polling places) and at a certain time (during voting). And whatever message the distribution communicates can still be uttered, just not in a certain manner (via gifts). *See id.* at 294-95. The provision imposes a less restrictive limit on

the plaintiffs' allegedly expressive activities than the restrictions upheld in *First Vagabonds Church* and *Clark*. Thus, even if giving gifts is "a form of expression," the narrow ban around polling places is "a reasonable time, place, or manner restriction." *First Vagabonds Church*, 638 F.3d at 761.

*Second*, in the alternative, the gift-giving ban can also be upheld because it satisfies the *O'Brien* test. That four-part test applies to expressive conduct and asks whether (1) the challenged law is within "the constitutional power of the government to enforce," (2) the government "had a substantial interest" that was "plainly served" by its law, (3) its interest was "unrelated to the suppression of expression," and (4) any "incidental restrictions of the alleged freedoms under the First Amendment were no greater than necessary to further the interest of the government." *Id.* (citing *Clark*, 468 U.S. at 298-99). The Eleventh Circuit upheld the restriction on food-sharing events in *First Vagabonds Church* under *O'Brien* because of the city's unquestioned power to regulate such activity, its "interest in managing park property," and its wide latitude to determine what restrictions were necessary to further that interest. *Id.* at 762.

The gift-giving ban satisfies *O'Brien*. Nobody questions that it is within the State's power to enforce. The provision also serves the State's interest in combatting "improper interference, political pressure, or intimidation while waiting in line to vote." S.B. 202, §2(13). These state interests are valid and strong. *Brnovich*, 141 S. Ct. at 2340. While some gift-givers might not have impermissible goals, the State can act prophylactically. *See Burson*, 504 U.S. at 206-07. The provision is aimed at curtailing improper influence, not at

30

suppressing ideas. And any incidental restrictions are no greater than necessary to further the State's interest because the provision specifically targets gift-giving while allowing expression on all issues to continue unimpeded.

*Third*, even if the gift-giving ban imposed a content-based restriction or involved a traditional public forum, it would be subject not to strict scrutiny, but to the *Anderson-Burdick* balancing test. When election laws implicate constitutional rights, they are presumptively analyzed under *Anderson-Burdick*'s more forgiving analysis rather than strict scrutiny. *Jacobson*, 974 F.3d at 1261. That is true for First Amendment claims no less than other claims. *E.g.*, *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014); *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Under *Anderson-Burdick*, a restriction on speech is valid if it imposes "reasonable, nondiscriminatory restrictions" and is justified by "a State's important regulatory interests." *Stein*, 774 F.3d at 694 (quoting *Timmons*, 520 U.S. at 358).

The gift-giving ban satisfies *Anderson-Burdick*. Requiring voters to vote without private third parties giving them gifts does not exceed the usual burdens of voting, and those third-party groups can still speak their intended messages and give gifts outside the small, restricted zone. Because the gift-giving ban serves strong and valid governmental interests in combatting improper influence, political pressure, and intimidation, it passes scrutiny under *Anderson-Burdick* or any other standard. *See supra* Section I.

31

### C.    The gift-giving ban is narrowly tailored to protect voters and polling places.

Even if the gift-giving ban were subject to strict scrutiny (or modified strict scrutiny), it is narrowly tailored to serve the State's compelling interests. This Court ruled that the State has multiple compelling interests, in "restoring peace and order around the polls, protecting voters from political pressure and intimidation, and supporting election integrity." Doc. 241 at 51-52. The Court found that the 150-foot ban is likely constitutional because it is a "reasonable resolution of the tension between the right to free speech and the right to cast a ballot without improper influence." *Id*. at 54 (citing *Burson*, 504 U.S. at 208). The 25-foot zone is constitutional for the same reason: it is narrowly drawn to protect voters from improper influence when they are waiting in line.

The two different zones further the State's interests in different ways. While the 150-foot zone around polling places is aimed at "restoring peace and order around the polls," the 25-foot around voters in line to vote is aimed at "protecting voters from political pressure and intimidation." Doc. 241 at 51-52. Both "support[] election integrity." Doc. 241 at 51-52. The Court recognized that all of these interests are valid. Georgia could have implemented a blanket 600-foot radius to further those multiple interests. *See Schirmer v. Edwards*, 2 F.3d 117, 123-24 (5th Cir. 1993) (upholding a "total ban on politicking" within 600 feet of a polling place). Instead, Georgia took a more surgical approach: two smaller zones tailored to better achieve its multiple interests.

