**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS
REGARDING THE FOOD, DRINK, AND GIFT BAN**

## TABLE OF CONTENTS

INTRODUCTION ........................................................... 1

BACKGROUND ............................................................ 2

ARGUMENT ............................................................... 6

I.    Plaintiffs Cannot Establish any Material Dispute of Fact Showing that the Food, Drink, and Gift Ban Violates the Voting Rights Act. ............................................................... 6

    A.    The provision does not impose any burden. ................... 8

    B.    Georgia voters have multiple available methods of voting. .......... 9

    C.    The provision serves important State interests. ......................... 10

    D.    The provision also passes Section 2's "results test." ................... 14

II.    The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate the Fourteenth or Fifteenth Amendments. .............. 14

III.    The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate the First Amendment ................................. 19

IV.    The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate Disability Laws. .......................................... 23

CONCLUSION ............................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Choate,*
  469 U.S. 287 (1985) .................................................................... 23

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) .................................................................... 15

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) .............................................. 7, 8, 9, 10, 12, 13, 14, 24

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ............................................................ 11, 15, 16

*Burson v. Freeman,*
  504 U.S. 191 (1992) .................................................................... 22

*Chisom v. Roemer,*
  501 U.S. 380 (1991) ...................................................................... 8

*Citizens for Police Accountability Pol. Comm. v. Browning,*
  572 F.3d 1213 (11th Cir. 2009) ......................................... 12, 13, 22

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) .................................................................... 19

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ...................................................................... 21

*Common Cause/Ga. v. Billups,*
  554 F.3d 1340 (11th Cir. 2009) ............................................. 16, 21

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ................................................... 12, 16, 19, 22

*Curling v. Raffensperger,*
  50 F.4th 1114 (11th Cir. 2022) ................................................... 21

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
  11 F.4th 1266 (11th Cir. 2021) ................................................... 20

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ...................................................................... 20

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ............................................................ 7, 9, 10

*Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...................................................................... 20

*Karantsalis v. City of Miami Springs*,
  17 F.4th 1316 (11th Cir. 2021) ...................................................................... 23

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
  55 F.4th 1296 (11th Cir. 2022) ...................................................................... 23

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir.) .......................................................................... 15, 17

*Lewis v. Zilog, Inc.*,
  908 F. Supp. 941 (N.D. Ga. 1995) ................................................................. 24

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ....................................................................................... 21

*Medina v. City of Cape Coral*,
  72 F. Supp. 3d 1274 (M.D. Fla. 2014) .......................................................... 24

*New Ga. Project v. Raffensperger*,
  976 F.3d 1278 (11th Cir. 2020) .............................................................. 10, 11

*Ohio Democratic Party v. Husted*,
  834 F.3d 620 (6th Cir. 2016) ......................................................................... 16

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) ......................................................................................... 20

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*,
  117 F.3d 1278 (11th Cir. 1997) ...................................................................... 24

*Storer v. Brown*,
  415 U.S. 724 (1974) ......................................................................................... 6

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) ....................................................................................... 22

*Todd v. Carstarphen,*
  236 F. Supp. 3d 1311 (N.D. Ga. 2017) ........................................................ 24

*United States v. O'Brien,*
  391 U.S. 367 (1968) ................................................................................ 21

*Williams v. Pryor,*
  240 F.3d 944 (11th Cir. 2001) .................................................................. 18

**Statutes**

52 U.S.C. § 10301 ......................................................................................... 7

O.C.G.A. § 21-2-263 ............................................................................... 5, 18

O.C.G.A. § 21-2-380 ................................................................................... 10

O.C.G.A. § 21-2-382 ................................................................................... 10

O.C.G.A. § 21-2-384 ................................................................................... 10

O.C.G.A. § 21-2-385 ................................................................................... 10

O.C.G.A. § 21-2-409.1 ................................................................................ 25

O.C.G.A. § 21-2-414 ................................................................... 2, 4, 18, 25

O.C.G.A. § 21-2-570 ................................................................................... 11

**Regulation**

28 C.F.R. § 35.150 ...................................................................................... 24

**Other Authorities**

Lisa Schur et al.,
  *Accessible Democracy: Reducing Voting Obstacles*
  *for People with Disabilities*, 14 Election L.J. 60, 63 (2015) ........................ 25

## INTRODUCTION

In recent election cycles, third-party organizations were becoming more aggressive in their interactions with voters who were waiting in line to vote. After first relying on tables near voting lines, these organizations began approaching voters who were waiting in line and attempting to hand them things of value.  This understandably led to complaints from many voters—including from voters who encountered the unwanted interactions with third parties and others who observed the interactions.  And county officials complained about the time they were devoting to monitoring this activity while also trying to understand what was permissible under then-existing law.

