**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON
ABSENTEE BALLOT PROVISION CLAIMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION .................................................................................... 1

BACKGROUND ...................................................................................... 4

    A.    Complaints and Concerns with Absentee by Mail Voting from 2018 and 2020. .................................................................................... 4

    B.    SB 202 Addressed the System's Vulnerabilities so as to Prevent Fraud, Restore Voter Confidence, and Improve Election Administration. ................................................................................... 7

    C.    The Results of the 2022 Election confirmed that SB 202 Made it Easier to Vote, Harder to Cheat, and Led to Confidence in Result. .............................................................................................. 10

ARGUMENT ........................................................................................... 11

    I.    Given the State Interests at Stake Here, Plaintiffs Face an Extraordinarily High Bar In Supporting Their Claims and, Thus, in Avoiding Summary Judgment ............................................. 13

    II.    State Defendants Are Entitled to Summary Judgment on Each of the Challenged Provisions Regulating Government and Third-Party Actors ....................................................................... 17

        A.    Prohibition on State and Local Officials Sending Out Unsolicited Absentee Ballot Applications ............................... 17

            1.    Prohibiting Election Officials from sending unsolicited absentee ballot applications does not unduly burden Plaintiffs' right to vote. ......................... 18

            2.    Prohibiting State and local election officials from sending unsolicited absentee ballot applications does not burden Plaintiffs' free speech and association rights. ........................................................... 23

            3.    Prohibiting State and local election officials from sending unsolicited absentee ballot applications is not racially discriminatory under Section 2 of the Voting Rights Act. ......................................................... 25

        B.    Regulations on Third-Party Distribution of Unsolicited Absentee Ballot Applications. .................................................. 28

1.  Third parties remain free to send out absentee ballot applications subject to certain limitations and are entirely free to communicate any message they wish. ........................................................ 28

2.  The limitations on third-party distribution of unsolicited absentee ballot applications does not unduly burden the right to vote. .................................... 33

3.  The limitations on third-party distribution of unsolicited absentee ballot applications does not violate Plaintiffs' right to free speech under the First Amendment. ........................................... 36

4.  The Third-Party Solicitation Provisions do not violate Plaintiffs' freedom of association. ..................... 41

5.  The Third-Party Solicitation Provisions do not violate Section 2 of the Voting Rights Act. .................... 43

C.  Ballot Harvesting Penalty ........................................... 43

1.  The Ballot Harvesting Penalty does not unduly burden the right to vote. ................................................. 44

2.  The Ballot Harvesting Penalty does not violate Section 2 of the Voting Rights Act. ............................... 48

3.  The Ballot Harvesting Penalty does not violate the ADA or Section 504 of the Rehabilitation Act. .............. 48

III.  State Defendants Are Entitled to Summary Judgment on Each of the Challenged Provisions Directly Affecting Voters. .......... 54

A.  Denial of absentee ballot applications for unregistered voters. ...................................................... 54

B.  Voter identification requirements associated with the absentee ballot application. ...................................... 56

1.  Voter identification requirements associated with absentee voting do not unduly burden the right to vote.  58

2.  The voter identification requirements do not violate Section 2 of the Voting Rights Act. ............................... 62

3.  The voter identification requirements do not violate the ADA or the Rehabilitation Act. ................................ 62

C.    Requirement for voters to sign the oath on the absentee ballot application with pen and ink [Signature Oath Requirement]............................................................................ 65

    1.    The Signature Oath Requirement does not unduly burden the right to vote................................................. 66

D.    Voter identification requirements associated with returning a completed absentee ballot. ................................. 68

    1.    Voter identification requirements for returning an absentee ballot do not unduly burden the right to vote. ............................................................................... 69

    2.    Voter identification requirements for returning a completed absentee ballot do not violate Section 2 of the Voting Rights Act. .............................................. 70

    3.    Voter identification requirements for returning a completed absentee ballot do not violate the ADA. ...... 71

E.    Signed oath requirement........................................................ 72

F.    Date of birth on absentee ballot return envelope. .................. 73

    1.    Georgia has compelling and important interests in verifying the identity of persons who return completed absentee ballots............................................ 74

    2.    Plaintiffs are unable to establish that the date-of-birth requirement violates the materiality provision. ......................................................................... 76

        a.    The materiality provision is limited to determining qualifications to vote and not general regulations for casting an absentee ballot making it inapplicable here. ...................... 77

        b.    Even if the Court views the materiality provision as applying to the absentee ballot return envelope, requiring a voter to list his/her date of birth is material to casting the absentee ballot and thus the requirement does not violate the materiality proision............. 81

CONCLUSION.................................................................................... 85

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alexander v. Choate,*
    469 U.S. 287 (1985) ............................................................... 50

*Am. Party of Tex. v. White,*
    415 U.S. 767 (1974) ............................................................... 14

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ...........................................................*passim*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................ 11, 12

*Ave. CLO Fund, Ltd. v. Bank of Am., N.A.,*
    723 F.3d 1287 (11th Cir. 2013) ................................................. 12

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) ............................................................. 78

*Bircoll v. Miami–Dade Cnty.,*
    480 F.3d 1072 (11th Cir. 2007) ............................................ 49, 63

*Blackston v. Shook & Fletcher Insulation Co.,*
    764 F.2d 1480 (11th Cir. 2015) ................................................. 12

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ............................................................... 42

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) .......................................................*passim*

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ...........................................................*passim*

*Burns v. Town of Palm Beach,*
    999 F.3d 1317 (11th Cir. 2021) ................................................. 37

*Burson v. Freeman,*
    504 U.S. 191 (1992) ............................................................... 15

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) ............................................................... 23

*Common Cause v. Thomsen*,
    574 F. Supp. 3d 634 (W.D. Wisc. 2021) ....................................... 61, 82, 83, 84

*Common Cause/Ga. v. Billups*,
    554 F.3d 1340 (11th Cir. 2009) .............................................*passim*

*Condon v. Reno*,
    913 F. Supp. 946 (D.S.C. 1995) ................................................................. 81

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ...........................................................*passim*

*Curling v. Raffensperger*,
    50 F.4th 1114 (11th Cir. 2022)................................................................ 18, 19

*Curry v. Baker*,
    802 F.2d 1302 (11th Cir. 1986) ................................................................... 13

*D.C. v. Heller*,
    554 U.S. 570 (2008) ................................................................................... 24

*DCCC v. Ziriax*,
    487 F. Supp. 3d 1207 (N.D. Okla. 2020)...................................................... 47

*Democracy N.C. v. N.C. State Bd. of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020)......................................... 38, 51, 64, 71

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ................................................................... 18

*Democratic Party of Georgia, Inc. v. Crittenden*,
    347 F. Supp. 3d 1324 (N.D. Ga. 2018) ........................................................ 84

*Diaz v. Cobb*,
    435 F. Supp. 2d 1206 (S.D. Fla. 2006)........................................................ 67

*Fair Fight Action, Inc. v. Raffensperger*,
    No. 1:18-CV-5391-SCJ, 2021 WL 9553856 (N.D. Ga. Mar. 31, 2021) ......... 19

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ................................................................................... 40

*Feldman v. Az. Sec'y of State's Off.*,
    843 F.3d 366 (9th Cir. 2016) ...................................................................... 38

*Fla. State Conf. of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) .................................................. 55, 81, 83, 84

*Frank v. Walker*, 768 F.3d 744 (7th Cir.  2014)............................ 27, 59, 60, 70

*Greater Birmingham Ministries v. Sec'y of State of Ala.,*
  992 F.3d 1299 (11th Cir. 2021) ............................................................*passim*

*Holton v. Hollingsworth,*
  270 Ga. 591, 514 S.E.2d 6 (1999) ................................................................ 52

*Howlette v. City of Richmond,*
  485 F. Supp. 17 (E.D. Va. 1978).................................................................. 67

*Jenness v. Fortson,*
  403 U.S. 431 (1971) ...................................................................................... 15

*Johnson v. Robison,*
  415 U.S. 361 (1974) ................................................................................ 24, 39

*L.E. ex rel. Cavorley v. Superintendent of Cobb*
  *Cnty. Sch. Dist.*, 55 F.4th 1296 (11th Cir. 2022)........................................... 49

*Lee v. Va. State Bd. of Elections,*
  843 F.3d 592 (4th Cir. 2016) ................................................................ 60, 61

*Lewis v. Zilog, Inc.,*
  908 F. Supp. 931 (N.D. Ga. 1995) ......................................................... 50, 63

*Libertarian Party of Ky. v. Grimes,*
  835 F.3d 570 (6th Cir. 2016) ....................................................................... 15

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018).................................................. 83, 84

*Mazo v. N.J. Sec'y of State,*
  54 F.4th 124 (3d Cir. 2022) ......................................................................... 39

*McKay v. Thompson,*
  226 F.3d 752 (6th Cir. 2000) ....................................................................... 76

*Medina v. City of Cape Coral,*
  72 F. Supp. 3d 1274 (M.D. Fla. 2014)............................................... 50, 54, 63

*Meyer v. Grant,*
    486 U.S. 414 (1988) ................................................................. 39

*New Ga. Project v. Raffensperger,*
    484 F. Supp. 3d 1265 (N.D. Ga. 2020) ...................................*passim*

*New Ga. Project v. Raffensperger,*
    976 F.3d 1278 (11th Cir. 2020) ........................................... 19, 72

*Norman v. Reed,*
    502 U.S. 279 (1992) ................................................................. 41

*Org. for Black Struggle v. Ashcroft,*
    493 F. Supp. 3d 790 (W.D. Mo. 2020) ....................................... 83

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ................................................................. 24

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................... 14, 69

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022) ............................................................. 77

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ................................................................. 41

*Roe v. Alabama ex rel. Evans,*
    43 F.3d 574 (11th Cir. 1995) ................................................... 13

*Romer v. Evans,*
    517 U.S. 620 (1996) ................................................................. 39

*Rosario v. Rockefeller,*
    410 U.S. 752 (1973) ....................................................... 14, 46, 73

*Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.,*
    547 U.S. 47 (2006) ............................................................. 36, 38

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003) ............................................... 79

*Stein v. Ala. Sec'y of State,*
    774 F.3d 689 (11th Cir. 2014) ................................................. 18

*Stewart v. Happy Herman's Cheshire Bridge, Inc.,*
  117 F.3d 1278 (11th Cir. 1997) ............................................................. 50, 63

*Storer v. Brown,*
  415 U.S. 724 (1974) ............................................................................ 14, 80

*Texas v. Johnson,*
  491 U.S. 397 (1989) ...................................................................... 36, 37, 38

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ................................................................................ 56

*Todd v. Carstarphen,*
  236 F. Supp. 3d 1311 (N.D. Ga. 2017) .................................................... 50, 63

*United States v. O'Brien,*
  391 U.S. 367 (1968) ................................................................................ 39

*Vote.Org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) ....................................................... 66, 76, 79

*VoteAmerica v. Raffensberger,*
  609 F. Supp. 3d 1341 (N.D. Ga. 2022) .................................................... 25, 41

*Voting for Am., Inc. v. Steen,*
  732 F.3d 382 (5th Cir. 2013) ....................................................... 24, 38, 39

*Walker v. Life Ins. Co. of N. Am.,*
  59 F.4th 1176 (11th Cir. 2023) ................................................................ 12

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ................................................................................ 24

*Williams v. Pryor,*
  240 F.3d 944 (11th Cir. 2001) ............................................................. 39, 40

*Wright v. N.Y. State Dep't of Corrections,*
  831 F.3d 64 (2d Cir. 2016) .................................................................. 50, 63

**Statutes**

29 U.S.C. § 794 ..................................................................................... 49

42 U.S.C. § 12132 ................................................................................. 49

42 U.S.C. § 1983 ................................................................. 76

52 U.S.C. § 10101 .............................................................. *passim*

52 U.S.C. § 10301 .............................................................. 25

Ala. Code § 17-11-10 ......................................................... 74

Ala. Code § 17-11-7 ........................................................... 74

Alaska Stat. § 15.20.203 ..................................................... 74

La. Stat. Ann. § 18:1306 ..................................................... 74

Miss. Code. Ann. § 23-15-633 ............................................. 74

Miss. Code. Ann. § 23-15-635 ............................................. 74

Miss. Code. Ann. § 23-15-639 ............................................. 74

Miss. Code. Ann. § 23-15-641 ............................................. 74

Mo. Ann. Stat. § 115.283 .................................................... 74

Mo. Ann. Stat. § 115.295 .................................................... 74

N.C. Gen. Stat. Ann. § 163-231 ........................................... 74

O.C.G.A. § 21-2-216 .......................................................... 55

O.C.G.A. § 21-2-381(a) ...................................................... *passim*

O.C.G.A. § 21-2-381(b) ...................................................... 2, 54

O.C.G.A. § 21-2-384 .......................................................... 2, 68, 72, 73

O.C.G.A. § 21-2-385 .......................................................... *passim*

O.C.G.A. § 21-2-386 .......................................................... 78

O.C.G.A. § 21-2-417 .......................................................... 57, 60, 64

O.C.G.A. § 21-2-568 .......................................................... 2, 45, 51

O.C.G.A. § 21-2-598 .......................................................... 45

Okla. St. tit. 26, § 14-108..................................................................... 74

Okla. St. tit. 26, § 14-108.1.................................................................. 74

Okla. St. tit. 26, § 14-123..................................................................... 74

S.C. Code Ann. § 7-15-220................................................................... 74

S.C. Code Ann. § 7-15-230................................................................... 74

**Regulations**

28 C.F.R. § 35.130................................................................................ 49

28 C.F.R. § 35.150................................................................................ 50

**Rule**

Fed. R. Civ. P. 56 ................................................................................ 11

**Other Authorities**

Gabriella Borter,
  *North Carolina Republican Operative Charged in Election
  Fraud Scheme*, Reuters (Feb. 27, 2019) ........................................ 44

Eileen Chou,
  *Paperless and Soulless: E-signatures Diminish the
  Signer's Presence and Decrease Acceptance*,
  6 Soc. Psych. & Personality Scis. 343 (2015) ............................... 65

Eileen Chou,
  *What's in a name? The toll e-signatures take on
  individual honesty*, 61 J. Experimental Soc. Psych. 84 (2015) .................... 65

## INTRODUCTION

In their wholesale attack on Georgia's Election Integrity Act of 2021, known as SB 202, Plaintiffs in these consolidated cases challenge several provisions related to the expansion and uniformity of absentee voting. But now that discovery is complete, it is clear Plaintiffs cannot raise a material issue of fact as to the lawfulness of any of these provisions. Summary judgment should therefore be granted to State Defendants on those claims.

The genesis of these provisions is straightforward: Following the 2018 and 2020 elections, the State received numerous complaints from voters and both sides of the political aisle about the confusion caused by voters receiving duplicate absentee ballot applications, errors in mailing of absentee ballot applications from third parties, the signature match procedures for verifying voter identity, and concerns over ballot harvesting, particularly related to drop box usage during the 2020 election cycle. Voters and partisans expressed concerns over alleged problems in the voting process, allegations that had to be investigated. Even though there was no evidence of widespread issues following either the 2018 or the 2020 election, voter confidence in the integrity of Georgia's election system was impaired by Democratic allegations following the 2018 elections and by Republican allegations following the 2020 elections.

As a result, the General Assembly concluded that more could be done to address areas where Georgia's voting system had been susceptible to

complaints and where the system had shown signs of stress when conducting an election during the COVID-19 pandemic. Accordingly, the General Assembly took several steps to strengthen the system, limit the risk of fraud, restore or reinforce voter confidence, and facilitate administrative efficiencies. As relevant here, SB 202 included three provisions directly affecting actors other than voters themselves:

- A prohibition on state and local officials sending unsolicited absentee ballot applications (O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

- Regulations on third parties sending out unsolicited absentee ballot applications (O.C.G.A. § 21-2-381(a)(1)(C)(ii), (iii), & (a)(3)(A)).

- Penalties for unauthorized handling of absentee ballots by third parties (O.C.G.A. § 21-2-568(a)(5)).

SB 202 also included six provisions directly regulating voter opportunities and requirements related to absentee ballots:

- Denial of absentee ballot applications for unregistered voters (O.C.G.A. § 21-2-381(b)(5)).

- Voter identification requirements associated with the absentee ballot application (O.C.G.A. § 21-2-381(a)(1)(C)(i)).

