**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON JURISDICTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ................................................................. 2

**I. Claims in *New Georgia Project* complaint (Case No. 1:21-cv-01229)** .......... 2
    A. Challenged provisions. ............................................................... 2
    B. Grounds for challenges. ............................................................. 3

**II. Claims in *Ga. State Conference of the NAACP* complaint (Case No. 1:21-cv-1259)** ................................................................................................... 4
    A. Challenged provisions. ............................................................... 4
    B. Grounds for challenges. ............................................................. 5

**III. Claims in *Sixth District AME* complaint (Case No. 1:21-cv-01284)** ........... 5
    A. Challenged provisions. ............................................................... 5
    B. Grounds for challenges. ............................................................. 6

**IV. Claims in *Asian Americans Advancing Justice – Atlanta* complaint (Case No. 1:21-cv-01333)** ..................................................................................... 7
    A. Challenged provisions. ............................................................... 7
    B. Grounds for challenges. ............................................................. 7

**V. Claims in *Concerned Black Clergy* complaint (Case No. 1:21-cv-01728)** .... 8
    A. Challenged provisions. ............................................................... 8
    B. Grounds for challenges. ............................................................. 8

ARGUMENT ........................................................................................ 9

**I. Legal standards regarding injuries for purposes of standing.** ................. 10
    A. Legal standards for injuries to organizations. .................................. 11
        1. Diversion of resources. ......................................................... 11
        2. Associational standing........................................................... 13
    B. Legal standards for injuries to individuals...................................... 14

**II. Application of law to Plaintiffs at issue in this case on injuries** .............. 14
    A. There is no injury to Plaintiffs from State Defendants for the decisions of county officials on election administration. .................................... 15
        1. Discretionary decisions about early voting times. ........................... 15
        2. Discretionary decisions about using mobile voting units. ................. 16

3. Discretionary decisions about drop boxes...........................................17

4. Discretionary decisions about mailing unsolicited absentee-ballot applications. ...........................................................................................18

5. Discretionary decisions about voter challenges. ..............................18

B. Evidence regarding injuries to Plaintiffs in *New Georgia Project* (Case No. 1:21-cv-01229). ...................................................................................19

    1. New Georgia Project .........................................................................19

    2. Black Voters Matter Fund.................................................................20

    3. Rise, Inc............................................................................................20

    4. Elbert Solomon ................................................................................21

    5. Fannie Marie Jackson Gibbs............................................................22

    6. Jauan Durbin ...................................................................................22

C. Evidence regarding injuries to Plaintiffs in *Ga. NAACP* (Case No. 1:21-cv-01259). ...................................................................................22

    1. Ga. State Conference of the NAACP.................................................23

    2. Ga. Coalition for the People's Agenda ............................................24

    3. League of Women Voters of Georgia ...............................................25

    4. GALEO Latino Community Development Fund ...............................26

    5. Common Cause ................................................................................26

    6. Lower Muskogee Creek Tribe ..........................................................28

D. Evidence regarding injuries to Plaintiffs in Sixth District AME (Case No. 1:21-cv-01284). ...................................................................................29

    1. Sixth District of the AME Church ....................................................29

    2. Ga. Muslim Voter Project.................................................................31

    3. Women Watch Afrika .......................................................................33

    4. Latino Community Fund Georgia .....................................................35

    5. Delta Sigma Theta Sorority, Inc. .....................................................36

    6. The ARC of the United States...........................................................37

    7. Georgia ADAPT................................................................................38

    8. Georgia Advocacy Office ..................................................................40

E. Evidence regarding injuries to Plaintiffs in Asian Americans Advancing Justice – Atlanta (Case No. 1:21-cv-01333). ........................................41

    1. Asian Americans Advancing Justice – Atlanta ................................42

    2. Steven Paik .....................................................................................43

    3. Angelina Thuy Uddallah ..................................................................44

    4. Anjali Enjeti-Sydow .........................................................................44

F. Evidence regarding injuries to Plaintiffs in Concerned Black Clergy (Case No. 1:21-cv-01728). ...................................................................................45

    1. The Concerned Black Clergy of Metropolitan Atlanta......................45

    2.   The Justice Initiative ......................................................... 46

    3.   Metropolitan Atlanta Baptist Ministers Union.................................. 49

    4.   First Congregational Church, United Church of Christ .................. 52

    5.   Georgia Latino Alliance for Human Rights ........................................ 53

**III. Traceability/redressability to Plaintiffs' claims. ........................................ 54**

  A. Legal standards for traceability and redressability. ........................................ 54

  B. There is no traceability or redressability to State Defendants for claims based
     on the processing of absentee applications and absentee ballots. ................. 56

  C. There is no traceability or redressability to State Defendants based on
     injuries suffered as a result of lines. ............................................................... 58

**IV. Plaintiffs' Section 2 claims should be dismissed because Section 2
     provides no private right of action. ................................................................. 59**

**V.  Plaintiffs' claims should be dismissed because they seek to govern
details of a local election in violation of the political question doctrine. .... 64**

**CONCLUSION ............................................................................................ 68**

## INTRODUCTION

At the outset of these cases, Plaintiffs had a minimal burden to invoke this Court's jurisdiction. But now that discovery is complete, Plaintiffs must face the facts—namely, that there is no foundation on which to rest this Court's jurisdiction because Plaintiffs cannot support the allegations in their various Complaints.

This motion addresses five cases involving 30 Plaintiffs. Only seven of the Plaintiffs are individuals—the rest are organizations claiming a combination of organizational harm through a diversion of resources or associational standing to raise claims on behalf of their members.[1]

None of them have standing. In addition to the lack of injury to Plaintiffs, they also raise claims that are barred because there is no private right of action to enforce Section 2 of the Voting Rights Act and because some of their claims are barred by the political-question doctrine.

Indeed, at the end of the day, these cases are all about politics, not about election administration. Because Plaintiffs continue to seek to use this Court as a platform to achieve their political goals, they cannot show with admissible evidence that this Court has jurisdiction to hear their claims. Accordingly, this

---

[1] An additional 10 Plaintiffs (individuals and organizations) who originally appeared on the Complaints have withdrawn their claims and been dismissed. [Docs. 10, 351, 446, 485, 486].

Court should grant summary judgment in favor of State Defendants without reaching the merits of Plaintiffs' claims.

## FACTUAL BACKGROUND

To avoid repetition, this brief details the claims in each case in this section that are applicable to later legal arguments, but only addresses the specific evidence regarding standing in the argument portion of the brief, after explaining the law applicable to all five cases. Because "at least one plaintiff must have standing to seek each form of relief requested in the complaint," *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019); *see also Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017), this Court must analyze each Plaintiff's standing because different Plaintiffs claim injuries based on different election practices.

## I.   Claims in *New Georgia Project* complaint (Case No. 1:21-cv-01229)

For the first case, the New Georgia Project's operative complaint is at NGP Doc. 39, and contains five separate counts.

### A. Challenged provisions.

The NGP Plaintiffs challenge the provisions of SB 202 related to (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [NGP Doc. 39, ¶ 68]; (2) changes to the window for mailing absentee ballots [NGP Doc. 39, ¶ 76]; (3)

changes to requirements to mail absentee ballots to unregistered voters [NGP Doc. 39, ¶ 81]; (4) prohibitions on the use of mobile voting facilities [NGP Doc. 39, ¶ 82]; (5) rules for the use of drop boxes in elections [NGP Doc. 39, ¶ 85]; (6) prohibiting officials from distributing unsolicited absentee ballot applications [NGP Doc. 39, ¶ 95]; (7) prohibitions on giving things of value to voters in line [NGP Doc. 39, ¶ 96]; (8) changes to the timeline and processing of out-of-precinct provisional ballots [NGP Doc. 39, ¶ 101]; (9) voter challenge procedures [NGP Doc. 39, ¶ 106]; and (10) changes to the runoff period to make all runoffs four weeks long [NGP Doc. 39, ¶ 108].

**B. Grounds for challenges.**

The NGP Plaintiffs challenge each of these provisions as unconstitutional burdens on the right to vote (Count I), violations of both discriminatory intent and effect prohibitions of Section 2 of the Voting Rights Act (Count II), and violations of the First Amendment (Count III). They further challenge the provisions that prohibit providing things of value to voters in line on First Amendment grounds (Count IV) and the requirement of including a date of birth on an absentee ballot application or envelope as a violation of the Civil Rights Act (Count V).

## II.     Claims in *Ga. State Conference of the NAACP* complaint (Case No. 1:21-cv-1259)

Second, the Ga. NAACP's operative complaint is at NAACP Doc. 35 and contains six separate counts.

### A.     Challenged provisions.

The Ga. NAACP Plaintiffs challenge provisions of SB 202 related to (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [NAACP Doc. 35, ¶ 134]; (2) prohibiting officials from distributing unsolicited absentee ballot applications [NAACP Doc. 35, ¶ 141]; (3) prohibitions on mailing duplicate absentee ballot applications [NAACP Doc. 35, ¶ 143]; (4) prohibitions on pre-filling of absentee ballot applications [NAACP Doc. 35, ¶ 144]; (5) changes to the window for mailing absentee ballots [NAACP Doc. 35, ¶ 147]; (6) changes to the runoff period to make all runoffs four weeks long [NAACP Doc. 35, ¶ 148]; (7) granting limited discretion to county election officials to set early voting times [NAACP Doc. 35, ¶ 149]; (8) rules for the use of drop boxes in elections [NAACP Doc. 35, ¶ 153]; (9) changes to the timeline and processing of out-of-precinct provisional ballots [NAACP Doc. 35, ¶ 159]; (10) providing a mechanism for suspension of county election officials [NAACP Doc. 35, ¶ 163]; (11) voter challenge procedures [NAACP Doc. 35, ¶ 164]; (12) prohibitions on

giving things of value to voters in line [NAACP Doc. 35, ¶ 166]; and (13) prohibitions on the use of mobile voting facilities [NAACP Doc. 35, ¶ 168].

**B. Grounds for challenges.**

The Ga. NAACP Plaintiffs challenge each of these provisions as enacted with discriminatory intent (Count I), as violations of both discriminatory intent and effect prohibitions of Section 2 of the Voting Rights Act (Count II), and as unconstitutional burdens on the right to vote (Count III). They further challenge the absentee ballot application provisions and prohibition on giving things of value to voters in line as violations of the First Amendment (Counts IV and V). Finally, they challenge the date of birth provision on the absentee ballot envelope as a violation of the Civil Rights Act (Count VI).

**III.   Claims in *Sixth District AME* complaint (Case No. 1:21-cv-01284)**

Next, the Sixth District AME Plaintiffs' operative complaint is at AME Doc. 83 and contains seven separate counts.

**A.   Challenged provisions.**

The Sixth District AME Plaintiffs challenge provisions of SB 202 related to (1) prohibitions on the use of mobile voting facilities [AME Doc. 83, ¶ 246–248]; (2) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [AME Doc. 83, ¶¶ 250–253, 255]; (3) changes to the window for mailing absentee ballots

5

[AME Doc. 83, ¶¶ 254]; (4) requiring a signature in pen and ink on an absentee ballot application [AME Doc. 83, ¶¶ 251–252]; (5) rules for the use of drop boxes in elections [AME Doc. 83, ¶¶ 264–267]; (6) changes to the runoff period to make all runoffs four weeks long [AME Doc. 83, ¶ 268]; (7) prohibitions on giving things of value to voters in line [AME Doc. 83, ¶¶ 269–270]; (8) changes to the timeline and processing of out-of-precinct provisional ballots [AME Doc. 83, ¶ 273]; (9) prohibitions on individuals returning the absentee ballots of others [AME Doc. 83, ¶ 274]; (10) all provisions together generally burdening voters [AME Doc. 83, ¶¶ 276, 324]; (11) all provisions together burdening voters with disabilities [AME Doc. 83, ¶ 321–323].

