UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:  GEORGIA SENATE BILL 202

No. 1:21-MI-55555-JPB
ALL CASES

## ORDER

This matter is before the Court on Plaintiffs'[1] Motion for Preliminary

Injunction [Doc. 574].  This Court finds as follows:

## BACKGROUND

Georgia Senate Bill 202 ("S.B. 202") governs election-related processes and

was signed into law by Governor Brian Kemp on March 25, 2021.  Shortly after

S.B. 202's passage, Plaintiffs filed complaints against Georgia state officials[2] and

counties[3] (collectively, "Defendants") challenging various provisions contained

---

[1] Plaintiffs include the named private plaintiffs in these three cases:  Sixth Dist. of the Afr. Methodist Episcopal Church v. Kemp, 1:21-CV-1284; Ga. State Conf. of the NAACP v. Raffensperger, 1:21-CV-1259; and The Concerned Black Clergy of Metro. Atlanta Inc. v. Raffensperger, 1:21-CV-1728.

[2] This list includes Brian Kemp, Governor of the State of Georgia, in his official capacity; Brad Raffensperger, Secretary of State of Georgia, in his official capacity; and individual members of the Georgia State Elections Board, in their official capacities.

[3] The complaints name as defendants the boards of elections and registration (as well as members of those boards) from the following counties:  Bibb, Chatham, Clarke, Clayton, Cobb, Columbia, DeKalb, Fulton, Gwinnett, Hall and Richmond.  The master docket contains a complete list of County Defendants.

within the law.  In the instant motion, Plaintiffs ask the Court to enjoin two provisions of S.B. 202, both of which pertain to runoff elections (the "Runoff Provisions").  According to Plaintiffs, the Runoff Provisions intentionally discriminate against black voters in violation of the Fourteenth and Fifteenth Amendments.

As stated above, Plaintiffs seek to enjoin the enforcement of the Runoff Provisions.  First, Plaintiffs challenge the provision that provides that runoffs will be held four weeks after the general election.  [Doc. 574-3, p. 90].  Second, Plaintiffs challenge the provision that states that advance voting for runoffs shall commence "[a]s soon as possible prior to a runoff . . . but no later than the second Monday immediately prior to such runoff and shall end on the Friday immediately prior to each . . . runoff."  Id. at 60.

## RELEVANT FACTS

This Court provided an extensive overview of the facts of this case in its October 11, 2023 Order.[4]  See [Doc. 686, pp. 3–27].  Those facts are incorporated by reference herein.  Because the Runoff Provisions are at issue here, the Court provides the following additional facts.

---

[4] In the October 11, 2023 Order, the Court analyzed whether several other provisions of S.B. 202 violated the Fourteenth Amendment, Fifteenth Amendment and § 2 of the Voting Rights Act.

In Georgia, a runoff election must be held when neither candidate for office obtains 50% of the vote in the primary or general election.  Before 2013, Georgia held runoffs for all elected offices three weeks after a primary or four weeks after a general election.  O.C.G.A. § 21-2-501(a) (2012).  In 2014, however, the law regarding runoffs changed.  Indeed, the new statute provided for two different runoff schedules—a four-week schedule for non-federal runoffs and a nine-week schedule for federal runoffs.  O.C.G.A. § 21-2-501(a) (2017).  Under the nine-week schedule, potential voters were allowed to register to vote after the general election and vote in the runoff.  Also, early voting spanned a period of three weeks.

Following the 2020 general election, runoffs were required for several statewide elections and both United States Senate races.  [Doc. 610-1, p. 23].  Because of the difficulties associated with conducting these runoffs on different schedules (some at four weeks and some at nine weeks), all of the runoffs were scheduled for the same day—nine weeks after the general election.  Id.

As stated above, under the nine-week runoff schedule, potential voters were allowed to register to vote after the general election and vote in the runoff.  As to the January 2021 runoff specifically, Georgians had thirty-five days to register to vote between the November general election and the voter registration deadline.  [Doc. 574-12, p. 76].  During this time period, 107,435 Georgians registered to

vote.  Id. at 78.  Of these new voters—voters who were eligible to vote in the 2021 runoff election—46.9% were white and 35.1% were black.  Id.

In the runoff election that was held in January 2021, 61% of active voters— or approximately 4.4 million people—voted.  [Doc. 610-1, p. 26].  Ultimately, Raphael Warnock and Jon Ossoff, both Democrats, won the 2021 runoff election. [Doc. 574-5, p. 9].  In Plaintiffs' view, black voters were consequential in these runoff wins.

S.B. 202 changed the law regarding runoff elections in at least two ways. First, instead of a nine-week period leading up to a runoff election, all runoffs (state and federal) must now take place four weeks after the general or primary election.  With this change, individuals are no longer permitted to vote in the runoff if they registered to vote after the general election.  Second, instead of three weeks of early voting, the early voting period is potentially reduced to one week, and no mandatory weekend voting days are required.

Defendants set forth several justifications for the law.  First, Defendants assert that the former law, which provided for two separate runoff periods, was inefficient.  "Instead of two alternative periods for runoffs depending on the offices going to a runoff, . . . state and county officials now have a single period to prepare for and execute."  [Doc. 610-1, p. 25].  Second, Defendants argue that a change

was needed to ensure that federal officials are able to take office at the start of a

congressional term.  Id. at 26.  Under the previous nine-week schedule, newly

elected federal officials did not timely take office.  Third, Defendants assert that

the Runoff Provisions were enacted in response to voter complaints.  For the 2021

runoff election, it was widely reported that the massive number of political ads

intruding into Christmas and the holiday season was not popular with Georgia

voters.  Because any runoff would occur before the holidays, a four-week runoff

period allows voters to get "back their Christmas."  Id. at 84.

Plaintiffs assert that the Runoff Provisions negatively affect black voters

because the registration period before runoff elections is eliminated and there are

fewer early voting days.  More specifically, Plaintiffs first argue that black voters

are negatively affected because "[h]ad S.B. 202's restrictions been in place during

the 2021 runoff, none of the myriad new registrants who voted in the runoff, and

who helped spur the historic election of Georgia's first Black U.S. Senator, would

have been eligible to vote at that time."  [Doc. 574-1, p. 21].  Second, Plaintiffs

contend that the Runoff Provisions disproportionately affect black voters because

they are more likely to vote early, and particularly, on weekend days.  Third,

Plaintiffs argue that the reduction of early voting days means longer lines on

Election Day.  In Plaintiffs' view, longer lines disproportionately affect black

voters.

## ANALYSIS

Plaintiffs seek a preliminary injunction in this case.  Before the Court can

analyze whether Plaintiffs are entitled to this relief, the Court must determine

whether Plaintiffs have standing.

### A.    Standing

Defendants argue that Plaintiffs lack standing to seek an injunction.[5]  "The

constitutionally minimum requirements for standing are three-fold."  Fla. State

Conf. of NAACP v. Browning, 522 F.3d 1153, 1159 (11th Cir. 2008).  First, a

plaintiff must show that he suffered an injury-in-fact.  Lujan v. Defs. of Wildlife,

504 U.S. 555, 560 (1992).  Second, a plaintiff must demonstrate that the injury was

caused by a defendant's complained-of actions.  Id.  And third, a plaintiff must

---

[5] In deciding whether Plaintiffs have standing, the Court "need not parse" the standing of
each plaintiff so long as one of them can demonstrate standing.  See Ga. Ass'n of Latino
Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100,
1113–14 (11th Cir. 2022) (holding that because one plaintiff had standing, the court did
not need to consider whether the other plaintiffs had standing to maintain the suit); see
also People First of Ala. v. Merrill, 467 F. Supp. 3d 1179, 1197 (N.D. Ala. 2020) ("And
if there is one plaintiff 'who has demonstrated standing to assert these rights as his own,'
the court 'need not consider whether the other individual and corporate plaintiffs have
standing to maintain the suit.'") (quoting Vill. of Arlington Heights v. Metro. Hous. Dev.
Corp., 429 U.S. 252, 264 (1977)).

establish that his injury or threatened injury is likely to be redressed by a favorable judicial decision.  Id.

The Court will first analyze whether Plaintiffs have shown an injury-in-fact. An organization can establish an injury-in-fact in two ways:  (1) through its own injury by showing a diversion of resources (organizational injury) or (2) through its members (associational standing).  Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 1114 (11th Cir. 2022).  Here, Defendants assert that Plaintiffs cannot show injury through either of these methods because their motion "does not produce any evidence of an injury related to runoff elections."  [Doc. 610, p. 20].  The Court disagrees.

As already stated above, an organization may establish an injury-in-fact by showing a diversion of resources.  Ga. Ass'n of Latino Elected Offs., 36 F.4th at 114.  "Under this theory, an organization has standing 'if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'"  Id. (quoting Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1250 (11th Cir. 2020)).  It is not enough to simply state that resources were diverted.  Instead, "an organizational plaintiff must explain where it would have to 'divert resources away *from* in order

to spend additional resources on combatting' the effects of the defendant's alleged conduct."  Id. (quoting Jacobson, 974 F.3d at 1250).

In the motion, Plaintiffs presented evidence that at least one named plaintiff, the Metropolitan Atlanta Baptist Ministers Union ("MABMU"), diverted resources away from its ordinary programs in response to the Runoff Provisions.[6]  The MABMU is a service organization with a mission to make the greater Atlanta area "a better place to live religiously, educationally, economically, politically, socially, financially, and in all other areas that impact people's lives."  [Doc. 618-5, p. 3].  According to Reverend Stanley Smith, who is the president of MABMU, "[v]oting and social justice ministry have been a component of MABMU's work for

_____

[6] As to the other named organizations, the Court is not convinced that Plaintiffs established an injury based on a diversion of resources.  By way of example, Plaintiffs argued that "[i]t is false that Common Cause 'says nothing about runoffs,' . . . Common Cause testified about its voter participation efforts in both the '2020 Primary and *Runoff* election cycles.'"  [Doc. 618, p. 26].  A close look at Plaintiffs' evidence, however, does not show that Common Cause diverted its resources to counteract the Runoff Provisions.  Instead, Common Cause's representative stated that "[a]s part of the organization's voter participation efforts, Common Cause GA provided free personal protective equipment (PPE), food, and water to persons, including voters, at or around polling sites, in Fulton County during the 2020 Primary and Runoff election cycles."  [Doc. 574-9, p. 3].  Simply put, the fact that Common Cause elected to give out water and other gifts during a runoff election does not show that it diverted resources away from its ordinary activities to counteract the Runoff Provisions.

decades" and voting rights activities include "providing transportation for seniors during early voting; participating in the Lawyers & Collars Voter Protection Campaign . . . ; providing voter education, training, and empowerment; and encouraging voter turnout." Id.  Reverend Smith stated that because of changes to Georgia's election laws, including the shortened "time between a general election and a runoff election" and the reduced "number of early voting days in runoff elections," MABMU had to "divert resources to help educate its membership and their constituent congregations on the additional obstacles to voting." Id. at 4.  As just one example, Reverend Smith explained that MABMU diverted a significant portion of its resources away from Christian education programming and worship and towards creating flyers to educate voters about S.B. 202.  Id. at 4–5.  Because MABMU has shown what it diverted its resources away from in response to the Runoff Provisions, the Court finds that the injury-in-fact element of the standing analysis is satisfied here.  See Browning, 522 F.3d at 1165–66 (holding that the plaintiffs demonstrated an injury-in-fact because they diverted personnel and time away from traditional activities to educating volunteers and voters on compliance with the challenged regulation); Democratic Party of Ga., Inc. v. Crittenden, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (finding that the plaintiffs successfully

established standing by showing that they diverted resources from existing uses to assisting individuals impacted by rules related to absentee ballots).[7]

Even when a plaintiff establishes a concrete injury, that plaintiff must also satisfy the traceability and redressability elements of standing.  As to traceability, the Eleventh Circuit Court of Appeals has held that "[t]he injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  Ga. Ass'n of Latino Elected Offs., 36 F.4th at 1115–16 (quoting Lujan, 504 U.S. at 560–61).  Under the redressability element, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" of the court.  Lujan, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 38 (1976)).  After consideration of these rules, the Court is satisfied that Plaintiffs have established that the injury is traceable to Defendants and that any injury can be redressed by a favorable decision here.

* * *

---

[7] Because the Court is satisfied that at least one plaintiff has shown standing through a diversion of resources theory, the Court will not analyze whether any plaintiff has established associational standing.

For the reasons set forth above, the Court concludes that Plaintiffs established all three standing elements.  As such, Plaintiffs have standing to seek preliminary injunctive relief from Defendants.

## B.     Preliminary Injunction Standard

A plaintiff seeking preliminary injunctive relief must show (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the balance of equities is in his favor; and (4) that an injunction would not be adverse to the public interest.  Sofarelli v. Pinellas County, 931 F.2d 718, 723–24 (11th Cir. 1991).  Because a preliminary injunction "is an extraordinary and drastic remedy," the Court may not issue such relief "unless the movant clearly establish[es] the burden of persuasion as to each of the four prerequisites."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal punctuation omitted) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).  Granting a preliminary injunction is thus the exception rather than the rule.  See id.

### 1.     Likelihood of Success on the Merits

To obtain a preliminary injunction, the moving party must show a substantial likelihood that he will ultimately prevail on the merits of his claim.  Sofarelli, 931 F.2d at 723.  This factor is generally considered the most important of the four factors, see Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986),

and failure to satisfy this burden—as with any of the other prerequisites—is fatal to the claim, see Siegel, 234 F.3d at 1176.

In this case, Plaintiffs contend that the Runoff Provisions violate the Fourteenth Amendment and the Fifteenth Amendment.  The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  In a case such as this, a successful Fourteenth Amendment claim "requires proof of *both* an intent to discriminate and actual discriminatory effect."  Greater Birmingham Ministries v. Sec'y of State for State of Ala., 992 F.3d 1299, 1321 (11th Cir. 2021).  The Fifteenth Amendment states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV.  Similar to the Fourteenth Amendment, successful Fifteenth Amendment claims require a showing of "racially discriminatory motivation."  Greater Birmingham Ministries, 992 F.3d at 1321.

Claims brought pursuant to the Fourteenth and Fifteenth Amendments are subject to a two-prong burden-shifting test.  Id.  Under the first prong, a plaintiff "must prove both that the law will have a discriminatory impact and that it was adopted with discriminatory intent."  League of Women Voters of Fla. Inc. v. Fla.

Sec'y of State, 66 F.4th 905, 922 (11th Cir. 2023).  "If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail."  Greater Birmingham Ministries, 992 F.3d at 1321.  Under the second prong, "'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.'"  Id. (quoting Hunter v. Underwood, 471 U.S. 222, 228 (1985)).

As explained earlier, the first prong requires courts to determine whether the law has both a discriminatory intent and effect.  The Eleventh Circuit has held that the "concept of discriminatory intent is sometimes subtle and difficult to apply." Dowdell v. City of Apopka, 698 F.2d 1181, 1185 (11th Cir. 1983).  Consequently, courts must "evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision."  Burton v. City of Belle Glade, 178 F.3d 1175, 1189 (11th Cir. 1999).  The Supreme Court of the United States, in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977), identified the following non-exhaustive list of factors that a court should consider when assessing discriminatory intent:  (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) the procedural and substantive departures; and (5) the contemporaneous

statements and actions of key legislators.  The Eleventh Circuit has supplemented the Arlington Heights list to include these other factors:  (6) "the foreseeability of the disparate impact;" (7) "the knowledge of that impact;" and (8) "the availability of less discriminatory alternatives."  Greater Birmingham Ministries, 992 F.3d at 1321.  In the analysis that follows, the Court will consider each of these factors in determining whether Plaintiffs have met their burden of showing that the Legislature acted with a discriminatory intent.

### i.   Impact of the Challenged Law

The first factor that the Court should consider is the impact of the challenged law.  This requires the Court to analyze whether the law bears more heavily on one race than another.  Id.  "When considering disparate effect the focus should not be on absolute numbers but rather on whether the challenged requirements 'operate to disqualify [minority voters] at a substantially higher rate.'"  Williams v. City of Dothan, 818 F.2d 755, 764 (11th Cir. 1987).

Plaintiffs argue that the Runoff Provisions bear more heavily on black voters because:  (1) voters can no longer register to vote after the general election and

vote in the runoff election; (2) there are fewer days to vote early; and (3) lines are longer on Election Day. Each argument is discussed below.

Plaintiffs cite to two different expert reports to support their assertion that eliminating new voter registration in the period immediately preceding a runoff bears more heavily on black voters.[8]  First, Plaintiffs reference a report written by Dr. Bernard L. Fraga, an associate professor of Political Science at Emory University.  According to Dr. Fraga's expert report, 107,435 Georgians registered to vote between November 3, 2020, and December 7, 2020.  [Doc. 574-12, p. 78]. Of these newly registered voters—voters who were eligible to vote in the 2021 runoff election—46.9% were white and 35.1% were black.  Id.  Similarly, Dr. Fraga also provided information about those who registered to vote between November 8, 2022, and December 12, 2022, the period leading up to the December

---

[8] The Court notes that Plaintiffs' entire argument as to this issue is limited to the following two sentences.

> First, the compression of runoff elections from nine to four weeks after the general election bears more heavily on Black voters by eliminating the window for voters to register after the general election and then vote in the runoff.  Had S.B. 202's restrictions been in place during the 2021 runoff, none of the myriad new registrants who voted in the runoff, and who helped spur the historic election of Georgia's first Black U.S. Senator, would have been eligible to vote at the time.

[Doc. 574-1, p. 21] (citations omitted).

2022 runoff election.  During this time, 18,278 Georgians registered to vote.  Id.

However, because S.B. 202's new rules regarding runoff elections were in place by

the end of 2022, none of these new registrants were allowed to vote in the 2022

runoff.  Significantly, over 50% of those new registrants were white while only

21.8% were black.  Id.  After providing only these statistics and without

referencing any additional supporting data, Dr. Fraga opines that "Black, Hispanic,

and Asian American/Pacific Islanders make up a larger share of registrants than

they do of Georgia's [citizen voting-age population ("CVAP")] or registered voter

population."[9]  Id. at 78–79.  Plaintiffs, in relying on this section of Dr. Fraga's

report, seem to suggest that because black voters make up a larger share of new

registrants preceding both the January 2021 and December 2022 runoff elections

than they do of Georgia's CVAP or registered voter population, the elimination of

the registration period has a disparate impact on black voters.

Problematically, though, Plaintiffs have not shown how much of a larger

share black voters occupy.  Indeed, Dr. Fraga did not provide the exact calculation

---

[9] According to Dr. Fraga, "CVAP is often used as the denominator when comparing rates
of voter turnout between racial/ethnic groups."  [Doc. 574-12, p. 15].  The Court notes
that it is unclear whether each of the named minority groups individually make up a
larger share of that group's percentage of the CVAP population or whether these groups,
taken together, comprise a larger share of new registrants than of those groups'
percentage of the CVAP population.

or estimation which would show the disparity or percentage point difference in terms of new registrants in relation to Georgia's CVAP or registered voter population.  Although new black registrants may make up a larger share of new registrants when considering Georgia's CVAP or registered voter population, Plaintiffs have not provided the Court with evidence to show that the larger share is significant.  This is important because the Eleventh Circuit, in <u>League of Women Voters</u>, determined that a disparate impact cannot be shown by statistically insignificant differences.  66 F.4th at 932 (holding that the record did not support a finding of disparate impact where the statistical difference was a mere 1.3 percentage point difference); <u>see also</u> <u>Williams</u>, 818 F.2d at 764 (stating that when considering whether a plaintiff has shown disparate impact, the focus should be on whether the challenged requirements operate to disqualify minority voters at a *substantially* higher rate).[10]  Here, the only calculation provided to the Court shows that with respect to the 2021 runoff, white voters comprised 46.9% of new registrants and black voters comprised 35.1% of new registrants.  With respect to the 2022 runoff, the only calculation proffered shows that over 50% of new registrants were white and 21.8% were black.  Without knowing the statistical

---

[10] Based on the limited record before the Court, the Court does not know if the statistical difference here is 1.3% or substantially higher than that.

difference between the share of new black registrants as compared to Georgia's CVAP or registered voter populations (and the same for white voters), the Court cannot make a finding of a disparate impact.

In addition to the report prepared by Dr. Fraga, Plaintiffs also presented a report from Dr. Carol Anderson, a professor of African American Studies at Emory University.  In her report, Dr. Anderson asserted that 70,000 Georgians registered to vote before the 2021 runoff.[11]  [Doc. 574-6, p. 142].  Dr. Anderson then cited statistics that in some counties, like Fulton and DeKalb, more newly registered voters were black.  Id.  Specifically, in Fulton County, 50% of the newly registered voters were black and 35% were white, and in DeKalb County, 47% of the newly registered voters were black and 34% were white.  Id.  Based on these counties, Dr. Anderson concluded that black voters are more heavily impacted than white voters.  While it may be true that in some counties, there were more new black voters than white voters, the Court cannot ignore that throughout the state, there appears to be more new white voters than black voters.  In any event, the Court is not convinced that a statewide statistical relationship can be inferred from data from one or two counties.  See League of Women Voters, 66 F.4th at 933–34 (declining to reach a

---

[11] The Court notes that this number conflicts with other evidence cited by Plaintiffs.  Dr. Fraga's report shows that more than 107,000 Georgians registered to vote during this same time period.

statistical conclusion about a state from an analysis driven predominantly by data from a single county).

In sum, after reviewing the expert reports presented by Dr. Fraga and Dr. Anderson and the limited argument presented by Plaintiffs, the Court is not persuaded that Plaintiffs have shown, on this record, that eliminating the registration period has a disproportionate impact on black voters.

Plaintiffs also assert that the Runoff Provisions have a disparate impact on black voters because there are no longer mandatory weekend voting days and early voting is reduced from three weeks to one week.  Essentially, Plaintiffs argue that this is discriminatory because black voters in Georgia are "disproportionately likely to vote early, and particularly on weekend days."  [Doc. 574-1, p. 28].

The Court will first address Plaintiffs' contention that the Runoff Provisions have a disparate impact because weekend voting is no longer required.[12]  While weekend voting is not mandatory, it is important to recognize that the provision at issue does not eliminate weekend voting.[13]  Indeed, even though weekend voting

---

[12] Here, Plaintiffs do not complain that there are less weekend early voting days.  Rather, Plaintiffs complain that weekend voting is not mandatory.

[13] The provision states that advance voting for runoffs shall commence "[a]s soon as possible prior to a runoff . . . but no later than the second Monday immediately prior to such runoff and shall end on the Friday immediately prior to each . . . runoff."  [Doc. 574-3, p. 90].

was not required, weekend voting occurred for the December 2022 runoff election. [Doc. 574-37, p. 13].  In fact, the evidence shows that "weekend voting remained widely used after S.B. 202."  Id. at 156.  Because weekend voting still occurs, the Court is not persuaded that the elimination of a mandatory weekend voting day disproportionately affects black voters.[14]

The Court will next analyze Plaintiffs' argument that the Runoff Provisions have a disparate impact because there are fewer early voting days.  To support their position, Plaintiffs provided evidence that black voters utilize early voting more often than white voters.  The Court is not convinced that this data necessarily proves that a shortened early voting window disproportionately impacts black voters.  In League of Women Voters, the plaintiffs, who were challenging a provision that reduced the hours when drop boxes were available, presented evidence that black voters were slightly more likely than white voters to deposit their ballots in drop boxes on days that fell outside the new early voting period.  66 F.4th at 935.  The Eleventh Circuit noted that this type of evidence "does not explain why black voters would disproportionately struggle to use drop boxes during the early voting period, if drop boxes were only available during that time."

---

[14] Had the evidence showed that all weekend voting was, in fact, actually eliminated, the analysis here may have been different.

Id.  Ultimately, the court concluded that "[a] finding that black voters in one county are slightly more likely to deposit ballots in drop boxes outside of early voting days is not evidence that the drop-box provision will have a disparate impact on black voters in Florida."  Id.  Plaintiffs' evidence in this case is similar. Here, Plaintiffs presented evidence that black voters are more likely to vote early. Plaintiffs did not present any evidence, however, which would show why black voters would disproportionately struggle to vote during the new early voting period.  In short, at least at this stage of the proceedings, the Court is not persuaded that evidence showing that black voters use early voting more often is sufficient to show that the Runoff Provisions, which shorten the early voting period, will have a disparate impact on black voters.  In other words, without more, generalized evidence related to the use of early voting is not sufficient to automatically show that this particular provision, which pertains to one aspect of runoff elections, is discriminatory.

Lastly, Plaintiffs assert that the reduced runoff period will cause longer lines on Election Day, which, in Plaintiffs' view, disproportionately affects black voters. This Court recognizes that with fewer early voting days available, the lines on Election Day have the potential to be longer.  The Court is not convinced, however, that these longer lines will disproportionately impact black voters.  For

the reasons announced in the October 11, 2023 Order [Doc. 686, pp. 34–36],

Plaintiffs' evidence is not sufficient, at this stage of the proceedings, to show that

black voters wait in longer lines at a meaningfully higher rate.  As such, Plaintiffs'

argument that the Runoff Provisions disproportionately impact black voters

because of the potential for longer lines fails to meet the high standard for

obtaining preliminary injunctive relief.

***

For the reasons stated above, Plaintiffs have failed to meet their burden to

show that the Runoff Provisions have a disparate impact on black voters.  Indeed,

Plaintiffs failed to show that eliminating the registration period before a runoff

election disproportionately impacts black people.  Plaintiffs also failed to show that

reducing the early voting period and not mandating weekend voting has a disparate

impact.  The Court thus weighs this factor in favor of Defendants and against a

discriminatory purpose finding.

### ii.    Historical Background and Specific Sequence of Events Leading up to the Passage of S.B. 202

Courts are required to consider the historical background as well as the

specific sequence of events in analyzing the intent of the Legislature.  In their

argument, Plaintiffs discuss the historical background[15] in combination with the

specific sequence of events leading to the legislation's passage. As such, the Court

considers these factors together.

In their motion, Plaintiffs argue that the factors weigh in their favor because

the Runoff Provisions were passed as a response to almost "70,000 Georgians"

registering to vote in the nine-week period leading up to the 2021 runoff election.

[Doc. 574-1, p. 25]. Plaintiffs assert that the registration of these 70,000 voters

was significant because these voters were "concentrated in Georgia's four largest

counties home to a significant bloc[k] of Black voters." Id.

The Court disagrees that Plaintiffs' evidence shows a racially discriminatory

motivation. Dr. Anderson stated in her report that "before the runoff, almost

70,000 Georgians registered to vote, the majority of whom identified as

_____

[15] Plaintiffs argue that Georgia has a "well-documented history of discrimination against Black voters." [Doc. 574-1, p. 10]. Plaintiffs also contend that the Runoff Provisions "come against the backdrop of Georgia's ongoing history of discrimination against Black Georgians, and Black voters specifically." Id. at 28–29. As stated in this Court's October 11, 2023 Order, the Court reviewed Plaintiffs' expert report, which provided a detailed history of the disenfranchisement of black voters in the United States and in Georgia specifically. See [Doc. 574-6]. As already explained in this Court's previous order, courts should give little weight to distant history and focus on the "precise circumstances surrounding the passing of the law in question." League of Women Voters, 66 F.4th at 923. As such, the Court focuses on the evidence Plaintiffs provide regarding recent history, as well as the specific sequence of events leading to the passing of the legislation.

Democrats." [Doc. 574-6, p. 142]. She then stated that "[t]he 'top four counties with the highest number of voters who registered after Nov. 3 [were] Fulton, Gwinnett, Cobb, and DeKalb,' all counties that Biden won by double-digit margins." Id. Then, Dr. Anderson explained that in two of the counties, there were more new black voters than white voters. Id.

Based on the limited record before it, this Court finds that these statistics tend to show, at most, that the Legislature was possibly motivated by a desire to curtail new Democratic voters—rather than new black voters. Indeed, Dr. Anderson states that the majority of the new registrants were Democrats. She did not state, however, that the majority of the new registrants were black. Moreover, Dr. Anderson's assertion that President Biden, a Democrat, won the top four counties with the highest number of new voters by double-digit margins simply suggests that new Democratic voters were significant in these counties. Importantly, the Eleventh Circuit has held that "partisan discrimination must not be conflated with racial discrimination." League of Women Voters, 66 F.4th at 925. Based on the Eleventh Circuit's guidance, this Court declines to conflate partisan discrimination with racial discrimination and ultimately finds that Plaintiffs have

not shown that this particular sequence of events shows a racially discriminatory motivation such that this factor should weigh in Plaintiffs' favor.

Even if this Court were to assume that this evidence could suggest that the Legislature acted with discriminatory intent, the Court cannot ignore what appears to be the Legislature's legitimate justifications for passing the law.  These justifications include, but are not limited to, the State's interest in (1) creating one efficient runoff schedule instead of two; (2) ensuring that elected officials are available when their federal term begins; and (3) responding to voter complaints about political ads during the holiday season.

To summarize, the Court finds that the sequence of events leading up to the passage of S.B. 202 shows, at most, a partisan motivation, not a racial motivation. Moreover, Defendants presented legitimate justifications for the Runoff Provisions.  For these reasons, the Court finds that this factor weighs in favor of Defendants and against a finding of discriminatory intent.

### iii.    Procedural and Substantive Departures

Courts should also consider whether there were any procedural or substantive departures in the legislative process.  In the October 11, 2023 Order, the Court fully considered the process used by the Legislature in passing S.B. 202 and analyzed whether there were significant procedural or substantive departures

from the normal procedure which would suggest intentional discrimination.  See

[Doc. 686, pp. 48–51].  The parties did not present any new evidence or argument

about this factor.  Consequently, for the same reasons discussed in the previous

order, this Court cannot find at this stage of the proceedings that the legislative

process surrounding S.B. 202 departed from the ordinary procedure in any

significant procedural or substantive way.  Accordingly, this factor weighs in favor

of Defendants and against a discriminatory purpose finding.

### iv.   Contemporaneous Statements and Actions of Key Legislators

Courts are also required to consider the contemporaneous statements and

actions of key legislators.  Plaintiffs presented no evidence pertaining to this factor.

As a result, this factor weighs in favor of Defendants and against a discriminatory

purpose finding.

### v.   Foreseeability and Knowledge of the Disparate Impact

The Court will next consider the foreseeability and knowledge of the

disparate impact.  Before addressing Plaintiffs' arguments, it is important to note

that Plaintiffs have not shown, at least at this stage of the proceedings, that the

Runoff Provisions have a disparate impact on black voters.  See supra Part B.1.i.

Without this showing, the Court questions whether the Legislature could have

foreseen or known about a disparate impact.  See League of Women Voters, 66

F.4th at 938.  The Court will nevertheless address this factor as if Plaintiffs showed a disparate impact as to the Runoff Provisions.

Plaintiffs contend that the disparate impact was foreseeable because of an email sent by Janine Eveler, the Director of the Cobb Board of Elections and Registration, to the Election Integrity Committee.  This email stated the following:

> Although I have been asking for years to consolidate state and federal runoffs, allowing only 28 days will not work for a runoff with federal races.  You are eliminating all but a few days of early voting which will mean that lines on election day will be untenable.  Please consider making runoffs at least 5 weeks after the election.  Besides, we will be doing an audit after the general election which will take time away from preparation for the runoff.

[Doc. 574-33, p. 4].  In a similar vein, Plaintiffs assert that the disparate impact was foreseeable because a former member of the Secretary of State's Office acknowledged that fewer early voting days could increase the potential for more voters on Election Day.  [Doc. 574-36, p. 119].

While the evidence presented by Plaintiffs might show that longer lines were foreseeable, Plaintiffs' evidence does not show that the Legislature knew that those longer lines could have a disparate impact on black people.[16]  As such, at this stage

---

[16] Plaintiffs imply in their briefing that Eveler told the Election Integrity Committee that lines on Election Day will be untenable in "major urban and suburban counties with significant Black populations."  [Doc. 574-1, p. 23].  While the email did say that lines

of the proceedings, Plaintiffs have not shown that the disparate impact, if any, was foreseeable.

Plaintiffs also assert that the disparate impact was foreseeable because "[i]t was national news that Black voters had higher turn-out in recent high-profile elections" and that it was "publicly known that much of this turnout was via absentee ballots." [Doc. 574, pp. 23–24]. Plaintiffs seem to be arguing that the legislators should have known that a shortened runoff period would have a racial impact because of these absentee ballots. Without more concrete evidence as to what the legislators actually knew, the Court finds that Plaintiffs have not made a showing that a disparate impact was foreseeable.

In sum, Plaintiffs presented limited evidence to support their assertion that the legislators knew or foresaw the disparate impact that S.B. 202 would have on black voters. Especially here, where Plaintiffs seek the drastic remedy of injunctive relief, this Court cannot find that Plaintiffs have presented enough evidence to show that the Legislature knew or foresaw that S.B. 202 would have a

---

could be untenable, the email never mentioned urban counties with significant black populations or implied that black voters would be disproportionately impacted.

disparate impact on minority voters.  Thus, for purposes of this motion only, this factor weighs against a finding of discriminatory intent.

### vi.   Availability of Less Discriminatory Alternatives

The final factor that courts consider is the availability of less discriminatory alternatives.  Plaintiffs argue that a five- or six-week runoff period would have been less discriminatory than the four-week period ultimately chosen.  Defendants, on the other hand, contend that "[i]t is simply not credible to claim a one-week difference in runoff timelines is the dividing line between intentional race discrimination and permissible state policy decisions."  [Doc. 610, p. 28].

The Court acknowledges that the Legislature did not include the alternative option that Plaintiffs would have preferred.  Importantly, the Eleventh Circuit has held that the failure to "'include the alternative option[s] that Plaintiffs would have preferred' is not evidence of discriminatory intent."  League of Women Voters, 66 F.4th at 942 (quoting Greater Birmingham Ministries, 992 F.3d at 1327).  In fact, "[t]he legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it."  Id.

In the October 11, 2023 Order, the Court explained at length that the evidence establishes that S.B. 202's proponents were receptive to input during the legislative process.  See [Doc. 686, pp. 57–59].  For the same reasons set forth in

the previous order, which are fully incorporated herein, the Court finds that the record at this stage of the proceedings does not convincingly support Plaintiffs' claim that the Legislature intended to discriminate by failing to include alternative options that were less discriminatory (i.e., a five- or six-week runoff period). Thus, for purposes of this motion only, this factor weighs against a finding of discriminatory intent.

***

The Court has carefully considered the factors above in analyzing whether Plaintiffs have shown that the Legislature intended to discriminate against black voters when it passed the Runoff Provisions. Because all of the factors weigh against a discriminatory intent finding, the Court cannot find that Plaintiffs are substantially likely to succeed on their claims pursuant to the Fourteenth and Fifteenth Amendments. Thus, Plaintiffs are not entitled to preliminary injunctive relief.

### 2. Other Preliminary Injunction Prerequisites

As explained in detail above, Plaintiffs failed to show a substantial likelihood of success on the merits as to their claims that the Runoff Provisions intentionally discriminate against black voters in violation of the Fourteenth Amendment and the Fifteenth Amendment. Therefore, this Court will not address

whether Plaintiffs will be irreparably harmed should an injunction not issue or whether the balance of equities[17] favors injunctive relief.  See Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994) (recognizing that when plaintiffs fail to establish a substantial likelihood of success on the merits, the other prerequisites need not be addressed).

## CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Preliminary Injunction [Doc. 574] is **DENIED**.

**SO ORDERED** this 12th day of January, 2024.

J. P. BOULEE
United States District Judge

---

[17] In a case like this, where the government is the party opposing the preliminary injunction, the final two preliminary injunction factors (the balance of the equities and the public interest) merge.  Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020).  In the context of an election, the balance of the equities and the public interest factors are considered in tandem because "the real question posed . . . is how injunctive relief . . . would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast."  Curling v. Kemp, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018).