# Exhibit 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

THE CONCERNED BLACK CLERGY OF
METROPOLITAN ATLANTA, INC., a
Georgia nonprofit corporation, THE JUSTICE
INITIATIVE, INC., a Georgia nonprofit
corporation, METROPOLITAN ATLANTA
BAPTIST MINISTERS UNION, INC., a
Georgia nonprofit corporation, FIRST
CONGREGATIONAL CHURCH, UNITED
CHURCH OF CHRIST INCORPORATED, a
Georgia nonprofit corporation, GEORGIA
LATINO ALLIANCE FOR HUMAN
RIGHTS, INC., a Georgia nonprofit
corporation,

               Plaintiffs,

      v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State; JOHN FERVIER, in
his official capacity as the Chair of the
Georgia State Election Board;
MATTHEW MASHBURN, SARA
TINDALL GHAZAL, EDWARD
LINDSEY, and DR. JANICE W.
JOHNSTON, Members of the Georgia
State Election Board, in their official
capacities,

               Defendants.

Civil Action No.
1:21-cv-01728-JPB

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## I.    INTRODUCTION

1.      "When the [voter] is relaxed, make them toil. When full, starve them. When settled, make them move."  Sun-Tzu & Samuel B. Griffith, *The Art of War* (1964).  On March 25, 2021, Governor Brian Kemp and members of the Georgia legislature engaged in legislative warfare against their own constituents.  Behind closed doors, surrounded by white men only, and sitting in front of a plantation portrait Governor Kemp signed into law Senate Bill 202 ("SB 202") – a law that instantly attacks and, in no uncertain terms, criminalizes traditional organizing methods used by Black and Latinx groups to encourage an inclusive and diverse democracy.  The law compromises access to the ballot box and targets Georgia's diverse and growing electorate.

2.      Black eligible voters account for nearly half of Georgia's electorate growth since 2000.[1]  Since 2016, Black, Latinx[2] and Asian voters have comprised the majority of newly registered voters, while white non-Latino voters have been

---

[1] https://www.pewresearch.org/fact-tank/2020/12/15/black-eligible-voters-have-accounted-for-nearly-half-of-georgia-electorates-growth-since-2000/, last visited April 23, 2021.

[2] The term "Latinx" will refer to the group that the Census Bureau designates as "Hispanic or Latino." Specifically, the Census Bureau defines "Hispanic or Latino" as "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race." U.S. Census Bureau, Hispanic Origin, available at: https://www.census.gov/topics/population/hispanic-origin/about.html.

on a steady decline.[3]  Indeed, Georgia is slated to become a majority minority state

by 2028.[4]

3.    Plaintiffs, representing several predominantly Black Georgia churches

and faith-based organizations, and Latinx organizations, now bring this action to

protect and preserve the voting rights of their members, constituents and similarly

situated Georgia citizens who have been imperiled by SB 202's severe,

unjustifiable, and discriminatory provisions.  At its core, SB 202 violates their

rights under the United States Constitution and federal voting rights statutes.  The

Georgia legislature's clear attempt to deny, dilute, and abridge the fundamental

right to vote of many Georgians, especially Black voters and other voters of color,

must be curtailed before further damage is done to our democracy.

4.    The recent election cycle in Georgia was a historic triumph for

democracy.  In a record turnout, five million Georgians—two-thirds of eligible

voters—exercised their right to vote in the 2020 general election.  Nearly 4.5

million did so again in the 2021 runoff elections for two seats in the United States

Senate.

---

[3] https://www.pewresearch.org/fact-tank/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/, last visited April 23, 2021.

[4] https://www.ajc.com/blog/politics/the-jolt-georgia-could-majority-minority-2028/nDKuQJp4yJ2PxCWTfL2pQM/, last visited April 23, 2021.

5.      Georgia achieved this unprecedented turnout, in part, by affording its voters several options for exercising their constitutional right to vote, not only in person on Election Day, but also using early voting, mail-in (absentee) ballot, voting in mobile voting units in the state's largest county, or depositing their ballots at secure drop-off boxes.  In the general election, more than 1.3 million absentee ballots were returned.  About 2.7 million Georgians voted early in the general election, and more than two million did so in the runoff elections.

6.      Thirty percent of the voters in the 2020 general election were Black, and Black voter registration increased 25% in 2020 as compared to 2016.  Black voters in particular took advantage of alternative ways to participate in the elections.  Nearly 30% of Black voters, for example, cast their ballots by mail in 2020.  Largely due to popular church-sponsored "Souls to the Polls" programs, 36.5% of Sunday early voters were Black.

7.      The historic turnout, combined with the changing demographics of Georgia voters, produced historic results.  For the first time since 1992, the Democratic candidate for President won the state of Georgia.  Voters also elected Georgia's first Black and first Jewish United States Senators.

8.      Rather than celebrate this zenith of Georgians' participation in their democracy, the General Assembly immediately launched a clandestine, culturally

biased campaign aimed at taming Black, Latinx and Asian participation at the polls. The result was SB 202—rushed through the legislative process with little notice to the public, without consideration of its impact on Black voters and others of color, and without justification for its anti-democratic encroachment on the right to vote.

9.  Under the guise of ensuring the integrity of future elections, the legislation imposes new burdens on Georgia voters, especially those already facing the biggest challenges in casting their votes. SB 202 targets voting practices disproportionately used by Black voters and other voters of colors. It suppresses votes and drastically limits participation in democracy.

10.  Although entitled the "Election Integrity Act of 2021," SB 202 is anything but an election integrity measure. Instead, it is a surgical attempt to cut Black, Latinx and Asian voters from the voting process. Georgia's election system has withstood extraordinary public scrutiny since Election Day 2020. In both the general and runoff elections, it proved to be secure, reliable, and efficient. Indeed, in a letter to Congress, Secretary of State Raffensperger reported that he had independently authenticated the legitimacy of the 2020 election, finding nothing "out of the ordinary scope of regular post-election issues…"

11.  House Speaker Ralston, similarly, conceded: "The facts are we've had

[two] recounts.  We've had an audit and…I know there's at least six lawsuits that have been filed, all of which have been dismissed.  Which kind of begs the question if there were, in fact, significant wrongdoing would it not have been disclosed?"

12.    No recount, no audit, and no court has found any evidence to support repeated claims of widespread voter fraud.  Indeed, allegations in Georgia and elsewhere that the 2020 election was "rigged" or "stolen" have come to be widely known as "the Big Lie."  SB 202, born of these false, corrosive, and polarizing allegations of fraud, serves no legitimate state interest in ensuring reliable election results or instilling voter confidence in Georgia's election system.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

14.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a), 42 U.S.C. §§ 1983 and 1988(a), and 52 U.S.C. § 10308(f) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

15.    This Court has jurisdiction to grant both declaratory and injunctive

relief pursuant to 28 U.S.C. §§ 2201 and 2202.

16.    This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

17.    Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and in this division under Local Civ. R. 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

## III.    PARTIES

18.    Plaintiff The Concerned Black Clergy of Metropolitan Atlanta, Inc. ("CBC") is a Georgia nonprofit corporation that has been active in voting rights work, registering people to vote, mobilizing voters, providing forums for officials, voter education and voter empowerment for nearly 40 years.  CBC is composed of 90% African American members and 10% Latinx, Middle Eastern, Asian, and Caucasian members.

19.    CBC partners with other organizations to support voting activities, including Get Out The Vote ("GOTV"), ensuring the comfort of voters in lines by providing food, water or other necessities ("line warming"), transportation, registration, distribution of educational materials and voter education.

20.     While CBC is primarily focused on the counties surrounding metropolitan Atlanta, in the 2018 and 2020 elections, including the Senate runoffs in 2020, CBC was engaged statewide in organizing pastors and providing them with training on voter education, voter registration and voter mobilization.

21.     CBC has members and a network of its members across Georgia whose right to vote will be burdened or denied as a result of SB 202.  CBC will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threaten to undermine its mission. CBC brings these claims on its own behalf, as well as on behalf of its member voters and constituents.

22.     Plaintiff THE JUSTICE INITIATIVE, INC. ("The Justice Initiative") is a Georgia nonprofit corporation dedicated to providing clear information and instruction to support and empower citizens to exercise their right to vote.  The Justice Initiative invests in funds for voting rights work in Georgia, including GOTV work, and partners with an affiliated entity in its voting rights work.

23.     From October 2020 through January 2021, the organization worked with another nonprofit organization to do voter advocacy and voter empowerment work.  As part of this effort, members of the organization traveled by bus to smaller rural counties to get additional people out to vote.

24.     Members of the Justice Initiative traveled by bus to 70 counties in south and central Georgia to encourage voters in black and rural communities to vote. The Justice Initiative participated in non-partisan voter advocacy throughout the entire state of Georgia.

25.     The Justice Initiative also does voter registration work, phone/text banking, line warming, assisting voters at the polls and to cure their ballots, and in the preparation and distribution of educational materials on voting.

26.     The Justice Initiative will be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202. The Justice Initiative brings these claims on its own behalf, as well as on behalf of its member voters.

27.     Plaintiff METROPOLITAN ATLANTA BAPTIST MINISTERS UNION, INC. ("MABMU" or "The Union") is a Georgia nonprofit corporation founded approximately 100 years ago. MABMU serves as a support organization that networks over 80 clergy of Baptist churches in the greater Atlanta area. Voting and social justice ministry have been a component of their work for decades.

28.     MABMU creates and distributes voting information materials throughout its membership as well as to related faith-based networks. They have

served as a coordinating hub and provider for voter outreach and assistance. MABMU has various committees that focus on education, civic and social action, and empowerment that impact the city of Atlanta and the state of Georgia communities.

29.     MABMU sponsors voting machine training, voter suppression education, voter verification and status education training, how to organize "Souls to the Polls" events, transportation, and Turnout Sunday Lawyers and Collars participation among many other creative voting activities. MABMU also provided transportation for residents of many senior high-rise facilities during early voting.

30.     MABMU has members and a network of its members across Georgia, whose right to vote will be burdened or denied as a result of SB 202. MABMU will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission. MABMU brings these claims on its own behalf, as well as on behalf of its member voters.

31.     Plaintiff FIRST CONGREGATIONAL CHURCH, UNITED CHURCH OF CHRIST INCORPORATED ("First Church") is one of the oldest African American Congregational churches in the United States and is a predominately African American church of about five hundred members.

32.     First Church routinely shares information about voting and its importance, and distributes instructional materials about how and when and where to vote.  The church was the contact point to help the infirm and others with transportation challenges get to the polls.  First Church also had a church-wide GOTV program.

33.     First Church has an older congregation, members that are shift workers, including weekend and evening workers, and other members that will be negatively impacted as a result of SB 202.  First Church has members and constituents across Georgia, whose right to vote will be burdened or denied as a result of SB 202.  First Church will also be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of SB 202, which also threatens to undermine its mission.  First Church brings these claims on its own behalf, as well as on behalf of its member voters.

34.     Plaintiff GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS ("GLAHR") educates, organizes and trains the Latinx community in Georgia to defend and promote their civil and human rights.  Established in 2001, GLAHR is a community organization that develops grassroots leadership in all Latinx immigrant communities in the state of Georgia.

35.     In 2020, GLAHR ran a vast outreach program in partnership with

Mijente during the Senate runoff campaign, making sure to reach every Latinx voter, including those living in rural South and middle Georgia. This program entailed training GLAHR members on GOTV outreach, publishing guides for newly eligible voters on every process of voting from registration to casting a ballot, traveling to several community forums to speak about the importance of voting, and creating voter education materials for digital media.

36.     As a result of SB 202, which threatens to undermine the organization's mission, GLAHR must divert scarce resources away from its traditional voter education and turnout programs toward efforts to ensure that voters, and communities of color in particular, can navigate the restrictions to their voting options imposed by SB 202.

37.     Defendant BRAD RAFFENSPERGER is Georgia's Secretary of State. He is sued in his official capacity. As Secretary of State, Defendant Raffensperger is Georgia's chief elections official. O.C. GA. § 21-2-210. He is responsible for administering and implementing Georgia's election law and regulations as well as coordinating Georgia's compliance with the National Voter Registration Act of 1993, 52 U.S.C. § 20507 *et seq.* He routinely issues guidance to Georgia's county election officials on election procedures and requirements.

38.     Defendants JOHN FERVIER, MATTHEW MASHBURN,

SARA TINDALL GHAZAL, EDWARD LINDSEY, and DR. JANICE W. JOHNSTON are members of the State Election Board and are sued in their official capacities. As members of the State Election Board, they are responsible for promulgating rules and regulations "conducive to the fair, legal, and orderly conduct of primaries and election"; "to obtain uniformity in the practices and proceedings of [election officials], as well as the legality and purity in all primaries and elections"; and "to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in this state." See O.C.G.A. § 21-2-31.

## IV.    FACTUAL ALLEGATIONS

### Georgia Has a History of Racial Discrimination in Voting

39.    Georgia has a long and well-documented history of voting discrimination against its communities of color. As the judiciary has recognized, "Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into the state constitution, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d

1336 (11th Cir. 2015).

40.    Georgia's history of implementing election laws that suppress non-white voters began shortly after Black men first gained the right to vote in 1868 through the ratification of the Fifteenth Amendment.

41.    Georgia was the first state to enact a poll tax in 1871.  In 1877, Georgia made the tax permanent and required that citizens pay all back taxes to vote.  White citizens were regularly able to evade paying taxes due to targeted exemptions.

42.    In 1908, Georgia adopted a constitutional amendment that allowed only white voters to participate in primary elections, known as "white primaries."

43.    In the same year, Georgia enacted a statute that restricted the registration of voters to a person who served in any war on behalf of the United States or the Confederate states, or who was a lawful descendant of a person who fought in those wars (the "grandfather clause"); a person of "good character" who understood the duties and obligations of citizenship; a person who was able to read and write correctly any paragraph of either the federal or state constitutions; or a person who owned 40 acres of land or $500.00 worth of taxable property.  These laws were enacted with the express purpose of making it more difficult for non-white voters to register.

44.    Although the poll tax was repealed in 1945, Georgia continued to implement other means of disenfranchising black and minority voters.

45.    In 1949, Georgia adopted a new law that required all voters to re-register under a new literacy test, which required citizens to demonstrate their ability to read and write or answer at least 10 of 30 factual questions correctly ("understanding" or "literacy tests").  In 1958, Georgia increased the required number of correct answers from 10 to 20 questions, including questions about what qualifications were needed to run for the Georgia General Assembly, how the writ of habeas corpus can be suspended, or what procedures were required to amend the U.S. Constitution.  These types of disenfranchising measures led to the passage of the Voting Rights Act of 1965 (VRA).

46.    The VRA required "covered jurisdictions," with a history of using unconstitutional tests and devices and low voter registration turnout rates, like Georgia, to submit changes in voting laws or procedures to the Department of Justice ("DOJ") or a federal court.

47.    As a "covered jurisdiction," Georgia was prohibited from making changes to its election laws or procedures unless the DOJ or a federal court found that the change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color."  52 U.S.C. § 10304.  The

VRA also abolished the literacy test for voter registration employed by Georgia and other jurisdictions, primarily in the South.

48.    Under the preclearance requirement, from 1965 to 2012, the federal government blocked 187 proposed changes to election law by Georgia and its counties and municipalities, finding in each case that the change would have a retrogressive impact on voters of color in Georgia.

49.    The VRA's preclearance requirement and the elimination of literacy tests or devices led to substantial gains in black and minority registration in Georgia until the Supreme Court's 2013 decision in *Shelby County v. Holder,* which effectively nullified the preclearance requirement.

50.    Following *Shelby County*, Georgia immediately began to impose restrictions on voting rights that resembled the state's racially discriminatory requirements before the adoption of the VRA.

51.    These measures involved voting restrictions across multiple categories, including the imposition of one of the strictest registration deadlines in the country, exact match voter identification requirements, documentary proof of citizenship, mass purges of registered voters, restrictions to early voting, and closures or relocations of polling locations despite an overall increase in registered voters. In fact, of all jurisdictions previously covered by Section 5 of the VRA,

16

Georgia is the only one to have enacted all of these restrictive measures.

52.    These barriers have had a disproportionate impact on voters of color, and other historically marginalized communities.

**Racial and Ethnic Demographics of Voting in Georgia**

53.    Since 1990, the Black population in Georgia has almost doubled, increasing from 1.8 million to 3.5 million in 2019. Similarly, the Latinx and Asian voting populations in Georgia have experienced significant growth, nearly tripling in size from 2000 to 2019. By the end of 2020, 270,000 Latinx Georgians were registered to vote.

54.    As a result of this growth, and outreach initiatives focused on engaging voters of color, Georgia added almost a quarter-million Black and Latinx voters to its registration rolls between October 2016 and October 2020. Notably, in advance of the general election in 2020, Black voter registration increased by 25 percent.

55.    By contrast, over the last 20 years, the proportion of white registered voters has decreased from each presidential election to the next.

56.    Although white voters still make up a majority of the Georgia electorate, that number decreased from 62% to 59% over the last four years.

57.    In line with the national trend, Black and Latinx populations in

17

Georgia experience lower socioeconomic status than their white counterparts. As an example, the 2019 median income for white households was $70,832, compared to the median for Black households of $47,096, and Latinx households of $52,661.

58.    Georgia's voting patterns are consistently polarized by race. For example, in the 2018 gubernatorial election, 93 percent of Black voters preferred one candidate, while only 25 percent of white voters supported that candidate.

### The General Assembly Rushed SB 202 Through the Legislative Process, Ignoring the Obvious Impact on Georgia Voters, Especially Voters of Color

59.    The legislative process by which the General Assembly and Governor Kemp passed and enacted SB 202 was marked by significant and concerning irregularities.

60.    Since the first version of SB 202, then a two-page bill limiting the mailing of absentee ballot applications to voters, was introduced on February 18 of this year, state legislators have made no bones about the intent of the bill. Their motivation was perhaps best captured by Georgia House Speaker David Ralston, who said that he does not want every registered voter to receive an absentee ballot because it would "certainly drive up turnout"—that is, alternatives to in-person voting on Election Day apparently allow for *too much* democracy.

61.    The legislative history of S.B. 202 reveals that the bill's passage was rushed, irregular, secretive, and an abuse of ordinary legislative process. It

evidences a calculated effort to avoid public scrutiny of a bill whose obvious goal was voter suppression.  In response to record turnout by voters of color, and against a backdrop of false, racially charged allegations of widespread voter fraud, the General Assembly passed SB 202 just 79 days after the 2021 runoff elections.

62.    SB 202 is predicated on the wholly false notion of voter fraud, which has become a common scheme to justify blocking access to the ballot—particularly for voters of color on the heels of record turnout during the 2020 general election. Representative Barry Fleming, Chair of the House Special Committee on Election Integrity, wrote in an op-ed: "If elections were like coastal cities, absentee balloting would be the shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant."

63.    Among the fanciful allegations were that voting machines were somehow programmed to "switch" votes, that voter signatures on absentee ballots were not property verified, that "suitcases" of fake ballots were counted, that large numbers of ineligible voters cast votes, and that deceased persons' identities were used to cast illegal votes.  Georgia election officials, including defendant Raffensperger, repeatedly debunked these rumors, conspiracy theories, and tropes. Secretary Raffensperger described Georgia's election as secure, honest, and efficient.  He reported to Congress that his office had confirmed the presidential

contest results by a hand audit, a candidate-requested recount, an audit of voting

machines, and an audit of absentee ballot signatures in Cobb County.  According to

the Secretary of State's office: "At the end of the day many of these bills are

reactionary to a three-month disinformation campaign that could have been

prevented."

64.    Following Secretary of State Raffensperger's defense of the integrity

of the 2020 general election and 2021 runoff election, and his refusal to "find"

votes for President Trump and overturn the will of Georgia's voters, SB 202

removes the Secretary of State as both chair and voting member of the State

Election Board, demoting him to an ex officio, nonvoting member of the Board.

65.    After the general election, other Georgia election officials warned that

these false allegations about the integrity of the election could themselves suppress

turnout in the runoff elections.

66.    Governor Kemp described these allegations as a mere "distraction."

Lieutenant Governor Geoff Duncan was even more explicit.  He reported that his

office had seen no credible examples of systemic voter fraud.  According to the

Lieutenant Governor: "The conversations around election reform were rooted in

misinformation that the former president and those around him spread […] All

because they wanted to overturn a fair election that unfortunately didn't turn out

the way that we Republicans wanted it to."  Washington Post, 4/13/21, at A19.

67.    Allegations of voter fraud found no support in court.  Lawsuits challenging Georgia's election results were repeatedly rejected by state and federal judges, as were dozens of other lawsuits in states carried by the Democratic candidate for President.  Not a single court found any evidence that the election results in Georgia were tainted by any "integrity" issues, much less voter fraud.

68.    Although SB 202 purports to ensure the integrity of the democratic process, the General Assembly rushed the bill to passage and signature with little opportunity for voters to be heard.  The legislative committees tasked with assessing election bills did not provide open, transparent, or inclusive practices for public testimony.  Neither the Senate Committee on Ethics nor the House Special Committee on Election Integrity announced clear guidelines for providing and receiving public input before any hearings.

69.    For example, basic information about who could testify, how to sign up to testify, or how testimony would be conducted often was not provided in advance of hearings.

70.    When guidance was provided about public testimony, it was often inconsistent.  For example, prior to a February 19, 2021 House Committee hearing, the Committee told the public that remote testimony via videoconferencing

technology would not be available.  But during the hearing, Chair Fleming invited

certain witnesses to testify remotely.  Only in response to a question during the

hearing did Chair Fleming agree for the first time that remote public testimony was

possible.  This opportunity, however, was offered only to members of the public

who were specially invited by House Committee members or staff to testify.

71.    Some witnesses were denied the opportunity to testify despite

repeatedly filing written requests.  Chair Fleming inaccurately proclaimed at the

end of the February 23, 2021 hearing that everyone who signed up to testify had

been afforded an opportunity to do so.

72.    The committees repeatedly failed to publicly post agendas for

committee hearings, or even the version of the bill that would be discussed at a

hearing.  In some cases, amended versions of bills were revealed just hours before

hearings to consider the amendments; in other cases, amendments were not posted

before hearings at all.  Members of the public and even some legislators were left

to guess whether and how the bill had been amended, leaving them little

opportunity for timely comment.

73.    Lengthy bills were often provided to the public with little or no time

to read them, much less analyze them, before the hearings.  Updated versions of

the bill were almost never promptly uploaded to the General Assembly website.

22

Many committee hearings were held on versions of the bills that had not been posted online for the public's consideration. This made it impossible for legislators and members of the public to comment meaningfully on the pending versions of election bills.

74.    For example, the original version of House Bill 531 ("HB 531"), provisions of which were incorporated into the final version of SB 202, was first made available, through postings on social media, mere hours before some members of the Committee convened for a hearing on February 18, 2021. Then, less than 24 hours later, the House Committee held another hearing before all its members. The House Committee continued to amend HB 531 and hold hearings on amended versions of the bill without making amendments or substitute versions publicly available.

75.    Many committee hearings related to elections bills were scheduled and held with little to no advance notice. Some of these hearings were not even live-streamed for the public to participate.

76.    The Senate Committee held numerous hearings, including on February 25, 2021, at either 7:00 a.m. or 7:30 a.m., significantly outside of traditional business hours. This unusual schedule limited public attendance and scrutiny.

77.    Although concerns were raised by members of the public about the potential racial impact of proposed election changes during House and Senate Committee hearings, it appears that the Committees conducted no analysis to evaluate the racial impact of any of the election bills they considered, including those that went on to be passed by the General Assembly.

78.    On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a statement that it was "concerned that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

79.    Nevertheless, SB 202 was rushed through the legislative process. What began as a two-page bill passed over from the Senate to the House on March 9, 2021 swelled to more than 90 pages in two weeks.  After the Georgia House of Representatives passed a substituted version of SB 202 on March 25, 2021, it was immediately transmitted to the Georgia Senate.  No conference committee was convened.  The bill was brought to the floor of the Senate for a vote hours later.  SB 202 was rushed to signature by the Governor, with little time for the public to weigh in.  Mere hours after the House and Senate voted on the now 98-page version of SB 202, Governor Kemp signed the bill into law in a closed-door signing ceremony.

80.    Even legislators were shut out of the signing.  Most egregiously,

Representative Park Cannon was arrested and forcibly removed from the State Capitol when she knocked on the Governor's door, requesting that the public be allowed to witness the SB 202's signing.

### SB 202 Places Undue Burdens on the Exercise of the Right to Vote, Especially for Black Voters and Other Voters of Color

81.     The challenged provisions of SB 202, both individually and collectively, place undue obstacles on the constitutional right to vote, effectively disenfranchising or deterring large segments of the electorate.  These obstacles have such a pronounced disparate impact on Black voters and other voters of color that this impact can only have been intentional.  These historically disenfranchised voters disproportionately prefer early voting on weekends, lack the requisite ID for obtaining absentee ballots, rely on accessible drop boxes, cast provisional out-of-precinct ballots, and experience long lines when voting in person. SB 202 systematically and purposefully targets these voters, intending to suppress their votes or inevitably doing so.

82.     Proponents of these measures offered no reliable factual evidence that they were necessary to ensure the integrity of elections or to restore confidence in the election.  The General Assembly purposefully disregarded evidence that SB 202 would severely burden the right to vote of Georgia citizens, especially Georgians of color.

**SB 202 Erects New Obstacles to Absentee Voting**

83.     Before SB 202, a Georgia voter could request an absentee ballot as early as 180 days before an election and as late as the Friday before Election Day. SB 202 compresses this time period by more than 100 days: a voter may request an absentee ballot no more than 78 days before an election, and an application must be received by the county election administrator at least 11 days before the election.

84.     Prior to SB 202's passage, a Georgia voter requesting an absentee ballot still had to provide identifying factors.

85.     SB 202 now imposes additional identification requirements to request an absentee ballot that directly impact Plaintiffs' members.  A voter must provide a Georgia driver's license or Georgia state identification card number.  A voter who does not have either, such as many of Plaintiffs' members, must instead submit a photocopy or electronic image of a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address.

86.     Under Section 27 of SB 202, a voter seeking to cast an absentee ballot must now add personal ID information on the outside of the ballot.  This information includes a Georgia driver's license number or Georgia state ID card number, the voter's date of birth, and, if the voter does not have a Georgia driver's

26

license or state ID card, the last four digits of the voter's Social Security number.

87.    Under Section 28, if the voter does not have a Georgia driver's license, state ID card, or Social Security number, he or she must produce a photocopy of a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address.

88.    A voter seeking to cast an absentee vote must also swear an oath, under criminal penalty, that he or she has completed the ballot in secret—even from the voter's child under 18 years of age or any child under 12 years of age.

89.    These new requirements for mail-in voting potentially affect all Georgia voters. But data from recent years demonstrates that while Black voters comprise 30% of Georgia's voting population, they account for almost 42% of the requests for absentee ballots. Per the Georgia Secretary of State's own data, Black voters are more likely to vote by mail than any other racial demographic. According to one national study, as many as 25% of Black voters do not have a current and valid form of government-issued photo ID, compared to 11% of voters of all races.

90.    Other communities, including immigrant, poor, elderly, and student voters, including Plaintiffs' members, have likewise relied disproportionately on absentee voting, particularly during the general and runoff elections. For instance, immigrant voters who often need translation services or other assistance to

complete a ballot often prefer to vote by mail so they have more time to complete their ballot.

91.    SB 202 will disparately impact Plaintiffs' member voters. It will force them to vote more heavily in person when in-person voting may not be tenable, and to overcome additional burdens that result from long lines, grueling waits, and greater risks of having one's ballot rejected.

92.    There is no credible evidence that mail-in ballots have been used fraudulently in Georgia or that curtailing mail-in voting is necessary to ensure the integrity of future elections.

### SB 202 Limits Access to Drop Boxes

93.    Before SB 202, Georgia voters could cast their ballot at one of 330 drop boxes in the state. Many of these drop boxes were located outdoors and accessible 24 hours a day.

94.    Before SB 202, many county election administrators kept drop boxes open after business hours, beyond the advance voting period, and until the polls closed at 7:00 p.m. on Election Day. They were nonetheless effectively secured according to an emergency rule promulgated by the State Election Board. Few, if any, instances of tampering or interference with drop boxes, indoors or outdoors, were reported in the 2020 election cycle.

95.    In the 2020 election cycle, many of Plaintiffs' member voters

preferred the use of drop boxes to avoid well-publicized mail delays.

96.    Section 26 of SB 202 limits the number of drop boxes to the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county. This drastically reduces the number of available drop boxes, especially in the most populous counties.

97.    In Gwinnett County, for example, there were 23 drop boxes available in the 2020 election cycle; SB 202 would reduce that number to six, in a county approaching one million residents. According to the New York Times, total drop boxes for Fulton, Cobb, DeKalb, and Gwinnett counties would be reduced from 94 to at most 23.

98.    SB 202 also prohibits the use of outdoor drop boxes, except during emergencies declared by the Governor. Under SB 202, drop boxes are allowed only inside the office of the board of registrars or absentee ballot clerk or inside an advance voting location.

99.    SB 202 limits the use of drop boxes to the hours of operation of that office or advance voting location. That is, drop boxes will no longer be an option for submitting ballots at night or otherwise outside normal business hours. Many of Plaintiffs' members use the drop boxes at night or otherwise outside of normal business hours.

100.   Before SB 202, drop boxes were already required to be under video surveillance 24 hours per day, seven days per week.  SB 202 now mandates that all drop boxes be under constant surveillance by a person: an election official, law enforcement officer, or licensed security guard.

101.   SB 202's restrictions on the location, availability, and operating hours of ballot drop boxes will disproportionately burden Black, Asian, and Latinx voters.  Georgia voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot.  For many voters—especially those with childcare or work commitments that limit their availability during normal voting hours, as well as those with medical conditions or other disabilities—casting an in-person ballot during advance voting or on Election Day may be difficult or impossible.  Widely reported and continuing failures and delays at the United States Postal Service have left many voters justifiably concerned about whether absentee ballots returned by mail will be received in time by their county election officials.  For these voters, secure drop boxes provide a reliable and accessible option, and the enacted restrictions severely burden their rights to vote by forcing them to navigate more onerous paths to voting, if they are able to vote at all.

102.   The new mandate for in-person constant surveillance of secure drop

boxes by an election official, licensed security guard, or law enforcement official, will also raise concerns about voter intimidation for Black voters and other voters of color, who are routinely and unfairly targeted by law enforcement. Without any evidence that in-person law enforcement surveillance is necessary to repel fraud or misconduct, the surveillance enacted by SB 202 recalls past practices of Jim Crow-era efforts to deter Black voters from casting their ballots. The new restrictions on drop boxes raise all of the same threats and burdens to many of Plaintiffs' members.

103.   There is no evidence that drop boxes have been used fraudulently in Georgia or that limiting the availability of drop boxes is necessary to ensure the integrity of future elections.

## SB 202 Prohibits Mobile Voting Units

104.   Before SB 202, Georgia law permitted county election administrators to provide mobile polling facilities for both early voting and voting on Election Day.

105.   In the 2020 election, two Fulton County mobile voting units made stops at twenty-four locations, including several Black churches. More than 11,200 people voted at these two facilities.

106.   Section 20 of SB 202 effectively outlaws the regular use of mobile voting units, which are used by many of Plaintiffs to serve their members and/or by

31

Plaintiffs' members.  It provides that "buses and other readily movable facilities" may be used only in an emergency declared by the Governor. Section 26, similarly, restricts early voting to "a building."

107.   The elimination of all mobile voting units except in an emergency declared at the sole discretion of the Governor burdens voters, especially voters of color.  Mobile voting units with four to eight voting stations were provided in the general election by Fulton County, where a majority of the population is nonwhite, as a safe and secure option for all voters in the county. Fulton County, like other Atlanta metro area counties, has a history of both long voting lines and backlogs of requests for absentee ballots.  Like so many of the voting options restricted by SB 202, mobile voting units enabled many more Georgians to cast their votes and participate in their democracy.  Indeed, the turnout in Fulton County in the 2020 general election was more than 77% overall, the highest in 28 years.

108.   There is no credible evidence that mobile voting facilities have been used fraudulently in Georgia or that prohibiting their use is necessary to ensure the integrity of future elections.

**SB 202 Restricts Early Voting in Runoff Elections**

109.   SB 202 short-ended the period for all runoff elections, which must now be held 28 days after the general or primary election. Section 28 reduces the advance voting period for runoffs from three weeks to one week.  It also gives

county boards of election unfettered discretion to eliminate all Sunday early voting days; early voting may be conducted on one or two Sundays, but only "if the registrar or absentee ballot clerk so chooses."

110.   Advance voting opportunities and particularly weekend voting opportunities are essential to ensuring that voters can safely, securely, and freely participate in our democracy.  They give voters the option to cast their ballots without facing the crowds and long lines on Election Day, and offer the flexibility to balance family and work obligations that make voting on Election Day problematic for thousands of Georgians.

111.   Shortening early voting in runoff elections imposes both direct and secondary burdens upon Georgians' right to vote, including those who vote on Election Day such as many of Plaintiffs' members.  Most directly, restricting the early voting period forces voters who need to vote early to do so on fewer days. This restriction operates to prevent some voters from voting altogether. Secondarily, the restriction adds to the long lines and wait times at the early voting polls on those fewer days—deterring, burdening, and in some cases preventing those voters from casting their ballots. The same secondary effects flow through to Election Day.  Simply put, the fewer days available to vote, the more onerous voting becomes.

112.   The change in Sunday voting from guaranteed to discretionary is

33

obviously targeted to Black voters and Plaintiff churches and faith-based organizations. It is widely known that "Souls to the Polls" programs effectively organize and encourage Black church parishioners to vote after Sunday services, increasing overall turnout among Black voters. Plaintiff churches and faith-based organizations coordinated Souls to the Polls and such a change in the law impacts the access to the ballot for those Plaintiffs' members.

113.    There is no credible evidence that reducing the time for runoff elections or limiting early voting days in runoff elections is necessary to ensure the integrity of future elections in Georgia.

### SB 202 Makes "Line Warming" a Criminal Offense

114.    In the lead-up to the 2021 runoff elections, Defendant Raffensperger sent an Official Election Bulletin aimed at suppressing so-called "line warming" via enforcement of the State's ban on buying votes, Ga. Code Ann. § 21-2-570. SB 202 bill now modifies the Georgia Code's provisions on electioneering.

115.    SB 202 bans "giv[ing], offer[ing] to give, or participat[ing] in the giving of … gifts, including, but not limited to, food and drink," to any voter standing in line at a polling place. As such, it equates an offer of comfort with "the giving of any money or gifts" to a voter.

116.    More specifically, SB 202 criminalizes an offer to provide free food

and drink to voters standing within 150 feet of a polling place. It also prohibits a volunteer from coming within 25 feet of any voter standing in line, even outside of the 150-foot zone.

117. As SB 202 itself acknowledges, in-person voting in Georgia is plagued by "long-term problems of lines." SB 202 § 2(7). According to the Bipartisan Policy Center, Georgia had the single longest average wait time to vote in 2018.

118. Long lines to vote are corrosive to democracy. They force voters to choose between their health, their time, or their job and exercising their fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future. Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.

119. Defendants' structuring of Georgia's elections helps create these lines. More than half of Georgia's 2,655 precincts are assigned more than 2,000 voters, the recommended maximum. In rural counties, over 22,000 voters can be assigned to a single polling place. The average polling place serves over three thousand voters, 47% more than they did in 2012, and far more than the recommended number.

120. The burdens of these lines do not fall evenly on Georgia voters. Rather, like so many deterrents to voting, they are disproportionately felt by Black voters and other voters of color. As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."

121. Since 2012, almost two million people have registered to vote in Georgia, making up more than a quarter of total registered voters in 2020. Many of these new voters are younger, nonwhite, and based in the nine counties making up metropolitan Atlanta. In the same period, rather than accommodating this increase by establishing sufficient polling locations to serve them, the state has cut polling locations by nearly 10%. The surge in registration in majority Black precincts means that these cuts disproportionately harm those voters.

122. In the June 2020 primary elections, hundreds of voters were forced to choose: wait in line for hours, with temperatures pushing 90 degrees, or sacrifice their right to vote. According to an Atlanta-Journal-Constitution analysis, Black voters bore the brunt of these long lines: only 61% of majority Black precincts close on time compared with 80% of mostly white precincts. Whether a precinct closes on time indicates whether there was a line of voters still waiting to cast their ballots. Some voters in Union City, Fulton County, which is 88% Black, waited in line until 12:37 a.m. to vote.

123.   Lines were long in the General Election in Georgia as well, with wait times of five hours common in metro Atlanta and some voters waiting over 11 hours.

124.   Because state officials allow these lines to occur year after year, many non-partisan volunteer organizations, in what is sometimes called "line warming," offer water, snacks, chairs, and other assistance to voters waiting in line.  Plaintiff churches and faith-based organizations provide line warming throughout the state of Georgia during elections.

125.   Providing voters with food and drink is consistent with the best values of our democracy and the basic principles of the mission for many of the Plaintiffs. It encourages voters to stay in line and emphasizes that every vote matters.  This humane service also helps reaffirm the dignity of Black voters, who are disproportionately affected by longer lines.

126.   There is no evidence that the offer of food or drink to voters waiting in line, without partisan electioneering or quid pro quo, has been used fraudulently in Georgia or that limiting such humane gestures is necessary to ensure the integrity of future elections.

**SB 202 Invalidates Out-of-Precinct Provisional Ballots**

127.   Before SB 202, if an otherwise eligible voter cast a provisional ballot

in the county of his or her residence, but at the wrong precinct, the ballot would be counted for every race on that ballot in which the voter was qualified to vote.

128.    More than 11,000 voters cast a provisional ballot in the 2020 general election and more than 10,000 voters cast a provisional ballot in the 2021 runoff elections. Most of these provisional ballots were "out-of-precinct" ballots.

129.    SB 202 now disenfranchises all out-of-precinct provisional ballot voters who cast a ballot before 5:00 p.m. on Election Day.  SB 202 requires poll officials to inform a voter that his or her vote is invalidated for *all* of the races on that ballot.

130.    While a ballot may include precinct-specific elections, it may similarly encompass congressional and other races that are not precinct-specific. Under the new law, however, Georgia election officials will discard the entire ballot cast in the incorrect precinct, regardless of whether the ballot also contains eligible votes.  That is, rather than counting the ballot's votes for eligible races as was done in the past, S.B. 202 will *require* the entire ballot to be thrown away— even if it was cast by an eligible registered voter, and even if it was cast in a timely manner and otherwise qualified to be counted.  This provision nullifies properly cast votes by qualified voters.

131.    This new practice will disproportionately affect Black voters, and

other historically disenfranchised communities, including many of Plaintiffs'
members, who are proven to be more likely than white voters to cast an out-of-
precinct ballot since they are more likely to have moved within their county than
white voters, and thus more likely to arrive at an incorrect precinct.

132.    Recent research demonstrates that Black voters in Georgia
disproportionately live in neighborhoods with much higher rates of in-county
moves.  Not only does the data reflect that the population with the most in-county
moves is 47% Black, relative to 37% non-Hispanic white, but the population with
the *least* in-county moves is only 22% Black, compared to 64% non-Hispanic
white.  Requiring election officials to discard ballots cast in the wrong precinct will
thus not only disenfranchise a substantial number of Georgia voters each year, but
it will do so disproportionately within Georgia's Black community, as well as
immigrant, minority, student, and poor populations that are more prone to
relocation.

133.    There is no evidence that categorically invalidating a broad range of
provisional ballots is necessary to ensure the integrity of future elections.

**SB 202 Allows Unlimited Challenges to the Qualifications of Voters**

134.    SB 202 subjects Georgia voters to the risk of having to defend their
vote against an unlimited number of public challenges by any person who wishes
to disenfranchise them, with or without merit.

39

135.    Baseless accusations of voter fraud have been used against voters of color to deter them from exercising their right to vote.  SB 202 needlessly exposes voters to abusive duplicative, frivolous, and potentially unlimited challenges to their eligibility before a government review board.  It places another disparate burden on voters of color.  It does so without any standard of what constitutes probable cause to question a particular voter.

136.    There is no legitimate state interest that justifies these severe burdens. State permission, or even encouragement, to bring an unlimited number of voter challenges only operates to enable serial vote suppressors to identify and harass voters, and particularly voters of color, based on racist and xenophobic tropes about "suspicious" voter conduct.

## SB 202 Permits the State Election Board to Take Over County Election Administration

137.    SB 202 heightens the power of the party that controls the majority in the Georgia General Assembly to control county-level election administration. Section 5 of SB 202 replaces Secretary of State Raffensperger, who is elected at-large statewide, as chair of the State Election Board with an individual selected by the General Assembly.  With this change, the General Assembly will appoint three of the State Election Board's five members.

138.    In turn, Section 6 of the bill grants a new power to the State Election

Board: the power to suspend local election superintendents and replace them with an individual of the State Election Board's choosing, who will wield all the powers and duties of an election superintendent, including personnel decisions.

139.   This takeover provision is subject to the criteria in Section 7, which are merely that an election superintendent to be suspended have violated Georgia election statutes, rules, or regulations three times in the last two election cycles, no matter how technical the violations, or showed gross negligence, malfeasance, or nonfeasance in their role administering elections.

140.   In addition to this low bar triggering potential suspension and replacement of an election superintendent, there are scarce temporal constraints on when the State Election Board may choose to "disappear" an election superintendent.  Section 7 only provides that the Board's suspension hearing take place between thirty and ninety days after receiving a petition—and the Board may petition itself for a suspension hearing. There is no limitation preventing such a suspension from taking place one week prior to Election Day or at any other crucial juncture in an election calendar where election officials' need to "seek 'order, rather than chaos' in their elections" is most heightened. *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1281 (2020).

141.   Following the 2020 general election and 2021 runoff election,

Secretary of State Raffensperger repeatedly attested to the integrity of these elections and assured the public that there was no evidence of widespread voter fraud that would cast doubt on the legitimacy of the vote counts.

142.    Four days before the U.S. Congress was scheduled to certify the results of the 2020 presidential election, Secretary of State Raffensperger received an extraordinary telephone call from then-President Trump, insisting that he had won the state of Georgia in the election and urging the Secretary of State to "find" 11,780 votes and overturn the will of a majority of Georgia's voters. Mr. Raffensperger properly declined the President's invitation, telling him "the data you have is wrong."

143.    On the heels of Mr. Raffensperger's assurances that the results of the general and runoff elections were correct and reliable, SB 202 ousts the Secretary of State from his chairmanship of, and even his voting membership on, the State Election Board and awards these positions to a chairperson chosen by the state legislature rather than the voting citizens of Georgia.

## FIRST CLAIM FOR RELIEF

**Violation of Section 2 of the Voting Rights Act 52 U.S.C. § 10301, et seq.;
42 U.S.C. § 1983
(Intentional Racial Discrimination & Discriminatory Results)**

144.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 143 above as though fully set forth herein.

145.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a),
prohibits voting laws, policies, or practices that "result[] in a denial or
abridgement of the right of any citizen of the United States to vote on account of
race or color[.]"

146.    42 U.S.C. § 1983 provides a cause of action, including for
declaratory or injunctive relief, against "[e]very person who, under color of any
statute, ordinance, regulation, custom, or usage…subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws…."

147.    Discriminatory intent is not required to prove a violation of Section 2.
A violation is established "if, based on the totality of circumstances," election
processes "are not equally open to participation" by protected classes of citizens, in
that they "have less opportunity than other members of the electorate to participate
in the political process and to elect representatives of their choice."

148.    SB 202 sets new voting laws, policies, and practices.  Among other
things, it: (1) bans mobile voting units for advance voting and election day,
except "in emergencies declared by the Governor pursuant to Code Section 38-3-
51 to supplement the capacity of the polling place where the emergency

circumstance occurred"; (2) imposes restrictive ID requirements for both requesting and casting an absentee ballot; (3) limits the availability of secure drop boxes; (4) restricts the timeline for early voting during runoff elections; (5) criminalizes "line warming," including offers of free food and water to voters standing in line; (6) empowers the State Election Board, newly reconstituted with a voting majority selected by the General Assembly, to near-arbitrarily suspend and replace local election superintendents; and (7) disenfranchises eligible voters who cast out-of-precinct provisional ballots before 5:00 PM.

149.  SB 202 violates Section 2 of the Voting Rights Act because these provisions result in the denial of voters of color full and equal access to the electoral process.

150.  SB 202 further violates Section 2 of the Voting Rights Act because, given the "totality of the circumstances," *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986), including the long history of race discrimination in Georgia, these provisions, individually and cumulatively, will disproportionately deny voters of color, and particularly Black voters, an equal opportunity to participate in the political process and to elect representatives of their choice.

## SECOND CLAIM FOR RELIEF

**Fourteenth Amendment**
**U.S. Const. amend., XIV; 42 U.S.C. § 1983 (Intentional Race Discrimination)**

151.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 150 above as though fully set forth herein.

152.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…"

153.   SB 202 violates the Fourteenth Amendment to the United States Constitution because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

154.   SB 202 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black voters and other voters of color in violation of the United States Constitution.

155.   Discriminatory intent, for purposes of a constitutional violation, may be established by proof that race was a motivating factor in the decisions of the defendants. *Village of Arlington Heights v. Metro Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977).

156.   Georgia's long history of racial discrimination in the context of

voting, the known and reasonably foreseeable discriminatory impact of SB 202, the bill's legislative history, and the tenuousness of the stated justifications for SB 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

## <u>THIRD CLAIM FOR RELIEF</u>

**Fifteenth Amendment**
**U.S. Const. amend., XV; 42 U.S.C. § 1983**
**(Intentional Race Discrimination in Voting)**

157.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 156 above as though fully set forth herein.

158.    42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…."

159.    Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

160.    Any burden on the constitutional right to vote "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."

46

*Crawford v. Marion County Election Board,* 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.). "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312 1318-19 (11th Cir. 2019).

161.   SB 202 violates the Fifteenth Amendment to the United States Constitution because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.  SB 202 embodies unjustifiable, irrelevant and illegitimate state interests.

## FOURTH CLAIM FOR RELIEF

**First and Fourteenth Amendments
U.S. Const. amend. XIV; 42 U.S.C. § 1983
(Undue Burden on the Right to Vote)**

162.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 161 above as though fully set forth herein.

163.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…"

164.   The right to vote is a fundamental constitutional right protected by both the due process and equal protection clauses of the Fourteenth Amendment. *See, e.g., Bush v. Gore,* 531 U.S. 98, 104-105 (2000); *Harper v. Va. State Bd. of Elections,* 383 U.S. 663, 670 (1966); *Anderson v. Celebrezze,* 460 U.S. 780, 786-87 (1983).

165.   The challenged provisions of SB 202 that place limitations on the use of drop boxes and that require identification for the return of absentee ballot applications and voted absentee ballots, individually and collectively impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations. Even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. *Common Cause/Ga. v. Billups,* 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the closer the scrutiny courts will apply when examining that law. *Stein v. Ala. Sec. of State,* 774 F.3d 689,694 (11th Cir. 2014).

166.   None of the burdens imposed by the challenged provisions of S.B. 202 are necessary to achieve, or reasonably related to, any sufficiently weighty legitimate state interest. The burdens imposed by the challenged provisions of SB 202 accordingly lack any constitutionally adequate justification.

## FIFTH CLAIM FOR RELIEF

### Freedom of Speech / Expression
### U.S. Const. amend. I; 42 U.S.C. § 1983

167.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 166 above as though fully set forth herein.

168.   SB 202 makes it a criminal misdemeanor to "give, offer to give, or participate in the giving of . . . gifts, including, but not limited to, food and drink," to voters.  The law applies within 150 feet of a polling place or within 25 feet of any voter standing in line to vote.  *Id.*  These provisions are overbroad, unconstitutionally burden Plaintiffs' First Amendment rights of speech and expression, and are not supported by any sufficient nor compelling, government purpose.

### V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

169.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, declaring that the challenged provisions of SB 202 are unconstitutional and in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

170.   Permanently enjoin Defendants, their agents, employees, and those

persons acting in concert with them from enforcing or giving any effect to the

challenged provisions of SB 202, including enjoining Defendants from conducting

any elections utilizing those provisions;

171.   Order Defendants to pay Plaintiffs' costs, expenses, and reasonable

attorneys' fees incurred in the prosecution of this action, as authorized by, inter

alia, 42 U.S.C. § 1988 and other applicable laws; and

172.   Grant such other and further relief as may be just and equitable.

Respectfully submitted this 19th day of January, 2024.

Respectfully submitted,

/s/ Kurt Kastorf

Kurt Kastorf
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA  30307
Telephone:  404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Matthew A. Fogelson*
Angela Groves*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC  20005
Telephone:  (202) 728-9557
Jbrowne@advancementproject.org
Mfogelson@advancementproject.org
Agroves@advancementproject.org

Clifford J. Zatz*
William Tucker*
Justin D. Kingsolver*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
CZatz@crowell.com
WTucker@crowell.com
JKingsolver@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th
Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted pro hac vice

*Counsel for Plaintiffs*