IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.<br>1:21-MI-55555-JPB |

### CONSOLIDATED PLAINTIFFS'
### STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      In 1960, the state of Georgia was effectively biracial in composition: according to the Census, 71.4% were white and 28.6% were Black. All other racial and ethnic groups were 0.08% of the population. Ex. 100 (Lee Rep. 18-19).

2.      Today, Georgia is a multiracial and multiethnic state. According to the 2020 Census data, whites (non-Hispanic) make up 52% of the State's population, with African Americans at 32.6%, Latinos at 10%, and Asian Americans at 4.4%. Ex. 100 (Lee Rep. 19).

3.      While people of color population growth outpaced white population growth in most of the State, people of color are heavily concentrated in just a few counties. According to 2020 Census figures, more than 50% of the statewide population of people of color reside in six of Georgia's 159 counties: Fulton, Gwinnett, Cobb, DeKalb, Clayton, and Chatham. Ex. 106 (Palmer Rep. ¶ 15 & Tbl. 1).

4.      According to U.S. Census Bureau estimates, these four counties

(Cobb, DeKalb, Fulton, and Gwinnett) comprise only 27% of the State's white population but 39.8% of the State's Black population, Ex. 85 (Burden Rep. 4), almost 45% of the State's Latino population, and nearly 62% of the State's Asian American and Pacific Islander (AAPI) population, Ex. 95 (Cobb Rep. 13-14, 17).

5.      The AAPI population is especially concentrated in the counties around Atlanta, Georgia: Forsyth (18%), Gwinnett (13.3%), Fulton (7.6%), DeKalb (6.6%), Cobb (5.6%) and Fayette (5.4%). Ex. 100 (Lee Rep. 21).

6.      Georgia's demographic change has been driven largely by a sizable decline in the (non-Hispanic) white population and the emergence of two racial/ethnic minority groups: Latinos and Asian Americans. Ex. 100 (Lee Rep. 19).

7.      From 2010 to 2020, Georgia's population grew by 10.6% (1,024,255 people). Ex. 106 (Palmer Rep. ¶ 12). During that period, Georgia's white population shrank by 1.0%, while Georgia's non-white population cumulatively grew by 25.2%. *Id*. By group, Georgia's Latino population grew by 31.6%, and Georgia's AAPI population grew by 52.6%, *id.* ¶ 12 & Tbl. 1; Ex. 100 (Lee Rep. 18), and Georgia's Black population grew by 12.5% (from 2,950,435 to 3,320,513), Ex. 95 (Cobb Rep. 1-2).

8.      Over 73% of Black population growth from 2010 to 2019 occurred in the Atlanta region, where nine of the ten counties with the greatest increase in the

Black population are located. According to county-level data from the Census'
American Community Survey ("ACS") table B02001 (2010 and 2019), the nine
counties with the greatest increases in Black population from 2010 through 2019
(together accounting for 73.03% of the State's Black population increase) are
found in the Atlanta region. The counties are Gwinnett, Fulton, Cobb, DeKalb,
Henry, Clayton, Douglas, Rockdale, and Newton. U.S. Census Bureau, "RACE,"
American Community Survey, ACS 5-year Estimates Selected Population Detailed
Tables, Table B02001 (2019), https://data.census.gov/table/
ACSDT5Y2019.B02001?g=040XX00US13$0500000&y=2019, last visited Jan.
19, 2024); U.S. Census Bureau, "RACE," American Community Survey, ACS 5-
year Estimates Selected Population Detailed Tables, Table B02001 (2010),
https://data.census.gov/table/ACSDT5Y2010.B02001?g=040XX00US13$0500000
&y=2010, last visited Jan. 19, 2024).

9.      Based on an analysis of 41 statewide elections from 2012 to 2022
(which constitutes all general and runoff elections during that period excluding
only the 2020 Special Senate elections), Black, Latino, AAPI, and other voters of
color shared the same candidates of choice in each election and voted cohesively in
support of these candidates, and white voters cohesively opposed each of those
candidates. Ex. 106 (Palmer Rep. ¶¶ 7, 21, 23, 26, 27 & Figs. 1-2); *see also* Ex. 95
(Cobb Rep. 3, 31).

10.     In every election analyzed from 2012-2022, white voters voted cohesively in opposition to the candidate of choice of Black, Latino, and AAPI voters. On average, only 14.3% of white voters supported the candidates of choice of voters of color (which were largely Democratic candidates), and in no election did this estimate exceed 20%. Ex. 106 (Palmer Rep. ¶ 27 & Figs. 1-2).

11.     Black voters are extremely cohesive, with a clear candidate of choice in all 41 elections analyzed. On average, 98.7% of Black voters supported Democratic candidates. Ex. 106 (Palmer Rep. ¶¶ 25-27 & Figs. 1-2); Ex. 85 (Burden Rep. 5-6 & Tbl 1).

12.     In Georgia, Black voters support the Democratic party by wide margins. Ex. 85 (Burden Rep. 4-5 & Tbl. 1). A study of presidential, gubernatorial, and senatorial elections from 2014 through 2022 showed that Black voters consistently favored Democratic candidates by margins between 77 percentage points and 87 percentage points, while majorities of white voters in every election supported Republican candidates. *Id*. 5 & Tbl. 1. Even in Democratic Party primary elections, where all candidates belong to the same party, Black and white voters tend to support different candidates. *Id*. 6-7 & Tbl. 2.

13.     After years of Republican dominance in Georgia statewide elections, elections became noticeably more competitive beginning in 2018 when the Republican candidate for Governor won by only 1.4 percentage points against

Democratic candidate Stacey Abrams. Ex. 85 (Burden Rep. 8); Ex. 95 (Cobb Rep. 30).

14.     Democratic candidate Stacey Abrams was the gubernatorial candidate of choice of Black voters in 2018. Ex. 85 (Burden Rep. 6, Tbl. 1).

15.     Between 2014 and 2022, although the total number of active registered voters increased among all racial groups, the share of registered voters that identify as white dropped by more than five points, from 57.9% white in 2014 to 51.6% white in 2022. Ex. 85 (Burden Rep. 8-10 & Tbl. 3); *see also* Ex. 106 (Palmer Rep. ¶¶ 12-16).

16.     Voter turnout rates in Georgia are consistently higher among white Georgians than Black, Hispanic, and AAPI Georgians. Ex. 94 (Clark Rep. Tbl. 6); Ex. 85 (Burden Rep. 9-10 & Tbl. 4); Ex. 96 (Fraga Rep. ¶ 35 & Tbl. 1); *see also* Ex. 113 (Grimmer Rep. Tbl. 2).

17.     Political participation among Black Georgians has long lagged behind that of white Georgians, with white voters consistently turning out at significantly higher rates than Black voters. *See* Ex. 94 (Clark Rep. Tbl. 6 (documenting average turnout gap of 8.8 points based on registered voters between 2010 and 2022)); Ex. 85 (Burden Rep. 9-10 & Tbl. 4 (documenting average turnout gap of 7.4 points based on CVAP between 2014 and 2022)).

18.     Between the 2018 and 2022 midterm elections, overall voter turnout,

adjusted or population growth, declined by 2.8 percentage points. Ex. 113 (Grimmer Rep. ¶ 28 & Tbl. 1).

19.     Over the most recent three midterm general elections, the white turnout rate in Georgia increased from 38.8% in 2014, to 53.6% in 2018, to 54.5% after SB 202 in 2022. Ex. 85 (Burden Rep. 10, Tbl. 4); *see also* Ex. 96 (Fraga Rep. ¶ 35, Tbl. 1) (calculating white turnout to be 55.3% in 2018 and 56.2% in 2022).

20.     Over the most recent three midterm general elections, the Black turnout rate in Georgia increased from 35.0% in 2014 to 49.4% in 2018, but decreased to 42.5% after SB 202 in 2022. Ex. 85 (Burden Rep. 10, Tbl. 4); *see also* Ex. 96 (Fraga Rep. ¶ 35, Tbl. 1 (calculating Black turnout to be 49.1% in 2018 and 46.6% in 2022)); Ex. 113 (Grimmer Rep. ¶ 33 & Tbl. 2 (calculating Black turnout, adjusted for population growth, to be 49.5% in 2018 and 41.7% in 2022)).

21.     The gap between white turnout and Black turnout in Georgia increased from 3.8 percentage points in 2014, to 4.2 percentage points in 2018, and to 12.0 percentage points in 2022 (after the implementation of SB 202). Ex. 85 (Burden Rep. 10, Tbl. 4); *see also* Ex. 113 (Grimmer Rep. ¶¶ 33-34 & Tbl. 2 (showing the gap between Black and white turnout, adjusted for population growth, increased from 4.4 percentage points in 2018 to 12.0 percentage points in 2022)).

22.     Over the most recent presidential elections in Georgia, the Black

turnout rate in Georgia increased from 51.8% in 2016 to 57.2% in 2020. Ex. 85 (Burden Rep. Tbl. 4); Ex. 113 (Grimmer Rep. Tbl. 2 (calculating Black turnout to be 52.0% in 2016 and 57.2% in 2020)).

23.     In recent presidential elections in Georgia, the AAPI turnout rate increased significantly, with surveys indicating an increase from 2016 to 2020 ranging from 21.9 and 23.0 percentage points. Ex. 113 (Grimmer Rep. Tbl. 2); *see also* Ex. 96 (Fraga Rep. ¶ 35, Tbl. 1); Ex. 100 (Lee Rep. 46).

24.     AAPI turnout in Georgia rose by 61,000 voters (84%) between the 2016 and 2020 presidential elections. Ex. 95 (Cobb Rep. 30).

25.     More than 325,000 additional ballots were cast by nonwhite voters in 2020 compared to 2016. Ex. 95 (Cobb Rep. 3).

26.     Over the most recent special senate runoff elections, the Black turnout rate in Georgia decreased from 54.9% in January 2021 to 43.0% in December 2022. Ex. 96 (Fraga Rep. ¶ 35, Tbl. 1); *see also* Ex. 113 (Grimmer Rep. Tbl. 2 (calculating Black turnout to be 52.5% in January 2021 and 38.6% in December 2022)).

27.     Over the most recent special senatorial elections, the AAPI turnout rate in Georgia decreased from 53.8% in January 2021 to 35.2% in December 2022. Ex. 96 (Fraga Rep. ¶ 35, Tbl. 1); Ex. 113 (Grimmer Rep. Tbl. 2 (calculating AAPI turnout to be 50.4% in January 2021 and 30.3% in December 2022)).

28.     Changes in voter turnout are an incomplete metric for gauging the impact of election law policies or changes in policies on the burdens citizens face when exercising the franchise. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶ 12); Ex. 101 (Lee Rebuttal Rep. ¶ 1).

29.     *Total* turnout is an insufficient measurement of the relative burdens that Black voters and white voters must overcome under a law like SB 202 in order to cast a ballot. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 12-17); Ex. 86 (Burden Sur-Rebuttal Rep. 11-12); Ex. 83 (Deposition of Dr. Justin Grimmer [ECF 747] ("Grimmer Dep.") 50:3-11 ("[T]he cost of voting could go up and an individual still could turn out to vote.")); Ex. 101 (Lee Rebuttal Rep. ¶¶ 1, 21-27).

30.     The fact that voters take steps to counter a "higher barrier" to voting, and subsequently vote, is not evidence that the barrier does not exist. Ex. 96 (Fraga Rep. ¶ 14).

31.     Political scientists, including Plaintiffs' Expert Dr. Fraga and State Defendants' expert Dr. Grimmer, agree that voter turnout is dependent on a host of factors, including the type of election, party control of Congress and the presidency, changes in election administration, the competitiveness of the election, and countermobilization efforts. Ex. 96 (Fraga Rep. ¶ 49); Ex. 113 (Grimmer Rep. ¶ 37); Ex. 83 (Grimmer Dep. 54:21-25, 78:14-84:14); Ex. 86 (Burden Sur-Rebuttal Rep. 11); Ex. 84 (Deposition of Dr. Daron Shaw [ECF 768] ("Shaw Dep.") 131:10-

132:1); Ex. 101 (Lee Rebuttal Rep. ¶¶ 1-2).

32.    It is exceedingly difficult for social scientists to determine whether changes in voter turnout can be causally attributed to voting laws like SB 202, particularly with data from just one election cycle. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 15-18); Ex. 86 (Burden Sur-Rebuttal Rep. 11); Ex. 83 (Grimmer Dep. 47:17-49:11).

33.    Defense expert Dr. Grimmer acknowledged that it is possible that a law could increase the costs of voting overall or on particular groups while turnout remains the same. Ex. 83 (Grimmer Dep. 50:8-51:5).

34.    Georgia state law has permitted all eligible voters to vote absentee-by-mail without having to specify a reason (called "no-excuse absentee voting") since 2005. O.C.G.A. § 21-2-381(a)(1)(A) (2005); Ex. 91 (Anderson Rep. 99); Ex. 96 (Fraga Rep. ¶ 51).

35.    In elections before 2018, white voters in Georgia tended to use absentee-by-mail voting more than other racial groups. Ex. 91 (Anderson Rep. 99); Ex. 85 (Burden Rep. 11); Ex. 96 (Fraga Rep. ¶ 51). Specifically, in the 2014 midterm elections, 3.33% of Black voters in Georgia voted via absentee-by-mail, compared to 4.49% of white voters. Ex. 85 (Burden Rep. 11 & Tbl. 5). In the 2016 presidential election, 3.92% of Black voters in Georgia voted via absentee-by-mail, compared to 5.33% of white voters. *Id*.

36.     In the November 2018 general election, Black voters' use of absentee-by-mail voting out-paced that of white voters for the first time, with 7.02% of Black voters in Georgia voting via absentee-by-mail, compared with 4.65% of white voters. Ex. 85 (Burden Rep. 11 & Tbl. 5); *see also* Ex. 96 (Fraga Rep. ¶ 55 & Tbl. 2 (showing that 4.6% of white voters, 7.1% of Black voters, 6.3% of Hispanic voters, 11.5% of AAPI voters, and 5.6% of all voters voted by mail in 2018)); Ex. 113 (Grimmer Rep. ¶ 63 & Fig. 2).

37.     In November 2020, Black voters' use of absentee-by-mail voting exceeded that of white voters by an even larger margin than in 2018, with 28.9% of Black voters voting via absentee-by-mail, compared with 24.0% of white voters. Ex. 85 (Burden Rep. 11 & Tbl. 5); *see also* Ex. 96 (Fraga Rep. ¶ 58 & Tbl. 2 (showing that 23.9% of white voters, 29.0% of Black voters, and 26.0% of all voters voted by mail in 2020)); Ex. 113 (Grimmer Rep. ¶¶ 60, 62 & Fig. 2).

38.     In all major Georgia statewide elections from 2018 to November 2022, AAPI registrants had the highest rate of absentee-by-mail ballot requests. Ex. 96 (Fraga Rep. ¶ 68, Tbl. 3); Ex. 113 (Grimmer Rep. Fig. 2).

39.     AAPI voters voted via absentee ballots at the highest rate compared to other racial groups from November 2018 to January 2021 in all major statewide elections. Ex. 96 (Fraga Rep. Tbl. 2).

40.     AAPI, Black, and Latinx voter turnout decreased at a

disproportionately high rate compared to white voters between the general and runoff elections directly before and after SB 202. Ex. 96 (Fraga Rep. ¶¶ 36-40, Tbls. 1, 2).

41.     AAPI voters' rates of voting absentee declined at a disproportionately high rate compared to white voters between the general and runoff elections directly before and after SB 202. Ex. 96 (Fraga Rep. ¶¶ 55, 57, 60-61). While AAPI voters' use of absentee ballots declined by 30.6 percentage points between the general elections directly before and after SB 202, white voters' rates declined by only 18.3 percentage points. *Id.* Tbl. 2. Similarly, while AAPI voters' use of absentee ballots declined by 28.7 percentage points between the runoff elections immediately before and after SB 202, white voters' rates declined by only 16.5 percentage points. *Id*.

42.     AAPI voters' rates of applying for absentee ballots declined at a disproportionately high rate compared to white voters between the general and runoff elections directly before and after SB 202. Ex. 96 (Fraga Rep. ¶¶ 68-70).

43.     Increases in the rates of AAPI absentee-by-mail ballot applications were sharper relative to white registrants before the passage of SB 202 but shrank faster than that of white registrants after SB 202's restrictions took effect. Ex. 96 (Fraga Rep. ¶ 70).

44.     While rates of AAPI voters applying for and voting by absentee ballot

decreased across the 2018 and 2022 midterm elections, white voters' rates increased. Ex. 96 (Fraga Rep. Tbls. 2, 3 & fn. 18). Similarly, AAPI registrants were more likely to request an absentee by mail ballot than white voters prior to SB 202, AAPI registrants were less likely than white voters to apply to vote by mail in the December 2022 statewide election. *Id*. ¶¶ 63-70.

45.     In 2018, 11.5% of AAPI voters voted via absentee-by-mail, and in 2020 39.7% of AAPI voters voted via absentee-by-mail. Ex. 96 (Fraga Rep. Tbl. 2); *see also* Ex. 113 (Grimmer Rep. ¶ 59).

46.     On average, Black voters comprised 42% of absentee-by-mail ballots returned each day in the November 2020 general election, despite accounting for only 32% of total voters. Ex. 85 (Burden Rep. 11, 16-17 & Tbl. 5 & Fig. 4).

47.     The 2020 general election also saw a marked shift in partisan voting-method patterns. For the first time, the Democratic candidate for president received more absentee-by-mail votes than the Republican candidate. Ex. 104 (Lichtman Rep. 9). Overall, nearly 850,000 absentee votes were cast for the Democratic candidate for president, while only 450,000 were cast for the Republican candidate. The Democratic candidate got 34.3% of his votes from absentee ballots, while the Republican got only 18.3%. This shift in absentee voting impacted election results. The Democratic candidate for president won Georgia's electoral votes for the first time in 28 years. And Democrats won both of Georgia's Senate

seats for the first time since 2000. *Id*. 9-11.

48.   The State's expert admitted that, taking an average of the four most recent election cycles (2016, 2018, 2020, and 2022), Black voters are more likely to vote by mail or to vote early in-person. Def's Ex. LLLL (Shaw Rebuttal Rep. ¶ 20).

49.   Despite changes in the relative usage of rates of absentee ballots, in recent elections, Black voters' absentee ballots were rejected at higher rates than those of white voters. Ex. 85 (Burden Rep. 11-12 & Tbl. 6 (showing that in every federal election from 2014-2022, Black voters had higher absentee ballot rejection rates than white voters)).

50.   Ahead of the 2018 election, Black-led nonpartisan organizations and Stacey Abrams' gubernatorial campaign engaged in voter mobilization efforts aimed at increasing registration and turnout among non-white voters, including an emphasis on absentee-by-mail voting. Ex. 85 (Burden Rep. 9); Ex. 4 (Burnough Decl. ¶ 12); Ex. 269 (Cotton Decl. ¶¶ 7-12).

51.   Black-led nonpartisan organizations hosted celebrations around voting that included food, music, drinks, and other line relief efforts. Ex. 31 (30(b)(6) Deposition of Georgia State Conference of the NAACP (Gerald Griggs) [ECF 731] ("GA NAACP Dep.") 48:13-49:14); Ex. 265 (Calhoun Decl. ¶¶ 17-18); Ex. 269 (Cotton Decl. ¶¶ 9-12, 23-24); Ex. 8 (Jones Decl. ¶ 10).

52.     In part as a result of these mobilization efforts, Black voter turnout increased from 35.0% in the November 2014 midterm elections to 49.4% in the 2018 midterm elections. Ex. 85 (Burden Rep. Tbl. 4); Ex. 91 (Anderson Rep. 140, 172).

53.     This outreach to minority voters expanded into the 2020 election cycle, including voter registration, line warming, and a continued emphasis on absentee-by-mail voting during the COVID-19 pandemic. Ex. 319 (Woodall 3/13/23 Decl. ¶¶ 8-14); Ex. 265 (Calhoun Decl. ¶¶ 9-21); Ex. 31 (GA NAACP Dep. 43:8-24 (similar programs that began "well before 2019 . . . really ramped [up] from 2019-2021")); Ex. 8 (Jones Decl. ¶¶ 9-10); *see also* Ex. 95 (Cobb Rep. 2-3 (noting 1.2 million new registrants added to voter rolls between 2018 and 2020)).

54.     Nonpartisan organizations and clergy offered food, water, and other items to voters, creating a welcoming environment at the polls and encouraging people to stay in line at crowded polling places experiencing long lines. Ex. 259 (Briggins 5/20/22 Decl. ¶¶ 10, 12-13); Ex. 265 (Calhoun Decl. ¶¶ 17-18); Ex. 269 (Cotton Decl. ¶¶ 9-12, 23-24); Ex. 272 (Dennis 5/16/23 Decl. ¶¶ 6-9); Ex. 297 (Kinard Decl. ¶¶ 5, 13) (Ms. Kinard received line relief support as a voter in 2010 and first served as a line relief volunteer in 2014); Ex. 19 (30(b)(6) Deposition of Delta Sigma Theta Sorority (Rhonda Briggins) [ECF 698] ("Delta Dep.") 97:21-

100:10); Ex. 31 (GA NAACP Dep. 48:13-50:4); Ex. 319 (Woodall 3/13/23 Decl. ¶¶ 9-11).

55.     Although Black community groups had provided line relief support for many years, these activities attracted new attention in 2018 and 2020. *See* Ex. 259 (Briggins 5/20/22 Decl. ¶¶ 10, 12-13 (describing line relief tradition and media coverage of long wait times for Black voters)); Ex. 257 (Brower 1/18/24 Decl. ¶ 32); *see also, e.g.*, Ligaya Figueras, *World Central Kitchen feeds metro Atlanta voters*, Atlanta J. Const., Oct 13, 2020, [https://www.ajc.com/things-to-do/world-central-kitchen-feeds-metro-atlanta-;voters/KDDBNKPRGFB63IIFSFXZEPPQBU/](https://www.ajc.com/things-to-do/world-central-kitchen-feeds-metro-atlanta-;voters/KDDBNKPRGFB63IIFSFXZEPPQBU/).

56.     These line relief activities occurred in neighborhoods and at polling places disproportionately serving voters of color, usually in metro-Atlanta counties. *See* Ex. 269 (Cotton Decl. ¶¶ 9, 23 (Poll Chaplains program focused on "poorer or Black neighborhoods" in metro-Atlanta because they tended to experience longer lines)); Ex. 265 (Calhoun Decl. ¶¶ 17-21); Ex. 297 (Kinard Decl. ¶¶ 6, 14).

57.     Black political engagement flourished during this period, facilitated in part by expansions of the opportunity to vote that were introduced during the pandemic, such as absentee ballot drop boxes and state and county efforts to mail unsolicited absentee ballot applications to registered voters. Ex. 4 (Burnough Decl. ¶¶ 13-14); Ex. 8 (Jones Decl. ¶¶ 9, 11).

58.    In addition, between the 2020 general and 2021 runoff elections, a historic number of Georgians registered to vote, with Black people accounting for a disproportionately large share of these newly eligible voters (over 35%, despite constituting just 30% of all registered voters). Ex. 96 (Fraga Rep. ¶¶ 170-173 & Tbl. 20).

59.    Both nationally and in Georgia, AAPIs are not only the fastest growing racial group, but also the fastest growing segment of the electorate. Ex. 100 (Lee Rep. 41). The AAPI population in the U.S. grew by 43% between 2000 and 2010 and by another 36% between 2010 and 2020. Ex. 100 (Lee Rep. 16). In a span of eight years, between 2004 and 2012, the number of registered AAPI voters doubled in Georgia. Ex. 92 (Chang Rep. 20).

60.    Historically, AAPIs have a lower turnout among the citizen voting age population ("CVAP") than whites and Blacks. This is true both nationally and in the state of Georgia. Ex. 100 (Lee Rep. 44-46, Fig. 2-3 & Tbl. 1).

61.    For each presidential election year between 2012 and 2020, voter registration and voter turnout rates for AAPIs in Georgia were significantly lower than for Georgians overall. Ex. 100 (Lee Rep. 45 & Tbl. 1).

62.    In Georgia's 2012 general election, AAPIs represented only 1% of voters despite composing 3.3% of the voting age population. Ex. 106 (Palmer Rep. Tbl. 1).

63.     Voter mobilization and outreach beget participation. People register to vote more often when they are asked to do so. They vote more often when they are asked to do so. Ex. 100 (Lee Rep. 48).

64.     According to the 2008 American National Election Study ("ANES") survey, which surveys voters up to three months before a given election, 47% of whites, 38% of Blacks, and 31% of Latinos reported being contacted and asked to vote in that election compared to only 21% for Asian Americans, representing a 26-percentage-point difference between white and AAPI voters. In the 2020 ANES survey, the respective numbers were 41% of Whites, 36% of Latinos and Blacks, and 32% of Asian Americans, representing a 9-percentage-point difference between white and AAPI voters. Ex. 100 (Lee Rep. 56).

65.     According to the 2020 American Election Eve poll, which interviews similar pools of voters as ANES a week from Election Day, 67% of Blacks, 56% of whites, 52% of Latinos, and 51% of Asian Americans reported being contacted about and encouraged to vote in 2020, reflecting at least an 11-percentage-point increase for Asian Americans between 2008 and 2020. Ex. 100 (Lee Rep. 56-57). According to some metrics, that number could be as large as a 30 percentage-point increase. *Id*. 57.

66.     30.9% of Asians in the United States speak a language other than English at home and report speaking English less than "very well," according to

the 2019 American Community Survey. Ex. 100 (Lee Rep. Fig 4); Ex. 106 (Palmer Rep. 7).

67.     In Georgia, 33% of Asians and 35% of Hispanics report speaking English less than "very well," according to the 2020 American Community Survey. Ex. 106 (Palmer Rep. ¶ 18).

68.     AAPIs, more than any other racial group, cite "difficulty with English" as a main reason for not registering to vote, according to the Current Population Survey Voting and Registration Supplement. Ex. 100 (Lee Rep. 52 & Fig. 6).

69.     In Georgia, county election officials are not required to provide translated election materials in any Asian languages. Ex. 33 (30(b)(6) Deposition of Georgia Secretary of State (Ryan Germany) [ECF 706] ("SOS Dep.") 41:24-42:10); Ex. 36 (30(b)(6) Deposition of Gwinnett County (Kelvin Williams) [ECF 711] ("Gwinnett Cnty. Williams Dep.") 77:11-22); Ex. 21 (30(b)(6) Deposition of Fulton County (Nadine Williams) [ECF 704] ("Fulton Cnty. Dep.") 149:2-7); Ex. 15 (30(b)(6) Deposition of Cobb County (Janine Eveler) [ECF 700] ("Cobb Cnty. Dep.") 186:8-10, 197:15-17); Ex. 18 (30(b)(6) Deposition of DeKalb County (Keisha Smith) [ECF 702] ("DeKalb Cnty. Dep.") 69:5-8).

70.     In Georgia, the Secretary of State did not provide instructional materials for how to request an absentee ballot on a statewide basis in any

language other than English. Ex. 33 (SOS Dep. 41:3-11).

71.     In Georgia, notices to cure deficiencies with absentee ballot applications are not provided in any Asian languages. Ex. 21 (Fulton Cnty. Dep. 122:7-9); Ex. 15 (Cobb Cnty. Dep. 204:3-23, 204:8-9); Ex. 18 (DeKalb Cnty. Dep. 72:8-73:3).

72.     The 2016, 2018, and 2020 elections in particular show increasing rates of Asian American voter participation relative to previous elections. Ex. 100 (Lee Rep. 55).

73.     In 2016, Asian American turnout numbers increased compared to 2012, while turnout numbers for Blacks and Latinos declined and turnout for whites inched marginally higher. Ex. 100 (Lee Rep. 55).

74.     The 2020 election was a record year for AAPI voter turnout. Nationally, 59 percent of all Asian Americans eligible to vote did so—the highest rate of voting for Asian Americans since the collection of this data. Ex. 100 (Lee Rep. 55).

75.     A large portion of AAPI citizens are new or first-time voters. Ex. 100 (Lee Rep. 48, 60, 84).

76.     In Georgia, 53.5% of Asian Americans eligible to vote turned out in 2020, a 21.9-percentage-point increase from 2016. Ex. 100 (Lee Rep. Tbl. 1).

77.     From 2016 to 2020, Asian Americans experienced an 84% vote gain

in Georgia. Ex. 100 (Lee Rep. 56).

78.     The increase in AAPI voter turnout is in part the result of increased

mobilization. Ex. 100 (Lee Rep. 55-63).

79.     According to the 2020 American Election Eve Poll, the proportion of

Asian Americans who voted for the first time in the congressional race in Georgia's

7th District is estimated at 41%; of those eligible AAPI voters who were contacted

and encouraged to vote, 46% were first-time voters, whereas of those who were not

contacted, the proportion of first-time voters is lower at 31%. Ex. 100 (Lee Rep.

60).

80.     AAPI voters found communications from non-partisan community

organizations such as Advancing Justice-Atlanta to be more informative and

persuasive than from other sources such as political parties or candidates. Ex. 100

(Lee Rep. 61).

81.     The increases in AAPI voter turnout are also in part due to the

availability of vote by mail, as AAPIs are by-far the group of voters that is likeliest

to vote by mail. Ex. 100 (Lee Rep. 65).

82.      Nationally, only 19% of Asian Americans voted in person on Election

Day in 2020. Ex. 100 (Lee Rep. 65).

83.     In Georgia, nearly 40% of Asian Americans voted by mail in the

November 2020 election, compared to 24% of white voters. Ex. 100 (Lee Rep.

Tbl. 2).

84.     In Georgia, AAPI voters stand out as the group least likely to vote in person in 2020, whether via early in person (44% of AAPIs compared to 54% for all Georgia voters) or in person on Election Day (16% of AAPIs, compared to 20% for all Georgia voters). Ex. 100 (Lee Rep. Tbl. 2).

85.     A 2020 poll surveying Asian Americans in ten battleground states found that 80% of Asian Americans report being comfortable voting by mail (57% were "very comfortable") while only 51% reported feeling comfortable voting in person (and only 27% were very comfortable). Ex. 100 (Lee Rep. 69).

86.     The November 2020 and January 2021 elections in Georgia resulted in historic wins for minority-preferred candidates in Georgia, including the elections of: President Joe Biden, the first Democratic presidential candidate to win the state in nearly three decades, and Vice President Kamala Harris, the first Black and first Indian-American Vice President ever elected; Reverend Raphael Warnock, a Democrat and Georgia's first Black Senator, who defeated incumbent Republican Senator Kelly Loeffler; and John Ossoff, a Democrat and Georgia's first Jewish Senator, who defeated incumbent Republican Senator David Perdue. Ex. 95 (Cobb Rep. 30-31); Ex. 85 (Burden Rep. 6, Tbl. 1 (showing Biden, Warnock, and Ossoff were Black-preferred candidates)); Ex. 4 (Burnough Decl. ¶¶ 14-15); Ex. 170 (Ga. Sec'y of State, Official Results of the November 3, 2020 General Election); Ex.

172 (Ga. Sec'y of State, Official Results of the January 5, 2021 Special Runoff Election).

87.     Democrats Joe Biden, Raphael Warnock, and John Ossoff won their elections in Georgia by extremely close margins: Biden by 0.25% (12,670 votes); Warnock by 2.08% (93,272 votes), and Ossoff by 1.22% (54,944 votes). Ex. 95 (Cobb Rep. 30); Ex. 85 (Burden Rep. 8); Ex. 170 (Ga. Sec'y of State, Official Results of the November 3, 2020 General Election); Ex. 172 (Ga. Sec'y of State, Official Results of the January 20, 2021 Special Runoff Election); *see also* Ex. 171 (Ga. Sec'y of State, Official Results of the November 3, 2020 General Election Recount (reporting Biden won by 0.24% (11,779 votes))).

88.     The recent competitiveness of Georgia elections "is widely understood to be a reflection of the growing participation of Black voters." Ex. 85 (Burden Rep. 4-5); *see also* Ex. 4 (Burnough Decl. ¶¶ 14-15); Ex. 8 (Jones Decl. ¶¶ 10-12).

89.     Georgia's competitive races, coupled with the state's rapidly growing AAPI population, means that Georgia's AAPIs have increasingly drawn attention as a potential pivotal electorate. Ex. 100 (Lee Rep. 21).

90.     In 2020, AAPI registrants were 2.6% of Georgia's voters but made up 3.8% of Georgia's absentee-by-mail ballot requests. Ex. 106 (Palmer Rep. Tbl. 1); Ex. 100 (Lee Rep. 67).

91.    In 2020, Georgia's 7th congressional district, which had been held by Republicans for a quarter century, elected a Democratic representative, Carolyn Bourdeaux, by a margin of about 10,000 votes or 2.8 percentage points. Ex. 100 (Lee Rep. 59).

92.    Plaintiff expert Taeku Lee estimates that, without Asian American votes, Carolyn Bourdeaux would not have won her congressional seat in 2020. Ex. 100 (Lee Rep. 59).

93.    In Forsyth County, AAPIs are 18 percent of the county population and were 7.8 percent of the county's turnout in the 2020 general election. Ex. 100 (Lee Rep. 67).

94.    In the leadup to November 2020, Georgia voters were confident that their vote would be counted in the upcoming general election, continuing a trend of confidence in Georgia's elections. Ex. 99 (King Rep. 16-18); Ex. 184 (Email thread J. Fuchs to SOS Staff, "Fwd: Final Poll Results: GA Statewide Survey" (Oct. 28, 2020), at CDR01357172).

95.    Survey results circulated to the Secretary of State's office in October 2020 showed that "Georgia voters overwhelmingly believe[d] that their vote [would] be counted accurately and kept secret, regardless of how they choose to vote," Ex. 184 (Email thread J. Fuchs to SOS Staff, "Fwd: Final Poll Results: GA Statewide Survey" (Oct. 28, 2020), at CDR01357172), and that during early voting

for the November 2020 election, both Republicans and Democrats were very confident that their vote would be counted, *id.* at CDR01357173.

96.     Messages received from political leaders, particularly those of the party a voter supports, can affect voter confidence, as can unsubstantiated claims of voter fraud. Ex. 99 (King Rep. 13-14); Ex. 80 (Deposition of Dr. Bridgett King [ECF 790] ("King Dep.") 94:6-24); Ex. 83 (Grimmer Dep. 39:3-41:20 (testifying that false narratives of voter fraud can undermine public confidence in election administration)); Ex. 34 (30(b)(6) Deposition of the Georgia State Election Board (Matthew Mashburn) [ECF 709] ("SEB Dep.")131:25-132:25, 136:7-137:1, 143:10-12).

97.     State and County election officials agree that there was not widespread voter fraud in the November 2020 election. Ex. 59 (Deposition of Ryan Germany [ECF 707] ("Germany Dep.") 65:2-5); Ex. 34 (SEB Dep. 127:25-128:21); Ex. 49 (Deposition of Lynn Bailey, taken Oct. 6, 2022 [ECF 715] ("Bailey 10/6/22 Dep.") 61:8-11); Ex. 82 (Deposition of Lynn Bailey, taken Mar. 21, 2023 [ECF 716] ("Bailey 3/21/23 Dep.") 175:8-12, 206:5-14); Ex. 72 (Deposition of Marie Frances Watson [ECF 722] ("Watson Dep.") 129:7-12); Ex. 57 (Deposition of Joseph Blake Evans [ECF 717] ("Evans Dep.") 54:4-55:9); Ex. 61 (Deposition of Chris Harvey [ECF 719] ("Harvey Dep.") 72:22-73:4); Ex. 21 (Fulton Cnty. Dep. 75:13-15, 129:1-3, 272:21-25); Ex. 15 (Cobb Cnty. Dep. 100:8-10).

98.     As the counting of November 2020 general election ballots finished, accusations of cheating with absentee voting were reported in some conservative media outlets and circulated widely on social media. Ex. 91 (Anderson Rep. 96-98).

99.     In Georgia, and elsewhere, the Trump campaign focused its fraud accusations on areas with large Black populations, such as Fulton and DeKalb Counties. *See, e.g.*, Ex. 177 (Trump Call to Frances Watson, Chief Investigator, Washington Post video (Dec. 23, 2020), USA-04279 at 1:15); Ex. 91 (Anderson Rep. 98 (quoting the Dec. 23, 2020 call in which President Trump stated: "if you can get to Fulton, you're going to find things that are going to be unbelievable . . . Fulton is the motherlode.")); Ex. 4 (Burnough Decl. ¶ 16); *see also* Ex. 122 (Dec. 3, 2020 Sen. Jud. Subcomm. Hr'g Tr., AME_002333:12-2334:6 (Giuliani) (referencing mail-in ballots in Philadelphia and other cities with Black majorities or pluralities)).

100.    The misinformation resulted in threats to election workers, particularly in metro-Atlanta counties. *See, e.g.*, Ex. 187 (Email from H. McCloud to SOS staff, "FW: 11.19.2020 - Election FAQs for Representatives" (Nov. 19, 2020), CDR00146327-44); Ex. 67 (Deposition of Hayley McCloud [ECF 789] ("McCloud Dep.") 79:12-84:9 (providing information related to voter fraud accusations)); Ex. 175 (Gabriel Sterling Press Conference, CBS 46 video clip

(Dec. 1, 2020), USA-04144 at 9:03-9:52 (Sterling describing a GIF with a slow-swinging noose aimed at a Gwinnett County elections worker)); Ex. 234 (*Hearing on the January 6th Investigation before the H. Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol*, 117th Cong. 33-34 (June 21, 2022) (testimony of Wandrea "Shaye" Moss, describing racist threats, including "Be glad it's 2020 and not 1920.")).

101.   In a December 15 email, Representative Bonnie Rich to SOS staff asking why SOS did not conduct a signature match audit in Fulton and DeKalb Counties, "the two counties where there is at least a perception of greatest fraud." Ex. 192 (Emails between H. McCloud to Members of the Georgia General Assembly "Re 12.14.2020 - Secretary of State Election Update" (Dec. 14-15, 2020), CDR00216111-12).

102.   In a phone call with the Secretary of State Brad Raffensperger that later became public, then-President Trump specifically pointed the finger at Black election workers, one of whom he described as a "professional vote scammer and hustler." Ex. 178 (Call from former President Donald Trump to Georgia Sec. of State Brad Raffensperger, Washington Post video (Jan. 2, 2021), USA-04281 at 4:14-4:19); Ex. 231 (Email from R. Sinners to SOS Staff, "Morning Reads - 12/2/21" (Dec. 2, 2021), CDR00024677-84).

103.   Following the November 2020 election, numerous unsuccessful

lawsuits alleging voter fraud or other purported irregularities were filed in Georgia. *E.g.*, *Trump v. Raffensperger*, No. 2020-CV-343255 (Ga. Super. Ct., Fulton Cnty. 2020) (lawsuit alleging that state officials and several counties violated elections code by sending unsolicited absentee ballot applications); *Wood v. Raffensperger*, No. 2020CV342959 (Ga. Super. Ct., Fulton Cnty. 2020) (court dismisses lawsuit alleging state officials had violated election code by accepting private grants to help fund elections, among other claims). *See* Ex. 105 (Minnite Rep. 30-32, 54-64).

104.    These lawsuits all proved unsuccessful "in identifying any fraud" or overturning the results of the election. Ex. 105 (Minnite Rep. 30-32, 54-64); Ex. 91 (Anderson Rep. 113-14).

105.    Issues raised in several of these lawsuits—from the legitimacy of the signature match process to the distribution of unsolicited absentee ballot applications—became blueprints for the election changes proposed in the Georgia General Assembly's 2021-2022 Legislative Session. *See* Ex. 91 (Anderson Rep. 113-14); Ex. 105 (Minnite Rep. 30-32, 54-64).

106.    On November 15, 2020, Representative Barry Fleming made a racially derogatory statement in a published op-ed when he compared the "always-suspect absentee balloting process" to "the shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is

significant. Expect the Georgia Legislature to address that in our next session in January." Ex. 186 (Barry Fleming, *Guest Column: Republican Party wins on Election Day, and future is bright*, Augusta Chronicle, Nov. 15, 2020, USA-04158-62); Ex. 5 (Hugley Decl. ¶ 11 ("I believe Representative Fleming questioned the security of absentee voting using a racially derogatory statement because more minority voters took advantage of mail-in absentee voting in 2020 than in previous election years.")); Ex. 6 (Nguyen Decl. ¶ 38); Ex. 91 (Anderson Rep. 100). Fleming had previously supported no-excuse absentee-by-mail voting in 2005 when it was introduced in Georgia. Ex. 294 (Khwaja Decl. ¶ 12).

107.   Current Georgia Elections Director Blake Evans testified in his deposition, "I think conspiracy theories, whether they were misinformation being touted, whether it was from the president or somebody else, contributed to the creation of a significant amount of concern amongst voters." Ex. 57 (Evans Dep. 175:1-5).

108.   On December 7, Secretary Raffensperger recertified the final 2020 Presidential recount results and dismissed continuing concerns that the election was fraught with problems because "the evidence, the actual evidence, [and] the facts tell us a different story." Ex. 176 (Georgia Secretary of State Update on 2020 Election Results, C-Span (Dec. 7, 2020), USA-04141 at 3:42); Ex. 91 (Anderson Rep. 114).

109.    Secretary Raffensperger and State officials repeatedly dismissed allegations that the 2020 elections were not secure. Ex. 176 (Georgia Final 2020 Presidential Recount Results, C-SPAN video (Dec. 7, 2020), USA-04141 at 3:42 (Secretary Raffensperger recertifying election results and dismissing voter fraud allegations because "the evidence, the actual evidence, [and] the facts tell us a different story.")); Ex. 200 (B. Raffensperger letter to Congressmen and Senator Loeffler, "RE: Point by Point Refutation of False Claims about Georgia Elections" (Jan. 6, 2021), CDR00119748-57); Ex. 69 (Deposition of Gabriel Sterling [ECF 721] ("Sterling Dep.") 118:16-119:6); Ex. 91 (Anderson Rep. 16, 107, 111, 130-31 (cataloging repeated statements by various election officials that Georgia's elections were safe and secure)); Ex. 67 (McCloud Dep. 79:12-84:9).

110.    The Secretary of State's Office sent Georgia legislators numerous emails in November and December 2020 for the express purposes of debunking misinformation and allegations of fraud regarding, and increasing confidence in, the 2020 and 2021 elections. *See, e.g.*, Ex. 190 (Email from H. McCloud to Members of the General Assembly, "12.04.2020 - Secretary of State Election Update - State Farm Video Debunked by WSBTV" (Dec. 4, 2020), CDR00463567-69); Ex. 188 (Email from H. McCloud to Members of the General Assembly, "12.01.2020 - Secretary of State Election Update" (Dec. 1, 2020), CDR00464854-56); Ex. 187 (Email from H. McCloud to SOS staff, "FW: 11.19.2020 - Election

FAQs for Representatives" (Nov. 19, 2020), CDR00146327-44); Ex. 192 (Emails

between H. McCloud and Members of the General Assembly "Re 12.14.2020 -

Secretary of State Election Update" (Dec. 14-15, 2020) CDR00216110-12); Ex. 67

(McCloud Dep. 83:18-19 (testifying that the purpose of the SOS's emails to

legislators during this time "was to try and prevent misinformation from

spreading"), 87:13-88:24 (testifying that the SOS Elections Updates emails were

regularly sent to all legislators to answer questions, debunk misinformation)).

111.    The State Election Board investigated dozens of allegations of voter

fraud from the 2020 election and "found no merit to the challenges against

Georgia's election integrity." Ex. 34 (SEB Dep. 134:8-25); *see also id*. 40:9-16

(observing that many complaints received by the SOS were "just craziness").

112.    The Legislature held at least five hearings in December 2020

purportedly related to voter "fraud" in November 2020: (1) December 3 Senate

Government Oversight Committee hearing, Ex. 135 (Sen. Gov. Oversight Comm.

Meeting Notice (Dec. 3, 2020), USA-03298); (2) December 3 Senate Judiciary

Election Law Study Subcommittee hearing, Ex. 136 (Sen. Jud. Election L. Study

Subcomm. Meeting Notice (Dec. 3, 2020), USA-03299); (3) December 10 House

Governmental Affairs Committee hearing, Ex. 137 (H. Gov. Aff. Comm. Meeting

Notice (Dec. 10, 2020), USA-03184)); (4) December 23 House Governmental

Affairs Committee hearing, Ex. 138 (H. Gov. Aff. Comm. Meeting Notice (Dec.

23, 2020), USA-03185)); and (5) December 30 Senate Judiciary Election Law Study Subcommittee hearing, Ex. 139 (Sen. Jud. Election L. Study Subcomm. Meeting Notice (Dec. 30, 2020), USA-03323)).

113.    The December 2020 legislative hearings were broadcast on television and were widely covered in conservative media. Ex. 9 (Jordan Decl. ¶ 32).

114.    In a departure from normal procedures, during some of the hearings, attorneys involved in the voter fraud lawsuits, including Rudy Giuliani and Ray Smith, were permitted to ask questions. Ex. 10 (Parent Decl. ¶¶ 15-21); Ex. 9 (Jordan Decl. ¶¶ 30-36); Ex. 6 (Nguyen Decl. ¶¶ 17-24); *see also* Ex. 191 (Email from R. Germany to SOS staff, "Re: draft statement" (Dec. 10, 2020), CDR00059322-23 (approved public statement from the Secretary of State's Office)); Ex. 344 (Dec. 30, 2020 Sen. Jud. Comm. Hr'g Tr., AME_002894:10-2899:11).

115.    Some of the election law changes proposed during the December 2020 legislative hearings were ultimately enacted in SB 202. *Compare* Ex. 124 (Dec. 10, 2020 H. Gov. Aff. Comm. Hr'g Tr., AME_002434:14-20) (testimony advocating for a prohibition on the distribution of unsolicited mail ballot applications), *and id*. at AME_002436:1-14 (testimony advocating for ID numbers on absentee ballot applications and ballots) *with* SB 202 §§ 25, 27-28 (prohibition on government entities mailing unsolicited mail ballot applications and new ID requirements for

absentee ballot applications and ballots).

116.   These hearings featured both overt and coded references to race. For example, Giuliani repeatedly linked Black election workers doing their jobs to drug dealers. Ex. 124 (Dec. 10, 2020 H. Gov. Aff. Comm. Hr'g Tr., AME_002498:6-24 (referring to Black election workers as "scurrying around" and hiding ballots like they were "passing out dope.")). He described two Black election workers, who later received death threats, as "passing around USB ports as if they're vials of heroin or cocaine." *Id*. at AME_002514:5-25; *see also* Ex. 6 (Nguyen ¶ 29 (describing Giuliani's testimony at December 10, 2020 House Governmental Affairs Committee hearing)); Ex. 10 (Parent Decl. ¶ 22 (describing relentless focus on Fulton and DeKalb counties and coded references to race)).

117.   At least one advisor to former President Trump pleaded guilty to a felony charge of aiding and abetting false statements and writings for knowingly, willingly, and unlawfully making false statements about election fraud during one of these December 2020 hearings. Tamar Hallerman and David Wickert, *Disavowing Trump, a tearful Jenna Ellis pleads guilty in Fulton election probe*, Atlanta J. Const. (Oct. 24, 2023), https://www.ajc.com/politics/fourth-defendant-negotiates-plea-deal-with-fulton-prosecutors/S3SO4MZ3MBGCJD6YD47ZE4MYQE/.

118.   Fulton County election workers Ruby Freeman and Wandrea' "Shaye"

Moss won a civil defamation suit against Rudy Giuliani based on numerous false statements Giuliani made regarding their election-related activities at State Farm Arena in Atlanta during the 2020 election cycle. Ms. Freeman and Ms. Moss were awarded $145,969,000 in damages. Ex. 320 (*Freeman v. Giuliani*, No. 21-cv-3354 BAH (D.D.C. 2023) ECF No. 142 (Final Judgment) (declaring that Giuliani "engaged in extreme and outrageous conduct" and that his conduct was "intentional, malicious, wanton, and willful")). Jenna Ellis, an advisor to former President Trump, pleaded guilty to a felony charge of aiding and abetting false statements and writings for knowingly, willingly, and unlawfully making false statements about election fraud during a December 2020 Georgia Senate Judiciary Subcommittee meeting. Ex. 321 (*Georgia v. Ellis*, No. 23SC188947 (Ga. Sup. Ct. 2023) (Accusation) (listing the false statements made, including "[t]hat at least 96,600 mail-in ballots were counted in the November 3, 2020, presidential election in Georgia, despite there being no record of those ballots having been returned to a county elections office"; and "[that] Fulton County election workers at State Farm Arena ordered poll watchers and members of the media to leave the tabulation area on the night of November 3, 2020, and continued to operate after ordering everyone to leave")); Exs. 322-323 (*Georgia v. Ellis*, No. 23SC188947 (Ga. Sup. Ct. 2023) (Motion to Nolle Prosequi, Order of Nolle Prosequi)).

119.  Efforts by Democratic legislators to contest the false claims were shut

down by organizers of the hearings. For example, during the December 10, 2020,

House Government Affairs Committee Hearing, shortly after Representative Bee

Nguyen's questioning of one witness exposed some of the factual infirmities in his

unfounded allegations of widespread absentee ballot fraud, the Chair ordered an

unexpected break. After the break, Committee members were prohibited from

questioning witnesses. *See, e.g.*, Ex. 6 (Nguyen Decl. ¶¶ 23, 25-28); *see also* Ex. 9

(Jordan Decl. ¶¶ 26-27); Ex. 10 (Parent Decl. ¶ 19 (Democratic legislators not

permitted to call witnesses or given advance notice of who would testify at the

December 3, 2020 Senate Judiciary Subcommittee hearing)).

120.   As the then-Lieutenant Governor conceded, those hearings provided

the momentum for voting laws in the 2021 Legislative Session. Ex. 181 (Geoff

Duncan, *Georgia's GOP lieutenant governor, says Giuliani's false fraud claims

helped lead to restrictive voting law*, CNNPolitics video (Apr. 8, 2021), USA-

04134 at 2:17-2:38).

121.   Trump campaign lawyers, Rudy Giuliani and Ray Smith, replayed

footage of Black Fulton County election workers at State Farm Arena on election

night bringing out cases of ballots from beneath a table and argued that they were

engaging in election fraud. Ex. 123 (Sen. Jud. Election L. Study Subcomm., Video

of Proceedings (Dec. 3, 2020), USA-04100 at 13:00-29:55); Ex. 124 (Dec. 10,

2020 H. Gov. Aff. Comm. Hr'g Tr., AME_002501:13-2507:11); Ex. 10 (Parent

Decl. ¶ 22).

122.    In late December 2020, the Senate Election Law Study Subcommittee issued a report, which collected and repeated allegations of fraud from the December hearings. Ex. 194 (Ga. Sen. Jud. Subcomm. Final Rep., CDR00008854-68).

123.    Secretary of State officials rejected the findings in the Senate Election Law Study Subcommittee report. For example, Gabriel Sterling referred to it as "full of disinformation and falsehoods." Ex. 197 (Email thread G. Sterling to SOS staff, "Re: FYI - Wednesday 12/30: Senate Judiciary - Elections Subcommittee Meeting" (Dec. 28, 2020), CDR00059366-67). Ryan Germany referred to it as "[f]rom the Giuliani show hearing the Senate had." Ex. 194 (Email from R. Germany to SOS staff, "Fwd: THE_FINAL REPORT.PDF" (Dec. 21, 2020), CDR00008853).

124.    More than 100 election bills were introduced in the 2021 legislative session. *See* Ex. 215 (SOS March 2021 Summary of Bills, CDR00466535-62); Ex. 4 (Burnough Decl. ¶¶ 29, 46); Ex. 91 (Anderson Rep. 133).

125.    The House Special Election Integrity Committee (EIC) considered nearly 50 bills, a "significant increase in the amount of election-related bills introduced in a single legislative session." Ex. 4 (Burnough Decl. ¶ 29).

126.    Committee chairs in both the House and Senate often introduced

substitute bills—many with significant new provisions—during hearings on the bill and did not make timely drafts available to Black and other Democratic committee members, which is not normal legislative process. Ex. 4 (Burnough Decl. ¶¶ 29, 34-36, 43 (House EIC)); Ex. 8 (Jones Decl. ¶ 19 (Senate Gov. Affairs)); Ex. 7 (Harrell Decl. ¶¶ 10-11, 13 (same)).

127.   The legislative session is not 40 calendar days; it is 40 legislative days which, in the 2021 legislative session, was 79 calendar days, including 58 weekdays. Georgia General Assembly Calendar & Daily Documents, https://www.legis.ga.gov/documents/house/calendars?session=1029&date=2023-12-04T21:12:09.280Z (identifying January 11, 2021 as the first day of the legislative session and March 31, 2021 as the last day); *see also* Ex. 67 (McCloud Dep. 198:7-198:21 (same)).

128.   County election officials struggled to keep up with the large volume, length, and complexity of the election bills introduced during the 2021 legislative session. *See, e.g.*, Ex. 15 (Cobb Cnty. Dep. 230:24-232:14); Ex. 4 (Burnough Decl. ¶ 34-37); Ex. 49 (Bailey 10/6/22 Dep. 59:17-24 (noting more than the typical amount of election bills were introduced in the 2021 legislative session), 62:11-63:2 ("The volume of bills coming through, there were more than usual, more than I can recall in a long time, if perhaps ever.")); Ex. 219 (Email from L. Bailey to election officials, "Latest version of legislation" (Mar. 17, 2021), COBB033033

(noting the bill was "sooooo long and testimony time so short")); Ex. 13 (30(b)(6)

Deposition of Athens-Clarke County [ECF 699] (Charlotte Sosebee) ("Athens-

Clarke Cnty. Dep.") 38:10-38:13; 158:25-159:5).

129.    On January 7, 2021, Georgia House Speaker David Ralston

announced a stand-alone, special committee on election integrity. Legislators

formed the House Special Election Integrity Committee ("EIC") to assess election

related bills during the 2021 legislative session. Ex. 179 (Speaker Ralston Press

Conference, Jan. 7, 2021, USA-04138 at 4:18-4:35); Ex. 91 (Anderson Rep. 132-

33); Ex. 4 (Burnough Decl. ¶¶ 23-29 (stating formation of EIC was an "unusual

legislative tactic")).

130.    The creation of the EIC was a divergence from previous sessions in

Georgia, because the House Governmental Affairs Committee traditionally

considers election-related legislation and had done so for at least 16 years

including for HB 244 (2005) and HB 316 (2019). Ex. 4 (Burnough Decl. ¶¶ 23-

25); Ex. 116 (HB 244 Status History, Ga. Gen. Assemb. 2005-2006 Regular

Session, https://www.legis.ga.gov/legislation/14446); Ex. 153 (HB 316 Status

History, Ga. Gen. Assemb. 2019-2020,

https://www.legis.ga.gov/legislation/54991).

131.    By 2021, several representatives on the House Governmental Affairs

Committee had substantial experience with election legislation. *See* Ex. 6 (Nguyen

Decl. ¶ 39). *Compare* Ex. 156 (Georgia General Assembly - House Committee on

Governmental Affairs Committee Members 2019,

https://www.legis.ga.gov/committees/house/92?session=27) *with* Ex. 155 (Georgia

General Assembly - House Committee on Governmental Affairs Committee

Members 2021, https://www.legis.ga.gov/committees/house/92?session=1029)

(showing at least 13 of 20 members of the 2021 Governmental Affairs committee

had served on the same committee in 2019).

132.    House Speaker Ralston selected Representative Barry Fleming as

Committee Chairman, rather than Representative Shaw Blackmon, who chaired the

Governmental Affairs Committee. Ex. 4 (Burnough Decl. ¶ 26).

133.    Speaker Ralston excluded all but one of the Government Affairs

Committee's Democratic members from the EIC, thereby minimizing the number

of Democrats on the committee who had prior experience with election legislation.

*See* Ex. 4 (Burnough Decl. ¶ 28); Ex. 6 (Nguyen Decl. ¶ 39).

134.    Rep. Barry Fleming and other sponsoring legislators worked with

Ryan Germany and outside counsel Bryan Tyson and Javier Pico-Prats to craft

many election-related bills. *See* Ex. 59 (Germany Dep. 33:1-35:11); Ex. 207

(Emails between R. Germany & E. Stiles, Sen. Dugan's Chief of Staff, "RE: Edits

to LC 28 0244" (Feb. 26-28, 2021), CDR00062772-74); Ex. 218 (Email thread

with J. Lanier, J. Pico-Prats, B. Tyson, R. Germany, and Rep. Fleming, "RE: Edits

to LC 28 0313S" (Mar. 14-15, 2021), CDR00157637-40).

135.    Senate committee meetings on election measures sometimes occurred at 7:00 a.m., with notice only provided the day before the meetings occurred. Ex. 8 (Jones Decl. ¶ 19); Ex. 7 (Harrell Decl. ¶ 8). These early morning committee meetings were unprecedented. *See* Ex. 7 (Harrell Decl. ¶ 8); Ex. 9 (Jordan Decl. ¶ 44).

136.    Because of these unusual procedures, it was difficult for legislators and the public to meaningfully engage in the process. Ex. 4 (Burnough Decl. ¶¶ 29-30; 34-38); Ex. 8 (Jones Decl. ¶ 19), Ex. 7 (Harrell Decl. ¶ 6); *see also* Ex. 256 (Battles Decl. ¶¶ 11-15 (describing effects of these procedural irregularities on public participation)).

137.    HB 531 was continuously changing without enough time for legislators or the public to review. For example, HB 531 was introduced on February 18, 2021, and witnesses testified on the bill on February 19, 2021, but the substitute bill that made changes to HB 531 and was to be discussed on February 19 was not circulated or made publicly available until February 22, 2021. *See e.g.*, Ex. 127 (Feb. 18, 2021 H. Election Integrity Comm. Hr'g Tr., SOS0003068:4-16 (Rep. Alexander)); Ex. 128 (Feb. 19, 2021 H. EIC Hr'g Tr., AME000100:2-22 (Cindy Battles)); Ex. 130 (Feb. 23, 2020 H. EIC Hr'g Tr., SOS0002497:7-16 (Linda Bridges)); Ex. 4 (Burnough Decl. ¶ 37).

138.   No election official testified during the full Committee hearings on SB 241. Ex. 8 (Jones Decl. ¶ 18).

139.   Rather than open debate, the Georgia Secretary of State staff met privately with certain EIC members before the bills' introduction in the Committee, but not with opponents (including no meetings with any Black legislators). Ex. 59 (Germany Dep. 36:14-38:12); Ex. 141 (H. Special Comm. on Election Integrity Meeting Notice (Feb. 4, 2021), USA-03187 (listing Democratic Representatives Alexander, Burnough, Douglas, and Smyre as members)); Ex. 4 (Burnough Decl. ¶¶ 43-45).

140.   Such secrecy in the drafting process impeded meaningful participation by anyone other than those selected by the bill sponsors. *See, e.g.*, Ex. 222 (Email thread J. Kirk to J. Eveler, "RE: LC 28 0300S - substitute for SB 241 & HB 531" (Mar. 19, 2021), COBB024273-75 ("If they [legislators] weren't being so secretive about what they were doing it would be easier to work on the right [bill] number.")); Ex. 256 (Battles Decl. ¶ 21 (describing SB 202's legislative process as "an exercise in obfuscation")).

141.   Legislators voted along party lines in both the House and Senate. No Democrats or Black legislators in either the House or Senate voted for SB 202. Ex. 144 (SB 202 Votes - House Passage (Mar. 25, 2021), USA-03968); Ex. 115 (SB 202 Votes - Senate Agreement to House Substitute (Mar. 25, 2021), USA-03969);

Ex. 4 (Burnough Decl. ¶ 50); Ex. 10 (Parent Decl. ¶ 43).

142.   Senators could only vote agree or disagree on the full SB 202, although it had morphed from a two-page bill when it passed the Senate to over 90 pages in the House, further limiting the Senate's opportunity to debate the substance of the final bill. *See* Ex. 8 (Jones Decl. ¶¶ 22-25); Ex. 115 (SB 202 Votes - Senate Agreement to House Substitute (Mar. 25, 2021), USA-03969); Ex. 2 (SB 202 as passed).

143.   Governor Kemp explicitly acknowledged that SB 202 was enacted in response to the 2020 Democratic victories in Georgia, stating: "I was as frustrated as anyone else with the results, especially at the federal level. And we did something about it with Senate Bill 202." Ex. 95 (Cobb Rep. 5, 62); Ex. 104 (Lichtman Rep. 45 (citing video recording of Governor Kemp's remark)).

144.   The testimony from election officials who would have to implement these dramatic changes to Georgia election law was often limited to the "good one[s]" selected by Germany and Fleming. Ex. 230 (Germany Text Messages, lines 15-18, 191); *see also* Ex. 204 (Email from R. Germany to L. Bailey, N. Boren, and J. Eveler, "draft legislation" (Feb. 18, 2021), COBB023443 (noting Chairman Fleming seeks the input of Lynn Bailey (Richmond County), Nancy Boren (Muscogee County), and Janine Eveler (Cobb County))).

145.   Nevertheless, these few election officials that testified during the

hearings on SB 202 and its predecessor bills testified *against* several of the challenged provisions. *See, e.g.*, Ex. 129 (Feb. 22, 2021 H. EIC Hr'g Tr., AME_000360:3-361:16 (Bartow Cnty. Elections Supervisor J. Kirk)); Ex. 128 (Feb. 19, 2021, H. EIC Comm. Hr'g Tr., AME_000204:20-205:19 (Richmond Cnty. Elections Supervisor L. Bailey), AME_000207:19-208:9 (same), AME_000223:14-224:2 (Cobb Cnty. Elections Supervisor J. Eveler), AME_000228:10-229:18 (Lowndes Cnty. Elections Supervisor D. Cox)); Ex. 118 (Mar. 18, 2021 H. EIC Hr'g Tr., AME_001627:11-19 (Heard Cnty. Elections Supervisor Tonnie Adams)).

146.   Tonnie Adams, Heard County Election Supervisor and Legislative Committee Chairman for the Georgia Association of Voter Registration and Election Officials ("GAVREO"), surveyed county election officials across the State for their feedback on the 2021 legislative proposals. Adams sent the responses to this Survey to all Georgia State Senators on March 8, 2021, Ex. 209 (Email from T. Adams to Members of the Ga. Senate, "Elections Officials' view of election bills? with attachment (Mar. 8, 2021), USA-ADAMS_000053.0001-000054.0016), and the same Survey responses to Georgia State Representatives on March 10, 2021, Ex. 216 (Email from T. Adams to Members of the Gen. Assemb., "Election Bills input from election officials" with attachment (Mar. 10, 2021) ("Adams Survey"), USA-ADAMS-000026.0001-000027.0016). Adams sent the responses to this

Survey to all legislators with a goal of influencing the legislature to adopt changes

that make election administration easier, not harder. Ex. 47 (Deposition of Charles

Tonnie Adams [ECF 714] ("Adams Dep.") 141:16-142:23, 146:13-147:10, 148:10-

149:12). The survey noted several election officials' opposition to election law

changes that ultimately became the challenged provisions, on the basis that they

would make election administration more difficult. *See generally* Ex. 216 (Adams

Survey).

147.   According to Tonnie Adams, of GAVREO, legislators largely did not

include the changes he and other election officials advocated for during 2021

legislative Sessions. Ex. 47 (Adams Dep. 80:11-14).

148.   Several county election officials expressed frustration about the

legislature failing to consider the input of county election officials, including

officials who testified in front of the legislature. *E.g.*, Ex. 49 (Bailey 10/6/22 Dep.

63:18-65:14); Ex. 211 (Email thread L. Bailey to election officials, "RE:

[EXTERNAL] Final Election Bill Status on Crossover Day - Get Ready" (Mar. 9,

2021), COBB032414-17 (Richmond County Elections Supervisor, noting, "[S]ome

of the (election) proposals make me sick . . . it is apparent that little or no research

has been done . . .")); Ex. 201 (Email from L. Bailey to election officials, "RE:

[EXTERNAL] Re: New Legislation" (Feb. 110, 2021) at COBB023362 (Fulton

County Elections Supervisor, asking, "[W]ill any legislator listen to us?")); Ex. 212

(Email thread L. Ledford to election officials, "RE: [EXTERNAL] Final Election Bill Status on Crossover Day - Get Ready" (Mar. 9, 2021) at COBB032406 (Gwinnett County Elections Supervisor noting "[i]t's all knee jerk with no thought whatsoever to administration, including budgets")); Ex. 214 (Email thread C. Sosebee to election officials, "RE: [EXTERNAL] Final Election Bill Status on Crossover Day - Get Ready" (Mar. 9, 2021), COBB032572 (Athens-Clarke County Elections Supervisor noting, "I am not sure [the legislators] care about our opinions at all.")); Ex. 223 (Email from J. Eveler to election officials, "RE: Latest version of SB 202" (Mar. 19, 2021), COBB024284 (Cobb County Elections Supervisor, referring to an email to legislators, "I doubt anyone will listen though.")); Ex. 220 (Email thread R. Barron to election officials, "Re: [EXT] Fwd: LC 28 0300S - substitute for SB 241 & HB 531" (Mar. 18, 2021), COBB024251 (Gwinnett County Elections Supervisor noting, "It's like beating our heads against the wall, they're [legislators] just not listening…")); Ex. 213 (Email thread R. Barron to election officials, "Re: [EXTERNAL] Final Election Bill Status on Crossover Day - Get Ready" (Mar. 9, 2021), COBB032418 (Fulton County Elections Supervisor noting, "They keep saying that they are doing this to make our jobs easier, but they are going to make it more difficult")).

149.   In contrast, in 2019, county election officials were polled about which voting machines they preferred, and the Legislature ultimately adopted the system

that 95% of responding officials preferred. *See* Ex. 167 (H. Gov. Aff. Elections

Subcomm. Hr'g, Video of Proceedings (Feb. 19, 2019), at 41:30-45:53 (Lynn

Bailey), https://www.youtube.com/watch?v=0eAe3YpLVbs&list=

PLIgKJe7_xdLXdPK0QRJ3d0SobsoioRiCc&t=1151s.

150.   Georgia legislators are familiar with the demographics of the State

and their districts. *E.g.*, Ex. 4 (Burnough Decl. ¶¶ 15-16); Ex. 8 (Jones Decl. ¶¶ 12,

20); Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 15:25-18:25, 19:14-20:17 (Jones)); Ex.

106 (Palmer Rep. ¶¶ 22-28).

151.   It is widely known among elected officials and political observers in

Georgia that voting is racially polarized in the State. Ex. 85 (Burden Rep. 7

(discussing media reporting on voting preferences by different racial groups)); Ex.

4 (Burnough Decl. ¶ 15); Ex. 8 (Jones Decl. ¶ 12); Ex. 78 (Deposition of Dr. Barry

Burden [ECF 743] ("Burden Dep.") 86:22-87:9); Ex. 80 (King Dep. 86:15-88:16

(discussing the difficulty of separating racial identity and party affiliation)).

152.   Georgia legislators are also familiar with the demographics of their

supporters and opponents, as well as with the different methods of voting preferred

by different groups of voters. *See* Ex. 4 (Burnough Decl. ¶¶ 15-16); Ex. 8 (Jones

Decl. ¶¶ 12, 20).

153.   After November 2020, it was widely known among elected officials

and political observers that Black voters disproportionately cast absentee-by-mail

ballots compared to white voters, and that this increased use of absentee voting contributed to statewide wins by Democratic candidates. Ex. 85 (Burden Rep. 11 & Tbl. 5); Ex. 5 (Hugley Decl. ¶¶ 20, 23); Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 15:25-16:11 (Jones)); Ex. 189 (Email thread H. McCloud to Legislators, "Re: Data from the SOS on the Presidential Results" with attachment (Dec. 23, 2020), CDR00063983-86 (SOS' breakdown of presidential results sent to Republican legislators)); Ex. 69 (Sterling Dep. 65:15-66:12 (noting that, in 2020, SOS office was aware of anecdotal evidence that Democrats tended to use absentee voting more than Republicans)).

154.   By 2021, it was widely known that Black voters—in Georgia and elsewhere—are less likely than white voters to possess state-issued photo ID. *See* Ex. 88 (Meredith Rep. ¶¶ 50-59 (discussing studies of ID possession in Georgia, North Carolina, South Carolina, Texas, and Wisconsin)).

155.   In Georgia, specifically, scholars have demonstrated disparities in DDS ID possession as far back as 2006, when the State adopted its photo voter ID requirement for in-person voting. Ex. 88 (Meredith Rep. ¶¶ 51-52).

156.   Legislators and advocacy groups involved in the legislative process specifically requested and received from the Georgia Secretary of State's office data revealing how many registered voters had a DDS ID or a Social Security number associated with their voter registration record. Ex. 206 (Email from H.

McCloud to SOS staff, "RE: Ethics Chair Max Burns - Data Request RE SB 67" (Feb. 18, 2021), CDR00043461-62 (SOS office gathering data in response to legislator's request)); Ex. 205 (Email from H. McCloud to Chairman Burns, "RE: Voters who have a DL or voter ID associated with their voter registration number" (Feb. 18, 2021), CDR01369683); Ex. 208 (Email from B. Evans to Q. Felder, "RE: ORR #21-97 - Logan Churchwell" with attachment (Mar. 1, 2021), CDR00044825-29 (data request from Public Interest Law Foundation)); Ex. 59 (Germany Dep. 141:11-20).

157.   Poy Winichakul, counsel at the Southern Poverty Law Center, testified during the February 19, 2021, House Special Committee on Election Integrity hearing about the specific burdens an ID requirement poses for voters of color. Ex. 128 (Feb. 19, 2021 H. EIC Comm. Hr'g Tr., AME_000109:2-AME_000111:1).

158.   Rev. James Woodall, then-President of the GA NAACP, provided statistics regarding the foreseeable discriminatory effects of the challenged provisions on Black voters in his testimony during the February 22, 2021, House Special Committee on Election Integrity hearing and the March 16, 2021, Senate Ethics Committee hearing. *See* Ex. 319 (Woodall 3/13/23 Decl. ¶¶ 15-16); Ex. 129 (Feb. 22, 2021, H. EIC Hr'g Tr., AME_000332:19-333:2). Specifically, Rev. Woodall testified that: (a) even if 97% of registered voters in Georgia had a DDS ID in their voter registration file, "that would leave about 210,000 Georgians,

eligible Georgia voters without access due to these ID requirements," *id*. at
AME_000332:19-AME_000333:2; (b) because "[h]igher percentages of Black and
Brown Georgians live in poverty," the limitations to getting an ID, or making a
photocopy of an ID, would disproportionately burden them, *id*. at AME_000335:6-
13; (c) "drop boxes being used only during normal business hours in this
legislation would very well defeat the purpose of having drop boxes at all," Ex.
131 (Mar. 16, 2021 Sen. Ethics Comm. Hr'g Tr., AME_001354:9-18); and (d)
"[v]oters in predominantly black neighborhoods wait on average 29 percent longer
than those in non-black neighborhoods. They're also 74 percent more likely to wait
more than half an hour to vote," Ex. 129 (Feb. 22, 2021, H. EIC Hr'g Tr.,
AME_000335:21-336:2); *see also id*. at. AME_000337:11-338:2 (explaining the
foreseeable disparate impact of the line relief provisions on minority-led
organizations like the GA NAACP).

159.    Defendant Sara Tindall Ghazal, then-Cobb County attorney and now-
State Election Board member, testified in the March 16, 2021, Senate Ethics
Committee Hearing on HB 531 (a predecessor of SB 202) that the proposed near-
ban on out-of-precinct ("OP") voting would disproportionately affect black voters.
Ex. 131 (Mar. 16, 2021 Sen. Ethics Comm. Hr'g Tr., AME_001409:14-1411:14)
(Ghazal, misspelled "Gazalle" in the transcript). Specifically, she explained to the
legislature that the provision "would have a hugely disparate impact on Black

voters. In 2018, for example, approximately 72 percent of the provisional ballots that were counted were Democratic voters with Black voters overrepresented within those Democratic votes by more than 20 percent." *Id*. at AME_001409:14-19. Ms. Ghazal went on to note, "What makes this provision particularly damaging is that it's final and irrevocable. A provision[al] ballot is a voter's last opportunity to have their vote counted and their voice heard. A voter cannot find another day or another method to cast their ballot if they can't make it to their precinct. They have no recourse to this utter and complete disenfranchisement, and I encourage you to strike this totally from the bill." *Id*. at AME_001411:22-1411:14.

160.   Aunna Dennis, Executive Director of Common Cause Georgia, criticized the restrictions on out-of-precinct (OP) voting and cited a study showing that voters of color are more likely to move within their county, increasing the chance they will vote in the wrong precinct. Ex. 118 (Mar. 18, 2021, H. EIC Hr'g Tr., AME_001517:2-24) (Dennis).

161.   Legislators also discussed how the bill would disparately impact Black voters. During the EIC's hearing on SB 202, Rep. Burnough objected to SB 202's cap on the number of drop boxes, noting that Clayton County (with a 73% Black population), would likely see a reduction from nine drop boxes to one. Ex. 119 (Mar. 22, 2021 H. EIC Hr'g Tr., AME_001717:24-1718:25).

162.   On March 22, 2021, Asian Americans Advancing Justice–Atlanta

submitted written testimony to the Special Committee on Election Integrity on the likely impact and harm SB 202 would have on AAPI voters in Georgia. The testimony included data on the high rates of voting by mail within the AAPI community; the already high rates of rejection of absentee ballot applications of AAPI voters; and descriptions of the specific harms that would befall Limited English Proficient voters and new or first-time voters. Ex. 226 (Email from P. Nguyen to Rep. Fleming and legislative staff, "Advancing Justice-Atlanta testimony on SB 202" with attachment (Mar. 22, 2021), AJATL-SB 202-00001185-87).

163.   After SB 202 passed the House on March 25, 2021, Senator Michelle Au testified on the Senate floor over concerns that SB 202 would disenfranchise minority, immigrant and working-class voters. Ex. 3 (Au Decl. ¶ 14).

164.   On December 23, 2020, and December 28, 2020, SOS Legislative Affairs Director Hayley McCloud sent to members of the General Assembly a spreadsheet that specified by county the number of ballots each presidential candidate received in the November 2020 election, broken down by method of voting (in-person election day ("ED"); absentee by mail ("ABM"); advance voting ("AV"); and provisional ("PROV")). Ex. 189 (Email thread H. McCloud to Legislators, "Re: Data from the SOS on the Presidential Results" with attachment (Dec. 23, 2020), CDR00063983-86); Ex. 196 (Email from H. McCloud to

Legislators, "Information from the Office of the Secretary of State: 2020 Presidential Compiled Results Data" with attachment (Dec. 28, 2020), CDR00099553-54). According to this data, Biden received almost twice as many votes cast via absentee-by-mail ballots as Trump, whereas Trump got more votes through in-person election day voting than Biden—almost 400,000 more (849,729 versus 451,157). Ex. 189 (CDR00063986 (spreadsheet)).

165.   Representative Bruce Williamson also requested that the Secretary of State's office provide voting totals "for each presidential candidate in each of the three voting classifications: Absentee Ballots, Early voting in person and Day of Election voting," which the Secretary's office provide on December 23, 2020, broken down by county. Ex. 189 (Email thread M. McCloud to M. Aziz, Rep. Blackmon, and Rep. Williamson, "RE: Data from the SOS on the Presidential Results" (Dec. 23, 2020), CDR00471627-30); *see also* Ex. 104 (Lichtman Rep. 37-38). That data was shared with legislators who served on the Election Integrity Committee and steered the effort to rewrite Georgia's election laws. Ex. 104 (Lichtman Rep. 37-38).

166.   On February 18, 2021, SOS Legislative Affairs Director Hayley McCloud sent an email to Senate Chairman Max Burns with data regarding voters who have an ID associated with their voter registration record, which stated: "In response to your question today regarding the 99% comment made in committee,

our team pulled specific data and found that approximately 99.9% of registered

voters have either DL# or SSN#, and roughly 97% of registered voters have a

driver's license or state voter ID number associated with their voter registration

record." Ex. 205 (Email from H. McCloud to Chairman Burns, "RE: Voters who

have a DL or voter ID associated with their voter registration number" (Feb. 18,

2021), CDR01369683); *see also* Ex. 206 (Email from H. McCloud to SOS staff,

"RE: Ethics Chair Max Burns - Data Request RE SB 67" (Feb. 18, 2021),

CDR00043461-62); Ex. 59 (Germany Dep. 141:11-20); Ex. 67 (McCloud Dep.

204:16-25).

167.   Legislators requested and had access to the State's absentee voter

records, which are publicly available on the SOS website. Ex. 185 (Email from S.

Teasley to Rep. Blackmon, "Voter Absentee File" (Nov. 11, 2020),

CDR01369749); *see* Ga. Sec. of State, *Voter Absentee Files*,

https://sos.ga.gov/page/voter-absentee-files, last visited Jan. 19, 2024).

168.   In Georgia, voter registration records include the self-identified race

of the voter. *See* Ex. 96 (Fraga Rep. ¶ 22); Ex. 88 (Meredith Rep. ¶ 13).

169.   In July 2017, voters filed a complaint challenging Georgia's use of a

direct-recording electronic voting ("DRE") system. *See* Complaint, *Curling v.

Kemp*, 1:17-cv-02989 (N.D. Ga.). Although the court later denied the plaintiffs a

preliminary injunction, it noted that continued use of DREs likely violated the 14th

Amendment. *See* Prelim. Inj. Ord., *Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018).

170.   In September and November 2017, the General Assembly convened hearings to examine Georgia's longstanding need for new voting machines, and during the 2018 legislative session, it considered but did not enact legislation that would have updated Georgia's voting equipment. Ex. 157 (Secure, Accessible & Fair Elections (SAFE) Commission Report Submitted to the General Assembly (Jan. 10, 2019) at 3, https://sos.ga.gov/sites/default/files/2022-03/safe_commission_report_final_1-10-18.pdf ("SAFE Commission Report")); Ex. 168 (SB 403 (2018), https://www.legis.ga.gov/legislation/52638 (developing procedures for updating the state's voting systems)).

171.   In April 2018, the Governor established the Secure, Accessible & Fair Elections ("SAFE") Commission, designated to study alternatives to the DRE system. *See* Ex. 158 (Ga. Secretary of State, *Elections Safeguards: SAFE Commission*, https://sos.ga.gov/page/elections-safeguards). The Commission included legislators, election officials, a cybersecurity expert, voters, and representatives from three political parties. *See* Ex. 157 (SAFE Commission Report 2).

172.   In January 2019, the SAFE Commission issued a report recommending that the State transition from its then-existing DRE system to a new

system using ballot marking devices ("BMDs"). Ex. 157 (SAFE Commission Report 4-7, 13-16). This recommendation was adopted in HB 316, almost half of which (23 of 49 sections) addresses changes to laws and processes to incorporate the new type of voting machine. *Compare* Ex. 152 (HB 316 as passed) *with* Ex. 157 (SAFE Commission Report 4-7, 13-16); Ex. 167 (H. Gov. Aff. Elections Subcomm., Video of Proceedings (Feb. 19, 2019) at 21:00, https://www.youtube.com/watch?v=0eAe3YpLVbs&list=PLIgKJe7_xdLXdPK0Q RJ3d0SobsoioRiCc&t=1151s (Rep. Fleming describing the purpose of HB 316 as making the necessary legislative changes to implement the change to BMDs)).

173.    Six sections of HB 316 addressed changes to the "exact match system" for voter registration, and a cure process for rejected absentee ballots that was triggered by *successful* litigation in federal court. *See* Ex. 152 (HB 316 §§ 6, 27, 30, 32, 37, 38); Ex. 167 (H. Gov. Aff. Elections Subcomm., Video of Proceedings (Feb. 19, 2019) at 41:30, https://www.youtube.com/watch?v=0eAe3YpLVbs&list=PLIgKJe7_xdLXdPK0Q RJ3d0SobsoioRiCc&t=1151s (Richmond County Elections Supervisor Lynn Bailey describing provisions of HB 316 as requiring election officials to take certain additional steps when a voter registration application is rejected and implementing court orders involving signature mismatches on absentee ballots)); *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018).

174.   Nowhere in the preamble of HB 316 does it say that a purpose of HB 316 is to address issues of voter confidence or voter suppression related to the 2018 election. *See* Ex. 152 (HB 316 as passed).

175.   No special committee was established to consider HB 316; instead, HB 316 was considered by the Senate Ethics Committee and the House Government Affairs Committees, which historically consider election bills in the General Assembly. Ex. 153 (Ga. Gen. Assemb., *Georgia General Assembly - HB 316 Status History*, https://www.legis.ga.gov/legislation/54991); Ex. 4 (Burnough Decl. ¶ 25).

176.   None of the committee meetings for HB 316 took place before 8:00 a.m., *see* Ex. 159-166 (2019 Meeting Notices), compared to regular early morning Senate Ethics committee meetings in 2021, *see* Ex. 8 (Jones Decl. ¶ 19); Ex. 7 (Harrell Decl. ¶ 8); Ex. 256 (Battles Decl. ¶ 21 ("[P]roponents conducted hearings at times that made it difficult for the public to partake . . . .")).

177.   HB 316 went through minor substitutes and revisions but did not have a huge overhaul, much less without advance notice like SB 202. Time was allotted for meetings with legislators about amendments to include in the bill and legislators from the majority party did not automatically reject ideas or decline to meet with advocates based on their constituencies. Despite the relative speed in which HB 316 moved through the General Assembly, organizations were given

time to review the bill and any proposed changes. Ex. 256 (Battles Decl. ¶¶ 19-21).

178.    Only 46 election bills were introduced in 2019, not 100 as in 2021.

Ex. 154 (Ga. Gen. Assemb., *Legislation Search, 2019-2020 Regular Session,*

*Elections*, https://www.legis.ga.gov/search?k=&s=27&t=21&p=1).

179.    During the 2021 legislative session, legislators and witnesses similarly

requested that the legislature not rush to pass SB 202 or its predecessor bills, and

instead take the next legislative session to fully examine the impact of the proposed

election law changes. Ex. 5 (Hugley Decl. ¶¶ 14-15); Ex. 120 (Mar. 25, 2021 SB

202 H. Fl. Debate Tr., AME_001840:8-15 (Rep. Alexander)); Ex. 118 (Mar. 18,

2021 H. EIC Hr'g Tr., AME_001578:10-15, AME_001591:21-1592:1 (Marilyn

Marks)); Ex. 131 (Mar. 16, 2021 Sen. Ethics Comm. Hr'g Tr., AME_001378:17-21

(Cindy Battles)).

180.    In 2021, calls for a study commission to examine the election reform

recommendations went unheeded in 2021. *See* Ex. 49 (Bailey 10/6/22 Dep. 64:23-

65:14); Ex. 221 (Email from L. Bailey to Representative Fleming, "Input to

Legislation" (Mar. 18, 2021), BAILEY-000028-29).

181.    Black and AAPI voters are less likely than white voters to be on the

"rollover" list. Ex. 113 (Grimmer Rep. 87 & Tbl. 11).

182.    Efforts by the Secretary of State and county election officials to send

absentee ballot applications to all active voters during the 2020 election cycle

"incentivized many Black voters, who had traditionally preferred to vote in person, to mail in their ballots." Ex. 4 (Burnough Decl. ¶ 13); *see also* Ex. 49 (Bailey 10/6/22 Dep. 119:16-120:6 (observing that the mailing contributed to "the volume of absentee ballots increas[ing] tremendously")); Ex. 59 (Germany Dep. 57:12-16).

183.   Then-General Counsel for the SOS, Ryan Germany, admitted in his deposition that the absentee voting process did not result in voter fraud. Ex. 59 (Germany Dep. 57:17-20).

184.   Gabriel Sterling stated in his deposition that the SOS Office was not concerned about fraud in absentee voting before, during, or after sending unsolicited absentee ballot applications to all active registered voters for the June 2020 primary, and that no widespread voter fraud occurred with absentee voting in the 2020 elections. Ex. 69 (Sterling Dep. 55:14-17 (no widespread fraud in 2020 absentee voting), 60:15-61:6 (SOS not concerned about fraud before, during, or after sending AB applications prior to June 2020)); *see also* Ex. 36 (Gwinnett Cnty. Williams Dep. 77:7-10 (county election officials testifying they were unaware of any voter fraud occurring from the mailing of unsolicited or duplicate absentee ballot applications)); Ex. 18 (DeKalb Cnty. Dep. 67:8-11 (same)); Ex. 15 (Cobb Cnty. Dep. 185:16-19 (same)); Ex. 21 (Fulton Cnty. Dep. 114:12-14 (same)).

185.   In an April 2020 interview, then-Georgia House Speaker David Ralston criticized the SOS's sending of unsolicited absentee ballot applications

because they would "drive up turnout" in 2020 and lead to electoral outcomes he

did not favor. Ex. 180 (*Live Call-In with House Speaker David Ralston*, YouTube

(Apr. 1, 2020), USA-04145 at 19:55-21:44); *see also* Ex. 69 (Sterling Dep. 60:16-

61:11) (noting SOS Office's awareness of Speaker Ralston's opposition).

186.   Counties with significant Black and Democratic-leaning populations,

like Douglas, DeKalb, and Richmond Counties, proactively sent absentee ballot

applications to registrants for the November 2020 election. Ex. 63 (Deposition of

Milton Kidd [ECF 703] ("Kidd Dep.") 49:6-25); Ex. 18 (DeKalb Cnty. Dep. 63:17-

23); Ex. 49 (Bailey 10/6/22 Dep. 49:7-50:1, 118:19-119:15).

187.   DeKalb and Douglas Counties cumulatively experienced an eight-fold

increase in absentee voting as compared to the last presidential general election,

substantially exceeding the six-fold statewide increase. Ex. 104 (Lichtman Rep.

19-20).

188.   According to State's expert and former Richmond County Elections

Supervisor Lynn Bailey, whose county sent pre-filled absentee ballot applications

to all registered voters in the 2020 elections, election officials did not have any

security concerns when they sent pre-filled absentee ballot applications to all

registered voters in Richmond County, and were able to verify the "voter's identity

when [the applications] came in." Ex. 49 (Bailey 10/6/2022 Dep. 49:7-50:1).

189.   Distributing unsolicited absentee ballot applications decreases the

costs of voting because it "ma[d]e it easier to vote," Ex. 69 (Sterling Dep. 53:3-10), and such mailings reminded voters "to start to pay attention again to the electoral process." Ex. 63 (Kidd Dep. 52:20-24).

190.   In the context of absentee ballot applications, election officials have testified that official absentee ballot applications sent directly from the state or county decrease confusion and increase efficiency. Ex. 15 (Cobb Cnty. Dep. 284:21-285:1).

191.   Election officials reported increased work due to SB 202, including canceling absentee ballot applications that were submitted too early and answering numerous questions about how to navigate the new process. Ex. 13 (Athens-Clarke Cnty. Dep. 88:24-25, 226:10-227:5).

192.   Election officials noted that SB 202's additional "complications" in requesting and casting an absentee ballot "impact[] the voters more than [they] impact[]" election officials. Ex. 21 (Fulton Cnty. Dep. 108:3-8).

193.   Gabriel Sterling noted that some absentee ballot applications sent from the state were not clearly marked as applications and that, "looking back, we might have made that clearer." Ex. 69 (Sterling Dep. 56:6-9).

194.   Cobb County Elections Supervisor Janine Eveler noted that the absentee ballot application process would be less confusing and result in fewer errors if voters had received and relied upon official applications sent by the state.

Ex. 15 (Cobb Cnty. Dep. 185:5-10).

195.    For the November 2020 election, the SOS Office created an online absentee-by mail application portal ("online portal"). Ex. 183 (Ga. SOS Press Release, "Secretary of State Raffensperger Unveils New Online Absentee Ballot Request Portal" (Aug. 31, 2020), CDR00210329-31).

196.    The online portal, activated on August 31, 2020, allowed "Georgia voters with a driver's license or state ID card . . . to request an absentee ballot entirely online." Ex. 813 (Ga. SOS Press Release, "Secretary of State Raffensperger Unveils New Online Absentee Ballot Request Portal" (Aug. 31, 2020), CDR00210329-31).

197.    The online portal is only in English. Ex. 100 (Lee Rep. 81-83).

198.    Educational materials regarding SB 202's changes to the procedure for utilizing absentee ballots were only in English. Ex. 33 (SOS Dep. 41:3-11); Ex. 15 (Cobb Cnty. Dep. 186:3-10); Ex. 21 (Fulton Cnty. Dep. 118:14-21).

199.    In the November 2020 election, voters of color under 65 years old used the SOS online portal to submit their absentee-by-mail applications at lower rates than white voters, with 45.9% of white applicants submitting their application via the portal, compared with 22.4% of Black applicants, 27.2% of Hispanic applicants, and 29.8% of AAPI applicants. Ex. 96 (Fraga Rep. ¶ 76 & Tbl. 4).

200.    Given that the online portal is only in English and contains complex,

lengthy, and technical language, AAPI voters who face language barriers or are attempting to vote for the first time are likely to experience a high error or abandonment rate. Ex. 100 (Lee Rep. 84).

201.   During the 2018 election, Courts in this District held, in two separate decisions, that requiring birth year information violated the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B). *See Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018); *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018).

202.   Following the *Crittenden* decisions, the Secure, Accessible & Fair Elections ("SAFE") Commission, established by Defendant Brian Kemp (then-Secretary of State, and now Governor), recommended changes to Georgia voting law. The Commission found that Georgia should update its voting laws to "make clear that slight variations in any information on the envelope not be a reason to reject an absentee ballot unless the variation does not allow the election official to identify the voter and confirm that the voter cast the ballot." Ex. 157 (SAFE Commission Report 3).

203.   In 2019, following the Commission's recommendations, the Georgia General Assembly passed, and the Governor signed, House Bill 316 ("HB 316"), which removed the requirement that voters write their birth year on ballot return envelopes. Ex. 152 (HB 316 § 30).

204.  HB 316 "resulted in a significant decrease in the percentage of absentee ballots that were rejected at the outset" in the 2020 General Election as compared to the 2018 General Election, in part because "[t]here were quite a number in 2018 that were rejected for that missing [birthdate] information." Ex. 325 (Oral Argument Transcript from *Wood v. Raffensperger et al.*, No. 20-cv-4651-SDG (N.D. Ga. Nov. 19, 2020), ECF. No. 64, at 51:12-15).

205.  Just a few months before SB 202's enactment, counsel for the Secretary of State and members of the Georgia State Election Board confirmed that HB 316 had "resulted in a significant decrease in the percentage of absentee ballots that were rejected at the outset" in the 2020 General Election as compared to the 2018 General Election, in part because "[t]here were quite a number in 2018 that were rejected for that missing [birthdate] information." Ex. 325 (Oral Argument Transcript from *Wood v. Raffensperger et al.*, No. 20-cv-4651-SDG (N.D. Ga. Nov. 19, 2020), ECF. No. 64, at 51:12-15).

206.  SB 202's birthdate requirement is not used to determine whether an individual is "qualified" to vote under Georgia law; rather it is used to verify that the absentee ballot was voted by the elector who requested the ballot. Ex. 326 (State Resp. to NGP's 1st ROGs (May 16, 2022) at 3); Ex. 18 (DeKalb Cnty. Dep. 213:2-13); Ex. 35 (30(b)(6) Deposition of Gwinnett County (Zachary Manifold) [ECF 712] ("Gwinnett Cnty. Manifold Dep.") 116:24-117:22); Ex. 13 (Athens-

Clarke Cnty. Dep. 76:10-3).

207.   In the context of applying for absentee ballots, Cobb County Elections Supervisor Janine Eveler expressed concern that voters may accidentally write the wrong date on the application instead of their own birthdate. Ex. 49 (Bailey 10/6/22 Dep. 187:1-12).

208.   State's expert and former Richmond County Elections Supervisor Lynn Bailey testified that based on experience, "it's not uncommon for voters to put the current date of birth, or particularly the year of birth, to put the current year rather than their actual year of birth." Ex. 49 (Bailey 10/6/22 Dep. 188:18-189:6).

209.   In the 2022 elections, in just seven counties, over a thousand absentee ballots were rejected for the purported lack of a birthdate. Ex. 308 (Declaration of Laurence Pulgram dated January 12, 2023 ("Pulgram Decl.") ¶¶ 3-32, Exs. 1-20); Ex. 254 (Hall Cnty. Resp. to AME 1st ROGs (Jan. 11, 2023) at 1, 5-14); Ex. 327 (Athens-Clarke Cnty. Resp. to AME 1st ROGs (Jan. 11, 2023) at 9-1, Ex. A); Ex. 328 (Chatham Cnty. Resp. to AME 1st ROGs (Jan. 23, 2023) at 3-6); Ex. 329 (Cobb Cnty. Resp. to AME 1st ROGs (Jan. 19, 2023) at 1, 4-8); Ex. 330 (Fulton Cnty Resp. to AME 1st ROGs (Jan. 11, 2023) at 1, 3-10); Ex. 331 (Richmond Cnty. Resp. to AME 1st ROGs (Jan. 11, 2023) at 1, 4-14); *see also* Prelim. Inj. Ord. (Aug. 18, 2023) at 12, ECF No. 613.

210.   In Gwinnett County alone, for instance, in a single run-off election, at

least 218 absentee ballots were rejected for purportedly lacking a correct birthdate—accounting for roughly 75% of all rejected absentee ballots for that runoff, *see* Ex. 308 (Pulgram Decl. ¶ 10, Ex. 4); *see also id.* ¶¶ 14-15 (Ex. 8 (Gwinnett Spreadsheet)), even though Gwinnett County's interrogatory responses stated that "0" absentee ballots were rejected for lack of a correct birthdate, Ex. 343 (Gwinnett Cnty. Resp. to AME 1st ROGs (Jan. 24, 2023) at 9). That was because Gwinnett County does not "separate" out absentee ballot exclusions based on the birthdate requirement. Ex. 35 (Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17).

211.   And in Cobb County, notice letters were issued to 759 voters indicating that their absentee ballots were rejected in the 2022 elections based on missing or incorrect birthdates. Ex. 308 (Pulgram Decl. ¶ 20). That same year Cobb County also notified 435 voters that their absentee ballots were rejected for listing identifying information that did not match the county's system records and advised 106 additional voters that their absentee ballots were rejected due to missing or mismatched signatures. *Id.* ¶¶ 23, 25, 27. Only 646 of these 1,300 voters submitted affidavits to Cobb County to cure their rejected ballots, and at least 146 of those 646 cure attempts were likely not successful given they failed to include copies of an ID (as required by O.C.G.A. § 21-2-386(a)(1)(C)), post-dated the statutory cure deadline, or lacked signatures. *Id.* ¶¶ 31-32. Because Cobb County

seemingly did not maintain records of failed cure attempts, there is no indication

that these impacted voters were able to cure their absentee ballots after rejection.

*Id.* ¶ 32. Indeed, over 70 ballot rejection notices were mailed the same day as or

one day before expiration of the cure period, and dozens more rejection notices

were only mailed to voters between four and seven days *after* any opportunity to

cure had expired. *Id.* ¶ 30.

212.   "[U]nder both the Constitution and the laws of the State, the Secretary

is the state official with the power, duty, and authority to manage the state's

electoral system. No other state official or entity is assigned the range of

responsibilities given to the Secretary of State in the area of elections." Ga. Op.

Att'y Gen. No. 2005-3, 2005 WL 897337, at *3 (Apr. 15, 2005).

213.   The Secretary of State "organizes and oversees all election activity,

including voter registration, . . . municipal, state, county, and federal elections . . .

[,] [is] responsible for certification of election results [and] qualification of

candidates. . . and preparation of ballots and election forms and materials . . . [,]

maintains the Statewide Voter Registration Database . . . [,] [and is] accountable for

investigating election fraud and enforcing state election laws." Ga. Sec'y of State,

*About the Elections Division*, https://sos.ga.gov/page/about-elections-division, last

visited Jan. 19, 2024.

214.   An injunction directed at the Secretary of State addressing election

procedures can reduce Plaintiffs' burden of assisting voters and "clarif[y] the legal requirements surrounding absentee ballots or clarif[y] the curative procedures for provisional ballots can reduce the number of rejected ballots." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1338 (N.D. Ga. 2018).

215.    The Secretary of State issues and periodically updates a Poll Worker Manual which is "used as a guide for the administration of elections conducted by county election officials for poll workers." Ex. 232 (Poll Worker Manual (May 2021), CDR01369922-CDR01370025).

216.    Counties generally do what they are told to do by the State Election Board, without necessity of separate enforcement proceedings. Ex. 34 (SEB Dep. 195:10, 257:24-258:4); Ex. 21 (Fulton Cnty. Dep. 257:24-258:4, 270:10-12); Ex. 15 (Cobb Cnty. Dep. 275:20-23); Ex. 18 (DeKalb Cnty. Dep. 206:8-12).

217.    Counties are subject to sanction by the State Election Board, including the imposition of civil penalties, if they violate any state election law. Ex. 33 (SOS Dep. 219:21-25); O.C.G.A. § 21-2-33.1(a). The State Election Board may take remedial action against counties without a court order. Ex. 34 (SEB Dep. 192:18-193:13).

218.    Several election officials informed legislators of their opposition to the 11-day absentee ballot request deadline in SB 202 and its predecessor bills and advocated instead for a 7- or 8- day deadline and a provision allowing applications

from voters with last-minute emergencies. *See, e.g.*, Ex. 216 (Adams Survey at USA-ADAMS-000027.0003 (noting election officials in at least 34 counties opposed the 11-day absentee ballot request deadline, 11 of whom wanted to keep the 3-day deadline, and 23 advocated for a date closer to Election Day that was less "punitive" on voters)); *see also* Ex. 47 (Adams Dep. 152:9-153:7, 163:3-165:19); Ex. 128 (Feb. 19, 2021 H. EIC Hr'g Tr., AME_000204:20-205:19 (Richmond Cnty. Elections Supervisor L. Bailey), AME_000228:10-229:9-16 (Lowndes Cnty. Elections Supervisor D. Cox)); Ex. 221 (Email from L. Bailey to Representative Fleming, "Input to Legislation" (Mar. 18, 2021), BAILEY-000028-29); Ex. 49 (Bailey 10/6/22 Dep. 111:25-113:13); Ex. 129 (Feb. 22, 2021 H. EIC Hr'g Tr., AME_000360:3-360:10 (Bartow County Elections Supervisor Joseph Kirk)); Ex. 224 (Email from J. Kirk to House Special Committee on Election Integrity members, "Comments from Election Supervisor on Substitute to SB 202" (Mar. 21, 2021), USA-ADAMS-000043.0001-44.0002); Ex. 118 (Mar. 18, 2021 H. EIC Hr'g Tr., AME_001629:8-12 (Heard Cnty. Elections Supervisor T. Adams)); Ex. 202 (Email from T. Adams to House Special Committee on Election Integrity members, "HB 270" (Feb. 10, 2021) USA-ADAMS-000062.0001 (informing legislators of concerns that an 11-day absentee deadline, without adequate provisions for cases of emergency, would unnecessarily burden voters, stating, "I can find no reason to change the current code . . .")).

219.   In November 2020 and January 2021, Black, Hispanic, and AAPI applicants were more likely than white applicants to request absentee ballots during the now-eliminated period. Ex. 96 (Fraga Rep. ¶¶ 109-110 & Tbls. 9-10).

220.   In November 2020, more than 30,000 mail ballot applications, including 12,664 requests from Black applicants, 1,529 from Hispanic applicants, and 1,721 from AAPI applicants, were submitted later than the new absentee ballot request deadline enacted in SB 202. Ex. 96 (Fraga Rep. ¶ 110 & Tbl. 10).

221.   In general elections before SB 202, Black voters' mail ballot applications were more likely than white voters' to be rejected for arriving too late. Ex. 96 (Fraga Rep. ¶ 99, Tbl. 7).

222.   Under SB 202's rules, absentee ballot applications from AAPI registrants in 2020 would have accounted for 5.2% of all late absentee ballot applications, a proportion higher than that of AAPI registrants who voted in 2020. Ex. 101 (Lee Rebuttal Rep. ¶ 7).

223.   In post-SB 202 elections, absentee ballot applicants are far more likely to have their ballots rejected due to the application being late. Ex. 96 (Fraga Rep. ¶ 100). In November 2022 that rejection rate rose to 25.9%, and in December 2022, the rate of absentee ballot application rejections was 30.6%—approximately three times higher than the highest pre-SB 202 rate of 9.5% (from November 2020 and January 2021). *Id*. ¶ 101 & Tbl. 7.

224.   County officials reported that absentee ballot rejection rates increased in post-SB 202 elections and that the primary reason ballots were rejected was due to being received either too early or too late. Ex. 37 (30(b)(6) Deposition of Hall County (Lori Wurtz) [ECF 713] ("Hall Cnty. Dep.") 51:1-54:23); Ex. 254 (Hall Cnty. Defendants' Responses to AME Plaintiffs First Interrogatories, Interrogatory No. 2 (January 11, 2023)); Ex. 330 (Fulton Cnty. Defendants' Responses to AME Plaintiffs First Interrogatories, Interrogatory No. 2 and 3, (January 11, 2023)); Ex. 51 (30(b)(6) Deposition of Columbia County (Nancy Gay) [ECF 701] ("Columbia Cnty. Dep.") 49:18-51:23).

225.   In the 2022 midterm elections, Black and Hispanic applicants for absentee-by-mail ballots were more likely than white applicants to have their ballots rejected due to the application being late. Ex. 96 (Fraga Rep. ¶¶ 99-100 & Tbl. 7). The percent of rejected absentee-by-mail applications whose "Status Reason" for rejection indicated the application was received after the absentee ballot application deadline was 24.2% in November 2022 and 26.7% in December 2022 for white voters, compared with 28.5% in November 2022 and 38.4% in December 2022 for Black voters, and 32.1% in November 2022 and 36.8% in December 2022 for Hispanic voters. *Id*. ¶ 99, Tbl. 7.

226.   For AAPI voters, the share of mail ballot applications rejected for arriving too late jumped by 12 percentage points from the November 2020 to the

November 2022 general election, and by 17.2 percentage points from the January 2021 to December 2022 runoff election. Ex. 96 (Fraga Rep. ¶¶ 99-100 & Tbl. 7). AAPI applicants had their rate of rejection more than double (November 2022) and triple (December 2022) relative to the pre-SB 202 rates. *Id*. ¶¶ 102 & Tbl. 7.

227.   A majority of days of the now-eliminated absentee ballot request period during the November 2020 election, more than half (52%-59%) of each day's requested absentee ballots were cast and counted—totaling more than 16,000 ballots. Ex. 87 (Burden Supp. Decl. 4-5 & Tbl. 1). Even on the Friday before Election Day, about one-third of requests resulted in mail ballots that were counted. *Id*.

228.   The State's data do not account for voters who did not submit an absentee-by-mail ballot application or absentee-by-mail ballot at all because they knew they had missed (or would miss) the deadline. *See* Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 265:17-266:18).

229.   Before SB 202, counties could start distributing absentee ballots 49 days before the election—the same date that counties typically distributed Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") ballots; however, now under SB 202, counties begin distributing UOCAVA ballots 49 days before election day, while regular absentee ballots cannot be mailed out until the 29th day before election day. Ex. 63 (Kidd Dep. 111:19-25, 180:5-22); Ex. 15

(Cobb Cnty. Dep. 270:3-20); Ex. 35 (Gwinnett Cnty. Manifold Dep. 144:4-146:7). Several county officials expressed concern that these timing changes further complicate the administration of absentee voting and unnecessarily increase the burden on election workers in the lead up to election day. Ex. 15 (Cobb Cnty. Dep. 172:2-17; 270:3-20); Ex. 35 (Gwinnett Cnty. Manifold Dep. 146:1-147:2); Ex. 18 (DeKalb Cnty. Dep. 87:6-88:22).

230.   The share of absentee-by-mail ballots that were rejected due to arriving after the receipt deadline sharply increased after the passage of SB 202, growing from 0.2% in the 2020 general election to 0.84% in the 2022 general election. Ex. 96 (Fraga Rep. ¶ 133 & Tbl 14); Ex. 113 (Grimmer Rep. ¶ 101 & Tbl. 17).

231.   The December 2022 rate of rejection is five times greater than the previous runoff election rate pre-SB 202, the January 2021 runoff, which had a 'ballot received after deadline' rejection rate of 0.30%. Ex. 96 (Fraga Rep. ¶ 133 & Tbl 14).

232.   After SB 202, Hispanic and AAPI voters were more likely to have their absentee ballot rejected due to receipt after the deadline than white voters. Specifically, in November 2022, 0.77% of white voters' absentee ballots were rejected for arriving late, compared with 1.60% of Hispanic voters and 2.32% of AAPI voters. Ex. 96 (Fraga Rep. ¶ 134 & Tbl. 14). In December 2022, 1.58% of

white voters' absentee ballots were rejected for arriving late, compared with 4.41%

of Hispanic voters and 5.20% of AAPI voters. *Id*.

233.   It is likely that some voters who submitted their absentee ballots after

the deadline would have submitted their ballots via a drop box during the four days

of the election cycle, when such drop boxes were available prior to SB 202. Ex. 96

(Fraga Rep. ¶ 133).

234.   After SB 202, AAPI voters faced the steepest rise in rejected absentee

ballots due to receipt after the deadline compared to any other racial group. Ex. 96

(Fraga Rep. Tbl. 14).

235.   Election administrators have no additional burden with the earlier

absentee ballot request dates in place prior to SB 202's passage. Instead, election

administrators benefit from having advance information of voters requesting an

absentee ballot to prepare and plan for absentee ballot verification, preparation, and

distribution. Ex. 98 (Kennedy Rep. 13).

236.   Elections officials find the shortened timeline for requesting absentee

ballots to be a burden. Ex. 13 (Athens-Clarke Cnty. Dep. 88:8-22).

237.   Voting absentee with less time is "very difficult" because voters have

to "get their ballots, turn them around, and mail them back." Ex. 15 (Cobb Cnty.

Dep. 172:2-10, 270:20-23); Ex. 75 (Deposition of Sandra Reed [ECF 805] ("Reed

Dep.") 27:8-22).

238.   Existing issues with slow mail delivery further exacerbate the problem of returning absentee ballots when there is less time to receive and vote that ballot. Ex. 63 (Kidd Dep. 180:25-181:7); Ex. 76 (Deposition of Lorraine Rose [ECF 800] ("Rose Dep.") 39:5-12).

239.   For voters with limited English proficiency or for voters who require language assistance, having less time to vote absentee makes it even more difficult for them to participate in the franchise. Ex. 21 (Fulton Cnty. Dep. 110:2-15).

240.   Under SB 202, voters in the 2022 general election who were able to vote absentee returned their ballots five to six days closer to election day than in the last few previous elections. Ex. 113 (Grimmer Rep. Tbl. 19).

241.   Counties recognize that having less time to prepare and send out absentee ballots is itself more burdensome on election operations, and this may compel counties to increase the size of their staff in order to meet burdens under this law. Ex. 35 (Gwinnett Cnty. Manifold Dep. 146:8-147:2); Ex. 18 (DeKalb Cnty. Dep. 87:6-88:22).

242.   In the weeks leading up to election day, which is when absentee ballots have to be sent out under the new SB 202 schedule, election officials have to also test their voting machines and conduct advance voting where staff are deployed to voting locations across the county, all of which is harder on large counties who have to test hundreds of machines and send out large numbers of

absentee ballots. Ex. 47 (Adams Dep. 178:22-180:15); Ex. 15 (Cobb Cnty. Dep. 172:11-17).

243.   The vast majority of county election directors surveyed by Georgia Association of Voter Registration and Election Officials ("GAVREO") opposed moving the ballot distribution window closer to election day because they believed doing so would create a large amount of work for election offices in the midst of preparing for and conducting early voting. Ex. 47 (Adams Dep. 34:15-17, 176:25-177:23); Ex. 209 (Email from T. Adams to Senators, "Elections Officials' view of election bills" with attachment (Mar. 8, 2021) at USA-ADAMS-000054.0009).

244.   When the voter ID law was passed in 2005, it was well-known among State legislators that most absentee voters were white voters. *See* Ex. 5 (Hugley Decl. ¶¶ 19-20 ("[I]t was well-known among members of the General Assembly that most absentee voters were Republican and white.")); *see also* Ex. 91 (Anderson Rep. 99); Ex. 69 (Sterling Dep. 62:8-13 (prior to 2018, Republicans disproportionately used absentee by mail voting)).

245.   Prior to SB 202, election officials would verify an absentee voter's identity by comparing the signature on a voter's absentee ballot application or absentee ballot envelope with their signature on file. O.C.G.A. § 21-2-381(a)(1)(C), § 21-2-385(a) (2019); Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 191:7-13).

246.   SB 202 requires a voter to affirm that they do not possess a DDS ID before submitting alternate ID on absentee ballot applications, Off. of Ga. Sec'y of State, *Application for Georgia Official Absentee Ballot* 1 (2021), https://securemyabsenteeballot.sos.ga.gov/resource/1688626692000/AbsenteeBallotPDF, as well as the absentee ballot itself. Ex. 238 (CDR00125708).

247.   If a voter fails to provide the required ID, or if the ID number provided does not match the information in the voter registration system—either because the voter registration record includes no DDS ID number or because it includes an incorrect DDS ID number—the voter must take additional steps before voting. In these circumstances, county election officials would typically issue a provisional absentee ballot and, in a separate mailing, a cure notice instructing the voter to submit a copy of acceptable ID along with a sworn affidavit to cure the deficiency in the application. O.C.G.A. § 21-2-381(b)(3); Ex. 57 (Evans Dep. 148:15-149:25); Ex. 15 (Cobb Cnty. Dep. 42:6-16, 250:18-251:18, 254:23-256:2); Ex. 237 (Absentee Ballot Application Cure Affidavit Form and Notice, DELKALB020319-20); Ex. 63 (Kidd Dep. 99:23-100:5); Ex. 36 (Gwinnett Cnty. Williams Dep. 79:11-80:2).

248.   Several county election officials informed legislators of their opposition to the proposed ID requirements for absentee ballot applications and absentee ballots in SB 202 and its predecessor bills, including noting that the new

ID requirements would increase the administrative burden on election officials. *E.g.*, Ex. 224 (Email from J. Kirk to House Special Committee on Election Integrity members, "Comments from Election Supervisor on Substitute to SB 202" (Mar. 21, 2021), USA-ADAMS-000043.0001-44.002 (opposing the ID requirement for absentee ballots)); Ex. 216 (Adams Survey at USA-ADAMS-000027.0004-06 (noting half of the officials surveyed opposed the change), USA-ADAMS-000027.0005 ("It will cause a huge increase of provisional balloting needing to be cured and costing the counties a great deal of money in postage, ballots, and staff to accomplish the increase."), USA-ADAMS-000027.0006 (because "[v]oters make errors on their information," the requirements "WILL cause a lots of litigation and again an increase in provisional balloting that have to be cured—a costly and time consuming burden on our offices."), *id.* ("[A]sking for more information will dramatically increase the number of rejected ballots that need to be cured because people don't follow instructions."), *id.* (the requirement will "require[e] us to have to duplicate more ballots.")); Ex. 193 (Email from T. Edwards to Legislators, "ACCG Draft Election Bills" (Dec. 18, 2020), USA-EDWARDS-00000316-17); Ex. 55 (Deposition of Todd Edwards [ECF 804] ("T. Edwards Dep.") 122:22-123:16 ("ACCG's position remained that [providing an ID or ID number] should be optional for voters to send in as a backup, so to speak, for verification, perhaps [to] expedite the process. But, no, we wanted [providing an

ID or ID number] to remain optional, as our policy position stated.")), *id.* at 193:3-11).

249.   In Georgia, to obtain DDS ID, a voter must visit one of 67 DDS locations in person, provide documentary proof of identity, citizenship, and residency, and usually pay a $32 fee. *See* Ex. 292 (S. Johnson Decl. ¶ 11); Ex. 28 (30(b)(6) Deposition of Georgia Department of Driver Services (Angelique McClendon) [ECF 705] ("DDS Dep.") 37:1-39:9, 57:2-17; 131:13-132:20).

250.   DDS will waive the $32 fee for individuals who swear they are registered to vote and lack required ID for voting, but all other requirements are the same. Ex. 28 (DDS Dep. 85:18-86:8, 87:8-23); Ex. 250 (GA Department of Driver Services' Field Operations Manager's Bulletin).

251.   Obtaining the necessary underlying documents can be costly, and the process itself presents many challenges for voters with limited resources. Ex. 292 (S. Johnson Decl. ¶¶ 13, 19-22 (describing obstacles that impede many low-income voters who attempt to obtain a driver's license)).

252.   Black citizens of voting age ("CVAs") disproportionately face travel burdens compared to white CVAs. Specifically, 6.74% of Black CVAs are more likely to have to travel more than 90 minutes round-trip to get to a DDS office, compared with 2.78% of white CVAs. Ex. 93 (Chatman Rep. ¶ 85, Tbl. 3).

253.   Black Georgians are less likely than white Georgians to possess a

printer, scanner, photocopier, or smartphone to copy an alternative ID. Ex. 292 (S. Johnson Decl. ¶¶ 9, 20, 30); Ex. 88 (Meredith Rep. ¶¶ 41-49).

254.   According to the Georgia Voter ID Coalition Coordinator for the nonprofit organization VoteRiders, even voters receiving assistance from VoteRiders sometimes give up before completing the process because of these challenges. Ex. 292 (S. Johnson Decl. ¶ 22).

255.   National studies show that strict voter ID laws result in decreased minority participation, particularly in primary elections, as compared to white participation. While there were no statistically significant differences in the turnout for white voters, AAPI turnout decreased by 12.5% in states with strict voter ID laws. Ex. 100 (Lee Rep. 91).

256.   Around the time SB 202 was enacted, SOS office data showed that approximately 272,729 registered voters did not have a DDS ID number associated with their voter record (about 3.5 percent of all registered voters), and these voters were disproportionately Black voters. Ex. 88 (Meredith Rep. ¶ 37 & Tbl. IV.B.6).

257.   According to the State's own records, about 56% (at least 151,595 voters) of the 272,729 voters without a DDS ID number associated with their voter registration record in April 2021 identified as Black, although Black voters constituted just 30% of registered voters in Georgia. Ex. 88 (Meredith Rep. ¶ 37 & Tbl. IV.B.6).

258.   In April 2021, after SB 202 was enacted, the SOS worked with Georgia DDS to update these records by matching voter registration records that did not contain a DDS ID number to DDS records of individuals with a Georgia driver's license or State ID card. Ex. 57 (Evans Dep. 158:13-159:5); Ex. 59 (Germany Dep. 141:11-142:4 (describing effort to update voter registration records)).

259.   After completing this project, the number of registered voters without a DDS ID number associated with their voter registration record exceeded 154,000 voters, Ex. 88 (Meredith Rep. ¶ 26) (describing September 2021 list of voters without a DDS ID number in the voter file), with Black voters still over-represented, constituting 58.8% (about 90,777 voters) of voters without a DDS ID number in the voter file, while white voters were just 25% (about 39,010) of voters without an ID number, *id*. ¶¶ 29-30 & Tbl. IV.B.1 (describing racial demographics of September 2021 list of voters without a DDS ID number in the voter file).

260.   The State has not repeated the matching project to update new voter registration records since summer 2021. Ex. 57 (Evans Dep. 160:24-161:9).

261.   The State did not use DDS data to update outdated or incorrect DDS ID numbers in the voter registration system. Ex. 57 (Evans Dep. 161:15-162:2).

262.   By the November 2022 general election, the number of Georgia voters without a DDS ID number associated with their voter registration record had

climbed to 171,716 voters, about 61% of whom (105,216 registrants) identified as

Black, compared to just 23% (39,597) who identified as white. Ex. 88 (Meredith

Rep. ¶¶ 64-65 & Tbl. VI.A.1); *see also* Ex. 96 (Fraga Rep. ¶ 91 & Tbl. 6

(documenting 171,691 voter records with no DDS ID, including 39,841 who

identify as white; 105,818 who identify as Black; 6,645 who identify as Hispanic;

and 4,505 who identify as AAPI)).

263.   An additional 71,274 voters had an out-of-date or otherwise

inaccurate DDS ID number associated with their voter registration record in

November 2022. Ex. 88 (Meredith Rep. ¶¶ 90-91 & Tbl. VI.F.1 (registrants with ID

problems by race)).

264.   Collectively, about 242,990 registered voters had no DDS ID number

or an incorrect DDS ID number associated with their voter registration record in

November 2022, approximately 53% of whom identified as Black (nearly 130,000

or 5.6% of all Black registrants) and 33% of whom identified as white (about

80,000 or 2% of white registrants). Ex. 88 (Meredith Rep. ¶ 65 Tbl. VI.A.1 (all

registrants by race), ¶¶ 90-91 & Tbl. VI.F.1).

265.   Some voters have a DDS ID, but because their ID number is not

recorded (or is inaccurately recorded) in the state voter registration system—the

case for at least 117,384 voters—they will be shunted to the provisional absentee

ballot process if they write their DDS ID number on a mail ballot application. *See*

Ex. 88 (Meredith Rep. ¶ 75 & Tbls. VI.C.2 (column 4) (identifying 46,110 voters who have been issued a DDS ID but have no DDS ID number in their voter registration record) & Tbl. VI.F.1 (columns 2 & 3) (identifying 71,274 voters who have an incorrect DDS ID number in the voter registration system)); O.C.G.A. § 21-2-381(b)(3); Ex. 57 (Evans Dep. 148:15-149:25); Ex. 15 (Cobb Cnty. Dep. 250:18-251:18); Ex. 237 (Absentee Ballot Application Cure Affidavit Form and notice (produced by DeKalb County Defendants), DELKALB020319-20); Ex. 63 (Kidd Dep. 99:23-100:5).

266.   A total of 2% of AAPI registrants (4,505 AAPI registrants) are confirmed "NO" DDS registrants. AAPI registrants were over twice as likely to have no DDS number associated with their voter registration record as Whites. Ex. 96 (Fraga Rep. ¶¶ 86-88 & Tbls. 5 & 6).

267.   Because the data available from the State of Georgia does not capture voters who were deterred by the ID requirement from submitting a mail ballot application at all, the data cannot account for every voter who was unable to cast a ballot in 2022 because of SB 202's new voter ID requirement for absentee ballot applications. *See* Ex. 89 (Meredith Sur-Rebuttal Rep. ¶¶ 2(a)-(b), 8-19).

268.   In the November 2018 election, AAPI voters' ballots were rejected for incorrect or missing ID information eight times more often than white voters (0.8% compared to 0.11%) and four times more often than all Georgians (0.8% compared

to 0.21%), while Latinx voters' absentee ballots were rejected almost 4 times the rate of white voters and about twice overall rate in Georgia. Ex. 96 (Fraga Rep. Tbl. 13).

269.   In the November 2022 election, 0.62% of AAPI voters' ballots, 0.41% of Hispanic voters' ballots, and 0.36% of white voters' ballots were rejected for incorrect or missing ID information. Ex. 96 (Fraga Rep. Tbl. 13).

270.   In the December 2022 election, 0.78% of AAPI voters' ballots and 0.64% of white voters' ballots were rejected for incorrect or missing ID information. Ex. 96 (Fraga Rep. Tbl. 13).

271.   County officials received complaints from voters noting the difficulties of having to make a physical copy of an alternative form of ID. Ex. 13 (Athens-Clarke Cnty. Dep. 226:22-227:2).

272.   Helen Lockette is a physically disabled African American voter residing in Dougherty County whose absentee ballots were rejected in 2022 because the DDS ID number in her voter registration record is out of date. Ex. 64 (Deposition of Helen Lockette [ECF 793] ("Lockette Dep.") 8:8-8:17, 9:23-10:13, 32:24-33:22); Ex. 90 (Meredith Supp. Decl. ¶ 2.a).

273.   Although Mrs. Lockette submitted absentee ballots throughout the 2022 election cycle, she did not receive any notice of an issue with her absentee ballot application until she attempted to vote in the December 2022 runoff election.

By the time she received notice in December 2022, she believed it was too late for her to correct the problem. Ms. Lockette later learned that all of her 2022 absentee ballots were rejected because of this problem. Ex. 64 (Lockette Dep. 26:18-30:10, 49:19-50:19); *see also* Ex. 270 (Daniel Decl. ¶¶ 8-14 (describing additional steps required to overcome ID problem in 2022 election cycle)); Ex. 90 (Meredith Supp. Decl. ¶¶ 1-2) (describing inaccuracies in Mrs. Lockette's and Mr. Daniel's voter registration records)).

274.   Ms. Lockette has regularly voted absentee by mail since about 2007, when her disability made in-person voting too difficult. Before 2022, Ms. Lockette had little trouble voting by mail. Ex. 64 (Lockette Dep. 16:5-17:2).

275.   Raymond Daniel is a disabled African American voter residing in Bibb County whose DDS ID number was not correctly reflected in the voter registration system during the 2022 election cycle. Ex. 270 (Daniel Decl. ¶¶ 1-5, 12-16); Ex. 90 (Meredith Supp. Decl. ¶ 2.b).

276.   A few days before the December 2022 runoff election, Mr. Daniel learned from a representative of a national organization that Bibb County had rejected his completed absentee ballot for that election because of an issue with his ID number. Ex. 270 (Daniel Decl. ¶ 13); Ex. 52 (Deposition of Raymond Omar Daniel [ECF 794] ("Daniel Dep.") 25:7-27:3).

277.   Mr. Daniel never received any notice from the Bibb County elections

office that there was an issue with his December 2022 absentee ballot. Ex. 270 (Daniel Decl. ¶ 15); Ex. 52 (Daniel Dep. 25:7-27:3).

278.   To correct the issue, Mr. Daniel visited his county board of elections office in person, and his December 2022 runoff election ballot was counted. Ex. 270 (Daniel Decl. ¶ 14); Ex. 52 (Daniel Dep. 27:1-27:3).

279.   The administrative burdens imposed by SB 202's ID requirements for absentee ballot applications—such as the burden of copying, scanning, or printing a separate document—disproportionately impact marginalized voters, including AAPI and limited English proficiency ("LEP") voters, and can prevent these voters from casting their ballot. Ex. 103 (Lee Decl. ¶¶ 13-17).

280.   There are significant gaps in AAPIs' access to the necessary technology to print or scan the documents SB 202 requires. Ex. 103 (Lee Decl. ¶ 18).

281.   AAPI voters are disproportionately LEP, and people with LEP are half as likely as native English speakers to have high levels of proficiency using digital tools or solving problems in digital environments. Ex. 103 (Lee Decl. ¶ 19).

282.   Over 95% of registrants who do not have a DDS ID number associated with their voter registration record do have a social security number ("SSN") associated with their record. Ex. 88 (Meredith Rep. ¶ 66 & Tbl. VI.A.2).

283.   Senator Dugan had announced plans to modify SB 241 to allow for

voters to use the last four digits of their social security number ("SSN4") and birth

date to request an absentee ballot, but this never occurred. Ex. 117 (Mar. 8, 2021,

SB 241 Sen. Fl. Debate Tr., AME_001041:19-1042:10).

284.   The Georgia SOS has admitted that, as a practical matter, counties

could use SSN to verify voters' identity on absentee ballot applications, just as they

currently use SSN to verify identity when a voter without DDS ID returns a

completed mail ballot. Ex. 33 (SOS Dep. 276:25-278:2); Ex. 65 (Deposition of

Matthew Mashburn [ECF 710] ("Mashburn Dep.") 171:20-172:10).

285.   The Georgia State Elections Board (SEB) enacted Emergency Rule

#183-1-14-0.6-.14 in April 2020 regarding absentee ballot drop boxes, pursuant to

its authority in O.C.G.A. § 21-2-31(2) (authorizing the SEB to promulgate rules

"consistent with law" regarding the "conduct of primaries and elections"). Ex. 142

(EB Emergency Rule 183-1-14-0.6.14, USA-04333-34); Ex. 145 (SEB Hr'g Tr.

(Apr. 15, 2020), USA-00681:5-USA-00686:13).

286.   SEB Emergency Rule #183-1-14-0.6-.14 regarding the use of drop

boxes was unanimously extended twice to apply to the November 2020 general

election and the January 2021 runoff election. Ex. 146 (SEB Hr'g Tr. (July 1,

2020), USA-00765:13-USA-00769:6); Ex. 147 (SEB Hr'g Minutes (Nov. 23,

2020), CDR00107194-95).

287.   Some State officials interpreted Georgia's election laws to have

allowed drop boxes prior to SB 202. Ex. 65 (Mashburn Dep. 73:16-24 (admitting

drop boxes were not *prohibited* under prior Georgia law)); *see also id*. 74:20-75:5

(admitting that prior to SB 202, there were arguments that the statutory provision

about creating additional registration sites allowed drop boxes, although the State

Election Board took the view that view that "there were no drop boxes that existed

upon the expiration of the governor's emergency order").

288.    In an email dated January 3, 2022, containing proposed talking points

for Secretary Brad Raffensperger, Ryan Germany wrote, "What most people don't

realize is that before the General Assembly changed the law in SB 202 (after the

2020 election), that Georgia law already authorized counties to utilize drop boxes.

None of them had yet, but I guarantee you that the Democrat-controlled counties

would have after facing pressure from liberal groups."" Ex. 198 (Email from R.

Germany to SOS staff, "talking points" (Jan. 3, 2022), CDR00056863-64).

289.    SEB Emergency Rule #183-1-14-0.6-.14 set guidelines for the use of

drop boxes, in the 2020 elections, including the following: drop boxes "may be

open beginning 49 days before election day and shall close at 7:00 p.m. on

Election Day," had to "only be located on county or municipal government

property generally accessible to the public," "use a video recording device to

monitor each drop box location," be "constructed of durable material to be able to

withstand vandalism and inclement weather" with an opening slot that does "not

allow ballots to be tampered with or removed" and "minimize[s] the ability for liquid to be poured into the drop box," "be securely fastened to the ground or an immovable fixture;" "be clearly labeled 'OFFICIAL ABSENTEE BALLOT DROP BOX,'" and have ballots collected "at least once every 24 hours" and be closed by 7:00 p.m. on Election Day. Ex. 142 (EB Emergency Rule 183-1-14-0.6.14, USA-04333-34).

290.    Counties had discretion as to the number of drop boxes they could use. *See* Ex. 82 (Bailey 3/21/23 Dep. 120:5-120:11).

291.    Consistent with O.C.G.A. § 21-2-382(a), there was no requirement that the drop boxes be located inside a building. Ex. 142 (EB Emergency Rule 183-1-14-0.6.14, USA-04333-34).

292.    The only day or time limitation the SEB Emergency Rule was that drop boxes "may be open beginning 49 days before election day and shall close at 7:00 p.m. on Election Day." Ex. 142 (EB Emergency Rule 183-1-14-0.6.14, USA-04333-34).

293.    During the 2020 elections, most drop boxes were located outdoors and available to voters 24 hours a day, seven days a week (including weekends). Ex. 69 (Sterling Dep. 68:2-11, 69:1-6); Ex. 35 (Gwinnett Cnty. Manifold Dep. 131:7-132:9); Ex. 21 (Fulton Cnty. Dep. 52:9-17).

294.    Many drop boxes were placed in underserved—usually minority—

communities, where public transportation options are limited. Ex. 261 (Brower 5/23/22 Decl. ¶ 9).

295.   Over 50% of absentee-by-mail ballots were returned via drop box in November 2020, totaling over 550,000 ballots. Exs. 173-174 (Stephen Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GBP.org, Sept. 2, 2022, https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-the-2020-presidential-election (reporting over 550,000 ballots returned by drop box in 2020)); Ex. 86 (Burden Sur-Rebuttal Rep. 6 (showing 52% of absentee-by-mail ballots were returned via drop box in 2020)); *see also* Ex. 110 (Rodden Rep. 15 (more than half of all mail-in ballots were submitted via drop box in Fulton, DeKalb, Cobb, and Gwinnett Counties in 2020)).

296.   A total of 64.65% of the 550,000 absentee ballots returned to drop boxes were returned to drop boxes in Fulton, DeKalb, Gwinnett, Cobb, Douglas, Chatham, Rockdale, and Clayton counties. Exs. 173-174 (Stephen Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GBP.org, Sept. 2, 2022, https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-the-2020-presidential-election).

297.   State and County election officials have asserted that SEB's Emergency Rule regarding drop boxes provided a high level of security. *E.g.*, Ex. 61 (Harvey Dep. 75:4-19, 76:7-16 (testifying that he did not have security concerns

about the chain of custody process for moving ballots from drop boxes; the process "was sound and was, for the most part, well executed")); Ex. 69 (Sterling Dep. 72:10-17 (affirming drop boxes in 2020 were secure), 155:12-156:20 (criticizing SB 202's drop box provisions as burdensome, in 2020 they were secure)); Ex. 36 (Gwinnett Cnty. Williams Dep. 63:10-20, 66:1-6, 68:16-23 (SOS provided guidance requiring 24-hour surveillance and locking mechanisms on the drop boxes, as well as chain of custody of ballots removed from them and custody forms for the boxes)); Ex. 21 (Fulton Cnty. Dep. 57:7-59:5 (SOS provided guidance requiring 24-hour cameras on the drop boxes and guidance on chain of custody procedures and forms), 60:16-22 (no security concerns regarding drop boxes), 69:10-20 (Fulton County did not have concerns about the security of drop boxes)); Ex. 49 (Bailey 10/6/22 Dep. 47:6-12 (drop boxes were "a very effective way for voters to return their ballots to us in a safe way"), 48:10-49:6 (Richmond County "didn't have any problems with" drop boxes in the 2020 election and was "comfortable with the procedures that were in place"); 83:21-84:5); Ex. 18 (DeKalb Cnty. Dep. 48:12-18); Ex. 129 (Feb. 22, 2021 H. EIC Hr'g Tr., AME_000361:1-16 (Douglas County Elections Supervisor testifying that that "drop boxes were a great tool that served us very well in our community.")).

298.   Election administrators from counties that opted to use drop boxes during the 2020 election cycle have noted several reasons why they decided to

utilize drop boxes, including that drop boxes increased absentee voting options, reduced long lines, limited the spread of COVID-19, and addressed concerns about delays with the U.S. Postal Service. Ex. 18 (DeKalb Cnty. Dep. 52:4-53:17); Ex. 21 (Fulton Cnty. Dep. 71:8-24, 75:6-9); Ex. 63 (Kidd Dep. 33:21-36:4).

299.   There was significant nationwide concern in 2020 about the performance of the USPS. The agency's financial and administrative futures remain uncertain. Voters surveyed by Gallup in September 2020 reported that "absentee ballots not being counted because the postal service delivered them too late" was a "major problem." Ex. 86 (Burden Sur-Rebuttal Rep. 2).

300.   When faced with equally convenient options of a mailbox or drop box, voters preferred using drop boxes because they provide a certainty that mailboxes do not. Ex. 86 (Burden Sur-Rebuttal Rep. 2-3).

301.   A growing dissatisfaction and distrust of the mail added to the increased use of drop boxes. Ex. 98 (Kennedy Rep. 15); Ex. 347 (Mar. 22, 2021 Sen. Ethics Comm. Hr'g Tr., AME_001675:17-AME_001677:1 (Heard Cnty. Elections Supervisor T. Adams)); Ex. 128 (Feb. 19, 2021 H. EIC Hr'g Tr., AME_000228:16-AME_000229:2 (Lowndes Cnty. Elections Supervisor D. Cox)).

302.   Election officials testified to the legislature during the 2021 legislative session that drop boxes were extremely popular with voters. *See* Ex. 128 (Feb. 19, 2021 H. EIC Hr'g Tr., AME_000207:12-19 (Richmond County Elections

Supervisor Lynn Bailey noting, "[O]ur jurisdiction used drop boxes in November with great success. Our voters loved it. We didn't have any issues with it. The drop boxes -- we followed the strict guidelines that were set in place by the Secretary of State's office that they had to be permanently affixed to the ground, they had to be monitored and all those things.")), AME_000228:16-21 (Lowndes County Elections Supervisor Deb Cox testifying, "The drop boxes are very important. They're hugely popular. [. . .] They were used extensively in our county after hours.")).

303.   Regarding the SOS Office's requests to counties for drop box surveillance video, then-SOS General Counsel Ryan Germany testified to the Legislature that ". . . anytime we have requested it [drop box surveillance video] from a county, we have – we have received it." Ex. 121 (Dec. 3, 2020 Sen. Oversight Comm. Hr'g Tr., AME_001958:11-18).

304.   The SEB did not discover any instances of drop box misuse resulting in the submission of ballots that should have not been submitted, or of improper access to the drop boxes. Ex. 65 (Mashburn Dep. 76:6-11, 77:9-14).

305.   Mr. Mashburn admitted the cause of any drop box security or surveillance related instances was county non-compliance with the SEB rules already in place to ensure ballot security. Ex. 65 (Mashburn Dep. 76:1-5).

306.   Some voters may have erroneously viewed drop boxes susceptible to

abuse predominantly because these voters were unaware of the existing procedures for the collection, placement, and monitoring of drop boxes to ensure their security under the SEB rule. Ex. 34 (SEB Dep. 175:25-176:25); Ex. 65 (Mashburn Dep. 81:16-23).

307.    Several county election officials informed legislators of their opposition to the absentee ballot drop box provisions in SB 202 and its predecessor bills, including opposing the limits on the numbers of drop boxes permitted per county and advocating for drop boxes to be permitted outdoors and available 24-hours a day until 7:00 p.m. on Election Day. *See, e.g.*, Ex. 216 (Adams Survey at USA-ADAMS-000027.0007-08 (noting 35 election officials surveyed advocated for the SEB's Emergency Rule regarding drop boxes to become law), USA-ADAMS-000027.0007 ("The counties who installed [drop boxes] should not have to close them due to a change in the allowed number based on population."), *id.* ("Making [drop boxes] available only at early voting and during those hours only makes absolutely no sense."), USA-ADAMS-000027.0008 ("Boxes should be open as soon as ballots can be issued and close at the close of polls on Election Day.")); Ex. 224 (Email from J. Kirk to House Special Committee on Election Integrity members, "Comments from Election Supervisor on Substitute to SB 202" (Mar. 21, 2021), USA-ADAMS-000043.0001-44.0002 (petitioning for at least one drop box per early voting location)); Ex. 118 (Mar. 18, 2021 H. EIC Hr'g Tr.,

AME_001627:11-19 (Heard County Elections Supervisor Tonnie Adams testifying

that the proposed drop box provisions would render drop boxes "useless")); Ex.

128 (Feb. 19, 2021, H. EIC Hr'g Tr., AME_000207:19-208:9 (Richmond County

Election Supervisor Lynn Bailey advocating that legislators permit drop boxes to

remain outdoors), AME_000223:14-224:2 (Cobb County Elections Supervisor

Janine Eveler testifying that she is "not a big fan of mandating the absentee ballot

drop boxes to be inside the advanced voting locations" and "having voters to bring

their ballots into the polling place . . . [could] caus[e] some confusion and disorder

in the poll"), AME_000228:10-229:7 (Lowndes County Elections Supervisor Deb

Cox testifying that requiring drop boxes to be indoors and only during early voting

hours "defeat[s] the purpose of having" drop boxes)); Ex. 129 (Feb. 22, 2021 H.

EIC Hr'g Tr., AME_000361:1-16) (Bartow Cnty. Elections Supervisor J. Kirk);

Ex. 227 (Email from T. Edwards to Legislators, "ACCG Election Bills Comments

to Leadership" with attachment (Mar. 23, 2021). USA-EDWARDS-00000228-31

(ACCG informing legislators of its members' preference that counties have

"flexibility and option to employ" drop boxes and of its members' opposition to

making drop boxes available "only in advance voting locations and during

absentee voting days/hours")).

308.  Some county election officials advocated to have drop boxes

permitted at every early voting location. *E.g.*, Ex. 224 (Email from J. Kirk to

House Special Committee on Election Integrity members, "Comments from Election Supervisor on Substitute to SB 202" (Mar. 21, 2021), USA-ADAMS-000043.0001-44.0002 (advocating for drop boxes at each advanced voting location)).

309.   County officials objected against having to disassemble drop boxes that were already put in place prior to SB 202. Ex. 216 (Adams Survey at USA-ADAMS-000027.0007); Ex. 224 (Email from J. Kirk to House Special Committee on Election Integrity members, "Comments from Election Supervisor on Substitute to SB 202" (Mar. 21, 2021), USA-ADAMS-000043.0001-44.0002 ("The counties who installed [drop boxes] should not have to close them due to a change in the allowed number based on population.")).

310.   "Ballot harvesting," which is commonly understood as groups or individuals returning large numbers of absentee ballots in an unlawful manner, was already illegal in Georgia prior to SB 202. *See* O.C.G.A. § 21-2-385(a) (2020); *see also* Ex. 187 (Email from H. McCloud to SOS staff, "FW: 11.19.2020 - Election FAQs for Representatives" (Nov. 19, 2020) at CDR00146331, ¶ 11 ("Since the passage of HB 316, ballot harvesting is explicitly forbidden by Georgia code.")); Ex. 198 (Email from R. Germany to SOS staff, "talking points" (Jan. 3, 2022), CDR00056863-64).

311.   State Defendants admit there was no evidence of widespread ballot

harvesting in the 2020 elections. *See, e.g.*, Ex. 346 (SOS Admission No. 16); Ex. 65 (Mashburn Dep. 76:6-11, 201:15-19).

312.   Mr. Germany, then-SOS's General Counsel, testified he did not recall any legislators expressing concerns regarding the security of drop boxes during the November 2020 election. Ex. 59 (Germany Dep. 66:4-7).

313.   The SEB dismissed a handful of complaints about drop boxes, where voters were alleged to each have deposited multiple ballots in a drop box. Investigators determined in each case that voters were legally dropping off ballots for their family members. Ex. 96 (Fraga Rep. ¶ 141).

314.   The SEB's investigations into the use of drop boxes in the 2020 election did not reveal any widespread voter fraud. Ex. 34 (SEB Dep. 83:10-17); Ex. 96 (Fraga Rep. ¶ 141).

315.   State officials responded to an Associated Press survey with no mention of drop boxes being associated with voter fraud, stolen ballots, or incidents in which the boxes or ballots were damaged to the extent that election results would have been affected. Ex. 96 (Fraga Rep. ¶ 141).

316.   In the most densely populated counties of Georgia, more than half of all absentee ballots cast in the November 2020 election were submitted via drop box: 64% in DeKalb, 61% in Cobb, and 55% in Fulton. Ex. 110 (Rodden Rep. 15).

317.   SB 202 resulted in a dramatic cut in the number of drop boxes

available in counties with large minority populations. Ex. 85 (Burden Rep. 27); Ex.

100 (Lee Rep. 79); Ex. 5 (Hugley Decl. ¶ 17 ("[T]he restrictions on drop boxes

were targeted at minority voters because they drastically cut the number of drop

boxes that the metro-Atlanta counties, which are heavily minority, could offer.")).

318.    In November 2020, there were approximately 300 drop boxes in

Georgia, 146 (48%) of which were in the four metro-Atlanta counties (Fulton,

DeKalb, Cobb, and Gwinnett) plus Douglas, Chatham, Rockdale, and Clayton

Counties. Ex. 85 (Burden Rep. 40-44 (showing 37 in Fulton; 33 in DeKalb; 24 in

Gwinnett; 10 in Douglas; 10 in Chatham; and 8 in Clayton)); Ex. 86 (Burden Sur-

Rebuttal Rep. 7 (noting that Cobb County actually had 16 drop boxes in 2020));

Exs. 173-174 (Total Absentee Ballots Collected by Drop Box, Georgia Public

Broadcasting spreadsheet (Sept. 2, 2022),

https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-
the-2020-presidential-election (showing 8 drop boxes in Rockdale County in

2020)); *see also* Ex. 96 (Fraga Rep. ¶ 143); Ex. 113 (Grimmer Rep. 98, fn. 49).

319.    SB 202 caused a reduction in the total possible number of drop boxes

by about 110, with the largest decreases in drop boxes required in the eight

counties that offered the highest number of drop boxes, Ex. 85 (Burden Rep. 40-44

(showing a loss of: 29 in Fulton, 27 in DeKalb, 18 in Gwinnett, 9 in Douglas, 8 in

Chatham, and 6 in Clayton)); Ex. 86 (Burden Sur-Rebuttal Rep. 7-8 (noting that

Cobb County had 16 drop boxes in 2020 but is now permitted only six, so was

forced to eliminate ten drop boxes)); Ex. 174 (Total Absentee Ballots Collected by

Drop Box, Georgia Public Broadcasting spreadsheet (Sept. 2, 2022),

https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-

the-2020-presidential-election (showing 8 drop boxes in Rockdale in 2020,

indicating a loss of 7 when compared to Burden Rep. at 43, which shows Rockdale

is permitted only one drop box under SB 202)), and are home to 53.2% of the

State's Black population and 69.3% of the State's AAPI population and 50.6% of

the State's Hispanic population, but only 29.1% of the State's white population

(Fulton, DeKalb, Gwinnett, Cobb, Douglas, Chatham, Rockdale, and Clayton

Counties), Ex. 169 (U.S. Census Bureau, "TOTAL POPULATION," American

Community Survey, ACS 5-Year Estimates Selected Population Detailed Tables,

Table B01003 (2021)[1]); Ex. 342 (U.S. Census Bureau, "HISPANIC OR LATINO

ORIGIN BY RACE," American Community Survey, ACS 5-Year Estimates

Selected Population Detailed Tables, Table B03002 (2021)[2]); U.S. Census Bureau,

---

[1] *Available at*
https://data.census.gov/table/ACSDT5YSPT2021.B01003?t=451:453&g=040XX0
0US13_050XX00US13051,13063,13067,13089,13097,13121,13135,13247&tp=tr
ue (last visited Jan. 17, 2024).
[2] *Available at*
https://data.census.gov/table/ACSDT5Y2021.B03002?g=040XX00US13_050XX0
0US13051,13063,13067,13089,13097,13121,13135,13247&y=2021&d=ACS%20
5-Year%20Estimates%20Detailed%20Tables&moe=false&tp=false (last visited
Jan. 17, 2024)).

"TOTAL POPULATION," American Community Survey, ACS 5-Year Estimates

Selected Population Detailed Tables, Table B01003 (2021),

https://data.census.gov/table/ACSDT5YSPT2021.B01003?t=012:451:453&g=050

XX00US13051,13063,13067,13089,13097,13121,13135,13247 (last visited Ja. 17,

2024) (AAPI population).

320.   Collectively, Fulton, DeKalb, Gwinnett, Cobb, Douglas, Chatham,

Rockdale, and Clayton Counties used 146 drop boxes in 2020 and were limited by

SB 202 to 33 drop boxes, a loss of 113 drop boxes (or approximately 77% of the

drop boxes those counties had available in 2020). Ex. 85 (Burden Rep. 40-44); Ex.

86 (Burden Sur-Rebuttal Rep. 7-8); Ex. 174 (Total Absentee Ballots Collected by

Drop Box, Georgia Public Broadcasting spreadsheet (Sept. 2, 2022),

https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-

the-2020-presidential-election); *see also* Ex. 97 (Fraga Sur-rebuttal Rep. ¶¶ 69-70);

Ex. 113 (Grimmer Rep. 110, Tbl. 21 (also showing 143 drop boxes reduced to 33)).

321.   Nearly one-half (45%) of the statewide Black population experienced

a decrease of 8 or more drop boxes. Ex. 85 (Burden Rep. Tbl. 11, Lines 10-14);

Ex. 86 (Burden Sur-Rebuttal Rep. 7-8 (update to show that Cobb County lost 10

drop boxes under SB 202, not the four noted in Ex. 85)).

322.   Fulton, DeKalb, and Gwinnett Counties (which contain one-third

(33.7%) of the statewide Black population) experienced the greatest reduction in

the number of drop boxes after SB 202. Ex. 85 (Burden Rep. 28, Tbl. 11, Lines 12-14); *see also* Ex. 113 (Grimmer Rep. Tbl. 21).

323.   Specifically, Fulton County had the largest reduction in the number of drop boxes in the State: from 37 in November 2020 to 8 in 2022. Ex. 85 (Burden Rep. 41-44); *see also* Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 69-70); Ex. 113 (Grimmer Rep. Tbl. 21).

324.   The number of drop boxes in DeKalb County decreased from 33 in November 2020 to 6 in November 2022. Ex. 85 (Burden Rep. 41-44); *see also* Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 69-70 (32 drop boxes in 2020 to 6 in 2022)); Ex. 113 (Grimmer Rep. Tbl. 21 (same)).

325.   The number of drop boxes in Gwinnett County decreased from 24 in November 2020 to 6 in November 2022. Ex. 85 (Burden Rep. 41-44); *see also* Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 69-70 (23 drop boxes in 2020 to 6 in 2022)); Ex. 113 (Grimmer Rep. Tbl. 21 (same)).

326.   The number of drop boxes in Chatham County decreased from 10 in November 2020 to 3 in November 2022. Ex. 85 (Burden Rep. 41-44); *see also* Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 69-70); Ex. 113 (Grimmer Rep. Tbl. 21).

327.   The number of drop boxes in Cobb County decreased from 16 in November 2020 to 6 in November 2022. Ex. 86 (Burden Sur-Rebuttal Rep. 7-8); *see also* Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 69-70); Ex. 113 (Grimmer Rep. Tbl.

21).

328.   Fulton County had 36 early voting locations in November 2022 but was permitted just 8 drop boxes under SB 202's strict limits. Ex. 235 (Fulton County Advance Voting Hours and Locations 2022 General Election, Fulton-County-SB202-00033198 (number of early voting locations)); Ex. 85 (Burden Rep. 42 (number of drop boxes allowed for Fulton in 2022)).

329.   SB 202 resulted in two-thirds to three-quarters of Black, Hispanic, and AAPI registrants in the state having a reduction in the number of drop boxes available for them to use, versus just over half of white registrants who saw a decrease in their number of drop boxes. Ex. 96 (Fraga Rep. ¶¶ 149-150 & Tbl. 15); *see also* Ex. 85 (Burden Rep. 40-44). Specifically, after SB 202, 74.8% of registered Black voters, and 67.9% of registered Hispanic voters saw drop boxes in their county decrease. Ex. 96 (Fraga Rep. ¶¶ 148-150 & Tbl. 15). After SB 202, 76.6% of registered AAPI voters saw drop boxes in their county decrease, representing the biggest decline in drop box access among all racial groups. *Id*. Only 53.7% of white voters saw a decrease in the number of drop boxes available in 2022 compared with 2020. *Id*.

330.   Only 29 counties did not use any drop boxes prior to the passage of SB 202. Together the counties represent only 4% of the Black population statewide. Ex. 85 (Burden Rep. 29).

331.   Only 9.1% of the statewide Black population resides in counties that saw an increase in the number of drop boxes after SB 202. Ex. 85 (Burden Rep. Tbl. 11, Lines 1 & 2). Of this 9.1%, only 0.8% had access to two more drop boxes in November 2022 compared with November 2020, while the remaining 8.3% saw an increase of a single drop box in their county. *Id*.

332.   White voters were disproportionately likely to see no change in the number of drop boxes available in their county. Statewide, 34% of white registered voters saw no change in the number of drop boxes available in their county, compared to only 15.2% of Black, 25.0% of Hispanic, and 18.2% of AAPI registered voters. Ex. 96 (Fraga Rep. ¶ 150).

333.   The reduction in availability of drop boxes due to SB 202 is systematically related to the size of the Black population in a county. Ex. 85 (Burden Rep. 27). A linear regression analysis of the change in drop boxes and the Black population shows that, on average, a county with a Black population 10 percentage points or greater than another county experienced a decrease of 3.4 more drop boxes as a result of SB 202. Ex. 85 (Burden Rep. 27 & n.51 (finding that the correlation is statistically significant)); *see also* Ex. 93 (Chatman Rep. ¶ 66 (finding in 2020, only about 2.5 percent of the population of Georgia lived in counties that did not provide a ballot drop box)).

334.   The State did not maintain records of drop box use by individual

voters, so the State does not have a record of drop box use by race. Ex. 252

(9/22/23 Prelim. Inj. Hr'g Tr. 89:11-14 (Grimmer)).

335.   Douglas County is the only county in Georgia that recorded drop box

use by voter in the 2020 Election Cycle. Ex. 85 (Burden Rep. 33-34); Ex. 63 (Kidd

Dep. 114:16-116:8).

336.   The data on drop boxes from Douglas County confirm what the

statewide evidence shows: Black voters were more likely to use drop boxes than

white voters. Ex. 85 (Burden Rep. 34). In November 2020, Black voters in

Douglas County were 4.1 percentage points more likely than other voters to return

absentee ballots via drop boxes; in January 2021, Black voters in Douglas County

were 6.0 percentage points more likely than other voters to return absentee ballots

via drop boxes. *Id*.

337.   Defense expert Dr. Grimmer's opinion that Black voters used drop

boxes less frequently than white voters is calculated based on two surveys, each

containing fewer than 145 total drop box voters in Georgia. Ex. 87 (Burden Supp.

Decl. 2-3). For 2022, the dataset he relies upon contains only 12 total self-reported

drop box users in the entire State. *Id*. Plaintiffs' expert Dr. Burden concludes these

sample sizes are too small to draw conclusions about Georgia's drop box voters as

a whole. *Id*.; *see also* Ex. 341 (Fraga Supp. Decl. ¶ 17) (concluding that "the

survey data relied on by defendant's expert (Dr. Grimmer) indicates that Black

voters in Georgia used drop boxes at a significantly higher rate than White voters in Georgia.").

338.   By reducing the number of drop boxes available, SB 202 results in increasing the distance that voters have to travel to use a drop box. Ex. 96 (Fraga Rep. ¶ 154).

339.   More than 1.1 million registered voters in Georgia who had access to a drop box in their county before SB 202 had to travel farther than the statewide average of 4.8 miles to use the nearest drop box post-SB 202. Ex. 96 (Fraga Rep. ¶ 179 & Tbl. 21).

340.   In densely populated urban counties, where higher shares of the population do not have access to automobiles, drop boxes had been conveniently dispersed through a wide range of neighborhoods prior to SB 202. After SB 202, in some of the most densely populated areas in the Atlanta area—above all in those in Fulton, Clayton and Dekalb counties—as well as in Savannah and other smaller cities, the nearest drop box location moved much further away. Ex. 110 (Rodden Rep. 16).

341.   The percent of registrants who are further than the statewide average distance from a drop box than they were pre-SB 202 was larger for Black (16.5%), Hispanic (15.5%), and AAPI (21.1%) registrants than for white registrants. Ex. 96 (Fraga Rep. ¶ 158); Ex. 324 (Deposition of Dr. Bernard L. Fraga [ECF 745]

("Fraga Dep.") 145:22-146:20).

342.    Extant evidence indicates that most voters use the drop box closest to their home address and proximity to the nearest drop box is the standard measure of drop box accessibility in peer-reviewed scientific research. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶¶ 49-54); *see also* Ex. 100 (Lee Rep. 76-77).

343.    Dr. Grimmer testified that he is not aware of any peer-reviewed literature that does not use distance from residential address as the standard measure of exposure to treatment related to drop box access. Ex. 83 (Grimmer Dep. 129:21-122:16).

344.    The survey data relied on by Defendants' expert shows that the percent of Georgia drop box users using proximity to residential address as a key consideration when choosing between drop boxes in 2020 is 68.8% or likely higher. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶ 61 & Tbl. 3).

345.    Dr. Grimmer testified that he is not aware of any peer-reviewed literature that does not use distance from residential address as the standard measure of exposure to treatment related to drop box access. Ex. 83 (Grimmer Dep. 129:21-122:16).

346.    The survey data relied on by Defendants' expert shows that the percent of Georgia drop box users using proximity to residential address as a key consideration when choosing between drop boxes in 2020 is 68.8% or likely

higher. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶ 61 & Tbl. 3).

347.    The average (mean) distance between a registered voter eligible to
vote as of November 8, 2022, and the closest drop box within their county
increased from 3.415 miles in the major statewide election prior to the enactment
of SB 202 (November 2020) to 4.802 miles in the major statewide election
following enactment of SB 202 (November 2022). This is an increase of 1.387
miles, or 2.774 miles in round-trip distance. Ex. 96 (Fraga Rep. ¶ 156 & Tbl. 15).

348.    There is a clear dichotomy between white and non-white voters when
it comes to the percentage of those voters who live above or below the average
distance from a drop box. Only 12.4% of white registrants who lived 4.8 miles (the
average) or closer to a drop box in 2020 now live further than 4.8 miles from their
county's closest drop box. The share of Black registrants shifting from being
relatively near a drop box to relatively far from a drop box was higher, at 16.5% of
Black registrants previously within 4.8 miles of a drop box. Both Hispanic and
AAPI registrants also saw a decrease in the percentage of voters living within 4.8
miles of a drop box that was greater than the white voter population; 15.5% for
Hispanic registrants and a decrease of 21.1% for AAPI registrants, a larger drop
than any other racial/ethnic group. Ex. 96 (Fraga Rep. ¶¶ 158-159); Ex. 324 (Fraga
Dep. 145:22-146:20, 148:13-19, 155:12-23, 156:10-16).

349.    Dr. Grimmer's analysis shows that voters in the four metro-Atlanta

counties (Cobb, DeKalb, Fulton, and Gwinnett Counties) returned their ballots to a wide variety of drop boxes. In Fulton County in 2020, a majority (52%) of mail-in voters who returned their ballot to a drop box returned their ballot to a drop box other than one of the seven most used drop boxes in the county. Ex. 113 (Grimmer Rep. ¶¶ 134-35, Tbl. 21). In fact, "Fulton County's drop box use was the least concentrated among all counties." *Id*. ¶ 135, Tbl. 21. Dr. Grimmer also acknowledged that Fulton County represented the plurality of voters who voted by drop box in Georgia—14.2% of drop box voters in the state voted in Fulton County. Ex. 83 (Grimmer Dep. 172:9-19). In DeKalb, Gwinnett, and Cobb Counties, mail-in voters who returned their ballot to a drop box returned their ballot to a drop box other than one of the 6 most used drop boxes at a rate of 19%, 39%, and 26% respectively. Ex. 113 (Grimmer Rep. ¶ 135, Tbl. 21).

350.   There are a number of costs associated with traveling to access a drop box, early voting location, or DDS office, the largest and most quantifiable of which is time. Ex. 93 (Chatman Rep. ¶ 25).

351.   In 2020, 6.47% of Black citizens of voting age ("CVAs") in Georgia faced a travel burden to access a ballot drop box (with travel burden defined as a round-trip exceeding 60 minutes), compared to 4.74% of white CVAs who faced such a travel burden, a difference of 1.73%. Ex. 93 (Chatman Rep. ¶ 86 & Tbl. 3).

352.   In 2022, 7.34% of Black CVAs in Georgia faced a travel burden to

access a ballot drop box, compared to 2.98% of white CVAs who faced such a

travel burden, a difference of 4.36 %. Ex. 93 (Chatman Rep. ¶ 86 & Tbl. 3).

353.   In 2020, Black CVAs statewide were 36% more likely than white

CVAs to have a round-trip exceeding an hour to access a ballot drop box. In 2022,

Black CVAs statewide were 146% more likely than white CVAs to have a round-

trip exceeding an hour to access a ballot drop box. Ex. 93 (Chatman Rep. ¶¶ 7, 88).

354.   A travel burden to access a ballot drop box exists almost exclusively

among those who do not have access to a vehicle, but instead take public

transportation or walk. Ex. 93 (Chatman Rep. ¶ 14); Ex. 102 (Deposition of Dr.

Daniel G. Chatman [ECF 737] ("Chatman Dep.") 72:7-9).

355.   Black voting age citizens in Georgia disproportionately lack access to

a vehicle at home. About 9% of Black CVAs in Georgia lack a vehicle in the

household; about 3% of white CVAs in Georgia lack a vehicle in the household.

Ex. 93 (Chatman Rep. ¶ 61); *see also* Ex. 14 (30(b)(6) Deposition of Black Voters

Matter Fund [ECF 696] (Clifford Albright) ("BVMF Dep.") 102:13-102:19,

107:12-107:21).

356.   In 2020, the median one-way travel time to a ballot drop box via

public transportation was 26.43 minutes. In 2022, the median one-way travel time

to a ballot drop box via public transportation was 42.13 minutes. Ex. 93 (Chatman

Rep. ¶ 39 & Tbl. 2).

357.   About 14% of Georgia's population of Black CVAs reside in Fulton County. Ex. 93 (Chatman Rep. ¶ 16).

358.   In Fulton County, the share of white CVAs without access to an automobile and who would have had a round-trip exceeding one hour to access a ballot drop box rose from 1.0% in 2020 to 2.35% in 2022. The share of Black CVAs without access to an automobile and who would have had a round-trip exceeding one hour to access a ballot drop box rose from 3.8% in 2020 to 13.2% in 2022. Ex. 229 (Chatman Sur-Rebuttal ¶ 16).

359.   The elimination of drop boxes on the final four days of the election cycle, coupled with sharp reductions in the availability and usefulness of drop boxes on other days, disproportionately burden Black voters compared to white voters. Ex. 85 (Burden Rep. 20).

360.   Black voters disproportionately returned absentee ballots in the last four days before Election Day in November 2020, as they did in all federal general elections since 2014. Ex. 85 (Burden Rep. 14-20). During this period, nearly 70% of absentee ballots returned were returned by drop boxes. Ex. 86 (Burden Sur-Rebuttal Rep. 6).

361.   By the 2020 election, it would be apparent that any new limitations placed on absentee voting procedures—whether it be requirements to request ballots or ways in which such ballots can be returned—will disrupt the voting

habits of Black voters in Georgia substantially more than those of white voters, imposing greater costs on Black voters relative to white voters. Ex. 85 (Burden Rep. 16 & Fig. 4).

362.   Voters who used drop boxes on these final four days in 2020 were not able to use them during those final four days after SB 202. Voters possessing completed ballots on those days are also not able to take advantage of early voting and would likely not have enough time to return their ballots by mail. The alternative is to appear in person at a county election office or other location with an authorized deputy registrar or get in line and vote in person on election day. Ex. 85 (Burden Rep. 30).

363.   Fulton County observed that SB 202's limits on both the number of drop boxes and their availability dramatically decreased usage of drop boxes. Ex. 21 (Fulton Cnty. Dep. 66:23-67:5).

364.   In 2020, Georgia voter Erendira Brumley worked as a poll worker on election day, and therefore had to vote absentee by depositing her absentee ballot into a drop box; but now under SB 202, Ms. Brumley—who has continued to serve as a poll worker—has to take time off from her full-time job as a software architect in order to be able to use drop boxes, which have been relocated inside buildings and are only accessible during work hours (9 a.m. to 5 p.m.). Ex. 50 (Deposition of Erendira Brumley [ECF 796] ("Brumley Dep.") 16:18-17:2, 21:5-11, 21:23-22:3,

22:19-23, 26:20-25, 29:14-20).

365.   Similarly, in the 2022 primary election, Georgia voter Jessica Owens, who votes absentee because she cannot stand in line to vote in person without incurring additional costs for childcare, no longer had access to the drop box she previously used that was seven minutes away from her house. Instead, Ms. Owens had to drive an hour roundtrip in search of the nearest drop box. Ex. 73 (Deposition of Jessica Owens [ECF 799] ("Owens Dep.") 24:13-25:7, 26:18-27:10, 28:24-29:12, 36:19-37:1, 37:14-22).

366.   The drop box Georgia voter Phil Weltner had used near his home during the 2020 elections was not available during the 2022 election; instead, Mr. Weltner and his daughter had to wait close to three hours in line before they were able to vote in the 2022 runoff election. Ex. 77 (Deposition of Phil Weltner [ECF 802] ("Weltner Dep.") 16:12-21, 24:17-25:5, 26:14-19).

367.   Georgia voter Monica Poole could not vote in person in the 2022 primary because of an injury that left her on crutches. As a result, she turned to absentee voting, only to be disenfranchised because of SB 202 restrictions that made it difficult to return her ballot. Drop box access was very limited—the closest drop box was almost an hour drive from her home—and by the time she was able to print her ballot and get someone to drive her to the post office, it was too late to ensure her ballot would be delivered at the elections office on time, and her ballot

was not counted. Ex. 74 (Deposition of Monica Poole [ECF 803] ("Poole Dep.") 25:25-26:11, 32:25-33:21).

368.   Georgia voter Sheree Giardino has served as a poll watcher and helps coordinate voter protection efforts across several counties, and through that work, Ms. Giardino observed many voters who were confused about the location of drop boxes during the 2022 elections. Ex. 60 (Deposition of Sheree M. Giardino [ECF 797] ("Giardino Dep.") 13:17-24, 17:23-18:10).

369.   The share of absentee-by-mail ballots cast drastically decreased after the passage of SB 202: only 6.2% of votes were cast by mail in the November 2022 election; by contrast, 26.1% and 23.9% of votes were cast absentee in the November 2020 and January 2021 elections respectively. Ex. 113 (Grimmer Rep. ¶¶ 54-55).

370.   Based on data from the Georgia Secretary of State's Office, there was an 81% decrease in mail-in voting between the November 2020 and 2022 elections—constituting a far greater decrease than any other state with competitive races. Ex. 100 (Lee Rep. 84-85).

371.   In pre-SB 202 Georgia elections between 2018 and 2021, AAPI registrants applied for absentee ballots at rates higher than white registrants. Ex. 96 (Fraga Rep. Tbl. 3).

372.   In the November 2018 midterm election, AAPI registrants applied for

absentee ballots at higher rates than white registrants (7.6% AAPI; 3.3% white). Ex. 96 (Fraga Rep. ¶ 70, Tbl. 3).

373.   In the November 2020 presidential election, most AAPI registrants applied for absentee ballots at higher rates than white registrants (34.8% AAPI; 22.5% white). Ex. 96 (Fraga Rep. ¶¶ 68, 70, Tbl. 3).

374.   In the January 2021 runoff election, most AAPI registrants applied for absentee ballots at higher rates than white registrants (22.9% AAPI; 17.0% white). Ex. 96 (Fraga Rep. ¶ 70, Tbl. 3).

375.   In Georgia elections post-SB 202, the rate of AAPI registrants applying for absentee ballots fell behind white registrants. Ex. 96 (Fraga Rep. ¶ 69, Tbl. 3).

376.   In the November 2022 midterm election, white registrants applied for absentee ballots at higher rates than AAPI registrants (3.6% white; 4.3% AAPI). Ex. 96 (Fraga Rep. ¶¶ 69-70, Tbl. 3).

377.   In the December 2022 runoff election, white registrants applied for absentee ballots at higher rates than AAPI registrants (3.2% white; 2.8% AAPI). Ex. 96 (Fraga Rep. ¶¶ 69-70, Tbl. 3).

378.   Rates of absentee-by-mail voting dropped off more sharply for Black, Hispanic, and AAPI voters after the implementation of SB 202, relative to White voters. Ex. 96 (Fraga Rep. ¶ 9 & Tbl. 2). The rates of absentee-by-mail voting

between 2020 and November 2022 general elections dropped off 21.7 percentage points for Blacks, 18.8 percentage points for Hispanic, 30.6 percentage points for AAPI compared to 18.3 percentage points for white voters. *Id*. In the November 2022 election, only 9.1% of AAPI voters used absentee ballots. *Id.* at ¶ 55 & Tbl. 2.

379.   After SB 202, AAPI voters had the largest drop off in absentee-by-mail rates of any group. Ex. 96 (Fraga Rep. ¶ 60).

380.   Between 2018 and 2022, the percentage of AAPI voters who voted by mail dropped from 11.2% to 9%, representing the sharpest decline in absentee-by-mail voting among any racial group. Ex. 96 (Fraga Rep. ¶¶ 60, 70).

381.   The decline for AAPI voters' use of absentee ballots from the January 2021 to the December 2022 runoff election was also greater than for white voters. Ex. 96 (Fraga Rep. Tbl. 2 (28.7% decline for AAPI voters compared to a 16.5% decline for white voters)).

382.   White voters were the *only* racial/ethnic group to have their rate of mail voting remain higher than the 2018 figure by the December 2022 election. Black, Hispanic, and AAPI voters, voted by mail at a lower rate in the December 2022 runoff than in November 2018. Ex. 96 (Fraga Rep. ¶¶ 61-62).

383.   In the three elections prior to SB 202, AAPI registered voters were more likely than White registered voters to request absentee-by mail ballots. That

changed after SB 202—AAPI voters were less likely than White voters to request absentee-by-mail ballots in the two elections following SB 202. Ex. 96 (Fraga Rep. ¶¶ 10, 67-68).

384.   Voters who support Democrats are disparately burdened by the cumulate effects of SB 202's absentee voting restrictions. They relied on drop boxes and voted by mail at far greater rates than voters who support non-Democratic candidates in the elections immediately preceding SB 202. Ex. 104 (Lichtman Rep. 17-26, 31-36).

385.   Many counties in Georgia offered Sunday voting prior to the enactment of SB 202. Ex. 82 (Bailey 3/21/23 Dep. 216:4-14); Ex. 35 (Gwinnett Cnty. Manifold Dep. 108:14-109:2); Ex. 36 (Gwinnett Cnty. Williams Dep. 46:3-47:11).

386.   Early voting is of particular importance for Black voter turnout given that Black voters in Georgia are disproportionately likely to vote early, and particularly on weekend days, which are no longer required during the runoff period. Ex. 19 (Delta Dep. 75:11-76:3); Ex. 38 (30(b)(6) Deposition of The Justice Initiative, Inc. (Fer-Rell M. Malone, Sr.) [ECF 727] ("JI Dep.") 101:9-102:5).

387.   Early voting is also of particular importance to voters who tend to support Democratic candidates. These voters relied on early voting disproportionately in both the 2022 presidential elections and the 2021 U.S. Senate

runoff. Ex. 104 (Lichtman Rep. 33-34).

388.    The reduced advance voting opportunities for runoff elections with a federal candidate on the ballot will naturally result in increased voting on Election Day—meaning longer lines, particularly in urban areas, which disproportionately affect Black voters, who already face longer lines on average. Ex. 107 (Pettigrew Rep. 1, 20, 33-34); Ex. 81 (Deposition of Dr. Stephen Pettigrew [ECF 791] ("Pettigrew Dep.") 160:10-162:9, 171:10-173:9, 177:12-178:1, 196:9-197:8, 205:9-208:9); Ex. 85 (Burden Rep. 20-22 & n.33).

389.    Former Cobb County Elections and Registration Director Janine Eveler recognized that the proposed early voting restrictions lead to longer wait times for voters. Ex. 217 (Email from Cobb County Elections Supervisor Janine Eveler to legislators (Mar. 11, 2021), CDR00009771-73). In March 2021, she warned legislators that in enacting SB 202, "[y]ou are eliminating all but a few days of early voting which will mean that lines on election day will be untenable." *Id*.

390.    Supporters of SB 202 claimed incorrectly that the number of OP voters had sharply increased. Ex. 118 (Mar. 18, 2021 H. EIC Hr'g Tr., AME_001518:20-24 (Fleming testimony claiming that in 2016 there were 200-300 OP voters and by 2020 there were 20,000)).

391.    Chairman Fleming's claim contradicts the State's own analysis,

conducted on or before March 11, 2021, showing that 8,191 OP votes were cast in 2020, a decline from 2018, when 10,917 OP votes were cast, and a moderate increase from 2016, when 6,124 OP votes were cast. Ex. 228 (Email from B. Evans to SOS staff, "Provisional Ballot 2016 to 2018 to 2020 from Surveys.xlsx" (Mar. 25, 2021), CDR00044731-32).

392.   County election officials informed legislators of their concern that the ban on counting OP provisional ballots before 5:00 p.m. would disenfranchise voters who mistakenly appear to vote at the incorrect precinct. *See* Ex. 216 (Adams Survey at USA-ADAMS-000027.00013).

393.   Voters' precincts may change from one election to another for a host of reasons including redistricting, or even scheduling conflicts. Ex. 21 (Fulton Cnty. Dep. 197:14-198:13).

394.   Multiple election officials admitted that, prior to SB 202, their counties encountered no administrative problems associated with duplicating OP ballots. *See, e.g.*, Ex. 49 (Bailey 10/6/22 Dep. 138:1-4); *see also* Ex. 63 (Kidd Dep. 146:9-147:1 ("[T]he poll workers see [OP] provisional ballots as another way in which we're helping voters exercise their right to vote."), 155:13-17 (pre-S.B. 202 processing of out-of-precinct provisional ballots was not burdensome)); Ex. 21 (Fulton Cnty. Dep. 192:2-4, 194:7-16, 196:1-9 (testifying that providing provisional ballots is not a difficult process, and it would be easier for county

administrators to permit voters to cast their ballots at an unassigned precinct within their county than to enforce SB 202's restrictions on out-of-precinct voting)); Ex. 257 (Brower 1/18/24 Decl. ¶¶ 22-23 (former Fulton and DeKalb County election official noting that, based on his experience in Fulton and DeKalb Counties, boards of elections "have had experience processing out-of-precinct ballots for almost two decades, and they are able to do so successfully" and that any time saved in denying an OP ballot to a voter "is not more important than allowing eligible voters the opportunity to cast a vote and have that vote counted.")).

395.   Defendant Sarah Tindall Ghazal, then-Cobb County attorney and now-SEB member, proposed to the Legislature several less-discriminatory alternatives to the ban on counting most OP provisional ballots that would have met the State's purported goals. She testified, "If the actual and not the pretextual goal were to reduce down-ballot votes not counting, a more narrowly tailored solution to the problem with such a disparate impact would be—should be contemplated, such as investing in voter education and outreach, mandating that poll workers stand outside precinct to check and redirect voters, or following the model that Senator Harrell outlined yesterday and giving voters their actual ballots. Ex. 131 (Mar. 16, 2021 Sen. Ethics Comm. Hr'g Tr., AME_001410:22-1411:14 (Ghazal)).

396.   Black voters were more likely to cast OP ballots than white voters in 2018 and the 2020 election cycle, including in November 2020. Ex. 85 (Burden Rep. 35-38), *id*. at 36 ("Black voters were disproportionately likely to cast out-of-precinct provisional ballots in the November 2020 election."); *see also id.* at 55 ("[T]he analysis presented here shows that individuals who cast out-of-precinct provisional ballots that were accepted for counting in recent Georgia elections were disproportionately Black voters. Examining three elections, the data demonstrate that Black voters were overrepresented among out-of-precinct voters in five out of six cases, and in several instance the overrepresentation was quite substantial."); *see also* Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 94:8-97:4).

397.   Evidence from 19 counties in November 2018, 77 counties in November 2020, and 67 counties in January 2021 show that Black voters were more likely to cast OP ballots than white voters. Ex. 85 (Burden Rep. 35-37 & 53-55).

398.   Under SB 202, voters who previously would have received a provisional ballot if they are in the wrong precinct are now informed by election officials that if it is before 5:00 p.m. such a ballot will not count. This means fewer voters who arrive at the wrong precinct will able to cast an effective ballot because not all of them will make it to their assigned precinct. Ex. 110 (Rodden Rep. 34).

399.   A full accounting of every provisional ballot in the State is not

possible, but "is also not necessary to reach firm conclusions about racial differences in the casting of out-of-precinct provisional ballots." Ex. 85 (Burden Rep. 54).

400.    The State requires very little in the way of recordkeeping regarding OP ballots. For example, counties do not record the time at which a provisional ballot is cast, so it is not possible to determine the time at which voters cast out-of-precinct ballots prior to SB 202. *See, e.g.*, Ex. 236 (Numbered List of Provisional/Challenged Voters Form, USA-BUTTS-000005.001 (sample of the hard copy form that is used to record provisional voters at the polling place on election day, with no space to record time)). Counties are not required to track OP voters electronically (though about 20 counties did so in Nov. 2020 and Jan. 2021. *See* Ex. 85 (Burden Rep. 35-37, 51).

401.    Likewise, SB 202's new OP rule places Black voters at greater risk of disenfranchisement, because socio-economic disadvantages faced by Black voters relative to white voters, such as lack of transportation and lower incomes, Black voters are more likely to face burdens in going to another polling place. Ex. 85 (Burden Rep. 38); Ex. 93 (Chatman Rep. ¶ 61).

402.    Black Georgians and Hispanic Georgians are more likely to move over a 12-month period than are white Georgians, increasing the likelihood that they will need to update or initiate a new voter registration. Ex. 85 (Burden Rep.

25).

403.   Black Georgians are particularly more likely to move within their home counties compared to white residents. Ex. 85 (Burden Rep. 25).

404.   Residential mobility can make it difficult for voters to determine their assigned precinct. Ex. 85 (Burden Rep. 25, 35); Ex. 47 (Adams Dep. 131:6-132:24 (Precinct cards are being sent "later and later" by the State, using a third-party vendor, so "a registrant that registers to vote just before the registration deadline, which is four weeks before the election, you're not going to get that precinct card until the election is over, chances are.")).

405.   Voters may also lack information about their assigned precinct for other reasons, such as having received incorrect information from an election official or third party. Ex. 85 (Burden Rep. 35).

406.   At least some voters who arrived at an unassigned polling place before 5:00 p.m. were unable to vote provisionally and were not able to make it to their assigned polling location to vote due to work obligations and limited time available to go vote. Ex. 30 (30(b)(6) Deposition of the Georgia Muslim Voter Project (Shafina Khabani) [ECF 725] ("GAMVP Dep.") 184:18-185:8).

407.   Voter Donald Jumper was disenfranchised in the December 2022 runoff election, because he mistakenly appeared at the wrong polling place before 5:00 p.m. and did not have time to travel and wait in line again at his assigned

precinct to vote. Ex. 293 (Jumper Decl. ¶¶ 4-8).

408.   Voter Sebastian Mason was disenfranchised in the December 2022 runoff election, because he mistakenly appeared at the wrong polling place before 5:00 p.m. and did not have time to travel and wait in line again at his assigned precinct to vote. Ex. 300 (Mason Decl. ¶¶ 4-8).

409.   Since the general election in 2020, Erendira Brumley has worked as a poll worker on election day, and after SB 202 was enacted, Ms. Brumley has, in that role, informed voters that they were out of precinct and had to visit their assigned precinct in order to vote. Ex. 50 (Brumley Dep. 21:5-11, 21:23-22:3, 22:19-23, 51:9-18).

410.   No other state that has banned all food or beverage distributions no matter the distance from the polling place, irrespective of intent or the minimal value of such items. Ex. 107 (Pettigrew Rep. 27).

411.   Line relief by Black activists and Black-led groups in Georgia transformed the environment at polling places by welcoming and encouraging Black voters seeking to participate in the political process despite generations of exclusion and discrimination. *See* Ex. 257 (Brower 1/18/24 Decl. ¶¶ 26-28 (explaining that line relief "is used to overcome the history of discrimination against Black voters, including the history of hostility that Black voters encountered when trying to vote" and "makes polling places more welcoming to

Black voters")); Ex. 345 (Woodall 1/18/24 Decl. ¶¶ 8-10 (explaining that line

warming was used "to engage Black voters and to help them feel protected at

polling places" and to make "Black voters feel safe and welcome at polling

places.")); Ex. 259 (Briggins 5/20/22 Decl. ¶¶ 6, 14, 18 (line relief is "a form of

social action")); Ex. 16 (30(b)(6) Deposition of Common Cause (Treaunna Dennis)

[ECF 697] ("Common Cause Dep.") 168:8-22 (line relief is part of "a process that

we have done in Georgia for many decades since we have been able to vote[,] since

reconstruction")).

412.   Voters at the edge of, or beyond, the 150-foot zone around precincts

usually wait an hour or more to vote. Ex. 35 (Gwinnett Cnty. Manifold Dep. 41:2-

5).

413.   Although poll workers may make "available self-service water from

an unattended receptacle," SB 202 § 33, many counties do not, or cannot, provide

self-service water receptacles to voters at polling precincts. Ex. 15 (Cobb Cnty.

Dep. 142:23-25); Ex. 21 (Fulton Cnty. Dep. 214:25-215:8); Ex. 37 (Hall Cnty.

Dep. 60:12-17); Ex. 51 (Columbia Cnty. Dep. 62:25-63:3); Ex. 18 (DeKalb Cnty.

Dep. 184:18-22); Ex. 63 (Kidd Dep. 136:5-15).

414.   Providing food and water to Black voters waiting to vote continues a

longstanding tradition in the Black community of offering sustenance to fortify and

support Black people exercising political rights. Ex. 259 (Briggins 5/20/22 Decl.

¶ 19); *see also* Ex. 312 (T. Scott Decl. ¶ 10).

415.   Banning line warming activities sends the message that "some people do not want Black people to vote." Ex. 257 (Brower 1/18/24 Decl. ¶ 30).

416.   Voters and organizations said that these line relief efforts helped to reduce the burdens of standing in long lines and fortified Black voters to stay in long lines, without which they would have left without voting. *See, e.g.*, Ex. 312 (T. Scott Decl. ¶¶ 6-11 (describing staying in a 4-hour line after receiving food and water and the feeling of solidarity it engendered)); Ex. 314 (Sutton Decl. ¶¶ 5-9); Ex. 265 (Calhoun Decl. ¶ 18); Ex. 269 (Cotton Decl. ¶ 10); Ex. 259 (Briggins 5/20/22 Decl. ¶¶ 14-16); Ex. 286 (Hector 6/3/22 Decl. ¶¶ 17-19); Ex. 291 (C. Johnson Decl. ¶ 9); Ex. 333 (Honor 6/3/22 Decl. ¶ 19); Ex. 262 (Brown Decl. ¶¶ 6-9).

417.   Individuals and groups seeking to participate in line-warming activities were seeking to create a celebration out of voting. Ex. 16 (Common Cause Dep. 168:8-168:22); Ex. 49 (Bailey 10/6/22 Dep. 142:6-9); Ex. 43 (30(b)(6) Deposition of the New Georgia Project (Stephanie Jackson-Ali) [ECF 733] ("NGP Dep.") 125:13-126:11 (testifying a goal of line warming was "voter appreciation and helping voters feel celebrated for being there and being in line")); Ex. 258 (Bray Decl. ¶¶ 9-10 ("Nothing says Southern hospitality more than gathering around a table to share food. This is especially true in Black communities. We want

to create that ethos in polling precincts in Georgia as well.")).

418.   Aunna Dennis testified, "Line warming is a community activation act that we do here in Georgia to celebrate the time that we are voting with our neighbors and our community members. It's equivalent for people in my community—I'm saying my community, people who are in communities of color, it's similar to us having a victory meal after emancipation or Juneteenth or someone who was just recently naturalized being able to have a meal with their family when they are getting in their Sunday best to go to vote. That's how we categorize line warming. This is a process that we have done in Georgia for many decades since we have been able to vote since reconstruction." Ex. 16 (Common Cause Dep. 168:8-168:22).

419.   Janine Eveler testified that there were "just a lot of things going on, and that made it a little chaotic." Ex. 15 (Cobb Cnty. Dep. 144:7-8.) In the same deposition, however, she denied that the November 2020 election was chaotic, stating that "it was not chaotic in any way, and the results were accurate." *Id*. at 57:18-19.

420.   Some election officials encouraged and appreciated line warming activities in their counties. Ex. 63 (Kidd Dep. 131:2-135:10); Ex. 265 (Calhoun Decl. ¶ 18); Ex. 271 (Dennis Line Relief Decl. ¶ 9).

421.   Many county election officials did not oppose line warming activities

in their counties. *E.g.*, Ex. 49 (Bailey 10/6/22 Dep. 140:7-142:10 ("[T]hose types of [line warming] activities are [] fine but they need to be 150 feet away.")), *id.* at 146:14-23); Ex. 36 (Gwinnett Cnty. Williams Dep. 29:1-13, 30:22-32:21).

422.    Those election officials who favored a Buffer Zone ban distinguished it favorably from the Supplemental Zone ban. Ex. 49 (Bailey 10/6/22 Dep. 141:7-10); Ex. 13 (Athens-Clarke Cnty. Dep. 151:22-152:19).

423.    No evidence suggested that the 150-foot buffer zone may have been "unsafe" prior to the enactment of SB 202. *E.g.*, Ex. 82 (Bailey 3/21/23 Dep. 127:22-129:12).

424.    County officials have not received complaints about line relief activities in the Supplemental Zone. Ex. 13 (Athens-Clarke Cnty. Dep. 152:10-14).

425.    Some county election officials had no concerns about line relief and did not understand the need for the ban. Ex. 63 (Kidd Dep. 137:5-10).

426.    One former election official stated he never saw nor heard any evidence that volunteers who were providing water or food at a polling location attempted to influence individuals' votes. Ex. 261 (Brower 5/23/22 Decl. ¶ 9).

427.    SB 202 still allows anyone to approach a voter in line for other reasons as long as they are not campaigning or offering food and water. Ex. 34 (SEB Dep. 250:21-251:2).

428.    Under SB 202, it is still "very difficult" and requires a "very fact-

dependent inquiry" to determine what is going on when a voter is approached in line. Ex. 253 (7/18/22 Prelim. Inj. Hr'g Tr. 108:25-109:11 (testimony from SEB member Matt Mashburn)).

429.   Voters' and State officials' complaints about these line relief efforts during the 2020 elections frequently centered around precincts with many Black voters, in areas with significant Black populations, or precincts where Black-led organizations distributed food and water. *See, e.g.*, Def's Ex. F (Germany 6/24/22 Decl. Ex. D (Nov. 2020 email chain including Frances Watson and Rick Barron regarding complaints near the CT Martin Recreation Center, located on MLK Jr. Drive in southwest Atlanta), Ex. E (SOS Investigation report about food trucks located at the East Cobb Government Center in Marietta during early voting for Jan. 2021 runoff, including Nakia Harris' On the Move Catering Truck), Ex. F (Complaint on behalf of "older voters" who felt intimidated by the "presence" of the group Black Voters Matter at Nov. 2020 early voting site in Albany, GA)).

430.   Citizen complaints were imbued with racial bias and coded language. For example, a white voter complained that she felt intimidated by Black line relief volunteers and their "hip hop music" and was ultimately referred to the Attorney General's office for having brandished a gun at the polling location. Def's Ex. F (Ex. F to 06/24/2022 Germany Decl.); Ex. 150 (Summary of SEB Meeting, Tuesday, February 7, 2023 [Pls. Dep. Ex. 218]); Ex. 173 (Ga. SEB Meeting Tr.

(Feb. 7, 2023), 147:4-148:19 (referring to "hip hop music" and analogizing the

volunteers to the "Black Panthers"), 191:5-192:7 (complainant referred to Attorney

Generals' office for carrying a firearm within 150 feet of a polling place,

dismissing electioneering allegations)).

431.   None of the investigations into these complaints during the 2020

election cycle found sufficient evidence to suggest any violations of Georgia law.

*See, e.g.*, Ex. 173 (Georgia State Election Board Meeting Transcript (Feb. 7, 2023),

191:5-192:7 (Black Voters Matter (BVM) cleared of wrongdoing, while older

white voter who brandished a gun and claimed that she felt intimidated by BVM

and their "hip hop music" was referred to the Attorney General's office)); *see also*

Ex. 59 (Germany Dep. 108:24-109:17 (investigations resulted in insufficient

evidence to suggest violation of GA law)).

432.   Prior to SB 202 no groups that participated in line-warming activities

were referred to the State Attorney General for unlawful line warming activities.

Ex. 34 (SEB Dep. 119:17-22).

433.   Georgia has historically had a very bad problem with line length. Ex.

34 (SEB Dep. 95:12-18).

434.   In every general election where data exists, people of color in Georgia

had an average wait time longer than the average for white Georgia voters. Ex. 107

(Pettigrew Rep. 19).

435.   Since at least the 2006 general election, voters in Georgia have experienced polling place lines that are significantly longer than voters throughout the rest of the country. Ex. 107 (Pettigrew Rep. 13-16).

436.   Historically, lines tend to be shorter in precincts with higher proportions of white voters and longer in precincts with higher proportions of non-white voters. Ex. 107 (Pettigrew Rep. 17-20); Ex. 85 (Burden Rep. 20-22).

437.   Lines are generally longer in presidential years than midterms. Ex. 81 (Pettigrew Dep. 187:21-188:1).

438.   In all four federal general elections from 2014-2020, white voters were more likely to experience no wait at all, whereas Black voters were more likely than white voters to experience wait times of more than ten minutes. Ex. 85 (Burden Rep. 21). In three of the four elections, Black voters were more likely to wait over 60 minutes to vote. *Id.*

439.   Many metro-Atlanta counties experienced significantly long lines during the June 2020 primary. Ex. 9 (Jordan Decl. ¶ 9); Ex. 19 (Delta Dep. 95:14-96:4); Ex. 37 (Hall Cnty. Dep. 58:4-17); Ex. 134 (H. Gov. Affairs Comm., *2020 Primary Election Investigation Report*, USA-03076-80).

440.   During the November 2020 presidential election, approximately 319,000 Georgians waited longer than an hour and another 583,000 waited between 31 and 60 minutes. Ex. 107 (Pettigrew Rep. 43); Ex. 81 (Pettigrew Dep.

112:9-11).

441.    In the November 2020 election, Black voters waited on average more

than 10 minutes longer to vote than white voters. Ex. 107 (Pettigrew Rep. 24).

442.    The racial gap in wait times during the November 2022 midterm

election was larger than in the November 2018 midterm election. Ex. 81 (Pettigrew

Dep. 131:14-22).

443.    Long lines also plagued early voting locations in metro-Atlanta during

the December 2022 runoff election. Ex. 21 (Fulton Cnty. Dep. 206:22-25 (wait

times over one hour)); Ex. 15 (Cobb Cnty. Dep. 169:23-170:3 (wait times over two

hours)); Ex. 107 (Pettigrew Rep. 35-36 (48 of 66 locations on Friday before runoff

had an hour-line or longer line)); Ex. 57 (Evans Dep. 180:19-181:4); Ex. 35

(Gwinnett Cnty. Manifold Dep. 33:18-22, 41:12-14 (wait times extended over an

hour, and runoff lines extending beyond 150 feet from the polls)).

444.    Metro-Atlanta counties experienced long lines on the Friday of early

voting during the December 2022 Senate runoff election. Every single one of

Fulton County's 24 early voting locations had a line of at least 30 minutes at some

point, and 21 of 24 locations had a line at least 60 minutes. Ex. 107 (Pettigrew

Rep. 35); Ex. 21 (Fulton Cnty. Dep. 206:22-25). In Gwinnett County, all 11 early

voting sites reported a wait of at least 45 minutes, with some polling locations

experiencing wait times over an hour and lines extending beyond 150 feet from the

polls. Ex. 107 (Pettigrew Rep. 35); Ex. 35 (Gwinnett Cnty. Manifold Dep. 41:2-14). Eleven of 16 early voting sites in DeKalb County reported a line over 1 hour. Voters at 8 of Cobb County's 12 early voting locations reported a line longer than 30 minutes, and at some locations lines of up to two hours. Ex. 107 (Pettigrew Rep. 35); Ex. 15 (Cobb Cnty. Dep. 135:5-6).

445.   In Fulton County, lines during the December 2022 Senate runoff election were over an hour. Ex. 21 (Fulton Cnty. Dep. 206:22-25).

446.   During the 2022 early runoff election period, 658,690 early voters located in Clayton, Cobb, DeKalb, Fulton, and Gwinnett Counties waited an average of 61 minutes to cast their ballots. Ex. 107 (Pettigrew Rep. 44-45 & Tbl. 43). That wait is twice as long as the average 27.4 minutes Georgia voters waited to cast their ballot in 2020. *Id.* at 20, Tbl. 2.2.

447.   SB 202's absentee voting, drop box, and compressed voting period restrictions have contributed to long lines, because these restrictions push voters toward voting in-person, resulting in increased wait times for early in-person and Election Day voters. Ex. 107 (Pettigrew Rep. 28-30, 38-45); Ex. 81 (Pettigrew Dep. 189:5-190:13).

448.   SB 202 impacts line lengths in precincts in predominantly Black neighborhoods substantially more than those in predominantly white neighborhoods because precincts in predominantly Black neighborhoods are

operating under more strain and closer to capacity. Ex. 107 (Pettigrew Rep. 24).

449.   Plaintiff Elbert Solomon decided to vote in person for the December 2022 runoff election because the drop box he used during the 2020 election was no longer available. Ex. 70 (Deposition of Elbert Solomon [ECF 742] ("Solomon Dep.") 31:9-24). He ended up standing in line for an hour and a half to vote. *Id*. 45:2-8.

450.   Sandra Reed, a voter from Atlanta, Georgia, had to wait almost two hours without food or water before voting, which was difficult because she felt ill, and she did not bring her own water because she did not know she was going to need it. Ex. 75 (Reed Dep. 13:6-7, 20:12-21:2, 28:18-29:3).

451.   Jessica Owens, a voter in Gwinnett County, was not able to provide food or water to friend who was four months pregnant and who waited in line for five and a half hours during the 2022 election, even though she had been able to do so in the 2020 election when her friend waited in line for nine and half hours before voting. Ex. 73 (Owens Dep. 14:17-22, 22:2-6, 30:12-31:7).

452.   Erendira Brumley, who chose to vote in person in the runoff election because she did not have enough time to request and return her absentee ballot before the deadline, encountered lines up to 3 hours long, which were difficult on her physically because she recently had back surgery. The waiting conditions were too arduous for her, and she only successfully voted after her third attempt waiting

in a line she could finally bear. Ex. 50 (Brumley Dep. 25:4-19, 40:6-23).

453.    Lorraine Rose, who has sciatica and has fused discs in her spine, struggled to stand in a line that wrapped around the precinct several times, and had to wait in line for over two hours before voting, during which time she had to sit in the gravel and stretch her spine to alleviate her pain. Ex. 76 (Rose Dep. 32:15-34:4).

454.    Neither Ms. Brumley or Ms. Rose were offered a chair to use while waiting in line to alleviate their discomfort, as groups are concerned such relief is now criminalized under SB 202. *See* Ex. 50 (Brumley Dep. 40:6-23); Ex. 76 (Rose Dep. 32:15-34:4).

455.    Voters do not always know they will be standing in line for a long time, and thus there is no guarantee they will bring food and water with them when they go to vote. Ex. 262 (Brown Decl. ¶ 5-9); Ex. 75 (Reed Dep. 28:24-29:3); Ex. 73 (Owens Dep. 31:4-5).

456.    Delta Sigma Theta believes that these line-relief efforts help re-affirm the dignity of Black voters, so many of whom are harmed by longer lines and should not be forced to wait in long lines without ready access to necessities like food and water. Otherwise, voters would be forced to leave line to get these necessities, losing their spots in line. The line-relief efforts also convey that there is a community of Black residents who are standing with them and supporting them

in the most important civic act they can do. Ex. 259 (Briggins 5/20/22 Decl. ¶¶ 12-18).

457.   Voters receive more support from the receipt of food and water than from mere words of encouragement. Voters perceive messages of hope and support for voting. Ex. 258 (Bray Decl. ¶¶ 14-16); Ex. 267 (Clarke Decl. ¶ 9); Ex. 314 (Sutton Decl. ¶ 8); Ex. 312 (T. Scott Decl. ¶ 10).

458.   By providing voters with necessary supplies like food and water, volunteers are encouraging voters to stay in line and reminding them of the importance of casting a ballot. Ex. 258 (Bray Decl. ¶ 15); Ex. 265 (Calhoun Decl. ¶¶ 17-18, 38-39); Ex. 269 (Cotton Decl. ¶¶ 9-12, 23-24); Ex. 290 (Supp. Jackson Decl. ¶¶ 9-10); Ex. 285 (Hector 5/6/23 Decl. ¶ 7); Ex. 333 (Honor 6/3/22 Decl. ¶ 12); Ex. 268 (Cobham Decl. ¶¶ 4-6); Ex. 295 (Kilanko 5/12/22 Decl. ¶¶ 6, 8). For example, Voter Hope Sims Sutton explained that receiving snacks during early voting for the January 2021 runoff sent the message that she should "keep standing in line to make sure [her] voice was heard in the political process." Ex. 314 (Sutton Decl. ¶¶ 5-9). In November 2020, voter Tamara Scott, who waited for four hours to vote with her autistic child and contemplated leaving, said, "[G]etting that food and water was one of the reasons that I decided to stay in line." Ex. 312 (T. Scott Decl. ¶¶ 6-11). Cy Mayes, President of the Social Action Committee at Big Bethel AME Church, said, "The act of line relief is special because it sends a message

about participation in democracy and the importance of humanitarian assistance in a way that words could not capture." Ex. 304 (Mayes Decl. ¶ 7-8).

459.   Leaving the voting line will typically require voters to forgo their place in the queue. Def's Ex. M (Mashburn 6/13/23 Decl. ¶ 21).

460.   Providing food and water to voters in line can send a political message by showing the government that voters will help one another to overcome the barriers to the ballot box. Ex. 258 (Bray Decl.¶ 18); Ex. 289 (Jackson Decl ¶¶ 15, 17); Ex. 259 (Briggins 5/20/22 Decl. ¶ 18); Ex. 307 (Paul Decl. ¶ 7).

461.   Providing line relief is a core value of the AME Church, which acknowledges the effort and sacrifice it takes for people to exercise their basic right to vote. In that way, conducting line relief is a form of protest. Just saying "thank you" for voting would not convey the same message as actually providing food and water and other line relief. Ex. 278 (Gaymon Decl. ¶¶ 6, 8, 9); Ex. 289 (Jackson Decl. ¶ 16); Ex. 297 (Kinard Decl. ¶¶ 8-10).

462.   Food and water can be seen as a symbol of Black political activism and it is a part of volunteer groups' cultural traditions in that way. Many Black voters also understand that those volunteer groups' line-relief activities provide those deeper principles and messages. Ex. 258 (Bray Decl. ¶¶ 19-20); Ex. 289 (Jackson Decl. ¶¶ 18-19).

463.   A former Fulton County election official testified that he never saw or

heard any evidence that volunteers who were providing water or food at a polling location attempted to influence an individual's vote. Ex. 261 (Brower 5/23/22 Decl. ¶ 9).

464.   Several voters who received line relief testified that they did not feel pressured to vote for a particular candidate and volunteers were not trying to convince anyone to vote a particular way in exchange for food and water. Ex. 267 (Clarke Decl. ¶¶ 8, 9); Ex. 312 (T. Scott Decl. ¶ 80); Ex. 314 (Sutton Decl. ¶ 10).

465.   Several line relief volunteers, including those affiliated with voting rights-organizations that organized line relief efforts, testified that they had never talked to any voters about their voting choices or discussed anything partisan while conducting line relief. Some noted specific training to refrain from wearing partisan material and to not engage or react to a candidate's name. Ex. 258 (Bray Decl. ¶ 11); Ex. 278 (Gaymon Decl. ¶ 15); Ex. 268 (Cobham Decl. ¶ 7); Ex. 299 (Khabani 4/13/23 Decl. ¶ 12); Ex. 295 (Kilanko 5/12/22 Decl. ¶ 7); Ex. 297 (Kinard Decl. ¶ 11); Ex. 307 (Paul Decl. ¶ 8); Ex. 309 (Ramirez Decl. ¶ 8); Ex. 281 (Griggs 5/24/22 Decl. ¶ 11).

466.   Line relief volunteers testified that they volunteered at polling locations where the voting line extended to the public sidewalk and street outside the polling location and beyond 150 feet from the outside of the polling place. Ex. 307 (Paul Decl. ¶ 12).

467.   People waiting in line understand the expressive nature of the food and beverage offerings as messages of support for voting and that they are non-partisan. Ex. 267 (Clarke Decl. ¶ 9); Ex. 268 (Cobham Decl. ¶ 7); Ex. 274 (Enriquez Decl. ¶¶ 7-8); Ex. 278 (Gaymon Decl. ¶¶ 14-16); Ex. 297 (Kinard Decl. ¶¶ 11, 16); Ex. 309 (Ramirez Decl. ¶ 9); Ex. 310 (Robinson Decl. ¶¶ 6-8); Ex. 312 (T. Scott Decl. ¶ 10); Ex. 314 (Sutton Decl. ¶ 8); Ex. 315 (Tharpe Decl. ¶¶ 8-10).

468.   Line relief sent the message to voters that their vote matters, that they had dignity as a voter, and that they should keep standing in line to make sure their voice was heard in the political process. For example, voter Hope Sutton said that line relief "sent the message that my vote matters, that I had dignity as a voter, and that I should keep standing in line to make sure my voice was heard in the political process." Ex. 314 (Sutton Decl. ¶ 8).

469.   Voters felt line relief was not just about the food and water—it made them feel like their voice had value in the democratic process. For example, voter Scott said that line relief caused them to feel that their "voice had value in the democratic process." Ex. 312 (T. Scott Decl. ¶ 10).

470.   According to voter Tonia Clarke, who was given a banana and water by a line relief volunteer, "[r]eceiving the water, in particular, was like receiving hope" and communicated that the line relief volunteer "appreciated that I was here and that I was expressing myself by voting and exercising my voice." Ex. 267

(Clarke Decl. ¶¶ 7, 9).

471.   The life relief ban prohibits the provision of line relief to voters waiting in line to vote irrespective of how far they are away from the polling place. Def's Ex. E (Germany 6/15/23 Decl. ¶ 15).

472.   The line relief ban was primarily focused on addressing concerns related to the area that extends 150 feet from the outer edge of any building (the "Buffer Zone") rather than the Supplemental Zone. Ex. 59 (Germany Dep. 96:7-97:16); Ex. 65 (Mashburn Dep. 93:17-95:6).

473.   The line relief ban even for the Supplemental Zone prevented Plaintiffs from conducting line relief during the 2022 elections, and will prevent them from resuming line relief in 2024 and beyond. Ex. 260 (Briggins 4/17/23 Decl. ¶¶ 8-9); Ex. 290 (Supp. Jackson Decl. ¶¶ 12-15); Ex. 299 (Khabani 4/13/23 Decl.¶¶ 14-15); Ex. 302 (Mattox 4/13/23 Decl. ¶¶ 7-8); Ex. 296 (Kilanko 4/19/23 Decl. ¶¶ 5, 10).

474.   Because of SB 202, some groups that had previously engaged in line relief have completely eliminated their line relief programs to avoid criminal penalties. Ex. 291 (C. Johnson Decl. ¶ 11); Ex. 262 (Brown Decl. ¶ 12); Ex. 286 (Hector 6/3/22 Decl. ¶¶ 10, 15, 22).

475.   Fulton County became the first county in Georga to deploy mobile voting units ("MVUs") when it deployed two MVUs with eight polling stations

each during the election cycle immediately preceding the enactment of SB 202. Ex. 21 (Fulton Cnty. Dep. 174:11-175:10).

476.   Voter turnout at the MVUs was very high. Ex. 21 (Fulton Cnty. Dep. 177:5-18).

477.   MVUs, the unlimited use of which had been authorized under Georgia law for nearly 40 years, became a target only after Fulton County deployed them to great effect in the 2020 election cycle. Georgia Laws 1982, p. 1512, § 5(12); Ex. 21 (Fulton Cnty. Dep. 177:5-18 (stating that voter turnout at the MVUs was very high)).

478.   When asked at his deposition if the SEB has the resources to require counties without a MVU to purchase one, Mr. Mashburn replied, "No." Ex. 65 (Mashburn Dep. 195:2-5). When asked if there's anything in SB 202 "that requires counties to get an equal distribution of mobile voting units," Mr. Mashburn responded, "Not that I recall." *Id.* at 57:20-23.

479.   At his deposition, Chris Harvey, the former Elections Director in the Secretary of State's office, testified as follows about MVUs: "It's hard to drive away a courthouse. It's easier to drive away something that has wheels. So I think I would generally be more concerned about the security of a mobile voting unit than I would be of a stationary building, but I don't think—I don't think security was— was really a—a major issue." Ex. 61 (Harvey Dep. 144:25-145:6).

480.   Prior to SB 202's enactment, Fulton County deployed MVUs to assist at precincts facing emergency situations, including an outbreak of Legionnaire's disease, power outages, and malfunctioning air conditioning. Ex. 21 (Fulton Cnty. Dep. 183:15-184:2). Their deployment ensured that voters could still cast their ballots and spared the County from the arduous process of relocating a polling place on the fly. *Id.* at 184:3-15.

481.   After SB 202, and during the 2022 election cycle, Fulton County was unable to deploy its MVUs to assist at a precinct experiencing a gas leak that required voters and poll workers to evacuate the building, as well as to other precincts experiencing air conditioning outages in the June heat. Ex. 21 (Fulton Cnty. Dep. 186:24-188:11, 190:3-191:17). Fulton County, as well as Douglas County, have indicated they would "definitely" deploy (or in Fulton County's case, redeploy) their mobile voting units if SB 202's restrictions on mobile voting were eliminated. *Id.* 183:1-7; Ex. 63 (Kidd Dep. 174:24-5).

482.   State and County election officials voiced concerns about the election administration challenges caused by a 4-week runoff period, such as lengthening Election Day lines. *E.g.*, Ex. 216 (Adams Survey at USA-ADAMS-000027.0014) (noting 36 surveyed county officials preferred a 5-week runoff period); Ex. 15 (Cobb Cnty. Dep. 168:24-169:7); Ex. 69 (Sterling Dep. 186:17-189:6). For example, in an email to legislators, Janine Eveler, Cobb County Director of

Elections & Registration, warned that "eliminating all but a few days of early voting [for runoff elections] will be untenable. Please consider making runoffs at least 5 weeks after the election." Ex. 217 (Email from Cobb County Elections Supervisor Janine Eveler to legislators (Mar. 11, 2021), CDR00009771-73). Ms. Eveler also warned that reduced early voting opportunities would lengthen Election Day lines significantly. *Id*. Former Georgia Election Director confirmed the axiomatic principle that reduced early voting could result in more voters on Election Day. Ex. 61 (Harvey Dep. 117:2-14).

483.   Heard County Elections Supervisor Tonnie Adams advocated for a longer runoff period and cast doubt on even a five-week runoff period, noting, "[F]ive weeks after the election, it is a very big rush for all of us to prepare for an election in three weeks or in two-and-a-half weeks depending on how quickly we get databases for the runoff." Ex. 128 (Feb. 19, 2021, H. EIC Hr'g Tr., AME_000238:6-9).

484.   Keith Hollingsworth applied for his ballot within two or three days after the general election, but by late November, as the runoff election approached, he still had not received anything in the mail. Ex. 66 (Deposition of Keith Hollingsworth [ECF 798] ("Hollingsworth Dep.") 26:2-17).

485.   On November 26, Mr. Hollingsworth's ballot was sent to his address in New Jersey, but he did not receive the ballot until Friday, December 2. Ex. 66

(Hollingsworth Dep. 29:1-12, 36:13-20, 37:20-23).

486.    In order to return the ballot in time to be counted during such a shortened time period, Mr. Hollingsworth had to spend money to FedEx his ballot to Georgia, an expense he would not have had to incur under the original runoff schedule. Ex. 66 (Hollingsworth Dep. 29:1-12, 36:13-20, 37:20-23).

487.    Mr. Hollingsworth expressed that his biggest concern was the timeline of having to get and return his absentee ballot in the span of four weeks, with a major intervening holiday, as such a shortened runoff period adds to the burden of voting. Ex. 66 (Hollingsworth Dep. 33:20-34:13).

488.    Erendira Brumley and her children feared they would not receive their absentee ballots in time given the shortened runoff period under SB 202, so Ms. Brumley and her daughter chose to vote in person. Ex. 50 (Brumley Dep. 25:4-26:6, 31:23-32:7).

489.    County officials recognize voters may not have enough time to receive and return their ballots during a runoff, especially accounting for the time required for mail transmission, potential mail delays, and major holidays that fall between the two elections. Ex. 13 (Athens-Clarke Cnty. Dep. 129:11-25, 130:11-21); Ex. 15 (Cobb Cnty. Dep. 168:17-23); Ex. 21 (Fulton Cnty. Dep. 145:1-3); *see also* Ex. 35 (Gwinnett Cnty. Manifold Dep. 123:3-124:2 (explaining why it is time intensive to process absentee ballot applications before a runoff election before

ballots can be mailed out)).

490.   The shorter timeline means if a ballot has to be reissued or there is a problem with ballot transmission, there is little to no time to correct that issue, thus increasing the risk of disenfranchisement. Ex. 35 (Gwinnett Cnty. Manifold Dep. 122:10-123:2).

491.   When it is harder to vote absentee, voters may instead choose to vote in person, which increases lines at the precincts and can lead to voters cancelling their absentee ballots in order to vote in person. Ex. 217 (Email from Cobb County Elections Supervisor Janine Eveler to legislators (Mar. 11, 2021), CDR00009771-73); Ex. 15 (Cobb Cnty. Dep. 168:24–169:7); Ex. 61 (Harvey Dep. 117:2-14).

492.   Lorraine Rose did not try to request an absentee ballot for the runoff election because she "did not believe that [she] would get it in time nor would [she] be able to return it in time." Ex. 76 (Rose Dep. 41:8-13).

493.   Her only option to vote was to go in person where she ended up waiting to vote for nearly two hours in a line that wrapped twice around the voting precinct. Ex. 76 (Rose Dep. 32:15-34:4).

494.   The SEB takeover provision was driven by purported concerns with Fulton County's administration of elections. Ex. 32 (30(b)(6) Deposition of the Georgia Republican Party, Inc., Vol. 1, taken Mar. 29, 2023 (Ryan Caudelle) [ECF 795] ("GOP Vol. I Dep.") 300:16-302:4); Ex. 47 (Adams Dep. 239:7-240:4); Ex.

118 (Mar. 18, 2021 H. EIC Comm. Hr'g Tr., AME_001553:9-1559:25); Ex. 59

(Germany Dep. 79:1-80:19; 90:23-91:18 (identifying only Fulton County as

warranting state intervention)); Ex. 49 (Bailey 10/6/22 Dep. 96:7-97:11 (testifying

that the SEB takeover provision was directed at Fulton County as a means to "help

mitigate some of the problems that were either perceived or real" with Fulton

County's election administration)). However, the Georgia Republican Party's Rule

30(b)(6) designee could not identify what the specific concerns were with Fulton

County's election administration that caused the Georgia GOP to propose the SEB

takeover provision, testifying, "I know the answer, but at the end of the day it's

getting harder for me to recall the answer. Oh, gosh, what was it? The fact that

there was—oh, what was it? I'm sorry. I thought I had it. At the very moment, I

can't remember. I do know—have the answer in my head, but I can't recall at the

moment." Ex. 32 (GOP Vol. I Dep. 302:2-15); Ex. 203 (GAGOP_0002908).

495.    At the time it was enacted, before this litigation, State's expert and

then-Richmond County Elections Supervisor Lynn Bailey opposed the SEB

takeover provisions. Specifically, Ms. Bailey described the SEB takeover provision

as "punitive" in a March 2021 email to local election officials. Ex. 49 (Bailey

10/6/22 Dep. 96:7-97:11); Ex. 210 (Email thread L. Bailey to election officials,

"Apologies!!" (Mar. 9, 2021), COBB032462). She voiced her opinion against the

SEB takeover provision, writing: "I believe that there should be a course of action

when a county election superintendent is deemed as underperforming, but this is not it." Ex. 221 (Email from L. Bailey to Representative Fleming, "Input to Legislation" (Mar. 18, 2021), BAILEY-000028-29)). Ms. Bailey further wrote that "any decision on whether or not to remove or replace an election superintendent should rest solely with the local governing authority and by the laws set forth by the local legislation that created the combined Boards of Elections and Registration and exists in the majority of counties in GA." Ex. 221 (Email from L. Bailey to Representative Fleming, "Input to Legislation" (Mar. 18, 2021), BAILEY-000028-29)). Even when called as a witness in this case, Ms. Bailey later testified that her position had not changed: "I feel the same way today as I did then." Ex. 49 (Bailey 10/6/22 Dep. 165:7-20).

496.   Several local election officials shared the opinion that it was dangerous to empower a single individual with the authority to determine which ballots are counted and which ballots are rejected. *E.g.*, Ex. 49 (Bailey 10/6/22 Dep. 96:7-97:21); Ex. 47 (Adams Dep. 53:24-54:7, 193:18-194:4).

497.   Of all the provisions of SB 202, the Georgia Association of Voter Registration and Election Officials ("GAVREO"), whose membership includes election officials from every county in Georgia, was most concerned with the SEB takeover provision. The Chair of GAVREO's Legislative Committee, Charles Tonnie Adams, testified, "There were so many parts of that bill that concerned us. I

believe more so than any other, the takeover provision is the one thing that
concerned us the most. The fact that an appointed body could take over an—
another appointed body that was appointed by the citizens of the county of which
they represent. That was I think one of the—the one thing that really concerned us
more than any other." Ex. 47 (Adams Dep. 53:24-54:7). Specifically, GAVREO
was concerned with the amount of state power potentially wielded over local
election officials. *Id.* 194:5-10. Mr. Adams further testified about GAVREO's
primary concern that one person "has the authority to determine which ballots are
counted and how they're counted . . . Because boards of elections and registration
determine whether or not a provisional ballot is counted. They vote on those. So
you essentially had one person that could say, well, I decide that this provisional
ballot is not valid, so they don't count it." *Id.* 192:20-193:15. GAVREO believed
"[i]t was dangerous to place that level of responsibility on one person over an
appointed board, whether that board was appointed by the county, the grand jury,
or the political parties, or a combination. And then in counties where the probate
judge is the elections superintendent, you were usurping the responsibilities of the
probate judge and a board of registrars that's appointed by the grand jury. Not to
mention Chatham County, who elects their board of elections." *Id.* 193:18-194:4.

498. The SEB does not believe the SEB takeover provision is necessary to
ensure compliance by local election officials with the SEB's policies, rules, and

regulations. Ex. 34 (SEB Dep. 195:11-18). SEB Rule 30(b)(6) designee, Matthew

Mashburn, testified of the SEB takeover provision that "we have plenty of

mechanisms to enforce code violations without this." *Id.* 195:22-23.

499.   Mr. Mashburn testified that he believed the SEB takeover provision

was intended to address systemic problems, Ex. 34 (SEB Dep. 195:16-25), but he

did not explain how the SEB's ability to ensure counties' compliance with the

Georgia election code was insufficient to address such problems.

500.   Mr. Mashburn, testified that "counties will do what they are told . . . .

I've found them to be very dedicated public servants by -- on the whole, by and

large, and so they will do what they are told to do." Ex. 34 (SEB Dep. 257:24-

258:4).

501.   In October 2022, in response to confusion at the polls when voters

showed up to vote and learned for the first time that they had been challenged, the

State Elections Director issued Official Election Bulletins ("OEBs") providing

limited guidance to counties for dealing with challenged voters at in-person voting

locations, and the 2021 Poll Worker Manual also provides instructions for issuing a

provisional challenged ballot. Ex. 242 (CDR01374757 (Oct. 11, 2022 OEB

explaining that in-person voters should vote provisionally if they cannot resolve

the challenge before checking in and that the "county has discretion within the law

about the exact process that a challenged voter may follow to resolve the challenge

once the voter arrives to vote")); Ex. 243 (FULTON-COUNTY-SB202-00039219 (Oct. 13, 2022 OEB, clarifying that voter challenges may not be filed with a poll manager or poll worker)); Ex. 232 (Poll Worker Manual, May 2021, 83-85, CDR01369922).

502.   Some counites developed their own procedures to manage the massive influx of voter challenges that followed enactment of the law with no training, funding, or additional resources; the State Election Board has not taken any action to implement any administrative rules, produce any trainings, or provide public education about voter challenges after SB 202. Ex. 49 (Bailey 10/6/22 Dep. 174:20-175:5, 177:7-178:1); Ex. 34 (SEB Dep. 222:21-223:1, 223:21-224:2, 234:1-235:10).

503.   Policies and procedures to handle voter challenges vary across counties in Georgia. *See* Ex. 240 (CDR01374686-90 (Gwinnett County voter challenge policy)); Ex. 21 (Fulton Cnty. Dep. 165:15-166:24); Ex. 338 (Forsyth County voter challenge policy); Ex. 239 (CDR01373466-69 (Athens-Clarke Section 229 voter challenge procedures)); Ex. 241 (CDR01376030-33 (DeKalb voter challenge procedures)); Ex. 49 (Bailey (10/6/2022) Dep. 178:17-179:1); Ex. 242 (CDR01374757-60 (final version of state OEB regarding challenged voters, stressing that each county has discretion as to how to handle a challenged voter arriving at the poll)).

504.   Before the 2020 election cycle, voter challenges were used sparingly, if at all, and only in particular instances, such as when an individual personally knew that another registered voter did not live at a particular address. Ex. 33 (SOS Dep. 223:14-225:1); Ex. 35 (Gwinnett Cnty. Manifold Dep. 42:19-43:2); Ex. 15 (Cobb Cnty. Dep. 62:23-63:13); Ex. 21 (Fulton Cnty. Dep. 147:5-13).

505.   County officials across Georgia have experienced a significant increase in the number of voter challenges since SB 202 was enacted, with tens of thousands of voters having their eligibility challenged in largely frivolous challenges, as unlike the prior law, SB 202 specifically permits and encourages unlimited challenges. Ex. 35 (Gwinnett Cnty. Manifold Dep. 42:19-45:13); Ex. 18 (DeKalb Cnty. Dep. 113:3-18, 115:16-22); Ex. 15 (Cobb Cnty. Dep. 62:23-63:13, 148:6-19). Ex. 34 (SEB Dep. 223:2-13); Ex. 21 (Fulton Cnty. Dep. 170:2-8, 173:11-174:10); Ex. 49 (Bailey 10/6/22 Dep. 171:6-10); Ex. 2 (SB 202 as passed (USA-03870, USA-03892, USA-03894)).

506.   Especially in the weeks leading up to an election, mass voter challenges, coupled with SB 202's 10-day notice deadline, distract county officials, divert resources from other election preparation activities, and are often duplicative of the work already being done in the course of the county's regular list maintenance activities. Ex. 49 (Bailey 10/6/22 Dep. 179:2-183:19); Ex. 18 (DeKalb Cnty. Dep. 137:6-144:8); Ex. 35 (Gwinnett Cnty. Manifold Dep. 44:22-

46:9, 63:3-66:16, 68:2-71:13, 80:11-85:16); Ex. 36 (Gwinnett Cnty. Williams Dep.

38:16-39:16); Ex. 21 (Fulton Cnty. Dep. 160:19-161:17, 173:15-174:10, 278:24-

282:7); Ex. 247 (Gwinnett Cnty. Board of Registrations & Elections Meeting

Minutes (Sept. 21, 2022), GC013407-12); Sept. 21, 2022 Gwinnett County Board

of Registrations & Elections Meeting at 1:09:01-1:57:42,

https://viewer.earthchannel.com/PlayerController.aspx?&PGD=gwinetcoga&eID=

988 (describing research conducted by staff on short deadlines and negative impact

on election preparation activities)).

507.   There are no penalties for bad-faith or baseless mass voter challenges,

even if they have a discriminatory motive or effect. Ex. 49 (Bailey 10/6/22 Dep.

175:19-176:4); Ex. 34 (SEB Dep. 235:25-236:21).

508.   Challenged voters are often forced to overcome significant obstacles

in order to maintain their right to vote—even when a county ultimately rejects a

voter challenge—and challenges against eligible voters may be upheld without

their knowledge or ability to provide evidence. *See, e.g.*, Ex. 335 (DeKalb Cnty.

Board of Registration & Elections October 25, 2023 Meeting Minutes (describing

hearing testimony of challenged voter, veteran Mr. James Darnell McWhorter, who

stated that he registered to vote at a commercial address where he was employed

because he experienced homelessness when he registered to vote)); Ex. 246

((Gwinnett Cnty. Board of Registrations & Elections Minutes (July 20, 2022),

GC013446 (reflecting voters who appeared at a challenge hearing in person to defend their right to vote)); July 20, 2022 Gwinnett Cnty. Board of Registrations & Elections Meeting at 00:05:48-00:14:54, https://viewer.earthchannel.com/PlayerController.aspx?&PGD=gwinetcoga&eID=970 (testimony from two challenged voters forced to attend a hearing: one who stated she received notice of the hearing only hours earlier, had lived at her residence for 7 years, and had correct information on file, and another who lived in an adjoining building and said he suspected that the challenger incorrectly believed the address was invalid); Ex. 35 (Gwinnett Cnty. Manifold Dep. 49:17-51:24); Ex. 21 (Fulton Cnty. Dep. 165:15-166:24, 280:15-281:9); Ex. 25 (30(b)(6) Deposition of Georgia Coalition for the People's Agenda (Cynthia Battles) [ECF 752] ("GCPA Battles Dep.") 88:10-89:15); Ex. 16 (Common Cause Dep. 166:4-167:15); Ex. 334 (Michael Kaplan, *Eligible Voters Are Being Swept Up in Conservative Activists' Efforts to Purge Voter Rolls*, CBS News (Dec. 4, 2023) (quoting DeKalb County voter James McWhorter)).

509.   Voters in Georgia are permitted to register to vote where they reside, including at a commercial address, shelter, or other non-traditional residence if that is where they are residing at the time they are registered to vote, though numerous challenges have been filed alleging such residences are not legal for the purposes of voter registration. Ex. 34 (SEB Dep. 224:21-228:12, 231:8-232:17); Ex. 245

((Gwinnett Cnty. Board of Registrations & Elections Meeting Minutes (Aug. 11, 2022), GC013403, GC013405 (placing voters in challenged status for registering at now closed extended stay or RV park)).

510.    On September 21, 2022, the Gwinnett County Board of Registrations and Elections considered the mass challenge of approximately 37,500 voters filed by activist group VoterGA. Ex. 247 (Gwinnett Cnty. Board of Registrations & Elections Meeting Minutes (Sept. 21, 2022) GC013407, GC013410); Gwinnett Cnty. Board of Registrations & Elections Meeting (Sept. 21, 2022) at 01:09:01-01:57:42,

https://viewer.earthchannel.com/PlayerController.aspx?&PGD=gwinetcoga&eID=988.

511.    At the September 21, 2022 meeting, election supervisor Zach Manifold explained that the Board staff determined, after extensive and time-consuming research, that most of the challenges were either not properly characterized as Georgia Code Section 230 challenges or were based on inaccurate or outdated information, and many of the challenged voters' registrations were already being evaluated as part of the county's regular list maintenance activities. Ex. 247 (September 21, 2022 Gwinnett County Board of Registrations and Elections Meeting Minutes (Sept. 21, 2022), GC013407, GC013410); Gwinnett Cnty. Board of Registrations & Elections Meeting (Sept. 21, 2022) at 01:09:01-

01:57:42, https://viewer.earthchannel.com/PlayerController.aspx?&PGD=gwinetcoga&eID=988. *See also* Ex. 35 (Gwinnett Cnty. Manifold Dep. 43:17-44:21, 54:21-57:8, 57:22-74:8).

512. On October 3, 2022, the Gwinnett County Board of Registrations and Elections convened a special meeting to address the VoterGA challenges remaining after the significant research conducted by the Board's staff, and the Board narrowly voted 3-2 to dismiss the remaining 776 challenges upon finding no probable cause to sustain them. Ex. 248 (GC013500, GC013501-02 (Gwinnett Cnty. Board of Registrations & Elections Meeting Minutes (Oct. 3, 2022)).

513. The Fulton County Board of Registration and Elections voted unanimously to put approximately 4,000 voters into challenged status and stated that they would need to vote provisionally at the next election at its March 16, 2023, meeting. Ex. 336 (Fulton Cnty. Board of Registration & Elections Meeting Minutes (Mar. 16, 2023) at 4-5); Fulton Cnty. Board of Registration & Elections Meeting (Mar. 16, 2023) at 00:25:24-2:21:13, https://www.youtube.com/watch?v=AL8aSN57aoA. *See also* Ex. 21 (Fulton Cnty. Dep. 279:15-283:1).

514. Challenged voters who testified at the March 16, 2023 Fulton County Board of Registration and Elections meeting were the victim of a clerical error, a

road name change by the city, or simply bad data analysis by the challenger, and at least one voter who spoke at the hearing stated that they only received the notice the day before the hearing, which was held at 10:00 a.m. on a Thursday; other voters who did not attend the hearing to defend their right to vote were placed in challenged status. Ex. 336 (Fulton Cnty. Board of Registration & Elections Meeting Minutes (Mar. 16, 2023)); Fulton Cnty. Board of Registration & Elections Meeting (Mar. 16, 2023) at 00:25:24-2:21:13, https://www.youtube.com/watch?v=AL8aSN57aoA; Ex. 21 (Fulton Cnty. Dep. 279:15-283:1).

515.   On September 6, 2022, the Forsyth County Board of Voter Registrations & Elections sustained hundreds of voter challenges within 90 days of a federal election. Ex. 337 (Forsyth Cnty. Board of Voter Registrations & Elections Regular Monthly Meeting (Sept. 6, 2022) at 8-28).

516.   Combining impacts across provisions of SB 202, over 1.6 million registered Georgians in 2022 faced increased barriers to voting as a result of SB 202. Ex. 96 (Fraga Rep. ¶¶ 174-75 & Tbl. 21).

517.   Together, the challenged provisions of SB 202 have disenfranchised far more Black, AAPI, and Latino voters than the approximately 12,000 votes that would have changed the outcome of the 2020 presidential election in Georgia. Ex. 96 (Fraga Rep. ¶¶ 176-182 & Tbl. 21).

518.    Dr. Fraga calculated that 717,368 Black voters (28.6% of all Black registered voters) faced increased barriers due to SB 202's challenged provisions. Ex. 96 (Fraga Rep. Tbl. 21).

519.    Dr. Fraga calculated that more than 62,512 AAPI voters (27.0% of all AAPI registered voters) faced increased barriers due to SB 202's challenged provisions. Ex. 96 (Fraga Rep. Tbl. 21).

520.    Compared to the 16.4% of white registered voters who faced increased barriers due to SB 202's challenged provisions, Black, Latino, and AAPI voters were each disproportionately burdened by the challenged provisions of SB 202. Ex. 96 (Fraga Rep. Tbl. 21).

521.    Procedures that discourage absentee voting will, in turn, push more people to vote in-person, provoking longer wait times at already crowded polling places. *See* Ex. 61 (Harvey Dep. 61:15-62:9); Ex. 257 (Brower 1/18/24 Decl. ¶ 16).

522.    In the wake of SB 202, Black voters, organizations, churches, and community groups undertook extra efforts to help voters of color mitigate SB 202's discriminatory effects. *E.g.*, Ex. 265 (Calhoun Decl. ¶¶ 29-37 (describing statewide voter outreach efforts in response to SB 202)); Ex. 269 (Cotton Decl. ¶¶ 26-38 (same)); Ex. 292 (S. Johnson Decl. ¶¶ 25-27 (helping voters obtain ID)).

523.    These third-party efforts kept some Black voters from being completely disenfranchised by SB 202/helped voters who would have otherwise

been disenfranchised if not for third-party groups being involved. *E.g.*, Ex. 270 (Daniel Decl. ¶¶ 11-14 (third-party organization informed voter his absentee ballot was rejected for ID reasons)); Ex. 96 (Fraga Rep. ¶ 49).

524.   The costs that a voter must incur in order to vote—including the time, resources, and effort needed to overcome administrative requirements—are a crucial factor in determining whether individuals vote. Ex. 85 (Burden Rep. 22); Ex. 94 (Clark Rep. 13-14); Ex. 93 (Chatman Rep. ¶ 24); Ex. 83 (Grimmer Dep. 129:7-20, 275:10-16); Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 85:17-86:19 (Burden)).

525.   Socioeconomic conditions—such as educational attainment, income, and residential mobility—impact the weight of the costs of voting and one's ability to navigate them. Ex. 85 (Burden Rep. 23, 25-26); Ex. 94 (Clark Rep. 14); Ex. 83 (Grimmer Dep. 275:10-275:23).

526.   Median annual household incomes for Black Georgians were only two-thirds of those reported by white Georgians. Ex. 85 (Burden Rep. 24).

527.   Black Georgians overall have less economic resources than do white Georgians. For example, Black Georgians are twice as likely as white Georgians to earn income below the poverty level as defined by the Census Bureau (20.1% compared to 9.8% for white Georgians). Ex. 106 (Palmer Rep. ¶ 30); Ex. 85 (Burden Rep. 24). Black Georgians have substantially less accumulated wealth

than do white Georgians. Ex. 85 (Burden Rep. 24). Black Georgians are significantly more likely to receive SNAP benefits than white Georgians (22.2% compared to 7.1%), and they earn 40% less per capita income than that earned by white Georgians ($24,114 per capita compared to $39,850). Ex. 106 (Palmer Rep. ¶ 30). Black Georgians have a civilian unemployment rate that is more than double that of white Georgians (8.8% compared to 4.2%). *Id*. Black Georgians are less likely to own their own homes than white Georgians (52.2% of Black households are in renter-occupied housing, compared to 25.3% of white households). *Id*.

528.    Black Georgians are also more likely than white Georgians to move over a 12-month period, increasing the likelihood they will need to update or initiate a new voter registration. Ex. 85 (Burden Rep. 24-25).

529.    Latino Georgians overall have less economic resources than do white Georgians. Specifically, Latino Georgians are more than twice as likely to earn income below the poverty level than white Georgians (21.0% compared to 9.8%). Ex. 106 (Palmer Rep. ¶ 31). Latino Georgians are more likely to receive SNAP benefits than are white Georgians (12.8% compared to 7.1%). Ex. 106 (Palmer Rep. ¶ 31). Latino Georgians earn 50% less per capita than white Georgians ($19,944 compared to $39,850). Ex. 106 (Palmer Rep. ¶ 31). Latino Georgians are significantly less likely to own their own homes than white Georgians (50.0% of Latino households are in renter-occupied housing, compared to 25.3% of white

households). Ex. 106 (Palmer Rep. ¶ 31).

530.   Poverty status is a strong indicator of whether a household has access to a personal vehicle. Ex. 93 (Chatman Rep. ¶ 62).

531.   Higher levels of education provide the skills to more easily understand the electoral process and complete voting forms, and the confidence and proficiency to facilitate participation even when rules change. Ex. 85 (Burden Rep. 22-23); *see also* Ex. 94 (Clark Rep. 5-6, 9).

532.   Black Georgians are less likely to have a high school diploma than white Georgians (88% compared to 91%), and significantly less likely to have a bachelor's degree (25% compared to 36%), which is particularly correlated with political participation. Ex. 85 (Burden Rep. 23 & Tbl. 8); Ex. 106 (Palmer Rep. ¶ 30).

533.   Latino Georgians are significantly less likely to have a high school diploma than white Georgians (64.2% compared to 91.2%) and are significantly less likely to have a bachelor's degree than white Georgians (19.0% compared to 35.8%). Ex. 106 (Palmer Rep. ¶ 31).

534.   Poor mental or physical health, and residential mobility tend to inhibit voter participation because they increase the burdens and costs associated with voting. Ex. 85 (Burden Rep. 24-25); *see* Ex. 64 (Lockette Dep. 9:23-11:17); Ex. 270 (Daniel Decl. ¶ 4).

535.   Black Georgians are also more likely to lack health insurance than white Georgians (13.3% compared to 9.7%). Ex. 106 (Palmer Rep. ¶ 30).

536.   Latino Georgians are much more likely to lack health insurance than white Georgians (31.2% compared to 9.7%). Ex. 106 (Palmer Rep. ¶ 31).

537.   Approximately 80% of Georgia's AAPI population live in households where a language other than English is spoken. Ex. 95 (Cobb Rep. 40).

538.   Among the Georgia AAPI population, a reported 33% to 44% speak English less than "very well" (compared to only 2% of white Georgians) although the share of those who fall in this category is much higher among those of Chinese (51%), Korean (53%), and Vietnamese (60%) origin or descent, and these groups account for roughly half of the state's AAPI population. Ex. 95 (Cobb Rep. 40); Ex. 106 (Palmer Rep. ¶ 18).

539.   Approximately 9% of AAPI citizens reported not registering to vote due to language barriers. Approximately 1.3% of all citizens reported not registering to vote due to language barriers. Less than 1% of white citizens reported not registering to vote due to language barriers. Ex. 100 (Lee Rep. 53, Fig. 6).

540.   In 2012, turnout among LEP voters nationally was 9 percentage points lower than voters without difficulty with English (approximately 75 percent of LEP voters compared to 84 percent of non-LEP voters). Ex. 100 (Lee Rep. 53-54).

541.    Approximately 79% of LEP voters would utilize in-language election materials if provided. Ex. 100 (Lee Rep. 53).

542.    According to the 2012 National Asian American Survey, 55% of AAPI registrants who voted in person reported that "translated election documents or bilingual election workers" were available at the polls. Among AAPI registrants who voted by mail, 69% reported that in-language materials or other assistance were available. Ex. 100 (Lee Rep. 54).

543.    AAPI voters are more likely than other voters to require assistance in requesting an absentee ballot application due to language barriers and lack of in-language materials from the state or county. Lee Rep. 85. Voting has become "significantly harder for AAPI" registrants in Georgia due in part to language barriers and the lack of in-language election materials and translators. Ex. 12 (30(b)(6) Deposition of Asian Americans Advancing Justice-Atlanta (Phi Nguyen) [ECF 694] ("AAAJ Dep.") 50:5-7; 51:11-18; 102:18-24; 120:2-5; 127:19-24; 128:8-17).

544.    Georgia's longstanding history of discrimination against Black Georgians and other minorities in voting and many other areas of life is well-documented and judicially recognized. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018); *See Wright v. Sumter Cnty. Bd. of Elections & Reg.*, 979 F.3d 1282, 1307-08 (11th Cir.

2020); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, -- F. Supp. 3d --, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *59-*64 (N.D. Ga. Oct. 26, 2023); Ex. 91 (Anderson Rep. 19-45, 57-63); Ex. 95 (Cobb Rep. 11-50); Ex. 195 (Tijerina Rep. 19-31).

545.   For most of its history, discrimination prevented Georgia's Black residents from registering to vote, voting or otherwise participating in the democratic process. *See* Ex. 91 (Anderson Rep. 19-80); Ex. 105 (Minnite Rep. 5).

546.   Georgia's history of discrimination has contributed to suppressed political participation for Black and minority voters. *See* Ex. 105 (Minnite Rep. 5); Ex. 94 (Clark Rep. 2-13 (discussing impact of past official discrimination on political participation among Black Georgians)).

547.   Because of discriminatory immigration and naturalization laws, including having been deemed "aliens ineligible for citizenship," AAPIs have the shortest history of right to franchise of any racial group. *See* Ex. 92 (Chang Rep. 15-18, 39).

548.   SB 202 relies on similar frameworks, understandings, logics, and goals as measures during the late-nineteenth and early-twentieth century that responded to concerns and fears about relatively rapid and concentrated increases in AAPI populations by seeking to discourage immigration, settlement, and civic and political participation. Ex. 92 (Chang Rep. 4).

549.    SB 202 was passed when the nation was experiencing a rise in anti-AAPI racism and racist incidents. Ex. 92 (Chang Rep. 60-61); Ex. 100 (Lee Rep. 35-38); Ex. 294 (Khwaja Decl. ¶ 11).

550.    The rise in anti-AAPI racist incidents have been linked to the association of COVID-19 and the resulting pandemic to China, Chinese people, and people thought to be Chinese. Ex. 92 (Chang Rep. 60); Ex. 100 (Lee Rep. 36-37 (summarizing reports and studies documenting increased rates of anti-AAPI harassment and hate in or around the time period when SB 202 was passed)).

551.    The anti-AAPI climate was stoked in substantial part by racist rhetoric such as then-President Trump's repeated references to COVID-19 as the "Chinese virus" and "kung flu." Ex. 103 (Lee Decl. ¶ 8); Ex. 100 (Lee Rep. 39-40).

552.    On March 16, 2021, a 21-year-old white man shot and killed eight people in the Atlanta, Georgia area, including six AAPI women. Ex. 92 (Chang Rep. 61-62); Ex. 103 (Lee Decl. ¶ 8).

553.    Georgia State Senator Bruce Thompson minimized the nature of the March 16, 2021, mass shooting by questioning the legality of the businesses where the shootings occurred and the Cherokee County Sheriff's Department stated that the white shooter was struggling with "sex addiction" and having a "really bad day." Ex. 294 (Khwaja Decl. ¶ 11); Ex. 92 (Chang Rep. 62).

554.    Nationally, between the first quarter of 2020 and the first quarter of

2021, anti-Asian American hate crimes increased by 169 percent. Ex. 100 (Lee Rep. 37). Even prior to COVID-19, anti-AAPI hate crimes increased by 146 percent between 2019 and 2020 while the overall incidence nationally increased by only 2 percent. *Id*. 37-38.

555.   The blame placed on AAPIs for COVID-19 have roots in historical and persistent stereotypes of Asian Americans as "perpetually foreign." Ex. 92 (Chang Rep. 60); Ex. 100 (Lee Rep. 40).

556.   Vis-à-vis the "perpetual foreigner" stereotype, AAPIs are especially likely to be suspected of disloyalty and being fraudulent voters. Ex. 100 (Lee Rep. 40); Ex. 92 (Chang Rep. 61).

557.   According to the recent STAATUS (Social Tracking of Asian Americans in the U.S.), an index report from The Asian American Foundation (TAAF), an "increasing percentage of Americans in 2022 question the loyalty of Asian Americans and blame Asian Americans for the COVID-19 pandemic, fueling the 'perpetual foreigner' stereotype." Ex. 92 (Chang Rep. 61).

558.   Anti-Asian tropes are often featured in election fraud claims. Ex. 100 (Lee Rep. 36).

559.   The racially-coded language used by Representative Barry Fleming, in his November 15, 2020 op-ed, describing the absentee ballot process as "the shady part of town down near the docks . . . [where] the chance of being

shanghaied is significant" conjure the historical and persistent stereotype of Asian Americans as perpetually foreign. Terms like "shanghai" are "racial codewords" that allow a person to violate an accepted social norm (in this case, the norm against an explicitly racial charge against Asian American voters in Georgia) while lending deniability to their having violated that norm. Ex. 103 (Lee Decl. ¶¶ 2-12).

560.   Following the 2020 election, false and racialized claims regarding "bamboo ballots" were so prevalent that it prompted a response from the Georgia's SOS office via a press release on August 9, 2021, stating, "Georgia's elections have grown more competitive over the past decade, but bamboo ballots and the Chinese Communist Party aren't the reason." Ex. 100 (Lee Rep. 36).

561.   Through the "perpetual foreigner" stereotype, AAPIs are vulnerable to accusations of disloyalty and wrongdoing especially during times of economic and political instability. Ex. 92 (Chang Rep. 5, 65). For example, an empirical analysis of the Economic Espionage Act, found that a significant 21 percent of Chinese defendants and 22 percent of all Asian defendants charged under the Economic Espionage Act were acquitted of charges, had charges dropped before trial, or pleaded guilty to making false statements during the investigation and received only probation. In contrast, the same can be said for only 11% of defendants with Western names. Ex. 92 (Chang Rep. 59-60).

562.   Within a year of SB 202's passage, a number of bills were introduced

in the Georgia state legislature that explicitly targeted China and people of Asian descent. For example, the legislature passed a bill that prohibits Chinese companies from bidding for state contracts, invoking inflammatory and racial rhetoric blaming the COVID-19 pandemic on China. That bill shares 13 cosponsors with SB 202. The state legislature recently considered another bill, which shares 6 cosponsors with SB 202, to restrict land ownership by certain Asian immigrants (e.g., Chinese immigrants), including those holding unexpired visas. While purportedly targeting non-Americans, these pieces of legislation harm AAPIs, Asians, and immigrants more broadly. Ex. 294 (Khwaja Decl. ¶ 13).

563. Mr. Germany admitted in his deposition that he cannot speak to the General Assembly's rationales in passing SB 202. Ex. 59 (Germany Dep. 159:10-21 (noting he could not speak to the Legislature's rationales), 174:16-22 (same)); *see also* Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 200:14-20 (Counsel for the State stating that Germany is testifying about the specific provisions in his individual capacity only, not speaking for the Legislature), 195:5-196:6 (Counsel for the State making clear Germany was not being offered as an expert)).

564. The State's expert admitted in his deposition that there is no evidence of meaningful fraud in the 2020 elections in Georgia, including in Fulton County and with respect to absentee ballots. Ex. 83 (Grimmer Dep. 37:9-23, 43:21-44:3).

565. The changes to absentee voting, advance voting, banning line relief

activities, limiting provisional voting, and restricting the use of drop boxes and mobile voting units do not enhance the security of Georgia elections. Ex. 98 (Kennedy Rep. 42).

566.  The confidence of Georgia voters has been affected by experiences from voting in person, shared party affiliation with electoral winners, and messages from elites, including a narrative that votes were changed during an election, whether true or false. Ex. 99 (King Rep. 3); Ex. 80 (King Dep. 96:9-24).

567.  Voter confidence in Georgia is stable over time, consistent with national trends; voters confirm their beliefs as well as understand administrative and policy changes through messaging from partisan elites, including beliefs about the prevalence of election fraud (officials changing the vote count). Ex. 99 (King Rep. 3, 44-45).

568.  In 2012 and 2020, absentee voters in Georgia were more confident that their ballots were being counted as intended than those who voted in person. Ex. 80 (King Dep. 139:7-140:16); Ex. 99 (King Rep. 16, 24).

569.  When voters perceive problems with the voting process, such as long lines, challenges to voter qualifications, disputes over voter intent from stray marks on a ballot, negative evaluations of poll workers, the type of voting machines used, or the outcome of electoral contests, that can cause increased distrust in the voting process. Ex. 99 (King Rep. 7-8).

570.   To address voter confidence concerns, the consensus among election administrators has been to distribute more information to the public that explains how elections are conducted and how election administrators address those challenges rather than adding restrictions that sacrifice voting opportunity and increase demands on voters' time and attention. Ex. 79 (Deposition of Kevin Kennedy [ECF 748] ("Kennedy Dep.") 185:18-186:1).

571.   The University of Georgia's School of Public & International Affairs Survey's ("SPIA Survey") was an English-only telephone survey with a sample size of 1,253 Georgia registrants who self-reported as having voted in the 2022 general election ("SPIA Survey"). Defs.' Ex. YYYY at 2. The Survey respondents consisted of 63.5% white voters, 29.1% Black voters, and 7.4% "Other" voters. Defs.' Ex. YYYY at 20.

572.   The SPIA Survey's results are unreliable because of several methodological problems, including that the sample of respondents is both very small and unrepresentative. Among other things, the demographic makeup of survey respondents does not align with the demographic makeup of actual November 2022 voters. Ex. 108 (Pettigrew Sur-Rebuttal Rep. 6); Ex. 81 (Pettigrew Dep. 139:11-141:16 (noting the Survey's sample is not representative of Georgia's population and that "the racial composition of this poll was well outside the margin of error of what we know to be the truth based on actual voting records"), 142:16-

22 ("I don't see this data as -- as -- as standing up to the standard of academic rigor that would allow us to draw scientifically valid conclusions.")).

573.   Because the number of Black respondents is so small, these issues make it particularly inappropriate to use the survey to draw conclusions about the experiences of Black voters. Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 116:23-117:3 (Burden)).

574.   The SPIA Survey only includes people who reported that they successfully voted in the 2022 general election, thereby skewing responses by excluding anyone who was unable to vote. Ex. 108 (Pettigrew Sur-Rebuttal Rep. 6); Ex. 81 (Pettigrew Dep. 142:16-22); Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 116:23-117:3 (Burden)); Defs.' Ex. YYYY.

575.   The survey does not state which findings are statistically significant and the Defendants have no expert testimony opining on this topic. Defs.' Ex. YYYY at 2.

576.   At least 16.4% of voting-eligible people in Georgia, or at least 1.3 million people, have disabilities, including 680,300 people with mobility impairments, 479,700 with cognitive impairments, 335,900 with hearing impairments, 258,400 with vision impairments, 242,500 with difficulty dressing or bathing, and 483,700 with difficulty going outside alone due to a physical or mental condition. Ex. 111 (Schur Rep. ¶¶ 9, 40, 42).

577.   More than 10% of Georgians have difficulty with physical activities such as walking, climbing stairs, lifting, and standing, and nearly one-sixth of Georgians (15.5%) have difficulty with one or more basic activities of daily living such as getting into a bed or chair, taking a bath or shower, or preparing meals. The abilities needed for several of these activities are also needed in the act of voting, both in person and by mail. Ex. 111 (Schur Rep. ¶ 45).

578.   The disability rate climbs strongly with age, from 8.0% among those aged 18-34 to 26.4% among those aged 65-74, 43.7% among those aged 75-84, and 70.5% among those aged 85 or older. Ex. 111 (Schur Rep. ¶ 46).

579.   People with disabilities experience significant transportation barriers. Ex. 111 (Schur Rep. ¶¶ 60-63). Approximately 733,000 adults in Georgia (9.6% of the population) have disabilities that make it more difficult to travel outside the home. Georgians with disabilities are four times more likely to live in zero-vehicle households (16.3% compared to 3.7%), less likely to be drivers (61.6% compared to 91.9%), and more likely to be financially burdened by travel (58.3% compared to 42.9%) than Georgians without disabilities. *Id.* ¶ 60. 733,000 Georgians aged 18 or older (9.6%) have travel-limiting disabilities, defined as a "temporary or permanent condition or handicap that makes it difficult to travel outside the home." *Id*.

580.   People with disabilities are significantly more likely than people

without disabilities to live alone in the community (18.5% compared to 12.4%), are three times more likely to live in institutional group quarters, and are less likely to be currently married with a spouse present (42.3% compared to 49.4%). Ex. 111 (Schur Rep. ¶ 50).

581.   People with disabilities are three times more likely than people without disabilities to live in institutions such as nursing homes or assisted living settings, and those who do generally have more significant disabilities and are more likely to require assistance from staff and administrators in voting and daily activities. Ex. 111 (Schur Rep. ¶¶ 50, 93).

582.   Among Georgia citizens with disabilities who are eligible to vote, 87.7% live in homes with Internet access, compared to 95.2% for people without disabilities. This means that an estimated 157,000 citizens with disabilities who are eligible to vote in Georgia live in homes without Internet access. Ex. 111 (Schur Rep. ¶ 56).

583.   People with disabilities in Georgia are less likely to use the Internet at home (59.6% compared to 79.1% of people without disabilities), and only 60.0% of people with disabilities use the Internet in any location compared to 81.9% of people without disabilities. Ex. 111 (Schur Rep. ¶ 57).

584.   Lack of computer and Internet access can impact the ability of citizens with disabilities to obtain necessary resources for voting by making it more

difficult to register to vote, find out how and where to vote, particularly if polling places have been changed, gather information on candidates and issues in order to make informed decisions in voting, and cure issues with mail-in ballot applications. Ex. 111 (Schur Rep. ¶ 59).

585.   Over two-fifths of Georgians with disabilities (44.4%, or approximately 1.1 million people) need assistance with one or more activities of daily living, with especially high rates needing assistance for going outside of the home for errands (24.6%), preparing meals (18.4%), doing light housework (18.4%), keeping track of money (13.5%), and accessing the Internet (13.4%). Ex. 111 (Schur Rep. ¶¶ 52-53, 96).

586.   Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members. Over one-third (39.1%, or an estimated 973,200 people) of Georgians with disabilities receive assistance in daily activities from family members, while 8.7% (216,400) receive assistance from any non-relative. 4.2% (105,400) receive assistance from friends or neighbors, 2.4% (58,800) from paid help, 0.5% (12,800) from partners or companions, and 2.6% (63,400) from other non-relatives. Ex. 111 (Schur Rep. ¶ 54).

587.   Lower employment levels, greater likelihood of living alone, lower Internet access, and transportation barriers among people with disabilities

contribute to social isolation. This social isolation limits the support network upon which people with disabilities may rely for assistance with fundamental daily activities, including accessing the right to vote. Ex. 111 (Schur Rep. ¶ 64).

588.   People with disabilities in Georgia and nationwide are less likely to vote than their nondisabled counterparts. If the rate of voter turnout had been the same between people with and without disabilities, an additional 28,600 people with disabilities would have voted in Georgia in 2020. Ex. 111 (Schur Rep. ¶ 66). Voting barriers faced by disabled voters play a role in the voter turnout gap between voters with and without disabilities. *Id*. ¶ 75.

589.   Part of the disability voting participation gap can be traced to inaccessible voting systems, which not only make voting more physically difficult but can have psychological effects that discourage voting. Ex. 111 (Schur Rep. ¶ 69).

590.   People with disabilities face myriad barriers in voting related to their disabilities, including the need for assistance in their daily life activities, a greater likelihood of living alone, a lower likelihood of having a vehicle or other access to transportation, high poverty rates, social stigma, and inaccessible voting systems, leading to lower voter participation rates than nondisabled eligible counterparts. Ex. 111 (Schur Rep. ¶¶ 10, 39, 66-71).

591.   People with disabilities can face extra barriers to in-person voting in:

1) Finding or getting to the polling place, particularly for those facing transportation barriers and Internet-access limitations; 2) Getting inside the polling place, particularly for those in wheelchairs or with visual impairments; 3) Standing in line, particularly for those with chronic illnesses or health conditions that cause pain when standing or limit their endurance; 4) Being prevented from voting by poll workers, particularly for those who appear to have a cognitive disability; 5) Reading or seeing the ballot, particularly for those with cognitive or vision impairments; 6) Understanding how to vote or use the equipment, particularly for those with cognitive, vision, or upper-arm-mobility impairments; 7) Communicating with poll workers, particularly for those with hearing, speech, or cognitive impairments; 8) Writing on the ballot, particularly for those with vision disabilities or disabilities that limit upper-body mobility; 9) Physically operating the voting machine, particularly for those with vision disabilities or disabilities that limit upper-body mobility. Ex. 111 (Schur Rep. ¶¶ 75-77).

592.   Across the United States, when voters with disabilities vote in person, they commonly face difficulties waiting in line or getting inside the polling place, especially for those with vision and mobility impairments. Ex. 111 (Schur Rep. ¶ 80). The most common polling place barriers people with disabilities faced were difficulty waiting in line (7.4% among all polling place voters with disabilities). *Id.*; *see also id.* at ¶ 81 (discussing news reports of long lines as barrier for disabled

voters).

593.   In 2020, 5.4% of Georgia registered voters with disabilities said they did not vote because they tried but were not allowed to vote, it was too much trouble, or they were dissuaded by the long lines, compared to 0.7% of registered voters without disabilities who did not vote for any of those three reasons. Applied to the population of eligible Georgia citizens with disabilities, this means 48,300 Georgians with disabilities did not vote for one of these three reasons. Ex. 111 (Schur Rep. ¶ 77). After the 2020 election, 3.2% of all registered voters with disabilities in Georgia said they did not vote because "I tried to vote, but was not allowed to when I tried" compared to 0.2% of people without disabilities. This disparity could be due to legal barriers such as having their eligibility challenged, having a mail ballot rejected, not having proper ID, or being at the wrong polling place. *Id*.

594.   Long lines deter Georgia voters with disabilities from voting at higher rates (0.8%) than voters without disabilities (0.4%). Ex. 111 (Schur Rep. ¶ 77). According to unrebutted expert testimony by Plaintiffs' expert, Dr. Lisa Schur, "Waiting in line can be onerous for many people with disabilities. I conclude with a reasonable degree of certainty, based on the above data, that close to 1% of registered voters with disabilities in Georgia, representing about 7,800 people, reported that they were dissuaded from voting in 2020 by the prospect of long lines

at the polls that were well documented, indicating that their voter turnout could have been almost a full percentage point higher if long lines were not an issue." Id. ¶ 101.

595.   Disabled voters only know they can skip the line if they read the signs or ask polling staff, or if they do their own independent research. Ex. 35 (Gwinnett Cnty. Manifold Dep. 182:10-183:23).

596.   Earnestine Floyd is a 74-year-old registered voter in Muscogee County who has chronic asthma and arthritis, which prevent her from walking or standing for long periods of time. She cannot risk going to vote in person and waiting in a long line, which could be painful and risky for her health; in-person voting is therefore not accessible to her due to her health conditions and needs. Ex. 275 (Floyd Decl. ¶¶ 1-4, 6).

597.   Desaree Green is a 59-year-old registered voter in Cobb County who has cancer and lupus, which limit her ability to walk or stand and prevent her from leaving her house, driving to her polling place, or waiting in line to vote in person during flare-ups. Ex. 280 (Green Decl. ¶ 3).

598.   Ms. Green votes by mail because these substantial limitations in her ability to walk or stand prevent her from leaving her house, driving to her polling place, or waiting in line to vote in person. Ex. 280 (Green Decl. ¶ 3).

599.   Patricia Chicoine is 76-years-old and is a registered voter in Fulton

County who has arthritis in her back and two replaced knees, which make walking and standing difficult and painful. Ex. 266 (Chicoine Decl. ¶¶ 1-3).

600.   Because of difficulties with an inaccessible drop box and other problems with absentee voting due to SB 202, Ms. Chicoine voted in person three times in 2022. Ex. 266 (Chicoine Decl. ¶¶ 10-12).

601.   In May and November 2022, Ms. Chicoine waited in line for about 20 minutes before asking a poll worker if she could sit down; she was not offered a seat and she did not see any signage indicating she had a right to sit or skip the line due to her disabilities. Ex. 266 (Chicoine Decl. ¶¶ 10-11).

602.   Jessica Mathis is a 39-year-old registered voter in Chatham County who has several health conditions, including cerebral palsy, causing muscle weakness and spasms in her legs, and uses a wheelchair outside the home. Ex. 301 (Mathis Decl. ¶¶ 1-2, 5).

603.   Because of her health conditions, Ms. Mathis cannot stand in line for more than 30 minutes without having extreme muscle weakness and spasms. Ex. 301 (Mathis Decl. ¶ 20).

604.   Ms. Mathis has significant difficulties with transportation due to her disabilities. She relies on her parents to drive her, but that is burdensome due to her spasticity and physical limitations, the difficulty transporting her wheelchair, and her parents' health conditions. Ex. 301 (Mathis Decl. ¶¶ 9-10). She regularly

experiences difficulties with Teleride, the paratransit service for people with disabilities. *Id*. ¶ 8. Specifically, she must reserve a ride at least the day before, and sometimes the driver fails to show up, or the ride is canceled, or the bus is full, or she has to wait much longer than the scheduled ride time. *Id*.

605.    To vote in person typically takes Ms. Mathis about four hours, assuming Teleride adheres to the 30-minute window it provides. Ex. 301 (Mathis Decl. ¶ 7). However, she has waited between 3-5 hours for Teleride to pick her up after voting at a polling place, including during the 2018 primary election when it felt like over 100 degrees outside, which made waiting outside very difficult. *Id*. ¶ 8.

606.    Voting-eligible people with disabilities vote by mail significantly more often than those without disabilities, and experience barriers to voting—both in person and by mail—more frequently than people without disabilities. People with disabilities who are almost twice as likely to rely on absentee voting compared to people without disabilities. Among Georgia voters in 2020, 44.7% of people with disabilities and 26.7% of people without disabilities voted using an absentee ballot. Only 12.4% of disabled voters in Georgia voted in person that year. Ex. 111 (Schur Rep. ¶¶ 8, 12, 73, 74, 98(b), & Tbl. 8).

607.    Any impediments to the vote by mail process, such as those that SB 202 imposes, increase the burden on voting for people with disabilities, because

voting by mail is often the most accessible – or only accessible – means of voting for them. For many people with mobility restrictions, transportation barriers, and difficulty standing in long lines, voting by mail is effectively the only option they have to vote. Ex. 111 (Schur Rep. ¶¶ 8, 63, 73); Ex. 35 (Gwinnett Cnty. Manifold Dep. 186:21-25).

608.    According to unrebutted expert testimony of Plaintiffs' expert witness Dr. Lisa Schur: "any impediments to the vote by mail process, such as those that SB 202 implements, increase the burden on voting for people with disabilities, because voting by mail is often the most accessible—or only accessible—means of voting for them." Ex. 111 (Schur Rep. ¶ 8).

609.    Earnestine Floyd must vote by absentee ballot due to her chronic asthma and arthritis, which has been aggravated by multiple car accidents and affects her ability to walk and stand for long periods of time. Ex. 275 (Floyd Decl. ¶ 3-5).

610.    Declarant Nikolaos Papadopoulos, a member of the Arc Georgia, has multiple disabilities including cerebral palsy and right-eye blindness due to glaucoma. He uses a power wheelchair for mobility. He requires assistance with many daily activities including dressing and bathing; as a result, he lives in a nursing facility and is unable to leave to vote in person unless he can hire a driver and a personal care attendant. He resides in Royston and is registered to vote in

Franklin County. Ex. 306 (Papadopoulos Decl. ¶¶ 1-3); Ex. 303 (Mattox 5/11/23 Decl. ¶ 21).

611.   Papadopoulos previously received assistance from the nursing facility staff in completing, sealing, and mailing an absentee ballot; however, since the enactment of SB 202, nursing facility staff have been confused whether they can provide assistance, without which Papadopoulos is unable to vote. Ex. 306 (Papadopoulos Decl. (ECF 594-3) ¶¶ 9, 11-14); Ex. 303 (Mattox 5/11/23 Decl. ¶ 21).

612.   Approximately 733,000 Georgians have a temporary or permanent condition or handicap that makes it difficult to travel outside of the home. Ex. 111 (Schur Rep. ¶ 60).

613.   According to unrebutted expert testimony by Plaintiffs' expert witness, Dr. Lisa Schur, "[m]easures that make it more difficult to vote by mail will likely increase the number of people with disabilities going to polling places (if they vote at all) and will exacerbate problems of long lines." Ex. 111 (Schur Rep. ¶ 80).

614.   According to unrebutted expert testimony by Plaintiffs' expert witness, Dr. Lisa Schur, "[t]he combined additional restrictions on mail-in voting in SB 202 are likely to push more people to vote in person at polling places, which will in turn exacerbate problems of long lines at polling places and consequently

make it harder for many people with disabilities to wait in line to vote in person. While older voters and those with physical disabilities may ask to be moved to the front of a line, it may be hard to get the attention of poll workers and convince them that one is entitled to do so, and this practice would not be available to individuals with different disabilities, such as cognitive or other less-visible impairments, who may now need to vote in person." Ex. 111 (Schur Rep. ¶ 26).

615.   SB 202 creates barriers to the absentee ballot voting process such that voters with disabilities do not feel that it is accessible. Ex. 316 (Thomas Decl. ¶¶ 9, 38); Ex. 303 (Mattox 5/11/23 Decl.¶ 21).

616.   People with disabilities have difficulties with absentee voting due to SB 202 restrictions, thereby causing them to vote in person, where they also face difficulties. Ex. 316 (Thomas Decl. 7-12) (Empish Thomas votes in person despite difficulties due to inaccessibility and denial of assistance at the polls, but because of SB 202 increased barriers, including criminal penalties on unauthorized ballot return assistance, she is not willing to vote absentee); Ex. 266 (Chicoine Decl. ¶¶ 10-12) (Patricia Chicoine faced inaccessible drop boxes and other problems related to absentee voting, so voted in person three times in 2022 despite also facing difficulties due to her mobility impairments).

617.   In 2016, about 80,000 Georgians with disabilities did not have a driver's license or other government issued-photo ID, which creates a barrier to

accessing absentee voting and reduces a voter's ability to vote absentee. Ex. 111 (Schur Rep. ¶¶ 43, 98(c)); Ex. 21 (Fulton Cnty. Dep. 125:8-11); Ex. 96 (Fraga Rep. ¶ 81). People with disabilities are less likely than people without disabilities to have access to a printer or photocopier that can be used to copy documentation. Only 67% of eligible voters with disabilities reported having a printer at home or easy access to one, compared to 82% of those without disabilities. Ex. 111 (Schur Rep. ¶¶ 58, 98); Ex. 35 (Gwinnett Cnty. Manifold Dep. 150:1-5, 150:18-151:10).

618.   Some Georgia voters with disabilities have not voted because of the SB 202 identification requirements and others have had difficulty complying with SB 202 identification requirements because they cannot print out and send in the needed paperwork to access an absentee ballot. Ex. 303 (Mattox 5/11/23 Decl.¶ 21). Between the 2020 and 2022 elections, the Fulton County Board of Registrations and Elections' office received an increased number of non-compliant absentee ballot applications due to insufficient identification information. Ex. 21 (Fulton Cnty. Dep. 128: 5-8).

619.   Defendant representatives have admitted that they would not need to undertake any changes if voter ID requirements were lifted. Ex. 13 (Athens-Clarke Cnty. Dep. 112:17-23).

620.   According to unrebutted expert testimony of Plaintiffs' expert witness Dr. Lisa Schur, limiting the time window and process for obtaining an absentee

ballot burdens many people with disabilities who either need to vote by mail due to their disabilities or find it less difficult to vote by mail due to their disabilities. Ex. 111 (Schur Rep. ¶¶ 18, 98).

621.   As Zan Thornton of Georgia ADAPT testified, some people with disabilities have had problems receiving their absentee ballots and now have less time to request another one so they are forced to vote in person, even though the reason they prefer to vote absentee is because of the barriers they face getting to and waiting at the polls. Georgia ADAPT assisted 10-15 voters with disabilities who encountered this issue. Ex. 317 (Thornton Decl. ¶ 17). One voter took a bus from North Carolina to Fulton County so that ADAPT could drive her to the polls to vote because her absentee ballot never arrived. A woman in Savannah applied for, but did not receive, her absentee ballot and needed ADAPT's help to get to the polls. *Id*. ¶ 18.

622.   According to unrebutted expert testimony of Plaintiffs' expert witness Dr. Lisa Schur "The Section 25 provision shortening the time frame for absentee ballot applications is likely to cause some people with disabilities to miss the deadline for applying for an absentee ballot, particularly those who lack Internet access or face disability-related barriers for which they cannot obtain assistance." Ex. 111 (Schur Rep. ¶ 98(c)(iii)).

623.   According to unrebutted expert testimony of Plaintiffs' expert witness

Dr. Lisa Schur, the new barriers and penalties on absentee voting imposed by

Section 25 on top of existing restrictions, make it harder for people with

disabilities to vote. Ex. 111 (Schur Rep. ¶ 98(e)(iii)).

624.   Defendants were notified of the harms that these provisions would

cause to voters with disabilities. GAO joined with other organizations to submit

comments on S.B. 202 and other voting rights bills during SB 202's legislative

session. Additionally, GAO submitted comments to the United States Senate

Committee on Rules and Administration for a field hearing in Atlanta on S.B. 202,

outlining several issues affecting voters with disabilities, including: new strict

identification requirements for absentee ballots; reduction in time to request

absentee ballots; and lack of access to drop boxes to cast their absentee ballots due

to new restrictions. Ex. 305 (Orland Decl. ¶¶ 15, 20).

625.   Defendants have confirmed that SB 202's impact on voters with

disabilities "would be something that comes up in public comment fairly

regularly." Ex. 34 (SEB Dep. 47:17-21).

626.   Georgia ADAPT testified that some of the people that ADAPT

provided rides to the polls had been unable to obtain an absentee ballot because of

the shortened time period, so they had to vote in person even though they prefer to

vote absentee because of the barriers they face to in-person voting. Ex. 317

(Thornton Decl. ¶ 17). It is difficult and burdensome for people with disabilities to

request a ballot, get it back from the County, get copies of their identification and send it back within the timeframe. Additionally, some voters were confused about the time limits, others thought that they would automatically receive the ballot as they had in years prior, and others simply never received their ballots. Ex. 23 (30(b)(6) Deposition of Georgia ADAPT Vol. II (Suzanne Thornton) taken Feb. 22, 2023 [ECF 729] ("ADAPT Vol. II Dep.") 25:6-26:15).

627.   Georgia ADAPT testified that they knew at least ten voters with disabilities who wanted to but were unable to request their absentee ballot within ten days of the election due to SB 202. Thornton testified that these voters had struggled because "the process is burdensome, having to make copies . . . not having a printer, not having a computer, having to go out and get the . . . information, and then following the procedures . . . . And if you're blind you have to get somebody to read it to you and follow along." Ex. 23 (ADAPT Vol. II Dep. 27:3-25).

628.   Georgia ADAPT was aware of ADAPT members who were unable to vote because they ran out of time to submit their absentee ballots by mail and were unable to get a ride to drop it off at a drop box. Ex. 22 (30(b)(6) Deposition of Georgia ADAPT Vol. I (Suzanne Thornton) taken Feb. 20, 2023 [ECF 726] ("ADAPT Vol. I Dep.") 109:23-110:3).

629.   Counties were concerned about being able to process absentee ballots

in the new shortened time period, could not process rollover applications sooner and had to increase their staffing levels in order to accommodate the condensed timeline. Ex. 35 (Gwinnett Cnty. Manifold Dep. 29:12-16; 30:2-5); Ex. 18 (DeKalb Cnty. Dep. 84:5-85:16); Ex. 37 (Hall Cnty. Dep. 80:18-81:3).

630.   Election officials in Gwinnett County have had people with disabilities who have contacted them in the final days and the final week before an election who indicated it would be hard for them to vote on Election Day and that they were impacted by the change of the deadline for absentee voting. Ex. 35 (Gwinnett Cnty. Manifold Dep. 186:21-187:10).

631.   Cobb County failed to issue absentee ballots for the November 2022 general election and the December 2022 runoff election to over one thousand voters with enough time for the voters to be able to complete and mail them back. Ex. 339 (Consent Order, *Cook v. Cobb Cnty. Bd, of Elections & Registration* (Ga. Super. Ct. Nov. 7, 2022)); Ex. 340 (Interlocutory Injunction, *Crowell v. Cobb Cnty. Bd. Of Elections & Registration* (Ga. Super. Ct. Dec. 2, 2022)).

632.   In advance of the November 2022 election, Desaree Green requested her absentee ballot on August 25, 2022, and would have requested it earlier but for SB 202's new restrictions on the timing to request and return an absentee ballot application and ballot itself. When she checked her online voter portal, her absentee ballot was issued on October 11, 2022 but as of November 11, 2022 days

after the election, the ballot still had not arrived. Ex. 280 (Green Decl. ¶ 6).

Because her ballot did not arrive prior to the election and, because the election

coincided with her experiencing a lupus flare up and she was unable to leave her

house, she was unable to vote in the November 2022 election. *Id*. ¶ 8. She was

unable to vote in person because the election coincided with her experiencing a

lupus flare up and she was unable to leave her house to vote. *Id*. Ms. Green

believed that "by requesting my ballot months in advance, I would have plenty of

time to receive, complete, and return that ballot" but instead the ballot never

arrived to her home at all. *Id*. ¶ 7. Because her ballot did not arrive in a timely

manner and the time to remedy any issues was curtailed, she was unable to vote in

the November 2022 election. *Id*. Even had her ballot arrived but without enough

time to mail it back, she would have been unable to drop off the ballot without the

help of a friend or neighbor. *Id*. ¶ 9. She worries she will be again disenfranchised

by the compressed timeframe in future elections. *Id*. ¶¶ 5-11.

633.   According to Dr. Schur, "limits on advance voting days for runoff

elections constrain the voting opportunities for a large portion of Georgian voters

with disabilities, as over two-fifths (43.4%) of them voted early at a polling place

or election office in 2020." Ex. 111 (Schur Rep. ¶ 103).

634.   According to Dr. Schur, this shortened timeframe can "create extra

scheduling difficulties for those who need to coordinate with family or non-family

members to obtain assistance in voting in runoff elections, or who need to arrange paratransit services that may be difficult to schedule (e.g., such services typically must be arranged at least one day in advance with a fixed time for return that may be difficult to predict, and the services are often a first-come/first-serve basis). It is also likely to contribute to longer lines on the days advance voting is available, which in turn will discourage voting in runoff elections." Ex. 111 (Schur Rep. ¶ 103).

635.   County officials from Gwinnett County testified that the reduced time period has changed election offices' operations and it is difficult for them to process large volumes of requests because the processing time for runoff is very tight. "I think being only a four-week window, and essentially one week is spent certifying the first election, then usually a handful of days are spent, you know, programming and starting to get everything back together for the next election. You're in a really tight window of maybe one week to get everything entered and into the system where we need it. So that's just a very...tight window for us to turn a ballot around." Staff had to work seven days a week during runoff between 12 to 16 hours a day. Ex. 35 (Gwinnett Cnty. Manifold Dep. 140:16-142:6).

636.   Cobb County election officials testified that "compressing the time frame from the previous nine weeks to four weeks means that a lot of things are going at the same time, and there aren't a lot of days to get everything done. By the

time you certify the original election, there's -- there is very little time to get all the mail ballots out and to get prepared for early voting." Ex. 15 (Cobb Cnty. Dep. 91: 25-92:15).

637.   Georgia ADAPT testified that "because of the compressed runoff period, we have less time to schedule rides in each location, whereas previously, we could plan to be in a geographic area for a few days during early voting and schedule rides over that time. People have gotten confused about new absentee ballot rules and timelines, or didn't have or couldn't get proper ID, and have ended up needing our support to vote in person, which meant we have needed to provide more rides to the polls." Ex. 317 (Thornton Decl. ¶ 15).

638.   Georgia ADAPT testified that the compressed runoff period makes it very difficult for voters with disabilities to vote since "you can't even schedule a bus, you can't even schedule mobility vans within that time period, and if you don't know if it's going to be open or not on Saturday or Sunday, it's very difficult for us to find a way to get there." Zan Thornton added that during the 2022 runoff elections ADAPT "have out 459 rides in that one week...and we had to pray for a miracle to get the rides out there and get people to help us." Ex. 22 (ADAPT Vol. I Dep. 111:6-21).

639.   Georgia ADAPT further testified that voters with disabilities were prevented from using early in-person voting instead because of "work or the

attendants" and the fact that people with disabilities have to schedule [their] attendant to help [them] go places. And so not being able to schedule their attendants, not able to have access to transportation, and not knowing the law and the confusion in the law did result in that." Ex. 23 (ADAPT Vol. II Dep. 34:9-17).

640.   In the December 2022 runoff election, Earnestine Floyd was unable to vote at all due to the compressed runoff timeline. She requested a ballot application, which did not arrive, and by the time she found out that there was going to be a runoff election, it was too late to receive a ballot by mail with time to return it. Due to her disabilities, she was uncomfortable and unable to vote in person and as a result she was unable to vote in the 2022 US Senate Runoff Election. Ex. 275 (Floyd Decl. ¶¶ 8, 12-14). She believed she submitted an absentee ballot application, but the ballot never arrived. *Id*. ¶ 10. She contacted the County Elections Office three or four days before the election and learned that she would not be receiving a ballot and that it was too late to request one. *Id*. Due to her disabilities, Ms. Floyd was unable to vote in person and as a result she was unable to vote in the December 2022 Election. *Id*. ¶¶ 12-14. She is unsure if she will be able to vote in upcoming elections that have a short timeline. *Id*. ¶¶ 5, 8, 10, 12-15.

641.   Close to one-sixth (15.7%) of voters with disabilities in the United States used a drop box in 2020. Ex. 111 (Schur Rep. ¶¶ 19, 99).

642.   SB 202's restrictions on drop boxes will make it harder for many people with disabilities to vote, due to transportation difficulties and mobility challenges in getting to and going inside an election office to deliver a ballot. Ex. 111 (Schur Rep. ¶ 19).

643.   Requiring that drop boxes be located inside election offices, and only during limited hours, means many people with disabilities face additional transportation and mobility challenges associated with reaching a drop box. Ex. 111 (Schur Rep. ¶ 99).

644.   Drop box restrictions create barriers for Georgians with disabilities in several ways, make it harder for people with disabilities to vote, and cause some Georgians with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting. Ex. 111 (Schur Rep. ¶ 99).

645.   The challenged provisions taken together, including the drop box restrictions, create a burden "on top of existing voting barriers for many Georgians with disabilities" with a "cascading effect that compounds the burden on people with disabilities to cast a ballot." Ex. 111 (Schur Rep. ¶ 108).

646.   The purpose of the drop boxes included "having drop boxes available outdoors" and providing "the convenience of being able to drive by and deposit [a] ballot." *See, e.g.*, Ex. 37 (Hall Cnty. Dep. 66:1-11); Ex. 69 (Sterling Dep. 157:16-158:19 (Chief Operating Officer in SOS's Office testifying that "the whole point of

the drop box is to have it outside.")). Counties acknowledge that because of mail delays compounded with the drop box restrictions, voters may have more problems using absentee ballots via mail than if they were able to use a drop box. Ex. 37 (Hall Cnty. Dep. 72:6-73:17).

647.    Defendant representatives have admitted that lifting the drop box restrictions would not create a major burden or undermine the purpose of the program. Ex. 37 (Hall Cnty. Dep. 69:16-22, 72:6-12 (pre-SB 202 drop boxes were secure)); Ex. 13 (Athens-Clarke Cnty. Dep. 114:23-116:11, 121:9-122:21 (same)); *id*. 123:5-17 (would take only "about two days" to return drop boxes to pre-SB 202 locations).

648.    Counties cannot modify the SB 202 drop box rules as a reasonable modification. *See, e.g.*, Ex. 21 (Fulton Cnty. Dep. 258:25-260:19); Ex. 37 (Hall Cnty. Dep. 152:7-16); Ex. 51 (Columbia Cnty. Dep. 156:14-23). In fact, the record shows that counties do not know if they are permitted to waive SB 202's restrictions as a reasonable modification more generally. Ex. 37 (Hall Cnty. Dep. 110:15-23).

649.    Difficulties taking ballots to a drop box for people with mobility impairments or difficulty going outside alone are magnified when drop box locations are restricted. Ex. 111 (Schur Rep. ¶ 83(g)).

650.    People with disabilities often have compromised immune systems that

make it risky to go into a public building, and many people with visual

impairments find it challenging to navigate into a building and find the drop box.

Ex. 112 (Schur Rebuttal Rep. ¶ 11).

651.   Plaintiff GAO is aware that many registrar's offices where drop boxes

may be located are physically inaccessible, and that accessible routes may be

poorly marked or otherwise difficult to locate. Ex. 305 (Orland Decl. ¶ 26).

652.   According to unrebutted expert testimony from plaintiffs' expert Dr.

Lisa Schur, even in buildings that are ADA compliant, it is still an extra burden for

people with mobility impairments to be forced to get out of their vehicles and go

inside an office to deliver a ballot. Ex. 111 (Schur Rep. ¶ 99(a)).

653.   People with disabilities in 2022 were forced to wait in line to access

indoor drop boxes, along with those waiting to vote in person, because it was not

clear to voters that the drop box was located inside. Ex. 317 (Thornton Decl. ¶ 21);

*see also* Ex. 112 (Schur Rebuttal Rep. ¶ 11).

654.   Many members of The Arc Georgia do not drive or have access to

reliable transportation; it is difficult for them to access transportation to a drop box

generally, but even harder when drop box locations are limited and only available

during business hours, when family and other supporters are at work and unable to

drive them. Ex. 303 (Mattox 5/11/23 Decl. ¶ 21).

655.   Given the transportation barriers faced by people with disabilities,

having a smaller number of drop boxes increases the difficulty in delivering a ballot and eliminates the benefit that drop boxes were designed to provide. Ex. 111 (Schur Rep. ¶ 99(a)).

656.   Transportation difficulties can have a negative impact on voting. There is a significantly higher likelihood of voting among individuals who have access to a vehicle they can drive compared to those who do not. Ex. 111 (Schur Rep. ¶ 62).

657.   Distribution of ballot drop boxes places a more substantial travel burden—having to travel more than an hour round trip—on citizens of voting age without access to a vehicle, which is more commonly found among people with disabilities than in the rest of the population. The travel burden increase with the reduction in drop boxes is disproportionately borne by people with disabilities— who are two to three times more likely to have travel burdens in reaching drop boxes as compared to people without disabilities. Ex. 93 (Chatman Rep. ¶¶ 3, 5).

658.   Studies show that travel distance increases to a drop box cause decreases in voter participation, demonstrating that the increased travel time for voters with disabilities will harm voter participation by raising the cost of voting. Ex. 112 (Schur Rebuttal Rep. ¶ 4). Extra travel time and inconvenience also harms voters with disabilities by creating additional costs for them to vote that voters without disabilities do not face. *Id.* ¶ 5.

659.    Before SB 202, voters with disabilities in Hall County could access drop boxes available outdoors, without having to go inside. But after the passage of SB 202, county officials have observed that voters with disabilities are impacted because they can no longer use an outdoor drop box. Ex. 37 (Hall Cnty. Dep. 65:22-66:11, 68:8-12, 132:9-16).

660.    Voters in Hall County, Athens-Clarke County, and Douglas County have expressed that they would prefer to be able to drop off their ballots outside. At least one voter in Hall County was not able to access the county's indoor drop box. Ex. 37 (Hall Cnty. Dep. 70:6-18, 153:2-6). County officials are aware in Athens-Clarke County that voters have had difficulties accessing drop boxes because they are located inside. Ex. 13 (Athens-Clarke Cnty. Dep. 124:6-17). County officials are aware in Douglas County that voters with disabilities have had difficulties accessing the drop boxes because of the hours and the placement of the drop boxes indoors. Ex. 63 (Kidd Dep. 128:23-129:18).

661.    For someone in a manual wheelchair or walker, reaching a drop box in Douglas County requires "a lot of effort," because drop boxes are located "on the basement floor of [a] courthouse." Finding accessible parking to reach the drop box is another barrier. Ex. 63 (Kidd Dep. 160:19-161:4; 161:10-20).

662.    Patricia Chicoine, a voter in Fulton County with arthritis that causes difficulty and pain with walking and standing, prefers to vote absentee via drop

box because it offers assurance her vote will be received and will not be lost in the mail. Ex. 266 (Chicoine Decl. ¶¶ 3-4). In 2020, this was easy to do because the drop box was outside and available at all hours. *Id*. ¶ 5.

663.   In 2021 drop box locations were reduced and Ms. Chicoine had to drive further to reach the drop box. Ex. 266 (Chicoine Decl. ¶¶ 5-6).

664.   In 2021, once SB 202 required the placement of drop boxes indoors, Ms. Chicoine had to walk down an extremely long hall, without handrails, and could only reach the drop box by supporting herself holding onto chairs and taking breaks along the way. A poll worker told Ms. Chicoine that she was not the first person to report inaccessibility with the drop box. Ex. 266 (Chicoine Decl. ¶¶ 7-9).

665.   One GAO constituent who had previously been able to drive to a drop box and submit his absentee ballot without leaving his car encountered a drop box in 2022 that was no longer accessible to him. Ex. 305 (Orland Decl. ¶ 17).

666.   This individual can ambulate about 10 yards but could not ascertain whether the drop box was reachable to him because it was inside the building, and poll workers refused to assist him. Ex. 305 (Orland Decl. ¶ 17).

667.   Plaintiff ADAPT is aware of several people who were not able to use drop boxes in 2022 because they are located inside. Ex. 317 (Thornton Decl. ¶¶ 16, 23).

668.   Wendell Halsell, a voter in DeKalb County who has lost the use of his

right leg and has COPD and breathing problems, voted via drop box in November

and December 2022, seeing a benefit in avoiding using the unreliable mail in his

area. Ex. 283 (Halsell Decl. ¶¶ 1, 3, 7).

669.   Entering the building where the drop box was located was very

exhausting for Mr. Halsell, and after having someone assist him up the ramp, Mr.

Halsell needed several minutes to recuperate. Ex. 283 (Halsell Decl. ¶ ¶ 8, 9).

670.   Empish Thomas, a voter in DeKalb County who is completely blind,

cannot get to drop boxes easily because she needs to set up two trips with MARTA

to drop off her ballot, or pay a driver; having to reach a drop box within a shorter

limit of time makes the program less accessible. Ex. 316 (Thomas Decl. ¶¶ 1, 4, 5,

17-18). SB 202's multiple new barriers to absentee voting, including the felony

provision, have compounded to prevent her from using the absentee ballot

program, including because she doesn't have a family member or "caregiver"

nearby to return her ballot. *Id*. ¶¶ 15-16, 19.

671.   People with disabilities are less likely to be able to vote without

assistance with no difficulties. Ex. 111 (Schur Rep. ¶ 92).

672.   Because a large number of people with disabilities live alone, many

who need assistance must rely on non-household members. An estimated 168,800

Georgians with disabilities receive assistance in activities of daily living from

friends, neighbors, or other non-relatives who would not be eligible to help with an

absentee ballot under this section (unless they happen to be poll workers). Ex. 111 (Schur Rep. ¶¶ 7, 54).

673.   Assistance in voting can take many forms, including but not limited to: driving someone to the polls, helping them get inside the polling place, providing support as they wait in line, helping them understand how to vote, reading and explaining words on the ballot, helping with the physical act of marking a ballot or operating the voting machine, and requesting and returning a mail ballot. When people with disabilities receive assistance in various aspects of the voting process, this does not suggest the assistor is "voting for" the person with a disability or exercising improper influence over the voter. Ex. 111 (Schur Rep. ¶ 94).

674.   People with disabilities may need assistance from non-family or household members to vote by absentee ballot. Ex. 37 (Hall Cnty. Dep. 153:7-10); Ex. 111 (Schur Rep. ¶¶ 7, 54); Ex. 306 (Papadopoulos Decl. ¶ 9); Ex. 316 (Thomas Decl. ¶ 16).

675.   Nationally, in 2020, among those who needed assistance in voting absentee, assistance was provided by friends, neighbors, or other non-relatives apart from health aides in 14% of the instances (8% by friends and neighbors and 6% by other non-relatives). Ex. 111 (Schur Rep. ¶ 91).

676.   Prior to the passage of SB 202, voters with disabilities and their

assistors were not concerned about violating the state law providing that only family or household members or "caregivers" of disabled voters could provide absentee ballot return assistance (O.C.G.A § 21-2-385(a)) because the misdemeanor penalty for violating state election law generally contained in O.C.G.A § 21-2-598 included an exception ("Except as otherwise provided by law...") and two state Attorney General opinions provided reassurance voters with disabilities were legally permitted to choose their assistor for ballot return assistance, notwithstanding section 21-2-385(a). Ex. 305 (Orland Decl. ¶¶ 22-23 & Exs. B-C); Ex. 284 (Hargroves Decl. ¶ 9).

677.   SB 202's new felony penalties for violating restrictions on absentee ballot return assistance for voters with disabilities removed the assurances that chosen assistors who are not family or household members may legally provide such assistance because the new Felony Provision (O.C.G.A. § 21-2-598(a)(5)) contains no exception for otherwise legal actions and because the Attorney General has not issued any updated opinion or clarification that its previous opinions remain in effect. Ex. 305 (Orland Decl. ¶ 24).

678.   State law does not define the terms "caregiver" and the Secretary of State's Office has not provided direction or guidance to counties on what "caregiver" means. Ex. 111 (Schur Rep. ¶ 96); Ex. 33 (SOS Dep. 195:8-198:12, 200:11-201:6); *see also* Ex. 37 (Hall Cnty. Dep. 155:3-22, 157:7-10); Ex. 51

(Columbia Cnty. Dep. 161:10-17); Ex. 18 (DeKalb Cnty. Dep. 226:7-229:6); Ex.

72 (Watson Dep. 183:6-15); Ex. 305 (Orland Decl. ¶ 24(b) & Ex. D (statutorily

mandated instructions that are required to include a list of authorized persons who

may return another voter's completed absentee ballot do not include any

exceptions to the categories listed in O.C.G.A. § 21-2-385(a) and do not define

"caregiver.")).

679.    SB 202's Felony Provision, without the exception in the prior

misdemeanor statute or clarity about who is authorized to provide assistance,

deters well-meaning and potentially legally permissible assistors who fear being

charged with a felony, which may deprive some disabled Georgians of the only

means they have to vote absentee or at all. Ex. 111 (Schur Rep. ¶¶ 7, 98); Ex. 284

(Hargroves Decl. ¶¶ 10-11, 13); Ex. 316 (Thomas Decl. ¶¶ 11-12, 16); Ex. 318 (J.

Wiley Decl. ¶ 10); Ex. 317 (Thornton Decl. ¶ 22); Ex. 306 (Papadopoulos Decl.

¶ 11); Ex. 22 (ADAPT Vol. I Dep. 112:23-113:12).

680.    Voters and assistors are confused about what "caregiver" means under

SB 202 and are concerned about the criminal penalties for even inadvertent

violations. Ex. 316 (Thomas Decl. ¶¶ 13-15); Ex. 284 (Hargroves Decl. ¶¶ 10, 13)

(homeless shelter staff "cannot take the risk of helping clients with their absentee

ballots" without knowing who qualifies as caregiver); Ex. 305 (Orland Decl. ¶ 24);

Ex. 306 (Papadopoulos Decl. ¶¶ 12, 14); Ex. 303 (Mattox 5/11/23 Decl.¶ 21).

681.   For example, at least one member of The Arc Georgia is unable to vote without assistance, Ex. 303 (Mattox 5/11/23 Decl.¶ 21). This member has cerebral palsy and glaucoma, lives in a nursing facilities and needs assistance with many activities of daily living, including voting. *Id.* Since the enactment of SB 202, the nursing facility staff and member have been confused about whether the staff can provide assistance. *Id.*

682.   That SB 202 now makes it a felony for someone other than a family or household member or undefined "caregiver" to return an absentee ballot for a disabled voter imposes additional burdens on disabled voters who need assistance to return their ballots, and may prevent them from voting absentee or at all. These burdens may especially affect people of color. Ex. 303 (Mattox 5/11/23 Decl.¶ 21); Ex. 305 (Orland Decl. ¶¶ 24-25); Ex. 306 (Papadopoulos Decl. ¶¶ 11-14); Ex. 284 (Hargroves Decl. ¶¶ 13-14); Ex. 316 (Thomas Decl. ¶¶ 15-16); Ex. 283 (Halsell Decl. ¶ 8); Ex. 24 (30(b)(6) Deposition of the Georgia Advocacy Office (Devon Orland) [ECF 739] ("GAO Dep.") 161:25-162:11); Ex. 23 (ADAPT Vol. II Dep. 40:5-23).

683.   Some Georgia voters with disabilities have been unable to vote because they did not have a family member or caregiver to assist them. Ex. 23 (ADAPT Vol. II Dep. 40:5-9).

684.   Defendant representatives have admitted that they would not need to

undertake any changes if the Felony Provision was lifted. *See, e.g.*. Ex. 57 (Evans Dep. 228:4-12 (Elections Director in SOS's Office testifying that he was unaware of any changes the office would need to make if the Felony Provision were removed)); Ex. 13 (Athens-Clarke Cnty. Dep. 127:19-128:4 ("very minimal changes" would be required if Felony provision were removed)).

685.   It is possible that a voter's polling place may change even if their precinct remains the same. Ex. 21 (Fulton Cnty. Dep. 197:10-198:13).

686.   Polling locations and precincts may change from one election to another and sometimes with little notice. Ex. 21 (Fulton Cnty. Dep. 198:20-200:5); Ex. 15 (Cobb Cnty. Dep. 152:7-11); Ex. 111 (Schur Rep. ¶ 102 n. 48).

687.   Drawing new precinct boundaries can create voter confusion and mistakes, which also exacerbates long lines at polling places. Ex. 107 (Pettigrew Rep. 41).

688.   Allowing voters to vote a provisional ballot if they arrive at the wrong polling place on Election Day was intended to help and offer "compassion" for people who would not be able to get to the correct polling place and would otherwise be unable to vote. Ex. 34 (SEB Dep. 90:2-13), Ex. 65 (Mashburn Dep. 85:19-86:7).

689.   The SEB did not conduct any studies on the effects of limiting out-of-precinct provisional voting to 5:00 to 7:00 p.m. on Election Day or which voters

would be most likely to vote out-of-precinct on Election Day. Ex. 34 (SEB Dep. 179:6-13).

690.   County election officials favored leaving the pre-SB 202 rules regarding out-of-precinct provisional ballots in place, or allowing them for people who could not travel to their assigned polling place by poll closure time in order to prevent voters from being unable to vote. Ex. 47 (Adams Dep. 181:5-182:13 (describing survey in which 31 county officials favored leaving pre-SB 202 rules in place or allowing out-of-precinct voting for voters who could not reach their assigned polling place by 7:00 p.m.)); Ex. 15 (Cobb Cnty. Dep. 103:8-104:8); Ex. 63 (Kidd Dep. 152:4-154:5 (expressing opposition to "arbitrary" out-of-precinct restriction because it removes a "tool" for people who lack transportation), 154:25-155:12 (recounting that pre-passage of SB 202, he spoke to Secretary of State's office about his "non-understanding of why this nonissue is an issue. And trying to get an understanding of what the perceived problem was."")).

691.   Allowing voters to cast an out-of-precinct provisional ballot served the interests of voters and public safety by avoiding voters rushing to drive long distances in potentially unsafe conditions to get to the correct polling place. The "balance" struck by SB 202 in allowing provisional ballots only between 5 p.m. and 7 p.m. on Election Day assumed that most voters could drive to the correct polling place within two hours and did not consider whether voters who use public

transportation would have enough time to make it to the correct polling place.

Ex. 47 (Adams Dep. 184:25-188:6).

692.   Requirements of SB 202 related to out of precinct provisional ballots "make it harder for a citizen to vote if they show up at the wrong polling place. If the polling place location has been changed, people with disabilities are less likely to be aware of this given their lower rates of Internet access. Also, for those people with disabilities who arrive at the wrong polling place, the cost of getting to the correct polling place is likely to be high given the transportation difficulties many of them face and their lower likelihood of having a car they can drive." Ex. 111 (Schur Rep. ¶ 22). "I conclude with a reasonable degree of certainty, based on the above data, that the new barriers imposed by Section 34 will make it harder for people with disabilities to vote. Therefore, I conclude that this section will cause some Georgians with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 202." *Id.* ¶ 102.

693.   Plaintiff ADAPT is aware of one voter who was unable to vote because they could not cast a provisional ballot at an out-of-precinct polling place before 5:00 p.m. on Election Day. The individual was blind and did not get "good directions or supports" to get to the correct polling place. Ex. 23 (ADAPT Vol. II Dep. 39:3-40:4).

694.    Plaintiff ADAPT had to take one 93-year-old woman who used a wheelchair to three polling places because her polling place had changed. No one else could drive her because she needed assistance getting from inside her house to the van. ADAPT had to provide a lot of advocacy and assistance to make sure she was able to cast her ballot. Ex. 317 (Thornton Decl. ¶ 16).

695.    Plaintiff The Arc of Georgia testified that many of its members require assistance with activities of daily living and do not drive. Many lack access to reliable transportation and are unable to afford to pay someone to drive them to a polling place. Ex. 303 (Mattox 5/11/23 Decl. ¶ 21).

696.    County election officials do not have authority to waive the rules about out-of-precinct voting on election day as a reasonable modification for a voter with a disability. Ex. 37 (Hall Cnty. Dep. 151:7-12); Ex. 15 (Cobb Cnty. Dep. 104:3-8, 153:9-18); Ex. 33 (SOS Dep. 211:4-212:15 (no specific accommodations for a disabled voter)).

697.    If SB 202 restrictions on out-of-precinct voting were rolled back, neither the state nor counties would need to undertake significant difficulty or expense to reinstate the former rules. Ex. 37 (Hall Cnty. Dep. 65:10-16 (if SB 202 out-of-precinct restrictions were rolled back, no changes would have to be made other than processing more provisional ballots)); Ex. 15 (Cobb Cnty. Dep. 153:19-23 (explaining that educating poll workers is the only thing that would need to

occur if SB 202's out-of-precinct restrictions were rolled back)); Ex. 21 (Fulton Cnty. Dep. 196:1-9 (testifying that it would be easier to administer a process similar to advance voting where voting machine is programmed for voter's correct precinct)); Ex. 63 (Kidd Dep. 156:14-157:8 (rolling back out-of-precinct restrictions would not result in voter confusion, and would only involve instructing voters)); Ex. 33 (SOS Dep. 285:21-288:14 (describing changes to revert back to pre-SB 202 procedures, specifically, informing and training counties, and revising and distributing provisional ballot forms)).

698.    Asian Americans Advancing Justice-Atlanta ("Advancing Justice-Atlanta") engages in election protection during every election cycle, including poll monitoring at various polling locations to observe and document issues at precincts (e.g., if voters show up at the wrong precinct, or voters erroneously think they can drop off their ballot at a location but cannot). Ex. 12 (AAAJ Dep. 42:6-8, 46:8-47:10).

699.    Advancing Justice-Atlanta does voter outreach in multiple languages because it works specifically with communities that have a high percentage of limited-English proficient ("LEP") people. Ex. 12 (AAAJ Dep. 42:15-18). For example, Advancing Justice's voter hotline has in-language capacity in Korean, Chinese, Vietnamese, Spanish and Hindi. Ex. 100 (Lee Rep. 62). Advancing Justice-Atlanta also works with a demographic that historically has less civic

engagement and familiarity with elections processes. Ex. 12 (AAAJ Dep. 49:22-50:17).

700.   Advancing Justice-Atlanta has a policy department that engages in policy advocacy work. The policy staff will track and monitor bills in the Georgia State Legislature in its priority areas of voting rights and immigrant justice, monitoring and analyzing the bills to determine the impact on communities and advocating for or against depending on whether they are helpful or harmful to community members. This advocacy may include direct conversations with lawmakers, giving testimony to lawmakers, educating the community, or putting out a call to action for community members to engage with their lawmakers. The policy department also advocates with County Boards of Elections to talk to them about ways to make voting more accessible, including specifically for AAPI voters. Ex. 12 (AAAJ Dep. 41:9-13, 42:25-44:4).

701.   Advancing Justice-Atlanta engages in litigation in the area of voting rights. Ex. 12 (AAAJ Dep. 42:15-14).

702.   Advancing Justice-Atlanta engaged in efforts to stop SB 202 from passing, as well as efforts to address the predecessor election bills that were introduced in the same legislative cycle. This included the policy and litigation staff analyzing the bills, preparing remarks to the legislature, giving testimony to lawmakers about concerns and harmful effects it would have on AAPI voters.

Advancing Justice-Atlanta had conversations and mobilized with community partners during this timeframe. Ex. 12 (AAAJ Dep. 35:4-21, 44:17-46:3).

703.    Advancing Justice-Atlanta does not always communicate changes to election laws to the community every time it happens. But given AAPIs in Georgia's use and reliance on absentee-by-mail voting at a disproportionately higher rate than the state's voters as a whole, SB 202's numerous changes to absentee voting forced Advancing Justice-Atlanta to pivot away from other organizational activities in order to assist community members in understanding the effects of the law. Advancing Justice-Atlanta had to divert its resources, including reducing its advocacy work, so that it could engage in more civic engagement and education to address the many changes created by SB 202. Ex. 12 (AAAJ Dep. 44:20-25). Advancing Justice-Atlanta also had to undertake significant efforts to first educate staff and then community members about the various restrictions to absentee voting imposed by SB 202. *Id.* 50:8-11.

704.    Advancing Justice-Atlanta staff that had to divert resources as a result of SB 202 include community organizers and canvassers who lead its civic engagement work, the Director of Civic Engagement and Organizing, volunteers, litigation staff, communications staff, policy staff and the Executive Director. Staff with different language abilities who do not regularly work on voting rights issues were also needed to help with translations to update materials. Ex. 12 (AAAJ Dep.

72:6-73:24).

705.   Advancing Justice-Atlanta spent significantly more nonfinancial resources towards updating the substance of its educational and training materials because of SB 202 than it has needed to in past election cycles. Compared to the work done to update materials in previous election cycles, the effects of SB 202 meant that more staff members were needed to work on updates and more materials required updates. Ex. 12 (AAAJ Dep. 55:22-56:12, 56:21-57:7).

706.   When Advancing Justice-Atlanta updated its Voter FAQ, the entire resource had to be revisited because of all the changes created by SB 202. This required staff to read and analyze the bill, distill its contents and craft language that is easily understandable by voters. Then, Advancing Justice-Atlanta had to translate the updated resource into four other languages, which requires two levels of review. To account for all of the changes, it took significant staff time to review the document, review the translation, and work with external translation services given the breadth and depth of the resource. At times, staff who would not normally work on a materials update, were needed to review the changes, for example the Executive Director. Ex. 12 (AAAJ Dep. 57:8-58:14); Ex. 294 (Khwaja Decl. ¶ 21).

707.   Advancing Justice-Atlanta was particularly concerned about all of the changes brought on by SB 202, so it organized a panel discussion for community-

based, voting rights, or civic engagement organizations that routinely interact directly with voters to educate those organizations about some of the law's most harmful provisions. This type of educational event would not routinely have happened when there are changes to election laws. This panel happened specifically because of the number and types of changes brought on by SB 202. Ex. 12 (AAAJ Dep. 69:13-70:20).

708.   Advancing Justice-Atlanta has diverted resources to ensure that staff and canvassers are educated on all the provisions of SB 202, that community partners understand the law, and that voters understand the restrictions under SB 202. To do this, Advancing Justice-Atlanta held meetings and conversations with staff, updated election protection training materials provided to staff and volunteers, updated and changed many public-facing elections materials and resources that the organization provides in multiple languages, and increased the number of locations covered for its poll monitoring work to have a presence at precincts that no longer have drop boxes because of SB 202. Ex. 12 (AAAJ Dep. 65:22-66:24).

709.   Advancing Justice-Atlanta was concerned about a higher risk of disenfranchisement with voting by mail compared to other methods of voting because of SB 202's numerous restrictions. Because AAPI voters prefer to vote by mail, Advancing Justice-Atlanta had to have many internal conversations about

how to navigate the tension between the accessibility of voting by mail with the potential for disenfranchisement and determining the messaging and recommendations that would go out to its communities. It took a lot of staff time to decide on the messaging and figuring out how to communicate that to voters. Ex. 12 (AAAJ Dep. 67:1-22).

710.    Staff and canvassers generally spend a significant amount of time reaching out to voters via door knocking, phone calls and text messages. Because of SB 202, time that could be dedicated to this kind of voter outreach had to be allocated towards understanding SB 202, educating others on the harmful impacts of SB 202 and fighting those harmful effects. Ex. 12 (AAAJ Dep. 64:10-23).

711.    One community organizer had to spend more time at one of the senior centers helping LEP Korean voters because they had a lot of questions around the new restrictions and steps to voting. Ex. 12 (AAAJ Dep. 74:13-18).

712.    After SB 202, Advancing Justice-Atlanta staff generally encountered more questions from voters with respect to absentee voting and helping voters navigate those issues. Ex. 12 (AAAJ Dep. 74:12-32).

713.    Because SB 202 eliminated scores of drop box locations in Georgia's most populous counties, Advancing Justice–Atlanta assigned staff members to stand at polling locations where drop boxes had existed before SB 202, so they could direct confused voters to other locations. Ex. 294 (Khwaja Decl. ¶ 22).

714.   Immigrant justice is another major priority for Advancing Justice-Atlanta, and because of the significant staff time that had to be dedicated to combating the harmful impact of SB 202, there were and are opportunity costs to the immigrant justice work. The work that has been needed to combat the effects of SB 202 has skewed the vision of the work towards addressing voting rights issues at the cost of engaging proactively in immigrant justice work. For example, the litigation team handles both voting rights and immigrant justice, and because SB 202 has taken up a lot of the department's time, the team slowed down its immigration work, including being unable to take on as many habeas corpus petitions to fight against the detention of immigrants in Georgia, and delaying working on a pardon request for a client. Ex. 12 (AAAJ Dep. 60:7-61:11).

715.   Advancing Justice-Atlanta was deeply involved with responding to the Atlanta spa shooting, but SB 202 passed shortly after that incident and some staff had to divert their attention to SB 202 instead of being able to fully engaged in taking care of its community in the aftermath of a crisis. Ex. 12 (AAAJ Dep. 62:10-21).

716.   Around the same time SB 202 passed, Advancing Justice-Atlanta was involved in responding to a deportation flight of Vietnamese refugees. Fighting against the detention and deportation of the southeast Asians is a priority area for the organization, and had resources not been taken up by fighting SB 202, staff

could have done more to respond to that issue. Ex. 12 (AAAJ Dep. 62:21-5).

717.    If SB 202 were enjoined, Advancing Justice-Atlanta would not have had to divert some of its resources to combating the harmful impacts of the provisions the organization is challenging. Ex. 12 (AAAJ Dep. 121:8-13).

718.    Steven Paik became a U.S. citizen in 2004, but only registered to vote for the first time in 2019 when he moved to Georgia and received in-language assistance from Advancing Justice-Atlanta after receiving a state-provided absentee ballot application in the mail. Ex. 68 (Deposition of Steven Paik [ECF 751] ("Paik Dep.") 20:5-21:21; 26:5-9).

719.    Mr. Paik has required in-language assistance from Advancing Justice-Atlanta in every election he has voted in. He received in-language assistance to request and understand his absentee ballot, a process which takes substantial time. Because Mr. Paik does not speak English and no one in his household speaks English, he has never been able to request an absentee ballot himself. Ex. 68 (Paik Dep. 21:13-16, 24:5-25:4, 43:6-18, 44:5-12, 47:18-48:6).

720.    Nora Aquino is dependent on her daughter or someone else to help her vote in person or by absentee because she does not drive and needs assistance getting to the polling location, interpreting, or explaining the election process so that Ms. Aquino understands what she is doing. Ex. 48 (Deposition of Nora Aquino [ECF 750] ("Aquino Dep.") 29:23-30:11, 44:12-15, 52:7-14). For these reasons,

casting a ballot takes longer for Ms. Aquino. SB 202's shortened time frame to
return absentee ballots makes it more difficult for voters like Ms. Aquino to
complete the voting process. *Id.* at 28:7-29:8 ("[T]he time frame for when you can
drop your ballots has been decreased . . . making it shorter and making it more
difficult for voters to fill out their information and to complete the process.").

721.    In 2020, Nora Aquino requested an absentee ballot a few times, but
never received it, so her daughter had to leave work in the middle of the day to
drive Ms. Aquino to the polling location, and the whole process of driving to pick
up Ms. Aquino, driving to the polling location and waiting to vote took well over
an hour out of her daughter's day. Ms. Aquino was dependent on her daughter's
availability to vote. Aquino Dep. 37:20-41:7, 42:13-43:13, 44:12-15. For the runoff
election in 2020, Ms. Aquino was able to vote by absentee ballot with the
assistance of her daughter, who helped her apply for the ballot and drove Ms.
Aquino to drop her ballot off at a drop box outside Brookhaven City Hall, after
business hours. *Id.* 45:17-46:9.

722.    Angelina Thuy Uddullah prefers to vote by mail and drop box because
she is a busy mom who is in law school while working full time, and this method
of voting is more convenient. She voted absentee by mail and a drop box for the
2021 run-off because she was working two jobs and had unpredictable hours. Ms.
Uddullah also spends time assisting her mother with voting because she is limited-

English proficient. Ex. 71 (Deposition of Angelina Thuy Uddullah [ECF 740] ("Uddullah Dep.") 22:16-23, 33:6-23, 34:13-16, 35:7-18, 37:16-21). Ms. Uddullah also prefers to vote by absentee ballot out of a greater fear of in-person voting due to a dangerous rise in anti-Asian violence. *Id*. at 35:19-24.

723.   Ms. Uddullah was unable to vote by absentee ballot after SB 202 because she missed the deadline for the 2022 General Election due to the shortened time frame. So, on Election Day, in order to cast her vote, Ms. Uddullah had to stop work and her studies, and bring her newborn and two-year-old nephew with her to the polls–an experience so hectic that she forgot to put on her shoes. When she got to the polling place, the line was so long it extended outside of the building. Ex. 71 (Uddullah Dep. 37:22-39:12).

724.   Ms. Uddullah struggled to vote in person for the 2022 Runoff Election because while she had planned to vote during the early voting period, she was working and did not have enough time. She almost missed voting on election day for the Runoff because she had school. She faced a dilemma of whether she would have enough time to make it to the polls, but was ultimately able to vote due to her husband leaving work early to drive her to the polling place. Ex. 71 (Uddullah Dep. 40:8-41:7).

725.   Anjali Enjeti-Sydow's preference is to vote by absentee ballot and drop boxes because she believes they are secure, convenient and reliable. She

prefers to use a drop box over U.S. mail because she feels more assured that her ballot will get returned and counted if she uses a drop box. When drop boxes were available during non-polling place hours, she felt it was more convenient because she did not have to drop off her absentee ballot during the work day and could avoid driving during rush out. Ex. 56 (Deposition of Anjali Enjeti-Sydow [ECF 741] ("Enjeti-Sydow Dep.") 41:15-42:15, 72:4-7, 73:4-15).

726.   Ms. Enjeti-Sydow was also turned off by the absentee ballot application process because it became much more onerous after SB 202 passed. Before SB 202, she could request her absentee ballot online, but after SB 202, she would have to complete several more steps. Ex. 56 (Enjeti-Sydow Dep. 50:14-51:1, 57:10-22, 58:1-7).

727.   Ms. Enjeti-Sydow has served as a poll worker since August 2020, which prevents her from voting in-person on Election Day. Prior to that, she could vote in person on election day. Ex. 56 (Enjeti-Sydow Dep. 46:10-16; 72:14-18). In 2020, she voted absentee by mail. *Id*. at 68:11-15.

728.   Ms. Enjeti-Sydow has a disability that limits her mobility. Ex. 56 (Enjeti-Sydow Dep. 47:2-3).

729.   After SB 202, the Ocee Library drop box near Ms. Enjeti-Sydow's home (which had been a 12- or 13-minute drive away) was shuttered. Ex. 56 (Enjeti-Sydow Dep. 46:21-47:2). Even though Ms. Enjeti-Sydow would prefer to

vote absentee-by-mail using a drop box, the limited availability of drop boxes after SB 202 did not afford her a realistic opportunity to do so. *Id*. at 46:21-47:11; 73:18-22.

730.    Although Ms. Enjeti-Sydow barely managed to deposit her daughters' absentee ballots in a drop box in the 2022 general election, this was an onerous and physically painful process for her. Because SB 202 advanced the last day of drop box use by four days and further limited drop box access to polling hours, Ms. Enjeti-Sydow scrambled to locate the nearest drop box at Alpharetta Library on "the last possible day of drop box absentee voting," jumping in the car and ultimately driving one-hour round-trip, on a day when she had to work and was "in so much pain and did not want to drive." Ex. 56 (Enjeti-Sydow Dep. 41:8-10; 105:18-106:9).

731.    Once when Ms. Enjeti-Sydow requested her absentee ballot, she was "sweating bullets because [she] had not received [her] ballot yet, and it was getting closer to the election." She emailed Fulton County because she was concerned she would not receive her absentee ballot in time. She stated there was a quick turnaround to drop off her completed absentee ballot, that it might have been possible to vote early (but that her preference was to vote absentee), and that she could not vote in person on election day because she was a poll worker at a location that was not her precinct. Ex. 56 (Enjeti-Sydow Dep. 69:15-72:18).

732.   The Arc Georgia is a nonpartisan, non-profit membership organization located in Smyrna, Georgia that serves people with intellectual and/or developmental disabilities ("IDD") statewide, both directly and through ten affiliated member chapters located throughout the state. Ex. 303 (Mattox 5/11/23 Decl. ¶¶ 4-5).

733.   The Arc Georgia's mission is to promote and protect the human rights of people with IDD and actively support their full inclusion and participation in the community throughout their lifetime. Ex. 303 (Mattox 5/11/23 Decl. ¶ 7).

734.   The Arc Georgia engages in public policy advocacy and develops programs to support people with IDD to learn, live, participate in recreational activities, and work in their communities with the supports they need to thrive. Through its work, The Arc Georgia has identified protecting the rights of voters with IDD through voter outreach, education, and registration as a priority. Ex. 303 (Mattox 5/11/23 Decl. ¶¶ 8-9).

735.   SB 202 has forced, and will continue to force, The Arc Georgia to divert non-financial resources, including employee time, effort, and attention from other programming and core organizational goals. Ex. 303 (Mattox 5/11/23 Decl. ¶¶ 13-23).

736.   Before the passage of SB 202, The Arc Georgia engaged in public policy and implemented programs to support the inclusion of people with IDD into

the community. This included, but was not limited to, trainings, outreach, and activities to: advance the rights of students with IDD in special education; help Georgians with IDD access adequate Medicaid services through federal Medicaid Waivers so that they could live in the community; promote integrated employment and post-secondary educational opportunities for people with IDD; ensure that people with IDD have access to transportation and assistive technology; and address stigma within the IDD community. Ex. 303 (Mattox 5/11/23 Decl. ¶ 13).

737.   Prior to SB 202, The Arc Georgia provided education and outreach to people with IDD to help them understand the voting process, including resources to explain things like voter registration, and assist with voter mobilization for Georgia ID requirements, transportation, guardianship and voting law, voting by mail, and ballot access for deaf, hard-of-hearing, blind, and low-vision voters. Ex. 303 (Mattox 5/11/23 Decl. ¶ 14).

738.   Prior to the passage of SB 202, The Arc Georgia also regularly convened a group of "Grassroots Connectors" consisting of volunteer disability rights advocates from across the state to support and advocate for voters with IDD, with a particular focus on supporting Black voters with IDD in rural communities. Ex. 303 (Mattox 5/11/23 Decl. ¶ 14).

739.   Due to the passage of SB 202, The Arc Georgia has spent significant time and resources studying the implications of SB 202 to ensure its activities

comply with the changes in the law. The Arc Georgia has had to train its volunteers and partners on the legislation to ensure that they are providing accurate information. Ex. 303 (Mattox 5/11/23 Decl. ¶ 16).

740.   As a result of SB 202, The Arc Georgia has spent time and resources developing new and costly training materials, educational programs and a documentary to help educate its members who are burdened by these changes in the law, as well as conducted widespread trainings by holding town halls, virtual events, multi-day trainings, and other grassroots activities for people with IDD about SB 202. Its outreach and educational programming on SB 202 rose to levels that well exceeded its typical work on voting pre-SB 202. Ex. 303 (Mattox 5/11/23 Decl. ¶¶ 18, 20); *see also* Ex. 11 (30(b)(6) Deposition of The Arc of the United States (Shannon Mattox) [ECF 695] ("Arc Dep.") 27:16-28:19).

741.   Additionally, because of SB 202, The Arc Georgia has responded to an increased number of calls from its members with questions about voting and SB 202. Ex. 303 (Mattox 5/11/23 Decl. ¶ 18); *see also* Ex. 11 (Arc Dep. 27:16-28:19).

742.   The Arc Georgia also has had to divert resources to educate people about the limitations on drop boxes and consequences for a person who is not a "caregiver" or family member returning a ballot for a person with a disability as a result of SB 202. Ex. 303 (Mattox 5/11/23 Decl. ¶¶ 16, 19, 20); *see also* Ex. 11 (Arc Dep. 27:16-28:19).

743.   Since SB 202 passed, there are many activities that are priorities for The Arc Georgia to which it has not been able to dedicate resources due to SB 202. For example, The Arc Georgia has not been able to conduct robust outreach and advocacy to help the almost 10,000 Georgians with IDD who are on the waiting list for Medicaid home and community-based services, services they need to live in their own homes in the community; to implement programs to help families advocate for children with IDD in special education; or to provide more support and leadership on issues other than voting to its 10 local chapters. It also would like to be advocating to address the shortage of direct support professionals who provide critical personal care services to people with IDD and have a high staff turnover due to low wages. This shortage has had a crucial impact in the community and leads to people with IDD being at risk of institutionalization, neglect, and abuse. Due to the passage of SB 202 and all the work The Arc Georgia has had to do associated with it, it has not been able to dedicate sufficient resources to address this important and time sensitive issue. Ex. 303 (Mattox 5/11/23 Decl. ¶ 22).

744.   If the challenged provisions of SB 202 were enjoined, The Arc Georgia would have more capacity to return to its work of ensuring that Georgians with IDD can be fully included in the community. Ex. 303 (Mattox 5/11/23 Decl. ¶ 23).

745.    As a result of SB 202, several members of the Arc Georgia have had difficulty voting. At least one member is unable to vote because individuals who previously helped him no longer know whether they qualify as "caregivers." Other members have had difficulty complying with the SB 202 identification requirements, as well as accessing drop boxes which have been the only reliable way for them to vote in the past. Ex. Ex. 303 (Mattox 5/11/23 Decl. ¶ 21).

746.    Since its founding, the Sixth District has been engaged in improving and enhancing the lives of its people and communities. This means engagement on issues of social justice, including those that relate to voter education and voter registration. Ex. 45 (30(b)(6) Deposition of Sixth District AME Church (Reginald T. Jackson) [ECF 691] ("Sixth District AME Dep.") 23:8-21, 24:6-20).

747.    Encouraging and supporting civic participation among its members as well as the broader community is a core aspect of the Sixth District's work. Advocating for the right to vote, regardless of candidate or party, and encouraging the Sixth District's eligible members to vote have been priorities of the church. These goals are especially important to the Sixth District because of the persistent discrimination that Black Americans have historically faced when trying to exercise their fundamental right to vote. Ex. 289 (Jackson Decl. ¶ 8).

748.    The Sixth District has over 500 member-churches and approximately 96,000 individual church members. Ex. 45 (Sixth District AME Dep. 22:1-7). All

ministers fall under the authority of the Sixth District; however, local churches

determine some aspects of how ministers are governed, such as compensation

matters. *Id.* at 22:8-18.

749.   One of the Sixth District's civic engagement programs is called

Operation Voter Turnout. Operation Voter Turnout is a voter mobilization program

organized by our church to educate, register, and mobilize our members to vote.

Ex. 289 (Jackson Decl. ¶ 10).

750.   One of the many activities the Sixth District organizes as part of

Operation Voter Turnout is "Souls to the Polls." Ex. 289 (Jackson Decl. ¶ 10).

751.   The "Souls to the Polls" initiative is an effort to transport churchgoers

to polling locations during advance voting periods after they have attended worship

services. Ex. 289 (Jackson Decl. ¶ 10).

752.   The Sixth District also holds "Get Out the Vote" efforts to increase

voter participation. Ex. 289 (Jackson Decl. ¶ 10).

753.   The Sixth District coordinates civic engagement efforts such as

Operation Voter Turnout. Ex. 289 (Jackson Decl. ¶ 10). For example, although

local churches implement Get Out the Vote efforts, the Sixth District provides

churches with instructions on how to carry out these efforts. Ex. 45 (Sixth District

AME Dep. 33:14-33:19; 32:8-33:19). Thus, Sixth District staff, including the

Bishop of the Church, are involved with voting-related efforts. Ex. 45 (Sixth

District AME Dep. 33:14-23).

754.   Another activity that the Sixth District's member churches have pursued through Operation Voter Turnout is handing out food, water, chairs, and other provisions to voters standing in lines at polls (also known as "line warming" or "line relief"). Most of the Sixth District's line relief activities have taken place in predominantly Black neighborhoods. Ex. 289 (Jackson Decl. ¶ 11).

755.   The Sixth District's member churches across the state have no plans to engage in any line relief activities in the upcoming election because of the new bans that SB 202 has introduced. Ex. 289 (Jackson Decl. ¶ 20).

756.   After the passage of SB 202, the Sixth District devoted time and resources to refining and reeducating its congregations about how SB 202 changed voting laws. Ex. 45 (Sixth District AME Dep. 27:5-29:13).

757.   After 2020, the Sixth District staff's workload around voter education increased. This included voter education efforts at each church to make sure voters were informed about SB 202 voting law changes. Ex. 45 (Sixth District AME Dep. 37:2-17).

758.   The Sixth District had to divert resources from programs in Malawi, Zimbabwe, Tanzania and church after-school programs that provided tutoring services to students to support voter education efforts about the changes in SB 202. Ex. 45 (Sixth District AME Dep. 38:23-41:3).

759.   The Sixth District engaged in more than just generalized voter education efforts to combat SB 202, including organizing boycotts and speaking with legislators and governmental officials about the bill. Ex. 45 (Sixth District AME Dep. 61:7-10; 68:16-23). The Sixth District also had to refine and reeducate congregations about the provisions of election law that SB 202 changed. *Id.* at 27:20-22.

760.   The Sixth District noted that part of its reeducation efforts involved informing members about the changes in absentee voting, the changes in ballot drop boxes, the changes in voter ID requirements, and the area where volunteers could not participate in line relief efforts. Ex. 45 (Sixth District AME Dep. 29:9-13).

761.   Between 2020 and 2022, the voter education workload of Sixth District staff members increased. Ex. 45 (Sixth District AME Dep. 37:2-17). The Sixth District noted that it had to refine and reeducate members after the passage of SB 202 because of provisions of the law that changed relating to drop boxes, absentee voting, and mobile voting units. *Id.* at 27:5-29:13.

762.   The voting law changes enacted by SB 202 forced the Georgia Muslim Voter Project (GAMVP) to prioritize get-out-the-vote (GOTV) and voter education efforts and increase staff time to learn about SB 202. As a result, GAMVP had to divert resources away from: redistricting advocacy; programs

GAMVP had planned to launch prior to SB 202's passage like translation services and education workshops in languages commonly used by the Muslim community; data and research studies to better address the various Muslim sects that GAMVP serves; and administrative work like cleaning up existing data sets. Ex. 30 (GAMVP Dep. 57:21-58:8; 98:20-101:21; 102:25-103:7).

763.   Prior to SB 202, GAMVP conducted line warming activities. As a result of SB 202, GAMVP stopped conducting line warming activities. Ex. 30 (GAMVP Dep. 110:8-19, 113:3-11).

764.   GAMVP allocated more staff time to focus on policy and advocacy and communications work as a result of SB 202's passage. Ex. 30 (GAMVP Dep. 116:9-117:7, 125:3-25).

765.   GAMVP was also aware of community members who had difficulty getting absentee ballots mailed to them on time to vote. Ex. 30 (GAMVP Dep. 171:4-11). Furthermore, another community member went to the precinct indicated on GAMVP's website to vote, which was give minutes from his home, and was told it was the wrong precinct. *Id.* at 131:4-6. Because he went to vote after 5 p.m. he was unable to obtain a provisional ballot. *Id.* at 131:9-17. The precinct he was told to vote at was another 20 minutes from his house, so he did not vote at all. *Id.* at 131:9-17.

766.   Women Watch Afrika (WWA) is a nonprofit organization providing

comprehensive social adjustment services to African refugees and immigrants, both men and women, who have left their country to make the United States their newfound home. Ex. 46 (30(b)(6) Deposition of Women Watch Afrika (Glory Kilanko) [ECF 738] ("WWA Dep.") 78:11-22).

767.   Women Watch Afrika's voting-related work increased after the passage of SB 202. Ex. 46 (WWA Dep. 16:4-12).

768.   As a result of SB 202, Women Watch Afrika had to divert staff time to reading and understanding the changes in SB 202, voter education around the changes in SB 202 in multiple languages, and assisting new citizens with obtaining voter ID. To ensure voters understood these changes, WWA increased the amount of time it spent talking to voters. For instance, prior to SB 202, WWA's advocates were instructed to disseminate information to at least seven families per shift. But after SB 202, WWA had to limit the number of family contacts to three per shift in order to give the families enough time to ask questions about SB 202. Ex. 46 (WWA Dep. 18:14-21:11, 74:5-75:12).

769.   WWA diverted resources from preparing people for citizenship exams and with English language classes and resource-mapping to learn more about the needs of the community it serves and how to address those needs. Ex. 46 (WWA Dep. 88:25-91:20).

770.   WWA's increased voter education efforts resulting from SB 202

included updated information about drop boxes, absentee voting, and early voting. Some of this information was disseminated through announcements on the radio. WWA did not previously do voter education announcements on the radio or did not do such announcements with such frequency prior to SB 202. Ex. 46 (WWA Dep. 32:10-33:20, 119:12-121:9).

771.    WWA moved three volunteers involved in WWA's program with DeKalb County Schools and re-allocated their volunteer time to work on WWA's SB 202 community outreach work. Ex. 46 (WWA Dep. 91:21-93:11; 119:21-121:9).

772.    Latino Community Fund Georgia ("LCF") is a nonprofit organization that engages in civic education and civic participation efforts including election protection, training volunteers on Georgia law and Spanish language assistance. Ex. 39 (Deposition of Latino Community Fund Georgia (Gilda Pedraza) [ECF 728] ("LCF Dep.") 36:1-21).

773.    In 2021, when SB 202 was first enacted, LCF diverted all of its civic participation staff time, the Executive Director's time, and part of LCF's communications team's time to understanding SB 202 and how it would impact the community that LCF serves. LCF's civic participation program was only one of three programs that LCF operated at the time. Ex. 39 (LCF Dep. 28:18-30:14).

774.    In 2021, one-third to one-half of LCF's staff prioritized work

surrounding SB 202. Ex. 39 (LCF Dep. 33:13-35:1).

775.   In re-allocating resources to address SB 202's changes, LCF's civic participation staff members had to halt or reduce strategy development and outreach to the Portuguese-speaking community LCF serves, reduced community education programs around redistricting, and reduced resources to other initiatives that had been established as organizational priorities prior to SB 202's passage. Ex. 39 (LCF Dep. 33:13-35:1).

776.   As a result of SB 202, LCF redesigned content on their website in both English and Spanish and redesigned, printed, and redistributed printed community education materials detailing the changes enacted by SB 202. LCF also devoted resources to new digital campaigns, including time and resources to educate community members through Spanish-speaking media. Ex. 39 (LCF Dep. 60:7-62:6).

777.   Delta Sigma Theta Sorority, Inc. ("DST") operates five programs to advance its mission: education, mental health, physical health, social action, and economic development. Each of these programs is designed to support children, women, and members. Ex. 19 (Delta Dep. 35:9-36:5, 36:16-24).

778.   In addition to the materials DST sends to voters periodically to educate and encourage voting, DST expended additional resources to making sure people understood the changes to SB 202, including changes to voting by absentee

ballot. Ex. 19 (Delta Dep. 51:6-25).

779.   To ensure the communities DST serves were well-educated about SB
202, DST shifted resources between its committees and added resources and
volunteer time to voter education through additional phone banking, providing
transportation, and election protection. This included re-allocating volunteer time
to election day work from volunteers that do not usually work on election day. Ex.
19 (Delta Dep. 57:8-58:2, 85:1-16).

780.   Following the passage of SB 202, DST volunteers were afraid to
participate in voter education initiatives due to concerns about being criminally
prosecuted under the law. Ex. 19 (Delta Dep. 45:2-23, 114:11-16, 25). Through a
significant expenditure of volunteer outreach and engagement efforts, DST was
able to assuage these members' concerns. *Id.* at 45:2-23, 114:11-16, 25. *See also id.*
at 51:15-25, 52:20-53:5, 55:12-18 (noting that additional effort was required to
ensure voters understood SB 202 provisions, including written communications
and zoom education sessions).

781.   Georgia ADAPT is a nonpartisan, statewide disability rights
organization, that is fiscally sponsored by the Fund for Southern Communities and
New Disabled South and whose mission includes two primary aims: 1) to use civil
resistance and principled nonviolence to end institutional bias against Georgians
with disabilities, and 2) to empower the disability community by encouraging use

of their voice and vote, as well as to educate candidates about how to reach and serve the disability community. Ex. 317 (Thornton Decl. ¶¶ 4-5); Ex. 22 (ADAPT Vol. I Dep. 48:12-23).

782.   SB 202 has forced, and will continue to force, Georgia ADAPT to divert non-financial resources including employee time, effort, and attention from other programming and core organizational goals. Ex. 317 (Thornton Decl. ¶¶ 7-25).

783.   Prior to the passage of SB 202, Georgia ADAPT spent about 80 percent of its time helping Georgians with disabilities get access to Medicaid services through federal Medicaid Waivers to help them get out of nursing facilities and other institutions and live in the community with the supports they need. The remainder of its time (about 20 percent) was spent on election-related activities. Ex. 317 (Thornton Decl. ¶ 7); Ex. 22 (ADAPT Vol. I Dep. 23:4-24:1).

784.   Since SB 202 passed, because of the challenges it created for voters with disabilities, especially in absentee voting, Georgia ADAPT has put more energy into offering individuals with disabilities rides to the polls and helping people drop off absentee ballots. Now, about 80 percent of Georgia ADAPT's energy and time goes to helping people request and receive their absentee ballots, following up if they do not get their absentee ballots, and getting to people to the polls who have been confused about new absentee ballot rules and timelines, who

did not have or could not get proper identification, or who otherwise needed to vote in person. Ex. 317 (Thornton Decl. ¶¶ 11, 15-18); Ex. 22 (ADAPT Vol. I Dep. 32:16-33:5).

785.   Prior to SB 202, Georgia ADAPT would receive about 200 calls in a major election cycle and provide about 150 rides. In 2022, after SB 202 passed, Georgia ADAPT received about 2,000 calls, and provided about 788 rides between the primary, the general election, and then the runoff, including about 450 rides for the runoff alone. This increased demand for rides required finding and training additional volunteer and paid drivers. Ex. 317 (Thornton Decl. ¶¶ 11-12); Ex. 22 (ADAPT Vol. I Dep. 27:3-20).

786.   Part of the change to Georgia ADAPT's work has been that it and its volunteers need to understand the restrictive new rules in SB 202, particularly because inadvertently providing someone with unauthorized food or water or assistance could result in criminal penalties. Ex. 317 (Thornton Decl. ¶ 14).

787.   Because of SB 202, Georgia ADAPT has ceased providing line relief and helping people apply for absentee ballots. Ex. 317 (Thornton Decl. ¶¶ 22-24).

788.   Since SB 202 was passed, there are activities that are a priority for Georgia ADAPT that it has not been able to engage in because of its focus on election work. Normally, Georgia ADAPT would be doing work to remove the institutional bias in Medicaid and the services that people with disabilities need to

live at home. But Georgia ADAPT has not been able to be in Washington, D.C.

doing that grassroots lobbying work due to its diminished capacity. Ex. 317

(Thornton Decl. ¶ 25); Ex. 22 (ADAPT Vol. I Dep. 71:1-12).

789.   Members of Georgia ADAPT were unable to return their absentee

ballots because of a lack of drop boxes or access to the drop box. Ex. 22 (ADAPT

Vol. I Dep. 109:12-15); Ex. 23 (ADAPT Vol. II Dep. 40:5-23).

790.   Georgia Advocacy Office ("GAO") is incorporated as a non-profit

organization in the State of Georgia and has been designated by the State of

Georgia since 1977 as the State's protection and advocacy system ("P&A") to

protect the legal and human rights of individuals with disabilities in the state of

Georgia. Ex. 305 (Orland Decl. ¶¶ 3-4).

791.   As the designated P&A, GAO is authorized to pursue administrative,

legal, and other appropriate remedies to protect and advocate for the legal rights of

individuals with disabilities and to redress incidents of discrimination in the state.

Central to its mission is empowering Georgians with disabilities to participate fully

and independently as active and engaged citizens. GAO has the authority to

prosecute actions in its own name and on behalf of its constituents. Ex. 305

(Orland Decl. ¶ 5).

792.   GAO is the designated agency in Georgia to receive an annual grant,

called Protection and Advocacy for Voting Access ("PAVA") pursuant to the Help

America Vote Act ("HAVA"). GAO receives a set amount of funding each year from this grant requiring them to promote access and engagement in the electoral process for voters with disabilities. Ex. 305 (Orland Decl. ¶¶ 9, 13); Ex. 24 (GAO Dep. 167:13-15).

793.   GAO's constituents for its voting program include all voters with disabilities throughout Georgia, including people who are in institutions, such as nursing facilities, psychiatric hospitals, group homes, and other congregate settings. Ex. 305 (Orland Decl. ¶ 10); Ex. 24 (GAO Dep. 146:23-147:9).

794.   Time spent by GAO's staff on one voting issue, such as assisting people to navigate the changes in voting due to SB 202, directly diminishes the time that GAO can spend on other work. Ex. 305 (Orland Decl. ¶ 13).

795.   SB 202 has forced, and will continue to force, GAO to divert resources, including financial, employee time, effort, and attention, from its other core activities including investigating and addressing allegations of abuse and neglect, advocating for appropriate assistive technology, and providing information and resources related to employment, inclusive education and other civil rights for Georgians with disabilities. Ex. 305 (Orland Decl. ¶¶ 14, 19, 25, 27).

796.   Prior to the passage of SB 202, GAO's PAVA work was specifically geared towards protecting the disability vote using a combination of supporting self-advocacy, citizen involvement, staff advocacy, and legal advocacy to protect

and advocate for the rights of Georgians with disabilities. Ex. 305 (Orland Decl. ¶ 14).

797.   Since the passage of SB 202, GAO has modified and expanded its voter education program, including updating a detailed PowerPoint presentation entitled Reminding You to Vote. Ex. 305 (Orland Decl. ¶ 19); *see also* Ex. 24 (GAO Dep. 169:1-9).

798.   Additionally, since the passage of SB 202, GAO has spent additional time during visits to nursing homes, psychiatric facilities, and day programs to educate voters about the burdens imposed by SB 202 and assisted voters in formulating and executing a plan to vote, which has reduced the amount of time GAO's 8 staff members can spend advising people about their other rights and monitoring conditions in those settings. Ex. 305 (Orland Decl. ¶ 19); *see also* Ex. 24 (GAO Dep. 153:11-24). Since the passage of SB 202, GAO has hosted webinars and educational events specifically to help explain the changes to the voting process for Georgians with disabilities due to SB 202, including new ID requirements and limitations and penalties for violations of voter assistance provisions. Ex. 305 (Orland Decl. ¶ 19).

799.   Further, since the passage of SB 202, GAO has called nursing facilities and attempted to speak to staff about voting access and practices for assisting residents, in light of the changes in SB 202. Ex. 305 (Orland Decl. ¶ 19);

*see also* Ex. 24 (GAO Dep. 153:11-24).

800.   As a result of SB 202, GAO has also paid almost $20,000 to rewrite and reshoot a pre-planned educational video and modify and expand a voting forum due to SB 202's significant changes to Georgia's voting processes for people with disabilities. Ex. 305 (Orland Decl. ¶ 19); *see also* Ex. 24 (GAO Dep. 169:1-9).

801.   Moreover, since the passage of SB 202, GAO has discontinued some voter support efforts including providing absentee ballot applications to voters with disabilities, including nursing facility residents, for fear of being charged with criminal penalties. Ex. 305 (Orland Decl. ¶ 19).

802.   As a result of the Felony Provision, GAO is fielding queries and complaints from individuals who could not get the people of their choosing to help them vote, and has assisted them to understand and comply with the new rules, or addressing complaints that poll workers are not well-trained and are not able or willing to assist voters with disabilities because the workers mistakenly felt it to be a violation of the law, and providing education to help voters and poll workers understand the rules and their rights. Ex. 305 (Orland Decl. ¶ 25); *see also* Ex. 24 (GAO Dep. 93:18-94:2, 151:2-152:9).

803.   Additionally, as a result of the Felony Provision, GAO has had to educate individual residents in nursing facilities about assistance requirements as

well as steps in the absentee voting process, and helped them formulate and execute plans to vote, which means spending less time advising them about their other rights. Ex. 305 (Orland Decl. ¶ 25); *see also* Ex. 24 (GAO Dep. 151:2-152:9).

804.   Further, the Felony Provision, has impacted GAO's work such that GAO has had to discontinue informing nursing facility staff about their obligations to assist, or help find a caregiver to assist, residents in the absentee voting process because of the lack of clarity about the new rules and the potential risks. Ex. 305 (Orland Decl. ¶ 25); *see also* Ex. 24 (GAO Dep. 151:2-152:9).

805.   Moreover, as a result of the Felony Provision, GAO no longer takes absentee ballot applications to residents of congregate living environments as a result of the inability to facilitate returning or mailing them. Ex. 305 (Orland Decl. ¶ 25).

806.   The time and resources GAO has expended ensuring that voters are not denied their access to the franchise because of SB 202 has directly reduced its other advocacy work and resources it can devote to its other core organizational goals and will continue to do so unless there is a change in the law. Ex. 305 (Orland Decl. ¶¶ 19(f), 27).

807.   Metropolitan Atlanta Baptist Ministers Union, Inc. ("MABMU") is a Georgia nonprofit corporation founded in 1917. It is a service organization and

network of over 80 clergy of Baptist churches in the greater Atlanta area that minister to largely Black congregants. MABMU's mission is to help make the greater Atlanta area a better place to live religiously, educationally, economically, politically, socially, financially, and in all other areas that impact people's lives. Ex. 313 (Declaration of Rev. Stanley Smith ("Rev. S. Smith Decl.") ¶ 2).

808.   MABMU has various committees that focus on education, civic and social action, and empowerment. MABMU holds weekly meetings of approximately two hours during which, among other things, reports are given on current events, political empowerment, and community members who are sick and in need of visitation. Time is also spent at the weekly meetings in active worship and on Christian education. Ex. 313 (Rev. S. Smith Decl. ¶ 3).

809.   Voting and social justice ministry have been a component of MABMU's work for decades. MABMU's core voting rights activities in recent years include: providing transportation for seniors during early voting; participating in the Lawyers & Collars Voter Protection Campaign, which places clergy at polling sites in underserved communities to provide a moral presence and support to voters; providing voter education, training, and empowerment; and encouraging voter turnout. Ex. 313 (Rev. S. Smith Decl. ¶ 4).

810.   As a result of the enactment of SB 202, MABMU has had to divert resources to help educate its membership and their constituent congregations on

the additional obstacles to voting imposed by SB 202. Ex. 313 (Rev. S. Smith Decl. ¶ 6).

811.   MABMU has had to divert a significant portion of its weekly meetings to SB 202 so that its membership can be well-informed about the restrictions on voting imposed by the law and thereby help their respective congregants educate themselves. Prior to SB 202, MABMU's weekly meetings included a 7-minute report on voter encouragement, empowerment, and education. After SB 202, MAMBU dedicated between 45 minutes and one hour every two weeks exclusively to a discussion of SB 202. Ex. 313 (Rev. S. Smith Decl. ¶ 6).

812.   Because of the added time spent addressing SB 202, MABMU has had less time for its Christian education programming and even less time for worship. Some Bible study items and current event reports have been taken off the agenda as have reports on sick community members in need of visitation. Ex. 313 (Rev. S. Smith Decl. ¶ 6).

813.   As a result of SB 202, MABMU has been forced to create new materials for its members to share with their respective congregations, including a flyer with a QR code that can be scanned to provide information related to voting. Ex. 313 (Rev. S. Smith Decl. ¶ 7).

814.   As a result of SB 202, MABMU has engaged more actively in Souls to the Polls events and the Lawyers and Collars program, as more members have

expressed interest in participating in and organizing those events and MABMU has

been called upon to educate and advise its members as to how to do so. Ex. 313

(Rev. S. Smith Decl. ¶ 7).

815.   During the 2020 General Election, MABMU encouraged people to

vote early by using absentee ballots and ballot drop boxes. Following the passage

of SB 202, MABMU is no longer recommending the use of absentee ballots and

ballot drop boxes due to the confusion and disruption SB 202 has created among

its member congregations. MABMU must dedicate additional time and resources

to re-educating its membership about these new provisions, explaining why its

prior recommendations regarding voting absentee and utilizing drop boxes no

longer hold, so that they can inform their respective congregants, who routinely

turn to MABMU for this kind of information. Ex. 313 (Rev. S. Smith Decl. ¶ 8).

816.   As part of its voting and social justice ministry, MABMU provides

transportation to seniors so they can vote early in-person, including early voting for

runoff elections. As a result of SB 202's shortening of the early voting period for

runoff elections, MABMU could not transport as many seniors to early voting

locations in 2022 as it had in January 2021. Ex. 313 (Rev. S. Smith Decl. ¶ 9).

817.   Part of MABMU's mission is to empower Black communities and to

help them understand that their vote counts and that it impacts their communities.

MABMU must dedicate additional resources to encourage people to overcome the

resignation that results from the knowledge that outside sources can come in and take over the running of elections from locally-elected officials, as if their vote really doesn't count. Such resignation counteracts MABMU's mission, making it harder to achieve MABMU's goal of community empowerment. Ex. 313 (Rev. S. Smith Decl. ¶ 10).

818.   The mission of Concerned Black Clergy of Metropolitan Atlanta, Inc. ("CBC") is to serve as a community gathering place for civic leaders, educators, businesses, and elected officials, all centered around issues of concern to the African American church and the African American faith community at large. Ex. 17 (30(b)(6) Deposition of Concerned Black Clergy (Sophia Burns and Rev. Shanan Jones) [ECF 692] ("CBC Dep.") 56:22-57:4).

819.   CBC has several committees, including political education; health; and economic development. Ex. 17 (CBC Dep. 62:2-12).

820.   A primary focus of CBC's work has related to housing, including issues around affordable housing and support for those facing eviction. Ex. 17 (CBC Dep. 62:2-24, 100:1-6).

821.   Since its founding, CBC, in partnership with other organizations, has engaged in activities designed to support voters in the exercise of the franchise. Such activities include: get out the vote ("GOTV") efforts; providing transportation to the polls; voter registration; voter education; and "line warming," including

providing food and water to voters standing in line to vote. Ex. 17 (CBC Dep. 67:23-68:4).

822.   As a result of the changes introduced by SB 202, CBC has had to divert resources to help educate its membership on the additional obstacles to voting imposed by SB 202. CBC has had to explain that "it's not that black folks are not going to be able to vote, but it's going to be much harder to vote." Ex. 17 (CBC Dep. 77:5-7, 94:9-95:5).

823.   CBC has had to divert resources to address concerns expressed by many in the community about the rationale offered for SB 202—that the bill made it easier to vote and harder to steal elections. Many members of the community served by CBC did not understand how restricting the time frames for absentee voting, reducing the number of drop boxes and no longer making drop boxes available outside and on a 24/7 basis, made voting easier. This confusion was further compounded by the repeated assurances given by State election officials that there had been no voter fraud in Georgia during the 2020 election cycle. Ex. 17 (CBC Dep. 77:2-11, 101:24-102:12).

824.   Prior to the passage of SB 202, approximately 30 percent of CBC's work related to voting, with the balance addressing issues related to health, housing, and other matters of interest to the Black community. Ex. 17 (CBC Dep. 63:5-15, 62:2-24, 100:1-6).

825.   After passage of SB 202, the community served by CBC became

singularly focused on voting and the new restrictions imposed by SB 202. Whereas

roughly half the phone calls received by CBC prior to SB 202 concerned housing

issues, after enactment of SB 202, nearly all the calls received—the number of

which increased significantly—pertained to voting. Ex. 17 (CBC Dep. 99:9-100:8).

826.   CBC had to hire two additional interns in 2022 to help with the influx

of calls related to SB 202. Ex. 17 (CBC Dep. 100:1-8).

827.   As a result of SB 202, CBC's weekly forums no longer discussed

health or other issues; the forums were dedicated exclusively to issues around

voting. CBC had to become, in essence, a voter education organization, as

concerns about SB 202 "became Def-Con 4." Ex. 17 (CBC Dep. 64:7-20, 66:8-20;

75:5-17, 93:23-95:5, 100:11-15).

828.   SB 202 caused CBC to have to use all its resources to focus on voter

education and re-education, explaining to its members that the way they have voted

in the past, particularly by utilizing drop boxes to vote absentee ballots, might no

longer be a viable option. Ex. 17 (CBC Dep. 73:21-74:20).

829.   As compared to the 2020 election cycle, and as a result of SB 202,

CBC spent more time during the 2022 election cycle coordinating and providing

transportation for voters to get to the polls because many community members no

longer wished to vote absentee given SB 202's restrictions on requesting and

casting an absentee ballot. Ex. 17 (CBC Dep. 84:13-85:20, 157:10-158:4).

830.   As a result of SB 202, CBC's line warming activities have been greatly diminished in efficacy, as its members are prohibited from approaching voters standing in line to offer them water and snacks; CBC members must instead stay behind established buffer lines. Ex. 17 (CBC Dep. 150:21-151:8).

831.   The mission of Georgia Latino Alliance for Human Rights, Inc. ("GLAHR") is to educate, organize, and train the Latinx community in Georgia to defend and promote their civil and human rights. Ex. 29 (30(b)(6) Deposition of Georgia Latino Alliance for Human Rights, Inc. (Adelina Conception Nicholls) [ECF 693] ("GLAHR Dep.") 27:22-28:7).

832.   Part of GLAHR's mission is to educate voters about how to vote, encourage them to vote, and to provide them with information about where and when they can vote. Ex. 29 (GLAHR Dep. 34:8-16).

833.   Among other initiatives, GLAHR has been engaged in GOTV efforts since 2018. It has continued these efforts since then, including during the 2022 election. GLAHR's voter education consists largely of grassroots engagement, such as going door-to-door in the Latinx community to encourage individuals to vote and provide them with information on how to do so. Ex. 29 (GLAHR Dep. 31:1-11; 34:20-36:1; 39:12-17).

834.   Since the passage of SB 202, GLAHR has had to substantially

increase resources devoted to fulfilling its mission of educating voters in the Latinx community. This has included the need to hire more people, devote more staff time, train these staff, and develop more materials. Ex. 29 (GLAHR Dep. 46:15-47:5).

835.   Prior to the passage of SB 202, in 2020, GLAHR canvassed approximately 5,000 households. In 2022, because of SB 202's passage, GLAHR canvassed approximately 25,000 households to engage in voter education and reeducation about matters such as drop boxes, limited voting hours, identification requirements, early voting, and absentee ballots. Ex. 29 (GLAHR Dep. 40:1-41:10).

836.   As a result of SB 202, GLAHR has also had to spend more time training and reeducating its own staff, which has been time-consuming for the organization and its individuals—many of whom are involved in civic engagement. Ex. 29 (GLAHR Dep. 41:18-42:3).

837.   As a result of SB 202, GLAHR has had to devote approximately 50 to 75 percent of its time to civic engagement and community reeducation. It has had to divert this time away from other initiatives, commitments, and causes, including those dealing with deportations, detentions, arrests, and racial profiling. GLAHR had to completely cancel a conference in Philadelphia due to the amount of canvassing and outreach work done in the Georgia Latinx community. Had SB 202

not been enacted, GLAHR would have developed more digital content rather than engage in its ramp up of door-to-door canvassing. Ex. 29 (GLAHR Dep. 42:13-43:11, 105:13-106:20, 48:20-25).

838.   The mission of The Justice Initiative, Inc. ("JI") is to support and empower citizens to exercise their right to vote and to combat injustice. Ex. 38 (JI Dep. 43:16-20, 46:7-20).

839.   In addition to its voting-related activities, JI is involved in policing issues and other issues of importance to the communities it serves, which are predominantly Black communities Ex. 38 (JI Dep. 47:9-15, 49:20-50:14).

840.   Prior to SB 202, JI's voting-related initiatives focused on registration, and providing voters with a general overview of the voting process. Ex. 38 (JI Dep. 29:12-14, 38:15-24).

841.   Prior to SB 202, JI undertook extended GOTV bus tours through south Georgia, stopping in up to five counties per day to educate and register voters. Ex. 38 (JI Dep. 31:12-32:1).

842.   Since the passage of SB 202, JI has shifted the focus and scope of its bus tours. Rather than engaging in car caravans, JI now conducts town hall-style lectures that provide intensive training around SB 202's requirements. Ex. 38 (JI Dep. 29:7-20; 31:12-32:8).

843.   As a result of instituting a more intensive training program in the

aftermath of the enactment of SB 202, rather than stopping in up to five counties per day, JI's bus tours now typically stop in just one county per day, thereby limiting their reach. Ex. 38 (JI Dep. 31:12-32:8).

844.   As a result of SB 202, JI has had to spend more time recruiting, educating, and organizing ministers to be present at the polls to serve as a source of moral support to those voters standing in line to vote. Ex. 38 (JI Dep. 59:11-60:5).

845.   First Congregational Church, United Church of Christ Incorporated ("First Church") is a holistic ministry that tends to the well-being of the person— mind, body, and soul. Among other initiatives, First Church is active in addressing food insecurity and it partners with students at Georgia State University to provide a food pantry. First Church also works with various educational and arts nonprofits to provide educational activities and after-school programs. First Church has financial assistance programs and has sponsored seminars on policing and community violence. Ex. 20 (30(b)(6) Deposition of First Congregational Church, United Church of Christ, Inc. (Rev. Dwight Andrews ) [ECF 735] ("UCOC Dep.") 20:13-23, 33:10-22, 35:12-19).

846.   Since its founding, First Church has engaged in activities designed to support voters in the exercise of the franchise. Recent voting-related activities include: get out the vote ("GOTV") efforts, including coordinating Souls to the Polls events; providing transportation to the polls; voter registration; and voter

education. Ex. 20 (UCOC Dep. 21:13-19, 34:23-35:4, 36:21-37:13).

847.   As a result of the changes introduced by SB 202, First Church has had to divert resources to help educate its membership on the additional obstacles to voting imposed by SB 202. Ex. 20 (UCOC Dep. 25:6-16, 27:2-28:2).

848.   First Church's social justice committee, which oversees the church's voting-related initiatives, was compelled to increase the size of its membership to address the need for education and understanding regarding all the changes introduced by SB 202. Ex. 20 (UCOC Dep. 70:1-9).

849.   First Church held community forums to discuss SB 202 and created educational flyers concerning all the new requirements. Ex. 20 (UCOC Dep. 28:3-16, 69:6-11).

850.   Many of First Church's congregants were confused by the provisions of SB 202, wondering why new laws were being created that give voters less time to vote, less access to ballot drop boxes, and no ability to accept water or snacks while waiting in long lines to vote. Given the lack of evidence of voter fraud, as repeatedly communicated by State election officials, many congregants did not understand what problems these laws were designed to address. Ex. 20 (UCOC Dep. 62:13-63:11, 64:9-66:11).

851.   While First Church continued to minister to its members in the ways it deemed most critical even after passage of SB 202, were it not forced to divert

portions of its limited resources to address SB 202, those limited resources would have been directed to other aspects of First Church's ministry. Ex. 20 (UCOC Dep. 45:4-8).

852.   The Ga. NAACP's mission is "eliminating racial discrimination through democratic processes such as public advocacy, direct action, and litigation, and thus ensuring the equal political, educational, social, and economic rights of all persons, in particular African Americans." Ex. 282 (Declaration of Gerald Griggs dated May 16, 2023 ("Griggs 5/16/23 Decl.") ¶ 2). It commits resources to voting rights by investing in voter education, registration, and mobilization. *Id.* ¶ 3.

853.   Educating voters about SB 202's provisions forced the Ga. NAACP to reorganize staff roles, reduce voter registration and get-out-the-vote activities, and divert resources from preexisting projects, including projects addressing climate justice, environmental issues, and housing discrimination. Ex. 31 (GA NAACP Dep. 58:10-12, 77:3-8, 62:13-24). As part of this effort, for the first time in its history, the Ga. NAACP organized a statewide, 22-city voter education campaign. Ex. 282 (Griggs 5/16/23 Decl. ¶ 9).

854.   Many of the Ga. NAACP's volunteers and its committee chairs—including the housing, political action, veterans' affairs, education, and membership chairs—"had to shift their focus" Ex. 31 (GA NAACP Dep. 65:7-18) from projects related to their committees to ensure voters were aware of SB 202's

restrictions, including its onerous absentee voting requirements, drop box

limitations, compressed voting periods, unlimited voter challenges, and

disenfranchisement of out-of-precinct voters. *Id.* 56:1-17, 60-62, 66:2-67:12,

82:15-83:3, 137:12-138:19, 151:11-25, 166:7-19, 175; Ex. 282 (Griggs 5/16/23

Decl. ¶¶ 7-10)).

855.   Several committee chair members had to entirely forsake their

committee duties to focus solely on SB 202 initiatives. Ex. 31 (GA NAACP Dep.

65:7-18). Housing Chair Penny Poole's responsibilities shifted from managing

housing discrimination issues to addressing voter challenges in Gwinnett County,

attending election board meetings, testifying before local education boards to keep

polling precincts open, partnering with churches to educate voters and establish

get-out-the-vote programs, and contacting local elected officials to discuss voter

issues related to the implementation of SB 202. *Id.* 60:22-61:6, 62:9-21; Ex. 282

(Griggs 5/16/23 Decl. ¶ 10).

856.   Likewise, the Ga. NAACP's Veteran Affairs Committee had to divert

attention from its existing areas of focus to "address the effects of SB 202 on

veterans who may be overseas, and who accordingly may not fly back [to Georgia]

to vote in-person and had to cast absentee ballots," and the Education Committee

had to shift its focus to "address issues for students who would not be able to vote

because they were off at college." Ex. 282 (Griggs 5/16/23 Decl. ¶ 10).

857.   Before 2021, the Ga. NAACP's voter registration, education, and participation activities covered twelve to thirteen counties, which accounted for approximately 75 percent of the African American vote in Georgia. Ex. 282 (Griggs 5/16/23 Decl. ¶ 11). After the passage of SB 202, however, the Ga. NAACP had to invest resources to expand its strategy to 59 counties and cover approximately 90 percent of the African American in an effort to combat any negative effects of SB 202. *Id.*

858.   After the enactment of SB 202, the Ga. NAACP experienced a marked increase in calls to its voter hotline. Ex. 31 (GA NAACP Dep. 37:5-17); Ex. 282 (Griggs 5/16/23 Decl. ¶ 8). This increased demand—coupled with the need to divert existing resources to SB 202 education efforts—required the Ga. NAACP to hire two paid attorneys as well as a paid State Director to spearhead the Ga. NAACP's election protection, voter mobilization, and voter education efforts for the 2022 election cycle. Ex. 282 (Griggs 5/16/23 Decl. ¶ 8).

859.   Because SB 202 criminalizes the handling of absentee ballot applications, the Ga. NAACP no longer assists voters with copying, scanning, or digitizing ID documents required to submit a ballot application as it did prior to March 2021. Ex. 31 (GA NAACP Dep. 73-75).

860.   The Ga. NAACP used to send unsolicited absentee ballot applications to voters and respond to requests for absentee ballots, but ceased doing so in

response to SB 202. Ex. 31 (GA NAACP Dep. 106:9-11, 106:16-22).

861.    Before the passage of SB 202, Ga. NAACP staff and volunteers provided free food, water, and PPE to voters standing in line and in the vicinity of polling locations, focusing their line relief efforts at polling locations within Black and other communities of color, which often experienced long lines. Ex. 282 (Griggs 5/16/23 Decl. ¶¶ 10-17). In 2020, these activities "spanned across nineteen (19) counties which, collectively, included about 80% of the Black voter population in Georgia." *Id.* ¶ 13. The Ga. NAACP no longer engages in line relief efforts because SB 202 criminalizes the activity. *Id.*

862.    Following the enactment of SB 202, the Ga. NAACP experienced a surge in voter demand for transportation to polling places. Ex. 31 (GA NAACP Dep. 56:1-17). To meet this demand, the Ga. NAACP had to expand its transportation programs and partner with additional organizations to assist members and voters. *Id.*

863.    The Ga. NAACP received hundreds of communications from voters expressing concern about SB 202's unlimited voter challenges, mobile voting restrictions, drop box limitations, and voting timeline compression. Ex. 31 (GA NAACP Dep. 137:12-138:19). Several voters also indicated they no longer felt comfortable using drop boxes because the presence of law enforcement and licensed security guards intimidated them. *Id.* 151:11-25.

864.    The Georgia Coalition for the People's Agenda ("GCPA") is an umbrella organization for many different human rights, civil rights, labor, women's, youth, and peace and justice groups that perform advocacy work in the State of Georgia. Ex. 263 (Declaration of Helen Butler dated May 14, 2023 ("Butler 5/14/23 Decl.") ¶ 2). With over 5,000 individual members across the state, the GCPA aims to improve the quality of governance in Georgia, help create a more informed and active electorate, and have responsive and accountable elected officials. *Id.* ¶¶ 2-3.

865.    Since the enactment of SB 202, the GCPA has invested significantly more resources into voter education than it did in previous years. Ex. 263 (Butler 5/14/23 Decl. ¶¶ 6-7). These efforts have included leading a virtual SB-202-education tour in five Georgia counties, organizing an in-person tour with seven stops across different counties, and engaging extensively with government officials and legislatures to address issues and confusion regarding SB 202's requirements. *Id.* ¶¶ 7, 10-11.

866.    The GCPA also enlisted additional volunteers and expanded its "Rides to the Polls" initiative to better serve seniors and other vulnerable communities who experienced difficulty traveling to the ballot box after SB 202's restrictions went into effect. Ex. 263 (Butler 5/14/23 Decl. ¶¶ 10-11); Ex. 26 (30(b)(6) Deposition of Georgia Coalition for the People's Agenda (Helen Butler) [ECF 724]

("GCPA Butler Dep.") 105-06).

867.   The GCPA typically "performs a lot of work on matters outside of the voting process—namely, criminal justice reform, equity in education, economic empowerment for Black-owned businesses, environmental justice, and elder issues." Ex. 263 (Butler 5/14/23 Decl. ¶ 8). Educating voters about the changes implemented by SB 202—including its new rules regarding absentee voting, out-of-precinct voting, drop box availability, compressed voting periods, and unlimited voter challenge procedures (*id.* ¶¶ 5, 7, 10-11; Ex. 26 (GCPA Butler Dep. 90, 105-06, 179:17-23); Ex. 25 (GCPA Battles Dep. 53, 55, 87:4-15); Ex. 264 (Declaration of Helen Butler dated January 11, 2024 ("Butler Authentication Decl.") at 43 (GCPA00000856) (GCPA pamphlet outlining SB 202's changes)))—prevented the GCPA from advancing these initiatives and forced it to divert time and resources away from its voter registration and get-out-the-vote activities. Ex. 263 (Butler 5/14/23 Decl. ¶¶ 6-8); Ex. 26 (GCPA Butler Dep. 20-23, 36:6-10).

868.   Instead of attending to the activities associated with their typical roles, GCPA staff had to dedicate substantial time to helping members and voters who were subject to voter challenges navigate the reinstatement process ever since the enactment of SB 202. Ex. 26 (GCPA Butler Dep. 179:17-23); Ex. 25 (GCPA Battles Dep. 87:4-15). These efforts included identifying challenged voters, operating phone banks to discuss challenge procedures and content with voters and

counties, attending hearings, and liaising with local officials to facilitate

reinstatement. Ex. 26 (GCPA Butler Dep. 179:17-23); Ex. 25 (GCPA Battles Dep.

87:4-15). One such voter—GCPA member Carry Smith—had to personally attend

a hearing to reinstate her right to vote after a stranger challenged her eligibility to

vote based on outdated information. Ex. 25 (GCPA Battles Dep. 88:10-89:5); Ex.

26 (GCPA Butler Dep. 133:11-134:24).

869.   After learning that at least 500 voters did not have their votes counted

due to SB 202's changes to out-of-precinct voting provisions, GCPA staff also

began obtaining and analyzing information about rejected out-of-precinct

provisional ballots. Ex. 25 (GCPA Battles Dep. 37-38). This process was onerous,

as it involved filing numerous Open Records Act requests, liaising with the

Secretary of State, and reviewing thousands of pages of records. *Id.* 75, 86.

870.   GCPA Policy & Engagement Director Cindy Battles had to divert so

much of her time to SB 202 education efforts that she could no longer collaborate

with community school boards to improve the quality of education in

underperforming schools, secure better access to state and local contracts for

Black-owned businesses, negotiate utility bills for seniors, or create citizen

oversight boards—the very tasks for which the GCPA hired her. Ex. 263 (Butler

5/14/23 Decl. ¶ 9); Ex. 26 (GCPA Butler Dep. 105:23-106:14).

871.   Likewise, GCPA Executive Director Helen Butler could no longer

fulfill her directorial duties due to the substantial time she had to personally

dedicate to SB 202 voter outreach and education activities, including by preparing

and giving presentations about SB 202, engaging with government officials and

legislators about the law, and even giving testimony about SB 202's absentee

voting restrictions before the United States House Judiciary Committee. Ex. 263

(Butler 5/14/23 Decl. ¶ 11).

872.   The GCPA had to entirely cease work on its citizen review board,

community school board, same-day-voter-registration, utility processing, and

contract facilitation initiatives as a result of redirecting resources and time to SB-

202-activities. Ex. 26 (GCPA Butler Dep. 98-99, 101:7-15, 107:15-19); Ex. 263

(Butler 5/14/23 Decl. ¶ 9); Ex. 25 (GCPA Battles Dep. 33-34).

873.   The GCPA used to assist voters with copying, scanning, or digitizing

identity documents, but no longer does so because SB 202 criminalizes the

handling of absentee ballot applications. Ex. 26 (GCPA Butler Dep. 95:12-96:2).

874.   Before 2021, the GCPA used to send hundreds of unsolicited absentee

ballot applications to voters—some of whom were illiterate—and to help voters

complete those applications. Ex. 264 (Butler Authentication Decl. at 21-41

(GCPA00001061-GCPA00001081) (Butler U.S. Senate Testimony, July 19, 2021));

*id*. at 4-19 (GCPA00004788-GCPA00004803 (Butler U.S. House of

Representatives Testimony, Jan. 20, 2022)). The GCPA no longer provides this

assistance due to SB 202's prohibitions. Ex. 26 (GCPA Butler Dep. 118:6-10).

875.   Before the passage of SB 202, GCPA staff and volunteers provided free food, water, and personal protective equipment to voters waiting in line near polling locations. Ex. 26 (GCPA Butler Dep. 40:5-22, 181). The GCPA ceased these line relief efforts when SB 202 criminalized them. *Id.*

876.   After SB 202 went into effect many members and voters—including elderly citizens and citizens with disabilities—sought transportation to polling places from the GCPA because they were unable to meet SB 202's new absentee ballot application requirements and could therefore not vote by mail. Ex. 26 (GCPA Butler Dep. 91:17-22, 113:13-15).

877.   During the 2022 elections, GCPA staff, including Cindy Battles, intervened at a polling place where, because of SB 202's changes to out-of-precinct voting provisions, a group of senior citizens was almost prevented from voting. Ex. 25 (GCPA Battles Dep. 55-57).

878.   Common Cause is a national, nonpartisan, nonprofit organization with the mission of making government more open, honest, and accountable for its 24,000+ Georgian members and for voters at large. Ex. 272 (Declaration of Treaunna ("Aunna") Dennis dated May 16, 2023 ("Dennis 5/16/23 Decl.") ¶¶ 2-3). To further these goals, Common Cause carries out campaigns directed at voter protection and education, gerrymandering and representation, ethics and

accountability, and the democratic process. *Id.*

879.   SB 202's restrictions on absentee voting required Common Cause to invest time and resources in mass education campaigns "at a scale unlike those the organization had previously conducted." Ex. 272 (Dennis 5/16/23 Decl. ¶ 7). These efforts involved organizing additional meetings, in-person community engagement panels, town halls, and other outward-facing events for voters and local communities regarding new rules about absentee and out-of-precinct voting, drop box availability, unlimited voter challenge procedures, and punishments for officials who defend voters' rights. *Id.* ¶ 8; Ex. 16 (Common Cause Dep. 102-03, 119, 163-65, 166-67).

880.   Before 2021, Common Cause contacted voters on provisional ballot lists to advise them of their provisional status and help them cure their ballots. Ex. 16 (Common Cause Dep. 98, 117-18). These efforts became significantly more onerous after SB 202 was enacted due to the sharp increase in provisional votes caused by the law. *Id.*

881.   Given its limited staff, diverting resources to SB 202 initiatives forced Common Cause to not only terminate its sheriff accountability program, but also abandon its goal of building an advisory board and discontinue its procurement and real estate activities in all but one local jurisdiction. Ex. 16 (Common Cause Dep. 107:13-108:21, 116:1-5); Ex. 272 (Dennis 5/16/23 Decl. ¶ 8). Common Cause

would have continued to engage in these activities if SB 202 had not been enacted. Ex. 16 (Common Cause Dep. 108:19-21, 113:14-16); Ex. 272 (Dennis 5/16/23 Decl. ¶ 8).

882.   Before the enactment of SB 202, Common Cause staff and volunteers provided free food, water, and personal protective equipment ("PPE") to voters waiting in line at polling locations and provided subgrants to two organizations in rural Georgia to furnish voters with PPE. Ex. 16 (Common Cause Dep. 168-69); Ex. 271 (Declaration of Treaunna ("Aunna") Dennis dated May 24, 2022 [ECF 171-26] ("Dennis Line Relief Decl.") ¶¶ 6-8). Common Cause entirely ceased its line relief activities on account of SB 202's criminal penalties. *Id*. at ¶ 15.

883.   County election officials also indicated that they needed mobile voting units, Ex. 16 (Common Cause Dep. 190), and that expanding early voting hours in future election cycles was feasible. *Id.* 191.

884.   Several Common Cause members had their registration eligibility challenged after SB 202 was enacted. Ex. 16 (Common Cause Dep. 166-67). Though those challenges were ultimately dismissed, the impacted members had to spend considerable time and effort advocating for themselves (including by seeking support from Common Cause) to reinstate their ability to vote. *Id.*

885.   Common Cause member, Sherrill Gammon, had her absentee ballot for the 2022 runoff election initially rejected by Cobb County because the date of

birth entered on the back of her ballot return envelope did not match their records. Ex. 277 (Declaration of Sherrill Gammon dated Dec. 12, 2024 ("Gammon Decl.") Gammon Decl. ¶ 6).

886.   Several Common Cause members indicated they had difficulty voting in the 2022 elections due to reduced weekend voting opportunities. Ex. 16 (Common Cause Dep. 201-02).

887.   Common Cause received complaints from and assisted community members regarding SB 202's "confusi[ng]" requirements and shortened voting timeline. Ex. 16 (Common Cause Dep. 30-31). Some voters, including college students, traveled back to their home counties to vote because they were confused by SB 202's absentee voting requirements. *Id.* 141:6-19.

888.   Since SB 202 went into effect, an increased number of voters reported to Common Cause that they could no longer use drop boxes. Ex. 16 (Common Cause Dep. 153:15-22). In particular, voters who worked outside city centers and had long commutes indicated that drop box sites closed so early they could not reach them in time. *Id.* 155.

889.   GALEO's mission is to increase civic engagement and leadership development of the Latino / Hispanic community across Georgia. Ex. 279 (Declaration of Jerry Gonzalez dated May 15, 2023 ("Gonzalez Decl.") ¶ 2). To that end, GALEO advocates on many issues of particular interest to the Latino /

Hispanic community, including immigrant rights, voting rights, and participation in the census. *Id.* ¶ 3.

890.   Before SB 202 went into effect, GALEO's voter education efforts focused on motivating and teaching citizens to vote. Ex. 27 (30(b)(6) Deposition of GALEO Latino Community Development Fund (Jerry Gonzales) [ECF 723] ("GALEO Dep.") 102:13-22). The implementation of SB 202 forced GALEO to "narrow the scope of [voting] options" it taught and focus instead on explaining the substance of SB 202's provisions, with particular emphasis on new absentee voting restrictions. *Id.* 99:8-23, 103:10-25; Ex. 279 (Gonzalez Decl. ¶¶ 5-8).

891.   Educating voters and GALEO's 225 active Georgian members about SB 202's provisions required making substantial changes to GALEO's civic engagement and voter education programs, including by creating and sending mailers, flyers, and other voter education materials addressing SB 202's changes to election laws; engaging in grassroots mobilization efforts; running tailored language assistance programs; and recruiting and training additional volunteers. Ex. 279 (Gonzalez Decl. ¶¶ 4, 7-8).

892.   SB 202's changes forced GALEO to divert time, energy, and resources from initiatives important to the Latino community such as get-out-the-vote campaigns, naturalization paperwork trainings, and voting walkthroughs. Ex. 27 (GALEO Dep. 94-98).

893.    Many Latino voters do not have utility bills in their name because they cohabitate in large households. Ex. 27 (GALEO Dep. 118). Accordingly, SB 202's new identification requirements make it harder for them to vote if they also lack an identity document. *Id.*

894.    Except for Gwinnett County, all Georgia counties only provide ballot applications, instructions, and ballots in English. Ex. 27 (GALEO Dep. 100). SB 202's complex ballot application requirements—including the Birthdate requirement—frustrate Latino voters' ability to vote because many of these voters are not proficient in English, making GALEO's educational activities around SB 202 even more important to its members and the Spanish-speaking community in general. *Id.* 100, 123:17-23; Ex. 279 (Gonzalez Decl. ¶ 6).

895.    Georgia has closed many voting precincts over time. Ex. 27 (GALEO Dep. 152:18-19). The majority of these precincts were located in minority communities. *Id.* 152:18-24. This phenomenon has contributed to longer wait times for voters assigned to minority community precincts. *Id.* Several GALEO members reported waiting in line for three to four hours when they attempted to vote in the 2022 general election. *Id.* 155. Discouraged by the long lines, some of those members left without voting. *Id.*

896.    Other voters indicated their international travel plans would likely prevent them from meeting SB 202's shortened absentee ballot mailing deadline.

Ex. 27 (GALEO Dep. 132-33). These voters contacted GALEO to seek guidance—which GALEO provided—regarding SB 202's absentee ballot application deadline and expressed concern about their ability to receive and return ballots within SB 202's compressed timeline. *Id.*

897.   The League of Women Voters of Georgia ("LWV") is a state subsidiary of the League of Women Voters nonpartisan membership organization with 624 members in the State of Georgia as of May 15, 2023. Ex. 311 (Declaration of Susannah Scott dated May 15, 2023 ("S. Scott Decl.") ¶¶ 2-3). The LWV encourages informed and active participation in government by voters and influences public policy through education and advocacy. *Id.* ¶ 2. To carry out its mission, the LWV not only educates voters and citizens about elections, the voting process, and public policy issues, but also studies issues under consideration by lawmakers and then advances particular policies in the public interest through grassroots advocacy. *Id.* The LWV has no paid full-time employees and traditionally performs its work on a voluntary basis. *Id.* ¶ 4.

898.   Due to SB 202's extensive changes to Georgia's election laws, the LWV had to entirely rework the voting materials and online guide it provides, including detailing SB 202's changes to the absentee and out-of-precinct voting process, compressed voting timeline, and availability of drop boxes. Ex. 311 (S. Scott Decl. ¶ 6); Vote411.org. This process required LWV to divert resources from

its traditional candidate survey program. *Id*. ¶¶ 6, 9.

899.   The LWV's efforts to educate voters about SB 202's provisions also involved hiring paid interns, attending media interviews and candidate forums, circulating e-mails, postcards, and social media posts, and hosting town halls, information sessions, and trainings for local leaders. Ex. 40 (30(b)(6) Deposition of League of Women Voters of Georgia (Susannah Scott) [ECF 732] ("LWV Dep.") 51-52, 67:10-17, 69:8-20).

900.   Carrying out activities to educate voters about SB 202's provisions strained the LWV's limited resources, forcing it to reduce the number of covered electoral races, limit work on redistricting issues, reduce voter registration drives, and entirely discontinue certain voter registration work typically done. Ex. 40 (LWV Dep. 62-63, 70-71); Ex. 311 (S. Scott Decl. ¶ 8).

901.   Before SB 202 went into effect, LWV staff and volunteers provided free food and water to voters waiting in line at polling locations. Ex. 40 (LWV Dep. 64:9-22). The LWV ceased these line relief efforts as a result of the associated penalties in SB 202. *Id.*

902.   The LWV is aware of voters who were unable to meet SB 202's shortened deadline for returning absentee ballots due to County and/or United States Postal Service ballot mailing delays. Ex. 40 (LWV Dep. 76:2-12). These voters only received their ballots a few days before—or even after—SB 202's

absentee ballot return deadline. *Id.*

903.    The Lower Muskogee Creek Tribe ("LMCT") did not devote any resources to voter education before 2021. Ex. 41 (30(b)(6) Deposition of Lower Muskogee Creek Tribe (Marian McCormick) [ECF 730] ("LMCT Dep.") 41:16-19). After SB 202 went into effect, LMCT Chief Marian McCormick began devoting approximately 25% of her time to voter education efforts. *Id.* 41-43. These efforts included creating and distributing flyers that outlined SB 202's changes as well as calling LMCT's 2,700 members to encourage them to vote. *Id.* 37-38, 41-43.

904.    SB 202 burdens the many LMCT members who lack computers, printers, and/or scanners because identity documents are now required to submit absentee ballot applications. Ex. 41 (LMCT Dep. 61:24-62:4).

905.    The LMCT does not assist voters with copying, scanning, or digitizing identity documents because SB 202 criminalizes the handling of absentee ballot applications. Ex. 41 (LMCT Dep. 49, 52).

906.    SB 202's early voting and weekend voting limitations frustrate LMCT members' ability to vote because most members are construction workers who work six or seven days per week. Ex. 41 (LMCT Dep. 64:4-10).

907.    Many LMCT members cannot meet SB 202's shorter absentee ballot mailing deadlines because they "work out of state, commuting back and forth." Ex.

41 (LMCT Dep. 63:8-16).

908.   After SB 202 went into effect, voting in person—rather than by absentee ballot—also became more difficult for LMCT members because the limited number of permitted drop boxes and polling places are far from the Tribe, and many members do not have access to a vehicle. Ex. 41 (LMCT Dep. 40, 43:22-44:9, 59:12-16, 64). As a result, the LMCT received an increased number of requests for transportation assistance. *Id.* 40, 43:22-44:9.

909.   The Georgia Secretary of State has agreed to recognize tribal identity documents for voting purposes. Ex. 41 (LMCT Dep. 61). Despite this, poll workers refused to recognize three LMCT members' tribal IDs when they attempted to vote in the 2022 elections. *Id.* 39:18-24, 45:14-46:20, 47.

910.   Plaintiff New Georgia Project ("NGP") was founded in 2014 as an organization to help "high opportunity voters," a constituency of Black, brown, young, LGBTQ+, and rural Georgians, build their grassroots political power. Ex. 43 (NGP Dep. 21:6-11, 21:25-22:12); *see also* Ex. 269 (Kendra Cotton Decl. ("Cotton Decl.") ¶ 3).

911.   NGP operationalizes its mission by first pursuing issue- and constituent-specific initiatives aimed at engaging their constituency in topics they care deeply about, including public safety, employment, healthcare, and family life. Ex. 269 (Cotton Decl. ¶ 6); Ex. 43 (NGP Dep. 24:23-25:7).

912.   NGP then mobilizes voters to vote through voter registration, organizing, and advocacy efforts centered around these high-priority issues. Ex. 269 (Cotton Decl. ¶ 405); Ex. 43 (NGP Dep. 25:8-11).

913.   In direct response to SB 202 in 2021, NGP was forced to shift funds, three staffers, and nearly all of the organization's volunteers from its Party at the Polls program, which focused on cultivating a positive atmosphere around polling locations to encourage voting, to its Rides to the Polls program, which saw demands for rides double during early and election day voting for the 2022 general election. Ex. 43 (NGP Dep. 61:4-22, 63:25-64:20, 66:2-6, 120:16-23, 121:9-13, 122:17-20).

914.   As a result of these changes, Party at the Polls has been "whittled down almost entirely" and now only operates in a small number of precinct locations. Ex. 43 (NGP Dep. 61:14-16; 122:6-8; 124:10-22).

915.   In response to SB 202, NGP had to devote resources to providing specialized aid to its constituents in navigating the complex web of legal changes stemming from the new law. Ex. 43 (NGP Dep. 57:15-19).

916.   As part of this effort, NGP established its Voter Protection ("VoPro") program. Ex. 43 (NGP Dep. 55:17-22, 57:20-58:2).

917.   To staff the VoPro program, NGP reassigned one full-time staff and around 200 volunteers from its Poll Chaplains program, which had organized faith-

based partners to provide food, water, and other items to encourage and support voters waiting in long lines to cast their ballot. Ex. 43 (NGP Dep. 57:4-19, 58:7-25, 59:22-60:2).

918.   NGP also spent additional resources to hire a director and a C-Suite officer to launch and manage VoPro. Ex. 43 (NGP Dep. 60:2-5, 60:17-61:3).

919.   NGP was forced to spend more money and staff time on training and recruiting volunteers for this program because prospective volunteers were increasingly worried that they would be exposed to legal liability under SB 202 for helping voters receive or cast their ballots. Ex. 43 (NGP Dep. 60:6-13).

920.   As a result, NGP curtailed its Poll Chaplains program from serving 40 precincts in 2018 and 120 precincts in 2020 to approximately a dozen in 2022, and the program is now limited to thanking and encouraging voters in line without distributing support items. Ex. 43 (NGP Dep. 58:4-6, 59:6-16).

921.   NGP also reconfigured its congregational organizing activities around absentee ballots by reallocating two staff members from existing faith programs to new efforts to educate congregational constituents about how to successfully vote under the new law. Ex. 43 (NGP Dep. 61:23-62:7).

922.   NGP does not have unlimited resources, and thus inevitably has to reallocate resources in response to the needs of voters after SB 202 was enacted. Ex. 43 (NGP Dep. 65:13-18).

923.   Plaintiff Black Voters Matter Fund ("BVMF"), which operates in nine states, was founded in 2016 to build power within marginalized, predominantly Black communities by engaging voters on issues of importance, increasing voter registration and turnout, and converting "nonvoters into voters." Ex. 265 (Calhoun Decl. ¶ 2); Ex. 14 (BVMF Dep. 21:14-17, 29:21-25).

924.   BVMF communicates with the community it serves through a number of tools including text messaging, phone calls, emails, and public events such as concerts and town hall meetings. Ex. 14 (BVMF Dep. 42:12-18).

925.   BVMF also provides grants to smaller groups that have deep roots in the communities they serve, and most of BVMF's events, like town halls, are hosted by those groups, which BVMF describes as its "partners." Ex. 14 (BVMF Dep. 42:20-25); Ex. 265 (Calhoun Decl. ¶ 22).

926.   In response to SB 202, BVMF has had to divert "time, energy, and resources" away from its core mission of converting nonvoters to voters, and toward assisting established voters navigate the increasingly complex voting process. Ex. 14 (BVMF Dep. 50:18-21).

927.   BVMF took several of its staff members as well as funds allocated for partnership grants out of its South Carolina and Tennessee programs to increase funding and bolster the operations of its Georgia-focused grant-giving programs, virtual town halls, and press events. Ex. 14 (BVMF Dep. 82:9-23).

928.   BVMF also shifted its issue-based communications to the community through texts, phone calls, and email campaigns, as well as public events and meetings, away from messaging about Medicaid expansion and towards educating Georgian voters about overcoming obstacles to vote under SB 202, such as navigating the law's new ID requirements, limitations on drop boxes, and bans on supporting voters in line with food and water. Ex. 14 (BVMF Dep. 42:12-18, 82:24-83:4).

929.   Because the nature of these communications concerning voting laws is more complex than issue advocacy related to healthcare education, BVMF has had to increase spending on printing and larger operational costs associated with more frequent literature drops, phone banking, canvassing, and texting earlier in the election cycle. Ex. 265 (Calhoun Decl. ¶ 35). BVMF was also forced to wind down its partner training programs on communications, fundraising, and voter outreach, and instead funneled those resources into trainings on subjects like when and how ID must be provided to avoid a ballot being rejected, and the risk of criminal prosecution for offering food or water to hungry or thirsty voters waiting in line. Ex. 14 (BVMF Dep. 50:12-21, 68:10-69:2; 72:22-73:11).

930.   The line relief ban also forced BVMF to abandon its practice of quietly handing out food and water to voters in line and instead spend additional personnel time and money on setting up large, attention-grabbing aid stations far

from the polling lines that make food and water available to voters in long lines.
Ex. 14 (BVMF Dep. 84:3-86:5).

931. Plaintiff Rise, Inc. is a student-led nonprofit organization with a mission to fight for free higher education by eliminating tuition and fees at public colleges and universities, ending college student housing and food insecurity, and increasing voting access for college students. Ex. 286 (Hector 6/3/22 Decl. ¶ 4).

932. Rise operates student-led advocacy campaigns, training programs, and volunteer networks across Georgia to further its mission. Ex. 44 (30(b)(6) Deposition of Rise Incorporated (Mary Hector) [ECF 734] ("Rise Dep.") 37:12-16); Ex. 286 (Hector 6/3/22 Decl. ¶ 4).

933. Rise's student organizers and volunteers engage in grassroots voter registration, education, turnout activities, including on-campus get-out-the-vote drives and canvasses, and the organization also helps students and young people vote absentee by informing them about services offering free and discounted transportation to polling locations. Ex. 286 (Hector 6/3/22 Decl. ¶ 6).

934. In response to SB 202, Rise abandoned several initiatives, including: (1) a fellowship for students attending historically Black colleges and universities. Ex. 44 (Rise Dep. 37:22-5, 59:15-19, 60:4-8); E Ex. 286 (Hector 6/3/22 Decl. ¶ 25); (2) advocacy on the issue of on-campus housing crises (including supporting Rise Fellows attending Spelman College who were engaged in protests for better

student housing), food insecurity, and student debt issues, Ex. 44 (Rise Dep. 38:7-

14; 60:21-61:8); Ex. 286 (Hector 6/3/22 Decl. ¶¶ 26-27); and (3) education of

Georgia's lawmakers about scholarship programs that are critical for access to

higher education in Georgia. Ex. 44 (Rise Dep. 59:21-60:8).

935.   Resources from these ceased efforts, and resources initially allocated

to Rise's programming in Pennsylvania, New Mexico, and Arizona, were diverted

to Georgia to support Rise's get-out-the-vote and student training programs to

assist young voters in navigating SB 202's voting restrictions. Ex. 44 (Rise Dep.

37:25-38:5; 38:15-19; 38:23-39:24, 60:4-8, 124:3-24).

936.   Rise hosted seven "Black the Vote" training sessions in Georgia, each

of which cost between $10,000 and $30,000, in response to SB 202, and between

2020 and 2022 Rise increased by four- or five-fold the number of paid fellows and

canvassers responsible for assisting young voters in Georgia overcome the burdens

imposed by SB 202. Ex. 44 (Rise Dep. 47:8-14, 127:18-128:2).

937.   Plaintiff Elbert Solomon's health issues that make it difficult to stand

in line for long periods of time without access to food or a restroom, and therefore

Mr. Solomon prefers voting by absentee ballot. Ex. 70 (Solomon Dep. 24:7-13).

938.   Mr. Solomon has had problems with mail being delayed, lost, or

erroneously delivered, so he lacks trust in the mail as a reliable method of returning

his ballot. Ex. 70 (Solomon Dep. 24:15-25:22).

939.   Because of his age, health issues, and concerns about the mail, Mr. Solomon previously voted by absentee ballot using a drive-up drop box in front of the Spaulding County elections office. Ex. 70 (Solomon Dep. 21:22-22:15, 30:16-21, 31:9-15).

940.   Changes to drop box accessibility in SB 202 meant Mr. Solomon could no longer just drive up to a drop box and deposit his ballot like he did in 2020, and as a result, Mr. Solomon was forced to switch to in-person voting. Ex. 70 (Solomon Dep. 31:9-24).

941.   As a result of the changes in election law, Mr. Solomon voted early in person during the December 2022 Senate runoff election and stood in line for an hour and a half—a stark contrast to his previous experiences when he never had to wait longer than fifteen minutes to vote. Ex. 70 (Solomon Dep. 45:2-8).

942.   Plaintiff Fannie Marie Jackson Gibbs has mobility and other health issues that limit her movement and largely confine her to her home, and these disabilities make it difficult or impossible for her to vote in person. Ex. 62 (Deposition of Fannie Marie Jackson Gibbs [ECF 744] ("Gibbs Dep.") 19:15-18, 75:11-76:14).

943.   Because of her condition, Ms. Gibbs voted by mail in the November 2020 and January 2021 runoff election and deposited her absentee ballot off in an outdoor, drive-up drop box during the June 2020 primary. Ex. 62 (Gibbs Dep. 29:2-

13).

944.    The drop box Ms. Gibbs used in 2020 was located outside and easily accessible by a car. Ex. 62 (Gibbs Dep. 31:4-9, 31:21-24).

945.    For the 2022 elections, the outdoor drop box was no longer accessible, so when Ms. Gibbs attempted to vote by drop box, she had a much more difficult time doing so, and had to use her walker and scooter and needed assistance from her grandson to enter the elections office where the drop box had been relocated. Ex. 62 (Gibbs Dep. 29:14-30:15, 30:21-31:9).

946.    Plaintiff Jauan Durbin (Mr./they) voted in the primary, general, and runoff elections in 2022. Ex. 53 (Deposition of Jauan Durbin [ECF 746] ("Durbin Dep.") 17:5-7, 37:3-23).

947.    Mr. Durbin previously handed out food and water to voters waiting in line during the 2020 election cycle, but is no longer able to engage in the same types of voter support activities because of SB 202. Ex. 53 (Durbin Dep. 17:16-18:19, 52:3-13).

948.    Mr. Durbin testified that their driver's license was rejected when they went to vote in person as inadequate proof of voter identification after SB 202 was enacted. Ex. 53 (Durbin Dep. 34:2-22).

949.    These prohibitions under SB 202 have silenced Mr. Durbin from expressing messages of solidarity and encouragement that were critical to

supporting Georgians standing in long lines to vote in 2020. Ex. 273 (Durbin Decl.

¶¶ 4–6); Ex. 53 (Durbin Dep. 36:11-13).

950.    Because of socioeconomic disparities in areas such as education,

income, and residential mobility, among other measures, navigating administrative

hurdles in the voting process will be more burdensome for Black voters, on

average, than white voters. Ex. 85 (Burden Rep. 22, 25-26); Ex. 94 (Clark Rep. 13-

14); Ex. 88 (Meredith Rep. ¶¶ 39-40).

951.    County election administrators need to tailor advance voting

opportunities to the needs of their voters. Ex. 98 (Kennedy Rep. 29).

952.    When testifying before the Legislature on legislation that became SB

202, election officials described the different needs of their counties and impacts of

the legislation based on their respective counties' unique characteristics and

demographics." Ex. 98 (Kennedy Rep. 29).

953.    Georgia is the most restrictive state in the country regarding the

legislative regulation of drop boxes and limits on counties' ability to manage drop

boxes. Ex. 97 (Fraga Sur-Rebuttal Rep. ¶ 42 & Tbl. 2); *see also* Ex. 83 (Grimmer

Dep. 121-15-122:11 (testifying he has no basis to disagree with Dr. Fraga's

comparison of state drop box regulations)).

954.    AAPI voter turnout decreased by 22.8 percentage points between the

general elections directly before and after SB 202, compared to a 14.1 percentage

point decrease among white voters. Ex. 96 (Fraga Rep. Tbl. 1).

955.   AAPI voter turnout decreased by 18.6 percentage points between the runoff elections directly before and after SB 202, compared to a 12.7 percentage point decrease among white voters. Ex. 96 (Fraga Rep. Tbl. 1).

956.   While AAPI voters' use of absentee ballots declined by 30.6 percentage points between the general elections directly before and after SB 202, white voters' rates declined by only 18.3 percentage points. Ex. 96 (Fraga Rep. Tbl. 2).

957.   While AAPI voters' use of absentee ballots declined by 28.7 percentage points between the runoff elections immediately before and after SB 202, white voters' rates declined by only 16.5 percentage points. Ex. 96 (Fraga Rep. Tbl. 2).

958.   In the general and runoff elections prior to SB 202, 34.8% and 22.9%, respectively, of AAPI registrants applied for absentee-by-mail ballots. In the general and runoff elections after SB 202, only 4.3% and 2.8%, respectively, of AAPI voters requested absentee ballots, reflecting differences of 30.5 and 20.1 percentage points. Ex. 96 (Fraga Rep. Tbl. 3).

959.   In the general and runoff elections prior to SB 202, 22.5% and 17.0%, respectively, of white registrants applied for absentee-by-mail ballots. In the general and runoff elections after SB 202, 3.6% and 3.2% of white registrants

applied for absentee ballots, reflecting differences of 11.6 and 6.3 percentage

points between the absentee ballot request decline rate for AAPI and white voters.

Ex. 96 (Fraga Rep. Tbl. 3).

960.    Gregory Edwards, the District Attorney for Dougherty County, has

testified that no official or entity can prevent him from bringing a prosecution for a

violation of the line relief ban under his authority. Ex. 54 (Deposition of Gregory

W. Edwards [ECF 754] ("G. Edwards Dep.") 43:15-22; 50:19-51:3; 51:15-19;

46:16-25).

961.    Similarly, Keith Gammage, Solicitor General of Fulton County, has

also testified that he "cannot categorically state that [he]'ll never bring a

prosecution for the offenses contained in the [Food and Water] statute." Ex. 58

(Deposition of Keith E. Gammage [ECF 801] ("Gammage Dep.") 61:7-21).

962.    Former Secretary of State Cox expressed her concern that a bill like

SB 202 that required driver's license identification would impose an undue burden

on many Georgia voters, especially the poor and elderly who are less likely to own

or drive a car and therefore, may lack a driver's license. Ex. 105 (Minnite Rep. 25).

963.    An analysis of Dr. Grimmer's code and data related to the 2020

Cooperative Elections Study (CES), which he used in both of his reports,

demonstrates that Black voters in 2020 were 42% more likely to use drop boxes

than white voters in 2020. The difference is approximately 6 percentage points

(20.2% for Black voters versus 14.2% for white voters statewide). Ex. 341 (Fraga Supp. Decl. ¶¶ 3, 5).

964.   Dr. Grimmer's findings that CES Study showed that black voters statewide in 2020 and 2022 used drop boxes less frequently or no more frequently than white voters are based on errors and not statistically significant. Ex. 341 (Fraga Supp. Decl. ¶¶ 6-9).

965.   Moreover, Dr. Grimmer's testimony at the September 22, 2023 Preliminary Injunction Hearing, *see* Ex. 252 (9/22/23 Prelim. Inj. Hr'g Tr. 233:20-234:14), does not support the conclusion that white voters used drop boxes more than Black voters in 2020 because it was limited to a comparison between white and Black mail-in voters, not all voters, which produces fundamentally flawed assessments of racial differences in dop box use. Ex. 341 (Fraga Supp. Decl. ¶¶ 12-16).

966.   Dr. Grimmer's calculations show that the Black and white voter turn gap increased from 9.9 percentage points in 2020 to 12 percentage points in 2022, Hispanic and white voter turn gap increased from 28.8 percentage points in 2020 to 29.6 CVAP or 31.4 CVAP trend percentage points in 2022, and AAPI and white voter turnout gap increased from 7.2 percentage points to 16 CVAP or 18.4 CVAP trend percentage points. Ex. 113 (Grimmer Rep. Tbl. 2).

967.   Prior to the enactment of SB 202 in 2021, Georgia's Latino voters

were not only increasing in numbers, but their political participation was increasing. For example, before the enactment of SB 202, the Latino voter registration rate had steadily increased in Georgia, rising from 164,784 in 2016 to 274,524 in 2020, with the addition of 109,740 registered voters, representing an almost 67% increase in Latino registered voters just in the four years preceding the enactment of SB 202 in 2021. Ex. 85 (Burden Rep. 8-9, Tbl. 3).

968.   Voter turnout rates for Latino voters in Georgia also increased by almost 16.7 percentage points between the November 2018 and the November 2020 general elections, growing from 25.5 percentage points in 2018 to 42.2 percentage points in the 2020, an increase of 65%. Ex. 96 (Fraga Rep. ¶¶ 36-37, Tbl. 1). Four metro-Atlanta counties (Fulton, Gwinnett, Cobb and DeKalb accounted for more than 40 percent of all Latino votes cast statewide in 2020. Ex. 95 (Cobb Rep. 30).

969.   However, Latino voter turnout substantially declined in the first Georgia statewide elections conducted following the enactment of SB 202. The Latino voter turnout rate in the November 2020 general election dropped to 26.2 percentage points in the November 2022 general election—a decrease of almost 38 percent. In comparison, white turnout decreased only 18% during this period. Latino turnout also dropped from 32.7 percentage points in the January 2021 runoff to 21.9 percentage points in the December 2022 runoff, following the

implementation of SB 202, representing a turnout decline for Latino voters of 33%, compared to a white decrease under 20%. Ex. 96 (Fraga Rep. ¶¶ 35-47, Tbl. 1).

970.   The turnout gap between white and Latino voters in the first post-SB 202 statewide general election in November 2022 was 30 percentage points (56.2% turnout for white voters versus 26.2% turnout for Latino voters). Ex. 96 (Fraga Rep. ¶¶ 35-47, Tbl. 1). The turnout gap between white and Latino voters in the December 2022 runoff was 27.8 percentage points. *Id.*

971.   Latino voter participation in absentee-by-mail voting in the November 2020 general election was 23.2% and 20.4% in the January 2021 runoff before the implementation of SB 202. Ex. 96 (Fraga Rep. ¶¶ 55-62, Tbl. 2). Those rates dropped off precipitously for Latino voters after the implementation of SB 202 and its onerous absentee ballot application and ballot return changes. In the November 2022 midterm election and December 2022 midterm runoff, only 4.4% of and 2.7%, respectively, of absentee-by-mail ballots were successfully cast by Latino voters, representing a decrease of 81% in the Latino absentee-by-mail votes cast in the November 2022 general election. Ex. 96 (Fraga Rep. ¶¶ 55-62, Tbl. 2).

972.   By comparison, 23.9% and 21.7% of the absentee-by-mail ballots cast by White voters in the November 2020 general election and January 2021 runoff, respectively, were successfully cast by white voters. In the November 2022 general election and December 2022 runoff, 5.6% and 5.2% of absentee ballots were

successfully cast by white voters, representing decreases of almost 77% and 76% for white voters post-SB 202 as compared to decreases of 81% and 87%, respectively, for Latino voters in those post-SB 202 elections. Ex. 96 (Fraga Rep. ¶¶ 55-62, Tbl. 2).

973.    Georgia's Latino voters were also consistently more likely to have their absentee-by-mail applications rejected as arriving "too late" in elections conducted after the implementation of SB 202 relative to White Georgia voters. Ex. 96 (Fraga Rep. ¶¶ 93-103, Tbl. 7).

974.    Post-SB 202, Latino voters experienced rejection rates due to their absentee ballot applications arriving "too late" of 32.1% in the November 2022 general election and 36.8% in the December 2022 runoff. White voters, on the other hand, experienced rejection rates of 24.2% and 26.7% in those elections due to their applications arriving "too late," a 7.9-percentage point difference between rejections for the same reason of applications submitted by Latino voters in the November 2022 general election and a 10-percentage point difference in the December 2022 runoff. Ex. 96 (Fraga Rep. ¶¶ 93-103, Tbl. 7).

975.    Georgia's Latino voters were also more likely to experience a decrease in the percentage of drop boxes within their County of voter registration than white voters after the implementation of SB 202, with Latino voters experiencing a decrease in the percentage of drop boxes of 67.9% within the

County of their voter registration in November 2022 compared to a decrease of 53.7% for white Georgia voters, a 14.2-percentage point difference. Ex. 96 (Fraga Rep. ¶¶ 136-153, Table 15).

976.   Georgia's Latino voters also faced higher increases in the distances to absentee ballot drop boxes relative to White Georgia voters in the aftermath of SB 202's restrictions on the number and availability of drop boxes. Ex. 96 (Fraga Rep. ¶¶ 154-161, Tbls. 15-18). For example, post-SB 202, Latino registered voters suffered a 15.5% decline in having a drop box located within 4.8 miles of their homes in the November 2022 election. Ex. 96 (Fraga Rep. ¶¶ 158-160, Tbl. 16). White voters, however, experienced a 12.4% decline. The difference is even greater when voters had a new drop box post-SB 202, with the percentage of Hispanic voters having a new drop box within 4.8 miles of their homes dropping by 11.6%, whereas White voters had a slight increase of 0.03% of access to a new drop box within 4.8 miles of their homes. Ex. 96 (Fraga Rep. ¶¶161-160, Tbl. 17).

977.   Georgia's voters of color, including Latino voters, are more likely to be adversely impacted by the change in the period for runoff elections which also eliminated any opportunity to register to vote between general and runoff elections than Georgia's white voters. Ex. 96 (Fraga Rep. ¶¶ 162-173, Tbls. 19-20).

978.   In sum, over 1.6 million registered Georgia voters faced increased barriers to the ballot box due to SB 202, with Georgia's Latino voters and other

voters of color bearing those barriers at higher percentages relative to Georgia's white voter populations. Ex. 96 (Fraga Rep. ¶¶ 174-182, Tbls 21).

979.   In their eight motions for summary judgment, including their motion seeking summary judgment on discriminatory intent under Section 2 of the Voting Rights Act, Defendants make no references to, nor efforts to rebut, the report of Plaintiffs' expert, Dr. James Cobb, a prominent Georgia historian, whose report addresses Georgia's history of discrimination in voting, including discrimination against Latino and Native American voters, and related issues. Ex. 95 (Cobb Rep. 1-76).

980.   Black voters' use of absentee-by-mail voting out-paced that of white voters 2.5 percentage points in 2018, 5.1 percentage points in 2020 and 1.7 percentage points in November 2022. AAPI voters' use of absentee-by-mail voting out-paced that of white voters 6.9 percentage points in 2018, 15.8 percentage points in 2020 and 3.5 percentage points in November 2022. Ex. 96 (Fraga Rep. Tbl. 2).

981.   Rates of Black and Latinx voters applying for absentee ballots decreased across the 2018 and 2022 midterm elections, while white voters' rates increased. Ex. 96 (Fraga Rep. Tbl. 3).

Date: January 19, 2024

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia


/s/ Aileen Bell Hughes
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181




Attorneys for the United States
of America

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General

SPARKLE SOOKNANAN
Principal Deputy Assistant Attorney
    General
Civil Rights Division

/s/ Maura Eileen O'Connor
ALBERTO RUISANCHEZ
JOHN A. RUSS IV
JASMYN G. RICHARDSON
RACHEL R. EVANS
ERNEST A. MCFARLAND
MAURA EILEEN O'CONNOR
ELIZABETH M. RYAN
SEJAL JHAVERI
J. ERIC RICH
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Elizabeth.ryan@usdoj.gov

*/s/ Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
Alaizah Koorji (pro hac vice)
*akoorji@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte (pro hac vice)
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC. 700 14th
Street, NW Washington, DC 20005
Telephone: (202) 682-1300

Caitlin May (Ga. Bar No. 602081)
*cmay@acluga.org*
Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan Topaz (pro hac vice)
*jtopaz@aclu.org*
Dayton Campbell-Harris (pro hac vice)

*dcampbell-harris@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt (pro hac vice)
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Sofie C. Brooks (pro hac vice)
sofie.brooks@wilmerhale.com
Lucas L. Fortier (pro hac vice)
lucas.fortier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Laura E. Powell (Ga. Bar. No. 970318)
*laura.powell@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office*

*/s/ Pichaya Poy Winichakul*
Pichaya Poy Winichakul (Bar 246858)
poy.winichakul@splcenter.org
Bradley E. Heard (Bar 342209)
bradley.heard@splcenter.org
Matletha N. Bennette (pro hac vice)
matletha.bennette@splcenter.org
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Facsimile: (404) 221-5857

*/s/ Adam Sieff*
Adam S. Sieff (pro hac vice)
adamsieff@dwt.com
Brittni Hamilton (pro hac vice)
brittnihamilton@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski (pro hac vice)
mjedreski@dwt.com
Grace Thompson (pro hac vice)
gracethompson@dwt.com
Danielle Eun Kim (pro hac vice)
daniellekim@dwt.com
Kate Kennedy
katekennedy@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

Telephone: (404) 521-6700

Jess Unger (pro hac vice)
jess.unger@splcenter.org
Sabrina S. Khan (pro hac vice)
sabrina.khan@splcenter.org
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

David M. Gossett (pro hac vice)
davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, and The Arc of the United States*

*/s/ Bryan L. Sells*
Bryan L. Sells
Email: bryan@bryansellslaw.com
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN
SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212

Jon Greenbaum (pro hac vice)
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg (pro hac vice)
erosenberg@lawyerscommittee.org
Julie M. Houk (pro hac vice)
jhouk@lawyerscommittee.org
Jennifer Nwachukwu (pro hac vice)
jnwachukwu@lawyerscommittee.org
Heather Szilagyi (pro hac vice)
hszilagyi@lawyerscommittee.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
vilia.hayes@hugheshubbard.com
Neil Oxford (pro hac vice)
neil.oxford@hugheshubbard.com
Gregory Farrell (pro hac vice)
gregory.farrell@hugheshubbard.com
Mana Ameri
mana.ameri@hugheshubbard.com
William Beausoleil
william.beausoleil@hugheshubbard.com
James Henseler (pro hac vice)
james.henseler@hugheshubbard.com

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Gerald Weber
Email: wgerryweber@gmail.com
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
Telephone: 404.522.0507

*/s/ Laurence F. Pulgram*
Laurence F. Pulgram (pro hac vice)
lpulgram@fenwick.com
Molly Melcher (pro hac vice)
mmelcher@fenwick.com
Armen Nercessian (pro hac vice)
Anercessian@fenwick.com
Ethan Thomas (pro hac vice)
EThomas@fenwick.com
FENWICK & WEST LLP
555 California Street
San Francisco, CA  94104
Telephone:    (415) 875-2300

Joseph S. Belichick (pro hac vice)
jbelichick@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone:  (650) 988-8500

Catherine McCord (pro hac vice)
cmccord@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 14

New York, NY  10010                    Telephone: (212) 430-2690


*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek*


<u>/s/ Uzoma N. Nkwonta</u>
Uzoma N. Nkwonta*
Jacob D. Shelly*
Melinda K. Johnson*                    Halsey G. Knapp, Jr.
Tina Meng Morrison*                     Georgia Bar No. 425320
Marcos Mocine-McQueen*                  Joyce Gist Lewis
Samuel T. Ward-Packard*                 Georgia Bar No. 296261
ELIAS LAW GROUP LLP                     Adam M. Sparks
250 Massachusetts Ave NW                Georgia Bar No. 341578
Suite 400                               KREVOLIN & HORST, LLC
Washington, D.C. 20001                  1201 W. Peachtree St., NW
Telephone: (202) 968-4490               One Atlantic Center, Suite 3250
unkwonta@elias.law                      Atlanta, GA 30309
jshelly@elias.law                       Telephone: (404) 888-9700
mjohnson@elias.law                      Facsimile: (404) 888-9577
tmengmorrison@elias.law                 hknapp@khlawfirm.com
mmcqueen@elias.law                      jlewis@khlwafirm.com
swardpackard@elias.law                  sparks@khlawfirm.com
*Admitted pro hac vice*

*Attorneys for Plaintiffs The New Georgia Project, Black Voters Matter Fund, Rise, Inc., Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin*

/s/Meredyth L. Yoon

MEREDYTH L. YOON
(Georgia Bar No. 204566)
LAURA MURCHIE*
**ASIAN AMERICANS
ADVANCING JUSTICE-ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*myoon@advancingjustice-atlanta.org*
*lmurchie@advancingjustice-
atlanta.org*

/s/ Eileen Ma

EILEEN MA*
KIMBERLY LEUNG*
**ASIAN AMERICANS
ADVANCING JUSTICE-ASIAN
LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*
*kimberlyl@advancingjustice-alc.org*

/s/Niyati Shah

NIYATI SHAH*
TERRY AO MINNIS*º
**ASIAN AMERICANS
ADVANCING JUSTICE-AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

/s/R. Adam Lauridsen

LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
LUIS G. HOYOS*
RYLEE KERCHER OLM*
NIHARIKA S. SACHDEVA
ELIZABETH A. HECKMAN
**KEKER, VAN NEST AND PETERS
LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400  (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*
*lhoyos@keker.com*
*rolm@keker.com*
*nsachdeva@keker.com*

*Attorneys for Plaintiffs Asian Americans Advancing Justice–Atlanta, Steven J.
Paik, Nora Aquino, Angelina Thuy Uddullah, and AnjaliEnjeti-Sydow
 *Admitted pro hac vice
 º Not admitted in D.C.*

*/s/ Kurt Kastorf*
_____

Kurt Kastorf (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: 404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Matthew A. Fogelson*
Angela Groves*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
JBrowne@advancementproject.org
MFogelson@advancementproject.org
AGroves@advancementproject.org

Clifford J. Zatz*
Justin D. Kingsolver*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
CZatz@crowell.com
JKingsolver@crowell.com
WTucker@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted pro hac vice

*Attorneys for Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta, Inc.,
The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union, Inc.,
First Congregational Church, United Church of Christ Incorporated, Georgia
Latino Alliance for Human Rights, Inc.*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)**

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was prepared in Times New Roman 14-point font in compliance with N.D. Ga. Local Rule 5.1(C).

<div style="text-align: right;">

*/s/ Maura Eileen O'Connor*
Maura Eileen O'Connor
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

<div align="right">

*/s/ Maura Eileen O'Connor*
Maura Eileen O'Connor
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

</div>