# EXHIBIT 96

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*, | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, | |
| *Defendants.* | |

1

|  |  |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, *et al.,*<br><br>     *Plaintiff,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.,*<br><br>     *Defendants.* | Case No. 1:21-CV-01333-JPB |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.,*<br><br>     *Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.,*<br><br>     *Defendants.* | Case No. 1:21-CV-01728-JPB |

**Expert Report of Bernard L. Fraga, Ph.D.**

**January 27, 2023**

## I.  **Background and Qualifications**

1.  My name is Bernard L. Fraga. I am an associate professor of political science with tenure at Emory University in Atlanta, Georgia. I research and teach on topics related to American elections. I earned my Bachelor of Arts degree in Political Science and Linguistics from Stanford University in 2008. I then earned

my Master of Arts degree in Political Science from Harvard University in 2011, and my Ph.D. in Government and Social Policy also from Harvard University in 2013. My undergraduate and graduate training included courses in political science, statistics, and election law.

2.      My academic research focuses on American politics, specifically American elections and racial/ethnic differences in rates of political participation. My book on race and voter turnout, *The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America* (Cambridge University Press, 2018), received a Best Book Award from the American Political Science Association Section on Race, Ethnicity, and Politics and received positive reviews in multiple scholarly outlets. I have also published peer-reviewed works on these topics in the *American Journal of Political Science*, the *Journal of Politics*, *Political Behavior*, *Political Research Quarterly,* the *Journal of Race, Ethnicity, and Politics*, and the *Quarterly Journal of Political Science,* including articles that focus on the measurement of electoral participation by racial/ethnic groups in the United States.[1]

3.      I also serve as a peer reviewer for numerous academic journals and press outlets in political science, have advised multiple Ph.D. dissertations, and have been invited to give many academic lectures pertaining to my analyses of American elections.

---

[1]This includes Fraga, Bernard L. (2016). "Candidates or Districts? Reevaluating the Role of Race in Voter Turnout." *American Journal of Political Science* 60 (1): 97-122 and Fraga, Bernard L. and Merseth, Julie Lee (2016) "Examining the Causal Impact of the Voting Rights Act Language Minority Provisions." *Journal of Race, Ethnicity, and Politics* 1(1): 31-59.

3

4. I previously served as an expert analyzing election data in *Richard Rose, et al. v. Brad Raffensperger, et al.* (N.D. Ga. 1:20-cv-02921, 2020-2022) where I provided deposition and trial testimony, *S.P.S., ex rel. Natalie Short, et al. v. Brad Raffensperger, et al.* (N.D. Ga. 1:19-cv-4960, 2019-2020), *Common Cause Indiana et al. v. Marion County Election Board et al.* (S.D. Ind. 1:17-cv-01388, 2017-2018), and *Shannon Perez, et al. v. State of Texas, et al.* (W.D. Tex. 5:11-cv-0360, 2017). I also served as an expert regarding quantitative analyses of U.S. Census Bureau-produced data in *State of California, et al. v. Wilbur Ross, et al.* and *City of San José, et al. v. Wilbur Ross, et al.* (N.D. Cal. 3:18-cv-01865 and 5:18-cv-02279, 2018-2019), where I provided deposition and trial testimony.

5. I have attached to this declaration a true and correct copy of my *curriculum vitae*, listing my academic background and publications. I am being compensated at a rate of $350.00 per hour. My compensation is not contingent upon my conclusions in this report.

## II.   Scope of Work

6. Plaintiffs identified in the above captioned cases retained me to analyze data related to elections in Georgia. Specifically, I was asked to analyze both evidence of potential impact of provisions of the Election Integrity Act of 2021, also known as Georgia Senate Bill 202 [SB202], available when the law was passed in 2021, as well as the actual impacts demonstrated thus far in 2022 elections. This report draws on the results of these data analyses, along with my existing knowledge, expertise, and experience.

4

### III.  Summary of Findings

7. Rates of voter turnout continue to be lower for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians in recent elections.

8. Black and Asian American/Pacific Islander voters were more likely to vote by mail than White voters in elections immediately prior to the implementation of SB202, indicating that changes to absentee-by-mail processes would likely have a disproportionate impact on voters from these groups.

9. Rates of absentee-by-mail voting dropped off more sharply for Black, Hispanic, and Asian American/Pacific Islander voters after the implementation of SB202, relative to White voters.

10. Black and Asian American/Pacific Islander registered voters were more likely than White registered voters to request absentee-by-mail ballots immediately prior to the implementation of SB202, but were less likely to request absentee-by-mail ballots relative to White registered voters in the most recent post-SB202 election.

11. Black, Hispanic, and Asian American/Pacific Islander Georgians were less likely to use the online portal to request absentee-by-mail ballots in 2020 than White Georgians, such that reinforcing reliance on the online portal while limiting third party absentee-by-mail application distribution would have a disproportionate impact on Black, Hispanic, and Asian American/Pacific Islander voters.

12. Black and Hispanic absentee-by-mail applicants were consistently more likely to have their absentee-by-mail applications rejected

5

due to arriving "too late" in post-SB202 elections, relative to White absentee-by-mail applicants and relative to pre-SB202 trends.

13. Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters would have been disproportionately negatively impacted by SB202 provisions shortening the window during which voters can request absentee-by-mail ballots in counterfactual pre-SB202 elections, on the order of thousands of additional rejected ballots relative to their share of the absentee-by-mail voting population.

14. Rates of absentee-by-mail ballot rejection went up for all groups in post-SB202 elections. However, rates of rejection increased far more for Hispanic and Asian American/Pacific Islander voters than for White voters.

15. Hispanic and Asian American/Pacific Islander absentee-by-mail voters were far more likely to have their absentee ballots rejected due to late receipt of the ballot by election officials, relative to pre-SB202 trends and relative to White voters both pre- and post-SB202.

16. Provisions of SB202 that restrict the number of drop boxes per county result in two-thirds to three-quarters of Black, Hispanic, and Asian American/Pacific Islander registrants in the state having a reduction in the number of drop boxes available for them to use, versus just over half of White registrants who saw a decrease in their number of drop boxes.

17. The reduction in the number of drop boxes resulting from SB202 had a disproportionate impact on the distance Black, Hispanic,

and Asian American/Pacific Islander registrants had to travel in order to vote via drop box, relative to White registrants.

18. Black, Hispanic, and Asian American/Pacific Islander were disproportionately likely to register to vote during the time period prior to the January 2021 runoff election that is no longer available for runoff-eligible registration under SB202.

19. Combining impacts across provisions of SB202, over 1.6 million currently registered Georgians had barriers to voting increase as a result of SB202: 42.7% of registrants whose barriers increased are Black, while 41.2% are White, 4.3% are Hispanic, and 3.7% are Asian American/Pacific Islander. For all racial/ethnic groups, with the exception of White Georgians, the shares negatively impacted exceed their shares of the registered voter population.

## IV.    Data and Definitions

20. SB202 was signed by Governor Kemp on March 25, 2021. The January 5, 2021 federal runoff election was the last major statewide election held in Georgia prior to the enactment of SB202. Therefore, I use elections prior to and including the January 5, 2021 federal runoff as the reference point for pre-SB202 elections, and consider any major statewide elections after the January 5, 2021 federal runoff as post-SB202 elections.

21. In this report, I focus on three major statewide elections prior to the enactment of SB202, and two major statewide elections after the enactment of SB202. The three pre-SB202 elections are the November 6, 2018 general election, the November 3, 2020 general election, and the January 5, 2021 runoff election. The two post-SB202 elections are the November 8, 2022 general election and the

December 6, 2022 runoff election. In this report I refer to each of these elections by their month and year, and do not examine data from other elections held during the period from 2018 to 2022 unless otherwise noted.

22. Where possible, I analyze differences and similarities between racial/ethnic groups as well. For the purposes of this report, I use the term "race" interchangeably with "race/ethnicity" or "race and ethnicity." Unless otherwise noted, I use the categories in a manner consistent with the "RACE/ETHNICITY" question in the paper version of Georgia's "STATE OF GEORGIA APPLICATION FOR VOTER REGISTRATION."[2] This includes "Black" (used interchangeably with African American in this report, and understood to indicate non-Hispanic Black), "White" (understood to indicate non-Hispanic White, and used interchangeably with non-Hispanic White), "Hispanic/Latino" (used interchangeably with Hispanic in this report, and understood to indicate Hispanics of any race per U.S. Census guidelines), "Asian American/Pacific Islander" (used interchangeably with Asian American, Asian/PI, and Asian/Pacific Islander, and understood to indicate non-Hispanic Asian and non-Hispanic Native Hawaiian and Pacific Islander persons), "American Indian" (understood to indicate non-

---

[2]https://sos.ga.gov/sites/default/files/forms/GA_VR_APP_2019.pdf. The application does not provide definitions of "RACE/ETHNICITY." Applicants are told that "Gender and race are requested and are needed to comply with the Voting Rights Act of 1965, but are not mandated by law," suggesting that "race" and "race/ethnicity" may be used interchangeably in the context of voter registration in Georgia.

Hispanic American Indians and Alaska Natives), and "Other" with a blank space provided to registrants.[3]

23. To calculate the number of registered voters in Georgia by race, I start with the individual-level records contained within the state voter registration list (also referred to as the "voter file" or "voter base"). I combine two voter registration lists provided in the discovery process: one list provided on November 18, 2022 (file date: November 8, 2022) and an older list provided on May 9, 2022 (file date: May 3, 2022). Using the "REGISTRATION_NUMBER" variable, I combined these lists such that entries in the May 3, 2022 file were used only if there was no corresponding registration number in the November 8, 2022 file. This process yielded 11,226,301 unique "REGISTRATION_NUMBER[s]."

24. The voter registration lists include information about race/ethnicity based on the responses Georgians give to the "RACE/ETHNICITY" question when they register to vote. This information is stored in a one- or two-letter code under the header "RACE" and a longer description under the header "RACE_DESC." Values of these variables, separated by an em dash, are as follows:

   i.   WH – White not of Hispanic Origin
   ii.  BH – Black not of Hispanic Origin
   iii. HP – Hispanic
   iv.  AP – Asian or Pacific Islander
   v.   AI – American Indian or Alaskan Native
   vi.  OT – Other

---

[3]As of the date of this report I have no information suggesting individuals who enter text into the blank space next to "Other" are re-coded into one of the five racial/ethnic groups based on the content of their responses.

      **vii.**   U – Unknown

25.    89.3% of individuals in the combined voter registration list have a RACE value falling into one of the first five categories in the above paragraph. 200,645 have a RACE value of "OT[her]" and 997,567 have a RACE value of "U[nknown]," a total of 1,198,212 entries or 10.7% of the voter registration list.

26.    Georgians are given an opportunity to respond to the RACE/ETHNICITY question each time they complete a voter registration application. Some Georgians have different responses to these questions at different points in time, including Georgians listed as "OT[her]" and those presumably not responding to the RACE/ETHNICITY question and thus appearing as "U[nknown]." Since neither of these categories clearly align with groupings used in, e.g., voting rights litigation, where available, I rely on previous self-reports by voters that correspond to one of the five racial/ethnic categories denoting a racial/ethnic group.[4] This reduces the number of individuals whose race does not fall into one

---

[4] I use information about self-reported race from Georgia voter registration lists acquired in November 2022, August 2022, May 2022, March 2022, November 2021, November 2020, June 2020, December 2018, January 2018, June 2016, and February 2016. I take the average proportion of all RACE/ETHNICITY values assigned to each REGISTRATION_NUMBER, excluding values of OT and U. This means each registrant has a value from 0 to 1 for each of the five racial/ethnic groups (WH, BH, HP, AP, and AI), with the sum across the categories equal to 0 (if they never self-identified as one of the five categories) or 1 (if they self-identified at least once with a category). This procedure also helps to minimize the effect of any errors in the RACE variable value on the voter registration list. For example, in January 2023 I was informed that there were a relatively small number of records erroneously coded as "White" due to a Department of Driver Services software error. This methodology would allow a previous correct self-report to have some impact in the analysis. If a list of voters with erroneous information coded in the RACE variable were provided to me, I would revise this analysis accordingly.

of the five categories to 854,930 entries or 7.6% of the voter registration list.[5]

27.    While the vast majority of Georgians self-report their race when registering to vote, approximately 10% of entries in the voter registration lists I received list their race as "OT[her]" or are listed as having "U[nknown]" race. After examining previous self-reported race, 7.6% of individuals still do not fall into at least one of the five racial/ethnic categories aligning with U.S. Census statistics. As the turnout rates I calculate use the entire citizen voting-age population (CVAP) for each racial/ethnic group, and it is likely that the "Other" or "Unknown" registrants would self-identify with one of the five racial/ethnic groups corresponding to U.S. Census categories if pushed to do so, I use Bayesian Improved Surname Geocoding (BISG) to impute race/ethnicity for the remaining "Other" or "Unknown" population.

28.    BISG is an increasingly common method for estimating the probability that a voter is non-Hispanic White, Black, Hispanic, or Asian American/Pacific Islander in the absence of self-reported race/ethnicity in both social science research[6] and voting rights

---

[5]1.06% of registrants self-identified as more than one of the five racial/ethnic groups across different voter registration list extracts.

[6]See, e.g., Fraga, Bernard L. (2018). The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America. New York: Cambridge University Press; Fraga, Bernard L. (2016). "Candidates or Districts? Reevaluating the Role of Race in Voter Turnout." American Journal of Political Science 60 (1): 97-122; Imai, Kosuke and Kabir Khanna. 2016. "Improving Ecological Inference by Predicting Individual Ethnicity from Voter Registration Records." Political Analysis 24: 263–272.

jurisprudence.[7] BISG relies on key pieces of information about individuals that have been demonstrated to be highly informative of an individual's racial/ethnic self-identification: an individual's name (most often surname, but also including first name and middle or maiden name where available) and U.S. Census Bureau-generated data on the racial/ethnic demographics of an individual's neighborhood. For this report I conducted BISG via the *wru* package as created for the statistical programming language **R**.[8] Using registration address information from the voter registration list, along with surname, first name, and middle/maiden name as listed in the voter registration list, I am able to perform BISG on Georgians that are consistently listed as "OT[her]" or "U[nknown]" race.

29.   Prior to performing BISG, 854,930 entries in the combined voter registration lists do not have self-reported racial/ethnic data. However, I can approximate racial/ethnic self-identification via BISG for 776,093 of these entries.[9] These estimates are probabilistic; similar to the aggregated self-identification data I discuss earlier in this section, BISG produces the probability (ranging from 0-1) that each individual is White, Black, Hispanic, or Asian American/Pacific Islander. Individuals with lower

---

[7]See *Clerveaux, et al. v. East Ramapo School District*, 984 F.3d 213, 219 (2d Cir. 2021); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 600, 613 (E.D. Mich. 2019).

[8]https://CRAN.R-project.org/package=wru. My analysis used v1.0.1 of the *wru* package and R version 4.2.2.

[9]The remaining 78,837 Georgians, representing 0.7% of all individuals in the combined voter registration lists, could not be predicted via BISG due to address discrepancies or uncommon surnames that preclude estimation.

confidence in race estimates will thus have less of an impact on any single group's total estimate.

30.    After conducting BISG, I have information regarding the self-reported or probabilistic race of 99.3% of all individuals on the combined voter registration lists. This is greater than the 92.4% of records with self-reported racial/ethnic data, but barring extreme differences in racial/ethnic groups' rates of listing race as other or unknown, differences present in the absence of BISG data should persist with the BISG data. In other words, analyses that use the additional BISG-estimated race/ethnicity values should be viewed as robustness checks for the self-reported race alone analyses.

## V.    Rates of voter turnout are consistently lower for Black, Hispanic, and Asian American Georgians than for non-Hispanic White Georgians.

31.    In this section I provide information about voter turnout rates by race/ethnicity in major statewide Georgia elections from 2018-2022.

32.    To do so I combine the voter registration list data with individual-level voter history data for each election as made public in "Voter History Files" by the Georgia Secretary of State's office.[10] Any individuals who are marked as having cast a non-provisional, non-supplemental ballot in the indicated election in the voter history

---

[10]https://sos.ga.gov/voter-history-files

data are marked as having voted.[11] These quantities serve as the numerator in my calculation of turnout rates.

33.   I divide the number of voters by race by the number of voting-age citizens by single race/ethnicity living in the State of Georgia, according to estimates from the U.S. Census Bureau. In this report I use the 2016-2020 5-year CVAP special tabulation, as produced by the U.S. Census Bureau. These are the most recent CVAP special tabulations available as of December 2022. These quantities serve as the denominator in my calculation of turnout rates.[12]

34.   Dividing the number of voters by race by the number of voting-age citizens by race, I construct a turnout rate for each racial/ethnic group. The resulting quantities are in **Table 1**.

35.   **Table 1** shows that across recent elections, voter turnout rates for African Americans, Hispanics, and Asian American/Pacific Islanders in the State of Georgia were substantially lower than turnout rates for the White population.

---

[11]Georgia voter history data provides three indicator variables denoting ballot type: "Absentee," "Provisional," and "Supplemental." I understand that records appearing in the voter history data with a blank value for all of these ballot types are Election Day voters.

[12]CVAP is often used as the denominator when comparing rates of voter turnout between racial/ethnic groups. For example, it is the main denominator in U.S. Census Bureau analyses of Current Population Survey Voting and Registration Supplement data related to race/ethnicity and voter turnout. See, e.g., Fraga, Bernard L. 2018. *The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America*. New York: Cambridge University Press. 37-38, 50; File, Thom. 2015. "Who Votes? Congressional Elections and the American Electorate: 1978-2014." U.S. Census Bureau report P20-577. 3-4.

|          | Pre-SB202 | | | Post-SB202 | |
|----------|-----------|----------|----------|----------|----------|
|          | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 52.7% | 67.0% | 59.9% | 52.9% | 47.2% |
| **White** | 55.3% | 69.2% | 61.8% | 56.2% | 49.7% |
| **Black** | 49.1% | 59.9% | 54.9% | 46.6% | 43.0% |
| **Hispanic** | 25.5% | 42.2% | 32.7% | 26.2% | 21.9% |
| **Asian/PI** | 34.9% | 64.1% | 53.8% | 41.3% | 35.2% |

**Table 1: Voter Turnout Rates by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2022.** Turnout is calculated as a percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino) as extracted from the 2016-2020 ACS 5-Year Special Tabulation. The number of voters by race is self-reported from the voter registration file.

36. In the November 2018 election, the statewide total turnout rate was 52.7%. The White population saw a turnout rate higher than the state average with 55.3% turnout. This stands in contrast to the turnout rates for the Black, Hispanic, and Asian American/Pacific Islander populations which were 49.1%, 25.5%, and 34.9% respectively and fell below the statewide total turnout rate.

37. The November 2020 election, which was a presidential election year, saw a jump in the total turnout rate to 67.0% and the highest rates across all four racial groups in the statewide election from 2018 to 2022. Again, the White turnout rate was higher than the overall average across groups, at 69.2%. The Black turnout rate of

15

59.9% fell below the White turnout rate as did the Hispanic and Asian American/Pacific Islander rates at 42.2% and 64.1%.

38. The final pre-SB202 statewide election in Georgia, the January 2021 runoff election, had a total turnout rate of 59.9%. All racial groups saw a drop in turnout from their respective rates two months prior in the November 2020 election. Although the White population still turned out more than the statewide average at 61.8%, the Black, Hispanic, and Asian American/Pacific Islander populations had turnout rates at 54.9%, 32.7%, and 53.8%, respectively.

39. The November 2022 election is the first post-SB202 statewide election that I examine. It had a similar total turnout rate to that of the preceding midterm election in 2018 with 52.9% of the Georgia voting-age population turning out. The White turnout rate at 56.2% was again above the total turnout rate of 52.9%, as well as above the Hispanic turnout rate of 26.2% and the Asian American/Pacific Islander turnout rate of 41.3%. Conversely, the Black population turned out at a rate of 46.6%, which is a decrease from their 2018 turnout rate.

40. The December 2022 runoff election saw the lowest total turnout rate in this election dataset at 47.2%, meaning that less than half of the eligible Georgia population turned out to vote. The White voter population was slightly above this at 49.7%, but was still the only time from 2018 to 2022 that the rate fell below 50%. The Black and Hispanic populations also saw their lowest turnout rates at 43.0% and 21.9%, respectively. The Asian American/Pacific

Islander turnout rate remained lower than it had been in the previous three statewide elections, at 35.2%.

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 52.7% | 67.0% | 59.9% | 52.9% | 47.2% |
| **White** | 57.3% | 71.9% | 64.2% | 58.4% | 51.5% |
| **Black** | 50.9% | 62.3% | 57.2% | 48.5% | 44.7% |
| **Hispanic** | 27.8% | 45.8% | 35.7% | 28.7% | 24.0% |
| **Asian/PI** | 39.2% | 71.4% | 60.0% | 46.2% | 39.4% |

**Table 1a: Voter Turnout Rates by Self-Reported or BISG Race/Ethnicity in major Georgia Statewide Elections, 2018-2022.** Turnout is calculated as the percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino) as extracted from the 2016-2020 ACS 5-Year Special Tabulation. The number of voters by race is based on self-reports in the voter registration file, with individuals consistently self-identifying as "Other" or with "Unknown" race in the registration file having race estimated via BISG.

41. Adding the BISG-estimated individuals to the racial/ethnic group voter totals derived from self-reported data results in the quantities found in **Table 1a**. In **Table 1a** we see that even after accounting for the population consistently listed as "Other" or "Unknown" in the voter registration file, large disparities in voter turnout rates persist across recent elections for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians.

42.    **Table 1a** depicts voter turnout trends similar to those in **Table 1**. Since the total number of voters is based on the voter history file, and is not influenced by the BISG imputation, the total turnout rates for November 2018, November 2020, January 2021, November 2022, and December 2022 elections are the same as in **Table 1** at 52.7%, 67.0%, 59.9%, 52.9%, and 47.2%, respectively. However, in **Table 1a** each racial group has higher turnout rates displayed for each individual election relative to the values in **Table 1**, because additional voters for each group could be identified via the BISG algorithm.

43.    In the November 2018 midterm election, **Table 1a** indicates that White turnout and Black turnout rates were 57.3% and 50.9%, respectively. Black Georgians therefore voted at a substantially lower rate than White Georgians. Moreover, for the Hispanic and Asian American/Pacific Islander populations, the turnout rates were even lower at 27.8% and 39.2%, respectively.

44.    The turnout rates from November 2020 in **Table 1a** showed the same pattern as in **Table 1**. Across racial groups, this election had the highest turnout rates compared to the other four statewide elections in the tables. White and Asian American/Pacific Islander Georgians turned out at the highest rates in the table at 71.9% and 71.4%, respectively, with both groups exceeding the total rate in 2020 which stood at 67.0%. Both Black and Hispanic turnout fell below the total turnout rate at 62.3% and 45.8%, respectively.

45.    The January 2021 runoff was the final pre-SB202 statewide election with a total turnout rate of 59.9%. All racial groups saw a drop in turnout from their respective rates two months prior in the

18

November 2020 election. Although the White population still turned out more at 64.2% than the state total at 59.9%, Black and Hispanic Georgians had turnout rates at 57.2% and 35.7%, respectively. The Asian American/Pacific Islander turnout rate of 60.0% was almost the same as the overall statewide rate.

46. The first statewide general election to be held following the enactment of SB202 was the November 2022 midterm election. The overall turnout rate was similar to 2018 with 52.9% of adult citizen Georgians turning out. As seen in the other elections, the White population once again had a turnout rate that exceeded the total rate at 58.4%. Unlike the other elections, however, November 2022 saw the Black, Hispanic and Asian American/Pacific Islander populations' turnout rates all fall below 50%, at 48.5%, 28.7%, and 46.2%, respectively. When comparing across groups, we see that Black Georgians were the only racial/ethnic group to see a decline in turnout relative to 2018; for all other groups, turnout increased.

47. The December 2022 runoff saw the lowest turnout rates for the White, Black, and Hispanic voter populations at 51.5%, 44.7%, and 24.0%, respectively. The Asian American/Pacific Islander turnout rate was 39.4%, the second lowest across 2018 to 2022 statewide elections. Again, the White turnout rate at 51.5% was the only group to exceed the overall total turnout rate which in this election which was 47.2%.

48. As noted in Section V, Paragraph 27 of this report, the addition of BISG-calculated race estimates may be especially important in situations where the denominator is a fixed, non-voter registration list derived figure. The estimates in **Table 1a** do indeed change

with BISG-calculated race estimates for "Other" and "Unknown" race persons, but the disparities <u>between</u> racial/ethnic groups are very similar. As a result, I relegate statistical estimates that add BISG-calculated race estimates to **Appendix A** going forward in this report.

49. A number of factors may influence voter turnout rates in any given election beyond changes in voting laws, both between and across racial/ethnic groups. This includes the level of competition in elections, mobilization by partisan and non-partisan campaigns and organizations, and historical factors such as the history and enduring effects of racial discrimination. In the above analysis of turnout data, and subsequent analyses in this report, I attempt to make comparisons that hold these factors constant to the degree possible. For instance, each of the election dates from 2018-2022 that I analyze had highly competitive, statewide elections on the ballot in Georgia. Efforts to mobilize voters by partisan and non-partisan organizations in the state were also common throughout the period. Finally, the historical factors that may contribute to racial/ethnic differences in turnout likely continued to influence turnout. Prior research has suggested that each of these factors, in particular, may aid in producing countermobilization that can begin to mitigate an otherwise negative effect of election law changes on turnout for groups that perceive they are negatively impacted by such laws.[13] As a result, I believe my estimates of the

---

[13]See, e.g., Fraga (2018) *The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America.* Ch. 4,7; Valentino, Nicholas A. and Fabian G. Neuner (2017) "Why the Sky Didn't Fall: Mobilizing Anger in Reaction to Voter ID Laws." *Political Psychology* 38(2): 331-350.

impact of SB202 on voters are likely to be smaller than the impact we would observe if we could truly hold all other factors driving turnout constant.

## VI. <u>Black and Asian American/Pacific Islander voters are more likely to vote by mail than non-Hispanic White voters in recent elections, but saw disproportionate drops in mail ballot use in elections after SB202.</u>

50.   While Black, Hispanic, and Asian American/Pacific Islander Georgians had lower voter turnout rates in recent elections than White Georgians, we also see racial/ethnic differences in the methods voters use to cast their ballots. These differences may be relevant to evaluating which groups are likely to face a disproportionate impact of SB202, given its focus on specific parts of the voting process.

51.   In this section I quantify rates of absentee-by-mail ballot use by Georgia voters. No-excuse absentee voting (including both early in-person and absentee-by-mail) was authorized by HB 244 in 2005. While I only analyze elections from 2018-2022, the vast majority of voters using no-excuse absentee voting voted early in-person historically, and those that voted by mail "skewed older, whiter, and more Republican."[1415]

---

[14]"Fast forward to 2021: There has been no evidence of widespread fraud with absentee-by-mail voting and, until the 2018 governor's race, the relative few voters that used absentee ballots skewed older, whiter and more Republican." https://www.gpb.org/news/2021/03/07/16-years-later-georgia-lawmakers-flip-views-on-absentee-voting

[15]https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2009/GAvoters pdf.pdf

52. To produce rates of absentee-by-mail ballot use in recent elections, I rely on lists of voters who applied to vote absentee in each election as made public in "Voter Absentee Files" by the Secretary of State's office.[16]

53. Within the absentee list there is a column titled "Ballot Status." Entries in this column can take a value of "A," "C," "R," "S," or can be blank. My understanding is that "A" indicates ballots that were accepted. In addition, there is a column in the voter absentee list titled "Ballot Style." Entries in this column can take a value of "MAILED," "IN PERSON," or "ELECTRONIC." My understanding is that "MAILED" indicates paper ballots that were mailed to voters. Therefore, if we filter the list to individuals whose "Ballot Status" is "A" and "Ballot Style" is "MAILED," we can identify the population that successfully voted using an absentee-by-mail ballot.[17]

54. I link the absentee data to the combined voter registration list using the "Voter Registration [number]" column in the absentee data. This can be further linked to voter history data via the same voter registration number, and racial/ethnic information derived from the combined voter registration lists.

---

[16]https://elections.sos.ga.gov/Elections/voterabsenteefile.do

[17]Georgia Absentee Files do not distinguish between voters who *returned* their ballots via the postal service and voters who placed their ballots in a drop box. I analyze drop boxes later in the report, but for this section absentee-by-mail includes both voters who returned a ballot via postal mail and those who placed their ballot in a drop box.

| | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 5.6% | 26.0% | 24.0% | 6.2% | 5.3% |
| **White** | 4.6% | 23.9% | 21.7% | 5.6% | 5.2% |
| **Black** | 7.1% | 29.0% | 27.5% | 7.3% | 5.5% |
| **Hispanic** | 6.3% | 23.2% | 20.4% | 4.4% | 2.7% |
| **Asian/PI** | 11.5% | 39.7% | 34.9% | 9.1% | 6.2% |

**Table 2: Percent of voters voting absentee-by-mail by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2022.** Percentages indicate the number of individuals who cast an absentee-by-mail ballot and had the ballot accepted, divided by the total number of voters in the election for each racial/ethnic group. The race/ethnicity of voters is based on self-reports in the voter registration file.

55. **Table 2** displays the percentage of voters in major Georgia statewide elections who voted absentee-by-mail by self-reported race, starting with the November 2018 election. In that election, absentee data indicates 5.6% of voters overall voted absentee-by-mail. The share of White voters voting by mail was lower than the statewide average, at 4.6%. However, for Black, Hispanic, and Asian American/Pacific Islander voters, the share voting by mail was higher than the statewide average and the average for Whites, at 7.1%, 6.3%, and 11.5%, respectively.

56. The election with the highest rate of absentee-by-mail voting overall in Georgia was 26.0% in November of 2020 during the COVID-19 pandemic. The election with the lowest was the runoff election in December 2022 at just 5.3%. This rate is close to the pre-pandemic rate of 5.6% in November 2018, while January 2021

23

and November 2022 have rates of 24.0% and 6.2%, respectively, indicating a decrease following November 2020.

57.    The large increase in absentee-by-mail voting rates that occurred in November 2020 followed by the drop in 2022 is also reflected in rates for the four self-reported racial groups. White voters increased their rate of voting by mail to 23.9% in 2020, declining slightly to 21.7% in January 2021, and then declining to 5.6% and 5.2% in November and December 2022, respectively.

58.    Black voters show a similar trend of increase and then decline in mail voting. However, compared to the rate for White voters, Black voters voted absentee-by-mail at higher rates in each election year. The Black voter population voted absentee-by-mail at a rate of 7.1% in November 2018 which jumped to its highest point in November 2020 at 29.0% and then 27.5% two months later in January 2021. In November 2022, the rate for the Black voter population declined to 7.3% and dropped even lower to 5.5% in December of 2022.

59.    Hispanic voters increased their rate of mail voting less than other racial groups relative to 2018. In 2018, 6.3% of Hispanic voters voted by mail. This increased substantially to 23.2% in 2020 and 20.4% in January 2021, but this was a smaller increase than for any other racial/ethnic group and led to Hispanic voters voted by mail at a lower rate than any other group from the 2020 election onward. This already relatively low rate dropped even further, to 4.4% and 2.7% respectively in November and December 2022.

60.    The Asian American/Pacific Islander voter population votes absentee-by-mail at a rate higher than the other three racial

24

groups in every election. In 2018, Asian American/Pacific Islander voters were the only group voting by mail at a double digit rate; in the subsequent two elections they were the only group where more than one-third voted absentee by mail, reaching a high point of 39.7% in November 2020. However, after SB202 Asian American/Pacific Islander voters had the largest drop off in absentee-by-mail rates of any group, reaching 9.1% in November 2022 and 6.2% in December 2022.

61. Notably, White voters were the only racial/ethnic group to have their rate of mail voting remain higher than the 2018 figure by the December 2022 election. Black, Hispanic, and Asian American/Pacific Islander voters, along with the statewide average, voted by mail at a lower rate in the December 2022 runoff than in November 2018.

62. Overall, we see a clear decline in mail ballot usage among voters in elections after the implementation of SB202. As with overall turnout, a variety of factors may influence the decision to vote by mail. However, the fact that we see a disproportionate drop in mail ballot use among Black, Hispanic, and Asian American/Pacific Islander voters in elections after SB202, relative to White voters, suggests that factors related to SB202 may have disproportionately impacted non-White voters' propensity to vote by mail.[18] I explore these factors in greater depth in subsequent sections.

---

[18]Indeed, White voters are the only group to see *higher* rates of mail ballot usage in both post-SB202 elections examined here (November 2022 and December 2022) relative to the November 2018 election.

**VII.** **Black and Asian American/Pacific Islander Georgians were more likely to request an absentee-by-mail ballot than White voters prior to SB202, but after SB202, their application rates declined faster than for White voters, and Black and Asian American/Pacific Islander Georgians were less likely than White voters to apply to vote by mail in the most recent post-SB202 statewide election.**

63.  As noted in **Table 2**, Black and Asian American/Pacific Islander voters were more likely to vote by mail than White voters in nearly all recent elections. However, this may not capture the entire population of individuals who attempted to vote by mail. In Georgia, individuals must generally apply to receive an absentee ballot. The public Georgia Absentee File contains a field titled "Application Status." The field has two possible values: "A" and "R." I understand these values to represent "A[ccepted]" and "[R]ejected," and that the Absentee File therefore contains a record of all individuals who applied for absentee ballots and had those applications processed in a formal manner by county officials.[19]

64.  To produce rates of absentee-by-mail ballot applications in recent elections, I rely on lists of voters who applied to vote absentee in each election as made public in in "Voter Absentee Files" by the Secretary of State's office.[20] As in Section VI of this report, I

---

[19]Note that this file may not include all absentee ballots sent to individuals who are on the "permanent absentee" list. Disabled, 65+ years old, and/or UOCAVA voters can request to receive an absentee ballot for all elections during a cycle with a single request form. At the time of this report, I do not have sufficient information to establish whether or not these persons are included in the public Absentee File for each election in a cycle.

[20]https://elections.sos.ga.gov/Elections/voterabsenteefile.do

26

examine the column in the voter absentee list titled "Ballot Style." Entries in this column can take a value of "MAILED," "IN PERSON," or "ELECTRONIC." My understanding is that "MAILED" indicates applications for paper absentee-by-mail ballots. I filter the absentee data to individuals with a "Ballot Style" of "MAILED."

65.    I then link the absentee data to the combined voter registration list using the "Voter Registration [number]" column in the absentee data. This can be further linked to racial/ethnic information derived from the combined voter registration lists. The aggregate total of applications to vote by mail for each racial/ethnic group form the numerator in my calculation of application rates.

66.    The denominator in my calculation of application rates consists of the number of registered voters eligible to vote in each election. I was provided with voter registration lists including "CANCELED" voters through the discovery process, along with the date of cancellation and date of registration. Combining this information with the aforementioned data on race/ethnicity, I constructed the total number of registered voters who were eligible to vote on each election day.

67.    **Table 3** shows the percent of registered voters eligible to vote in each election who requested an absentee-by-mail ballot.

27

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 4.1% | 22.8% | 17.3% | 3.5% | 2.9% |
| **White** | 3.3% | 22.5% | 17.0% | 3.6% | 3.2% |
| **Black** | 5.5% | 24.3% | 19.1% | 3.7% | 2.8% |
| **Hispanic** | 4.2% | 18.2% | 11.2% | 1.6% | 1.0% |
| **Asian/PI** | 7.6% | 34.8% | 22.9% | 4.3% | 2.8% |

**Table 3: Percent of registered voters applying for absentee-by-mail ballots by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2022.** Percentages indicate the number of individuals who applied for an absentee-by-mail ballot, divided by the total number of registered voters eligible to vote in the election for each racial/ethnic group. The race/ethnicity of voters is based on self-reports in the voter registration file.

68. **Table 3** illustrates the increase of voters requesting mail ballots during the COVID-19 pandemic with November 2020 having the highest rates of voters applying for absentee-by-mail ballots. This peak in absentee-by-mail application rates applies to all racial/ethnic groups. The racial group with the highest rate of mail ballot requests in 2020 was Asian Americans/Pacific Islanders at 34.8%, and the lowest was Hispanic at 18.2%. The rate for Black registrants was slightly higher than for White registered voters at 24.3% compared to 22.5%.

69. Following the implementation of SB202, these rates dropped to the single digits for all racial groups. In November 2022, the group with the highest percentage of voters applying for a mail ballot was the Asian American/Pacific Islander population at a rate of 4.3%

28

and the lowest was for Hispanic registrants at just 1.6%. A month later during the December 2022 election, the White voter population's rate was highest at 3.2%, and the lowest was again the Hispanic rate of 1.0%.

70. In the three pre-SB202 elections, the percent of Black and Asian American/Pacific Islander registrants applying to vote by mail was higher than Whites. Increases in absentee-by-mail applications were also sharper for Black and Asian American/Pacific Islander voters in 2020 and 2021 relative to Whites. However, in the two post-SB202 elections, the percent of absentee-by-mail applications from Black, Hispanic, and Asian American/Pacific Islander Georgians shrank more quickly than for Whites. White Georgians were the only group to request absentee-by-mail ballots at a higher rate post-SB202 than in the November 2018 election. Indeed, by the December 2022 election, White registrants were more likely to request an absentee-by-mail ballot than Black, Hispanic, or Asian American/Pacific Islander registrants, a reversal of the pre-SB202 trend. This may indicate a disproportionate shift away from applying for absentee-by-mail ballots by minority registrants due to provisions of SB202 related to submission and acceptance of absentee ballot applications.

**VIII.** **<u>Black and Hispanic absentee-by-mail applicants were less likely to use the online portal to request an absentee ballot in 2020 and 2021 elections compared to White applicants, and were therefore more likely to have use for forms provided by third parties that were restricted under SB202.</u>**

71.    SB202 added a number of provisions to the Georgia Code related to mailing Georgians absentee-by-mail applications. Some of these provisions placed additional restrictions on third parties mailing absentee-by-mail applications to registered voters. Provisions relevant to this topic included the following:

    **i.**    "No person or entity other than a relative authorized to request an absentee ballot for such an elector…shall send any elector an absentee ballot application that is prefilled with the elector's required information. . . ."[21]

    **ii.**    "Any application for an absentee ballot sent to any elector by any person or entity shall utilize the form of the application made available by the Secretary of State and shall clearly and prominently disclose on the face of the form: 'This is NOT an official government publication and was NOT provided to you by any governmental entity and this is NOT a ballot.'"[22]

    **iii.**    "All persons or entities, other than the Secretary of State, election superintendents, boards of registrars, and absentee ballot clerks, that send applications for absentee ballots to electors in a primary, election, or runoff shall mail such

---

[21]SB202, as passed (Enrolled version), p. 39 lines 970-973.
[22]SB202, as passed (Enrolled version), p. 40 lines 981-985.

applications only to individuals who have not already requested, received, or voted an absentee ballot in the primary, election, or runoff. […] A person or entity in violation of…this paragraph shall be subject to sanctions by the State Election Board which, in addition to all other possible sanctions, may include requiring such person or entity to pay restitution to each affected county or municipality in an amount up to $100.00 per duplicate absentee ballot application. . . ."[23]

72. These restrictions limited the availability of absentee-by-mail applications for Georgians. Provisions restricting the mailing of pre-filled application forms are especially notable as the Secretary of State's office sent pre-filled absentee-by-mail application forms to all registered Georgians in advance of the (rescheduled) spring 2020 presidential preference and state primary elections. The Secretary of State's office "abandoned" this approach for the November 2020 election, instead creating an online absentee-by-mail application portal ("online portal").[24]

73. The online portal, activated on August 31, 2020, allowed "Georgia voters with a driver's license or state ID card…to request an absentee ballot entirely online."[25] In this section I examine which absentee-by-mail applicants used the online portal to apply for a mail ballot. Individuals not using the online portal may have had

---

[23]SB202, as passed (Enrolled version), p. 41-42 lines 1025-1041.
[24]https://www.ajc.com/news/state--regional-govt--politics/absentee-voting-program-embraced-georgia-voters-then-abandoned/hkNttNsgXlaYZXjUatnvjK/.
[25]https://sos.ga.gov/news/secretary-state-brad-raffensperger-unveils-new-online-absentee-ballot-request-portal.

a greater need for the third party mailed absentee applications restricted under SB202.

74. To evaluate who used the online portal to apply for an absentee-by-mail ballot for the 2020 and 2021 elections, I rely on a list of online portal applicants provided by the State Defendants during the discovery process.[26] The file lists the Registration Number and election for which the applicant requested a ballot. 409,312 entries are associated with the November 2020 election, and 465,132 are associated with the January 2021 election.[27]

75. On April 20, 2020, the Georgia Secretary of State's office began mailing pre-filled absentee-by-mail application forms to all registered voters in the state.[28] While the forms were applications to vote by mail in the 2020 presidential preference and state primary elections, the forms also allowed applicants who are over 65 years of age (termed "Elderly" on the form) to request to vote absentee-by-mail for the remainder of the election cycle by checking a box on the form. While not all Elderly individuals checked this box, the fact that all eligible registrants had this option means that they were significantly less likely to need to use the online portal to request an absentee-by-mail ballot or rely on a

---

[26]The file produced by the State Defendants was "List of Entire Online Absentee Request Extract.xlsx."

[27]2,820 individuals have a value of "Y" for the column "FL_FULL_ELEC_CYCLE." Based on the birthyear for these individuals, or indications that they applied as UOCAVA voters, I interpret this variable to indicate persons who are able to use a single absentee-by-mail application to request absentee-by-mail ballots for the full election cycle, per Georgia Code § 21-2-381(a)(1)(G). I mark these individuals as having requested an absentee ballot for the January 2021 runoff if they requested an absentee ballot via the online portal for the November 2020 election.
[28]https://www.ajc.com/news/state--regional-govt--politics/voters-mailed-absentee-ballot-request-forms-for-may-georgia-primary/hc0FkOo85uVCALbWvQUo9L/.

third-party mailing. Therefore, I exclude individuals with a birth year of 1955 or earlier from the analysis in this section.

|  | Nov 2020 | Jan 2021 |
|---|---|---|
| **Total** | 34.1% | 59.3% |
| **White** | 45.9% | 67.8% |
| **Black** | 22.4% | 48.6% |
| **Hispanic** | 27.2% | 59.6% |
| **Asian/PI** | 29.8% | 70.8% |

**Table 4: Percent of absentee-by-mail applicants applying for absentee-by-mail ballots using the online portal by Self-Reported Race/Ethnicity, 2020 and 2021.** Percentages indicate the number of individuals who applied for an absentee-by-mail ballot using the Secretary of State's online application portal, divided by the total number of absentee-by-mail applicants under the age of 65 in 2020. The race/ethnicity of voters is based on self-reports in the voter registration file.

76.    **Table 4** shows the percentage of absentee-by-mail applicants, by race/ethnicity, who used the online portal. In the November 2020 election, White applicants used the online portal at the highest rate of any racial/ethnic group, with 45.9% of applicants under 65 years old using the portal to submit their absentee-by-mail applications. Black applicants used the portal at the lowest rate of any racial/ethnic group, at 22.4%. This is less than half the rate of portal use as White applicants. Hispanic and Asian American/Pacific Islander applicants used the portal at substantially lower rates than Whites as well.

77.    All racial/ethnic groups saw an increase in the share of applicants using the online portal for the January 2021 runoff election. Total,

33

nearly 60% of absentee-by-mail applicants under the age of 65 used the online portal. However, nearly 68% of White applicants and over 70% of Asian American/Pacific Islander applicants for absentee-by-mail ballots relied on the portal in the runoff. Black applicants again used the portal at the lowest rate of any racial/ethnic group, with less than half of applicants (48.6%) relying on the online system. This also aligns with evidence of lower rates of home internet access for Black and Hispanic adults, relative to White adults.[29]

78.    In the absence of comprehensive, individual-level data on who used a third-party absentee ballot form to apply for an absentee-by-mail ballot in 2020 and 2021, the patterns we see in the use of the (at the time) new online portal system suggest that Black and Hispanic absentee-by-mail applicants were more likely to have use for the forms these organizations mailed. Pre-filled forms, in particular, would have mirrored the method of requesting an absentee-by-mail ballot encouraged by the Georgia Secretary of State's office in the spring of 2020. However, pre-filled absentee-by-mail ballot applications were outlawed by SB202.

---

[29]https://www.pewresearch.org/fact-tank/2021/07/16/home-broadband-adoption-computer-ownership-vary-by-race-ethnicity-in-the-u-s/.

**IX.** **Black, Hispanic, and Asian American/Pacific Islander registrants are less likely than White registrants to have a Georgia driver's license or identification card number listed in their voter registration record, and this number is used as the principal means of identification to apply for an absentee ballot under SB202.**

79.    SB202 also added a provision to the Georgia Code "requiring" applicants to list "the number of his or her Georgia driver's license or identification card" on the absentee-by-mail ballot application, or to provide a copy of one of several forms of identification of the individual does not have a Georgia driver's license or identification card.[30]

80.    As noted in Section VIII of this report, a Georgia Department of Driver Services (DDS) number is required to use the online absentee-by-mail ballot application portal. However, prospective applicants are able to apply for an absentee-by-mail ballot outside of the online portal if they do not have a DDS number, as SB202 added language indicating "If such elector does not have a Georgia driver's license or identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the elector shall affirm this fact in the manner prescribed in the application and the elector shall provide a copy of a form of identification listed in subsection (c) of Code Section 21-2-417." Subsection (c) of the listed Code lists "a copy of a current utility bill, bank statement, government check,

---

[30]SB202, as passed (Enrolled version), p. 38 lines 948-949. My understanding is that this number is issued by the Georgia Department of Driver Services (DDS), and therefore I refer to it as a "DDS number" for the remainder of the report.

35

paycheck, or other government document that shows the name and address of such elector."[31]

81. While not making it impossible to request an absentee-by-mail ballot without a Georgia DDS number, the fact that use of the online portal already <u>required</u> a DDS number and SB202 added the need to transmit alternate identification with a paper absentee ballot application reflects a significant increase in the burden Georgians without a DDS number must endure to request an absentee-by-mail ballot, relative to both the pre-SB202 requirements and the requirements faced by Georgians with a DDS number.

82. To evaluate which registered Georgians do not have a DDS number, I rely on the versions of the Georgia voter registration file provided by the State Defendants during the discovery process. These files have additional columns not provided in the public Georgia voter registration file, including a column titled "DRIVER_LICENSE_NUMBER." In the version of the voter registration file I was provided with, this column takes a value of "YES," "NO," or is blank for each registrant.

83. Of registered voters who were eligible to vote in the December 2022 runoff election (the most recent major statewide election), 171,691 are listed as lacking a DDS number associated with their

---

[31]This provision of SB202 is unclear. Subsection (c) also mentions identification in subsection (a) but does not list those forms of identification in the section itself, as subsection (c) appears to be designed to address registrants who need to verify identity and residence in Georgia. Subsection (a) includes additional forms of identification that do not list an address, such as a United States Passport. Instructions on the Georgia Secretary of State's website, as of January 2022, list these additional forms as well: https://sos.ga.gov/page/georgia-voter-identification-requirements.

registration record. An additional 88,179 have a blank value in the "DRIVER_LICENSE_NUMBER" field.

84.   **Table 5** shows the percent of Georgia registered voters, by race/ethnicity, who have a DDS number associated with their registration record, do not have a DDS number, or have unknown DDS number status as they have a blank value in the "DRIVER_LICENSE_NUMBER" field.

|  | Has DDS Number | No DDS Number | Unknown DDS # Status |
|---|---|---|---|
| **Total** | 96.72% | 2.17% | 1.11% |
| **White** | 97.97% | 0.94% | 1.09% |
| **Black** | 94.58% | 4.22% | 1.20% |
| **Hispanic** | 97.42% | 2.03% | 0.55% |
| **Asian/PI** | 97.47% | 1.94% | 0.59% |

**Table 5: Percent of registrants by Georgia Department of Driver Services (DDS) number status by Self-Reported Race/Ethnicity, November 2022.** Percentages indicate the number of individuals who are marked as having, not having, or unknown driver's license number status, divided by the total number of non-cancelled registrants as of November 8, 2022. The race/ethnicity of voters is based on self-reports in the voter registration file.

85.   The first row of **Table 5** indicates that, overall, 96.72% of those with a voter registration status enabling them to vote as of November 2022 had a DDS number associated with their registration record. 2.17% were marked as having "NO" DDS number on the voter registration list, and 1.11% had an unknown DDS number status as the field was blank on the file.

37

86.   Black Georgians are the racial/ethnic group with the lowest percent of registrants who had a DDS number, at 94.58%. The group with the highest percent listed with a DDS number is White registrants at a rate of 97.97%. Hispanic and Asian American/Pacific Islander rates were closer to that of White registrants, at 97.42% and 97.47% respectively.

87.   However, the appearance of similarity in DDS number status based on the confirmed "YES" records masks substantial differences in rates of "NO" DDS number registrants by race/ethnicity. White registrants are least likely to have a confirmed "NO" DDS number registration as of November 2022 (0.94%). 2% of Hispanic and Asian American/Pacific Islander registrants are confirmed "NO" DDS registrants while 4.22% of Black registrants are listed as missing a DDS number associated with their record.

88.   Comparing across groups, Black registered voters were over four times as likely to have no DDS number associated with their voter registration record as Whites. Hispanic and Asian American/Pacific Islander registrants were over twice as likely to have no DDS number associated with their voter registration record as Whites. Differences in missing DDS status cannot fully account for these disparities, and suggest that increased reliance on a DDS number, as mandated by SB202, will have a disproportionate impact on Black, Hispanic, and Asian American/Pacific Islander registered voters in Georgia.

89.   Indeed, we see corroborating evidence that the DDS number mandate is a barrier disproportionately impacting Black and

Hispanic would-be absentee-by-mail applicants. **Table 4** indicates Black and Hispanic absentee-by-mail applicants in November 2020 and January 2021 were less likely to use the online portal (which also required a DDS number at the time)[32] to request their absentee-by-mail ballots.

90.    In **Table 6** I provide the count of registrants eligible to vote in Georgia as of November 8, 2022 who are marked as not having a DDS number associated with their registration record.[33] Again, these individuals face increased barriers to voting in Georgia as a result of SB202's provisions that prioritize a DDS number as the primary means of requesting an absentee-by-mail ballot.

---

[32]https://www.gpb.org/news/2020/08/28/heres-how-request-georgia-absentee-ballot-using-the-online-portal.

[33]The State's process for linking DDS numbers to registration records is not clear. A small number of Georgians without a listed DDS number registered to vote online (where a DDS number is required) or at a DDS office. It is likely that nearly all of these individuals have a DDS number. Therefore, in Table 7 I subtract these persons in the column titled "No DDS # or Registration."

39

|  | No DDS Number | No DDS # or Registration |
|---|---|---|
| **Total** | 171,691 | 161,603 |
| **White** | 39,841 | 36,364 |
| **Black** | 105,818 | 100,412 |
| **Hispanic** | 6,645 | 6,284 |
| **Asian/PI** | 4,505 | 4,236 |

**Table 6: Number of registrants lacking Georgia Department of Driver Services (DDS) number by Self-Reported Race/Ethnicity, November 2022.** Numbers indicate the number of registered voters who are marked as not having a DDS number linked to their registration record as of November 8, 2022. "No DDS # or Registration" excludes individuals who are recorded as registering to vote online or at a DDS office. The race/ethnicity of voters is based on self-reports in the voter registration file.

91. **Table 6** translates **Table 5** into counts of registrants as of November 2022 without a DDS number in their registration. The number of Black registrants without an DDS number is over two and a half times more than the White registrants with a difference of 65,977 registrants. Using the figures from the first column of **Table 6**, 61.6% of registrants marked as not having a DDS number are Black while 23.2% are White.

92. This pattern continues in the second column even after removing individuals who are marked as not having a DDS number, but are listed as having registered to vote at a DDS branch or online. Even with this lower bound estimate, the size of the Black registered voter population in Georgia that does not have a DDS number is two and a half times larger than the number of White registrants without a DDS number. While smaller numbers of Hispanic and

40

Asian American/Pacific Islander registrants lack a DDS number, this is primarily due to the smaller size of these populations overall as **Table 5** demonstrates there would be half as many Hispanic and Asian American/Pacific Islander registrants without a DDS number if their rate of not having a DDS number was equal to that of White Georgians.

**X.    Black and Hispanic applicants for absentee-by-mail ballots were consistently more likely to have their applications rejected for being "too late" under SB202, relative to other reasons and relative to White applicants.**

93.    Sections VI and VII of this report indicate that Black, Hispanic, and Asian American/Pacific Islander Georgians were more likely to vote by mail and apply to vote by mail than White Georgians immediately prior to the enactment of SB202. After SB202, vote by mail rates and vote by mail application rates declined for all groups but declined more sharply for Black, Hispanic, and Asian American/Pacific Islander Georgians than for White Georgians.

94.    Beyond prioritizing DDS number-based methods of applying for an absentee-by-mail ballot, SB202 made other modifications to the absentee-by-mail ballot application process that may have contributed to the disproportionate decline in absentee-by-mail applications and voting by Black, Hispanic, and Asian American/Pacific Islander Georgians. In this section, I examine provisions that created a mandatory deadline for absentee-by-mail ballot applications.

95.    SB202 revised Georgia Code Section 21-2-381 to add a cutoff date for "timely" receipt of an application to vote absentee-by mail.

41

Specifically, the code was modified to state that "not earlier than 78 days or less than 11 days prior to the date of the primary or election, or runoff of either, in which the elector desires to vote, any absentee elector may make…an application for an official ballot." This is further clarified in the same subsection where SB202 added language stating 'To be timely received, an application for an absentee-by-mail ballot shall be received by the board of registrars or absentee ballot clerk no later than 11 days prior to the primary, election, or runoff."[34]

96.    SB202 also added language indicating that absentee-by-mail applications received later than the new 11 days prior to election day requirement must be rejected. Specifically, SB202 added language indicating that "if the application is not timely received," the application for an absentee-by-mail ballot shall be rejected.[35]

97.    The public Georgia Absentee File contains information about the reason an absentee-by-mail application was rejected. As in preceding sections, I rely on lists of voters who applied to vote absentee in each election as made public in in "Voter Absentee Files" by the Secretary of State's office[36] and isolate records with a "Ballot Style" of "MAILED." I then subset those records to those

---

[34]SB202, as passed (Enrolled version), p. 38 lines 928-936.

[35]SB202, as passed (Enrolled version), p. 43, lines 1083-1084. As noted in Paragraph 3 of this section, "timely" receipt of an application also entails receipt 78 days *or later* prior to an election. However, my understanding is that individuals requesting absentee-by-mail ballots prior to the application window are not consistently recorded by county officials. Therefore, I focus on documented rejections due to the late cutoff date in this section, where information gathered from counties during the discovery process indicates that overall the Absentee File either accurately reflects actual rejections, or provides a lower bound estimate of such rejections.

[36]https://elections.sos.ga.gov/Elections/voterabsenteefile.do.

who have an "Application Status" of "[R]ejected." I understand this to be the population of individuals who applied for an absentee-by-mail ballot, but had their application processed in a formal manner by county officials and then had their application rejected. 19,571 applications to vote absentee-by-mail have an "Application Status" of "[R]ejected."

98. The public Absentee File contains a column titled "Status Reason." This column has unstandardized text indicating why an absentee-by-mail application was rejected. In the five elections examined in this report, there were a total of 859 unique text descriptions given for why an absentee-by-mail application was rejected. To determine which ballots were listed as rejected for arriving late, I read the text of the "Status Reason" column for each rejected absentee-by-mail application and flagged entries indicating the application was received "too late to process," "too late," "after deadline," or other language indicating that late receipt of the application was the reason for rejection (collectively, an application received "too late").

99. **Table 7** shows the percent of the 19,571 rejected absentee-by-mail applications where the "Status Reason" for rejection indicated the application was received "too late," by election and race/ethnicity of the applicant.

43

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | Nov 2018 | Nov 2020 | Jan 2021 | Nov 2022 | Dec 2022 |
| **Total** | 4.4% | 9.5% | 9.5% | 25.9% | 30.6% |
| **White** | 4.5% | 7.8% | 14.5% | 24.2% | 26.7% |
| **Black** | 5.6% | 11.0% | 6.0% | 28.5% | 38.4% |
| **Hispanic** | 2.4% | 17.0% | 16.2% | 32.1% | 36.8% |
| **Asian/PI** | 0 | 5.5% | 6.5% | 17.5% | 23.7% |

**Table 7: Percent of rejected absentee-by-mail ballot applications rejected due to arriving "Too Late," by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2022.** Percentages indicate the percent of rejected absentee-by-mail applications whose "Status Reason" for rejection indicated the application was received too close to the election date. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

100. **Table 7** indicates that in elections post-SB202, applicants for absentee-by-mail ballots were far more likely to have their ballots rejected due to the application being late. This is true across racial/ethnic groups. However, the largest increase relative to pre-SB202 rates is observed for Black, Hispanic, and Asian American/Pacific Islander applicants.

101. December 2022 was the election with the highest rates of "too late" rejection with a total rate of 30.6%. While comparable in terms of the total number of absentee-by-mail ballots cast, November 2018 had the lowest rate of "too late" ballots with a total rate of 4.4%. Additionally, even the lower of the two post-SB202 rates (25.9%, from the November 2022 election) is still almost three times higher

44

than the highest pre-SB202 total rate of 9.5% (from November 2020 and January 2021).

102.    For the post-SB202 elections, Hispanic applicants for absentee-by-mail ballots had the highest "too late" rejection rates at 31.1% for November 2022 election and Black applicants had the highest rate at 38.4% for the December 2022 election. Applications submitted by Asian American/Pacific Islanders were rejected for arriving too late at the lowest rate in both years at 17.5% and 23.7%, though relative to the pre-SB202 rates Asian American/Pacific Islander applicants had their rate of rejection more than double (November 2022) and triple (December 2022).

103.    Of note, when examining the difference between rates of absentee-by-mail applications submitted "Too Late" in the January 2021 runoff relative to the November 2020 general, we see declining rates of rejection for being "too late" among Black and Hispanic applicants, but an increase for White applicants. However, post-SB202, we see that the rate of applications rejected for being "Too Late" increases much more for Black applicants than for White applicants when going from the 2022 general to the 2022 runoff. This reversal of the pre-SB202 trend is notable, and indicates that the earlier cutoff date for absentee-by-mail applications introduced in SB202 has a disproportionate, negative impact on Black and Hispanic applicants.

**XI.** **Black, Hispanic, and Asian American/Pacific Islander Absentee-by-mail applicants would have been disproportionately impacted by SB202 provisions shortening the window in which voters can request ballots in counterfactual pre-SB202 elections.**

104.  Beyond examining absentee ballot applications that were listed as rejected in official records, we can also examine how many absentee-by-mail applications would have been rejected pre-SB202 if the SB202 limits on when applications could be submitted were in force.

105.  The public Absentee File also contains a column titled "Application Date." This column is populated with a year, month, and day. My understanding is that this is the date an application to vote absentee was received; in the case of absentee-by-mail applications, this was the date an application to vote absentee-by-mail was received by the board of registrars or absentee ballot clerk in the applicant's county.[37]

106.  To do this, I examined the number of applications to vote absentee-by-mail submitted during the original period where applications could be accepted, and then the counterfactual period where applications would have been accepted under the timeframe permitted by SB202. **Table 8** shows the original window and total number of days available for Georgians to submit absentee-by-mail applications, and the counterfactual window and number of days that would have been available if SB202 had been in effect for these elections.

---

[37]This information was confirmed by plaintiffs in "Responses and Objections to Frist Interrogatories 09 02 2022," p. 4: "Application Date: The date an application is received by a county."

| | Nov 2018 | | Nov 2020 | | Jan 2021 | |
|---|---|---|---|---|---|---|
| | *Original* | *SB202* | *Original* | *SB202* | *Original* | *SB202* |
| **Early Deadline** | 05/10/18 | 08/21/18 | 05/07/20 | 08/18/20 | 07/09/20* | 10/20/20* |
| **Late Deadline** | 11/02/18 | 10/26/18 | 10/30/20 | 10/23/20 | 01/01/20 | 12/25/20 |
| **Total Days** | 177 | 67 | 177 | 67 | 177 | 67 |

**Table 8: Absentee application cutoff dates for pre-SB202 elections, original dates, and dates under SB202 rules.** Note that for the January 2021 runoff election, the original and SB202-mandated early deadlines are hypothetical as the runoff election had not been ordered by either date and the runoff election would have been held in December 2020 under the provisions of SB202.

107. **Table 8** illustrates how the SB202 laws have dramatically shortened the time period individuals can apply for an absentee ballot. Under policies in place immediately prior to SB202, potential voters had 177 days to submit their applications. Under SB202, voters had 67 days to do so. In total, this is a 110 day decrease in the available dates in which voters can apply to vote absentee-by-mail in Georgia.

|  | Nov 2018 | Nov 2020 | Jan 2021 |
|---|---|---|---|
| **Total** | 8.1% | 1.8% | 1.5% |
| **White** | 8.6% | 1.4% | 1.2% |
| **Black** | 7.8% | 2.2% | 1.8% |
| **Hispanic** | 6.8% | 2.9% | 2.5% |
| **Asian/PI** | 6.6% | 2.4% | 1.9% |

**Table 9: Percent of absentee-by-mail ballot applications that would have missed SB202 late receipt deadline by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2021.** The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

108. Using the original and counterfactual application dates from **Table 8** and data on when voters applied for their ballots, **Table 9** shows the percentage of applicants whose absentee-by-mail ballot applications would have missed the late receipt deadline broken down by racial/ethnic group. Overall, the shortened period to request an absentee-by-mail ballot under SB202 would have resulted in 8.1% of applicants for the November 2018 election, 1.8% for the November 2020 election, and 1.5% for the January 2021 election having their absentee-by-mail applications rejected for being "too late."

109. In the November 2020 and subsequent January 2021 runoff, White applicants had rates of missing the late receipt deadline lower than Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail applicants. In fact, Hispanic applicants were more than twice as likely to apply for absentee-by-mail ballots after the counterfactual SB202 deadline as White applicants.

Additionally, while not as high as the Hispanic rates, the percent of absentee-by-mail ballot applications by Black Georgians that would have been rejected for late receipt are higher for these two elections than White Georgians.

|            | Nov 2018 | Nov 2020 | Jan 2021 |
|------------|----------|----------|----------|
| **Total**      | 22,778   | 30,706   | 19,498   |
| **White**      | 11,115   | 12,697   | 8,349    |
| **Black**      | 8,999    | 12,664   | 8,176    |
| **Hispanic**   | 627      | 1,529    | 819      |
| **Asian/PI**   | 822      | 1,721    | 930      |

**Table 10: Number of absentee-by-mail ballot applications that would have missed SB202 late receipt deadline by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2021.** The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

110. **Table 10** uses the same methodology as **Table 9**, but shows total counts and counts by race/ethnicity instead of percentages. We see that the number of absentee-by-mail applications that would have missed the SB202 late receipt deadline in 2018, 2020, and 2021 and that were submitted by Black, Hispanic, and Asian American/Pacific Islander applicants (combined) exceeds the number of SB202-mandated deadline late applications for White applicants in 2020 and 2021. This is despite White applicants making up a majority of the Georgia CVAP, registered voter population, actual voting population, absentee-by-mail voting population, and absentee applicant populations.

49

111. In total, the new shorter period to apply as instated by SB202 would have missed 22,778 applicants for the November 2018 election, 30,706 for the November 2020 election, and 19,498 for the January 2021 election.

112. Of those who would have missed the deadline in the two pre-SB202 elections, White and Black applicants make up a majority of individuals at 12,697 and 12,664, respectively, for November 2020 along with 8,349 and 8,176 for the 2021 runoff. Counts were also similar for the Hispanic and Asian American/Pacific Islander voters at 1,529 and 1,721, respectively, for November 2020 plus 819 and 930 for the January 2021 election.

113. My evaluation of the above statistics is that provisions of SB202 that move up the late deadline for receipt of absentee-by-mail applications disproportionately impact racial/ethnic minority voters. Had SB202 been in force for elections that took place immediately prior to implementation of SB202, tens of thousands of applicants would have had their applications rejected due to late receipt, a disproportionate share of whom would have been Black, Hispanic, or Asian American/Pacific Islander.

XII. **Black, Hispanic, and Asian American/Pacific Islander voters were more likely to have absentee-by-mail ballots rejected due to requirements added or modified in SB202 as compared to white voters.**

114. SB202 also added provisions to Georgia Code Section 21 related to submission and receipt of absentee-by-mail ballots, in addition to the aforementioned absentee-by-mail applications. Specifically, SB202 added provisions increasing the amount of information a

voter had to submit along with their absentee ballot. Prior to SB202, voters had to sign the back of the ballot envelope and print their name. These requirements were retained, but added requirements include:

i. A voter must "print the number of his or her Georgia driver's license or identification card" or "mark to affirm that he or she does not have a Georgia driver's license or identification card."[38]

ii. If the voter does not have a Georgia driver's license or identification card, the voter must "print the last four digits of his or her social security number."[39]

iii. The voter must also "print his or her date of birth."[40]

115. In addition, the amount of time between receipt of an absentee-by-mail ballot by a voter and the deadline for submitting the absentee-by-mail ballot has been shortened as SB202 reduces the *earliest* possible date ballots can be sent to voters from 49 days prior to an election to 29 days prior to an election.[41]

116. As noted in Section VI, Paragraph 53, Georgia absentee data associated with each election has a column indicating "Ballot Status." This field can take a value of "A," "C," "R," "S," or can be blank. My understanding is that "A" indicates ballots that were accepted and "R" indicates ballots that were rejected. Blank values

---

[38]SB202, as passed (Enrolled version), p. 51 lines 1295-1298.
[39]SB202, as passed (Enrolled version), p. 51 lines 1299-1300. Voters without a Social Security Number may include a copy of alternative identifying documents inside of the ballot envelope.
[40]SB202, as passed (Enrolled version), p. 51 line 1299.
[41]SB202, as passed (Enrolled version), p. 49 lines 1233-1234.

appear to be present for individuals whose absentee ballot application was not accepted.

117. Ballots that were rejected have additional text in the "Status Reason" field. This text appears to indicate the reason why the ballot was rejected. 203 unique values are present in the "Status Reason" field for voters whose ballots were rejected in the November 2018 election. However, the "Status Reason" values appear to have been standardized by the November 2020 election, as there are only five unique values in the 'Status Reason" field for voters whose ballots were rejected in the November 2020 and January 2021 elections, and seven unique values in the "Status Reason" field for voters whose ballots were rejected in the November 2022 and December 2022 elections.

118. **Table 11** provides a summary of values in the "Status Reason" field by election for absentee-by-mail voters whose ballots were rejected. For 2018, I reviewed the unique "Status Reason" codes and attempted to group the values into the same categories as were standardized by the November 2020 election.[42]

---

[42]As a large number of ballots were rejected for reasons related to incomplete or incorrect information related to the "Oath," with no additional information about the rejection reason provided, I list this total as a separate category for the 2018 election. However, inconsistencies in recording the specific reasons why ballots were rejected may have led to ballots that would have been rejected for "Oath" issues in one county ultimately being recorded differently, and then "cured," in another county (see https://www.washingtonpost.com/business/2018/11/16/signature-mismatches-missing-birthdays-errant-spouses-why-thousands-absentee-ballots-were-tossed-out-georgia/). A substantial share of these ballots may have been improvidently rejected as well, see, e.g., *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018); *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1300 (N.D. Ga. 2018).

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Ballot Received after Deadline** | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% |
| **Incorrect ID Information** | 0.12% | 0 | 0 | 0.11% | 0.16% |
| **Ineligible Elector** | 0.01% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Invalid Signature** | 0.10% | 0.05% | 0.15% | 0.02% | 0.03% |
| **MIDR - ID not Provided** | 0.01% | 0.00% | 0.00% | 0.01% | 0.00% |
| **Missing ID Information** | 0.09% | 0 | 0 | 0.34% | 0.51% |
| **Missing Signature** | 0.08% | 0.10% | 0.11% | 0.05% | 0.07% |
| **Oath Incomplete or Incorrect** | 1.32% | 0 | 0 | 0 | 0 |
| **Unclassified** | 0.17% | 0 | 0 | 0 | 0 |

**Table 11: Percent of Absentee-by-Mail voters whose ballots were rejected by reason for rejection, 2018-2022.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected for the reason listed. Values of "0" indicate no records, while "0.00%" indicates percentages smaller than one-hundredth of one percent (0.01%).

119. As shown in **Table 11**, the percentage of ballots rejected because they were received after the deadline saw its highest percentage post SB202 at 1.66% for the December 2022 runoff election. The January 2021 runoff, which took place before SB202 shortened the time period between general election and runoff, had a 'ballot received after deadline' rejection rate of 0.30%. This means the December 2022 runoff post-SB202 had a 'ballot received after deadline' rejection rate over five times greater than the previous runoff election rate pre-SB202. For the other statewide elections,

rates pre- and post-SB202 varied, with the "Ballot Received after Deadline" rejection rate being 1.57% in November 2018 and November 2020 which was pre-SB202, and 0.84% in November 2022 which was post-SB202.

120. Absentee-by-mail ballots were not rejected for incorrect ID information during the pre-SB202 elections in November 2020 and January 2021. Prior to that, 0.12% were rejected for that reason in November 2018. In the two post-SB202 elections, both saw rates of mail ballots rejected for incorrect ID information with November 2022 at 0.11% and December 2022 at 0.16%.

121. Those whose absentee-by-mail ballots were rejected due to being an 'ineligible elector' was very small in elections both pre- and post-SB202. In November 2018, it was 0.01% while November 2020, January 2021, November 2022, and December 2022 all had rates under 0.01%

122. **Table 11** shows that the highest rate of mail ballots being rejected for an invalid signature occurred in the January 2021 runoff election at a rate of 0.15%. This was a pre-SB202 rate along with November 2018 at a rate of 0.10% rejected for invalid signatures and 0.05% in November 2020. Following the enactment of SB202, the invalid signature ballot rejection rate was 0.02% for November 2022 and 0.03% for December 2022.

123. In the five elections listed in the table, the incidence of mail ballots being rejected due to ID not being provided was 0.01% less in each election. Pre-SB202, the rate was 0.01% in 2018 and less than that in November 2020 and January 2021. Post-SB202 the rate was 0.01% in November 2022 and less than that in December 2022.

124. The percentage of absentee-by-mail ballots rejected for missing ID information is higher post-SB202. Before the bill's enactment, the rate was 0.09% in November 2018 and zero in November 2020 and January 2021. However, following SB202 becoming law, the rate increased to 0.34% in November 2022 and even higher to 0.51% in December 2022.

125. Conversely, there was a slight decrease following the signing of SB202 into law when it came to absentee-by-mail ballots being rejected for missing signatures. Pre-SB202 the rates were 0.08% in November 2018, 0.10% in November 2020, and 0.11% in January 2021. These rates lowered slightly in November 2022 to 0.05% and in December 2022 to 0.07%.

126. After the statewide 2018 election, absentee-by-mail ballots changed and so did the tracking of the reasons for rejection.[43] Therefore, in November 2018, 1.32% were rejected for incomplete or incorrect oath section and 0.17% were unclassified while all other years both pre- and post-SB202 were zero.

127. **Table 12** combines the above reasons for absentee-by-mail ballot rejection, showing the population of mail voters who had their ballots rejected for any reason overall and by self-reported race/ethnicity.

---

[43]See Footnote to Paragraphs 118 and 129 in this section for the legal context regarding absentee-by-mail ballot acceptances in the 2018 election.

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | Nov 2018 | Nov 2020 | Jan 2021 | Nov 2022 | Dec 2022 |
| **Total** | 3.47% | 0.34% | 0.57% | 1.38% | 2.43% |
| **White** | 2.46% | 0.24% | 0.48% | 1.19% | 2.31% |
| **Black** | 4.34% | 0.45% | 0.65% | 1.43% | 2.14% |
| **Hispanic** | 4.53% | 0.49% | 0.82% | 2.11% | 5.49% |
| **Asian/PI** | 6.49% | 0.57% | 0.84% | 3.05% | 6.04% |

**Table 12: Percent of Absentee-by-Mail voters whose ballots were rejected by Self-Reported Race/Ethnicity, 2018-2022.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

128. SB202 added language instructing the county "registrar or clerk" to "compare the number of the elector's Georgia driver's license number or state identification card…and date of birth entered on the absentee ballot envelope with the same information contained in the elector's voter registration records."

129. **Table 13** below shows that Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters were more likely to have their ballots rejected due to "Incorrect ID Information" or "Missing ID Information" in the November 2018 election.[44]

---

[44]According to a court order after the November 2018 election, voters whose ballots were rejected due to incorrect or missing date of birth information had their ballots reinstated without further action by the voter. Several entries in the absentee file for the November 2018 election continue to indicate voters' ballots were rejected due to incorrect or missing date of birth information. Any voters whose record continues

56

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 0.21% | 0 | 0 | 0.45% | 0.67% |
| **White** | 0.11% | 0 | 0 | 0.36% | 0.64% |
| **Black** | 0.27% | 0 | 0 | 0.59% | 0.73% |
| **Hispanic** | 0.40% | 0 | 0 | 0.41% | 0.77% |
| **Asian/PI** | 0.80% | 0 | 0 | 0.62% | 0.78% |

**Table 13: Percent of Absentee-by-Mail voters whose ballots were rejected due to missing or incorrect ID information by Self-Reported Race/Ethnicity, 2018-2022.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected due to "Missing ID Information" or "Incorrect ID Information." The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

130. During the November 2020 and January 2021 elections, no voters had their ballots rejected due to "Incorrect ID Information" or "Missing ID Information," except a small number of voters who registered to vote by mail and are subject to HAVA requirements to send identification with their absentee ballot.[45]

131. However, provisions of SB202 reinstated a date of birth requirement which was enjoined in 2018 as a result of a court order

to indicate that their ballot was rejected for identification issues, including date of birth issues, are included in this table. See https://www.ajc.com/blog/politics/absentee-ballots-missing-birth-dates-must-counted-judge-orders/BEytww5CRxzsJp1r7tSklM/.

[45]My understanding is that under "Status Reason" these voters have the text "MIDR – ID not Provided." 58 rejected absentee ballots in the November 2020 election have this text (<0.01% of all absentee ballots submitted in the November 2020 election) and 45 rejected absentee ballots in the January 2021 election have this text (<0.01% of all absentee ballots submitted in the January 2021 election).

and added a requirement of providing a Georgia driver's license number, Social Security number, or state identification card on the ballot's outer oath envelope. As **Table 13** indicates, 2,396 individuals had their absentee ballots rejected in the November 2022 or December 2022 elections due to "Incorrect ID Information" or "Missing ID Information."

132. **Table 13** shows that Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters were more likely to have their ballots rejected due to incorrect or missing ID information in the elections after passage of SB202, when in November 2020 and January 2021 no absentee-by-mail ballots were rejected for these reasons.

133. **Table 14** also indicated a sharp increase in the share of absentee-by-mail ballots that were rejected due to arriving after the receipt deadline. Indeed, the highest rate of rejection for a single reason across all of the elections I examined was for late arriving ballots in the December 2022 runoff election (1.66%). While SB202 did not directly address absentee ballot deadlines, it did restrict the availability of drop boxes where absentee ballots could be submitted. It is likely that some voters who submitted their absentee ballots after the deadline would have submitted their ballots via a drop box during the three-day window prior to and including election day when drop boxes were open in 2020 and 2021, but not available after the implementation of SB202. Furthermore, at least one county indicated that they failed to send some absentee-by-mail ballots in a timely manner due in part to

58

"reduced time frames for the receipt of requests for and processing of absentee ballot provided under SB202."[46]

134. **Table 14** indicates that Hispanic and Asian American/Pacific Islander voters continued to be more likely to have their ballot rejected due to receipt after the deadline than white voters after implementation of SB202, with the magnitude of the disparity growing substantially in the first election after implementation of SB202 (November 2022), and then growing even more in the most recent post-SB202 election (December 2022).

|  | Pre-SB202 | | | Post-SB202 | |
|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** |
| **Total** | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% |
| **White** | 1.50% | 0.16% | 0.26% | 0.77% | 1.58% |
| **Black** | 1.56% | 0.20% | 0.31% | 0.70% | 1.27% |
| **Hispanic** | 1.89% | 0.26% | 0.51% | 1.60% | 4.41% |
| **Asian/PI** | 1.99% | 0.25% | 0.55% | 2.32% | 5.20% |

**Table 14: Percent of Absentee-by-Mail voters whose ballots were rejected due to receipt after the deadline by Self-Reported Race/Ethnicity, 2018-2022.** Values indicate the percent of all absentee ballots with a status of "A" or "R" that were rejected due to "Ballot Received after Deadline." The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

135. Taken together, the analyses of absentee ballot rejection rates and reasons for rejection point to substantial racial disparities in ballot rejection rates after SB202 went into effect. These disparities are

---

[46]https://www.cobbcounty.org/communications/news/investigation-discovers-more-1000-absentee-ballots-never-sent-mail.

particularly noticeable for rejection reasons associated with SB202 mandates related to identification requirements and ballot receipt deadlines.

## XIII. **Black, Hispanic, and Asian American/Pacific Islander Georgians were more likely to experience a decrease in the number of drop boxes available than White Georgians.**

136. SB202 added provisions to the Georgia Code Section 26 related to the establishment of absentee-by-mail ballot drop boxes. The Georgia State Election Board adopted a rule titled "Secure Absentee Ballot Drop Boxes" at their April 15, 2020 meeting, noting that "For the Elections held on June 9, 2020, County registrars are authorized to establish one or more drop box locations as a means for absentee by mail electors to deliver their ballots to the county registrars. Placing a voted absentee ballot into the drop box shall be deemed delivery pursuant to O.C.G.A. § 21-2-385 and is subject to the limitations on who may deliver a ballot on behalf of an elector."[47]

137. The Rule, which was passed unanimously by the Board, also specified that a drop box "shall only be located on county or municipal government property generally accessible to the public…may open beginning 49 days before Election day and shall close at 7:00pm on Election Day…must have adequate lighting and use a video recording device to monitor each drop box location…shall be constructed of a durable material able to withstand vandalism and inclement weather…shall be securely

---

[47]Rules of State Election Board 183-1-14-0.6-.14, "Secure Absentee Ballot Drop Boxes."

fastened to the ground or an immovable fixture" and "shall be clearly labeled 'OFFICIAL ABSENTEE BALLOT DROP BOX.'"[48]

138.  The Rule was repealed and then readopted with similar language in July 2020, stating that the rule would remain in effect for a period of 180 days commencing July 1, 2020.[49] The revised rule also removed specific mention of an election date. The revised rule was reauthorized at the November 23, 2020 meeting of the State Election Board to authorize use for the January 5, 2021 runoff election. In the November 2020 general election, 112 out of 159 counties in Georgia (70%) had drop boxes, as authorized under the rules above.

139.  The public Georgia Absentee File does not record who votes absentee via drop box at an individual level. Individuals voting via drop box are combined in the absentee file with individuals returning their ballot via postal mail, as both groups have a "Ballot Style" of "MAILED." However, media reports indicate "more than 555,000 Georgians used nearly 300 boxes across 112 counties" in 2020.[50] Using the publicly available data compiled by Georgia Public Broadcasting, we see that approximately half of the absentee-by-mail ballots cast in the November 2020 election were cast via drop box.

140.  In Section 2 of the enrolled version of SB202, bill authors indicate their motivations for specific provisions of the legislation. Section

---

[48]Ibid.

[49]Administrative History of Chapter 183-1 – GEORGIA ELECTION CODE. The revised rule is Rule 183-1-14-0.8-.14.

[50]https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-the-2020-presidential-election.

61

2 mentions drop boxes in one section, stating "Opportunities for delivering absentee ballots to a drop box were first created by the State Election Board as a pandemic response. The drop boxes created by rule no longer existed in Georgia law when the emergency rules that created them expired. The General Assembly considered a variety of options and constructed a system that allows the use of drop boxes, while also ensuring the security of the system and providing options in emergency situations."[51]

141. Notably, state officials responded to an Associated Press survey with no mention of drop boxes being associated with "voter fraud," "stolen ballots," or "incidents in which the boxes or ballots were damaged to the extent that election results would have been affected."[52] Furthermore, the Georgia State Board of Elections "dismissed a handful of complaints about drop boxes, where voters were alleged to each have deposited multiple ballots in a drop box. Investigators determined in each case that voters were legally dropping off ballots for their family members."[53]

142. Unlike the State Election Board rules repeatedly reauthorized during the 2020 election cycle, SB202 specifies the number of drop boxes counties were permitted to have in a new subsection (c) of Georgia Code Section 21-2-382. The section indicates that "A board of registrars or absentee ballot clerk shall establish at least one drop box [and] may establish additional drop boxes subject to the

---

[51]SB202, as passed (Enrolled version), p. 5, lines 113-118.

[52]https://apnews.com/article/voting-rights-2022-midterm-elections-covid-health-wisconsin-c61fa93a12a1a51d6d9f4e0a21fa3b75.

[53]https://www.npr.org/2022/07/27/1112487312/georgia-voting-law-ballot-drop-box-access.

62

limitations of this Code section, but may only establish additional drop boxes totaling the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county."[54]

143. Approximately 296 drop boxes were used in the November 2020 election under the State Election Board Rule. Approximately 189 drop boxes were used in the November 2022 election under the above provisions of SB202.

144. In 2020, 44 counties had 0 drop boxes, while Fulton and DeKalb counties had over two dozen drop boxes each. However, the number of drop boxes post-SB202 was now distributed via a formula based on population. Each county was mandated to have at least one drop box, and counties could have one additional drop box per 100,000 active registrants in the county.

145. In this section of the report I evaluate changes in the availability of drop boxes resulting from SB202's regulation of the number of drop boxes. I use information produced by the State Defendants during discovery  to evaluate the location of each drop box in the November 2022 election, including the county and address of the drop box.[55] My understanding is that this is a list of drop box location information provided to state officials by counties. Therefore, for counties with no drop box information, I searched county websites to determine if they listed drop boxes available for the November 2022 election. These searches provided information not available in the data provided during discovery. For example,

---

[54]SB202, as passed (Enrolled version), p. 47, lines 1172-1178.
[55]The file produced by the State Defendants was "Copy of dropbox locations spreadsheet_Format 9_15.xlsx."

Clayton County website lists that three drop boxes were available in the November 2022 and December 2022 elections, but no Clayton County drop boxes appear in the data provided by plaintiffs.[56] I assumed that counties with no drop box information listed used their early in-person voting location as the location of their drop box, consistent with the requirements of SB202.

146. For 2020, I rely on the aforementioned data posted publicly by the Georgia Public Broadcasting network, which is also based on drop box ballot transfer forms filed by county officials.[57]

147. I combine this county-level information on drop box availability in the November 2020 and November 2022 data with combined voter registration data used in other analyses in this report, including self-reported race/ethnicity for each registrant.

148. **Table 15** shows the percent of registered voters who saw an increase, no change, or a decrease in the number of drop boxes available in their county between the November 2020 and November 2022 elections.

---

[56]https://www.claytoncountyga.gov/news/two-newly-added-early-advance-voting-locations/; https://www.claytoncountyga.gov/news/december-6-2022-general-election-runoff/.

[57]https://www.gpb.org/news/2022/09/02/see-where-georgians-used-drop-boxes-in-the-2020-presidential-election.

|          | Increase | No Change | Decrease |
|----------|----------|-----------|----------|
| **Total**    | 11.0% | 26.3% | 62.7% |
| **White**    | 12.2% | 34.1% | 53.7% |
| **Black**    | 10.0% | 15.2% | 74.8% |
| **Hispanic** | 7.0%  | 25.1% | 67.9% |
| **Asian/PI** | 5.1%  | 18.3% | 76.6% |

**Table 15: Percent of Registered Voters with an Increase, No Change, or Decrease in the number of Drop Boxes in their county for November 2022 relative to November 2020, by Self-Reported Race/Ethnicity.** The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

149. As **Table 15** shows, nearly 2/3 of Georgians saw a reduction in the number of drop boxes available in their county in the first major statewide election after implementation of SB202 (November 2022), relative to November 2020. Only 11% saw an increase overall, and 26% saw no change in their available drop boxes. However, the share seeing an increase in drop boxes was higher for White registered voters (12.2%) and lower for Black (10.0%), Hispanic (7.0%) and Asian American/Pacific Islander registered voters (5.1%).

150. Indeed, despite facially dispersing drop boxes to every Georgia county, SB202 meaningfully decreased the number of allowable drop boxes for most Georgians (62.7%). The decreases were even larger for Black Georgians (74.8%), who were over 20 percentage points more likely to have a decrease in the number of drop boxes they could use relative to White registered Georgians (53.8%).

65

34.0% of White registrants saw no change in the number of drop boxes available in their county, while only 15.2% of Black voters, 25.0% of Hispanic voters, and 18.2% of Asian American/Pacific Islander voters can say the same.

151. The above data may also be accompanied by the conclusion of an analysis by Georgia Public Broadcasting (GPB), indicating that drop boxes were disproportionately likely to be reduced in "places that used them the most."[58]

152. Furthermore, SB202 modified the availability of drop boxes in terms of their accessibility and opening hours. Under the original rule adopted in April 2020, drop boxes "shall only be located on county or municipal government property generally accessible to the public…[and] may open beginning 49 days before Election Day and shall close at 7:00pm on Election Day," such that drop boxes would be open 24 hours a day from opening until 7:00pm on Election Day. Subsequent renewals of this rule used the same language. However, SB202 instead mandated that drop boxes "shall be established at the office of the board of registrars or absentee ballot clerk or inside locations at which advance voting…is conducted in the applicable primary, election, or runoff and may be open during the hours of advance voting at that location. Such drop boxes shall be closed when advance voting is not being conducted at the location. All drop boxes shall be closed when the advance voting period ends. . . ."[59]

---

[58]https://www.npr.org/2022/07/27/1112487312/georgia-voting-law-ballot-drop-box-access.
[59]SB202, as passed (Enrolled version), p. 47, lines 1179-1185.

66

153. Thus, with the exception of Georgians who had a drop box available to them for the first time (nearly all of the individuals listed under the column "Increase" in **Table 15**), SB202 limited not only the number of drop boxes Georgians could use, but eliminated 24-hour access to said boxes, access on Saturdays and Sundays without early in-person voting, moved drop boxes inside of early voting locations, and eliminated the possibility of submitting a ballot via drop box on Election Day or on the Saturday, Sunday, and Monday immediately preceding Election Day.

## XIV. Increases in distance from drop boxes after SB202 were greater for Black, Hispanic, and Asian American/Pacific Islander registrants than for Whites.

154. Extant evidence indicates that individuals are more likely to use a drop box near their place of residence.[60]  Therefore, beyond simply reducing the number of drop boxes available in a county, SB202's provisions may have increased the distance Georgians had to travel in order to use a drop box as well. This imposes additional burdens on voters, particularly voters with lower levels of socioeconomic resources.

155. To determine the distance between registered voters and available drop boxes in their county, I geocoded every registered voter in the combined Georgia voter registration data used throughout this report. I determined a latitude and longitude for their registration address using a U.S. Census Bureau Application Programming

---

[60]Collingwood, Loren, Benjamin Gonzalez O'Brien. (2022) "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research.* 49 (6): 604-617.

Interface (API)[61] and calculated the straight-line distance between this address and all drop boxes in the county for 2020 and 2022, based on the geocoding of early-in person voting locations provided by counsel where drop boxes were located, data from the public Georgia Public Broadcasting (GPB) analysis, and searches in Google Maps for the latitude and longitude of various addresses.

156. Based on the above data, the average (mean) distance between a registered voter eligible to vote as of November 8, 2022 and the closest drop box within their county increased from 3.415 miles in the major statewide election prior to the enactment of SB202 (November 2020) to 4.802 miles in the major statewide election following enactment of SB202 (November 2022). This is an increase of 1.387 miles, or 2.774 miles in round-trip distance.

157. In 2022, the statewide average distance to the closest drop box was 4.8 miles, implying a round trip distance of nearly 10 miles. **Table 16** shows that the share of voters who lived within the post-SB202 statewide average of 4.8 miles from the closest drop box in their county declined from 2020 to 2022. Over two-thirds of registrants lived 4.8 miles or closer to a drop box open for the November 2020 election, but that number dropped by 14.7% after the enactment of SB202.[62]

---

[61]https://geocoding.geo.census.gov/geocoder/.

[62]The overall percentage living within 4.8 miles of a drop box is not precisely 50% because 4.802 is the arithmetic mean distance to the nearest drop box, not the median distance to a drop box for registrants. Use of the median distance to construct a statewide average would skew conclusions as not all counties are the same size (in terms of population or geographic area) and voters must use drop boxes within their county.

|  | Drop Box within 4.8mi (Pre-SB202) | Drop Box within 4.8mi (Post-SB202) | % Change Pre-Post SB202 |
|---|---|---|---|
| **Total** | 66.8% | 57.0% | -14.7% |
| **White** | 57.1% | 50.0% | -12.4% |
| **Black** | 80.0% | 66.8% | -16.5% |
| **Hispanic** | 75.6% | 63.9% | -15.5% |
| **Asian/PI** | 78.2% | 61.7% | -21.1% |

**Table 16: Percent of Registrants within 4.8 miles of an absentee-by-mail drop box pre-SB202 (November 2020) and post-SB202 (November 2022), by Self-Reported Race/Ethnicity.** Percentages indicate the number of registered voters whose registration address is within 4.8 miles of a drop box in the same county, among registrants registered to vote as of November 8, 2022. "% Change Pre-Post SB202" is the percentage point decline divided by the pre-SB202 percentage. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

158. A reduction in the number of drop boxes, if not having a disparate impact on certain racial/ethnic groups, would imply that all Georgians with drop boxes in both years saw a similar shift in their distance to drop boxes. However, **Table 16** shows that this is not the case. The percent of registrants who are further than the statewide average from a drop box than they were pre-SB202 was larger for Black, Hispanic, and Asian American/Pacific Islander registrants than for White registrants.

159. Breaking these changes down by race, there is a clear dichotomy between White and non-White voters regarding the percent of registrants with an above average versus below average distance from a drop box. Only 12.4% of White registrants who lived 4.8

miles or closer to a drop box in 2020 now live further than 4.8 miles from their county's closest drop box. The share of Black registrants shifting from being relatively near a drop box to relatively far from a drop box was higher, at 16.5% of Black registrants previously within 4.8 miles of a drop box. Both Hispanic and Asian American/Pacific Islander registrants also saw a decrease in the percentage of voters living within 4.8 miles of a drop box that was greater than the White voter population; 15.5% for Hispanic registrants and a decrease of 21.1% for Asian American/Pacific Islander registrants, a larger drop than any other racial/ethnic group.

160. 44 counties were listed or could be verified to have had drop boxes in 2022 but not in 2020. For registrants residing in these counties, the presence of any drop box increases the opportunity to vote via drop box, regardless of distance to the drop box. **Table 17** below indicates that if we include these registrants in the 2022 population that is now closer to a drop box, the racial disparities in distance change become even more stark. We see a decline of 6.8% overall in the share of individuals who are within 4.8 miles of a drop box (excluding those who have a drop box for the first time in their county), and on average Black, Hispanic, and Asian American registrants were also burdened by being even further from a drop box post-SB202 relative to pre-SB202. However, the share of White registrants who are within the statewide average drop box distance in 2022 (or have a drop box for the first time in 2022) increased by 0.03%. Therefore, for White Georgians the size of the population that had access to drop boxes for the first time in

2022 offset the White population that lived further from a drop box in 2022. For Black registrants, the post-SB202 distance to a drop box is not mitigated by the availability of a drop box for the first time in November 2022: 12.9% fewer Black registrants are within 4.8 miles of a drop box. 11.6% of Hispanic registrants closer than the statewide average to a drop box are now further away, and 18.1% of Asian American/Pacific Islander registered voters are now further than the statewide average away from a drop box post-SB202.

| | Drop Box within 4.8mi (Pre-SB202) | Drop Box within 4.8mi or New Box (Post-SB202) | % Change Pre-Post SB202 |
|---|---|---|---|
| **Total** | 66.8% | 62.3% | -6.8% |
| **White** | 57.1% | 57.1% | +0.03% |
| **Black** | 80.0% | 69.7% | -12.9% |
| **Hispanic** | 75.6% | 66.9% | -11.6% |
| **Asian/PI** | 78.2% | 64.1% | -18.1% |

**Table 17: Percent of Registrants within 4.8 miles of an absentee-by-mail drop box pre-SB202 (November 2020) and post-SB202 (or having a new drop box for November 2022), by Self-Reported Race/Ethnicity.** Percentages indicate the number of registered voters whose registration address is within 4.8 miles of a drop box in the same county, among registrants registered to vote as of November 8, 2022. "% Change Pre-Post SB202" is the percentage point decline divided by the pre-SB202 percentage. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

161. **Table 18** translates the percentages in **Table 17** into raw numbers of registrants, where we see that the number of persons no longer within 4.8 miles of a drop box (excluding those who had

71

a drop box for the first time in 2022) was entirely Black, Hispanic, and Asian American/Pacific Islander. 259,021 Black registrants ended up above the statewide average distance to a drop box post-SB202, while the number of White registrants closer than average to a drop box (or having a drop box for the first time) <u>grew</u> by 687 persons post-SB202. Over 28,000 Hispanic and nearly 33,000 Asian American/Pacific Islander registrants also found themselves farther than average from a drop box post-SB202.

72

|  | Drop Box within 4.8mi (Pre-SB202) | Drop Box within 4.8mi or New Box (Post-SB202) | Change Pre-Post SB202 |
|---|---|---|---|
| **Total** | 5,297,487 | 4,938,534 | -358,953 |
| **White** | 2,415,447 | 2,416,134 | 687 |
| **Black** | 2,008,259 | 1,749,237 | -259,021 |
| **Hispanic** | 246,925 | 218,325 | -28,600 |
| **Asian/PI** | 181,309 | 148,482 | -32,827 |

**Table 18: Number of Registrants within 4.8 miles of an absentee-by-mail drop box pre-SB202 (November 2020) and post-SB202 (or having a new drop box for November 2022), by Self-Reported Race/Ethnicity.** Numbers indicate the number of registered voters whose registration address is within 4.8 miles of a drop box in the same county, among registrants registered to vote as of November 8, 2022. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

XV. **SB202's mandate of a general runoff election four weeks after the November general election reduces the amount of time voters can register for the runoff election, disproportionately impacting Black, Hispanic, and Asian American/Pacific Islander Georgians.**

162. SB202 says a "runoff shall be held on the twenty-eighth day after the day of holding the preceding general or special primary or general or special election."[63] The bill removes language that says the "runoff shall be held on the Tuesday of the ninth week following such general election,"[64] along with accompanying nine-

---

[63]SB202, as passed (Enrolled version), p. 87, lines 2226-2239.
[64]SB202, as passed (Enrolled version), p. 87, lines 2233-2234.

week post-election dates for runoffs for other types of federal and non-federal general, special, and primary elections.

163. Furthermore, SB202 indicates that "Only the electors who are duly registered to vote and not subsequently deemed disqualified to vote in the runoff for candidates for that particular office shall be entitled to vote therein. . . ."[65]

164. Georgia Code, Section 21-2-224, subsection (a) ("Registration Deadlines") reads as follows:

   i. "If any person whose name is not on the list of registered electors maintained by the Secretary of State under this article desires to vote at any general primary, general election, or presidential preference primary, such person shall make application as provided in this article by the close of business on the fifth Monday or, if such Monday is a legal holiday, by the close of business on the following business day prior to the date of such general primary, general election, or presidential preference primary."

165. A 2017 consent decree clarified that the National Voter Registration Act (NVRA) applies to runoff elections for federal office in Georgia, such that there is a 30 day window prior to the election where voters may register to vote and be eligible to vote in the election.[66] Media reports also indicated to voters that they had a 30 day window to register prior to a runoff election.[67] Yet, with

---

[65]SB202, as passed (Enrolled version), p. 88, lines 2261-2264.
[66]Georgia State Conference of the NAACP, et al. v. State of Georgia (2017), CA No. 1:17 cv 01397 - TCB.
[67]https://www.11alive.com/article/news/verify/runoff-election-register-to-vote-verify/85-44fe726e-e2a6-420e-84ea-fb492654dcb0.

74

the new SB202-mandated 28 day post-general runoff schedule, <u>no</u> prospective runoff voters may initiate a new voter registration application after the runoff election is scheduled.

|  | **Jan 2021** | | **Dec 2022** | |
|---|---|---|---|---|
|  | *Original* | *SB202* | *Original* | *No SB202* |
| **Election Date** | 01/05/21 | 12/01/20 | 12/06/22 | 01/10/23 |
| **Registration Deadline** | 12/07/20 | 11/02/20 | 11/07/22 | 12/12/22 |
| **Days Post-General to Register** | 35 | 0 | 0 | 35 |

**Table 19: Election dates and registration cutoff dates for runoff elections, with and without SB202-mandated runoff schedule.**

166. **Table 19** indicates that in the pre-SB202 January 2021 runoff election, Georgians had 35 days to register to vote between the November general election date and the voter registration deadline. If the January 2021 runoff had been held under the schedule mandated by SB202, none of the voters registering to vote after the November 2020 general election would have been eligible to vote in the runoff.

167. Correspondingly, for the December 2022 runoff election, which was held under the schedule mandated by SB202, no voters who registered to vote after the November 2022 general election were eligible to vote in the runoff. However, under the pre-SB202 schedule registrants who registered in the 35 days between

75

November 8, 2022 and December 12, 2022 would have been eligible to vote in the runoff.

168. To evaluate how many registrants would have had their eligibility to vote in a runoff shift due to the presence or absence of SB202's runoff schedule, I relied on the voter registration list's "REGISTRATION_DATE" column. My understanding is that this value indicates the date a voter applied to register to vote, and is therefore information about the date-based component determining eligibility to vote in a given election.

169. The combined registration list discussed in Section IV, Paragraph 23 of this report forms the basis of my analyses in previous sections. However, the most recent voter registration entries in that file have a date of November 8, 2022. In order to examine the full set of registrants registering to vote between November 7, 2022 (the actual cutoff date for the December 2022 runoff) and December 12, 2022 (the cutoff date for a runoff held using the pre-SB202 calendar used for the 2020 election cycle) I rely on an additional voter registration list with a date of January 6, 2023.[68] This file has 33,124 records with a "REGISTRATION_NUMBER" that does not appear in the combined voter registration list I used earlier in this report, and 24,109 records with a "REGISTRATION_DATE" of November 8, 2022 or later.

170. **Table 20** shows how many individuals registered to vote in 2020 who would have been ineligible to vote in the 2020 runoff under SB202's runoff schedule, broken down by race/ethnicity. **Table 20**

---

[68]This file produced by the State Defendants was "01062023 Georgia_Daily_VoterBase_Confidential-DOJ_PUBLIC_FILE.txt."

also shows how many individuals registered to vote in 2022 and would have been eligible to vote under pre-SB202 rules, but were ineligible due to SB202's restriction. I provide percentages in order to facilitate comparison of the counts across racial/ethnic groups.

| | Jan 2021 SB202 Runoff Ineligible | | Dec 2022 No SB202 Runoff Eligible | |
| --- | --- | --- | --- | --- |
| | **Count** | **Percent** | **Count** | **Percent** |
| **Total** | 107,435 | 100% | 18,278 | 100% |
| **White** | 50,393 | 46.9% | 9,292 | 50.8% |
| **Black** | 37,712 | 35.1% | 3,988 | 21.8% |
| **Hispanic** | 5,585 | 5.2% | 1,764 | 9.7% |
| **Asian/PI** | 4,133 | 3.8% | 638 | 3.5% |

**Table 20: Number and Percent of Registrants whose eligibility to vote shifts with SB202, 2021 and 2022 Runoff Elections, by Self-Reported Race.** Values indicate the number and percent of registrants who would lose eligibility in the January 2021 runoff election under a counterfactual SB202 schedule, or would gain eligibility in the December 2022 runoff under a counterfactual non-SB202 schedule. The racial/ethnic breakdown is based on self-reported race/ethnicity from the voter registration file.

171. Total, 107,435 registrants registered to vote in the period between November 3, 2020 and December 7, 2020 (inclusive of start and end dates for this period). 18,278 registrants registered to vote in the period between November 8, 2022 and December 12, 2022 (inclusive).

172. For both the January 2021 runoff counterfactual ineligible registrant population, and the December 2022 runoff counterfactual eligible registrant population, Black, Hispanic, and Asian American/Pacific Islanders make up a larger share of

77

registrants than they do of Georgia's CVAP or registered voter population.

173. In the latter case, it is important to note that this is likely a large underestimate of the number of individuals who would have been eligible to vote if the registration period was governed by pre-SB202 regulations. Individuals and organizations had no incentive to conduct, e.g., voter registration drives after the November 2022 general election for the explicit purpose of encouraging participation in the December 2022 election; these new registrants would not have been eligible to vote. However, despite this caveat we see that a disproportionate share of these voters ineligible due to SB202's runoff schedule were Black, Hispanic, or Asian American/Pacific Islander.

## XVI. <u>Over 1.6 million registered voters in Georgia face increased barriers to voting as a result of SB202.</u>

174. As a final step, I combine analyses in this report to provide an estimate of the number of individuals eligible to vote as of November 8, 2022 who face increased barriers to voting as a result of provisions of SB202 outlined in this report. The components of the calculation are as follows:

   i. Registrants under 65 years of age who did not use the online portal to request their absentee-by-mail ballot for the January 2021 runoff.

   ii. Registrants who are confirmed not to have a DDS number associated with their registration record, and did not register to vote online or at a DDS office.

    **iii.** Registrants whose absentee-by-mail applications would have been "too late" in the November 2020 election under the SB202-mandated absentee-by-mail application window.

    **iv.** Registrants who had a drop box available in their county in the November 2020 election, but had the distance to a drop box increase beyond the statewide 2022 average of 4.8 miles for the November 2022 election.

    **v.** Registrants who were eligible to vote in the January 2021 federal runoff election, but registered during the period that would not have allowed these voters to be eligible to vote in the January 2021 runoff under provisions of SB202.

175. **Table 21** provides my estimates. When calculating the TOTAL row, which is my estimated overall number of registrants facing increased barriers, I only count each individual once even when they face multiple, overlapping increased barriers to voting under the provisions of SB202.

| | Total | White | Black | Hispanic | Asian/PI |
|---|---|---|---|---|---|
| **No Online Absentee Request** | 383,882 | 144,626 | 184,801 | 15,179 | 15,215 |
| **No DDS Number** | 161,603 | 36,364 | 100,412 | 6,284 | 4,236 |
| **Late Absentee Application** | 29,507 | 12,028 | 12,234 | 1,513 | 1,694 |
| **Drop Box Distance Increase** | 1,134,665 | 487,948 | 456,156 | 48,399 | 42,813 |
| **Late Runoff Registrant** | 99,256 | 47,488 | 33,954 | 5,272 | 3,931 |
| **TOTAL** | 1,681,564 | 692,127 | 717,368 | 71,565 | 62,512 |
| *# of Registrants* | 7,928,070 | 4,231,169 | 2,509,302 | 326,531 | 231,705 |
| **TOTAL % of Registrants** | 21.2% | 16.4% | 28.6% | 21.9% | 27.0% |

**Table 21: Estimated number of registered voters in Georgia facing increased barriers to voting as a result of provisions of SB202, by Self-Reported Race/Ethnicity.** Only includes individuals registered to vote as of November 8, 2022. Total number of registrants for each racial/ethnic group listed in the row "# of Registrants." "Total % of Registrants" indicates the share of each group's registrants facing increased barriers to voting as a result of provisions of SB202.

176. Starting with the first row, "No Online Absentee Request," we see that 383,882 individuals currently registered to vote (as of November 8, 2022) were under the age of 65 and did not use the online absentee-by-mail ballot request portal emphasized in the wake of SB202. The number of Black registrants (184,801) exceeds the number of White registrants (144,626). Black registrants make up 48.1% of Georgians negatively impacted, despite making up only 31.7% of registrants overall. Asian American/Pacific Islanders

80

also make up 4.0% of Georgians negatively impacted, despite only being 2.9% of registrants overall.

177. The next item, "No DDS Number," shows that 161,603 currently registered Georgians have no DDS number attached to their registration record and did not register to vote at a DDS branch or online. Again, the number of Black registrants (100,412) far exceeds the number of White registrants (36,364). Black Registrants make up 62.1% of Georgians negatively impacted because of this item.

178. "Late Absentee Applications" are the next row in **Table 21.** Here 29,507 Georgians would have had their absentee-by-mail application rejected for being "too late" in November 2020 under SB202 rules. 12,234 (41.5%) of these applicants are Black, and only 12,028 (40.8%) are White. Furthermore, 5.2% of these would-be rejected applicants are Hispanic and 5.7% are Asian American/Pacific Islander, higher than their shares of the registered voter population in Georgia which are 3.1% and 2.9%, respectively.

179. The largest single component of my measure is the 1.1 million Georgians currently registered to vote who had a drop box pre-SB202, but post-SB202 their nearest drop box is further away than the current statewide average distance from a drop box (4.8 miles). This is also a clear result of SB202's provisions: limits on the number of drop boxes in a county meant many Georgians are now further from a drop box than they were in 2020. However, also recall that in **Table 17** we saw the aggregate effect of SB202 provisions was to lower barriers for a slightly larger number of

81

White registrants than the number with barriers increased. I do not account for lowered barriers in this report, but given the prominence of drop box distance as a factor in my calculations it is important to note nonetheless.

180. **Table 21** indicates that 456,156 of the registrants impacted by reduced proximity to drop boxes are Black, and 487,948 are White. Despite a larger raw number of Whites being impacted by this aspect of SB202, the fact that 40% of impacted registrants are Black, 4.3% are Hispanic, and 3.8% are Asian American/Pacific Islander (relative to making up 31.7%, 4.1%, and 2.9% of all Georgia registrants, respectively) indicates a disproportionate impact of restrictions on drop boxes for these populations.

181. The last measure that I quantify in **Table 21** is the number of registrants who would not have been eligible to vote in the January 2021 runoff election with the SB202-mandated runoff timeline. Just under 100,000 Georgians who are currently registered to vote would have been ineligible to vote in the 2021 runoff with SB202. 47,488 of these registrants are White (47.8%), 33,954 are Black (34.2%), 5,272 are Hispanic (5.3%), and 3,931 are Asian American/Pacific Islander (4.0%). Black, Hispanic, and Asian American/Pacific Islander registrants are thus disproportionately impacted by this provision as well.

182. In **Table 21** we see that for some of the categories the number of Black registrants negatively impacted exceeds the number of White registrants negatively impacted, despite the fact that Black registrants are less than one-third of the registered voter population in Georgia. The overall estimates in the final row of

**Table 21** show that the number of Black registrants negatively impacted by SB202 (717,368) is greater than the number of White registrants negatively impacted (692,127). Converting these estimates to percentages, we see that 42.7% of registrants negatively impacted by the provisions of SB202 are Black, while 41.2% are White, 4.3% are Hispanic, and 3.7% are Asian American/Pacific Islander. This indicates a disproportionate, negative impact on Georgia registered voters who are Black, Hispanic, or Asian American/Pacific Islander, relative to White registrants.

## XVII. Conclusion

183. The quantities shown in **Table 21**, and throughout this report, indicates a clear pattern whereby several major provisions of the Election Integrity Act of 2021, also known as Georgia Senate Bill 202 [SB202], have a disproportionate, negative impact on Black registrants, Hispanic registrants, and/or Asian American/Pacific Islander registrants in terms of increased barriers to voting. These impacts manifest when examining data available when the law was passed in 2021, as well as information gleaned from the November 2022 and December 2022 elections. I therefore conclude that SB202's implementation demonstrably increased barriers to voting that Georgians face, with disproportionately strong impacts on Black, Hispanic, and Asian American/Pacific Islander Georgians.

I reserve the right to supplement or revise my opinions and conclusions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

Executed the 27th day of January, 2023 at Atlanta, Georgia

Bernard L. Fraga, Ph.D.