IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> v. <br><br> THE STATE OF GEORGIA, *et al.*, <br><br> Defendants | Civil Action No. 1:21-CV-2575-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br> Plaintiffs <br><br> v. <br><br> BRIAN KEMP; *et al.*, <br><br> Defendants | Civil Action No. 1:21-CV-01284-JPB |
| THE NEW GEORGIA PROJECT, *et al.*, <br><br> Plaintiffs <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.*, | Civil Action No. 1:21-CV-01229-JPB |

Defendants,

REPUBLICAN NATIONAL
COMMITTEE, *et al.*,

          Intervenor-Defendants

GEORGIA STATE CONFERENCE OF
THE NAACP*, et al.*,

          Plaintiffs

          v.

BRAD RAFFENSPERGER, *et al.,*

          Defendants

Civil Action No.
1:21-CV-01259-JPB

ASIAN AMERICANS ADVANCING
JUSTICE—ATLANTA, et al.,

          Plaintiffs,

          v.

BRAD RAFFENSPERGER, in his official
capacity as the Georgia Secretary of State,
et al.,

          Defendants,

REPUBLICAN NATIONAL
COMMITTEE, et al.,

          Intervenor-Defendants.

Civil Action No.
1:21-CV-01333-JPB

THE CONCERNED BLACK CLERGY OF
METROPOLITAN ATLANTA, INC., *et al.*,

Plaintiffs

v.

BRAD RAFFENSPERGER, *et al.,*

Defendants

Civil Action No.
1:21-CV-01728-JPB

**PLAINTIFFS' OPPOSITION TO STATE AND INTERVENOR
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON
DISCRIMINATORY INTENT CLAIMS**

# **Table of Contents**

I.    INTRODUCTION.................................................................................1

II.   CHALLENGED PROVISIONS .........................................................5

    A.  Provisions Affecting Absentee Voting .........................................5

    B.  Provisions Affecting In-person Voting..........................................8

    C.  Other Provisions ...........................................................................9

III.  LEGAL STANDARD ........................................................................10

IV.  ARGUMENT ....................................................................................12

    A.  Intentional Racial Discrimination Violates the Constitution and
        Section 2....................................................................................12

    B.  Historical Background and Sequence of Events Leading up to the 2021
        Legislative Session ....................................................................24

    C.  The Legislature's Asserted Justifications Are Pretextual..........38

    D.  Procedural and Substantive Departures During the Legislative Process
        Suggest a Discriminatory Purpose..............................................59

    E.  Other *Arlington Heights* Factors...............................................73

    F.  Impact of the Challenged Provisions...........................................90

    G.  Defendants Have Not Established that the Legislature Would Have
        Enacted SB 202 Absent this Discriminatory Purpose ............................133

V.    CONCLUSION ...............................................................................137

## <u>Table of Authorities</u>

**Cases**

*Abbott v. Perez*,
     138 S. Ct. 2305 (2018) ................................................................. 15, 97

*Allen v. Milligan*,
     599 U.S. 1 (2023) ...................................................................... passim

*Allen v. Tyson Foods, Inc.*,
     121 F.3d 642 (11th Cir. 1997)...................................................... 11, 36

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
     --- F. Supp. 3d. ---, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) ........ 25, 97, 100

*Anderson v. Liberty Lobby, Inc.*,
     477 U.S. 242 (1986) ........................................................................11

*Ash v. Tyson Foods, Inc.*,
     546 U.S. 454 (2006) ........................................................................74

*Ash v. Tyson Foods, Inc.*,
     664 F.3d 883 (11th Cir. 2011)............................................... 16, 69, 74

*Bonner v. City of Prichard*,
     661 F.2d 1206 (11th Cir. 1981)........................................................18

*Brnovich v. Democratic Nat'l Comm.*,
     141 S. Ct. 2321 (2021) ............................................................. passim

*Burton v. City of Belle Glade*,
     178 F.3d 1175 (11th Cir. 1999)........................................................16

*Busbee v. Smith*,
     549 F. Supp. 494 (D.D.C. 1982) ......................................................76

*Cargill v. Turpin*,
     120 F.3d 1366 (11th Cir. 1997)........................................................19

*Chisom v. Roemer*,
     501 U.S. 380 (1991) ............................................................. 19, 20, 99

*Church of Scientology of Ga., Inc. v. City of Sandy Springs*,
   843 F. Supp. 2d 1328 (N.D. Ga. 2012) .................................................................85

*City of Carrollton Branch of the N.A.A.C.P. v. Stallings*,
   829 F.2d 1547 (11th Cir. 1987).........................................................................75

*Clingman v. Beaver*,
   544 U.S. 581 (2005) ...................................................... 92, 95, 130, 131

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   945 F.3d 83 (2d Cir. 2019) ...............................................................48

*DeKalb Cnty. v. U.S. Dep't of Labor*,
   812 F.3d 1015 (11th Cir. 2016).........................................................134

*Fair Fight Action v. Raffensperger*,
   634 F. Supp. 3d 1128 (N.D. Ga. 2022) ...............................................91

*Familias Unidas Por La Educacion v. El Paso Indep. Sch. Dist.*,
   633 F. Supp. 3d 888 (W.D. Tex. 2022)...............................................69

*Ferrill v. Parker Grp., Inc.*,
   168 F.3d 468 (11th Cir. 1999)..........................................................14

*Fla. State Conf. of NAACP v. Lee*,
   576 F. Supp. 3d 974 (N.D. Fla. 2021).................................................112

*Ga. State Conference of NAACP v. Fayette Cnty. Bd. Of Com'rs*,
   775 F.3d 1336 (11th Cir. 2015).................................................. passim

*Garza v. Cnty. of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990)...................................................... 15, 48

*Gomillion v. Lightfoot*,
   364 U.S. 339 (1960) .......................................................................23

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
   992 F.3d 1299 (11th Cir. 2021).................................................. passim

*Hallmark Devs., Inc. v. Fulton Cnty.*,
   466 F.3d 1276 (11th Cir. 2006).................................................... 74, 75

*Harper v. Virginia State Bd. of Elections*,
　　383 U.S. 663 (1966) .......................................................................23

*Harris v. Graddick*,
　　593 F. Supp. 128 (M.D. Ala. 1984).............................................. 20, 122

*Hickson Corp. v. N. Crossarm Co.*,
　　357 F.3d 1256 (11th Cir. 2004).........................................................10

*Hunt v. Cromartie*,
　　526 U.S. 541 (1999) ....................................................................2, 16

*Hunter v. Underwood*,
　　471 U.S. 222 (1985) ................................................................ passim

*I.L. v. Alabama*,
　　739 F.3d 1273 (11th Cir. 2014)........................................................78

*Jean v. Nelson*,
　　711 F.2d 1455 (11th Cir. 1983)........................................... 87, 134, 135

*Jenkins v. Nell*,
　　26 F.3d 1243 (11th Cir. 2022)..........................................................73

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
　　4 F.3d 1103 (3d Cir. 1993) ........................................................ 79, 116

*Johnson v. DeSoto Cnty. Bd. of Comm'rs,*
　　204 F.3d 1335 (11th Cir. 2000)................................................... 13, 24

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
　　72 F.3d 1556 (11th Cir. 1996)..................................................... 81, 83

*Johnson v. Gov. of State of Fla.*,
　　405 F.3d 1214 (11th Cir. 2005)................................................... 13, 17

*Larue v. Wal-Mart Stores East, LP (Delaware)*,
　　2023 WL 1971320 (N.D. Ga. Feb. 10, 2023).....................................12

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
　　66 F.4th 905 (11th Cir. 2023)...................................................... passim

iv

*League of Women Voters of Fla. v. Fla. Sec'y of State*,
  81 F.4th 1328 (11th Cir. 2023)................................................................ 95, 97, 132

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014)........................................................ 48, 96, 107, 131

*LULAC v. Perry*,
  548 US 399 (2006) ......................................................................................... passim

*Martin v. Kemp*,
  341 F. Supp. 3d 1326 (N.D. Ga. 2018) ...................................................................73

*McMillan v. Escambia Cnty., Fla.*,
  748 F.2d 1037 (former 5th Cir. 1984) ........................................................... 18, 19

*Mhany Mgmt., Inc. v. Cnty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016) ...................................................................................68

*Miranda v. B & B Cash Grocery Store, Inc.*,
  975 F.2d 1518 (11th Cir 1992)...............................................................................11

*Miss. State Chapter, Operation PUSH v. Allain*,
  674 F. Supp. 1245 (N.D. Miss. 1987) ............................................................ passim

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ...............................................................................................14

*N. Carolina State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016)............................................................................ passim

*NAACP v. Gadsden Cnty. Sch. Bd.*,
  691 F.2d 978 (11th Cir. 1982)................................................................................16

*Nipper v. Smith*,
  39 F.3d 1494 (11th Cir. 1994)..............................................................................116

*Palmore v. Sidoti*,
  466 U.S. at 429 (1984) ...........................................................................................47

*Patino v. City of Pasadena*,
  230 F. Supp. 3d 667 (S.D. Tex. 2017) ...................................................................69

*Payroll Mgmt., Inc. v. Lexington Ins. Co.*,
  815 F.3d 1293 (11th Cir. 2016) ............................................................10

*Perez v. Abbott*,
  253 F. Supp. 3d 864 (W.D. Tex. 2017) ............................................ 59, 63, 65, 69

*Perkins v. Matthews*,
  400 U.S. 379 (1971) ................................................................. 94, 122

*Pullman-Standard v. Swint*,
  456 U.S. 273 (1982) ........................................................................11

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ............................................................ 12, 91, 96

*Richardson v. Jackson*,
  545 F. Supp. 2d 1318 (N.D. Ga. 2008) .................................................12

*Riley v. Birmingham Board of Educ.*,
  154 Fed. App'x 114 (11th Cir. 2005) ...................................................75

*Riley v. Univ. of Ala. Health Servs. Found.*,
  990 F. Supp. 2d 1177 (N.D. Ala. 2014) ...............................................137

*Rogers v. Lodge*,
  458 U.S. 613 (1982) ................................................................. passim

*S. Broward Hosp. Dist. v. Coventry Health & Life Ins. Co.*,
  2015 WL 12532580 (S.D. Fla. June 10, 2015) .......................................137

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) ........................................................................17

*Singleton v. Merrill*,
  582 F. Supp. 3d 924 (N.D. Ala. 2022) ........................................... 39, 135

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ...........................................................74

*Stanley v. City of Dalton*,
  219 F.3d 1280 (11th Cir. 2000) ........................................................134

*Stout by Stout*,
  882 F.3d 998 (11th Cir. 2018) ................................................................ 46, 48, 78

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ...................................................................................... passim

*Tipton v. Bergrohr GMBH-Siegen*,
  965 F.2d 994 (11th Cir. 1992) ............................................................................ 91

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984) ............................................................................ 74

*United States v. Bd. of Comm'rs of Indianapolis*,
  573 F.2d 400 (7th Cir. 1978) ............................................................................. 87

*United States v. Brown*,
  494 F. Supp. 2d 440 (S.D. Miss. 2007) ............................................................ 109

*United States v. Brown*,
  561 F.3d 420 (5th Cir. 2009) ........................................................................... 109

*United States v. Dallas Cnty. Comm'n*,
  739 F.2d 1529 (11th Cir. 1984) ......................................................................... 99

*United States v. Virginia*,
  518 U.S. 515 (1996) ......................................................................... 39, 134, 135

*United States v. Woodard*,
  938 F.2d 1255 (11th Cir. 1991) ......................................................................... 19

*Veasey v. Abbott*,
  830 F.3d 216 (2016) .................................................................................. passim

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ................................................................................. passim

*Voinovich v. Quilter*,
  507 US 146 (1993) ........................................................................................... 94

*Washington v. Davis*,
  426 U.S. 229 (1976) ........................................................................... 39, 81, 91

*Wate v. Kubler*,
   839 F.3d 1012 (11th Cir. 2016) ................................................... 11, 35

*White v. Regester*,
   412 U.S. 755 (1973) ...................................................................93

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   657 F. App'x 871 (11th Cir. 2016) ....................................... 2, 10, 40, 97

**Statutes & Rules**

52 U.S.C. § 10301 ............................................................... passim

52 U.S.C. § 20301 .....................................................................21

N.D. Ga. L.R. 56.1(B)(1) ..............................................................11

O.C.G.A. § 21-2-265 ..................................................................58

O.C.G.A. § 21-2-266 ...................................................................9

O.C.G.A. § 21-2-33.1 .................................................................10

O.C.G.A. § 21-2-33.2 .................................................................10

O.C.G.A. § 21-2-381 ............................................................ passim

O.C.G.A. § 21-2-382 .................................................................6, 7

O.C.G.A. § 21-2-384 ................................................................8, 89

O.C.G.A. § 21-2-385 ......................................................... 5, 6, 54, 58

O.C.G.A. § 21-2-414 ...................................................................9

O.C.G.A. § 21-2-418 .................................................................8, 9

O.C.G.A. § 21-2-419 .............................................................. 8, 9, 33

O.C.G.A. § 21-2-570 ...................................................................9

O.C.G.A. § 21-2-70 ...................................................................58

U.S. Const. amend. XIV ............................................................................12

U.S. Const. amend. XV...............................................................................12

## I.    INTRODUCTION

During recent election cycles, Black and Asian American Pacific Islander (AAPI) voters, especially during 2018 and 2020, made concerted efforts to mobilize their vote. Both Black and AAPI voters, for example, used absentee voting at previously unseen rates, more than white voters, and used drop boxes, line relief efforts, and other tools to help get out the vote and elect candidates of choice. In response to this rising minority political strength, the Legislature enacted new obstacles that targeted the ways in which Black voters and other voters of color had turned out to vote in the November 2020 election.

Despite extensive record evidence of the Legislature's motivation to suppress Black and AAPI votes, State and Intervenor Defendants have moved for summary judgment on all claims involving intentional race discrimination. *See generally* State Defendants' Mot. For Summary J. on Discriminatory-Intent Claims (ECF 759) and Intervenors' Mot. For Summary J. (ECF 761). Consistent with the Court's instructions, *see* Order (Dec. 5, 2023) (ECF 774), all Plaintiffs join this opposition to summary judgment as to the specific racially discriminatory purpose-based claims they have brought. Private Plaintiffs allege that certain provisions of SB 202 were enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Other purpose-based claims, by both private Plaintiffs and the United States, challenge certain overlapping

provisions of SB 202 under Section 2 of the Voting Rights Act.[1] This opposition brief addresses all provisions for which there is evidence that the Legislature acted with intent to discriminate based on race. These provisions are identified in Section II, below.

Summary judgment is rarely appropriate in voting rights litigation "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Com'rs*, 775 F.3d 1336, 1348-49 (11th Cir. 2015) (*Fayette Cnty.*); *see also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016). Summary judgment is also uncommon in cases alleging intentional race discrimination. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (noting that a legislature's "motivation is itself a factual question" and reversing summary judgment).

Here, genuine disputes of material fact exist regarding both the intent behind

---

[1] For example, the United States filed its claim under Section 2 of the Voting Rights Act, challenging six provisions as intentionally racially discriminatory against Black voters: the prohibition on government entities mailing unsolicited absentee ballot applications; requiring voters who lack certain ID to provide a copy of another form of ID each time they request an absentee ballot; requiring voters to request absentee ballots at least 11 days before Election Day; restrictions on the number, use, and availability of drop boxes; the prohibition on distributing food and water to voters waiting in line; and prohibiting the counting of most out-of-precinct provisional ballots. *See* First Amended Compl., *United States v. State of Georgia*, 1:21-CV-2575 (N.D. Ga.) (ECF No. 139).

the challenged provisions and their effect on minority voters. As one example, State Defendants argue that the historical context, sequence of events, and legislative process surrounding SB 202 are not suspect because they purportedly mirror the context and process surrounding HB 316, an elections bill enacted in 2019. The evidence shows, however, that the impetus for, legislative process around, and content of HB 316 are not comparable to SB 202. *Infra* IV.D.3.

Relatedly, although Defendants claim that improving election administration was a primary motivation for SB 202, record evidence shows that many election officials informed the Legislature that the challenged provisions would make election administration *more* difficult—not less so. Indeed, many county election officials opposed the enacted provisions and said the Legislature failed to meaningfully consider their input. *Infra* IV.C.2 & IV.D.2.

The record also reveals numerous factual disputes as to discriminatory effect. For example, Defendants contend that the dramatic reduction in access to drop boxes under SB 202 has no discriminatory effect on Black voters because, they allege, white voters used drop boxes more than Black voters in 2020. Plaintiffs' experts' analyses, however, show the opposite—that Black voters used drop boxes at a higher rate than white voters in 2020, and nearly 75% of Georgia's Black voters experienced a decline in drop box availability under SB 202 compared to just 54% of white voters. *Infra* IV.F.2.a. Factual disputes about

disparities in wait times to vote and the impact of line relief activities on Black

voters' access to the ballot also raise triable issues of fact as to the effect of SB

202's line relief ban. *Infra* IV.F.2.b. Whether satisfying SB 202's new voter ID

requirements is easy, as Defendants allege, is also disputed. Record evidence

shows that nearly 130,000 Black registrants have either no DDS ID number or an

inaccurate DDS ID number in the voter registration system, compared to just

80,000 white registrants, and because of socioeconomic disparities, obtaining DDS

ID or providing a copy of an alternative accepted ID is disproportionately

burdensome for Black voters. *Infra* IV.F.2.a. Viewed in context of the totality of

evidence that plaintiffs have put forth, these racially disparate effects are among

the disputed facts that could reasonably support the ultimate factual conclusion that

these restrictions were adopted with racially discriminatory intent. Indeed, as

discussed below, SB 202 includes multiple independent yet mutually reinforcing

provisions that foreseeably and disproportionately impede access to the polls for

Black voters.

These and other material factual disputes relating to the Legislature's intent,

the regularity of the legislative process, the degree to which the State's proffered

justifications are pretextual, and the impact of the challenged provisions on

minority voters present triable issues that must be resolved at trial.

Nor have Defendants met their burden for summary judgment concerning

the challenged provisions on behalf of AAPI or Latino voters. Defendants cite no evidence to support their motion relating to AAPI or Latino voters; nor do they even discuss intentional discrimination claims brought on behalf of AAPI or Latino voters. In contrast, Plaintiffs demonstrate that the record evidence precludes summary judgment on Plaintiffs' claims on behalf of AAPI or Latino voters.[2]

## II.   CHALLENGED PROVISIONS

### A.   Provisions Affecting Absentee Voting

**Voter identification for absentee voting.** Before SB 202, election officials verified an absentee voter's identity by comparing the signature on a voter's absentee ballot application or absentee ballot envelope with their signature on file. O.C.G.A. § 21-2-381(b)(1) (2019); § 21-2-386(a)(1)(B) (2019); Prelim. Inj. Hr'g Tr. 191:7-13. Documentary identification was not required. SB 202 imposes new identification requirements at two stages of the absentee voting process. First, at the request stage, voters must include on their absentee ballot application the ID number from their Georgia driver's license or state ID card issued by the Georgia Department of Driver Services (collectively, "DDS ID") or, if they do not have DDS ID, they must provide a copy of another form of ID listed in the statute. SB 202 § 25 (amending O.C.G.A. § 21-2-381(a)(1)(C)(i)). Second, when returning their absentee ballot, voters must print their DDS ID number on the absentee ballot

---

[2] Defendants also do not cite any evidence in their motion relating to Native American voters.

envelope or, if they do not have DDS ID, voters may either print the last four digits of their Social Security number ("SSN4") or include a copy of certain other forms of ID. SB 202 § 28 (amending O.C.G.A. § 21-2-385(a)). Even the option to provide SSN4 instead of a DDS ID number or photocopy of an alternative form of ID is not available when a voter requests an absentee ballot. SB 202 § 25 (amending O.C.G.A. § 21-2-381(a)(1)(C)).

**Drop Boxes.** Before SB 202, drop boxes were authorized under Georgia law. *See* O.C.G.A. § 21-2-382(a) (2019) (authorizing boards of elections to establish additional "places" or "sites" to receive voted absentee ballots); SAMF ¶¶ 287-288 (CDR00056863-64). In April 2020, the Georgia State Elections Board (SEB) enacted an emergency rule setting guidelines for counties that chose to use absentee ballot drop boxes. The SEB extended the emergency rule through the November 2020 and January 2021 elections. SAMF ¶¶ 285-286 (SEB Emergency Rule). Under the SEB Emergency Rule, drop boxes had to be located on government property, continuously monitored via security camera, and secured and constructed in a way that prevented tampering and removal. Counties could open drop boxes 49 days before Election Day and make them available until 7:00 p.m. on Election Day. SAMF ¶ 289 (USA-04333-USA-04334 (SEB Emergency Rule)). Most drop boxes were located outdoors and available to voters 24 hours a day, seven days a week. SAMF ¶ 293 (Sterling Dep. 68:2-11, 69:1-6). Counties had

discretion over whether to use drop boxes and, if so, how many. SAMF ¶ 290 (Bailey Dep. 120:5-120:11).

Under SB 202, each county must provide at least one drop box, but the number of additional drop boxes is limited to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county." SB 202 § 26 (codified in O.C.G.A. § 21-2-382(c)(1)). Drop boxes must be located indoors at early voting sites or the registrar's office. *Id*. They are available only during early voting days and hours, ending on the Friday before Election Day. *Id*. They must be under constant surveillance by a person, not a video security camera. *Id*. SB 202 also amended O.C.G.A. § 21-2-382(a) to eliminate the reference to an "additional site[]" for "voting absentee ballots" and replaced "location[s]" with "building[s]." SB 202 § 26 (amending O.C.G.A. § 21-2-382(a)).

**Unsolicited absentee ballot applications.** Before SB 202, state and county election officials were permitted to proactively mail absentee ballot applications to registered voters without a request from a voter. In advance of the June 2020 primary election, the Office of the Georgia Secretary of State (SOS) sent absentee ballot request forms to all of Georgia's 6.9 million active voters. SAMF ¶ 182 (Germany Dep. 57:12-16). Several counties sent such mailings for the November 2020 election. *See infra* 28. Under SB 202, these proactive mailings are prohibited.

SB 202 § 25 (codified in O.C.G.A. § 21-2-381(a)(1)(C)(ii)).

**Time to request mail ballot applications and distribute mail ballots.**

Before SB 202, voters could request an absentee ballot until the Friday before Election Day. *See* O.C.G.A. § 21-2-381(a)(1)(A) (2019). Under SB 202, voters must submit such requests at least 11 days before Election Day. *See* SB 202 § 25 (amending O.C.G.A. § 21-2-381(a)(1)(A)). Local election officials, in turn, are circumscribed in when they can distribute absentee ballots to voters. Before SB 202, local officials began mailing ballots between 49 and 45 days before an election. Under SB 202, they must wait until 29 days before the election to begin issuing most absentee ballots. SB 202 § 27 (amending O.C.G.A. § 21-2-384(a)(2)).

### B.    Provisions Affecting In-person Voting

**Ban on counting out-of-precinct provisional ballots.** For almost 20 years, Georgia voters who appeared at a precinct in their county other than the one to which they were assigned could cast a provisional ballot, with officials counting only those election contests for which the voter was eligible to vote in the correct precinct (including statewide offices). *See* O.C.G.A. §§ 21-2-418(a), 21-2-419 (c)(2) (2019). Under SB 202, counties may no longer count such out-of-precinct (OP) ballots unless they are cast after 5:00 p.m. on Election Day and accompanied by the voter's sworn statement, witnessed by a poll official, that the voter is unable to vote at their correct polling place and giving the reason therefor. SB 202 § 34

(amending O.C.G.A. § 21-2-418(a)); SB 202 § 35 (amending O.C.G.A. § 21-2-419(c)(2)).

**Line relief ban.** Before SB 202, volunteers could offer free food or drink to any elector within 150 feet of the outer edge of the polling place (Buffer Zone) or 25 feet of any voter standing in line to vote (Supplemental Zone), no matter how long the line. O.C.G.A. § 21-2-414 (2017). SB 202 now prohibits these activities—even providing a cup of water—and violations are subject to criminal penalty.[3] SB 202 § 33 (amending O.C.G.A. § 21-2-414); O.C.G.A. § 21-2-414(f).

**Mobile voting.** Prior to SB 202, counties could deploy "portable or movable polling facilities" without limitation. O.C.G.A. § 21-2-266 (2013). Fulton County is the only county in Georgia to ever use such "mobile voting units" (MVUs); it deployed two buses during the election cycle immediately preceding the enactment of SB 202. State Defendants' SMF ¶ 339; SAMF ¶ 475 (Fulton Cnty. Dep. 174:11-175:10). SB 202 prohibits the use of MVUs except "in emergencies declared by the Governor." SB 202 § 20 (amending O.C.G.A. § 21-2-266(b)).

## C.    Other Provisions

**SEB to replace local election superintendents in some circumstances.**

Under SB 202, the SEB may, "on its own motion," suspend local election

---

[3] On August 18, 2023, the Court preliminary enjoined the line relief ban in the 25-foot Supplemental Zone. (ECF No. 614). Defendants appealed this decision, but the appeal is not cause to delay ruling on Defendants' summary judgment motions.

superintendents who have committed at least three violations of election law or SEB rules and regulations in the last two general election cycles, or have "demonstrated nonfeasance, malfeasance, or gross negligence in the administration of elections" for at least two elections within a two-year period. SB 202 §§ 6, 7 (codified in O.C.G.A. §§ 21-2-33.1(f) & 21-2-33.2(a) and (c)). The SEB may then appoint a superintendent. SB 202 § 6 (codified in O.C.G.A. § 21-2-33.1(f)). Suspension may become permanent if the suspended superintendent does not timely petition for reinstatement. SB 202 § 7 (codified in O.C.G.A. § 21-2-33.2(e)(2)). Under SB 202, a local government "shall not expend any public funds for attorneys' fees or expenses of litigation relating to" such a reinstatement petition. SB 202 § 7 (codified in O.C.G.A. § 21-2-33.2(g)).

## III.   LEGAL STANDARD

Under Rule 56, "[s]ummary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wright*, 657 F. at 872 (quoting *Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 815 F.3d 1293, 1297 (11th Cir. 2016)). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). "The basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so

one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The moving party has the burden of showing the absence of a genuine issue as to any material fact." *Id.*

The existence of racially discriminatory intent is a "pure question of fact." *Rogers v. Lodge*, 458 U.S. 613, 622-23 (1982) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 287-88 (1982)). At the summary judgment stage, courts "do not weigh conflicting evidence or make credibility determinations." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). The Court "must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party." *Fayette Cnty.*, 775 F.3d at 1343. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 646 (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir 1992)).

The State's motion violates Northern District of Georgia Local Rule 56.1(B)(1) because it relies on facts "set out only in the brief and not in the movant's statement of undisputed facts." N.D. Ga. L. Civ. 56.1(B)(1). Under Local Rule 56.1(B)(1), "the Court is not permitted to consider such fact[s] in resolving any pending motion for summary judgment." *Richardson v. Jackson*, 545 F. Supp. 2d 1318, 1326 (N.D. Ga. 2008); *see also Larue v. Wal-Mart Stores East, LP*

*(Delaware)*, No. 1:21-cv-02766-JPB, 2023 WL 1971320, at *3 n.3 (N.D. Ga. Feb. 10, 2023) (noting that pursuant to Local Rule 56.1(B)(1) the court "does not consider any facts set forth only in Plaintiff's response brief"). For the Court's convenience, Exhibit 1 in support of Plaintiffs' responses to Defendants' motions for summary judgment, *see* ECF 807-3, catalogues material facts in the State's brief that are not included in their Consolidated Statement of Material Facts.

## IV.   ARGUMENT

Defendants are not entitled to summary judgment. Their arguments fail because they depend on disputed material facts, incorrect legal standards for intentional discrimination claims, or both.[4]

### A.   Intentional Racial Discrimination Violates the Constitution and Section 2

#### 1.   14th and 15th Amendment Claims

Decades of caselaw establish that the Fourteenth and Fifteenth Amendments to the U.S. Constitution prohibit voting practices that intentionally discriminate on the basis of race. U.S. Const. amend. XIV; U.S. Const. amend. XV; *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997); *Johnson v. Gov. of State of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005) (en banc). To prove a constitutional violation, plaintiffs must show "intent to discriminate and actual discriminatory

---

[4] Defendants fail to address the record evidence with respect to AAPI or Latino voters. Defendants' failure to do so makes clear that these voters' claims should proceed. *See, e.g.*, *Allen*, 121 F.3d at 646 (discussing the movant's burden).

effect." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (*GBM*). If plaintiffs show that a challenged law was motivated at least in part by discriminatory purpose, a showing of "some cognizable injury to" minority voters flowing from the challenged action is sufficient evidence of discriminatory effect. *Johnson v. DeSoto Cnty. Bd. of Comm'rs,* 204 F.3d 1335, 1344 n.18 (11th Cir. 2000) (*DeSoto Cnty. II*); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) (evidence that Black voters "disproportionately used each of the removed mechanisms [and] disproportionately lacked the photo ID required by [the challenged law] . . . establishes sufficient disproportionate impact for an *Arlington Heights* analysis"); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 269 (1977) (finding a potential discriminatory effect where minority residents were disproportionately eligible to live in the low-income development the municipality declined to accommodate).

To determine whether a challenged voting law was enacted with a discriminatory purpose, Defendants do not dispute that courts apply *Arlington Heights*, 429 U.S. at 266-68 (describing evidentiary factors that may inform the intent analysis). *See also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021); *GBM*, 992 F.3d at 1321-22. Under this standard, plaintiffs must show that race was a motivating factor for the official action, but the evidence need not

show "that the challenged action rested solely on racially discriminatory purposes"
or even that the discriminatory purpose "was the 'dominant' or 'primary' one."
*Arlington Heights*, 429 U.S. at 265; *see also Allen v. Milligan*, 599 U.S. 1, 37
(2023) ("Demonstrating discriminatory intent, we have long held, 'does not require
a plaintiff to prove that the challenged action rested *solely* on racially
discriminatory purpose . . . .'" (quoting *Arlington Heights*, 429 U.S. at 265
(alternation in original))). "Once racial discrimination is shown to have been a
'substantial' or 'motivating' factor behind enactment of the law, the burden shifts
to the law's defenders to demonstrate that the law would have been enacted
without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (quoting *Mt.
Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *GBM*,
992 F.3d at 1321.

Plaintiffs need not show that the challenged decision was motivated by
"racial animus," "racial bias," or "racist intent." *Cf. e.g.*, State's Br. 28, 29, 34.
"[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."
*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999). An intent
to disadvantage minority citizens, for whatever reason, is sufficient. *See, e.g.*,
*Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J.,
concurring in part and dissenting in part).

Nor does the "presumption of legislative good faith" preclude the Court

from finding that the Legislature acted with discriminatory intent, as Defendants'
claim. *See, e.g.*, State's Br. 35, 40 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324
(2018)); Intervenors' Br. 14. Defendants dramatically overstate the force of the
presumption, which is not absolute and can be overcome by a showing under
*Arlington Heights*. Indeed, that is the point of the *Arlington Heights* analysis—
"[w]hen there is a proof that a discriminatory purpose has been a motivating factor
in the decision, this judicial deference [to the legislature] is no longer justified."
429 U.S. at 265-66; *see, e.g.*, *Abbott*, 138 S. Ct. at 2326-27; *McCrory*, 831 F.3d at
221, 233 (holding "judicial deference accorded to legislators" overcome where
plaintiffs met their burden under *Arlington Heights*). The Supreme Court in
*Brnovich v. Democratic National Committee* confirmed that *Abbott*'s discussion of
legislative good faith did not change the "familiar approach outlined in *Arlington
Heights*." 141 S. Ct. at 2349. Under this well-settled framework, there is no
heightened presumption of legislative good faith because plaintiffs already have
the burden to show that racial discrimination was a motivating factor behind a
challenged decision. *See Hunter*, 471 U.S. at 228; *GBM*, 992 F.3d at 1324.

Because "[o]utright admissions of impermissible racial motivation are
infrequent," *Cromartie*, 526 U.S. at 553, analyzing whether a government action
was motivated by a discriminatory purpose requires a fact-intensive analysis of
"the totality of the relevant facts[,]" *Lodge*, 458 U.S. at 618, including "all

15

available direct and circumstantial evidence of intent," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999). Expert evidence is highly relevant in an intentional discrimination case. *See Hunter*, 471 U.S. at 228-29 (relying on experts to find discriminatory intent); *NAACP v. Gadsden Cnty. Sch. Bd.*, 691 F.2d 978, 981-82 (11th Cir. 1982) (holding the district court clearly erred in discounting expert testimony on intentional discrimination). But no single piece of evidence need be dispositive on its own. It is sufficient for plaintiffs to present "a convincing mosaic of circumstantial evidence in support of their [discriminatory intent] claims." *GBM*, 992 F.3d at 1322 n.33 (internal quotation marks and citation omitted). The court must "consider all of the evidence cumulatively." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 897 (11th Cir. 2011). "Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context." *McCrory*, 831 F.3d at 233.

### 2. Section 2 Claims

a. Section 2 of the Voting Rights Act prohibits any law or practice that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 52 U.S.C. §§ 10301(a); 10303(f)(2). A violation of Section 2

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to

participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b). Although the contours of the analysis differ somewhat depending on whether the claim alleges "vote dilution" or "vote denial," *see, e.g.*, *Johnson*, 405 F.3d at 1227 n.26, in every Section 2 case, "liability . . . must be determined 'based on the totality of circumstances,'" *Milligan*, 599 U.S. at 26 (quoting 52 U.S.C. § 10301(b)).

Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). As amended in 1982, it forbids "not only those voting practices directly prohibited by the Fifteenth Amendment but also any practice 'imposed or applied . . . in a manner which *results* in a denial or abridgement of the right . . . to vote on account of race or color.'" *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1553 (11th Cir. 1984) (quoting 52 U.S.C. § 10301(a)) (emphasis and alterations in original).

To determine whether decisionmakers acted with a discriminatory purpose, in a Section 2 case, courts apply the "familiar approach outlined in *Arlington Heights*." *Brnovich*, 141 S. Ct. at 2349 (approving of district court's application of *Arlington Heights* framework to discriminatory purpose claims brought under Section 2 and the Constitution); *see also McMillan v. Escambia Cnty.* 748 F.2d 1037, 1047 (former 5th Cir. 1984) (holding that in a purpose-based case under Section 2, "'direct or indirect circumstantial evidence, including the normal

17

inferences to be drawn from the foreseeability of defendant's actions' [is] relevant evidence of intent." (quoting S. Rep. No. 97-417 at 27 n.108));[5] *Veasey v. Abbott*, 830 F.3d 216, 229-30 (5th Cir. 2016) (en banc) (applying *Arlington Heights* in a Section 2 case alleging intentional discrimination); *McCrory*, 831 F.3d at 220-21 (same).

b. Defendants argue that *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) (*LWV*), eliminated stand-alone claims for intentional race discrimination under Section 2. State's Br. 27 n.10. But under Circuit rules, the panel in *LWV* did not have the authority to override longstanding circuit precedent holding that Section 2 prohibits both intentionally discriminatory voting laws *and* those that, regardless of a legislature's intent, have a discriminatory result. *See Marengo Cnty.*, 731 F.2d at 1553; *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." (quoting *United States v. Woodard*, 938 F.2d 1255, 1258 (11th Cir. 1991))). Circuit authority for four decades has recognized that "Congress intended

---

[5] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent former Fifth Circuit decisions handed down by September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc). *McMillan* was filed in 1977 over a voting practice in Florida, *see* 748 F.2d at 1039; the 1984 decision is treated as a former Fifth Circuit case given prior proceedings in the case but also as binding Eleventh Circuit precedent. *Bonner*, 661 F.2d at 1207-08.

that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of section 2." *McMillan*, 748 F.2d at 1046; *see also id.* (concluding that a showing of intentional discrimination that was "sufficient to constitute a violation of the [F]ourteenth [A]mendment" was also "sufficient to constitute a violation of [S]ection 2"); *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (recognizing that Section 2 "[p]laintiffs must either prove [discriminatory] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." (quoting S. Rep. No. 97-417 at 27 (1982))). Plaintiffs, including the United States, preserve their objection to any interpretation of Section 2 that does not recognize statutory liability where it has proven discriminatory intent consistent with a constitutional violation.

c. Nevertheless, as this Court has repeatedly recognized in response to Defendants' motions, the United States can prove a statutory violation in this case consistent with *LWV* and the statutory text while still relying on Defendants' discriminatory intent as relevant evidence of a Section 2 violation. Although Section 2 plaintiffs *need* not prove an intent to discriminate, *see, e.g.*, *Chisom*, 501 U.S. at 404 (holding that a violation of Section 2 can "be established by proof of discriminatory results alone"), such evidence, where it exists, is relevant to whether the challenged system or practice "results in a denial or abridgement of the

right" to vote "on account of race." 52 U.S.C. § 10301(a). As this Court recently reiterated, the critical question in a Section 2 case is whether "the political processes are not equally open" to minority voters. Order at 6-7, 21-CV-2575 (ECF No. 140).

When the State acts with the intent to place obstacles in the path of a class of voters based on their race, that intent affects whether the political process is "equally open" to the targeted class of voters because it casts those voters as second-class citizens whose participation is not equally welcomed or accepted in the political sphere. *See, e.g.*, *Marengo Cnty. Comm'n*, 731 F.2d at 1570 (holding that a county's refusal to hire Black election officials "impaired [Black voters'] access to the political system and the confidence of [Black voters] in the system's openness"); *Harris v. Graddick*, 593 F. Supp. 128, 131-33 (M.D. Ala. 1984) (holding that failure to hire Black poll workers contributed to a political process that was not equally open to Black voters by perpetuating an environment of intimidation and fear). Accordingly, when lawmakers intentionally discriminate against minority voters, and the evidence reveals a discriminatory effect resulting from that action, the political process is not "equally open" to minority voters, and the lawmakers have violated Section 2. 52 U.S.C. § 20301(b); *see also McCrory*, 831 F.3d at 221. This is true where, as here, lawmakers seek to entrench their political power by targeting minority voters through an array of specific, mutually

reinforcing legislative provisions that make voting more onerous for that group.

Here, extensive evidence of SB 202's discriminatory effect, coupled with evidence of the Legislature's discriminatory purpose and a "searching practical evaluation of the 'past and present reality,'" is sufficient to establish, based on the totality of relevant facts, that political processes in Georgia are not equally open to Black or AAPI voters. *Thornburg v. Gingles*, 478 U.S. 30, 75 (1986) (quoting S. Rep. No. 97-417 at 30). As discussed further below, factual disputes as to both purpose and effect preclude the Court from granting summary judgment.

### 3. The *Brnovich* "Guideposts" Are Not Relevant Where Evidence Shows an Intent to Discriminate

Although Defendants frame their analysis of discriminatory effect in terms of the *Brnovich* guideposts,[6] these guideposts are not relevant when evidence shows that decisionmakers acted with a discriminatory purpose. In *Brnovich*, the Supreme Court identified certain circumstances that may be relevant when analyzing a Section 2 vote denial claim based exclusively on evidence of discriminatory results (*i.e.*, without proving intent to discriminate). *See* 141 S. Ct. 2338-40. The Supreme Court in *Brnovich* did not apply these guideposts in the portion of its decision that analyzed the plaintiffs' discriminatory purpose-based

---

[6] Defendants rely on *Brnovich*'s first guidepost ("usual burdens of voting"), *e.g.*, State's Br. 45, 47; fourth guidepost ("opportunities provided by a State's entire system of voting"), *id.* at 44; and fifth guidepost ("strength of the state interests"), *id.* at 49-50; *see also* Intervenors' Br. 14-16; *Brnovich*, 141 S. Ct. at 2338-40.

claims, which arose under Section 2 of the VRA and the Constitution. *See* 141 S. Ct. at 2348-50.

And for good reason. A system that is intentionally designed to and does in fact impede minority voter participation is not "equally open" to minority voters, 52 U.S.C. § 10301(b), even if the system affords "multiple ways to vote" (i.e., early in-person, Election Day, or absentee by mail), State's Br. 44 (arguing no discriminatory impact because there are multiple ways to vote in Georgia), or obstructs a relatively small share of voters from casting a ballot, *id.* at 45 (arguing no discriminatory impact because "nearly every voter already has a qualifying ID"). If, for example, a state legislature admitted that it enacted a poll tax for in-person voting specifically to impair Black voters' access to the franchise—say, because it knew more Black voters would struggle to pay the tax—the political process would not be "equally open" to Black voters, even if only some Black voters were disenfranchised and regardless of the continued availability of tax-free absentee by mail voting. *See, e.g.*, *McCrory*, 831 F.3d 230 (rejecting the argument that "disproportionate impact of the [challenged] legislation depends on the options remaining after enactment of the legislation" (internal quotation omitted)); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 668 (1966) (holding that because a poll tax introduces a "capricious or irrelevant factor" to voter qualification, the "degree of the discrimination is irrelevant").

Similarly, where the evidence shows a legislature intended to discriminate against minority voters and achieved a discriminatory effect, "the strength of the state interests served by a challenged voting rule," *Brnovich*, 141 S. Ct. at 2339-40; State's Br. 49-50, is relevant only under the second step of the *Hunter v. Underwood* standard, where the state bears the burden of showing that the challenged law would have been enacted without the discriminatory purpose, 471 U.S. at 228. This is because there is no legitimate state interest in intentionally providing minority voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). In this way, permissible acts may become impermissible when motivated by a discriminatory purpose. *See, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339, 347-48 (1960); *Hunter*, 471 U.S. at 233.

Simply put, the State's attempt to graft the *Brnovich* guideposts onto the discriminatory purpose-based claims in this case has no basis in the case law. *See, e.g.*, Order, *United States v. State of Georgia*, No. 21-CV-2575, at *12 (Dec. 9, 2021), ECF No. 69 (holding that *Brnovich* Court "decline[d] . . . to announce a test to govern all VRA § 2 claims" involving vote denial or abridgment (alterations in original)).[7]

---

[7] Even if the Court concludes that the *Brnovich* guideposts are relevant to Section 2 discriminatory purpose claims, those guideposts are plainly inapplicable to private Plaintiffs' constitutional claims, where plaintiffs need only establish intent to

B.   **Historical Background and Sequence of Events Leading up to the 2021 Legislative Session**

1.  **The Experience of Black voters**

The recent historical background and sequence of events leading up to SB 202's passage reveal the Legislature's motive for and means to impair Black voting strength. Defendants' discussion of these critical *Arlington Heights* factors omits key facts supporting the inference of discriminatory intent, and, by inaccurately insisting that Plaintiffs must present evidence of "racial animus," *e.g.*, State's Br. 28, 34; Intervenors' Br. 13, urges the Court to view the evidence through an incorrect legal lens.

Based on the record evidence here, the Court can reasonably infer that the recent history of Black voters' political participation in Georgia elections threatened the political status quo and provoked the General Assembly to curtail the ways Black Georgians vote. *See League of United Latin Am. Citizens v. Perry*, 548 US 399 (2006) ("*LULAC*"); Order (Oct. 11, 2023), ECF 686, at *45 ("10/11/2023 PI Order"). The facts here resemble those the Supreme Court recognized as "bear[ing] the mark of intentional discrimination" in *LULAC*, 548 U.S. at 440. There, facing an "increasingly powerful Latino population that threatened to oust [an] incumbent" congressman in a region with "severe" racial

---

discriminate and "some cognizable injury" resulting from the challenged practice. *DeSoto Cnty. II*, 204 F.3d at 1344 n.18.

polarization in elections, the Texas Legislature reduced the district's Latino population to protect the incumbent's reelection prospects. *Id.* at 423, 427. As the Fourth Circuit has observed, the Supreme Court's decision in *LULAC* recognized that racially polarized voting coupled with a growing and increasingly effective minority voting population can motivate legislators to "entrench themselves through discriminatory election laws." *McCrory*, 831 F.3d at 222.

Several key facts show that the same thing happened here. First, voting in Georgia is highly polarized along racial lines, and Black voters rarely support the majority party in the Legislature. Black voters are extremely cohesive, overwhelmingly voting for candidates of choice, often with over 90% of their vote, and white voters routinely vote as a bloc to defeat these candidates. SAMF ¶¶ 9-11 (Palmer Rep. ¶¶ 25-27 & Figs. 1-2; Burden Rep. 5-6 & Tbl. 1). *See also Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d. ---, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *68 (N.D. Ga. Oct. 26, 2023) (finding that Georgia elections are racially polarized).[8]

Racially polarized voting is a "critical background fact[]" in a discriminatory purpose-based case because it "provide[s] an incentive for intentional

---

[8] Black, AAPI, and other voters of color often share the same candidates of choice and vote cohesively in support of these candidates—which white voters cohesively oppose. SAMF ¶ 9 (Palmer Rep. ¶¶ 7, 21, 23, 26, 27, and Fig. 1; *see also* Cobb Rep. 3, 31).

discrimination in the regulation of elections." *McCrory*, 831 F.3d at 221-22; *see also Lodge*, 458 U.S. at 623-24 (recognizing that facts establishing racially polarized voting "bear heavily on the issue of purposeful discrimination"). In statewide general elections in Georgia, Black voters support the Democratic party by wide margins. SAMF ¶ 12 (Burden Rep. 6-7 & Tbl. 2).[9] Thus, restricting "voting mechanisms and procedures that most heavily affect African Americans will predictably redound to the benefit of" the majority party in the Legislature, which is supported primarily by white voters. *McCrory*, 831 F.3d at 214; SAMF ¶¶ 151-152 (Burden Rep. 4-5). Racial polarization in Georgia elections is "stark and durable[,]" and it is common knowledge among elected officials and political observers. SAMF ¶¶ 10-11 (Burden Rep. 5); *see also* SAMF ¶¶ 10-12, 150-151 (Jones Decl. ¶ 12; Burnough Decl. ¶ 15; Burden Dep. 86:22-87:9). "It is the political cohesiveness of the minority groups that provides the political payoff for legislators who seek to dilute or limit the minority vote." *McCrory*, 831 F.3d at 222.

Second, as in *LULAC*, years of mounting engagement and mobilization efforts among Black voters, coupled with demographic changes that inherently reduced the preeminence of white voters in Georgia elections, produced newly

---

[9] Even in Democratic Party primary elections, the voting choices of Black and white voters diverge significantly, demonstrating that the political preferences of racial groups go beyond partisanship. SAMF ¶ 12 (Burden Rep. 6-7 & Tbl. 2).

close statewide elections. Political participation among Black Georgians has long lagged behind that of white Georgians. *See* SAMF ¶¶ 16-17 (Clark Rep. Tbl. 6; Burden Rep. 9-10 & Tbl. 4). And until recently, Black voters cast absentee ballots at disproportionately low rates. SAMF ¶ 35 (Burden Rep. 11 & Tbl. 5).

**Mounting voter engagement.** By 2018, however, this status quo had begun to shift. Ahead of the 2018 election, both nonpartisan organizations and Stacy Abrams' gubernatorial campaign concentrated on voter registration and turnout among non-white voters, including a pioneering emphasis on absentee voting. SAMF ¶ 50 (Burden Rep. 9; Burnough Decl. ¶ 12; *see also* Cotton Decl. ¶ 7 (describing Black-led efforts to educate and register voters of color before the 2018 election cycle)). In the 2018 general election, Black voters' use of absentee voting outpaced that of white voters for the first time. SAMF ¶ 36 (Burden Rep. 11, 13-16 & Tbl. 5; Fraga Rep. ¶ 55 & Tbl. 2). In the 2020 election cycle, this outreach to voters of color expanded, and the emphasis on absentee voting took on new urgency because of the pandemic. SAMF ¶ 53 (Cobb Rep. 2-3 (noting 1.2 million new registrants added to voter rolls between 2018 and 2020); Woodall 3/13/23 Decl. ¶ 14; Calhoun Decl. ¶¶ 14, 17-21; GA NAACP Dep. 43:8-24 (similar programs that began "well before 2019 . . . really ramped [up] from 2019-2021")).

The Secretary of State's (SOS) decision to send absentee ballot applications to all active voters before the June 2020 primary further "incentivized many Black

27

voters, who had traditionally preferred to vote in person, to mail in their ballots."
SAMF ¶ 182 (Burnough Decl. ¶ 13; Bailey Dep. 119:16-120:6; Germany Dep.
57:12-20). Although the SOS declined to repeat this proactive mailing for the 2020
general election, several Georgia counties with significant Black populations did
so. SAMF ¶ 186 (Kidd Dep. 49:6-25; DeKalb Cnty. Dep. 63:17-23; Bailey 10/6/22
Dep. 49:7-50:1, 118:19-119:15). In November 2020, Black voters' use of absentee
voting exceeded that of white voters by an even larger margin than in 2018. SAMF
¶ 37 (Burden Rep. 11 & Tbl. 5; Fraga Rep. ¶ 58 & Tbl. 2). By then, it was widely
known that Black voters were using absentee voting disproportionately. SAMF ¶
153 (Burden Rep. 11 & Tbl. 5; Hugley Decl. ¶¶ 20, 23; Prelim. Inj. Hr'g Tr. 15:25-
16:11 (Jones)).

Black-led organizations and clergy also expanded other innovative voter
mobilization programs during this period. Although they were not new, line relief
activities attracted significant attention in 2018 and 2020. SAMF ¶¶ 54-55 (Kinard
Decl. ¶¶ 5, 13; Briggins 5/20/22 Decl. ¶¶ 10, 12-13; Brower 1/18/24 Decl. ¶ 32).
Individuals and organizations distributed food, water, and other items to voters
waiting in line at crowded polling places. SAMF ¶ 54 (Delta Dep. 97:21-100:10;
Cotton Decl. ¶ 9; GA NAACP Dep. 48:13-50:4; Woodall 3/13/23 Decl. ¶¶ 9-11).
These activities occurred in neighborhoods and at polling places disproportionately
serving voters of color, usually in metro-Atlanta counties. *See* SAMF ¶ 56 (Kinard

Decl. ¶¶ 6, 14; Cotton Decl. ¶¶ 9, 23; Calhoun Decl. ¶¶ 17-21). Line relief efforts helped to reduce the burden of long voting lines, which are disproportionately concentrated in Black communities, and fortified Black voters to stay in line. *See, e.g.*, SAMF ¶ 416 (Briggins 5/20/22 Decl. ¶¶ 14-16; Scott Decl. ¶¶ 6-11; Sutton Decl. ¶¶ 5-9); SAMF ¶¶ 434, 436 (Pettigrew Rep. 17-20; Burden Rep. 20-22).

**Demographic change.** These conspicuous voter engagement efforts coincided with a striking demographic shift in the State. *Cf. LULAC*, 548 U.S. at 423, 438-39 (noting growth in Latino population and voter registration). From 2010 to 2020, Georgia's total population grew by 10.6% (1,024,255 people), but population growth was unevenly distributed across races and geography. Georgia's white population shrank by 1.0%, while the Black population grew by over 12%. SAMF ¶ 7 (Palmer Rep. ¶ 12 & Tbl. 1; Cobb Rep. 1). Over 73% of Black population growth occurred in the Atlanta region, where nine of the ten counties with the greatest increase in Black population are located. SAMF ¶ 8 (citing ACS data). Four metro-Atlanta counties (Cobb, DeKalb, Fulton, and Gwinnett) comprise nearly 40% of the State's Black population. Only 27% of the State's white population lives in those four counties. SAMF ¶ 4 (Burden Rep. 4).

The net effect of growing Black voter mobilization coupled with these demographic shifts was increased Black voter participation—both in absolute numbers and as a percentage of the electorate. Black voter turnout jumped from

35% in the 2014 midterm election to over 49% in November 2018. SAMF ¶ 20 (Burden Rep. 10 & Tbl. 4). In presidential elections, it jumped from about 52% in 2016 to over 57% in 2020. SAMF ¶¶ 22, 26 (Burden Rep. 11 & Tbl. 4; Fraga Rep. Tbl. 1; Grimmer Tbl. 2). More than 325,000 additional ballots were cast by nonwhite voters in 2020 compared to 2016. SAMF ¶ 25 (Cobb Rep. at 2-3). Then, between the 2020 general and 2021 runoff elections, a historic number of Georgians registered to vote for the first time, with Black Georgians accounting for a disproportionate share of these newly eligible voters (over 35%, despite constituting just 30% of all registered voters). SAMF ¶ 58 (Fraga Rep. ¶¶ 170-173 & Tbl. 20). Black voter turnout remained high in the January 2021 runoff elections for U.S. Senate. SAMF ¶ 26 (Fraga Rep. Tbl. 1). Although white voters continue to vote at higher rates than Black voters, SAMF ¶ 17 (Clark Rep. 15 & Tbl. 6; Burden Rep. 9-10 & Tbl. 4), the white share of registered voters has declined over the last several years, SAMF ¶ 15 (Burden Rep. 8-9 & Tbl. 3 (from about 58% in 2014 to under 52% in 2022)).

**The Legislature's response to newly close elections.** Black political engagement flourished during this period, facilitated in part by expansions of the opportunity to vote that were introduced during the pandemic, such as absentee ballot drop boxes and State and county efforts to mail unsolicited absentee ballot applications to registered voters. *See, e.g.*, SAMF ¶¶ 57, 182 (Bailey Dep. 10/6/22

119:16-120:6; Burnough Decl. ¶ 13). After years of one-party dominance, statewide elections in Georgia became closely contested. SAMF ¶ 13 (Burden Rep. 8). In 2018, the Black-preferred candidate for governor lost by just 1.4 percentage points. Then, Black-preferred candidates secured stunning wins in razor-close elections in November 2020 and January 2021. SAMF ¶¶ 86-87 (Burden Rep. 8; Cobb Rep. 30; Ga. Sec'y of State, Official Results 11/3/2020; Ga. Sec'y of State, Official Results 1/5/2021). The 2020 presidential race in Georgia was decided by less than 0.25 percentage points (12,670 votes) and resulted in the election of the nation's first Black Vice President. *Id*. The two Senate runoff elections in January 2021 were decided by 1.2 points (54,944 votes) and 2.0 points (93,272 votes), respectively, and sent Georgia's first Jewish and first Black senators to Congress. *Id*. The recent competitiveness of Georgia elections "is widely understood to be a reflection of the growing participation of Black voters." SAMF ¶ 88 (Burden Rep. 4-5); *cf. McCrory*, 831 F.3d at 225-26 ("[M]uch of the recent success of Democratic candidates in North Carolina resulted from African American voters overcoming historical barriers and making their voices heard to a degree unmatched in modern history.").

Following a post-election campaign to delegitimize these election results through a racially charged and baseless election fraud narrative, *see infra*, the 2021 legislative session convened just one week after the January 2021 Senate runoff

elections. This Legislature voted to curtail many practices that Black voters had relied on to achieve the historic wins of the 2020 election cycle. *See* 10/11/2023 PI Order at *45 (recognizing that these facts alone "could potentially suggest that the Legislature acted with a discriminatory intent"). As in *LULAC*, the State "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive," and did so because those voters were poised to exercise their growing political muscle. *LULAC*, 548 U.S. at 428-40. "This bears the mark of intentional discrimination." *Id.* at 440; *see also McCrory*, 831 F.3d at 214-15 (same); *Veasey*, 830 F.3d at 241 (evidence that a challenged voting law passed "in the wake of a seismic demographic shift" that threatened the majority party's hold on power supported a finding of intentional discrimination (internal quotation omitted)).

This inference is bolstered by the dramatic about-face from longstanding policy reflected in several of the challenged provisions. *See Arlington Heights*, 429 U.S. at 267 (noting that a sudden change in policy tied to a race-related change in use would suggest a discriminatory purpose). For example, in 2005, when Georgia first enacted a photo voter ID law and exempted absentee voters from the ID requirement, "it was well-known among members of the General Assembly that most absentee voters were Republican and white." SAMF ¶ 244 (Hugley Decl. ¶

32

20; *see also* Sterling Dep. 62:8-13 (prior to 2018, Republicans disproportionately used absentee by mail voting)). Only after Black voters began using absentee voting disproportionately—and to great effect—did the Legislature change course and limit the use of absentee voting through SB 202. Similarly, for almost 20 years, the State counted out-of-precinct provisional (OP) ballots. *See* O.C.G.A. § 21-2-419(c) (2020). Only when statewide elections became very close and Black-preferred candidates narrowly won historic elections did the Legislature take aim at this practice that provides a failsafe for voters. And likewise, mobile voting units, the unlimited use of which had been authorized under Georgia law for nearly 40 years, became a target only after Fulton County deployed them to great effect in the 2020 election cycle. Georgia Laws 1982, p. 1512, § 5 (12); SAMF ¶ 476 (Fulton Cnty. Dep 177:17-18 (stating that voter turnout at the MVUs was very high)). These sudden and multiple changes in longstanding policy, all occurring at once, also suggest the Legislature was motivated, at least in part, by a discriminatory purpose. *Arlington Heights*, 429 U.S. at 267; *see also* SB 202 § 25 (amending O.C.G.A. § 21-2-381(a)(1)(A)) (changing the deadline for voters to submit mail ballot requests); O.C.G.A. § 21-2-381 (2005) (establishing previous deadline).

The State does not contest the facts underlying this conclusion but contends that they are insufficient to support a finding of discriminatory purpose because

they do not establish that the Legislature enacted SB 202 with "racist intent" or "racial animus." *E.g.*, State's Br. 28, 34. But racial animus is not required to prove discriminatory purpose. *See supra* 14-15 (citing cases). Here, record evidence supports the inference that legislators enacted SB 202's challenged provisions to impair Black voting strength *for political gain*. "'[T]argeting a particular race's access to the franchise because its members vote for a particular party' is impermissible." *LWV*, 66 F.4th at 924 (quoting *McCrory*, 831 F.3d at 222); *see also LULAC*, 548 U.S. at 440. "This is so even absent any evidence of race-based hatred and despite the obvious political dynamics." *McCrory*, 831 F.3d at 222-23. As discussed above, *supra* 15, the "presumption of legislative good faith" also does not preclude the Court from crediting this reasonable inference. *Contra* State's Br. 35, 40; Intervenors' Br. 14.

The State's reliance on *LWV* to argue that the circumstances underlying SB 202 cannot justify an inference of discriminatory purpose is also misplaced. State's Br. 35 (citing *LWV*, 66 F.4th at 924). Indeed, the discussion there only reinforces that summary judgment is inappropriate here. The court in *LWV* concluded, after a trial on the merits, that on the specific facts of that case there was insufficient evidence to conclude the Florida legislature was motivated by racial concerns. *LWV*, 66 F.4th at 924. To reach this conclusion, the court specifically relied on (1) evidence that "Florida black voters relied on vote by mail *less* than Florida white

voters," *id.* at 924-25 (emphasis in original), and (2) its determination based on the record after trial "that the supporters' justifications [for the challenged law] were credible," *id.* at 931. In contrast, here, record evidence shows that Black voters in Georgia recently began using absentee voting more than white voters and, critically, used it to great effect in very close statewide elections. Unlike in Florida, Black-preferred candidates *prevailed* in Georgia in November 2020 and January 2021. And, as discussed *infra* IV.C, Plaintiffs contest the State's proffered justifications for the challenged provisions, and material factual disputes as to pretext must be resolved at trial. *See, e.g.*, *Wate*, 839 F.3d at 1018 (on summary judgment, the court may not "make credibility determinations").

Together, the recent historical context and specific sequence of events leading to SB 202's passage support the reasonable inference of discriminatory purpose. *See LULAC*, 548 U.S. at 238-40; *McCrory*, 831 F.3d at 214-15. Even if the State contends this Court should draw a *different* inference from these facts, *see, e.g.*, State's Br. 35 (arguing that "[t]his inference is wholly unwarranted"), the Court must deny summary judgment. *See Allen*, 121 F.3d at 646 (on summary judgment, the court must draw all reasonable inferences in the nonmovant's favor).

### 2.  The Experience of AAPI Voters

Although Defendants fail to address AAPI voters—which by itself is sufficient to require denial of the motion for summary judgment—the record

supports an inference of intentional discrimination with respect to them, as well. SB 202's limitations on absentee voting were intended to curtail the ways AAPI voters participate in the political process in response to (1) the rapid growth of the AAPI population and electorate; and (2) increased AAPI political participation in recent years, driven in large part by mobilization efforts of third-party organizations (*e.g.*, Plaintiff Asian Americans Advancing Justice-Atlanta (Advancing Justice-Atlanta)), as well as the availability and ease of absentee voting.

**Rapid demographic change**. The AAPI population in the U.S. grew by 43% between 2000 and 2010 and by another 36% between 2010 and 2020. Between 2010 and 2020, the AAPI population in Georgia grew by 52%. SAMF ¶ 59 (Lee Rep. 16). In Georgia, AAPI residents are not only the fastest growing racial group, but also the fastest growing electorate. SAMF ¶ 59 (Lee Rep. 41). About 62% of Georgia's AAPI population and almost 45% of its Latino population resides in Cobb, DeKalb, Fulton, and Gwinnett counties. SAMF ¶ 4 (Cobb Rep. 13-14, 17).

**Increased political participation**. These dramatic increases in population coincide with increased political participation among AAPI voters, elevating an oft-overlooked minority group into Georgia's political landscape. Recent turnout rates demonstrate the high rate of growth in AAPI political participation. The 2020

election was a record year for AAPI voter turnout in Georgia with 53.5% of eligible AAPI Georgians turning out, a 21.9% increase from 2016. SAMF ¶ 76. (Lee Rep. Tbl. 1). From 2016 to 2020, AAPI voter turnout increased 84% in Georgia. SAMF ¶ 77 (Lee Rep. 56).

The increased participation by AAPI voters was a significant political shift. Historically, AAPI voters turned out at lower rates than white voters in Georgia, and AAPI voter registration and turnout rates in presidential election years between 2012 and 2020 were lower than Georgians overall. *See* SAMF ¶ 61 (Lee Rep. 44-46, Figs. 2-3 & Tbl. 1). These lower turnout rates are attributable to the lack of voter engagement and mobilization, as well as language barriers limiting access to the ballot. First, with respect to voter engagement, AAPI voters are less likely than white voters and even other minority voters to report being contacted and asked to vote in the upcoming election. *See* SAMF ¶ 64 (Lee Rep. 56). Second, language access is a barrier to AAPI voter participation. In Georgia, 33% of AAPI residents speak a language other than English at home and report speaking English less than "very well." SAMF ¶ 67 (Palmer Rep. ¶ 67). AAPI persons, more than any other racial group, cite "difficulty with English" as a main reason for not registering to vote. *See* SAMF ¶ 68 (Lee Rep. 52 & Fig. 6).

The recent increase in AAPI voter turnout in large part results from mobilization efforts by third parties. SAMF ¶ 78 (Lee Rep. 55-63). For the 2020

election, Plaintiff Advancing Justice-Atlanta engaged in voter outreach activities, including voter registration, get-out-the vote drives, and assistance with absentee voting, early voting, and Election Day voting. *See* SAMF ¶ 80 (Lee. Rep. 61); SAMF ¶¶ 698, 712 (AAAJ Dep. 42:6-8, 46:8-47:1, 74:12-32). Given the language diversity and high rates of limited-English proficiency (LEP) among AAPI persons in the State, Advancing Justice-Atlanta conducts outreach in several different languages. SAMF ¶ 699 (Lee Rep. 62).

The availability and ease of absentee voting also drove increases in AAPI voter turnout, as AAPI voters are now by far the group likeliest to vote by mail. SAMF ¶ 81 (Lee Rep. 65). In Georgia, nearly 40% of AAPI voters voted absentee in 2020, compared to just 24% of white voters. SAMF ¶ 83 (Lee Rep. Tbl. 2). AAPI voters were the group least likely to vote in person in 2020, whether via early in person (44% of AAPI voters compared to 54% for all Georgia voters) or in person on Election Day (16% of AAPIs, compared to 20% for all Georgia voters). SAMF ¶ 84 (Lee Rep. Tbl. 2). The data thus show that the voting strength of AAPI voters in Georgia would be significantly hindered by any barriers to mail-in voting. SAMF ¶ 85 (Lee Rep. 66).

## C.     The Legislature's Asserted Justifications Are Pretextual

Contrary to Defendants' assertions, State's Br. 34; Intervenors' Br. 16, the statement of purpose written in the text of the legislation does not afford the

Legislature a free pass on intentional discrimination.[10] *Arlington Heights* requires courts to consider and scrutinize circumstantial evidence to determine whether those stated purposes are pretextual. 429 U.S. at 264-66; *see also Washington v. Davis*, 426 U.S. 229, 241 (1976). Requiring direct evidence of discriminatory intent would "ignore the reality that neutral reasons can and do mask racial intent." *Veasey*, 830 F.3d at 235-36.

Here, record evidence suggests the State's purported primary justifications for SB 202—improving voter confidence and efficient election administration, State's Br. 34, 36, 49—are pretextual or tenuous. "[A] tenuous explanation for [the challenged system] is circumstantial evidence that the system is motivated by discriminatory purposes." *Marengo Cnty. Comm'n*, 731 F.2d at 1571. Because the Court may not "weigh conflicting evidence or make credibility determinations" at summary judgment, *Wright*, 657 F. App'x at 872, the motion must be denied.

### 1.  Voter Confidence in Election Integrity

Although the State argues that improving voter confidence in the integrity of Georgia's elections was the most important rationale for SB 202, *see* State's Br. 32, a reasonable fact finder could conclude, based on record evidence, that this

---

[10] Nor do *post hoc* rationalizations not considered by the Legislature at the time. *See infra* IV.G; *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 944 (N.D. Ala. 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

rationale is pretextual. After the 2020 election, the Trump campaign and leaders in the Georgia General Assembly promoted racialized accusations of voter fraud—despite constant, public assurances from the SOS's Office that these allegations were baseless—that undermined voter confidence among white, Republican-leaning voters. The General Assembly then used this racialized and self-created dip in "voter confidence" among white voters to justify new restrictions on the methods of voting that Black voters had used to elect—legally and without fraud—candidates of choice.

**Confidence in Georgia's elections was high.** In the leadup to November 2020, Georgia voters were confident that their vote would be counted in the upcoming general election, continuing a trend of confidence in Georgia's elections. SAMF ¶ 94 (King Rep. 16-18; CDR01357172). Survey results circulated to the SOS's Office in October 2020 showed that "Georgia voters overwhelmingly believe[d] that their vote will be counted accurately and kept secret, regardless of how they choose to vote." SAMF ¶ 95 (CDR01357172-73). The survey also showed that during early voting for the November 2020 election, both Republicans and Democrats were very confident that their vote would be counted. *Id.* (CDR01357173).

But messages received from political elites, particularly those of the party a voter supports, have a dramatic effect on voter confidence, as can unsubstantiated

claims of voter fraud. SAMF ¶ 96 (King Rep.13-14; Grimmer Dep. 39:3-41:20). In the days and weeks following the November 2020 election, the Trump campaign and some Republican leaders in the Legislature promoted a racialized election fraud narrative, discussed below, that eroded confidence among Trump's supporters. *See* SAMF ¶ 107 (Evans Dep. 175:1-5).

**Trump campaign and legislators promoted racialized and pretextual voter fraud narrative.** In Georgia, and elsewhere, the Trump campaign focused its fraud accusations on areas with large Black populations, such as Fulton and DeKalb Counties. *See, e.g.*, SAMF ¶ 99 (USA-04279 (Washington Post video of Dec. 23, 2020, Trump Call to Frances Watson, SOS Chief Investigator at 1:15); Anderson Rep. 98 (quoting the Dec. 23, 2020 call in which then-President Trump stated: "if you can get to Fulton, you're going to find things that are going to be unbelievable . . . Fulton is the motherlode."); Burnough Decl. ¶ 16; *see also* USA-AME_002333:12-2334:6 (Trump campaign references to mail-in ballots in Philadelphia and other cities with Black majorities or pluralities)). In a phone call with the Georgia SOS that became public, Trump specifically pointed the finger at Black election workers, one of whom he described as a "professional vote scammer and hustler." SAMF ¶ 102 (USA-04281 at 4:14-4:19; CDR00024677-84). Some Republican legislators repeated these false claims. On November 15, Representative Barry Fleming—who would eventually lead the charge on SB

202—made a racially derogatory statement in a published op-ed when he
compared the "always-suspect absentee balloting process" to the "shady part of
town down near the docks you do not want to wander into because the chance of
being shanghaied is significant." SAMF ¶ 106 (USA-04158-62 (Fleming op-ed);
Hugley Decl. ¶ 11 ("I believe Representative Fleming questioned the security of
absentee voting using a racially derogatory statement because more minority voters
took advantage of mail-in absentee voting in 2020 than in previous years.")); *see
also* SAMF ¶ 101 (CDR00216111 (Dec. 15, 2020 email from Rep. Rich to SOS
staff asking why SOS did not conduct a signature match audit in Fulton and
DeKalb Counties, "the two counties where there is at least a perception of greatest
fraud")); SAMF ¶¶ 122-123 (CDR00008853-68 & CDR00059366-67 (Dec. 2020
report issued by the Senate Judiciary Subcommittee on Elections)).

The Trump campaign also filed a barrage of lawsuits alleging voter fraud
and other irregularities in Georgia. SAMF ¶ 103 (Minnite Rep. 30). These lawsuits
proved to be baseless, but the issues raised in them became blueprints for the
election changes proposed in the 2021 Legislative Session. *See, e.g.*, *Trump v.
Raffensperger*, No. 2020CV343255 (Ga. Super. Ct., Fulton Cnty. 2020) (plaintiffs
voluntarily dismiss lawsuit alleging that state and county officials violated
elections code by, among other things, sending unsolicited absentee ballot
applications and entering into a consent decree relating to signature verification);

42

*Wood v. Raffensperger*, No. 2020CV342959 (Ga. Super. Ct., Fulton Cnty. 2020)

(court dismisses lawsuit alleging state officials had violated elections code by

accepting private grants to help fund elections, among other claims); SAMF ¶ 103-

104 (Minnite Rep. 30-32, 54-64; Anderson Rep. 114).

    The SOS's Office repeatedly and consistently debunked these fraud

claims—in press conferences, press releases, individual communications with

legislators, and in legislative hearings—reassuring legislators and the public that

there was no validity to the claims. *See, e.g.*, SAMF ¶¶ 108-109 (USA-04141 at

3:42; CDR00119748-57 (Jan. 6, 2021 letter from Raffensperger to members of

Congress); McCloud Dep. 79:12-84:9; Sterling Dep. 118:16-119:6; Anderson Rep.

16, 107, 111, 130-31 (cataloging repeated statements by election officials that

Georgia's elections were safe and secure)); SAMF ¶ 110 (CDR00146327-44;

McCloud Dep. 83:18-19, 87:13-88:24); *see also* SAMF ¶ 564 (Grimmer Dep.

37:9-23, 43:21-44:3 (agreeing there was no significant fraud in Georgia in 2020)).

    Nevertheless, in December 2020, the Legislature held several hearings that

amplified and legitimized the false voter fraud narrative, creating an official

platform for the spread of this racialized misinformation. SAMF ¶ 112 (USA-

03298; USA-03299; USA-03184; USA-03185); SAMF ¶ 116; (Parent Decl. ¶ 22

(describing relentless focus on Black election workers and alleged election

irregularities in Fulton and DeKalb Counties)). The hearings were broadcast on

television and were widely covered in conservative media. SAMF ¶ 113 (Jordan Decl. ¶ 32). In a remarkable departure from normal practice, the Senate Judiciary Committee Election Law Subcommittee allowed invited witnesses from the Trump campaign to ask questions during two of these hearings. SAMF ¶ 114 (Jordan Decl. ¶ 30; Parent Decl. ¶ 21; 12/30/2020 Sen. Jud. Hr'g, AME_002894:10-2899:11). Trump campaign lawyers, Rudy Giuliani and Ray Smith, replayed footage of Black election workers at State Farm Arena in Atlanta and falsely argued that they were engaging in election fraud. SAMF ¶ 121 (USA-04100 at 13:00-29:55; 12/10/2020 H. Gov. Aff. Hr'g, AME_002501:13-2507:11; Parent Decl. ¶ 22). Playing on longstanding racial tropes, Giuliani repeatedly linked Black election workers doing their jobs to drug dealers. In one hearing, he said the officials from the State Farm Arena footage, who were Black, were "scurrying around" and hiding ballots like they were "passing out dope." SAMF ¶ 116 (12/10/2020 H. Gov. Aff. Hr'g, AME_002498:6-24). Later, he described two Black election workers, who subsequently received death threats, as "passing around USB ports as if they're vials of heroin or cocaine." *Id.* (12/10/2020 H. Gov. Aff. Hr'g, AME_002514:5-25). These two election workers later won a $145,969,000 civil defamation suit against Giuliani because of these false statements. SAMF ¶ 118 (*Freeman v. Giuliani*, No. 21-cv-3354 (D.D.C. 2023)).[11]

---

[11] Another advisor to former President Trump pleaded guilty to a felony charge of

Legislative leadership at these hearings did not rebut the false fraud allegations or contradict Giuliani's comparison of Black election workers to drug dealers. *See generally* Ex. 124 (12/20/2023 H. Gov. Aff. Comm. Hr'g Tr.). Efforts by legislators in the minority party to contest the false claims were shut down by hearing organizers. *See, e.g.*, SAMF ¶ 119 (Nguyen Decl. ¶¶ 23, 25-28 (questioning of witness cut short); Jordan Decl. ¶¶ 26-27; Parent Decl. ¶ 19 (minority party legislators not permitted to call witnesses or given advance notice of who would testify)). In late December, the Senate Judiciary Committee Election Law Subcommittee released a report collecting and repeating previously discredited fraud allegations from the December hearings. *See* SAMF ¶¶ 122-123 (CDR00008853-8868; CDR00059366-67).

**Fraud hearings led to SB 202.** A reasonable fact finder could conclude that by providing an official platform at which specious and racially charged allegations could go unchallenged, legislators lent the General Assembly's institutional legitimacy to this election fraud narrative and set the stage for the restrictive voting bills of the coming legislative session. As Georgia's then-Lieutenant Governor himself conceded, the December 2020 hearings provided the

---

aiding and abetting false statements and writings for knowingly, willingly, and unlawfully making false statements about election fraud during one of these December 2020 hearings. SAMF ¶ 118 (*Georgia v. Ellis*, No. 23SC188947 (Ga. Sup. Ct. 2023) (Accusation, Motion to Nolle Prosequi, Order of Nolle Prosequi)).

momentum for voting laws in the 2021 Legislative Session. SAMF ¶ 120 (USA-04134 at 2:17-2:38). Witnesses at the hearings "translate[d] their grassroots effort into official action" when their election reform proposals were incorporated into SB 202. *Stout by Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 998, 1008 (11th Cir. 2018) (alteration in original). *Compare, e.g.*, SAMF ¶ 115 (12/10/2020 H. Gov. Aff. Hr'g, AME_002434:14-20 (testimony advocating for ban on unsolicited mail ballot applications), AME_002436:1-14 (testimony advocating for ID numbers on absentee ballot applications and ballots)) *with* SB 202 §§ 25, 27-28 (prohibiting government entities mailing unsolicited mail ballot applications and new ID requirements for absentee ballot applications and ballots).

**Legislators knew the fraud narrative was false, yet acted on it.** As shown above, the post-election narrative in late 2020 was inextricably intertwined with racial bias and stereotyping. The fraud allegations were directed at areas with large numbers of Black voters; absentee balloting suddenly became suspect only after Black voters began to use it at higher rates than white voters; and Black election workers were compared to drug dealers and subjected to threats of lynching. *See supra*; SAMF ¶ 100 (USA-04144 at 9:03-9:52 (Sterling describing a widely circulated GIF showing a slow-swinging noose aimed at a Gwinnett County elections worker); 6/21/22 H. Select Comm. Hr'g Tr. 33-34 (describing racist threats received by Black election workers, including "Be glad it's 2020 and not

1920.")). Citizen complaints the State claims revealed a lack of voter confidence were imbued with racial bias. *See, e.g.*, SAMF ¶¶ 429-430 (Ex. F to Defs.' Ex. F (06/24/2022 Germany Decl.); Ga. SEB Meeting Tr. (Feb. 7, 2023), 147:4-148:19, 191:5-192:7 (white voter complained that she felt intimidated by Black line relief volunteers and their "hip hop music" and was ultimately referred to Attorney General's office for brandishing a gun); Exs. D and E to Def's Ex. F (06/24/2022 Germany Decl.) (complaints focused on precincts with many Black voters and areas with significant Black populations)).

It is reasonable to conclude that legislators knew these racially charged election fraud accusations, having been repeatedly debunked, including by State officials, were false. *See, e.g.*, *supra* 43. To act on this narrative, even if for political survival, is state action giving force and effect to racial bias. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Stout by Stout*, 882 F.3d at 1007 (recognizing that "constituent statements and conduct can be relevant in determining the intent of public officials"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 122 (2d Cir. 2019) (statements by members of the public which "were susceptible to an inference of religious animus and hostility" and that "influenced at least [one decisionmaker's] decisionmaking process" were evidence of discriminatory purpose); *Garza*, 918

F.2d at 778 & n.1 (Kozinski, J., concurring in part and dissenting in part) (targeting

minority voters for political ends constitutes intentional race discrimination).

### 2. Efficient Election Administration

The record also suggests that SB 202's stated motivation to ease election

administration burdens was pretextual or tenuous. *See* State's Br. 34. First, county

election officials informed the Legislature that the challenged provisions would

make election administration *more* difficult—not less. Indeed, many county

election officials opposed the enacted provisions *Cf. LWV*, 66 F.4th at 919

(upholding law where election officials supported the provisions as enacted).[12]

Second, many of the challenged provisions are related tenuously at best to solving

any actual election administration issues. *See McCrory*, 831 F.3d at 214 (When a

challenged law "impose[s] cures for problems that did not exist," the State's

"asserted justifications cannot and do not conceal the State's true motivation.").

---

[12] Moreover, contrary to Defendants' suggestion, even if certain of SB 202's
provisions *had* eased, rather than exacerbated, election officials' administrative
burdens, that would hardly preclude a genuine dispute of material fact about
whether race played a role in the Legislature's motivations. The Supreme Court
has observed that "every voting rule imposes a burden of some sort" on voters.
*Brnovich*, 141 S. Ct. at 2338. The observation applies equally to election
officials—some administrative burdens must be shouldered by officials to ensure
voters can cast their ballots. *See League of Women Voters of N.C. v. North
Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (a state may not "pit its desire for
administrative ease against its minority citizens' right to vote"). Efforts to lighten
such inevitable administrative burdens may well be pretextual if, as here, they
target voting practices used disproportionately by Black voters.

**Election officials opposed many of the challenged provisions of SB 202.**

County election officials testified and submitted comments to legislators to express

their concerns about foreseeable administrative burdens caused by the challenged

provisions. For example, dozens of county election officials informed the

Legislature of their opposition to the 11-day absentee ballot request deadline. *See*

SAMF ¶ 218 (USA-ADAMS-000027.0003-05 (noting that of 56 county election

officials who commented on this topic, 11 wanted to keep the 3-day deadline and

23 advocated for a date closer to Election Day that was less "punitive" on voters);

USA-ADAMS-000062.0001 (Heard County); USA-ADAMS-000043.0001-

44.0002 (Bartow County)).[13] Several testified in favor of a more moderate deadline

7 or 8 days before Election Day.[14]

Election officials also advocated for the SEB's Emergency Rule regarding

---

[13] During the 2021 Legislative session, Tonnie Adams, Heard County Election
Supervisor and Legislative Committee Chairman for the Georgia Association of
Voter Registration and Election Officials (GAVREO), solicited feedback from
county election officials statewide on pending legislative proposals. Adams sent
the responses to this survey to all legislators on March 10, 2021, with a goal of
influencing the Legislature to adopt changes that make election officials' lives
easier, not harder. SAMF ¶ 146 (USA-ADAMS-000026.0001-27.0016 (03/10/2021
Adams emailing survey responses to Representatives, *hereinafter* "Adams
Survey"); USA-ADAMS_000053.0001-54.0016 (03/08/2021 emailing Adams
Survey to Senators); Adams Dep. 146:13-147:10; 148:10-149:12; USA-ADAMS-
000053.0001-02)).
[14] *E.g.*, SAMF ¶ 218 (2/19/2021 EIC Hr'g, AME_000204:20-205:19 (Richmond
County Elections Supervisor); *id.* at 228:10-229:9-16 (Lowndes County Elections
Supervisor); 2/22/2021 EIC Hr'g, AME_000360:3-10 (Bartow County Elections
Supervisor)).

drop boxes, discussed *supra* 6, to become law. SAMF ¶ 307 (USA-ADAMS-000027.0007-0008). County officials opposed SB 202's severe limits on the number of drop boxes permitted in each county, arguing that "[t]he counties who installed [drop boxes] should not have to close them due to a change in the allowed number based on population." SAMF ¶ 307 (USA-ADAMS-000027.0007; USA-ADAMS-000043.0001-44.002 (petitioning for at least one drop box per early voting location)). Although the State claims that limiting the number of drop boxes addresses concerns about "uneven use of drop boxes in 2020" and eases the burden on election officials, State's Br. 7, county election officials informed legislators that the State's desire for "uniformity" disproportionately *burdened* counties, unlike the SEB Emergency Rule, which allowed counties to decide how many drop boxes to use in 2020. *See* SAMF ¶ 307 (USA-ADAMS-000027.0007-08). The ACCG, an association representing county governments in Georgia, informed legislators of its members' preference that counties have "flexibility and option to employ" drop boxes, instead. SAMF ¶ 307 (USA-EDWARDS-00000228–31).

County election officials also opposed SB 202's limits on the hours and locations of drop boxes. They asked the Legislature to allow drop boxes to be located outdoors and available 24-hours a day until 7:00 p.m. on Election Day. *See, e.g.*, SAMF ¶ 307 (USA-ADAMS-000027.0007 ("Making [drop boxes] available only at early voting and during those hours only makes absolutely no sense."); *id.*

at USA-ADAMS-000027.0008 ("Boxes should be open as soon as ballots can be issued and close at the close of polls on Election Day."); USA-ADAMS-000043.0001-44.0002)). At legislative hearings, county officials, including the State Defendants' own expert on election administration, implored the Legislature to let the drop boxes remain outdoors. SAMF ¶ 307 (2/19/2021 H. EIC Hr'g, AME_000207:19-208:9 (Richmond County); *id.*, AME_000223:14-224:2 (Cobb County); 2/22/2021 H. EIC H'rg, AME 000361:1-16 (Bartow County)). Multiple elections directors testified that putting drop boxes inside makes them "useless." *E.g.*, SAMF ¶ 307 (3/8/2021 H. EIC Hr'g, AME_001627:11-19 (Heard County); 2/19/2021 H. EIC Hr'g, AME_00228:10-229:7 (Lowndes County)); *see also* SAMF ¶ 307 (USA-EDWARDS-00000228-31 (ACCG email informing legislators of counties' opposition to limitations on drop boxes "being inside early voting locations and in use only during the days and hours of early voting")). This testimony directly contradicts the State's claim—unsupported by any citation to the legislative record—that the Legislature adopted these limitations on drop box use because of concerns about administrative hardships in 2020. *See* State's Br. 5, 7. Indeed, as discussed below, Defendants have not identified any evidence showing that these alleged hardships were presented to legislators.

County election officials informed the Legislature that the new ID requirements for absentee voting would *increase* the administrative burden on

election officials. *E.g.*, SAMF ¶ 248 (USA-ADAMS-000043.0001-44.0002; USA-ADAMS-000027.0004-0006 (noting half of the officials surveyed opposed the change); USA-EDWARDS-00000316-17; T. Edwards Dep. 122:22-123:16, 193:3-11 (showing that ACCG opposed SB 202's voter ID requirement)). They noted that requiring this information "will dramatically increase the number of rejected [absentee] ballots that need to be cured," and "require[] us to have to duplicate more ballots." SAMF ¶ 248 (USA-ADAMS-000027.0006). Other election officials offered a similar critique. *Id.* If the Legislature were actually concerned about practices that required election officials to manually duplicate ballots, as it claimed, *see* SB 202 § 2 ¶ 14; State's Br. 12, it would have heeded these warnings. *Cf. Arlington Heights*, 429 U.S. at 267 (substantive departures from "factors usually considered important by the decisionmaker" may be evidence of discriminatory purpose).

Election officials informed legislators of their concern that the ban on counting out-of-precinct provisional ballots cast before 5:00 p.m. would disenfranchise voters who make a good faith mistake and appear in person to vote at the incorrect precinct, preferring that voters not be disenfranchised for the sake of administrative convenience. *See* SAMF ¶ 392 (USA-ADAMS-000027.00013). Local election officials also expressed alarm at the SEB takeover provision, believing it was dangerous to empower a single individual with the authority to

determine which ballots are counted and which rejected. SAMF ¶ 496 (Adams

Dep. 53:24-54:7; 193:18-194:4; Bailey 10/06/22 Dep. 96:7-97:21).

**SB 202 purports to solve problems that do not exist.** There was also very

little evidence that the problems these provisions purported to solve existed, further

suggesting the justifications are pretextual. *See McCrory*, 831 F.3d at 214. For

example, SB 202's drop box limitations were purportedly enacted because drop

boxes were not previously authorized under Georgia statute. *See* SB 202 § 2 ¶ 10;

State's Br. 4-5. But the General Counsel for the Secretary of State concluded drop

boxes *were* authorized under prior law. SAMF ¶ 288 (CDR00056863-64); *see also*

SAMF ¶ 287 (Mashburn Dep. 73:16-24 (SEB member admitted that drop boxes

were not *prohibited* under prior law)). This evidence at the very least creates an

issue of fact as to whether the true motivation for the drop box changes enacted in

2021 was *not* to authorize drop boxes for the first time, but to dramatically restrict

their use. The State also claims the limitations on drop boxes were enacted to

prevent ballot harvesting. State's Br. 6. But ballot harvesting is not mentioned in

the preamble to SB 202, was already illegal prior to SB 202, and, the State admits,

did not occur during the 2020 elections. *See* O.C.G.A. § 21-2-385(a) (2020);

SAMF ¶ 310 (CDR00146329, ¶ 11; CDR00056863-64); SAMF ¶ 311 (SOS

Admission No. 16). Furthermore, the State has not pointed to any evidence before

the Legislature that election officials experienced administrative or security issues

with drop boxes during the 2020 elections.[15] To the contrary, several county election officials testified that they and their voters liked using drop boxes and experienced no issues under the SEB Emergency Rule. *See, e.g.*, SAMF ¶ 302 (2/19/2021 H. EIC Hr'g, AME_000207:12-19 (Lynn Bailey noting, "Our voters loved it. We didn't have any issues with it. [. . .] [W]e followed the strict [SEB] guidelines [. . .]."), AME_000228:16-21 (Lowndes County Elections Supervisor Deb Cox testifying, "The drop boxes are very important. They're hugely popular. [. . .] They were used extensively in our county after hours.")); SAMF ¶ 303 (12/3/2020 Sen. Oversight Hr'g, AME_001958:11-18 (Germany testifying before legislators that SOS had no issues obtaining drop box surveillance footage from counties)).

The provision banning most out-of-precinct (OP) voting is another example of a solution in search of a problem. *See McCrory*, 831 F.3d at 214. Contrary to legislators' claims, the number of OP provisional ballots had not drastically increased in recent years. SB 202 § 2 ("The number of duplicated ballots has continued to rise dramatically from 2016 through 2020 . . ."). Chairman Fleming falsely claimed that the number of OP votes increased from 200-300 in 2016 to 20,000 in 2020. SAMF ¶ 390 (3/18/2021 H. EIC Hr'g, AME_001518:20-24). But

---

[15] Although Defendants now cite two alleged incidents of improperly secured drop boxes in 2020, there is no evidence legislators were aware of these incidents. *See infra* IV.G.

the State's own data at that time showed that only 8,191 OP votes were cast in 2020, a decline from 10,917 in 2018, and that only 6,124 were cast in 2016. *See* SAMF ¶ 391 (CDR00044731-32).

Similarly, although the State justifies SB 202's early deadline for mail ballot applications (11 days before Election Day, rather than four under prior law) by asserting that absentee ballots requested during the now-eliminated seven days were almost never voted and therefore burdened county election officials unnecessarily, *see* State's Br. 10-11; SB 202 § 2 ¶9, the State's own data prove this false. For a majority of days of the now-eliminated request period during the November 2020 election, more than half (52%-59%) of the absentee ballots requested each day were ultimately cast and counted, about 16,000 in total. SMF ¶ 227 (Burden Supp. Decl. 4-5 & Tbl. 1). Even on the Friday before Election Day, about one-third of requests resulted in mail ballots that were counted. *Id.*

In light of the many public and private objections from experienced and longstanding county election officials, and evidence that the problems the challenged provisions were purportedly enacted to solve did not exist, material factual disputes prevent this Court from crediting the State's assertion that improved election administration motivated the challenged provisions. *See, e.g.*, *Fayette Cnty*, 775 F.3d at 1343; *Veasey*, 830 F.3d at 238-39 (district court need not "simply accept that legislators were really so concerned with [the] almost

nonexistent problem" that defendants claimed motivated the passage of a voter ID law). When coupled with evidence of the racialized narrative infecting the voter confidence justification, *supra* IV.C.1, and the discriminatory impact of the many *particular* provisions the Legislature enacted, *infra* IV.F, the proffered justifications do not overcome the inference of discriminatory intent generated by other record evidence, including the sudden departures from past practices.

### 3. Justifications for SEB Takeover Provision and Ban on Mobile Voting Units

In passing the SEB takeover provision, the Legislature claimed that state officials were limited in how to address counties with long-term problems with election administration and compliance. SB 202 § 2 ¶ 7. However, according to the SEB, the Board has "plenty of mechanisms to enforce code violations without this." SAMF ¶ 498 (SEB Dep. 195:11-23).[16] Although the State now asserts that prior to SB 202, the SEB struggled to ensure county compliance with its orders, "even when county officials decided to blatantly violate Georgia law," ECF 757-1, p. 5, the SEB's 30(b)(6) designee testified that "counties will do what they are told . . . . I've found them to be very dedicated public servants [] — on the whole, by and large, and so they will do what they are told to do." SAMF ¶ 500 (SEB

---

[16] Although Mr. Mashburn testified that he believed the SEB takeover provision was intended to address systemic problems, he did not explain how the SEB's ability to ensure counties' compliance with the Georgia election code was insufficient to address such problems. SAMF ¶ 499 (SEB Dep. 195:16-25).

Dep. 257:24-258:4).

The true reason the Legislature enacted the SEB takeover provision—a provision widely understood to be targeted at majority-minority Fulton County, *see* SAMF ¶ 494 (GOP Vol. 1 Dep., 300:16-302:4; Germany Dep. 79:1-80:19; 90:23-91:18; Bailey Dep. 10/6/22 96:7-97:11)—was to assuage the outrage manufactured over false and wholly discredited allegations that the 2020 presidential election was stolen by Black election workers and Black voters in Fulton County—in other words, because Fulton County's large Black population helped deliver the state of Georgia to the presidential candidate favored by Black voters and disfavored by the majority of the Legislature. Even the State's own expert on election administration, Lynn Bailey, described the provision as "punitive" towards Fulton County. SAMF ¶ 495 (Bailey Dep. 10/6/22 96:7-97:11; COBB032462).

Equally unavailing are the State's several asserted justifications for the prohibition on mobile voting units, none of which appear in the bill's preamble. The State first claims there were concerns about the non-uniform use of MVUs across counties. State's Br. 18-19. But that remains the case under SB 202 today, since the statute does not require every county to utilize MVUs during an emergency—rather, the counties continue to have discretion as to their use in that situation. Furthermore, the decision whether to utilize MVUs as additional voting locations, and if so, how many, is no different than the decision of how many

advance voting locations to establish, a decision that under Georgia law rests with local election officials. O.C.G.A. § 21-2-385(d)(1). The State next asserts a concern "that county commissioners could abusively place mobile voting units in areas to boost turnout for their own elections or to benefit favored candidates." State's Br. 19. But under Georgia law, county commissioners have no say in where polling places, including MVUs, are located—local election officials make those decisions. O.C.G.A. §§ 21-2-70(4), 21-2-265. Finally, the State falls back on its catchall rationale: that MVUs present "security" concerns. State's Br. 19. For this proposition, the State cites exclusively to the deposition of Chris Harvey, the former Elections Director in the Secretary of State's office, and his statement of the obvious: "It's hard to drive away a courthouse. It's easier to drive away something that has wheels." SAMF ¶ 479 (Harvey Dep. 144:25-145:1). However, the State's citation omits what Mr. Harvey said next: "So I think I would generally be more concerned about the security of a mobile voting unit than I would be of a stationary building, but I don't think—I don't think security was—was really a—a major issue." *Id.* (Harvey Dep. 145:2-6). That the State found it necessary to truncate this quotation speaks volumes about the *bona fides* of its asserted rationale. As with the SEB takeover provision, a reasonable fact finder could conclude that the Legislature enacted the MVU provision because it did not like how Fulton County's Black residents voted in the 2020 election.

### D. Procedural and Substantive Departures During the Legislative Process Suggest a Discriminatory Purpose

The record evidence and justifiable inferences establish a genuine dispute of material fact as to the substantive and procedural regularity of the legislative process for SB 202. *See Arlington Heights*, 429 U.S. at 267-68. The State's cursory discussion of these *Arlington Heights* factors leaves out key facts revealing intentional procedural departures that minimized informed debate on and critique of SB 202 and its predecessor bills. Defendants fail to address extensive testimony from legislators and evidence from the legislative record on these issues, focusing instead on attacking an expert who gathered evidence relating to the legislative process. *See* State's Br. 31. As discussed below, the veil of secrecy that bill drafters maintained throughout the legislative process suggests that "improper purposes [were] playing a role." *Arlington Heights*, 429 U.S. at 267; *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 961-62 (W.D. Tex. 2017) (three-judge court) (finding that "[t]he exclusion of minority [legislator] and public input despite the minority population growth, the misleading information [provided by proponents], the secrecy and closed process, and the rushed process, all support an inference that" the 2011 redistricting plan was drawn "at least in part with a racially discriminatory motive"). *Infra* IV.D.1. The Legislature also substantively departed from its usual procedures when it ignored the views of county election officials and rejected calls for a study committee, "factors usually considered important by" the

Legislature. *Arlington Heights*, 429 U.S. at 267. *Infra* IV.D.2. Finally, despite the State's arguments to the contrary, the legislative process and substantive context surrounding HB 316 (2019) during a prior legislative session bear little resemblance to those of SB 202. *Infra* IV.D.3.

### 1.  Procedural Departures in 2021 Legislative Session

**Creation of a New "Election Integrity Committee."** For at least 16 years before SB 202, the House Governmental Affairs Committee had reviewed election bills, including 2005's omnibus voting law, HB 244, and 2019's HB 316. *See e.g.*, SAMF ¶ 130 (Burnough ¶¶ 24-25; HB 244 Status History; HB 316 Status History). By 2021, several representatives on the committee had substantial experience with election legislation. *See* SAMF ¶ 131 (Nguyen Decl. ¶ 39; 2019 & 2021 Committee Rosters). In 2021, in a departure from this longstanding procedure, the Legislature created the House Special Election Integrity Committee (EIC) and directed election legislation there, rather than to the Governmental Affairs Committee. SAMF ¶ 129 (Speaker Ralston Press Conf., Jan. 7, 2021, USA-04138 at 4:18-4:35; Burnough Decl. ¶¶ 23-26 (formation of EIC was an "unusual legislative tactic")); *see also Veasey*, 830 F.3d at 238 (listing deviation from ordinary committee process as a relevant procedural departure). Representative Fleming, who made his motivations clear when he used racially derogatory language to denigrate absentee voting after the November 2020 election, *see*

SAMF ¶ 106 (USA-04158-62),[17] led the EIC, rather than Representative

Blackmon, who chaired the Governmental Affairs Committee, SAMF ¶ 132

(Burnough Decl. ¶ 26). Speaker Ralston excluded all but one of the Governmental

Affairs Committee's Democratic members from the EIC, thereby dramatically

reducing the number of committee members who had prior experience with

election legislation. *See* SAMF ¶ 133 (Burnough Decl. ¶ 28; Nguyen Decl. ¶ 39).

"[A] legislature need not break its own rules to engage in unusual procedures."

*McCrory*, 831 F.3d at 228. That the Legislature bypassed the usual committee with

15 years of experience dealing with complicated election issues belies the State's

contention that it was committed to "deep consideration of election-related issues

throughout 2021." State's Br. 30.

     **Lack of transparency prevented meaningful engagement.** The State

makes much of the total number of legislative hearings on election bills in 2021,

State's Br. 30, but ignores the irregularities in how these hearings were conducted

that prevented meaningful engagement by election officials, the public, and

minority party legislators. Over 100 election bills were introduced in the 2021

legislative session. *See* SAMF ¶ 124 (CDR00466535-62 (SOS March 2021

Summary of Bills)). The EIC considered nearly 50 bills, a "significant increase in

---

[17] Fleming made the statements despite having supported no-excuse absentee
voting when it was introduced in 2005. *See* SAMF ¶ 106 (Khwaja Decl. ¶ 14).

the amount of election-related bills introduced in a single legislative session."

SAMF ¶ 125 (Burnough Decl. ¶ 29). Further undermining the State's argument

that the process involved "deep consideration" of elections issues, State's Br. 30,

legislators, members of the public, and experienced election officials struggled to

keep up because "the volume of bills coming through, there were more than usual,

more than . . . perhaps ever." SAMF ¶ 128 (Bailey Dep. 62:11-63:2; Athens-Clarke

Cnty. Dep. 38:10-38:13, 158:25-159:5; Cobb Cnty. Dep. 230:24-232:14).

　　To make matters worse, committee chairs in both the House and Senate

often introduced substitute bills—many with significant new provisions—during

hearings on the bill and did not make timely drafts available to Black and other

Democratic committee members beforehand. SAMF ¶ 126 (Burnough Decl. ¶¶ 29,

34-36, 43 (House EIC); Jones Decl. ¶ 19 (Sen. Gov. Affairs); Harrell Decl. ¶¶ 10-

11, 13 (same)). This was not normal legislative process. *See* SAMF ¶ 126

(Burnough Decl. ¶¶ 29, 36; Jones Decl. ¶ 19; Harrell Decl. ¶¶ 10, 13). On the

Senate side, committee meetings on election measures sometimes occurred at 7:00

a.m. with notice only provided the day before. SAMF ¶ 135 (Jones Decl. ¶ 19;

Harrell Decl. ¶ 8). These early morning committee meetings were unprecedented,

SAMF ¶ 135 (Harrell Decl. ¶ 8; Jordan Decl. ¶ 44), thereby making it harder for

the members of the public most affected to have a voice in shaping the legislation.

　　Because of these unusual procedures, it was difficult for legislators and the

public to meaningfully engage in the process. SAMF ¶ 136 (Burnough Decl. ¶¶ 29-30, 34-38; Jones Decl. ¶ 19, Harrell Decl. ¶ 6; Battles Decl. ¶¶ 11-15 (describing effects of these procedural irregularities on public participation)); *see also Perez*, 253 F. Supp. 3d at 961 (finding that "rushed process provided less time for minorities to evaluate the [challenged redistricting] plans" and contributed to inference of discriminatory motive). For example, in three of the five hearings on HB 531, one of SB 202's predecessor bills, legislators or witnesses complained that they had not been able to view the bill draft before the hearing and thus were unable to fully comment on the bill. *See, e.g.*, SAMF ¶ 137 (2/18/2021 H. EIC Hr'g, SOS0003068:4-16 (Rep. Alexander); 2/19/2021 H. EIC Hr'g, AME000100:2-22 (Cindy Battles); 2/23/2021 H. EIC Hr'g, SOS0002497:7-16 (Linda Bridges)). Similarly, when the final version of SB 202 returned to the Senate, after ballooning from the two-page version the Senate initially passed to over 90 pages in the House, Senators were permitted only an up or down vote on the floor, limiting the Senate's opportunity to debate the substance of the final bill. *See* SAMF ¶ 142 (Jones Decl. ¶ 25; SB 202 as passed in Senate; SB 202 as enacted). This hardly qualifies as "careful and close consideration [of] election bills." State's Br. 31.

Rather than conducting a deliberate and public process, as was customary, Representative Fleming and other sponsoring legislators worked out of the public

eye with Ryan Germany, General Counsel to the SOS, and outside counsel Bryan Tyson and Javier Pico-Prats, to craft election-related bills. *See* SAMF ¶ 134 (Germany Dep. 33:1-35:11; CDR00062772-74; CDR00157637-40). The State has not asserted the Legislature had ever done this for election bills in any other session, including for HB 316 in 2019. SOS staff met privately with Republican members of the EIC before election bills were introduced in the Committee to explain the substance of the bills but did not meet with Democratic members of the EIC, all of whom are Black. SAMF ¶ 139 (Germany Dep. 36:3-38:12; USA-03187 (listing Democratic Representatives Alexander, Burnough, Douglas, and Smyre as members)). Such secrecy in the drafting process impeded meaningful participation by anyone other than the few white legislators and outside attorneys selected by the bill sponsors. *See, e.g.*, SAMF ¶ 140 (COBB024273 (3/19/21 email from Bartow County Elections Director: "If they [legislators] weren't being so secretive about what they were doing it would be easier to work on the right [bill] number"); Battles Decl. ¶ 21 (describing SB 202's legislative process as "an exercise in obfuscation")).

The evidence also raises a genuine dispute about the State's insistence that the legislative calendar made this frenetic pace inevitable and routine. State's Br. 24. First, the legislative session is not 40 calendar days, it is 40 legislative days. The 2021 legislative session lasted 79 calendar days, including 54 weekdays. *See*

SAMF ¶ 127 (McCloud Dep. 198:7-198:21). Second, as discussed further below the last major election bill to pass the General Assembly was developed and debated through two legislative sessions, a process that was suggested but rejected in the case of SB 202. SAMF ¶ 179 (Hugley Decl. ¶¶ 14-15; 3/24/2021 SB 202 H. Fl. Debate, AME_001840:8-15 (Rep. Alexander); 3/18/2021 H. EIC Hr'g, AME_001578:10-15, AME_001591:21-1592:1 (Marilyn Marks); 3/16/2021 Sen. Ethics Hr'g, AME_001378:17-21 (Cindy Battles)); *see also infra* IV.D.3 (discussing HB 316). The evidence suggests that proponents of SB 202 concocted the rushed and secretive process, much as they had concocted the voter confidence problems they cited as their rationale for the bill. *See Perez*, 253 F. Supp. 3d at 961 (finding that legislators' argument that time constraints made a rushed process inevitable was "pretextual in some regards").

### 2.    Substantive Departures in 2021 Legislative Session

**Legislators ignored county election officials' concerns**. Many of SB 202's challenged provisions represent substantive departures because they defy the recommendations of county election officials. Here, unlike in *LWV*, the Legislature ignored the testimony of county election officials, the most knowledgeable sources on many of the election procedures SB 202 changed. *Compare LWV*, 66 F.4th at 919 ("The county supervisors of elections, through their trade organization, influenced the final version. In fact, their lobbyist testified that probably 80 percent

of the provisions . . . have a tweak that [was] [the supervisors'] suggestion[] on how to operate." (alterations in original) (internal quotation marks omitted)) *with supra* 49-53 (describing election officials' opposition to provisions of SB 202).

While county election officials provided meaningful input in previous legislative cycles, in 2021 they believed that they were shut out of the process. For example, in 2019, county election officials were polled about which voting machines they preferred, and the Legislature ultimately adopted the system that 95% of responding officials preferred. *See* SAMF ¶ 149 (H. Gov. Aff. Elections Subcomm. Hr'g, Video of Proceedings (Feb. 19, 2019), at 41:30-45:53 (Lynn Bailey)). In 2021, in contrast, record evidence supports the inference that lawmakers already knew what they wanted in the bill and merely feigned interest in hearing from election officials, which in turn suggests that one of SB 202's primary justifications—improved election administration—is pretextual.

In 2021, the Legislature invited a few election officials to provide input, *see* SAMF ¶ 144 (COBB023443 (Germany email noting Rep. Fleming seeks the input of Lynn Bailey, Nancy Boren, and Janine Eveler)), and some testified on HB 531, but those same officials expressed frustration that their input was not meaningful to the outcome. The elections director for Athens-Clarke County captured the views of many county election officials when she lamented, "I am not sure [the legislators] care about our opinions at all." SAMF ¶ 148 (COBB032572; *see also*

COBB024284 (Cobb County Elections Supervisor referring to an email she sent to legislators, "I doubt anyone will listen though."); COBB024251 (Gwinnett County Elections Supervisor noting, "It's like beating our heads against the wall, they're [legislators] just not listening…"); COBB032418 (Fulton County Elections Supervisor noting, "They keep saying that they are doing this to make our jobs easier, but they are going to make it more difficult"); Bailey 10/6/2022 Dep. 63:18-65:14 (Richmond County Elections Supervisor)).

No election official testified during committee hearings on SB 241, one of SB 202's predecessor bills. *See* SAMF ¶ 138 (Jones Decl. ¶ 18). The few election officials that Chairman Fleming featured during the hearings on HB 531 provided testimony that weighed against enacting the bill's restrictive measures. *See supra* IV.C.2. According to Tonnie Adams of GAVREO, legislators largely did not include the changes he and other election officials advocated for during the 2021 legislative session. SAMF ¶ 147 (Adams Dep. 80:11-14).

A reasonable fact finder could conclude, based on this evidence, that the legislative process leading to the passage of SB 202 was a meaningless charade, not designed to improve election administration but rather to accomplish some other purpose.

**Lack of a study commission.** Calls for a study commission to examine the issues and make election reform recommendations went unheeded in 2021. SAMF

¶ 180 (Bailey 10/6/22 Dep. 65:1-14; BAILEY-000028-29). This was another departure from past practice. When considering election reform legislation in 2019, the Legislature relied heavily on the work of a study committee that had spent eight months studying the relevant issues. *See infra* IV.D.3 (describing HB 316). In 2021, the Legislature moved forward without such studied recommendations.

* * *

This evidence of procedural and substantive departures creates factual disputes as to the regularity of the legislative process for SB 202. State's Br. 25. The secretiveness of the drafting process, deliberate choices that prevented public debate, and exclusion of experienced legislators suggest a desire to evade public scrutiny. *See, e.g.*, *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 607 (2d Cir. 2016) (noting the district court had "found it strange" that "officials most familiar with the situation [] were excluded from the discussions"); *McCrory*, 831 F.3d at 228 (noting that the "hurried pace" of the legislative process "strongly suggests an attempt to avoid in-depth scrutiny"); *Perez*, 253 F. Supp. 3d at 961. Disregarding election officials' input and the aid of a study committee also favor a finding of discriminatory intent. *See Familias Unidas Por La Educacion v. El Paso Indep. Sch. Dist.*, 633 F. Supp. 3d 888, 900-01 (W.D. Tex. 2022) (lack of interpreters, which precluded affected community from participating in decision-making process, was a substantive departure); *Patino v. City of Pasadena*, 230 F.

Supp. 3d 667, 723 (S.D. Tex. 2017) (that decisionmaker "disregarded th[e] recommendation" of a committee established to review proposals was evidence of discriminatory intent). "[C]onsider[ing] all of the evidence cumulatively, [and] viewing it in the light most favorable to" the Plaintiffs, *Ash*, 664 F.3d at 897, the evidence of procedural and substantive departures contributes to the inference of discriminatory intent, further establishing that summary judgment is inappropriate on the present record.

### 3. Historical Background, Legislative Process, and Substantive Content of HB 316 Are Materially Different from SB 202

To support its position that SB 202 was an unremarkable legislative response to legitimate concerns arising out of the 2020 election, the State repeatedly likens SB 202 to HB 316, legislation enacted during the 2019 legislative session. *See* State's Br. 3, 23, 36. However, abundant evidence contradicts this characterization, creating additional material factual disputes that cannot be resolved on summary judgment.

Although the State describes HB 316 as a response to complaints and litigation emerging from the 2018 election, State's Br. 3, the bill stemmed primarily from the longstanding need for new voting machines in Georgia, which legislators spent years considering. In July 2017, voters filed a complaint challenging Georgia's use of a direct-recording electronic voting (DRE) system. *See* Complaint, *Curling v. Kemp*, 1:17-cv-02989 (N.D. Ga.). Although the court

later denied the plaintiffs a preliminary injunction, it noted that continued use of DREs likely violated the 14th Amendment. *See* PI Ord., *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1306 (N.D. Ga. 2018).

The General Assembly began studying the issue while litigation was ongoing. It convened hearings on the topic in September and November 2017, and during the 2018 legislative session, it considered but did not enact legislation that would have updated Georgia's voting equipment. SAMF ¶ 170 (SAFE Commission Report (Jan. 10, 2019) at 3; SB 403 (2018) (developing procedures for updating the state's voting systems)). Soon thereafter, and still six months before the November 2018 election, the Governor established the SAFE Commission, a committee designated to study alternatives to the DRE system. *See* SAMF ¶ 171 (*Elections Safeguards: SAFE Commission*, Ga. Secretary of State, https://sos.ga.gov/page/elections-safeguards). The Commission included legislators, election officials, a cybersecurity expert, voters, and representatives from three political parties. *See* SAMF ¶ 171 (SAFE Commission Report 2). In January 2019, the SAFE Commission issued a report recommending that the State transition from its DRE system to ballot marking devices (BMD). SAMF ¶ 172 (SAFE Commission Report 4-7, 13-16). With HB 316, the Legislature accepted this recommendation and adopted BMDs. *Compare* HB 316 as passed *with* SAMF ¶ 172 (SAFE Commission Report 4-7, 13-16).

While State Defendants suggest that the number of hearings and legislative days devoted to HB 316 compares favorably to SB 202's process, *see* State. Br. 3 & n.2, the comparison fails because of the years of study and discussion that came first. The two-year process that resulted in HB 316 allowed legislators to learn about the issue and provided opportunities for meaningful engagement on the substance of the bill. *See, e.g.*, SAMF ¶¶ 170-172, 177 (SAFE Commission Report; Battles Decl. ¶ 20). SB 202 lacked that opportunity for meaningful engagement. Other details relating to the legislative process on HB 316 also differ from the process on SB 202. For example, only 46 election bills were introduced in 2019, not 100 as in 2021. SAMF ¶ 178 (Ga. Gen. Assemb., *Legislation Search, 2019-2020 Regular Session, Elections*, https://www.legis.ga.gov/search?k=&s=27&t=21&p=1). None of the committee meetings on HB 316 took place before 8:00 a.m., compared to regular early morning Senate Ethics committee meetings in 2021. *See* SAMF ¶ 176 (2019 Meeting Notices). Advocacy groups were given time to review the different iterations of HB 316, as well as any proposed changes, unlike SB 202. SAMF ¶ 177 (Battles Decl. ¶¶ 19-21). The House Governmental Affairs Committee reviewed HB 316, not a newly created special committee. SAMF ¶ 175 (Burnough Decl. ¶ 25; HB 316 Bill Status summary). And much of HB 316 came from a public recommendation by experts, rather than a secretive process controlled by legislative leadership from the majority party.

Finally, unlike SB 202, HB 316 did not include multiple provisions that curtailed or eliminated existing methods of voting. Almost half (23 of 49) of HB 316's substantive sections focused on changing laws and processes to incorporate a new type of voting machine. *See* SAMF ¶ 172 (HB 316; H. Gov. Aff. Elections Subcomm., Video of Proceedings (Feb. 19, 2019) at 21:00). Another six sections addressed changes to the "exact match system" for voter registration, and a cure process for rejected absentee ballots that was triggered by *successful* litigation in federal court. *See* SAMF ¶ 173 (HB 316 §§ 6, 27, 30, 32, 37, 38; H. Gov. Aff. Elections Subcomm., Video of Proceedings (Feb. 19, 2019) at 41:30 (Lynn Bailey testimony) (describing provisions of HB 316 as requiring election officials to take certain additional steps when a voter registration application is rejected and implementing court orders involving signature mismatches on absentee ballots)); *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341-42 (N.D. Ga. 2018). Thus, rather than incorporating conspiracy theories derived from baseless post-election lawsuits and highly unusual legislative hearings that perpetuated disproven, racialized theories of election fraud, *see supra* IV.C.1 (discussing origins of SB 202), HB 316 largely reflected the deliberative recommendations of a study committee and the affirmative findings of a federal court. By codifying an absentee ballot cure process, HB 316 created more opportunities for absentee voting, whereas SB 202 took opportunities away.

A reasonable fact finder could conclude that SB 202 and HB 316 were not comparable in context, legislative process, or substance. The lack of commonality between the two bills undermines the State's assertion that SB 202 was unremarkable post-election legislation designed to respond to credible concerns arising out of the 2020 election.

### E.   Other *Arlington Heights* Factors

#### 1.   Contemporaneous statements and viewpoints of decisionmakers

The contemporaneous statements and viewpoints of decisionmakers contribute to the convincing "mosaic of circumstantial evidence" that the Georgia Legislature targeted Black and AAPI voters for political gain. *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022); *see also Arlington Heights*, 429 U.S. at 268. Notwithstanding the State's arguments to the contrary, State's Br. 38, racially coded statements such as Chair Fleming's derogatory description of absentee voting and use of the term "shanghaied"—and its inherent and contextual relationship to AAPI individuals—are circumstantial evidence of discriminatory intent, *see, e.g.*, *Underwood v. Hunter*, 730 F.2d 614, 621 (11th Cir. 1984) (identifying code words like the "corrupt and the ignorant" as references to Black and poor white voters); *Ash*, 664 F.3d at 897 (explaining, in a Section 1981 case, that use of "boy" to refer to Black employees, among other factors, permitted a reasonable jury to determine that defendant's claimed race-neutral justification was

pretextual); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (citing "camouflaged racial expressions" as evidence of discriminatory intent (internal quotation marks omitted)). Whether a particular comment evinces discriminatory intent "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (explaining, in a Section 1981 case, that, although use of "boy" to refer to Black employees "will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign").

The cases on which the State relies are not to the contrary. *See* State's Br. 38 (citing *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1284-85 (11th Cir. 2006); *Riley v. Birmingham Bd. of Educ.*, 154 Fed. App'x 114, 116 (11th Cir. 2005)). These cases merely hold that ambiguous statements are not direct evidence of discriminatory intent and cannot be the *sole* piece of evidence on which an intentional discrimination claim depends. *See Hallmark*, 466 F.3d at 1284-85; *Riley*, 154 Fed. App'x at 116.

Here, the contemporaneous statements and viewpoints of decisionmakers such as Chair Fleming and Speaker Ralston are one piece of a larger mosaic of circumstantial evidence that supports the inference of discriminatory intent. These statements create a genuine dispute of material fact as to the intent of the Legislature because they show that key legislators promoted unfounded and

racialized claims of election fraud around absentee voting to minimize Black and AAPI voters' voting power, just as those voters began using this voting method to exercise their political muscle.[18] *See LULAC*, 548 U.S. at 440; *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1552 (11th Cir. 1987). A reasonable fact finder could determine that Fleming's statement, uttered by an architect of SB 202 and considered along with other circumstantial evidence, shows that the Legislature was motivated, at least in part, by a discriminatory purpose. *See, e.g.*, *Stallings*, 829 F.2d at 1552; *Veasey*, 830 F.3d at 236-37; *Busbee v. Smith*, 549 F. Supp. 494, 500, 509 (D.D.C. 1982) (three-judge court); *see also* SAMF ¶ 106 (Hugley Decl. ¶ 11 (describing her understanding of Rep. Fleming's statements)).

The State wrongly contends that Fleming's statement is not relevant because it was not made about SB 202. State's Br. 37 (quoting *GBM*, 992 F.3d at 1323 (concluding statement at issue was not evidence of a discriminatory intent behind Alabama's voter ID law because it was made "during the debate on a different bill")). But once again, the State truncates the quotation, *see* State's Br. 36, omitting the very next sentence of Fleming's op-ed, which reveals the close link

---

[18] For example, Speaker Ralston's statement that sending unsolicited absentee applications would "drive up turnout" and thus be detrimental to his party in the November 2020 election betrays the real, non-pretextual goals of the restrictions in SB 202. SAMF ¶ 185 (USA-04145 at 19:55-21:44 (Rep. David Ralston Interview); Sterling Dep. 60:16-61:11).

between the views he expressed in the op-ed and SB 202: "Expect the Georgia Legislature to address that in our next session in January." SAMF ¶ 106 (USA-04158-USA-04162). True to his word, Fleming was a central figure in the Legislature's successful effort to curb Black and AAPI voters' access to absentee voting. *See supra* IV.D.1-2 (discussing the legislative process for SB 202 and its predecessor bills).

Other contemporaneous statements and legislation by Georgia lawmakers—including SB 202's sponsors—provide additional circumstantial evidence of discriminatory conduct against AAPI voters in particular. *See McCrory*, 831 F.3d at 223 (noting in the context of *Arlington Heights* that "[e]xamination of North Carolina's history of race discrimination and *recent patterns of official discrimination*, combined with the racial polarization of politics in the state, seems particularly relevant in this inquiry. The district court erred in ignoring or minimizing these facts" (emphasis added)). Within a year of SB 202's passage, the Legislature passed a bill prohibiting Chinese companies from bidding on state contracts; that bill shares 13 co-sponsors with SB 202. *See* SAMF ¶ 562 (Khwaja Decl. ¶ 15). While purportedly targeting non-Americans, such legislation harms AAPI persons, Asians, and immigrants more broadly and reveals an ongoing anti-AAPI sentiment that embodies the historical and pervasive stereotype of AAPI

individuals as "perpetually foreign."[19] *Id.*; SAMF ¶ 556 (Lee Rep. 40, Chang Rep. 61).

Likewise, while Defendants insist that Fleming's statement regarding absentee voting has "nothing to do with race," State's Br. 37 & n.14, Professor Lee explains that the term "shanghaied" is racial both inherently and in the context in which it was used (*i.e.,* with respect to absentee ballots, and given the time period in which the statement was made). SAMF ¶ 559 (Lee Supp. Decl. ¶ 6). The term is a "racial codeword" and is inherently racial given its association with AAPI individuals as "perpetual foreigners"—a pervasive association that features more prominently during highly racialized and politicized moments. SAMF ¶ 559 (Lee Supp. Decl. ¶ 7). The statement was published (and SB 202 passed) at such a moment: it was during this time that former President Trump introduced and popularized the terms "Chinese virus" and "kung flu," and when anti-AAPI incidents and hate crimes were notably high. SAMF ¶ 559 (Lee. Supp. Decl. ¶ 8); SAMF ¶ 551 (Lee Rep. 39-40 (summarizing reports and studies documenting increased rates of anti-AAPI harassment and hate in or around the passage of SB

---

[19] It is that stereotype that caused people of Asian descent to be ineligible to become naturalized citizens—and thus ineligible to vote—until 1952. *See* SAMF ¶ 547 (Chang Rep. 15-18, 39). As explained in greater detail in both Professor Lee and Chang's expert reports, the U.S. federal and individual state governments historically have enacted myriad laws against AAPIs.

202)). Indeed, it was around this time that a mass shooting in Atlanta killed eight people, six of whom were AAPI women, SAMF ¶ 552 (Lee Supp. Decl. ¶ 8). Senator Bruce Thompson minimized the horrific nature of these shootings by questioning the legality of the businesses where they occurred. SAMF ¶ 553 (Khwaja Decl. ¶ 11).

The statements of non-legislator witnesses are likewise relevant. The "views and associated lobbying efforts" of non-legislators can "be circumstantial evidence of the Legislature's intent." Order (May 9, 2023), ECF No. 544, at *5-*6; *see also Stout by Stout*, 882 F.3d at 1007; *I.L. v. Alabama*, 739 F.3d 1273, 1287 (11th Cir. 2014). As described above, the December 2020 hearings at which non-legislators peddled false and racially charged allegations of election fraud provided the momentum for election legislation during the 2021 Legislative Session. *See supra* 41-46. Although witnesses like Rudy Guiliani who testified before the Legislature are not legislators, public statements by an attorney on behalf of a party leader provide relevant "evidence of the racial and partisan political environment" surrounding legislation. *McCrory*, 831 F.3d at 229 n.7.

## 2. The Challenged Provisions' Disparate Impact was Foreseeable and Known

In intentional discrimination cases in the Eleventh Circuit, courts also consider "the foreseeability of the disparate impact" and "knowledge of that impact." *GBM*, 992 F.3d at 1322. Plaintiffs are not required to present any

particular kind of evidence, such as evidence that the Legislature considered certain statistics, to prove these factors. *Cf. Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1134 (3d Cir. 1993) ("[B]y adopting a flexible approach to the evidence, plaintiffs may still be able to prove the existence of a violation."). As set forth in Section IV.F, the challenged provisions disproportionately impact Black and AAPI voters. A genuine dispute exists as to whether the disparate impact was foreseeable and known. *Contra* State's Br. 40-43.

First, legislators who supported SB 202 requested and received data that shed light on the challenged provisions' foreseeable impact on Black and AAPI voters. *See McCrory*, 831 F.3d at 230 (holding that legislators' request for and receipt of election data revealing racial impact of challenged provisions weighed in favor of discriminatory purpose finding). For example, at legislators' request, in December 2020 the SOS Office sent legislators a spreadsheet specifying the number of votes each presidential candidate received in November 2020, broken down by county and method of voting (in-person Election Day, absentee by mail, advance voting, and provisional). SAMF ¶ 164 (CDR00063983-86 (12/23/2020 cover email and attachment); CDR00099553 (12/28/2020 cover email to all legislators and attachment)). These data show that Biden received almost twice as many votes cast via absentee by mail as Trump. *Id.* (CDR00063986). From these data, legislators could predict which counties and which candidate's voters would

be impacted by changes to absentee and provisional voting. Because of racially polarized voting, legislators also would have known, from the same data, whether Black, AAPI, or white voters would be disproportionately impacted. *See supra* IV.B.1 (discussing racially polarized voting).

Legislators also requested and had access to the State's absentee voter records, which are publicly available on the SOS website and routinely consulted by elected officials. *See, e.g.*, SAMF ¶¶ 150, 156, 167 (Prelim. Inj. Hr'g Tr. 15:25-16:11, 18:2-8 (Jones); CDR01369749 (11/19/2020 email from SOS staff to Rep. Blackmun); Ga. Sec. of State, Voter Absentee Files, https://sos.ga.gov/page/voter-absentee-files (accessed Dec. 5, 2023)). They also requested and received from the SOS Office data revealing how many registered voters had a DDS ID or a Social Security number associated with their voter registration record. SAMF ¶ 156 (CDR01369683 (2/18/21 email from McCloud to Chairman Burns)); *see also* SAMF ¶ 166 (CDR00043461-62; Germany Dep. 141:11-20; McCloud Dep. 204:16-25). In Georgia, voter registration records include the self-identified race of the voter. SAMF ¶ 168 (Fraga Rep. ¶ 22; Meredith Rep. ¶ 13).[20] Relying on these data, the Legislature enacted legislation restricting practices disproportionately

---

[20] The State's data show that when SB 202 was enacted, almost 273,000 registered voters did not have a DDS ID number associated with their voter registration record, and these voters were disproportionately Black voters. SAMF ¶¶ 256-257 (Meredith Rep. ¶ 37 & Tbl. IV.B.6).

used by Black voters. "When juxtaposed against the unpersuasive non-racial explanations the State proffered for the specific choices it made," *McCrory*, 831 F.3d at 230; *see also supra* IV.C., this Court "cannot ignore the choices the General Assembly made with this data in hand." *McCrory*, 831 F.3d at 230.

Second, common sense among elected officials in Georgia dictates that disparate harm to Black and AAPI voters was the natural consequence of the challenged provisions. *See Davis*, 426 U.S. at 253 (Stevens, J., concurring) ("[N]ormally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation."); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556, 1565 (11th Cir. 1996) (*DeSoto Cnty. I*) (observing that a state legislature is "composed of elected officials thoroughly knowledgeable about political, electoral, and racial realities across the state"). Georgia legislators are familiar with the demographics of their districts. SAMF ¶ 150 (Burnough Decl. ¶¶ 15-16; Jones Decl. ¶¶ 12, 20; 9/22/23 Prelim. Inj. Hr'g Tr.15:25-17:1, 19:1-13 (Jones); Palmer Rep. ¶¶ 22-28). It is also common knowledge that the four large metro-Atlanta counties are home to almost half of Georgia's Black population, but only about a quarter of its white population. *See id.*; *see also* SAMF ¶ 4 (Burden Rep. 4). Based on this information, it was foreseeable—indeed, obvious—that the provisions of SB 202 that

disproportionately (or almost exclusively) affect these counties—like the dramatic reduction in the number of drop boxes, the line relief ban, and the restriction on mobile voting units—would disproportionately impact Black voters. *See* SAMF ¶¶ 158, 161 (2/19/2021 H. EIC Hr'g, AME_000335:21-AME_000336:2 (Woodall); 3/22/2021 House EIC Hr'g, AME_001717:24-AME_001718:25 (Rep. Burnough)).

Georgia legislators are also familiar with the demographics of their supporters and opponents, as well as with the different methods of voting preferred by different groups of voters and that voting is highly racially polarized in Georgia. SAMF ¶¶ 150-152 (Burnough Decl. ¶¶ 15-16; Jones Decl. ¶¶ 12, 20; 9/22/23 Prelim. Inj. Hr'g Tr. 15:25-18:25, 19:14-20:17 (Jones on method of voting data available to legislators)). By 2021, it was well known that Black Georgians disproportionately cast absentee ballots in the 2020 election cycle, SAMF ¶ 153 (Burden Rep. 11 & Tbl. 5; Hugley Decl. ¶¶ 20, 23; 9/22/23 Prelim. Inj. Hr'g Tr. 15:25-16:11 (Jones)), and thus that policies burdening absentee voting would disproportionately impact Black voters.[21] *See* SAMF ¶ 152 (Burnough Decl. ¶¶ 15-16; Jones Decl. ¶¶ 12, 20 (legislators understand the methods of voting used by different groups of voters)).

It was likewise widely known that Black voters—in Georgia and

---

[21] The same is true of AAPI Georgians. *See* SAMF ¶¶ 81-82 (Lee Rep. 65 (describing how AAPI voters are the group likeliest to vote absentee)).

elsewhere—are less likely than white voters to possess state-issued photo ID. SAMF ¶ 154 (Meredith Rep. ¶¶ 50-59 (discussing studies of ID possession in Georgia, North Carolina, Texas, and Wisconsin)). Because of well-known socioeconomic disparities between Black and white Georgians, *see infra* 96-98 (discussing socioeconomic disparities), it required no speculation by legislators to foresee that Black Georgians would be disparately burdened by the requirement to obtain DDS ID or procure a copy of an alternative ID to attach to their absentee ballot application. SAMF ¶ 253 (Meredith ¶¶ 41-49; S. Johnson Decl. ¶¶ 9, 30); *cf. McCrory*, 831 F.3d at 227 (noting district court finding that "a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans") (alteration in original); *DeSoto Cnty. I*, 72 F.3d at 1565. These disparities also made the near-ban on out-of-precinct (OP) voting foreseeably more onerous for Black voters, who are both more likely than white voters to vote OP and less likely than white voters to have the resources needed to travel to the correct precinct when turned away. *See* SAMF ¶¶ 355, 396-97, 399-404 (Burden Rep. 25, 35-38, 53-55; Chatman Rep. ¶ 61 (about 9 percent of Black citizens of voting age in Georgia lack a vehicle in the household compared to about 3 percent of white citizens of voting age)).

　　AAPI voters are also less likely to have voter IDs than white Georgians, such that SB 202's new ID requirements disparately burden AAPI voters. *See*

SAMF ¶ 266 (Fraga Rep. Tbl. 5). Furthermore, national studies show that strict voter ID laws result in decreased minority participation, particularly in primary elections. *See* SAMF ¶ 255 (Lee Rep. 91). Thus, it would come as no surprise that SB 202's ID requirements disparately impact AAPI voters, as they are less likely to have access to the technology necessary to print or scan alternative identifying documents and more likely to experience difficulty navigating the necessary technology due to language barriers. *See* SAMF ¶ 279 (Lee Decl. ¶¶ 13-20).

Third, the data and common knowledge were confirmed by witnesses— including nonpartisan county election officials, voter advocates, and others—who testified before the Legislature that each of the contemplated reforms would obstruct minority voters. Some of these witnesses provided specific examples and statistics, although such specificity is not required for a court to find that discriminatory impact was foreseeable. *See, e.g.*, *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1373-74 (N.D. Ga. 2012) (finding that opponent's testimony that a zoning limitation "would not work for the church" and would "hamper and greatly burden" the church's ability to "occupy the space and to use it for its intended purposes" established foreseeable impact). For example, Defendant Sara Tindall Ghazal, then-Cobb County attorney and now-State Election Board member, told legislators that the near-ban on OP voting "would have a hugely disparate impact on Black voters. In 2018, for example,

approximately 72 percent of the provisional ballots that were counted were Democratic voters with Black voters overrepresented within those Democratic votes by more than 20 percent." SAMF ¶ 159 (3/16/2021 Sen. Ethics Comm. Hr'g, AME_001409:14-19). She also pointed out that this provision would foreclose affected voters from voting because a "provision[al] ballot is a voter's last opportunity to have their vote counted and their voice heard. A voter cannot find another day or another method to cast their ballot if they can't make it to their precinct." SAMF ¶ 159 (3/16/2021 Sen. Ethics Comm. Hr'g, AME_001410:22-AME_001411:14). Aunna Dennis, Executive Director of Common Cause Georgia, cited a study showing that voters of color are more likely to move within their county, increasing the chance they will go to vote at the wrong precinct. SAMF ¶ 160 (3/17/2021, Sen. Ethics Comm. Hr'g, AME_001517:2-5, 12-24 (Dennis)).

Reverend James Woodall of the Georgia NAACP provided statistics in his testimony demonstrating the foreseeable effects of SB 202 and its predecessor bills. SAMF ¶ 158 (Woodall 3/13/23 Decl. ¶¶ 15-16). For example, Rev. Woodall testified that: (a) even if 97% of registered voters in Georgia had a DDS ID in their voter registration file, "that would leave about 210,000 Georgians, eligible Georgia voters without access due to these ID requirements," *id.* (2/22/2021, H. EIC Comm. Hr'g, AME_000332:19-AME_000333:2 (Woodall)); (b) because "[h]igher percentages of Black and Brown Georgians live in poverty," the limitations to

getting an ID, or making a photocopy of an ID, would disproportionately burden them, *id*. (AME_000335:6-13); (c) "drop boxes being used only during normal business hours in this legislation would very well defeat the purpose of having drop boxes at all," *id.* (AME_001354:9-18); and (d) "[v]oters in predominantly [B]lack neighborhoods wait on average 29 percent longer than those in non-[B]lack neighborhoods. They're also 74 percent more likely to wait more than half an hour to vote," *id*. (AME_000335:21-AME_00336:2). *See also* SAMF ¶ 157 (2/19/2021, H. EIC Comm. Hr'g, AME_000109:2-AME_000111:1 (Winichakul) (explaining interaction between socioeconomic disparities and voter ID requirements)).

With respect to the impact of SB 202 on AAPI voters, on March 22, 2021, Plaintiff Advancing Justice-Atlanta submitted written testimony to the Special Committee on Election Integrity on the likely impact and harm the bill would have on AAPI voters in Georgia. The testimony included data on the high rates of voting by mail within the AAPI community; the already high rates of rejection of absentee ballot applications of AAPI voters; and descriptions of the specific harms that would befall limited-English proficient voters and new or first-time voters. SAMF ¶ 162 (AJATL-SB202-00001185-86). In addition, after SB 202 passed the House on March 25, 2021, but while the Senate was still considering it, Senator Au spoke

on the Senate floor about concerns that SB 202 would disenfranchise minority, immigrant, and working-class voters. SAMF ¶ 163 (Au Decl. ¶ 14).

Taking the facts in the light most favorable to the non-moving parties, genuine disputes of material fact exist about the foreseeability and knowledge of the challenged provisions' disparate impact.

### 3.  The Legislature Failed to Adopt Less Discriminatory Alternatives

In the Eleventh Circuit, courts also consider "the availability of less discriminatory alternatives" to the challenged practices. *GBM*, 992 F.3d at 1322; *see also Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983), *aff'd*, 472 U.S. 846 (1985) (citing *United States v. Bd. of Comm'rs of Indianapolis*, 573 F.2d 400, 413 (7th Cir. 1978)) (holding a plaintiff can make a prima facie case of discrimination by establishing that the government ignored less discriminatory options which would have furthered its policies as effectively as the more discriminatory option it chose)).[22] Although the State emphasizes that the Legislature considered and even implemented alternatives to *other* parts of SB 202 that Plaintiffs have not

---

[22] The State argues that *Brnovich* eliminated this factor from the Section 2 analysis. State's Br. 43 (citing *Brnovich*, 141 S. Ct. at 2345-46). Not so. The quoted language concerned the Court's discriminatory results analysis under Section 2. *See Brnovich*, 141 S. Ct. at 2348-49 (separately discussing the discriminatory intent claim under the "familiar" *Arlington Heights* analysis). Post-*Brnovich*, courts in the Eleventh Circuit continue to consider the availability of less discriminatory alternatives when considering intentional race discrimination challenges to voting laws. *See, e.g.*, *LWV*, 66 F.4th at 940.

challenged, State's Br. 44, it does not overcome the inference of discriminatory intent raised by the remaining discriminatory provisions and the Legislature's failure to enact less discriminatory alternatives *to those provisions*. Considering the facts in the light most favorable to the non-moving parties, material questions of fact exist as to whether the proponents of SB 202 "passed the [challenged provisions] without adopting a number of proposed ameliorative measures that might have lessened this impact." *Veasey*, 830 F.3d at 236.

As set forth above, *supra* 49-53, county election officials petitioned the Legislature to adopt several alternatives to the challenged provisions. *Cf. LWV*, 66 F.4th at 919 (noting that the legislature adopted county election officials' suggestions on 80% of the bill's provisions). They advocated for a 7- or 8-day absentee ballot request deadline instead of the enacted 11-day deadline, viewing the latter as "punitive" to voters. Election officials opposed the dramatic reduction in the number of drop boxes allowed per county, and proposed several alternatives, including letting counties determine the number of drop boxes to use, or allowing a drop box at every early voting location. Implementing the latter proposal in Fulton County, for example, would have allowed for drop boxes at each of the County's 36 early voting locations in November 2022, rather than the eight drop boxes permitted under SB 202's strict limits. SAMF ¶ 328 (Fulton-County-SB202-00033198).

Likewise, the Legislature rejected voter identification proposals that might have lessened the disparate impact on Black voters, and instead required identification numbers that Black voters are less likely to have, thereby requiring them to take extra steps to prove their identity. *See, e.g., McCrory*, 831 F.3d at 229. The Legislature considered but did not include a provision allowing voters to use the last four digits of their Social Security Number (SSN4) to request an absentee ballot. SAMF ¶ 283 (3/8/2021 SB 241 Sen. Fl. Debate, AME_001041:19-AME_001042:10 (Dugan)). The option to use SSN4 would have mitigated the disparate impact of SB 202's ID requirement for absentee ballot applications, as more than 95% of registrants who have no DDS ID number or an incorrect one in their voter registration file do have their SSN4. SAMF ¶ 282 (Meredith Rep. ¶ 66 & Tbl. VI.A.2). Under SB 202, SSN4 is permitted to verify a voter's identity on an absentee ballot, O.C.G.A. § 21-2-384(b), and election officials and legislators affirmed that it would be sufficient to verify identity on absentee ballot applications as well. *See, e.g.*, SAMF ¶¶ 283, 284 (3/8/2021 SB 241 Sen. Fl. Debate, AME_001041:19-AME_001042:10 (Dugan); SOS 30(b)(6) Dep. 276:25-278:2; Mashburn Dep. 171:20-172:10). Yet the Legislature declined to adopt such an option for voters.

Current SEB member and Defendant, Sarah Tindall Ghazal, proposed to the Legislature several less-discriminatory alternatives to the ban on counting most OP

ballots that would have met the State's purported goals:

> If the actual and not the pretextual goal were to reduce down-ballot votes not counting, a more narrowly tailored solution to the problem with such a disparate impact would be—should be contemplated, such as investing in voter education and outreach, mandating that poll workers stand outside precinct to check and redirect voters, or following the model that Senator Harrell outlined yesterday and giving voters their actual ballots.

SAMF ¶ 395 (3/16/2021 Sen. Ethics Comm. Hr'g, AME_001410:22-

AME_001411:14); *see also* SAMF ¶ 394 (Fulton Cnty. Dep. 192:2-4, 194:7-16,

196:1-9 (describing feasible alternative to restrictions on OP voting)).

Each of these alternatives would have achieved the Legislature's alleged

non-discriminatory interests in increasing voter confidence, lessening burdens on

election administrators, and ensuring the security and integrity of the ballot. *See*

State's Br. 49-50. That the Legislature could have met its goals by less restrictive

means, rather than adopting multiple mutually reinforcing restrictions, is

circumstantial evidence of discriminatory intent. *See Fair Fight Action v.*

*Raffensperger*, 634 F. Supp. 3d 1128, 1235 (N.D. Ga. 2022) (finding less-

discriminatory alternative would effectively implement Help America Vote Act

verification requirements).

### F.     Impact of the Challenged Provisions

The "impact of the official action" and "whether it 'bears more heavily on

one race than another'" is an "important starting point" in a discriminatory purpose

case. *Arlington Heights*, 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242). This is

because lawmakers "usually intend the natural consequences of their actions."

*Bossier Parish*, 520 U.S. at 487. To argue that SB 202 has no discriminatory effect,

Defendants rely on erroneous legal standards and incomplete and fragmentary

selections from the record. Applying the proper legal standard and viewing *all* the

evidence in the light most favorable to Plaintiffs, *see Tipton v. Bergrohr GMBH-*

*Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992), Defendants have not met their

burden of showing there is no genuine dispute of material fact as to discriminatory

effect, under the Constitution or Section 2.

### 1.  The Defendants Misstate the Standard for Determining Discriminatory Effect

Before it even gets to the disputed material facts, the State predicates its

arguments regarding discriminatory effect on several recurring legal errors.

1. Defendants wrongly contend that SB 202 has no discriminatory effect

because, they claim, the available statistical evidence reveals relatively few

affected voters. *See, e.g.,* State's Br. 45 ("nearly every voter already has a

qualifying ID"), 46 (early deadline for mail ballot applications "works for almost

everyone to whom it applies"), 47 (OP ballots are "only a small subset of

provisional ballots overall"); Intervenors' Br. 15.

First, whether the challenged practices "work[] for almost everyone to

whom" they apply, State's Br. 46, is disputed. Case law requires the Court to

consider the impact of SB 202's many challenged provisions collectively, and the record reveals that hundreds of thousands of voters are impacted. *See Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring); *McCrory*, 831 F.3d at 231 (discussing cumulative effect of challenged provisions). For example, Dr. Fraga estimates that just a subset of challenged provisions—ID requirements for absentee voting, reduction in drop boxes, early deadline for absentee ballot applications, and changes to the runoff period—affect about 1.6 million registered voters. SAMF ¶ 516 (Fraga Rep. ¶¶ 174-175 & Tbl. 21). Black and AAPI voters are dramatically overrepresented in this group. SAMF ¶¶ 517-520 (Fraga Rep. ¶ 182 & Tbl. 21 (showing 28.6% of Black registrants and 27.0% of AAPI registrants are impacted, compared to 16.4% of white registrants)). Even considering individual challenged provisions in isolation, record evidence reveals individual provisions impacting anywhere from tens of thousands to hundreds of thousands of voters. *See, e.g.*, SAMF ¶¶ 262-265, 516 (Meredith Rep. ¶ 75 & Tbls. IV.C.2, VI.F.1; Fraga Rep. Tbl. 21).

Second, despite Defendants' suggestions to the contrary, the Eleventh Circuit has not specified a minimum number of affected voters or size of statistical disparity that is required to show discriminatory effect. Indeed, establishing such a categorial threshold would be inconsistent with courts' duty to conduct an "intensely local appraisal" of the challenged voting law "in the light of past and

present reality, political and otherwise" in the jurisdiction in question. *White v. Regester*, 412 U.S. 755, 769-70 (1973); *Lodge*, 458 U.S. at 622. In *LWV*, the court held, based on the record compiled at trial, that evidence derived from flawed statistical analyses suggesting one to two percentage point disparities in usage was insufficient to establish that the particular Florida law at issue had a discriminatory effect on Black voters. *See* 66 F.4th at 932-33 (criticizing reliance on weak correlations and unrepresentative survey samples with fewer than 100 relevant observations); *id.* at 934 (survey data on drop box usage "clarifie[d] little"). In Georgia, on the other hand, with a combination of racially polarized voting and statewide elections determined by a few thousand votes, *see supra* IV.B.1, an intentionally discriminatory law that impairs even a small number of Black or AAPI voters from participating in the political process on an equal basis with white voters can have substantial practical effect on Black and AAPI voters' opportunity to elect representatives of their choice. *Cf. Voinovich v. Quilter*, 507 US 146, 154-55 (1993) ("Which effect [a] practice has, if any at all, depends entirely on the facts and circumstances of each case."). Under Section 2 and the Constitution, courts must consider such local circumstances when assessing the impact of a challenged law.

One way to show a discriminatory effect is through quantifiable statistical disparities—in, for example, usage patterns, wait times, or ID possession rates—

because these disparities reveal some portion of the tangible burden imposed by a

challenged voting law. But those disparities are only part of the story. Other,

qualitative factors can also contribute to a law's discriminatory effect and render

the political process "not equally open" to minority voters. 52 U.S.C. § 10301(b).[23]

These qualitative factors include the accessibility and atmosphere of polling places,

*see, e.g.*, *Perkins v. Matthews*, 400 U.S. 379, 388 (1971) (holding that polling

places located "at places calculated to intimidate [Black voters] from entering"

have "an obvious potential for 'denying or abridging the right to vote on account of

race or color'"); *Marengo Cnty. Comm'n*, 731 F.2d at 1570; *Harris*, 593 F. Supp.

at 131-33, the weight of socioeconomic disparities that cause even neutrally

applied laws to burden Black or AAPI voters more than white voters in Georgia,

*see infra* 96-98 & SAMF ¶¶ 537-539 (Cobb Rep. 40, Lee Rep. 53) (discussing

such disparities in Georgia); *League of Women Voters of Fla. v. Fla. Sec'y of State*,

81 F.4th 1328, 1332 (11th Cir. 2023) (*LWV II*) ("laws affect people differently

across political and socioeconomic lines"), and the cumulative effect of SB 202's

challenged provisions, *McCrory*, 831 F.3d at 231; *Clingman*, 544 U.S. at 607-08

(O'Connor, J., concurring). These impacts, as they pertain to individual provisions

---

[23] In this case, statistical disparities calculated from the State's election data often
understate even these quantifiable effects because they do not account for
individuals who were deterred from voting or even attempting to vote by the
challenged provision. *See, e.g.*, SAMF ¶ 267 (Meredith Sur-Rebuttal ¶¶ 8-9).

of SB 202, are discussed in more detail below.

2. Defendants' contention that robust voter turnout and the reelection of one Black-preferred candidate in the 2022 election show that SB 202 has no discriminatory effect also fails as a matter of law and fact. *Cf.* State's Br. 25-27, 42. First, as Plaintiffs' and Defendants' experts agree, it is almost impossible to determine the influence of an election law such as SB 202 with data from just one election cycle. SAMF ¶ 32 (Burden Sur-Rebuttal Rep. 11; Grimmer Dep. 47:17-49:11). There are too many other factors that influence turnout in any given election, including countermobilization efforts and the competitiveness of gubernatorial and senatorial elections on the ballot, as was the case in 2022. SAMF ¶ 31 (Burden Sur-Rebuttal 11; Shaw Dep. 131:10-132:1).

Second, voter turnout cannot be the measure of discriminatory effect because neither the Constitution nor Section 2 requires plaintiffs challenging an intentionally discriminatory voting law to show that voters have been completely disenfranchised. *Cf.* State's Br. 44-45 (arguing no discriminatory impact because Black voters will not be "unable to comply"). To the contrary, the Eleventh Circuit and other courts have long recognized that laws making voting more *difficult*, though not impossible, for minority voters can violate Section 2 or the Constitution. *See, e.g.*, *Marengo Cnty. Comm'n*, 731 F.2d at 1570 (failure to appoint Black poll officials "impaired [B]lack access to the political system and

the confidence of [B]lacks in the system's openness"); *LWV of N.C.*, 769 F.3d at

243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote

under any circumstances."); *see also Bossier Parish*, 528 U.S. at 359 (Souter, J.,

concurring in part and dissenting in part) ("[A]bridgement necessarily means

something more subtle and less drastic than the complete denial of the right to cast

a ballot, denial being separately forbidden.").

     Total turnout reveals nothing about the relative burdens that minority voters

and white voters must overcome to cast a ballot under SB 202, and the evidence

shows that SB 202 interacts with socioeconomic disparities to impose heightened

burdens on Black and AAPI voters relative to white voters. SAMF ¶ 29 (Burden

Sur-Rebuttal 11-12; Fraga Sur-Rebuttal ¶¶ 12-17; Grimmer Dep. 50:3-11 ("[T]he

cost of voting could go up and an individual still could turn out to vote."); Lee

Rebuttal ¶¶ 21-27); SAMF ¶ 525 (Burden Rep. 23, 25-26). Lower political

participation among Black voters in Georgia is due, in part, to socioeconomic

challenges experienced by Black voters.[24] The costs that a voter must incur to

---

[24] Lower political participation among Black Georgians is also linked to the State's
long history of official discrimination against Black residents in the area of voting.
*Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1307 (11th
Cir. 2020); SAMF ¶ 546 (Clark Rep. 2-13). For most of its history, that
discrimination prevented most of the State's Black residents from registering to
vote, voting, or otherwise participating in the democratic process. SAMF ¶ 544
(Anderson Rep. 19-45, 57-63); *see also Wright*, 979 F.3d at 1294-1297; *Alpha Phi
Alpha Fraternity*, 2023 WL 7037537, at *65 (finding that "Georgia has a history—
uncontrovertibly in the past, and extending into the present—of voting practices

vote—including the time, resources, and effort needed to overcome administrative requirements—are a crucial factor in determining whether individuals vote. SAMF ¶ 524 (Burden Rep. 22; Clark Rep. 13-14; Grimmer Dep. 129:7-20, 275:10-16). Socioeconomic conditions impact the weight of those costs and one's ability to navigate them. SAMF ¶ 525 (Burden Rep. 25-26; Clark Rep. 14; Grimmer Dep. 275:10-275:23). Educational attainment, income, and residential mobility are particularly salient factors. SAMF ¶¶ 525, 531 (Burden Rep. 22-25; Clark Rep. 5-6, 9, 13-14). On these and other variables affecting the costs of voting, Black Georgians fare consistently worse than white Georgians. *See* SAMF ¶¶ 355, 526-528, 531-532, 534-535 (Chatman Rep. ¶ 61; Burden Rep. 22-25; Palmer Rep. ¶ 30; Clark Rep. 5-6, 9 (documenting disparities between Black and white Georgians in access to a vehicle, income and wealth, residential mobility, education, and health)).

Similarly, lower participation rates among AAPI voters are attributable to racial and/or socioeconomic factors arising from (1) the "perpetually foreign" and "model minority" stereotypes, which falsely posit that residents of Asian descent are either ineligible to vote or, if they are eligible, are apathetic as to exercising

---

that disproportionately impact Black voters."). This history is well documented, undisputed, and relevant in a discriminatory purpose-based case, whether under Section 2 or the Constitution. *See, e.g.*, *LWV II*, 81 F.4th at 1332 (Pryor, C.J., concurring in denial of rehearing en banc) ("Past discrimination is relevant" in a discriminatory purpose case. (quoting *Abbott*, 138 S. Ct. at 2325)).

their rights to vote in this country; and relatedly (2) literacy and language barriers, which depress participation among AAPI eligible voters, who are disproportionately limited-English proficient. *See supra*; SAMF ¶ 556 (Lee Rep. 40); *see generally* Ex. 100 (Lee Rep. Sections VII, VIII); Ex. 92 (Chang 73, 76-77) (noting discrimination against AAPIs and language access issues). Indeed, in Georgia, language access is still a barrier to voting. SAMF ¶ 68 (Lee Rep. 52, 86).

Thus, navigating the electoral process, and any hurdles it involves, will, on average, burden Black and AAPI voters more than white voters in Georgia. SAMF ¶ 950 (Burden Rep. 22, 25-26; Clark Rep. 13-14; Meredith Rep. ¶¶ 39-40). SB 202 exacerbates this present reality by disrupting practices that Black and AAPI voters are more likely than white voters to use, such as absentee voting, out-of-precinct voting, and line relief efforts. These increased burdens in voting, rather than raw turnout, are the appropriate measure of discriminatory impact. *See McCrory*, 831 F.3d at 232-33; *United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1538-39 (11th Cir. 1984) (voter registration location and hours that were disproportionately burdensome for Black residents "hindered access to the political process by [Black voters]"); *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) ("If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for [B]lacks to register than whites, [B]lacks would have less opportunity 'to *participate* in the political process' than whites, and § 2 would

therefore be violated—even if the number of potential [B]lack voters was so small that they would on no hypothesis be able to elect their own candidate." (emphasis in original) (quoting 52 U.S.C. § 10301(b)).

Moreover, in 2022, Black voters, churches, and organizations undertook extraordinary efforts to help voters of color mitigate SB 202's discriminatory effects. *E.g.*, SAMF ¶ 522 (Calhoun Decl. ¶¶ 29-37 (describing statewide voter outreach efforts in response to SB 202); Cotton Decl. ¶¶ 26-38 (same); S. Johnson Decl. ¶¶ 25-27 (helping voters obtain ID)). These third-party efforts kept some Black voters from being disenfranchised by SB 202 in 2022. *E.g.*, SAMF ¶ 523 (Daniel Decl. ¶¶ 11-14 (third-party organization informed voter his absentee ballot was rejected for ID reasons)). Similarly, Plaintiff Advancing Justice-Atlanta expended significant resources attempting to counteract SB 202's negative impacts, extensively updating voter education materials and conducting trainings so that AAPI voters would understand and not run afoul of SB 202's myriad restrictions on voting. SAMF ¶¶ 703-713 (AAAJ Dep. 57:13-25, 59:5-18, 56:24-57:6). Any success of these efforts is not evidence that SB 202 caused no harm, but rather the lengths the community will go to overcome burdens imposed on the right to vote. A political system is not "equally open" if Black and AAPI voters must disproportionately deploy exceptional resources simply to participate.[25]

---

[25] Likewise, while the relative successes of majority and minority candidates can

Finally, to the extent total turnout *is* relevant, the record suggests that Black voters have not fared well under SB 202.[26] Turnout rates among white voters increased by 0.9 percentage points from 2018 to 2022, but—even after enormous get-out-the-vote efforts—turnout among Black voters decreased by almost 7 percentage points. SAMF ¶¶ 16-20 (Burden Rep. Tbl. 4; Fraga Rep. Tbl. 1; Grimmer Rep. Tbl. 2). The turnout gap between white and Black voters increased from about 4.2 percentage points in the November 2018 midterm to about 12.0 percentage points in November 2022. SAMF ¶ 21 (Burden Rep. 10, Tbl. 4; Grimmer Rep. ¶¶ 33-24 & Tbl. 2).

### 2. The Discriminatory Effect of the Challenged Provisions

A reasonable fact finder could conclude that the challenged provisions, both standing alone and taken together, bear more heavily on Black and AAPI voters than on white voters. Genuine disputes as to several impact-related facts preclude

---

be "one circumstance" relevant to the Section 2 analysis, 52 U.S.C. § 10301(b), *see* State's Br. 45, the Supreme Court has cautioned against giving too much weight to the results of a single election. *See Gingles*, 478 U.S. at 76; *Alpha Phi Alpha Fraternity Inc.*, 2023 WL 7037537, at *72.

[26] The University of Georgia survey on which the State relies to argue that SB 202 has no discriminatory effect cannot carry the State's burden on summary judgment. Among other things, the survey has multiple methodological flaws, including that the sample of respondents is very small, unrepresentative, and only includes people who reported that they successfully voted in 2022, there by skewing responses by excluding anyone who was unable to vote. SAMF ¶¶ 571-575 (Pettigrew Surrebuttal 6; Pettigrew Dep. 139:11-141:16, 142:16-22; 9/22/23 Prelim. Inj. Hr'g Tr. 116:23-117:3 (Burden); Defs.' Ex. YYYY); *see also LWV*, 66 F.4th at 932-33.

summary judgment.

### a. SB 202's restrictions on absentee voting bear more heavily on Black and AAPI voters than white voters.

Procedures that make absentee voting more cumbersome will impact Black and AAPI voters disproportionately because they are more likely than white voters to vote absentee, but the evidence of discriminatory effect is not limited to Black and AAPI voters' disproportionate use of absentee voting.[27] The particular provisions challenged here cumulatively layer additional burdens disproportionately on Black and AAPI voters, in ways that are distinct to the operation of each provision.

**Voter ID for absentee voting.** Requiring voters to write a DDS ID number on their mail ballot application that matches the ID number in the voter registration system disproportionately burdens Black voters because (1) Black voters are less likely than white voters to have an ID number (or a correct ID number) in their voter registration record, and (2) due to socioeconomic disparities, navigating alternative processes will be more burdensome, on average, for Black voters than

---

[27] Although the difference in the rates at which Black and white voters used absentee voting was less in 2018 and 2022 than in 2020, the pattern of disproportionate use by Black voters is consistent, and because of socioeconomic disparities in Georgia, the burden imposed by disruptions in access to absentee voting is even greater for Black voters. SAMF ¶¶ 35-37; 525 (Burden Rep. 25-26 & Tbl. 5). Moreover, as noted above, there is no categorical minimum disparity required to trigger a finding of discriminatory effect. *See supra* 93-94.

white voters. Nearly 243,000 registered Georgia voters either do not have a DDS ID number or have an inaccurate DDS ID number in their voter registration record. SAMF ¶ 264 (Meredith Rep. ¶¶ 90-91 & Tbl. VI.F.1). Although Black registrants constitute about 30% of all registered voters, over 53% of registrants with either no DDS ID number or an inaccurate DDS ID number in the voter registration system are Black—nearly 130,000, or 5.6% of all Black registrants. In contrast, white registrants constitute about 51% of all registered voters but are just 33% of registrants with an ID problem in the voter registration system (about 80,000, or 2% of white registrants). SAMF ¶ 264 (Meredith Rep. ¶ 65 Tbl. VI.A.1 (all registrants by race) & ¶ 91 Tbl. VI.F.1 (registrants with ID problems by race)).[28]

Although the State argues the voter ID requirements have no discriminatory effect because most registered voters *do* have a DDS ID number in their voter

---

[28] Evidence shows that the number of affected voters is not likely to decline significantly from these levels. Shortly after SB 202 was passed, the SOS updated voter registration records by matching its records to those maintained by the Georgia DDS. SAMF ¶ 258 (Evans Dep. 158:13-159:5; Germany Dep. 141:21-142:4). This project reduced the number of voters without a DDS ID number associated with their voter record from about 273,000 voters when SB 202 was passed to about 154,000 in September 2021. SAMF ¶ 259 (Meredith Rep. ¶¶ 26, 29-30 & Tbl. IV.B.1). However, the State concluded it could not accurately update records containing outdated or incorrect DDS ID numbers, SAMF ¶ 261 (Evans Dep. 161:15-162:2), and it did not update any voter registration records after the summer of 2021, SAMF ¶ 260 (Evans Dep. 160:24-161:9). By November 2022, the number of voters without a DDS ID number in their voter record had climbed to almost 172,000 voters. SAMF ¶ 262 (Meredith Rep. Tbl. VI.A.1 & ¶¶ 64-65). Another 71,274 voters had an inaccurate DDS ID number in their record. SAMF ¶ 263 (Meredith Rep. ¶¶ 90-91 & Tbl. VI.F.1).

registration record, a system that fails to accommodate 243,000 registrants—
including nearly 130,000 Black registrants—does not work for "nearly every
voter." State's Br. 45 & n.18; SAMF ¶ 264 (Meredith Rep. Tbl. VI.F.1).
Particularly in a state where the most recent presidential election was decided by
12,000 votes and voting is racially polarized, the disparities in this case are not
trivial numbers or "small differences." *Brnovich*, 141 S. Ct. at 2339. In Georgia,
disqualifying or deterring even a fraction of these voters can significantly impair
Black voters' opportunity to participate in the political process and elect
representatives of choice on an equal basis with white voters. Indeed, courts
considering intentional race discrimination challenges to other voter ID
requirements have found a discriminatory effect based on similar disparities. *See
Veasey*, 830 F.3d at 236, 251 (evidence of foreseeable discriminatory effect where
district court found a 1.3 percentage point disparity in voter ID possession);
*McCrory*, 831 F.3d at 216, 231 (evidence of discriminatory impact where district
court found a 3 percentage point disparity in ID possess rates, *see N.C. State Conf.
of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 366 (M.D.N.C. 2016)).

The State's assertions that "getting an acceptable photo ID is not difficult in
Georgia," ECF 763 at 60, and voters without qualifying DDS ID can easily "use a
host of other forms of identification to vote absentee," State's Br. 45, raise
disputed facts. The State's characterization elides practical realities that make these

processes disproportionately burdensome for Black voters. *See McCrory*, 831 F.3d at 233 (finding discriminatory effect where disparities in ID possession interacted with socioeconomic disparities). For example, obtaining DDS ID can be difficult, particularly for low-income voters and those with limited resources like regular internet access, transportation, and disposable income. *See* SAMF ¶ 251 (S. Johnson Decl. ¶¶ 19-21). In Georgia, these voters are disproportionately Black voters. SAMF ¶¶ 252, 253, 525-528, 531-532 (Burden Rep. 22-26; Clark Rep. 2-14; Meredith Rep. ¶¶ 39-50; S. Johnson Decl. ¶ 9; Chatman Rep. ¶ 85 & Tbl. 3). The process involves visiting one of 67 DDS locations in-person; providing documentary proof of identity, citizenship, and residency; and usually paying a $32 fee.[29] SAMF ¶ 249 (S. Johnson Decl. ¶ 11; DDS Dep. 37:1-39:9, 57:2-17, 131:13-132:20). Obtaining the necessary underlying documents can be costly. SAMF ¶ 251 (S. Johnson Decl. ¶ 13). Even voters with assistance sometimes give up before completing the process because of these challenges. SAMF ¶ 254 (S. Johnson Decl. ¶ 22). Whether it really is "not difficult" to get qualifying ID in Georgia is a dispute of fact that cannot be resolved on summary judgment.

In addition to being more likely to encounter problems because of the DDS ID requirement in the first place, SAMF ¶ 264 (Meredith Rep. VI.F.1), Black

---

[29] DDS will waive the $32 fee for individuals who swear they are registered to vote and lack required ID for voting, but all other requirements are the same. SAMF ¶ 250 (DDS Dep. 85:18-86:7, 87:8-89:19; DDS Field Ops. Manager's Bulletin).

Georgians are less likely than white Georgians to possess the technology necessary to provide a copy of an alternative ID.[30] SAMF ¶ 253 (S. Johnson Decl. ¶ 9; Meredith ¶¶ 45-47). Socioeconomic disparities in areas like health and access to transportation also impact Black Georgians' relative ability to visit their county elections office to resolve ID issues in person. *See, e.g.,* SAMF ¶ 534 (Burden Rep. 24; Lockette Dep. 9:23-11:17; Daniel Decl. ¶ 4). Some voters have a DDS ID, but because their ID number is not properly reflected in the state voter registration system—the case for at least 117,384 voters—they will be shunted to the provisional absentee ballot process if they write their DDS ID number on a mail ballot application. SAMF ¶ 265 (Meredith ¶ 75 & Tbls. VI.C.2 (column 4) & VI.F.1 (columns 2 & 3)). That process requires that they submit a copy of acceptable ID *and* a sworn affidavit to cure the deficiency in their mail ballot application. O.C.G.A. § 21-2-381(b)(3); SAMF ¶ 265 (Evans Dep. 148:15-149:25; Cobb Cnty. Dep. 250:18-251:18; DEKALB020319-20; Kidd Dep. Tr. 99:23-100:5). Voters who fail to complete these additional steps will have their absentee

---

[30] Thus, whether Black voters are more or less likely to have alternative ID is not determinative. *Contra* 10/11/2023 PI Order 44. The relevant inquiry is the burden imposed on those without a (correct) DDS ID number in their voter registration record, including the obstacles voters may face in getting a copy of an alternative ID to local election officials. *See, e.g.*, *Brnovich*, 141 S. Ct. at 2338 (Section 2's "equally open" requirement includes "consideration of a person's ability to *use*" the available means of voting (emphasis in original)); *Dallas Cnty. Comm'n*, 739 F.2d at 1537-38.

ballot rejected. O.C.G.A. § 21-2-381(b)(3). Testimony from affected voters demonstrates some of the burdens the provisional absentee ballot process imposes, which sometimes result in disenfranchisement. *See* SAMF ¶¶ 272-278 (Lockette Dep. 8:8-8:17, 9:23-10:13, 26:18-30:10, 32:24-33:22, 49:19-50:19; Daniel Decl. ¶¶ 1-5, 8-16).

Previously, absentee voting provided voters who had ID issues an opportunity to "participate in the political process" without encountering these new burdens imposed by SB 202. 52 U.S.C. § 10301(b). SB 202 removes this possibility, rendering the State's system of voting less open to these voters.

**Early deadline for submitting mail ballot applications.** Black voters are also more likely to be impacted by SB 202's earlier deadline (11 days before Election Day) to submit mail ballot applications. In addition to using absentee voting more than white voters, they are more likely to submit mail ballot requests later in the election cycle. In general elections before and after SB 202, Black voters' mail ballot applications were more likely than white voters' to be rejected for arriving too late. SAMF ¶¶ 221, 225 (Fraga Rep. ¶¶ 99-100 & Tbl. 7).

The State claims, without citation to empirical evidence, that absentee ballot applications submitted during the week before the election (the period now banned by SB 202) resulted in county election officials wasting precious time issuing ballots that "were almost certain not to be voted." State's Br. 10-11. However, the

State's own election data show that well over half of such ballots were successfully cast and counted during the November 2020 election. *See supra* 55; SAMF ¶ 227 (Burden Supp. Decl. 4-5 & Tbl. 1). Nor can the State "pit its desire for administrative ease against its minority citizens' right to vote." *LWV of N.C.*, 769 F.3d at 244.

Moreover, despite State Defendants' framing of the issue, Plaintiffs need not prove that "Black voters will be unable to" meet SB 202's earlier deadline for absentee ballot applications, State's Br. 46. *See, e.g., supra* 96 (citing cases); *McCrory*, 831 F.3d at 232 (holding that neither the constitutional standard nor Section 2 requires plaintiffs to show that challenged provisions prevented Black voters from voting at the same levels as they had in the past). Early closure of the absentee ballot application window bears more heavily on Black and AAPI voters than white voters because it impacts voting habits that are more prevalent among Black Georgians (i.e., later submission of mail ballot applications) and interacts with socioeconomic disparities and language barriers that leave Black and AAPI Georgians with less access to the resources needed to navigate these disruptions to their participation. SAMF ¶¶ 67, 239, 279, 950 (Burden Rep. 22, 25-26; Palmer Rep. ¶ 18; Fulton Cnty. Dep. 110:2:15; Lee Decl. ¶¶ 13-17); *McCrory*, 831 F.3d 233 (holding that the district court erred by failing to recognize that socioeconomic disparities contributed to discriminatory effect of challenged provisions); *Miss.*

*State Chapter, Operation PUSH v. Allain*, 674 F. Supp. 1245, 1256 (N.D. Miss.

1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991) (finding a violation of Section 2 where

challenged law imposed "administrative barriers [to voting that] are harder to

overcome for persons of lower socio-economic status and persons of lower

educational attainment, a group that is disproportionately black"); *Dallas Cnty.*

*Comm'n*, 739 F.2d at 1537-38.

Nor is it material to the discriminatory effect inquiry that only a small

percentage of all mail ballot applications submitted in November 2022 were

rejected for arriving after SB 202's early deadline. *Contra* State's Br. 46. First, the

State's data fail to account for voters who did not submit a mail ballot application

at all because they knew they had missed (or would miss) the deadline. SAMF

¶ 228 (Prelim. Inj. Hr'g Tr. 265:17-266:18 (Grimmer)). Second, an intentionally

discriminatory election system that disenfranchises even a relatively small

percentage of eligible voters can have discriminatory effects, particularly when—

as in Georgia—elections are racially polarized and decided by relatively few votes.

*See, e.g.*, *McCrory*, 831 F.3d at 217, 231 (discriminatory impact established by

evidence that Black voters used an eliminated practice more than white voters,

even though the district court found that less than one percent of voters used the

practice, *see McCrory*, 182 F. Supp. 3d at 405 (discussing out-of-precinct

provisional voting)); *United States v. Brown*, 494 F. Supp. 2d 440, 469 (S.D. Miss.

2007) (in a discriminatory intent case under Section 2, noting impact on 20 white voters whose mail ballots were unfairly targeted for exclusion and 174 white voters whose registrations were challenged), *aff'd, United States v. Brown*, 561 F.3d 420 (5th Cir. 2009); *see also Operation PUSH*, 674 F. Supp. at 1255 (finding discriminatory results from dual registration requirement where 56 Black voters' ballots were rejected because of the provision in an election in which two races were decided by fewer than 56 votes). In November 2020, over 12,000 mail ballot requests from Black voters were submitted after what would later become the application deadline of SB 202. Applications submitted on those days would now be rejected as untimely under SB 202. SAMF ¶ 220 (Fraga Rep. ¶ 110 & Tbl. 10). Under SB 202's rules, absentee ballot applications from AAPI registrants in 2020 would have accounted for 5.2% of all late absentee ballot applications, a proportion higher than that of AAPI registrants who voted in 2020. SAMF ¶ 222 (Lee Rebuttal Rep. ¶ 7). With SB 202's 11-day deadline in effect in 2022, the share of mail ballot applications rejected for arriving too late jumped significantly for all voters, but the increase was greatest for Black voters, whose applications were disproportionately likely to be rejected for arriving too late. SAMF ¶¶ 225-226 (Fraga Rep. ¶¶ 99-100 & Tbl. 7). Similarly, the share of AAPI voters' mail ballot applications rejected for arriving too late jumped by 12 percentage points from the November 2020 to the November 2022 general election, and by 17.2 percentage

points from the January 2021 to December 2022 runoff election. *Id.*

After the passage of SB 202, the rate of AAPI voters' mail ballot applications also fell drastically—more than any other racial group. SAMF ¶¶ 38, 375 (Fraga Rep. ¶ 69 & Tbl. 3). In the November 2022 general election post-SB 202, only 4.3% of AAPI registrants requested mail ballots—a decline of 30.5 percentage points from the November 2020 election. SAMF ¶¶ 38, 373, 376 (Fraga Rep. ¶¶ 68-70 & Tbl. 3). In comparison, mail ballot applications for white voters declined by 18.3 percentage points, reflecting a 12.2 percentage point disparity. *See* SAMF ¶ 956 (Fraga Rep. Tbl. 2). Similarly, in both run-off elections, from January 2021 to December 2022, the percentage of AAPI registrants requesting a mail ballot declined at a disproportionately high rate compared to white voters. *See* SAMF ¶¶ 38, 374, 377, 957-958 (Fraga Rep. ¶¶ 68-70 & Tbl. 3 (reporting the decline for AAPI voters was 20.1 percentage points)). Following SB 202, Plaintiff Uddullah missed the new mail ballot application deadline and was forced to stand in a long line, with two young children, to vote in person. SAMF ¶ 723 (Uddullah Dep. 37:22-40:1).

**Condensed timeline for absentee ballots.** AAPI voters are more likely to be impacted by SB 202's new deadlines regarding absentee ballots. By delaying the distribution of absentee ballots, SB 202 condensed the amount of time AAPI voters have to complete and return absentee ballots. AAPI voters are

disproportionately burdened by this obstacle because they use absentee voting more than any other racial group in Georgia. *See* SAMF ¶¶ 39 (Fraga Rep. Tbl. 2). In addition, abbreviating the timeline to complete and return an absentee ballot poses a unique challenge for AAPI LEP voters. AAPI voters, especially those who are LEP, find the compressed timeline to be a barrier to vote because it provides less time to access translation assistance. *See* SAMF ¶ 719 (Paik Dep. 42:12-14, 44:5-12 ("So when the time is shorter, then it's difficult for me . . . I have to ask [Advancing Justice-Atlanta] and then they can translate, and it take time.")); SAMF ¶ 720 (Aquino Dep. 28:7-29:8 ("[T]he time frame for when you can drop your ballots has been decreased . . . making it shorter and making it more difficult for voters to fill out their information and to complete the process.")). The cost and logistical difficulties of accessing language assistance in a shorter amount of time are therefore burdens that AAPI LEP voters must bear to exercise their right to vote. *See Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 985 (N.D. Fla. 2021) (denying summary judgment where plaintiff presented evidence that people of color would bear the brunt of the "costs associated with requesting" an absentee ballot).

Indeed, the relative decline in AAPI voters' use of absentee ballots post SB 202, compared to white voters', is striking. In the November 2022 election, only 9.1% of AAPI voters used absentee ballots, a 30.6 percentage point decrease from

November 2020. *See* SAMF ¶ 378 (Fraga Rep. ¶ 55 & Tbl. 2). In comparison,

white voters' use of absentee ballots declined by 18.3 percentage point from

November 2020 to November 2022. SAMF ¶¶ 378, 957 (Fraga Rep. Tbl. 2)

(between the January 2021 runoff and the December 2022 runoff elections,

showing a 28.7 percentage point decline in AAPI voters' use of absentee ballots,

compared to a 16.5 point decline for white voters)). AAPI voters also had their

absentee ballots rejected for late arrival at the highest rate compared to other racial

groups post-SB 202. *See* SAMF ¶ 232 (Fraga Rep. ¶ 134 & Tbl. 14).

**Prohibiting state and county governments from proactively mailing
absentee ballot applications.** Provisions of SB 202 that impede access to absentee

ballot applications exacerbate the discriminatory impacts of the provisions

discussed above. State and county initiatives to proactively mail absentee ballot

applications to registered voters in 2020 made "it easier to vote," SAMF ¶ 189

(Sterling Dep. 53:3-10), and contributed to "the volume of absentee ballots

increas[ing] tremendously." SAMF ¶ 182 (Bailey 10/6/22 Dep. 119:21-120:6). In

particular, the Secretary of State's mailing for the June 2020 primary "incentivized

many Black voters, who had traditionally preferred to vote in person, to mail in

their ballots." SAMF ¶ 182 (Burnough Decl. ¶ 13). Such mailings also reminded

voters "to start to pay attention again to the electoral process." SAMF ¶ 189 (Kidd

Dep. 52:20-24). Prohibiting these mailings deprives county election officials of a

tool that effectively promoted and facilitated absentee voting and encouraged voters to participate.

Now, voters who may have automatically received a mail ballot application at home must navigate the process to obtain one. Because SB 202 requires a "wet signature" on a mail ballot application, SB 202 § 25, voters must procure a hard copy of the application—either by printing it from a website, visiting the county elections office in person, or contacting the county elections office and affirmatively requesting one through the mail—and then return the signed copy to the county elections office. O.C.G.A § 21-2-381(a).

The State's brief does not address the disproportionate impacts this process imposes on Black voters. Socioeconomic disparities mean that completing the process is more likely to be onerous for Black voters, SAMF ¶ 950 (Burden Rep. 25-26, Meredith Rep. ¶ 40), who are disproportionate users of absentee voting, compared to white voters.[31] Black voters are less likely than white voters to have access to a printer, scanner, or smartphone, making it more difficult to print, sign, and return a mail ballot application, all from one's home. SAMF ¶ 253 (S. Johnson Decl. ¶¶ 9, 20, 30; Meredith Rep. ¶¶ 43-48). Black voters also have less access to transportation than white voters, making travel to a county elections office more

---

[31] Because they are less likely than white voters to be on the "rollover list," Black voters are also more likely to encounter this process multiples times in an election cycle. SAMF ¶ 181 (Grimmer Rep. 87).

burdensome. SAMF ¶ 355 (BVMF Dep. 102:13-102:19, 107:12-107:21; Chatman

Rep. ¶ 61 (about 9 percent of Black citizens of voting age in Georgia lack a vehicle

in the household compared to about 3 percent of white citizens of voting age)).

These and other socioeconomic conditions, like lower levels of educational

attainment, make navigating these administrative hurdles more burdensome, on

average, for Black voters than white voters. SAMF ¶¶ 524-525 (Burden Rep. 22-

23); *McCrory*, 831 F.3d at 233; *Operation PUSH*, 674 F. Supp. at 1256; *see also*

*Brnovich*, 141 S. Ct. at 2338 (Section 2's "equally open" requirement includes

"consideration of a person's ability to *use*" the available means of voting

(emphasis in original)).

AAPI voters similarly face disproportionate barriers as a result of SB 202's

restrictions. The SOS's website is only in English, making the task of obtaining an

absentee ballot application online difficult, if not impossible, for LEP AAPI voters.

SAMF ¶¶ 69, 71, 197 (N. Williams Dep.118:11-13; Smith Dep. 69:5-8; Lee Rep.

81-83). Furthermore, AAPI persons are less likely to have access to the technology

necessary to produce alternative identification (even more so for LEP AAPI

persons). SAMF ¶ 279 (Lee Supp. Decl. ¶¶ 13-17). Digital proficiency among LEP

individuals also creates barriers for AAPI persons to access an absentee ballot

application and successfully obtain alternative identification. LEP people are half

as likely as native English speakers to have high levels of proficiency using digital

tools or solving problems in digital environments. SAMF ¶ 281 (Lee Supp. Decl. ¶ 19).

**Reduction in drop box availability.** Record evidence supports the reasonable inference that Black and AAPI voters are disproportionately impacted by the severe restrictions in SB 202 on the number and availability of drop boxes. Whether Black voters were more likely than white voters to use drop boxes in 2020 is a dispute of material fact that cannot be resolved on summary judgment. While individual-level data on the race of voters who used drop boxes is not available (except in one county), the available evidence on drop box usage in the 2020 election cycle is sufficient to conclude that Black voters were more likely to use drop boxes than white voters.[32] As explained in more detail below, drop boxes were used most where and when Black Georgians voted most.

First, Black voters in 2020 cast absentee ballots at higher rates than white voters. SAMF ¶ 37 (Burden Rep. 11, Tbl. 5; Fraga Rep. ¶ 55 & Tbl. 2). Second,

---

[32] The State has no record of drop box use by race; it did not maintain records of drop box use by individual voter. Only Douglas County recorded this information in 2020. SAMF ¶¶ 334-335 (Kidd Dep. 114:16-116:8; 9/22/23 Prelim. Inj. Hr'g Tr. 89:11-14 (Grimmer)). The case law does not require plaintiffs to present such data. *See, e.g., Nipper v. Smith*, 39 F.3d 1494, 1538 n.84 (11th Cir. 1994) (refusing to require data from recent elections with Black candidates, when such data did not exist because Black candidates had not run); *Jenkins*, 4 F.3d at 1134 ("[M]inority voters should not be forced to suffer a violation of their rights because of external circumstances that limit the availability of data specific to the challenged district if other evidence supports their claim.").

64.65% of the 550,000 absentee ballots returned via drop box in November 2020 were cast in just eight counties in which 53.2% of the State's Black population but only 29.1% of the State's white population reside—Fulton, Cobb, DeKalb, Gwinnett, Douglas, Chatham, Rockdale, and Clayton. SAMF ¶¶ 296, 319 (Burden Rep. 40-44; Burden Sur-Rebuttal Rep. 7; Ex. 173 (Stephen Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GBP.org (Sept. 2, 2022)); Ex. 173 (Total Absentee Ballots Collected by Drop Box, Georgia Public Broadcasting spreadsheet (Sept. 2, 2022)); Ex. 169 (U.S. Census Bureau, ACS 5-year estimates (2021))). That is, nearly 65% of ballots returned by drop box in the November 2020 election were returned in eight counties that are home to over half of the State's Black population and less than one third of the State's white population.

Third, Black voters disproportionately returned absentee ballots during the last four days of the November 2020 election period (i.e., Saturday 10/31-Tuesday 11/3), as they did in all federal general elections since at least 2014. SAMF ¶ 360 (Burden Rep. 14-20). During this four-day period, nearly 70% of absentee ballots returned were returned by drop box. SAMF ¶ 360 (Burden Sur-Rebuttal Rep. 6). SB 202 eliminated drop boxes in these four days, when Black voters were more likely to return their ballots, thereby removing the only method—other than hand

delivering the ballot to an elections office—that guaranteed a voter could get their ballot in on time.

Douglas County is the only county in Georgia that recorded drop box use by voter in the 2020 election cycle. SAMF ¶ 335 (Burden Rep. 33-34; Kidd Dep. 114:16-116:8). The data from Douglas County confirm what the available evidence elsewhere in Georgia shows: Black voters were more likely than white voters to use drop boxes. SAMF ¶ 336 (Burden Rep. 34). In November 2020, Black voters in Douglas County were 4.1 percentage points more likely than other voters to return absentee ballots via drop box; in January 2021, Black voters in Douglas County were 6.0 percentage points more likely than other voters to return absentee ballots via drop box. *Id*. (Burden Rep. 34).

Together, this evidence supports the reasonable inference that Black voters used drop boxes more than white voters in November 2020. When ruling on the State's summary judgment motion, this Court must "construe the facts and draw all rational inferences therefrom in the" Plaintiffs' favor. *Fayette Cnty.*, 775 F.3d at 1343. Defendants' contrary claim that Black voters used drop boxes less frequently than white voters (State's Br. 46) is based on sample sizes that are too small to draw conclusions about Georgia voters as a whole. SAMF ¶ 337 (Burden Suppl. Decl. 2-3); Pls.' Response to Defs.' SMF ¶ 321. Defense expert Dr. Justin Grimmer relies on two surveys, each containing fewer than 145 total drop box

voters in Georgia. SAMF ¶ 337 (Burden Supp. Decl. 2-3). For 2022, the dataset he relies upon includes only *twelve* self-reported drop box users. *Id*. (Burden Supp. Decl. 2-3). An analysis of the 2020 CES data that included *all* Georgia voters, *i.e.*, not limited to absentee voters as Dr. Grimmer's analysis was, *see* SAMF ¶ 965 (Fraga Supp. Decl. ¶¶ 12-16), showed that in November 2020, Black voters in Georgia were six percentage points more likely than white voters in Georgia to use drop boxes. SAMF ¶ 963 (Fraga Supp. Rep. ¶ 5 (showing 20.2% of Black voters and 14.2% of white voters used drop boxes in November 2020)).

As part of its comprehensive effort to restrict voting methods relied on disproportionately by Black and AAPI voters, SB 202 took aim at the widespread access to and use of drop boxes. It cut the total possible number of drop boxes by about 110, with the largest decreases required in the eight counties (Fulton, DeKalb, Gwinnett, Cobb, Douglas, Chatham, Rockdale, and Clayton) that are home to over 53% of the State's Black population and 69% of the State's AAPI population. SAMF ¶ 319 (Burden Rep. 40-44; Burden Sur-Rebuttal Rep. 7-8; Ex. 173 (Total Absentee Ballots Collected by Drop Box, Georgia Public Broadcasting spreadsheet (Sept. 2, 2022))); *see also* SAMF ¶ 317 (Hugley Decl. ¶ 17 ("[T]he restrictions on drop boxes were targeted at minority voters because they drastically cut the number of drop boxes that the metro-Atlanta counties, which are heavily minority, could offer.")) These eight counties used 146 drop boxes in 2020 but are

limited to 33 drop boxes under SB 202, a loss of 113 drop boxes. SAMF ¶ 320 (Burden Rep. 40-44, Burden Sur-Rebuttal 7-8). Expert analysis shows the reduction in availability of drop boxes under SB 202 is not random; it is systematically related to the size of a county's Black population. SAMF ¶ 333 (Burden Rep. 27).

The Court previously found that 34.7% of the State's Black population, spread over 133 counties, saw no change (25.6%) or an increase in drop boxes (9.1%) under SB 202, a percentage nearly equivalent to the 33.7% of the State's Black population that resides in the three counties that experienced the largest decreases. 10/11/2023 PI Order at 33; *but see* Pls.' Response to Defs.' SMF ¶ 323. However, that facial equivalency masks the striking disparity in the relative changes in drop box numbers. For example, of the 9.1% of the statewide Black population residing in counties that saw an increase in the number of drop boxes under SB 202, 0.8% had access to two more drop boxes than in 2020, while the remaining 8.3% saw an increase of a single drop box in their county. SAMF ¶ 331 (Burden Rep. Tbl. 11, Lines 1 & 2). Meanwhile, the 33.7% of the statewide Black population residing in the three most impacted counties lost between 18 and 29 drop boxes in each county. SAMF ¶ 322-325 (Burden Rep. 41-44 & Tbl. 11, Lines 12-14). Moreover, the relevant comparison is not Black voters who gained a drop box under SB 202 to Black voters who lost drop boxes under SB 202 but rather

how Black voters' access to drop boxes compares to white voters' access under SB 202. On that measure, the evidence shows that Black voters fared considerably worse than white voters. Statewide, nearly 75% of Black registered voters lost at least one drop box in their county, compared to just 54% of white registrants. SAMF ¶ 329 (Fraga Rep. ¶¶ 148-150 & Tbl. 15). About 40% of the statewide Black population experienced a decrease of 10 or more drop boxes under SB 202, compared to just 27% of the statewide white population. *See* SAMF ¶¶ 4, 323-235, 327 (Burden Rep. 4, 41-44, Burden Sur-Rebuttal Rep. 7-8). SB 202 also caused a disproportionate increase in the travel burden experienced by Black voters to reach a drop box. SAMF ¶¶ 351-353 (Chatman Rep. ¶¶ 7, 86, 88). A reasonable fact finder could conclude that SB 202's drop box limitations have a discriminatory effect on Black voters.

The elimination of drop boxes also impacted AAPI voters. Prior to SB 202, AAPI voters were more likely to cast absentee ballots than white voters, SAMF ¶¶ 38, 379-381 (Fraga Rep. ¶ 60, n.17 & Tbl. 2), and the eight counties with high drop box usage (discussed above) account for 69.3% of the State's AAPI population. SMF ¶ 319 (citing Census data). After SB 202, 77% of registered AAPI voters saw drop boxes in their county decrease, compared to only 53.7% of white voters. SAMF ¶ 329 (Fraga Rep. ¶ 149, Tbl. 15). AAPI voters also experienced increased travel time to the nearest drop box. AAPI voters saw a 21.1% decrease in voters

living within 4.8 miles of a drop box (the statewide average distance to the closest

drop box in 2022), whereas white voters saw a 0.03% increase. SAMF ¶ 348

(Fraga Rep. ¶ 159). Extant evidence indicates that most voters use the drop box

closest to their home. SAMF ¶ 342 (Lee Rep. 76-77; Fraga Sur-Rebuttal Rep.

¶¶ 49-54). A reasonable fact finder could thus find that the reduction in overall

number of available drop boxes had a discriminatory impact on AAPI voters.

### b. SB 202 makes in-person voting more onerous in ways that disproportionately impact Black voters.

**Line relief ban.** SB 202's prohibition on line relief overwhelmingly impacts

Black voters and other voters of color because it targets a practice engaged in by

minority-led organizations to support voters of color. These line relief activities

grew out of both a history of exclusion of Black voters at the polls and the long

lines that have plagued predominantly Black precincts in Georgia for years.

Defendants' contention that the line relief ban does not harm Black voters, which

is premised principally on its view that SB 202 will reduce polling place lines, *see*

State's Br. 47-48, is a material disputed fact.

Courts have long recognized that accessibility of polling places impacts a

group's access to the political process. Accessibility includes physical availability,

such as distance to a polling place, and the environment that confronts voters at the

polling place. *See, e.g., Perkins*, 400 U.S. at 387; *Harris*, 615 F. Supp. at 241

(failing to hire Black poll officials violated Section 2 in part because "the presence

of [B]lack poll officials does much to remedy the intimidation [felt by] [B]lack voters"). Line relief by Black activists and Black-led groups in Georgia transformed the environment at polling places by welcoming and encouraging Black voters seeking to participate in the political process despite generations of exclusion and discrimination. *See* SAMF ¶ 411 (Brower 1/18/24 Decl. ¶¶ 26-28 (explaining that line relief "is used to overcome the history of discrimination against Black voters, including the history of hostility that Black voters encountered when trying to vote"); Woodall 1/18/24 Decl. ¶¶ 8-10; Common Cause Dep. 168:8-22; Briggins 5/20/22 Decl. ¶¶ 6, 14, 18). Providing food and water to Black voters waiting to vote continues a longstanding tradition in the Black community of offering sustenance to fortify and support Black people exercising political rights. SAMF ¶ 414 (Briggins 5/20/22 Decl. ¶ 19; Scott Decl. ¶ 10). "[S]purning" these voluntary efforts "impair[s] [Black voters'] access to the political system." *Marengo Cnty. Comm'n*, 731 F2d at 1570; *see also* SAMF ¶ 415 (Brower 1/18/24 Decl. ¶ 30).

State Defendants argue that line relief needed to be banned because "polling places turned into 'celebration[s].'" State's Br. 8. Plaintiffs do not dispute that, indeed, one of the goals of line warming activities was to celebrate voting and the dignity of voters. SAMF ¶¶ 417-418 (Common Cause Dep. 168:5-169:16 ("Line warming is a community activation act that we do here in Georgia to celebrate the

time that we are voting with our neighbors and our community members. [For] people who are in communities of color, it's similar to us having a victory meal after emancipation or Juneteenth."); NGP Dep. 125:13-126:11 (goal of line warming was "voter appreciation and helping voters feel celebrated for being there and being in line.")). But Plaintiffs dispute that a celebratory atmosphere at a polling place was disruptive to voters who encountered it. Rather, these celebrations were a way of making polling places more accessible for many Black voters. *See, e.g.*, SAMF ¶ 411 (Brower 1/18/24 Decl. ¶ 28; Woodall 1/18/24 Decl. ¶¶ 9-10). What the Defendants attempt to paint as a "chaotic" environment, State's Br. 8, was, for many Black voters, a welcoming one, where they were encouraged to exercise their right to vote and line relief efforts were not a disruption. SAMF ¶¶ 417-418 (Common Cause Dep.168:8-22).

Further, Black voters in Georgia experienced longer wait times in federal general elections from 2014 to 2020, with substantial disparities in some cases, SAMF ¶¶ 436, 438 (Burden Rep. 20-22; Pettigrew Rep. 17-20), in a state with some of the longest wait times in the country, SAMF ¶ 435 (Pettigrew Rep. 13-16). In the November 2020 election, for example, Black voters waited on average more than 10 minutes longer to vote than white voters. SAMF ¶ 441 (Pettigrew Rep. 24). And although Defendants have argued that provisions of SB 202 would help with long lines, long lines plagued early voting locations in metro-Atlanta during the

December 2022 runoff election. SAMF ¶ 443 (Fulton Cnty. Dep. 206:22-207:23 (wait times over one hour); Cobb Cnty. Dep. 169:23-170:3 (wait times over two hours); Pettigrew Rep. 35-36 (48 of 66 locations on Friday before runoff had a line at least an hour long)). The State concedes that close to 10% of Georgia voters— about 400,000 people—waited more than 30 minutes to vote in 2022. State's Br. 48. Preliminary 2022 general election survey data show that the racial gap in wait times was the largest of the last three midterm election cycles. SAMF ¶ 442 (Pettigrew Dep. 131:14-22).

Prior to SB 202, line relief efforts facilitated a more open political process for Black voters, both by providing an accessible environment—combatting generations of exclusion—and by alleviating some of the burdens of waiting in these long lines. *See, e.g.*, SAMF ¶¶ 456, 458 (Briggins 5/20/22 Decl. ¶¶ 12-16 (line relief efforts "re-affirm the dignity of Black Voters" waiting in long lines); Scott Decl. ¶¶ 6-11 (receiving food and water allowed her to stay in a four-hour line to vote and engendered a feeling of solidarity)). Line relief encouraged Black voters to stay in the long lines. SAMF ¶ 458 (Calhoun Decl. ¶¶ 17-18, 38-39; Cotton Decl. ¶¶ 9-12, 23-24). Banning these efforts therefore disproportionately impacts Black voters.

**Out-of-precinct provisional (OP) voting.** Evidence from 19 counties in November 2018, 77 counties in November 2020, and 67 counties in January 2021

shows that Black voters were more likely than white voters to cast OP ballots. SAMF ¶ 397 (Burden Rep. 35-37 & 53-55). A full accounting of every provisional ballot in the State is not possible, but it "is also not necessary to reach firm conclusions about racial differences in the casting of out-of-precinct provisional ballots."[33] SAMF ¶ 399 (Burden Rep. 54). Nor is such evidence required to establish that the elimination of most OP voting has a discriminatory effect on Black voters. *See, e.g.*, *Gingles,* 478 U.S. at 57 n.25 ("[T]he fact that statistics from only one or a few elections are available for examination does not foreclose a vote dilution claim."); *Operation PUSH*, 674 F. Supp. 1245, 1255 (N.D. Miss. 1987) (finding discriminatory impact of Mississippi's dual registration law based in part on evidence collected in only five cities that more prospective Black voters than white voters were turned away from polls due to registration issues). Using several different methods of identifying the race of voters who voted out of precinct in 2018, 2020, and 2021, it is clear that "individuals who cast out-of-precinct

---

[33] The State has failed to track OP voters. It requires counties to do nothing more than hand-write the names of provisional voters on a form, with no space for voter registration number, address, date of birth, or time. *See* SAMF ¶ 400 (USA-BUTTS-000005.001 (sample of the form to record provisional voters)). Counties are not required to track OP voters electronically, but about 20 counties did so in Nov. 2020 and Jan. 2021. SAMF ¶ 400 (Burden Rep. 35-37, 51). No single year is conclusive, but Dr. Burden found that the information he collected from the counties was sufficient to draw reliable conclusions regarding relative rates of OP voting statewide.

provisional ballots that were accepted for counting in recent Georgia elections were disproportionately Black voters." SAMF ¶ 396 (Burden Rep. 55).[34]

This disparate impact is not surprising given differences in socioeconomic factors between Black and white Georgians. For example, residential mobility within a county, which is higher among Black Georgians than white Georgians, can make it difficult for voters to determine their assigned precinct. SAMF ¶ 404 (Burden Rep. 25, 35.) As discussed above, because of greater socioeconomic disadvantages faced by Black voters relative to white voters, Black voters have fewer resources to overcome these challenges in order to avoid voting OP. SAMF ¶ 401 (Burden Rep. 38).

Defendants do not offer any evidence about relative rates of OP voting by Black voters and white voters. State's Br. 47. Rather, they erroneously claim that if only a small number of voters are affected, there cannot be a finding of intentional discrimination. Not true. The Defendants attempt to rely on *Brnovich* to say that

---

[34] In its October 11, 2023 Order, the Court found that, in 2020, white voters were more likely than Black voters to cast provisional ballots. 10/11/23 PI Order 25 & 41 (citing ECF 566-42 at 55). However, Dr. Burden reached the opposite conclusion. Looking at data from many sources over the course of three elections, he concluded that Black voters were more likely to cast OP ballots than white voters, including in November 2020. SAMF ¶¶ 396-397 (Burden Rep. 35-38, 53-55 ("Black voters were disproportionately likely to cast out-of-precinct provisional ballots in the November 2020 election."); *see also id.* at 55 ("Examining three elections, the data demonstrate that Black voters were overrepresented among out-of-precinct voters in five out of six cases, and in several instance the overrepresentation was quite substantial."); Prelim. Inj. Hr'g Tr. 94:8-97:4).

SB 202's provision has no discriminatory effect. State's Br. 47. The Court's determination in *Brnovich* that the OP provision of the Arizona law at issue did not violate the results test of Section 2 tells us nothing about whether SB 202 was passed with an intent to discriminate against Black voters and has a discriminatory effect in Georgia. *Cf. Gingles*, 478 U.S. at 48-49 (recognizing that a challenged voting practice, such as at-large elections, may be valid in one jurisdiction but invalid elsewhere where it "operates to minimize or cancel out" the voting strength of a racial group); *McCrory*, 831 F.3d at 217, 231 (discriminatory impact established by evidence that Black voters used an eliminated practice more than white voters, even though the district court found that less than one percent of voters used the practice). As explained above, *supra* 93-94, there is no bright-line rule for "how much" is enough discriminatory impact in a discriminatory purpose-based case. Defendants fail to undertake the "intensely local appraisal" that Section 2 and the Constitution require. *Regester*, 412 U.S. at 769-70; *Gingles*, 478 U.S. at 78-79. In Georgia, statewide contests can now be decided by fewer than 12,000 votes and local contests are regularly won by tens or hundreds of votes. Those who seek to turn back the electoral successes of Black voters need only affect a few thousand voters to ensure Black voters cannot "participate in the political process and [] elect representatives of their choice" on an equal basis with white voters. 52 U.S.C. § 10301(b); *see also Operation PUSH*, 674 F. Supp. at 1255. While the raw

numbers of voters who cast OP ballots may be small, the impact from not being able to cast an OP ballot on Election Day is severe: complete disenfranchisement. And the only evidence presented in this case on OP ballots demonstrates that Black voters were disproportionately likely to vote OP before SB 202.

### c.  Latino Voters were also negatively impacted by SB 202

As with AAPI voters, Defendants failed to address Latino voters in their motion for summary judgment on discriminatory intent. Notwithstanding Defendants' failure to make any evidentiary showing that they are entitled to summary judgment, Plaintiffs take this opportunity to note the existence of material disputed facts as to Latino voters.

Prior to the enactment of SB 202, Georgia's Latino voters were not only increasing in number, but their political participation was also increasing. For example, before the enactment of SB 202, Latino voter registration had steadily increased in Georgia, rising from 164,784 voters in 2016 to 274,524 in 2020. SAMF ¶ 967 (Burden Rep. 8-9, Tbl. 3). In 2020, more than 40% of all Latino votes were cast in the four metro-Atlanta counties (Fulton, Gwinnett, Cobb, and DeKalb), SAMF ¶ 968 (Cobb Rep. 30), and statewide Latino voter turnout reached 42.2%, *id.* Fraga Rep. ¶¶ 36-37, Tbl. 1).

After the adoption of SB 202, however, Latino voters in Georgia faced multiple setbacks. For example, with SB 202's limitations on the number of drop

boxes permitted in each county, Latino voters saw a 67.9% decrease in the availability of drop boxes, compared to a drop of 53.7% for white voters. SAMF ¶ 975 (Fraga Rep. ¶¶ 136-153, Table 15). Georgia's Latino voters also faced greater distances to drop boxes post-SB 202 relative to white Georgians. SAMF ¶ 976 (Fraga Rep. ¶¶ 154-161, Tbls. 15-18). For example, post-SB 202, Latino registered voters experienced a 15.5% decline in having a drop box located within 4.8 miles of their homes in the November 2022 election, while white voters experienced a 12.4% decline. *Id.* (Fraga Rep. ¶¶ 158-160, Tbl. 16).

Latino voters in Georgia were also more likely than white voters to have their absentee ballot applications rejected for arriving "too late." SAMF ¶ 973-974 (Fraga Rep. ¶¶ 93-103 & Tbl. 7) (showing that among Latino voters, 32.1% of rejected absentee ballot applications were rejected for lateness in November 2022, compared to just 24.2% among white voters). In sum, over 1.6 million registered Georgia voters faced increased barriers to the ballot box due to SB 202, with Georgia's Latino voters and other voters of color bearing those barriers at higher percentages relative to Georgia's white voter populations. SAMF ¶¶ 516-520 (Fraga Rep. ¶¶ 174-182 & Tbl. 21).[35]

---

[35] In none of their eight motions for summary judgment do Defendants make any effort to rebut or even discuss the report of Plaintiffs' expert, Dr. James Cobb, a prominent Georgia historian, which addresses Georgia's history of discrimination in voting, including discrimination against Latino and Native American voters, as well as the threat Latino and Native Americans' expanding political participation

### 3.  Considering the Totality of Relevant Circumstances Reveals Material Factual Disputes that Preclude Summary Judgment

Cumulatively, SB 202's "panoply of restrictions" exacerbates the disproportionate impact on Black voters as the various provisions build upon each other. *Clingman*, 544 U.S. at 607-08 (O'Connor, J., concurring in part and concurring in the judgment); *see also McCrory*, 831 F.3d at 231. After years of making absentee voting easier, the Legislature changed course once it was clear that Black voters were using it at higher rates than white voters, and using it to great electoral effect. The Legislature erected hurdles at each step in the absentee voting process, from requesting a ballot to returning it and having it counted, each step individually and cumulatively affecting Black voters disproportionately. *See Arlington Heights*, 429 U.S. at 267 (noting that a sudden change in policy tied to a race-related change in use would suggest a discriminatory purpose). "A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition." *Clingman*, 544 U.S. at 607-08 (O'Connor, J., concurring in part and concurring in the judgment); *see also LWV of N.C.*, 769 F.3d at 242 (failure to consider cumulative effect of restrictive voting law was reversible error).

---

posed for the majority party in the Legislature. SAMF ¶ 979 (Cobb Rep. 1-14, 18-34, 39-66). Since neither Defendants nor Intervenors have addressed Latino or Native American voters, or Dr. Cobb's report, in any of their motions for summary judgment, they should be precluded from doing so in their reply briefs.

For example, a reasonable fact finder could find that SB 202's limits on the distribution of absentee ballot applications and new voter ID requirement make obtaining an absentee ballot more burdensome. Then, dramatically reducing drop boxes in counties with the highest Black voter populations, and eliminating drop boxes entirely during the last four days of the election cycle, makes timely return of completed mail ballots more difficult. *See, e.g.*, SAMF ¶¶ 364-365 (Brumley Dep. 26:22-25, 29:14-20; Owens Dep. 24:13-25:7, 26:18-27:10, 28:24-29:12, 36:19-37:1, 37:14-22). Given Black and AAPI voters' disproportionate use of absentee voting and disparities in socioeconomic resources, it is reasonable to conclude that these obstacles will disproportionately impact Black and AAPI voters' "opportunity . . . to participate in the political process." 52 U.S.C. § 10301(b).

Procedures that discourage absentee voting will, in turn, push more people to vote in-person, provoking longer wait times at already crowded polling places. *See* SAMF ¶ 521 (Harvey Dep. Tr. 61:15-62:9; Brower 1/18/24 Decl. ¶ 16); SAMF ¶ 447 (Pettigrew Rep. 28-30, Pettigrew Dep. 189:5-190:13). SB 202 bans groups from providing food and water to voters waiting in such lines, and because most OP voting is also eliminated, voters who reach the front of the line and discover they are at the wrong precinct will confront the unenviable choice of either traveling to and waiting in line at yet another precinct—if the voter can even do

so—or accepting disenfranchisement. Here again, the evidence shows that these burdens weigh more heavily on Black voters than white voters.

Under Section 2's totality of circumstances analysis, these pervasive effects should be considered alongside evidence relating to other factors that affect whether the political process is equally open to minority voters. The State's history of racial discrimination and the lingering effects of that history on socioeconomic conditions and political participation are highly relevant. *See Milligan*, 599 U.S. at 22-23; *LWV II*, 81 F.4th at 1332-33 (recognizing that "[p]ast discrimination is relevant" under *Arlington Heights* and affects whether the political process is "equally open to minority voters"); *McCrory*, 831 F.3d at 223; *see also* SAMF ¶¶ 525-528, 531-532, 544-546, 950 (Burden Rep. 22-26; Clark Rep. 2-14; Anderson Rep. 19-45, 57-63; Meredith Rep. ¶¶ 39-40 (describing the history of discrimination, socioeconomic disparities, and their effects on political participation in Georgia)). Racially polarized voting and the closeness of Georgia elections are also relevant. *See supra* 24-32 (discussing *LULAC v. Perry*, 548 U.S. at 427-28, *McCrory*, 831 F.3d at 214, 221-22, and conditions in Georgia); *see also Lodge*, 458 U.S. at 623-24 ("Voting along racial lines allows those elected to ignore [minority voter] interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race.").

Taken together, record evidence pertaining to these factors, alongside the evidence of discriminatory effect and discriminatory purpose, supports the reasonable inference that in the totality of circumstances, the political processes under SB 202 are "not equally open" to Black and AAPI voters in that they "have less opportunity than [white voters] to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Although Defendants urge this Court to draw different inferences from the available facts, on summary judgment, the Court may not weigh conflicting evidence and "must construe the facts and draw all rational inferences therefrom in the manner most favorable to" Plaintiffs. *Fayette Cnty.*, 775 F.3d at 1343.

### G. Defendants Have Not Established that the Legislature Would Have Enacted SB 202 Absent this Discriminatory Purpose

After Plaintiffs establish that the challenged provisions were motivated in part by a race-based purpose, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228 (1985). "[M]ere protestations of lack of discriminatory intent and affirmations of good faith will not suffice to rebut the prima facie case. . . . A defendant must introduce evidence to support its explanations." *Jean*, 711 F.2d at 1486 (citations omitted).

As set forth above, *supra* IV.C, a genuine dispute of material fact exists as to whether the purported non-racial justifications considered by the Legislature at the

time were pretextual or tenuous. Defendants also proffer *post hoc* justifications for the challenged provisions, without evidence that they were actually considered by the Legislature during the 2021 legislative session. The standard is not whether *any potential* non-race-based reason exists to justify the law; at this step, "courts must scrutinize the Legislature's *actual* non-racial motivations to determine whether they *alone* can justify the Legislature's choices." *McCrory*, 831 F.3d at 221 (emphasis in original); *see, e.g.*, *Stanley v. City of Dalton*, 219 F.3d 1280, 1292-93 (11th Cir. 2000); *DeKalb Cnty. v. U.S. Dep't of Labor*, 812 F.3d 1015, 1021 (11th Cir. 2016). *Post hoc* rationalizations offer no evidence as to the actual purpose of the Legislature—the heart of the matter in a discriminatory purpose-based case. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."); *Singleton v. Merrill*, 582 F. Supp. 3d 924, 944 (N.D. Ala. 2022), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023)).

For example, the State's allegation that the number of drop boxes in some counties in 2020 were "unmanageable" is *post hoc*, as there is no evidence that any county election official complained to anybody—let alone the Legislature—about not being able to manage the number of drop boxes they *voluntarily* installed. *Contra* State's Br. 7. The State also provides no evidence that the Legislature knew about the two alleged instances of unsecure drop boxes on which State Defendants

now rely. *See* State's Br. 6. These are *post hoc* rationales that are irrelevant to the analysis of whether the Legislature acted with discriminatory intent, or whether the Legislature would have passed the challenged provisions even absent the discriminatory purpose. *Virginia*, 518 U.S. at 533.

For evidence of legislative intent, Defendants' reply primarily on eight declarations provided by Ryan Germany, former general counsel to the Secretary of State. These declarations offer little more than "self-serving testimony of [a] high government official[] that the policy was not intended to be discriminatory." *Jean*, 711 F.2d at 1496. First, State Defendants admit they offer Germany's statements for his views only and not as an expert witness or as evidence of legislators' intent. *See* SAMF ¶ 563 (9/22/23 Prelim. Inj. Hr'g Tr. 200:14-20 (Counsel for the State telling the Court that Germany is testifying in his individual capacity only, not speaking for the Legislature), 195:5-196:6 (Counsel for the State making clear Germany was not offered as an expert)). Mr. Germany has conceded that he does not know the actual legislative rationale for various challenged provisions of SB 202. *E.g.*, SAMF ¶ 563 (Germany Dep. 159:10-21, 174:16-22).

As lay witness testimony, Germany's many declarations are largely inadmissible or at least unreliable because of evidentiary failings. For example, the State relies on a series of Mr. Germany's statements to argue that voter complaints in 2020 spurred the Legislature to enact SB 202. *See*, *e.g.*, State's Br. 2-4 (arguing

135

that complaints after 2020 were similar to those after 2018, citing Germany's

7/23/2023 declaration (ECF. 601-3)). But Germany's many declarations identify

few, if any, *specific* complaints relating to provisions challenged in this lawsuit,

and Defendants admit that many complaints related to the 2020 election were "just

craziness[,]" *see* SAMF ¶ 111 (SEB Dep. 40:13-16), not a reasonable basis for

legislation. For example, the State contends that the availability of drop boxes in

2020 caused the State to receive "numerous complaints" about ballot harvesting.

*See* State's Br. 6; Defs.' SMF ¶¶ 304, 318, 373 (citing Germany 6/29/2023 Decl.

¶¶ 7, 13 and Germany 7/27/2023 Decl. ¶¶ 68, 74). But Germany's declarations do

not identify any specific complaints about ballot harvesting[36] or other allegations

that "dropboxes were being used fraudulently," Germany 7/27/2023 Decl. ¶ 74, let

alone evidence that such complaints were presented to legislators. *See, e.g.*, SAMF

¶ 312 (Germany Dep. 66:4-7 (admitting he did not recall any legislators expressing

concerns regarding the security of drop boxes)). Germany also fails to establish

that he has personal knowledge of these unidentified complaints. *See S. Broward*

*Hosp. Dist. v. Coventry Health & Life Ins. Co*., No. 14-61157, 2015 WL

---

[36] Paragraph 13 of Germany's 6/29/2023 declaration (ECF 592-2), which discusses
ballot harvesting, references video from a surveillance camera that, he says, was
posted on YouTube. The attached exhibit is an email dated February 1, 2022, from
the Elections Supervisor in Gwinnett County to a person whose email address and
affiliation are not identified in the exhibit. It is unclear from Germany's declaration
or the attached exhibit what the video is, whether Germany or any legislators ever
saw it, or how it may have influenced the legislative process in early 2021.

12532580, at *3 (S.D. Fla. June 10, 2015) ("For a matter to be considered within a witness's personal knowledge, it must be derived from the exercise of his own senses, not from the reports of others . . . ." (quoting *Riley v. Univ. of Ala. Health Servs. Found.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (internal quotation omitted)). The Court should disregard Mr. Germany's assertions as to the Legislature's motivations for enacting SB 202, and the facts and arguments that rely on Mr. Germany's inadmissible assertions.

A genuine dispute of material fact exists as to whether the Legislature would have enacted the challenged provisions without the race-based purpose.

## V.   CONCLUSION

For the foregoing reasons, this Court should deny State Defendants' and Intervenor-Defendants' motions for summary judgment.

Date: January 19, 2024

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

KRISTEN CLARKE
Assistant Attorney General

SPARKLE SOOKNANAN
Principal Deputy Assistant Attorney
   General
Civil Rights Division

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

*/s/ Elizabeth M. Ryan*
ALBERTO RUISANCHEZ
JOHN A. RUSS IV
JASMYN G. RICHARDSON
RACHEL R. EVANS
ERNEST A. MCFARLAND
MAURA EILEEN O'CONNOR
ELIZABETH M. RYAN
SEJAL JHAVERI
J. ERIC RICH
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Elizabeth.ryan@usdoj.gov

*Attorneys for the United States*
*of America*

/s/ Leah C. Aden
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
Alaizah Koorji (pro hac vice)
*akoorji@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte (pro hac vice)
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC. 700 14th
Street, NW Washington, DC 20005
Telephone: (202) 682-1300

Caitlin May (Ga. Bar No. 602081)
*cmay@acluga.org*
Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan Topaz (pro hac vice)
*jtopaz@aclu.org*
Dayton Campbell-Harris (pro hac vice)

*dcampbell-harris@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt (pro hac vice)
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Sofie C. Brooks (pro hac vice)
sofie.brooks@wilmerhale.com
Lucas L. Fortier (pro hac vice)
lucas.fortier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Laura E. Powell (Ga. Bar. No.
970318)
*laura.powell@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Sixth District of the African Methodist Episcopal Church,
Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office*

*/s/ Pichaya Poy Winichakul*
Pichaya Poy Winichakul (Bar 246858)
poy.winichakul@splcenter.org
Bradley E. Heard (Bar 342209)
bradley.heard@splcenter.org
Matletha N. Bennette (pro hac vice)
matletha.bennette@splcenter.org
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Facsimile: (404) 221-5857

*/s/ Adam Sieff*
Adam S. Sieff (pro hac vice)
adamsieff@dwt.com
Brittni Hamilton (pro hac vice)
brittnihamilton@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski (pro hac vice)
mjedreski@dwt.com
Grace Thompson (pro hac vice)
gracethompson@dwt.com
Danielle Eun Kim (pro hac vice)
daniellekim@dwt.com
Kate Kennedy
katekennedy@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

Telephone: (404) 521-6700

Jess Unger (pro hac vice)
jess.unger@splcenter.org
Sabrina S. Khan (pro hac vice)
sabrina.khan@splcenter.org
SOUTHERN POVERTY
LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

David M. Gossett (pro hac vice)
davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, and The Arc of the United States*

*/s/ Bryan L. Sells*
Bryan L. Sells
Email: bryan@bryansellslaw.com
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN
SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212

Jon Greenbaum (pro hac vice)
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg (pro hac vice)
erosenberg@lawyerscommittee.org
Julie M. Houk (pro hac vice)
jhouk@lawyerscommittee.org
Jennifer Nwachukwu (pro hac vice)
jnwachukwu@lawyerscommittee.org
Heather Szilagyi (pro hac vice)
hszilagyi@lawyerscommittee.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
vilia.hayes@hugheshubbard.com
Neil Oxford (pro hac vice)
neil.oxford@hugheshubbard.com
Gregory Farrell (pro hac vice)
gregory.farrell@hugheshubbard.com
Mana Ameri
mana.ameri@hugheshubbard.com
William Beausoleil
william.beausoleil@hugheshubbard.com
James Henseler (pro hac vice)
james.henseler@hugheshubbard.com

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Gerald Weber
Email: wgerryweber@gmail.com
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
Telephone: 404.522.0507

*/s/ Laurence F. Pulgram*
Laurence F. Pulgram (pro hac vice)
lpulgram@fenwick.com
Molly Melcher (pro hac vice)
mmelcher@fenwick.com
Armen Nercessian (pro hac vice)
Anercessian@fenwick.com
Ethan Thomas (pro hac vice)
EThomas@fenwick.com
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
Telephone:  (415) 875-2300

Joseph S. Belichick (pro hac vice)
jbelichick@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone: (650) 988-8500

Catherine McCord (pro hac vice)
cmccord@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 14

New York, NY 10010                              Telephone: (212) 430-2690


*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek*


<u>*/s/ Uzoma N. Nkwonta*</u>
Uzoma N. Nkwonta*
Jacob D. Shelly*
Melinda K. Johnson*                             Halsey G. Knapp, Jr.
Tina Meng Morrison*                             Georgia Bar No. 425320
Marcos Mocine-McQueen*                          Joyce Gist Lewis
Samuel T. Ward-Packard*                         Georgia Bar No. 296261
ELIAS LAW GROUP LLP                             Adam M. Sparks
250 Massachusetts Ave NW                        Georgia Bar No. 341578
Suite 400                                       KREVOLIN & HORST, LLC
Washington, D.C. 20001                          1201 W. Peachtree St., NW
Telephone: (202) 968-4490                       One Atlantic Center, Suite 3250
unkwonta@elias.law                              Atlanta, GA 30309
jshelly@elias.law                               Telephone: (404) 888-9700
mjohnson@elias.law                              Facsimile: (404) 888-9577
tmengmorrison@elias.law                         hknapp@khlawfirm.com
mmcqueen@elias.law                              jlewis@khlwafirm.com
swardpackard@elias.law                          sparks@khlawfirm.com
*Admitted pro hac vice*

*Attorneys for Plaintiffs The New Georgia Project, Black Voters Matter Fund, Rise, Inc., Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin*

/s/Meredyth L. Yoon

MEREDYTH L. YOON
(Georgia Bar No. 204566)
LAURA MURCHIE*
**ASIAN AMERICANS**
**ADVANCING JUSTICE-ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*myoon@advancingjustice-atlanta.org*
*lmurchie@advancingjustice-*
*atlanta.org*

/s/ Eileen Ma

EILEEN MA*
KIMBERLY LEUNG*
**ASIAN AMERICANS**
**ADVANCING JUSTICE-ASIAN**
**LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*
*kimberlyl@advancingjustice-alc.org*

/s/Niyati Shah

NIYATI SHAH*
TERRY AO MINNIS*º
**ASIAN AMERICANS**
**ADVANCING JUSTICE-AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

/s/R. Adam Lauridsen

LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
LUIS G. HOYOS*
RYLEE KERCHER OLM*
NIHARIKA S. SACHDEVA
ELIZABETH A. HECKMAN
**KEKER, VAN NEST AND PETERS**
**LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400  (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*
*lhoyos@keker.com*
*rolm@keker.com*
*nsachdeva@keker.com*

*Attorneys for Plaintiffs Asian Americans Advancing Justice–Atlanta, Steven J.*
*Paik, Nora Aquino, Angelina Thuy Uddullah, and AnjaliEnjeti-Sydow*
*\*Admitted pro hac vice*
*º Not admitted in D.C.*

*/s/ Kurt Kastorf*
_____

Kurt Kastorf (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, GA 30307
Telephone: 404-900-0330
kurt@kastorflaw.com

Judith Browne Dianis*
Matthew A. Fogelson*
Angela Groves*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
JBrowne@advancementproject.org
MFogelson@advancementproject.org
AGroves@advancementproject.org

Clifford J. Zatz*
Justin D. Kingsolver*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
CZatz@crowell.com
JKingsolver@crowell.com
WTucker@crowell.com

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
JLudwig@crowell.com

*Admitted pro hac vice

*Attorneys for Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta, Inc.,
The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union, Inc.,
First Congregational Church, United Church of Christ Incorporated, Georgia
Latino Alliance for Human Rights, Inc.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was prepared in Times New Roman 14-point font in compliance with Local Rule 5.1(C).

*/s/ Elizabeth M. Ryan*
Elizabeth M. Ryan
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Elizabeth M. Ryan*
Elizabeth M. Ryan
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice