# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No. 1:21-MI-55555-JPB |
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> v. <br><br> THE STATE OF GEORGIA, *et al.*, <br><br> Defendants <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> Intervenor-Defendants. | Civil Action No. 1:21-CV-2575-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, <br><br> Plaintiffs <br><br> v. <br><br> BRIAN KEMP; *et al.*, <br><br> Defendants | Civil Action No. 1:21-CV-01284-JPB |

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

                Intervenor-Defendants.

---

THE NEW GEORGIA PROJECT*, et al.*,

           Plaintiffs

           v.

BRAD RAFFENSPERGER, *et al.*,

           Defendants

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

                Intervenor-Defendants.

Civil Action No.
1:21-CV-01229-JPB

---

GEORGIA STATE CONFERENCE OF THE NAACP*, et al.*,

           Plaintiffs

           v.

BRAD RAFFENSPERGER, *et al.,*

           Defendants

REPUBLICAN NATIONAL COMMITTEE, *et al.*,

                Intervenor-Defendants.

Civil Action No.
1:21-CV-01259-JPB

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., <br><br> Defendants, <br><br> REPUBLICAN NATIONAL COMMITTEE, et al., <br><br> Intervenor-Defendants. | Civil Action No. 1:21-CV-01333-JPB |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.*, <br><br> Plaintiffs <br><br> v. <br><br> BRAD RAFFENSPERGER, *et al.,* <br><br> Defendants <br><br> REPUBLICAN NATIONAL COMMITTEE, *et al.*, <br><br> Intervenor-Defendants. | Civil Action No. 1:21-CV-01728-JPB |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ABSENTEE BALLOT PROVISION CLAIMS</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND .................................................................................2

    A.    Section 2 Claims .........................................................................2

        1.    Black Voters ......................................................................2

        2.    Asian-American Voters ......................................................6

            a.    SB 202's Curtailment of Absentee Voting Directly Impacted AAPI Voters' Ability to Participate in the Franchise ................................................................12

        3.    Latinx Voters ...................................................................15

        4.    Native American Voters...................................................17

    B.    ADA Claims ...............................................................................18

        1.    Importance of Absentee Voting Access for Georgians with Disabilities...............................................................20

        2.    Voters with Disabilities Face Barriers to Voting Due to Their Disabilities ............................................................21

    C.    Immateriality Claims .................................................................24

        1.    SB 202's Birthdate Requirement......................................24

        2.    The Birthdate Requirement Disenfranchises Voters...............26

        3.    Procedural History ...........................................................27

III.  CHALLENGED PROVISIONS..........................................................28

IV.   LEGAL STANDARD........................................................................31

V.    ARGUMENT.....................................................................................33

    A.    Disputes of Fact Remain as to Whether SB 202's ID Requirements for Absentee Ballot Applications and Prohibition on Officials Proactively Sending Absentee Ballot Applications Abridge the Rights of Voters of Color Under Section 2 ...................33

1.      Cumulative Impact of Absentee Ballot Provisions .................36

        a.      SB 202's Restrictions on Absentee Voting Caused
                a Disproportionate Decrease in Turnout and Use of
                Absentee Ballots Among Voters of Color ....................42

2.      SB 202's Voter ID Requirements for Absentee Ballot
        Applications Prevent Black, AAPI, Latinx and Native
        American Voters from Having an Equal Opportunity to
        Participate in Elections ...........................................................46

        a.      The Record Contains Numerous Material Facts
                Evidencing SB 202's Additional and Burdensome
                ID Requirements for Absentee Ballot Applications
                Have a Disparate Impact on Black, AAPI, Latinx,
                and Native American Voters ..........................................47

        b.      Defendants' Arguments do not Reconcile the
                Remaining Factual Disputes .........................................50

3.      SB 202's Prohibition on Government Officials Proactively
        Sending Absentee Ballot Applications Prevents Voters of
        Color from Having an Equal Opportunity to Participate in
        the Franchise.............................................................................56

        a.      SB 202's Blanket Prohibition on Election Officials
                Proactively Mailing Absentee Ballot Applications
                Disparately Impacts Voters of Color ...........................57

        b.      Defendants' Arguments Do Not Reconcile the
                Remaining Factual Disputes .........................................59

B.      Disputes of Fact Remain as to Whether SB 202's Felony
        Provision and Voter ID Requirements Violate the ADA ..................63

1.      Elements of a Prima Facie ADA Claim....................................63

        a.      The ADA Requires that Voters with Disabilities
                Have an Equal Opportunity to Participate in Each
                Voting Program ...........................................................64

        b.      The ADA Prohibits Exclusion or Denial of Access
                by Reason of Disability Under Disparate Impact
                and Failure to Accommodate Theories........................68

        c.      The ADA Prohibits Discriminatory Methods of
                Administration and Discriminatory Eligibility
                Criteria.........................................................................71

2.      The Absentee Voting Restrictions Discriminate Against
        Voters with Disabilities by Excluding Them From

Georgia's Absentee Voting Program in Violation of the ADA ...................................................................73

    a.    The Absentee Voting Restrictions Discriminate by Reason of Disability.........................................75

        (i)    Felony Provision ................................78

        (ii)    Voter Identification Requirements .....................83

    b.    The Absentee Voting Restrictions Work Together to Disproportionately Impact Voters with Disabilities and That Disparate Impact is Exacerbated by SB 202's Restrictions to In-Person and Early Voting.........................................85

C.    The Birthdate Requirement Violates the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B) ................................87

    1.    Completing the Absentee Ballot Envelope Is an "Act Requisite to Voting" Because Without It, the Vote Will Not Count. ...................................90

    2.    Because the Birthdate Requirement Is Not Material to Voter Qualification, It Is Invalid Under the Materiality Provision...................................95

    3.    State Statutes Are Not Immune to Materiality Challenges. ...................................100

    4.    Plaintiffs Have Standing to Obtain Relief Against State Defendants...................................102

D.    Disputes of Fact Remain as to Whether SB 202's Absentee Ballot ID Provisions Violate the First and Fourteenth Amendment ...................................106

    1.    The Absentee Ballot ID Provision Burdens Voters. ..............108

    2.    State Defendants' Asserted Interests Are Insufficient to Justify the Burdens Imposed by the Absentee ID Provisions. ...................................110

E.    Disputes of Fact Remain as to Whether SB 202's Restrictions on Distributing Absentee Ballot Applications Constitute Viewpoint Discrimination...................................112

VI.    CONCLUSION ...................................114

LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE...................................124

CERTIFICATE OF SERVICE..............................................................................125

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Choate,*
    469 U.S. 287 (1985)........................................................67

*Allen v. Tyson Foods, Inc.,*
    121 F.3d 642 (11th Cir. 1997).......................................31, 32, 53, 57

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger,*
    No. 1:21-CV-05337-SCJ, 2023 WL 7037537 (N.D. Ga. Oct. 26,
    2023) ...............................................................2, 3, 4

*Am. Council of the Blind of N.Y., Inc. v. City of N.Y.,*
    495 F. Supp. 3d 211 (S.D.N.Y. 2020) ...........................67, 75, 82, 84

*American Association of People with Disabilities v. Harris,*
    647 F.3d 1093 (11th Cir. 2011)...................................54, 66

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)........................................................106

*Artistic Ent., Inc. v. City of Warner Robins,*
    331 F.3d 1196 (11th Cir. 2003)....................................89

*B.C. v. Mount Vernon Sch. Dist.,*
    837 F.3d 152 (2d Cir. 2016).........................................70

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023).......................................92, 93, 94

*Berg v. Fla. Dep't of Lab. & Emp. Sec., Div. of Vocational Rehab.,*
    163 F.3d 1251 (11th Cir. 1998)....................................70

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021)..........................................*passim*

*Burdick v. Takushi*,
504 U.S. 428 (1992)........................................................................106

*L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*,
55 F.4th 1296 (11th Cir. 2022).................................................65, 69

*CBS v. Primetime 24 Joint Venture*,
245 F.3d 1217 (11th Cir. 2001).......................................................93

*City of Rancho Palos Verdes, Cal. v. Abrams*,
544 U.S. 113, 121 (2005)................................................................89

*Common Cause Ga. v. Georgia*,
17 F.4th 102, 107 (11th Cir. 2021)..................................................89

*Common Cause v. Thomsen*,
574 F. Supp. 3d 634 (W.D. Wis. 2021)..........................................102

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008)....................................................96, 107, 110

*Democracy N.C. v. N.C. State Board of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020)......................................*passim*

*Democratic Party of Ga., Inc. v. Crittenden*,
347 F. Supp. 3d 1324 (N.D. Ga. 2018).....................................*passim*

*Diaz v. Cobb*,
435 F. Supp. 2d 1206 (S.D. Fla. 2006)............................................99

*Disability Advocs., Inc. v. Paterson*,
598 F. Supp. 2d 289 (E.D.N.Y. 2009)..............................................77

*Disabled in Action v. Bd. of Elections in City of N.Y.*,
752 F.3d 189 (2d Cir. 2014).............................................................68

*Fair Fight Action, Inc. v. Raffensperger*,
2021 WL 9553856 (N.D. GA Mar. 31, 2021) ..................................32

*Farley v. Nationwide Mut. Ins. Co.*,
197 F.3d 1322 (11th Cir. 1999)........................................................68

*Fla. State Conf. of NAACP v. Browning*,
　　522 F.3d 1153 (11th Cir. 2008) ................................................................. 96, 99

*Fla. State Conf. of NAACP v. Lee*,
　　576 F. Supp. 3d 974 (N.D. Fla. 2021) .................................................. 43, 49, 59

*Frank v. Walker*,
　　768 F.3d 744 (7th Cir. 2014) .................................................................. 53, 110

*Frank v. Walker*,
　　819 F.3d 384 (7th Cir. 2016) .................................................................. 52, 53

*Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
　　775 F.3d 1336 (11th Cir. 2015) (*Fayette Cnty.*) ................................................ 32

*In re Georgia Senate Bill*
　　202, No. 1:21-MI-55555, 2023 WL 6628601 (N.D. Ga., Oct. 11,
　　2023) ............................................................................................... 52

*Georgia State Conference of the NAACP et al. v. Brad Raffensperger et al.*,
　　No. 1:21-cv-01259-JPB ............................................................................ 24

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
　　966 F.3d 1202 (11th Cir. 2020) ................................................................ 34, 40

*Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*,
　　29 F.4th 406 (8th Cir. 2022) ...................................................................... 66

*Henrietta D. v. Bloomberg*,
　　331 F.3d 261 (2d Cir. 2003) ...................................................................... 69

*Hickson Corp. v. N. Crossarm Co., Inc.*,
　　357 F.3d 1256 (11th Cir. 2004) .................................................................. 31

*Howlette v. City of Richmond*,
　　485 F.Supp. 17 (E.D. Va. 1978) .................................................................. 99

*Hunt v. Aimco Props., L.P.*,
　　814 F.3d 1213 (11th Cir. 2016) .................................................................. 71

*Johnson v. Callanen*,
  No. SA-22-CV-00409-XR, 2023 WL 4374998 (W.D. Tex. July 6,
  2023) ...................................................................................................71

*Johnson v. De Grandy*,
  512 U.S. 997 (1994).............................................................................32

*Kerrigan v. Philadelphia Board of Election*,
  No. 2:7-cv-687, 2008 WL 3562521 (E.D. Pa. Aug. 14, 2008)..........................65

*Kiman v. N.H. Dep't of Corr.*,
  451 F.3d 274 (1st Cir. 2006) ...............................................................71

*La Unión del Pueblo Entero v. Abbott*,
  604 F. Supp. 3d 512 (W.D. Tex. 2022) ....................................... 73, 93, 95, 100

*League of Women Voters of Ark. v. Thurston*,
  No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) .... 91, 93, 94

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023)................................................................*passim*

*League of Women Voters of Fla. v. Lee*,
  595 F. Supp. 3d 1042 (N.D. Fla. 2022), *aff'd in part, rev'd in part*
  *on other grounds*, *League of Women Voters of Fla. Inc. v. Fla.*
  *Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).............................................66, 69

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014)...............................................................60

*Leary v. Daeschner*,
  228 F.3d 729 (6th Cir. 2000)................................................................89

*Lewis v. Cain*,
  No. 3:15-cv-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021).....................73

*Livernois v. Med. Disposables, Inc.*,
  837 F.2d 1018 (11th Cir. 1988)............................................................*passim*

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).............................................................................103

*Made in the USA Found. v. United States*,
   242 F.3d 1300 (11th Cir. 2001) ..................................................................103

*Martin v. Crittenden*,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018) ....................................... 93, 94, 101, 104

*Martin v. Taft*,
   222 F. Supp. 2d 940 (S.D. Ohio 2002) ....................................................94, 104

*Nat'l Fed'n of the Blind, Inc. v. Lamone*,
   No. RDB-14-1631, 2014 WL 4388342 (D. Md. Sept. 4, 2014) .................33, 63

*Nat'l Fed'n of the Blind v. Lamone*,
   813 F.3d 494 (4th Cir. 2016) ................................................................*passim*

*New Ga. Project v. Raffensperger*,
   484 F. Supp. 3d 1265 (N.D. Ga. 2020) ................................................. 103, 105

*Nicholas v. Fulton Cnty. Sch. Dist.*,
   No. 1:20-cv-3688-MLB, 2022 WL 2276900 (N.D. Ga. June 23,
   2022) ..............................................................................................................70

*Norman v. Reed*,
   502 U.S. 279 (1992) ................................................................................107, 108

*Olmstead v. Zimring*,
   527 U.S. 581 (1999) ......................................................................................20

*Org. for Black Struggle v. Ashcroft*,
   493 F. Supp. 3d 790 (W.D. Mo. 2020) ..........................................................99

*Osburn v. Cox*,
   369 F.3d 1283 (11th Cir. 2004) ....................................................................34

*PA. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*,
   No. 23-3166 (3rd Cir. Dec. 13, 2023), ECF No. 43 .........................................91

*Pa. State Conf. of the NAACP v. Schmidt*,
   No. 1:22-cv-00339, 2023 WL 3902954 (W.D. Pa. Nov. 21, 2023)...................91

*PA. State Conf. of the NAACP v. Schmidt*,
No. 1:22-CV-00339, 2023 WL 8091601 (W.D. Pa. Nov. 21, 2023)...............101

*Payan v. L.A. Cmty. Coll. Dist.*,
11 F.4th 729 (9th Cir. 2021)................................................................70

*People First of Ala. v. Merrill*,
491 F. Supp. 3d 1076 (N.D. Ala. 2020).........................................*passim*

*Price v. Shibinette*,
No. 21-cv-25-PB, 2021 WL 5397864 (D.N.H. Nov. 18, 2021) .......................72

*R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*,
114 F. Supp. 3d 1260 (N.D. Ga. 2015)...........................................33, 63, 74, 84

*Ritter v. Migliori*,
142 S. Ct. 1824 (2022). ECF No. 763 ............................................................90

*Schwartz v. City of Treasure Island*,
544 F.3d 1201 (11th Cir. 2008).......................................................69

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003)..........................................88, 89, 96

*Shotz v. Cates*,
256 F.3d 1077 (11th Cir. 2001).......................................................65

*Sixth Dist. of African Methodist Episcopal Church v. Kemp*,
574 F. Supp. 3d 1260 (N.D. Ga. 2021)............................................93

*Sixth District of the African Methodist Episcopal Church et al. v.
Brian Kemp et al.*,
No. 1:21-cv-01284-JPB ....................................................................24

*Sofarelli v. Pinellas Cnty.*,
931 F.2d 718 (11th Cir. 1991)........................................................89

*Sosa v. Mass. Dep't of Corr.*,
80 F.4th 15 (1st Cir. 2023)............................................................70

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)...................................................................103

*Tennessee v. Lane*,
541 U.S. 509 (2004).....................................................................20

*The New Georgia Project, et al., v. Brad Raffensperger et al.*,
No. 1:21-cv-01229-JPB ........................................................24, 105

*Thornburg v. Gingles*,
478 U.S. 30 (1986).................................................................*passim*

*Trivette v. Tenn. Dep't of Corr.*,
No. 3:20-cv-00276, 2021 WL 10366330 (M.D. Tenn. May 5,
2021) ...........................................................................................66

*United States v. Campbell*,
26 F.4th 860 (11th Cir. 2022)....................................................113

*United States v. Mississippi*,
380 U.S. 128 (1965)...................................................................101

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981).....................................................................78

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016)........................................................52

*Vega v. Tekoh*,
597 U.S. 134 (2022).....................................................................89

*Vote.Org. v. Callanen*,
89 F. 4th 459 (5th Cir. 2023)..................................................95, 96

*Vote.Org v. Callanen*,
No. 22-50536, 2023 WL 8664636 (5th Cir. Dec. 15, 2023) ......89, 96

*Vote.org v. Ga. State Election Bd.*,
661 F. Supp. 3d. at 1338 ......................................................89, 105

*Wash. Ass'n of Churches v. Reed*,
    492 F. Supp. 2d 1264 (W.D. Wash. 2006).............................................101, 113

*Wate v. Kubler*,
    839 F.3d 1012 (11th Cir. 2016).........................................................................32

*Westchester Disabled On the Move, Inc. v. Cnty. of Westchester*,
    346 F. Supp. 2d 473 (S.D.N.Y. 2004) .............................................................65

*United States ex. Rel. Williams v. NEC Corp.*,
    931 F.2d 1493 (11th Cir. 1991).........................................................................93

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
    657 F. App'x 871 (11th Cir. 2016)..............................................................31, 32

**Statutes**

42 U.S.C. § 1971..........................................................................................................100

42 U.S.C. § 12112(b)(5)(A) .........................................................................................69

42 U.S.C. § 12132.........................................................................................................63

52 U.S.C. § 10101(a)(1)..............................................................................................100

52 U.S.C. § 10101(a)(2)(B)..........................................................................87, 88, 91, 95

52 U.S.C. § 10101(e) ..............................................................................................91, 92

52 U.S.C. § 10301(a) ...................................................................................................34

ADA Title I...................................................................................................................69

Americans with Disabilities Act Title II.........................................................*passim*

*Common Cause/GA.*, 554 F.3d at 1354 .......................................................106, 110

Materiality Provision with the 1964 Civil Rights Act...........................................95

O.C.G.A. §§ 21-2-31.2(a) and 21-2-33.1(f).........................................................106

O.C.G.A. § 21-2-33.2(b) .........................................................................................104

O.C.G.A. § 21-2-380(b) ........................................................68

O.C.G.A. § 21-2-381 (2019) ...........................................*passim*

O.C.G.A. § 21-2-384 ........................................................104

O.C.G.A. § 21-2-385 .........................................30, 49, 54, 79

O.C.G.A. § 21-2-386(a)(1)(C) ...............................26, 27, 31

O.C.G.A § 21-2-391(b)(1) ................................................25

O.C.G.A. § 21-2-499(a) ...................................................104

O.C.G.A. § 21-2-568(a)(5)..........................................29, 79

O.C.G.A. § 21-2-598 ........................................................80

Rehabilitation Act of 1973 Section 504.....................*passim*

Telecommunications Act ..................................................89

Voting Rights Act Section 2 ......................................*passim*

Voting Rights Act Section 208........................................80

**Other Authorities**

28 C.F.R. Pt. 35, App. B, Subpart B................................72, 73

28 C.F.R. § 35.130(a)..........................................63, 65, 72

28 C.F.R. § 35.130(b)(7)..................................................69

28 C.F.R. § 35.130(b)(7)(i) ........................................71, 77

28 C.F.R. § 35.130(b)(8)..................................................73

28 C.F.R. § 35.150.......................................................64, 65

First Amendment ......................................................112, 113

Fifth Amendment..............................................................89

Fourteenth Amendment ..................................................................106

Elections Division, Ga. Sec'y of State; ...................................... 102, 105

Federal Rule of Civil Procedure 56(a) ................................................88

Federal Rule of Civil Procedure 56(f) .................................................88

O.C.G.A. § 21-2-598; 2016 Ga. Op. Att'y Gen. 02 (2016)....................80

Off. Of  Ga. Sec'y of State, Application for Georgia Official Absentee
    Ballot (2021)..................................................................................108

Op. Att'y Gen. No. 2005-3, 2005 WL 897337 (Apr. 15, 2005) .................. 102, 105

Report of the U.S. Comm'n on Civil Rights 1959 at 103-04 (1959).....................96

Report of the U.S. Comm'n on Civil Rights 1963, at 22 (1963)...........................96

Rule 56 ............................................................................................31

Senate Bill 202................................................................................1

## I.    INTRODUCTION

Senate Bill 202 ("SB 202") illegally infringes thousands of Georgians' right to vote in part by imposing numerous new, burdensome, and unnecessary restrictions on the process of absentee voting. State Defendants assert there are no disputes of material fact as to any challenged provision or any plaintiffs. As demonstrated herein, Defendants are incorrect. The record is replete with material factual disputes, rendering a grant of summary judgment to Defendants improper.

First, Defendants analyze each provision in isolation, ignoring how the cumulative impact of SB 202's restrictions across Georgia's entire absentee ballot program harms Black, Asian-American and Pacific Islander ("AAPI"), Hispanic ("Latinx"), and Native American voters, as well as voters with disabilities.

Second, Defendants have cited no evidence and made no arguments relating to AAPI, Latinx, or Native American voters whatsoever, and thus have entirely failed to meet their burden. As to voters with disabilities, Defendants misstate and misapply the legal standards of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and in the process ignore substantial record evidence indicating that SB 202 denies voters with disabilities an equal opportunity to access absentee voting.

Third, Defendants ignore evidence that the challenged absentee ballot provisions constitute an undue burden on minority voters. They also misinterpret the legal standard for Plaintiff NGP's viewpoint discrimination claims.

Finally, as to the claims based on the immaterial requirement to include dates of birth on absentee ballot return envelopes, Defendants simply repackage the same arguments they unsuccessfully raised in opposition at the preliminary injunction stage, which this Court rejected. Because of the multitude of remaining material factual disputes, the Court should deny Defendants' motion in its entirety and allow the case to proceed to trial.

## II.    BACKGROUND

### A.    <u>Section 2 Claims</u>

#### 1.    **Black Voters**

The record evidence demonstrates that voting in Georgia is highly polarized along racial lines. Black voters are extremely cohesive, overwhelmingly voting for their candidates of choice, often with over 90% of their vote, and white voters routinely vote as a bloc to defeat these candidates. SAMF ¶ 11 (Palmer ¶¶ 25-27 & Figs. 1-2; Burden 5-6 & Tbl. 1); *see also Alpha Phi Alpha Fraternity Inc. v.*

*Raffensperger*, No. 1:21-CV-05337-SCJ, 2023 WL 7037537, at *68 (N.D. Ga. Oct. 26, 2023) (finding that Georgia elections are racially polarized).[1]

Prior to 2018, white voters in Georgia used absentee ballots more than Black voters. SAMF ¶ 35 (Burden 11 & Tbl. 5; Fraga ¶ 51; Anderson 99). Ahead of the 2018 election, as one example, nonpartisan organizations concentrated on voter registration and turnout among non-white voters, including with an emphasis on absentee voting. SAMF ¶ 50 (Burden 9; Burnough Decl. ¶ 12; Cotton Decl. ¶¶ 7-12).

In the 2018 general election, Black voters' use of absentee voting outpaced that of white voters for the first time. SAMF ¶ 36 (Burden 11, Tbl. 5; Fraga ¶ 55 & Tbl. 2; Grimmer ¶ 63 & Fig. 2). In fact, compared to the 4.6% of white voters who voted absentee-by-mail in the 2018 general election, the percentages of Black, Latinx, and AAPI voters who voted absentee-by-mail were 7.1%, 6.3%, and 11.5%, respectively, all of which exceeded the rate at which white voters voted absentee. *Id*. Although the difference in the rates at which Black and white voters used absentee voting was less in 2018 and 2022 than in 2020, the pattern of disproportionate use

---

[1] Black, AAPI, Latinx, and Native American voters often share the same candidates of choice and vote cohesively in support of these candidates—which white voters cohesively oppose. SAMF ¶ 9 (Palmer ¶¶ 7, 21, 23, 26, 27, and Fig. 1; *see also* Cobb at 3, 31).

by Black voters is consistent, and because of socioeconomic disparities in Georgia, the burden imposed by disruptions in access to absentee voting is even greater for Black voters. SAMF ¶¶ 525, 950 (Burden 25-26).

The absentee ballot provisions of SB 202 place additional burdens disproportionately on Black voters in ways that are distinct to the operation of each provision.

**Voter ID for Absentee Voting.** Requiring voters to write a DDS ID number on their mail ballot application that matches the ID number in the voter registration system disproportionately burdens Black voters because (1) Black voters are less likely than white voters to have an ID number (or a correct ID number) in their voter registration record, and (2) due to socioeconomic disparities, navigating alternative processes will be more burdensome, on average, for Black voters than white voters. Nearly 243,000 registered Georgia voters either do not have a DDS ID number or have an inaccurate DDS ID number in their voter registration record. SAMF ¶¶ 262-263 (Meredith ¶¶ 64-65, 90-91 & Tbl. VI.A.1 & Tbl. VI.F.1). Although Black registrants constitute about 30% of all registered voters, over 53% of registrants with either no DDS ID number or an inaccurate DDS ID number in the voter registration system are Black—nearly 130,000, or 5.6% of all Black registrants. In contrast, white registrants constitute about 51% of all registered voters but are just 33% of registrants with an ID problem in the voter registration system (about 80,000, or 2%

of white registrants). SAMF ¶ 264 (Meredith ¶¶ 90-91 & Tbl. VI.F.1).[2]

**Demographic change.** Additionally, between 2010 and 2020, while Georgia's total population grew by 10.6%, Georgia's white population shrank by 1.0%, while the Black population grew by over 12%. SAMF ¶ 13 (Palmer at 5, ¶ 12 & Tbl. 1; Cobb at 1). With the growing Black voter mobilization along with these demographic shifts came increased Black voter participation, with Black voter turnout rising from 35% in the 2014 midterm election to over 49% in November 2018. SAMF ¶ 20 (Burden 10, Tbl. 4). In presidential elections, it grew from about 52% in 2016 to over 57% in 2020. SAMF ¶ 22 (Burden Tbl. 4; Grimmer Tbl. 2). Between the 2020 general and 2021 runoff elections, a historic number of Georgians registered to vote for the first time, with Black Georgians accounting for a

---

[2] Evidence shows that the number of affected voters is not likely to decline significantly from these levels. Shortly after SB 202 was passed, the SOS updated voter registration records by matching its records to those maintained by the Georgia DDS. SAMF ¶ 258 (Evans Dep. 158:13-159:5; Germany Dep. 141:21-142:4). This project reduced the number of voters without a DDS ID number associated with their voter record from about 273,000 voters when SB 202 was passed to about 154,000 in September 2021, still disproportionately Black voters. SAMF ¶ 259 (Meredith ¶¶ 26, 29-30 & Tbl. IV.B.1). However, the State concluded it could not accurately update records containing outdated or incorrect DDS ID numbers, Evans Dep. 161:15-162:2, and it did not update any voter registration records after the summer of 2021, SAMF ¶ 260 (Evans Dep. 160:24-161:9). By November 2022, the number of voters without a DDS ID number in their voter record had climbed to almost 172,000 voters. SAMF ¶ 262 (Meredith Tbl. VI.A.1 & ¶¶ 64-65). Another 71,274 voters had an inaccurate DDS ID number in their record. SAMF ¶ 262 (Meredith ¶¶ 90-91 & Tbl. VI.F.1).

disproportionately large share of these newly eligible voters (over 35%, despite constituting just 30% of all registered voters). SAMF ¶ 58 (Fraga ¶¶ 170-173 & Tbl. 20). The white share of registered voters has declined conspicuously over the last several years. SAMF ¶ 15 (Burden 9-10 & Tbl. 3; Palmer ¶¶ 12-16 (from about 58% in 2014 to under 52% in 2022)).

**The Legislature's reaction to these demographic and voting participation changes.** After years of one-party dominance, statewide elections in Georgia became closely contested. SAMF ¶ 13 (Burden 8). For example, the 2020 presidential race was decided by only 12,670 votes (less than a 0.25% margin), resulting in the election of the nation's first Black vice president. SAMF ¶ 87 (Cobb 30; Burden 8; Ga. Sec'y of State, Official Results of the November 3, 2020 General Election; Ga. Sec'y of State, Official Results of the January 20, 2021 Special Runoff Election; Ga. Sec'y of State, Official Results of the November 3, 2020 General Election Recount). The recent competitiveness of Georgia elections reflects the growing participation of Black voters. SAMF ¶ 88 (Burden 4-5). Only after Black voters began using absentee voting disproportionately—and to great effect—did the Legislature change course and limit the use of absentee voting through SB 202.

### 2.    Asian-American Voters

Defendants cite ***no evidence*** relating to AAPI voters, and indeed fail to mention at all. Defendants have thus entirely failed to meet their burden. *See*

*Livernois v. Med. Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir. 1988) (summary judgment is improper where movant "did not satisfy its burden of informing the district court of the basis of its motion"). Nonetheless, Plaintiffs demonstrate herein that the record evidence precludes summary judgment on Plaintiffs' claims on behalf of AAPI voters. At bottom, SB 202 unlawfully reverses the types of ballot access that resulted in record-breaking AAPI turnout for the November 2020 election, which marked the first time in American history that a majority of AAPI citizens (59%) voted. SAMF ¶ 74 (Lee 55).

AAPI people have long endured racial discrimination and xenophobia, having historically been deemed "aliens ineligible for citizenship" and continuing to be majority foreign-born even today. *See* SAMF ¶¶ 547, 555 (Chang 15-18, 39, 60; Lee 40). Because of discriminatory immigration and naturalization laws, AAPI people have the shortest voting history of any racial group. SAMF ¶ 547 (Chang 15-18). While race-based restrictions on citizenship are no longer lawful, stereotypes and suspicions against AAPI people as unassimilable, "perpetually foreign," and disloyal persist and are particularly amplified whenever economic, social, or national security concerns arise. *See* SAMF ¶¶ 549, 555-558, 561 (Khwaja Decl. ¶¶ 11-13; Chang 5, 59-61, 65, 78; Lee 36, 40).

Anti-Asian tropes have been featured in election fraud claims even as of the last national election.[3] SAMF ¶¶ 106, 556-559 (Chang 60-61; Lee 36, 40; Anderson 100; ECF No. 566, Fleming op-ed; Lee Supp. Decl. ¶¶ 2-12). During SB 202's legislative history, AAPI people were blamed for the COVID-19 pandemic. SAMF ¶¶ 550-551 (Chang 60; Lee 36-37; Lee Supp. Decl. ¶ 8). Notably, in November 2020, Representative Barry Fleming—a vocal supporter of SB 202—made a racially derogatory statement in a published op-ed when he compared the "always-suspect absentee balloting process" to the "shady part of town down near the docks you do not want to wander into because the chance of being *shanghai*ed is significant." SAMF ¶¶ 106, 559 (Fleming op-ed, (emphasis added); Hugley Decl. ¶ 11); Nguyen Decl. ¶ 38); Anderson 100; Lee Supp. Decl. ¶¶ 2-12). The experience of AAPI voters in Georgia is further colored by a context of fear and intimidation, where, between the first quarters of 2020 and 2021, hate crimes against AAPI people rose *169%*. SAMF ¶ 554 (Lee 37-38). For example, on March 16, 2020, a Georgia mass shooting

---

[3] For example, on August 9, 2021, the Georgia's Secretary of State office had to issue a statement that "Georgia's elections have grown more competitive over the past decade, but bamboo ballots and the Chinese Community Party aren't the reason" in response to the prevalence of false and racialized claims regarding "bamboo ballots." SAMF ¶ 560 (Lee 36).

targeting Asian-owned businesses killed eight people, including six AAPI women.[4] SAMF ¶ 552 (Chang 61-62; Lee Supp. Decl. ¶ 8).

Despite these circumstances, population and participation increases have turned AAPI Georgians into a potentially pivotal voting group where close elections are increasingly common.[5] SAMF 87 (Cobb 30; Burden 8; Ga. Sec'y of State, Official Results of the November 3, 2020 General Election; Ga. Sec'y of State, Official Results of the November 3 General Election Recount). The 2020 election saw record AAPI voter turnout in Georgia: 53.5% of eligible AAPI Georgians voted in 2020, a 21.9 percentage point increase from 2016, reflecting an 84% gain. SAMF ¶¶ 76-77 (Lee 56, Tbl. 1). This increase in AAPI turnout is largely due to the availability and ease of absentee voting and third-party mobilization by organizations who focus outreach on disenfranchised groups such as AAPIs and

---

[4] The horror and tragedy of these mass murders were only made worse by marginalizing rhetoric from public officials. Georgia Senator Bruce Thompson questioned the legality of the businesses where the shootings occurred. SAMF ¶ 553 (Khwaja Decl. ¶ 12). The Cherokee County Sheriff's Department rationalized that the white shooter was struggling with "sex addiction" and having "a really bad day." *Id.* (Chang 62).

[5] Historically, AAPI voter participation lagged behind white and other racial groups in Georgia, despite the increasing AAPI population. SAMF ¶¶ 60-61 (Lee 44-46, Figs. 2-3, & Tbl. 1). In Georgia's 2012 general election, for example, AAPI people represented only 1% of voters despite composing 3.3% of the voting age population. SAMF ¶ 62 (Palmer Tbl. 1; Lee 47).

individuals with limited English proficiency ("LEP"). SAMF ¶¶ 78, 80-81 (Lee 55-63, 65).

**Availability of absentee ballots**. AAPI registrants applied for and used absentee voting at higher rates than any other racial group in Georgia prior to SB 202. SAMF ¶¶ 81, 371-374 (Lee 65; Fraga ¶¶ 68, 70, Tbl. 3). In 2020, nearly 40% of AAPI voters voted absentee, compared to just 24% of white voters. SAMF ¶ 83 (Lee Tbl. 2). AAPI voters were also the group least likely to vote in person in 2020, whether via early voting (44% of AAPI voters versus 54% for all Georgia voters) or on Election Day (16% of AAPI voters versus 20% for all Georgia voters). SAMF ¶ 84 (Lee Tbl. 2). Further, AAPI voters are significantly more likely to have access to in-language materials when voting absentee (versus voting in person). SAMF ¶¶ 54, 239, 719 (Lee 54; Fulton Cnty. Dep. 110:2-15; Paik Dep. 44:5-12 (obtaining translation assistance requires substantial time)). Finally, concerns over violence and hate crimes have only further cemented AAPI voters' need for access to absentee voting.[6] SAMF ¶¶ 552, 554 (Chang 61-61; Lee Supp. Decl. ¶ 8; Lee 37-38).

**Mobilization efforts**. Organizations like Plaintiff Advancing Justice-Atlanta also play a significant role in the recent increase in AAPI voter turnout. SAMF ¶ 78 (Lee 55-63). AAPI voters have been less likely than white voters, and even other

---

[6] AAPI voters report being more comfortable voting absentee than voting in person. SAMF ¶ 85 (Lee 69).

minority voters, to be contacted and asked to vote in upcoming elections and, as a result, less likely to vote. SAMF ¶ 64 (Lee 56). But Advancing Justice-Atlanta and other organizations have helped reverse this trend. For the 2020 election, Advancing Justice-Atlanta conducted numerous voter outreach activities, including personal phone calls, multi-lingual informational mailers, get-out-the-vote drives, and assistance with voter registration, absentee voting, early voting, and Election Day voting. SAMF ¶¶ 698-699 (Lee 49, 62; AAAJ Dep. 42:6-8; 42:15-19, 46:8-47:10, 49:22-50:17). The success of these mobilization efforts was clear: 46% of AAPI Georgians who voted in the 2020 election and were contacted about voting were first-time voters. SAMF ¶ 79 (Lee 60).[7]

**Language access**. Language barriers continue to significantly and disproportionately impede AAPI voter participation in Georgia. Approximately 80% of AAPI Georgians live in non-English-speaking households and at least 33% of those AAPI people are limited English proficient ("LEP"), although some scholars estimate that number is higher.[8] SAMF ¶¶ 537-538 (Cobb 40; Palmer ¶ 18). Compared to Georgia's white population, where only 2% are LEP, lack of English

---

[7] From 2008 to 2020, the number of AAPI people contacted and asked to vote jumped by at least 11 percentage points, and as much as 30 percentage points according to some metrics. SAMF ¶ 65 (Lee 56-57).

[8] *See* SAMF ¶ 510 (Cobb 40) (noting that 44 percent of AAPI people in Georgia reported speaking English "less than very well").

proficiency constitutes a barrier to voting that falls largely on minority voters' shoulders. SAMF ¶ 538 (Palmer ¶ 18).

Language barriers prevent AAPI people from registering to vote, SAMF ¶¶ 539 (Lee 53, Fig. 6), and from ultimately casting their ballots, SAMF ¶ 540 (Lee 53-54) more than any other racial group. SAMF ¶ 543 (Lee 85; AAAJ Dep. 50:5-7; 51:11-18; 102:18-24; 120:2-5; 127:19-24; 128:8-17). Moreover, because the state of Georgia and its counties do not provide Asian-language voting materials, AAPI voters rely heavily on community organizations such as Advancing Justice-Atlanta to help them register and navigate the voting process, including voting absentee. SAMF ¶¶ 69, 70, 718 (SOS 4/13 Dep. 41:3-11, 41:24-42:10; Gwinnett Cnty. Williams Dep. 77:11-22; Fulton Cnty. Dep. 149:2-7; Cobb Cnty. Dep 186:8-10; 197:15-17; DeKalb Cnty. Dep. 69:5-8; Lee 49, 62; Paik Dep. 20:5-21; 26:5-9). In doing so, Advancing Justice-Atlanta conducts outreach in multiple languages, including operating a voter hotline in Korean, Chinese, Vietnamese, Spanish and Hindi. SAMF ¶ 699 (Lee 49, 62; AAAJ Dep. 42:15-18; 49:22-50:17).

a. **SB 202's Curtailment of Absentee Voting Directly Impacted AAPI Voters' Ability to Participate in the Franchise**

SB 202 created numerous absentee-voting restrictions impacting AAPI voters, including by prohibiting government officials from proactively sending absentee ballot applications; imposing new ID requirements for absentee ballot applications;

condensing the time in which voters may submit absentee ballots; and limiting the number of drop boxes available.[9] *See* O.C.G.A. § 21-2-381. These provisions work together to restrict absentee voting, particularly for AAPI voters, a large portion of whom are LEP or first-time voters. SAMF ¶¶ 75, 538 (Lee 48, 60, 84; Cobb 40; Palmer ¶ 18). Due to AAPI Georgians' heavy reliance on absentee voting, AAPI voters' access to the ballot has been significantly[10] and disproportionately hindered by the numerous barriers SB 202 introduced. SAMF ¶¶ 40-42 (Fraga ¶¶ 36-40; 52, 57, 60-62; 68-70).

AAPI voters' use of absentee ballots decreased disproportionately in the elections following SB 202 when compared to white voters. While AAPI voters' use of absentee ballots declined by 30.6 percentage points between the general elections directly before and after SB 202, white voters' rates declined by only 18.3 percentage

---

[9] The Advancing Justice-Atlanta Plaintiffs also challenge other SB 202 restrictions in the timeline and drop box provisions in other briefs. *See* Plaintiffs' Opposition to Motion for Summary Judgment on Dropbox Provisions; Plaintiffs' Opposition to Motion for Summary Judgment on Changes in Timing.

[10] Here, "significant" is used colloquially and synonymously with "substantial," as distinct from the term "statistically significant," a variant of "statistical significance." Statistical significance refers to the likelihood that a result or relationship observed in a data set is not due to chance. *See* DAVID H. KAYE & DAVID A. FREEDMAN, REFERENCE GUIDE ON STATISTICS, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed.), Federal Judicial Center (2011), 2011 WL 7724256, at *24-25. In conducting his analysis, Dr. Fraga found and presented disparities that are statistically significant. His underlying calculations can be made available to the court.

points. SAMF ¶¶ 41, 956 (Fraga Tbl. 2).[11] Similarly, while AAPI voters' use of absentee ballots declined by 28.7 percentage points between the runoff elections immediately before and after SB 202, white voters' rates declined by only 16.5 percentage points. SAMF ¶ 957 (Fraga Tbl. 2). Overall, AAPI voters' use of absentee ballots decreased across the two most recent midterm elections, while white voters' rates increased in the same time period. *Id.*; SAMF ¶ 43 (Fraga ¶ 70).

SB 202 also resulted in a disproportionate decrease in AAPI participation overall. AAPI voter turnout decreased by 22.8 percentage points between the general elections directly before and after SB 202, compared to a 14.1 percentage point decrease among white voters. SAMF ¶¶ 40, 954 (Fraga Tbl. 1). Similarly, AAPI voter turnout decreased by 18.6 percentage points between the runoff elections directly before and after SB 202, compared to a 12.7 percentage point decrease among white voters. SAMF ¶ 955 (Fraga Tbl. 1).

---

[11] These disparities are substantial and significant, both as a practical matter and in lay people's terms, in that they reflect that AAPI voters saw declines nearly 1.5 times higher than declines observed among white voters. They are also statistically significant in that they cannot be attributed to random chance. *See* DAVID H. KAYE & DAVID A. FREEDMAN, REFERENCE GUIDE ON STATISTICS, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3d ed.), Federal Judicial Center (2011), 2011 WL 7724256, at *24-25.

3. **Latinx Voters**

As is the case with AAPI voters, Defendants fail to address the claims of Latinx voters in their motions for summary judgment and have entirely failed to meet their burden as to Plaintiffs' claims as to those voters. Nevertheless, Plaintiffs take this opportunity to note the existence of just some of the disputed material facts precluding summary judgment with respect to SB 202's absentee ballot changes as to Georgia's Latinx voters.

**Latinx Voter's Rising Voter Registration and Political Participation Prior to SB 202.** Despite Georgia's long and well-documented past and recent history of racial bias, violence and hate against Latinx people and other nonwhite Georgians, including with respect to efforts to suppress the vote of nonwhite Georgians, SAMF ¶ 979 (Cobb 450, 20-28, 34-54, and 57), Latinx representation within Georgia's electorate and their participation in Georgia's elections grew substantially in the last decade, and the election of Latinx members to the Georgia General Assembly was also beginning to increase. SAMF ¶ 979 (Cobb 13-14, 29-32). In fact, prior to the enactment of SB 202, Latinx voter registration had steadily increased in Georgia, rising from 164,784 voters in 2016 to 274,524 in 2020. SAMF ¶ 967 (Burden 8-9, Tbl. 3). In 2020, statewide Latinx voter turnout reached 42.2%. SAMF ¶ 968 (Fraga ¶¶ 36-37, Tbl. 1), with more than 40% of all Latinx votes cast

in the four metro-Atlanta counties (Fulton, Gwinnett, Cobb, and DeKalb), SAMF ¶ 968 (Cobb 30).

As is the case with many AAPI voters, many of Georgia's Latinx voters face additional barriers to voting because of language barriers. Except for Gwinnett County, all Georgia counties only provide ballot applications, instructions, and ballots in English. SAMF ¶ 894 (GALEO Dep. 100). SB 202's complex ballot application requirements—including the Birthdate requirement—frustrate Latino voters' ability to vote because many of these voters are not proficient in English. SAMF ¶ 894 (GALEO Dep. 100, 123:17-23; Gonzalez Decl. ¶ 6).

Additionally, Georgia has closed many voting precincts over time. SAMF ¶ 895 (GALEO Dep. 152:18-19). The majority of these precincts were located in minority communities. SAMF ¶ 895 (GALEO Dep. 152:18-24). This phenomenon has contributed to longer wait times for voters assigned to minority community precincts. *Id.* Several GALEO members reported waiting in line for three to four hours when they attempted to vote in the 2022 general election. SAMF ¶ 895 (GALEO Dep. 155). Discouraged by the long lines, some of those voters left without casting a ballot. *Id.* Thus, Georgia's Latinx voters often face the additional burden of long lines at the polls when they do attempt to vote in person.

### 4. Native American Voters

While there is no discrete compilation of socioeconomic data pertaining specifically to the Lower Muskogee Creek Tribe,[12] their self-reported Native American identity places them in the U.S. Census Bureau's American Indian and Native Alaskan ("AIAN")[13] racial classification. SAMF ¶ 979 (Cobb 18-19), and they suffer socio-economic disparities compared to white residents, including high rates of poverty, lower educational achievement, lower access to vehicles needed to access in-person voting and absentee ballot drop boxes, and technology needed to copy ID documents for absentee-by-mail voting mandated by SB 202. SAMF ¶ 979 (Cobb 54-57).

The 1990 Census reported Georgia's Native American population to be 13,000, and that number grew to just under 51,000 by 2020. SAMF ¶ 979 (Cobb 20). The 37,486 Native American Georgians who were registered to vote by December 2022 reflected an increase of almost 450 percent from the 6,849 Native American voters who were registered to vote in Georgia in 2018. Although Native American voters account for only about 0.5% of the state's total registered voters, in raw

---

[12] After the forced surrender of tribal lands and eventual forced removal of large numbers of tribal peoples out of Georgia in the early 1800s, the Lower Muskogee Creek Tribe was one of the tribal entities which reorganized in Georgia, Florida and Alabama in 1973. SAMF ¶ 979 (Cobb ¶¶ 18-19).

[13] Plaintiffs refer to persons within the U.S. Census Bureau's AIAN classification in this brief as, Native Americans.

numbers, this represented roughly three times President Biden's margin of victory in Georgia in 2020. SAMF ¶ 979 (Cobb 20 n. 34).

Despite making strides in increasing the mobilization, voter registration and participation by Georgia's tribal members in Georgia's elections, Tribal voters have continued to face difficulties voting in person, including in the 2022 elections, because poll officials have refused to accept their Tribal IDs for voting. SAMF ¶¶ 909, 979 (LMCT Dep. 39:18-24, 45:14-46:20, 47; Cobb 57). Additionally, SB 202's limitations on polling place hours on election day as well as during early voting frustrate LMCT members' ability to vote in person or by drop box because of work commitments, long commutes, and less access to a vehicle for transportations. SAMF ¶ 908 (LMCT Dep. 40, 43:22-44:9, 59:12-16, 64).

Thus, while Georgia's Native American population and voter registration numbers may be relatively small in comparison to white voters and other racial minority groups, SB 202's new absentee ballot restrictions impose additional burdens on Native Americans which are compounded by burdens which inhibit or prevent them from voting in person.

## B.    ADA Claims

The restrictions placed on Georgia's absentee voting program by SB 202 Sections 25, 27 and 47 (collectively, "Absentee Voting Restrictions") discriminate against voters with disabilities. Because of SB 202's restrictions on absentee voting,

voters with disabilities will face significant additional burdens in voting, will be dissuaded from voting, and in some cases will not be able to vote at all. Specifically, voters with disabilities across Georgia lack an equal opportunity to access absentee voting in two ways relevant to the present motion. First, Section 47 of SB 202, otherwise known as the Felony Provision, enhances penalties for ballot return assistance from trusted sources and has created fear of felony prosecution and confusion about who is qualified to return a disabled voter's absentee ballot; since people with disabilities disproportionately need voting assistance, this provision deters and burdens them and their good-faith assistors. Second, voters with disabilities disproportionately lack IDs and struggle to obtain the additional identifying documents that are now required to vote absentee.

Defendants misstate and misapply the legal standards of the ADA and Section 504, and in the process ignore substantial record evidence indicating SB 202 denies voters with disabilities equal opportunity to cast their ballots. Thus, summary judgment is unwarranted on Plaintiffs' claims that the Absentee Voting Restrictions violate these civil rights laws.

The ADA is a landmark civil rights law enacted "to address and eliminate discrimination against individuals with disabilities." 8/18/2023 PI Order [ECF No. 615] 12. "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic

deprivations of fundamental rights." *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). Moreover, as this Court has already found, "[t]he ADA is ***broadly construed*** to effectuate its remedial purposes and serves as a safeguard to individuals with disabilities in various areas of public life, ***including voting***." 8/18/2023 PI Order [ECF No. 615] 12 (emphases added). Indeed, the ADA "as a whole is intended 'to provide a ***clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities***.'" *Olmstead v. Zimring*, 527 U.S. 581, 589 (1999) (emphasis added) (quoting 42 U.S.C. § 12101(b)(1)); *see also Tennessee*, 541 U.S. at 516.

1.    **Importance of Absentee Voting Access for Georgians with Disabilities**

At least 1.3 million voting-eligible Georgians have disabilities, including mobility difficulties; blindness and deafness; cerebral palsy; and intellectual, developmental, and mental disabilities. *See, e.g.*, SAMF ¶¶ 576, 599, 610, 670, 793 (Schur ¶¶ 9, 40; Thomas Decl. ¶¶ 4-5; Chicoine Decl. ¶ 3; Papadopoulous Decl. ¶¶ 1-3; Mattox Decl. ¶¶ 5, 21(a); Orland Decl. ¶ 6). Disabilities are particularly prevalent among older adults.[14] These voters face "myriad barriers" to accessing the

---

[14] The disability rate climbs strongly with age, from 8.0% among those aged 18-34 to 26.4% among those aged 65-74, 43.7% among those aged 75-84, and 70.5% among those aged 85 or older. SAMF ¶ 578 (Schur ¶ 46(b)).

ballot,[15] including difficulty leaving the home, lacking accessible transportation, needing assistance with daily activities, and high rates of poverty, social isolation, and stigma. SAMF ¶ 590 (Schur ¶¶ 39-40). For many disabled voters, absentee voting is the most (or only) accessible means of voting. SAMF ¶¶ 607-608 (Schur ¶¶ 66-71, 73). As such, voters with disabilities will vote absentee by mail significantly more often than the broader population. SAMF ¶ 607 (Schur ¶¶ 66-71, 73); *see also* Gwinnett Cnty. Manifold Dep. 186:21-25. In 2020, for example, 44.7% of Georgians with disabilities voted absentee by mail, compared to 26.7% of Georgians without disabilities. SAMF ¶ 606 (Schur ¶ 73).

### 2. Voters with Disabilities Face Barriers to Voting Due to Their Disabilities

But even with the option to vote absentee, disabled voters face barriers due to their disabilities, which are exacerbated by SB 202's restrictions on absentee voting. For example:

**Assistance.** Voters with disabilities are more likely to need assistance to be able to vote—either in person or absentee. SAMF ¶ 671 (Schur ¶ 92). Over two-

---

[15] Voting in person can be particularly burdensome for some voters, who may have difficulties leaving the house, standing in line at the polls, potentially for hours and without the ability to receive food and water from others (which SB 202's line relief ban prohibits), and facing accessibility obstacles at polls. SAMF ¶¶ 591, 607 (Schur ¶¶ 72, 75-77, 79-82); *see also e.g.*, SAMF 602-605 (Mathis Decl. ¶¶ 1, 2, 5, 7-10, 20).

fifths (44.4%) of Georgians with disabilities need assistance with one or more activities of daily living, including 24.6% who need help going outside of the home for errands. SAMF ¶ 585 (Schur ¶ 52). Many of these activities require abilities that are also needed in the act of voting. SAMF ¶ 577 (Schur ¶ 45).

Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members for help. SAMF ¶ 586 (Schur ¶ 54). Not all Georgians can count on family for that help. A significant percentage (8.7%) of Georgians with disabilities rely on friends or neighbors, paid help, or other non-relatives, with many relying on multiple people for assistance. SAMF ¶ 586 (Schur ¶ 54). On a national scale, 14% of individuals requiring assistance with absentee voting in the 2020 elections received help from friends, neighbors, or non-relatives other than health aides (8% by friends and neighbors and 6% by other non-relatives). SAMF ¶ 675 (Schur ¶ 91).

Moreover, Georgians with disabilities are three times more likely than Georgians without disabilities to live in institutional settings such as nursing facilities and assisted living facilities. SAMF ¶ 580 (Schur ¶¶ 50(c), 93). Those in institutions generally have more significant disabilities and are more likely to require critical assistance in voting and daily activities. SAMF ¶ 580 (Schur ¶ 93). As a result, these individuals rely on staff or administrators for voting assistance. SAMF ¶ 581 (Schur ¶ 93).

22

**Transportation.** Access to transportation is strongly correlated with access to the polls. SAMF ¶ 656 (Schur ¶ 62). Yet, in Georgia, people with disabilities are four times *more* likely to live in households without vehicles. SAMF ¶ 579 (Schur ¶ 60). People with disabilities are also much less likely to be drivers than those without disabilities (61.6% compared to 91.9%). SAMF ¶ 579 (Schur ¶¶ 60, 62). Over half (58.3%) of Georgians with disabilities, compared to 42.9% of those without disabilities, find travel a financial burden. SAMF ¶ 579 (Schur ¶ 60). As a result, voters with disabilities are more likely to rely on absentee voting. SAMF ¶ 606 (Schur ¶ 73). But when absentee voting requires printing or copying the voter's identifying documents, even absentee voting will require travel outside the home for those who do not have access to technology such as computers, printers, or internet in their home. Thus, even among disabled voters relying on absentee voting, travel barriers make it more burdensome and costly to vote. SAMF ¶¶ 579, 584, 607, 617 (Schur ¶ 98). They are also more likely than Georgians without disabilities to need transportation assistance in returning ballots by mail or drop box. SAMF ¶ 579 (Schur ¶ 60).

**Technology.** People with disabilities in Georgia are less likely than those without disabilities to have access to computers, internet, printers, or copiers at home, which also decreases disabled voters' abilities to obtain resources necessary to vote. SAMF ¶¶ 582-584, 617 (Schur ¶¶ 56-59). Lack of internet access makes it

23

more burdensome to register to vote, find out how and where to vote, or cure issues with absentee ballot applications. SAMF ¶ 584 (Schur ¶ 59). Therefore, barriers to registering for or using absentee voting have a greater impact on voters with disabilities than voters without disabilities.

## C.    Immateriality Claims

The Court recites the undisputed facts relevant to the materiality issue in its order preliminarily enjoining enforcement of the birthdate requirement as to absentee ballots.[16] 8/18/2023 PI Order [ECF No. 613] 2-5. Defendants' Consolidated Statement of Facts (ECF No. 755) presents no new factual contentions that call the Court's previous holding on this issue into doubt, and their new legal theories are meritless.

### 1.    SB 202's Birthdate Requirement

SB 202 requires an absentee voter to place their ballot in a first, inner

---

[16] Defendants' motion does not seek summary judgment on the challenges to the birthdate requirement on absentee ballot *applications*. *See generally Georgia State Conference of the NAACP et al. v. Brad Raffensperger et al.*, No. 1:21-cv-01259-JPB (ECF No. 35, ¶ 137-139, 235-237); *Sixth District of the African Methodist Episcopal Church et al. v. Brian Kemp et al.*, No. 1:21-cv-01284-JPB (ECF No. 83, ¶¶ 250-253); *The New Georgia Project, et al., v. Brad Raffensperger et al.*, No. 1:21-cv-01229-JPB (ECF No. 39, ¶¶ 68, 193-197); ECF No. 763 at 78-89 (addressing other challenges to absentee ballot application requirements); ECF No. 761-1 at 46-58 (addressing only the challenges to the birthdate requirement on absentee ballot return envelopes).

envelope, and then to put that into a second, "outer oath envelope" or "ballot return envelope." 8/18/2023 PI Order [ECF 613] 3, 5. The voter must then "print his or her date of birth" and provide other information, including an ID number, on the ballot return envelope. *Id.* at 3.

The birthdate requirement does not affect a voter's qualification to vote in any way. ECF No. 763 at 92; 8/18/2023 PI Order [ECF 613] at 21-22; *see also* SAMF ¶ 206 (State Resp. to NGP 1st ROGs 5/16/22 at 3; DeKalb Cnty. Dep. 213:2-13; Gwinnett Cnty. Manifold Dep. 116:24-117:22; Athens-Clarke Cnty. Dep. 76:10-3). Any Georgia voter can apply to vote absentee, and election officials confirm a person's qualification to vote when reviewing and approving their absentee ballot application. O.C.G.A § 21-2-391(b)(1); 8/18/2023 PI Order [ECF No. 613] 21. Election officials send absentee ballots only to voters whom they have already deemed qualified. *Id.*

If the date on the ballot return envelope does not match a voter's registration records, election officials must reject the ballot. *Id.* at 15-16; *see also, e.g.*, SAMF ¶¶ 209-211 (Pulgram Decl. ¶¶ 3-32, Exs. 1-20; Hall Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 5-14; Athens-Clarke Cnty. Resp. to AME 1st ROGs 1/11/2023 at 9-1; Chatham Cnty. Resp. to AME 1st ROGs 1/23/2023 at 3-6; Cobb Cnty. Resp. to AME 1st ROGs 1/19/2023 at 1, 4-8; Fulton Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 3-10; Richmond Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 4-

14; Gwinnett Cnty. Resp. to AME 1st ROGs 1/24/2023 at 9; Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17) (summarizing counts of ballots rejected in certain counties). Voters whose absentee ballots have been rejected have only three days from the date of the election, regardless of whether or when they receive notice, to submit an affidavit to county officials, along with valid identification, in an attempt to cure the issue. Absent a cure, the vote will not be counted. O.C.G.A. § 21-2-386(a)(1)(C).

## 2. The Birthdate Requirement Disenfranchises Voters

In 2022, in just the seven counties for which records were obtained, at least a thousand votes were rejected for errors or omissions concerning the voter date of birth on ballot return envelopes. SAMF ¶¶ 209-211 (Pulgram Decl. ¶¶ 3-32, Exs. 1-20; Hall Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 5-14; Athens-Clarke Cnty. Resp. to AME 1st ROGs 1/11/2023 at 9-1; Chatham Cnty. Resp. to AME 1st ROGs 1/23/2023 at 3-6; Cobb Cnty. Resp. to AME 1st ROGs 1/19/2023 at 1, 4-8; Fulton Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 3-10; Richmond Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 4-14; Gwinnett Cnty. Resp. to AME 1st ROGs 1/24/2023 at 9; Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17). For example, many voters write the current date or year, rather than the birthdate on file; write the current date on the return envelope; or leave the space blank altogether. SAMF ¶¶ 207-208 (Bailey 10/6/2022 Dep. 187:1-12, 188:18-189:6). Individual records

obtained through open records requests from two counties substantiate almost 1,000 ballots rejected based on date of birth in 2022. SAMF ¶¶ 210-211 (Pulgram Decl. ¶¶ 10, 14-15, 20, 23, 25, 27, 30-32, Exs. 4, 8; Gwinnett Cnty. Resp. to AME 1st ROGs 1/24/2023 at 9; Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17).

In Gwinnett County alone, for instance, in a single run-off election in 2022, at least 218 absentee ballots—roughly 75% of all excluded absentee ballots for that runoff—were rejected for lacking a correct birthdate. SAMF ¶ 210 (Pulgram Decl. ¶¶ 10, 14-15, Exs. 4, 8; Gwinnett Cnty. Resp. to AME 1st ROGs 1/24/2023 at 9; Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17). Cobb County rejected 759 absentee ballots based on missing or incorrect birthdates in the same year. SAMF ¶ 211 (Pulgram Decl. ¶¶ 20, 23, 25, 27, 30-32). Cobb County seemingly does not maintain records of how many voters cured the deficiency, if any did, but dozens of voters did not receive their notice of rejection until after the cure period had expired. *Id.*

### 3.    Procedural History

On August 18, 2023, the Court granted in part the GA NAACP Plaintiffs' and the AME Plaintiffs' motion to preliminarily enjoin Defendants from enforcing the birthdate requirement, holding that it likely violates the Materiality Provision because it denies the right to vote based on a requirement immaterial to voter

qualification. *See generally* 8/18/2023 PI Order [ECF No. 613]. The Court declined to enjoin State Defendants, but only because it found that Plaintiffs' injury—the rejection of absentee ballots with missing or incorrect birthdates—was not redressable by State Defendants, who are "removed from the process of accepting or rejecting absentee ballots." *Id.* at 16; *see also id.* at 28-29. The injunction remains in effect pending Defendants' appeal to the Eleventh Circuit. Plaintiffs have cross-appealed the Court's exclusion of the State Defendants from the injunction, based on their potential to redress the injury by any of several means. Plaintiffs briefly address those issues below and more fully in their brief on jurisdiction.

## III.  CHALLENGED PROVISIONS

Plaintiffs Advancing Justice-Atlanta, AME, GA NAACP, NGP, and CBC challenge various provisions of SB 202 related to absentee voting. The provisions relevant to this motion are outlined below for the Court's convenience:

**<u>Prohibition on government officials proactively sending absentee ballot applications</u>**. Prior to SB 202, state and county election officials were permitted to proactively mail absentee ballot applications to registered voters without a request from a voter. In advance of the June 2020 primary election, the Office of the Georgia Secretary of State (SOS) sent absentee ballot request forms to all of Georgia's 6.9 million active voters. SAMF ¶ 182 (SOS Dep. 3/7 at 57:12-20). Several counties sent such mailings for the November 2020 election. *See infra* § V.A.3.a. Under SB

28

202, such proactive mailings are now prohibited. *See* O.C.G.A. § 21-2-381(a)(1)(C)(ii).

**Handling completed absentee ballots ("Felony Provision")**. Section 47 of SB 202 heightens the criminal penalty from a misdemeanor to a felony for ballot return assistance not authorized by state law.[17] O.C.G.A. §§ 21-2-568(a)(5), 21-2-385(a). Georgia Code section 21-2-568, as modified by SB 202, now provides that anyone other than a voter's family or household member, or the "caregiver" of a voter with a disability, who knowingly "[a]ccepts an absentee ballot from an elector for delivery or return to the board of registrars … shall be guilty of a felony." O.C.G.A. § 21-2-568(a)(5). The term "caregiver" is not defined in the law, nor has the Secretary of State's office provided any definition. SAMF ¶ 678 (Orland Decl. ¶ 24(b) & Ex. D). There are no exceptions to this provision, even for mistakes or assistance allowed by other laws. SAMF ¶ 677 (Orland Decl. ¶ 24).

**Voter ID requirements for returning completed absentee ballot applications**. Prior to SB 202, election officials would verify an absentee voter's identity by comparing the signature on a voter's absentee ballot application or absentee ballot envelope with their signature on file. O.C.G.A. § 21-2-381(a)(1)(C) (2019); SAMF 249 (PI Hr'g Tr. 191:7-13). Documentary identification was not

---

[17] Defendants refer to this provision in their briefing as the "Ballot Harvesting Penalty."

required. Section 25 of SB 202 created a new ID requirement for absentee ballot applications, mandating that voters provide their driver's license or state ID card number.[18] *See* O.C.G.A. § 21-2-381((a)(1)(C)(i). If an elector does not have a valid ID card, they must prove their identity by providing "a copy of a form of identification" such as a utility bill, paystub, or other government document containing their current address.[19] *Id.* (citing O.C.G.A. § 21-2-417(c)).

**<u>Voter ID requirements for returning completed absentee ballots</u>**. Section 27 of SB 202 also created a new ID requirement for returning completed absentee ballots (together with Section 25 of SB 202, "Voter ID Requirements"). Voters must again print their DDS ID number on the absentee ballot envelope. O.C.G.A. § 21-2-385(a). Only if a voter affirms that they do not have a driver's license or state ID card may they provide the last four digits of their social security number, or if they do not have a social security number, they must provide a copy of "a form of identification" such as a utility bill, paystub, or other government document containing their current address. *Id.* (citing O.C.G.A. § 21-2-417(c)).

---

[18] This is in addition to fulfilling all the law's previous requirements: voter's name, address, which election the ballot was for, and the name and relationship of the person requesting the ballot if not the voter themselves. *See* O.C.G.A. 21-2-381 (2019).

[19] This is a separate requirement from filling out the absentee ballot itself, where voters without state IDs may write the last four digits of their social security number.

**Date of birth requirement**. SB 202 requires an absentee voter to "print his or her date of birth" and provide other information on the ballot return envelope. 8/18/2023 PI Order [ECF 613] 3, 5. If the date on the ballot return envelope does not match a voter's registration records, election officials must reject the ballot. *Id.* at 15-16. Absent a cure, the vote will not be counted. O.C.G.A. § 21-2-386(a)(1)(C).

## IV.    LEGAL STANDARD

Under Rule 56, summary judgment "is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016) (quoting *Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 815 F.3d 1293, 1297 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir. 2004). "The basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The moving party has the burden of showing the absence of a genuine issue as to any material fact." *Id.*

31

At the summary judgment stage, courts "do not weigh conflicting evidence or make credibility determinations." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). Courts "must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party." *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015) (*Fayette Cnty.*). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 646. "Summary judgment is not often granted in voter denial lawsuits" due to their fact-specific nature. *Fair Fight Action, Inc. v. Raffensperger*, 2021 WL 9553856 *5 (N.D. GA Mar. 31, 2021) (quoting *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1221 (11th Cir. 2020)).

Courts rarely grant summary judgment in voting-rights cases, where "ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts."[20] *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994); *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348-49 (11th Cir. 2015); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016).

---

[20] In quoted excerpts herein, all emphases have been added and all citations and internal quotations omitted unless otherwise noted.

Regarding claims specifically brought pursuant to the ADA, whether persons with disabilities have been excluded from participation or otherwise discriminated against in a program under Title II, and whether such exclusion or discrimination is due to disability, are questions of fact that may preclude summary judgment. *See, e.g.*, *R.W. v. Bd. of Regents of the Univ. Sys. of Ga.*, 114 F. Supp. 3d 1260, 1285-86 (N.D. Ga. 2015) (denying parties' cross-motions for summary judgment on plaintiff's ADA claims where there were material issues of fact as to both whether plaintiff had been excluded from participation or otherwise discriminated against with respect to his enrollment and housing at a state university and whether that exclusion or discrimination was by reason of his disability); *see also Nat'l Fed'n of the Blind, Inc. v. Lamone*, No. RDB-14-1631, 2014 WL 4388342, at *1 n.6 (D. Md. Sept. 4, 2014); 8/18/2023 PI Order [ECF No. 615] 22.

## V.    ARGUMENT

### A.    Disputes of Fact Remain as to Whether SB 202's ID Requirements for Absentee Ballot Applications and Prohibition on Officials Proactively Sending Absentee Ballot Applications Abridge the Rights of Voters of Color Under Section 2

SB 202's imposition of new and additional ID requirements for absentee ballots and prohibition on state and county election officials from proactively sending absentee ballot applications violate Section 2 of the Voting Rights Act.

Section 2 of the Voting Rights Act ("VRA") provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be

imposed or applied . . . in a[ny] manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). In deciding whether § 2 has been violated, courts look to the "totality of the circumstances" to determine whether the state's system of voting is not "equally open" to minority groups "in that [their] members have less opportunity than" non-minority voters "to participate in the political process and to elect representatives of their choice."[21] *Id*. § 10301(b); *see also Thornburg v. Gingles*, 478 U.S. 30, 43 (1986) ("The right question" in a § 2 analysis "is whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice"); *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004) (courts ask whether minority voters are denied "meaningful access to the political process").

In analyzing § 2 claims, courts should consider "any circumstance that has a logical bearing on whether voting is 'equally open,'" in that it affords minority voters an equal opportunity to participate in the franchise, including consideration of

---

[21] Defendants misstate this standard, asserting that Plaintiffs must show that the law's "disparate impact is caused by racial bias." *See* ECF No. 763 at 26. However, this statement mischaracterizes the case law and improperly attempts to import an intent requirement into a § 2 results claim, which undisputedly does not require a showing of intent. *See Greater Birmingham Ministries*, 992 F.3d at 1329. While the Eleventh Circuit has identified a causation element (*i.e.*, that the challenged law caused the denial or abridgement of the right to vote), a showing of racial prejudice or bias is not required. *Id*. at 1330.

voters' "ability to *use* the means that are equally open." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021). In *Gingles*, the Supreme Court identified several salient factors, including some particularly applicable in vote denial and abridgement cases, such as "the history of voting-related discrimination in the State" and "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate in the political process." 478 U.S. at 44-45. In *Brnovich*, the Supreme Court identified additional guideposts that courts may consider in § 2 cases, including the "size of the burden imposed"; "the degree to which a voting rule departs from" the standard when § 2 was amended; "the size of any disparities in a rule's impact on members of different racial or ethnic groups"; "the opportunities provided by a State's entire system of voting"; and "the strength of the state interests served by a challenged voting rule." 141 S. Ct. at 2338-39.

While courts may consider any relevant circumstances, including but not limited to the *Gingles* and *Brnovich* factors, the "core of § 2(b) is the requirement that voting be 'equally open,'" including "consideration of a person's ability to *use* the means that are equally open." *Brnovich*, 141 S. Ct. at 2338 (emphasis in original).

The challenged absentee voting provisions at issue in this motion, *see supra* § III, individually and collectively render Georgia's voting system not equally open to participation by voters of color, as compared to white Georgians. Plaintiffs

address each provision at issue in this motion individually below; in addition, Plaintiffs discuss the provisions' cumulative impact. Namely, these interdependent provisions create substantial barriers for voters of color and prevent them from participating equally in the franchise, in violation of VRA § 2.[22]

### 1.    Cumulative Impact of Absentee Ballot Provisions

SB 202's interdependent restrictions on absentee voting caused decreases in Black, AAPI, Latinx, and Native American voters' use of absentee ballots—and ultimately their ability to vote—by making it "significantly harder for AAPI voters" and other voters of color to navigate the election system as compared to white voters. SAMF ¶ 543 (AAAJ Dep. 50:5-7); *see Brnovich*, 141 S. Ct. at 2338 (§ 2 results analysis includes "consideration of a person's ability to *use* the" electoral systems in place). For example, as for AAPI voters, absentee voting is the preferred, and in many cases only, means of voting. SAMF ¶¶ 38-39 (Fraga ¶ 68, Tbls. 2-3; Lee Figs. 2, 68; Grimmer Fig. 2). Thus, SB 202's numerous and compounding restrictions resulted in an estimated 62,512 AAPI voters in Georgia (27.0% of all AAPI

---

[22] Intervenors cursorily argue there is no evidence that any of the challenged provisions result in a disparate impact on minority voters. ECF No. 761-1 at 14-16. As discussed herein, Intervenors are incorrect. First, as with State Defendants, Intervenors do not address *any* record evidence or make *any* arguments regarding AAPI, Latino, or Native American voters. Summary judgment is improper for that reason alone. Second, as demonstrated herein, there are numerous disputes of material fact on this question. Accordingly, Intervenors are not entitled to summary judgment.

registered voters) not having an "equal opportunity" to vote absentee. SAMF ¶ 519 (Fraga Tbl. 21); *Gingles*, 478 U.S. at 44 (noting that the "right question [in § 2 results cases] is whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice"); *Brnovich*, 141 S. Ct. at 2338 (same).

These restrictions come on the heels of past and present discrimination against Black, AAPI, Latinx, Native American Georgians' and interact with that discrimination to limit the ability of minority voters to participate in the political process. SAMF ¶¶ 544, 546-549, 554-56-562 (Chang 4, 15-18, 39, 59-61; Lee 35-38, 40; Lee Supp. Decl. ¶ 2-12; Khwaja Decl. ¶¶ 11-13; Anderson 19-45, 57-63; Cobb 11-50; Tijerina 19-31; Minnite 5; Clark 2-13); *see supra* § II.A.1-4. The evidence also makes clear that SB 202 was enacted in direct response to the growing AAPI and Black voter population and rate of participation, and degree of electoral success, within Georgia. SAMF ¶¶ 87-88, 548, 549, 559, 560, 562, (Chang 4, 60-61; Lee 35-38; Khwaja Decl. ¶ 11; Lee Supp. Decl. ¶¶ 2-12; Cobb 30; Burden 4-5, 8); *see supra* § II.A.1-4. *Gingles*, 478 U.S. at 44-45 (taking past and present discrimination into account in § 2 results analysis); *Brnovich*, 141 S. Ct. at 2340 (same).

SB 202's restrictions on absentee voting impede Black, AAPI, Latinx, and Native American Georgians' ability to vote in part by: restricting election officials'

ability to send absentee ballot applications; imposing new ID requirements; condensing the time in which voters may submit an absentee ballot; and limiting the number of drop boxes available in each county.[23] These overlapping and compounding restrictions create barriers to voting absentee for nonwhite voters that resulted in lower turnout rates and use of absentee ballots in the elections following SB 202. SAMF ¶¶ 959-962 (Fraga Tbls. 1, 2).

For context, one of the main reasons AAPI and Latinx voters utilize absentee voting as opposed to voting in person is due to a higher incidence rate of language barriers among these groups. Over one-third of AAPI Georgians are LEP. SAMF ¶ 538 (Cobb 40; Palmer ¶ 18). Similarly, thirty-five percent of Latinx Georgians over the age of five are LEP. SAMF ¶ 67 (Palmer ¶ 18). In general, voting absentee provides additional time for LEP voters to obtain assistance, including with translating materials, so they can meaningfully engage in the voting process. SAMF ¶¶ 239, 541-543, 719, 894 (Lee 54, 53-54; Fulton Cnty. Dep. 110:2-15; Paik Dep. 21:13-16, 24:5-25:4, 43:6-18, 47:18-48:6; GALEO Dep. 100; Gonzalez Decl. ¶ 6). And yet, in Georgia, absentee ballot applications, ballots, and voter educational

---

[23] As addressed in concurrently filed summary judgment oppositions, Plaintiffs also contend that the shortened timeline for submitting absentee ballot applications and the reduced numbers of drop boxes contribute to the abridgement and denial of the right to vote of voters of color. *See* Plaintiffs' Opposition to Motion for Summary Judgment on Dropbox Provisions; Plaintiffs' Opposition to Motion for Summary Judgment on Changes in Timing.

materials (including those regarding SB 202's changes to absentee voting) are only available in English, except for Gwinnett County, which is required to provide these materials in Spanish as well. SAMF ¶¶ 197-198, 894 (GALEO Dep. 100; Lee 81-84; SOS Dep. 41:3-11; DeKalb Cnty. Dep. 69:5-8; Cobb Cnty. Dep. 186:3-10; Fulton Cnty. Dep. 118:14-21).

SB 202's provision regarding proactively sending absentee ballot applications compounds the existing language difficulties many AAPI, Latinx, and other language minority voters face by effectively forcing them to navigate a website that is only in English. SAMF 197 (Lee 81-83). Although government mailing of pre-filled absentee ballot applications in 2020 was quite successful,[24] SAMF ¶ 189 (Sterling Dep. 04/06 53:3-15; Kidd Dep. 52:20-24), SB 202 prohibits government officials from continuing this practice. *See* O.C.G.A. § 21-2-381(a)(1)(C)(ii). In practice, this requires AAPI voters (a large portion of whom are LEP and/or first-time voters), and other LEP voters, to request absentee ballot applications through the Secretary of State ("SOS") website.

These language barriers are amplified by the fact that the SOS website is set up in such a way that only registrants with Department of Drivers Services ("DDS")

---

[24] State and county officials had no concerns of fraud arising from official, pre-filled applications. SAMF ¶¶ 184, 186 (Sterling Dep. 55:14-17; 60:15-61:6; Bailey 10/6 Dep. 49:7-50:1).

numbers can use it to access absentee ballot applications, which excludes hundreds of thousands of voters of color. SAMF ¶¶ 196-197, 256, 257, 262 (Ga. SOS Press Release; Lee 81-83; Fraga ¶¶ 86-88, 91, Tbls. 5-6; Meredith ¶ 37 & Tbl. IV.B.6). Moreover, the method by which voters without DDS numbers must prove their identity (printing or scanning a copy of an identifying document) compounds the disparate impact on minority voters because it requires technology to which AAPI, Black, Latinx, and Native American Georgians have disproportionately low access. SAMF ¶¶ 253, 273-274; 904; 979 (S. Johnson Decl. ¶¶ 9, 20, 30; Meredith ¶¶ 41-49; Lee Supp. Decl. ¶¶ 14-20; LMCT Dep. 61:24-62:4; Cobb 55-56, fig. 9). Thus, SB 202 makes accessing and submitting an absentee ballot application extremely difficult, if not impossible, for many AAPI voters and other voters of color on their own, forcing them to rely on third party organizations such as Plaintiff Advancing Justice-Atlanta. SAMF ¶ 279-281 (Lee Supp. Decl. ¶¶ 13-19) *Greater Birmingham Ministries*, 992 F.3d at 1329 (a violation of § 2 is shown "if 'members of a protected class have less opportunity than other members of the electorate to participate in the political process").

Plaintiff Steven Paik exemplifies how SB 202's compounding barriers impact AAPI voters. Although he became a United States citizen in 2004, Mr. Paik was unable to vote for many years because he is not proficient in English and did not have access to language assistance where he lived. SAMF ¶ 718 (Paik Dep. 20:19-

22). When Mr. Paik moved to Georgia, Plaintiff Advancing Justice-Atlanta helped him vote for the first time in the 2020 election by assisting him with the registration process and explaining what the offices and who the candidates were, all while translating election materials from English into Korean. SAMF ¶ 718 (Paik Dep. 21:2-18).

Following SB 202, Plaintiff Advancing Justice-Atlanta was forced to undertake even greater efforts to assist Mr. Paik in voting; had it not done so, Mr. Paik again would not have been able to vote. In the 2020 election, Mr. Paik received an official absentee ballot application from the government. SAMF ¶ 719 (Paik Dep. 21:13-16; 26:5-9). In the 2022 election, however, he did not receive one automatically because SB 202 prohibited government entities from proactively sending absentee ballot applications. *See* O.C.G.A. § 21-2-381. After hearing about the upcoming election on television and from receiving a mailer, Mr. Paik called Advancing Justice-Atlanta for assistance requesting an absentee ballot application because he did not know how to navigate the process on his own and neither the state nor the county where Mr. Paik resides provides ballots or voter education materials in Asian languages. SAMF ¶ 198, 719 (Paik Dep. 48:15-49:5; SOS Dep. 41:3-11; Gwinnett Cnty. Williams Dep. 77:11-22). As a result of Plaintiff Advancing Justice-Atlanta's assistance, Mr. Paik navigated what would have otherwise been insurmountable hurdles to voting absentee. SAMF ¶ 719 (Paik Dep. 24:5-25:4).

### a. SB 202's Restrictions on Absentee Voting Caused a Disproportionate Decrease in Turnout and Use of Absentee Ballots Among Voters of Color

The evidence makes clear that SB 202 imposed an unequal and substantial burden on voters of color, which creates at minimum a dispute of fact. *See Brnovich*, 141 S. Ct. at 2338-39. As a result of SB 202, fewer voters of color applied for absentee ballots and cast their votes absentee. SAMF ¶ 380 (Fraga ¶¶ 60, 70). While rates of voters of color applying for and voting by absentee ballot decreased across the 2018 and 2022 midterm elections, white voters' rates increased. SAMF ¶ 44 (Fraga ¶¶ 63-70, Tbls. 2, 3, fn. 18).

AAPI voters exemplify this disparity. *First*, AAPI voter participation decreased following SB 202's promulgation. **AAPI voter turnout decreased by 22.8 percentage points**, between the general elections directly before and after SB 202, from 64.1% to 41.3%. SAMF ¶ 948 (Fraga Tbl. 1). Similarly, **AAPI voter turnout decreased by 18.6 percentage points** between the runoff elections directly before and after SB 202, from 53.8% to 35.2%. SAMF 955 (Fraga Tbl. 1). The disparity is even more pronounced when compared to overall turnout among white voters. *See Brnovich*, 141 S. Ct. at 2339 (noting that "the size of any disparities in a rule's impact on members of different racial or ethnic groups" is an important guidepost). While AAPI voters saw a decrease of 22.8 percentage points across general elections following SB 202, turnout among white voters only decreased 13 percentage points in the same time period, **a difference of 9.8 percentage points**.

SAMF ¶ 948 (Fraga Tbl. 1). Similarly, where AAPI turnout across runoff elections following SB 202 decreased by 18.6 percentage points, turnout among white voters decreased by only 12.1 percentage points, **a difference of 6.5 percentage points**. SAMF 955 (Fraga Tbl. 1). These disparities, at a minimum, create a dispute of fact that SB 202 abridged AAPI citizens' right to vote. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 938 (11th Cir. 2023) (upholding the district court's finding that disparities of 6.58 and 12.58 percentage points showed disparate impact).

*Second*, the number of AAPI registrants applying absentee ballots decreased at disproportionally higher rates than white voters post-SB 202.[25] *See Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 985 (N.D. Fla. 2021) (denying summary judgment where plaintiff presented evidence that people of color would bear the brunt of the "costs associated with requesting" an absentee ballot). In all major Georgia statewide elections from 2018 until November 2022 (before SB 202 was in effect), AAPI registrants had the highest rate of absentee ballot requests.[26]

---

[25] The percentage of AAPI, Black, and Latinx voters requesting absentee ballots post-SB 202 fell below even the November 2018 rates; in fact, white voters are the only group to see higher rates of absentee ballot usage in both post-SB 202 elections relative to the November 2018 election. *See* SAMF ¶ 44 (Fraga Tbl. 3, fn. 18).

[26] As a share of the total electorate, AAPI citizens were 2.6% of Georgia's voters in 2020, but made up 3.8% of Georgia's absentee ballot users. SAMF 90 (Lee 67; Palmer ¶ 12, Tbl. 1).

SAMF ¶¶ 371-374 (Fraga ¶¶ 68, 70, Fraga Tbl. 3). While the rates at which AAPI voters requested absentee ballots across pre- and post-SB 202 general and runoff elections declined by 30.5 and 20.1 percentage points, respectively, the rates for white voters declined by only 18.9 and 13.8 percentage points, **a difference of 11.6 and 6.3 percentage points**. SAMF ¶¶ 958, 959 (Fraga Tbl. 3); *see League of Women Voters*, 66 F.4th at 938 (upholding the district court's finding that disparities of 6.58 and 12.58 percentage points showed disparate impact).

*Third*, the number of AAPI registrants who voted absentee decreased at disproportionately higher rates than white voters following SB 202. While the rates at which AAPI registrants voted absentee across pre- and post-SB 202 general and runoff elections declined by 30.6 and 28.7 percentage points, respectively, the rates for white voters declined by only 18.3 and 16.5 percentage points, respectively, **a difference of 12.3 and 12.2 percentage points**. SAMF ¶¶ 956, 957 (Fraga Tbl. 2); *see League of Women Voters of Fla.*, 66 F.4th at 938 (upholding the district court's finding that disparities of 6.58 and 12.58 percentage points showed disparate impact).

Notwithstanding these severe burdens and stark statistical differences, Defendants assert that SB 202 does not disparately impact minority voters. In fact, they argue the law made it *easier* for minority voters to cast their ballots, citing a University of Georgia School of Public Relations and International Affairs ("SPIA")

survey. *See* ECF No. 763 at 28; SPIA Survey, ECF No. 756-44, Def. Ex. YYYY. Defendants' reliance on the SPIA survey is misplaced. ***First*** and foremost, it does not address AAPI, Latinx, or Native American voters. The survey breaks out race by white, Black, and "Other" — notably absent from this list are AAPI, Latinx, and Native American voters. *Id*. at 20; SAMF ¶ 572 (Pettigrew Sur-Rebuttal 6; Pettigrew Dep. 139:11-141:16). Thus, the survey is inapplicable to other minority voters and cannot be used to show that AAPI, Latinx, or Native American voters' experience improved post-SB 202. Similarly, the SPIA survey reflects a very small, unrepresentative subset of Georgians. SAMF ¶ 572 (Pettigrew Sur-Rebuttal 6; Pettigrew Dep. 139:11-141:16). The survey, conducted solely in English, sampled 1,253 voters, only 0.03% of the total number of people who voted in the 2020 election, and omitted entire racial groups. Def. Ex. YYYY 2, 20. As such, its findings should be viewed with skepticism, particularly as applied to AAPI voters. *See League of Women Voters*, 66 F.4th at 933 ("[a]ny relationship found in a small, *unrepresentative* sample is, by definition, not reliably descriptive of the population.") (emphasis in original). ***Second***, assuming the "Other" category captured AAPI, Latinx, and Native American voters, *the survey results support Plaintiffs' assertion* that SB 202 disproportionally impacts AAPI, Latinx, and Native American voters' ability to cast a ballot. For example, 12.6% of the "Other" group reported that it was harder to vote in the 2022 general election than it was in 2020,

compared to 4.4% of white voters. Def. Ex. YYYY 13. Similarly, 8.6% of the "Other" group reported having a negative experience voting in the 2022 election, whereas only 3.9% of white voters reported the same. *Id*. at 8.

In sum, taken together, there is ample record evidence to support Plaintiffs' position that the challenged provisions stripped Georgians of color of an equal opportunity participate in elections. *See Brnovich*, 141 S. Ct. at 2338. Certainly, there are numerous disputes of material fact regarding the discriminatory impacts of these provisions. The Court should deny therefore summary judgment.

> **2.    SB 202's Voter ID Requirements for Absentee Ballot Applications Prevent Black, AAPI, Latinx and Native American Voters from Having an Equal Opportunity to Participate in Elections**

Summary judgment as to Plaintiffs' claim that SB 202's identification requirements cause a discriminatory result for voters of color is unwarranted and inappropriate on this record. As a threshold matter, Defendants make no arguments addressing Plaintiffs' claim that SB 202's ID requirements disparately impact AAPI, Latinx, or Native American voters. ECF No. 763 at 62. Accordingly, the Court should deny summary judgment as to Advancing Justice-Atlanta Plaintiffs, whose claims focus solely on AAPI voters, and to other Plaintiffs, whose claims include discrimination against AAPI, Latinx, and Native American voters. *See Livernois*, 837 F.2d at 1023 (holding summary judgment was not appropriate where movant "did not satisfy its burden of informing the district court of the basis of its motion").

a.    **The Record Contains Numerous Material Facts Evidencing SB 202's Additional and Burdensome ID Requirements for Absentee Ballot Applications Have a Disparate Impact on Black, AAPI, Latinx, and Native American Voters**

The Court should additionally deny summary judgment because of the myriad material facts evidencing the unequal and substantial burden this provision has on voters of color. First, SB 202's new ID requirement that voters have a DDS number disparately impacts AAPI, Black, and Latinx voters, who are more likely than white voters in Georgia not to have this number to begin with. SAMF ¶¶ 256-266 (Meredith ¶¶ 26, 29-30, 37, Tbl. IV.B.6, Tbl. IV.B.1; Fraga ¶¶ 85-80; Tbls. 5, 6). Separately, studies show that strict voter ID laws result in decreased minority participation, particularly in primary elections, as compared to white participation. SAMF ¶ 255 (Lee 91). In Georgia specifically, scholars have demonstrated disparities among racial groups in DDS ID possession as far back as 2006, when the State adopted its photo ID requirement for in-person voting. SAMF ¶ 155 (Meredith ¶¶ 51-52). SB 202's new and burdensome ID requirements contributed to an 18-22 percentage point decrease in overall AAPI turnout and 28-30 percentage point decrease in AAPI voters' use of absentee ballots in the elections following SB 202's passage. SAMF ¶¶ 955-959 (Fraga Tbls. 1-3).

Second, AAPI voters' ballots continue to be rejected at higher rates than white voters' ballots for reasons relating to ID information. For example, in the November 2018 election, AAPI voters' ballots were rejected for "Incorrect" or "Missing" ID

information at eight times the rate of white voters, and four times the overall rate in Georgia. SAMF ¶ 268 (Fraga Tbl. 13). The trend of AAPI voters' ballots being rejected for ID deficiencies at a disproportionately higher rate than white voters continued after SB 202.[27] SAMF ¶¶ 269-270 (Fraga Tbl. 13). These statistically significant disparities, combined with the sharp decrease in AAPI voters' use of absentee ballots post-SB 202, create a triable issue of fact as to whether the consistent pattern of past and present ID requirements for absentee ballot applications disproportionately effect AAPI voters' ability to successfully apply for and cast their absentee ballots in Georgia. *Cf. League of Women Voters of Fla., Inc.*, 66 F.4th at 932-33 (discounting the weight of statistically *insignificant* correlations while noting that small disparities can bolster other consistent evidence).

Third, the existence of alternative methods to verify identity does not diminish the burden on voters of color because these methods also disproportionately impact AAPI, Latinx, Black, and Native American voters. *See* ECF No. 763 at 57; *see also Brnovich*, 141 S. Ct. 2339. Because these voters are more likely than white voters to not have the type of identification SB 202 requires, they are also more likely to have

---

[27] The notice to cure a ballot for insufficient or incorrect identification is not provided in any Asian language, leaving LEP voters, a disproportionate number of whom are AAPI, in the dark as to why their application was rejected and how to correct it. SAMF ¶ 71 (Cobb Cnty. Dep. 203:4-7, 204:8-9; Fulton Cnty. Dep. 122:3-9; DeKalb Cnty. Dep. 72:8-73:3).

to utilize the burdensome alternate method of validating their identity: printing, scanning, and submitting a physical copy of an alternative identifying document. This process requires technology voters of color, particularly those who are LEP, disproportionately do not have. SAMF ¶¶ 253, 279-281, 904, 979 (S. Johnson Decl. ¶¶ 9, 20, 30; Meredith ¶¶ 41-49; Lee Supp. Decl. ¶¶ 13-19; LMCT Dep. 61:24-62:4; Cobb 55-56; fig. 9). *See Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 985 (denying summary judgment where plaintiff presented evidence that people of color would bear the brunt of the "costs associated with requesting" an absentee ballot). This alternative method for validating one's identity is unnecessarily burdensome, requiring more effort from voters than when submitting the ballot itself. *Cf.* O.C.G.A. § 21-2-385(a) (requiring only the last four digits of the voter's SSN). Indeed, county officials received complaints from voters concerning the difficulties of making a physical copy of another form of ID. SAMF ¶ 271 (Athens-Clarke Cnty. Dep. 226:22-227:2).

Far from creating an equally open election system, SB 202's additional identification requirements present yet another barrier voters of color must overcome that white voters typically do not. *See Brnovich*, 141 S. Ct. at 2338 ("[E]qual openness remains the touchstone" of a VRA § 2 analysis).

**b.** **Defendants' Arguments do not Reconcile the Remaining Factual Disputes**

Defendants offer several justifications for these provisions, all of which are contradicted by the record. Defendants assert that the ID provision did not result in decreased Black turnout in general or Black voters' use of absentee voting. First, neither of these arguments address the provision's impact on AAPI, Latinx, or Native American voters, and summary judgment should be denied for that reason alone. ECF No. 763 at 62. Second, that argument ignores material issues of fact as to Black voters. The record suggests that Black voters have not fared well under SB 202.[28] Turnout rates among white voters increased by 0.9 percentage points from 2018 to 2022, but—even after enormous get-out-the-vote efforts—turnout among Black voters decreased by almost 7 percentage points. SAMF ¶¶ 10-20 (Burden Tbl. 4; Fraga Tbl. 1; Grimmer Tbl. 2). The turnout gap between white and Black voters increased from about 4.2 percentage points in the November 2018 midterm to about 12.0 percentage points in November 2022. SAMF ¶ 21 (Burden 10, Tbl. 4; Grimmer ¶¶ 33-24 & Tbl. 2).

---

[28] The University of Georgia survey on which the State relies to argue that SB 202 has no discriminatory effect cannot carry the State's burden on summary judgment. Among other things, the survey has multiple methodological flaws, including that the sample of respondents is very small, unrepresentative, and only includes people who reported that they successfully voted in 2022, there by skewing responses by excluding anyone who was unable to vote. SAMF ¶¶ 571-575 (Pettigrew Surrebuttal 6; Pettigrew Dep. Tr. 139:11-141:16, 142:16-22; Burden PI testimony 116:23-117:3; Defs.' Ex. YYYY); *see also LWV*, 66 F.4th at 932-33.

Third, Defendants overlook the fact that AAPI and Latinx voter turnout did, in fact, decrease following SB 202's passage. SAMF ¶¶ 16, 40, 954-955 (Fraga ¶¶ 36-40, Tbl. 1). AAPI Georgians' rates of applying for and using of absentee voting decreased even more. SAMF ¶¶ 956-959 (Fraga Tbls. 2, 3). Rates of Latinx voters applying for absentee ballots also decreased across the 2018 and 2022 midterm elections, while white voters' rates increased. SAMF ¶ 981 (Fraga Tbl. 3). Thus, it cannot be said that there is no "evidence sufficient to create a material issue of fact on this claim" even when looking at voter turnout and absentee ballot usage alone. ECF No. 763 at 62.

Moreover, Defendants' attempt to measure SB 202's impact by turnout rates alone grossly oversimplifies the law's impact on minority voters; rather, courts must consider the "totality of the circumstances." *Brnovich*, 141 S. Ct. at 2338, *see Gingles*, 478 U.S. at 45 (assessment of whether the "political processes are equally open depends upon a searching practical evaluation of the past and present reality"). There are too many other factors that influence turnout in any given election, including countermobilization efforts and the competitive gubernatorial and Senatorial elections on the ballot in 2022. SAMF ¶¶ 30-32 (Burden Sur-Rebuttal 11-12; Grimmer Dep. 50:3-11, 54:21-25; 78:14-84:14; Shaw Dep. 131:10-132:1; Lee Sur-Rebuttal ¶¶ 1-2; Fraga ¶¶ 14, 49). Furthermore, even when looking only across midterm elections, the data show that rates of applying for and using absentee ballots

by voters of color decreased, while white voters' rates increased, evidencing disparate impact. SAMF ¶¶ 44, 981 (Fraga Tbls. 2, 3, fn. 18). At a minimum, the stark differences in turnout and rates of voting by absentee ballot between the elections directly before and after SB 202 are sufficient to create a dispute of fact. *See In re Georgia Senate Bill* 202, No. 1:21-MI-55555, 2023 WL 6628601, at *12, n.15 (N.D. Ga., Oct. 11, 2023) ("The Court cannot ignore evidence from other years which support the opposite conclusion.").

Defendants next argue that the additional ID requirement is not burdensome because it will only apply to a small portion of Georgians. ECF No. 763 at 58. However, when that small portion of Georgians consists primarily of minority voters, it evidences a disproportionate impact. *See Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily."). Furthermore, there are 100,412 Black, 6,284 Latinx, and 4,505 AAPI registered voters in Georgia without a qualifying ID. SAMF 262 (Meredith ¶¶ 64-64 & Tbl. VI.A.1; Fraga ¶¶ 91 & Tbls. 5 & 6). These numbers are significant in an election context where races are often won by a few thousand votes. *See Veasey v. Abbott*, 830 F.3d 216, 251, 272 (5th Cir. 2016) (en banc) (affirming district court finding of a Section 2 discriminatory results violation where statistical analysis showed that just 4% of white voters and 5.3% of Black voters (a 1.3 percentage point disparity) lacked

required photo ID); *Frank*, 819 F.3d at 386 ("The right to vote is personal and is not

defeated by the fact that 99% of other people can secure the necessary [voter ID]

easily."). Moreover, on motions for summary judgment, the Court "must view the

movant's evidence and all factual inferences arising from it in the light most

favorable to the nonmoving party." *Allen*, 121 F.3d at 646.

Defendants' cited cases are also distinguishable. *See* ECF No. 763 at 59-61

(citing *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *Common Cause/GA.*, 554

F.3d at 1354; *Lee v. Virginia State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016)).

None of these cases address the issue here (whether requiring voters to print or scan

a document separate from a government ID to request an absentee ballot application

causes a disparate impact), and instead discuss *in-person* voter ID laws.

Furthermore, those courts did not have the same record now before the Court. *See*,

*e.g.*, *Frank*, 768 F.3d at 747 (noting the lack of record evidence that the Wisconsin

law "reduce[d] the number of voters below what otherwise would have been

expected," or whether "that effect differ[ed] by race or ethnicity"). Here, in contrast,

Plaintiffs have presented statistically significant evidence of disparities between pre-

and post-SB 202 turnout numbers showing rates of voting absentee decreased overall

post-SB 202, and "that effect," in fact, "differ[ed] by race or ethnicity" to the degree

of a 12 percentage point difference. *Id.*; SAMF ¶¶ 40-42; 954-959 (Fraga ¶¶ 36-40;

63-70; Tbls. 1-3). This creates, at a minimum, a dispute of fact.

Finally, Defendants assert that the provision furthers various state interests, including increasing orderly administration, fraud prevention, and restoring confidence in the integrity of the voting system. ECF No. 763 at 59. However, these interests are not served by the challenged provision. Rather than assisting with efficient election administration, SB 202 inexplicably imposes a different, more onerous alternate identification requirement for requesting an absentee ballot application than submitting the ballot itself. *Compare* O.C.G.A. § 21-2-381 (requiring copy of secondary identifying document for application) *with* O.C.G.A. § 21-2-385 (requiring last four digits of voter's SSN for ballot). Thus, election officials must learn processes for checking two different sets of ID information for ballot applications and ballots, increasing inefficiencies and inviting error. Further, election officials anticipated their workload would increase following SB 202; and, indeed, it did. SAMF ¶¶ 191, 248 (Athens-Clarke Cnty. Dep. 88:24-25; 226:10-227:5 (explaining how SB 202 created more work for election officials); USA-ADAMS-000043.0001-44.002 (03/21/2021 emails from Bartow County Elections Supervisor Joseph Kirk to House EIC and Senate Ethics Committee members opposing the ID requirement for absentee ballots); Adams Survey at USA-ADAMS-000027.0004-27.0006 (noting half of the officials surveyed opposed the change); Adams Survey at USA-ADAMS-000027.0004-27.0006 (because "[v]oters make errors on their information," the requirements "WILL cause a lots of litigation and

again an increase in provisional balloting that have to be cured—a costly and time consuming burden on our offices").

Nor does the provision serve the state's interest of increasing confidence in the voting system or preventing fraud. Voter confidence among Georgian voters is stable over time, consistent with national trends; indeed, absentee voters in Georgia were more confident that their ballots were being counted as intended than those who voted in person.[29] SAMF ¶¶ 567-568 (King Dep. 116:15-117:12, 139:7-140:16; King 3, 16, 18, 24, 44-45). In reality, education and outreach measures, rather than adding restrictions that sacrifice voting opportunity and increase demands on voters' time and attention as SB 202 does, increases voter confidence. SAMF ¶ 570 (Kennedy Dep. 185:18-186:1). Further, Georgia election officials consistently testified they were unaware of any voter fraud associated with absentee ballot applications in recent elections. SAMF ¶¶ 184, 193-194 564 (Grimmer Dep. 37:9-23, 43:21-44:3; Sterling Dep. 04/06 56:6-9; Gwinnett Cnty. Manifold Dep. 77:7-10; Smith DeKalb Cnty. Dep. 67:8-11; Cobb Cnty. Dep. 185:16-19; Fulton Cnty. Dep. 114:12-14).

---

[29] Even if SB 202 *did* advance the asserted state interests—and it does not—that would not end the analysis. State interests are only one factor that must be considered along with the other *Brnovich* and *Gingles* factors, which here weigh heavily in favor of finding a violation of § 2; after all, even rules that are "supported by strong state interests" are not *per se* permissible but merely "*less likely* to violate § 2." *Brnovich*, 141 S. Ct. at 2340 (emphasis added).

As demonstrated, there is more than sufficient record evidence to create a dispute of fact that SB 202's identification requirements for absentee ballot applications result in disparate impact on voters of color. Thus, the Court should deny summary judgement.

### 3.    SB 202's Prohibition on Government Officials Proactively Sending Absentee Ballot Applications Prevents Voters of Color from Having an Equal Opportunity to Participate in the Franchise

The Court should deny Defendants' summary judgment motion as to the challenge to SB 202's prohibition on election officials proactively sending absentee ballot applications. As with other provisions, Defendants make no arguments addressing the claim that this provision of SB 202 disparately impacts AAPI, Latinx, or Native American voters. ECF No. 763 at 25-28. The Court should therefore deny summary judgment as to plaintiffs who have alleged claims on behalf of AAPI, Latinx, and Native American voters. *See Livernois*, 837 F.2d at 1823 (holding that summary judgment was not appropriate where movant "did not satisfy its burden of informing the district court of the basis of its motion").

The Court should also deny summary judgment for the independent reason that the record is rife with disputes of material fact. This provision creates sweeping changes to the process for requesting an absentee ballot. These changes, compounded by fact that the Secretary of State's website is only in English and only accessible for voters with a DDS number, make it very difficult for AAPI, Black,

and Latinx voters to navigate the new system on their own, as evidenced by the disproportionate decline in minority registrants' use of absentee voting in the elections following SB 202. SAMF ¶¶ 40, 370, 954-959 (Fraga ¶¶ 36-40, Tbls. 1-3; Lee 84-85).

a.    **SB 202's Blanket Prohibition on Election Officials Proactively Mailing Absentee Ballot Applications Disparately Impacts Voters of Color**

As to disparate impact, again, Defendants do not address the myriad material facts evidencing that this provision presents a substantial barrier for AAPI, Latinx, and Native American Georgians to voting absentee, rendering Georgia's system of voting not equally open. *See Allen*, 121 F.3d at 646 (the moving party bears the initial burden of showing that no genuine issue exists as to any material fact). And their sole focus on Black voters ignores significant disputes of fact.

State and county initiatives to proactively mail absentee ballot applications to registered voters in 2020 made "it easier to vote" and contributed to "the volume of absentee ballots increas[ing] tremendously." SAMF ¶¶ 182, 189 (Sterling Dep. 53:3-10; Bailey 10/6/22 Dep. 119:21-120:6). Now, registrants who had previously automatically received a ballot application at home must navigate the process of obtaining an application in essentially one of two ways: through the Secretary of State's website, or by relying on third party organizations. Neither option creates an equally open election system in which voters of color have an equal opportunity to

57

participate. *See Gingles*, 478 U.S. at 45; *Brnovich*, 141 S. Ct. at 2338. That is particularly true of LEP AAPI and Latinx voters, who are less likely than white Georgians to use the online portal to independently request an absentee ballot application. SAMF ¶¶ 199, 200 (Fraga ¶ 76, Tbl. 4; Lee 84).

In utilizing the Secretary of State's website, LEP AAPI and Latinx voters must overcome several hurdles: (1) know that they have to request an application; (2) know where to go to request an application; and (3) navigate a website that is only in English. SAMF ¶ 197 (Lee 81-83). AAPI voters are disproportionately impacted by these barriers because more AAPI Georgians are LEP and/or first-time voters than white voters, and voter education materials, including information about when elections occur, are not widely available in English. SAMF ¶ 198 (SOS 4/13 Dep. 41:3-11; Cobb Cnty. Dep. 186:3-10; Fulton Cnty. Dep. 118:14-21). Moreover, requesting an absentee ballot application from the Secretary of State's website requires a DDS number, which a disproportionately high number of voters of color do not have. SAMF ¶¶ 196, 262, 266 (Meredith ¶¶ 64-65, Tbl. VI.A.1; CDR00210329; Fraga ¶¶ 87-88, 91, Tbl. 6). Additionally, absentee ballot applications obtained from the Secretary of State website are only available in English. SAMF ¶¶ 197, 198 (Lee 81-83; Fulton Cnty. Dep. 118:11-13; DeKalb Cnty. Dep. 69:5-8). Furthermore, the educational materials the state circulated regarding SB 202's changes to the procedure for utilizing absentee ballots were only in

English. SAMF ¶ 197 (SOS 4/13 Dep. 41:3-11; Cobb Cnty. Dep. 186:3-10; Fulton Cnty. Dep. 118:14-21). *Cf. Brnovich*, 141 S. Ct. at 2344 (crediting Arizona for providing in-language voting and educational materials). These compounding barriers are likely to generate a higher error or abandonment rate for AAPI or Latinx registrants who face language barriers or discourage those who are attempting to vote for the first time. SAMF ¶ 198 (Lee 84). *See Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 985 (N.D. Fla. 2021) (denying summary judgment where plaintiff presented evidence that minority voters would bear the brunt of the "costs associated with requesting" an absentee ballot).

### b. Defendants' Arguments Do Not Reconcile the Remaining Factual Disputes

Defendants offer several justifications for these provisions, all of which are contradicted by the record. First, Defendants assert the provisions increase efficiencies by reducing the time election officials had to spend mailing applications and canceling duplicate applications. *See* ECF No. 763 at 19-21. In reality, the prohibition created more work, albeit in different ways, for election officials, including canceling absentee ballot applications that were submitted too early under the new law and answering voter questions about how to navigate the new process. SAMF ¶ 191 (Athens-Clarke Cnty. Dep. 88:24-25, 226:10-227:5). Although Defendants rightfully attribute many duplicate applications to voters "simply forg[etting] they had applied for absentee ballots" and resubmitting an application,

59

(ECF No. 763 at 21, 30), voter forgetfulness and oversight are not solved by preventing state and local officials from sending absentee ballot applications. Thus, disputes of fact remain as to whether SB 202's additional restrictions on absentee ballot applications increased administrative efficiencies.

Furthermore, even if Defendants were correct factually, Georgia cannot merely saddle voters with the burdens associated with easing the government's administrative cost; officials must shoulder some administrative burdens to ensure voters can cast their ballots. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *see also* SAMF ¶ 192 (Fulton Cnty. Dep. 108:3-8) (SB 202's additional "complications" in requesting and casting an absentee ballot "impact[] the voters more than [they] impact[]" election officials)).

Defendants next contend these provisions "ensure uniformity across counties." ECF No. 763 at 21. However, county election administrators need to tailor advance voting opportunities to the needs of their voters. SAMF ¶ 951 (Kennedy 29). When testifying before the Georgia Legislature on legislation that became SB 202, election officials described the different needs of their counties and impacts of the legislation based on their respective counties' unique characteristics and demographics. SAMF ¶ 952 (Kennedy 29). In the context of absentee ballot applications, election officials have testified that official absentee ballot applications

sent directly from the state or county decrease confusion and increase efficiency. SAMF ¶ 190 (Cobb Cnty. Dep. at 284:21-285:1).

Relatedly, while Defendants contend that this provision serves the state interest of fraud prevention, ECF No. 763 at 20-21, the record demonstrates that it does not. As state witnesses attested multiple times, there was no widespread voter fraud associated with absentee ballots applications, absentee ballots, or otherwise. SAMF ¶¶ 184, 564 (Sterling Dep. 55:14-17; 60:15-61:6; Grimmer Dep. 37:9-23, 43:21-44:3). Indeed, Defendants cannot point to a single instance of voter fraud associated with absentee ballot applications. The only examples Defendants can muster are instances in which voters complained of suspected fraud because of their own actions or misunderstandings.[30] When asked, each of the County Defendants' 30(b)(6) witnesses testified they were not aware of any voter fraud occurring from the mailing of unsolicited or duplicate ballot applications. SAMF ¶ 184 (Gwinnett

---

[30] In one case, a couple received an absentee ballot application they requested, but forgot they did so. Resp. to SMF ¶¶ 455, 475 (Bailey 3/21 Dep. at 100:3-12). In another, a disabled voter did not understand the implication of checking the "disabled voter" box on their first absentee ballot application and was confused when the state later sent them unsolicited absentee ballot applications. Resp. to SMF ¶¶ 455, 475 (Sterling Dep. at 54:13-18). In another, voters mistook absentee ballot applications for actual ballots. Resp. to SMF ¶¶ 455, 475 (Watson Dep. at 200:23-201:13). In the final instance, the complainant simply saw a postal or election workers doing their jobs or, in one case, a company that was mailing their own documents that were just the same approximate size of absentee ballots. Resp. to SMF ¶¶ 455, 475 (Watson Dec. at 203:20-204:23).

Cnty. Williams Dep. 77:7-10; DeKalb Cnty. Dep. 67:8-11; Cobb Cnty. Dep. 185:16-19; Fulton Cnty. Dep. 114:12-14). Ultimately, the challenged provisions add very little, if anything, to the security of Georgia elections. SAMF ¶ 565 (Kennedy 42).

Defendants also assert that this provision against proactive mailing will reduce voter confusion. ECF No. 763 at 19-21. However, state officials admit that past confusion was due in part to how election information was presented by the *state*. SAMF ¶¶ 193, 194 (Sterling Dep. 04/06 at 56:6-9 (noting that some absentee ballot applications sent from the state were not clearly marked as applications: "So looking back we might have made that clearer")). Moreover, election officials noted that using properly marked state-provided absentee ballot applications actually reduces errors and confusion, and increases efficiencies for election workers. SAMF ¶ 194 (Cobb Cnty. Dep. at 185:5-10). Finally, as noted above, many instances of confusion resulted in voters not reading the information on the ballot application, or simply forgetting they had previously applied for one. Resp. to Def. SMF ¶¶ 455, 475 (Bailey 3/21 Dep. at 100:3-12; Sterling Dep. at 54:13-18). Accordingly, there remains a dispute as to whether the challenged provisions reduced voter confusion.

For these reasons, the Court should deny Defendants' motion for summary judgment on the proactive mailing provisions.

**B. Disputes of Fact Remain as to Whether SB 202's Felony Provision and Voter ID Requirements Violate the ADA**

As noted above, whether persons with disabilities have been excluded from participation or otherwise discriminated against in a program under Title II, and whether such exclusion or discrimination is due to disability, are questions of fact that may preclude summary judgment. *See, e.g.*, *R.W. v. Bd. of Regents*, 114 F. Supp. 3d at 1285-86; *see also Nat'l Fed'n of the Blind, Inc. v. Lamone*, 2014 WL 4388342, at *1 n.6; 8/18/2023 PI Order [ECF 615] 22.[31]

**1.     Elements of a Prima Facie ADA Claim**

Title II of the ADA provides that "no qualified individual with a disability shall, ***by reason of such disability***, ***be excluded from participation in or be denied the benefits of*** the services, programs, or activities of a public entity, ***or be subjected to discrimination*** by any such entity." 42 U.S.C. § 12132 (emphases added); *see also* 28 C.F.R. § 35.130(a).[32]

Plaintiffs can establish a prima facie case of a Title II violation by showing:

---

[31] AME Plaintiffs also respond to arguments regarding the absentee ballot provisions raised by Intervenors in their brief. ECF No. 761 at 18-22. References to Defendants also include Intervenors unless otherwise specified.

[32] AME Plaintiffs also bring claims under Section 504 of the Rehabilitation Act, and Defendants do not contest that they receive federal financial assistance within the meaning of that statute. Since claims under the ADA and Section 504 are governed by the same standards and can be analyzed together, AME Plaintiffs focus their discussion on the ADA in this brief. *See* 8/18/2023 PI Order [ECF 615] 12.

(1) a qualified individual with a disability; (2) was either excluded from participation in or denied the benefits of a public entity's services, programs, activities, or otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

8/18/2023 PI Order [ECF 615] 12-13 (citing *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021)).

a.    **The ADA Requires that Voters with Disabilities Have an Equal Opportunity to Participate in Each Voting Program**

The regulations implementing the ADA make clear that persons with disabilities must have the "opportunity to participate in or benefit from the aid, benefit, or service" in a way that is "*equal* to that afforded others."[33] 28 C.F.R. § 35.130(b)(1)(ii) (emphasis added); *see also id.* at § 35.130(b)(1)(iii). Courts recognize that one way to show that people with disabilities do not have equal opportunities to benefit from a program and thus are excluded from or denied the

_____

[33] Relying on *Democracy N.C. v. N.C. State Board of Elections*, 476 F. Supp. 3d 158, 233 (M.D.N.C. 2020), Defendants mistakenly assert that disabled voters might have multiple options to vote on "equal footing with other voters," thus satisfying the ADA's requirements. ECF No. 763 at 51. Defendants' reference is inapposite; that the *Democracy N.C.* court ruled against a blind plaintiff on one challenged provision because it did not find sufficient evidence to conclude that his inability to use a mailbox was due to his disability, *Democracy N.C.*, 476 F. Supp. 3d. at 233, does not defeat, or even address, the focus of Plaintiffs' claims. It is worth noting, however, that the court in *Democracy N.C.* did find that the plaintiff was denied meaningful access under the ADA by the statute prohibiting him from receiving needed assistance in completing his ballot. *Id.* at 232.

benefits of that program is to show that they lack meaningful access[34] to that

program. *See, e.g.*, *Nat'l Fed'n of the Blind v. Lamone ("NFB")*, 813 F.3d 494, 503-

04, 506-07 (4th Cir. 2016); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076,

1155, 1158-59, 1161 (N.D. Ala. 2020); *Democracy N.C. v. N.C. State Bd. of*

*Elections*, 476 F. Supp. 3d 158, 231-32 (M.D.N.C. 2020); *Westchester Disabled On*

*the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004).[35]

---

[34] Although some courts in this Circuit have expressed the relevant standard as whether a voting program is "readily accessible," *see People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1155, 1159-60, 1165 (N.D. Ala. 2020), that language is derived from 28 C.F.R. § 35.150, which deals only with ***physical accessibility*** of "existing facilities," *see Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (physical accessibility of wheelchair ramps and bathrooms at a courthouse). Indeed, Section 35.150(a), includes references that indicate its applicability to physical sites. *See e.g.*, 35.150(a)(2) (reference to "historic property"); 35.150(b)(2) (safe harbor provisions listing numerous physical sites such as swimming pools). Accordingly, the "readily accessible" standard does not apply to other issues of accessibility. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 504 (4th Cir. 2016) (voting programs).

[35] Defendants apparently do not dispute that absentee voting and in-person voting are separate "services, programs, or activities" for purposes of an ADA analysis, nor can they. *See, e.g.*, ECF No. 763 at 51, 63; *see also NFB*, 813 F.3d at 503-05 (absentee voting relevant program); *People First of Ala.*, 491 F. Supp. 3d at 1158-59 (in-person voting relevant program); *Democracy N.C.*, 476 F. Supp. 3d at 231-33 (absentee voting relevant program); *cf. L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1302-03 (11th Cir. 2022). Intervenors' argument that the "entire program of voting" is the relevant program, ECF No. 761-1 at 19-21, fails for the reasons articulated in *NFB* and other cases. Their reliance on *Kerrigan v. Philadelphia Board of Election*, No. 2:7-cv-687, 2008 WL 3562521, at *16-18 (E.D. Pa. Aug. 14, 2008), is misplaced, as that case addressed the physical accessibility of polling locations and based its analysis on 28 C.F.R. § 35.150, which is not applicable outside of the context of physical facilities. *See supra* note 34.

Describing the relevant standard as "meaningful access," however, does not suggest a different or lesser standard than the equal opportunity that the ADA requires, and does not reduce the Title II inquiry to "some abstract question of *de minimis* 'meaningfulness.'" *Trivette v. Tenn. Dep't of Corr.*, No. 3:20-cv-00276, 2021 WL 10366330, at *11 (M.D. Tenn. May 5, 2021). "Title II is not targeted at merely guaranteeing minimally adequate services to disabled people, but to remedying 'unequal treatment of persons with disabilities by States and their political subdivisions.'" *Id.* (quoting *Lane*, 541 U.S. at 526). The meaningful access standard requires that public entities "must afford [disabled] persons equal opportunity to ... gain the same benefit" as people without disabilities. *Gustafson v. Bi-State Dev. Agency of Mo.-Ill. Metro. Dist.*, 29 F.4th 406, 412 (8th Cir. 2022) (second alteration in original) (internal quotations and citations omitted).

As this Court has already determined, the exclusion or denial need not be absolute to establish an ADA violation. *See* 12/9/2021 MTD Order [ECF No. 110] 36 ("Plaintiffs need not show that the voting access allegedly denied here is absolute."); *see also League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042,

---

Equally unhelpful is *American Association of People with Disabilities v. Harris*, 647 F.3d 1093, 1107-08 (11th Cir. 2011) (addressing whether voting machines are considered physical facilities under the Title II regulations without addressing absentee voting or the scope of the relevant voting program for ADA analysis).

1157 (N.D. Fla. 2022), *aff'd in part, rev'd in part on other grounds*, *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023); *People First of Ala.*, 491 F. Supp. 3d at 1155; *Democracy N.C.*, 476 F. Supp. 3d at 230-31. The presence of restrictions that might "dissuade" a voter can render a voting program inaccessible in violation of Title II. *See People First of Ala.*, 491 F. Supp. 3d at 1160, 1165 (holding that restrictions on curbside voting and photo ID requirements for absentee voting rendered in-person voting and absentee voting, respectively, inaccessible for at least some disabled voters because those restrictions "may dissuade" them from using those methods of voting). And access is not meaningful if Plaintiffs have to rely on "workarounds and alternate means" to access the program. *Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*, 495 F. Supp. 3d 211, 235-36 (S.D.N.Y. 2020) (no meaningful access to City's street crossings where blind pedestrians had to rely on "workarounds and alternate means" to cross streets, including by relying on strangers or crossing streets on their own despite risking their safety).

In determining whether the relevant program complies with the ADA, the appropriate comparison is between disabled individuals' access and non-disabled individuals' access. *See NFB*, 813 F.3d at 506-07 (comparing disabled voters' ability to mark absentee ballots without assistance with the ability of others to do the same); *Alexander v. Choate*, 469 U.S. 287, 301-02 (1985). Once a public entity chooses to

67

make a particular program available to all voters, it must ensure that the program is accessible to both disabled and non-disabled individual.[36] *See People First of Ala.*, 491 F. Supp. 3d at 1158 (collecting cases). Furthermore, courts should analyze the cumulative impacts of various restrictions on disabled voters' access to the particular voting program, because the relevant benefit is not "merely the opportunity to vote at some time and in some way," but rather equal opportunity to fully participate in that program. *Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 198-99 (2d Cir. 2014) (holding that under ADA meaningful access standard, Board of Elections violated mandate that public entities are prohibited from affording "persons with disabilities services that are not equal to that afforded others" with respect to casting a private ballot in person on election day).

### b.    The ADA Prohibits Exclusion or Denial of Access by Reason of Disability Under Disparate Impact and Failure to Accommodate Theories

While Plaintiffs must "establish a causal link between their disabilities and the exclusion, denial of benefits, or discrimination" under the third element of the prima facie case, *People First of Ala.*, 491 F. Supp. 3d at 1155, they need only demonstrate that disability is "*a factor* that **made a difference in the outcome**." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) (first

---

[36] Any voter can apply for an absentee ballot in Georgia. *See* O.C.G.A. § 21-2-380(b) (Georgia electors need no "reason" or excuse to vote absentee).

emphasis added) (quoting *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996)); *see also Schwartz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 278-79, 291 (2d Cir. 2003) (holding that ADA plaintiff can show exclusion or denial "by reason of such disability" as long as "the disability was a substantial cause of the exclusion or denial," "even if there are other contributory causes for the exclusion or denial"); *Democracy N.C.*, 476 F. Supp. 3d at 232.

For purposes of responding to this motion, Plaintiffs assert that they can show causation through at least two distinct theories of liability: (1) SB 202's challenged provisions have a disparate impact on disabled voters, and (2) Defendants have failed to make reasonable modifications (or accommodations) to avoid discrimination.[37] *See League of Women Voters of Fla.*, 595 F. Supp. 3d at 1157; *NFB*, 813 F.3d at 503 n.5; *L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1303 (11th Cir. 2022). A Title II violation may be established without showing intentional discrimination or animus under a disparate impact or failure to accommodate theory. *See, e.g.*, *NFB*, 813 F.3d at 510.

---

[37] Title II of the ADA uses the term "reasonable modifications," 28 C.F.R. § 35.130(b)(7), instead of "reasonable accommodations" as is used in Title I of the ADA related to employment, 42 U.S.C. § 12112(b)(5)(A). Courts have used the terms interchangeably and thus AME Plaintiffs do as well in reference to their claim that Defendants have violated 28 C.F.R. § 35.130(b)(7).

Importantly, under a disparate impact theory, even statutes that do not facially address disability or make distinctions based on disability can still have the effect of depriving disabled individuals' access to the program due to their disabilities. *See Democracy N.C.*, 476 F. Supp. 3d at 232 (finding causal link between exclusion from absentee voting based on nursing home staff assistance restrictions and plaintiff's disability); *People First of Ala.*, 491 F. Supp. 3d at 1161, 1165 (finding causal link between exclusion from in-person voting and absentee voting based on curbside voting restrictions and photo ID requirements, respectively, and plaintiffs' disabilities). If a facially neutral practice or policy has a significant enough disparate impact to raise an inference of causation, liability may be found based on disparate impact. *See, e.g.*, *Nicholas v. Fulton Cnty. Sch. Dist.*, No. 1:20-cv-3688-MLB, 2022 WL 2276900, at *19 (N.D. Ga. June 23, 2022); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016); *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021); *Sosa v. Mass. Dep't of Corr.*, 80 F.4th 15, 31 (1st Cir. 2023); *see also Berg v. Fla. Dep't of Lab. & Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1254 (11th Cir. 1998) (assuming, without deciding, that "because section 504 ensures that disabled persons enjoy access to federally-funded programs and activities equal to that of non-disabled persons, discrimination might be present when a facially-neutral state action creates an obstacle between disabled persons and

access to federally-funded programs and activities that is greater than the obstacle for nondisabled persons").

Furthermore, public entities have an affirmative obligation to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7)(i); *see also Johnson v. Callanen*, No. SA-22-CV-00409-XR, 2023 WL 4374998, at *6 (W.D. Tex. July 6, 2023) (granting plaintiffs' motion for summary judgment on ADA Title II claims challenging blind and visually impaired voters' access to absentee ballots).[38] The determination of whether an accommodation is reasonable is "a highly fact-specific inquiry." 8/18/2023 PI Order [ECF No. 615] 22; *see also NFB*, 813 F.3d at 508.

c.   **The ADA Prohibits Discriminatory Methods of Administration and Discriminatory Eligibility Criteria**

Plaintiffs' Complaint also raises allegations that Defendants fail to address in their brief. First, Plaintiffs allege that Defendants violate Title II's prohibition on

_____

[38] The Eleventh Circuit has held that a defendant's obligation to provide a reasonable modification is triggered "when the defendant has 'enough information to know of both the disability and desire for an accommodation,'" such that the circumstances would "cause a reasonable [defendant] to make appropriate inquiries about the possible need for an accommodation." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (citations omitted); *see also Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006) (suggesting that a public entity's affirmative obligation to provide reasonable accommodations could be triggered where the need for accommodation is "obvious").

"utiliz[ing] criteria or ***methods of administration*** … [t]hat ***have the effect*** of subjecting qualified individuals with disabilities to discrimination on the basis of disability … [or] [t]hat ***have the purpose or effect*** of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)-(ii) (emphases added); AME Amended Complaint [ECF 83 in Case No. 1-21-cv-01284-JPB] ("AME Am. Compl.") ¶¶ 29-30, 323, 355, 368.[39] "The phrase 'criteria or methods of administration' refers to official written policies of the public entity and to the actual practices of the public entity." 28 C.F.R. Pt. 35, App. B, Subpart B. "This paragraph ***prohibits both blatantly exclusionary policies or practices and nonessential policies and practices that are neutral on their face***, but ***deny individuals with disabilities an effective opportunity to participate***." *Id.* (emphases added).

"Courts have recognized ***methods of administration claims as distinct causes of action***." *Price v. Shibinette*, No. 21-cv-25-PB, 2021 WL 5397864, at *8 (D.N.H. Nov. 18, 2021) (emphasis added). Methods of administration claims lie where a

---

[39] Defendants in their motion do not appear to challenge AME Plaintiffs' methods of administration claim. AME Am. Compl. ¶¶ 29-30, 323, 355, 368. Whether Georgia's method of administering the absentee voting program has the effect of discriminating against disabled voters or the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' absentee voting program is a question of fact inappropriate for summary judgment.

program's administration or multiple aspects of a program compound to frustrate its purpose for disabled people. *See, e.g.*, *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 490; *Lewis v. Cain*, No. 3:15-cv-318, 2021 WL 1219988, at *26-52 (M.D. La. Mar. 31, 2021).

AME Plaintiffs also assert that Defendants violate Title II's prohibition on using "***eligibility criteria that screen out or tend to screen out*** an individual with a disability or any class of individuals with disabilities ***from fully and equally enjoying*** any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8) (emphases added); AME Am. Compl. ¶¶ 29-30, 321, 353, 366.[40] "This concept … makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, indirectly prevent or limit their ability to participate." 28 C.F.R. Pt. 35, App. B, Subpart B.

### 2. The Absentee Voting Restrictions Discriminate Against Voters with Disabilities by Excluding Them From Georgia's Absentee Voting Program in Violation of the ADA

The parties dispute material facts as to whether the Absentee Voting Restrictions violate the ADA and Section 504, making these claims inappropriate

---

[40] Defendants do not appear to challenge AME Plaintiffs' eligibility criteria claim. AME Am. Compl. ¶¶ 29-30, 321, 353, 366. Whether the Absentee Voting Restrictions use "eligibility criteria" that "screen out" disabled voters is a question of fact inappropriate for summary judgment.

for summary judgment.  *See, e.g.*, *R.W.*, 114 F. Supp. 3d at 1285-86. Defendants do not contest that AME Plaintiffs' members or constituents are qualified individuals with disabilities or that Defendants are public entities providing a service, program, or activity. *See* ECF 763 at 49-51.

The Absentee Voting Restrictions, individually and cumulatively, deny voters with disabilities an equal opportunity to participate in the State's absentee voting program in violation of the ADA and Section 504.

There is ample evidence that voters with disabilities have less access to absentee voting under the current law, including because it is harder to find assistors to help them vote absentee, and because they face higher barriers to complying with SB 202's identification requirement. Some were prevented from voting altogether. *See*, *e.g.*, SAMF ¶¶ 615-617, 679, 682-683, 745 (Thomas Decl. ¶¶ 9, 11, 15-16, 38 (Absentee Voting Restrictions made absentee voting inaccessible to her as a person with a disability); Mattox Decl. ¶ 21 (SB 202 has made it harder for members of The Arc Georgia to vote); Hargroves Decl. ¶¶ 10, 13 (people with disabilities face increased barriers to voting absentee due to the Felony Provision); Thornton Decl. ¶ 22 (Georgia ADAPT's policy is to no longer help people with disabilities apply for absentee ballots due to the Felony Provision); ADAPT Vol. II Dep. 40:5-9 (several ADAPT members were unable to vote due to SB 202's Absentee Voting Restrictions); Fulton Cnty. Dep. 125:8-11

(to the extent a voter lacks identification this would reduce their ability to vote absentee)).

Moreover, that certain disabled voters were ultimately able to vote absentee does not mean, as Defendants contend, that there has been no denial of meaningful access to the absentee voting program. Just because some voters with disabilities have been determined and persistent enough to vote despite the numerous barriers created by SB 202 does not mean that the current law complies with the ADA. *See, e.g.*, *Am. Council of the Blind*, 495 F. Supp. 3d at 235 ("conditioning access upon arduous or costly 'coping mechanisms' ... is 'anathema to the stated purpose of the Rehabilitation Act' and the ADA"). Instead, the ADA requires that voters with disabilities have an equal opportunity to access—or have meaningful access to—the absentee voting program when compared to non-disabled voters. *See, e.g.*, *NFB*, 813 F.3d at 506-07 (Maryland's absentee voting program did not "provide disabled individuals an 'opportunity to participate ... equal to that afforded to others'" and thus did not provide "meaningful access to absentee voting" (quoting 28 C.F.R. § 35.130(b)(1)(ii))).

### a. The Absentee Voting Restrictions Discriminate by Reason of Disability

The Absentee Voting Restrictions discriminate against voters by reason of their disabilities. Because disabled voters are less likely to have the required identification under the Voter ID Requirements to vote by mail, and less likely to

have access to a copier to provide alternative identification, the Absentee Voting Restrictions impose "eligibility criteria" to the absentee ballot that "screen[s] out" disabled voters from "fully and equally enjoying" the absentee voting program, in violation of the ADA. *See supra* at 71-73.

The Absentee Voting Restrictions also have a disparate impact on voters with disabilities. Voters with disabilities rely on absentee voting significantly more often than in-person voting because of limitations caused by their disabilities—in 2020, for example, 44.7% of Georgians with disabilities voted by mail compared to only 12.4% who voted in person. SAMF ¶ 606 (Schur ¶¶ 12, 73, Tbl. 8). These voters face barriers to voting at disproportionately high rates, including lack of access to technology, transportation, and information regarding elections or voting locations. *See supra* 71-73. The Absentee Voting Restrictions create burdens for disabled voters that nondisabled voters do not face, making voting harder or disenfranchising them entirely. *See, e.g.*, SAMF ¶¶ 615-617, 679-680, 682-683, 745 (Thomas Decl. ¶¶ 9, 11, 15-16, 38 (Absentee Voting Restrictions); Mattox Decl. ¶ 21 (same); ADAPT Vol. II Dep. 40:5-9 (same); Hargroves Decl. ¶¶ 10, 13 (Felony Provision); Fulton Cnty Dep. 125:8-11 (Voter ID Requirements)).

In addition, Defendants failed to make any modifications that would provide voters with disabilities an equal opportunity to vote absentee, despite knowing that SB 202 was likely to and did create barriers for voters with disabilities in accessing

the absentee voting program. *See, e.g.*, SAMF ¶¶ 624-625 (Orland Decl. ¶ 15 (GAO raised concerns with Georgia State legislature about SB 202's effect on voters with disabilities); SEB Dep. 47:17-21 (SB 202's impact on voters with disabilities "comes up in public comment fairly regularly")). For example, in 2021, Plaintiff GAO submitted comments to the United States Senate Committee on Rules and Administration for a field hearing in Atlanta on SB 202. SAMF ¶ 624 (Orland Decl. ¶ 20). GAO's comments outlined how SB 202's new strict identification requirements for absentee ballots would impact disabled voters. SAMF ¶ 624 (Orland Decl. ¶ 20).

Moreover, Defendants have not presented any evidence that any modification would "fundamentally alter" the absentee voting program, an inquiry which is inherently fact-intensive and precludes summary judgment here. 28 C.F.R. § 35.130(b)(7)(i); *see also, e.g.*, *Disability Advocs., Inc. v. Paterson*, 598 F. Supp. 2d 289, 335 (E.D.N.Y. 2009) ("Courts have found that whether the requested relief constitutes a 'fundamental alteration' is a 'complex[,] fact-intensive' inquiry particularly inappropriate for summary judgment." (quoting *Martin v. Taft*, 222 F. Supp. 2d 940, 986 (S.D. Ohio 2002))). The evidence shows that reasonable modifications could be made to the current absentee voting program that would improve access without fundamentally altering the absentee voting program. *See, e.g.*, SAMF ¶¶ 619, 684 (Evans Dep. 228:4-12 (Elections

77

Director in SOS's Office was unaware of any changes the office would need to make if the Felony Provision were removed); Athens Dep. 112:17-23 (office would not need to undertake any changes if Voter ID Requirements were lifted), 127:19-128:4 ("very minimal changes" would be required if Felony provision were removed)). In contrast, Defendants have not put forward any evidence, aside from self-serving, conclusory testimony, to support their narrative that SB 202's absentee voting provisions actually combat supposed fraud and reduce the burdens placed on election officials in previous elections. [ECF 763 at 16] (Georgia implemented SB 202 "absent direct evidence of widespread fraud").

Thus, the evidence shows that SB 202 denies Georgia voters with disabilities, due to their disabilities, an equal opportunity to access the State's absentee voting program. Defendants are not entitled to summary judgment.

### (i)    Felony Provision[41]

Many Georgians with disabilities need assistance from others with daily activities, including voting. SAMF ¶¶ 581, 585-586, 590, 671 (Schur ¶¶ 10, 50, 52-54, 92, 93, 96). But the Felony Provision disparately impacts and unlawfully burdens

---

[41] Although the Court denied Plaintiffs' motion for a preliminary injunction for the Felony Provision under the ADA, the Court's factual findings and legal conclusions at the preliminary injunction stage are not binding at trial. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

voters with disabilities for two reasons: 1) voters with disabilities disproportionately vote absentee, so any law that makes absentee voting more difficult has an outsized impact on them; and 2) voters with disabilities rely on assistance to vote much more than their nondisabled counterparts. *See supra* at 20-21. For disabled voters who need assistance to return their absentee ballots, especially from friends, neighbors, or paid staff, the Felony Provision unlawfully denies them meaningful access to absentee voting.

Under current law (O.C.G.A. § 21-2-385(a)), only a family or household member, or the "caregiver" of a disabled elector is permitted to return another voter's absentee ballot. Under SB 202, the punishment for being wrong about who is a caregiver has increased from a misdemeanor to a felony. O.C.G.A. § 21-2-568(a)(5). As discussed below, prior to SB 202, disabled voters and their good-faith assistors understood their actions to comply with the law and to not be subject to even misdemeanor penalties; the changes to ballot return assistance provisions and penalties under SB 202 place significant new burdens on disabled voters and their assistors. SAMF ¶¶ 616, 670, 679-683, 745, 802 (Orland Decl. ¶ 25 (GAO constituents could not get the people of their choosing to help them vote); Mattox Decl. ¶ 21 (members of The Arc Georgia unable to vote because they need support to submit ballots from neighbors, friends, social workers, or support staff); ADAPT Vol. II Dep. 40:5-9 (Georgia ADAPT members unable to vote because they did not

have a family member or caregiver to assist them); Hargroves Decl. ¶¶ 10, 13 (homeless shelter staff "cannot take the risk of helping clients with their absentee ballots" without knowing who qualifies as caregiver); Thomas Decl. ¶¶ 11, 16 (absentee voting not accessible to voter in large part because of Felony Provision); Papadopoulos Decl. ¶¶ 11-14).

Defendants argue that the Felony Provision could not violate the ADA because pre-SB 202 assistance from non-qualified assistors was a misdemeanor. [ECF 763 at 54]. However, the legal landscape prior to SB 202 was different in material ways. Significantly, prior to SB 202 the State recognized an exception that assistors who were otherwise qualified under Section 208 of the Voting Rights Act would not be subject to prosecution. *See* O.C.G.A. § 21-2-598; 2016 Ga. Op. Att'y Gen. 02 (2016) (interpreting the exception broadly). This exception assured disabled voters and their assistors that the voter's choice of assistor, within the limits set by Section 208, was legally authorized to provide voting assistance and had no reason to fear prosecution, even as a misdemeanor. *See* SAMF ¶¶ 676-677 (Orland Decl. ¶¶ 22-24). Defendants have done nothing to affirm that this interpretation of the law is still valid after SB 202, increasing uncertainty among voters and assistors.

Compounding the heightened criminal penalty under SB 202, the statute does not define the term "caregiver," and thus, disabled voters and their assistors cannot be assured that they will not be prosecuted for what might be considered lawful

behavior. Aside from arguments made in litigation, State Defendants have given no guidance on, or definition of, the term. *See* SAMF ¶ 678 (SOS Dep. 195:8-198:12, 200:11-201:6; Hall Cnty. Dep. 155:3-22, 157:7-10; Columbia Cnty. Dep. 161:10-17; DeKalb Cnty. Dep. 226:9-229:6; Watson Dep. 183:6-15). For example, Defendants' attorneys assert that a personal assistant is a "caregiver" for purposes of providing assistance in returning an absentee ballot, ECF 763 at 53; however, the statute and subsequent instructions from the State make no mention of personal assistants and voters may not know whether to view their personal assistants as caregivers.[42] *See* SAMF ¶ 678 (Orland Decl. ¶ 24(b)) (statutorily-mandated state instructions do not define "caregiver"). Defendants' attorneys' argument made for the purpose of this litigation about who qualifies as a caregiver has no force and cannot resolve legitimate voter concerns since it is not directed to those voters. Moreover, the impact of the uncertainty about who is a qualified assistor, especially considering the enhanced criminal penalties for even good-faith mistakes, is a question of fact inappropriate for resolution by summary judgment.

---

[42] In discussing the ambiguity of "caregiver," AME Plaintiffs are not advancing a constitutional argument about the statute's vagueness. Instead, AME Plaintiffs are asserting that the inability of voters with disabilities to know with any certainty what the term means or to rely on it in making decisions about who will assist them in voting denies these voters an equal opportunity to vote absentee by receiving the assistance they need from the assistors of their choice.

As a consequence of the Felony Provision, voters with disabilities have had to ask family members to travel or miss work, have feared asking potentially eligible assistors because of threat of felony prosecution, have had homeless shelter and nursing facility staff be unwilling to assist because of fear of felony prosecution, or have been prevented from voting altogether because of lack of access to an eligible assistor. *See* SAMF ¶ 682 (Hargroves Decl. ¶¶ 13-14; Papadopoulos Decl. ¶¶ 11-14; Halsell Decl. ¶ 8; Mattox Decl. ¶¶ 21(a); Orland Decl. ¶¶ 24-25; Thomas Decl. ¶ 15-16; ADAPT Vol. II Dep. 40:5-23).

Defendants do not dispute—because they cannot—that voters with disabilities must devise their own workarounds for overcoming the Felony Provision to vote absentee. That certain voters with disabilities may eventually, through their own persistence and determination, locate assistors or find other means of voting does not negate the fact that these voters have had to work harder to vote and do not have an equal opportunity to access Georgia's absentee voting program, especially where voters without disabilities do not need to go to the same lengths. *See Am. Council of the Blind of N.Y.*, 495 F. Supp. 3d at 235 ("workarounds and alternate means" of access are not dispositive in ADA and Section 504 cases). Defendants instead argue that AME Plaintiffs have failed to present evidence of anyone being prosecuted under the Felony Provision. [ECF 763 at 52]. But the risk of felony prosecution has a chilling effect on potential assistors and reduces the likelihood that individuals will

be willing to assist voters with disabilities. *See, e.g.*, SAMF ¶ 679 (ADAPT Vol. I Dep. 112:23-113:12; Orland Decl. ¶ 24; Hargroves Decl. ¶¶ 10-11, 13; Papadopoulos Decl. ¶ 11).

Defendants' motion for summary judgment should be denied because there are genuine disputes of material fact with respect to whether the Felony Provision denies Georgians with disabilities an equal opportunity to access absentee voting.

### (ii)    Voter Identification Requirements

The Voter ID Requirements have a disparate impact on voters with disabilities and also constitute illegal eligibility criteria that screen out disabled voters from Georgia's absentee voting program. Defendants dismiss the significant burden SB 202's Voter ID Requirements places on disabled voters as only a mere "difficulty." [ECF 763 at 63-64]. But the Voter ID Requirements unlawfully burden voters with disabilities for two reasons: 1) voters with disabilities disproportionately vote absentee (*see supra* at 20-21), and thus anything that makes absentee voting more difficult has an outsized impact on them; and 2) voters with disabilities are more likely to lack the proper identification or the means to provide required alternative documentation (*see supra* at 19).

About 80,000 Georgians with disabilities do not have a driver's license or other government-issued photo ID. SAMF ¶ 617 (Schur ¶ 98(c)). Disabled voters without government identification must either go to a location to get government-issued

identification or provide a photocopy of other forms of acceptable identification under SB 202. But these options require substantial additional effort for voters with disabilities, who are less likely to have access to transportation or to drive a vehicle or to have access to photocopiers. *See supra* at 23. Georgia voters with disabilities disproportionately have either not successfully voted because of the Voter ID Restrictions or have faced barriers to complying with the requirements because they cannot print out and submit the needed documents to access an absentee ballot. SAMF ¶ 745 (Mattox Decl. ¶ 21). Therefore, the Voter ID Requirements create extra burdens on voters with disabilities by requiring a disparate percentage of voters with disabilities to coordinate transportation to obtain or make a copy of government identification or find another way to present the alternative forms of identification. *See Am. Council of the Blind*, 495 F. Supp. 3d at 235 (no meaningful access where plaintiffs had to rely on "workarounds and alternate means" for access).

Defendants' assertions that access to transportation or technology are "unrelated to being disabled" is contrary to the evidence offered by Dr. Schur. [ECF 763 at 71]; *supra* at 21-24. In any event, the extent to which these obstacles are related to disability, and thus whether they are by reason of disability, is a question of fact inappropriate for summary judgment. *See R.W.*, 114 F. Supp. 3d at 1278.

### b. The Absentee Voting Restrictions Work Together to Disproportionately Impact Voters with Disabilities and That Disparate Impact is Exacerbated by SB 202's Restrictions to In-Person and Early Voting

Voting absentee is more than just a mere preference for voters with disabilities. Indeed, disabled voters disproportionately rely on access to absentee voting because they are more likely to face barriers voting in person, and increased restrictions on in-person voting makes access to absentee voting even more important for those who already find in-person voting more burdensome. SAMF ¶ 606 (Schur ¶¶ 12, 73, Tbl. 8). For some voters with disabilities, absentee voting is the only way they can exercise their fundamental rights to vote. SAMF ¶ 607 (Schur ¶¶ 8, 63, 73; Gwinnett Cnty. Manifold Dep. 186:21-25).

Defendants attempt to characterize the significant burden that the Absentee Voting Restrictions place on voters with disabilities as only a mere "difficulty," and cite *Todd v. Carstarphen* to argue that this characterization insulates them from liability. [ECF 763 at 50, 63-64] (citing 236 F. Supp. 3d 1311, 1329 (N.D. Ga. 2017)). But unlike *Todd*, where the court, following multiple evidentiary hearings and a fact-intensive inquiry, found that the plaintiff had meaningful access and, in any event, was offered and specifically refused a number of potential accommodations that would have addressed the barriers she faced, *see* 236 F. Supp. 3d at 1316, 1329-36, Defendants have made no such showing here. Moreover, AME Plaintiffs present ample evidence that disabled voters have been denied meaningful

access and equal opportunity to participate in the absentee voting program. *See supra* at 75-84. *Todd* only serves to illustrate the fact-intensive nature of any such inquiry.

In the present case, several restrictions on absentee voting collectively deny access to voters with disabilities. The Absentee Voting Restrictions, taken together with the other provisions of SB 202 that restrict drop boxes and shorten the timeframe for requesting and returning absentee ballots and for voting in runoff elections, make absentee voting significantly less accessible to voters with disabilities than to voters without disabilities. These new restrictions collectively exacerbate the barriers that disabled voters face when voting absentee. For example, a voter with disabilities who lacks access to a person clearly authorized to return their absentee ballot for any reason—including because the voter does not have an available family or household member, or whose potential assistor is deterred by the felony penalty if they are not a qualified "caregiver" under the law—may not be able to access a drop box, mailbox, post office, registrar's office, or early voting location to return their absentee ballot. *See* SAMF ¶¶ 632, 680-683 (Green Decl. ¶ 9; Thomas Decl. ¶ 13-16; ADAPT Vol. II Dep. 40:5-9). Having fewer accessible drop boxes, because they are located indoors and only during certain business hours, compounds this problem. *E.g.*, SAMF ¶¶ 653, 662-669 (Chicoine Decl. ¶¶ 4-9; Orland Decl. ¶ 17; Halsell Decl. ¶ 8; Thornton Decl. ¶¶ 16, 21, 23). The risk that disabled voters may not be able to successfully cast an absentee ballot is further exacerbated by the

shorter time period allowed for requesting and returning absentee ballots under SB 202, which gives voters with disabilities even less time to find an authorized assistor who is available during the prescribed hours for returning absentee ballots to a drop box or other location. SAMF ¶¶ 620, 622-23 (Schur ¶¶ 18, 98).

Moreover, under the current law, voting in person is disproportionately more burdensome for persons with disabilities, which further increases the importance of absentee voting accessibility to disabled voters and thus exacerbates the impact of the Absentee Voting Restrictions on those voters. When voters with disabilities vote in person, they face disability-related barriers that non-disabled voters do not encounter (*e.g.*, getting into the polling place or using equipment, *see* SAMF ¶¶ 591-92 (Schur ¶¶ 75-77, 80)). The most common barrier that disabled voters face with voting in person is difficulty waiting in line (7.4% among all polling place voters with disabilities, SAMF ¶ 592 (Schur ¶¶ 80-81)), a barrier that in 2020 dissuaded approximately 7,800 voters with disabilities from voting at all. SAMF ¶ 594 (Schur ¶¶ 77, 101). As such, the Absentee Voting Restrictions, together with other restrictions to the in-person and absentee voting programs, have a far greater impact on voters with disabilities than those without disabilities.

## C.   The Birthdate Requirement Violates the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B)

The GA NAACP and AME Plaintiffs challenge the birthdate requirement as violative of the Materiality Provision. The Materiality Provision prohibits any

"person acting under color of law" from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). SB 202's birthdate requirement violates this provision because it (1) denies qualified voters the right to vote by rejecting their ballots (2) due to an "error or omission" in inputting birthdates (3) on a "record or paper relating to any . . . act requisite to voting," *i.e.*, the absentee ballot return envelope required to submit the ballot, (4) which is immaterial to whether the voter is qualified to vote under State law. *See id.*; 8/18/2023 PI Order [ECF No. 613] at 22-24. The Materiality Provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). The birthdate requirement epitomizes the kind of immaterial requirement that the Materiality Provision is meant to preclude.

A party is entitled to summary judgment only upon meeting its burden to show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56(f)

(court may "grant summary judgment for a nonmovant"); *Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (affirming grant of summary judgment for nonmovant "where a legal issue has been fully developed"). To prevail on their preliminary injunction motion, Plaintiffs were required to—and did—show a substantial likelihood of success on the merits of their claim, *see Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 723-24 (11th Cir. 1991)—a standard that is "much more stringent than the proof required to survive a summary judgment motion." *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (collecting cases). Since Plaintiffs obtained a preliminary injunction, the correct decision, Defendants cannot, on the same record and issue, prevail on summary judgment.[43]

---

[43] In a footnote, State Defendants assert that there is no private right of action under the Materiality Provision. ECF No. 763 at 87 n.20. That is wrong. "[T]he Eleventh Circuit has already directly addressed this issue in *Schwier v. Cox* and concluded that the Materiality Provision can be enforced by a private right of action under § 1983." *Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d. 1329, 1339 (N.D. Ga.) (following *Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003), and holding that organizational plaintiff had a private right of action under CRA and § 1983); *see also Common Cause Ga. v. Georgia*, 17 F.4th 102, 107 (11th Cir. 2021) (nonprofit voting rights organization was "prevailing party" in private action under § 1983; *Vote.Org v. Callanen*, No. 22-50536, 2023 WL 8664636, at *6-10 (5th Cir. Dec. 15, 2023) (voting rights organization has private right of action to enforce materiality provision of the CRA). The "recent Supreme Court decisions" that State Defendants cite neither addresses *Schwier* nor considers enforcement of CRA violations. *See Vega v. Tekoh*, 597 U.S. 134 (2022) (Fifth Amendment); *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 121 (2005) (the Telecommunications Act provided a "more restrictive private remedy for statutory violations" incompatible with a private right of action).

1.    **Completing the Absentee Ballot Envelope Is an "Act Requisite to Voting" Because Without It, the Vote Will Not Count.**

Defendants argue that the Materiality Provision has no application to ballot submission procedures and governs only the "determinations of whether a voter is qualified to vote, not to the mechanics of voting." ECF No. 763 at 87; *see also* ECF No. 761-1 at 46-48. As support, Defendants rely almost entirely on Justice Alito's *dissent* from an order denying a stay in *Ritter v. Migliori*, 142 S. Ct. 1824, 1826 (2022). ECF No. 763 at 88, *see also* ECF No. 761-1 at 46-48. But the dissent is not the law, and, indeed, in *Ritter* the Supreme Court let stand the Third Circuit's enforcement of the Materiality Provision against a requirement to sign and date returns of vote by mail. *Ritter*, 142 S. Ct. at 1824. Accordingly, as this Court has already explained in addressing State Defendants' argument in this regard the first time, "[i]t *has never been the law* that the Materiality Provision only applies to that initial determination of whether a voter is qualified to vote." 8/18/2023 PI Order [ECF No. 613] at 28 (emphasis added). Indeed, "[a]t bottom, '[t]he Materiality Provision is implicated when a ballot is not counted because of an error on voting-related paperwork that is *not* material to determining qualifications of the voter.'" *Id.* at 28 (quoting *Pa. State Conf. of the NAACP v. Schmidt*, No. 1:22-cv-00339, 2023 WL 3902954, at *7 (W.D. Pa. Nov. 21, 2023) (emphasis added)).

The Materiality Provision expressly prohibits "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or

paper relating to any application, registration, *or other act requisite to voting . . . .*"
52 U.S.C. § 10101(a)(2)(B) (emphasis added). A "vote" includes "all action
necessary to make a vote effective" including "having such ballot counted and
included in the appropriate totals of votes cast." *Id.* § 10101(e); *Pa. State Conf. of
NAACP v. Schmidt*, No. 1:22-CV-339, 2023 WL 3902954, at *6 (W.D. Pa. June 8,
2023) (rejecting intervenors' argument that CRA does not prohibit mandatory rules
for completing and casting ballots because it "runs afoul of the plain language of the
statutory text which broadly defines the word 'vote'").[44] "[T]he materiality provision
is intended to address those state election practices that increase the number of errors
or omissions on papers or records related to voting and provide an excuse to
disenfranchise otherwise qualified voters." *League of Women Voters of Ark. v.
Thurston*, No. 5:20-cv-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021)
(denying motion to dismiss challenge to rejection of absentee ballots due to omission
or mismatch of redundant information immaterial to qualification).

"When a voter returns an absentee ballot to the clerk or registrar, the ballot
contained in the inner envelope is the voter's vote, and completing the outer
envelope is necessary for submission of that ballot. As such, returning the absentee

---

[44] The Third Circuit recently stayed the district court's injunction pending appeal.
*PA. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, No. 23-3166
(3rd Cir. Dec. 13, 2023), ECF No. 43 (noting "we need not and do not conclude here
that the movants' likelihood of winning on appeal is more likely than not").

ballot and completing the outer envelope is 'requisite to, or essential to, completion of the act of voting.'" 8/18/2023 PI Order [ECF No. 613] 27 (quoting *Pa. State Conf. of the NAACP*, 2023 WL 3902954, at *7). "In light of the statutory definition of 'vote,'" invalidating a ballot that does not comply with the birthdate requirement "denies an individual the right of 'having such ballot counted and included in the appropriate totals of votes cast,' and therefore 'den[ies] the right of an individual to vote in any election.'" *Ball v. Chapman*, 289 A.3d 1, 25 (Pa. 2023) (first quoting 52 U.S.C. § 10101(e), then quoting § 10101(a)(2)(B)); 8/18/2023 PI Order [ECF No. 613] 24-25 (citing *Ball*).[45] As this Court held, "completing the outer envelope [of an absentee ballot] is an 'act requisite to voting' because, without it, the vote will not count." 8/18/2023 PI Order [ECF No. 613] at 27. The Materiality Provision therefore applies to errors or omissions in completing the outer envelope—including compliance with the birthdate requirement.

The Court's holding followed core tenets of statutory construction. "[T]he word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind . . . . [I]n the absence of any language limiting the breadth of that

_____

[45] Intervenors ignore this holding and Congress's "expansive" definition of "voting," claiming that the Materiality Provision is "silent about what it means to 'deny' the right to vote." ECF No. 761-1 at 50. But "denying" the right to vote plainly includes "denying" an individual's right to have their "ballot counted and included in the appropriate totals of votes cast." § 10101(e); ECF No. 613 at 24-25.

word, it must be read as referring to all of the subject that it is describing." *CBS v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). Defendants' overly narrow construction, in which the Materiality Provision reaches only those requirements that affect a voter's *qualification* to vote, would eliminate "any" —an intentionally expansive term—from Section 10101's "any . . . act requisite to voting." That construction cannot be valid. *See United States ex. Rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991) ("Any interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided."). Compliance with the birthdate requirement, which Georgia requires for a vote to count, falls within the broad category of "any . . . other act requisite to voting" under the Materiality Provision. *See, Ball*, 289 A.3d at 26 (majority opinion), 38 (Brobson, J., dissenting); *see also La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022); *Sixth Dist. of African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018); *League of Women Voters of Ark.*, 2021 WL 5312640, at *4.

This Court's preliminary injunction order also correctly extended a line of persuasive precedent that has consistently held that the CRA applies to rules requiring voters to include dates on absentee ballot envelopes. Specifically, this District has twice held that prior Georgia laws requiring absentee voters to provide

birthdates on ballot return envelopes violate the CRA. *See Martin*, 347 F. Supp. 3d 1302; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) (the "*Crittenden* cases"); 8/18/2023 PI Order [ECF No. 613] at 23 n.15 (noting that, in *Ball*, "the Supreme Court of Pennsylvania determined that the practice of rejecting absentee ballots because the return envelope was incorrectly dated or undated violated the Materiality Provision"). Congress has barred states from using immaterial requirements to strip voters of their rights both to cast a ballot and "hav[e] such ballot counted." *Ball*, 289 A.3d at 24-25; *see also League of Women Voters of Ark.*, 2021 WL 5312640, at *4*.

Defendants attempt to distinguish the *Crittenden* cases on the grounds that those cases concerned laws that gave responsible officials discretion as to enforcement. ECF No. 763 at 94-95, n.23; *see also* ECF No. 761-1 at 52-53. But this ignores that Georgia law in place at the time, like SB 202, *required* voters to include year of birth on absentee ballots. ECF No. 548-1 at 6-7. *Martin*, 347 F. Supp. 3d. at 1309. Indeed, the holding in *Martin* focused on the birthdate *requirement*, not on state discretion: "a voter's ability *to correctly recite his or her year of birth on the absentee ballot* envelope is not material to determining said voter's qualifications under Georgia law." *Id.* at 1308-09 (emphasis added).

Section 10101 therefore applies to SB 202's birthdate requirement.

### 2. Because the Birthdate Requirement Is Not Material to Voter Qualification, It Is Invalid Under the Materiality Provision.

Defendants argue that the birthdate requirement—which they admit is not related to voter qualification—passes muster because, "under Georgia law the requirement for a voter to write his/her date of birth on the envelope *is* material as a necessary requirement to casting an absentee ballot." ECF No. 763 at 81-84 (emphasis in original); *see also* ECF No. 761-1 at 51-53. This is circular reasoning: the Materiality Provision would be meaningless if a voting requirement were material simply by virtue of its being part of a statute defining voting requirements. *See* 8/18/2023 PI Order [ECF No. 613] at 26 n.17; *see also, e.g.*, *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540. The question under the Materiality Provision is not whether the requirement is on the books—of course it is—the question is whether it is *material* to determining whether an individual is qualified to vote. 52 U.S.C. § 10101(a)(2)(B). This Court should follow the Fifth Circuit in "reject[ing] that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'" *Vote.Org. v. Callanen*, 89 F. 4th 459, 487 (5th Cir. 2023).

Congress enacted the Materiality Provision with the 1964 Civil Rights Act to combat states' "use of plainly arbitrary procedures" to deny the right to vote, such as the "requirement of vouchers or some other unduly technical method of identification" or "rejection for insignificant errors in filling out forms." U.S.

Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1963, at 22 (1963). Its purpose, as the Eleventh Circuit correctly describes it, was to "counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). For example, 1,300 out of 1,500 Black registrants in a county in Louisiana were at one time removed from the voter rolls due to supposed spelling errors on their applications. U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1959 at 103-04 (1959). States had imposed such barriers to voting as supposedly "necessary requirement[s] to casting" ballots (ECF No. 763 at 92); Congress responded with the Materiality Provision, prohibiting them. Because the birthdate requirement is one such technical requirement for casting a ballot and is *not* material to qualification, it is invalid.[46]

---

[46] The Fifth Circuit's recent, non-binding Section 10101 decision as to Texas's so-called "Wet Signature" requirement for registration does not change the analysis at all. *See Vote.Org v. Callanen*, 89 F.4th 459(5th Cir. 2023) (by a 2-1 vote, reversing grant of summary judgment in favor of non-profit voting rights organization). The *Vote.Org v. Callanen* majority acknowledged that it was setting its "own course" on this point, *id.* at *11, when it adopted a balancing approach to materiality, based on inapplicable cases such as *Crawford* and *Gingles*, instead of Section 10101 precedents. *See id.* at *21. As the dissent in *Vote.Org. v. Callanen* makes clear, any such balancing approach is inconsistent with the literal approach applied by the Eleventh Circuit in *Schwier* and *Browning*. *See id.* at 492. And, in any event, *Vote.Org. v. Callanen* is inapposite, as it dealt with a requirement for a voter's initial registration; by contrast, here, the voter returning an absentee ballot has both already been accepted on the registration rolls and been deemed qualified to receive and return an absentee ballot in that election.

According to Defendants, a voter's birthdate might help local election officials verify voter *identity*. *See* ECF No. 763 at 85-87, 93-94. But voter identity is not voter qualification. And even as to voter identity, the evidence here is at least factually disputed as to whether the birthdate plays any meaningful role. SAMF ¶ 206 (State Resp. to NGP 1st ROGs 5/16/22; DeKalb Cnty. Dep. 213:2-13; Gwinnett Cnty. Manifold Dep. 116:24-117:22; Athens-Clarke Cnty. Dep. 76:10-3) (county officials do not need birthdates to verify identity). State Defendants provide no declaration or other evidence that the birthdate requirement is material even to voter identity. Their primary support is improper, conclusory expert testimony from an *attorney* for the Office of Georgia Secretary of State, Ryan Germany, which itself cites no factual support or authority. *See generally* ECF No. 755-3 (Germany Decl.). As this Court previously noted, "voters are required to provide their social security number and the number from their driver's license or state identification card on the outer envelope" of the absentee ballot. 8/18/2023 PI Order [ECF No. 613] at 35. As before, Defendants "fail to adequately explain why these verification methods are not sufficient to identify a voter." *Id*.

Nor can Defendants defend the birthdate requirement with generalized appeals to voter confidence and fears of voter fraud. *See* ECF No. 763 at 18-21. Again, these are not matters of voter qualification. And as with voter identity, Defendants in any event present no evidence suggesting that failure to include a date

of birth on a ballot return envelope indicates voter fraud or abuse, that the birthdate requirement would deter a fraudster with access to a registered voter's absentee ballot and ID (which itself would include the birthdate), or that the birthdate requirement has any effect on voter confidence. *See* ECF No. 763 at 18-21. Defendants do not dispute that thousands of ballots were not counted for lack of birthdate, SAMF ¶¶ 209-211(Pulgram Decl. ¶¶ 3-32, Exs. 1-20; Hall Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 5-14; Athens-Clarke Cnty. Resp. to AME 1st ROGs 1/11/2023 at 9-1; Chatham Cnty. Resp. to AME 1st ROGs 1/23/2023 at 3-6; Cobb Cnty. Resp. to AME 1st ROGs 1/19/2023 at 1, 4-8; Fulton Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 3-10; Richmond Cnty. Resp. to AME 1st ROGs 1/11/2023 at 1, 4-14; Gwinnett Cnty. Resp. to AME 1st ROGs 1/24/2023 at 9; Gwinnett Cnty. Manifold Dep. 114:19-115:11, 117:23-119:17), but they cannot identify a single one that was fraudulent[47], nor any investigation stemming from the purported lack of compliance.

Again, for a requirement to survive scrutiny under the Materiality Provision, it must be material to voter *qualification*, and this Court has already determined that the "uncontroverted facts show that a voter's ability to correctly provide his or her

---

[47] To the contrary, as the State's own expert witness, Dr. Justin Grimmer testified, "there is no evidence of meaningful fraud in Georgia [elections] in 2020." SAMF 564 (Grimmer Dep. 36:19-20); *see also id.* at 38:11-39:2 (explaining analysis finding claims of fraud to be false).

birthdate on the outer envelope of an absentee ballot is *not* material to determining that voter's qualifications under Georgia law." 8/18/2023 PI Order [ECF No. 613] at 22 (emphasis added); *Browning*, 522 F.3d at 1175 (courts consider whether, "accepting the error as *true and correct*, the information contained in the error is material to determining the eligibility of the applicant"). Defendants offer no facts that warrant disturbing this holding. To the contrary, Defendants admit that "it is the absentee ballot application . . . that is used to determine a voter's qualifications, *not* the absentee ballot return envelope". ECF No. 763 at 89; *see also* 8/18/2023 PI Order [ECF No. 613] at 28-29 (holding that Defendants' admission that "the outer envelope is not used to determine voter qualifications merely reinforces the immateriality of the Birthdate Requirement," citing *Ball*, 289 A.3d at 25 n.139); SAMF ¶ 206 (State Resp. to Pls. 1st ROGs 5/16/22; DeKalb Cnty. Dep. 213:2-13; Gwinnett Cnty. Manifold Dep. 116:24-117:22; Athens-Clarke Cnty. Dep. 76:10-3). Nor do Defendants cite any case in which a date of birth requirement was determined to be material for these purposes after voter eligibility had been confirmed.[48]

---

[48] The cases Defendants cite are inapposite. *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) involved requirements that voters certify they had not been found mentally incapacitated or guilty of a felony, which were qualifications to vote. *See also Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (Dkt. 583 at 12-13) (challenged fields, *i.e.*, voter name, address, and attestation, were material to voter qualification). And, in *Howlette v. City of Richmond*, 485 F.Supp. 17, 21-22 (E.D. Va. 1978), the court found material a

The availability of a "cure" mechanism—which is, in all events, demonstrably insufficient (*see* SAMF ¶ 211 (Pulgram Decl. ¶¶ 20, 23, 25, 27, 30-32))—is also irrelevant. *See* ECF No. 761-1 at 50. Section 10101 "provides that state actors may not deny the right to vote based on errors or omissions that are not material; it does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *La Union del Pueblo Entero*, 604 F. Supp. 3d at 541.

### 3.    State Statutes Are Not Immune to Materiality Challenges.

Defendants argue that "[t]he materiality provision applies to ad hoc executive actions, not state laws that are duly enacted by the Legislature." ECF No. 761-1 at 51-53; *see also* ECF No. 763 at 92. This argument fails too, given the CRA's plain language. The CRA provides that "[a]ll citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote . . .; *any constitution, law, custom, usage, or regulation of any State* or Territory, or by or under its authority, to the contrary notwithstanding." 52 U.S.C. § 10101(a)(1) (emphasis added). The Supreme Court has long recognized that Section 10101, previously codified as 42 U.S.C. § 1971, expressly permits bringing "an action like this one which *challenges the validity of state laws* allegedly used as devices" to

_____

requirement to notarize signatures collected to propose a referendum where signatories had not otherwise verified that they were the person signing.

deny access to the franchise. *United States v. Mississippi*, 380 U.S. 128, 136 (1965) (emphasis added). And courts across the country routinely enforce the Materiality Provision against state statutes that impose immaterial voting requirements. *See, e.g.*, *PA. State Conf. of the NAACP v. Schmidt*, No. 1:22-CV-00339, 2023 WL 8091601, at *20 (W.D. Pa. Nov. 21, 2023) (Pennsylvania date requirement for mail-in ballots); *see also Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006) (granting preliminary injunction against enforcement of Washington "matching" statute).

Nor do the cases that Defendants cite support their position. For instance, Intervenors argue that the *Crittenden* cases are irrelevant because the Georgia state law before SB 202 *permitted*, but did not require, rejection of absentee ballots based on failure to meet Georgia's then-applicable birthyear requirement. ECF No. 761-1 at 52. But, as discussed above, that was not the basis of the holding in those cases. *Supra* § V.C.1. Rather, the court found that the absence of a rejection mandate "only strengthened" its conclusion that the birthyear requirement was immaterial. *Martin*, 347 F. Supp. 3d at 1309; *see also Democratic Party of Ga., Inc.*, 347 F. Supp. 3d at 1340 ("While county election officials are permitted to count such absentee mail-in ballots, however, the [Secretary's] memorandum does not explicitly inform them

that they are *required* to do so.").[49]

### 4.     Plaintiffs Have Standing to Obtain Relief Against State Defendants[50]

In its preliminary injunction order, the Court declined to enjoin State Defendants on the basis that injury to Plaintiffs and their members from the birthdate requirement was not traceable to, or redressable through an injunction against, State Defendants. 8/18/2023 PI Order [ECF No. 613] at 16-17. On summary judgment, Plaintiffs supply further facts that detail and highlight State Defendants' role in the execution of SB 202's birthdate requirement. SAMF ¶¶ 212-217 (Ga. Op. Att'y Gen. No. 2005-3, 2005 WL 897337, at *3 (Apr. 15, 2005); Elections Division, Ga. Sec'y of State, https://sos.ga.gov/index.php/elections; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d at 1338; Poll Worker Manual (May 2021), CDR01369922-CDR01370025; SEB Dep. 195:2-10, 192:18-193:13, 257:24-258:4;

---

[49] State Defendants and Intervenors also misconstrue the non-binding case *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021). *Thomsen* concerned a Wisconsin statute that permitted student IDs as an approved form of voter identification provided certain requirements were met, and it merely held that the challenged IDs were "material to a determination whether an individual may vote under Wisconsin law." *Id.* By contrast, here, Defendants have not demonstrated that the birthdate requirement is material to voter qualification in any way.

[50] The Court has already found, and State Defendants do not dispute, that Plaintiffs have shown an injury-in-fact sufficient to confer organizational and associational standing to challenge the birthdate requirement, ECF No. 613 at 6-14, and that Plaintiffs have standing as to County Defendants to challenge the birthdate requirement. ECF No. 613 at 16-17.

Fulton Cnty. Dep. 257:24-258:4, 270:10-12; Cobb Cnty. Dep. 275:20-23; DeKalb Cnty. Dep. 206:8-12; SOS Dep. 219:21-25). As more fully briefed in Plaintiffs' opposition to summary judgment on jurisdiction, the evidence demonstrates that an order to the State Defendants would be "*likely*" to redress Plaintiffs' harms; at a minimum they raise a genuine dispute as to that undoubtedly material factual issue. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (*citing Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)) (a party has standing if it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision"); *see also Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)) (it need only be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'" of the court); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310-11 (11th Cir. 2001) (partial relief satisfies the redressability prong of Article III standing).

"[T]he Georgia Secretary of State and the State Election Board have broad powers to ensure the uniformity in the administration of election laws." *New Ga. Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1285-86 (N.D. Ga. 2020). Moreover, the Secretary directly controls the "form and substance" of absentee ballot envelopes and may stop prescribing forms that demand voters' birthdates. The Secretary also certifies election results from the counties and "shall notify the county

103

submitting the incorrect returns and direct the county to correct and recertify such returns." O.C.G.A. § 21-2-499(a). As in *Martin*, 347 F. Supp. 2d 1302, the Secretary may be enjoined to certify only counts that tally ballots without rejections for compliance with the birthdate requirement. SB 202 also empowers the SEB to take over a county office by suspending the superintendent and installing a replacement without seeking a court order. O.C.G.A. § 21-2-33.2(b) (SB 202 § 7).

The Court's order granting preliminary injunction did not address several means by which State Defendants are responsible for and can redress Plaintiffs' already-established injuries.

*First*, the Court may order the Secretary of State to eliminate the immaterial birthdate requirement from the ballot return envelope. The Secretary of State issues and has statutory responsibility to control the "form and substance" of absentee ballot envelopes under O.C.G.A. § 21-2-384 (SB 202 § 27). The *Crittenden* cases did not discuss this method of redress, because it involved only counting ballots that had already been returned. But, to the extent that ballots have not been printed at the time this Court renders its decision, fixing the ballot envelope is an easy solution.

*Second*, as in *Crittenden*, this Court may order the Secretary of State, consistent with the duty of that office to certify only correct election results, to reject counties' returns that omit ballots with missing or incorrect birthdates. *See Democratic Party of Ga., Inc.*, 347 F. Supp. 3d at 1347 ("[t]he Secretary of State is

ENJOINED from certifying the State Election results until she has confirmed that each county's returns include the counts for absentee ballots where the birth date was omitted or incorrect."). A county that rejects ballots based on the birthdate requirement has committed an "error," which the Secretary is required to correct.

*Third*, the Court can order the SEB to exercise its statutory powers to instruct the counties, through either training and/or rules, not to reject ballots due to the birthdate requirement. *See New Georgia Project*, 484 F. Supp. 3d at 1285-86 ("Both the Secretary and the State Election Board have significant statutory authority to train local election officials and set election standards. Thus, these Defendants have the ability to fully redress Plaintiffs' injuries [resulting from Georgia statute governing deadline on receipt of absentee ballots] statewide."); *Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d. at 1338 (finding plaintiff organization's "injury is sufficiently traceable to Defendants' [including the State Election Board] alleged violations of the Materiality Provision and is redressable by a favorable decision enjoining the pen-and-ink requirement"). The factual record now before the Court demonstrates that counties do and will cooperate with such directions of the SEB, and that cooperation would provide the redress Plaintiffs seek. SAMF ¶¶ 212-217 (Ga. Op. Att'y Gen. No. 2005-3, 2005 WL 897337, at *3 (Apr. 15, 2005); Elections Division, Ga. Sec'y of State, https://sos.ga.gov/index.php/elections; *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d at 1338; Poll Worker Manual (May

2021), CDR01369922-CDR01370025; SEB Dep. 195:2-10, 192:18-193:13, 257:24-258:4; Fulton Cnty. Dep. 257:24-258:4, 270:10-12; Cobb Cnty. Dep. 275:20-23; DeKalb Cnty. Dep. 206:8-12; SOS Dep. 219:21-25). And if the counties did not cooperate, the SEB is empowered to take remedial action under SB 202 against counties that do not comply with election requirements, without a court order. O.C.G.A. §§ 21-2-31.2(a) and 21-2-33.1(f).

At the least, genuine and material factual issues remain as to whether an order by the Court to the State Defendants is likely to result in the counting of votes previously rejected for lack of a birthdate.

### D. Disputes of Fact Remain as to Whether SB 202's Absentee Ballot ID Provisions Violate the First and Fourteenth Amendment

SB 202 imposes an absentee ballot ID requirement that will burden upwards of 117,384 Georgia voters who have mismatched or missing ID numbers in Georgia's voter file.

To determine whether these requirements unduly burden the right to vote, courts "apply the flexible standard from *Anderson* and *Burdick*." *Common Cause/Ga.*, 554 F.3d at 1351 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Under this test, courts must first consider whether and to what extent a challenged law burdens the right to vote, *see Anderson*, 460 U.S. at 789, and the "relevant" burdens are "those imposed on persons who are eligible to vote" but are impacted by the operation of the state

106

law. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (controlling op.); *see also id.* at 199; *id.* at 212-14 (Souter, J., dissenting) (similar); *id.* at 239 (Breyer, J., dissenting) (similar). Once a court determines the character and magnitude of the burden, it must then consider the strength of the state interests and whether they justify the burden at issue. *See Anderson*, 460 U.S. at 789.

The standard the State must meet varies depending on the magnitude of the burden that the law imposes. Laws imposing severe burdens are subject to strict scrutiny, *Norman v. Reed*, 502 U.S. 279, 280 (1992), while burdens that are less severe are subject to a sliding scale under which the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and in so doing, consider both the "*legitimacy* and *strength* of each of those interests." *Anderson*, 460 U.S. at 789 (emphasis added). For any law that burdens voters, even if that burden is less severe, the law must still be justified by state "interest[s] *sufficiently weighty* to justify the limitation." *Norman*, 502 U.S. at 288-89 (emphasis added).

State Defendants argue that the Absentee Ballot ID Provision does not burden voting in any meaningful way but disregard clear evidence to the contrary. Because the full record reveals several material disputes of fact that the Court cannot resolve at this stage, State Defendants are not entitled to summary judgment.

### 1.    The Absentee Ballot ID Provision Burdens Voters.

More than 46,000 Georgia voters have been issued a DDS ID but had no DDS ID number associated with their voter file in November 2022; over 70,000 more had an out-of-date or otherwise incorrect DDS ID reflected in the voter file. SAMF ¶ 265 (Meredith ¶ 75 & Tbls. VI.C.2 (column 4) & Tbl. VI.F.1 (columns 2 & 3)). But SB 202 requires a voter requesting an absentee ballot to submit an application that includes the ID number from their Georgia driver's license or state ID card issued by the Georgia Department of Driver Services (collectively, "DDS ID"). SB 202 § 25. If the voter does not have either form of ID, they have the option to provide alternate documentation, *but only after they certify that they do not have a DDS ID.*[51] And there is no option to provide the last four digits of a social security number when a voter requests an absentee ballot. *Id.*

When returning absentee ballots, voters must again print their DDS ID number on the absentee ballot envelope. Although State Defendants suggest that voters can ease this burden by providing the last four digits of their social security number ("SSN") or copies of other forms of identification, ECF No. 763 at 68. n.17, this option is available *only to voters who affirm they do not have DDS ID.* SB 202

---

[51] SAMF ¶ 246 (Off. Of Ga. Sec'y of State, Application for Georgia Official Absentee Ballot (2021), https://securemyabsenteeballot.sos.ga.gov/resource/1688626692000/AbsenteeBallotPDF).

§ 28; SAMF ¶ 246 (CDR00125708). Furthermore, if the voter's provided ID number does not match the information in the voter registration system—either because the voter registration record includes no DDS ID number or an incorrect number—the voter must jump through additional hoops: county election officials must issue a provisional absentee ballot and, in a separate mailing, a cure notice instructing the voter to submit a copy of acceptable ID along with an affidavit affirming that the individual is a registered and qualified voter who previously requested, submitted, and completed an absentee ballot. SAMF ¶ 265 (DEKALB020319-20); O.C.G.A. § 21-2-381(b)(3). In other words, voters with non-matching ID numbers will be forced to jump through a series of hoops to cure the mismatched ID issues on their absentee ballots and applications in order to vote by mail. And if these voters fail to complete the cumbersome cure process, they may be disenfranchised entirely.

State Defendants fail to acknowledge this consequence of the Absentee Ballot ID Provision, and instead cite statistics of the proportion of Georgia voters with a DDS ID and list the other acceptable forms of ID in a footnote, ECF No. 763 at 56-57. None of that helps the 117,384 voters with mismatched or missing DDS ID numbers, who, by law, cannot use an alternative form of ID. SAMF ¶ 265 (Meredith ¶ 75 & Tbls. VI.C.2 (column 4) & Tbl. VI.F.1 (columns 2 & 3); SB 202 § 28 ("If the elector does not have a Georgia driver's license or state identification card issued pursuant to Article 5 of Chapter 5 of Title 40, the elector shall so affirm in the space

provided on the outer oath envelope" before providing alternate ID); O.C.G.A. § 21-2-381(a)(1)(C)(i) (same for absentee ballot application). The cases the State cites in support similarly do not address the burdens imposed on voters whose identification is not accurately reflected in the state's voter file. *Crawford*, 553 U.S. 181 (addressing identification requirement for in person voting); *Common Cause/Ga.*, 554 F.3d 1340 (same); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) (involving ID law requiring absentee voters to submit a photocopy of an acceptable form of ID from a list of options). Voters whose DDS ID numbers are not reflected in the state's voter file are uniquely burdened—not just by ID requirement in general, but by the additional logistical hoops imposed by SB 202 when the voter file is not up to date.

### 2.  State Defendants' Asserted Interests Are Insufficient to Justify the Burdens Imposed by the Absentee ID Provisions.

State Defendants argue that any burdens imposed by the absentee ballot provisions are justified by the State's interests in preventing fraud, restoring voter confidence in election integrity, encouraging uniformity, and promoting efficient and orderly election administration. ECF No. 763 at 7. But these interests are not implicated when a voter has a DDS ID that is simply not reflected in the voter file, nor do they justify the additional hoops these voters must jump through in order to cast an absentee ballot using alternative forms of ID. Forcing registered and qualified voters with the exact form of ID contemplated in SB 202 to navigate a cumbersome cure process before they may vote absentee, and potentially disenfranchising them

if they fail to cure, does not serve the State's interests of preventing fraud and promoting integrity. For the same reasons, the absentee ID provisions also undermine the State's goal of creating a uniform system of verifying voter's identity, as these voters must navigate a distinct and more burdensome process to request and return an absentee ballot.

Next, State Defendants claim that the ID requirements are a response to criticisms about the subjectivity of the signature matching process and the absentee ID requirements provide a more objective way to verify identity. ECF No. 763 at 59. Even if true, this observation cannot justify the resulting burden on voters, particularly when other forms of non-DDS ID also provide objective means of verifying identity. *Id.* The problem here is that voters who have acceptable DDS ID, which for one reason or another is not reflected in the voter file, are forced into a cumbersome cure procedure in order to vote absentee.

Finally, the record refutes State Defendants' claim that the ID requirements facilitate more orderly administration of absentee voting. *Id.* A significant number of county election officials opposed the Absentee Ballot ID Provision at least in part because they believe it will *increase* administrative burdens. SAMF ¶ 248 (USA-ADAMS-000043.0001-44.002 (03/21/2021 emails from Bartow County Elections Supervisor Joseph Kirk to House EIC and Senate Ethics Committee members opposing the ID requirement for absentee ballots); Adams Survey at USA-ADAMS-

000027.0004-06 (noting half of the officials surveyed opposed the change); *id.* (Adams Survey at USA-ADAMS-000027.0004-06 (because "[v]oters make errors on their information," the requirements "WILL cause a lots of litigation and again an increase in provisional balloting that have to be cured—a costly and time consuming burden on our offices")). In any event, the impact of the absentee ID provisions on local officials' administration of elections is at least a dispute of material fact that should not be resolved on summary judgment.

### E.    Disputes of Fact Remain as to Whether SB 202's Restrictions on Distributing Absentee Ballot Applications Constitute Viewpoint Discrimination

NGP Plaintiffs' Count III challenges ten provisions of SB 202 as viewpoint discrimination in violation of the First Amendment.[52] As explained in more detail in Plaintiffs' Opposition to Intervenors' Motion for Summary Judgment, extensive evidence supports NGP Plaintiffs' allegation that in purpose and effect, the challenged provisions retaliate against voters who support Democratic candidates by burdening their favored methods of voting. Though State Defendants previously moved to dismiss this claim in its entirety, they now argue that summary judgment should be granted on the claim only as it relates to SB 202's prohibition on officials' proactive distribution of absentee ballot applications. ECF No. 763 at 23-25. And

---

[52] Only NGP Plaintiffs bring a Viewpoint Discrimination claim.

since they do not discuss the claim's challenge to any other provisions, *id*, State Defendants have waived any argument that summary judgment is appropriate as to the remaining nine provisions implicated in NGP Plaintiffs' viewpoint discrimination claim. *See United States v. Campbell*, 26 F.4th 860, 872-73 (11th Cir. 2022) (en banc) (explaining that waiver is "the intentional relinquishment or abandonment" of a right or argument).

State Defendants' argument about the one provision they do address fails. They reason that there can be no First Amendment claim grounded in a restriction on state actors, ECF No. 763 at 23-25, but that misses the point. The question is whether the ban on absentee ballot application distribution has the purpose and effect of targeting voting and get-out-the-vote activity because of the viewpoints of absentee voters. *Reed*, 576 U.S. at 154; *see also* Opp. Intervenors' Mot. Summ. J. (Section II). It does—this provision is part and parcel of a bundle of restrictions on absentee voting, all of which are aimed to discriminate against voters who support Democratic candidates, and who have disproportionately relied on absentee voting in recent elections. *See, e.g.*, SAMF ¶ 47 (Lichtman 9-11); *see also* SAMF ¶ 185 (USA-04145 at 19:55-21:44 (House Speaker David Ralston Interview)); ECF No. 686-1 (Court's Order noting that "the Speaker of the Georgia House of Representatives, David Ralston, a Republican, warned that sending these unsolicited applications would 'drive up turnout' in 2020 and lead to electoral outcomes that he

did not favor."). Specifically, voters in Douglas, DeKalb, and Richmond County—the counties that proactively sent absentee ballot applications to voters for the 2020 general election—overwhelmingly supported Democratic candidates in that election. SAMF ¶ 186 (Kidd Dep. 49:6-25; DeKalb Cnty. Dep. 63:17-23; Bailey 10/6/22 Dep. 49:7-50:1, 118:19-119:15; Lichtman 19-20).

## VI.    CONCLUSION

As demonstrated, the record is replete with material factual disputes. Viewing all the evidence in the light most favorable to Plaintiffs, a grant of summary judgment is unwarranted. The Court should therefore deny Defendants' motion and allow the case to proceed to trial.

Dated: January 19, 2024

/s/ Brian Dimmick
Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Davin M. Rosborough*
*drosborough@aclu.org*
Sophia Lin Lakin*
*slakin@aclu.org*
Jonathan Topaz*
*jtopaz@aclu.org*
Dayton Campbell-Harris*^
*dcampbell-harris@aclu.org*
Casey Smith*
*csmith@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Respectfully submitted,

Caitlin May (Ga. Bar No. 602081)
*cmay@acluga.org*
Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Leah C. Aden*
*laden@naacpldf.org*
Alaizah Koorji*
*akoorji@naacpldf.org*
John S. Cusick*
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte (pro hac vice)
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC. 700 14th
Street, NW Washington, DC 20005
Telephone: (202) 682-1300

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
Alexandra Hiatt (pro hac vice)
*alexandra.hiatt@wilmerhale.com*
WILMER CUTLER PICKERING

115

HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Sofie C. Brooks (pro hac vice)
*sofie.brooks@wilmerhale.com*
Lucas L. Fortier (pro hac vice)
*lucas.fortier@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

*Admitted pro hac vice
^ Practice limited to federal court
Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Laura Powell (pro hac vice)
*laura.powell@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, and Georgia Advocacy Office*

/s/ Pichaya Poy Winichakul
Pichaya Poy Winichakul (Bar 246858)
poy.winichakul@splcenter.org
Bradley E. Heard (Bar 342209)
bradley.heard@splcenter.org
Matletha N. Bennette*
matletha.bennette@splcenter.org
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Jess Unger*
jess.unger@splcenter.org
Sabrina S. Khan*
sabrina.khan@splcenter.org
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

/s/ Adam Sieff
Adam S. Sieff*
adamsieff@dwt.com
Brittni Hamilton*
brittnihamilton@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski*
mjedreski@dwt.com
Grace Thompson*
gracethompson@dwt.com
Danielle Eun Kim*
daniellekim@dwt.com
Kate Kennedy*
katekennedy@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett*
davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund Georgia, and The Arc of the United States

*Admitted pro hac vice

Dated: January 19, 2024                 Respectfully submitted,

*/s/ Meredyth L. Yoon*

MEREDYTH L. YOON
(Georgia Bar No. 204566)
LAURA MURCHIE*
**ASIAN AMERICANS
ADVANCING JUSTICE-ATLANTA**
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*myoon@advancingjustice-atlanta.org*
*lmurchie@advancingjustice-
atlanta.org*

*/s/ Eileen Ma*

EILEEN MA*
KIMBERLY LEUNG*
**ASIAN AMERICANS
ADVANCING JUSTICE-ASIAN
LAW CAUCUS**
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@advancingjustice-alc.org*
*kimberlyl@advancingjustice-alc.org*

*/s/ Niyati Shah*

NIYATI SHAH*
TERRY AO MINNIS*º
NOAH BARON*
**ASIAN AMERICANS
ADVANCING JUSTICE-AAJC**
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*

*/s/ R. Adam Lauridsen*

LEO L. LAM*
R. ADAM LAURIDSEN*
CONNIE P. SUNG*
CANDICE MAI KHANH NGUYEN*
LUIS G. HOYOS*
RYLEE KERCHER OLM*
NIHARIKA S. SACHDEVA*
ELIZABETH A. HECKMANN*
**KEKER, VAN NEST AND PETERS
LLP**
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400 (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*csung@keker.com*
*cnguyen@keker.com*
*lhoyos@keker.com*
*rolm@keker.com*
*nsachdeva@keker.com*
*eheckmann@keker.com*

*Attorneys for Plaintiffs Asian Americans Advancing Justice–Atlanta, Steven J. Paik, Nora Aquino, Angelina Thuy Uddullah, and Anjali Enjeti-Sydow*

*\*Admitted pro hac vice*
*º Not admitted in D.C.*

Dated: January 19, 2024

Respectfully submitted,

_/s/ Halsey G. Knapp_
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree St., NW
One Atlantic Center, Suite 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlwafirm.com
sparks@khlawfirm.com

_/s/ Uzoma N. Nkwonta_
Uzoma N. Nkwonta*
Jacob D. Shelly*
Melinda K. Johnson*
Tina Meng Morrison*
Marcos Mocine-McQueen*
Samuel T. Ward-Packard*
ELIAS LAW GROUP LLP
250 Massachusetts Ave NW
Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
mjohnson@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
swardpackard@elias.law


*Admitted _pro hac vice_
_Counsel for NGP Plaintiffs_

120

*/s/ Bryan L. Sells*
Bryan L. Sells
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN
SELLS, LLC
PO Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: bryan@bryansellslaw.com

Jon Greenbaum (pro hac vice)
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg (pro hac vice)
erosenberg@lawyerscommittee.org
Julie M. Houk (pro hac vice)
jhouk@lawyerscommittee.org
Jennifer Nwachukwu (pro hac vice)
jnwachukwu@lawyerscommittee.org
Heather Szilagyi (pro hac vice)
hszilagyi@lawyerscommittee.org
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

Vilia Hayes (pro hac vice)
vilia.hayes@hugheshubbard.com
Neil Oxford (pro hac vice)
neil.oxford@hugheshubbard.com
Gregory Farrell (pro hac vice)
gregory.farrell@hugheshubbard.com
Mana Ameri
mana.ameri@hugheshubbard.com
William Beausoleil
william.beausoleil@hugheshubbard.com
James Henseler (pro hac vice)

HUGHES HUBBARD & REED LLP
One Battery Park Plaza New York,
New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Gerald Weber
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
Telephone: 404.522.0507
Email: wgerryweber@gmail.com

*/s/ Laurence F. Pulgram*
Laurence F. Pulgram (pro hac vice)
lpulgram@fenwick.com
Molly Melcher (pro hac vice)
mmelcher@fenwick.com
Armen Nercessian (pro hac vice)
Anercessian@fenwick.com
Ethan Thomas (pro hac vice)
EThomas@fenwick.com
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 875-2300

Joseph S. Belichick (pro hac vice)
jbelichick@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
 801 California Street
Mountain View, CA 94041-2008
Telephone: (650) 988-8500

Catherine McCord (pro hac vice)
cmccord@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 14

james.henseler@hugheshubbard.com


New York, NY  10010
Telephone: (212) 430-2690

*Attorneys for Plaintiffs Georgia State Conference of the NAACP, Georgia
Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc.,
GALEO Latino Community Development Fund, Inc., Common Cause, and the
Lower Muskogee Creek*

Dated: January 19, 2024                    Respectfully submitted,

*/s/ Kurt Kastorf*
Kurt Kastorf (GA Bar No. 315315)        Clifford J. Zatz*
KASTORF LAW, LLC                        Justin D. Kingsolver*
1387 Iverson Street, N.E., Suite 100    William Tucker*
Atlanta, GA 30307                       CROWELL & MORING LLP
Telephone: 404-900-0330                 1001 Pennsylvania Avenue, N.W.
kurt@kastorflaw.com                     Washington, DC 20004
                                        Telephone: (202) 624-2500
Judith Browne Dianis*                   CZatz@crowell.com
Matthew A. Fogelson*                    JKingsolver@crowell.com
Angela Groves*                          WTucker@crowell.com
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850          Jordan Ludwig*
Washington, DC 20005                    CROWELL & MORING LLP
Telephone: (202) 728-9557               515 South Flower Street, 40th Floor
JBrowne@advancementproject.org          Los Angeles, CA 90071
MFogelson@advancementproject.org        Telephone: (213) 443-5524
AGroves@advancementproject.org           JLudwig@crowell.com


*Admitted *pro hac vice*

*Attorneys for Plaintiffs The Concerned Black Clergy of Metropolitan Atlanta, Inc.,
The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union, Inc.,
First Congregational Church, United Church of Christ Incorporated, Georgia
Latino Alliance for Human Rights, Inc.*

## LOCAL RULE 7.1(D) CERTIFICATION OF COMPLIANCE

I hereby certify that the foregoing pleading has been prepared with Times New Roman font, 14 point, one of the font and point selections approved by the Court in L.R. 5.1C, N.D. Ga.

*/s/ R. Adam Lauridsen*
R. ADAM LAURIDSEN
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned counsel, hereby certify that on January 19, 2024, a true and correct copy of the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ABSENTEE BALLOT was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

*/s/ R. Adam Lauridsen*
R. ADAM LAURIDSEN
Attorney for Plaintiffs