IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SIXTH DISTRICT OF THE AFRICAN
METHODIST EPISCOPAL CHURCH, a
Georgia nonprofit organization, et al.,

             Plaintiffs,

             v.

BRIAN KEMP, Governor of the State of
Georgia, in his official capacity, et al.,

             Defendants.

Case No. 1:21-cv-01284

UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

             v.

THE STATE OF GEORGIA; THE
GEORGIA STATE ELECTION
BOARD; AND BRAD
RAFFENSPERGER, IN HIS OFFICIAL
CAPACITY AS GEORGIA
SECRETARY OF STATE,

             Defendants.

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

## **COMPLAINT IN INTERVENTION**

The United States of America, Plaintiff-Intervenor, herein alleges:

1.      In March 2021, the Georgia legislature enacted an omnibus election bill known as Georgia Senate Bill 202 (2021) ("SB 202").  *See* Exhibit 1.  The legislature passed the bill against the backdrop of:

- Georgia's history of discrimination against Black Georgians, pervasive polarization in voting, and demographic shifts in the State leading to an increase in the number of Black voters and other voters of color;

- A dramatic increase in Black Georgians' use of absentee voting;

- Heavily publicized Black voter mobilization efforts (including efforts to overcome long lines in precincts serving Black voters); and

- Black Georgians' unprecedented recent successes in electing candidates of choice.

2.      In particular, SB 202's provisions:

- Prohibit government entities from mailing unsolicited absentee ballot applications;

- Require most voters who lack certain identification numbers to provide a copy of another form of identification each time they request an absentee ballot, reduce the period of time in which voters may apply for an

absentee ballot, and restrict the use and availability of drop boxes to return that ballot;

- Prohibit distributing food and water to voters waiting in line to cast their ballots; and

- Prohibit counting out-of-precinct provisional ballots unless they are cast after 5 p.m. on Election Day.

The Georgia legislature enacted SB 202 with knowledge of the disproportionate effect that these provisions (collectively, the "challenged provisions"), both singularly and together, would have on Black voters' ability to participate in the political process on an equal basis with white voters.

3.      The Attorney General accordingly files this complaint in intervention on behalf of the United States to protect against the denial of equal protection of the laws in violation of the Fourteenth Amendment to the United States' Constitution.

4.      In this action, the Attorney General challenges portions of SB 202, which was signed into law on March 25, 2021, and makes significant changes to Georgia's election laws.

5.      In enacting SB 202, the Georgia General Assembly intended to deny or abridge the right of Black Georgians to vote on account of race or color, in violation of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201.

7.      Venue is proper in this court under 28 U.S.C. §§ 90(a)(2) and 1391(b).

8.      The United States is authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2.  The Attorney General of the United States has certified that this case is of general public importance.  The certificate of the Attorney General is appended to this complaint and incorporated herein.

## PARTIES

9.      Plaintiff-Intervenor is the United States of America.

10.      Defendant Georgia is one of the states of the United States of America.

11.      Defendant Georgia State Election Board is the state agency responsible for promulgating rules and regulations relating to the election process in Georgia.

12.     Defendant Brad Raffensperger is the Georgia Secretary of State, the State's chief election officer, and since SB 202 went into effect, an ex officio non-voting member of the State Election Board.  His office oversees election activities in Georgia, including voter registration and the administration of state and federal elections.  He is sued in his official capacity.

## ALLEGATIONS

### Population and Voter Participation Data

13.     According to the 2020 Census, the State of Georgia had a total population of 10,711,908.  Of those individuals, 5,362,156 (50.1%) were non-Hispanic white, and 3,278,119 (30.6%) were non-Hispanic Black.

14.     According to the 2020 Census, the voting-age population of Georgia was 8,220,274, of whom 4,342,333 (52.8%) were non-Hispanic white, and 2,513,389 (30.6%) were non-Hispanic Black.

15.     According to the 2021 American Community Survey 1-Year Estimates, Georgia had 7,786,111 voting-age citizens, of whom 4,420,171 (56.8%) were non-Hispanic white, and 2,448,678 (31.4%) were non-Hispanic Black.

16.     In the past three decades, Georgia's Black population has grown in size and in its proportion of Georgia's total population.  The number of Black residents increased 88.7% from 1990 to 2020, according to decennial Census

counts, and Black residents' share of Georgia's total population increased from 26.8% of the population in 1990 to 30.6% in 2020.

17.     According to 2010 and 2021 American Community Survey 5-Year Estimates, 77.3% of the Black population growth in the past decade occurred in the Atlanta region, where nine of the ten counties with the greatest increase in Black population are located.

18.     Georgia's four most populous counties are Fulton, Cobb, DeKalb, and Gwinnett Counties.  They are located in the metro-Atlanta area.  These four counties also contain the largest Black voting-age populations in Georgia.

19.     As of November 8, 2022, the date of the most recent federal general election, Georgia had about 7,785,528 registered voters, of whom about 4,048,728 (51.6%) were white; 2,312,592 (29.5%) were Black; 306,380 (3.9%) were Hispanic; and 1,117,828 (15%) were other races.

20.     According to American Community Survey data, although the turnout rate among Black voters in Georgia has increased in recent elections, it continues to lag behind that of white voters.  For example, in the November 2022 general election, 42.5% of the Black Citizen Voting Age Population (CVAP) voted, compared to 54.5% of the white CVAP, a difference of 12 percentage points.  In the January 2021 runoff, the last election before the enactment of SB 202, 54.9%

of the Black CVAP voted, compared to 61.8% of white CVAP, a difference of 6.9 percentage points.  In November 2020, 57.2% of the Black CVAP voted, compared to 67.1% of the white CVAP, a difference of 9.9 percentage points.  In November 2018, 49.4% of the Black CVAP voted, compared to 53.6% of the white CVAP, a difference of 4.2 percentage points.

21.    The white share of the electorate has dropped in the past decade, from 57.9% in 2014 to 53.4% in 2018, 52.7% in 2020, and about 51.6% in 2022.

22.    Georgia elections have long been marked by racially polarized voting.

23.    Black voters in Georgia have traditionally been less likely to vote by mail than white voters, but that began to change in 2018, when 7.02% of Black voters, compared to 4.65% of white voters, cast an absentee ballot in the November election.[1]

24.    Absentee voting spiked in 2020, during the COVID-19 pandemic, particularly among Black voters.  In November 2020, 28.9% of Black voters cast an absentee ballot, compared to 24.0% of white voters.  In the January 2021 general election runoff, 27.6% of Black voters cast an absentee ballot, compared to 21.7% of white voters.

---

[1] Throughout this document, the terms "absentee ballot" and "absentee voting" are used to refer to absentee-by-mail voting.

25.     In the November 2022 general election, 7.44% of Black voters cast an absentee ballot, compared to 5.60% of white voters.

**Socio-Economic Data**

26.     Data from the American Community Survey show wide economic disparities between Black and white residents in Georgia.

27.     According to the 2021 American Community Survey 1-Year Estimates, 20.2% of Black residents in Georgia live in poverty, compared to 9.5% of non-Hispanic white residents.  Black residents in Georgia also have a lower per capita income ($26,833) than non-Hispanic white residents ($43,022).

28.     According to the 2021 American Community Survey 1-Year Estimates, the unemployment rate for Black residents in Georgia was almost twice the rate for non-Hispanic white residents (8.2% compared to 4.1%).

29.     According to the 2021 American Community Survey 1-Year Estimates, Black residents in Georgia were less likely than non-Hispanic white residents to have a high school degree (88.6% compared to 92.2%) and less likely to have a bachelor's degree or higher (27.8% compared to 38.1%).

30.     According to the 2021 American Community Survey 1-Year Estimates, Black residents in Georgia were more likely than non-Hispanic white

residents to have moved within their county of residence in the preceding year (6.5% compared to 5.0%).

31.     According to the 2021 American Community Survey 1-Year Estimates, Black households in Georgia were less likely than non-Hispanic white households to have a broadband internet subscription at home (88.3% with access compared to 90.6%).

32.     According to the 2017-2021 American Community Survey 5-Year Estimates, Black households in Georgia were nearly three times as likely as non-Hispanic white households to lack access to a vehicle (10.6% without access compared to 3.6%).

**The State of Georgia's History of Discrimination**

33.     The history of official racial discrimination against Black citizens in Georgia with regard to voting is longstanding, well-documented, and recognized by Federal courts. *See, e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("It is wholly unnecessary . . . to recount the voluminous details of Georgia's history in this Order. . . Generally, Georgia has a history chocked full of racial discrimination at all levels."); *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 301 F. Supp. 3d 1297, 1323-24 (M.D. Ga. 2018)

(finding that Georgia's history of discrimination impeded political participation among Black Americans).

34.     Based on its history of racial discrimination, Georgia was subject to the preclearance requirement of Section 5 of the Voting Rights Act when it was enacted in 1965, by virtue of being covered under the formula set forth in Section 4(b) of the Voting Rights Act.  28 C.F.R. pt. 51 App.  Under Section 5, covered jurisdictions were required to obtain preclearance from the United States Attorney General or from a three-judge court of the United States District Court for the District of Columbia prior to implementing any voting change.  52 U.S.C. § 10304(a).  Georgia remained subject to Section 5 until the decision of the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013).

35.     To obtain preclearance under Section 5, covered jurisdictions in Georgia were required to demonstrate that voting changes "neither ha[d] the purpose nor w[ould] have the effect of denying or abridging the right to vote on account of race[,] color," or "member[ship] [in] a language minority group."  52 U.S.C. §§ 10304(a), 10303(f)(2).

36.     From 1968 to 2013, the Attorney General interposed objections under Section 5 of the Voting Rights Act to at least 177 submissions in Georgia, finding that either the State or one of the covered political subdivisions within the State

had failed to show that the proposed changes would not have the purpose or effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

37.     Since 1982, plaintiffs secured favorable outcomes in at least 74 lawsuits brought against governmental units in Georgia under Section 2 of the Voting Rights Act, and that count is almost certainly underinclusive.  At least five of these lawsuits resulted in reported judicial decisions; at least 69 were settled favorably without a reported decision.

**Provisions of SB 202**

38.     SB 202 makes multiple significant changes to Georgia's election laws. Among other changes, SB 202 alters existing law by (a) prohibiting governmental entities from distributing unsolicited absentee ballot applications (SB 202 § 25); (b) requiring voters who do not have identification issued by the Georgia Department of Driver Services, or whose identification is not correctly reflected in the State's voter registration system, to provide a copy of another form of identification in order to request an absentee ballot (§ 25); (c) reducing the period of time during which registrants can request absentee ballots (§ 25); (d) limiting the use of absentee ballot drop boxes (§ 26); (e) banning the distribution of food or drink to persons waiting in line to vote (§ 33); and (f) prohibiting jurisdictions

- 11 -

from counting out-of-precinct provisional ballots if they were cast before 5 p.m. on Election Day (§ 34).

## A.   **Government-Mailed Absentee Ballot Applications**

39.   To encourage mail-in voting during the June 2020 primary election, the Secretary of State mailed absentee ballot applications to all of the (then) 6.9 million active registrants on the voter rolls.

40.   Absentee voting hit record levels in the June 2020 primary.

41.   The Secretary of State did not mail unsolicited absentee ballot applications prior to the November 2020 general election or the January 2021 runoff election, instead opting to create an online absentee ballot request system. Only voters with a State-issued driver's license or non-driver's license identification number could use this online system to request an absentee ballot.

42.   The Secretary's decision not to distribute unsolicited absentee ballot applications for the November 2020 and January 2021 elections followed criticism from the Georgia House Speaker, David Ralston, who warned that mailing applications to all active registered voters would "drive up turnout."  Speaker Ralston further claimed that increased turnout would be "extremely devastating" to election outcomes that he favored.

43.    SB 202 prohibits state and local governments from mailing absentee ballot applications to registered voters unless specifically requested by the voter or an authorized relative of the voter.  SB 202 § 25.

44.    Under SB 202, a request for an absentee ballot must be made in writing, using a form that is available on the Secretary of State's website, among other places.

45.    Under Georgia law, most voters must submit a new absentee ballot application for each election.  Only voters of "advanced age or disability," and overseas and military voters, are exempt from this requirement.  O.C.G.A. § 21-2-381(a)(1)(G).

**B.**    **Identification Requirement for Requesting an Absentee Ballot**

46.    Since 2006, in-person voters in Georgia have been required to show photo identification.  *See* O.C.G.A. § 21-2-417.  Prior to SB 202, absentee voters were exempt from this requirement.

47.    Instead, election officials would compare the signature on a voter's absentee ballot envelope with the voter's signature in the voter file.

48.    SB 202 imposes new identification requirements at two stages of the absentee voting process.

49.     First, at the request stage, voters must include on their absentee ballot application the identification number from their Georgia driver's license or personal identification card issued by the Georgia Department of Driver Services (collectively "DDS-issued ID").  If they do not have DDS-issued ID, they must provide a copy of another form of identification, such as a utility bill.  SB 202 § 25.

50.     Second, when returning their absentee ballot, voters must print their DDS-issued ID number on the absentee ballot envelope.  If they do not have DDS-issued ID, voters must print the last four digits of their Social Security number.  If they do not have either DDS-issued ID or a Social Security number, voters must include a copy of another form of identification, such as a utility bill, with the absentee ballot.  SB 202 § 28.

51.     The option to provide the last four digits of the voter's Social Security number, in lieu of a DDS-issued ID number, is not available when a voter requests an absentee ballot.

52.     During the legislative debates on SB 241, a predecessor bill to SB 202, a sponsor described the bill as allowing voters to list the last four digits of their Social Security number when requesting an absentee ballot.  When another

legislator pointed out that the bill did not actually include that provision, the sponsor said that a future version of the bill would include it.

53.     During the legislative debate, supporters of SB 202 did not explain why the use of the last four digits of a voter's Social Security number was sufficient to verify identity when a voter returned a completed absentee ballot but was not sufficient to verify identity when a voter requested an absentee ballot.

54.     During the 2021 Legislative Session, when the legislature was considering adopting new election legislation, the Georgia Secretary of State's office analyzed voter registration records to determine how many registered voters had a driver's license or Social Security number associated with their voter record. In February 2021, Gabriel Sterling, the Chief Operating Officer of the Georgia Secretary of State's office, publicly claimed through Twitter that 99.9% of Georgia voters had the last four digits of their Social Security number in the State's voter registration system.  Mr. Sterling also claimed that 97% of Georgia voters had driver's license numbers in the system.  Both figures were also communicated directly to individual legislators.

55.     Data show, however, that Black Georgians are less likely than white Georgians to possess the DDS-issued ID number needed to request an absentee ballot.  In April 2021, just weeks after SB 202 was enacted, over 272,000

registered voters did not have a driver's license number associated with their registration, and about 56.5% of those voters identified as Black (even though Black Georgians represent only 30% of registered voters).

56.     Even after efforts by the State to update voter registration records, by November 2022 over 171,000 registered voters still did not have a DDS-issued ID number associated with their voter registration record.  Over 61% of these voters— more than 100,000 voters—identify as Black.  That represents more than double the share of Black voters in the electorate as a whole.

57.     About 70,000 additional voters had an incorrect DDS-issued ID number associated with their voter record in November 2022.

58.     In total, by November 2022 there remained 243,000 registered voters who did not have a DDS-issued ID number or had the wrong ID number in their voter registration record, and over 53% of those registrants are Black.

59.     Over 95% of voters who do not have a DDS ID number associated with their voter record do have the last four digits of their Social Security number on file.

### C.     Window to Request Absentee Ballots

60.     Before the passage of SB 202, registrants could request an absentee ballot as early as 180 days before an election and as late as four days before an

election.  *See*, *e.g.*, Georgia Secretary of State, Elections Division, *Absentee Voting: A Guide to Registered Voters 2020*, at p. 5 (noting that voters may request absentee ballots "between 180 days prior to the election and the end of the business day on the Friday before Election Day").

61.     SB 202 shortens this request period.  Under SB 202, voters can begin requesting absentee ballots 78 days before the election, and the last day to request an absentee ballot is 11 days before Election Day.  SB 202 § 25.

62.     Because of changes made to the election calendar under SB 202, which now provides only 28 days between a primary or general election and the runoff, *see* SB 202 § 42, the new deadline results in a particularly short time period for requesting absentee ballots for runoff elections (*i.e.*, voters must request their absentee ballot for a runoff election by the 17th day after Election Day).

63.     In the November 2020 general election, Black voters were more likely than white voters to request absentee ballots between ten and four days before Election Day—a period of time that is closed to such requests under SB 202.  In addition, of the absentee ballots requested during this period, those that were successfully cast and counted were disproportionately cast by Black voters.

64.     Black voters were also more likely to request an absentee ballot between ten and four days before the January 5, 2021, general runoff election.

Again, of the absentee ballots requested during this period, those that were successfully cast and counted were disproportionately cast by Black voters.

65.    In 2022, with SB 202's 11-day deadline in effect, the share of mail ballot applications rejected for arriving too late jumped significantly for all voters, but the increase was greatest for Black voters.

**D.    Drop Boxes**

66.    In response to concerns about COVID, the State Election Board passed an emergency rule for the June 9, 2020, primary election that allowed voters to return their absentee ballots in drop boxes.  *See* State Election Board Rule 183-1-14-0.6-.14.  The drop boxes were required to be "on county or municipal government property generally accessible to the public," with a video recording device to monitor each location.  *Id.* §§ (2) & (4).

67.    Drop boxes were available until the close of polls on Election Day, and many were accessible after business hours in the days leading up to the election.

68.    The emergency rule was later extended to allow the use of drop boxes through the January 5, 2021, general runoff election.

69.    Drop boxes were widely used by voters during the November 2020 and January 2021 elections, particularly in the metro-Atlanta area.  For example,

Fulton County had 38 drop box locations in each election, and Gwinnett County had 23 in each election.

70.     According to the Cobb County Elections Director, 60% of the absentee ballots returned in Cobb County during the November 2020 election were returned via drop box.[2]  A statewide analysis showed that over 50% of all absentee ballots were returned via drop box in the November 2020 election, totaling over 550,000 ballots.  After drop boxes' widespread use in the November 2020 election, some metro-Atlanta counties, like DeKalb County, added more drop boxes for the January 2021 runoff election.

71.     The rejection rate for late-arriving absentee ballots dropped substantially in 2020 compared to past elections.

72.     In recent elections, late ballots were disproportionately cast by Black voters.  In federal general elections from November 2014 to 2022, including the January 2021 runoff, Black voters were almost always over-represented among voters who returned absentee ballots in the final four days of the election.

---

[2]  Julia Marnin, *Number of Election Ballot Drop Boxes Falls From 38 to 8 in Fulton County, Georgia*, Newsweek (Apr. 19, 2021, 3:27 PM), https://www.newsweek.com/number-election-ballot-drop-boxes-falls-38-8-fulton-county-georgia-1584803.

73.     SB 202 requires each county to have one drop box but limits additional drop boxes to "the lesser of either one drop box for every 100,000 active registered voters in the county or the number of advance voting locations in the county."  SB 202 § 26.

74.     Under SB 202, drop boxes must be located at early voting sites or the registrar's office.  Absent a declaration of emergency by the Governor, drop boxes must be stationed indoors.  In addition, drop boxes can only operate during early voting hours, and must close permanently at the close of the early voting period, *i.e.* the Friday before Election Day.  The drop boxes must now also be under constant surveillance by an election official, law enforcement officer, or licensed security guard.  SB 202 § 26.

75.     Put differently, SB 202 limits the use of drop boxes to those times and locations where voters could opt to vote in person instead.

76.     By requiring that drop boxes close permanently at the end of the early voting period, SB 202 also ensures that voters who attempt to return their absentee ballot in the three days before or on Election Day will no longer be able to use drop boxes as a reliable alternative to mailing their ballot.  This is particularly important in light of a federal court's finding that in 2018, 85% of absentee ballots rejected as untimely "arrived within seven (7) days [after] Election Day, implying that many

were mailed either before or on Election Day." *New Georgia Project v.*

*Raffensperger*, 484 F. Supp. 3d 1265, 1305 (N.D. Ga. 2020), *order stayed on other*

*grounds by* 976 F.3d 1278 (11th Cir. 2020).

77.    SB 202's limits on the number of drop boxes that each county may

deploy has caused a precipitous decline in drop box availability in the counties that

are home to the largest number of Black voters in the State.  Specifically, SB 202

limits Fulton County to about eight drop boxes, Gwinnett County to about six, and

DeKalb and Cobb Counties to about five each.

78.    The new provisions resulted in a dramatic cut in the number of drop

boxes available in counties with large minority populations, in particular in metro-

Atlanta counties, and resulted in 75% of Black registered voters seeing a decrease

in the number of drop boxes in their county, compared to 54% of white voters.

### F.    Food and Drink Distribution

79.    Before the passage of SB 202, various groups and organizations

distributed food and water to persons waiting in long lines to vote.  These line

relief activities grew out of both a history of exclusion of Black voters at the polls

and the long lines that have plagued predominantly Black precincts in Georgia for

years. Line relief by Black activists and Black-led groups in Georgia transformed

the environment at polling places by welcoming and encouraging Black voters

seeking to participate in the political process despite generations of exclusion and discrimination.

80.     In federal general elections from 2014 to 2020, Black voters generally experienced longer wait times, with substantial disparities in some cases. In all four general elections from 2014 to 2020, white voters were more likely to experience no wait at all, and in three of the four elections, Black voters were more likely to wait over 60 minutes to vote.

81.     From preliminary 2022 general election survey data, the racial gap in wait times was the largest during the 2022 general election than any of the last three midterm election cycles.

82.     SB 202 prohibits giving food and water to persons waiting in line to vote.  SB 202 § 33.  Poll workers may make "available self-service water from an unattended receptacle." *Id.*

83.     SB 202's prohibition on line relief overwhelmingly impacts Black voters and other voters of color because it targets a practice engaged in by minority-led organizations to support voters of color.  SB 202 will prevent churches, non-profit organizations, and other groups from sharing food and water to encourage voters not to abandon long lines to vote due to hunger or thirst.

**F.** **Out-of-Precinct Provisional Ballots**

84.     Prior to the enactment of SB 202, voters could cast a provisional

ballot at any precinct in the county in which the voters are registered, and the votes

cast on such ballots were counted for all races in which the voters would have been

eligible to vote if they had cast a regular ballot at the correct precinct.  *See*

O.C.G.A. § 21-2-419(c)(2) (2020).  Georgia has counted such out-of-precinct

provisional ballots since at least 2002.

85.     SB 202 prohibits local jurisdictions from counting such ballots if they

were cast before 5 p.m. on Election Day.

86.     Under SB 202, voters casting an out-of-precinct provisional ballot

after 5 p.m. must execute a sworn statement, witnessed by a poll official, stating

the reason why the voters are unable to vote at their assigned precinct.  SB 202

§ 34.

87.     Data from past elections show that prohibiting the counting of

provisional ballots cast in the voter's county but outside the voter's assigned

precinct will mean the rejection of several thousand votes that would have been

counted in prior elections.

88.     For a variety of reasons, including higher rates of residential mobility

and less access to transportation among Black Georgians, Black voters were

disproportionately likely to cast out-of-precinct provisional ballots in November 2018, November 2020, and January 2021.

### SB 202's Historical Background

89.    SB 202's passage followed a series of historic wins by multiple Black-preferred candidates; a significant and well-publicized rise in Black political mobilization and voting strength; shifting racial demographics in the State, including an increase in the number of Black and Latino voters; and changes to the State's typical election procedures that resulted from the ongoing pandemic, including a notable increase in absentee voting.

90.    In 2020, the total Black population in Georgia was rising, particularly in the metro-Atlanta area, and Black Georgians constituted a growing share of the total population.

91.    Black voter turnout rose not only in the 2018 midterm election and the 2020 presidential election, but also in the 2021 runoff election, compared to past runoff elections.  Indeed, Black turnout dropped less than white turnout between the November 2020 general election and the January 2021 runoff election, which defied typical voting patterns for Black voters.  The notable turnout was a direct reflection of the increasingly-successful Black-led mobilization efforts in Georgia that encouraged participation by voters of color and low-propensity voters.

92.     Black Georgians undertook substantial new efforts to harness their political power in 2018 when Stacey Abrams, a Black candidate, ran for governor. The 2018 election yielded high turn-out among Black voters and other voters of color and specifically encouraged their use of absentee ballots.

93.     During early voting and on Election Day in 2018, advocates and organizations helped to ensure that voters who faced long lines (often voters of color) had basic food and water.  Community leaders served free food at Pittman Park Recreation Center—a predominantly Black precinct in Fulton County where hundreds waited in long lines—to make sure their neighbors were not so hungry that they abandoned the line.

94.     As they had in 2018, civic organizations, churches, and advocacy organizations again helped to ensure that voters facing long lines in 2020 had food and water.

95.     At the same time, the ongoing pandemic had changed election processes in Georgia.  Chief among the pandemic-related changes was a dramatic increase in the use of absentee ballots.  The Secretary of State's efforts to open access to absentee voting and the counties' encouragement of after-hours drop boxes as alternatives to returning absentee ballots by mail facilitated the rise of absentee voting.

- 25 -

96.     Black-led mobilization efforts also emphasized absentee voting.

97.     These mobilization efforts led to the popular public perception that Black voter turnout was increasing, driven in large part by absentee voting, and that this growing turnout was providing Black voters with increased opportunities to elect Black-preferred candidates.

98.     In the November 2020 election, nearly 30% of Black voters in Georgia voted by absentee ballot, compared to fewer than 7% in 2018.

99.     The November 2020 general election in Georgia resulted in historic firsts that reflected significant demographic and political shifts in the State.  For example, Vice President Kamala Harris became the first Black and Indian-American Vice President ever elected.

100.   Reverend Raphael Warnock, who is Black, advanced to a runoff election against incumbent Senator Kelly Loeffler.

101.   Black political mobilization continued for the January 2021 runoff election.  Once again, many voters cast absentee ballots—including via drop boxes—and voter mobilization organizations directed a great deal of effort at turning out Georgia's Black community.

102.    A record number of voters, nearly 4.5 million, cast ballots in the January runoff election, about 88% of the number who voted in the November general election.

103.    Some precincts, primarily precincts in Fulton County, saw an increase in turnout between the November 2020 and January 2021 elections.

104.    On January 5, 2021, with strong turnout among Black voters, the State of Georgia elected its first Black Senator, Reverend Raphael Warnock, and its first Jewish-American Senator, Jon Ossoff.

105.    This overall rise in Black political success occurred against the backdrop of virulent racial appeals.  Two years earlier, during the 2018 Georgia gubernatorial contest, a racist robocall referred to candidate Stacey Abrams as "Negress Stacey Abrams" and "a poor man's Aunt Jemima."

106.    Throughout the 2020 campaign, and particularly during the runoff for the U.S. Senate seats, there was a similar atmosphere.  One campaign ran a digital advertisement against Mr. Ossoff that included an anti-Semitic trope of an enlarged nose, and a U.S. Senate candidate mispronounced and mocked the pronunciation of then-Senator Kamala Harris' first name during a campaign event, despite having been her Senate colleague for four years.

107.   One phone caller threatened to behead Reverend Warnock and referred to the church at which he is a pastor, Ebenezer Baptist—the church once pastored by Rev. Martin Luther King, Jr.—using a vile racial epithet.  The church had to filter comments on its social media pages given the significant number of racist comments relating to Rev. Warnock's candidacy.

108.   The historic contests in 2020 and 2021 in Georgia garnered significant media attention, particularly because of the success of Black-led mobilization efforts and the narrow margins in the presidential election.

109.   Legal requirements, combined with the increased use of absentee ballots, explained the delays in announcing the results of the November 2020 election.  For example, Georgia law requires that absentee ballots be tabulated no earlier than 7 a.m. on Election Day.  O.C.G.A. § 21-2-386(a)(5).  It also requires that voters be given until three days after the election to cure their rejected ballot. O.C.G.A. § 21-2-417(b) (giving provisional ballot voters three days to provide voter ID if they were unable to provide it at the polls); O.C.G.A. § 21-2-386(a)(1)(C) (giving absentee ballot voters three days to correct or address a rejected ballot).

110.   Still, despite a dearth of evidence, accusations of fraud around the absentee voting process and the tabulation of votes circulated widely.

111.   In the wake of the November 2020 general election, the country witnessed an unprecedented campaign to overturn the results of a presidential election.  Many of these exceptional events were focused on Georgia.

112.   On December 2, 2020, lawyers behind several lawsuits seeking to overturn presidential election results in multiple states hosted a press conference at a "Stop the Steal" event in Alpharetta, Georgia.  They reiterated unfounded claims of voter fraud, called on Georgia Governor Brian Kemp to be locked up, and encouraged voters to boycott the January runoff unless the Governor called a special session to change the State's election laws and procedures in response to their claims of an allegedly rigged election.

113.   A number of lawmakers in the Georgia Senate, who subsequently helped draft, promote, and pass SB 202, issued a statement in support of an unsuccessful lawsuit brought by the State of Texas asking the United States Supreme Court to overturn Georgia's election results.

114.   Misinformation resulted in threats to election workers.  In late November, an election recount observer recorded a Dominion Voting Systems employee in Gwinnett County and alleged that the employee, who is a racial minority, was manipulating votes.  A GIF with a slow-swinging noose aimed at the worker was later created and death threats were made against the election worker.

115.   State and local election officials in Georgia consistently debunked allegations of widespread fraud and conducted two statewide recounts pursuant to state law:  one initiated by the Secretary of State because of the closeness of the vote tallies in the presidential race, and a second done at the request of one of the presidential campaigns.

116.   Neither recount changed the outcome, and on December 7, the Secretary of State recertified the final 2020 presidential results.  The Secretary dismissed continuing concerns of fraud because "the evidence, the actual evidence, [and] the facts tell us a different story."[3]

117.   A barrage of lawsuits alleging voter fraud were brought and, although nearly all of the lawsuits were dropped, dismissed, or settled out-of-court, the issues raised in them became blueprints for the proposed election changes in the Georgia General Assembly's 2021-2022 Legislative Session.  These lawsuits often included allegations focused on counties containing significant numbers of Black voters and other voters of color.

118.   Some of the same attorneys involved in the lawsuits testified at state legislative committee hearings about election legislation that would eventually find

---

[3] *Georgia Secretary of State Update on 2020 Election Results*, C-Span (Dec. 7, 2020), https://www.c-span.org/video/?507078-1/georgia-final-2020-presidential-recount-results.

its way into SB 202.  In particular, during a state Senate Judiciary subcommittee

hearing in early December 2020, lawyers replayed misleading video footage of

mostly Black Fulton County election workers tabulating ballots, alleging that the

video contained evidence of voter fraud, although these allegations had already

been debunked by the Secretary of State's office.  The lawyers also presented

individuals who alleged, among other things, that absentee ballots had been cast

fraudulently.  At least one member of the Senate Ethics Committee, the committee

to which many of the election bills in the then-upcoming 2021-2022 Legislative

Session were later referred, attended that hearing.

119.   In an April 2021 CNN Interview, Lt. Governor Geoff Duncan

acknowledged that the momentum for SB 202 was fueled by the very

misinformation sowed in those committee hearings.

**Legislative History and Enactment of SB 202**

120.   On January 11, 2021, six days after the runoff election, Georgia's

2021-2022 Legislative Session began.  The Session lasted for 40 legislative days,

during which nearly 80 election-related bills were introduced and considered.

121.   Election-related bills had traditionally been referred to the House

Governmental Affairs Committee, but on January 7, Georgia House Speaker David

Ralston announced a stand-alone, special committee on election integrity in

Georgia.  The House referred its election bills to this special committee, chaired by Representative Barry Fleming.

122.   Rep. Fleming had already made his intentions for new election legislation clear in a November 15, 2020, op-ed for the Augusta Chronicle, in which he compared the "always-suspect absentee balloting process," to the "shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant."[4]

123.   On February 17, 2021, SB 202 was introduced in the Senate with no Black sponsors.  The bill was three pages.

124.   On March 3, 2021, the Senate Ethics Committee held a hearing on the three-page version of SB 202.  Chairman Max Burns introduced it as a "straightforward bill" to address confusion resulting from multiple absentee ballot applications being sent to voters.

125.   SB 202 passed favorably out of the Committee on March 3.  On March 8, the Senate passed the three-page version of SB 202 with minimal floor debate.  It passed along party lines with no support from Black legislators.

---

[4] Barry Fleming, *Guest Column: Republican Party wins on Election Day, and future is bright*, The Augusta Chronicle (Nov. 15, 2020), https://www.augustachronicle.com/story/opinion/columns/guest/2020/11/15/guest-column-republican-party-wins-on-election-day-and-future-is-bright/43155971/.

126.   On March 17, Chairman Fleming introduced a substitute version of SB 202 at a hearing of the House Special Committee on Election Integrity.  The now 90-page bill included numerous sections from other elections bills.

127.   Rep. Burnough, a Black representative from Clayton County, said that she had not received the omnibus version of the bill until one hour before the hearing.  She also noted that Senator Burns, who sponsored the original version of SB 202, did not testify about any of the changes, as is customary for a bill substitute.

128.   Witnesses had minimal time to read and comment on the new version of SB 202 prior to the hearing.

129.   The Special Committee on Election Integrity met again the following day, March 18.  Rep. Burnough confirmed that the omnibus version of SB 202 was still not publicly available on the General Assembly's website.

130.   At this committee meeting, proponents of the bill alleged that absentee voting needed to be more secure.  Rep. Chuck Martin, a white representative from Fulton County, remarked that absentee voting is "the portion of the voting process that is most open to foolishness."

131.   Most witnesses criticized the bill, citing, among other things, the bill's harmful impacts on voters of color.  Tonnie Adams, Heard County Elections

Supervisor and Legislative Committee Chairman for the Georgia Election Officials Association, contended that SB 202's restrictions rendered drop boxes useless.

132.   Witnesses also expressed concern with procedural issues, including that the bill lacked a fiscal note and was not posted online, and that it was difficult to obtain permission to testify remotely.

133.   The House Special Committee met again on March 22 to discuss some amendments to the bill, and within an hour, the Committee voted favorably on its 90-page substitute to the original three-page SB 202.

134.   Numerous legislators continued to voice concerns about the bill.  Rep. Kimberly Alexander inquired about the lack of a fiscal note, a legislative item traditionally attached to an omnibus bill.

135.   Rep. Burnough objected to the cap on the number of drop boxes a county may use, predicting that it would particularly hurt Fulton County, leading to long lines and reduced voting access.

136.   The subsequent House floor debate, held on March 25, lasted less than two hours.  Supporters insisted that the bill would restore integrity to the vote, while opponents noted that it would suppress the Black vote and that the voter fraud concerns were pretextual.

137.   Representatives also expressed process concerns.  Rep. Alexander reminded the House that officials from the Association of County Commissioners of Georgia ("ACCG") testified that more time was needed to understand the fiscal and logistical impacts.  Rep. Debbie Buckner expressed concern that the legislative process had been so swift, and the bill had contained so many changes, "the House website couldn't even keep up."

138.   Once again, legislators voted along party lines and the omnibus version of SB 202 moved to the Senate that same day.  No Black representative voted for the bill.

139.   The Senate floor debate began with a discussion over the lack of a fiscal note.  Lt. Governor Duncan eventually ruled that a fiscal note was not required, despite Senator Elena Parent pointing specifically to O.C.G.A. §§ 28-5-42 and 28-5-49 as requiring its inclusion because the bill clearly required certain State and county expenditures.

140.   Once again, legislators passed SB 202 along party lines, and no Black senator voted for the bill.

141.   Governor Kemp signed SB 202 later that same day, behind closed doors and before a group of supporters that did not include any people of color.

When Rep. Park Cannon, who is Black, attempted to witness the signing, she was arrested.

**Passage of SB 202 was Motivated by Discriminatory Purpose**

142.   SB 202 was enacted with the purpose of denying or abridging the right of Black Georgians to vote on account of their race or color.

143.   Against a history of voting discrimination in Georgia, demographic shifts in the voting population and changes in Black voters' participation and mobilization, and Black Georgians' unprecedented successes in electing representatives of choice, Georgia enacted SB 202 because of the impact that numerous provisions, both singularly and together, would have on Black voters' ability to participate in the political process on an equal basis with white voters.

144.   As outlined previously in this Complaint, race continues to be a significant and, oftentimes, decisive factor in the State of Georgia's electoral process in that:

(a).   Georgia's history of voting-related discrimination against Black voters is long-standing, well-documented, and judicially recognized;

(b).   Georgia elections are marked by pervasive racially polarized voting;

(c).   Georgia has used voting practices or procedures that enhance the opportunity for discrimination against Black voters;

(d). Black Georgians continue to suffer the effects of official discrimination, including a history of discrimination in voting-related activities. The continued effects of discrimination, including Black Georgians' markedly lower socioeconomic conditions relative to white citizens, hinder their ability to participate effectively in the political process;

(e). Racial appeals have characterized a number of political campaigns in Georgia, including during the 2020 election cycle, which was immediately followed by the passage of SB 202; and

(f). Many elected officials in Georgia have not been responsive to the particularized needs of Black residents.

145. The lack of evidence of voter fraud in the 2020 election cycle and numerous statements from the Secretary of State's office debunking voter fraud claims undermine the justifications proffered by proponents of SB 202, providing evidence that the proffered rationales for the bill's provisions are pretextual.

146. The impact of the challenged provisions, both individually and collectively, will weigh more heavily on Black voters.

147.   In enacting SB 202, members of the Georgia legislature knowingly targeted practices on which Black voters relied disproportionately in order to impede Black voters' emerging political strength.

148.   The first four challenged provisions—which prohibit government entities from distributing unsolicited absentee ballot applications, require voters without a DDS-issued ID to copy another form of ID when they request an absentee ballot, shorten the window to request an absentee ballot, and limit the use of absentee ballot drop boxes—each make, and are intended to make, absentee voting incrementally more burdensome and less accessible.

149.   Together, these four provisions introduce new impediments at every step of the absentee voting process: obtaining an application, completing and timely submitting the application, and timely returning a completed absentee ballot.

150.   The General Assembly adopted these changes after Black voters began disproportionately using absentee voting, and Black voters will be disproportionately impacted by each of these new obstacles.

151.   In addition, Black voters had been more likely than white voters to submit absentee ballot applications closer to Election Day, including during the final week of the request period, which SB 202 eliminates.

- 38 -

152.   Because Black voters are less likely than white voters to have a DDS-issued identification number associated with their voter record, they will be disproportionately burdened by the obligation to include a copy of an alternative identification when requesting an absentee ballot, particularly as the legislature chose not to permit voters to use the last four digits of their Social Security number when making requests for absentee ballots.

153.   In recent elections, Black voters have also been more likely than white voters to have an absentee ballot rejected because it arrived late.

154.   By reducing access to absentee voting at each step of the process—curtailing access to absentee ballot applications, imposing an early deadline and new identification requirement for requesting absentee ballots, and limiting access to drop boxes for timely return of completed ballots—SB 202 will push more Black voters to in-person voting, where they will be more likely than white voters to confront long lines, and where SB 202 imposes additional impediments to casting a ballot by banning the distribution of food and water to voters waiting in long lines and prohibiting the counting of most out-of-precinct provisional ballots.

155.   Because of socioeconomic conditions linked to past and present race discrimination, these additional burdens will weigh more heavily on Black voters. For example, because they are more likely to live in poverty and less likely to have

internet access than white Georgians, Black Georgians have less access to online methods for requesting an absentee ballot. Because Black Georgians are less likely than white Georgians to have access to a vehicle, traveling to a registrar's office to obtain an application in person is also more burdensome.

156.   For similar reasons, traveling to the correct precinct after waiting in line at an incorrect precinct, or accessing one of the few drop boxes remaining in metro-Atlanta counties under SB 202, will be disproportionately burdensome for Black voters.

157.   Thus, SB 202's provisions curbing access to absentee voting and making it more difficult to successfully cast a ballot in person will interact with historical and ongoing discrimination to disproportionately impair Black voters' opportunity to participate in the political process.

158.   All of the challenged provisions will have a cumulative negative effect on the ability of Black Georgians to participate in the political process.

159.   The General Assembly voted to enact SB 202 with the knowledge of Georgia's history of voting discrimination against Black citizens and socioeconomic disparities experienced by Black citizens.

160.   The sequence of events leading to the enactment of SB 202 provides additional evidence that legislators were motivated, at least in part, by a desire to impede Black voters' ability to participate in the political process.

161.   In the years preceding SB 202, the Black proportion of the State's population grew steadily, and the white share of the electorate fell.  Black voters became disproportionately likely to vote via absentee ballot compared to white voters, and Black-led mobilization efforts received prominent press coverage.  This culminated in 2020 with Black Georgians achieving historic successes in electing their representatives of choice, including helping to elect the country's first Black Vice President and electing the State's first Black U.S. Senator—each time defeating the candidate preferred by a majority of white voters.

162.   White legislators who supported SB 202 were aware of these trends as they were happening.

163.   In response to proliferating claims of voter fraud, two statewide recounts confirmed the November presidential election results, the Secretary of State's office debunked voter fraud claims in no uncertain terms, and numerous lawsuits alleging voter fraud were dismissed or rejected by both federal and state courts.  Nonetheless, white state legislators persistently relied on these debunked allegations of voter fraud to justify their enactment of SB 202, even after being

warned by other legislators about the disproportionately negative effects the bill would have on Black Georgians' ability to cast ballots.

164.   Despite the significance of the changes to existing election laws contained in SB 202, the House Special Committee on Election Integrity began debate on the new, 90-page omnibus version of the bill before it was publicly available on the General Assembly's website and over the objection of witnesses who had not been given the opportunity to review the bill prior to testifying.  One representative on the committee said that she had not received the omnibus version until just an hour before the hearing.  The Special Committee passed SB 202 five days later.

165.   This timeline severely limited opportunities for consideration and comment by interested members of the public.

166.   The legislative history of SB 202 indicates that the Georgia General Assembly departed from its normal procedural practice in passing the bill. Consideration of all election bills was stripped from the usual standing House committee and given instead to a Special Committee set up for that purpose, chaired by a representative who publicly recognized his goal of making absentee voting harder.  The Special Committee accepted from the Senate a three-page bill about duplicate absentee ballot applications and turned it into a 90-page omnibus

bill, with minimal notice to either the public or other representatives.  The bill's original sponsor did not present the significant changes in the bill substitute to the Special Committee.  Despite several questions regarding the lack of a fiscal note, the inevitable state and county expenditures that the bill would necessitate, and state law provisions requiring fiscal notes for such expenditures, legislators declined to include a fiscal note with the omnibus bill.

167.   In the absence of relief under Sections 3(a) and (c) of the Voting Rights Act, 52 U.S.C. § 10302(a) & (c), providing for the assignment of federal observers and court-ordered preclearance, Georgia will continue to violate the voting guarantees of the Fourteenth and Fifteenth Amendments in the future.

## CAUSE OF ACTION

## Violation of Equal Protection

## U.S. Constitution, Amendment XIV (Intentional Race Discrimination)

168.   The United States re-alleges and incorporates by reference the allegations set forth in all prior paragraphs of this Complaint.

169.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits state and local governments from denying to any person within their jurisdiction the equal protection of the laws.

170.   The challenged provisions of SB 202 were adopted with the purpose of hindering Black voters' opportunity to participate in the political process on an equal basis with white voters, in violation of the Equal Protection Clause.  These provisions include the following:

(a).   the ban on government entities mailing unsolicited absentee ballot request forms to voters (Section 25);

(b).   the requirement that voters who do not have a DDS-issued ID number associated with their voter registration record provide a copy of another form of ID in order to request an absentee ballot and are not permitted to use the last four digits of their Social Security number to verify their identity for such requests (Section 25);

(c).   the new deadline for requesting absentee ballots 11 days before Election Day (Section 25);

(d).   the cutback in the number of drop boxes permitted and the prohibition on using drop boxes after hours and in the days leading up to the election (Section 26);

(e).   the ban on groups providing food and water in a non-partisan way to voters facing long lines at the polls (Section 33); and

(f).    the prohibition on counting most out-of-precinct provisional ballots

(Section 34).

171.   Due to disparities in social and economic conditions caused by

historical and ongoing discrimination, including higher rates of poverty and

unemployment, lower educational attainment, and less access to the internet and

transportation, Black voters will be disproportionately burdened by the challenged

provisions of SB 202.

172.   For example, Black voters in Georgia have disproportionately voted

by absentee ballot in recent elections, but SB 202 makes absentee voting less

accessible by erecting new hurdles at every step of the process.  Together, these

obstacles will push Black voters toward in-person voting, where they will be more

likely than white voters to confront long lines, and where, because of SB 202, they

will face additional impediments to successfully casting a ballot that will be

counted.

173.   Further, the Georgia legislators knew from debate within the General

Assembly and witness testimony at hearings that SB 202 would harm Black voters,

yet it rushed through a hasty process to pass SB 202 while relying on debunked

and pretextual claims of voter fraud as a rationale.

174.   Unless enjoined by order of this Court, Defendants will continue to violate the Equal Protection Clause by implementing and enforcing the challenged provisions of SB 202.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that this Court enter an order:

(1)   Declaring that challenged provisions of SB 202 (including the relevant portions of Sections 25, 26, 33, and 34) are illegal and unconstitutional as described above in violation of the Fourteenth Amendment to the United States Constitution;

(2)   Enjoining the Defendants, their agents and successors in office, and all persons acting in concert with them, from enforcing the requirements of the challenged provisions of SB 202 (including the relevant portions of Sections 25, 26, 33, and 34), and enjoining Defendants and their agents and successors in office from excessively limiting the number of absentee ballot drop boxes and prohibiting their availability after hours and in the days leading up to the election;

(3)   Authorizing the appointment of Federal observers, pursuant to

Section 3(a) of the Voting Rights Act, 52 U.S.C. § 10302(a), to observe

elections in Georgia;

(4)   Retaining jurisdiction and requiring certain new voting changes

for Georgia be subject to a preclearance requirement pursuant to Section

3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c); and

(5)   Ordering such additional relief as the interests of justice may

require, together with the costs and disbursements in maintaining this

action.

Dated: February 6, 2024                    Respectfully submitted,


RYAN K. BUCHANAN                    KRISTEN CLARKE
United States Attorney                    Assistant Attorney General
Northern District of Georgia
                                                          SPARKLE SOOKNANAN
*/s/ Aileen Bell Hughes*                    Principal Deputy Assistant Attorney
AILEEN BELL HUGHES                         General
Georgia Bar No. 375505                    Civil Rights Division
Assistant U.S. Attorney
Office of the United States Attorney    */s/ Elizabeth M. Ryan*
600 U.S. Courthouse                    ALBERTO RUISANCHEZ
75 Ted Turner Drive, SW                JOHN A. RUSS IV
Atlanta, GA 30303                     JASMYN G. RICHARDSON
Phone: (404) 581-6000                 RACHEL R. EVANS
Fax: (404) 581-6181                    ERNEST A. MCFARLAND
                                                          MAURA EILEEN O'CONNOR

ELIZABETH M. RYAN
SEJAL JHAVERI
J. ERIC RICH
JUDY BAO
BRIAN REMLINGER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
elizabeth.ryan@usdoj.gov