**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

SIXTH DISTRICT OF THE
AFRICAN METHODIST
EPISCOPAL CHURCH, a Georgia
nonprofit organization, GEORGIA
MUSLIM VOTER PROJECT, a
Georgia nonprofit organization,
WOMEN WATCH AFRIKA, a
Georgia nonprofit organization,
LATINO COMMUNITY FUND
GEORGIA, a Georgia nonprofit
organization, DELTA SIGMA THETA
SORORITY, INC., a Washington D.C.
nonprofit organization on behalf of
7000+ Sorors residing in Georgia, THE
ARC OF THE UNITED STATES, a
Washington D.C. nonprofit
organization, GEORGIA ADAPT, a
Georgia nonprofit organization,
GEORGIA ADVOCACY OFFICE, a
Georgia nonprofit organization,

       Plaintiffs,

v.

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity,
BRAD RAFFENSPERGER, Secretary
of State of Georgia, in his official
capacity, GEORGIA STATE
ELECTION BOARD, JOHN
FERVIER, Chairman, MATTHEW
MASHBURN, SARA TINDALL
GHAZAL, EDWARD LINDSEY, and
DR. JANICE W. JOHNSTON,
Members of the Georgia State Election
Board, in their official capacities,
FULTON COUNTY REGISTRATION

CIVIL ACTION NO. 1:21-CV-01284-
JPB


**SECOND AMENDED
COMPLAINT**

AND ELECTIONS BOARD, AARON
V. JOHNSON, MICHAEL HEEKIN,
and TERESA K. CRAWFORD,
Members of the Fulton County
Registration and Elections Board, in
their official capacities, PATRISE
PERKINS-HOOKER, Chairwoman of
the Fulton County Registrations and
Elections board, in her official
capacity, DEKALB COUNTY
BOARD OF REGISTRATIONS AND
ELECTIONS, ANTHONY LEWIS,
SUSAN MOTTER, VASU
ABHIRAMAN, NANCY JESTER, and
KARLI SWIFT, Members of the
DeKalb County Board of Registrations
and Elections, in their official
capacities, GWINNETT COUNTY
BOARD OF REGISTRATIONS AND
ELECTIONS, ALICE O'LENICK,
LORETTA MIRANDOLA, DAVID
HANCOCK, and ANTHONY
RODRIQUEZ, Members of the
Gwinnett County Board of
Registrations and Elections, in their
official capacities, ZACH
MANIFOLD, Elections Supervisor of
the Gwinnett County Board of
Registrations and Elections, in his
official capacity, COBB COUNTY
BOARD OF ELECTIONS AND
REGISTRATION, JENNIFER
MOSBACHER, DEBBIE FISHER,
STACY EFRAT, and STEVEN F.
BRUNING, Members of the Cobb
County Board of Elections and
Registration, in their official capacities,
TORI SILAS, Chairwoman of the
Cobb County Board of Elections and
Registration, in her official capacity,

HALL COUNTY BOARD OF
ELECTIONS AND REGISTRATION,
DAVID KENNEDY, KEN
COCHRAN, JACK NOA, JOHNNY
VARNER, and GALA SHEATS,
Members of the Hall County Board of
Elections and Registration, in their
official capacities, LORI WURTZ,
Director of Hall County Elections, in
her official capacity, CLAYTON
COUNTY BOARD OF ELECTIONS
AND REGISTRATION, DARLENE
JOHNSON, ARVIS WALKER,
CAROL WESLEY, DOROTHY F.
HALL, and DANNY HOPE, Members
of the Clayton County Board of
Elections and Registration, in their
official capacities, SHAUNA DOZIER,
Clayton County Elections Director, in
her official capacity, RICHMOND
COUNTY BOARD OF ELECTIONS,
TIM MCFALLS, SHERRY T.
BARNES, MARCIA BROWN, ISAAC
MCADAMS, and BETTY REECE,
Members of the Richmond County
Board of Elections, in their official
capacities, TRAVIS DOSS, JR.,
Richmond County Elections Director,
in his official capacity, BIBB
COUNTY BOARD OF ELECTIONS,
JOEL HAZARD, MIKE KAPLAN,
KAREN EVANS-DANIEL, ROBERT
ABBOTT, and THOMAS
ELLINGTON, Members of the Bibb
County Board of Elections, in their
official capacities, and THOMAS
GILLON, Bibb County Elections
Supervisor, in his official capacity,
BIBB COUNTY BOARD OF
REGISTRARS, VERONICA SEALS,

Bibb County Chief Registrar, in her
official capacity, CHATHAM COUNTY
BOARD OF ELECTIONS, THOMAS J.
MAHONEY, MALINDA HODGE,
MARIANNE HEIMES, and ANTAN
LANG, Members of Chatham County
Board of Elections, in their official
capacities, CHATHAM COUNTY
BOARD OF REGISTRARS, COLIN
MCRAE, WANDA ANDREWS,
WILLIAM L. NORSE, KATHERINE
DURSO, and DEBRA GEIGER,
Members of the Chatham County Board
of Registrars, in their official capacities,
CLARKE COUNTY BOARD OF
ELECTION AND VOTER
REGISTRATION, WILLA JEAN
FAMBROUGH, HUNAID QADIR,
ANN TILL, ROCKY RAFFLE, and
ADAM SHIRLEY, Members of the
Clarke County Board of Election and
Voter Registration, in their official
capacities, CHARLOTTE SOSEBEE,
Clarke County Board of Election and
Voter Registration Director, in her
official capacity, COLUMBIA
COUNTY BOARD OF ELECTIONS,
ANN CUSHMAN, WANDA DUFFIE,
and LARRY WIGGINS, Members of the
Columbia County Board of Elections, in
their official capacities, COLUMBIA
COUNTY BOARD OF REGISTRARS,
NANCY L. GAY, Columbia County
Chief Registrar, in her official capacity,

Defendants.

**INTRODUCTION**

1.      As the United States Supreme Court has explained, the right to vote is "a fundamental matter in a free and democratic society." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).  "No right," the Court has held, "is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  That is because voting is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

2.      The full promise of the right to vote, however, remains elusive for Black voters, other voters of color, people with disabilities, and especially for voters of color with disabilities.  These marginalized groups face both intentional and targeted discrimination on the basis of race, as well as the thoughtless, "benign neglect" forms of discrimination most commonly experienced by people with disabilities.

3.      A central lesson of our democracy is that the right to vote is powerful—but voter access, like democracy itself, can be fragile and must be guarded with vigilance.

4.      Senate Bill 202 ("S.B. 202") is the latest iteration of Georgia's ongoing record of racial discrimination in voting, following the centuries-long and ongoing efforts by Georgia elected officials and legislators to curtail, severely burden, and restrict ballot access for voters of color.  Whether this outcome is

intentional or not, provisions in S.B. 202 will also illegally restrict the voting rights of people with disabilities.

5.     Publicly available data reflects that for more than two decades, Georgia has experienced a significant demographic change, and Georgia may become a state comprised of a majority of people of color ("majority-minority") by 2030.  Because of this shift, voters of color—particularly Black voters—currently and will continue to make up a larger portion of Georgia's electorate.  Black eligible voters, for example, account for nearly half (48%) of Georgia's 1.9 million-person growth in the electorate since 2000.  And since 2016, Black voter registration has increased by 25%, the largest increase among racial or ethnic eligible voter demographic groups.  In the metro-Atlanta county of Gwinnett, for example, the voting-age population has shifted from majority white to majority-minority.

6.     But consistent with Georgia's history, legislators and other elected officials have responded to these recent racial demographic shifts with unrelenting efforts to suppress the political participation of people of color.  Since the Supreme Court's 2013 decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), which eliminated the federal preclearance requirements of the Voting Rights Act of 1965 ("VRA"), these efforts have intensified and Georgia legislators have devised a myriad of changes to state election laws.  In fact, of the states previously covered by the preclearance requirement, Georgia is the only state that has enacted voting

restrictions across five major categories studied by the U.S. Commission on Civil Rights:  voter identification ("ID") requirements, documentary proof of citizenship requirements, voter purges, cuts to early voting, and polling place closures or relocations.  These barriers have made voting materially more difficult for historically disenfranchised communities, including people of color as well as voters with disabilities, older voters, students, and poor voters.

7.     Despite these barriers, however, more than 5 million Georgians exercised the right to vote in the 2020 General Election ("General Election").  Nearly 4.5 million did so again in the 2021 Runoff Elections ("Runoff Elections") for two seats in the United States Senate.  A record number of votes were cast in both elections.

8.     Consistent with recent patterns, voters of color—in particular Black voters—made their voices heard in the General Election and Runoff Elections.  And while Black turnout has dropped in previous special elections, Black voters turned out in historic numbers in the Runoff Elections; Black turnout in the Runoff Elections was almost 92% of that in the General Election, a higher percentage than for white voters.

9.     People with disabilities also turned out to vote in the 2020 General Election and Runoff Elections at higher rates than in past elections.  Disability voter turnout in Georgia increased from 57.8% in the 2016 general election to 62.8% in the General Election.

10.     This record participation is all the more remarkable given that it occurred in two elections that took place in the middle of a global pandemic—a pandemic that has disproportionately harmed people of color and people with disabilities.

11.     The COVID-19 pandemic was not the only challenge facing voters of color this past election cycle.  In both the General Election and the Runoff Elections, historically disenfranchised and other voters overcame substantial barriers, in part due to the efforts of Plaintiffs and other organizations that expended efforts and resources to ensure that Georgians could cast their lawful vote using voting methods that have been in place for decades and across multiple elections.

12.     Countless Black Georgians—including those who have disabilities— waited for hours in needlessly long lines, where they were comforted and sustained by free water and refreshments offered by an array of civic and religious organizations, including parishioners of Plaintiff Sixth District of the African Methodist Episcopal Church ("AME Church"), sorors of Plaintiff Delta Sigma Theta Sorority, Inc. ("the Deltas"), and volunteers of Plaintiffs The Arc of the United States ("The Arc") and Georgia ADAPT.

13.     Other Georgians, who could not wait in long lines because of a disability, or because they work long days and multiple jobs and could not wait in such lines, returned their ballots to secure, video-monitored drop boxes—an option

they learned about from Plaintiff Georgia Muslim Voter Project ("GAMVP"), the Deltas, and other Plaintiff organizations.

14.     People with disabilities—hoping to avoid long lines, but still vote in person—showed up at advance voting locations, often with transportation support from Plaintiffs Georgia ADAPT and The Arc of Georgia.  Still others, such as the young immigrant women and other Georgians who receive support from Plaintiffs Women Watch Afrika ("WWA") and the Deltas, took advantage of early voting, eager and proud to cast a lawful ballot in their new country.

15.     Many Spanish-speaking Latinx[1] Georgians, meanwhile, were able to confidently cast absentee ballots after receiving in-language voter education materials from Plaintiff Latino Community Fund Georgia ("LCF Georgia").

16.     Plaintiffs Georgia Advocacy Office ("GAO") and The Arc of Georgia provided absentee ballot applications to nursing home residents and other people with disabilities who find it difficult or impossible to go to the polls to vote.  In turn, many of these people with disabilities, including nursing home residents, needed—and received—assistance in returning both the application for the absentee ballot, and the absentee ballot itself.

17.     In both the General Election and Runoff Elections, individuals across the State of Georgia—from Columbus to Augusta, from Valdosta to Blairsville,

---

[1] The term "Latinx" is a non-gender-binary term that refers to people of Latin American origin or descent.

from Atlanta to Macon, and everywhere in between—cast votes using a host of lawful means. They voted in person, during early voting and on Election Day; they voted by mail, returning absentee ballots to secure drop boxes and to the United States Postal Service; and some, in Fulton County, Georgia's most populous county, voted in mobile voting units.

18.    The General Election and Runoff Elections in Georgia were celebrated not only because of record participation (as well as the election of the first Black Senator and first Jewish Senator from Georgia), but also because of their integrity. The losing presidential candidate and his allies launched an unsubstantiated attack on the integrity of the election and sought to reverse its results, claiming that it was beset by fraud. But each of the baseless allegations underlying this attack was rebuked, both by judges and by Georgia's own state and local election officials. Defendant Secretary of State affirmed that the election was "secure, reliable, and efficient." Indeed, his office conducted a comprehensive audit and investigation of the claims of wrongdoing, which showed, as Defendant Secretary wrote to Congress, "that there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia," and that they were not "seeing anything out of the ordinary scope of regular post-election issues." Defendant Governor has disputed unsubstantiated claims of election fraud in Georgia, calling those conspiracy theories "simply a distraction." The Lieutenant Governor also pushed back against the "amount of misinformation that continues

to fly around."  Specifically, he explained that he was troubled that "some folks are willing, just for the sole intent of flipping an election, of spreading misinformation."  The Georgia Voting Systems Manager also refuted allegations and conspiracy theories of election fraud, stating that "[e]verybody's vote did count [in November]."

19.    In short, in a safe and secure election, a record number of Georgians—in particular, those of color—performed democracy's most vital act: they voted.

20.    Then, in response to the historic and increasing political participation of voters of color, on March 25, 2021, the Georgia General Assembly and Defendant Governor made that most vital act more difficult.

21.    Increased voter turnout, celebrated by many, is too often taken by some, including Georgia's legislature, as invitation to devise new or recycled ways to constrict access to the ballot.

22.    With no valid justification—and with little opportunity for any, let alone meaningful, public input and review—the Georgia General Assembly enacted S.B. 202, a sweeping series of provisions that makes it harder, if not impossible, for certain Georgians, including historically disenfranchised groups, to vote.  These provisions—purported solutions in search of a problem—include:  (a) an unnecessary restriction on the use of mobile voting units; (b) new and burdensome ID requirements that force voters to provide ID or other sensitive

personal information each time they request an application for an absentee ballot and each time they cast an absentee ballot ("ID Requirements"); (c) a delayed and compressed time period for requesting absentee ballots; (d) limitations on the use of secure drop boxes as a means of returning absentee ballots; (e) a drastic reduction in early voting in runoff elections; (f) a cruel and inhumane ban—with criminal penalties—on anyone who provides free food and water or other assistance and relief to Georgians as they wait in line to vote ("Line Relief Ban"); (g) the complete disenfranchisement of some voters who cast out-of-precinct, but in-county provisional ballots ("in-county provisional ballots"); and (h) the restriction, enforced by criminal penalties, of who is allowed to assist people in submitting an application for an absentee ballot and in submitting the absentee ballot itself.

23.    These provisions will affect and severely burden all Georgia voters. But consistent with Georgia's long and ongoing record of racial discrimination, the harms will be disproportionately felt by voters of color, especially Black voters. These historically disenfranchised voters lack IDs or will be severely burdened in obtaining access to them; they use early and weekend voting, especially on Sundays, when Plaintiff AME Church and other churches encourage voting through "Souls to the Polls" events; they require access to secure drop boxes; they rely on water and other relief to withstand the long lines they disproportionately wait in to vote; and they are more likely to move and cast provisional ballots.

24.     Voters with disabilities have received scant attention in Georgia's battles over voting rights.  But each of the voting restrictions imposed by S.B. 202 also restricts access for and discriminates against people with disabilities.  Georgia voters with disabilities are less likely to drive, and more likely to rely on others to get to the polls.  They are also the least likely to be able to withstand long lines at the polling place.  As a result, they rely most heavily on early voting and absentee voting in order to cast a ballot.  In 2016, 68.2% of disabled voters either voted by mail or voted early.  Only 31.8% went to the polls on Election Day.  In 2020, the numbers are even more stark.  While 88.1% of voters with disabilities went to the polling place early or voted by mail in the General Election, only 11.9% braved the lines to vote at a polling place on Election Day itself.

25.     Each of S.B. 202's challenged provisions independently makes it more difficult, if not impossible, for historically disenfranchised communities to vote.  Cumulatively, however, the burden is even more severe—by restricting absentee voting, limiting the availability of drop boxes, restricting the use of mobile voting units, and shortening advance voting for federal runoff elections, S.B. 202 will force more voters to the polls on Election Day.  For some Georgians, this may be simply a manageable—though unnecessary—inconvenience.  But for voters of color and other historically disenfranchised communities—who *already* endure disproportionately longer lines than white voters—the challenges created by long lines could be determinative.  For voters with inflexible jobs, limited

access to transportation, and caregiving responsibilities, long lines present a potentially insurmountable obstacle.  For many voters with disabilities, who cannot stand in lines for long periods (or who need supports to do so), who face greater transportation barriers to get to the polls, or who face architectural access barriers once they get there and require assistance from others to vote, the extra burdens and "inconveniences" are not just significant, but discriminatory, denying access to the electoral process.  And rather than receive a simple bottle of water while waiting in an even longer line, those voters may now be forced to wait without assistance for hours, and those who seek to alleviate voters' exhaustion by providing a seat, water, or other refreshments risk criminal prosecution.

26.     This severe burden is not an accident.  Nor is it legal.  S.B. 202's challenged provisions deny voters of color a full and equal opportunity to participate in the political process.  By design and as a result, these provisions—both on their own and in their aggregate effect—violate Section 2 of the VRA and the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

27.     S.B. 202's challenged provisions further violate the right to vote of *all* Georgia voters, as protected by the First and Fourteenth Amendments to the United States Constitution.

28.     S.B. 202's Line Relief Ban violates another of Georgians' constitutional rights:  their right to political speech and expression, as protected by

the First Amendment.  Through providing water and other resources, Plaintiffs AME Church, the Deltas, and others throughout Georgia engage in "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).  This is protected speech under the First Amendment, and S.B. 202's attempt to restrict that speech—via the imposition of criminal penalties—is unconstitutional.

29.     S.B. 202's challenged provisions also violate the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") by denying Georgians with disabilities a full and equal opportunity to participate in the State's voting programs.  The ADA is a landmark civil rights legislation meant to address centuries of discrimination against people with disabilities that persists in all spheres of public life.  Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and to integrate them into the economic and social mainstream of society.  The ADA, which was based on Section 504 and imposes nearly identical legal obligations on covered entities, does not address only discrimination based on outright animus, but broadly prohibits anything that unnecessarily denies individuals with disabilities an equal opportunity to benefit from or participate in a government program, service, or activity (among other provisions).  Indeed, the ADA's implementing regulations

prohibit eligibility criteria that screen out, or tend to screen out, people with disabilities as well as "methods of administration" that have the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."

30.     S.B. 202 imposes eligibility criteria that will tend to screen out people with disabilities.  For example, it imposes additional, unnecessary, and burdensome requirements to apply for and submit an absentee ballot.  S.B. 202 also imposes methods of administration that defeat the objectives of the absentee and in-person voting programs.  For example, it restricts drop box locations and times and imposes criminal penalties for providing unauthorized assistance to individuals with disabilities in returning an absentee ballot.

31.     For each of these reasons, S.B. 202's challenged provisions violate federal law and the United States Constitution.  But the harm extends even further: these provisions are an attack on democracy itself.  Voting is our most sacred right as citizens.  "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 17.  With the enactment of S.B. 202, the State of Georgia has undermined that right, especially for voters of color.  That enactment must be enjoined.

## PARTIES

### Plaintiffs

32.     Plaintiff AME Church is a nonprofit religious organization.  As the Sixth District of the national AME Church, AME Church covers all of Georgia. The national AME Church traces its roots to 1816 as the first independent Protestant denomination founded by Black people in response to segregation and discrimination in the Methodist Episcopal Church.  Today, there are more than 500 membership-based churches that are part of the AME Church in Georgia, with 36 congregations and tens of thousands of members in Atlanta alone, a majority of whom are Black and many of whom are registered Georgia voters.

33.     The national AME Church has always placed a strong emphasis on social justice initiatives.  Many civil rights leaders and activists have been among its most prominent members, including the anti-lynching journalist Ida B. Wells-Barnett, and Oliver Brown, the AME minister who sued on behalf of his school-age daughter in the landmark Supreme Court case *Brown v. Board of Education*. Encouraging and supporting civic participation among its members is a core aspect of the AME Church's work.  Advocating for the right to vote, regardless of whom that vote is for, and encouraging the AME Church's eligible members to vote has been a priority of the church.  The civil rights march from Selma to Montgomery in Alabama was organized in and began at the steps of Brown Chapel AME Church in Selma.  After they were beaten by Alabama State Troopers on the

Edmund Pettus Bridge on "Bloody Sunday," the wounded marchers fled back to the sanctuary of Brown Chapel.  AME Church's activities in support of voter participation reflect this history.  Those activities are, and have always been, conducted on a nonpartisan basis.  During the Civil Rights Movement, AME member churches served as organizational centers for Black civil rights leaders. Today, AME Church continues to encourage civic participation by holding "Souls to the Polls" events to transport churchgoers to polling locations during advance voting periods, registering voters for elections, hosting "Get Out the Vote" ("GOTV") efforts to increase voter turnout, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations.  Prior to the General Election, AME Church approached Defendant Secretary to offer up every single one of its Georgia churches to serve as polling sites if needed.

34.    By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.  Moreover, S.B. 202 makes it substantially more difficult for AME Church to continue in its civic-engagement activities and further its mission.  AME Church will be forced to

divert much-needed and limited resources from its day-to-day activities to combat the suppressive effects of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes to the law; developing new training materials and public education documents; and reallocating resources during the crucial run-up to an election.  S.B. 202 will also require AME Church to divert time, money, and other resources away from its voter engagement activities, such as transporting voters to the polls and public outreach efforts to rural voters in Georgia, as well as away from other non-voting priorities that advance its social justice mission, such as its food bank programs. As a result, due to S.B. 202, AME Church is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

35.    Specifically, AME Church will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202, especially the new ID Requirements for casting absentee ballots.  In order to fund these new public education efforts, officials of AME Church will have to not only divert resources from other initiatives but also spend more time seeking grants and outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, AME Church will have less resources available to educate its members about other voting-related issues.  AME Church will also have less time, money, and other resources to coordinate, oversee,

manage, and plan for other GOTV efforts, such as transporting voters to the polls and engaging in outreach efforts for rural voters.

36.    Not only will AME Church have to educate its members about the new ID Requirements, it will also have to help members who do not have any S.B. 202-approved ID or documentation to obtain these materials for absentee ballot applications or for submission of the absentee ballot itself.  In some cases, this will require AME Church to transport members to a Georgia Department of Drivers Services office, transport them back to their residence, and help members photocopy documents required for applications and ballots.  These activities will also divert time, money, and resources away from other public education efforts.

37.    AME Church will also have to dedicate more time money, and other resources towards understanding the new legal requirements of S.B. 202, and how these requirements may impact AME Church's existing voter engagement efforts such as its activities supporting voters waiting in line.  AME Church anticipates that it may need to hire outside counsel to help better understand the legal requirements of S.B. 202.  This financial burden will mean that AME Church has less money for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

38.    AME Church will have to spend more time, money, and other resources on existing training programs provided to pastors at AME congregations across the State.  These training programs, which help pastors organize voter

engagement efforts for members, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities.  In addition, more training will need to be focused on the provisions of S.B. 202 and how they affect AME Church's voter engagement efforts.  Less time will be available to train pastors on other core civic and voter engagement work. Finally, AME Church anticipates that there will be more inquiries from pastors and members relating to S.B. 202, which will mean that AME Church will be able to devote less time to its other work.

39.     Provisions in S.B. 202 which compress the timeframe for voters to apply for absentee ballots and limit the availability of drop boxes will also force AME Church to divert resources from turnout and GOTV efforts in the critical period leading up to an election.  AME Church will have to devote time, money, and other resources in the weeks leading up to an election to assist voters in complying with absentee ballot requirements and transporting voters to drop boxes, which will be less accessible due to S.B. 202.  This will result in less time, money, and other resources available to AME Church for public education efforts and transportation to the polls.

40.     Plaintiff GAMVP is a nonpartisan, nonprofit organization whose mission is to activate and elevate the voices of Muslim voters in Georgia regardless of which candidates or issues they support.  GAMVP was founded in late 2015, in

response to the growing anti-Muslim rhetoric that was prevalent in mainstream politics and the low rates of civic engagement in the Muslim community.  Thus, voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities.  In light of the upcoming post-census redistricting cycle, GAMVP has and will continue to provide public education and training about the importance of the decennial census and its impact on redistricting, the allocation of funding, and policy-making.

41.     In furtherance of this mission, GAMVP holds voter registration drives, civic engagement workshops, voter education forums, and participates in GOTV efforts, including the provision of food and drink to voters waiting in line to cast a ballot, in Bibb, Chatham, Clarke, Cobb, Columbia, DeKalb, Fulton, Gwinnett, and Richmond Counties and is actively seeking to expand its efforts statewide.  GAMVP also provides resources to Muslim voters in advance on in-person voting, drop box voting, and voting by mail through their phone-banking and text-banking programs and through use of other multimedia.  GAMVP has and continues to serve Muslims of all races and ethnic backgrounds, including the growing Black Muslim community in Georgia.  GAMVP also works with a wide range of age groups.  For instance, GAMVP has held civic engagement workshops for teenagers at Islamic schools as well as voter education sessions at mosques with a focus on their elder members.

42.     By severely restricting mobile voting for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the advance voting period in runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members and many of the communities that GAMVP works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

43.     Moreover, S.B. 202 makes it substantially more difficult for GAMVP to carry out its civic-engagement mission.  GAMVP will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force GAMVP to divert time, money, and other resources from other activities, such as their census and redistricting education workshops, to assist Georgia voters who are burdened by the provisions of S.B. 202.  As a result, due to S.B. 202, GAMVP is limited, and

will continue to be limited, in the resources that it can devote to its other core

organizational goals.

44.     Specifically, GAMVP will have to divert more time, money, and other

resources towards educating voters across the State about the provisions of S.B.

202.  To engage in these public education efforts, GAMVP will have to not only

divert resources from other initiatives, but also spend more time seeking outside

funding.  By spending more time and staff resources on these S.B. 202-specific

public education efforts, GAMVP will have fewer resources available to educate

its members about other voting-related issues.  GAMVP will also have less time,

money, and other resources to coordinate, oversee, manage, and plan for other

GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

45.     GAMVP will also have to dedicate more time, money, and other

resources towards understanding the new legal requirements of S.B. 202 and how

these requirements may impact GAMVP's existing voter engagement efforts such

as its activities supporting voters waiting in line.  As a result, the GAMVP will

have fewer resources for other core activities, including voter turnout and GOTV

efforts in addition to non-voting related social justice activities.

46.     GAMVP will have to spend more time, money, and other resources on

existing training programs provided to its members across the state.  These training

programs, which help members educate and assist other voters, will need to

undergo substantial revisions in light of S.B. 202.  Time and resources spent

overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work. Finally, GAMVP anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that GAMVP will be able to devote less time to other core activities and non-voting related work.

47.     Plaintiff WWA is a nonpartisan, nonprofit organization that seeks to promote the social and economic development and health equity of women and girls, and the acculturation of immigrants and refugees arriving to the United States from 23 African nations.  In furtherance of its mission, WWA provides social services, advocacy, health and legal education, know your rights workshops, citizenship preparation, legal services, domestic violence/female genital mutilation prevention, and civic engagement.

48.     By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members and many of the communities that WWA works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

49.     Moreover, S.B. 202 makes it substantially more difficult for WWA to engage in its mission to provide civic engagement for the refugee and immigrant community of newly naturalized citizens (both male and female), and to promote the social and economic development of women and girls of those communities. WWA will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including informing itself about S.B. 202 and its scope to be able to assist its members and those that it serves to comply with the many changes to the voting process; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force the WWA to divert time, money, and other resources from other activities—such as WWA's Domestic Violence Prevention and End Female Genital Mutilation programs, its Citizenship Preparation classes, the WWA Safe Birth Initiative, which provides cultural sensitivity training to healthcare workers that serve refugee women, and its Health Advocates Program, which has trained over 600 refugee and immigrant women in becoming health advocates—to assist Georgia voters who are burdened by the provisions of S.B. 202.  As a result, due to S.B. 202, WWA is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

50.     Specifically, WWA will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202.  To engage in these public education efforts, WWA will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, WWA will have fewer resources available to educate its members about other voting-related issues.  WWA will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

51.     WWA will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact WWA's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, WWA will have fewer resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

52.     WWA will have to spend more time, money, and other resources on existing training programs provided to its members across the State.  These training programs, which help members educate and assist other voters, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work.

Finally, WWA anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that WWA will be able to devote less time to its other work.

53.    LCF Georgia is an organization comprised of 30 Latinx-led organizations serving Latinx communities across Georgia.  Its mission is to be a catalyst for investment and collaborative work with and within the Latinx community.  As part of this mission, LCF Georgia provides critical resources to Spanish-speaking and Portuguese-speaking voters across the state, including the translation of materials, civic engagement training, voter education materials regarding absentee voting, early voting, and voting by drop box.  For instance, LCF Georgia launched and coordinated the "Latinos for Democracy" coalition, which reached every Latinx voter in Georgia at least twice in the 2020 primaries and provided support to voters on Election Day as part of its election protection program.  LCF Georgia also operates and coordinates an active text-to-vote and phone-banking operation, sends bilingual mailers with voting information, and runs a canvass program, which provides information to voters in English and Spanish.

54.    By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, implementing the Line

Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia and many of the communities that LCF Georgia works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

55.     Moreover, S.B. 202 makes it substantially more difficult for LCF Georgia to engage in its mission to provide civic engagement for the refugee and immigrant communities of newly naturalized citizens (both male and female), and to promote the social and economic development of women and girls of those communities.  LCF Georgia will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force LCF Georgia to divert time, money, and other resources from other activities—such its low-fee or free skill-building and technical assistance to Latinx-serving nonprofits and their staff—to assist Georgia voters who are burdened by the provisions of S.B. 202.  As a result, due to S.B. 202, LCF Georgia is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

56.     Specifically, LCF Georgia will have to divert more time, money, and other resources towards educating voters across the State about the provisions of S.B. 202.  To engage in these public education efforts, LCF Georgia will have to not only divert resources from other initiatives, but also spend more time seeking outside funding.  By spending more time and staff resources on these S.B. 202-specific public education efforts, LCF Georgia will have fewer resources available to educate its members about other voting-related issues.  LCF Georgia will also have less time, money, and other resources to coordinate, oversee, manage, and plan for other GOTV efforts, such as poll monitoring and engaging in outreach efforts to voters.

57.     LCF Georgia will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact LCF Georgia's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, LCF Georgia will have fewer resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

58.     LCF Georgia will have to spend more time, money, and other resources on existing training programs provided to its members across the State. These training programs, which help members organize voter engagement efforts and educate and assist other voters, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will

necessarily have to come at the expense of time and resources spent on other core activities and non-voting related work.  Finally, LCF Georgia anticipates that there will be more inquiries from members and the communities they serve relating to S.B. 202, which will mean that LCF Georgia will be able to devote less time to its core activities and other, non-voting related work.

59.     Plaintiff the Deltas is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women, that was founded in 1913 on the campus of Howard University and incorporated under the laws of the District of Columbia.  Six weeks after the organization was initially formed in 1913, several of its founding members marched in the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas' first public act.  The Deltas' participation in the march involved personal risk and indignity, as they were not welcomed by some white suffragists, who insisted that the Black women march at the end of the procession.  Civic engagement has remained a core tenet of the Deltas' mission since its founding, as democracy and justice can only be achieved through voting.  Thus, voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities.  In light of the upcoming post-census redistricting cycle, the Deltas have and will continue to provide public education and training about the importance of the decennial census and its impact on redistricting, the allocation of funding, and policy-making.  The organization has 58 chapters that

include alumnae and college chapters and approximately 7,587 members in Georgia, most of whom are registered voters in Georgia.

60.    Consistent with its mission, the Deltas have hosted candidate forums and informational events on voting, including on how to regain the right to vote in Georgia after a felony conviction.  In 2014, shortly after the 2013 *Shelby County* decision immobilized an effective voting protection, the Deltas, along with other organizations, successfully opposed one of many efforts the Georgia legislature attempted to drastically reduce early voting.  In the recent electoral cycles, including the General Election and Runoff Elections, the Deltas dedicated resources to help organize a civic engagement and education campaign in the State, including voter registration drives, reminders to voters to request absentee ballots, and purchases of billboards and yard signs with reminders to vote.  During the 2021 legislative cycle, the Deltas, specifically members of the Decatur Alumnae Chapter, testified in opposition to Senate Bills 29, 67, 70, 71, and 73, which, similar to S.B. 202, proposed to restrict absentee voting or the ability to participate in runoff elections.  The Deltas' testimony forewarned that such restrictions would disproportionately harm voters of color in Georgia.

61.    By severely restricting mobile voting units for advance voting and Election Day, imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections implementing the Line

Relief Ban, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.

62.     Moreover, S.B. 202 makes it substantially more difficult for the Deltas to engage in its civic engagement mission.  Deltas will be forced to divert much-needed resources from its day-to-day activities to combat the suppressive effect of S.B. 202, including assisting its members and those that it serves to comply with the many changes to the voting process as a result of S.B. 202; helping its members and those it serves understand the changes; developing new training materials and public education documents; and reallocating resources to serve voters during the crucial run-up to an election.  S.B. 202 will also force the Deltas to divert time, money, and other resources from its voter-engagement activities, such as its voter registration and voter education efforts, including related to the post-census redistricting cycle, to assist Georgia voters who are burdened by the provisions of S.B. 202, as well as other activities that advance its social-justice mission.  As a result, due to S.B. 202, the Deltas is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

63.     Not only will the Deltas have to educate its members about the new ID Requirements, it will also have to help members who do not have any S.B. 202-approved ID or documentation to obtain these materials for absentee ballot

applications or for submission of the absentee ballot itself.  In some cases, this will require the Deltas to transport members to a Georgia Department of Drivers Services office, transport them back to their residence, and help members photocopy documents required for applications and ballots.  These activities will also divert time, money, and resources away from other public education efforts.

64.    The Deltas will also have to dedicate more time, money, and other resources towards understanding the new legal requirements of S.B. 202 and how these requirements may impact the Delta's existing voter engagement efforts such as its activities supporting voters waiting in line.  As a result, the Deltas will have less resources for other core activities, including voter turnout and GOTV efforts in addition to non-voting related social justice activities.

65.    The Deltas will have to spend more time, money, and other resources on existing training programs provided to its members across the state.  These training programs, which help members organize voter engagement efforts for members, will need to undergo substantial revisions in light of S.B. 202.  Time and resources spent overhauling the training program will necessarily have to come at the expense of time and resources spent on other core activities.  In addition, more training will need to be focused on the provisions of S.B. 202 and how they affect the Deltas' voter engagement efforts.  Finally, the Deltas anticipates that there will be more inquiries from members and the communities they serve relating to S.B.

202, which will mean that the Deltas will be able to devote less time to its other work.

66.     Provisions in S.B. 202 which compress the timeframe for voters to apply for absentee ballots and limit the availability of drop boxes will also force the Deltas to divert resources from turnout and GOTV efforts in the critical period leading up to an election.  The Deltas will have to devote time, money, and other resources in the weeks leading up to an election to assist voters in complying with absentee ballot requirements and transporting voters to drop boxes, which will be less accessible due to S.B. 202.  This will result in less time, money, and other resources available to the Deltas for public education efforts and transportation to the polls.

67.     Plaintiff Georgia ADAPT is a self-advocacy organization founded in 1987 that is run by and for Georgians with disabilities.  It has dual missions:  (1) to use civil resistance and principled nonviolence to end institutional bias against Georgians with disabilities, and (2) to empower the disability community by encouraging use of their voice and vote, as well as to educate candidates about how to reach and serve the disability community.  Georgia ADAPT has several regional chapters and members across the State.  In furtherance of its mission, Georgia ADAPT engages in voter education work, helps community members apply for absentee ballots, and puts on GOTV programs.  Its voter education work includes paying for American Sign Language interpreters to communicate voting-related

information to the Deaf community and translating election information into Braille.  In 2020, Georgia ADAPT provided hundreds of rides to polling locations for people with disabilities through their Native 2 Native ("N2N") and Disability 2 Disability ("D2D") programs.  Georgia ADAPT members also offered water, food, personal protective equipment, and limited seating to voters waiting in line in several counties.

68.     By placing additional identification requirements and restrictions on requesting and casting an absentee ballot, reducing the time period for requesting absentee ballots, limiting the number, availability, and accessibility of drop boxes, reducing the early voting period in runoff elections, disenfranchising otherwise eligible voters who cast in-county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will severely burden or deny the right to vote of the organization's members across Georgia.

69.     Moreover, S.B. 202 makes it substantially more difficult for Georgia ADAPT to provide its civic-engagement activities and further its mission.  In order to combat the suppressive effect of S.B. 202, including informing itself about S.B. 202 and its scope to be able to assist its members and those that it serves to comply with the many changes; helping its members and those it serves to better understand the changes; and developing new, costly training materials and public education documents to educate its members and eligible voters it serves about the

changes, Georgia ADAPT will be forced to divert resources from its other core activities such as helping to de-institutionalize Georgians with disabilities, helping people with disabilities obtain home- and community-based services, and providing people with disabilities support with Medicaid issues.  As a result, due to S.B. 202, Georgia ADAPT is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

70.    Plaintiff Georgia Advocacy Office ("GAO") is a private, non-profit Georgia corporation.  GAO has been designated by the State of Georgia since 1977 as its protection and advocacy system to protect the legal and human rights of individuals with disabilities in the state of Georgia pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq*., the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041 *et seq*., and the Protection and Advocacy for Individual Rights Program of the Rehabilitation Act, 29 U.S.C. § 794e.

71.    GAO's mission is to work with and for oppressed and vulnerable individuals in Georgia who are labeled as disabled or mentally ill to secure protection and advocacy.  Central to this mission is empowering Georgians with disabilities to participate fully and independently as active and engaged citizens.

72.    GAO operates seven programs, including one specifically geared towards protecting the disability vote (Protection and Advocacy for Voting Access).  Each of GAO's programs uses a combination of supporting self-

advocacy, citizen involvement, staff advocacy, and legal advocacy to protect and advocate for the rights of Georgians with disabilities.

73.    GAO plays a role in enforcing the Help America Vote Act of 2002, 52 U.S.C. § 20901 *et seq*., by educating voters with disabilities and responding to violations of voting rights of Georgians with disabilities.  In particular, GAO seeks to expand the electoral participation of individuals with disabilities who reside in congregate care settings.  GAO's voter education efforts include creating and sharing educational videos and written guidance, answering voter questions, and providing information about voting processes and voting rights to all individuals with disabilities, including people in nursing homes or psychiatric facilities.  GAO also contributes funds to GOTV programs operated by Plaintiff The Arc, providing money for GOTV programs.  Additionally, GAO runs a nonpartisan election protection hotline to support voters with disabilities who experience problems while voting.  GAO attorneys field calls from this hotline and, when necessary, escalate complaints to the Secretary of State or testify before the state legislature about the problems reported by voters with disabilities.

74.    GAO's advocacy around voting is cross-programmatic, as it involves a fundamental right for all Americans, including Americans with disabilities.  As a result, staff members across multiple programs participate in its voting-related activities.

75.     Because of the additional burdens on voting that S.B. 202 imposes, GAO will need to completely overhaul and expand its voter education program. For example, GAO staff will have to spend additional time during visits to nursing homes and psychiatric facilities to talk with voters about the burdens imposed by S.B. 202 and to assist them in formulating and executing a plan to vote, and to answer questions from residents about voting.  Staff have limited time during facility visits—primarily focusing on preventing abuse and neglect—and spending increased time on voting issues will necessarily mean they can spend less time working with residents on other critical issues.

76.     Due to the restrictions on absentee voting that S.B. 202 imposes, GAO also expects to have to devote resources to securing transportation for residents of congregate care facilities to the polls, diverting such resources from its other programs.

77.     By placing additional identification requirements and restrictions on requesting and casting an absentee ballot, reducing the time period for requesting absentee ballots, limiting the number, availability, and accessibility of drop boxes, reducing the early voting period in runoff elections, disenfranchising otherwise eligible voters who cast county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will discriminate against and deny access to many voters with disabilities, making it substantially more difficult for the people GAO serves to vote.

78.     S.B. 202 will also make it substantially more difficult for GAO to carry out its mission to protect the rights of people with disabilities.  In order to combat the suppressive effect of S.B. 202, including informing itself about S.B. 202 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with disabilities about the changes, GAO will have to expend more time, money, and other resources on its efforts to educate and assist voters as described above.  These burdens will force GAO to divert resources from its other core activities including investigating and addressing allegations of abuse and neglect, advocating for appropriate assistive technology, and providing information and resources related to employment, inclusive education and other civil rights for people with disabilities.  As a result, due to S.B. 202, GAO is limited, and will continue to be limited, in the resources it can devote to its other core organizational goals.

79.     Plaintiff The Arc is a private, nonprofit organization, founded in 1950 to promote and protect the human rights of people with intellectual and developmental disabilities ("IDD").  The Arc engages in public policy advocacy and develops programs to support people with IDD to learn, live, and work inclusively in their communities.  Protecting the right of people with disabilities to

vote and participate in civic engagement has been a priority of The Arc for over 70 years.

80.     The Arc's Georgia office, known as The Arc Georgia, serves individuals with IDD and their families through a central office in East Point, Georgia, and through 10 locally affiliated chapters across the state.  The local affiliated chapters are membership organizations and dues-paying affiliates of The Arc of the United States.  For its Georgia office, The Arc has identified protecting the rights of voters with IDD through voter outreach, education, and registration as a priority.

81.     In furtherance of its mission, The Arc Georgia leads the Register, Educate, Vote—Use your Power ("REV UP") Georgia program, a statewide volunteer coalition of advocacy organizations seeking to foster civic engagement and protect the voting rights of Georgians with IDD.  As part of this work, The Arc Georgia provides education and outreach to people with IDD to help them understand the voting process, including resources to explain things like voter registration, and assists with voter mobilization for Georgia ID requirements, transportation, guardianship and voting laws, voting by mail, and ballot access for deaf, hard-of-hearing, blind, and low-vision voters.

82.     As part of its voting access programming, The Arc Georgia also regularly convenes a group of "Grassroots Connectors" consisting of disability rights advocates from across the State.  These Grassroots Connectors support and

advocate for voters with IDD, with a particular focus on supporting Black voters with IDD in rural communities.  Specifically, during the General Election and Runoff Elections, The Arc Georgia supported voters with disabilities by coordinating transportation to the polls and to drop box locations, providing food and water to voters waiting in long lines, educating voters on the absentee ballot process, assisting voters with IDD with applying for and filling out absentee ballots, engaging in a GOTV postcard campaign, arranging two virtual presidential election town halls focused on issues relevant to voters with disabilities, organizing a virtual Senate candidate disability forum that was broadcast to over 8,000 viewers in Georgia and beyond, and engaging in voter registration outreach and assistance.

83.     By imposing the ID Requirements and restrictions on requesting and casting an absentee ballot, reducing the time period for requesting absentee ballots, limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, disenfranchising in-county provisional ballots, and restricting and penalizing provision of assistance with the absentee balloting process, S.B. 202 will deny access to the right to vote for many members of The Arc Georgia and the voters that it supports.

84.     Moreover, S.B. 202 makes it substantially more difficult for The Arc Georgia to engage in its civic engagement mission.  In order to combat the suppressive effect of S.B. 202, including serving as a plaintiff in this lawsuit to

challenge some of S.B. 202's provisions; informing itself about S.B. 202 and its scope to be able to assist people with disabilities to comply with the many changes; helping people with disabilities to better understand the changes; and developing new, costly training materials and public education documents to educate people with disabilities about the changes, The Arc will have to expend more time, money, and resources on its efforts to educate and assist voters as described above. These burdens will force The Arc to divert resources from its other core activities, including advocating for appropriate assistive technology, and providing information and resources related to housing, homelessness, and healthcare for people with disabilities.  As a result, due to S.B. 202, The Arc is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

## **Defendants**

85.    Defendant Brian Kemp is the Governor of the State of Georgia, and is sued in his official capacity.  Defendant Kemp has the chief executive power of the state, Ga. Const. art. 5, § 2, and signed the challenged statutes into law on March 25, 2021.  As Governor, Defendant Kemp has sole authority to declare that a state of emergency or disaster exists, O.C.G.A. § 38-3-51.

86.    Defendant Brad Raffensperger is the Secretary of State of Georgia and the chief elections official of the State, O.C.G.A. § 21-2-210.  Secretary of State Raffensperger is responsible for implementing elections statutes and routinely

issues guidance to the county election officials of all 159 counties on various elections procedures and requirements.  Secretary of State Raffensperger is named as a Defendant in his official capacity.

87.     Defendant Georgia State Election Board (the "State Election Board") is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent."  O.C.G.A. § 21-2-31(2).

88.     Defendants John Fervier, Chairman, Matthew Mashburn, Sarah Tindall Ghazal, Edward Lindsey, and Dr. Janice W. Johnston are members of the State Election Board and are named as Defendants in their official capacities.  The members of the State Election Board are responsible for "promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

89.     Defendant Fulton County Registration and Elections Board is responsible for the conduct of primary and general elections in Fulton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

90.     Defendants  Aaron V. Johnson, Michael Heekin, and Teresa K. Crawford are the Members of the Fulton County Registration and Elections Board, reside in Fulton County, and are sued in their official capacities.

91.     Defendant Patrise Perkins-Hooker  is the Chairwoman of the Fulton County Registration and Elections Board, and is sued in his official capacity. Defendant Perkins-Hooker is responsible for the day-to-day operations of running elections in Fulton County, to the extent such power does not conflict with the power of the Secretary of State.

92.     Defendant DeKalb County Board of Registration & Elections is responsible for the conduct of primary and general elections in DeKalb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

93.     Defendants Anthony Lewis, Susan Motter, Dele Lowman Smith, Samuel E. Tillman, and Baoky N. Vu are the Members of the DeKalb County Board of Registration & Elections, reside in DeKalb County, and are sued in their official capacities.

94.     Defendant Erica Hamilton is the Director of Voter Registration and Elections in DeKalb County, and is sued in her official capacity.  Defendant Hamilton is in charge of the day-to-day operations of running elections in DeKalb County, to the extent such power does not conflict with the power of the Secretary of State.

95.     Defendant Gwinnett County Board of Registrations and Elections is responsible for the conduct of primary and general elections in Gwinnett County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

96.     Defendants Alice O'Lenick, Loretta Mirandola, David Hancock, and Anthony Rodriquez, are the Members of the Gwinnett County Board of Registrations and Elections, reside in Gwinnett County, and are sued in their official capacities.

97.     Defendant Wandy Taylor is the Chairwoman of the Gwinnett County Board of Registrations and Elections, and is sued in her official capacity. Defendant Taylor is responsible for the day-to-day operations of running elections in Gwinnett County, to the extent such power does not conflict with the power of the Secretary of State.

98.     Defendant Cobb County Board of Elections and Registration is responsible for the conduct of primary and general elections in Cobb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

99.     Defendants Jennifer Mosbacher, Debbie Fisher; Stacy Efrat, and Steven F. Bruning are the Members of the Cobb County Board of Elections and Registration, reside in Cobb County, and are sued in their official capacities.

100.   Defendant Tori Silas is the Chairwomanof the Cobb County Board of Elections and Registration, and is sued in her official capacity.  Defendant Eveler is responsible for the day-to-day operations of running elections in Cobb County, to the extent such power does not conflict with the power of the Secretary of State.

101.   Defendant Hall County Board of Elections and Registration is responsible for the conduct of primary and general elections in Hall County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

102.   Defendants Tom Smiley, David Kennedy, Ken Cochran, Craig Lutz, and Gala Sheats are the Members of the Hall County Board of Elections and Registration, reside in Hall County, and are sued in their official capacities.

103.   Defendant Lori Wurtz is the Hall County Elections Director, and is sued in her official capacity.  Defendant Wurtz is responsible for the day-to-day operations of running elections in Hall County, to the extent such power does not conflict with the power of the Secretary of State.

104.   Defendant Clayton County Board of Elections and Registration is responsible for the conduct of primary and general elections in Clayton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

105.   Defendants Darlene Johnson, Diane Givens, Carol Wesley, Dorothy Foster Hall, and Patricia Pullar are the Members of the Clayton County Board of

Elections and Registration, reside in Clayton County, and are sued in their official capacities.

106.   Defendant Shauna Dozier is the Clayton County Elections Director, and is sued in her official capacity.  Defendant Dozier is responsible for the day-to-day operations of running elections in Clayton County, to the extent such power does not conflict with the power of the Secretary of State.

107.   Defendant Richmond County Board of Elections is responsible for the conduct of primary and general elections in Richmond County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

108.   Defendants Tim McFalls, Sherry T. Barnes, Marcia Brown, Terence Dicks, and Bob Finnegan are the Members of the Richmond County Board of Elections, reside in Richmond County, and are sued in their official capacities.

109.   Defendant Lynn Bailey is the Richmond County Elections Director and the Richmond County Chief Registrar, and is sued in her official capacity. Defendant Bailey is responsible for the day-to-day operations of running elections in Richmond County, to the extent such power does not conflict with the power of the Secretary of State.

110.   Defendant Bibb County Board of Elections is responsible for the conduct of primary and general elections in Bibb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

111.   Defendants Mike Kaplan, Herbert Spangler, Rinda Wilson, Henry Ficklin, and Cassandra Powell are the Members of the Bibb County Board of Elections, reside in Bibb County, and are sued in their official capacities.

112.   Defendant Jeanetta R. Watson is the Bibb County Elections Supervisor, and is sued in her official capacity.  Defendant Watson is responsible for the day-to-day operations of running elections in Bibb County, to the extent such power does not conflict with the power of the Secretary of State.

113.   Defendant Bibb County Board of Registrars is responsible for the registration of voters in Bibb County, consistent with state statutes and the guidance of the Secretary of State.

114.   Defendant Veronica Seals is the Chief Registrar of Bibb County, and is sued in her official capacity.

115.   Defendant Chatham County Board of Elections is responsible for the conduct of primary and general elections in Chatham County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

116.   Defendants Thomas J. Mahoney, Malinda Hodge, Marianne Heimes, and Antan Lang are the Members of the Chatham County Board of Elections, reside in Chatham County, and are sued in their official capacities.

117.   Defendant Chatham County Board of Registrars is responsible for the registration of voters in Chatham County, consistent with state statutes and the guidance of the Secretary of State.

118.   Defendants Colin McRae, Wanda Andrews, William L. Norse, Jon Pannell, and Randolph Slay are the Members of the Chatham County Board of Registrars, reside in Chatham County, and are sued in their official capacities.

119.   Defendant Clarke County Board of Election and Voter Registration is responsible for the conduct of primary and general elections in Clarke County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

120.   Defendants Willa Jean Fambrough, Hunaid Qadir, Ann Till, Rocky Raffle and Adam Shirley are the Members of the Clarke County Board of Election and Voter Registration, reside in Clarke County, and are sued in their official capacities.

121.   Defendant Charlotte Sosebee is the Director of the Clarke County Board of Election and Voter Registration, and is sued in his official capacity. Defendant Sosebee is responsible for the day-to-day operations of running elections in Clarke County, to the extent such power does not conflict with the power of the Secretary of State.

122.   Defendant Columbia County Board of Elections is responsible for the conduct of primary and general elections in Columbia County, O.C.G.A. §§ 21-2-

40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

123.   Defendants Ann Cushman, Wanda Duffie, and Larry Wiggins are the Members of the Columbia County Board of Elections, reside in Columbia County, and are sued in their official capacities.

124.   Defendant Columbia County Board of Registrars is responsible for the registration of voters in Columbia County, consistent with state statutes and the guidance of the Secretary of State.

125.   Defendant Nancy L. Gay is the Chief Registrar of Columbia County, and is sued in her official capacity.

## JURISDICTION AND VENUE

126.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States of America.

127.   This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a), 42 U.S.C. §§ 1983 and 1988(a), and 52 U.S.C. § 10308(f) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, the Civil Rights Act of 1964, 52 U.S.C. § 10101, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

128.   This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

129.   This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

130.   Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and under Local Civ. R. 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.  Plaintiffs AME Church, GAMVP, WWA, the Deltas, LCF Georgia, The Arc, Georgia ADAPT, and GAO all operate within this district and division.

## FACTUAL ALLEGATIONS

### A. Georgia has a long history and ongoing record of racial discrimination in voting.

131.   S.B. 202 is the latest iteration of a long line of official acts of racial discrimination.  Georgia's history of racially discriminatory voting practices is well-established and judicially-recognized.  *See*, *e.g.*, *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994) ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-1380 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in

voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chock full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

132.   Georgia's long history of voter suppression dates back to the post-Civil War period when the Ku Klux Klan used widespread violence to intimidate Black and Republican voters to re-establish white supremacy.  Georgia's Black voters have historically been disenfranchised through a variety of election laws, including grandfather clauses, literacy tests, poll taxes, and the adoption of "white primaries."

133.   The Fourteenth Amendment granted Black men the right to vote in 1868.  That same year, 33 Black members were elected to the Georgia General Assembly, who were subsequently expelled.

134.   Congress passed the Fifteenth Amendment on February 26, 1869.  By late 1870, all the former Confederate states had been readmitted to the Union, and the Republican Party controlled most state legislatures, due primarily to the support of Black voters.

135.   In response to the Reconstruction Amendments and following the end of Reconstruction in 1877, Georgia and other southern states enacted literacy tests, grandfather clauses, poll taxes and other discriminatory voter registration practices in a deliberate effort to disenfranchise Black voters.

136.   In 1877, Georgia authorized a cumulative poll tax, but most white voters bypassed the provision through exemptions for those whose ancestors fought in the Civil War or who could vote before the war.  Thus, Georgia became the first state to enact a "poll tax" to disenfranchise many poor Black voters.  The poll tax was only abolished in 1945, after it had been in effect for nearly 75 years.

137.   The Democratic Party in Georgia adopted "white primaries" in 1900, which as the name suggests, allowed only white voters to vote in primaries.  This practice continued in Georgia until it was held unconstitutional 45 years later in *King v. Chapman*, 62 F. Supp. 639, 650 (M.D. Ga. 1945) ("The defendants acting as the duly constituted authorities of the Democratic Party, in refusing to permit plaintiff to vote in the Primary of July 4, 1944, solely on account of his race and color, deprived the plaintiff of a right secured to him by the Constitution and laws of the United States, and was in violation of the Fourteenth, Fifteenth and Seventeenth Amendments."), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

138.   In 1908, Georgia adopted a constitutional amendment with the express purpose of disenfranchising Black voters by writing into the constitution the principle of "white primaries."  Hoke Smith ran successfully for governor in 1906

with this constitutional amendment as a key part of his campaign platform:  "I favor a constitutional amendment which will insure a continuation of white supremacy . . . [and] the protection of the white primaries."

139.   In addition to racially discriminatory laws and racist campaigns, Black Georgians also endured—and were at consistent risk of—physical violence by state and private actors, including white supremacist groups.  Violent attacks against Black Georgia residents resulted in hundreds of deaths and fostered an environment of fear that deterred eligible Black voters from casting ballots, especially in counties with significant Black populations.  As an example, after a lynching in Forsyth County in 1912, white terror groups distributed leaflets demanding that all Black people leave the county or suffer deadly consequences. Many Black families did so.  The Equal Justice Initiative documented 589 known lynchings in Georgia from 1877 until 1950, the second highest among states.

140.   In 1958, Georgia passed a new voter registration act that required those who were illiterate to satisfy "understanding tests" by correctly answering 20 of 30 questions related to citizenship posed by the voting registrar.

141.   Terrell County, Georgia, was the subject of the first court action under the Civil Rights Act of 1957, in which a challenge to literacy tests for voting was found to have subjected Black voters to "distinctions in the registration process on the basis of their race and color."

142.   In 1961, the U.S. Commission on Civil Rights reported that "the problem of denials of the right to vote because of race appears to occur in only eight Southern States—Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee."  The report noted that in many rural counties of Georgia, there was "total exclusion from the suffrage" for Black voters. The report concluded that "[t]he right to vote without distinctions of race or color—the promise of the 15th amendment—continues to suffer abridgment," and that there was evidence of "discriminatory disenfranchisement" in Georgia.

143.   Beginning in 1965, with the passage of the VRA, Georgia was one of nine states whose records of voter obstruction required them, under Section 4(b) of the VRA, to get federal preclearance for changes to their election rules.  Georgia's inclusion in this group was based on the State's enforcement of unconstitutional tests or devices and low voter registration and turnout rates.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966) ("Section 4(b) of the Act also embraces [Georgia]" due to "evidence of actual voting discrimination.").

144.   From 1965 to 2012, Georgia's racially discriminatory voting schemes necessitated federal intervention 187 times, including over 91 objections since the 1982 reauthorization of Section 5 of the VRA.

145.   In 2013, the Supreme Court in *Shelby County* invalidated the coverage provision that determined which jurisdictions were subject to the VRA's preclearance requirement.  570 U.S. 529.  Georgia, a formerly covered jurisdiction,

immediately began to impose restrictions on voting rights without first obtaining approval from the Department of Justice or the United States District Court for the District of Columbia and satisfying their burden that the law did not worsen the ability to vote of communities of color.

146.   Since *Shelby County* was decided, Georgia has regularly sought to suppress the vote of people of color, and Black voters in particular.  In 2020, on the seventh anniversary of *Shelby County*, the late Representative John Lewis warned, "A rampant war is being waged against minorities' voting rights in my home state of Georgia."

147.   Indeed, in many respects, the state's legacy of voter suppression is unparalleled.  Georgia is the only state formerly covered by the VRA's preclearance requirement that has enacted voting restrictions across five major categories studied by the U.S. Commission on Civil Rights: voter ID requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling place closures or relocations.  Since 2011, more voting rights lawsuits have been filed against Georgia and its officials than any other state except Texas.

148.   After *Shelby County*, state and local officials and lawmakers have sought to curtail the voting rights of Black voters at every stage of the process, from registration, to early voting, to Election Day itself.  The examples catalogued below are but a sampling of the race-based voter suppression in Georgia.

149.   ***Registration Deadlines***.   Georgia's registration deadline—29 days before an election—is one of the strictest in the country.   In 2018, a disproportionate number of the 87,000 voters who became ineligible due to late registration were people of color.   In one congressional district, the number of ineligible voters was nearly 14 times the margin of victory.

150.   ***Exact Match Registration Rejections***.   From 2010 to 2016, Georgia employed an administrative policy that disproportionately rejected voter registrations from people of color.   Under Georgia's "exact match" policy, a voter's registration application would not be accepted if the information therein did not perfectly match—down to a hyphen, an accent mark, or the inclusion of a middle initial—records held by the Georgia Department of Drivers Services or the Social Security Administration.   By race, the population of voters attempting to register was 47.2% white, 29.4% Black, 3.6% Hispanic, and 2.6% Asian, but among applicants who failed the exact match verification procedure, only 13.6% were white, while 63.6% were Black, 7.9% were Hispanic, and 4.8% were Asian. Georgia maintained this policy despite its awareness of the policy's discriminatory impact gleaned through the preclearance processes, litigation, and public testimony.   Georgia agreed to process approximately 34,000 applications that had been suspended under this policy only in response to litigation.

151.   But in 2017, Georgia enacted legislation codifying a version of the "exact match" protocol.   Shortly before Georgia's 2018 gubernatorial election

between then-Secretary of State Brian Kemp and former state representative

Stacey Abrams, the Associated Press reported that the Secretary of State's office

had placed on hold more than 50,000 voter registrations due to the exact match

law.  And although Georgia's population was 32% Black, nearly 70% of the

affected applications belonged to Black voters.

152.  ***Voter Purges***.  Georgia's refusal to register eligible voters goes hand

in hand with its aggressive purges of registered voters from the voter rolls.  Few

states have removed voters as aggressively as Georgia.

153.   In 2010, nearly 379,000 voters were removed from Georgia's rolls.

After *Shelby County*, Georgia escalated the purges:  by 2014, the number of voters

whose registrations were cancelled rose to 517,000.  Georgia purged

approximately 1.5 million voters between the 2012 and 2016 election, which was

twice as many as it had between the 2008 and 2012 election.  On a single day in

July 2017, Georgia removed 560,000 voters—8% of Georgia's registered voters—

from the rolls.  Of the removed voters, 107,000 were taken off the rolls merely

because they had not voted in prior elections, not because they had moved or

otherwise become ineligible.  The purge, according to the *Atlanta Journal-*

*Constitution*, may have been "the largest mass disenfranchisement in U.S. history."

154.   Voter purges disproportionately affect Black voters and voters of

color.  Among those eliminated from voter rolls in 2017, Black voters were

canceled at a higher rate than white voters likely because they had not voted in

prior elections. Based on a review of all voter-purge data from 2017, an American Public Media ("APM") Report found Black voters were canceled at a higher rate than white voters for inactivity in six of every ten counties across Georgia, and were removed at a rate of 1.25 times greater than white voters in more than a quarter of those counties.

155.   The purges, moreover, have an extraordinarily high error rate.  In 2019, the Secretary of State purged 313,000 voters from the rolls on the grounds that they had moved from the address provided in their registration.  An expert study concluded that 198,000 of these voters, or 63.3%, had not actually moved.  A disproportionate number of voters whose registrations were erroneously canceled were Black or nonwhite.

156.   ***Eligibility Challenges***.  Almost a week into early voting during the Runoff Elections, True the Vote, a Texas-based organization that has perpetuated the myth of voter fraud, in coordination with some Georgia voters, initiated mass challenges to the voting eligibility of more than 360,000 Georgia voters.  Tens of thousands of Georgia voters were ultimately subjected to baseless, untimely, and potentially discriminatory challenges.  Counties dismissed the overwhelming majority of these challenges for lack of probable cause.  But that didn't end the matter: some counties faced a second and even third wave of baseless mass voter challenges.  These mass challenges are not new to Georgia voters.  As just one example, in 2015, in the runup to municipal elections, registered voters in the City

of Sparta were subjected to mass challenges to their eligibility.  Nearly all the

challenged voters were Black, despite comprising less than 20% of the City's

electorate.

157.   ***Criminal Investigations***.  In 2014, then-Secretary of State Kemp

launched a criminal investigation into the New Georgia Project after the voter

engagement group registered 85,000 new voters.  The State found purported

problems with only 0.03% of the registrations, and no charges were filed.  The

State recently renewed similar criminal investigations in response to the historic

turnout in the General Election.  The State has again targeted the New Georgia

Project along with individual voters, many of whom are voters are color.

158.   Four years earlier, the Secretary of State's office and Georgia Bureau

of Investigation launched a formal investigation following purported concerns

about increases in Black absentee voter participation during Brooks County

elections in 2010, which flipped the Brooks County School Board from majority-

white to majority-Black.  Shortly thereafter, twelve Black City of Quitman

residents—mostly Black women—were arrested and faced varying felony charges

relating to alleged voter fraud and unlawful possession of absentee ballots.  In

2014, a jury acquitted one woman, Lula Smart, of all the felony charges that she

faced following a trial.  Georgia dropped the remaining charges against the other

10 residents (the twelfth person passed away) in 2014, and the State Election

Board dismissed any remaining potential cases in 2016.

159. ***Changes to Election Dates***.  In 2012, the Georgia legislature changed the dates of nonpartisan county elections from November to July.  The city of Augusta attempted to exempt itself, passing a local law providing that Augusta conducted elections as a municipality, not a county.  A Georgia lawmaker proposed a "clean-up" bill that would have deemed all consolidated Georgia governments as counties for election purposes.  In December 2012, the U.S. Department of Justice blocked the bill under the VRA preclearance process.  But after *Shelby County*, state lawmakers successfully rescheduled Augusta's nonpartisan elections to July, against the wishes of the city council.  From the outset, it was clear that moving the election date would disproportionately affect the ability of Black voters to participate.

160. ***Cuts to Early Voting***.  It is well-established that Black voters, both in Georgia and nationally, regularly vote early when possible and comprise a disproportionate number of early voters.  Nonetheless, the Georgia legislature has repeatedly pushed to restrict the availability of early voting.  Starting in 2011, Georgia cut early voting in half, from 45 days to 21 days.

161. A few years later, and after *Shelby County*, in 2014, Georgia lawmakers proposed a bill that would have further reduced early voting to just 6 days for small, consolidated cities.  That same year, one lawmaker explained that he opposed Sunday voting at a local mall because it was "dominated by African American shoppers" and was "near several large African American mega

churches" and that he "prefer[red] more educated voters than a greater increase in the number of voters."

162.   During the next legislative session in 2015, Georgia legislators unsuccessfully sought to further reduce early in-person voting from 21 days to 12 days.  That same bill would have restricted the availability of Sunday voting, which is disproportionately used by Black voters.

163.   In 2018, legislators proposed to shorten voting hours on Election Day in Atlanta, which is majority-Black and the most populous city in Georgia, from 8:00 p.m. to 7:00 p.m.  A legislator in the House of Representative also proposed a version of this bill that would have effectively eliminated early voting on the Sunday before Election Day statewide.

164.   ***Polling Place Closures***.  Counties across the state have closed polling locations despite an overall increase in registered voters.  One study found that since 2013, 10% of Georgia's polling locations have been shuttered.

165.   Examples of polling place closures that disproportionately burden voters of color are legion.  From 2012 to 2018, county election officials closed 214 polling locations, or nearly 8% of the state's polling places, as a result of precinct consolidation.  Many of these closures occurred in communities with substantial minority populations, making it more difficult for Black voters and other voters of color to cast their ballots.

166.   In 2015, election officials in Macon-Bibb County proposed reducing the number of precincts from 40 to 26.  Many of the proposed closures were once again located in predominantly Black communities.  Under the proposal, several majority Black precincts would have had more than 5,000 voters.  No majority white precincts would have reached that threshold, and most had thousands fewer voters than the proposed precincts in Black communities.  In response to community opposition, the County did not close as many precincts as it had proposed initially, but the majority of the eventual closures still disproportionately affected Black voters.

167.   In 2016, the polling place for a precinct with significant numbers of Black voters was relocated to a sheriff's office.  Civil rights organizations and Macon-Bibb County residents raised concerns about how siting a polling location at a law enforcement office would intimidate and deter voters from exercising their voting rights, especially Black voters.  These organizations and residents eventually succeeded in blocking the relocation, and the polling place was moved to a church-owned facility.  But when the organizers complained, they were told that "if people weren't criminals, they shouldn't have a problem voting inside of a police station."

168.   In 2018, the Randolph County Board of Elections and Registration proposed eliminating seven out of nine polling places in the predominantly Black county in part under the unsubstantiated and erroneous view that such closures

were necessary to make voting accessible to people with disabilities.  The proposal was made on the advice of a consultant hired by the county board after its elections supervisor abruptly quit.  The consultant had been "highly recommended" by the Secretary of State's office.  At the time, Black Georgians constituted 32% of the population of the State but 61% of the population of Randolph County.  One of the polling places that the Board sought to close served a population that was 97% Black.  After public outcry and the threat of litigation, the county backtracked.

169.   In 2020, Cobb County—Georgia's third largest county—decided to cut the number of early voting sites for the Runoff Elections from 11 to 5, despite the need to serve more than 537,000 voters.  The closures were concentrated in communities of color:  most of the county's Black and Latinx voters lived in an area that had previously had four polling places; Cobb County consolidated these sites into a single location.  Black and Latinx voters are more likely to live in poverty than other residents and to have more difficulty traveling long distances due to limited public transportation options.  The polling place closures would have disproportionately deterred voters of color from participating in the runoffs.  After public outcry and the threat of litigation, Cobb County added two sites and moved the location of a third.  Cobb County was just one of several in Georgia that sought to close polling locations for the Runoff Elections.

170.   ***Long Wait Times***.  Polling place closures have led to failures in election administration, especially unacceptably long wait times.  Voters of color,

moreover, are more likely than white voters to experience long lines.  Studies have repeatedly confirmed the racial disparity in voting wait times.  For instance, one study found that Black and Latinx voters waited 45% longer than white voters— and that the racial waiting gap could not be explained by the level of resources across counties.

171.   The nationwide trend holds true in Georgia, as well.  During one election, the average wait time after 7:00 p.m. was 6 minutes in polling places that were 90% white and 51 minutes in polling places that were 90% nonwhite.  In other words, the wait times for nonwhite voters were 8.5 times longer than the wait times for white voters.

172.   In Cobb County, whose voters are 27.6% Black, 13% Latinx, and 5.4% Asian, early voters during the General Election encountered lines up to 10 hours long.  As noted, however, the county persisted in reducing early voting sites for the Runoff Elections.

173.   ***Vote Dilution***.  In addition to erecting outright barriers to the franchise, Georgia has also systematically attempted to dilute the votes of nonwhite voters.  In 2015, Georgia enacted H.B. 566, which redrew certain legislative districts for the Georgia House of Representatives.  Two of those districts were challenged as racial gerrymanders:  after an influx of voters of color, their boundaries were redrawn to prevent voters of color from electing candidates of their choice and ensuring the election of white incumbents.

**B. Georgians with disabilities have also experienced historical and widespread discrimination**

174.    Georgians with disabilities have also endured widespread historical and continuing discrimination and neglect in all spheres of public life.  They face barriers to accessing education, employment, healthcare, housing, transportation, living independently, and even in receiving informational services from state and local entities.  Similarly, Georgians with disabilities face many obstacles to participating in the electoral process.

175.    Georgians with disabilities are among the most isolated and disenfranchised in the state.  Disabilities are more prevalent in groups that experience other forms of marginalization.  Black Georgians experience disability at a higher rate than other ethnic groups.  Disability tends to increase with age, and in Georgia more than one-quarter of the population over 65 has a disability.  Georgians with disabilities are over twice as likely to live in poverty than their peers without disabilities, due in large part to lower rates of employment.  In 2020, only 17.9 percent of people with disabilities were employed, compared with 61.8 percent of those without disabilities.

176.    Even before S.B. 202's enactment, Georgians with disabilities faced many barriers in exercising their right to vote.  They are twice as likely not to have internet access, and extremely unlikely to own a printer.  Lack of internet access makes it harder to learn of new voting requirements, polling place locations, where to register, and how to request an absentee ballot.  Registering to vote can be a

challenge for voters who do not have state-issued identification.  Few voters have been able to obtain the "free" identification cards required to be made available by counties pursuant to Ga. Code Ann. § 21-2.417.1.  Remaining registered to vote is also a challenge due to housing instability.  As compared to other voters over the age of 35, voters with disabilities are significantly more likely to move frequently. Voters with disabilities are thus at disproportionately high risk of being purged from voting rolls.

177.  ***In-person voting*** – While many Georgians with disabilities want to vote in person, they face significant barriers to doing so, often resulting in a denial of access.  Getting to the polls may be the first challenge; because of the cumulative effects of disability and poverty, people with disabilities are less likely to drive or own a vehicle and are thus dependent on other forms of transportation. Vast parts of the State have little or no accessible public transportation, and the public transportation that does exist outside of metropolitan areas often operates infrequently.  Paratransit services are scarce.  Thus, many people with disabilities rely on others to get them to the polls.  Poll closures can exacerbate existing transportation challenges, requiring voters with disabilities to arrange to travel even further to access the ballot box.  The attempted poll closures in Randolph County in 2018, for example, would have required voters to travel an additional 10 miles to reach the nearest polling place.

178.   Once a voter with disabilities is able to arrive at the polls, they often face obstacles on the path of travel to the polling place and in the building itself. Common barriers include a lack of accessible parking spots, nonexistent or inadequate ramps, and doors too heavy for a wheelchair user to open.  Polling places that have an accessible route often lack the signage or staff to direct people with mobility disabilities along that route.

179.   Accessible voting machines are critical for people with print disabilities (such as those who are blind, have dyslexia, or have limited hand or arm mobility).  But the federally required accessible voting machines are often not operating, and staff are frequently ill-trained to help make them work.  Moreover, despite the disability community's numerous requests for more appropriate assistive technologies, the "accessible" voting machines currently in use do not afford many disabled voters a private and independent voting experience.

180.   Given the challenges facing voters with disabilities at their polling places, some people with disabilities wish to exercise their right to have a person of their choosing assist them in the voting process.  But the State has, in the past, targeted people who have provided such assistance.  In 2012, a Black Coffee County woman helped her nephew, a first-time voter, figure out how to use the voting machine.  She was subjected to a three-year-long State Election Board investigation and ultimately, indicted on felony charges.  While the assistor was

quickly acquitted by a jury, local elected officials have acknowledged that this very

public prosecution has made Georgians reluctant to ask for or provide needed help.

181.   Among the biggest barriers to in-person voting for people with

disabilities are the long lines at polling places.  In recent elections, voters—

including people with disabilities—have had to wait in hours-long lines to vote in

parts of Georgia.  For people with disabilities (including chronic illnesses), and

older voters, such lines are difficult if not impossible to endure.  Long and

unpredictable waits may be dangerous for people who cannot stand for long

periods and whose disabilities require regular access to food and water.  Even

shorter waits of 15 to 20 minutes can be taxing and dangerous to their health.  A

significant percentage of people with disabilities use early voting to avoid election

day lines.  But even early voting locations have had long waits.

182.   ***Voting by mail*** – Because of these multiple barriers to in-person

voting, a substantial number of people with disabilities choose to vote by mail.

While many states allow people to opt-in to permanently receive an absentee

ballot, Georgia requires its citizens to apply for an absentee ballot for each

election.  (Voters who designate themselves as disabled or seniors have the option

of applying for an absentee ballot only once per federal election cycle.)  So, in

Georgia, voting by mail requires separate steps to apply for, receive, complete and

return the absentee ballot.  Because the process is cumbersome, disability rights

organizations, such as GAO, frequently help with the first step, by bringing

applications for absentee ballots to people with disabilities, especially those in congregate settings such as nursing homes.

183.  Unlike some states, Georgia does not provide an accessible absentee ballot marking process.  Voters with print disabilities (such as people who are blind, have dyslexia, or have limited use of their hands), need to find in-person assistance to fill out an absentee ballot.  Many voters with disabilities seek help from family, friends, caregivers and neighbors to enable them to apply for and return their absentee ballots.

184.  Given the barriers to obtaining transportation and inaccessibility of some registrar's offices, Georgians with disabilities greatly benefited from the opportunity to personally drop off their ballot in a secure, outdoor drop box location—or, alternatively, to ask someone they knew to drop off their ballot via drop box at whatever time and location was most convenient to them.

185.  Residents of nursing homes or other congregate living facilities, in particular, rely on voting by mail because few facilities provide transportation for residents to reach the polling place.  Many residents in nursing homes do not have cell phones and have inconsistent or unreliable access to the internet.  A facility staff member is typically in charge of distributing incoming mail and picking up outgoing mail.  Accordingly, it can take a few days for residents to receive absentee ballots delivered to the facility, or to be able to have absentee ballots put in the mail.

## C. Georgia has an increasing number of voters of color.

186.   Against the backdrop of these discriminatory provisions, historically disenfranchised groups—including most especially Georgia voters of color—have sought to play a more active role in the political process.

187.   Georgia is home to an increasing population of Black voters and other voters of color.  In the past 30 years, Georgia's Black population has nearly doubled—from 1.8 million in 1990 to 3.5 million in 2019.  Of Georgia's total population of approximately 10.6 million, as of July 2019, 60.2% are white, 32.6% are Black, 9.9% are Latinx, and 4.4% are Asian.

188.   Between October 2016 and October 2020, Georgia added nearly a quarter-million Black and Latinx voters to its voter registration rolls.  Meanwhile, the white share of the state's electorate declined, dropping by ten percentage points since 2008.

189.   Black eligible voters account for nearly half of Georgia's electorate growth since 2000.  Between 2000 and 2019, Georgia saw the largest percentage increase among Black voters of any state in the country.  The population of Black voters in the State reached a record high of 2.5 million eligible voters in 2019—a third of the State's total electorate.

190.   Latinx and Asian people also make up a growing share of the Georgia electorate.  The Latinx and Asian voting populations in the State more than tripled in size from 2000 to 2019.

191.   This growth among nonwhite voters has been especially prominent in the Atlanta metro area.  Metro Atlanta is home to 3.9 million registered voters—over half of the State's electorate in 2020.  Between 2016 and 2020, the area saw an increase of 115,000 Black voters, 64,000 Latinx voters, and 53,000 Asian voters.  During that same time period, Latinx and Asian people increased as a share of the electorate in every Atlanta metro area county.

192.   According to the 2019 American Community Survey ("ACS"), the following counties are home to a sizeable population of color: Bibb County (54.4% Black, 3.3% Latinx, 2% Asian); Clayton County (69.3% Black, 13.2% Latinx, 5.1% Asian); Cobb County (27.6% Black, 13% Latinx, 5.4% Asian); DeKalb County (54.0% Black, 8.5% Latinx, 6.1% Asian); Fulton County (44.1% Black, 7.2% Latinx, 7.1% Asian); Gwinnett County (27.8% Black, 21.2% Latinx, 11.6% Asian); Hall County (7.2% Black, 28.4% Latinx, 1.8% Asian); and Richmond County (56.5% Black, 4.9% Latinx, 1.9% Asian).

193.   Despite their increasing population growth, the Black and Latinx populations in Georgia still trail behind the white population on many socioeconomic measures.

194.   According to the ACS, Black and Latinx residents experience poverty (18.8% and 19.1% of those populations, respectively)at nearly twice the rate of white residents (10%).  White per capita income ($38,435) is significantly greater than Black ($24,215) and Latinx ($20,066) per capita income.  The 2019 median

income for white households was $70,832, compared to the median of Black households of $47,096, and Latinx households of $52,661.

195.   Black and Latinx households in Georgia are also substantially less likely to own a vehicle: 11.7% of Black households and 7.2% of Latinx households lack a vehicle, as compared to 3.6% of white households.  Relatedly, as compared to white residents, Black residents are more than four times as likely and Latinx residents are more than twice as likely to use public transportation to commute to work.

196.   According to the ACS, Black households in Georgia are also more than 1.5 times as likely to live without broadband internet access than white households.

197.   These inequalities have contributed to the limited number of candidates of color elected to state-wide offices, despite the State's changing demographics and the increasing number of such candidates running for office since 2000.  For example, no Black candidate has ever been elected as Georgia's Governor.

198.   Voting in Georgia is highly racially polarized.  For example, in the 2008 presidential election, Barack Obama secured 98% of Black voter support in Georgia and only 23% of white voter support.  Similarly, 93% of Black voters supported Stacey Abrams for governor in 2018, compared to only 25% of white voters.  And in the Runoff Elections, Black voters' candidates of choice, Reverend

Raphael Warnock and Jon Ossoff, won with roughly 94% of Black voter support compared to 29% of white voter support.  The majority of Latinx and Asian voters also choose candidates different than their white counterparts in the state.  For instance, Warnock and Ossoff received double the share of the Latinx (64%) and Asian (60%) vote than the white vote.

### D. Black voter participation reached historic levels in the 2020 primary election, General Election, and the Runoff Elections.

199.   In June 2020, Georgians faced innumerable obstacles to cast ballots in a primary election for President, U.S. Senate, and many local offices.  As just a few examples, Georgia voters—especially majority-minority counties—endured a combination of hours-long wait times in the summer heat, problems with voting equipment, and insufficient available ballots at polling locations.

200.   Fulton County voters, 40% of whom are Black, experienced some of the longest lines in the primary election.

201.   To mitigate these concerns in the General Election, voting rights and election protection organizations continued to advocate for more equitable voting options, which were granted by certain elections officials and included additional polling places and drop boxes, easier processes for voters to request absentee ballots, and the doubling of voter education and line relief efforts in anticipation of even higher turnout in the General Election.

202.   In both the General Election and the Runoff Elections, Georgia voters turned out in record numbers.  While turnout typically declines significantly for

runoff elections (specifically among Black voters, and particularly as compared to elections where a presidential election is on the ballot), that was not true in January 2021.  More than 4.4 million Georgians returned to the polls for the Runoff Elections.  Black voter turnout was 91.8% of that in November's General Election.

203.   A significant driver of the record-breaking turnout in both elections was the historic participation of Black voters.  Of the over 5 million Georgians who voted in the General Election, 30% were Black.  This followed a 25% increase in Black voter registration in 2020 as compared to 2016.

204.   Much of this increase in turnout is attributable to higher rates of absentee voting.  In the General Election, more than 1.3 million absentee ballots were cast.  That marks a five-fold increase over the number of absentee ballots cast in the State in 2016.  Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.  Candidates preferred by Black voters received a higher percentage of absentee votes relative to their overall percentage of the final vote count.

205.   The high rates of voting by mail, and the lack of evidence of voter fraud, illustrate that additional voting options are not only safe but also necessary.  These additional voting options help, for example, alleviate lines during in-person early voting and decrease in-person voting demand on Election Day.  These options remain necessary to ensure that voters from historically disenfranchised

communities who, for a variety of reasons, depend on alternatives to in-person voting on Election Day, can exercise their right to vote.

206.   The increase in absentee voting was due, in part, to the use of drop boxes.  They allow voters to submit their absentee ballots in advance of Election Day, avoiding the risks of delay or loss attendant to sending a ballot through the mail.  Drop boxes were used with high frequency in majority-minority counties. Fulton County voters used drop boxes for more than half of the absentee ballots cast in the General Election.

207.   Early in-person voting was another major driver of increased turnout. Approximately 2.7 million Georgians voted early in person in the General Election.  More than 2 million voters cast early in-person ballots in the Runoff Elections.  Early voting turnout was particularly high in counties with large minority populations, with some counties seeing upward of a 500% increase.

208.   Yet, despite the unprecedented use of absentee voting, long lines remained at many polling places both during early voting and on Election Day. This was markedly true at polling places serving neighborhoods primarily comprised of Black people.  While on Election Day polls closed at 7:00 p.m., individuals who are in line by the time the polls close are allowed to vote, and the vast majority of polling places that had to stay open late to ensure those waiting in line could cast their ballots were in majority-Black neighborhoods.  Some voters waited hours to vote.

209.   As part of an effort to help voters sustain their strength and make it to the voting booth despite these long lines, Georgia organizations brought and then provided free food and water to polling places.  These efforts contributed to turnout numbers in neighborhoods described above, where wait-times sometimes stretched for hours.

210.   Together, these opportunities—in concert with efforts by organizations focused on increasing minority voter participation and registration— resulted in historic electoral outcomes.  Black voters' preferred presidential candidate won Georgia's electoral votes for the first time in three decades.  Black voters also successfully elected their candidates of choice in the Runoff Elections, including Reverend Raphael Warnock, elected as the first Black person to represent Georgia in the United States Senate.  Exit polls following the Runoff Elections indicated that over 90% of Black voters supported Reverend Warnock and fellow Democratic candidate Jon Ossoff, who was elected to Georgia's other Senate seat.

### E. The Georgia General Assembly passed S.B. 202 immediately following historic Black voter participation in the General Election and Runoff Elections, in a flawed and nontransparent process.

211.   In response to increasing Black voter participation and record election participation in recent elections, the Georgia General Assembly passed S.B. 202, only 79 days after the Runoff Elections.  S.B. 202 placed restrictions on many of the safe and secure options by which Black voters, voters of color, immigrant

voters, poor voters, student voters, older voters, and voters with disabilities exercised their right to vote.

1.    ***S.B. 202 was passed in a hostile, racially charged environment following the General Election and Runoff Elections***

212.   S.B. 202 was passed against the backdrop of a racially charged environment created by misinformation and conspiracy theories spread during the 2020 campaign and in the weeks following Election Day.  In the months leading up to the General Election, election officials in multiple states raised concerns about deliberate misinformation efforts targeting minority—and in particular—Black voters.  A robocall targeted Black voters in Detroit "using racially charged-stereotypes and false information to deter voting by mail," according to Michigan's Secretary of State.  On social media, Black and Latinx voters were reportedly flooded with ads designed to discourage them from voting altogether.

213.   Following the General Election, certain elected officials, news organizations, and campaign aides and lawyers levied unfounded claims of voter fraud, as dozens of lawsuits were filed to invalidate hundreds of thousands of ballots cast in cities with large Black voter populations including Milwaukee, Philadelphia, Detroit, and Atlanta.

214.   In Georgia, allegations targeting the integrity of the election included groundless, false assertions that voter signatures were not adequately verified on absentee ballots, that "suitcases" full of fake ballots were counted in the final tally,

that ineligible voters participated in the election, and that the identities of deceased individuals were used to cast votes.

215.   Georgia's election officials repeatedly addressed and debunked these claims of voter fraud.

216.   In post-election litigation, state and federal judges rejected at least four lawsuits challenging Georgia's election results based on dubious claims of voter fraud.  By mid-December, dozens of state and federal judges across the country rejected post-election lawsuits challenging the results of the General Election.

217.   In the wake of the General Election, legislatures across the country sought to restrict voting access in yet another attempt to suppress Black political participation and disenfranchise Black voters.  According to a report from the NYU School of Law's Brennan Center for Justice, in the first 50 days of 2021, state legislators in 43 states filed over 250 bills that would restrict voting access— seven times as many restrictive voting laws as proposed during the same period in 2020.

218.   In Georgia, the effort to restrict voting began days after the Runoff Elections.  Georgia held the Runoff Elections to fill its two U.S. Senate seats, and Jon Ossoff and Raphael Warnock were declared the projected winners the next day.  Two days after Election Day and a day after the insurrection, in the early hours of January 7, 2021, the U.S. Congress certified President Joe Biden and Vice

President Kamala Harris, the first Black and Asian-American Vice President, as the winners of the General Election after the process was delayed by a violent mob of rioters who stormed the U.S. Capitol.  Later that day, Georgia House Speaker David Ralston announced that he would form a Special Committee on Election Integrity.  Representative Barry Fleming serves as the Chair of the 14-member Special Committee, and Representative Alan Powell serves as its vice-chair.

219.   At the start of the legislative session, the Chair of the Gwinnett County Elections Board indicated why she wanted the Georgia General Assembly to impose new restrictions on voting: "They don't have to change all of them, but they've got to change the major parts of them so that we at least have a shot at winning."  The U.S. Supreme Court has warned that measures designed to harm racial minority voters for political interests can run afoul of the federal Constitution.  *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 914 (1995)).

220.   Georgia House Speaker David Ralston stated that he does not want every registered voter to receive an absentee ballot because it would "certainly drive up turnout."  He also has baselessly invoked concerns about voter fraud and election fraud as reasons why vote-by-mail should not be acceptable.

### 2. *The Georgia General Assembly passed S.B. 202 with little process or regard for the ideals of an open democracy*

221.   Neither legislative committee tasked with assessing S.B. 202, its precursors, Senate Bill ("S.B. 241") and House Bill ("H.B. 531"), and other

elections bills with provisions added to S.B. 202 provided open, transparent, or inclusive practices for public testimony. For example, neither the Senate Committee on Ethics ("Senate Committee") nor the House Special Committee on Election Integrity ("House Committee") publicly announced basic information about who could testify, how to sign up for testimony, or how testimony would be conducted in advance of hearings.

222.   When guidance was provided about public testimony, it was often inconsistent. For example, prior to a February 19, 2021 House Committee hearing, the House Committee indicated to members of the public that remote testimony via videoconferencing technology would not be available. But during the hearing, Chair Fleming invited certain witnesses to testify remotely. Only in response to a question during the hearing did Chair Fleming indicate publicly for the first time that remote public testimony would be available. However, this opportunity was only offered to members of the public who were specially invited by House Committee members or staff to testify.

223.   On some occasions, witnesses were denied the opportunity to testify despite repeatedly filing written requests to testify. For example, the NAACP Legal Defense & Educational Fund ("LDF"), counsel for Plaintiffs, was unable to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting in writing an opportunity to testify on multiple occasions beforehand. Despite this, Chair Fleming inaccurately proclaimed at the

end of the February 23, 2021 hearing that everyone who signed up to testify had been afforded an opportunity to do so.

224.   Members of the disability community were often shut out of the legislative process entirely.  For example, Gaylon Tootle, the First Vice President for the National Federation of the Blind-Georgia, a member of Plaintiff The Arc of Georgia, and a Black resident of Georgia with a visual disability, attempted to testify multiple times at hearings on elections bills about the impact of proposed changes on voters with disabilities but was denied each time.

225.   Updated versions of the bill were almost never uploaded to the General Assembly website in a timely manner.  Many committee hearings on elections bills took place even though the version of the bill being discussed had not been uploaded online for the public's consideration and legislators explained during the start of committee hearings that the bill being reviewed would likely change after substantive changes were discussed among legislators.  This made it impossible for legislators and members of the public to meaningfully offer comments and engage with the substance of elections bills.

226.   For example, during a February 25, 2021 Senate Committee hearing, Senate Committee Chair Max Burns, the author of S.B. 202, announced that a substitute version of S.B. 241 incorporating a significant set of amendments, would be provided by the next day.  Doing so was particularly important, he explained, because members should have an opportunity to review the amended text before

the next Senate Committee meeting on March 1, 2021.  However, a substitute version of the bill was never provided the following day, nor at any time prior to the meeting to consider the amendments.  Instead, the final amendments, which would ultimately form the basis for S.B. 202, were only publicly disclosed and discussed for the first time *during* the March 1, 2021 meeting.  One senator even complained at the March 1, 2021 meeting that it was her first time reading the proposed changes.  That same day, the Senate Committee held a vote on an amended version of the same bill, which was then sent to the Senate floor.

227.   Between March 17, 2021, when the House Committee first considered the more than ninety pages of amendments to the substituted version of S.B. 202, and March 22, 2021, when the House Committee recommended S.B. 202 for passage, the House Committee held three public hearings to discuss the bill and produced four substitute versions.  The operative version of the bill was never publicly posted on the Georgia General Assembly website before the hearing, depriving members of the public the opportunity to review and discuss.

228.   In the House Committee, when Chair Fleming was challenged about the lack of transparency in the legislative process at a hearing held on March 18, 2021 to discuss S.B. 202, he responded that his office was willing to send a copy of an updated bill to anyone who asked for it.  This would require a member of the public to follow all hearings, know that there was a change in a bill, know from watching the March 18, 2021 hearing that one could request a copy of the bill, and

have the time and knowledge to reach out to a legislative staffer to request a copy of the bill, which had grown from three pages the previous day to ninety.

229.   Lengthy bills were often provided to the public with little or no time to read them, much less analyze them, before the House and Senate Committees convened hearings on them.  For example, the original version of H.B. 531, provisions of which were incorporated into the final version of S.B. 202, was only made available through postings on social media mere hours before members of the House Committee convened for a hearing on February 18, 2021.  Then, less than 24 hours later, the House Committee held another hearing before all its members at 9:30 a.m.  The House Committee continued to amend H.B. 531 and hold hearings on amended versions of the bill without making amendments or substitute versions publicly available.

230.   Many committee hearings related to elections bills were scheduled and held with little to no advance notice.  For example, members of the House Committee were given three hours' notice that S.B. 202 would be discussed at a House Committee hearing on March 17, 2021.  And only after the agenda was circulated did those members receive the substitute version of S.B. 202 which had grown from three to over ninety pages. Despite insufficient notice to his own Committee members, much less any notice to the public, Chair Fleming held a full hearing on eighty-seven pages of amendments mere hours later.

231.   Some of these hearings were not live-streamed for the public to participate.  Often, testimony was limited only to those members of the public who could attend these hearings in-person.  This requirement was often enforced even as the COVID-19 pandemic was ravaging the state.

232.   The Senate Committee, in which S.B. 202 was introduced and which heard precursors S.B. 241 and H.B. 531, held numerous hearings early in the morning at either 7:00 a.m. or 7:30 a.m., including on February 25, 2021.  These hearings took place in a building that was not officially open to the public until 7:00 a.m., which forced members of the public to arrive late or miss part of the meeting.  The scheduling of these hearings, ninety minutes before the start of traditional business hours and at the beginning of the building's opening hours, appear calculated to avoid scrutiny and exclude members of the public.

233.   Although concerns were raised by members of the public about the potential racial impact of proposed elections changes during House and Senate Committee hearings, it appears that no analysis was ever conducted by the Committees to evaluate the racial impact of any of the elections bills considered or passed by the General Assembly.  Neither Committee ever responded to written requests from LDF and the Southern Poverty Law Center ("SPLC"), also serving as a counsel to Plaintiffs, to produce a racial impact analysis.  In fact, when directly asked on March 17, 2021 in oral testimony by a representative of the

SPLC whether the Senate Committee would conduct a racial impact analysis, the Committee members refused to respond.

234.   On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a statement stating it was "concerned that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

235.   S.B. 202 was rushed out of the Georgia General Assembly. Amendments were still being added to S.B. 202 in the Rules Committee the same morning that the House of Representatives was set to consider the bill on the chamber floor.  After the House passed a substituted version of S.B. 202 on March 25, 2021, it was immediately transmitted to the Senate.  No conference committee was convened.  The bill was brought to the floor of the Senate for a vote mere hours later.  Prior to the Senate vote, State Senator Elena Parent requested that the bill's fiscal impact be determined before passage.  Within minutes, Lieutenant Governor Duncan denied this request and ruled that no fiscal determination needed to be made because S.B. 202's fiscal impact would not exceed $5 million.  No evidence was provided to support this on-the-spot determination, despite evidence submitted in both the House and Senate Committees that several provisions of S.B. 202 would have significant fiscal impact.

236.   S.B. 202 was rushed into being signed into law with little time for the public to weigh in.  Mere hours after the House and Senate voted on the now 98-

page version of S.B. 202, Governor Brian Kemp signed the bill into law in a closed-door signing ceremony.  During the time between passage of S.B. 202 in the General Assembly and when the Governor signed the bill into law, the Governor's office did not accept any messages by phone.  S.B. 202 moved from the House to the Senate and was signed into law by the Governor in less than seven hours.

237.   Even legislators were forcibly shut out of the process of the Governor signing S.B. 202 into law.  Representative Park Cannon was arrested and forcibly removed from the State Capitol when she knocked on the Governor's office door, requesting that the public be allowed to witness the announcement of the bill signing that was under way.

**F.  The challenged provisions of S.B. 202 place limitations on opportunities for voters to exercise their right to vote.**

**1.   *Sections 20 & 26, mobile voting unit restrictions***

238.   Prior to the enactment of S.B. 202, Georgia law permitted county election administrators to procure and provide portable or movable polling facilities, also known as "mobile voting units," as supplemental polling locations during the advance voting period and on Election Day.

239.   In the 2020 election cycle, these mobile voting units were deployed to mitigate the shortage of accessible and secure polling locations that resulted in long lines of voters at existing and traditional polling locations.  Fulton County, for instance, purchased two mobile voting units which made stops at twenty-four

different locations, including several Black churches, during the advance voting period ahead of the General Election.

240.   Despite the absence of any facts to indicate the mobile voting units used in the 2020 election cycle were not secure, caused confusion, or generated any other voter access or election administration issues, Section 20 of S.B. 202 restricts the use of mobile voting units to situations where an emergency is declared by the Governor.  Such an emergency declaration may only occur under a narrow set of conditions and only after particular procedures are taken, including a convening of a special session of the General Assembly.  Relatedly, Section 26 of S.B. 202 additionally restricts the use of mobile voting units to supplement existing polling locations during the advance voting period.

**2.**      ***Section 25, new identification requirements, timing parameters, and wet signature requirements for requesting an absentee ballot***

241.   Georgia has relied on vote-by-mail procedures for decades.  Prior to S.B. 202's enactment, a voter could request an absentee ballot by providing certain information, such as the current address at which they are registered to vote and the voter's signature or the signature of the eligible relative requesting the ballot on behalf of the voter, and the signature of the person providing assistance to the voter, if applicable.  Additionally, before S.B. 202, voters could request an absentee ballot 180 days prior to an election through the Friday prior to the election.

242.   Section 25 of S.B. 202 now requires, in addition to the voter's

registration address, that the voter provide their date of birth and Georgia driver's

license or state ID card number.  S.B. 202 further demands that a voter who does

not have a Georgia driver's license or state ID card instead provide a photocopy or

electronic image of other acceptable ID, such as a utility bill, bank statement,

government check, paycheck, or other government document containing the name

and address of the voter.

243.   Section 25 of S.B. 202 further requires voters to add their signature to

the absentee ballot application in "pen and ink."  Voters who had previously

applied to vote absentee entirely online will now have to obtain a hard copy of an

absentee ballot application.

244.   Section 25 of S.B. 202 still requires that the voter or a relative

assisting or requesting the absentee ballot sign the absentee ballot application with

"his or her usual signature."

245.   Section 25 of S.B. 202 requires that Georgia election officials verify

the identity of the voter by comparing the voter's name, date of birth, and Georgia

driver's license or state ID card (or other identifying record) with the information

in the voter's voter registration record.

246.   Section 25 of S.B. 202 also delays and compresses the time period

during which a voter may request an absentee ballot.  Unless a voter is

hospitalized, S.B. 202 reduces the time a voter can request an absentee ballot to 78

days prior to an election and requires that the application be received by the county election administrator 11 days prior to the election.

### 3. *Sections 27 & 28, new identification requirements for casting an absentee ballot*

247.  Under Section 27 of S.B. 202, a voter must now provide additional personal ID information on the outside of the absentee ballot mailing envelope to complete their absentee ballot submission.  This information includes a Georgia driver's license number or state ID card number, the voter's date of birth, and the last four digits of the voter's social security number if the voter does not possess a Georgia driver's license or state ID card.

248.  According to Section 28 of S.B. 202, if the voter does not possess a Georgia driver's license, state ID card, or social security number, the voter must include a photocopy of other acceptable identification—such as a utility bill, bank statement, government check, paycheck, or other government document containing the voter's name and address with their returned absentee ballot.

249.  The voter must additionally sign an oath in their "usual signature" swearing, under criminal penalty, that they have completed their ballot in secret. S.B. 202 § 27.

250.  Section 28 of S.B. 202 requires that Georgia election officials, in order to confirm the identity of the voter, compare the information on the absentee mailing envelope—namely, the voter's Georgia driver's license number or state ID card number, the voter's date of birth, and, if the voter does not possess a Georgia

driver's license or state ID card, the last four digits of the voter's social security number—with the information contained in the voter's registration records.

251.   If the identifying information does not match, Section 28 of S.B. 202 requires that Georgia election officials reject the voter's absentee ballot.

### 4.   *Section 26, secure drop box limitations*

252.   Before S.B. 202's enactment, Georgia voters enjoyed the ability to safely and securely cast their ballot by drop box in one of the existing 330 drop boxes in Georgia, many of which were freestanding and installed outside of a building.

253.   Before S.B. 202, many county election administrators chose to exercise their discretion to keep drop boxes open after business hours and beyond the advance voting period and up until the polls closed at 7:00 p.m. on Election Day.

254.   In the 2020 election cycle, which includes the January 2021 runoffs, pursuant to emergency regulations passed by Defendant State Election Board, counties were required to monitor each drop box through 24/7 video surveillance to ensure security of drop box voting.

255.   The statewide use of drop boxes in the 2020 election cycle provided the flexibility necessary to ensure voters had meaningful access to secure drop boxes, minimized crowding, alleviated the risk of long lines during in-person

voting, and helped address voter concerns about mail delivery. Drop boxes were and continue to be necessary to providing equitable voting options.

256. First, Section 26 of S.B. 202 curtails the availability of drop boxes to the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county. This drastically reduces the number of drop boxes available in the most populous counties, but also in smaller counties. For instance, voters in Richmond County would go from having 5 drop boxes (with the option for more) to having only 1, or from 35 to 5 and 36 to 8 in DeKalb and Fulton Counties, respectively.

257. Second, S.B. 202 requires drop boxes to be established inside of the office of the board of registrars or absentee ballot clerk or inside of an advance voting location. Only during Governor-declared emergencies are drop boxes permitted to be located outside.

258. Third, S.B. 202 limits the hours in which a drop box is available to the hours of operation of that office or advance voting location.

259. Fourth, S.B. 202 replaces the 24/7 human surveillance requirement with a mandate that all drop boxes be under constant surveillance by an election official, law enforcement officer, or licensed security guard.

### 5. *Section 28, runoff early voting restriction*

260. S.B. 202 forces all runoff elections to take place 28 days after the general or primary election and Section 28 of S.B. 202 drastically reduces the

advance voting period for runoffs from three weeks to one week, with no mandatory weekend voting days, including Sunday voting.

### 6.    *Section 33, Line Relief Ban*

261.    Section 33 of S.B. 202—the Line Relief Ban—criminalizes volunteers who provide free food, seating, and water, or any other "gifts," as well as other practices and materials associated with line relief, to voters standing within 150 feet of the outer edge of a polling place.

262.    Because S.B. 202 also prohibits a volunteer from coming within 25 feet of any voter standing in line, even outside of the 150-foot zone, it covers conduct hundreds of feet in distance from the polling place entrance.  It would prevent a volunteer from getting close enough to offer the loan of a folding chair (or umbrella for shade) to an older or disabled voter.

### 7.    *Sections 34 & 35, out-of-precinct provisional ballot*

263.    Prior to S.B. 202, if an otherwise eligible voter casts a provisional ballot in the county in which they reside but at a different precinct than the one assigned to them ("out-of-precinct"), their ballot would be counted for every race on that ballot in which the voter was qualified to vote.

264.    Over 11,000 voters cast a provisional ballot in the General Election and more than 10,000 voters cast a provisional ballot in the Runoff Elections. Most of these provisional ballots comprised out-of-precinct ballots.

265.   Sections 34 and 35 of S.B. 202 now prohibit election officials from counting provisional ballots cast by Georgia voters who cast a ballot before 5:00 p.m. on Election Day, if they cast their ballot in a different precinct, even if it is located within the same county in which the voter resides.  Rather than count their votes for all of the races to which the voter was qualified and otherwise eligible to vote on that precinct's provisional ballot, S.B. 202 requires poll officials to inform such person that their vote is invalidated for all of the races on that ballot.

**8.**   ***Section 47, felony punishment for acceptance of an absentee ballot for delivery or return if not a family member or caregiver***

266.   Prior to S.B. 202, a limited set of people were technically authorized to assist voters with disabilities in returning their absentee ballot:  caregivers, household members, and certain family members.  O.C.G.A. § 21-2-385.  S.B. 202 now criminalizes the provision of such assistance in returning a ballot by mail or personal delivery.  Even though state and federal law allows voters with disabilities to receive assistance in voting from a person of their choice (except an employer or union steward), S.B. 202 now criminalizes such assistance from anyone who is not a family member or "caregiver."

**G. S.B. 202 severely burdens all voters, and discriminates against Black voters, other voters of color, disabled voters, and other historically disenfranchised communities, in particular.**

267.   The challenged provisions of S.B. 202 independently and cumulatively establish obstacles that severely burden or outright deny Plaintiffs'

members' right to vote.  By closing off options to vote at mobile voting sites, by mail, by drop box, or through early voting (where runoffs are concerned), the provisions of S.B. 202 funnel voters toward in-person voting on Election Day.  For voters that are able to access this option, they are forced to stand in long lines, for long periods of time, made longer by the elimination of alternatives that funnel other voters to do the same.  Once these voters are in line, S.B. 202 raises the cost of queueing to cast a ballot by prohibiting line relief volunteers from offering voters a drink of water or something to eat.  And even after these voters reach the front of these lines to cast as ballot, S.B. 202 effectively disenfranchises many of them who happen to appear at the wrong precinct, or at the very least, imposes additional severe burdens upon these voters that require them to repeat the performance a second time, if that is even possible.

268.   S.B. 202 thus imposes cascading burdens, whose cumulative effect on Georgia voters as a whole is even more severe and significant than any of its individual parts.  These burdens, moreover, fall upon *all* Georgia voters, including those who are willing and able to bear the additional costs to exercise their right to vote.  This is because S.B. 202's obstacles raise the cost of voting for every voter, requiring all eligible Georgia voters to expend more resources and incur greater opportunity costs to cast a ballot—including, for example, expenditures for transportation and childcare, and the costs of foregoing employment

opportunities—even where a voter is not completely deterred or prevented from voting.

### 1.     *Elimination of mobile voting units*

269.   The elimination of all mobile voting units except at Defendant Governor Kemp's discretion in the event of "emergencies" unduly and especially burdens voters of color.  Mobile voting units consist of buses specially outfitted to provide four to eight additional, secure voting stations.  In the General Election, these mobile voting units were used within Fulton County, where the majority of the population is nonwhite and with Black voters comprising more than 40% of registered voters, to provide accessible voting.  Fulton County's own website notes that "the County's new Mobile Voting Unit is an accessible voting unit that will create a simple, secure voting experience for voters of all ages and voters with disabilities."  The most populous county in Georgia, Fulton—along with the other Atlanta metro area counties—has an established history of long voting lines and backlogs of absentee ballot requests, which disproportionately affect voters of color in Georgia.  Indeed, these impediments to voting during the June 2020 primary led Fulton County to double its budget for elections, secure grants, and procure the two mobile voting units that were used in the General Election.  The efforts by Fulton County were successful and posed no election security risks.  The General Election saw the largest voter turnout in 28 years, with an overall turnout rate of 77.92%.  With the historic voter turnout in the General Election, which

Georgia's election officials have universally confirmed was secure and accurate, it is clear that these mobile voting units contributed to the ability of Fulton County voters who would otherwise not have been able to vote, to cast their votes. These mobile voting units, moreover, helped reduce barriers to voting that disproportionately affect voters of color. By eliminating mobile voting units, S.B. 202 will disproportionately burden the majority nonwhite citizens of Fulton County who relied on these units to participate in the General Election.

## 2. *Additional requirements for absentee voting*

270. The ID Requirements impose a severe burden on Georgia voters, and most acutely voters of color and with disabilities. Absentee voting has been critical to ensuring that all voters, and especially voters with disabilities, have equitable and safe access to the ballot box. The addition of the ID Requirements for absentee voting will dramatically limit absentee ballot access by imposing discriminatory and unnecessary burdens on or barriers to voting for voters who do not have one of a few limited forms of acceptable ID. Moreover, people with disabilities are much less likely to have access to the internet, to own a home computer, or even to own a smartphone. Voters who lack access to printers, scanners, copiers, or the internet would find it difficult if not impossible to make copies of alternative documents in order to comply with this absentee voting requirement.

271.   These harms will not be borne equally among different voting populations.  Instead, they will fall disproportionately on people of color, people with disabilities, older people, poor people, rural residents, and students—all populations who face heightened challenges accessing DMV offices, photocopiers, and the ability to pay for photocopies, or a polling place to vote in-person.

272.   For instance, a disproportionate number of people with disabilities do not drive and therefore are less likely to possess a state driver's license or other ID card.  Voters with disabilities face significant transportation barriers.  They own their own vehicles less frequently, depend on others for rides more frequently, and limit their travel to daytime trips.  A 2017 survey by the U.S. Department of Transportation's Bureau of Transportation Statistics found that 12.2% of people with disabilities aged 18-64 who are employed and 22.5% of people with disabilities in the same age group who are not employed live in households without a vehicle, compared to 3.9% of people without disabilities who are employed and 9.5% of those who are not employed.  The same survey found that, even for those who had access to a vehicle, only 60.4% of people with disabilities drove, compared with 91.7% of those without disabilities.  The same survey found that people without disabilities took 83.9% of trips by personal vehicle, while people with disabilities took only 74.6% of trips in a personal vehicle.

273.   In addition, approximately 16.6% of Georgia's voting-age citizens who lack access to a vehicle live more than 10 miles from a state office that issues

IDs.  Almost all of these citizens live in rural areas where public transportation is unavailable.  These areas also house high concentrations of people of color, people with disabilities, and people living in poverty.  In Georgia's "Black Belt," there are 21 contiguous and predominantly Black rural counties where all State driver's license offices are open two days per week or fewer.  The same populations would face similar challenges in accessing a photocopier to copy their ID, which S.B. 202 would require of voters without a driver's license or state ID.  For older people, people with disabilities, students, and others who cannot physically cast a ballot in-person and therefore rely on vote-by-mail, the discriminatory nature of the ID Requirements is particularly acute.

274.   Moreover, the ID Requirements would exacerbate existing racial disparities in absentee ballot rejections.  As it stands, without these additional requirements that Black and other voters of color will be disproportionately unable or burdened to satisfy, there are well-documented and long-standing racial disparities in absentee ballot rejections in Georgia.  Data from recent elections reported by the Brennan Center for Justice reflects that racial disparities continue, consistent with previous literature.

275.   Such exacerbating factors and their impact on people of color and other historically disenfranchised communities have led to similarly stringent ID Requirements adopted by other states to be invalidated as violating the U.S. Constitution, Section 2 of the VRA, or both.

276.   The General Election and Runoff Elections featured historically high turnout fueled by broad reliance upon absentee voting.  Data from these elections show that nonwhite voters used mail-in voting at unprecedented rates even higher than white voters.  For example, nearly 30% of Black voters voted by mail in the 2020 General Election, compared to 24% of white voters.

277.   In the absence of any recorded or statistically significant evidence of absentee voter fraud in Georgia—an Arizona State University study found just eight isolated instances of alleged absentee voter fraud in Georgia that actually resulted in a plea or consent order between 2000 and 2012, a rate of less than 0.00003% during the covered time period, and dozens of state and federal courts, as well as state election officials, reaffirmed the absence of voter fraud in the aftermath of Georgia's General Election—there is simply no sufficiently weighty justification, let alone a rational or compelling need, for imposing the onerous ID Requirements on absentee ballot voters that will disproportionately burden minority, poor, older voters, rural populations, voters with disabilities, and student voters.  Given that these voters disproportionately rely on absentee voting by necessity rather than choice, the ID Requirements—by erecting new and unwarranted barriers to absentee voting—will deprive them of an equal opportunity to participate in the electoral process and elect representatives of their choosing.  Moreover, these ID Requirements pose security risks to voters, as absentee ballots and ballot applications will now be known to include significant

personally identifying information.  Immigrant voters, voters with disabilities, and voters of color are particularly vulnerable to identity theft scams based on their need for additional language and other assistance to complete forms.

### 3.   *Restrictions on distribution of absentee ballots*

278.   Data from recent years demonstrates that while Black voters comprise 30% of Georgia's voting population, these voters account for almost 42% of the request for absentee ballots.  Per the Georgia Secretary of State's own data, Black voters are more likely to vote by mail than any other racial demographic.  This is not because Black voters simply prefer to vote by mail; they face unique obstacles to voting in person because they are more likely to lack access to transportation and to work in jobs that do not allow them to take time off during business hours. Other communities, including people with disabilities, immigrants, the poor, older people, and students, have likewise relied disproportionately on absentee voting, particularly during the General Election and Runoff Elections.  For instance, immigrant voters who often need translation services to complete a ballot often prefer to vote by mail so they have more time to complete their ballot.  Voters with disabilities often need to vote by mail because they have difficulty leaving their homes, have little or no access to transportation, face architectural or other barriers at the polling place, or have difficulty waiting in long lines to vote in person.

279.   Because S.B. 202 will severely restrict access to absentee ballots, including by explicitly restricting their distribution by state and local officials and

voter outreach organizations, the severe burdens imposed by the law will disparately impact and discriminate against these voters, including by forcing them to vote more heavily in-person when in-person voting may not be a tenable option, and under circumstances where in-person voting involves overcoming additional burdens that result from long lines, grueling waits, and greater risks of having one's ballot rejected—burdens that are already disproportionately visited upon voters of color.

### 4.    *Restrictions on drop boxes*

280.   S.B. 202's restrictions on the location, availability, and operating hours of ballot drop boxes will disproportionately burden Black, Asian, and Latinx voters, as well as voters with disabilities.  Georgia voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot.  Many voters have caregiving or strict (and/or unpredictable) work commitments that limit their availability during normal voting hours, as well as those with medical conditions or other disabilities—and voters of color compose a disproportionately large share of these groups.  For these voters, casting an in-person ballot during advance voting or on Election Day may be an untenable option.  In addition, widely reported and continuing failures at the United States Postal Service have raised justifiable concerns about relying on the Postal Service to cast a ballot.  Finally, voters of color are more likely to use ballot drop boxes.  For these voters, secure drop boxes

provide a reliable and accessible option, and the enacted restrictions severely burden their right to vote and deny their access to vote by forcing them to navigate more onerous paths to voting, if they are able to vote at all.

281.   The requirement that drop boxes all be moved inside a building poses a particular barrier for voters with mobility disabilities.  Many registrar's offices are physically inaccessible due to a lack of adequate accessible paths of travel to building entrances, entrances that are themselves inaccessible, or other barriers.  If an accessible route is available, it may be hard to find, and poorly marked. Because of S.B. 202, voters with mobility disabilities can no longer drive (or be driven) to a drop box on the street and submit the ballot from the car.  Instead, they must find an accessible parking spot, exit the vehicle (which is often time consuming and difficult), navigate an accessible route to the building entrance, find the registrar's office, and repeat the entire process for the return.  In other words, they must face many of the challenges that make voting in person difficult for them and that make absentee voting a better option for them.

282.   The new mandate for in-person "constant surveillance" of secure drop boxes by an election official, licensed security guard, or law enforcement official also poses serious voter intimidation concerns for Black voters and other voters of color whom law enforcement routinely and unfairly target.  Without any evidence that (potentially armed) law enforcement surveillance is necessary to repel fraud or misconduct, S.B. 202's needless surveillance mandate recalls Jim Crow era voter

intimidation deployed to deter Black voters in particular from casting a ballot.  The

new drop box restrictions raise the same threats and burdens, and fall most heavily

upon communities of color, and do not increase the security of Georgia elections.

### 5.      *Prohibiting provisional ballots cast in the wrong precinct*

283.   S.B. 202 also outright *disenfranchises* eligible Georgia voters who

cast ballots in the wrong precinct—the most severe burden there is.  Under the new

law, Georgia election officials must discard the entire ballot cast in the incorrect

precinct, even if the ballot contains eligible votes.  For example, while local races

on a ballot may be precinct-specific, ballots also contain congressional and federal

races which are not precinct-specific.  Yet rather than counting the ballot's votes

for eligible races as was done in the past, S.B. 202 *requires* the entire ballot to be

thrown away—even if it was cast by an eligible registered voter, and even if it was

cast in a timely manner and otherwise qualified to be counted—disenfranchising

voters from participating in elections in which they have a right to vote.

284.   This new practice will disproportionately affect Black voters, and

other historically disenfranchised communities, who are proven to be more likely

than white voters to cast an out-of-precinct ballot.  Such voters are more likely to

have moved within their county than white voters, and thus more likely to arrive at

an incorrect precinct.  Recent research specifically demonstrates that Black voters

in Georgia disproportionately live in neighborhoods with much higher rates of in-

county moves.  Not only does the data reflect that the population with the most in-

county moves is 47% Black, relative to 37% non-Hispanic white, but the

population with the *least* in-county moves is only 22% Black, compared to 64%

non-Hispanic white.  Requiring election officials to discard ballots cast in the

wrong precinct will thus not only disenfranchise a substantial number of Georgia

voters each year, but it will do so disproportionately within Georgia's Black

community, as well as other similarly situated immigrant, minority, student, and

poor populations prone to the same pressures that require regular relocation.

285.   This practice will also place additional burdens on voters with

disabilities, many of whom do not have their own vehicles and who rely on public

transportation, paratransit, or rides from family members, friends, or outside

organizations to get to the polls.  These voters, if they arrive at the wrong polling

place, cannot easily go to the correct polling place, as they may not be able to

obtain another ride to that polling place, might face a lengthy journey on public

transportation, or may not be able to access the correct polling place.  These voters

will be effectively disenfranchised if they cannot cast a provisional ballot at the

polling place where they arrive.

### 6.     *The early voting runoff restrictions*

286.   S.B. 202 dramatically reduces both the timeframe for runoff elections

and the early voting period available during those elections, including by

eliminating the guarantee of an opportunity to vote early on the weekend.

Advance voting opportunities and particularly weekend voting opportunities are

essential to ensuring voters can safely, securely, and freely participate in our democracy—particularly for voters of color, who are more likely than white voters to be employed in jobs that do not allow scheduling flexibility.  They are important mechanisms that give voters the option to cast their ballots without facing the crowds and long lines on Election Day, as well as the flexibility to balance family and work obligations that make voting on Election Day untenable for thousands of Georgians, and especially voters of color.

287.  Eliminating opportunities to vote early imposes direct and secondary burdens upon Georgians' right to vote, including those that vote on Election Day. Most directly, restricting the early vote period forces voters who need to vote early to do so on fewer days.  This restriction functionally prevents some voters from voting altogether.  And even for those who do vote early anyway, the restriction has the secondary effect of adding to the long lines and wait times at the early voting polls on those fewer days, which has the effect of deterring, burdening, and in some cases functionally eliminating those voters' right to vote.  The same secondary effects flow through to Election Day, where some voters who prefer but do not need to vote early are pushed due to overcrowding during the early vote period.  Simply put, the fewer days available to vote, the more onerous voting becomes.

### 7.  *The Line Relief Ban*

288.   In addition to curbing voters' opportunities to vote absentee, at mobile voting units, or during early voting, S.B. 202's Line Relief Ban imposes *criminal liability* on any volunteer who offers food, water, or seating to voters standing in long lines at in-person polling places—oftentimes for hours—to vote.

289.   This burden is most severely felt by Black voters and other voters of color, who disproportionately experience significantly longer wait times and longer lines during in-person voting.  The line waits experienced in majority nonwhite precincts of Georgia are staggering.  During early voting for the General Election in Gwinnett County, for example, early voting lines began forming at 4:00 a.m., three hours prior to the opening of polls, and during midday reported wait times of five to eight hours.  Six of Gwinnett County's seven most congested polling places serve predominantly nonwhite neighborhoods.  This is not an isolated incident, but in fact a regular occurrence across Georgia.

### 8.  *Criminalizing the acceptance of an absentee ballot for delivery or return*

290.   Section 47 of S.B. 202 makes it a felony offense to knowingly accept an absentee ballot "from an elector for delivery or return to the board of registrars" except as authorized by Ga. Code. Ann. § 21-2-385(a).  This code section provides that only certain family members, household members, and caregivers can mail or deliver absentee ballots on behalf of voters with disabilities.

291.   Numerous Georgians with disabilities regularly receive assistance from people who do not clearly fall within these categories in returning their voted absentee ballots.  Staff of nursing facilities, for example, include people who are not nurses or otherwise considered to be "caregivers," who may collect absentee ballots from residents and post them in the mail.  Meanwhile, Georgians with disabilities living in the community often seek assistance from neighbors, friends, distant family members, or trusted acquaintances to return their ballots.

292.   By criminalizing this type of assistance—on top of imposing ID and wet signature requirements for voting absentee—S.B. 202 disproportionately burdens, discriminates against, and denies access to voters with disabilities and their chosen assistors.  People who are otherwise allowed to help a voter with a print disability apply for and mark their absentee ballots will no longer be able to help ensure that the voted ballot gets received by election officials.  Voters with disabilities may be required to identify additional people they trust to help them with the final step of mailing or personally delivering their voted ballots.  And whether they are authorized to or not, fewer people overall will be willing to assist voters with disabilities with the absentee balloting process, due to the new, severe penalty for violation of Ga. Code. Ann. § 21-2-385(a).

### 9.   *The cumulative effects of the challenged provisions*

293.   As S.B. 202 itself acknowledges, in-person voting in Georgia is plagued by "long-term problems of lines."  S.B. 202 § 2(7).  According to the

Bipartisan Policy Center, in 2018, Georgia had the single longest average wait time to vote out of all fifty states.  Long lines are corrosive to democracy.  These lines force voters to choose between their health, their time, or their job and exercising their fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future.  Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.

294.   Defendants' structuring of Georgia's elections helps create these lines. More than half of Georgia's 2,655 precincts are assigned more than 2,000 voters, the recommended maximum.  In rural counties, over 22,000 voters can be assigned to a single polling place.  The average polling place serves over three thousand voters, 47% more than they did in 2012, and far more than the recommended number.

295.   The burdens of these lines do not fall evenly on Georgia voters.  As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."

296.   Georgia is no exception: at polling places that were 10% or less white, the average waiting time was 51 minutes.  At polling places that were 90% white, the average waiting time was six minutes.  Even though only one-third of Georgia's polling places are in majority Black neighborhoods, in the June 2020

primary election, two-thirds of the polling places that had to be kept open late to accommodate voters waiting in line were in majority Black neighborhoods.

297.   Since 2012, almost two million people have registered to vote in Georgia, making up more than a quarter of total active registered voters in 2020. Many of these new voters are younger, nonwhite, and based in the nine counties making up metropolitan Atlanta.  In the same period, rather than accommodating this increase by establishing sufficient polling locations to serve them, the State has cut polling locations by nearly 10%.  Although the cuts happened across neighborhoods, the surge in registration in majority Black precincts means they disproportionately harm those voters.

298.   In the June 2020 primary elections, hundreds of voters were forced to choose: wait in line for hours, with temperatures pushing 90 degrees, or sacrifice their right to vote.  According to an *Atlanta-Journal-Constitution* analysis, Black voters, many of whom have disabilities including chronic illnesses, heart conditions, and asthma, bore the brunt of these long lines: only 61% of majority Black precincts closed on time compared with 80% of mostly white precincts. Whether a precinct closes on time indicates whether there was a line of voters still waiting to cast their ballots.  Some voters in Union City, Fulton County, which is 88% Black, waited in line until 12:37 a.m. to vote.

299.   Voters and journalists documented hundreds of voters waiting in the rain and hot sun in lines extending as far as the eye can see, telling a compelling

story of the magnitude of the problem. *See, e.g.*, Emma Hurt (@Emma_Hurt),

Twitter (June 9, 2020),

https://twitter.com/Emma_Hurt/status/1270500551487295488.



300.   Long lines were a feature of the General Election in Georgia as well,

with wait times of five hours common in metro Atlanta and some voters waiting

over 11 hours.

301.   Because state officials allow these lines to occur year after year,

Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, step up to help

affected voters in Georgia, who are predominantly Black voters and voters with

disabilities condemned to wait in these long lines, overcome the burdens and

barriers those lines impose upon their exercise of the right to vote.  They engage in

line relief efforts, providing voters water, snacks, chairs, and other assistance to

voters waiting in line to vote.

302.   Volunteers from Plaintiff organizations offer water bottles and snacks to voters waiting in line.  For example, during the lunchtime rush, when the polling site is busiest and the weather is hottest, Plaintiff AME Church's volunteers, who are generally AME Church parishioners, offer people water bottles out of coolers. As they do so, they encourage people verbally to stay in line and answer questions about the process.

303.   Providing voters with the supplies they need encourages them to stay in line, reminds them of the importance of casting a ballot, and affirms their value as a person and a voter.  Volunteers offering line relief create a sense of community, reminding voters that voting is a joyful thing and a civic responsibility.  For Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, providing support to voters in line is critical to their speech, including conveying the message of the importance of staying in line, the importance of voting, and underscoring each person's value.  For Plaintiff AME Church, providing this support is living up to the tenets of the Gospel: "For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink."  Matthew 25:35 (NIV).  Additionally, Plaintiffs AME Church and the Deltas believe that line relief helps reaffirm the dignity of Black voters, who are disproportionately affected by longer lines, and who should not be forced to wait in long lines without necessities like food and water.

304.   Because many member churches of Plaintiff AME Church serve as polling sites, those are frequently the sites of the line relief activity its volunteers offer.  These activities are deeply tied with the mission of AME Church and, in addition to members' private contributions, it uses its food pantry inventory to support these activities.

305.   Voters overwhelmingly thank Plaintiffs for these efforts.

306.   S.B. 202's Line Relief Ban targets this practice with criminal penalties.  It bans "giv[ing], offer[ing] to give, or participat[ing] in the giving of … gifts, including, but not limited to, food and drink" to any voter standing in line at a polling place.  Ga. Code Ann. § 21-2-414(a).

307.   In the lead-up to the Runoff Elections, Defendant Secretary of State sent an Official Election Bulletin aimed at suppressing line relief activities via enforcement of the State's ban on buying votes, Ga. Code Ann. § 21-2-570.  This bill now modifies the State's provisions on electioneering.

308.   But Plaintiffs are not bribing voters and they are not electioneering. Line relief is not partisan:  Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, give all voters, regardless of how they plan to cast their ballot, encouragement and support.  Plaintiffs do not ask voters for whom they are voting, and indeed give out their supplies to all voters without knowing what candidates any given voter intends to support.  Their message is not to stay in line for a particular cause or candidate, nor is it to offer a bribe to take a certain action.

309.   Instead, it is merely to encourage people to vote and remind people how precious that right is.  In doing so, Plaintiffs try to remedy a situation caused in part by Defendants.  Plaintiffs go to the polling sites with the longest lines and support whatever voters they find there.  Their activities facilitate, rather than hinder, the free exercise of voters' rights.

310.   The Line Relief Ban will thus not only result in the arrests of Black clergymen, lay leaders, and other volunteers.  It will materially aggravate the already severe burdens that this legislation inflicts specifically and disparately upon Black voters, as well as other poor voters of color from similarly situated communities, who rely on line relief to make it through interminable delays to cast a ballot.

**10.   *S.B. 202's provisions deny qualified individuals with disabilities an equal opportunity to participate in and benefit from voting***

311.   The challenged provisions of S.B. 202 collectively and individually discriminate against people with disabilities in exercising their right to vote, including against Plaintiffs' members and/or constituents.

312.   Provisions of S.B. 202, including provisions requiring an absentee ballot applicant to either have a Georgia ID or to provide copies of identifying documents (which many will also not have), impose eligibility criteria that will screen out or tend to screen out people with disabilities from the absentee voting program.  Other provisions, including those restricting the ability of voters to cast

provisional ballots in the wrong precinct, establish such eligibility criteria with respect to the in-person voting program.

313.   Provisions of S.B. 202, including provisions shortening advance voting times, restricting who may provide assistance to people with disabilities in the process of voting an absentee ballot, and the Line Relief Ban, limit the ability of people with disabilities to enjoy the same opportunity as others to participate in absentee voting and in-person voting.

314.   The multiple restrictions S.B. 202 imposes on opportunities for people with disabilities to access the ballot constitute methods of administering state and local voting programs that will screen out or tend to screen out people with disabilities from voting and/or will defeat or substantially impair the purpose of a voting program—to allow eligible voters to cast their ballots.

**11.**   ***The disparate burdens and barriers imposed by individual provisions of S.B. 202 and the combined effect of the provisions will exponentially harm voters with multiple and/or intersecting race and disability identities***

315.   Not only will each provision of S.B. 202 disparately impact and discriminate against Black voters, other voters of color, voters with disabilities, and other historically disenfranchised communities, voters with multiple of those identities—many of whom are Plaintiffs' members—will face compounded burdens, in scale and degree.

316.   The ID Requirements pose severe barriers to voters of color with disabilities.  A voter of color is less likely to have a Georgia driver's license or

state ID card.  A voter of color with a disability may be even less likely to have ready access to and be able to photocopy or upload another form of acceptable ID, such as a utility bill, because they live in a congregate setting.

317.   Voters of color disproportionately rely on public transportation. Voters of color with disabilities may require accessible, paratransit public transportation.  This type of transportation can be even more difficult to obtain and is less reliable than public transportation.

318.   The negative impact of S.B. 202's drop box restrictions are particularly acute for voters of color with disabilities.  Some registrar's offices inaccessible, and family members or other assistors may have strict or unpredictable work commitments that limit their availability during normal business hours.  Voters of color with disabilities may be unable to rely on these assistors for transportation to a drop box or to vote early during the now-limited runoff advance voting period.

319.   The cumulative negative effects of S.B. 202's provisions in creating long lines will be exponentially felt by voters of color with disabilities.  Black voters who are more likely to face long lines to vote in-person will experience compounding burdens if they also have disabilities that impede their ability to wait in long lines to cast a ballot.  As a result of S.B. 202's criminalization of line relief efforts, the cost of waiting in long lines to vote will be dramatically higher for voters of color with disabilities.

## FIRST CLAIM FOR RELIEF
### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, *et seq.*; 42 U.S.C. § 1983
### (Intentional Racial Discrimination & Discriminatory Results)

320.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

321.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), including pursuant to 42 U.S.C. § 1983, prohibits voting laws, policies, or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"

322.   In violation of the rights of Plaintiffs' members to vote free from racial discrimination and the rights of Plaintiffs to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, S.B. 202 (1) adopts and/or operates bans on mobile voting units for advance voting and election day other than "used in emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) imposes new, restrictive ID Requirements for requesting an absentee ballot; (3) imposes new, restrictive ID Requirements for casting an absentee ballot; (4) limits access to secure drop boxes; (5) restricts the timeline for advance voting during runoff elections; (6) implements the Line Relief Ban; and (7) disenfranchises eligible voters who cast in-county provisional ballots.

323.   S.B. 202 violates Section 2 of the VRA because the above-listed sections were adopted for the purpose of denying voters of color full and equal access to the political process.

324.   S.B. 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the above-listed provisions, individually and cumulatively, will disproportionately deny voters of color an equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote.  Specifically, S.B. 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, and particularly Black voters, from having an equal opportunity to participate in the political process on account of their race or color.

## SECOND CLAIM FOR RELIEF
### Fourteenth and Fifteenth Amendments
### U.S. Const. amend., XIV, XV; 42 U.S.C. §1983
### (Intentional Race Discrimination)

325.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

326.   S.B. 202 violates the Fourteenth and Fifteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, because S.B. 202's provisions that (1) adopt and/or operate bans on mobile voting units for advance voting and election day other than "used in emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) impose new, restrictive ID

Requirements for requesting an absentee ballot; (3) impose new, restrictive ID

Requirements for casting an absentee ballot; (4) limit access to secure drop boxes;

(5) restrict the timeline for advance voting during runoff elections; (6) implements

the Line Relief Ban; and (7) disenfranchise eligible voters who cast in-county

provisional ballots were it was purposefully enacted and operates to deny, abridge,

or suppress the right to vote of otherwise eligible voter on account of race or color.

327.   The facts alleged herein reveals that S.B. 202 was enacted, at least in

part, with a racially discriminatory intent to discriminate against Black voters and

other voters of color in violation of the United States Constitution.

328.   Georgia's long history and ongoing record of racial discrimination in

the context of voting, the known and reasonably foreseeable discriminatory impact

of S.B. 202, the sequence of events and substantive departures from the normal

legislative process which resulted in the enactment of S.B. 202, and the

tenuousness of the stated justifications for S.B. 202 raise a strong inference of a

discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments.

### THIRD CLAIM FOR RELIEF
**Freedom of Speech / Expression**
**U.S. Const. amend. I; 42 U.S.C. §1983**

329.   Plaintiffs re-allege and incorporate by reference all prior paragraphs

as through fully set forth herein.

330.   This action is brought pursuant to 42 U.S.C. § 1983 to enforce Plaintiffs' rights under the First Amendment, as applied to the states by the Fourteenth Amendment, to engage in protected speech and expression.

331.   Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, provide food, water, and other support to these voters, as part of conveying their message of the importance of staying in line, the value of each individual's vote, and their inherent value as a person.

332.   Plaintiffs' line relief goes to the heart of the First Amendment. Encouraging people to participate in the political process, despite the barriers placed in front of them, is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).

333.   This message cannot be split out from Plaintiffs' expressive conduct. Line relief volunteers tell people that voting is important verbally—and they prove it through their actions.  The act of line relief cannot be split away from its message of political engagement, and the First Amendment sees no difference between the two.  *See Meyer*, 486 U.S. at 424 ("The First Amendment protects [the] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

334.   This law creates a criminal misdemeanor to "give, offer to give, or participate in the giving of . . . gifts, including, but not limited to, food and drink,"

to voters.  Ga. Code Ann. § 21-2-414(a).  These provisions apply "[w]ithin 25 feet of any voter standing in line" to vote.  *Id.*  These provisions are squarely aimed at the activities of Plaintiffs, including AME Church, the Deltas, WWA, and The Arc, to support voters waiting in line.

335.   These provisions unconstitutionally burden Plaintiffs' First Amendment rights of speech and expression, and are not supported by any sufficient, let alone compelling, government purpose.

### FOURTH CLAIM FOR RELIEF
**Title II of the Americans with Disabilities Act**
**42 U.S.C. §§ 12131, et seq.**
**(Discrimination on the Basis of Disability by State and Local Government Entities**

336.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

337.   Title II of the Americans with Disabilities Act ("ADA") prohibits state and local government entities from denying qualified individuals with disabilities an equal opportunity to benefit from the entity's services, programs, or activities.  42 U.S.C. § 12132.  The ADA's protections extend to all aspects of voting, including in-person voting on Election Day, advance voting, and absentee voting.  The changes made by S.B. 202 exclude qualified disabled citizens from exercising these rights, further disenfranchising an already marginalized community.

338.   Plaintiffs' members and/or constituents include individuals with disabilities within the meaning of the ADA.   These individuals have impairments

that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  These individuals are qualified for the programs, services, and activities being challenged herein in that they are registered voters otherwise eligible to request and cast a ballot, including an absentee ballot through the mail or at a drop box, in Georgia elections, and are qualified to participate in Defendants' programs and activities related to voting.  42 U.S.C. § 12131(2).

339.   All state and local Defendants are public entities as defined by Title II of the ADA, and individual Defendants are the public officials responsible for running these public entities and supervising their operations.  42 U.S.C. § 12131(1).

340.   The ADA's implementing regulations provide that public entities must not "impose or apply eligibility criteria that screen out or tend to screen out" people with disabilities from "fully and equally enjoying" the programs, services or activities of state and local governments."  28 C.F.R. § 35.130(b)(8).

341.   The ADA's implementing regulations also provide that public entities may not provide aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded "equal opportunity to obtain the same result . . . as that provided to others," or are

"otherwise limit[ed] . . . in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."  28 C.F.R. § 35.130(b)(1).

342.   Further, the ADA's implementing regulations prohibit "methods of administration that . . . defeat or substantially impair accomplishment" of the program's objectives.  28 C.F.R. § 35.130(b)(3).

343.   Under the ADA, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7).

344.   The challenged provisions of S.B. 202 collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of Plaintiffs' organizations.

345.   S.B. 202 imposes burdensome requirements to apply for and submit an absentee ballot by, for example, reducing the time period to request an absentee ballot and adding burdensome identification requirements, as well as criminal penalties to neighbors, friends, or institutional staff who provide even the most basic of assistance to individuals with disabilities in returning an absentee ballot. S.B. 202 further disenfranchises disabled voters who go to the wrong precinct within the right county, and who do not have the resources (physical or financial) to travel to the correct precinct.  By limiting the locations, number, and accessibility of the drop box program, S.B. 202 essentially makes the program

unavailable to many disabled voters.  Finally, by pushing voters to in-person

voting, S.B. 202 will create even longer lines, and further obstacles to people with

disabilities.

346.   Defendants have included no systemic provisions to provide

reasonable modifications to individuals with disabilities in order to avoid these

illegal and discriminatory effects.

347.   Therefore, S.B. 202 discriminates against qualified Georgia voters

with disabilities who wish to participate in the electoral process and violates the

ADA by denying them a full and equal opportunity to participate in the State's

voting programs.

**FIFTH CLAIM FOR RELIEF**
**Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**
**(Discrimination on the Basis of Disability by Recipients of Federal Financial
Assistance)**

348.   Plaintiffs re-allege and incorporate by reference all prior paragraphs

as through fully set forth herein.

349.   Section 504 of the Rehabilitation Act of 1973 ("Section 504")

prohibits discrimination against people with disabilities by any program or activity

receiving federal financial assistance.  Under Section 504, otherwise qualified

individuals with disabilities may not be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any such program.  29

U.S.C. § 794(a).  A program or activity includes "all of the operations of a

department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1).

350.   Plaintiffs' members and/or constituents include individuals with disabilities within the meaning of Section 504.  These individuals have impairments that substantially limit one or more of their major life activities, including, but not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(A). These individuals are qualified for the programs and activities being challenged herein in that they are registered voters otherwise eligible to request and cast a ballot, including an absentee ballot through the mail or at a drop box, in Georgia elections, and are qualified to participate in Defendants' programs and activities related to voting.  29 U.S.C. § 794(a).

351.   Defendants receive "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

352.   The operations of defendants are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B).

353.   Section 504 prohibits covered entities from imposing or applying eligibility criteria that screen out or tend to screen out people with disabilities from fully and equally enjoying the benefits of the programs or activities of a covered entity.

354.   Section 504 also prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

355.   Further, Section 504 prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

356.   Finally, under Section 504, a covered entity must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

357.   The challenged provisions of S.B. 202 collectively and individually discriminate against people with disabilities in exercising their right to vote, including on members and/or constituents of Plaintiffs' organizations.  S.B. 202 imposes burdensome requirements to apply for and submit an absentee ballot by, for example, reducing the time period to request an absentee ballot and adding burdensome identification requirements, as well as criminal penalties to neighbors, friends, or institutional staff who provide even the most basic of assistance to individuals with disabilities in returning an absentee ballot.  S.B. 202 further disenfranchises disabled voters who go to the wrong precinct within the right county, and who do not have the resources (physical or financial) to travel to the

correct precinct.  By limiting the locations, number, and accessibility of the drop box program, S.B. 202 essentially makes the program unavailable to many disabled voters.  Finally, by pushing voters to in-person voting, S.B. 202 will create even longer lines, and further obstacles to people with disabilities.

358.   Therefore, S.B. 202 discriminates against qualified Georgia voters with disabilities who wish to participate in the electoral process and violates Section 504 by denying them a full and equal opportunity to participate in the State's voting programs.

### SIXTH CLAIM FOR RELIEF
### Violation of the Civil Rights Act of 1964
### 52 U.S.C. §10101, 42 U.S.C. § 1983

359.   Section 10101(a)(2)(B) of the Civil Rights Act prohibits anyone, acting under color of law, from "deny[ing] the right to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

360.   S.B. 202 requires that Georgia election officials confirm the identity of an absentee voter by matching the information provided on a voter's absentee ballot with information in the voter's voter registration record.  If the information does not match, S.B. 202 requires that Georgia election officials reject that

absentee ballot.  If the voter does not cure the rejected ballot, that voter's ballot will not be counted.

361.   Under S.B. 202, Georgia election officials will reject absentee ballots because of an "error or omission [that] is not material" to determining whether a Georgia voter is eligible to vote.

362.   For instance, under S.B. 202, a voter who receives an absentee ballot has already been recognized as qualified to vote.  When that voter casts their absentee ballot, they are required, at a minimum, to list their Georgia driver's license number or state ID card number *and* date of birth.  If that voter inadvertently omits their date of birth, or makes an error in writing their date of birth, Georgia election officials will reject the absentee ballot solely because the date of birth on the absentee ballot does not match the date of birth in the voter's voter registration records.

363.   Such a rejection violates 52 U.S.C. § 10101(a)(2)(B), because the rejection of that voter's ballot is based on an "error or an omission [that] is not material" to determining whether that voter is eligible to vote.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the challenged provisions of S.B. 202 are illegal and unconstitutional as described above, in

violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, the

Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), Title II of the Americans

with Disabilities Act of 1990, 42 U.S.C. § 12132, Section 504 of the Rehabilitation

Act, and the First, Fourteenth, and Fifteenth Amendments to the United States

Constitution;

2.      Grant Plaintiffs permanent injunctive relief enjoining Defendants,

their agents, employees, and those persons acting in concert with them from

enforcing or giving any effect to the challenged provisions of S.B. 202, including

enjoining Defendants from conducting any elections utilizing those provisions;

3.      Retain jurisdiction pursuant to Section 3(c) of the Voting Rights Act,

42 U.S.C. § 1973a(c), for such a period of time as the Court deems appropriate and

decree that, during such period, no voting qualification or prerequisite to voting or

standard, practice, or procedure with respect to voting different from that in force

at the time this proceeding was commenced shall be enforced unless and until the

Court finds that such qualification, prerequisite, standard, practice, or procedure

does not have the purpose and will not have the effect of denying or abridging the

right to vote on account of race or color, or in contravention of the voting

guarantees set forth in section 1973b(f)(2) of the Voting Rights Act.

4.      Issue an order requiring Defendants to pay Plaintiffs' costs, expenses,

and reasonable attorneys' fees incurred in the prosecution of this action, as

authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

5.      Grant such other and further relief as may be just and equitable.

Respectfully submitted, this 18th day of July 2024.

*/s/ Leah C. Aden*
Leah C. Aden (pro hac vice)
*laden@naacpldf.org*
Alaizah Koorji (pro hac vice)
*akoorji@naacpldf.org*
John S. Cusick (pro hac vice)
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte (pro hac vice)
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC. 700 14th
Street, NW Washington, DC 20005
Telephone: (202) 682-1300

Caitlin May (Ga. Bar No. 602081)
*cmay@acluga.org*
Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

Sophia Lin Lakin (pro hac vice)
*slakin@aclu.org*
Davin M. Rosborough (pro hac vice)
*drosborough@aclu.org*
Jonathan Topaz (pro hac vice)
*jtopaz@aclu.org*
Dayton Campbell-Harris (pro hac
vice)

*dcampbell-harris@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, D.C. 20005
Telephone: (202) 731-2395

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Sofie C. Brooks (pro hac vice)
*sofie.brooks@wilmerhale.com*

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000


Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Laura E. Powell (Ga. Bar. No.
970318)
*laura.powell@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP

2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs Sixth District of the African Methodist Episcopal Church,
Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office*

*/s/ Pichaya Poy Winichakul*
Pichaya Poy Winichakul (Bar
246858)
poy.winichakul@splcenter.org
Bradley E. Heard (Bar 342209)
bradley.heard@splcenter.org
Matletha N. Bennette (pro hac vice)
matletha.bennette@splcenter.org
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

Jess Unger (pro hac vice)
jess.unger@splcenter.org
Sabrina S. Khan (pro hac vice)
sabrina.khan@splcenter.org
SOUTHERN POVERTY

LAW CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

*/s/ Adam Sieff*
Adam S. Sieff (pro hac vice)
adamsieff@dwt.com
Brittni Hamilton (pro hac vice)
brittnihamilton@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

Matthew Jedreski (pro hac vice)
mjedreski@dwt.com
Grace Thompson (pro hac vice)
gracethompson@dwt.com
Danielle Eun Kim (pro hac vice)
daniellekim@dwt.com
Kate Kennedy
katekennedy@dwt.com
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

David M. Gossett (pro hac vice)
davidgossett@dwt.com
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500
Washington, D.C. 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Attorneys for Plaintiffs Georgia Muslim Voter Project, Women Watch Afrika,
Latino Community Fund Georgia, and The Arc of the United States*