Stephen S. Pettigrew , Ph.D.                     August 15, 2025
Georgia Senate Bill 202, In Re

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                  ATLANTA DIVISION
 3                      - - -
 4

      IN RE:                    : Master Case No.
 5                              :
      GEORGIA SENATE BILL 202  : 1:21-MI-55555-JPB
 6                              :
                                :
 7

 8

 9                      - - -
10           FRIDAY, AUGUST 15, 2025
11                      - - -
12

13        Videotaped deposition of STEPHEN S.
14   PETTIGREW, PH.D., taken at the offices of the
15   ACLU of Pennsylvania, 1800 John F. Kennedy
16   Boulevard, 6th Floor, Philadelphia,
17   Pennsylvania 19103, beginning at 10:03 a.m.,
18   before KAREN M. BILGER, a Professional
19   Reporter and Notary Public.
20

21

22        VERITEXT LEGAL SOLUTIONS
             MID-ATLANTIC REGION
23

24

25
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 2

```
 1      A P P E A R A N C E S:
 2
 3      AMERICAN CIVIL LIBERTIES UNION
        BY: DAVIN ROSBOROUGH, ESQUIRE
 4      915 15th Street NW
        Washington, DC 20005
 5      703-380-0804
        drosborough@aclu.org
 6      Representing AME Plaintiffs
 7
 8      SCHAERR JAFFE, LLP
        BY:  BRIAN J. FIELD, ESQUIRE
 9      1717 K Street NW
        Suite 900
10      Washington, DC 20006
        202-787-1060
11      bfield@schaerr-jaffe.com
        Representing State Defendants
12
13      ALSO PRESENT (via Zoom):
14
15      LEGAL DEFENSE FUND
        BY: JOHN S. CUSICK, ESQUIRE
16      40 Rector Street
        5th Floor
17      New York, NY 10006
        347-491-2597
18      jcusick@naacpldf.org
        Representing AME Plaintiffs
19
20
        SCHAERR JAFFE, LLP
21      BY: JOSHUA J. PRINCE, ESQUIRE
        1717 K Street NW
22      Suite 900
        Washington, DC 20006
23      202-787-1060
        jprince@schaerr-jaffe.com
24      Representing State Defendants
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 3

```
 1      APPEARANCES CONTINUED (via Zoom):
 2
 3      CONSOVOY MCCARTHY, PLLC
        BY: WILLIAM BOCK, IV, ESQUIRE
 4      1600 Wilson Boulevard
        Suite 700
 5      Arlington, VA 22209
        703-143-9423
 6      wbock@consovoymccarthy.com
        Representing Republican Party Intervenor
 7      Defendants, the Republican National
        Committee, National Republican Senatorial
 8      Committee, the National Republican
        Congressional Committee and the Georgian
 9      Republican Party, Inc.
10
11      NOLAND LAW FIRM
        BY: GRACE SIMMS MARTIN, ESQUIRE
12      5400 Riverside Drive
        Suite 205
13      Macon, Georgia 31210
        478-621-4980
14      grace@nolandlawfirmllc.com
        Representing Macon-Bibb County Defendants
15
16      FREEMAN, MATHIS & GARY, LLP
17      BY: CASEY M. TORRES, ESQUIRE
        100 Galleria Parkway
18      Suite 1600
        Atlanta, GA 30339-5948
19      470-588-0317
        casey.torres@fmglaw.com
20      Representing Chatham County Board of
        Registers, Chatham County Board of Elections,
21      Clayton County Board of Elections and
        Registration, and all individuals of each
22      named
23
24      Daniel Grbich, Video Technician (In Person)
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 4

1

                          I N D E X

2

                            - - -

3

4        Testimony of:                        Page

5        STEPHEN S. PETTIGREW, PH.D.

6

              BY MR. FIELD.............        7

7

8

9

10                          - - -

11                    E X H I B I T S

                            - - -

12

13       EXHIBIT      DESCRIPTION                    PAGE
         NUMBER

14

         Exhibit 1   Rebuttal Supplemental          9
15                   Expert Report of Dr.
                     Stephen Pettigrew

16

         Exhibit 2   Supplemental Expert Report     13
17                   of Justin Grimmer, Ph.D.

18       Exhibit 3   Expert Report of Stephen       21
                     Pettigrew, Ph.D.

19

20

21

22

23

24

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 5

1                 DEPOSITION  SUPPORT  INDEX

2

3     DIRECTIONS  TO  WITNESS  NOT  TO  ANSWER

4     Page     Line

5

6     REQUEST  FOR  PRODUCTION  OF  DOCUMENTS

      Page     Line     Description

7

8

9     STIPULATIONS

      Page     Line

10

11

      QUESTIONS  MARKED

12    Page     Line

13

14

15

16

17

18

19

20

21

22

23

24

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 6

```
 1                      - - -
 2              VIDEO TECHNICIAN:  Good morning.
 3              We are going on the record at
 4       10:03 a.m. on August 15, 2025.  Please
 5       note that microphones are sensitive
 6       and may pick up whispering and private
 7       conversations.  Please mute your
 8       phones at this time.
 9              Audio and video recording will
10       continue to take place unless all
11       parties agree to go off the record.
12              This is Media Unit No. 1 of the
13       video recorded deposition of Doctor
14       Stephen Pettigrew being taken in the
15       matter, In Re: Georgia Senate Bill
16       202, filed in the United States
17       District Court for the Northern
18       District of Georgia, Atlanta Division.
19              This deposition is being held at
20       1800 JFK Boulevard, Philadelphia,
21       Pennsylvania.
22              My name is Daniel Grbich
23       representing Veritext.  I'm the
24       videographer.  The court reporter is
```

Page 7

1          Karen Bilger from the firm of

2          Veritext.

3               I'm not authorized to administer

4          an oath, nor am I related to any party

5          in this action or financially

6          interested in the outcome.

7               Will counsel please state their

8          appearance and affiliations for the

9          record?

10              MR. ROSBOROUGH:  Davin

11         Rosborough for the plaintiffs

12         defending the deposition.

13              MR. FIELD:  Brian Field for the

14         State Defendants taking the

15         deposition.

16              VIDEO TECHNICIAN:  At this time

17         the court reporter may swear in the

18         witness, and we may proceed.

19                        -  -  -

20              STEPHEN S. PETTIGREW, Ph.D.,

21         after having been first duly sworn,

22         was examined and testified as follows:

23                        -  -  -

24                   EXAMINATION

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 8

```
 1                         -  -  -

 2     BY MR. FIELD:

 3            Q.      Doctor Pettigrew, good morning.

 4            A.      Good morning.

 5            Q.      I appreciate your making

 6     yourself available this morning to talk.

 7                    We're going to talk about your

 8     most recent supplemental expert report.  I'll

 9     do my best to reference which report I'm

10     referring to, but there's a whole bunch of

11     reports in this case, as you know, several

12     authored by you, several authored by others.

13            A.      Yes.

14            Q.      At any point, if you have a

15     question, when I say that report, what I

16     mean, please let me know.  And I'll try to

17     use dates --

18            A.      Yes.

19            Q.      -- to the extent I remember to

20     do so.

21                    Can you state your full name

22     for the record?

23            A.      Stephen Pettigrew.

24            Q.      I'd like to introduce Exhibit
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 9

```
 1      1, so that you have it.  This is a copy of

 2      the report you authored in July.

 3              A.     Uh-huh.

 4                         - - -

 5              (Whereupon, a document was

 6          marked as Exhibit 1 for

 7          identification.)

 8                         - - -

 9      BY MR. FIELD:

10              Q.     Go ahead and take a look at it

11      and just confirm for me that this is your

12      July 4, 2025 report.

13              A.     Yup, looks to be.

14              Q.     Great.

15              And this is the only report you

16      authored in this case since the 2024

17      elections in Georgia; is that correct?

18              A.     Correct.

19              Q.     Okay.

20              And are there any opinions in

21      this report that you no longer hold?

22              A.     No.

23              Q.     And are there any corrections

24      you wish to make to this 2025 report?
```

Stephen S. Pettigrew , Ph.D.                        August 15, 2025
Georgia Senate Bill 202, In Re

Page 10

1          A.      No.

2          Q.      Okay.

3                  And before this you've

4     submitted a few other reports, at least two,

5     in 2023, correct?

6          A.      Yes.

7          Q.      I'd like to begin by getting a

8     sense of the limits of your July 2025 report.

9                  So in this report you're not

10    offering any opinion about line warming

11    activities during the 2024 election, correct?

12         A.      Correct.

13         Q.      And you are not offering any

14    opinions about how the vote-by-mail process

15    operated in the 2024 election, correct?

16         A.      That's right.

17         Q.      And you're also not providing

18    any opinion about whether vote-by-mail rules

19    pushed voters toward voting in person or not

20    voting at all in the 2024 election, correct?

21         A.      That's right.

22         Q.      You're not offering any

23    opinions here in the 2025 report about any

24    runoff elections in 2024 or about any impact

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 11

```
 1      that runoff schedules might have had on
 2      lines, correct?
 3              A.      That's right.
 4              Q.      A few more of these.
 5                      You're not offering any opinion
 6      here in the 2025 report about whether
 7      precinct size had any impact on line length,
 8      correct?
 9              A.      That's right.
10              Q.      And you're not offering any
11      opinion about whether line length decreased
12      voter turnout in the 2024 elections, correct?
13              A.      That's right.
14              Q.      And, lastly, you're not
15      offering any opinion about voter confidence
16      in the integrity of the 2024 elections,
17      correct?
18              A.      That's right.
19              Q.      Wonderful.
20                      Now, we referenced your 2023
21      opinions.
22              A.      Uh-huh.
23              Q.      I'm sorry.  Reports.
24                      Are there any opinions in
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 12

1    either of your 2023 reports that you no

2    longer hold?

3          A.      No.

4          Q.      Are there any opinions from

5    either of your 2023 reports that have changed

6    based on the 2024 Georgia election data?

7          A.      No.

8          Q.      For this July 2025 report what

9    information or data did you review as you

10   were drafting it?

11         A.      The main thing I reviewed was

12   Doctor Grimmer's -- Doctor Grimmer's report

13   from, I think, June.  I was asked to

14   basically respond to that.

15         Q.      Okay.

16                 Did you review any data or just

17   his report?

18         A.      I -- I did look -- you know,

19   after seeing his report and seeing that he

20   worked with the CES data, I did end up

21   looking at the CES data myself, the 2022 and

22   2024 CES data.

23         Q.      Where did you get that data

24   from?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 13

1          A.      From the CES Dataverse website.

2          Q.      Okay.

3                  So you pulled it directly from

4    CES?

5          A.      I did.

6          Q.      Okay.

7                  Just for clarity, we'll get to

8    it later, so I'm going to go ahead and

9    introduce Doctor Grimmer's -- his report that

10   is titled Supplemental Expert Report, which

11   is dated June 13th.

12                 MR. FIELD:  We'll do this as

13          Exhibit 2.

14                         - - -

15                 (Whereupon, a document was

16          marked as Exhibit 2 for

17          identification.)

18                         - - -

19   BY MR. FIELD:

20         Q.      Go ahead and take a look and

21   just acquaint yourself with which report that

22   is.

23         A.      Yup.

24         Q.      I'm sure it looks familiar?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 14

1           A.      Yup.

2                   - - -

3                   (Whereupon, witness reviewed

4           document as requested.)

5                   - - -

6    BY MR. FIELD:

7           Q.      All right.  So I'm going to

8    have you turn to your report, Section 1.

9           A.      Okay.

10          Q.      And while we'll jump back and

11   forth between the reports for your report

12   we're just going to walk through it kind of

13   top to bottom.

14          A.      Perfect.

15          Q.      So we'll start with Section 1.

16                  So looking at the heading of

17   this section it reads, "SB202 did not add new

18   hours of weekend voting, so increases in

19   weekend voting cannot be attributed to it";

20   is that correct?

21          A.      That's right.

22          Q.      Okay.

23                  So starting with the second

24   clause, you do agree that there was an

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 15

1    increase in weekend voting during the 2024

2    elections in Georgia, correct?

3             A.    It's not something that I

4    looked specifically at myself, but it's in

5    Doctor Grimmer's report, and I, you know,

6    take that for what it is.

7             Q.    You have no basis to dispute

8    that weekend voting increased in the 2024

9    elections in Georgia compared with previous

10   elections, correct?

11            A.    It's not something I looked at,

12   so I don't dispute it, don't -- you know,

13   can't corroborate it; just take him at his

14   analysis.

15            Q.    Okay.

16                  Looking at the first clause of

17   your heading you state that SB202 did not add

18   hours of weekend voting, correct?

19            A.    That's right.

20            Q.    All right.

21                  Let's start by ensuring that we

22   understand or are on the same page about what

23   SB202 provided regarding weekend voting.

24            A.    Uh-huh.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 16

1          Q.      So before SB202, Georgia had a
2     three-week period of early voting with one
3     required Saturday and optional weekend dates,
4     correct?
5          A.      I'd have to look at the law,
6     but --
7          Q.      If I represent that, does --
8          A.      It seems -- that seems like
9     what I recall, but I can't say for certain.
10         Q.      Okay.
11                 But in SB202, the General
12    Assembly required one additional Saturday for
13    early voting and stated that Sunday voting is
14    permitted during early voting, correct?
15         A.      Again, that's sounds about what
16    I remember, but without having the text in
17    front of me, I think that's right.
18         Q.      Well, you do have an opinion
19    here that SB202 did not add hours --
20         A.      That's right.
21         Q.      -- of weekend voting?
22         A.      Yeah.
23                 MR. ROSBOROUGH:  Sorry.
24                 Just -- just make sure you wait

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 17

```
 1          for him to finish his full question
 2          before answering, even if you think
 3          you know what he's getting at.
 4                  THE WITNESS:  Yes.
 5      BY MR. FIELD:
 6          Q.      And the reason I'm asking is, I
 7      mean, if this is your opinion, I need to
 8      understand what it is you know took that to
 9      form this opinion.
10          A.      Yes.
11          Q.      So stepping back a second just
12      for clarity for the record.
13                  Before SB202, Georgia law
14      required a three-week period of early voting
15      with just one Saturday required and optional
16      additional weekend dates.
17                  Do you have any reason to
18      dispute that?
19          A.      Difference between what the law
20      required and what was -- what was operating
21      in practice on the ground in Georgia counties
22      before SB202.  My contention from the first
23      report that I filed in 2023 was Georgia law
24      pre-SB202 set a threshold, the vast majority
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 18

```
 1     of Georgia voters lived in a county that
 2     provided in excess of that minimal threshold
 3     and, in fact, in excess of the threshold set
 4     by SB202.
 5           Q.     Right.  Okay.
 6                  But for this question, and this
 7     line of questions, right now I'm trying to
 8     make sure that we're on the same page, and it
 9     seems that we might not be so that's why I'm
10     spending a moment here.
11           A.     Okay.
12           Q.     Is -- I want to make sure we're
13     on the same page of what SB202 required.
14     Before -- we'll talk about what actually
15     happened in practice.
16                  But before SB202, the law
17     required a Saturday and permitted additional
18     weekend voting, if a county wanted to offer
19     it, correct?
20           A.     That was the minimum threshold,
21     correct.
22           Q.     Okay.
23                  In SB202, the law requires
24     every county to offer at least two Saturdays,
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

1    correct?

2           A.      Yeah.

3           Q.      And allows counties to offer

4    Sunday early voting, correct?

5           A.      Sure.

6           Q.      Okay.

7                   So if any county previously

8    provided only one Saturday of early voting,

9    that county must increase weekend voting to

10   comply with SB202, correct?

11          A.      That seems correct, yes.

12          Q.      And if any county previously

13   did not allow for Sunday early voting, but

14   did so after SB202, that county would be

15   adding more weekend voting, correct?

16          A.      Ah, if -- yeah.  If there were

17   counties that did that, then they would be

18   required to add per SB202.

19          Q.      And you have no reason to doubt

20   the Georgia General Assembly's statement in

21   SB202 that more than 100 counties had never

22   offered voting on Sundays and many counties

23   offered only a single day of weekend voting

24   before SB202, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 20

```
 1            A.      I'm not sure about that.  I --
 2      I've never heard that 100-county thing
 3      before.
 4                    In my 2023 report, I went back
 5      and collected the -- I think from the 2020
 6      election -- the hours of early voting that
 7      were available on weekends in -- in as many
 8      Georgia counties that could, and I believe
 9      that actually may have -- might have been all
10      159.  A hundred seems like way more than --
11      that seems like a misrepresentation by the
12      General Assembly, but I'd have to -- I think
13      I have those specific numbers in my 2023
14      report.
15            Q.      And to confirm.  This is 100
16      counties that had not offered voting on
17      Sundays specifically.  Do you have -- you --
18            A.      I think my orig -- I'm sorry.
19            Q.      So you dispute the General
20      Assembly's statement that 100 counties had
21      not offered voting on Sundays, correct?
22            A.      That doesn't sound correct to
23      me --
24            Q.      Okay.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

                                                        Page 21

1          A.       -- but I'd want to go back to

2     my original report and look at the data.

3          Q.       Would you agree with me that it

4     is likely that at least some counties added

5     weekend voting after SB202 in Georgia,

6     correct?

7          A.       Um, yes.  Probably some, but a

8     small number.  And the number of voters

9     affected was very small.  I did look at that.

10         Q.       I'll go ahead and introduce

11    this exhibit for reference.

12              This is your January 2023,

13    report, which I think was the one you were

14    referencing.

15              MR. FIELD:  This will be Exhibit

16         3.

17                        - - -

18              (Whereupon, a document was

19         marked as Exhibit 3 for

20         identification.

21                        - - -

22    BY MR. FIELD:

23         Q.       All right.  And go ahead and

24    take a look, if you feel inclined to.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 22

1           A.      Yes.

2                         - - -

3                  (Whereupon, witness reviewed

4           document.)

5                         - - -

6       BY MR. FIELD:

7           Q.      Okay.  Ready?

8           A.      Sure.

9           Q.      So turning your discussion from

10      your 2025 report, Section 1, which, again,

11      that's where we'll spend most of our time.

12          A.      Okay.

13          Q.      You discussed Doctor Grimmer's

14      report.  And you reference his statements

15      about weekend voting.  And if you turn to

16      Doctor Grimmer's report then to paragraph 66,

17      he says in paragraph 66, "I find that the

18      2024 election had the highest share of votes

19      cast during Sunday and weekend voting of any

20      of the six federal general elections I

21      examined in Table 9."

22                  Did I read that correctly?

23          A.      Ah, first beginning of the

24      paragraph?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 23

1          Q.      Correct.

2          A.      Yes.  That's right.  That's

3     what he wrote.

4          Q.      You do not disagree with the

5     accuracy of that statement, correct?

6          A.      It's not something I had looked

7     at the data on, but if it's -- if the numbers

8     in this table are correct, then that's a

9     correct statement.

10          Q.      So sitting here today you have

11     no basis to dispute the accuracy of this

12     statement, correct?

13          A.      Ah, no, but, again, I haven't

14     looked at the data myself.

15          Q.      But the data were available to

16     you, correct?

17          A.      They were.  I wasn't asked -- I

18     was not asked to look at that particular

19     thing, no.

20          Q.      Let's actually stop there for a

21     second.

22                  What were you asked to look at

23     specifically about Doctor Grimmer's report?

24          A.      So I was asked to respond to --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 24

1    mostly focusing on the next section.  I think

2    the next section of his report focused

3    specifically on wait times, and then -- and

4    then this section just asked to comment on

5    how the analysis here, this Table 9 in

6    particular, how that relates back to what I

7    had written in my 2023 report.  I wasn't

8    asked to actually verify the numbers anywhere

9    in his report, but in particular not the

10   numbers in Table 9.

11          Q.     So you were asked to opine on

12   his opinions here in this section, which

13   includes Table 9, but you were not asked to

14   look at the data as part of that, correct?

15          A.     That's right.

16          Q.     Okay.

17          So you don't have a basis to

18   disagree with the accuracy of that statement,

19   because you haven't analyzed the data.  But

20   it seems that your response is largely

21   focused on addressing what you claim to be

22   Doctor Grimmer's mischaracterization of your

23   earlier reports; is that correct?

24          A.     That's right.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 25

```
 1            Q.     Okay.

 2                   So if we look at your

 3      January 2023 report, Exhibit 3.

 4            A.     Uh-huh.

 5            Q.     Give me a second while I turn

 6      to it.

 7                   We're going to look at page 1.

 8      Toward the bottom you start a sentence with,

 9      "Although the bill requires..."

10            A.     Mm-hmm.

11            Q.     You got where I am?

12                   Okay.

13                   "Although the bill does require

14      for the first time two days of Saturday

15      voting during the early/advanced voting

16      period, I find that this requirement will

17      have no impact on voting hours in most

18      counties, particularly those that tend to

19      have long lines, because they offered two

20      days of Saturday voting prior to SB202."

21                   Did I read that correctly?

22            A.     That's right.

23            Q.     But as we just discussed, SB202

24      does provide for more than just Saturday
```

```
 1    early voting, correct?  It also permits
 2    Sunday early voting?
 3           A.      As you said, yeah.
 4           Q.      Okay.
 5                   And you can't say how many
 6    counties would have provided two Saturdays of
 7    early voting in 2024 absent SB202, correct?
 8           A.      Yeah.  Impossible to evaluate
 9    that.
10           Q.      Well, there's some ways you
11    could have evaluated it, right?  You could --
12    you could have looked to see what each
13    counties trend was over the past four or five
14    general elections, correct?
15           A.      Your last question was asking
16    what would counties have done in the absence
17    of SB202 --
18           Q.      Correct.
19           A.      -- if I'm understanding that
20    right?
21                   I don't know how you would
22    evaluate what they would have done in the
23    absence of the law.  You could have -- you
24    could make the assumption that they wouldn't
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 27

```
 1    make any changes.  But, you know, looking at
 2    trends and that sort of thing isn't
 3    necessarily reflective of how these sorts of
 4    decisions are made on the ground, things like
 5    staffing and, you know, the logistics of
 6    running election might have an impact on how
 7    much early voting a county might decide to
 8    offer.
 9          Q.    So isn't it equally speculative
10    for you to look at 2020 and say that informs
11    what they would have done in 2024?
12              MR. ROSBOROUGH:  Object to the
13         form.
14              THE WITNESS:  I would say -- can
15         you state that again?
16    BY MR. FIELD:
17          Q.    Sure.
18              Isn't it equally speculative
19    then for all the reasons you just set out for
20    you to look at the data from November 2020
21    and say because of this of data from 2020,
22    here is what these counties will do in 2024?
23              MR. ROSBOROUGH:  I object to the
24         form.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 28

```
 1                THE WITNESS:  I think the case
 2           that I'm making here on page 4 of my
 3           report is, the vast majority of
 4           counties and Georgia voters lived in a
 5           place where SB202 wasn't going to add
 6           hours of weekend voting.  So if we see
 7           changes in the number of voters who
 8           vote on weekends, you couldn't
 9           attribute it to an underlying change
10           in the number of hours of voting, if
11           the number of hours of voting didn't
12           change.
13      BY MR. FIELD:
14           Q.    You have an assumption in
15      there.  You just said, SB202 wasn't going to
16      add hours.  So to say that, you're assuming
17      November 2020 was the baseline and that was
18      going to still be in place in 2024, correct?
19                MR. ROSBOROUGH:  Object to the
20           form.
21                THE WITNESS:  It feels like
22           you're kind of making me speculate
23           about a hypothetical here.  But, um --
24           I mean, it tends to be the case that
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 29

```
 1              counties don't change course in terms
 2              of how they run elections.  What they
 3              do in one election tends to be what
 4              they do in the next election.
 5    BY MR. FIELD:
 6         Q.    But you just said they can't
 7    look at the previous elections because all
 8    these things change on the ground and
 9    staffing and logistics and all that type of
10    thing?
11                   MR. ROSBOROUGH:  I object to
12              form.
13                   THE WITNESS:  Counties tend --
14              there tends to be momentum in election
15              administration.  They tend to do
16              similar things that they did the last
17              time.
18                   What I was -- when you asked
19              earlier about what would have happened
20              in the abscess of SB202, the
21              implication there was, what if
22              counties would, in the absence of
23              SB202, have restricted early voting or
24              brought down the number of hours of
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 30

```
 1              early voting.  And the momentum of the
 2              status quo, right, like the -- the
 3              policy that they had in 2020 and in
 4              2018 and in years prior, that tends to
 5              carry forward.
 6                     So it would be -- it would be
 7              unusual for a county to -- to have a
 8              certain number of hours of early
 9              voting, and then, in the absence of
10              some sort of like legal change that
11              forced them to have fewer hours, it
12              would be weird for them to end up
13              having fewer hours.
14     BY MR. FIELD:
15              Q.     Sure.
16                     And that's precisely my
17     question.  Momentum is a great word.
18                     Because what I asked you was,
19     you can't say how many counties would have
20     provided two Saturdays of early voting in
21     2024, absent 2020 -- I'm sorry, absent SB202.
22     And you said, right, that's impossible to
23     know.  And I said, if I can just -- I will
24     get to a question and give you a chance to
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 31

```
 1    clarify.
 2                    And I said, well, I think there
 3    is a way that you can know that.  You could
 4    look at the previous several election cycles,
 5    see what have they offered; was there a
 6    status quo for which there is momentum.  And
 7    then you told me that there are various
 8    things that can change and staffing
 9    limitations, location limitations, all of
10    that.  Saying nothing of Covid; we'll go to
11    Covid in a second.
12                    So I'm trying to understand,
13    which is it?  Is it that you can look at past
14    elections to predict what the hours would be
15    in the future or you can't?
16           A.     I think I see where the
17    disconnect was.
18                    When you asked the original
19    question, you used the word trend, look at
20    the trend that counties have, and in my head
21    what I was hearing was kind of the trend is
22    that a county is increasing its number of
23    hours.  And, you know, when I -- when I hear
24    the word trend, I'm thinking like sort of
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 32

1      linear changes over time rather than

2      something that stays flat.

3                  So when I disagreed that you

4      could use trends to predict how many hours

5      that they have, that's kind of what I was --

6      what I was trying to suggest.

7                  But I'll reiterate what I said,

8      which is that the number of hours that a

9      county offered of early voting in the last

10     election is going to be their best predictor

11     of what it is in the next election.  It tends

12     to stay the same unless -- unless there's

13     sort of outside forces that compel them to --

14     to change it.

15          Q.     So that hypothesis or -- term

16     of art -- so that statement --

17          A.     Yeah.

18          Q.     -- is something you could test.

19     You could have looked at 2016 and 2020 and

20     seen, did these counties stay relatively the

21     same?  Because they stayed relatively the

22     same, I can suggest that 2020 and 2024 will

23     be the same.  But you didn't do that.  You

24     only looked at November 2020, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

1          A.       I would have done it, if it

2     were possible.  But tracking down the number

3     of hours that are avail -- number of hours of

4     early voting is really tough because often --

5     especially when you've got 159 counties,

6     often times a county website -- you know, a

7     lot of these counties don't have the best web

8     presence and so tracking down -- you know, I

9     was working on this analysis in 2022 or so,

10    tracking down what early voting hours were

11    six years earlier is nearly an impossibility

12    in -- in most of these counties.  So it would

13    have -- just for data-limitation reasons, it

14    wouldn't -- it just wasn't going to be

15    possible for me to do the analysis you

16    suggested.

17              If the data were available, if

18    I -- if I had that data and could look at '16

19    versus '20, I would have done it.

20              Um, I -- you know, knowing what

21    I know about how elections run in, not just

22    in Georgia but in other states, I have a

23    strong reason to think that we would see

24    similar patterns in terms of the number of

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 34

```
 1     hours offered in '16 and in '20, and that the
 2     trend in all likelihood, if you did have
 3     counties changing the number of hours, it was
 4     probably moving in the direction of adding
 5     hours, not subtracting hours because that
 6     tends to be what happens.
 7              Q.     But in authoring your
 8     January 2023 report, you were unable to --
 9     did not and were unable to analyze any voting
10     hours from an election before November 2020,
11     correct?
12              A.     I don't remember if I looked at
13     -- if I was able to get data from 2018 or
14     not, so I can't say for certain that I didn't
15     look before 2020.  In all likelihood though,
16     2020 was probably the last election I was --
17     the most recent election I was able to look
18     at just far data limitation reasons.
19              Q.     But if you looked at 2018,
20     that's not in your report, correct?
21              A.     I don't remember to be honest.
22              Q.     Okay.  I can --
23              A.     If it's not there, then it --
24     yeah, if it's not in there, then it was
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 35

1    because of data limitation reasons.

2              Q.      Okay.

3                      And what I'm really thinking of

4    is, you know, the two charts where you've got

5    the dots on the line and, you know, trying to

6    talk about the hours that you referenced

7    earlier, both of those charts look at

8    November 2020?

9              A.      Which -- yeah, I -- do you know

10   -- I mean, I can look at that chart, if you

11   want me to, if you know what page it was on.

12             Q.      I don't happen to recall the

13   page number.  We will -- I think we will get

14   there.

15             A.      Okay.

16             Q.      For the 2025 report, you did

17   not perform this same analysis, correct?

18             A.      I wasn't asked to look at, you

19   know, number of hours offered in the 2024

20   election, no.

21             Q.      But you could have, correct?

22             A.      Theoretically, yeah.  If I had

23   been asked, then it seems possible.

24             Q.      But doesn't it seem like that's

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 36

1      something you should have done in order to

2      make your conclusion or to support your

3      conclusion that there was not, in fact, an

4      increase in weekend voting attributable to

5      SB202?

6                    MR. ROSBOROUGH:  I object to the

7            form.

8                    You can answer.

9                    THE WITNESS:  It seems

10           irrelevant, right?

11                 If -- if I found in 2020 that

12           most counties in Georgia were offering

13           a number of hours in excess of SB202,

14           and now SB202 forces them to keep

15           those hours in place, then I'm not

16           sure how -- I'm not sure what I would

17           glean from data that just confirms

18           that they were abiding with the law.

19                 They -- they were already --

20           they were abiding with the provisions

21           with the law before the law existed,

22           so verifying that they were complying

23           with SB202 after the fact seems like

24           kind of honestly busy work, because it

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 37

```
 1              is kind of busy work; it's challenging
 2              to get that data.
 3     BY MR. FIELD:
 4              Q.    But you -- you have said that
 5     you would have analyzed 2016 data were it
 6     available to see if there were momentum to
 7     use your word.  You also suggested that a
 8     county doing something over multiple election
 9     cycles suggests that they're more likely to
10     do so; that's evidence of that momentum.
11                    You now have the data from
12     2020.  You agree that some counties didn't
13     offer two Saturdays; you agreed that some
14     counties didn't offer Sundays.  You could
15     have now compared every county in 2020 to
16     2024 to see if you are correct, were they, in
17     fact, offering the same amount or more or, in
18     fact, some less?
19                    MR. ROSBOROUGH:  I object to the
20              form.
21                    THE WITNESS:  Are you asking,
22              did I look to see if counties were
23              breaking this law?
24     BY MR. FIELD:
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 38

```
 1          Q.     They wouldn't be breaking the
 2     law.  Sundays were optional.  They may have
 3     offered Sundays before and not offered them
 4     now.  I mean, there's a whole host of
 5     possible ways that hours could have been
 6     offered in 2020 and offered in 2024 that
 7     would have been changes that would not have
 8     broken SB202.
 9          A.     Understanding how elections run
10     in the United States, this -- this whole line
11     of logic just doesn't gel with my expertise
12     on how elections work in the United States.
13     We're just not -- it's just -- county
14     election offices don't work this way.
15               They're going to -- they just
16     do what they've done in the past for the most
17     part.  And if they're compelled to change
18     their actions because of some change in the
19     law, and they need to come into compliance
20     with them, then maybe they would make a
21     change.
22               What I found in -- so that
23     would explain why maybe comparing '16 to '20
24     makes sense, because there wasn't a big
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 39

```
 1    change in the law.  So counties had a bit
 2    more leeway to make changes, if they wanted,
 3    but -- but my expectation would be there
 4    wouldn't be dramatic changes between '16 and
 5    '20, although Covid, you know, that may be a
 6    factor there.
 7                But in 2024 -- like, looking to
 8    2024, these counties that were abiding by the
 9    provisions of SB202 prior to its passage,
10    asking whether I, you know, ought to have
11    gone back and confirmed that they were
12    abiding by the law as a way to -- I'm not
13    even sure what that would accomplish, right?
14          Q.     It's -- sorry.  Go ahead.
15          A.     No, I didn't mean to cut you
16    off.
17          Q.     Right.
18                So some -- I mean, so you look
19    at hours, which is different than days,
20    correct?
21          A.     Hours is different than days,
22    right.  Sure.
23          Q.     And some counties may have
24    offered nine to noon on a Saturday.  That
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 40

```
 1     would not comply now with SB202, so they
 2     would have had to increase their hours.  Some
 3     counties might not have offered a Sunday and
 4     might now offer a Sunday.
 5                    It seems that these are
 6     relevant data to determine whether or not
 7     SB202, in fact, did not add new hours of
 8     weekend voting.
 9                    MR. ROSBOROUGH:  I object to the
10          form.
11                    THE WITNESS:  I think it would
12          be helpful for -- do you know what
13          section of my original -- I think it
14          might be helpful for me to just remind
15          myself of -- of what the -- you know,
16          the data that I have in here from my
17          original report.
18                    Do you remember what section
19          that was?
20     BY MR. FIELD:
21          Q.    Yeah.  I will look -- I believe
22     it to be pages 37 to 39.
23          A.    Here we go.  Yeah.
24          Q.    Yeah, 37 has your first chart.
```

Stephen S. Pettigrew , Ph.D.                     August 15, 2025
Georgia Senate Bill 202, In Re

Page 41

```
 1                    - - -
 2              (Whereupon, witness reviewed
 3         document.)
 4                    - - -
 5              THE WITNESS:  And so --
 6    BY MR. FIELD:
 7         Q.    Take your time to read it.
 8         A.    Yeah, for sure.
 9         Q.    Read it to yourself for the
10    sake of the record.
11         A.    Yeah.
12                    - - -
13              (Whereupon, witness reviewed
14         document.)
15                    - - -
16              THE WITNESS:  I'm trying to find
17         the -- I have somewhere in here the
18         number of hours that SB202 requires.
19              I think -- yeah.  So 136 hours
20         is the minimum number required by
21         SB202.
22              And so what I show is -- let me
23         find the table.  I'm pretty sure it's
24         in here.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 42

1            So in this 2023 report, Figure
2       4.4 is where I show total number of
3       hours on the vertical axis of early
4       voting available in 2020.  I don't
5       know if you want to flip to it.  Page
6       37.
7            So this black line represents
8       the minimal threshold required by
9       SB202.
10           What you can see is, of the
11      counties that are below this line,
12      which just eyeballing it doesn't look
13      like 100 point -- 100 dots to me,
14      which the General Assembly suggested,
15      but not a relevant thing right here.
16      The vast majority of these -- these
17      dots are counties that have a very
18      small number of voters, right?  You
19      can see most of those dots below the
20      black line have fewer than 10,000
21      voters, and all of the counties over
22      100,000 people have well in excess of
23      the minimum threshold that SB202
24      requires.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 43

```
 1              And so the point here is, most
 2         Georgia voters live in -- lived in a
 3         county and continue to live in a
 4         county where imposing this -- polling
 5         all the dots below this black line up
 6         to the black line is not going to have
 7         a practical effect on their
 8         opportunities to vote.
 9              And so Doctor Grimmer's kind of
10         implication that more people voted
11         over the weekend and maybe somehow
12         that's tied to SB202, it just doesn't
13         make sense to me, when most people
14         lived in counties that offered way
15         more hours than -- than were required
16         by SB202.
17    BY MR. FIELD:
18         Q.    Okay.  So let's hit a few
19    things you had in that answer.
20              So, first, the 100-county
21    comment from the General Assembly was related
22    to Sunday early voting.
23         A.    Okay.
24         Q.    Second, you do agree every dot
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 44

1    below this black line on Figure 4.4 of your

2    January 2023 report would need to increase

3    its hours of early voting to comply with

4    SB202, correct?

5            A.      Yeah.  The -- the black line

6    would be that threshold.

7            Q.      In Figure 4.4, the black line

8    that you have drawn here at the 136-hour mark

9    doesn't address whether or not a county is

10   offering two Saturdays, correct?

11           A.      It doesn't.  It's just for

12   simplicity of, you know, graphing the data.

13   It's kind of complicated, when you get into

14   these nuances of days and Sundays versus

15   Saturdays and all that.

16           Q.      Do you know one way or the

17   other how many counties before SB202 offered

18   two Saturdays of early voting?

19           A.      I don't know that specific

20   answer, but with a little thinking I may be

21   able to back it out.  They're just -- you

22   know, many of these counties -- you couldn't

23   have hours -- this number of hours without

24   having multiple Saturdays and all the other

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 45

1    stuff.
2          Q.      And as you sit here today you
3    don't know how many counties before SB202
4    offered Sunday early voting, correct?
5          A.      Um, again, it's something that
6    I looked at, when I originally wrote that
7    back two, three years ago.
8                  Um, I'm not sure if I have it
9    specifically described in here.  But
10   certainly, when I wrote this, I wasn't, you
11   know, misrepresenting the data.  It just
12   didn't make it into the -- that specific
13   point of how many counties had Sunday voting
14   just didn't make it into this report.
15         Q.      And for your 2025 report, you
16   haven't gone back confirmed whether or not
17   counties now offer Sunday early voting
18   post-SB202, correct?
19         A.      I didn't look at that.
20         Q.      Okay.
21                 So going back to your 2025
22   report, Section 1, where we were at the
23   beginning, you say in -- this is the first
24   sentence of the final paragraph on page 4,

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 46

1    The increase in weekend voting noted by

2    Doctor Grimmer in his June 2025 report is

3    likely not attributable to SB202's provisions

4    about weekend voting.

5                    And then you go on to talk

6    about the things we've just been talking

7    about.

8                    It's that likely word I'd like

9    understand.

10                   What do you mean by likely?

11   What significance can we put on the word

12   likely?

13          A.     I guess, can you ask -- I --

14   I'm not sure what you're asking there.

15          Q.     Okay.

16                 Are you saying that it is not

17   possible that SB202 caused an increase in

18   weekend voting in Georgia in 2024?

19          A.     I'm not saying it's impossible.

20          Q.     Okay.

21          A.     But given -- given that what we

22   see here that the vast majority of Georgia

23   voters -- you know, I have somewhere in here

24   the percentage -- I think in the 2023 report

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 47

1      somewhere in here I report the percentage of

2      Georgia voters, who live in one of these

3      counties that already abided by those -- by

4      that 136-hour threshold.  I'm not seeing it

5      right now.

6                  But the vast majority of

7      Georgia voters already lived somewhere

8      that -- that offered at least that many hours

9      so the increases in weekend voting that

10     Doctor Grimmer noted you couldn't see those

11     increases without -- without those voters

12     having been -- right?  Like, if it was

13     expansion of hours causing more people to

14     vote, that can't be the whole explanation of

15     what's going on, because there just aren't

16     enough voters who were affected by SB202 in

17     this way.

18          Q.    All Doctor Grimmer is actually

19     saying in paragraph 66 is that 2024 -- the

20     2024 election had the highest share of votes

21     cast during Sunday and weekend voting of any

22     of the six federal general elections I

23     examined in Table 9.

24                  That doesn't have a causal

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 48

1      statement about SB202, correct?

2             A.      He doesn't connect it back to

3      SB202 in that sentence.

4             Q.      Okay.

5                     And the heading of this section

6      -- the topic of this section is just

7      assessing the rates of weekend voting in the

8      post-SB202 elections, correct?

9             A.      Yeah, that's this header.

10            Q.      Okay.

11                    And you don't have any reason

12     to dispute that the 2024 election in Georgia

13     had the highest share of votes cast during

14     Sunday and weekend voting, correct?

15            A.      Again, I didn't look at the

16     data, but if Doctor Grimmer's analysis is

17     correct, if that table is correct, then that

18     seems to be the correct conclusion.

19                    Actually, you know, let me step

20     back and look at this table a little more

21     closely.

22            Q.      Okay.

23            A.      Um, because, in fact -- can you

24     -- can you ask -- can you ask the last

Page 49

```
 1    question again, because I don't remember what

 2    it was?

 3            Q.      I'm not sure exactly which

 4    question was the last one.

 5            A.      Because what I'm -- I mean, I'm

 6    looking at this table again with, you know --

 7    Table 9, third column -- or fourth column,

 8    Share of Early In-person Votes on Sundays.

 9    There were more -- there were a higher

10    proportion of Sunday voters in 2020 than in

11    2024 and 2022.  2.7 percent of early

12    in-person voters voted on Sundays in 2020.

13    That was higher than 2022 and 2024.

14                   So I actually do have reason to

15    -- to disagree with his conclusion that -- he

16    says, the 2024 -- oh, he -- he sneakily

17    doesn't address this piece.  He says that the

18    2024 election had the highest share of votes

19    cast on the weekend.  He says that --

20    compared to other Presidential elections.  He

21    says that the 2022 election had the highest

22    share of votes cast on Sundays compared to

23    other midterms -- or compared to other --

24    yeah, other midterms.  But he doesn't address
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 50

1    the fact that there were more Sunday voters

2    in 2020 -- a higher percentage of Sunday

3    voters in 2020 than there were in 2024, if

4    I'm -- if I'm understanding this table

5    correctly.

6           Q.     I think what you're looking at

7    -- sp there's two different ways to look at

8    the data.

9                  The first column -- or the

10   first two columns talks about the share of

11   all votes cast.

12          A.     Mm-hmm.

13          Q.     2024 had the same percentage

14   for Sunday, much higher per weekend.

15                 You were looking at the

16   percentage or share of early in-person votes,

17   correct?

18          A.     Ah, the first part of it isn't

19   necessarily correct.

20                 I see that there's 1.5 percent

21   of all votes cast in 2020 were on Sundays,

22   1.5 percent in 2024.  To say that those are

23   equal isn't true.  Those are rounded off

24   numbers.  We don't actually know -- one of

Page 51

1    them is going to be a little bigger than the

2    other but within a tenth of a percentage

3    point.

4              But when we look at the number

5    of people voting in person early, there's a

6    clear difference here that there was almost

7    half -- more than half a percentage point

8    more people voting on Sunday of early voters

9    in 2020 than in 2024.  And that -- he doesn't

10   make -- I don't see here, um --

11        Q.    So if you look at paragraph 67

12   where he addresses this.

13        A.    Mm-hmm.

14              So -- so the statement that

15   more -- more early in-person voters voted on

16   Sundays in '24 than ever before isn't true,

17   and he agrees with that, because he says it

18   was second to the 2020 election.

19        Q.    I think you're blending the two

20   topics.

21              So he does, in fact, address --

22   contrary to your earlier statement, he does

23   address the Sunday voting as a share of early

24   in-person in 67.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 52

1              The paragraph we were talking

2      about in 66 from our discussion here still

3      sounds to be correct, where he says, "I find

4      that the 2024 election had the highest share

5      of votes cast during Sunday and weekend

6      voting of any of the six federal general

7      elections I examined in Table 9."

8              A.      Looking at column two of the

9      table, that statement is correct, but --

10     column two accounts for all the people who

11     voted on -- sorry, on election day.

12             Q.      Correct.

13             A.      Column four accounts for only

14     the people who voted early in person.

15              To say unequivocally that there

16     was -- it's a question of what goes into the

17     denominator here.

18             Q.      It looks like the denominator

19     in the first analysis is all votes cast, the

20     denominator in the second set of columns is

21     all votes cast early in person.  He addresses

22     the first section in paragraph 66; he

23     addresses a second section in paragraph 67.

24             A.      And so I would have to map this

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 53

1     out, but given these two columns in
2     conjunction with each other, the reason you
3     would see a noticeable gap between 2020 and
4     2024 in column four, but a very minimal gap
5     in column two, isn't a function of early
6     voting at all.  It has to be a function of
7     just how many people voted on election day.
8                    I need to think more about
9     which of the two denominators would be the
10    appropriate one.  But to -- to look at this
11    and say unequivocally which -- you know, he
12    -- to step back from what I said earlier.  I
13    didn't see that next paragraph where he does
14    acknowledge that there were -- you know,
15    column four has a higher number in 2020.  But
16    the point being to suggest that unequivocally
17    there was more Sunday voting in 2024 than in
18    2020 just isn't true.  There's mixed evidence
19    here.
20         Q.     And that's not what he said.
21    He said during Sunday and weekend voting,
22    correct?
23              A.     That's not correct.
24                    During Sunday and during

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 54

1      weekend voting?  During Sunday voting it was

2      not higher than the six federal elections.

3      It's clear in column four.

4             Q.     Column -- column four being the

5      early in person.  Paragraph 66 is not talking

6      about early in person.  Paragraph 66 is

7      talking about highest share of votes cast,

8      all votes cast as a denominator, correct?

9             A.     I see.

10            So that first sentence only

11     pertains to the first couple columns of this

12     table.

13            Q.     Correct.

14            A.     Based on that -- well, from the

15     table -- I mean, he has -- I guess he has

16     further numbers in the paragraph.

17            But -- but from the table that

18     statement is right, but then in the next --

19     but -- but to take that as evidence that

20     Sunday voting was, no matter how we measure

21     it, higher in -- in 2024 than in 2020 is not

22     true.  And he's acknowl -- there's different

23     ways to measure it, he presented a couple

24     different ones, and they conflict.  So it's

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 55

1    mixed evidence at best.
2              Q.      And in 67, he explains what
3    you're saying is a conflict or mixed
4    evidence, correct?
5                      Despite a larger share -- this
6    is in the middle of paragraph 67.  Despite a
7    larger share of early in-person voters
8    casting their ballots on Sunday, a smaller
9    share of total votes were cast on Sunday in
10   the 2020 election because fewer voters cast
11   their ballots early in person during the 2020
12   election, correct?  That's --
13             A.      That's what he says.
14                     The -- the last little clause
15   of that sentence "because fewer voters cast"
16   I don't -- I don't know that I agree that
17   that's -- he's sort of the making a causal
18   claim here.
19             Q.      And you haven't analyzed this
20   data to say one way or the other whether
21   that's correct, right?
22             A.      Not even that.  He hasn't done
23   that analysis here.
24                     This is -- this last piece is

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 56

```
 1    seemingly speculative on his part, because he
 2    hasn't looked at the reason that we see this
 3    difference.
 4              Q.    And you'd agree also that in
 5    2022, there's a higher share of early
 6    in-person votes who voted on Sunday than the
 7    previous off-year election, correct?
 8              A.    I do see that in the tables,
 9    yeah.
10              Q.    Okay.
11                    So we're back to Section 1 of
12    your report.
13              A.    Okay.
14              Q.    Your analysis is limited to the
15    early voting hours in the November 2020
16    election, correct?
17                    MR. ROSBOROUGH:  I object to the
18              form.
19                    THE WITNESS:  The analysis that
20              I did in the 2023 report, that's what
21              I looked at.
22    BY MR. FIELD:
23              Q.    And you haven't done any
24    analysis since then, correct?
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 57

```
 1          A.      Have not.
 2          Q.      You would agree that the 2020
 3   elections were anomalous in many ways, right?
 4          A.      Yeah.  Covid was a unique
 5   phenomenon.
 6          Q.      Covid had a --
 7          A.      Hopefully unique in our lives.
 8          Q.      Fair.  Fair point.
 9                  So it's possible the counties
10   added hours or days to help spread folks out
11   while voting during the pandemic, correct?
12          A.      That's possible.
13          Q.      And, again, you didn't compare
14   weekend voting hours in 2020 with weekend
15   voting hours in any previous election to
16   determine whether or not it was common for
17   the counties to offer the same amount of
18   weekend voting, correct?
19          A.      I attempted to collect that
20   data but, as I said, really hard to find that
21   data going back more than one election cycle.
22          Q.      So you did not make that
23   comparison, correct?
24          A.      Correct.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 58

1            Q.      So since you conducted no

2    analysis of county-level early voting

3    schedules both before and after SB202, what

4    is the basis for your conclusion that SB202

5    did not result in any additional weekend

6    voting?

7                    MR. ROSBOROUGH:  I object to the

8            form.

9                    THE WITNESS:  As I said in my

10           original report, and as I reiterate

11           here, the vast majority of voters live

12           in a place -- in a county that offered

13           more than the required number of hours

14           of voting prior to SB202, and so the

15           imposition of SB202 and putting this

16           136-hour threshold, I think is the

17           number, the imposition of that

18           wouldn't have an impact on how the --

19           how many opportunities those voters

20           had to vote, because their counties

21           were already offering at least that

22           many.  And as you can see like in some

23           cases multiple times as many hours of

24           -- of voting.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 59

```
 1     BY MR. FIELD:
 2          Q.     Even though that might have
 3     just been driven by Covid in 2020, correct?
 4     You don't know one way or the other, right?
 5          A.     I don't know one way or the
 6     other, but...
 7          Q.     So before moving out of this
 8     section I want to make sure we've got one
 9     thing that I think we don't dispute, which
10     is, you don't dispute that the 2024 election
11     had the highest share of votes cast during
12     weekend voting as measured against all votes
13     cast compared with any of the six previous
14     federal elections, correct?
15          A.     You're referencing Table 9 of
16     Doctor Grimmer's analysis --
17          Q.     Correct.
18          A.     -- in that the third column,
19     that number in the third column at the bottom
20     is higher than the other numbers.  Yeah.
21          Q.     Let's -- I think on the record
22     table and third column is going to be really
23     --
24          A.     Sure.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 60

```
 1              Q.      -- difficult to --
 2              A.      Sure.
 3              Q.      -- understand.
 4                      So let me ask it again.
 5              A.      Yeah.
 6              Q.      You don't dispute that in the
 7    2024 election, when measured against the
 8    number of all votes cast in Georgia, the 2024
 9    election had the highest share of votes cast
10    over the weekend of early voting as compared
11    to any of the six previous federal elections,
12    correct?
13              A.      That's what Doctor Grimmer's
14    table shows.  If those numbers are calculated
15    correct, then that seems to be the case.
16              Q.      So you don't -- you don't have
17    a basis to dispute that, correct?
18              A.      I don't have a basis to
19    dispute, but I haven't corroborated the
20    numbers.
21              Q.      But you had a chance to; you
22    just didn't, correct?
23              A.      Wasn't asked to.
24              Q.      All right.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 61

1              Let's look at Section 2.

2              Here we're talking about voter

3     lines, correct?

4              A.      That's right.

5              Q.      And you state that in the

6     heading, Long lines are still a problem in

7     Georgia, right?

8              A.      That's right.

9              Q.      And you find, for example, that

10    7.5 percent of black voters, and 5.8 percent

11    of voters waited more than 30 minutes to vote

12    in 2024, correct?

13             A.      I didn't find that.  Those are

14    Doctor Grimmer's findings, but I'm report --

15    kind of rereporting them here.

16             Q.      Okay.

17             So you -- just for clarity.

18    Table 2.1 of your report states that 7.5

19    percent of black voters, and 5.8 percent of

20    white voters waited more than 30 minutes to

21    vote in 2024, correct?

22             A.      That is what the table shows,

23    yeah.

24             Q.      And this relies on CES data,

Page 62

```
 1    correct?
 2              A.      Yes.
 3              Q.      And all you've done here, I
 4    think you've confirmed it, but let's just
 5    double check.  All you've done here is copied
 6    those four numbers in Table 2.1 from Doctor
 7    Grimmer's 2025 report, correct?
 8              A.      A tiny more -- bit more than
 9    that.
10              If we look at Doctor Grimmer's
11    Table 16.  I don't remember what page that
12    was.
13              So page -- well, paragraph 81,
14    just above paragraph 81.
15              Q.      And we'll be in this page for a
16    little bit --
17              A.      I'm sure.
18              Q.      -- so you may want to flag it.
19              A.      Yeah.
20              Q.      That's what I did.
21              A.      Um --
22              Q.      Go ahead.
23              A.      So Doctor Grimmer reports the
24    number of black and the number of white
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 63

1    voters who waited 31 minutes to an hour, as
2    well as more than one hour.  All I've done
3    here is just added those two pairs of numbers
4    together to create my table, so it's not a
5    copy/paste of what he has in his, but it's
6    just adding a couple numbers together.  And
7    I'll add that I did -- I did use the CES data
8    myself to look at these numbers.
9           Q.    So you polled the 31 minutes to
10   an hour, and more than an hour numbers from
11   Doctor Grimmer's Table 16, and added those
12   together.  You also looked at the CES data to
13   confirm that Doctor Grimmer's numbers were
14   correct?
15          A.    I did look to see if they were
16   correct yesterday.  I did find what I think
17   is an error in his analysis.  I was looking
18   at his -- I -- I basically tried to replicate
19   this table on my own the way that I would
20   understand that he would have done it.  I
21   came up with different numbers for white
22   voters for 2024.
23                 In looking at his code, which
24   he shared, I did see a difference between the

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 64

1    approach that he took and the approach that I

2    took, which I'd be happy to explain, um,

3    really simple difference in the variable

4    selection he used, but I think that he's

5    using the wrong variable in calculating this.

6    And the consequence is that the white numbers

7    for 2024 are not quite right here.

8            Again, I hadn't actually seen

9    this until yesterday afternoon, so -- so it

10   is correct that my Table 2.1 is basically

11   reflecting what he has in his -- in his table

12   here, but I have reason to think that his

13   numbers aren't quite right.

14           Q.     Okay.  So let's unpack that a

15   bit.

16           A.     Uh-huh.

17           Q.     You had his replication code,

18   when you wrote your report, correct?

19           A.     I did.

20           Q.     And you had the CES data

21   available at that point, correct?

22           A.     I did.

23           Q.     And you could have run your own

24   analysis at that point, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 65

```
 1              A.      I didn't.
 2              Q.      But you did not check his code,
 3     you did not run your own analysis of the CES
 4     data, correct?
 5              A.      I took the table here, and I
 6     replicated it.
 7              Q.      Okay.
 8                      So polling the CES data that we
 9     talked about at the beginning of the
10     deposition that was yesterday?
11              A.      I had -- I looked at it
12     yesterday, correct.
13                      I had -- later in my -- in my
14     report here I used the CES data again, so I
15     had polled it before I wrote this report.  I
16     hadn't replicated this specific table of his.
17     I hadn't gone through all of his tables and
18     tried to replicate them myself.
19              Q.      Okay.
20                      So since we don't have anything
21     in your report addressing this purported
22     variable selection issue, can you explain it
23     for the record --
24              A.      Of course.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

1          Q.      -- and explain what effect your
2     positing that has on the numbers in Doctor
3     Grimmer's table?
4          A.      Sure.  I'd be happy to.
5                  So the CES study is -- it's a
6     two-wave survey.
7          Q.      Mm-hmm.
8          A.      People are interviewed before
9     election day, and people are interviewed
10    after election day.  Consequent -- and so
11    it's the same people being reinterviewed.
12         Q.      Mm-hmm.
13         A.      The -- in the data people --
14    there's two variables that indicate what
15    state somebody lives in.  There's what state
16    did they live in during the pre-election
17    wave; what state did they live in during the
18    post-election wave.  The question -- so the
19    main question we're analyzing here about wait
20    times is, of course, the post-election
21    question they get asked after the election.
22                 So in analyzing a variable like
23    that, the appropriate state variable to be
24    using would be the state that they reported

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 67

1     living in after the election because that
2     gels with the post-election question for the
3     post-election state question.
4               Doctor Grimmer uses the
5     pre-election state to -- to subset -- you
6     know, it's a national survey, to subset down
7     to just the Georgia responses.  He uses the
8     pre-election data.
9               When I tried to sort of
10    independently replicate the numbers, I used
11    the post-election data because that's what
12    you would use, when you're analyzing the
13    post-election question about wait times.  In
14    most circumstances, it's not going to matter
15    which one you use because the vast, vast
16    majority of people don't move between taking
17    the first wave and taking the second wave.
18              So when I was seeing these
19    differences between the numbers I was coming
20    up with and the numbers he was coming up
21    with, I ended up -- you know, it was
22    surprising to me, because I was finding that
23    we had roughly the same sample sizes in the
24    -- whether you used one or the other.

Stephen S. Pettigrew , Ph.D.                      August 15, 2025
Georgia Senate Bill 202, In Re

```
 1                    What I found though is that
 2        there's one single respondent in the data
 3        that makes it into his analysis, who this
 4        person said that they lived in Georgia in the
 5        pre-election wave, and then, when they're
 6        asked about -- in the post-election, when
 7        they're asked about wait times, they
 8        indicate, I think it was New Hampshire is
 9        where they lived.  This one respondent was
10        white, and so that's why it affects the white
11        row here.  This person indicated they waited
12        longer than an hour to vote.
13                    Most crucially, and why it had
14        such an effect -- I don't want to get too
15        technical.  But when you analyze survey data,
16        you use what are called survey weights, to
17        where you can take your sample and up-weight
18        and down-weight people to make them
19        reflective of the population you care about,
20        so in this case, like all voters in Georgia
21        or Nationwide.  This person had a weight of
22        almost 13, which means that compared to the
23        average person who took this survey, this
24        person, who moved from Georgia to New
```

Stephen S. Pettigrew , Ph.D.          August 15, 2025
Georgia Senate Bill 202, In Re

Page 69

```
 1    Hampshire, was worth 13 responses.
 2                   As a result, whether or not
 3    this outlier person or just -- just, you
 4    know, person with a big weight, whether
 5    they're included or not changes -- so it has
 6    the effect in this table in the 2024, white
 7    more than one hour, he reports 2.5 percent of
 8    voters in Georgia waited -- white voters in
 9    Georgia waited more than one hour, 2.5
10    percent is what he reported.  When you take
11    out this one single person, who seems to have
12    moved out of Georgia, it drops to less than a
13    percent.  If I remember it was like .77
14    percentage points.  So it has almost a 2
15    percentage point drop in the percentage of
16    white voters, who waited more than an hour,
17    which then is pretty consequential, when
18    you're comparing the gap in wait times
19    between white and black, when the white
20    number drops by 2 percentage points.
21                   So that's what I found.
22         Q.      Okay.
23                   And you ran that code
24    yesterday?
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 70

1           A.      Yes.

2           Q.      Okay.

3                   Can you provide that through

4     counsel to us?

5           A.      I'd be happy to.

6           Q.      Okay.

7           A.      Just to -- just be clear.  I

8     took his code and all I did was switched from

9     using the pre-election state variable to

10    using the post-election state variable, and

11    it comes up with these numbers.

12                  MR. ROSBOROUGH:  And, counsel,

13           if you could just send me an e-mail

14           reminding me.

15                  MR. FIELD:  Yes, I will.

16                  MR. ROSBOROUGH:  We'll be happy

17           to do that.

18                  MR. FIELD:  I will make that

19           request by e-mail.

20                  MR. ROSBOROUGH:  Thank you.

21                  MR. FIELD:  When I make that

22           request, this is the code I'm

23           referring to for sure.

24                  MR. ROSBOROUGH:  Understood.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 71

1      BY MR. FIELD:

2              Q.      All right.

3                      So with the exception of your

4      statement about white voters in 2024, who

5      waited more than one hour, you don't have any

6      reason to doubt the accuracy of the data in

7      this table, correct?

8              A.      Ah, well, I confirmed that he

9      makes the same mistake in every year.  Um, I

10     -- it was getting down to crunch time

11     yesterday, so I didn't look all the way back

12     to 2014.  I did look at 2022, since that was

13     a lot of the discussion of -- of my report,

14     2022 and '24.

15                     In 2022, the error in the code

16     is there, but because -- but it doesn't --

17     the numbers, you know, rounded off here, the

18     numbers don't change in a meaningful way,

19     because you don't have this crazy, anomalous

20     person, who, you know, was worth 13

21     responses.

22                     And so -- so his numbers -- you

23     know, if his numbers here in the 2022 column

24     were rounded out further, right, more than

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 72

1    three decimal points, for sure we would see

2    differences, when you fix this mistake.  When

3    they're rounded off in the way that they are,

4    unless there are other very anomalous people

5    with both high weights and that moved in or

6    out of Georgia, um, you wouldn't see a

7    difference.

8              So I didn't -- I didn't see big

9    differences in the 2022 column, but -- you

10   know, in the rounded-off version, but

11   certainly, if you go out enough decimal

12   points, you get a different estimate.

13        Q.    Table 2.1 from your report

14   looks at the CES data, which is what is in

15   Table 16 of Doctor Grimmer's report, correct?

16        A.    That's right.

17        Q.    But you did not separately

18   respond to Doctor Grimmer's discussion of

19   line-related data from the University of

20   Georgia School of Public and International

21   Affairs or SPIA, correct?

22        A.    I didn't address that in the

23   report here.

24        Q.    Why not?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 73

1          A.      Ah, I don't have a great answer
2     to that.  It -- the CCES is a data source --
3     you know, in a previous rebuttal that I had
4     written, I did address the -- an earlier
5     version of that -- of that SPIA UGA survey,
6     and I, you know, had some gripes with the
7     methodology.  Most of Doctor Grimmer's focus
8     here is on the considerably higher quality
9     CES data, and so that's where I spent my
10    time, since that -- to somebody who does
11    research in this world that's a much more
12    authoritative data source than a, you know,
13    random one-off poll.
14          Q.      So your characterization of
15    SPIA is a random one-off poll?
16          A.      That's probably not fair.
17              They do polling a bit, but it's
18    -- but it's not done as -- you know, the CES
19    is a multimillion-dollar study that is --
20    has, you know, at this point probably 20 or
21    30 universities involved in running the
22    study.  It's a -- it's a ridiculously
23    high-quality poll.  There really -- there
24    aren't many, if any, political science or

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 74

1    survey research polls that are done as well

2    as the CES.  So, you know, anything is not

3    going to stack up to that.

4            Q.    And between SPIA and CES, do

5    you know one way or the other which one

6    relies on phones, which one relies on e-mail

7    or just internet posts?

8            A.    Ah, I believe that -- I can't

9    say for -- I don't know about the SPIA one

10   for certain.  I believe there is a phone

11   poll, but I'd want to check that.

12               The CES, my understanding is

13   that it's an online poll -- an online panel

14   poll that is pretty standard in survey

15   research these days run by YouGov, which is

16   one of the more respected pollsters out

17   there.

18           Q.    Okay.

19               But you don't dispute that at

20   least using the SPIA data, and SPIA, again,

21   that's the S-P-I-A, data, that only 2.7 of

22   Georgia voters reported waiting more than

23   30 minutes in line, correct?  Paragraph 77 of

24   Doctor Grimmer's report.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 75

1          A.      Yeah.  If that's what he

2     reports, then -- then I don't have reason to

3     dispute it.

4               But the one thing about the

5     SPIA survey data is that I didn't -- I didn't

6     have access to the raw data.  What -- what we

7     had access to was what are called the top

8     lines, basically summary statistics.  I

9     didn't have the individual rows of the data

10    showing each respondent's response.  So any

11    analysis that I do is just going to rely on

12    essentially the calculations that have

13    already been done and put out there

14    pubically.

15         Q.      Okay.

16               And you don't have any reason

17    to dispute based on the SPIA data that in

18    2024, 2.6 percent of white voters reported

19    waiting more than 30 minutes in line to vote,

20    correct?

21               MR. ROSBOROUGH:  I object to the

22         form.

23               THE WITNESS:  Again, I can't --

24         without access to the data there's no

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 76

1              way for me to corroborate that.

2                   But it is kind of relevant to

3              point out that, when -- that 2.6

4              number is considerably different than

5              the number that Doctor Grimmer reports

6              using the CES data, when you correct

7              the mistake that I suggest that he

8              made, it brings the CES data much

9              closer to the SPIA survey data.  You

10             know, he reports 2.6 percent in the

11             SPIA data; he reports 5.8 percent in

12             the -- in the CES data.  But if we --

13             if we remove this -- this anomalous

14             person, it drops it 2 percentage

15             points almost.

16       BY MR. FIELD:

17             Q.    And you don't dispute that the

18       SPIA data show that in 2024 only 1.9 percent

19       of black voters waited -- reported waiting in

20       line more than 30 minutes, correct?

21             A.    Again, didn't have access to

22       the data, so I can't say whether or not it's

23       correct.

24             Q.    And you haven't even looked at

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 77

```
 1    the top lines to know, correct?
 2            A.      I did look at the top lines.
 3    That is what the top line looks like.
 4            Q.      When did you look at that?  You
 5    hadn't mentioned that before.
 6            A.      I did.  I said I had access to
 7    the top line data.  I looked -- I looked at
 8    basically a summary report, but I don't
 9    have -- what I would call data -- you know, I
10    don't consider a top line to be really data;
11    it's a summary table; it's -- it's a report.
12                    So when I say I didn't have
13    access to the data, what I meant is I don't
14    have access to the individual rows of the
15    dataset.  I did look at the top lines and
16    confirm, you know, the number they reported
17    in the -- in that summary report matches the
18    number that he reports.
19            Q.      When did you do that?
20            A.      Ah, after -- you know, when I
21    had access to his report, so maybe June.
22            Q.      So you looked at it, confirmed
23    it, and then said nothing about it in your
24    report?
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 78

1          A.      Ah, sure.

2          Q.      I mean, you don't reference the

3     SPIA data and the SPIA survey at all in your

4     2025 report, correct?

5          A.      I didn't -- yeah, I don't

6     reference it in my report.

7          Q.      Okay.

8                  So but -- so earlier, when I

9     asked you what you looked at, when you were

10    -- when you were composing your 2025 report,

11    you referenced CES data and Doctor Grimmer's

12    report.

13         A.      Yeah.

14         Q.      It's now also the top line SPIA

15    survey reports?

16         A.      Yeah.

17                 MR. ROSBOROUGH:  I object to the

18             form.

19                 THE WITNESS:  I had forgotten

20             about that piece.  But, yeah, I did

21             look at that.

22                 But, again, just as a -- to make

23             sure that he didn't have like a typo

24             or something like that in his report.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

1     BY MR. FIELD:

2             Q.      Okay.

3                     So the SPIA data show that

4     white voters reported waiting more than 30

5     minutes in line to vote in 2024, more than

6     did black voters, correct?

7             A.      That is what his numbers

8     suggest here.

9             Q.      And what the top line number

10     suggests, correct?

11             A.      Sure.

12             Q.      And that's contrary to your

13     conclusion from the CES data, correct?

14             A.      Contrary to -- contrary to what

15     his own table says.

16             Q.      I mean, it's his data in Table

17     16, CES data, but you're the one making the

18     conclusion from that that long lines are

19     still a problem.  And, specifically, as a

20     basis for that you point to black voters

21     waiting more than 30 minutes to vote more

22     frequently than white voters, correct?

23                     MR. ROSBOROUGH:  I object to the

24             form.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 80

```
 1              THE WITNESS:  My point that
 2         lines are still a problem in Georgia
 3         doesn't have to do -- well, it only
 4         partially has to do with the race
 5         component.
 6              Second paragraph here I point
 7         out that just the overall percentage
 8         of voters in Georgia -- sorry, overall
 9         the number of voters in Georgia, who
10         experienced more than a half hour
11         wait, is statistically significantly
12         different.  It's larger than nobody in
13         both 2022 and 2024 and that's his own
14         data.
15    BY MR. FIELD:
16         Q.    And we'll get to that.
17         A.    Okay.
18         Q.    But with respect to the racial
19    difference.
20         A.    Uh-huh.
21         Q.    Your conclusion and statements
22    here are not supported by the SPIA survey
23    results, correct?
24         A.    The SPIA results show a
```

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 81

1    difference from the CES data.

2            Q.      And, in fact, they would not

3    support your statement that black voters wait

4    in line more frequently than white voters,

5    correct?

6            A.      Not necessarily, right?

7                    When we have two data sources,

8    and we're comparing whether one --

9            Q.      I didn't ask about a

10   comparison.

11                   I'm saying SPIA.  Is it

12   correct -- so let me -- let me ask the

13   question differently.

14           A.      Yes.

15           Q.      I'll try it this way.

16           A.      Okay.

17           Q.      You say in the final paragraph

18   on page 5 that there's evidence of "A

19   continued racial difference in wait times."

20                   MR. ROSBOROUGH:  I object to the

21           form.  Sorry.

22                   MR. FIELD:  I haven't gotten to

23           the question yet, but I think you know

24           where I'm going.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 82

1                    All right.  Let me just ask it

2            again.

3    BY MR. FIELD:

4            Q.    You say that there's "Evidence

5    of a continued racial difference in wait

6    times."

7                    The SPIA data do not show a

8    racial difference with black voters reporting

9    higher wait times than white voters, correct?

10                    MR. ROSBOROUGH:  I object to the

11            form.

12                    THE WITNESS:  The absence of

13            evidence isn't evidence of absence.

14                    The SPIA data do not provide

15            evidence of black voters waiting

16            longer than white voters but the

17            considerably higher quality CES data

18            do and show, you know, much bigger --

19            I think a much bigger sample.  I'm not

20            100 percent certain on that but the

21            CES data has something like 1,600

22            Georgians in it.  I don't recall what

23            the sample size was with the -- with

24            the SPIA data, but sample size isn't

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 83

```
 1              everything with survey dat.
 2                    The high quality CES data does
 3              show significant -- a significant
 4              racial gap in 2024 between white and
 5              black voters with black voters waiting
 6              significantly -- were more likely to
 7              experience a significant -- a long
 8              line of over 30 minutes.
 9       BY MR. FIELD:
10              Q.    But you didn't offer any of
11       that in your report.  It sounds to me like in
12       your report you just ignored evidence that
13       didn't support what you wanted to say?
14                    MR. ROSBOROUGH:  I object to the
15              form.
16                    THE WITNESS:  I do -- what do
17              you mean I didn't talk about any of
18              that in my report?  The whole last
19              paragraph talks about that.
20       BY MR. FIELD:
21              Q.    No.  You don't talk about SPIA
22       and why it's of less value and why it can't
23       be trusted quite as much, because CES has
24       more respondents.
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 84

1                    Doctor Grimmer says, here's the

2        SPES data -- I'm sorry, here's the SPIA data

3        and here's the CES data.  One shows a

4        slightly higher black -- a percentage of

5        black voters waiting more than 30 minutes,

6        the other one shows white voters waiting more

7        than 30 minutes, and you just ignore the one

8        that shows white voters reporting waiting

9        more than 30 minutes, correct?

10            A.     I don't address the SPIA data

11        here, but, if I did, all I would be doing

12        would be referencing back to the critiques

13        that I provided of it from the last response

14        that I did.  This is the rebuttal from 2023.

15            Q.     Okay.

16                    Lets's look at paragraph 81 of

17        Doctor Grimmer's report.  Keep -- keep

18        section 2 of your report out.  We're going to

19        talk between these two.

20                    You don't dispute that a

21        smaller share of black voters reported

22        waiting in line more than 30 minutes in the

23        two elections after the passage of SB202 than

24        in 2016, '18 or '20, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 85

```
 1              A.      Let me just re --
 2              Q.      Go ahead.
 3              A.      -- restate that.
 4              You said a smaller share of
 5      black voters waited --
 6              Q.      More than 30 minutes --
 7              A.      -- more than 30 minutes --
 8              Q.      -- in '22 and '24, as compared
 9      to '16, '18 or '20.
10              A.      Well, that's -- that's what
11      this table shows, yeah.
12              Q.      And you've confirmed at least
13      with respect to black voters, you don't have
14      any reason to doubt that this is an accurate
15      representation of the CES data, correct?
16              A.      It's an accurate
17      representation, but it misses a lot of
18      context that I think is important that I talk
19      about later in my report.
20              Q.      And if we look for a moment at
21      2022, white voters reported waiting in line,
22      this table shows, more than one hour at a
23      higher rate than black voters, correct?
24              A.      That number is higher, that's
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 86

```
 1    correct.
 2            Q.      Okay.
 3                    And as you've mentioned earlier
 4    your change in the code doesn't affect the
 5    1.1 percent figure, correct, of white voters
 6    waiting more than one hour?
 7            A.      Yeah.  I think for 2022, the
 8    changes from making that tweak are --
 9            Q.      Would be somewhere down the
10    decimal train?
11            A.      That's right.
12            Q.      Okay.
13            A.      Yeah.
14            Q.      And even for those over
15    30 minutes, it looks like black voters
16    reported waiting more than 30 minutes
17    approximately 2.3 percentage points more than
18    white voters, is that correct, in 2022?
19            A.      Can you state that again?  I'm
20    sorry.
21            Q.      Sure.
22                    In 2022 --
23            A.      I spaced out for a second.
24            Q.      No problem.
```

Stephen S. Pettigrew , Ph.D.                 August 15, 2025
Georgia Senate Bill 202, In Re

Page 87

1              And I should have said at the

2      beginning, if you need a break at any point,

3      feel free.

4              A.    No, I'm good.  Thank you.

5              MR. ROSBOROUGH:  Maybe when we

6          hit a natural pausing point in the

7          next like 15 minutes would be good to

8          take a five, ten-minute break?

9              MR. FIELD:  Let's do it now.

10              MR. ROSBOROUGH:  Okay.

11              MR. FIELD:  I think I'm not

12          hitting a natural breaking point.

13              MR. ROSBOROUGH:  Okay.

14              MR. FIELD:  So we'll go off the

15          record.

16              VIDEO TECHNICIAN:  The time is

17          now 11:15.  This concludes Media Unit

18          No. 1.

19                      - - -

20              (Whereupon, there was a recess

21          in the proceeding from 11:15 a.m.

22          until 11:29 a.m.)

23                      - - -

24              VIDEO TECHNICIAN:  The time is

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 88

```
 1          now 11:29.  This begins Media Unit No.
 2          2.
 3    BY MR. FIELD:
 4          Q.      Doctor Pettigrew, thank you for
 5    the explanation about Table 16 in Doctor
 6    Grimmer's report.  I want to make sure I
 7    understand one or two more things about your
 8    code and calculation that you made yesterday.
 9          A.      Mm-hmm.
10          Q.      Just to confirm, yesterday was
11    the first time you used the CES data to run
12    any code to check the numbers that were in
13    Table 16 of Doctor Grimmer's report, correct?
14          A.      That's right.
15          Q.      Okay.
16                  And you ran the code -- you
17    referenced your code for the more than an
18    hour white voters, 2022 and 2024.  Is that
19    because of the -- those are the only two you
20    ran or those were the only two where you
21    suggested a change needs to be made?
22          A.      That was the one -- well,
23    that's the one that had the big change was
24    the white 2024, and it's -- it isn't --
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 89

1    because these columns should add up to
2    100 percent, changing the last row slightly
3    changes the other numbers in the column.
4    But, yeah, it's that 2024 middle column of
5    five numbers for white.
6                Q.      Okay.
7                        Did you go back and check any
8    years previous to 2022?
9                A.      I did not, no.
10               Q.      And did you go back and check
11   2022 and 2024 for black voters?
12               A.      Yes.
13               Q.      And those numbers you don't
14   suggest any changes need to be made, correct?
15               A.      Correct.
16               Q.      But I'm presuming that you also
17   suggest that a change needs to be made in the
18   overall column at the bottom?
19               A.      Yes, although it was slight,
20   and I don't remember what -- I don't remember
21   what the number or change would be.
22               Q.      Okay.
23               A.      I remembered offhand the 2.5
24   goes down to .77, but I don't remember what

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 90

1    the change was for overall.

2           Q.      Okay.

3           A.      But it was smaller.

4           Q.      Okay.  Got it.

5                   All right.  So the question

6    that we were starting to discuss at the end

7    of our last session.

8                   So I think we answered this,

9    let me just double check, that looking at

10   paragraph 81 of Doctor Grimmer's report you

11   do not dispute that a smaller share of black

12   voters reported waiting in line for more than

13   30 minutes in the two elections after the

14   passage of SB202, than in 2016, '18 or '20,

15   correct?

16          A.      '16, '18 and '20, correct, not

17   '14.  And as I said in the later part of my

18   report, I think that's missing a bit of

19   context, and I'm sure we'll talk about that.

20          Q.      Okay.

21                  All right.  So now we're

22   looking at 2022.  For voters who reported

23   waiting more than 30 minutes it looks like

24   black voters reported waiting more than 30

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

```
 1      minutes approximately 2.3 percentage points
 2      more than white voters, correct?
 3              A.      In twenty-twenty --
 4              Q.      Two.
 5              A.      2022?
 6                      Ah, 2.3 percentage points.  Is
 7      that what you said?
 8              Q.      Correct.
 9              A.      Yeah.
10              Q.      That's a yes?
11              A.      Yes.
12              Q.      Okay.
13                      And you don't know whether that
14      figure is a statistically significant figure,
15      correct?
16              A.      I do not.
17              Q.      Okay.
18                      How would you go about
19      calculating whether or not that difference is
20      statistically significant?
21              A.      There's a formula for -- for --
22      you calculate a standard error around a
23      percentage.  It's a function of the value of
24      the percentage, so -- or I guess the value of
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

```
 1      the difference in the percentage, and then

 2      the sample size of the black and white

 3      respondents, and you plug it into this

 4      formula and that gives you a standard error,

 5      and then you multiply it by 1.96, which has

 6      to do with the normal distribution, and then

 7      -- and then you evaluate whether that number

 8      -- adding and subtracting that number from

 9      the difference, we're seeing the 2.3

10      difference, whether that crosses the zero

11      threshold or not.

12              Q.      Okay.

13                      So if I were to tell you --

14      let's stipulate, and I know that you haven't

15      run this, but if we were to stipulate that

16      that margin of error figure is 3.1 percentage

17      points, if that's the case, is the 2.3

18      percentage point statistically significant?

19              A.      If that's the case, then that

20      would be true.

21              Q.      What would be true, sir, that

22      it is or is not statistically significant?

23              A.      If the standard error is -- you

24      said 3.1?
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 93

1              Q.      3.1.
2              A.      Then it would not be
3    statistically significant.  That feels high
4    to me given that standard errors are a --
5    standard errors of a proportion, which these
6    are, that's a function of closeness to zero
7    or 50 percent.  And so, again, if it is 3.1,
8    then that would be the case.
9              Q.      That this is not a
10   statistically significant difference,
11   correct?
12             A.      In 2022.
13             Q.      Correct.
14             A.      But in 2024, you do see that.
15             Q.      And you would also agree that
16   the percentage of voters of any race waiting
17   in line more than 30 minutes in 2024 is
18   significantly lower than in the previous two
19   election cycles, correct?
20             A.      I didn't look at that in
21   particular but that's what Doctor Grimmer
22   suggests in his analysis.  I didn't -- I
23   didn't do those calculations myself to check
24   every single number of his.

Page 94

1          Q.      Well, you did check the 2024

2     numbers, correct?

3          A.      I checked what's in the table.

4     I didn't -- he -- he asserts statistical

5     significant differences from year to year,

6     and I didn't check those in particular.

7          Q.      Right.  I haven't asked that

8     question.

9          A.      Oh, okay.  I thought that's

10    what you were asking.

11         Q.      So you would agree that the

12    percentage of voters of any race waiting in

13    line more than 30 minutes in 2024 is lower

14    than in the previous two election cycles,

15    correct?

16         A.      The -- the value -- so you're

17    -- you're just asking if the number is lower

18    than, but ignoring statistical significance?

19         Q.      Correct.

20         A.      And when you say the previous

21    two election cycles, what do you mean by

22    that?

23         Q.      The previous two general

24    election cycles, '20 and '16.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 95

1          A.      The Presidentials?  Then, yeah,
2     with his table, that's true.  That's correct
3     based on his numbers.
4          Q.      And for those waiting more than
5     30 minutes, it looks like black voters
6     reported waiting more than 30 minutes at
7     approximately 1.7 percentage points more than
8     white voters in 2024, correct?
9          A.      That's what he reports but
10    that's half the size that it actually is
11    based on my calculations.  I -- I came up
12    with a calculation of something like three,
13    three and a half percentage points.  There's
14    a gap between white and black in what I did
15    yesterday.
16          Q.      Okay.
17               All right.  So looking at page
18    5 of your report you have numbers that you
19    pulled from Table 16, correct?
20          A.      Yes.
21          Q.      And then you state that these
22    data show a statistically significant racial
23    difference with black voters waiting in line
24    more than white voters, correct?

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 96

1          A.       Ah, where do you see that?

2          Q.       Actually, strike that.  Let me

3     separate this out.

4                    The statistical significance

5     you talk about separate from the racial gap,

6     correct?

7          A.       That's right.

8          Q.       Okay.

9                    On the rational gap are you

10    making any statement or do you have any

11    opinion about the statistical significance?

12         A.       I hadn't -- it's not in here.

13                   In digging through the 2024

14    data yesterday, I did evaluate that just kind

15    of in the process of looking at stuff, and I

16    do see a significant difference between white

17    and black, but, of course, it's not in here,

18    because I just did it yesterday.

19         Q.       A statistically significant

20    difference between white and black wait

21    times?

22         A.       Correct.  Between white and

23    black and the percentage of people waiting

24    more than 30 minutes.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 97

1            Q.      Yeah.

2                    Again, since it's not in your

3      report, can you provide me clearly what

4      relationship it is that you're suggesting

5      there's a significant -- I'm sorry, a

6      statistically significant relationship

7      between?

8            A.      Yeah.

9                    So looking at -- starting with

10     Doctor Grimmer's Table 16, he has 7 percent

11     of black voters waiting 31 minutes to an

12     hour, and a half of a percentage of them

13     waiting more than an hour.  So that seven and

14     a half percent compared to -- and then this

15     is where his table is off -- but seven and a

16     half compared to something like three and a

17     half percent, 3.7, I think, percent is the --

18     is the corrected value, when you address the

19     issue that I mentioned, that difference, that

20     7.5 minus 3-point-something, I don't know the

21     exact number, that's where I saw the

22     statistical significant difference similar to

23     what we saw in 2012, '14, '16, '18.

24           Q.      And would I find that

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 98

1      calculation in your code?

2                A.      Sure.

3                Q.      Okay.

4                        What is the margin of error --

5      is that the right term?

6                A.      Sure.

7                Q.      For that calculation?

8                A.      I don't remember offhand.

9                Q.      Okay.

10               A.      You know, it's an intermediate

11     step on the -- on the path to calculating it.

12     I don't remember what the value was.

13               Q.      Okay.

14                       But, again, we'll find that in

15     your code?

16               A.      Sure.

17               Q.      Okay.

18                       So going back to my earlier

19     question about statistical significance in

20     your report on page 5, you're talking here

21     about just the number of voters who wait more

22     than 30 minutes is statistically significant,

23     correct?

24               A.      I think the way to say it is

Page 99

1    that Doctor Grimmer's report provides

2    statistically significant evidence that there

3    were voters in Georgia still waiting longer

4    than 30 minutes in 2022 and 2024.

5              Q.      Can you describe for me the

6    calculation that you performed to reach the

7    conclusion about a statistical significance?

8              A.      Yeah.

9                      Similar to what I was saying

10   earlier, it's a function of the value.  So in

11   2024, it was 6.3 percent; in 2022, 5.3

12   percent.  It's a function of that, it's a

13   function of the sample size, which I actually

14   don't remember anymore.  I think in 2024, it

15   was about 1,600 people.  I don't remember in

16   2022.  Those go into a formula.  There's a

17   square root.  You multiple it by 1.96.  That

18   gives you a value that you're comparing and

19   seeing whether adding or subtracting that --

20   that margin from either 6.3 or 5.3, whether

21   that makes the number cross zero or not and

22   that's how we assess statistical

23   significance.

24             Q.      And as part of this analysis

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 100

1    did you do any -- is there a null hypothesis

2    testing that you --

3              A.     That's essentially what it is,

4    yeah.

5                    The null hypothesis is the null

6    of there were zero people who waited in line

7    longer than 30 minutes.  That's what you're

8    evaluating against.

9              Q.     That was my -- okay.  Perfect.

10   That was my question.

11                   The null that you're testing is

12   whether or not there were zero people who

13   waited 30 minutes or more?

14             A.     Yeah, which is -- and that's --

15   that's consistent with the President's

16   Commission on Election Administration, which

17   I talk -- I don't mention here, but that's --

18   that's the standard that they provided, and I

19   mention in my earlier report as nobody should

20   wait longer than 30 minutes.

21             Q.     Okay.

22                   So it's your view that you

23   would reject the null, if one person waits

24   more than 30 minutes, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 101

1          A.      Not -- not exactly.

2          Q.      Okay.

3          A.      You have to separate apart --

4    the recommendation of the Commission is that

5    nobody should -- should wait longer than 30

6    minutes.  So if I watched somebody wait

7    longer than 30 minutes, then I would see

8    evidence that this -- this sort of guideline

9    was being violated.  Obviously, I wasn't

10   there watching people vote.  What I have is

11   survey data.  We use the survey data to

12   assess whether we can reject the null that

13   there were no -- the null that nobody waited

14   longer than 30 minutes.  It's a slight

15   nuance, but -- but, basically, what this is

16   showing, what the -- what the CES data is

17   showing is that we have evidence to suggest

18   we can reject the null that nobody waited

19   longer than 30 minutes.  And our best guess

20   for 2024 is that 6.3 percent of people waited

21   longer than 30 minutes, and in 2022, 5.3

22   percent of people.

23          Q.      So if there were one person,

24   who had reported waiting more than 30

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 102

1     minutes, that would be enough for you to show

2     statistical significance, correct?

3          A.      No.

4                  If -- if this survey -- if --

5     if we had 1,600 respondents in Georgia, and

6     only one person said that they waited longer,

7     that's not enough evidence using that as your

8     data source, right, using -- you know, you

9     would never -- 1,600 people and only one

10    person over that threshold, you would never

11    have a statistically significant result.

12                 What I was saying earlier is

13    sort of a hypothetical where like I'd go to

14    Georgia during an election and watch like a

15    polling place and -- and physically observe

16    people waiting longer than 30 minutes, that

17    to me would be a -- that would be evidence of

18    if -- if just one person was waiting that

19    long, that would be evidence, but --

20         Q.      Evidence of?

21         A.      Of -- of this nobody-should-

22    wait-longer-than-30-minute standard.

23                 Again, that's not what I'm

24    doing here.  So -- so to say -- it's just a

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 103

1      difference between, how do we know that that
2      one person waited longer than 30 minutes?  If
3      like -- if we had a credible report or I had
4      a firsthand experience of it, that's a
5      different type of evidence than what we see
6      in survey data where with survey data, you
7      know, margins of errors in data sources like
8      that exist, because you have things like
9      measurement error, you have, you know,
10     potential of that one person, maybe they
11     misclicked, when they were filling out the
12     survey.  But when we have enough people, you
13     know, 5.3 or 6.3 percent of people, we can
14     essentially rule out the possibility that all
15     of those people were misclicking or that we
16     just got a bad sample or something like that.
17             Q.     But, again, but the null you're
18     testing is that no one waited more than 30
19     minutes, therefore, if at least one person
20     reports having waited more than 30 minutes,
21     you can reject the null?
22             A.     That's not how -- that's not
23     how null hypothesis testing works.
24             Q.     Explain.  Because you did --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 104

1     you said that the -- you are -- you are

2     looking to test whether or not there were no

3     voters who waited more than 30 minutes,

4     correct?

5              A.      You set -- when you do a null

6     hypothesis test like this, you set your null

7     hypothesis, which the standard for something

8     like this would be -- would be a null

9     hypothesis of zero.  In terms of this

10    specific question that -- that null

11    hypothesis actually really makes sense.

12    Usually -- you know, in most null hypothesis

13    testing we use zero, just because that's the

14    convention.  Here it's the convention, but

15    it's also the recommendation of the

16    Commission.  So it really has like

17    substantive meaning.

18              When we do a null hypothesis

19    test with survey data of this sort, having a

20    survey with just one person, who I didn't

21    observe, you know, firsthand or I don't --

22    it's just a report by that person, the

23    standard that data scientist statisticians

24    would use, that just one person in the full

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 105

1    survey almost certainly wouldn't be enough to

2    reject the null; you'd need an absurdly high

3    sample size.

4                  But in this case, out of 1,600

5    people in 2024, we had 6.3 percent of people

6    indicating that they waited a long time.

7    When you use that to calculate a margin of

8    error, which helps to account for what I was

9    saying, which helps to account for maybe the

10   sample isn't, you know, perfectly reflective

11   of the population, maybe people, you know,

12   misclick or something like that, you use the

13   margin of error to account for those things.

14   And what's left in this circumstance is

15   evidence that allows us to reject the null

16   that nobody in Georgia -- that nobody in

17   Georgia waited longer than 30 minutes and

18   that this -- this percentage was maybe just

19   an anomaly of the data.

20        Q.    But what if we -- put the

21   survey data aside.

22        A.    Okay.

23        Q.    So let's talk about the

24   hypothetical you were offering, which is you

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 106

1      -- you are there, you're collecting data.

2      You're standing outside a poll location in a

3      county, and you see somebody, one person,

4      wait more than 30 minutes.  Is that enough to

5      reject a null that no one waited more than

6      30 minutes?  I mean, the answer has to be

7      yes.

8           A.    Well, you're using this

9      language of like, to reject the null.  I --

10     it's not a statistical test that I'm doing in

11     that circumstance.  I just have evidence.

12          Q.    Okay.

13          A.    It's not -- it's -- it's

14     firsthand evidence.  It's a different type of

15     evidence than a statistical test with a null.

16          Q.    Okay.

17          A.    That is evidence that the

18     President's Commission recommendation is

19     being violated.

20          Q.    Okay.

21                So would you have the same

22     conclusion here, long lines are still a

23     problem, because there was any voter who

24     waited more than 30 minutes?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 107

1          A.      If I had definite evidence, you

2     know, firsthand evidence of that sort,

3     then -- then -- yes, then it is breaking that

4     -- that standard.

5              Q.      Okay.

6                  So let me -- I should have said

7     it that way.

8              A.      Okay.

9              Q.      We're talking about that one

10    voter you observed waiting more than 30

11    minutes, a single voter, who you observed

12    waiting more than 30 minutes, you have

13    concrete evidence, that to you is enough for

14    you to say that long lines were still a

15    problem in Georgia, correct?

16             A.      There's a lot to unpack here,

17    right?  This is sort of an absurd

18    hypothetical because, for one, you can't have

19    a long line with one person, right?  It's

20    just not -- you can't have one person waiting

21    for 30 minutes but nobody else.  Who were

22    they waiting behind?  Who's behind them?

23    Like it -- for one, like, lines don't work

24    that way.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 108

```
 1                    So in that sense --
 2            Q.       They can absolutely work that
 3     way.   You have a line, and then the last
 4     person gets in line and that's the one person
 5     who waits more than 30 minutes, and then the
 6     line is under 30 minutes and from there on
 7     out it's not over 30 minutes.
 8            A.       In practice though that isn't
 9     how it works.
10            Q.       But I'm using your hypo -- you
11     referenced the watching one person.
12            A.       Okay.
13            Q.       So I'm asking, in that
14     hypothetical one person waits more than 30
15     minutes.   By sheer coincidence that's the
16     only person in the whole State of Georgia
17     that happened to get into line and make it go
18     over 30 minutes.   Are long lines a problem in
19     Georgia?
20            A.       If it's one single person, then
21     it just depends on how you characterize
22     problem, right?   If it is one single person,
23     and you're certain that person waited longer,
24     then -- then Georgia's elections are breaking
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 109

1    the standard that the President's Commission

2    on Elections Administration set forth that

3    says nobody should wait longer than 30

4    minutes.  Whether or not you would

5    characterize that one single person as a

6    problem, that's more of a subjective thing.

7                   What I'm suggesting here is,

8    over 1 in 20 voters -- we're not talking

9    about one single person in the whole state of

10   millions.  We're talking about 1 out of every

11   20 voters in both of these elections were

12   waiting longer than -- than 30 minutes, I'm

13   willing to characterize that as a problem.

14           Q.       Okay.

15           A.       Whether or not I think one

16   single person is a problem, I don't know.  I

17   haven't thought about that, because it's just

18   -- that's not how elections work.

19           Q.       Okay.

20                   And, again, the word problem

21   that I'm using is yours, so I'm trying to

22   define where you draw the line on what is a

23   problem.  And it sounded to me like the

24   problem you were pointing to the President's

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 110

1      Commission, over 30 minutes, problem.  But

2      now it sounds like there's some gray area

3      between over 30 minutes and how many people

4      were waiting more than 30 minutes, and

5      there's a line somewhere there.  We just --

6      we don't know where it is, but you're saying

7      Georgia is at least on the problem side of

8      the line?

9                  MR. ROSBOROUGH:  Object to form.

10                 THE  WITNESS:   The  statistical

11          evidence that over 1 in 20 Georgia

12          voters waited longer than 30 minutes

13          in both of these elections, that's a

14          problem.

15     BY MR. FIELD:

16          Q.     Okay.

17                 What about in 1 in 10?

18          A.     I don't know.

19          Q.     One in 30?

20                 Well, I mean, you're saying

21     something is a problem, but you can't say how

22     you know it's a problem.  You just know it

23     is, and we should take your word for it?

24                 MR. ROSBOROUGH:  I object to the

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 111

```
 1              form.
 2                     THE  WITNESS:   If  we  had  enough
 3              -- we're talking about if it was 1 in
 4              10, 1 in 30, whatever your
 5              hypotheticals are, if we had
 6              statistically significant evidence,
 7              right, if we had enough data to -- to
 8              measure that that was meaningfully
 9              different from zero, then I -- I need
10              to think more about it.  But 1 in 20
11              voters is a lot of voters and that's
12              -- that's a problem.
13     BY MR. FIELD:
14              Q.     Okay.
15                     Did you perform this
16     statistical significance test on the SPIA
17     data?
18              A.     I couldn't.  I don't -- I don't
19     believe that the -- I don't -- I don't
20     believe that the -- the SPIA top line data
21     had enough pieces of the information that I
22     would need to do to -- to perform that test.
23              Q.     But you don't recall for sure
24     --
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 112

1           A.      I can't say for 100 percent,
2      but I don't recall doing that test.
3           Q.      And have you taken any steps to
4      see if you're able to obtain the underlying
5      data from SPIA?
6           A.      Uh-uh.
7           Q.      That's a no?
8           A.      Correct.  No.
9           Q.      Without saying anything about
10     what caused the drop in wait times do you at
11     least agree that wait times have dropped for
12     black voters in elections conducted after
13     SB202?
14                  MR. ROSBOROUGH:  I object to the
15          form.
16                  THE WITNESS:  In Georgia, yes.
17          Nationwide, yes.
18     BY MR. FIELD:
19          Q.      And we'll get to the
20     nationwide.
21          A.      Okay.
22          Q.      I promise we'll give you a
23     chance to talk trends.
24          A.      Okay.  Sounds good.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 113

1          Q.     I just want to make sure that
2     we're on the same page about some
3     calculations comparing some figures here,
4     because I am clearly not a mathematician.  So
5     I want to make sure we're on the same page.
6          A.     Sounds good.
7          Q.     I think I've added numbers
8     correctly.
9                 All right.  So would you agree
10    that the drop in wait times of more than 30
11    minutes was more pronounced for black voters
12    than it was for white voters in the elections
13    after SB202?
14         A.     What do you mean by more
15    pronounced?
16         Q.     A greater drop.  And why don't
17    we actually just compare elections?
18                So compare 2020 to 2022 for
19    white voters, if I have it correct, there's a
20    17.2 percentage point drop compared to a 27.4
21    percentage point drop in black voters, again,
22    comparing '20 to '22.
23         A.     Let me just do that math in my
24    head as well --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 114

1          Q.      Sure.

2          A.      -- just to make sure we're --

3     we're clear.

4                  Okay.  Now that I have it in my

5     head can you restate?

6          Q.      Absolutely.

7                  In 2020 to 2022, white voters

8     experienced approximately a 17 percentage

9     point drop compared to black voters

10    experiencing approximately a 27 percentage

11    point drop?

12         A.      You're saying 2020 to 2022?

13         Q.      Correct.

14         A.      It's an odd comparison to make.

15    Nobody would ever compare a midterm to a

16    Presidential like that.

17                 Just in terms of the numbers,

18    just kind of doing the mental math, in terms

19    of the percentage point change, I think the

20    way you said is correct.  I'll trust your

21    math on that.

22         Q.      Sure.

23         A.      Is it necessarily like the

24    correct way to think of it as a percentage

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 115

1     point drop, that, you know, if a group has --
2     let's imagine that zero white voters waited
3     in a long line in 2020, and then also zero
4     waited in 2022 in a long line, and black
5     voters had whatever they had -- you know,
6     whatever the number is here, well, of course
7     there's more room for black voters to drop,
8     because they were above zero.  There's no --
9     in that circumstance there's no room for them
10    to drop.
11                    So the fact that white voters
12    start at a lower threshold means they have
13    less of an opportunity to drop.  I mean, in
14    fact, the drop among black voters in
15    comparing 2020 to 2022, they dropped -- what
16    did you say, 20-something points?
17         Q.     Black voters '20 to '22
18    dropping 27.4 points.
19            A.     Yeah.
20                    It's not even possible among
21    white voters, because they only started at
22    20 percent.
23                    So -- so it is the case that in
24    terms of percentage points black voters

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 116

1     dropped from '20 to '22 more than white

2     voters, but that's because -- in part because

3     they started higher.

4                Q.      Okay.

5                        And then I think you were

6     suggesting that the better comparison is 2020

7     to 2024.  So let's check that one.

8                A.      Sure.

9                Q.      By my math, suspect as it is,

10    my math comes to a 15.8 percentage point drop

11    for white voters compared to a 26.5

12    percentage point drop for black voters.

13                       Does that sound right?

14                A.      That seems right just kind of

15    eyeballing it.

16                        But, again, white voters

17    couldn't drop by 20 points -- or 20-some

18    points that you said, because they didn't

19    start that high.  So it's just an

20    impossibility.

21                Q.      It's an impossibility; however,

22    it is true that in both 2022 and 2024 black

23    voters experienced a larger drop in their

24    wait times over 30 minutes than did white

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 117

1      voters, correct?

2              A.     It's just such an odd

3      comparison to make.

4              Q.     It's true though, correct?

5                     My statement that I'm saying is

6      true, correct?

7              A.     The -- the calculations that

8      you suggest are true, but making that

9      comparison is -- is -- I don't know why you

10     would do that, right?

11                    If 100 percent of black voters

12     waited longer than 30 minutes in 2020, and

13     then it dropped to zero, you could never have

14     that big of a drop among white voters.  So

15     it's just -- it's sort of an apples to

16     oranges comparison to make, I think.  Just,

17     yeah, a little bit odd.

18             Q.     Sticking with Table 16 again.

19                    In 2020, the share of black

20     voters who waited more than 30 minutes to

21     vote was 34 percent, correct?

22             A.     Yes.

23             Q.     Okay.

24                    And the share of white voters

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 118

1    was 21.5, correct?

2            A.      Yes.

3            Q.      Okay.

4                    So a 12.5 percentage point

5    difference with black voters waiting more

6    than 30 minutes than white voters, correct?

7            A.      That's right.

8            Q.      Okay.

9                    So in 2016 though -- right.  In

10   2016, would you have any reason to question

11   or doubt that the difference between black

12   and white voters waiting more than 30 minutes

13   is 2.3 percentage points?

14           A.      Ah, let's see.  Doing the math.

15                   It seems to be true, although

16   those numbers, I think, are ones that I have

17   in my original report as well that I could in

18   theory pull out.

19                            - - -

20                   (Whereupon, witness referred to

21         documents.)

22                            - - -

23                   THE WITNESS:  Do I have that?

24                   I think I have that, although --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 119

1              it's possible I have those specific

2              numbers in here.

3                    Maybe not.

4                    But based on what's in this

5              table, that -- you know, doing the

6              quick mental math, that seems to be

7              the case.

8    BY MR. FIELD:

9              Q.    Sure.

10                   So we've thrown a lot of

11   numbers around, so I'm going to crystalize a

12   few here.

13             A.    Uh-huh.

14             Q.    So in 2022 -- from Doctor

15   Grimmer's chart, in 2022, 2.3 percentage

16   points more black voters than white voters

17   waited longer than 30 minutes to vote,

18   correct?

19             A.    2.3 percentage points, yes.

20             Q.    And that's the same as in 2016,

21   correct?

22             A.    Yes, I think so.

23             Q.    Okay.

24                   Let me know if you want --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 120

1           A.      Oh, yeah.

2           Q.      I wasn't sure if you --

3           A.      I'm listening.  Sorry.  I'm

4     just -- I'm just seeing what's in here.  I'm

5     trying to remember what's in the Appendix and

6     what's not.

7           Q.      Okay.

8           A.      But you can go ahead now.

9     Sorry.

10          Q.      Okay.

11                  So in 2024, 1.7 percentage

12    points more block voters than white voters

13    waited more 30 minutes to vote, correct?

14          A.      That's the number that I

15    dispute.  I think it's like three and a half

16    or so.

17          Q.      Okay.

18                  All right.  Let's -- we'll look

19    at that one separately then.

20                  Let's go ahead and look at

21    Section 3 of your report then.

22                  I promised you we would look at

23    wait line trends in the country so here we

24    are.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 121

1                    So here we're talking about
2      drops in wait times, and your suggestion that
3      those drops in wait times cannot be
4      attributed to SB202; correct?
5              A.    That's right.
6              Q.    Again, you do agree that there
7      has been a drop in wait times in the
8      elections since SB202, correct?
9              A.    Yes.
10             Q.    But you're saying here that it
11     is not possible that SB202 had any impact on
12     the drop in wait times in 2024; is that
13     correct?
14             A.    Where do I have that?
15             Q.    I'm asking you, is that --
16     well, let me step back.
17                   Do you agree that SB202 had any
18     impact on the drop in wait times in 2024?
19             A.    I haven't seen evidence of
20     that.
21             Q.    Is it possible that it did?
22             A.    I haven't seen evidence -- I
23     haven't seen in any of the expert reports
24     that I've reviewed any case that -- any case

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 122

1      for why that would be -- why that would

2      happen.

3              Q.      Okay.

4                      But this section largely just

5      suggests that there are two factors that

6      provide "Much better explanations for shorter

7      lines"; is that correct?

8              A.      That's right.

9              Q.      Okay.

10                     So first you point to the

11     nationwide wait time trends, and then you

12     point to a new voter check-in system that

13     Georgia had implemented, correct?

14             A.      Yes.

15             Q.      Is it your opinion that those

16     two things are the explanations for a drop in

17     wait times in Georgia in 2024?

18             A.      Long lines and wait times are

19     explained by lots of different factors.  This

20     reason No. 1, the national drop, Georgia's

21     trend follows a similar trend -- follows a

22     similar pattern to the national trend, which

23     is relevant here because things like voter

24     participation patterns don't just happen

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 123

```
 1     isolated within a state; it tends to be
 2     similar across states.  And so we see a drop
 3     in Georgia, but we also see similar drops
 4     across the country.  That's important
 5     context.
 6                    And then the other piece here,
 7     this -- this line-shortening program, the --
 8     the new check-in system, the electronic
 9     check-in system that they're using that --
10     that isn't related to SB202, knowing what I
11     know about what causes lines, and taking, you
12     know, some of the evidence provided by some
13     of the state witnesses and as well as press
14     releases put out by the State and whatnot,
15     this program seems to have had such a huge
16     success -- been such a huge success in
17     shortening lines, right, it -- you know, one
18     of the -- one of the quotes here or one of
19     the pieces of evidence provided by Lynn
20     Bailey was that counties with this program it
21     took about a minute to check in, counties
22     without it took eight minutes to check in per
23     voter.  Knowing, you know, what queueing
24     theory says about causes of long lines, what,
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 124

1    you know, my research, others' research has
2    shown, a drop from eight minutes to -- to a
3    minute or less at the biggest bottleneck
4    point that Georgia has in terms of its -- its
5    voting process, that's -- to me that has a
6    massive effect on how long lines were, more
7    so than, you know, the possibility that
8    somehow SB202 is shortening lines, even
9    though, as I talked about it in my original
10   report, there's nothing in there that
11   suggests that lines would get shorter; none
12   of the provisions would have that effect.
13          Q.     And do you recall any expert
14   having said SB202 caused lines to be shorter
15   or rather that lines were shorter after
16   SB202?
17          A.     I only reviewed Doctor
18   Grimmer's report and, you know, he's a good
19   researcher; he's cautious about his language
20   in that way, so he makes the case that lines
21   were shorter.
22          Q.     And you don't dispute that?
23          A.     As we've said earlier -- yeah.
24   As we said earlier, yeah.

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

Page 125

```
 1                  Um, the implication is SB202
 2       must -- you know, this is a conversation
 3       about SB202, he's providing this post-SB202
 4       evidence here.
 5                  What I'm suggesting is, we
 6       shouldn't look at this evidence and -- you
 7       know, any human being in a discussion of
 8       SB202, who is being told, look, lines are
 9       shorter after SB202, I think people will
10       naturally say, well, it must be tied to
11       something like that.  And my purpose -- you
12       know, my goal with this section is to point
13       out, one, there's nothing in SB202 that even
14       theoretically would shorten lines but also we
15       have two other really great explanations for
16       why we saw this drop.
17             Q.     Okay.
18                  So it seems like you're trying
19       to refute a conclusion that wasn't made; is
20       that correct?
21             A.     He included this in his
22       analysis for a purpose.  I take the purpose
23       to be, hey, look, lines are shorter now after
24       SB202, and then let's -- you know, he doesn't
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 126

1    explicitly tie it together, but he also
2    doesn't provide a reason why SB202 would have
3    this positive effect.
4            Q.      Right.  Because he doesn't
5    offer a conclusion connecting SB202 to longer
6    lines or shorter lines.  And it may be that
7    in litigation there's a relative or a
8    relevant point about why shorter lines
9    matter.
10               But you're responding to a
11   conclusion that you can't identify anywhere,
12   correct?
13           A.      He includes this long section
14   in his report.  What I'm responding to is
15   basically trying to say, you shou -- you
16   know, you shouldn't draw the conclusion that
17   is kind of implied by his -- you know, if
18   that's not the point he's trying to make,
19   then why is it even in here?
20           Q.      Okay.
21               Well, let the lawyers worry
22   about that question.
23           A.      For sure.
24           Q.      It might come up in a brief.

Page 127

1            But putting that aside, did you

2    come up with these two explanations or were

3    you asked whether or not the trends and

4    check-in system would be ways to explain the

5    decrease in wait times?

6            A.    I'm not sure what you're

7    asking.

8            Q.    Okay.

9            A.    Like, where do these

10   explanations come from?

11           Q.    Sure.  Yeah.  Where do they

12   come from?

13           A.    My own analysis.  The check-in

14   program I was aware of through some of my

15   other work unrelated to -- to this

16   litigation.

17           Q.    And what other potential

18   explanations did you consider and conclude

19   were not worth putting in this section?

20           A.    I mean, there's plenty of

21   things that explain wait times.  Um, and

22   where -- I think the -- these two

23   explanations are -- you know, this national

24   trend as well as this seemingly successful

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 128

1    change in voting technology, um, they seem to

2    have had such a big impact based on -- you

3    know, based on everything that queueing

4    theory tells us, based on my research, based

5    on the work of others, this to me explains

6    the vast, vast majority of the drop, if not

7    nearly all of the drop that we see, just

8    based on -- based on, you know, my -- my

9    knowledge of this topic.

10          Q.     Okay.  Let's start with the

11   trends.

12          A.     Uh-huh.

13          Q.     What statistical test or

14   procedure did you use to make the claim, "The

15   national trends in wait times are extremely

16   similar to the ones in Georgia"?

17          A.     Extremely is maybe -- can you

18   show me where that is?

19          Q.     Of course.  That is on page 7.

20          A.     Oh, okay.

21          Q.     Last sentence of the first

22   paragraph.

23                 So I was going to ask you --

24   well, I'll let my question stand.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 129

1          A.      Yeah.

2                  Um, the evidence that I'm --

3      you know, the evidence that allows me to draw

4      that is in the previous couple paragraphs.

5                  So starting on page 6, I say,

6      Doctor Grimmer's report shows that lines in

7      2022 were shorter than '18, but longer than

8      2014.  When we look at the national data, we

9      see the same pattern.  Lines in 2022 were

10     shorter than 2018, longer than 2014.

11                 And then the next paragraph,

12     his report shows the lines in '24 were

13     shorter than 2020 and 2016.  The national

14     data shows '24 was shorter than 2020, 2012,

15     2008, not 2016, so slight difference there.

16     But these patterns that we see of the ebbs

17     and flows nationally map closely on to what

18     we see in Georgia.

19          Q.      So it's extremely similar, if

20     the arrows are just pointing the same

21     direction, is that correct, in your opinion?

22          A.      Extremely is probably a -- I

23     added a little flourish there, but they're

24     similar.  They're, for sure, similar.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 130

1          Q.     Okay.

2                 So would you, if you were

3     writing this again, not include extremely?

4          A.     It's a bit of a subjective

5     word.  I -- it's not wrong to say, but it's

6     maybe a little --

7          Q.     Well, what -- what makes

8     something extremely similar versus similar?

9     I'm trying to understand.  Because it sounds

10    like what you're looking at is, if the arrows

11    are pointed the same direction, that makes

12    them extremely similar.

13         A.     Again, it's just, you know, a

14    -- an adverb that I chose to include here.  I

15    don't have a precise definition of where that

16    line is.

17         Q.     Okay.

18                But you didn't run any

19    statistical test or any type of analysis

20    other than, which way are the arrows pointing

21    between Georgia and the national trend,

22    correct?  If both are pointing up, they're

23    similar.  If both are pointing down, they're

24    similar; is that correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 131

1          A.      Again, I mean, I -- it's more

2     detailed than that.  It's -- you know,

3     comparing -- comparing '24 and '22 to

4     multiple years, we see the similar patterns

5     nationally that we do in Georgia.

6          Q.      But, again, you're only looking

7     at direction, not quantity or not amount of

8     change, correct?

9          A.      Not quite direction, but like

10    comparing larger/smaller between '24 and the

11    previous years, '22 and the previous years.

12    I guess that's one way to say direction.

13         Q.      But you're not -- you're not

14    though -- we'll get to that in a second.

15    Okay.

16         A.      Sure.

17         Q.      You do agree -- and I think you

18    said this; I want to make sure I understand.

19              You agree that one way to look

20    at election data in Georgia is to compare it

21    to other trends of other states, correct?

22              MR. ROSBOROUGH:  I object to the

23         form.

24              THE WITNESS:  That's certainly

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 132

1          one way you could understand what's
2          going on, sure.
3     BY MR. FIELD:
4          Q.     And if data in Georgia were
5     different than the national trend, would it
6     be your opinion potentially that SB202 might
7     be at least one cause for Georgia's data
8     being different than a trend that you see in
9     other states?
10         A.     SB202 only affected Georgia, so
11    it's one of the things that could be
12    explaining it.
13              But, again, just to reiterate
14    what I have in here, and what I have in my
15    previous report, all the materials I've
16    reviewed from the State's witnesses don't
17    provide any compelling reasons why SB202
18    should be shortening lines.
19         Q.     Yes.  And I'm -- I'm stepping
20    out to try to make sure we understand what is
21    the research method being applied, and I --
22    terms of art aside -- what is the point of
23    looking at trends.
24              If I'm understanding correctly,

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 133

1    the point at looking at trends -- at looking

2    at trends is to see if Georgia were different

3    than the trend you see in other states, you

4    would presumably have to ask, well, SB202

5    only affected Georgia, as you said.  Could

6    SB202 be the cause?  Is that correct; is that

7    the point of the comparison?

8            A.    I think maybe -- let me kind of

9    state what I think --

10           Q.    Sure.

11           A.    The purpose of including this

12   section is to say, you know, certainly -- and

13   we've talked about this extensively.

14   Certainly the numbers in 2022 and in 2024 in

15   Georgia are less than what they had been in

16   most of the previous elections.  Doctor

17   Grimmer's analysis though by omitting this

18   piece of information about the national trend

19   also having, you know, pretty huge drop-offs,

20   by omitting that relevant piece of

21   information, it makes it feel like SB202 is

22   entirely what's going on here.  But the

23   reality of how long lines work is that

24   they're driven by lots of different factors,

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 134

1    one of which, of course, is the behavior of

2    the people who are voting, right, when they

3    show up and -- and how many people show up

4    and all of that sort of stuff.  Those -- that

5    pattern in particular tends to be similar

6    across states and similar nationally.  And so

7    I provide the context of the national data to

8    show there was something going on nationally

9    that was causing wait times to drop pretty

10   significantly in the last couple election

11   cycles, and if it's happening, you know,

12   across all 50 states, then that -- that

13   factor, whatever it is, and I can't

14   specifically pin down it was this -- this

15   change in voter behavior, but -- but we're

16   seeing it everywhere else, it would be weird

17   to not see it in Georgia.  We see it in

18   Georgia and so that just sort of discredits

19   the -- the idea that SB202 is -- is kind of

20   the big thing explaining what's going on here

21   in Georgia in particular.  So that's the

22   point.

23            Q.     Okay.

24                   So looking -- looking at your

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 135

1     Table 3.1, what was the change nationally

2     from 2020 to 2024 in the share of voters

3     waiting more than 30 minutes to vote?

4          A.    Ah, 15 and a half percentage

5     points, I believe.

6          Q.    Between 2020 --

7          A.    Sorry.  Six and a half

8     percentage points.  Sorry.

9               Is that right?

10         Q.    I have five and a half.

11         A.    Five and a half, yeah.  Sorry.

12    Mental math.  Sorry for all of us.

13         Q.    Yeah.  There's no test today.

14         A.    It feels like it.

15         Q.    So keep your finger there, and

16    let's return to Doctor Grimmer's Table 16,

17    which you have open.

18              Didn't Doctor Grimmer's data

19    show that 24.7 percent of voters waited more

20    than 30 minutes in 2020 compared to only 6.3

21    percent in 2024?

22         A.    Are you talking about Table 16?

23         Q.    Correct.

24         A.    That's just Georgia.  His table

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 136

1      is only about Georgia; my table is nationally

2      -- wait times nationally.

3               Q.      Right.  Correct.  We're going

4      to make --

5               A.      Oh, I see.  I see.

6               Q.      Setting up a comparison.

7               A.      Okay.

8                       So can you say it again then?

9               Q.      Happy to.  And I'll actually

10     break it into two parts --

11              A.      Okay.

12              Q.      -- so you don't have to

13     memorize all those numbers.

14              A.      Okay.

15              Q.      Didn't Doctor Grimmer's data

16     show that 24.7 percent of voters waited more

17     than 30 minutes in 2020?

18              A.      That's what I see, yeah.

19              Q.      And 6.3 percent in 2024,

20     correct?

21              A.      Ah, yes.

22              Q.      So if I'm doing the math

23     correctly, that's a difference of 18.4

24     percentage points, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 137

1           A.      Yeah.  If that's the math,
2      yeah.  It seems like it.
3           Q.      The decrease in the share of
4      voters in Georgia, who waited more than 30
5      minutes, declined 12.9 percentage points more
6      than the decline in other states.  I took the
7      18.4 that we just talked about, compared that
8      to the 5.5 percent drop that you have in your
9      chart.
10          A.      That's right.
11          Q.      Okay.
12                  So Georgia experienced a larger
13     decrease in voters waiting in line more than
14     30 minutes, correct?
15          A.      Compared to --
16          Q.      The national.
17          A.      -- national -- the national
18     numbers, that's right.
19          Q.      Okay.
20                  And several times more,
21     correct, 18.4 percent decrease versus just a
22     5.5 percent decrease?
23          A.      A couple times more.
24          Q.      Right.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 138

1              And would it be fair to say

2      that that 12.9 percentage point difference

3      actually probably underestimates the

4      difference between Georgia and other states

5      because the national calculation itself

6      includes Georgia?

7              A.      A little bit, but I -- I

8      wouldn't expect -- if I did this national

9      calculation and omitted Georgia, I wouldn't

10     expect to see huge differences just given

11     that Georgia had, I think -- in 2024 at

12     least, Georgia had 1,600 people in the data

13     and nationally, I think, the sample was 60 or

14     70,000.  So it's -- it's a fairly small

15     fraction.  So it would be a little bit

16     different, if I omitted Georgia from my

17     table, but I wouldn't think that it would be

18     meaningfully different.

19              Q.      Okay.

20              So, again, the 12.9 percentage

21     points, that's the difference between the

22     decreased Georgia experienced and the

23     decrease in the national trends that you have

24     here.  Okay?  That's what the 12.9 percent

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 139

1    was?

2         A.    I think so, yeah.  It's hard to

3    keep all these -- it's hard when I can't

4    write it down.

5         Q.    And I -- I should have said.

6    You are welcome to write down as we go.

7         A.    That's all right.

8         Q.    So how would you assess whether

9    the 12.9 percentage point difference in those

10   differences is statistically significant?

11        A.    Again, if you -- if you were to

12   do that, you could -- there's a formula for

13   assessing difference in changes in

14   proportions, it's a function of the size of

15   the changes, it's a function of sample sizes.

16   You'd use that formula, you get a standard

17   error, margin of error, and then assess

18   whether that difference in the differences is

19   bigger than zero.

20        Q.    There is a difference in

21   differences research design that you could

22   have used here to compare, correct?

23        A.    Sure.

24        Q.    But you didn't?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 140

1              A.      Correct.

2              Q.      Okay.

3                      So is it still your opinion

4       with that 12.9 percentage point difference

5       that the trend in Georgia is extremely

6       similar to the trend nationally?

7              A.      Yeah.

8              Q.      Just because they go in the

9       same direction?

10             A.      Trend, yeah.  The trend is

11      similar.  It goes up; it goes down.

12             Q.      Okay.

13                     So 1 percent up -- or, sorry.

14      One percent down in Georgia, 99 percent down

15      in the nation, that's still extremely

16      similar?

17             A.      I mean, again, you're -- you're

18      going out to extremes to try to, you know,

19      pin this down.  But I would say substantively

20      these -- these differences are -- they're not

21      a 99 versus 1 percent change.  They're in the

22      same ballpark.

23             Q.      Even though it's several times

24      more?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 141

1          A.      Sure.

2          Q.      That's an extremely similar

3    trend in your opinion?

4          A.      The trend from 2020 -- in the

5    national data from 2020 to 2024 is that

6    things got better across the country, see the

7    same thing in Georgia.

8          Q.      Okay.

9                  When you're comparing changes

10   in two different datasets, is it typical to

11   conduct a difference in differences

12   calculation or analysis?

13         A.      There's a lot of things you

14   could do.  That's one of them.

15         Q.      Why did you not perform that

16   analysis, when you were -- you're purporting

17   to compare the change in Georgia and the

18   change nationally?

19                 MR. ROSBOROUGH:  I object to the

20         form.

21                 THE WITNESS:  It didn't seem

22         particularly relevant.

23                 The point I'm trying to make

24         here is long lines are driven by lots

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 142

1              of factors, some of those factors
2              affect the whole country kind of
3              similarly.  And what we see in the
4              national data is a similar pattern to
5              what we see in Georgia.  That's the
6              point I was trying to make.
7                   I wasn't trying to assess
8              whether Georgia's change was
9              significantly bigger or significantly
10             smaller.  I'm just trying to -- trying
11             to provide context for these drops we
12             see in Georgia, we saw them elsewhere.
13             We saw them in lots of other states.
14    BY MR. FIELD:
15        Q.    When would you use a difference
16    in differences analysis?  What question would
17    you want to answer, when you would turn to
18    that analysis?
19        A.    If I was specifically trying
20    to -- if I was specifically trying to assess
21    whether the trend in Georgia was larger or
22    smaller than the nationwide trend, then maybe
23    you could do that.  But in this context all
24    I'm trying to provide is evidence showing

Page 143

1    that Georgia wasn't the only place where

2    lines were getting shorter; they were getting

3    shorter on average across the country.

4            Q.      In the last paragraph of

5    Section 3.1, you say, "If the national

6    pattern in 2026 or beyond reverts back to

7    where it was pre-2022, Georgia will

8    experience wait times that are worse than

9    they would be if SB202 were not in effect."

10              Did I read that correctly?

11           A.      Yes.

12           Q.      Okay.

13              So a few questions.

14              What -- what do you mean, when

15   you say, if it reverts back to where it was

16   pre-2022?  If what reverts back?

17           A.      These national patterns that I

18   kind of identified here where we had a few

19   election cycles in a row where nationally

20   lines were very long.  If we were to go back

21   to that pattern, I would -- I would expect to

22   see Georgia experiencing wait times worse

23   than if SB202 were not in effect, as I said.

24              In fact, you know, thinking

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 144

1      about it, it isn't even really necessary that

2      the national pattern needs to revert back to

3      what it was before.  As I've claimed

4      throughout here and in my original report,

5      lines in Georgia would be shorter in the

6      absence of SB202.  There's no evidence to

7      suggest -- they would be the same or shorter

8      or they would never -- sorry.  Let me make

9      sure I'm saying that clearly.

10                 SB202 isn't having a positive

11     impact on how long lines are.  There's

12     nothing in the bill that -- that -- that

13     would do that based on my earlier report.

14     There's lots of aspects of it that could go

15     in the other direction.  And -- and so what

16     I -- I'm sort of evaluating the

17     counterfactual world in 2026 of, do we have

18     SB202; do we not have SB202?

19                 My -- my argument here is,

20     lines in 2026 and beyond would be worse, if

21     SB202 was in place, than if it weren't in

22     place.

23          Q.    You said something, and you

24     might have walked away from it.

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 145

1           A.      Okay.

2           Q.      I want to make sure I

3     understand if this is your opinion.

4                   Is it your opinion that lines

5     in 2024 would have been shorter absent SB202?

6           A.      They would not have been longer

7     for sure.  If SB202 went away, they wouldn't

8     be longer.  There's nothing in the bill that

9     is making them shorter.  There's a lot of

10    reasons to believe they would, in fact, be

11    worse -- they would have been worse in

12    2024 -- sorry, wait.  Am I -- it's hard to

13    keep all these in my head.

14          Q.      Yup.

15          A.      If SB202 had not been in effect

16    in 2024, I think lines in Georgia would have

17    been better; SB202 was making lines worse.

18          Q.      Okay.

19          A.      Yes.

20          Q.      So your conclusion is that

21    SB202 caused longer lines in 2024; is that

22    correct?  Or contributed to.

23          A.      I think contributed -- to say

24    that they caused longer lines, right, like --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 146

1    as Doctor Grimmer has pointed out in some of

2    his response to my stuff, like, we want to be

3    careful about causal language.  But I think

4    all the evidence suggests that SB202 isn't

5    helping things.  There's a lot of reasons to

6    think that it would be hurting things.

7            Q.      But as we talked about at the

8    very beginning of your deposition, you

9    haven't analyzed 2022 or 2024 Georgia

10   election data to actually form that opinion,

11   correct?

12           A.      What do you mean by that?

13           Q.      In your earlier reports you

14   suggested that vote-by-mail rules and SB202

15   would push voters to voting in -- in line,

16   correct?

17           A.      I did -- yeah, I talked about

18   that in my previous report.

19           Q.      But you said earlier you

20   haven't looked at 2024 data to see if that's

21   correct, right?

22           A.      I wasn't asked to.  I was just

23   asked to respond to Doctor Grimmer's report.

24           Q.      I didn't ask you what you had

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 147

1    been asked.

2              A.    Sure.

3              Q.    You did not look at that,

4    correct?

5              A.    I didn't, because I wasn't

6    asked to.

7              Q.    Right.

8                    And then you talked about

9    precinct size and whether that would have an

10   impact on line length.

11                   Again, didn't look at that for

12   2024 to see if that forecast was correct,

13   right?

14             A.    Wasn't asked to and didn't.

15             Q.    Okay.

16                   And you didn't look at whether

17   or not voter turnout in 2024 had an impact --

18   any impact on line length and whether SB202

19   caused a decrease in voter turnout or

20   anything like that, correct?

21             A.    Same as before.  Wasn't asked

22   to; didn't do it.

23             Q.    Right.

24                   So in your 2023 reports, these

Page 148

1    are the things you thought or suggested are

2    the aspects of SB202 that might result in

3    longer lines?

4                    MR. ROSBOROUGH:  I object to the

5            form.

6    BY MR. FIELD:

7            Q.      Correct?

8            A.      Ah, if I remember right, yeah.

9            Q.      Now we have shorter lines, and

10   you haven't gone back and checked whether or

11   not these things did, in fact, have any

12   impact, correct?

13           A.      There's not really a way to do

14   that, right?  What you're suggesting is an

15   analysis you can't do.  We have one data

16   point or, I guess, two data points, the 2022

17   and 2024 election.  What you're suggesting or

18   implying is possible in some sort of analysis

19   where I look at these different patterns and

20   compare them to prior to SB202 and, um -- and

21   come up with some statistically significant

22   or statistically non-significant result.

23                    With two data points what

24   you're suggesting just isn't -- you're never

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 149

1     going to get anything out of that analysis
2     with two data points.  The more relevant --
3     the more relevant kind of thing here to
4     understand is -- is what the literature tells
5     us the research on queueing theory, on -- on
6     long lines, what it tells us we should expect
7     will make lines worse, make lines better.
8     What we -- all those -- all those elements
9     you mentioned in, you know, from my previous
10    report, all of those points are making things
11    worse.  And -- or, you know, in the case of
12    maybe weak -- like, not having an effect.
13    And -- and so what -- it's just -- you know,
14    I can't evaluate that with a sample size of
15    two.  It's just not --
16              Q.    You could have looked at -- I
17    mean, do you have any understanding of how
18    many people voted by mail in '22 or 2024?
19              A.    I haven't looked at it, but I
20    know it's in Doctor -- I think it's in
21    Grimmer's report here.
22              Q.    Okay.
23                    And -- but so you could have
24    looked at that.  You could have looked at

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 150

1    precinct size.  You talked about that, right?
2    You could have looked at precinct size?
3           A.    But none of those things -- you
4    know, looking at those things aren't going
5    to -- as a -- as a researcher having one or
6    two data points, it's not going to help me to
7    draw, you know, definitive conclusions either
8    way about those very specific aspects of the
9    bill.
10          After, you know, we had
11    20 years from now or some -- some number of
12    years from now, when we have more data, and
13    we could maybe more systematically evaluate
14    that, then it may be a possibility.  But --
15    but with just a couple election cycles, or
16    one four-year election cycle, that
17    statistical analysis is essentially based on
18    an N, a sample size of one or two.
19          Q.    But yet you're -- you are
20    willing to make the assertion that SB202
21    resulted in longer lines or at least
22    contributed to it, even though you can't look
23    at any of these questions?
24          A.    All of the theoretical evidence

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 151

1          and evidence -- you know, quantitative

2          evidence we've seen in other contexts, maybe

3          outside of Georgia research, it -- it points

4          all in the same direction.  So it would be --

5          it would be surprising and anomalous for --

6          for these aspects of SB202 to not go in the

7          same direction that we've seen in other

8          research.

9                    Q.      Okay.

10                   And assuming the reversion

11         happens that you reference at the end of 3.1,

12         are you able to quantify the difference in

13         wait times Georgians will face with and

14         without SB202?

15                   A.      Again, it's -- you can't live

16         in the counterfactual world where -- you

17         can't live in both worlds where SB202 does

18         exist in '26 and does not exist in '26.  So

19         that makes it challenging to -- to, you know,

20         do that sort of analysis on one particular --

21         using one data point.

22                   Q.      So that's a no, you can't,

23         correct?

24                   A.      No, with just data from 2026,

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 152

1       it'd be -- I don't know how a researcher

2       would do that.

3               Q.      Okay.

4               Then you next discuss the

5       check-in system that you've referenced.

6               A.      Mm-hmm.

7               Q.      And you state that because of

8       this check-in system any drop in wait times

9       cannot to attribute to SB202, correct?

10              A.      Ah, where do I say that?

11              Q.      The first sentence.

12              A.      Yeah.

13              Other than -- the other reason

14      the drop in wait times cannot be attributed

15      to SB202 is Georgia recently implemented a

16      massive, new voter check-in system, which

17      appears to have sped up the voting process.

18              Yeah, that's what I said.

19              Q.      Okay.

20              But you did not conduct any

21      analysis to determine whether that referenced

22      check-in system did, in fact, reduce check-in

23      times in Georgia in 2024 as compared with

24      previous elections, correct?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 153

1          A.      Didn't have that data available
2     to me, but based on, you know, multiple State
3     witness testimonies, as well as like public
4     press releases from the Secretary of State's
5     office, they claim a huge success of this
6     program.  And -- and the size of that success
7     to me seems like.  Other than the national
8     trends, the number one thing that would be
9     driving this drop in wait times.
10         Q.      And which statement that you
11    just referenced talked about the 2024
12    election?
13         A.      Ah, neither of them in
14    particular referenced the 20 -- well,
15    Secretary -- I guess -- let's see.
16              Oh, yeah, it's prior to 20 --
17    so none of them specifically are about 2024.
18              But in 2022, they piloted this
19    program in a bunch of counties, and -- and,
20    you know, multiple -- multiple sources here
21    indicate that it had a massive impact on how
22    quickly people were checking in to vote.
23              And so --
24         Q.      Do you know how many counties?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 154

1          A.      I do not know the answer to
2     that.  I don't know if that was in any of
3     those -- any of those press releases or
4     whatnot.  It's possible that Ms. Bailey's
5     testimony has a table on that, but I don't
6     remember specifically.
7          Q.      And do you know whether the
8     piloted program that Ms. Bailey discussed was
9     changed or tweaked in any way before full
10    implementation?
11         A.      I don't know for certain, but
12    my understanding is just based on some of the
13    reading of -- of the public documents out
14    here, as well as I mentioned that, you know,
15    I became aware of this through some of my
16    other work not related to this case, um, my
17    understanding is that, when they fully rolled
18    it out in 2024, it was -- there weren't, you
19    know, massive differences.  The technology is
20    what the technology is, and they just were
21    putting it into more places in 2024 or, I
22    think, all -- all places in 2024, I believe.
23         Q.      And have you taken any steps to
24    confirm whether or not the eight minutes to

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 155

```
 1    one-minute check-in time Ms. Bailey
 2    referenced during the pilot did, in fact,
 3    occur during the general election in 2024?
 4          A.    I didn't have any data to be
 5    able to confirm that.  I just am, you know,
 6    taking her at her word of that number being
 7    accurate or even close to accurate.
 8          Q.    Okay.
 9                Did you request any such data?
10          A.    I did not.
11          Q.    Okay.
12                And then you also point to a
13    press release from the Georgia Secretary of
14    State's office stating that the average
15    check-in time of a minute and a half had been
16    reduced to 47 seconds --
17          A.    Yes.
18          Q.    -- correct?
19                And, again, that's before the
20    2024 election, correct?
21          A.    Yeah.
22                I -- I believe -- I'd have to
23    go back, but I believe this was a reference
24    to the 2022 election, although perhaps it was
```

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 156

1    the general election in 2023.  I'm not
2    certain.
3              Q.      The general election?
4              A.      Well, the -- like state and
5    local elections that may have happened in
6    2023.  Just given the date of that quote was
7    November 8th, which is just a few days after
8    election day in '23.
9              Q.      Right.
10             But you would agree that the --
11    an election in November of 2023 would be very
12    different than an election --
13             A.      Oh, of course.
14             Q.      -- in November of 2024,
15    correct?
16             A.      Of course.  Yeah.
17             But, you know, still seeing a
18    50 percent drop in -- in check-in times in a
19    -- in a much lower turnout election is pretty
20    consequential.
21             Q.      And according to Secretary
22    Raffensperger's statement he's talking about
23    technology investments that predated the 2020
24    election, correct?

Stephen S. Pettigrew , Ph.D.                      August 15, 2025
Georgia Senate Bill 202, In Re

Page 157

1          A.      That's right.

2          Q.      So some of those investments

3     would have been seen in the 2020 data,

4     correct?

5                  MR. ROSBOROUGH:  I object to the

6          form.

7                  THE WITNESS:  I don't -- he

8          talked about investments.  I don't

9          know whether that meant that they had

10         started to kind of map this out in

11         2019, and -- I don't know when

12         implementation began to happen on any

13         of these things, so it's hard to say

14         what potential effect they may have

15         had in 2020.

16    BY MR. FIELD:

17         Q.      But you're saying a lot about

18    the potential impact it had.  I'm trying to

19    understand where -- if it -- if it's

20    potentially -- if those investments were also

21    part of 2020, that seems to be relevant to

22    your conclusions, right?

23         A.      My understanding is that

24    specifically this Poll Pad program, which to

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 158

1    me seems like has been so successful, my
2    understanding is that none of that had been
3    rolled out in the 2020 election and that it
4    wasn't until 2022 that that was rolled out.
5                But this suggests that the --
6    the work was starting potentially to be done
7    earlier than that prior to, you know, 2019.
8    These programs don't just happen magically.
9    And so some of the work was starting to be
10   done but perhaps hadn't actually been
11   implemented in any real election yet is my
12   understanding.
13        Q.    On page 8 you reference, and
14   you've done so during your deposition a few
15   times, you've referenced your own research
16   and knowledge about the causes of long lines
17   to vote.
18                When you're referencing your
19   research analysis about causes of long lines
20   to vote, does any of that involve studying
21   lines in Georgia specifically?
22        A.    Ah, most of my research looks
23   across the country, and Georgia is one aspect
24   of that.  I worked on the -- what's it

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 159

1    called -- the Election Performance Index
2    Project, which is this MIT project which
3    evaluates how good of a job that states do at
4    running their elections.  One piece of that
5    is -- is how long are lines from state to
6    state.  And I -- you know, I remember from
7    that project that, you know, when I was
8    working on it in the 2010s, that Georgia was
9    a state that was consistently in the -- in
10   the longest lines category.
11           Q.      Okay.
12                   And then you say later in that
13   same sentence -- I'll just read the whole
14   sentence.
15           A.      Sure.
16           Q.      "Based on my own research and
17   knowledge about the causes of long lines to
18   vote, if a check-in system can cut check-in
19   times in half or by seven minutes, it will
20   have a huge positive impact on wait times."
21                   What do you mean by huge
22   positive?
23           A.      Lines getting considerably
24   shorter, if -- if check-in times are half of

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 160

1     what they were or seven minutes shorter than

2     what they were.

3              Q.       But you don't know one way or

4     the other whether check-in times in Georgia

5     in 2024 were reduced by this amount, correct?

6              A.       I haven't -- I mean, I haven't

7     seen any evidence about that.  I mean,

8     they -- these -- these sources wouldn't be

9     able to actually make that comparison

10    anymore, since by 2024 every county had

11    rolled this out.  So they couldn't do the

12    comparison of counties that had the program

13    and counties that didn't, because my

14    understanding is that everyone had it by

15    2024.

16                      But it's hard to think -- just

17    knowing -- you know, knowing voter check-in

18    systems, that sort of stuff, if it was

19    speeding things up so much in 2022, by being

20    much more efficient, I don't remember the

21    exact nuances of this, but I think it was

22    something like people could just scan their

23    driver's license, and it just sped things up

24    a lot, I don't have any reason to think that

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 161

1       in 2024 magically the program didn't work

2       anymore.

3              Q.       And that's -- and that's not my

4       point.  I think it worked very well.

5              A.       Sure.

6              Q.       But I am saying or asking,

7       you're making a statement in this section

8       pointing to this program as a contributing

9       factor to shorter lines in Georgia.  But it

10      seems that that's not a position that you've

11      tested beyond reading two press releases and

12      Ms. Bailey's Declaration?

13             A.       Let me step back and -- when we

14      think about what causes long lines and -- and

15      how lines develop in a voting system, we tend

16      to think of the couple different points where

17      there can be bottlenecks in the system.  The

18      first one is usually -- you know, the first

19      potential bottleneck is checking in, then,

20      you know, the next bottleneck would maybe be

21      if you don't have enough voting machines, so

22      voters have to wait for one to be available.

23      In some states you vote on a piece of paper,

24      and you scan it through a scanner, and

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 162

1    sometimes there's bottlenecks there.  In

2    Georgia, the check-in system prior to this

3    program being implemented that was the big

4    bottleneck.  That was where it was taking

5    people a long time to get through the

6    check-in process and that made lines back up.

7                All the evidence suggested here

8    was what the State witnesses have tauted is

9    this program works really well.  It -- it

10   sort of releases that pressure valve of that

11   bottleneck in the check-in process in turn --

12   you know, by cutting check-ins in half by

13   cutting them from eight minutes to one

14   minute.  I mean, that's -- that's crazy.

15   We're talking about like somebody -- if you

16   have -- if check-ins take eight minutes, then

17   the average wait time is going to be

18   potentially, you know, well, well, well in

19   excess of eight minutes, because everybody is

20   taking eight minutes, so everybody is waiting

21   for the people in front of them to check in.

22   If you cut that down to one minute, that has

23   such a huge impact.

24                And so I haven't -- I don't --

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 163

1          I didn't have access to any data to evaluate

2      these claims, but what we see is a drop in

3      wait times.  We know that this program was

4      implemented for the first time in these

5      election cycles and by every account of

6      people who have dug into this, I don't know

7      precisely what the like exact effect of it

8      is, but it seems like it had a big effect.

9              Q.      Okay.

10              But, again, you didn't ask for

11      any data about implementation of this

12      program, correct?

13              A.      Correct.

14              Q.      And then in this section you

15      talk about -- I believe it's your position

16      that SB202 had a net negative impact on

17      lines, correct?

18              A.      That's a quote from my original

19      report.

20              Q.      Okay.  Fair.

21              A.      My January '23 report, and I

22      stand -- still stand by that.

23              Q.      Can you explain what you mean

24      by a net negative impact?

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 164

1          A.        That in the -- comparing the

2     two worlds where an election happens with

3     SB202 versus without SB202, lines will be

4     longer in the world where SB202 existed --

5     exists compared to the world where SB202

6     doesn't exist.

7          Q.        I thought you just said a few

8     moments ago that we can't do that comparison.

9          A.        That's what I'm saying.  It's

10    sort of a hypothetical, if we had -- if -- if

11    magically we could wave a wand and do that.

12    I mean, this is what causal inferencing is

13    all about in data science and quantitative

14    research is -- is evaluating these

15    counterfactual worlds.

16              What I'm saying is that's how

17    we think about causality is comparing what we

18    observe to a counterfactual world we can't

19    observe, but maybe can have some way of

20    estimating it potentially.  And there's

21    different ways to do that.

22              What I'm saying is, if you had

23    a research design that could do that, what I

24    would expect to see is lines longer in the

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 165

1     world where SB202 does exist.

2          Q.    But you have not conducted that

3     research design, correct?

4          A.    Correct.

5               We have two data points to work

6     on and -- and, you know, one of the things --

7     in order to make those sorts of quantitative

8     causal claims, I would say pretty much always

9     -- to really make a credible claim like that

10    you need some sort of like randomization

11    element to the research design.  And

12    something like SB202 wasn't randomly rolled

13    out in some Georgia counties but not others.

14    It was sort of imposed blanket across the

15    state, everybody has to comply with it and

16    that makes it challenging to tease apart

17    what's a consequence of SB202, what's a

18    consequence of national trends, what's a

19    consequence of other things.  And so -- and

20    so it's why just one or just a couple

21    election cycles makes it hard to evaluate

22    even if you have suggestive evidence of a

23    causal effect here.

24          Q.    So you can't say one way or the

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 166

1      other whether SB202 has a net negative impact

2      on lines, correct?

3              A.      All the theoretical research

4      and quantitative research and other context

5      suggests that it would and that's what I'm

6      relying on, when I make this -- this claim.

7              Q.      Okay.

8                      Because you have not tested

9      that and cannot test it, correct?

10             A.      There's not enough data to test

11     it.

12             Q.      Okay.

13                     MR. FIELD:  Let's go off the

14             record.

15                     VIDEO TECHNICIAN:  The time is

16             now 12:44.  We're going off the video

17             record.

18                             - - -

19                     (Whereupon, a short recess was

20             taken from 12:44 p.m. until 12:51

21             p.m.)

22                             - - -

23                     VIDEO TECHNICIAN:  The time is

24             now 12:51.  We're back on the video

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 167

1          record.

2                    MR. FIELD:  I don't have any

3          other questions.

4                    MR. ROSBOROUGH:  And I have no

5          questions.

6                    THE WITNESS:  Great.  Thank you.

7                    VIDEO TECHNICIAN:  The time is

8          now 12:51.  This concludes Media Unit

9          No. 2 and this video deposition.

10                            -  -  -

11                    (Witness excused.)

12                            -  -  -

13                    (Deposition concluded at 12:51

14          p.m.)

15

16

17

18

19

20

21

22

23

24

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 168

1                   C E R T I F I C A T E
2
3

        I, Karen M. Bilger, a Notary Public, do
4    hereby certify that the foregoing deposition
     of STEPHEN PETTIGREW, PH.D., was taken before
5    me, pursuant to notice, at the time and place
     indicated; that said deponent was by me duly
6    sworn to tell the truth, the whole truth, and
     nothing but the truth; that the testimony of
7    said deponent was correctly recorded in
     machine shorthand by me and thereafter
8    transcribed under my supervision with
     computer-aided transcription; that the
9    deposition is a true record of the testimony
     given by the witness; and that I am neither
10   of counsel nor kin to any party in said
     action, nor interested in the outcome
11   thereof.
12         WITNESS my hand and official seal this
     21st day of August, 2025.
13
14
15
16   
     Karen M. Bilger, Court Reporter
17   Notary Public
18
19
20
21
22
23
24

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

Page 169

1    Davin Rosborough

2    drosborough@aclu.org

3                         August 22, 2025

4    RE: Georgia Senate Bill 202, In Re

5         8/15/2025, Stephen S. Pettigrew, Ph.D. (#7506052)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-southeast@veritext.com.

16        Return completed errata within 30 days from

17   receipt of testimony.

18        If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                          Page 170

 1   Georgia Senate Bill 202, In Re

 2   Stephen S. Pettigrew, Ph.D. (#7506052)

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Stephen S. Pettigrew, Ph.D.              Date

25
```

Page 171

1    Georgia Senate Bill 202, In Re

2    Stephen S. Pettigrew, Ph.D. (#7506052)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, Stephen S. Pettigrew, Ph.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Stephen S. Pettigrew, Ph.D.              Date

13    *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[& - 2020]**                                                Page 1

| & | | | |
|---|---|---|---|

**&**   3:16

**1**

**1**   4:14 6:12 9:1
9:6 14:8,15
22:10 25:7
45:22 56:11
87:18 109:8,10
110:11,17
111:3,4,10
122:20 140:13
140:21
**1,600**   82:21
99:15 102:5,9
105:4 138:12
**1.1**   86:5
**1.5**   50:20,22
**1.7**   95:7 120:11
**1.9**   76:18
**1.96**   92:5
**1.96.**   99:17
**10**   110:17
111:4
**10,000**   42:20
**100**   3:17 19:21
20:2,15,20
42:13,13 43:20
82:20 89:2
112:1 117:11
**100,000**   42:22
**10006**   2:17
**1018**   168:16

**10:03**   1:17 6:4
**11:15**   87:17,21
**11:29**   87:22
88:1
**12.5**   118:4
**12.9**   137:5
138:2,20,24
139:9 140:4
**12:44**   166:16
166:20
**13**   4:16 68:22
69:1 71:20
**136**   41:19 44:8
47:4 58:16
**13th**   13:11
**14**   90:17 97:23
**15**   1:10 6:4
87:7 135:4
**15.8**   116:10
**159**   20:10 33:5
**15th**   2:4
**16**   33:18 34:1
38:23 39:4
62:11 63:11
72:15 79:17
85:9 88:5,13
90:16 94:24
95:19 97:10,23
117:18 135:16
135:22
**1600**   3:4,18
**17**   114:8
**17.2**   113:20

**1717**   2:9,21
**18**   84:24 85:9
90:14,16 97:23
129:7
**18.4**   136:23
137:7,21
**1800**   1:15 6:20
**19103**   1:17
**1:21**   1:5

**2**

**2**   4:16 13:13,16
61:1 69:14,20
76:14 84:18
88:2 167:9
**2.1**   61:18 62:6
64:10 72:13
**2.3**   86:17 91:1
91:6 92:9,17
118:13 119:15
119:19
**2.5**   69:7,9
89:23
**2.6**   75:18 76:3
76:10
**2.7**   49:11 74:21
**20**   33:19 34:1
38:23 39:5
73:20 84:24
85:9 90:14,16
94:24 109:8,11
110:11 111:10
113:22 115:16
115:17,22

**116:**1,17,17
150:11 153:14
153:16 171:15
**20005**   2:4
**20006**   2:10,22
**2008**   129:15
**2010s**   159:8
**2012**   97:23
129:14
**2014**   71:12
129:8,10
**2016**   32:19
37:5 84:24
90:14 118:9,10
119:20 129:13
129:15
**2018**   30:4
34:13,19
129:10
**2019**   157:11
158:7
**202**   1:5 6:16
169:4 170:1
171:1
**202-787-1060**
2:10,23
**2020**   20:5
27:10,20,21
28:17 30:3,21
32:19,22,24
34:10,15,16
35:8 36:11
37:12,15 38:6
42:4 49:10,12

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[2020 - 30]**                                                        Page 2

| | | | |
|---|---|---|---|
| 50:2,3,21 51:9 | **2023**  10:5 | 101:20 105:5 | **22**  85:8 113:22 |
| 51:18 53:3,15 | 11:20 12:1,5 | 116:7,22 | 115:17 116:1 |
| 53:18 54:21 | 17:23 20:4,13 | 120:11 121:12 | 131:3,11 |
| 55:10,11 56:15 | 21:12 24:7 | 121:18 122:17 | 149:18 169:3 |
| 57:2,14 59:3 | 25:3 34:8 42:1 | 133:14 135:2 | **22209**  3:5 |
| 113:18 114:7 | 44:2 46:24 | 135:21 136:19 | **23**  156:8 |
| 114:12 115:3 | 56:20 84:14 | 138:11 141:5 | 163:21 |
| 115:15 116:6 | 147:24 156:1,6 | 145:5,12,16,21 | **24**  51:16 71:14 |
| 117:12,19 | 156:11 | 146:9,20 | 85:8 129:12,14 |
| 129:13,14 | **2024**  9:16 | 147:12,17 | 131:3,10 |
| 135:2,6,20 | 10:11,15,20,24 | 148:17 149:18 | **24.7**  135:19 |
| 136:17 141:4,5 | 11:12,16 12:6 | 152:23 153:11 | 136:16 |
| 156:23 157:3 | 12:22 15:1,8 | 153:17 154:18 | **26**  151:18,18 |
| 157:15,21 | 22:18 26:7 | 154:21,22 | **26.5**  116:11 |
| 158:3 | 27:11,22 28:18 | 155:3,20 | **27**  114:10 |
| **2022**  12:21 | 30:21 32:22 | 156:14 160:5 | **27.4**  113:20 |
| 33:9 49:11,13 | 35:19 37:16 | 160:10,15 | 115:18 |

| | |
|---|---|
| 49:21 56:5 | 38:6 39:7,8 |
| 71:12,14,15,23 | 46:18 47:19,20 |

**3**

| | | | |
|---|---|---|---|
| 72:9 80:13 | 48:12 49:11,13 | 161:1 | **3**  4:18 21:16,19 |
| 85:21 86:7,18 | 49:16,18 50:3 | **2025**  1:10 6:4 | 25:3 97:20 |
| 86:22 88:18 | 50:13,22 51:9 | 9:12,24 10:8 | 120:21 |
| 89:8,11 90:22 | 52:4 53:4,17 | 10:23 11:6 | **3.1**  92:16,24 |
| 91:5 93:12 | 54:21 59:10 | 12:8 22:10 | 93:7 135:1 |
| 99:4,11,16 | 60:7,8 61:12 | 35:16 45:15,21 | 143:5 151:11 |
| 101:21 113:18 | 61:21 63:22 | 46:2 62:7 78:4 | **3.1.**  93:1 |
| 114:7,12 115:4 | 64:7 69:6 71:4 | 78:10 168:12 | **3.7**  97:17 |
| 115:15 116:22 | 75:18 76:18 | 169:3 | **30**  61:11,20 |
| 119:14,15 | 79:5 80:13 | **2026**  143:6 | 73:21 74:23 |
| 129:7,9 133:14 | 83:4 88:18,24 | 144:17,20 | 75:19 76:20 |
| 143:7,16 146:9 | 89:4,11 93:14 | 151:24 | 79:4,21 83:8 |
| 148:16 153:18 | 93:17 94:1,13 | **205**  3:12 | 84:5,7,9,22 |
| 155:24 158:4 | 95:8 96:13 | **21**  4:18 | 85:6,7 86:15 |
| 160:19 | 99:4,11,14 | **21.5**  118:1 | 86:16 90:13,23 |
| | | **21st**  168:12 | |

Stephen S. Pettigrew , Ph.D.    August 15, 2025
Georgia Senate Bill 202, In Re

**[30 - accomplish]**    Page 3

90:24 93:17
94:13 95:5,6
96:24 98:22
99:4 100:7,13
100:20,24
101:5,7,14,19
101:21,24
102:16,22
103:2,18,20
104:3 105:17
106:4,6,24
107:10,12,21
108:5,6,7,14,18
109:3,12 110:1
110:3,4,12,19
111:4 113:10
116:24 117:12
117:20 118:6
118:12 119:17
120:13 135:3
135:20 136:17
137:4,14
169:16
**30339-5948**
3:18
**31** 63:1,9 97:11
**31210** 3:13
**34** 117:21
**347-491-2597**
2:17
**37** 40:22,24
42:6
**39** 40:22

**4**

**4** 9:12 28:2
45:24
**4.4** 42:2 44:1,7
**40** 2:16
**47** 155:16
**470-588-0317**
3:19
**478-621-4980**
3:13

**5**

**5** 81:18 95:18
98:20
**5.3** 99:11,20
101:21 103:13
**5.5** 137:8,22
**5.8** 61:10,19
76:11
**50** 93:7 134:12
156:18
**5400** 3:12
**55555** 1:5
**5th** 2:16

**6**

**6** 129:5
**6.3** 99:11,20
101:20 103:13
105:5 135:20
136:19
**60** 138:13
**66** 22:16,17
47:19 52:2,22

54:5,6
**67** 51:11,24
52:23 55:2,6
**6th** 1:16

**7**

**7** 4:6 97:10
128:19
**7.5** 61:10,18
97:20
**70,000** 138:14
**700** 3:4
**703-143-9423**
3:5
**703-380-0804**
2:5
**7506052** 169:5
170:2 171:2
**77** 69:13 74:23
89:24

**8**

**8** 158:13
**8/15/2025**
169:5
**81** 62:13,14
84:16 90:10
**8th** 156:7

**9**

**9** 4:14 22:21
24:5,10,13
47:23 49:7
52:7 59:15

**900** 2:9,22
**915** 2:4
**99** 140:14,21

**a**

**a.m.** 1:17 6:4
87:21,22
**abided** 47:3
**abiding** 36:18
36:20 39:8,12
**able** 34:13,17
44:21 112:4
151:12 155:5
160:9
**above** 62:14
115:8 169:6
171:7
**abscess** 29:20
**absence** 26:16
26:23 29:22
30:9 82:12,13
144:6
**absent** 26:7
30:21,21 145:5
**absolutely**
108:2 114:6
**absurd** 107:17
**absurdly** 105:2
**access** 75:6,7
75:24 76:21
77:6,13,14,21
163:1
**accomplish**
39:13

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[account - analyzing]**                              Page 4

| | | | |
|---|---|---|---|
| **account** 105:8 105:9,13 163:5 | **add** 14:17 15:17 16:19 19:18 28:5,16 40:7 63:7 89:1 | **affected** 21:9 47:16 132:10 133:5 | **allotted** 169:19 |
| **accounts** 52:10 52:13 | | **affects** 68:10 | **allow** 19:13 |
| **accuracy** 23:5 23:11 24:18 71:6 169:9 | **added** 21:4 57:10 63:3,11 113:7 129:23 | **affiliations** 7:8 | **allows** 19:3 105:15 129:3 |
| | | **afternoon** 64:9 | **ame** 2:6,18 |
| **accurate** 85:14 85:16 155:7,7 | **adding** 19:15 34:4 63:6 92:8 99:19 | **ago** 45:7 164:8 | **american** 2:3 |
| **acknowl** 54:22 | | **agree** 6:11 14:24 21:3 37:12 43:24 55:16 56:4 57:2 93:15 94:11 112:11 113:9 121:6,17 131:17,19 156:10 | **amount** 37:17 57:17 131:7 160:5 |
| **acknowledge** 53:14 | **additional** 16:12 17:16 18:17 58:5 | | **analysis** 15:14 24:5 33:9,15 35:17 48:16 52:19 55:23 56:14,19,24 58:2 59:16 63:17 64:24 65:3 68:3 75:11 93:22 99:24 125:22 127:13 130:19 133:17 141:12 141:16 142:16 142:18 148:15 148:18 149:1 150:17 151:20 152:21 158:19 |
| **acknowledge...** 171:3 | **additions** 171:6 | | |
| **acknowledg...** 169:12 | **address** 44:9 49:17,24 51:21 51:23 72:22 73:4 84:10 97:18 | **agreed** 37:13 | |
| **aclu** 1:15 | | **agrees** 51:17 | |
| **aclu.org** 2:5 169:2 | | **ah** 19:16 22:23 23:13 50:18 71:8 73:1 74:8 77:20 78:1 91:6 96:1 118:14 135:4 136:21 148:8 152:10 153:13 158:22 | |
| **acquaint** 13:21 | **addresses** 51:12 52:21,23 | | |
| **action** 7:5 168:10 | **addressing** 24:21 65:21 | | |
| **actions** 38:18 | **administer** 7:3 | | |
| **activities** 10:11 | **administration** 29:15 100:16 109:2 | | |
| **actually** 18:14 20:9 23:20 24:8 47:18 48:19 49:14 50:24 64:8 95:10 96:2 99:13 104:11 113:17 136:9 138:3 146:10 158:10 160:9 | **advanced** 25:15 | **ahead** 9:10 13:8,20 21:10 21:23 39:14 62:22 85:2 120:8,20 | **analyze** 34:9 68:15 |
| | **adverb** 130:14 | | **analyzed** 24:19 37:5 55:19 146:9 |
| | **affairs** 72:21 | | **analyzing** 66:19,22 67:12 |
| | **affect** 86:4 142:2 | **aided** 168:8 | |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[anomalous - back]**                                   Page 5

**anomalous**
  57:3 71:19
  72:4 76:13
  151:5
**anomaly**
  105:19
**answer**  5:3
  36:8 43:19
  44:20 73:1
  106:6 142:17
  154:1
**answered**  90:8
**answering**  17:2
**anymore**  99:14
  160:10 161:2
**apart**  101:3
  165:16
**appearance**  7:8
**appearances**
  3:1
**appears**  152:17
**appended**
  171:7
**appendix**  120:5
**apples**  117:15
**applicable**
  169:8
**applied**  132:21
**appreciate**  8:5
**approach**  64:1
  64:1
**appropriate**
  53:10 66:23

**approximately**
  86:17 91:1
  95:7 114:8,10
**area**  110:2
**argument**
  144:19
**arlington**  3:5
**arrows**  129:20
  130:10,20
**art**  32:16
  132:22
**aside**  105:21
  127:1 132:22
**asked**  12:13
  23:17,18,22,24
  24:4,8,11,13
  29:18 30:18
  31:18 35:18,23
  60:23 66:21
  68:6,7 78:9
  94:7 127:3
  146:22,23
  147:1,6,14,21
**asking**  17:6
  26:15 37:21
  39:10 46:14
  94:10,17
  108:13 121:15
  127:7 161:6
**aspect**  158:23
**aspects**  144:14
  148:2 150:8
  151:6

**assembly**  16:12
  20:12 42:14
  43:21
**assembly's**
  19:20 20:20
**assertion**
  150:20
**asserts**  94:4
**assess**  99:22
  101:12 139:8
  139:17 142:7
  142:20
**assessing**  48:7
  139:13
**assuming**  28:16
  151:10
**assumption**
  26:24 28:14
**atlanta**  1:2
  3:18 6:18
**atlantic**  1:22
**attached**
  169:11
**attempted**
  57:19
**attorney**
  169:13
**attributable**
  36:4 46:3
**attribute**  28:9
  152:9
**attributed**
  14:19 121:4
  152:14

**audio**  6:9
**august**  1:10 6:4
  168:12 169:3
**authored**  8:12
  8:12 9:2,16
**authoring**  34:7
**authoritative**
  73:12
**authorized**  7:3
**avail**  33:3
**available**  8:6
  20:7 23:15
  33:17 37:6
  42:4 64:21
  153:1 161:22
  169:6
**average**  68:23
  143:3 155:14
  162:17
**aware**  127:14
  154:15
**axis**  42:3

**b**

**b**  4:11
**back**  14:10
  17:11 20:4
  21:1 24:6
  39:11 44:21
  45:7,16,21
  48:2,20 53:12
  56:11 57:21
  71:11 84:12
  89:7,10 98:18

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[back - calculation]                                               Page 6

| | | | |
|---|---|---|---|
| 121:16 143:6 | **begins** 88:1 | 171:1 | **bottlenecks** |
| 143:15,16,20 | **behavior** 134:1 | **bit** 39:1 62:8,16 | 161:17 162:1 |
| 144:2 148:10 | 134:15 | 64:15 73:17 | **bottom** 14:13 |
| 155:23 161:13 | **believe** 20:8 | 90:18 117:17 | 25:8 59:19 |
| 162:6 166:24 | 40:21 74:8,10 | 130:4 138:7,15 | 89:18 |
| **bad** 103:16 | 111:19,20 | **black** 42:7,20 | **boulevard** 1:16 |
| **bailey** 123:20 | 135:5 145:10 | 43:5,6 44:1,5,7 | 3:4 6:20 |
| 154:8 155:1 | 154:22 155:22 | 61:10,19 62:24 | **break** 87:2,8 |
| **bailey's** 154:4 | 155:23 163:15 | 69:19 76:19 | 136:10 |
| 161:12 | **best** 8:9 32:10 | 79:6,20 81:3 | **breaking** 37:23 |
| **ballots** 55:8,11 | 33:7 55:1 | 82:8,15 83:5,5 | 38:1 87:12 |
| **ballpark** | 101:19 | 84:4,5,21 85:5 | 107:3 108:24 |
| 140:22 | **better** 116:6 | 85:13,23 86:15 | **brian** 2:8 7:13 |
| **based** 12:6 | 122:6 141:6 | 89:11 90:11,24 | **brief** 126:24 |
| 54:14 75:17 | 145:17 149:7 | 92:2 95:5,14 | **brings** 76:8 |
| 95:3,11 119:4 | **beyond** 143:6 | 95:23 96:17,20 | **broken** 38:8 |
| 128:2,3,4,4,8,8 | 144:20 161:11 | 96:23 97:11 | **brought** 29:24 |
| 144:13 150:17 | **bfield** 2:11 | 112:12 113:11 | **bunch** 8:10 |
| 153:2 154:12 | **bibb** 3:14 | 113:21 114:9 | 153:19 |
| 159:16 | **big** 38:24 69:4 | 115:4,7,14,17 | **busy** 36:24 |
| **baseline** 28:17 | 72:8 88:23 | 115:24 116:12 | 37:1 |
| **basically** 12:14 | 117:14 128:2 | 116:22 117:11 | |
| 63:18 64:10 | 134:20 162:3 | 117:19 118:5 | **c** |
| 75:8 77:8 | 163:8 | 118:11 119:16 | **c** 2:1 168:1,1 |
| 101:15 126:15 | **bigger** 51:1 | **blanket** 165:14 | **calculate** 91:22 |
| **basis** 15:7 | 82:18,19 | **blending** 51:19 | 105:7 |
| 23:11 24:17 | 139:19 142:9 | **block** 120:12 | **calculated** |
| 58:4 60:17,18 | **biggest** 124:3 | **board** 3:20,20 | 60:14 |
| 79:20 | **bilger** 1:18 7:1 | 3:21 | **calculating** |
| **began** 157:12 | 168:3,16 | **bock** 3:3 | 64:5 91:19 |
| **beginning** 1:17 | **bill** 1:5 6:15 | **bottleneck** | 98:11 |
| 22:23 45:23 | 25:9,13 144:12 | 124:3 161:19 | **calculation** |
| 65:9 87:2 | 145:8 150:9 | 161:20 162:4 | 88:8 95:12 |
| 146:8 | 169:4 170:1 | 162:11 | 98:1,7 99:6 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[calculation - checking]                                    Page 7

138:5,9 141:12
**calculations**
75:12 93:23
95:11 113:3
117:7
**call** 77:9
**called** 68:16
75:7 159:1
**care** 68:19
**careful** 146:3
**carry** 30:5
**case** 1:4 8:11
9:16 28:1,24
60:15 68:20
92:17,19 93:8
105:4 115:23
119:7 121:24
121:24 124:20
149:11 154:16
**cases** 58:23
**casey** 3:17
**casey.torres**
3:19
**cast** 22:19
47:21 48:13
49:19,22 50:11
50:21 52:5,19
52:21 54:7,8
55:9,10,15
59:11,13 60:8
60:9
**casting** 55:8
**category**
159:10

**causal** 47:24
55:17 146:3
164:12 165:8
165:23
**causality**
164:17
**cause** 132:7
133:6
**caused** 46:17
112:10 124:14
145:21,24
147:19
**causes** 123:11
123:24 158:16
158:19 159:17
161:14
**causing** 47:13
134:9
**cautious**
124:19
**cces** 73:2
**certain** 16:9
30:8 34:14
74:10 82:20
108:23 154:11
156:2
**certainly** 45:10
72:11 105:1
131:24 133:12
133:14
**certify** 168:4
**ces** 12:20,21,22
13:1,4 61:24
63:7,12 64:20

65:3,8,14 66:5
72:14 73:9,18
74:2,4,12 76:6
76:8,12 78:11
79:13,17 81:1
82:17,21 83:2
83:23 84:3
85:15 88:11
101:16
**challenging**
37:1 151:19
165:16
**chance** 30:24
60:21 112:23
**change** 28:9,12
29:1,8 30:10
31:8 32:14
38:17,18,21
39:1 71:18
86:4 88:21,23
89:17,21 90:1
114:19 128:1
131:8 134:15
135:1 140:21
141:17,18
142:8 170:4,7
170:10,13,16
170:19
**changed** 12:5
154:9
**changes** 27:1
28:7 32:1 38:7
39:2,4 69:5
86:8 89:3,14

139:13,15
141:9 169:10
171:6
**changing** 34:3
89:2
**characterizati...**
73:14
**characterize**
108:21 109:5
109:13
**chart** 35:10
40:24 119:15
137:9
**charts** 35:4,7
**chatham** 3:20
3:20
**check** 62:5 65:2
74:11 88:12
89:7,10 90:9
93:23 94:1,6
116:7 122:12
123:8,9,21,22
127:4,13 152:5
152:8,16,22,22
155:1,15
156:18 159:18
159:18,24
160:4,17 162:2
162:6,11,12,16
162:21
**checked** 94:3
148:10
**checking**
153:22 161:19

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

**[chose - conclusions]**

Page 8

chose 130:14
circumstance
105:14 106:11
115:9
circumstances
67:14
civil 2:3
claim 24:21
55:18 128:14
153:5 165:9
166:6
claimed 144:3
claims 163:2
165:8
clarify 31:1
clarity 13:7
17:12 61:17
clause 14:24
15:16 55:14
clayton 3:21
clear 51:6 54:3
70:7 114:3
clearly 97:3
113:4 144:9
close 155:7
closely 48:21
129:17
closeness 93:6
closer 76:9
code 63:23
64:17 65:2
69:23 70:8,22
71:15 86:4
88:8,12,16,17

98:1,15
coincidence
108:15
collect 57:19
collected 20:5
collecting
106:1
column 49:7,7
50:9 52:8,10
52:13 53:4,5
53:15 54:3,4,4
59:18,19,22
71:23 72:9
89:3,4,18
columns 50:10
52:20 53:1
54:11 89:1
come 38:19
126:24 127:2
127:10,12
148:21
comes 70:11
116:10
coming 67:19
67:20
comment 24:4
43:21
commission
100:16 101:4
104:16 106:18
109:1 110:1
committee 3:7
3:8,8

common 57:16
compare 57:13
113:17,18
114:15 131:20
139:22 141:17
148:20
compared 15:9
37:15 49:20,22
49:23 59:13
60:10 68:22
85:8 97:14,16
113:20 114:9
116:11 135:20
137:7,15
152:23 164:5
comparing
38:23 69:18
81:8 99:18
113:3,22
115:15 131:3,3
131:10 141:9
164:1,17
comparison
57:23 81:10
114:14 116:6
117:3,9,16
133:7 136:6
160:9,12 164:8
compel 32:13
compelled
38:17
compelling
132:17

complete 171:8
completed
169:16
compliance
38:19
complicated
44:13
comply 19:10
40:1 44:3
165:15
complying
36:22
component
80:5
composing
78:10
computer
168:8
conclude
127:18
concluded
167:13
concludes
87:17 167:8
conclusion 36:2
36:3 48:18
49:15 58:4
79:13,18 80:21
99:7 106:22
125:19 126:5
126:11,16
145:20
conclusions
150:7 157:22

**concrete**
  107:13
**conduct**  141:11
  152:20
**conducted**  58:1
  112:12 165:2
**confidence**
  11:15
**confirm**  9:11
  20:15 63:13
  77:16 88:10
  154:24 155:5
**confirmed**
  39:11 45:16
  62:4 71:8
  77:22 85:12
**confirms**  36:17
**conflict**  54:24
  55:3
**congressional**
  3:8
**conjunction**
  53:2
**connect**  48:2
**connecting**
  126:5
**consequence**
  64:6 165:17,18
  165:19
**consequent**
  66:10
**consequential**
  69:17 156:20

**consider**  77:10
  127:18
**considerably**
  73:8 76:4
  82:17 159:23
**consistent**
  100:15
**consistently**
  159:9
**consovoy**  3:3
**consovoymc...**
  3:6
**contention**
  17:22
**context**  85:18
  90:19 123:5
  134:7 142:11
  142:23 166:4
**contexts**  151:2
**continue**  6:10
  43:3
**continued**  3:1
  81:19 82:5
**contrary**  51:22
  79:12,14,14
**contributed**
  145:22,23
  150:22
**contributing**
  161:8
**convention**
  104:14,14
**conversation**
  125:2

**conversations**
  6:7
**copied**  62:5
**copies**  169:14
**copy**  9:1 63:5
**correct**  9:17,18
  10:5,11,12,15
  10:20 11:2,8
  11:12,17 14:20
  15:2,10,18
  16:4,14 18:19
  18:21 19:1,4
  19:10,11,15,24
  20:21,22 21:6
  23:1,5,8,9,12
  23:16 24:14,23
  26:1,7,14,18
  28:18 32:24
  34:11,20 35:17
  35:21 37:16
  39:20 44:4,10
  45:4,18 48:1,8
  48:14,17,17,18
  50:17,19 52:3
  52:9,12 53:22
  53:23 54:8,13
  55:4,12,21
  56:7,16,24
  57:11,18,23,24
  59:3,14,17
  60:12,15,17,22
  61:3,12,21
  62:1,7 63:14
  63:16 64:10,18

  64:21,24 65:4
  65:12 71:7
  72:15,21 74:23
  75:20 76:6,20
  76:23 77:1
  78:4 79:6,10
  79:13,22 80:23
  81:5,12 82:9
  84:9,24 85:15
  85:23 86:1,5
  86:18 88:13
  89:14,15 90:15
  90:16 91:2,8
  91:15 93:11,13
  93:19 94:2,15
  94:19 95:2,8
  95:19,24 96:6
  96:22 98:23
  100:24 102:2
  104:4 107:15
  112:8 113:19
  114:13,20,24
  117:1,4,6,21
  118:1,6 119:18
  119:21 120:13
  121:4,8,13
  122:7,13
  125:20 126:12
  129:21 130:22
  130:24 131:8
  131:21 133:6
  135:23 136:3
  136:20,24
  137:14,21

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

[correct - data]

Page 10

| | | | |
|---|---|---|---|
| 139:22 140:1 | 21:4 25:18 | **couple** 54:11,23 | **cycle** 57:21 |
| 145:22 146:11 | 26:6,13,16 | 63:6 129:4 | 150:16 |
| 146:16,21 | 27:22 28:4 | 134:10 137:23 | **cycles** 31:4 37:9 |
| 147:4,12,20 | 29:1,13,22 | 150:15 161:16 | 93:19 94:14,21 |
| 148:7,12 | 30:19 31:20 | 165:20 | 94:24 134:11 |
| 151:23 152:9 | 32:20 33:5,7 | **course** 29:1 | 143:19 150:15 |
| 152:24 155:18 | 33:12 34:3 | 65:24 66:20 | 163:5 165:21 |
| 155:20 156:15 | 36:12 37:12,14 | 96:17 115:6 | |
| 156:24 157:4 | 37:22 39:1,8 | 128:19 134:1 | **d** |
| 160:5 163:12 | 39:23 40:3 | 156:13,16 | **d** 4:1 |
| 163:13,17 | 42:11,17,21 | **court** 1:1 6:17 | **daniel** 3:24 |
| 165:3,4 166:2 | 43:14 44:17,22 | 6:24 7:17 | 6:22 |
| 166:9 171:8 | 45:3,13,17 | 168:16 | **dat** 83:1 |
| **corrected** 97:18 | 47:3 57:9,17 | **covid** 31:10,11 | **data** 12:6,9,16 |
| **corrections** | 58:20 123:20 | 39:5 57:4,6 | 12:20,21,22,23 |
| 9:23 171:6 | 123:21 153:19 | 59:3 | 21:2 23:7,14 |
| **correctly** 22:22 | 153:24 160:12 | **crazy** 71:19 | 23:15 24:14,19 |
| 25:21 50:5 | 160:13 165:13 | 162:14 | 27:20,21 33:13 |
| 113:8 132:24 | **country** 120:23 | **create** 63:4 | 33:17,18 34:13 |
| 136:23 143:10 | 123:4 141:6 | **credible** 103:3 | 34:18 35:1 |
| 168:7 | 142:2 143:3 | 165:9 | 36:17 37:2,5 |
| **corroborate** | 158:23 | **critiques** 84:12 | 37:11 40:6,16 |
| 15:13 76:1 | **county** 3:14,20 | **cross** 99:21 | 44:12 45:11 |
| **corroborated** | 3:20,21 18:1 | **crosses** 92:10 | 48:16 50:8 |
| 60:19 | 18:18,24 19:7 | **crucially** 68:13 | 55:20 57:20,21 |
| **counsel** 7:7 | 19:9,12,14 | **crunch** 71:10 | 61:24 63:7,12 |
| 70:4,12 168:10 | 20:2 27:7 30:7 | **crystalize** | 64:20 65:4,8 |
| 169:14 | 31:22 32:9 | 119:11 | 65:14 66:13 |
| **counterfactual** | 33:6 37:8,15 | **cs** 169:15 | 67:8,11 68:2 |
| 144:17 151:16 | 38:13 43:3,4 | **cusick** 2:15 | 68:15 71:6 |
| 164:15,18 | 43:20 44:9 | **cut** 39:15 | 72:14,19 73:2 |
| **counties** 17:21 | 58:2,12 106:3 | 159:18 162:22 | 73:9,12 74:20 |
| 19:3,17,21,22 | 160:10 | **cutting** 162:12 | 74:21 75:5,6,9 |
| 20:8,16,20 | | 162:13 | 75:17,24 76:6 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

76:8,9,11,12,18
76:22 77:7,9
77:10,13 78:3
78:11 79:3,13
79:16,17 80:14
81:1,7 82:7,14
82:17,21,24
83:2 84:2,2,3
84:10 85:15
88:11 95:22
96:14 101:11
101:11,16
102:8 103:6,6
103:7 104:19
104:23 105:19
105:21 106:1
111:7,17,20
112:5 129:8,14
131:20 132:4,7
134:7 135:18
136:15 138:12
141:5 142:4
146:10,20
148:15,16,23
149:2 150:6,12
151:21,24
153:1 155:4,9
157:3 163:1,11
164:13 165:5
166:10
**dataset**  77:15
**datasets**  141:10
**dataverse**  13:1

**date**  156:6
170:24 171:12
**dated**  13:11
**dates**  8:17 16:3
17:16
**davin**  2:3 7:10
169:1
**day**  19:23
52:11 53:7
66:9,10 156:8
168:12 171:15
**days**  25:14,20
39:19,21 44:14
57:10 74:15
156:7 169:16
**dc**  2:4,10,22
**decide**  27:7
**decimal**  72:1
72:11 86:10
**decisions**  27:4
**declaration**
161:12
**declare**  171:4
**decline**  137:6
**declined**  137:5
**decrease**  127:5
137:3,13,21,22
138:23 147:19
**decreased**
11:11 138:22
**deemed**  171:6
**defendants**
2:11,24 3:7,14
7:14

**defending**  7:12
**defense**  2:15
**define**  109:22
**definite**  107:1
**definition**
130:15
**definitive**  150:7
**denominator**
52:17,18,20
54:8
**denominators**
53:9
**depends**  108:21
**deponent**  168:5
168:7 169:13
171:3
**deposing**
169:13
**deposition**  1:13
5:1 6:13,19
7:12,15 65:10
146:8 158:14
167:9,13 168:4
168:9
**describe**  99:5
**described**  45:9
**description**
4:13 5:6
**design**  139:21
164:23 165:3
165:11
**despite**  55:5,6
**detailed**  131:2

**determine**  40:6
57:16 152:21
**develop**  161:15
**difference**
17:19 51:6
56:3 63:24
64:3 72:7
80:19 81:1,19
82:5,8 91:19
92:1,9,10
93:10 95:23
96:16,20 97:19
97:22 103:1
118:5,11
129:15 136:23
138:2,4,21
139:9,13,18,20
140:4 141:11
142:15 151:12
**differences**
67:19 72:2,9
94:5 138:10
139:10,18,21
140:20 141:11
142:16 154:19
**different**  39:19
39:21 50:7
54:22,24 63:21
72:12 76:4
80:12 103:5
106:14 111:9
122:19 132:5,8
133:2,24
138:16,18

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[different - earlier]**                                    Page 12

141:10 148:19
156:12 161:16
164:21
**differently**
81:13
**difficult** 60:1
**digging** 96:13
**direction** 34:4
129:21 130:11
131:7,9,12
140:9 144:15
151:4,7
**directions** 5:3
**directly** 13:3
**disagree** 23:4
24:18 49:15
**disagreed** 32:3
**disconnect**
31:17
**discredits**
134:18
**discuss** 90:6
152:4
**discussed** 22:13
25:23 154:8
**discussion** 22:9
52:2 71:13
72:18 125:7
**dispute** 15:7,12
17:18 20:19
23:11 48:12
59:9,10 60:6
60:17,19 74:19
75:3,17 76:17

84:20 90:11
120:15 124:22
**distribution**
92:6
**district** 1:1,1
6:17,18
**division** 1:2
6:18
**doctor** 6:13 8:3
12:12,12 13:9
15:5 22:13,16
23:23 24:22
43:9 46:2
47:10,18 48:16
59:16 60:13
61:14 62:6,10
62:23 63:11,13
66:2 67:4
72:15,18 73:7
74:24 76:5
78:11 84:1,17
88:4,5,13
90:10 93:21
97:10 99:1
119:14 124:17
129:6 133:16
135:16,18
136:15 146:1
146:23 149:20
**document** 9:5
13:15 14:4
21:18 22:4
41:3,14

**documents** 5:6
118:21 154:13
**doing** 37:8
84:11 102:24
106:10 112:2
114:18 118:14
119:5 136:22
**dollar** 73:19
**dot** 43:24
**dots** 35:5 42:13
42:17,19 43:5
**double** 62:5
90:9
**doubt** 19:19
71:6 85:14
118:11
**dr** 4:15
**drafting** 12:10
**dramatic** 39:4
**draw** 109:22
126:16 129:3
150:7
**drawn** 44:8
**drive** 3:12
**driven** 59:3
133:24 141:24
**driver's** 160:23
**driving** 153:9
**drop** 69:15
112:10 113:10
113:16,20,21
114:9,11 115:1
115:7,10,13,14
116:10,12,17

116:23 117:14
121:7,12,18
122:16,20
123:2 124:2
125:16 128:6,7
133:19 134:9
137:8 152:8,14
153:9 156:18
163:2
**dropped**
112:11 115:15
116:1 117:13
**dropping**
115:18
**drops** 69:12,20
76:14 121:2,3
123:3 142:11
**drosborough**
2:5 169:2
**dug** 163:6
**duly** 7:21 168:5

**e**

**e** 2:1,1 4:1,11
70:13,19 74:6
168:1,1 170:3
170:3,3
**earlier** 24:23
29:19 33:11
35:7 51:22
53:12 73:4
78:8 86:3
98:18 99:10
100:19 102:12

Stephen S. Pettigrew , Ph.D.
August 15, 2025
Georgia Senate Bill 202, In Re

124:23,24
144:13 146:13
146:19 158:7
**early** 16:2,13
16:14 17:14
19:4,8,13 20:6
25:15 26:1,2,7
27:7 29:23
30:1,8,20 32:9
33:4,10 42:3
43:22 44:3,18
45:4,17 49:8
49:11 50:16
51:5,8,15,23
52:14,21 53:5
54:5,6 55:7,11
56:5,15 58:2
60:10
**ebbs** 129:16
**effect** 43:7 66:1
68:14 69:6
124:6,12 126:3
143:9,23
145:15 149:12
157:14 163:7,8
165:23
**efficient** 160:20
**eight** 123:22
124:2 154:24
162:13,16,19
162:20
**either** 12:1,5
99:20 150:7

**election** 10:11
10:15,20 12:6
20:6 22:18
27:6 29:3,4,14
31:4 32:10,11
34:10,16,17
35:20 37:8
38:14 47:20
48:12 49:18,21
51:18 52:4,11
53:7 55:10,12
56:7,16 57:15
57:21 59:10
60:7,9 66:9,10
66:16,18,20,21
67:1,2,3,5,8,11
67:13 68:5,6
70:9,10 93:19
94:14,21,24
100:16 102:14
131:20 134:10
143:19 146:10
148:17 150:15
150:16 153:12
155:3,20,24
156:1,3,8,11,12
156:19,24
158:3,11 159:1
163:5 164:2
165:21
**elections** 3:20
3:21 9:17
10:24 11:12,16
15:2,9,10

22:20 26:14
29:2,7 31:14
33:21 38:9,12
47:22 48:8
49:20 52:7
54:2 57:3
59:14 60:11
84:23 90:13
108:24 109:2
109:11,18
110:13 112:12
113:12,17
121:8 133:16
152:24 156:5
159:4
**electronic**
123:8
**element** 165:11
**elements** 149:8
**ended** 67:21
**ensuring** 15:21
**entirely** 133:22
**equal** 50:23
**equally** 27:9,18
**errata** 169:11
169:13,16
**error** 63:17
71:15 91:22
92:4,16,23
98:4 103:9
105:8,13
139:17,17
**errors** 93:4,5
103:7

**especially** 33:5
**esquire** 2:3,8
2:15,21 3:3,11
3:17
**essentially**
75:12 100:3
103:14 150:17
**estimate** 72:12
**estimating**
164:20
**evaluate** 26:8
26:22 92:7
96:14 149:14
150:13 163:1
165:21
**evaluated**
26:11
**evaluates** 159:3
**evaluating**
100:8 144:16
164:14
**everybody**
162:19,20
165:15
**evidence** 37:10
53:18 54:19
55:1,4 81:18
82:4,13,13,15
83:12 99:2
101:8,17 102:7
102:17,19,20
103:5 105:15
106:11,14,15
106:17 107:1,2

Stephen S. Pettigrew , Ph.D.                                    August 15, 2025
Georgia Senate Bill 202, In Re

[evidence - field]                                                        Page 14

107:13 110:11
111:6 121:19
121:22 123:12
123:19 125:4,6
129:2,3 142:24
144:6 146:4
150:24 151:1,2
160:7 162:7
165:22
**exact** 97:21
160:21 163:7
**exactly** 49:3
101:1
**examination**
7:24
**examined** 7:22
22:21 47:23
52:7
**example** 61:9
**exception** 71:3
**excess** 18:2,3
36:13 42:22
162:19
**excused** 167:11
**exhibit** 4:13,14
4:16,18 8:24
9:6 13:13,16
21:11,15,19
25:3
**exist** 103:8
151:18,18
164:6 165:1
**existed** 36:21
164:4

**exists** 164:5
**expansion**
47:13
**expect** 138:8,10
143:21 149:6
164:24
**expectation**
39:3
**experience** 83:7
103:4 143:8
**experienced**
80:10 114:8
116:23 137:12
138:22
**experiencing**
114:10 143:22
**expert** 4:15,16
4:18 8:8 13:10
121:23 124:13
**expertise** 38:11
**explain** 38:23
64:2 65:22
66:1 103:24
127:4,21
163:23
**explained**
122:19
**explaining**
132:12 134:20
**explains** 55:2
128:5
**explanation**
47:14 88:5

**explanations**
122:6,16
125:15 127:2
127:10,18,23
**explicitly** 126:1
**extensively**
133:13
**extent** 8:19
**extremely**
128:15,17
129:19,22
130:3,8,12
140:5,15 141:2
**extremes**
140:18
**eyeballing**
42:12 116:15

**f**

**f** 1:15 168:1
**face** 151:13
**fact** 18:3 36:3
36:23 37:17,18
40:7 48:23
50:1 51:21
81:2 115:11,14
143:24 145:10
148:11 152:22
155:2
**factor** 39:6
134:13 161:9
**factors** 122:5
122:19 133:24
142:1,1

**fails** 169:18
**fair** 57:8,8
73:16 138:1
163:20
**fairly** 138:14
**familiar** 13:24
**far** 34:18
**federal** 22:20
47:22 52:6
54:2 59:14
60:11
**feel** 21:24 87:3
133:21
**feels** 28:21 93:3
135:14
**fewer** 30:11,13
42:20 55:10,15
**field** 2:8 4:6
7:13,13 8:2 9:9
13:12,19 14:6
17:5 21:15,22
22:6 27:16
28:13 29:5
30:14 37:3,24
40:20 41:6
43:17 56:22
59:1 70:15,18
70:21 71:1
76:16 79:1
80:15 81:22
82:3 83:9,20
87:9,11,14
88:3 110:15
111:13 112:18

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[field - georgia]                                                    Page 15

119:8 132:3
142:14 148:6
157:16 166:13
167:2
**figure**  42:1
44:1,7 86:5
91:14,14 92:16
**figures**  113:3
**filed**  6:16 17:23
**filling**  103:11
**final**  45:24
81:17
**financially**  7:5
**find**  22:17
25:16 41:16,23
52:3 57:20
61:9,13 63:16
97:24 98:14
**finding**  67:22
**findings**  61:14
**finger**  135:15
**finish**  17:1
**firm**  3:11 7:1
**first**  7:21 15:16
17:22 22:23
25:14 40:24
43:20 45:23
50:9,10,18
52:19,22 54:10
54:11 67:17
88:11 122:10
128:21 152:11
161:18,18
163:4

**firsthand**  103:4
104:21 106:14
107:2
**five**  26:13 87:8
89:5 135:10,11
**fix**  72:2
**flag**  62:18
**flat**  32:2
**flip**  42:5
**floor**  1:16 2:16
**flourish**  129:23
**flows**  129:17
**fmglaw.com**
3:19
**focus**  73:7
**focused**  24:2,21
**focusing**  24:1
**folks**  57:10
**follows**  7:22
122:21,21
**forced**  30:11
**forces**  32:13
36:14
**forecast**  147:12
**foregoing**
168:4 171:5
**forgotten**  78:19
**form**  17:9
27:13,24 28:20
29:12 36:7
37:20 40:10
56:18 58:8
75:22 78:18
79:24 81:21

82:11 83:15
110:9 111:1
112:15 131:23
141:20 146:10
148:5 157:6
**formula**  91:21
92:4 99:16
139:12,16
**forth**  14:11
109:2
**forward**  30:5
**found**  36:11
38:22 68:1
69:21
**four**  26:13
52:13 53:4,15
54:3,4 62:6
150:16
**fourth**  49:7
**fraction**  138:15
**free**  87:3
**freeman**  3:16
**frequently**
79:22 81:4
**friday**  1:10
**front**  16:17
162:21
**full**  8:21 17:1
104:24 154:9
**fully**  154:17
**function**  53:5,6
91:23 93:6
99:10,12,13
139:14,15

**fund**  2:15
**further**  54:16
71:24
**future**  31:15

**g**

**ga**  3:18
**galleria**  3:17
**gap**  53:3,4
69:18 83:4
95:14 96:5,9
**gary**  3:16
**gel**  38:11
**gels**  67:2
**general**  16:11
19:20 20:12,19
22:20 26:14
42:14 43:21
47:22 52:6
94:23 155:3
156:1,3
**georgia**  1:1,5
3:13 6:15,18
9:17 12:6 15:2
15:9 16:1
17:13,21,23
18:1 19:20
20:8 21:5 28:4
33:22 36:12
43:2 46:18,22
47:2,7 48:12
60:8 61:7 67:7
68:4,20,24
69:8,9,12 72:6

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[georgia - half]                                                Page 16

| | | | |
|---|---|---|---|
| 72:20 74:22 | 132:7 142:8 | **going** 6:3 8:7 | 76:5 84:1 |
| 80:2,8,9 99:3 | **georgian** 3:8 | 13:8 14:7,12 | 93:21 146:1 |
| 102:5,14 | **georgians** | 25:7 28:5,15 | **grimmer's** |
| 105:16,17 | 82:22 151:13 | 28:18 32:10 | 12:12,12 13:9 |
| 107:15 108:16 | **getting** 10:7 | 33:14 38:15 | 15:5 22:13,16 |
| 108:19 110:7 | 17:3 71:10 | 43:6 45:21 | 23:23 24:22 |
| 110:11 112:16 | 143:2,2 159:23 | 47:15 51:1 | 43:9 48:16 |
| 122:13,17 | **give** 25:5 30:24 | 57:21 59:22 | 59:16 60:13 |
| 123:3 124:4 | 112:22 | 67:14 74:3 | 61:14 62:7,10 |
| 128:16 129:18 | **given** 46:21,21 | 75:11 81:24 | 63:11,13 66:3 |
| 130:21 131:5 | 53:1 93:4 | 84:18 98:18 | 72:15,18 73:7 |
| 131:20 132:4 | 138:10 156:6 | 119:11 128:23 | 74:24 78:11 |
| 132:10 133:2,5 | 168:9 171:9 | 132:2 133:22 | 84:17 88:6,13 |
| 133:15 134:17 | **gives** 92:4 | 134:8,20 136:3 | 90:10 97:10 |
| 134:18,21 | 99:18 | 140:18 149:1 | 99:1 119:15 |
| 135:24 136:1 | **glean** 36:17 | 150:4,6 162:17 | 124:18 129:6 |
| 137:4,12 138:4 | **go** 6:11 9:10 | 166:16 | 133:17 135:16 |
| 138:6,9,11,12 | 13:8,20 21:1 | **good** 6:2 8:3,4 | 135:18 136:15 |
| 138:16,22 | 21:10,23 31:10 | 87:4,7 112:24 | 146:23 149:21 |
| 140:5,14 141:7 | 39:14 40:23 | 113:6 124:18 | **gripes** 73:6 |
| 141:17 142:5 | 46:5 62:22 | 159:3 | **ground** 17:21 |
| 142:12,21 | 72:11 85:2 | **gotten** 81:22 | 27:4 29:8 |
| 143:1,7,22 | 87:14 89:7,10 | **grace** 3:11,14 | **group** 115:1 |
| 144:5 145:16 | 91:18 99:16 | **graphing** 44:12 | **guess** 46:13 |
| 146:9 151:3 | 102:13 108:17 | **gray** 110:2 | 54:15 91:24 |
| 152:15,23 | 120:8,20 139:6 | **grbich** 3:24 | 101:19 131:12 |
| 155:13 158:21 | 140:8 143:20 | 6:22 | 148:16 153:15 |
| 158:23 159:8 | 144:14 151:6 | **great** 9:14 | **guideline** 101:8 |
| 160:4 161:9 | 155:23 166:13 | 30:17 73:1 | **h** |
| 162:2 165:13 | **goal** 125:12 | 125:15 167:6 | |
| 169:4 170:1 | **goes** 52:16 | **greater** 113:16 | **h** 4:11 170:3 |
| 171:1 | 89:24 140:11 | **grimmer** 4:17 | **half** 51:7,7 |
| **georgia's** | 140:11 | 46:2 47:10,18 | 80:10 95:10,13 |
| 108:24 122:20 | | 62:23 67:4 | 97:12,14,16,17 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[half - impact]**                                          Page 17

120:15 135:4,7
135:10,11
155:15 159:19
159:24 162:12
**hampshire**
68:8 69:1
**hand** 168:12
**happen** 35:12
122:2,24
157:12 158:8
**happened**
18:15 29:19
108:17 156:5
**happening**
134:11
**happens** 34:6
151:11 164:2
**happy** 64:2
66:4 70:5,16
136:9
**hard** 57:20
139:2,3 145:12
157:13 160:16
165:21
**head** 31:20
113:24 114:5
145:13
**header** 48:9
**heading** 14:16
15:17 48:5
61:6
**hear** 31:23
**heard** 20:2

**hearing** 31:21
**held** 6:19
**help** 57:10
150:6
**helpful** 40:12
40:14
**helping** 146:5
**helps** 105:8,9
**hereto** 171:7
**hey** 125:23
**high** 72:5 73:23
83:2 93:3
105:2 116:19
**higher** 49:9,13
50:2,14 53:15
54:2,21 56:5
59:20 73:8
82:9,17 84:4
85:23,24 116:3
**highest** 22:18
47:20 48:13
49:18,21 52:4
54:7 59:11
60:9
**hit** 43:18 87:6
**hitting** 87:12
**hmm** 25:10
50:12 51:13
66:7,12 88:9
152:6
**hold** 9:21 12:2
**honest** 34:21
**honestly** 36:24

**hopefully** 57:7
**host** 38:4
**hour** 44:8 47:4
58:16 63:1,2
63:10,10 68:12
69:7,9,16 71:5
80:10 85:22
86:6 88:18
97:12,13
**hours** 14:18
15:18 16:19
20:6 25:17
28:6,10,11,16
29:24 30:8,11
30:13 31:14,23
32:4,8 33:3,3
33:10 34:1,3,5
34:5,10 35:6
35:19 36:13,15
38:5 39:19,21
40:2,7 41:18
41:19 42:3
43:15 44:3,23
44:23 47:8,13
56:15 57:10,14
57:15 58:13,23
**huge** 123:15,16
133:19 138:10
153:5 159:20
159:21 162:23
**huh** 9:3 11:22
15:24 25:4
64:16 80:20
119:13 128:12

**human** 125:7
**hundred** 20:10
**hurting** 146:6
**hypo** 108:10
**hypothesis**
32:15 100:1,5
103:23 104:6,7
104:9,11,12,18
**hypothetical**
28:23 102:13
105:24 107:18
108:14 164:10
**hypotheticals**
111:5

**i**

**idea** 134:19
**identification**
9:7 13:17
21:20
**identified**
143:18
**identify** 126:11
**ignore** 84:7
**ignored** 83:12
**ignoring** 94:18
**imagine** 115:2
**impact** 10:24
11:7 25:17
27:6 58:18
121:11,18
128:2 144:11
147:10,17,18
148:12 153:21

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

157:18 159:20
162:23 163:16
163:24 166:1
**implementati...**
154:10 157:12
163:11
**implemented**
122:13 152:15
158:11 162:3
163:4
**implication**
29:21 43:10
125:1
**implied** 126:17
**implying**
148:18
**important**
85:18 123:4
**imposed**
165:14
**imposing** 43:4
**imposition**
58:15,17
**impossibility**
33:11 116:20
116:21
**impossible** 26:8
30:22 46:19
**inclined** 21:24
**include** 130:3
130:14
**included** 69:5
125:21

**includes** 24:13
126:13 138:6
**including**
133:11
**increase** 15:1
19:9 36:4 40:2
44:2 46:1,17
**increased** 15:8
**increases** 14:18
47:9,11
**increasing**
31:22
**independently**
67:10
**index** 5:1 159:1
**indicate** 66:14
68:8 153:21
**indicated** 68:11
168:5
**indicating**
105:6
**individual** 75:9
77:14
**individuals**
3:21
**inferencing**
164:12
**information**
12:9 111:21
133:18,21
**informs** 27:10
**ins** 162:12,16
**integrity** 11:16

**interested** 7:6
168:10
**intermediate**
98:10
**international**
72:20
**internet** 74:7
**intervenor** 3:6
**interviewed**
66:8,9
**introduce** 8:24
13:9 21:10
**investments**
156:23 157:2,8
157:20
**involve** 158:20
**involved** 73:21
**irrelevant**
36:10
**isolated** 123:1
**issue** 65:22
97:19
**it'd** 152:1
**iv** 3:3

**j**

**j** 2:8,21
**jaffe** 2:8,20
**jaffe.com** 2:11
2:23
**january** 21:12
25:3 34:8 44:2
163:21

**jcusick** 2:18
**jfk** 6:20
**job** 159:3
**john** 1:15 2:15
**joshua** 2:21
**jpb** 1:5
**jprince** 2:23
**july** 9:2,12 10:8
12:8
**jump** 14:10
**june** 12:13
13:11 46:2
77:21
**justin** 4:17

**k**

**k** 2:9,21
**karen** 1:18 7:1
168:3,16
**keep** 36:14
84:17,17
135:15 139:3
145:13
**kennedy** 1:15
**kin** 168:10
**kind** 14:12
28:22 31:21
32:5 36:24
37:1 43:9
44:13 61:15
76:2 96:14
114:18 116:14
126:17 133:8
134:19 142:2

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

**[kind - lines]**

Page 19

| | | | |
|---|---|---|---|
| 143:18 149:3 157:10 | 123:23 124:1,7 124:18 125:2,7 | **larger** 55:5,7 80:12 116:23 | **limits** 10:8 |
| **know** 8:11,16 | 125:12,24 | 131:10 137:12 | **line** 5:4,6,9,12 10:10 11:7,11 |

143:18 149:3
157:10
**know** 8:11,16
12:18 15:5,12
17:3,8 26:21
27:1,5 30:23
31:3,23 33:6,8
33:20,21 35:4
35:5,9,11,19
39:5,10 40:12
40:15 42:5
44:12,16,19,22
45:3,11 46:23
48:19 49:6
50:24 53:11,14
55:16 59:4,5
67:6,21 69:4
71:17,20,23
72:10 73:3,6
73:12,18,20
74:2,5,9 76:10
77:1,9,16,20
81:23 82:18
91:13 92:14
97:20 98:10
102:8 103:1,7
103:9,13
104:12,21
105:10,11
107:2 109:16
110:6,18,22,22
115:1,5 117:9
119:5,24
123:11,12,17

123:23 124:1,7
124:18 125:2,7
125:12,24
126:16,17
127:23 128:3,8
129:3 130:13
131:2 133:12
133:19 134:11
140:18 143:24
149:9,11,13,20
150:4,7,10
151:1,19 152:1
153:2,20,24
154:1,2,7,11,14
154:19 155:5
156:17 157:9
157:11 158:7
159:6,7 160:3
160:17 161:18
161:20 162:12
162:18 163:3,6
165:6
**knowing** 33:20
123:10,23
160:17,17
**knowledge**
128:9 158:16
159:17

**l**

**language** 106:9
124:19 146:3
**largely** 24:20
122:4

**larger** 55:5,7
80:12 116:23
131:10 137:12
142:21
**lastly** 11:14
**law** 3:11 16:5
17:13,19,23
18:16,23 26:23
36:18,21,21
37:23 38:2,19
39:1,12
**lawyers** 126:21
**leeway** 39:2
**left** 105:14
**legal** 1:22 2:15
30:10 169:23
**length** 11:7,11
147:10,18
**lets's** 84:16
**level** 58:2
**liberties** 2:3
**license** 160:23
**likelihood** 34:2
34:15
**likely** 21:4 37:9
46:3,8,10,12
83:6
**limitation**
33:13 34:18
35:1
**limitations**
31:9,9
**limited** 56:14

**limits** 10:8
**line** 5:4,6,9,12
10:10 11:7,11
18:7 35:5
38:10 42:7,11
42:20 43:5,6
44:1,5,7 72:19
74:23 75:19
76:20 77:3,7
77:10 78:14
79:5,9 81:4
83:8 84:22
85:21 90:12
93:17 94:13
95:23 100:6
107:19 108:3,4
108:6,17
109:22 110:5,8
111:20 115:3,4
120:23 123:7
130:16 137:13
146:15 147:10
147:18 170:4,7
170:10,13,16
170:19
**linear** 32:1
**lines** 11:2 25:19
61:3,6 75:8
77:1,2,15
79:18 80:2
106:22 107:14
107:23 108:18
122:7,18
123:11,17,24

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[lines - lynn]**                                                    Page 20

| | | | |
|---|---|---|---|
| 124:6,8,11,14 | **lives** 57:7 66:15 | 148:3 150:21 | 146:20 149:16 |
| 124:15,20 | **living** 67:1 | 164:4,24 | 149:19,24,24 |
| 125:8,14,23 | **llp** 2:8,20 3:16 | **longest** 159:10 | 150:2 |
| 126:6,6,8 | **local** 156:5 | **look** 9:10 12:18 | **looking** 12:21 |
| 129:6,9,12 | **location** 31:9 | 13:20 16:5 | 14:16 15:16 |
| 132:18 133:23 | 106:2 | 21:2,9,24 | 27:1 39:7 49:6 |
| 141:24 143:2 | **logic** 38:11 | 23:18,22 24:14 | 50:6,15 52:8 |
| 143:20 144:5 | **logistics** 27:5 | 25:2,7 27:10 | 63:17,23 90:9 |
| 144:11,20 | 29:9 | 27:20 29:7 | 90:22 95:17 |
| 145:4,16,17,21 | **long** 25:19 61:6 | 31:4,13,19 | 96:15 97:9 |
| 145:24 148:3,9 | 79:18 83:7 | 33:18 34:15,17 | 104:2 130:10 |
| 149:6,7,7 | 102:19 105:6 | 35:7,10,18 | 131:6 132:23 |
| 150:21 158:16 | 106:22 107:14 | 37:22 39:18 | 133:1,1 134:24 |
| 158:19,21 | 107:19 108:18 | 40:21 42:12 | 134:24 150:4 |
| 159:5,10,17,23 | 115:3,4 122:18 | 45:19 48:15,20 | **looks** 9:13 |
| 161:9,14,15 | 123:24 124:6 | 50:7 51:4,11 | 13:24 52:18 |
| 162:6 163:17 | 126:13 133:23 | 53:10 61:1 | 72:14 77:3 |
| 164:3,24 166:2 | 141:24 143:20 | 62:10 63:8,15 | 86:15 90:23 |
| **listening** 120:3 | 144:11 149:6 | 71:11,12 77:2 | 95:5 158:22 |
| **literature** | 158:16,19 | 77:4,15 78:21 | **lot** 33:7 71:13 |
| 149:4 | 159:5,17 | 84:16 85:20 | 85:17 107:16 |
| **litigation** 126:7 | 161:14 162:5 | 93:20 120:18 | 111:11 119:10 |
| 127:16 | **longer** 9:21 | 120:20,22 | 141:13 145:9 |
| **little** 44:20 | 12:2 68:12 | 125:6,8,23 | 146:5 157:17 |
| 48:20 51:1 | 82:16 99:3 | 129:8 131:19 | 160:24 |
| 55:14 62:16 | 100:7,20 101:5 | 147:3,11,16 | **lots** 122:19 |
| 117:17 129:23 | 101:7,14,19,21 | 148:19 150:22 | 133:24 141:24 |
| 130:6 138:7,15 | 102:6,16,22 | **looked** 15:4,11 | 142:13 144:14 |
| **live** 43:2,3 47:2 | 103:2 105:17 | 23:6,14 26:12 | **lower** 93:18 |
| 58:11 66:16,17 | 108:23 109:3 | 32:19,24 34:12 | 94:13,17 |
| 151:15,17 | 109:12 110:12 | 34:19 45:6 | 115:12 156:19 |
| **lived** 18:1 28:4 | 117:12 119:17 | 56:2,21 63:12 | **lynn** 123:19 |
| 43:2,14 47:7 | 126:5 129:7,10 | 65:11 76:24 | |
| 68:4,9 | 145:6,8,21,24 | 77:7,7,22 78:9 | |

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

**[m - mi]**                                                    Page 21

| m | |
|---|---|

**m**  1:18 3:17
   168:3,16
**machine**  168:7
**machines**
   161:21
**macon**  3:13,14
**made**  27:4 76:8
   88:8,21 89:14
   89:17 125:19
   162:6 171:5
**magically**
   158:8 161:1
   164:11
**mail**  10:14,18
   70:13,19 74:6
   146:14 149:18
**main**  12:11
   66:19
**majority**  17:24
   28:3 42:16
   46:22 47:6
   58:11 67:16
   128:6
**make**  9:24
   16:24 18:8,12
   26:24 27:1
   36:2 38:20
   39:2 43:13
   45:12,14 51:10
   57:22 59:8
   68:18 70:18,21
   78:22 88:6

   108:17 113:1,5
   114:2,14 117:3
   117:16 126:18
   128:14 131:18
   132:20 136:4
   141:23 142:6
   144:8 145:2
   149:7,7 150:20
   160:9 165:7,9
   166:6
**makes**  38:24
   68:3 71:9
   99:21 104:11
   124:20 130:7
   130:11 133:21
   151:19 165:16
   165:21
**making**  8:5
   28:2,22 55:17
   79:17 86:8
   96:10 117:8
   145:9,17
   149:10 161:7
**map**  52:24
   129:17 157:10
**margin**  92:16
   98:4 99:20
   105:7,13
   139:17
**margins**  103:7
**mark**  44:8
**marked**  5:11
   9:6 13:16
   21:19

**martin**  3:11
**massive**  124:6
   152:16 153:21
   154:19
**master**  1:4
**matches**  77:17
**materials**
   132:15
**math**  113:23
   114:18,21
   116:9,10
   118:14 119:6
   135:12 136:22
   137:1
**mathematician**
   113:4
**mathis**  3:16
**matter**  6:15
   54:20 67:14
   126:9
**mccarthy**  3:3
**mean**  8:16 17:7
   28:24 35:10
   38:4 39:15,18
   46:10 49:5
   54:15 78:2
   79:16 83:17
   94:21 106:6
   110:20 113:14
   115:13 127:20
   131:1 140:17
   143:14 146:12
   149:17 159:21
   160:6,7 162:14

   163:23 164:12
**meaning**
   104:17
**meaningful**
   71:18
**meaningfully**
   111:8 138:18
**means**  68:22
   115:12
**meant**  77:13
   157:9
**measure**  54:20
   54:23 111:8
**measured**
   59:12 60:7
**measurement**
   103:9
**media**  6:12
   87:17 88:1
   167:8
**memorize**
   136:13
**mental**  114:18
   119:6 135:12
**mention**  100:17
   100:19
**mentioned**  77:5
   86:3 97:19
   149:9 154:14
**method**  132:21
**methodology**
   73:7
**mi**  1:5

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[microphones - necessarily]**                                    Page 22

| | | | |
|---|---|---|---|
| **microphones** 6:5 | 101:21 102:1 | **mistake** 71:9 | **naacpldf.org** 2:18 |
| **mid** 1:22 | 102:16 103:2 | 72:2 76:7 | **name** 6:22 8:21 |
| **middle** 55:6 | 103:19,20 | **mit** 159:2 | **named** 3:22 |
| 89:4 | 104:3 105:17 | **mixed** 53:18 | **nation** 140:15 |
| **midterm** | 106:4,6,24 | 55:1,3 | **national** 3:7,7,8 |
| 114:15 | 107:11,12,21 | **mm** 25:10 | 67:6 122:20,22 |
| **midterms** | 108:5,6,7,15,18 | 50:12 51:13 | 127:23 128:15 |
| 49:23,24 | 109:4,12 110:1 | 66:7,12 88:9 | 129:8,13 |
| **millions** 109:10 | 110:3,4,12 | 152:6 | 130:21 132:5 |
| **minimal** 18:2 | 113:11 116:24 | **moment** 18:10 | 133:18 134:7 |
| 42:8 53:4 | 117:12,20 | 85:20 | 137:16,17,17 |
| **minimum** | 118:6,12 | **moments** 164:8 | 138:5,8,23 |
| 18:20 41:20 | 119:17 120:13 | **momentum** | 141:5 142:4 |
| 42:23 | 123:22 124:2 | 29:14 30:1,17 | 143:5,17 144:2 |
| **minus** 97:20 | 135:3,20 | 31:6 37:6,10 | 153:7 165:18 |
| **minute** 87:8 | 136:17 137:5 | **morning** 6:2 | **nationally** |
| 102:22 123:21 | 137:14 154:24 | 8:3,4,6 | 129:17 131:5 |
| 124:3 155:1,15 | 159:19 160:1 | **move** 67:16 | 134:6,8 135:1 |
| 162:14,22 | 162:13,16,19 | **moved** 68:24 | 136:1,2 138:13 |
| **minutes** 61:11 | 162:20 | 69:12 72:5 | 140:6 141:18 |
| 61:20 63:1,9 | **mischaracteri...** | **moving** 34:4 | 143:19 |
| 74:23 75:19 | 24:22 | 59:7 | **nationwide** |
| 76:20 79:5,21 | **misclick** 105:12 | **multimillion** | 68:21 112:17 |
| 83:8 84:5,7,9 | **misclicked** | 73:19 | 112:20 122:11 |
| 84:22 85:6,7 | 103:11 | **multiple** 37:8 | 142:22 |
| 86:15,16 87:7 | **misclicking** | 44:24 58:23 | **natural** 87:6,12 |
| 90:13,23 91:1 | 103:15 | 99:17 131:4 | **naturally** |
| 93:17 94:13 | **misrepresent...** | 153:2,20,20 | 125:10 |
| 95:5,6 96:24 | 20:11 | **multiply** 92:5 | **nearly** 33:11 |
| 97:11 98:22 | **misrepresenti...** | **mute** 6:7 | 128:7 |
| 99:4 100:7,13 | 45:11 | | **necessarily** |
| 100:20,24 | **misses** 85:17 | **n** | 27:3 50:19 |
| 101:6,7,14,19 | **missing** 90:18 | **n** 2:1 4:1 | 81:6 114:23 |
| | | 150:18 | |

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re                    August 15, 2025

[necessary - offered]                                    Page 23

**necessary**
144:1 171:6
**need** 17:7 38:19
44:2 53:8 87:2
89:14 105:2
111:9,22
165:10
**needs** 88:21
89:17 144:2
**negative**
163:16,24
166:1
**neither** 153:13
168:9
**net** 163:16,24
166:1
**never** 19:21
20:2 102:9,10
117:13 144:8
148:24
**new** 2:17 14:17
40:7 68:8,24
122:12 123:8
152:16
**nine** 39:24
**noland** 3:11
**nolandlawfir...**
3:14
**non** 148:22
**noon** 39:24
**normal** 92:6
**northern** 1:1
6:17

**notary** 1:19
168:3,17
171:13,19
**note** 6:5 169:10
**noted** 46:1
47:10 171:7
**notice** 168:5
**noticeable** 53:3
**november**
27:20 28:17
32:24 34:10
35:8 56:15
156:7,11,14
**nuance** 101:15
**nuances** 44:14
160:21
**null** 100:1,5,5
100:11,23
101:12,13,18
103:17,21,23
104:5,6,8,10,12
104:18 105:2
105:15 106:5,9
106:15
**number** 4:13
21:8,8 28:7,10
28:11 29:24
30:8 31:22
32:8 33:2,3,24
34:3 35:13,19
36:13 41:18,20
42:2,18 44:23
51:4 53:15
58:13,17 59:19

60:8 62:24,24
69:20 76:4,5
77:16,18 79:9
80:9 85:24
89:21 92:7,8
93:24 94:17
97:21 98:21
99:21 115:6
120:14 150:11
153:8 155:6
**numbers** 20:13
23:7 24:8,10
50:24 54:16
59:20 60:14,20
62:6 63:3,6,8
63:10,13,21
64:6,13 66:2
67:10,19,20
70:11 71:17,18
71:22,23 79:7
88:12 89:3,5
89:13 94:2
95:3,18 113:7
114:17 118:16
119:2,11
133:14 136:13
137:18
**nw** 2:4,9,21
**ny** 2:17

**o**

**oath** 7:4
**object** 27:12,23
28:19 29:11

36:6 37:19
40:9 56:17
58:7 75:21
78:17 79:23
81:20 82:10
83:14 110:9,24
112:14 131:22
141:19 148:4
157:5
**observe** 102:15
104:21 164:18
164:19
**observed**
107:10,11
**obtain** 112:4
**obviously**
101:9
**occur** 155:3
**odd** 114:14
117:2,17
**offer** 18:18,24
19:3 27:8
37:13,14 40:4
45:17 57:17
83:10 126:5
**offered** 19:22
19:23 20:16,21
25:19 31:5
32:9 34:1
35:19 38:3,3,6
38:6 39:24
40:3 43:14
44:17 45:4
47:8 58:12

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

**[offering - page]**

Page 24

**offering** 10:10
10:13,22 11:5
11:10,15 36:12
37:17 44:10
58:21 105:24
**offhand** 89:23
98:8
**office** 153:5
155:14
**offices** 1:14
38:14
**official** 168:12
**offs** 133:19
**oh** 49:16 94:9
120:1 128:20
136:5 153:16
156:13
**okay** 9:19 10:2
12:15 13:2,6
14:9,22 15:15
16:10 18:5,11
18:22 19:6
20:24 22:7,12
24:16 25:1,12
26:4 34:22
35:2,15 43:18
43:23 45:20
46:15,20 48:4
48:10,22 56:10
56:13 61:16
64:14 65:7,19
69:22 70:2,6
74:18 75:15
78:7 79:2

80:17 81:16
84:15 86:2,12
87:10,13 88:15
89:6,22 90:2,4
90:20 91:12,17
92:12 94:9
95:16 96:8
98:3,9,13,17
100:9,21 101:2
105:22 106:12
106:16,20
107:5,8 108:12
109:14,19
110:16 111:14
112:21,24
114:4 116:4
117:23 118:3,8
119:23 120:7
120:10,17
122:3,9 125:17
126:20 127:8
128:10,20
130:1,17
131:15 134:23
136:7,11,14
137:11,19
138:19,24
140:2,12 141:8
143:12 145:1
145:18 147:15
149:22 151:9
152:3,19 155:8
155:11 159:11
163:9,20 166:7

166:12
**omitted** 138:9
138:16
**omitting**
133:17,20
**ones** 54:24
118:16 128:16
**online** 74:13,13
**open** 135:17
**operated** 10:15
**operating**
17:20
**opine** 24:11
**opinion** 10:10
10:18 11:5,11
11:15 16:18
17:7,9 96:11
122:15 129:21
132:6 140:3
141:3 145:3,4
146:10
**opinions** 9:20
10:14,23 11:21
11:24 12:4
24:12
**opportunities**
43:8 58:19
**opportunity**
115:13
**optional** 16:3
17:15 38:2
**oranges** 117:16
**order** 36:1
165:7

**orig** 20:18
**original** 21:2
31:18 40:13,17
58:10 118:17
124:9 144:4
163:18
**originally** 45:6
**ought** 39:10
**outcome** 7:6
168:10
**outlier** 69:3
**outside** 32:13
106:2 151:3
**overall** 80:7,8
89:18 90:1
**own** 63:19
64:23 65:3
79:15 80:13
127:13 158:15
159:16

**p**

**p** 2:1,1 74:21
**p.m.** 166:20,21
167:14
**pad** 157:24
**page** 4:4,13 5:4
5:6,9,12 15:22
18:8,13 25:7
28:2 35:11,13
42:5 45:24
62:11,13,15
81:18 95:17
98:20 113:2,5

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[page - person]**                                              Page 25

| | | | |
|---|---|---|---|
| 128:19 129:5 | 93:21 94:6 | 101:10,20,22 | 84:4 86:17 |
| 158:13 170:4,7 | 134:5,21 | 102:9,16 | 91:1,6,23,24 |
| 170:10,13,16 | 151:20 153:14 | 103:12,13,15 | 92:1,16,18 |
| 170:19 | **particularly** | 105:5,5,11 | 93:16 94:12 |
| **pages** 40:22 | 25:18 141:22 | 110:3 125:9 | 95:7,13 96:23 |
| **pairs** 63:3 | **parties** 6:11 | 134:2,3 138:12 | 97:12 105:18 |
| **pandemic** | **parts** 136:10 | 149:18 153:22 | 113:20,21 |
| 57:11 | **party** 3:6,9 7:4 | 160:22 162:5 | 114:8,10,19,24 |
| **panel** 74:13 | 168:10 | 162:21 163:6 | 115:24 116:10 |
| **paper** 161:23 | **passage** 39:9 | **percent** 49:11 | 116:12 118:4 |
| **paragraph** | 84:23 90:14 | 50:20,22 61:10 | 118:13 119:15 |
| 22:16,17,24 | **past** 26:13 | 61:10,19,19 | 119:19 120:11 |
| 45:24 47:19 | 31:13 38:16 | 69:7,10,13 | 135:4,8 136:24 |
| 51:11 52:1,22 | **paste** 63:5 | 75:18 76:10,11 | 137:5 138:2,20 |
| 52:23 53:13 | **path** 98:11 | 76:18 82:20 | 139:9 140:4 |
| 54:5,6,16 55:6 | **pattern** 122:22 | 86:5 89:2 93:7 | **perfect** 14:14 |
| 62:13,14 74:23 | 129:9 134:5 | 97:10,14,17,17 | 100:9 |
| 80:6 81:17 | 142:4 143:6,21 | 99:11,12 | **perfectly** |
| 83:19 84:16 | 144:2 | 101:20,22 | 105:10 |
| 90:10 128:22 | **patterns** 33:24 | 103:13 105:5 | **perform** 35:17 |
| 129:11 143:4 | 122:24 129:16 | 112:1 115:22 | 111:15,22 |
| **paragraphs** | 131:4 143:17 | 117:11,21 | 141:15 |
| 129:4 | 148:19 | 135:19,21 | **performance** |
| **parkway** 3:17 | **pausing** 87:6 | 136:16,19 | 159:1 |
| **part** 24:14 | **pennsylvania** | 137:8,21,22 | **performed** 99:6 |
| 38:17 50:18 | 1:15,17 6:21 | 138:24 140:13 | **period** 16:2 |
| 56:1 90:17 | **people** 42:22 | 140:14,14,21 | 17:14 25:16 |
| 99:24 116:2 | 43:10,13 47:13 | 156:18 | **permits** 26:1 |
| 157:21 | 51:5,8 52:10 | **percentage** | **permitted** |
| **partially** 80:4 | 52:14 53:7 | 46:24 47:1 | 16:14 18:17 |
| **participation** | 66:8,9,11,13 | 50:2,13,16 | **person** 3:24 |
| 122:24 | 67:16 68:18 | 51:2,7 69:14 | 10:19 49:8,12 |
| **particular** | 72:4 96:23 | 69:15,15,20 | 50:16 51:5,15 |
| 23:18 24:6,9 | 99:15 100:6,12 | 76:14 80:7 | 51:24 52:14,21 |

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

[person - possible]

Page 26

54:5,6 55:7,11
56:6 68:4,11
68:21,23,24
69:3,4,11
71:20 76:14
100:23 101:23
102:6,10,18
103:2,10,19
104:20,22,24
106:3 107:19
107:20 108:4,4
108:11,14,16
108:20,22,23
109:5,9,16
**pertains** 54:11
**pettigrew** 1:14
4:5,15,18 6:14
7:20 8:3,23
88:4 168:4
169:5 170:2,24
171:2,4,12
**ph.d.** 1:14 4:5
4:17,18 7:20
168:4 169:5
170:2,24 171:2
171:4,12
**phenomenon**
57:5
**philadelphia**
1:16 6:20
**phone** 74:10
**phones** 6:8
74:6

**physically**
102:15
**pick** 6:6
**piece** 49:17
55:24 78:20
123:6 133:18
133:20 159:4
161:23
**pieces** 111:21
123:19
**pilot** 155:2
**piloted** 153:18
154:8
**pin** 134:14
140:19
**place** 6:10 28:5
28:18 36:15
58:12 102:15
143:1 144:21
144:22 168:5
**places** 154:21
154:22
**plaintiffs** 2:6
2:18 7:11
**please** 6:4,7 7:7
8:16
**plenty** 127:20
**pllc** 3:3
**plug** 92:3
**point** 8:14
42:13 43:1
45:13 51:3,7
53:16 57:8
64:21,24 69:15

73:20 76:3
79:20 80:1,6
87:2,6,12
92:18 97:20
113:20,21
114:9,11,19
115:1 116:10
116:12 118:4
122:10,12
124:4 125:12
126:8,18
132:22 133:1,7
134:22 138:2
139:9 140:4
141:23 142:6
148:16 151:21
155:12 161:4
**pointed** 130:11
146:1
**pointing**
109:24 129:20
130:20,22,23
161:8
**points** 69:14,20
72:1,12 76:15
86:17 91:1,6
92:17 95:7,13
115:16,18,24
116:17,18
118:13 119:16
119:19 120:12
135:5,8 136:24
137:5 138:21
148:16,23

149:2,10 150:6
151:3 161:16
165:5
**policy** 30:3
**political** 73:24
**poll** 73:13,15
73:23 74:11,13
74:14 106:2
157:24
**polled** 63:9
65:15
**polling** 43:4
65:8 73:17
102:15
**polls** 74:1
**pollsters** 74:16
**population**
68:19 105:11
**positing** 66:2
**position** 161:10
163:15
**positive** 126:3
144:10 159:20
159:22
**possibility**
103:14 124:7
150:14
**possible** 33:2
33:15 35:23
38:5 46:17
57:9,12 115:20
119:1 121:11
121:21 148:18
154:4

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**post** 45:18 48:8
66:18,20 67:2
67:3,11,13
68:6 70:10
125:3
**posts** 74:7
**potential**
103:10 127:17
157:14,18
161:19
**potentially**
132:6 157:20
158:6 162:18
164:20
**practical** 43:7
**practice** 17:21
18:15 108:8
**pre** 17:24 66:16
67:5,8 68:5
70:9 143:7,16
**precinct** 11:7
147:9 150:1,2
**precise** 130:15
**precisely** 30:16
163:7
**predated**
156:23
**predict** 31:14
32:4
**predictor** 32:10
**presence** 33:8
**present** 2:13
**presented**
54:23

**president's**
100:15 106:18
109:1,24
**presidential**
49:20 114:16
**presidentials**
95:1
**press** 123:13
153:4 154:3
155:13 161:11
**pressure**
162:10
**presumably**
133:4
**presuming**
89:16
**pretty** 41:23
69:17 74:14
133:19 134:9
156:19 165:8
**previous** 15:9
29:7 31:4 56:7
57:15 59:13
60:11 73:3
89:8 93:18
94:14,20,23
129:4 131:11
131:11 132:15
133:16 146:18
149:9 152:24
**previously** 19:7
19:12
**prince** 2:21

**prior** 25:20
30:4 39:9
58:14 148:20
153:16 158:7
162:2
**private** 6:6
**probably** 21:7
34:4,16 73:16
73:20 129:22
138:3
**problem** 61:6
79:19 80:2
86:24 106:23
107:15 108:18
108:22 109:6
109:13,16,20
109:23,24
110:1,7,14,21
110:22 111:12
**procedure**
128:14
**proceed** 7:18
**proceeding**
87:21
**process** 10:14
96:15 124:5
152:17 162:6
162:11
**production** 5:6
**professional**
1:18
**program** 123:7
123:15,20
127:14 153:6

153:19 154:8
157:24 160:12
161:1,8 162:3
162:9 163:3,12
**programs**
158:8
**project** 159:2,2
159:7
**promise** 112:22
**promised**
120:22
**pronounced**
113:11,15
**proportion**
49:10 93:5
**proportions**
139:14
**provide** 25:24
70:3 82:14
97:3 122:6
126:2 132:17
134:7 142:11
142:24
**provided** 15:23
18:2 19:8 26:6
30:20 84:13
100:18 123:12
123:19
**provides** 99:1
**providing**
10:17 125:3
**provisions**
36:20 39:9
46:3 124:12

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[pubically - record]                                              Page 28

| | | | |
|---|---|---|---|
| **pubically** 75:14 | **question** 8:15 | 83:4 95:22 | 144:1 148:13 |
| **public** 1:19 | 17:1 18:6 | 96:5 | 162:9 165:9 |
| 72:20 153:3 | 26:15 30:17,24 | **raffensperger's** | **reason** 17:6,17 |
| 154:13 168:3 | 31:19 49:1,4 | 156:22 | 19:19 33:23 |
| 168:17 171:19 | 52:16 66:18,19 | **ran** 69:23 | 48:11 49:14 |
| **pull** 118:18 | 66:21 67:2,3 | 88:16,20 | 53:2 56:2 |
| **pulled** 13:3 | 67:13 81:13,23 | **random** 73:13 | 64:12 71:6 |
| 95:19 | 90:5 94:8 | 73:15 | 75:2,16 85:14 |
| **purported** | 98:19 100:10 | **randomization** | 118:10 122:20 |
| 65:21 | 104:10 118:10 | 165:10 | 126:2 152:13 |
| **purporting** | 126:22 128:24 | **randomly** | 160:24 169:11 |
| 141:16 | 142:16 | 165:12 | 170:6,9,12,15 |
| **purpose** 125:11 | **questions** 5:11 | **rate** 85:23 | 170:18,21 |
| 125:22,22 | 18:7 143:13 | **rates** 48:7 | **reasons** 27:19 |
| 133:11 | 150:23 167:3,5 | **rather** 32:1 | 33:13 34:18 |
| **pursuant** 168:5 | **queueing** | 124:15 | 35:1 132:17 |
| **push** 146:15 | 123:23 128:3 | **rational** 96:9 | 145:10 146:5 |
| **pushed** 10:19 | 149:5 | **raw** 75:6 | **rebuttal** 4:14 |
| **put** 46:11 75:13 | **quick** 119:6 | **reach** 99:6 | 73:3 84:14 |
| 105:20 123:14 | **quickly** 153:22 | **read** 22:22 | **recall** 16:9 |
| **putting** 58:15 | **quite** 64:7,13 | 25:21 41:7,9 | 35:12 82:22 |
| 127:1,19 | 83:23 131:9 | 143:10 159:13 | 111:23 112:2 |
| 154:21 | **quo** 30:2 31:6 | 169:9 171:5 | 124:13 |
| **q** | **quote** 156:6 | **reading** 154:13 | **receipt** 169:17 |
| | 163:18 | 161:11 | **recent** 8:8 |
| **quality** 73:8,23 | **quotes** 123:18 | **reads** 14:17 | 34:17 |
| 82:17 83:2 | **r** | **ready** 22:7 | **recently** 152:15 |
| **quantify** | | **real** 158:11 | **recess** 87:20 |
| 151:12 | **r** 2:1 168:1 | **reality** 133:23 | 166:19 |
| **quantitative** | 170:3,3 | **really** 33:4 35:3 | **recommendat...** |
| 151:1 164:13 | **race** 80:4 93:16 | 57:20 59:22 | 101:4 104:15 |
| 165:7 166:4 | 94:12 | 64:3 73:23 | 106:18 |
| **quantity** 131:7 | **racial** 80:18 | 77:10 104:11 | **record** 6:3,11 |
| | 81:19 82:5,8 | 104:16 125:15 | 7:9 8:22 17:12 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[record - reported]                                        Page 29

41:10 59:21
65:23 87:15
166:14,17
167:1 168:9
**recorded**   6:13
168:7
**recording**   6:9
**rector**   2:16
**reduce**   152:22
**reduced**   155:16
160:5
**reference**   8:9
21:11 22:14
78:2,6 151:11
155:23 158:13
**referenced**
11:20 35:6
78:11 88:17
108:11 152:5
152:21 153:11
153:14 155:2
158:15 169:6
**referencing**
21:14 59:15
84:12 158:18
**referred**   118:20
**referring**   8:10
70:23
**reflecting**
64:11
**reflective**   27:3
68:19 105:10
**refute**   125:19

**regarding**
15:23
**region**   1:22
**registers**   3:20
**registration**
3:21
**reinterviewed**
66:11
**reiterate**   32:7
58:10 132:13
**reject**   100:23
101:12,18
103:21 105:2
105:15 106:5,9
**related**   7:4
43:21 72:19
123:10 154:16
**relates**   24:6
**relationship**
97:4,6
**relative**   126:7
**relatively**   32:20
32:21
**release**   155:13
**releases**   123:14
153:4 154:3
161:11 162:10
**relevant**   40:6
42:15 76:2
122:23 126:8
133:20 141:22
149:2,3 157:21
**relies**   61:24
74:6,6

**rely**   75:11
**relying**   166:6
**remember**   8:19
16:16 34:12,21
40:18 49:1
62:11 69:13
89:20,20,24
98:8,12 99:14
99:15 120:5
148:8 154:6
159:6 160:20
**remembered**
89:23
**remind**   40:14
**reminding**
70:14
**remove**   76:13
**replicate**   63:18
65:18 67:10
**replicated**   65:6
65:16
**replication**
64:17
**report**   4:15,16
4:18 8:8,9,15
9:2,12,15,21,24
10:8,9,23 11:6
12:8,12,17,19
13:9,10,21
14:8,11 15:5
17:23 20:4,14
21:2,13 22:10
22:14,16 23:23
24:2,7,9 25:3

28:3 34:8,20
35:16 40:17
42:1 44:2
45:14,15,22
46:2,24 47:1
56:12,20 58:10
61:14,18 62:7
64:18 65:14,15
65:21 71:13
72:13,15,23
74:24 77:8,11
77:17,21,24
78:4,6,10,12,24
83:11,12,18
84:17,18 85:19
88:6,13 90:10
90:18 95:18
97:3 98:20
99:1 100:19
103:3 104:22
118:17 120:21
124:10,18
126:14 129:6
129:12 132:15
144:4,13
146:18,23
149:10,21
163:19,21
**reported**   66:24
69:10 74:22
75:18 76:19
77:16 79:4
84:21 85:21
86:16 90:12,22

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

90:24 95:6
101:24
**reporter**  1:19
6:24 7:17
168:16
**reporting**  82:8
84:8
**reports**  8:11
10:4 11:23
12:1,5 14:11
24:23 62:23
69:7 75:2 76:5
76:10,11 77:18
78:15 95:9
103:20 121:23
146:13 147:24
**represent**  16:7
**representation**
85:15,17
**representing**
2:6,11,18,24
3:6,14,20 6:23
**represents**  42:7
**republican**  3:6
3:7,7,8,9
**request**  5:6
70:19,22 155:9
**requested**  14:4
**require**  25:13
**required**  16:3
16:12 17:14,15
17:20 18:13,17
19:18 41:20
42:8 43:15

58:13 171:13
**requirement**
25:16
**requires**  18:23
25:9 41:18
42:24
**rereporting**
61:15
**research**  73:11
74:1,15 124:1
124:1 128:4
132:21 139:21
149:5 151:3,8
158:15,19,22
159:16 164:14
164:23 165:3
165:11 166:3,4
**researcher**
124:19 150:5
152:1
**respect**  80:18
85:13
**respected**
74:16
**respond**  12:14
23:24 72:18
146:23
**respondent**
68:2,9
**respondent's**
75:10
**respondents**
83:24 92:3
102:5

**responding**
126:10,14
**response**  24:20
75:10 84:13
146:2
**responses**  67:7
69:1 71:21
**restate**  85:3
114:5
**restricted**
29:23
**result**  58:5 69:2
102:11 148:2
148:22
**resulted**  150:21
**results**  80:23
80:24
**return**  135:16
169:13,16
**reversion**
151:10
**revert**  144:2
**reverts**  143:6
143:15,16
**review**  12:9,16
169:7
**reviewed**  12:11
14:3 22:3 41:2
41:13 121:24
124:17 132:16
**ridiculously**
73:22
**right**  10:16,21
11:3,9,13,18

14:7,21 15:19
15:20 16:17,20
18:5,7 21:23
23:2 24:15,24
25:22 26:11,20
30:2,22 36:10
39:13,17,22
42:15,18 47:5
47:12 54:18
55:21 57:3
59:4 60:24
61:4,7,8 64:7
64:13 71:2,24
72:16 81:6
82:1 86:11
88:14 90:5,21
94:7 95:17
96:7 98:5
102:8 107:17
107:19 108:22
111:7 113:9
116:13,14
117:10 118:7,9
120:18 121:5
122:8 123:17
126:4 134:2
135:9 136:3
137:10,18,24
139:7 145:24
146:21 147:7
147:13,23
148:8,14 150:1
156:9 157:1,22

Stephen S. Pettigrew , Ph.D.    August 15, 2025
Georgia Senate Bill 202, In Re

[riverside - schaerr]    Page 31

**riverside** 3:12
**rolled** 154:17
158:3,4 160:11
165:12
**room** 115:7,9
**root** 99:17
**rosborough** 2:3
7:10,11 16:23
27:12,23 28:19
29:11 36:6
37:19 40:9
56:17 58:7
70:12,16,20,24
75:21 78:17
79:23 81:20
82:10 83:14
87:5,10,13
110:9,24
112:14 131:22
141:19 148:4
157:5 167:4
169:1
**roughly** 67:23
**rounded** 50:23
71:17,24 72:3
72:10
**row** 68:11 89:2
143:19
**rows** 75:9
77:14
**rule** 103:14
**rules** 10:18
146:14

**run** 29:2 33:21
38:9 64:23
65:3 74:15
88:11 92:15
130:18
**running** 27:6
73:21 159:4
**runoff** 10:24
11:1

**s**

**s** 1:13 2:1,15
4:5,11 7:20
74:21 169:5
170:2,3,24
171:2,4,12
**sake** 41:10
**sample** 67:23
68:17 82:19,23
82:24 92:2
99:13 103:16
105:3,10
138:13 139:15
149:14 150:18
**saturday** 16:3
16:12 17:15
18:17 19:8
25:14,20,24
39:24
**saturdays**
18:24 26:6
30:20 37:13
44:10,15,18,24

**saw** 97:21,23
125:16 142:12
142:13
**saying** 31:10
46:16,19 47:19
55:3 81:11
99:9 102:12
105:9 110:6,20
112:9 114:12
117:5 121:10
144:9 157:17
161:6 164:9,16
164:22
**says** 22:17
49:16,17,19,21
51:17 52:3
55:13 79:15
84:1 109:3
123:24
**sb202** 14:17
15:17,23 16:1
16:11,19 17:13
17:22,24 18:4
18:13,16,23
19:10,14,18,21
19:24 21:5
25:20,23 26:7
26:17 28:5,15
29:20,23 30:21
36:5,13,14,23
38:8 39:9 40:1
40:7 41:18,21
42:9,23 43:12
43:16 44:4,17

45:3,18 46:17
47:16 48:1,3,8
58:3,4,14,15
84:23 90:14
112:13 113:13
121:4,8,11,17
123:10 124:8
124:14,16
125:1,3,3,8,9
125:13,24
126:2,5 132:6
132:10,17
133:4,6,21
134:19 143:9
143:23 144:6
144:10,18,18
144:21 145:5,7
145:15,17,21
146:4,14
147:18 148:2
148:20 150:20
151:6,14,17
152:9,15
163:16 164:3,3
164:4,5 165:1
165:12,17
166:1
**sb202's** 46:3
**scan** 160:22
161:24
**scanner** 161:24
**schaerr** 2:8,11
2:20,23

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

| | | | |
|---|---|---|---|
| **schedules** 11:1 | 47:10 50:20 | 116:14 118:15 | 104:5,6 109:2 |
| 58:3 | 51:10 53:3,13 | 119:6 123:15 | **setting** 136:6 |
| **school** 72:20 | 54:9 56:2,8 | 125:18 137:2 | **seven** 97:13,15 |
| **science** 73:24 | 58:22 63:15,24 | 153:7 157:21 | 159:19 160:1 |
| 164:13 | 72:1,6,8 93:14 | 158:1 161:10 | **several** 8:11,12 |
| **scientist** 104:23 | 96:1,16 101:7 | 163:8 | 31:4 137:20 |
| **seal** 168:12 | 103:5 106:3 | **seen** 32:20 64:8 | 140:23 |
| **second** 14:23 | 112:4 118:14 | 121:19,22,23 | **share** 22:18 |
| 17:11 23:21 | 123:2,3 128:7 | 151:2,7 157:3 | 47:20 48:13 |
| 25:5 31:11 | 129:9,16,18 | 160:7 | 49:8,18,22 |
| 43:24 51:18 | 131:4 132:8 | **selection** 64:4 | 50:10,16 51:23 |
| 52:20,23 67:17 | 133:2,3 134:17 | 65:22 | 52:4 54:7 55:5 |
| 80:6 86:23 | 134:17 136:5,5 | **senate** 1:5 6:15 | 55:7,9 56:5 |
| 131:14 | 136:18 138:10 | 169:4 170:1 | 59:11 60:9 |
| **seconds** 155:16 | 141:6 142:3,5 | 171:1 | 84:21 85:4 |
| **secretary** 153:4 | 142:12 143:22 | **senatorial** 3:7 | 90:11 117:19 |
| 153:15 155:13 | 146:20 147:12 | **send** 70:13 | 117:24 135:2 |
| 156:21 | 153:15 163:2 | **sense** 10:8 | 137:3 |
| **section** 14:8,15 | 164:24 | 38:24 43:13 | **shared** 63:24 |
| 14:17 22:10 | **seeing** 12:19,19 | 104:11 108:1 | **sheer** 108:15 |
| 24:1,2,4,12 | 47:4 67:18 | **sensitive** 6:5 | **sheet** 169:11 |
| 40:13,18 45:22 | 92:9 99:19 | **sent** 169:14 | **short** 166:19 |
| 48:5,6 52:22 | 120:4 134:16 | **sentence** 25:8 | **shorten** 125:14 |
| 52:23 56:11 | 156:17 | 45:24 48:3 | **shortening** |
| 59:8 61:1 | **seem** 35:24 | 54:10 55:15 | 123:7,17 124:8 |
| 84:18 120:21 | 128:1 141:21 | 128:21 152:11 | 132:18 |
| 122:4 125:12 | **seemingly** 56:1 | 159:13,14 | **shorter** 122:6 |
| 126:13 127:19 | 127:24 | **separate** 96:3,5 | 124:11,14,15 |
| 133:12 143:5 | **seems** 16:8,8 | 101:3 | 124:21 125:9 |
| 161:7 163:14 | 18:9 19:11 | **separately** | 125:23 126:6,8 |
| **see** 26:12 28:6 | 20:10,11 24:20 | 72:17 120:19 | 129:7,10,13,14 |
| 31:5,16 33:23 | 35:23 36:9,23 | **session** 90:7 | 143:2,3 144:5 |
| 37:6,16,22 | 40:5 48:18 | **set** 17:24 18:3 | 144:7 145:5,9 |
| 42:10,19 46:22 | 60:15 69:11 | 27:19 52:20 | 148:9 159:24 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

160:1 161:9
**shorthand**
168:7
**shou** 126:15
**show** 41:22
42:2 76:18
79:3 80:24
82:7,18 83:3
95:22 102:1
128:18 134:3,3
134:8 135:19
136:16
**showing** 75:10
101:16,17
142:24
**shown** 124:2
**shows** 60:14
61:22 84:3,6,8
85:11,22 129:6
129:12,14
**side** 110:7
**sign** 169:12
**signature**
168:16
**signed** 169:19
**significance**
46:11 94:18
96:4,11 98:19
99:7,23 102:2
111:16
**significant** 83:3
83:3,7 91:14
91:20 92:18,22
93:3,10 94:5

95:22 96:16,19
97:5,6,22
98:22 99:2
102:11 111:6
139:10 148:21
148:22
**significantly**
80:11 83:6
93:18 134:10
142:9,9
**similar** 29:16
33:24 97:22
99:9 122:21,22
123:2,3 128:16
129:19,24,24
130:8,8,12,23
130:24 131:4
134:5,6 140:6
140:11,16
141:2 142:4
**similarly** 142:3
**simms** 3:11
**simple** 64:3
**simplicity**
44:12
**single** 19:23
68:2 69:11
93:24 107:11
108:20,22
109:5,9,16
**sir** 92:21
**sit** 45:2
**sitting** 23:10

**six** 22:20 33:11
47:22 52:6
54:2 59:13
60:11 135:7
**size** 11:7 82:23
82:24 92:2
95:10 99:13
105:3 139:14
147:9 149:14
150:1,2,18
153:6
**sizes** 67:23
139:15
**slight** 89:19
101:14 129:15
**slightly** 84:4
89:2
**small** 21:8,9
42:18 138:14
**smaller** 55:8
84:21 85:4
90:3,11 131:10
142:10,22
**sneakily** 49:16
**solutions** 1:22
169:23
**somebody**
66:15 73:10
101:6 106:3
162:15
**sorry** 11:23
16:23 20:18
30:21 39:14
52:11 80:8

81:21 84:2
86:20 97:5
120:3,9 135:7
135:8,11,12
140:13 144:8
145:12
**sort** 27:2 30:10
31:24 32:13
55:17 67:9
101:8 102:13
104:19 107:2
107:17 117:15
134:4,18
144:16 148:18
151:20 160:18
162:10 164:10
165:10,14
**sorts** 27:3
165:7
**sound** 20:22
116:13
**sounded**
109:23
**sounds** 16:15
52:3 83:11
110:2 112:24
113:6 130:9
**source** 73:2,12
102:8
**sources** 81:7
103:7 153:20
160:8
**southeast**
169:15

Stephen S. Pettigrew , Ph.D.                August 15, 2025
Georgia Senate Bill 202, In Re

**[sp - sticking]**                                                    Page 34

sp  50:7
spaced  86:23
specific  20:13
   44:19 45:12
   65:16 104:10
   119:1 150:8
specifically
   15:4 20:17
   23:23 24:3
   45:9 79:19
   134:14 142:19
   142:20 153:17
   154:6 157:24
   158:21
speculate  28:22
speculative
   27:9,18 56:1
sped  152:17
   160:23
speeding
   160:19
spend  22:11
spending  18:10
spent  73:9
spes  84:2
spia  72:21 73:5
   73:15 74:4,9
   74:20,20 75:5
   75:17 76:9,11
   76:18 78:3,3
   78:14 79:3
   80:22,24 81:11
   82:7,14,24
   83:21 84:2,10

   111:16,20
   112:5
spread  57:10
square  99:17
stack  74:3
staffing  27:5
   29:9 31:8
stand  128:24
   163:22,22
standard  74:14
   91:22 92:4,23
   93:4,5 100:18
   102:22 104:7
   104:23 107:4
   109:1 139:16
standing  106:2
start  14:15
   15:21 25:8
   115:12 116:19
   128:10
started  115:21
   116:3 157:10
starting  14:23
   90:6 97:9
   129:5 158:6,9
state  2:11,24
   7:7,14 8:21
   15:17 27:15
   61:5 66:15,15
   66:17,23,24
   67:3,5 70:9,10
   86:19 95:21
   108:16 109:9
   123:1,13,14

   133:9 152:7
   153:2 156:4
   159:5,6,9
   162:8 165:15
state's  132:16
   153:4 155:14
stated  16:13
statement
   19:20 20:20
   23:5,9,12
   24:18 32:16
   48:1 51:14,22
   52:9 54:18
   71:4 81:3
   96:10 117:5
   153:10 156:22
   161:7
statements
   22:14 80:21
states  1:1 6:16
   33:22 38:10,12
   61:18 123:2
   131:21 132:9
   133:3 134:6,12
   137:6 138:4
   142:13 159:3
   161:23
stating  155:14
statistical  94:4
   94:18 96:4,11
   97:22 98:19
   99:7,22 102:2
   106:10,15
   110:10 111:16

   128:13 130:19
   150:17
statistically
   80:11 91:14,20
   92:18,22 93:3
   93:10 95:22
   96:19 97:6
   98:22 99:2
   102:11 111:6
   139:10 148:21
   148:22
statisticians
   104:23
statistics  75:8
status  30:2
   31:6
stay  32:12,20
stayed  32:21
stays  32:2
step  48:19
   53:12 98:11
   121:16 161:13
stephen  1:13
   4:5,15,18 6:14
   7:20 8:23
   168:4 169:5
   170:2,24 171:2
   171:4,12
stepping  17:11
   132:19
steps  112:3
   154:23
sticking  117:18

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[stipulate - systematically]**                    Page 35

| | | | |
|---|---|---|---|
| **stipulate**   92:14 | 79:8 89:14,17 | 54:1,20 55:8,9 | 120:2 126:23 |
| 92:15 | 101:17 117:8 | 56:6 | 127:6,11 |
| **stipulations**   5:9 | 144:7 | **sundays**   19:22 | 129:24 131:16 |
| **stop**   23:20 | **suggested** | 20:17,21 37:14 | 131:18 132:2 |
| **street**   2:4,9,16 | 33:16 37:7 | 38:2,3 44:14 | 132:20 133:10 |
| 2:21 | 42:14 88:21 | 49:8,12,22 | 139:23 141:1 |
| **strike**   96:2 | 146:14 148:1 | 50:21 51:16 | 144:9 145:2,7 |
| **strong**   33:23 | 162:7 | **supervision** | 147:2 159:15 |
| **study**   66:5 | **suggesting**   97:4 | 168:8 | 161:5 |
| 73:19,22 | 109:7 116:6 | **supplemental** | **surprising** |
| **studying** | 125:5 148:14 | 4:14,16 8:8 | 67:22 151:5 |
| 158:20 | 148:17,24 | 13:10 | **survey**   66:6 |
| **stuff**   45:1 96:15 | **suggestion** | **support**   5:1 | 67:6 68:15,16 |
| 134:4 146:2 | 121:2 | 36:2 81:3 | 68:23 73:5 |
| 160:18 | **suggestive** | 83:13 | 74:1,14 75:5 |
| **subjective** | 165:22 | **supported** | 76:9 78:3,15 |
| 109:6 130:4 | **suggests**   37:9 | 80:22 | 80:22 83:1 |
| **submitted**   10:4 | 79:10 93:22 | **sure**   13:24 | 101:11,11 |
| **subscribed** | 122:5 124:11 | 16:24 18:8,12 | 102:4 103:6,6 |
| 171:14 | 146:4 158:5 | 19:5 20:1 22:8 | 103:12 104:19 |
| **subset**   67:5,6 | 166:5 | 27:17 30:15 | 104:20 105:1 |
| **substantive** | **suite**   2:9,22 3:4 | 36:16,16 39:13 | 105:21 |
| 104:17 | 3:12,18 | 39:22 41:8,23 | **suspect**   116:9 |
| **substantively** | **summary**   75:8 | 45:8 46:14 | **swear**   7:17 |
| 140:19 | 77:8,11,17 | 49:3 59:8,24 | **switched**   70:8 |
| **subtracting** | **sunday**   16:13 | 60:2 62:17 | **sworn**   7:21 |
| 34:5 92:8 | 19:4,13 22:19 | 66:4 70:23 | 168:6 171:14 |
| 99:19 | 26:2 40:3,4 | 72:1 78:1,23 | **system**   122:12 |
| **success**   123:16 | 43:22 45:4,13 | 79:11 86:21 | 123:8,9 127:4 |
| 123:16 153:5,6 | 45:17 47:21 | 88:6 90:19 | 152:5,8,16,22 |
| **successful** | 48:14 49:10 | 98:2,6,16 | 159:18 161:15 |
| 127:24 158:1 | 50:1,2,14 51:8 | 111:23 113:1,5 | 161:17 162:2 |
| **suggest**   32:6,22 | 51:23 52:5 | 114:1,2,22 | **systematically** |
| 53:16 76:7 | 53:17,21,24 | 116:8 119:9 | 150:13 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[systems - things]**                                    Page 36

| systems 160:18 | 110:23 125:22 | technology | testimony 4:4 |
|---|---|---|---|
| **t** | 162:16 | 128:1 154:19 | 154:5 168:6,9 |
| **t** 4:11 168:1,1 | **taken** 1:14 6:14 | 154:20 156:23 | 169:9,17 171:8 |
| 170:3,3 | 112:3 154:23 | **tell** 92:13 168:6 | **testing** 100:2 |
| **table** 22:21 | 166:20 168:4 | **tells** 128:4 | 100:11 103:18 |
| 23:8 24:5,10 | **talk** 8:6,7 18:14 | 149:4,6 | 103:23 104:13 |
| 24:13 41:23 | 35:6 46:5 | **ten** 87:8 | **text** 16:16 |
| 47:23 48:17,20 | 83:17,21 84:19 | **tend** 25:18 | **thank** 70:20 |
| 49:6,7 50:4 | 85:18 90:19 | 29:13,15 | 87:4 88:4 |
| 52:7,9 54:12 | 96:5 100:17 | 161:15 | 167:6 |
| 54:15,17 59:15 | 105:23 112:23 | **tends** 28:24 | **theoretical** |
| 59:22 60:14 | 163:15 | 29:3,14 30:4 | 150:24 166:3 |
| 61:18,22 62:6 | **talked** 65:9 | 32:11 34:6 | **theoretically** |
| 62:11 63:4,11 | 124:9 133:13 | 123:1 134:5 | 35:22 125:14 |
| 63:19 64:10,11 | 137:7 146:7,17 | **tenth** 51:2 | **theory** 118:18 |
| 65:5,16 66:3 | 147:8 150:1 | **term** 32:15 | 123:24 128:4 |
| 69:6 71:7 | 153:11 157:8 | 98:5 | 149:5 |
| 72:13,15 77:11 | **talking** 46:6 | **terms** 29:1 | **thereof** 168:11 |
| 79:15,16 85:11 | 52:1 54:5,7 | 33:24 104:9 | **thing** 12:11 |
| 85:22 88:5,13 | 61:2 98:20 | 114:17,18 | 20:2 23:19 |
| 94:3 95:2,19 | 107:9 109:8,10 | 115:24 124:4 | 27:2 29:10 |
| 97:10,15 | 111:3 121:1 | 132:22 | 42:15 59:9 |
| 117:18 119:5 | 135:22 156:22 | **test** 32:18 | 75:4 109:6 |
| 135:1,16,22,24 | 162:15 | 104:2,6,19 | 134:20 141:7 |
| 136:1 138:17 | **talks** 50:10 | 106:10,15 | 149:3 153:8 |
| 154:5 | 83:19 | 111:16,22 | **things** 27:4 |
| **tables** 56:8 | **tauted** 162:8 | 112:2 128:13 | 29:8,16 31:8 |
| 65:17 | **tease** 165:16 | 130:19 135:13 | 43:19 46:6 |
| **take** 6:10 9:10 | **technical** 68:15 | 166:9,10 | 88:7 103:8 |
| 13:20 15:6,13 | **technician** 3:24 | **tested** 161:11 | 105:13 122:16 |
| 21:24 41:7 | 6:2 7:16 87:16 | 166:8 | 122:23 127:21 |
| 54:19 68:17 | 87:24 166:15 | **testified** 7:22 | 132:11 141:6 |
| 69:10 87:8 | 166:23 167:7 | **testimonies** | 141:13 146:5,6 |
| | | 153:3 | 148:1,11 |

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

**[things - trends]**

Page 37

149:10 150:3,4
157:13 160:19
160:23 165:6
165:19
**think**  12:13
16:17 17:2
20:5,12,18
21:13 24:1
28:1 31:2,16
33:23 35:13
40:11,13 41:19
46:24 50:6
51:19 53:8
58:16 59:9,21
62:4 63:16
64:4,12 68:8
81:23 82:19
85:18 86:7
87:11 90:8,18
97:17 98:24
99:14 109:15
111:10 113:7
114:19,24
116:5 117:16
118:16,24
119:22 120:15
125:9 127:22
131:17 133:8,9
138:11,13,17
139:2 145:16
145:23 146:3,6
149:20 154:22
160:16,21,24
161:4,14,16

164:17
**thinking**  31:24
35:3 44:20
143:24
**third**  49:7
59:18,19,22
**thought**  94:9
109:17 148:1
164:7
**three**  16:2
17:14 45:7
72:1 95:12,13
97:16 120:15
**threshold**
17:24 18:2,3
18:20 42:8,23
44:6 47:4
58:16 92:11
102:10 115:12
**thrown**  119:10
**tie**  126:1
**tied**  43:12
125:10
**time**  6:8 7:16
22:11 25:14
29:17 32:1
41:7 71:10
73:10 87:16,24
88:11 105:6
122:11 155:1
155:15 162:5
162:17 163:4
166:15,23
167:7 168:5

169:18
**timeframe**
169:8
**times**  24:3 33:6
58:23 66:20
67:13 68:7
69:18 81:19
82:6,9 96:21
112:10,11
113:10 116:24
121:2,3,7,12,18
122:17,18
127:5,21
128:15 134:9
136:2 137:20
137:23 140:23
143:8,22
151:13 152:8
152:14,23
153:9 156:18
158:15 159:19
159:20,24
160:4 163:3
**tiny**  62:8
**titled**  13:10
**today**  23:10
45:2 135:13
**together**  63:4,6
63:12 126:1
**told**  31:7 125:8
**took**  17:8 64:1
64:2 65:5
68:23 70:8
123:21,22

137:6
**top**  14:13 75:7
77:1,2,3,7,10
77:15 78:14
79:9 111:20
**topic**  48:6
128:9
**topics**  51:20
**torres**  3:17
**total**  42:2 55:9
**tough**  33:4
**toward**  10:19
25:8
**tracking**  33:2,8
33:10
**train**  86:10
**transcribed**
168:8
**transcript**
169:6,19 171:5
171:8
**transcription**
168:8
**trend**  26:13
31:19,20,21,24
34:2 122:21,21
122:22 127:24
130:21 132:5,8
133:3,18 140:5
140:6,10,10
141:3,4 142:21
142:22
**trends**  27:2
32:4 112:23

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

**[trends - used]**                                    Page 38

120:23 122:11
127:3 128:11
128:15 131:21
132:23 133:1,2
138:23 153:8
165:18
**tried**  63:18
65:18 67:9
**true**  50:23
51:16 53:18
54:22 92:20,21
95:2 116:22
117:4,6,8
118:15 168:9
171:8
**trust**  114:20
**trusted**  83:23
**truth**  168:6,6,6
**try**  8:16 81:15
132:20 140:18
**trying**  18:7
31:12 32:6
35:5 41:16
109:21 120:5
125:18 126:15
126:18 130:9
141:23 142:6,7
142:10,10,19
142:20,24
157:18
**turn**  14:8 22:15
25:5 142:17
162:11

**turning**  22:9
**turnout**  11:12
147:17,19
156:19
**tweak**  86:8
**tweaked**  154:9
**twenty**  91:3,3
**two**  10:4 18:24
25:14,19 26:6
30:20 35:4
37:13 44:10,18
45:7 50:7,10
51:19 52:8,10
53:1,5,9 63:3
66:6,14 81:7
84:19,23 88:7
88:19,20 90:13
91:4 93:18
94:14,21,23
122:5,16
125:15 127:2
127:22 136:10
141:10 148:16
148:23 149:2
149:15 150:6
150:18 161:11
164:2 165:5
**type**  29:9 103:5
106:14 130:19
**typical**  141:10
**typo**  78:23

**u**

**uga**  73:5
**uh**  9:3 11:22
15:24 25:4
64:16 80:20
112:6,6 119:13
128:12
**um**  21:7 28:23
33:20 45:5,8
48:23 51:10
62:21 64:2
71:9 72:6
125:1 127:21
128:1 129:2
148:20 154:16
**unable**  34:8,9
**under**  108:6
168:8
**underestimates**
138:3
**underlying**
28:9 112:4
**understand**
15:22 17:8
31:12 46:9
60:3 63:20
88:7 130:9
131:18 132:1
132:20 145:3
149:4 157:19
**understanding**
26:19 38:9
50:4 74:12

132:24 149:17
154:12,17
157:23 158:2
158:12 160:14
**understood**
70:24
**unequivocally**
52:15 53:11,16
**union**  2:3
**unique**  57:4,7
**unit**  6:12 87:17
88:1 167:8
**united**  1:1 6:16
38:10,12
**universities**
73:21
**university**
72:19
**unpack**  64:14
107:16
**unrelated**
127:15
**unusual**  30:7
**use**  8:17 32:4
37:7 63:7
67:12,15 68:16
101:11 104:13
104:24 105:7
105:12 128:14
139:16 142:15
**used**  31:19 64:4
65:14 67:10,24
88:11 139:22
169:19

Stephen S. Pettigrew , Ph.D.
Georgia Senate Bill 202, In Re

August 15, 2025

**[uses - voting]**

Page 39

| | | | |
|---|---|---|---|
| **uses** 67:4,7 | **veritext.com.** | 52:11,14 53:7 | 97:11 98:21 |
| **using** 64:5 | 169:15 | 56:6 149:18 | 99:3 104:3 |
| 66:24 70:9,10 | **version** 72:10 | **voter** 11:12,15 | 109:8,11 |
| 74:20 76:6 | 73:5 | 61:2 106:23 | 110:12 111:11 |
| 102:7,8 106:8 | **versus** 33:19 | 107:10,11 | 111:11 112:12 |
| 108:10 109:21 | 44:14 130:8 | 122:12,23 | 113:11,12,19 |
| 123:9 151:21 | 137:21 140:21 | 123:23 134:15 | 113:21 114:7,9 |
| **usually** 104:12 | 164:3 | 147:17,19 | 115:2,5,7,11,14 |
| 161:18 | **vertical** 42:3 | 152:16 160:17 | 115:17,21,24 |
| **v** | **video** 3:24 6:2 | **voters** 10:19 | 116:2,11,12,16 |
| | 6:9,13 7:16 | 18:1 21:8 28:4 | 116:23 117:1 |
| **va** 3:5 | 87:16,24 | 28:7 42:18,21 | 117:11,14,20 |
| **value** 83:22 | 166:15,16,23 | 43:2 46:23 | 117:24 118:5,6 |
| 91:23,24 94:16 | 166:24 167:7,9 | 47:2,7,11,16 | 118:12 119:16 |
| 97:18 98:12 | **videographer** | 49:10,12 50:1 | 119:16 120:12 |
| 99:10,18 | 6:24 | 50:3 51:8,15 | 120:12 135:2 |
| **valve** 162:10 | **videotaped** | 55:7,10,15 | 135:19 136:16 |
| **variable** 64:3,5 | 1:13 | 58:11,19 61:10 | 137:4,13 |
| 65:22 66:22,23 | **view** 100:22 | 61:11,19,20 | 146:15 161:22 |
| 70:9,10 | **violated** 101:9 | 63:1,22 68:20 | **votes** 22:18 |
| **variables** 66:14 | 106:19 | 69:8,8,16 71:4 | 47:20 48:13 |
| **various** 31:7 | **vote** 10:14,18 | 74:22 75:18 | 49:8,18,22 |
| **vast** 17:24 28:3 | 28:8 43:8 | 76:19 79:4,6 | 50:11,16,21 |
| 42:16 46:22 | 47:14 58:20 | 79:20,22 80:8 | 52:5,19,21 |
| 47:6 58:11 | 61:11,21 68:12 | 80:9 81:3,4 | 54:7,8 55:9 |
| 67:15,15 128:6 | 75:19 79:5,21 | 82:8,9,15,16 | 56:6 59:11,12 |
| 128:6 | 101:10 117:21 | 83:5,5 84:5,6,8 | 60:8,9 |
| **verify** 24:8 | 119:17 120:13 | 84:21 85:5,13 | **voting** 10:19,20 |
| 169:9 | 135:3 146:14 | 85:21,23 86:5 | 14:18,19 15:1 |
| **verifying** 36:22 | 153:22 158:17 | 86:15,18 88:18 | 15:8,18,23 |
| **veritext** 1:22 | 158:20 159:18 | 89:11 90:12,22 | 16:2,13,13,14 |
| 6:23 7:2 | 161:23 | 90:24 91:2 | 16:21 17:14 |
| 169:14,23 | **voted** 43:10 | 93:16 94:12 | 18:18 19:4,8,9 |
| | 49:12 51:15 | 95:5,8,23,24 | 19:13,15,22,23 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[voting - weekend]                                          Page 40

| | | | |
|---|---|---|---|
| 20:6,16,21 | 112:10,11 | 90:23,24 93:16 | 68:5 164:11 |
| 21:5 22:15,19 | 113:10 116:24 | 94:12 95:4,6 | **way** 20:10 31:3 |
| 25:15,15,17,20 | 120:23 121:2,3 | 95:23 96:23 | 38:14 39:12 |
| 26:1,2,7 27:7 | 121:7,12,18 | 97:11,13 99:3 | 43:14 44:16 |
| 28:6,10,11 | 122:11,17,18 | 101:24 102:16 | 47:17 55:20 |
| 29:23 30:1,9 | 127:5,21 | 102:18 107:10 | 59:4,5 63:19 |
| 30:20 32:9 | 128:15 134:9 | 107:12,20,22 | 71:11,18 72:3 |
| 33:4,10 34:9 | 136:2 143:8,22 | 109:12 110:4 | 74:5 76:1 |
| 36:4 40:8 42:4 | 145:12 151:13 | 118:5,12 135:3 | 81:15 98:24 |
| 43:22 44:3,18 | 152:8,14 153:9 | 137:13 162:20 | 107:7,24 108:3 |
| 45:4,13,17 | 159:20 161:22 | **waits** 100:23 | 114:20,24 |
| 46:1,4,18 47:9 | 162:17 163:3 | 108:5,14 | 124:20 130:20 |
| 47:21 48:7,14 | **waited** 61:11 | **walk** 14:12 | 131:12,19 |
| 51:5,8,23 52:6 | 61:20 63:1 | **walked** 144:24 | 132:1 148:13 |
| 53:6,17,21 | 68:11 69:8,9 | **wand** 164:11 | 150:8 154:9 |
| 54:1,1,20 | 69:16 71:5 | **want** 18:12 | 160:3 164:19 |
| 56:15 57:11,14 | 76:19 85:5 | 21:1 35:11 | 165:24 |
| 57:15,18 58:2 | 100:6,13 | 42:5 59:8 | **ways** 26:10 |
| 58:6,14,24 | 101:13,18,20 | 62:18 68:14 | 38:5 50:7 |
| 59:12 60:10 | 102:6 103:2,18 | 74:11 88:6 | 54:23 57:3 |
| 124:5 128:1 | 103:20 104:3 | 113:1,5 119:24 | 127:4 164:21 |
| 134:2 146:15 | 105:6,17 106:5 | 131:18 142:17 | **wbock** 3:6 |
| 152:17 161:15 | 106:24 108:23 | 145:2 146:2 | **we've** 46:6 59:8 |
| 161:21 | 110:12 115:2,4 | **wanted** 18:18 | 119:10 124:23 |
| **w** | 117:12,20 | 39:2 83:13 | 133:13 151:2,7 |
| **wait** 16:24 24:3 | 119:17 120:13 | **warming** 10:10 | **weak** 149:12 |
| 66:19 67:13 | 135:19 136:16 | **washington** 2:4 | **web** 33:7 |
| 68:7 69:18 | 137:4 | 2:10,22 | **website** 13:1 |
| 80:11 81:3,19 | **waiting** 74:22 | **watch** 102:14 | 33:6 |
| 82:5,9 96:20 | 75:19 76:19 | **watched** 101:6 | **week** 16:2 |
| 98:21 100:20 | 79:4,21 82:15 | **watching** | 17:14 |
| 101:5,6 102:22 | 83:5 84:5,6,8 | 101:10 108:11 | **weekend** 14:18 |
| 106:4 109:3 | 84:22 85:21 | **wave** 66:6,17 | 14:19 15:1,8 |
| | 86:6,16 90:12 | 66:18 67:17,17 | 15:18,23 16:3 |

Stephen S. Pettigrew , Ph.D.                    August 15, 2025
Georgia Senate Bill 202, In Re

[weekend - yeah]                                              Page 41

16:21 17:16
18:18 19:9,15
19:23 21:5
22:15,19 28:6
36:4 40:8
43:11 46:1,4
46:18 47:9,21
48:7,14 49:19
50:14 52:5
53:21 54:1
57:14,14,18
58:5 59:12
60:10
**weekends** 20:7
28:8
**weight** 68:17
68:18,21 69:4
**weights** 68:16
72:5
**weird** 30:12
134:16
**welcome** 139:6
**went** 20:4
145:7
**whatnot** 123:14
154:4
**whispering** 6:6
**white** 61:20
62:24 63:21
64:6 68:10,10
69:6,8,16,19,19
71:4 75:18
79:4,22 81:4
82:9,16 83:4

84:6,8 85:21
86:5,18 88:18
88:24 89:5
91:2 92:2 95:8
95:14,24 96:16
96:20,22
113:12,19
114:7 115:2,11
115:21 116:1
116:11,16,24
117:14,24
118:6,12
119:16 120:12
**william** 3:3
**willing** 109:13
150:20
**wilson** 3:4
**wish** 9:24
**witness** 5:3
7:18 14:3 17:4
22:3 27:14
28:1,21 29:13
36:9 37:21
40:11 41:2,5
41:13,16 56:19
58:9 75:23
78:19 80:1
82:12 83:16
110:10 111:2
112:16 118:20
118:23 131:24
141:21 153:3
157:7 167:6,11
168:9,12 169:8

169:10,12,18
**witnesses**
123:13 132:16
162:8
**wonderful**
11:19
**word** 30:17
31:19,24 37:7
46:8,11 109:20
110:23 130:5
155:6
**work** 36:24
37:1 38:12,14
107:23 108:2
109:18 127:15
128:5 133:23
154:16 158:6,9
161:1 165:5
**worked** 12:20
158:24 161:4
**working** 33:9
159:8
**works** 103:23
108:9 162:9
**world** 73:11
144:17 151:16
164:4,5,18
165:1
**worlds** 151:17
164:2,15
**worry** 126:21
**worse** 143:8,22
144:20 145:11
145:11,17

149:7,11
**worth** 69:1
71:20 127:19
**write** 139:4,6
**writing** 130:3
**written** 24:7
73:4
**wrong** 64:5
130:5
**wrote** 23:3 45:6
45:10 64:18
65:15

| x |
|---|
| **x** 4:1,11 |

| y |
|---|

**yeah** 16:22
19:2,16 26:3,8
32:17 34:24
35:9,22 40:21
40:23,24 41:8
41:11,19 44:5
48:9 49:24
56:9 57:4
59:20 60:5
61:23 62:19
75:1 78:5,13
78:16,20 85:11
86:7,13 89:4
91:9 95:1 97:1
97:8 99:8
100:4,14
115:19 117:17
120:1 124:23

124:24 127:11
129:1 135:11
135:13 136:18
137:1,2 139:2
140:7,10
146:17 148:8
152:12,18
153:16 155:21
156:16
**year**   56:7 71:9
94:5,5 150:16
**years**   30:4
33:11 45:7
89:8 131:4,11
131:11 150:11
150:12
**yesterday**
63:16 64:9
65:10,12 69:24
71:11 88:8,10
95:15 96:14,18
**york**   2:17
**yougov**   74:15
**yup**   9:13 13:23
14:1 145:14

**z**

**zero**   92:10 93:6
99:21 100:6,12
104:9,13 111:9
115:2,3,8
117:13 139:19
**zoom**   2:13 3:1

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO.<br>1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE<br>OF THE NAACP, *et al.*, | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his<br>official capacity as the Secretary of the<br>State for the State of Georgia, *et al.*, | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN<br>METHODIST EPISCOPAL CHURCH,<br>*et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State<br>of Georgia, in his official capacity, *et<br>al.*, | |
| *Defendants.* | |



EXHIBIT
1
8-15-25

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

    *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

    *Defendants.*

Case No. 1:21-CV-01728-JPB

Rebuttal Supplemental Expert Report of Dr. Stephen Pettigrew

Dr. Stephen Pettigrew
University of Pennsylvania
Program on Opinion Research and Election Studies
Ronald O. Perelman Center for Political Science and Economics, Suite 406
133 S. 36th Street
Philadelphia, PA 19104

On behalf of Plaintiffs in the three above captioned cases.

In this report, I respond to the June 2025 declaration by Dr. Justin Grimmer, addressing points that relate to my January 2023 initial expert report and March 2023 sur-rebuttal report. Specifically, I highlight three points.

- Dr. Grimmer's analysis of weekend voting is not relevant to a discussion of the impacts of SB202, since SB202 did not cause voting hours to increase in most Georgia counties.
- Dr. Grimmer's analysis demonstrates that long lines continue to be a problem in Georgia.
- Dr. Grimmer's evidence of lines getting shorter in Georgia cannot be attributed to SB202, since lines were shorter nationwide in recent elections and because Georgia adopted a new voter check-in system that was not mandated by SB202.

I acknowledge that Dr. Grimmer's report has points that I do not specifically address here because they are not relevant to my 2023 reports. I otherwise reserve the right to address Dr. Grimmer's findings later if additional information or data become available.

# 1:   SB202 did not add new hours of weekend voting, so increases in weekend voting cannot be attributed to it.

Section VII of Dr. Grimmer's June 2025 report focuses on the percentage of Georgia voters who cast a ballot during weekend early voting in 2022 and 2024. He finds that "the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections [he] examined" (paragraph 66).

He contrasts this evidence against a mischaracterization of my March 2023 report. In paragraph 64, he tries to claim that my report implies that, "SB202 will cause a decline in the use of weekend voting." However, his next sentence quotes my report, clearly showing that I did not claim that SB202 would decrease the number of weekend voters. Instead, I stated that, "I find that this requirement will have no impact on voting hours in most counties. . . because they offered two days of Saturday voting prior to SB202."

Just as I noted in my March 2023 sur-rebuttal to Dr. Grimmer's 2023 rebuttal report, the evidence he provides here is non-responsive and irrelevant to my analysis. Section 4.2.3 of my January 2023 report notes that "most Georgia voters (and disproportionately white voters) live in a county that-prior to SB202-already offered at least as many hours of early voting as are required by SB202." I go on to note that, "counties where lines were longest in recent elections already tend to offer the most hours of early voting; the counties that will expand early voting hours under SB202 already had short lines."

The increase in weekend voting noted by Dr. Grimmer in his June 2025 report is likely not attributable to SB202's provisions about weekend voting, since, before SB202, most Georgia counties already offered at least that many hours of weekend voting. His analysis seems to be an attempt to tie increases in weekend voting to SB202. He presents no evidence about the amount of weekend voting that Georgia counties had in 2022 and 2024, nor does he state that the number of hours changed after SB202. Without such evidence, and with my evidence that (pre-SB202) most counties already offered extensive weekend voting hours, it is improbable that changes in the share of weekend voters can be attributed SB202's provisions related to early voting.

# 2:    Long lines are still a problem in Georgia

Section IX of Dr. Grimmer's report discusses wait times in Georgia in 2022 and 2024, utilizing a similar data source and methodology as my January 2023 report. The evidence he provides clearly shows that a significant number of Georgia voters still experienced long lines in 2022 and 2024, and that Black Georgians were more likely than white Georgians to wait in a long line to vote.

Table 16 (page 63) in his report shows the percentage of voters who reported waiting in a line between "31 minutes and 1 hour", as well as "More than 1 hour". The table shows that 6.3 percent of Georgia voters waited longer than 30 minutes to vote in 2024, and 5.3 percent waited at least that long in 2022. Both of these percentages are statistically significant at the standard 0.05 threshold: meaning his report provides statistical evidence that long lines continue to be a problem for Georgia voters.

Table 2.1: Percentage of Georgia voters waiting more than 30 minutes to vote

| Race | 2022 | 2024 |
|---|---|---|
| Black | 6.6% | 7.5% |
| White | 4.3% | 5.8% |

The same table in his report also shows evidence of a continued racial difference in wait times. For convenience, I have replicated the relevant numbers from Dr. Grimmer's Table 16 in the table above. In 2024, roughly 1-in-17 white Georgia voters (5.8 percent) waited longer than 30 minutes to vote, while about 1-in-13 Black Georgians (7.5 percent) waited that long. His evidence from 2022 also shows racial differences, with 4.3 percent of white voters experiencing a long line, compared to 6.6 percent of Black voters.

# 3:   Drops in wait times cannot be attributed to SB202

Section IX of Dr. Grimmer's report presents evidence that fewer Georgia voters experienced long lines in the 2022 and 2024 general elections. He uses this evidence to refute my assessment that, if administrative procedures and political factors remain constant, SB202 will have a "net-negative impact on lines" (page 26 of my January 2023 report).

The case he makes, however, ignores this "all other things equal" part of my analysis. I state on page 24 of my January 2023 report that, "SB202 is not the only factor that may increase or decrease the length of lines in Georgia elections." There are two non-SB202 factors which provide much better explanations for why lines were shorter in Georgia in 2022 and 2024.

## 3.1   Reason 1: Lines were shorter nationwide in 2022 and 2024

Table 3.1: Voter wait times nationally, using Cooperative Election Study.

| Response | 2008 | 2012 | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|---|
| 31 minutes - 1 hour | 9.8% | 8.6% | 2.1% | 7.5% | 4.6% | 11.5% | 4.3% | 9.3% |
| More than 1 hour | 6.0% | 3.9% | 0.3% | 2.0% | 1.2% | 5.8% | 0.8% | 2.5% |
| More than 30 minutes | 15.8% | 12.4% | 2.3% | 9.6% | 5.8% | 17.3% | 5.1% | 11.8% |

Dr. Grimmer's analysis compares the wait times in Georgia in 2022 and 2024 to Georgia's waits in 2014 through 2020. In doing so, he omits a crucial piece of information: wait times were shorter across the country in the most recent two elections. He is using evidence from elections in which lines were short across the country to suggest that SB202 would not have a detrimental impact on lines in Georgia during an election when lines are longer nationwide.

Table 3.1[1] uses the same data and statistical approach as Table 16 in Dr. Grimmer's report. The table here, however, uses the Cooperative Election Study data from across the country, rather than just Georgia.

Dr. Grimmer's report shows that lines in Georgia in 2022 were shorter than 2018, but longer than 2014. My analysis of the national data shows that lines were shorter nationwide in 2022 compared to 2018, but longer than 2014.

---

[1] Each cell in the table reports the percentage of in-person voters who waited a given amount of time. The bottom row adds together the other two rows.

Dr. Grimmer's report shows that lines in Georgia in 2024 were shorter than 2020 and 2016. My analysis of the national data shows that lines were shorter nationwide in 2024 compared to 2020, 2012, and 2008, but not 2016. The national trends in wait times are extremely similar to the ones in Georgia.

This suggests that SB202 cannot be credited with decreasing wait times in Georgia, since its provisions do not apply to the other 49 states. Dr. Grimmer's June 2025 report, as well as his 2023 rebuttal report, does not make a case for *why* SB202 would improve wait times. By not making any such claims, his finding that lines got shorter in recent elections is irrelevant to the question of whether SB202 may have a negative impact on lines.

His evidence here also does not refute the reasons I explained in my January 2023 report for why SB202 would have a negative impact on wait times, holding other factors constant. Clearly the 2022 and 2024 election cycles had much different patterns of voter turnout and wait times than prior election cycles both in Georgia and nationwide. If the national pattern in 2026 or beyond reverts back to where it was pre-2022, Georgia will experience wait times that are worse than they would be if SB202 were not in effect. Dr. Grimmer's report does not address this point or provide evidence to refute it.

## 3.2 Reason 2: Georgia implemented a massive wait-time-shortening program in 2022 that was unrelated to SB202

The other reason that the drop in wait times cannot be attributed to SB202 is that Georgia recently implemented a massive, new voter check-in system which appears to have sped up the process of getting voters through the line. In paragraph 34 of her February 2023 report, Ms. Lynn Bailey states that, "Beyond SB202's provisions, the State has undertaken additional efforts to address line length and reduce voter wait time." She goes on to describe a pilot program for a cellular version of the state's poll pads used for checking in voters. She describes the program as "streamlin[ing] the check-in process"

She then presents evidence that counties involved in the 2022 pilot program had check-in times that were much shorter than those in counties that had not implemented the program. Chart A of her report shows that during early voting, counties with the program had wait times that averaged less than one minute, while those without the program had average waits of 8 minutes.

In a media report from November 8, 2023, COO of the Office of the Georgia Secretary of State Gabriel Sterling stated that, "the average check-in time before [the program] was about a minute and half...Now, we're averaging about 47 seconds to check people in. So,

that leaves just shorter lines."[2]

On May 22, 2024, Secretary of State Brad Raffensperger issued a press release that described the further expansion of this program.[3] The press release describes investments in Georgia's election technology that stretch back to 2019–well before the passage of SB202. It also directly connects the implementation of the poll pad program to shorter wait times: "Recent investments into upgraded poll pad technology ensure that voters smoothly check-in, leading to election day wait times of less than 1 minute in most counties."

Based on my own research and knowledge about the causes of long lines to vote, if a check-in system can cut check-in times in half or by seven minutes, it will have a huge positive impact on wait times.[4] As Ms. Bailey, Mr. Sterling, and Secretary Raffensperger emphasize, this program was not created by SB202, nor does SB202 require that it stays in place.

As I stated on page 26 of my original January 2023 report, "The state or individual counties may alter their administrative procedures or voting technology, and those changes may have an impact on line length. But even if those changes have a positive impact on line length, that does not mean that SB202 does not have a net-negative impact on lines." The success of this poll pad program is exactly the type of administrative change that I was alluding to in my report. The program's existence does not mean that SB202 does not negatively impact line length in Georgia or have a disparate impact on voters of color.

---

[2]"'It was a great, easy day': Central Georgia election officials say GARViS system is a success." November 8, 2023. https://www.13wmaz.com/article/news/local/central-georgia-election-officials-say-garvis-system-succeeds-houston-county-peach-county-secretary-of-state-office-peach-state/93-d4918284-178c-4b70-a5d9-c8fbe2e4fed9

[3]"Raffensperger's Poll Pad Upgrades, GARViS, Lead to Smooth May General Primary." May 22, 2024. https://sos.ga.gov/news/raffenspergers-poll-pad-upgrades-garvis-lead-smooth-may-general-primary

[4]Stephen Pettigrew. "The Racial Gap in Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132(3). Fall 2017.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement this report with additional analyses as new information becomes available. Executed on July 04, 2025 in Philadelphia, Pennsylvania.

Stephen Pettigrew, PhD

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

## SUPPLEMENTAL EXPERT REPORT OF JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I.    PREAMBLE MATERIAL AND SUMMARY OF FINDINGS

1.    In Georgia's first presidential election since the passage of SB 202, the 2024 general election, overall voter turnout was higher than in any election since at least 1980. Updating my analysis of turnout rates across self-reported racial groups, I calculate that in the 2024 general election American Indian, Asian, Hispanic, and white voters had their highest turnout rate in any statewide general election since at least 2014. The turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election, and higher than the 2014, 2018, or 2022 elections. I use the Census Bureau's Current Population Survey (CPS) November supplement to compare the self-reported turnout rate of Black voters in Georgia with the turnout rate



EXHIBIT
2
8-15-25

of Black voters in other states. I find that the change in turnout in Georgia among Black voters is similar to the change in Black voter turnout nationwide, with Black turnout lower nationwide in 2024 compared to 2020.

2.      In the 2024 election Georgia voters continued their shift towards early in-person voting and away from Election Day voting. In the 2024 election 71.1% of all ballots were cast using early in-person voting ("early voting"), the highest share of ballots cast during early voting for any election since at least 2014. Every self-reported racial group had their highest share of ballots cast using early voting during the 2024 election. As the share of ballots cast during early voting has increased, the share of ballots cast on Election Day has decreased. Overall, 23.4% of all ballots were cast on Election Day in 2024. The only election with a smaller share of ballots cast on Election Day than the 2024 election was the 2020 election. About 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022.

3.      Using data from the 2024 election I update my analysis of the rate mail-in absentee ballots are rejected and the rate mail-in ballots were rejected for arriving after the deadline or because of an issue verifying the voter's identity. In the 2024 election 1.7% of all returned mail in ballots were rejected. This is a lower rate than in 2016 and 2018, but a higher rejection rate than in

2020 and 2022. In the 2024 election I calculate that a smaller share of mail-in ballots were rejected for arriving late than in 2016 and 2018, but a larger share than in the 2020 or 2022 elections. I find that the rate mail-in ballots were rejected for identification reasons in the 2024 election were similar to, but higher than, the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections. There is no consistent relationship between the Black-white gap in rejection rates for signature reasons in 2016, 2018, and 2020 and the Black-white gap in rejections rates for identification reasons in 2024. The Black-white gap in rejections for identification reasons in 2024 was smaller than the Black-white gap for signature reasons in 2016, but the 2024 Black-white identification gap was larger than the 2018 and 2020 Black-white signature gap.

4.    The 2024 election saw the largest share of votes cast on the weekend using early in-person voting in any election since at least 2014. During the 2024 election 7.7% of all votes were cast on the weekend using early in person voting. Weekend voting rates were up for every group in the 2024 election: across every self-reported racial group the 2024 election saw the largest share of ballots cast on the weekend using early in person voting. And every racial group but white voters had the largest share of ballots cast on Sunday for any election since at least 2014. For example, in the 2024 election 2.1% of all votes from Black voters were cast on Sunday using early in-person

voting and 8.3% of all ballots from Black voters were cast on the weekend using early-in person voting.

5.    Using data from the 2024 election I updated my analysis of the number and share of voters who cancel their mail-in ballots and then vote either early in person or on Election Day. In the 2020 election over 289,000 voters canceled their mail in ballot and then voted early in-person or on Election Day. In the 2024 election a smaller share and number of mail in ballots were canceled and subsequently voted early in person or on Election Day than in the 2020 election. But, the 2024 election saw a larger share and number of canceled ballots voted in person than in the 2014, 2016, 2018, or 2022 election.

6.    I find that the two-post SB 202 elections—2022 and 2024— had smaller shares of voters who waited more than 30 minutes to vote than in the 2016, 2018, or 2020 election. Using the Cooperative Election Study (CES), the same data source Dr. Burden and Dr. Pettigrew used to measure line length in their expert reports, I find that there was a decline in the share of voters who report waiting more than 30 minutes to vote in the 2022 and 2024 election compared to the 2016, 2018, or 2020 elections. According to the CES, overall in the 2022 election 5.3% of voters in Georgia report waiting more than 30 minutes to vote and in the 2024 election 6.3% of voters in Georgia report waiting more than 30 minutes to vote. The two-post SB 202 elections also saw

a decline in the share of Black and white voters who report waiting more than 30 minutes to vote compared to the voters from the same self-reported groups in the 2016, 2018, or 2020 elections. Only the 2014 election had a smaller share of voters who report waiting more than 30 minutes and the difference between the share of voters who report waiting more than 30 minutes in the 2014 and the 2022 and 2024 elections is not statistically significant. A different publicly available survey of Georgia voters after the 2024 election confirms that a smaller share of voters report waiting more than 30 minutes than reported in the 2016, 2018, or 2020 CES.

7.    SB 202 altered the application window for mail-in absentee ballots and verified voters' identity using identification, like a driver's license, instead of a signature. Using the Absentee Voter History File I find that the vast majority of mail-in ballot applications conformed to the SB 202 application window. Overall, 0.61% of mail-in ballot applications were rejected for arriving after the deadline and 0.16% were rejected for arriving before the application window opens. I calculated that 0.37% of mail-in ballot applications were rejected for identification reasons.

8.    SB 202 also left in place the "roll over" list for mail-in ballot voters 65 and older, self-reported disabled voters, overseas, and military voters. The roll over list enables Georgia voters to apply for an absentee ballot once in an election cycle and receive ballots for all subsequent elections. I find that 43.7%

of all mail in absentee ballot applications came from voters on the roll over list, including 76.6% of all voters 65 and older.

9.    In the 2024 election self-reported rates of drop box use among mail in voters were similar to the self-reported rate of drop box among mail in voters in the 2020 election. I used the 2024 CES survey to estimate the self-reported drop box use rate. I find that overall use of drop boxes among mail-in voters was similar in the 2020 and 2024 elections, but lower in the 2022 election. I find that there is no consistent relationship between race and self-reported drop box use among mail in voters. In the 2020 and 2022 elections white mail-in voters were more likely to self-report returning their ballot using a drop box, but in the 2024 election Black mail-in voters were more likely to self-report returning their ballot using a drop box.

## II.    VOTING IN GEORGIA

10.    To measure voter turnout in Georgia I follow the same procedure I used in my first expert report and rely upon state provided turnout statistics. Specifically, I measured 2024 turnout using data on the votes cast in individual precincts and counties, which I then aggregated to calculate the overall turnout and voter turnout by self-identified racial group.[1]

---

[1] For the 2024 election I used the file "FINAL Reapportionment Report 02212025 November 2024 General.xlsx" which was provided to me by counsel. For the 2022 general election, I used the Statewide.xlsx file from the "SSVRZ422 2022" zip file and the "Precinct turnout by race" folder, which was

11.    To assess differences across racial groups I follow the same procedure as in my first expert report and rely upon self-reported racial identity, as tallied in the state turnout statistics. Voters self-identify as American Indian, Asian or Pacific Islander (which I refer to as Asian hereafter), Black, Hispanic, white, Other, or the race is "Unknown". In this report, like my first expert report, I focus on American Indian, Asian, Black, Hispanic, and white voters.

12.    I calculate the turnout statistics in this section primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP. Since I wrote my first expert report the 2022 CVAP estimates have been released, so I use the 2022 CVAP for Georgia as the denominator in my estimates of the 2022 CVAP turnout rate. The Census Bureau has not yet released the 2024 estimates of the CVAP, so I use two different approaches to estimate the 2024 CVAP. First,

---

obtained by counsel. In the 2020 election, I used data downloaded from the secretary of state's data portal, specifically the "General Election 2020 Active, Inactive Voters by Race, Gender_County.xlsx" file. For the 2018 and 2016 election I used the file "SSVRZ376R3.xlsx" which I downloaded from the Secretary of State's office website. The downloaded turnout data from the Secretary of State's website was missing data for 2014, so counsel obtained the file "November 2014 General Election - Active, Inactive Voters by Race Gender - (COUNTY).xlsx". For the January 2021 runoff I used the "General Election Runoff 2021 Active, Inactive Voters by Race, Gender_County.xlsx" file downloaded from the Secretary of State's office website and for the December 2022 election I used the "Statewide.xlsx" which was contained in the "SSVRZ422 2022" zip file obtained from counsel.

I use the 2023 estimates of the CVAP from the Census Bureau for the denominator in the 2024 CVAP turnout rate. I label turnout estimates with this denominator as the "CVAP" estimates for each group. As I described in my first report, using CVAP estimates from a prior year creates a risk of underestimating the size of groups in the 2024 electorate, which would cause me to overestimate turnout rates for that group. To mitigate this risk, my second measure of group size uses historical growth rates to make a plausible estimate for each group's actual size in the 2024 election. As in my first report I extrapolate using available CVAP data. Specifically, I calculated the average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group. I then divided the average of the 2-year change by 2 to obtain a one-year average growth rate, which I then added to the 2023 CVAP estimate. This projection serves as an estimate of the 2024 CVAP. I label turnout estimates with this denominator as the "CVAP Trend" estimates.[2]

## III.  TURNOUT IN THE 2024 GEORGIA FEDERAL ELECTION REMAINED HIGH.

13.    In Table 1 I present estimates of the overall turnout rates in the state of Georgia for general federal elections from 2014 to 2024. This updates Table 1 from my first expert report, and it is structured the same way. The "Year" column presents the year of the election. The "CVAP Turnout Rate"

---

[2] The only election the CVAP and CVAP Trend estimates will differ is in 2024.

column calculates the turnout rate using the CVAP corresponding to each election year, except for 2024 where I use the 2023 CVAP. The "CVAP Turnout Rate, Trend" column calculates the turnout rate using the corresponding CVAP but extrapolates the 2023 turnout rate to 2024 based on the historical rate of growth for racial groups. The "VEP Turnout Rate" column uses data from Dr. Michael McDonald (2024) to calculate the overall turnout rate from the voting eligible population ("VEP").[3] The VEP is an estimate of the number of individuals who are eligible to vote in a state's election. The VEP is available at the state-level but is not broken down by racial group.

14.    In the first general presidential election after the passage of SB 202 in Georgia, overall voter turnout was higher than any presidential or midterm election since 2014, though similar to the turnout rate in the 2020 general election. Using the CVAP turnout estimates in the second column, I find that the turnout rate in the 2024 CVAP Georgia presidential election was 1.4 percentage points higher than the 2020 Georgia presidential election and 9.6 percentage points higher than turnout in the 2016 Georgia presidential election. I reach a similar conclusion if I use the estimates from the "CVAP Turnout Rate, Trend" column. Using the projected measure of CVAP I find that the turnout rate is higher in the 2024 Georgia presidential election than in the

[3] Univ. of Fla. Election Lab, 2024 General Election Turnout (as of May 13, 2025), https://election.lab.ufl.edu/2024-general-election-turnout/.

2020 election, with a difference of 0.5 percentage points. The turnout rate in the 2024 election was 8.7 percentage points higher in 2024 than in 2016 according to "CVAP Turnout Rate, Trend" measure of turnout.

| Year | CVAP Turnout Rate | CVAP Turnout Rate, Trend | VEP Turnout Rate |
|------|------|------|------|
| 2014 | 0.377 | 0.377 | 0.386 |
| 2016 | 0.589 | 0.589 | 0.598 |
| 2018 | 0.544 | 0.544 | 0.541 |
| 2020 | 0.671 | 0.671 | 0.682 |
| 2022 | 0.515 | 0.515 | 0.519 |
| 2024 | 0.685 | 0.676 | 0.683 |

Table 1: Turnout rates in Georgia federal elections from 2014 to 2024, calculated using state-provided election returns and McDonald's (2024) data.

15.    Using the VEP turnout rates in the fourth column, I also find that the 2024 election was the highest turnout election for all 6 general federal elections in Table 1, though using this measure of turnout I again find that the turnout rate in the 2024 election was similar to the turnout rate in the 2020 election. The VEP turnout rate in 2024 was 0.1 percentage points higher in 2024 than in 2020. But the 2024 VEP turnout rate was 8.5 percentage points higher in 2024 than in 2016.

16.    McDonald (2024) provides VEP turnout rates in Georgia for all federal elections from 1980 to 2024.[4] I present those VEP turnout rates in

---

[4] To create this time series I combine the data available on Professor McDonald's website available here—Michael McDonald, Univ. of Fla. Election Lab, 1980-2022 General Election Turnout Rates (v1.2) (Oct. 6, 2024), https://election.lab.ufl.edu/dataset/1980-2022-general-election-turnout-rates-

Figure 1 for the Midterm (left-hand panel) and General (right-hand panel) elections from 1980 to 2024. Using McDonald's (2024) VEP estimates presented in the right-hand panel of Figure 1, I find that the turnout rate in the 2024 Georgia presidential election (right-hand panel) was the highest turnout rate in any general federal election in Georgia since at least 1980. The second highest VEP turnout rate occurred in the 2020 election. The federal election with the third highest VEP turnout rate is the 2008 election and the 2024 VEP turnout rate was 5.6 percentage points higher than the 2008 VEP turnout rate.



Figure 1: VEP Turnout Rates from 1980 to 2024, calculated using McDonald's (2024) data.

v1-2/, along with the estimates from 2024 here—Univ. of Fla. Election Lab, *supra* note 4, https://election.lab.ufl.edu/2024-general-election-turnout/.

17.   The left-hand panel presents the VEP turnout rates for the midterm elections in Georgia from 1982 to 2022. As I explained in my first expert report and as Table 1 shows, the VEP turnout rate in 2022 in Georgia was lower than in 2018. The 2022 VEP turnout rate was 2.2 percentage points lower than the 2018 VEP turnout rate. But, the 2022 VEP turnout rate was the second highest VEP turnout rate in any Georgia midterm election from 1982 to 2022. The election with the third highest VEP turnout rate was the 2010 midterm election when turnout was 11.2 turnout points lower than the VEP turnout rate in the 2022 midterm election.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|------|---------------|------|---------------|------|---------------|------|---------------|------|---------------|
|      | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.022 | 0.022 | 0.133 | 0.133 | 0.352 | 0.352 | 0.102 | 0.102 | 0.388 | 0.388 |
| 2016 | 0.066 | 0.066 | 0.369 | 0.369 | 0.521 | 0.521 | 0.304 | 0.304 | 0.590 | 0.590 |
| 2018 | 0.077 | 0.077 | 0.343 | 0.343 | 0.495 | 0.495 | 0.275 | 0.275 | 0.539 | 0.539 |
| 2020 | 0.157 | 0.157 | 0.599 | 0.599 | 0.572 | 0.572 | 0.403 | 0.403 | 0.671 | 0.671 |
| 2022 | 0.209 | 0.209 | 0.341 | 0.341 | 0.421 | 0.421 | 0.214 | 0.214 | 0.539 | 0.539 |
| 2024 | 0.514 | 0.496 | 0.632 | 0.608 | 0.570 | 0.560 | 0.429 | 0.411 | 0.692 | 0.690 |

Table 2: Voter turnout by self-reported racial group, calculated using state-provided election returns.

18.   In Table 2 I calculated turnout rates for self-identified racial groups for federal general elections in Georgia from 2014 to 2024. Table 2 updates Table 2 from my first expert report. In the left-most column of Table 2 I present the election year. For each self-identified racial group I present a pair of CVAP turnout rates for each election. The "CVAP" column for each self-identified racial group is the CVAP turnout rate with the 2024 estimate

calculated using the 2023 5-year estimate of the CVAP in Georgia. In the "CVAP Trend" column for each self-identified racial group is the CVAP turnout with the 2024 estimate calculated using the extrapolated measure of the 2024 CVAP.[5]

19.    Comparing presidential elections, every racial group had higher turnouts rates in the 2024 election than in the 2016 election. Using the CVAP trend measure of turnout the turnout rate among Asian voters was 23.9 percentage points higher in the 2024 election than in the 2016 election (26.3 percentage points higher using the CVAP measure of turnout). Continuing to use the CVAP trend measure, the turnout rate among self-identified Black voters was 3.9 percentage points higher in the 2024 election than in the 2016 election (4.9 percentage points higher using the CVAP measure of turnout), among self-identified Hispanic voters the turnout rate was 10.7 percentage points higher in 2024 than in 2016 (12.5 percentage points higher using the CVAP measure), and among white voters the 2024 turnout rate was 10.0 percentage points higher than in 2016 (10.2 percentage points higher using the CVAP measure).

---

[5] Table 2 in this report differs from Table 2 in the first report in two ways. First, Table 2 in this report adds the 2024 turnout rates. Second, Table 2 in this report uses the 5-year estimate of the 2022 CVAP in Georgia, which was not available at the time I wrote my first report.

20.    Asian, Hispanic, and white voters had higher turnout rates in the 2024 election than in the 2020 election, though Black voters saw a decline in turnout in the 2024 election compared to the 2020 election. Continuing my use of the CVAP trend measure, I find that turnout among self-identified Asian voters was 0.9 percentage points higher in the 2024 election than in the 2020 election (3.3 percentage points higher using the CVAP measure). Using the CVAP trend measure of turnout, the turnout rate among self-identified Hispanic voters was 0.8 percentage point higher turnout rate in 2024 than in 2020 (2.6 percentage points higher using the CVAP measure of turnout) and the turnout rate among white voters was 1.9 percentage point higher turnout in the 2024 election than in the 2020 election (2.1 percentage points higher in 2024 than in 2020 using the CVAP measure of turnout). The only group with a decline in turnout in 2024 relative to 2020 was among self-identified Black voters. Using the CVAP trend measure of turnout I find a 1.2 percentage point decline in Black turnout in 2024 relative to the 2020 election (0.2 percentage point decline using the CVAP measure of turnout).

21.    Turnout rates in Georgia and nationwide tend to be higher in presidential elections than in midterm elections. This is true across all self-identified racial groups. The turnout rate for each self-identified racial group in the 2024 general election was higher than the turnout rate in the 2014, 2018, or 2022 midterm elections.

## IV.    COMPARING GEORGIA'S TURNOUT TO OTHER STATES

22.    In my first expert report I contrasted turnout rates in Georgia and the turnout rates in other states. I made two types of comparisons. To assess differences in overall turnout, I made a comparison of the aggregate turnout in Georgia to the turnout rates in other states. To assess differences in turnout among different self-reported racial groups, I also compared the turnout rate among different groups in Georgia to the turnout rates of self-identified racial groups in three other states: Louisiana, North Carolina, and South Carolina.

23.    In this expert report I update the overall comparisons for the 2024 election. To compare the turnout rates across different self-reported racial groups I use a different and more comprehensive strategy. Instead of using voter file data from three states where it was available, I use recently available data from the Current Population Survey (CPS), a census conducted post-election survey designed to measure turnout rates after federal elections. The use of this survey data provides a more comprehensive comparison of turnout rates among self-reported racial groups in Georgia to the turnout rates of self-reported racial groups in other states. I describe some tradeoffs below, but I use the survey data to provide a more comprehensive comparison with the turnout rates in other states.

24.    As I cautioned in my first expert report, interpreting any of the comparisons that I make in this section as a causal effect of SB 202 would

require strong and difficult to justify assumptions in this setting. For example, one key assumption would be that the only differences across Georgia and other states was the passage of SB 202. Of course, there are numerous differences across American states that could affect turnout rates and are unrelated to SB 202 in Georgia.

25.    Even though the across state comparisons would require strong assumptions to interpret as the causal effect of SB 202, these comparisons are essential to provide context for the changes in turnout observed in Georgia. As I describe in paragraph 38 in my first expert report, some of the Plaintiffs' experts interpreted changes observed in Georgia alone as evidence of the effect of SB 202. Using turnout comparisons within a single state to assess a policy's effect on turnout requires even stronger assumptions and risks confusing a nationwide pattern for a state-specific policy consequence. Using other states helps identify what those nationwide trends might be.

26.    In Table 3 I compare the aggregate turnout rate in the state of Georgia to the turnout rate in other states, calculated using the McDonald's (2024) VEP turnout rates. In Table 3 the "Year" column contains the year of the election, the "Georgia Turnout Rate" presents the VEP turnout rate in Georgia, which is identical to the "VEP Turnout Rate" column in Table 1. The "Other States' Turnout Rate" column calculates the VEP turnout rate across all other states and the District of Columbia. To perform this calculation I

summed together the total votes cast in these states and then divided this by the total size of the voting eligible population. Finally, I divided the total number of voters by the total voting eligible population in these states.

| Year | Georgia Turnout Rate | Other States' Turnout Rate |
|------|----------------------|----------------------------|
| 2014 | 0.386 | 0.367 |
| 2016 | 0.598 | 0.604 |
| 2018 | 0.541 | 0.509 |
| 2020 | 0.682 | 0.679 |
| 2022 | 0.519 | 0.467 |
| 2024 | 0.683 | 0.646 |

Table 3: Comparing the VEP turnout rate in Georgia to the VEP turnout rate in other states from 2014 to 2024.

27. Georgia's turnout rate in the 2024 election was 3.7 percentage points higher than the national average in other states. As discussed above, 68.3% of the voting-eligible population cast a vote in the 2024 election in Georgia and in other states, on average, 64.6% of the voting-eligible population turned out to vote. Unlike the turnout rates in other states, Georgia's turnout rate in 2024 was higher than in 2020, though as I mentioned above the 2024 turnout rate was similar to the turnout rate in 2020. The 2024 VEP turnout rate in Georgia was 0.1 percentage points higher than the 2020 VEP turnout rate in Georgia. Across the other states, the 2024 VEP turnout rate was 3.3 percentage points lower than the VEP turnout rate in 2020. Georgia's 2024 VEP turnout rate also increased more compared to the 2016 VEP turnout rate than other states' 2024 turnout rate increased over the 2016 VEP turnout rate

in the other states. The 2024 VEP turnout rate in Georgia was 8.5 percentage points higher than the 2016 VEP turnout rate in Georgia, while in other states the 2024 turnout rate was 4.2 percentage points higher than the turnout rate in the 2016 election.

28.    To enable a comparison of the turnout rates of self-identified racial groups in Georgia to the turnout rates of self-identified racial groups outside of Georgia, I use survey data from the US Census' Current Population Survey (CPS) November Supplement.[6] The CPS is a large-scale survey that serves as "the primary source of labor force statistics for the population of the United States."[7] After federal elections in even years the CPS November supplement is administered to respondents after the standard CPS battery and asks a sample of respondents about whether they turned out to vote in the recent general election and also asks them to report their self-identified race. Using these survey responses, I compare the turnout rates for Black and white respondents in Georgia to the turnout rates for Black and white respondents in other states in four federal elections before SB 202 was enacted; 2014, 2016,

---

[6] U.S. Bureau of Lab. Stats., Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/.

[7] U.S. Census Bureau, Current Population Survey (CPS) (Oct. 23, 2024), https://www.census.gov/programs-surveys/cps.html.

2018, and 2020 November general elections; and two federal elections after the passage of SB 202; the 2022, and 2024 November general elections.

29.    At the time I wrote my first expert report, the CPS November supplement for the 2022 election was not yet released. In place of the CPS data, in my first expert report I used available data from three states that recorded voters' self-identified racial groups in the voter file: Louisiana, North Carolina, and South Carolina. The comparison of the turnout rates of Black, white, and other self-identified racial groups in these states to the turnout rates in Georgia provided useful context for Georgia's turnout rates but necessarily limited the comparison to the turnout rates in the three states with available data at the time.

30.    Using the CPS turnout data, I followed standard practice and calculated the turnout rates using two different methods. First, I calculated the turnout rates using the same procedure as the Census.[8] Following the Census' procedure I classified respondents who reported that they turned out to vote as "VOTED." I then classified individuals who reported not turning out to vote, individuals who said that they "Don't Know", "Refused", or did not complete the turnout supplement as "NOT VOTED".[9] Among this population

---

[8] Aram Hur & Christopher H. Achen, *Coding voter turnout responses in the Current Population Survey*, 77 Pub. Op. Q. 985 (2013).

[9] In the 2014, 2016, 2018, and 2020 surveys I perform this classification based entirely on the PES1 variable in the CPS. In the 2022 and 2024 CPS I use the

of respondents I then applied the Census provided survey weights to calculate the turnout rates.[10] I classified an individual's self-identified racial group following the procedure in the replication code of Ansolabehere, Fraga, and Schaffner (2022).[11] I manually verified my calculations, confirming that my implementation of the Census procedure yielded turnout estimates that correspond to the Census provided estimates of turnout rates for the self-reported groups.

| | Black | | | | White | | | |
| | Georgia | | Other States | | Georgia | | Other States | |
| Year | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj |
|---|---|---|---|---|---|---|---|---|
| 2014 | 0.43 | 0.40 | 0.39 | 0.35 | 0.45 | 0.39 | 0.46 | 0.41 |
| 2016 | 0.60 | 0.60 | 0.59 | 0.60 | 0.64 | 0.63 | 0.65 | 0.65 |
| 2018 | 0.60 | 0.60 | 0.50 | 0.51 | 0.56 | 0.55 | 0.58 | 0.55 |
| 2020 | 0.64 | 0.65 | 0.63 | 0.66 | 0.70 | 0.74 | 0.71 | 0.72 |
| 2022 | 0.54 | 0.49 | 0.44 | 0.40 | 0.61 | 0.57 | 0.58 | 0.53 |
| 2024 | 0.61 | 0.66 | 0.59 | 0.59 | 0.69 | 0.74 | 0.71 | 0.71 |

Table 4: Estimated turnout rates for Black and white respondents in Georgia and other states, calculated using the CPS survey.

31.    I present the turnout estimates using the CPS in Table 4. In the "Year" column I identify the election year. The columns under "Black" contain the turnout estimates for self-identified Black respondents and the columns under "White" contain the turnout estimates for self-identified white

---

PES1 variable in the CPS and the PRSUPINT variable, which identifies individuals who refuse to complete the November supplement.

[10] The provided weight is variable PWSSWGT.

[11] Stephen Ansolabehere et al.,, *The current population survey voting and registration supplement overstates minority turnout*, 84 J. Pols. 1850 (2022).

respondents. Within each self-identified racial group the columns under "Georgia" contain the turnout estimates for respondents in Georgia and the columns under "Other States" contain the turnout estimates for respondents in other estates. In the columns labeled "CPS" I present the estimated turnout rate calculated following the Census' procedure for calculating the turnout rates.

32. There are several issues with using self-reported turnout to measure the voter turnout rate. The most obvious and well documented problem is that some respondents who did not vote in the election will falsely report voting when asked in a survey, like the CPS.[12] A second issue is that the Census procedure classifies all respondents who refuse to complete the November supplement as not voting in that election. But these respondents did not offer any information about their participation in the election. It is a strong assumption to suppose that none of the respondents who did not complete the supplement also did not vote in the corresponding election.

33. Hur and Achen (2013) provide one methodology to address these issues. The Hur and Achen (2013) procedure makes two modifications to the Census Bureau's procedure for estimating the turnout rate using the CPS turnout data. First, Hur and Achen (2013) drop respondents who refuse to

---

[12] Hur & Achen, *supra* note 8; Michael P. McDonald, *On the overreport bias of the National Election Study turnout rate*, 11 Pol. Analysis 180 (2003).

complete the November supplement rather than code those respondents as non-voters. Second, Hur and Achen (2013) adjust the Census provided turnout weights so that the overall estimated turnout rates using the CPS data are exactly equal to the VEP turnout rates from McDonald (2024). I followed the Hur and Achen (2013) procedure, calibrating the turnout estimates from the CPS for each state to the VEP turnout in McDonald (2024). I present the result of applying this procedure and the corresponding turnout rates in the "CPS Adj." columns in Table 4.

34.    Hur and Achen's (2013) procedure is not guaranteed to address issues of inaccurate estimated turnout rates using the CPS November supplement. The Hur and Achen (2013) procedure rests upon strong assumptions about how non-respondents compare to respondents in the November supplement and relies on the calibration of the census weights using the VEP turnout rates.[13] For example, a sufficient assumption for the Hur and Achen (2013) weight recalibration to provide an accurate estimate of the turnout rate in each self-identified racial group is that every group over-reports turnout at approximately the same rate within a state. Despite the strong assumptions, the Hur and Achen (2013) methodology addresses potential pathologies in the Census Bureau's turnout estimates.

---

[13] Ansolabehere et al., *supra* note 11.

35.     Using the CPS estimated turnout rates, I find that the changes in turnout rates in the general elections in Georgia after the passage SB 202 are similar to changes in turnout rates in other states in the same time period. For example, in the 2022 midterm using the "CPS" turnout estimates I calculated a Black turnout rate in Georgia of 54% (49% using the Hur and Achen adjustment). This is an increase of 11 percentage points over the 2014 Black turnout rate in Georgia (9 percentage point increase using the adjusted turnout rates). In the other states, I find that the turnout rate in 2022 was 5 percentage points higher in 2022 than in 2014 (5 percentage points higher using the adjusted turnout rate). The 2022 Black turnout rate in Georgia was 6 percentage points lower than the 2018 Georgia Black turnout rate (11 percentage points lower using the adjusted turnout rate). In the other states I find that the 2022 Black turnout rate was also 6 percentage points lower in 2022 than in 2018 ( and also 11 percentage points lower using the adjusted turnout rate).

36.     There is also similarity in the changes in Black turnout rates in the three presidential elections included in Table 4. Using the "CPS" turnout estimates I found a Black turnout rate of 61% in the 2024 presidential election (66% using the Hur and Achen adjustment). This is a one percentage point increase in turnout rate compared to the Black turnout rate in Georgia in the 2016 presidential election (6 percentage point increase using the Hur and

Achen adjustment). In other states there is no difference in the Black turnout rate from 2016 to the 2024 election (one percentage point decrease using the Hur and Achen adjustment). Continuing to use the "CPS" measure of turnout, the Black turnout rate in the 2024 presidential election in other states was 3 percentage points lower than the Black turnout rate in the 2020 presidential election (1 percentage point higher using the Hur and Achen adjustment). The 2024 Black turnout rate in other states was four percentage points lower than the 2020 Black turnout rate in other states (7 percentage points lower using the Hur and Achen adjustment).

37.     Focusing on the changes in turnout among white voters I reach a similar conclusion: the trends in turnout in Georgia are similar to the average trend in turnout in other states, though there is some evidence that white turnout in Georgia increased at higher rates than the white turnout in other states. In the 2022 Georgia midterm election the white turnout rate was 16 percentage points higher than in the 2014 Georgia midterm election (18 percentage points higher using the Hur and Achen adjustment), while the average white turnout rate in 2022 in other states was 12 percentage points higher than the average white turnout rate in 2014 in other states (12 percentage points using the Hur and Achen adjustment). Compared to the white turnout rate in the 2018 Georgia midterm election, white turnout was 5 percentage points higher in 2022 (2 percentage points higher using the Hur

and Achen adjustment). The average white turnout rate in the 2022 midterm election in other states and the average white turnout rate in the 2018 midterm election had no difference (2 percentage point decline using the Hur and Achen adjustment). In presidential elections, I find the 2024 white turnout rate in Georgia was 5 percentage points higher than the 2016 white turnout rate in Georgia (11 percentage points higher using the Hur and Achen adjustment), while in other states the white turnout rate increased 6 percentage points from 2016 to the 2024 election (6 percentage point increase using the Hur and Achen adjustment). Using the "CPS" estimates of turnout, I find that the white turnout rate in the 2024 election in Georgia was 1 percentage point lower than the white turnout rate in Georgia in the 2020 election (no difference using the Hur and Achen adjustment). In other states the 2024 white turnout rate was the same as the 2020 white turnout rate (1 percentage point lower using the adjusted turnout rate).

## V.    EVIDENCE ON HOW GEORGIA VOTERS CAST THEIR BALLOTS

38.    I also updated my analysis of how voters in Georgia cast their ballots to include the 2024 Georgia general election. I use the same procedure in this report as I used to obtain estimates of how Georgia voters use their absentee ballots from 2014 to 2022 in my first report. To assess how Georgia voters cast their ballots in the 2024 election I use the spreadsheet contained in

"Voter History File - Nov 2024 General Election.zip". After the 2024 election (and unlike the Voter History files I used in my first expert report), the Georgia Secretary of State's office updated the Voter History file to contain information about how voters cast their ballots. In the voter history file I use the field "Ballot Style" to assess how voters cast their ballots. I then merged in registered voters' self-identified race using the "Statewide Voter File_2025-01-15.csv". Because this voter file was generated after the 2024 election (apparently on January 15th, 2025) there are 6,884 individuals who turned out to vote who are not found in the provided voter file. Unlike in my first expert report, the provided file of "canceled" voters does not contain information about self-reported race, so I cannot use this file to merge with the voter file to obtain voters' self-report race. To mitigate the number of voters with missing race information, I used the version of the voter file from my first expert report. For 4,966 of these remaining voters I successfully merged information about self-identified race using the 2022 voter file used in my first expert report. This leaves 1,918 voters for whom I was unable to assign a self-identified race.

39.    Using this merged data set for the 2024 election, I updated my analysis of how Georgia voters cast ballots in recent federal general elections in Georgia. Table 5 presents the share of ballots cast in each election (first column) using early-in person (second column), mail-in absentee (third column

column), and on Election Day in person (fourth voting). Table 5 updates Table
7 in my first expert report.

| Year | Early Voting | Mail Voting | Election Day |
|------|--------------|-------------|--------------|
| 2014 | 0.326 | 0.041 | 0.633 |
| 2016 | 0.531 | 0.049 | 0.421 |
| 2018 | 0.478 | 0.056 | 0.466 |
| 2020 | 0.537 | 0.261 | 0.202 |
| 2022 | 0.579 | 0.062 | 0.360 |
| 2024 | 0.711 | 0.051 | 0.234 |

Table 5: Share of ballots cast using early, mail, and Election Day

40.     Table 5 shows that voters in Georgia in 2024 continued a shift
away from casting their vote on Election Day voting and instead towards in-
person during the early voting period. In the 2024 election 71.1% of all ballots
were cast in-person during the early voting period, the largest share of ballots
cast in-person during the early voting period for any of the six federal general
elections I examine in Table 5. Comparing 2014 to 2024 there was a 38.5
percentage point increase in the percentage of ballots cast using in-person
early voting. A larger share of votes were cast in-person during early voting in
2024 than in the 2016 and 2020 elections. The share of ballots cast in-person
during the early voting period was 18 percentage points higher in 2024 than
in 2016 and 17.4 percentage points higher in 2024 than in the 2020 election.

41.     Nearly all the increase in the share of ballots cast in-person during
the early voting period comes from a decline in the share of ballots cast on
Election Day. Comparing 2014 to 2024 there was a 39.9 percentage point

decrease in the percentage of Georgia voters who cast their vote on Election Day. Compared to 2024 a larger share of voters cast their ballots on Election Day in the 2016, 2018, and 2022 general elections in Georgia. Only the 2020 general election in Georgia saw a smaller share of ballots cast on Election Day than the 2024 general election: the share of votes cast on Election Day in the 2024 election was 3.2 percentage points higher than the share of votes cast on Election Day in the 2020 election.

42.    In the 2024 election 5.1% of all votes were cast using mail-in absentee voting. This is more than in 2014 (1 percentage point more in 2024) and 2016 (0.2 percentage points more than in 2016), but it was less than in 2018 (0.5 percentage points less than in 2018) and 2022 (1.1 percentage points less than in 2022). By far the highest rate of mail-in voting in Georgia general elections occurred during the 2020 election when 26.1% of all votes were cast using mail-in absentee voting, 21 percentage points higher than in the 2024 election.

43.    Using the merged 2024 voter history file and voter file, I updated my analysis of how rates of early in-person, mail-in absentee, and Election Day voting varied across self-reported racial groups. In Table 6 I report the share of ballots cast for each mode of voting for Asian, Black, Hispanic, and White voters. For space reasons I provide the table for American Indian voters in the Appendix to this report. The calculated shares of votes cast using each voting

method from 2014 to 2022 in Table 6 are identical to the numbers contained in

Figure 1 in my first expert report.

| Year | Asian | | | Black | | | Hispanic | | | White | | |
|------|-------|------|----------|-------|------|----------|-------|------|----------|-------|------|----------|
| | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day |
| 2014 | 0.196 | 0.036 | 0.767 | 0.386 | 0.035 | 0.579 | 0.195 | 0.024 | 0.780 | 0.306 | 0.046 | 0.648 |
| 2016 | 0.448 | 0.063 | 0.485 | 0.556 | 0.041 | 0.402 | 0.417 | 0.033 | 0.547 | 0.527 | 0.054 | 0.417 |
| 2018 | 0.367 | 0.116 | 0.515 | 0.501 | 0.073 | 0.426 | 0.339 | 0.063 | 0.597 | 0.478 | 0.046 | 0.475 |
| 2020 | 0.447 | 0.398 | 0.151 | 0.525 | 0.294 | 0.179 | 0.496 | 0.233 | 0.269 | 0.546 | 0.240 | 0.211 |
| 2022 | 0.518 | 0.092 | 0.388 | 0.637 | 0.075 | 0.288 | 0.476 | 0.045 | 0.478 | 0.559 | 0.056 | 0.384 |
| 2024 | 0.675 | 0.076 | 0.245 | 0.701 | 0.055 | 0.242 | 0.613 | 0.030 | 0.353 | 0.728 | 0.049 | 0.220 |

Table 6: Mode of Voting Across Voters Self-Identified Racial Groups

44.    Each self-reported racial group cast the largest share of their votes

in-person during early voting in the 2024 election. Compared to the 2014

election there was a 47.9 percentage point increase in the share of ballots Asian

voters cast in-person during early voting, a 31.5 percentage point increase in

the share of ballots Black voters cast in-person during early voting, a 41.8

percentage point increase in the share of ballots Hispanic voters cast in-person

during early voting, and a 42.2 percentage point increase in the share of ballots

white voters cast in-person during early voting. There was also an increase in

the share of ballots cast in-person during early voting compared to the most

recent presidential election (2020) and midterm election (2022). Among Asian

voters in 2024 there was a 22.8 percentage point increase in the share of ballots

cast in-person during the early voting period compared to 2020 and a 15.7

percentage point increase in the share of ballots cast in-person during the early

voting period compared to 2022. Among Black voters in the 2024 election there

was a 17.6 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 6.4 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Hispanic voters in the 2024 election there was a 11.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 13.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2022. Among white voters in the 2024 election there was a 18.2 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 16.9 percentage point increase in the share of ballots cast in-person during early voting compared to 2022.

45.    Table 6 shows that in the 2024 election each racial group cast the second-smallest share of ballots on Election Day, second to the share of ballots cast on Election Day in 2020. Further, across racial groups the 2020 election continues to be the election with the largest share of ballots cast using mail-in absentee voting and the smallest share of ballots cast on Election Day. In each racial group the 2024 election saw a smaller share of ballots cast using mail-in absentee voting than the 2022 election.

46.    I also updated my analysis of the rate of provisional voting in Georgia elections and overall in Table 7, which updates Table 8 from my first report. The "Race" column in Table 7 records the self-reported race of the voter

and the overall calculation. The "2014" to "2022" columns are the same
estimates as in Table 8 in my first report. The "2024" column presents the
share of votes cast classified as provisional by self-reported racial group and
overall for the 2024 election. Table 21, located in the Appendix, is structured
the same as Table 7, except it provides a count of the number of ballots
classified as provisional for each self-reported racial group and overall instead
of the share of ballots classified as provisional.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.0061 | 0.0026 | 0.0055 | 0.0033 | 0.0013 | 0.0012 |
| Asian | 0.0047 | 0.0033 | 0.0053 | 0.0027 | 0.0011 | 0.0006 |
| Black | 0.0031 | 0.0018 | 0.0034 | 0.0032 | 0.0010 | 0.0011 |
| Hispanic | 0.0049 | 0.0037 | 0.0057 | 0.0033 | 0.0016 | 0.0012 |
| White | 0.0012 | 0.0007 | 0.0013 | 0.0011 | 0.0004 | 0.0003 |
| Overall | 0.0019 | 0.0012 | 0.0022 | 0.0018 | 0.0006 | 0.0006 |

Table 7: Share of all general election votes classified as provisional by self-reported racial identity and overall.

47.    Overall, the 2024 election saw a smaller share of votes classified
as provisional than in the 2014, 2016, 2018, and 2020 general elections and a
similar share of ballots classified as provisional in the 2022 general election.
This same pattern is found in every self-reported racial group: every group had
a smaller share of ballots classified as provisional in the 2024 election than in
the 2014, 2016, 2018, and 2020 election. American Indian, Asian, Hispanic,
and white voters had a smaller share of votes classified as provisional in the
2024 election than in the 2022 election. Black voters saw an increase in the
share of ballots classified as provisional from 2022 to 2024, though the increase
in rate was substantively small: the share of Black voters who had their ballot

classified as provisional increased in 2024 compared to the 2022 election by 0.009 percentage points (an increase of 0.00009 in the share of ballots cast there were provisional).

48.    There is a similar pattern with the count of provisional ballots. Overall, the 2024 election had fewer ballots classified as provisional than the 2014, 2016, 2018, and 2020 elections, but in the 2024 election there were 695 more ballots classified as provisional than the 2022 election. In the 2024 election Asian, Black, and white voters had their second fewest number of provisional ballots cast, with the fewest number of provisional ballots cast for each group in 2022. In the 2024 election 42 American Indian voters had their ballot classified as provisional (fewer than 2018 and 2020, but more than 2014, 2016, and 2022), 91 Asian voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022), 1,620 Black voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, but more than 2022), 233 Hispanic voters had their ballots classified as provisional (fewer than 2016, 2018, and 2020, but more than 2014 and 2022), and 904 white voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022).

## VI.   ASSESSING BALLOT REJECTION RATES AND REASONS FOR MAIL-IN ABSENTEE VOTING IN GEORGIA

49.    I updated my analysis of the rate of absentee ballot rejections and the reason for those rejections using data from the 2024 general election. I calculated the share of mail-in absentee ballots that were returned and ultimately rejected, along with the reason those ballots were rejected. I use the Absentee Voter History files that the Secretary of State posts to their website, which I then merge with the voter file to include information about the voters' self-identified racial group. Using these merged files, I identify mail in absentee ballots in the 2016, 2018, 2020, and 2022 files by identifying rows where the "Ballot Style" field is equal to "Mailed". In the 2024 absentee voter history file I identified rows with the "Ballot Style" field equal to "ABSENTEE BY MAIL." In all analyses I focused on the ballots that were returned: ballots with the "Ballot Status" field equal to "A" (accepted) or "R" (rejected). The overall rejection rate for mail in absentee ballots is the share of ballots that are returned and rejected. I also calculated the reasons for rejection. I focus on four categories of rejections: ballots rejected due to arriving after the deadline, ballots rejected due to issues involving the voters' signature, ballots rejected due to an issue involving the voters' identification, and ballots rejected due to incorrect completion of the oath envelope as an "Oath" rejection. For the 2016 and 2018 elections I manually classified the "Status Reason" field to

correspond with these four categories.[14] For the 2020, 2022, and 2024 elections I use standardized rejection reasons included in the voter file, which I classify into the four categories.[15] Note that after the passage of HB 316 in 2018 the oath envelope was simplified to no longer require a voter to include their address or their date of birth. As a result of this simplification the "Oath" rejection rate will mechanically reduce to zero in these years. After classifying the reason for rejection, I calculated the share of returned mail in absentee ballots that were rejected for that reason.

50.    Table 8 presents the rates of rejections for mail in ballots in Georgia for the 2016, 2018, 2020, 2022, and 2024 elections overall and across self-reported racial groups. The "Race" column describes the self-reported racial identity of the voter or whether the calculation is for all voters. The "Year" column provides the election year. I extended my original analysis of mail-in ballot rejection reasons to include the 2016 election. The "Overall" column contains the share of all returned mail in ballots that are rejected. The "Deadline" column contains the share of all returned mail in ballots rejected

---

[14] My replication code contains the coded reasons in the "RejReasons16.csv" and "RejReasons18.csv" files.

[15] I classify the entry "BALLOT RECEIVED AFTER DEADLINE" as a rejection for arriving after the deadline. I classify "Invalid Signature" and "Missing Signature" as rejections for signature reasons. And I classify "Incorrect ID Information", "MIDR - ID not Provided", and "Missing ID Information" as rejections for ID reasons.

for arriving after the deadline, the "Signature" column contains the share of all returned mail in ballots rejected for an issue related to the voters' signature, the "ID" column contains the share of returned mail in ballots rejected for an issue related to voters' identification, and the "Oath" column contains the share of returned mail in ballots rejected for an issue related to the completion of the Oath envelope.

51.    Table 8 shows that the overall rejection rate for mail in absentee ballots in Georgia was lower in 2024 than in 2016 and 2018, but higher than the rejection rate in 2020 or 2022. I find that 1.7% of all returned mail in absentee ballots were rejected in 2024. This is 1.2 percentage points lower than the rejection rate in 2016 and 1.8 percentage points lower than the rejection rate in 2018. The overall mail-in ballot rejection rate in 2024 was 1.4 percentage points higher than the mail-in ballot rejection rate in 2020 and 0.3 percentage points higher than the overall rejection rate in 2022. In summary, the two general elections after the passage of SB 202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016 or 2018, but a higher mail-in ballot rejection rate than in 2020.

52.    The mail-in ballot rejection rate for every self-reported racial group followed a similar pattern: in the two general federal elections after the passage of SB 202 all groups had lower mail-in ballot rejection rates than mail-in ballot rejection rates in 2016 or 2018, but higher mail-in ballot rejection

rates than found in the 2020 election. For example, in the 2016 election 4.1% of all returned mail in ballots from Black voters were rejected. In the 2018 election 4.3% of all returned ballots were rejected. In the 2022 election 1.4% of all returned mail in ballots from Black voters were rejected and in the 2024 election 2% of the returned mail in ballots were rejected. But, in the 2020 election 0.4% of the returned mail in ballots from Black voters were rejected. The rejection rates among returned mail in ballots for white voters follows a similar pattern. In the 2016 election 2.3% of all returned mail in ballots from white voters were rejected and in the 2018 election 2.5% of all returned mail in ballots from white voters were rejected. In the 2022 election 1.2% of returned mail in ballots from white voters were rejected and in the 2024 election 1.3% of the returned mail in ballots from white voters were rejected. Again, the lowest mail-in ballot rejection rate for returned mail in ballots from white voters occurred in the 2020 election, when 0.2% of the returned mail in ballots were rejected.

53.    Focusing now on the reasons mail-in ballots were rejected, I first consider reasons related to the oath contained on the absentee ballot return envelope, which was required for mail-in ballots returned during the 2016 and 2018 elections. After the passage of HB 316, the oath was simplified so that voters did not have to include their date of birth and address on the oath envelope. The share of returned mail in ballots rejected for oath related reasons

is found in the "Oath" column in Table 8. Overall, in the 2016 election 1.1% of all returned mail in ballots were rejected for an oath envelope related reason, constituting 38% of all rejected mail-in absentee ballots (0.011/0.029 x 100). The rejection rate of mail-in ballots for oath related reasons rose to 1.5% in the 2018 election, constituting approximately 43% of all rejected mail-in ballots. After the passage of HB 316 this rejection rate declined to 0% in 2020, 2022, and 2024. A similar pattern is found in every self-reported racial group: oath envelope rejection rates were a large proportion of all ballot rejections in the 2016 and 2018 elections but then were eliminated after HB 316. For example, in 2016 1.3% of all returned mail in ballots from Black voters were rejected for oath related reasons, constituting 32% of all mail-in ballot rejections for Black mail-in voters. In 2022 2.2% of all returned mail in ballots were rejected for oath-related reasons, constituting 51% of all mail-in ballot rejections for Black mail-in voters. White voters followed a similar pattern. In 2016 0.9% of all returned mail in ballots from white voters were rejected for oath-related reasons, constituting 39% of all mail-in ballot rejections for white mail-in voters. In 2018 0.7% of all returned mail in ballots were rejected for oath-related reasons, constituting 28% of all mail-in ballot rejections for white mail-in voters.

54.    There is also variation from election-to-election in the share of mail-in ballots rejected for arriving after the deadline. The share of mail-in

ballots rejected for arriving after the deadline are found in the "Deadline" column of Table 8. Overall, the two general federal elections in Georgia after the passage of SB 202 had a smaller share of returned mail in ballots rejected for arriving after the deadline than were rejected for arriving after the deadline in the 2016 and 2018 elections, but the post-SB 202 elections had a larger share of mail-in ballots rejected for arriving after the deadline than in the 2020 election. In the 2016 election 1.4% of all returned mail in ballots were rejected for arriving after the deadline, constituting 48% of all mail-in ballot rejections. In the 2018 election 1.6% of all returned mail in ballots were rejected for arriving after the deadline, constituting 46% of all mail-in ballot rejections. In 2022 0.8% of all returned mail in ballots were rejected for arriving after the deadline, constituting 57% of all mail-ballot rejections. In 2024 1.2% of all returned mail in ballots were rejected for arriving after the deadline, constituting 71% of all rejections of returned mail in ballots. In the 2020 election 0.2% of all mail-in absentee ballots were rejected for arriving after the deadline, constituting 67% of all rejected mail-in ballots.

55.    There is a similar pattern among self-reported racial groups. Black voters had a smaller share of mail in absentee ballots rejected for arriving after the deadline in the elections after SB 202 than in 2016 or 2018, but a higher rate of rejection than in 2020. For example, in 2016 1.9% of all returned mail in ballots from Black voters were rejected for arriving after the deadline,

constituting 46% of all mail-in ballot rejections for Black mail-in voters. In 2018 1.5% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 35% of all rejected mail-in ballots for Black voters. In the 2022 election 0.7% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters. In the 2024 election 1.3% of all returned mail in ballots were rejected for arriving after the deadline, constituting 65% of all mail-in ballot rejections. The 2020 election saw the lowest rate of mail-in ballot rejections for Black voters for arriving after the deadline. In 2020 0.2% of all mail-in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters.

56.    White voters followed a similar pattern of change. The deadline rejection rates in the post-SB 202 elections were lower than in 2016 or 2018, but higher than in 2020. In the 2016 election 1.1% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 43% of mail in ballot rejections for white voters. In 2018 1.5% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 60% of all mail-in ballot rejections for white voters. In 2022 0.8% of all mail-in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections for white

voters. In 2024 0.9% of all mail-in ballots were rejected constituting 69% of all mail-in ballot rejections for white voters. In 2020 0.2% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections (rounding affects the appearance of results).

57.    Dr. Burden's expert report attributes the lower rejection rate in the 2020 election to the presence of drop boxes. Dr. Burden writes "drop boxes were an important contributor to lower rejection rates. A voter using a drop box to return an absentee ballot by election day is guaranteed that it will be received on time to be counted, whereas a voter returning a ballot via the postal service cannot be certain that it will be delivered by the election day deadline." Dr. Burden does not provide evidence for his causal claim that "drop boxes were an important contributor to lower rejection rates." Dr. Burden's analysis seems to be based on the following logic: there were more drop boxes available in the 2020 election and a lower rejection rate of absentee ballots in the 2020 election. But merely comparing rejection rates across the 2020 election and the post-SB 202 elections is not a credible way to estimate the causal effect of SB 202 and risks confusing a correlation-a change in rejection rates-with causation- the causal effects of more drop boxes on mail-in absentee ballot rejection rates. This is because there are many other differences across the 2020 and post-SB 202 elections that confound any changes made in Georgia's policies. And as a

result, it is difficult to attribute changes in the rejection rates to the changes mandated by SB 202.

58.    One important difference is that different populations of voters used mail-in ballots in each election and these different populations could result in differences in the rejection rates that are unrelated to the presence of drop boxes or any other policy related to SB 202. For example, the average mail-in ballot voter in the 2020 election was younger than the average mail-in ballot voter in other election years. In the 2020 election the average mail-in ballot voter was 56.8 years old. Compared to prior years, the 2020 average mail-in ballot voter was over two years younger than the average age of mail-in ballot voters in 2016 (58.9 years), more than a year younger than mail-in ballot voters in 2018 (58.0 years), 5 years younger than the average age of mail-in ballot voters in 2022 (63.9), and more than 3 years younger than the average age of mail-in ballot voters in 2024 (59.9).

59.    Further confounding the comparisons across elections is that mail-in ballot voters in the 2020 election returned their ballot earlier than mail-in ballot voters in the 2016, 2018, 2022, and 2024 elections. Using the absentee voter history file for each corresponding election, I find that in the 2020 general election 63% of all mail-in absentee ballots had been returned at least two weeks before the election. This is a larger share than in the other elections I examine in Table 8: In 2016 50% of mail-in ballots were returned at least two

weeks before the election, 49% in 2018, 47% in 2022, and 46% in 2024. In contrast, a smaller share of voters in the 2020 election returned their ballot in the week immediately before the election. In the 2020 election 17.3% of mail-in ballots were returned in the week before the election. In contrast, 28.9% of mail-in ballots were returned in the week immediately before the election in 2016, in 2018 it was 29.1%, in 2022 it was 24.1%, and in 2024 it was 25.9%. The result of these patterns is that the typical mail-in ballot was returned much earlier in the 2020 election than in the other elections I examined. The median mail-in ballot in 2020 was returned 18 days before the election, while the median mail-in ballot in 2016 was returned 13 days before the election. The median mail-in ballot in 2018, 2022, and 2024 were also returned 13 days before the election. Voters' decision to return their ballot earlier further confounds any attempt to isolate the effect of a policy change from SB 202 on the share of ballots rejected for arriving after the deadline.

60.    In contrast to mail-in ballots rejected for arriving after the deadline or for errors on the oath envelope, in most elections and for most self-reported racial groups a smaller share of rejections are due to issues with the voters' signature or because they failed to provide accurate identification. In the "Signature" column I calculated the share of mail-in ballots rejected for signature related reasons and in the "ID" column I calculated the share of mail-in ballots rejected for identification related reasons. As discussed in my first

expert report, prior to SB 202 mail-in absentee ballots were verified using a signature match. After SB 202 mail-in absentee ballots were verified using voter's identification, including a driver's license number. In the two post-SB202 elections, I find that the rate mail-in ballots were rejected for identification reasons is similar to the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections.

61.    In the 2024 election 0.42% of all returned mail in ballots were rejected for issues related to the voter's identification. This constitutes 24% of mail-in ballot rejections in the 2024 election. In the 2022 election 0.46% of mail-in ballots were rejected for issues related to the voter's identification, constituting 33% of all mail-in ballot rejections. This is higher than signature rejection reasons in pre-SB 202 elections, though the differences are relatively small compared to variation in the share of ballots rejected for Oath or deadline reasons for the elections in Table 8. For example, in the 2016 election 0.28% of all mail-in ballots were rejected for signature reasons. In the 2018 election 0.20% of all mail-in ballots were rejected for signature reasons, while in the 2020 election 0.15% of all mail-in ballots were rejected for signature reasons. The 2024 election mail-in ballot rejection rate for identification issues with mail-in ballots was 0.14 percentage points higher than the 2016 election rejection rate for signature issues with mail-in ballots, 0.22 percentage points

higher than the rejection rate for signature issues in the 2018 election, and 0.26 percentage points higher than the rejection rate in the 2020 election.

62.    I find similar patterns across self-reported racial groups: the ID rejection rates in the post-SB 202 elections were similar to the signature rejection rates in the pre-SB202 elections. For example, in the 2024 election 0.52% of returned mail in ballots from Black voters were rejected for ID related reasons. In the 2016 election 0.51% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.01 percentage points lower than the identification rejection rate for Black voters in 2024. In 2018 0.28% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.23 percentage points less than the identification related rejection rate among Black mail-in voters in 2024. And in 2020 0.24% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.28 percentage points lower than the identification related rejection rate for Black mail-in voters in 2024. There is a similar pattern for white voters. In 2024 0.31% of returned mail in ballots from white voters were rejected for identification reasons. In the 2016 election 0.18% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.13 percentage points lower than the 2024 identification rejection rate for white voters. In 2018 0.12% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.19

percentage points lower than the 2024 identification rejection rate for white voters. And in 2020 0.08% of mail-in ballots from white voters were rejected for a signature related issue, a rejection rate that is 0.23 percentage points lower than the 2024 identification rejection rate for white voters.

63.    I also find that the Black-white gap in the signature rejection rate in the pre-SB 202 elections is similar to the Black-white gap in the identification rejection rate in the post-SB 202 elections. In the 2024 election the Black-white gap in the identification rejection rate was 0.20 percentage points and in the 2022 election the Black-white gap in the identification rejection rate was 0.23 percentage points. In the 2016 election the Black-white gap in the signature rejection rate was 0.34 percentage points, in the 2018 election the Black-white gap in the signature rejection rate was 0.17 percentage points, and in the 2020 election the Black-white gap in the signature rejection was 0.17 percentage points.

| Race | Year | Overall | Deadline | Signature | ID | Oath |
|------|------|---------|----------|-----------|-----|------|
| Overall | 2016 | 0.029 | 0.014 | 0.003 | 0.001 | 0.011 |
| | 2018 | 0.035 | 0.016 | 0.002 | 0.000 | 0.015 |
| | 2020 | 0.003 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.008 | 0.001 | 0.005 | 0.000 |
| | 2024 | 0.017 | 0.012 | 0.001 | 0.004 | 0.000 |
| American Indian | 2016 | 0.048 | 0.021 | 0.003 | 0.006 | 0.018 |
| | 2018 | 0.053 | 0.031 | 0.000 | 0.000 | 0.019 |
| | 2020 | 0.007 | 0.005 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.037 | 0.029 | 0.002 | 0.006 | 0.000 |
| | 2024 | 0.038 | 0.034 | 0.001 | 0.004 | 0.000 |
| Asian | 2016 | 0.063 | 0.025 | 0.006 | 0.003 | 0.028 |
| | 2018 | 0.064 | 0.020 | 0.003 | 0.000 | 0.040 |
| | 2020 | 0.006 | 0.002 | 0.003 | 0.000 | 0.000 |
| | 2022 | 0.031 | 0.023 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.029 | 0.021 | 0.001 | 0.007 | 0.000 |
| Black | 2016 | 0.041 | 0.019 | 0.005 | 0.001 | 0.013 |
| | 2018 | 0.043 | 0.015 | 0.003 | 0.000 | 0.022 |
| | 2020 | 0.004 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.007 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.020 | 0.013 | 0.002 | 0.005 | 0.000 |
| Hispanic | 2016 | 0.051 | 0.022 | 0.005 | 0.002 | 0.019 |
| | 2018 | 0.044 | 0.018 | 0.003 | 0.001 | 0.021 |
| | 2020 | 0.005 | 0.003 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.020 | 0.015 | 0.000 | 0.004 | 0.000 |
| | 2024 | 0.032 | 0.023 | 0.001 | 0.008 | 0.000 |
| White | 2016 | 0.023 | 0.011 | 0.002 | 0.000 | 0.009 |
| | 2018 | 0.025 | 0.015 | 0.001 | 0.000 | 0.007 |
| | 2020 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.012 | 0.008 | 0.001 | 0.004 | 0.000 |
| | 2024 | 0.013 | 0.009 | 0.001 | 0.003 | 0.000 |

Table 8: Rate of absentee ballot rejections and rate of rejections by reason, overall and by self-reported racial identity.

## VII.  ASSESSING THE RATES OF WEEKEND VOTING IN THE POST-SB 202 ELECTIONS.

64.    One argument made in expert reports was that SB 202 would cause a decline in the use of weekend voting during in-person early voting. For example, when analyzing the consequences of SB 202, Dr. Lee opined that one consequence of SB 202 would be "the elimination of weekend voting on most weekends" (pg. 93). And when pointing to policies that Dr. Lee opines will

"raise the costs of voting" he cites "doing away with weekend voting on most weekends" (pg. 94). Dr. Pettigrew similarly implies that SB 202 will cause a decline in the use of weekend voting. Dr. Pettigrew writes that "Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202" (Pettigrew pg. 1).

65.    In my first expert report I concluded that "the 2022 general election and the 2022 runoff election saw the highest rate of weekend votes cast of any midterm election, and the second highest share of weekend votes cast in a general election, other than the 2020 general election." In Table 9 I update my analysis for the 2024 election. Using the Absentee Voter History file from the 2024 election, I identified all individuals with a "Ballot Style" entry equal to "EARLY IN-PERSON" and a "Ballot Return Date" equal to a weekend date when early in-person voting was active: either Sunday (October 20th, 2024 and October 27th, 2024) or Saturday (October 19th, 2024 and October 26th, 2024). I then measured the rate of Sunday and weekend voting using two different denominators. Following the analysis in Tables 31 and 32 of my first report, the two "Share of All Early In-Person Votes" columns calculate the share of all early in-person votes cast on "Sunday" or the

"Weekend". The two "Share of All Votes Cast" columns present estimates of the share of all votes cast, regardless of the method for casting those votes, on "Sunday" or the "Weekend."

| Year | Share of All Votes Cast | | Share of All Early In Person Votes | |
|---|---|---|---|---|
| | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.005 | 0.023 | 0.017 | 0.070 |
| 2016 | 0.006 | 0.042 | 0.012 | 0.079 |
| 2018 | 0.008 | 0.043 | 0.016 | 0.089 |
| 2020 | 0.015 | 0.053 | 0.027 | 0.099 |
| 2022 | 0.011 | 0.055 | 0.018 | 0.094 |
| 2024 | 0.015 | 0.077 | 0.021 | 0.109 |

Table 9: Share of all ballots cast on the weekend and the share of all early in person ballots cast on the weekend

66.    Using my calculations in Table 9 and focusing first on the share of all votes cast, I find that the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections I examined in Table 9. In 2024 I calculated that 1.49% of all votes cast in the Georgia presidential election were cast on a Sunday, early in person. This is similar to, but higher than, the 1.46% of all votes cast on Sunday, early in person in the 2020 election. In the 2022 election there was the highest share of all votes cast on Sunday for any midterm election considered in Table 9, with 1.07% of all votes in that election cast on Sunday. The 2018 (0.8%), 2016 (0.6%), and 2014 (0.5%) all had smaller shares of votes cast on Sunday. The 2024 election had the highest share of votes cast on the weekend. In the 2024 election 7.70% of all votes cast in the election were cast during in-person early

voting on a Saturday or Sunday. This is a 2.24 percentage point increase over the share of ballots cast on the weekend in the 2022 election, which had the second highest share of ballots cast on the weekend (5.46%). The 2024 election had a 2.36 percentage point increase over the share of ballots cast on the weekend in the 2020 election, 3.45 percentage point increase over the share of ballots cast on the weekend in the 2018 election, 3.49 percentage point increase over the share of ballots cast on the weekend in the 2016 election, and a 5.42 percentage point increase over the share of ballots cast on the weekend in the 2014 election.

67.    If instead I examine the share of all early in-person votes cast on Sunday or the weekend I reach a similar conclusion: after the passage of SB 202 voters casting ballots early in-person make use of Sunday and weekend voting. In the 2024 election 2.09% of all early in-person votes were cast on Sunday. This is second only to the 2020 election, where 2.70% of early in-person votes were cast on Sunday. Despite a larger share of early in-person voters casting their ballot on Sunday, a smaller share of total votes were cast on Sunday in the 2020 election because fewer voters cast their ballot early in-person in the 2020 election. As I noted in my first expert report, the highest rate of Sunday voting among early in-person voters in any midterm occurred in the 2022 election. The 2024 election had the highest share of early in-person votes cast on the weekend, with 10.89% of all early in-person votes cast on

Saturday or Sunday. This is a 1 percentage point increase over the share of early in person votes cast on the weekend in 2020, the election with the second highest share of early in-person votes cast.

68.    This same pattern is found across self-reported racial groups: the 2024 election had the highest share of ballots cast on the weekend for every group but American Indian voters. In Table 10 I calculated the share of all ballots cast in each election ("Year" column), regardless of the method of voting, for each self-reported racial group on "Sunday" and on the "Weekend". In the 2024 election 2.05% of all votes from Black voters were cast on Sunday during early in-person voting, the highest share for any of the 6 elections examined in Table 10. The share of votes from Black voters cast on Sunday is a 0.16 percentage point increase over the share of votes from Black voters cast on Sunday in 2020, the general election with the second highest-share of votes from Black voters cast on Sunday. In the 2022 election 1.6% of all votes from Black voters were cast on Sunday, the highest share of votes from Black voters cast on Sunday for any midterm election analyzed in Table 10 and the third highest share of Black votes cast on Sunday, behind the 2024 and 2020 elections. The 2024 election also had the largest share of votes from Black voters cast on the weekend during in-person early voting of any of the six elections I examined in Table 10. In the 2024 election 8.26% of all votes cast by Black voters were cast on the weekend using in-person early voting. The 2024

election's share of votes from Black voters cast on the weekend using in-person early voting is 2.17 percentage points higher than the share of votes from Black voters cast on the weekend using in-person early voting than in 2020, 3.15 percentage points higher than the same quantity in 2018, 3.25 percentage points higher than the same quantity in 2016, and 4.78 percentage points higher than the same quantity in 2014. The election with the second highest share of votes cast from Black voters on the weekend using in-person early voting was 2022, the other post-SB 202 election. In that election 6.75% of all votes from Black voters were cast on the weekend using in-person early voting. Hispanic and Asian voters cast the largest share of the ballots on Sunday and on the weekend using in-person early voting in the 2024 election. White voters cast the largest share of their ballots on the weekend using in-person early voting in the 2024 election and the second largest share of ballots cast on Sunday using in-person early voting. American Indian voters cast 1.7% of ballots cast in the 2024 election on Sunday using in-person early voting and 8.1% of ballots cast in the 2024 election on the weekend using in-person early voting.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|--------|---------|--------|---------|--------|---------|--------|---------|--------|---------|
|      | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.006  | 0.023   | 0.005  | 0.025   | 0.012  | 0.035   | 0.003  | 0.019   | 0.002  | 0.016   |
| 2016 | 0.004  | 0.040   | 0.011  | 0.064   | 0.010  | 0.050   | 0.005  | 0.043   | 0.004  | 0.036   |
| 2018 | 0.008  | 0.040   | 0.012  | 0.062   | 0.013  | 0.051   | 0.007  | 0.045   | 0.005  | 0.036   |
| 2020 | 0.016  | 0.055   | 0.021  | 0.067   | 0.019  | 0.061   | 0.015  | 0.058   | 0.012  | 0.047   |
| 2022 | 0.011  | 0.054   | 0.022  | 0.079   | 0.016  | 0.068   | 0.013  | 0.061   | 0.007  | 0.047   |
| 2024 | 0.017  | 0.081   | 0.030  | 0.108   | 0.021  | 0.083   | 0.019  | 0.085   | 0.011  | 0.072   |

Table 10: Share of All Ballots Cast on Sunday and the Weekend by Racial Group

69.    In Table 11 I computed the share of all votes cast during in-person early voting that were cast on Sunday or the weekend for each self-reported racial identity in the 6 elections I examined in Table 10. The 2024 election saw the largest share of early in-person votes cast on the weekend for every group but Asian voters. For Asian voters 16.2% of early in-person votes were cast on the weekend in the 2024 election. This is the second highest share of early in-person votes cast on the weekend and 0.6 percentage points less than 2018 election, when 16.8% of Asian early in person voters cast their ballot on the weekend. For some groups the share of early in-person votes cast on Sunday in the 2024 election was less than the maximum share of early in-person votes cast on Sunday: 2.7% of American Indian early in person votes were cast on Sunday in the 2024 election, 0.5 percentage points less than the maximum in 2020; 4.5% of Asian early in person votes were cast on Sunday in the 2024 election, 0.3 percentage points less than the maximum in the 2020 election; 2.9% of Black early in person votes were cast on Sunday in the 2024 election,

0.8 percentage points less than the maximum in the 2020 election; 3.1% of

Hispanic early in-person votes were cast on Sunday in the 2024 election, which

was the maximum across the six elections; and 1.5% of white early in-person

votes were cast on Sunday, 0.6 percentage points less than the maximum in

the 2020 election. As Table 10 shows, even though some groups in the 2024

election had a smaller share of early in-person votes cast on Sunday, a larger

share of all votes were cast on Sunday and on the weekend. As measured by

the share of voters who cast their ballots using that method, in the 2024

election weekend voting was the most popular it had ever been.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|--------|---------|--------|---------|--------|---------|--------|---------|--------|---------|
| | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.023 | 0.086 | 0.023 | 0.124 | 0.032 | 0.094 | 0.016 | 0.092 | 0.008 | 0.054 |
| 2016 | 0.009 | 0.088 | 0.024 | 0.138 | 0.019 | 0.094 | 0.011 | 0.099 | 0.008 | 0.069 |
| 2018 | 0.021 | 0.101 | 0.032 | 0.168 | 0.026 | 0.106 | 0.020 | 0.132 | 0.010 | 0.074 |
| 2020 | 0.032 | 0.109 | 0.048 | 0.150 | 0.037 | 0.118 | 0.030 | 0.118 | 0.021 | 0.086 |
| 2022 | 0.022 | 0.106 | 0.042 | 0.153 | 0.025 | 0.106 | 0.028 | 0.128 | 0.013 | 0.084 |
| 2024 | 0.027 | 0.128 | 0.045 | 0.162 | 0.029 | 0.118 | 0.031 | 0.139 | 0.015 | 0.099 |

Table 11: Share of Early in Person Ballots Cast on the Weekend, By Self-Identified Racial Group

## VIII. AFTER SB 202 FEWER VOTERS CANCELED MAIL IN BALLOTS AND THEN VOTED IN PERSON THAN IN THE 2020 ELECTION.

70.    As I explained in my first expert report, the preamble of SB 202

stated that "[t]he lengthy absentee ballot process also led to elector confusion,

including electors who were told they had already voted when they arrived to

vote in person. Creating a definite period of absentee voting will assist electors

in understanding the election process while also ensuring that opportunities

to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, § 2(9). In my first expert report I assessed the rate that voters who had a mail in ballot application accepted then canceled that ballot and voted either in person on Election Day or during early in-person voting. I had found that in the 2020 election 289,650 voters had canceled their mail in ballots and then voted either in person on Election Day or early in-person, constituting 16.7% of all mail in ballot applicants. I had found that in the first election after SB 202 the number and share of mail in ballot applicants who subsequently voted in person had declined.

71.    In Tables 12, 13, 14, and 15 I extend Tables 13, 14, 15, and 16 in my first expert report. In Table 12 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 13 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 14 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted early in-person, and in Table 15 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted early in-person. In each table I perform the calculation overall (bottom row) and for self-reported racial groups, for the 2014, 2016, 2018, 2020, 2022, and 2024 elections.

72.     Tables 12 and 13 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day in 2024 is lower than in 2020. In the 2024 election 1.5% of mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day. In the 2020 election 1.7% of all mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day, a 0.2 percentage point larger share of mail in ballot applicants. In the 2024 election 4,893 voters canceled their mail in ballots and voted in person, fewer voters than in the 2020 election, but more than in the 2014, 2016, 2018, and 2022 midterm election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.015 | 0.012 | 0.014 | 0.029 | 0.011 | 0.026 |
| Asian | 0.007 | 0.006 | 0.018 | 0.019 | 0.006 | 0.021 |
| Black | 0.010 | 0.009 | 0.020 | 0.017 | 0.006 | 0.017 |
| Hispanic | 0.011 | 0.022 | 0.034 | 0.034 | 0.012 | 0.029 |
| White | 0.005 | 0.005 | 0.007 | 0.015 | 0.005 | 0.012 |
| Overall | 0.007 | 0.006 | 0.015 | 0.017 | 0.006 | 0.015 |

Table 12: Share of mail in ballot applicants with canceled ballots ultimately voting on Election Day

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 2 | 5 | 10 | 152 | 9 | 48 |
| Asian | 8 | 36 | 203 | 1280 | 55 | 327 |
| Black | 328 | 522 | 2,208 | 9,124 | 541 | 1,716 |
| Hispanic | 11 | 92 | 290 | 1,671 | 62 | 236 |
| White | 436 | 709 | 913 | 13,763 | 770 | 2,032 |
| Overall | 848 | 1,493 | 4,072 | 28,965 | 1,592 | 4,893 |

Table 13: Number of mail in ballot applicants with canceled ballots ultimately voting on Election Day

73.     Tables 14 and 15 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day is lower than in

2020, though higher than in the 2014, 2016, 2018, and 2022 elections. In the 2024 election 7.6% of all mail-in ballot applicants canceled their ballot and ultimately voted in person during early voting. In 2020 15.0% of mail-in ballot applicants canceled their ballots and ultimately voted in person, a 7.4 percentage point larger share than in the 2024 election. Table 15 shows that 25,021 mail-in ballot applicants canceled their ballot and ultimately voted early in person in the 2024 election. This is a smaller number than in the 2020 election, when 260,685 mail-in ballot applicants canceled their ballots and ultimately voted in person. But, the 2024 number of canceled mail in ballot applicants was larger than in the other four elections analyzed in Table 15: 2014, 2016, 2018, and 2022 elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 0.007 | 0.028 | 0.066 | 0.143 | 0.056 | 0.077 |
| Asian | 0.013 | 0.024 | 0.048 | 0.137 | 0.045 | 0.096 |
| Black | 0.019 | 0.024 | 0.058 | 0.156 | 0.040 | 0.083 |
| Hispanic | 0.006 | 0.040 | 0.056 | 0.141 | 0.045 | 0.097 |
| White | 0.009 | 0.018 | 0.026 | 0.147 | 0.032 | 0.068 |
| Overall | 0.012 | 0.021 | 0.043 | 0.150 | 0.036 | 0.076 |

Table 14: Share of mail in ballot applicants with canceled ballots ultimately voting early in-person

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 1 | 12 | 48 | 759 | 44 | 140 |
| Asian | 15 | 141 | 540 | 9,166 | 416 | 1,483 |
| Black | 605 | 1,382 | 6,274 | 84,613 | 3,582 | 8,169 |
| Hispanic | 6 | 171 | 473 | 6,958 | 231 | 788 |
| White | 778 | 2,825 | 3,290 | 133,144 | 4,752 | 12,007 |
| Overall | 1,540 | 4,995 | 12,000 | 260,685 | 10,067 | 25,021 |

Table 15: Number of mail in ballot applicants with canceled ballots ultimately voting early in-person

## IX.    FEWER VOTERS WAITED MORE THAN 30 MINUTES IN THE FIRST PRESIDENTIAL ELECTION AFTER SB 202.

74.    In the initial expert reports, some of the Plaintiffs' experts opined that SB 202 would cause longer lines in Georgia. For example, Dr. Burden opined that the disparity between wait times for Black and white voters "may be worsened now that absentee voting is more difficult" (Burden pg. 2). Dr. Burden goes on to say that "To my knowledge, data on wait times in the November 2022 election have not yet been made publicly available via the CES or other reliable academic surveys. However, media coverage of that election and the December 6 runoff election suggests that long wait times, in some cases lasting hours, were experienced in Atlanta-area communities with large shares of Black voters" (Burden, pg. 22). Dr. Pettigrew argues provisions in SB 202 will affect wait times. Dr. Pettigrew states that "SB202 will negatively affect wait times" (pg. 28), that "Changes to early voting hours will not solve Georgia's long line problem", and that "Shrinking precincts will not shorten lines". More directly, Dr. Pettigrew opines that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color" (Pettigrew Rep. 29). None of the claims in these reports are based on an appropriately designed causal study, nor are they descriptive claims about the observed patterns after SB 202. Using updated data from the same sources as Plaintiffs' experts, I describe voter wait times after SB 202. I

again caution that these comparisons can only describe the causal effect of SB 202 on wait times under strong assumptions. But, the descriptive patterns show that, in contrast to the predictions from the Plaintiffs' experts, the share of voters waiting more than 30 minutes was lower in the post-SB 202 elections than in the pre-SB 202 elections.

75.    In my first expert report I used a survey of Georgia voters conducted by the School of Public and International Affairs (SPIA) survey research center at the University of Georgia. The SPIA survey research center conducted a similar survey of Georgia voters after the 2024 election. The 2024 iteration of the SPIA survey was conducted from November 11th to November 20th, 2024 and included a "total of 1,541 Georgia registrants who self-reported as having voted in the 2024 general election." I was not provided with access to the underlying data, but counsel provided me with a document from the SPIA survey research center describing the top-line results and cross tabs by a variety of relevant voter characteristics. This matches the same document that was also posted on the Secretary of State's website.[16]

76.    Among the voters who reported voting either in person during early voting or on Election Day, the survey asked "Approximately, how long

---

[16] Sch. Pub. & Int'l Affs. ("SPIA"), Survey Rsch. Ctr., Univ. Ga., *2024 Georgia Post-Election Survey* (2024), https://sos.ga.gov/sites/default/files/2024-12/GA%20Voter%20Survey-2024.pdf [hereinafter "2024 SPIA Survey"].

did you have to wait in line to vote?" This is the same question that Dr Burden and Dr. Pettigrew used in their analysis of wait times from the Cooperative Election Study (CES) surveys, which I also analyze below. In response to this question, voters were provided with the response options "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". Dr. Pettigrew imputes numbers to calculate wait times from this scale; I showed in my first expert report that Dr. Pettigrew provides no theoretical or substantive justification for that practice and there is no justification for the practice in the literature. Rather than imputing numbers for categories, I will instead focus on the proportion of respondents in each response category.

77.    According to the SPIA survey 2.7% of Georgia voters report waiting more than 30 minutes in line–2.0% report waiting 31 minutes - 1 hour and 0.7% report waiting more than an hour. Breaking down the estimates by race, the survey reports that 2.6% of white voters report waiting longer than 30 minutes to vote—1.8% report waiting 31 minutes to 1 hour and 0.8% report waiting more than an hour to vote. According to the SPIA survey, 1.9% of Black voters reported waiting more than 30 minutes to vote–1.7% report waiting 31 minutes to 1 hour and 0.2% report waiting more than an hour to vote. Comparing the 2024 SPIA survey with the 2022 SPIA survey, a smaller share of voters waited longer than 30 minutes to vote in 2024 than in 2022. In the 2022 SPIA survey 4.7% of all voters said that they waited longer than 30

minutes to vote, which is 2 percentage points more than the share of voters waiting longer than 30 minutes in the 2024 election.

78.    While I do not have access to the underlying data, I am able to assess statistical significance approximately using standard formulas and information from the topline survey results. Using these standard formulas, the margin of error for the 2 percentage point difference is 1.4 percentage points. This implies that the 95-percent confidence interval for the 2 percentage point difference is [0.006,0.034]. Because the 95-percent confidence interval does not contain zero, the observed 2 percentage point difference is statistically significant at the traditional 0.05 confidence level.

79.    According to the 2022 SPIA survey, 4.8% of white voters reported waiting longer than 30 minutes. There is 2.2 percentage points more than the share of white voters who report waiting longer than 30 minutes in the 2024 election. I calculated an approximate margin of error equal to 1.4 percentage points, which implies that the 95-percent confidence interval is [-0.005, 0.05]. Because the 95-percent confidence interval contains zero, the observed difference is not statistically significant at the traditional 0.05 confidence level. In the 2022 survey 4.0% of Black voters reported waiting longer than 30 minutes to vote. There is a 2.1 percentage point difference in the share of Black voters who report waiting longer than 30 minutes in each election, with a margin for the difference of 2.4 percentage points or a 95-percent confidence

interval of [-0.003, 0.04]. Because the confidence interval contains zero, the difference in the share of voters waiting longer than 30 minutes to vote is not statistically significant across elections at the traditional 0.05 confidence level.

80.    Dr. Burden and Dr. Pettigrew relied on the Cooperative Election Study (CES) when assessing voters' wait times in previous Georgia elections. The CES "is the largest academic survey focused on American elections" and is a standard source in the social sciences.[17] At the time I wrote my first expert report the 2022 CES survey was not yet available, so I was not able to assess wait times in Georgia using the same survey as Dr. Burden and Dr. Pettigrew. The final 2022 CES survey has subsequently been released and a preliminary 2024 CES survey is available. To assess wait times among Georgia voters using the same surveys as Dr. Pettigrew and Dr. Burden, I downloaded the survey from the CES data repository.[18] Using the 2014, 2016, 2018, 2020, 2022 and 2024 surveys I examined the reported wait times of voters who cast their ballot either early in-person or on Election Day. Like in the SPIA survey, the CES asks individuals who report voting in person or attempting to vote in person "Approximately, how long did you have to wait in line to vote?" Respondents

---

[17] Jonathan M. Tisch Coll. Civic Life, Tufts Univ., *Cooperative Election Study*, https://tischcollege.tufts.edu/research-faculty/research-centers/cooperative-election-study.

[18] Harvard Univ., *Cooperative Election Study*, https://cces.gov.harvard.edu/data.

are asked to select "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". In the 2016, 2018, 2020, and 2022 surveys I use the vote validation in the CES to assess turnout and apply the vote validation weights. Vote validation is a procedure where respondents' turnout is validated against official turnout records and are the weights Dr. Burden uses when calculating wait times when the vote validation weights are available. When calculating wait times using vote validation weights the calculations will exclude anyone who either 1) reported attempting to vote but was unable to cast their ballot or 2) anyone who falsely reported voting. The 2014 survey does not contain a vote validation, so I use the provided "weight" variable, which is the same procedure Dr. Burden follows. Vote validation is not yet complete for the 2024 survey, so I use the post-election survey weights, "commonpostweight". I present the results of the survey for each in Table 16. The survey stacks the responses for Black voters (top table), white voters (middle table), and overall (bottom table). The "Response" column are the options available to respondents and the "2014" to "2024" columns correspond to that election year.

|  | Response | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|
| | Not at all | 0.309 | 0.164 | 0.197 | 0.160 | 0.221 | 0.275 |
| | Less than 10 minutes | 0.312 | 0.335 | 0.372 | 0.155 | 0.443 | 0.407 |
| Black | 10 - 30 minutes | 0.325 | 0.369 | 0.249 | 0.345 | 0.270 | 0.242 |
| | 31 minutes - 1 hour | 0.049 | 0.106 | 0.118 | 0.218 | 0.063 | 0.070 |
| | More than 1 hour | 0.005 | 0.027 | 0.063 | 0.122 | 0.003 | 0.005 |
| | Not at all | 0.423 | 0.313 | 0.270 | 0.241 | 0.410 | 0.373 |
| | Less than 10 minutes | 0.343 | 0.348 | 0.320 | 0.334 | 0.395 | 0.416 |
| White | 10 - 30 minutes | 0.216 | 0.183 | 0.241 | 0.210 | 0.153 | 0.154 |
| | 31 minutes - 1 hour | 0.014 | 0.111 | 0.115 | 0.138 | 0.032 | 0.033 |
| | More than 1 hour | 0.003 | 0.045 | 0.053 | 0.077 | 0.011 | 0.025 |
| | Not at all | 0.388 | 0.257 | 0.247 | 0.209 | 0.354 | 0.360 |
| | Less than 10 minutes | 0.338 | 0.347 | 0.330 | 0.282 | 0.404 | 0.389 |
| Overall | 10 - 30 minutes | 0.242 | 0.241 | 0.250 | 0.262 | 0.189 | 0.189 |
| | 31 minutes - 1 hour | 0.028 | 0.115 | 0.118 | 0.161 | 0.043 | 0.046 |
| | More than 1 hour | 0.004 | 0.040 | 0.055 | 0.086 | 0.010 | 0.017 |

Table 16: Voter wait times in Georgia, using Cooperative Election Study from 2014 to 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

81.    Using the CES surveys I find that a smaller share of Black voters report waiting in line for more than 30 minutes in the two elections after the passage of SB 202 than in the 2016, 2018, or 2020, but a larger share than in the 2014 midterm election. In the 2022 election 6.6% of Black voters reported waiting longer than 30 minutes to vote and in the 2024 election 7.5% of Black voters reported waiting longer than 30 minutes to vote. In the 2020 election 34.0% of Black voters reported waiting more than 30 minutes to vote. This is 27.4 percentage points more than in the 2022 election (95-percent confidence interval of [-0.353, -0.196]), a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 26.5 percentage points more in the 2020 election than in the 2024 election (95-percent confidence interval [-0.336, -0.195]), a difference that is

statistically significant at the standard 0.05 threshold. In the 2018 election 18.2% of Black voters reported waiting more than 30 minutes to vote. This is 11.6 percentage points more than in the 2022 election (95-percent confidence interval [-0.180, -0.052]) a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes to vote was 10.7 percentage points more than in the 2024 election (95-percent confidence interval [-0.164, -0.049]) , a difference that is statistically significant at the standard threshold. In the 2016 election 13.3% of Black voters reported waiting more than 30 minutes to vote. This is 6.7 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.122, -0.013]) , a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 5.8 percentage points more in the 2016 election than in the 2024 election (95-percent confidence interval [-0.107, -0.009]), a difference that is also statistically significant at the standard 0.05 threshold. In the 2014 election 5.4% of Black voters reported waiting more than 30 minutes to vote. This is 1.2 percentage points less than in the 2022 election (95-percent confidence interval [-0.030, -0.055]) and 2.1 percentage points less than in the 2024 election (95-percent confidence interval [-0.019, 0.062]). But neither of those differences are statistically significant at the standard threshold.

82.    I also find that a smaller share of white voters reported waiting longer than 30 minutes to vote in the two elections after SB 202 than in the 2016, 2018, or 2020 elections, but a larger share reported waiting longer than 30 minutes than in the 2014 election. In the 2022 election 4.3% of white voters reported waiting longer than 30 minutes to vote and in the 2024 election 5.7% of white voters reported waiting longer than 30 minutes to vote. In the 2020 election 21.5% of white voters reported waiting longer than 30 minutes to vote. This is 17.2 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.209, -0.135]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2020 election was 15.8 percentage points more than in the 2024 election (95-percent confidence interval [-0.192, -0.123]) , a difference statistically significant at the standard threshold of 0.05. In the 2018 election 16.9% of white voters reported waiting longer than 30 minutes to vote. This is 12.6 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.158, -0.093]), a difference that is statistically significant at the standard threshold. The share of white voters waiting more than 30 minutes in the 2018 election was 11.1 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.142, -0.080]), a difference that is statistically significant at the standard threshold. In the 2016 election 15.6% of white voters reported waiting longer than 30 minutes to vote.

This is 11.3 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.144, -0.083]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2016 election was 9.9 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.128, -0.070]). And in the 2014 election 1.8% of white voters reported waiting longer than 30 minutes to vote. This is 2.5 percentage points less than in the 2022 election (95-percent confidence interval [0.006, 0.043]) and 3.9 percentage points less than in the 2024 election (95-percent confidence interval [0.020, 0.059]). Both differences are statistically significant at the standard threshold.

## X.    REJECTION RATES FOR MAIL IN ABSENTEE APPLICATIONS AND USE OF THE "ROLL OVER" LIST.

83.    SB 202 also altered the mail-in absentee ballot application window, requiring voters to submit applications no earlier than 78 days before the election and no later than 11 days before the election. SB 202 also required voters to provide proof of identity using a Drivers License or other identification, rather than with a signature, when submitting an absentee ballot application. In my first expert report I examined the share of applications in 2022 that were rejected for arriving after the deadline and the share of ballots rejected for identification related issues. In Table 12 of my first expert report I found that in the 2022 election 0.25% of mail-in absentee ballot

applications were rejected for arriving after the deadline, with mail-in ballot application rejection rates across racial groups of: 0.25% for American Indian voters, 0.27% for Asian voters, 0.27% for Black voters, 0.37% for Hispanic voters, 0.22% for white voters.

84.    In Table 17 I update the calculations in Table 12 from my original report to include rejection reasons for mail-in ballot applications in the 2024 election. To make these calculations I used the data contained in the file "STATEWIDE_With_App_Reason.zip" provided to me by counsel. This spreadsheet is similar to the Absentee Voter History file the state distributes, but this file contains two additional fields "Rejected Reason" and "Rejected Reason Memo." "Rejected Reason" appears to be a standardized coding of the reasons mail-in ballot applications are rejected and "Rejected Reason Memo" contains a more complete description of the rejection reason. I used the "Rejected Reason" field to identify mail-in ballot applications rejected for arriving after the deadline, before the deadline, and for identification related issues.[19] Based on these fields I then calculated the rejection rates for mail-in

---

[19] I classified a mail-in ballot application as rejected for arriving after the deadline if the Rejected Reason is "Application Received After Application Window Closed". I classified a mail-in ballot application as rejected for arriving before the deadline if the Rejected Reason is "Application Received Before Application Window Open". I classified the mail-in ballot application as rejected for identification reason if the Rejected Reason field contains "Cure Not Received - Incorrect ID Information" or "Cure Not Received - Missing PII/ID Information".

ballot applications for these reasons for each self-reported racial group and overall.

| Race | After Deadline | Before Window Opens | Identification Issue |
|------|------|------|------|
| American Indian | 0.0129 | 0.0011 | 0.0043 |
| Asian | 0.0073 | 0.0006 | 0.0068 |
| Black | 0.0085 | 0.0015 | 0.0044 |
| Hispanic | 0.0100 | 0.0016 | 0.0052 |
| White | 0.0041 | 0.0018 | 0.0027 |
| Overall | 0.0061 | 0.0016 | 0.0037 |

Table 17: Share of mail-in ballot applications in the 2024 general election rejected for either arriving after the deadline, before the application window opens, or for identification related reasons.

85.   Turning first to the "After Deadline" column in Table 17, I find that 0.61% of all mail-in ballot applications were rejected for arriving after the deadline, a total of 2,059 applications. This is 0.36 percentage points higher than the share of mail-in ballot applications rejected for arriving late in the 2022 election, but it is smaller than the estimated number of individuals who would be affected by late applications in Dr. Lee or Dr. Fraga's expert report by counterfactually applying SB 202 deadlines to prior elections.[20] In the 2024 election the vast majority of mail-in ballot applications from every self-identified racial group arrived before the deadline for mail-in applications. Overall 99.39% of mail-in ballots were classified as arriving before the deadline, either in the SB 202 application window or before the window opened primarily because of use of the roll over list or because an applicant applied too

---

[20] Lee Sur-Rebuttal Rep. ¶ 7, p. 4. Fraga Expert Rep. p. 80.

early. That said, the share of mail-in ballot applications rejected for arriving after the deadline was higher than the share of mail-in ballot applications rejected for arriving after the deadline in the 2022 election for every self-reported racial group. In the 2024 election, 0.85% of mail-in ballot applications from Black voters were rejected for arriving late (implying 99.15% were classified as arriving before the deadline), 0.73% of mail-in ballot applications from Asian voters were rejected for arriving late (99.27% classified as arriving before the deadline), 1% of mail-in ballot applications from Hispanic voters were rejected for arriving late (99% classified as arriving before the deadline), and 0.41% of mail-in ballot applications from white voters were rejected for arriving late (99.59% classified as arriving before the deadline).

86.   In the "Before Window Opens" column I calculated the share of mail-in ballot applications where the mail-in absentee ballot application was rejected for arriving before the mail-in ballot application window opened 78 days before the election. Overall, 0.16% of mail-in ballot applications were rejected for arriving before the mail-in ballot application window opened. Table 17 shows that there is no consistent relationship between an applicant's self-report race and the share of ballot applications rejected for arriving outside the application window. White voters had the lowest rate of mail-in ballot application rejections for applications arriving after the deadline, but white

voters had the highest rate of mail-in ballot application rejects for ballots arriving before the deadline.

87. An important exception to the SB 202 window is that individuals 65 and older, self-declared disabled, military, and overseas voters are able to apply for an absentee once for an entire election cycle. In my first expert report I used information from the Secretary of State's office to identify the share of mail-in absentee ballot applications from individuals on the rollover list. I reported that information in Table 11 of my first report. I updated this calculation for the 2024 general election in this report and the results are presented in Table 18. For each self-reported racial group and overall ("Race" column), I describe the overall share of applicants on the roll over list "Share Roll Over, Overall," share of applicants who are 65 and older on the list ("Share Roll Over, 65 & Over"), and the share of applicants who are on the roll over list and under 65 ("Share Roll Over, Under 65").

| Race | Share Roll Over Overall | Share Roll Over 65& Over | Share Roll Over Under 65 |
|------|-------------------------|--------------------------|--------------------------|
| American Indian | 0.150 | 0.717 | 0.066 |
| Asian | 0.165 | 0.587 | 0.014 |
| Black | 0.451 | 0.750 | 0.140 |
| Hispanic | 0.184 | 0.669 | 0.039 |
| White | 0.482 | 0.786 | 0.075 |
| Overall | 0.437 | 0.766 | 0.089 |

Table 18: Share of Absentee Ballot Applications on State Roll Over List in the 2024 General Election

88. In the 2024 general election 43.7% of all mail in ballot applications were from individuals on the roll over list. Applicants 65 and over were more

likely to be on the roll over list, with 76.6% of mail in ballot applications from voters 65 and over on the roll over list compared to 8.9% of applications from voters under 65. Similar to the 2022 election, a larger share of Black and white voters were on the roll over list compared to voters from other self-reported racial groups. Overall, 45.1% of applications from Black voters were from Black voters on the roll over list and 48.2% of applications from white voters were from white voters on the roll over list. In contrast, 16.5% of applications from Asian voters were from Asian voters on the roll over list and 18.4% of applications from Hispanic voters were from Hispanic voters on the roll over list. Across all racial groups more than a majority of applications from voters 65 and over were from voters on the roll over list: 75.0% of applications from Black voters 65 and over came from Black voters on the roll over list, 78.6% of applications from white voters 65 and over came from white voters on the roll over list, 58.7% of applications from Asian voters were from Asian voters on the roll over list, and 66.9% of applications from Hispanic voters were from Hispanic voters on the roll over list. Among voters under 65, Black voters had the largest share of applications from individuals on the roll over list: 14.0% of mail in ballot applications from Black voters under 65 came from individuals on the roll over list. I calculated 7.5% of mail in ballot applications from white voters under 65 came from individuals on the roll over list, 1.4% of applications from Asian voters under 65 came from individuals on the roll over list, and

3.9% of applications from Hispanic voters under 65 came from individuals on the roll over list.

89.    Returning to Table 17, the "Identification Issue" column contains the share of mail-in ballot applications rejected for identification reasons. When a voter submits a mail-in ballot application and an identification issue occurs, a "cure" form is distributed. A voter will only have their application rejected in this column if their "cure" form was not received to address the identification issue, which I will call a rejection for identification reasons. Overall 0.37% of mail-in ballot applications were rejected for identification related reasons. I estimated that 0.44% of mail-in ballot applications from Black voters were rejected for identification related reasons, 0.68% of mail-in ballot applications Asian voters were rejected identification reasons, 0.52% of mail in ballot applications from Hispanic voters were rejected for identification reasons, and 0.27% of mail in ballot applications were rejected for identification for white voters.

## XI.    SURVEY-BASED ESTIMATES OF DROP BOX USE

90.    In a sur-rebuttal, I calculated self-reported survey-based estimates of the rate Black and white mail-in voters returned their ballots using a drop box. In that sur-rebuttal, I concluded that "in the 2020 general election...I find that white mail in absentee ballot voters in Georgia are more likely than Black mail in voters to report returning their ballot via drop box." I also found that

in the 2022 election, white mail-in voters were more likely to report using a drop box than Black mail-in voters, but that difference was smaller than in 2020. In this report, I update these calculations, which are found in Table 19.

91.    I used the Cooperative Election Study (CES) for the 2020, 2022, and 2024 election. I define a mail-in voter who reports using a drop box using the same procedure as in the sur-rebuttal.[21] I then calculated the share of mail-in voters who self-report returning their ballot at a drop box, for white mail-in voters, Black mail-in voters, and then overall for all mail-in voters in Georgia. For the 2020 and 2022 estimates, I applied the post-election voter validated weights. These weights are not available in the 2024 CES, so for those estimates I applied the post-election weights.

92.    In Table 19 I find that in the 2024 election, unlike the 2020 and 2022 elections, white mail-in voters were less likely than Black mail-in voters to report using a drop box. According to the 2024, CES Black mail-in voters were 14 percentage points more likely to self-report that they returned their ballots at a drop box than white mail-in voters. This difference, however, is not statistically significant at conventional levels.

---

[21] I classify a mail-in voter as using a drop box if they report returning their ballot at a "Drop box used only for ballots, not located at an election office or polling place", "Main election office", "Neighborhood polling place", or "Voting center, not a neighborhood polling place".

| Year | White Mail-In Voters | Black Mail-In Voters | Overall Mail-In Voters |
|------|------|------|------|
| 2020 | 0.54 | 0.45 | 0.49 |
| 2022 | 0.32 | 0.27 | 0.29 |
| 2024 | 0.36 | 0.50 | 0.47 |

Table 19: Share of Mail-in Voters Returning Ballots at a Drop Box, using Cooperative Election Study from 2020, 2022, and 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

93.    Table 19 also shows that the overall self-reported rate of drop box use among mail-in voters in Georgia is similar to the overall self-reported rate of drop box use in Georgia in the 2020 election. In the 2024 election 47% of mail-in voters self-report returning their ballot at a drop box, two percentage points less than the 49% of mail-voters who self-report returning their ballot at a drop box in 2020. This difference is not statistically significant at conventional levels.

94.    The estimates from Table 19 are useful, but there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember how they returned their ballot or their mode of voting. That said, Table 19 demonstrates that, at least in the self-reported behavior among CES respondents, there has not been a large decrease in the rate of drop box voting among mail-in voters in Georgia.

## XII.  CONCLUSION

95.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on June 13, 2025

Justin Grimmer, Ph.D.

# APPENDIX

| Year | Early Voting | Mail Voting | Election Day |
|------|-------------|-------------|--------------|
| 2014 | 0.268 | 0.024 | 0.708 |
| 2016 | 0.459 | 0.033 | 0.505 |
| 2018 | 0.397 | 0.049 | 0.553 |
| 2020 | 0.509 | 0.240 | 0.247 |
| 2022 | 0.512 | 0.050 | 0.437 |
| 2024 | 0.627 | 0.040 | 0.328 |

Table 20: American Indian mode of voting in Georgia elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 24 | 25 | 54 | 51 | 16 | 42 |
| Asian | 104 | 223 | 357 | 336 | 87 | 91 |
| Black | 2,226 | 1,967 | 3,737 | 4,222 | 1,092 | 1,620 |
| Hispanic | 141 | 341 | 513 | 494 | 146 | 233 |
| White | 2,009 | 1,758 | 3,020 | 3,159 | 886 | 904 |
| Overall | 5,038 | 4,820 | 8,648 | 9,272 | 2,564 | 3,259 |

Table 21: Count of general election votes classified as provisional by self-reported racial identity and overall.

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*, | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, | |
| *Defendants.* | |



EXHIBIT
3
8-15-25  KB
PENGAD 800-631-6989

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

    *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

    *Defendants.*

Case No. 1:21-CV-01728-JPB


<u>Expert Report of Dr. Stephen Pettigrew</u>

Dr. Stephen Pettigrew
University of Pennsylvania
Program on Opinion Research and Election Studies
Ronald O. Perelman Center for Political Science and Economics, Suite 406
133 S. 36th Street
Philadelphia, PA 19104

On behalf of Plaintiffs in the three above captioned cases.

# Table of Contents

Introduction and summary of findings     iii

Qualifications     v

1   Introduction     1

2   Data and methods     3
   2.1   Converting survey responses to minutes waited . . . . . . . . . . . . .   4
   2.2   Self-reported versus verified voters . . . . . . . . . . . . . . . . . . .   7

3   Wait times in recent elections in Georgia     11
   3.1   Georgia voters are more likely to face longer than 30 minute waits to vote . .   11
   3.2   Georgia voters spend more time in line than voters in nearly every other state   13
   3.3   Non-white voters in Georgia wait significantly longer to vote . . . . . . . . .   17
     3.3.1   Accounting for other disparities between white and non-white voters .   20

4   Impact of SB202's line relief ban on wait times     26
   4.1   SB202 places new burdens on voters waiting in line . . . . . . . . . . . . . .   26
     4.1.1   Ban on providing food or water to voters in line . . . . . . . . . . .   26
   4.2   SB202 will negatively affect wait times . . . . . . . . . . . . . . . . . . . .   28
     4.2.1   Mail voting restrictions will push voters toward voting in-person or not voting at all . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
     4.2.2   Shortening the runoff election schedule will increase line length or decrease turnout . . . . . . . . . . . . . . . . . . . . . . . . . . .   33
     4.2.3   Changes to early voting hours will not solve Georgia's long line problem   36
     4.2.4   Shrinking precincts will not shorten lines . . . . . . . . . . . . . . .   40

5   Consequences of long lines     42
   5.1   Long lines decrease voter turnout in future elections . . . . . . . . . . . . .   42
   5.2   Long lines diminish voter confidence in the integrity of elections . . . . . . .   44

A   Supplemental material for analyses     47
   A.1   Sample sizes of CCES data . . . . . . . . . . . . . . . . . . . . . . . . . .   47
   A.2   Analysis of SPAE data . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
   A.3   Voters waiting more than 60 minutes . . . . . . . . . . . . . . . . . . . .   49
   A.4   Wait times in each state . . . . . . . . . . . . . . . . . . . . . . . . . . .   50
   A.5   Differences in line length between Georgia and other states, using regression with demographic controls . . . . . . . . . . . . . . . . . . . . . . . . . .   55

   A.6  Relationship between race and line length  . . . . . . . . . . . . . . . . . . .  57

**B  Curriculum Vitae**                            **61**

# Introduction and summary of findings

My name is Dr. Stephen Pettigrew. I have been retained as an expert witness by the AME, GA NAACP, and CBC Plaintiffs in this case to provide my analysis and opinions concerning long lines to vote in Georgia and their consequences, racial disparities in wait times, and the likely impact of SB202 on wait times. I reserve the right to continue to supplement my declaration/report in light of additional facts, testimony and/or materials that may come to light and reserve the right to address a broader scope of issues in any future report. I hereby declare as follows.

- Georgia voters spend more time waiting to vote than voters in almost every other state. In midterm elections, the average early in-person or Election Day voter in Georgia waited more than twice as long as voters in other states (12.6 minutes versus 6.2 minutes), even after accounting for demographic differences like education, age, or race. In presidential elections, Georgia voters waited 1.6 times longer (22.3 minutes versus 14.2).

- The 2012 Presidential Commission on Election Administration recommends that no voter should have to wait longer than 30 minutes to vote. This recommendation was the result of consultation with researchers and practioners and has become the standard by which lines are deemed "within reason." The percentage of voters in Georgia waiting more than 30 minutes to vote in recent midterm elections (8.8%) is higher than all but one other state. Georgia's rate in recent presidential elections (22.0%) is the third-highest in the country.

- Non-white voters in Georgia wait in significantly longer lines than white Georgia voters. This difference remains even after accounting for differences in population density and demographics, like education and age. This finding is consistent with political science literature on the topic.

- Black voters face significantly longer wait times than white voters in Georgia, even when comparing white and non-white voters who live within the same county. In the November 2020 election, Black voters waited more than 10 minutes longer to vote than white voters. Comparable data from the 2022 election is not yet available.

- Precincts in predominantly non-white neighborhoods tend to function much closer to their operational capacity than precincts in predominantly white neighborhoods. This

means that applying equal strain to all precincts (like a small, uniform increase in the number of in-person voters) will have substantially bigger impacts on line length in non-white precincts.

- SB202 is likely to have a negative impact on the length of lines throughout Georgia, particularly in precincts that serve racial minorities. While other administrative changes (separate from those in SB202) may have a positive impact on the line length, the provisions in SB202 will lessen or negate the potential impact of those changes.

- Although SB202 requires an expansion of early voting hours, that change will have almost no impact on long lines. Prior to SB202, most counties already offered at least as many hours as required by SB202. The Georgia counties with the longest lines already offered the most hours of early voting, and will not be required to add hours under the new law.

- Waiting in a long line makes a voter less likely to vote in subsequent elections. Policies that make election lines longer reshape the electorate and put a thumb on the electoral scale. In Georgia, this means discouraging Black and other racial minority voters from turning out, while having a smaller impact on white voters' turnout.

- Voters who experience a long wait to vote are less confident in the integrity of the electoral system as a whole. They are less likely to believe their and others' votes were accurately recorded in the final vote count.

# Qualifications

I have been the Director of Data Science in the Program on Opinion Research and Election Studies at the University of Pennsylvania and the Deputy Executive Director of the Robert A. Fox Leadership Program at UPenn since December of 2017.

I hold a PhD in Political Science from Harvard University, conferred in May 2017. I received a Masters Degree in Statistics from Harvard in March 2014. I am a proud alum of the University of Georgia. In May of 2011, I received a Masters in Political Science and International Affairs and a Bachelor of Arts as a political science and history double major from UGA.

Prior to starting at UPenn, I worked as a data scientist and project manager at the MIT Election Data and Sciences Lab, where my research focused on issues related to election administration, particularly long lines. In addition to my academic work, I am a consultant for the NBC News Decision Desk. As a Senior Analyst, I help produce statistical models and apply them to determine NBC's projections of winning candidates on election nights.

I have published nine peer-reviewed articles in journals such as *Science*, *Electoral Studies*, the *Election Law Journal*, and *Political Science Quarterly*. I have published research about the differences in election day wait times between white and non-white voters. My published work has also demonstrated that waiting in a long line makes voters less likely to vote in subsequent elections. Some of my other work has focused on voter registration list maintenance and the processes in place to secure the vote-reporting system on Election Night. More recently, I have published work on changes to mail ballot rules during the COVID-19 pandemic and shifts in public opinion about those rules. My research has been covered by a variety of media outlets including the *New York Times*, *Washington Post*, *FiveThirtyEight*, and the *Chronicle of Higher Education*.

I have also contributed to reports on election administration by non-profit organizations such as *The Pew Charitable Trusts* and the *Bipartisan Policy Center*. I was responsible for a large proportion of the statistical work that went into the early versions of Pew and MIT's Election Performance Index,[1] which has become the go-to source for evaluating the efficacy of states' election administration processes. I conducted the main statistical analysis and was a co-author on a report about long lines and polling place resources in the 2016 General Election For the *Bipartisan Policy Center*.[2]

---

[1] https://elections.mit.edu

[2] "Improving the Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources." *Bipartisan Policy Center*. April 2018. With John Fortier, Tim Harper, Charles

In June 2021, I testified before the Congressional Subcommittee on Elections for the United States House of Representatives about the causes and effects of long lines at election polling places.[3] I was invited as an expert witness to comment on the problem of long lines to vote in the United States and the legal changes that could help to alleviate the problem.

I have been asked by above-mentioned plaintiffs to provide a report about long lines to vote in Georgia. In particular, I was asked to address several questions in this declaration:

- How long have Georgia voters had to wait in line to vote in recent elections? How does this compare to wait times of voters in other states?

- Are there differences in wait times between white and non-white voters in Georgia? Are there particular minority racial or ethnic groups that tend experience noticeably longer waits?

- What impact might SB202 have on election wait times for Georgia voters? How might these impacts differ across racial groups?

- What are the impacts that long lines have on voters? How do long wait times impact voter turnout in subsequent elections? How do they impact voter confidence in the electoral system as a whole?

The conclusions, analyses, and opinions of this report are my own. I am being compensated at a rate of $350 per hour for my work. This compensation is not in any way contingent on the nature of my findings or the outcome of this litigations. I have not previously testified as an expert at trial or by deposition. I have provided a copy of my full Curriculum Vitae at the end of this report.

---

Stewart, and Matthew Weil.

[3]My written testimony can be found here: https://www.congress.gov/117/meeting/house/112747/witnesses/HHRG-117-HA08-Wstate-PettigrewS-20210611.pdf.

# Section 1:    Introduction

The experience that a voter has at their polling place is an important, yet often understated, part of the democratic process. Voters who have a positive experience at their precinct are more likely to have high confidence in the integrity of the electoral system as a whole and are more likely to continue to turn out in future elections. One factor that significantly impacts voters' evaluations of their polling place experience is how long they had to wait in line to cast their ballot. Because of this, managing the length of lines during early voting and on Election Day is one of the most important tasks that state and local election administrators must take on.

Since at least 2006, election wait times for voters in Georgia have consistently been some of the worst in the nation.[4] Communities of color, particularly Black Georgians, have been disproportionately affected by the problem. In the 2020 election, non-white voters spent nearly 50% longer in line than white voters. Across all federal general elections since 2006–the earliest data available–non-white voters in Georgia have experienced significantly longer lines to vote than white Georgia voters.

Based on my analysis of the SB202, I understand that SB202 makes it illegal for non-partisan groups to distribute provisions like water to people standing in line. This will make the voting experience worse for people who live in areas afflicted with long lines to vote.

My analysis also finds that SB202's restrictions on mail voting will have a significant impact on the number of people showing up to vote in-person. This will have a negative impact on the length of lines to vote in Georgia, and will counteract any positive gains made by other changes to election procedure separate from SB202. The potential impact of SB202 will be larger in precincts with significant minority populations that already function near their operational capacity. Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202.

The effect of SB202 on long lines will be strongest in runoff elections. Because the period between an primary or general election and the subsequent runoff election has been shortened by SB202 from 9 weeks to 4 weeks, there will be considerably less time for early voting to occur. SB202 changed the early voting requirements for runoffs, mandating that early voting

---

[4]This pattern has been comprehensively noted in the Elections Performance Index. The Pew Charitable Trusts launched the EPI in 2013, and in 2017 the MIT Election Data and Science Lab took over administration of the project. More information about the EPI is available at: https://elections-blog.mit.edu/about.

begin "as soon as possible... but no later than the second Monday immediately prior to such runoff." Because early voting must conclude by the Friday before a runoff, this leaves just five required days for early voting and zero required weekend days. Prior to SB202, Georgia required 16 days of early voting for a runoff election.

These changes will have one of three consequences on line length and turnout during runoffs. Voters may continue voting the same way they would in the absence of this law, and the lines during early voting will be dramatically longer because the same number of people will try to vote during a shortened early voting period. Alternatively, voters may switch from voting early to voting on Election Day, and Election Day lines will be longer. Or, third, voters will not vote and turnout will go down, even if line length stays the same. As I will show later in this report, the limited data available from the December 2022 Senate runoff election suggests that the first scenario played out, and lines were catastrophically long during the shortened early voting period.

Because of all these changes, SB202 will make exacerbate the problems that it purports to address. Section 2, paragraph 4 of SB202 states that the purpose of the legislation is to "address the lack of elector confidence in the election system." Yet researchers who study confidence in electoral system have consistently found that voter confidence is closely tied together with the quality of the experience they have at the polling place. Research by political scientists suggests that by adding to the length of lines, SB202 will actually make voters less confident in the electoral system as a whole, less likely to believe that their vote was counted correctly, and less likely to believe that the contents of their ballot will be kept secret.

SB202 also has the potential to diminish turnout. My research, and that of others, has found that voters who encounter long lines are less likely to turn out to vote in future elections. All other things equal, roughly one out of every hundred voters who waits at least 30 minutes to vote will not turn out in the next election. Because the effects of the law will be felt more strongly by Black and other racial minority groups, SB202 puts a thumb on the electoral scale and makes it more difficult for people of color to vote.

This report provides analyses that made me reach each of these conclusions. After providing more detail about the data and analysis used in this report, I describe the current state of election lines in Georgia, including the differences between racial groups. I then analyze the impact that SB202 may have on election lines. I conclude with a discussion of the academic literature that focuses on the consequences of waiting in a long line.

# Section 2:   Data and methods

Political scientists have been studying the problem of long lines for nearly two decades. One of the important early questions that they grappled with is how many minutes is an unreasonably long wait. The answer that has become a benchmark for researchers and election officials was provided by the bipartisan Presidential Commission on Election Administration (PCEA). The Commission, convened in 2013 by President Obama, was chaired by Benjamin Ginsberg, the chief lawyer for Mitt Romney's 2012 presidential campaign, and Robert Bauer, the White House Counsel and chief lawyer for the 2008 Obama campaign. Other commissioners were former State Directors of Elections, county election officials, and business leaders. The commission's final report was informed by testimony and research from academics and other experts on election administration and other related fields.

One of the charges given to the PCEA was to study the problem of lines at polling places and provide a set of best practices for election administrators to deal with the problem. The Final Report of the PCEA recommended in January 2014 that "as a general rule, no voter should have to wait more than half an hour in order to have an opportunity to vote."[5] They arrived at this standard through consultation with practitioners who had on-the-ground expertise in the operation of polling places and researchers who had studied Americans' opinions about the voting experience. Therefore throughout the analyses of this expert report, I utilize this 30-minute threshold as a benchmark for assessing the areas and types of voters who are most affected by election lines.

To evaluate the percentage of voters waiting longer than the 30-minute benchmark, as well as the average wait time of voters overall, I draw from several data sources and use analysis techniques that have become standard practice to researchers who study the topic. In particular, the analysis utilizes survey responses to the Cooperative Election Study (formerly the Cooperative Congressional Election Study from 2006 to 2019).[6] The CES is one of the largest academic surveys focused on public opinion and elections, and has been supported financially by the National Science Foundation. In 2020, the CES included a nationally

---

[5]"The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration." January 2014. Quotation from page 14. Emphasis in the original report. At writing of this testimony, the PCEA Report is available through the U.S. Election Assistance Commission's website: https://www.eac.gov/election-officials/pcea.

[6]A full archive of these data are available at https://cces.gov.harvard.edu/.

representative sample of 61,000 American adults, including 2,002 Georgians.[78] The 2022 version of this study is not yet available.

Data from the CES is a standard tool for helping political scientists to understand and study American elections.[9] The data are also an invaluable tool for understanding polling place wait times at the state and sometimes local level. In each even-year study since 2006,[10] in-person voters have been asked, "Approximately how long did you have to wait in line to vote?" Voters are given the option to respond: "Not at all", "Less than 10 minutes", "10 - 30 minutes", "31 minutes - 1 hour", or "More than 1 hour". Respondents who indicate that they waited more than an hour are asked a follow-up question where they can type in the amount of time they waited.

## 2.1    Converting survey responses to minutes waited

For the analysis in this report, I analyzed these data in two ways. First, I considered the proportion of voters who waited more than 30 minutes to cast their ballot. This follows the benchmark set by the PCEA Report, which indicated that states and localities should work to get this percentage to zero. The second way that I analyzed the CES data was by converting the responses to the survey question into minutes and hours. Following the convention used throughout the literature,[11] the wait time of each respondent was coded based on the midpoint of their response to the survey question. Those who responded "Not at all" were coded as having waited 0 minutes; those responding "Less than 10 minutes" were coded with a 5 minute wait; "10 - 30 minutes" became 20 minutes; and "31 minutes - 1 hour" was 45 minutes. For respondents who indicated they waited "More than 1 hour", I recorded their response to the open-ended follow-up question.[12]

This approach of substituting the mid-point of each category to represent a voter's wait time has an important consequence for the analyses throughout this report. When comparing

---

[7]The principle investigators for the 2020 study were Dr. Stephen Ansolabehere (Harvard University), Dr. Brian Schaffner (Tufts University), and Sam Luks (YouGov). Researchers from over 50 universities and colleges across the country and world participated in the creation and analysis of the study.

[8]The appendix includes a table of the CES national and Georgia sample size in all years

[9]The website for the study includes a list of over 100 peer-reviewed academic studies that have utilized this CCES. There are even more published papers than are included on this list: https://cces.gov.harvard.edu/publications.

[10]The one exception is 2010. The wait time question was not asked in this year, and thus omitted from my analyses.

[11]See, for example, Stephen Pettigrew. 2017. 'The Race Gap in Precinct Wait Times: Why Minority Precincts are Underserved by Local Election Officials.' *Political Science Quarterly* 132.

[12]Following the convention in the literature, anybody who said they waited more than an hour, but did not answer the follow-up, was assigned the average of the wait times of other people in their state who waited more than an hour and did answer the follow-up.

the average wait time of two groups, this midpoint imputation strategy is likely to understate how big of a gap exists between their wait times. To understand why, imagine that group A had a higher percentage of people who selected the "More than 1 hour" category than group B. It follows, then, that the (true, but unknown) average wait time of the people in group A who selected "31 minutes - 1 hour" was higher than the average wait time of people in group B who selected that option. This is because if group A had more people who waited longer than 1 hour, then they also would have a higher percentage of people who waited (for example) between 55 and 60 minutes.

Figure 2.1: Distribution of simulated wait times for two hypothetical groups



Figure 2.1 illustrates this point. The graph shows the distribution of simulated wait times from two hypothetical groups of 1000 people. Because the data were simulated, I can calculate the actual average wait time for people in group A to be 25.2 minutes, and the average in group B is 13.0 minutes–a gap of 12.2 minutes. When grouping the data into bins using the vertical lines in the graph, and then apply the midpoint imputation approach described above, the estimate of the average wait time for group A is 26.2 and group B's is 14.4–a gap of 11.8 minutes.[13]

---

[13]This simulation analysis highlights that in some cases, the midpoint imputation approach may estimate group average wait times that are too high. For this reason, throughout this report I focus on comparisons of average wait times between groups, rather than focusing on the precise estimate of the average wait for an

Table 2.1: Actual average wait times within each response category (simulated data)

| Response | Group A | Group B |
|---|---|---|
| Not at all | 0 min | 0 min |
| Less than 10 min | 6.4 min | 5 min |
| 10 to 30 min | 19.4 min | 17.3 min |
| 30 to 60 min | 41.1 min | 39.8 min |
| More than 1 hr | 73.2 min | 70.2 min |

This imputation approach underestimated the true gap between the groups. Table 2.1 shows that this is because within the "Less than 10", "10 to 30 min", "30 to 60 min", and "More than 1 hr" categories, the actual average wait time of people in group A was higher than the actual average for people in group B.[14]

The fact that this midpoint imputation approach underestimates gaps between groups has big implications for the analyses throughout this report. For example, in the next section, I compare Georgia's average wait time to the average wait in all other states, finding a large and statistically significant gap. The difference is meaningful, even without accounting for the likelihood that the true difference is probably higher than my estimate. Similarly, when I find that non-white Georgians wait significantly longer to vote than white Georgians, my estimates are probably underestimating the racial gap we would find if we knew the exact number of minutes and seconds that every Georgia voter waited.

When the CCES was first conducted about 15 years ago, there were questions about the validity of using the data to study election lines. In the time since, several studies have solidified the case for its use. Research using other survey data sources, particularly the Survey of the Performance of American Elections (SPAE), reach similar conclusions to research using the CES.[15] Other non-survey-based studies have also validated the survey-based estimation approach. One such study was conducted in North Carolina, where election officials reported wait times during the 2014 election. These reports had a statistically significant correlation[16] with the survey-based reports of wait times by voters throughout the

---

individual group. By always having a reference group as a point of comparison, I ensure that even if the exact estimate of an individual group is too high, I am drawing conclusions based on differences between group estimates that are likely to be too low.

[14]This does not apply to the 'Not at all' category, where everybody had a wait time of exactly 0 minutes.

[15]Charles Stewart III. 2020. "How We Voted in 2020: A Topical Look at the Survey of the Performance of American Elections." MIT Election Data and Science Lab. http://electionlab.mit.edu/sites/default/files/2021-03/HowWeVotedIn2020-March2021.pdf

[16]A statistically significant correlation is one that is unlikely to have arisen due to purely random chance.

state.[17] Other studies have used wait time reports by polling place observers,[18] line length reports from poll workers,[19] and even cell phone tracking data[20] to help understand wait times at polling places. In each case, these other methodologies reach similar conclusions as research which uses survey-based measures.

## 2.2   Self-reported versus verified voters

There is one other methodological consideration to using survey data. Political scientists have long noted that survey respondents tend to report having turned out to vote at rates that are higher than the true turnout rate. This means that in a survey like the CES, there are some respondents who say that they voted (and perhaps even report how long they waited to vote) even though they did not actually vote. We see this in the 2020 CES, where 91% of respondents who indicated that they had voted. The turn turnout in Georgia in that election was 68%.[21].

One solution to this problem is a process called voter verification. To do vote verification, the company or organization administering the survey attempts to match the people who replied to the survey with publicly available voter file information from states. Survey respondents are thus categorized as a "verified voter" (i.e. successfully matched to the voter registration file, which indicates that they voted), a "verified non-voter" (successfully matched to the voter registration file, which indicates that they did not vote), and a "non-verified voter" (not successfully matched to the voter file).

Ideally, all survey respondents who actually voted would be matched to the voter file, and the turnout rate calculated would be exactly the same as the true turnout rate (based on total ballots cast). Unfortunately, the vote verification process is not close to ideal. The vote

---

[17]MIT Election Data and Science Lab. August 2018. "Elections Performance Index Methodology Report." https://elections-blog.mit.edu/sites/default/files/2020-08/2016-epi-methodology.pdf, pp 79-81.

[18]Stein, et. al. 2019. "Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-County Study." *Political Research Quarterly* 73(2).
Douglas M. Spencer and Zachary S. Markovits. 2010. "Long Lines at Polling Stations? Observations from an Election Day Field Study." *Election Law Journal: Rules, Politics, and Policy* 9.

[19]Matthew Weil, Tim Harper, Charles Stewart III, and Christopher Thomas. 2019. "The 2018 Voting Experience: Polling Place Lines." Bipartisan Policy Center.
John C. Fortier, Matthew Weil, Charles Stewart III, Tim Harper, and Stephen Pettigrew. 2018. "Improving the Voter Experience. Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources." Bipartisan Policy Center.
United States Government Accountability Office. "Observations on Wait Times for Voters on Election Day 2012."GAO-14-850.

[20]M. Keith Chen, Kareem Haggag, Devin G. Pope, and Ryne Rohla. 2021. "Racial Disparities in Voting Wait Times: Evidence from Smartphone Data." Conditionally accepted at *The Review of Economics and Statistics*.

[21]See: http://www.electproject.org/2020g

verification process in the 2020 CES suggests that Georgia's turnout rate was just 51%. This is almost as far away from the true turnout of 68% as the estimate based on self-reported turnout. This presents a difficult choice between analyzing the wait times of all self-reported voters, or only analyzing the wait times of verified voters. Throughout this report I chose to analyze self-reported voters, for reasons that I will explain here.

The biggest consideration is that restricting the analysis to verified voters would needlessly diminish the sample size of the analysis. This may not be a big deal when analyzing the country as a whole, but for this report, I'm restricting my focus to Georgia, where there were only 2002 people who responded to the CES in 2020. Restricting to verified Georgia voters cuts this number to 1,160, the sample diminishes further when we consider that only 290 of those verified voters were Black.

The loss of sample size from restricting the analysis to verified voters could be justified if it provided an unbiased picture of the electorate. Unfortunately, political science research has found that the vote verification process produces results that are biased in several ways. More than one-in-ten Americans are not listed in the commercial databases used for vote verificatoin, and another 12% of people have errors in their records.[22] More importantly, certain demographic groups are more difficult to identify in the vote verification process.[23] Voters who tend to move more often–like young people and poor people–are also more difficult to identify in voter registration records.[24] Together, these sources of imprecision and bias in a verified voter-based analysis tarnishes the reliability of its results, and add the additional cost of a smaller sample.

With all that in mind, the question is whether the choice of analyzing self-reported or verified voters could change the results. In the case of the CES survey, the answer is no. The two panels in figure 2.2 show estimates of wait times for all self-reported voters (on the horizontal axis) and all verified voters (on the vertical axis). When estimating the percent of voters who waited over 30 minutes (top panel) or the average wait time (bottom panel), there is an extremely high correlation between the estimates based on self-reported voters and those based on verified voters. The correlation coefficients are 0.98 for both graphs.[25]

Going a step further, I divided the survey respondents between those with a verified record of voting (same as the vertical axis in Figure 2.2) and those who said they voted, but did not have a verified record (similar to the horizontal axis of Figure 2.2, but removing

---

[22]Simon Jackman and Bradley Spahn. 2021. "Politically Invisible in America." *PS: Political Science and Politics.* 54(4).

[23]Ruth Igielnik, Scott Keeter, Courtney Kennedy, and Bradley Spahn. 2018. "Commercial Voter Files and the Study of U.S. Politics." *Pew Research Center.*

[24]Ansolabehere S, Hersh E, Shepsle K. 2012. "Movers, Stayers, and Registration: Why Age is Correlated with Registration in the U.S." *Quarterly Journal of Political Science.* 17 (4).

[25]Regression shows that each of these correlations are statistically significant (p<0.001).

those with a verified vote record). Even this more difficult statistical test finds very strong correlations. The correlation in the percent of each group waiting over 30 minutes is 0.81, and the correlation in average wait times is 0.84.[26]

What these strong correlations tell us is that there are not big differences between the self-reported voters with and without a verified voting record. For the results throughout this report to be caused by the choice of analyzing self-reported voters, there must be systematic differences between the wait times reported by verified voters and those reported by non-verified, but self-reported voters. Furthermore, for this analysis choice to affect estimates of the gap between white and non-white voters, at least one of two things would have to be true. Non-white respondents who did not vote (even though they said they did) would have to report wait times that were higher than what they would have experienced had they voted. Or alternatively, white respondents who inaccurately claimed to have voted would have to report wait times that were lower than they would have experienced had they voted. In other words, their responses would have to be systematically out-of-sync with the experience of other people in their neighborhood with a similar demographic profile. The results above suggest that these systematic differences do not exist in the data. Analyzing self-reported voters does not create bias, and it provides a larger sample size for the analysis.

---

[26]Both of these correlations are statistically significant (p<0.001).

Figure 2.2:

Percent of voters waiting at least 30 minutes

Each dot is a state-year (GA in red)



Average wait time (in minutes)

Each dot is a state-year (GA in red)



10

# Section 3:    Wait times in recent elections in Georgia

Since at least the 2006 general election,[27] voters in Georgia have experienced polling place lines that are significantly longer than voters throughout the rest of the country. In the November 2020 election, over 900,000 Georgia voters waited longer than 30 minutes to cast their ballot. In all, 24.6% of early in-person and Election Day voters in Georgia waited in a line for longer than the PCEA-recommended 30 minute maximum. This percentage is significantly higher ($p < 0.01$) than the percentage of in-person and Election Day voters in all other states – 17.2%.

In terms of minutes, the average Georgia voter in 2020 waited 27.4 minutes to cast their ballot. This means that the *average* wait time experienced by Georgians was nearly as long as the PCEA's recommendation for the *maximum* wait time. For non-white voters, the average wait was even longer–34.2 minutes–while white Georgia voters waited on average 24.3 minutes.[28] While lines in 2020 tended to be longer in parts of the country, in-person voters outside of Georgia only waited an average of 17.8 minutes.[29]

## 3.1    Georgia voters are more likely to face longer than 30 minute waits to vote

This pattern of election wait times being signficantly longer in Georgia than elsewhere is not a uniquely 2020 phenomenon. My analysis of past CES data finds that, on average, Georgia voters are nearly twice as likely to experience an unacceptably long wait to vote and spend more than 50 percent more minutes in line than voters elsewhere. Figure 3.1 shows the percentage of voters who waited more than 30 minutes to vote in Georgia and in all other states. The left side of the graph shows that in the 2006, 2014, and 2018 midterm elections, 3.8% of in-person voters outside of Georgia waited more than a half hour, while 8.8% of in-person Georgia voters waited this long ($p < 0.01$ for this difference).[30] Similarly, in presidential elections between 2008 and 2020, 22.0% of Georgia voters waited 30 minutes,

---

[27]This is the first year these data were collected.

[28]This difference in average wait times between white and non-white Georgians is statistically significant ($p > 0.01$)

[29]This difference of 9.5 minutes between wait times inside and outside of Georgia is statistically significant ($p < 0.01$).

[30]I also replicated all the analyses in this section on data from the 2008 through 2020 Survey of the Performance of American Elections (SPAE). These results yield nearly identical conclusions to the CES data, and are provided in appendix section A.2.



Figure 3.1: Voters waiting more than 30 minutes in recent elections

while just 12.9% of non-Georgia voters did.[31]

Figure 3.2 highlights the extent to which Georgia stands out from other states. In midterm elections, the percentage of Georgia voters experiencing a 30 minute wait was higher than every state except one. And in presidential years, this percentage was higher in Georgia than every state except two. When I pull apart the data even further, I find that in years with available data, Georgia has never been better than eighth worst among its peers in presidential elections, and tenth worst in midterms.[32]

One feature of Georgia elections that could account for these long wait times is the fact that Georgia typically has large numbers of voters who cast ballots during the early voting period. Across the country, wait times tend to be longer during early voting than on Election Day, so this could potentially explain why Georgia's lines are longer than nearly all other states.

Figure 3.3 shows that this does not explain away the long line problem in Georgia. While early voters do tend to wait longer than their Election Day counterparts, Georgians still tend to be significantly more likely to face a long line than non-Georgians. Roughly 1-in-5 early voters in Georgia (20.1%) waited more than 30 minutes, while only 13.2% of early voters

---

[31]The figures in Appendix section A.3 shows that these patterns are not unique to drawing the line at 30 minutes. Georgia voters are also significantly more likely to wait longer than 60 minutes to vote as well.

[32]Figures showing the results in each state are found in appendix section A.4.

Figure 3.2: Voters waiting more than 30 minutes, by state



outside of Georgia waited that long. And on Election Day, 14.2% of Georgia voters faced an unreasonably long wait, compared to just 8.4% of voters from other states.

## 3.2  Georgia voters spend more time in line than voters in nearly every other state

Another standard approach that political scientists use to study election lines is by considering the average number of minutes that voters waited. After converting the survey responses into hours and minutes (following the methodological approach described in section 2), I considered whether the patterns identified in the prior sub-section hold up using this different measure of line length.

Figure 3.4 underscores that no matter the approach used to measure line length, Georgia stands out as having particularly lengthy wait times. The left side of the graph shows that Georgia voters have average wait times that are significantly longer ($p < 0.01$) than non-Georgians. It's particularly striking that in midterm elections, the average Georgia voter waits nearly twice as long as voters in other states – 12.4 minutes compared to 6.4 minutes.

Figure 3.3: Voters waiting more than 30 minutes, by mode of vote



Figure 3.4: Average wait time of voters in recent elections



The right side of the graph shows that breaking down the data by mode of vote (i.e. early in-person or Election Day in-person) reveals a similar pattern of Georgia voters experiencing particularly long waits.

Figure 3.5: Average wait time of voters, by state



In midterm elections, the average wait time of voters (see Figure 3.5) in Georgia is longer than every state except South Carolina. And in presidential elections, Georgians wait longer than voters in all but three states. When the data are broken down into individual years, Georgia still fares no better than fifth worst in midterms and seventh worst in presidential elections (see appendix section A.4).

The consistency of these results paints a clear picture, and raises the question of whether the differences between Georgia and other states is simply because the demographic profile of Georgia voters is meaningfully different from other states. To test this possibility, I follow the convention of the academic literature and use linear regression (OLS) to control for demographic factors like age, education, race, and gender.[33] Each of these attributes are known in the political science literature to be strong predictors of voter turnout and line length, so controlling for them in a regression allows me to test whether Georgia's long lines are attributable to something more than these factors.

Table 1 shows the results of nine separate regressions using different subsets of the data

---

[33]In the regressions, I operationalize race as whether or not the voter is white and education as whether or not she has a bachelors degree. Age is coded in years, and gender is coded as a dichotomous variable.

Table 3.1: Voters waiting over 30 minutes, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|---|---|---|---|---|---|
| All | All in-person | 9.5% (0.1) | 16.7% (0.4) | 7.1pp. (0.4) | <0.01 |
| Midterms | All in-person | 3.8% (0.1) | 9.3% (0.4) | 5.6pp. (0.4) | <0.01 |
| Presidential | All in-person | 12.9% (0.1) | 21.3% (0.5) | 8.5pp. (0.6) | <0.01 |
| All | Early in-person | 13.2% (0.2) | 19.8% (0.6) | 6.6pp. (0.6) | <0.01 |
| Midterms | Early in-person | 4.8% (0.2) | 9.4% (0.7) | 4.6pp. (0.7) | <0.01 |
| Presidential | Early in-person | 16.9% (0.2) | 25.3% (0.8) | 8.4pp. (0.8) | <0.01 |
| All | Election Day | 8.2% (0.1) | 13.2% (0.5) | 5.0pp. (0.5) | <0.01 |
| Midterms | Election Day | 3.5% (0.1) | 9.2% (0.6) | 5.8pp. (0.6) | <0.01 |
| Presidential | Election Day | 11.1% (0.1) | 16.3% (0.8) | 5.2pp. (0.8) | <0.01 |

Table 3.2: Average wait time, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|---|---|---|---|---|---|
| All | All in-person | 11.3 (0.1) | 18.5 (0.3) | 7.3min. (0.3) | <0.01 |
| Midterms | All in-person | 6.2 (0.1) | 12.6 (0.3) | 6.4min. (0.3) | <0.01 |
| Presidential | All in-person | 14.2 (0.1) | 22.3 (0.4) | 8.1min. (0.4) | <0.01 |
| All | Early in-person | 14.8 (0.1) | 22.5 (0.5) | 7.7min. (0.5) | <0.01 |
| Midterms | Early in-person | 7.0 (0.1) | 12.7 (0.5) | 5.6min. (0.5) | <0.01 |
| Presidential | Early in-person | 18.2 (0.2) | 27.8 (0.7) | 9.6min. (0.7) | <0.01 |
| All | Election Day | 9.9 (0.1) | 14.0 (0.4) | 4.1min. (0.4) | <0.01 |
| Midterms | Election Day | 6.0 (0.1) | 12.5 (0.4) | 6.5min. (0.4) | <0.01 |
| Presidential | Election Day | 12.4 (0.1) | 15.3 (0.6) | 2.8min. (0.6) | <0.01 |

based on election type (midterm, presidential, all years) and vote mode (early in-person, Election Day, or both). No matter how the data are sliced, Georgia consistently has a higher percentage of voters who waited more than 30 minutes to cast their ballot. These differences, which are statistically significant in every regression ($p < 0.01$), range from Georgians being 4.6 to 8.5 percentage points more likely to encounter a line that is longer than the PCEA's 30-minute ceiling of acceptability. This pattern persists when we look at each individual election year. In every year for which we have data, there is a consistent pattern of Georgians waiting significantly longer to vote (whether on Election Day or early) than voters in other states.[34]

Table 2 presents similar results, this time using average wait time as the outcome variable in the regression. Like before, Georgians wait significantly ($p < 0.01$) longer than

---

[34]There are 15 instances where Georgians waited significantly longer than non-Georgians. I find zero cases where the average wait for Georgians is significantly shorter than elsewhere. There were three cases (2012 early voters and 2012 and 2020 Election Day voters) where there was not a significant difference in waiting times between Georgians and non-Georgians. These results are found in appendix section A.5.

non-Georgians. The biggest of these discrepencies occurs in presidential elections among early in-person voters, who wait 9.6 minutes longer in Georgia (27.8 minutes) than in other states (18.2 minutes).

## 3.3   Non-white voters in Georgia wait significantly longer to vote

One major concern about long lines being a chronic problem is that some voters must budget a lengthy portion of their day every time they want to cast a ballot, while other voters may go years without ever standing in a line. As I discuss in this section, non-white voters are more likely to be in the first category, and white voters are more likely to be in the second.

Political science researchers have noted this consistent relationship between race and wait times. It is one of the most robust findings to emerge from these studies. Researchers have found that non-white voters tend to wait longer than white voters by using survey data,[35] leveraging poll closing times,[36] stationing observers outside of polling places to record information about the flow of voters,[37] partnering with local officials to have poll workers record information about line lengths throughout the day,[38] and using cell phone tracking data.[39] Every one of these research approaches has shown that lines tend to be shorter in precincts with higher proportions of white voters and longer in precincts with higher proportions of non-white voters.

Figure 3.6 illustrates that this trend holds in Georgia. This bar graph shows percentage of Georgia voters who waited at least 30 minute to vote,[40] broken down by whether the voter

[35]Pettigrew 2017.

Charles Stewart III. 2013. "Waiting to Vote in 2012." *Journal of Law & Politics* 28(4).

Charles Stewart III and Stephen Ansolabehere. 2015. "Waiting to Vote." *Election Law Journal: Rules, Politics, and Policy* 14(1).

[36]Stephen Pettigrew. 2021. "The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout." *Electoral Studies* 71.

Michael C. Herron and Daniel A. Smith. 2015. "Precinct Closing Times in Florida During the 2012 General Election." *Election Law Journal: Rules, Politics, and Policy* 14(3).

Christopher Famighetti, Amanda Melillo, and Myrna Pérez. 2014. "Election Day Long Lines: Resource Allocation." Brennan Center for Justice.

[37]Stein, et al. 2020.

Spencer and Markovits 2010.

[38]Weil, Harper, Stewart, and Thomas 2019.

Fortier, Weil, Stewart, Harper, and Pettigrew 2018.

United States Government Accountability Office. 2013.

[39]Chen, Haggag, Pope, and Rohla 2021.

[40]The black bars are 95% confidence intervals around the estimate. A confidence interval is similar to a margin of error. In this instance, our best estimate of the true percentage is the top of each colored bar, and the black bars signify the margin of error around that best estimate.

Figure 3.6: Percentage of white and non-white voters waiting 30+ minutes



was white or a person of color.[41] As these results show, white voters are less likely than voters of color to have to wait at least 30 minutes to vote, particularly in presidential elections.[42]

For presidential elections, non-white voters are about 7.2 percentage points more likely to experience a 30 minute wait during the early voting period than white voters.[43] And they are 5.3 percentage points more likely to experience a 30 minute line on a presidential Election Day.[44]

Lines tend to be shorter for everybody during midterm elections, so the discrepancy between white and non-white voters is smaller. Still, my analysis estimates that people of color are slightly more likely to experience a long line during early and Election Day voting for a midterm. As I discuss in Section 4 this makes polling places in areas resided in predominantly by people of color much more susceptible to dramatic increases in wait times as a result of SB202.

Digging a little more closely into the data, Figure A.10 separates voters of color into

---

[41]Throughout this section, I will use "people of color" to denote anybody who is not both white and non-Hispanic.

[42]I also replicated this analysis using the average wait time (in minutes) as the outcome of interest. This analysis also found that non-white voters' average wait was significantly longer than white voters. The figure with these results can be found in Figure A.9 in Appendix Section A.6.

[43]Statistically significant at $p < 0.001$

[44]Statistically significant at $p < 0.01$.



Figure 3.7: Percent waiting over 30 minutes, by race

three categories: Black, Hispanic, and all other racial groups.[45] The patterns here are most clear for Black voters, who are consistently more likely than white voters to experience a long line. With the exception of Election Day voting during midterms, the average wait time for Black voters is significantly longer than those of white voters. I also find that Hispanic voters wait significantly longer than white voters on Election Day during presidential elections. They also reported longer average wait times in presidential early voting and midterm Election Day voting, although those results are not statistically significant, owing to the fact that Hispanic voters are a much smaller group of Georgians than white or Black voters, so data about them were limited.

Figure 3.8 shows that these patterns are not driven by just one or two elections. In every general election where data exist, I find that people of color in Georgia have an average wait time that is longer than the average for white Georgia voters. In 2020, this difference was nearly ten minutes ($p < 0.01$). Comparing the changes from 2016 to 2020 illustrates that the added strain of pandemic-related protocols in precincts had dramatically different impacts on areas with significant minority populations, compared to areas predominantly with predominantly white residents. Even though the race gap in wait times was relatively small in 2016, compared to 2012 and 2008, the gap ballooned in 2020. The average wait

---

[45]The analogous graph showing these results for the percent waiting more than 30 minutes is in Figure 3.7 in the appendix.



Figure 3.8: Average wait time of white and non-white voters, by year

time among people of color increased by 100% from 2016 to 2020, while it only increased by 60% for white voters. This is further evidence that predominantly non-white polling places operate much closer to their operational capacity than white precincts, meaning that added strain from administrative changes due to the pandemic or from SB202 will have a much bigger impact on them.

### 3.3.1  Accounting for other disparities between white and non-white voters

What explains these racial disparities in wait times for Georgia voters? One possible explanation for these differences by race could be that white voters tend to live in very different types of places than non-white voters. If, for example, Black voters are more likely to live in urban areas, and the logistics of voting are more complicated in urban areas, then that could provide an explanation for the results shown in the previous graphs. Similarly, researchers have found that education is strongly predictive of whether somebody turns out to vote,[46] and there are significant differences in the rates of college education between white and non-white voters. Higher turnout rates can also create longer lines–particularly if local

---

[46]See, for example Rachel Milstein Sondheimer and Donald P. Green. 2009. 'Using Experiments to Estimate the Effects of Education on Voter Turnout.' *American Journal of Political Science* 54(1).

election officials do not anticipate or have the resources to deal with the extra congestion at polling places.

My research, published in *Political Science Quarterly*, answers the question of whether the racial gap in wait times is driven by factors like these.[47] To do that study, I used regression and other statistical techniques to compare white and non-white voters who lived in similar contexts to each other. In essence, I compared (for example) white voters in Fulton County to voters of color in Fulton County, and college-educated white voters to college-educated voters of color. Using data from across the US, I find that although factors like these do explain a small piece of the racial gap in wait times, they do not provide a full explanation. Even after controlling for these other factors, I still find that precincts resided in predominantly by people of color have an average wait time that is twice as long as precincts with residents who are predominantly white. And I find that minority voters are six times more likely than white voters to wait longer than 60 minutes to vote. In my analysis of data from Georgia, I utilized these same statistical techniques to assess whether the racial differences in Georgia wait times is attributed to, for example, an urban-rural divide.

Figure 3.9 provides a preliminary indication that the patterns in Georgia are not simply a consequence of population density. The figure shows the average wait time of white voters across all available years (on the x-axis) and the average wait of people of color (on the y-axis). Each dot represents a county in Georgia. Because Georgia is divided into 159 counties, data were extremely thin in many of them. The graph here presents data from only the 47 counties with data from at least five white voters and five people of color, across all the years of responses.[48]

Although the sample size of individual counties are small, this graph provides some initial evidence that within counties, where differences in population density tend to be much smaller than density differences between counties, people of color are more likely to wait in a longer line to vote. In two-thirds of these counties non-white voters reported a longer average wait time than the white voters in their county.[49]

---

[47]Stephen Pettigrew. 2017. "The Race Gap in Precinct Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132.

[48]Out of the 112 "missing" counties, 41 counties had either zero white survey respondents or zero non-white respondents, 30 counties had just one white or non-white respondent, and 20 counties had just two white or non-white respondents. I am constrained by the small sample sizes in most Georgia counties from choosing a threshold higher than 5. Research suggests, however, that line lengths are highly correlated within small geographic regions like counties. This means that estimating a county's average wait time requires a smaller sample size than if this geographic correlation did not exist. For further analysis on this point, see Appendix 2 in my research in "The Downstream Consequences of Long Waits." *Electoral Studies.* 71. June 2021.

[49]When I calculate this statistic using all 112 counties where we have at least one white and one non-white respondent, the value is 58.5%, although nearly half of the counties included in that calculation have just one or two white or non-white survey-takers.



Figure 3.9: Average wait times in recent elections, by county

To further analyze this relationship using a larger sample, I estimated regressions that simultaneously control for race, age, education, and early versus Election Day voters, while comparing voters within the same county and same election (using county and year fixed-effects). In one set of these regressions, race was coded as white/people of color, while in another set of these regressions I used four racial categories: white, Black, Hispanic, and other race.

Figure 3.10 presents the main results for these two regression. Each bar represents the average difference in wait times for each racial group, as compared to white voters, after

22

Figure 3.10: Wait times in all election years since 2006



controlling for all the factors listed above. In the regression comparing white voters to all people of color, I find that people of color tend to wait 2.79 minutes longer than white voters, and this difference is statistically significantly different from a difference of zero ($p < 0.01$).[50] In the second regression, I find that Black Georgia voters wait significantly longer ($p < 0.01$) than white voters by 3.64 minutes. I do not find that Hispanic voters and voters of other races/ethnicities have significant differences in average wait times than white voters, but this is this is attributable to small sample sizes resulting in large margins of error around the wait time estimates for those groups.[51]

The results from pooling all election years does find evidence of a significant racial gap in wait times, although the magnitude of this effect is not enormous. This owes largely to the fact that midterm elections often can have shorter lines, so this makes for a smaller potential racial gap. When I separate out the data and only look at presidential election years, in Figure 3.11, I find that the sizes of the effects grow.[52] Non-white voters wait 5.05 minutes longer than white ones ($p < 0.01$) and Black Georgians wait 5.29 minutes longer ($p < 0.01$). Also, after disentangling presidential and midterm elections, I find that voters in other racial

---

[50]A full table of these regression results is available in Table A.4 in Appendix Section A.6.

[51]For context, the 2020 CES study had only 83 Hispanic respondents in Georgia. Only 47 of them voted and only 25 voted in person. For this type of statistical test where we're comparing voters from across the state, a sample size of 25 is unlikely to be big enough to draw conclusions.

[52]A full table of these regression results is available in Table A.5 in Appendix Section A.6.



Figure 3.11: Wait times in presidential election years

groups (primarily Asian-Americans and Native Americans) wait 6.95 minutes longer than white voters in presidential elections ($p < 0.05$). I do not find a statistically significant result for Hispanic voters, although this seems to be in part driven by the fact that there are only 170 Hispanic voters in this specific subset of the data, compared to 2,589 white voters.

Lastly, I analyzed what these differences looked like in the November 2020 election. Based on Figure 3.12, voters of color waited 10.45 minutes longer, on average, than white voters in 2020 ($p < 0.01$).[53] Black voters waited 10.49 minutes longer ($p < 0.05$), and voters of other races waited 14.35 longer ($p < 0.05$).

These findings are particularly relevant when we consider the potential impact of SB202 on election lines. As I will describe in the next section, researchers have found that applying equal amounts of additional strain on two precincts can have dramatically different effects on the length of lines in those precincts, depending on the amount of strain those precincts were under prior to the new strain being applied. Precincts in predominantly Black neighborhoods tend to already be under more strain and closer to operating capacity than precincts in predominantly white neighborhoods, so the changes in SB202 will have substantially larger impacts on line length in precincts that serve mostly Black voters, even if white and non-white voters react to SB202 in similar ways.

---

[53]A full table of these regression results is available in Table A.6 in Appendix Section A.6.

Figure 3.12: Wait times in November 2020



# Section 4:   Impact of SB202's line relief ban on wait times

There are several provisions in SB202 that will have an impact on whether voters experience long lines to vote. Broadly speaking, these provisions fall into one of two categories. First, there are sections of the law that increase the burden on voters who are experiencing a long line. Second, there are changes that will increase the length of lines, particularly in areas with high concentrations of racial minority voters. The most impactful of these changes are the alterations to the vote-by-mail process and the runoff election schedule. These changes will have the consequence of either decreasing turnout overall or pushing more voters toward voting in-person, thereby increasing the length of lines.

It is also worth noting here that SB202 is not the only factor that may increase or decrease the length of lines in Georgia elections. The state or individual counties may alter their administrative procedures or voting technology, and those changes may have an impact on length length. But even if those changes have a positive impact on line length, that does not mean that SB202 does not have a net-negative impact on lines. And in fact, the money and effort spent by the state or counties on those line mitigation efforts may not be as necessary if SB202 were not the law.

## 4.1   SB202 places new burdens on voters waiting in line

### 4.1.1   Ban on providing food or water to voters in line

One of the changes that most directly pertains to voters waiting in line is Section 33 of SB202. This section amends Code Section 21-2-414(a) by banning any person from giving or offering any food or drink to a voter standing in line. The section further prohibits any person, including all non-profit, non-partisan groups from setting up water or snack stations that are within 150 feet of a polling place or within 25 feet of any voter standing in line.

These new rules mean that if an organization wanted to set up such a table under those guidelines, voters would be required to leave line and travel at least 25 feet to retrieve a cup or bottle of water, potentially risking their place in line. This is especially problematic after polls have closed, because leaving the line to get water makes it possible that the voter would lose their chance to vote at all. This is particularly concern during statewide primary and primary run-off elections, which tend to be scheduled in the hot months of May or June in

Georgia.

The language of the law is absolute in describing this ban on offering food or water to anybody in line. It makes it a crime for a voter to share their water bottle with another voter in line. If an organization sets up a table for distributing water that is in compliance with this law, and a voter leaves the line to go to that table, that voter could face criminal penalties for bringing a second cup or bottle to another person who stayed in line. The law does allow for (but does not mandate) poll workers to set up self-service water stations, but voters are still required to leave the line to use it. And those voters could face criminal penalties for retrieving extra water bottles for others in line.

This provision of SB202 has been described as a way to cut down on vote buying or other types of corruption. Georgia's Election Code already makes it a felony for somebody to "offer to give or receive. . . money or gifts for the purpose of. . . voting for a particular candidate in any primary or election."[54] And I know of no research that shows that this type of vote buying or corruption has ever occurred at polling places in Georgia in modern elections.

I am similarly unaware of any other state that has banned all food or beverage distributions no matter the distance from the polling place, irrespective of intent or the minimal value of such items. Given this, and given the fact that Georgia's election law already has an explicit ban on vote buying, the consequence of including this provision in SB202 is that is will make the voting experience worse for voters in areas with chronically long lines, while having no impact on vote buying.

I also know of no other state that defines the boundary line for electioneering or campaigning near a polling place using a movable reference point-the location of voters in line. It is not uncommon for polling places in some areas of Georgia to have lines that extend well beyond 600 feet. In the 2020 general election, for example, journalists documented lines that extended more than a thousand feet from the polling place.[55]

The impact that this restriction has on Georgia voters is clear. Imagine that a non-profit organization sets up a water station at the beginning of the day that is 300 feet away from a polling place–fully in compliance with Georgia's election code. As the line of voters grows and shrinks throughout the day, this water station could oscillate inside or outside of the 25-foot boundary defined by SB202, despite the station never changing its physical location. This makes it virtually impossible for organizations to remain in compliance with the law, particularly because they are most likely to set up refreshment stations at polling places

---

[54]O.C.G.A. 21-2-570

[55]See: https://www.theguardian.com/us-news/2020/oct/13/more-than-10-hour-wait-and-long-lines-as-early-voting-starts-in-georgia; https://www.independent.co.uk/news/world/americas/us-election/georgia-election-early-voting-long-lines-2020-election-b1041310.html; https://www.nbcnews.com/politics/2020-election/early-voting-begins-georgia-long-lines-high-turnout-n1242995

where lines are expected to be the longest. This discourages those organizations from setting up these relief stations at all, making the experience of waiting in a long line even worse for Georgia voters.

In the absence of relief stations, SB202 sets up a realistic scenario of a voter being denied the ability to cast a ballot. At the time of polls closing, any voter that is in line can cast a ballot as long as they do not get out of line. A voter at the end of the day could be denied the right to vote if they step out of line to use a water fountain or to retrieve water from a line relief station that is set up in accordance with SB202's restrictions. This was not a problem prior to SB202 because line relief organizations could bring water bottles to voters standing in line.

This concern does not just apply to voters in line at the end of the day. When voting lines extend a long distance from the precinct building, a voter returning to the line after retrieving water are at the mercy of those around them in line to let them back in. Otherwise, they may have to join the end of the line or may leave entirely and not vote at all. None of this was a concern prior to SB202, because line relief organizations could provide water and snacks to voters while they stayed in line.

Lastly, SB202's strict rules about line relief make simple, helpful acts illegal. Imagine a voter who wishes to get water and those around them in line assure them that they can hold their spot in the line. If that voter returns with a second bottle of water for the person who held their spot, or even shared their water bottle with a family member, they would be committing a crime under SB202. The law is clear on this point: "nor shall any person give... any money or gifts, including, but not limited to, food or drink, to an elector." SB202 criminalizes getting out of line to refill a bottle of water at a water fountain and then sharing it with a family member or anybody else in line.

The line relief provisions in SB202 will have the largest impact on voters who live in areas that already tend to have long lines. As I showed in my earlier analysis, racial minority (particularly Black) voters in Georgia tend to face longer wait times than white voters. Any law that makes waiting in a long line more difficult or uncomfortable will disproportionately impact on people who are most likely to encounter such a line. In Georgia, those voters tend to be non-white.

## 4.2    SB202 will negatively affect wait times

There are several provisions in SB202 that will have an impact on the logistics and flow of voters through polling places. Political scientists who study election lines have relied on the findings of queueing theory to help understand the impact that policy changes can have

on lines. Queueing theory is a branch of mathematics and operations research that provides explanations for how and why lines or queues form. The principles of queueing theory have been applied to the understanding of traffic on a highway, lines in grocery stores, computer processor efficiency, and in recent years, lines at polling places.

When it comes to election lines, queueing theory shows that one of the biggest things that can impact how long voters wait to vote is the number of voters who show up. Just as bottlenecks on the highway are more likely to occur when more cars are on the road at rush-hour, bottlenecks are more likely to occur a polling place when too many voters show up at once. Poll workers can only check-in so many voters per hour and there are a finite number of voting machines on which to cast a ballot. When the number of arrivals push past the logistical capacity of the polling place, lines form. As the number of arrivals grows linearly, wait times grow exponentially.

These principles are closely related to another idea in queueing theory: the "elbow of death." Researchers have coloquially used this term to describe when a polling place has reached its operational capacity and new voters arriving to vote cause wait times to grow exponentially.[Jacob Jaffe, Charles Stewart III, and Jacob Coblentz. 2018 "Modeling Voting Service Times with Machine Logs." Available at: https://dx.doi.org/10.2139/ssrn.3216178] Adding just a few dozen voters to a precinct that has a reasonable average wait time (say, 10 minutes) can cause its average wait time to cascade to 30 or 45 minutes. As I show in the rest of this section, SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color.

## 4.2.1  Mail voting restrictions will push voters toward voting in-person or not voting at all

Many of the election administration changes made by SB202 impact the way that voters cast ballots by mail.[56] While it may not seem that these changes would impact wait times for in-person voters, queueing theory and political science research on voter behavior suggest otherwise. Put simply, increasing accessibility of mail voting is one of the most effective ways to shorten lines at polling places. As you increase the number of voters mailing in a ballot, you decrease the congestion at polling places, thereby decreasing the chances of a long line. SB202, however, adds several provisions that could make it less likely that voters will cast ballots by mail. The consequence of these changes is that it will either push more voters toward voting in-person (thereby increasing the length of lines) or being turned off from

---

[56]Throughout this section I refer to "mail ballots" or "voting by mail." I use these terms as synonyms to "absentee ballots" or "absentee voting," and as contrasts to Election Day, early/advanced/absentee in-person voting.

voting at all.

Several major changes in SB202 impact the way in which voters can apply for and return a mail ballot. The law limits mail balloting by adding multiple restrictions on mail ballot applications. Amendments to Code Section 21-2-382(3)(A) place bans on any organization from sending mail ballot applications to any voter who has already requested one. Similarly, the law restricts any government officials from distributing mail ballot applications without prior request by a voter. Organizations are also banned from distributing pre-filled mail ballot applications. The law adds limits the number of dropboxes a county may set up for returning mail ballots.

Any provision that tightens the rules for casting a mail ballot removes a critical tool available to local government for combating congestion at polling places. While it is beyond the scope of this report to estimate the exact impact that these changes will have on how many voters cast a mail ballot, it is reasonable to assume that these changes will not *increase* the rates of voting by mail, and are much more likely to decrease mail voting rates.

Even if these changes have a small impact on mail ballot rates in Georgia, they could have substantial impact on line length, particularly in areas with high concentrations of racial minorities where lines tend to already be long. To illustrate this, I used queueing theory principles to estimate how wait times are impacted by adding in-person voters who otherwise would have voted by mail. The idea of the simulations is to take two hypothetical precincts–one with short lines and one with long lines–and assess the impact that voters switching from mail to in-person voting would have on the wait times for people in those precincts.

In the first of these simulated precincts, I began with 200 voters arriving throughout the 12 hours that the polling place was open. To account for the queueing principle that clustered arrivals can impact wait times, roughly half of these voters arrived alone, one-third arrived with another person, and the remaining voters arrived in groups of three, four, or five. I calibrated number of seconds it takes to check-in a voter so that across simulations, the average wait time for voters was just 10 minutes. I then re-ran the simulation, each time increasing the number of in-person voters by 5 percentage points (i.e. from 200 voters, to 210, to 220, etc.).

The top of Figure 4.1 shows the average number of minutes voters waited to check-in across 1000 simulations of each scenario. There is a slight increase in the average wait time as the number of voters increases from 200 in increments of 5 percentage points. The bottom of the figure shows the percentage of voters who waited longer than 30 minutes. Again, while there is a slight increase in these percentages as the number of in-person voters increases, the changes are not dramatic.

Figure 4.1: Precinct A: 10 minute wait time when there are 200 voters

The scenarios presented in Figure 4.1 show the distribution of wait times and percent of voters experiencing a 30+ minute wait in Precinct A, depending on how many voters switch from voting by mail to voting in-person. Voters in this polling place can expect to see modest increases in the amount of time they wait in line, but even a 20 percentage point increase in the number of in-person voters (resulting from people switching away from mail voting) will not dramatically impact the experience of voters at polling places. When the number of in-person voters jumps from 200 to 240, the average wait time increase from 9.8 minutes to 17.6, while the percentage of voters experiencing a 30+ minute wait goes from 6.4% to 19.9%.

The scenarios in Precinct A are a sharp contrast to the simulations presented in Figure 4.2. In these simulations, I calibrated the model to mimic a precinct in Georgia that struggles to keep up with the volume of voters. In this case, 200 in-person voters puts the polling place at tremendous strain, with average wait times of approximately 30 minutes and about 40% of voters waiting more than half-an-hour to vote.

Table 4.1: Precinct A (standard errors in parentheses)

| Number of Voters | Avg. wait in minutes | Voters waiting more than 30min. |
|---|---|---|
| 200 | 9.8 (3.9) | 6.4% (8.1) |
| 210 | 11.2 (4.7) | 8.5% (10.0) |
| 220 | 13.0 (5.7) | 11.5% (12.1) |
| 230 | 14.9 (6.7) | 15.0% (13.9) |
| 240 | 17.6 (8.7) | 19.9% (16.5) |

Figure 4.2: Precinct B: 30 minute wait time when there are 200 voters



What Figure 4.2 and Table 4.2 illustrate is how dramatic an impact even a small increase in the number of voters can have. If just ten voters switch from casting a mail ballot to voting in-person, the expected percentage of voters at this precinct experiencing a 30-minute wait would jump from about 40% to nearly 50%. If the impact of SB202 on mail voting is even larger, then the downstream effect on polling place lines becomes catastrophic. An

Table 4.2: Precinct B (standard errors in parentheses)

| Number of Voters | Avg. wait in minutes | Voters waiting more than 30min. |
|---|---|---|
| 200 | 29.6 (14.7) | 39.7% (21.2) |
| 210 | 36.2 (17.2) | 49.0% (21.0) |
| 220 | 46.2 (21.8) | 58.8% (21.1) |
| 230 | 55.3 (24.7) | 65.8% (19.8) |
| 240 | 67.9 (27.0) | 72.9% (16.6) |

average wait time of 30 minutes becomes more than an hour when 40 additional voters show up at the polling place, and nearly three-quarters (72.9%) of voters will end up waiting in a line that is longer than 30 minutes.

The results in these graphs and tables highlight the principle of the "elbow of death." Even small changes to a precinct (like ten additional voters) can have significantly larger impacts on places that are already near their capacity. When we take into account the fact that Black and other non-white Georgia voters already experience longer wait times than white Georgia voters, the implication becomes clear. Even if white and non-white Georgia voters switch from mail voting to in-person voting at the exact same rates, the impact of these switches will be much larger in non-white areas of the state, where precincts are already operating under strain.

My research on long lines also suggests another potential impact of tightening mail voting rules on voters experiencing long lines to vote. I have found that voters who live in an area with a long line in one election are significantly more likely to turn to voting-by-mail in subsequent elections.[57] This research shows that wide accessibility to mail voting can be a useful approach for combating long lines. SB202 makes this conversion from in-person voters into mail voters less likely by adding administrative barriers to voting by mail. The consequence is that those voters will either remain in-person voters in subsequent elections (making it more likely that long lines will persist) or they will abstain from voting entirely, thereby dropping overall turnout.

## 4.2.2 Shortening the runoff election schedule will increase line length or decrease turnout

Another major change in SB202 is that it changes the state's runoff elections to be 4 weeks after a general or primary election, instead of the nine weeks it had been through 2020. This 28 day window between preliminary and runoff election makes the schedule for early

---

[57]Pettigrew 2021.

in-person and mail voting extremely tight. First, the 28 day window is shortened by the fact that the results of the preliminary election are never known instantly.

Imagine that just one Georgia county does not complete its vote count and certification process until the Thursday after Election Day. In this scenario, a candidate could potentially request a recount, which they have two business days (Friday and the following Monday) to do. This would delay any preparation for a potential runoff election until just 21 days before the runoff. If the recount is granted, it would further cut into this 21 day window by at least a day or two.

Without knowing the results of the preliminary general or primary election, election clerks may not know which races will appear on the runoff ballot, making it impossible to send out mail ballots or prepare voting equipment for early voting. Voters may also not know whether a runoff will actually be held or (possibly) which candidates qualified, pending the results of the recount.

This leaves, at absolute most, 19 or 20 days to prepare for the runoff. Voters who wish to vote by mail must have their mail ballot application "received by the board of registrars or absentee ballot clerk no later than 11 days prior to the...runoff" (Section 25 (a)(1)(A)) Accounting for postal delivery time, this means they would have to submit the application by about 13 days before the runoff. This leaves less than a week for a voter to decide they want to vote by mail.

In the December 2022 Senate runoff, the biggest dropoff in turnout (compared to the November general election) was in the mail ballot counts. While the total number of ballots of all types in the runoff was about 90% of the ballot count in the general election, the number of runoff mail ballots was only 78% of the general election mail ballot count. This works out to be 54,821 fewer mail ballots counted in the Senate runoff than in the Senate general election.[58]

The situation for early in-person voting is even worse. Prior to SB202, early in-person voting for runoff elections followed the same schedule as general and primary elections–16 mandated days of early voting. Under SB202, the early voting period for a runoff is now required to begin "no later than the second Monday immediately prior to such runoff" (Section 28 (d)(1)(B)). Because early voting ends on the Friday before the election, this leaves only 5 days of mandated early voting for a runoff. The lack of mandated weekend voting will have a bigger impact on racial minority voters (compared to white voters) because they tend to be more likely to vote on weekends than weekdays.[59] Counties have the option to begin early

---

[58]These statistics were calculated by using the certified vote counts that are provided by the Georgia Secretary of State's office: https://results.enr.clarityelections.com/GA/.

[59]See, for example, Herron and Smith. 2014. "Race, Party, and Consequences of Restricted Early Voting in Florida in the 2012 General Election." *Political Research Quarterly.* 67 (3).

voting earlier, but in 2022 only a handful of counties provided more than the 5 required days.

It is difficult to overstate the impact that these changes could have on line length for runoff elections. Fewer mail voters means either more in-person voters. Fewer days of early voting means either longer lines on the remaining early voting days or longer lines on Election Day. The only way that decreased mail voting and fewer early voting days does not impact the length of lines is if voter turnout goes down.

Although more comprehensive data were not available, I collected information about wait times during the runoff early voting period in a few counties where it was available in real time. Five counties–Clayton, Cobb, DeKalb, Fulton, and Gwinnett–displayed the current wait time at all their early voting locations. These counties are five of the six most populous counties in the state, making up more than a third (36%) of all the registered voters in the state.

On the Friday during the early voting period, I recorded every instance where a voting location updated the current wait time that displayed in each county's public dashboard. In all, I collected 742 wait time reports from the 66 early voting locations in these 5 counties. The data presented a clear picture that lines were catastrophically long on this day of early voting.

Of the 742 reports, 703 of them (94.7%) indicated that the wait time at the early voting location was currently at least 30 minutes. 496 reports (66.8%) indicated the line was longer than an hour. Of the 66 locations, 60 had a line of at least 30 minutes during the afternoon and evening that I captured the data. 48 locations had an hour-long line at some point on that day. And nearly a quarter of early voting sites (15) had a line that exceeded two hours.

Figure 4.3 provides a full picture of these 742 wait time reports. Each dot on the graph represents one of these reports. The all the reports from an specific early voting location are grouped vertically, with a bar extending from the shortest to the longest reported wait time at that location.

The figure shows that Fulton and Gwinnett Counties had the longest lines on this early voting day. Every single one of Fulton's 24 early voting locations had a line of at least 30 minutes at some point, and 21 of 24 had a line at least over 60 minutes. In Gwinnett County, all 11 early voting sites reported a wait of at least 45 minutes. Early voting sites in DeKalb County avoided lines in excess of two hours, but still have 11 of their 16 sites report a line over 1 hour. Lines in Cobb County were the best of these five counties, and yet 8 of their 12 early voting locations reported a line longer than 30 minutes.

If the wait times in these counties on Friday are indicative of what they were throughout the rest of the week, the 658,690 early voters in these five counties waited, on average, about 61 minutes to cast their ballot. These voters made up roughly 38% of all the early voters in

Figure 4.3: Wait times during early voting on Friday before runoff



the state. If you make the extremely generous assumption that early voters in the remaining 154 Georgia counties waited exactly 0 minutes to vote, you still end up with a statewide average wait time of over 23 minutes–nearly at the maximum reasonable wait time threshold prescribed by the PCEA Report.

## 4.2.3 Changes to early voting hours will not solve Georgia's long line problem

Another major administrative change in SB202 is its rules on when early voting sites must be open. Previously, local election officials had more discretion in the days and hours that voters could cast a ballot prior to Election Day. Under SB202, counties are now required to offer early voting on every weekday and Saturday, beginning 22 days prior to Election Day and ending on the Friday before Election Day. During these days, advanced voting locations must be open from 9:00am through 5:00pm, and officials have the option to have them open

from 7:00am through 7:00pm. Sunday voting is not required under SB202, although county officials have the option of opening polling places on Sundays during the early voting period.

The bill claims that these changes in scheduling requirements will "dramatically increase the total voting hours" for Georgia voters. If it were the case that the law will have a dramatic impact on early voting hours, then it could have a positive impact on line length and wait times. However, my analysis below shows that these rules will have a minimal impact on line length for two reasons. First, most Georgia voters (and disproportionately white voters) live in a county that–prior to SB202–already offered at least as many hours of early voting as are required by SB202. Second, counties where lines were the longest in recent elections already tend to offer the most hours of early voting; the counties that will expand early voting hours under SB202 already had short lines.



Figure 4.4: Total early voting hours in Georgia counties
Nov. 2020 election

Figure 4.4 illustrates the first point. In it, each dot represents one Georgia county in the November 2020 election.[60] On the horizontal axis is the total number of registered

---

[60]The data provided by the State did not include early voting hours for Cook County in 2020.

voters, and on the vertical axis is the total number of hours of early voting, adding up the number of hours each early voting site was open on each day. The black horizontal line at 136 represents the minimum number of hours of early voting required by SB202 (8-hours of voting on 15 weekdays, plus 8 hours of voting on 2 Saturdays). It is worth pointing out that SB202 provides guidance on the minimum number of early polling places a county must have open–only that they must have at least one site that is open during the 136 hours specified in the law.[61] Of course, many large counties provide for many more than one early voting site. Fulton County, for example, had 37 early voting sites that were open about 8 hours a day for all 21 days of early voting–over 6,200 hours of early voting.

The clear take-away from Figure 4.4 is that counties that had fewer than 136 early voting hours in 2020 tended to be much smaller than the counties that met the requirements of SB202 before it was even adopted. 98 counties met the 136-hour standard, while 60 fell below that bar. Of those 60 counties, 20 of them had at least 134 hours and in most cases those counties needed to extend their Saturday closing time from 4:00pm to 5:00pm. The clear upward trend in this graph shows that larger counties are less likely to have to make changes to their early voting hours to comply with SB202.[62]

One possibility with this analysis is that by multiplying the available voting hours across all polling places, the graph may be masking counties that have lots of early voting sites but not many hours that they are open. Figure 4.5 assuages this concern. This graph is similar to the previous one, except this time the vertical axis shows the total number of early voting hours available in at least one location. If a county has five early voting sites open for 8 hours on the Friday before Election Day, that will only count as 8 hours in this graph, rather than 40 (as with the previous graph). The take-away from this graph is similar to the previous one. Counties with fewer voters are significantly more likely to fall below the 136-hour threshold, and thus require an expansion of early voting hours.

The reason this relationship between county size and hours of early voting is important is because it directly impacts how much SB202's changes can affect wait times. Table 4.4 provides an idea of how many voters will be affected by requiring every county to offer 136 hours of early voting. The 6.0 million voters represented in the top row of the table live in the 98 counties that will not have to add early voting hours to comply with SB202. The middle row represents the 483k Georgia voters who live in a county that will have to add less

---

[61]It is worth pointing out that while most Georgia counties will not have to add hours to comply with SB202, some will have to shift their opening/closing times on particular days to comply with the 9-to-5:00 requirement of SB202. Coweta County provides the most common example of this. In November 2020, the weekdays hours in Coweta were 8:30am to 4:30pm. In the May 2022 primary election, Coweta shifted its early voting hours to 9:00am to 5:00pm to comply with SB202.

[62]This positive correlation between registered voters and total early voting hours is statistically significant ($p < 0.01$).

Figure 4.5: Available early voting hours in Georgia counties



than two hours to comply with the law. And the bottom row shows the 481k voters living in a county that will add more than two hours. This means that the wait times of 86.2% of Georgia's registered voters cannot be affected by the early voting provisions of SB202, since they live in a county that will not be required to expand early hours. Half of the remaining 13.8% of voters live in a county that will only be required to add a couple hours of early voting.

Georgia's voter registration data also makes it clear that whatever positive impacts will come from expanding early voting hours in these 60 counties will disproportionately

Table 4.3: How many voters will be impacted by expanded early voting requirements?

| 2020 early hours | sample | Reg. voters | Percent white | Percent Black |
|---|---|---|---|---|
| 136+ | 783 | 6,029,607 | 50.6% | 30.8% |
| 134-135.5 | 62 | 482,977 | 69.4% | 18.7% |
| <134 | 52 | 480,864 | 66.7% | 22.6% |

Table 4.4: How much can expanded early voting requirements help fix long lines?

| 2020 early hours | Avg. 2020 wait | Pct >30min in 2020 |
|---|---|---|
| 136+ | 28.8 min. | 26.7% |
| 134-135.5 | 19.2 min. | 15.5% |
| <134 | 19.5 min. | 10.1% |

benefit white voters. Of the voters who live in counties that will not have to expand early voting, 50.6% are white and 30.8% are Black. The other two groups of voters are considerably more white–nearly 70%–and less Black–around 20%. This means that the group with that experiences the longest wait times to vote–Black voters–also has the least potential to be positively impacted by this provision in SB202.

The final reason that SB202's expanded early voting requirements are unlikely to alleviate long lines is that the counties most affected already have the shortest lines. Table 4.4 shows the 2020 wait time statistics for voters who live in counties that will or will not be affected by expanded early voting hours. As the table makes clear, voters who live in counties that had least 136 hours of early voting in 2020 experienced longer lines than those in counties that will expand early voting under SB202. Voters in the first category were 11.2 percentage points more likely to wait longer than 30 minutes to vote than voters who will experience a small increase in early voting hours.[63] And they were 16.6 percentage points more likely to experience a long wait than those in counties with larger expansions of early voting.[64].

While setting minimum thresholds for early voting hours in Georgia is a welcome change to the law, I see no evidence in the data to suggest that this change will make a noticeable dent in the long wait times experienced by Georgia voters. The vast majority of voters live in counties that will not be required to change their early voting hours to comply with SB202. These voters also live in areas that tend to be afflicted by longer lines to vote–a problem that this provision of SB202 will not solve. Moreover, to the extent that the changes could have a small impact on wait times in some counties, that impact is more likely to be felt by white Georgia voters, who make up a significantly larger proportion of the voters impacted by this provision.

### 4.2.4  Shrinking precincts will not shorten lines

Another provision of SB202 that relates to line length is the requirement that a precinct be split apart if it had more than 2,000 voters and a line that persisted at least one hour past

[63]Statistically significant at $p < 0.01$
[64]Statistically significant at $p < 0.01$

poll closing time. While it seems logical that smaller polling places translate into shorter lines, this provision is unlikely to have the desired effect on line length, and may actually exacerbate the problem.

To understand why this is the case, it is important to understand that long wait times arise because the ratio of voters-to-resources (like poll workers, check-in machines, or vote-casting machines) is too high. My research (Pettigrew 2016) finds that under-resourced precincts is one of the biggest drivers of long lines. A precinct with 2,000 voters and 50 vote-casting machines is likely to have shorter lines than a precinct with 200 voters, but only 3 vote-casting machines.

Without requiring or providing money to counties to acquire additional resources for these problematic precincts, SB202 runs the risk of making the line problem worse for more voters. If you split a precinct in half and divvy the voting machines equally between then, you have not improved the voters-per-machine ratio. Lines are just as likely to develop. Even worse, if the resources cannot be equally divided (if, for example, there were 7 check-in stations in the old precinct), then the new precinct that received fewer resources is likely to experience lines that are even longer than before. And because lines grow non-linearly, the result could be that the average wait time across all voters in both precincts is actually worse than it would have been if the precincts had been kept as one. On top of all of that, research has shown that drawing new precinct boundaries can create voter confusion. A voter who finds out they are at the wrong location when they check-in to vote make the line longer for everybody behind them. SB202 also limits that voter's ability to vote by disallowing them from casting an out-of-precinct provisional ballot if it is earlier than 5:00pm.

Lastly, this change would not impact the vast majority of voters. In the November 2020 general election, only about 1-in-5 Georgia voters voted on Election Day. The other 80% of voters would not be affected by this change. And even among the 20% of Election Day voters, the majority of them do not live in a precinct that exceeds the 2,000 voters minimum for this provision to apply.

# Section 5:    Consequences of long lines

I turn now to the consequences that long lines have on voters. The most basic impact of waiting in a line is the time burden placed upon the voter—what has been referred to as a "time tax."[65] Compared to those who live in areas with consistently short lines, voters who live in areas with chronically long lines must sacrifice more of their time to exercise their right to vote. This can be a particular burden for people who have less flexibility in their schedule, whether because they have constraints in their work schedule or because they have childcare or eldercare responsibilities.

In addition to these direct consequences of long lines, political scientists have considered two ways that lines can impact voters. First, they have estimated the impact that lines have on voter turnout in the current or future election. Second, they have considered the impact that lines have on voters' confidence in the integrity of the electoral system as a whole.

## 5.1    Long lines decrease voter turnout in future elections

Perhaps the most impactful consequence of long lines is the effect that they have on voter turnout. There are two ways in which lines can have an impact on turnout. The first occurs when a voter joins the line but leaves before casting their ballot. This is referred to in queueing theory as "reneging." Although it is difficult to collect data on reneging, the studies that do exist find, perhaps unsurprisingly, that longer lines tend to have higher numbers of people who renege by leaving the line.[66] Lines with as few as five people in them can significantly increase the chance that somebody will leave the line before voting.[67] Some of these voters may return at another time to cast a ballot, but limiting voting hours or early voting opportunities diminishes their opportunities to do so.

The second, and more significant, way in which long lines can impact voter turnout is by deterring voters from ever joining the line at all–referred to in queueing theory as "balking." I have found in my own research, published in *Electoral Studies*, that the longer a voter waits in a line in one election, the less likely they are to vote in the next election.[68] Voters who

---

[65]Elora Mukherjee. 2013. "Abolishing the Time Tax on Voting." *Notre Dame Law Review* 85(1).
Donald L. Davison and Michael Krassa. 2019. "Time Taxes and Voting Queues: The Voting Rights Act after Shelby County, Alabama v. Holder (2013)." *National Political Science Review* 20(1).

[66]Spencer and Markovits. 2010.

[67]Stein, et al. 2020.

[68]Stephen Pettigrew. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral Studies* 71.

waited more than one hour were 1.6 percentage points less likely to turnout in future elections than voters who waited less than 15 minutes. And those who waited between 31 and 60 minutes were one percentage point less likely compared to those where lines were short.

To arrive at these estimates, I used several different data sources and statistical approaches. Using demographic and turnout history information, I paired voters who lived in neighborhoods with long lines to voters in neighborhoods with short lines. This approach allowed me to conclude that, "When selecting two voters from the same state, who are the same race and similar age, have the identical turnout history, and live in neighborhoods with nearly identical demographic profiles, the voter who lives in the neighborhood with an average wait of more than an hour was 1.6 percentage points less likely to vote...than their counterpart in a neighborhood with an average wait of less than 15 minutes."[69]

Other researchers have found similar results using different data sources and empirical approaches. Cottrell, Herron and Smith (2020) using precinct-level data in Florida to compare voters in polling places with short lines to those with long lines.[70] They find that each hour an in-person voter spends waiting in line to vote is associated with a one percentage point drop in the likelihood of future turnout. They characterize this finding as "qualitatively similar" to the result in my own work.

While these effect sizes may seem small, it is important to remember the large number of people affected by long lines in Georgia. In the 2020 presidential election, 8.7 percent of in-person voters in Georgia waited more than 60 minutes to vote and another 15.9 percent waited between 31 and 60 minutes. There were over 3.67 million ballots cast in-person in the presidential race, meaning that approximately 319,000 Georgians waited longer than an hour and another 583,000 waited between 31 and 60 minutes.

Based on the estimates of the effects of long lines on turnout, this translates into nearly 9,000 voters who would not have turned out in 2022, due to their experience in a long line in 2020. In a state as closely divided as Georgia–President Biden won the state by just under 12,000 votes in 2020–a drop-off of several thousand voters can be hugely consequential on electoral outcomes. Even more consequently, I showed in Section 3.3 that long lines tend to afflict voters of color more than white voters. Because of this, dropoff in future turnout due to long lines will more heavily affect those communities of racial minorities. Policies, like SB202, that increase the length of lines diminish the political power of racial minorities.

---

[69]Pettigrew, 2021.

[70]David Cottrell, Michael C. Herron, and Daniel A. Smith. 2021. "Voting Lines, Equal Treatment, and Early Voting Check-In Times in Florida." *State Politics & Policy Quarterly.* 21(2), pp 109-138.

## 5.2  Long lines diminish voter confidence in the integrity of elections

One of the main justifications provided in SB202 for changing Georgia's election administration laws was that it would help improve confidence in the electoral system as a whole. The bill, which is titled the "Electoral Integrity Act of 2021," alludes to a "significant lack of confidence in Georgia election systems" and suggests that the legislation is meant to "address the lack of elector confidence in the election system." Political science research on the topic of voter confidence has found that one of the biggest drivers of a person's confidence in the accuracy of an election's results is whether or not their preferred candidate won.[71] Voters who supported a winning presidential candidate are about 22 percentage points more likely to believe that their own vote was properly counted and 32 percentage points more likely to trust in the vote count in their county. This provides some explanation for why some Republican voters in 2020 were open to the message that the election had been stolen. Thinking specifically about Georgia, political science research would predict that voter confidence among Georgia Republicans–which was extremely low following Republican losses in most statewide races in 2020–should bounce back in 2022 after the Republicans won elections for all eight statewide Constitutional offices. This bounce-back in confidence would have happened regardless of whether SB202 existed or not.

Although it is not possible to have a democratic system in which every voter's preferred candidate wins, research has found that there are some ways in which legislators and policymakers can have an impact on voters' perceptions of electoral integrity. The key way to do this is by improving the quality of the voting process, particularly when it comes to what might be referred to as the "customer service" aspect of elections. Voters who feel like they received good customer service at the polling place are more confident that poll workers will properly count their vote and that the final results are accurate.

Research has found that long lines are one of the biggest ways to erode voter confidence. My own research[72] has found that the longer somebody waits in line to vote, the less confident they are that their vote was counted correctly. Figure 5.1 reproduces Figure A1 from that research. It shows that of voters who did not wait at all, 71% reported being "very confident" that their vote was counted properly. Only 61% of voters who waited between 31 and 60 minutes and just 58% of those who waited more than an hour had that confidence. These dropoffs, which are statistically significant ($p < 0.01$), demonstrate the important role that the precinct experience can have on voters' overall beliefs about election integrity.

---

[71]Sances, Michael W. and Charles Stewart III. 2015. "Partisanship and confidence in the vote count: Evidence from US national elections since 2000." *Electoral Studies* 40. 176-188.

[72]Pettigrew, Stephen. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral Studies* 71.

Figure 5.1: Voter confidence in the electoral system, by wait time



Other researchers have studied the issue of long lines and voter confidence and reached similar conclusions. Herron, Smith, Serra, and Bafumi find in their 2017 article that voters who waited in a long line were significantly less confident that their ballot would be counted properly.[73] They also find that those voters were also significantly less confidence that the contents of their ballot would remain a secret. The authors summarize their findings by saying, "voters who experience long lines may be disproportionately skeptical that their votes will be kept secret or will be counted" and that this finding, "should be a concern to all local election administrators."

These findings suggest that SB202 has the potential to have a net-negative impact on voters' confidence in the electoral system. As Georgia voters find it more difficult to vote by mail, they will either not vote at all or opt to vote in-person. If they choose the latter

---

[73]Michael C. Herron, Daniel A. Smith, Wendy Serra, and Joseph Bafumi. 2017. "Wait Times and Voter Confidence. A Study of the 2014 Midterm Election in Miami-Dade County." From *Races, Reforms, & Policy: Implications of the 2014 Midterm Elections.* Edited by Christopher J. Galdieri, et al. University of Akron Press.

approach, my analysis suggests that they make it more likely that all voters in their precinct will encounter long lines, casting doubt upon the integrity of the electoral system in the minds of those voters.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to light. Executed on January 13, 2023 in Philadelphia, Pennsylvania.

Stephen Pettigrew, PhD

# Appendix A:    Supplemental material for analyses

## A.1    Sample sizes of CCES data

Table A.1: Total number of respondents in the CCES/CES surveys

| Year | Nationwide | Georgians |
|------|------------|-----------|
| 2006 | 36,421 | 1,188 |
| 2008 | 32,800 | 889 |
| 2012 | 54,535 | 1,759 |
| 2014 | 56,200 | 1,732 |
| 2016 | 64,600 | 2,062 |
| 2018 | 60,000 | 1,925 |
| 2020 | 61,000 | 2,002 |

## A.2   Analysis of SPAE data

Figure A.1: Voters waiting more than 30 minutes (SPAE data)



Figure A.2: Average wait time (SPAE data)



## A.3   Voters waiting more than 60 minutes



Figure A.3: Voters waiting more than 60 minutes

Figure A.4: Voters waiting more than 60 minutes, by vote mode

## A.4  Wait times in each state



Figure A.5: Voters waiting more than 30 minutes in presidential elections, by state



Figure A.6: Voters waiting more than 30 minutes in midterm elections, by state



Figure A.7: Average wait time in presidential elections, by state



Figure A.8: Average wait time in midterm elections, by state

Table A.2: Voters waiting over 30 minutes, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|------|--------|--------------|---------|------------|---------|
| 2008 | All in-person | 14.4% (0.3) | 34.3% (1.5) | 19.9pp. (1.5) | <0.01 |
| 2012 | All in-person | 11.8% (0.2) | 17.4% (1.0) | 5.5pp. (1.0) | <0.01 |
| 2014 | All in-person | 2.1% (0.1) | 2.6% (0.5) | 0.6pp. (0.5) | 0.254 |
| 2016 | All in-person | 9.1% (0.2) | 15.4% (0.9) | 6.3pp. (0.9) | <0.01 |
| 2018 | All in-person | 5.4% (0.1) | 16.2% (0.7) | 10.8pp. (0.7) | <0.01 |
| 2020 | All in-person | 17.4% (0.3) | 24.5% (1.2) | 7.1pp. (1.2) | <0.01 |
| 2008 | Early in-person | 19.9% (0.7) | 38.6% (2.2) | 18.7pp. (2.3) | <0.01 |
| 2012 | Early in-person | 16.7% (0.5) | 21.3% (1.6) | 4.6pp. (1.7) | <0.01 |
| 2014 | Early in-person | 2.5% (0.2) | 4.4% (0.8) | 1.9pp. (0.8) | 0.017 |
| 2016 | Early in-person | 11.2% (0.4) | 17.4% (1.2) | 6.2pp. (1.3) | <0.01 |
| 2018 | Early in-person | 6.3% (0.3) | 13.0% (1.0) | 6.6pp. (1.0) | <0.01 |
| 2020 | Early in-person | 19.5% (0.4) | 27.8% (1.5) | 8.3pp. (1.6) | <0.01 |
| 2008 | Election Day | 12.8% (0.3) | 28.0% (2.2) | 15.2pp. (2.2) | <0.01 |
| 2012 | Election Day | 10.3% (0.2) | 14.4% (1.3) | 4.0pp. (1.3) | <0.01 |
| 2014 | Election Day | 2.0% (0.1) | 1.6% (0.6) | -0.4pp. (0.6) | 0.510 |
| 2016 | Election Day | 8.3% (0.2) | 12.6% (1.2) | 4.3pp. (1.3) | <0.01 |
| 2018 | Election Day | 5.0% (0.2) | 20.2% (1.0) | 15.2pp. (1.0) | <0.01 |
| 2020 | Election Day | 15.4% (0.3) | 17.0% (2.2) | 1.6pp. (2.2) | 0.473 |

## A.5  Differences in line length between Georgia and other states, using regression with demographic controls

Table A.3: Average wait time, from regressions with demographic controls

| Year | Voters | Other states | Georgia | Difference | P value |
|------|--------|--------------|---------|------------|---------|
| 2008 | All in-person | 15.1 (0.2) | 39.8 (1.3) | 24.7min. (1.3) | <0.01 |
| 2012 | All in-person | 13.6 (0.2) | 15.9 (0.9) | 2.3min. (0.9) | <0.01 |
| 2014 | All in-person | 4.4 (0.1) | 7.5 (0.3) | 3.1min. (0.3) | <0.01 |
| 2016 | All in-person | 10.9 (0.1) | 15.2 (0.6) | 4.3min. (0.6) | <0.01 |
| 2018 | All in-person | 8.0 (0.1) | 17.9 (0.4) | 9.9min. (0.5) | <0.01 |
| 2020 | All in-person | 17.9 (0.2) | 27.1 (1.0) | 9.2min. (1.0) | <0.01 |
| 2008 | Early in-person | 21.2 (0.6) | 49.6 (2.2) | 28.4min. (2.3) | <0.01 |
| 2012 | Early in-person | 18.2 (0.5) | 18.9 (1.6) | 0.7min. (1.6) | 0.668 |
| 2014 | Early in-person | 4.6 (0.2) | 7.1 (0.6) | 2.5min. (0.6) | <0.01 |
| 2016 | Early in-person | 12.6 (0.2) | 17.1 (0.8) | 4.4min. (0.9) | <0.01 |
| 2018 | Early in-person | 8.6 (0.2) | 16.5 (0.6) | 7.9min. (0.7) | <0.01 |
| 2020 | Early in-person | 20.5 (0.3) | 32.2 (1.3) | 11.7min. (1.4) | <0.01 |
| 2008 | Election Day | 13.3 (0.2) | 24.9 (1.7) | 11.6min. (1.7) | <0.01 |
| 2012 | Election Day | 12.2 (0.2) | 13.5 (1.0) | 1.3min. (1.1) | 0.214 |
| 2014 | Election Day | 4.4 (0.1) | 7.6 (0.4) | 3.2min. (0.4) | <0.01 |
| 2016 | Election Day | 10.3 (0.1) | 12.7 (0.8) | 2.4min. (0.8) | <0.01 |
| 2018 | Election Day | 7.8 (0.1) | 19.5 (0.6) | 11.7min. (0.7) | <0.01 |
| 2020 | Election Day | 15.6 (0.2) | 15.4 (1.6) | -0.2min. (1.6) | 0.898 |

## A.6 Relationship between race and line length

Figure A.9: Average wait time of white and non-white voters

Figure A.10: Average wait time, by race



Regression results that corresponds with Figure 3.10:

Table A.4: Wait times since 2006

| | DV: Minutes waiting to vote | |
|---|---|---|
| | (1) | (2) |
| People of color | 2.79** (0.97) | |
| Black | | 3.64*** (1.06) |
| Hispanic | | −1.59 (2.45) |
| Other race | | 1.37 (2.15) |
| Age | −0.07** (0.03) | −0.07** (0.03) |
| Bachelors | 1.07 (0.92) | 1.22 (0.92) |
| EDay voters | −7.50*** (0.88) | −7.43*** (0.88) |
| Intercept | 29.96 (63.87) | 34.51 (63.89) |
| Observations | 5,884 | 5,884 |
| R² | 0.17 | 0.18 |

*Note:*    County and year fixed effects included
\* p<0.05; \*\* p<0.01; \*\*\* p<0.001

Regression results that corresponds with Figure 3.11:

Table A.5: Wait times in presidential elections

| | DV: Minutes waiting to vote | |
|---|---|---|
| | (1) | (2) |
| People of color | 5.05*** (1.45) | |
| Black | | 5.29*** (1.59) |
| Hispanic | | 0.34 (3.68) |
| Other race | | 6.95* (3.17) |
| Age | −0.07 (0.04) | −0.08 (0.04) |
| Bachelors | 0.89 (1.39) | 0.82 (1.40) |
| EDay voters | −15.06*** (1.30) | −15.05*** (1.30) |
| Intercept | 2.54 (74.79) | 7.34 (74.86) |
| Observations | 3,755 | 3,755 |
| R² | 0.14 | 0.14 |

*Note:*    County and year fixed effects included
\* p<0.05; \*\* p<0.01; \*\*\* p<0.001

Regression results that corresponds with Figure 3.12:

Table A.6: Wait times in November 2020

|  | DV: Minutes waiting to vote | |
|---|---|---|
|  | (1) | (2) |
| People of color | 10.45** (3.64) | |
| Black | | 10.49* (4.14) |
| Hispanic | | 3.66 (8.76) |
| Other race | | 14.35* (7.23) |
| Age | 0.26* (0.11) | 0.25* (0.11) |
| Bachelors | 3.09 (3.40) | 3.05 (3.42) |
| EDay voters | −17.00*** (3.64) | −17.04*** (3.66) |
| Intercept | 8.05 (60.38) | 8.25 (60.42) |
| Observations | 897 | 897 |
| $R^2$ | 0.23 | 0.23 |

*Note:*  County and year fixed effects included
* $p<0.05$; ** $p<0.01$; *** $p<0.001$

# Appendix B:   Curriculum Vitae

# Stephen S. Pettigrew

University of Pennsylvania

pettigr@sas.upenn.edu

stephenpettigrew.com

## Work Experience

**University of Pennsylvania** — Philadelphia, PA
Deputy Executive Director: Robert A. Fox Leadership Program — Dec. 2017–pres.
Director of Data Sciences: Program on Opinion Research
    and Electoral Studies — Dec. 2017–pres.

**NBC News** — New York, NY
Senior Analyst: Decision Desk and Data Analytics Lab — Dec. 2017–pres.

**MIT Election Data and Science Lab** — Cambridge, MA
Project Manager — Apr. 2017–Nov. 2017
Data Scientist — Sept. 2011–Apr. 2017

## Education

**Harvard University** — Cambridge, MA
PhD: Political Science — May 2017
Dissertation: *Long Lines and Voter Purges: The Logistics of Running Elections
    in America*
Master of Arts: Statistics — Mar. 2014

**University of Georgia** — Athens, GA
Master of Arts: Political Science and International Affairs — May 2011
Bachelor of Arts: Political Science & History (Double Major) — May 2011

## Peer-Reviewed Publications

"Trumped by Trump? Public Support for Vote By Mail During the COVID-19 Pandemic." *Election Law Journal.* Forthcoming.

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout." *Electoral Studies* 71. June 2021.

"Protecting the Perilous Path of Election Returns: From the Precinct to the News." with Charles Stewart. *Ohio State Technology Law Journal.* 15: (2). Summer 2020.

"Abstention, Protest, and Residual Votes in the 2016 Election." with Michael Alvarez, Charles Stewart, and Cameron Wimpy. *Social Science Quarterly.* 101: (3). March 2020.

"The Race Gap in Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132: (3). Fall 2017. pp 527-547.

"Comment on 'Estimating the Reproducibility of Psychological Science'" with Daniel Gilbert, Gary King, and Tim Wilson. *Science* 351: (6277). March 4, 2016.

"Hosting the Olympic Games: An Overstated Advantage in Sports History." with Danyel Reiche.
*International Journal of the History of Sport* 33: (6-7). March-April 2016. pp 635-647.

"How the West will be Won: Using Monte Carlo Simulations to Estimate the Effects of NHL
Realignment." *Journal of Quantitative Analysis in Sports* 10 (3). September 2014. pp 345-356.

"Strategic Politicians, Partisan Roll Calls, and the Tea Party: Evaluating the 2010 Midterm Elections."
with Jamie Carson. *Electoral Studies* 32: (1). March 2013. pp 26-36.

## Other Political Science Publications

"Uncertainty over a blue wave: NBC News finds Democratic and GOP voter registrations at same level
as past election cycles" *NBC News*. Oct. 16, 2018. With John Lapinski, Stephanie Perry, and
Rezwana Uddin.

"Improving the Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and
Managing Polling Place Resources" *Bipartisan Policy Center*. April 2018. With John Fortier, Tim
Harper, Charles Stewart, and Matthew Weil.

"The United States is Getting Better at Running Elections." *The Monkey Cage*. August 9, 2016. With
Charles Stewart

"Elections Performance Index: Methodology 2014" *The Pew Charitable Trusts*. August 2016.

"These are the Two Pivotal Senators if There's a Vote to Replace Scalia." *The Monkey Cage*. February
14, 2016.

"The 2014 Elections that Ended in a Tie." *FiveThirtyEight*. December 5, 2014.

"Elections Performance Index: Methodology 2012" *The Pew Charitable Trusts*. April 2014.

"Republican Advantages in Candidate Recruitment in 2014 have Led to an Increasingly Polarized House
of Representatives." with Jamie Carson. *London School of Economics American Politics and Policy
Blog*. September 17, 2013.

"Elections Performance Index: Methodology 2008-2010" *The Pew Center for the States*. February 2013.

## Professional Talks and Testimony

Testimony before the Subcommittee on Elections for the Committee on House Administration of the
United States House of Representatives. Hearing on "Voting in America: The Potential for Polling
Place Quality and Restrictions on Opportunities to Vote to Interfere with Free and Fair Access to
the Ballot." June 11, 2021. Link to written testimony.

Panel on Efficiency, Security and Equity. Georgia College and State University. Election Integrity
Symposium. Spring 2021.

"What Happens Behind the Scenes on Election Night."
University of Texas at Tyler. March 2021.
University of Pennsylvania (Wharton). December 2021.
New York University. October 2019.
Columbia University. October 2019.
University of Georgia. October 2019.
Dartmouth College. May 2019.
Second Measure. August 2018.

## Stephen Pettigrew

"Everything is Data: How to Use Numbers to Answer the Questions You've Always Had." University of Georgia Honors Program. October 2015.

Guest lecturer in "Election Law and Participation" seminar. Bates College. May 2015.

### Teaching Experience

**PSCI207: Applied Data Science (UPenn)**                    S2018, S2019, F2019, S2021
  with Dr. John Lapinski and Samantha Sangenito
  *Topics*: R programming • Survey research • Experiments

**PSCI107: Introduction to Data Science (UPenn)**                    Fall 2020
  with Dr. Marc Trussler
  *Topics*: R programming • Data science

**17.20: Introduction to the American Political Process (MIT)**                    Spring 2016
  with Dr. Devin Caughey
  *Topics*: American political institutions • Mass opinion and behavior

**Gov2002: Causal Inference**                    Fall 2015
  with Dr. Matt Blackwell
  *Topics*: Experimental design • Instrumental variables • Regression discontinuity • Matching
  Harvard University Certificate of Distinction in Teaching (2015)

**Gov2001: Advanced Quantitative Research Methodology**                    Spring 2014, 2015
  with Dr. Gary King
  *Topics*: Maximum likelihood estimation • Predictive modeling • Missing data
  Harvard University Certificate of Distinction in Teaching (2014, 2015)

**Gov1540: The American Presidency**                    Fall 2013, 2014, 2015
  with Dr. Roger Porter
  *Topics*: Presidential power • Interbranch relations • Elections • Presidential decision making
  Harvard University Certificate of Distinction in Teaching (2015)

**Harvard Government Math Pre-fresher**                    Aug. 2013, 2014
  *Topics*: Probability • Matrix algebra • Calculus • Optimization • R programming

### Conference Presentations

"Protecting the Perilous Path of Election Returns: From the Precinct to the News." Symposium on Elections in the Era of Technological Threats and Opportunities. Moritz College of Law. Ohio State University. January 2020. Columbus, OH. With Charles Stewart.

"Education Weighting in the National Exit Poll" *American Association of Public Opinion Researchers Annual Conference.* May 2019. Toronto, ON.

"Moved Out, Moved On: Assessing the Effectiveness of Registration List Maintenance" *Election Sciences, Reform, & Administration Conference.* July 2016. Portland, OR.

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout" *American Political Science Annual Meeting.* September 2016. Philadelphia, PA.

"How Long Lines Affect Turnout." *Society for Political Methodology Annual Meeting.* July 2016. Houston, TX.

"Home Advantage at the Olympics: Will Brazil Win More Medals than Usual?" *Who Will Win in Rio? Conference.* July 2016. Cambridge, MA.

## Stephen Pettigrew

"The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout" *Yale Center for the Study of American Politics Conference.* June 2016. New Haven, CT.

"The Downstream Effects of Long Lines: How Long Waits at the Precinct Depress Future Turnout" *Midwest Political Science Association Annual Meeting.* April 2016. Chicago, IL.

"A Population Model of Voter Registration and Deadwood" *Midwest Political Science Association Annual Meeting.* April 2016. Chicago, IL. With Charles Stewart.

"Why the Home Advantage at the Olympic Games is Overrated: Relating Host Medals to Increased Participation" *World Congress on Elite Sport Policy.* November 2015. Melbourne, Australia. With Danyel Reiche.

"A Population Model of Voter Registration and Deadwood" *New Research on Election Administration and Reform.* June 2015. Cambridge, MA. With Charles Stewart.

"Time Tax: Which Groups Wait in the Longest Lines on Election Day?" *Western Political Science Association Annual Meeting.* April 2015. Las Vegas, NV.

"Assessing the Offensive Productivity of NHL Players using In-game Win Probabilities." *MIT Sloan Sports Analytics Conference.* February 2015. Boston, MA.
    Best research paper award finalist

"How the West will be Won: Using Monte Carlo Simulations to Estimate the Effects of NHL Realignment." *New England Symposium on Statistics in Sports.* September 2013. Cambridge, MA.

"Evaluating New Representatives: How Redistricting Disrupts Congressional Representation" *American Political Science Association Annual Meeting.* August 2013. Chicago, IL. With Brian Schaffner and Stephen Ansolabehere.

"Redistricting and the Personal Vote in 2012" *2013 CCES Sundance Conference.* May 2013. Sundance, UT. With Stephen Ansolabehere.

"The Electoral Value of Seniority: Does Incumbent Tenure Affect the Attitudes of Voters?" *Midwest Political Science Association Annual Meeting.* April 2013. Chicago, IL. With Stephen Ansolabehere.

"Competition and Candidate Emergence Decisions in U.S. House Primaries, 2000-2010" *Midwest Political Science Association Annual Meeting.* April 2012. Chicago, IL.

"Strategic Politicians, the Great Recession, and the Tea Party Movement: Evaluating the 2010 Midterm Elections." *Midwest Political Science Association Annual Meeting.* March 2011. Chicago, IL. With Jamie Carson.

## Sports Analytics Research and Publications

| | |
|---|---|
| **Winners View**: Data analytics consultant | April 2016–June 2016 |
| **Philadelphia 76ers**: Basketball analytics consultant | July 2014–November 2014 |
| **Rink Stats**: My hockey analytics blog | June 2013–Present |
| **Wall Street Journal** | |
|     The Madness Machine | March 16, 2015 |
|     As NBA Playoffs Begin, Odds of Beating the Heat | April 19, 2014 |

## Stephen Pettigrew

| | |
|---|---|
| The Stanley Cup: What are the Odds? | April 16, 2014 |
| NCAA Tournament: Our Sorry, Broken Brackets | April 7, 2014 |
| 2014 Sochi Olympics: Why Canada will Rule (Again) in Hockey | February 7, 2014 |

**FiveThirtyEight**

| | |
|---|---|
| Is There Home-Field Advantage At The Olympics? With Danyel Reiche. | August 9, 2016 |
| Playoff Hockey is 36 Percent More Bone-Crushing | April 15, 2015 |
| How To Tell If A March Madness Underdog is Going to Win | March 19, 2015 |
| After Signing Day, Wisconsin Makes The Best Of Its Recruits | February 4, 2015 |

**Deadspin**

| | |
|---|---|
| How Those 3-on-3 Overtime Rules Would Cut Down NHL Shootouts | March 18, 2015 |
| Are Outdoor Hockey Games Really Sloppier? | February 19, 2015 |
| Are Teams Better or Worse in Must-Score Shootout Situations? | December 22, 2014 |
| The *College Gameday* Curse is Real...For Some Teams With Lucas Puente. | September 5, 2014 |
| 11 Million Brackets vs. ESPN, CBS, and FOX Experts: Who was Better? | April 10, 2014 |
| How the Long-Change OT Could Cut NHL Shootouts by a Third | March 12, 2014 |

## Awards and Distinctions

APSA Elections, Public Opinion, and Voting Behavior Graduate Student Travel Award - Sept. 2016
Best Research Paper Finalist - 2015 Sloan Sports Analytics Conference
Harvard University Certificate of Distinction in Teaching (four times)
Phi Beta Kappa
University of Georgia Honors International Studies Scholar
University of Georgia Charter Scholar
Eagle Scout

## Professional Service

### Theses Advised

Bayley Tuch. 2020-2021. "Vote Mirages in the 2020 Election: How Vote-by-Mail Policies Impact the Reporting of Election Results." Undergraduate senior thesis. University of Pennsylvania. Winner of Philo Bennett Prize for best thesis in American politics and/or political theory.

### Conferences Organized

*Election Sciences, Reform, and Administration Conference*. University of Pennsylvania. July 2019.
*Political Analytics Conference*. Harvard University. April 2016, March 2017, November 2018.
*Who Will Win in Rio? Understanding Political, Economic, and Athletic Success at the 2016 Olympic Games*. Harvard University. July 2016.

### Publicly Available Datasets

November 2018 General Election Results (county level)
November 2016 General Election Results (county level)
U.S. House Primary Election Results (1956-2010)
Cumulative CCES Common Content (2006-2012)
Essential Files to Generate Pew Elections Performance Index
Cleaned 2014 Election Administration and Voting Survey Data

## Stephen Pettigrew

Cleaned 2012 Election Administration and Voting Survey Data
Cleaned 2010 Election Administration and Voting Survey Data
Cleaned 2008 Election Administration and Voting Survey Data