Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4                     ---o0o---

5

6

7    IN RE GEORGIA SENATE BILL 202

                                Master Case No:

8                               1:21-MI-55555-JPB

     _____/

9

10

11

12

13        VIDEOTAPED DEPOSITION OF JONATHAN RODDEN, Ph.D.

14              Tuesday, August 12, 2025

15

16

17

18

19   STENOGRAPHICALLY REPORTED BY:

20   Catherine M. Meyer, CSR No. 11596

21

22

23

24

25

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 2

1                          I N D E X
2                                                    PAGE
3    EXAMINATION BY MR. PRINCE                        7
4    EXAMINATION BY MR. MOCINE-McQUEEN                120
5
6
7
8
9
10                         E X H I B I T S
11                                                   PAGE
12   Exhibit 1      Notice of Deposition             10
13   Exhibit 2      Expert Response Report of        12
                    Dr. Daron Shaw
14
     Exhibit 3      Supplementary Report of          16
15                  Jonathan Rodden, Ph.D.,
                    dated June 16, 2025
16
     Exhibit 7      Table 10 entitled "Reasons For   47
17                  Not Voting.  By Selected
                    Characteristics:  November 2024"
18
     Exhibit 8      Table 10 entitled "Reasons For   55
19                  Not Voting.  By Selected
                    Characteristics:  November 2020"
20
     Exhibit 9      Table 10a entitled "Margins of   58
21                  Error    For Reasons For Not
                    Voting.  By Selected
22                  Characteristics:  November 2016"
23   Exhibit 10     Expert Report of Jonathan Rodden, 97
                    Ph.D., dated February 7, 2023
24
25   (Exhibits 4, 5, and 6 not marked.)

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 3

1       VIDEOTAPED DEPOSITION OF JONATHAN RODDEN, Ph.D.

2

3       BE IT REMEMBERED, that pursuant to Notice, and on

4    the 12th day of August 2025, commencing at the hour of

5    9:12 a.m. (PST), in the offices of Fenwick & West, LLP,

6    801 California Street, Mountain View, California, before

7    me, Catherine M. Meyer, a Certified Shorthand Reporter,

8    personally appeared JONATHAN RODDEN, Ph.D., produced as

9    a witness in said action, and being by me first duly

10   sworn, was thereupon examined as a witness in said

11   cause.

12

13                       ---o0o---

14

15   APPEARANCES:

16   For the NGP Plaintiffs and the Deponent Jonathan Rodden,
     Ph.D.:

17

               MARCOS MOCINE-MCQUEEN, ESQ.
18             Elias Law Group, LLP
               250 Massachusetts Avenue NW, Suite 400
19             Washington D.C. 2001
               (202) 968-4490
20             mmcqueen@elias.law
21   For the AME Plaintiffs:
22             ELIANA METNI, ESQ., (via Zoom)
               Southern Poverty Law Center
23             400 Washington Avenue
               Montgomery, Alabama 36104
24             (334) 956-8200
25

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

```
 1    For the RNC Plaintiffs:
 2                    WILLIAM BOCK, ESQ. (via Zoom)
                      Consovoy McCarthy, PLLC
 3                    1600 Wilson Boulevard, Suite 700
                      Arlington, Virginia 22209
 4                    (703) 243-9423
                      wbock@consovoymccarthy.com
 5
      For the State Defendants:
 6
                      BRYAN P. TYSON, ESQ. (via Zoom)
 7                    Clark Hill, LLC
                      3630 Peachtree Road, N.E.
 8                    Suite 550
                      Atlanta, Georgia 30326
 9                    (678) 336-7249
                      btyson@clarkhill.com
10
                      JOSHUA J. PRINCE, ESQ.
11                    MIRANDA SHERRILL, ESQ. (via Zoom)
                      Schaerr Jaffe, LLP
12                    1717 K Street NW, Suite 900
                      Washington, DC 20006
13                    (202) 787-1060
                      jprince@schaerr-jaffe.com
14                    msherrill@schaerr-jaffe.com
15    For the Macon-Bibb County Defendants:
16                    WILLIAM NOLAND, ESQ. (via Zoom)
                      Noland Law Firm, LLC
17                    5400 Riverside Drive, Suite 205
                      Macon, Georgia 31210
18                    (478) 621-4980
                      william@nolandlawfirmllc.com
19
      For the Chatham County Board of Registrars, Chatham
20    County Board of Elections and Chatham County Board of
      Elections and Registrars Defendants:
21
                      CASEY M. TORRES, ESQ. (via Zoom)
22                    Freeman, Mathis & Gary, LLP
                      100 Galleria Parkway, Suite 1600
23                    Atlanta, Georgia 30339
                      (770) 818-0000
24                    casey.torres@fmglaw.com
25    Also Present:  Alex Hoo, videographer.
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 5

1          THE VIDEOGRAPHER:  Good morning.  We are

2     going on the record at 9:12 a.m. on August 12th,

3     2025.  Please note that the microphones are

4     sensitive and may pick up whispering and private

5     conversations.  Please mute your phones at this

6     time.  Audio and video recording will continue to

7     take place unless all parties agree to go off the

8     record.

9          This is media unit one of the video

10    recorded deposition of Dr. Jonathan Rodden in the

11    matter of Georgia State Bill 202 filed in the

12    United States District Court for the Northern

13    District of Georgia, Atlanta Division, case number

14    1:21-MI-55555-JPB.  The location of the deposition

15    is Fenwick & West, LLP, at 801 California Street,

16    Mountain View, California 94041.  My name Alex Hoo

17    representing Veritext and I am the videographer.  I

18    am not authorized to administer an oath, I am not

19    related to any party in this action, nor am I

20    financially interested in the outcome.  If there

21    are any objections to proceeding, please state them

22    at the time of your appearance.

23          Counsel and all present, including

24    remotely, will now state their appearances and

25    affiliations for the record beginning with the

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 6

```
 1   noticing attorney.
 2           MR. PRINCE:  Good morning.  My name Joshua
 3   Prince.  I'm representing the State defendants in
 4   this action.
 5           MR. MOCINE-McQUEEN:  Good morning.  My
 6   name is Marcos Mocine-McQueen.  I represent the NGP
 7   plaintiffs.  I'm with the Elias Law Group and I'm
 8   also representing this morning Dr. Rodden.
 9           MR. BOCK:  Good morning.  My name is
10   William Bock, and I'm representing the Republican
11   Party plaintiffs in this case.
12           MR. NOLAND:  Good morning.  My name is
13   William Noland, and I represent the Macon-Bibb
14   County defendants.
15           MR. TYSON:  Good morning.  My name is
16   Bryan Tyson, and I represent the State defendants
17   in this matter as well.
18           MS. SHERRILL:  Good morning.  Miranda
19   Sherrill also for State defendant.
20           MR. TORRES:  Good morning.  Casey Torres
21   on behalf of the Chatham County Board of
22   Registrars, Chatham County Board of Elections and
23   Clayton County Board of Elections and Registrars.
24           MS. METNI:  Good morning.  Eliana Metni
25   with the Southern Poverty Law Center.  My case team
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 7

1    is the AME plaintiffs.

2            THE VIDEOGRAPHER:  Will the court reporter

3    please introduce herself and administer the oath to

4    the witness and then counsel may proceed.

5            THE REPORTER:  My name is Catherine Meyer,

6    California CSR No. 11596.

7                    JONATHAN RODDEN, Ph.D.,

8                     sworn as a witness,

9                     testified as follows:

10            MR. PRINCE:  Thank you.

11    EXAMINATION BY MR. PRINCE:

12        Q.  Dr. Rodden, good morning.

13        A.  Good morning.

14        Q.  It's good to see you again.  Would you

15    please state your full name for the record.

16        A.  Jonathan Andrew Rodden.

17        Q.  I know this is your second deposition in

18    this matter.  But before we get started, I'd like

19    to go over some of the ground rules that we laid in

20    your first deposition which, of course, you'll most

21    likely remember.

22            First you understand that you're being

23    deposed as a witness today in the case in the

24    matter of Senate Bill 202?

25        A.  Yes.

Page 8

1      Q.  I will be asking questions to try to

2   further understand the opinions that you've

3   presented in the three reports that you've

4   submitted in this case.  Do you understand that?

5      A.  Yes.

6           MR. MOCINE-McQUEEN:  I would just note

7   that the scope of this deposition -- I guess I

8   should phrase this as an objection.  Object to the

9   extent that what was noticed as a deposition on the

10  supplemental report of Dr. Rodden.  You may

11  continue.  Thank you.

12  BY MR. PRINCE:

13     Q.  Dr. Rodden, are you currently under the

14  influence of any substance or subject to any other

15  influence that would affect your ability to fully,

16  truthfully and completely answer my questions

17  today?

18     A.  No.

19     Q.  You understand that you are legally

20  obligated to answer my questions truthfully, fully

21  and completely in accordance with your oath; is

22  that right?

23     A.  Yes.

24     Q.  Okay.  The second rule is that if you do

25  not understand one of my questions or if you need

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 9

1    something clarified or repeated that you'll ask me

2    for clarification or to repeat the question.  Do

3    you understand that?

4        A.  Yes.

5        Q.  Okay.  And on the inverse of that, if you

6    answer a question, I'll take it that you understood

7    it.  Is that fair?

8        A.  Yes.

9        Q.  Okay.  Third is that unlike in a normal

10   conversation we are being recorded and our

11   conversation is being transcribed, so everything

12   that we say will eventually be published in a

13   transcript.  So to assist the court reporter in

14   making an accurate transcription, will you allow me

15   to finish my questions before answering them?

16       A.  Yes.

17       Q.  And I'll do the same for you.  I will let

18   you finish your answer before asking my next

19   question.

20            Because we are being transcribed, that

21   also requires you to answer my questions vocally

22   and clearly not with nods, gestures or grunts.

23   Will you do that?

24       A.  Yes.

25       Q.  If at any time for any reason you need to

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 10

1    take a break, you can just ask and I'll make sure

2    we take it.  I just ask that if there is a pending

3    question when you need a break that you answer the

4    pending question before we leave.  Is that fair?

5         A.  Yes.

6         Q.  If your counsel objects to a question,

7    unless they direct you not to answer you are

8    obligated to answer that question.  Do you

9    understand that?

10        A.  Yes.

11        Q.  And finally, do you understand that you're

12   not to talk with your counsel about any questions I

13   ask or about any answers you've given during this

14   deposition consistent with the standing order of

15   Judge Boulee?

16        A.  Yes.

17           MR. PRINCE:  I'm going to mark and

18   introduce what we'll call Exhibit 1.  I am handling

19   my own exhibits today, so we'll do this as quickly

20   as possible.  But --

21           MR. MOCINE-McQUEEN:  Thank you, sir.

22           (Exhibit 1 marked for Identification.)

23           MR. MOCINE-McQUEEN:  Do you have an extra

24   copy for me?  If you don't, that's okay.  We can

25   share.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 11

1              MR. PRINCE:  (Hands to counsel.)

2              MR. MOCINE-McQUEEN:  Thank you, sir.

3     BY MR. PRINCE:

4         Q.  Dr. Rodden, do you recognize this

5     document?

6         A.  Yes.

7         Q.  And do you know what it is?

8         A.  It's a notice of deposition.

9         Q.  And you received this from your counsel?

10        A.  Yes.

11        Q.  Did you do anything to prepare for today's

12    deposition?

13        A.  Yes.  I reread my -- my report carefully.

14        Q.  Okay.  Was there anything else that you

15    did?

16        A.  I spoke briefly with counsel going over

17    some of the items in my report.

18        Q.  And how long would you say you met with

19    your counsel?

20        A.  I'd say between -- maybe two hours.

21        Q.  Did you communicate with anyone else

22    besides your counsel to prepare for this

23    deposition?

24        A.  No.

25        Q.  In preparing for this deposition, did you

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 12

1    read any of the expert reports prepared by other

2    experts in the case?

3        A.   Yes.  I read the report of Dr. Shaw which

4    was -- which was directly related to my report.  I

5    also briefly examined the report of Dr. Grimmer.

6        Q.   Okay.  And did you communicate with any of

7    plaintiffs' experts in this matter?

8        A.   No.

9        Q.   You mentioned that you briefly reviewed

10   Dr. Grimmer's reports in this matter.  Did you

11   offer any conclusions or do you intend to offer any

12   conclusions as to Dr. Grimmer's conclusions?

13       A.   No.

14            MR. PRINCE:  I'll go ahead and mark

15   Exhibit 2 which is Dr. Shaw's supplemental report.

16            (Exhibit 2 marked for Identification.)

17   BY MR. PRINCE:

18       Q.   I may have given -- we'll be going back to

19   Dr. Shaw's report throughout.  So I just want to

20   get that in today.

21            When we last met in 2023, we spent a lot

22   of time addressing the issue of causality.  Do you

23   remember that?

24       A.   Yes, I do.

25       Q.   And do you remember what you said

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 13

1    regarding the rigor necessary to claim that one
2    thing caused another thing?
3         A.   The conversation was lengthy and I
4    remember some of it, but I can't -- can't remember
5    exactly every aspect of that conversation.
6         Q.   Certainly.   As a social scientist are
7    there generally accepted standards that would
8    govern a scientist's ability to say that one thing
9    caused another?
10        A.   Yes.   In the discussion we had last time,
11   I was drawing attention to the rather intense focus
12   in the social sciences in recent years on
13   experiments and on reserving the use of the word
14   "cause" for a very small range of settings in which
15   it is possible to conduct something like
16   experimental manipulation.   And this was -- we
17   discussed -- I believe in the last deposition I
18   referred to this as the gold standard of causality
19   and that there are lots of social scientists who
20   like to reserve the use of the word "cause" for
21   those settings in which it is possible to achieve
22   something like an experiment.
23        Q.   Okay.   And in your initial reports you
24   indicated that you offered no claim that Georgia
25   Senate Bill 202 caused any changes in voter

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 14

1    turnout.  Do you remember that?

2         A.  If you would repeat the question.  I want

3    to make sure I understand --

4         Q.  Sure.

5         A.  -- what I'm responding to.

6         Q.  In your initial report did you make any

7    claims that Senate Bill 202 caused changes in

8    turnout in Georgia?

9         A.  I don't believe I made that claim.

10        Q.  Do you make any claims in your

11   supplemental 2025 report that Georgia Senate Bill

12   202 caused changes in turnout?

13        A.  The way I structure this report is to

14   start out by simply describing changes in turnout.

15   And I think I'm clear about the fact that there are

16   lots of things that can shape turnout beyond

17   election law.  But the remainder of the report

18   focuses on aspects of SB202 that have direct

19   impacts on individuals' ability to vote, and I

20   focus on those.

21        Q.  When you use the word "impact" to describe

22   SB 202s effects, is that a causal term?

23        A.  I focus on -- on aspects of the law that

24   directly shape -- so, for example, looking at --

25   looking at ballots that have been rejected, I think

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 15

1     we can -- we can infer that the cause of a person

2     not voting, if their ballot is rejected and we know

3     they don't vote, it seems appropriate to classify

4     that as the cause of their not voting.  That's a

5     case where it seems very clear that the cause of

6     the person not voting was, in fact, the rejection

7     of the ballot.  And the report focuses on issues

8     like that.

9         Q.  You would agree, however, that that is an

10    inference that you can draw and is not up to what

11    you called the gold standard for establishing

12    causality through experimentation?

13        A.  I'm not sure I understand.  If someone's

14    ballot is rejected and no vote is recorded for

15    them, I'm not sure why this is something that would

16    require an experiment to draw the inference that

17    the cause of the person's nonvoting was the

18    rejection of the ballot.  I believe a strong claim

19    that Dr. Shaw makes is that people did not vote in

20    Georgia because they were uninterested in voting.

21    I can draw the inference that if someone attempted

22    to cast a ballot and it was rejected, I think the

23    inference does not require an experiment to draw

24    that that person -- the cause of that person's

25    nonvoting was not lack of interest.  I think we can

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 16

1    draw that inference without any experiment.

2         Q.  And we'll turn to your -- to your report's

3    treatment of ballot rejections in a minute.  But

4    you would agree that the number of ballots that

5    were rejected in 2024 in absolute terms was quite

6    small; would you not?

7         A.  In the state of Georgia where elections

8    are determined by very small margins, I'm not sure

9    what constitutes a small number of ballots or a

10   small effect.

11        Q.  There were less than 10,000 ballots that

12   were rejected?

13        A.  I believe that's correct.

14        Q.  And that is out of millions of vote cast?

15        A.  That's correct.

16        MR. PRINCE:  I'm going to mark and

17   introduce Exhibit 3 which is your supplemental

18   report.

19        (Exhibit 3 marked for Identification.)

20        MR. MOCINE-McQUEEN:  I trust that you're

21   able to get to the right breaking spot?

22        MR. PRINCE:  Luck of the draw.

23   BY MR. PRINCE:

24        Q.  Now, is this a true and correct copy of

25   your most recent report?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 17

1          A.   Yes.

2          Q.   What prompted you to write the

3     supplemental report?

4          A.   I was made aware by counsel that

5     additional reports were -- were possible in this

6     case in response to new data from the 2024

7     election.  And I was asked to write a report based

8     on those -- on the new information.

9          Q.   And how long did it take you to write this

10    report?

11         A.   I really don't recall.  But it was a

12    rather brief period that the -- that the -- between

13    when I was asked to work on this and the deadline

14    for finishing it.  And so I worked for some period

15    as I was able during that -- during that chunk of

16    time.  But the precise number of hours I'm afraid I

17    don't remember.

18         Q.   Were you compensated for your work on this

19    report?

20         A.   Yes.

21         Q.   And do you know the rate at which you were

22    compensated?

23         A.   Yes.  My -- the rate was $550 per hour.

24         Q.   Now, what new evidence or information did

25    you consider in preparing the supplemental report?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 18

1        A.  Well, as I described, I started by

2     continuing the analysis from my previous report.  I

3     was asked to just provide basic information about

4     turnout that was purely descriptive and to do that

5     by race.  And so in Georgia it is possible to

6     examine the voter file and get direct information

7     supplied by voters about their self-described race

8     and it was possible to get information from a

9     series of files called absentee files from the

10    Secretary of State to get information about

11    absentee voting.  There's also a vote history file

12    that is -- that tells us whether a person voted and

13    by what mechanism they voted, and there was also a

14    voter file which tells us -- gives us a list of

15    registered voters, but also very usefully gives us

16    an ID that allows us to merge these files together.

17    So a lot of my analysis came from those -- from

18    those files.  And there's also information that

19    the -- that the election administrators in Georgia

20    supply to a -- to a survey called EAVS, E-A-V-S.

21    And some of the county level data from that survey

22    I also examined in my report.

23        Q.  Okay.  And you mentioned the process of

24    merging these various data sets.  What does that

25    look like in practice?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 19

1      A.   There is a unique ID given to every
2   Georgia voter.  And so I use a software program
3   that allows me to -- to merge the files together
4   based on that common ID, so everyone who has that
5   common ID is merged together.  One thing that is
6   worth noting in that process is that sometimes
7   there are multiple -- in the absentee file there
8   might be multiple observations for an individual.
9   And so I try to take account of that in my report
10  and make sure I don't double-count any individuals.
11     Q.   And did you provide the merged data sets
12  that you created to defendants?
13     A.   Yes.
14     Q.   Did anyone assist you in preparing the
15  supplemental report?
16     A.   No.
17     Q.   To your knowledge, did you cite any
18  academic articles in this report?
19     A.   I don't recall specifically citing any
20  academic articles in this report.  But I suspect
21  you can correct me if that's wrong.
22     Q.   That's my read as well.
23          Are there any topics which you addressed
24  in your 2023 report that you did not update in your
25  2025 report?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

1       A.  I don't recall.  I did not review my 2023

2   report in preparing for the deposition today, but I

3   suspect there were some issues.  I remember

4   conducting some analysis about -- yes, there's one

5   issue I do recall which is that I had -- I had

6   examined websites that were assembled by some of

7   the counties that were reporting to voters on lines

8   in realtime during the early voting period.  So I

9   was -- I was -- during the early voting period of

10  the midterm election was checking those websites

11  and collecting information about lines in various

12  locations.  I was unaware of the fact that this

13  lawsuit was even still -- that there was still

14  prospects of future reports being written in this

15  case when we reached the 2024 election.  So I

16  believe some of those websites did exist, and it

17  would have been possible to have visited those and

18  collected information about lines.  But I was

19  unaware that this was even a -- this was a

20  possibility that there would be some interest in

21  collecting that information.  So I did not collect

22  it and was not in this report.

23      Q.  So you don't consider line length at all

24  in the 2025 report?

25      A.  That is correct.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 21

1    Q.  Do you consider ballot challenges in your

2    2025 report?

3    A.  No.  I don't believe I had any information

4    on that supplied to me.

5    Q.  We talked about line length.  Did you

6    consider wait times in your 2025 report?

7    A.  I believe I meant to say wait times.

8    Q.  So consider them the same?

9    A.  Yes, I put those in the same category.

10   And that was something I previously analyzed.  But

11   this is correct; there's nothing in the new report

12   that addresses that topic.

13   Q.  Did you look at the number of poling

14   places in Georgia that were open past 8:00 p.m. on

15   election day?

16   A.  I don't believe I had that information

17   provided to me, so no, I did not.

18   Q.  And is it fair to assume that if there was

19   a topic that you identified in your 2023 report

20   that you did not address in your 2025 report that

21   you were not offering any additional opinions about

22   those topics?

23   A.  Yes, that's fair.

24   Q.  Okay.  Do you consider your supplemental

25   2025 report to be a complete and accurate

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 22

1    reflection of the views related -- your views

2    related to the 2024 election in Georgia with the

3    caveats that we've mentioned?

4         A.  Of my views of the election, that seems

5    very broad.  I mean, these are -- this is -- these

6    are my opinions related to the questions that I

7    was -- I was asked to address.

8         Q.  And does your report contain a complete

9    and accurate reflection of the views to which you

10   were asked to address?

11        A.  Yes.

12        Q.  Throughout your supplemental report you

13   discuss differences between elections in terms of

14   the percentage point difference.  Could you explain

15   what that is?  What does it mean to say that there

16   is a percentage point difference?

17        A.  When you say differences between

18   elections, it might be helpful if you would be

19   specific.  It might be useful to go to a particular

20   spot in the report that I can --

21        Q.  Sure.

22        A.  -- use as an example.

23        Q.  So let's go to page 1 in the summary of

24   findings.  Under section 2-A, the second bullet

25   point, you write that "Voters who cast a mail

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 23

1    ballot in 2020 were 4.8 percentage points less

2    likely to turn out in 2024 than those who cast an

3    in-person ballot in 2020."  So what does it mean

4    when you say percentage points less likely?

5        A.  Yes.  That means that when we compare the

6    two groups that I describe they're both -- were

7    expressing both of these as percentages.  So we're

8    just subtracting one percentage from the other.

9        Q.  And why is percentage point difference an

10   appropriate metric to use compared to percentages

11   to show changes across time?

12       A.  I don't have a strong opinion about the

13   superiority of looking at a raw percentage point

14   difference or perhaps the alternative would be to

15   take that 4.8 and divide it by the -- by the

16   percentage of the reference group and say that

17   it's -- that it's some percent higher.  That's

18   another -- that's another way of expressing the

19   data that one could also choose.  This one is

20   perhaps easier to digest.  I think the answer to

21   your question is a little simpler if I just say we

22   take one thing and we subtract it from the other.

23       Q.  Sure.  Now, is it possible that small

24   changes in percentage points could look inflated

25   when written as a percentage difference instead?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

                                              Page 24

1        A.   I think as long as one understands what

2    one is looking at there are -- there are perfectly

3    valid reasons to -- to express the data in that way

4    as well.  I don't have any strong preference for

5    one or the other.  I think if one understands what

6    one is looking at, one need not think of it as

7    inflated.  It's a very common way in scientific

8    publications, for instance, in medicine, I think

9    that would be the most common way to present even

10   what might seem like a small effect.

11       Q.   Now, you indicated in your initial reports

12   that you made no causal claims as we discussed.  I

13   count a handful of times where your report

14   indicates that SB202 impacted voters.  We started

15   down this line a little bit already.  But are these

16   causal claims where you say that SB202 impacted a

17   voter?

18       A.   There are situations when the -- like the

19   one I was describing where the -- it seems to me

20   there should be little controversy about a claim of

21   impact.  I would say that if someone is interested

22   in voting by mail and there's a situation where the

23   application arrives at their house unsolicited and

24   then there's a law passed and that switches to a

25   situation where the person has to seek out the

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 25

1   application during a specified window and has to

2   provide a lot more information that the -- there's

3   an impact on that person's -- on what it takes for

4   that person to vote by mail.  I don't think that's

5   a controversial claim and I don't know what benefit

6   there is from getting into too much of a rabbit

7   hole about causation.  The fact that that person

8   was impacted to me seems -- that seems like a fine

9   word to use to explain the change that they faced

10  as a result of SB202.

11      Q.  But you didn't try to quantify the level

12  of impact between receiving an absentee ballot

13  application in the mail and having to go on-line

14  and download it from the Secretary of State

15  website, correct?

16      A.  The question is whether I know the cost --

17  if I quantify the cost in some -- by some metric?

18      Q.  Correct.

19      A.  I don't know how I would do that.  I don't

20  have a technique for doing that.

21      Q.  Would you agree that intuitively it sounds

22  like a low burden of having to just find the

23  application on-line?

24      A.  It's clear that in states where -- where

25  there is -- there is universal vote by mail where

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

Page 26

1    people are mailed ballots, in situations people

2    mailed ballot applications that lots of people end

3    up making use of vote by mail.  In situations where

4    they are required to go through a process of

5    requesting an application, filling out information

6    and knowing that it might be rejected that the

7    rates at which people vote by mail are far lower.

8    So I think we can infer that there is a significant

9    burden created by those requirements.

10       Q.  Can you explain how you calculated turnout

11   for your report?

12       A.  Yes.  I should be clear that if we look

13   at -- if we look at that brief section on turnout

14   and we look at figure one, for instance, there is

15   no measure of overall turnout.  That's not

16   something I was asked to examine.  But I do present

17   data on turnout by race.  And so the way that's

18   calculated as I was describing earlier the voter

19   file has a field in it that tells us the

20   self-described race of the voter, and then we can

21   merge in information that to my knowledge is very

22   accurate.  It tells us at the individual level

23   whether an individual cast a valid ballot in the

24   election or not.  And so what I'm doing here is I'm

25   looking at that whole group of registered voters

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 27

1    who self-identify as black or African-American and

2    I'm looking at the share of those people who are

3    known to have voted.  And I'm doing that also for

4    those who self-described as white.  So those are

5    the two turnout figures that I provide in figure

6    one.

7         Q.  And if you look, sticking to figure one,

8    to the 2016 election and you compare that with the

9    2024 election, you would agree that we're about .04

10   percentage points in decline between 2016 and 2024?

11        A.  For which group?

12        Q.  For black voters in Georgia.

13        A.  So you are taking a 57.1 and comparing

14   that with 56.7 percent.

15        Q.  Correct.

16        A.  Yes, that's right.  2016 was sort of a

17   different era in Georgia politics.  This is really

18   before Georgia became a very competitive swing

19   state where lots of resources were being -- were

20   being invested in attempts to mobilize black

21   voters.

22        Q.  And the difference even between 2016 and

23   2020 is less than a percentage point difference,

24   right, for black voters?

25        A.  You're going from 57 -- I'm sorry.  Which

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 28

1    election to which election?

2        Q.   My apologies.  So from 2016 to 2020 it's

3    about slightly over a two percentage point

4    increase, correct, in black voter share?

5        A.   2.7 percentage point?  Yeah.

6        Q.   Okay.  Was there anything about the 2020

7    election that you would consider unique compared to

8    other elections?

9        A.   In Georgia in particular?

10       Q.   Let's start there.  In Georgia in

11   particular was there anything about the 2020

12   election that made it different than other

13   elections?

14       A.   Well, I think that as I was describing,

15   Georgia elections have become increasingly

16   competitive.  They have been -- they have become

17   focal points for the entire country.  I mean, in

18   2020 it became the case that the presidency and the

19   Senate were both a -- really dependent on the

20   outcome in Georgia.  That is something that

21   compared to the past, compared to 2016 was not the

22   case.  So that is something that made the 2020

23   election different relative to the past.  I think

24   in the entire country, of course, 2020 was a year

25   in which the pandemic affected the basic process of

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

 1    voting and lots of -- lots of efforts were made to

 2    try to make voting safe in -- during the pandemic.

 3    And Georgia was no exception to that.

 4         Q.  And we mentioned that the control of the

 5    Senate was on the line in 2020.  I believe the

 6    saying was that the Senate runs through Georgia or

 7    something to that effect.  Could the fact that

 8    there were two high-profile Senate elections in

 9    2020 have affected turnout?

10         A.  Yes.  I believe having competitive

11    elections is one of the many things that shapes

12    turnout.

13         Q.  Now, Senator -- now, Senator Warnock was

14    also on the ballot that year.  And if he had won,

15    which he did, he would have been Georgia's first

16    black senator.  Is it possible that his inclusion

17    on the ballot would have motivated black Georgia

18    voters compared to other years?

19         A.  That is possible.

20         Q.  Is it possible that concerns about the

21    Trump administration's response to COVID in 2020

22    could have led to an increase in turnout in 2020?

23         A.   I think every election turnout is shaped

24    in part by the issues that are current at the

25    moment and that voters are reacting to.  So I

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 30

1    think -- I think it's possible that a long list of

2    things shape turnout, and yes, COVID is on that

3    list.

4        Q.   Is it possible that for those voters who

5    were motivated to turn out in 2020 because of their

6    disagreement with President Trump's COVID response

7    that their concerns would not have been as strong

8    in 2024?

9        A.   I believe the mix of issues that voters

10   are concerned with does vary from one election to

11   the next.  So yes.

12       Q.   We talked about several ways that the 2020

13   election was unique.  Could the uniqueness of the

14   2020 election help explain some differences in the

15   method by which Georgia voters cast their votes

16   between 2020 and 2024?

17       A.   Well, if we look at figure -- figure

18   three, we certainly can see that relative to the

19   past there was a big increase in mail-in voting and

20   we saw something similar in a lot of other states.

21   But the -- the return to levels of mail-in voting

22   that we saw before that is something that probably

23   requires an explanation beyond simply the end of

24   the pandemic.  In most situations when voters are

25   given the opportunity to vote by mail, and I

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 31

1    believe I mentioned earlier some of the western

2    states where mail-in voting has become a lot easier

3    once voters experience the ease of mail-in voting,

4    they usually continue to vote by mail.  In Georgia

5    we see a dramatic reduction again in mail-in

6    voting, which is not surprising given that SB202

7    changed the structure and the requirements of the

8    nature of mail-in voting.  So certainly two things

9    are happening.  The pandemic is coming to an end

10   and people are feeling safer, but also there's a

11   big legislative change that clearly has an impact

12   on people's -- on their ability to vote by mail.

13       Q.  But here again, you don't make any attempt

14   to quantify the impact on people's ability to vote

15   by mail from SB202, correct?

16       A.  Well, I quantify -- no, I think that's not

17   correct.  I think I try to quantify those aspects

18   of voting by mail that we can quantify.  And I try

19   to clarify in the report that there are things we

20   can measure and there are things we can't.  And in

21   some ways the things we can measure are probably

22   only the tip of the iceberg or a small part of the

23   effect.

24           So we can measure when someone applies for

25   a ballot and does not receive one and does not

Page 32

1    vote, that's something we can measure and we can

2    infer that this has something to do with

3    legislation.  We can look at a person who submits a

4    ballot and that ballot is not counted, and we can

5    look at the fact that they submit a ballot in the

6    last few days before an election and it is -- ends

7    up being too late.  These are things we can

8    measure.  But what we cannot measure is, for

9    instance, those individuals who had an interest in

10   voting by mail but who really preferred to vote by

11   mail but were deterred from applying to vote by

12   mail, say, because of the time frame issue or

13   because they did not have a driver's license number

14   or some other thing like that.  So there's a set of

15   things that we cannot measure.  And my report is

16   very clear about the fact that it's just trying to

17   focus on those things we can measure.

18       Q.  We talked about some things that were

19   unique to 2020 -- to the 2020 election.  Let's turn

20   our focus to some things that potentially were

21   different about the 2024 election.

22            Is it possible that there were some voters

23   who liked President Biden who decided not to vote

24   because they felt that he was unfairly treated

25   after he dropped out of the race?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 33

1        A.   I think when we try to think about the
2    various reasons why people did the things they did
3    after an election we can come up with a very long
4    list of possible -- possible explanations.  That
5    is -- that is conceivable.  I've heard that said.
6    I don't know if I've seen any data that would back
7    that up, but that is conceivable.
8        Q.   Is it likewise conceivable that there were
9    some who decided not to vote in 2024 because they
10   felt that they were not given a chance to help pick
11   the nominee after President Biden dropped out?
12       A.   Again, that's something that one -- one
13   sees that claim in popular media.  Again, it's not
14   something I've seen any -- any -- any research on.
15   That's not to say nothing has been done of that
16   kind, but I've certainly not seen it.
17       Q.   But it's possible?
18       A.   Sure.  Lots of things are possible.
19       Q.   In a similar vein is it possible that
20   there may have been some voters that considered
21   Vice President Harris to be on the wrong side of
22   the Israeli/Palestinian conflict and so decided not
23   to vote?
24       A.   That is also conceivable.  I've not seen
25   any analysis to that effect in Georgia.

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

Page 34

1        Q.  Is it possible that any of those

2    differences that we've discussed, any of those

3    possibilities would have a particularly pronounced

4    effect on black voters and their motivation to

5    vote?

6        A.  That's why I'm really not sure.  I'm

7    not -- you'd have to -- you'd have to give me a

8    specific hypothesis about one of those and how it

9    asymmetrically affected black voters.

10       Q.  Without trying to quantify the effect, is

11   it possible that one particular reason that a voter

12   decides not to vote would impact one racial group

13   more than it impacts others?

14       A.  I'm going to have to have you repeat that

15   just to make sure I understand.

16       Q.  Sure.  I'll phrase it in terms like this.

17   Is it possible that of those voters who decided not

18   to vote because they felt President Biden was

19   unfairly treated that there may be more black

20   voters in that group than white voters conceivably?

21       A.  That wouldn't have occurred to me

22   particularly.  But lots of things -- one can spin

23   any number of stories without data.  So I don't --

24   the list of things that one might claim in the

25   absence of data is really endless.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 35

```
 1        Q.  But your report makes no attempt to
 2   disprove any of these endless hypotheses for what
 3   happened in the 2024 election, correct?
 4        A.  That's right.  My report is fairly clear
 5   about the descriptive nature of the -- of the
 6   turnout information.
 7        Q.  We've talked about the uniqueness of the
 8   2020 election.  Is there a reason why 2020 would be
 9   a helpful baseline comparator for the way that
10   people vote in the state of Georgia?
11        A.  That last phrase in the question you were
12   referring to the method of voting?
13        Q.  Correct.
14        A.  So -- so is -- is it sensible to compare
15   2020 to 2024 in terms of mail-in voting, is that --
16        Q.  Yeah.
17        A.  -- relative to -- relative to in-person
18   forms of voting?
19        Q.  Correct.
20        A.  Yes.  I think that the immediately
21   preceding election there's lots of information to
22   suggest that these things are habit forming and
23   that once people start to vote by mail they tend to
24   continue to vote by mail.  There's a lot of
25   stickiness to the -- to the form of voting that
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 36

1    people use.  So to go back several years earlier

2    and ask well, what form of voting was this person

3    doing in 2016, that seems a lot less relevant than

4    asking what form of voting they were using in the

5    immediately preceding election.

6        Q.  Let's turn to figure one which is on page

7    4 of your supplemental report.  Now, from reading

8    this correctly, the turnout gap in 2016 between

9    black and white voters was 10.6 percentage points;

10   is that correct?

11       A.  That sounds right.

12       Q.  And then by 2020 it had risen to 12.5

13   percentage point?

14       A.  Yes.

15       Q.  And finally in the most recent election it

16   was 15.4 percentage points based on your

17   conclusions here; is that right?

18       A.  Yes.

19       Q.  Okay.  So at least for presidential

20   elections the turnout gap was expanding even before

21   SB202; is that correct?

22       A.  That's correct.

23       Q.  Looking to midterm elections, your report

24   does not address the turnout gap for the 2014

25   election; is that correct?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 37

1     A.  I don't believe I had a voter file that

2     would allow me to do this analysis for 2014.

3     Q.  But if the data were to show that the

4     turnout gap was narrower in 2014 compared to 2018

5     and 2022, would you agree that it would show that

6     the same trend and expanding turnout gap even

7     before 2022 or even before SB202?

8          MR. MOCINE-McQUEEN:  Object to scope and

9     form.

10          THE WITNESS:  The question is if I imagine

11     that I had data that I don't have, is it

12     conceivable that there was an upward trend in the

13     racial turnout gap?

14     BY MR. PRINCE:

15     Q.  Between 2014 and 2020, correct.

16     A.  I wouldn't want to speculate about what --

17     what those data look like.  It's possible that it

18     was not expanding.  I just don't -- I just don't

19     know.

20     Q.  Is it fair to say that SB202 cannot be

21     responsible for a trend that started before it was

22     enacted?

23     A.  Well, it depends on whether that trend

24     accelerated.  We could have -- very often in -- in

25     examining a time series and trying to understand an

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 38

1    interruption in that time series one might see a

2    trend that is moving upwards and then see an

3    intervention and then a kind of an increase in

4    the -- in the trend.  So the presence of a

5    pre-trend doesn't mean we can't -- we can't

6    determine that something had an effect on the -- on

7    the outcome.  We often face data that are trending

8    in some direction.  And we want to say if there's a

9    change in that trend.

10       Q.  But here your report does not suggest that

11   SB202 caused the turnout gap to increase; does it?

12       A.  That's correct.

13       Q.  And that means that it's possible that the

14   turnout gap increased for a reason that was

15   independent of SB202?

16       A.  That is possible.  There are aspects of

17   that turnout trend that are clearly unrelated to

18   election law and there's some aspects of it that

19   one can relate directly to election law.  And so

20   the purpose of my report was to focus on those

21   things that can be most clearly linked to the

22   impact of the law.

23       Q.  You mentioned that you reviewed Dr. Shaw's

24   report which I believe is Exhibit 2.  Are you aware

25   that Dr. Shaw found the turnout in Georgia

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 39

1    increased compared to 2020 and 2024?

2         A.   Yes.  Dr. Shaw asks a very different

3    question about overall turnout and he is also

4    looking at a different denominator for turnout.  So

5    he's asking a rather different question.  But I

6    believe that he -- to answer your question, I

7    believe he did make the claim that when we look at

8    votes cast as a share of voting eligible population

9    that he gets -- he concludes that that concept of

10   turnout was -- was higher in 2024 than in 2020 if I

11   remember correctly.

12        Q.  You mentioned that he uses a different

13   denominator.  How can the denominator that you

14   choose in calculating turnout affect the turnout

15   calculation?

16        A.   In this case what -- what Dr. Shaw is

17   doing is he's taking two different data sets and

18   putting them together.  So this is the -- the

19   denominator for -- for Dr. Shaw is something that

20   is assembled by someone named Michael McDonald at

21   the University of Florida.

22             So what Professor McDonald is doing is

23   trying to get a measure from the census of the

24   citizen voting age population, but then he's

25   altering that by learning things about each state,

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

Page 40

1    about the prison rules related to prisoners voting,

2    rules related to mentally incapacitated persons

3    voting, and rules about felon enfranchisement and

4    so forth to get a sense of what the voting eligible

5    population is.  And that's going to be a different

6    number than the registered voting population

7    because there are some individuals who are not

8    registered.

9            So when he looks at that denominator, he

10   gets -- well, again, I don't actually examine

11   overall turnout, so we can't really compare his

12   results and mine.  I was asked to examine turnout

13   by race.  But to answer your question, if one can

14   get different results because one is using a very

15   different data set that's constructed in a very

16   different way for the denominator even though the

17   numerator might be the same as the number of votes

18   cast which we get from the Secretary of State.

19       Q.  Are there any benefits to looking at

20   voting-eligible population compared to the list of

21   registered voters?

22       A.  Yes, because when we look at registered

23   voters, the downside of that is that registration

24   can change over time.  So, for instance, the --

25   Georgia has been very good about using the DMV to

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 41

 1    register voters and has made improvements to that
 2    process over time.  So the number of registered
 3    voters is something that is changing in response to
 4    policy and to effort and so forth, whereas the
 5    voting-eligible population, if we trust that
 6    Professor McDonald has calculated this correctly,
 7    is something that is less -- is less responsive to
 8    policy changes.  So if we want just a pure measure
 9    of overall turnout, that is, especially one that is
10    comparable across states, then that is the
11    advantage of using the voting-eligible population.
12    The disadvantage, of course, in this case is that
13    we can't examine race, and this case has a lot to
14    do with claims of differential impact on racial
15    groups.  So for our purposes, voting-eligible
16    population unfortunately is not useful.
17        Q.  In terms of turnout generally, would
18    voting-eligible population be helpful in showing
19    turnout across time in the same state?
20        A.  If we were interested in understanding
21    something about turnout that also was driven by
22    changes in policies related to registration, that
23    would be useful.  I chose not to use
24    voting-eligible population for two reasons.  The
25    most obvious one is I was asked to examine race,

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 42

1    and it's not possible to do that.  But it's also

2    the case that if we want to understand the impact

3    of SB202, it is not a policy that had anything to

4    do with registration.  It's not a policy that

5    shaped -- that affected unregistered voters.  So

6    for my purposes it made sense to look at registered

7    voters in particular.  But using voting-eligible

8    population in general to gauge turnout over time

9    within a state is -- that's certainly a fine thing

10   to do and I think it's useful for the court to have

11   that information along with some other ways of

12   measuring turnout.

13        Q.  And you have no reason to question

14   Dr. Shaw's calculation of voting-eligible

15   population?

16        A.  I don't think so.  I don't -- I didn't go

17   and download the data myself from Dr. McDonald, but

18   I have no reason to believe that Dr. Shaw made any

19   errors in his calculations.

20        Q.  And you would agree generally that

21   Dr. McDonald's data set is widely used in the

22   field?

23        A.  Yes.

24        Q.  Have you used it yourself?

25        A.  I have.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 43

1          Q.  One thing that you did in your 2023 report

2     was to use Dr. McDonald's data to compare Georgia's

3     turnout to other states with competitive Senate

4     races.  Do you remember that?

5          A.  Yes.

6          Q.  Did you compare Georgia's turnout to other

7     states in your 2025 report?

8          A.  No.

9          Q.  With the understanding that Georgia did

10    not have a Senate or a gubernatorial election in

11    2024, is there anything that you would consider

12    helpful -- let me rephrase that.

13             Would national trends in voting turnout

14    both generally and for self-reported racial groups

15    have anything to say about things that are

16    happening specifically in Georgia?

17         A.  There are clearly national trends and

18    getting back to our earlier discussion about

19    changing policy focus, changing impressions of

20    candidates, that sort of thing, there are national

21    trends in turnout.  And those trends can sometimes

22    be seen across the board, but then we can sometimes

23    see very different things happening in different

24    states.

25             So one of the things that Dr. Shaw is

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 44

1    aware of and makes some -- some -- draws some

2    attention to is the fact that turnout trends can

3    look very different in swing states as we refer to

4    them or these states that -- where the Electoral

5    College votes are up for grabs, states that have a

6    large number of Electoral College votes and the

7    presidential election result is difficult to

8    predict ahead of time.  These are states where lots

9    of effort and television advertising and campaign

10   expenditure and mobilization and door knocking

11   takes place.  So we can see some very different

12   kinds of trends in those states than we see in the

13   other states.  And I think that's something that

14   probably all the experts in this case would --

15   would agree to.

16       Q.  Let's turn to Exhibit 2, Dr. Shaw's

17   supplemental report.  We're going to go all the way

18   to the back, figure 1A, the last page.  Do you

19   remember looking at this figure when you reviewed

20   Dr. Shaw's report?  Sorry.  I'm in the last page of

21   the report altogether.  It's a color document.

22              MR. MOCINE-McQUEEN:  Page 35.

23              MR. PRINCE:  35, yes.

24              MR. MOCINE-McQUEEN:  I guess it's in the

25   appendix probably.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 45

1          THE WITNESS:  I will -- I had forgotten

2     about this figure.  But I will familiarize myself

3     with it right now.

4          So this is -- this is just -- it would

5     appear to be ballots cast divided by

6     voting-eligible population from Professor McDonald

7     with some states that were deemed to be

8     battleground colored in purple, the United States

9     as a whole colored in blue, and Georgia colored in

10    red.  So I think I got it, yes.

11    BY MR. PRINCE:

12         Q.  Okay.  And would you agree that compared

13    to the United States Georgia had a higher turnout

14    based on this chart?

15         A.  Based on this chart, yes.

16         Q.  And that Georgia also did better than

17    several battleground states as well, namely Nevada

18    and Arizona; is that correct?

19         A.  Yes.  It shows me that he identifies one,

20    two, three, four, five, six, seven battleground

21    states and shows that Georgia ranked fifth out of

22    seven battle ground states in turnout.

23         Q.  Put this aside for now.  I'm going to hand

24    you three documents now.

25          MR. MOCINE-McQUEEN:  I just want to check

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 46

1    if there's a point that Dr. Rodden feels like he

2    needs a break at some point here or -- and he can

3    speak for himself.

4              THE WITNESS:  How long have you been going

5    so far?

6              MR. MOCINE-McQUEEN:  A little over an

7    hour.

8              MR. PRINCE:  We can take a break now if

9    you'd like.

10             THE WITNESS:  Yeah, that's fine.

11             MR. MOCINE-McQUEEN:  Before you hand out

12   the new.

13             THE VIDEOGRAPHER:  We are off the record

14   at 10:14.

15             (Break taken from 10:14 a.m. to

16   a.m.)

17             THE VIDEOGRAPHER:  We are on the record at

18   10:28.

19   BY MR. PRINCE:

20       Q.  Dr. Rodden, during the break did you have

21   a conversation with your counsel at all about any

22   of the questions that I've asked today?

23       A.  No.

24       Q.  I'm going to hand you first what is going

25   to be marked as Exhibit 7.  Thankfully this one is

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 47

```
 1    just one page.
 2            MR. MOCINE-McQUEEN:  Small print.
 3            MR. PRINCE:  Yes.
 4            (Exhibit 7 marked for Identification.)
 5    BY MR. PRINCE:
 6        Q.  Dr. Rodden, have you ever seen this
 7    document before?
 8        A.  It is possible I saw it at my last
 9    deposition or at least something like it.  But from
10    the format of it it would appear to be something
11    from the CPS.
12        Q.  And what is the CPS?
13        A.  Current population survey.  There's a
14    supplement that tells us some things about voting
15    after each election.
16        Q.  And is that put out by the census?
17        A.  Yes.
18        Q.  Have you visited the census's website
19    before?
20        A.  Yes.
21        Q.  Would you agree that this particular
22    survey provides valuable insights into voter
23    behavior?
24        A.  Yes and no.  It is -- it is a sample.  And
25    there is a serious problem of reporting on various
```

Page 48

 1    issues.  Like we know -- as we learn more about

 2    voting and as we get our access to voter files and

 3    we can validate votes in surveys, one of the things

 4    we've learned is there are really big problems with

 5    overreporting of voting and a lack of knowledge

 6    about one's registration status.  And so we've been

 7    learning to take the CPS data with a certain grain

 8    of salt.  There are situations in which it is the

 9    best thing we have and it's -- we are kind of

10    forced to use it.  But when we have direct

11    information from a voter file, that's a much better

12    way to understand turnout, for instance.

13        Q.  Understanding that survey responses can be

14    overreported, is it consistent with the literature

15    on polling to assume that such instances of

16    overreporting are consistent across years?

17        A.  It's unclear.  I think there -- one can

18    imagine a situation when we think about looking

19    across years or across states, in particular across

20    states over time there are moments when the focus

21    on an election and the moral imperative of voting

22    in that election is very strong and the

23    embarrassment of not voting is something that is

24    stronger in some contexts than others.  So it would

25    not surprise me if there was variation in the

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 49

1   extent of kind of moral embarrassment of not voting

2   and hence overreporting of voting.  This is

3   something that I can imagine would easily change

4   over time and across geographic settings.  I don't

5   have -- this is not something I've studied.

6        Q.  Certainly.  This particular exhibit would

7   not capture embarrassment over not voting because

8   the focus of the question is reasons for not

9   voting, correct?

10       A.  Yes.  This would appear to be people who

11  have -- who have first responded that they did not

12  vote and then they're being asked a follow-up

13  question about the reason.  So I think that's

14  correct.

15       Q.  In this exhibit -- and I have the benefit

16  of being able to magnify it on my computer, so I

17  apologize.  Do you see a column that says "forgot

18  to vote"?

19       A.  Yes.

20       Q.  And the total percent distribution of

21  voters in the United States who forgot to vote was

22  4.1 percent.  Do you see that?

23       A.  Yes.

24       Q.  And if you jump down to white non-Hispanic

25  alone, the number is slightly higher at

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 50

1    4.7 percent.  Do you see that?

2         A.  Yes.

3         Q.  And then for black alone it is two point

4    something percent.  It is smaller.

5         A.  2.2 percent, yes.

6         Q.  I told your counsel this on the break, but

7    thank you for your willingness to deal with me as I

8    stutter through statistics.

9         A.  Okay.

10        Q.  So voters in 2024, black voters in

11   particular, did not report that they forgot to vote

12   in high numbers, correct?

13        A.  Yeah, relative to other groups that would

14   appear to be the case.

15        Q.  Let's jump over one column to the right.

16   Do you see the column that says "Not interested"?

17        A.  Yes.

18        Q.  The total percentage of Americans who

19   reported they were not interested in voting was

20   19.7 percent.  Do you that?

21        A.  Yes.

22        Q.  Whereas, white non-Hispanic alone was

23   2.3 percent points lower at 17.4 percent.  Do you

24   see that?

25        A.  Yes.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

1          Q.  By contrast black alone voters reported

2     that they were not interested in voting at a rate

3     of 23.8 percent.  And what's the percentage point

4     increase there between black voters and the total

5     U.S. population?  Sorry for making you do math on

6     the fly.

7          A.  We're comparing the top line --

8          Q.  With the black alone line.

9          A.  So around four percentage point

10    difference.

11         Q.  And that number is even more pronounced

12    when you compare the black alone line with white

13    non-Hispanic alone, correct?

14         A.  Yes.

15         Q.  Okay.  Let's jump over to the line that

16    says "Did not like candidates or campaign issues."

17    Do you see that the total percent of voters that

18    reported they did not vote because they did not

19    like the candidate was 14.7 percent?

20         A.  Yes.

21         Q.  Okay.  And then for a white non-Hispanic

22    alone slightly higher at 15.7 percent?

23         A.  I want to say that it looks like

24    15.1 percent.

25         Q.  Am I on the wrong line?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

1      A.   If we're looking at did not like

2   candidates white non-Hispanic alone, I am seeing

3   15.1 percent.

4      Q.   Whether it's 15.1 or 15.7, it's slightly

5   higher than the national -- the national

6   percentage, correct?  Either --

7      A.   So I was looking at white -- yeah, so

8   white Hispanic alone and black alone are

9   15.7 versus 15.1 unless I'm just --

10     Q.   Sorry.  I should have brought you a ruler.

11     A.   I need a paper to come across this.

12     Q.   I read it as 15.2 percent of black alone

13  said that they did not vote because --

14     A.   Yes --

15     Q.   -- they did not like the candidate.

16     A.   -- compared to 15.7 percent.  So .5 of

17  a -- so half of a percentage point difference.

18     Q.   Okay.  Would voters who were independently

19  uninterested in voting in 2024 have been deterred

20  from voting by SB202?

21     A.   I'm sorry.  Repeat the question.

22     Q.   Sure.  Would voters who reported that they

23  were uninterested in voting in 2024 have been

24  deterred from voting by SB202?

25     A.   Well, I mean, I just -- this is -- this is

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

Page 53

1    some national survey response.  This would tell me

2    nothing about Georgia.  I mean, Dr. -- Dr. Shaw

3    presented some similar data for Georgia that showed

4    no difference in interest in voting between --

5    between black voters in Georgia and white voters.

6    There was no statistically significant difference.

7    So --

8        Q.  But Georgia would be included in this

9    national data in theory, correct?

10       A.  Yes, a small part of it, yes.

11       Q.  And is it at least plausible that the rate

12   of voting in Georgia follows these national trends?

13       A.  Well, as I described earlier, this

14   question of being not interested is something that

15   we can -- you know, we don't have breakdowns by

16   state here, but I can imagine we'll see very

17   different responses to that question in Georgia

18   than we see in the rest of the country because

19   someone who is living in -- in a state where there

20   are no contested elections is much more likely to

21   say they're not interested in the election than

22   someone who is living in a -- in a state like

23   Georgia.  So yeah, this -- this table would just

24   not be something I would use to try to analyze or

25   learn anything about the level of interest that

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 54

1    Georgia voters have in the election.

2        Q.   What about the column on did not like the

3    candidates; would that be something that could also

4    affect Georgia voters?  Assuming that you're

5    correct that it's unlikely that Georgia voters were

6    simply uninterested in voting, could the fact that

7    a certain percentage of black voters in Georgia did

8    not like either now President Trump or then Vice

9    President Harris have affected their willingness to

10   get out and vote?

11       A.   Well, in this case white voters --

12   15.1 percent of white voters report not voting

13   because they did not like the candidate and

14   15.2 percent of black voters report not voting

15   because they did not like the candidate.

16       Q.   So they're comparable?

17       A.   That's right.  So I don't see -- it seems

18   to me that the dislike of the candidate -- again,

19   I'd might be open to being persuaded otherwise in

20   the -- in the presence of some good data.  But my

21   priors would be that dissatisfaction with the

22   candidates is a -- is something that is broad and

23   affects every racial group.

24       Q.   I'm going to hand you what we're going to

25   mark as Exhibit 8 I believe.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 55

1              (Exhibit 8 marked for Identification.)

2      BY MR. PRINCE:

3          Q.   Again one page.  This is the one that you

4      saw in your initial deposition.

5              MR. MOCINE-McQUEEN:  Objection.  Scope.

6      Sorry.

7              MR. PRINCE:  Sure.  Not a problem.

8      BY MR. PRINCE:

9          Q.   I want to compare the percentage point

10     difference between black voters that reported in

11     2020 that they did not vote because they were not

12     interested and black voters that reported that they

13     did not vote because they were not interested in

14     2024.  If I did my math correctly, I show a 5.7

15     percentage point increase between 2020 and 2024 in

16     the amount of black voters in the United States

17     that reported they did not vote because they were

18     not interested.  Does that seem correct?

19         A.   I have no idea.  I've been handed a table

20     here with margins of error.

21         Q.   I think it's on the other side of the

22     document.  Sorry.

23         A.   This one I think I just will need a

24     magnifying glass.

25         Q.   Sure.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 56

1        A.  Okay.  So the -- if you could just direct
2    me to the cell in this table that I should be
3    looking at, and then I will try to make sure I can
4    understand what it says.
5        Q.  So the cell is not interested for black
6    voters alone.  I get 18.1 percent.
7        A.  Not interested.  So we get 18.1 percent
8    for --
9        Q.  2020.
10       A.  -- black voters and 17.8 percent for white
11   voters.  So again very similar.  Okay.
12       Q.  What I'm asking to compare is that
13   response given in 2020 compared to that response
14   given in 2024.
15       A.  Right.  So white voters go from
16   17.8 percent to 18.4 percent, so they go up by .6
17   of a percentage point.  Black alone goes from 18.1
18   to 23.8.  Is that -- am I --
19       Q.  That's what --
20       A.  -- looking at the things --
21       Q.  -- I have as well.
22       A.  -- you'd like me to look at?
23       Q.  So 5.7 percentage point increase between
24   2020 and 2024 using this same survey?
25       A.  That looks to be correct.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 57

1      Q.  Let's also jump over to the did not like
2  category.  I see a five percentage point increase
3  in black voters who did not vote because they
4  reported they did not like the candidates between
5  2020 and 2024.
6      A.  Yes, I think that's looks like what I see
7  as well.
8      Q.  Let's do one more category.  Do you see
9  the category that says not interested, or sorry,
10  too busy?
11      A.  Yes.
12      Q.  Okay.  I count a 6.6 percentage point
13  increase for black voters between 2020 and 2024 who
14  said they are too busy.  Does that look right to
15  you?
16      A.  So I'm starting with what -- so for white
17  voters it goes from 12.8 to 17.  So --
18      Q.  4.1.
19      A.  Okay.  And then for black voters it goes
20  from 10.5 percent to 17.1; is that correct?
21      Q.  I think that's right.
22      A.  So yeah.  Okay.
23      Q.  So 6.6 percentage point increase?
24      A.  Okay.
25      Q.  I'm going to hand you Exhibit 9.

```
 1              (Exhibit 9 marked for Identification.)
 2      BY MR. PRINCE:
 3         Q.   And this is the same survey data but for
 4      2016.  If we start again at the group of voters who
 5      say they were not interested in 2016 and compare
 6      that to the group of voters who said they were not
 7      interested in 2024 for white non-Hispanic voters, I
 8      see a 4.1 percentage point increase.
 9         A.   So which category are we in now?
10         Q.   Not interested comparing 2016 and 2024.
11         A.   14.3 to 17.4, is that right, for white
12      non-Hispanic I believe you asked?
13         Q.   Correct.
14         A.   Right.
15         Q.   And then for black alone I see a 5.2
16      percentage point increase between 2016 and 2024.
17      Does that sound right?
18         A.   Yes.
19         Q.   Okay.  Let's jump over to did not like
20      again.  Between 2016 and 2024, if I'm reading this
21      correctly, I see a 10.3 percentage point decrease
22      in the amount of white non-Hispanic voters who
23      reported they did not like the candidate.  Does
24      that look right?
25         A.   It went from 26 to 15.1.  Is that what
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 59

1    you're looking at?

2        Q.  Let's see.

3        A.  For 15 -- are you looking at white

4    non-Hispanic 15.7?  Yeah, okay.  So it decreased

5    by -- okay.

6        Q.  And then for black alone I see a decrease

7    of 4.4 percentage points between 2016 and 2024 for

8    those black voters who said they did not like the

9    candidate.  Does that look right?

10       A.  Okay.

11       Q.  We're done with looking at those.

12       A.  Thank God.

13           MR. MOCINE-McQUEEN:  That was intense.

14           THE WITNESS:  I was really regretting I

15   did not bring my reading glasses.

16   BY MR. PRINCE:

17       Q.  I apologize.  I should -- I should have

18   messaged and told you you need a magnifying glass.

19           MR. MOCINE-McQUEEN:  This is the first

20   time my bifocals have bailed me out.

21   BY MR. PRINCE:

22       Q.  Is it fair to say then that both black and

23   white voters disliked the candidates more in 2016

24   than they disliked them in 2024 based on what we

25   just looked at?  I guess I prematurely said you

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 60

1    don't have to look at that again.

2         A.  Well, the problem is that these are only

3    voters who did not vote.  I think there are lots of

4    voters who held their noses and did not like the

5    candidates and voted anyway.  So we're just looking

6    at reported reasons for not voting among folks who

7    reported that they did not vote.

8         Q.  Sure.  But I understand your report to be

9    offering an opinion on reasons why black voters

10   voted at a smaller rate in 2024 compared to 2020.

11   Is that an accurate representation of what you're

12   offering an opinion on?

13        A.  Well, I stated this earlier.  I'll restate

14   it.  My report provides data on turnout by race and

15   then goes and focuses on aspects of specific

16   aspects of turnout that can be measured and that

17   have something to do with SB202 and tries to show

18   in those cases who is affected by those, so part of

19   that will feed into racial discrepancies in

20   turnout.  But at no point did I make the claim that

21   I could explain all of the racial variation in

22   turnout with those with those -- with those

23   factors.  I think I made it very clear in my report

24   about the fact that there are other -- there are

25   other -- other aspects of -- of -- other aspects of

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 61

1    elections that shape turnout.  Just to -- just to

2    be clear, I argue aggregate turnout in Georgia and

3    nationwide can move in different directions for

4    different groups if they have different levels of

5    engagement with the races or candidates on the

6    ballot.  So I think that's -- that is clear about

7    how I view the possible explanations for turnout

8    variation.  So I would not disagree that there are

9    many other reasons for turnout bouncing around

10   across elections within a particular state that are

11   not related to election law.

12        Q.  Let's talk a bit about mail-in voting in

13   Georgia.  You would agree with me that mail-in

14   voting in Georgia has been less used historically

15   with 2020 being the exception, correct?  I think we

16   talked about this.

17        A.  Do you mean less used relative to other

18   states or just that 2020 was a -- was a spike?

19        Q.  The latter two.

20        A.  Yes, I would agree with that.

21        Q.  Okay.  Your report states on page 6 that

22   SB202 led to a dramatic falloff in the level of

23   mail-in voting in Georgia.  Do you remember writing

24   that?

25        A.  Yes.

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

Page 62

1          Q.  Does the literature suggest that the way a
2     person votes in one election is likely to stay the
3     same across elections?
4          A.  Yes.
5          Q.  And is that consistent?
6          A.  Consistent in what way?  You mean across
7     states or across time?
8          Q.  So we spent some time talking about the
9     uniqueness of the 2020 election and the fact that
10    many Georgia voters likely voted by mail in 2020
11    because they perceived in-person voting as being
12    dangerous or risky.  Would you agree that it's
13    possible that Georgia voters who voted by mail in
14    2020 only did so because of the pandemic?
15              MR. MOCINE-McQUEEN:  Objection to form.
16    You may answer.
17              THE WITNESS:  I would -- it would surprise
18    me if it was not the case that there were some
19    voters for whom that was true.  I suspect, and this
20    is really speculation unfortunately, I don't know
21    of a good survey that asked people why they voted
22    the way they did.  It's possible such a study
23    exists.  I haven't seen it if it does.  But I'm
24    sure that some people voted by mail because of
25    concerns about the pandemic.  Others probably voted

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 63

1    by mail because they found it to be an easy option.

2    Among those who tried it it would have been my

3    expectation in the absence of SB202 given what I

4    know about mail-in voting more generally, I would

5    have expected some of those people that you have in

6    mind, people who voted purely because of the

7    pandemic who actually prefer to vote in person, I

8    would expect some of those people to shift back.

9    But to have mail vote in collapse completely back

10   to the point it was before, even below, that is

11   something that I believe has to be attributed to

12   the changes associated with SB202.

13   BY MR. PRINCE:

14        Q.  Let's look at figure 3A on page 7 of your

15   supplemental report.  Can you tell me what figure

16   3A shows?

17        A.  This is just plotting out for the court

18   the use of mail and early in-person absentee

19   ballots as a share of all ballots cast.  And it's

20   breaking that out by race and it starts in 2016.

21   It shows an upward trend in early in-person

22   absentee forms of voting that starts in 2018.  And

23   that is something that is true for both black and

24   white voters.  And as we've been discussing, it

25   shows a big increase in mail-in voting in 2020.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 64

1   Also in that runoff election that followed it and

2   then a large reduction in -- beginning in 2022 and

3   even further in 2024.  So now in recent elections

4   rates of mail-in voting that are -- that are very

5   low.

6        Q.  Earlier you testified that the literature

7   suggests that a way a person votes in one election

8   is likely to stay the same across elections.  Is

9   that a general understanding or is that something

10  that is unique to Georgia and Georgia culture?

11       A.  My understanding is that this has been

12  observed in a number of states.

13       Q.  Are you aware of it ever being observed in

14  Georgia?

15       A.  Well, in some ways I think I observed it

16  myself in Georgia.  I looked in the voter file and

17  saw that people who -- people who voted by mail in

18  2016 and 2018 were more likely to run -- to vote by

19  mail in 2020.  So we definitely see some

20  persistence in -- in voting by mail.  Once people

21  try it, they seem to persist in Georgia as well.

22       Q.  If you look at white voters who voted by

23  mail in 2016 and compare that with white voters

24  that voted by mail in 2018, the number or the

25  percentage drops shortly, correct?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 65

1      A.   From 2016 to 2018 looks like a small drop,

2   yes.

3      Q.   So even before SB202 a small amount of

4   voters who voted by mail in one election decided

5   that they did not want to continue doing so by the

6   next election?

7      A.   I don't think we know that.  I think this

8   is just looking at -- this is just looking at a

9   percentage.  There's churn on the voter file.

10  There are -- there are people moving in and out of

11  state and so forth.  So I wouldn't -- I wouldn't

12  interpret that as telling me something about what

13  happens with individuals who we follow over time.

14  But if the question is do some people switch from

15  voting by mail to voting in person, I suspect there

16  are some people who do that.

17     Q.   Do you find that in 2016 55.7 percent of

18  black voters voted early in person?  Do you see

19  that?

20     A.   Yes.

21     Q.   And that number by 2024 had risen to

22  68.9 percent of black voters?

23     A.   Yes.

24     Q.   And that's a difference of about 13.2

25  percentage points.  Am I reading that correctly?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 66

1          A.  Yes.

2          Q.  And white voters also started to vote

3     early in person at higher rates between 2016 and

4     2024; is that right?

5          A.  Yes.

6          Q.  Just to get the numbers on the record,

7     it's 52.9 percent in 2016 to 71.7 percent in 2024?

8          A.  Yes.

9          Q.  And that would reflect an 18.8 percentage

10    point increase between 2016 to 2024, correct?

11         A.  Yes.

12         Q.  So is it fair to say that a supermajority

13    of black and white voters vote early in person in

14    the state of Georgia?

15         A.  Yes.

16         Q.  And that the rate at which they vote early

17    in person has accelerated even since SB202?

18         A.  Yes.

19         Q.  As to voting by mail, in 2016 you report

20    that 3.99 percent of black voters voted by mail in

21    2016 compared to 5.44 percent in 2024.  Do you see

22    that?

23         A.  Yes.

24         Q.  And that's an increase of about 1.45

25    percentage points?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 67

1        A.   Yes.

2        Q.   Does this not show that compared to the

3   last normal prepandemic general election voting by

4   mail is up even for black voters in the state of

5   Georgia?

6        A.   Yes, that's right.

7        Q.   As to midterm elections, you report in

8   2018 that 7.15 percent of black Georgians voted by

9   mail compared to 7.48 percent in 2022, an increase

10  of about .33 percentage points; is that correct?

11       A.   Yes.

12       Q.   So voting by mail increased at the midterm

13  level, too, between 2018 and 2022 by black voters.

14       A.   By a very small amount, yes.

15       Q.   Similarly for white voters, in 2018

16  4.57 percent voted by mail compared to 5.63 percent

17  in 2024.  Do you see that?  Or sorry, in 2022.

18       A.   My own figure is rather hard to read here.

19  But --

20       Q.   If I represent to say --

21       A.   This is even --

22       Q.   -- that it says 5.63?

23       A.   -- worse than your table.  But I will

24  accept your representation, yes.

25       Q.   Okay.  So white voters also increased in

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 68

```
 1    their share of voting by mail between the last
 2    prepandemic midterm election and the 2022 midterm
 3    election?
 4         A.  Yes.  As I've explained, this is a --
 5    there was a big increase in -- in voting by mail in
 6    part because of the policies that were -- that made
 7    it so much easier.  And so yes, we've fallen back
 8    to very, very close to the levels of voting by mail
 9    from before the pandemic.  And I think what we're
10    seeing is that they're slightly elevated above what
11    they were before, but they're in very similar range
12    of what they were before the -- before the moves
13    that were made to make voting by mail so much
14    easier in 2020.  So removing those policies did
15    bring voting by mail back to levels very similar to
16    what they were before.
17         Q.  Let's turn to figure 3B also on page 7.
18    What does this chart show?
19         A.  This is purely an effort to make it easier
20    on the reader.  Instead of putting all of the
21    different forms of voting on one graph where it
22    would be too hard to visualize, I made a separate
23    graph for election day ballots as a share of
24    ballots cast by race.  And so here we see
25    information for election day ballots as a share of
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 69

1    all ballots cast during the same period for the
2    same racial groups.
3        Q.   Sure.  And consistent with what we've
4    discussed, the 2020 election saw a significant
5    decrease in election day voting.  Is that reflected
6    in this chart?
7        A.   Yes.
8        Q.   But compared to 2016, even the 2024
9    election saw a significant drop in election day
10   voting for both black and white voters in the state
11   of Georgia?
12       A.   Yes.  That's related to the increasing
13   popularity of early in-person voting.
14       Q.   And for white voters you report that
15   41.4 percent voted on election day in 2016 compared
16   to 22.7 percent?
17       A.   Yes.
18       Q.   And that would be about an 18.7 percentage
19   point decrease?
20       A.   Yes.
21       Q.   Whereas for black voters, they voted
22   39.9 percent in 2016 compared to 24.8 percent in
23   2024.  Do you see that?
24       A.   Yes.
25       Q.   And that would reflect a 15.1 percentage

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 70

1   point decrease?

2       A.  Yes.

3       Q.  Does that mean that white voters stopped

4   voting on election day on a slightly higher rate

5   than black voters between 2016 and 2024?

6       A.  Yeah, the -- because I'd phrase it as the

7   transition -- we can make sure we agree on this.

8   The transition away from election day voting was a

9   tiny bit larger for whites than for black voters.

10  By 2024 that -- we would not have drawn that

11  conclusion if we were looking -- if we were looking

12  at, say, 2022.  But I think the specific question

13  you asked was to compare 2016 to 2024, and I think

14  that is correct.

15      Q.  Okay.  Let's turn to pages 22 and 24 of

16  your report.  Starting on page 22 looking at figure

17  A1, can you tell me what this figure shows?

18      A.  This is a county -- I'm sorry.  This is a

19  precinct level map that also -- also allows for the

20  visualization of the county boundaries and the

21  county names and it is colored according to mail

22  ballots as a share of votes cast.

23      Q.  Just so I understand the figure, your

24  table gets darker as the share of vote by mail

25  increase; is that right?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 71

1        A.   Yes.

2        Q.   And looking at the legend, the highest

3    number that I see is .167; is that right?

4        A.   Yes.

5        Q.   So does that mean that the precinct in

6    Georgia with the highest share of mail-in voting in

7    2024 only saw 16.7 percent of its voters vote by

8    mail?

9        A.   Yes.

10       Q.   And jumping down to figure A2, what do we

11   see in figure A2?

12       A.   This is early voting as a share of votes

13   cast in November 2024 presented in a similar way

14   where we're coloring the precincts by early votes

15   as a share of votes cast.

16       Q.   And by contrast with figure A1, the legend

17   here goes up to one.  So would that mean that there

18   are at least some precincts in the state of Georgia

19   in the 2024 election that saw 100 percent of their

20   voters vote early in person?

21       A.   Well, I'd have to look at the data as to

22   whether there is only one in that category or

23   whether there are multiple.  But I should point out

24   that sometimes precincts are drawn in such a way

25   that a precinct will have three voters in it or

Jonathan Rodden , Ph.D.                         August 12, 2025
Georgia Senate Bill 202, In Re

Page 72

1    four voters in it or something like that.  So it's

2    possible.  We get kind of surprising things like

3    100 percent of people voting early because --

4    because of that.  But indeed the -- and this just

5    reflects what we saw in the figure 3A I believe it

6    was earlier where indeed early voting is a -- is

7    the leading form of voting in Georgia much more --

8    much more common than voting by mail at this point.

9        Q.  And with the understanding that some

10   precincts are quite small, is your answer the same

11   with respect to figure A3 that some precincts, no

12   matter the size, saw 100 percent of their voters

13   vote on election day in 2024?

14       A.  Yes.  And again, I wouldn't be able to say

15   whether this is one kind of --

16       Q.  At least one --

17       A.  -- outlier.  But yes, there's some -- some

18   precincts somewhere where everyone voted on

19   election day.

20       Q.  Okay.

21       A.  And we can see from the map it was likely

22   a rural place.

23       Q.  Let's jump back up to page 9 of your

24   report.  On the first paragraph looks like the

25   third sentence you write that 2,012,688 voters were

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 73

1    registered to vote in 2024 voted by mail in 2020

2    but did not vote in 2024.  Am I reading that

3    correctly?

4         A.  Yes.

5         Q.  Okay.  For those voters did you look to

6    see whether they voted in the 2021 runoff election?

7         A.  I don't believe so.

8         Q.  Now, the 2021 runoff election took place

9    before SB202 was enacted.  Is that consistent with

10   your understanding?

11        A.  The 2021 -- the January 2021 runoff?

12        Q.  Correct.

13        A.  Yes.

14        Q.  Would looking to whether voters voted in

15   the 2021 runoff had moved from voting by mail in

16   the previous November election just a month and a

17   half prior had been helpful in calculating any

18   effects of SB202?

19        A.  I'm sorry.  If you could repeat the

20   question.  I'm just trying to make sure I

21   understand.  So you're asking me if would it have

22   been helpful in examining people in 2024...

23        Q.  I can repeat the question.

24        A.  Yes.

25        Q.  So the November 2020 election and the

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 74

1    January 2021 runoff election both took place before
2    SB202 was enacted.  If there were voters that voted
3    by mail in 2020 that did not vote by mail in the
4    January 2021 election, could that be used to show
5    that SB202's impacts are more muted than you
6    suggest?
7         A.  Just my approach here was to compare
8    presidential elections.  Your question, I'm
9    struggling to make sure I understand it.  You're
10   asking would it have been useful to compare 2020
11   November with January to see if there are people
12   who voted by mail in November --
13        Q.  But did not vote by mail in January.
14        A.  Well, there are lots of things that -- you
15   know, this is a runoff election that is happening
16   some months later.  So asking whether they switched
17   to in person or whether they didn't vote, again I'm
18   not sure why that would help me in understanding
19   the role of SB202 since this is something that is
20   happening before SB202.  So comparing a general
21   election with a runoff, it's just not something
22   that would occur to me.
23        Q.  If you look back to figure 3A on page 7,
24   there's at least some decrease between the two
25   elections we've been discussing for black voters

Jonathan Rodden , Ph.D.                        August 12, 2025
Georgia Senate Bill 202, In Re

Page 75

1    and for white voters, right?  Looks like about a

2    2.1 percentage point decrease between white voters

3    between November 2020 and January 2021 compared

4    to -- I'm not even going to try to do that math on

5    the fly.

6              MR. MOCINE-McQUEEN:  I'll just object to

7    form.  You may answer.

8    BY MR. PRINCE:

9        Q.  Compared to a 1.7 percentage point

10   decrease in black voters?

11             MR. MOCINE-McQUEEN:  I'm sorry.  I

12   mumbled.  But objection to form.  Thank you.

13             THE WITNESS:  Well, these are just

14   different -- these are different groups of folks.

15   You know, we're looking at the -- what's happening

16   in figure 3A is we're looking at people who

17   voted -- who cast a valid ballot and were asking

18   what was the form of voting that they used.  So

19   we're not following individuals over time here.

20   We're just -- we're looking at those who voted

21   which are -- these are different.  It's just not

22   the same people.  So I can't conclude that they are

23   people who are, you know, in here who are voting by

24   one form in one election and another form in the

25   other.

1    BY MR. PRINCE:

2        Q.   The same would be true of the entire chart

3    though; wouldn't it?  You can't look at a voter

4    that voted in 2018 by mail based on this chart

5    alone and say that that same voter voted in 2024?

6        A.   Correct.  I do that sort of thing

7    elsewhere in the report.  But this is -- this is

8    something that really only gives us aggregate

9    descriptive statistics about what form of voting

10   was being used among those who participated.

11       Q.   And those aggregate statistics show a

12   small decrease between November 2020 and

13   January 2021 in the rate at which black voters and

14   white voters voted by mail?

15       A.   Yes.  I think that -- I think that

16   getting -- getting your hands on a mail-in ballot

17   for the January election required -- it was a

18   different kind of process than what you would need

19   to do to get your hands on a mail-in ballot for

20   the -- for the November election.  I don't quite

21   remember -- I have some recollection that the

22   window for getting that application -- getting

23   that -- getting that ballot was different and that

24   there are people who would have -- who would have

25   gotten themselves a mail-in ballot for November who

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 77

1    wouldn't have one for -- for the runoff and they
2    would have then -- they would have then ended up
3    voting early in person which is I believe what
4    we -- what we see when we look at -- no.  It looks
5    like we see a reduction in early in person.  I'm
6    just trying to follow the chart to understand what.
7    So we see people -- people look like they're voting
8    on -- in greater numbers on election day itself,
9    which is very consistent with the idea that it was
10   harder to get an absentee ballot in time for
11   that -- for that runoff and that people would have
12   switched over to election day voting.  That seems
13   to be what's happening.
14       Q.  So the return to normalcy you see even
15   just in the nine weeks between the November
16   election and the January election, you see it at
17   least beginning?
18       A.  No, I don't think so.  I mean, I think
19   people were still very concerned.  But I believe
20   the process of getting a mail-in ballot for the
21   runoff was something that some people didn't do in
22   time and so they were forced to switch.  That would
23   be the most likely interpretation that I would
24   give.  I don't think the conditions of -- I'm no
25   public health expert and my memory is bad, but I

Jonathan Rodden , Ph.D.                                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 78

1    don't remember things getting that much better

2    between November and January.

3        Q.  What is your understanding of what was

4    needed -- of what voters needed to do to get an

5    absentee ballot for the January runoff?

6        A.  They had to have requested it by -- by a

7    certain date.  And I don't have in my mind what

8    that date was for the -- for the runoff.

9        Q.  So this was part of the same election

10   cycle as the November election.  So would you have

11   any reason to question whether -- if I were to tell

12   you that absentee voters in the November election

13   rolled over to the January 2021 election, meaning

14   that they got their absentee ballots automatically

15   if they had voted by -- if they had requested one

16   earlier?

17       A.  This is -- whether everybody -- you know,

18   data on the rates of that rollover, that's just

19   something I don't have and I'm -- you know, you're

20   kind of -- you're asking me to kind of make some

21   conjectures about what's happening, what's behind

22   the differences we see in November and January and

23   I'm just trying to think through some scenarios.

24   This is not something that I have a great deal of

25   knowledge about.  I don't -- but it would surprise

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

1    me to know.  But if you -- you know, if you tell me

2    this is how it worked, then I can accept it.  It

3    would surprise me to think that everyone who asked

4    for an absentee ballot in November automatically

5    received one for the -- for the runoff, but that's

6    possible.  Again, I'm working on very limited

7    information here.

8         MR. MOCINE-McQUEEN:  Counsel, I want to

9    get on the record.  Objection to the scope of this

10   line of questions regarding the 2020 runoff and

11   election as discovery for that period has already

12   closed and the scope of this deposition is the

13   supplemental data from 2024.  And to the extent

14   we're now having a discussion about data that is

15   entirely related to elections for which discovery

16   is already closed, I would object to the scope.

17   Thank you.

18        MR. PRINCE:  And I'll respond just by

19   saying that Dr. Rodden's report talks specifically

20   about decreases in absentee voting by mail between

21   2020 and 2024.  So it's directly relevant to the

22   supplemental report that he offered.

23   BY MR. PRINCE:

24        Q.  In addressing the voters that voted in

25   2020 but did not vote in 2024, did you consider

Jonathan Rodden , Ph.D.                          August 12, 2025
Georgia Senate Bill 202, In Re

Page 80

1    whether those voters had voted in previous general

2    elections like the 2016 and 2012 general election?

3          A.   I don't recall whether I considered it.

4    It's something that I -- my approach was to use the

5    immediately preceding election.  But as we go

6    further back -- I think I also looked at what I

7    refer to as habitual voters who voted by --

8    habitually by mail.  So I did look at one election

9    previous but I did not consider going back further.

10   I don't think I had the ability to go back further

11   than 2016.  But in my view going further and

12   further back was less relevant to what I was trying

13   to do.

14         Q.   Let's turn to page 10.  The last line of

15   the first paragraph reads that your analysis

16   indicates that within precincts those with a recent

17   history of mail-in voting had turnout rates in 2024

18   that were lower than in-person voters by 4.6

19   percentage points.  Do you see that?

20         A.   Not there.  Yes.  Page 10?

21         Q.   First paragraph.

22         A.   At the top of the page.  Okay.  Yes.

23         Q.   Okay.  And what is the comparator here for

24   that 4.6 percentage point decrease that you're

25   indicating?  Is that 2018 and 2024?  Sorry.  2018

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 81

1    and 2020?

2         A.  I'll have to read the context here a

3    little bit more.

4         Q.  Certainly.

5         A.  So what I'm doing here first is examining

6    people who voted by mail, people who voted in 2020,

7    and then the next paragraph discusses the habitual

8    voters, those who cast valid ballots in 2018 and

9    2020.  So this one is really just focusing as 2020

10   as the comparison.

11        Q.  Okay.  So between 2020 and 2024 then is

12   when you saw a 4.6 percentage point decrease

13   between those that voted by mail in 2020 and those

14   that voted in person; is that correct?

15        A.  Yes.

16        Q.  We're going to turn to section B at the

17   bottom of this page now.

18             MR. MOCINE-McQUEEN:  Is this -- it's been

19   about another hour and change.  Is this a good time

20   for a break or --

21             THE WITNESS:  I think I'd like one, yeah.

22             MR. PRINCE:  I should have given you a

23   break after making you look at those spreadsheets.

24   That's fine.

25             THE VIDEOGRAPHER:  We are off the record

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 82

1    at 11:25.

2            (Break taken from 11:25 a.m. to

3    a.m.)

4            THE VIDEOGRAPHER:  We are on the record at

5    11:35.

6    BY MR. PRINCE:

7        Q.  Doctor, I'll ask the same question that I

8    asked at the end of the last break.  During the

9    break did you talk to your counsel about any of the

10   questions or answers that you've given during this

11   deposition?

12       A.  No.

13       Q.  Before we left, I indicated that we were

14   going to turn to subpart B titled "Rejected mail-in

15   ballot applications."  The second line of that

16   section you indicate that there were 8,495

17   applications that were rejected for the

18   November 2024 election, correct?

19       A.  Yes.

20       Q.  And you calculated that to be about

21   2.5 percent of all applicants?

22       A.  Yes.

23       Q.  Another way to read that data is that

24   97.5 percent of all applicants who sought an

25   absentee ballot received one, right?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 83

1        A.   Yes.

2        Q.   In the second to last paragraph on this

3    page you refer to formal rejections.  Do you see

4    that?

5        A.   Yes.

6        Q.   What did you mean by formal rejections?

7        A.   I meant that it was marked in the file I

8    received from the Secretary of State as rejected.

9    And I meant to distinguish that from -- I noticed

10   there were some other set of applicants for whom

11   there was no sent date specified.  But I wanted to

12   clarify that I was focusing here on ones that were

13   marked as rejected.

14       Q.   In your answer there, was that referring

15   to what you refer to in the last sentence in that

16   paragraph that says "instances a voter was never

17   sent a ballot but their application may not have

18   been recorded as 'rejected'"?

19       A.   Yes.

20       Q.   Do you have any reason to think that this

21   happened?

22       A.   I believe there were some -- some -- in

23   the way the data were collected, I recall that

24   there were some -- there was some discrepancy

25   between the field that said rejected and the field

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 84

1    that said sent date, that there was some number
2    where there was no sent date but it was not marked
3    as rejected.  I wasn't sure what to make of those.
4    In these cases when one is working for the
5    plaintiffs, one doesn't have the ability to ask
6    questions of election administrators and get
7    responses to that sort of thing.  So I left that
8    aside and focused on the ones that were formally
9    marked as rejected.
10       Q.  Then when you say that 2.5 percent of all
11   applications were rejected, do you mean rejected
12   initially but given the opportunity to cure or do
13   you mean rejected regardless of the outcome?
14       A.  These were -- these were just marked as
15   rejected.  And to my knowledge, I was not provided
16   with information about cures.
17       Q.  So it's possible that within this universe
18   of 2.5 percent of rejected applications some of
19   those applications were later cured?
20       A.  That I do not know.
21       Q.  But you have no reason to think that it's
22   not possible; you just can't give an opinion one
23   way or the other?
24       A.  I'm sorry.  The use of the word "cure" to
25   me brings to mind an actual ballot that's been

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 85

```
 1    submitted that one tries to cure.  Is there -- if
 2    there is also a cure process -- I think perhaps
 3    what you mean is someone had a problem with their
 4    ballot, their absentee ballot which they were then
 5    encouraged to fix or something like that.  Yeah,
 6    that is something that I don't think I'm able to --
 7    if an individual submits a ballot and it's marked
 8    as rejected, is it possible that they then were
 9    able to solve the problem that was indicated and
10    then submit a new ballot?  That is not something --
11    I was not given information about that.
12        Q.  You said that more than two percent of
13    those who successfully cast ballots in 2020 by mail
14    had applications rejected in 2024.  And did this
15    group include what you would call habitual voters?
16        A.  I'm sorry.  So which -- where are we?  I
17    want to make sure I'm in the right place in the
18    text.
19        Q.  We're still in the first paragraph at the
20    very end.
21        A.  The end of the first paragraph.  Okay.
22    Great.
23            Yes, I looked at individuals who had
24    successfully cast mail-in ballots in both 2018 and
25    2020.  So that is a smaller group because, of
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 86

1    course, there was a lot less mail-in balloting as

2    we've established happening in 2018.  And it was a

3    midterm year that had lower turnout in any case.

4    So what I was showing here is that if we look at

5    people who just cast a mail-in ballot in 2020, we

6    see a rejection rate of somewhere slightly over two

7    percent.  And then if I look at the smaller group

8    of people who had cast a mail-in ballot in both

9    2018 and 2020 saw a similar thing.

10       Q.  Does your report address the reason why

11   absentee ballot applications were rejected?

12       A.  No.  I was given a file that had a -- had

13   a field called "reason for rejection."  But

14   unfortunately the most common reason for rejection

15   was called "other."  And then there was an

16   additional field that had handwritten responses.  I

17   think -- I can't remember the number, but a very

18   large number of different handwritten responses

19   about reasons for rejection.  So given the quality

20   of the data and the time constraints that I had, I

21   only looked at overall rejections because it

22   wasn't -- I did not find the data quality to be

23   very encouraging.  And some of those fields, some

24   of those handwritten responses said things like

25   voter error and they didn't say what was the nature

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 87

1    of the voter error.  Some of the responses were

2    very cryptic.  So instead of trying to wade through

3    all of that, I just looked at overall rejections.

4        Q.  So you can't say sitting here that of

5    the more than two percent of absentee ballot

6    applications that were rejected in 2024 a certain

7    amount would have been approved before SB202?

8        A.  Well, as I looked through all of those

9    responses, it's clearly the case that many of them

10   had to do with lacking driver's license.  The

11   problem is that there was a field called lacking

12   DL, missing DL, missing ID.  Those responses were

13   substantial.  What share of all responses those

14   were I can't remember, but that was one of the

15   leading reasons for rejection.  And we also know

16   that there was no collection of rejection data as

17   far as I know.  Like at least it was not made

18   available to me in the past.  But it was possible

19   to look at the -- at the date sent field and to see

20   that over 99 percent, 99.5 percent of people in the

21   past who applied for an absentee ballot have a

22   record of it being sent.  So I infer from that the

23   rejection rate was -- was much lower in the past.

24       Q.  Let's look at the bottom of page 10.  In

25   the last paragraph you write that "It demonstrates

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 88

1    that absentee ballot application rejections were

2    relatively concentrated in the Atlanta metro area,

3    with a striking anomaly in Cobb County, where

4    ballot rejections were more numerous than even the

5    other urban counties."  Do you see that?

6         A.   Yes.

7         Q.   Did you mean application rejections were

8    more numerous based on the topic of this section?

9         A.   Yes.

10        Q.   Okay.

11        A.   I see.  It looks like I said ballot

12   rejections and meant to say ballot application

13   rejections, yes.  Thank you.

14        Q.   You're welcome.

15             Let's turn to page 11.  In the last

16   paragraph of this section, you indicate that "Of

17   those whose ballot application was rejected, only

18   52.1 percent ended up casting a ballot."  Do you

19   see that?

20        A.   Yes.

21        Q.   Does your report indicate how these voters

22   whose applications were rejected ended up voting?

23        A.   No.  I merely was interested in analyzing

24   whether they had according to the vote history file

25   ultimately cast a valid ballot.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 89

1        Q.  So it's possible that a voter whose

2   application was rejected but was sent a provisional

3   ballot giving them a chance to cure may have voted

4   by mail even after the initial rejection?

5        A.  I believe that is possible.  I was not

6   provided with data on that to my knowledge.  I

7   imagine that is possible.  It's also possible that

8   some folks voted early in person or on election

9   day.

10        Q.  Are you aware that in some counties in

11   Georgia election staff will call those whose

12   applications are rejected to tell them how to fix

13   the error?

14        A.  I don't have any information on which

15   counties those are and how that process works.  I

16   have -- I have heard that this can happen, but I

17   don't have any -- any hard information about that.

18        Q.  The last line of this paragraph you give

19   your ultimate conclusion.  You say that 1.5 percent

20   of black voters applied had applications rejected

21   and did not vote.  Am I reading that correctly?

22        A.  Yes.

23        Q.  Okay.  And the number for white voters who

24   applied had application rejected and did not vote

25   was .8 percent?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 90

1      A.  Yes.

2      Q.  So there's a .7 percentage point

3  difference between black and white voters?

4      A.  Yes.

5      Q.  Is that number statistically significant?

6      A.  Well, this is the -- this is the entire --

7  there's no sample here.  This is the entire -- this

8  is just the entire universe of data, so there isn't

9  some kind of sampling error to be concerned about

10  here.

11      Q.  Understood.  Given that 1.5 percent of the

12  millions of black voters that voted in Georgia were

13  able to vote even after their application was

14  rejected, that would mean that 98.5 percent of all

15  black voters who applied to vote ended up voting?

16      A.  Of black voters who applied for an

17  absentee ballot --

18      Q.  Correct.

19      A.  -- yes.  I'm sorry.  No, no.  I mean, they

20  didn't -- this is -- this is just telling me what

21  share of people had their application rejected and

22  ultimately did not vote.  There are -- there are

23  people who would have sent in an application and it

24  was accepted and they otherwise did not vote.  I

25  don't mean to imply that the -- that the ultimate

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 91

1    turnout percentage among that group was that high.
2    I'm saying of everyone who applied for an absentee
3    ballot what share fall into this category of
4    application rejected and ultimately did not vote,
5    and that figure is 1.5 percent.
6         Q.   Okay.  So everyone who voted -- strike
7    that.
8         Let's jump up to the top of this page.
9    The first line says that "Among individuals whose
10   race is recorded as black on the voter file,
11   2.8 percent of applicants were rejected, compared
12   with 2.1 percent for white applicants."  Am I
13   reading that right?
14        A.   Yes.
15        Q.   And that would be a similar .7 percentage
16   point difference between black and white voters?
17        A.   Yes.
18        Q.   And I may have covered this already, but
19   of those who applied to vote absentee but had their
20   ballot rejected, 52.1 percent ended up casting a
21   ballot anyway?
22        A.   Yes.
23        Q.   So given that the initial number of
24   rejections is only 8,495, we're looking at a very
25   small number of voters who applied to vote by mail

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 92

1    whose ballots were rejected and did not vote, less
2    than 5,000, right?
3        A.   Now, these are people whose applications
4    were rejected --
5        Q.   Correct.
6        A.   -- and did not vote.  And then there's
7    another category that I imagine we might talk next
8    of people who -- who submitted a ballot and it was
9    rejected.
10       Q.   In terms of rejected ballots themselves,
11   on page 11 you report that depending on the data
12   set you're using, either 4,570 or 4,761 ballots
13   were rejected after they were sent in; is that
14   right?
15       A.   Yes.
16       Q.   And that would be roughly 1.5 percent of
17   all absentee ballots that were submitted in the
18   state?
19       A.   That sounds right.
20       Q.   So on the flip side, that means that
21   98.5 percent of all absentee ballots in the state
22   were accepted?
23       A.   Yes.
24       Q.   Do you have any reason to dispute
25   Dr. Shaw's conclusion on page 4 of his supplemental

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 93

1   report that the rejection rate was lower in 2024
2   than it was in either 2018 or 2016?  It's the last
3   white bullet on page 4.
4       A.  Yes.  I wasn't sure what his -- quite sure
5   what he had done there.  So I don't recall whether
6   I reported rejection rates for those elections
7   myself in my previous reports, so I'm not
8   entirely -- and I did not get the chance to look
9   through Dr. Shaw's replication materials and
10  understand exactly how he came to those data.  So I
11  have to stop short of endorsing the finding, but I
12  don't have any specific reason to -- to dispute it.
13      Q.  You report that the rate at which
14  submitted ballots were rejected in 2024 as late was
15  five to six times higher in 2024 compared to 2020;
16  is that correct?
17      A.  Yes.
18      Q.  But in terms of actual numbers, the
19  difference is only about a thousand rejected
20  ballots; is that right?
21      A.  Yes.  I thought it was -- it was worth
22  noting that the raw number of rejections was
23  significantly higher even though the number of
24  ballots transmitted was far, far smaller.
25      Q.  And that reflects that the higher

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 94

1    denominator of absentee ballots that were returned

2    in 2020 will influence the rate of rejection,

3    right?  If you have more ballots submitted in 2020,

4    the rate is going to be lower if you have a smaller

5    numerator?

6        A.   Only if people are applying some different

7    standards.  And if there's a -- there's a clear

8    standard for how ballots should be -- the

9    conditions under which they should be rejected.  I

10   just -- I guess the question is whether having more

11   ballots to deal with makes them have less time to

12   do due diligence or something like that.  That

13   never occurred to me.  It seems to me that we would

14   want to look at the rate of -- the rate at which

15   ballots are rejected.  But that's a -- that's the

16   comparison to make.  I'm not sure why having more

17   ballots would necessarily lead to a lower rate

18   unless the claim is being made that just because

19   there are more ballots there's less man power to --

20   to inspect them or something like that.  But that's

21   not something that occurred to me.

22       Q.   My question is slightly different.  Just

23   as a pure mathematical exercise, if you have 2,000

24   ballots that were rejected in one election, 2,000

25   ballots that were rejected in a later election, and

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 95

1    this is a hypothetical exercise so it's not based

2    on the actual numbers, if the first election had

3    15,000 ballots submitted and the second election

4    had only 10,000 ballots submitted, the rate would

5    change based on the denominator, right?

6         A.   Sure.   The rate is a function of both the

7    numerator and the denominator, so it will be

8    affected by variation in both of them.

9         Q.   Now, looking at the percentage point

10   difference between the 2020 and 2024 elections,

11   would you agree that there was less than one

12   percentage point difference in the total number of

13   rejected absentee ballots?

14        A.   If I understand correctly, you are

15   taking -- you're taking -- I'm sorry.

16        Q.   I can tell you the numbers I'm looking at

17   if it would --

18        A.   You were asking -- I was not sure if you

19   were asking about percentage points or percentage

20   difference.   Maybe you just want to repeat.

21        Q.   Sure.   So you report that .22 percent of

22   all ballots returned in 2020 were rejected.   Then

23   you report that 1.2 percentage of all ballots that

24   were returned in 2024 were rejected.

25        A.   Yes.   Okay.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 96

1      Q.  Would you agree that that is less than a

2  percentage point difference between the two

3  elections?

4      A.  It's around a percentage point difference,

5  yes.

6      Q.  Now, black absentee ballots were rejected

7  at 1.8 percent if I'm reading your report

8  correctly.  This is the first full paragraph of

9  page 12.

10      A.  Yes, the full paragraph.  Yes.  Okay.

11      Q.  And white absentee ballots were rejected

12  at a rate of 1.2 percent?

13      A.  Yes.

14      Q.  So that's about a .6 percentage point

15  difference; is that right?

16      A.  Yes.

17          MR. PRINCE:  I'm going to mark whatever

18  exhibit number this is.

19          THE REPORTER:  Ten.

20          MR. PRINCE:  We're going to mark

21  Exhibit 10.  This is your original report.

22          MR. MOCINE-McQUEEN:  Okay.

23          MR. PRINCE:  With counsel's objection

24  noted before it's made.

25          MR. MOCINE-McQUEEN:  Thank you.  Just

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 97

1    objection to the scope.

2            (Exhibit 10 marked for Identification.)

3    BY MR. PRINCE:

4        Q.   I want to turn to page 28 in this report.

5    You just testified that in the 2024 election it was

6    a .6 percentage point difference between black

7    absentee ballots rejected and white absentee

8    ballots rejected.  Let's look at your figure 14 on

9    page 28 at the 2016 election.  In 2016 you reported

10   that black ballots were rejected at a rate of 4.05

11   percent while white ballots were rejected at a rate

12   of 2.22 percent; is that right?

13       A.   Yes.

14       Q.   So that was a percentage point difference

15   of about 1.83?

16       A.   Yes.

17       Q.   Okay.  And similarly for the 2018 election

18   you report that 4.29 percentage -- percent of black

19   votes by mail were rejected compared to

20   2.41 percent of white absentee ballots.  Do you see

21   that?

22       A.   Yes.

23       Q.   And that would be a percentage point

24   difference of about 1.88 again?

25       A.   Yes.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 98

1        Q.  From these would you agree that the
2    differential in both the 2016 and the 2018
3    elections between black and white ballots rejected
4    were worse than they were after SB202?
5        A.  Yes.
6        Q.  Do you agree that in the 2024 election
7    over 98 percent of black mail-in votes were
8    accepted?
9        A.  These are mail-in ballots --
10       Q.  Ballots.
11       A.  -- that were actually sent by the voter.
12   Leaving aside the question of application
13   rejections --
14       Q.  Sure.
15       A.  -- then yes.
16       Q.  Okay.  Do you agree that a higher
17   percentage of ballots were rejected in the 2022
18   runoff than in the 2024 general election?
19       A.  The 2022 runoff?
20       Q.  Correct.
21       A.  Which -- let's see, that would have been
22   the December of 2022 that that was -- that was --
23   are you asking about a particular racial group,
24   black voters?
25       Q.  Let's start there.

Jonathan Rodden , Ph.D.                          August 12, 2025
Georgia Senate Bill 202, In Re

Page 99

1          A.   2.26 percent.

2          Q.   You report 1.8 percent for black voters in

3     2024.

4          A.   Okay.  Then yes.

5          Q.   Would you agree that regardless of these

6     percentage point differences that we've been

7     discussing in the rate of black and white mail-in

8     rejections that the racial disparity in burdens

9     alleged caused is small in absolute terms?

10         A.   Would you repeat the question, please?

11         Q.   Sure.  Would you agree that regardless of

12     these percentage point differences that we've been

13     discussing in the rate of black and white mail

14     ballot rejections that the racial disparity in

15     burdens allegedly caused is small in absolute

16     terms?

17         A.   I haven't really -- I haven't really

18     developed for myself a framework for deciding

19     what's a small effect and what's a large effect.  I

20     feel like my job as an expert is just to lay out

21     the data and for the court to decide what's small

22     and what's large.

23         Q.   We're talking at most several hundred

24     ballots difference between the two.

25         A.   The difference between the two meaning --

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 100

1       Q.   Between white voters --

2       A.   -- the number of ballots rejected?

3       Q.   Correct.

4       A.   I haven't gone and looked at the raw

5    numbers to verify the number.  If you have that

6    calculation, I'd be happy to look at it.  But I

7    think it's -- I think all of this is in the report.

8       Q.   Sure.  Does your report show, your 2025

9    report, so jumping back to the current one, that

10   the rejections for mail-in ballots were higher for

11   Democrats than they were for black voters?  It's on

12   page 12.

13            MR. MOCINE-McQUEEN:  Thank you.

14            THE WITNESS:  So the question is just

15   comparing --

16   BY MR. PRINCE:

17       Q.   The rate of rejection.

18       A.   The rate of rejection is something that --

19   just to be clear about what's happening here, we

20   have a rate of rejection that is -- that is

21   calculated purely from -- we have race on the voter

22   file.  We don't have party on the voter file.  So

23   that's an exercise in equilogical inference that

24   gives us the data for party.  If you could direct

25   me to where -- I just want to make sure we're on

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 101

1     the same page here --

2         Q.   Sure.

3         A.   -- about what you're asking me.

4         Q.   So the second to last paragraph.

5         A.   Okay.

6         Q.   I guess the last full paragraph on this

7     page you report that 2.48 percent of mail-in

8     absentee ballots cast by Democrats were rejected

9     for being too late.

10        A.   Yes.  And the question was whether that's

11    a higher rate than -- than for black voters.  I

12    just wanted to look at the confidence interval

13    there and see what that looked like.  But yes, that

14    looks like a higher rate, yes.

15        Q.   I'm trying to understand the last

16    paragraph on page 12.  You write that for those who

17    submitted a ballot in the last four days of 2020

18    election only 69 percent cast a valid ballot in

19    2024.  Am I reading that correctly?

20        A.   Yes.

21        Q.   And is that referring to overall or does

22    that number only include voters who tried to vote

23    by mail in 2024 but failed?

24        A.   What I'm doing in these paragraphs is

25    starting with the first concept.  I'm starting with

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 102

1    overall and in the following paragraphs zeroing in

2    on people who applied for a mail-in ballot in 2024.

3        Q.   So this last paragraph of paragraph 12 is

4    overall a decrease of 31 percentage points --

5        A.   Yes.

6        Q.   -- in general elections?

7        A.   If we considered all registered voters who

8    were eligible to vote in 2024 and had cast a valid

9    vote in 2020, I'm comparing those who voted by mail

10   with a ballot submission date before the final

11   four-day period with those who submitted their

12   ballot in that final four-day period and finding

13   that they had very different rates of repeat voting

14   in 2024.  But then I go on to look at the smaller

15   group of people who actually applied for a mail-in

16   ballot in 2024.

17       Q.   And because this first paragraph is

18   dealing only with overall voter trends, is it fair

19   to say that it does not address voters that tried

20   to vote in 2024 before but were unable to?  In this

21   first paragraph with your caveat as to next

22   paragraphs well taken.

23            MR. MOCINE-McQUEEN:  Just to clarify for a

24   minute.  Are we speaking about the first paragraph

25   in section C?

Page 103

1          MR. PRINCE:  We are still on the bottom of

2     page 12.

3          MR. MOCINE-McQUEEN:  Okay.

4          MR. PRINCE:  So there is direct evidence.

5          MR. MOCINE-McQUEEN:  Okay.  Thank you.

6          THE WITNESS:  I'm just looking at whether

7     they cast a valid ballot in 2024 or not, and so I'm

8     not paying any attention to the reason why they

9     didn't cast a valid ballot.  So they could have

10    been prevented from voting because of some snafu or

11    they could have just not voted.

12    BY MR. PRINCE:

13       Q.  So it is possible that voters who voted in

14    the last four days of the 2020 election were simply

15    not motivated to vote in 2024 for the reasons that

16    we've discussed?

17       A.  Is it possible that people who vote late

18    are unique individuals who are kind of uniquely

19    unmotivated or something like that; is that the

20    question?

21       Q.  Slightly different.  The question is

22    whether it is possible that voters who voted in the

23    last four days of the 2020 election were among

24    those voters who for whatever reason were not

25    motivated to vote in 2024?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 104

1        A.  We don't know.  Yeah, as I said, we don't
2    know what their reason is for not voting.  And so
3    there could have been lots of reasons why these
4    people didn't vote.  You know, their lack -- their
5    lower rate of repeat voting I don't know yet in
6    this analysis why they're not voting.  We can go on
7    and then look specifically at the people who had
8    their ballots rejected and so forth.  But for
9    those -- who this first paragraph I'm analyzing,
10   yes, it could include someone who was not
11   motivated.  But to explain the difference between
12   these two groups, we would have to think that late
13   voters are uniquely non-motivated, and I don't have
14   any data to suggest that that is the case.
15       Q.  Let's change our focus to out-of-precinct
16   voting for a bit.  I'm going to turn to page 18 of
17   your report.
18            Now, your supplemental report finds that
19   nearly 12,000 provisional ballots were cast in
20   2020; is that right?  So 11,781.
21       A.  Thank you.  Yes.
22       Q.  And you also find that the number of
23   provisional ballots dropped to just over 3200 by
24   2024?
25       A.  Yeah, just to be clear, this is the number

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 105

1   of accepted provisional ballots.  This is not

2   paying attention to rejected provisional ballots.

3        Q.   Sure.  Your report does not attempt to

4   show the percent of black voters who voted by

5   provisional ballot in 2024, correct?

6        A.   Provisional ballots by race in 2024.  I

7   don't believe I had individual provisional voting

8   indicators.  I'm sure I did not have that.

9        Q.   And your report also indicates that you

10  have no way of knowing how many voters showed up at

11  the wrong polling place in 2024 and were turned

12  away because they showed up before 5:00 o'clock; is

13  that correct?

14       A.   That's correct.

15       Q.   How does the lack of such knowledge

16  influence your analysis, if at all?

17       A.   I try to be -- I always try to be up front

18  about what can and cannot be learned from the data

19  at hand.  And so what I can see is that counted

20  provisional ballots decreased by quite a lot in

21  some parts of the state.  The question is how does

22  it affect my analysis not knowing what -- yeah,

23  what do I -- what can I say when I don't know the

24  number of people who were turned away who did not

25  end up voting.  I can only say what I've said in

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 106

1    the report which is I can kind of provide for the

2    court the information about where the changes are

3    likely affecting people, but we don't know how many

4    of those people would have -- made it to another

5    polling place and how many of them turned around

6    and went home.  That is something --

7        Q.  You anticipated my next question that we

8    simply do not know if any particular voter or any

9    group of voters were turned away from an

10   out-of-precinct polling place and ended up voting

11   later?

12       A.  I think it's almost certainly the case

13   that some did and it's almost certainly the case

14   that some did not.  And the breakdown of those two

15   unfortunately is not -- is not knowable because

16   the -- because SB202 was implemented in such a way

17   that this information was not recorded.

18       Q.  On page 19 the last paragraph the first

19   line you write "The evidence is only suggestive,

20   but we can verify that the counties with the

21   largest falloffs in counted provisional ballots

22   are...those with the largest decreases in turnout."

23   Do you see that?

24       A.  Yes.

25       Q.  Wouldn't that be the expected outcome?

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 107

1        A.   Expected according to what logic?

2        Q.   As -- you can strike the question.

3             You also write on page 20 that among those

4   who voted non-provisionally in 2020, 85 percent

5   voted again in 2024; is that right?  So those that

6   voted in their own precincts in 2020.

7        A.   Just give me one moment to read the

8   relevant text.

9        Q.   Sure.

10       A.   Okay.  I've read it.  Now, the question

11  again?

12       Q.   The question was essentially just a

13  recitation of the data that you find, that

14  85 percent of those who are registered to vote in

15  2024 and voted in their own precinct in 2020 voted

16  again in 2024?

17       A.   Well, I don't know.  The phrase about

18  voted in their own precincts, unfortunately this is

19  less specific than that.  This is just a -- I

20  received an indicator in the 2020 -- I believe it

21  was in the 2020 absentee file that told me whether

22  the vote was cast -- someone's ballot was cast

23  provisionally or not.  And so I'm just looking at

24  people who voted provisionally.  And there could

25  have been other reasons for the provisional vote.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 108

1    But 85 percent of those whose ballots were not cast

2    provisionally in 2020 voted again in 2024, and then

3    those who had cast a provisional ballot in 2020,

4    63 percent voted again in 2024.  So that's just

5    telling us that people who had -- who had cast

6    votes provisionally in the -- in 2020 have lower

7    levels of turnout in 2024 than people who did not

8    cast provisional ballots.

9         Q.  We don't know why that -- that is, right?

10        A.  We don't know.  But it is -- it's very

11   likely that a lot of -- a lot of -- we do know --

12   one thing we do know is that many of the counted

13   provisional ballot, so we're looking at people who

14   voted provisionally, and their ballot counted.  We

15   do know that most of those were people who were

16   voting out of precinct in 2020.  So you're -- I

17   just want to clarify.  I think in your initial

18   question was inferring that all of those were

19   people who were voting out of precinct and their

20   vote was being counted.  We know that a lot of them

21   were.  We don't -- we don't -- we can't think that

22   all of them were.  I think some of these would have

23   been people who, for instance, cast a provisional

24   ballot because of some -- some issue regarding

25   their registration status that they eventually

Page 109

1    cleared up.  But many of them were people who voted

2    in the wrong precinct and their vote was counted.

3    And so we can see that -- that of those people

4    their -- their -- who voted provisionally for

5    whatever reason, they are much less likely to have

6    voted again in 2024, those of them who are still

7    registered.

8        Q.  Let's look at table one on page 17.  Can

9    you tell me what we're looking at here?

10       A.  Yes.  This is something that I think is

11   potentially confusing and it would be -- I'd be

12   happy to try to explain it.  This is a table that

13   is looking at the data from the -- that the county

14   election administrators provided to the EAVS

15   survey.  And they're telling us how many

16   out-of-precinct provisional ballots were offered to

17   people.  So there's a -- there's information about

18   out-of-precinct ballots and then they are giving

19   them the breakdowns by what type of provisional

20   ballot.

21            And so in this case this is the number in

22   the first column of out-of-precinct provisional

23   ballots offered and then there is also information

24   provided about out-of-precinct provisional ballots

25   that have been rejected.  And what we would expect,

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 110

1    at least what I would expect, if -- if SB202 is

2    being implemented in the way that I understand it

3    is supposed to be implemented, we should expect to

4    see that some out-of-precinct provisional ballots

5    are offered after 5:00 o'clock but that those would

6    be accepted, and that if an out-of-precinct

7    provisional ballot is offered -- if a ballot is

8    offered that is provisional before 5:00 o'clock, it

9    should be categorized in some other way other than

10   out of precinct because they are not supposed to be

11   offering out-of-precinct ballots before

12   5:00 o'clock because they will not count.

13          And so most of the counties, including

14   lots of counties that are not included in this

15   table, will have a rejected share that is zero or

16   very close to it.  The only thing you should not

17   have anything that is not zero is if someone

18   insists on filling out a provisional ballot even

19   though they're told it won't count.  So you can

20   imagine some people do unusual things.  So -- but

21   you'd expect these to be very close to zero.

22          But there are a handful of counties where

23   the number is not close to zero, where it seems to

24   be the case that some people are being offered

25   provisional ballots who arrived at the wrong

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 111

1     precinct and it's before 5:00 o'clock and those

2     ballots are ultimately not counted.  I'm just

3     trying to understand the data that I've been given

4     trying to understand what's going on because if I

5     want to explore the role of out-of-precinct

6     provisional ballots and the change in the law, I

7     have to understand something about what is

8     happening with the out-of-precinct ballots.  It

9     looks like some counties like Douglas, Clayton,

10    Henry, Muscogee are offering some out-of-precinct

11    ballots that are ultimately rejected.

12         Q.  Are you aware of any provision in SB202

13    that would require a county to reject a provisional

14    ballot after 5:00 p.m.?

15         A.  After 5:00 p.m.?

16         Q.  On election day.

17         A.  Well, if -- if it was -- if the person was

18    ultimately in the wrong -- I mean, I'm sorry, if

19    they were ultimately not registered.  And this is

20    really just a question.  I'd be happy to be shown

21    that there's some other thing happening here.  My

22    understanding is if -- if you are then rejecting

23    the after-5:00 o'clock ballot for some other reason

24    that it should not be -- that the reason for

25    rejection would not be because it's out of

Jonathan Rodden , Ph.D.                          August 12, 2025
Georgia Senate Bill 202, In Re

Page 112

1      precinct.  It would be because of registration, is

2      the person is not registered or some other problem,

3      some other bucket it seems that should fall into.

4              So it's possible these are just -- that

5      there's something, some problem with the way the

6      data are being transmitted to EAVS.  But they're

7      being classified as out-of-precinct provisional

8      ballots, but what they really meant to classify

9      them was as something else.

10     Q.  Let's turn to page 18 of your report.  I

11     want to talk a little bit about figure 7.  Can you

12     explain what this figure shows?

13     A.  Yes.  So the problem in trying to analyze

14     provisional ballots is that as we discussed before,

15     we don't have this number that we would like to

16     have which is the number of people who tried to

17     vote and are turned away and they end up not

18     voting.  That's the thing that we don't know.  But

19     what we can know is how many people were showing up

20     and casting provisional ballots in 2020 before

21     SB202 and how many people were receiving

22     provisional ballots that ultimately counted in

23     2024.

24              So I was working through in the text some

25     counties that saw big reductions in the amount of

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 113

```
 1    counted provisional ballots.  So here we're
 2    visualizing those on the -- on the vertical axis.
 3    We're seeing that some counties, and those are the
 4    larger data markers, are the urban counties, places
 5    like Fulton and surrounding counties.  We see that
 6    those places experienced big reductions in the
 7    number of provisional ballots that counted.  And we
 8    can also see that those are counties that had on
 9    the horizontal axis higher shares of registered
10    voters who identified as black.
11        Q.  The size of the circle does not show the
12    number of voters who cast provisional ballots,
13    correct?  It just reflects the population of the
14    county?
15        A.  Yes.  It's just an effort to give the
16    viewer a sense of which are the big counties and
17    which are the small counties.
18        Q.  And looking at this chart, there are a
19    fair amount of counties that have higher
20    percentages of black registered voters that saw a
21    very small decrease in the amount of provisional
22    ballots cast between 2020 and '24, right?
23        A.  Yes.  That's one thing that I probably
24    wrote a bit about in the text is that provisional
25    ballots owing to -- showing up in the wrong
```

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 114

1     precinct.  This is a largely an urban problem.

2     This is something that in rural areas people are

3     very unlikely to show up to the wrong precinct.

4     But in an urban neighborhood where there is a

5     complex structure of vote tabulation districts and

6     precincts and polling locations, people are much

7     more likely to show up to the wrong polling place.

8     And so in some ways out-of-precinct voting is an

9     almost exclusively urban problem.

10         Q.  And even with this exclusively urban

11    problem, if I'm looking at this correctly, the

12    county with the sharpest decrease between 2020 and

13    2024 in the share of provisional ballots cast on

14    election day is somewhere less than six percent.

15    I'm reading the chart correctly?

16         A.  Yes.  This is the change in -- so we're

17    taking counted provisional ballots as a share of

18    election day votes cast, and we're -- and we're

19    just looking at the percentage point difference.

20    So there was a decline of six percentage points in

21    the share of all election day ballots that are

22    counted provisional.  So if the implication is

23    that's a small difference, I wouldn't see that as a

24    very small difference.  It seem like that's a

25    substantial difference.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 115

1          Q.   There are two counties on this figure that

2    saw more than a four percentage point difference

3    between 2020 and 2024.

4          A.   That's right.

5          Q.   The overwhelming majority, regardless of

6    racial breakdown, saw less than two percent.

7          A.   That's correct.

8               MR. PRINCE:  We're very close.

9               MR. MOCINE-McQUEEN:  Okay.  I was going to

10   check in.  Does everyone feel good powering

11   through?

12              THE WITNESS:  Depends on how close we are.

13              MR. PRINCE:  I have this much of a page

14   and then I'll call my friends and see if there's

15   anything I'm missing.

16              MR. MOCINE-McQUEEN:  Okay.

17   BY MR. PRINCE:

18         Q.   Does your report look to the rates in

19   which voters reported that they used drop boxes in

20   the three elections where drop boxes have been an

21   option in Georgia?

22         A.   No.

23         Q.   Let's talk about figure 5 on page 14.  Can

24   you walk me through what figure 5 shows?

25         A.   Yes.  This is -- if we just take the

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 116

1    number of drop boxes in the county and we divide
2    that by the population but make that -- make it per
3    thousand voters, if we were to examine that, it
4    would be -- it's a very skewed -- the data are very
5    skewed and hard to look at in a graph.  So I take
6    the natural log of that -- of that number.  That's
7    just something that makes the graph easier to look
8    at.  And then that's on the horizontal axis.  And
9    then on the vertical axis is the 2024 late rejected
10   ballots as a share of mail ballots sent.  So this
11   is showing us that the places that have fewer drop
12   boxes per thousand voters are the places that have
13   more late rejected ballots.
14        Q.  So just here again the larger the circle
15   does not show anything other than county
16   population?
17        A.  That's right.  If we want to see the share
18   of late rejected ballots, we need to look at its
19   positioning vertically on the graph.  The size of
20   the data marker is just the size of the population
21   of the county.
22        Q.  And the county with the very worst,
23   meaning the highest number of rejected ballots, saw
24   less than a four percentage point increase in
25   rejected ballots between 2020 and 2024; is that a

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 117

1    fair way to read this table?

2        A.   This is not -- this is not a change.  This

3    is just looking at the late rejected ballots as a

4    share of mail ballots sent in 2024.  But the answer

5    to the question is still yes, that it's the highest

6    value we see on here is indeed less than four

7    percent.

8        Q.   And once more the overwhelming majority of

9    counties saw less than a two percentage point

10   increase between elections?

11       A.   Again, it's not an increase between

12   elections.  Just to be clear, it's a -- this is

13   just a late rejected -- if we're talking about

14   figure 5, it's the -- it's the late rejected ballot

15   share in 2024.  There's no comparison with 2020

16   here.

17       Q.   Okay.

18       A.   That is happening in 20 -- no.  That's a

19   different thing happening in figure 6.  So yeah,

20   just want to be -- just want to be clear.  This is

21   a level not a change in figure 5.  The answer is

22   still yes, that the majority of the data markers

23   are going to be below two percent.

24       Q.   Okay.  Let's turn to figure 6 then and

25   talk about what I was trying to talk about in

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 118

1    figure 5.

2         A.   Okay.

3         Q.   First can you explain what figure 6 is

4    showing?  We got high level summary before I asked

5    the question.

6         A.   Yeah, this one is -- so we have changes on

7    both axes in this graph.  So this is change in --

8    and again, the data markers correspond to counties.

9    So this is change in late rejected ballots as a

10   share of mail ballots transmitted.  So a positive

11   number means that there was an increase in the --

12   in the percentage of ballots that were rejected.

13   So as we move to the right on the graph, we have

14   higher rejection rates, higher increases in

15   rejection rates and then on the Y axis is change in

16   turnout from 2020 to 2024.  So all we're witnessing

17   here is that the places that experienced bigger

18   changes in late rejected ballots are also the same

19   counties that saw the biggest declines in turnout.

20        Q.   There are other options available for

21   Georgia voters to vote after the last four days of

22   voting, correct?

23        A.   If one has -- has applied for and received

24   a mail-in ballot, I am not entirely sure what the

25   procedure is for forfeiting that ballot and

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 119

1   switching to another form of voting.  It would

2   surprise me if it was not possible.  I believe it

3   is possible to go through some sort of forfeiture

4   process and switch over to an in-person form of

5   voting.  I don't know the details on how that

6   works.  So if it might vary across counties.

7        Q.  But at least in theory, voters who

8   received an absentee ballot can have that absentee

9   ballot cancelled and vote on election day if they

10  miss the deadline for voting by mail?

11       A.  I believe so.  But whether voters know

12  that and understand it is another question.

13           MR. PRINCE:  I think we're probably good

14  for a break.  I'll make a quick call and get back

15  together in 15 minutes or so.

16           MR. MOCINE-McQUEEN:  Sounds good.

17           THE VIDEOGRAPHER:  We are off the record

18  at 12:34.

19           (Break taken from 12:34 p.m. to

20  p.m.)

21           THE VIDEOGRAPHER:  We are on the record at

22  12:48.

23  BY MR. PRINCE:

24       Q.  Dr. Rodden, in this last break did you

25  talk with your counsel about any questions or

Page 120

1    answers that you've given today?

2         A.  No, just about lunch.

3         Q.  Well, I won't dive into that.

4              With that, the State has no further

5    questions at this time.  Do any of the other

6    defendants want to ask any questions?  Does the RNC

7    have any questions?

8              MR. BOCK:  No, the RNC does not have any

9    questions at this time.

10             MR. PRINCE:  That's all for me.

11             MR. MOCINE-McQUEEN:  If it's okay I'll ask

12   a few quick follow-up questions.

13   EXAMINATION BY MR. MOCINE-McQUEEN:

14        Q.  This is again Marcos Mocine-McQueen with

15   the Elias Law Group.  We'll do this quickly.

16             Dr. Rodden, when you said that SB202 -- or

17   let me go back.

18             There was a great deal of discussion about

19   the word "cause" and the meaning of "cause."  You

20   were asked several times whether a provision or

21   element of SB202, whether you were attributing a

22   causal relationship or whether that caused a change

23   in some -- something related to turnout or

24   rejections.  When you use the word -- when you were

25   answering those questions, were you -- were you

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 121

1     considering the word "cause" in the common laymen's

2     sense or were you considering it in the

3     professional sense that you would use it in your

4     line of work?

5          A.   That was -- I was reserving -- I was being

6     very careful about the use of the word "cause" in

7     the way that social scientists are often careful

8     about it.  I think we use the word "cause" in

9     casual conversation in a different way.  When

10    social scientists use it, they usually mean that we

11    have an experiment in which we randomized some

12    treatments.  And what I've said repeatedly in this

13    case is that we don't have a situation in which

14    we -- which we issued -- we implemented SB202 in a

15    randomized way across precincts where we chose some

16    treatment and control of precincts.  That's the

17    kind of thing we would need to do for social

18    scientists to start throwing around the word

19    "cause."  And so I meant to say that we don't have

20    that kind of situation, and for that reason I avoid

21    rather carefully using the word "cause."

22         Q.   Other than causation, are there other

23    types of relationships that social scientists

24    study?

25         A.   Well, often causation is what we're

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 122

1    interested in, but we can go about -- in situations

2    where we don't have an experiment we can still

3    learn things about the -- we can still increase our

4    confidence that something caused another thing by

5    looking at what we call observational data, so data

6    that the world has given us that does not

7    reassemble an experiment.  And so we can have a

8    relatively strong sense, a consensus among scholars

9    who study a thing that there is an association that

10   one thing is very likely to cause another thing.

11          So an example of that is in my own work on

12   electoral systems, most scholars who study this

13   sort of thing would say that that is the Dutch

14   style system of proportional representation where

15   the country is divided into one large district and

16   the seats in the legislature are allocated

17   according to vote share, that that kind of a system

18   will lead to more parties than a system like the

19   U.S. where there are single member district

20   winner-take-all electoral system.

21          So we don't have an experiment.  We didn't

22   take the Netherlands and divide it up into some

23   part of the country that has an American style

24   system and another part that has a proportional

25   system.  But yet we can look at the observational

Page 123

1    data from around the world and see there's such a

2    strong correspondence between the nature of the

3    electoral system and the -- and the party system.

4    And we have such a strong sense of what that causal

5    mechanism looks like, we start to gain confidence

6    that these things are not just associated kind of

7    randomly but that there's a real reason for that

8    association.  And that's the kind of thing that

9    social scientists do all the time without an

10   experiment even though they might be very careful

11   about the use of the word "cause."

12       Q.  So just to -- last question.  When you

13   asked about drawing that direct causal relationship

14   and you stated that you had not, should that be

15   understood to mean that there is no association?

16       A.  Yeah, and clearly it's the case that --

17   you know, throughout the report there are moments

18   when we can see that some things are clearly

19   associated with one another in a way that's linked

20   to a clear causal mechanism, and there are a number

21   of spots like that in the report.

22       Q.  Changing subjects a little bit, there was

23   a discussion of the possible influence of things

24   like COVID, various candidates appearing on the

25   ballot, whether voters liked those ballots and

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 124

1    whether the Palestinian and Israeli conflict could

2    influence voters, and you were asked if it was

3    possible that the turnout gap was caused by things

4    other than SB202.  You indicated in the affirmative

5    in some way.  I don't have the exact question here.

6    I don't think we need to read it.  My only question

7    is did you mean to say that the entirety of the

8    trend was explainable by things other than SB202?

9         A.   No.  The spirit of my response I hope was

10   that many things can affect turnout, and SB202 is

11   election law is among them.  I try to focus on

12   exactly the parts of the election law that we could

13   measure.  But it is my understanding, it is my

14   testimony that I believe that part of the turnout

15   difference is -- is associated with changes in

16   election law but that there are other things going

17   on as well.  But the entirety of the turnout change

18   is probably not driven by the -- by change in

19   election law, but that the entirety is not driven

20   by factors like people's attitudes about the --

21   about Gaza and so forth.

22        MR. MOCINE-McQUEEN:  All right.  I have

23   nothing further.

24        MR. PRINCE:  Nothing further from me.

25        THE VIDEOGRAPHER:  The time is 12:54 p.m.

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 125

1    And that concludes today's testimony.

2              (Whereupon, the deposition was concluded

3              at 12:54 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 126

1                    SIGNATURE OF DEPONENT

2

3          I, the undersigned, JONATHAN RODDEN, Ph.D., do

4    hereby certify that I have read the foregoing deposition

5    and find it to be a true and accurate transcription of

6    my testimony, with the following corrections, if any:

7

8    PAGE     LINE                   CHANGE

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23

24                    _____

                      JONATHAN RODDEN, Ph.D., Date

25

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

Page 127

1                    REPORTER'S CERTIFICATE

2

3

4          I, CATHERINE M. MEYER, a Shorthand Reporter,

5     State of California, do hereby certify:

6          That JONATHAN RODDEN, Ph.D., in the foregoing

7     deposition named, was present and by me sworn as a

8     witness in the above-entitled action at the time and

9     place therein specified;

10          That said deposition was taken before me at said

11     time and place, and was taken down in shorthand by me, a

12     Certified Shorthand Reporter of the State of California,

13     and was thereafter transcribed into typewriting, and

14     that the foregoing transcript constitutes a full, true

15     and correct report of said deposition and of the

16     proceedings that took place;

17          That before completion of the proceedings,

18     review of the transcript [ ] was [ X ] was not

19     requested.

20          IN WITNESS WHEREOF, I have hereunder subscribed

21     my hand this 26th day of August 2025.

22

23

          CATHERINE M. MEYER, CSR NO. 11596

24          State of California

25

Veritext Legal Solutions
800.808.4958                                      770.343.9696

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[& - 2018]**                                    Page 1

| & |
| --- |

**&**   3:5 4:22 5:15

| 0 |
| --- |

**04**   27:9

| 1 |
| --- |

**1**   2:12 10:18,22
22:23
**1.2**   95:23 96:12
**1.45**   66:24
**1.5**   89:19 90:11
91:5 92:16
**1.7**   75:9
**1.8**   96:7 99:2
**1.83**   97:15
**1.88**   97:24
**10**   2:12,16,18
2:23 80:14,20
87:24 96:21
97:2
**10,000**   16:11
95:4
**10.3**   58:21
**10.5**   57:20
**10.6**   36:9
**100**   4:22 71:19
72:3,12
**10:14**   46:14,15
**10:28**   46:18
**10a**   2:20
**11**   88:15 92:11
**11,781**   104:20

**11596**   1:20 7:6
127:23
**11:25**   82:1,2
**11:35**   82:5
**12**   1:14 2:13
96:9 100:12
101:16 102:3
103:2
**12,000**   104:19
**12.5**   36:12
**12.8**   57:17
**120**   2:4
**12:34**   119:18
119:19
**12:48**   119:22
**12:54**   124:25
125:3
**12th**   3:4 5:2
**13.2**   65:24
**14**   97:8 115:23
**14.3**   58:11
**14.7**   51:19
**15**   59:3 119:15
**15,000**   95:3
**15.1**   51:24 52:3
52:4,9 54:12
69:25
**15.1.**   58:25
**15.2**   52:12
54:14
**15.4**   36:16
**15.7**   51:22 52:4
52:9,16 59:4

**16**   2:14,15
**16.7**   71:7
**1600**   4:3,22
**167**   71:3
**17**   57:17 109:8
**17.1**   57:20
**17.4**   50:23
58:11
**17.8**   56:10,16
**1717**   4:12
**17819**   127:23
**18**   104:16
112:10
**18.1**   56:6,7,17
**18.4**   56:16
**18.7**   69:18
**18.8**   66:9
**19**   106:18
**19.7**   50:20
**1:21**   1:8 5:14
**1a**   44:18

| 2 |
| --- |

**2**   2:13 12:15,16
22:24 38:24
44:16
**2,000**   94:23,24
**2,012,688**   72:25
**2.1**   75:2 91:12
**2.2**   50:5
**2.22**   97:12
**2.26**   99:1
**2.3**   50:23

**2.41**   97:20
**2.48**   101:7
**2.5**   82:21 84:10
84:18
**2.7**   28:5
**2.8**   91:11
**20**   107:3
117:18
**20006**   4:12
**2001**   3:19
**2012**   80:2
**2014**   36:24
37:2,4,15
**2016**   2:22 27:8
27:10,16,22
28:2,21 36:3,8
58:4,5,10,16,20
59:7,23 63:20
64:18,23 65:1
65:17 66:3,7
66:10,19,21
69:8,15,22
70:5,13 80:2
80:11 93:2
97:9,9 98:2
**2018**   37:4
63:22 64:18,24
65:1 67:8,13
67:15 76:4
80:25,25 81:8
85:24 86:2,9
93:2 97:17
98:2

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[202 - 4.1]**                                               Page 2

| | | | |
|---|---|---|---|
| **202**   1:7 3:19 | 116:25 117:15 | 79:13,21,25 | **24.8**   69:22 |
| 4:13 5:11 7:24 | 118:16 | 80:17,25 81:11 | **243-9423**   4:4 |
| 13:25 14:7,12 | **2021**   73:6,8,11 | 82:18 85:14 | **250**   3:18 |
| **2020**   2:19 23:1 | 73:11,15 74:1 | 87:6 93:1,14 | **26**   58:25 |
| 23:3 27:23 | 74:4 75:3 | 93:15 95:10,24 | **26th**   127:21 |
| 28:2,6,11,18,22 | 76:13 78:13 | 97:5 98:6,18 | **28**   97:4,9 |
| 28:24 29:5,9 | **2022**   37:5,7 | 99:3 101:19,23 | |
| 29:21,22 30:5 | 64:2 67:9,13 | 102:2,8,14,16 | **3** |
| 30:12,14,16 | 67:17 68:2 | 102:20 103:7 | **3**   2:14 16:17,19 |
| 32:19,19 35:8 | 70:12 98:17,19 | 103:15,25 | **3.99**   66:20 |
| 35:8,15 36:12 | 98:22 | 104:24 105:5,6 | **30326**   4:8 |
| 37:15 39:1,10 | **2023**   2:23 | 105:11 107:5 | **30339**   4:23 |
| 55:11,15 56:9 | 12:21 19:24 | 107:15,16 | **31**   102:4 |
| 56:13,24 57:5 | 20:1 21:19 | 108:2,4,7 | **31210**   4:17 |
| 57:13 60:10 | 43:1 | 109:6 112:23 | **3200**   104:23 |
| 61:15,18 62:9 | **2024**   2:17 16:5 | 114:13 115:3 | **33**   67:10 |
| 62:10,14 63:25 | 17:6 20:15 | 116:9,25 117:4 | **334**   3:24 |
| 64:19 68:14 | 22:2 23:2 27:9 | 117:15 118:16 | **336-7249**   4:9 |
| 69:4 73:1,25 | 27:10 30:8,16 | **2025**   1:14 2:15 | **35**   44:22,23 |
| 74:3,10 75:3 | 32:21 33:9 | 3:4 5:3 14:11 | **36104**   3:23 |
| 76:12 79:10,21 | 35:3,15 39:1 | 19:25 20:24 | **3630**   4:7 |
| 79:25 81:1,6,9 | 39:10 43:11 | 21:2,6,20,25 | **39.9**   69:22 |
| 81:9,11,13 | 50:10 52:19,23 | 43:7 100:8 | **3a**   63:14,16 |
| 85:13,25 86:5 | 55:14,15 56:14 | 127:21 | 72:5 74:23 |
| 86:9 93:15 | 56:24 57:5,13 | **202s**   14:22 | 75:16 |
| 94:2,3 95:10 | 58:7,10,16,20 | **205**   4:17 | **3b**   68:17 |
| 95:22 101:17 | 59:7,24 60:10 | **22**   70:15,16 | |
| 102:9 103:14 | 64:3 65:21 | 95:21 | **4** |
| 103:23 104:20 | 66:4,7,10,21 | **22.7**   69:16 | **4**   2:25 36:7 |
| 107:4,6,15,20 | 67:17 69:8,23 | **22209**   4:3 | 92:25 93:3 |
| 107:21 108:2,3 | 70:5,10,13 | **23.8**   51:3 | **4,570**   92:12 |
| 108:6,16 | 71:7,13,19 | **23.8.**   56:18 | **4,761**   92:12 |
| 112:20 113:22 | 72:13 73:1,2 | **24**   70:15 | **4.05**   97:10 |
| 114:12 115:3 | 73:22 76:5 | 113:22 | **4.1**   49:22 58:8 |

Jonathan Rodden , Ph.D.                      August 12, 2025
Georgia Senate Bill 202, In Re

**[4.1. - accepted]**                                              Page 3

**4.1.** 57:18
**4.29** 97:18
**4.4** 59:7
**4.57** 67:16
**4.6** 80:18,24
81:12
**4.7** 50:1
**4.8** 23:1,15
**400** 3:18,23
**41.4** 69:15
**47** 2:16
**478** 4:18

**5**

**5** 2:25 52:16
115:23,24
117:14,21
118:1
**5,000** 92:2
**5.2** 58:15
**5.44** 66:21
**5.63** 67:16,22
**5.7** 55:14 56:23
**52.1** 88:18
91:20
**52.9** 66:7
**5400** 4:17
**55** 2:18
**55.7** 65:17
**550** 4:8 17:23
**55555** 1:8 5:14
**56.7** 27:14
**57** 27:25

**57.1** 27:13
**58** 2:20
**5:00** 105:12
110:5,8,12
111:1,14,15,23

**6**

**6** 2:25 56:16
61:21 96:14
97:6 117:19,24
118:3
**6.6** 57:12,23
**621-4980** 4:18
**63** 108:4
**678** 4:9
**68.9** 65:22
**69** 101:18

**7**

**7** 2:3,16,23
46:25 47:4
63:14 68:17
74:23 90:2
91:15 112:11
**7.15** 67:8
**7.48** 67:9
**700** 4:3
**703** 4:4
**71.7** 66:7
**770** 4:23
**787-1060** 4:13

**8**

**8** 2:18 54:25
55:1 89:25

**8,495** 82:16
91:24
**801** 3:6 5:15
**818-0000** 4:23
**85** 107:4,14
108:1
**8:00** 21:14

**9**

**9** 2:20 57:25
58:1 72:23
**900** 4:12
**94041** 5:16
**956-8200** 3:24
**968-4490** 3:19
**97** 2:23
**97.5** 82:24
**98** 98:7
**98.5** 90:14
92:21
**99** 87:20
**99.5** 87:20
**9:12** 3:5 5:2

**a**

**a.m.** 3:5 5:2
46:15,16 82:2
82:3
**a1** 70:17 71:16
**a2** 71:10,11
**a3** 72:11
**ability** 8:15
13:8 14:19
31:12,14 80:10
84:5

**able** 16:21
17:15 49:16
72:14 85:6,9
90:13
**above** 68:10
127:8
**absence** 34:25
63:3
**absentee** 18:9
18:11 19:7
25:12 63:18,22
77:10 78:5,12
78:14 79:4,20
82:25 85:4
86:11 87:5,21
88:1 90:17
91:2,19 92:17
92:21 94:1
95:13 96:6,11
97:7,7,20
101:8 107:21
119:8,8
**absolute** 16:5
99:9,15
**academic** 19:18
19:20
**accelerated**
37:24 66:17
**accept** 67:24
79:2
**accepted** 13:7
90:24 92:22
98:8 105:1
110:6

Jonathan Rodden , Ph.D.                                    August 12, 2025
Georgia Senate Bill 202, In Re

access  48:2
accordance
    8:21
account  19:9
accurate  9:14
    21:25 22:9
    26:22 60:11
    126:5
achieve  13:21
action  3:9 5:19
    6:4 127:8
actual  84:25
    93:18 95:2
actually  40:10
    63:7 98:11
    102:15
additional  17:5
    21:21 86:16
address  21:20
    22:7,10 36:24
    86:10 102:19
addressed
    19:23
addresses
    21:12
addressing
    12:22 79:24
administer
    5:18 7:3
administratio...
    29:21
administrators
    18:19 84:6
    109:14

advantage
    41:11
advertising
    44:9
affect  8:15
    39:14 54:4
    105:22 124:10
affected  28:25
    29:9 34:9 42:5
    54:9 60:18
    95:8
affecting  106:3
affects  54:23
affiliations
    5:25
affirmative
    124:4
afraid  17:16
african  27:1
age  39:24
aggregate  61:2
    76:8,11
agree  5:7 15:9
    16:4 25:21
    27:9 37:5
    42:20 44:15
    45:12 47:21
    61:13,20 62:12
    70:7 95:11
    96:1 98:1,6,16
    99:5,11
ahead  12:14
    44:8

alabama  3:23
alex  4:25 5:16
alleged  99:9
allegedly  99:15
allocated
    122:16
allow  9:14 37:2
allows  18:16
    19:3 70:19
altering  39:25
alternative
    23:14
altogether
    44:21
ame  3:21 7:1
american  27:1
    122:23
americans
    50:18
amount  55:16
    58:22 65:3
    67:14 87:7
    112:25 113:19
    113:21
analysis  18:2
    18:17 20:4
    33:25 37:2
    80:15 104:6
    105:16,22
analyze  53:24
    112:13
analyzed  21:10
analyzing
    88:23 104:9

andrew  7:16
anomaly  88:3
answer  8:16,20
    9:6,18,21 10:3
    10:7,8 23:20
    39:6 40:13
    62:16 72:10
    75:7 83:14
    117:4,21
answering  9:15
    120:25
answers  10:13
    82:10 120:1
anticipated
    106:7
anyway  60:5
    91:21
apologies  28:2
apologize  49:17
    59:17
appear  45:5
    47:10 49:10
    50:14
appearance
    5:22
appearances
    3:15 5:24
appeared  3:8
appearing
    123:24
appendix  44:25
applicants
    82:21,24 83:10
    91:11,12

Jonathan Rodden , Ph.D.
Georgia Senate Bill 202, In Re

August 12, 2025

[application - ballot]

Page 5

**application**
24:23 25:1,13
25:23 26:5
76:22 83:17
88:1,7,12,17
89:2,24 90:13
90:21,23 91:4
98:12
**applications**
26:2 82:15,17
84:11,18,19
85:14 86:11
87:6 88:22
89:12,20 92:3
**applied** 87:21
89:20,24 90:15
90:16 91:2,19
91:25 102:2,15
118:23
**applies** 31:24
**applying** 32:11
94:6
**approach** 74:7
80:4
**appropriate**
15:3 23:10
**approved** 87:7
**area** 88:2
**areas** 114:2
**argue** 61:2
**arizona** 45:18
**arlington** 4:3
**arrived** 110:25

**arrives** 24:23
**articles** 19:18
19:20
**aside** 45:23
84:8 98:12
**asked** 17:7,13
18:3 22:7,10
26:16 40:12
41:25 46:22
49:12 58:12
62:21 70:13
79:3 82:8
118:4 120:20
123:13 124:2
**asking** 8:1 9:18
36:4 39:5
56:12 73:21
74:10,16 75:17
78:20 95:18,19
98:23 101:3
**asks** 39:2
**aspect** 13:5
**aspects** 14:18
14:23 31:17
38:16,18 60:15
60:16,25,25
**assembled** 20:6
39:20
**assist** 9:13
19:14
**associated**
63:12 123:6,19
124:15

**association**
122:9 123:8,15
**assume** 21:18
48:15
**assuming** 54:4
**asymmetrically**
34:9
**atlanta** 1:3 4:8
4:23 5:13 88:2
**attempt** 31:13
35:1 105:3
**attempted**
15:21
**attempts** 27:20
**attention** 13:11
44:2 103:8
105:2
**attitudes**
124:20
**attorney** 6:1
**attributed**
63:11
**attributing**
120:21
**audio** 5:6
**august** 1:14 3:4
5:2 127:21
**authorized**
5:18
**automatically**
78:14 79:4
**available** 87:18
118:20

**avenue** 3:18,23
**avoid** 121:20
**aware** 17:4
38:24 44:1
64:13 89:10
111:12
**axes** 118:7
**axis** 113:2,9
116:8,9 118:15

**b**

**b** 2:10 81:16
82:14
**back** 12:18
33:6 36:1
43:18 44:18
63:8,9 68:7,15
72:23 74:23
80:6,9,10,12
100:9 119:14
120:17
**bad** 77:25
**bailed** 59:20
**ballot** 15:2,7,14
15:18,22 16:3
21:1 23:1,3
25:12 26:2,23
29:14,17 31:25
32:4,4,5 61:6
75:17 76:16,19
76:23,25 77:10
77:20 78:5
79:4 82:15,25
83:17 84:25

**[ballot - board]**                                              Page 6

85:4,4,7,10
86:5,8,11 87:5
87:21 88:1,4
88:11,12,17,18
88:25 89:3
90:17 91:3,20
91:21 92:8
99:14 101:17
101:18 102:2
102:10,12,16
103:7,9 105:5
107:22 108:3
108:13,14,24
109:20 110:7,7
110:18 111:14
111:23 117:14
118:24,25
119:8,9 123:25
**balloting** 86:1
**ballots** 14:25
16:4,9,11 26:1
45:5 63:19,19
68:23,24,25
69:1 70:22
78:14 81:8
85:13,24 92:1
92:10,12,17,21
93:14,20,24
94:1,3,8,11,15
94:17,19,24,25
95:3,4,13,22,23
96:6,11 97:7,8
97:10,11,20
98:3,9,10,17

99:24 100:2,10
101:8 104:8,19
104:23 105:1,2
105:6,20
106:21 108:1,8
109:16,18,23
109:24 110:4
110:11,25
111:2,6,8,11
112:8,14,20,22
113:1,7,12,22
113:25 114:13
114:17,21
116:10,10,13
116:18,23,25
117:3,4 118:9
118:10,12,18
123:25
**based** 17:7 19:4
36:16 45:14,15
59:24 76:4
88:8 95:1,5
**baseline** 35:9
**basic** 18:3
28:25
**battle** 45:22
**battleground**
45:8,17,20
**beginning** 5:25
64:2 77:17
**behalf** 6:21
**behavior** 47:23
**believe** 13:17
14:9 15:18

16:13 20:16
21:3,7,16 29:5
29:10 30:9
31:1 37:1
38:24 39:6,7
42:18 54:25
58:12 63:11
72:5 73:7 77:3
77:19 83:22
89:5 105:7
107:20 119:2
119:11 124:14
**benefit** 25:5
49:15
**benefits** 40:19
**best** 48:9
**better** 45:16
48:11 78:1
**beyond** 14:16
30:23
**bibb** 4:15 6:13
**biden** 32:23
33:11 34:18
**bifocals** 59:20
**big** 30:19 31:11
48:4 63:25
68:5 112:25
113:6,16
**bigger** 118:17
**biggest** 118:19
**bill** 1:7 5:11
7:24 13:25
14:7,11

**bit** 24:15 61:12
70:9 81:3
104:16 112:11
113:24 123:22
**black** 27:1,12
27:20,24 28:4
29:16,17 34:4
34:9,19 36:9
50:3,10 51:1,4
51:8,12 52:8
52:12 53:5
54:7,14 55:10
55:12,16 56:5
56:10,17 57:3
57:13,19 58:15
59:6,8,22 60:9
63:23 65:18,22
66:13,20 67:4
67:8,13 69:10
69:21 70:5,9
74:25 75:10
76:13 89:20
90:3,12,15,16
91:10,16 96:6
97:6,10,18
98:3,7,24 99:2
99:7,13 100:11
101:11 105:4
113:10,20
**blue** 45:9
**board** 4:19,20
4:20 6:21,22
6:23 43:22

Jonathan Rodden , Ph.D.
Georgia Senate Bill 202, In Re

August 12, 2025

**[bock - causal]**

Page 7

**bock** 4:2 6:9,10 120:8
**bottom** 81:17 87:24 103:1
**boulee** 10:15
**boulevard** 4:3
**bouncing** 61:9
**boundaries** 70:20
**boxes** 115:19 115:20 116:1 116:12
**break** 10:1,3 46:2,8,15,20 50:6 81:20,23 82:2,8,9 119:14,19,24
**breakdown** 106:14 115:6
**breakdowns** 53:15 109:19
**breaking** 16:21 63:20
**brief** 17:12 26:13
**briefly** 11:16 12:5,9
**bring** 59:15 68:15
**brings** 84:25
**broad** 22:5 54:22
**brought** 52:10

**bryan** 4:6 6:16
**btyson** 4:9
**bucket** 112:3
**bullet** 22:24 93:3
**burden** 25:22 26:9
**burdens** 99:8 99:15
**busy** 57:10,14

**c**

**c** 102:25
**calculated** 26:10,18 41:6 82:20 100:21
**calculating** 39:14 73:17
**calculation** 39:15 42:14 100:6
**calculations** 42:19
**california** 3:6,6 5:15,16 7:6 127:5,12,24
**call** 10:18 85:15 89:11 115:14 119:14 122:5
**called** 15:11 18:9,20 86:13 86:15 87:11

**campaign** 44:9 51:16
**cancelled** 119:9
**candidate** 51:19 52:15 54:13,15,18 58:23 59:9
**candidates** 43:20 51:16 52:2 54:3,22 57:4 59:23 60:5 61:5 123:24
**capture** 49:7
**careful** 121:6,7 123:10
**carefully** 11:13 121:21
**case** 1:7 5:13 6:11,25 7:23 8:4 12:2 15:5 17:6 20:15 28:18,22 39:16 41:12,13 42:2 44:14 50:14 54:11 62:18 86:3 87:9 104:14 106:12 106:13 109:21 110:24 121:13 123:16
**cases** 60:18 84:4

**casey** 4:21 6:20
**casey.torres** 4:24
**cast** 15:22 16:14 22:25 23:2 26:23 30:15 39:8 40:18 45:5 63:19 68:24 69:1 70:22 71:13,15 75:17 81:8 85:13,24 86:5,8 88:25 101:8,18 102:8 103:7,9 104:19 107:22,22 108:1,3,5,8,23 113:12,22 114:13,18
**casting** 88:18 91:20 112:20
**casual** 121:9
**categorized** 110:9
**category** 21:9 57:2,8,9 58:9 71:22 91:3 92:7
**catherine** 1:20 3:7 7:5 127:4 127:23
**causal** 14:22 24:12,16 120:22 123:4

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[causal - color]**                                    Page 8

123:13,20
**causality** 12:22
  13:18 15:12
**causation** 25:7
  121:22,25
**cause** 3:11
  13:14,20 15:1
  15:4,5,17,24
  120:19,19
  121:1,6,8,19,21
  122:10 123:11
**caused** 13:2,9
  13:25 14:7,12
  38:11 99:9,15
  120:22 122:4
  124:3
**caveat** 102:21
**caveats** 22:3
**cell** 56:2,5
**census** 39:23
  47:16
**census's** 47:18
**center** 3:22
  6:25
**certain** 48:7
  54:7 78:7 87:6
**certainly** 13:6
  30:18 31:8
  33:16 42:9
  49:6 81:4
  106:12,13
**certificate**
  127:1

**certified** 3:7
  127:12
**certify** 126:4
  127:5
**challenges** 21:1
**chance** 33:10
  89:3 93:8
**change** 25:9
  31:11 38:9
  40:24 49:3
  81:19 95:5
  104:15 111:6
  114:16 117:2
  117:21 118:7,9
  118:15 120:22
  124:17,18
  126:8
**changed** 31:7
**changes** 13:25
  14:7,12,14
  23:11,24 41:8
  41:22 63:12
  106:2 118:6,18
  124:15
**changing** 41:3
  43:19,19
  123:22
**characteristics**
  2:17,19,22
**chart** 45:14,15
  68:18 69:6
  76:2,4 77:6
  113:18 114:15

**chatham** 4:19
  4:19,20 6:21
  6:22
**check** 45:25
  115:10
**checking** 20:10
**choose** 23:19
  39:14
**chose** 41:23
  121:15
**chunk** 17:15
**churn** 65:9
**circle** 113:11
  116:14
**cite** 19:17
**citing** 19:19
**citizen** 39:24
**claim** 13:1,24
  14:9 15:18
  24:20 25:5
  33:13 34:24
  39:7 60:20
  94:18
**claims** 14:7,10
  24:12,16 41:14
**clarification**
  9:2
**clarified** 9:1
**clarify** 31:19
  83:12 102:23
  108:17
**clark** 4:7
**clarkhill.com**
  4:9

**classified** 112:7
**classify** 15:3
  112:8
**clayton** 6:23
  111:9
**clear** 14:15
  15:5 25:24
  26:12 32:16
  35:4 60:23
  61:2,6 94:7
  100:19 104:25
  117:12,20
  123:20
**cleared** 109:1
**clearly** 9:22
  31:11 38:17,21
  43:17 87:9
  123:16,18
**close** 68:8
  110:16,21,23
  115:8,12
**closed** 79:12,16
**cobb** 88:3
**collapse** 63:9
**collect** 20:21
**collected** 20:18
  83:23
**collecting**
  20:11,21
**collection**
  87:16
**college** 44:5,6
**color** 44:21

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[colored - control]**                                      Page 9

**colored** 45:8,9
  45:9 70:21
**coloring** 71:14
**column** 49:17
  50:15,16 54:2
  109:22
**come** 33:3
  52:11
**coming** 31:9
**commencing**
  3:4
**common** 19:4,5
  24:7,9 72:8
  86:14 121:1
**communicate**
  11:21 12:6
**comparable**
  41:10 54:16
**comparator**
  35:9 80:23
**compare** 23:5
  27:8 35:14
  40:11 43:2,6
  51:12 55:9
  56:12 58:5
  64:23 70:13
  74:7,10
**compared**
  23:10 28:7,21
  28:21 29:18
  37:4 39:1
  40:20 45:12
  52:16 56:13
  60:10 66:21

67:2,9,16 69:8
69:15,22 75:3
75:9 91:11
93:15 97:19
**comparing**
  27:13 51:7
  58:10 74:20
  100:15 102:9
**comparison**
  81:10 94:16
  117:15
**compensated**
  17:18,22
**competitive**
  27:18 28:16
  29:10 43:3
**complete** 21:25
  22:8
**completely**
  8:16,21 63:9
**completion**
  127:17
**complex** 114:5
**computer**
  49:16
**conceivable**
  33:5,7,8,24
  37:12
**conceivably**
  34:20
**concentrated**
  88:2
**concept** 39:9
  101:25

**concerned**
  30:10 77:19
  90:9
**concerns** 29:20
  30:7 62:25
**conclude** 75:22
**concluded**
  125:2
**concludes** 39:9
  125:1
**conclusion**
  70:11 89:19
  92:25
**conclusions**
  12:11,12,12
  36:17
**conditions**
  77:24 94:9
**conduct** 13:15
**conducting**
  20:4
**confidence**
  101:12 122:4
  123:5
**conflict** 33:22
  124:1
**confusing**
  109:11
**conjectures**
  78:21
**consensus**
  122:8
**consider** 17:25
  20:23 21:1,6,8

21:24 28:7
43:11 79:25
80:9
**considered**
  33:20 80:3
  102:7
**considering**
  121:1,2
**consistent**
  10:14 48:14,16
  62:5,6 69:3
  73:9 77:9
**consovoy** 4:2
**consovoymc...**
  4:4
**constitutes**
  16:9 127:14
**constraints**
  86:20
**constructed**
  40:15
**contain** 22:8
**contested** 53:20
**context** 81:2
**contexts** 48:24
**continue** 5:6
  8:11 31:4
  35:24 65:5
**continuing**
  18:2
**contrast** 51:1
  71:16
**control** 29:4
  121:16

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[controversial - data]                               Page 10

**controversial**
25:5
**controversy**
24:20
**conversation**
9:10,11 13:3,5
46:21 121:9
**conversations**
5:5
**copy** 10:24
16:24
**correct** 16:13
16:15,24 19:21
20:25 21:11
25:15,18 27:15
28:4 31:15,17
35:3,13,19
36:10,21,22,25
37:15 38:12
45:18 49:9,14
50:12 51:13
52:6 53:9 54:5
55:18 56:25
57:20 58:13
61:15 64:25
66:10 67:10
70:14 73:12
76:6 81:14
82:18 90:18
92:5 93:16
98:20 100:3
105:5,13,14
113:13 115:7
118:22 127:15

**corrections**
126:6
**correctly** 36:8
39:11 41:6
55:14 58:21
65:25 73:3
89:21 95:14
96:8 101:19
114:11,15
**correspond**
118:8
**corresponden...**
123:2
**cost** 25:16,17
**counsel** 5:23
7:4 10:6,12
11:1,9,16,19,22
17:4 46:21
50:6 79:8 82:9
119:25
**counsel's** 96:23
**count** 19:10
24:13 57:12
110:12,19
**counted** 32:4
105:19 106:21
108:12,14,20
109:2 111:2
112:22 113:1,7
114:17,22
**counties** 20:7
88:5 89:10,15
106:20 110:13
110:14,22

111:9 112:25
113:3,4,5,8,16
113:17,19
115:1 117:9
118:8,19 119:6
**country** 28:17
28:24 53:18
122:15,23
**county** 4:15,19
4:20,20 6:14
6:21,22,23
18:21 70:18,20
70:21 88:3
109:13 111:13
113:14 114:12
116:1,15,21,22
**course** 7:20
28:24 41:12
86:1
**court** 1:1 5:12
7:2 9:13 42:10
63:17 99:21
106:2
**covered** 91:18
**covid** 29:21
30:2,6 123:24
**cps** 47:11,12
48:7
**created** 19:12
26:9
**cryptic** 87:2
**csr** 1:20 7:6
127:23

**culture** 64:10
**cure** 84:12,24
85:1,2 89:3
**cured** 84:19
**cures** 84:16
**current** 29:24
47:13 100:9
**currently** 8:13
**cycle** 78:10

**d**

**d** 2:1
**d.c.** 3:19
**dangerous**
62:12
**darker** 70:24
**daron** 2:13
**data** 17:6 18:21
18:24 19:11
23:19 24:3
26:17 33:6
34:23,25 37:3
37:11,17 38:7
39:17 40:15
42:17,21 43:2
48:7 53:3,9
54:20 58:3
60:14 71:21
78:18 79:13,14
82:23 83:23
86:20,22 87:16
89:6 90:8
92:11 93:10
99:21 100:24

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[data - differential]                                        Page 11

104:14 105:18
107:13 109:13
111:3 112:6
113:4 116:4,20
117:22 118:8
122:5,5 123:1
**date** 78:7,8
83:11 84:1,2
87:19 102:10
126:24
**dated** 2:15,23
**day** 3:4 21:15
68:23,25 69:5
69:9,15 70:4,8
72:13,19 77:8
77:12 89:9
102:11,12
111:16 114:14
114:18,21
119:9 127:21
**days** 32:6
101:17 103:14
103:23 118:21
**dc** 4:12
**deadline** 17:13
119:10
**deal** 50:7 78:24
94:11 120:18
**dealing** 102:18
**december**
98:22
**decide** 99:21
**decided** 32:23
33:9,22 34:17

65:4
**decides** 34:12
**deciding** 99:18
**decline** 27:10
114:20
**declines** 118:19
**decrease** 58:21
59:6 69:5,19
70:1 74:24
75:2,10 76:12
80:24 81:12
102:4 113:21
114:12
**decreased** 59:4
105:20
**decreases**
79:20 106:22
**deemed** 45:7
**defendant** 6:19
**defendants** 4:5
4:15,20 6:3,14
6:16 19:12
120:6
**definitely** 64:19
**democrats**
100:11 101:8
**demonstrates**
87:25
**denominator**
39:4,13,13,19
40:9,16 94:1
95:5,7
**dependent**
28:19

**depending**
92:11
**depends** 37:23
115:12
**deponent** 3:16
126:1
**deposed** 7:23
**deposition** 1:13
2:12 3:1 5:10
5:14 7:17,20
8:7,9 10:14
11:8,12,23,25
13:17 20:2
47:9 55:4
79:12 82:11
125:2 126:4
127:7,10,15
**describe** 14:21
23:6
**described** 18:1
18:7 26:20
27:4 53:13
**describing**
14:14 24:19
26:18 28:14
**descriptive**
18:4 35:5 76:9
**details** 119:5
**determine** 38:6
**determined**
16:8
**deterred** 32:11
52:19,24

**developed**
99:18
**difference**
22:14,16 23:9
23:14,25 27:22
27:23 51:10
52:17 53:4,6
55:10 65:24
90:3 91:16
93:19 95:10,12
95:20 96:2,4
96:15 97:6,14
97:24 99:24,25
104:11 114:19
114:23,24,25
115:2 124:15
**differences**
22:13,17 30:14
34:2 78:22
99:6,12
**different** 27:17
28:12,23 32:21
39:2,4,5,12,17
40:5,14,15,16
43:23,23 44:3
44:11 53:17
61:3,4,4 68:21
75:14,14,21
76:18,23 86:18
94:6,22 102:13
103:21 117:19
121:9
**differential**
41:14 98:2

Jonathan Rodden , Ph.D.                                    August 12, 2025
Georgia Senate Bill 202, In Re

**difficult**  44:7
**digest**  23:20
**diligence**  94:12
**direct**  10:7
  14:18 18:6
  48:10 56:1
  100:24 103:4
  123:13
**direction**  38:8
**directions**  61:3
**directly**  12:4
  14:24 38:19
  79:21
**disadvantage**
  41:12
**disagree**  61:8
**disagreement**
  30:6
**discovery**
  79:11,15
**discrepancies**
  60:19
**discrepancy**
  83:24
**discuss**  22:13
**discussed**  13:17
  24:12 34:2
  69:4 103:16
  112:14
**discusses**  81:7
**discussing**
  63:24 74:25
  99:7,13

**discussion**
  13:10 43:18
  79:14 120:18
  123:23
**dislike**  54:18
**disliked**  59:23
  59:24
**disparity**  99:8
  99:14
**disprove**  35:2
**dispute**  92:24
  93:12
**dissatisfaction**
  54:21
**distinguish**
  83:9
**distribution**
  49:20
**district**  1:1,2
  5:12,13 122:15
  122:19
**districts**  114:5
**dive**  120:3
**divide**  23:15
  116:1 122:22
**divided**  45:5
  122:15
**division**  1:3
  5:13
**dl**  87:12,12
**dmv**  40:25
**doctor**  82:7
**document**  11:5
  44:21 47:7

  55:22
**documents**
  45:24
**doing**  25:20
  26:24 27:3
  36:3 39:17,22
  65:5 81:5
  101:24
**door**  44:10
**double**  19:10
**douglas**  111:9
**download**
  25:14 42:17
**downside**  40:23
**dr**  2:13 5:10
  6:8 7:12 8:10
  8:13 11:4 12:3
  12:5,10,12,15
  12:19 15:19
  38:23,25 39:2
  39:16,19 42:14
  42:17,18,21
  43:2,25 44:16
  44:20 46:1,20
  47:6 53:2,2
  79:19 92:25
  93:9 119:24
  120:16
**dramatic**  31:5
  61:22
**draw**  15:10,16
  15:21,23 16:1
  16:22

**drawing**  13:11
  123:13
**drawn**  70:10
  71:24
**draws**  44:1
**drive**  4:17
**driven**  41:21
  124:18,19
**driver's**  32:13
  87:10
**drop**  65:1 69:9
  115:19,20
  116:1,11
**dropped**  32:25
  33:11 104:23
**drops**  64:25
**due**  94:12
**duly**  3:9
**dutch**  122:13

**e**

**e**  2:1,10 18:20
**earlier**  26:18
  31:1 36:1
  43:18 53:13
  60:13 64:6
  72:6 78:16
**early**  20:8,9
  63:18,21 65:18
  66:3,13,16
  69:13 71:12,14
  71:20 72:3,6
  77:3,5 89:8

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

ease   31:3
easier   23:20
  31:2 68:7,14
  68:19 116:7
easily   49:3
easy   63:1
eavs   18:20
  109:14 112:6
effect   16:10
  24:10 29:7
  31:23 33:25
  34:4,10 38:6
  99:19,19
effects   14:22
  73:18
effort   41:4 44:9
  68:19 113:15
efforts   29:1
either   52:6 54:8
  92:12 93:2
election   14:17
  17:7 18:19
  20:10,15 21:15
  22:2,4 26:24
  27:8,9 28:1,1,7
  28:12,23 29:23
  30:10,13,14
  32:6,19,21
  33:3 35:3,8,21
  36:5,15,25
  38:18,19 43:10
  44:7 47:15
  48:21,22 53:21
  54:1 61:11

62:2,9 64:1,7
65:4,6 67:3
68:2,3,23,25
69:4,5,9,9,15
70:4,8 71:19
72:13,19 73:6
73:8,16,25
74:1,4,15,21
75:24 76:17,20
77:8,12,16,16
78:9,10,12,13
79:11 80:2,5,8
82:18 84:6
89:8,11 94:24
94:25 95:2,3
97:5,9,17 98:6
98:18 101:18
103:14,23
109:14 111:16
114:14,18,21
119:9 124:11
124:12,16,19
elections   4:20
  4:20 6:22,23
  16:7 22:13,18
  28:8,13,15
  29:8,11 36:20
  36:23 53:20
  61:1,10 62:3
  64:3,8 67:7
  74:8,25 79:15
  80:2 93:6
  95:10 96:3
  98:3 102:6

115:20 117:10
117:12
electoral   44:4,6
  122:12,20
  123:3
element   120:21
elevated   68:10
eliana   3:22
  6:24
elias   3:18 6:7
  120:15
elias.law   3:20
eligible   39:8
  40:4,20 41:5
  41:11,15,18,24
  42:7,14 45:6
  102:8
embarrassment
  48:23 49:1,7
enacted   37:22
  73:9 74:2
encouraged
  85:5
encouraging
  86:23
ended   77:2
  88:18,22 90:15
  91:20 106:10
endless   34:25
  35:2
endorsing
  93:11
ends   32:6

enfranchisem...
  40:3
engagement
  61:5
entire   28:17,24
  76:2 90:6,7,8
entirely   79:15
  93:8 118:24
entirety   124:7
  124:17,19
entitled   2:16,18
  2:20 127:8
equilogical
  100:23
era   27:17
error   2:21
  55:20 86:25
  87:1 89:13
  90:9
errors   42:19
especially   41:9
esq   3:17,22 4:2
  4:6,10,11,16,21
essentially
  107:12
established
  86:2
establishing
  15:11
eventually   9:12
  108:25
everybody
  78:17

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[evidence - figure]**                                    Page 14

**evidence** 17:24 103:4 106:19

**exact** 124:5

**exactly** 13:5 93:10 124:12

**examination** 2:3,4 7:11 120:13

**examine** 18:6 26:16 40:10,12 41:13,25 116:3

**examined** 3:10 12:5 18:22 20:6

**examining** 37:25 73:22 81:5

**example** 14:24 22:22 122:11

**exception** 29:3 61:15

**exclusively** 114:9,10

**exercise** 94:23 95:1 100:23

**exhibit** 2:12,13 2:14,16,18,20 2:23 10:18,22 12:15,16 16:17 16:19 38:24 44:16 46:25 47:4 49:6,15 54:25 55:1 57:25 58:1

96:18,21 97:2

**exhibits** 2:25 10:19

**exist** 20:16

**exists** 62:23

**expanding** 36:20 37:6,18

**expect** 63:8 109:25 110:1,3 110:21

**expectation** 63:3

**expected** 63:5 106:25 107:1

**expenditure** 44:10

**experience** 31:3

**experienced** 113:6 118:17

**experiment** 13:22 15:16,23 16:1 121:11 122:2,7,21 123:10

**experimental** 13:16

**experimentat...** 15:12

**experiments** 13:13

**expert** 2:13,23 12:1 77:25 99:20

**experts** 12:2,7 44:14

**explain** 22:14 25:9 26:10 30:14 60:21 104:11 109:12 112:12 118:3

**explainable** 124:8

**explained** 68:4

**explanation** 30:23

**explanations** 33:4 61:7

**explore** 111:5

**express** 24:3

**expressing** 23:7 23:18

**extent** 8:9 49:1 79:13

**extra** 10:23

**f**

**face** 38:7

**faced** 25:9

**fact** 14:15 15:6 20:12 25:7 29:7 32:5,16 44:2 54:6 60:24 62:9

**factors** 60:23 124:20

**failed** 101:23

**fair** 9:7 10:4 21:18,23 37:20 59:22 66:12 102:18 113:19 117:1

**fairly** 35:4

**fall** 91:3 112:3

**fallen** 68:7

**falloff** 61:22

**falloffs** 106:21

**familiarize** 45:2

**far** 26:7 46:5 87:17 93:24,24

**february** 2:23

**feed** 60:19

**feel** 99:20 115:10

**feeling** 31:10

**feels** 46:1

**felon** 40:3

**felt** 32:24 33:10 34:18

**fenwick** 3:5 5:15

**fewer** 116:11

**field** 26:19 42:22 83:25,25 86:13,16 87:11 87:19

**fields** 86:23

**fifth** 45:21

**figure** 26:14 27:5,7 30:17

Jonathan Rodden , Ph.D.                          August 12, 2025
Georgia Senate Bill 202, In Re

**[figure - further]**                                      Page 15

30:17 36:6
44:18,19 45:2
63:14,15 67:18
68:17 70:16,17
70:23 71:10,11
71:16 72:5,11
74:23 75:16
91:5 97:8
112:11,12
115:1,23,24
117:14,19,21
117:24 118:1,3
**figures**  27:5
**file**  18:6,11,14
  19:7 26:19
  37:1 48:11
  64:16 65:9
  83:7 86:12
  88:24 91:10
  100:22,22
  107:21
**filed**  5:11
**files**  18:9,9,16
  18:18 19:3
  48:2
**filling**  26:5
  110:18
**final**  102:10,12
**finally**  10:11
  36:15
**financially**  5:20
**find**  25:22
  65:17 86:22
  104:22 107:13

126:5
**finding**  93:11
  102:12
**findings**  22:24
**finds**  104:18
**fine**  25:8 42:9
  46:10 81:24
**finish**  9:15,18
**finishing**  17:14
**firm**  4:16
**first**  3:9 7:20
  7:22 29:15
  46:24 49:11
  59:19 72:24
  80:15,21 81:5
  85:19,21 91:9
  95:2 96:8
  101:25 102:17
  102:21,24
  104:9 106:18
  109:22 118:3
**five**  45:20 57:2
  93:15
**fix**  85:5 89:12
**flip**  92:20
**florida**  39:21
**fly**  51:6 75:5
**fmglaw.com**
  4:24
**focal**  28:17
**focus**  13:11
  14:20,23 32:17
  32:20 38:20
  43:19 48:20

49:8 104:15
124:11
**focused**  84:8
**focuses**  14:18
  15:7 60:15
**focusing**  81:9
  83:12
**folks**  60:6
  75:14 89:8
**follow**  49:12
  65:13 77:6
  120:12
**followed**  64:1
**following**  75:19
  102:1 126:6
**follows**  7:9
  53:12
**forced**  48:10
  77:22
**foregoing**
  126:4 127:6,14
**forfeiting**
  118:25
**forfeiture**
  119:3
**forgot**  49:17,21
  50:11
**forgotten**  45:1
**form**  35:25
  36:2,4 37:9
  62:15 72:7
  75:7,12,18,24
  75:24 76:9
  119:1,4

**formal**  83:3,6
**formally**  84:8
**format**  47:10
**forming**  35:22
**forms**  35:18
  63:22 68:21
**forth**  40:4 41:4
  65:11 104:8
  124:21
**found**  38:25
  63:1
**four**  45:20 51:9
  72:1 101:17
  102:11,12
  103:14,23
  115:2 116:24
  117:6 118:21
**frame**  32:12
**framework**
  99:18
**freeman**  4:22
**friends**  115:14
**front**  105:17
**full**  7:15 96:8
  96:10 101:6
  127:14
**fully**  8:15,20
**fulton**  113:5
**function**  95:6
**further**  8:2
  64:3 80:6,9,10
  80:11,12 120:4
  124:23,24

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[future - groups]**                                    Page 16

**future**  20:14

**g**

**gain**  123:5
**galleria**  4:22
**gap**  36:8,20,24
    37:4,6,13
    38:11,14 124:3
**gary**  4:22
**gauge**  42:8
**gaza**  124:21
**general**  42:8
    64:9 67:3
    74:20 80:1,2
    98:18 102:6
**generally**  13:7
    41:17 42:20
    43:14 63:4
**geographic**
    49:4
**georgia**  1:2,7
    4:8,17,23 5:11
    5:13 13:24
    14:8,11 15:20
    16:7 18:5,19
    19:2 21:14
    22:2 27:12,17
    27:18 28:9,10
    28:15,20 29:3
    29:6,17 30:15
    31:4 33:25
    35:10 38:25
    40:25 43:9,16
    45:9,13,16,21

53:2,3,5,8,12
53:17,23 54:1
54:4,5,7 61:2
61:13,14,23
62:10,13 64:10
64:10,14,16,21
66:14 67:5
69:11 71:6,18
72:7 89:11
90:12 115:21
118:21
**georgia's**  29:15
    43:2,6
**georgians**  67:8
**gestures**  9:22
**getting**  25:6
    43:18 76:16,16
    76:22,22,23
    77:20 78:1
**give**  34:7 77:24
    84:22 89:18
    107:7 113:15
**given**  10:13
    12:18 19:1
    30:25 31:6
    33:10 56:13,14
    63:3 81:22
    82:10 84:12
    85:11 86:12,19
    90:11 91:23
    111:3 120:1
    122:6
**gives**  18:14,15
    76:8 100:24

**giving**  89:3
    109:18
**glass**  55:24
    59:18
**glasses**  59:15
**go**  5:7 7:19
    12:14 22:19,23
    25:13 26:4
    36:1 42:16
    44:17 56:15,16
    80:5,10 102:14
    104:6 119:3
    120:17 122:1
**god**  59:12
**goes**  56:17
    57:17,19 60:15
    71:17
**going**  5:2 10:17
    11:16 12:18
    16:16 27:25
    34:14 40:5
    44:17 45:23
    46:4,24,24
    54:24,24 57:25
    75:4 80:9,11
    81:16 82:14
    94:4 96:17,20
    104:16 111:4
    115:9 117:23
    124:16
**gold**  13:18
    15:11
**good**  5:1 6:2,5
    6:9,12,15,18,20

6:24 7:12,13
7:14 40:25
54:20 62:21
81:19 115:10
119:13,16
**gotten**  76:25
**govern**  13:8
**grabs**  44:5
**grain**  48:7
**graph**  68:21,23
    116:5,7,19
    118:7,13
**great**  78:24
    85:22 120:18
**greater**  77:8
**grimmer**  12:5
**grimmer's**
    12:10,12
**ground**  7:19
    45:22
**group**  3:18 6:7
    23:16 26:25
    27:11 34:12,20
    54:23 58:4,6
    85:15,25 86:7
    91:1 98:23
    102:15 106:9
    120:15
**groups**  23:6
    41:15 43:14
    50:13 61:4
    69:2 75:14
    104:12

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[grunts - impressions]                                    Page 17

| | | | |
|---|---|---|---|
| **grunts** 9:22 | 86:2 100:19 | 118:14,14 | **identification** |
| **gubernatorial** | 111:8,21 | **highest** 71:2,6 | 10:22 12:16 |
| 43:10 | 117:18,19 | 116:23 117:5 | 16:19 47:4 |
| **guess** 8:7 44:24 | **happens** 65:13 | **hill** 4:7 | 55:1 58:1 97:2 |
| 59:25 94:10 | **happy** 100:6 | **hispanic** 49:24 | **identified** |
| 101:6 | 109:12 111:20 | 50:22 51:13,21 | 21:19 113:10 |
| **h** | **hard** 67:18 | 52:2,8 58:7,12 | **identifies** 45:19 |
| **h** 2:10 | 68:22 89:17 | 58:22 59:4 | **identify** 27:1 |
| **habit** 35:22 | 116:5 | **historically** | **imagine** 37:10 |
| **habitual** 80:7 | **harder** 77:10 | 61:14 | 48:18 49:3 |
| 81:7 85:15 | **harris** 33:21 | **history** 18:11 | 53:16 89:7 |
| **habitually** 80:8 | 54:9 | 80:17 88:24 | 92:7 110:20 |
| **half** 52:17 | **health** 77:25 | **hole** 25:7 | **immediately** |
| 73:17 | **heard** 33:5 | **home** 106:6 | 35:20 36:5 |
| **hand** 45:23 | 89:16 | **hoo** 4:25 5:16 | 80:5 |
| 46:11,24 54:24 | **held** 60:4 | **hope** 124:9 | **impact** 14:21 |
| 57:25 105:19 | **help** 30:14 | **horizontal** | 24:21 25:3,12 |
| 127:21 | 33:10 74:18 | 113:9 116:8 | 31:11,14 34:12 |
| **handed** 55:19 | **helpful** 22:18 | **hour** 3:4 17:23 | 38:22 41:14 |
| **handful** 24:13 | 35:9 41:18 | 46:7 81:19 | 42:2 |
| 110:22 | 43:12 73:17,22 | **hours** 11:20 | **impacted** 24:14 |
| **handling** 10:18 | **henry** 111:10 | 17:16 | 24:16 25:8 |
| **hands** 11:1 | **hereunder** | **house** 24:23 | **impacts** 14:19 |
| 76:16,19 | 127:20 | **hundred** 99:23 | 34:13 74:5 |
| **handwritten** | **high** 29:8 50:12 | **hypotheses** | **imperative** |
| 86:16,18,24 | 91:1 118:4 | 35:2 | 48:21 |
| **happen** 89:16 | **higher** 23:17 | **hypothesis** 34:8 | **implemented** |
| **happened** 35:3 | 39:10 45:13 | **hypothetical** | 106:16 110:2,3 |
| 83:21 | 49:25 51:22 | 95:1 | 121:14 |
| **happening** 31:9 | 52:5 66:3 70:4 | **i** | **implication** |
| 43:16,23 74:15 | 93:15,23,25 | **iceberg** 31:22 | 114:22 |
| 74:20 75:15 | 98:16 100:10 | **idea** 55:19 77:9 | **imply** 90:25 |
| 77:13 78:21 | 101:11,14 | | **impressions** |
| | 113:9,19 | | 43:19 |

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[improvements - issues]**                    Page 18

**improvements**
  41:1
**incapacitated**
  40:2
**include**  85:15
  101:22 104:10
**included**  53:8
  110:14
**including**  5:23
  110:13
**inclusion**  29:16
**increase**  28:4
  29:22 30:19
  38:3,11 51:4
  55:15 56:23
  57:2,13,23
  58:8,16 63:25
  66:10,24 67:9
  68:5 70:25
  116:24 117:10
  117:11 118:11
  122:3
**increased**
  38:14 39:1
  67:12,25
**increases**
  118:14
**increasing**
  69:12
**increasingly**
  28:15
**independent**
  38:15

**independently**
  52:18
**indicate**  82:16
  88:16,21
**indicated**  13:24
  24:11 82:13
  85:9 124:4
**indicates**  24:14
  80:16 105:9
**indicating**
  80:25
**indicator**
  107:20
**indicators**
  105:8
**individual**  19:8
  26:22,23 85:7
  105:7
**individuals**
  14:19 19:10
  32:9 40:7
  65:13 75:19
  85:23 91:9
  103:18
**infer**  15:1 26:8
  32:2 87:22
**inference**  15:10
  15:16,21,23
  16:1 100:23
**inferring**
  108:18
**inflated**  23:24
  24:7

**influence**  8:14
  8:15 94:2
  105:16 123:23
  124:2
**information**
  17:8,24 18:3,6
  18:8,10,18
  20:11,18,21
  21:3,16 25:2
  26:5,21 35:6
  35:21 42:11
  48:11 68:25
  79:7 84:16
  85:11 89:14,17
  106:2,17
  109:17,23
**initial**  13:23
  14:6 24:11
  55:4 89:4
  91:23 108:17
**initially**  84:12
**insights**  47:22
**insists**  110:18
**inspect**  94:20
**instance**  24:8
  26:14 32:9
  40:24 48:12
  108:23
**instances**  48:15
  83:16
**intend**  12:11
**intense**  13:11
  59:13

**interest**  15:25
  20:20 32:9
  53:4,25
**interested**  5:20
  24:21 41:20
  50:16,19 51:2
  53:14,21 55:12
  55:13,18 56:5
  56:7 57:9 58:5
  58:7,10 88:23
  122:1
**interpret**  65:12
**interpretation**
  77:23
**interruption**
  38:1
**interval**  101:12
**intervention**
  38:3
**introduce**  7:3
  10:18 16:17
**intuitively**
  25:21
**inverse**  9:5
**invested**  27:20
**israeli**  33:22
  124:1
**issue**  12:22
  20:5 32:12
  108:24
**issued**  121:14
**issues**  15:7 20:3
  29:24 30:9
  48:1 51:16

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[items - liked]                                                Page 19

| | | | |
|---|---|---|---|
| **items** 11:17 | 78:20,20 90:9 | **known** 27:3 | **leading** 72:7 |
| **j** | 103:18 106:1 | **l** | 87:15 |
| | 121:17,20 | | **learn** 48:1 |
| **j** 4:10 | 122:17 123:6,8 | **lack** 15:25 48:5 | 53:25 122:3 |
| **jaffe** 4:11 | **kinds** 44:12 | 104:4 105:15 | **learned** 48:4 |
| **jaffe.com** 4:13 | **knocking** 44:10 | **lacking** 87:10 | 105:18 |
| 4:14 | **know** 7:17 11:7 | 87:11 | **learning** 39:25 |
| **january** 73:11 | 15:2 17:21 | **laid** 7:19 | 48:7 |
| 74:1,4,11,13 | 25:5,16,19 | **large** 44:6 64:2 | **leave** 10:4 |
| 75:3 76:13,17 | 33:6 37:19 | 86:18 99:19,22 | **leaving** 98:12 |
| 77:16 78:2,5 | 48:1 53:15 | 122:15 | **led** 29:22 61:22 |
| 78:13,22 | 62:20 63:4 | **largely** 114:1 | **left** 82:13 84:7 |
| **job** 99:20 | 65:7 74:15 | **larger** 70:9 | **legally** 8:19 |
| **jonathan** 1:13 | 75:15,23 78:17 | 113:4 116:14 | **legend** 71:2,16 |
| 2:15,23 3:1,8 | 78:19 79:1,1 | **largest** 106:21 | **legislation** 32:3 |
| 3:16 5:10 7:7 | 84:20 87:15,17 | 106:22 | **legislative** |
| 7:16 126:3,24 | 104:1,2,4,5 | **late** 32:7 93:14 | 31:11 |
| 127:6 | 105:23 106:3,8 | 101:9 103:17 | **legislature** |
| **joshua** 4:10 6:2 | 107:17 108:9 | 104:12 116:9 | 122:16 |
| **jpb** 1:8 5:14 | 108:10,11,12 | 116:13,18 | **length** 20:23 |
| **jprince** 4:13 | 108:15,20 | 117:3,13,14 | 21:5 |
| **judge** 10:15 | 112:18,19 | 118:9,18 | **lengthy** 13:3 |
| **jump** 49:24 | 119:5,11 | **law** 3:18,22 | **level** 18:21 |
| 50:15 51:15 | 123:17 | 4:16 6:7,25 | 25:11 26:22 |
| 57:1 58:19 | **knowable** | 14:17,23 24:24 | 53:25 61:22 |
| 72:23 91:8 | 106:15 | 38:18,19,22 | 67:13 70:19 |
| **jumping** 71:10 | **knowing** 26:6 | 61:11 111:6 | 117:21 118:4 |
| 100:9 | 105:10,22 | 120:15 124:11 | **levels** 30:21 |
| **june** 2:15 | **knowledge** | 124:12,16,19 | 61:4 68:8,15 |
| **k** | 19:17 26:21 | **lawsuit** 20:13 | 108:7 |
| | 48:5 78:25 | **lay** 99:20 | **license** 32:13 |
| **k** 4:12 | 84:15 89:6 | **laymen's** 121:1 | 87:10 |
| **kind** 33:16 38:3 | 105:15 | **lead** 94:17 | **liked** 32:23 |
| 48:9 49:1 72:2 | | 122:18 | 123:25 |
| 72:15 76:18 | | | |

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[likely - mail]                                          Page 20

**likely** 7:21 23:2
  23:4 53:20
  62:2,10 64:8
  64:18 72:21
  77:23 106:3
  108:11 109:5
  114:7 122:10
**likewise** 33:8
**limited** 79:6
**line** 20:23 21:5
  24:15 25:13,23
  29:5 51:7,8,12
  51:15,25 79:10
  80:14 82:15
  89:18 91:9
  106:19 121:4
  126:8
**lines** 20:7,11,18
**linked** 38:21
  123:19
**list** 18:14 30:1
  30:3 33:4
  34:24 40:20
**literature**
  48:14 62:1
  64:6
**little** 23:21
  24:15,20 46:6
  81:3 112:11
  123:22
**living** 53:19,22
**llc** 4:7,16
**llp** 3:5,18 4:11
  4:22 5:15

**location** 5:14
**locations** 20:12
  114:6
**log** 116:6
**logic** 107:1
**long** 11:18 17:9
  24:1 30:1 33:3
  46:4
**look** 18:25
  21:13 23:24
  26:12,13,14
  27:7 30:17
  32:3,5 37:17
  39:7 40:22
  42:6 44:3
  56:22 57:14
  58:24 59:9
  60:1 63:14
  64:22 71:21
  73:5 74:23
  76:3 77:4,7
  80:8 81:23
  86:4,7 87:19
  87:24 93:8
  94:14 97:8
  100:6 101:12
  102:14 104:7
  109:8 115:18
  116:5,7,18
  122:25
**looked** 59:25
  64:16 80:6
  85:23 86:21
  87:3,8 100:4

101:13
**looking** 14:24
  14:25 23:13
  24:2,6 26:25
  27:2 36:23
  39:4 40:19
  44:19 48:18
  52:1,7 56:3,20
  59:1,3,11 60:5
  65:8,8 70:11
  70:11,16 71:2
  73:14 75:15,16
  75:20 91:24
  95:9,16 103:6
  107:23 108:13
  109:9,13
  113:18 114:11
  114:19 117:3
  122:5
**looks** 40:9
  51:23 56:25
  57:6 65:1
  72:24 75:1
  77:4 88:11
  101:14 111:9
  123:5
**lot** 12:21 18:17
  25:2 30:20
  31:2 35:24
  36:3 41:13
  86:1 105:20
  108:11,11,20
**lots** 13:19
  14:16 26:2

27:19 29:1,1
  33:18 34:22
  35:21 44:8
  60:3 74:14
  104:3 110:14
**low** 25:22 64:5
**lower** 26:7
  50:23 80:18
  86:3 87:23
  93:1 94:4,17
  104:5 108:6
**luck** 16:22
**lunch** 120:2

**m**

**m** 1:20 3:7 4:21
  127:4,23
**macon** 4:15,17
  6:13
**made** 14:9 17:4
  24:12 28:12,22
  29:1 41:1 42:6
  42:18 60:23
  68:6,13,22
  87:17 94:18
  96:24 106:4
**magnify** 49:16
**magnifying**
  55:24 59:18
**mail** 22:25
  24:22 25:4,13
  25:25 26:3,7
  30:19,21,25
  31:2,3,4,5,8,12

Jonathan Rodden , Ph.D.                        August 12, 2025
Georgia Senate Bill 202, In Re

**[mail - mechanism]**                                    Page 21

31:15,18 32:10
32:11,12 35:15
35:23,24 61:12
61:13,23 62:10
62:13,24 63:1
63:4,9,18,25
64:4,17,19,20
64:23,24 65:4
65:15 66:19,20
67:4,9,12,16
68:1,5,8,13,15
70:21,24 71:6
71:8 72:8 73:1
73:15 74:3,3
74:12,13 76:4
76:14,16,19,25
77:20 79:20
80:8,17 81:6
81:13 82:14
85:13,24 86:1
86:5,8 89:4
91:25 97:19
98:7,9 99:7,13
100:10 101:7
101:23 102:2,9
102:15 116:10
117:4 118:10
118:24 119:10
**mailed**  26:1,2
**majority**  115:5
117:8,22
**make**  10:1 14:3
14:6,10 19:10
29:2 31:13

34:15 39:7
56:3 60:20
68:13,19 70:7
73:20 74:9
78:20 84:3
85:17 94:16
100:25 116:2,2
119:14
**makes**  15:19
35:1 44:1
94:11 116:7
**making**  9:14
26:3 51:5
81:23
**man**  94:19
**manipulation**
13:16
**map**  70:19
72:21
**marcos**  3:17
6:6 120:14
**margins**  2:20
16:8 55:20
**mark**  10:17
12:14 16:16
54:25 96:17,20
**marked**  2:25
10:22 12:16
16:19 46:25
47:4 55:1 58:1
83:7,13 84:2,9
84:14 85:7
97:2

**marker**  116:20
**markers**  113:4
117:22 118:8
**massachusetts**
3:18
**master**  1:7
**materials**  93:9
**math**  51:5
55:14 75:4
**mathematical**
94:23
**mathis**  4:22
**matter**  5:11
6:17 7:18,24
12:7,10 72:12
**mccarthy**  4:2
**mcdonald**
39:20,22 41:6
42:17 45:6
**mcdonald's**
42:21 43:2
**mcqueen**  2:4
3:17 6:5,6 8:6
10:21,23 11:2
16:20 37:8
44:22,24 45:25
46:6,11 47:2
55:5 59:13,19
62:15 75:6,11
79:8 81:18
96:22,25
100:13 102:23
103:3,5 115:9
115:16 119:16

120:11,13,14
124:22
**mean**  22:5,15
23:3 28:17
38:5 52:25
53:2 61:17
62:6 70:3 71:5
71:17 77:18
83:6 84:11,13
85:3 88:7
90:14,19,25
111:18 121:10
123:15 124:7
**meaning**  78:13
99:25 116:23
120:19
**means**  23:5
38:13 92:20
118:11
**meant**  21:7
83:7,9 88:12
112:8 121:19
**measure**  26:15
31:20,21,24
32:1,8,8,15,17
39:23 41:8
124:13
**measured**
60:16
**measuring**
42:12
**mechanism**
18:13 123:5,20

Jonathan Rodden , Ph.D.                     August 12, 2025
Georgia Senate Bill 202, In Re

**[media - needed]**                                    Page 22

**media** 5:9
33:13
**medicine** 24:8
**member** 122:19
**memory** 77:25
**mentally** 40:2
**mentioned** 12:9
18:23 22:3
29:4 31:1
38:23 39:12
**merely** 88:23
**merge** 18:16
19:3 26:21
**merged** 19:5,11
**merging** 18:24
**messaged**
59:18
**met** 11:18
12:21
**method** 30:15
35:12
**metni** 3:22 6:24
6:24
**metric** 23:10
25:17
**metro** 88:2
**meyer** 1:20 3:7
7:5 127:4,23
**mi** 1:8 5:14
**michael** 39:20
**microphones**
5:3
**midterm** 20:10
36:23 67:7,12

68:2,2 86:3
**millions** 16:14
90:12
**mind** 63:6 78:7
84:25
**mine** 40:12
**minute** 16:3
102:24
**minutes** 119:15
**miranda** 4:11
6:18
**missing** 87:12
87:12 115:15
**mix** 30:9
**mmcqueen**
3:20
**mobilization**
44:10
**mobilize** 27:20
**mocine** 2:4
3:17 6:5,6 8:6
10:21,23 11:2
16:20 37:8
44:22,24 45:25
46:6,11 47:2
55:5 59:13,19
62:15 75:6,11
79:8 81:18
96:22,25
100:13 102:23
103:3,5 115:9
115:16 119:16
120:11,13,14
124:22

**moment** 29:25
107:7
**moments** 48:20
123:17
**montgomery**
3:23
**month** 73:16
**months** 74:16
**moral** 48:21
49:1
**morning** 5:1
6:2,5,8,9,12,15
6:18,20,24
7:12,13
**motivated**
29:17 30:5
103:15,25
104:11,13
**motivation**
34:4
**mountain** 3:6
5:16
**move** 61:3
118:13
**moved** 73:15
**moves** 68:12
**moving** 38:2
65:10
**msherrill** 4:14
**multiple** 19:7,8
71:23
**mumbled** 75:12
**muscogee**
111:10

**mute** 5:5
**muted** 74:5

**n**

**n** 2:1
**n.e.** 4:7
**name** 5:16 6:2
6:6,9,12,15 7:5
7:15
**named** 39:20
127:7
**names** 70:21
**narrower** 37:4
**national** 43:13
43:17,20 52:5
52:5 53:1,9,12
**nationwide**
61:3
**natural** 116:6
**nature** 31:8
35:5 86:25
123:2
**nearly** 104:19
**necessarily**
94:17
**necessary** 13:1
**need** 8:25 9:25
10:3 24:6
52:11 55:23
59:18 76:18
116:18 121:17
124:6
**needed** 78:4,4

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[needs - okay]**                                              Page 23

needs 46:2
neighborhood
  114:4
netherlands
  122:22
nevada 45:17
never 83:16
  94:13
new 17:6,8,24
  21:11 46:12
  85:10
ngp 3:16 6:6
nine 77:15
nods 9:22
noland 4:16,16
  6:12,13
nolandlawfir...
  4:18
nominee 33:11
non 49:24
  50:22 51:13,21
  52:2 58:7,12
  58:22 59:4
  104:13 107:4
nonvoting
  15:17,25
normal 9:9
  67:3
normalcy
  77:14
northern 1:2
  5:12
noses 60:4

note 5:3 8:6
noted 96:24
notice 2:12 3:3
  11:8
noticed 8:9
  83:9
noticing 6:1
noting 19:6
  93:22
november 2:17
  2:19,22 71:13
  73:16,25 74:11
  74:12 75:3
  76:12,20,25
  77:15 78:2,10
  78:12,22 79:4
  82:18
number 5:13
  16:4,9 17:16
  21:13 32:13
  34:23 40:6,17
  41:2 44:6
  49:25 51:11
  64:12,24 65:21
  71:3 84:1
  86:17,18 89:23
  90:5 91:23,25
  93:22,23 95:12
  96:18 100:2,5
  101:22 104:22
  104:25 105:24
  109:21 110:23
  112:15,16
  113:7,12 116:1

116:6,23
  118:11 123:20
numbers 50:12
  66:6 77:8
  93:18 95:2,16
  100:5
numerator
  40:17 94:5
  95:7
numerous 88:4
  88:8
nw 3:18 4:12

**o**

o'clock 105:12
  110:5,8,12
  111:1,23
o0o 1:4 3:13
oath 5:18 7:3
  8:21
object 8:8 37:8
  75:6 79:16
objection 8:8
  55:5 62:15
  75:12 79:9
  96:23 97:1
objections 5:21
objects 10:6
obligated 8:20
  10:8
observational
  122:5,25
observations
  19:8

observed 64:12
  64:13,15
obvious 41:25
occur 74:22
occurred 34:21
  94:13,21
offer 12:11,11
offered 13:24
  79:22 109:16
  109:23 110:5,7
  110:8,24
offering 21:21
  60:9,12 110:11
  111:10
offices 3:5
okay 8:24 9:5,9
  10:24 11:14
  12:6 13:23
  18:23 21:24
  28:6 36:19
  45:12 50:9
  51:15,21 52:18
  56:1,11 57:12
  57:19,22,24
  58:19 59:4,5
  59:10 61:21
  67:25 70:15
  72:20 73:5
  80:22,23 81:11
  85:21 88:10
  89:23 91:6
  95:25 96:10,22
  97:17 98:16
  99:4 101:5

103:3,5 107:10
115:9,16
117:17,24
118:2 120:11
**once** 31:3 35:23
64:20 117:8
**one's** 48:6
**ones** 83:12 84:8
**open** 21:14
54:19
**opinion** 23:12
60:9,12 84:22
**opinions** 8:2
21:21 22:6
**opportunity**
30:25 84:12
**option** 63:1
115:21
**options** 118:20
**order** 10:14
**original** 96:21
**outcome** 5:20
28:20 38:7
84:13 106:25
**outlier** 72:17
**overall** 26:15
39:3 40:11
41:9 86:21
87:3 101:21
102:1,4,18
**overreported**
48:14
**overreporting**
48:5,16 49:2

**overwhelming**
115:5 117:8
**owing** 113:25
**own** 10:19
67:18 107:6,15
107:18 122:11

**p**

**p** 4:6
**p.m.** 21:14
111:14,15
119:19,20
124:25 125:3
**page** 2:2,11
22:23 36:6
44:18,20,22
47:1 55:3
61:21 63:14
68:17 70:16
72:23 74:23
80:14,20,22
81:17 83:3
87:24 88:15
91:8 92:11,25
93:3 96:9 97:4
97:9 100:12
101:1,7,16
103:2 104:16
106:18 107:3
109:8 112:10
115:13,23
126:8
**pages** 70:15

**palestinian**
33:22 124:1
**pandemic**
28:25 29:2
30:24 31:9
62:14,25 63:7
68:9
**paper** 52:11
**paragraph**
72:24 80:15,21
81:7 83:2,16
85:19,21 87:25
88:16 89:18
96:8,10 101:4
101:6,16 102:3
102:3,17,21,24
104:9 106:18
**paragraphs**
101:24 102:1
102:22
**parkway** 4:22
**part** 29:24
31:22 53:10
60:18 68:6
78:9 122:23,24
124:14
**participated**
76:10
**particular**
22:19 28:9,11
34:11 42:7
47:21 48:19
49:6 50:11
61:10 98:23

106:8
**particularly**
34:3,22
**parties** 5:7
122:18
**parts** 105:21
124:12
**party** 5:19 6:11
100:22,24
123:3
**passed** 24:24
**past** 21:14
28:21,23 30:19
87:18,21,23
**paying** 103:8
105:2
**peachtree** 4:7
**pending** 10:2,4
**people** 15:19
26:1,1,2,7 27:2
31:10 33:2
35:10,23 36:1
49:10 62:21,24
63:5,6,8 64:17
64:17,20 65:10
65:14,16 72:3
73:22 74:11
75:16,22,23
76:24 77:7,7
77:11,19,21
81:6,6 86:5,8
87:20 90:21,23
92:3,8 94:6
102:2,15

103:17 104:4,7
105:24 106:3,4
107:24 108:5,7
108:13,15,19
108:23 109:1,3
109:17 110:20
110:24 112:16
112:19,21
114:2,6
**people's** 31:12
31:14 124:20
**perceived**
62:11
**percent** 23:17
27:14 49:20,22
50:1,4,5,20,23
50:23 51:3,17
51:19,22,24
52:3,12,16
54:12,14 56:6
56:7,10,16,16
57:20 65:17,22
66:7,7,20,21
67:8,9,16,16
69:15,16,22,22
71:7,19 72:3
72:12 82:21,24
84:10,18 85:12
86:7 87:5,20
87:20 88:18
89:19,25 90:11
90:14 91:5,11
91:12,20 92:16
92:21 95:21

96:7,12 97:11
97:12,18,20
98:7 99:1,2
101:7,18 105:4
107:4,14 108:1
108:4 114:14
115:6 117:7,23
**percentage**
22:14,16 23:1
23:4,8,9,13,16
23:24,25 27:10
27:23 28:3,5
36:9,13,16
50:18 51:3,9
52:6,17 54:7
55:9,15 56:17
56:23 57:2,12
57:23 58:8,16
58:21 59:7
64:25 65:9,25
66:9,25 67:10
69:18,25 75:2
75:9 80:19,24
81:12 90:2
91:1,15 95:9
95:12,19,19,23
96:2,4,14 97:6
97:14,18,23
98:17 99:6,12
102:4 114:19
114:20 115:2
116:24 117:9
118:12

**percentages**
23:7,10 113:20
**perfectly** 24:2
**period** 17:12,14
20:8,9 69:1
79:11 102:11
102:12
**persist** 64:21
**persistence**
64:20
**person** 15:1,6
15:24 18:12
23:3 24:25
25:4,7 32:3
35:17 36:2
62:2,11 63:7
63:18,21 64:7
65:15,18 66:3
66:13,17 69:13
71:20 74:17
77:3,5 80:18
81:14 89:8
111:17 112:2
119:4
**person's** 15:17
15:24 25:3
**personally** 3:8
**persons** 40:2
**persuaded**
54:19
**ph.d.** 1:13 2:15
2:23 3:1,8,16
7:7 126:3,24
127:6

**phones** 5:5
**phrase** 8:8
34:16 35:11
70:6 107:17
**pick** 5:4 33:10
**place** 5:7 44:11
72:22 73:8
74:1 85:17
105:11 106:5
106:10 114:7
127:9,11,16
**places** 21:14
113:4,6 116:11
116:12 118:17
**plaintiffs** 3:16
3:21 4:1 6:7,11
7:1 12:7 84:5
**plausible** 53:11
**please** 5:3,5,21
7:3,15 99:10
**pllc** 4:2
**plotting** 63:17
**point** 22:14,16
22:25 23:9,13
27:23 28:3,5
36:13 46:1,2
50:3 51:3,9
52:17 55:9,15
56:17,23 57:2
57:12,23 58:8
58:16,21 60:20
63:10 66:10
69:19 70:1
71:23 72:8

Jonathan Rodden , Ph.D.                          August 12, 2025
Georgia Senate Bill 202, In Re

75:2,9 80:24
81:12 90:2
91:16 95:9,12
96:2,4,14 97:6
97:14,23 99:6
99:12 114:19
115:2 116:24
117:9
**points**  23:1,4
23:24 27:10
28:17 36:9,16
50:23 59:7
65:25 66:25
67:10 80:19
95:19 102:4
114:20
**policies**  41:22
68:6,14
**policy**  41:4,8
42:3,4 43:19
**poling**  21:13
**politics**  27:17
**polling**  48:15
105:11 106:5
106:10 114:6,7
**popular**  33:13
**popularity**
69:13
**population**
39:8,24 40:5,6
40:20 41:5,11
41:16,18,24
42:8,15 45:6
47:13 51:5

113:13 116:2
116:16,20
**positioning**
116:19
**positive**  118:10
**possibilities**
34:3
**possibility**
20:20
**possible**  10:20
13:15,21 17:5
18:5,8 20:17
23:23 29:16,19
29:20 30:1,4
32:22 33:4,4
33:17,18,19
34:1,11,17
37:17 38:13,16
42:1 47:8 61:7
62:13,22 72:2
79:6 84:17,22
85:8 87:18
89:1,5,7,7
103:13,17,22
112:4 119:2,3
123:23 124:3
**potentially**
32:20 109:11
**poverty**  3:22
6:25
**power**  94:19
**powering**
115:10

**practice**  18:25
**pre**  38:5
**preceding**
35:21 36:5
80:5
**precinct**  70:19
71:5,25 104:15
106:10 107:15
108:16,19
109:2,16,18,22
109:24 110:4,6
110:10,11
111:1,5,8,10
112:1,7 114:1
114:3,8
**precincts**  71:14
71:18,24 72:10
72:11,18 80:16
107:6,18 114:6
121:15,16
**precise**  17:16
**predict**  44:8
**prefer**  63:7
**preference**  24:4
**preferred**
32:10
**prematurely**
59:25
**prepandemic**
67:3 68:2
**prepare**  11:11
11:22
**prepared**  12:1

**preparing**
11:25 17:25
19:14 20:2
**presence**  38:4
54:20
**present**  4:25
5:23 24:9
26:16 127:7
**presented**  8:3
53:3 71:13
**presidency**
28:18
**president**  30:6
32:23 33:11,21
34:18 54:8,9
**presidential**
36:19 44:7
74:8
**prevented**
103:10
**previous**  18:2
73:16 80:1,9
93:7
**previously**
21:10
**prince**  2:3 4:10
6:2,3 7:10,11
8:12 10:17
11:1,3 12:14
12:17 16:16,22
16:23 37:14
44:23 45:11
46:8,19 47:3,5
55:2,7,8 58:2

Jonathan Rodden , Ph.D.                                August 12, 2025
Georgia Senate Bill 202, In Re

59:16,21 63:13
75:8 76:1
79:18,23 81:22
82:6 96:17,20
96:23 97:3
100:16 103:1,4
103:12 115:8
115:13,17
119:13,23
120:10 124:24
**print** 47:2
**prior** 73:17
**priors** 54:21
**prison** 40:1
**prisoners** 40:1
**private** 5:4
**probably** 30:22
31:21 44:14,25
62:25 113:23
119:13 124:18
**problem** 47:25
55:7 60:2 85:3
85:9 87:11
112:2,5,13
114:1,9,11
**problems** 48:4
**procedure**
118:25
**proceed** 7:4
**proceeding**
5:21
**proceedings**
127:16,17

**process** 18:23
19:6 26:4
28:25 41:2
76:18 77:20
85:2 89:15
119:4
**produced** 3:8
**professional**
121:3
**professor** 39:22
41:6 45:6
**profile** 29:8
**program** 19:2
**prompted** 17:2
**pronounced**
34:3 51:11
**proportional**
122:14,24
**prospects**
20:14
**provide** 18:3
19:11 25:2
27:5 106:1
**provided** 21:17
84:15 89:6
109:14,24
**provides** 47:22
60:14
**provision**
111:12 120:20
**provisional**
89:2 104:19,23
105:1,2,5,6,7
105:20 106:21

107:25 108:3,8
108:13,23
109:16,19,22
109:24 110:4,7
110:8,18,25
111:6,13 112:7
112:14,20,22
113:1,7,12,21
113:24 114:13
114:17,22
**provisionally**
107:4,23,24
108:2,6,14
109:4
**pst** 3:5
**public** 77:25
**publications**
24:8
**published** 9:12
**pure** 41:8 94:23
**purely** 18:4
63:6 68:19
100:21
**purple** 45:8
**purpose** 38:20
**purposes** 41:15
42:6
**pursuant** 3:3
**put** 21:9 45:23
47:16
**putting** 39:18
68:20

## q

**quality** 86:19
86:22
**quantify** 25:11
25:17 31:14,16
31:17,18 34:10
**question** 9:2,6
9:19 10:3,4,6,8
14:2 23:21
25:16 35:11
37:10 39:3,5,6
40:13 42:13
49:8,13 52:21
53:14,17 65:14
70:12 73:20,23
74:8 78:11
82:7 94:10,22
98:12 99:10
100:14 101:10
103:20,21
105:21 106:7
107:2,10,12
108:18 111:20
117:5 118:5
119:12 123:12
124:5,6
**questions** 8:1
8:16,20,25
9:15,21 10:12
22:6 46:22
79:10 82:10
84:6 119:25
120:5,6,7,9,12

Jonathan Rodden , Ph.D.                                    August 12, 2025
Georgia Senate Bill 202, In Re

120:25
**quick** 119:14
120:12
**quickly** 10:19
120:15
**quite** 16:5
72:10 76:20
93:4 105:20

**r**

**rabbit** 25:6
**race** 18:5,7
26:17,20 32:25
40:13 41:13,25
60:14 63:20
68:24 91:10
100:21 105:6
**races** 43:4 61:5
**racial** 34:12
37:13 41:14
43:14 54:23
60:19,21 69:2
98:23 99:8,14
115:6
**randomized**
121:11,15
**randomly**
123:7
**range** 13:14
68:11
**ranked** 45:21
**rate** 17:21,23
51:2 53:11
60:10 66:16

70:4 76:13
86:6 87:23
93:1,13 94:2,4
94:14,14,17
95:4,6 96:12
97:10,11 99:7
99:13 100:17
100:18,20
101:11,14
104:5
**rates** 26:7 64:4
66:3 78:18
80:17 93:6
102:13 115:18
118:14,15
**rather** 13:11
17:12 39:5
67:18 121:21
**raw** 23:13
93:22 100:4
**reached** 20:15
**reacting** 29:25
**read** 12:1,3
19:22 52:12
67:18 81:2
82:23 107:7,10
117:1 124:6
126:4
**reader** 68:20
**reading** 36:7
58:20 59:15
65:25 73:2
89:21 91:13
96:7 101:19

114:15
**reads** 80:15
**real** 123:7
**really** 17:11
27:17 28:19
32:10 34:6,25
40:11 48:4
59:14 62:20
76:8 81:9
99:17,17
111:20 112:8
**realtime** 20:8
**reason** 9:25
34:11 35:8
38:14 42:13,18
49:13 78:11
83:20 84:21
86:10,13,14
92:24 93:12
103:8,24 104:2
109:5 111:23
111:24 121:20
123:7
**reasons** 2:16,18
2:21 24:3 33:2
41:24 49:8
60:6,9 61:9
86:19 87:15
103:15 104:3
107:25
**reassemble**
122:7
**recall** 17:11
19:19 20:1,5

80:3 83:23
93:5
**receive** 31:25
**received** 11:9
79:5 82:25
83:8 107:20
118:23 119:8
**receiving** 25:12
112:21
**recent** 13:12
16:25 36:15
64:3 80:16
**recitation**
107:13
**recognize** 11:4
**recollection**
76:21
**record** 5:2,8,25
7:15 46:13,17
66:6 79:9
81:25 82:4
87:22 119:17
119:21
**recorded** 5:10
9:10 15:14
83:18 91:10
106:17
**recording** 5:6
**red** 45:10
**reduction** 31:5
64:2 77:5
**reductions**
112:25 113:6

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[refer - report]**                                    Page 29

**refer**  44:3 80:7
   83:3,15
**reference**  23:16
**referred**  13:18
**referring**  35:12
   83:14 101:21
**reflect**  66:9
   69:25
**reflected**  69:5
**reflection**  22:1
   22:9
**reflects**  72:5
   93:25 113:13
**regarding**  13:1
   79:10 108:24
**regardless**
   84:13 99:5,11
   115:5
**register**  41:1
**registered**
   18:15 26:25
   40:6,8,21,22
   41:2 42:6 73:1
   102:7 107:14
   109:7 111:19
   112:2 113:9,20
**registrars**  4:19
   4:20 6:22,23
**registration**
   40:23 41:22
   42:4 48:6
   108:25 112:1
**regretting**
   59:14

**reject**  111:13
**rejected**  14:25
   15:2,14,22
   16:5,12 26:6
   82:14,17 83:8
   83:13,18,25
   84:3,9,11,11,13
   84:15,18 85:8
   85:14 86:11
   87:6 88:17,22
   89:2,12,20,24
   90:14,21 91:4
   91:11,20 92:1
   92:4,9,10,13
   93:14,19 94:9
   94:15,24,25
   95:13,22,24
   96:6,11 97:7,8
   97:10,11,19
   98:3,17 100:2
   101:8 104:8
   105:2 109:25
   110:15 111:11
   116:9,13,18,23
   116:25 117:3
   117:13,14
   118:9,12,18
**rejecting**
   111:22
**rejection**  15:6
   15:18 86:6,13
   86:14,19 87:15
   87:16,23 89:4
   93:1,6 94:2

   100:17,18,20
   111:25 118:14
   118:15
**rejections**  16:3
   83:3,6 86:21
   87:3 88:1,4,7
   88:12,13 91:24
   93:22 98:13
   99:8,14 100:10
   120:24
**relate**  38:19
**related**  5:19
   12:4 22:1,2,6
   40:1,2 41:22
   61:11 69:12
   79:15 120:23
**relationship**
   120:22 123:13
**relationships**
   121:23
**relative**  28:23
   30:18 35:17,17
   50:13 61:17
**relatively**  88:2
   122:8
**relevant**  36:3
   79:21 80:12
   107:8
**remainder**
   14:17
**remember**  7:21
   12:23,25 13:4
   13:4 14:1
   17:17 20:3

   39:11 43:4
   44:19 61:23
   76:21 78:1
   86:17 87:14
**remembered**
   3:3
**remotely**  5:24
**removing**
   68:14
**repeat**  9:2 14:2
   34:14 52:21
   73:19,23 95:20
   99:10 102:13
   104:5
**repeated**  9:1
**repeatedly**
   121:12
**rephrase**  43:12
**replication**
   93:9
**report**  2:13,14
   2:23 8:10
   11:13,17 12:3
   12:4,5,15,19
   14:6,11,13,17
   15:7 16:18,25
   17:3,7,10,19,25
   18:2,22 19:9
   19:15,18,20,24
   19:25 20:2,22
   20:24 21:2,6
   21:11,19,20,25
   22:8,12,20
   24:13 26:11

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

[report - rodden's]                                   Page 30

31:19 32:15
35:1,4 36:7,23
38:10,20,24
43:1,7 44:17
44:20,21 50:11
54:12,14 60:8
60:14,23 61:21
63:15 66:19
67:7 69:14
70:16 72:24
76:7 79:19,22
86:10 88:21
92:11 93:1,13
95:21,23 96:7
96:21 97:4,18
99:2 100:7,8,9
101:7 104:17
104:18 105:3,9
106:1 112:10
115:18 123:17
123:21 127:15
**report's**  16:2
**reported**  1:19
43:14 50:19
51:1,18 52:22
55:10,12,17
57:4 58:23
60:6,7 93:6
97:9 115:19
**reporter**  3:7
7:2,5 9:13
96:19 127:4,12
**reporter's**
127:1

**reporting**  20:7
47:25
**reports**  8:3
12:1,10 13:23
17:5 20:14
24:11 93:7
**represent**  6:6
6:13,16 67:20
**representation**
60:11 67:24
122:14
**representing**
5:17 6:3,8,10
**republican**
6:10
**requested**  78:6
78:15 127:19
**requesting**  26:5
**require**  15:16
15:23 111:13
**required**  26:4
76:17
**requirements**
26:9 31:7
**requires**  9:21
30:23
**reread**  11:13
**research**  33:14
**reserve**  13:20
**reserving**  13:13
121:5
**resources**
27:19

**respect**  72:11
**respond**  79:18
**responded**
49:11
**responding**
14:5
**response**  2:13
17:6 29:21
30:6 41:3 53:1
56:13,13 124:9
**responses**
48:13 53:17
84:7 86:16,18
86:24 87:1,9
87:12,13
**responsible**
37:21
**responsive**  41:7
**rest**  53:18
**restate**  60:13
**result**  25:10
44:7
**results**  40:12
40:14
**return**  30:21
77:14
**returned**  94:1
95:22,24
**review**  20:1
127:18
**reviewed**  12:9
38:23 44:19
**right**  8:22
16:21 27:16,24

35:4 36:11,17
45:3 50:15
54:17 56:15
57:14,21 58:11
58:14,17,24
59:9 66:4 67:6
70:25 71:3
75:1 82:25
85:17 91:13
92:2,14,19
93:20 94:3
95:5 96:15
97:12 104:20
107:5 108:9
113:22 115:4
116:17 118:13
124:22
**rigor**  13:1
**risen**  36:12
65:21
**risky**  62:12
**riverside**  4:17
**rnc**  4:1 120:6,8
**road**  4:7
**rodden**  1:13
2:15,23 3:1,8
3:16 5:10 6:8
7:7,12,16 8:10
8:13 11:4 46:1
46:20 47:6
119:24 120:16
126:3,24 127:6
**rodden's**  79:19

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**role** 74:19
 111:5
**rolled** 78:13
**rollover** 78:18
**roughly** 92:16
**rule** 8:24
**ruler** 52:10
**rules** 7:19 40:1
 40:2,3
**run** 64:18
**runoff** 64:1
 73:6,8,11,15
 74:1,15,21
 77:1,11,21
 78:5,8 79:5,10
 98:18,19
**runs** 29:6
**rural** 72:22
 114:2

**s**

**s** 2:10 18:20
**safe** 29:2
**safer** 31:10
**salt** 48:8
**sample** 47:24
 90:7
**sampling** 90:9
**saw** 30:20,22
 47:8 55:4
 64:17 69:4,9
 71:7,19 72:5
 72:12 81:12
 86:9 112:25

113:20 115:2,6
 116:23 117:9
 118:19
**saying** 29:6
 79:19 91:2
**says** 49:17
 50:16 51:16
 56:4 57:9
 67:22 83:16
 91:9
**sb** 14:22
**sb202** 14:18
 24:14,16 25:10
 31:6,15 36:21
 37:7,20 38:11
 38:15 42:3
 52:20,24 60:17
 61:22 63:3,12
 65:3 66:17
 73:9,18 74:2
 74:19,20 87:7
 98:4 106:16
 110:1 111:12
 112:21 120:16
 120:21 121:14
 124:4,8,10
**sb202's** 74:5
**scenarios** 78:23
**schaerr** 4:11,13
 4:14
**scholars** 122:8
 122:12
**sciences** 13:12

**scientific** 24:7
**scientist** 13:6
**scientist's** 13:8
**scientists** 13:19
 121:7,10,18,23
 123:9
**scope** 8:7 37:8
 55:5 79:9,12
 79:16 97:1
**seats** 122:16
**second** 7:17
 8:24 22:24
 82:15 83:2
 95:3 101:4
**secretary** 18:10
 25:14 40:18
 83:8
**section** 22:24
 26:13 81:16
 82:16 88:8,16
 102:25
**see** 7:14 30:18
 31:5 38:1,2
 43:23 44:11,12
 49:17,22 50:1
 50:16,24 51:17
 53:16,18 54:17
 57:2,6,8 58:8
 58:15,21 59:2
 59:6 64:19
 65:18 66:21
 67:17 68:24
 69:23 71:3,11
 72:21 73:6

74:11 77:4,5,7
 77:14,16 78:22
 80:19 83:3
 86:6 87:19
 88:5,11,19
 97:20 98:21
 101:13 105:19
 106:23 109:3
 110:4 113:5,8
 114:23 115:14
 116:17 117:6
 123:1,18
**seeing** 52:2
 68:10 113:3
**seek** 24:25
**seem** 24:10
 55:18 64:21
 114:24
**seems** 15:3,5
 22:4 24:19
 25:8,8 36:3
 54:17 77:12
 94:13 110:23
 112:3
**seen** 33:6,14,16
 33:24 43:22
 47:6 62:23
**sees** 33:13
**selected** 2:17
 2:19,21
**self** 18:7 26:20
 27:1,4 43:14
**senate** 1:7 7:24
 13:25 14:7,11

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[senate - small]**                                        Page 32

28:19 29:5,6,8
43:3,10
**senator** 29:13
29:13,16
**sense** 40:4 42:6
113:16 121:2,3
122:8 123:4
**sensible** 35:14
**sensitive** 5:4
**sent** 83:11,17
84:1,2 87:19
87:22 89:2
90:23 92:13
98:11 116:10
117:4
**sentence** 72:25
83:15
**separate** 68:22
**series** 18:9
37:25 38:1
**serious** 47:25
**set** 32:14 40:15
42:21 83:10
92:12
**sets** 18:24
19:11 39:17
**settings** 13:14
13:21 49:4
**seven** 45:20,22
**several** 30:12
36:1 45:17
99:23 120:20
**shape** 14:16,24
30:2 61:1

**shaped** 29:23
42:5
**shapes** 29:11
**share** 10:25
27:2 28:4 39:8
63:19 68:1,23
68:25 70:22,24
71:6,12,15
87:13 90:21
91:3 110:15
114:13,17,21
116:10,17
117:4,15
118:10 122:17
**shares** 113:9
**sharpest**
114:12
**shaw** 2:13 12:3
15:19 38:25
39:2,16,19
42:18 43:25
53:2
**shaw's** 12:15
12:19 38:23
42:14 44:16,20
92:25 93:9
**sherrill** 4:11
6:18,19
**shift** 63:8
**short** 93:11
**shorthand** 3:7
127:4,11,12
**shortly** 64:25

**show** 23:11
37:3,5 55:14
60:17 67:2
68:18 74:4
76:11 100:8
105:4 113:11
114:3,7 116:15
**showed** 53:3
105:10,12
**showing** 41:18
86:4 112:19
113:25 116:11
118:4
**shown** 111:20
**shows** 45:19,21
63:16,21,25
70:17 112:12
115:24
**side** 33:21
55:21 92:20
**signature** 126:1
127:23
**significant** 26:8
53:6 69:4,9
90:5
**significantly**
93:23
**similar** 30:20
33:19 53:3
56:11 68:11,15
71:13 86:9
91:15
**similarly** 67:15
97:17

**simpler** 23:21
**simply** 14:14
30:23 54:6
103:14 106:8
**single** 122:19
**sir** 10:21 11:2
**sitting** 87:4
**situation** 24:22
24:25 48:18
121:13,20
**situations**
24:18 26:1,3
30:24 48:8
122:1
**six** 45:20 93:15
114:14,20
**size** 72:12
113:11 116:19
116:20
**skewed** 116:4,5
**slightly** 28:3
49:25 51:22
52:4 68:10
70:4 86:6
94:22 103:21
**small** 13:14
16:6,8,9,10
23:23 24:10
31:22 47:2
53:10 65:1,3
67:14 72:10
76:12 91:25
99:9,15,19,21
113:17,21

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[small - study]**                                                      Page 33

114:23,24
**smaller** 50:4
  60:10 85:25
  86:7 93:24
  94:4 102:14
**snafu** 103:10
**social** 13:6,12
  13:19 121:7,10
  121:17,23
  123:9
**software** 19:2
**solve** 85:9
**someone's**
  15:13 107:22
**sorry** 27:25
  44:20 51:5
  52:10,21 55:6
  55:22 57:9
  67:17 70:18
  73:19 75:11
  80:25 84:24
  85:16 90:19
  95:15 111:18
**sort** 27:16
  43:20 76:6
  84:7 119:3
  122:13
**sought** 82:24
**sound** 58:17
**sounds** 25:21
  36:11 92:19
  119:16
**southern** 3:22
  6:25

**speak** 46:3
**speaking**
  102:24
**specific** 22:19
  34:8 60:15
  70:12 93:12
  107:19
**specifically**
  19:19 43:16
  79:19 104:7
**specified** 25:1
  83:11 127:9
**speculate** 37:16
**speculation**
  62:20
**spent** 12:21
  62:8
**spike** 61:18
**spin** 34:22
**spirit** 124:9
**spoke** 11:16
**spot** 16:21
  22:20
**spots** 123:21
**spreadsheets**
  81:23
**staff** 89:11
**standard** 13:18
  15:11 94:8
**standards** 13:7
  94:7
**standing** 10:14
**start** 14:14
  28:10 35:23

58:4 98:25
  121:18 123:5
**started** 7:18
  18:1 24:14
  37:21 66:2
**starting** 57:16
  70:16 101:25
  101:25
**starts** 63:20,22
**state** 4:5 5:11
  5:21,24 6:3,16
  6:19 7:15 16:7
  18:10 25:14
  27:19 35:10
  39:25 40:18
  41:19 42:9
  53:16,19,22
  61:10 65:11
  66:14 67:4
  69:10 71:18
  83:8 92:18,21
  105:21 120:4
  127:5,12,24
**stated** 60:13
  123:14
**states** 1:1 5:12
  25:24 30:20
  31:2 41:10
  43:3,7,24 44:3
  44:4,5,8,12,13
  45:7,8,13,17,21
  45:22 48:19,20
  49:21 55:16
  61:18,21 62:7

64:12
**statistically**
  53:6 90:5
**statistics** 50:8
  76:9,11
**status** 48:6
  108:25
**stay** 62:2 64:8
**stenographic...**
  1:19
**stickiness**
  35:25
**sticking** 27:7
**stop** 93:11
**stopped** 70:3
**stories** 34:23
**street** 3:6 4:12
  5:15
**strike** 91:6
  107:2
**striking** 88:3
**strong** 15:18
  23:12 24:4
  30:7 48:22
  122:8 123:2,4
**stronger** 48:24
**structure** 14:13
  31:7 114:5
**struggling** 74:9
**studied** 49:5
**study** 62:22
  121:24 122:9
  122:12

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[stutter - talk]**                                    Page 34

stutter 50:8
style 122:14,23
subject 8:14
subjects 123:22
submission
  102:10
submit 32:5
  85:10
submits 32:3
  85:7
submitted 8:4
  85:1 92:8,17
  93:14 94:3
  95:3,4 101:17
  102:11
subpart 82:14
subscribed
  127:20
substance 8:14
substantial
  87:13 114:25
subtract 23:22
subtracting
  23:8
successfully
  85:13,24
suggest 35:22
  38:10 62:1
  74:6 104:14
suggestive
  106:19
suggests 64:7
suite 3:18 4:3,8
  4:12,17,22

summary 22:23
  118:4
superiority
  23:13
supermajority
  66:12
supplement
  47:14
supplemental
  8:10 12:15
  14:11 16:17
  17:3,25 19:15
  21:24 22:12
  36:7 44:17
  63:15 79:13,22
  92:25 104:18
supplementary
  2:14
supplied 18:7
  21:4
supply 18:20
supposed 110:3
  110:10
sure 10:1 14:3
  14:4 15:13,15
  16:8 19:10
  22:21 23:23
  33:18 34:6,15
  34:16 52:22
  55:7,25 56:3
  60:8 62:24
  69:3 70:7
  73:20 74:9,18
  84:3 85:17

93:4,4 94:16
  95:6,18,21
  98:14 99:11
  100:8,25 101:2
  105:3,8 107:9
  118:24
surprise 48:25
  62:17 78:25
  79:3 119:2
surprising 31:6
  72:2
surrounding
  113:5
survey 18:20
  18:21 47:13,22
  48:13 53:1
  56:24 58:3
  62:21 109:15
surveys 48:3
suspect 19:20
  20:3 62:19
  65:15
swing 27:18
  44:3
switch 65:14
  77:22 119:4
switched 74:16
  77:12
switches 24:24
switching
  119:1
sworn 3:10 7:8
  127:7

system 122:14
  122:17,18,20
  122:24,25
  123:3,3
systems 122:12

**t**

t 2:10
table 2:16,18
  2:20 53:23
  55:19 56:2
  67:23 70:24
  109:8,12
  110:15 117:1
tabulation
  114:5
take 5:7 9:6
  10:1,2 17:9
  19:9 23:15,22
  46:8 48:7
  115:25 116:5
  122:20,22
taken 46:15
  82:2 102:22
  119:19 127:10
  127:11
takes 25:3
  44:11
talk 10:12
  61:12 82:9
  92:7 112:11
  115:23 117:25
  117:25 119:25

| | | | |
|---|---|---|---|
| **talked** 21:5 | 113:24 | 86:24 110:20 | 115:20 |
| 30:12 32:18 | **thank** 7:10 8:11 | 122:3 123:6,18 | **throwing** |
| 35:7 61:16 | 10:21 11:2 | 123:23 124:3,8 | 121:18 |
| **talking** 62:8 | 50:7 59:12 | 124:10,16 | **time** 5:6,22 |
| 99:23 117:13 | 75:12 79:17 | **think** 14:15,25 | 9:25 12:22 |
| **talks** 79:19 | 88:13 96:25 | 15:22,25 23:20 | 13:10 17:16 |
| **team** 6:25 | 100:13 103:5 | 24:1,5,6,8 25:4 | 23:11 32:12 |
| **technique** | 104:21 | 26:8 28:14,23 | 37:25 38:1 |
| 25:20 | **thankfully** | 29:23 30:1,1 | 40:24 41:2,19 |
| **television** 44:9 | 46:25 | 31:16,17 33:1 | 42:8 44:8 |
| **tell** 53:1 63:15 | **theory** 53:9 | 33:1 35:20 | 48:20 49:4 |
| 70:17 78:11 | 119:7 | 42:10,16 44:13 | 59:20 62:7,8 |
| 79:1 89:12 | **thing** 13:2,2,8 | 45:10 48:17,18 | 65:13 75:19 |
| 95:16 109:9 | 19:5 23:22 | 49:13 55:21,23 | 77:10,22 81:19 |
| **telling** 65:12 | 32:14 42:9 | 57:6,21 60:3 | 86:20 94:11 |
| 90:20 108:5 | 43:1,20 48:9 | 60:23 61:6,15 | 120:5,9 123:9 |
| 109:15 | 76:6 84:7 86:9 | 64:15 65:7,7 | 124:25 127:8 |
| **tells** 18:12,14 | 108:12 110:16 | 68:9 70:12,13 | 127:11 |
| 26:19,22 47:14 | 111:21 112:18 | 76:15,15 77:18 | **times** 21:6,7 |
| **ten** 96:19 | 113:23 117:19 | 77:18,24 78:23 | 24:13 93:15 |
| **tend** 35:23 | 121:17 122:4,9 | 79:3 80:6,10 | 120:20 |
| **term** 14:22 | 122:10,10,13 | 81:21 83:20 | **tiny** 70:9 |
| **terms** 16:5 | 123:8 | 84:21 85:2,6 | **tip** 31:22 |
| 22:13 34:16 | **things** 14:16 | 86:17 100:7,7 | **titled** 82:14 |
| 35:15 41:17 | 29:11 30:2 | 104:12 106:12 | **today** 7:23 8:17 |
| 92:10 93:18 | 31:8,19,20,21 | 108:17,21,22 | 10:19 12:20 |
| 99:9,16 | 32:7,15,17,18 | 109:10 119:13 | 20:2 46:22 |
| **testified** 7:9 | 32:20 33:2,18 | 121:8 124:6 | 120:1 |
| 64:6 97:5 | 34:22,24 35:22 | **third** 9:9 72:25 | **today's** 11:11 |
| **testimony** | 38:21 39:25 | **thought** 93:21 | 125:1 |
| 124:14 125:1 | 43:15,23,25 | **thousand** 93:19 | **together** 18:16 |
| 126:6 | 47:14 48:3 | 116:3,12 | 19:3,5 39:18 |
| **text** 85:18 | 56:20 72:2 | **three** 8:3 30:18 | 119:15 |
| 107:8 112:24 | 74:14 78:1 | 45:20,24 71:25 | |

Jonathan Rodden , Ph.D.
Georgia Senate Bill 202, In Re

August 12, 2025

| | | | |
|---|---|---|---|
| **told** 50:6 59:18 107:21 110:19 | 38:4,5,9,17 63:21 124:8 | 101:15 111:3,4 112:13 117:25 | 118:19 120:23 124:3,10,14,17 |
| **took** 73:8 74:1 127:16 | **trending** 38:7 | **tuesday** 1:14 | **two** 11:20 23:6 27:5 28:3 29:8 |
| **top** 51:7 80:22 91:8 | **trends** 43:13,17 43:21,21 44:2 44:12 53:12 102:18 | **turn** 16:2 23:2 30:5 32:19 36:6 44:16 68:17 70:15 80:14 81:16 82:14 88:15 97:4 104:16 112:10 117:24 | 31:8 39:17 41:24 45:20 50:3 61:19 74:24 85:12 86:6 87:5 96:2 99:24,25 104:12 106:14 115:1,6 117:9 117:23 |
| **topic** 21:12,19 88:8 | | | |
| **topics** 19:23 21:22 | | | |
| **torres** 4:21 6:20,20 | **tried** 63:2 101:22 102:19 112:16 | | |
| **total** 49:20 50:18 51:4,17 95:12 | **tries** 60:17 85:1 | | |
| | **true** 16:24 62:19 63:23 76:2 126:5 127:14 | **turned** 105:11 105:24 106:5,9 112:17 | **type** 109:19 |
| | | | **types** 121:23 |
| **transcribed** 9:11,20 127:13 | | **turnout** 14:1,8 14:12,14,16 18:4 26:10,13 26:15,17 27:5 29:9,12,22,23 30:2 35:6 36:8 36:20,24 37:4 37:6,13 38:11 38:14,17,25 39:3,4,10,14,14 40:11,12 41:9 41:17,19,21 42:8,12 43:3,6 43:13,21 44:2 45:13,22 48:12 60:14,16,20,22 61:1,2,7,9 80:17 86:3 91:1 106:22 108:7 118:16 | **typewriting** 127:13 |
| **transcript** 9:13 127:14,18 | **trump** 29:21 54:8 | | **tyson** 4:6 6:15 6:16 |
| **transcription** 9:14 126:5 | **trump's** 30:6 | | |
| **transition** 70:7 70:8 | **trust** 16:20 41:5 | | **u** |
| **transmitted** 93:24 112:6 118:10 | **truthfully** 8:16 8:20 | | **u.s.** 51:5 122:19 |
| | **try** 8:1 19:9 25:11 29:2 31:17,18 33:1 53:24 56:3 64:21 75:4 105:17,17 109:12 124:11 | | **ultimate** 89:19 90:25 |
| **treated** 32:24 34:19 | | | **ultimately** 88:25 90:22 91:4 111:2,11 111:18,19 112:22 |
| **treatment** 16:3 121:16 | | | |
| **treatments** 121:12 | **trying** 32:16 34:10 37:25 39:23 73:20 77:6 78:23 80:12 87:2 | | **unable** 102:20 |
| **trend** 37:6,12 37:21,23 38:2 | | | **unaware** 20:12 20:19 |
| | | | **unclear** 48:17 |

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[under - view]**                                          Page 37

**under** 8:13
22:24 94:9
**undersigned**
126:3
**understand**
7:22 8:2,4,19
8:25 9:3 10:9
10:11 14:3
15:13 34:15
37:25 42:2
48:12 56:4
60:8 70:23
73:21 74:9
77:6 93:10
95:14 101:15
110:2 111:3,4
111:7 119:12
**understanding**
41:20 43:9
48:13 64:9,11
72:9 73:10
74:18 78:3
111:22 124:13
**understands**
24:1,5
**understood** 9:6
90:11 123:15
**unfairly** 32:24
34:19
**unfortunately**
41:16 62:20
86:14 106:15
107:18

**uninterested**
15:20 52:19,23
54:6
**unique** 19:1
28:7 30:13
32:19 64:10
103:18
**uniquely**
103:18 104:13
**uniqueness**
30:13 35:7
62:9
**unit** 5:9
**united** 1:1 5:12
45:8,13 49:21
55:16
**universal** 25:25
**universe** 84:17
90:8
**university**
39:21
**unmotivated**
103:19
**unregistered**
42:5
**unrelated**
38:17
**unsolicited**
24:23
**unusual** 110:20
**update** 19:24
**upward** 37:12
63:21

**upwards** 38:2
**urban** 88:5
113:4 114:1,4
114:9,10
**use** 13:13,20
14:21 19:2
22:22 23:10
25:9 26:3 36:1
41:23 43:2
48:10 53:24
63:18 80:4
84:24 120:24
121:3,6,8,10
123:11
**used** 42:21,24
61:14,17 74:4
75:18 76:10
115:19
**useful** 22:19
41:16,23 42:10
74:10
**usefully** 18:15
**uses** 39:12
**using** 36:4
40:14,25 41:11
42:7 56:24
92:12 121:21
**usually** 31:4
121:10

**v**

**v** 18:20
**valid** 24:3
26:23 75:17

81:8 88:25
101:18 102:8
103:7,9
**validate** 48:3
**valuable** 47:22
**value** 117:6
**variation** 48:25
60:21 61:8
95:8
**various** 18:24
20:11 33:2
47:25 123:24
**vary** 30:10
119:6
**vein** 33:19
**verify** 100:5
106:20
**veritext** 5:17
**versus** 52:9
**vertical** 113:2
116:9
**vertically**
116:19
**vice** 33:21 54:8
**video** 5:6,9
**videographer**
4:25 5:1,17 7:2
46:13,17 81:25
82:4 119:17,21
124:25
**videotaped**
1:13 3:1
**view** 3:6 5:16
61:7 80:11

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[viewer - votes]**                                    Page 38

| | | | |
|---|---|---|---|
| **viewer**  113:16 | 92:1,6 101:22 | 28:4 34:11 | 66:13,20 67:4 |
| **views**  22:1,1,4 | 102:8,9,20 | 37:1 47:22 | 67:13,15,25 |
| 22:9 | 103:15,17,25 | 48:2,11 64:16 | 69:10,14,21 |
| **virginia**  4:3 | 104:4 107:14 | 65:9 76:3,5 | 70:3,5,9 71:7 |
| **visited**  20:17 | 107:22,25 | 83:16 86:25 | 71:20,25 72:1 |
| 47:18 | 108:20 109:2 | 87:1 89:1 | 72:12,25 73:5 |
| **visualization** | 112:17 114:5 | 91:10 98:11 | 73:14 74:2,25 |
| 70:20 | 118:21 119:9 | 100:21,22 | 75:1,2,10 |
| **visualize**  68:22 | 122:17 | 102:18 106:8 | 76:13,14 78:4 |
| **visualizing** | **voted**  18:12,13 | **voters**  18:7,15 | 78:12 79:24 |
| 113:2 | 27:3 60:5,10 | 20:7 22:25 | 80:1,7,18 81:8 |
| **vocally**  9:21 | 62:10,13,21,24 | 24:14 26:25 | 85:15 88:21 |
| **vote**  14:19 15:3 | 62:25 63:6 | 27:12,21,24 | 89:20,23 90:3 |
| 15:14,19 16:14 | 64:17,22,24 | 29:18,25 30:4 | 90:12,15,16 |
| 18:11 25:4,25 | 65:4,18 66:20 | 30:9,15,24 | 91:16,25 98:24 |
| 26:3,7 30:25 | 67:8,16 69:15 | 31:3 32:22 | 99:2 100:1,11 |
| 31:4,12,14 | 69:21 72:18 | 33:20 34:4,9 | 101:11,22 |
| 32:1,10,11,23 | 73:1,6,14 74:2 | 34:17,20,20 | 102:7,19 |
| 33:9,23 34:5 | 74:12 75:17,20 | 36:9 40:21,23 | 103:13,22,24 |
| 34:12,18 35:10 | 76:4,5,14 | 41:1,3 42:5,7 | 104:13 105:4 |
| 35:23,24 49:12 | 78:15 79:24 | 49:21 50:10,10 | 105:10 106:9 |
| 49:18,21 50:11 | 80:1,7 81:6,6 | 51:1,4,17 | 113:10,12,20 |
| 51:18 52:13 | 81:13,14 89:3 | 52:18,22 53:5 | 115:19 116:3 |
| 54:10 55:11,13 | 89:8 90:12 | 53:5 54:1,4,5,7 | 116:12 118:21 |
| 55:17 57:3 | 91:6 102:9 | 54:11,12,14 | 119:7,11 |
| 60:3,7 63:7,9 | 103:11,13,22 | 55:10,12,16 | 123:25 124:2 |
| 64:18 66:2,13 | 105:4 107:4,5 | 56:6,10,11,15 | **votes**  30:15 |
| 66:16 70:24 | 107:6,15,15,18 | 57:3,13,17,19 | 39:8 40:17 |
| 71:7,20 72:13 | 107:24 108:2,4 | 58:4,6,7,22 | 44:5,6 48:3 |
| 73:1,2 74:3,13 | 108:14 109:1,4 | 59:8,23 60:3,4 | 62:2 64:7 |
| 74:17 79:25 | 109:6 | 60:9 62:10,13 | 70:22 71:12,14 |
| 88:24 89:21,24 | **voter**  13:25 | 62:19 63:24 | 71:15 97:19 |
| 90:13,15,22,24 | 18:6,14 19:2 | 64:22,23 65:4 | 98:7 108:6 |
| 91:4,19,25 | 24:17 26:18,20 | 65:18,22 66:2 | 114:18 |

Veritext Legal Solutions

Jonathan Rodden , Ph.D.
Georgia Senate Bill 202, In Re
August 12, 2025

**[voting - won]**
Page 39

**voting** 2:17,19
2:21 15:2,4,6
15:20 18:11
20:8,9 24:22
29:1,2 30:19
30:21 31:2,3,6
31:8,18 32:10
35:12,15,18,25
36:2,4 39:8,24
40:1,3,4,6,20
41:5,11,15,18
41:24 42:7,14
43:13 45:6
47:14 48:2,5
48:21,23 49:1
49:2,7,9 50:19
51:2 52:19,20
52:23,24 53:4
53:12 54:6,12
54:14 60:6
61:12,14,23
62:11 63:4,22
63:25 64:4,20
65:15,15 66:19
67:3,12 68:1,5
68:8,13,15,21
69:5,10,13
70:4,8 71:6,12
72:3,6,7,8
73:15 75:18,23
76:9 77:3,7,12
79:20 80:17
88:22 90:15
102:13 103:10

104:2,5,6,16
105:7,25
106:10 108:16
108:19 112:18
114:8 118:22
119:1,5,10

**w**

**wade** 87:2
**wait** 21:6,7
**walk** 115:24
**want** 12:19
14:2 37:16
38:8 41:8 42:2
45:25 51:23
55:9 65:5 79:8
85:17 94:14
95:20 97:4
100:25 108:17
111:5 112:11
116:17 117:20
117:20 120:6
**wanted** 83:11
101:12
**warnock** 29:13
**washington**
3:19,23 4:12
**way** 14:13
23:18 24:3,7,9
26:17 35:9
40:16 44:17
48:12 62:1,6
62:22 64:7
71:13,24 82:23

83:23 84:23
105:10 106:16
110:2,9 112:5
117:1 121:7,9
121:15 123:19
124:5
**ways** 30:12
31:21 42:11
64:15 114:8
**wbock** 4:4
**we've** 22:3 34:2
35:7 48:4,6
63:24 68:7
69:3 74:25
86:2 99:6,12
103:16
**website** 25:15
47:18
**websites** 20:6
20:10,16
**weeks** 77:15
**welcome** 88:14
**went** 58:25
106:6
**west** 3:5 5:15
**western** 31:1
**whereof** 127:20
**whispering** 5:4
**white** 27:4
34:20 36:9
49:24 50:22
51:12,21 52:2
52:7,8 53:5
54:11,12 56:10

56:15 57:16
58:7,11,22
59:3,23 63:24
64:22,23 66:2
66:13 67:15,25
69:10,14 70:3
75:1,2 76:14
89:23 90:3
91:12,16 93:3
96:11 97:7,11
97:20 98:3
99:7,13 100:1
**whites** 70:9
**widely** 42:21
**william** 4:2,16
4:18 6:10,13
**willingness**
50:7 54:9
**wilson** 4:3
**window** 25:1
76:22
**winner** 122:20
**witness** 3:9,10
7:4,8,23 37:10
45:1 46:4,10
59:14 62:17
75:13 81:21
100:14 103:6
115:12 127:8
127:20
**witnessing**
118:16
**won** 29:14

Jonathan Rodden , Ph.D.                    August 12, 2025
Georgia Senate Bill 202, In Re

**[word - zoom]**                                         Page 40

| | |
|---|---|
| **word** 13:13,20 14:21 25:9 84:24 120:19 120:24 121:1,6 121:8,18,21 123:11 | **wrote** 113:24 |
| | **x** |
| | **x** 2:1,10 127:18 |
| | **y** |
| **work** 17:13,18 121:4 122:11 | **y** 118:15 |
| **worked** 17:14 79:2 | **yeah** 28:5 35:16 46:10 50:13 52:7 53:23 57:22 59:4 70:6 81:21 85:5 104:1,25 105:22 117:19 118:6 123:16 |
| **working** 79:6 84:4 112:24 | |
| **works** 89:15 119:6 | |
| **world** 122:6 123:1 | |
| **worse** 67:23 98:4 | **year** 28:24 29:14 86:3 |
| **worst** 116:22 | **years** 13:12 29:18 36:1 48:16,19 |
| **worth** 19:6 93:21 | |
| | **z** |
| **write** 17:2,7,9 22:25 72:25 87:25 101:16 106:19 107:3 | **zero** 110:15,17 110:21,23 |
| | **zeroing** 102:1 |
| **writing** 61:23 | **zoom** 3:22 4:2 4:6,11,16,21 |
| **written** 20:14 23:25 | |
| **wrong** 19:21 33:21 51:25 105:11 109:2 110:25 111:18 113:25 114:3,7 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

## NOTICE OF DEPOSITION OF JONATHAN RODDEN, PH.D.

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for the State Defendants in the above-captioned action will take the deposition of Jonathan Rodden, Ph.D.

The deposition will be taken upon oral examination before an official authorized by law to administer oaths under the Federal Rules of Civil Procedure and will be recorded by videographic means and/or stenographic means. The examination will be held at Fenwick & West, LLP, 801 California Street, Mountain View, CA 94041, and will commence at 9:00 a.m. PDT/12:00 p.m. EDT on August 12, 2025, and continuing thereafter until completed. The deposition will be available to attend via Zoom videoconferencing through Veritext Legal Solutions. Details regarding the videoconferencing will be emailed to those participating once all arrangements are finalized.



EXHIBIT C.M.

1

8/12/25  Rodden

July 21, 2025

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**STATE LAW DEPARTMENT**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com.

2

Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**CLARK HILL PLC**
3630 Peachtree Road, NE
Suite 550
Atlanta, Georgia 30326
(678) 336-7249

*Counsel for State Defendants*

3

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, a true and correct copy of the foregoing Notice of Deposition of Jonathan Rodden, Ph.D. was served on all counsel of record by electronic mail delivery.

/s/ Gene C. Schaerr
Gene C. Schaerr

*Counsel for State Defendants*

4

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

**EXPERT RESPONSE REPORT OF DR. DARON SHAW**

I, Dr. Daron Shaw, am an adult of sound mind and make this statement

voluntarily, based on my own personal knowledge, education, and experience.

## I.    STATEMENT OF PURPOSE

I have been engaged by the State Defendants here to review and respond

to Dr. Jonathan Rodden's Supplementary Report of June 16, 2025. I have

completed that review.

## II.    SUMMARY OF OPINIONS

In the following report, I consider the four broad topics addressed by Dr.

Rodden's supplemental report on the 2024 general election in Georgia. First, I

consider turnout in the 2024 election in Georgia, comparing it to other recent

presidential elections in Georgia and to turnout in other states in 2024. Second,

I examine turnout across different racial groups in the 2024 election in

Georgia, comparing it to other recent presidential elections in Georgia and to

other states. Third, I analyze absentee mail-in ballot voting in the 2024 election

in Georgia, and the disposition of absentee mail-in ballot requests. Fourth, I



EXHIBIT c.m.
2
8/12/25 Rodden

consider in-person Election Day voting in the 2024 election in Georgia, and the occurrence and treatment of provisional ballots.

My findings can be summarized as follows:

- The turnout rate in Georgia for the 2024 general election was 68.3% of the voter eligible population (VEP). This is an increase of +1.2 percentage points from 2020. Other estimates of turnout vary, from an increase compared to 2020 of +3.5 points to a decrease of -1.7 points. If there was a decline, it was marginal and statewide turnout in 2024 was higher than in 2016 or 2012.

- The VEP turnout data show that turnout nationally declined by 2.3 points from 2020 to 2024. At a minimum, the rate of decline in Georgia was much less significant than it was nationally or in most other states. If one calculates the change in statewide turnout rates from 2020 to 2024 using the VEP and then ranks the states from most positive to most negative, Georgia ranks as the fifth most positive and it is one of only eight states where turnout did not decline.

- The preponderance of evidence indicates turnout among Black voters in the 2024 election in Georgia was either flat or decreased slightly (-1 to -2 points) compared to 2020. But

the decline in Black turnout nationally was much more substantial, about -5 to -6 points. In battleground states, turnout among Black voters decreased by an average of -1.6 points, right around the mark we see in Georgia.

- Rather than assuming turnout shifts are caused by changes in the voting laws of Georgia, there is considerable evidence for alternative hypotheses. Most notably, survey evidence suggests that differential Black-White turnout rates in 2024 are attributable to the fact that Black voters were less motivated to vote in 2024 than White voters (by 3 percentage points, using the most conservative estimate).

- In the 2024 general election, roughly three-quarters of Georgians used convenience voting methods (defined as early in-person voting and absentee mail-in ballot voting). All told, 71% voted in-person early, 23% voted in-person on Election Day, and 5% voted absentee mail-in. Compared to 2020, early in-person voting increased by 17 points, absentee mail-in voting decreased by 15 points, and Election Day voting increased by 3 points. Mail-in voting rates were like those in 2014, 2016, 2018, and 2022. There is no direct causal evidence that Black voter turnout was affected by the shift

3

from absentee mail-in voting to in-person voting relative to 2020.

- By one estimate, out of 8.25 million registrants, 335,736 Georgians requested absentee mail-in ballots for the 2024 election. Of the 327,241 mail-in ballots issued, 273,512 ballots were returned and 268,751 were counted.

  - Of the 8,495 rejected absentee mail-in ballot applications, 4,269 people did not vote. The rejection rate for applications appears to have been higher in 2024 than in 2020, although the greater number of applications in the Covid-19 pandemic election of 2020 strongly suggests that fewer applications were rejected in 2024.

  - Of the absentee mail-in ballots returned by Georgia voters, 4,761 were rejected. The rejection rate for submitted ballots in 2024 is higher than in 2020 but much lower than in 2018 or 2016.

- Out of 1.24 million in-person Election Day voters, about 3,259 provisional ballots were cast. This is about 6,000 fewer provisional ballots than were cast in 2020. We have no directly relevant data—causal or otherwise—on whether

out-of-precinct voters being re-directed to their correct precincts (rather than being given provisional ballots, as permitted under SB 202) resulted in fewer votes being cast.

## III.  DATA SOURCES

I relied on publicly available estimates of Georgia turnout, vote by mode, and the source and disposition of absentee mail-in ballots and provisional ballots from the Elections Division of the Georgia Secretary of State's website, particularly the interactive "Election Data Hub." In addition, for turnout estimates for Georgia and other states I used publicly available data from the Current Population Study (which is funded by the U.S. Census Bureau) and the University of Florida Election Lab. In analyzing CPS data, I made use of Dr. Grimmer's estimates of self-reported turnout. I also made use of Dr. Rodden's estimates derived from his analysis of statewide voter files. In addition, I drew from public reports of the 2024 election that analyze voter file information, including Catalist ("What Happened 2024?"), L2 ("2024 State-by-State Turnout Report"), and Blue Rose Research ("2024 Retrospective and Looking Forward"). For data on turnout and turnout by voting methods, I also drew from the Comprehensive Reports of the Election Administration and Voting Survey (EAVS), published by the Election Assistance Commission.[1]

---

[1] *See Research and Data, Studies and Reports,* U.S. Election Assistance Comm'n (June 30, 2025), https://www.eac.gov/research-and-data/studies-and-reports.

Finally, I analyzed data from surveys, including 2024 Fox News Polls[2] and post-election polls and reports from Pew Research Center[3] and the Associated Press ("2024 VoteCast").[4]

## IV.    OPINION

### A.    Turnout in Georgia in 2024 increased slightly compared to 2020, bucking the national trend of lower turnout.

Dr. Rodden relies on data from the Georgia statewide voter file to estimate turnout based on the number of voters divided by the number of registrants (note 2, Rodden Report). He does not present overall statewide turnout estimates using this method; rather he uses this method to focus on turnout by race and estimates that Black voter turnout in Georgia declined by 3.1 points in 2024 compared to 2020, while White voter turnout declined by 0.2 points.

This is a reasonable way to calculate turnout, but turnout is a surprisingly tricky thing to nail down precisely. Consider the data presented in Table 1, which includes estimates of the total number of registered numbers in Georgia for different election years, along with the number of "active

---

[2] *See* Fox News Poll Archive, https://www.foxnews.com/official-polls/fox-news-poll-archive (last accessed July 8, 2025).

[3] Pew Rsch. Ctr., *Behind Trump's 2024 Victory, a More Racially and Ethnically Diverse Voter Coalition* (June, 2025), https://tinyurl.com/4rhftnnz.

[4] Humera Lodhi et al., *AP VoteCast: How America voted in 2024,* Associated Press, https://apnews.com/projects/election-results-2024/votecast/ (last accessed July 8, 2025).

registered voters" (defined as those who have had "contact"[5] with the election system in the past five years), and the total number of ballots cast. As one can see, even among registered voters, turnout rates vary considerably depending on the denominator. Turnout in 2024 looks different depending on whether we use total registered voters or active registered voters. Furthermore, even within a specific category—say, registered voters—sometimes the definitive number is unclear. For example, in 2020 some sources referenced the number of registered voters on the date that statewide registration for the general election closed (October 6, 2020), while others referenced the number listed on Election Day (November 3, 2020).

**Table 1—Different Turnout Numbers for Georgia**

|  | Total Registered Voters | Active Registered Voters | Total Ballots Cast | Turnout (Registered Voters) | Turnout (Active Voters) |
|---|---|---|---|---|---|
| **2024** | 8,249,917 | 7,266,799 | 5,297,264 | 64.21% | 72.9% |
| **2020** | 7,587,625 | 7,233,584 | 5,023,159 | 66.20% | 69.4% |
| **2020\*** | 7,866,677 | 7,233,584 | 5,023,159 | 63.85% | 69.4% |
| **2016** | 6,657,621 | 6,108,758 | 4,165,405 | 62.57% | 68.2% |
| **2012** | 6,066,961 | 5,428,900 | 3,919,355 | 64.60% | 72.2% |

Source: Data on registered voters are from the Georgia Secretary of State. In 2020, however, several sources reference "final" registration numbers published by the Secretary of State after the October 6 registration deadline (the "\*" data row uses this number). In 2020 and 2024, active voter estimates are from the Secretary of State's Office. In 2016, active voter estimate is based on data from the Center for Election Innovation and Research.

---

[5] "Contact" includes voting in an election, requesting an absentee ballot, signing a petition, updating your address either through the Department of Driver Services or with your local election office.

The best approach—one that is employed by most studies of turnout in the U.S.—is to use a number that is calculated consistently across election years and accounts for the total eligible voter population. The voter eligible population (VEP) relies on estimates of the voting age population in a state and then excludes people who are systematically ineligible to vote (non-citizens, felons (depending on state law), and mentally incapacitated persons).[6]

This approach has several advantages over estimating turnout as a share of the registered voter population. While registration turnout rates serve important election administration purposes, they are not comparable across space and time. With respect to space, states and localities vary in how they manage their voter registration rolls, particularly how they remove registered voters from them. With respect to time, a particular state or locality might change their voter registration laws and policies over elections. Finally, registration is part of the process of voting and elections in the U.S. such that we wish to consider the ease or difficulty of registering to vote in different states when we gauge (and compare) democratic participation.[7] Put simply,

---

[6] McDonald, Michael P., and Samuel L. Popkin. "The Myth of the Vanishing Voter." *The American Political Science Review* 95, no. 4 (2001): 963–74. http://www.jstor.org/stable/3117725.

[7] Analytically, when comparing turnout in a state (in this instance, Georgia) to other states, using only registered voters as the denominator penalizes any state with high registration rates through automatic voter registration, like Georgia. Conversely, it rewards states that make it more difficult to register to vote.

turnout should consider how many eligible citizens (not just registrants) cast ballots.

For my analysis, I rely on turnout as a share of the VEP as calculated by Dr. Michael McDonald and the University of Florida Election Lab.[8] Figure 1A shows the increasing number of raw votes cast in Georgia in presidential elections from 2012 to 2024; almost 1.38 million more votes were cast in the Trump-Harris contest than in the Obama-Romney contest, which is as much a reflection of the state's considerable population growth as anything else. More importantly, however, Figure 1B shows that turnout as a share of the VEP has increased in each of the past four elections. The state shows a +8.8 percentage point increase in turnout from 2012 (59.4%) to 2024 (68.3%). The shift from 2020 to 2024 is +1.2 percentage points.[9]

---

[8] Election Lab, Univ. of Fla., *United States Voter Turnout,* https://election.lab.ufl.edu/voter-turnout/ (last accessed July 8, 2025).

[9] It is worth pointing out that the estimate of turnout of the VEP in Georgia for 2020 has changed. In the most recent report, the University of Florida Election Lab has it at 67.06%, down from 68.3% in Dr. Grimmer's report. There appears to have been a downward adjustment in the estimate of the statewide VEP. *See* Election Lab, Univ. of Fla., *2020 General Election Turnout,* https://election.lab.ufl.edu/voter-turnout/2020-general-election-turnout/ (updated Oct. 6, 2024).

### Figure 1A and 1B—Turnout in Georgia, 2012-2024



How unique are the VEP turnout estimates for Georgia? Figure 2 shows that the story varies slightly depending on which approach one embraces. If one uses the VEP or the percentage of ballots cast out of all "active" voters, turnout in Georgia in 2024 is higher (by 1.2 and 3.5 points, respectively) than in 2020. If, on the other hand, one uses the percentage of ballots cast out of all registered voters or the self-reported turnout data from the U.S. Census Bureau's Current Population Survey (CPS), turnout decreases slightly (by roughly 2 points) from 2020 to 2024. But across all estimators, the more general trend is that turnout in 2024 was higher than in 2016.

Figure 2—Different Turnout Estimates for Georgia, 2016-2024



Source: VEP data are from the University of Florida Election Lab. CPS data are from the U.S. Census Bureau's *Current Population Survey* website and data archives, https://www.census.gov/programs-surveys/cps.html. Data on votes cast, registered voters, and active voters are from the Georgia Secretary of State's website and election hub. In 2016, active voter estimate is based on data from the Center for Election Innovation and Research.

To provide additional context for Georgia's 2024 turnout, Figure 3 relies on VEP estimates to show that Georgia ranks near the top of the list of states when comparing the turnout shift from 2020 to 2024. More specifically, Georgia (+1.2) ranks fifth, behind Wisconsin (+1.6), Nevada (+1.55), Pennsylvania (+1.5), and Michigan (+1.4), and is one of only eight states (those listed above, along with Rhode Island, New Hampshire, and North Dakota) that did not see a turnout decline from 2020 to 2024. While much of the analysis offered on behalf of the plaintiffs attempts to argue that SB 202 caused a significant decline in turnout in Georgia in 2024, even a cursory

examination of Figure 3 demonstrates that the 2024 election saw a much more notable decline in turnout across the U.S. generally (-2.3 points nationwide), with 18 states and D.C. experiencing a turnout drop of 3 points or more.

Of course, Georgia was a battleground state and, presumably, the 2020-2024 turnout decline was less precipitous in the battleground states, where the presidential campaigns and their allies spent hundreds of millions of dollars registering and mobilizing voters. These seven states—Georgia, along with Arizona, Michigan, Nevada, North Carolina, Pennsylvania, and Wisconsin— are marked in Figure 3 and, in fact, turnout was relatively higher in those states. But even compared against other states in this cohort, Georgia fares well: while Georgia's turnout rose by +1.2 percentage points, turnout decreased by -3.0 points in Arizona and by -0.7 points in North Carolina.

Figure 3—Statewide VEP Turnout Shifts, 2020 to 2024



Notes: Georgia is indicated by a red bar. Battleground states are indicated by purple bars. The U.S. average is indicated by a blue bar. 2024 VEP turnout estimates for each state are provided in Figure A1 of the appendix.
Source: Data are based on turnout among voter eligible populations, as estimated by Professor Michael McDonald of the University of Florida Election Lab (also the U.S. Election Project).

**B.** **Turnout among Black voters was probably lower than among White voters in Georgia in 2024, such that the "racial gap" increased compared to 2020. However, the racial gap in Georgia is less than we see nationwide. Moreover, from 2020 to 2024 it increased much more nationally than it did in Georgia.**

Using merged files of registered voter records, Dr. Rodden estimates that the gap between White and Black voter turnout in Georgia has gone from about 10.6 percentage points in 2016 to 12.3 points in 2020 to 15.4 points in 2024 (Figure 1, Rodden Report). The implication is that SB 202 exacerbated this gap in 2024. Unfortunately, these files were not provided by plaintiffs, nor do I have data on the VEP for racial groups. I therefore use self-reported turnout data by racial group from the CPS to estimate White and Black turnout in Georgia over time. Figure 4 shows estimated turnout trends by race in Georgia and across all other states.

**Figure 4—Turnout by Race in Georgia, 2016-2024**



Source: Data are from the U.S. Census Bureau's Current Population Survey, https://www.census.gov/programs-surveys/cps.html, and are also presented in Professor Justin Grimmer's Supplemental Expert Report (June 16, 2025

Consistent with Dr. Rodden's estimates, there is a White-Black turnout difference in Georgia that increases in 2024—5 points in 2016, 5 points in 2020, and 8 points in 2024. However, the racial turnout gap and the 2024 racial gap "bump" exist across all other states. Indeed, they are larger nationally than in Georgia: 6 points in 2016, 8 points in 2020, and 12 points in 2024.

The more general finding that turnout among Black voters decreased from 2020 to 2024, while turnout among White voters was steady, is corroborated by other data sources, as well. Figure 5 is based on analyses of registered voter files by Catalist and shows that Black voter turnout declined by -5.6 points from 2020 to 2024 among the citizen voting age population, compared to a -1.1 decrease in turnout among White voters, a -3.0 point decrease among Latinos, and a -6.7 decrease among Asian Americans and Pacific Islanders.[10] What about the battleground states, where perhaps greater effort was made to mobilize racial and ethnic minorities? In the seven battleground states, White voter turnout increased by +1.5 points, while Black voter turnout declined by -1.6 points, Latino voter turnout increased by +1.3 points, and Asian American and Pacific Islander voter turnout decreased by -

---

[10] Catalist, *What Happened 2024*, see especially Fig. 3 (May 20, 2025), https://catalist.us/whathappened2024.

2.2 points. These numbers seem close to those found in Georgia, indicating that racial turnout dynamics in Georgia look like those in the other battleground states in 2024.

**Figure 5—Turnout Shift from 2020 to 2024 by Race**



Source: Data are from Catalist, *What Happened 2024,* Fig. 3, *supra* note 10.

Simply stated, turnout declined more precipitously among Black voters than White voters in 2024—thereby increasing the White-Black turnout gap—but this phenomenon was not Georgia-specific. In fact, the data at hand indicate that it may have been less pronounced in Georgia than in most other states.

If changes in Georgia's election law—most notably, SB 202—cannot explain the across-the-board decline in turnout among Black voters compared to their White counterparts, what can? The most obvious explanation is that Black voters were not as enthused about the presidential election in 2024 as White voters. The numbers in Table 2 bear this out.

**Table 2—Motivation to Vote in the 2024 Election**

| "How motivated are you to vote in the upcoming presidential election?" | Georgia | | N. Carolina | | U.S. National | |
|---|---|---|---|---|---|---|
| | Whites | Blacks | Whites | Blacks | Whites | Blacks |
| Extremely | 70% | 60% | 69% | 59% | 65% | 58% |
| Very | 17 | 24 | 18 | 22 | 20 | 24 |
| Somewhat | 10 | 13 | 11 | 14 | 14 | 15 |
| Not at all | 3 | 4 | 2 | 4 | 2 | 2 |
| | | | | | | |
| MOTIVATED | 87% | 84% | 87% | 81% | 85% | 82% |
| NOT MOTIVATED | 13 | 17 | 13 | 18 | 16 | 17 |
| N | 587 | 1,297 | 653 | 2,194 | 789 | 144 |

Source: Data are from Fox News Polls, https://www.foxnews.com/official-polls/fox-news-poll-archive. Georgia polls were conducted on August 23-26 and September 20-24, 2024. North Carolina polls were conducted on August 23-26, September 20-24, and October 24-28, 2024. The U.S. National poll was conducted October 11-14, 2024.

Table 2 presents data aggregated from statewide and national surveys conducted by Fox News during the 2024 general election campaign.[11] In every poll, respondents were asked at the beginning of the survey about their motivation to vote in the upcoming presidential election. Historically, responses to this question have been highly correlated with individual-level turnout. The first two data columns show that, in Georgia, White respondents were 10 points more likely than Black respondents to say they were

---

[11] Fox News Polls were conducted via mixed-mode probability sample designs, with roughly two-thirds of the surveys conducted by live phone interviewers (85% of these were on cell phones, 15% on landlines) and one-third were conducted by text-to-web surveys. Surveys were weighted to age-gender, race-region, and education benchmarks, as estimated by the 2023 American Community Survey.

"extremely" motivated to vote (70% to 60%, respectively). Even if we collapse categories and allow "extremely" and "very" motivated voters to comprise a broader "motivated to vote" category, White respondents remain 3 points more likely to be motivated to vote than Black respondents.

Table 2 offers similar data from North Carolina—another battleground state with a substantial Black voter population (according to L2 registered voter file data, 21% compared to 33% for Georgia)—as well as the nation. In North Carolina, the racial gap among "extremely motivated" voters is 10 points (69% among White voters, 59% among Black voters). Nationally, the racial gap is 7 points (65% among White voters, 58% among Black voters). In sum, the survey evidence strongly suggests that there was a *national* tendency in the 2024 election for Black voters to be less motivated to vote than White voters.

Table 3 shows how voters responded to this question during the general election campaign of 2020. Here we see that 65% of White voters said they were "extremely" motivated to vote in both 2020 and 2024, while the percentage of "extremely" motivated Black voters dropped from 63% in 2020 to 58% in 2024. This tracks with the notion that Black voters were less enthused and less motivated to vote in 2024 and that this was manifest in slightly lower turnout.

Table 3—Motivation to Vote in the 2020 Election

| | 2020 U.S. National | |
| | Whites | Blacks |
|---|---|---|
| "How motivated are you to vote in the upcoming presidential election?" | | |
| Extremely | 65% | 63% |
| Very | 21 | 21 |
| Somewhat | 10 | 10 |
| Not at all | 2 | 2 |
| | | |
| MOTIVATED | 86% | 84% |
| NOT MOTIVATED | 12 | 12 |
| N | 445 | 2,653 |

Source: Data are from U.S. National Fox News Polls conducted on September 7-10, 2020, October 3-6, 2020, and October 27-29, 2020.[12]

**C.    Georgia voters have been gradually moving from in-person Election Day voting to convenience voting methods over the past decade. Notwithstanding an appreciable increase in absentee mail-in voting during the pandemic election of 2020, in-person early voting has become the dominant mode of voting in Georgia. Although turnout has increased since 2012, it is unclear whether increased in-person early voting has affected overall statewide turnout.**

In his supplemental report, Dr. Rodden demonstrates that Georgians have been moving away from in-person Election Day voting for years. This finding is replicated in Figure 6, which plots vote by mode from 2014-2024, based on data provided by the Georgia Secretary of State. Dr. Rodden's emphasis is on the spike in mail-in balloting in 2020, along with the fact that

---

[12] Fox News Poll (release Sept. 13, 2020), https://tinyurl.com/38vmfj9u (Sept. 7-10, 2020 national); Fox News Poll (release Oct. 7, 2020), https://tinyurl.com/yc3na6pr (Oct. 3-6, 2020 national sample); Fox News Poll (release Oct. 30 & Nov. 1, 2020), https://tinyurl.com/ywcnmzfh (Oct. 27-29, 2020 national).

Black voters were slightly more likely to use mail-in balloting options in 2020 than White voters. He contends that the decline in mail-in balloting in 2024 compared to 2020 was likely caused by SB 202, and that this decline disproportionately and adversely affected Black voters.

**Figure 6—Voting by Different Modes in Georgia, 2014-2024**



Dr. Rodden's argument, though, depends on using 2020 voting as the basis for comparison. The data clearly indicate that the broader trend over the past decade has been away from in-person Election Day voting and towards in-person early voting. Mail-in voting has been minimal, excepting 2020's pandemic election, varying from 4.1% (2014) to 6.2% (2022), with 5.1% availing themselves of this option in 2024. This makes using the 20.2% mail-in voting rates of 2020 a somewhat dubious baseline.

20

Perhaps even more to the point, Dr. Rodden's focus on mail-in voting assumes that there is a significant shift in Black voter turnout that requires an institutional and Georgia-specific explanation. Again, however, the decline in Black turnout in Georgia in 2024 was minimal and certainly less acute than in other states (where SB 202 obviously had no effect). Moreover, a plausible alternative explanation—consistent with public opinion data presented earlier—is that Black voters, in general, were just less motivated to vote in 2024.

Still, Dr. Rodden explores the relative decline in Georgia turnout among those who voted by mail in 2020. He finds that most 2020 mail-in voters simply shifted to in-person voting in 2024 (Dr. Grimmer also finds this to be the case), while a much smaller percentage did not vote at all. By his estimates, however, this fall-off among 2020 mail-in voters was roughly 5 points greater than among voters who voted in-person in 2020.

But what if mail-in voters are dissimilar from voters who cast their ballots in-person? For instance, what if those who prefer to vote by mail are simply less likely to vote than those who prefer to vote in-person? This could lead us to incorrectly blame their failure to cast a ballot in 2024 on the relative difficulty of the method by which they choose to vote instead of their lesser tendency to vote.

To address this possibility, Table 4 examines data from AP VoteCast, a massive pre-election poll that asked American citizens a wide array of attitudinal and demographic questions immediately before the 2024 general election.[13] More specifically, Table 4 looks at the *a priori* estimated likelihood of casting a ballot in 2024—in Georgia, as well as nationally—by how respondents cast their ballot or how they intended to cast their ballot. It presents a mean turnout likelihood (or "propensity") score, which is a 0.00-1.00 continuous variable estimated by NORC at the University of Chicago based on a statistical model that relies on a given voter's past voting history, along with a small set of demographic variables, all of which are available from the

---

[13] AP VoteCast is a survey of the American electorate conducted by NORC at the University of Chicago (NORC) for Fox News, *PBS NewsHour, The Wall Street Journal,* and The Associated Press (AP). *See* https://www.norc.org/research/projects/ap-votecast.html. The survey was funded by AP. The survey of 139,938 registered voters was conducted October 28 to November 5, 2024, concluding as polls closed on Election Day. Interviews were conducted via phone and web, with 4,767 completing by phone and 135,171 completing by web. Interviews are from two main sources. First, interviews are from a random sample of registered voters drawn from state voter files and from self-identified registered voters randomly sampled from NORC's probability-based AmeriSpeak® panel, which is designed to be representative of the U.S. population. Second, interviews are of self-identified registered voters selected from nonprobability panels. The probability sample is weighted to known population benchmarks, most importantly those set forth in the 2023 ACS. The non-probability sample is also calibrated to attitudinal benchmarks taken form the probability sample. Interviews were conducted in English and Spanish. Telephone interviews were conducted using live interviewers. Respondents may have received a small monetary incentive up to $10 for completing the survey. Participants selected from state voter files were contacted by mail, phone, and text message and had the opportunity to take the survey by phone or online. AmeriSpeak participants could be contacted by email, mail, or phone, and had the opportunity to take the survey by phone or online. Participants selected from the nonprobability panels took the survey online.

registered voter file.[14] The data suggest that Georgians who had cast a vote by mail and those who intended to vote by mail (by 0.02 and 0.13 points, respectively) were much less likely to vote than those voting or intending to vote in-person. Nationally, however, there is virtually no relationship between mode of voting and likelihood of turning out to vote in 2024.

**Table 4—2024 Turnout Propensity by Method of Voting**

|  | By Mail | In-Person Early | In-Person Election Day | Total |
|---|---|---|---|---|
| **Georgia** |  |  |  |  |
| How did you vote? (for those who say they have already voted) | 0.8201 (174) | 0.8425 (1,337) | -- | 1,511 |
| How will you vote? | 0.476 (373) | 0.6066 (1,261) | 0.6292 (1,125) | 2,759 |
| **U.S.** |  |  |  |  |
| How did you vote? (for those who say they have already voted) | 0.8607 (15,404) | 0.8595 (18,892) | -- | 34,296 |
| How will you vote? | 0.6806 (15,681) | 0.6666 (23,705) | 0.7271 (38,963) | 78,349 |

Notes: Cell entries represent the estimated likelihood of voting on a 0.0-1.0 scale based on NORC's turnout propensity models. The number of respondents is presented in parentheses. The data exclude respondents who said they voted "today," either early (N=16 in Georgia) or by mail (N=0 in Georgia). Source: 2024 AP VoteCast Survey.

---

[14] On this 0-10 scale, 10 represents the most likely to vote, and 0 represents the least likely to vote.

Dr. Rodden acknowledges this issue for his argument. On page 9 of his report, he writes, "One might imagine, then, that the asymmetric decline in turnout among mail-in voters is perhaps capturing something like declining interest or excitement among *urban* voters" (italics mine). He attempts to control for this attitudinal explanation by estimating a statistical model of 2024 turnout in Georgia in which population density is introduced as a control variable and 2020 mail-in vote is a predictor. He also presents a precinct-fixed effects model, where he presumably controls for effects across precincts and therefore estimates pure *within* precinct effects on 2024 turnout for those who voted by mail-in 2020. Even if one were to concede that Black voters who cast ballots by mail in 2020 experienced a relatively greater decrease in turnout in 2024, these analyses fail to address the alternative explanation. In short, Dr. Rodden's model cannot rule out the possibility that mail-in voters were attitudinally or otherwise distinct (and not just in urban areas).

Dr. Rodden also estimates that "habitual" voters—those who voted in the general elections of 2018 and 2020—were less likely to vote in 2024 if they voted by mail in those elections than if they had cast ballots in person. This analysis is more on point, as it attempts to focus exclusively on a specific and narrow class of mail-in voters. However, as has been noted several times in this report, Dr. Rodden's emphasis remains correlation rather than causation.

At most, he can say that the results of this specific analysis are consistent with his correlational story, but he cannot rule out plausible alternative hypotheses.

**D.    A closer examination of absentee mail-in balloting processes in Georgia in 2024 reveals that a small number of voters did not successfully navigate the voting requirements. A high-end estimate is that 4,279 Georgians requested an absentee ballot in 2024 but were denied and did not cast an in-person ballot. Another 4,761 mailed in ballots that were not counted. The rejection rates seem slightly higher for 2024 than for 2020, but were likely lower than for 2016. There is no causal evidence that the disposition (rejection) of absentee mail-in ballot requests reduced turnout or exacerbated racial voting disparities.**

In exploring the narrative that Black voter turnout in Georgia declined in 2024 because casting a mail-in ballot was more difficult than in 2020, Dr. Rodden focuses on two elements of the absentee mail-in balloting process. First, applying for a mail-in ballot. Second, accepting (counting) mail-in ballots. Each is considered below.

With respect to the first process, using data from an absentee voter file provided on January 15, 2025, Dr. Rodden estimates that 8,495 Georgians requested absentee mail-in ballots but were denied in 2024 (see Table 5, which also includes data from a more recent search on the Georgia Secretary of State's Election Data website). This is 2.5% of 335,736 absentee mail-in ballot requests,[15] which is higher than the denial rate in 2018 and 2020 (0.5%). Dr.

---

[15] The Georgia Secretary of State reports that only 656 (0.19%) of absentee mail-in ballot requests were denied. This might be because Georgia law requires mailing a provisional absentee ballot to the voter as the response to most problems with an application.

Rodden further estimates that 4,226 (52.1%) of those whose mail-in ballot applications were rejected ended up casting a ballot in-person (4,226). Thus, out of 5.3 million voters in Georgia, 4,269 asked for an absentee mail-in ballot but did not end up voting.

With respect to the second process, Dr. Rodden uses a combination of absentee voter file and (mostly) EAVS data, and estimates that 4,761 Georgians had their absentee mail-in ballots rejected in 2024. This is 1.7% of those submitting a mail-in ballot. He finds that 3,805 of these (79.9%) were rejected due to lateness, which he says demonstrates that voters unsuccessfully attempted to mail their ballots in at the last minute. This is offered as evidence that the lack of drop boxes in 2024 caused ballots to be late and disproportionately affected turnout among Black voters.

**Table 5—Analysis of Georgia Absentee Mail-in Balloting in 2024**

|  | Secretary of State | 1/15/25 Voter File and EAVS |
|---|---|---|
| Absentee Mail-In Ballot requests | 345,079 | 335,736 |
| Absentee Mail-In Ballots issued | 344,423 | 327,241 |
| Rejected/Denied | 656 | 8,495 |
| Rejected/Denied Rate | 0.19% | 2.53% |
| Absentee Mail-In Ballots returned | 289,316 | 273,512 |
| Absentee Mail-In Ballots counted as votes | 286,191 | 268,751 |
| Rejected/Denied | 3,125 | 4,761* |
| Rejected/Denied Rate | 1.08% | 1.74%* |
| Rejected/Denied due to lateness | -- | 3,805* |
| % of rejections due to lateness | -- | 79.92%* |

Source: Data in "Secretary of State" column are from an July 14, 2025, interactive search on absentee voting in the Nov. 5, 2024 general election from the Georgia Secretary of State's website (https://sos.ga.gov/page/election-data-

hub-turnout). Data in the "Voter File and EAVS" column are from Dr. Rodden's Supplemental Report, which relies on a 1/15/25 voter file and the EAVS 2024 Survey. *Indicates that the estimate is based on the EAVS.

A few points seem worth making here. First, as we see in Table 6, limiting the comparison of 2024 to 2020 ignores important historical context. As noted earlier, 1.7% of submitted absentee mail-in ballots were rejected in in 2024, which is higher than in 2020 (0.3%) but lower than in 2016 (2.9%). For Black voters, the rejection rates were 2.0% in 2024, 0.4% in 2020, and 4.1% in 2016. For Hispanic voters, the rejection rates were 3.2% in 2024, 0.5% in 2020, and 4.1% in 2016.

**Table 6—Rates of Absentee Ballot Rejection, 2016-2024**

|       | Overall | Whites | Blacks | Hispanics |
|-------|---------|--------|--------|-----------|
| **2024** | 1.7%    | 1.3%   | 2.0%   | 3.2%      |
| **2020** | 0.3%    | 0.2%   | 0.4%   | 0.5%      |
| **2016** | 2.9%    | 2.3%   | 4.1%   | 4.1%      |

Source: Dr. Justin Grimmer's Report analyzing EAVS data from 2016-2024.

Second, the focus on rates of rejection obscures the fact that far fewer Georgians applied for absentee mail-in ballots in 2016, 2018, 2022, or 2024 compared to 2020. Table 7 draws on EAVS data to show overtime variation in absolute levels of absentee mail-in voting. In 2016 and 2018, absentee mail-in voting was relatively infrequent, with high rates of return among those requesting ballots (89.9% and 86.2%, respectively) and rejection rates between 6.4% and 9.8%. In 2020, absentee mail-in ballots were sent out to millions of voters, with significantly lower rates of return (~75%) and extremely low rejection rates (~0.5%). In 2022 and 2024, absentee mail-in voting returned to

being less frequent, with high rates of return (90% and 83.5%, respectively) and rejection rates between 1.5% and 1.75%. Given Dr. Rodden's focus on rejection rate differences, it is important bear in mind that roughly 327,000 mail-in ballots were transmitted to Georgian voters in 2024, compared to 1.76 million in 2020. Maybe even more relevant is that the raw number of rejected mail-in ballots (as well as the rejection rate) declines significantly after 2018: 13,677 (6.4%) in 2016, 23,803 (9.8%) in 2018, 4,804 (0.4%) in 2020, 3,785 (1.5%) in 2022, and 4,761 (1.7%) in 2024.

**Table 7—Absentee Mail-In Balloting in Georgia, 2016-2024**

|  | 2024 | 2022 | 2020 | 2018 | 2016 |
|---|---|---|---|---|---|
| Mail Voters | 268,751 | 248,487 | 1,311,361 | 218,858 | 199,356 |
| Mail Ballots Transmitted | 327,241 | 280,897 | 1,759,036 | 281,490 | 236,925 |
| Mail Ballots Returned | 273,512 | 252,272 | 1,316,165 | 242,661 | 213,033 |
| % Mail Ballots Returned | 83.58% | 89.80% | 74.80% | 86.20% | 89.92% |
| Mail Ballots Counted | 268,751 | 248,487 | 1,311,361 | 218,858 | 199,356 |
| % of Returned Ballots Counted | 98.26% | 98.50% | 99.64% | 90.20% | 93.58% |
| Rejection Rate | 1.74% | 1.50% | 0.36% | 9.80% | 6.42% |

Source: EAVS, 2016-2024.

In short, focusing on 2020-2024 differences misses that (1) 2020 saw an anomalous spike in mail-in voting due to the pandemic, (2) rejection rates among absentee mail-in ballots were higher in 2016 and 2018 than in either 2022 or 2024, and (3) dissecting rejection rates among absentee mail-in voters

in 2024 obfuscates the fact that this is an extremely small percentage (~1.7%) of a small percentage (~5.1%) of the total ballot universe.

Furthermore, there is no relevant causal evidence that the disposition of absentee ballot requests or absentee ballots themselves affected turnout or exacerbated racial disparities in turnout. Consequently, Dr. Rodden's specific claim that "the surge in late ballots was likely a consequence of SB 202" (page 12) is simply speculation.

### E. Provisional ballots decreased from 11,781 in 2020 to 3,229 in 2024. It is unclear how many voters seeking to vote at an incorrect precinct went to their correct precinct at the direction of election administrators.

Dr. Rodden argues that provisional ballots should have declined precipitously in 2024, as voters trying to cast Election Day ballots at an incorrect precinct prior to 5:00 PM were directed to the correct precinct rather than given a provisional ballot. The data do show a significant decrease, from 11,781 in 2020 to 3,229 in 2024 (a decline of 73%). Dr. Rodden, however, contends that the drop should have been even steeper. He postulates that many voters were incorrectly given provisional ballots in certain counties— rather than being redirected—which resulted in higher rejection rates (for being "out of precinct").[16]

---

[16] It is worth noting that Dr. Rodden's comparison here includes provisional ballots issued for any reason, not just to those voting out of precinct (EAVS did not ask the reason for issuing a provisional ballot in its 2020 survey). In light of this, the number of provisional ballots

As evidence, Dr. Rodden's Table 1 presents Georgia counties issuing more than 20 out-of-precinct provisional ballots, and he estimates that 27.4% of these provisional ballots were rejected (696 out of 2,543). He then correlates the drop in counted provisional ballots with turnout decline, suggesting that it is significant, and that the correlation is particularly strong in counties with a higher percentage of Black voters.

There are several issues with this analysis. First, it is geographically and temporally selective. Geographically, Dr. Rodden's analysis includes 21 (out of 99) counties, but it excludes 78 counties. Furthermore, even within his selected universe, for 10 of the 21 counties listed the rejection rate is 15% or below. Temporally, the exclusive focus on the 2024-2020 comparison is also problematic. Table 8 borrows from Dr. Grimmer's Report and presents data showing that (a) provisional balloting has never been common in Georgia, and (b) provisional ballots reached a high-water mark in 2020, whereas provisional balloting in 2024 looks like 2016. The percentage of provisional ballots cast by Black voters has increased over time: 49.7% in 2024, 45.5% in 2020, and 40.8% in 2016. But we do not know much about rejection rates by race in previous elections, which makes it difficult to properly analyze these for 2024.

---

given because voters showed up at an incorrect precinct are likely lower than the reported total.

**Table 8—Provisional Ballots in Georgia, 2016-2024**

|  | 2024 | 2020 | 2016 |
|---|---|---|---|
| Overall | 3,259 | 9,272 | 4,820 |
| Whites | 904 | 3,159 | 1,758 |
| Blacks | 1,620 | 4,222 | 1,967 |
| Hispanics | 233 | 494 | 141 |
| Asians | 91 | 336 | 104 |

Source: Dr. Justin Grimmer's Report, Table 21 (based on analyses of voter files).

Second, as Dr. Rodden concedes, we have no idea how many people were redirected in 2024 and ended up voting at the correct precinct. As such, all estimates of provisional balloting and turnout in 2024 are just speculation.

Third, the potential problem alluded to by Dr. Rodden is an administrative problem. If, in fact, voters attempting to vote before 5:00 pm at an incorrect precinct are given a provisional ballot, this is inconsistent with the law. There is no reason to think this potentiality is a systematic problem requiring legal remedy.

Fourth and finally, evidence is presented indicating that those who cast provisional ballots in 2020 were less likely to vote in 2024. The notion that this shows how changes in voting laws depressed turnout is dubious. Even if true, it is (again) consistent with the alternative hypothesis that provisional voters might be less likely to vote because they are relatively less engaged, less informed, and less knowledgeable.

## V.    Conclusion

The data indicate that turnout in Georgia in the 2024 general election was similar to 2020, even as turnout in most other states decreased. Turnout among Black voters in Georgia appears to have declined slightly, though not nearly as much as it did nationally or in other comparable states. The most plausible explanation for this decline is relatively lower levels of enthusiasm and interest among Black voters in the 2024 election.

As we have seen nationally, in-person Election Day voting in Georgia has decreased as convenience voting increased. Most notably, in-person early voting continued its positive long-term trend in Georgia, while mail-in voting reverted to historical levels after rising dramatically in the Covid-19 pandemic election of 2020. Black voters were especially likely to take advantage of absentee mail-in balloting in 2020, but there is no relevant causal evidence that changes in mail-in voting procedures drove a change in the turnout rate in 2024.

Analyses of absentee mail-in ballot rejection rates or provisional ballot rejection rates do not effectively make the case that legal changes caused turnout shifts in 2024. The rejections affected a fractional percentage of the electorate in 2024 and were not out of line with historical data beyond 2020.

I hold the conclusions expressed here to a reasonable degree of scientific certainty.

July 14, 2025                    Respectfully submitted,

_Daron Shaw_

Daron Shaw

Appendix

Table 1A—Turnout in Georgia Elections, 2010-2024

|  | Eligible Voters | Total Ballots Cast | Turnout (VEP) |
|---|---|---|---|
| **2024** | 7,760,407 | 5,297,264 | 68.26% |
| **2022** | 7,590,660 | 3,964,926 | 52.23% |
| **2020** | 7,490,838 | 5,023,159 | 67.06% |
| **2018** | 7,254,119 | 3,949,905 | 54.45% |
| **2016** | 6,960,129 | 4,165,405 | 59.85% |
| **2014** | 6,732,653 | 2,596,947 | 38.57% |
| **2012** | 6,593,817 | 3,919,355 | 59.44% |
| **2010** | 6,394,095 | 2,623,035 | 41.02% |

Source: Data are from the University of Florida Election Lab https://election.lab.ufl.edu/voter-turnout/.

### Figure 1A—2024 VEP Turnout by State



Notes: Georgia is indicated by a red bar. Battleground states are indicated by purple bars. The U.S. average is indicated by a blue bar.

Source: Data are based on turnout among voter eligible populations, as estimated by Professor Michael McDonald of the Florida Election Lab (also the U.S. Election Project).

*The New Georgia Project et al. v. Brad Raffensperger et al.*, Case No. 1:21-cv-01229

Consolidated Case No. 1:21-mi-55555 (*In re SB 202*)


United States District Court for the Northern District of Georgia


**Supplementary Report of Jonathan Rodden, Ph.D.**


Jonathan Rodden

June 16, 2025



## TABLE OF CONTENTS

I.    Introduction and statement of purpose ........................................................... 1

II.   Summary of findings ........................................................................................ 1

    A.    Voting .................................................................................................... 1

    B.    Election day voting ............................................................................... 2

III.  Data sources ..................................................................................................... 3

IV.   Turnout ............................................................................................................. 3

V.    Mail-in ballots .................................................................................................. 5

    A.    Mail ballot turnout ............................................................................... 5

    B.    Rejected mail-in ballot applications .................................................... 10

    C.    Rejected ballots .................................................................................... 11

VI.   Election-day voting and provisional ballots ..................................................... 15

VII.  Appendix .......................................................................................................... 22

## I.    Introduction and statement of purpose

I have been asked by plaintiffs the New Georgia Project, Black Voters Matter Fund, Rise, Inc., and individual voters Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin to supplement my earlier analysis in this case to include data pertaining to the general election in November of 2024 in Georgia.[1] Specifically, I have been asked to provide basic information about turnout in November 2024 in comparison with previous elections and then answer three specific questions about the November 2024 election. First, did SB 202 have a discernable impact on voters? Second, if there was an impact, was it correlated with race and/or political affiliation? Third, is there evidence that the voters most affected by SB 202 were less likely to cast a valid ballot in 2024?

My report is focused on two broad aspects of SB 202: 1) changes to mail-in voting, including the application process and the availability of ballot drop boxes, and 2) changes to election-day voting, including the treatment of voters who arrive at the wrong precinct. I make use of four types of data: 1) individual-level data from Georgia's voter file, vote history file, and absentee file; 2) precinct-level data collected by the Georgia Secretary of State; 3) county-level data reported by county election administrators; and 4) information about ballot drop boxes from the Secretary of State's Office.

## II.    Summary of findings

Based on my analysis of the supplemental data described above, I conclude that turnout declined slightly among White voters, and more substantially among Black voters. I also found that SB 202's changes to mail-in voting and election-day voting impacted voters in the following ways:

### A.    Voting

- Voting by mail collapsed after the implementation of SB 202, especially among Black and Democratic voters, who had been most reliant on it in the past.
- Voters who cast a mail ballot in 2020 were 4.8 percentage points less likely to turn out in 2024 than those who cast an in-person ballot in 2020.
- Among habitual voters—those who had cast valid ballots in both the 2018 midterm and 2020 general election—turnout in 2024 was lower by 3 percentage points among voters who used mail ballots in both previous elections than habitual voters who used other voting methods.
- Around 2.5 percent of all applicants for a mail-in absentee ballot in 2024 were rejected. The rejection rate was over 2 percent even among those who had successfully cast a mail-in ballot in 2020, and also among the habitual mail voters who had successfully cast mail-in ballots in both 2018 and 2020. In 2018 and 2020, only 0.5 percent of applications did not result in a ballot being sent.

---

[1] My latest CV is appended to this report as Exhibit A.

- Among individuals whose race is recorded as Black on the voter file, 2.8 percent of applicants were rejected, compared with 2.1 percent for White applicants.
- Ecological inference analysis using precinct-level data suggests that the rejection rate was 4.13 percent for Democratic applicants and 1.08 percent for Republican applicants.
- The rate at which mail-in ballots were rejected because those ballots were received after the deadline was 5 to 6 times higher in 2024 than in 2020.
- Rejections as a share of all submitted ballots were 1.5 percent overall, 1.8 percent for Black voters, and 1.2 percent for White voters.
- Ecological inference estimates indicate that rejections as a share of mail-in ballots submitted were 2.7 percent for Democrats and 0.9 percent for Republicans.
- Ballots that were rejected because they arrived too late were concentrated in urban counties where voters had relied most heavily on drop boxes in 2020, and where the availability of drop boxes has decreased the most.
- Among all registered voters who were eligible to vote in 2024 and had cast a valid vote in 2020, those who returned their absentee ballot before the final four days of the election (i.e. the Saturday before the election through Tuesday, election day) voted successfully in 2024 at a rate of 83 percent. However, among voters who submitted their absentee ballot in those final four days, only 69 percent cast a valid ballot in 2024—a difference of 14 percentage points. Drop boxes were generally available during these final three days (and on election day) prior to SB 202, but the bill prohibited drop box operation after early voting ends on the Friday before election day.
- Among those who successfully voted by mail in 2020 and applied for an absentee ballot in 2024, 95.6 percent of voters whose ballots had been cast prior to the final four days successfully voted again in 2024. However, among voters whose ballots were submitted in the final four days in 2020, the rate of successful voting for those who applied for an absentee ballot in 2024 was 89.3 percent: a gap of around 6 percentage points.
- The increase in late-rejected ballots was driven primarily by urban counties. In Fulton County, for instance, over 2 percent of mail-in ballots in 2024 arrived after the deadline, as compared to two tenths of a percent in 2020.
- Counties experiencing the largest surge in rejected late ballots also experienced the largest decrease in turnout.

### B.    Election day voting

- There is considerable heterogeneity across counties in the share of provisional ballots issued to out-of-precinct voters that were rejected, ranging from zero to 93 percent, indicating that SB 202 has not been implemented in a uniform way across counties.
- Urban counties with larger Black and Democratic populations experienced a larger reduction in *counted provisional ballots* as a share of election-day ballots than other

counties, suggesting that SB 202 impacted the ability of out-of-precinct voters to cast a ballot that can be counted without seeking out a different polling place.

- Among voters who voted in 2020 and were registered to vote in November 2024, 85 percent of those who did not cast a provisional ballot in 2020 voted again in 2024. Among those who cast provisional ballots in 2020, 63 percent voted again in 2024—a difference of 22 percentage points. Many of the counted provisional ballots in 2020 were cast by voters who had visited the wrong precinct.
- Counties with the largest reductions in counted provisional ballots experienced the largest decreases in turnout from 2020 to 2024.

## III.  Data sources

I received a Georgia voter file that was extracted on January 15, 2025 from plaintiffs, who received the information from the State Defendants. I merged this file with a file containing information about absentee voters in the November 2024 election, including information about rejected applications for mail-in ballots, and a "vote history" file containing individual indicators for whether registered voters had cast a valid ballot in the November 2024 election. For some of my analysis, I also examined voter file extracts, absentee files, and vote history files for previous elections. I also examined a precinct-level dataset called a "reapportionment report," which contains information about precinct-level election outcomes, registration, and race prepared by the Georgia Secretary of State's office. I also examined data reported by Georgia's county election administrators to the Election Administration and Voting Survey, which is administered by the U.S. Election Assistance Commission after each general election. Finally, I consulted information about the location of ballot drop boxes assembled by the Secretary of State's office.

## IV.  Turnout

My previous report documented a surprisingly large decline in turnout in Georgia in the 2022 midterm relative to the 2018 midterm—especially among Black voters. The same pattern holds if we compare the 2024 election to previous presidential election years. Figure 1 below demonstrates that turnout (as a share of registered voters) among White voters was slightly lower in 2024 than in 2020, by two tenths of a percentage point.



Figure 1: Turnout by race, Georgia general elections, 2016 to 2024

The decline in turnout was dramatically larger for Black voters: from 59.8 percent to 56.7 percent: a decline of 3.1 percentage points.[2] As can be visualized in Figure 1, the turnout gap between Black and White voters has continuously grown since SB 202. White turnout was higher than Black turnout by 12.5 percentage points in 2020, 13.3 percentage points in 2022, and 15.4 percentage points in 2024. The increasing turnout gap can be visualized in Figure 2, which plots the difference between White and Black turnout for general elections from 2016 to 2024.

_____

[2] To obtain these figures, I used voter file extracts from immediately after the election merged with vote history files, dropping anyone on the voter file who registered after election day, and used the most proximate pre-election voter file to recover anyone who may have fallen off the voter file between election day and the date of my post-election voter file extract. I did this because I did not have access to a voter file from election day itself.

Figure 2: Racial turnout gap, Georgia general elections, 2016 to 2024



Aggregate turnout in Georgia and nationwide can move in different directions for different groups if they have different levels of engagement with the races or candidates on the ballot. To mitigate the impact of these broader trends, this report focuses on those aspects of voting that can be: 1) directly linked to SB 202, and 2) measured using available data. If a voter does not cast a ballot either because: they apply for an absentee ballot and do not receive one; their ballot application is rejected; their submitted absentee ballot is rejected; or they are turned away after showing up at the wrong precinct, then their failure to cast a valid ballot cannot be attributed solely to lack of interest in the races or candidates.

The remainder of this report measures SB 202-specific impediments to voting and assesses which groups are most affected by them. It is often the case, however, that the measurable aspect of impediments to voting are only a part of the problem. For instance, it is difficult to evaluate how many of those who prefer a mail-in ballot, perhaps due to mobility challenges, did not apply for one due to SB 202 and ultimately failed to vote in person, or how many voters who failed to submit their mail-in ballot were stymied by the lack of drop boxes in the final days of the election. Unfortunately, there is no way of knowing how many voters were turned away from the wrong polling place on election day and missed their window to vote due to the demands of work, childcare, or other obligations.

## V. Mail-in ballots

### A. Mail ballot turnout

Georgia voters had embraced mail-in ballots with enthusiasm in the 2020 November general election. As documented in my previous report, this enthusiasm was especially pronounced among

Black and Democratic voters. One of the most consequential things about SB 202 was that it made it harder for interested voters to obtain and cast a mail-in ballot. Stricter ID requirements, a narrower window for voters to return to their absentee ballots, and restrictions on distributing mail ballot applications have all impeded Georgians' ability to vote by mail. In addition, as documented in my initial report, many voters—especially in urban areas—had come to rely on drop boxes as a failsafe way to make sure their ballot counted, especially in the days immediately before the election, when concerns of timely postal delivery begin to mount. But restrictions imposed by SB 202 on the number of drop boxes that can exist—as well as additional requirements that drop boxes must be placed in government buildings, accessible only during standard business hours, and completely prohibited after the close of early voting on the Friday evening before election day on Tuesday—have made it even more difficult for voters to return their ballots.

The most obvious implication of SB 202 is that it has led to a dramatic falloff in the level of mail-in voting in Georgia. Using data on registered voters from the voter file and the appended vote history file, Figure 3a builds on a similar figure in my initial report and adds data from 2024. It provides data on early-in person votes and mail-in votes as a share of all valid ballots cast for general elections and a pair of high-profile runoffs from 2016 to 2024, broken down by race. To complete the picture, Figure 3b provides data on in-person election-day voting. Figures A1, A2, and A3 in the Appendix provide precinct-level maps of voting in 2024 by ballot type. These maps demonstrate which types of voting are more common in various parts of Georgia. For instance, mail-in ballots are more common in urban areas like metro Atlanta and Chatham County as well as certain rural areas like Webster and Hancock Counties. In-person voting is most popular in rural areas. To make these maps, I aggregated individual-level data from the voter file, absentee file, and vote history file and summed up the information to the level of precincts, then merged this precinct-level data with digital boundary files of Georgia's 2024 precincts. For comparison here and throughout the report, Figures A4 and A5 provide precinct-level maps of race and partisanship in 2024.

Figure 3a below demonstrates that mail-in ballots as a share of ballots cast fell dramatically after the implementation of SB 202. Black voters had been consistently more likely to cast mail-in ballots than White voters since 2018. After reaching a pandemic high in 2020, mail-in balloting dropped for both groups, but especially for Black voters, such that rates of mail-in voting are now very similar for both groups. And for both Black and White voters after SB 202, early in-person voting has subsequently gained in popularity.

**Figure 3a: Mail and early in-person absentee ballots as share of ballots cast, by race, 2016 to 2024**



**Figure 3b: Election-day ballots as share of ballots cast, by race, 2016 to 2024**



Figures 4a and 4b below examine the reliance on mail-in, early in-person, and election-day voting by partisanship. I used the voter file, absentee file, and vote history file to determine the method of voting for each voter and then summed up the votes by precinct. I then merged these precinct-level aggregates with precinct-level vote totals for the 2024 election, focusing on the Democratic and Republican votes for president. I then conducted ecological inference analysis to obtain estimates of voting method for Democrats and Republicans.

Figure 4a demonstrates that early in-person voting gained favor with both Democrats and Republicans in 2024. While mail-in voting has declined precipitously among Democrats and Republicans alike, it is still roughly twice as popular among Democrats as Republicans.

**Figure 4a: Mail and early in-person absentee ballots as share of ballots cast, by party, 2016 to 2024**



**Figure 4b: Election-day ballots as share of ballots cast, by party, 2016 to 2024**



It is clear from Figures 3a, 3b and 4a, 4b that many people who stopped voting by mail after SB 202 switched to another form of voting. But there were also voters who just stopped voting after SB 202 was enacted. Specifically, 212,688 voters who were registered in 2024 and voted by mail in 2020 did not cast a valid ballot in 2024. To ascertain this, I merged the individual-level vote history and absentee files from 2018 and 2020 with the 2024 individual-level files. Among registered voters who voted in 2020 and were eligible to vote again in the 2024 election, those who voted by mail in 2020 had a lower turnout rate in 2024 by 4.88 percentage points than those who cast in-person ballots in 2020.

My initial report noted that mail-in voting has become more popular in urban areas, especially those with a history of long lines at polling places. One might imagine, then, that the asymmetric decline in turnout among mail-in voters is perhaps capturing something like declining interest or excitement among urban voters. To examine this possibility, I did two things. First, I ran a simple regression among those who were registered for the 2024 November general election and voted in the November 2020 general election. The dependent variable is an indicator for whether the individual voted in 2024, and the independent variables include, in addition to an indicator for whether the individual had voted by mail in 2020, a control variable for the population density of the individual's precinct. This regression indicates that controlling for the population density of the individual's precinct, the probability of voting in 2024 was 4.3 percentage points lower than for those who had voted by mail in 2020.

Additionally, I ran a regression with precinct fixed effects. This analysis ignores any variation *across* Georgia's precincts, focusing only on *within-precinct* differences between those who voted by mail in 2020 and those who voted in person. This analysis indicates that within precincts, those with a recent history of mail-in voting had turnout rates in 2024 that were lower than in-person voters by 4.6 percentage points.

It is also useful to examine more habitual voters—those who cast valid ballots in both the 2018 midterm and 2020 general election. Of these voters, turnout in 2024 was lower by 3 percentage points among those who voted by mail in both previous elections than other habitual voters. This difference remains the same in regressions that control for precinct population density, and in regressions that include precinct fixed effects.

The asymmetric falloff in turnout among past mail voters—even among habitual voters and even within precincts—indicates that SB 202 not only made it harder for past mail voters to vote by mail, but that it also made them less likely to vote. Next, I examine some of the reasons for this, including rejected mail-in ballot applications and rejected ballots.

### B.    Rejected mail-in ballot applications

I was provided with a version of the individual-level absentee voting file that includes a field indicating that a mail-in absentee ballot has been requested. This file indicates that 8,495 applications were rejected for the November 2024 election, which is 2.5 percent of all applicants. These rejections did not primarily occur among inexperienced voters who have never tried to obtain an absentee ballot in the past. On the contrary, the rejection rate was also over 2 percent among those who had *successfully* cast a mail-in ballot in 2020, and even among the habitual mail voters who had successfully cast mail-in ballots in both 2018 and 2020.

I do not have access to specific information about rejected absentee ballot applications in previous elections. However, in each previous individual-level absentee file, there is a field indicating the date on which an application was requested as well as a date on which it was sent to the voter. I examined the share of all applications where a blank field for the "sent date" indicates that no ballot was sent. In 2018 and again in 2020, only 0.5 percent of applications did not result in a ballot being sent. Formal rejections alone were over 2.5 percent of applications in November of 2024, and this does not account for instances a voter was never sent a ballot but their application may not have been recorded as "rejected."

In the Appendix, Figure A6 provides a map of rejected mail-in applications for the November 2024 election. It demonstrates that absentee ballot application rejections were relatively concentrated in the Atlanta metro area, with a striking anomaly in Cobb County, where ballot rejections were more numerous than even the other urban counties. The map reveals another hotspot in Dougherty County.

Among individuals whose race is recorded as Black on the voter file, 2.8 percent of applicants were rejected, compared with 2.1 percent for White applicants.

I have also used precinct-level ecological inference analysis, as described above, to estimate the rate at which ballots were rejected for Democrats and Republicans. This analysis provides an estimated rejection rate of 4.13 percent for Democratic applicants (with a lower 95 percent confidence interval of 3.86 and an upper confidence interval of 4.32); and a rejection rate of 1.08 percent for Republicans (with a lower confidence interval of 0.91 and an upper confidence interval of 1.36).

For many registered voters, a denied mail ballot application was the end of the road for their voting prospects. Of those whose ballot application was rejected, only 52.1 percent ended up casting a ballot. There was a marked racial disparity—46.2 percent of denied applicants who are Black ended up voting, and 60.2 percent of denied applicants who are White ended up voting. Another way of slicing the same data is to ask: of everyone who applied for an absentee ballot, what share are in the category of "application rejected and ultimately did not vote"? This figure is 1.5 percent for Black voters and 0.8 percent for White voters.

### C.    Rejected ballots

I then looked into another group of registered voters that successfully obtained their absentee ballot and tried to vote, but whose ballots were ultimately rejected and not counted. By far the most common reason a ballot was rejected in 2024 was because it was received after the deadline. I examined rejected ballots in two ways. First, in the absentee file, there is a field that flags an absentee ballot as rejected. There were 4,570 ballots with such a designation in the file. Second, I examined responses from county election administrators to the Election Administration and Voting Survey (EAVS), which is administered by the U.S. Election Assistance Commission after each general election. This resource provides more detailed county-level data on rejected ballots, including the reason for rejection. The total number of rejected ballots reported to EAVS was 4,761, which is very close to the number obtained from the absentee file.

The most common reason a ballot was rejected was that it arrived late. According to EAVS, there were 3,229 such ballots. However, if I focus instead on mail-in ballots with a documented return date on the voter file that is after the election, for a voter with no vote recorded in 2024, the number is higher: 3,805.[3] That is to say, there are ballots with late submission dates that clearly did not count and are not formally marked as rejected. It is possible that additional late ballots had not yet been included in the tallies at the time the county election administrators responded to EAVS.

A precinct-level map of all rejected ballots is provided in Figure A7 in the Appendix, and a map focusing only on ballots received after the deadline is provided in Figure A8. These maps show

---

[3] UOCAVA ballots can be accepted until 3 business days after the election. I do not classify these ballots as late.

that rejected ballots (and late ballots) are concentrated primarily in the metro Atlanta area along with the Savannah area.

According to the EAVS report from 2020, there were only 2,963 ballots rejected for being late. In 2020, there were 1,759,036 ballots transmitted and 1,316,165 returned, meaning that late ballots were only 0.22 percent of all ballots returned. In 2024, the raw number of late rejected ballots was higher, even though there were only 327,241 ballots sent out and 273,512 returned (according to the EAVS data). In other words, more mail ballots were rejected even though far fewer mail ballots were sent out. Using data related to all late uncounted ballots in the absentee file, 1.4 percent of all ballots returned in 2024 were rejected. Using the EAVS data, the figure is 1.2 percent. In other words, the rate at which submitted ballots were rejected for being late was about 5 or 6 times as high in 2024 as in 2020.

The surge in late ballots is very likely a consequence of SB 202. In 2020, if a voter with a mail-in ballot had not yet returned their ballot in the three days prior to election day or on election day itself, and the voter had concerns about the timeliness of postal delivery, which had begun to mount in that election, many voters could utilize a 24-hour drop box nearby up until election day. My first report demonstrated that in much of Georgia, a large share of voters relied on drop boxes to submit their mail-in ballots. Moreover, there was a large spike in such mail-in ballot submissions in the days before the election and on election day itself. But after SB 202, voters no longer have these options in the crucial final days. These same voters appear to have taken their chances with the postal service and, as a result, their ballot arrived too late to be counted.

There is a racial and partisan disparity in these ballot rejections. Rejections as a share of all submitted ballots are 1.5 percent overall, 1.8 percent for Black voters, and 1.2 percent for White voters. The ecological inference estimates indicate that rejections as a share of mail-in ballots submitted were 2.66 percent for Democrats (with a confidence interval from 2.5 to 2.8) and 0.92 percent for Republicans (with a confidence interval from 0.81 to 1.03).

Focusing on late ballots only, we see that 1.44 percent of Black voters who were issued a mail-in ballot had that ballot rejected for being late, compared to 0.99 percent for White voters. As for partisanship, the ecological inference estimates indicate that 2.48 percent of mail-in absentee ballots cast by Democrats were rejected for being too late (confidence interval from 2.34 to 2.64), and the same is true of 0.89 percent of ballots cast by Republicans (confidence interval from 0.77 to 1.02).

There is direct evidence that this had an impact on turnout. I identified people who submitted valid, counted absentee mail ballots during the final four-day period from Saturday to election day on Tuesday in 2024. If we consider all registered voters who were eligible to vote in 2024 and had cast a valid vote in 2020, those who voted by mail with a ballot submission date before that final four-day period successfully voted again in 2024 at a rate of 83 percent. For those who submitted their ballot in that final four-day period, only 69 percent cast a valid ballot in 2024: a difference of 14 percentage points. This 14-percentage point difference remains if I run a regression that controls

12

for precinct population density or if I include fixed effects for precincts. Within precincts, voters whose absentee ballots were submitted during that final four-day period in 2020 were far less likely to cast a valid ballot in 2024 than other absentee voters in the same precinct whose ballot arrived earlier.

It is also useful to zero in on people who applied for a mail-in ballot in 2024. Of those who successfully voted by mail in 2020 and applied for an absentee ballot in 2024, 95.6 percent of those whose ballot had been cast prior to the final four days successfully voted again in 2024. However, for those whose ballot was submitted in 2020 in that final four-day period in 2020, the rate of successful voting among those who applied for an absentee ballot in 2024 was 89.3 percent: a gap of around 6 percentage points. Again, this gap is identical in regressions that control for precinct population density or include precinct fixed effects. Again, this large gap can be seen even within precincts. This gap is driven primarily by people who do not return their ballot at all and people who submit a late ballot.

Finally, we can zero in on this last group by focusing on those who voted absentee in 2020 and obtained an absentee ballot and *submitted it* in 2024. Among those whose absentee ballot was received before the final four-day period in 2020, 99 percent of the ballots submitted in 2024 were counted. But for voters who previously submitted a mail-in ballot (such as via drop box) in the final four-day period in the 2020 election, only 97 percent of the ballots cast in 2024 were counted and not rejected for being late. This 2 percentage point gap again remains even when controlling for population density or including precinct fixed effects.

It is also illuminating to explore the geography of late ballots depicted in Figure A8 in the Appendix. As discussed in my previous report, the urban counties with elevated rates of late ballot submissions had been quite reliant on drop boxes in 2020, and these were the counties where SB 202 required the removal of drop boxes. Figure A9 in the Appendix provides a map of known drop boxes used in 2020 and in 2024, allowing for a visualization of the removal of drop boxes under SB 202.

Figure 5 below examines county-level data, plotting drop boxes per 1,000 registered voters on the horizontal axis and late rejected ballots as a share of absentee ballots returned on the vertical axis. The size of the data markers corresponds to the size of the county (in terms of registered voters). It shows that late rejected ballots were more prevalent in 2024 in the large, urban counties with fewer drop boxes per 1,000 voters.

**Figure 5: Log drop boxes per thousand voters and late rejected ballots as share of mail-in ballots returned in 2024, Georgia counties**



Because comparable data on ballots rejected for being received past the deadline are available in the EAVS surveys, it is possible to contrast late rejected ballots at the county level in 2020 and 2024. Figure 6 demonstrates that the relatively urban counties—which also have relatively large Black populations and are largely Democratic—experienced some of the largest increases in late rejected ballots (on the horizontal axis) and also the largest decreases in turnout from 2020 to 2024 (on the vertical axis).

Figure 6: Change in turnout, 2020 to 2024, and change in late rejected ballots as share of ballots transmitted



## VI.    Election-day voting and provisional ballots

In urban environments, precincts are often oddly shaped, and the need to find suitable buildings to host voting on election day can mean that a polling place is sometimes located on the perimeter of the precinct, such that a voter might find that a polling place across the street from their home is open and greeting voters, but the correct polling place for the voter's precinct is surprisingly far away, on the other side of the precinct. Voters are typically completely unaware of the geography of their precinct boundaries. A common problem with election-day in-person voting in the United States is that voters often mistakenly show up at the polling place that is closest to them or most familiar to them, for instance their child's elementary school, even though it is not the correct polling place for their precinct.

One way to handle this is to move away from a precinct-based model of voting and use vote centers that can print bespoke ballots for each registered voter according to their precinct. This is the model used for early voting in Georgia. Another common practice is to allow the voter to cast a provisional ballot at the incorrect polling place, only counting the races for which the voter is

eligible to vote (e.g., not counting the ballot for a city council race in a district in which the voter does not reside). This was the practice in Georgia prior to SB 202.

SB 202, however, stipulates that provisional ballots cast by so-called "out-of-precinct" voters will no longer be counted if the individual arrives at the polling place before 5:00 PM on election day even for those contests for which the voter is qualified. Election administrators are expected to instruct voters who show up at the wrong polling place before 5:00 PM that if the voter casts a provisional ballot, it will not count. The voters are to be instructed to leave, find their correct polling place, and cast a ballot there.

An initial question is whether election administrators are following through on these instructions or continuing to distribute provisional ballots that cannot count. County election administrators have reported to the 2024 EAVS survey how many provisional ballots were distributed for being out-of-precinct, and how many of them were rejected. If no one is given an out-of-precinct provisional ballot before 5:00 PM, and all such ballots distributed after 5:00 PM are counted (or rejected under a different category, such as non-registration), rejection rates due to a voter being in the wrong precinct should be zero, or perhaps slightly higher if some voters insist on casting a provisional ballot in spite of being told it will not count. In some counties the rejection rates are consistent with this. However, in other counties, the rejection rate is surprisingly high. Table 1 provides data from the EAVS survey on the number of out-of-precinct provisional ballots offered and rejected in 2024 for all counties where at least 20 out-of-precinct provisional ballots were offered.

Several counties have zero rejections or very low rates, as one would expect if no provisional ballots were being offered before 5:00 PM and then rejected. However, it seems clear that administrators in other counties are offering provisional ballots to out-of-precinct voters and then rejecting those ballots. Five counties have rejection rates above 50 percent. Notably, the rate of rejection is highest at 76 percent in Douglas County and 93 percent in Muscogee County.

**Table 1: Out-of-precinct provisional ballots offered and rejected in November 2024, all counties with 20 or more out-of-precinct provisional ballots**

| County | Out-of-precinct provisional ballots offered | Out-of-precinct provisional ballots rejected | Rejected as share of offered |
|--------|------|------|------|
| LOWNDES | 90 | 0 | 0.00 |
| HOUSTON | 26 | 0 | 0.00 |
| CHEROKEE | 22 | 0 | 0.00 |
| HALL | 23 | 0 | 0.00 |
| COFFEE | 21 | 0 | 0.00 |
| COBB | 215 | 17 | 0.08 |
| RICHMOND | 94 | 10 | 0.11 |
| FULTON | 705 | 84 | 0.12 |
| FORSYTH | 22 | 3 | 0.14 |
| CARROLL | 26 | 4 | 0.15 |
| GWINNETT | 356 | 63 | 0.18 |
| DOUGHERTY | 27 | 8 | 0.30 |
| BIBB | 98 | 34 | 0.35 |
| COLUMBIA | 26 | 10 | 0.38 |
| PAULDING | 31 | 12 | 0.39 |
| CHATHAM | 76 | 34 | 0.45 |
| DEKALB | 326 | 163 | 0.50 |
| HENRY | 55 | 34 | 0.62 |
| CLAYTON | 149 | 93 | 0.62 |
| DOUGLAS | 98 | 74 | 0.76 |
| MUSCOGEE | 57 | 53 | 0.93 |

*Source: EAVS*

A far bigger problem for voters with this new out-of-precinct provisional ballot policy, however, is much more difficult to track with data. Voters might show up at the incorrect polling place with a narrow time window to vote before, for instance, starting work or picking up children from school or daycare. Being told to locate and arrange transportation to another polling place, perhaps after waiting in line and with the prospect of another line, might prevent the individual from voting. For some of those who vote on election day, the use of a vote center model throughout the early voting period might create additional confusion, since throughout the early voting period, there is no such thing as a "wrong" precinct, but that is no longer the case on election day.

17

From an analytical perspective, the fact that provisional ballots are no longer distributed means there is nothing for a researcher to examine. Out-of-precinct voters are sent away without any record of their visit. Unfortunately, the 2020 EAVS did not include detailed data about the specific reason for offering, accepting, or rejecting, a provisional ballot in Georgia. However, it did include the total number of accepted provisional ballots in 2020, which was 11,781. In 2024, the number fell all the way to 3,229. Most of this dramatic drop in counted provisional ballots was likely driven by the fact that in 2024, out-of-precinct voters were no longer offered provisional ballots that would be counted. However, we have no way of knowing how many voters showed up at the wrong polling place in 2024 and were turned away. It is worthwhile nevertheless to examine the geography of these reductions in counted provisional ballots.

Below, Figures 7 and 8 plot the change in counted provisional ballots as a share of election-day ballots cast from 2020 to 2024, on the vertical axis, against Black registered voters as a share of the total (Figure 7) and the Democratic presidential vote share (Figure 8) on the horizontal axis. The size of the data marker corresponds to the number of registered voters in the county.

**Figure 7: Black registered voters as share of total and change in counted provisional ballots from 2020 to 2024 as share of election-day votes cast**



**Figure 8: Democratic presidential vote share and change in counted provisional ballots from 2020 to 2024 as share of election-day votes cast**



Figures 7 and 8 show that the number of counted provisional ballots has decreased dramatically in some of the most urban counties with relatively large Black and Democratic-leaning populations. In Fulton County, for instance, there were 3,598 counted provisional ballots in 2020 but only 649 in 2024. In DeKalb County, the number went from 1,126 to 260. It is possible that some voters learned the importance of visiting the correct polling place after the implementation of SB 202. However, it is quite likely that the counties with the biggest falloffs in counted provisional ballots were those most affected by the new practice of not offering provisional ballots, or in some of the counties documented in Table 1, offering them but not counting them.

The evidence is only suggestive, but we can verify that the counties with the largest falloffs in counted provisional ballots are also those with the largest decreases in turnout. Figure 9 demonstrates this relationship with a scatterplot, where the vertical axis measures the change in turnout from 2020 to 2024, and the horizontal axis is the change in counted provisional ballots as a share of election-day ballots.

Figure 9: Change in turnout and change in counted provisional ballots as share of election-day ballots cast, 2020 to 2024, Georgia counties



The Secretary of State's office did not track individual-level provisional ballots in 2024. It is not clear if the records are meant to be complete, but in previous years, the vote history file did contain a field indicating whether a voter's (counted) ballot was known to have been cast provisionally. I used this information in my previous report. It is possible to examine, then, whether voters known to have cast a provisional ballot in 2020 were less likely to cast a valid ballot in 2024. Among those who were registered to vote in November of 2024 who had voted in 2020, 85 percent of those whose ballots were cast non-provisionally in 2020 voted again in 2024. Among those who cast provisional ballots in 2020, 63 percent voted again in 2024—a difference of 22 percentage points. Although individual-level indicators of the reason for casting a provisional ballot in 2020 are unavailable, many of those who cast valid provisional ballots in 2020 were undoubtedly out-of-precinct voters, and this group experienced a large falloff in participation in 2024, when provisional ballots were no longer offered to out-of-precinct voters before 5:00 PM.

## VI.   CONCLUSION

Turnout in Georgia was lower in 2024 than in 2020, especially in urban areas where Black voters and Democratic voters are most concentrated. The gap between Black turnout and White turnout was larger in 2024 than in any other election for which I have been able to analyze individual-level data.

This bulk of this report focused on the measurable ways in which SB 202 thwarted participation in 2024, including rejected ballot applications, rejected ballots, late ballots, and changes to provisions for out-of-precinct voters. For each of these impediments, the burdens were disproportionately borne by Black and Democratic voters.

## VII.   APPENDIX

### Figure A1: Mail-in ballots as share of votes cast in November 2024



Figure A2: Early voting as share of votes cast in November 2024



**Figure A3: Election-day in-person voting as share of votes cast in November 2024**



**Figure A4: Black registered voters as share of registered voters in November 2024**



**Figure A5: Harris vote share in November 2024**



**Figure A6: Rejected absentee ballot applications for November 2024 general election**



**Figure A7: Rejected ballots submitted by voters for the November 2024 general election**



**Figure A8: Ballots submitted after the deadline for the November 2024 general election**



Figure A9: Known drop box locations in 2020 and 2024



Exhibit A

# Jonathan Rodden

Stanford University
Department of Political Science
Encina Hall Central
616 Jane Stanford Way
Stanford, CA 94305

Phone:       (650) 723-5219
Email:       jrodden@stanford.edu
Homepage:    http://www.jonathanrodden.com

## Education

Ph.D. Political Science, Yale University, 2000.

Fulbright Scholar, University of Leipzig, Germany, 1993–1994.

B.A., Political Science, University of Michigan, 1993.

## Academic Positions

Professor, Department of Political Science, Stanford University, 2012–present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2020–present.

Senior Fellow, Hoover Institution, Stanford University, 2012–present.

Director, Spatial Social Science Lab, Stanford University, 2012–present.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, 2010–2012.

Associate Professor, Department of Political Science, Stanford University, 2007–2012.

Fellow, Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, 2006–2007.

Ford Career Development Associate Professor of Political Science, MIT, 2003–2006.

Visiting Scholar, Center for Basic Research in the Social Sciences, Harvard University, 2004.

Assistant Professor of Political Science, MIT, 1999–2003.

Instructor, Department of Political Science and School of Management, Yale University, 1997–1999.

## Publications

### Books

*Why Cities Lose: The Deep Roots of the Urban-Rural Divide.* Basic Books, 2019.

*Decentralized Governance and Accountability: Academic Research and the Future of Donor Programming.* Co-edited with Erik Wibbels, Cambridge University Press, 2019.

*Hamilton's Paradox: The Promise and Peril of Fiscal Federalism*, Cambridge University Press, 2006. Winner, Gregory Luebbert Award for Best Book in Comparative Politics, 2007; Martha Derthick Award for lasting contribution to the study of federalism, 2021.

*Fiscal Decentralization and the Challenge of Hard Budget Constraints*, MIT Press, 2003. Co-edited with Gunnar Eskeland and Jennie Litvack.

## Peer Reviewed Journal Articles

The Great Global Divider? A Comparison of Urban-Rural Partisan Polarization in Western Democracies, *Comparative Political Studies* (with Twan Huijsmans), https://doi.org/10.1177/00104140241237458.

The Great Recession and the Public Sector in Rural America, 2023, *Journal of Economic Geography* https://doi.org/10.1093/jeg/lbad015.

How Social Context Affects Immigration Attitudes, 2023, *Journal of Politics* 85( 2): 372-388 (with Adam Berinsky, Christopher Karpowitz, Zeyu Chris Peng, and Cara Wong).

Homicide Deaths Among Adult Cohabitants of Handgun Owners in California, 2004 to 2016: A Cohort Study, 2022, *Annals of Internal Medicine* 175(5): 804-811 (with David M. Studdert, Yifan Zhang, Erin E. Holsinger, Lea Prince, Alexander F. Holsinger, Garen J. Wintemute, and Matthew Miller).

Policies to Influence Perceptions about COVID-19 Risk: The Case of Maps. 2022, *Science Advances* 8(11): 1-9 (with Claudia Engel and Marco Tabellini).

Polarization and Accountability in COVID Times, 2022, *Frontiers in Political Science* January 19, 2022 (with Pablo Beramendi).

Who Registers? Village Networks, Household Dynamics, and Voter Registration in Rural Uganda, 2021, *Comparative Political Studies* 55(6), 899–932, https://doi.org/10.1177/00104140211036048 (with Romain Ferrali, Guy Grossman, and Melina Platas).

Partisan Dislocation: A Precinct-Level Measure of Representation and Gerrymandering, 2021, *Political Analysis* 30(3), 403-425, doi:10.1017/pan.2021.13 (with Daryl DeFord Nick Eubank).

Who is my Neighbor? The Spatial Efficiency of Partisanship, 2020, *Statistics and Public Policy* 7(1):87-100 (with Nick Eubank).

Handgun Ownership and Suicide in California, 2020, *New England Journal of Medicine* 382: 2220-2229 (with David M. Studdert, Yifan Zhang, Sonja A. Swanson, Lea Prince, Erin E. Holsinger, Matthew J. Spittal, Garen J. Wintemute, and Matthew Miller).

Viral Voting: Social Networks and Political Participation, 2020, *Quarterly Journal of Political Science* 163: 265-284, (with Nick Eubank, Guy Grossman, and Melina Platas). Winner, *Political Ties Award* for the best paper on the subject of political networks.

It Takes a Village: Peer Effects and Externalities in Technology Adoption, 2020, *American Journal of Political Science* 64(3): 536-553, (with Romain Ferrali, Guy Grossman, and Melina Platas). Winner, 2020 Best Conference Paper Award, American Political Science Association Network Section.

Assembly of the LongSHOT Cohort: Public Record Linkage on a Grand Scale, 2019, *Injury Prevention* 26: 153-158 (with Yifan Zhang, Erin Holsinger, Lea Prince, Sonja Swanson, Matthew Miller, Garen Wintemute, and David Studdert).

Crowdsourcing Accountability: ICT for Service Delivery, 2018, *World Development* 112: 74-87 (with Guy Grossman and Melina Platas).

Geography, Uncertainty, and Polarization, 2018, *Political Science Research and Methods* doi:10.1017/psrm.2018.12 (with Nolan McCarty, Boris Shor, Chris Tausanovitch, and Chris Warshaw).

Handgun Acquisitions in California after Two Mass Shootings, 2017, *Annals of Internal Medicine* 166(10):698-706. (with David Studdert, Yifan Zhang, Rob Hyndman, and Garen Wintemute).

Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 2015, *Election Law Journal* 14(4): 1-15 (with Jowei Chen).

The Achilles Heel of Plurality Systems: Geography and Representation in Multi-Party Democracies, 2015, *American Journal of Political Science* 59(4): 789-805 (with Ernesto Calvo). Winner, Michael Wallerstein Award for best paper in political economy, American Political Science Association.

Why has U.S. Policy Uncertainty Risen Since 1960?, 2014, *American Economic Review: Papers and Proceedings* May 2014 (with Nicholas Bloom, Brandice Canes-Wrone, Scott Baker, and Steven Davis).

Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures, 2013, *Quarterly Journal of Political Science* 8: 239-269 (with Jowei Chen).

How Should We Measure District-Level Public Opinion on Individual Issues?, 2012, *Journal of Politics* 74(1): 203-219 (with Chris Warshaw).

Representation and Redistribution in Federations, 2011, *Proceedings of the National Academy of Sciences* 108, 21: 8601-8604 (with Tiberiu Dragu).

Dual Accountability and the Nationalization of Party Competition: Evidence from Four Federatons, 2011, *Party Politics* 17, 5: 629-653 (with Erik Wibbels).

The Geographic Distribution of Political Preferences, 2010, *Annual Review of Political Science* 13: 297–340.

Fiscal Decentralization and the Business Cycle: An Empirical Study of Seven Federations, 2009, *Economics and Politics* 22(1): 37–67 (with Erik Wibbels).

Getting into the Game: Legislative Bargaining, Distributive Politics, and EU Enlargement, 2009, *Public Finance and Management* 9(4) (with Deniz Aksoy).

The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting, 2008. *American Political Science Review* 102(2): 215-232 (with Stephen Ansolabehere and James Snyder).

Does Religion Distract the Poor? Income and Issue Voting Around the World, 2008, *Comparative Political Studies* 41(4): 437-476 (with Ana Lorena De La O).

Purple America, 2006, *Journal of Economic Perspectives* 20(2) (Spring): 97–118 (with Stephen Ansolabehere and James Snyder).

Economic Geography and Economic Voting: Evidence from the U.S. States, 2006, *British Journal of Political Science* 36(3): 527-47 (with Michael Ebeid).

Distributive Politics in a Federation: Electoral Strategies, Legislative Bargaining, and Government Coalitions, 2004, *Dados* 47(3) (with Marta Arretche, in Portuguese).

Comparative Federalism and Decentralization: On Meaning and Measurement, 2004, *Comparative Politics* 36(4): 481-500. (Portuguese version, 2005, in *Revista de Sociologia e Politica* 25).

Reviving Leviathan: Fiscal Federalism and the Growth of Government, 2003, *International Organization* 57 (Fall), 695-729.

Beyond the Fiction of Federalism: Macroeconomic Management in Multi-tiered Systems, 2003, *World Politics* 54(4) (July): 494-531 (with Erik Wibbels).

The Dilemma of Fiscal Federalism: Grants and Fiscal Performance around the World, 2002, *American Journal of Political Science* 46(3): 670-687.

Strength in Numbers: Representation and Redistribution in the European Union, 2002, *European Union Politics* 3(2): 151-175.

Does Federalism Preserve Markets?  1997, *Virginia Law Review* 83(7): 1521-1572 (with Susan Rose-Ackerman). Spanish version, 1999, in *Quorum* 68.

## Working Papers

Elections, Political Polarization, and Economic Uncertainty, NBER Working Paper 27961 (with Scott Baker, Aniket Baksy, Nicholas Bloom, and Steven Davis).

Federalism and Inter-regional Redistribution, Working Paper 2009/3, Institut d'Economia de Barcelona.

Representation and Regional Redistribution in Federations, Working Paper 2010/16, Institut d'Economia de Barcelona (with Tiberiu Dragu).

Changing the Default: The Impact of Motor-Voter Reform in Colorado (with Justin Grimmer), 2022.

## Chapters in Books

Recessions and Ratchets: Federal Funds and Public Sector Employment, in *American Federalism Today*, edited by Michael Boskin, Hoover Institution Press.

The Urban-Rural Divide in Historical Political Economy, in *Oxford Handbook of Historical Political Economy*, edited by Jeffery A. Jenkins and Jared Rubin, 2023, Oxford University Press.

Political Geography and Representation: A Case Study of Districting in Pennsylvania (with Thomas Weighill), in *Political Geometry*, edited by Moon Duchin and Olivia Walch, 2022, Springer.

Keeping Your Enemies Close: Electoral Rules and Partisan Polarization, in *The New Politics of Insecurity*, edited by Frances Rosenbluth and Margaret Weir, 2022, Cambridge University Press.

Decentralized Rule and Revenue, 2019, in Jonathan Rodden and Erik Wibbels, eds., *Decentralized Governance and Accountability*, Cambridge University Press.

Geography and Gridlock in the United States, 2014, in Nathaniel Persily, ed. *Solutions to Political Polarization in America*, Cambridge University Press.

Can Market Discipline Survive in the U.S. Federation?, 2013, in Daniel Nadler and Paul Peterson, eds, *The Global Debt Crisis: Haunting U.S. and European Federalism*, Brookings Press.

Market Discipline and U.S. Federalism, 2012, in Peter Conti-Brown and David A. Skeel, Jr., eds, *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press.

Federalism and Inter-Regional Redistribution, 2010, in Nuria Bosch, Marta Espasa, and Albert Sole Olle, eds., *The Political Economy of Inter-Regional Fiscal Flows*, Edward Elgar.

Back to the Future: Endogenous Institutions and Comparative Politics, 2009, in Mark Lichbach and Alan Zuckerman, eds., *Comparative Politics: Rationality, Culture, and Structure* (Second Edition), Cambridge University Press.

The Political Economy of Federalism, 2006, in Barry Weingast and Donald Wittman, eds., *Oxford Handbook of Political Economy*, Oxford University Press.

Fiscal Discipline in Federations: Germany and the EMU, 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

The Political Economy of Pro-cyclical Decentralised Finance (with Erik Wibbels), 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

Globalization and Fiscal Decentralization, (with Geoffrey Garrett), 2003, in Miles Kahler and David Lake, eds., *Governance in a Global Economy: Political Authority in Transition*, Princeton University Press: 87-109. (Updated version, 2007, in David Cameron, Gustav Ranis, and Annalisa Zinn, eds., *Globalization and Self-Determination: Is the Nation-State under Siege?* Routledge.)

Introduction and Overview (Chapter 1), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Soft Budget Constraints and German Federalism (Chapter 5), 2003, in Rodden, et al, *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Federalism and Bailouts in Brazil (Chapter 7), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Lessons and Conclusions (Chapter 13), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

## Online Interactive Visualization

Stanford Election Atlas, 2012 (collaboration with Stephen Ansolabehere at Harvard and Jim Herries at ESRI)

## Other Publications

Supporting Advanced Manufacturing in Alabama, Report to the Alabama Innovation Commission, Hoover Institution, 2021.

How America's Urban-Rural Divide has Shaped the Pandemic, 2020, *Foreign Affairs*, April 20, 2020.

An Evolutionary Path for the European Monetary Fund? A Comparative Perspective, 2017, Briefing paper for the Economic and Financial Affairs Committee of the European Parliament.

Amicus Brief in *Rucho et al. v. Common Cause*, 2019, Supreme Court of the United States, with Wesley Pegden and and Samuel Wang.

Amicus Brief in *Gill et al. v. Whitford et al.,* 2017, Supreme Court of the United States, with Jowei Chen and Wesley Pegden.

Representation and Regional Redistribution in Federations: A Research Report, 2009, in *World Report on Fiscal Federalism*, Institut d'Economia de Barcelona.

On the Migration of Fiscal Sovereignty, 2004, *PS: Political Science and Politics* July, 2004: 427–431.

Decentralization and the Challenge of Hard Budget Constraints, *PREM Note* 41, Poverty Reduction and Economic Management Unit, World Bank, Washington, D.C. (July).

Decentralization and Hard Budget Constraints, *APSA-CP* (Newsletter of the Organized Section in Comparative Politics, American Political Science Association) 11:1 (with Jennie Litvack).

Book Review of *The Government of Money* by Peter Johnson, *Comparative Political Studies* 32,7: 897-900.

## Fellowships, Honors, and Grants

Andrew Carnegie Fellow, 2025.

National Science Foundation, funding for study "Segregation, Suburbanization, and Representation," 2023.

John Simon Guggenheim Memorial Foundation Fellowship, 2021.

Martha Derthick Award of the American Political Science Association for "the best book published at least ten years ago that has made a lasting contribution to the study of federalism and intergovernmental relations," 2021.

National Institutes of Health, funding for "Relationship between lawful handgun ownership and risk of homicide victimization in the home," 2021-2024.

National Collaborative on Gun Violence Research, funding for "Cohort Study Of Firearm-Related Mortality Among Cohabitants Of Handgun Owners." 2020.

Fund for a Safer Future, Longitudinal Study of Handgun Ownership and Transfer (LongSHOT), GA004696, 2017-2018.

Stanford Institute for Innovation in Developing Economies, Innovation and Entrepreneurship research grant, 2015.

Michael Wallerstein Award for best paper in political economy, American Political Science Association, 2016.

Common Cause Gerrymandering Standard Writing Competition, 2015.

General support grant from the Hewlett Foundation for Spatial Social Science Lab, 2014.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2012.

Sloan Foundation, grant for assembly of geo-referenced precinct-level electoral data set (with Stephen Ansolabehere and James Snyder), 2009-2011.

Hoagland Award Fund for Innovations in Undergraduate Teaching, Stanford University, 2009.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, beginning Fall 2010.

Research Grant on Fiscal Federalism, Institut d'Economia de Barcelona, 2009.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2008.

United Postal Service Foundation grant for study of the spatial distribution of income in cities, 2008.

Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

Fellow, Center for Advanced Study in the Behavioral Sciences, 2006-2007.

National Science Foundation grant for assembly of cross-national provincial-level dataset on elections, public finance, and government composition, 2003-2004 (with Erik Wibbels).

MIT Dean's Fund and School of Humanities, Arts, and Social Sciences Research Funds.

Funding from DAAD (German Academic Exchange Service), MIT, and Harvard EU Center to organize the conference, "European Fiscal Federalism in Comparative Perspective," held at Harvard University, November 4, 2000.

Canadian Studies Fellowship (Canadian Federal Government), 1996-1997.

Prize Teaching Fellowship, Yale University, 1998-1999.

Fulbright Grant, University of Leipzig, Germany, 1993-1994.

Michigan Association of Governing Boards Award, one of two top graduating students at the University of Michigan, 1993.

W. J. Bryan Prize, top graduating senior in political science department at the University of Michigan, 1993.

## Other Professional Activities

Selection committee, best paper award, American Journal of Political Science.

Selection committee, best paper award, American Political Economy

International Advisory Committee, Center for Metropolitan Studies, Sao Paulo, Brazil, 2006–2010.

Selection committee, Mancur Olson Prize awarded by the American Political Science Association Political Economy Section for the best dissertation in the field of political economy.

Selection committee, Gregory Luebbert Best Book Award.

Selection committee, William Anderson Prize, awarded by the American Political Science Association for the best dissertation in the field of federalism and intergovernmental relations.

## Courses

*Undergraduate*

Politics, Economics, and Democracy

Introduction to Comparative Politics

Introduction to Political Science

Political Science Scope and Methods

Institutional Economics

Spatial Approaches to Social Science

*Graduate*

Political Economy

Political Economy of Institutions

Federalism and Fiscal Decentralization

Politics and Geography

## Consulting

2017. Economic and Financial Affairs Committee of the European Parliament.

2016. Briefing paper for the World Bank on fiscal federalism in Brazil.

2013-2018: Principal Investigator, SMS for Better Governance (a collaborative project involving USAID, Social Impact, and UNICEF in Arua, Uganda).

2023. Expert witness in *Agee, Jr. et al v. Benson et al*, No. 1:22-cv-00272 (W.D. Mi. 2023).

2022. Expert witness in *Rivera v. Schwab* No. 2022-cv-89 (Kan. Dist. Ct. 2022)

2022. Drew Pennsylvania Congressional redistricting plan that was chosen by the Pennsylvania Supreme Court for implementation in *Carter v. Chapman* No. 7 MM 2022, 2022WL 549106 (Pennsylvania Supreme Court).

2022. Written expert testimony in *Benninghoff v. 2021 Legislative Reapportionment Commission* (Pennsylvania Supreme Court).

2022 Expert witness in *Bennett v. Ohio Redistricting Commission*, No. 2012-1198 (Ohio Supreme Court).

2022 Expert witness in *Adams v. DeWine* No. 2012-1428 (Ohio Supreme Court).

2022 Expert witness in *Neiman v. LaRose* No. 2022-0298 (Ohio Supreme Court)

2019: Written expert testimony in *McLemore, Holmes, Robinson, and Woullard v. Hosemann*, United States District Court, Mississippi.

2019: Expert witness in *Nancy Corola Jacobson v. Detzner*, United States District Court, Florida.

2018: Written expert testimony in *League of Women Voters of Florida v. Detzner* No. 4:18-cv-002510, United States District Court, Florida.

2018: Written expert testimony in *College Democrats of the University of Michigan, et al. v. Johnson, et al.*, United States District Court for the Eastern District of Michigan.

2017: Expert witness in *Bethune-Hill v. Virginia Board of Elections*, No. 3:14-CV-00852, United States District Court for the Eastern District of Virginia.

2017: Expert witness in *Arizona Democratic Party, et al. v. Reagan, et al.*, No. 2:16-CV-01065, United States District Court for Arizona.

2016: Expert witness in *Lee v. Virginia Board of Elections*, 3:15-cv-357, United States District Court for the Eastern District of Virginia, Richmond Division.

2016: Expert witness in *Missouri NAACP v. Ferguson-Florissant School District*, United States District Court for the Eastern District of Missouri, Eastern Division.

2014-2015: Written expert testimony in *League of Women Voters of Florida et al. v. Detzner, et al.*, 2012-CA-002842 in Florida Circuit Court, Leon County (Florida Senate redistricting case).

2013-2014: Expert witness in *Romo v Detzner*, 2012-CA-000412 in Florida Curcuit Court, Leon County (Florida Congressional redistricting case).

2011-2014: Consultation with investment groups and hedge funds on European debt crisis.

2011-2014: Lead Outcome Expert, Democracy and Governance, USAID and Social Impact.

2010: USAID, Review of USAID analysis of decentralization in Africa.

2006–2009: World Bank, Independent Evaluations Group. Undertook evaluations of World Bank decentralization and safety net programs.

2008–2011: International Monetary Fund Institute. Designed and taught course on fiscal federalism.

1998–2003: World Bank, Poverty Reduction and Economic Management Unit. Consultant for *World Development Report*, lecturer for training courses, participant in working group for assembly of decentralization data, director of multi-country study of fiscal discipline in decentralized countries, collaborator on review of subnational adjustment lending.

Last updated: June 16, 2025

**Table 10. Reasons For Not Voting, By Selected Characteristics: November 2024**
(Numbers in thousands, Population 18 and Over)

| Characteristics | | Total not voting[1] | Percent distribution of reasons for not voting | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Illness or disability | Out of town | Forgot to vote | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
| Total | | 18,161 | 12.4 | 7.4 | 4.1 | 19.7 | 17.8 | 2.2 | 14.7 | 3.6 | 0.3 | 2.4 | 12.2 | 3.1 |
| Age | 18 to 24 years | 2,611 | 2.8 | 14.1 | 5.0 | 20.4 | 22.3 | 2.3 | 10.1 | 5.3 | 0.0 | 1.6 | 12.8 | 3.3 |
| | 25 to 44 years | 7,476 | 6.4 | 6.3 | 4.7 | 21.1 | 23.6 | 1.6 | 14.0 | 3.5 | 0.2 | 3.2 | 12.2 | 3.2 |
| | 45 to 64 years | 4,960 | 12.5 | 7.7 | 3.5 | 19.9 | 15.7 | 2.1 | 17.8 | 3.5 | 0.6 | 2.1 | 12.4 | 2.4 |
| | 65 years and over | 3,115 | 35.0 | 4.2 | 3.1 | 15.7 | 3.5 | 3.8 | 15.4 | 2.6 | 0.3 | 1.5 | 11.4 | 3.6 |
| Sex | Male | 9,071 | 10.0 | 8.8 | 4.6 | 21.0 | 18.5 | 1.6 | 15.2 | 3.6 | 0.2 | 2.2 | 11.4 | 2.7 |
| | Female | 9,090 | 14.8 | 6.1 | 3.7 | 18.4 | 17.0 | 2.8 | 14.2 | 3.6 | 0.4 | 2.5 | 13.0 | 3.4 |
| Race and Hispanic Origin | White alone | 13,295 | 12.4 | 7.6 | 4.5 | 18.6 | 17.2 | 1.9 | 15.1 | 4.2 | 0.3 | 2.5 | 12.5 | 3.0 |
| | White non-Hispanic alone | 10,380 | 13.4 | 7.6 | 4.7 | 17.4 | 16.1 | 2.1 | 15.7 | 4.6 | 0.4 | 2.4 | 12.6 | 3.0 |
| | Black alone | 3,040 | 13.7 | 5.0 | 2.2 | 23.8 | 17.1 | 3.4 | 15.2 | 2.1 | 0.2 | 2.1 | 11.1 | 4.0 |
| | Asian alone | 930 | 10.0 | 12.6 | 4.1 | 19.2 | 21.4 | 0.9 | 12.0 | 3.1 | 0.4 | 1.1 | 11.2 | 3.9 |
| | Hispanic (any race) | 3,332 | 9.1 | 7.7 | 3.4 | 23.1 | 21.8 | 1.4 | 12.4 | 2.7 | 0.0 | 2.8 | 12.8 | 2.7 |
| | White alone or in combination | 13,790 | 12.2 | 7.8 | 4.5 | 18.9 | 17.5 | 1.9 | 15.0 | 4.0 | 0.3 | 2.5 | 12.5 | 2.9 |
| | Black alone or in combination | 3,354 | 13.3 | 5.6 | 2.1 | 23.9 | 18.5 | 3.1 | 14.5 | 1.9 | 0.2 | 2.1 | 11.1 | 3.6 |
| | Asian alone or in combination | 1,030 | 9.4 | 11.9 | 3.8 | 20.4 | 23.1 | 0.8 | 12.4 | 2.8 | 0.4 | 1.0 | 10.3 | 3.6 |
| Educational attainment | Less than high school graduate | 1,734 | 20.3 | 5.6 | 3.5 | 18.9 | 13.6 | 4.3 | 11.6 | 2.7 | 0.2 | 1.9 | 15.5 | 1.9 |
| | High school graduate | 6,800 | 12.8 | 5.2 | 4.0 | 22.8 | 17.3 | 2.9 | 14.5 | 2.9 | 0.3 | 2.5 | 11.6 | 3.4 |
| | Some College | 5,632 | 11.9 | 8.5 | 4.6 | 18.8 | 18.8 | 1.4 | 14.7 | 3.5 | 0.2 | 2.5 | 11.9 | 3.2 |
| | Bachelor's Degree or more | 3,995 | 9.2 | 10.6 | 3.9 | 16.5 | 19.0 | 1.4 | 16.4 | 5.2 | 0.5 | 2.2 | 12.2 | 2.9 |
| Nativity | Native-born citizen | 16,159 | 12.6 | 7.1 | 4.2 | 20.2 | 17.2 | 2.4 | 14.8 | 3.8 | 0.3 | 2.4 | 12.0 | 3.1 |
| | Naturalized citizen | 2,002 | 11.3 | 10.4 | 3.3 | 15.9 | 22.3 | 1.1 | 14.4 | 2.2 | 0.0 | 2.6 | 13.8 | 2.7 |
| Duration of residence | Less than 1 year | 2,593 | 8.0 | 8.9 | 5.9 | 15.8 | 20.0 | 2.8 | 12.0 | 9.8 | 0.2 | 1.1 | 13.5 | 2.2 |
| | 1 to 2 years | 2,657 | 9.2 | 6.4 | 4.4 | 18.9 | 23.7 | 3.4 | 13.7 | 3.7 | 0.2 | 2.5 | 10.2 | 3.8 |
| | 3 years or longer | 12,678 | 13.9 | 7.4 | 3.7 | 20.9 | 16.2 | 1.9 | 15.6 | 2.3 | 0.4 | 2.7 | 12.4 | 2.6 |
| | Not reported | 234 | 16.5 | 6.3 | 3.1 | 8.3 | 14.3 | 4.5 | 4.6 | 2.6 | 0.0 | 0.0 | 11.3 | 28.5 |
| Region | Northeast | 2,599 | 14.5 | 6.9 | 3.3 | 19.6 | 17.6 | 0.4 | 15.6 | 2.9 | 0.0 | 2.8 | 13.6 | 2.9 |
| | Midwest | 4,174 | 13.5 | 6.0 | 3.4 | 16.9 | 17.8 | 2.4 | 17.7 | 3.1 | 1.1 | 2.3 | 13.0 | 2.9 |
| | South | 7,726 | 12.8 | 9.6 | 3.5 | 18.1 | 18.2 | 3.0 | 13.3 | 4.2 | 0.1 | 2.7 | 11.4 | 3.1 |
| | West | 3,662 | 8.8 | 5.0 | 6.8 | 26.6 | 17.0 | 1.9 | 13.6 | 3.5 | 0.0 | 1.6 | 11.9 | 3.2 |
| Family Income[2] | Total in families | 12,134 | 11.3 | 8.0 | 3.6 | 20.6 | 19.0 | 1.5 | 14.6 | 3.0 | 0.1 | 2.6 | 12.3 | 3.3 |
| | Under $10,000 | 331 | 16.7 | 7.6 | 5.5 | 16.4 | 8.8 | 3.7 | 14.1 | 2.4 | 0.0 | 5.9 | 14.9 | 4.0 |
| | $10,000 to $14,999 | 285 | 12.9 | 5.8 | 2.9 | 24.9 | 18.4 | 6.9 | 6.5 | 0.7 | 0.0 | 0.3 | 16.0 | 4.6 |
| | $15,000 to $19,999 | 245 | 20.7 | 3.5 | 3.9 | 19.9 | 17.4 | 5.1 | 7.4 | 2.1 | 0.0 | 0.6 | 19.5 | 0.0 |
| | $20,000 to $29,999 | 798 | 18.3 | 3.3 | 4.6 | 23.1 | 11.4 | 4.0 | 17.3 | 3.7 | 0.0 | 3.4 | 9.5 | 1.4 |
| | $30,000 to $39,999 | 1,046 | 16.7 | 3.6 | 2.7 | 18.5 | 22.2 | 3.3 | 12.9 | 2.8 | 0.0 | 4.4 | 9.7 | 3.3 |
| | $40,000 to $49,999 | 781 | 7.8 | 6.5 | 2.4 | 20.2 | 18.6 | 1.9 | 19.8 | 3.4 | 0.0 | 3.4 | 13.5 | 2.6 |
| | $50,000 to $74,999 | 1,763 | 14.7 | 7.6 | 4.0 | 23.5 | 18.8 | 1.3 | 12.8 | 1.5 | 0.0 | 1.3 | 10.6 | 4.0 |
| | $75,000 to $99,999 | 1,442 | 12.5 | 6.9 | 4.5 | 18.0 | 22.7 | 0.4 | 14.4 | 3.5 | 0.3 | 2.6 | 10.3 | 3.9 |
| | $100,000 to $149,999 | 1,970 | 7.2 | 7.6 | 3.1 | 21.4 | 21.8 | 0.5 | 15.5 | 4.5 | 0.4 | 3.1 | 12.7 | 2.1 |
| | $150,000 and over | 2,282 | 3.7 | 14.7 | 3.5 | 18.9 | 19.5 | 0.3 | 17.7 | 3.6 | 0.0 | 2.1 | 14.4 | 1.6 |
| | Income not reported | 1,192 | 15.5 | 7.0 | 3.7 | 21.9 | 15.6 | 1.3 | 9.5 | 1.5 | 0.0 | 2.4 | 12.8 | 8.9 |

Margins of Error[3]



EXHIBIT c.m.
7
8/12/25 Rodda

**Margins of Error[3]**

| Characteristics | Total not voting[1] | Percent distribution of reasons for not voting | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Illness or disability | Out of town | Forgot to vote | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
| Total | 510 | 0.9 | 0.8 | 0.6 | 1.1 | 1.2 | 0.3 | 1.2 | 0.5 | 0.2 | 0.5 | 1.0 | 0.5 |
| **Age** | | | | | | | | | | | | | |
| 18 to 24 years | 186 | 1.0 | 2.6 | 1.5 | 2.9 | 3.5 | 1.0 | 2.6 | 1.6 | 0.0 | 0.8 | 2.9 | 1.2 |
| 25 to 44 years | 325 | 1.1 | 1.1 | 0.9 | 1.9 | 2.1 | 0.5 | 1.6 | 0.7 | 0.2 | 0.8 | 1.5 | 0.7 |
| 45 to 64 years | 245 | 1.6 | 1.4 | 1.0 | 2.1 | 1.8 | 0.6 | 2.1 | 0.9 | 0.4 | 0.7 | 1.8 | 0.8 |
| 65 years and over | 186 | 2.8 | 1.4 | 1.1 | 2.5 | 1.3 | 1.0 | 2.2 | 0.9 | 0.3 | 0.8 | 1.9 | 1.1 |
| **Sex** | | | | | | | | | | | | | |
| Male | 342 | 1.1 | 1.1 | 0.8 | 1.5 | 1.5 | 0.4 | 1.4 | 0.7 | 0.2 | 0.6 | 1.2 | 0.5 |
| Female | 335 | 1.2 | 0.8 | 0.6 | 1.4 | 1.4 | 0.6 | 1.4 | 0.6 | 0.2 | 0.6 | 1.4 | 0.6 |
| **Race and Hispanic Origin** | | | | | | | | | | | | | |
| White alone | 421 | 1.0 | 0.8 | 0.7 | 1.3 | 1.3 | 0.4 | 1.3 | 0.6 | 0.2 | 0.5 | 1.1 | 0.5 |
| White non-Hispanic alone | 368 | 1.1 | 0.9 | 0.7 | 1.3 | 1.3 | 0.4 | 1.4 | 0.8 | 0.2 | 0.6 | 1.2 | 0.6 |
| Black alone | 225 | 2.6 | 1.7 | 1.1 | 3.5 | 3.3 | 1.2 | 3.4 | 0.9 | 0.4 | 1.2 | 2.4 | 1.5 |
| Asian alone | 121 | 4.1 | 4.0 | 2.7 | 5.1 | 5.0 | 1.1 | 4.2 | 1.7 | 0.7 | 0.9 | 4.0 | 2.8 |
| Hispanic (any race) | 235 | 2.0 | 1.8 | 1.2 | 3.2 | 3.2 | 0.8 | 2.4 | 0.9 | 0.0 | 1.1 | 2.7 | 1.0 |
| White alone or in combination | 440 | 1.0 | 0.8 | 0.6 | 1.3 | 1.3 | 0.3 | 1.3 | 0.6 | 0.2 | 0.5 | 1.1 | 0.5 |
| Black alone or in combination | 238 | 2.4 | 1.8 | 1.0 | 3.5 | 3.3 | 1.1 | 3.3 | 0.8 | 0.3 | 1.4 | 2.3 | 1.4 |
| Asian alone or in combination | 128 | 3.7 | 3.7 | 2.5 | 4.8 | 5.0 | 1.0 | 3.9 | 1.5 | 0.7 | 0.8 | 3.6 | 2.5 |
| **Educational attainment** | | | | | | | | | | | | | |
| Less than high school graduate | 153 | 3.6 | 2.4 | 1.6 | 3.3 | 3.1 | 1.6 | 2.9 | 1.3 | 0.4 | 1.3 | 3.2 | 1.4 |
| High school graduate | 308 | 1.5 | 0.9 | 0.8 | 1.7 | 1.9 | 0.6 | 1.7 | 0.6 | 0.2 | 0.7 | 1.4 | 0.7 |
| Some College | 272 | 1.5 | 1.4 | 1.0 | 2.1 | 1.9 | 0.5 | 1.8 | 0.7 | 0.2 | 0.8 | 1.8 | 0.8 |
| Bachelor's Degree or more | 217 | 1.5 | 1.6 | 1.1 | 2.3 | 2.3 | 0.7 | 2.3 | 1.3 | 0.4 | 0.9 | 2.1 | 1.0 |
| **Nativity** | | | | | | | | | | | | | |
| Native-born citizen | 483 | 0.9 | 0.8 | 0.6 | 1.2 | 1.2 | 0.4 | 1.2 | 0.5 | 0.2 | 0.6 | 1.0 | 0.5 |
| Naturalized citizen | 181 | 2.4 | 2.9 | 1.5 | 3.3 | 3.7 | 0.7 | 3.2 | 1.1 | 0.0 | 1.2 | 3.1 | 1.4 |
| **Duration of residence** | | | | | | | | | | | | | |
| Less than 1 year | 221 | 2.0 | 1.9 | 1.8 | 3.0 | 3.5 | 1.0 | 2.7 | 2.1 | 0.3 | 0.6 | 2.8 | 1.0 |
| 1 to 2 years | 199 | 2.2 | 1.8 | 1.5 | 3.0 | 3.1 | 1.3 | 2.7 | 1.3 | 0.3 | 1.2 | 2.3 | 1.3 |
| 3 years or longer | 444 | 1.0 | 1.0 | 0.6 | 1.4 | 1.3 | 0.4 | 1.5 | 0.5 | 0.2 | 0.7 | 1.2 | 0.5 |
| Not reported | 59 | 10.1 | 7.3 | 3.7 | 6.6 | 9.9 | 5.4 | 4.3 | 3.5 | 0.0 | 0.0 | 6.9 | 14.0 |
| **Region** | | | | | | | | | | | | | |
| Northeast | 208 | 2.5 | 2.1 | 1.2 | 2.9 | 3.3 | 0.3 | 3.0 | 1.1 | 0.0 | 1.6 | 3.0 | 1.1 |
| Midwest | 276 | 1.9 | 1.5 | 1.0 | 2.2 | 2.4 | 0.8 | 2.7 | 0.8 | 0.6 | 0.9 | 2.1 | 0.9 |
| South | 344 | 1.5 | 1.3 | 0.8 | 1.8 | 1.8 | 0.6 | 1.5 | 0.8 | 0.2 | 0.8 | 1.5 | 0.8 |
| West | 225 | 1.7 | 1.2 | 1.7 | 3.0 | 2.4 | 0.7 | 2.4 | 0.9 | 0.0 | 0.7 | 2.1 | 1.0 |
| **Family income[2]** | | | | | | | | | | | | | |
| Total in families | 464 | 1.0 | 1.0 | 0.7 | 1.4 | 1.5 | 0.4 | 1.5 | 0.5 | 0.1 | 0.7 | 1.3 | 0.6 |
| Under $10,000 | 72 | 7.1 | 5.8 | 4.1 | 7.2 | 5.3 | 3.0 | 7.4 | 2.7 | 0.0 | 6.3 | 7.4 | 4.8 |
| $10,000 to $14,999 | 75 | 6.3 | 4.9 | 2.6 | 9.1 | 14.3 | 4.8 | 6.2 | 1.2 | 0.0 | 0.5 | 9.7 | 5.4 |
| $15,000 to $19,999 | 67 | 8.4 | 3.4 | 4.4 | 9.0 | 8.9 | 5.3 | 5.8 | 2.9 | 0.0 | 0.8 | 11.0 | 0.0 |
| $20,000 to $29,999 | 113 | 5.5 | 2.0 | 3.0 | 5.8 | 4.7 | 2.4 | 5.9 | 2.1 | 0.0 | 2.9 | 3.6 | 1.5 |
| $30,000 to $39,999 | 131 | 4.2 | 2.3 | 1.5 | 4.7 | 5.7 | 1.9 | 4.4 | 1.5 | 0.0 | 2.6 | 3.4 | 2.1 |
| $40,000 to $49,999 | 130 | 3.2 | 3.7 | 1.9 | 6.1 | 5.7 | 1.8 | 6.2 | 2.1 | 0.0 | 3.8 | 5.3 | 1.8 |
| $50,000 to $74,999 | 172 | 3.4 | 2.9 | 1.6 | 4.1 | 3.8 | 0.9 | 3.5 | 0.8 | 0.0 | 1.1 | 2.8 | 2.1 |
| $75,000 to $99,999 | 149 | 3.0 | 2.6 | 2.3 | 3.9 | 4.5 | 0.4 | 4.1 | 1.5 | 0.5 | 1.3 | 3.4 | 1.7 |
| $100,000 to $149,999 | 188 | 2.1 | 2.1 | 1.2 | 4.1 | 4.2 | 0.6 | 3.9 | 1.9 | 0.5 | 1.7 | 3.3 | 1.1 |
| $150,000 and over | 204 | 1.2 | 2.7 | 1.3 | 3.1 | 3.6 | 0.4 | 3.4 | 1.3 | 0.0 | 1.0 | 3.2 | 0.9 |
| Income not reported | 143 | 3.6 | 3.0 | 2.3 | 4.8 | 3.5 | 1.0 | 3.6 | 1.2 | 0.0 | 1.9 | 3.6 | 3.1 |

[1] Only individuals who report not voting but also report being registered are asked the question about reason for not voting.

[2] Family income is limited to persons who report income or refuse to answer the income question. Respondents who report not knowing their income are not included in this section, which includes only the reference person with relatives in the household or people with the following relationship to the householder: spouse, child, grandchild, parent, sibling, or other relative. This section excludes foster children, unmarried partners, non-relatives, and roommates.

[3] This figure added to or subtracted from the estimate provides the 90-percent confidence interval.

NOTES:

Estimates may not sum to totals due to rounding.

Information on confidentiality protection, sampling error, nonsampling error, and definitions is available at <https://www.census.gov/programs-surveys/cps/technical-documentation/complete.24.html>

Source: U.S. Census Bureau, Current Population Survey Public-Use Data, November 2024

Table 10. Reasons For Not Voting, By Selected Characteristics: November 2020
(In thousands)

| Selected characteristics | | Total not voting[1] | Out of town | Forgot to vote | Concerns about the coronavirus (COVID-19) pandemic | Illness or disability | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | 12,810 | 6.1 | 3.7 | 4.3 | 13.0 | 17.6 | 13.1 | 2.4 | 14.5 | 4.9 | 0.1 | 2.6 | 14.5 | 3.2 |
| Age | 18 to 24 years | 2,017 | 8.8 | 5.7 | 2.3 | 4.5 | 19.2 | 18.4 | 3.0 | 11.0 | 4.9 | - | 2.5 | 15.7 | 4.0 |
| | 25 to 44 years | 5,350 | 5.8 | 3.6 | 3.8 | 5.8 | 19.8 | 16.3 | 1.4 | 16.7 | 5.8 | - | 3.4 | 14.4 | 3.2 |
| | 45 to 64 years | 3,364 | 6.3 | 3.2 | 4.1 | 15.8 | 16.7 | 11.7 | 3.0 | 15.3 | 4.6 | 0.1 | 2.0 | 14.3 | 3.0 |
| | 65 years and over | 2,079 | 3.8 | 2.8 | 8.1 | 35.2 | 15.1 | 2.1 | 3.3 | 11.2 | 3.1 | 0.2 | 1.8 | 14.0 | 2.6 |
| Sex | Male | 6,375 | 7.0 | 3.5 | 3.4 | 9.7 | 20.1 | 14.2 | 2.2 | 14.6 | 5.2 | 0.1 | 2.6 | 14.5 | 2.9 |
| | Female | 6,434 | 5.1 | 3.9 | 5.2 | 16.3 | 15.1 | 12.1 | 2.6 | 14.5 | 4.6 | 0.1 | 2.6 | 14.5 | 3.5 |
| Race and Hispanic origin | White alone | 9,926 | 6.3 | 3.5 | 4.3 | 12.7 | 17.8 | 12.8 | 1.9 | 15.9 | 4.9 | 0.1 | 2.6 | 14.1 | 3.1 |
| | White non-Hispanic alone | 8,056 | 6.4 | 3.3 | 4.3 | 13.2 | 17.6 | 12.0 | 2.1 | 16.1 | 4.7 | - | 2.4 | 14.5 | 3.4 |
| | Black alone | 1,800 | 4.7 | 5.0 | 3.4 | 14.0 | 18.1 | 10.5 | 5.8 | 10.2 | 4.6 | - | 3.4 | 16.0 | 4.4 |
| | Asian alone | 441 | 8.5 | 0.5 | 9.3 | 12.8 | 11.9 | 24.8 | - | 6.1 | 9.1 | - | 1.1 | 15.4 | 0.4 |
| | Hispanic (of any race) | 2,096 | 6.9 | 4.1 | 4.5 | 10.2 | 17.9 | 16.7 | 1.0 | 15.8 | 5.0 | 0.2 | 3.1 | 12.9 | 1.7 |
| | White alone or in combination | 10,261 | 6.3 | 3.6 | 4.2 | 12.7 | 17.8 | 13.2 | 1.8 | 15.7 | 4.8 | 0.1 | 2.6 | 14.1 | 3.1 |
| | Black alone or in combination | 1,949 | 4.7 | 5.3 | 3.1 | 14.2 | 17.5 | 11.8 | 5.4 | 10.1 | 4.6 | - | 3.5 | 15.5 | 4.4 |
| | Asian alone or in combination | 515 | 8.6 | 3.0 | 9.0 | 10.9 | 13.3 | 22.7 | - | 6.4 | 7.8 | - | 1.1 | 16.8 | 0.3 |
| Educational attainment | Less than high school graduate | 1,503 | 4.5 | 3.7 | 5.5 | 24.1 | 16.3 | 10.9 | 5.8 | 5.9 | 3.1 | 0.3 | 2.5 | 14.4 | 2.9 |
| | High school graduate | 5,036 | 5.6 | 3.6 | 3.9 | 13.1 | 19.0 | 13.3 | 2.1 | 14.0 | 4.4 | - | 2.8 | 14.6 | 3.7 |
| | Some College | 3,901 | 6.4 | 4.5 | 4.0 | 10.0 | 17.6 | 14.2 | 2.5 | 16.9 | 5.0 | - | 2.2 | 14.0 | 2.6 |
| | Bachelors Degree or more | 2,371 | 7.5 | 2.6 | 5.0 | 10.7 | 15.6 | 12.4 | 0.6 | 17.2 | 6.9 | - | 2.9 | 15.1 | 3.3 |
| Nativity | Native-born citizen | 11,688 | 5.9 | 3.7 | 4.0 | 12.9 | 17.7 | 13.1 | 2.6 | 14.7 | 4.8 | - | 2.5 | 14.7 | 3.2 |
| | Naturalized citizen | 1,122 | 7.6 | 3.6 | 7.2 | 13.8 | 16.1 | 13.5 | 0.3 | 12.8 | 6.1 | 0.3 | 3.5 | 12.3 | 2.8 |
| Duration of residence | Less than 1 year | 2,283 | 8.1 | 4.3 | 2.1 | 6.3 | 17.1 | 13.3 | 3.2 | 16.2 | 9.4 | - | 2.3 | 15.0 | 2.7 |
| | 1 to 2 years | 2,119 | 4.9 | 3.8 | 2.5 | 9.7 | 17.5 | 15.4 | 2.0 | 15.1 | 6.9 | 0.1 | 2.3 | 17.8 | 2.0 |
| | 3 years or longer | 8,240 | 5.8 | 3.6 | 5.5 | 15.5 | 17.9 | 12.4 | 2.2 | 14.1 | 3.2 | 0.1 | 2.9 | 13.4 | 3.5 |
| | Don't know, refused | 167 | 6.8 | - | 0.6 | 24.2 | 10.9 | 14.6 | 5.1 | 8.2 | - | - | - | 17.6 | 11.9 |
| Region | Northeast | 2,177 | 5.2 | 3.4 | 6.0 | 14.1 | 16.3 | 9.3 | 1.8 | 16.9 | 4.8 | 0.1 | 3.0 | 14.6 | 4.5 |
| | Midwest | 3,049 | 5.2 | 3.2 | 4.0 | 13.9 | 17.0 | 15.2 | 1.8 | 15.3 | 3.9 | - | 2.1 | 15.1 | 3.2 |
| | South | 5,423 | 7.3 | 3.3 | 4.6 | 13.8 | 17.9 | 13.8 | 3.5 | 11.7 | 5.3 | - | 3.3 | 12.9 | 2.6 |
| | West | 2,160 | 5.0 | 5.9 | 2.3 | 8.6 | 19.0 | 12.4 | 0.9 | 18.3 | 5.3 | 0.3 | 1.1 | 17.4 | 3.4 |
| Family income[2] | Total in families | 8,456 | 6.3 | 3.5 | 4.4 | 12.6 | 17.6 | 13.7 | 2.1 | 14.1 | 5.0 | - | 2.6 | 15.0 | 3.1 |
| | Under $10,000 | 302 | 6.5 | 5.2 | 2.9 | 15.9 | 9.9 | 12.6 | 6.2 | 8.6 | 2.8 | - | 6.6 | 21.5 | 1.3 |
| | $10,000 to $14,999 | 336 | 0.8 | 2.2 | 1.7 | 21.0 | 15.4 | 14.2 | 8.5 | 13.6 | 3.8 | - | 2.9 | 11.0 | 4.8 |
| | $15,000 to $19,999 | 224 | 2.9 | 1.1 | 3.0 | 13.7 | 25.5 | 4.7 | 1.8 | 9.8 | 4.9 | - | 3.8 | 24.1 | 4.7 |
| | $20,000 to $29,999 | 736 | 4.0 | 1.3 | 5.7 | 18.9 | 19.8 | 12.2 | 4.0 | 7.9 | 9.8 | - | 1.9 | 12.3 | 2.2 |
| | $30,000 to $39,999 | 736 | 6.4 | 4.6 | 6.8 | 16.1 | 17.3 | 12.4 | 1.4 | 13.3 | 2.1 | - | 2.4 | 14.7 | 2.5 |
| | $40,000 to $49,999 | 643 | 8.1 | 2.8 | 4.7 | 12.0 | 16.9 | 13.9 | 1.7 | 17.3 | 7.4 | - | 0.2 | 13.3 | 1.6 |
| | $50,000 to $74,999 | 1,435 | 5.7 | 3.4 | 5.2 | 10.9 | 18.9 | 15.5 | 1.2 | 13.4 | 4.3 | - | 2.8 | 16.0 | 2.7 |
| | $75,000 to $99,999 | 964 | 8.6 | 3.8 | 3.4 | 7.2 | 19.8 | 14.4 | 0.8 | 19.7 | 4.9 | - | 3.1 | 11.6 | 2.6 |
| | $100,000 to $149,999 | 989 | 5.5 | 3.5 | 2.8 | 8.8 | 16.9 | 14.5 | 0.1 | 17.9 | 6.5 | - | 3.7 | 16.2 | 3.8 |
| | $150,000 and over | 752 | 8.7 | 5.6 | 5.4 | 8.4 | 17.3 | 18.5 | 0.6 | 10.6 | 5.7 | - | 1.3 | 14.8 | 3.1 |
| | Income not reported | 1,339 | 6.6 | 3.3 | 3.8 | 15.4 | 15.7 | 11.0 | 3.6 | 14.7 | 3.1 | 0.3 | 2.2 | 16.0 | 4.5 |

[1] Only individuals who report not voting but also report being registered are asked the question about reason for not voting.

[2] Family income is limited to persons who report income or refuse to answer the income question. Respondents who report not knowing their income are not included in this section, which includes only the reference person with relatives in the household or people with the following relationship to the householder: spouse, child, grandchild, parent, sibling, or other relative. This section excludes foster children, unmarried partners, non-relatives, and roommates.

NOTES:

A dash '-' represents zero or rounds to zero.

Estimates may not sum to totals due to rounding.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see https://www.census.gov/programs-surveys/cps/technical-documentation/complete.2020.html

Source: U.S. Census Bureau, Current Population Survey, November 2020


EXHIBIT GM.
8
8/12/25 Redden

Table 10
Page: 1 of Pages: 2

Table 10a. Margins of Error for Reasons For Not Voting, By Selected Characteristics: November 2020
(In thousands)

| Selected characteristics | | Out of town | Forgot to vote | Concerns about the coronavirus (COVID-19) pandemic | Illness or disability | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | 0.8 | 0.6 | 0.7 | 1.1 | 1.3 | 1.1 | 0.5 | 1.2 | 0.7 | 0.1 | 0.5 | 1.2 | 0.6 |
| Age | 18 to 24 years | 2.4 | 2.0 | 1.3 | 1.8 | 3.4 | 3.3 | 1.4 | 2.7 | 1.8 | - | 1.3 | 3.1 | 1.7 |
| | 25 to 44 years | 1.2 | 1.0 | 1.0 | 1.2 | 2.1 | 1.9 | 0.6 | 2.0 | 1.2 | - | 1.0 | 1.8 | 0.9 |
| | 45 to 64 years | 1.6 | 1.2 | 1.3 | 2.4 | 2.5 | 2.1 | 1.1 | 2.4 | 1.4 | 0.2 | 0.9 | 2.3 | 1.1 |
| | 65 years and over | 1.6 | 1.4 | 2.3 | 4.0 | 2.7 | 1.2 | 1.5 | 2.6 | 1.5 | 0.4 | 1.1 | 2.9 | 1.3 |
| Sex | Male | 1.2 | 0.9 | 0.9 | 1.4 | 1.9 | 1.7 | 0.7 | 1.7 | 1.1 | 0.1 | 0.8 | 1.7 | 0.8 |
| | Female | 1.1 | 0.9 | 1.1 | 1.8 | 1.7 | 1.6 | 0.8 | 1.7 | 1.0 | 0.1 | 0.8 | 1.7 | 0.9 |
| Race and Hispanic origin | White alone | 0.9 | 0.7 | 0.8 | 1.3 | 1.5 | 1.3 | 0.5 | 1.4 | 0.8 | 0.1 | 0.6 | 1.3 | 0.7 |
| | White non-Hispanic alone | 1.0 | 0.8 | 0.9 | 1.4 | 1.6 | 1.4 | 0.6 | 1.6 | 0.9 | 0.1 | 0.7 | 1.5 | 0.8 |
| | Black alone | 1.8 | 1.9 | 1.6 | 3.0 | 3.3 | 2.6 | 2.0 | 2.6 | 1.8 | - | 1.6 | 3.2 | 1.8 |
| | Asian alone | 5.3 | 1.4 | 5.5 | 6.4 | 6.2 | 8.2 | - | 4.6 | 5.5 | - | 2.0 | 6.9 | 1.2 |
| | Hispanic (of any race) | 2.2 | 1.7 | 1.8 | 2.6 | 3.4 | 3.3 | 0.9 | 3.2 | 1.9 | 0.4 | 1.5 | 2.9 | 1.1 |
| | White alone or in combination | 0.9 | 0.7 | 0.8 | 1.3 | 1.4 | 1.3 | 0.5 | 1.4 | 0.8 | 0.1 | 0.6 | 1.3 | 0.7 |
| | Black alone or in combination | 1.7 | 1.8 | 1.4 | 2.9 | 3.1 | 2.7 | 1.9 | 2.5 | 1.7 | - | 1.5 | 3.0 | 1.7 |
| | Asian alone or in combination | 4.9 | 3.0 | 5.1 | 5.5 | 6.0 | 7.4 | - | 4.3 | 4.7 | - | 1.8 | 6.6 | 1.0 |
| Educational attainment | Less than high school graduate | 2.1 | 1.9 | 2.3 | 4.2 | 3.6 | 3.1 | 2.3 | 2.3 | 1.7 | 0.5 | 1.5 | 3.5 | 1.7 |
| | High school graduate | 1.2 | 1.0 | 1.0 | 1.8 | 2.1 | 1.8 | 0.8 | 1.9 | 1.1 | 0.1 | 0.9 | 1.9 | 1.0 |
| | Some College | 1.5 | 1.3 | 1.2 | 1.8 | 2.3 | 2.1 | 1.0 | 2.3 | 1.3 | 0.1 | 0.9 | 2.1 | 1.0 |
| | Bachelors Degree or more | 2.1 | 1.3 | 1.7 | 2.4 | 2.8 | 2.6 | 0.6 | 3.0 | 2.0 | - | 1.3 | 2.8 | 1.4 |
| Nativity | Native-born citizen | 0.8 | 0.7 | 0.7 | 1.2 | 1.4 | 1.2 | 0.6 | 1.3 | 0.8 | 0.1 | 0.6 | 1.3 | 0.6 |
| | Naturalized citizen | 3.0 | 2.1 | 2.9 | 3.9 | 4.2 | 3.9 | 0.6 | 3.8 | 2.7 | 0.7 | 2.1 | 3.8 | 1.9 |
| Duration of residence | Less than 1 year | 2.2 | 1.6 | 1.2 | 1.9 | 3.0 | 2.7 | 1.4 | 2.9 | 2.3 | - | 1.2 | 2.9 | 1.3 |
| | 1 to 2 years | 1.8 | 1.6 | 1.3 | 2.5 | 3.2 | 3.0 | 1.2 | 3.0 | 2.1 | 0.2 | 1.2 | 3.2 | 1.2 |
| | 3 years or longer | 1.0 | 0.8 | 1.0 | 1.5 | 1.6 | 1.4 | 0.6 | 1.5 | 0.7 | 0.1 | 0.7 | 1.4 | 0.8 |
| | Don't know, refused | 7.4 | - | 2.2 | 12.7 | 9.2 | 10.5 | 6.5 | 8.1 | - | - | - | 11.3 | 9.6 |
| Region | Northeast | 1.8 | 1.5 | 1.9 | 2.9 | 3.0 | 2.4 | 1.1 | 3.1 | 1.7 | 0.2 | 1.4 | 2.9 | 1.7 |
| | Midwest | 1.5 | 1.2 | 1.4 | 2.4 | 2.6 | 2.5 | 0.9 | 2.5 | 1.3 | - | 1.0 | 2.5 | 1.2 |
| | South | 1.4 | 0.9 | 1.1 | 1.8 | 2.0 | 1.8 | 1.0 | 1.7 | 1.2 | 0.1 | 0.9 | 1.7 | 0.8 |
| | West | 1.8 | 1.9 | 1.2 | 2.3 | 3.2 | 2.7 | 0.8 | 3.2 | 1.9 | 0.4 | 0.9 | 3.1 | 1.5 |
| Family income[1] | Total in families | 1.0 | 0.8 | 0.9 | 1.4 | 1.6 | 1.4 | 0.6 | 1.4 | 0.9 | 0.1 | 0.7 | 1.5 | 0.7 |
| | Under $10,000 | 5.4 | 4.9 | 3.7 | 8.0 | 6.6 | 7.3 | 5.3 | 6.2 | 3.7 | - | 5.4 | 9.0 | 2.5 |
| | $10,000 to $14,999 | 1.9 | 3.1 | 2.7 | 8.5 | 7.5 | 7.3 | 5.8 | 7.1 | 4.0 | - | 3.5 | 6.5 | 4.5 |
| | $15,000 to $19,999 | 4.3 | 2.7 | 4.3 | 8.8 | 11.1 | 5.4 | 3.4 | 7.6 | 5.5 | - | 4.9 | 10.9 | 5.4 |
| | $20,000 to $29,999 | 2.7 | 1.6 | 3.3 | 5.5 | 5.6 | 4.6 | 2.8 | 3.8 | 4.2 | - | 1.9 | 4.6 | 2.1 |
| | $30,000 to $39,999 | 3.4 | 3.0 | 3.5 | 5.2 | 5.3 | 4.7 | 1.6 | 4.8 | 2.0 | - | 2.2 | 5.0 | 2.2 |
| | $40,000 to $49,999 | 4.1 | 2.5 | 3.2 | 4.9 | 5.6 | 5.2 | 2.0 | 5.7 | 3.9 | - | 0.7 | 5.1 | 1.9 |
| | $50,000 to $74,999 | 2.3 | 1.8 | 2.2 | 3.2 | 4.0 | 3.7 | 1.1 | 3.4 | 2.0 | - | 1.7 | 3.7 | 1.6 |
| | $75,000 to $99,999 | 3.5 | 2.3 | 2.2 | 3.2 | 4.9 | 4.3 | 1.1 | 4.9 | 2.7 | - | 2.1 | 4.0 | 2.0 |
| | $100,000 to $149,999 | 2.8 | 2.2 | 2.0 | 3.4 | 4.6 | 4.3 | 0.3 | 4.7 | 3.0 | - | 2.3 | 4.5 | 2.3 |
| | $150,000 and over | 3.9 | 3.2 | 3.2 | 3.9 | 5.3 | 5.4 | 1.1 | 4.3 | 3.2 | - | 1.6 | 4.9 | 2.4 |
| | Income not reported | 2.6 | 1.9 | 2.0 | 3.8 | 3.8 | 3.3 | 1.9 | 3.7 | 1.8 | 0.6 | 1.5 | 3.8 | 2.2 |

[1] Family income is limited to persons who report income or refuse to answer the income question. Respondents who report not knowing their income are not included in this section, which includes only the reference person with relatives in the household or people with the following relationship to the householder: spouse, child, grandchild, parent, sibling, or other relative. This section excludes foster children, unmarried partners, non-relatives, and roommates.

NOTES:

Only individuals who report not voting but also report being registered are asked the question about reason for not voting.

A dash '-' represents zero or rounds to zero.

For information on confidentiality protection, sampling error, nonsampling error, and definitions, see hhttps://www.census.gov/programs-surveys/cps/technical-documentation/complete.2020.html

Source: U.S. Census Bureau, Current Population Survey, November 2020

Table 10
Page: 2 of Pages: 2

Table 10a. Margins of Error for Reasons For Not Voting, By Selected Characteristics: November 2016
(in thousands)

| Selected characteristics | | Illness or disability | Out of town | Forgot to vote | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Margins of error for distribution of reasons for not voting | | | | | | | | | | | |
| TOTAL | | 0.7 | 0.6 | 0.4 | 0.8 | 0.8 | 0.4 | 1.0 | 0.5 | - | 0.3 | 0.7 | 0.4 |
| Age | 18 to 24 years | 0.9 | 1.9 | 1.2 | 2.1 | 2.2 | 0.7 | 2.3 | 1.3 | - | 0.8 | 1.7 | 1.0 |
| | 25 to 44 years | 0.8 | 0.9 | 0.5 | 1.4 | 1.4 | 0.5 | 1.6 | 0.9 | - | 0.5 | 1.2 | 0.6 |
| | 45 to 64 years | 1.4 | 1.1 | 0.8 | 1.5 | 1.4 | 0.7 | 1.9 | 0.7 | 0.1 | 0.6 | 1.3 | 0.7 |
| | 65 years and over | 2.6 | 1.2 | 0.8 | 1.6 | 0.9 | 1.2 | 2.3 | 0.9 | 0.2 | 0.6 | 1.7 | 0.8 |
| Sex | Male | 0.9 | 1.0 | 0.5 | 1.2 | 1.2 | 0.4 | 1.4 | 0.6 | 0.1 | 0.5 | 0.9 | 0.5 |
| | Female | 1.1 | 0.7 | 0.5 | 1.1 | 1.0 | 0.6 | 1.4 | 0.7 | 0.1 | 0.4 | 1.0 | 0.5 |
| Race and Hispanic origin | White alone | 0.8 | 0.7 | 0.4 | 0.9 | 0.9 | 0.4 | 1.1 | 0.5 | 0.1 | 0.4 | 0.8 | 0.4 |
| | White non-Hispanic alone | 0.9 | 0.8 | 0.4 | 1.0 | 0.9 | 0.4 | 1.2 | 0.6 | 0.1 | 0.4 | 0.8 | 0.4 |
| | Black alone | 2.3 | 1.8 | 1.4 | 2.8 | 2.5 | 1.5 | 2.9 | 1.4 | - | 1.1 | 2.4 | 1.2 |
| | Asian alone | 4.5 | 5.7 | 3.0 | 6.8 | 6.7 | 1.8 | 7.5 | 3.2 | 0.5 | 1.7 | 6.2 | 4.0 |
| | Hispanic (of any race) | 2.6 | 2.6 | 1.8 | 3.7 | 3.6 | 0.7 | 4.3 | 2.2 | - | 1.7 | 3.2 | 1.5 |
| | White alone or in combination | 0.8 | 0.7 | 0.4 | 0.9 | 0.9 | 0.4 | 1.1 | 0.5 | 0.1 | 0.4 | 0.8 | 0.4 |
| | Black alone or in combination | 2.2 | 1.7 | 1.3 | 2.7 | 2.4 | 1.4 | 2.8 | 1.3 | - | 1.1 | 2.3 | 1.1 |
| | Asian alone or in combination | 4.2 | 5.4 | 2.7 | 6.6 | 6.2 | 1.6 | 7.0 | 2.9 | 0.4 | 2.1 | 6.0 | 3.8 |
| Educational attainment | Less than high school graduate | 2.6 | 1.3 | 1.3 | 2.3 | 2.0 | 1.5 | 2.8 | 1.1 | - | 0.8 | 2.2 | 0.8 |
| | High school graduate | 1.3 | 0.9 | 0.6 | 1.4 | 1.3 | 0.6 | 1.6 | 0.7 | 0.1 | 0.6 | 1.1 | 0.6 |
| | Some College | 1.1 | 1.1 | 0.6 | 1.4 | 1.5 | 0.6 | 1.7 | 0.8 | - | 0.5 | 1.3 | 0.6 |
| | Bachelors Degree or more | 1.4 | 1.7 | 0.8 | 1.7 | 1.8 | 0.5 | 2.2 | 1.2 | - | 0.8 | 1.5 | 0.9 |
| Nativity | Native-born citizen | 0.7 | 0.6 | 0.4 | 0.8 | 0.8 | 0.4 | 1.0 | 0.5 | 0.1 | 0.3 | 0.7 | 0.4 |
| | Naturalized citizen | 2.6 | 2.6 | 1.0 | 3.0 | 3.0 | 0.7 | 3.4 | 1.5 | - | 0.9 | 2.6 | 1.9 |
| Duration of residence | Less than 1 year | 1.3 | 1.5 | 0.9 | 1.8 | 1.8 | 0.8 | 2.1 | 1.6 | 0.1 | 0.7 | 1.7 | 0.8 |
| | 1 to 2 years | 1.5 | 1.4 | 1.0 | 2.0 | 2.2 | 1.0 | 2.5 | 1.2 | - | 0.9 | 1.7 | 0.9 |
| | 3 years or longer | 1.0 | 0.8 | 0.5 | 1.0 | 0.9 | 0.4 | 1.2 | 0.4 | 0.1 | 0.4 | 0.9 | 0.4 |
| | Don't know, refused | 4.2 | 4.2 | 2.8 | 7.4 | 5.5 | 3.2 | 6.8 | 3.6 | - | 2.1 | 6.2 | 6.9 |
| Region | Northeast | 1.9 | 1.7 | 0.8 | 1.9 | 1.8 | 0.9 | 2.3 | 1.0 | 0.2 | 0.8 | 1.7 | 1.0 |
| | Midwest | 1.5 | 1.2 | 0.7 | 1.7 | 1.7 | 0.8 | 2.1 | 0.8 | - | 0.7 | 1.4 | 0.7 |
| | South | 1.1 | 0.9 | 0.6 | 1.2 | 1.2 | 0.6 | 1.5 | 0.7 | 0.1 | 0.5 | 1.1 | 0.5 |
| | West | 1.4 | 1.3 | 1.1 | 2.0 | 1.8 | 0.5 | 2.2 | 1.2 | 0.1 | 0.6 | 1.7 | 1.0 |
| Family income[2] | Total in families | 0.9 | 0.7 | 0.5 | 1.0 | 1.0 | 0.4 | 1.2 | 0.5 | 0.1 | 0.4 | 0.9 | 0.5 |
| | Under $10,000 | 4.4 | 2.1 | 2.6 | 4.8 | 3.8 | 3.2 | 4.9 | 2.3 | 0.7 | 2.1 | 3.0 | 1.4 |
| | $10,000 to $14,999 | 5.1 | 3.0 | 1.5 | 5.4 | 4.1 | 3.8 | 5.5 | 2.1 | - | 0.6 | 4.6 | 2.1 |
| | $15,000 to $19,999 | 5.7 | 4.0 | 3.1 | 5.0 | 4.7 | 1.7 | 5.4 | 3.6 | 1.2 | 3.2 | 4.4 | 2.2 |
| | $20,000 to $29,999 | 3.4 | 1.9 | 1.2 | 3.2 | 3.2 | 1.6 | 4.0 | 1.4 | 0.2 | 1.3 | 2.9 | 1.0 |
| | $30,000 to $39,999 | 3.0 | 2.2 | 1.6 | 3.2 | 3.2 | 1.1 | 3.7 | 2.0 | - | 1.2 | 2.8 | 1.7 |
| | $40,000 to $49,999 | 3.4 | 2.4 | 2.0 | 4.0 | 3.7 | 0.5 | 4.1 | 2.1 | - | 1.5 | 3.4 | 1.6 |
| | $50,000 to $74,999 | 1.8 | 1.6 | 1.0 | 2.3 | 2.4 | 0.5 | 2.8 | 1.5 | - | 0.8 | 2.3 | 1.2 |
| | $75,000 to $99,999 | 2.1 | 2.2 | 1.3 | 3.0 | 3.4 | 0.8 | 3.6 | 1.6 | - | 1.6 | 2.6 | 1.1 |
| | $100,000 to $149,999 | 2.0 | 2.7 | 1.2 | 3.3 | 2.9 | | 3.5 | 1.6 | 0.4 | 1.2 | 2.3 | 1.6 |
| | $150,000 and over | 2.3 | 3.7 | 1.9 | 3.6 | 3.8 | 0.8 | 4.1 | 2.0 | - | 1.8 | 2.7 | 1.8 |
| | Income not reported | 2.5 | 2.2 | 1.2 | 2.7 | 2.6 | 0.7 | 3.3 | 1.1 | - | 1.2 | 2.3 | 1.4 |

[1] Only individuals who report not voting but also report being registered are asked the question about reason for not voting.

[2] Family income is limited to persons who report income or refuse to answer the income question. Respondents who report not knowing their income are not included in this section, which includes only the reference person with relatives in the household or people with the following relationship to the householder: spouse, child, grandchild, parent, sibling, or other relative. This section excludes foster children, unmarried partners, non-relatives, and roommates.

NOTES:
A dash '-' represents zero or rounds to zero.

Source: U.S. Census Bureau, Current Population Survey, November 2016

Table 10
Page: 2 of Pages: 2



EXHIBIT Cimi
9
8/12/28  Rodda

Table 10. Reasons For Not Voting, By Selected Characteristics: November 2016
(In thousands)

| Selected characteristics | | Total not voting[1] | Illness or disability | Out of town | Forgot to vote | Not interested | Too busy, conflicting schedule | Transportation problems | Did not like candidates or campaign issues | Registration problems | Bad weather conditions | Inconvenient polling place | Other reason | Don't know or refused |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | | 18,933 | 11.7 | 7.9 | 3.0 | 15.4 | 14.3 | 2.6 | 24.8 | 4.4 | | 2.1 | 11.1 | 2.7 |
| Age | 18 to 24 years | 3,042 | 2.7 | 13.2 | 4.7 | 17.3 | 18.3 | 1.5 | 20.6 | 5.5 | - | 2.3 | 10.8 | 3.1 |
| | 25 to 44 years | 7,246 | 4.7 | 7.1 | 2.4 | 17.2 | 19.2 | 2.0 | 25.2 | 6.0 | - | 2.3 | 11.5 | 2.6 |
| | 45 to 64 years | 5,420 | 12.7 | 7.8 | 3.4 | 15.1 | 12.4 | 2.5 | 27.5 | 2.6 | 0.1 | 2.5 | 10.6 | 2.9 |
| | 65 years and over | 3,225 | 33.9 | 5.1 | 2.1 | 10.3 | 2.8 | 5.1 | 23.1 | 2.9 | 0.1 | 1.1 | 11.5 | 2.1 |
| Sex | Male | 9,366 | 8.3 | 9.9 | 2.8 | 16.8 | 16.0 | 2.0 | 25.1 | 3.9 | 0.1 | 2.3 | 9.8 | 2.9 |
| | Female | 9,567 | 15.0 | 5.9 | 3.1 | 14.0 | 12.6 | 3.2 | 24.4 | 4.9 | - | 2.0 | 12.4 | 2.4 |
| Race and Hispanic origin | White alone | 14,766 | 12.1 | 8.1 | 2.8 | 14.5 | 14.4 | 2.4 | 25.9 | 4.5 | 0.1 | 2.1 | 10.6 | 2.6 |
| | White non-Hispanic alone | 12,633 | 12.8 | 8.3 | 2.7 | 14.3 | 13.9 | 2.7 | 26.0 | 4.4 | 0.1 | 2.0 | 10.2 | 2.6 |
| | Black alone | 2,645 | 11.7 | 6.7 | 3.7 | 18.6 | 13.5 | 4.5 | 19.6 | 4.0 | | 2.6 | 12.4 | 2.7 |
| | Asian alone | 712 | 6.5 | 11.0 | 2.8 | 17.0 | 16.2 | 1.0 | 22.3 | 3.3 | 0.1 | 0.9 | 13.8 | 5.2 |
| | Hispanic (of any race) | 2,403 | 7.3 | 7.6 | 3.3 | 16.5 | 16.2 | 0.6 | 25.2 | 5.4 | - | 3.2 | 12.2 | 2.4 |
| | White alone or in combination | 15,120 | 12.0 | 8.1 | 2.8 | 14.6 | 14.4 | 2.4 | 26.0 | 4.5 | 0.1 | 2.1 | 10.6 | 2.5 |
| | Black alone or in combination | 2,824 | 11.3 | 6.5 | 3.5 | 18.9 | 13.7 | 4.3 | 20.5 | 3.7 | | 2.5 | 12.5 | 2.6 |
| | Asian alone or in combination | 798 | 6.4 | 11.2 | 2.5 | 18.1 | 15.7 | 0.9 | 21.4 | 2.9 | 0.1 | 1.5 | 14.1 | 5.3 |
| Educational attainment | Less than high school graduate | 2,214 | 19.7 | 3.8 | 4.4 | 13.8 | 10.3 | 5.7 | 23.1 | 3.0 | - | 1.6 | 12.9 | 1.7 |
| | High school graduate | 6,852 | 13.4 | 6.5 | 3.0 | 17.4 | 13.1 | 2.9 | 24.0 | 4.0 | 0.1 | 2.3 | 10.5 | 2.6 |
| | Some College | 6,154 | 8.7 | 7.8 | 2.6 | 15.4 | 16.7 | 2.1 | 26.1 | 4.5 | | 1.8 | 11.6 | 2.7 |
| | Bachelors Degree or more | 3,712 | 8.6 | 13.2 | 2.8 | 12.7 | 14.9 | 1.0 | 24.9 | 5.7 | | 2.6 | 10.4 | 3.3 |
| Nativity | Native-born citizen | 17,531 | 11.7 | 7.6 | 3.1 | 15.4 | 14.2 | 2.7 | 25.0 | 4.4 | 0.1 | 2.2 | 11.1 | 2.4 |
| | Naturalized citizen | 1,402 | 11.0 | 11.3 | 1.6 | 15.3 | 15.5 | 0.8 | 22.3 | 3.7 | - | 1.3 | 11.6 | 5.5 |
| Duration of residence | Less than 1 year | 3,565 | 6.6 | 9.6 | 3.0 | 13.7 | 14.9 | 2.6 | 21.6 | 10.6 | | 2.1 | 13.0 | 2.3 |
| | 1 to 2 years | 2,982 | 8.1 | 6.2 | 3.2 | 15.5 | 18.1 | 3.3 | 25.6 | 5.1 | | 2.6 | 9.5 | 2.7 |
| | 3 years or longer | 12,104 | 14.2 | 7.9 | 3.0 | 15.8 | 13.3 | 2.4 | 25.7 | 2.4 | 0.1 | 2.0 | 10.9 | 2.4 |
| | Don't know, refused | 282 | 5.7 | 5.6 | 2.5 | 20.7 | 10.1 | 3.2 | 16.4 | 4.1 | | 1.3 | 13.1 | 17.3 |
| Region | Northeast | 3,235 | 14.3 | 10.6 | 2.4 | 14.3 | 12.3 | 2.7 | 23.6 | 3.8 | 0.1 | 2.2 | 10.5 | 3.5 |
| | Midwest | 4,289 | 11.4 | 7.3 | 2.0 | 15.6 | 15.3 | 3.3 | 27.8 | 3.1 | | 2.1 | 10.2 | 2.0 |
| | South | 7,870 | 12.5 | 7.4 | 3.1 | 14.9 | 15.0 | 2.9 | 23.7 | 4.9 | 0.1 | 2.6 | 11.0 | 2.0 |
| | West | 3,540 | 7.8 | 7.3 | 4.5 | 17.5 | 13.4 | 1.0 | 24.4 | 5.4 | | 1.2 | 13.1 | 4.2 |
| Family income[2] | Total in families | 12,583 | 11.1 | 8.0 | 2.9 | 16.4 | 15.5 | 1.7 | 23.8 | 4.1 | 0.1 | 2.4 | 11.1 | 2.9 |
| | Under $10,000 | 659 | 15.7 | 3.1 | 4.8 | 20.5 | 11.3 | 7.8 | 21.3 | 3.9 | 0.4 | 3.1 | 6.9 | 1.3 |
| | $10,000 to $14,999 | 517 | 16.9 | 5.1 | 1.2 | 19.5 | 10.0 | 8.6 | 20.6 | 2.4 | | 0.2 | 13.1 | 2.4 |
| | $15,000 to $19,999 | 446 | 18.6 | 8.1 | 4.9 | 13.5 | 12.1 | 1.4 | 16.6 | 6.6 | 0.6 | 5.0 | 10.3 | 2.3 |
| | $20,000 to $29,999 | 1,144 | 16.5 | 4.8 | 1.9 | 14.4 | 14.6 | 3.3 | 26.9 | 2.5 | | 2.2 | 11.6 | 1.3 |
| | $30,000 to $39,999 | 1,195 | 13.2 | 6.3 | 3.5 | 15.6 | 14.9 | 1.6 | 22.7 | 5.6 | | 1.8 | 11.0 | 3.7 |
| | $40,000 to $49,999 | 910 | 12.4 | 6.1 | 4.0 | 19.0 | 16.1 | 0.2 | 20.5 | 4.4 | | 2.2 | 12.7 | 2.4 |
| | $50,000 to $74,999 | 2,244 | 8.5 | 6.4 | 2.5 | 14.7 | 16.9 | 0.7 | 25.6 | 5.3 | | 1.4 | 14.6 | 3.4 |
| | $75,000 to $99,999 | 1,371 | 7.2 | 7.6 | 2.6 | 14.9 | 21.3 | 1.0 | 24.9 | 3.6 | | 3.9 | 10.9 | 1.8 |
| | $100,000 to $149,999 | 1,435 | 6.2 | 12.2 | 2.4 | 20.9 | 14.5 | - | 24.6 | 4.2 | 0.2 | 2.2 | 8.7 | 3.9 |
| | $150,000 and over | 956 | 5.6 | 16.2 | 4.0 | 15.4 | 17.9 | 0.6 | 21.3 | 4.4 | | 3.2 | 8.1 | 3.4 |
| | Income not reported | 1,706 | 13.2 | 9.3 | 2.7 | 15.2 | 13.6 | 1.0 | 25.7 | 2.3 | | 2.8 | 10.4 | 3.8 |

[1] Only individuals who report not voting but also report being registered are asked the question about reason for not voting.

[2] Family income is limited to persons who report income or refuse to answer the income question. Respondents who report not knowing their income are not included in this section, which includes only the reference person with relatives in the household or people with the following relationship to the householder: spouse, child, grandchild, parent, sibling, or other relative. This section excludes foster children, unmarried partners, non-relatives, and roommates.

NOTES:
A dash '-' represents zero or rounds to zero.

Source: U.S. Census Bureau, Current Population Survey, November 2016

Table 10
Page: 1 of Pages: 2

*New Georgia Project et al. v. Brad Raffensperger et al.*, Case No. 1:21-cv-01229

Consolidated Case No. 1:21-mi-55555 (*In re SB 202*)


United States District Court for the Northern District of Georgia


Expert Report of Jonathan Rodden, Ph.D.


Jonathan Rodden

February 7, 2023



i

## TABLE OF CONTENTS

I.      STATEMENT OF PURPOSE ................................................................ 1

II.     QUALIFICATIONS AND EXPERIENCE ...................................... 3

III.    DATA SOURCES ................................................................................. 4

IV.     RACE AND VOTING BEHAVIOR IN GEORGIA ...................... 6

V.      TRENDS IN BALLOT TYPE BY RACIAL AND PARTISAN GROUP ....................... 8

        *Absentee Voting* ................................................................................. 12

        *Drop Boxes* ......................................................................................... 14

        *Mobile Voting* ..................................................................................... 18

        *The Impact of Long Lines on Choice of Voting Method* .................. 19

VI.     WHICH GROUPS HAVE TROUBLE CASTING VALID BALLOTS IN GEORGIA? 27

        *Difficulties with Mail-in Ballots* ...................................................... 27

        *Difficulties with Election-Day Ballots* ............................................ 30

VII.    WAIT TIMES IN DECEMBER 2022 ............................................. 34

VIII.   TRENDS IN TURNOUT BEFORE AND AFTER SB 202 ........ 41

        *Race and turnout* ............................................................................... 43

        *Partisanship and turnout* .................................................................. 47

        *Precincts with a history of long lines* ............................................... 48

        *Mail-in voters who submitted their ballots in the last four days* ...... 50

        *Provisional ballots and turnout* ....................................................... 51

IX.     CONCLUSIONS ................................................................................... 51

# I.    STATEMENT OF PURPOSE

I have been asked by plaintiffs New Georgia Project, Black Voters Matter Fund, Rise, Inc., and individual voters Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin to examine racial and partisan voting patterns in recent Georgia general elections as they relate to Senate Bill ("SB") 202.

The first topic I have been asked to explore is the relationship between race and voting outcomes in recent Georgia elections. Through my analysis, I found that in recent general elections, Black voters in Georgia overwhelmingly prefer Democratic candidates. White voters have, on the whole, preferred Republican candidates. There is also a strong correlation between population density and vote shares of Democratic candidates among white voters.

Second, I have been asked to quantify racial and partisan differences across various methods of voting, with special attention to possible impacts of SB 202. As described in more detail below, I find the following:

- Prior to SB 202, mail-in voting was more common among Black voters than white voters, and among voters for Democratic candidates than among voters for Republican candidates. These racial and partisan asymmetries grew in the November 2020 General Election and the 2021 Runoff.

- Voters were especially likely to transition away from in-person voting in the November 2020 General Election if they lived in precincts that had been plagued by long lines in the recent past. These precincts were predominantly occupied by Black and Democratic voters.

- Drop-boxes were used disproportionately in November of 2020 in urban, Democratic counties with relatively large Black populations. A significant share of mail-in ballots was returned using drop boxes in these counties, especially in the last four days before the election—a time frame when Black voters were more likely than white voters to return their ballots.

- Not only were Black and Democratic voters[1] more likely to use drop boxes, but they were more likely to lose access to a geographically proximate drop box after SB 202.

- After SB 202, rates of mail-in voting declined precipitously for all groups.

---

[1] These categories of voters are not mutually exclusive and there is significant overlap because analysis has shown that Black voters in Georgia have historically supported Democrats, but throughout the report, race and party are considered separately.

Third, I have been asked to examine difficulties associated with casting both absentee and election-day ballots by racial and partisan groups. I find that:

- From 2016 to 2022, Black and Democratic voters have been more likely to have their mail-in absentee ballots rejected.

- Black and Democratic voters had been more likely to have their mail-in absentee ballots classified as "challenged" or "provisional" prior to SB 202 and the rates at which ballots fall into this category has grown since SB 202.

- On election day, Black and Democratic voters have been far more likely to cast provisional ballots, and these ballots are most often cast in urban areas. The same is true if we focus on "out-of-precinct" provisional ballots in the more limited set of counties where appropriate data are available. Racial and partisan disparities in election-day provisional ballots were especially pronounced in 2020.

- The quantity of election-day provisional ballots fell dramatically after SB 202, most likely because voters showing up at the wrong polling place are no longer offered provisional ballots that will be counted.

Fourth, while it appears that the rise of mail-in voting in 2020 temporarily alleviated the perennial problem of long lines on election day in urban precincts in Georgia, I have been asked to collect and examine data related to wait times in the December 2022 runoff election, as SB 202 imposed additional requirements upon the mail-in voting process and sharply curtailed the early voting period. I find that:

- In many of the same urban, Democratic areas with large Black populations in Atlanta and Savannah where voters had to wait in long election-day lines in the recent past, voters had to wait in very long lines throughout the early voting period for the December 2022 Runoff Election.

- As in the past, long election-day lines for the December 2022 Runoff Election were once again disproportionately found in these same urban neighborhoods with relatively large concentrations of Black and Democratic voters.

Finally, I have been asked to examine whether the groups most affected by SB 202 exhibited differential turnout trends than those less impacted. I find that:

- Turnout decreased in the November and December elections of 2022 relative to previous elections, and this decrease was clearly more pronounced among Black and Democratic voters.

- The decline in turnout was especially pronounced among individuals who:

2

- o  Live in precincts that had been affected by long lines in the past.

- o  Live in precincts that demonstrated high rates of provisional balloting in the November 2020 election.

- o  Had cast mail-in ballots on the last four days in the November 2020 election.

## II.    QUALIFICATIONS AND EXPERIENCE

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab—a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences. I am engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as Exhibit A.

In my current academic work, I conduct research on voting, demographics, geography, and aspects of election administration, including registration, the structure of precincts, redistricting, and methods of voting. Recent papers and books focus on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy, Proceedings of the National Academy of Science, Science Advances*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy, and another received an award from the American Political Science Association section on social networks.

In 2021, I received a John Simon Guggenheim Memorial Foundation Fellowship, and received the Martha Derthick Award of the American Political Science Association for "the best book published at least ten years ago that has made a lasting contribution to the study of federalism and intergovernmental relations."

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured

3

in more popular publications like the *Wall Street Journal*, the *New York Times*, and *Boston Review*. I recently authored a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. I frequently work with geo-coded voter files and other large administrative data sets, including in recent papers published in the *Annals of Internal Medicine* and *The New England Journal of Medicine*. I have developed a national data set of geo-coded precinct-level election results that has been used extensively in policy-oriented research related to redistricting and representation.

I have been accepted and testified as an expert witness in a number of election law and redistricting cases: *Romo v. Detzner*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP* v. *Ferguson-Florissant Sch. Dist.*, No. 4:2014-CV-02077 (E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Cmte. v. Hobbs*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Va. State Bd. of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018); *Carter v. Chapman*, No. 464 MD 2021, 465 MD 2021 (Pa. Commw. Ct. 2021); *Bennet v. Ohio Redistricting Comm'n*, No. 2021-1198 (Ohio 2021); *Adams v. DeWine*, No. 2021-1428 (Ohio 2021); *Neiman v. LaRose*, No. 2022-0298 (Ohio 2022); *Rivera v. Schwab*, No. 2022-cv-89 (Kan. Dist. Ct. 2022). I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, electoral districts, voting, ballots, and election administration.

## III.    DATA SOURCES

This report relies on data from several sources. First, I rely on several snapshots of the Georgia voter file on different dates. These files were obtained from the Secretary of State by counsel and provided to me. Second, I have downloaded individual-level absentee ballot information from the Georgia Secretary of State,[2] which I merged with voter files based on a unique voter registration number. Third, I also rely on individual-level voter history information, also downloaded from the Secretary of State's web page,[3] which I append to the extracts from the voter file using the same unique voter registration number.

---

[2] Ga. Sec'y of State, *Voter Absentee Files*, Elections Division, https://elections.sos.ga.gov/ Elections/voterabsenteefile.do (last visited Feb. 1, 2023).

[3] Ga. Sec'y of State, *Voter History Files*, Elections Division, https://elections.sos.ga.gov/ Elections/voterhistory.do (last visited Feb. 1, 2023).

I have also been provided with a series of spreadsheets and text files that were obtained from the United States Department of Justice via records requests from Georgia counties. Specifically, I make use of individual-level lists of provisional ballots, which I merged with the Georgia voter file by use of the voter registration number. Additionally, I consulted files provided by these counties that include information about the use of ballot drop boxes in recent elections.

I consulted precinct-level election results for the general elections of 2016, 2018, and 2020 from a group at Harvard University known as the Algorithm-Assisted Redistricting Methodology (ALARM) Project, and another geo-spatial precinct-level data file made available by the Redistricting Data Hub.[4]

To obtain information about media coverage of long lines in past Georgia elections, I conduct searches using the Lexis-Nexis database. I also use data on ballots submitted through drop boxes from ballot transfer forms collected and published by the Atlanta Journal-Constitution.[5]

Additionally, I have collected data on the polling places used in the June 9, 2020 election. Stephen Fowler, a reporter for Georgia Public Broadcasting, has assembled a complete list of polling places and associated precincts used in the June 2020 Primary. He has also obtained spreadsheets sent by the Georgia Secretary of State to individual counties including information from e-pollbooks about check-ins each hour in each precinct. Mr. Fowler has made the data publicly available.[6] I used Google Maps to geocode and map these polling places.

In order to create visualizations, I collected data on race and population from the American Community Survey for various years. These data, along with accompanying geographic boundary files at the level of census block groups, were downloaded from the National Historical Geographic Information System (NHGIS).

I also consulted data on turnout for various elections from the U.S. Elections Project (https://www.electproject.org/). As detailed below, I collected data on wait times reported by several Georgia counties for their early voting locations leading up to the December 2020 Runoff, and I was provided by counsel with a series of spreadsheets called "Open-Close-Reports" for each Georgia county for the December 2022 Runoff Election.

---

[4] Redistricting Data Hub, https://redistrictingdatahub.org/ (last visited Feb. 6, 2023).
[5] Mark Niese, Stephen Fowler, Sarah Kallis, & Isaiah Portiz, *Drop Box Use Heavy in Democratic Areas before Georgia Voting Law*, Atl. Journal-Constitution (July 12, 2021), https://www.ajc.com/politics/drop-box-use-soared-in-democratic-areas-before-georgia-voting-law/N4ZTGHLWD5BRBOUKBHTUCFVOEU/.
[6] Stephen Fowler, "Georgia Primary Polling Place Dataset," Tableau Public (updated Nov. 28, 2022), https://public.tableau.com/profile/stephen.fowler#!/vizhome/GeorgiaPollsOpenClose69/GA69PollsOpenClose.

## IV.    RACE AND VOTING BEHAVIOR IN GEORGIA

A straightforward way to comprehend the relationship between race and voting behavior in Georgia is to examine precinct-level election outcomes. In Figure 1, each data marker is a Georgia precinct, and the size of the data marker corresponds to the precinct's population size. In both graphs, the vertical axis is the average Democratic vote share across statewide races in the November 2020 General Election. In the first panel, Figure 1A, the horizontal axis corresponds to the share of the voting-age population in each precinct that is Black according to the 2020 Decennial Census. Precincts with relatively high population density—greater than 1,500 people per square kilometer—are colored green, while all other precincts in Georgia are colored gray. The vast majority of the relatively dense precincts are in the Atlanta metro area.

Figure 1 indicates that there is a very strong correlation between the race of a precinct and its voting behavior, especially outside of the dense, metropolitan precincts. The gray-colored precincts are tightly arranged along the 45-degree line, indicating a very close correspondence between the race of the precinct and its voting behavior. Note that there are very few precincts below the 45-degree line in Figure 1A, which indicates that there are very few precincts where the Democratic vote share is lower than the share of the voting-age population that is Black. In all of Georgia, the average Democratic vote share in the 2020 General election was 94 percent in the 267 precincts where the Black voting-age population share was above 80 percent. And the average Democratic vote share was 32 percent in the 1,331 precincts where the Black voting-age population was below 20 percent. It is very clear that Black Georgia voters overwhelmingly prefer Democratic candidates and white Georgia voters prefer Republican candidates.

Many of the most Democratic precincts in Georgia are urban. In Figure 1B, I plot the relationship between the log of precinct population density (on the horizontal axis) and average Democratic vote share (on the vertical axis). Precincts without a large Black population (less than 30 percent Black) are colored gray, and those with a substantial Black population (more than 30 percent) are colored red. Figure 1B conveys that there is a very strong correlation between population density and Democratic voting in Georgia. As we move to the right on the graph, we move from rural, to suburban, to dense precincts of the Atlanta urban core, and we see that the Democratic vote share increases sharply.

**Figure 1: Race, Population Density, and Average Democratic Vote Share in the 2020 General Election, Georgia Precincts**



Figure 1A: Black Voting-Age Population Share and Average Democratic Vote Share, by Density



Figure 1B: Population Density and Average Democratic Vote Share, by Race

Size of data marker corresponds to population of precinct

The red data markers indicate that Black Georgians vote in large numbers for Democratic candidates regardless of geography. Urban precincts with large Black populations vote

overwhelmingly for Democratic candidates—with Democratic vote shares often approaching 100 percent. The relatively rural precincts with relatively high Democratic vote shares—located in the upper left-hand corner of Figure 1B—are mostly in the Southern Georgia areas with large Black populations.

In sum, Black voters in Georgia overwhelmingly prefer Democratic candidates regardless of geography, and urban voters also overwhelmingly support Democratic candidates. Therefore, any reform that makes voting more difficult in urban areas relative to exurban and rural areas will have a disproportionate impact on voters who support Democratic candidates.

## V.    TRENDS IN BALLOT TYPE BY RACIAL AND PARTISAN GROUP

After a substantial increase in absentee voting in the last two general elections, SB 202 introduces several provisions aimed at changing the process by which voters apply for absentee ballots and submit those ballots to be counted. For instance, SB 202 prohibits state and local government officials from sending unsolicited absentee ballot applications to any elector and repeals a law requiring counties to mail absentee ballots to unregistered eligible voters who submit an absentee ballot application and then return their registration card by the deadline. SB 202 additionally imposes new identification requirements on voters both when they seek to apply for an absentee ballot and when those voters cast that absentee ballot to be counted.

Beyond the new requirements related to applying for an absentee ballot, SB 202 also shifts the window of time during which absentee ballots are distributed to voters 20 days closer to election day, meaning voters will have less time to receive and cast their ballot. The opportunities to cast a ballot are not only limited in time; SB 202 has introduced restrictions to the use of drop boxes both in terms of limiting the number that a county can have and limiting where they are located and when they can be open for use. Under SB 202, mobile polling, which was implemented in 2020 in Fulton County, is also banned unless the Governor declares an emergency, and there are now fewer mandatory early voting days that are required before runoff elections, including no requirement for weekend early voting.

In order to ascertain whether this multitude of changes might have a disproportionate impact on racial or partisan groups, it is necessary to establish which groups have been adopting these practices of absentee voting.

In the general elections from 2016 to 2022, Black voters were less likely than whites to cast their ballots in person on election day. In order to analyze these trends, I examined a Georgia voter file

extract taken shortly after each election,[7] merged it with the voter history file and absentee file, and ascertained which voters had cast a valid ballot, and which of those voters had cast that ballot in person on election day. The Georgia voter file includes self-reported data on race, which allows me to calculate separate statistics by race.

As demonstrated in Figure 2 below, which captures the calculations I performed for voting trends in general and runoff elections from 2016 to 2022, Black voters were less likely than white voters to cast their ballots in person at a polling place in the general elections of 2016, 2018, and 2020, as well as in the runoff election in January 2021. During the pandemic, Georgia voters generally switched in large numbers from in-person election day voting to absentee voting, but reliance on absentee voting was significantly more pronounced among Black voters.

In the general election of November 2022, after the implementation of SB 202 and its significant new barriers to voting by mail, both Black and white voters have moved sharply back toward in-person voting. However, the increase in in-person voting has been sharper for whites than for African Americans. In the November 2022 General Election, I estimate that 28.7 percent of Black voters and 38.4 percent of white voters cast their ballots in person on election day—a difference of almost 10 percentage points.

The racial asymmetry in in-person voting was especially notable in the recent runoffs. In the January 2021 runoff election, I estimate that 33 percent of whites voted in person on election day, and 22 percent of Blacks did so—a difference of 11 percentage points. In the 2022 December runoff, almost half of white voters cast their ballots on election day, but only 37 percent of Black voters—a difference of almost 13 percentage points.

---

[7] For the November 2016 General Election, I use an extract from January 5, 2017. For the November 2018 General Election, I use an extract from January 5, 2019. For the November 2020 Election and the January 2021 Runoff Election, I use an extract from March 31, 2021.



Figure 2: Election Day Ballots as Share of Ballots Cast, by Race, 2016-2022

Next, I explore differences in election-day versus absentee voting by party. For general elections, it is not possible to obtain individual-level data on partisanship, since Georgia does not require voters to register with a political party. However, it is possible to use aggregate precinct-level data to assess the relationship between partisanship and methods of voting. Each registered voter in the Georgia voter file is assigned to a specific precinct. I then matched these precinct codes in the voter file with vote tabulation districts, for which aggregate election results are available. This allowed me to examine both voting method and partisanship at the same relatively fine-grained geographic level.

In order to use this aggregate precinct-level information to draw inferences about individuals and then obtain an inference about the voting technique used by Democratic versus Republican voters, I use a technique known as ecological inference. This technique is widely used by expert witnesses in court cases related to the Voting Rights Act, where it is important to ascertain whether voting in a particular jurisdiction or district is racially polarized, but where the lowest level of aggregation for voting data is the precinct. Here, the challenge is similar: we have individual-level data on voting technique but not partisanship. Rather, we have aggregate information about voting techniques and partisanship at the level of precincts. Ecological inference is a procedure that draws deterministic bounds around the plausible range of values for Democratic and Republican rates of election day voting in each precinct. That is, we can rule out certain levels of Democratic and Republican rates of election day voting that are impossible given the data, and then estimate a

statistical model to bring together information from the entire distribution of precincts and home in further on the most likely rate of election day voting for Democrats and Republicans within the deterministic bounds in each precinct. Finally, these precinct-level estimates are aggregated into a summary estimate for the entire state, along with estimated 95 percent confidence intervals.

**Figure 3: Election Day Ballots as Share of Ballots Cast, by Party, 2016-2022**



The data markers in Figure 3 represent point estimates for Democrats (in blue) and Republicans (in red).[8] Figure 3 demonstrates a rather striking partisan difference in method of voting. The difference was already noticeable in 2016 and 2018, but it expanded significantly in 2020, when the estimated partisan gap was around 12 percentage points. However, after the implementation of SB 202, in November of 2022, the partisan gap expanded to almost 20 percentage points, with around 46 percent of Republicans, and around 26 percent of Democrats casting their ballots in-person on election day. The partisan gap was consistently large in the 2021 and 2022 runoffs.

---

[8] The 95 percent confidence intervals around these point estimates are quite narrow—so narrow that it is not practical to include them in Figure 3. This indicates that for each election, the estimated difference between Democrats and Republicans is statistically significant.



**Figure 4: Mail and Early In-Person Absentee Ballots as Share of Ballots Cast, by Race, 2016-2022**

### Absentee Voting

The decline in election day voting shown in Figures 2 and 3 above corresponds to an increase in absentee voting. The rise in absentee voting can be broken into two categories: (1) mail-in voting, and (2) early in-person voting. The black solid line in Figure 4 above displays *early in-person* ballots as a share of all valid ballots cast by Black voters in general elections, and the black line with long dashes represents the same quantity in runoff elections. The black line with short dashes displays *mail-in* ballots as a share of all valid ballots cast by Black voters in general elections, and the dotted lines are for runoff elections. The orange lines present the same information for white voters.

Figure 4 clarifies that the decline in election day voting displayed in Figure 2 above was largely driven by a rise in mail-in absentee ballots—an increase that has been especially pronounced among Black Georgians. In 2016, white voters were more likely than Black voters to make use of mail-in absentee ballots in Georgia. However, by 2018, Black voters had become more likely than white voters to use mail-in ballots. As mail-in balloting experienced dramatic growth in 2020 and 2021, the racial gap in voting method grew as well. By the time of the January 2021 runoff, 27.4

percent of Black voters were using mail-in ballots, while 21.6 percent of white voters were doing so.

With the exception of the 2020 General Election, Black voters have been more likely than white voters to make use of early voting. After the collapse of mail-in voting, Black voters moved disproportionately toward early in-person voting, whereas rates of early voting held constant for white voters. The decline in mail-in voting among whites was associated with an increase in election day voting, whereas among African Americans, it was associated with a mix of increased early voting and election day voting.

**Figure 5: Estimates of Mail and Early In-Person Absentee Ballots as Share of Ballots Cast by Party, 2016-2022**



Next, using the same ecological inference method described above, Figure 5 presents estimates of rates of use of absentee voting method for Democrats and Republicans. It demonstrates a partisan gap in the use of mail-in voting that was already present in 2016 and 2018 and grew dramatically in 2020, when I estimate that over 34 percent of Democratic voters, and around 17 percent of Republican voters, used mail-in voting. The rate of absentee voting was also twice as high for Democrats as Republicans in the January 2021 Runoff Election. Rates of mail-in voting then plummeted for both Democrats and Republicans, though remaining slightly higher for Democrats than Republicans.

By comparison, rates of early in-person voting were more stable for both Democrats and Republicans until the collapse of mail-in voting that took place after SB 202. After SB 202, rates of early in-person voting declined slightly among Republicans (Figure 5), while rates of election day voting increased dramatically (Figure 3). Among Democrats, the decline of mail-in voting was associated with substantial increases in early in-person voting (Figure 5) and election day voting (Figure 3).

The large decline in voting by mail after 2020 coincided with the implementation of SB 202, but of course, it also coincided with the return to a sense of normalcy after the height of the COVID-19 pandemic. As a result, it is difficult to ascertain how much of the decline in mail-in voting is attributable to the provisions of SB 202 that make it more difficult to obtain and cast an absentee ballot. One way to gain some purchase on this is to examine rates at which individuals who have gained experience voting by mail continue to vote by mail in the next election. Among those who voted in the 2018 midterm election and had voted by mail in 2016, 56 percent voted again by mail in 2018. Of those who voted in November of 2020 and had voted by mail in November of 2018, 74 percent voted by mail once again in 2020. However, of those who voted in 2022 and had voted by mail in 2020, only 22 percent did so again in 2022.

In other words, prior to SB 202, once a Georgia voter tries out voting by mail, they typically opt to use this technique again in the subsequent election. This was not the case after SB 202, when an unusually large number of mail-in voters switched to another form of voting.

### Drop Boxes

At least for some parts of Georgia, the term "mail-in" ballots is something of a misnomer. For many voters in urban Georgia, in November of 2022, absentee ballots were obtained in the mail but submitted via official drop boxes. There is no standardized statewide data source that would allow me to measure the reliance of voters on drop boxes. It is possible to assemble information from individual ballot transfer forms that are filed every time election officials collect ballots from a drop box. Journalists at the Atlanta Journal-Constitution collected these forms via public records requests to county election administrators and made the data available to the public.[9] For each county, I have summed up the total number of ballots cast via drop boxes as reported by the AJC, and from the voter history and absentee files I have summed up the total number of mail-in absentee ballots received, as well as the total number of valid ballots cast.

---

[9] Mark Niese, Stephen Fowler, Sarah Kallis, & Isaiah Portiz, *Drop Box Use Heavy in Democratic Areas before Georgia Voting Law*, Atl. Journal-Constitution (July 12, 2021), https://www.ajc.com/politics/drop-box-use-soared-in-democratic-areas-before-georgia-voting-law/N4ZTGHLWD5BRBOUKBHTUCFVOEU/.

In the most densely populated counties of Georgia, more than half of all mail-in ballots were submitted via drop box: 64 percent in DeKalb, 61 percent in Cobb, and 55 percent in Fulton County. In Figure 6 below, the horizontal axis measures votes cast in the November 2020 Election by Black voters as a share of all votes cast (calculated from the voter file and voter history file), and the vertical axis measures ballots submitted to drop boxes as a share of total ballots cast (by any technique).

**Figure 6: Black Share of November 2020 Votes Cast and Drop Box Ballots as Share of all Valid Mail-in Ballots**



Figure 6 demonstrates a positive county-level correlation between race and reliance on drop boxes. Counties with larger Black populations relied more heavily on drop boxes. We can also see that voters were especially reliant on drop boxes in the large Atlanta-area counties. In fact, around 56 percent of all drop box ballots counted by the team at AJC were from Fulton, DeKalb, Cobb, and Gwinnett Counties, although these counties only accounted for 38 percent of the votes cast among all counties for which drop box data were available.

Figure 7 below demonstrates a very strong county-level relationship between partisanship and reliance on drop boxes. In the most Republican counties, very few ballots were submitted via drop box, but in the most Democratic counties, over 15 percent of *all* ballots submitted were via drop box—reaching well over 20 percent in Cobb, DeKalb, and Clarke Counties.

**Figure 7: Democratic Presidential Vote Share and Drop Box Ballots as Share of all Valid Mail-in Ballots**



Not only did the large Atlanta-area counties rely more heavily on drop boxes, but they are also the counties most affected by SB 202's provisions that reduce the *number* of drop boxes. I geo-coded the address of the drop box locations reported for 2020 by the AJC, as well as a list of drop box locations used in 2022 that I received from counsel. In Figure 8 below, the purple dots indicate the locations of 2020 drop boxes, and the green dots indicate the locations of 2022 drop boxes. Note that in some rural counties, the AJC team was unable to get data on drop box locations in 2020, and in other instances, the green dots are directly on top of the purple dots because the same location was used.

Not only did voters in heavily Democratic urban counties rely more on drop boxes prior to SB 202, but from Figure 8 one can discern that these are also the counties where voters lost access to geographically proximate drop boxes. In densely populated urban counties, where higher shares of the population do not have access to automobiles, drop boxes had been conveniently dispersed through a wide range of neighborhoods prior to SB 202. After SB 202, in some of the most densely populated areas in the Atlanta area—above all those in Fulton, Clayton, and DeKalb Counties—as well as in Savannah and other smaller cities, the nearest dop box location moved much farther away.

**Figure 8: Drop Box Locations in 2020 and 2022 Superimposed on 2020 Precinct-Level Partisanship**



It is likely that voters made extensive use of drop boxes rather than returning their ballots by mail because they were concerned that the ballot would not be received in time via postal delivery. If this is true, we would expect to see that ballots submitted via drop box would increase as a share of all mail-in ballots submitted as the election draws nearer. To examine this, I sum up the drop box totals reported by the AJC for each week before the election, and for the final four days (including election day). Using the absentee file for the November 2020 Election, I drop the

counties that were not included in the AJC data, and then sum up the mail-in ballots received each week. Then, I obtain an estimate of the share of all mail-in ballots that were submitted via drop box for each week. These are rough estimates, since I am not sure whether there might be a lag in some counties between the date a ballot is received and the date recorded in the absentee file, or on the ballot transfer forms used by the AJC. Nevertheless, the trend reported in Figure 9 below is clear: as the election drew nearer, voters relied increasingly on drop boxes vis-à-vis the postal service. During the last four days, two-thirds of the mail-in votes recorded appear to have been submitted by drop box.

**Figure 9: Estimates of Ballots Submitted Via Drop Box as Share of all Valid Mail-in Ballots by Week, 2020 General Election**



SB 202 requires that drop boxes no longer be available for the Saturday through the Monday before a Tuesday general election or on the day of the election. It is clear from Figure 9 above that these were the days when voters were most reliant on drop boxes. Among those who submitted a mail-in ballot in 2020, about 8.8 percent of Black voters submitted their ballot in the four final days, whereas for white voters the figure was around 7.4 percent.

*Mobile Voting*

In the November 2020 election, Fulton County introduced an innovation during the early voting period: mobile polling places. Election officials were able to bring early voting opportunities to areas of the county that were otherwise not well served by early voting locations, or to bolster early voting locations that were experiencing long lines. By mapping the votes associated with each early voting location code in the absentee file and consulting a schedule of locations for the early voting buses used in Fulton County, I was able to ascertain which codes corresponded to the mobile

units. I calculate that around 3.5 percent of all early voters in Fulton County used the mobile units, which made up around 2 percent of all votes cast in the November 2020 election.

By prohibiting mobile voting, SB 202 targeted a popular voting technique that was only implemented in Fulton County, which has the largest Black population of any county in Georgia (around 15 percent of Black early voters in 2020 were from Fulton County) and contributes more Democratic votes than any other county in Georgia (around 18 percent of all Democratic early votes in 2020 came from Fulton County).

### The Impact of Long Lines on Choice of Voting Method

The remarkable popularity of mail-in voting in Georgia in 2020 likely had much to do with the pandemic as well as measures taken by election officials to make it more convenient. It is interesting to note, however, that the switch to mail-in (and drop box) voting took place disproportionately among African Americans and Democrats. Moreover, after SB 202, it appears that whites and Republicans have largely returned to election day voting, especially in the runoff elections, while African Americans and Democrats have been far less likely to return to election-day voting, turning instead to early voting and still-elevated rates of mail-in voting.

Why are Black and Democratic voters in Georgia relatively resistant to voting on election day? To understand this, it is useful to examine experiences in the recent past with election-day voting among those groups, as well as media portrayals of those experiences. Difficulties with election administration in metro Atlanta have become quite well known not only in Georgia, but in the national and international press, which have featured many stories about angry voters waiting in very long lines on election day in metro Atlanta.

For instance, consider the coverage of the AJC, which is Georgia's largest daily newspaper. I have searched the Lexis-Nexis database for all stories that contain the terms "Atlanta," long lines," and "election," where "long lines" and "election" are found in the same paragraph. To include the early voting period as well as post-election coverage, I include the period from August 1 of the year of each November election to August 1 of the following year. This approach yields a set of stories about struggles with long lines in various elections, with many stories about waits of over an hour in Cobb, Gwinnett, Clayton, DeKalb, and Fulton Counties.

Figure 10 below plots the number of AJC stories associated with each election period.[10] There was considerable coverage associated with the 2004 election, as well as the presidential elections of

---

[10] I display the data for the AJC because it is the largest paper in Georgia, and my intention is to gain an understanding of access of potential Georgia voters to media reporting on long lines in Georgia. Similar patterns can be seen if searches are carried out for national and international media outlets.

2008 and 2012. There were a number of reports of long lines in metro Atlanta in the 2018 Midterm, and then an unprecedented number of stories surrounding the serious difficulties experienced in the June primary of 2020, when thousands of people waited outdoors for hours on a hot summer day.

**Figure 10: Number of AJC Stories Between August 1 of Election Year and August 1 of Following Year on Long Lines Associated with Elections in Atlanta**



It has been well established not only in media stories, but also in studies by academic and public interest researchers that the difficulties with election day administration in Georgia are highly concentrated in relatively urban communities with large majorities of African Americans and Democratic voters, primarily in metro Atlanta.[11]

To understand the nature of the problem, it is useful to analyze some data from the disastrous election of June 2020. At many polling places, hundreds of people were still in line when the polls were scheduled to close at 7 p.m. These polling places were allowed to stay open as long as was necessary to process those already in line, but according to Georgia law (O.C.G.A §821-2-413(g)), new individuals were not permitted to enter the line.

---

[11] For an academic study, see M. Keith Chen, Kareem Haggag, Devin Pope, & Ryne Rohla, "Racial Disparities in Voting Wait Times: Evidence from Smartphone Data" *The Review of Economics and Statistics* 104(6): 1341-1350 (2022). For a similar study focusing on Georgia, see The Center for New Data, "Access to Polls: Assessment of Early Vote Wait Times in Georgia's General Election and Potential Effects of Voting Restrictions in Runoff" (2020), *available at* https://www.newdata.org/ga-analysis (last accessed Feb. 6, 2023). For studies by election protection advocacy groups, see Georgia Election Protection Leadership Committee, Georgia Appleseed Center for Law and Justice, and the Lawyers' Committee for Civil Rights Under Law, "Resolving Recurring Election Administration Problems in Georgia" (2012); *see also* Lawyers' Committee for Civil Rights Under Law, "2012 Election Protection Report," *available at* https://866ourvote.org/wp-content/uploads/2020/10/EP2012-FullReport.pdf (last accessed Feb. 6, 2023).

This provides us with an opportunity to identify the troubled precincts as well as evening wait times. A simple binary way of identifying precincts experiencing long lines is to ask whether they were still processing voters after 8 p.m.(one hour after the official closing time). We can infer that individuals voting in these precincts had wait times of at least an hour.

Figure 11 below provides a map of all the polling places that were still processing voters after 8 p.m. on June 9, 2020, along with data on African Americans as a share of the population at the level of census block groups from the American Community Survey, and Figure 12 below zooms in on metro Atlanta. We can see that these troubled polling places were concentrated in the Atlanta metro area, with a few also in Savannah and Columbus, and that many of the neighborhoods served by these troubled polling places had Black majorities. Problems with long lines were not common in rural areas with Black majorities, but in urban and suburban Black neighborhoods in Atlanta, as well as Savannah and Columbus.

For each polling place, using data on self-reported race in the voter file, I calculate that minority groups constituted local majorities in 32 percent of the polling places used in June 9, 2020 in Georgia. However, these majority-minority polling places accounted for over 63 percent of the polling places that were still processing voters after 8 p.m. Another way to look at the data is to calculate the share of majority-white polling places that were still processing voters after 8 p.m. versus the share of majority-minority polling places where this was true. Only 6 percent of majority-white precincts were forced to stay open past 8 p.m., while 21 percent of majority-minority polling places had to do so. In other words, the rate at which polling places experienced problems requiring them to stay open late was well over three times higher for minority precincts.

**Figure 11: Polling Places Open After 8 p.m. on June 9, 2020 and Black Share of Population, Georgia**



**Figure 12: Polling Places Open After 8 p.m. and Black Share of Population, Atlanta Area**



Breaking the data down a bit further, we can see that the rate at which polling places stayed open late is highly correlated with race and ethnicity, but the problem is especially severe in polling places where the population is overwhelmingly composed of minorities. To show this, Figure 13 below presents the share of polling places open past 8 p.m. for precincts where minorities make up 0 to 10 percent of registered voters, 10 to 20, and so on, up to the highest category—the polling places where minorities made up more than 90 percent of registered voters. Figure 13 demonstrates a linear increase in the share of polling places open past 8 p.m.as the minority share of registered voters increases, up to the group of precincts where minorities make up 80 to 90 percent of the population. However, after that, there is a discontinuous jump in the share of polling places open late. The share of polling places that were open past 8 p.m.in the 129 precincts where minorities made up 80 to 90 percent of registered voters was around 19 percent, but in the 196 precincts where minorities made up 90 to 100 percent of registered voters, it jumped all the way to almost 36 percent. Note that at the opposite extreme—the 360 precincts where non-Hispanic whites made

up over 90 percent of registered voters—the rate at which polling places were open late was less than 3 percent.

**Figure 13: The Share of Polling Places Open Past 8 p.m., by Minorities as a Share of Registered Voters, Georgia Polling Places, June 9, 2020**



The connection between race and problems with in-person voting on election day is not merely a reflection of the fact that minority-dominated precincts are concentrated in the greater Atlanta metro area. The red squares in Figure 13 limit the analysis exclusively to the Atlanta metro area.[12] The fact that all the red squares are higher than the black circles indicates that the share of polling places that were open late was higher in the Atlanta metro area across the board than in the rest of the state regardless of precinct racial shares. However, we can also see that the relationship between the racial composition of the polling place and the likelihood of late check-ins holds up *within* the Atlanta metro area. Among the Atlanta-area polling places that were over 90 percent non-Hispanic white, around 6 percent were still checking in voters after 8 p.m., while among the Atlanta-area precincts where the minority population was over 90 percent, around 45 percent were doing so.

It is also possible to examine the prevalence of polling place difficulties by party in addition to race. Included in the vote history file from the June 2020 election is a variable that indicates

---

[12] Here, I define the Greater Atlanta metro area to contain the counties of Cherokee, Clayton, Cobb, Coweta, Dekalb, Douglas, Fayette, Fulton, Gwinnett, Henry, Paulding, and Rockdale.

whether the individual voted in the Democratic or Republican primary. I can then use this to assess the prevalence of polling place difficulties by party. Among those who lived in neighborhoods assigned to polling places that were open past 8 p.m. in June of 2020, 75.4 percent voted in the Democratic Primary, while only 21.7 percent voted in the Republican Primary. Among those who lived in neighborhoods where the polling place was closed by 8 p.m., 50 percent voted in the Republican Primary and 47.8 percent voted in the Democratic Primary. Or to look at the data another way, 22 percent of those voting in the Democratic Primary lived in a troubled precinct, while 7.2 percent of those voting in the Republican Primary lived in these precincts. In other words, the rate was three times higher for Democrats than for Republicans.

Many of the Atlanta-area precincts with very long lines in June of 2022 were the same precincts that had experienced difficulties in previous elections. According to the Election Assistance Commission, in 2016, 48 percent of jurisdictions in the United States had less than 1,000 registered voters per polling place, 27 percent had between 1,000 and 2,000, and only 25 percent of the jurisdictions had more than 2,000 registered voters per polling place.[13] In Georgia in June of 2020, only 15 percent of polling places served less than 1,000 active registered voters; 20 percent served between 1,000 and 2000; and 65 percent of polling places had more than 2,000 active registered voters. In fact, 42 percent of the polling places served over 3,000 people, and there were 316 polling places serving over 5,000 people each, and 35 that served over 10,000. Polling places serving such large numbers of voters are extremely unusual. According to the Election Assistance Commission, the overall average of registered voters per polling station in the United States was 1,547 in 2016. In Georgia, for the June of 2020 primary, it was almost twice as large: 3,046.

Of the 242 precincts that were still checking in voters at 8 p.m.in on June 9, 2020, 227 (94 percent) had numbers of active registered voters above the national average of 1,547, and 203 (84 percent) were above the Georgia median of 2,646 active registered voters. The vast majority of these troubled polling places were in the Atlanta metro area (83 percent).

Across all polling places in the State, by observing the timing of the last check-in of the evening, I calculate that the average minimum evening wait time was around four minutes for all the precincts at or below the national average size of 1,547. For those above the statewide median, it was around 27 minutes. For those metro Atlanta precincts with more than 5,000 active voters, it was around 50 minutes.

Many of the troubled Atlanta-area polling places that served massive numbers of voters had something in common: they simultaneously served several precincts. I have characterized each

---

[13] Election Assistance Commission: *EAVS Deep Dive: Poll Workers and Polling Places* at 4 (Nov. 2017), https://www.eac.gov/sites/default/files/document_library/files/EAVSDeepDive_poll workers_pollingplaces_nov17.pdf. Note that the EAC sample excludes three states that automatically mail ballots to all voters: Colorado, Washington, and Oregon.

polling place used in the June 9, 2020 Primary according to whether it serves a single precinct or multiple precincts. I found 185 polling places that served multiple precincts, 134 of which were in metro Atlanta, and 102 of which were in Fulton County alone. These polling locations clearly accounted for a large part of the problem in the June 2020 Primary. Only 7 percent of the polling places that served a single precinct checked in voters after 8 p.m., whereas of those serving multiple precincts, 52 percent did so. The average number of check-ins after 7 p.m. was 8 in the polling places that served a single precinct, and 49 in those that served multiple precincts. The average estimated minimum wait time after 7 p.m. was around 12 minutes in single-precinct polling places, but it was one hour and nine minutes in the mostly Atlanta-area polling places that served multiple precincts.

To summarize, many urban polling places in Georgia have become stressed in recent years during high-turnout elections—a problem that became impossible to ignore after the June 2020 Primary. As a result, we might anticipate that voters residing in these troubled precincts would develop strategies for avoiding election-day voting by switching to early or mail-in voting in the November 2020 election.

Indeed, this was the case. Focusing only on people who voted in November of 2020, I find that the rate of Election-Day voting was lower by 7.4 percentage points among voters who lived in precincts that had been open past 8 p.m.in the June Primary than among those who did not live in these precincts. The voters in these troubled precincts demonstrated higher rates of voting both by mail and early in-person.

It is also useful to focus on individuals who voted in-person in the troubled June 2000 Primary and then voted again by some method in November. We might expect a larger aversion to in-person voting among this group of voters, who were most likely to have experienced the long lines for themselves. Indeed, this is the case. Among this group, the rate of election-day voting in November 2020 was lower among those registered in the troubled precincts by 14.6 percentage points than those living elsewhere.

In sum, amid the broader shift toward absentee voting in 2020, there was an especially large shift toward absentee voting among voters in urban precincts that had recently experienced long lines that were publicized in the media. By making mail-in voting more difficult in all elections and reducing the availability of early voting during runoffs, SB 202 was designed to push voters back to in-person voting on election day. Below, I will explore the implications for both turnout and wait times in 2022.

# VI.    WHICH GROUPS HAVE TROUBLE CASTING VALID BALLOTS IN GEORGIA?

It is clear from the data that both Black and Democratic voters are most likely to be impacted by SB 202's new requirements and limitations as to various methods of voting. However, I have been asked to examine not only which groups are more likely to vote with which type of ballot, but also which groups of voters encounter more difficulties in having their vote counted, both prior to and after SB 202.

Using individual-level data on the absentee voter files, I can assess the various metrics of rejected mail-in ballots from 2016 to 2022, as well as challenged/provisional absentee ballots from 2020 to 2022. Additionally, for election-day voters, I can examine provisional ballots, and for a smaller sample of counties, I can examine a specific category of provisional ballot that will become much more important under SB 202: out-of-precinct ballots.

### *Difficulties with Mail-in Ballots*

In the absentee files provided by the Secretary of State, for each general election from 2016 to 2022, there is a field that identifies voters whose absentee ballots were submitted but rejected and the reason for the rejection, such as a voter failing to sign the oath on their ballot, failing to provide a matching signature, or failing to provide the information required on the absentee ballot or corresponding envelope. Figure 14 below displays the share of mail-in ballots that have been rejected in each general election from 2016 to 2022, separately for Black voters and white voters. Rejections were relatively common in 2016 and 2018, with a significant racial disparity. For example, in 2018, around 4.3 percent of mail-in ballots submitted by Black voters were rejected, and 2.4 percent for white voters. The share of mail-in ballots rejected plunged for both groups of voters in the November 2020 election and the ensuing runoff, rejection rates increased again in 2022. Black votes had higher rejection rates than white voters in each election with the exception of the December 2022 runoff.

**Figure 14: Rejected Mail-in Ballots, by Race**



Again, it is possible to aggregate the data in the merged individual-level voter file/absentee file to the level of precincts, enabling me to contrast rejection rates in Democratic and Republican precincts and calculate estimates for Democrats and Republicans via ecological inference. These estimates, along with 95 percent confidence intervals, are presented in Figure 15 below. Estimated rejection rates have been higher among Democrats than Republicans in each election from 2016 to 2022.

Figure 15: Rejected Mail-in Ballots by Partisanship, 2016-2022



In addition to outright rejections of absentee ballots, the 2020, 2021, and 2022 absentee files contain an additional field that flags whether a voter's eligibility was challenged and/or whether the absentee ballot was deemed provisional. Again, it is possible to use individual-level data to examine whether there is a difference in the prevalence of these indicators between Blacks and whites. And again, it is possible to aggregate to the precinct level to contrast Democratic and Republican precincts.

Figure 16 below displays shares of all mail-in ballots, by race, which were either challenged or cast provisionally, and Figure 17 below displays this data by party. In each election, the rate at which provisional ballots cast by Black voters were deemed "challenged or provisional" was higher than that for whites. These rates were also substantially higher in Democratic precincts than in Republican precincts, with the exception of the December 2021 Runoff.

Figures 16 and 17 also show that rates at which mail-in ballots are deemed "challenged" or provisional" has increased substantially after SB 202, especially in Democratic-leaning precincts.



Figure 16: Challenged/Provisional Mail-in Ballots, by Race, 2020-2022



Figure 17: Challenged/Provisional Mail-in Ballots, by Party, 2020-2022

### Difficulties with Election-Day Ballots

SB 202 also adopts new procedures for out-of-precinct ballots, where now ballots cast outside the precinct in which the voter is registered cannot be counted for any election contest if the ballot is cast before 5:00 p.m. on election day.

As described above, lines on Election day in urban Georgia have been extremely long in some instances, making it very costly or even prohibitive to correct a mistaken visit to the wrong polling

place upon getting to the check-in desk and realizing the mistake. In the past, a registered voter finding themselves in this situation was able to cast a provisional ballot, which would then be counted for all races on the out-of-precinct ballot for which that individual was eligible to vote (e.g. counted for statewide or countywide race but not for a city council race for which the ballot referred to the incorrect city council district). Under SB 202, voters finding themselves in this situation will no longer be allowed to cast a provisional ballot that will be counted (unless they reach the front of the line after 5 p.m.).

To get a sense of the possible impact of this change, I proceeded in two steps. First, I assessed individual-level data specifying whether a registered voter cast a provisional ballot in each election. As above, I used the individual-level data to examine race and combine it with precinct-level data to examine partisanship. Second, counsel has provided me with a series of lists of provisional ballots cast in selected counties that log this information in a systematic way for a certain subset of recent elections, including 4 counties in 2016,[14] 7 counties in 2018,[15] 20 counties in 2020,[16] and 12 counties in 2021 for the January Runoff Election.[17] Some of these lists include (1) codes that identify the reason for casting a provisional ballot, including the "out of precinct" designation, and (2) voter registration identification numbers that allow me to link to the voter file, thus allowing me to ascertain the voter's race and precinct of registration. I obtained both of the above categories of information for the above-listed counties and elections.

In Figures 18 and 19 below, I provide information on total provisional ballots cast as a share of election day ballots, broken down by race and party. We can see that prior to SB 202, provisional ballots were quite common in Georgia, and they were growing, especially among Black voters and in Democratic precincts. Roughly 1.8 percent of election-day ballots cast by Black voters, and 1.7 percent of the ballots cast by Democratic voters were provisional in 2020. By contrast, less than a half a percent of the election-day votes of white voters, and I estimate that one third of a percent of the votes of Republican voters were provisional in 2020. In other words, the rate at which provisional ballots were cast in 2020 was more than three times higher among Black voters than among white voters and is estimated to be more than five times higher among Democrats than Republicans.

---

[14] The 2016 counties were Carroll, Cobb, Gwinnett, and Rockdale

[15] The 2018 counties were Carroll, Cobb, Glynn, Gwinnett, Rockdale, Walton, and White.

[16] The 2020 counties were Bartow, Carroll, Cobb, Columbia, Fannin, Gilmer, Glynn, Gordon, Gwinnett, Henry, Houston, Liberty, Long, Madison, Newton, Rockdale, Taylor, Twiggs, Walton, and White.

[17] The 2021 counties were Fannin, Gilmer, Gordon, Gwinnett, Henry, Houston, Liberty, Long, Madison, Newton, Rockdale, and Walton.

**Figure 18: Provisional Ballots as Share of Election-Day Ballots Cast, 2016-2022, by Race**



**Figure 19: Provisional Ballots as Share of Election-Day Ballots Cast, 2016-2022, by Party**



Recall from above that the most Democratic precincts are typically quite urban, and the most Republican precincts are quite rural. In 2020, for instance, in the precincts where the Democratic vote share was more than 80 percent, the average population density was 1,300 people per square kilometer, whereas in the precincts where the Republican vote share was above 80 percent, the average population density was around 430 people per square kilometer. Out-of-precinct voting in Georgia happens predominantly in urban, Democratic areas. For instance, in 2020, provisional ballots as a share of all ballots cast in precincts with population density above 1000 per square km were more than triple the rate in precincts where the population density was less than 500 per square km. More than 78 percent of all out-of-precinct ballots were cast in precincts where the population density was above the median.

Next, let us drill down further and examine the "out of precinct" provisional ballots in the counties with the requisite data available. In 2016 and 2018, data are only available from a small number of counties, but in each case, two of them—Cobb and Gwinnett—are relatively large metro-Atlanta area counties with relatively high rates of provisional voting. However, it should be noted that some of the largest metropolitan counties with the highest rates of provisional voting—DeKalb and Fulton—are not included in my analysis for any of these elections, because although I have lists of provisional ballots from those counties, I do not have voter identification numbers that allow me to link them to the voter file. As a result, it is quite possible that some of my estimates of rates of "out-of-precinct" voting for Black voters, and for Democratic precincts, are *too low*.

**Table 1: Out-of-Precinct Ballots in Select Georgia Counties**

| General Election | Out-of-precinct votes per 1,000 ballots cast, Black voters | Out-of-precinct votes per 1,000 ballots cast, white voters | Out-of-precinct votes per 1,000 ballots cast, most Democratic precincts (>80%) | Out-of-precinct votes per 1,000 ballots cast, most Republican precincts (>80%) |
|---|---|---|---|---|
| 2016 (4 counties) | 9 | 3 | 13 | 5 |
| 2018 (7 counties) | 10 | 3 | 15 | 2 |
| 2020 (20 counties) | 6 | 2 | 12 | 1 |
| 2021 (12 counties) | 6 | 2 | 7 | 1 |

Estimates of "out-of-precinct" ballots as a share of all in-person ballots cast for the relevant counties are provided in Table 1 above. Note that the rows are not strictly comparable since each row refers to a different set of counties.[18] Nevertheless, a clear story emerges. First, despite the changing sample of counties, out-of-precinct ballots are around three times more common among Black voters than among whites in each election.

_____

[18] *See supra* nn.10-13.

Second, out-of-precinct ballots are especially prevalent in the relatively urban precincts in counties like Gwinnett, Cobb, and Henry, where the Democratic vote share is above 80 percent. In the 2020 general election, in these very Democratic precincts in the 20 counties for which data were available, 12 out of every 1,000 election-day ballots were cast in the wrong precinct. This was true for only one in 1,000 ballots in the relatively rural precincts where the Republican vote share was above 80 percent.

The impact of SB 202 can be seen in Figures 18 and 19 above, which demonstrate a steep decline in provisional ballots as a share of election-day ballots cast. Out-of-precinct provisional ballots had made up the largest category of provisional ballots, and these were used overwhelmingly by Black and Democratic voters in cities. As a result of SB 202, voters who may have previously reached the front of the line, realized they were in the wrong polling place, and received a provisional ballot are now told that if it is before 5 p.m., such a ballot will not count. It is relatively clear from Figures 18 and 19 that these voters are no longer submitting provisional ballots. There is no good way to know whether all these voters are making their way to the correct polling place and casting ballots, or whether some portion of them are giving up and going home. However, as I discuss later in my report, turnout declined more steeply in 2022 in precincts with higher rates of provisional voting in 2020.

## VII.    WAIT TIMES IN DECEMBER 2022

As described above, many residents of urban areas in Georgia faced very long lines in the June 2020 Primary, as well as in previous general elections. Residents of these troubled precincts, disproportionately composed of Black voters and Democrats, moved away from in-person voting in November 2020 and in the runoff of January 2021. As a result of the massive shift toward mail-in voting, traffic at polling places on November 3, 2020 was relatively light. However, by making mail-in voting more cumbersome, SB 202 was designed to nudge these absentee voters back to election day voting, especially in runoffs, which now have far less time for early voting. One might anticipate that by pushing voters into an abbreviated early voting period in the December 2022 Runoff with fewer weekend opportunities and no opportunities to submit ballots in the final days via drop box, SB 202 would generate (1) long wait times during the early voting period and (2) long wait times on election day.

To my knowledge, in the past, detailed information on wait times was not available during the early voting period, though media reports sometimes have described long lines in urban locations. In November and December of 2022, the counties of Cobb, DeKalb, Fulton, and Gwinnett in the Atlanta area, and Chatham (home to Savannah) provided online estimates of wait times at each of their early voting locations and updated them sporadically throughout the day during the early

voting period.[19] I visited these web sites and recorded the reported wait times on 11 occasions: 3 p.m. on November 28; 1:40 p.m. on November 29, 6:45 p.m. on November 30; 10:30 a.m. on December 1; 12 p.m. on December 1; 1:45 p.m. on December 1; 5 p.m. on December 1; 11 a.m. on December 2; 2:30 p.m. on December 2; 4:30 p.m. on December 2; and at 7 p.m. on December 2 (all times EST).

Figure 20 below simply provides the average wait time for each location across the 11 snapshots, as well as the maximum reported wait time from these 11 observations. It is clear that some of the locations had very long wait times. The average wait time was more than 30 minutes in 47 of the 72 urban locations, more than 45 minutes in 36 locations, and more than an hour in 20 locations, and more than an hour and a half in 6 locations. Some of the maximum wait times reported on these web pages are also striking. Well over half of these voting locations (43) had at least one observation with a wait time over 60 minutes, and one-third of them (24) had at least one observation with a wait time over 90 minutes.

---

[19] Fulton County Department of Registration and Elections, "*Early Voting Locations with Wait Time for December 6, 2022 Runoff Election*," ArcGIS Online, https://www.arcgis.com/apps/ dashboards/1a86b03b27fa48188bf3699c4eccfb20 (last accessed Feb. 6, 2023); Gwinnett County, "*Web Alert*," https://www.gwinnettcounty.com/web/gwinnett/Alert (last accessed Feb. 6, 2023), https://dekalbgis.maps.arcgis.com/apps/dashboards/4c790bbc7bca4d748a71d69429904d6c (last accessed Feb. 6, 2023); Cobb County, "*Advance Voting Map*," ArcGIS Online, https://cobbcountyga.maps.arcgis.com/apps/webappviewer/index.html?id=1c3b458b93b3436db0 3c77cf585b23d2 (last accessed Feb. 6, 2023); Chatham County, "*Chatham County Early Voting Wait Times*," Arc GIS Online https://chathamcountyga.maps.arcgis.com/apps/instant/basic/ index.html?appid=937ea91056e9499783c975a300cdace5 (last accessed Feb. 6, 2023).

**Figure 20: Average and Maximum Wait Times, Early Voting Locations for 2022 Runoff in Counties with Published Data**



Figure 21 below provides a map of early voting locations in the Atlanta area, with colors ranging from yellow to red according to the average wait time during the early voting period, and in the background, precinct-level results of the 2020 presidential election ranging from red for the most Republican precincts to blue for the most Democratic precincts. Long waits for early voting were found in many of the same urban and suburban areas that had faced long waits on election day in the past. *See supra* Figures 11 and 12.

**Figure 21: Average Wait Times, Early Voting Locations for 2022 Runoff in Atlanta-Area Counties with Published Data**



From counsel I have also received a spreadsheet for each county marked as an "Open-Close-Report" for election day on December 6, 2020. These spreadsheets include a line for each polling location in each county, and columns that indicate the times of the first and last check-ins of the day. As in the analysis above for the June 2020 Primary, it is possible to ascertain which polling places were still processing voters more than one hour after the official closing time, indicating that at the end of the day, wait times were a minimum of one hour.

Table 2 below provides the number of polling places open past 8 p.m. on December 6, 2022, for the counties of the Atlanta area, as well as Columbus and Savannah. There were 214 such precincts in the Atlanta area. In Fulton County, 129 out of 167 polling places were open at least an hour beyond closing time, and many were open far longer. There were 33 polling places with very long

evening lines in DeKalb County, and 17 in Cobb. Outside these three metro areas, in the entire remainder of the state, only 12 polling places were open past 8 p.m.[20]

**Table 2: Number of Polling Places Open Past 8 p.m. on December 6, 2022**

| | |
|---|---|
| **Atlanta Area** | |
| Clayton | 4 |
| Cobb | 17 |
| Cherokee | 5 |
| DeKalb | 33 |
| Douglas | 2 |
| Fulton | 129 |
| Forsyth | 6 |
| Gwinnett | 10 |
| Henry | 8 |
| *Atlanta Area Total:* | *214* |
| | |
| **Savannah Area** | |
| Chatham | 18 |
| | |
| **Columbus Area** | |
| Muscogee | 5 |
| | |
| **Rest of State** | 12 |

Figure 22 below displays a map with a red dot for each precinct where the polling place was open past 8 p.m. on December 6, 2022, along with information about precinct-level race. It looks remarkably similar to a similar map displayed above for the June 2020 Primary. *See supra* Figures 11 and 12. Once again, long lines were found disproportionately in neighborhoods with relatively large Black populations. Figure 23 below includes information about party, demonstrating that long lines were also found in neighborhoods with relatively large Democratic vote shares.

In sum, it appears that in both the early voting period and on election day of the December 2022 Runoff, long lines have returned to the same urban and suburban precincts in metro Atlanta where they were found in past troubled elections.

---

[20] They were scattered between Floyd (1), Jackson (1), Jones (1), Newton (2), Paulding (1), Peach (1), Walker (2), and Ware (3).

**Figure 22: Polling Places Open Past 8 p.m. on December 6, 2022 and Race**



**Figure 23: Polling Places Open Past 8 p.m. on December 6, 2022 and Party**



## VIII.   TRENDS IN TURNOUT BEFORE AND AFTER SB 202

Thus far, we have learned that SB 202 had the biggest impact on Black and Democratic voters, who had become more accustomed to voting by mail, were more likely to cast out-of-precinct provisional ballots, more likely to use drop boxes and submit mail-in ballots in the final days before the election, and more likely to be leery of voting in-person on election day due to the prospect of long lines. If SB 202 had an impact on turnout, we would anticipate that turnout would decline more for the most effected groups: Black and Democratic voters, and more specifically, those who had learned from past experience with long lines to avoid voting on election day, and those who had grown accustomed to voting by mail.

To examine turnout as a share of registered voters, I use a voter file extract right after each election, and drop everyone who registered after the election, as well as voters whose registration was cancelled on a date prior to the election. I then merge in the relevant vote history file and calculate the share of registered voters who cast a valid vote in each general election. In Figure 24 below, I report turnout separately for those indicated in the voter file as Black and those indicated as white registered voters, separately for general and runoff elections.

**Figure 24: Turnout for Black and White Registered Voters in General Elections and Runoffs, 2016 to 2022**



For both Black and white registered voters in Georgia, turnout experienced a significant decline after the implementation of SB 202. Perhaps the most relevant comparison is the November 2022 midterm with the most recent preceding midterm election in 2018. For white registered voters, turnout declined by 4 percentage points (from 62.3 percent to 58.3 percent). For Black registered voters, it declined by 10 percentage points.

This sharp decrease in turnout as a share of registered voters was somewhat surprising, since as in 2018, the 2022 Midterm Election was expected to feature at least one extremely competitive statewide race and featured a rematch of the same gubernatorial candidates who had squared off in a hotly contested election in 2018. Moreover, unlike 2018, the 2022 election featured a U.S. Senate election that was expected to have important implications for partisan control of the Senate.

It is difficult to make comparisons of trends in turnout across states, especially in a non-presidential year, since each state has different races on the ballot, different candidates, and accordingly, different levels of anticipated competitiveness. Many U.S. states in 2018 did not feature competitive statewide races. To get some sense of Georgia's declining turnout in comparative perspective, let us examine all the states that featured a highly competitive U.S. Senate race—one with a margin of 5 or fewer percentage points. The most reliable comparative turnout data for U.S. states is collected by Dr. Michael McDonald and reported at "The U.S. Elections Project" (electproject.org). He divides the total number of ballots cast by the "voting eligible" population, which is an adjustment of the voting-age population for "persons who are ineligible to vote, such as non-citizens, felons (depending on state law), and mentally incapacitated persons."

Note that since McDonald reports turnout as a share of the voting-eligible population, rather than registered voters, overall reported turnout rates are far lower in the McDonald data than in the calculations above that use registered voters as the denominator. According to McDonald, Georgia's turnout in 2022 was 52.6 percent, down from 54.1 percent in 2018—a decrease of 1.5 percentage points.

In Table 3 below, I report the change in turnout (as a share of voting-eligible population) from 2018 to 2022 for each state with a competitive Senate race in 2022. Like Georgia, three other states—Wisconsin, North Carolina, and Nevada—also experienced a decrease in turnout between 2018 and 2022. Arizona and Pennsylvania experienced impressive increases in turnout.

Table 3: Turnout Change from 2018 to 2022 in States with Competitive Senate Races in 2022

| | Turnout change since 2018 | Governor elections in 2018 and 2022? | Was there a 2018 Senate election? |
|---|---|---|---|
| Georgia | -1.5% | x | |
| Wisconsin | -1.3% | x | x |
| North Carolina | -0.9% | | |
| Nevada | -0.2% | x | x |
| Arizona | 2.0% | x | x |
| Pennsylvania | 2.9% | x | x |

Source: https://www.electproject.org/election-data/voter-turnout-data

Each of these comparison states had a gubernatorial election in both 2018 and 2022 except for North Carolina. In Georgia and North Carolina, there was a competitive U.S. Senate election in 2022, but no Senate election in 2018, so if anything, one might have anticipated an increase in turnout in these states relative to the others in Table 3. However, among these competitive states, Georgia experienced the largest decline in turnout.

### *Race and turnout*

Perhaps the most striking feature of Figure 20 above is not the overall decline in turnout from 2018 to 2022, but the racial asymmetry in the decline. To get a better sense of the geography of this racial asymmetry, I calculate Black registered voters as a share of all registered voters in each county using the voter file, averaging over the voter file extracts for 2018 and 2022, as well as the change in overall county-level turnout from 2018 to 2022. Figure 25 below plots the Black registered voter share on the horizontal axis, and the change in turnout from 2018 to 2022 on the vertical axis. The size of the data markers corresponds to the number of registered voters in the county, and some of the most densely populated counties in the Atlanta area are labeled.

In the counties where there are very few Black voters, the decline in turnout was modest, but as the Black share of registered voters increases, the decline in turnout becomes more pronounced. The decline in turnout was quite significant in some of the counties with relatively large Black populations.

**Figure 25: Change in Turnout from 2018 to 2022 and Black Share of Registered Voters, Georgia Counties**



Note: Size of data marker is determined by number of registered voters in 2022

Since a large share of Georgia's population lives in a handful of large counties in the Atlanta area, and these counties are internally heterogeneous, it is useful to move beyond the plot of counties. Figure 26 below provides a similar plot, using precincts as the unit of analysis. It shows that in the precincts with the smallest Black population shares, the decline in turnout was quite modest, but in those with the largest Black populations, turnout declined by around 9 percentage points.

**Figure 26: Change in Turnout from 2018 to 2022 and Black Share of Registered Voters, Georgia Precincts**



Solid line is fitted using locally weighted scatterplot smoothing (lowess)

It is also useful to zoom in individually on the four largest counties, which collectively make up almost one third of Georgia's population. In Figure 27 below, we see that within each county, in the mostly suburban neighborhoods where the population is overwhelmingly white, turnout did not fall at all, or fell only very slightly, while the decline in turnout was very large—around 9 or 10 percentage points—in the precincts with the largest Black populations. The relationship between precinct-level race and turnout is especially large in these urban counties.

**Figure 27: Change in Turnout from 2018 to 2022 and Black Share of Registered Voters, Precincts in the Four Largest Georgia Counties**



Black share of registered voters

Solid lines are fitted using locally weighted scatterplot smoothing (lowess)

Next, let us move beyond pictures and quantify the precinct-level relationship between race and the change in turnout. Specifically, I regress the precinct-level change in turnout from 2018 to 2022 on the share of registrants who were Black (averaged over 2018 and 2022). I include county fixed effects, which means that I focus exclusively on within-county variation. The coefficient is -.072, with a 95 percent confidence interval from -.083 to -.060.

It is also useful to consult the individual-level data from the voter file and vote history files to learn more about the decline in turnout. First, let us consider registered voters who have not built a habit of voting in general elections in Georgia. Among those who appeared on the voter file in November of 2022, let us consider those who, according to the vote history files, did not cast votes in either the 2018 or 2020 general elections, either because they were not yet registered or because they declined to participate. Among this group of non-habitual voters, only 9 percent of Black registrants, and 15.5 percent of white registrants cast votes in November of 2022—a gap of around 6.5 percentage points.

Next, let us consider more experienced voters—those who were registered to vote in 2022 and had cast valid ballots in other recent general elections. Among Black registrants who had voted in the 2018 midterm, 76 percent voted again in 2022, while for white registrants, 82.2 percent did so—a

racial gap of around 6 percentage points. Among Black registrants who had voted in the 2020 general election, 71.6 percent did so again in 2022, while for whites, 76.7 percent did so—a gap of around 5 percentage points. Next, let us consider what we might call habitual voters: those who voted in both the 2018 and 2020 general elections. Among voters in this category, 82.2 percent of Black registrants voted in 2022, as did 86 percent of white registrants—a gap of around 4 percentage points.

In short, it is not only the case that there was a racial disparity in turnout in 2022 among non-habitual or new voters, but even among voters with a similar history of turnout, the decline in turnout in November of 2022 was greater among African Americans than among whites.

*Partisanship and turnout*

The decline in turnout from 2018 to 2022 also occurred disproportionately in relatively Democratic counties and precincts. Figure 28 below plots the Democratic share of the two-party vote in the 2020 Presidential election on the horizontal axis, and once again, the change in county-level turnout on the vertical axis. It shows that the drop in turnout was larger in relatively Democratic counties.

**Figure 28: Change in Turnout from 2018 to 2022 and Democratic Presidential Vote Share in 2020, Georgia Counties**



Again, since most of the large counties are quite heterogeneous, it is useful to examine precinct-level data within counties. Figure 29 below displays precinct-level data for the four largest

counties, demonstrating that turnout did not fall at all, or fell by a rather small amount, in the most Republican precincts, but fell substantially in the most Democratic precincts.

**Figure 29: Change in Turnout from 2018 to 2022 and Democratic Presidential Vote Share in 2020, Precincts in the Four Largest Georgia Counties**



Biden share of two-party vote in 2020 presidential election

Solid lines are fitted using locally weighted scatterplot smoothing (lowess)

Again, I have estimated a regression model in which the dependent variable is the precinct-level turnout change from 2018 to 2022, but now, the independent (or explanatory) variable is the Democratic share of the vote for the two major parties in the 2020 presidential election. Again, I include county fixed effects to focus on within-county variation. The coefficient is -.10, with a 95 percent confidence interval of -.110 to -.091. This means that going from a completely Republican to a completely Democratic precinct is associated with a 10 percentage-point expansion of the turnout decline.

***Precincts with a history of long lines***

As explained above, voters in predominantly urban and African American precincts with a history of long lines on election day were more likely to switch to absentee voting in 2020. SB 202 nudged mail-in voters in such precincts back toward potentially crowded in-person voting sites. As demonstrated above, those sites were indeed very crowded in the December 2022 Runoff Election. We might expect that many such voters would respond to the changes of SB 202 by switching to a form of in-person voting and still cast a ballot despite the higher costs. However, if some such

voters were deterred from casting a ballot, we would anticipate that the decline in turnout would be greater in the precincts with a history of long lines than in other precincts.

To examine this possibility, I estimate another precinct-level regression in which the dependent variable—that is, the variable to be explained—is the change in turnout from November 2018 to November 2022. In this regression, the independent (explanatory) variable is a simple indicator (1 or 0) for whether the precinct experienced long lines in 2020. Once again, I include county fixed effects, so that I focus on *within-county* differences between precincts that experienced long lines and those that did not. The estimated coefficient is -.011, with a 95 percent confidence interval from -.021 to -.001. This indicates that within counties, the decline in turnout in 2022 was greater by 1.1 percentage point in precincts with a history of long lines than in precincts without that experience, and that this difference is statistically significant.

One might suspect, however, that turnout in these urban, minority-dominated precincts with a history of long lines was already trending downward relative to other precincts in the same county over a long period of time, and 2022 was just the latest manifestation. This is not the case. Using individual-level data in the voter file, for each election since 2016, I estimate the within-county effect on turnout of living in a precinct with long lines in 2020. Since I am using individual-level data, I can do this separately for Black and white voters. The coefficients and 95 percent confidence intervals for Black and white registrants in each election are displayed in Figure 30 below.

Prior to 2020, Black voters had higher turnout in the urban precincts that were affected by long lines in 2020 than Black voters in other precincts in the same county. In other words, the long lines emerged in precincts with a history of relatively *high* Black turnout. In 2020, this turnout advantage was attenuated somewhat, but it remained significant. As we learned above, voters in these precincts switched in especially large numbers to non-election day voting, including relying on absentee by mail voting and early voting, presumably to escape the prospect of long lines.

However, after SB 202, this turnout advantage suddenly disappeared. Black voters in the affected precincts suddenly demonstrated significantly *lower* turnout than other Black voters in their county. For whites, who were often the minority in these urban and mostly Black precincts, turnout was a little over 2 percentage points lower than for whites elsewhere in the county, and this continued after SB 202.

**Figure 30: Coefficients and 95 Percent Confidence Intervals for Individual-Level Regressions of Turnout on Being Assigned to a Precinct that Experienced Long Lines in 2020, Separate Effects for Black and White Voters, 2016-2022**



### Mail-in voters who submitted their ballots in the last four days

As described above, many voters, especially in urban parts of Georgia, made use of ballot drop boxes in 2020, and many voters found the drop boxes especially useful during the final days before the election, likely because they feared that submitting the ballot by mail would cause it to arrive after the deadline. Since SB 202 placed considerable new restrictions on the availability of drop boxes, we might suspect that some voters who had relied on this practice would be less likely to cast a ballot in 2022. Those who submitted a mail-in ballot on one of the last four days before the 2020 election had turnout rates in 2022 that were lower by 26 percentage points than all other 2020 voters who were still registered in 2022.

However, we might suspect that those who submit their ballots at the last moment tend to be less reliable follow-up voters in general. Indeed, this is the case. Among those who voted in 2018, voters who submitted mail-in ballots in the final four days ended up with turnout rates in 2020 that were 8 percentage points lower than other 2018 voters. In 2018, the difference was 22.6 percentage points. By comparison, the 26 percentage-point difference was larger in 2022.

*Provisional ballots and turnout*

As described above, a number of voters showed up at the wrong polling place in 2020 and received provisional ballots. These out-of-precinct provisional ballots were clustered in certain relatively dense precincts. There is no good way of tracking the number of individuals who showed up at the wrong polling place in 2022, were turned away, and told to find the correct polling location; and no good way to track how many of them ultimately found the correct polling place or returned home. However, if SB 202 discouraged some of them from voting, we would expect the decline in turnout in 2022 to be greater in precincts where high rates of provisional ballots had previously been observed.

I estimate another precinct-level regression in which the dependent variable is the change in turnout from 2018 to 2022. This time, the independent variable is the share of ballots in the precinct that were cast provisionally in 2020. Again, I include county fixed effects to focus on within-county variation. In this model, the coefficient is -.954, and the 95 percent confidence interval is -1.28 to -.627. To understand this, consider a move from the precincts with no provisional ballots at all (this was true of over 30 percent of the precincts), where the decline in turnout was around 6 percentage points, to the precincts above the 80th percentile value, where the decline in turnout was around 7.5 percentage points. The difference is 1.5 percentage points. In sum, the decline in turnout was slightly larger in precincts with more provisional voters.

## IX.   CONCLUSIONS

The biggest impacts of SB 202 are on 1) mail-in voters, especially users of drop boxes— particularly those who submit their ballots in the final days before election day, 2) voters in precincts where long lines are most prevalent, and 3) voters in areas where out-of-precinct provisional voting is most prevalent. Black and Democratic voters are over-represented in each of these categories.

By making it more difficult to cast a mail-in ballot, SB 202 nudges voters back to early and election-day voting. By reducing the early voting period for runoff elections, it especially pushes voters toward election-day voting for those contests. For some voters in precincts where early voting is easy and election day is typically smooth and efficient, the impact might be small. But for voters in urban precincts with a history of long lines during early voting and on election day, where voters are predominantly Black and typically vote for Democratic candidates, this can mean that the cost of voting involves waiting in a long line and missing work. In the December 2022 runoff election, voters in many urban areas had to wait in long lines either during the abbreviated early voting period or on election day.

Finally, the November 2022 election saw a disproportionate decline in turnout, among voters who had previously submitted mail-in ballots on the final days before the election, among voters living

in precincts with a recent history of long lines, and among voters living in precincts that had seen elevated rates of provisional voting in the past. Each of these groups was also disproportionately composed of Black voters and Democratic voters, and more generally, there was a disproportionate decline in turnout among Black voters and in Democratic precincts and counties.