Applying *Burson*, this Court reasoned that every ban on influencing voters in line must terminate some distance from the polling place. Doc. 614 at 24. But that rationale can apply only to zones designed by reference to a polling

place. The reason the Supreme Court "recognized states' interests in peace and order around polling places" in *Burson* is because the law at issue in that case drew a zone around the polling place. *Id.* at 26. Neither the Supreme Court nor any other court has confronted a law that draws a zone around voters standing in line to vote. Even if the State's interests in protecting *polling places* "diminish in importance as the distance from the polling place increases," *id.*, the State's interest in protecting *voters in line* does not. Both are valid interests. Doc. 241 at 51-52. The 25-foot ban around the voting line is thus "a less restrictive alternative in kind," not "a difference only in degree." *Burson*, 504 U.S. at 210. Because the two zones are "reasonable and do[] not significantly impinge on constitutionally protected rights," they do not violate the First Amendment. *Id.* at 209.

Within these zones, banning the giving of gifts furthers compelling state interests. "Handing a voter something of value, even water, could be a means of influence," and thus "a categorical bar on soliciting voters" furthers valid state interests. *LWV II*, 66 F.4th at 929. Those interests include "protecting voters from confusion and undue influence" during the voting process, and in "preserving the integrity of the election process." *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009). The point of those "common sense" zones—and the reason they are constitutional—is that they limit access to voters while they are in the process of voting. *Burson*, 504 U.S. at 208, 211 (emphasis added). So do zones around voters in lines longer than a buffer zone around the polling place. There is no

33

reason that voters in lines shorter than 150-feet should be protected from undue influence, while voters waiting in longer lines cannot be protected.

"Today, all 50 States and the District of Columbia have laws curbing various forms of speech in and around polling places on Election Day." *Minn. Voters All.*, 138 S. Ct. at 1883. In contrast to large "300–foot no-political-speech buffer zone[s]" that "prohibit[] core political speech over a large geographical area," S.B. 202 prohibits gift-giving within a targeted area tailored to fit the very interest it is protecting: the voters. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1043, 1054 (6th Cir. 2015); *Frank v. Lee*, ___ F.4th ___, 2023 WL 6966156 (10th Cir. Oct. 23, 2023) (upholding a 300-foot buffer zone under *Burson*). "The state has a compelling interest in protecting its voters," and that's what the gift-giving ban does. *Schirmer*, 2 F.3d at 123. Indeed, it is difficult to see how the State could have been any more precise in tailoring the gift-giving ban to "limit access to the area around the voter." *Burson*, 504 U.S. at 211.

And again, Plaintiffs are bringing a facial challenge. Facial challenges fail unless the law is unconstitutional in "all possible applications." *Gay Lesbian Bisexual All.*, 110 F.3d at 1550 (citation omitted). The gift-giving ban has many permissible applications—such as offers of money, gifts given inside the polling place, and food and water that are intended to influence voters— that doom Plaintiffs' facial claim. And because the gift-giving ban is a reasonable regulation of a nonpublic forum, a separate overbreadth analysis is not appropriate. *See Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015). This claim, too, should be dismissed.

*     *     *

The Eleventh Circuit's ruling on this Court's preliminary injunction order will likely resolve many of the issues in Plaintiffs' First Amendment claims. After the Eleventh Circuit decides those appeals, this Court should grant summary judgment in favor of Defendants on Plaintiffs' First Amendment claims against the gift-giving ban.[13]

## V.    Plaintiffs cannot show a violation of the materiality provision of the Civil Rights Act.

Plaintiffs cannot prevail on their novel theory under the materiality provision of the Civil Rights Act. This Court held that Plaintiffs are likely to prevail on that claim, Doc. 613, and Defendants appealed that order, Docs. 641, 643. The Court should withhold a ruling on the merits of Plaintiffs' materiality provision claims until the Eleventh Circuit resolves those appeals. The Eleventh Circuit is likely to reverse, and for at least four reasons this Court should render summary judgment in favor of Defendants.

### A.    The materiality provision governs voter qualifications, not rules for casting a valid ballot.

As Justice Alito explained, the materiality provision of the Civil Rights Act applies to "the requirements that must be met in order to register (and thus be 'qualified') to vote," not to "the requirements that must be met in order to cast a ballot that will be counted." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissental). Text and context confirm Justice Alito's reasoning.

*First,* the text of the provision applies only to an "error or omission" in an "application, registration, or other act requisite to voting" that affects a

---

[13] AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 4); NGP 1st Am. Compl., Doc. 39, No. 1:21-cv-1229 (Count 4); NAACP 1st Am. Compl., Doc. 35, No. 1:21-cv-1259 (Count 5); CBC Compl., Doc. 1, No. 1:21-cv-1728 (Count 5).

"determin[ation] whether such individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). If the "paper or record" at issue does not determine a voter's qualification—say, a ballot envelope—the materiality provision doesn't apply. *Id.* "[I]t is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." *Ball v. Chapman*, 289 A.3d 1, 38 (Pa. 2023) (Brobson, J., dissenting). In other words, the materiality provision applies to voters, not votes. Once a voter has been deemed qualified, it does not exempt them from the ordinary burdens of casting a ballot. Rather, the provision "prohibits states from *disqualifying* potential voters based on their failure to provide information not relevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1287 (11th Cir. 2003) (emphasis added). Qualified voters who fail to follow state-law procedures for casting a ballot cannot prevail under the materiality provision.

*Second*, the context of §10101 (a) confirms that it sets rules governing voter qualifications. The first paragraph begins, "All citizens of the United States who are *otherwise qualified by law* to vote at any election … shall be entitled and allowed to vote at all such elections…." 52 U.S.C. §10101(a)(1) (emphasis added). And the materiality provision is nestled between two paragraphs placing limits on the determination of voter qualifications: Paragraph (a)(2)(A) prevents state actors from discriminatory application of rules "in determining whether any individual is qualified under state law or laws to vote in any election." *Id.* §10101(a)(2)(A). Paragraph (a)(2)(C) restricts state actors from "employ[ing] any literacy test as a qualification for voting in

36

any election." *Id.* §10101(a)(2)(C). The materiality provision's placement in the middle of these limitations on voter-qualification requirements confirms that it, too, applies only to voter-qualification requirements.

The remedies in subsection (e) likewise confirm that the statute concerns voter qualifications. If a court finds that a violation of §10101 is part of a "pattern or practice" of racial discrimination, the court can issue an order declaring that any applicant is "qualified to vote," if the applicant provides evidence that "(1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of … the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law." *Id.* §10101(e). That is, the remedy for a violation of the materiality provision is that a voter is declared "registered" or "qualified to vote," not that the rules for casting a ballot are set aside. Even "an applicant so declared qualified to vote" by a court order would not be absolved from following the ordinary rules for casting a ballot. *Id.*

The Court did not address this text and context when it ruled that Defendants' reading is "too narrow." Doc. 613 at 28. *But see Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466-67 (2017) (instructing courts to read statutory text in context). The Court also said Defendants' interpretation "has never been the law." *Id.* To the contrary, courts understood these principles for decades, applying the materiality provision with little trouble to state action that erroneously disqualified voters. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004) ("Nothing in … the case law in this jurisdiction or in other jurisdictions indicates that [the materiality provision] was intended to

37

apply to the counting of ballots by individuals *already deemed qualified to vote*."). It is only in the last two or three years that courts began extending the materiality provision to ordinary requirements for casting a ballot. Given their rebuff of text and history, those decisions are "very likely wrong." *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissental).

The Court also faulted Defendants for not addressing the Eleventh Circuit's test for analyzing a violation of the materiality provision. *See* Doc. 613 at 21 n.14 (citing *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008) (asking "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant")). But because the materiality provision doesn't apply to the birthdate requirement, neither does the test. For example, a Georgia voter who mistakenly addresses and mails her absentee ballot to Alabama has made an "error" on a "paper" that results in her not receiving an absentee ballot. The mistake is not "material" to her "qualifications" to vote, though it might result in her not being able to cast a ballot. It makes no more sense to apply the materiality provision to a voter's error in writing her birthdate than to her error in writing an address. The test in *Browning* is neither helpful nor applicable in either circumstance.

## B. The birthdate requirement doesn't deny anyone the right to vote.

Plaintiffs' §10101 claims fail for another reason: the birthdate requirement doesn't "deny the right of any individual to vote." 52 U.S.C. §10101(a)(2)(B). "Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with

certain rules." *Brnovich*, 141 S. Ct. at 2338. Rejecting a ballot when a voter fails to comply with these rules is "not the denial" of the right to vote. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Instead, "the failure to follow those rules constitutes the forfeiture of the right to vote." *Id.*

For this reason, a person is denied the right to vote under the materiality provision if that person is erroneously deemed not "qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). But "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter*, 142 S. Ct. at 1825. "It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under [the materiality provision]." *Vote.Org v. Callanen*, 39 F.4th 297, 306 n.6 (5th Cir. 2022). So voters who fail to comply with the birthdate requirement are not denied the right to vote when their vote is not counted. *Cf.* Doc. 548-1 at 8-9. That is doubly true of voters who fail to cure the deficiency as Georgia law allows voters to do. *See* Ga. Code §21-2-385(a)(1)(C).

This Court rejected the reasoning of Justice Alito and the Fifth Circuit because "Congress expansively defined 'voting'" in §10101. Doc. 613 at 25. But Congress's definition of "vote" does not transform all ballot rejections into denials of "the right to vote." Even if the definition of "vote" is expansive, the definition is silent about what it means to "deny" the right to vote. 52 U.S.C. §10101(e). And that was precisely Justice Alito's point: "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not *denied*

'the right to vote.'" *Ritter*, 142 S. Ct. at 1825. The reasoning does not depend on how expansively Congress defined what it means to "vote." This Court feared that it could not distinguish between a mistake that is a "forfeiture" and one that is a "denial." Doc. 613 at n.17. But Defendants' consistent interpretation makes that question easy: a voter is denied the right to vote when a "person acting under color of law" imposes extra steps *beyond* those required by law for the purpose of inducing errors. 52 U.S.C. §10101(a)(2); *see infra* Section V.C. But the necessary steps created by state law to cast a ballot can't "deny" anyone's right to vote. "[T]he failure to follow *those* rules constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S. Ct. at 1825 (emphasis added). If the alternative were true, "virtually every rule governing how citizens vote would [be] suspect." *Vote.Org*, 39 F.4th at 306 n.6.

### C. The materiality provision does not displace state law.

The materiality provision applies to ad hoc executive actions, not state laws that are duly enacted by the Legislature. The Court did not address this argument in its preliminary-injunction order, but it resolves many of the Court's concerns. The statute forbids action taken based on an error or omission that is "not material in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. §10101(a)(2)(B). That is, the statute asks whether the error or omission was material "under State law." *Id.* The text does not reach errors or omissions that state law says are material. Thus, plaintiffs proceeding under the materiality provision must allege that the defendant went beyond state law. *See, e.g.*, *Schwier v. Cox*, 412 F. Supp. 2d

1266, 1276 (N.D. Ga. 2005) (ruling that requiring social security numbers from prospective voters "is not material in determining whether one is qualified to vote under Georgia law" because Georgia law did not require social security numbers).

Plaintiffs' problem is with state law itself. Georgia requires absentee voters to fill in their birthdate on the ballot envelope. Ga. Code §21-2-385(a). If the voter fails to write in his birthdate, or if the birthdate does not match the voter's records, the election official "shall" reject the ballot. *Id.* §21-2-386(a)(1)(C). Plaintiffs admit that "[u]nder S.B. 202, if the voter does not properly write his or her birthdate or other identification number, the official *must* reject the ballot." Doc. 548-1 at 7. In other words, the birthdate requirement is material under state law.

Northern District of Georgia cases applying the materiality provision confirm this reading. In *Martin v. Crittenden*, for example, the court ruled that election officials could not reject absentee ballots for deficient birthdates when state law did not require them to. 347 F. Supp. 3d 1302, 1304 (N.D. Ga. 2018). Under a prior Georgia law, a deficient birthdate was "a ground for rejection," but the law did not "mandate the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth." *Jones v. Jessup*, 615 S.E.2d 529, 531 n.5 (Ga. 2005). In *Martin*, this Court ruled that rejecting ballots for deficient birthdates violated the materiality provision when that practice was not required "under Georgia law." *Martin*, 347 F. Supp. 3d at 1308-09. But "*Martin* isn't instructive" where a birthdate is *required* by state law, "because the court held that the county's decision was *inconsistent* with state law."

41

*Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (emphasis added) (citing *Martin*, 347 F. Supp. 3d at 1308-09). *Democratic Party of Georgia, Inc. v. Crittenden*, for its part, merely "adopt[ed] the rationale" of *Martin* "for the sake of statewide uniformity," with no further analysis. 347 F. Supp. 3d 1324, 1341 (N.D. Ga. 2018). Neither opinion addressed the textual arguments made here.

Unlike the ultra vires birthdate issue in *Martin* and *Democratic Party of Georgia*, the birthdate requirement is now imposed *by state law*. Ga. Code §§21-2-385(a), -386(a)(1)(C). That ends the inquiry under the materiality provision. *See Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by [state law] without offending 52 U.S.C. §10101(a)(2)(B)"). Eleventh Circuit precedent also does not conflict with this application of the statutory text. True, the Eleventh Circuit has heard facial challenges to state law under the materiality statute. *See, e.g.*, *Browning*, 522 F.3d at 1172-75. But "assumptions are not holdings," *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016), and the circuit has not addressed the argument that state law determines what is material. This court is bound by the statute's plain language, which does not preempt the voting requirements imposed by state law.

### D.   Plaintiffs have no evidence that the birthdate requirement discriminates on the basis of race.

Plaintiffs' claims under the materiality provision fail for a final independent reason: they cannot show that the birthdate requirement

discriminates on the basis of race. Congress enacted §10101 as part of the Civil Rights Act of 1964 "under the authority of the Fifteenth Amendment to enforce that Amendment's guarantee." *United States v. Mississippi*, 380 U.S. 128, 138 (1965) (citing 42 U.S.C. §1971, recodified as 52 U.S.C. §10101). "[W]ell-settled law establishes that [§10101] was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Courts have thus held that §10101 claims "fail as a matter of law" when they "do not allege that the actions by [election] officials were racially motivated." *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009); *see also Ind. Democratic Party*, 458 F. Supp. 2d at 839. Text and precedent support those rulings.

The plain text of §10101 requires evidence of racial discrimination to prove a violation of the materiality provision. *See Browning*, 522 F.3d at 1173 (The text of §10101 is "the appropriate starting point of inquiry in discerning congressional intent."). The materiality provision prohibits denying someone the right to vote for errors that are not material to a voter's qualifications "under State law." 52 U.S.C. §10101(a)(2)(B). The statute says the term "qualified under State law" "*shall not*, in any event, imply qualifications more stringent than those used by the persons found … to have violated subsection (a) in qualifying persons other than those of the race or color against which the pattern or practice of discrimination was found to exist." *Id.* §10101(e) (emphasis added). That is, a qualification is illegitimate only if used to

"qualify[] persons" of one "race or color" but disqualify persons of other races or colors. *Id.*

Statutory context further confirms that the materiality provision is aimed at racial discrimination. Section 10101 begins by guaranteeing "[a]ll citizens" the right to vote "without distinction of race, color, or previous condition of servitude." *Id.* §10101(a). Paragraph (a)(2), which contains the materiality provision, implements that race-neutral guarantee by (A) forbidding discriminatory "standards, practices, or procedures" to determine whether voters are qualified; (B) forbidding denials of the right to vote based on immaterial errors or omissions on registration forms; and (C) restricting the use of literary tests as voter qualifications. *Id.* §10101(a)(2). If the racial discrimination is part of a larger "pattern or practice," courts have special remedial power to receive "application[s]" from "any person of such race or color" affected by the pattern or practice, and issue orders "declaring [them] qualified to vote." *Id.* §10101(e). The remaining sections lay out remedies, jurisdiction, and procedures. This context confirms that the statute prevents racially discriminatory state action, not neutral rules of voter registration. Plaintiffs' §10101 claims fail because they cannot show the birthdate requirement is part of a "pattern or practice of discrimination." *Broyles*, 618 F. Supp. 2d at 697; *see supra* Section II (discussing Plaintiffs' failure to show racial discrimination).

If there were any doubt that the statute requires evidence of racial discrimination, constitutional concerns resolve it. Because §10101 is an exercise of Congress's remedial powers under the Fifteenth Amendment,

*Mississippi*, 380 U.S. at 138, the "statute's 'current burdens' must be justified by 'current needs,'" *Shelby Cnty. v. Holder*, 570 U.S. 529, 550-51 (2013); *see also City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) (Congress's exercise of its remedial power under the Fourteenth Amendment requires "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end"). If Congress intended §10101 to sweep beyond racial discrimination, it must show that extraordinary remedy is justified by "current conditions." *Shelby Cnty.*, 570 U.S. at 554. But the "exceptional conditions" that might have justified such an "uncommon exercise of congressional power" in 1964 can no longer justify the application of §10101 without a showing of racial discrimination. *South Carolina v. Katzenbach*, 383 U.S. 301 (1966). Extending §10101 beyond incidents of racial discrimination would thus be unconstitutional.

The Court need not declare §10101 unconstitutional, however, because the text requires racial discrimination as an element. Instead, it need only recognize that racial discrimination must be a "necessary ingredient" of a §10101 violation, *Bolden*, 446 U.S. at 62-64 (plurality op.). Even if another reading of §10101 were plausible, constitutional principles require construing §10101 consistent with the Fifteenth Amendment's prohibition on racial discrimination. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").

Eleventh Circuit precedent also supports this reading. In *Browning*, the court relied on the text of §10101 as the "appropriate starting point of inquiry in discerning congressional intent" and not "the historically motivating examples of intentional and overt racial discrimination." *Browning*, 522 F.3d at 1173. The court had no occasion to decide whether discrimination is a required element of a §10101 claim, since it found that the requirements at issue were material. *Id*. But *Browning*'s interpretive rules compel the conclusion that the text resolves this case. In fact, even the dissent would have found a violation of the materiality provision only because it thought the registration requirement at issue was racially discriminatory and "frustrate[d]" Congress's intent to combat "burdensome state registration requirements to disenfranchise African–Americans." *Id*. at 1181 (Barkett, J., dissenting).

In short, racial discrimination has always been part of the text, context, and history of §10101. *See id*. at 1173 (maj. op.). Plaintiffs would have the Court ignore this essential element and extend the materiality provision to ordinary, nondiscriminatory election procedures. The materiality provision does not reach that far. And Congress can't just pass such a sweeping provision by accident. *Contra Migliori v. Cohen*, 36 F.4th 153, 163 n.56 (3d Cir.), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022). Rather, Congress would have to justify that application under present circumstances in this country. But it can't. The reality is simpler: §10101 violations require evidence of racial discrimination, as courts have long understood. Plaintiffs don't have that evidence, so their §10101 claims fail.

46

\*       \*       \*

The Eleventh Circuit's ruling on this Court's preliminary injunction order will likely resolve these issues. After the Eleventh Circuit decides those appeals, this Court should grant summary judgment in favor of Defendants on Plaintiffs' claims under the materiality provision.[14]

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendants.

Dated: October 30, 2023                     Respectfully submitted,

                                            */s/ Gilbert C. Dickey*

Gilbert C. Dickey\*                          John E. Hall, Jr.
Conor D. Woodfin\*                              Georgia Bar No. 319090
CONSOVOY MCCARTHY PLLC                       William Bradley Carver, Sr.
1600 Wilson Boulevard, Suite 700               Georgia Bar No. 115529
Arlington, Virginia 22209                    Baxter D. Drennon
(703) 243-9423                                 Georgia Bar No. 241446
                                             HALL BOOTH SMITH, P.C.
Tyler R. Green\*                              191 Peachtree Street NE, Suite 2900
CONSOVOY MCCARTHY PLLC                       Atlanta, Georgia 30303
222 S. Main Street, 5th Floor                (404) 954-5000
Salt Lake City, UT 84101                     (404) 954-5020 (Fax)
(703) 243-9423

\*admitted pro hac vice

                *Counsel for Intervenors*

---

[14] AME 1st Am. Compl., Doc. 83, No. 1:21-cv-1284 (Count 7); NGP 1st Am. Compl., Doc. 39, No. 1:21-cv-1229 (Count 5); NAACP 1st Am. Compl., Doc. 35, No. 1:21-cv-1259 (Count 6).

## CERTIFICATE OF COMPLIANCE

This document complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook.

*/s/ Gilbert C. Dickey*

## CERTIFICATE OF SERVICE

On October 30, 2023, I e-filed this document on ECF, which will email everyone requiring service.

*/s/ Gilbert C. Dickey*