The Legislature responded to these concerns in SB 202, balancing the interests of third parties, voters, and election officials.  Rather than entirely banning the practice of providing food and drinks, SB 202 requires third parties to stand a few feet from the voting line when handing out things of value, thus ensuring that any voter interacting with them does so voluntarily.

Because this provision serves compelling State interests, does not impair any Georgian's ability to vote, and allows third parties to continue their voter outreach steps away from the voting line, and because there are no material disputes of fact, the Court should enter summary judgment for State Defendants on Plaintiffs' challenges to this provision under the Voting Rights Act ("VRA"), First, Fourteenth and Fifteenth Amendments, and the Americans

with Disabilities Act ("ADA").

## BACKGROUND

**A.    Line-warming activities before SB 202.**

SB 202 is the latest in a line of Georgia laws aimed at increasing electoral efficiency, preventing voter intimidation, and enhancing voter confidence, particularly in areas around polling locations.   SOF ¶ 240 (Mashburn 3/7 104:7–105:7).  In 2010, the General Assembly passed a bill establishing a 150-foot "Buffer Zone" around buildings used as polling places, with an additional 25-foot "Supplemental Zone" around any voter waiting in line at a polling place.   SOF  ¶  241  (O.C.G.A.  §  21-2-414(a)  (2010);  H.B.  540,  150th  Gen. Assemb.,  Reg.  Sess.  (Ga.  2010)).   In  those  locations,  various  "[c]ampaign activities"  were  prohibited,  including  solicitation  of  votes,  distribution  of campaign material, and conducting polling.  O.C.G.A. §§ 21-2-414(a)-(d) (2010).

Subsequently,  third  parties  began  setting  up  tables  within  the  Buffer Zone, which distracted voters and officials.  SOF ¶ 242 (Mashburn 3/14 124:7–17).  In 2017, the legislature responded by prohibiting the setting up of tables and booths within either protective zone.  O.C.G.A. § 21-2-414(a) (2017).

But third parties then began sending representatives to polling places to hand things of value to voters waiting in line to vote.  This led state and county officials to receive many complaints and questions.  SOF ¶ 243 (Germany 3/7 107:4–108:11; Edwards 50:4–50:8). For instance, poll workers were "inundated

with questions" about whether this activity was acceptable.  SOF ¶ 244 (Mashburn 3/14 93:17–94:25).  They often had difficulty determining what activities qualified as "campaign activities." SOF ¶ 245 (Eveler 143:6–16). And voters repeatedly complained that these activities seemed unlawful and intimidating.  SOF ¶ 246 (Germany 6/24/22 Decl. ¶¶ 29–30).

Given the subjective nature of the then-existing law, county officials struggled to determine whether certain activities were lawful.  SOF ¶ 247 (Sterling 204:10–205:13; Mashburn 3/14 126:12–127:3, 181:4–16; Bailey 10/6 147:6–18; Eveler 138:15–24). This led to delays while officials corresponded with supervisors about whether the activity around lines was permissible. SOF ¶ 248 (Mashburn 3/14 152:20–153:14). Sometimes disagreements even led to police involvement.  SOF ¶ 251 (*Id.*; Mashburn 3/14 138:10–13).

As time progressed, the third parties increased their line-warming activities by providing voters with more valuable items, like phone chargers, candy, clothing, fans, and homemade knitted items.  SOF ¶ 252 (Mashburn 3/14 143:22–144:6; Eveler 288:5–12; Harvey 149:19–25); Mashburn 3/7 104:12–105:7).  Along with the increased value of these items, the third parties also began creating more chaotic atmospheres around polling locations by playing loud music, bringing in performers, and otherwise creating a "circus" environment.  SOF ¶ 253 (Bailey 10/6 140:25–141:5; Mashburn 3/7 104:12–105:7, 109:7–13; Bailey 3/21 217:3–5; Mashburn 3/14 107:24–108:2, 128:1–5,

198:3–11).  In addition to causing confusion and distractions, these activities gave the appearance that political parties were "running the line."  SOF ¶ 254 (Mashburn 3/14 111:23–113:1; *see also* Mashburn 3/7 101:15–102:16).  One such organization stated its activities were the "last chance to reach Georgians before they vote" in an election that could "determine control of the U.S. Senate."  SOF ¶ 257 (Germany 6/24/22 Decl. ¶ 30(c)).

Unsurprisingly, these activities led to complaints and concerns about potential confrontations.  SOF ¶ 258 (Germany 3/7 97:10–22, 98:2–10, 107:25–108:11; Germany 4/13 235:25–240:7; Mashburn 3/14 110:12–19, 114:20–25; N. Williams 154:7–155:2; Bailey 10/06 59:25–60:14; Mashburn 3/7 109:7–13).

## B.   **Legislative response to concerns raised.**

To address these problems, the legislature enacted SB 202's Food, Drink, and Gift Ban, which prohibits handing things of value to voters anywhere in line, whether in the Buffer or Supplemental Zone.  O.C.G.A. § 21-2-414(a) (2021).  But third parties may still hand out things of value outside the 150-foot Buffer Zone or, in the rare event that a line extends more than 150-feet from a polling place, anywhere that is at least 25 feet from the voting line.

These measures sought to prevent intimidation and undue influence, SOF ¶ 272 (Sterling 204:6–24, 205:17–206:2), while giving everyone a "safe spot to be in."  SOF ¶ 273 (Bailey 3/21 127:15–128:6).  And it responded to poll worker confusion by creating a bright-line, easily administrable rule.  SOF

¶ 274 (Mashburn 3/14 93:17–22, 181:17–182:2; Sterling 204:25–205:13; Harvey 148:16–149:18).  Additionally, this provision sought to preserve order around the polls and end the "chaotic atmosphere" caused by disruptive activities.  SOF ¶ 275 (Bailey 3/21 128:7–129:4; Mashburn 3/14 198:8–11). Moreover, this provision sought to increase voter confidence by making it easier to prevent electioneering by decreasing voter interactions.  SOF ¶ 276 (Mashburn 3/14 112:1–2, 112:16–18; Mashburn 3/7 101:15–102:16; Germany 3/7 107:25–108:11; Germany 6/24/22 Decl. ¶¶ 32–33, 35–36; Eveler 288:13–289:14).

## C.     Impact of Food, Drink, and Gift Ban.

In addition to the Food, Drink, and Gift Ban, there were other aspects of SB 202 that addressed lines.  For instance, SB 202 ensured that there were provisions in place for tracking line length and, where necessary, reducing precinct sizes to reduce lines.  SOF ¶ 286 (O.C.G.A. § 21-2-263(b); Germany 6/24/22 Decl. ¶¶ 10–12). These provisions, along with many others that promote early and absentee voting, have significantly reduced lines in Georgia.

Indeed, contrary to Plaintiffs' claims, turnout in 2022 was near record highs for a midterm election.  SOF ¶ 287 (Shaw Suppl. Rep. ¶¶ 10, 12, 17, 23). And recent polling data found that 99.5% of black voters reported no problem voting in the 2022 election.  SOF ¶ 358 (PI Hr'g Tr. 251:2–9).  Recent data also show that only about 4.7% of black or white voters waited more than 30

minutes.  SOF ¶ 288 (PI Hr'g Tr. 250:23–251:1; Grimmer Rep. ¶ 218).  And

another survey found that only 4% of white voters, and 2% of black voters,

experienced wait times of more than 30 minutes.  PI Hr'g Tr. 252:3–9.  Thus,

SB 202's measures to decrease wait times appear successful.  Germany 6/24/22

Decl. ¶¶ 11–16.

## ARGUMENT

The Supreme Court has long recognized that "there must be a

substantial regulation of elections if they are to be fair and honest and if some

sort of order, rather than chaos, is to accompany the democratic processes."

*Storer v. Brown,* 415 U.S. 724, 730 (1974).  SB 202's Food, Drink, and Gift Ban

is one such regulation.  It was enacted to further multiple compelling state

interests: (1) to protect voters from intimidation; (2) to protect voter confidence

in the integrity of the electoral system; (3) to promote efficiency; and (4) to

ensure the orderly administration of elections.  These compelling interests are

sufficient for the challenged provision to survive any standard of scrutiny.

Thus, Plaintiffs' claims under VRA, U.S. Constitution, or ADA fail.  And,

because there are no disputed issues of material fact, summary judgment

should be entered in favor of State Defendants.

## I.   Plaintiffs Cannot Establish any Material Dispute of Fact Showing that the Food, Drink, and Gift Ban Violates the Voting Rights Act.

Section 2 of the Voting Rights Act prohibits jurisdictions from

"impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). The Eleventh Circuit confirms that "[t]his analysis turns on whether, based on the totality of the circumstances, the challenged law ... deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021) ("*GBM*"). To state a valid vote-denial claim, a plaintiff must show: (1) proof of disparate impact (a denial or abridgement) resulting from the law or policy in question; and (2) that the disparate impact is caused by racial bias. *Id.* at 1328–30.[1]

Such claims must be assessed under the "totality of circumstances." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) (quoting 52 U.S.C. § 10301(b)).  Although "[a]ny circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered," the *Brnovich* Court listed five circumstances: (a) "the size of the burden imposed by a challenged voting rule"; (b) "the degree to which a voting

---

[1] State Defendants reassert and preserve their argument that there is no implied cause of action under Section 2.  *See* State Defs.' Opp'n to PI Mot. on Immaterial Voting Requirements 16–17 [Doc. 582].

rule departs from what was standard practice when § 2 was amended in 1982";
(c) "[t]he size of any disparities in a rule's impact on members of different racial
or ethnic groups"; (d) "the opportunities provided by a State's entire system of
voting"; and (e) "the strength of the state interests served by a challenged
voting rule." *Id.* at 2338–39. The "touchstone" is whether the voting system as
a whole is equally open to voters. *Id.* at 2338. A state law that imposes "modest
burdens" with a "small … disparate impact" complies with Section 2 so long as
it is based on valid government interests. *Id.* at 2346.

Here, the undisputed facts demonstrate that there are no cognizable
burdens or disparities. Moreover, "Section 2 does not require a State to show
that its chosen policy is absolutely necessary or that a less restrictive means
would not adequately serve the State's objectives." *Id.* at 2345–46. Because
Plaintiffs cannot prove that the Food, Drink, and Gift Ban affords any group
meaningfully "less opportunity than other members of the electorate to
participate in the political process," *Chisom v. Roemer*, 501 U.S. 380, 388 (1991)
(cleaned up), under the undisputed facts, there is no violation.

## A.   The provision does not impose any burden.

The undisputed facts show that the Food, Drink, and Gift Ban does not
burden voting in any meaningful way, but merely places sensible limits on the
permissible activities around a voting line. Yet Plaintiffs assume that States
must remove any possible burden on voting. However, the Supreme Court

rejects that view, holding that voters must "tolerate the usual burdens of voting," and "[m]ere inconvenience" is not enough to "demonstrate a violation of § 2." *Brnovich*, 141 S. Ct. at 2338 (citation omitted).

The "usual burdens of voting" certainly include waiting in a voting line. *Id.* at 2347. And, as far as the record reflects, so called "line-warming" activities were unknown anywhere in the country when Section 2 was amended in 1982. Rather, as the record confirms, this practice was very rare in Georgia before 2018, and even then, it occurred at a much lower level than in 2020.  SOF ¶ 259 (Mashburn 3/7 104:11–105:7; Eveler 287:16–25; Kabani 111:20–23; Smith 149:16–150:4; Griggs 48:13–23).

Section 2 does not require States to add voting conveniences, let alone conveniences unknown when the statute was last amended in 1982. Given the undisputed facts, that is reason enough to reject Plaintiffs' claims.

**B.   Georgia voters have multiple available methods of voting.**

Plaintiffs also cannot "clear the hurdle of demonstrating that minority voters are less likely than white voters" to be able to vote because of third parties not being allowed to distribute things of value to voters waiting in line to vote. *GBM*, 992 F.3d at 1329.  Where, as here, "a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means."  *Brnovich*, 141 S. Ct. at 2339.

Georgia laws as a whole "make[] it very easy to vote." *Id.* at 2330. In addition to normal, election-day polling, Georgia allows for no-excuse absentee voting, O.C.G.A. § 21-2-380(b), 17 mandatory days of early voting with optional Sundays, *id.* § 21-2-385(d)(1), drop boxes in every county, *id.* § 21-2-382(c)(1), and many weeks of absentee voting by mail, *id.* § 21-2-384(a)(2). Considering these various ways to vote—including placing an absentee ballot in one's own mailbox—prohibiting third parties from handing food and drinks to voters in line does not eliminate or meaningfully limit any access. *See id.* Rather, where a voter may select among multiple options, there is no interference with the right to vote. *See*, *e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) ("*NGP*"). And Plaintiffs cannot show that the Ban "actually makes voting harder for African Americans," *GBM*, 992 F.3d at 1330 (cleaned up), and thus cannot succeed on their Section 2 claim.

## C.   The provision serves important State interests.

Moreover, "[e]ven if the plaintiffs had shown a disparate burden" arising from the Ban, which they cannot do, "the State's justifications would suffice to avoid § 2 liability." *Brnovich*, 141 S. Ct. at 2347. Georgia's interests in enacting the Ban are not subject to material factual dispute. Those interests include: "improv[ing] … election procedures," "safeguarding voter confidence," "deterring and detecting voter fraud," *GBM*, 992 F.3d at 1319, and running an efficient and orderly election, *Brnovich,* 141 S. Ct. at 2345; *Burdick v. Takushi*,

504 U.S. 428, 433 (1992); *NGP*, 976 F.3d at 1282.  This list overlaps with the interests identified in SB 202—increasing voter confidence, reducing the burden on election officials, streamlining the elections process, and promoting uniformity in voting.  SOF ¶ 277 (SB 202 at 4:70–82, 6:126–29).  And here, this Court has twice concluded that these are "compelling" interests animating the Ban. 8/18/22 Order at 52 [Doc. 241]; 8/18/23 Order at 24 [Doc. 614].

**Efficiency**.  In 2020, officials were unclear if handing things of value to voters violated the law against providing items of value for the "purpose of … voting," O.C.G.A. § 21-2-570; *see also* Mashburn 3/14 94:15–25 ("poll managers were getting confused," and "inundated with questions" about the legality of these activities); Eveler 138:15–24 ("we didn't know where the line was, basically").  They requested guidance from the Secretary of State's office, requiring county and State officials to divert time away from conducting the election, attempting to discern what practices are permissible around the voting line.  SOF ¶ 250 (Germany 6/24/22 Decl. ¶¶ 29–31).  Moreover, county officials were spending significant time trying to monitor what was happening in the voting line. SOF ¶ 554 (Eveler 143:17–25; Sosebee 148:15–25).

SB 202 responded by creating a clear rule that prohibited approaching voters anywhere in line to give them anything of value.  Such clarity is "important when conducting elections," as county officials undertake "hundreds of tasks" each day during an election.  SOF ¶ 279 (Germany 6/15/23

Decl. ¶ 26).  This clear rule thus ensures that a county official or poll worker is not required to "stop[] what he or she is doing to contact the Secretary of State's office with a question," a process that can create the very lines Plaintiffs claim are present in Georgia.  SOF ¶ 280 (*Id.* ¶ 26).  And this is true irrespective of where a voter is standing in line. Accordingly, this provision enhanced the "orderly administration" of elections. *Brnovich*, 141 S. Ct. at 2345.

**Voter confidence**. Similarly, SB 202's regulation of voting lines enhances "public confidence in the integrity of the electoral process," which "has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). Indeed, when third-party organizations approach voters in line, there is a "real risk that a voter will feel unwanted pressure and even harassment and not want to vote in future elections."  SOF ¶ 261 (Mashburn Decl. ¶ 19).

In fact, as this Court previously recognized, Plaintiffs openly describe their activities as "political activism," which is "capable of intimidating and confusing the electorate and interfering with the act of voting."  8/18/22 Order at 50 [Doc. 241] (quoting *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009)).  And this occurs anywhere in the voting line, as all voters in line are "captive" to someone approaching them and are left with just two options: "forgo his or her place in line and return

another time," or be "subject[ed] … to the solicitation." SOF ¶ 262 (Mashburn Decl. ¶ 21; Bailey 3/21 172:12–173:8).

As former General Counsel for the Office of the Secretary of State Ryan Germany explains, moreover, voters "always suspect the motives are partisan" when they observe organizations approaching voters in line with something of value. SOF ¶ 263 (Germany 6/24/22 Decl. ¶ 29(d)). Those concerns are understandable, as third-party groups rarely offer their items of value to non-voters in the area. SOF ¶ 264 (Mashburn Decl. ¶ 24). And the Ban responded to these concerns, and the others discussed above, to enhance voter confidence.

**Maintaining order.** Additionally, as this Court previously found, the Ban furthered the State's compelling interest in "maintaining peace and order around the polling place." 8/18/23 Order at 24 [Doc. 614] (citing *Browning*, 572 F.3d at 1219); *see also Brnovich*, 141 S. Ct. at 2345. Before SB 202, outside organizations had turned the areas around polling places "into a circus." SOF ¶ 253 (Mashburn 3/14 128:1–5); *see also* 8/18/22 Order at 8 [Doc. 241]. State election officials also received complaints from counties that these unregulated activities made it "more and more difficult to sort of keep order in the lines." SOF ¶ 265 (Harvey 147:11–21; Bailey 3/21 128:7–15). This chaos caused state election officials to worry that voters could "misunderstand interaction with outside individuals that are approaching voters in line, and that it can cause confrontation even amongst the voters themselves standing in line." SOF ¶ 267

13

(Bailey 3/21 128:21–129:2; Germany 3/7 107:25–108:11; Mashburn 3/14 114:20–25).  The Ban, thus restored an order to the polling place that "tends to decrease voter confusion."  *Brnovich*, 141 S. Ct. at 2345.

### D.    The provision also passes Section 2's "results test."

For similar reasons, the Ban survives Section 2's "results test."  First, under the undisputed facts, the provisions do not impose a cognizable burden: Between mailboxes, post offices, registrar's offices, and early voting locations, voters have ample options to return their ballots without needing to encounter a lengthy voting line.  Any trip to any of these locations "—much like traveling to an assigned polling place—falls squarely within the heartland of the 'usual burdens of voting.'"  *Brnovich*, 141 S. Ct. at 2346 (citation omitted).  And the many valid state interests supporting those provisions doom Plaintiffs' claims under this analysis as well.  *See id.* at 2347.

Subsequent experience also demonstrates that this provision serves the interests it was designed to serve:  In the 2022 elections, the State did not receive the complaints about this provision they had received following the 2020 election cycle.  SOF ¶ 289 (Watson 185:13–19).  That is enough to sustain the law against a background of no material disputes of fact.

## II.    The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate the Fourteenth or Fifteenth Amendments.

Plaintiffs' constitutional claims under the Fourteenth and Fifteenth

Amendments fail for similar reasons: The undisputed facts show that the Ban imposes no cognizable burden on voting; any impact is not discriminatory; and strong state interests make clear that the provisions would have been enacted regardless of any marginal "racial discrimination factor," *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir.) ("*LWV*") (citation omitted), *reh'g denied*, 81 F.4th 1328 (11th Cir. 2023); *GBM*, 992 F.3d at 1321, a factor that was not even present here.[2]

Under the relevant analytical framework, these undisputed facts are sufficient to require rejection of Plaintiffs' constitutional voting rights claims. In assessing such a claim, a court must: (i) "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; (ii) "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; (iii) "determine the legitimacy and strength of each of those interests"; and (iv) "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see Burdick*, 504 U.S. at 433–34. The analysis is not a "litmus-paper test" and instead requires a "flexible" approach. *Common*

---

[2] State Defendants' concurrently filed motion for summary judgment on discriminatory purpose addresses the intent factors. As that motion confirms, there was no discriminatory intent behind the Ban.

*Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (internal quotation omitted).  If a plaintiff's voting rights "are subjected to severe restrictions, the [respective] regulation must be narrowly drawn to advance a state interest of compelling importance.  But when [the law] imposes only reasonable, nondiscriminatory restrictions … , the [s]tate's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (cleaned up).  And ordinary burdens (such as going to a polling place to vote) that "aris[e] from life's vagaries" fall into the latter, non-severe category. *Crawford*, 553 U.S. at 191, 197–98 (controlling opinion).  For such burdens, advancing sufficient justifications places no "evidentiary burden on the state." *Common Cause*, 554 F.3d at 1353.

Here, any burden is slight to nonexistent.  There is, of course, no right to food or drinks in a voting line, just as there is no right to vote in any particular manner.  *Burdick*, 504 U.S. at 433.  The Constitution does not "demand[] recognition and accommodation of such variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016).

And recent data confirm that this provision did not cause the harmful results Plaintiffs feared.  Rather, Georgia voters of all races reported "high levels of satisfaction" with the electoral process.  *See* Order at 31 [Doc. 686-1]

(citing PI Hr'g Tr. at 252 discussing Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga., *2022 Georgia Post-Election* Survey 252 (2023) ("SPIA Survey")). In fact, this Court recently noted that "99.5% of black voters reported no problem when voting, and no black voters reported poor experiences when voting." *Id.* at 31–32. And, as this Court further explained, Plaintiffs' evidence focuses on differences in wait times at polling locations that "are not statistically significant enough to demonstrate that black voters wait in longer lines at a meaningfully higher rate than white voters." Order at 35 [Doc.686-1]. Rather, Plaintiffs rely on statistical differences in wait time during elections held between 2014 and 2020 that are "even smaller … than those reviewed and rejected by the Eleventh Circuit in [*LWV*]." *Id.* But even if Plaintiffs' data were not insufficient under *LWV*, Plaintiffs' expert conceded that the data were insufficient to make reliable racial comparisons in reported wait times. *See id.*

However, even if those issues with Plaintiffs' data were not fatal, this Court has already explained that longer wait times for black voters compared with white voters does "not alone support a conclusion that [the Food, Drink and Gift Ban] has a disparate impact on black voters." *Id.* (quoting *LWV*, 66 F.4th at 935) (alteration in original). Indeed, these statistical analyses do not show that the Ban "makes it harder for voters in line to cast their ballots." *Id.* Quite the opposite. SB 202 included *many* provisions aimed at reducing lines to make the voting process easier for all Georgia voters.   For example, all

17

precincts are now required to measure line wait times at least three times. O.C.G.A. § 21-2-263(b); SOF ¶ 291 (Germany 6/24/22 Decl. ¶¶ 10–11). And all precincts with any reported wait time greater than one hour and more than 2,000 electors in the last general election must now take corrective action, such as providing more voting equipment or more poll workers, or reducing precinct size. O.C.G.A. § 21-2-263(b); SOF ¶ 279 (Germany 6/24/22 Decl. ¶ 12).

Moreover, even where lines remain, the Ban provides various ways for voters to access food and drinks. For instance, this provision allows every polling location to provide a self-serve water container. O.C.G.A. § 21-2-414(e); SOF ¶ 281 (Mashburn 3/14 95:7–25). And it allows third parties to provide food and drinks just a few feet from the line. SOF ¶ 282 (Mashburn 3/14 128:6–10). And voters may bring their own food and drinks. SOF ¶ 283 (Wurtz 133:15–23). The General Assembly thus ensured that voters were able to access food and drinks if needed, even as it protected voters from unwanted interactions with third parties attempting to hand them things of value line. Accordingly, Plaintiffs cannot demonstrate that the Ban has a discriminatory impact.

Given this minimal burden, any reasonable justification is sufficient," as "[o]nly in an exceptional circumstance will a statute not be rationally related to a legitimate government interest[.]" *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). This is not such an "exceptional" case. As explained above, the Ban serves a slew of neutral and valid state interests, and therefore are

constitutional. *See Crawford*, 553 U.S. at 204.

## III.   The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate the First Amendment

The Ban also does not restrict speaking to voters in line, only the non-expressive conduct of providing items of value, and thus it is subject to rational basis review.   Given the compelling interests of the State supported by the record, 8/18/22 Order at 51–52 [Doc 241], the statute clearly is a "rational means to serve a legitimate end" which passes that review.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).  And that is true regardless of the line's length, as Plaintiffs have failed to show these valid concerns—such as intimidation and appearance of partisanship, SOF ¶ 268 (Germany 6/24/22 Decl. ¶¶ 30–31; Germany 6/15/23 Decl. ¶¶ 22, 29)—dissipate as lines grow longer.[3]

Plaintiffs nonetheless claim that giving these items is itself expressive conduct, but to determine what qualifies as "expressive conduct" covered by the First Amendment, courts ask "whether the reasonable person would interpret" the conduct as expressing "*some* sort of message."  *Holloman v.*

---

[3] If the Court were inclined to deny this motion with respect to Plaintiffs' First Amendment claim, at least with respect to the supplemental zone, State Defendants respectfully request that the Court await resolution of the pending appeal of the Court's preliminary-injunction order addressing the same claim. The Eleventh Circuit's insights on these issues are likely to be dispositive, one way or the other.

*Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). And "a regulated party [cannot] always transform conduct into 'speech' simply by talking about it." *Rumsfeld v. FAIR*, 547 U.S. 47, 65–66 (2006). The record confirms that no "reasonable person would interpret" the conduct here as expressing a message. Rather, some voters apparently interpreted the conduct in a muddle of ways, including partisanship and electioneering. SOF ¶ 269 (Germany 6/24/22 Decl. ¶¶ 29–30). Even those voters who enjoyed the provided items differentiated the "encouragement and support" from the items provided. SOF ¶ 270 (Durbin Decl. ¶ 6), confirming that this conduct is not expressive, because additional speech is required to convey a message. *Rumsfeld*, 547 U.S. at 66.

True, the court earlier found that Plaintiffs were engaged in speech, 8/18/22 Order at 31 [Doc. 241], but that was based on perceived similarity to the activity addressed in *Food Not Bombs*. *Id.* at 30–31 (discussing *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1242 (11th Cir. 2018)). However, a subsequent panel explained that case's fact-bound nature, explaining that "most social-service food sharing events will not be expressive." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021). Plaintiffs cannot explain how their conduct is sufficiently different from the default to qualify as expressive.

Even if the conduct were expressive, it is a content neutral and reasonable time, place, and manner restriction, providing for alternative

avenues of expression. *See McCullen v. Coakley*, 573 U.S. 464, 477 (2014). Laws regulating an activity—even an activity intertwined with certain forms of speech, such as running a pornographic theater—are content-neutral if done to prevent secondary effects resulting from that activity. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986). Likewise, the Supreme Court's decision in *O'Brien* and its progeny establish that it is improper to infer that a law is targeting speech, based on its content, simply because the law covers a narrow category of conduct that can be used to convey only a few particular messages. *United States v. O'Brien*, 391 U.S. 367 (1968). While the Court concluded that the Ban was content-based in a previous order, 8/18/22 Order at 39–40 [Doc. 241], the record has now developed sufficiently to show that the law is content-neutral, and targets only secondary effects, such as voter intimidation and appearance of corruption, that result from *anyone* handing out items of value to voters in line for *any reason*. SOF ¶ 284 (Germany 6/15/23 Decl. ¶¶ 21–22, 28).

And the law is reasonable under the "*Anderson-Burdick* test." *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022). Addressing the test's first prong, plaintiffs have failed to satisfy their burden to "direct th[e] Court to … admissible and reliable evidence that quantifies the extent and scope" of the burden on their rights. *Common Cause*, 554 F.3d at 1354. They have provided no such evidence—regardless of location in the voting line. And even if they

21

had, their interests are not outweighed by the State's compelling interests. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Election laws that impose only "reasonable, nondiscriminatory restrictions" are "generally" justified by the "State's important regulatory interests," *id.* (cleaned up), as there is no constitutional right to be free from "the usual burdens of voting," *Crawford*, 553 U.S. at 198. And the balance of these interests is unchanged throughout the line as well. Finally, binding authority has upheld more restrictive bans. *See Burson v. Freeman*, 504 U.S. 191, 198–99 (1992) (upholding 100-foot content-based solicitation ban, despite plurality's also concluding that the challenged buffer zone was a public forum); *Browning*, 572 F.3d at 1219 (upholding ban that applied even after voters had voted).

Even if a higher form of scrutiny applied, the Court should only apply a modified form with a "lowered … narrow tailoring requirement," 8/18/22 Order at 43 [Doc. 241], requiring the State to assert a compelling interest and "demonstrate that its law is necessary to serve the asserted interest," *Burson*, 504 U.S. at 199. State Defendants satisfy both requirements here, and Plaintiffs have not shown otherwise. Defendants have shown compelling state interests, including protection against voter intimidation, that are supported by the record, and, the law is narrowly tailored in that it allows multiple avenues to reach voters with any message—including speaking without giving out items, or giving out items a few feet away from the protective zones. *See*

22

SOF ¶ 285 (Mashburn Decl. ¶ 24; Germany 6/15/23 Decl. ¶ 28).  Thus, SB 202 is a "reasonable resolution of the tension between [any] right to free speech and the right to cast a ballot without improper influence."  8/18/22 Order at 54 [Doc. 241].  Because there are no disputes of material fact on any of these issues, summary judgment should be entered for State Defendants on these claims.

## IV.   The Record Further Confirms that the Food, Drink, and Gift Ban Does Not Violate Disability Laws.

Plaintiffs also cannot show that this provision violates Title II of the ADA or Section 504 of the Rehabilitation Act, each of which requires this Court to apply the same standard.  *See L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.,* 55 F.4th 1296, 1301 n.2 (11th Cir. 2022). Under those laws, a plaintiff must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, activities, or otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021). To "assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

As this Court has recognized, however, mere "[d]ifficulty in accessing a benefit … does not by itself establish a lack of meaningful access." AME PI

Order 15 [Doc. 615]).  Individuals are not "entitled to the accommodation of [their] choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). Indeed, "when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided …." *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014) (cleaned up).

To the contrary, as *Brnovich* held, "courts must consider the opportunities provided by a State's *entire* system of voting when assessing the burden imposed[.]" 141 S. Ct. at 2339 (emphasis added). ADA regulations also state that a public entity must make its services, programs, or activities— "when viewed in [their] entirety"—"readily accessible" to disabled individuals. 28 C.F.R. § 35.150(a).

There can be dispute that the Ban does not violate any disability law.  As already explained, Georgia provides voters with myriad ways to vote that do not require in-person voting at a polling place.  And, considering other provisions of SB 202, lines have been substantially reduced in Georgia.  SOF ¶ 293 (Grimmer Rep. ¶ 218).  Indeed, voters returning absentee ballots to drop boxes do not have to wait in line with those seeking to vote in person. *See* SOF ¶ 294 (ADAPT 31:8–17, 108:21–109:2).  Also, disabled voters, like all voters, may obtain water from a self-serve receptacle at the polling location, or from

third-party organizations standing just feet from the voting line.  SOF ¶ 295

(O.C.G.A. § 21-2-414(e); Mashburn 3/14 95:7–25, 128:6–10).

Aside from those undisputed facts, Plaintiffs' disability claims are also undercut by Georgia law providing that "each elector … who is disabled and requires assistance in voting … be authorized … to vote immediately at the next available voting compartment or booth without having to wait in line." O.C.G.A. § 21-2-409.1.  Accordingly, disabled voters have "meaningful access" to the voting booth.  That is likely why Plaintiffs' expert, Dr. Schur, recognized that Georgia has experienced high turnout from disabled voters, and why Dr. Schur praised this turnout before being retained by the party suing Georgia. Schur 34:11–22; Lisa Schur et al., *Accessible Democracy: Reducing Voting Obstacles for People with Disabilities*, 14 Election L.J. 60, 63 (2015).

## CONCLUSION

For all these reasons, Plaintiffs' various challenges to the Food, Drink, and Gift Ban fail as a matter of law and fact.  This provision responded directly to complaints made by voters and election officials, and, as this Court has already concluded, it furthers compelling state interests.  Accordingly, the Court should enter summary judgment for State Defendants on each of Plaintiffs' claims related to the Food, Drink, and Gift Ban.

Respectfully submitted this 30th day of October 2023.

25

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Edward H. Trent*
Cristina Martinez Squiers*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com

26

Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104
ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr

28