- A requirement for voters to sign the oath on the absentee ballot application with pen and ink (O.C.G.A. § 21-2-381(a)(1)(C)(i)).

- Voter identification requirements associated with returning a completed absentee ballot (O.C.G.A. § 21-2-384(b)).

- A requirement for voters to sign an oath on the return envelope of the absentee ballot (O.C.G.A. § 21-2-384(b), (c)(1)).

- A requirement for voters to include the voter's date of birth on the absentee ballot return envelope (O.C.G.A. § 21-2-384(b)).

Under the undisputed evidence, none of these provisions violates the Voting Rights Act, the Americans with Disabilities Act, or the Constitution. Each provision furthers important—even compelling—governmental interests in preventing voter fraud, protecting the integrity of the voting process and its results, reducing the risk of voter confusion, and promoting the efficient administration of elections in a fair and uniform manner for all eligible voters. *See* SOF ¶¶ 538–39 (Germany 10/30/23 Decl. ¶¶ 22–23). None of those provisions, individually or collectively, imposes anything beyond a minimal burden necessary to accomplish the governmental interests, and no provision, individually or in combination, disenfranchises any eligible voter.

Indeed, the results of the 2022 elections—after SB 202 went into effect—demonstrated that voters found voting in Georgia easy, that turnout remained high, that more people of all races used absentee voting, and that the complaints that arose following the 2018 and 2020 elections all but disappeared. SB 202's provisions are entirely consistent with Georgia's constitutional obligations safeguarding its citizens' right to vote. And the Court should grant the State Defendants' Motion for Summary Judgment as to the challenged absentee ballot provisions.

## BACKGROUND

### A.   Complaints and Concerns with Absentee by Mail Voting from 2018 and 2020.

Prior to SB 202, Georgia election officials received numerous complaints about the election process.  SOF ¶¶ 427, 430 (Mashburn 3/7 62:3–7; Germany 10/30/23 Decl. ¶¶ 5–8, 18).  Following the 2018 elections, Democrats made serious allegations about the security and integrity of Georgia's election system.  When the results of the election were not what they had hoped, there were complaints about absentee voting, SOF ¶ 427 (PI Hr'g Tr. 183:1–5, 11–17), signature matching on absentee ballot applications, SOF ¶ 428 (Mashburn 3/14 196:20–24, 196:25–197:4; Sterling 95:8–96:16; PI Hr'g Tr. 191:11–20) and other concerns over the integrity of the election.  SOF ¶ 429 (Germany 10/30/23 Decl. ¶ 5).

In 2020, the roles were reversed.  This time it was Republicans complaining about the electoral process after the results did not turn out the way they had hoped.  SOF ¶ 430 (PI Hr'g Tr. 190:11–21; Germany 10/30/23 Decl. ¶ 18).  In 2020, Democratic organizations again made significant outreach to encourage voters to utilize the absentee by mail system during the COVID-19 pandemic.  SOF ¶ 441 (Germany 3/7 92:13–94:7).  To avoid potential exposure from in-person voting, not only did third party organizations send out mailings to Georgia voters to encourage them to vote absentee by mail, but some counties sent out unsolicited absentee ballot applications to registered

voters in their county while the Secretary of State sent applications to all active, registered voters for the June 2020 primary.  SOF ¶¶ 434–35 (Bailey 10/6 126:13–127:1; Germany 3/7 58:5–23).  The massive increase in the number of absentee ballot applications in circulation led to election officials receiving numerous duplicate applications from the same voters.   SOF ¶¶ 436–37 (Germany 3/7 183:3–9, 183:16–21; Sterling 53:3–20; Germany 10/30/23 Decl. ¶¶ 59–61).  Further, officials received numerous calls and complaints about absentee ballot applications arriving after they had already requested an absentee ballot.  This caused confusion among voters as to whether their initial application had been received and accepted and whether the subsequent application was actually a ballot.  SOF ¶¶ 442–44, 464–65 (Germany 10/30/23 Decl. ¶ 67; Watson 178:11–179:4, 200:23–201:13; Eveler 185:2–11; K. Smith 66:13–20; Kidd 189:25–90:22; Bailey 10/6 50:3–24; 126:13– 27:1; 127:7–13; 129:8–16; Germany 5/20/22 VoteAmerica  Decl. ¶ 42; VoteAmerica Hr'g Tr. 20:3–5; Germany 3/7 183:3–9). Officials also received questions over who was sending them the information and concerns that many pre-filled applications had erroneous information, including people who did not live at the address, minor children, misspellings, and even pet names.  SOF ¶¶ 447–50 (Bailey 10/6 131:3–24; Watson 127:18–128:8; Germany 10/30/23 Decl. ¶¶ 32–35, 38–42).

In trying to keep up with the volume and address the large number of duplicate applications resulting from so many different groups sending out

absentee ballots indiscriminately, voting officials were overwhelmed.   SOF ¶ 466 (Sosebee 167:2–10, 169:20–170:3; N. Williams 107:10–20).   One county even admitted that approximately 20 voters received duplicate *ballots* based on duplicate applications.   SOF ¶ 467 (Watson 201:14–202:9; *see also,* Sosebee 169:10–19 (few times when voter got more than one ballot—count first one to return)).   One man who received 2 ballots put the second one on sale online.   SOF ¶ 468 (Mashburn 3/7 63:5–9).   There was also an extraordinary number of people who canceled their absentee ballots at the polls so they could vote in person, resulting in longer lines for all voters.   SOF ¶¶ 440, 445 (Grimmer Rep. ¶¶ 98–99; Germany 10/30/23 Decl. ¶¶ 47–48, 89; Germany Vote America 199:13–200:7; VoteAmerica Hr'g Tr. 29:25–30:4).

With the volume of applications, the concerns over the signature match process were again highlighted.   Prior to the 2020 elections, Democrat groups had complained that signature matching was not actually a trustworthy way to confirm voters' identities.   After the November 2020 election, Republican groups made the same allegations. SOF ¶¶ 428, 431 (Germany 10/30/23 Decl. ¶¶ 17–18, 71–76).   Indeed, it took approximately 3 to 4 minutes to process a single application when relying on a signature match.   SOF ¶ 490 (Bailey 3/21 122:14–123:4,  125:22–126:12).    And, when considering the more than 1,700,000 applications in 2020, some questioned whether counties were spending sufficient time per application to adequately conduct thorough

signature matching.  SOF ¶ 491 (Germany 10/30/23 Decl. ¶¶ 18, 29, 71–76).

Of course, when an application was rejected for a signature mismatch, it

highlights concerns of the subjective nature of signature match and the fact

that election officials are not handwriting experts, a potential vulnerability of

signature matching.  SOF ¶ 492 (Germany 10/30/23 Decl. ¶ 76).

Voters and activists also raised concerns about ballot harvesting with

the dramatic increase in absentee by mail voting and the use of drop boxes to

return those ballots.  SOF ¶ 471 (Watson 203:20–204:10; Germany 10/30/23

Decl. ¶ 95).  Additionally, the State had to investigate numerous claims of

alleged voter fraud, most of them associated with absentee voting.  SOF ¶ 471

(Germany 10/30/23 Decl. ¶ 95).

### B.    SB 202 Addressed the System's Vulnerabilities so as to Prevent Fraud, Restore Voter Confidence, and Improve Election Administration.

While election officials did not uncover any evidence of widespread issues

during the 2018 or 2020 elections, they were, as noted above, inundated with

concerns and complaints.  To address these issues, the General Assembly chose

to modify the absentee voting system, among other changes, while leaving in

place its accessibility to all Georgia voters for any reason.  SOF ¶¶ 189, 493

(Grimmer Rep. ¶ 71; Bailey 3/21 189:20–190:12; Germany 10/30/23 Decl.

¶¶ 23, 31). They prohibited State and local election officials from sending out

unsolicited absentee ballot applications to avoid uneven treatment of voters

and increase uniformity.  They also addressed the large number of duplicate absentee ballot applications from the same voter by prohibiting third-party organizations from sending applications to those who had already requested an absentee ballot (lists of who had requested such a ballot is updated daily), by prohibiting the pre-filling of the application (to avoid the numerous errors being reported and resulting confusion and claims of potential fraud), and by requiring a disclaimer that clearly told the voter who was sending the application and that it was not a ballot.  SOF ¶¶ 525, 532 (Germany 10/30/23 Decl. ¶¶ 52–53, 62, 67–68).

To address the long-standing issues with signature match verification, the General Assembly utilized the fact that Georgia voters are used to the requirement to provide identification when voting in person and simply applied that same concept to the absentee voting process, while making allowances for Georgia voters who may not a driver's license or state identification card.  SOF ¶ 484 (PI Hr'g Tr. 192:5–192:1; Mashburn 3/7 60:5–21; Germany 10/30/23 Decl. ¶¶ 77–78).  Indeed, over 97% of all registered voters had either a Georgia driver's license or state identification number associated with their voter file. SOF ¶¶ 486–87 (Sterling 239:8–20; Evans 79:6–80:4).  For those who had neither form of identification, a series of alternate forms of identification would be accepted.  SOF ¶ 488 (Sosebee 74:4–14; Germany 4/13 87:17–89:2).  The process was objective and took about one minute to verify the person's identity

and eligibility to vote, a marked decrease from the time it took to conduct signature match verification.  SOF ¶ 494 (Bailey 3/21 126:6–12).  The voter would merely list their name, date of birth, address, and provide their driver's license number or other acceptable identification.  By signing the oath, the voter verified that the information was true and correct and the voter was otherwise qualified to vote.  SOF ¶ 495 (Germany 10/30/23 Decl. ¶¶ 78–80).

When returning the completed ballot, for those 2-3% who may not have a driver's license or state identification number, virtually all have the last four digits of their social security number on file (approximately 99.9% of all voters).  SOF ¶¶ 510, 513 (Sterling 239:8–20 (99.9% have ID or SSN); PI Hr'g Tr. 193:2–20).  For the very few who did not, they could still use the same alternate identification used to request their ballot.  SOF ¶ 511 (Sosebee 74:4–14; Germany 4/13 87:17–89:2; Germany 10/30/23 Decl. ¶¶ 82, 84 n. 1).  This, along with the voter's name and date of birth, verified their identity to process their ballot, very similar to the process for in-person voting.  The voter would then sign the oath that the ballot was completed consistent with the State's secret ballot provisions.  And very few applications or ballots were rejected due to a lack of voter identification.  SOF ¶ 497 (Grimmer Rep. ¶¶ 16, 165–68, 171–72).

Finally, the General Assembly reinforced its anti-ballot harvesting rules in a further effort to protect voters' private information used to verify their eligibility and identity, rules that are not themselves the subject of this

lawsuit.  In doing so, the legislature established that, although improperly handling a completed absentee ballot *application* was a misdemeanor, improper handling of a completed ballot would now be a felony, when previously it was only a misdemeanor.  SOF ¶ 526 (Germany 10/30/23 Decl. ¶¶ 96–98).

### C. The Results of the 2022 Election confirmed that SB 202 Made it Easier to Vote, Harder to Cheat, and Led to Confidence in Result.

Following SB 202, Georgia's elections in 2022 continued a trend of record turnout for midterm elections.  SOF ¶¶ 204–05, 348–51, 354 (Shaw 2/24 Rep. ¶¶ 21–22; Shaw 2/14/23 Rep. ¶¶ 15–16 & tbl. 7; Grimmer Rep. ¶¶ 8, 27–28, 41–42, 44–45; Ga. Sec'y of State, *Georgia Voters Lead Southeast in Engagement, Turnout* (May 17, 2023), https://tinyurl.com/2huchh3h).  Additionally, Georgia saw an increase in voters of all races using absentee voting in 2022 when compared to previous midterm elections, SOF ¶¶ 355–56 (Grimmer Rep. ¶¶ 8, 52–54; Shaw 2/14 Rep. ¶¶ 24–25; Shaw 2/24 Rep. ¶ 20), while seeing a significant drop in the percentage of duplicate absentee ballot applications, SOF ¶ 522 (Grimmer Rep. ¶¶ 179–180), and in the rejection of absentee ballot applications and ballots, SOF ¶¶ 497, 515 (Grimmer Rep. ¶¶ 16, 168, 171–72).  Finally, a comprehensive study from the University of Georgia's School of Public and International Affairs following the November 2022 general election found remarkable voter satisfaction with the voting

experience, with both Black and white Georgia voters reporting that it was easier to vote in 2022 than before, 99.5% reporting no problems voting, and 97% of Black voters and 96% of white voters rating their experience as either Excellent or Good, and no Black voters rating their experience as "poor".  SOF ¶¶ 357–59 (Shaw 2/24 Rep. ¶¶ 29–31; Shaw 2/14 Rep. ¶¶ 73–74; Shaw 97:20–98:24; Survey Rsch. Ctr., Sch. of Pub. & Int'l Affs. Univ. of Ga., *2022 Georgia Post-Election* Survey 13 (2023) ("SPIA Survey")).

Accordingly, not only were Georgia voters not meaningfully burdened by SB 202's provisions, but the law functioned as intended, making it easier to vote, harder to cheat, and ensuring confidence in the results of the election. Indeed, the State did not receive the same complaints after the 2022 elections that it received after the 2018 and 2020 elections.  SOF ¶ 528 (Eveler 197:7–14; Germany 10/30/23 Decl. ¶ 99).

## ARGUMENT

Given these undisputed facts and others listed in Defendants' master Statement of Undisputed Facts, State Defendants are entitled to summary judgment on all of Plaintiffs' absentee ballot-related claims.  Summary judgment is appropriate where the record shows that there is no genuine dispute about any material fact and the moving party has shown that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56(c)).  A factual dispute is

"material" only if it "might affect the outcome of the suit under the governing law." *Id.* at 248. And a dispute is only "genuine" if supported by more than a mere "scintilla of evidence." *Id.* at 252. Although the Court views the record in the light most favorable to the non-moving party, *Walker v. Life Ins. Co. of N. Am.,* 59 F.4th 1176, 1185–86 (11th Cir. 2023), the non-moving party cannot rely on speculation or conjecture to meet its burden of production. *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 2015)).

Here, SB 202's absentee ballot provisions serve acknowledged State interests of preventing fraud, promoting efficiency, and enhancing public confidence in Georgia's elections—something that was severely challenged following the 2018 and 2020 elections. The provisions at issue here create at most a minimal burden on voters, but nothing beyond the toils of everyday life and did not have a disparate impact on minority voters as Plaintiffs claimed it would when the law was passed. The provisions also comply with the requirements of the Americans with Disabilities Act ("ADA") by providing multiple means for disabled voters to vote and receive assistance in voting should they require it. There are simply no disputed issues of material fact regarding the issues in this case and, with SB 202 complying with all statutory and constitutional requirements, State Defendants are entitled to judgment as

a matter of law as to these provisions.[1]

## I. Given the State Interests at Stake Here, Plaintiffs Face an Extraordinarily High Bar In Supporting Their Claims and, Thus, in Avoiding Summary Judgment.

As the Eleventh Circuit has noted, "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). That Court has thus cautioned "that federal courts should refrain from holding a state election law unconstitutional when a reasonable alternative course of action exists." *Roe v. Alabama ex rel. Evans,* 43 F.3d 574, 582 (11th Cir. 1995). And, as the Supreme Court has made clear, "[t]he Constitution

---

[1] References to various Complaints and Plaintiff groups are as follows: New Georgia Project ("NGP"), Case No. 1:21-cv-01229-JPB, Doc. 39; Asian Americans Advancing Justice-Atlanta ("AAAJ"), Case No. 1:21-cv-01333-JPB, Doc. 27; Sixth District of the African American Methodist Episcopal Church ("AME"), Case No. 1:21-cv-01284-JPB, Doc. 83; Georgia State Conference of the NAACP ("NAACP"), Case No. 1:21-cv-01259-JPB, Doc. 35; and The Concerned Black Clergy of Metropolitan Atlanta ("CBC"), Case No. 1:21-cv-01728-JPB, Doc. 1. The United States only raised claims of intentional discrimination which are addressed in another Motion.

The other challenged provisions of SB 202 are addressed in other motions consistent with the Court's scheduling order on dispositive motions. Accordingly, just because a specific challenged provision, *e.g.*, authorization and regulation of absentee ballot drop boxes is not addressed here, does not mean a trial on that provision is necessary as the provision is addressed elsewhere. Similarly, just because Plaintiffs' allegations of racially discriminatory intent is not addressed in this Motion does not mean the issue is ripe for trial as all issues of alleged discriminatory intent are addressed in a separate motion. The same is true for standing issues, including lack of redress against State Defendants.

provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' and the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi,* 504 U.S. 428, 433 (1992) (quoting U.S. Const. art. I, § 4, cl. 1).  Indeed, the Supreme Court recognizes:

> Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'"

*Id.* (quoting *Storer v. Brown,* 415 U.S. 724, 730 (1974)).

It follows from these principles that States have a valid—even compelling—interest in protecting the integrity and security of the voting process and preventing fraud.  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (discussing laws enacted to combat voter fraud); *id.* at 2347 ("preserving the integrity of [a State's] election process" is a "compelling" interest (citation omitted)); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (same); *Am. Party of Tex. v. White*, 415 U.S. 767, 782 n.14 (1974) (same); *Rosario v. Rockefeller*, 410 U.S. 752, 761 (1973) (same); *accord Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) (preventing fraud and promoting voter confidence are a compelling state interests).  States also have a valid and "independent interest" in protecting voter confidence in the

integrity and legitimacy of the process because "public confidence in the integrity of the electoral process . . . encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008). And States have "a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient." *Id.* at 191; *accord Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1320 (11th Cir. 2021). Additionally, States have legitimate interests in "orderly administration [that] tends to decrease voter confusion." *Brnovich*, 141 S. Ct. at 2345; *accord Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 578 (6th Cir. 2016). And the Supreme Court has rejected challenges based on partisan motivations, explaining that, "if a nondiscriminatory law is supported by valid neutral justification, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford,* 553 U.S. at 204.

Moreover, states do not have to wait until they "sustain some level of damage before the legislature" may "take corrective action." *Burson v. Freeman,* 504 U.S. 191, 209 (1992) (citation omitted). Instead, the State may "respond to *potential* deficiencies in the electoral process with foresight rather than reactively." *Id.* (citation omitted, emphasis added); *see also Brnovich*, 141 S. Ct. at 2348 (same); *Crawford*, 553 U.S. at 194–96 (upholding the state's

interest in preventing fraud even though "[t]he record contains no evidence of any such fraud actually occurring in Indiana at any time in its history").

This is precisely what Georgia did here—deciding there were sufficient concerns, even absent direct evidence of widespread fraud, to justify taking action to secure the integrity of the election process.  SOF ¶¶ 538–39 (Germany 10/30/23 Decl. ¶¶ 21–23).  The area of the voting process that has long been considered the most susceptible to fraud, and that was the source of a large portion of the complaints from voters and activists from both political parties, is the absentee voting process.  SOF ¶ 472 (Germany 10/30/23 Decl. ¶ 17, 23; The Carter Ctr., *2022 General Election Observation: Fulton County, Georgia* 16 (2022) (Germany 7/27/23 Decl., Ex. 34 [Doc. 601-3]); U.S. Election Assistance Comm'n, *Election Crimes: An Initial Review and Recommendations for Future Study* 8, 10, 12, 18–19 (Dec. 2006); Germany 3/7 90:1–11; Sterling 102:11–18).  Georgia addressed those concerns with a comprehensive review of its absentee voting process, electing to keep no-excuse absentee voting, replace subjective signature matching with an objective photo ID based verification method, and putting in place other reforms to improve and streamline the absentee voting process.  SOF ¶ 524 (Germany 10/30/23 Decl. ¶ 23).  And, as noted above, given voters' experience in the 2022 elections, SB 202 accomplished that goal.

## II.     State Defendants Are Entitled to Summary Judgment on Each of the Challenged Provisions Regulating Government and Third-Party Actors.

### A.     Prohibition on State and Local Officials Sending Out Unsolicited Absentee Ballot Applications

In SB 202, the General Assembly elected to prohibit election officials from sending out *unsolicited* absentee ballot applications, only sending them to a voter in response to a request for an application.   But absentee ballot applications are still "available online by the Secretary of State and each election superintendent and registrar."   O.C.G.A. § 21-2-381(a)(1)(C)(ii); *see also*, SOF ¶ 473 (Germany 10/30/23 Decl. ¶ 31).   Nevertheless, AAAJ [AAAJ Am. Compl. Count III] and AME Plaintiffs [Am. Compl. ¶ 287 and Count III] assert that the prohibition on state and local officials sending unsolicited absentee ballot applications creates an undue burden on their right to vote while pushing voters away from absentee voting to in person voting and longer lines.   Relatedly, the NGP Plaintiffs [NGP Am. Compl. ¶ 95 and Count III] claim that the prohibition on the State's sending out unsolicited absentee ballot applications violates their rights to free speech and political association.   As shown below, none of Plaintiffs' claims has merit, and they cannot establish a material issue of fact as to any of them.

1.   **Prohibiting Election Officials from sending unsolicited absentee ballot applications does not unduly burden Plaintiffs' right to vote.**

In the Eleventh Circuit, when evaluating claims of undue burden to the right to vote, courts evaluate the constitutionality of election laws by applying the *Anderson-Burdick* test. *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022); *see also, Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). "That test requires [the court] to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consider the extent to which those justifications require the burden to plaintiffs' rights." *Lee*, 915 F.3d at 1318; *accord Curling*, 50 F.4th at 1122. As the Supreme Court has made clear, this requires a flexible standard, *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), one which balances the burden imposed against the interest served by the State's rule. *Crawford,* 553 U.S. at 190. The higher the burden, the stricter the scrutiny. *Stein v. Ala. Sec'y of State,* 774 F.3d 689, 694 (11th Cir. 2014). Conversely, when a regulation imposes only "reasonable, non-discriminatory restrictions," then "the state's important regulatory interests are generally sufficient to justify" such restrictions. *Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434 (same). "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring)

(quotation omitted).   However, burdens "are severe if they go beyond the merely inconvenient." *Id.; see also, Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553856, at *6 (N.D. Ga. Mar. 31, 2021), *opinion clarified,* No. 1:18-CV-5391-SCJ, 2021 WL 9553849 (N.D. Ga. Nov. 15, 2021); *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1289 (N.D. Ga.), *stay on appeal granted,* 976 F.3d 1278 (11th Cir. 2020), *appeal voluntarily dismissed,* 2021 WL 4128939 (11th Cir. Mar. 9, 2021).   This "examination offers no license for 'second-guessing and interfering with' state decisions; the Constitution charges States, not federal courts, with designing election rules." *Curling*, 50 F.4th at 1122 (quoting *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020)).

1.   The state interests underlying SB 202's prohibition on sending unsolicited absentee ballot applications are apparent from the provision's history.   By the time SB 202 was passed, there was a great deal of controversy about the State's pandemic-era practice of sending out unsolicited absentee ballot applications.   *See* SOF ¶¶ 441–44 (Germany 10/30/23 Decl. ¶¶ 47–48, 58, 89; Germany 5/20/22 VoteAmerica Decl. ¶¶ 39, 41–42; 3/18/21 Tr. at 20:3-5; 21:1–23:7; Kidd 190:6–22; Bailey 10/6 50:3–24; Watson 178:6–179:4, 200:18–201:13; Mashburn 3/7 62:3–9).   In June 2020, the Secretary of State, in response to reports that certain counties were sending absentee ballot applications to voters, decided to send absentee ballot applications to all active

registered voters.  SOF ¶ 434 (Harvey 52:10–15; Sterling 52:5–12).  But the Secretary chose not to repeat the exercise for the November 2020 general election, although some Georgia counties chose to do so.  SOF ¶ 435 (Germany 3/7 60:1–22; K. Smith 63:16–23).  While there was a significant increase in Georgia voters using the absentee option in 2020 due to the pandemic, SOF ¶ 436 (Grimmer Rep. ¶¶ 8, 54; Sterling 54:7–9), local election officials were inundated with absentee ballot applications at a rate that was difficult for them to timely process. This led to voters submitting duplicate applications when they were not sure of the status of their initial applications and to numerous reports of voters showing up to vote in person having forgotten that they had submitted a request for absentee ballot, which requires the time-consuming process of cancelling absentee ballots discussed below and led to complaints of fraud.  SOF ¶ 443 (Germany 10/30/23 Decl. ¶¶ 47–48, 89; Bailey 10/6 124:23–126:7; Eveler 185:2–11; K. Smith 66:13–67:2; Kidd 188:24–91:5; Germany 3/7 183:3–9).  Election officials also received numerous calls and complaints where voters seemed to be confusing absentee ballot applications with actual absentee ballots.  SOF ¶ 444 (Germany 10/30/23 Decl. ¶ 58; Watson 178:6–179:4, 200:18–201:13; Mashburn 3/7 62:3–9).  Similarly, throughout the 2020 cycle, the number of requested and subsequently cancelled absentee ballots was extremely large—upwards of 15% of all absentee ballots requested were subsequently cancelled so the voter could instead vote in person.  SOF

20

¶ 445 (Grimmer Rep. ¶ 98).

The large number of absentee ballot applications, duplicate applications and cancelled absentee ballots created extreme burdens on election administrators and raised questions and confusion from voters. SOF ¶¶ 453, 470 (Evans 102:18–103:21; Germany 10/30/23 Decl. ¶¶ 27, 46–49, 88; 6/10/22 Hr'g Tr. 28:5–30:4, *VoteAmerica v. Raffensperger*, No.1:21-cv-1390 ("VoteAmerica Hr'g Tr.")). Indeed, many voters simply forgot they had applied for absentee ballots, which again caused administrative burdens and cast doubt on the election process. SOF ¶¶ 443, 454 (Bailey 3/21 99:25–101:1; Germany 10/30/23 Decl. ¶¶ 45, 47–48, 89). In addition to administrative burdens and costs to the state sending out unrequested absentee ballot applications to 6.9 million registered voters, this process resulted in many questions regarding the integrity and legitimacy of the 2020 election results. SOF ¶¶ 474–75 (Bailey 3/21 100:3–12; Sterling 38:21–22; 54:13–18; Watson 200:18–201:13; Germany 10/30/23 Decl. ¶¶ 25-27).

For those reasons and to ensure uniformity across counties (which is important for perceptions of a fair election process), the General Assembly decided to prohibit election officials from sending unsolicited absentee ballot applications. SOF ¶ 529 (Germany 10/30/23 Decl. ¶¶ 26–28, 31).

2.    Prohibiting State and local election officials from sending unsolicited absentee ballot applications creates no burden on Plaintiffs, let

alone a substantial burden.  Absentee ballot applications are available online from the Secretary of State, via a phone call to the local election office, or even from third parties (*see* discussion *infra,* Section II.B).  Contrary to Plaintiffs' allegations (AME Am. Compl. ¶ 287), there is no evidence that in-person voting lines were longer in 2022 because the State and/or local election officials did not send out absentee ballot applications to all registered voters.  Indeed, voters reported very short waiting times during the 2022 elections.  SOF ¶¶ 360–62 (Grimmer 196:19–23).

By contrast, sending 6.9 million unsolicited absentee ballot applications created a large expense for the State and confusion for voters.  SOF ¶ 474 (Germany 10/30/23 Decl. ¶ 25; Sterling 38:16–39:2).  Further, even if State or local election officials sending unsolicited absentee ballot applications made things more convenient for *some* voters who were planning on voting absentee by mail during those elections, there is no evidence that requiring voters to request an absentee ballot application (or simply download one from the Secretary of State's website), SOF ¶ 473 (Germany 10/30/23 Decl. ¶ 31), burdened anyone beyond a *de minimis* amount.  Plaintiffs do not identify any voter who was unable to vote absentee, let alone vote at all, because the State did not send out unsolicited absentee ballot applications.

Because this provision is non-discriminatory and only imposes at most a minimal burden on voters, the State's interest in "orderly administration" of

the absentee ballot process and controlling unnecessary costs more than justifies it. *Brnovich*, 141 S. Ct. at 2345; *see also Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434. Plaintiffs cannot provide evidence sufficient to establish a material issue of fact on these issues. And State Defendants are therefore entitled to summary judgment on Plaintiffs' claims.

> **2. Prohibiting State and local election officials from sending unsolicited absentee ballot applications does not burden Plaintiffs' free speech and association rights.**

NGP Plaintiffs further claim (NGP Am. Compl. ¶¶ 177–84) that, by prohibiting State and local election officials from sending out unsolicited absentee ballot applications, SB 202 burdens their free speech rights. There is no basis to such a claim. Indeed, Plaintiffs cannot even articulate how the *State's actions* implicate *Plaintiffs' speech* rights at all.

That failure is significant because the Supreme Court requires Plaintiffs to first "demonstrate that the First Amendment even applies" to the sending out of unsolicited absentee ballots. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). When Plaintiffs remain free to send absentee ballot applications to voters, subject to basic, common-sense requirements discussed below, and remain free to say whatever they want to encourage voters to vote absentee, there is no plausible claim that Plaintiffs' First Amendment rights have been infringed by the State's not sending out

unsolicited absentee ballot applications.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas.").  And absent such a showing, this court must apply rational basis review and, on that basis, uphold the measure in question.  *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (holding that "collecting and delivering the [voter registration] forms are merely conduct," and so "rational basis scrutiny is appropriate"); *D.C. v. Heller*, 554 U.S. 570, 628 n.27 (2008) (explaining that "almost all laws, would pass rational-basis scrutiny"); *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (refusing to apply strict scrutiny when no constitutional guarantee was violated).[2]

The same applies to NGP Plaintiffs' association claim.  There is no evidence or even a logical basis to argue that the State's not sending out unsolicited absentee ballot applications impedes Plaintiff's "corporate

---

[2] If the Court declines to apply rational basis review the regulations still would survive under the *Anderson-Burdick* test for the reasons given in the following discussion of the regulations on third-party distribution of unsolicited absentee ballots.  *See* Section II.B. That argument is incorporated by reference.

advocacy"—which is "the cornerstone of associational rights." *VoteAmerica v. Raffensberger,* 609 F. Supp. 3d 1341, 1358 (N.D. Ga. 2022); *accord* Order at 35, *VoteAmerica v. Raffensperger*, No.1:21-cv-1390 [Doc. 179] (granting State Defendants partial summary judgment) (Ex. DDDDD). There is simply no infringement of Plaintiffs' right to political association. Because Plaintiffs cannot provide evidence creating a material issue of fact on these questions, State Defendants are entitled to summary judgment on Plaintiffs' claims challenging this provision of SB 202.

> **3.** **Prohibiting State and local election officials from sending unsolicited absentee ballot applications is not racially discriminatory under Section 2 of the Voting Rights Act.**

Plaintiffs NAACP [NAACP Am. Compl. ¶ 179(2)] and AAAJ [AAAJ Am. Compl. ¶ 120(3), 121] claim that prohibiting the State and local officials from sending unsolicited absentee ballot applications is racially discriminatory under Section 2 of the Voting Rights Act. But Plaintiffs have no evidence sufficient to create a material issue of fact on this claim.

Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). "This analysis turns on whether, based on the totality of

the circumstances, the challenged law … deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." *Greater Birmingham Ministries*, 992 F.3d at 1329.  To state a valid vote-denial claim, a plaintiff must establish: (1) proof of disparate impact (a denial or abridgement) resulting from the law or policy in question; and (2) that the disparate impact is caused by racial bias.  *See id.* at 1328–30.[3]

Such claims must be assessed under the "totality of circumstances." *Brnovich*, 141 S. Ct. at 2338.  Although "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered," the *Brnovich* Court listed five circumstances:  (a) "the size of the burden imposed by a challenged voting rule"; (b) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982"; (c) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups"[4]; (d) "the opportunities provided by a State's

---

[3] State Defendants reassert and preserve their argument that there is no implied cause of action under Section 2.  *See* State Defs.' Opp'n to PI Mot. at 16–17 [Doc. No. 582] (Ex. OOOO).

[4] This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may well result in some predicable disparities … [b]ut the mere fact there is some disparity in impact does not necessarily mean that a *system* is not equally open or that it does not give everyone an equal opportunity to vote." *Brnovich,* 141 S. Ct. at 2338 (emphasis added).  For this reason, a "meaningful comparison is essential." *Id.*  This meaningful comparison focused on racial disparities in "absolute terms." 141 S. Ct. at 2344–45.  It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for

entire system of voting"; and (e) "the strength of the state interests served by a challenged voting rule". *Id.* at 2338–39. The "touchstone" is whether the voting system as a whole is equally open to voters. *Id.* at 2338. A state law that imposes "modest burdens" and with a "small ... disparate impact" complies with Section 2 so long as it is based on valid governmental interests. *Id.* at 2346.

Here, the undisputed material facts demonstrate that there are no cognizable burdens or disparities. Indeed, after SB 202, voter participation of both Black and white voters remained near record high. SOF ¶ 204-05 (Shaw 2/24 Rep. ¶¶ 20–22). Black voter turnout was nearly at the record turnout from the 2018 midterm. SOF ¶ 354 (Shaw 2/24 Rep. ¶¶ 21–22; Shaw 2/14 Rep. ¶¶ 10, 12, 17, 23; Grimmer Rep. ¶¶ 8, 158–64). Even though Black turnout dropped more than white turnout between 2018 and 2022, that was the case across the nation in 2022, but at a smaller decline in Georgia. SOF ¶¶ 352–53 (Shaw 2/24 Rep. ¶¶ 46–52). Additionally, a higher percentage of Black voters

---

non-minority voters was about 0.5%." *Id.* The majority looked to the numbers in the aggregate and concluded that the policy "work[s] for 98% or more of voters to whom it applies—minority and non-minority alike." *Id.*

The Court also opined on how the "use of statistics [can be] highly misleading." *Id.* at 2345. For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." *Id.* (quoting *Frank v. Walker*, 768 F.3d 744, 752, n. 3 (7th Cir. 2014)) (internal quotation marks omitted).

voted absentee by mail after SB 202.  SOF ¶¶ 355–56 (Shaw 2/24 Rep. ¶ 20).

And Black voter satisfaction was extremely high after the 2022 election with

more saying it was easier to vote in 2022 than previously and no Black voters

claiming they had a poor voting experience.  SOF ¶¶ 357–59 (Shaw 2/24 Rep.

¶¶ 29–31 (citing SPIA Survey); PI Hr'g Tr. 250:13–251:16).

In short, there is no evidence of a disparate impact on minority voters.

Because they cannot prove that the provision "actually make[] voting harder

for African Americans," *Greater Birmingham Ministries*, 992 F.3d at 1330

(cleaned up), Plaintiffs cannot succeed on their Section 2 claim.

### B.     Regulations on Third-Party Distribution of Unsolicited Absentee Ballot Applications.

All Plaintiffs next claim that SB 202's Third-Party Solicitation Provision

burdens citizens' right to vote, while NAACP Plaintiffs claim (NAACP Am.

Compl. ¶¶ 216–22) that provision also impermissibly impacts its rights to free

speech and association.  They are incorrect, as these common-sense limitations

on actions do not impact voters' rights at all nor do they limit anyone's free

speech or association rights.

### 1.     Third parties remain free to send out absentee ballot applications subject to certain limitations and are entirely free to communicate any message they wish.

The history behind these provisions is also instructive.  Before their

adoption, Georgia voters often complained to the State about absentee-ballot

applications they received from third-party organizations, which did not have

a consistent, required form prior to 2020. SOF ¶ 456 (Germany 10/30/23 Decl. ¶¶ 32–34; Germany 5/20/22 Decl. ¶¶ 13, 23, 41, 49–51, *VoteAmerica v. Raffensperger,* No. 21-01390 ("Germany 5/20/22 VoteAmerica Decl."); Germany 181:7–12, *VoteAmerica*, No. 21-01390 ("Germany VoteAmerica"); Mashburn 90:11–23, 91:2–13, *VoteAmerica*, No. 21-01390 ("Mashburn VoteAmerica"); Bailey 10/6 126:8–127:1). In particular, voters complained about: (1) receiving applications that were pre-filled with incorrect information, SOF ¶ 457 (K. Williams 103:24–104:17; Bailey 10/6 126:13–127:1); (2) receiving duplicate applications, SOF ¶ 458 (Germany 3/7 182:23–183:9); and (3) confusion about who was sending them an application and why, SOF ¶ 459 (K. Williams 105:20–106:14; Germany 10/30/23 Decl. ¶¶ 32, 54–58). SB 202 addresses each of these complaints.

*Pre-Filling Prohibition.* Before SB 202, some organizations increased their use of pre-filled absentee-ballot applications. SOF ¶ 447 (Germany 5/20/22 VoteAmerica Decl. ¶¶ 20; Bailey 10/6 131:3–24; Watson 127:13–128:8). And that pre-filled information was often incorrect. SOF ¶ 448 (Germany 5/20/22 VoteAmerica Decl. ¶ 21). For instance, many voters complained that the pre-filled applications listed individuals who no longer (or never) lived at the address, who no longer (or never) lived in Georgia at all, were minors, or were deceased. SOF ¶ 449 (Watson 127:13–128:8; Bailey 10/6 126:8–127:1). Other voters complained to the State that the applications were pre-filled with

incorrect information. SOF ¶ 450 (Watson 127:13–128:8; Bailey 10/6 126:8–127:1). These errors caused many Georgia voters to contact the Secretary of State's office with questions and concerns about potential fraud. SOF ¶ 451 (Watson 127:13–128:8; Bailey 10/6 126:8–127:1; Germany 5/20/22 VoteAmerica Decl. ¶ 22; 3/18/21 Tr. at 22:2–9, *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021); VoteAmerica Hr'g Tr. 22:4–14; Mashburn VoteAmerica 83:20–84:4). Voters submitting an absentee ballot application with incorrect information (including pre-filled information) results in either the application being denied, the local election officials sending a cure notice and the voter being required to submit the correct information, or potentially an absentee ballot being mailed to an incorrect location or voter. SOF ¶ 452 (Germany 4/13 89:11–90:19; Germany 10/30/23 Decl. ¶ 50).

Responding to these concerns, SB 202 prohibits sending absentee-ballot applications that are "prefilled with the elector's required information." O.C.G.A. § 21-2-381(a)(1)(C)(ii). But this provision still allows organizations like Plaintiffs to send absentee-ballot applications; they simply may not pre-fill the applications. SOF ¶ 452 (Germany 10/30/23 Decl. ¶ 50).

*Anti-Duplication Provision.* Georgia voters also complained about receiving multiple absentee-ballot applications. SOF ¶¶ 442, 461 (Germany 5/20/22 VoteAmerica Decl. ¶¶ 39, 41–42; 3/18/21 Tr. at 21:1–23:7, *Hearings &*

*Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021); VoteAmerica Hr'g Tr. 19:23–20:5, 22:4–14).  Voters were worried that these applications presented an open invitation for voter fraud—a concern exacerbated by voters believing that the *applications* themselves were actually *ballots*.   SOF ¶¶ 464–65 (Germany 5/20/22 VoteAmerica Decl. ¶ 42; VoteAmerica Hr'g Tr. 20:3–5; Kidd 190:6–22; Bailey 10/6 50:3–24).

Moreover, voters who *received* multiple applications often returned multiple applications because they thought that the fact they were receiving another application indicated a problem with their initial application or they thought it was form that they had to submit.   SOF ¶ 443 (Germany VoteAmerica 50:23–51:21; Germany 10/30/23 Decl. ¶¶ 47–48, 89).  And, in some instances, they did so even though they did not intend to vote by absentee ballot.  SOF ¶ 438 (Germany 5/20/22 VoteAmerica Decl. ¶ 43; VoteAmerica Hr'g Tr.  42:7–22; Germany VoteAmerica 199:13–25).  This required election officials to divert their finite resources to processing many unnecessary absentee-ballot applications.  SOF ¶ 439 (VoteAmerica Hr'g Tr.  28:16–21). Then, on Election Day, officials were required to process many absentee-ballot cancellations when voters who had submitted absentee-ballot applications arrived to vote in person, leading to longer lines.   SOF ¶¶ 440, 470 (VoteAmerica Hr'g Tr.  29:25–30:4;  Germany VoteAmerica 199:13–200:9; Evans 102:21–103:21; Germany 10/30/23 Decl. ¶¶ 27, 46–48, 88-89).  For the

31

2020 general election, for instance, there were 289,050 absentee-ballot applications cancelled by voters when they arrived to vote in person, either during Early Voting (260,085) or on Election Day (28,965) compared with only 16,072 such cancelled applications during the 2018 general election (with 12,000 during Early Voting and 4,072 on Election Day), and 11,659 cancelled applications during the 2022 general election (with 10,067 during Early Voting and 1,592 on Election Day).  SOF ¶ 446 (Grimmer Rep. ¶¶ 94–99, tbls. 14, 16). Indeed, 15% of all absentee ballot applications led to absentee ballots that were later cancelled in 2020 compared to 4.3% in 2018 and only 3.6% in 2022.  SOF ¶ 445 (Grimmer Rep. ¶¶ 98–99).

Responding to these concerns, SB 202 prohibits distributing duplicate applications once a voter has requested an absentee ballot.  O.C.G.A. § 21-2-381(a)(3)(A); SOF ¶ 530 (Germany 10/30/23 Decl. ¶ 62).  But this provision does *not* prohibit organizations like Plaintiffs from sending multiple applications *before* a voter requests a ballot nor does it limit Plaintiffs' ability to communicate any message they want—just not an actual application to those who have already submitted one.  *Id.*  And it contains a safe harbor allowing Plaintiffs to avoid liability for sending duplicate applications if they relied upon information made available by the State within five business days before their mailing.  O.C.G.A. § 21-2-381(a)(3)(A). This administrative requirement for third parties is the minimum necessary to ensure that unnecessary duplicate

absentee ballot applications are not sent.

*Disclaimer Provision*.  Finally, Georgia voters expressed confusion about who was sending the various absentee-ballot applications.  SOF ¶ 459 (Bailey 10/6 126:8–127:1, 127:7–13, 129:4–16; Mashburn 3/7 62:3–15; Germany 10/30/23 Decl. ¶ 32, 54-58).  In many instances, voters thought they came from the State, and thus they contacted election officials with questions.  SOF ¶ 460 (Germany 10/30/23 Decl. ¶¶ 64–67; Mashburn VoteAmerica 90:11–23).  As one county election supervisor explained, the misimpression that each such application was sent by the State would lead "people [to] feel the need to complete and sign [the] form without really paying attention to what it is for."  SOF ¶ 478 (Germany 10/30/23 Decl. ¶ 65).  To address this problem, SB 202 requires Plaintiffs to include the short disclaimer when sending absentee-ballot applications and to clarify that the application was not a ballot.  O.C.G.A. § 21-2-381(a)(1)(C)(ii).

> **2.  The limitations on third-party distribution of unsolicited absentee ballot applications does not unduly burden the right to vote.**

As noted above, courts uphold common-sense, non-discriminatory election regulations, when they serve an important governmental interest.  *See Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434.  Also, as noted above (at Section II.B.1.), the three Third-Party Solicitation Provisions further the State's interests in avoiding voter confusion (Disclaimer Provision), avoiding

duplicate absentee ballot applications from the same voters which serves election administration (Anti-Duplication Provision), and avoiding errors commonly found in pre-filled absentee ballot applications, which likewise prevents voter confusion and unnecessary consumption of poll worker time (Pre-filled Prohibition).

Any burden from these provisions on Plaintiffs is minimal at best. Indeed, Plaintiff organizations remain free to send any other material they want to voters as often as they wish. Only distribution of the actual absentee ballot application is limited and then only to avoid duplication. O.C.G.A. § 21-2-381(a)(3)(A). To reduce errors, moreover, the application must also not be pre-filled. SOF ¶ 531 (Germany 5/20/22 VoteAmerica Decl. ¶ 22; 3/18/21 Tr. at 22:10–23:12, *Hearings & Meetings of H. Special Comm. on Election Integrity*, 2021 Leg., Reg. Sess. (Ga. 2021); VoteAmerica Hr'g Tr. 22:4–14; Mashburn VoteAmerica 83:20–84:19). Finally, to address voter confusion, a short and accurate disclaimer must be affixed to the application stating who is sending the application (information that could be inferred from any other material provided by Plaintiffs) and noting that the form is not a ballot. O.C.G.A. § 21-2-381(a)(1)(C)(ii).

Plaintiffs do not explain how the Pre-filling Prohibition and Disclaimer Provisions burdens them at all, let alone even moderately. Any burden imposed by the Anti-Duplication Provision is also minimal, as it simply

requires matching a mailing list to publicly available information within five business days of the mailing.  O.C.G.A. § 21-2-381(a)(3)(A).

When it comes to voters, moreover, this provision actually *decreases* the burden on voters who will no longer receive an unsolicited absentee ballot application after having already submitted such an application to local election officials and on local election officials who do not have to process duplicate absentee ballot applications.  SOF ¶ 532 (Germany 10/30/23 Decl. ¶¶ 52–53, 62, 67–68).  Further, requiring voters to fill out the application itself is not a burden beyond what every voter must do to request an absentee ballot.  Any errors in the pre-filling either makes the application worthless to the voter or results in the application's being rejected if submitted, benefiting no one.  The Disclaimer Provision, moreover, informs the voter of who sent the form and does not create any voter burden at all.  SOF ¶ 525 (Germany 10/30/23 Decl. ¶¶ 53, 62, 68; Germany 5/20/22 VoteAmerica Decl. ¶ 48).

Given the State's interests in decreasing voter confusion, decreasing the burden on election officials in responding to said confusion and processing absentee ballot cancellations of in-person voters on election day (*see* Section I.B.1, *supra*), State Defendants more than satisfy the *Anderson-Burdick* balancing test.  *See Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 434.  Plaintiffs cannot establish the existence of a material issue of fact on their voting rights challenge to these provisions.

### 3. The limitations on third-party distribution of unsolicited absentee ballot applications does not violate Plaintiffs' right to free speech under the First Amendment.

The NAACP Plaintiffs' claim (NAACP Am. Compl. ¶¶ 216–22) that the Third-Party Solicitation Provisions violate the First Amendment is also foreclosed by Supreme Court precedent. Indeed, while the First Amendment protects certain speech and expressive conduct, the Supreme Court has repeatedly explained that the Free Speech Clause protects only "inherently expressive" conduct. *E.g.*, *Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*"). And such a showing requires more than merely "combining speech and conduct." *Id.* Otherwise, "a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.* But that is what Plaintiffs try to do here, asking the Court to import the expressive conduct from their cover letters—which SB 202 does not affect—into the activity that SB 202 does affect—namely, the absentee-ballot applications.

To avoid interchanging conduct and speech, the Supreme Court has developed a two-part test to determine whether conduct is inherently expressive. First, courts ask whether the plaintiff intended to "convey a particularized message." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Second, courts ask whether that message would likely be "understood by those who

viewed it." *Id.*  Plaintiffs cannot satisfy either element.[5]

In fact, courts across the country have applied the two-part *Johnson* test and rejected claims that sending or collecting forms or even ballots is protected expressive conduct.  *See New Ga. Project*, 484 F. Supp. 3d at 1300 (collecting cases and rejecting First Amendment claim since collecting voter registration forms is not a form of speech).  In *Feldman v. Arizona Secretary of State's Office*, for instance, the Ninth Circuit explained that a similar activity—collecting ballots—is not expressive conduct, despite the "ballot collectors['] inten[t] to

---

[5] The Eleventh Circuit's five-part test on when conduct is expressive is not only inapplicable here but further establishes that sending absentee ballot applications is not expressive conduct under the First Amendment.  Those factors are (1) whether the plaintiff intends to distribute literature or hang banners in connection with the expressive activity, (2) whether the activity will be open to all, (3) whether the activity takes place in a traditional public forum, (4) whether the activity addresses an issue of public concern and (5) whether the activity "has been understood to convey a message over the millennia." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1344–45 (11th Cir. 2021), *cert. denied,* 142 S. Ct. 1361 (2022).

An absentee ballot application—prefilled or not—contains no message from Plaintiffs, as the form is a state designed form asking for information from the voter; is not "open to all" but only to those selected by Plaintiffs; mass mailing campaigns do not take place in traditional public forums; and the State form is not understood to convey any particular message from Plaintiffs over the millennia.  If any aspect of the mailing sends a message it is the material that *accompanies* the form (e.g., the cover letter) and that message remains unaffected even if the application is blank rather than pre-filled, only goes to those who have not already requested an absentee ballot and contains a disclaimer clarifying that the form is being sent by Plaintiffs and not the State.  There is absolutely nothing "expressive" in sending an absentee ballot application and nothing about the three provisions challenged here that affects speech at all.  *Johnson,* 491 U.S. at 404.

communicate that voting is important."  843 F.3d 366, 392 (9th Cir. 2016).

Similarly, the Fifth Circuit applied *Johnson* and rejected a challenge to a law

that limited who could work with voter-registration forms, holding that "non-

expressive conduct does not acquire First Amendment protection whenever it

is combined with another activity that involves protected speech."  *Steen*, 732

F.3d at 389, 392.

Moreover, the inclusion of a cover letter with an absentee-ballot

application does not convert the application itself into speech.  To the contrary,

providing the application is instead simply a way to facilitate the machinery of

voting—pure conduct.  *See Democracy N.C. v. N.C. State Bd. of Elections*, 476

F. Supp. 3d 158, 225 (M.D.N.C. 2020) ("Delivering absentee ballot requests is

not expressive conduct.").  For that reason, the application itself—the only part

of Plaintiffs' mailing that SB 202 regulates—could not be "understood by those

who viewed it" to "convey a particularized message" coming from Plaintiffs.

*Johnson*, 491 U.S. at 404.  Indeed, the voter confusion when receiving absentee

ballot applications from third parties over who was sending them the form

makes this clear.

For all these reasons, Plaintiffs cannot bootstrap mere conduct into

protected speech.  *Cf.*, *FAIR*, 547 U.S. at 65–66 ("[W]e rejected the view that

'conduct can be labeled "speech" whenever the person engaging in the conduct

intends thereby to express an idea.'") (quoting *United States v. O'Brien*, 391

U.S. 367, 376 (1968)).[6]   And, because these provisions of SB 202 do not implicate speech, they are subject only to rational-basis review.   *Steen*, 732 F.3d at 392; *Johnson*, 415 U.S. at 375 n.14.[7] Under that standard, addressed above, each provision easily survives review because they are rationally related to the important ends of avoiding voter confusion and reducing the administrative burden on election officials.   *See Romer v. Evans*, 517 U.S. 620, 631 (1996) (holding that a law will survive rational basis review if "it bears a rational relation to some legitimate end"); *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001) ("A statute is constitutional under rational basis scrutiny so long as 'there is *any reasonably conceivable state of facts* that could provide a

---

[6] Because the applications are conduct, and not speech, any assertion that the applications are core political speech likewise fails.  These provisions of SB 202 do not implicate the Plaintiffs' "right freely to engage in discussions concerning the need for that [political] change" that the Supreme Court found constituted core political speech in *Meyer v. Grant*, 486 U.S. 414, 421 (1988).  Rather, *Meyer* involved the "circulation of an initiative petition" that included "both the expression of a desire for political change and a discussion of the merits of the proposed change," including "an explanation of the nature of the proposal and why its advocates support it."  *Id*.  Significantly, the petition in *Meyer* required the sponsors "to persuade" potential signatories to support it, such that it was "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Id*. at 421–22.  Those features are all absent from mailing absentee-ballot applications.

[7] In fact, the Third Circuit recently recognized as much, holding that, even if a law regulates the mechanics of the electoral process, the *Anderson-Burdick* framework does not apply unless the law "burden[s] a relevant constitutional right."  *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, No. 22-1033, 2023 WL 6377826 (U.S. Oct. 2, 2023) (mem.).

rational basis for the' statute" (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314 (1993))).

As the General Assembly confirmed when passing SB 202, these provisions addressed "some outside groups" sending "multiple absentee ballot applications," often "with incorrectly filled-in voter information," leading to "significant confusion by electors." SOF ¶ 476 (SB 202 at 5:102–106). And, as State Election Board ("SEB") Member Matthew Mashburn explained, there was a "giant wave of complaints" from voters who received applications "for people that used to live" at their homes but no longer do, applications that had women's "maiden name[s]," or applications "for [a] dead relative[.]" SOF ¶ 477 (Mashburn VoteAmerica 88:16–89:15).

Under SB 202, voters who already requested an absentee ballot will no longer receive an application from third-party groups that confuses those voters. Nor will voters face the confusion from receiving an official-looking form pre-filled with incorrect personal information. By addressing such concerns, these provisions of SB 202 easily survive rational-basis review. As the Eleventh Circuit explains: "Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny." *Williams*, 240 F.3d at 948. This is not such an "exceptional" case. And Plaintiffs cannot establish a

material issue of fact relevant to their speech claim.[8]

### 4. The Third-Party Solicitation Provisions do not violate Plaintiffs' freedom of association.

In addition to claiming that the Third-Party Solicitation Provisions burden their speech, NAACP Plaintiffs claim (NAACP Am. Compl. ¶¶ 216–22) that the provisions burden their freedom of association. But those claims fail any level of scrutiny for substantially the same reasons as Plaintiffs' speech claims fail. The Supreme Court has often explained that the First Amendment protects "join[ing] in a common endeavor" or engaging in "collective effort on behalf of shared goals." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 622 (1984). And this Court has correctly concluded that "the cornerstone of associational rights is cooperative advocacy." *VoteAmerica*, 609 F. Supp. 3d at 1358. Because of its emphasis on "common" or "cooperative" work, the right to associate cannot be invoked to link people who are legally "strangers" to them because they are "not members of [that] particular organization." *Id.*

---

[8] If the Court were to nonetheless conclude that the Pre-Filling Prohibition and the Anti-Duplication Provision regulate speech, the *Anderson-Burdick* standard applies, and the provisions still survive. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Under that test, the slight burdens can be "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). Such interests are clearly at issue here. Accordingly, the Third-Party Solicitation Rules are permissible under the *Anderson-Burdick* framework and State Defendants are entitled to summary judgment on Plaintiffs' free speech claims.

Accordingly, Plaintiffs' mailings lack any shared association between Plaintiffs and the voters they target and do not restrict their associational rights.

Moreover, even if the Third-Party Solicitation Provisions somehow affected Plaintiffs' associational rights, "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms," are constitutional. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 640–41 (2000). Here again, the Third-Party Solicitation Provisions readily meet that test for the reasons described above. Starting with the narrow tailoring requirement, the Third-Party Solicitation Provisions do not affect Plaintiffs' ability to send communications to any Georgia voter. Plaintiffs may continue communicating with voters through other mailings. They may even send non-duplicative and non-prefilled ballot applications—as long as they include the disclaimer that merely confirms who is sending the application.

There is simply no evidence that Plaintiffs' ability to associate with voters turns on pre-filling an absentee-ballot application or on sending duplicate applications after a voter has already requested a ballot or on sending applications without the required disclaimer. Accordingly, State Defendants are entitled to summary judgment on Plaintiffs' freedom-of-association claims.

### 5.    The Third-Party Solicitation Provisions do not violate Section 2 of the Voting Rights Act.

NAACP Plaintiffs [NAACP Am. Compl. ¶ 179(3)] also asserts that the Third-Party Solicitation Provisions are racially discriminatory under Section 2 of the VRA.   But here again, they have no evidence sufficient to create a material issue of fact on this issue.   As note above (Section II.A.3), this provision of SB 202 did not impact Black turnout in general, which remained near record high, or Black voters using absentee by mail voting, which reached a new high in 2022.   There is no evidence the Third-Party Solicitation Provisions "deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice."   *Greater Birmingham Ministries*, 992 F.3d at 1329.   Plaintiffs being unable to prove that these provisions "actually make[] voting harder for African Americans," *id.* at 1330, State Defendants are entitled to summary judgment.

### C.    Ballot Harvesting Penalty

AAAJ [AAAJ Am. Compl. ¶¶ 114–16] and AME Plaintiffs [AME Am. Compl. ¶¶ 299–301] further claim that SB 202's Ballot Harvesting Penalty unduly burdens the right to vote, while AAAJ Plaintiffs also claim that the penalty is racially discriminatory in violation of Section 2 of the VRA [AAAJ Am. Compl. ¶¶ 120(5)–121] and, according to AME Plaintiffs [AME Am. Compl. ¶ 360], the penalty violates the ADA.   Critically, Plaintiffs do not challenge the basic third-party ballot return (ballot harvesting) limitations in

43

O.C.G.A. § 21-2-385(a)—which have previously been upheld in *New Georgia Project,* 484 F. Supp. 3d at 1299–1302 (upholding the limitations on ballot harvesting against challenges of undue burden and free speech implications). They challenge only SB 202's increase in the penalty for violating the anti-ballot harvesting provision.   But their challenges to that provision are untenable, and they lack sufficient evidence to create a material issue of fact on these claims.

### 1.   The Ballot Harvesting Penalty does not unduly burden the right to vote.

Before SB 202, Georgia law already allowed certain authorized people (including family, people who reside together, and caregivers of voters with disabilities) to return ballots, but even before SB 202, criminalized ballot harvesting by unauthorized individuals.[9] The statute identifies who is permitted to return another voter's ballot to minimize the risk of voter intimidation and fraud.   O.C.G.A. § 21-2-385(a), (b); SOF ¶ 479 (Germany 6/29/23 Decl. ¶¶ 2, 8).   SB 202 merely strengthened Georgia's existing prohibition on ballot harvesting by make a violation of that prohibition a felony

---

[9] Political operatives in North Carolina pleaded guilty to violations of North Carolina's ballot harvesting law in a crime that led to an overturned Congressional election in 2018.   *See* Gabriella Borter, *North Carolina Republican Operative Charged in Election Fraud Scheme*, Reuters (Feb. 27, 2019) (Ex. RRRR).

rather than a misdemeanor.  SOF ¶ 480 (Germany 10/30/23 Decl. ¶¶ 96–98).[10]

This, in turn, further protects voters from efforts at ballot harvesting

prohibited by Georgia law. SOF ¶ 526 (Germany 10/30/23 Decl. ¶¶ 96–98).

The powerful state interests underlying SB 202's Ballot Harvesting

Penalty are apparent from its history.  In the wake of the 2020 election, there

were numerous complaints of improper ballot harvesting.  *See, e.g.,* SOF ¶ 471

(Watson 203:20–204:10; Sterling 161:21–24; Germany 10/30/23 Decl. ¶ 95).  To

better protect voters from intimidation, or the type of meddling seen in recent

elections in North Carolina, and protect voter's confidential information on the

absentee ballot application and return envelope, the Georgia Assembly chose

to increase the penalties for violation of this provision to make it on par with

other prohibited conduct that affects the security and integrity of Georgia's

elections.  *See* SOF ¶ 479, 534 (Germany 6/29/23 Decl. ¶¶ 8, 26; Germany

---

[10] SB 202 added a new subsection (5) to O.C.G.A. § 21-2-568(a) setting out penalties for violation of Georgia's anti-ballot harvesting rules.  That new section provides:

(a) Any person who knowingly:

* * *

(5) Accepts an absentee ballot from an elector for delivery or return to the board of registrars except as authorized by subsection (a) of Code Section 21-2-385

shall be guilty of a felony.

O.C.G.A. § 21-2-568(a)(5) thus increases the penalty for violation of O.C.G.A. § 21-2-385(a) for ballot harvesting from a misdemeanor to a felony.  *See* O.C.G.A. § 21-2-598 which previously applied to violations of O.C.G.A. § 21-2-385(a).

10/30/23 Decl. ¶¶ 96–98).

Given these interests, the Ballot Harvesting Penalty easily satisfies the *Anderson-Burdick* balancing test. Indeed, Plaintiffs offer nothing to suggest that making a violation of the anti-ballot harvesting provisions a felony rather than a misdemeanor unduly burdens the right to vote. Yet the penalties further the State's interests in avoiding ballot harvesting and intimidation of voters, and, more generally, in protecting the integrity of the voting process— all compelling state interests. *See e.g.*, *Rosario*, 410 U.S. at 761 ("It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal."); *accord Common Cause/Ga.*, 554 F.3d at 1353.

In *New Georgia Project*, the district court found no more than a moderate burden on disabled voters from Georgia's third-party ballot return limitations during the COVID-19 pandemic. 484 F. Supp. 3d at 1299. And Plaintiffs here do not identify any burden beyond the minimal inconvenience of having to comply with the anti-ballot harvesting provision to avoid potential criminal penalties. The fact that the anti-ballot harvesting provision furthers the State's interests of preventing voter fraud, promoting voter confidence, and a generalized interest in the orderly administration of elections was—and remains—more than sufficient to justify any burden associated with the limitations on who may handle another voter's completed absentee ballot. *Id.* at 1300. As a result, penalties for violating that provision are also justified,

easily defeating Plaintiffs' stand-alone challenge to the penalty provision.[11]

The same is true of AAAJ Plaintiffs' claims [AAAJ Am. Compl. ¶ 114] about the criminalization of improper handling of completed absentee ballot applications under O.C.G.A. § 21-2-381(a)(1)(C)(ii).   The State surely has a compelling interest in not just regulating who may handle a completed absentee ballot application, but also in criminalizing violations of that provision.   SOF ¶ 534 (Germany 10/30/23 Decl. ¶¶ 96–98).

In short, protecting voters from ballot-harvesting efforts is both a compelling State interest and is advanced by the Ballot Harvesting Penalty at issue here.   SOF ¶ 479 (Germany 6/29/23 Decl. ¶¶ 8, 18, 21, 26).   And Plaintiffs cannot establish a material issue of fact with respect to the constitutionality of that provision.

---

[11] The Northern District of Oklahoma was also faced with the same claims Plaintiffs raise here regarding the criminalization of third-party inappropriate assistance with absentee ballot requests and returns. *DCCC v. Ziriax*, 487 F. Supp. 3d 1207, 1233–34 (N.D. Okla. 2020). That court found that, even though "the requirements will burden some voters," the state enacted the provision for non-discriminatory reasons "in an effort to avoid the type of ballot harvesting and ballot payment scheme at issue in 2018 in North Carolina, which required a new election for a Congressional seat." *Id.* at 1234. The court concluded that any burden from the law was overcome by the state's interests. *Id.*

The same is true here. All voters can have their ballots returned from family or those who live in their household. O.C.G.A. § 21-2-385(a). For voters with disabilities, their ballots can also be returned by a caregiver, even if the caregiver does not live in their household. *Id.* Nothing about the penalty provision creates anything but a minimal burden on voters.

### 2. The Ballot Harvesting Penalty does not violate Section 2 of the Voting Rights Act.

AAAJ Plaintiffs [AAAJ Am. Compl. ¶¶ 115, Count I] also asserts that the Ballot Harvesting Penalty is racially discriminatory under Section 2 of the VRA.  Again, Plaintiffs lack evidence sufficient to create a material issue of fact on this claim.  As noted above, this provision of SB 202 did not impact Black turnout in general, which remained near record high, or Black voters using absentee by mail voting, which reached a new high in 2022.  There is no evidence the Ballot Harvesting Penalty "deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice."  *Greater Birmingham Ministries*, 992 F.3d at 1329; *see also* Watson 179:10–14, 183:2–5 (no issues with ballot return provisions after SB 202); Sosebee 126:12 – 127:4 (no issues with ballot return provisions).  Further, Plaintiffs offer no evidence that Black voters were affected by the misdemeanor penalty for improper handling of completed absentee ballot applications.  Plaintiffs being unable to prove that the penalty "actually makes voting harder for African Americans," *Greater Birmingham Ministries*, 992 F.3d at 1330, State Defendants are entitled to summary judgment.

### 3. The Ballot Harvesting Penalty does not violate the ADA or Section 504 of the Rehabilitation Act.

Plaintiffs' ADA claim also fails because the Ballot Harvesting Penalty

does not violate the ADA[12] and/or Section 504 of the Rehabilitation Act.[13] Under prevailing law, claims under Title II of the ADA and Section 504 are evaluated under the same standard. *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301 n.2 (11th Cir. 2022); AME Pls.' PI Br. at 10 [Doc. 546-1]. To state a Title II claim, "a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami–Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007). To determine if a person was excluded from a public service or activity, the ADA focuses on the program *as a whole* to determine if voters with disabilities have meaningful access to the program.

---

[12] Title II of the ADA provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a).

[13] Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)) provides:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

49

28 C.F.R. § 35.150(a).   The Supreme Court has explained that to "assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

For that reason, courts in this circuit recognize that mere "[d]ifficulty in accessing a benefit," as Plaintiffs allege regarding the voter identification requirements, "does not by itself establish a lack of meaningful access."  *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1329 (N.D. Ga. 2017).  Nor are qualified individuals "entitled to the accommodation of her choice, but only to a reasonable accommodation."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995)).  Thus, meaningful access does not "require the governmental entity to provide *every* requested accommodation."  *Medina v. City of Cape Coral*, 72 F. Supp. 3d 1274, 1278 (M.D. Fla. 2014); *accord Todd*, 236 F. Supp. 3d at 1334 ("a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff," but it still "must be effective" (quoting *Wright v. N.Y. State Dep't of Corrections*, 831 F.3d 64, 72 (2d Cir. 2016)).  "Instead, when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided by the governmental entity."  *Medina*, 72 F. Supp. 3d at 1278 (cleaned up).  Plaintiffs cannot meet these standards.

AME Plaintiffs nevertheless claim that, by increasing a violation of

O.C.G.A. § 21-2-385(a) from a misdemeanor to a felony under rules governing illegal intimidation and meddling with the ballots or vote of a voter under O.C.G.A. § 21-2-568(a), the legislature has denied voters with disabilities meaningful access to absentee vote-by-mail.  [*See* AME Am. Compl. ¶ 358]. Plaintiffs are incorrect.  *See* AME PI Order at 19 [Doc. 615] ("[T]he availability of alternative methods of absentee voting offers a strong rebuttal to Plaintiffs' argument that the Challenged Provisions deny their constituents meaningful assess to absentee voting").  The felony penalties for violating the ballot assistance rules do not deny voters with disabilities meaningful access to the absentee vote-by-mail program.  What Plaintiffs ignore is that there are still multiple ways for voters with disabilities to participate in the absentee vote-by-mail program and to do so on equal footing with other voters.  Title II of the ADA requires nothing more.  *Democracy N.C.,* 476 F. Supp. 3d at 233 (finding that even though North Carolina law specifically prohibited nursing home staff from assisting a resident with a disability by returning an absentee ballot, because the residents with disabilities could still return the ballot by U.S. mail, there was no violation of Title II of the ADA).

Plaintiffs' claims also fail when addressed more granularly.  Plaintiffs suggest that "neighbors, friends, or nursing facility staff" may not qualify as caregivers (a category of assistance available only to disabled voters) because the term "caregiver" is not defined in the statute.  AME Pls.' PI Br. at 13, 15

[Doc. 546-1]. They also claim that residential staff at locations such as psychiatric hospitals, group homes, or other congregate settings may fall outside of O.C.G.A. § 21-2-385(a). Orland Decl. ¶ 16 [Doc. 546-7] (Ex. N). Yet Plaintiffs have not identified a single incident where a friend, neighbor, nursing home staff, or other residential facility provider was prosecuted, questioned, or prevented from returning an absentee ballot on behalf of a voter with a disability. AME PI Order at 18 [Doc. 615] ("[A]lthough Halsell declined his nephew's assistance in returning his ballot, his nephew is expressly authorized to return Halsell's ballot under the Ballot Return Provision."); *see also,* SOF ¶ 535 (Watson 179:10–14, 183:3–5 (no issues with ballot return provisions after SB 202)). Their vagueness concerns are, therefore, illusory. *Cf.*, AME PI Order at 19 n.12 [Doc. 615] (refusing to address Plaintiffs' vagueness argument "because Plaintiffs do not bring a constitutional vagueness claim").[14]

The declarations submitted with Plaintiffs' motion for preliminary injunction [Doc. 546], which this Court denied, (AME PI Order [Doc. 615]), do

---

[14] Additionally, the Georgia Attorney General (twice) and Georgia Supreme Court have both held that, in federal elections, voters with disabilities are entitled to assistance consistent with Section 208 of the Voting Rights Act, even if Georgia statutory law is more restrictive. *Holton v. Hollingsworth,* 270 Ga. 591, 593, 514 S.E.2d 6, 9 (1999); AME Pls.' PI Br. at 15 n.6 [Doc. 546-1] (citing 2016 Ga. Op. Att'y Gen. 02 (2016); 1984 Ga. Op. Att'y Gen. 34 (1984)). The burden Plaintiffs claim voters with disabilities face under the Ballot Harvesting Penalty is, therefore, simply a fiction.

not help them.  For example, Empish Thomas, a blind voter, puts her own personal limitation on the term "caregiver" by excluding someone who is clearly a caregiver—her assistant whom she pays to assist her with daily tasks that she cannot complete because of her disability—from the scope of the statute.  Thomas Decl. ¶¶ 14–15 [Doc. 546-4] (Ex. O).  Her choices are not a state-imposed burden.[15]

In short, Plaintiffs are unable to prove that SB 202's Ballot Harvesting Penalty denies a voter with a disability meaningful access to absentee voting. Nothing in O.C.G.A. § 21-2-385(a) prevents a qualified individual from assisting a voter with a disability in requesting and casting an absentee ballot. And nothing in the ADA requires that *every* voter be able to use any accommodation they desire, or that *every* "obstacle" be removed.  It only requires voters with a disability have "meaningful access" to the program.

---

[15] Plaintiffs' other evidence is similarly unhelpful to their cause.  Matt Hargroves, a homeless-shelter staff who regularly returned ballots for homeless voters with disabilities before SB 202, now claims he will not return ballots for homeless voters with disabilities even though part of his job appears to be assisting with the care of the voter.  Hargroves Decl. ¶¶ 8–11, 13 [Doc. 546-12] (Ex. L).  Yet he fails to explain why SB 202's making violations of this law a felony—while maintaining the same statutory term "caregiver" that has been the law for years—necessitates a change in behavior.  Zan Thornton likewise claims that ADAPT will not "touch[]" a ballot for a voter with a disability and will only take a voter to a drop box, but not put the ballot in the box for the voter.  Thornton Decl. ¶ 23 [Doc. 546-13] (Ex. P).  Thornton too fails to explain how SB 202's making ballot harvesting a felony without changing what the law criminalizes has changed ADAPT's behavior.

*Medina*, 72 F. Supp. 3d at 1279.  Plaintiffs have no evidence establishing that the Ballot Harvesting Penalty denies meaningful access to absentee voting by mail, especially since the same provision did not apparently do so when the penalty was a misdemeanor before SB 202.  Because there is no material issue of fact as to these claims, State Defendants are entitled to summary judgment on them.

## III.   State Defendants Are Entitled to Summary Judgment on Each of the Challenged Provisions Directly Affecting Voters.

The Court should also grant summary judgment to State Defendants on each of the challenged provisions of SB 202 that directly regulate or affect individual voters.

### A.   Denial of absentee ballot applications for unregistered voters.

For example, NGP Plaintiffs [NGP Am. Compl. ¶ 81] claim that requiring *unregistered* voters to resubmit an absentee ballot application after they register to vote unduly burdens their right to vote.  *See* O.C.G.A. § 21-2-381(b)(5).  While this provision does not specifically require a resubmission of an absentee ballot application after registering, such a requirement would nonetheless be eminently reasonable:  It alleviates the administrative burden on local election officials of having to match new voter registrations with pending absentee ballot applications. SOF ¶ 481 (Eveler 171:3–21; Gay 168:4–9).  It also conforms to the responsibility of election officials to confirm

eligibility to vote *before* issuing a ballot, which requires that the person be properly registered at the time the absentee ballot application is received.  SOF ¶¶ 482–83 (Germany 10/30/23 Decl. ¶ 70).  An unregistered voter is not eligible to vote until registered, O.C.G.A. § 21-2-216(a), and only then should a ballot be sent to such voter.

Plaintiffs cannot explain how that requirement presents more than a minimal burden.  Indeed, Plaintiffs have no evidence of how many voters were even affected by this provision and are thus unable to create a material issue of fact as to its lawfulness.

Plaintiffs' position is also foreclosed by the Eleventh Circuit's decision in *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008).  That decision upheld Florida's requirement that a "valid registration is a prerequisite to voting in elections." *Id.* at 1156.  There, the court upheld the state's decision that an unregistered voter, even one who is otherwise eligible to vote, will not have a provisional vote counted.  *Id.* at 1171.  Under these principles, there is no constitutional prohibition on Georgia's requiring a citizen to be registered to vote before accepting an absentee ballot application. If Florida could deny the *votes* of unregistered voters casting provisional ballots, Georgia certainly has the discretion to require registration as a prerequisite to accepting an absentee ballot *application*.

Similarly, in *New Georgia Project,* the district court found that having to

complete a new absentee ballot application for each election was at most a minimal burden. 484 F. Supp. 3d at 1294. And it follows from that conclusion that requiring an individual to complete a new absentee ballot application after actually registering to vote is no more than a minimal burden. As a result, "the States' regulatory interest is generally enough to uphold a reasonable, nondiscriminatory restriction on voting rights." *Id.* at 1294–95 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). And State Defendants are entitled to summary judgment on the Unregistered Voter Provision.

## B. Voter identification requirements associated with the absentee ballot application.

Plaintiffs also challenge SB 202's voter identification requirements applicable to absentee ballots. In Georgia, as in many other states, there was significant criticism of the signature match process for absentee voting. SOF ¶ 431 (Germany 10/30/23 Decl. ¶¶ 17–18; Mashburn 3/14 196:20–197:4; 197:2–4; Sterling 95:25–96:16). It was seen as too subjective and, in 2020, with the sheer volume of absentee ballot applications, there was concern expressed that election officials were not spending sufficient time on signature matching (which is time consuming) to properly verify voter identity. SOF ¶ 432 (Sterling 95:25–96:16; Bailey 10/6 90:18–91:5). To make the process more objective, Georgia chose to utilize similar voter identification requirements

applicable to in-person voting and require one of the same forms of identification that Georgia voters have had to provide since 2005, while also allowing for other identification documents for people who might not have a Georgia driver's license or state identification card.[16]   O.C.G.A. § 21-2-381(a)(1)(C)(i); O.C.G.A. § 21-2-417(c); SOF ¶ 484 (Mashburn 3/7 60:5–21). Indeed, this was of particular benefit to voters with disabilities, whose signature may not be uniform due to their disability.  SOF ¶ 485 (ADAPT 2/20 79:20–24, 99:2–10).  Further, Plaintiffs acknowledge that 96.5% of Georgia voters have either a driver's license or voter identification number associated with their voter file, State Defs.' Opp'n to PI Mot. at 64 n.21 [Doc. 601] (Ex. QQQQ), although State Defendants show that in 2020, 98.6% had one of these

---

[16] The acceptable forms of identification include those required to vote in person, "1. A Georgia driver's license which was properly issued by the appropriate state agency; 2. A valid Georgia voter identification card issued under Code Section 21-2-417.1 or other valid identification card issued by a branch, department, agency, or entity of the State of Georgia, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector; 3. A valid United States passport; 4. A valid employee identification card containing a photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state; 5. A valid United States military identification card, provided that such identification card contains a photograph of the elector; or 6. A valid tribal identification card containing a photograph of the elector."  O.C.G.A. § 21-2-417(a).  For an absentee voter who does not have one of these forms of identification, the following are available alternatives: "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector."  O.C.G.A. § 21-2-417(c).

two forms of identification and 99.2% of those who actually voted in 2022 has one of these forms of identification.  SOF ¶ 487 (Sterling 239:8–20).  Either way, the voter identification requirement is not burdensome.

All Plaintiffs nonetheless claim that requiring a voter to provide identification as part of an absentee ballot application unduly burdens the right to vote and violates Section 2 of the VRA.  They claim that those without a valid photo identification have obstacles to getting such an identification, including lack of transportation.  Further, AME Plaintiffs claim (AME Am. Compl. ¶¶ 349–60) that voting identification requirements improperly deny disabled voters access to vote absentee in violation of the ADA.  But Plaintiffs cannot establish a material issue of fact as to any of these claims.

### 1.   Voter identification requirements associated with absentee voting do not unduly burden the right to vote.

Requiring voters to provide identification to verify their eligibility and identity as part of the absentee ballot process—identification requirements that not only match the requirements for in-person voting but allow a wider range of identification options—does not unduly burden the right to vote, as courts have consistently held when evaluating other challenges to voter identification requirements.  *See e.g.*, *Crawford*, 553 U.S. at 202–03 (upholding Indiana's photo ID requirement); *Common Cause/Ga.,* 554 F.3d at 1354 (upholding Georgia's photo identification requirement); *Frank v. Walker*, 768

F.3d 744, 746 (7th Cir. 2014) (upholding photo ID requirements for absentee voting). SB 202 replaced the inaccurate and problematic signature match requirement with a more objective system. *See* O.C.G.A. § 21-2-381(a)(1)(C)(i); SOF ¶ 489 (Mashburn 3/7 60:5–21; Mashburn 3/14 67:25–68:20). This provision also furthers the State's interest to prevent fraud, restore confidence in the integrity of the voting system, and assist in a more orderly administration of absentee voting, more than satisfying the *Anderson-Burdick* balancing standard.

The Seventh Circuit's decision in *Frank* is particularly instructive. There the Seventh Circuit upheld Wisconsin's voter photo identification requirements for absentee voting. 768 F.3d at 746. In doing so, the court noted the lack of evidence that a "substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so." *Id.* Further, the court noted there was no evidence that the law "reduce[d] the number of voters below what otherwise would have been expected." *Id.* at 747. As to those without a photo ID, the court noted that, "if photo ID is available to people willing to scrounge up a birth certificate and stand in line at the office that issues drivers' licenses, then all we know from the fact that a particular person lacks a photo ID is that he was unwilling to invest the necessary time." *Id.* at 748.

So too here: All Plaintiffs are able to do is to note the number of registered voters who do not have a state issued driver's license or free voter

ID card as part of their voter file (at most 3.5%) (State Defs.' Opp'n to PI Mot. at 64 n.21 [Doc. 601]) and not any reasons why they do not have the ID.  A claim of lack of transportation or some other justification is mere speculation, as getting an acceptable photo ID is not difficult in Georgia, SOF ¶ 496 (McClendon 20:19–22:11, 76:4–5, 80:22–81:24), not to mention the numerous other forms of identification allowed by Georgia, a list far more expansive than what Wisconsin permitted. *Compare Frank,* 768 F.3d at 748 *with* O.C.G.A. § 21-2-381(a)(1)(C)(i) and § 21-2-417(a), (c).

Consistent with *Crawford*, numerous other courts have upheld voter ID requirements.  Indeed, as noted above, Georgia's in-person voter identification requirement has been in place for nearly two decades and upheld by the Eleventh Circuit.  *Common Cause/Ga.*, 554 F.3d at 1354 ("The NAACP and voters, despite their best efforts, failed to identify a single individual who would be unable to vote because of the Georgia statute [requiring photo ID] or who would face an undue burden to obtain a free voter identification card."); *accord Greater Birmingham Ministries*, 992 F.3d at 1320 (upholding Alabama's photo ID requirement because "Alabama's interests in passing the voter ID law are not substantively different from the neutral, nondiscriminatory reasons espoused by Indiana and upheld by the Supreme Court in *Crawford*").

Similarly, the Fourth Circuit in *Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016) upheld Virginia's voter ID law even with plaintiffs

claiming that it was a burden to obtain a free voter ID from the State. *Id.* at 605–07. The court found that the governmental interests of "prevention of voter fraud, and the preservation of voter confidence in the integrity of elections" were sufficient to support the requirement, noting the controlling decision in *Crawford*. *Id.* at 606–07; *see also Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wisc. 2021) (applying rational basis review to restrictions on the use of student IDs).

Georgia statistics on the use of absentee by mail voting in 2022 support the same conclusion here: The available statistics show that a higher percentage of voters, both Black and white, voted absentee by mail in 2022 than they did in 2018. SOF ¶ 355 (Grimmer 102:24–103:5; Grimmer Rep. ¶¶ 60, 62). Further, turnout was near record highs for a midterm election. SOF ¶¶ 348, 354 (Shaw 2/14 Rep. ¶ 10 (p. 6 – summary of findings), ¶¶ 12, 17, 23; Grimmer Rep. ¶¶ 158–64). There was also a very low rejection rate for lack of proper identification. SOF ¶ 497 (Grimmer Rep. ¶¶ 16, 158–68, 171–72). There is simply no evidence that the identification requirement imposed anything beyond a minimal burden no different than any everyday burden of voting. *Burdick*, 504 U.S. at 434. State Defendants are thus entitled to summary judgment on this claim.

### 2. The voter identification requirements do not violate Section 2 of the Voting Rights Act.

Plaintiffs also assert that the voter identification requirements for requesting an absentee ballot are racially discriminatory under Section 2 of the VRA.  Again, Plaintiffs lack evidence sufficient to create a material issue of fact on this claim.  As noted above, this provision of SB 202 did not impact Black turnout in general, which remained near record high, or Black voters using absentee by mail voting, which reached a new high in 2022.  There is no evidence the voter identification requirements "deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice."  *Greater Birmingham Ministries*, 992 F.3d at 1329.  Plaintiffs being unable to prove that the voter identification requirements "actually make[] voting harder for African Americans," *id.* at 1330, State Defendants are entitled to summary judgment.

### 3. The voter identification requirements do not violate the ADA or the Rehabilitation Act.

AME Plaintiffs [AME Am. Compl. ¶¶ 360–71] also claim that the absentee ballot application voter identification requirements violate the ADA and Section 504 of the Rehabilitation Act.  But their claims have no merit.  Indeed, Zan Thorton, head of ADAPT, testified that replacing the signature match procedure with voter identification *benefits* disabled voters.  SOF ¶ 485 (ADAPT 2/20 79:20–24).

Plaintiffs cannot prove "that [anyone] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; [or] that the exclusion, denial of benefit, or discrimination was by reason of [their] disability." *Bircoll,* 480 F.3d at 1083.  Looking at Georgia's voting system as a whole, disabled voters have meaningful access to participate in absentee voting just like they did before SB 202 changed the signature match requirement with a voter identification requirement.

As noted above, moreover, courts in this circuit recognize that mere "[d]ifficulty in accessing a benefit," as Plaintiffs to allege based on the enhanced penalty, "does not by itself establish a lack of meaningful access." *Todd*, 236 F. Supp. 3d at 1329.  Qualified individuals are not "entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart*, 117 F.3d at 1286 (quoting *Lewis*, 908 F. Supp. at 948).   Thus, meaningful access does not require the governmental entity to provide *every* requested accommodation.   *Todd,* 236 F. Supp. 3d at 1334 ("a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff," but it still "must be effective" (quoting *Wright*, 831 F.3d at 72). "Instead, when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided by the governmental entity." *Medina*, 72 F. Supp. 3d at 1278

(cleaned up).  Given these standards, Plaintiffs cannot establish a material issue of fact as to the lawfulness of this portion of SB 202.

That is particularly so given the reality that disabled voters have the same ability to apply for an absentee ballot as voters without disabilities. Disabled voters also have multiple ways of establishing their identify, including all six state and federal photo identifications they would use for in person voting as well as several alternate forms of identification.  O.C.G.A. § 21-2-417(a), (c).  Plaintiffs have no evidence that disabled voters are unable to provide one of the numerous forms of identification accepted for absentee by mail purposes.  Having multiple ways of participating in the absentee by mail process satisfies the ADA.  *See Democracy N.C.,* 476 F. Supp. 3d at 233.  Indeed, when compared to the old signature match process, ADAPT admits that the voter identification scheme benefits disabled voters.  ADAPT 2/20 79:20–24, 99:2–10.  Additionally, lack of identification or difficulty producing a copy of an alternate identification is not an obstacle that is "by reason of such disability," and thus cannot form the basis of a claim under the ADA.  *Democracy N.C.,* 476 F. Supp. 3d at 230, 232–33; *see also,* Sosebee 226:10–22 (no issues raised due to lack of computers, printers, etc.).

For all these reasons, State Defendants are entitled to summary judgment on this claim as well.

## C. Requirement for voters to sign the oath on the absentee ballot application with pen and ink [Signature Oath Requirement].

AME Plaintiffs [AME Am. Compl. ¶¶ 251, 301] further allege that the Signature Oath Requirement unduly burdens the right to vote and violates the ADA.  Yet voters in Georgia have long been required to sign an oath as part of the absentee ballot application process.  SOF ¶ 498 (Germany 10/30/23 Decl. ¶ 87; Sterling 60:7–15).  And, to avoid potential fraud, the State made it clear with SB 202 that the signature was to be handwritten, applied with pen and ink and not an electronic or facsimile of a signature.  *See* O.C.G.A. § 21-2-381(a)(1)(C)(i); SOF ¶ 505 (Germany 10/30/23 Decl. ¶ 89, 92-93).  Even though voters may email their applications, the signature must be made with pen and ink in the voter's own handwriting.  As noted above, requiring a voter to sign, in his/her own hand with pen and ink, ensures the voter takes the oath seriously, deters fraud, and verifies the information being provided to confirm the voter's eligibility and identity.  SOF ¶ 505 (Germany 10/30/23 Decl. ¶¶ 89, 92–93; Eileen Chou, *Paperless and Soulless: E-signatures Diminish the Signer's Presence and Decrease Acceptance*, 6 Soc. Psych. & Personality Scis. 343 (2015); *id.* at 348 (noting the discrepancy between customary use of e-signatures and the mind's interpretation could "foster negativity and skepticism"); s*ee also* Eileen Chou, *What's in a name? The toll e-signatures take on individual honesty*, 61 J. Experimental Soc. Psych. 84 (2015)).  Additionally,

use of ink can maintain legibility and avoid tampering. SOF ¶ 506 (Mashburn 3/7 58:22–59:14; Germany 10/30/23 Decl. ¶ 89).

For their part, Plaintiffs have no evidence that these requirements truly burden the right to vote in general, or that they impose any meaningful burden on disabled voters in violation of the ADA. Plaintiffs thus cannot establish a material issue of fact on these points, and State Defendants are entitled to summary judgment on these claims.

### 1. The Signature Oath Requirement does not unduly burden the right to vote.

The Signature Oath Requirement easily satisfies the *Anderson-Burdick* balancing test. Indeed, the Fifth Circuit in *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), found that requiring an original pen and ink signature on a voter registration, even if the voter first registered by facsimile, was "at most a *de minimis* burden" and furthered Texas's important interests in "(1) guaranteeing that the applicant attests to meeting the State's voting qualifications and (2) helping to deter and detect voter fraud." *Id.* at 307. The same is true here.

Other courts have also noted the importance of a voter signing an oath to guarantee eligibility and deter fraud. For example, the Eastern District of Virginia found such interests sufficient to uphold a requirement that not only the voter sign the oath by hand, but have their signature notarized when a

registered voter merely signs a petition to place an issue on the ballot. *Howlette v. City of Richmond,* 485 F. Supp. 17 (E.D. Va.), *aff'd,* 580 F.2d 704 (4th Cir. 1978). Similar to Georgia's interests here, the court found that having a voter's signature notarized

> [first] impresses upon the signers of the petitions the seriousness of the act of signing a petition for a referendum. Second, the individual notarization requirement dissuades non-qualified persons from signing the names of qualified voters by subjecting those who take the oath to potential criminal liability for perjury. Third, the requirement that each person signing the petition appear and make oath before a notary will often provide an additional, neutral witness to the signing, further aiding the City in discouraging and prosecuting fraud and misrepresentation.

*Id.* at 23. Requiring such a handwritten, pen and ink signature on the oath to request an absentee ballot is more than reasonable.

Similarly, in *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006), the district court upheld not just the signature oath requirement, but also the need for a voter to check three boxes confirming specific aspects of the voter's qualifications as part of the voter registration process. Both the signature oath and the check-boxes, while covering the same qualifications, were each material as they contained different information. *Id.* at 1212–13.

Given these authorities, and State Defendants' evidence on Georgia's own interests in this provision, Plaintiffs cannot create a material issue of fact on their challenges to the Signature Oath Requirement. State Defendants are therefore entitled to summary judgment on those claims.

67

### D. Voter identification requirements associated with returning a completed absentee ballot.

All Plaintiffs also claim that identification requirements when *returning* an absentee ballot unduly burden the right to vote and are racially discriminatory under Section 2 of the VRA, and the AME Plaintiffs [AME Am. Compl. ¶¶ 360, 370] again claim the provision violates the ADA, all without any evidentiary support. Yet, while a voter's eligibility is determined when the voter submits an absentee ballot application, the State also has a compelling interest in verifying the identity of the person returning that ballot. SOF ¶¶ 514, 516, 536 (Germany 10/30/23 Decl. ¶¶ 81, 84–86). And SB 202 gave such voters the same options of voter identification as used when requesting a ballot. *See* O.C.G.A. § 21-2-384(b).[17] These requirements protect against fraud, promote the actual and perceived integrity of the election process, and create a uniform and objective means of verifying a voter's identity. SOF ¶¶ 494, 514 (Germany 10/30/23 Decl. ¶¶ 81, 84–86; Sterling 102:11–18, 104:12–105:2; Bailey 10/6 91:18–92:5; Bailey 3/21 110:22–111:15.

---

[17] The options are extensive for the few voters who do not have a driver's license or state issued identification number associated with their voter file. The voter may provide the last four digits of his/her social security number, which accommodates 99.9% of voters. SOF ¶ 510 (Sterling 239:8–20; PI Hr'g Tr. 193:2–20). For the less than 1% without either a state issued identification (driver's license or voter ID card) or social security number associated with their voter file, the same form of identification provided with the application can be provided when returning their ballot. SOF ¶ 511 (Sosebee 74:4–14; Germany 4/13 87:17–89:2; Germany 10/30/23 Decl. ¶¶ 82, 84 n.1).

Plaintiffs nevertheless claim that these requirements unduly burden the right to vote, are racially discriminatory, and violate the ADA. But they have no evidence that any group of voters were substantially or even moderately burdened in their right to vote from having to provide proper identification on the absentee ballot return envelope. Given the undisputed evidence of the State's interests in this provision of SB 202, State Defendants are entitled to summary judgment.

1.     **Voter identification requirements for returning an absentee ballot do not unduly burden the right to vote.**

As to the right to vote: Georgia unequivocally has a compelling interest in verifying that the person who returns an absentee ballot is the voter to whom the ballot was issued. *See e.g.*, *Crawford*, 553 U.S. at 196–97 (confirming voter identification is a compelling state interest in preventing fraud); *Brnovich*, 141 S. Ct. at 2347 ("preserving the integrity of [a State's] election process" is a "compelling" interest (citation omitted)); *Purcell*, 549 U.S. at 4 (same). Even Plaintiffs acknowledge that all but a small minority of voters (at most 3.5%) have a driver's license number or state voter identification number associated with their voter file, which voters are required to provide when registering if they have those numbers. State Defs.' Opp'n to PI Mot. at 64 n.21 [Doc. 601]; *see also,* SOF ¶¶ 486–87 (Sterling 239:8–20; Evans 79:6–80:4). Of those that do not, virtually all of them (99 to 99.9%) have the last four digits of

their social security number associated with their voter file.  Pls.' PI Br. at 19 [Doc. 566-1] (Ex. NNNN); SOF ¶ 510 (Sterling 239:8–20).  With any of those numbers, as well as the voter's name and date of birth, the voter can easily satisfy their identification requirements.

For those without a state identification number and the last four digits of their social security number, those very few voters can still use an alternate form of identification when requesting their ballot.  Such a requirement is nothing more than an inconvenience at best, more than justified by the State's compelling interests to prevent fraud.  *Crawford*, 553 U.S. at 205 (Scalia, J., concurring); *Frank*, 768 F.3d at 748.

Given that Plaintiffs cannot establish a material issue of fact on this claim, State Defendants are entitled to summary judgment.

**2.    Voter identification requirements for returning a completed absentee ballot do not violate Section 2 of the Voting Rights Act.**

Plaintiffs also assert that the voter identification requirements for returning an absentee ballot are racially discriminatory under Section 2 of the VRA.  But once again, they lack evidence sufficient to create a material issue of fact on this claim.  As noted above, this provision of SB 202 did not impact Black turnout in general, which remained near record high, or Black voters using absentee by mail voting, which reached a new high in 2022.  There is no evidence the voter identification requirements "deprive[] minority voters of an

70

equal opportunity to participate in the electoral process *and* to elect representatives of their choice." *Greater Birmingham Ministries*, 992 F.3d at 1329. After SB 202, only a tiny number of absentee ballots were rejected due to identification issues associated with the absentee ballot return envelope. Grimmer Rep. ¶¶ 16, 170–71. Plaintiffs being unable to prove that the voter identification requirements "actually make[] voting harder for African Americans," *Greater Birmingham Ministries*, 992 F.3d at 1330, State Defendants are entitled to summary judgment.

### 3. Voter identification requirements for returning a completed absentee ballot do not violate the ADA.

For their part, AME Plaintiffs [AME Am. Compl. ¶¶ 360, 370] again throw out an ADA claim with no evidence to support it. As noted above, not only are disabled voters entitled to use one of multiple forms of identification to satisfy the voter identification requirements when returning a completed ballot, but any obstacles identified that may burden a disabled voter's ability to do so is unrelated to being disabled, such as lack of transportation, lack of access to a printer or copier, etc. *Democracy N.C.*, 476 F. Supp. 3d at 232–33; 42 U.S.C. § 12132 (forbidding discrimination only "by reason of such disability"). Just as with voter identification when requesting a ballot, voter identification requirements for returning a ballot do not violate the ADA. And State Defendants are entitled to summary judgment on this claim as well.

### E.      Signed oath requirement.

CBC Plaintiffs [CBC Compl. ¶ 117] and AME Plaintiffs [AME Am. Compl. ¶ 257] claim that requiring absentee voters to sign an oath confirming that the vote was cast in secret (i.e., not subject to undue influence) is somehow problematic, but they do not explain how it unduly burdens a voter.  Plaintiffs also have no evidence of any voter being burdened by this provision.  And Georgia voters have long been required to sign an oath when returning their ballot.  SOF ¶ 520 (Germany 10/30/23 Decl. ¶ 90; Sterling 60:7–15).  Such a common-sense requirement clearly passes constitutional muster.

The oath on the absentee ballot envelope simply confirms that the voter is eligible to vote, has completed the ballot in secret (i.e., was not seen or influenced by individuals not permitted by law to view a voter's completed ballot) and that it was not handled by an unauthorized person.  *See* O.C.G.A. § 21-2-384(b) & § 21-2-384(c)(1).  The voter simply signs the oath to ensure the ballot is the person's ballot and was not subject to vote buying, intimidation or unlawful ballot harvesting.

Nothing about the provision burdens the right to vote:  The procedural requirement of signing an oath on the envelope is a minimal burden, and the small risk that some ballots may be rejected due to a failure to fulfill this requirement does not transform that burden into a severe one.  *New Ga. Project,* 976 F.3d at 1281 ("as a legal matter, it is just not enough to conclude

that if some ballots are likely to be rejected because of a rule, 'the burden on many voters will be severe'" (citation omitted)); SOF ¶ 522 (Grimmer Rep. ¶¶ 16, 165, 171 (low rejection of ballots for signature issues)).

Moreover, the oath requirement is supported by important—even compelling—state interests:  That requirement protects the integrity of the ballot and reduces the risk of fraud, undue influence or pressure on the voter, and vote buying.  SOF ¶¶ 521, 537 (Germany 10/30/23 Decl. ¶¶ 91–93).

Given the minimal burden and the state's interests, the regulation easily survives both rational basis review and *Anderson-Burdick* scrutiny.  *See Rosario*, 410 U.S. at 761 ("It is clear that preservation of the integrity of the electoral process is a legitimate and valid state goal."); *accord Common Cause/Ga.*, 554 F.3d at 1353.  Plaintiffs cannot create a material issue of fact regarding the regulation's lawfulness.  Accordingly, State Defendants are entitled to summary judgment on this claim.

## F.    Date of birth on absentee ballot return envelope.

So too with Plaintiffs' challenges to SB 202's requirement that voters include their date of birth on the absentee ballot return envelope.  *See* NGP Am. Compl. ¶¶ 193–197; NAACP Am. Compl. ¶¶ 233–37;  AME Am. Compl. ¶¶ 372–76.  As noted above, O.C.G.A. § 21-2-384(b) requires a voter to "print his or her date of birth" on the absentee ballot return envelope as part of the voter identification requirements.   Plaintiffs nevertheless claim that

requirement violates the Voting Rights Act's materiality provision.  52 U.S.C. § 10101(a)(2)(B) ("materiality provision").[18]  But that claim fails, both for lack of standing, and on the merits.

### 1. Georgia has compelling and important interests in verifying the identity of persons who return completed absentee ballots.

The date-of-birth requirement serves as part of Georgia's new, streamlined, objective methods of verifying voters' identity when returning an absentee ballot, and that requirement serves the same compelling interests identified above (Section III.B & III.D); *accord* SOF ¶ 514 (Germany 10/30/23 Decl. ¶¶ 81, 84–86).[19]  Once a voter's qualifications are verified based on information submitted on the absentee ballot application, a ballot is mailed to the voter. SOF ¶ 507 (Germany 10/30/23 Decl. ¶¶ 84–85).  In doing so, county officials no longer have control over the ballot that was issued to a specific

---

[18] The Court's order granting Plaintiffs' motion for preliminary injunction against enforcement of this provision is currently on appeal.  *See* 8/18/23 Order [Doc. 613].

[19] Indeed, other states require much more on an absentee ballot envelope. Several require witness signatures and others require the voter to send back a *notarized* signature—more steps than writing a date of birth that appears on the same driver's license used by most voters.  *See* Ala. Code §§ 17-11-7(b), 17-11-10(b)(2) (Ala.: two witnesses or notary); Alaska Stat. § 15.20.203 (Alaska: witness or notary); La. Stat. Ann. § 18:1306(E)(2) (La.: witness); Miss. Code. Ann. §§ 23-15-633, -635, -639, -641 (Miss.: witness signature); Mo. Ann. Stat. §§ 115.283, 115.295 (Mo.: notary); N.C. Gen. Stat. Ann. § 163-231(a)(6) (N.C.: two witnesses or notary); Okla. St. tit. 26, §§ 14-108, -108.1, -123 (Okla.: notary); S.C. Code Ann. §§ 7-15-220, -230 (S.C.: witness).

voter. SOF ¶ 508 (Germany 10/30/23 Decl. ¶ 84).  When that ballot is returned, whether in the mail or in a dropbox, the voter is not present for local election officials to verify the person's identity. SOF ¶ 509 (Germany 10/30/23 Decl. ¶ 84).  Accordingly, as noted above, the voter must provide basic identifying information, including the voter's date of birth, on the absentee ballot return envelope.  Moreover, every voter has his/her date of birth associated with their voter file.  SOF ¶ 517 (Germany 10/30/23 Decl. ¶ 83).  The voter's name, date of birth, and some other form of identification (most often a driver's license or state voter identification number) is used to verify that the person returning the ballot is indeed the person to whom the ballot was issued.  SOF ¶ 512 (Germany 10/23/23 Decl. ¶¶ 81, 84–85).  Such requirements are objective and efficient ways to verify a voter's identity when returning an absentee by mail ballot. SOF ¶ 512 (Germany 10/23/23 Decl. ¶¶ 81, 84–85).

Moreover, county poll workers routinely use a voter's date of birth as part of the verification process.  SOF ¶ 519 (Bailey 10/6 196:16–197:15; K. Williams 47:21–48:21; Manifold 112:22–113:2, 116:24–117:1; Wurtz 47:13–48:8).  Indeed, following SB 202, very few ballots were rejected due to voter identification issues on the absentee ballot envelope when compared to 2018. SOF ¶ 515 (Grimmer Rep. ¶¶ 171–72).

In short, whether viewed as a qualification for voting, or as a legitimate part of the *process* with which a qualified voter must comply to have his/her

vote counted, the date-of-birth requirement serves important—even compelling—state interests.  And Plaintiffs cannot establish a material issue of fact on that question.[20]

### 2. Plaintiffs are unable to establish that the date-of-birth requirement violates the materiality provision.

Under a proper reading of the law, Plaintiffs also cannot establish any material issue of fact as to the lawfulness of SB 202's date-of-birth requirement.  That is because the Voting Rights Act's materiality provision applies only to determinations of whether a voter is qualified to vote, not to the mechanics of voting.  *See* 52 U.S.C. § 10101(a)(2)(B).  Alternatively, even if it

---

[20] Preliminarily, Plaintiffs cannot challenge the date-of-birth requirement because the law does not give them a private right of action.  Plaintiffs seek relief only under 52 U.S.C. § 10101(a)(2)(B) through 42 U.S.C. § 1983.  But the Civil Rights Act provisions on which Plaintiffs rely do not provide an implied right of action.  *See Vote.Org*, 39 F.4th at 305 n.5; *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) (holding that "Section 1971 is enforceable by the Attorney General, not by private citizens").  And recent Supreme Court decisions confirm that the Eleventh Circuit's earlier decision to the contrary in *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), was incorrect because "Section 1983 does not provide an avenue for relief every time a state actor violates a federal law." *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 n.6 (2022) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005)) (cleaned up).  As set out more fully in State Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction Based on Immaterial Voting Conditions, Plaintiffs simply do not have a private cause of action under the materiality provision, (State Defs.' Opp'n to PI Mot. at 16–17 [Doc. 582]), nor are they able to establish standing for their claims against State Defendants. *Id.* at 10–16.  Summary judgment should be granted on this basis alone.  State Defendants nevertheless appreciate that this Court may feel bound by *Schwier* until that decision is expressly overruled.

did apply to run-of-the-mill voting rules, the materiality provision reaches only requirements that are not "material" to a voter's qualifications "under State law." *Id.* Because listing one's birthdate is required by SB 202 to validly cast an absentee ballot, it is, by definition, material under State law. Nothing in the materiality provision takes away a state's ability to reasonably regulate both voter qualifications *and* the voting process. *Anderson,* 460 U.S. at 788; *Burdick*, 504 U.S. at 433.

> **a.  The materiality provision is limited to determining qualifications to vote and not general regulations for casting an absentee ballot making it inapplicable here.**

Based on its clear text, the materiality provision only bars election officials from determining that a person is not "*qualified* … to vote" based on an error unrelated to the State's voting qualifications. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). By its terms, this provision applies to "the requirements that must be met in order to register (and thus be 'qualified') to vote," not to "the requirements that must be met in order to cast a ballot that will be counted." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting). Indeed, the Supreme Court has long recognized that election codes may properly have provisions that "govern[] the registration and qualifications of voters" as well as "the voting process itself." *Anderson*, 460 U.S. at 788; *Burdick*, 504 U.S. at 433. Accordingly, for purposes of the materiality

provision, it is important to know whether the statutory provision at issue goes to a voter's qualification or rather regulates the voting process itself. This is so because the materiality provision is silent about requirements for a qualified voter to cast a valid ballot. Thus, the text makes the materiality provision far narrower than Plaintiffs suggest.

*First,* the provision applies only to an "error or omission" in an "application, registration, or other act requisite to voting" that affects a "determin[ation] whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). As this Court has noted, it is the absentee ballot application (which includes the individual's date of birth) that is used to determine a voter's qualifications, not the absentee ballot *return* envelope. 8/18/23 Order at 21–22 [Doc. 613]; *see also,* SOF ¶ 516 (Germany 10/30/23 Decl. ¶¶ 77, 82–84); O.C.G.A. § 21-2-386(a)(1)(B). That in turn means that errors or omissions on the return envelope are not covered under the materiality provision. 52 U.S.C. § 10101(a)(2)(B). As one respected judge has put it, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." *Ball v. Chapman*, 289 A.3d 1, 38 (Pa. 2023) (Brobson, J., dissenting). Certainly, county registrars may consider exactly the type of information required here—a voter's date of birth—when processing absentee ballots. *See Common Cause/Ga.,* 554 F. 3d at 1354.

In other words, the materiality provision does not apply once a voter has been deemed qualified to vote.  This is because the provision "prohibits states from *disqualifying* potential voters based on their failure to provide information not relevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1286–87 (11th Cir. 2003) (emphasis added).  It follows, therefore, that *qualified* voters who fail to follow state-law procedures for casting a ballot cannot prevail under the materiality provision because their ballot was not counted, not because they were found "unqualified," but rather because they failed to comply with reasonable rules on returning an absentee ballot. *Brnovich*, 141 S. Ct. at 2338.[21]

*Second*, under Plaintiffs' theory, "virtually every rule governing how citizens vote would [be] suspect," *Vote.Org*, 39 F.4th at 305–06, 305 n.6

---

[21] The surrounding provisions in § 10101(a) confirm that it only sets rules governing voter qualifications.  The first paragraph begins, "All citizens of the United States who are *otherwise qualified by law* to vote at any election … shall be entitled and allowed to vote at all such elections…." 52 U.S.C. § 10101(a)(1) (emphasis added).  Then the placement of the materiality provision between two paragraphs placing limits on the determination of voter qualifications supports a narrow reading of the materiality provision and its inapplicability here.  Paragraph (a)(2)(A) prevents state actors from discriminatory application of rules "in determining whether any individual is qualified under State law or laws to vote in any election." *Id.* § 10101(a)(2)(A). And paragraph (a)(2)(C) restricts state actors from "employ[ing] any literacy test as a qualification for voting in any election." *Id.* § 10101(a)(2)(C).  The materiality provision's placement in the middle of these limitations on voter-qualification requirements confirms that it too applies only to voter-qualification requirements and not the general rules for returning an absentee ballot which is the issue here.

(rejecting such a reading), because unless the rule goes directly to determining a voter's qualifications, it is not "material." Taking Plaintiffs' argument to its logical conclusion would obliterate clear guidelines every court in the country recognizes, namely that verifying a voter's identity properly serves the state's interest in preventing fraud, including photo identification for in-person voting. *See Crawford*, 553 U.S. at 196 ("While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear"). If a voter can be required to identify him/herself when returning the absentee by mail ballot, there is no justification that such identifying information could not include the voter's date of birth, especially when that information is part of the individual's voter file and establishes the voter's age, an eligibility requirement. Indeed, "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338.

Indeed, States are not just permitted, but obligated, to establish rules for casting ballots apart from merely establishing qualifications or eligibility to vote. *Burdick,* 504 U.S. at 433 (affirming that "government must play an active role in structuring elections '… if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process'" (quoting *Storer*, 415 U.S. at 730)). Voter identification requirements, such as the date-of-birth requirement here, are legitimate State requirements for

having one's vote counted, even when one is qualified to vote. *Crawford,* 553 U.S. at 196–97. That is what Georgia has done here and it is entirely consistent with the materiality provision.

Because the date-of-birth on the absentee ballot return envelope is not used to determine voter "qualifications," the requirement cannot violate the materiality provision. Accordingly, the materiality provision is simply inapplicable here and State Defendants are entitled to summary judgment on this claim.

> **b.    Even if the Court views the materiality provision as applying to the absentee ballot return envelope, requiring a voter to list his/her date of birth is material to casting the absentee ballot and thus the requirement does not violate the materiality provision.**

Alternatively, should the Court find that the materiality provision applies to the absentee ballot return envelope, under Georgia law the requirement for a voter to write his/her date of birth on the envelope[22] *is* material as a necessary requirement to casting an absentee ballot. Accordingly, rejecting a ballot for an error or omission of the date of birth on the return envelope does not violate the materiality provision because that

---

[22] The voter's birthdate is not a trick question such as how many days have passed since they were born, *see Browning*, 522 F.3d at 1173 (quoting *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995)), but basic identifying information that confirms identity and that is normally included when filling out government forms. SOF ¶ 517 (Germany 10/30/23 Decl. ¶ 85).

provision only applies to "immaterial" conditions.  As the Western District

Court of Wisconsin explained:

> The crux of this argument turns on what it means to be "qualified"
> to vote.  Common Cause Wisconsin apparently has in mind only
> the *substantive* voting qualifications, such as being a citizen, a
> resident of Wisconsin, and at least 18 years old. Common Cause
> Wisconsin is right that whether the individual's ID bears a
> signature is not a substantive qualification of this type.  But
> "qualified" in § 10101(a)(2)(B) is not limited to these substantive
> qualifications.
>
> The phrase "qualified under State law" is defined in § 10101(e):
> "the words 'qualified under State law' shall mean qualified
> according to the laws, customs, or usages of the State." Under
> Wisconsin law, an individual is not qualified to vote without a
> compliant ID. Defendants' straightforward argument squares with
> the statutory text: an individual isn't qualified to vote under
> Wisconsin law unless he or she has one of the forms of
> identification listed in § 5.02(6m), so any required information on
> an ID is indeed "material" to determining whether the individual
> is qualified to vote.

*Common Cause*, 574 F. Supp. 3d at 636 (footnote omitted) (finding that having

one of required forms of identification was material to voting under Wisconsin

law).

Under this view of materiality, individuals who vote absentee are

required to verify their identity when returning the ballot issued to the voter

and sign an oath.  The voter cannot just leave the absentee ballot return

envelope blank and have that ballot accepted.  Similarly, for example, if the

ballot was issued to John Smith born February 15, 1975, and the absentee

ballot return envelope says it is being returned by John Smith born

February 16, 1976, accepting the error as true, *Browning*, 522 F.3d at 1175, that is not the same person and the ballot was either returned by the wrong person (i.e., fraud), or, as Georgia law provides, Mr. Smith can correct his error and have his vote counted.  Bailey 3/21 178:9–179:3. Nothing in the materiality provision prevents Georgia from taking such common-sense steps to further its compelling state interest in preventing fraud in the absentee by mail process and such measures do not deny anyone the right to vote.

SB 202, moreover, *requires* that a voter's identity be confirmed through the voter's date of birth being written on the absentee ballot envelope.  That substantive requirement of state law thus ends the inquiry under the materiality provision.  *See Org. for Black Struggle v. Ashcroft,* 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (ruling that election officials "may reject applications and ballots that do not clearly indicate the required information required by [state law] without offending 52 U.S.C. § 10101(a)(2)(B)").  That is, *if* the VRA's materiality provision applies to a ballot return envelope, as Plaintiffs claim, then the date-of-birth requirement is necessarily "material to a determination whether an individual may vote" under Georgia law.  *Common Cause*, 574 F. Supp. 3d at 636.  Georgia law makes it so, and the VRA requires that Georgia's law be respected.[23]

---

[23] In this regard, the pre-SB 202 decisions in *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) and *Democratic Party of Georgia, Inc. v. Crittenden*,

In essence, as in *Browning*, the real "thrust of plaintiffs' argument is not that the information sought by [state law] [is] immaterial, but that the likelihood of error combined with the consequences are unjustifiably burdensome on the applicant." *Browning,* 522 F.3d at 1175.  Yet, as noted above (Section III.D.1), requiring a voter to list his/her date of birth on the absentee ballot return envelope does not burden the right to vote, let alone deny the right to vote.  Either the materiality provision does not apply because the date-of-birth requirement on the absentee ballot return envelope is not used to challenge a voter's *qualifications*, or the date-of-birth requirement *is* material because it is a requirement under State law for casting an absentee ballot.  Under either view, Plaintiffs cannot establish a material issue of fact as to the lawfulness of this provision, and State Defendants are entitled to summary judgment.

---

347 F. Supp. 3d 1324 (N.D. Ga. 2018) (following *Martin* for uniformity) are inapposite here.  In *Martin*, after erring on the scope of the materiality provision, the court ruled that rejecting ballots for a deficient year of birth on the absentee ballot return envelope violated the materiality provision "when such information is not uniformly required across the State." *Martin*, 347 F. Supp. 3d at 1309.  But "*Martin* isn't instructive" where a birthdate is *required* by state law "because the court held that the county's decision [pre-SB 202] was *inconsistent* with state law." *Common Cause*, 574 F. Supp. 3d at 636 (emphasis added) (citing *Martin*, 347 F. Supp. 3d at 1308–09).  Of course, the birthdate is now required by a new structure that no longer utilizes signature matching.

## CONCLUSION

Plaintiffs cannot carry their burden to prove violations of their constitutional right to vote under the First and Fourteenth Amendments, under Section 2 of the Voting Rights Act or under the ADA/Rehabilitation Act as to any of their claims challenging provisions of SB 202 regulating absentee voting.  The Court should therefore grant summary judgment to State Defendants on all those claims.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik S. Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Edward H. Trent*
Cristina Martinez Squiers*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**

1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com.
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing document has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

/s/ *Gene C. Schaerr*
Gene C. Schaerr