**B. Grounds for challenges.**

The Sixth District AME Plaintiffs challenge each of these provisions as violations of both discriminatory intent and effect prohibitions of Section 2 of the Voting Rights Act (Count I), intentional racial discrimination (Count II), and as unconstitutional burdens on the right to vote (Count III). They further challenge the prohibitions on giving things of value to voters in line as a violation of the First Amendment (Count IV); the absentee ballot, out of precinct provisional ballot, and drop box provisions as violations of the Americans with Disabilities Act and Rehabilitation Act (Counts V and VI); and the use of date of birth as a violation of the Civil Rights Act (Count VII).

IV.    Claims in *Asian Americans Advancing Justice – Atlanta* complaint (Case No. 1:21-cv-01333)

Fourth is the Asian Americans Advancing Justice – Atlanta (AAAJ), whose operative complaint is at AAAJ Doc. 27, and which contains three counts.

A.    **Challenged provisions.**

The AAAJ Plaintiffs challenge provisions of SB 202 related to (1) changes to the window for requesting and mailing absentee ballots [AAAJ Doc. 27, ¶¶ 85–86]; (2) rules for the use of drop boxes in elections [AAAJ Doc. 27, ¶¶ 97– 99]; (3) prohibiting officials from distributing unsolicited absentee ballot applications [AAAJ Doc. 27, ¶ 104]; (4) prohibitions on mailing duplicate absentee ballot applications [AAAJ Doc. 27, ¶ 107]; (5) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [AAAJ Doc. 27, ¶ 109]; (5) prohibition on absentee-ballot application harvesting [AAAJ Doc. 27, ¶ 114].

B. **Grounds for challenges.**

The AAAJ Plaintiffs challenge each of these provisions as violations of both discriminatory intent and effect prohibitions of Section 2 of the Voting Rights Act (Count I), intentional racial discrimination (Count II), and as unconstitutional burdens on the right to vote (Count III).

## V.     Claims in *Concerned Black Clergy* complaint (Case No. 1:21-cv-01728)

Next, the Concerned Black Clergy's operative complaint is at CBC Doc. 1 and contains six distinct counts.

### A.     Challenged provisions.

The CBC Plaintiffs challenge provisions of SB 202 related to (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [CBC Doc. 1, ¶ 114–117]; (2) rules for the use of drop boxes in elections [CBC Doc. 1, ¶¶ 125, 127–129]; (3) prohibitions on the use of mobile voting facilities [CBC Doc. 1, ¶¶ 135–136]; (4) changes to the runoff period to make all runoffs four weeks long [CBC Doc. 1, ¶ 138]; (5) prohibitions on giving things of value to voters in line [CBC Doc. 1, ¶ 144–145]; (6) changes to the timeline and processing of out-of-precinct provisional ballots [CBC Doc. 1, ¶ 158]; (7) voter challenge procedures [CBC Doc. 1, ¶ 163]; (8) providing a mechanism for suspension of county election officials [CBC Doc. 1, ¶ 167].

### B. Grounds for challenges.

The CBC Plaintiffs challenge each of these provisions as violations of both discriminatory intent and effect prohibitions of Section 2 of the Voting Rights Act (Count I), intentional racial discrimination (Counts II and III), and as unconstitutional burdens on the right to vote (Count IV). They further

challenge the prohibitions on giving things of value to voters in line as a violation of the First Amendment (Count V), and a subset of provisions as violations of the Americans with Disabilities Act (Count VI).

## ARGUMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but need not disprove the opposing party's claims. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb Cty., Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The non-moving party "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)); *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("there must be enough of a showing that the jury could reasonably find for that party").

## I.      Legal standards regarding injuries for purposes of standing.

The legal standards governing standing are straightforward. Federal courts may decide only active "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. To establish standing to present a case or controversy, a litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *U.S. v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Jacobson*, 974 F.3d at 1245 (quoting *Lujan*, 504 U.S. at 561).

While standing is provisionally determined at the time a lawsuit is filed, it is continuously reevaluated and "must persist throughout a lawsuit." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) ("GALEO"). Further, "[i]f a case 'no longer presents a live controversy with respect to which the court can give meaningful relief,' the case is moot and must be dismissed." *Id*. (quoting *Friends of Everglades v. S. Fla. Water Mgmt. Dist*., 570 F.3d 1210, 1216 (11th Cir. 2009)). Additional standards apply specifically to organizations, while others apply to individuals.

### A.    Legal standards for injuries to organizations.

Organizations must show one of two types of standing: organizational or associational. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (*SFFA*). Organizations may establish injury under Article III either by showing they had to divert resources, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009), or by associational standing, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

#### 1.    Diversion of resources.

First, an organizational plaintiff making claims of diversion of resources must prove that counteracting the defendant's allegedly illegal acts required diversion of either financial resources or its personnel's time and energy. *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Common Cause/Ga.*, 554 F.3d at 1350. At this stage of the case, Plaintiffs must sustain their burden of proof with trial-worthy evidence, *Lujan*, 504 U.S. at 561, which must show an injury—in this case diversion of resources—as of the time the plaintiffs filed their complaint. *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1212 (11th Cir. 2019); *Arcia*, 772 F.3d at 1340; *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003).

Moreover, each plaintiff must be more than just a "concerned bystander" who is interested in a problem—the plaintiff must show that the injury is

distinct to that plaintiff. *Gardner v. Mutz*, 962 F.3d 1329, 1342 (11th Cir. 2020) (no injury when plaintiff had only generalized interest in preserving history). Thus, an organizational plaintiff "must prove *both* that it has diverted its resources *and* that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *City of S. Miami v. Governor of Fla.*, 65 F.4th 631, 638–39 (11th Cir. 2023) (emphasis in original).

This is where the organization's mission and its efforts to address an alleged harm come into play. The key point of conflict with an organizational mission is not that the organization would not undertake the work, [NGP Doc. 108, p. 8], but rather whether there is sufficient particularity about the injury as opposed to a generalized grievance. Thus, the Plaintiff organizations must point "to a concrete harm to an identifiable community, not speculative fears of future harm." *Id*. at 639. This means the organizational Plaintiffs must "produce concrete evidence that [SB 202] is an imminent threat to their members." *Id*. at 640.

Finally, Plaintiffs cannot claim injury simply by spending resources on new initiatives or spending more on existing initiatives. They must identify what activities they must "divert resources away *from* in order to spend additional resources" combatting the practices at issue. *Jacobson*, 974 F.3d at 1250 (emphasis in original). Furthermore, they must demonstrate a concrete

12

injury such as perceptible impairment of organizational activities or daily operations, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919–21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended," *Cigar Ass'n of Am. v. United States*, 323 F.R.D. 54, 63 (D.D.C. 2017); *accord Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (observing no evidence that plaintiff was forced to divert resources, "let alone that such diversion impairs the Party"); *compare Ga. Latino Alliance for Human Rights v. Deal*, 691 F.3d 1250, 1260 (11th Cir. 2012) (finding challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").

### 2. *Associational standing.*

The other option is associational standing. That form of standing requires that (1) members would have standing to sue in their own right, (2) the interests asserted are germane to the organization's purpose, and (3) neither the claim nor the requested relief requires individual members to sue. *SFFA*, 600 U.S. at 199. And, as the Eleventh Circuit recently explained, imposing harm on members or the organization itself as a result of something that is not "certainly impending" means there is no injury for purposes of standing. *City of S. Miami*, 65 F.4th at 638, 640.

Thus, the question at this stage is not whether members might possibly have an injury—it is whether Plaintiffs can do something more than "only speculate" about whether any injuries would result from the provisions of SB

13

202 they challenge. *Id.* at 638 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–13 (2013)). Further, Plaintiffs cannot "have standing based on their [members'] 'subjective fear of . . . harm' and its 'chilling effect.'" *City of S. Miami*, 65 F.4th at 638 (quoting *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1238–39 (11th Cir. 2019)).

### B.   Legal standards for injuries to individuals.

Like organizations, individuals must establish that their injuries are "concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc). For possible future injuries, courts regularly use terms like "substantial risk," "significant risk," or "realistic danger." *Id.* at 927–28 (collecting cases). Thus, like the organizations, the individual Plaintiffs must establish something more than speculative fears about future possible harms from SB 202. *Clapper*, 568 U.S. at 410.

### II.   Application of law to Plaintiffs at issue in this case on injuries.

Applying the foregoing legal principles to the Plaintiffs in these cases demonstrates the complete lack of evidence of any concrete and particularized injury to any Plaintiff that is traceable to and redressable by State Defendants. This section first considers several issues where there cannot be any injury beyond speculation as a matter of law and then moves to the specific alleged injuries of each plaintiff.

**A.    There is no injury to Plaintiffs from State Defendants for the decisions of county officials on election administration.**

To begin with, county election officials are responsible for many of the decisions regarding the administration of elections in Georgia. *See*, *e.g.*, *Georgia Republican Party, Inc. v. Sec'y of State for Ga.*, No. 20-14741-RR, 2020 WL 7488181, at *2 (11th Cir. Dec. 21, 2020) (finding no injury traceable to Secretary of State when county officials' absentee signature-verification process yielded a low number of ballot rejections). As discussed below, there are a number of provisions of Georgia law committed to the discretion of county officials. Thus, to show an injury, Plaintiffs must rely on the intervening acts of third parties—specifically decisions by county election officials—that may never actually occur. In other words, any injury alleged by Plaintiffs is not "certainly impending," and they can "only speculate" about whether they will be injured as a result of SB 202. *City of S. Miami*, 65 F.4th at 638, 640. And a "'subjective fear of . . . harm' and its 'chilling effect'" is insufficient to state an injury. *Id.* at 638 (quoting *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1238–39 (11th Cir. 2019)).

1.    *Discretionary decisions about early voting times.*

Plaintiffs challenge several provisions regarding decisions about when to open polling locations during early voting, both during the regular elections

15

and during four-week runoffs.[2] But, while setting minimums, state law commits decisions about the number of advance-voting sites as well as some discretion as to the hours of those sites to county registrars (state law requires early voting sites to be open from at least 9 a.m. to 5 p.m. on weekdays and mandatory Saturdays, with the option for counties to extend those hours between 7 a.m. to 7 p.m.). O.C.G.A. § 21-2-385(d). As a result, Plaintiffs can only be injured under their claims regarding early voting if county officials independently decide not to open voting locations on dates Plaintiffs prefer. Any relief against State Defendants will not eliminate this discretionary role of county officials and thus Plaintiffs cannot show a certainly impending injury against State Defendants. *City of S. Miami*, 65 F.4th at 638, 640.

　　　　2.　　*Discretionary decisions about using mobile voting units.*

Plaintiffs who challenge mobile voting units[3] have another problem, in that they freely admit they were only ever used in Georgia in a single county during the 2020 pandemic-election cycle. SMF[4] ¶ 1 ([NAACP Doc. 35, ¶ 168]).

---

[2] [NGP Doc. 39, ¶ 108], [NAACP Doc. 35, ¶¶ 148–49], [AME Doc. 83, ¶ 268], [CBC Doc. 1, ¶ 138].

[3] [NGP Doc. 39, ¶ 82], [NAACP Doc. 35, ¶ 168], [AME Doc. 83, ¶ 246–248], [CBC Doc. 1, ¶¶ 135–136].

[4] As required by this Court's instructions, III. m., all citations to the record are included in the brief and in the accompanying combined Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

As a result, any injury from the provision of SB 202 prohibiting the use of those units could only exist if county officials independently decided to utilize those units. Any relief ordered against State Defendants would not eliminate this discretionary role of county officials and thus Plaintiffs cannot show a certainly impending injury against State Defendants. *City of S. Miami*, 65 F.4th at 638, 640.

### 3. *Discretionary decisions about drop boxes.*

Similarly, Plaintiffs who challenge drop boxes acknowledge that they, too, have only been used since the 2020 election cycle following the promulgation of an emergency SEB rule at the height of the COVID-19 pandemic. SMF ¶ 2 ([NGP Doc. 39, ¶ 85], [NAACP Doc. 35, ¶ 153], [AME Doc. 83, ¶¶ 264–267], [AAAJ Doc. 27, ¶¶ 97–99], [CBC Doc. 1, ¶¶ 125, 127–129]). As a result, any injury from the provision of SB 202 prohibiting the statutory authorization of drop boxes could, at best, result in placing the decision of whether to even have drop boxes back in the hands of county officials.[5] This could create a situation where Plaintiffs have even *less* access to drop boxes, but at the very least would be subject to the discretion of county officials if any relief was ordered against State Defendants. Accordingly, Plaintiffs cannot

---

[5] As discussed in the merits brief on this issue, no drop boxes would be authorized if the SB 202 drop box language were enjoined.

show a certainly impending injury against State Defendants on these claims. *City of S. Miami*, 65 F.4th at 638, 640.

> 4. *Discretionary decisions about mailing unsolicited absentee-ballot applications.*

Plaintiffs separately complain about limitations on government officials' mailing unsolicited absentee-ballot applications contained in SB 202. [NGP Doc. 39, ¶ 95], [NAACP Doc. 35, ¶ 141], [AAAJ Doc. 27, ¶ 104]. But, like the other provisions, Plaintiffs could only be injured if county officials *independently* decided to mail absentee-ballot applications if they were authorized to do so. Any relief ordered against State Defendants in this action would not eliminate this discretionary role of county officials and thus Plaintiffs cannot show a certainly impending injury traceable to State Defendants. *City of S. Miami*, 65 F.4th at 638, 640.

> 5. *Discretionary decisions about voter challenges.*

Plaintiffs also challenge the addition of language clarifying that there is no limit to the number of voter challenges an individual may bring. [NGP Doc. 39, ¶ 106], [NAACP Doc. 35, ¶ 164], [CBC Doc. 1, ¶ 163]. But Plaintiffs cannot dispute that the entirety of the process for handling challenges to voter eligibility is undertaken by county officials without a role for State Defendants. O.C.G.A. §§ 21-2-229(a), (d); 21-2-230(a), (b). As a result, Plaintiffs can only be injured if (1) a non-party elector challenges some number of voters Plaintiffs

think is excessive, (2) county officials independently find probable cause to hear such a challenge, and (3) the challenge heard without input from State Defendants is improper or without merit. Any relief against State Defendants will not eliminate this discretionary role of individual electors and county officials, and thus Plaintiffs cannot show a certainly impending injury traceable to State Defendants. *City of S. Miami*, 65 F.4th at 638, 640.

**B. Evidence regarding injuries to Plaintiffs in *New Georgia Project* (Case No. 1:21-cv-01229).**

Looking at specific Plaintiffs, in evaluating the specific injuries in the New Georgia Project case, the evidence demonstrates that there is no cognizable injury sufficient to provide this Court with jurisdiction. None of the organizational plaintiffs can show any injury through organizational or associational standing and none of the individual plaintiffs have presented evidence of any injury.

1.   *New Georgia Project*

New Georgia Project is not a membership organization and thus can rely solely on organizational standing. *See SFFA*, 600 U.S. at 199; SMF ¶ 3 (NGP Dep. 21:25–22:3). The only diversion-of-resources injury that NGP could identify is an increase in an existing program to provide voters with free rides to the polls. SMF ¶ 4 (NGP Dep. 125:2–12). NGP has not been harmed by SB 202, but actually has more resources today because its funding has increased

19

since the adoption of SB 202. SMF ¶ 5 (NGP Dep. 63:10–19; 66:7–10). Far from showing any organizational harm as a result of SB 202, NGP has benefited and thus has not presented evidence of any injury. At most, NGP is taking action based on perceived harms of SB 202 that are speculative.

### 2. Black Voters Matter Fund

For its part, Black Voters Matter Fund (BVMF) has not eliminated any projects as a result of SB 202. SMF ¶ 6 (BVMF Dep. 88:21–89:8). It is still engaged in the same organizational development, training, and voter education programs it was engaged in prior to SB 202. SMF ¶ 7 (BVMF Dep. 69:6–9, 72:4–24). BVMF agreed that it can continue to encourage voters to stay in line to vote by coordinating distribution of food and water outside the restricted area at the polls after SB 202 or if the voters approach BVMF. SMF ¶ 8 (BVMF Dep. 83:17–84:7, 86:22–87:3). Ultimately, BVMF would be engaged in voter outreach programs even if SB 202 did not exist. SMF ¶ 9 (BVMF Dep. 55:3–9). As a result, BVMF has not been injured, but is pursuing its normal activities or is taking action based on perceived harms of SB 202 that are speculative.

### 3. Rise, Inc.

The same is true of *Rise, Inc.*, which is the only NGP Plaintiff this Court previously reviewed in the ruling on State Defendants' Motion to Dismiss. [NGP Doc. 108, pp. 6–7]. During the deposition of Rise, it could not identify

any cuts in any budget as a result of SB 202 nor could it establish any quantifiable amount of diverted funds as a result of SB 202. SMF ¶ 10 (Rise Dep. 47:3–8; 65:10–12). Rise has continued to provide training on requesting and casting of absentee ballots and encouraging voters to check their voter status and voting location, as it was doing before SB 202. SMF ¶ 11 (Rise Dep. 39:25–41:3). Thus, Rise cannot show any injury, but rather that it is carrying out its normal activities or is taking action based on perceived harms of SB 202 that are speculative.

### 4.   *Elbert Solomon*

For his part, Mr. Solomon was unable to identify any situation where he was prevented from voting. In fact, the only challenge Mr. Solomon could identify after the adoption of SB 202 was that he would have preferred to vote on Sunday in 2022—a decision in the hands of county officials. SMF ¶ 12 (Solomon Dep. 40:19–41:2, 44:18–45:1). But he was still able to vote in that election. SMF ¶ 13 (Solomon Dep. 40:19–41:2, 44:18–45:1). While Mr. Solomon complained he had difficulty turning in voter-registration applications for other voters—not himself—those applications were all accepted. SMF ¶ 14 (Solomon Dep. 27:16–29:10). As a result, Mr. Solomon cannot show any injury or burden on his right to vote as a result of SB 202 and lacks standing to pursue his claims. If anything, Mr. Solomon's deposition revealed that he had no problems in the post-SB 202 election landscape.

### 5.    *Fannie Marie Jackson Gibbs*

Similarly, despite claiming injury from SB 202, Ms. Gibbs has voted in every election since SB 202 took effect, without difficulty. SMF ¶ 15 (Gibbs Dep. 59:12–24; 59:25–60:5). The lack of any difficulty or problem with voting demonstrates that Ms. Gibbs lacks an injury and thus lacks standing to challenge any provision of SB 202.

### 6.    *Jauan Durbin*

That leaves Mr. Durbin, but the only change in his voting experience since the enactment of SB 202 is that he says he votes on Election Day, whereas he voted early in the 2022 primary elections and the November 2022 general election. SMF ¶ 16 (Durbin Dep. 16:19–23, 37:3–9). The wait Mr. Durbin encountered in November 2022 was about 15 minutes long. SMF ¶ 17 (Durbin Dep. 38:7–9). Thus, Mr. Durbin only has evidence of normal experiences associated with voting and cannot present evidence of any injury as a result of SB 202.

### C. Evidence regarding injuries to Plaintiffs in *Ga. NAACP* (Case No. 1:21-cv-01259).[6]

In evaluating the specific injuries in the Ga. NAACP case, the evidence demonstrates that there is no cognizable injury sufficient to provide this Court

---

[6] Plaintiff the Urban League of Greater Atlanta was dismissed on January 6, 2022 [Doc. 10].

with jurisdiction. None of the organizational plaintiffs can show any injury through organizational or associational standing.

*1.     Ga. State Conference of the NAACP*

First, there were no activities or projects the Ga. NAACP was unable to continue as a result of SB 202. SMF ¶ 18 (Ga. NAACP Dep. 58:6–10). Therefore, Ga. NAACP cannot identify what it has diverted resources *from* for the simple reason that it has continued all of its projects. None of the Ga. NAACP's staff members' responsibilities changed as a result of SB 202. SMF ¶ 19 (Ga. NAACP Dep. 60:10–13). The Ga. NAACP only employs one administrative assistant and relies on volunteers for the remainder of its activities. SMF ¶ 20 (Ga. NAACP Dep. 20:10–12). But it is unable to quantify the amount of time any volunteers spent on other activities as a result of SB 202. SMF ¶ 21 (Ga. NAACP Dep. 76:15–77:25). Further, the Ga. NAACP was unable to identify any members who were limited in voting in any way. SMF ¶ 22 (Ga. NAACP Dep. 133:6–135:8). At most, Ga. NAACP was only able to speculate about whether members were affected by SB 202 and had members contact them to say they had no issues voting after SB 202. SMF ¶ 23 (Ga. NAACP Dep. 136:2–23, 139:6–11).

As a result, Ga. NAACP cannot show it has any injury by diverting resources or that it has standing to seek relief on behalf of its members,

because it cannot identify any members who were injured or affected by SB 202.

### 2. *Ga. Coalition for the People's Agenda*

Second, the Ga. Coalition for the People's Agenda (GCPA) claims it diverted resources related to its efforts to educate voters. SMF ¶ 24 (GCPA Dep. 36:12–37:7, 87:3–8). But it always provides education when laws related to voting change. SMF ¶ 25 (GCPA Dep. 103:7–18). Further, GCPA did not dismiss or hire any staff members as a result of SB 202. SMF ¶ 26 (GCPA Dep. 105:17–23).

Regarding any impact on its members, GCPA was unable to identify any members who lack government-issued photo identification. SMF ¶ 27 (GCPA Dep. 110:12–21). It is also not aware of any voter who was unable to vote as a result of the changes to absentee-ballot applications and timelines for those applications in SB 202. SMF ¶ 28 (GCPA Dep. 113:3–115:13, 119:22–120:6, 120:16–121:10). GCPA is unaware of any voters who were unable to vote because of being unable to get time off of work, the drop box changes, or out of precinct voting provisions of SB 202. SMF ¶ 29 (GCPA Dep. 125:4–7, 130:6–20, 130:22–131:2, 131:16–132:1). Nor has GCPA taken any steps to determine if any of its members waited in line in 2022. SMF ¶ 30 (GCPA Dep. 138:14–139:6).

Thus, GCPA has not presented evidence of any injury beyond choosing to divert resources in response to speculative harms, and does not have any evidence of any members who were injured or affected by SB 202 sufficient to confer associational standing on behalf of members.

### 3. *League of Women Voters of Georgia*

Third, the League of Women Voters of Georgia (LWV) has increased its work in advocacy as a result of SB 202 but has also been affected by decreased activity of its local league partners in its resource-allocation decisions. SMF ¶ 31 (LWV Dep. 61:6–62:11). Thus, any organizational injury is limited to those resource-allocation decisions of local leagues and not to SB 202.

Regarding any impact on its members, LWV was unable to identify any members who lack government-issued photo identification. SMF ¶ 32 (LWV Dep. 73:5–8). It is also not aware of any voter who was unable to vote as a result of the changes to absentee-ballot applications and timelines for those applications in SB 202. SMF ¶ 33 (LWV Dep. 73:23–74:2, 75:1–5, 75:19–76:25). LWV also has no knowledge of any voter or member being harmed by the voter-challenge provisions or the takeover provisions of SB 202. SMF ¶ 34 (LWV Dep. 78:5–20, 78:21–79:4). As a result, LWV lacks associational standing because it cannot identify any individual or member affected by SB 202.

4. *GALEO Latino Community Development Fund*

Fourth, GALEO Latino Community Development Fund (GALEO) has been engaged in voter education before *and after* SB 202. SMF ¶ 35 (GALEO Dep. 101:14–18). Yet GALEO cannot identify any projects related to voter registration that it took resources away from to address the impact of SB 202. SMF ¶ 36 (GALEO Dep. 98:8–12). GALEO did not hire or dismiss any staff members as a result of SB 202, SMF ¶ 37 (GALEO Dep. 109:3–8), and there have been no projects that GALEO has been unable to engage in as a result of SB 202. SMF ¶ 38 (GALEO Dep. 109:17–21). As a result, GALEO cannot demonstrate any injury to itself, financial or otherwise.

GALEO has no knowledge of any voter or member who was unable to vote because of SB 202's requirements related to government-issued identification, absentee-ballot applications and deadlines, early voting, drop boxes, out-of-precinct voting, suspension provisions, or waiting in line. SMF ¶ 39 (GALEO Dep. 117:15–118:6, 121:3–6, 113:3–115:13, 132:14–19, 133:4–18, 138:1–5, 143:9–11, 146:9–147:4, 148:17–21, 150:3–14, 155:8–12). GALEO also lacks associational standing because it is not aware of any voter or member who was affected by the provisions of SB 202 it challenges. *Id.*

5. *Common Cause*

Fifth, Common Cause is not claiming any diversion of financial resources as a basis for its standing in the case. SMF ¶ 40 (Common Cause Dep. 7:10–

19). Common Cause provided information about legislative changes, legislative debriefs, grassroots mobilization, pollworker recruitment, provisional ballot programs before and after SB 202. SMF ¶ 41 (Common Cause Dep. 106:4–107:12). While Common Cause identified some programs it wished to engage in for future events, it only identified the sheriff accountability program as an existing program it stopped engaging in. SMF ¶ 42 (Common Cause Dep. 107:13–108:11). But this program was a program funded by the national organization and Common Cause simply chose to prioritize election projects over the sheriff projects. SMF ¶ 43 (Common Cause Dep. 108:22–113:6). The only other reasons Common Cause could identify for not engaging in certain projects was due to a lack of funding from its national organization, about which Defendants were not permitted to inquire. SMF ¶ 44 (Common Cause Dep. 108:22–113:6, 113:13–116:10). The only areas where Common Cause claims it diverted resources to projects were in the areas of provisional ballot curing programs and voter education programs, both of which it engaged in prior to SB 202. SMF ¶ 45 (Common Cause Dep. 117:16–121:4). Thus, Common Cause cannot show any diversion of resources based on anything more than speculation about the possible impact of SB 202, which is not sufficient to show an injury.

Common Cause also has no knowledge of any voter or member who was unable to vote because of SB 202's requirements related to government-issued

identification, absentee-ballot applications and deadlines, early voting, drop boxes, out-of-precinct voting, suspension provisions, or voter challenge provisions. SMF ¶ 46 (Common Cause Dep. 124:14–125:4, 139:18–22, 140:14– 141:23, 147:9–17, 155:24–156:15, 161:4–162:20, 163:20–166:3, 166:4–165:19). Thus, Common Cause has not shown any associational standing because it has no knowledge of any member or voter affected by the provisions it challenges.

### 6.   *Lower Muskogee Creek Tribe*

Unlike other organizational Plaintiffs, Lower Muskogee Creek Tribe (LMCT) is not relying on a diversion of resources, but only on associational standing on behalf of its members. SMF ¶ 47–48 (LMCT Dep. 48:3–9, 53:8–12). The only types of injuries that LMCT could identify are members not getting off work until 6:00 or 7:00pm and being unable to utilize early voting hours. SMF ¶ 49 (LMCT Dep. 63:22–64:10). But SB 202 expanded the number of early voting hours. LMCT was unable to identify any member who was prevented from voting since the enactment of SB 202. SMF ¶ 50 (LMCT Dep. 67:14–19, 76:18–25, 77:6–78:8). Given the lack of any impact of SB 202 on any member of LMCT, it cannot demonstrate an injury for purposes of associational standing, which is its sole method of establishing this Court's jurisdiction.

## D. Evidence regarding injuries to Plaintiffs in Sixth District AME (Case No. 1:21-cv-01284).[7]

In evaluating the specific injuries in the Sixth District AME case, the evidence demonstrates that there is no cognizable injury sufficient to provide this Court with jurisdiction. None of the organizational plaintiffs can show any injury through organizational or associational standing.

### 1.   Sixth District of the AME Church

Since 2016, the Sixth District of the African Methodist Episcopal Church (Sixth District AME) has been very engaged in voter registration, voter education, voter mobilization, and voter organization for every election. SMF ¶ 51 (Sixth District AME Dep. 27:9–19). What the Sixth District claims are its efforts combatting SB 202 can more accurately be described as generalized voter-education efforts that include making sure people have ID and are making a plan to vote, all of which the Church undertakes as a normal practice. SMF ¶ 52 (Sixth District AME Dep. 93:24–94:16). Although the Sixth District claims to have spent more time on voting and voting education efforts in 2022 than in 2018, it could not identify how these efforts were related to combatting the challenged provisions of SB 202. SMF ¶ 53 (Sixth District AME Dep. 43:3–6).

---

[7] Plaintiff Southern Christian Leadership Conference was dismissed on March 13, 2023 [Doc. 486].

Further, the Sixth District has member churches, but not individual members, and has no control over how the ministers function in each local church. SMF ¶ 54 (Sixth District AME Dep. 21:4–9, 22:16–18). Thus, despite claiming that the Sixth District has had to divert time and resources allegedly combatting the challenged provisions of SB 202, the activities they identified like Get Out the Vote efforts, food programs, after-school programs, and senior/shut-in ministries, are all conducted at the local level by member churches and not at the district level. SMF ¶ 55 (Sixth District AME Dep. 40:2–41:3, 43:3–6, 46:4–20). As a result, the Sixth District itself has not shown diverted resources.

Nor can the Sixth District claim associational standing. First, the Sixth District cannot stand in the shoes of its member churches, which operate autonomously. *See* SMF ¶ 55 (Sixth District AME Dep. 40:2–41:3, 43:3–6, 46:4–20). Second, the interests asserted must be germane to the Sixth District's mission. *SFFA*, 600 U.S. at 199.

While claiming intentional racial discrimination, the Sixth District based its conclusions about the purpose behind SB 202 solely on the timeline of its being passed after the 2020 election. SMF ¶ 56 (Sixth District AME Dep. 63:24–64:4; 9–11, 66:7–14). Similarly, the only basis for the Sixth District's claims that SB 202 was passed to marginalize and disenfranchise black and minority voters was that SB 202 was enacted after *Shelby Cty. v. Holder*, 570

U.S. 529 (2013), involving the Voting Rights Act, and Gov. Kemp's alleged statements that he was not happy with the results of the 2020 election. SMF ¶ 57 (Sixth District AME Dep. 86:2–21). None of these statements is sufficient to confer standing on the Sixth District for purposes of this lawsuit.

### 2.    *Ga. Muslim Voter Project*

Moving to the next Plaintiff, the primary purpose of the Georgia Muslim Voter Project ("GMVP") is to educate minorities about the political process, to build voter turnout in elections, and to promote civic responsibility among local communities. SMF ¶ 58 (GMVP Dep. 35:20–36:5). The organization has always done voter education events and maintained an active voter engagement campaign for the 2020 election cycle. SMF ¶ 59 (GMVP Dep. 37:8–10, 38:22–23, 39:1–3). Those voter education efforts were in effect before SB 202 and after its passage. SMF ¶ 60 ([AME Doc. 83, ¶ 40], GMVP Dep. 62:8–11, 63:22–64:5, 67:8–12).   Regardless of whether they agree with a law, GMVP continually updates their communications, trainings, and workshops to make sure that they are always providing updates on changes in election laws. SMF ¶ 61 (GMVP Dep. 128:4–10, 65:6–11).

While this Court previously considered GMVP's diversion of resources based on claims of diverting resources from a leadership development program, [Doc. 613, pp. 9–10], their deposition showed that GMVP had never actually started those programs and just "wished" they could be implementing them.

SMF ¶ 62 (GMVP Dep. 107:8–11). Similarly, expanding translation for workshops and services and materials and gathering data and data research studies on the Muslim community are other goals of the organization which have not yet been launched. SMF ¶ 63 (GMVP Dep. 98:1–2, 106:11–16, 98:14–17, 100:5–6). As their representative put it, their "harm" "was really about, I guess, more so taking away from the things that we wish we could be doing." SMF ¶ 64 (GMVP Dep. 104:21–25). But this is not evidence of a diversion of resources *from* an existing program, but merely different decisions about resource allocation for possible future programs.

To be sure, GMVP moved staff from part-time to full-time for voter registration, get-out-the-vote, and voter education work when they saw the "slew of voting right bills that were being passed," but that action was not tied specifically to SB 202. SMF ¶ 65 (GMVP Dep. 121:11–16). GMVP does not distinguish what work was done by the organization that pertained only to the challenged provisions of SB 202 rather than the other election bills they were working on. GMVP thus cannot show that it diverted resources from any activity it was currently engaged in, and cannot show it did anything beyond responding to speculative potential harms of SB 202, which cannot confer standing.

Regarding associational standing, GMVP did not create an individual membership program until after the passage of SB 202. SMF ¶ 65 (GMVP Dep.

45:20–25). And GMVP does not have any specific information on which to base its claim that fewer people are able to vote in Georgia as a result of the eight challenged provisions of SB 202. SMF ¶ 66 (GMVP Dep. 165:8–10, 15–24, 166:1–3, 171:4–7, 172:14–23, 174:8–15, 178:14–17, 184:1–3). GMVP has not determined whether any member of the community who lacks an ID is also lacking a utility bill, bank statement or other forms of ID permitted under SB 202. SMF ¶ 67 (GMVP Dep. 169:15–20). GMVP likewise does not know of anyone who could not vote because of the absentee ballot requirements in SB 202. SMF ¶ 68 (GMVP Dep. 169:21–23, 170:5). The information they have is based on hearsay and may not even concern members of their community, let alone their organization's membership. SMF ¶ 69 (GMVP Dep. 187:16–22). As a result, GMVP also does not have associational standing given its lack of any knowledge of any affected member.

### 3. *Women Watch Afrika*

For its part, Women Watch Afrika ("WAA") does not have any members, and thus cannot claim associational standing. SMF ¶ 70 (WAA Dep. 125:11–12). Instead, they are a community service provider that conducts civic engagements, voter registration and voter education ongoingly for residents becoming citizens working with them through their first time voting. SMF ¶ 71 (WAA Dep. 16:16–25, 17:8, 125:13–16). They have been doing this kind of work since 2013. SMF ¶ 72 (WAA Dep. 18:8–13).

33

WAA regularly keeps apprised of all changes with election laws to educate individuals talking with citizens. SMF ¶ 73 (WAA Dep. 19:8–17, 27:23–28:9). But WAA does not address obtaining state-issued identification in its voter registration education, so it could not have diverted any resources regarding provisions of SB 202 related to IDs. SMF ¶ 74 (WAA Dep. 52:12-16). Moreover, WAA continued to engage in activities after the passage of SB 202 that it did before the law, including encouraging voters to check early voting locations and their own voting records, providing information on requesting and returning absentee ballots, and providing language assistance. SMF ¶ 75 (WAA Dep. 40:18–23, 40:24–41:2, 202 41:3–10, 41:11–17, 41:41:18–42:2, 43:12–15, 54:18–55:1). These were not new activities after SB 202, but just a continuation of the organization's existing work.

The only new activity WAA could identify was coordinating with taxi services for rides to the polls for individuals. SMF ¶ 76 (WAA Dep. 68:25–69:13, 69:25–70:4). But it was unable to tie this new activity to any provision of SB 202. SMF ¶ 76 (WAA Dep. 68:25–69:13, 69:25–70:4). Further, WAA had no knowledge of any voter that used a mobile voting unit, that was unable to request an absentee ballot in the shorter period, was unable to use pen and ink to apply for an absentee ballot, that was unable to use a drop box, or affected by the food-and-drink in line provisions or the out-of-precinct provisions of SB 202. SMF ¶ 77 (WAA Dep. 102:4–8, 103:14–17, 105:24–106:2, 107:23–108:1,

110:19–23, 111:1–5, 111:8–12). In fact, WAA only knew of one individual who allegedly did not receive her absentee ballot, but knew nothing about why and had no idea if it had anything to do with SB 202. SMF ¶ 78 (WAA Dep. 129:18–22, 130:2–6).

In short, WAA cannot claim associational standing because it does not have members and has not shown any diversion of resources related to actual harms it claims exist from SB 202. At most it has shown a slight change in activities based on speculative potential harms.

### 4.    *Latino Community Fund Georgia*

Next, the Latino Community Fund of Georgia ("LCF") was incorporated in 2018 and has been involved in civic education and civic participation efforts including election protection, training volunteers on Georgia law and Spanish language assistance. SMF ¶ 79 (LCF Dep. 36:1–21). The civic participation education program includes education, voter registration, mobilization and election protection, all of which predate SB 202. SMF ¶ 80 (LCF Dep. 36:25–37:3).

LCF does not have individual members, and thus cannot claim associational standing. SMF ¶ 81 (LCF Dep. 50:1–7). Regarding any potential diversion of resources, LCF claims to receive information about voters who had difficulty finding the correct precinct, but does not keep records of such

instances and does not have specific information of any particular occurrences. SMF ¶ 82 (LCF Dep. 50:1–7, 51:9–14).

The only work LCF did related to SB 202 involved communicating about the requirements of Georgia law to other organizations, updating training and digital campaigns and training the community on the changes. SMF ¶ 83 (LCF Dep. 61:17–62:6). Consistent with SB 202, LCF provided voter education on the use of drop boxes during the early voting or Election Day at the polls and encouraging voters not to use absentee voting by mail. SMF ¶ 84 (LCF Dep. 64:20–65:9). This was consistent with its prior focus on providing voter education generally.

LCF does not know of anyone specifically who has not been able to vote because of the challenged provisions of SB 202. SMF ¶ 85 (LCF Dep. 94:19–23). LCF has knowledge of a man who was unable to vote because he was in the wrong precinct in the last election in 2022, but does not know if he actually voted or any other specifics about his experience. SMF ¶ 86 (LCF Dep. 84:23–85:2). As a result, LCF cannot show that it has diverted resources from any activities to any new activities as a result of the provisions of SB 202.

### 5. *Delta Sigma Theta Sorority, Inc.*

The next Plaintiff is Delta Sigma Theta Sorority (DST), a member organization that provides voter education in Georgia. SMF ¶ 87 (DST Dep. 49:6–21). The organization regularly conducts voter education in its

newsletters as it focuses on local elections every two years. SMF ¶ 88 (DST Dep. 50:6–18, 51:2–14).

But DST was unable to identify any members who were unable to vote as a result of the provisions of SB 202. SMF ¶ 89 (DST Dep. 42:24–44:10). Thus, it cannot show any associational standing to challenge SB 202.

Further, any diversion of resources involves either members taking time off work to volunteer on Election Day generally—unrelated to SB 202—or time spent on this litigation, which cannot be the basis for a diversion of resources. SMF ¶ 90 (DST Dep. 85:10–14, 86:1–20, 87:5–8). Thus, DST has not shown that it diverted resources in response to SB 202 sufficient to show an injury in this case.

### 6.  *The ARC of the United States*

Then comes the ARC of the United States (ARC), which has been engaged in voter education, assisting in registration, and getting out the vote prior to the passage of SB 202. SMF ¶ 91 (ARC Dep. 118:9–15). The only purported diversion the ARC could identify was that it decided to include information about SB 202 in its usual advocacy related meetings and training documents. SMF ¶ 92 (ARC Dep. 27:16–28:19).

At its deposition, the ARC could not identify any member who could not vote and could not identify any specific examples of members who had trouble voting. SMF ¶ 93 (ARC Dep. 31:25–33:17). The ARC also could not identify any

activities prior to the adoption of SB 202 for any activities they would have diverted resources from as a result of SB 202. SMF ¶ 94 (ARC Dep. 51:16–18, 52:20–23). Further, the ARC could not identify any particular member who was burdened or was unable to vote as a result of SB 202. SMF ¶ 95 (ARC Dep. 88:14–18, 101:15–21). And, while it provided some examples of concerns of the organization about potential burdens on members, it was unable to give any specific examples of these potential problems. SMF ¶ 96 (ARC Dep. 88:22–90:3). Thus, the ARC has not shown that it diverted resources in response to SB 202 sufficient to show an injury in this case.

### 7. *Georgia ADAPT*

For the next party, Georgia ADAPT uses "civil resistance" and "principled nonviolence" to end bias against Georgians with disabilities and it works to empower the disabled community in Georgia. SMF ¶ 97 (ADAPT Dep. Vol. I 48:12–49:9). It is not relying on financial diversion of resources for standing purposes. SMF ¶ 98 (ADAPT Dep. Vol. I 17:23–18:8).

Prior to the adoption of SB 202, ADAPT provided rides to the polls and educational activities, including handing out snacks and water in the 2020–2021 election cycle only. SMF ¶ 99 (ADAPT Dep. Vol. I 24:2–15, 83:17–84:15, 85:20–86:8). ADAPT would also provide interpreters for some voters with disabilities. SMF ¶ 100 (ADAPT Dep. Vol. I 87:17–88:3).

Of these activities, ADAPT has only stopped providing interpreter services. SMF ¶ 101 (ADAPT Dep. Vol. I 88:1–3). It still provides water and a snack to voters to whom it gives rides. SMF ¶ 102 (ADAPT Dep. Vol. I 29:11–21). And it still provides rides for voters. SMF ¶ 103 (ADAPT Dep. Vol. I 34:1–11, 68:21–69:2). ADAPT was not able to identify specific programs it ceased engaging in aside from interpreter services for deaf voters. SMF ¶ 104 (ADAPT Dep. Vol. I 88:10–22, 116:18–117:1). Thus, ADAPT has not diverted resources based on non-speculative harms, because it has continued its existing programs.

ADAPT is also unaware of any members who were unable to vote by absentee ballot and could only identify one person who had difficulty voting because of a car battery issue. SMF ¶ 105 (ADAPT Dep. Vol. I 103:2–104:2, 105:25–106:11). While it knew of some members who had issues voting because of identification or other challenged provisions, it was not sure of the details of those events. SMF ¶ 106 (ADAPT Dep. Vol. II 20:9–21:20, 34:2–36:13, 36:25–39:2. 40:5–25). It also was not aware of the situations for individuals who did not receive absentee ballots but for which it later provided rides. SMF ¶ 107 (ADAPT Dep. Vol. II 29:20–31:16). ADAPT also does not maintain a membership roster, so it cannot say for certain who its members are. SMF ¶ 108 (ADAPT Dep. Vol. II 8:9–14). Thus, ADAPT cannot rely on associational standing for any injury.

8.     *Georgia Advocacy Office*

Regarding the final Plaintiff, the majority of funding for the Georgia Advocacy Office (GAO) comes from federal grants. SMF ¶ 109 (GAO Dep. 27:10–18). One of GAO's goals is "to ensure full participation in the electoral process for individuals with individuals residing in facilities and congregate settings." SMF ¶ 110 (GAO Dep. 48:09-19). And this was the organization's goal prior to enactment of SB 202. SMF ¶ 111 (*Id.*). While GAO's primary mission is to advocate for people with disabilities, SMF ¶ 112 (GAO Dep. 50:16–25), a large portion of GAO's work involves voter education specific to individuals with disabilities or those that are housed in a psychiatric facility. SMF ¶ 113 (GAO Dep. 51:16–52:01). And much of this education revolves around changes in voting laws as they occur. SMF ¶ 114 (GAO Dep. 56:21–57:05). For example, GAO updated training materials in response to the change in voting machines Georgia implemented in 2019. SMF ¶ 114 (GAO Dep. 56:21–57:05).

GAO also could not explain changes in its voter education-related work after the passage of SB 202: "[O]verwhelmingly, before SB202, our concentration was telling people to exercise their right to vote. And now it's more about helping to facilitate them to vote and how to vote." SMF ¶ 115 (GAO Dep. 60:14–17). And, as a practical matter, the GAO said it continued its earlier process of occasionally escalating complaints the organization received

from individuals with disabilities related to voting to the Secretary of State's office, "a couple times a year, maybe." SMF ¶ 116 (GAO Dep. 150:05–11). But, since the passage of SB 202, GAO could not recall escalating any such complaints. SMF ¶ 117 (GAO Dep. 150:12–16).

Another of GAO's primary examples of purported resource diversion involved the creation of a videotape the organization had made related to voting, which "we had planned to use for years," but which had to be remade after SB 202. SMF ¶ 118 (GAO Dep. 150:22–151:10). But GAO could not explain why the video redo was ordered and paid for *before* SB 202 was passed. SMF ¶ 119 (GAO Dep. 172:13–174:09). Other purported "expenses" resulting from SB 202 involved thousands of dollars allocated to banquet halls and hotels. SMF ¶ 120 (GAO Dep. 174:10–177:01).

Finally, GAO could not definitively identify any injury to GAO's members. As a result, GAO has not presented evidence of associational or organizational standing.

### E. Evidence regarding injuries to Plaintiffs in Asian Americans Advancing Justice – Atlanta (Case No. 1:21-cv-01333).[8]

In evaluating the specific injuries in the Asian Americans Advancing Justice – Atlanta case, the evidence demonstrates that there is no cognizable

---

[8] Plaintiffs Nora Aquino and Thao Tran were dismissed on March 1, 2023 [Doc. 446].

injury sufficient to provide this Court with jurisdiction. None of the organizational plaintiffs can show any injury through organizational or associational standing and none of the individual plaintiffs have presented evidence of any injury.

### 1. *Asian Americans Advancing Justice – Atlanta*

Asian Americans Advancing Justice – Atlanta (AAAJ) does not assert standing based on a diversion of financial resources or based on associational standing. SMF ¶ 121 (AAAJ Dep. 7:14–8:5). Its sole basis for standing is diversion of non-financial resources because it is not a membership organization. SMF ¶ 122 (*Id.,* AAAJ Dep. at 7:24–8:5).

AAAJ has long engaged in voter engagement and voter education, including get-out-the-vote activities and policy advocacy as part of its mission of encouraging voters to participate in the political process. SMF ¶ 123 (AAAJ Dep. 41:22–42:24, 82:13–17). That includes updating materials and training staff when laws related to elections change. SMF ¶ 124 (AAAJ Dep. 55:16–56:2; 68:25–69:6).

While claiming it was unable to engage on some immigrant detention issues, AAAJ does not have any documents reflecting the changes in resource allocation it claims occurred. SMF ¶ 125 (AAAJ Dep. 60:7–61:11, 61:23–62:2). Ultimately, the types of decisions made by AAAJ were related to resource allocations as opposed to discontinuing certain categories of its work. SMF ¶

126 (AAAJ Dep. 97:3–98:8). But AAAJ's advocacy often changes, so it could not say for sure whether particular activities it chose not to engage in were actually planned activities it could not engage in as a result of SB 202. SMF ¶ 127 (AAAJ Dep. 93:23–95:7). Moreover, AAAJ admitted it is unaware of any specific individuals who were unable to vote as a result of SB 202. SMF ¶ 128 (AAAJ Dep. 119:20–120:8).

As a result, AAAJ cannot show that it has diverted resources based on non-speculative potential harms from SB 202 and thus does not have standing to bring this case. This leaves the individual Plaintiffs.

### 2.   *Steven Paik*

Despite making a number of claims about his concerns about the voting process, Mr. Paik was able to successfully vote by absentee ballot in the 2021 and 2022 elections. SMF ¶ 129 (Paik Dep. 24:7–25:1). In fact, Mr. Paik used a dropbox when voting in the 2022 election. SMF ¶ 130 (Paik Dep. 26:10–16, 40:9–17, 40:24–41:19). Mr. Paik agreed that the changes in Georgia law in SB 202 did not personally impact him, but he had only "heard it is going to get difficult" to vote. SMF ¶ 131 (Paik Dep. 42:3–43:3). Without any personal impact or asserted potential injury from SB 202, Mr. Paik does not have any injury sufficient for standing.

### 3. *Angelina Thuy Uddallah*

Ms. Uddallah has likewise failed to present evidence sufficient to support standing. She says her preference is to vote by mail, but only voted absentee by mail in the January 2021 runoff election. SMF ¶ 134 (Uddallah Dep. 35:19–36:2, 36:17–37:10). Moreover, Ms. Uddallah has only used a drop box in the January 2021 runoff and in no other election. SMF ¶ 135 (Uddallah Dep. 42:21–43:1). Ms. Uddallah voted in person using early voting in the 2022 general election. SMF ¶ 136 (Uddallah Dep. 36:3–36:12). Ms. Uddallah was able to vote in the general election and runoff in 2022. SMF ¶ 137 (Uddallah Dep. 42:13–16). Without any personal impact or asserted potential injury from SB 202, Ms. Uddallah does not have any injury sufficient for standing.

### 4. *Anjali Enjeti-Sydow*

The same is true of Ms. Enjeti-Sydow. She admitted she has not attempted to vote by absentee ballot since SB 202, but has instead opted to vote early in person. SMF ¶ 138 (Enjeti-Sydow Dep. 43:20–44:2, 48:21–49:3). Ms. Enjeti-Sydow chose not to vote using a drop box after the passage of SB 202, even though she had never used a drop box except in the 2020 election cycle. SMF ¶ 139 (Enjeti-Sydow Dep. 40:23–14). Ms. Enjeti-Sydow did successfully deliver her daughters' absentee ballots to a drop box in a process that took 30–45 seconds after she arrived. SMF ¶ 140 (Enjeti-Sydow Dep. 104:21–105:14, 106:20–107:5). She also has not waited in a voting line that was

44

longer than 25 minutes after the passage of SB 202. SMF ¶ 142 (Enjeti-Sydow Dep. 63:23–64:11, 64:18–65:14, 66:10–67:22). Without any personal impact or asserted potential injury from SB 202, Ms. Enjeti-Sydow does not have any injury sufficient for standing.

In short, none of the Plaintiffs in the AAAJ-Atlanta case has sufficient evidence to establish standing.

### F. Evidence regarding injuries to Plaintiffs in Concerned Black Clergy (Case No. 1:21-cv-01728).[9]

Moving to the specific injuries in the Concerned Black Clergy case, the evidence demonstrates that there is no cognizable injury sufficient to provide this Court with jurisdiction. None of the organizational plaintiffs can show any injury through organizational or associational standing.

### 1. *The Concerned Black Clergy of Metropolitan Atlanta*

To start, the Concerned Black Clergy of Metropolitan Atlanta (CBC) explained that, while 30–40 percent of CBC's time centered on election activities prior to the passage of SB 202, once the law was passed, "it began to really be the focus of our organization." SMF ¶ 143 (CBC Dep. 64:07–08). But this change in focus resulted not necessarily from the passage of SB 202, due

---

[9] Plaintiffs Samuel Dewitt Proctor Conference, Mijente, and Sankofa United Church of Christ Limited were dismissed on December 19, 2022 [Doc. 351], and Plaintiffs Faith in Action Network, Greater Works Ministries, and Exousia Lighthouse International were dismissed on March 13, 2013 [Doc. 485].

to the "great deal of hysteria" surrounding its passage and the high degree of "misinformation and disinformation circulating." SMF ¶ 144 (CBC Dep. 63:12–64:13). So, while CBC says it "moved away from health issues, and you know, all of the other issues that we would talk about in the community," in order to focus on SB 202, this move was ultimately the result of speculative hysteria about what the law meant as distinct from the provisions of the law itself. SMF ¶ 145 (*Id.*). Moreover, any changes were not diversions but were only increases in voter-related activities, that "went from a grass fire to a house fire to neighborhood fire to a five-alarm fire." SMF ¶ 146 (CBC Dep. 73:21–23). But these increases again stemmed from a misunderstanding of SB 202 rather than the provisions of the law themselves.

CBC's witness Rev. Jones further admitted that CBC has not "surveyed or polled its members to determine if the challenged provisions in this lawsuit have impaired members' ability to vote." SMF ¶ 147 (CBC Dep. 138:18–22). As a result, CBC cannot show any member who was injured nor any injury to itself that was the result of non-speculative beliefs about the impact of SB 202 on the organization.

### 2. *The Justice Initiative*

Second, the Justice Initiative (JI) is not claiming a financial diversion of resources in this action, so they are relying on alleged diversion of the organization's time and personnel. SMF ¶ 148 (JI Dep. 21:14–17). But the

evidence produced by the organization falls short of what is required to establish injury for purposes of Article III standing. JI could only point to doing "more" of its usual practices as a result of SB 202—specifically, "more intense training." SMF ¶ 149 (JI Dep. 29:07–09) ("[B]asically… we went into a more intense training of citizens because of the effects of SB 202."). However, when describing that "more intense training," JI stated that, usually, the organization "may have done caravans to empower people to go and vote and get out the polls," and "we may have actually been in five counties a day." SMF ¶ 150 (JI Dep. 31:12–20). Since SB 202, however, these caravans are "covering one county a day." SMF ¶ 151 (*Id.*). JI considers this as "non-financial diversion of resources" essentially because "we're hitting one county a day versus four counties a day." SMF ¶ 151 (JI Dep. 32:07–08). But they offered no evidence tying that purported "diversion" to specific provisions of SB 202.

JI also offered a slew of apparent changes in the organization dealing with issues entirely distinct from SB 202, including Get Out the Vote Efforts, List Maintenance, and Voter ID, but could not identify specifically what aspects or provisions of SB 202 resulted in the organization's diversion of resources as to these widely varying election topics that are required by a variety of different election laws. SMF ¶ 152 (JI Dep. 37:11–38:14). Ultimately, JI insisted that its already-existing voter-education efforts were "increased and… more individualized" because of SB 202. SMF ¶ 153 (JI Dep. 40:15–19).

47

But JI had no documentation reflecting whatever increase it claimed occurred. SMF ¶ 153 (JI Dep. 54:18–24).

Even if the increased activity in existing programs were sufficient to provide standing, all of JI's non-financial resources are allocated based on whether any volunteers desire to devote time to a particular program or initiative, not whether the organization so chooses:

> Q. And who decides how resources are allocated by the Organization?
>
> A. The CEO, myself, in conjunction with others who are involved in the process. In other words, *we make a recommendation.* Being that [the volunteers] are the resources, *they make a decision* as to whether or not they're going to be able to help or not.

SMF ¶ 154 (JI Dep. 53:13–20). Put differently, the organization itself has no control over how its non-financial resources are expended. They are merely a function of volunteer availability and individual preference, and this cannot confer organizational standing.

With respect to the purported injury of members, JI has no process for conferring membership apart from individuals volunteering to be members. SMF ¶ 154 (JI Dep. 66:1–5). All that is required is to occasionally "show up at meetings." SMF ¶ 154 (*Id.* at 11-13). There are no fees associated with membership, and once a person shows up at a meeting that person becomes a member. SMF ¶ 154 (JI Dep. 66:11–67:06). And there are no benefits of membership that JI could identify apart from "the general sense of having

participated [in] activities and action that brings justice and particular voice to the voiceless." SMF ¶ 155 (*Id*.).

To determine the extent of any injury to JI's members, the organization simply solicited reports. SMF ¶ 156 (JI Dep. 70:24–71:2). But it could only identify one individual who purportedly experienced harm as a result of SB 202. SMF ¶ 157 (JI Dep. 71:04–16). That individual, who was not named or otherwise identified by JI, reported that a poll worker intimidated her while voting and asked her for whom she was voting. SMF ¶ 157 (JI Dep. 71:04–16). JI could not connect how this action by the poll worker, which was itself against the law, was the result of SB 202 except by the unsupported non sequitur that "Georgia law empowers the poll worker to be illegal." SMF ¶ 158 (JI Dep. 72:15–16). Moreover, JI ultimately admitted that any explanation for the poll worker's actions was entirely speculative, saying "I can't say what caused the poll worker to do that." SMF ¶ 159 (JI Dep. 73:14–22). As a result, JI cannot show any associational standing because it cannot even identify an affected member who could suffer some non-speculative harm resulting from SB 202.

### 3. *Metropolitan Atlanta Baptist Ministers Union*

Third, the Metropolitan Atlanta Baptist Ministers Union ("Union") could not identify any legally significant diversion of resources for purposes of establishing Article III standing. The Union had an "in-house" member, named Darrell Elligan, who generally provides reports on "political and voter

registration issues," "political empowerment," "political education," and "political encouragement." SMF ¶ 161 (Union Dep. 30:13–31:07). Mr. Elligan has performed this task on a weekly basis for his entire tenure at the Union. SMF ¶ 162 (Union Dep. 31:01–09). As part of his pre-SB 202 duties, Mr. Elligan would periodically create voter-education-related materials, and these materials increased after the passage of SB 202. SMF ¶ 163 (Union Dep. 51:05–52:04; 53:07–11). The Union also discussed SB 202 in conjunction with its preexisting voter coordinating hub, claiming that SB 202 required more activity around the efforts of the hub and that SB 202 necessitated "more activity," "longer meetings," and "more discussions." SMF ¶ 164 (Union Dep. 58:01–60:01). But Union admitted that most of the informational material it disseminated to its members was created not by the Union, but by other organizations including the Secretary of State's office. SMF ¶ 165 (Union Dep. 60:04–09). And the Union has no evidence of a causal connection between any specific provision of SB 202 and any increase in "activity" or meeting time.

In addition to the purported lengthening of meetings at the Union and the general increase in material provided as a result of SB 202, the Union claimed its voter transportation schedule was also affected by SB 202. But in support of this, the Union only identified transportation efforts undertaken by *other* organizations that the Union would join, such as Souls to the Pools. SMF ¶ 166 (Union Dep. 88:07–13). Moreover, the Union admitted it had engaged in

50

transportation services, if informally, at least since 2018. SMF ¶ 167 (Union Dep. 79:09–25).

Even on the issue of food and drink in line, the Union admitted that it is possible it was encouraging people to have a snack and remain in line before SB 202, but claimed "it was more important in 2022" due to SB 202. SMF ¶ 168 (Union Dep. 93:13–20, 93:21–25). But that fact, if true, doesn't establish any diversion of resources or any other burden on the Union – especially since it is still allowed under SB 202 to engage in "line-warming" activities beyond the boundaries set by the statute.

Finally, due do the drop box provisions of SB 202, the Union's designee reported that members decreased giving rides to seniors to drop off ballots "because of intimidation." SMF ¶ 169 (Union Dep. 119:21–120:04). But he did not provide any insight as to the provision of SB 202 that purportedly made members intimidated to do so. And regardless, a reduction in activity doesn't establish a diversion of resources.

As a result, the Union has not shown it was injured directly because it has not diverted resources from any activity to any other activity. And it cannot identify any member who was harmed as a result of non-speculative potential harms from SB 202.

####    4.    *First Congregational Church, United Church of Christ*

Next, the First Congregational Church, United Church of Christ ("UCOC") based its claims of purported resource diversion on the fact that the organization needed to "ramp up" its usual voter education efforts in the wake of SB 202. SMF ¶ 170 (UCOC Dep. 25:02–13). It claimed that "we took time away from other things to make sure that our members were properly prepared to vote," SMF ¶ 171 (UCOC Dep. 25:14–16), but did not describe those projects that had resources taken away in any detail. Moreover, UCOC admitted that it "can't quantify the hours of time" the organization apparently diverted in response to SB 202. SMF ¶ 172 (UCOC Dep. 27:02–13). Beyond that, UCOC has "no documents… that quantify the number of additional hours or redirected hours." SMF ¶ 173 (UCOC Dep. 27:14–21). Finally, with respect to activities or initiatives that UCOC is unable to engage in due to its purported resource diversion on account of SB 202, it admitted that, "the way in which the church operates, it's impossible to answer that…" SMF ¶ 174 (UCOC Dep. 44:06-12). As a result, UCOC has not shown and cannot show that it diverted resources to any activities or from any activities beyond doing more on its existing voting-related programs.

With respect to injury to UCOC's members, it only "know[s] of one member particularly, who … actually did not vote because of SB 202, only one." SMF ¶ 175 (UCOC Dep. 23:15–21). But the reason the individual was unable

to vote was because "they were in the wrong – at the wrong precinct and could not [get to the correct precinct] because they were dependent on mass transportation…" SMF ¶ 176 (UCOC Dep. 23:22–24:06). UCOC has no documentation evidencing this story. SMF ¶ 177 (UCOC Dep. 24:14–18). And in any event, SB 202 allows out-of-precinct voting, and UCOC has no evidence this voter could not have voted that way. As a result, UCOC cannot show it has associational standing to bring claims on behalf of this one unnamed member who was at the incorrect precinct.

### 5. *Georgia Latino Alliance for Human Rights*

Finally, the Georgia Latino Alliance for Human Rights' ("Alliance") cannot establish standing. Its mission is "educate voters about how to vote… and to encourage them to vote… and to give them information about where and when they can vote." SMF ¶ 178 (Alliance Dep. 34:08–19). While the Alliance identified several areas where it claimed SB 202 conflicts with its mission, it was unable to explain how educating voters about the changes adopted in SB 202 had any impact on the organization. SMF ¶ 179 (Alliance Dep. 33:03–25, 34:05–07).

Moreover, to the extent the Alliance described how it "diverted" resources in response to SB 202, it is more accurately described as simply doing more of the same things it usually did. SMF ¶ 180 (Alliance Dep. 39:12–25). While the Alliance's purpose is to educate voters, its designee explained that

the difference in education after SB 202 was one of degree. "[W]e did it before…
the difference, the amount of, number of people canvassing on the streets.
Materials, increase in staff, and also all the time-consuming for all of us…"
SMF ¶ 181 (Alliance Dep. 41:23–42:02). And, when asked what the Alliance
would be doing today but for the passage of SB 202, its designee could only
speculate, saying, the Alliance "probably would create more digital contents,"
instead of responding to SB 202. SMF ¶ 182 (Alliance Dep. 48:20–25). Thus,
the Alliance has not presented evidence of diversions of resources *from*
particular activities *to* particular activities as a result of SB 202, much less the
particular provisions of SB 202 it has challenged, but rather that it continued
to fulfill its mission of educating voters.

## III.   Traceability/redressability to Plaintiffs' claims.

### A.   Legal standards for traceability and redressability.

That still leaves the final two elements of standing. The key questions
for traceability and redressability "are who caused the injury and how it can
be remedied." *City of S. Miami*, 65 F.4th at 640. As *Jacobson* explains, "general
supervision and administration of the election laws[] does not make the
[challenged election law] traceable to [the Secretary of State]." 974 F.3d at
1254; *see also Lewis*, 944 F.3d at 1300 (where the court rejected the plaintiffs'
reliance upon "a host of provisions of the Alabama Code that generally describe
the Attorney General's [enforcement] authority" to establish traceability).

Part of the reason for closely analyzing redressability is the limited jurisdiction of this Court:

> "Federal courts have no authority to erase a duly enacted law from the statute books." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018); *see also Steffel v. Thompson*, 415 U.S. 452, 469, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974) ("Of course, a favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (internal quotation marks omitted)). Our power is more limited: we may "enjoin executive officials from taking steps to enforce a statute." Mitchell, supra, at 936.

*Jacobson*, 974 F.3d at 1255. Accordingly, the general authority to enforce state laws or a role as the "chief election official" does not automatically establish traceability as to each challenged provision. *See City of S. Miami*, 65 F.4th at 614 ("Neither the governor nor the attorney general acts under [the statute] in such a way that the organizations' injury is traceable to them or redressable by enjoining them."). Moreover, as discussed above, the Court exercising its authority to enjoin enforcement of certain provisions does not enjoin the provisions themselves. *Jacobson*, 974 F.3d at 1255. So, if another party—such as a district attorney or county official—can continue to implement the challenged provisions even were this Court to enjoin the parties to this action, Plaintiffs have not established redressability under Article III.[10] *Id.*

---

[10] Indeed, orders from this Court binding a handful of counties and not others could lead to "arbitrary and disparate treatment to voters in its different counties." *Bush v. Gore*, 531 U.S. 98, 107, 121 S. Ct. 525 (2000) (per curiam); *Jacobson*, 957 F. 3d at 1209. And *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th

Further, any "injury cannot 'result [from] the independent action of some third party not before the court.'" *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1328 (N.D. Ga. 2020) (quoting *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011)). And "traceability does not exist where 'an independent source would have caused [plaintiff] to suffer the same injury.'" *Anderson*, 497 F. Supp. 3d at 1328 (quoting *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012)).

While injuries are discussed on a plaintiff-by-plaintiff basis, traceability and redressability relate to the specific claims brought by Plaintiffs. Even if Plaintiffs have shown injuries for some of the claims they bring against State Defendants, there is no traceability or redressability related to several categories of claims in these cases.

**B. There is no traceability or redressability to State Defendants for claims based on the processing of absentee applications and absentee ballots.**

First, as this Court already found, Georgia law is clear that county officials process absentee-ballot applications and absentee ballots. [Doc. 613, pp. 15–17]; O.C.G.A. § 21-2-386. Thus, none of Plaintiffs' claimed injuries

---

Cir. 2011), offers no support to Plaintiffs because it was decided before *Jacobson* and *Lewis*, and was decided only under a proper-party analysis that did not consider standing, making it a "drive-by jurisdictional ruling[]" that either has no precedential effect or is limited to the proper-party context. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91, 118 S. Ct. 1003, 1011 (1998).

regarding the processing of absentee ballots are traceable to or redressable by State Defendants. *Id*. That includes all claims from Plaintiffs regarding the processing of absentee ballot applications and absentee ballots:

- For *NGP*, (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [NGP Doc. 39, ¶ 68]; (2) changes to the window for mailing absentee ballots [NGP Doc. 39, ¶ 76]; (3) changes to requirements to mail absentee ballots to unregistered voters [NGP Doc. 39, ¶ 81]; and (4) prohibiting officials from distributing unsolicited absentee ballot applications [NGP Doc. 39, ¶ 95].

- For *Ga. NAACP*, (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [NAACP Doc. 35, ¶ 134]; (2) prohibiting officials from distributing unsolicited absentee ballot applications [NAACP Doc. 35, ¶ 141]; (3) prohibitions on mailing duplicate absentee ballot applications [NAACP Doc. 35, ¶ 143]; (4) prohibitions on pre-filling of absentee ballot applications [NAACP Doc. 35, ¶ 144]; (5) changes to the window for mailing absentee ballots [NAACP Doc. 35, ¶ 147].

- For *Sixth District AME*, (1) using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [AME Doc. 83, ¶¶ 250–253, 255]; (2) changes to the window for mailing absentee ballots [AME Doc. 83, ¶¶ 254]; (3) requiring a signature in pen and ink on an absentee ballot application [AME Doc. 83, ¶¶ 251–252].

- For *AAAJ*, (1) changes to the window for requesting and mailing absentee ballots [AAAJ Doc. 27, ¶¶ 85–86]; (2) prohibiting officials from distributing unsolicited absentee ballot applications [AAAJ Doc. 27, ¶ 104]; (3) prohibitions on mailing duplicate absentee ballot applications [AAAJ Doc. 27, ¶ 107]; (4) using a driver's license number or other acceptable identificaiton instead of a signature for absentee ballot applications and ballots [AAAJ Doc. 27, ¶ 109].

- For *CBC*, using a driver's license number or other acceptable identification instead of a signature for absentee ballot applications and ballots [CBC Doc. 1, ¶ 114–117].

In short, Plaintiffs cannot establish traceability or redressability for any of these claims.

### C. There is no traceability or redressability to State Defendants based on injuries suffered as a result of lines.

Plaintiffs also make a number of claims that can only result in an injury if there are long lines for voting.[11] Under Plaintiffs' theory regarding the prohibition on food and drink (and other items of value) being provided to voters in line, they can only be injured if the lines are long enough to necessitate nutrition and hydration for those waiting. But, because counties are responsible for decisions about voting equipment allocation, poll worker allocation, and poll worker training, any lines that result from those facts are due purely to county actions, not to any actions of State Defendants. *Anderson*, 497 F. Supp. 3d at 1328–29. As a result, any injuries to Plaintiffs that result from the prohibition on handing out food, drink, and other items of value to voters in line are not traceable to or redressable by State Defendants, and thus cannot be pursued against State Defendants.

---

[11] For NGP, it is the prohibition on giving things of value to voters in line [NGP Doc. 39, ¶ 96]; for Ga. NAACP, it is prohibitions on giving things of value to voters in line [NAACP Doc. 35, ¶ 166]; for Sixth District AME, it is prohibitions on giving things of value to voters in line [AME Doc. 83, ¶¶ 269–270]; for CBC, it is prohibitions on giving things of value to voters in line [CBC Doc. 1, ¶ 144–145].

## IV.   Plaintiffs' Section 2 claims should be dismissed because Section 2 provides no private right of action.[12]

Plaintiffs also bring a number of claims under Section 2 of the Voting Rights Act (VRA).[13] But Section 2 is enforceable only by the Attorney General because it lacks any private right of action, and Plaintiffs' VRA claims must be dismissed on that ground as well.

Certainly the text of Section 2 of the VRA provides no private enforcement mechanism. And the sole enforcement section of the VRA provides *only* the Attorney General with a cause of action to enforce Section 2. *See* 52 U.S.C. 10308(d) ("Whenever any person has engaged . . . in any act or practice prohibited by section 10301 . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief . . . ."). This language has prompted the Supreme Court to acknowledge that "[Section] 2 . . . provides no right to sue on its face" and "lack[s] . . . express authorizing language" for private suits. *Morse v. Republican Party of Va.,* 517 U.S. 186, 232 (1996) (Stevens, J., plurality opinion); *id.* at 240 (Breyer, J., concurring in the judgment) (describing any

---

[12] Even though this argument is made in the "jurisdictional" summary-judgment motion, this question is not jurisdictional because "[t]he existence of a private right of action is an issue 'separate and distinct' from the issue of standing, . . . and 'is not jurisdictional.'" *Mulhall v. Unite Here Local 355*, 618 F.3d 1279, 1293 (11th Cir. 2010) (citations omitted).

[13] For NGP, Count II; for Ga. NAACP, Count II; for Sixth District AME, Count I; for AAAJ, Count I; for CBC, Count I.

"right of action to enforce [Section] 2" as an "implied private right of action"). Nevertheless, private actions under Section 2—like these cases—persist. To understand why the Supreme Court has permitted these claims for so long without a definitive answer on whether a private right of action exists, it is necessary to briefly examine the history of the VRA.

Not long after the VRA became law, the Supreme Court decided *Allen v. State Board of Elections*, in which the Court implied a private right of action to enforce Section 5 of the VRA.[14] 393 U.S. 544 (1969). The Court reasoned that "[t]he guarantee of Section 5 that no person shall be denied the right to vote… might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement of the prohibition." *Id.* at 556–57. This ruling, of course, did not address Section 2 of the VRA. And in any event, the decades that followed saw the Supreme Court steadily chip away at what it would later call its "*ancien regime,*" exemplified by *Allen,* where the Court would somewhat readily find implied rights of action to shore up weak statutory-enforcement language. *Ziglar v. Abbasi*, 582 U.S. 120, 131–32 (2017). As one district court recently put it, "*Allen* has been relegated to the

---

[14] Unlike Section 2, Section 5 dealt with the "preclearance" process whereby certain jurisdictions had to obtain prior approval from the Attorney General or the District Court for the District of Columbia prior to enforcing changes in election laws.

dustbin of history." *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893, 912 (E.D. Ark. 2022).

Today, courts appropriately look carefully at the text of a statute before finding an implied private right of action or remedy where Congress declined to articulate one. As the Supreme Court put it in another context, "[h]aving sworn off the habit of venturing beyond Congress's intent, we will not accept [plaintiffs'] invitation to have one last drink." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001). More recently, the Supreme Court instructed that, when addressing Section 2 in a new context, "a fresh look at the statutory text is appropriate." *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2326 (2021). And following the Supreme Court's decision in *Shelby County*, resourceful plaintiffs' attorneys are finding new contextual scenarios in which to bring Section 2 claims that were historically brought pursuant to the now-inoperative Section 5. This counsels in favor of looking at the text of Section 2 anew.

And the text of Section 2 does not contain a private right of action to enforce it:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

61

(b)  A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b). So, to the extent Plaintiffs claim to have a private right of action read in by the judiciary, they must look elsewhere in the VRA for it. And, although "Congress is not required to place a remedy in every provision of every statute it passes," *Ark. NAACP* 586 F. Supp. 3d at 907–8, an examination of the VRA ultimately evinces a design by Congress that precludes private enforcement of Section 2.

The *Ark. NAACP* case provides a thorough analysis on this point and it need not be exhaustively repeated here. But a high-level review shows that Section 12 of the VRA is "the only remedial provision that Congress provided for violations of [Section] 2." *Id.* But that Section is "focused entirely on enforcement proceedings instituted by the Attorney General of the United States." *Id.* This creates a "problem for the Plaintiffs because '[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude other.'" *Id.* (quoting *Sandoval*, 532 U.S. at 290).

62

Following its analysis of the VRA, the *Ark. NAACP* district court concluded that "the text and structure of the Voting Rights Act does not manifest an intent to create a private remedy for Section 2 violations." *Id.* at *32 (cleaned up). This interpretation is not really a new one so much as it is an underexplored one. And much of the existing jurisprudence that assumed—without deciding—that Section 2 provided a private right of action "rests on an erroneous assumption that 'a legislature never adopts half-way measures, never attacks the easy part of the problem without attacking the more sensitive part as well.'" *Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 658 (11th Cir. 2020) (Branch, J., dissenting), *vacated by* 141 S. Ct. 2618 (quoting *Morse v. Republican Party of Virginia*, 517 U.S. 186, 246 (1996) (Scalia, J., dissenting)).

Granted, other district courts have reached different conclusions, relying on the language in *Morse* and the history of Section 2 cases. *See, e.g, Alpha Phi Alpha v. Raffensperger*, Case No. 1:21-cv-05337-SCJ (N.D. Ga. Jan. 28, 2022), Doc. No. 65, slip op. at 31–34 (collecting cases and finding private right of action exists); *see also Ga. State Conference of the NAACP v. Georgia*, No. 1:21-CV-5338-ELB-SCJ-SDG, 2022 U.S. Dist. LEXIS 238741, at *20-21 (N.D. Ga. Sep. 26, 2022) (three-judge court). But a closer review of the entirety of the VRA demonstrates that, although Section 2 is enforceable, it is only by the

Attorney General and not by every individual plaintiff who wishes to take up the cause. Plaintiffs' VRA Section 2 claims should therefore be dismissed.

**V.  Plaintiffs' claims should be dismissed because they seek to govern details of a local election in violation of the political question doctrine.**

The final basis for dismissal is the political question doctrine, that is, that "federal courts will not intervene to . . . supervise the administrative details of a local election." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986); *see also Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1251 (N.D. Ga. 2022). Federal courts do not select the best policy options for elections, nor do they "redline the already reasonable voting polic[ies] the State has in place." *Curling v. Raffensperger*, 50 F.4th 1114, 1125 (11th Cir. 2022).

While courts have authority to "say what the law is," there are some questions that are "in their nature[,] political" and beyond the scope of Article III. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803). The political-question doctrine emerges out of the Article III case-or-controversy requirement and is rooted in the separation of powers. *Made in the USA Found. v. United States*, 242 F.3d 1300, 1312 (11th Cir. 2001). Cases that require the court to decide a political question must be dismissed for lack of jurisdiction. *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1358 (11th Cir. 2007).

Application of the political-question doctrine entails examination of six factors, any one of which can render a case nonjusticiable. *McMahon*, 502 F.3d

at 1357–58 (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691 (1962)). Here, Plaintiffs' various Complaints seek sweeping relief, requesting this Court govern details of elections including—among other topics—the length of time of runoff elections,[15] the opening hours for early voting,[16] and the use or non-use of mobile voting facilities instead of fixed physical locations.[17] Those requests implicate at least two of the six indicia of a nonjusticiable political question.

First, the Elections Clause commits the administration of elections to other government departments—Congress and state legislatures—not courts. *Baker*, 369 U.S. at 217; U.S. Const. art. I, §4, cl. 1. As one three-judge district court put it, it is not proper for a federal court "to assume the roles of state and federal legislatures, … to exercise the *discretion* that has been explicitly reserved to those political bodies." *Agre v. Wolf*, 284 F. Supp. 3d 591, 596 (E.D. Pa. 2018) (three-judge court) (emphasis in original). As that court further observed, the Elections Clause and the history of its adoption demonstrates that "the Framers did not envision such a primary role for the courts." *Id.* at 599. The "manner" of conducting elections includes "notices, registration,

---

[15] [NGP Doc. 39, ¶ 108]; [NAACP Doc. 35, ¶ 148]; [AME Doc. 83, ¶ 268]; [CBC Doc. 1, ¶ 138].

[16] [NAACP Doc. 35, ¶ 149]

[17] [NGP Doc. 39, ¶ 82]; [NAACP Doc. 35, ¶ 168]; [AME Doc. 83, ¶ 246–248]; [CBC Doc. 1, ¶¶ 135–136].

supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). These are reserved expressly to state legislatures—not the courts. Courts should focus on enforcement of the First and Fourteenth Amendments, which are "generally unobtrusive to States in promulgating election regulations." *Agre*, 284 F. Supp. 3d at 599.

Applying that doctrine here, it is apparent that Plaintiffs' claims present nonjusticiable political questions because they require this Court to replace Georgia's Election Code with this Court's judgment about the administration of elections, despite the "textually demonstrable constitutional commitment of the issue" to state legislatures and to Congress. *Baker*, 369 U.S. at 217; *Agre*, 284 F. Supp. 3d at 620.

Second, there are no "judicially discoverable and manageable standards" that this Court can apply to Plaintiffs' claims. *McMahon*, 502 F.3d at 1357–58. Plaintiffs' claims require this Court to effectively become an election administrator and micromanage tasks that have been delegated by the General Assembly to state and local election officials.

66

Much like cases alleging partisan gerrymandering, where courts were called upon to decide the definition of "fairness" and then "[h]ow much is too much," *Rucho v. Common Cause*, 139 S. Ct. 2484, 2500–01 (2019), Plaintiffs ask this Court to take on the task of election administration by "enforcing uniform standards and processes" that cover a variety of areas. Doc. No. [41], p. 90]; *see also Jacobson*, 974 F.3d at 1263 (applying *Rucho* to ballot-order challenge when "[t]here are no discernable and manageable standards 'to answer the determinative question'"). The judiciary is ill-equipped to handle these questions that involve the "complex, subtle, and professional decisions" required to conduct elections. *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S. Ct. 2440, 2446 (1973) (applied to military training). Ultimately, Plaintiffs' Complaints "pose[] basic questions that are political, not legal." *Rucho*, 139 S. Ct. at 2489; *Jacobson*, 974 F.3d at 1266. These features of Plaintiffs' Complaints, therefore, require dismissal, as "no justiciable 'controversy' exists when parties seek adjudication of a political question . . . ." *Massachusetts v. EPA*, 549 U.S. 497, 516, 127 S. Ct. 1438, 1452 (2007).

As another judge in this District did in another case also asking that Court to "micromanage the State's election process," this Court should dismiss the specific claims listed as nonjusticiable political questions. *Coalition for Good Governance v. Raffensperger*, No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at *9 (N.D. Ga. May 14, 2020). Those claims include:  claims

67

about the length of time of runoff elections, the opening hours for early voting, and the use or non-use of mobile voting facilities.  All of those claims are barred by the political-question doctrine and should be dismissed on that basis.

## CONCLUSION

Plaintiffs made sweeping claims against the state of Georgia and SB 202. But at this stage of the case, they must support this Court's jurisdiction with admissible evidence. They cannot do so, and their claims must therefore be dismissed for lack of Article III jurisdiction.

Respectfully submitted this 30th day of October, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519
dboyle@taylorenglish.com
Deborah A. Ausburn
Georgia Bar No. 028610
dausburn@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
Tobias C. Tatum, Sr.
Georgia Bar No. 307104

69

ttatum@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson