IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.
1:21-MI-55555-JPB

VIDEOTAPED DEPOSITION OF
BERNARD L. FRAGA, Ph.D.

August 11, 2025
9:10 a.m.

Clark Hill, LLC
3630 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia

LAURA R. SINGLE, CCR-B-1343

A P P E A R A N C E S

For the AME Plaintiffs:

LEAH ADEN, ESQ. (Via Zoom)
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street
5th Floor
New York, New York 10006
212-965-7715
laden@naacpldf.org

For the Georgia State Conference of the NAACP Plaintiffs:

VILIA B. HAYES, ESQ.
MANA AMERI, ESQ. (Via Zoom)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
212-837-6839
vilia.hayes@hugheshubbard.com

JULIE HOUK, ESQ.
The Lawyers' Committee for Civil Rights Under Law
1500 K Street, N.W.
Suite 900
Washington, D.C. 20005
202-662-8391
jhouk@lawyerscommittee.org

A P P E A R A N C E S

For the Asian Americans Advancing Justice-Atlanta Plaintiffs:

NOAH BARON, ESQ. (Via Zoom)
Asian Americans Advancing Justice ALC
1620 L Street, N.W.
Suite 1050
Washington, D.C. 20036-5660
202-296-2300
noahb@advancingjustice-alc.org

For The Concerned Black Clergy of Metropolitan Atlanta, Inc., Plaintiffs:

CLIFFORD J. ZATZ, ESQ. (Via Zoom)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-624-2500
czatz@crowell.com

For the State Defendants:

BRYAN F. JACOUTOT, ESQ.
DIANA LAROSS, ESQ.
BRYAN P. TYSON, ESQ. (Via Zoom)
Clark Hill, LLC
3630 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia 30326
678-336-7249
bjacoutot@clarkhill.com

A P P E A R A N C E S

For the Macon-Bibb County Defendants:
GRACE S. MARTIN, ESQ. (Via Zoom)
Noland Law Firm, LLC
5400 Riverside Drive
Suite 205
Macon, Georgia 31210
478-621-4980
grace@nolandlawfirmllc.com

For the Clayton County Board of Registrars and Elections, Chatham County Board of Registrars, Chatham County Board of Elections Defendants:
CASEY M. TORRES, ESQ. (Via Zoom)
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948
770-818-0000
casey.torres@fmglaw.com

For the Intervenor Defendants:
BAXTER D. DRENNON, ESQ. (Via Zoom)
Hall Booth Smith, P.C.
200 River Market Avenue
Suite 500
Little Rock, Arkansas 72201
501-319-6996
bdrennon@hallboothsmith.com

Also Present:
Justin Grimmer, Ph.D. (Via Zoom)

I N D E X

| EXAMINATION OF BERNARD L. FRAGA, Ph.D. | PAGE |
|---|---|
| BY MR. JACOUTOT................................ | 11 |
| BY MS. HAYES.................................. | 124 |

* * *

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| For the State Defendants: | | |
| Exhibit 1 | Notice of Deposition of Bernard Fraga, Ph.D. | 11 |
| Exhibit 2 | CV for Bernard L. Fraga | 18 |
| Exhibit 3 | Amended Supplemental Expert Report of Bernard L. Fraga, Ph.D., 6/2/25 | 29 |
| Exhibit 4 | Rebuttal Report of Bernard L. Fraga, Ph.D., July 14, 2025 | 48 |
| Exhibit 5 | CDC Tweet, 11/16/20 | 63 |
| Exhibit 6 | Article titled, "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election" | 71 |
| Exhibit 7 | Copy of a Tweet/post by Bernard L. Fraga, 4/28/25 | 76 |

Bernard L. Fraga , Ph.D. August 11, 2025
Georgia Senate Bill 202, In Re

Page 6

I N D E X

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| For the State Defendants: | | |
| Exhibit 8 | Article titled, "Dropbox Allocation and Use Among Georgia Voters in the 2020 Election" | 85 |
| Exhibit 9 | AJC article titled, "2020 Census: Georgia's minority populations have surged" | 102 |
| Exhibit 10 | Supplemental Expert Report of Justin Grimmer, Ph.D. | 104 |
| Exhibit 11 | Supplemental Expert Response Report of Justin Grimmer, Ph.D. | 105 |

Veritext Legal Solutions
800.808.4958 770.343.9696

P R O C E E D I N G S

(Pursuant to Article 10(B) of the Rules and Regulations of the Georgia Board of Court Reporting, a written disclosure statement was submitted by the court reporter to all counsel present at the proceeding.)

* * *

THE VIDEOGRAPHER: We are on the record and the time is approximately 9:10 a.m. This is the beginning of the videotaped deposition for Dr. Bernard Fraga.

Would counsel present please identify themselves and who they represent for the record.

MS. HAYES: Vilia Hayes, Hughes Hubbard & Reed, LLP, counsel for the Georgia NAACP Plaintiffs and the witness Dr. Fraga.

MS. HOUK: Julie Houk appearing for Georgia NAACP Plaintiffs also, Lawyers Committee for Civil Rights Under Law.

MR. JACOUTOT: Bryan Jacoutot of Clark Hill, PLC, for the State Defendants.

MS. LAROSS: Diana LaRoss with Clark Hill also for the State Defendants.

MR. JACOUTOT: And I think at this time we can have the folk on Zoom state their appearance.

MR. ZATZ: [Audio distortion] Zatz, Crowell & Moring, LLP, appearing for The Concerned Black Clergy of Metropolitan Atlanta Plaintiffs.

THE COURT REPORTER: I'm sorry. I can hardly hear you.

MR. ZATZ: Can you hear me now?

THE COURT REPORTER: Barely. State your appearance again. I'm sorry.

MS. HAYES: Can we make it louder? Hold on for a minute.

MR. JACOUTOT: It's probably on the little device here, the speaker.

THE VIDEOGRAPHER: Yeah. It's all the way up.

MR. JACOUTOT: We'll have to work with it.

THE COURT REPORTER: Okay. State your appearance again, please.

MR. ZATZ: Can you hear me now?

THE COURT REPORTER: Go ahead.

MR. ZATZ: Cliff Zatz, Crowell & Moring, LLP, appearing for The Concerned Black Clergy of Metropolitan Atlanta, Plaintiffs.

MS. HAYES: That's Clifford Zatz, Z-A-T-Z.

THE COURT REPORTER: I see it. Thank you.

MS. HAYES: Okay.

MR. DRENNON: Baxter Drennon, Hall Booth Smith for the Intervener Defendants.

MR. JACOUTOT: Maybe it's not coming out of there now.

MS. MARTIN: Grace Martin with Noland Law Firm for the Macon-Bibb County Defendants.

MR. BARON: Noah Baron with The Asian Americans Advancing Justice, AAJC, on behalf of The Asians Americans Advancing Justice Plaintiffs.

MS. AMERI: Mana Ameri from Hughes Hubbard & Reed for the Georgia NAACP Plaintiff.

MR. MOCINE-MCQUEEN: Marcos Mocine-McQueen with the Elias Law Group on behalf of the NGP Plaintiffs and [audio distortion] by Tina Meng for the same Plaintiffs and law firm.

THE COURT REPORTER: I'm sorry. I need you to repeat that.

MR. MOCINE-MCQUEEN: Marcos, M-A-R-C-O-S, Mocine-McQueen for the Elias Law Group and later I will be joined by Tina Meng Morrison also with the Elias Law Group, also on behalf of the NGP Plaintiffs.

THE COURT REPORTER: Thank you.

MR. TYSON: And good morning. This is Bryan

Tyson on behalf of the State Defendants also with Clark Hill. Good morning.

MS. ADEN: Good morning. Leah Aden, with the NAACP Legal Defense Fund on behalf of the AME Plaintiffs.

And, Ms. Court Reporter, if you have an email that you can put in the chat, we could also maybe email you to make your life easier.

THE COURT REPORTER: I will do that. Thank you.

MS. ADEN: Thank you.

MR. TORRES: Casey Torres with Freeman Mathis & Gary, LLP. We represent the Clayton County Board of Registrars and Elections, the Chatham County Board of Registrars, the Chatham County Board of Elections, and all the individuals named for each.

MR. JACOUTOT: I think we've covered everybody.

THE VIDEOGRAPHER: Thank you, Counsel.

Would the court reporter please swear in the witness.

BERNARD L. FRAGA, Ph.D.,

Having been first duly sworn to state the truth, was examined and testified as follows:

/ / /

EXAMINATION

BY MR. JACOUTOT:

Q. Good morning, Dr. Fraga.

A. Good morning.

Q. Apologies for the technical difficulties there, but I think we are on the right track right now.

MR. JACOUTOT: This will be the supplemental expert deposition of Dr. Bernard Fraga, taken by the State Defendants.

The deposition is being taken for purposes of discovery and all purposes allowed under the Federal Rules of Civil Procedure.

BY MR. JACOUTOT:

Q. Dr. Fraga, could you once more state your full name and address for the record?

A. Sure. My name is Bernard L. Fraga, and I reside at [redacted] in Decatur, Georgia.

Q. Great.

And, again, my name is Bryan Jacoutot. I represent the State Defendants.

I'm handing you what's being marked Defendants' Exhibit 1.

(Exhibit 1 was marked for

identification, attached at the end of the original transcript.)

BY MR. JACOUTOT:

Q. This is a notice of your -- a copy of your notice of deposition.

A. Thank you.

Q. I just want you to take a look at that and confirm that that's what you've received and why you're here today.

A. I confirm.

Q. Okay. And you realize that having just taken the oath that was administered that you are agreeing to tell the whole truth in response to my questions just as if you were on the stand at trial?

A. I do.

Q. Okay. How many depositions have you had as an expert witness?

A. I believe four.

Q. Okay, four. And I think we've already had -- we already had one in this case, correct?

A. That's correct.

Q. So you know the drill; but for the record, I'm just going to go over the ground rules as always so there's no confusion.

For the court reporter, she's taking down

our testimony here today, so try not to talk over each other. And if I've asked a question, even if it looks like it's obvious to where I am going with it, if you can just respond -- wait -- wait until I finish asking the question to respond.

Is that agreeable?

A. Sure.

Q. Okay. And I think if we do a bad job of that, the court reporter is free to let us know.

Also please respond with audible answers rather than nodding or shaking your head or saying uh-huh or uh-uh if that's possible.

Is that agreeable?

A. Yes.

Q. Okay. And then particularly when I am deposing statistical experts like yourself I might be framing questions or using jargon that doesn't align with the way you understand it in your field. So if I say anything that has kind of, you know, maybe a separate connotation to you or something that maybe is not going to be used colloquially and you don't understand it, just let me know and I'll try to rephrase. I won't be offended if you say, well, that's not what that means in our field or anything like that.

A. Sure.

Q. And the same thing as just as a -- as to the broader questions, if you don't understand a question I've asked, just let me know and I'll try to rephrase it.

A. Okay.

Q. As far as breaks go, we can do them whenever you need them. The only thing that I would ask is that if I have a question pending to you if you could just respond to that question before we go on the break.

Is that okay with you?

A. Sure.

Q. Great.

MS. HAYES: Just as a suggestion to start off, it usually pays to take like 5 minutes every hour or so just so -- because if we wait too long, then people are interrupting each other --

MR. JACOUTOT: Yeah.

MS. HAYES: -- because they decide they need a break, so I would suggest that.

MR. JACOUTOT: Okay. That sounds good to me.

BY MR. JACOUTOT:

Q. Is that okay with the witness?

A. Sure.

Q. Perfect.

MR. JACOUTOT: Now, is the witness intending to read and sign the deposition?

MS. HAYES: Yes.

MR. JACOUTOT: Okay.

BY MR. JACOUTOT:

Q. So to begin with, I just have some boilerplate questions, Dr. Fraga.

Do you have any health conditions that -- or are you currently -- well, let me rephrase that.

Do you have any health conditions that might keep you from testifying truly today?

A. I do not.

Q. And are you taking any medications that might keep you from testifying truthfully today?

A. No.

Q. Okay. What did you do to prepare for today's testimony?

A. I reviewed my expert reports and other expert reports that were filed in this case.

Q. Can you recall which expert -- apart from your own, which expert reports that you reviewed in preparation for today?

A. There are a lot of expert reports in this

case.

Q. Yes, there are.

A. I believe that the focus was on expert reports that have been filed in 2025.

Q. Okay. So did you review Dr. Grimmer's 2025 expert reports?

A. I believe so.

Q. And there were two of those, correct? There was the June supplemental expert report and the July supplemental response report?

A. That sounds right.

Q. Okay. And you reviewed both of those?

A. Yes.

Q. Okay. Did you review an expert report from Dr. Pettigrew?

A. No.

Q. Did you review a report in 2025 from Dr. Clark?

A. I don't believe so.

Q. Okay. So before we get into the substance of your reports -- and let me just be clear. You -- you also filed two reports, correct, in 2025?

A. Yes.

Q. And the first report that was filed in June was amended?

A. I'm not sure how amended is being used in this context.

Q. Did you -- did you do any edits or provide any edits to your June -- your initial June 2025 report?

A. I believe that there were edits. I'm not sure that the edits -- if the edits were made before it was actually given to the Defendants or after.

Q. Okay. Okay. And then you also filed a July supplemental report as well, right?

A. That sounds right.

Q. Okay. So before we get into the substance of those reports, I wanted to ask how many times have you given court testimony as an expert witness in an election-related case?

A. I think at least three.

Q. Do you remember the case names of those three cases?

A. Yes.

Q. Can you start with the most recent and work your way back?

A. So I gave -- if -- if I could have the listing from my CV, I believe that that contains all of those --

Q. Okay.

A. -- just to make sure I get the names right.

Q. Okay. Perfect. Well, that is what's next on my list, so we can go to that.

A. Okay. Great.

Q. I'm now handing you what we're going to mark Defendants' Exhibit 2.

(Exhibit 2 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. And that should be a copy of your CV; is that correct?

A. That's correct.

MS. HAYES: Thank you.

MR. JACOUTOT: Uh-huh (affirmatively).

BY MR. JACOUTOT:

Q. Can you just take a quick look through it -- it looks like you're already doing that -- and just kind of confirm that it's up to date?

A. It appears to be up to date.

Q. Okay. And if you look here in the top right corner, it does say updated on July 15, 2025; is that correct?

A. That's correct.

Q. Okay. If I can direct you to the peer-reviewed journal article section, it looks like to me that the top four articles listed that have been published, they were published after your previous deposition in this case; is that right?

A. I think so. It's a bit difficult to define published in the contemporary context because things get published online before they're in print.

Q. Okay. And would the online publications have a date that's different from the date listed on your CV for each of these publications?

A. I'm not sure.

Q. Okay. Well, for our purpose then, I'm just going to go through the top four with you because I believe we've already had the opportunity to go through the older ones.

So if you don't mind, can you start with the number 18 on your CV? Tell me what that publication was and a little bit about it.

A. Sure. This publication from 2025 in the Journal of Race, Ethnicity, and Politics is titled, "Partisan Change With Generational Turnover: Latino Party Identification from 1989 to 2023." In that article we look at party identification for Latinos over the period indicated.

Q. What specifically about party identification are you looking for in that article?

A. In that article we document party identification, that is, identification as Democrats or Republicans or in some cases Independents over the time span.

Q. Okay. And we don't need to go through the substance of that article in too much detail; but having conducted the analysis for that article, did any of it affect your conclusions here in this case?

A. No.

Q. Okay. And if we just move right down right to number 17 there, can you tell me about that one?

A. This is an article titled, "Can Elite Allegations of Election Fraud Demobilize Supporters?" It appeared in the Journal of Political Behavior in 2025.

Q. And did it go into sort of -- when you -- when you say elite allegations, what do you mean by elite allegations in that title?

A. In this paper we examined whether elected officials making allegations of election fraud may demobilize their supporters.

Q. So when you say elite, it's referring to elected officials and not necessarily, you know,

hyper-wealthy individuals or anything like that?

A. The intent is not to refer to hyper-wealthy individuals.

Q. And I guess technically speaking the current President would be considered a hyper-wealthy individual as well.

A. I can't really speak to that.

Q. I can say I would consider him hyper-wealthy.

The next article, can -- it's entitled, "Evaluating the Minority Candidate Penalty With a Regression" -- I'm sorry. That's not the next article. Pardon me.

The next article is "Reversion to the Mean, or Their Version of the Dream? Latino Voting in an Age of Populism." What -- what did that article analyze?

A. So in this article, which appeared in the American Political Science Review, we examine shifts in Latino voting behavior, in particular in vote choice in recent elections.

Q. And what did that article find with respect to shifts in Latino voting behavior in recent elections?

A. If I recall correctly, we had a number of

conclusions. One that is sticking in my mind at the moment is that we found that there may be durable shifts in Latino voting behavior.

Q. And when you say shifts, are you referring to preference of candidate or preference of political party?

And that's a compound question, so let me rephrase it.

When you say shifts, are you referring to the Latino preference of political party generally?

A. It's a hard question to answer because part of the article is about trying to disentangle partisan shifts more broadly versus preference for candidates of a particular party.

Q. Okay.

A. It's difficult to do in some instances.

Q. Right. That's fair.

Did the article observe any shift in Latino population toward Republicans and away from Democrats?

A. Again, that's kind of a complicated question to give a short answer to; but I think it's fair to say we were investigating the extent to which shifts similar to what you mention occurred.

Q. And when you say you -- you at least sort of

concede that you were investigating the extent to which those shifts occurred, I suppose that means that there was a degree of shift in that direction, correct?

MS. HAYES: I'm going to object to the form of the question.

THE WITNESS: Again, I think in that article part of it is not starting with a perspective on whether there are shifts instead trying to understand the extent to which something that appears to be a shift is a shift in reality.

BY MR. JACOUTOT:

Q. Okay. Can you describe what you mean when you say a shift in -- in reality?

A. So in the article one of the things that, as is implied by the title, we think a lot about is whether the trends we've seen in recent elections are a reversion to a preexisting kind of normal state versus something new or novel. We also think a lot about whether this is actual shift by individuals or new individuals entering the electorate.

Q. And so when you mentioned -- just the word "reality" kind of stuck in my head. Are you referring to the -- the mean that you would be reverting to that the title describes? Is that the

reality?
A. Not necessarily. I think that as in much of my work we're trying to accurately describe the patterns that we see.
Q. Okay. Now, having conducted the analysis for that article, did it affect any of your conclusions in this case?
A. No.
Q. And I'll ask the same question for number 17 because I don't think I did. Having conducted the analysis for the article listed there in number 17, did it affect your conclusions here?
A. No.
Q. Okay. And the number 15 is the final article I just want to briefly touch on. It's entitled, "Evaluating the Minority Candidate Penalty with a Regression Discontinuity Approach." Can you describe what that article analyzed?
A. So in this article, which appeared in the British Journal of Political Science, my co-authors and I examined the extent to which minority candidates face a penalty using a statistical procedure called a regression discontinuity.
Q. How do you describe -- when you say penalty, what is that referring to?

A. Here when we're examining a penalty, we're trying to determine whether a minority candidate if seeking office would receive a smaller share of the vote than a non-minority candidate.

Q. I may be just reading it wrong, but it seems that the title presupposes that such penalty exists and you are -- I'll just leave it at that.

MS. HAYES: Is that a question? I'll object to the form.

MR. JACOUTOT: I'll go back and rephrase without the -- the ending there.

BY MR. JACOUTOT:

Q. I may be reading this wrong; but based on the title, it seems as though the study assumes the existence of a minority candidate penalty; is that fair?

A. No.

Q. Okay. So no assumption of a penalty?

A. No.

Q. Okay. You mentioned the publication process is a little difficult to describe sometimes in terms of timing and how everything is actually released to the public. Is that a fair characterization of what you said?

MS. HAYES: Object to the form.

THE WITNESS: I'm not sure. If I recall correctly, when I was discussing publications, I was simply talking about the date that's listed on the CV and the way we might define published given the fact that now a lot of publications get posted even by a journal online before they're in print.

BY MR. JACOUTOT:

Q. Okay. So do you have any other publications that are forthcoming?

A. I don't believe so.

Q. Okay. And it looks like you're currently employed by Emory University; is that right?

A. That's correct.

Q. And is that a full-time employment?

A. Yes.

Q. Are you doing any work outside of the scope of your full-time employment position that relates to the subject matters about which your expert report comments on?

A. I don't believe so.

Q. I don't have this in front of --

THE VIDEOGRAPHER: Counsel, I think your microphone --

MR. JACOUTOT: Thank you. I'm getting too

relaxed.

BY MR. JACOUTOT:

Q. I don't have this in front of me, but I recall seeing a report that you received a $200,000 grant for some research through the Carnegie Foundation?

A. I believe it was the Carnegie Corporation.

Q. Carnegie Corporation, okay.

And what sort of research are you conducting with that grant?

A. So that grant, which I believe is listed on my CV, if I can look --

Q. Sure. Take your time.

A. It's on page 4, the Andrew Carnegie Fellowship of the Carnegie Corporation of New York awarded in 2024 is a highly competitive national award where applicants propose a project that fits within the scope of a kind of call filed by in this case the Carnegie Corporation. And if I recall correctly, as part of my application, I noted that I would be studying the relationship between political polarization and voter turnout.

Q. Well, congratulations, by the way, on getting that grant.

A. Thank you.

Q. So that grant allows you sort of to -- strike that.
What do you mean by political polarization?
A. So I don't have the call in front of me; but if I recall correctly, the way the Carnegie Corporation or at least the writers of the call for proposals I suppose describe polarization -- they are thinking about it as conflict within the electorate, disagreement. There are a number of different facets to that.
Q. Okay. So you don't have a definition sitting here today of what you would consider to be political polarization?
A. There are many definitions in the literature that I could choose from.
Q. None that you would use in the abstract?
MS. HAYES: I object to the form of the question.
THE WITNESS: That's very context dependent.
BY MR. JACOUTOT:
Q. Okay. And to be clear, just to respond to the form objection, you don't have a definition of political polarization that you would use in the abstract in your line of work?
A. I don't think that most scholars of American

politics, if they're being careful as I'm trying to be here, would have a kind of broad, general definition. In fact, much political science research on this topic is about evaluating different definitions.

Q. Okay. That's fair.

Okay, Dr. Fraga. I am going to hand you, which will be marked as Exhibit 3, your amended supplemental expert report from June 23, 2025.

(Exhibit 3 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Uh-huh (affirmative).

If you could take a look at that and just confirm that that is the report that you filed in this case.

MS. HAYES: Thank you.

THE WITNESS: It appears to be the report I filed.

BY MR. JACOUTOT:

Q. Okay. And just so you know, we're going to jump around a little on this report and on the other report that you filed, so it's not going to be

necessarily this linear progression through. So I'm going to start with page 18 of your June supplemental report.

First, can you tell us what table 5 represents?

A. Table 5 represents the percent of absentee-by-mail voters whose ballots were rejected by self-reported race or ethnicity in elections from 2018 to 2024.

Q. Okay. And that's rejected absentee ballots for any reason; is that right?

A. As I mention in the note, the values in the table indicate the percent of all absentee-by-mail ballots with a status of A, which represents accepted, or R, which represents rejected, that were rejected.

Q. Okay. You're going to have to bear with me because I'm going to get into some math. And if my calculations are off, feel free to correct me.

If you look at the last sentence of paragraph 37, which sort of spills over to the next page, you state that the racial disparity in rejection rates was larger post-SB202 than pre-SB202 in percentage point terms; is that correct?

A. That's correct.

Q. If you flip back, is it fair to say that the different -- the difference in rejection rates among White and Black voters was substantially lower in 2024 than it was in 2020?

A. I don't believe so, but could you repeat the question so I can make sure I get it right?

Q. Sure.

Is it fair to say that the difference in rejection rates among White and Black voters was substantially lower in 2024 than it was in 2020?

A. Well, first, just to clarify in this table I'm looking at absentee-by-mail voters, not all voters.

Q. Okay. Yes.

So with that stipulation in mind, I'll pose the question again. Is it fair to say that the difference in rejection rates in absentee-by-mail voting among White and Black voters was substantially lower in 2024 than it was in 2020?

A. No, I don't believe that's accurate.

Q. Okay. So in 2020 in this table 5, .24 percent of White voters' ballots were rejected; is that right?

A. Again, in this table I'm looking at absentee-by-mail voters. I wasn't sure if you

mentioned that in your comment.

Q. Yeah. I don't think I did.

So in -- in 2020 with respect to absentee-by-mail voters, which is what this table discusses, .24 percent of White voters' ballots were rejected; is that right?

A. That's what the table shows.

Q. Do you have any reason to think that the table's numbers would be inaccurate?

A. No.

Q. Additionally, if you look below in the Black voter column, it says that .45 of Black voters had theirs rejected; is that right?

A. That's correct.

Q. So that means that the Black voters' rejection rate was 87.5 percent higher than White voters' rejection rate; is that right?

A. I'm not sure. That's not a calculation that I did in this table.

Q. Do you have any reason to dispute that calculation?

A. Other than the fact that I don't have a calculator in front of me.

Q. That's fair.

You don't have to confirm it, but would that

be a no then, you don't have any reason to dispute the calculation but you also don't want to confirm it?

A. If I can't confirm it, I'm not sure just back of the envelope, which I don't have here, if that's accurate --

Q. Okay.

A. -- at all. So in a sense that's disputing it, we also don't have the additional decimal points that might be important in making that calculation. In this table and the reference that I'm making in paragraph 37, I am mentioning it in percentage point terms where we see that in November 2024 there was a .45 percentage point difference between White and Black rejection rates with Black people rejected at a higher rate; and in November of 2020, it was smaller than that. If I am doing it correctly, I believe it was .21. So that is the motivation for the statement that I am making in paragraph 37 that compares November 2024 to November 2020.

Q. Let's look at 2024, November. In that -- in the White row it lists 1 -- the table lists 1.2 percent of White voters' ballots being rejected, is that right, for the reason in the -- in the table 5 title?

A. Just to clarify it says 1.2 percent of absentee-by-mail voters.
Q. Yeah.
A. Yes.
Q. And it says 1.65 percent with respect to Black voters?
A. That's correct; Black absentee-by-mail voters.
Q. So in 2024 does that mean that the difference in rejection rates was much lower than in 2020?
A. No.
Q. Why is that?
A. Because as I just mentioned, the rejection rate for Black voters was much higher than it was for White voters in percentage point terms relative to 2020.
Q. Is it fair to say that Black voters in 2024 -- I want to make sure I frame this right, so let's pause there and I'll re-ask the question.
Is it fair to say that the rejection rate listed here in table 5 in 2024 of 1.65 percent for Black voters is approximately 37.5 percent higher than the rejection rate listed for White voters? So
A. It's not a calculation that I did here. So

without additional information, I can't confirm that.

Q. Sure.

But you would agree with me that 37.5 percent is lower than 87.5 percent?

MS. HAYES: I'm going to object to the form of the question.

THE WITNESS: Those numbers are different.

BY MR. JACOUTOT:

Q. Would you say --

A. One of them is the -- and, again, I don't have the exact numbers in front of me, so I'm trying to recall since it's not something I calculated; but the number beginning with an eight is larger than the number beginning with a three.

Q. Okay. I'm glad we can agree on that.

A. Me, too.

And, if I may, just to clarify because I think that I stated a calculation incorrectly. The percentage point difference between the White rejection rate in 2020 and the Black rejection rate in 2020 was .21 percentage points versus .45 percentage points in November 2024. So in percentage point terms, it was more than double in 2024 relative to 2020.

Q. Uh-huh (affirmatively).

A. I may have misstated that before when I was answering your question.

Q. Thank you for that.

Let's look at paragraph 38. There you reference table 6, which is immediately below. And you say that your analysis, quote, shows that Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters were consistently more likely to have their ballots rejected due to, quote, incorrect ID information or missing ID information post-SB202 versus White Georgians; is that correct?

A. That's correct.

Q. And you say, this includes the November 2024 presidential election, right?

A. That's correct.

Q. Do you still agree with that statement?

A. Yes.

Q. Okay. If you look at table 6 in November of 2024, can you tell me the difference in percentage point terms between White and Black voters as described here?

A. So here I'm looking at the percent of absentee-by-mail voters whose ballots were rejected due to missing or incorrect ID information, and in November 2024 I find that there was a .04 percent --

percentage point difference between the rejection rate for Black Georgians who voted by -- attempted to vote absentee-by-mail versus White Georgians who attempted to vote absentee-by-mail.

Q. I think -- is that .05 the difference?

A. That's correct. Sorry. .05 based on the rounding that's in this table.

Q. Okay. Is that .05 percent difference statistically significant in your opinion?

A. Yes.

Q. How so?

A. So when we talk about statistical significance in an academic context, it generally refers to whether or not the difference or value indicated is likely to be something that is due to vagaries of the statistical sample used and would not be reflected in the population if we had all of the data.

In this case, I am using all of the data as in this is data reported by the State that includes at least according to the State every single individual meeting the criteria that I mentioned in the table and in the note to the table. So there is no kind of sampling bias or error that might produce these estimates that would be different from the

population because it is the population. So any difference that we see in this table between two values is by design statistically significant.

Q. Okay. And would you agree then that with respect to the difference in rejection rates described here in table 6 between White voters and Hispanic voters is also statistically significant?

A. That's correct. Hispanic voters had a higher rate of rejection for ID issues probably defined than White Georgians did in November 2024.

Q. And the difference between White voters and Asian American/Pacific Islanders described here in table 6 is also statistically significant in your opinion?

A. That's correct.

Q. I notice you have figures here in November 2018 but no figures in November 2020 or January 2021. Well, strike that. That's not -- that's not true.

I notice that in January 2021 all of the values for all races including the total is zero, correct?

A. The number that I'm showing here I have it rounded to 0.00. I know in another table I clarify whether a number is truly zero as in no people versus just rounding to such a small number that it would be

equivalent to zero. Here it's sufficient to say it rounds to a number that is zero according to the rounding in the table to two decimal points of a percentage.

Q. Uh-huh (affirmatively). Okay.

A. So we have data for those years. I examined whether there were individuals who were rejected due to missing or incorrect ID information, and it was as shown in the table --

Q. Okay.

A. -- rounding to zero.

Q. And based on the expert reports that you reviewed in preparation for today's deposition, there's nothing in this table that you would want to change?

A. So when I reviewed the expert reports, I focused on parts of the reports that were most relevant to me understanding my report and the criticisms of it. I don't recall anything that would make me question what's in this table.

Q. Okay. Can you turn to paragraph 39? I don't think you have to actually turn. At the bottom of page 19 here, you state: In the post-SB202 presidential election of November 2024, Black, Hispanic, and Asian American/Pacific Islander

Georgians were more likely to have their ballots rejected due to receipt after the deadline than White Georgians; is that correct?

A. That's correct.

Q. And you say: This gap in rejection rates reached its highest level in post-SB202 elections; is that right?

A. That's correct.

Q. In November 2022 in table 7, White voters are listed as having .77 percent of their absentee-by-mail votes rejected due to receipt after the deadline; is that correct?

A. That's correct.

Q. And then Black voters list .7 percent for that same reason; is that right?

A. That's correct.

Q. So isn't the White voter rejection rate higher in a post-SB202 election than the Black voter rejection rate described here?

A. In this election, yes.

Q. What about December 2022, the runoff; is it higher there as well?

A. In the December 2022 runoff, yes, it is higher in that election.

Q. Is that the gap that you're referring to at

the end of your -- at the end of paragraph 39?

A. So in this specific comparison of Black Georgians to White Georgians who attempted to vote absentee-by-mail, when I say this gap in rejection rates reached its highest level in post-SB202 elections, I'm referring to the November 2024 election.

If I recall correctly, if we aggregate rejection rates across the three elections that are with post-SB202, we would also find that the rejection rate in the aggregate was higher for Black Georgians than for White Georgians.

Q. Did you opine on that in your report as all?

A. In my report in the last sentence of paragraph 39, I say: This gap in rejection rates, which indicates a gap between Black, Hispanic, and Asian Americans/Pacific Islander Georgians relative to White Georgians reached its highest level in post-SB202 elections.

Q. So you're referring to that aggregate figure you just described in -- sorry. Strike that.

So this final sentence of paragraph 39 refers to the aggregate figure you just described?

A. It refers to virtually any way of aggregating or disaggregating the data that I present

here. If we aggregate by group, we reach the same conclusion, we reach the same conclusion. If we aggregate across years, the same conclusion. If we look at individual years to find which election had -- and quoted from my report -- the highest level that's post-SB202, we find elections post-SB202 with the highest level out of the six that I look at.

Q. Did any of the pre-SB202 elections that you examine here feature an election in which the White voter absentee-by-mail rejection rate was higher than the Black voter absentee-by-mail rejection rate?

A. So just to clarify here, I'm looking at in table 7 --

Q. Yes.

A. That's an earlier table, but in table 7 I'm referring to the ones that are rejected due to receipt after the deadline.

Q. Uh-huh (affirmative).

A. So could you -- sorry. Could you restate it with that?

Q. Yeah.

So are there any elections in table 7 from the pre-SB202 columns that you have identified that feature an election in which White voters had a higher rejection rate than Black voters?

A. For receipt after the deadline?

Q. Correct.

A. No.

Q. Okay.

A. The White rejection rate was always lower pre-SB202.

Q. Okay. In the final sentence of paragraph 40 which is right below the table, you state -- well, unfortunately, I think we have to read the whole thing. So let's just start at the beginning of paragraph 40.

You state: Altogether the analyses of absentee ballot rejection rates and reasons for rejection point to substantial racial disparities in ballot rejection rates in elections conducted after SB202 went into effect, including through the November 2024 presidential election. These disparities are particularly noticeable for rejections due to SB202-imposed mandates related to identification requirements and ballot receipt deadlines.

Right?

A. That's correct.

Q. And table 7 describes those rejection rates for absentee votes due to receipt after deadline; is

that right?

A. That's correct.

Q. And you've just stated that pre-SB202 there was not a single election that you examined in which a White voter had a higher rejection rate than Black voters, right?

MS. HAYES: I'm going to object to the form. It's just a little confusing.

THE WITNESS: Yeah. I'm a -- I'm a little confused myself, but I think I understand. And if we're referring again to receipt after the deadline in isolation versus the previous table which looks at missing or incorrect ID information and if we're ignoring other reasons for absentee ballot rejection, then the statement you made is correct.

BY MR. JACOUTOT:

Q. Okay. So you just -- do you stand by the statement that you make here in paragraph 40 that the disparities are particularly noticeable for rejections due to SB202-imposed mandates related to ballot receipt deadlines?

A. Well, one of the things that has perhaps made it so the expert reports we have are so long is the fact that SB202 contained a number of provisions.

What I stand by is what I say in the last sentence. These disparities are particularly noticeable for rejections to SB202-imposed mandates related to identification requirements and ballot receipt deadlines.

Q. Okay. If we separate those two out, take away SB202-imposed mandates related to identification requirements and just consider what is considered in table 7, which is SB202-imposed mandates related to ballot receipt deadlines, can you do that for the purpose of my next question?

A. I have that in my head, yes.

Q. Do you stand by this final statement in paragraph 40 if we're only viewing the data that's presented in table 7?

A. I can't stand by a statement after modifying the statement to do something different than what the statement says, if that makes sense.

Q. Sure.

A. Just in that statement -- and I try and be careful in my reports to accurately describe the entire picture or to accurately describe in a single table. This last sentence is an accurate description. Modifying the sentence may make it inaccurate.

Q. Let me ask you this. Is your analysis in table 7 -- specifically with respect to White voters and Black voters, does your analysis indicate that SB202 ballot receipt deadline requirements had a disproportionate effect on Black voters as compared to White voters?

A. I'm not sure. Here, if we think about it in terms of what it says in paragraph 40, which is racial disparities, you might look at Hispanic and Asian disparities and they're much larger. If we aggregate Black, Hispanic, and Asian American, which is something more similar to what I am stating in 39 and 40, I have no reason to doubt what I say in those paragraphs.

Q. You would agree with me that the data in table 7 indicates that in two of three post-SB202 elections Black voters experienced fewer rejections per absentee-by-mail votes due to receipt after the deadline than did White voters?

MS. HAYES: Object to the form.

THE WITNESS: Yes. November 2024 is the election where we see Black rejection rates higher than White rejection rates post-SB202.

BY MR. JACOUTOT:

Q. Okay.

MR. JACOUTOT: We are at about that one-hour mark --

MS. HAYES: Does that work for you?

MR. JACOUTOT: -- if y'all want to do the -- do a break.

THE WITNESS: Sure. I'm happy to.

THE VIDEOGRAPHER: Stand by.

The time is 10:06 a.m. We are off video record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 10:13 a.m. We are back on video record.

MS. HAYES: I just wanted to confirm that J. Grimmer that is showing up on the -- on the feed and I don't believe has entered appearance is Dr. Justin Grimmer who is participating in this?

MR. JACOUTOT: Yes, that's correct.

And, Dr. Grimmer, if you would like to just state your name for the record and that you're here.

DR. GRIMMER: Justin Grimmer. I'm here.

Hi, Dr. Fraga.

THE WITNESS: Hey. How are you doing?

MR. JACOUTOT: Okay. And we're back on the

record?

THE VIDEOGRAPHER: Yes.

BY MR. JACOUTOT:

Q. Dr. Fraga, you can put that to the side right now; but I would keep it sort of handy because we'll probably kind of go back and forth to it.

MS. HAYES: I can hand it back to you.

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. What I am handing you now is -- not that one -- your rebuttal report -- rebuttal report dated July 14th, 2025.

MR. JACOUTOT: I'm marking that as Exhibit 4.

(Exhibit 4 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Uh-huh (affirmative).

Can you review that briefly and make sure that's what you submitted in this case?

A. It appears to be what I submitted in this case.

Q. Okay. So if you could turn to section 2,

which is entitled, Summary of Findings Regarding Dr. Grimmer's June 2025 Report.

In paragraph 4 at the beginning of the section, you state that Dr. Grimmer selectively compares turnout in pre-SB202 elections with turnout in post-SB202 elections in a manner that ignores evidence contrary to his conclusions.

Do you see that?

A. I do.

Q. You say: In particular, Dr. Grimmer ignores the highly competitive 2021 elections that peer-reviewed literature credits as an impetus for SB202's provisions at issue in this case.

Is that correct?

A. That's correct.

Q. But it is true that Dr. Grimmer in other reports analyzed those elections in this case; isn't that right?

MS. HAYES: Object to the form.

THE WITNESS: Well, to clarify, as I state here, Dr. Grimmer selectively compares turnout in certain pre-SB202 elections with turnout in certain post-SB202 elections; and that includes this ignoring the highly competitive 2021 elections.

BY MR. JACOUTOT:

Q. But he does look at the highly competitive 2021 elections for purposes of analyzing turnout in his expert reports; does he not?

A. I think in an earlier report from a couple of years ago he includes a chart that has those runoffs in it; but if I recall correctly, despite mentioning that runoff quite a bit, the runoff is not mentioned at all in later reports and is not compared in the same way as other elections kind of apples to apples even in that original report.

Q. Okay. Now, you state also in paragraph 4 that the selective inclusion of certain elections and exclusion of others leads Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout in absentee balloting; is that right?

A. That's correct.

Q. What's your definition of impact here?

A. So here when I think about impact and in that statement Dr. Grimmer to provide statistics of limited value for assessing SB202's impact, I'm trying to think about it in the way that perhaps channeling Dr. Grimmer in that I'm evaluating his report. He's thinking about impact. If I recall

correctly in his reports, he primarily thinks about it in terms of voter turnout; and as I describe in this paragraph and in the report corresponding section of the report corresponding to the paragraph, I don't think that that's an accurate way of thinking about impact.

MR. JACOUTOT: Would you mind reading that response back to me?

(The record was read back by the court reporter.)

BY MR. JACOUTOT:

Q. So I might have to get you to answer that again, but I'm going to try to unpack it.

When you were referring to impact here in this paragraph, you're referring to the effect on voter turnout?

A. I'm trying to think about impact in that paragraph in the way that he thinks about impact. Now, I'm being careful here because obviously I'm not Dr. Grimmer --

Q. Uh-huh (affirmatively).

A. -- and I'm trying to think about his report and the way that he frames and presents things. When you asked the question what does impact mean there, I'm thinking about it or trying to think about it in

the way that he would use that term based on what I'm reading in the report.

Q. Okay. So then you're not using impact with any specific scholarly definition in mind?

A. I'm not sure -- I'm trying to think about it. I'm not sure that there is a specific scholarly definition of impact or that any scholars have sat down and said this is the specific definition of impact we should always use.

Q. Uh-huh (affirmatively).

A. Usually scholars say, well, we look at impact in different ways and we try and tailor our definition in a way that's most appropriate to the question at hand.

Q. So then is it fair to say that you are not thinking about any specific scholarly definition when you use the term "impact" here?

A. Scholarly definition, I don't think so. Dr. Grimmer's definition, I'm trying to get there.

Q. Okay. And can you point to any report of Dr. Grimmer's where he defines impact?

A. I don't recall a specific place where he talks about impact, but -- or where he defines impact. I believe he uses the word "impact."

Q. Okay. Are you in your report assessing the

causal effect of SB202 on turnout or absentee voting?

A. So this is something that I address in an earlier report. I believe I have a couple of sections of a 2023 report maybe a response to one of Dr. Grimmer's reports where I talk about how difficult it is to establish causality especially when thinking about the impact of election laws on voter turnout.

So to try and respond to the question, at very least in my previous reports, I've said it's challenging. We try to do our best, and that's what I've tried to do in my reports.

Q. So in the reports in which you have attempted to assess causal effect, what is your research design for estimating that causal effect?

MS. HAYES: I'm going to object to the form of the question.

THE WITNESS: When I say it's difficult and we're trying to do our best, causal impact, causal effect, those have more kind of clear definitions versus just impact more broadly in the discipline. So I want to be cautious here in saying -- and I think your question implies something about design, which also has a clear definition in the causal inference literature.

BY MR. JACOUTOT:

Q. So what's the definition for the -- for research design in causal inference literature?

A. Research design -- and this might be in an earlier report; but just broadly speaking, when we talk about research design in causal inference, it's usually about a strategy for trying to overcome the fundamental problem of causal inference.

Q. Is comparing outcomes before and after an election law is implemented the standard research design for estimating causal effect as a result of that election law?

A. I think any causal strategy for investigating the impact or the causal effect, sorry, of an election law should at least consider a kind of pre-law, post-law comparison. I'm not sure that it has to especially when we think about things like racial disparities and differences.

Q. Is it in your opinion most accurate in this circumstance to compare turnout in 2018 and 2020 with turnout in 2022 and 2024 for the purposes of assessing the causal effect of SB202 on turnout?

A. It really depends. It really depends on the component of law we're thinking about and the ways in which we're comparing those elections, the

populations we're looking at, what we mean by impact, et cetera.

Q. Is doing -- strike that.

But, nevertheless, you did decide in your analysis to compare pre-SB2 elections from 2018 and 2020 to post-SB2 elections in 2022 and the 2024 and the accompanying runoffs of those elections?

A. Could you mention the elections again? Because I think there might be like one that's missing there.

Q. Yeah.

So in your analysis you chose the method of comparing pre-SB202 elections of 2018 and 2020 with post-SB2 -- SB202 elections of 2022 and 2024 and their relevant runoff elections; is that right?

A. So in my analyses I present data for those six elections.

Q. Is that the standard methodology used in academic literature to assess impact of a change in election administration policy on turnout or absentee voting?

MS. HAYES: Object to the form.

THE WITNESS: So I think the standard methodology is to examine elections that are relevant to the election law in question where

the context is as similar as possible. That is not always what is done. There are other strategies that could be employed, but I think that's a solid starting point.

BY MR. JACOUTOT:

Q. You mentioned that it's important to compare elections where the context is as similar as possible; is that right?

A. I'm not sure exactly what I said, but I remember saying context is important.

Q. And, of course, you're looking for elections that are as similar as possible, right, for purposes of your comparison?

A. Again, I'm not sure exactly what I said; but I think a good starting point as a kind of research strategy is to examine situations -- elections, that is -- where the context is relatively similar. It doesn't necessarily mean comparing one election to another and then a separate election to another separate election; but it means more broadly, if the context changes in a significant manner, we would want to consider that.

Q. Would it affect your conclusion if other factors that affect turnout are changed between the pre-SB202 elections and the post-SB202 elections?

A. Well, now we're referring to something that in my opinion approximates the fundamental problem of causal -- causal inference with observational data. There's always things that change. So it's about getting as close as possible and making -- making it clear that we're doing so.

Q. And is it your opinion that measuring or comparing elections that are close in time to the law in which you are analyzing is the best way to account for -- let me strike that. I don't want to keep that in your mind too long.

So you're looking for -- strike that, too.

You've chosen in your analysis to use elections that are close in time to SB202 for purposes of conducting your analysis, right?

A. I selected elections that are close in time.

Q. Is that because you use their close temporal proximity as a proxy for establishing that these are similar in context elections?

A. I don't think so. It's hard to disentangle because in this case elections that are close temporally to SB202 are both similar in context particularly from 2018 on and in the case of the 2020 and 2021 elections, statewide elections, motivating for the passage of SB202 according to the analyses

and media reports that I've seen. So these things go together and fit pretty nicely. From 2018 onward, that's a pretty nice set to look at.

Q. But, of course, within that subset of 2018 onward, there were other aspects that -- beyond SB202 that affected turnout that occurred, correct?

A. Yeah. Again, this is the fundamental problem with causal inference in some sense. It's not a pure counter-factual. You can never really know that.

Q. Right.

Did you do anything in your research design to adjust for any sort of changes that occurred that affect turnout beyond SB202?

A. Yes.

Q. And what did you do?

A. So the biggest ones starting from the beginning and now -- you know, this is a really broad discussion; but it's thinking about changes in the size of different populations over time. That's not something that's directly the number of voters, but it's related to how many people could vote.

I also considered in some of my analyses of burdens, for example, people who registered before a certain date because those are the people that are

perhaps most burdened by SB202. I considered data on self-reported race and ethnicity that varies over time. I considered differences in rates of using certain methods of voting. For example, we were reviewing tables of the percentage rejected out of absentee voters.

So those are just a few of the ways in which I tried to account for things that are outside of the specifics of provisions of SB202 that might impact the statistics I present.

Q. Is another way to account for that to use elections that are a little bit earlier in time?

A. If I can refer to my report here, in section 4 of my report from July 14th, 2025, paragraph 19, page 10, I state: In my three reports, I focus my analyses of voter turnout trends on elections beaconing in 2018 and continuing to the most recent statewide elections available. The reason I do so is because from 2018 onwards the statewide elections in Georgia began to be viewed as highly competitive by campaigns and voters as turnout reached, quote, modern highs. And I cite a peer-reviewed article there.

Q. Uh-huh (affirmatively).

Well, I understand that that's what you

choose to do, but is another way to control for variables outside of SB202 or account for variables outside of SB202 to use elections that are a little bit earlier in time than the ones that you chose?

MS. HAYES: Object to the form.

THE WITNESS: No. If anything, I think it's the opposite. You're starting to introduce variables, as I am mentioning here, including very large changes in campaign activity and competitiveness from pre-2018 elections.

BY MR. JACOUTOT:

Q. Okay. Let's talk a little bit more broadly about the '20 and -- the 2020 and 2024 general elections because these are the two that you compare against each other, is that right, for purposes of your SB202 analysis?

A. No. Well --

Q. I can rephrase.

You don't use -- in your analysis and in your reports, you don't go -- you don't analyze anything before 2018, correct, any contests? I'll rephrase it again. I want to get the record clear.

In your analysis you don't analyze any election contests that occurred before 2018; is that right?

A. I think it's fair to say what I say here, which is in -- on page 10, paragraph 19 of my July 2025 report, I focus my analyses of voter turnout trends on elections beginning in 2018 and continuing to the most recent statewide elections available.

As I mention in my -- at the very least in my first report in kind of the introduction, you know, I'm also using my knowledge, expertise, and experience. I've studied elections in Georgia for quite some time at this point and looked at a lot of data. So I'm certainly not ignoring pre-2018 elections. The election of 2018 onward is intentional for the reasons I really mention in particular in paragraph 19 of this report.

Q. And your reports include analysis of the 2020 general election and the 2024 general election; is that right?

A. They do.

Q. Excellent. Let's talk about those. And I do want to get -- I want to make sure that this is correct.

So it's true that these are the only two general elections you analyzed in your reports, right?

A. No.

Q. What other general elections did you analyze?

A. The 2018 general election and the 2022 general election as well.

Q. Then it's true that these are the only two general presidential elections that you analyzed in reports, right?

A. Those are the only elections that are the focus of my analyses of voter turnout trends.

Q. Okay. So I just want to talk about the characteristics of those elections real quick.

Was the incumbent party at the top of the presidential ticket in 2020 the same as the incumbent party at the top of the presidential ticket in 2024?

A. No.

Q. In the 2020 election, do you know whether any public health authorities were recommending limited contact due to the prevalence COVID-19?

A. The 2024 election you say?

Q. The 2020.

A. The 2020 election?

Q. Uh-huh (affirmative).

A. Honestly, my memory is a little bit fuzzy about what the recommendations were from officials by then; but I do remember that the November 2020

election was during the pandemic -- the height of the pandemic. Perhaps not the height but during more of a pandemic than we're in now. I'll put it that way.

Q. Yeah.

Okay. I'm going to hand what's going to be marked Exhibit 5. And this is just to kind of jog your memory about that time period.

(Exhibit 5 was marked for identification, attached at the end of the original transcript.)

BY MR. JACOUTOT:

Q. This is a publicly available screen capture of a Tweet of the Centers for Disease Control on November 16th, 2020. Can you take a look at that real quick and let me know when you've had a chance to read it?

A. I've had a chance to read it.

Q. Okay. And can you tell me what they list as a recommendation under number four in that post?

A. The CDC says: Stay home if you can. Do your part. Get the facts.

And it has a link.

Q. Okay. And that is in reference to a report that the CDC urges you to take action now to fight rapidly rising COVID-19 cases; is that right?

A. Sorry. Did you say it's in reference to a report?

Q. Or in reference to a statement made from that CDC account; is that right?

MS. HAYES: I'm going to object to the form.

THE WITNESS: I don't know. I don't recall seeing this Tweet before. There's a link, maybe a video here. I don't know when that alert was actually issued. It could be an older thing; but the Tweet is from after the 2020 election, yes.

BY MR. JACOUTOT:

Q. Does it refresh your memory at all as to sort of what you recall occurring around the time of the 2020 election with respect to public health guidance?

A. You know, honestly my recollection -- and, again, this is not something that I looked at in my report. It wasn't the focus of my report -- is that by November 2020 things like washing your hands for 20 seconds as a way of, quote, taking action now to fight rapidly rising COVID-19 cases, I'm not sure that that's accurate. Honestly, I don't know. I think the record and everything since 2020 has shown that it wasn't really clear what we could do.

Q. Okay.

A. But this is from after the election. I do see that.

Q. Okay. Around the time of the election, though, fair to say?

A. No.

Q. When was the election in 2020?

A. In my report I think I have the specific date, but it was certainly before the 16th. By law they have to be before the 16th of November, so --

Q. Do you know -- do you know if it -- sorry to interrupt. Are you finished?

A. Go ahead.

Q. Do you know if the election was held in November of 2020?

A. It was held in November of 2020.

Q. Okay. Thank you. And you can put that aside.

Is it possible that public health authority recommendations to avoid social gatherings can affect in-person turnout in elections?

MS. HAYES: Object to the form.

THE WITNESS: I don't know. I think that my recollection -- this is in one of my tables, but I'm pretty confident about it even without looking at the numbers that 2020 had a very high

rate of voter turnout in November 2020 and that included a very large number of people voting in person.

BY MR. JACOUTOT:

Q. Okay. Do you know who the incumbent party was in 2016 in the general presidential election?

A. Yes.

Q. Who was -- which party was that?

A. The Democratic party.

Q. Okay. And was that the same incumbent party as in the 2024 general election?

A. Yes, it was the same party. Not the incumbent candidate. Well, that got complicated as we all saw, but yes.

Q. And was Donald Trump a challenger for the office of president in the 2016 election?

A. He was not the incumbent.

Q. Yes.

And was he the incumbent in the 2024 election?

A. Well, this is where things get a little bit tricky as we know because he's -- he was the previous president and the current incumbent didn't run again, by the summer had dropped. So, if anything, he was in some ways more of an incumbent than the Democratic

nominee. Things were -- things were complicated.

Q. They were.

Do you know whether the concerns related to COVID were greater or lesser in 2024 than they were in 2020?

A. They were certainly lesser in 2024.

Q. Would you say that 2024 more closely approximated 2016 than 2020 in terms of the prevailing public health guidance being circulated?

A. I'm not sure about that. I'm not sure. I think that -- I mean, now again we're talking about things well outside of what I discussed in my report; but I'm honestly not sure about that. We learned a lot from the pandemic and a lot of people absorbed that information.

Q. Okay. If you can turn to your July report and go to page 12, paragraph 23. At the beginning of paragraph 23, you state that the inclusion of elections prior to 2018 and omission of key runoff elections in '21 -- excuse me, 2021 and 2022 lead Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting; is that correct?

A. That's correct.

Q. Why does the inclusion of elections prior to

2018 produce statistics of limited value as you describe them here?

A. So when I make the statement that says, Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting, I'm referring to the paragraph that opened that section of the report, section 4, where I cite research from Dr. Trey Hood, a researcher specializing in Georgia elections who indicates the 2018 election is where we saw a substantial shift in Georgia in particular in terms of voter turnout certainly but in terms of campaign attention and mobilization as well.

Q. Anything that you would like to add to that paragraph in your report as to why the inclusion of elections prior to 2018 produced statistics of limited value?

A. Sorry. Are you asking me do I want to change -- to add something to my report?

Q. Yes.

A. Not at this time.

Q. And you agree with me that the 2020 general presidential election, which is the only pre-general -- pre-SB202 general presidential election that you analyzed -- you would agree with me

that that was an exceptional election due to the ongoing public health crisis at the time?

A. Well, just to be clear, every presidential election is exceptional in some way or another, first. Second, you know, I say here again in the paragraph I focused my analyses of voter turnout trends on elections beginning in 2018. That doesn't mean that I don't consider earlier elections. 2018 onward according to the peer-reviewed literature is when there was a shift in Georgia that corresponds most closely to the current period we're in in Georgia, the period around when SB202 was enacted. That's the motivation.

Q. In 2018 that was an exceptional election as well, right?

A. Every election is in some ways exceptional as in there's unique features of each election.

Q. Was 2018 the first time a major party nominated a Black woman for governor in Georgia; do you know?

A. I don't recall the full history during reconstruction, but it was certainly the first time that -- well, a Black woman, yes.

Q. Was it also the first major statewide election held in Georgia after Donald Trump's victory

over Hillary Clinton in 2016?

A. I believe so.

Q. In your time as a political scientist, do you notice that supporters of the party who won the previous general election tend to have lower turnouts in subsequent midterms than supporters of the party who lost?

A. I don't know that that's something that is super well established in the literature. It depends on a lot of factors.

Q. Okay. Have you ever analyzed that topic?

A. It hasn't been the focus of a paper. It's not something that I've studied extensively.

Q. Okay. Now, you referenced your report and an article from Dr. Trey Hood several times today; is that right?

A. I'm not sure about several times; but I've referred to that report, yes.

Q. Okay. I have that article, which I believe you have cited here as footnote 14; is that right?

A. I haven't seen the article yet, but I do cite an article.

Q. I'm going to hand you the article here. It's going to be Exhibit 7 -- excuse me, Exhibit 6.

A. Sure.

(Exhibit 6 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Uh-huh (affirmative).

And can you tell me that the article I've just handed you and marked as Exhibit 6 is the article that you reference in footnote 14 of your report?

A. It is that article.

Q. Can you turn --

A. Sorry. At some point, I would like a break, too, just a nature break, but --

Q. Yeah. We can -- we can do that.

A. Is that okay?

Q. Yeah.

A. It's a little early. Sorry but --

Q. No. That's okay. We -- I'm not -- we haven't started on that one, so we can go ahead.

THE VIDEOGRAPHER: The time is 10:53 a.m. We are off video record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 10:59 a.m. We are back on video record.

BY MR. JACOUTOT:

Q. Okay. We'll try to pick up where we left off, Dr. Fraga.

A. Sure.

Q. So you have in front of you marked as Exhibit 6 the article entitled, "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election"; is that right?

A. Yes.

Q. And that is the article you cited in footnote 14 of your July report?

A. That's correct.

Q. Can you turn to figure 5 on page 1836?

A. I'm there.

Q. That figure measures voter turnout across Georgia's midterm elections dating back to 2002; is that right?

A. That's correct.

Q. And do you see a fairly consistent level of turnout throughout most of the columns there? It's -- well, let me just ask you that.

Do you see a fairly consistent level of turnout amongst four of the five columns there?

A. It depends on which four of the five; but if

you're saying 2002 to 2014 had lower turnout than 2018, that's correct.

Q. And they were all within -- the 2002 to 2014 midterm elections were all within 30 to 40 percent turnout; is that right?

A. They were.

Q. And what was the turnout rate in 2018?

A. In this chart it is listed as 54.9 percent.

Q. And I believe this article makes the point that 2018 was a historic election; is that right?

A. It does.

Q. So in your report analyzing SB202, you use two elections and any runoffs from those elections against which to compare post-SB20 turnout; is that right?

A. Two elections post-SB202 and the runoff for one of those elections? Is that what you're saying?

Q. No. The pre-SB202 elections that you used to analyze in your report, that's the 2018 and the 2020 election and their runoffs; is that right?

A. I'm not sure. I don't think I focused on the 2018 runoff --

Q. Okay.

A. -- in my report.

Q. Do you know if there was a 2018 runoff?

A. Yes.
Q. Is there any reason why you didn't focus on that one?
A. The turnout rate -- my recollection of the turnout rate is that it was very low. The gubernatorial election was close to qualifying for a runoff but did not.
Q. Okay.
A. I believe there was a runoff election for a statewide office, at least one, but not the kind of -- high profile for some but not high profile for the general Georgia electorate probably.
Q. So the reason that you excluded that runoff election from your analysis here was because the turnout was -- was low?
A. No. It's because it wasn't a major statewide election.
Q. But it was the -- the runoff election in 2018 was a statewide election, right?
A. I believe so. That was an election I believe I've analyzed in another report. It's been awhile. I believe there was at least one statewide office on the ballot that -- in that runoff election.
Q. Your assessment in your expert reports on the impact of SB202 on turnout in Georgia is limited

to elections within Georgia; is that right?

A. In my expert report, I focus on elections in Georgia.

Q. Have you looked into whether it's possible that the trends in turnout that you see in Georgia are similar to broader national trends?

A. So in preparing my most recent report, I'm using my knowledge and experience that includes analyzing Dr. Grimmer's report from 2023. So I know that he looked at trends in other states in 2023 and then later he did in his 2025 report as well. So in that sense, yeah, I've looked at trends in other states. It's not the focus of my report.

Q. Yeah.

Do the trends in other states that you've looked at affect the analysis of your report?

Let me -- actually, I'll rephrase that for you because I can see where that might be a more broad question than I'm meaning it to be.

Do the trends that you looked at outside of Georgia affect the conclusions contained in your expert reports?

A. No.

Q. Okay. I am now going to hand you what will be marked Exhibit 7.

(Exhibit 7 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Do you recognize what's in that image in front of you on Exhibit 7?

A. I do.

Q. Can you tell me what it is?

A. This is a picture of a Tweet that I made in April of 2025. The Tweet -- I made the Tweet, not the picture.

Q. And I think technically they're called posts now.

A. The post.

Q. Can you tell me what this post is describing?

A. So in this post I state: The 2024 current population survey says there was a 10.9 point gap between the non-Hispanic White turnout rate and the Black turnout rate. That's the largest turnout gap in a presidential year since 1992.

Q. And you include an image in that post; is that right?

A. That's correct.

Q. What's that image from?

A. The image is a picture of voter turnout rates using survey data.

Q. And you list the source in that image as well?

A. Yes.

Q. Is that a reliable source in your -- in your field?

A. These are survey estimates of voter turnout and considered to be -- in particular in the case of the CPS, absent some kind of vote validation, easy -- I don't know -- easy to use perhaps, commonly used survey estimates of turnout.

Q. Okay. Based on this figure, can you compare White turnout from 2020 to 2024?

A. I can compare those current population survey estimates of turnout.

Q. And can you do the same for Black turnout?

A. Yes.

Q. And can you do the same for Latino turnout?

A. Yes.

Q. And can you do the same for Asian turnout?

A. Yes.

Q. And this is to be clear a nationwide survey?

A. Yes.

Q. Okay. Now, SB202 would not be applicable in any of the other 49 states that make up these nationwide figures; is that right?

A. Could you explain what you mean by applicable?

Q. That the states in the other -- the other 49 states do not have on their books the substance of Senate Bill 202 that was passed here in Georgia.

A. It's tough in two ways if I can get there. One is that other states also passed legislation, some of them, similar to SB202 around the same time and SB202 -- and the discussion of SB202 may have impacted turnout for populations in those other states as well.

Q. Did any of those other states pass Senate Bill 202 in their own legislature?

MS. HAYES: I object to the form of the question.

THE WITNESS: No. Well -- sorry. To clarify some of those others states may have passed bills also labeled SB202, but they did not pass -- now I'm starting to think about the states like Florida that had a very similar bill, but there's enough nuance where SB202 specifically was a bill introduced in the Georgia

legislature, not another legislature.

BY MR. JACOUTOT:

Q. I think that's fair.

A. We can agree to that.

Q. Can these -- these trends in this image be explained by SB202?

A. That wasn't something that I looked at for the report.

Q. With respect to minorities, would you say these national trends are similar to what you observe in your report in Georgia?

A. No.

Q. Did Black voter turnout go down from 2020 to 2024 in this survey that you reference here?

A. According to the survey, yes.

Q. Is that similar to what you observed in Georgia following implementation of SB202?

A. There was also a decline in Black turnout in Georgia, but that's not using survey estimates.

Q. Okay. And, again, referring back to these survey estimates, which I understand is not exactly apples to apples with your report; but based on the image here in Exhibit 7, did Asian voter turnout go down from 2020 to 2024?

A. Yes.

Q. Is that downward trend similar to what you observed in Georgia following implementation of SB202?

A. Not really.

Q. How is it different?

A. First of all, Asian American turnout in Georgia is -- in recent elections has been significantly higher than what the survey estimates show and the trends in Black, Latino, and Asian turnout nationally are generally -- while in some cases it's in the same direct, it's quite remarkably different from what we see in Georgia because overall turnout in Georgia and especially White turnout in Georgia increased. So that's a pretty big -- a pretty big difference.

Q. Well, did Asian voter turnout in Georgia increase or decrease after passage of SB202?

A. It decreased.

Q. Okay. If we wanted to compare the change in Georgia turnout before and after SB202 is implemented to the change in other states where SB202 was not implemented, could we do something like that?

A. There would be a lot of caveats to that analysis. So is it possible to make a calculation? Yes. Would it be informative? Likely not.

Q. Is there a term for an analysis like that in your field?

A. A spurious correlation or association. I think spurious is usually one of the ways we might talk about it.

Q. What about difference in differences; are you familiar with that?

A. Yes.

Q. And what is that?

A. A difference in differences analysis?

Q. Yes.

A. That is a method of comparing trends which relies on -- well, an assumption called the parallel trends assumption. So the idea is we can look at the trend -- well, it's literally comparing differences before and after some event or some point in time. So it's very reliant on trends being -- the assumption is that the trends would be similar absent some kind of intervention or treatment.

Q. Okay. And you didn't do that in your report, right?

A. That's an interesting question. The -- the difference in differences analysis as formally defined requires a set of assumptions that I don't rely on in my report, so I'm not sure that that would

be tenable; but if you take my analysis of a turnout gap, that is effectively making the calculations that you would do in a differences in differences analysis.

Q. And that's, of course, cabined to just the State of Georgia, correct?

A. I'm analyzing the State of Georgia in my report.

Q. Can we go back to your report from July?

A. I have it.

Q. Okay. And if I can get you to go to paragraph 24 on page 12. You begin by somewhat critiquing Dr. Grimmer's use of elections prior to 2018 in his report; is that right?

A. Yes.

Q. And you note in the last sentence that -- excuse me. One second. I have to find my quote.

You note in the last sentence of paragraph 24 which spills over to the next page that in all of the statewide federal elections after the passage of SB202, there was a higher mail-in-ballot rejection rate than in the two statewide federal elections immediately preceding the implementation of SB202.

Do you see that?

A. Yes.

Q. Why did you focus on the 2020 general election and the 2021 runoff election for purposes of this comparison?

A. In this comparison I focused on those elections because 2018 was subject to -- my understanding is -- I wasn't involved in it, but my understanding is that 2018 was subject to significant litigation regarding absentee ballot rejections in particular and that there were some changes in procedures that I believe occurred right around the time of the election itself, which makes comparison with that election something requiring greater caution.

Q. And so those aspects of the 2018 election that you just mentioned were the reason why you choose not to include it in your report?

A. Well, to clarify I do include the 2018 election in my report.

Q. Sure.

Those aspects of the 2018 election that you just mentioned were the reason why you chose not to include it for purposes of this comparison in your report?

A. I'm trying to remember here from 2023 from my earlier report. I believe I cite an analysis

or -- now we're really getting back, but maybe something from the state election board about ballots being accepted that were rejected initially. So it's really that the 2018 data is not -- on rejections in particular is not as reliable.

It's not so much the litigation that occurred. It's the fact that that 2018 data might not be as accurate a reflection of actual rejections, but we know for sure that in 2020 and 2021, at least according to the state data, that this statement is correct.

Q. Okay. I'm going to switch to a new topic. If you could turn -- excuse me. Yes, page 17, paragraph 32.

So here in the second to the last sentence you write: Peer-reviewed research analyzing Georgia's drop box availability in 2022 established that, quote, individuals located closer to drop boxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots.

Is that right?

A. So I believe you said 2022 there, but the quote is 2020. It refers to 2020 --

Q. Okay.

A. -- I believe.

Q. Gotcha. Sorry about that. Those numbers can start blending together after a little while.

And you cite in this paragraph, though, here at footnote 33 an article entitled, Drop box allocation and use among Georgia voters in the 2020 election; is that right?

A. Correct.

Q. I'm going to hand you a copy of that article.

MR. JACOUTOT: I'll mark it as Exhibit 8.

(Exhibit 8 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Uh-huh (affirmative).

Is this a correct copy of the article you cite?

A. Yes.

Q. Do you know if this article is based on accepted methodology in the field?

A. To the extent to which it examines closeness to drop boxes as an indicator of where -- closest to residential address as an indicator of where people are going to deposit a ballot, it is in line with

peer-reviewed social science literature.

Q. And do you find the findings in this article -- article to be a credible estimation of the effect of distance on the probability of voting absentee?

A. Well, to be clear as I cite, what I find credible is that individuals located closer to drop boxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots.

Q. Okay. Can you turn to page 60 as it shows up on the article there?

A. I'm there.

Q. All right. We're going to get to a little bit more math.

At the middle paragraph in the right-hand column, it starts off with: Figure 2 charts the likelihood of a voter casting a mail ballot based on the effect of distance (in miles) estimated in model 1 of table 1.

And it says: At near zero miles to the closest drop box, the estimated likelihood of a voter casting a ballot -- excuse me, casting a by-mail ballot is about 15.75 percent.

Do you see that?

A. Yes.

Q. And then it goes on to 10 miles away and it says: The estimated likelihood of a voter casting a by-mail ballot is about 14.9 percent.

Do you see that?

A. I do.

Q. So then taking those figures and moving down a line from zero miles to the drop box to 10 miles to the drop box, there's a total of 0.85 percentage point reduction in the probability of voter votes by mail --

MS. HAYES: Objection to the form of the question.

BY MR. JACOUTOT:

Q. -- is that right?

A. That sounds about right.

Q. So given that the distance they are observing in the study is 10 miles and there's a total reduction in probability of 0.85 percent, is it fair to say that the reduction in probability the study observes is on average 0.085 percent per mile?

MS. HAYES: Object to the form.

THE WITNESS: If I recall correctly, excuse me, in the study, they provide some descriptive statistics and charts that would help us understand how much of an extrapolation that is,

that is, there may be non-linear effects here.

BY MR. JACOUTOT:

Q. And --

A. So I'm not sure that that would be accurate as a result.

Q. And, if I may to clarify, when you say non-linear effects, are you referring to the possibility that the -- maybe mile zero to mile one would have a different probability of reduction in voting by absentee than the difference between mile zero and mile six -- excuse me, mile five and mile six?

A. I'm bringing that up -- I'm not sure. I haven't looked at the descriptive data in as much depth. That wasn't something I looked at in the report. I looked at distance to a drop box and how that changed in my own reports.

What I'm referring to is that I remember them doing some analyses, at least descriptive analyses, that could imply they accounted for non-linearity. I don't vouch for their method of doing so. It might be that a linear model is more appropriate than the one they employed. I'm not sure. This is not something that I looked at in depth for my report.

Q. Okay. But do you agree with the analysis in the report that the total reduction in probability of voting based on distance to drop box over 10 miles is 0.85 percent?

MS. HAYES: Object to the form of the question.

THE WITNESS: My understanding of the way that they set up their analysis is that this is the average impact. That doesn't mean that it's the average impact for, for example, a drop box voter or an individual who lives in a county with drop boxes.

So it's hard for me to say that that's kind of the aggregate average effect of a 10-mile shift. It's not clear that there -- the use of this article in my report is to indicate that they're saying not drop box use but vote by mail is impacted by drop box proximity and, therefore, the way Dr. Grimmer has set up his analysis is inherently biased.

BY MR. JACOUTOT:

Q. Okay. Can you turn to paragraph 8 in your July report? At the -- the last sentence in paragraph 8, you state that Dr. Grimmer generates a flawed estimate for turnout in the 2024 presidential

election that masks a likely drop in turnout for racial/ethnic minority groups relative to the pre-SB202 presidential election of 2020.

Do you see that?

A. Yes.

Q. And it looks like -- is it a fair characterization of paragraphs 9 through 11 that you use those paragraphs to characterize or explain what you believe he did wrong in that -- in his analysis?

A. Did you say paragraphs 9 and 10?

Q. 9 through 11.

A. 9 through 11. I believe I would include at least paragraph 12 in that as well.

Q. Okay. Can you explain how you calculate the turnout estimates by racial groups starting with the denominator?

A. Sure.

So in here I'm going to refer, I believe, if I can to my June 2025 report. I think it's the bottom one there.

MS. HAYES: It's Exhibit 3.

MR. JACOUTOT: Oh, that one.

THE WITNESS: There we go.

BY MR. JACOUTOT:

Q. That's the notice.

A. Oh, thank you.

So on page 6, paragraph 12, I say: I use the average change in population between the 2020 5-year estimates and the 2021 5-year estimates --

Q. Uh-huh (affirmatively).

A. -- the '21 5-year estimates and '22 5-year estimates; and '22 and '23 5-year estimates to construct the mean one-year change and then add that to the 2023 5-year estimates.

Q. And do you describe in this report how you calculate the numerator of your turnout estimate?

A. I believe that I referred to an earlier report.

Q. Okay. Is it the January 2023 report that you refer to?

A. Yes.

Q. Okay. At the time Dr. Grimmer wrote his 2023 report, the 5-year CVAP wasn't available; is that right?

A. There were 5-year CVAP estimates available. I'm not sure which year -- year you're referring to there.

Q. For -- excuse me. Sorry to interrupt.

The 5-year CVAP wasn't available for the 2022 elections; isn't that right?

A. I don't remember exactly when the 2022 5-year CVAP came out.

Q. Okay.

A. If we can, whenever it's convenient to take another small break, that would be fantastic.

Q. Yeah. We can do that -- we can do that now.

A. Okay.

THE VIDEOGRAPHER: Stand by, please.

THE WITNESS: Thanks.

THE VIDEOGRAPHER: The time is 11:35 a.m. We are off video record.

(A lunch recess was taken.)

THE VIDEOGRAPHER: The time is 12:23 p.m. We are back on video record.

BY MR. JACOUTOT:

Q. Okay. Welcome back, Dr. Fraga.

A. Thank you.

Q. Do you realize you're still under oath from your prior oath?

A. I do.

Q. I'm trying to figure out where we left off, so just bear with me. I think we were going to begin talking about the forecasting methods that you use in your report and that Dr. Grimmer uses in his.

A. Okay.

Q. At the time Dr. Grimmer wrote his 2023 report: The 5-year CVAP wasn't available for the most recent election; isn't that right?

A. The 2022 5-year CVAP estimates, I'm not sure that they were out --

Q. Okay.

A. -- by then, but I don't remember the exact date when they became available.

Q. Did you use a forecasting method in your 2023 report?

A. No.

Q. Did any other expert report that you reviewed in preparation for this deposition use a forecasting method?

A. There wasn't something that I focused on when I was reviewing the reports, so I'm not sure.

Q. Okay. Would Dr. Grimmer's forecasting method cause his 2022 turnout estimate to appear higher or lower than if he had not made a forecast of the denominator?

A. So now we're referring to the 2023 reports, Dr. Grimmer's 2023 report; is that right?

Q. Yes.

A. It would vary depending on which -- well, the method he would use to forecast and it would vary

depending on which racial and ethnic group he was looking at.

Q. Do you still have your rebuttal report of July 14th in front of you?

A. Yes.

Q. For this report did you use a forecasting method?

A. Yes.

Q. And did you write -- oh, excuse me. Can you put your June supplemental report in front of you?

A. That's -- yeah. That is in front of me.

Q. In this report did you write that your forecasting -- excuse me. On page 6, paragraph 13, did you write that your forecasting approach aligns with Dr. Grimmer's approach in his February 14th, 2023, report?

A. No.

Q. So let me get the paragraph 13 on the record. And it says: I also use the 2022 5-year estimates as CVAP denominator for the 2022 elections, the 2020 5-year estimates as the CVAP denominator for the 2020 and 2021 elections, and the 2018 5-year estimates as the CVAP denominator for the 2018 election. This aligns with Dr. Grimmer's approach in his February 14th, 2023, report and results in

slightly different turnout estimates from what I reported in my original January 27, 2023, report.
Do you see that?
A. Yes.
Q. So does your forecasting approach align with Dr. Grimmer's approach in his February 14th, 2023, report?
A. No. To clarify, when I say this aligns with Dr. Grimmer's approach, I'm referring to the non-forecasted CVAP estimates --
Q. Okay.
A. -- that are in paragraph 13.
Q. Okay.
A. I use a different approach from Dr. Grimmer, a different data in particular, which is what I describe in paragraph 12 for the 2024 election.
Q. Okay.
A. So in -- just to -- if I may on that --
Q. Sure.
A. -- I align with Dr. Grimmer's approach for pre-2024 elections in terms of the denominator and we use a similar, but I use more recent data --
Q. Uh-huh (affirmatively).
A. -- in my forecasting for 2024 than he does.
Q. Okay. In paragraph 11 you state that

because we are now several years removed from the time period covered by the 2016 to 2020 estimates and there's continued differential population growth by race/ethnicity in Georgia, changes in turnout rates between 2024 and previous years would be biased and misleading if I did not now extrapolate the population estimates.

Do you see that?

A. Yes.

Q. Is that -- are you referring there to your forecasting method for denominator for 2024?

A. Yes.

Q. Okay. All right. If I can get you back on the July 14th report that you have in front of you.

A. I have it.

Q. I do apologize for all the jumping around.

In paragraph 11 -- if you can look at paragraph 11 of that report for me on page 5.

A. I have it.

Q. Is this where you're sort of critiquing Dr. Grimmer's forecasting procedure for the way he gets his denominator for voter turnout?

A. Yes.

Q. Okay. And at the bottom of paragraph 11, you say: He, referring to Dr. Grimmer, relies on

population growth trends from a decade go (2014), skips over data from odd numbered years, and adds unnecessary roughness to his estimates by cutting a 2-year change projection in half.

Do I have that right?

A. Yes.

Q. So to make sure I have Dr. Grimmer's statistical forecasting method correct, he calculates the average change from 2014 to 2016, from -- from 2016 to 2018. Well, let me -- let me parse this out for you.

Is it your understanding that Dr. Grimmer as part of his forecasting method calculates the average change from 2014 to 2016?

A. Yes and no. So he calculates the average change we see in the 2014 5-year estimates --

Q. Uh-huh (affirmatively).

A. -- to the 2016 5-year estimates.

Q. Okay.

A. Now, it's important to note that the 2014 5-year data is 5 years of data with 2014 as the end point. So really this is, you know, data that is roughly approximate to 2012. He doesn't use the 2015 5-year data and then he uses the 2016 5-year data instead. So it's not really the change from '14 to

'16. It's skipping over '15 in terms of that dataset, and it doesn't really represent an average population that we would see in '14 and '16. This is instead more like '12 and '14. So it's already going to inherently an underestimate of a growing population.

Q. And what's your basis for -- for kind of concluding there that it really represents -- I'm sorry. 2013?

A. 2012.

Q. 2012 or 2013.

What's your basis for concluding that?

A. The Census Bureau.

Q. So do you do any -- is that just -- it happens to be right in the middle of 2012 to 2016?

A. The Census Bureau technical documentation indicates that the 5-year estimates are a 5-year average of the three -- of the -- they're an average of 5 years of individual annual surveys.

Q. Uh-huh (affirmatively).

A. And when they did analyses to examine the validity of those, right, in their reports they say you can roughly think of this as kind of the midpoint.

Q. Uh-huh (affirmatively).

A. It's not precisely that, which is why people don't usually talk about it that way; but it's the average of 5 years of data. And if you take the middle year, it's the average. So in theory that's what it would represent. Also July of those middle years of those --
Q. Okay.
A. -- annual estimates.
Q. Now, he also uses those 5-year CVAP estimates all the way out to 2022 for purposes of his analysis, right?
A. Yes.
Q. And where would you, I guess, put the population estimate for the 2022 5-year CVAP that he uses? Where would you place that in terms of what year it reflects most likely?
A. Well, again, it's an average of 5 years; but if we think about growth -- and this is some of the census projection technique that they use, which they describe. So this is a very rough approximation of a more complicated statistical calculation, but it's roughly corresponding to July of 2020.
Q. Okay. Would you say that most of the population estimates -- CVAP population estimates that Dr. Grimmer relies on are from within the last

10 years?

A. I would have to do the math here, but I don't think so.

Q. But you would have to do math to confirm that?

A. The last 10 years, I think that's right that they're within the last 10 years. I think it's possible that most are pre-2020, but we're only halfway through the decade, so...

Q. Okay.

A. And just to clarify this again because the Census Bureau estimates -- this is something I spend many pages on in my book. They're not necessarily using 2020 census data to update the projections that the Census Bureau itself makes. So we're really talking about projections on projections the Census Bureau is making and has a lot of caveats on.

Q. Okay. Let's talk about this phrase "unnecessary roughness" that you use in paragraph 11.

A. Yes.

Q. That's like a football term to me. So is that a term that's used in forecasting literature?

A. Oh, I see. Unnecessary roughness like fighting. No. I selected that term because it seemed like something easier to interpret than

coarseness, which is something that we hear sometimes more in the forecasting literature. Course also has an implication of -- I don't know -- negative language. So this was an attempt to -- to accurately describe it without using jargon.

Q. Okay. Have you used that term elsewhere or is it specific to this report?

A. Roughness? I use the word "rough" quite a bit in my work.

Q. What is it -- what is the roughness that you're describing here? What does it pertain to?

A. He does not look at any of the odd numbered survey data years except for 2023, which is not incorporated into his forecasting except as the base for the 2020 -- no. Yeah -- except as the base for the 2024 estimates. So he's making -- he's kind of skipping datasets that could be informative for trends.

Q. Okay. So you're sort of characterizing Dr. Grimmer's statistical model as rough because he does not include the odd years between CVAP estimates?

A. When generating a forecast, correct.

Q. Okay. So on page 6, paragraph 12, you fault Dr. Grimmer's forecasting method because data from

the 2020 census demonstrated that Georgia's Black, Hispanic, and Asian population surged while its number of White residents dropped slightly; is that right?

A. Correct.

Q. And you cite an AJC article in footnote 9 in support of that?

A. Yes.

Q. I'm going to hand you what I will be marking Exhibit 9.

(Exhibit 9 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. And can you just confirm that that is the article that you're referencing in that footnote?

A. It is.

Q. Okay. Doesn't the 2020 census include increases in population from the year 2010 to 2020?

A. Yes.

Q. Is there anything in the article here to suggest that the surge they are reporting on was over a time period different from between 2010 and 2020?

A. I don't believe so, not in this article.

Q. Doesn't Dr. Grimmer's forecasting method from his June 2025 reporting -- excuse me, report include data from the 5-year 2020, 5-year 2022, and the 5-year 2023 CVAP?

A. It's not clear that it does.

Q. If it does contain data from those CVAP 5-year analyses, would that alter your conclusion that he fails to account for the surge referenced in the AJC article?

A. No.

Q. Okay. You go on to say in paragraph 12 that Dr. Grimmer, quote, does not, therefore, mitigate the risk of underestimating the size of groups. To the contrary, he overestimates turnout for growing Black, Hispanic, and Asian American/Pacific Islander populations in post-SB202 elections, especially the 2024 presidential election.

Do you see that?

A. Yes.

Q. And that's a reference to Dr. Grimmer's 2025 supplemental expert report, correct?

A. Correct.

Q. Let's pull up that expert report.

MR. JACOUTOT: I'm going to mark this as Exhibit -- Exhibit 10.

(Exhibit 10 was marked for identification, attached at the end of the original transcript.)

THE WITNESS: Thank you.

BY MR. JACOUTOT:

Q. Uh-huh (affirmative).

Does this appear to be a copy of Dr. Grimmer's June 2025 supplemental expert report?

A. It does.

Q. Okay. It doesn't look like these pages are numbered.

MS. HAYES: They're not.

THE WITNESS: They're not.

MR. JACOUTOT: Can we just go off the record for a second?

THE VIDEOGRAPHER: The time is 12:44 p.m. We are off video record.

(A discussion was held off the record.)

THE VIDEOGRAPHER: The time is 12:45 p.m. We are back on video record.

BY MR. JACOUTOT:

Q. Okay, Dr. Fraga. If you could turn to table 2 just above paragraph 18 in the report.

A. I'm there.

Q. Before we get into that table, in Dr. Grimmer's 2025 supplemental report, his estimates from the 2022 election are based on the 5-year CVAP for 2022, which is the same denominator you use; is that right?

A. They're based on the 2022 end point 5-year estimates, yes.

Q. Okay. Did you assess the accuracy of Dr. Grimmer's 2022 general election projections from his 2023 report once you received the data?

A. I don't believe so. I don't recall doing that.

Q. Okay. We can put that aside.

And can we turn back to the July report and can we go to table 2? Oh, I'm sorry. Am I on your report? Sorry about that. One second.

I'm going to hand you the supplemental expert report of Dr. Grimmer dated July 14th, 2025.

A. Thank you.

Q. It's being marked as Exhibit 11.

(Exhibit 11 was marked for identification, attached at the end of the original transcript.)

BY MR. JACOUTOT:

Q. Can you turn to table 2 in that July report?

MS. HAYES: Can you hand us one, too?
MR. JACOUTOT: Oh, I'm sorry.
MS. HAYES: Thanks.
BY MR. JACOUTOT:
Q. Can you turn to table 2 in his report?
A. Do you know which paragraph that is?
Q. I'm about to find it for you.
A. It looks like there are page numbers here.
Q. Yeah.
MS. HAYES: Page 13.
BY MR. JACOUTOT:
Q. Yes, page 13 just above paragraph 20.
A. I'm there.
Q. Okay. First, I want to draw your attention to the Asian 2022, Black 2022, Hispanic 2022, White 2022, and total '22 rows. In those rows he compares his denominator with your denominator for the 2025 supplemental reports; is that right?
A. That's correct.
Q. And you both use the same denominator for the 2022 calculations; is that right?
A. That's correct.
Q. And I want you to look at the Black 2024 row. Do you see that row?
A. Yes.

Q. Here Dr. Grimmer compares his forecast of the 5-year 2024 CVAP for Black Georgians to your forecast for the 5-year in 2024 CVAP for Black Georgians; is that right?

A. Yes.

Q. Is Dr. Grimmer's forecasted 5-year 2024 CVAP for Black Georgians larger than yours?

A. Yes.

Q. So all else being equal, wouldn't Dr. Grimmer's forecasting method for the 5-year 2024 CVAP result in a smaller turnout estimate for Black voters than your methods?

MS. HAYES: Object to the form.

THE WITNESS: So -- just so I have this straight, I'm just trying to clarify. Because Dr. Grimmer is using a larger denominator in the Black turnout calculation for 2024, if we have the same numerator that is the same number of Black voters, would his turnout estimate be lower -- his turnout rate estimate be lower than mine?

BY MR. JACOUTOT:

Q. Yes.

A. Yes.

Q. Now, your criticism of Dr. Grimmer's

forecasting method in your July report -- you state that -- as we just reviewed earlier in paragraph 12 of your July report, you state that he overestimates turnout for growing Black populations in post-SB202 elections. And if I am reading this right -- and I could be getting it wrong, but I believe that's a reference to his denominator, isn't it?

A. Well, I don't say that here, but it is correct that his denominator for Black voters, again, all else equal -- and there's a lot that's not equal -- would not be as problematic for estimating or as inaccurate for estimating Black turnout as it is for Hispanic and Asian turnout.

Q. Okay. So let's turn back to table 2 in Dr. -- hold on. Table -- turn back to Dr. Grimmer's supplemental report of July but move over to table 3, which is on page 15.

In the column titled, Grimmer votes Fraga denom -- it's den but it stands for Fraga denominator. Dr. Grimmer uses his method for calculating the number of voters from Asian and Hispanic populations and then applies your projection of the denominator; is that right?

A. That's what it seems to indicate.

Q. And using your denominator in the Grimmer

votes Fraga denominator column, does Asian turnout go up between 2020 and 2024 or down?

A. It looks like it goes up by about 5 -- what is that -- thousands of a percentage point --

Q. Okay.

A. -- or, I mean, I guess it's five-tenths of a percentage point because of the decimal point.

Q. Yeah.

And I think he gets a little more granular here. The last sentence of the preceding paragraph in paragraph 21, can you read that into the record?

A. This is me reading from Dr. Grimmer's report where he says: He finds that the 2024 Hispanic turnout rate was 0.02 percentage points higher than the 2020 Hispanic turnout rate.

Q. Okay. And so if you turn back to table 3, that's not expressed in that table given how small that difference is; is that right?

A. No, it is not in the table.

Q. Okay. But you would agree that -- this thing is killing me.

You -- you would agree with me, Dr. Fraga, that at least using Dr. Grimmer's -- Grimmer's numerator coupled with your denominator that Hispanic turnout slightly increased in 2024 as compared to

2020?

MS. HAYES: Object as to form.

THE WITNESS: So just to clarify, you're saying if we switch out my numerator for his and switch out his denominator for mine, then you get a .02 percentage point increase in turnout.

BY MR. JACOUTOT:

Q. Yes.

A. Yes.

Q. Does that indicate that the -- to you that the problem with the figures that you might be perceiving is not entirely to do with the denominator of -- that Dr. Fraga -- excuse me, Dr. Grimmer uses?

A. No.

Q. That does not indicate that to you?

A. No.

Q. So is it your testimony today that the denominator that Dr. Grimmer uses is the result of the discrepancy between the voting turnout patterns that you see?

A. I'm sorry. I'm lost now on what -- are you referring to my paragraph 12 from my report where I'm critiquing his projection or -- I'm not saying that there's an issue -- I'm saying there's an issue with his projection in that paragraph, not because of

the -- well --

Q. And you're -- you're not -- well, I don't want too many negatives.

A. Yeah. There's a lot of negatives there, yeah.

Q. In paragraph 12 sitting here today, you're saying that the criticisms you put forth in paragraph 12 are not entirely to do with his denominator?

I'll rephrase that, actually. It seems to me that paragraph 12 levels a criticism against the way Dr. Grimmer calculates his denominator. Is that a fair characterization of paragraph 12?

A. Yeah. It focuses on that.

Q. Okay. But even when Dr. Grimmer uses your denominator, he still perceives an increase in voter turnout for Asian and Hispanic voters between 2020 and 2024; isn't that right?

A. As long as he uses his numerator, yes.

Q. Okay. And the -- in paragraph 13 after critiquing Dr. Fraga's forecast in the previous two paragraphs, paragraph 13 deals with how you correct what you perceive as those problems; is that right?

A. I think that you're referring to his -- Dr. Grimmer's forecast, right?

Q. Yes.

A. Okay.

Q. Yes.

A. So could you restate the question? Because I think the timing of when those forecasts were made makes it impossible, but --

Q. Well --

MS. HAYES: You're referring to paragraph 13 in Exhibit 4?

MR. JACOUTOT: The July expert report of Dr. Fraga, yes.

THE WITNESS: Okay. So in paragraph -- sorry.

BY MR. JACOUTOT:

Q. What is it that you're attempting to establish with paragraph 13 in your July expert report?

A. I'm saying that I used a better forecasting method in my June report than Dr. Grimmer used in his June report for estimating the denominator. So I didn't change my denominator after seeing Dr. Grimmer's June report.

Q. Okay. In paragraph 13 are you referring -- you just -- excuse me. Strike that.

You just referenced a forecasting method that you used in paragraph 13; is that right?

A. Correct.

Q. Was that forecasting method exclusively for the denominator in your calculation for turnout?

A. Yes.

Q. Can you describe how you arrived at the numerator?

A. For the numerator I used the voter file data and self-reported race information in the majority of the tables that I report in all of my reports.

Q. Is it true that when you use the self-reported race information for purposes of your numerator that there are times when voters select other as their race?

A. It's not clear when they're selecting other and when that's imputed on them.

Q. How would other be imputed on them?

A. There have been a number of updates to the voter registration system, at least one major one, in the time period I think that this case might have been brought but certainly since SB202. I'm not sure about other changes to voter registration options in terms of race that were provided. So I don't know for sure that people who are listed as other selected other.

Q. Does your procedure for calculating the

numerator attempt to establish a race of a voter even when they've selected other before?

A. I don't think that's the way I would characterize my procedure.

Q. How would you characterize how you impute race?

A. So here I would say this is not an imputation. It's instead using all available data on the self-reported race in the city of individuals.

Q. Am I right that you calculated the number of times a registered voter identified with a race in 11 separate instances in the voter file -- file?

A. I don't remember how many instances, and it varies depending on how many times a person appeared in the file.

Q. Okay. So if it's a younger voter that only became eligible in 2020, they would have obviously less instances in the voter file than someone who is older?

A. Not necessarily. It depends on whether that older person was -- has been in the state for a long -- it gets very tricky.

Q. You can't make broad generalizations ever.

Let me ask you how you handle this for your -- for purposes of your numerator. If a

registered voter appears in 11 instances of the voter file and they identify as -- they are identified as other nine times, one time they're identified as Black and another time they identify as Hispanic, how do you -- how do you put them -- what race do you consider them for purposes of your analysis?

A. So I use a procedure similar to what the Census Bureau does when imputing or -- it's not really even an imputation. It's just determining -- establishing, perhaps, race of individuals where I would put them as .5 Black and .5 Hispanic for the purpose of aggregating turnout information.

Q. Okay. How does that show up in -- or does that show up in a -- in your table that you provide in your report?

A. When I'm creating statistics that you see in the table, the numerator, which is the calculation of turnout by race, aggregates that person as counting effectively in a specific election half -- so .0 -- 0.5 in the kind of aggregation of the number of Black voters and .05 in the aggregation of the number of Hispanic voters. So it equally weights those self-reported racial categories.

Q. Okay. And so since you can't have a half a person, would it just round that up to appear as one

person?

A. No.

Q. How would it --

A. They are half a person in -- for the context -- for the purposes of aggregation. So the idea is that, you know, let's say .5 Black, there's someone else who may be is .5 Black, .5 White, so the 2.5 Black scores would aggregate and create one. So the idea is it accounts for any shifts in how people identify racially by equally weighting based on the clear responses that they gave to that --

Q. Okay. And I --

A. -- self-supported race.

Q. Yeah. And I don't see any sort of .5s in your tables. Does --

A. They're rounded.

Q. They're rounded, okay. Just at the end, I guess?

A. Yes.

Q. Okay. How did you calculate the self-reported racial groups for voters who registered after November of 2022?

A. So their -- my recollection is they used a similar procedure to what we've just been discussing.

Q. So in your supplemental report, you had

access to a new voter file from 2025; is that right?

A. Yes.

Q. Did you use the new voter file to update the inferred race of individuals registered before November 2022?

A. My recollection is that that information was incorporated into the race modeling is what I recall.

Q. So if it was incorporated into the race modeling, would that mean that you used it -- you used the updated file in your analysis?

A. It depends on what the responses were.

Q. How so?

A. Well, if an individual was listed as unknown in the January 2025 file but had a self-appointed race of Black in -- I think you mentioned 11 files -- then that unknown value for January 2025 would drop.

MR. JACOUTOT: I didn't know if you wanted to say something.

MS. HAYES: No, no, no. I'm just...

BY MR. JACOUTOT:

Q. So is it in a sense then using your method -- let's not say in a sense.

Using your method, is it more likely that voters who have been in the file longer and who have had more chances to report their race that they would

likely have -- well, strike that.

If a voter has had 12 instances to report their race, would that be more or less likely for them to get a report that's something other than other?

A. I don't think so, and here's why. This is something I've worked on in my research for a very long time. I'm, you know, a scholar of race in politics in the sense of studying racial categories and Census Bureau methods, et cetera. Here I'm trying to use all of the data we can to avoid throwing out voters --

Q. Uh-huh (affirmatively).

A. -- which is what Dr. Grimmer does with other and unknown respondents in the -- in the re-apportionment files that he relies on. My recollection when looking at the patterns is that you do not see an instance where someone who has been in the file longer is more likely to have an other or unknown reported. In fact, I believe it's the opposite because individuals that have been in the file for a long time tended to not update their registration as much. Also I don't know how long they have been doing this, but the State since this case was in litigation -- my understanding is they

updated the online registration form to default everybody to unknown. So a recent registrant is far more likely to be completely dropped from Dr. Grimmer's analysis.

Q. Let me ask you this, though. Is it true that voters who appear in more voter files have more opportunities to report a race other than other?

A. No; because then appearing in the file is not an indication of how many times they have been given the self-reported race question. It's simply an indication of them being in the file more. In fact, a young person probably proportionally has more opportunities.

Q. Or a new voter?

A. A newer -- a newer registrant.

Q. Thank you.

If a voter always self-reports as other and then in November 2020 they self-identify as Hispanic, how would you -- would you classify that voter as 100 percent Hispanic for all elections?

A. If they appeared in the file with other and then self-reported that they were Hispanic in a later file, yes.

Q. And that would include the 2018 election?

A. If they were in the file and a voter, yes.

Q. Okay. So is it true that the share of voters who are classified as other than cannot increase as you add more file observations?

A. I'm trying to think through the scenario here. I think that might be true, but I need a bit more concrete of an example.

Q. Well, let me ask you this. As you add more voter file operations, is it fair to say that the share of voters classified as other probably decreases?

A. No.

Q. Okay. Why not?

A. Because if people become more likely, which is what we observe, to identify as other or unknown when they're newer registrants -- so over time in more recent years for whatever reason, some of them might be a change to the registration system. There's more new registrants who are identifying as other or unknown than the share other and the share unknown as well would increase. That's exactly what we have observed.

In my previous research -- this is not something I focus on in the report, although I might mention it in my first report -- something like 10 percent right now of voters in a recent election

identified as other or unknown, and that's much higher than it was 15 years ago.

Q. And --

A. 20 years ago maybe, yeah.

Q. Do you view that increase in other unknown of late to be attributable to the fact that the State has sort of pre-selected unknown in the registration online?

A. That wasn't something that I focused on in my report.

Q. Okay.

A. So I'm not sure.

Q. Okay.

MR. JACOUTOT: If we can take a 5- to 10-minute break, I might be able to just make sure I've got everything I need.

MS. HAYES: Okay.

THE VIDEOGRAPHER: The time is 1:14 p.m. We are off video record.

(A recess was taken.)

THE VIDEOGRAPHER: The time is 1:26 p.m. We are back on video record.

BY MR. JACOUTOT:

Q. Okay, Dr. Fraga. I have just a few more final questions for you --

A. Great.

Q. -- and then we can be on our way.

If you will return to your July rebuttal report and go to paragraph 25 --

MS. HAYES: Exhibit 4?

MR. JACOUTOT: Yes.

BY MR. JACOUTOT:

Q. It should be right below section 5.

A. I'm there.

Q. Okay. In -- in the title of section 5, you state that Dr. Grimmer's analysis of drop box use relies on a survey question whose ambiguous wording precludes accurate measurement of changes in rates of drop box use after SB202's implementation.

Do you see that?

A. I do.

Q. What evidence did you rely on that the drop box question led to -- excuse me. What evidence did you rely on for the conclusion that the drop box question led to inaccurate responses?

A. I looked at the survey questionnaire in the cooperative election study surveys that Dr. Grimmer relied on.

Q. Anything else?

A. I used my knowledge of SB202, I suppose, the

text of the bill; my understanding of drop boxes and how they were used in 2020 as well.

Q. Do you have any evidence that a specific survey respondent gave an inaccurate answer to that question?

A. I'm trying to remember in some sense post-2020 anyone is giving an inaccurate answer. I'm trying to remember the choices and think about whether there are some that are so clearly impossible under the legislation that, you know, I could pull it out as an example; but I would say virtually all of the responses are questionable given the choices.

Q. So then is it fair to say, though, that sitting here today you cannot provide any evidence that any specific survey respondent answered a question inaccurately as a result of the way that question was worded?

A. I think that -- I think we can, but I cannot observe who voted via drop box and who didn't in the survey.

Q. So sitting here today, you don't have any evidence to that effect?

A. Well, as I just said, I think we can. It's a question of whether we're talking about them giving a bad answer in the survey versus knowing for sure

that they voted, for example, via drop box but saying they didn't or knowing for sure that they voted by mail not in a drop box but saying they didn't. The survey doesn't get at that at all.

Q. Okay. I think that answers my question.

I believe that is all the questions I have for you today, Dr. Fraga. Thank you for your time.

A. Thank you.

MR. JACOUTOT: I believe if y'all have any questions --

MS. HAYES: I'm just going to ask you one question.

EXAMINATION

BY MS. HAYES:

Q. Could you just go to paragraph 29 in that same section?

A. Yeah. I'm there.

Q. Okay. I'm just -- it just suggests that six people -- if I am reading it correctly me -- and I may not be right either -- that six Black Georgians who responded to the survey indicated that they deposited a ballot in a, quote, drop box used only for ballots not located in an election office or polling place --

A. That's correct.

Q. -- is that correct?

So you said that by -- anyone looking -- would it be true that anyone looking at a survey -- of the survey answers wouldn't know whether these people actually used a drop box or not?

A. In the survey we cannot determine if they actually used a drop box or not. We don't have validated data. Given SB202 and the way it's written, that is essentially an inaccurate response.

Q. And why is that?

A. Because drop boxes under SB202 may only be located at an election office or a polling place, in fact, inside of those places. I mean, the -- the question is not well tailored to Georgia. It's not really a polling place. It's like an earlier voting location, but -- so, yeah, those six individuals in a sense is -- you know, they're not accurately answering the question. They don't have the chance to.

Q. All right. Thank you, Dr. Fraga.

MR. JACOUTOT: Thank you, Counsel.

MS. HAYES: Should we just make sure is there anybody on the Zoom that has a question?

MR. DRENNON: No questions from the Intervenor Defendants.

MR. BARON: I have many questions but none of this witness.

MS. HAYES: Who is that?

MR. BARON: This is Noah Baron.

MS. HAYES: All right. You win some prize today.

THE VIDEOGRAPHER: Stand by, please.

The time is 1:33 p.m. We are off video record.

* * *

THE COURT REPORTER: Does anybody want to order the transcript?

MR. JACOUTOT: Yes.

(Proceedings concluded at 1:33 p.m.)

* * *

COURT REPORTER DISCLOSURES

The following representations and disclosures are made in compliance with Georgia Law, more specifically:

Article 10(B) of the Rules and Regulations of the Board of Court Reporting (disclosure forms) OCGA 9-11-28(c) (disqualification of reporter for financial interest) OCGA 15-14-37(a) and (b) (prohibitions against contracts except on a case-by-case basis).

- I am a certified reporter in the State of Georgia.
- I am a subcontractor for Veritext Legal Solutions.
- I have been assigned to make a complete and accurate record of these proceedings.
- I have no relationship of interest in the matter on which I am about to report which would disqualify me from making a verbatim record or maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.
- I have no direct contract with any party in this action and my compensation is determined solely by the terms of my subcontractor agreement.

FIRM DISCLOSURES

- Veritext was contacted to provide reporting services by the noticing or taking attorney in this matter.
- There is no agreement in place that is prohibited by OCGA 15-14-37(a) and (b). Any case-specific discounts are automatically applied to all parties, at such time as any party receives a discount.
- Transcripts: The transcript of this proceeding as produced will be a true, correct, and complete record of the colloquies, questions, and answers as submitted by the certified court reporter.
- Exhibits: No changes will be made to the exhibits as submitted by the reporter, attorneys, or witnesses.
- Password-Protected Access: Transcripts and exhibits relating to this proceeding will be uploaded to a password-protected repository, to which all ordering parties will have access.

* * *

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF GWINNETT:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquies, questions and answers were reduced to typewriting under my direction; that the transcript is a true and correct record of the evidence given upon said proceeding.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of this action.

I have no relationship of interest in this matter which would disqualify me from maintaining my obligation of impartiality in compliance with the Code of Professional Ethics.

I have no direct contract with any party in this action and my compensation is based solely on the terms of my subcontractor agreement.

Nothing in the arrangements made for this proceeding impacts my absolute commitment to serve all parties as an impartial officer of the court.

This the 17th day of August, 2025.

LAURA R. SINGLE, CCR-B-1343

BRYAN F. JACOUTOT, ESQ.
bjacoutot@clarkhill.com

August 18, 2025

RE: Georgia Senate Bill 202, In Re v.

8/11/2025, Bernard L. Fraga, Ph.D. (#7503487)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-southeast@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Bernard L. Fraga , Ph.D. August 11, 2025
Georgia Senate Bill 202, In Re

Page 131

Georgia Senate Bill 202, In Re v.
Bernard L. Fraga, Ph.D. (#7503487)

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________
PAGE_____ LINE_____ CHANGE________________________
__________________________________________________
REASON____________________________________________

________________________________ _______________
Bernard L. Fraga, Ph.D. Date

Veritext Legal Solutions
800.808.4958 770.343.9696

Georgia Senate Bill 202, In Re v.
Bernard L. Fraga, Ph.D. (#7503487)

ACKNOWLEDGEMENT OF DEPONENT

I, Bernard L. Fraga, Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________
Bernard L. Fraga, Ph.D. Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
______ DAY OF ________________, 20___.

__________________________
NOTARY PUBLIC

**&**

**&** 2:13 3:13 4:11 7:14 8:2 8:20 9:11 10:13

**0**

**0** 115:19
**0.00.** 38:23
**0.02** 109:14
**0.085** 87:20
**0.5** 115:20
**0.85** 87:8,18 89:4
**02** 110:6
**04** 36:25
**05** 37:5,6,8 115:21

**1**

**1** 5:12 11:24,25 33:22 86:19,19
**1.2** 33:22 34:1
**1.65** 34:5,22
**10** 6:10 7:2 59:15 61:2 87:1,7,17 89:3 89:14 90:10 100:1,6,7 103:25 104:1 120:24 121:15 127:7
**10.9** 76:19
**100** 4:12 119:19
**10004-1482** 2:14
**10006** 2:6
**1001** 3:14
**102** 6:8
**104** 6:10
**105** 6:12
**1050** 3:6
**10:06** 47:8
**10:13** 47:11
**10:53** 71:21
**10:59** 71:24
**11** 1:11 5:4,12 6:12 90:7,11 90:12 95:25 96:17,18,24 100:19 105:20 105:21 114:11 115:1 117:15
**11/16/20** 5:19
**11:35** 92:10
**12** 67:17 82:12 90:13 91:2 95:16 98:4 101:24 103:11 108:2 110:22 111:6,8,10,12 118:2
**12314** 129:19
**124** 5:5
**12:23** 92:13
**12:44** 104:16
**12:45** 104:20
**13** 94:13,18 95:12 106:10 106:12 111:19 111:21 112:7 112:15,22,25
**1343** 1:22 129:19
**14** 5:17 70:20 71:9 72:12 97:25 98:3,4
**14.9** 87:3
**14th** 48:12 59:14 94:4,15 94:25 95:6 96:14 105:18
**15** 18:23 24:14 98:1 108:17 121:2
**15-14-37** 127:10 128:6
**15.75** 86:23
**1500** 2:19
**16** 98:1,3
**1600** 4:12
**1620** 3:6
**16th** 63:14 65:8 65:9
**17** 20:13 24:9 24:11 84:13
**17th** 129:14
**18** 5:14 19:18 30:2 104:24 130:3
**1836** 72:14
**19** 39:23 59:14 61:2,14 62:18 63:25 64:21
**1989** 19:23
**1992** 76:22
**1:14** 121:18
**1:21** 1:5
**1:26** 121:21
**1:33** 126:8,14

**2**

**2** 5:14 18:6,7 48:25 86:16 97:4 104:24 105:15,25 106:5 108:14
**2.5** 116:8
**20** 60:13 64:20 106:12 121:4 132:15
**200** 4:18
**200,000** 27:4
**20004** 3:14
**20005** 2:20
**2002** 72:17 73:1,3
**20036-5660** 3:7
**2010** 102:20,24
**2012** 97:23 98:10,11,15
**2013** 98:9,11

**2014** 73:1,3 97:1,9,14,16,20 97:21
**2015** 97:23
**2016** 66:6,16 67:8 70:1 96:2 97:9,10,14,18 97:24 98:15
**2018** 5:22 30:9 38:17 54:20 55:5,13 57:23 58:2,4 59:17 59:19 60:10,21 60:24 61:4,11 61:12 62:3 67:19 68:1,10 68:16 69:7,8 69:14,18 72:8 73:2,7,10,19,22 73:25 74:19 82:14 83:5,7 83:14,17,20 84:4,7 94:22 94:23 97:10 119:24
**202** 1:4 78:8,16 130:4 131:1 132:1
**202-296-2300** 3:7
**202-624-2500** 3:15
**202-662-8391** 2:21
**2020** 6:6,8 31:4 31:10,19,21 32:3 33:16,20 34:11,17 35:20 35:21,24 38:17 54:20 55:6,13 57:23 60:13 61:16 62:13,16 62:20,21,25 63:14 64:10,14 64:19,23 65:6 65:14,15,25 66:1 67:5,8 68:22 73:20 77:15 79:13,24 83:1 84:9,23 84:23 85:5 90:3 91:3 94:21,22 96:2 99:22 100:8,14 101:15 102:1 102:19,20,24 103:3 109:2,15 110:1 111:16 114:17 119:18 123:2,7
**2021** 38:17,19 49:11,24 50:3 57:24 67:20 83:2 84:9 91:4 94:22
**2022** 40:9,21,23 54:21 55:6,14 62:3 67:20 84:17,22 91:25 92:1 93:4,18 94:19,20 99:10 99:14 103:3 105:3,4,6,9 106:15,15,15 106:16,21 116:22 117:5
**2023** 19:23 53:4 75:9,10 83:24 91:9,14 91:18 93:1,10 93:21,22 94:16 94:25 95:2,6 101:13 103:4 105:10
**2024** 27:16 30:9 31:4,10 31:19 33:13,20 33:21 34:9,19 34:22 35:22,23 36:13,19,25 38:10 39:24 41:6 43:17 46:21 54:21 55:6,14 60:13 61:16 62:14,19 66:11,19 67:4 67:6,7 76:18 77:15 79:14,24 89:25 95:16,21 95:24 96:5,11 101:16 103:17 106:23 107:2,3 107:6,10,17 109:2,13,25 111:17
**2025** 1:11 5:18 16:4,5,17,22 17:4 18:23 19:20 20:17 29:9 48:12 49:2 59:14 61:3 75:11 76:11 90:19 103:2,20 104:8 105:2,18 106:17 117:1 117:14,16 129:14 130:3
**205** 4:5
**208** 11:19
**21** 33:18 35:21 67:20 91:6 109:11
**212-837-6839** 2:14
**212-965-7715** 2:7
**22** 91:6,7 106:16
**23** 29:9 67:17 67:18 91:7
**24** 31:21 32:5 82:12,19
**25** 122:4
**27** 95:2

**29** 5:15 124:15

**3**

**3** 5:15 29:8,10 90:21 108:16 109:16
**30** 73:4 130:16
**30326** 3:22
**30339-5948** 4:13
**31210** 4:6
**32** 84:14
**33** 85:4
**3630** 1:15 3:21
**37** 30:21 33:12 33:19
**37.5** 34:23 35:3
**38** 36:4
**39** 39:21 41:1 41:15,22 46:12

**4**

**4** 5:17 27:14 48:14,15 49:3 50:12 59:14 68:7 112:8 122:5
**4/28/25** 5:24
**40** 2:5 43:7,11 44:19 45:14 46:8,13 73:4
**45** 32:12 33:14 35:21
**478-621-4980** 4:6
**48** 5:17
**49** 78:2,6

**5**

**5** 5:19 14:16 30:4,6 31:21 33:24 34:22 63:6,8 72:14 91:4,4,6,6,7,9 91:18,20,24 92:2 93:2,4 94:19,21,22 96:18 97:16,18 97:21,21,24,24 98:17,17,19 99:3,9,14,17 103:3,3,4,7 105:3,6 107:2 107:3,6,10 109:3 115:11 115:11 116:6,7 116:7 121:14 122:8,10
**500** 4:18
**501-319-6996** 4:19
**54.9** 73:8
**5400** 4:5
**550** 1:16 3:21
**55555** 1:5
**5s** 116:14
**5th** 2:6

**6**

**6** 5:20 36:5,18 38:6,13 70:24 71:1,8 72:6 91:2 94:13 101:24
**6/2/25** 5:16
**60** 86:10
**63** 5:19
**678-336-7249** 3:22

**7**

**7** 5:24 40:9,14 42:13,15,22 43:24 45:9,15 46:2,16 70:24 75:25 76:1,7 79:23
**71** 5:20
**72201** 4:19
**7503487** 130:5 131:2 132:2
**76** 5:24
**77** 40:10
**770-818-0000** 4:13

**8**

**8** 6:5 85:10,11 89:22,24
**8/11/2025** 130:5
**85** 6:5
**87.5** 32:16 35:4

**9**

**9** 6:8 90:7,10 90:11,12 102:6 102:10,11
**9-11-28** 127:9
**900** 2:20
**9:10** 1:12 7:9

**a**

**a.m.** 1:12 7:9 47:8,11 71:21 71:24 92:10
**aajc** 9:8
**able** 121:15
**above** 104:24 106:12 130:6 132:7
**absent** 77:11 81:18
**absentee** 30:7 30:10,13 31:12 31:17,25 32:4 34:2,7 36:8,23 37:3,4 40:11 41:4 42:10,11 43:13,25 44:15 46:18 50:16 53:1 55:20 59:6 67:22 68:5 83:8 86:5 88:10

**absolute** 129:13
**absorbed** 67:14
**abstract** 28:16 28:24
**academic** 37:13 55:19
**accepted** 30:15 84:3 85:21
**access** 117:1 128:18,21
**accompanying** 55:7
**account** 57:9 59:8,11 60:2 64:4 103:8
**accounted** 88:20
**accounts** 116:9
**accuracy** 105:8 130:9
**accurate** 31:20 33:6 45:23 51:5 54:19 64:22 84:8 88:4 122:13 127:17
**accurately** 24:3 45:21,22 101:4 125:17
**acknowledge...** 132:3
**acknowledg...** 130:12
**action** 63:24 64:20 127:24 129:8,11
**activity** 60:9
**actual** 23:20 84:8
**actually** 17:8 25:22 39:22 64:9 75:17 111:9 125:5,7
**add** 68:14,19 91:8 120:3,7
**additional** 33:9 35:1
**additionally** 32:11
**additions** 132:6
**address** 11:17 53:2 85:24
**adds** 97:2
**aden** 2:4 10:3,3 10:11
**adjust** 58:13
**administered** 12:12
**administration** 55:20
**advancing** 3:3 3:5 9:8,9
**advancingjus...** 3:8
**affect** 20:10 24:6,12 56:23 56:24 58:14 65:19 75:16,21
**affected** 58:6
**affirmative** 29:15 42:18 48:20 62:22 71:6 85:16 104:6
**affirmatively** 18:16 35:25 39:5 51:21 52:10 59:24 91:5 95:23 97:17 98:20,25 118:13
**age** 21:16
**aggregate** 41:8 41:11,20,23 42:1,3 46:11 89:14 116:8
**aggregates** 115:18
**aggregating** 41:25 115:12
**aggregation** 115:20,21 116:5
**ago** 50:6 121:2 121:4
**agree** 35:3,15 36:16 38:4 46:15 68:22,25 79:4 89:1 109:20,22
**agreeable** 13:6 13:13
**agreeing** 12:13
**agreement** 127:25 128:5 129:12
**ahead** 8:19 65:12 71:20
**ajc** 6:8 102:6 103:9
**alc** 3:5
**alc.org** 3:8
**alert** 64:8
**align** 13:17 95:5,20
**aligns** 94:14,24 95:8
**allegations** 20:15,19,20,22
**allocation** 6:5 85:5
**allotted** 130:19
**allowed** 11:13
**allows** 28:1
**alter** 103:7
**altogether** 43:12
**ambiguous** 122:12
**ame** 2:3 10:4
**amended** 5:15 16:25 17:1 29:8

**ameri** 2:12 9:11 9:11
**american** 21:19 28:25 36:7 38:12 39:25 46:11 80:6 103:15
**americans** 3:3 3:5 9:8,9 41:17
**analyses** 43:12 55:16 57:25 58:23 59:16 61:3 62:9 69:6 88:19,20 98:21 103:7
**analysis** 20:9 24:5,11 36:6 46:1,3 55:5,12 57:13,15 60:16 60:19,23 61:15 74:14 75:16 80:24 81:1,10 81:23 82:1,4 83:25 89:1,8 89:19 90:9 99:11 115:6 117:10 119:4 122:11
**analyze** 21:17 60:20,23 62:2 73:19
**analyzed** 24:18 49:17 61:23 62:6 68:25 70:11 74:21
**analyzing** 50:3 57:9 73:12 75:9 82:7 84:16
**andrew** 27:14
**annual** 98:19 99:8
**answer** 22:11 22:22 51:12 123:4,7,25
**answered** 123:15
**answering** 36:2 125:18
**answers** 13:10 124:5 125:4 128:13 129:5
**anybody** 125:23 126:11
**apart** 15:22
**apologies** 11:6
**apologize** 96:16
**appear** 93:18 104:7 115:25 119:6
**appearance** 7:25 8:8,17 47:15
**appeared** 20:16 21:18 24:19 114:14 119:21
**appearing** 7:17 8:2,21 119:8
**appears** 18:21 23:11 29:20 48:23 115:1
**appended** 132:7
**apples** 50:10,11 79:22,22
**applicable** 78:1 78:5 130:8
**applicants** 27:17
**application** 27:20
**applied** 128:8
**applies** 108:22
**appointed** 117:14
**apportionment** 118:16
**approach** 24:17 94:14,15 94:24 95:5,6,9 95:14,20
**appropriate** 52:13 88:23
**approximate** 97:23
**approximated** 67:8
**approximately** 7:9 34:23
**approximates** 57:2
**approximation** 99:20
**april** 76:11
**arkansas** 4:19
**arrangements** 129:12
**arrived** 113:5
**article** 5:20 6:5 6:8 7:2 19:2,24 20:2,3,8,9,14 21:10,13,14,16 21:18,22 22:12 22:18 23:7,15 24:6,11,15,18 24:19 59:22 70:15,19,21,22 70:23 71:7,9 71:11 72:6,11 73:9 85:4,9,17 85:20 86:3,3 86:11 89:16 102:6,17,22,25 103:9 127:7
**articles** 19:3
**asian** 3:3,5 9:7 36:7 38:12 39:25 41:17 46:10,11 77:22 79:23 80:6,9 80:16 102:2 103:15 106:15 108:13,21 109:1 111:16

**asians** 9:9
**aside** 65:17 105:13
**asked** 13:2 14:4 51:24
**asking** 13:5 68:18
**aspects** 58:5 83:14,20
**assess** 53:14 55:19 105:8
**assessing** 50:15 50:22 52:25 54:22 67:22 68:5
**assessment** 74:24
**assigned** 127:16
**association** 81:3
**assumes** 25:14
**assumption** 25:18 81:13,14 81:18
**assumptions** 81:24
**atlanta** 1:2,17 3:3,11,22 4:13 8:3,22
**attached** 12:1 18:8 29:11 48:16 63:9 71:2 76:2 85:12 102:12 104:2 105:22 130:11
**attempt** 101:4 114:1
**attempted** 37:2 37:4 41:3 53:14
**attempting** 112:14
**attention** 68:12 106:14
**attorney** 128:4 129:7 130:13
**attorneys** 128:16
**attributable** 121:6
**audible** 13:10
**audio** 8:1 9:15
**august** 1:11 129:14 130:3
**authorities** 62:17
**authority** 65:18
**authors** 24:20
**automatically** 128:7
**availability** 84:17
**available** 59:18 61:5 63:12 91:18,20,24 93:2,8 114:8 130:6
**avenue** 3:14 4:18 11:19
**average** 87:20 89:9,10,14 91:3 97:9,13 97:15 98:2,18 98:18 99:3,4 99:17
**avoid** 65:19 118:11
**award** 27:17
**awarded** 27:16
**awhile** 74:22

**b**

**b** 1:22 2:12 7:2 127:7,10 128:6 129:19
**back** 17:21 25:10 31:1 33:5 47:12,25 48:6,7 51:8,9 71:25 72:17 79:20 82:9 84:1 92:14,16 96:13 104:21 105:14 108:14 108:15 109:16 121:22
**bad** 13:8 123:25
**ballot** 43:13,15 43:20 44:15,22 45:4,10 46:4 74:23 82:21 83:8 85:25 86:17,22,23 87:3 124:22
**balloting** 50:16 67:23 68:6
**ballots** 30:7,10 30:14 31:22 32:5 33:23 36:9,23 40:1 84:2,20 86:9 124:23
**barely** 8:7
**baron** 3:5 9:7,7 126:1,4,4
**base** 101:14,15
**based** 25:13 37:6 39:12 52:1 77:14 79:22 85:20 86:17 89:3 105:3,6 116:10 129:11
**basis** 98:7,12 127:12
**battery** 2:13
**baxter** 4:17 9:1
**bdrennon** 4:20
**beaconing** 59:17
**bear** 30:17 92:22

**began** 59:20
**beginning** 7:10 35:13,14 43:10 49:3 58:18 61:4 67:17 69:7
**behalf** 9:8,14 9:22 10:1,4
**behavior** 20:16 21:20,23 22:3
**believe** 12:18 16:3,7,19 17:6 17:23 19:15 26:11,21 27:7 27:11 31:5,20 33:17 47:15 52:24 53:3 70:2,19 73:9 74:9,20,21,22 83:10,25 84:22 84:25 90:9,12 90:18 91:12 102:25 105:11 108:6 118:20 124:6,9
**bernard** 1:9 5:3 5:12,14,15,17 5:24 7:11 10:23 11:10,18 130:5 131:2,24 132:2,4,12
**best** 53:11,19 57:9
**better** 112:17
**beyond** 58:5,14
**bias** 37:24
**biased** 89:20 96:5
**bibb** 4:3 9:6
**big** 80:14,15
**biggest** 58:17
**bill** 1:4 78:8,16 78:23,25 123:1 130:4 131:1 132:1
**bills** 78:21
**bit** 19:6,19 50:8 59:12 60:4,12 62:23 66:21 86:14 101:9 120:5
**bjacoutot** 3:23 130:2
**black** 3:11 8:2 8:21 31:3,9,18 32:11,12,15 33:15,15 34:6 34:7,15,18,23 35:20 36:6,20 37:2 39:24 40:14,18 41:2 41:11,16 42:11 42:25 44:5 46:3,5,11,17,22 69:19,23 76:21 77:18 79:13,18 80:9 102:1 103:14 106:15 106:23 107:2,3 107:7,11,17,19 108:4,9,12 115:4,11,20 116:6,7,8 117:15 124:20
**blending** 85:2
**board** 4:9,9,10 7:3 10:14,15 10:16 84:2 127:8
**boilerplate** 15:9
**book** 100:13
**books** 78:7
**booth** 4:17 9:1
**bottom** 39:22 90:20 96:24
**box** 84:17 85:4 86:21 87:7,8 88:16 89:3,10 89:17,18 122:11,14,18 122:19 123:19 124:1,3,22 125:5,7
**boxes** 84:18 85:23 86:8 89:12 123:1 125:11
**break** 14:11,21 47:5 71:13,14 92:5 121:15
**breaks** 14:7
**briefly** 24:15 48:21
**bringing** 88:13
**british** 24:20
**broad** 29:2 58:18 75:19 114:23
**broader** 14:3 75:6
**broadly** 22:13 53:21 54:5 56:20 60:12
**brought** 113:20
**bryan** 3:19,20 7:20 9:25 11:21 130:1
**burdened** 59:1
**burdens** 58:24
**bureau** 98:13 98:16 100:12 100:15,17 115:8 118:10

**c**

**c** 2:1 3:1 4:1 7:1 9:19 127:9
**cabined** 82:5
**calculate** 90:14 91:11 116:20
**calculated** 35:12 114:10
**calculates** 97:8 97:13,15

111:11
**calculating** 108:21 113:25
**calculation** 32:18,21 33:2 33:10 34:25 35:18 80:24 99:21 107:17 113:3 115:17
**calculations** 30:19 82:2 106:21
**calculator** 32:23
**call** 27:18 28:4 28:6
**called** 24:23 76:13 81:13
**campaign** 60:9 68:12
**campaigns** 59:21
**candidate** 21:11 22:5 24:16 25:2,4 25:15 66:13
**candidates** 22:14 24:22
**caption** 129:4
**capture** 63:12
**careful** 29:1 45:21 51:19
**carnegie** 27:5,7 27:8,14,15,19 28:5
**case** 1:3 12:20 15:21 16:1 17:15,17 19:5 20:10 24:7 27:19 29:18 37:19 48:22,24 49:13,17 57:21 57:23 77:10 113:19 118:25 127:12,12 128:7
**cases** 17:18 20:5 63:25 64:21 80:11
**casey** 4:11 10:12
**casey.torres** 4:14
**casting** 86:17 86:22,22 87:2
**categories** 115:23 118:9
**causal** 53:1,14 53:15,19,20,25 54:3,6,8,11,13 54:14,22 57:3 57:3 58:8
**causality** 53:6
**cause** 93:18
**caution** 83:13
**cautious** 53:22
**caveats** 80:23 100:17
**ccr** 1:22 129:19
**cdc** 5:19 63:20 63:24 64:4
**census** 6:8 98:13,16 99:19 100:12,14,15 100:16 102:1 102:19 115:8 118:10
**centers** 63:13
**certain** 49:22 49:23 50:13 58:25 59:4
**certainly** 61:11 65:8 67:6 68:12 69:22 113:20
**certificate** 129:1
**certified** 127:14 128:13
**certify** 129:4,7
**cetera** 55:2 118:10
**challenger** 66:15
**challenging** 53:11
**chance** 63:15 63:17 125:18
**chances** 117:25
**change** 19:22 39:15 55:19 57:4 68:19 80:19,21 91:3 91:8 97:4,9,14 97:16,25 112:20 120:17 131:4,7,10,13 131:16,19
**changed** 56:24 88:17
**changes** 56:21 58:13,19 60:9 83:9 96:4 113:21 122:13 128:15 130:10 132:6
**channeling** 50:24
**characteristics** 62:11
**characterizati...** 25:23 90:7 111:12
**characterize** 90:8 114:4,5
**characterizing** 101:19
**chart** 50:6 73:8
**charts** 86:16 87:24
**chat** 10:7
**chatham** 4:9,10 10:15,15
**choice** 21:21
**choices** 123:8 123:12

**choose** 28:15 60:1 83:16
**chose** 55:12 60:4 83:21
**chosen** 57:13
**circulated** 67:9
**circumstance** 54:20
**cite** 59:22 68:7 70:22 83:25 85:3,18 86:6 102:6
**cited** 70:20 72:11
**city** 114:9
**civil** 2:18 7:19 11:14
**clarify** 31:11 34:1 35:17 38:23 42:12 49:20 78:20 83:17 88:6 95:8 100:11 107:15 110:3
**clark** 1:14 3:20 7:20,22 10:2 16:18
**clarkhill.com** 3:23 130:2
**classified** 120:2 120:9
**classify** 119:19
**clayton** 4:9 10:13
**clear** 16:21 28:21 53:20,24 57:6 60:22 64:24 69:3 77:24 86:6 89:15 103:5 113:14 116:11
**clearly** 123:9
**clergy** 3:11 8:3 8:21
**cliff** 8:20
**clifford** 3:13 8:23
**clinton** 70:1
**close** 57:5,8,14 57:16,17,21 74:6
**closely** 67:7 69:11
**closeness** 85:22
**closer** 84:18 86:7
**closest** 85:23 86:21
**coarseness** 101:1
**code** 127:22 129:10
**colloquially** 13:21
**colloquies** 128:12 129:5
**column** 32:12 86:16 108:18 109:1
**columns** 42:23 72:21,24
**coming** 9:3
**comment** 32:1
**comments** 26:20
**commitment** 129:13
**committee** 2:18 7:18
**commonly** 77:12
**compare** 54:20 55:5 56:6 60:14 73:14 77:14,16 80:19
**compared** 46:5 50:9 109:25
**compares** 33:19 49:5,21 106:16 107:1
**comparing** 54:9,25 55:13 56:18 57:8 81:12,15
**comparison** 41:2 54:16 56:13 83:3,4 83:11,22
**compensation** 127:24 129:11
**competitive** 27:16 49:11,24 50:2 59:20
**competitiven...** 60:10
**complete** 127:16 128:12 132:8
**completed** 130:16
**completely** 119:3
**compliance** 127:4,22 129:10
**complicated** 22:21 66:13 67:1 99:21
**component** 54:24
**compound** 22:7
**concede** 23:1
**concerned** 3:11 8:2,21
**concerns** 67:3
**concluded** 126:14
**concluding** 98:8,12
**conclusion** 42:2 42:2,3 56:23 103:7 122:19
**conclusions** 20:10 22:1 24:7,12 49:7 75:21

**concrete** 120:6
**conditions** 15:10,12
**conducted** 20:9 24:5,10 43:15
**conducting** 27:9 57:15
**conference** 2:11
**confident** 65:24
**confirm** 12:8 12:10 18:20 29:17 32:25 33:2,4 35:1 47:13 100:4 102:16
**conflict** 28:8
**confused** 44:10
**confusing** 44:8
**confusion** 12:24
**congratulations** 27:23
**connotation** 13:20
**consider** 21:8 28:12 45:8 54:15 56:22 69:8 115:6
**considered** 21:5 45:8 58:23 59:1,3 77:10
**consistent** 72:20,23
**consistently** 36:8
**construct** 91:8
**contact** 62:18
**contacted** 128:3
**contain** 103:6
**contained** 44:25 75:21
**contains** 17:23
**contemporary** 19:7
**contests** 60:21 60:24
**context** 17:2 19:7 28:19 37:13 56:1,7 56:10,17,21 57:19,22 116:5
**continued** 96:3
**continuing** 59:17 61:4
**contract** 127:23 129:11
**contracts** 127:11
**contrary** 49:7 103:14
**control** 60:1 63:13
**convenient** 92:4
**cooperative** 122:22
**copies** 130:14
**copy** 5:24 12:4 18:12 85:8,17 104:7
**corner** 18:23
**corporation** 27:7,8,15,19 28:6
**correct** 12:20 12:21 16:8,22 18:13,14,24,25 23:4 26:14 30:19,24,25 32:14 34:7 36:11,12,15 37:6 38:8,15 38:21 40:3,4,8 40:12,13,16 43:2,23 44:2 44:16 47:18 49:14,15 50:18 58:6 60:21 61:21 67:23,24 72:13,19 73:2 76:25 82:6 84:11 85:7,17 97:8 101:23 102:5 103:21 103:22 106:19 106:22 108:9 111:21 113:1 124:25 125:1 128:11 129:6 132:8
**corrections** 132:6
**correctly** 21:25 26:2 27:20 28:5 33:17 41:8 50:7 51:1 87:22 124:19
**correlation** 81:3
**corresponding** 51:3,4 99:22
**corresponds** 69:10
**counsel** 7:5,12 7:15 10:20 26:23 125:21 130:14
**counter** 58:9
**counting** 115:18
**county** 4:3,9,9 4:10 9:6 10:14 10:15,16 89:11 129:3
**couple** 50:5 53:3
**coupled** 109:24
**course** 56:11 58:4 82:5 101:2
**court** 1:1 7:3,5 8:4,7,16,19,24

9:17,24 10:6,9 10:21 12:25 13:9 17:14 51:9 126:11 127:1,8 128:13 129:14
**covered** 10:18 96:2
**covid** 62:18 63:25 64:21 67:4
**cps** 77:11
**create** 116:8
**creating** 115:16
**credible** 86:3,7
**credits** 49:12
**crisis** 69:2
**criteria** 37:22
**criticism** 107:25 111:10
**criticisms** 39:19 111:7
**critiquing** 82:13 96:20 110:23 111:20
**crowell** 3:13 8:1,20
**crowell.com** 3:15
**cs** 130:15
**current** 21:4 66:23 69:11 76:18 77:16
**currently** 15:11 26:12
**cutting** 97:3
**cv** 5:14 17:23 18:12 19:11,18 26:4 27:12
**cvap** 91:18,20 91:24 92:2 93:2,4 94:20 94:21,23 95:10 99:9,14,24 101:21 103:4,6 105:3 107:2,3 107:6,11
**czatz** 3:15

**d**

**d** 4:17 5:1 6:1 7:1
**d.c.** 2:20 3:7,14
**data** 37:18,19 37:20 39:6 41:25 45:14 46:15 55:16 57:3 59:1 61:11 77:3 84:4,7,10 88:14 95:15,22 97:2,21,21,22 97:24,24 99:3 100:14 101:13 101:25 103:3,6 105:10 113:7 114:8 118:11 125:8
**dataset** 98:2
**datasets** 101:17
**date** 18:20,21 19:10,10 26:3 58:25 65:8 93:8 131:24 132:12
**dated** 48:11 105:18
**dating** 72:17
**day** 129:14 132:15
**days** 130:16
**deadline** 40:2 40:12 42:17 43:1,25 44:12 46:4,19
**deadlines** 43:21 44:22 45:5,10
**deals** 111:21
**decade** 97:1 100:9
**decatur** 11:19
**december** 40:21,23
**decide** 14:20 55:4
**decimal** 33:9 39:3 109:7
**declare** 132:4
**decline** 79:18
**decrease** 80:17
**decreased** 80:18
**decreases** 120:10
**deemed** 132:6
**default** 119:1
**defendants** 3:18 4:3,10,16 5:11 6:4 7:21 7:23 9:2,6 10:1 11:11,22,24 17:8 18:6 125:25
**defense** 2:4 10:4
**define** 19:6 26:4
**defined** 38:10 81:24
**defines** 52:21 52:23
**definition** 28:11,22 29:3 50:19 52:4,7,8 52:13,16,18,19 53:25 54:2
**definitions** 28:14 29:5 53:21
**degree** 23:3
**demobilize** 20:15,23
**democratic** 66:9,25

**democrats** 20:4 22:20
**demonstrated** 102:1
**den** 108:19
**denom** 108:19
**denominator** 90:16 93:20 94:20,21,23 95:21 96:11,22 105:4 106:17 106:17,20 107:16 108:7,9 108:20,23,25 109:1,24 110:5 110:12,18 111:8,11,15 112:19,20 113:3
**dependent** 28:19
**depending** 93:24 94:1 114:14
**depends** 54:23 54:23 70:9 72:25 114:20 117:11
**deponent** 130:13 132:3
**deposing** 13:16 130:13
**deposit** 85:25
**deposited** 124:22
**deposition** 1:8 5:12 7:10 11:10,12 12:5 15:4 19:5 39:13 93:13
**depositions** 12:16
**depth** 88:15,25
**describe** 23:13 24:3,18,24 25:21 28:7 45:21,22 51:2 68:2 91:10 95:16 99:20 101:5 113:5
**described** 36:21 38:6,12 40:19 41:21,23
**describes** 23:25 43:24
**describing** 76:17 101:11
**description** 5:10 6:3 45:24
**descriptive** 87:23 88:14,19
**design** 38:3 53:15,24 54:3 54:4,6,11 58:12
**despite** 50:7
**detail** 20:8
**determine** 25:2 125:6
**determined** 127:24
**determining** 115:9
**device** 8:12
**diana** 3:19 7:22
**difference** 31:2 31:8,17 33:14 34:10 35:19 36:19 37:1,5,8 37:14 38:2,5 38:11 80:15 81:6,10,23 88:10 109:18
**differences** 54:18 59:3 81:6,10,15,23 82:3,3
**different** 19:10 28:9 29:4 31:2 35:7 37:25 45:17 52:12 58:20 80:5,12 88:9 95:1,14 95:15 102:24
**differential** 96:3
**difficult** 19:6 22:16 25:21 53:6,18
**difficulties** 11:6
**direct** 19:1 80:11 127:23 129:11
**direction** 23:3 129:5
**directly** 58:21
**disaggregating** 41:25
**disagreement** 28:9
**discipline** 53:22
**disclosure** 7:4 127:8
**disclosures** 127:1,3 128:1
**discontinuity** 24:17,23
**discount** 128:9
**discounts** 128:7
**discovery** 11:13
**discrepancy** 110:19
**discussed** 67:12
**discusses** 32:5
**discussing** 26:2 116:24
**discussion** 58:19 78:12 104:18
**disease** 63:13

**disentangle** 22:12 57:20
**disparities** 43:14,18 44:20 45:2 46:9,10 54:18
**disparity** 30:22
**disproportion...** 46:5
**dispute** 32:20 33:1
**disputing** 33:8
**disqualificati...** 127:9
**disqualify** 127:19 129:9
**distance** 86:4 86:18 87:16 88:16 89:3
**distortion** 8:1 9:15
**district** 1:1,1
**division** 1:2
**document** 20:3
**documentation** 98:16
**doing** 18:19 26:17 33:17 47:24 55:3 57:6 88:19,22 105:11 118:24
**donald** 66:15 69:25
**double** 35:23
**doubt** 46:13
**downward** 80:1
**dr** 7:11,16 11:4 11:10,16 15:9 16:5,15,18 29:7 47:16,19 47:22,23 48:4 49:2,4,10,16,21 50:14,21,24 51:20 52:19,21 53:5 67:21 68:4,8 70:15 72:3 75:9 82:13 89:19,24 91:17 92:16,24 93:1,17,22 94:15,24 95:6 95:9,14,20 96:21,25 97:7 97:12 99:25 101:20,25 103:1,12,20 104:8,23 105:2 105:9,18 107:1 107:6,10,16,25 108:15,15,20 109:12,22,23 110:13,13,18 111:11,14,20 111:24 112:10 112:18,21 118:14 119:4 121:24 122:11 122:22 124:7 125:20
**draw** 106:14
**dream** 21:15
**drennon** 4:17 9:1,1 125:24
**drill** 12:22
**drive** 4:5
**drop** 84:17,18 85:4,23 86:7 86:21 87:7,8 88:16 89:3,10 89:12,17,18 90:1 117:16 122:11,14,17 122:19 123:1 123:19 124:1,3 124:22 125:5,7 125:11
**dropbox** 6:5
**dropped** 66:24 102:3 119:3
**due** 36:9,24 37:15 39:7 40:2,11 42:16 43:19,25 44:21 46:18 62:18 69:1
**duly** 10:24
**durable** 22:2

**e**

**e** 2:1,1 3:1,1 4:1 4:1 5:1 6:1 7:1 7:1 131:3,3,3
**earlier** 42:15 50:5 53:3 54:5 59:12 60:4 69:8 83:25 91:12 108:2 125:15
**early** 71:18
**easier** 10:8 100:25
**easy** 77:11,12
**edits** 17:3,4,6,7 17:7
**educational** 2:4
**effect** 43:16 46:5 51:15 53:1,14,15,20 54:11,14,22 86:4,18 89:14 123:22
**effectively** 82:2 115:19
**effects** 88:1,7
**eight** 35:13
**either** 124:20
**elected** 20:21 20:25
**election** 5:22 6:6 17:15 20:15,22 36:14

39:24 40:18,20 40:24 41:7 42:4,9,24 43:17 44:4 46:22 53:7 54:10,12,15 55:20,25 56:18 56:19,20 60:24 61:12,16,16 62:3,4,16,19,21 63:1 64:10,14 65:1,3,6,13 66:6,11,16,20 68:10,23,25 69:1,4,14,16,17 69:25 70:5 72:9 73:10,20 74:6,9,14,17,18 74:19,20,23 83:2,2,11,12,14 83:18,20 84:2 85:6 90:1,3 93:3 94:24 95:16 103:17 105:3,9 115:19 119:24 120:25 122:22 124:23 125:12
**elections** 4:9,10 10:14,16 21:21 21:24 23:17 30:8 40:6 41:6 41:9,19 42:6,8 42:22 43:15 46:17 49:5,6 49:11,17,22,23 49:25 50:3,10 50:13 54:25 55:5,6,7,8,13 55:14,15,17,24 56:7,11,16,25 56:25 57:8,14 57:16,19,21,24 57:24 59:12,16 59:18,19 60:3 60:10,14 61:4 61:5,9,12,23 62:1,6,8,11 65:20 67:19,20 67:25 68:9,16 69:7,8 72:17 73:4,13,13,16 73:17,18 75:1 75:2 80:7 82:13,20,22 83:5 91:25 94:20,22 95:21 103:16 108:5 119:20
**electorate** 23:21 28:8 74:12
**elias** 9:14,20,22
**eligible** 114:17
**elite** 20:14,19 20:20,24
**email** 10:7,8
**emory** 26:13
**employed** 26:13 56:3 88:23
**employee** 129:7
**employment** 26:15,18
**enacted** 69:12
**entered** 47:15
**entering** 23:21
**entire** 45:22
**entirely** 110:12 111:8
**entitled** 21:10 24:16 49:1 72:6 85:4
**envelope** 33:5
**equal** 107:9 108:10,11
**equally** 115:22 116:10
**equivalent** 39:1
**errata** 130:11 130:13,16
**error** 37:24
**especially** 53:6 54:17 80:13 103:16
**esq** 2:4,12,12 2:18 3:5,13,19 3:19,20 4:4,11 4:17 130:1
**essentially** 125:9
**establish** 53:6 112:15 114:1
**established** 70:9 84:17
**establishing** 57:18 115:10
**estimate** 89:25 91:11 93:18 99:14 107:11 107:19,20
**estimated** 86:18,21 87:2
**estimates** 37:25 77:9,13,17 79:19,21 80:8 90:15 91:4,4,6 91:7,7,9,20 93:4 94:20,21 94:23 95:1,10 96:2,7 97:3,16 97:18 98:17 99:8,10,24,24 100:12 101:16 101:22 105:2,7
**estimating** 53:15 54:11 108:11,12 112:19
**estimation** 86:3
**et** 55:2 118:10
**ethics** 127:22 129:10
**ethnic** 90:2 94:1

**ethnicity** 19:21 30:8 59:2 96:4
**evaluating** 21:11 24:16 29:4 50:24
**event** 81:16
**everybody** 10:19 119:2
**evidence** 49:7 122:17,18 123:3,14,22 129:6
**exact** 35:11 93:7
**exactly** 56:9,14 79:21 92:1 120:20
**examination** 5:3 11:2 124:13
**examine** 21:19 42:9 55:24 56:16 98:21
**examined** 10:25 20:21 24:21 39:6 44:4
**examines** 85:22
**examining** 25:1
**example** 58:24 59:4 89:10 120:6 123:11 124:1
**excellent** 61:19
**except** 101:13 101:14,15 127:11
**exceptional** 69:1,4,14,16
**excluded** 74:13
**exclusion** 50:14
**exclusively** 113:2
**excuse** 67:20 70:24 82:17 84:13 86:22 87:22 88:11 91:23 94:9,13 103:2 110:13 112:23 122:18
**exhibit** 5:12,14 5:15,17,19,20 5:24 6:5,8,10 6:12 11:24,25 18:6,7 29:8,10 48:14,15 63:6 63:8 70:24,24 71:1,8 72:6 75:25 76:1,7 79:23 85:10,11 90:21 102:10 102:11 103:25 103:25 104:1 105:20,21 112:8 122:5
**exhibits** 128:15 128:15,19
**existence** 25:15
**exists** 25:6
**experience** 61:9 75:8
**experienced** 46:17
**expert** 5:15 6:10,12 11:10 12:17 15:20,21 15:22,23,25 16:3,6,9,14 17:14 26:19 29:9 39:12,16 44:24 50:4 74:24 75:2,22 93:12 103:21 103:23 104:8 105:18 112:9 112:15
**expertise** 61:8
**experts** 13:16
**explain** 78:4 90:8,14
**explained** 79:6
**expressed** 109:17
**extensively** 70:13
**extent** 22:23 23:1,10 24:21 85:22
**extrapolate** 96:6
**extrapolation** 87:25

**f**

**f** 3:19 130:1
**face** 24:22
**facets** 28:9
**fact** 26:5 29:3 32:22 44:25 84:7 118:20 119:12 121:6 125:13
**factors** 56:24 70:10
**facts** 63:21
**factual** 58:9
**fail** 84:20 86:9
**fails** 103:8 130:18
**fair** 22:17,22 25:16,23 29:6 31:1,8,16 32:24 34:18,21 52:15 61:1 65:4 79:3 87:19 90:6 111:12 120:8 123:13
**fairly** 72:20,23
**familiar** 81:7
**fantastic** 92:5
**far** 14:7 119:2
**fault** 101:24

**feature** 42:9,24
**features** 69:17
**february** 94:15 94:25 95:6
**federal** 11:14 82:20,22
**feed** 47:15
**feel** 30:19
**fellowship** 27:15
**fewer** 46:17
**field** 13:18,24 77:8 81:2 85:21
**fight** 63:24 64:21
**fighting** 100:24
**figure** 41:20,23 72:14,16 77:14 86:16 92:21
**figures** 38:16 38:17 78:3 87:6 110:11
**file** 113:7 114:12,12,15 114:18 115:2 117:1,3,10,14 117:24 118:19 118:22 119:8 119:11,21,23 119:25 120:3,8
**filed** 15:21 16:4 16:22,24 17:9 27:18 29:17,21 29:25
**files** 117:15 118:16 119:6
**final** 24:14 41:22 43:7 45:13 121:25
**financial** 127:10
**financially** 129:8
**find** 21:22 36:25 41:10 42:4,6 82:17 86:2,6 106:7
**findings** 49:1 86:2
**finds** 109:13
**finish** 13:5
**finished** 65:11
**firm** 4:4 9:6,16 128:1
**first** 10:24 16:24 30:4 31:11 61:7 69:5,18,22,24 80:6 106:14 120:24
**fit** 58:2
**fits** 27:17
**five** 72:24,25 88:11 109:6
**flawed** 89:25
**flip** 31:1
**floor** 2:6
**florida** 78:23
**fmglaw.com** 4:14
**focus** 16:3 59:15 61:3 62:9 64:18 70:12 74:2 75:2,13 83:1 120:23
**focused** 39:17 69:6 73:21 83:4 93:15 121:9
**focuses** 111:13
**folk** 7:25
**following** 79:17 80:2 127:3
**follows** 10:25
**football** 100:21
**footnote** 70:20 71:9 72:12 85:4 102:6,17
**forecast** 93:19 93:25 101:23 107:1,3 111:20 111:24
**forecasted** 95:10 107:6
**forecasting** 92:23 93:9,14 93:17 94:6,13 94:14 95:5,24 96:11,21 97:8 97:13 100:22 101:2,14,25 103:1 107:10 108:1 112:17 112:24 113:2
**forecasts** 112:4
**foregoing** 129:4 132:5
**form** 23:5 25:9 25:25 28:17,22 35:5 44:7 46:20 49:19 53:16 55:22 60:5 64:5 65:21 78:17 87:11,21 89:5 107:13 110:2 119:1
**formally** 81:23
**forms** 127:8
**forth** 48:6 111:7
**forthcoming** 26:10
**found** 22:2
**foundation** 27:6
**four** 12:18,19 19:3,14 63:19 72:24,25
**fraga** 1:9 5:3 5:12,14,15,17 5:24 7:11,16 10:23 11:4,10

11:16,18 15:9 29:7 47:23 48:4 72:3 92:16 104:23 108:18,19 109:1,22 110:13 112:10 121:24 124:7 125:20 130:5 131:2,24 132:2 132:4,12
**fraga's** 111:20
**frame** 34:19
**frames** 51:23
**framing** 13:17
**fraud** 20:15,22
**free** 13:9 30:19
**freeman** 4:11 10:12
**front** 26:22 27:3 28:4 32:23 35:11 72:5 76:7 94:4 94:10,11 96:14
**full** 11:17 26:15 26:18 69:21
**fund** 2:5 10:4
**fundamental** 54:8 57:2 58:7
**further** 129:7
**fuzzy** 62:23

**g**

**g** 7:1
**ga** 4:13
**galleria** 4:12
**gap** 40:5,25 41:4,15,16 76:19,21 82:2
**gary** 4:11 10:13
**gatherings** 65:19
**general** 29:2 60:13 61:16,16 61:23 62:1,3,4 62:6 66:6,11 68:22,24,24 70:5 74:12 83:1 105:9
**generalizations** 114:23
**generally** 22:10 37:13 80:10
**generates** 89:24
**generating** 101:23
**generational** 19:22
**georgia** 1:1,4 1:17 2:11 3:22 4:6 5:20 6:6 7:3,15,17 9:12 11:19 59:20 61:9 68:9,11 69:10,12,19,25 72:6 74:12,25 75:1,3,5,21 78:8,25 79:11 79:17,19 80:2 80:7,12,13,14 80:16,20 82:6 82:7 85:5 96:4 125:14 127:4 127:14 129:2 130:4 131:1 132:1
**georgia's** 6:8 72:17 84:17 102:1
**georgians** 36:11 37:2,3 38:10 40:1,3 41:3,3,12,12,17 41:18 107:2,4 107:7 124:20
**getting** 26:25 27:24 57:5 84:1 108:6
**give** 22:22
**given** 17:8,14 26:5 87:16 109:17 119:10 123:12 125:8 129:6 132:9
**giving** 123:7,24
**glad** 35:15
**go** 8:19 12:23 14:7,10 18:3 19:14,15 20:7 20:18 25:10 48:6 58:1 60:20 65:12 67:17 71:20 79:13,23 82:9 82:11 90:23 97:1 103:11 104:14 105:15 109:1 122:4 124:15
**goes** 87:1 109:3
**going** 12:23 13:3,21 18:5 19:14 23:5 29:7,23,25 30:2,17,18 35:5 44:7 51:13 53:16 63:5,5 64:5 70:23,24 75:24 84:12 85:8,25 86:13 90:18 92:22 98:4 102:9 103:24 105:17 124:11
**good** 9:25 10:2 10:3 11:4,5 14:22 56:15
**gotcha** 85:1
**governor** 69:19
**grace** 4:4,7 9:5
**grant** 27:5,10 27:11,24 28:1

**granular** 109:9
**great** 11:20 14:14 18:4 122:1
**greater** 67:4 83:12
**grimmer** 4:24 6:10,12 47:14 47:16,19,22,22 49:4,10,16,21 50:14,21,24 51:20 67:21 68:4 89:19,24 91:17 92:24 93:1 95:14 96:25 97:12 99:25 103:12 105:18 107:1 107:16 108:18 108:20,25 110:13,18 111:11,14 112:18 118:14 122:22
**grimmer's** 16:5 49:2 52:19,21 53:5 75:9 82:13 93:17,22 94:15,24 95:6 95:9,20 96:21 97:7 101:20,25 103:1,20 104:8 105:2,9 107:6 107:10,25 108:15 109:12 109:23,23 111:24 112:21 119:4 122:11
**ground** 12:23
**group** 9:14,20 9:22 42:1 94:1
**groups** 90:2,15 103:13 116:21
**growing** 98:5 103:14 108:4
**growth** 96:3 97:1 99:18
**gubernatorial** 5:22 72:9 74:6
**guess** 21:4 99:13 109:6 116:18
**guidance** 64:15 67:9
**gwinnett** 129:3

**h**

**h** 131:3
**half** 97:4 115:19,24 116:4
**halfway** 100:9
**hall** 4:17 9:1
**hallboothsmi...** 4:20
**hand** 29:7 48:7 52:14 63:5 70:23 75:24 85:8 86:15 102:9 105:17 106:1
**handed** 71:8
**handing** 11:23 18:5 48:10
**handle** 114:24
**hands** 64:19
**handy** 48:5
**happens** 98:15
**happy** 47:6
**hard** 22:11 57:20 89:13
**hayes** 2:12 5:5 7:14,14 8:9,23 8:25 14:15,20 15:5 18:15 23:5 25:8,25 28:17 29:19 35:5 44:7 46:20 47:3,13 48:7 49:19 53:16 55:22 60:5 64:5 65:21 78:17 87:11,21 89:5 90:21 104:12 106:1,3,10 107:13 110:2 112:7 117:19 121:17 122:5 124:11,14 125:22 126:3,5
**head** 13:11 23:23 45:12
**health** 15:10,12 62:17 64:14 65:18 67:9 69:2
**hear** 8:5,6,18 101:1
**height** 63:1,2
**held** 65:13,15 69:25 104:18
**help** 87:24
**hereto** 132:7
**hey** 47:24
**hi** 47:23
**high** 65:25 74:11,11
**higher** 32:16 33:16 34:15,23 38:9 40:18,22 40:24 41:11 42:10,25 44:5 46:23 80:8 82:21 93:19 109:14 121:2
**highest** 40:6 41:5,18 42:5,7
**highly** 27:16 49:11,24 50:2 59:20
**highs** 59:22
**hill** 1:14 3:20 7:20,22 10:2

**hillary** 70:1
**hispanic** 36:7 38:7,8 39:25 41:16 46:9,11 76:20 102:2 103:15 106:15 108:13,22 109:13,15,24 111:16 115:4 115:11,22 119:18,20,22
**historic** 73:10
**history** 69:21
**hold** 8:9 108:15
**home** 63:20
**honestly** 62:23 64:16,22 67:13
**hood** 68:8 70:15
**houk** 2:18 7:17 7:17
**hour** 14:17 47:1
**hubbard** 2:13 7:14 9:11
**hughes** 2:13 7:14 9:11
**hugheshubba...** 2:15
**huh** 13:12 18:16 29:15 35:25 39:5 42:18 48:20 51:21 52:10 59:24 62:22 71:6 85:16 91:5 95:23 97:17 98:20,25 104:6 118:13
**hyper** 21:1,2,5 21:9

**i**

**idea** 81:14 116:6,9
**identification** 12:1 18:8 19:23,24 20:1 20:4,4 29:11 43:20 45:4,7 48:16 63:9 71:2 76:2 85:12 102:12 104:2 105:22
**identified** 42:23 114:11 115:2,3 121:1
**identify** 7:12 115:2,4 116:10 119:18 120:14
**identifying** 120:18
**ignores** 49:6,10
**ignoring** 44:14 49:24 61:11
**image** 76:6,23 77:1,2,4 79:5 79:23
**immediately** 36:5 82:23
**impact** 5:22 50:16,19,20,22 50:25 51:6,14 51:17,18,24 52:3,7,9,12,17 52:21,23,24,24 53:7,19,21 54:14 55:1,19 59:9 67:22 68:5 72:8 74:25 89:9,10
**impacted** 78:13 89:18
**impacts** 129:13
**impartial** 129:13
**impartiality** 127:21 129:10
**impetus** 49:12
**implementati...** 79:17 80:2 82:23 122:14
**implemented** 54:10 80:20,22
**implication** 101:3
**implied** 23:16
**implies** 53:23
**imply** 88:20
**important** 33:10 56:6,10 97:20
**imposed** 43:19 44:21 45:3,7,9
**impossible** 112:5 123:9
**improprieties** 5:21 72:8
**imputation** 114:8 115:9
**impute** 114:5
**imputed** 113:15,16
**imputing** 115:8
**inaccurate** 32:9 45:25 108:12 122:20 123:4,7 125:9
**inaccurately** 123:16
**include** 61:15 76:23 83:16,17 83:22 90:12 101:21 102:19 103:3 119:24
**included** 66:2
**includes** 36:13 37:20 49:23 50:6 75:8
**including** 38:20 43:16 60:8
**inclusion** 50:13 67:18,25 68:15
**incorporated** 101:14 117:7,8

**incorrect** 36:10 36:24 39:8 44:13
**incorrectly** 35:18
**increase** 80:17 110:6 111:15 120:3,20 121:5
**increased** 80:14 109:25
**increases** 102:20
**incumbent** 62:12,13 66:5 66:10,13,17,19 66:23,25
**independents** 20:5
**indicate** 30:13 46:3 89:16 108:24 110:10 110:15
**indicated** 19:25 37:15 124:21
**indicates** 41:16 46:16 68:9 98:17
**indication** 119:9,11
**indicator** 85:23 85:24
**individual** 21:6 37:22 42:4 89:11 98:19 117:13
**individuals** 10:17 21:1,3 23:20,21 39:7 84:18 86:7 114:9 115:10 117:4 118:21 125:16
**inference** 53:25 54:3,6,8 57:3 58:8
**inferred** 117:4
**information** 35:1 36:10,10 36:24 39:8 44:14 67:15 113:8,11 115:12 117:6
**informative** 80:25 101:17
**inherently** 89:20 98:5
**initial** 17:4
**initially** 84:3
**inside** 125:13
**instance** 118:18
**instances** 22:16 114:12,13,18 115:1 118:2
**intending** 15:3
**intent** 21:2
**intentional** 61:13
**interest** 127:10 127:18 129:9
**interested** 129:8
**interesting** 81:22
**interpret** 100:25
**interrupt** 65:11 91:23
**interrupting** 14:18
**intervener** 9:2
**intervenor** 4:16 125:25
**intervention** 81:19
**introduce** 60:7
**introduced** 78:25
**introduction** 61:7
**investigating** 22:23 23:1 54:14
**involved** 83:6
**islander** 36:7 39:25 41:17 103:15
**islanders** 38:12
**isolation** 44:12
**issue** 49:13 110:24,24
**issued** 64:9
**issues** 38:9

**j**

**j** 3:13 47:14
**jacoutot** 3:19 5:4 7:20,20,24 8:11,15 9:3 10:18 11:3,9 11:15,21 12:3 14:19,22,24 15:3,6,7 18:11 18:16,17 23:12 25:10,12 26:8 26:25 27:2 28:20 29:14,22 35:8 44:17 46:24 47:1,4 47:18,25 48:3 48:9,13,19 50:1 51:7,11 54:1 56:5 60:11 63:11 64:11 66:4 71:5 72:1 76:5 79:2 85:10,15 87:13 88:2 89:21 90:22,24 92:15 102:15 103:24 104:5 104:14,22 105:24 106:2,4 106:11 107:22 110:7 112:9,13

117:17,20 121:14,23 122:6,7 124:9 125:21 126:13 130:1
**january** 38:17 38:19 91:14 95:2 117:14,16
**jargon** 13:17 101:5
**jhouk** 2:21
**job** 13:8
**jog** 63:6
**joined** 9:21
**journal** 19:2,21 20:16 24:20 26:6
**jpb** 1:5
**julie** 2:18 7:17
**july** 5:17 16:9 17:9 18:23 48:12 59:14 61:2 67:16 72:12 82:9 89:23 94:4 96:14 99:5,22 105:14,18,25 108:1,3,16 112:9,15 122:3
**jump** 29:24
**jumping** 96:16
**june** 16:9,24 17:4,4 29:9 30:2 49:2
90:19 94:10 103:2 104:8 112:18,19,21
**justice** 3:3,5 9:8,9
**justin** 4:24 6:10 6:12 47:16,22

**k**

**k** 2:19
**keep** 15:13,16 48:5 57:10
**key** 67:19
**killing** 109:21
**kind** 13:19 18:20 22:21 23:18,23 27:18 29:2 37:24 48:6 50:10 53:20 54:15 56:15 61:7 63:6 74:10 77:11 81:19 89:13 98:7,23 101:16 115:20
**know** 12:22 13:9,19,22 14:4 20:25 29:23 38:23 58:10,18 61:8 62:16 63:15 64:6,8,16,22 65:10,10,13,22 66:5,22 67:3
69:5,20 70:8 73:25 75:9 77:12 84:9 85:20 97:22 101:3 106:6 113:22 116:6 117:17 118:8 118:23 123:10 125:4,17
**knowing** 123:25 124:2
**knowledge** 61:8 75:8 122:25

**l**

**l** 1:9 3:6 5:3,14 5:15,17,24 10:23 11:18 130:5 131:2,24 132:2,4,12
**labeled** 78:21
**laden** 2:7
**language** 101:4
**large** 60:9 66:2
**larger** 30:23 35:13 46:10 107:7,16
**largest** 76:21
**laross** 3:19 7:22,22
**late** 121:6
**latino** 19:22 21:15,20,23
22:3,10,18 77:20 80:9
**latinos** 19:24
**laura** 1:22 129:19
**law** 2:19 4:4 7:19 9:5,14,16 9:20,22 54:10 54:12,15,16,16 54:24 55:25 57:8 65:8 127:4
**laws** 53:7
**lawyers** 7:18
**lawyerscom...** 2:21
**lawyers’** 2:18
**lead** 67:20
**leads** 50:14
**leah** 2:4 10:3
**learned** 67:13
**leave** 25:7
**led** 122:18,20
**left** 72:2 92:21
**legal** 2:4 10:4 127:15 130:23
**legislation** 78:10 123:10
**legislature** 78:16 79:1,1
**lesser** 67:4,6
**level** 40:6 41:5 41:18 42:5,7 72:20,23

**levels** 111:10
**life** 10:8
**likelihood** 86:17,21 87:2
**likely** 36:8 37:15 40:1 80:25 84:19,19 86:8,9 90:1 99:16 117:23 118:1,3,19 119:3 120:13
**limited** 50:15 50:22 62:18 67:21 68:1,4 68:17 74:25
**line** 28:24 85:25 87:7 131:4,7,10,13 131:16,19
**linear** 30:1 88:1 88:7,22
**linearity** 88:21
**link** 63:22 64:7
**list** 18:3 40:14 63:18 77:4
**listed** 19:3,10 24:11 26:3 27:11 34:22,24 40:10 73:8 113:23 117:13
**listing** 17:23
**lists** 33:22,22
**literally** 81:15
**literature** 28:14 49:12 53:25 54:3 55:19 69:9 70:9 86:1 100:22 101:2
**litigation** 83:8 84:6 118:25
**little** 4:19 8:11 19:19 25:21 29:24 44:8,9 59:12 60:3,12 62:23 66:21 71:18 85:2 86:13 109:9
**lives** 89:11
**llc** 1:14 3:20 4:4
**llp** 2:13 3:13 4:11 7:15 8:2 8:21 10:13
**located** 84:18 86:7 124:23 125:12
**location** 125:16
**long** 14:18 44:24 57:11 111:18 114:22 118:8,22,23
**longer** 117:24 118:19
**look** 12:7 18:18 18:22 19:24 27:12 29:16 30:20 32:11 33:21 36:4,18 42:4,7 46:9 50:2 52:11 58:3 63:14 81:14 96:17 101:12 104:10 106:23
**looked** 61:10 64:17 75:4,10 75:12,16,20 79:7 88:14,15 88:16,24 122:21
**looking** 20:2 31:12,24 36:22 42:12 55:1 56:11 57:12 65:25 94:2 118:17 125:2,3
**looks** 13:3 18:19 19:2 26:12 44:13 90:6 106:8 109:3
**lost** 70:7 110:21
**lot** 15:25 23:16 23:19 26:5 61:10 67:14,14 70:10 80:23 100:17 108:10 111:4
**louder** 8:9
**low** 74:5,15
**lower** 31:3,10 31:19 34:10 35:4 43:5 70:5 73:1 93:19 107:20,20
**lunch** 92:12

**m**

**m** 4:11 9:19
**macon** 4:3,6 9:6
**made** 17:7 44:16,24 64:3 76:10,11 93:19 112:4 127:4 128:15 129:12 132:5
**mail** 30:7,13 31:12,17,25 32:4 34:2,7 36:8,23 37:3,4 40:11 41:4 42:10,11 46:18 82:21 84:19,20 86:8,9,17,22 87:3,10 89:17 124:3
**maintaining** 127:21 129:10
**major** 69:18,24 74:16 113:18

**majority** 113:8
**make** 8:9 10:8 18:1 31:6 34:19 39:20 44:19 45:24 48:21 61:20 68:3 78:2 80:24 97:7 114:23 121:15 125:22 127:16
**makes** 45:18 73:9 83:11 100:15 112:5
**making** 20:22 33:10,11,19 57:5,5 82:2 100:17 101:16 127:20
**mana** 2:12 9:11
**mandates** 43:19 44:21 45:3,7,9
**manner** 49:6 56:21
**marcos** 9:13,19
**mark** 18:5 47:2 85:10 103:24
**marked** 11:23 11:25 18:7 29:8,10 48:15 63:6,8 71:1,8 72:5 75:25 76:1 85:11 102:11 104:1 105:20,21
**market** 4:18
**marking** 48:13 102:9
**martin** 4:4 9:5 9:5
**masks** 90:1
**master** 1:3
**math** 30:18 86:14 100:2,4
**mathis** 4:11 10:13
**matter** 127:18 128:4 129:9
**matters** 26:19
**mcqueen** 9:13 9:13,19,20
**mean** 20:19 21:14 23:13,24 28:3 34:9 51:24 55:1 56:18 67:11 69:8 78:4 89:9 91:8 109:6 117:9 125:13
**meaning** 75:19
**means** 13:24 23:2 32:15 56:20
**measurement** 122:13
**measures** 72:16
**measuring** 57:7
**media** 58:1
**medications** 15:15
**meeting** 37:22
**memory** 62:23 63:7 64:12
**meng** 9:15,21
**mention** 22:24 30:12 55:8 61:6,13 120:24
**mentioned** 23:22 25:20 32:1 34:14 37:22 50:9 56:6 83:15,21 117:15
**mentioning** 33:12 50:8 60:8
**method** 55:12 81:12 88:21 93:9,14,18,25 94:7 96:11 97:8,13 101:25 103:1 107:10 108:1,20 112:18,24 113:2 117:22 117:23
**methodology** 55:18,24 85:21
**methods** 59:4 92:23 107:12 118:10
**metropolitan** 3:11 8:3,22
**mi** 1:5
**microphone** 26:24
**middle** 86:15 98:15 99:4,5
**midpoint** 98:24
**midterm** 72:17 73:4
**midterms** 70:6
**mile** 87:20 88:8 88:8,10,11,11 88:11 89:14
**miles** 86:18,20 87:1,7,7,17 89:3
**mind** 19:17 22:1 31:15 51:7 52:4 57:11
**mine** 107:21 110:5
**minorities** 79:9
**minority** 6:8 21:11 24:16,21 25:2,4,15 90:2
**minute** 8:10 121:15
**minutes** 14:16
**misleading** 96:6
**missing** 36:10 36:24 39:8

44:13 55:10
**misstated** 36:1
**mitigate** 103:12
**mobilization** 68:13
**mocine** 9:13,13 9:19,20
**model** 86:18 88:22 101:20
**modeling** 117:7 117:9
**modern** 59:22
**modifying** 45:16,24
**moment** 22:2
**moring** 3:13 8:2,20
**morning** 9:25 10:2,3 11:4,5
**morrison** 9:21
**motivating** 57:24
**motivation** 33:18 69:13
**move** 20:12 108:16
**moving** 87:6

**n**

**n** 2:1 3:1 4:1 5:1 6:1 7:1
**n.e.** 1:15 3:21
**n.w.** 2:19 3:6 3:14
**naacp** 2:4,11 7:15,18 9:12 10:4
**naacpldf.org** 2:7
**name** 11:17,18 11:21 47:20
**named** 10:17
**names** 17:17 18:1
**national** 27:16 75:6 79:10
**nationally** 80:10
**nationwide** 77:24 78:3
**nature** 71:14
**near** 86:20
**necessarily** 20:25 24:2 30:1 56:18 100:13 114:20
**necessary** 132:6
**need** 9:17 14:8 14:20 20:7 120:5 121:16
**negative** 101:3
**negatives** 111:3 111:4
**never** 58:9
**nevertheless** 55:4
**new** 2:6,6,14,14 23:19,21 27:15 84:12 117:1,3 119:14 120:18
**newer** 119:15 119:15 120:15
**ngp** 9:14,22
**nice** 58:3
**nicely** 58:2
**nine** 115:3
**noah** 3:5 9:7 126:4
**noahb** 3:8
**nodding** 13:11
**noland** 4:4 9:5
**nolandlawfir...** 4:7
**nominated** 69:19
**nominee** 67:1
**non** 25:4 76:20 88:1,7,21 95:10
**normal** 23:18
**northern** 1:1
**notary** 132:13 132:19
**note** 30:12 37:23 82:16,18 97:20 130:10
**noted** 27:20 132:7
**notice** 5:12 12:4,5 38:16 38:19 70:4 90:25
**noticeable** 43:18 44:20 45:2
**noticing** 128:4
**novel** 23:19
**november** 33:13,16,20,20 33:21 35:22 36:13,18,25 38:10,16,17 39:24 40:9 41:6 43:17 46:21 62:25 63:14 64:19 65:9,14,15 66:1 116:22 117:5 119:18
**nuance** 78:24
**number** 5:10 6:3 19:18 20:13 21:25 24:9,11,14 28:9 35:13,14 38:22,24,25 39:2 44:25 58:21 63:19 66:2 102:3 107:18 108:21 113:17 114:10 115:20,21
**numbered** 97:2 101:12 104:11

**numbers** 32:9 35:7,11 65:25 85:1 106:8
**numerator** 91:11 107:18 109:24 110:4 111:18 113:6,7 113:12 114:1 114:25 115:17

**o**

**o** 7:1 9:19
**oath** 12:12 92:18,19
**object** 23:5 25:8,25 28:17 35:5 44:7 46:20 49:19 53:16 55:22 60:5 64:5 65:21 78:17 87:21 89:5 107:13 110:2
**objection** 28:22 87:11
**obligation** 127:21 129:10
**observational** 57:3
**observations** 120:3
**observe** 22:18 79:10 120:14 123:19
**observed** 79:16 80:2 120:21
**observes** 87:20
**observing** 87:17
**obvious** 13:3
**obviously** 51:19 114:17
**occurred** 22:24 23:2 58:6,13 60:24 83:10 84:7
**occurring** 64:13
**ocga** 127:9,10 128:6
**odd** 97:2 101:12,21
**offended** 13:23
**office** 25:3 66:16 74:10,23 124:23 125:12
**officer** 129:13
**officials** 20:22 20:25 62:24
**oh** 90:22 91:1 94:9 100:23 105:15 106:2
**okay** 8:16,25 12:11,16,19 13:8,15 14:6 14:12,22,25 15:6,18 16:5 16:12,14,20 17:9,9,12,25 18:2,4,22 19:1 19:9,13 20:7 20:12 22:15 23:13 24:5,14 25:18,20 26:9 26:12 27:8 28:11,21 29:6 29:7,23 30:10 30:17 31:14,21 33:7 35:15 36:18 37:8 38:4 39:5,10 39:21 43:4,7 44:18 45:6 46:25 47:25 48:25 50:12 52:3,20,25 60:12 62:10 63:5,18,23 64:25 65:3,16 66:5,10 67:16 70:11,14,19 71:16,19 72:2 73:23 74:8 75:24 77:14 78:1 79:20 80:19 81:20 82:11 84:12,24 86:10 89:1,22 90:14 91:14,17 92:3,7,16,25 93:6,17 95:11 95:13,17,25 96:13,24 97:19 99:7,23 100:10 100:18 101:6 101:19,24 102:19 103:11 104:10,23 105:8,13 106:14 108:14 109:5,16,20 111:14,19 112:1,11,22 114:16 115:13 115:24 116:12 116:17,20 120:1,12 121:11,13,17 121:24 122:10 124:5,18
**older** 19:16 64:9 114:19,21
**omission** 67:19
**once** 11:16 105:10
**ones** 19:16 42:16 58:17 60:4
**ongoing** 69:2
**online** 19:8,9 26:6 119:1 121:8
**onward** 58:2,5 61:12 69:9
**onwards** 59:19

**opened** 68:6
**operations** 120:8
**opine** 41:13
**opinion** 37:9 38:14 54:19 57:2,7
**opportunities** 119:7,13
**opportunity** 19:15
**opposite** 60:7 118:21
**options** 113:21
**order** 126:12
**ordering** 128:21
**original** 12:2 18:9 29:12 48:17 50:11 63:10 71:3 76:3 85:13 95:2 102:13 104:3 105:23
**outcome** 129:8
**outcomes** 54:9
**outside** 26:17 59:8 60:2,3 67:12 75:20
**overall** 80:12
**overcome** 54:7
**overestimates** 103:14 108:3
**own** 15:23 78:16 88:17

**p**

**p** 2:1,1 3:1,1,20 4:1,1 7:1
**p.c.** 4:17
**p.m.** 92:13 104:16,20 121:18,21 126:8,14
**pacific** 36:7 38:12 39:25 41:17 103:15
**page** 5:3,10 6:3 27:14 30:2,22 39:23 59:15 61:2 67:17 72:14 82:12,19 84:13 86:10 91:2 94:13 96:18 101:24 106:8,10,12 108:17 131:4,7 131:10,13,16 131:19
**pages** 100:13 104:10
**pandemic** 63:1 63:2,3 67:14
**paper** 20:21 70:12
**paragraph** 30:21 33:12,19 36:4 39:21 41:1,15,22 43:7,11 44:19 45:14 46:8 49:3 50:12 51:3,4,15,18 59:14 61:2,14 67:17,18 68:6 68:15 69:6 82:12,18 84:14 85:3 86:15 89:22,24 90:13 91:2 94:13,18 95:12,16,25 96:17,18,24 100:19 101:24 103:11 104:24 106:6,12 108:2 109:10,11 110:22,25 111:6,7,10,12 111:19,21 112:7,11,15,22 112:25 122:4 124:15
**paragraphs** 46:14 90:7,8 90:10 111:21
**parallel** 81:13
**pardon** 21:13
**park** 2:13
**parkway** 4:12
**parse** 97:10
**part** 22:11 23:8 27:20 63:21 97:13
**participating** 47:16
**particular** 21:20 22:14 49:10 61:14 68:11 77:10 83:9 84:5 95:15
**particularly** 13:15 43:18 44:20 45:2 57:23
**parties** 128:8 128:21 129:13
**partisan** 19:22 22:13
**parts** 39:17
**party** 19:23,24 20:1,3 22:6,10 22:14 62:12,14 66:5,8,9,10,12 69:18 70:4,6 127:23 128:9 129:7,11
**pass** 78:15,22
**passage** 57:25 80:17 82:20
**passed** 78:8,10 78:21
**password** 128:18,20

**patterns** 24:4 110:19 118:17
**pause** 34:20
**pays** 14:16
**peach** 5:20 72:7
**peachtree** 1:15 3:21
**peer** 19:2 49:12 59:22 69:9 84:16 86:1
**penalty** 21:11 24:16,22,24 25:1,6,15,18
**pending** 14:9
**pennsylvania** 3:14
**people** 14:18 33:15 38:24 58:22,24,25 66:2 67:14 85:24 99:1 113:23 116:9 120:13 124:19 125:5
**perceive** 111:22
**perceives** 111:15
**perceiving** 110:12
**percent** 30:6,13 31:22 32:5,16 33:23 34:1,5 34:22,23 35:4 35:4 36:22,25 37:8 40:10,14 73:4,8 86:23 87:3,18,20 89:4 119:20 120:25
**percentage** 30:24 33:12,14 34:16 35:19,21 35:22,22 36:19 37:1 39:4 59:5 87:8 109:4,7 109:14 110:6
**perceptions** 5:21 72:7
**perfect** 15:2 18:2
**period** 19:25 63:7 69:11,12 96:2 102:24 113:19
**person** 65:20 66:3 114:14,21 115:18,25 116:1,4 119:12
**perspective** 23:8
**pertain** 101:11
**pettigrew** 16:15
**ph.d.** 1:9 4:24 5:3,12,16,17 6:10,13 10:23 130:5 131:2,24 132:2,4,12
**phrase** 100:18
**pick** 72:2
**picture** 45:22 76:10,12 77:2
**place** 52:22 99:15 124:24 125:12,15 128:5
**places** 125:13
**plaintiff** 9:12
**plaintiffs** 2:3 2:11 3:3,11 7:16,18 8:3,22 9:10,15,16,23 10:5
**plaza** 2:13
**plc** 7:21
**please** 7:12 8:17 10:21 13:10 92:8 126:7
**point** 30:24 33:12,14 34:16 35:19,23 36:20 37:1 43:14 52:20 56:4,15 61:10 71:13 73:9 76:19 81:16 87:9 97:22 105:6 109:4,7,7 110:6
**points** 33:9 35:21,22 39:3 109:14
**polarization** 27:22 28:3,7 28:13,23
**policy** 55:20
**political** 20:16 21:19 22:5,10 24:20 27:21 28:3,13,23 29:3 70:3
**politics** 19:21 29:1 118:9
**polling** 124:24 125:12,15
**population** 22:19 37:17 38:1,1 76:19 77:16 91:3 96:3,7 97:1 98:3,6 99:14 99:24,24 102:2 102:20
**populations** 6:9 55:1 58:20 78:13 103:16 108:4,22
**populism** 21:16
**pose** 31:15
**position** 26:18
**possibility** 88:8
**possible** 13:12 56:1,8,12 57:5

65:18 75:4 80:24 100:8
**post** 5:24 30:23 36:11 39:23 40:6,18 41:5 41:10,19 42:6 42:6 46:16,23 49:6,23 54:16 55:6,14 56:25 63:19 73:14,16 76:15,16,18,23 103:16 108:4 123:7
**posted** 26:6
**posts** 76:13
**pre** 30:23 42:8 42:23 43:6 44:3 49:5,22 54:16 55:5,13 56:25 60:10 61:11 68:24,24 73:18 90:3 95:21 100:8 121:7
**preceding** 82:23 109:10
**precisely** 99:1
**precludes** 122:13
**preexisting** 23:18
**preference** 22:5 22:5,10,13
**preparation** 15:24 39:13 93:13
**prepare** 15:18
**preparing** 75:7
**present** 4:23 7:6,12 41:25 55:16 59:10
**presented** 45:15
**presents** 51:23
**president** 21:5 66:16,23
**presidential** 36:14 39:24 43:17 62:6,13 62:14 66:6 68:23,24 69:3 76:22 89:25 90:3 103:17
**presupposes** 25:6
**pretty** 58:2,3 65:24 80:14,15
**prevailing** 67:9
**prevalence** 62:18
**previous** 19:5 44:12 53:10 66:22 70:5 96:5 111:20 120:22
**primarily** 51:1
**print** 19:8 26:7
**prior** 67:19,25 68:16 82:13 92:19
**prize** 126:5
**probability** 86:4 87:9,18 87:19 88:9 89:2
**probably** 8:11 38:9 48:6 74:12 119:12 120:9
**problem** 54:8 57:2 58:8 110:11
**problematic** 108:11
**problems** 111:22
**procedure** 11:14 24:23 96:21 113:25 114:4 115:7 116:24
**procedures** 83:10
**proceeding** 7:6 128:10,19 129:6,13
**proceedings** 126:14 127:17
**process** 25:20
**produce** 37:24 68:1
**produced** 68:16 128:11
**professional** 127:22 129:10
**profile** 74:11 74:11
**progression** 30:1
**prohibited** 128:6
**prohibitions** 127:11
**project** 27:17
**projection** 97:4 99:19 108:22 110:23,25
**projections** 100:14,16,16 105:9
**proportionally** 119:12
**proposals** 28:7
**propose** 27:17
**protected** 128:18,20
**provide** 17:3 50:14,21 67:21 68:4 87:23 115:14 123:14 128:3
**provided** 113:22

**provisions** 44:25 49:13 59:9
**proximity** 57:18 89:18
**proxy** 57:18
**public** 25:23 62:17 64:14 65:18 67:9 69:2 132:19
**publication** 19:18,20 25:20
**publications** 19:9,11 26:2,5 26:9
**publicly** 63:12
**published** 19:4 19:4,7,8 26:4
**pull** 103:23 123:10
**pure** 58:9
**purpose** 19:13 45:11 115:12
**purposes** 11:12 11:13 50:3 54:21 56:12 57:15 60:15 83:2,22 99:10 113:11 114:25 115:6 116:5
**pursuant** 7:2
**put** 10:7 48:4 63:3 65:16 94:10 99:13 105:13 111:7 115:5,11

**q**

**qualifying** 74:6
**question** 13:2,5 14:3,9,10 22:7 22:11,21 23:6 24:9 25:8 28:18 31:6,16 34:20 35:6 36:2 39:20 45:11 51:24 52:14 53:9,17 53:23 55:25 75:19 78:18 81:22 87:12 89:6 112:3 119:10 122:12 122:18,20 123:5,16,17,24 124:5,12 125:14,18,23
**questionable** 123:12
**questionnaire** 122:21
**questions** 12:14 13:17 14:3 15:9 121:25 124:6,10 125:24 126:1 128:12 129:5
**quick** 18:18 62:11 63:15
**quite** 50:8 61:10 80:11 101:8
**quote** 36:6,9 59:21 64:20 82:17 84:18,23 103:12 124:22
**quoted** 42:5

**r**

**r** 1:22 2:1 3:1 4:1 7:1 9:19 30:15 129:19 131:3,3
**race** 19:21 30:8 59:2 96:4 113:8,11,13,22 114:1,6,9,11 115:5,10,18 116:13 117:4,7 117:8,15,25 118:3,8 119:7 119:10
**races** 38:20
**racial** 30:22 43:14 46:9 54:18 90:2,15 94:1 115:23 116:21 118:9
**racially** 116:10
**rapidly** 63:25 64:21
**rate** 32:16,17 33:16 34:15,21 34:24 35:20,20 37:2 38:9 40:17,19 41:11 42:10,11,25 43:5 44:5 66:1 73:7 74:4,5 76:20,21 82:22 107:20 109:14 109:15
**rates** 30:23 31:2,9,17 33:15 34:10 38:5 40:5 41:5 41:9,15 43:13 43:15,24 46:22 46:23 59:3 77:3 96:4 122:13
**rather** 13:11
**reach** 42:1,2
**reached** 40:6 41:5,18 59:21
**read** 15:4 43:9 51:9 63:16,17 109:11 130:9 132:5
**reading** 25:5,13 51:7 52:2 108:5 109:12 124:19
**real** 62:11 63:15

**reality** 23:11,14 23:23 24:1
**realize** 12:11 92:18
**really** 21:7 54:23,23 58:9 58:18 61:13 64:24 80:4 84:1,4 97:22 97:25 98:2,8 100:15 115:9 125:15
**reason** 30:11 32:8,20 33:1 33:24 40:15 46:13 59:18 74:2,13 83:15 83:21 120:16 130:11 131:6,9 131:12,15,18 131:21
**reasons** 43:13 44:14 61:13
**rebuttal** 5:17 48:11,11 94:3 122:3
**recall** 15:22 21:25 26:1 27:4,19 28:5 35:12 39:19 41:8 50:7,25 52:22 64:6,13 69:21 87:22 105:11 117:7
**receipt** 40:2,11 42:17 43:1,20 43:25 44:11,22 45:4,10 46:4 46:18 130:17
**receive** 25:3
**received** 12:8 27:4 105:10
**receives** 128:9
**recent** 17:20 21:21,23 23:17 59:17 61:5 75:7 80:7 93:3 95:22 119:2 120:16,25
**recess** 47:10 71:23 92:12 121:20
**recognize** 76:6
**recollection** 64:16 65:23 74:4 116:23 117:6 118:17
**recommendat...** 63:19
**recommendat...** 62:24 65:19
**recommending** 62:17
**reconstruction** 69:22
**record** 7:8,13 11:17 12:22 47:9,12,20 48:1 51:9 60:22 64:23 71:22,25 92:11 92:14 94:19 104:14,17,19 104:21 109:11 121:19,22 126:9 127:17 127:20 128:12 129:6
**rector** 2:5
**reduced** 129:5
**reduction** 87:9 87:18,19 88:9 89:2
**reed** 2:13 7:15 9:12
**refer** 21:2 59:13 90:18 91:15
**reference** 33:11 36:5 63:23 64:1,3 71:9 79:14 103:20 108:7
**referenced** 70:14 103:8 112:24 130:6
**referencing** 102:17
**referred** 70:18 91:12
**referring** 20:24 22:4,9 23:24 24:25 40:25 41:6,20 42:16 44:11 51:14,15 57:1 68:6 79:20 88:7,18 91:21 93:21 95:9 96:10,25 110:22 111:23 112:7,22
**refers** 37:14 41:23,24 84:23
**reflected** 37:17
**reflection** 84:8
**reflects** 99:16
**refresh** 64:12
**regarding** 49:1 83:8
**registered** 58:24 114:11 115:1 116:21 117:4
**registrant** 119:2,15
**registrants** 120:15,18
**registrars** 4:9,9 10:14,15
**registration** 113:18,21 118:23 119:1 120:17 121:7
**regression** 21:12 24:17,23

**regulations** 7:3 127:7
**rejected** 30:7 30:10,15,16 31:22 32:6,13 33:15,23 36:9 36:23 39:7 40:2,11 42:16 59:5 84:3
**rejection** 30:23 31:2,9,17 32:16,17 33:15 34:10,14,21,24 35:20,20 37:1 38:5,9 40:5,17 40:19 41:4,9 41:11,15 42:10 42:11,25 43:5 43:13,14,15,24 44:5,15 46:22 46:23 82:21
**rejections** 43:19 44:21 45:3 46:17 83:8 84:4,8
**related** 5:21 17:15 43:19 44:21 45:3,7,9 58:22 67:3 72:7
**relates** 26:18
**relating** 128:19
**relationship** 27:21 127:18 129:9
**relative** 34:16 35:23 41:17 90:2 129:7
**relatively** 56:17
**relaxed** 27:1
**released** 25:22
**relevant** 39:18 55:15,25
**reliable** 77:7 84:5
**reliant** 81:17
**relied** 122:23
**relies** 81:13 96:25 99:25 118:16 122:12
**rely** 81:25 122:17,19
**remarkably** 80:11
**remember** 17:17 56:10 62:25 83:24 88:18 92:1 93:7 114:13 123:6,8
**removed** 96:1
**repeat** 9:18 31:5
**rephrase** 13:23 14:4 15:11 22:8 25:10 60:18,22 75:17 111:9
**report** 5:15,17 6:10,12 16:9 16:10,14,17,24 17:5,10 26:19 27:4 29:9,17 29:20,24,25 30:3 39:18 41:13,14 42:5 48:11,11 49:2 50:5,11,25 51:3,4,22 52:2 52:20,25 53:3 53:4 54:5 59:13,14 61:3 61:7,14 63:23 64:2,18,18 65:7 67:12,16 68:7,15,19 70:14,18 71:10 72:12 73:12,19 73:24 74:21 75:2,7,9,11,13 75:16 79:8,11 79:22 81:21,25 82:8,9,14 83:16,18,23,25 88:16,25 89:2 89:16,23 90:19 91:10,13,14,18 92:24 93:2,10 93:12,22 94:3 94:6,10,12,16 94:25 95:2,7 96:14,18 101:7 103:2,21,23 104:8,24 105:2 105:10,14,16 105:18,25 106:5 108:1,3 108:16 109:12 110:22 112:9 112:16,18,19 112:21 113:9 115:15 116:25 117:25 118:2,4 119:7 120:23 120:24 121:10 122:4 127:19
**reported** 30:8 37:20 59:2 95:2 113:8,11 114:9 115:23 116:21 118:20 119:10,22
**reporter** 7:5 8:4,7,16,19,24 9:17,24 10:6,9 10:21 12:25 13:9 51:10 126:11 127:1,9 127:14 128:14 128:16
**reporting** 7:4 102:23 103:2 127:8 128:3
**reports** 15:20 15:21,23,25 16:4,6,21,22

17:13 39:12,16 39:17 44:24 45:21 49:17 50:4,9 51:1 53:5,10,12,13 58:1 59:15 60:20 61:15,23 62:7 74:24 75:22 88:17 93:16,21 98:22 106:18 113:9 119:17
**repository** 128:20
**represent** 7:13 10:13 11:22 98:2 99:5
**representations** 127:3
**represents** 30:5 30:6,14,15 98:8
**republicans** 20:5 22:19
**requested** 84:20 86:9
**required** 132:13
**requirements** 43:20 45:4,8 46:4
**requires** 81:24
**requiring** 83:12
**research** 27:5,9 29:3 53:15 54:3,4,6,10 56:15 58:12 68:8 84:16 118:7 120:22
**researcher** 68:8
**reside** 11:19
**residential** 85:24
**residents** 5:21 72:7 102:3
**respect** 21:22 32:3 34:5 38:5 46:2 64:14 79:9
**respond** 13:4,5 13:10 14:10 28:21 53:9
**responded** 124:21
**respondent** 123:4,15
**respondents** 118:15
**response** 6:12 12:13 16:10 51:8 53:4 125:9
**responses** 116:11 117:11 122:20 123:12
**restate** 42:19 112:3
**result** 54:11 88:5 107:11 110:18 123:16
**results** 94:25
**return** 84:20 86:9 122:3 130:13,16
**reversion** 21:14 23:18
**reverting** 23:25
**review** 16:5,14 16:17 21:19 48:21 130:7
**reviewed** 15:20 15:23 16:12 19:2 39:13,16 49:12 59:22 69:9 84:16 86:1 93:13 108:2
**reviewing** 59:5 93:16
**right** 11:7,7 16:11 17:10,11 18:1,22 19:5 20:12,12 22:17 26:13 30:11 31:6,23 32:6 32:13,17 33:24 34:19 36:14 40:7,15 43:8 43:22 44:1,6 48:5 49:18 50:17 55:15 56:8,12 57:15 58:11 60:15,25 61:17,24 62:7 63:25 64:4 69:15 70:16,20 72:9,18 73:5 73:10,15,20 74:19 75:1 76:24 78:3 81:21 82:14 83:10 84:21 85:6 86:13,15 87:14,15 91:19 91:25 93:3,22 96:13 97:5 98:15,22 99:11 100:6 102:4 105:5 106:18 106:21 107:4 108:5,23 109:18 111:17 111:22,24 112:25 114:10 117:1 120:25 122:8 124:20 125:20 126:5
**rights** 2:18 7:19
**rising** 63:25 64:21
**risk** 103:13
**river** 4:18
**riverside** 4:5

**road** 1:15 3:21
**rock** 4:19
**rough** 99:20 101:8,20
**roughly** 97:23 98:23 99:22
**roughness** 97:3 100:19,23 101:8,10
**round** 115:25
**rounded** 38:23 116:16,17
**rounding** 37:7 38:25 39:3,11
**rounds** 39:2
**row** 33:22 106:24,24
**rows** 106:16,16
**rules** 7:2 11:14 12:23 127:7
**run** 66:23
**runoff** 40:21,23 50:8,8 55:15 67:19 73:16,22 73:25 74:7,9 74:13,18,23 83:2
**runoffs** 50:7 55:7 73:13,20

**s**

**s** 2:1 3:1 4:1,4 7:1 9:19 131:3
**sample** 37:16
**sampling** 37:24
**sat** 52:7
**saw** 66:14 68:10
**saying** 13:11 53:23 56:10 73:1,17 89:17 110:4,23,24 111:7 112:17 124:1,3
**says** 32:12 34:1 34:5 45:18 46:8 63:20 68:3 76:19 86:20 87:2 94:19 109:13
**sb2** 55:5,6,14
**sb20** 73:14
**sb202** 30:23,23 36:11 39:23 40:6,18 41:5 41:10,19 42:6 42:6,8,23 43:6 43:16,19 44:3 44:21,25 45:3 45:7,9 46:4,16 46:23 49:5,6 49:22,23 53:1 54:22 55:13,14 56:25,25 57:14 57:22,25 58:5 58:14 59:1,9 60:2,3,16 68:24 69:12 73:12,16,18 74:25 78:1,11 78:12,12,21,24 79:6,17 80:3 80:17,20,21 82:21,23 90:3 103:16 108:4 113:20 122:25 125:8,11
**sb202's** 49:13 50:15,22 67:22 68:5 122:14
**scenario** 120:4
**scholar** 118:8
**scholarly** 52:4 52:6,16,18
**scholars** 28:25 52:7,11
**science** 21:19 24:20 29:3 86:1
**scientist** 70:3
**scope** 26:17 27:18
**scores** 116:8
**screen** 63:12
**second** 69:5 82:17 84:15 104:15 105:16
**seconds** 64:20
**section** 19:2 48:25 49:4 51:4 59:13 68:7,7 122:8 122:10 124:16
**sections** 53:4
**see** 8:24 24:4 33:13 38:2 46:22 49:8 65:2 72:20,23 75:5,18 80:12 82:24 86:24 87:4 90:4 95:3 96:8 97:16 98:3 100:23 103:18 106:24 110:20 115:16 116:14 118:18 122:15
**seeing** 27:4 64:7 112:20
**seeking** 25:3
**seemed** 100:25
**seems** 25:5,14 108:24 111:9
**seen** 23:17 58:1 70:21
**select** 113:12
**selected** 57:16 100:24 113:23 114:2 121:7
**selecting** 113:14
**selective** 50:13
**selectively** 49:4 49:21

**self** 30:8 59:2 113:8,11 114:9 115:23 116:13 116:21 117:14 119:10,17,18 119:22
**senate** 1:4 78:8 78:15 130:4 131:1 132:1
**sense** 33:8 45:18 58:8 75:12 117:21 117:22 118:9 123:6 125:17
**sent** 130:14
**sentence** 30:20 41:14,22 43:7 45:1,23,24 82:16,18 84:15 89:23 109:10
**separate** 13:20 45:6 56:19,20 114:12
**serve** 129:13
**services** 128:3
**set** 58:3 81:24 89:8,19
**several** 70:15 70:17 96:1
**shaking** 13:11
**share** 25:3 120:1,9,19,19
**sheet** 130:11
**shift** 22:18 23:3 23:11,11,14,20 68:10 69:10 89:15
**shifts** 21:19,23 22:3,4,9,13,23 23:2,9 116:9
**short** 22:22
**show** 80:9 115:13,14
**showing** 38:22 47:14
**shown** 39:9 64:23
**shows** 32:7 36:6 86:10
**side** 48:4
**sign** 15:4 130:12
**signature** 129:19
**signed** 130:19
**significance** 37:13
**significant** 37:9 38:3,7,13 56:21 83:7
**significantly** 80:8
**similar** 22:24 46:12 56:1,7 56:12,17 57:19 57:22 75:6 78:11,23 79:10 79:16 80:1 81:18 95:22 115:7 116:24
**simply** 26:3 119:10
**single** 1:22 37:21 44:4 45:22 129:19
**sitting** 28:12 111:6 123:14 123:21
**situations** 56:16
**six** 42:7 55:17 88:11,12 124:18,20 125:16
**size** 58:20 103:13
**skipping** 98:1 101:17
**skips** 97:2
**slightly** 95:1 102:3 109:25
**small** 38:25 92:5 109:17
**smaller** 25:3 33:16 107:11
**smith** 4:17 9:2
**social** 65:19 86:1
**solely** 127:24 129:12
**solid** 56:4
**solutions** 127:15 130:23
**somewhat** 82:12
**sorry** 8:4,8 9:17 21:12 37:6 41:21 42:19 54:14 64:1 65:10 68:18 71:13,18 78:19 85:1 91:23 98:9 105:15,16 106:2 110:21 112:12
**sort** 20:18 22:25 27:9 28:1 30:21 48:5 58:13 64:13 96:20 101:19 116:14 121:7
**sounds** 14:22 16:11 17:11 87:15
**source** 77:4,7
**southeast** 130:15
**span** 20:6
**speak** 21:7
**speaker** 8:12
**speaking** 21:4 54:5

**specializing** 68:9
**specific** 41:2 52:4,6,8,16,22 65:7 101:7 115:19 123:3 123:15 128:7
**specifically** 20:1 46:2 78:25 127:5
**specifics** 59:9
**spend** 100:12
**spills** 30:21 82:19
**spurious** 81:3,4
**stand** 12:14 44:18 45:1,13 45:16 47:7 92:8 126:7
**standard** 54:10 55:18,23
**stands** 108:19
**start** 14:15 17:20 19:17 30:2 43:10 85:2
**started** 71:20
**starting** 23:8 56:4,15 58:17 60:7 78:22 90:15
**starts** 86:16
**state** 2:11 3:18 5:11,20 6:4 7:21,23,25 8:7 8:16 10:1,24 11:11,16,22 23:18 30:22 37:20,21 39:23 43:8,12 47:20 49:4,20 50:12 59:15 67:18 72:7 76:18 82:6,7 84:2,10 89:24 95:25 108:1,3 114:21 118:24 121:6 122:11 127:14 129:2
**stated** 35:18 44:3 129:4
**statement** 7:4 33:18 36:16 44:15,19 45:13 45:16,17,18,20 50:21 64:3 68:3 84:10
**states** 1:1 75:10 75:13,15 78:2 78:6,7,10,14,15 78:20,23 80:21
**statewide** 57:24 59:18,19 61:5 69:24 74:10,17 74:19,22 82:20 82:22
**stating** 46:12
**statistical** 13:16 24:22 37:12,16 97:8 99:21 101:20
**statistically** 37:9 38:3,7,13
**statistics** 50:15 50:21 59:10 67:21 68:1,4 68:16 87:24 115:16
**status** 30:14
**stay** 63:20
**sticking** 22:1
**stipulation** 31:15
**straight** 107:15
**strategies** 56:3
**strategy** 54:7 54:13 56:16
**street** 2:5,19 3:6
**strike** 28:2 38:18 41:21 55:3 57:10,12 112:23 118:1
**stuck** 23:23
**studied** 61:9 70:13
**study** 25:14 87:17,20,23 122:22
**studying** 27:21 118:9
**subcontractor** 127:15,25 129:12
**subject** 26:19 83:5,7
**submitted** 7:5 48:22,23 128:13,16
**subscribed** 132:14
**subsequent** 70:6
**subset** 58:4
**substance** 16:20 17:12 20:8 78:7
**substantial** 43:14 68:10
**substantially** 31:3,10,18
**sufficient** 39:1
**suggest** 14:21 102:23
**suggestion** 14:15
**suggests** 124:18
**suite** 1:16 2:20 3:6,21 4:5,12 4:18
**summary** 49:1
**summer** 66:24
**super** 70:9
**supplemental** 5:15 6:10,12

11:9 16:9,10 17:10 29:9 30:2 94:10 103:21 104:8 105:2,17 106:18 108:16 116:25
**support** 102:7
**supported** 116:13
**supporters** 20:15,23 70:4 70:6
**suppose** 23:2 28:7 122:25
**sure** 11:18 13:7 14:1,13 15:1 17:1,7 18:1 19:12,20 26:1 27:13 31:6,7 31:25 32:18 33:4 34:19 35:2 45:19 46:7 47:6 48:21 52:5,6 54:16 56:9,14 61:20 64:21 67:10,10,13 70:17,25 72:4 73:21 81:25 83:19 84:9 88:4,13,24 90:17 91:21 93:4,16 95:19 97:7 113:20,23 121:12,16 123:25 124:2 125:22
**surge** 102:23 103:8
**surged** 6:9 102:2
**survey** 76:19 77:3,9,13,17,24 79:14,15,19,21 80:8 101:13 122:12,21 123:4,15,20,25 124:4,21 125:3 125:4,6
**surveys** 98:19 122:22
**swear** 10:21
**switch** 84:12 110:4,5
**sworn** 10:24 132:14
**system** 113:18 120:17

**t**

**t** 8:23 131:3,3
**table** 30:4,6,13 31:11,21,24 32:4,7,19 33:11,22,24 34:22 36:5,18 37:7,23,23 38:2,6,13,23 39:3,9,14,20 40:9 42:13,15 42:15,22 43:8 43:24 44:12 45:9,15,23 46:2,16 86:19 104:23 105:1 105:15,25 106:5 108:14 108:15,16 109:16,17,19 115:14,17
**table's** 32:9
**tables** 59:5 65:23 113:9 116:15
**tailor** 52:12
**tailored** 125:14
**take** 12:7 14:16 18:18 27:13 29:16 45:6 63:14,24 82:1 92:4 99:3 121:14
**taken** 11:10,12 12:12 47:10 71:23 92:12 121:20 129:4
**talk** 13:1 37:12 53:5 54:6 60:12 61:19 62:10 81:5 99:2 100:18
**talking** 26:3 67:11 92:23 100:16 123:24
**talks** 52:23
**technical** 11:6 98:16
**technically** 21:4 76:13
**technique** 99:19
**tell** 12:13 19:18 20:13 30:4 36:19 63:18 71:7 76:9,16
**temporal** 57:17
**temporally** 57:22
**tenable** 82:1
**tend** 70:5
**tended** 118:22
**tenths** 109:6
**term** 52:1,17 81:1 100:21,22 100:24 101:6
**terms** 25:21 30:24 33:13 34:16 35:23 36:20 46:8 51:2 67:8 68:11,12 95:21 98:1 99:15 113:22 127:25 129:12

**testified** 10:25
**testifying** 15:13 15:16
**testimony** 13:1 15:19 17:14 110:17 130:9 130:17 132:8
**text** 123:1
**thank** 8:24 9:24 10:9,11,20 12:6 18:10,15 26:25 27:25 29:13,19 36:3 48:8,18 65:16 71:4 76:4 85:14 91:1 92:17 102:14 104:4 105:19 119:16 124:7,8 125:20,21
**thanks** 92:9 106:3
**theirs** 32:13
**theory** 99:4
**thing** 14:2,8 43:10 64:9 109:21
**things** 19:7 23:15 44:23 51:23 54:17 57:4 58:1 59:8 64:19 66:21 67:1,1,12
**think** 7:24 10:18 11:7 12:19 13:8 17:16 19:6 22:22 23:7,16 23:19 24:2,10 26:23 28:25 32:2,8 35:18 37:5 39:22 43:9 44:10 46:7 50:5,20 50:23 51:5,17 51:22,25 52:5 52:18 53:23 54:13,17 55:9 55:23 56:3,15 57:20 60:6 61:1 64:23 65:7,22 67:11 73:21 76:13 78:22 79:3 81:4 90:19 92:22 98:23 99:18 100:3,6 100:7 109:9 111:23 112:4 113:19 114:3 117:15 118:6 120:4,5 123:8 123:18,18,23 124:5
**thinking** 28:8 50:25 51:5,25 52:16 53:7 54:24 58:19
**thinks** 51:1,18
**thousands** 109:4
**three** 17:16,18 35:14 41:9 46:16 59:15 98:18
**throwing** 118:12
**ticket** 62:13,14
**time** 7:9,24 20:6 26:15,18 27:13 47:8,11 57:8,14,16 58:20 59:3,12 60:4 61:10 63:7 64:13 65:3 68:21 69:2,18,22 70:3 71:21,24 78:11 81:16 83:11 91:17 92:10,13 93:1 96:2 102:24 104:16,20 113:19 115:3,4 118:8,22 120:15 121:18 121:21 124:7 126:8 128:8 130:18
**timeframe** 130:8
**times** 17:13 70:15,17 113:12 114:11 114:14 115:3 119:9
**timing** 25:22 112:4
**tina** 9:15,21
**title** 20:20 23:16,25 25:6 25:14 33:25 122:10
**titled** 5:20 6:5,8 19:21 20:14 108:18
**today** 12:9 13:1 15:13,16,24 28:12 70:15 110:17 111:6 123:14,21 124:7 126:6
**today's** 15:19 39:13
**together** 58:2 85:2
**top** 18:22 19:3 19:14 62:12,14
**topic** 29:4 70:11 84:12
**torres** 4:11 10:12,12
**total** 38:20 87:8 87:18 89:2 106:16

**touch** 24:15
**tough** 78:9
**toward** 22:19
**track** 11:7
**transcript** 12:2 18:9 29:12 48:17 63:10 71:3 76:3 85:13 102:13 104:3 105:23 126:12 128:10 129:4,6 130:6 130:19 132:5,8
**transcripts** 128:10,18
**treatment** 81:19
**trend** 80:1 81:15
**trends** 23:17 59:16 61:4 62:9 69:7 75:5 75:6,10,12,15 75:20 79:5,10 80:9 81:12,14 81:17,18 97:1 101:18
**trey** 68:8 70:15
**trial** 12:14
**tricky** 66:22 114:22
**tried** 53:12 59:8
**true** 38:18 49:16 61:22 62:5 113:10 119:5 120:1,5 125:3 128:11 129:6 132:8
**truly** 15:13 38:24
**trump** 66:15
**trump's** 69:25
**truth** 10:24 12:13
**truthfully** 15:16
**try** 13:1,22 14:4 45:20 51:13 52:12 53:9,11 72:2
**trying** 22:12 23:9 24:3 25:2 29:1 35:11 50:23 51:17,22 51:25 52:5,19 53:19 54:7 83:24 92:21 107:15 118:11 120:4 123:6,8
**turn** 39:21,22 48:25 67:16 71:12 72:14 84:13 86:10 89:22 104:23 105:14,25 106:5 108:14 108:15 109:16
**turnout** 27:22 49:5,5,21,22 50:3,16 51:2 51:16 53:1,8 54:20,21,22 55:20 56:24 58:6,14 59:16 59:21 61:3 62:9 65:20 66:1 67:22 68:5,11 69:6 72:16,21,24 73:1,5,7,14 74:4,5,15,25 75:5 76:20,21 76:21 77:2,9 77:13,15,17,18 77:20,22 78:13 79:13,18,23 80:6,10,13,13 80:16,20 82:1 89:25 90:1,15 91:11 93:18 95:1 96:4,22 103:14 107:11 107:17,19,20 108:4,12,13 109:1,14,15,25 110:6,19 111:16 113:3 115:12,18
**turnouts** 70:5
**turnover** 19:22
**tweet** 5:19,24 63:13 64:7,10 76:10,11,11
**two** 16:8,22 38:2 39:3 45:6 46:16 60:14 61:22 62:5 73:13,16 78:9 82:22 111:20
**typewriting** 129:5
**tyson** 3:20 9:25 10:1

**u**

**uh** 13:12,12,12 18:16 29:15 35:25 39:5 42:18 48:20 51:21 52:10 59:24 62:22 71:6 85:16 91:5 95:23 97:17 98:20,25 104:6 118:13
**under** 2:19 7:19 11:13 63:19 92:18 123:10 125:11 129:5
**underestimate** 98:5

**underestimati...** 103:13
**understand** 13:18,22 14:3 23:10 44:10 59:25 79:21 87:25
**understanding** 39:18 83:6,7 89:7 97:12 118:25 123:1
**unfortunately** 43:9
**unique** 69:17
**united** 1:1
**university** 26:13
**unknown** 117:13,16 118:15,20 119:2 120:14 120:19,20 121:1,5,7
**unnecessary** 97:3 100:19,23
**unpack** 51:13
**update** 100:14 117:3 118:22
**updated** 18:23 117:10 119:1
**updates** 113:17
**uploaded** 128:20
**urges** 63:24
**use** 6:5 28:16 28:23 52:1,9 52:17 57:13,17 59:11 60:3,19 73:12 77:12 82:13 85:5 89:15,17 90:8 91:2 92:23 93:9,13,25 94:6,19 95:14 95:22,22 97:23 99:19 100:19 101:8 105:4 106:20 113:10 115:7 117:3 118:11 122:11 122:14
**used** 13:21 17:1 37:16 55:18 73:18 77:12 100:22 101:6 112:17,18,25 113:7 116:23 117:9,10 122:25 123:2 124:22 125:5,7 130:19
**uses** 52:24 92:24 97:24 99:9,15 108:20 110:13,18 111:14,18
**using** 13:17 24:22 37:19 52:3 59:3 61:8 75:8 77:3 79:19 100:14 101:5 107:16 108:25 109:23 114:8 117:21 117:23
**usually** 14:16 52:11 54:7 81:4 99:2

**v**

**v** 130:4 131:1 132:1
**vagaries** 37:16
**validated** 125:8
**validation** 77:11
**validity** 98:22
**value** 37:14 50:15,22 67:21 68:1,4,17 117:16
**values** 30:12 38:3,20
**variables** 60:2 60:2,8
**varies** 59:2 114:14
**vary** 93:24,25
**verbatim** 127:20
**verify** 130:9
**veritext** 127:15 128:3 130:14 130:23
**veritext.com.** 130:15
**version** 21:15
**versus** 22:13 23:19 35:21 36:11 37:3 38:24 44:12 53:21 123:25
**victory** 69:25
**video** 47:8,12 64:8 71:22,25 92:11,14 104:17,21 121:19,22 126:8
**videographer** 7:8 8:13 10:20 26:23 47:7,11 48:2 71:21,24 92:8,10,13 104:16,20 121:18,21 126:7
**videotaped** 1:8 7:10
**view** 121:5
**viewed** 59:20
**viewing** 45:14
**vilia** 2:12 7:14

**vilia.hayes** 2:15
**virtually** 41:24 123:11
**vote** 21:20 25:4 37:3,4 41:3 58:22 77:11 84:19 86:8 89:17
**voted** 37:2 123:19 124:1,2
**voter** 27:22 32:12 40:17,18 42:10,11 44:5 51:2,16 53:8 59:16 61:3 62:9 66:1 68:11 69:6 72:16 77:2,9 79:13,23 80:16 86:17,21 87:2 87:9 89:11 96:22 111:15 113:7,18,21 114:1,11,12,16 114:18 115:1,1 117:1,3 118:2 119:6,14,17,19 119:25 120:8
**voters** 6:6 30:7 31:3,9,12,13,18 31:22,25 32:4 32:5,12,15,17 33:23 34:2,6,8 34:15,16,18,23 34:24 36:8,20 36:23 38:6,7,8 38:11 40:9,14 42:24,25 44:6 46:2,3,5,6,17 46:19 58:21 59:6,21 85:5 107:12,19 108:9,21 111:16 113:12 115:21,22 116:21 117:24 118:12 119:6 120:2,9,25
**votes** 40:11 43:25 46:18 87:9 108:18 109:1
**voting** 5:21 21:15,20,23 22:3 31:18 53:1 55:21 59:4 66:2 72:7 86:4 88:10 89:3 110:19 125:15
**vouch** 88:21

**w**

**wait** 13:4,4 14:17
**want** 12:7 24:15 33:2 34:19 39:14 47:4 53:22 56:22 57:10 60:22 61:20,20 62:10 68:18 106:14,23 111:3 126:11
**wanted** 17:13 47:13 80:19 117:17
**washing** 64:19
**washington** 2:20 3:7,14
**way** 8:13 13:18 17:21 26:4 27:23 28:5 41:24 50:10,23 51:5,18,23 52:1,13 57:9 59:11 60:1 63:3 64:20 69:4 89:7,19 96:21 99:2,10 111:11 114:3 122:2 123:16 125:8
**ways** 52:12 54:24 59:7 66:25 69:16 78:9 81:4
**we've** 10:18 12:19 19:15 23:17 116:24
**wealthy** 21:1,2 21:5,9
**weighting** 116:10
**weights** 115:22
**welcome** 92:16
**went** 43:16
**white** 31:3,9,18 31:22 32:5,16 33:14,22,23 34:16,24 35:19 36:11,20 37:3 38:6,10,11 40:2,9,17 41:3 41:12,18 42:9 42:24 43:5 44:5 46:2,6,19 46:23 76:20 77:15 80:13 102:3 106:15 116:7
**win** 126:5
**witness** 7:16 10:22 12:17 14:25 15:3 17:14 18:10 23:7 26:1 28:19 29:13,20 35:7 44:9 46:21 47:6,24 48:8,18 49:20 53:18 55:23 60:6 64:6 65:22 71:4 76:4 78:19 85:14 87:22

Bernard L. Fraga , Ph.D.                    August 11, 2025
Georgia Senate Bill 202, In Re

[witness - zoom]                                          Page 41

| | | |
|---|---|---|
| 89:7 90:23 92:9 102:14 104:4,13 107:14 110:3 112:11 126:2 130:8,10,12,18 | **x** | 99:17 100:1,6 100:7 101:13 101:21 120:16 121:2,4 |

**x**   5:1 6:1

**york**   2:6,6,14 2:14 27:15

**witnesses** 128:17

**y**

**young**   119:12

**woman**   69:19 69:23

**y'all**   47:4 124:9

**younger**   114:16

**won**   70:4

**yeah**   8:13 14:19 32:2 34:3 42:21 44:9 55:11 58:7 63:4 71:15,17 75:12 75:14 92:6 94:11 101:15 106:9 109:8 111:4,5,13 116:14 121:4 124:17 125:16

**z**

███████ 11:19

**z**   8:23,23

**word**   23:22 52:24 101:8

**zatz**   3:13 8:1,1 8:6,18,20,20,23

**worded**   123:17

**zero**   38:20,24 39:1,2,11 86:20 87:7 88:8,11

**wording** 122:12

**zoom**   2:4,12 3:5,13,20 4:4 4:11,17,24 7:25 125:23

**work**   8:15 17:20 24:3 26:17 28:24 47:3 101:9

**year**   76:22 91:4 91:4,6,6,7,8,9 91:18,20,21,21 91:24 92:2 93:2,4 94:19 94:21,22 97:4 97:16,18,21,24 97:24 98:17,17 99:4,9,14,16 102:20 103:3,3 103:4,7 105:3 105:6 107:2,3 107:6,10

**worked**   118:7

**write**   84:16 94:9,12,14

**writers**   28:6

**written**   7:4 125:9

**wrong**   25:5,13 90:9 108:6

**years**   39:6 42:3 42:4 50:6 96:1 96:5 97:2,21 98:19 99:3,6

**wrote**   91:17 93:1

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| --- | --- |

## NOTICE OF DEPOSITION OF BERNARD FRAGA, PH.D.

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for the State Defendants in the above-captioned action will take the deposition of Plaintiffs' expert, Bernard Fraga, Ph.D.

The deposition will be taken upon oral examination before an official authorized by law to administer oaths under the Federal Rules of Civil Procedure and will be recorded by videographic means and/or stenographic means. The examination will be held at Clark Hill PLC, 3630 Peachtree Road, NE, Suite 550, Atlanta, GA 30326, and will commence at 9:00 a.m. EDT on August 11, 2025, and continuing thereafter until completed. The deposition will also be available to attend via Zoom videoconferencing through Veritext Legal Solutions. Details regarding the videoconferencing will be emailed to those participating once all arrangements are finalized.

EXHIBIT 1
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

This 21st day of July, 2025.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Cristina Martinez Squiers*
Edward H. Trent*
Nicholas P. Miller*
Annika Boone Barkdull*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
**Admitted pro hac vice*

*/s/Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**CLARK HILL PLC**
3630 Peachtree Road, NE
Suite 550
Atlanta, Georgia 30326
(678) 336-7249

*Counsel for State Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I served a true and correct copy of the foregoing **NOTICE OF DEPOSITION OF BERNARD FRAGA, PH.D.** on all counsel of record by electronic mail delivery.

This 21st day of July, 2025.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411

*Counsel for State Defendants*

EXHIBIT 2
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

# Bernard L. Fraga

updated 07/15/2025

CONTACT INFORMATION

Department of Political Science
1555 Dickey Drive, Tarbutton Hall 327
Emory University
Atlanta, GA 30322

Website: http://bernardfraga.com
E-Mail: bernardfraga@emory.edu
Phone: (404) 727-2442

## ACADEMIC APPOINTMENTS

**Emory University**, Atlanta, GA
- Ann and Michael Hankin Distinguished Professor, Department of Political Science (2024 - )
- Director, Latin American, Latinx, and Caribbean Studies (2025 - )
- Faculty Affiliate, Latin American, Latinx, and Caribbean Studies (2023 - )
- Faculty Coordinator, Latinx Studies Initiative (2023-2025)
- Associate Professor, Department of Political Science (2020-2024)
- Faculty Affiliate, Latinx Studies Faculty Initiative (2020-2023)

**Indiana University**, Bloomington, IN
- Associate Professor, Department of Political Science (2019-2020)
- Faculty Affiliate, Center for Research on Race and Ethnicity in Society (2013-2020)
- Faculty Affiliate, Latino Studies Program (2013-2020)
- Assistant Professor, Department of Political Science (2013-2019)

## EDUCATION

**Harvard University**, Cambridge, MA
- Ph.D., Government and Social Policy (2013)
- A.M., Political Science (2011)

**Stanford University**, Stanford, CA
- B.A., Political Science and Linguistics (2008)
- *Degree Conferred with Distinction and Departmental Honors*

## PEER-REVIEWED BOOK

Fraga, Bernard L. (2018) *The Turnout Gap: Race, Ethnicity, and Political Inequality in a Diversifying America.* New York: Cambridge University Press.

Award: APSA Section on Race, Ethnicity, and Politics Best Book Award (2019)
Reviews: *Perspectives on Politics*, *Journal of Race, Ethnicity, and Politics*, *National Review of Black Politics*, *American Review of Politics*
Author Meets Critics: Midwest Political Science Association Annual Meeting (2019)

## PEER-REVIEWED JOURNAL ARTICLES

18. Wakefield, Derek, Bernard L. Fraga, and Colin A. Fisk. (2025) "Partisan Change with Generational Turnover: Latino Party Identification from 1989 to 2023" *Journal of Race, Ethnicity, and Politics.*

17. Fraga, Bernard L., Zachary Peskowitz, and James Szewczyk. (2025) "Can Elite Allegations of Election Fraud Demobilize Supporters?" *Political Behavior.* 47 (1): 309-333.

16. Fraga, Bernard L., Yamil R. Velez., and Emily A. West. (2025) "Reversion to the Mean, or their Version of the Dream? Latino Voting in an Age of Populism." *American Political Science Review.* 119 (1): 517-525.

15. White, Ariel, Paru Shah, Eric Gonzalez Juenke, and Bernard L. Fraga. (2024) "Evaluating the Minority Candidate Penalty with a Regression Discontinuity Approach." *British Journal of Political Science.* 54 (3): 1006-1013.

14. Ansolabehere, Stephen, Bernard L. Fraga, and Brian Schaffner. (2022) "The CPS Voting and Registration Supplement Overstates Minority Turnout." *Journal of Politics.* 84 (3): 1850-1855.

13. Fraga, Bernard L. and Michael G. Miller. (2022) "Who Do Voter ID Laws Keep from Voting?" *Journal of Politics.* 84 (2): 1091-1105.

12. Stauffer, Katelyn E. and Bernard L. Fraga. (2022) "Contextualizing the Gender Gap in Voter Turnout." *Politics, Groups, and Identities.* 10 (2): 334-341.

11. Fraga, Bernard L., Daniel J. Moskowitz, and Benjamin Schneer. (2022) "Partisan Alignment Increases Turnout: Evidence from Redistricting." *Political Behavior.* 44 (4): 1883-1910. Award: Best Paper in Political Behavior (2023)

10. Shah, Paru, Eric Gonzalez Juenke, and Bernard L. Fraga. (2022) "Here Comes Everybody: Using a Data Cooperative to Understand the New Dynamics of Representation." *PS: Political Science and Politics.* 55 (2): 300-302.

9. Fraga, Bernard L. and Hans J.G. Hassell. (2021) "Are Minority Candidates Penalized by Party Politics? Race, Gender, and Access to Party Support." *Political Research Quarterly.* 74 (3): 540-555.

8. Fraga, Bernard L., Eric Gonzalez Juenke, and Paru Shah. (2020) "Did Women and Candidates of Color Lead or Ride the Democratic Wave in 2018?" *PS: Political Science and Politics.* 53 (3): 435-439.

7. Fraga, Bernard and John Holbein. (2020) "Measuring Youth and College Student Voter Turnout." *Electoral Studies.* 65 (3): 102086.

6. Fraga, Bernard L., Eric Gonzalez Juenke, and Paru Shah. (2020) "One Run Leads to Another: Minority Incumbents and the Emergence of Lower Ticket Minority Candidates." *Journal of Politics.* 82 (2): 771-775.

5. Fraga, Bernard L. and Eitan D. Hersh. (2018) "Are Americans Stuck in Uncompetitive Enclaves? An Appraisal of U.S. Electoral Competition." *Quarterly Journal of Political Science* 13 (3): 291-311.

4. Fraga, Bernard L. (2016) "Candidates or Districts? Reevaluating the Role of Race in Voter Turnout." *American Journal of Political Science.* 60 (1): 97-122.

3. Fraga, Bernard L. (2016) "Redistricting and the Causal Impact of Race on Voter Turnout." *Journal of Politics* 78 (1): 19-34.
Award: MPSA Lucius Barker Award (2015)

2. Fraga, Bernard L. and Julie Lee Merseth. (2016) "Examining the Causal Impact of the Voting Rights Act Language Minority Provisions." *Journal of Race, Ethnicity, and Politics* 1 (1): 31-59.

1. Fraga, Bernard L. and Eitan D. Hersh. (2011) "Voting Costs and Voter Turnout in Competitive Elections." *Quarterly Journal of Political Science* 5 (4): 339-356.

SCHOLARLY BOOK REVIEWS

Fraga, Bernard L. (2021) Review of *Dangerously Divided: How Race and Class Shape Winning and Losing in American Politics* by Zoltan L. Hajnal. *Journal of Race, Ethnicity, and Politics.* 6 (1): 293-295.

Fraga, Bernard L. (2016) Review of *American Identity and the Politics of Multiculturalism* by Jack Citrin and David O. Sears. *Perspectives on Politics* 14 (2): 562-564.

**Non-Peer Reviewed Publications**

Fraga, Luis Ricardo, Ricardo Ramírez, and Bernard L. Fraga. (2024) "American Democracy and Voter Suppression." *The ANNALS of the American Academy of Political and Social Science.* 708 (1): 227-242.

Fraga, Bernard L., Zachary Peskowitz, James Szewczyk. (2021) "New Georgia runoffs data finds that more Black voters than usual came out. Trump voters stayed home." *Washington Post, Monkey Cage Blog.* Jan 29.

Fraga, Bernard L. and Jonathan Robinson (2020) "We have data on who voted early in key battleground states and whom they may be voting for." *Washington Post, Monkey Cage Blog.* Nov 1.

Gonzalez Juenke, Eric, Paru Shah, Bernard L. Fraga, and Erika Vallejo (2020) "State legislatures likely to have more women and people of color next year." *Washington Post, Monkey Cage Blog.* Oct 24.

Fisk, Colin A. and Bernard L. Fraga (2020) "'Til Death Do Us Part(isanship): Voting and Polarization in Opposite-Party Marriages" Democracy Fund Voter Study Group. August 2020.

Fraga, Bernard L. (2020) "The next Congress will probably be the most diverse ever." *Washington Post, Monkey Cage Blog.* Jun 22.

McElwee, Sean, Brian F. Schaffner, Jesse H. Rhodes, and Bernard L. Fraga. (2019) "Trump Is Driving Out Precious Republican Voters." *New York Times.* Feb 16.

Fraga, Bernard L. and Brian Schaffner. (2018) "The early vote suggests minority turnout will be high in 2018, but so will turnout among whites." *Vox, Mischiefs of Faction Blog.* Nov 1.

Fraga, Bernard L. (2018) "The turnout gap between whites and racial minorities is larger than you think, and hard to change." *Washington Post, Monkey Cage Blog.* Sep 25.

McElwee, Sean, Jesse H. Rhodes, Brian F. Schaffner, and Bernard L. Fraga. (2018) "The Missing Obama Millions." *New York Times.* Mar 10.

Fraga, Bernard L., Sean McElwee, Jesse Rhodes, and Brian Schaffner. (2017) "Why did Trump win? More whites—and fewer blacks—actually voted." *Washington Post, Monkey Cage Blog.* May 8.

Ansolabehere, Stephen and Bernard L. Fraga. (2016) "Do Americans Prefer Co-Ethnic Representation? The Impact of Race on House Incumbent Evaluations." *Stanford Law Review* 68 (6): 1553-1594.

Fraga, Bernard L. and Brian Schaffner. (2016) "Who's voting early? Latino turnout is surging, but white turnout is, too." *Washington Post, Monkey Cage Blog.* Nov 4.

Fraga, Bernard L. (2015) "The Voting Rights Act turns 50 today. Here are three trends in minority voting you should know about." *Washington Post, Monkey Cage Blog.* Aug 6.

Fraga, Bernard L. (2013) "The SCOTUS Majority Is Missing Exactly What the VRA Sought to Remedy." *Monkey Cage Blog.* Jun 27.

**Selected Working Papers**

"Protests, Pandemics, and Political Participation: Voter Turnout in Georgia in the 2020 Elections." with Kiela Crabtree

"Trauma & Resilience: The Political Consequences of the 2013 Boston Marathon Bombing." with Wayde Z.C. Marsh

"Separating Race and Party in Congressional Elections"

**Book Project** *Why We Won't Vote: Polarization, Non-Voting, and the Future of American Democracy*

GRANTS

Andrew W. Mellon Foundation Grant 2206-13340. "Imagining Democracy Hub at Emory University" (co-PI with Carol Anderson). $526,000. (2023)

Massachusetts Institute of Technology Election Data and Science Lab, Evolving Election Administration Landscape Grant. "Leveraging Historical Voter Files as Accurate Measures of Who Votes: Analyzing and Disseminating Voter File Data to Enhance Understanding of Elections" (PI with Silvia Kim and Daron Shaw). $120,603. (2022)

National Science Foundation Grant SES-2127913. "Collaborative Research: The Role of Elites, Organizations, and Movements in Reshaping Politics and Policymaking." (PI with Najja Baptist, Niambi Carter, Jarvis Hall, Periloux Peay, and Artemesia Stanberry). Total Award: $1,142,040, Emory Award: $238,500. (2021)

Emory University Public Scholarship Advancement Fund. (PI) $2,250. (2020)

American Political Science Association Centennial Center Research Grant. "Candidate Characteristics Cooperative Virtual Workshop." (PI with Eric Gonzalez Juenke and Paru Shah). $10,000. (2020)

National Science Foundation Grant SES-2037376. "Build and Broaden: The Inaugural Conference of the Atlanta Network for Race, Ethnicity and Politics." (co-PI with Pearl K. Dowe and Andra Gillespie). $59,142. (2020)

Social Science Research Council Identity, Community, and Participation Research Grant. "An Inventory and Analysis of GOTV Efforts Targeting Communities of Color." (PI) $7,375. (2019)

Massachusetts Institute of Technology Election Data and Science Lab New Initiatives Grant. "Who Does Voter ID Legislation Keep from Voting? Evidence from Texas." (PI with Michael G. Miller). $10,235. (2017)

FELLOWSHIPS & AWARDS

Andrew Carnegie Fellowship, Carnegie Corporation of New York (2024)

Emory University Centro Latinx Mentorship Award (2024)

American Political Science Association Section on Elections, Public Opinion, and Voting Behavior Best Paper in *Political Behavior* Award (2023)

American Political Science Association Section on Elections, Public Opinion, and Voting Behavior Emerging Scholar Award (2023)

American Political Science Association Section on Race, Ethnicity, and Politics Best Book on Race, Ethnicity, and Political Behavior Award (2019)

Midwest Political Science Association Latino Caucus Early Career Award (2018)

Visiting Scholar (non-residential) (2017-2020)
Institute for Democracy & Higher Education, Tufts University

Indiana University Summer Instructional Development Fellowship (2017)

Indiana University Latino Faculty and Staff Council Emerging Scholar Award (2017)

Indiana University Trustees Teaching Award (2015)

Midwest Political Science Association Lucius Barker Award (2015)

American Political Science Association Section on Race, Ethnicity, and Politics Best Dissertation Award Honorable Mention (2014)

Harvard Graduate Prize Dissertation Completion Fellowship (2012-2013)

Harvard University Center for American Politics Travel Grant (2012)

Harvard University Certificate of Distinction in Teaching (2011, 2012)

SSRC Graduate Studies Enhancement Grant (2010, 2011, 2012)

NSF-IGERT Doctoral Fellow (2009-2011)
Multidisciplinary Program in Inequality & Social Policy, Harvard University

American Political Science Association Minority Fellow (2008-2010)

Mellon Mays Undergraduate Fellowship (2006-2008)

INVITED
KEYNOTES

Brown University, Taubman Center Latine Identity and Opinion Symposium. "*Sueño Americano* or *Sueño Republicano*? Latino Voters in 2020, 2022, and Beyond." June 14, 2024.

University of North Carolina, Greensboro, Harriet Elliott Lecture. "*Sueño Americano* or *Sueño Republicano*? Latino Voters in 2020, 2022, and Beyond." October 26, 2023.

Dickinson College, Clarke Forum for Contemporary Issues Bruce R. Andrews Lecture. March 21, 2023. "*Sueño Americano* or *Sueño Republicano*? Latino Voters in 2020, 2022, and Beyond"

Case Western Reserve University, Office for Inclusion, Diversity, and Equal Opportunity. October 21, 2020. "The Power of the Latinx Vote"

Tufts University, Tisch College of Civic Life Civic Life Lunch, February 4, 2019. "The Turnout Gap: Race and Voter Turnout"

INVITED
TALKS

University of California, Berkeley, Travers Conference, "The State of Elections in 2024: Problems, Reforms, and Prospects." April 12, 2024.

Harvard University, Department of Government. March 20, 2024. "Reversion to the Mean, or their Version of the Dream? Latino Voting in an Age of Populism."

Harvard Law School, Charles Hamilton Houston Institute for Race & Justice Race, Reform, and Multiracial Democracy Conference. September 22, 2023. Invited Panelist for "Race and Electoral Systems."

University of Houston, Mini-Conference on the Politics of Gender, Diversity, and Representation. May 5, 2023. "When Do Disparities in Turnout Produce Disparities in Democracy?"

University of Georgia, Department of Political Science Speaker Series. February 28, 2023. "Reversion to the Mean, or their Version of the Dream? An Analysis of Latino Voting in 2020."

New York University, American Politics Workshop. December 6, 2022. "When Do Disparities in Turnout Produce Disparities in Democracy?"

Dartmouth College, Contemporary Research on Threats to Democracy and the Rule of Law in the United States Workshop. December 3, 2022. "When Do Disparities in Turnout Produce Disparities in Democracy?"

University of Michigan, Interdisciplinary Race, Ethnicity, and Politics Workshop. April 1, 2022. "Reversion to the Mean, or their Version of the Dream? Characteristics of 2016-2020 Latino Vote Switchers"

University of California, Los Angeles, Race, Ethnicity, and Politics & American Politics Workshop. February 28, 2022. "Reversion to the Mean, or their Version of the Dream? Characteristics of 2016-2020 Latino Vote Switchers"

University of Wisconsin, American Politics Workshop. April 10, 2021. "Can Elite Allegations of Electoral Fraud Demobilize Voters?: A Quantitative Case Study of the 2021 Georgia Runoff"

University of Notre Dame, Rooney Center for the Study of American Democracy. February 28, 2020. "Separating Race and Party in Congressional Elections"

University of Pittsburgh, Seminar in Representation and Identity Politics. February 22, 2019. "Separating Race and Party in Congressional Elections"

Fordham University, American Forum Speaker Series, February 6, 2019. "The Turnout Gap: How Racial/Ethnic Disparities in Voter Turnout Skew Election Outcomes"

Princeton University, Conference on Identity and Inequality, October 19, 2018. "The Turnout Gap: Causes and Consequences of Racial/Ethnic Disparities in Voter Turnout"

University of California San Diego, Spring Conference on American Politics, Center for American Politics, May 24, 2018. "Who Does Voter ID Keep from Voting?"

Northwestern University, Race, Ethnicity, and Politics Workshop, February 23, 2018. "The Turnout Gap: Causes and Consequences of Racial/Ethnic Disparities in Voter Turnout."

The Ohio State University, Symposium Rapporteur for *The New American Electorate Beyond the Voting Booth: Building an Inclusive Democracy*, December 1, 2017.

Columbia University, American Politics Workshop, April 25, 2017. "The Turnout Gap: Exploring the Causes and Consequences of Racial/Ethnic Differences in Voter Turnout."

Vanderbilt University, Research on Individuals, Politics, and Society Speaker Series, February 27, 2017. "The Turnout Gap: Exploring the Causes and Consequences of Racial/Ethnic Differences in Voter Turnout."

Rice University, Speaker Series, January 27, 2017. "The Turnout Gap: Examining the Causes and Consequences of Racial/Ethnic Differences in Voter Turnout."

ICPSR Summer Institute, Blalock Lecture, August 4, 2016. "Using Big Data to Measure, Map, and Explain Racial Differences in Voter Turnout."

University of Chicago. American Politics Workshop, Nov 9, 2015. "Changing Districts, Changing Turnout: Redistricting and Minority Political Participation."

Harvard Kennedy School, Ash Center for Democratic Governance and Innovation Workshop Participant and Panelist, March 26, 2015. "How Data is Helping Us Understand Voting Rights

After *Shelby County v. Holder.*"

CONFERENCE PARTICIPATION

American Political Science Association Annual Meeting

Program Co-Chair: 2021 (Section on Race, Ethnicity, and Politics), 2023 (Latino Caucus)
Paper/Book Presentation: 2010, 2011, 2014 (2), 2017 (2), 2018, 2021 (2), 2022 (2), 2024 (2)
Roundtable/Workshop Panelist: 2018, 2024
Panel Chair/Discussant: 2015, 2017, 2021 (3), 2024 (2)

Midwest Political Science Association Annual Meeting

Paper/Book Presentation: 2010, 2012, 2014, 2015, 2016 (2), 2017, 2018, 2019, 2022, 2024
Roundtable/Workshop Panelist: 2019
Workshop Organizer: 2019
Panel Chair/Discussant: 2014, 2015, 2017, 2019 (2), 2024

Southern Political Science Association Annual Meeting

Paper Presentation: 2016, 2020, 2023 (3), 2024
Panel Chair/Discussant: 2016, 2021, 2023

Western Political Science Association Annual Meeting

Paper Presentation: 2015
Workshop Organizer: 2019
Panel Chair/Discussant: 2015, 2018

Election Sciences, Reform, and Administration Summer Conference

Program Committee: 2017 (Co-Chair), 2024
Paper Presentation: 2017, 2023
Panel Chair/Discussant: 2017, 2018, 2023

Politics of Race, Immigration, and Ethnicity Consortium (PRIEC)

Presentation: 2013, 2018
Discussant: 2017, 2022

Symposium on the Politics of Immigration, Race, and Ethnicity (SPIRE)

Co-Organizer: 2017, 2018, 2020, 2022, 2023, 2024
Institution Host: 2014, 2022
Paper Presentation: 2012

National Conference of Black Political Scientists (NCOBPS)

Paper Presentation: 2023

Elections, Public Opinion, and Voting Behavior Conference

Paper Presentation: 2023
Discussant: 2023

CAMPUS PRESENTATIONS

**Emory University**
Osher Lifelong Learning Institute (OLLI): 2024
LEADs Experience Keynote Address: 2023
2O36 The Podium - The Future of Politics: 2023
Emory Faculty on Race: 2021
Latinx Alumni Association: 2020
Latinx Pre-Law Society: 2020

**Indiana University**
American Politics Workshop: 2015, 2017, 2018
Workshop on Race, Ethnicity, and Migration: 2016
Neal-Marshall Black Culture Center: 2014
Social Science Research Commons, Workshop in Methods: 2013

**Harvard University**
American Politics Research Workshop: 2011 (2), 2012
Political Psychology and Behavior Workshop: 2010, 2011

**TEACHING**

**Emory University**

Imagining Democracy (Undergraduate)
Latinx Politics in the United States (Undergraduate)
Voting, Elections, and Public Opinion (Undergraduate)
Election Data Science and Analytics (Undergraduate/Graduate)
Elections, Public Opinion, and Voting Behavior (Graduate)

**Indiana University**

Voting, Elections, and Public Opinion (Undergraduate)
Racial and Ethnic Politics in the U.S. (Undergraduate)
Election Law and Voting Rights (Undergraduate)
Analyzing Politics (Undergraduate)
Electoral Politics and Political Participation (Graduate)
The Politics of Race, Ethnicity, Gender, and Identity (Graduate)
American Politics Workshop (Graduate)

**Harvard University**

Teaching Fellow/Tutor, Sophomore Tutorial on Democracy (Undergraduate)
Teaching Fellow, American Government (Undergraduate)

**ADVISING & INSTITUTIONAL SERVICE**

Ph.D. Dissertation Committee Member

Arica Schuett (Emory, Chair)
Alexandra Snipes (Emory, Co-Chair)
Stephanie Schmidtt (Iowa)
Kevin Russell (Emory)
Layla Brooks (Emory)
Joseph Glasgow (Emory)
Devon Thurman (Emory)
Kevin Sparrow (Emory, defended May 2024)
Alejandra Campos (Notre Dame, defended July 2023)
Xuan Li (Indiana, Central Eurasian Studies)
Eric Schmidt (Indiana, defended June 2021)
Vivian Ferrillo (Indiana, defended August 2021)
Rita Nassar (Indiana, Co-Chair, defended May 2021)
Colin Fisk (Indiana, Chair, defended April 2021)
Katelyn Stauffer (Indiana, defended July 2018)
Laura Bucci (Indiana, defended July 2017)
Matthew Fowler (Indiana, defended July 2017)
Ian Anson (Indiana, defended June 2015)

Master's Thesis Examiner in Political Science, Yannick Vogel, Freie Universität Berlin (2017-2018)

Member, Laney Graduate School Executive Council, Emory University (2021-2024)

Faculty Representative, Centro Latinx Advisory Board, Emory University (2021-)

Faculty Mentor, Center for Law and Social Science Undergraduate Fellows Program, Emory University (2021-)

Faculty Mentor, Scholarly-Inquiry and Research Experience Program, Emory University (2020)

Faculty Mentor, Advanced Empirical Research on Politics for Undergraduates Program (Sierra Wiese), Society for Political Methodology (2019)

Faculty Mentor, Center for Research on Race and Ethnicity in Society Postdoctoral Scholar (Vanessa Cruz Nichols), Indiana University (2017-2019)

Faculty Mentor, Center for Research on Race and Ethnicity in Society Undergraduate Research Program, Indiana University (2017-2018)

Honors Thesis Mentor, Department of Political Science, Indiana University (2014-2016, 2018-2020)

Faculty Mentor, Cox Research Scholars Program, Indiana University (2013-2020)

Co-coordinator, Department of Political Science Political Analytics Program, Indiana University (2018-2020)

Coordinator, Department of Political Science American Politics Subfield, Indiana University (2018-2019)

Board Member, All In Campus Democracy Project and Big 10 Voting Challenge, Indiana University (2016, 2018)

Member, Diversity and Affirmative Action Committee, Bloomington Faculty Council, Indiana University (2016-2017)

Member, Center for Research on Race and Ethnicity in Society Postdoctoral Fellowship Selection Committee, Indiana University (2014)

Department of Political Science Committee Member, Emory University

Graduate Admissions Committee (2021-)
American Politics Search Committee (Chair, 2024-2025)
Undergraduate Program Committee (2023-2024)
Graduate Policy Committee (2021-2023)
American Politics Search Committee (2021-2022)

Department of Political Science Committee Member, Indiana University

Development Committee (2018-2019)
Personnel Committee (2017-2018)
Graduate Program and Admissions Committee (2013-2017)
Undergraduate Program Committee (2015-2016)
Graduate Awards Committee (2014-2015)

**Professional Activities & Affiliations**

Vice President, Midwest Political Science Association (MPSA) (2021-2024)

President, American Political Science Association Section on Race, Ethnicity and Politics (2023-2025); Executive Committee (2019-2023); Nominations Committee (2017-2019)

President, Latino Caucus in Political Science (2022-2023)

Editorial Board Member: *PS: Political Science* (2022 -); *Journal of Politics* (2021 -); *American Journal of Political Science* (2019 -); *Political Behavior* (2019 -)

Reviewer: *American Journal of Political Science*; *American Political Science Review*; *American Sociological Review*; *American Politics Research*; *British Journal of Political Science*; Cambridge University Press; *Election Law Journal*; *Electoral Studies*; *Journal of Politics*; *Journal of Race, Ethnicity, and Politics*; *Legislative Studies Quarterly*; *National Review of Black Politics*;

*Ethnic and Racial Studies*; Oxford University Press; *Perspectives on Politics*; *PLOS One*; *Political Analysis*; *Political Behavior*; *Political Research Quarterly*; *Politics, Groups, and Identities*; *Proceedings of the National Academy of Sciences*; *PS: Political Science and Politics*; *Public Opinion Quarterly*; *Quarterly Journal of Political Science*; W.W. Norton & Co.; *Weather, Climate, and Society*

Member, APSA Commission on Planning for Annual Meetings (2023-2024)

Member, *American Journal of Political Science* Editor Search Committee (2024)

Member, *American Political Science Review* Editor Search Committee (2023)

Member, Institute for Latino Studies Advisory Council, University of Notre Dame (2024 - )

Member, USC Price School of Public Policy Center for Inclusive Democracy Advisory Committee (2021 -)

Member, MIT Election Data and Science Lab Advisory Board (2020-2024)

Member, American Association for Public Opinion Research (AAPOR) Task Force on Pre-Election Polling (2020-2021)

Research Affiliate, Democracy Fund Voter Study Group (2018-2022)

Member, APSA Presidential Task Force on Congressional Reform (2019)

Member, Western Political Science Association (WPSA) Committee on the Status of Latinos/as in the Profession (2017-2020, Chair 2018-2019)

Member, Section on Elections, Public Opinion, and Voting Behavior, APSA: Executive Committee (2020-2022), *Political Behavior* Editor Search Committee (Chair 2021-2022)

Chair, Lucius Barker Award Committee, MPSA (2017-2018)

Member: American Political Science Association, Midwest Political Science Association

EXPERT TESTIMONY

Expert, *LULAC* v. *Abbott*, Voter turnout in Texas elections (2025 - )

Expert, *Georgia State Conference of the NAACP, et al.* v. *Raffensperger*, *Sixth District of the African Methodist Episcopal Church, et al.* v. *Kemp*, *Asian Americans Advancing Justice-Atlanta, et al.* v. *Raffensperger*, & *The Concerned Black Clergy of Metropolitan Atlanta, Inc, et al.* v. *Raffensperger*. Voting rights in Georgia elections. (2021 - )

Expert, *Rose, et al.* v. *Raffensperger*, Voting rights in Georgia elections. (2021-2022)

Expert, *The Need to Enhance the Voting Rights Act: Practice-based Coverage*. Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights, and Civil Liberties. U.S. House of Representatives. (2021)

Expert, *Issa, et al.* v. *Newsom, et al.* & *RNC, et al.* v. *Newsom, et al.*, Evaluation of voter fraud claims. (2020)

Expert, *S.P.S., ex rel. Natalie Short, et al.* v. *Brad Raffensperger, et al.*, Competition in Georgia elections. (2019-2020)

Expert, *State of California, et al.* v. *Wilbur Ross, et al.* & *City of San José, et al.* v. *Wilbur Ross, et al.*, Effects of Census addition of citizenship question. (2018-2019)

Panelist, *Voting Rights in Indiana* meeting of the Indiana Advisory Committee to the U.S. Commission on Civil Rights, Racial/Ethnic Disparities in Voter Turnout. (2018)

Expert, *Common Cause Indiana, et al.* v. *Marion County Election Board, et al.*, Impact of closure of early voting sites on minority voters. (2018)

Expert, *Shannon Perez, et al.* v. *State of Texas, et al.*, Assessment of partisan gerrymandering. (2017)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01259-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.,*<br><br>*Plaintiffs,*<br><br>v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.,*<br><br>*Defendants.* | CIVIL ACTION<br><br>Case No. 1:21-CV-01284-JPB |

EXHIBIT 3
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, *et al.*,<br><br>*Plaintiff,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01333-JPB |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01728-JPB |

**Amended Supplemental Expert Report of Bernard L. Fraga, Ph.D.**

**June 23, 2025**

## I. Scope of Work

1. I was asked by attorneys for the plaintiffs in the above-captioned cases to update tables in my original report (dated January 27, 2023) and sur-rebuttal report (dated March 3, 2023) with data from the 2024 presidential election. I was also asked to determine if the trends in voter turnout and absentee balloting in elections

pre- and post-implementation of SB202 established in my original report and sur-rebuttal report continue to remain present when adding 2024 to the original set of election data from 2018-2022.

2. I have only updated the tables and analyses from my original and sur-rebuttal reports in which 2024 election data had the potential to inform my conclusions. For tables in those two reports that I have not updated in this report, those data and the corresponding conclusions continue to reflect my current understanding of the impact or potential impact of SB202.

## II. Summary of Supplemental Findings

3. Rates of voter turnout continue to be lower for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians in elections after implementation of SB202. This includes the most recent federal, presidential election in November 2024.

4. In Section V of my sur-rebuttal report, I stated that "disparities between White and non-White turnout increased substantially immediately after the implementation of SB202."[1] I find that the same pattern persists when including the most recent federal, presidential election in November 2024. Voter turnout disparities for Black, Hispanic, and Asian American/Pacific Islander Georgians, relative to White Georgians, in presidential and non-presidential elections are larger than they were in presidential and non-presidential elections immediately preceding implementation of SB202.

[1] Sur-rebuttal report of Bernard L. Fraga, dated March 3, 2023, p.15 at 32.

5. In Section VI of my original report, I stated that "Black and Asian American/Pacific Islander voters are more likely to vote by mail than non-Hispanic White voters in recent elections, but saw disproportionate drops in mail ballot use in elections after SB202." [2] I find that the same pattern of disproportionate drops in mail ballot use persists for these groups including in the most recent federal, presidential election of November 2024 where Black voters saw their rate of voting by mail drop from 29% in 2020 to 5% in 2024, and Asian American/Pacific Islander voters saw their rate of voting by mail drop from 40% in 2020 to 7% in 2024.

6. Black, Hispanic, and Asian American/Pacific Islander voters remain more likely to have absentee-by-mail ballots rejected due to requirements added or modified in SB202 as compared to White voters, including in the post-SB202 presidential election of 2024. This includes SB202 provisions limiting the amount of time absentee ballots could be accepted and provisions that heightened identification requirements for absentee ballots.

7. Other conclusions from my original report and sur-rebuttal report still hold, including my conclusion that "over 1.6 million currently [as of November 2022] registered Georgians had barriers to voting increase as a result of SB202...[f]or all racial/ethnic groups, with the exception of White Georgians, the shares negatively impacted exceed their shares of the registered voter population."[3]

[2] Report of Bernard L. Fraga, dated January 27, 2023, p.21.
[3] Report of Bernard L. Fraga dated January 27, 2023, p.7 at 19.

## III. Supplemental Data Sources

8. In this supplemental report, I use the same data on voters voting in Georgia in elections from 2018-2022 used in my original and sur-rebuttal reports, adding voter registration and voter history data pertaining to the 2024 election.

9. In order to estimate the citizen voting-age population (CVAP), I adapt the method used by Dr. Justin Grimmer in his expert report, dated February 14, 2023.

10. Dr. Grimmer takes the average change in population between the: 2010-2014 5-Year estimates and the 2012-2016 5-Year estimates; the 2012-2016 5-Year estimates and the 2014-2018 5-Year estimates; and the 2014-2018 5-Year estimates and the 2016-2020 5-year estimates—to construct a mean two-year change in CVAP over the period from 2014-2020. He then adds this mean change to the 2020 5-Year estimate to approximate a 2022 estimate of the CVAP.[4]

11. In my original report, I used the 2016-2020 5-Year CVAP estimates for all of my turnout calculations because they were "the most recent CVAP special tabulations available as of December 2022."[5] I did not make modifications to the Census-provided estimates, including interpolation and extrapolation, as they were

---

[4] Dr. Grimmer notes "[t]his method for extrapolation is mathematically similar to methods for linear interpolation commonly used to create estimates of census data for years between the censuses," citing a 2006 article by Dr. Stephen Ansolabehere and Dr. David M. Konisky as they "use interpolation to create estimates for non-census years."[4] Report of Justin Grimmer, dated February 14, 2023, p. 17 at 25. However, the Ansolabehere and Konisky article does not make use of CVAP data, 5-Year estimates from the Census Bureau, or outline the specifics of their "linear interpolation" method.

[5] Report of Bernard L. Fraga, dated January 27, 2023, p.14 at 33.

not necessary to demonstrate the "general patterns of turnout."[6] However, because we are now several years removed from the time period covered by the 2016-2020 estimates, and there is continued differential population growth by race/ethnicity in Georgia, changes in turnout rates between 2024 and previous years would be biased and misleading if I did not now extrapolate the population estimates.

12. Therefore, in this report, I use the average change in population between the: 2020 5-Year estimates and the 2021 5-Year estimates; the 2021 5-Year estimates and the 2022 5-year estimates; and the 2022 5-year estimates and the 2023 5-year estimates—to construct a mean one-year change in CVAP over the period from 2020-2023. I then add this mean change to the 2023 5-Year estimate to approximate a 2024 estimate of the CVAP for the overall population and the non-Hispanic White, Black, Hispanic, and Asian American/Pacific Islander populations in Georgia.

13. I also use the 2022 5-Year estimates as the CVAP denominator for the 2022 elections, the 2020 5-Year estimates as the CVAP denominator for 2020 and 2021 elections, and the 2018 5-Year estimates as the CVAP denominator for the 2018 election. This aligns with Dr. Grimmer's approach in his February 14, 2023 report, and results in slightly different turnout estimates from what I reported in my original January 27, 2023 report. However, differences between my revised estimates for turnout in the period from 2018-2022 and my earlier estimates for turnout from 2018-

[6] Report of Justin Grimmer, dated February 14, 2023, at fn.3.

2022 do not have a substantive impact on any of my conclusions in my original report, sur-rebuttal report, or this report.

## IV. Rates of voter turnout for Black, Hispanic, and Asian American/Pacific Islander Georgians continue to be lower than for non-Hispanic White Georgians.

14. In this section, I provide information about voter turnout rates by race/ethnicity in major statewide Georgia elections from 2018-2024. The methodology and data I use are the same as what is outlined in Section IV of my original report,[7] dated January 27, 2023, except that (a) the CVAP estimates are as described in Section III of this report and (b) I have added 2024 voter registration list data and November 2024 voter history data. Specifically, I use a voter registration list with a date of January 15, 2025 provided by defendants in the discovery process,[8] and a voter history file corresponding to the November 2024 general election provided by defendants in the discovery process.[9] I added new registrants from the voter registration list to the 2018-2022 data I relied on in my original report and merged vote history data from 2024, in both cases using the unique Voter Registration Number to identify individuals.

15. Dividing the number of voters by race by the number of voting-age citizens by race, I construct a turnout rate for each racial/ethnic group. The resulting quantities are in **Table 1**.

[7] Report of Bernard L. Fraga, dated January 27, 2023, pp.7-14 at 20-30.
[8] The filename of this file is "Statewide Voter File_2025-01-15.zip".
[9] The filename of this file is "Voter History File – Nov 2024 General Election.zip".

16. **Table 1** shows that in recent elections through November 2024, turnout rates for African American, Hispanic, and Asian American/Pacific Islanders in Georgia were substantially lower than turnout rates for the White population.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 54.4% | 67.0% | 59.9% | 51.5% | 46.0% | 67.7% |
| **White** | 55.9% | 69.2% | 61.8% | 55.9% | 49.4% | 71.5% |
| **Black** | 51.1% | 59.9% | 54.9% | 45.3% | 41.8% | 59.1% |
| **Hispanic** | 29.7% | 42.2% | 32.7% | 22.8% | 19.1% | 41.2% |
| **Asian/PI** | 37.7% | 64.1% | 53.8% | 37.0% | 31.5% | 63.1% |

**Table 1: Voter Turnout Rates by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as a percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino), as extracted from the Census Bureau's American Community Survey (ACS) 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is self-reported from the voter registration file.

17. The November 2024 election is the first post-SB202 presidential election. Overall, the turnout rate was 0.7 percentage points higher in 2024 (67.7%) than it was in 2020 (67.0%). White turnout was approximately 2.3 percentage points higher in 2024, at 71.5%, than it was in 2020, at 69.2%. However, Black turnout was lower in 2024 (59.1%) than it was in the pre-SB202 presidential election of 2020 (59.9%). Hispanic turnout was also lower in 2024 (41.2%) than it was in 2020 (42.2%). Asian American/Pacific Islander

turnout was likewise lower in 2024 (63.1%) than in 2020 (64.1%). Therefore, turnout for all racial/ethnic minority groups listed in **Table 1** was lower in the first post-SB202 presidential election than in the pre-SB202 presidential election, despite non-Hispanic White turnout increasing in this first post-SB202 presidential election.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 54.4% | 67.0% | 59.9% | 51.5% | 46.0% | 67.7% |
| **White** | 57.8% | 71.9% | 64.2% | 58.1% | 51.3% | 74.6% |
| **Black** | 53.0% | 62.3% | 57.2% | 47.1% | 43.5% | 62.0% |
| **Hispanic** | 32.3% | 45.8% | 35.7% | 25.0% | 21.0% | 45.1% |
| **Asian/PI** | 42.3% | 71.4% | 60.0% | 41.3% | 35.3% | 71.2% |

**Table 1a: Voter Turnout Rates by Self-Reported or Bayesian Improved Surname Geocoding (BISG) Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as the percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino), as extracted from the ACS 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is based on self-reports in the voter registration file, with individuals consistently self-identifying as "Other" or with "Unknown" race in the registration file having race estimated via BISG.

18. In line with my original report, I also add the Bayesian Improved Surname Geocoding (BISG)-estimated individuals to the racial/ethnic group voter totals derived from self-reported data results in the quantities found in **Table 1a** to verify that my conclusions are not contingent on the behavior of individuals who

are listed as "Unknown" or "Other" race in the voter registration file.[10] In **Table 1a**, we see that even after accounting for the population consistently listed as "Other" or "Unknown" in the voter registration file, large disparities in voter turnout rates persist across recent elections for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians, and there is a pattern of lower racial/ethnic minority turnout in presidential and non-presidential elections post-SB202, despite higher non-Hispanic White turnout in presidential and non-presidential elections post-SB202.

19. **Table 1a** depicts voter turnout trends similar to those in **Table 1**. Since the total number of voters is based on the voter history file, and is not influenced by the BISG imputation, the total turnout rates for November 2018, November 2020, January 2021, November 2022, December 2022, and November 2024 elections are the same as in **Table 1** at 54.4%, 67.0%, 59.9%, 51.5%, 46.0%, and 67.7%, respectively. However, in **Table 1a**, just as in Table 1a of my January 27, 2023 report,[11] each racial group has higher turnout rates displayed for each individual election relative to the values in **Table 1**, because additional voters for each group could be identified via the BISG algorithm.

20. Regardless of whether one relies solely on self-reported race/ethnicity or recodes Other/Unknown race Georgians via BISG, November 2024 saw a drop in turnout for every non-White

[10] See paragraphs 27-30 in my January 27, 2023 report for more details about the BISG procedure. As I note above, my conclusions do not change with the inclusion of BISG-estimated race/ethnicity values.

[11] Report of Bernard L. Fraga, dated January 27, 2023, Table 1a, p.17 & p.18 at 42.

group relative to the pre-SB202 presidential election of 2020, but not for White Georgians. Using BISG, Non-Hispanic White turnout increased by approximately 2.3 percentage points, from 71.9% in 2020 to 74.6% in 2024. Black voter turnout, Hispanic voter turnout, and Asian American/Pacific Islander voter turnout decreased.

21. As in my original report,[12] the turnout rate estimates in **Table 1a** do indeed change with BISG-calculated race estimates for "Other" and "Unknown" race persons, but the differences between racial/ethnic groups and overall trends are very similar. As a result, I rely on self-reported race only in the remainder of this supplemental report.

## V. Disparities in voter turnout for Black, Hispanic, and Asian American/Pacific Islander Georgians, relative to White Georgians, are larger in post-SB202 elections than they were in elections immediately preceding implementation of SB202.

22. In Section V of my sur-rebuttal report dated March 3, 2023, I state that "disparities between White and non-White turnout increased substantially immediately after the implementation of SB 202."[13] In the below paragraphs I show that the same pattern persists when adding the 2024 election to the analysis.

23. In **Table 2** below, I reproduce turnout rate estimates from Table 1 from the March 3, 2023 sur-rebuttal report,[14] but rescale the turnout rates for Black, Hispanic, and Asian American/Pacific

[12] Report of Bernard L. Fraga, dated January 27, 2023, pp.19-20 at 48.
[13] Sur-Rebuttal of Bernard L. Fraga, dated March 3, 2023, p.15 at 32.
[14] Sur-Rebuttal of Bernard L. Fraga, dated March 3, 2023, Table 1, p.15.

Islander Georgians to display them relative to the non-Hispanic White Georgian turnout rate in each election. Specifically, I subtract the unrounded turnout rate shown in **Table 1** for White Georgians in each election from the unrounded turnout rate in **Table 1** for Black Georgians, Hispanic Georgians, and Asian American/Pacific Islander Georgians in the same year. The result is the percentage point difference or disparity in voter turnout rates between White Georgians and non-White Georgians in each election.[15]

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **White** | 55.9% | 69.2% | 61.8% | 55.9% | 49.4% | 71.5% |
| **Black** | -4.7 | -9.4 | -6.9 | -10.7 | -7.6 | -12.4 |
| **Hispanic** | -26.2 | -27.1 | -29.1 | -33.1 | -30.3 | -30.3 |
| **Asian/PI** | -18.2 | -5.1 | -8.0 | -19.0 | -17.9 | -8.4 |

**Table 2: Difference in Voter Turnout Rate from White Georgians in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as a percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino) as extracted from the ACS 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is self-reported from the voter registration file.

24. **Table 2** shows that the largest disparity in turnout between Black Georgians and White Georgians (12.4 percentage points) in the time period I examine in this table was in the November 2024

[15] I also provide the White turnout rate from Table 1 for reference.

presidential election, which was the first presidential election after the implementation of SB202. Similarly, the largest disparity in turnout between Hispanic Georgians and White Georgians (33.1%) was in the post-SB202 federal election of November 2022. The largest disparity in turnout between Asian American/Pacific Islander Georgians and White Georgians (19.0 percentage points) was also in a post-SB202 election, November 2022. Across racial/ethnic minority groups, the largest disparities between their respective rate of turnout and non-Hispanic White turnout are post-SB202, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout are in pre-SB202 elections.

25. If we compare the three types of elections shown in **Table 2** (midterm elections, presidential elections, and runoff elections) in the pre-SB202 period to the same three types of elections in the post-SB202 period, we always see larger disparities post-SB202 than pre-SB202. This persistence, despite, for instance, higher turnout overall in the November 2024 election, suggest a durable, disproportionate, negative impact of SB202 on racial/ethnic minority turnout that cannot be accounted for by corresponding changes in turnout rates for non-Hispanic White voters.

## VI. Black and Asian American/Pacific Islander voters were more likely to vote by mail than non-Hispanic White voters in elections immediately before SB202, but saw disproportionate drops in their mail ballot use in elections after SB202's implementation.

26. In this section, I quantify rates of absentee-by-mail ballot use by Georgia voters from 2018 to 2024. To produce rates of absentee-by-

mail ballot use in these recent elections, I rely on lists of voters who applied to vote absentee in each election as made public in "Voter Absentee Files" by the Secretary of State's office.[16]

27. I link the absentee data to the combined voter registration list using the "Voter Registration [number]" column in the absentee data. This can be further linked to voter history data via the same voter registration number, and racial/ethnic information derived from the combined voter registration lists.

28. **Table 3** displays the percentage of voters in major Georgia statewide elections who voted absentee-by-mail by self-reported race, starting with the November 2018 election. My findings regarding the percent of voters voting absentee-by-mail for elections from 2018 through 2022 are unchanged from my original report.[17]

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 5.6% | 26.0% | 24.0% | 6.2% | 5.3% | 5.1% |
| **White** | 4.6% | 23.9% | 21.7% | 5.6% | 5.2% | 4.9% |
| **Black** | 7.1% | 29.0% | 27.5% | 7.3% | 5.5% | 5.4% |
| **Hispanic** | 6.3% | 23.2% | 20.4% | 4.4% | 2.7% | 3.0% |
| **Asian/PI** | 11.5% | 39.7% | 34.9% | 9.1% | 6.2% | 7.4% |

**Table 3: Percent of voters voting absentee-by-mail by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Percentages indicate the number of individuals who cast an absentee-by-mail ballot and had the ballot accepted, divided by the total number of voters in the

[16] https://elections.sos.ga.gov/Elections/voterabsenteefile.do.

[17] Report of Bernard L. Fraga, dated January 27, 2023, Table 2, p.23.

election for each racial/ethnic group. The race/ethnicity of voters is self-reported from the voter registration file.

29. In the 2024 election, which had not occurred when I produced my original report dated January 27, 2023, we see dramatic declines in the share of voters voting absentee-by-mail relative to the pre-SB202 presidential election of 2020.

30. Notably, White Georgian voters were the only racial/ethnic group to have their rate of mail voting in all post-SB202 federal elections remain higher than their rate of mail voting in the pre-SB202 (and pre-pandemic) November 2018 election. Black, Hispanic, and Asian American/Pacific Islander voters in Georgia, along with the statewide average, voted by mail at a lower rate in the post-SB202 November 2024 election than in November 2018.

## VII. Compared to White voters, Black, Hispanic, and Asian American/Pacific Islander voters were more likely to have absentee-by-mail ballots rejected due to requirements added or modified in SB202, including in the post-SB202 presidential election of 2024.

31. As noted in Section XII of my original report dated January 27, 2023, SB202 also added provisions to Georgia Code Section 21 related to submission and receipt of absentee-by-mail ballots. Specifically, under SB202, Georgia added identification requirements such that a voter must "print the number of his or her Georgia driver's license or identification card" or "print the last four digits of his or her social security number" on the ballot

envelope.[18] In my original report at page 50, I noted that these provisions disproportionately increased rates of rejection for Black, Hispanic, and Asian American/Pacific Islander would-be absentee-by-mail voters in elections in 2022, relative to elections immediately before the implementation of SB202.

32. In this supplemental report, I add an analysis of absentee-by-mail ballot rejection reasons for the November 2024 election, using the same methodology as I detailed in Section XII of my original report while I also use of the voter absentee file corresponding to the November 2024 election as provided by defendants in the discovery process.[19, 20]

33. **Table 4** provides a summary of values in the "Status Reason" field by election for absentee-by-mail voters whose ballots were rejected. These estimates are the same as the original Table 11 found at page 53 in my original report, except that 2024 data has been added.

[18] SB202, as passed (Enrolled version), p. 51 lines 1295-1300, as cited in Report of Bernard L. Fraga, dated January 27, 2023, pp.50-51 at 114.
[19] Report of Bernard L. Fraga, dated January 27, 2023, pp.51-52 at 116-118.
[20] In November 2024, the ballot rejection reasons recorded by the State were the same as those used in November and December 2022 elections, except that they included the word "REJECTION" prior to listing the reason for rejection. A small number of ballots with a rejection reason of "APPLICATION REJECTED" make up the 0.00% for the "Unclassified" row corresponding to the November 2024 election.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Ballot Received after Deadline** | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% | 1.16% |
| **Incorrect ID Information** | 0.12% | 0 | 0 | 0.11% | 0.16% | 0.09% |
| **Ineligible Elector** | 0.01% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Invalid Signature** | 0.10% | 0.05% | 0.15% | 0.02% | 0.03% | 0.03% |
| **MIDR - ID not Provided** | 0.01% | 0.00% | 0.00% | 0.01% | 0.00% | 0.00% |
| **Missing ID Information** | 0.09% | 0 | 0 | 0.34% | 0.51% | 0.14% |
| **Missing Signature** | 0.08% | 0.10% | 0.11% | 0.05% | 0.07% | 0.04% |
| **Oath Incomplete or Incorrect** | 1.32% | 0 | 0 | 0 | 0 | 0 |
| **Unclassified** | 0.17% | 0 | 0 | 0 | 0 | 0.00% |

**Table 4: Percent of Absentee-by-Mail voters whose ballots were rejected by reason for rejection, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected for the reason listed. Values of "0" indicate no records, while "0.00%" indicates percentages smaller than one-hundredth of one percent (0.01%).

34. As shown in **Table 4**, the percentage of ballots rejected because they were received after the deadline saw its highest percentage post SB202 at 1.66% for the December 2022 runoff election. The January 2021 runoff, which took place before SB202 shortened the time period between the general election and runoff election, had a 'ballot received after deadline' rejection rate of 0.30%. This means the December 2022 runoff post-SB202 had a 'ballot received after deadline' rejection rate over five times greater than the previous runoff election rate pre-SB202. Similarly, in November 2024, the percentage of ballots rejected because they were received after the deadline was 1.16%, while the rate of rejection in the pre-SB202 presidential election of November 2020 was only 0.18%.

This means the November 2024 post-SB202 election had a 'Ballot Received After Deadline" rejection rate over six times greater than the previous presidential election prior to implementation of SB202.

35. Absentee-by-mail ballots rejected for incorrect or missing ID information were also higher on average in post-SB202 elections than in pre-SB202 elections, including the 2024 presidential election.

36. **Table 5** combines the above reasons for absentee-by-mail ballot rejection, showing the population of mail voters who had their ballots rejected for any reason overall and by self-reported race/ethnicity. This table has the same values and interpretation as Table 12 on page 56 of my original report, except that 2024 data has been added.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 3.47% | 0.34% | 0.57% | 1.38% | 2.43% | 1.47% |
| **White** | 2.46% | 0.24% | 0.48% | 1.19% | 2.31% | 1.20% |
| **Black** | 4.34% | 0.45% | 0.65% | 1.43% | 2.15% | 1.65% |
| **Hispanic** | 4.53% | 0.49% | 0.82% | 2.11% | 5.57% | 2.58% |
| **Asian/PI** | 6.49% | 0.57% | 0.84% | 3.05% | 6.06% | 2.40% |

**Table 5: Percent of Absentee-by-Mail voters whose ballots were rejected by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected. The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

37. Examining **Table 5**, we see that, again, rejection rates were much higher overall in the November 2024 election post-SB202 than

they were in the pre-SB202 November 2020 election. In addition, the racial disparity in rejection rates was larger post-SB202 than pre-SB202 in percentage point terms.

38. **Table 6,** which is the same as Table 13 on page 57 of my original report, except that now 2024 data has been added, shows that Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters were consistently more likely to have their ballots rejected due to "Incorrect ID Information" or "Missing ID Information" post-SB202 relative to White Georgians. This includes the November 2024 presidential election.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 0.21% | 0.00% | 0.00% | 0.45% | 0.67% | 0.23% |
| **White** | 0.11% | 0.00% | 0.00% | 0.36% | 0.64% | 0.21% |
| **Black** | 0.27% | 0.00% | 0.00% | 0.59% | 0.73% | 0.26% |
| **Hispanic** | 0.40% | 0.00% | 0.00% | 0.41% | 0.77% | 0.28% |
| **Asian/PI** | 0.80% | 0.00% | 0.00% | 0.62% | 0.78% | 0.31% |

**Table 6: Percent of Absentee-by-Mail voters whose ballots were rejected due to missing or incorrect ID information by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected due to "Missing ID Information" or "Incorrect ID Information." The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

39. **Table 7,** which is the same as Table 14 on page 59 in my original report except that 2024 data has been added, shows a sharp increase in the share of absentee-by-mail ballots that were rejected due to arriving after the receipt deadline. However, in the post-SB202 presidential election of November 2024, Black, Hispanic,

and Asian American/Pacific Islander Georgians were more likely to have their ballots rejected due to receipt after the deadline than White Georgians. This gap in rejection rates reached its highest level in post-SB202 elections.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% | 1.16% |
| **White** | 1.50% | 0.16% | 0.26% | 0.77% | 1.59% | 0.93% |
| **Black** | 1.56% | 0.20% | 0.31% | 0.70% | 1.27% | 1.29% |
| **Hispanic** | 1.89% | 0.26% | 0.51% | 1.60% | 4.49% | 2.23% |
| **Asian/PI** | 1.99% | 0.25% | 0.55% | 2.32% | 5.22% | 2.03% |

**Table 7: Percent of Absentee-by-Mail voters whose ballots were rejected due to receipt after the deadline by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee ballots with a status of "A" or "R" that were rejected due to "Ballot Received after Deadline." The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

40. Altogether, the analyses of absentee ballot rejection rates and reasons for rejection point to substantial racial disparities in ballot rejection rates in elections conducted after SB202 went into effect, including through the November 2024 presidential election. These disparities are particularly noticeable for rejections due to SB202-imposed mandates related to identification requirements and ballot receipt deadlines.

## VIII. Conclusion

41. In my original report, dated January 27, 2023, I concluded that "several major provisions of the Electoral Integrity Act of 2021, also known as Georgia Senate Bill 202 [SB202], have a disproportionate, negative impact on Black registrants, Hispanic registrants, and/or Asian American/Pacific Islander registrants in terms of increased barriers to voting. These impacts manifest when examining data available when the law was passed in 2021, as well as information gleaned from the November 2022 and December 2022 elections."[21] After examining relevant data from the November 2024 election, I have determined that patterns found in my original report, specifically with respect to turnout rates and absentee-by-mail voting, also apply to this most recent presidential election in November 2024. Thus, with all of the information in my original report, sur-rebuttal report, and this supplemental report, it remains my opinion "that SB202's implementation demonstrably increased barriers to voting that Georgians face, with disproportionately strong impacts on Black, Hispanic, and Asian American/Pacific Islander Georgians."[22]

---

[21] Report of Bernard L. Fraga, dated January 27, 2023, p.83 at 183.
[22] Report of Bernard L. Fraga, dated January 27, 2023, p.83 at 183.

I reserve the right to supplement or revise my opinions and conclusions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

Executed the 23rd day of June, 2025 at Atlanta, Georgia

Bernard L. Fraga, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:21MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01259-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*,<br><br>*Defendants.* | CIVIL ACTION<br><br>Case No. 1:21-CV-01284-JPB |

EXHIBIT 4
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

| | |
|---|---|
| ASIAN AMERICANS ADVANCING JUSTICE-ATLANTA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01333-JPB |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.*,<br><br>*Defendants.* | Case No. 1:21-CV-01728-JPB |

**Rebuttal Report of Bernard L. Fraga, Ph.D.**

**July 14, 2025**

## I. Scope of Work

1. I was asked by attorneys for the plaintiffs in the above-captioned cases to evaluate the analyses and conclusions made by Dr. Justin Grimmer, defendants' expert, in his supplemental report dated June 13, 2025. My evaluation of Dr. Grimmer's original report, which was produced by the defendants on February 14, 2023, can

be found in my sur-rebuttal report dated March 3, 2023. My evaluation of Dr. Grimmer's "Update to Expert Report," dated September 7, 2023, may be found in my January 19, 2024 Supplementary Declaration.[1]

2. My silence on any particular analyses or conclusions reached by the defendants' experts, including but not limited to Dr. Grimmer, does not indicate agreement with the analyses or conclusions in question.

## II. Summary of Findings Regarding Dr. Grimmer's June 2025 Report

3. Dr. Grimmer's own calculations of voter turnout, like mine, show that the gap between White voter turnout and Black, Hispanic, and Asian American/Pacific Islander voter turnout in Georgia grew substantially after SB202 went into effect. My findings reveal this same pattern even when using different estimation methods from those of Dr. Grimmer.

4. As in his original February 2023 report, Dr. Grimmer selectively compares turnout in certain pre-SB202 elections with turnout in certain post-SB202 elections in a manner that ignores evidence contrary to his conclusions. In particular, Dr. Grimmer ignores the highly competitive 2021 elections that peer-reviewed literature credits as an impetus for SB202's provisions at issue in this case. The selective inclusion of certain elections and exclusion of others

[1] Dr. Grimmer's supplemental report dated June 13, 2025 referred to his supplementary declaration dated January 19, 2024 at 90-91 as a "sur-rebuttal" report.

leads Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting.

5. Dr. Grimmer's analysis of drop box use relies on a survey question whose ambiguous wording precludes accurate measurement of changes in rates of drop box use after SB202's implementation. Even Dr. Grimmer's flawed data shows that Black voters were more likely to use drop boxes than White voters in 2020, 2022, and 2024, with disproportionate declines in drop box use by Black voters after implementation of SB202.

## III. Dr. Grimmer's own calculations of voter turnout show that the gap between White voter turnout and Black, Hispanic, and Asian American/Pacific Islander voter turnout in Georgia grew substantially after SB202 went into effect.

6. In Section V of my sur-rebuttal report dated March 3, 2023, I noted that in his original report dated February 14, 2023, "Dr. Grimmer also makes selective comparisons when examining the turnout rates of racial/ethnic groups in isolation." And "[i]f instead Dr. Grimmer focused on turnout trends from 2018-2022, inclusive of intervening elections, he would find that disparities between White and non-White turnout increased substantially immediately after the implementation of SB202."[2]

7. Dr. Grimmer continues to employ these same selective analyses in Section III of his June 2025 supplemental report.[3] Specifically, he masks the clear trend of increasing disparities between White and

[2] Sur-Rebuttal Report of Dr. Bernard L. Fraga, dated March 3, 2023, p. 14 at 31 and p. 15 at 32.

[3] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 14 at 20.

non-White turnout after implementation of SB202, including in the 2024 presidential election.

8. Dr. Grimmer and I both estimate turnout by race in Georgia, relying primarily on counts of the number of voters by self-reported race in Georgia and U.S. Census Bureau estimates of the citizen voting-age population by race. However, Dr. Grimmer generates a flawed estimate for turnout in the 2024 presidential election that masks a likely drop in turnout for racial/ethnic minority groups relative to the pre-SB202 presidential election of 2020.[4]

9. Dr. Grimmer calculates voter turnout by race "primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP."[5] However, the U.S. Census Bureau has not yet provided a tabulation of the citizen voting-age population with a 2024 end point comparable to the other estimates Dr. Grimmer and I use in our other reports.

10. As a result, Dr. Grimmer relies on an extrapolation of the citizen voting-age population by race to 2024 in order to estimate turnout in the 2024 presidential election. He does so to "mitigate [the] risk" of "underestimating the size of groups in the 2024 electorate, which would cause [him] to overestimate turnout rates for that group."[6]

11. However, in his extrapolation procedure, he calculates the "average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group," then "divide[s] the average of the 2-year change by 2," then adds this to the "2023 CVAP

[4] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 14 at 20.
[5] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 7 at 12.
[6] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 8 at 12.

estimate."[7] This means that he relies on population growth trends from a decade ago (2014), skips over data from odd numbered years,[8] and adds unnecessary roughness to his estimates by cutting a two year change projection in half.

12. Data from the 2020 Census demonstrated that Georgia's "Black, Hispanic and Asian populations surged" while "its number of white residents dropped slightly."[9] Dr. Grimmer's reliance on trends from a decade ago likely fails to capture the extent of this "surge." He does **not**, therefore, "mitigate [the] risk" of "underestimating the size of groups"; to the contrary, he overestimates turnout for growing Black, Hispanic, and Asian American/Pacific Islander populations in post-SB202 elections, especially the 2024 presidential election.

13. To avoid this problem, in my June 23, 2025 amended supplemental report, I instead rely on the most recent Census Bureau CVAP estimates available, that is, the 2021, 2022, and 2023 end-point CVAP estimates.[10] Using that data, we see that while "White turnout was approximately 2.3 percentage points higher in 2024, at 71.5%, than it was in 2020, at 69.2%", Black turnout, Hispanic turnout, and Asian American/Pacific Islander turnout were all

---

[7] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 8 at 12.

[8] This is despite him knowing such data is available and is otherwise used in other aspects of his report. For example, Dr. Grimmer uses 2023 CVAP estimates as a base for his 2024 extrapolation.

[9] Jeremy Redmon, Paradise Afshar, and Lautaro Grinspan. "2020 Census: Georgia's minority populations have surged." *Atlanta Journal Constitution*. August 12, 2021. Available at https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY.

[10] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 6 at 12-13.

lower in the 2024 presidential election than they were in the 2020 presidential election.[11]

14. Further, in my amended supplemental report, I state that "[a]cross racial/ethnic minority groups, the largest disparities between their respective rate of turnout and non-Hispanic White turnout are post-SB202, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout are in pre-SB202 elections."[12] Even using Dr. Grimmer's estimates, we can still see a clear increase in turnout gaps between White Georgians and Black, Hispanic, or Asian American/Pacific Islander Georgians after SB202 went into effect.

15. **Table 1** below uses Dr. Grimmer's turnout estimates to construct the gap in turnout between White Georgians and Black, Hispanic, or Asian American/Pacific Islander Georgians. This table reproduces turnout rate estimates from Table 2 of Dr. Grimmer's supplemental report dated June 13, 2025, but rescales the turnout rates for Black, Hispanic, and Asian American/Pacific Islander Georgians to display them relative to the non-Hispanic White Georgian turnout rate in each statewide federal election from 2018-2024. The result is the percentage point difference or disparity in voter turnout rates between White Georgians and non-White Georgians in each election.[13]

[11] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 8-9 at 17.
[12] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 12-13 at 24.
[13] The presentation of the table is analogous to Table 2 from my June 23, 2025 amended supplemental report.

| | *Pre-SB202* | | | *Post-SB202* | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **White** | 53.9% | 67.1% | Missing | 53.9% | Missing | 69.0% |
| **Black** | -4.4 | -9.9 | Missing | -11.8 | Missing | **-12.9** |
| **Hispanic** | -26.4 | -26.8 | Missing | **-32.5** | Missing | -27.9 |
| **Asian/PI** | -19.6 | -7.2 | Missing | **-19.8** | Missing | -8.1 |

**Table 1: Difference in Voter Turnout Rate from White Georgians using Dr. Grimmer's Estimates, 2018-2024.** Turnout rates calculated using the replication code provided by defendants. "Missing" indicates elections where Dr. Grimmer did not provide any turnout estimates in his June 13, 2025 supplemental expert report. The **bolded** numbers reflect the largest gap between White and non-White Georgians in the available elections between 2018-2024.

16. **Table 1** shows the same pattern that I showed in my 2025 amended supplemental report. Dr. Grimmer's data shows that the largest disparity in turnout between Black Georgians and White Georgians (12.9 percentage points) in the elections Dr. Grimmer examines from 2018-2024 was in the November 2024 presidential election, which was the first presidential election after the implementation of SB202. Similarly, the largest disparity in turnout between Hispanic Georgians and White Georgians (32.5 points) was in the post-SB202 federal election of November 2022. The largest disparity in turnout between Asian American/Pacific Islander Georgians and White Georgians (19.8 percentage points) was also in a post-SB202 election, November 2022. In fact, despite methodological differences in our data and analyses, both Dr. Grimmer and I show that the largest disparities between racial/ethnic minority groups' rate of turnout and non-Hispanic

White turnout occurred in post-SB202 elections, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout occurred in pre-SB202 elections.

17. As in my June 2025 amended supplemental report, if we compare turnout in the midterm election immediately preceding the implementation of SB202 (in 2018) to the midterm election immediately after the implementation of SB202 (in 2022), **Table 1** shows a larger disparity in turnout between White Georgians and Black Georgians, between White Georgians and Hispanic Georgians, and between White Georgians and Asian American/Pacific Islander Georgians post-SB202. Again, we see these findings even using Dr. Grimmer's turnout estimates.

18. Furthermore, despite Dr. Grimmer using a different, and more likely to be biased, method of calculating the citizen voting-age population for 2024, his findings nonetheless reinforce my conclusions. **Table 1**, which shows the difference in voter turnout rate from White Georgians as estimated by Dr. Grimmer, shows a larger disparity or gap in turnout in the presidential election after SB202 (in 2024) relative to the presidential election immediately preceding SB202 (in 2020). This is true when comparing turnout between White Georgians and Black Georgians, between White Georgians and Hispanic Georgians, and between White Georgians and Asian American/Pacific Islander Georgians. As shown in my June 23, 2025 amended supplemental report, I also find these same patterns: Black turnout, Hispanic turnout, and Asian American/Pacific Islander turnout all dropped disproportionately (relative to White voters) in 2024.

**IV. <u>As in his original February 2023 report, Dr. Grimmer selectively compares turnout in certain pre-SB202 elections with turnout in certain post-SB202 elections. Doing so ignores the highly competitive elections that peer-reviewed literature credits as an impetus for SB202 and ignores evidence contrary to his conclusions.</u>**

19. In my three reports, I focus my analyses of voter turnout trends on elections beginning in 2018 and continuing to the most recent statewide elections available. The reason I do so is because from 2018 onward, statewide elections in Georgia began to be viewed as highly competitive by campaigns and voters as turnout reached "modern highs."[14] According to Dr. M.V. (Trey) Hood III, an academic researcher specializing in Georgia elections and the director of the University of Georgia SPIA survey Dr. Grimmer uses in his expert reports, the 2018 election in Georgia was a "historic" election where "midterm turnout reached modern highs and a charismatic Democratic African-American woman came within a whisker of taking the 2018 gubernatorial contest to a runoff."[15] Dr. Hood and his co-author predicted (correctly) in 2019 that "[r]elatively recent demographically-driven political

[14] M.V. Hood III and Seth C. McKee (2019) "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election." *Social Science Quarterly*. 100 (5): 1828-1847, at 1844. The authors also note that campaigns did not treat the state as competitive in elections before 2018: "Obama and his respective GOP opponents treated Georgia as a 'blackout'/'base' Republican state in 2008 and 2012 (also the case in 2016)." Ibid. Internal citations omitted.

[15] M.V. Hood III and Seth C. McKee (2019) "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election." *Social Science Quarterly*. 100 (5): 1828-1847, at 1844.

developments have increasingly distanced Georgia from its more Republican Deep South neighbors. As a consequence, one can anticipate that for the first time since 1996, the Peach State will be a vigorously contested prize in the 2020 presidential election and it will also likely feature a contentious and competitive U.S. Senate race."[16]

20. These close electoral contests extended beyond the conventional November matchups to include two critical runoff elections for Georgia's U.S. Senate seats. Indeed, researchers note that "[a]fter the 2020 presidential election **and subsequent 2021 Senate runoffs**, contests all won by Democrats in Georgia, the Republican-controlled legislature passed SB202 to appease their agitated and disaffected base of supporters."[17]

21. Dr. Grimmer's supplemental report ignores the pre-SB202 2021 runoff elections or the relevant post-SB202 comparison election (a U.S. Senate seat runoff in 2022), despite the 2021 runoffs being viewed by academics as a primary motivator for the passage of SB202 itself.

22. In my (2023) original and sur-rebuttal reports, and also my (2025) amended supplemental report, I show that racial disparities in turnout were substantially higher in the post-SB202 2022 Senate runoff election, relative to the pre-SB202 2021 Senate runoff elections. Importantly, Dr. Grimmer also showed the same pattern of higher racial disparities in turnout in the post-SB202 2022 Senate runoff election relative to the pre-SB202 2021 Senate

[16] Ibid.

[17] M.V. Hood III and Seth C. McKee (2023) "Partisan schism in America's newest swing state." *Party Politics*. 29 (5): 853-864, at 853. Emphasis added.

runoff election in his original expert report.[18] However, he removed runoff analyses from his turnout discussion and all tables in his most recent (June 2025) report.[19]

23. The inclusion of elections prior to 2018, and omission of key runoff elections in 2021 and 2022, lead Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting. This includes his observation that "[t]he turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election"[20] and that "[a]bout 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022."[21]

24. The inclusion of the 2016 election and omission of key runoff elections in 2021 and 2022 also leads Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on mail-in ballot rejection rates. This includes his observation that "the two general elections after the passage of SB202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016

---

[18] Expert Report of Dr. Justin Grimmer, dated February 14, 2023, p. 23 at Table 2.

[19] The 2021 and 2022 Senate runoffs were mentioned at least 70 times in Dr. Grimmer's original 2023 expert report. In his June 2025 supplemental report, he mentions Georgia's runoff elections three times: twice in quoting material from his original 2023 expert report, and once in what appears to be an erroneous copy-paste of a footnote from that original report. *See* Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, pp. 6-7 n.1.

[20] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 1 at 1.

[21] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 2 at 2.

or 2018, but a higher mail-in ballot rejection rate than in 2020."[22] Instead, in **all of the statewide federal elections** after the passage of SB202, there was a higher mail-in ballot rejection rate than in the two statewide federal elections immediately preceding the implementation of SB202.[23]

## V. Dr. Grimmer's analysis of drop box use relies on a survey question whose ambiguous wording precludes accurate measurement of changes in rates of drop box use after SB202's implementation. However, even Dr. Grimmer's flawed data shows Black voters were more likely to use drop boxes than White voters in 2020, 2022, and 2024, with disproportionate declines in drop box use by Black voters after implementation of SB202.

25. Dr. Grimmer relies on a question from the 2022 and 2024 Cooperative Election Study ("CES") to evaluate what proportion of Georgia absentee-by-mail voters returned their ballot in a drop box in the post-SB202 2022 and 2024 elections. The question, which is the same in both years of the survey, reads "Which of the following statements most accurately describes where your ballot was returned?"[24] The question has not been tailored for the State of

[22] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 35 at 51.
[23] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 18-19 at 36-37.
[24] For 2022, the question label is CC22_403c, 2022 CES post-election wave questionnaire, downloaded from https://doi.org/10.7910/DVN/PR4L8P [file name: ces22_common_post_qx.pdf], p. 22.
For 2024, the question label is CC24_403c, 2024 CES post-election wave questionnaire, downloaded from https://doi.org/10.7910/DVN/X11EP6 [file name: CCES24_Common_post.docx], p. 16.

Georgia. Instead, seven response options are available, and only one response mentions a drop box. The response that most clearly indicates a deposit in a drop box states: "Drop box used only for ballots, not located at an election office or polling place."[25] However, as a result of the implementation of SB202 in 2021, all drop boxes in Georgia are located inside of either election offices or certain polling places used for early voting and only during early voting hours.[26]

26. Therefore, a 2022 or 2024 voter using a drop box in Georgia **cannot** indicate that they used a drop box via this or other listed responses without significant ambiguity as to how they returned their ballot. For instance, a voter answering yes to this option, may have deposited a ballot in a drop box although the answer is technically inaccurate.

27. Further, a respondent who returned his ballot to **an election office after early voting may not have used a drop box** but may have answered yes. Another may have looked at the list of options and decided to mark "I don't know." Or a respondent who deposited a ballot in a drop box at an election office may have decided to ignore the second clause in the response option "Drop box used only for ballots, not located at an election office or polling place."

28. As Dr. Grimmer acknowledges in his report, "there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember

---

[25] Ibid.

[26] SB202, as passed (Enrolled version), p. 47, lines 1172-1191.

how they returned their ballot or their mode of voting."[27] Given the nature of the survey question, the scenario Dr. Grimmer outlines in his caveat likely influences the responses that at least some of the Georgia voters gave in the online survey.

29. An examination of Dr. Grimmer's data indicates that his estimates of differences in drop box include only six (6) Black Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place," and six (6) White Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place" in the 2024 CES survey. His data also indicates only two (2) Black Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place," and eight (8) White Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place" in the 2022 CES survey. This number of respondents who selected the only response clearly indicating drop box use is too small to draw any conclusions about drop box usage given the problems inherent in the survey question's response options.

30. Dr. Grimmer has made consequential errors in analyzing survey data on drop box use in previous reports in this case. At least two experts have previously found errors in Dr. Grimmer's analysis of survey data on drop box use that led him to make incorrect

[27] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 74 at 94.

conclusions about rates of drop box use by race in 2020 and 2022.[28] This includes excluding non-mail-in voters in the denominator of his calculations,[29] an error he again makes in this report.

31.    I noted in my 2024 supplemental declaration that Dr. Grimmer failed to report an analysis contained in his computer code showing "Black voters were significantly (p = 0.0163, significant at the 95% level) **more** likely to use drop boxes than White voters in the 2020 election."[30] Dr. Grimmer also admitted that he edited the survey data as it contained "badly biased estimates"[31] of what share of Georgia voters voted absentee in 2020. Finally, Dr. Grimmer admitted to making an "arithmetic error" in calculating the share of White and Black Georgians who voted via drop box in 2022 attributable to this editing process, and after fixing this error he found that, on average, Black Georgians had a higher rate of drop box use in the survey than White Georgians.[32]

32.    In his 2025 report, Dr. Grimmer does not show any analyses of drop box use by Black or White Georgians who voted in total. Instead, he only shows rates of drop box use for the subset of Georgians who self-reported that they used an absentee-by-mail

---

[28] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, pp. 4-12 at 4-16; Supplemental Declaration of Dr. Barry Burden, dated August 24, 2023, pp. 1-4; Update to Expert Report of Dr. Justin Grimmer, dated September 7, 2023, p. 2 at 3.

[29] Supplemental Declaration of Bernard L. Fraga, dated January 19, 2024, pp. 10-12 at 12-17.

[30] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 4 at 5.

[31] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 6 at 7 (citing "Grimmer – Additional Data and Code", file "code.R", line 204).

[32] Update to Expert Report of Dr. Justin Grimmer, dated September 7, 2023, p. 2 at 3.

ballot. Subsetting the data in this way produces a biased analysis of SB202's impact because it cannot account for individuals who may have decided not to use an absentee-by-mail ballot because of limits on drop box availability or accessibility. Peer-reviewed research analyzing Georgia's drop box availability in 2020 established that "Individuals located closer to drop boxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots."[33] Therefore, an analysis of how SB202's drop box provisions may have impacted drop box use must include, at a minimum, all Georgians who decided to vote in the denominator of the analysis.

33. Dr. Grimmer and I both show that the rate of absentee-by-mail voting in Georgia was disproportionately reduced for Black voters after SB202 was enacted.[34] Dr. Grimmer's original report also shows that limits on the number of drop boxes disproportionately reduced drop box availability in Fulton and DeKalb counties,[35] the two counties with the largest number of Black registrants in the state. If some Black voters decided not to vote absentee-by-mail because of limited drop box availability, Dr. Grimmer's decision to use only mail-in voters in the denominator would bias estimates of racial disparities in changes in drop box use as well. As I stated in one of my previous reports, "[a]ny statistics that use the population of mail-in absentee voters as the denominator, rather than all

---

[33] Greenberger, Michael and Jason M. Roberts. 2024. "Dropbox Allocation and Use Among Georgia Voters in the 2020 Election." *Election Law Journal* 23 (1): 55-68.
[34] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 29 at Table 6; Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 14 at Table 3.
[35] Report of Dr. Justin Grimmer, dated February 14, 2023, p. 110 at Table 21.

voters statewide, will provide a misleading estimate of differences in rates of drop box use by Black Georgians and White Georgians" and "comparisons among mail-in voters alone are not logically informative as to how, e.g., the availability of drop boxes or subsequent restrictions on drop boxes could have disparate racial impacts."[36]

34. Using the replication code provided by Dr. Grimmer, I estimated the share of White voters in Georgia who voted via drop box and Black voters in Georgia who voted via drop box in the 2020, 2022, and 2024 elections. As I note earlier in this report, the single survey question Dr. Grimmer relies on is severely flawed and not tailored to the realities of how voting occurs and elections are conducted in Georgia post-SB202. However, using this flawed data I produced **Table 2** below.

35. In **Table 2**, I show that, using Dr. Grimmer's method of identifying who voted via drop box, Black voters in Georgia were more likely to vote via drop box than White voters in Georgia in every election examined by Dr. Grimmer in Table 19 of his 2025 supplemental report.[37] Black voters in Georgia were also more likely to vote via drop box than voters overall in the state in 2020, 2022, and 2024.

---

[36] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 10-11 at 14-15.

[37] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 74 at Table 19.

| | White Voters | Black Voters | Overall Voters |
|---|---|---|---|
| **2020** | 13.1% | 18.2% | 14.7% |
| **2022** | 3.0% | 4.1% | 3.3% |
| **2024** | 2.3% | 4.6% | 4.3% |

**Table 2: Share of Georgia Voters Returning Ballots at a Drop Box, using Dr. Grimmer's Methodology.** Drop box use rates calculated using replication code provided by defendants.

36. **Table 2** also demonstrates a disproportionate decrease in drop box use by Black voters in Georgia after the enactment of SB202 in 2021. In 2020, Black voters voted via drop box at a rate of 18.2%. In 2022, this rate dropped to 4.1%, a decline of 14.1 percentage points. By comparison, in 2020, White voters voted via drop box at a rate of 13.1%. In 2022, this rate dropped to 3.0%, a decline of 10.1 percentage points.

37. Dr. Grimmer's analyses in Section XI of his report are therefore not reliable evidence of rates of drop box use or differences in rates of drop box use by Georgia voters by race in 2020, 2022, or 2024.

I reserve the right to supplement or revise my opinions and conclusions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

Executed the 14th day of July, 2025 at Atlanta, GA

Bernard L. Fraga, Ph.D.

 EXHIBIT 5
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

**CDC**
@CDCgov

URGENT ALERT: CDC urges you to take action NOW to fight rapidly rising #COVID19 cases. Do your part: 1) Wear a mask over your mouth AND nose. 2) Stay 6 feet away from others. 3) Wash your hands. 4) Stay home if you can. Do your part. Get the facts: bit.ly/3bGvO6p.

**3 Healthy Habits**

Do you do these 3 healthy habits? Wear a mask. Stay at least 6 feet apart from others who do not live in your household. Wash your hands with soap and water for at least 20 seconds.

2:32 PM · Nov 16, 2020

EXHIBIT
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

# Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election

M. V. Hood III, *University of Georgia*

Seth C. McKee, *Texas Tech University*

*Objective.* In the historic 2018 Georgia gubernatorial election, which for the first time featured a black Democratic woman against a white Republican man, we assess opinions toward voting-related concerns and their impact on voters' preferences. *Methods.* We surveyed political behavior with a representative sample of likely Georgia voters to gauge their perceptions of voting-related improprieties and their possible effect on vote choice. *Results.* Our analysis makes it clear that not only did voters divide over election-related concerns, which dominated the narrative of the gubernatorial contest, but opinions on this matter strongly influenced the choice for governor. *Conclusions.* Reflecting a national development, but amplified in Georgia because demographic changes and growing minority participation are increasing competition, election administration has become highly politicized and it was the focal point of the 2018 gubernatorial campaign and the principal short-term factor shaping mass voting behavior.

Voter suppression in the American South is a story as old as the Civil War. Soon after the conflict ended, during Reconstruction ex-Confederate soldiers were marginalized by the practice of requiring a loyalty oath to the Union as a condition of reenfranchisement (Foner, 1988). Learning thoroughly the methods of their northern overseers, when native southern whites finally "redeemed" their state governments, the eventual implementation of an elaborate structure of restrictive voting laws shrunk the southern electorate to the point that most poor whites and the vast majority of blacks did not participate from the early 1900s until well into the 1950s (Burnham, 2010; Key, 1949; Kousser, 1974; Woodward, 2002). This era of the Solid (Democratic) South ended in the wake of the 1960s civil rights movement, which brought forth the landmark 1964 Civil Rights Act and the 1965 Voting Rights Act (VRA), with the latter provision spurring massive voter mobilization among blacks and whites in certain southern localities (Bullock and Gaddie, 2009; Davidson and Grofman, 1994; McKee, 2017; Timpone, 1995).[1]

From the mid-1960s up to the new millennium, American politics experienced a lengthy period in which most sections of the United States, including the South, approved of election reforms that, at least at the margins, lowered the costs of voting (Highton and

Direct correspondence to M. V. (Trey) Hood III, Department of Political Science, School of Public and International Affairs, 180 Baldwin Hall, University of Georgia, Athens, GA 30602 (th@uga.edu). The authors will share all data and coding for replication purposes. The title of this article pays tribute to the song "Why Georgia" by John Mayer.

[1]In Georgia, between 1964 and 1968, black voting-age registration went from 44 to 56 percent while white voting-age registration pre-VRA (1962–1964) to post-VRA (1966–1967) increased from 63 to 80 percent (McKee, 2017:143–44).

SOCIAL SCIENCE QUARTERLY, Volume 100, Number 5, August 2019
© 2019 by the Southwestern Social Science Association
DOI: 10.1111/ssqu.12655

Wolfinger, 1998; Keyssar, 2009; Rosenstone and Hansen, 1993) (e.g., shortening closing dates for registration prior to Election Day, the national "motor voter" law in 1993, no-excuse absentee voting by mail, early in-person voting). The contentious 2000 presidential election, however, proved a harbinger for a decided partisan tilt toward election administration (Hicks et al., 2015). The controversial *Bush v. Gore* (2000) Supreme Court ruling, which determined the outcome of the 2000 presidential contest, heralded a new era of contentious party politics in which election reforms would take center stage in battles to win not only national majorities in Congress and the White House, but anywhere partisan elections were highly competitive (Hasen, 2012).

This brings us to Georgia, a Deep South state that has been moving in a more competitive, read Democratic direction, since Barack Obama was elected in 2008. The Peach State offers an illuminating case study of the changing South and particularly as manifested in a closely fought 2018 gubernatorial election pitting a Republican white man against a Democratic African-American woman; the descriptive standard bearers of the Deep South's contemporary major party coalitions (McKee, 2018). In this study, we contextualize and evaluate the 2018 Georgia gubernatorial election via three lenses: the historical backdrop of this Deep South state, the contemporary partisan wrangling over restrictive voting reforms (i.e., stricter voter identification [ID] laws), and how these two factors collided to create the distinct political milieu of the 2018 contest.

Republican Brian Kemp, the Secretary of State (2010–2018), defeated Democratic political activist and former state representative (2010–2017) Stacey Abrams with 50.2 percent of the total votes cast to become the new governor of Georgia. This remarkably close contest and the fact that both candidates played key roles in either overseeing the administration of the voting apparatus (Kemp) or mobilizing vast numbers of supporters via registration drives (Abrams) generated considerable concern over questions of fairness and hence the legitimacy of the outcome. We have leveraged a unique survey of likely general election voters to evaluate their preferences in the 2018 Georgia gubernatorial election. Most importantly, given the contentious context of this contest, our emphasis is placed on gauging opinions toward alleged voting-related improprieties and how these views may have impacted vote choice. But before we turn to an assessment of mass political behavior in the 2018 election, we begin with a trip back in time to briefly contextualize the history of Georgia politics and how it brought us to the current era.

## Georgia Politics: Then to Now

Georgia is a Deep South state, one of five, including Alabama, Louisiana, Mississippi, and South Carolina. This southern subregion, mainly because of its much larger percentage of African Americans, has always endured more contentious race relations than its Rim South counterparts consisting of Arkansas, Florida, North Carolina, Tennessee, Texas, and Virginia (Key, 1949). For most of the Peach State's post-Civil War history, race has driven the character of its politics and advantaged a one-party Democratic faction of white elites residing primarily in the rural (black-belt) sections of the state (Key, 1949).

Starting with the Reconstruction era (1865–1877), Georgia was perhaps the most militant in its resistance to federal intervention. Indeed, the Peach State was never compliant with northern oversight (Russ, 1935) and twice had to be readmitted to the Union (McKee, 2019:21). Georgia was the first southern state to enact a poll tax in 1871 (Kousser, 1974); long before the elaborate post-Reconstruction implementation of Jim Crow laws (circa 1889–1908; see McKee, 2019:39) ensured a one-party white supremacist

Democratic Solid South (Woodward, 2002). In 1877, the Peach State enacted a cumulative, and hence more punitive, poll tax widely regarded as disfranchising the black population. In the 1880s, turnout in Georgia was under 50 percent while in the rest of the South, which still lacked "effective restrictive legal devices," turnout was over 65 percent (Kousser, 1974:67).

From the late 1800s into the 1950s, Democratic politics was synonymous with Georgia politics. For most of these decades, a bi-factionalism within the party pitted a more formidable rural, "pseudo-Populist" (Key, 1949:116), demagogic group (highlighted by the likes of Tom Watson and Eugene Talmadge) against a relatively progressive urban opposition (e.g., Ellis Arnall). The urban faction was institutionally disadvantaged by the County-Unit System, employed for most statewide and even congressional, Democratic primary contests (Buchanan, 1997; Key, 1949). This arrangement produced substantial malapportionment because rural counties had comparatively more unit votes than the smaller number of more populous urban counties. Like the Electoral College, the campaign strategy was the same, heavily contest the most competitive counties (states) and sometimes the popular vote loser was the victor (e.g., Eugene Talmadge in the 1946 Democratic gubernatorial primary) because unit votes (electoral votes) privileged candidates who garnered support from rural residents.

There were two revolutions in the 1960s, one concerning civil rights and the other reapportionment (Cox and Katz, 2002). These two extremely electorally disruptive developments were tightly linked. As African Americans fought and won concessions for equal rights under the law, Georgia's Democratic monopoly was broken up by abolition of the County-Unit System (*Gray v. Sanders*, 1963) and enforcement of the one-person, one-vote principle (see *Wesberry v. Sanders*, 1964; *Reynolds v. Sims*, 1964) in district-based elections (i.e., U.S. House and state legislative races). As a consequence, in the 1970s, the Grand Old Party (GOP) was gaining strength in Georgia's rapidly growing suburbs (Fenno, 2000). The one-sided Democratic affiliation of Georgia's burgeoning black electorate directly contributed to GOP growth as white elites appropriated the erstwhile moribund Republican Party as the vehicle for maintaining political power (Hood, Kidd, and Morris, 2012). Nonetheless, Georgia Democrats held the upper hand via biracial coalitions up through the 1980s (Lamis, 1988). But Republican ascendancy took off in the 1990s in part because majority–minority redistricting undermined the Democrats' biracial coalitions (Black and Black, 2002) as the Department of Justice insisted that the Peach State (under Section 5 Preclearance Voting Rights Act enforcement) draw three majority black congressional districts for the 1992 elections (Bullock, 2010). Consider that before the 1992 election, Republican Newt Gingrich was the only Republican in Georgia's 10-member U.S. House delegation, but by 1995 (with a party switch by future Governor Nathan Deal), the 11-member Peach State delegation consisted of three black Democrats and eight white Republicans (McKee, 2010).

By the 1990s, whites in rural sections of Georgia were strongly realigning in favor of the Republican Party (Bullock and Gaddie, 2013) and long-running cultural battles like the one waged over the Confederate battle flag (Huffmon, Knotts, and McKee, 2017–2018; Hutchings, Walton, and Benjamin, 2010) ultimately benefited the GOP, since its almost exclusively white coalition had become the new home of racial conservatives (Valentino and Sears, 2005). In 2002, Sonny Perdue became the first Georgia Republican governor since Reconstruction and rural whites were a key contributor to his victory (Hayes and McKee, 2004). Republican electoral success in the new millennium has been impressive up and down the ballot, with the GOP consistently winning the majority (and lately all) of statewide contests and holding majorities in the Georgia Senate since 2002 and in the Georgia House since 2004.

FIGURE 1

Index of Republican Electoral Strength in the South, 1950–2016

NOTES: Shown is David's Index (see David, 1972) Composite B (votes for governor, U.S. Senate, and U.S. House) for Republican electoral strength. We have applied a 10-year moving average to smooth out any short-term spikes in the data series.

We conclude this brief synopsis of Georgia politics with two telling figures that speak to long-term partisan changes in the Peach State. First, Figure 1 displays Republican electoral strength based on a composite index of the party's performance weighted equally (in thirds) for gubernatorial, U.S. Senate, and U.S. House elections (see David, 1972). We present these data from 1950 to 2016 for the South, Rim South, Deep South (including Georgia), and Georgia. Several things stick out in Figure 1. From the 1950s to early the 1970s, the Deep South, and especially Georgia, had an electorally weak (but strengthening) Republican Party compared to the Rim South. Interestingly, the rise of Democratic native son Jimmy Carter from 1974 to 1980 is the only period in which the GOP index was higher in Georgia than the Deep South as a whole. Thereafter, Georgia plays catch up with the rest of the South until the historic 2008 election of Democrat Barack Obama, when its GOP index finally exceeds that of the Rim South. Notice, however, that since 2008, Deep South Republicanism grows ever stronger while it levels off in Georgia.

In Figure 2, we present the Republican margin of the two-party (popular) presidential vote in Georgia (GOP percentage minus Democratic percentage) from 1960 to 2016. The presidential vote is the most salient indicator of change in signaling the direction of party politics (Carmines and Stimson, 1989). With this in mind, we begin with 1960 to show that the Peach State went decidedly for New England Democrat John Kennedy but then trended Republican for the next three contests in which the "Southern Strategy" (Phillips, 1969) of courting racially conservative white voters paid electoral dividends.[2] Not surprisingly, Georgia embraced its native son, Democrat Jimmy Carter, in 1976 and was

[2]Barry Goldwater was the first Republican to win Georgia's popular presidential vote (Democrats prevailed even in the Reconstruction elections of 1868, 1872, and 1876) and the first non-Democrat to do so since Whig nominee Zachary Taylor in 1848.

FIGURE 2

Presidential Popular Two-Party Vote Margin (Republican Minus Democratic) in Georgia, 1960–2016

NOTES: Data are from Dave Leip's *Atlas of Presidential Elections* (⟨https://uselectionatlas.org/⟩). Values are computed as the Republican percentage of the presidential vote minus the Democratic percentage and therefore positive values mean a higher Republican vote, whereas negative values mean a higher Democratic vote.

the only southern state to stick with him in 1980. Only fellow Democratic southerner Bill Clinton has managed to carry Georgia since 1980 (in 1992). But we consider the emergence of Democrat Barack Obama in 2008 to be a true turning point in Georgia politics. In the previous two elections, 2000 and 2004, Republican George W. Bush won the Peach State by double digits. In contrast, Georgia presidential elections have been notably more competitive since. A major reason for this development is because of changing demography and minority voter mobilization in favor of Democrats. It is this political reality that leads us to the next section, which outlines efforts by Georgia Republicans to maintain power via election administration.

## The New Millennium and the Republican Push for Restrictive Voting Reforms

Cobb County, located northwest of Atlanta's beltway, provides an excellent vignette for comprehending the remarkable demographic changes overtaking the Peach State. Comparisons between 1990 and 2016 reveal notable transformations to this rapidly growing and diversifying county.[3] Over this quarter-century, Cobb's population increased 63 percent, African Americans went from 10 to 27 percent, Latinos from 2 to 13 percent, while the share of non-Hispanic whites plummeted from 88 to 61 percent. At the same time, graduate degree holders (25 years or older) increased from 9 to 15 percent and residents born in Georgia declined from 46 to 38 percent. Politically, these changes benefit Democrats. In 1996, the two-party presidential vote went 61 to 39 percent in favor of Republican Bob Dole over Democrat Bill Clinton. Twenty years later, Democrat Hillary Clinton bested Republican Donald Trump 51 to 49 percent. In 2014, Republican Governor Nathan Deal defeated Democrat Jason Carter (Jimmy Carter's grandson) 57 to 43 percent in Cobb

[3]Comparing 1990 decennial census data with 2012–2016 five-year American Community Survey (ACS) estimates.

County. In 2018, Cobb County went 55 to 45 percent in favor of Democrat Stacey Abrams over Republican Brian Kemp. Perhaps most interesting is that from 1992 to 1998, Republican Congressman Newt Gingrich represented most of Cobb County and in 2018 the best cognate of his district (changed through redistricting), the current Georgia District 6, was won by African-American Lucy McBath—the only majority white district (70 percent) in Georgia represented by a Democrat.[4]

Statewide, over the same period of time (1990–2016), Georgia's black population went from 27 to 31 percent (third highest in the South) and Latinos increased from 2 to 9 percent (third highest in the South), whereas the non-Hispanic white population dropped from 71 to 60 percent. The share of Georgia natives declined from 64 to 55 percent, the percent urban increased from 63 to 75 percent (2010 census: fourth highest in the South), and based on 2012 (ACS) data, 30 percent of northern in-migrants came from the "deep blue" Northeast (fifth highest in the South; see McKee and Teigen, 2016:229). Based on these metrics, Georgia is looking *less* Deep South and *more* Rim South (McKee and Springer, 2015) and the currently dominant Georgia GOP has a big problem on its hands. Compositional changes to the Georgia electorate clearly advantage the Democratic opposition, and like so many other states (southern and northern) that are experiencing real or impending competition, if Republicans control the political system, then they have busily proposed/enacted restrictive voting reforms as a means to at least slow the Democratic advance (Levitt, 2012; McKee, 2019).

Control of election administration, particularly in the new millennium, a time of historically competitive two-party competition (Shafer, 2016), has increasingly been recognized and deployed as a means to seek electoral advantage. For sure, gerrymandering is a time-honored American tradition (Engstrom, 2013), and bipartisan in the sense that both parties use this tactic if they have the opportunity (McGann et al., 2016).[5] But more recently, restrictive voting measures have come to the fore.

Most salient and divisive among them has been the push for stricter voter ID as a requirement for in-person voting. It is not our purpose to litigate whether this reform actually curtails the electorate in a manner that disadvantages the Democratic Party (on this debate, see the recent exchange between Hajnal, Kuk, and Lagevardi, 2018 and Grimmer et al., 2018 in *The Journal of Politics*). Rather, what we know for certain is that tightening voter ID at the polls is one of the most partisan-polarized reforms in American politics. Further, there is little doubt Republican officials view this measure as a way to gain electoral advantage (Keyssar, 2009) and this is the principal reason their Democratic counterparts overwhelmingly oppose stricter voter ID. Finally, the stark elite partisan divide on this issue has resonated, registered, and filtered down to the mass public (see Gronke et al., 2018), with rank-and-file Republicans receiving the GOP's message that stricter voter ID is needed to combat possible voter fraud (von Spakovsky, 2012), while many Democratic voters are cognizant of their party's talking point that the reform is nothing more than a naked partisan ploy (Levitt, 2012).

[4]In the 2018 midterms, Georgia Democrats netted three seats in the state Senate and 12 in the state House, making the upper chamber 63 percent Republican and the lower chamber 59 percent Republican (National Conference of State Legislatures website: ⟨http://www.ncsl.org/research/about-state-legislatures/partisan-composition.aspx⟩). Democrats came within 420 votes of unseating Republican Congressman Rob Woodall in the rapidly changing District 7.

[5]Following the lead of Texas Republicans (McKee and Shaw, 2005), when they took control of redistricting after the 2004 elections, Georgia Republicans "redistricted" their congressional map for the 2006 midterms (Hood and McKee, 2009). Likewise, when Georgia Democrats were in charge for the 2002 elections, they implemented a partisan gerrymander for the state Senate, which was later overturned in *Georgia v. Ashcroft* (2003) (see Gaddie and Bullock, 2006).

In 2005, along with Indiana the Peach State was the first to pass a strict photo ID law (Hicks, McKee, and Smith, 2016). Even at this early date (since then, over 40 states have entertained voter ID laws; see Barreto et al., 2018), partisan lawmakers were deeply divided over this reform. In Georgia's large General Assembly ($N = 56$ senators, $N = 180$ representatives), among those casting a vote, 95 percent of House Democrats voted no and 98 percent of House Republicans voted yes; in the state Senate, 100 percent of Democrats voted no and 94 percent of Republicans voted yes (Hicks, McKee, and Smith, 2016:Table A1).[6] After the 2010 Republican wave election, many state legislatures in swing states flipped in favor of GOP majorities and a raft of new voter ID legislation was proposed with impressive partisan polarization in the votes cast for and against (see McKee, 2015). In the South, from 2011 to 2013, seven states took up stricter voter ID legislation (AL, AR, NC, SC, TN, TX, and VA), "summing all of these votes by party ... 98 percent of GOP lawmakers voted yes for a stricter voter ID provision while 98 percent of their Democratic counterparts voted no" (McKee, 2019:310).

Republican majorities make it difficult to overturn restrictive voting reforms like voter ID laws, which invariably get challenged in the courts, increasingly the Democrats' only hope for recourse. From the vantage of Democrats, compounding their problem was the recent *Shelby County v. Holder* (2013) U.S. Supreme Court ruling, which rendered null and void Section 5 Preclearance under the Voting Rights Act. The absence of Section 5 enforcement in Georgia is particularly worrisome to Democrats because the GOP majority no longer is required to get approval from the federal government in making changes to its voting/elections apparatus (e.g., for redistricting, altering voting precincts, administering voter registration, etc.). Amidst this highly charged partisan backdrop, events leading up to the 2018 Georgia gubernatorial election and those unfolding during the campaign itself meant that perceptions of voting-related improprieties would take center stage.

## Turnout in Georgia

Despite no presidential campaign presence in Georgia in the 2008 election (Huang and Shaw, 2009), there was a palpable "Obama effect" manifest in black mobilization (see McKee, Hood, and Hill, 2012). Figures 3 and 4 display registered turnout in Georgia according to race and gender in presidential (2004–2016) and midterm (2006–2018) elections, respectively. Both figures start with the most immediate election (presidential and midterm) prior to Obama's 2008 candidacy. Between 2004 and 2008, turnout among black women and men jumped 4 (percentage) points and concomitantly dropped 3 points among white women and men. In the two Obama elections of 2008 and 2012, black women were the most participatory segment of the Peach State electorate. In contrast, their black male peers were the least participatory of these four groups. Turnout plunged in the 2016 presidential election, as the two most unpopular major party nominees dampened participation across the board.

Interestingly, in the first Obama midterm of 2010, characterized by the president as a "shellacking" (a 63 Democratic House seat-loss; Jacobson and Carson, 2016), compared to 2006, participation increased among all four groups and the rate of increase was higher among African Americans, with black women increasing their turnout the most: an impressive 10 points (45–55 percent). Participation dropped substantially among all four groups

[6]Not a single Indiana Democrat voted yes on strict photo ID, whereas every Republican did (Hicks, McKee, and Smith, 2016:Table A1).

FIGURE 3

Registered Turnout by Race and Gender in Georgia Presidential Elections

NOTES: Data only include active registrants and are the official numbers archived by the Georgia Secretary of State: (http://sos.ga.gov/index.php/Elections/voter_turn_out_by_demographics).

FIGURE 4

Registered Turnout by Race and Gender in Georgia Midterm Elections

NOTES: Data only include active registrants and are the official numbers archived by the Georgia Secretary of State: (http://sos.ga.gov/index.php/Elections/voter_turn_out_by_demographics).

in 2014 and then registered a modern midterm surge in 2018.[7] Turnout rocketed up to 62 percent for white women and men, while black women were not far behind at 59 percent and black men again trailed, but nonetheless increased their participation to 47 percent (from 35 percent in 2014).

[7]One has to go back to 1912 (50.4 percent) to find a higher national midterm turnout than 2018 (50.1 percent) based on Michael P. McDonald's voting eligible population (VEP) numbers (http://www.electproject.org/home/voter-turnout/voter-turnout-data).

FIGURE 5

Voting Eligible Turnout in Georgia Midterm Elections, 2002–2018

NOTES: Data show turnout for the highest office (e.g., governor) based on Georgia's voting-eligible population (VEP). All data were compiled, computed, and made available at Michael P. McDonald's U.S. Elections Project website: ⟨http://www.electproject.org/home/voter-turnout/voter-turnout-data⟩.

Overall, based on the VEP, starting with the 2002 midterm, 2018 turnout was easily a contemporary high, far outpacing all previous years. As displayed in Figure 5, in the first two midterms of the new millennium (2002 and 2006), VEP turnout in Georgia was in the mid-30s. In the next two contests (2010 and 2014), Georgia VEP turnout registered in the high-30s. Then, in 2018, the Peach State's VEP midterm turnout vaults to the mid-50s (54.9 percent). In sum, there is a palpable trend of increasing participation in midterm years when Georgia holds its gubernatorial election.

## The Historic 2018 Georgia Gubernatorial Election

We have chronicled turnout patterns in contemporary Georgia elections because this is the appropriate backdrop in which to assess the dynamics of the 2018 gubernatorial contest. Indeed, in a closed-door Republican meeting held in the summer of 2018, GOP gubernatorial nominee Brian Kemp, Georgia's Secretary of State since 2010, let those in attendance know that "[t]he Democrats are working hard. There have been these stories about them ... registering all these minority voters that are out there ... If they can do that, they can win these elections in November" (Joseph, 2018). Kemp's Democratic opponent, Stacey Abrams, a former Georgia General Assembly House Minority Leader, cut her teeth leading minority voter registration drives (the New Georgia Project) dating back to 2014.[8] Hence, the Secretary of State, responsible for election administration, sought the governorship against an opponent highly familiar with and harshly critical of his oversight of election administration.

Indeed, given Georgia's history of voter suppression coupled with the controversy surrounding Republican control of election administration in more recent years, it was a

[8]This information on Stacey Abrams is taken directly from her website: ⟨https://staceyabrams.com/meet-stacey/⟩.

foregone conclusion that the 2018 governor's race would be historically contentious.[9] Further, the possibility of America's first black woman winning a gubernatorial election, and her obvious stark visual contrast with a white male opponent, was an irresistible media story, and a reflection of the contemporary faces of the Deep South's major party coalitions. To be sure, both gubernatorial nominees had policies to push and the partisan divide was exacerbated by the fact that Kemp was backed by President Trump (including at the GOP primary stage) while Abrams clearly aligned with the progressive wing of the Democratic Party.[10] Nonetheless, the issue of voting-related improprieties dominated the headlines because it was obvious that the election would come down to which side was more capable of mobilizing its supporters.

Specifically, there were at least three voting-related issues that became highly salient and resonated with voters in the 2018 election: (1) Georgia's "use it, or lose it" voting law, (2) the "exact match" legislation passed a year prior to the election, and (3) the vulnerability of Georgia's voter registration database. Ironically, the authority to purge inactive voters (after six years of not voting) from the registration rolls was passed in 1997, when Democrats had majority control of the General Assembly along with the governorship. Nevertheless, only more recently, under GOP majorities, has the state been aggressive in enforcing this so-called use it, or lose it law. An analysis estimates that since 2012, 1.4 million voters have been removed from Georgia's registration system and most because of inactivity (Judd, 2018a).

Second, making national news was that over 50,000 Georgians had their registration eligibility flagged for not complying with the "exact match" law, which means the name of a registrant must match an official form of identification (e.g., driver's license, Social Security number; see Niesse, 2018). What made this news was the fact that minorities were disproportionately more likely to have their registration out of compliance with this law (80 percent of the total), with African-American registrants comprising 70 percent of those failing to pass the exact match standard (Good, 2018). The law was made effective on July 1, 2017 and, like stricter voter ID, the legislation was passed in remarkably polarized fashion: in both chambers only one Republican voted *against* passage (a state senator) and only three Democrats voted in *favor* (all state representatives).[11]

Finally, for the last few years there have been issues regarding the security of Georgia's voter registration database. Within the context of the 2018 election, accusations swirled around the ease with which the system could be hacked and Democratic complaints that Kemp refused to take any steps to make the system more secure. Days before the election, Kemp accused Democrats of hacking the system while Democrats, and Abrams in particular, said Kemp "cooked up the charge . . . and he recognizes that if he got caught two days before the election having exposed so many Georgians, he would lose" (Associated Press, 2018; also see Judd, 2018b).

[9]The 2018 contest will go down in the annals along with the "Three Governors Controversy" of 1946 (Bullock, Buchanan, and Gaddie, 2015) and the 1966 contest in which the Republican won the popular vote but, falling short of a majority, lost the governorship when the Democratic-controlled Georgia General Assembly chose the Democrat Lester Maddox (Bullock and Hood, 2015).

[10]Trump's endorsement was likely pivotal in Kemp winning the GOP nomination over Lieutenant Governor Casey Cagle. On her way to winning the Democratic nomination, Abrams defeated former state representative Stacey Evans, a white woman, which further speaks to the changing locus of political power in the modern Democratic Party in a Deep South state.

[11]The voting summary on the legislation (House Bill 268) can be found here: (http://www.legis.ga.gov/legislation/en-US/Display/20172018/HB/268). Among all Republicans voting yea or nay (both Senate and House), 99 percent voted yes (134 of 135) and among all Democrats voting yea or nay, 95 percent voted no (61 of 64).

In sum, the 2018 Georgia gubernatorial election was mainly fought over issues related to allegations of voting improprieties, with the Democrat Stacey Abrams assuming the mantle of voter access and leveling accusations of voter suppression, while the Republican Brian Kemp defended his role of election overseer in defense of ballot integrity amidst possible incidents of voter fraud. It is within this highly divisive political milieu that we constructed four questions that captured the leading sentiments of likely Georgia voters regarding their perceptions of voting-related improprieties in the 2018 gubernatorial election.

## Data and Methods

To evaluate opinions toward voting-related concerns and their effects on vote choice in the 2018 Georgia gubernatorial election, we surveyed over 1,000 ($N = 1{,}091$) likely voters in the period leading up to Election Day (October 21–30, 2018).[12] Our sample is representative of the Peach State's 2018 midterm electorate on the basis of race, gender, and age (see the Supplementary Appendix for additional details).[13]

Of primary interest was survey respondents' answers to the following four questions (frequency distributions in brackets), which directly tap into perceptions of voting-related improprieties germane to the campaign rhetoric hanging over the 2018 governor's contest:

> Do you think it is *very likely*, *likely*, *not very likely*, or *not likely at all* each of the following will happen during this year's midterm election in Georgia?

1. Many votes will actually not be counted (19, 28, 35, 18 percent).
2. Someone will tamper with Georgia's voting system (18, 28, 38, 15 percent).
3. Many people will show up to vote and be told they are not eligible (20, 32, 35, 13 percent).
4. There will be voter fraud, that is, people who are not eligible will vote (16, 34, 32, 18 percent).

With this four-option ordinal scale, in the analysis that follows, we coded responses according to our theoretical expectations. Specifically, we coded the responses to reflect our expectations regarding the partisan divide over each question. Hypothesizing Democrats exhibit the greatest likelihood of choosing the "very likely" response for the first three questions, we coded these responses from 0 to 3 with 0 = *not likely at all*, 1 = *not very likely*, 2 = *likely*, and 3 = *very likely*. For shorthand, the variable labels for the first three questions are as follows: (1) "Votes Not Counted," (2) "Not Eligible," (3) "Tampering." Regarding the fourth question on the issue of voter fraud, we rely on what we know about the national partisan framing of this issue—that Republicans are more likely to perceive widespread evidence of electoral fraud (Gronke et al., 2019). To keep the coding consistent with Democrats more inclined to offer a "very likely" response, the voter fraud variable is 0 = *very likely*, 1 = *likely*, 2 = *not very likely*, and 3 = *not likely at all*. This variable is labeled "No Fraud," and like the other three, there are notable partisan splits on this question: 67.2

[12]The survey was administered by the School of Public and International Affairs Research Center at the University of Georgia. Our preelection poll surveyed respondents at a time when early voting was underway and therefore the survey instrument was designed (via a branching question) to capture the opinions of those who either stated they already voted or that they intended to vote. The entire survey instrument will be made available upon request. Likely voters were respondents who had voted in the 2018 May primaries and/or the 2016 general election, who indicated they were currently registered to vote in Georgia, and were *definitely* or *probably* going to vote in the 2018 November election.

[13]The AAPOR response rates were 4.43 percent (RR1) and 4.87 percent (RR3).

percent of Republicans viewed voter fraud as *very likely* or *likely*, whereas 66.7 percent of Democrats considered this malfeasance *not very likely* or *not likely at all*.[14]

In the context of Georgia's 2018 gubernatorial election, the first two aforementioned questions, which we labeled "Votes Not Counted" and "Tampering," are arguably much more specific to this contest because of Kemp's capacity as Secretary of State and suspicions surrounding the possibility of him being less than an honest broker of the election apparatus while seeking the governorship. The question of eligibility (Not Eligible) is perhaps best contextualized in both national and state perspectives because, nationally, Democrats advocate for greater voter access, while in Georgia, Secretary Kemp invested considerable resources in removing inactive voters from the registration rolls. As discussed, voter fraud (No Fraud) is nationally viewed by Republicans as more than a hypothetical, whereas Democrats perceive it as a rarity (in other words, *very likely* no fraud). But within the context of Georgia politics, because of the profiles of the major party nominees, a Republican Secretary of State and a Democratic political activist (leading voter registration drives), perceptions of voter fraud may be different for other voter characteristics, principally race and gender. We expect divisions over voting-related concerns to be significant with respect to party, race, and gender, since these are cardinal characteristics shaping southern politics and influencing public opinion.

In the empirical analysis that follows, our objective is first to assess opinions toward these voting-related issues outlined above. We employ ordered probit regression since each of our four dependent variables ("Votes Not Counted," "Tampering," "Not Eligible," and "No Fraud") are coded 0, 1, 2, 3. Second, we are then interested in seeing what effect, if any, these perceptions of voting-related concerns had on gubernatorial vote choice. In other words, in our assessment of vote choice we include what were the dependent variables in the first analysis as explanatory variables. Thus, we anticipate that opinions toward possible voting-related improprieties directly influenced one's vote for governor. Finally, in estimating both opinions toward voting-related improprieties and vote choice, we have included one additional model based on an additive index we labeled "VRC Index." VRC stands for voting-related concerns. This index sums the responses to the four voting-related questions and therefore its low value equals 0 (responses coded 0 on all four questions) and its high value equals 12 (responses coded 3 on all four questions). Hence, scaling the VRC Index in this fashion allows us to run an OLS regression when this measure serves as the dependent variable for assessing opinions toward voting-related improprieties. With regard to evaluating vote choice (1 = vote for Stacey Abrams, 0 = vote for Brian Kemp or Libertarian candidate Ted Metz), the VRC Index becomes the primary independent variable of interest (see the Supplementary Appendix for detailed information on variable coding).

## Results

All the models we present in this section include covariates for *party affiliation* (Democrat, independent, and Republican as omitted category), *race* (black, other, and white as omitted category), *gender* (female, with male as omitted category), *age groups* (18–29, 30–44,

[14]For "Votes Not Counted," 72.9 percent of Democrats considered this *very likely* or *likely*, while 76.9 percent of Republicans found this *not very likely* or *not likely at all*. For "Not Eligible," 79.0 percent of Democrats considered this *very likely* or *likely* while 73.5 percent of Republicans found this *not very likely* or *not likely at all*. For "Tampering," 68.9 percent of Democrats considered this *very likely* or *likely*, while 72.2 percent of Republicans found this *not very likely* or *not likely at all*.

45–64, with 65 and above as omitted category), *ideology* (six-point scale: strong liberal to strong conservative), *education* (five-point scale: high school or less to graduate study), *income* (six-point scale: from under $25,000 to over $150,000), and *density* (number of inhabitants per square mile of land area in each Georgia county). The Supplementary Appendix provides the detailed coding for each of these variables.

Table 1 displays the results for the five models examining perceptions of voting-related improprieties in the 2018 Georgia gubernatorial election. We will emphasize the effects of party, race, and gender in these models. As expected, in every instance, compared to Republicans, Democrats are significantly more likely to perceive a higher incidence of: votes not being counted, tampering, voters being deemed ineligible; and a lower likelihood of voter fraud. Not surprisingly, in the last model with the VRC Index as the dependent variable, compared to Republicans, Democrats register much higher on this index of voting-related concerns.

Similar to the partisan disparity in opinions regarding voting-related improprieties (Democrats vs. Republicans), the differences with respect to race and gender comport with our expectations in every model except for the one gauging perceptions of fraud. In this case, contrary to the partisan dynamic, whites and males expect there to be a lower incidence of voter fraud vis-à-vis blacks and females. This runs counter to the national partisan framing of the fraud narrative and we suspect the reason for this is directly attributable to Kemp serving as the Georgia Secretary of State, which prompted African Americans and women to view fraud as more likely because the Republican gubernatorial candidate was not to be trusted.

To get a better sense of the relative differences toward opinions on voting-related concerns, in Table 2 we show predicted probabilities according to *party affiliation* (Democrat vs. Republican), *race* (black vs. white), and *gender* (female vs. male). The probability differences among Democrats and Republicans are greatest with respect to the issues of voter eligibility and fraud, and thus align with the nationally-driven rhetoric regarding these concerns. Interestingly, in the case of race, the differences are largest for the two issues that are most immediate to the context of Georgia's gubernatorial election: the possibility of not all votes being counted and the possibility of tampering. For both issues, African Americans are notably more likely to think these voting-related improprieties may have occurred. Finally, the gender gap on voting-related concerns is markedly smaller than that for partisan and racial differences, not once nearing double digits.

Turning to vote choice in the gubernatorial election, we present two models in Table 3. The first model includes what were the dependent variables in the previous analysis as the key explanatory variables for estimating vote choice. In the second model, the VRC Index is the primary variable of interest for evaluating vote choice. Starting with the first model, after controlling for a host of variables related to voter preferences, we find that opinions toward tampering, voter eligibility, and fraud all significantly and positively influence the likelihood of voting for the Democrat Stacey Abrams. Stated somewhat differently, respondents who thought it more likely that tampering occurred and voters were denied access to the franchise, while also thinking fraud was not a very likely occurrence, were much more likely to support Abrams.

In the second model, the VRC Index registers a highly significant and positive effect on the likelihood of voting Democratic in the 2018 Georgia gubernatorial election. That is, respondents registering higher on this index of voting-related concerns were much more likely to vote for Abrams. We make this relationship more decipherable in Figure 6, which plots the probability of casting a vote for Abrams on the $y$-axis according to the respondent's placement on the VRC Index, which is plotted from 0 to 12 on the $x$-axis. As displayed,

TABLE 1

**Factors Influencing Voting-Related Concerns in the 2018 Gubernatorial Election**

| | Is it *Very Likely* that Each of the Following Will Happen During This Year's Midterm Election in Georgia? | | | | |
|---|---|---|---|---|---|
| | Votes Not Counted | Tampering | Not Eligible | No Fraud | VRC Index |
| Democrat | 0.579 (0.151)*** | 0.437 (0.142)** | 0.835 (0.132)*** | 0.789 (0.119)*** | 2.112 (0.295)*** |
| Independent | 0.200 (0.162) | 0.006 (0.108) | 0.433 (0.157)** | 0.454 (0.130)*** | 0.879 (0.286)** |
| Black | 0.635 (0.116)*** | 0.598 (0.116)*** | 0.399 (0.101)*** | −0.290 (0.105)** | 0.977 (0.225)*** |
| Other | 0.434 (0.186)* | 0.538 (0.200)** | 0.318 (0.160)* | −0.302 (0.175) | 0.849 (0.333)* |
| Female | 0.167 (0.070)* | 0.255 (0.072)*** | 0.199 (0.068)** | −0.197 (0.081)* | 0.304 (0.116)* |
| Ages 18–29 | −0.602 (0.221)** | 0.059 (0.157) | −0.024 (0.167) | −0.023 (0.144) | −0.487 (0.272) |
| Ages 30–44 | −0.075 (0.131) | −0.034 (0.099) | −0.062 (0.131) | −0.100 (0.103) | −0.810 (0.215) |
| Ages 45–64 | −0.175 (0.065)** | 0.008 (0.078) | −0.108 (0.084) | 0.108 (0.076) | −0.128 (0.105) |
| Ideology | −0.094 (0.038)* | −0.092 (0.036)* | −0.094 (0.037)* | −0.094 (0.052) | −0.300 (0.069)*** |
| Education | −0.055 (0.024)* | −0.040 (0.028) | −0.059 (0.025)* | 0.055 (0.030) | −0.089 (0.048) |
| Income | −0.031 (0.019)* | −0.006 (0.015) | −0.022 (0.015) | 0.007 (0.019) | −0.022 (0.027) |
| Density | $3.68 \times 10^{-6}$ (0.00003) | −0.0001 (0.0000)** | −0.00004 (0.00004) | 0.00007 (0.00004) | $-2.76 \times 10^{-6}$ (0.00006) |
| Constant | | | | | 6.010 (0.539)*** |
| Pseudo $R^2/R^2$ | 0.109 | 0.085 | 0.117 | 0.067 | 0.437 |
| *N* | 957 | 961 | 951 | 973 | 880 |

NOTES: First four models are ordered probit regressions and the last model is an OLS regression. In the probit models the dependent variable is coded: 0 = *not likely at all*, 1 = *not very likely*, 2 = *likely*, 3 = *very likely* (reverse-coded for "No Fraud" model). VRC = voting-related concerns, and the dependent variable is an additive index coded from 0 to 12. Robust *SE*s are in parentheses and clustered on the county. *$p < 0.05$; **$p < 0.01$; ***$p < 0.001$ (two-tailed).

TABLE 2

Predicted Probabilities of a Voting-Related Concern Being Very Likely According to Party, Race, and Gender

| Very Likely ... | Votes Not Counted | Tampering | Not Eligible | No Fraud |
|---|---|---|---|---|
| Democrat | 0.226 | 0.206 | 0.263 | 0.259 |
| Republican | 0.099 | 0.110 | 0.076 | 0.078 |
| difference | 0.127 | 0.096 | 0.187 | 0.181 |
| Black | 0.265 | 0.251 | 0.226 | 0.119 |
| White | 0.114 | 0.109 | 0.136 | 0.178 |
| difference | 0.151 | 0.142 | 0.090 | −0.059 |
| Female | 0.177 | 0.177 | 0.185 | 0.137 |
| Male | 0.143 | 0.124 | 0.144 | 0.179 |
| difference | 0.034 | 0.053 | 0.041 | −0.042 |

NOTES: Predicted probabilities generated using the observed values approach (see Hanmer and Kalkan, 2013). Recall that in the case of "No Fraud," the predicted probabilities are actually registering the likelihood that a respondent chooses the option *not likely at all* with respect to the incidence of voter fraud occurring.

TABLE 3

Influence of Voting-Related Concerns on 2018 Gubernatorial Vote Choice

| | 1 = Abrams, 0 = Kemp/Metz | 1 = Abrams, 0 = Kemp/Metz |
|---|---|---|
| Votes not counted | −0.070 (0.156) | – |
| Tampering | 0.342 (0.115)** | – |
| Not eligible | 0.333 (0.153)* | – |
| No fraud | 0.469 (0.110)*** | – |
| Voting-related concerns index | – | 0.169 (0.061)** |
| Democrat | 3.622 (0.397)*** | 3.630 (0.389)*** |
| Independent | 1.475 (0.370)*** | 1.517 (0.357)*** |
| Black | 1.919 (0.376)*** | 1.848 (0.335)*** |
| Other | 0.981 (0.438)* | 0.908 (0.401)* |
| Female | 0.087 (0.258) | 0.046 (0.249) |
| Ages 18–29 | 0.361 (0.325) | 0.568 (0.360) |
| Ages 30–44 | −0.568 (0.314) | −0.479 (0.347) |
| Ages 45–64 | −0.210 (0.255) | −0.128 (0.258) |
| Ideology | −0.523 (0.110)*** | −0.540 (0.101)*** |
| Education | 0.155 (0.077)* | 0.167 (0.081)* |
| Income | 0.051 (0.068) | 0.071 (0.066) |
| Density | 0.0001 (0.0001) | 0.0001 (0.0001) |
| Constant | −2.240 (0.743)** | −1.688 (0.712)* |
| Pseudo $R^2$ | 0.889 | 0.885 |
| *N* | 852 | 852 |

NOTES: Models are probit regressions and the dependent variable is coded 1 = vote for Abrams and 0 = vote for Kemp/Metz. The voting-related concerns index is an additive index coded from 0 to 12. Robust *SE*s are in parentheses and clustered on the county. $^*p < 0.05$; $^{**}p < 0.01$; $^{***}p < 0.001$ (two-tailed).

after controlling for all of the other covariates in the second model in Table 3 (based on the observed values approach, see Hanmer and Kalkan, 2013), the probability of voting for Abrams based on the VRC Index ranges from a low of 0.38 (at 0 on the index) to a high of 0.52 (at 12 on the index).

FIGURE 6

Voting-Related Concerns and the 2018 Georgia Gubernatorial Vote

NOTES: Predicted probabilities were derived from the second model in Table 3 and computed using the observed values approach (Hanmer and Kalkan, 2013). Dotted lines are the upper and lower bounds at the 95 percent confidence level.

## Conclusion

In this study, we have surveyed the political history of a rapidly changing southern state whose latest transformations auger a tilt back in favor of the Democratic Party (Bullock, 2017). We contend that current demographic trends and a fairly recent (since 2008) but sustainable increase in minority mobilization has prompted Georgia's Republican majority to increasingly turn to election administration as one possible means to counter Democratic advances. Georgia's shift toward the Democratic Party and the GOP's response to this development produced a historic gubernatorial election in 2018, which heavily centered on allegations of voting-related improprieties. Importantly, this controversy was framed by the national parties' competing narratives of "protecting ballot integrity" (Republicans' position) versus "increasing voter access" (Democrats' stance).[15] Framed in this way, our empirical analysis shows that (likely) voters polarized in their perceptions of voting-related improprieties in alignment with their partisan proclivities and their views on this issue directly influenced their preferences for governor. In the immediate context of the 2018 Georgia gubernatorial election, the relationship between the issue of voting-related improprieties and vote choice was enhanced by the fact that the Republican candidate refused to recuse himself as the sitting Secretary of State (with authority over Georgia's election administration), while his Democratic opponent had risen to prominence through her success in mobilizing minority registration.

[15]A question on the 2018 Georgia gubernatorial election exit poll ($N = 2{,}943$) nicely captures the partisan split over potential voting-related improprieties. It asks, "Which concerns you more? Some people will": (1) *Cast illegitimate votes* (42 percent chose this option) or (2) *Be prevented from voting* (51 percent chose this option). The vote went 82 to 16 percent in favor of the Republican Kemp for respondents choosing the first option, a proxy for ensuring ballot integrity. In contrast, the vote cleaved 76 to 22 for the Democrat Abrams among respondents selecting the second option, which relates to voter access. All of the results of the exit poll can be found at: ⟨https://www.cnn.com/election/2018/exit-polls/georgia⟩.

The nation's first African-American president galvanized Georgia's black electorate in 2008 (McKee, Hood, and Hill, 2012), and since then the Peach State has remained electorally competitive even though Obama and his respective GOP opponents treated Georgia as a "blackout"/"base" Republican state (Gimpel, Kaufmann, and Pearson-Merkowitz, 2007; Shaw, 2006) in 2008 and 2012 (also the case in 2016). A decade hence, midterm turnout reached modern highs and a charismatic Democratic African-American woman came within a whisker of taking the 2018 gubernatorial contest to a runoff. In the process, Abrams's candidacy captured the attention of Oprah Winfrey and yes, Barack Obama, who campaigned on her behalf because it appeared that a Democratic victory was finally possible. Stacey Abrams may have come up short, but Democratic gains materialized down Georgia's ballot in U.S. House and state legislative elections. Relatively recent demographically-driven political developments have increasingly distanced Georgia from its more Republican Deep South neighbors. As a consequence, one can anticipate that for the first time since 1996, the Peach State will be a vigorously contested prize in the 2020 presidential election and it will also likely feature a contentious and competitive U.S. Senate race. Beyond 2020, ongoing compositional changes to Georgia's electorate are expected to be countered with increasing concern on the part of the extant GOP majority because this development is clearly providing a path for a Democratic comeback.

## REFERENCES

Associated Press. 2018. "Security Experts Say Georgia's Voter Database Vulnerable to Hackers." Available at ⟨https://www.nbcnews.com/politics/elections/security-experts-say-georgia-s-voter-database-vulnerable-hackers-n931266⟩.

Barreto, Matt A., Stephen Nuño, Gabriel R. Sanchez, and Hannah L. Walker. 2018. "The Racial Implications of Voter Identification Laws in America." *American Politics Research*. Available at ⟨https://journals-sagepub-com.lib-e2.lib.ttu.edu/doi/full/10.1177/1532673X18810012⟩.

Black, Earl, and Merle Black. 2002. *The Rise of Southern Republicans*. Cambridge, MA: Harvard University Press.

Buchanan, Scott E. 1997. "The Effects of the Abolition of the Georgia County-Unit System on the 1962 Gubernatorial Election." *Politics & Policy* 25(4):687–704.

Bullock, Charles S. III. 2010. *Redistricting: The Most Political Activity in America*. Lanham, MD: Rowman & Littlefield.

———. 2017. "Georgia: Republicans Still Dominate." In Charles S. Bullock III and Mark J. Rozell, eds., *The New Politics of the Old South*. Lanham, MD: Rowman & Littlefield.

Bullock, Charles S. III, Scott E. Buchanan, and Ronald Keith Gaddie. 2015. *The Three Governors Controversy: Skullduggery, Machinations, and the Decline of Georgia's Progressive Politics*. Athens: University of Georgia Press.

Bullock, Charles S. III, and Ronald Keith Gaddie. 2009. *The Triumph of Voting Rights in the South*. Norman, OK: University of Oklahoma Press.

———. 2013. *Georgia Politics in a State of Change*. New York: Pearson.

Bullock, Charles S. III, and M. V. Hood III. 2015. "The Damnedest Mess: An Empirical Evaluation of the 1966 Georgia Gubernatorial Election." *Social Science Quarterly* 96(1):104–18.

Burnham, Walter Dean. 2010. *Voting in American Elections: The Shaping of the American Universe Since 1788*. Bethesda, MD: Academica Press.

Carmines, Edward G., and James A. Stimson. 1989. *Issue Evolution: Race and the Transformation of American Politics*. Princeton, NJ: Princeton University Press.

Cox, Gary W., and Jonathan N. Katz. 2002. *Elbridge Gerry's Salamander: The Electoral Consequences of the Reapportionment Revolution*. Cambridge: Cambridge University Press.

David, Paul T. 1972. *Party Strength in the United States: 1872–1970*. Charlottesville, VA: University Press of Virginia.

Davidson, Chandler, and Bernard Grofman, eds. 1994. *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965–1990*. Princeton, NJ: Princeton University Press.

Engstrom, Erik J. 2013. *Partisan Gerrymandering and the Construction of American Democracy*. Ann Arbor: University of Michigan Press.

Fenno, Richard F. Jr. 2000. *Congress at the Grassroots: Representational Change in the South, 1970–1998*. Chapel Hill, NC: University of North Carolina Press.

Foner, Eric. 1988. *Reconstruction: America's Unfinished Revolution, 1863–1877*. New York: Harper & Row.

Gaddie, Ronald Keith, and Charles S. Bullock III. 2006. "From Ashcroft to Larios: Recent Redistricting Lessons from Georgia." *Fordham Urban Law Journal* 34(3):997–1048.

Gimpel, James G., Karen M. Kaufmann, and Shanna Pearson-Merkowitz. 2007. "Battleground Versus Blackout States: The Behavioral Implications of Modern Presidential Campaigns." *Journal of Politics* 69(3):786–97.

Good, Courtney. 2018. "53,000 Stalled Votes in Georgia's Governor Election: Stacey Abrams vs. Brian Kemp." *College Media Network* November. Available at ⟨https://www.collegemedianetwork.com/53000-stalled-votes-in-georgias-governor-election-stacey-abrams-vs-brian-kemp/⟩.

Grimmer, Justin, Eitan Hersh, Marc Meredith, Jonathan Mummolo, and Clayton Nall. 2018. "Obstacles to Estimating Voter ID Laws' Effect on Turnout." *Journal of Politics* 80(3):1045–51.

Gronke, Paul, William D. Hicks, Seth C. McKee, Charles Stewart III, and James Dunham. 2018. "Voter ID Laws: A View from the Public." *Social Science Quarterly* 100(1):215–32.

Hajnal, Zoltan, John Kuk, and Nazita Lagevardi. 2018. "We All Agree: Strict Voter ID Laws Disproportionately Burden Minorities." *Journal of Politics* 80(3):1052–59.

Hanmer, Michael J., and Kerem Ozan Kalkan. 2013. "Behind the Curve: Clarifying the Best Approach to Calculating Predicted Probabilities and Marginal Effects from Limited Dependent Variable Models." *American Journal of Political Science* 57(1):263–77.

Hasen, Richard L. 2012. *The Voting Wars: From Florida 2000 to the Next Election Meltdown*. New Haven, CT: Yale University Press.

Hayes, Danny, and Seth C. McKee. 2004. "Booting Barnes: Explaining the Historic Upset in the 2002 Georgia Gubernatorial Election." *Politics & Policy* 32(4):708–39.

Hicks, William D., Seth C. McKee, Mitchell D. Sellers, and Daniel A. Smith. 2015. "A Principle or a Strategy: Voter Identification Laws and Partisan Competition in the American States." *Political Research Quarterly* 68(1):18–33.

Hicks, William D., Seth C. McKee, and Daniel A. Smith. 2016. "The Determinants of State Legislator Support for Restrictive Voter ID Laws." *State Politics and Policy Quarterly* 16(4):411–31.

Highton, Bejamin, and Raymond E. Wolfinger. 1998. "Estimating the Effects of the National Voter Registration Act of 1993." *Political Behavior* 20(2):79–104.

Hood, M. V. III, Quentin Kidd, and Irwin L. Morris. 2012. *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South*. New York: Oxford University Press.

Hood, M. V. III, and Seth C. McKee. 2009. "Trying to Thread the Needle: The Effects of Redistricting in a Georgia Congressional District." *Political Science and Politics* 42(4):679–87.

Huang, Taofang, and Daron Shaw. 2009. "Beyond the Battlegrounds? Electoral College Strategies in the 2008 Presidential Election." *Journal of Political Marketing* 8(4):272–91.

Huffmon, Scott H., H. Gibbs Knotts, and Seth C. McKee. 2017–2018. "Down with the Southern Cross: Opinions on the Confederate Battle Flag in South Carolina." *Political Science Quarterly* 132(4):719–41.

Hutchings, Vincent L., Haynes Walton Jr., and Andrea Benjamin. 2010. "The Impact of Explicit Racial Cues on Gender Differences in Support for Confederate Symbols and Partisanship." *Journal of Politics* 72(4): 1175–88.

Jacobson, Gary C., and Jamie L. Carson. 2016. *The Politics of Congressional Elections*. Lanham, MD: Rowman & Littlefield.

Joseph, Cameron. 2018. "Georgia Governor's Race Is Epic Showdown Over Voting Rights." *Talking Points Memo* October. Available at ⟨https://talkingpointsmemo.com/feature/abrams-kemp-bring-long-running-war-over-voting-rights-to-georgia-governors-race⟩.

Judd, Alan. 2018a. "Georgia's Strict Laws Lead to Large Purge of Voters." *Atlanta Journal-Constitution* October. Available at ⟨https://www.ajc.com/news/state-regional-govt-politics/voter-purge-begs-question-what-the-matter-with-georgia/YAFvuk3Bu95kJIMaDiDFqJ/⟩.

———. 2018b. "How Brian Kemp Turned Warning of Election System Vulnerability Against Democratics." *Atlanta Journal-Constitution* December 14. Available at ⟨https://www.myajc.com/news/state-regional-govt-politics/how-brian-kemp-turned-warning-election-system-vulnerability-against-democrats/iLOkpHK3ea39t8Eh4PCGxM/⟩.

Key, V. O. Jr. 1949. *Southern Politics in State and Nation*. New York: Alfred A. Knopf.

Keyssar, Alexander. 2009. *The Right to Vote: The Contested History of Democracy in the United States*. New York: Basic Books.

Kousser, J. Morgan. 1974. *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880–1910*. New Haven, CT: Yale University Press.

Lamis, Alexander P. 1988. *The Two-Party South*. Oxford: Oxford University Press.

Levitt, Justin. 2012. "Election Deform: The Pursuit of Unwarranted Electoral Regulation." *Election Law Journal: Rules, Politics, and Policy* 11(1):97–117.

McGann, Anthony J., Charles Anthony Smith, Michael Latner, and Alex Keena. 2016. *Gerrymandering in America: The House of Representatives, the Supreme Court, and the Future of Popular Sovereignty*. New York: Cambridge University Press.

McKee, Seth C. 2010. *Republican Ascendancy in Southern U.S. House Elections*. New York: Routledge.

———. 2015. "Politics Is Local: State Legislator Voting on Restrictive Voter Identification Legislation." *Research & Politics* 2(3):1–7.

———. 2017. "Race and Subregional Persistence in a Changing South." *Southern Cultures* 23(2):134–59.

———. 2018. "Sorting Dixie: The Changing Profile of Southern Presidential Primary Electorates." In Robert G. Boatright, ed., *The Routledge Handbook of Primary Elections*. New York: Routledge.

———. 2019. *The Dynamics of Southern Politics: Causes and Consequences*. Thousand Oaks, CA: CQ Press.

McKee, Seth C., M. V. Hood III, and David Hill. 2012. "Achieving Validation: Barack Obama and Black Turnout in 2008." *State Politics and Policy Quarterly* 12(1):3–22.

McKee, Seth C., and Daron R. Shaw. 2005. "Redistricting in Texas: Institutionalizing Republican Ascendancy." In Peter F. Galderisi, ed., *Redistricting in the New Millennium*. Lanham, MD: Lexington Books.

McKee, Seth C., and Melanie J. Springer. 2015. "A Tale of 'Two Souths': White Voting Behavior in Contemporary Southern Elections." *Social Science Quarterly* 96(2):588–607.

McKee, Seth C., and Jeremy M. Teigen. 2016. "The New Blue: Northern In-Migration in Southern Presidential Elections." *Political Science and Politics* 49(2):228–33.

Niesse, Mark. 2018. "Kemp Defends Georgia's 'Exact Match' Voter Registration Law." *Atlanta Journal-Constitution* August. Available at ⟨https://www.ajc.com/news/state-regional-govt-politics/kemp-defends-georgia-exact-match-voter-registration-law/tuzifo37vnhJQn5ja0oUYI/⟩.

Phillips, Kevin P. 1969. *The Emerging Republican Majority*. New Rochelle, NY: Arlington House.

Rosenstone, Steven J., and John Mark Hansen. 1993. *Mobilization, Participation, and Democracy in America*. New York: Macmillan Publishing Company.

Russ, William A. Jr. 1935. "Radical Disfranchisement in Georgia, 1867–71." *Georgia Historical Quarterly* 19(3):175–209.

Shafer, Byron E. 2016. *The American Political Pattern: Stability and Change, 1932–2016*. Lawrence, KS: University Press of Kansas.

Shaw, Daron R. 2006. *The Race to 270: The Electoral College and the Campaign Strategies of 2000 and 2004*. Chicago, IL: University of Chicago Press.

Timpone, Richard J. 1995. "Mass Mobilization or Government Intervention? The Growth of Black Registration in the South." *Journal of Politics* 57(2):425–42.

Valentino, Nicholas A., and David O. Sears. 2005. "Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South." *American Journal of Political Science* 49(3):672–88.

von Spakovsky, Hans A. 2012. "Protecting the Integrity of the Election Process." *Election Law Journal: Rules, Politics, and Policy* 11(1):90–96.

Woodward, C. Vann. 2002. *The Strange Career of Jim Crow*. Oxford: Oxford University Press.

## Supporting Information

Additional supporting information may be found online in the Supporting Information section at the end of the article.



Bernard L. Fraga
@blfraga
The 2024 Current Population Survey says there was a 10.9 point gap between the non-Hispanic White turnout rate (70.5%) and the Black turnout rate (59.6%). That's the largest turnout gap in a presidential year since 1992.
80%
70%
60%
50%
40%
30%
% of Eligible Adults Voting
White
Black
Latino
Asian
1948 1952 1956 1960 1964 1968 1972 1976 1980 1984 1988 1992 1996 2000 2004 2008 2012 2016 2020 2024
Source: ANES (pre-1964), CPS (1964+)
Analysis by Prof. Bernard L. Fraga, bernardfraga.com
3:52 PM · Apr 28, 2025 · 100.3K Views
9
64
106
43

EXHIBIT 7
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR



ELECTION LAW JOURNAL
Volume 23, Number 1, 2024
© Mary Ann Liebert, Inc.
DOI: 10.1089/elj.2023.0011

Open camera or QR reader and scan code to access this article and other resources online.

# Dropbox Allocation and Use Among Georgia Voters in the 2020 Election

Michael Greenberger and Jason M. Roberts

## ABSTRACT

Ballot dropboxes provide voters who fill out mail-in ballots with a secure and convenient method for returning their ballot. During the COVID-19 pandemic, the use of ballot dropboxes increased dramatically as voters sought to cast ballots safely and conveniently. In the wake of the 2020 election, ballot dropboxes have come under considerable scrutiny as many Republican-controlled state legislatures have sought to eliminate them or sharply reduce the number available and/or limit the hours in which they can be used by voters. This article uses novel data on the number of ballots collected in Georgia dropboxes paired with measures of how accessible these dropboxes were to voters in order to analyze how the allocation of dropboxes affected voting behavior in an election where voters could choose to vote in a variety of ways. When controlling for the number of potential users, dropboxes closer in distance to voters are used at higher rates. Individuals located closer to dropboxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots. Our findings carry important implications for election administrators seeking to make voting accessible by adding additional ballot dropboxes and for administrators seeking to adjust to mandated decreases in the number of dropboxes provided to voters.

**Keywords:** dropbox voting, absentee voting, voting behavior, election administration

## INTRODUCTION

THE COVID-19 PANDEMIC upended all aspects of life in the United States beginning in March of 2020. Among those things affected was the process of voting and administering elections throughout the country. The typical mode of voting in the United States—in person, in often crowded polling places—could not have been more inconsistent with the Center for Disease Control's (CDC) "social distancing" guidelines put in place to help mitigate the spread of COVID-19. Many voters likely feared that going to the voting booth would increase their risk of contracting COVID-19. At the same time, election administrators feared that it would be difficult to convince poll workers to serve given the risks involved in working in tight quarters and interacting with thousands of voters throughout election day. Given the critical importance that poll workers play in administering elections, this issue alone was enough to potentially imperil the smooth administration of the 2020

Michael Greenberger is an assistant professor in the Department of Political Science at the University of Denver, in Denver, Colorodo, USA. Jason M. Roberts is a professor in the Department of Political Science at the University of North Carolina at Chapel Hill, in Chapel Hill, North Carolina, USA.
We thank Lali Madduri, Lia Merivaki, Mara Suttmann-Lea, Mitchell Brown, and Martha Kropf for helpful comments and feedback. Thank you also to Brian Brew, Colin Case, and Emily Ommundsen for help in the data collection process. We are also grateful to the Rapoport Family Foundation for their generous support.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

election (Suttman-Lea 2020; Jones and Stein 2021; King and Barnes 2019).

Given the difficulties presented by COVID-19, a variety of changes to voting procedures were enacted. Polling places were moved to larger venues, early voting hours were extended, and absentee voting rules were loosened. For voters wishing to minimize their potential exposure to COVID-19, voting via an absentee or mailed ballot was the safest method of voting as it did not require a voter to have an in-person interaction with elections staff or other voters. Absentee voting, however, is also one of the most procedurally difficult methods of voting. Ballots have to be requested in advance of the election by the voter and often have stringent requirements that have to be met for the ballot to be accepted.[1] In addition, if a voter is returning the ballot via mail they must purchase postage in many states and mail the ballot early enough so that it will be received by their state's deadline.[2] All the while hoping that the United States Postal Service (USPS) handles their ballot properly.[3] As a result of these difficulties and other factors, the rejection rate for absentee ballots is much higher than for other forms of voting (Baringer et al. 2020; Cottrell et al. 2021; Shino et al. 2022).

One step that many jurisdictions took to mitigate the costs of absentee voting was to install ballot "dropboxes." These dropboxes provided a secure place for a voter to return their ballot at a time that was convenient to them without having to rely on or incur the costs of using the USPS. In the wake of the 2020 election, however, ballot dropboxes have come under considerable scrutiny as many Republican-controlled state legislatures have sought to sharply reduce the number available and/or the hours in which they can be used by voters. One of the states where dropboxes have been the most controversial is Georgia. Now President Joe Biden narrowly won Georgia in 2020, which was the first time a Democratic candidate for president had won the Peach State since Bill Clinton's victory in 1992. In addition, Democratic candidates won both U.S. Senate races in Georgia in 2020.[4] Republicans in the Georgia legislature responded to their electoral shortfalls in 2020 by enacting a sweeping reform measure *Senate Bill 202* that among other things sharply reduced the number of dropboxes that can be deployed in Georgia, the hours in which the dropboxes can be used, and enhanced the security requirements for dropboxes.

Georgia voters did not lose total access to ballot dropboxes for future elections, but many, especially those in urban counties, are likely to have fewer dropboxes to choose from and will in many cases have to travel much farther to access a dropbox. Our goal in this article is to assess how the accessibility of dropboxes affected dropbox use in Georgia in 2020 in order to understand how election administrators in any state might place dropboxes to most efficiently serve voters in the future (assuming the election administrators do have some autonomy over the placement of dropboxes). To do this we estimate the effect of dropbox placement on the propensity for voters to cast an absentee by-mail ballot. We also estimate the effect of proximity on dropbox usage at the dropbox-level, that is, how many ballots can election administrators expect a dropbox to receive based on how close voters are to the dropbox. Given the costs associated with dropbox implementation and maintenance, this is an important question for election administrators.

We find that proximity to dropboxes is very important for voters—dropboxes geographically close to voters were used at higher rates than those farther away from voters. Voters closer to dropboxes were more likely to vote by mail and less likely to fail to deliver their requested by-mail ballots. Our findings suggest that limiting the number of dropboxes will likely decrease their use in subsequent elections, especially in areas where dropboxes were placed extremely close to voters. These tend to be urban areas that have large numbers of non-white voters and voters who are more apt to vote for Democratic party candidates. Although these results are intuitive, they are meaningful for election

[1]Some states require an excuse to vote via mail. Other states have photo identification requirements, witness signature requirements, and/or signature verification requirements.

[2]Some states require that absentee ballots be received by the close of business on election day, while others allowed a ballot that is postmarked by election day to arrive in the days following an election.

[3]The USPS loses some ballots. A much larger problem is that many ballots do not receive postmarks and thus their mail date cannot be verified by elections staff.

[4]Georgia had a special election for the Senate and a regular Senate election on the ballot at the same time. In neither race did a candidate gain a majority of the votes cast, so under a Georgia law a runoff between the top two vote getting candidates ensued.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

administrators across the United States responding to new guidelines on dropbox usage. This article adds to the preexisting literature on distance and dropboxes by demonstrating the effect of proximity in an election in which vote-by-mail is *not* the standard of voting and by considering the utility of dropbox placement from a resource-limited election administrator's perspective.

## DROPBOXES AND THE COST OF VOTING

Voting is a costly act for citizens. It takes time and physical effort to register to vote, and the voting process itself takes time and effort. These costs vary based on the method of voting one chooses and the voting rules in a voter's state. The costs of voting are not exceedingly high for most voters, but they can be consequential to individual voting decisions, in part because the direct benefits of voting are also not high (Aldrich 1993). In almost all cases, one individual's vote is not outcome consequential. The existing literature has consistently demonstrated that even small increases in the costs of voting have a deterrent effect on turnout and ballot completion (McNulty et al. 2009; Aldrich 1993; Engstrom 2012; Engstrom and Roberts 2020). For example, factors such as rain on election day, long lines at the polling place, and a change in voting location have all been shown to decrease voter turnout (Joslyn et al. 2020; Walker et al. 2019; Brady and McNulty 2011). Similarly, policies that decrease the cost of voting such as allowing voters to register to vote and cast a ballot at the same time are associated with higher levels of turnout (Haspel and Knotts 2005).

Ballot dropboxes have the potential to sharply decrease the cost of voting for some voters. For voters who wish to cast an absentee ballot in Georgia, dropboxes have two clear advantages for the voter: (1) the voter does not have to pay postage if depositing a ballot in a dropbox and (2) the voter has more time to complete their ballot given that they do not need to mail the ballot in time for it to reach the county elections office by election day.[5] In addition, the usage of a dropbox minimizes the chances that the ballot will be lost, damaged, or delayed by removing the USPS from the chain of custody for the ballot. Evidence from vote-by-mail states such as Oregon and Washington suggest that voters strongly prefer dropboxes to the USPS for ballot return as the overwhelming majority of voters use dropboxes to return their ballots.[6]

Prior to the 2020 general election, dropbox voting was rare in states not using universal vote-by-mail elections. As a result, very little scholarship exists that details the relationship between geographic distance and dropbox use. To the best of our knowledge, two studies have addressed this question. Collingwood et al. (2018) found that the addition of over 30 new dropboxes in King County, Washington, increased turnout. In this study, proximity to dropboxes was associated with a greater likelihood of turnout. In a follow-up study that used a natural experiment to identify an average treatment effect, McGuire et al. (2020) estimate that a one mile decrease in distance to nearest dropbox increased the probability of voting by 0.64 percent. Both of these studies focus on the effect of proximity on turnout in a state with a robust universal vote-by-mail program.

Our study builds on this prior work by expanding our geographic scope from single, mostly urban counties, to the entire state of Georgia. Here, we compare dropbox use-rates across urban, suburban, and rural counties. Like prior studies of dropbox use, we have no direct knowledge of whether or not specific voters actually used a particular dropbox.[7] However, we do have data on the total number of ballots cast in each dropbox. In addition to individual level effects, we focus on use-rates for dropboxes themselves. We believe this outcome variable is especially important for legislators, scholars, and election administrators interested in how many voters use dropboxes, and in what circumstances dropboxes will prove most effective. As McGuire et al. (2020) point out, dropboxes are expensive—if no one uses them, they may not be a worthwhile investment for election administrators.

Our theoretical expectations are straightforward. We expect that, like prior studies have shown, voters

[5]Georgia requires absentee ballots to reach the county elections office by election day. To ensure timely arrival, a voter would need to complete their ballot several days before election day.

[6]"Voting by Mail and Absentee Voting," MIT Election Data and Science Lab. <https://electionlab.mit.edu/research/voting-mail-and-absentee-voting>.

[7]An important exception to this is recent work demonstrating that most voters use the dropbox nearest to them (Collingwood and Gonzalez O'Brien 2021). However, this data linking voters to their nearest dropbox has not been used in any analysis of turnout or voting behavior.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

closer to dropboxes will be more likely to vote by mail and that mail-in ballots will be less likely to go undelivered by voters.[8] We expect that dropboxes placed proximate to more voters will be used at higher rates, and that this association will be magnified among voters within the closest distances to dropboxes. We also expect that as election day nears and voters worry that ballots mailed via USPS would not be counted on time, dropboxes will be used more frequently. Given these expectations, we expect that election administrators can place dropboxes most efficiently (defined as maximizing use for voters) by placing boxes to maximize the number of voters within a very close distance to a box rather than a location that attempts to minimize distance to dropbox for all voters.

## DATA COLLECTION

Data on ballot dropbox usage were accessed via a records request made to the *Open Records Request Officer* housed in the Georgia Secretary of State's office. The records were provided for free and contained all ballot transfer forms for the 109 counties (out of 159 counties) that used at least one ballot dropbox. Counties using dropboxes filed "ballot transfer forms" to track ballots being retrieved from dropboxes throughout the state. Demographic and political characteristics of counties with and without dropboxes are reported in Table 4 in Supplementary Appendix A. Counties with and without dropboxes are similar in two-party vote share, though counties with dropboxes tend to have larger population, more urban residents, and higher incomes.

Each transfer form listed the county name, the location of the ballot dropbox, the date of pickup, and the number of ballots retrieved. This means that for each dropbox in the state of Georgia (275 unique boxes), there was at least one form for each day for each box. Given that many counties began collecting ballots from dropboxes on the first of September (09/01/2020), the 109 counties produced thousands of ballot transfer forms.

We coded the ballot dropbox forms using a program written for MTurk, Amazon's human intelligent task workforce.[9] MTurk workers were presented with a dropbox transfer form and asked to select the county, dropbox location, date of pickup, and number of ballots collected. Supplementary Appendix B contains a full description of the coding procedures, a sample of the ballot transfer forms, and a description of the reliability checks used to validate the MTurk workers' coding accuracy. The result of the MTurk coding process is a count on the total number of ballots cast in each dropbox for each day of the election period. Again, like prior studies, we do not know which voters cast their ballots in dropboxes, but by collecting this data we *do* know how many ballots were cast in each ballot dropbox on each day.

Data on voting behavior comes from the voter registration, voter history, and absentee voter files provided by the Georgia Secretary of State's Office. Georgia registration records include a voter's residential address. Using this address, we geocoded voters to geographic locations. Over 92 percent of voters in every county were successfully geocoded at the street address or point address level.[10]

We then routed each geocoded voter to all dropboxes located within their county and calculated the driving distance to reach each dropbox for every voter living in a county with at least one dropbox.[11] Using a voter's records in their history and absentee file, we can determine their method of voting in the 2020 election. This data collection yields us information on distances between all voters and dropboxes, how voters proximate to each dropbox voted, and the number of ballots cast in each box—roughly 5 million voters who cast a ballot in Georgia during the 2020 November General Election.

## MEASURES OF ACCESSIBILITY AND USE

As state legislatures consider reducing access to dropboxes (but not wholly eliminating them), our study aims to assess whether proximity increases the rate at which dropboxes are used. This is the most important relationship for understanding how

[8]We refer to mail-in ballots which are granted to absentee voters but not successfully returned as "undelivered." We do not include voters who requested a mail-in ballot but voted by other means in any analysis of undelivered ballots.

[9]Variance between forms, low image quality, and challenging to read handwriting limited our ability to use optical character recognition software (OCR) to code the thousands of ballot transfer forms.

[10]We used the ArcGIS Business Analyst geocoder to achieve this level of accuracy. Using Tiger/Line Census files (open source) yielded similar but slightly less accurate geocoding results.

[11]These calculations reflect distance on roads, not as-the-crow flies measurements.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

voting behavior may be affected as counties reduce the number of dropboxes available to voters. We address this in two ways: first, how an individual's proximity to a dropbox affects their voting behavior, and second, how a dropbox's location relative to groups of voters affects its rate of use.

Our independent variables aim to capture the accessibility of dropboxes used in the 2020 general election. We estimate accessibility in two ways, as a simple distance between a voter $i$ and their nearest dropbox $j$, and as a function of distance decay. As demonstrated by Gimpel and Schuknecht (2003), the same increase in distance is likely to have a larger effect on voters closer to their destination than voters farther away. An extra mile will likely matter more to a voter who was originally half a mile away to begin with compared to a voter already expecting to travel ten miles. Also, at distances farther away from dropboxes, travel is likely to be unimpeded and straightforward (assuming that election officials sought to locate dropboxes in areas of high density) (Gimpel and Schuknecht 2003). Distance decay measures are familiar to studies of accessibility in the context of markets and elections and are generally derived from a standard gravity model (Song 1996; Fotheringham and O'Kelly 1989; Kwan 1998; Haynes and Fotheringham 2020).

Distance decay, $A_i$, can be derived as the inverse of the squared distance $d$ between a voter's origin $i$ and destination $j$ such that:

$$A_i = 1/{d_{ji}}^2$$

The distance decay model inflates the increasing costs of travel at short differences. Consider a voter traveling two miles (distance decay value of .25) and a voter traveling three miles (distance decay value of .11). Here, a one mile increase in distance corresponds to a change in distance decay of .14. If instead those two voters were traveling nineteen (distance decay value of .0028) and twenty miles (distance decay value of .0025), a one mile increase in distance only corresponds to a change in distance decay of .003. Distance decay captures the relative unimportance of a voter needing to travel an extra mile when they are already planning to travel longer distances.

For our individual level analysis, our first dependent variable is whether a voter cast a by-mail ballot. We control for a voter's history of voting by mail by including a categorical variable for vote method in 2018 as a control. Voters who voted by mail in a past election are much more likely to vote by mail in the future. We also control for age and race. Our second dependent variable for the individual-level analysis is whether or not a mail-in ballot was successfully delivered. These models use the same control variables.

**FIG. 1.** Counties and dropboxes in Georgia

Our dependent variable for the dropbox-level analysis is a dropbox's use rate. A dropbox's use rate is calculated by dividing the number of ballots collected in a dropbox by the total number of eligible ballots. We estimate the number of eligible ballots as all registered voters for whom a given dropbox is their closest available (within their county) dropbox. The actual number of ballots collected in a dropbox is then divided by the number of eligible voters to calculate a dropbox's use rate.

Most counties only used one dropbox (see Figure 1, see also Figure D.1 in Supplementary Appendix D for a zoomed view of the large number of boxes in the Atlanta Metro area). In these cases, linking voters to their closest available dropbox means that the voters eligible to use a particular dropbox are all registered voters in a given county and that important control variables like age, race, and population density can be taken from the registration statistics at the county level. However,

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

several counties used more than one dropbox. Age and race are individual level variables and can be aggregated up from the individual-level data to create age and race statistics for a given dropbox based on the individuals for whom a given dropbox is their closest option. We control for the Democratic share of the vote using support for Hillary Clinton in the 2016 General Election, the percent of individuals without any undergraduate college degree, and median household income. Importantly, we also include a control for the percent of individuals in a dropbox's use zone who previously voted by mail. Voters who voted by mail prior to the roll-out of dropboxes in 2020 may already be familiar with the process and habituated to sending their ballot in the mail.

To estimate population density we create geographically based dropbox "use zones" conceptualized as thiessen polygons—areas partitioned into regions based on proximity to a point (in this case, the nearest dropbox). Densities for these areas are calculated using the full population living in the approximated polygon. This aims to capture the ease of movement near a dropbox as higher density areas are likely to be more difficult to navigate quickly because of traffic, stoplights, and other impediments. By using eligible voters in the denominator of the outcome variable, we also control for the total number of people in a dropbox's use zone.

## RESULTS: PROXIMITY AND VOTING BEHAVIOR

Table 1 presents the estimated magnitude of the effect of proximity to dropboxes on the likelihood of a voter registered to vote in the 2020 election casting a by-mail absentee ballot. All ballots cast via dropbox were absentee by-mail ballots. Columns 1 and 2 report the base effect of distance and include a county fixed-effect. Column 1 uses miles, and column 2 uses distance decay. Model 1 estimates that a one mile increase to the nearest dropbox is associated with a decrease in the likelihood of voting by mail by -0.3 percentage points. A unit increase in the value of distance decay is associated with an increase in the likelihood of voting by mail by 1 percentage point. A decrease from 1 mile to 0.25 miles (an increase from 1 to 2 in distance decay) is associated with a 1 percentage point increase in the likelihood of voting by mail. These estimates support the theory that a decrease in cost to voting in a certain form increases the likelihood that a voter will use that form of voting.

Models 3 and 4 include controls for vote method in 2018. The reference category for the vote method used in 2018 is an electronic ballot cast, a method used by overseas voters under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). While all controls are statistically associated with the likelihood of a voter choosing to vote by mail, the important confounder controlled for with the inclusion of this variable is whether or not a voter previously voted by mail. Voters who in 2018 voted by mail were very likely to vote by mail again in 2020. Models 5 and 6 include controls for race and age, demographic factors that may vary with how voters choose to vote. The reference category for race is non-hispanic white. Across all models, the measures for dropbox distance are statistically significant and in the expected direction. Models directly interacting distance to dropbox and vote method used in 2018 are reported in Table 6 of Supplementary Appendix C. Figures charting average marginal effects for these models are in Figure C.1. Average marginal effects of the interaction between distance to dropbox and race are presented in Figure C.2 in Supplementary Appendix C.[12]

Figure 2 charts the likelihood of a voter casting a by mail ballot based on the effect of distance (in miles) estimated in Model 1 of Table 1. At near zero miles to the closest dropbox, the estimated likelihood of a voter casting a by-mail ballot is about 15.75 percent. At ten miles away from the nearest dropbox, the estimated likelihood of a voter casting a by-mail ballot is about 14.9 percent.

Prior studies have demonstrated an increase in turnout resulting from proximity to a ballot dropbox roughly equal to the effect estimated for vote-by-mail specifically above. Our research design does not identify a causal relationship, but the associations we find comport with prior causal estimates made in prior studies (Collingwood et al. 2018; Collingwood and Gonzalez O'Brien 2021). Using the information in Georgia's publicly available data, however, we can also estimate the effect of proximity to a dropbox on the likelihood that a requested by-mail ballot goes undelivered (this does not

[12]The estimates from these models show that the association between decreased dropbox proximity and voting by mail does not vary to a distinguishable level by race/ethnicity.

TABLE 1. PROXIMITY TO DROPBOX AND MAIL-IN BALLOTS

| | *Dependent variable: Voted by Mail 2020* | | | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Miles | −0.003*** | | −0.005*** | | −0.004*** | |
| | (0.0003) | | (0.0004) | | (0.0004) | |
| Dist. decay | | 0.010*** | | 0.031*** | | 0.013*** |
| | | (0.003) | | (0.003) | | (0.003) |
| Voted early '18 | | | 0.633*** | 0.564*** | 0.142*** | 0.050 |
| | | | (0.029) | (0.027) | (0.035) | (0.034) |
| Voted by mail '18 | | | 2.297*** | 2.230*** | 1.821*** | 1.733*** |
| | | | (0.029) | (0.028) | (0.035) | (0.034) |
| No vote '18 | | | −0.314*** | −0.378*** | −0.349*** | −0.435*** |
| | | | (0.029) | (0.027) | (0.035) | (0.034) |
| Voted in person '18 | | | 0.207*** | 0.138*** | −0.072** | −0.164*** |
| | | | (0.029) | (0.027) | (0.035) | (0.034) |
| Asian | | | | | 0.699*** | 0.701*** |
| | | | | | (0.009) | (0.009) |
| Am. Indian | | | | | 0.173*** | 0.178*** |
| | | | | | (0.025) | (0.026) |
| Black | | | | | 0.283*** | 0.288*** |
| | | | | | (0.003) | (0.003) |
| Hispanic | | | | | 0.245*** | 0.248*** |
| | | | | | (0.008) | (0.008) |
| Other | | | | | 0.003 | 0.006 |
| | | | | | (0.004) | (0.004) |
| Age | | | | | 0.041*** | 0.041*** |
| | | | | | (0.0001) | (0.0001) |
| Constant | −1.576*** | −1.596*** | −1.790*** | −1.758*** | −3.794*** | −3.739*** |
| | (0.031) | (0.029) | (0.038) | (0.036) | (0.043) | (0.041) |
| Observations | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 |
| County F.E. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Log likelihood | −2,488,279 | −2,440,002 | −2,350,128 | −2,305,334 | −2,196,565 | −2,154,820 |
| Bayesian inf. crit. | 4,976,605 | 4,880,051 | 4,700,364 | 4,610,775 | 4,393,329 | 4,309,840 |

*Note:* *p < 0.1; **p < .05; ***p < 0.01

include ballots surrendered by voters at early voting locations, surrendered at election day voting locations, or returned spoiled). This dependent variable is coded 1 for voters with requested and undelivered ballots, and 0 for requested and delivered ballots.[13] The independent variables are the same as those used in the above models. These results are reported in Table 2.

Column 1 reports that a one mile increase in distance to the closest dropbox is associated with a 0.6 percentage point increase in the likelihood of that ballot being undelivered. Using distance decay rather than raw miles, the model presented in column 2 reports that a one unit increase in distance decay is associated with a 4.5 percentage point increase in the likelihood of a by-mail ballot being undelivered. A change from the mean value of distance decay (.18, or 2.35 miles) increasing by one standard deviation (to .54, or 1.36 miles) corresponds to a roughly 1.5% decrease in the likelihood of a ballot being undelivered. The distribution of distance decay values is such that the vast majority of observations fall between 0 and 1, meaning that the model estimate of 4.5% reflects a move over nearly the entire range of observed values. The larger magnitude of the distance decay association with undelivered ballots (as compared to raw miles) reflects the importance of distance differences at small values (e.g, a dropbox being within walking distance or not).[14] The addition of control variables in models 3 and 4 does not change

[13]Results for the same models using all voters (rather than only voters who at least requested a ballot) are presented in Table 5 in Supplementary Appendix C.

[14]It is important to again note here that this measure is an inverse exponent, meaning that it cannot be extrapolated linearly in miles (e.g, an increase from 3 miles to 4 miles (a distance decay decrease of only .07) would have a significantly smaller association with the outcome variable than 4.5 a percentage point increase).

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

TABLE 2. PROXIMITY TO DROPBOXES AND UNDELIVERED BY MAIL BALLOTS

| | *Dependent variable: Ballot Undelivered* | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Miles | 0.006** | | 0.008*** | |
| | (0.003) | | (0.003) | |
| Dist. decay | | −0.045** | | −0.045** |
| | | (0.022) | | (0.022) |
| Voted early '18 | | | −0.687*** | −0.710*** |
| | | | (0.201) | (0.194) |
| Voted by mail '18 | | | −1.180*** | −1.194*** |
| | | | (0.203) | (0.196) |
| No vote '18 | | | −0.940*** | −0.962*** |
| | | | (0.201) | (0.194) |
| Voted in person '18 | | | −0.775*** | −0.801*** |
| | | | (0.201) | (0.194) |
| Age | | | −0.008*** | −0.008*** |
| | | | (0.0005) | (0.0005) |
| Asian | | | 0.154*** | 0.146** |
| | | | (0.058) | (0.059) |
| Am. Indian | | | 0.535*** | 0.488*** |
| | | | (0.150) | (0.153) |
| Black | | | 0.165*** | 0.164*** |
| | | | (0.019) | (0.019) |
| Hispanic | | | 0.292*** | 0.292*** |
| | | | (0.052) | (0.052) |
| Other | | | 0.135*** | 0.128*** |
| | | | (0.031) | (0.031) |
| Constant | −4.719*** | −4.685*** | −3.470*** | −3.398*** |
| | (0.100) | (0.098) | (0.226) | (0.217) |
| Observations | 1,051,709 | 1,051,709 | 1,051,709 | 1,051,709 |
| County F.E. | ✓ | ✓ | ✓ | ✓ |
| Log likelihood | −76,339.250 | −74,443.280 | −75,981.890 | −74,098.380 |
| Bayesian inf. crit. | 152,720.100 | 148,928.100 | 152,144.000 | 148,376.800 |

*Note:* *p<0.1; **p<0.05; ***p<0.01

substantively the estimates of the effect of distance to dropbox. Voters with previous vote by mail experience and older voters were less likely to leave mail ballots undelivered. Compared to white voters, all racial and ethnic groups were more likely to leave by-mail ballots undelivered.

## RESULTS: DROPBOX USE RATE AND PROXIMITY

At an individual level, proximity affects voting behavior in mode of voting and the successful delivery of by-mail ballots. Election administrators, however, may be interested in the efficacy of ballot dropbox placement (especially in instances where counties may use multiple dropboxes or be limited to a certain number of dropboxes). The correlation between distance traveled and dropbox use provides strong descriptive evidence that proximity is an important factor for understanding variation in dropbox use rates (full histogram of dropbox use rates in Supplementary Appendix A). Figure 3 illustrates the negative correlation between dropbox use rates (measured at the dropbox level) and travel distance to dropbox. The use rate of a dropbox and the median travel time of its potential users correlate with a Pearson's correlation coefficient of −0.22 (95% confidence interval of −0.33 to −0.1). Median distance decay and dropbox use rate correlate at 0.30 (95% confidence interval of 0.19 to 0.40).

Figure 3 also demonstrates that beyond about 6 miles, increasing travel times have little effect on dropbox usage. This suggests that the covariance between dropbox usage and distance times is primarily driven by dropboxes with median distances at or below 6 miles. This finding adds further evidence that distance decay is a useful measure for capturing the accessibility of a dropbox. Because voters do not appear to have their behavior changed by distances that already involve a

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

**FIG. 2.** Average marginal effect of distance on voting behavior.

significant amount of travel, most of the substantively important variance in cost should be between 0 and 5 miles, which distance decay highlights as most important.

Table 3 reports models estimating the effect of the median distance and median distance decay for voters in a given dropbox's use zone on the use rate of that dropbox. Only voters for whom that dropbox is the closest usable dropbox are included in this calculation. The model uses ordinary least squares estimation. Alternative modeling specifications including a beta regression estimation, a model including a fixed-effect by county, and a model including a spatially lagged dependent

**FIG. 3.** Travel distance and dropbox use rate.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

TABLE 3. TIME, DISTANCE, AND DROPBOX USE RATES

| | *Dependent variable: Dropbox Use Rate* | |
|---|---|---|
| | *(1)* | *(2)* |
| Median distance | −0.028** | |
| | (0.013) | |
| Median distance decay | | 0.435*** |
| | | (0.090) |
| Percent Black | −0.107 | −0.079 |
| | (0.130) | (0.125) |
| Mean age | 0.00004 | 0.0001 |
| | (0.0001) | (0.0001) |
| Number boxes in county | 0.0001 | −0.003 |
| | (0.005) | (0.005) |
| Percent ballots mailed '18 | 1.632 | 2.372 |
| | (2.367) | (2.277) |
| Median household income | 0.207 | 0.222 |
| | (0.191) | (0.180) |
| Population density | 0.0004 | −0.001 |
| | (0.002) | (0.001) |
| Dem. share of '16 vote | 0.100 | 0.074 |
| | (0.266) | (0.257) |
| Percent less than college | 0.002 | 0.004 |
| | (0.009) | (0.008) |
| Constant | −2.179 | −2.629 |
| | (2.192) | (2.081) |
| Observations | 275 | 275 |
| $R^2$ | 0.079 | 0.139 |
| Adjusted $R^2$ | 0.047 | 0.109 |
| Residual std. error (df=265) | 0.394 | 0.381 |
| F Statistic (df=9; 265) | 2.511*** | 4.737*** |

*Note:* *p<0.1; **p<0.05; ***p<0.01

variable are all reported in Supplementary Appendix C. Across all model specifications the effect of distance is statistically significant with estimated effects in the expected direction (increased median distance to dropbox associated with decreased box usage).

Across both models reported in Table 3, dropboxes for which the average user would need to travel farther are associated with lower rates of use. As a reminder, because distance decay is calculated as the inverse of the distance squared, larger distances equal lower distance decay values (meaning that a positive coefficient for distance decay indicates that an increase in distance corresponds to a decrease in dropbox use). The proportion of likely dropbox users that are Black has no distinguishable effect on use rate. Similarly, the average age, population density, income, Democratic vote-share in 2016, percent without college education, and percentage of 2018 ballots cast via mail in a dropbox's use zone have no distinguishable effect on dropbox use rate.

Interpretation for the models using median distance is quite straightforward: a one mile increase in the median distance traveled by a voter in a dropbox's use zone corresponds to a 2.8 percentage point decrease in the use rate for a given dropbox.

**FIG. 4.** Distance decay and dropbox use rate, mail-in voters.



Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

**FIG. 5.** Dropbox use rate among mail-in voters.

For example, if we consider a dropbox as being accessible to 18,000 registered voters and with a use rate of 0.15 (roughly the sample means for eligible voters and use rate), we would expect a one mile increase in the median distance to correspond to a use rate decrease of about 0.03 (to 0.12), all else equal. In this scenario, the number of voters using the dropbox would decrease from 2,700 to 2,160. For reference, the average median distance in the sample is around 4 miles, so a shift of one mile in distance represents quite a big change in the context of these data.

Interpreting the estimated effect of distance decay is much less straightforward. Modeled using distance decay, a decrease in mileage from 1 to 0.25 (a one unit increase in distance decay) corresponds to 43.5 percentage point increase in the dropbox use rate. Figure 4 graphs simulated predicted probabilities of predicted dropbox use rates across the range of observed values for a dropbox use zone's median value of distance decay. The predictions are based on the results for Model 2 in Table 3. For these simulations, covariate values for control variables are generated by sampling observed values from the data. The dashes at the bottom of Figure 4 indicate observed values of median distance decay in the data. A median distance decay of 0.25 (2.13 miles) corresponds to a dropbox use rate of about 0.22, and a one standard deviation increase to a distance decay of about 0.5 (1.41 miles) corresponds to a dropbox use rate of about 0.26.

Figure 5 presents the same predicted outcomes as Figure 4, but with the axis transformed to represent miles to dropbox rather than the distance decay value. The predicted use rate drops dramatically between half a mile and 2 miles, but then tapers to a relatively slow drop over the remaining increases in distance to the dropbox. This figure highlights that changes made to dropbox access in the most dense, urban environments are likely to affect the voting behavior of nearby voters. We discuss the implications of this along other findings in the discussion.

## RESULTS: DROPBOX PROXIMITY AND VOTE TIMING

Modeling the effect of dropbox access on the likelihood of a late-cast or last-minute ballot is somewhat simpler. We use logistic regression with a fixed effect for each county to estimate the effect of a voter's distance and distance decay to their

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

**FIG. 6.** Mail-in ballots counted by date and ballot cast type.

nearest dropbox on their likelihood of casting a late or last-minute ballot. We consider last-minute ballots as those cast within 5 days of the election.[15]

Proponents of ballot dropboxes argue that access to mail-in ballot dropboxes affects decisions on vote timing and ballot approval (Brower 2022). As election day approaches, absentee voters may worry that their mail-in ballot will not be counted if they mail it too late and choose instead to vote via dropbox. By eliminating use of the USPS from their voting cost-benefit calculation, voters can confidently cast mail-in ballots up to election day in a ballot dropbox.

Figure 6 charts the number of mail-in ballots *accepted* each day up to and through election day in Georgia. The totals are separated by ballot type (mail-in via mail or dropbox). The cyclical week effects are to be expected, as is the general higher magnitude of mail-in ballots over dropbox ballots. Critically, however, the gap between mail-in and mail-in via dropbox ballots narrows dramatically for ballots counted day of and day before election ballot totals.

Whereas the number of mailed-in ballots counted decreases as election day approaches and arrives, the number of mail-in ballots cast via dropbox increased up to election day. Voters behave rationally by casting mail-in ballots via dropbox when the deadline draws near. A pertinent question then is whether or not a voter may be dissuaded from voting if they need to vote with a mail-in ballot but a dropbox is not accessible. To understand this relationship we regress whether a ballot was cast at the last minute and whether a ballot was accepted on a voter's distance to dropbox and distance decay values for every voter who requested a mail-in ballot. Although we detect statistically significant effects of distance and distance decay on these outcomes, the substantive effects are so minimal as to cast doubt on the substantive importance of the results (especially given the high number of observations). We find no meaningful evidence that closer access to dropboxes within a county leads a voter to cast a last minute ballot. Full models reporting this finding are located in Supplementary Appendix C.

## DISCUSSION

Beginning with the 2022 midterm elections, many voters had to travel farther to reach a dropbox than they did in 2020. Arizona, Florida, Georgia, Iowa, and Wisconsin have all implemented or are considering implementing severe limitations on

[15]As we discuss later, the results for this test are statistically significant but the substantive effect is extremely small. Defining a last-minute ballot as one cast within 4 or 6 days rather than 5 days does not affect the results.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

the ability of local election officials to make dropboxes accessible to their constituents. In Georgia, the state legislature's passage of Georgia SB 202 has mandated that counties not use more than one dropbox for every 100,000 voters. According to our data, this suggests that the number of dropboxes in the Atlanta area will drop by approximately 75%. The eliminated dropboxes are among the most efficiently placed and well-used dropboxes in the state. Limiting the number of dropboxes forces election administrators to make choices about resource allocation. Our findings here point to certain dropboxes being more useful than others.

Dropboxes are used most frequently when they are within a short distance of a large number of voters. Although proponents of Georgia S.B 202 argue that all voters will still have access to a dropbox, curtailing access to dropboxes in densely populated areas is most likely to affect counties with dropboxes located within short distances of many voters. Voters residing in rural counties, where voters lived farther from dropboxes in 2020, are unlikely to be affected even if their distance to a dropbox increases, as changes in distance affect dropbox voting much less at further distances. An extra mile matters significantly more for a voter delivering their ballot as a walker, cyclist, or public transit user than it does for a driver.

This research has practical implications for election administrators. Our key finding is that voters farther from dropboxes are relatively unaffected by the need to travel further to use one. Consider a county with 200,000 registered voters in Georgia. According to Georgia's recently passed *SB 202*, this county can only use 1 dropbox per 100,000 voters—a total of 2 dropboxes. While *SB 202* mandates that "drop boxes shall be evenly geographically distributed by population in the county," this is somewhat vague. If the county has two dense population centers and a rural population distributed throughout the rest of the area, more ballots would be collected and fewer mail-in ballots would be undelivered if the election administrators place the dropboxes in the densely populated areas rather than a location that is more centrally located.

The data available for Georgia are limited. We cannot recover estimates for the effect of dropbox placement on overall turnout. Rural voters, systematically farther away from dropboxes, were more likely to vote in 2018 and 2020 than their urban counterparts. Distance from a dropbox correlates with rural location and likelihood of voting in 2018. A reduction in dropboxes carries the greatest potential to harm voters living closest to locations that formerly had dropboxes. Because dropbox locations were primarily in densely populated areas, a reduction in boxes will lead urban voters to vote in less convenient methods. Additionally, a reduction in dropboxes will lead to a greater share of by-mail voters failing to deliver their ballots. In 2020, 1.2 percent of white voters failed to return their mail-in ballots, while Black and Hispanic voters failed to return at rates of 2.0 and 1.9 percent, respectively. These are significant disparities that can be ameliorated through the use of dropboxes, which decrease rates of undelivered ballots.

Generally, changes made to one method of voting—like relocation or removal of precinct polling places—are accommodated by voters through substitution with a new method of voting (Clinton et al. 2021). Nonetheless, the focused removal of dropboxes from the highest population counties will disproportionately negatively affect voters living in urban and suburban areas. It is likely not a coincidence that these dropboxes were targeted by a Republican legislature given that these areas have the largest concentration of non-white voters and the largest concentrations of Democratic voters in the state. In the context of Georgia, this correlates with the Atlanta Metro area, which contains Georgia's most Democratic and diverse group of voters. While this research does investigate why Republican legislators enacted *SB 202*, the legislation will make voting less convenient and lead to more undelivered ballots in Georgia's most reliably Democratic and least white counties.

## SUPPLEMENTARY MATERIAL

Supplementary Appendix

## REFERENCES

Aldrich, John H. 1993. "Rational Choice and Turnout." *American Journal of Political Science* 37:246–278.

Anselin, Luc. 1988. *Spatial Econometrics: Methods and Models*, Volume 4. Springer Science & Business Media.

Baringer, Anna, Michael C. Herron, and Daniel A. Smith. 2020. "Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus." *Election Law Journal* 19(3):289–320.

Bivand, Roger, and David W. S. Wong. 2018. "Comparing Implementations of Global and Local Indicators of Spatial Association." *TEST* 27(3):716–748.

Brady, Henry E., and John E. McNulty. 2011. "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place." *American Political Science Review* 105:1–20.

Brower, Mac. 2022. "The Republican War on Drop Boxes." *Democracy Docket*.

Clinton, Joshua D., Nick Eubank, Adriane Fresh, and Michael E. Shepherd. 2021. "Polling Place Changes and Political Participation: Evidence from North Carolina Presidential Elections, 2008–2016." *Political Science Research and Methods* 9(4):800–817.

Collingwood, Loren, and Benjamin Gonzalez O'Brien. 2021. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research* 49(6):604–617.

Collingwood, Loren, William McGuire, Benjamin Gonzalez O'Brien, Katherine Baird, and Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal* 17(1):58–72.

Cottrell, David, Michael C. Herron, and Daniel A. Smith. 2021. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* 49(6):577–590.

Cribari-Neto, Francisco, and Achim Zeileis. 2010. "Beta Regression in R." *Journal of Statistical Software* 34(2): 1–24.

Engstrom, Erik J. 2012. "The Rise and Decline of Turnout in Congressional Elections: Electoral Institutions, Competition, and Strategic Mobilization." *American Journal of Political Science* 56:373–386.

Engstrom, Erik J., and Jason M. Roberts. 2020. *The Politics of Ballot Design: How States Shape American Democracy.* Cambridge, U.K.: Cambridge University Press.

Fotheringham, A. Stewart, and Morton E. O'Kelly. 1989. *Spatial Interaction Models: Formulations and Applications,* Volume 1. Kluwer Academic Publishers Dordrecht.

Gimpel, J.G., and J.E. Schuknecht. 2003. "Political Participation and the Accessibility of the Ballot Box." *Political Geography* 22(5):471–488.

Haspel, Moshe, and H. Gibbs Knotts. 2005. "Location, Location, Location: Precinct Placement and the Costs of Voting." *Journal of Politics* 67:560–573.

Haynes, Kingsley E., and A. Stewart Fotheringham. 2020. *Gravity and Spatial Interaction Models.* Regional Research Institute, West Virginia University.

Jones, Colin J., and Robert M. Stein. 2021. "Recruiting Persons to Work the Polls." *Election Law Journal* 20:315–326.

Joslyn, Nick, Andrew Bilbo, Jack Arndt, Heidi Berger, and Mark Joslyn. 2020. "Distance Traveled to Polling Locations: Are Travel Costs Imposed Equally on Party Members?" *The Social Science Journal* 57:14–25.

King, Bridgett A., and Alicia Barnes. 2019. "Descriptive Representation in Election Administration: Poll Workers and Voter Confidence." *Election Law Journal* 18:16–30.

Kwan, Mei-Po. 1998. "Space-Time and Integral Measures of Individual Accessibility: A Comparative Analysis Using a Point-Based Framework." *Geographical Analysis* 30(3):191–216.

McGuire, William, Benjamin Gonzalez O'Brien, Katherine Baird, Benjamin Corbett, and Loren Collingwood. 2020. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly* 101(5):1789–1809.

McNulty, John E., Conor M. Dowling, and Margaret H. Ariotti. 2009. "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters." *Political Analysis* 17:435–455.

Shear, Michael D, and Stephanie Saul. 2021. "Trump, in taped call, pressured Georgia official to 'find'votes to overturn election." *The New York Times.*

Shino, Enrijeta, Mara Suttmann-Lea, and Daniel A. Smith. 2022. "Determinants of Rejected Mail Ballots in Georgia's 2018 General Election." *Political Research Quarterly* 75(1):231–243.

Song, Shunfeng. 1996. "Some Tests of Alternative Accessibility Measures: A Population Density Approach." *Land Economics*, 474–482.

Suttman-Lea, Mara. 2020. "Poll Worker Decision Making at the American Ballot Box." *American Politics Research* 48:714–718.

Walker, Hannah L., Michael C. Herron, and Daniel A. Smith. 2019. "Early Voting Changes and Voter Turnout: North Carolina in the 2016 General Election." *Political Behavior* 41:841–869.

Address correspondence to:
*Michael Greenberger*
*University of Denver*
*Department of Political Science*
*College of Arts, Humanities & Social Sciences*
*2000 E. Asbury Ave.*
*Denver, Colorado*
*80208*
*USA*

*E-mail:* michael.greenberger@du.edu

Received for publication March 3, 2023; received in revised form August 10, 2023; accepted August 11, 2023; published online November 1, 2023.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/

NEWS

# 2020 Census: Georgia's minority populations have surged

Government will use figures in allocating hundreds of billions of dollars in federal funds

Nearly half of the state's growth happened in the four largest Atlanta-area counties – Cobb, DeKalb, Fulton and Gwinnett. They grew by nearly a half a million people. The skyline of downtown Atlanta is visible near Lindbergh on Thursday, Aug. 12, 2021. (Christine Tannous / christine.tannous@ajc.com)

By Jeremy Redmon, Paradise Afshar and Lautaro Grinspan

Aug 12, 2021

Georgia grew substantially more diverse over the last 10 years as its Black, Hispanic and Asian populations surged and as its number of white residents dropped slightly, according to new 2020 U.S. Census data released Thursday.

Statewide, the number of Black Georgians increased by 13%, while the white population dropped by 1%. Meanwhile, the state's Asian population jumped by 53% and its Hispanic population rose by 32%. The Peach State narrowly remained majority white at just over 50%.

EXHIBIT 9
WIT: Fraga
DATE: 8/14/25
Laura Single, CCR

https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/

"We know these changes are happening rapidly, so if we are not already a majority-minority state, we will be soon," said Mike Carnathan, a research and analytics director for the Atlanta Regional Commission.

ExploreMetro Atlanta is now majority-nonwhite, according to Census 2020
Georgia's population jumped by 10% to 10.7 million between 2010 and 2020, adding about 1 million people but failing to pick up another seat in the U.S. House of Representatives. Nearly half of the state's growth happened in the four largest Atlanta-area counties Carnathan tracks – Cobb, DeKalb, Fulton and Gwinnett. Combined, they grew by nearly a half a million people.

The new numbers will help the government decide where to send hundreds of billions of dollars in federal funds for hospitals, fire departments, schools, roads and other services. They will also help businesses decide where to build new factories and stores.

Georgia lawmakers will use the data to redraw state and congressional legislative districts, ensuring each has an equal number of constituents as the state's population has grown, especially in metropolitan areas.

At the same time, 67 of Georgia's 159 counties — most of them smaller and rural — lost population, part of a nationwide trend.



https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/

Credit: HYOSUB SHIN / AJC

August 5, 2020 Americus - Aerial photo shows downtown Americus on Wednesday, August 5, 2020. (Hyosub Shin / Hyosub.Shin@ajc.com)

Tom Smith, an economist who teaches at Emory University, underscored the challenges of conducting the census in the middle of the coronavirus pandemic, which delayed the Census Bureau's work for months. Cities and counties that saw their populations shrink or grow more slowly than expected, he said, will "lose federal funding in all types of areas. And those cities now are scrambling to figure out how they are going to budget for some of their services."

The Asian American population boomed in the Atlanta region during the last 10 years, including in Forsyth County, where jobs and housing are plentiful. Forsyth saw its Asian population more than triple to 34,256. Gwinnett added more than 41,000 Asian residents.

"We have known, especially over the last 10 years, that our communities have really thrived, especially in North Atlanta suburbs," said Aisha Yaqoob, executive director of Asian American Advocacy Fund. "We're going to continue to see shifts, especially as industries' needs in health care and education continue to grow in the next few years."

Asian Americans in the Atlanta area are seeking better political representation.

"We hope that elected officials are taking note," said Karuna Ramachandran, who directs statewide partnerships for Asian Americans Advancing Justice-Atlanta. "What the data is telling us is that no one can afford to ignore Asian Americans anymore. They just have to pay more attention."

"We're still fighting for really basic things like language access, which feels like such an uphill battle," she added.

https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/



Credit: HYOSUB SHIN / AJC

December 9, 2020 Lilburn - Gwinnett County Public Schools' Hispanic Mentoring Program staff Nury Crawford (second from left), program director, and Tania Muniz (third from left) with parent volunteer Marilu Bamaca (right) help parents Maria Alonso (left) as she picks up two science experiments and gift her son at Plaza Las Americas in Lilburn on Wednesday, December 9, 2020. (Hyosub Shin / Hyosub.Shin@ajc.com)

More

Georgia's Hispanic population has reached 1.1 million, up from 853,689 in 2010. Clayton County's Hispanic population increased by 19% and Gwinnett's rose by 16%, good for the second and third biggest jumps in the state.

Such increases should be reflected in the redistricting decisions lawmakers will make in 2021, said Jerry Gonzalez, who leads the Georgia Association of Latino Elected Officials.

"The census is about two things. It's about power and money, and redistricting is about that, too," he said. That process "should demonstrate the growth and influence of communities, particularly communities of color across the state that grew so significantly. Redistricting should take that into account and… not preserve power for politicians."

https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/

Charlton County, a small rural county near the Florida border, saw its Hispanic population grow by the biggest rate at 21%. It is home to the Folkston ICE Processing Center, an immigration detention facility. Nearly 19% of Charlton's 12,518 residents live in correctional facilities, census data shows.

Gonzalez and other Latino advocates believe it's too soon to rule out the possibility of an undercount. The lead-up to the census was marred by controversy and confusion surrounding the Trump administration's unsuccessful attempt to add a question to the census questionnaire about citizenship status. Pandemic-related disruptions could also have disproportionately affected Latinos and other communities of color.

"Because of everything that was happening in 2020, I'm just going to guess that the growth might be even more than" 32%, said Santiago Marquez, CEO of the Latin American Association.

COVID-19, he said, was particularly damaging, forcing in-person canvassing efforts during the census rollout from organizations like the LAA to be scaled back or shifted online.

"We weren't able to canvas the way that we would have and I think that really hurt us," he said. "The pandemic really slowed down a lot of those efforts and there was only so much that could be done in 2020, especially with harder-to-reach populations."

*AJC data specialist John Perry contributed to this report.*

## Census 2020: Interactive map shows how Georgia counties changed since 2010

Jeremy_Redmon

Jeremy Redmon has reported for The Atlanta Journal-Constitution since 2005.

https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY/

Paradise Afshar

Paradise is a Report for America corp. member covering Latin and Asian immigration for the Atlanta Journal.

Lautaro_Grinspan

Lautaro Grinspan is an immigration reporter at The Atlant

EXHIBIT 10
WIT: Fraga
DATE: 8/11/25
Laura Single, CCR

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
|---|---|

# SUPPLEMENTAL EXPERT REPORT OF JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I. PREAMBLE MATERIAL AND SUMMARY OF FINDINGS

1. In Georgia's first presidential election since the passage of SB 202, the 2024 general election, overall voter turnout was higher than in any election since at least 1980. Updating my analysis of turnout rates across self-reported racial groups, I calculate that in the 2024 general election American Indian, Asian, Hispanic, and white voters had their highest turnout rate in any statewide general election since at least 2014. The turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election, and higher than the 2014, 2018, or 2022 elections. I use the Census Bureau's Current Population Survey (CPS) November supplement to compare the self-reported turnout rate of Black voters in Georgia with the turnout rate

of Black voters in other states. I find that the change in turnout in Georgia among Black voters is similar to the change in Black voter turnout nationwide, with Black turnout lower nationwide in 2024 compared to 2020.

2.       In the 2024 election Georgia voters continued their shift towards early in-person voting and away from Election Day voting. In the 2024 election 71.1% of all ballots were cast using early in-person voting ("early voting"), the highest share of ballots cast during early voting for any election since at least 2014. Every self-reported racial group had their highest share of ballots cast using early voting during the 2024 election. As the share of ballots cast during early voting has increased, the share of ballots cast on Election Day has decreased. Overall, 23.4% of all ballots were cast on Election Day in 2024. The only election with a smaller share of ballots cast on Election Day than the 2024 election was the 2020 election. About 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022.

3.       Using data from the 2024 election I update my analysis of the rate mail-in absentee ballots are rejected and the rate mail-in ballots were rejected for arriving after the deadline or because of an issue verifying the voter's identity. In the 2024 election 1.7% of all returned mail in ballots were rejected. This is a lower rate than in 2016 and 2018, but a higher rejection rate than in

2020 and 2022. In the 2024 election I calculate that a smaller share of mail-in ballots were rejected for arriving late than in 2016 and 2018, but a larger share than in the 2020 or 2022 elections. I find that the rate mail-in ballots were rejected for identification reasons in the 2024 election were similar to, but higher than, the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections. There is no consistent relationship between the Black-white gap in rejection rates for signature reasons in 2016, 2018, and 2020 and the Black-white gap in rejections rates for identification reasons in 2024. The Black-white gap in rejections for identification reasons in 2024 was smaller than the Black-white gap for signature reasons in 2016, but the 2024 Black-white identification gap was larger than the 2018 and 2020 Black-white signature gap.

4.    The 2024 election saw the largest share of votes cast on the weekend using early in-person voting in any election since at least 2014. During the 2024 election 7.7% of all votes were cast on the weekend using early in person voting. Weekend voting rates were up for every group in the 2024 election: across every self-reported racial group the 2024 election saw the largest share of ballots cast on the weekend using early in person voting. And every racial group but white voters had the largest share of ballots cast on Sunday for any election since at least 2014. For example, in the 2024 election 2.1% of all votes from Black voters were cast on Sunday using early in-person

voting and 8.3% of all ballots from Black voters were cast on the weekend using early-in person voting.

5.    Using data from the 2024 election I updated my analysis of the number and share of voters who cancel their mail-in ballots and then vote either early in person or on Election Day. In the 2020 election over 289,000 voters canceled their mail in ballot and then voted early in-person or on Election Day. In the 2024 election a smaller share and number of mail in ballots were canceled and subsequently voted early in person or on Election Day than in the 2020 election. But, the 2024 election saw a larger share and number of canceled ballots voted in person than in the 2014, 2016, 2018, or 2022 election.

6.    I find that the two-post SB 202 elections—2022 and 2024— had smaller shares of voters who waited more than 30 minutes to vote than in the 2016, 2018, or 2020 election. Using the Cooperative Election Study (CES), the same data source Dr. Burden and Dr. Pettigrew used to measure line length in their expert reports, I find that there was a decline in the share of voters who report waiting more than 30 minutes to vote in the 2022 and 2024 election compared to the 2016, 2018, or 2020 elections. According to the CES, overall in the 2022 election 5.3% of voters in Georgia report waiting more than 30 minutes to vote and in the 2024 election 6.3% of voters in Georgia report waiting more than 30 minutes to vote. The two-post SB 202 elections also saw

a decline in the share of Black and white voters who report waiting more than 30 minutes to vote compared to the voters from the same self-reported groups in the 2016, 2018, or 2020 elections. Only the 2014 election had a smaller share of voters who report waiting more than 30 minutes and the difference between the share of voters who report waiting more than 30 minutes in the 2014 and the 2022 and 2024 elections is not statistically significant. A different publicly available survey of Georgia voters after the 2024 election confirms that a smaller share of voters report waiting more than 30 minutes than reported in the 2016, 2018, or 2020 CES.

7.    SB 202 altered the application window for mail-in absentee ballots and verified voters' identity using identification, like a driver's license, instead of a signature. Using the Absentee Voter History File I find that the vast majority of mail-in ballot applications conformed to the SB 202 application window. Overall, 0.61% of mail-in ballot applications were rejected for arriving after the deadline and 0.16% were rejected for arriving before the application window opens. I calculated that 0.37% of mail-in ballot applications were rejected for identification reasons.

8.    SB 202 also left in place the "roll over" list for mail-in ballot voters 65 and older, self-reported disabled voters, overseas, and military voters. The roll over list enables Georgia voters to apply for an absentee ballot once in an election cycle and receive ballots for all subsequent elections. I find that 43.7%

of all mail in absentee ballot applications came from voters on the roll over list, including 76.6% of all voters 65 and older.

9. In the 2024 election self-reported rates of drop box use among mail in voters were similar to the self-reported rate of drop box among mail in voters in the 2020 election. I used the 2024 CES survey to estimate the self-reported drop box use rate. I find that overall use of drop boxes among mail-in voters was similar in the 2020 and 2024 elections, but lower in the 2022 election. I find that there is no consistent relationship between race and self-reported drop box use among mail in voters. In the 2020 and 2022 elections white mail-in voters were more likely to self-report returning their ballot using a drop box, but in the 2024 election Black mail-in voters were more likely to self-report returning their ballot using a drop box.

## II. VOTING IN GEORGIA

10. To measure voter turnout in Georgia I follow the same procedure I used in my first expert report and rely upon state provided turnout statistics. Specifically, I measured 2024 turnout using data on the votes cast in individual precincts and counties, which I then aggregated to calculate the overall turnout and voter turnout by self-identified racial group.[1]

[1] For the 2024 election I used the file "FINAL Reapportionment Report 02212025 November 2024 General.xlsx" which was provided to me by counsel. For the 2022 general election, I used the Statewide.xlsx file from the "SSVRZ422 2022" zip file and the "Precinct turnout by race" folder, which was

11.    To assess differences across racial groups I follow the same procedure as in my first expert report and rely upon self-reported racial identity, as tallied in the state turnout statistics. Voters self-identify as American Indian, Asian or Pacific Islander (which I refer to as Asian hereafter), Black, Hispanic, white, Other, or the race is "Unknown". In this report, like my first expert report, I focus on American Indian, Asian, Black, Hispanic, and white voters.

12.    I calculate the turnout statistics in this section primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP. Since I wrote my first expert report the 2022 CVAP estimates have been released, so I use the 2022 CVAP for Georgia as the denominator in my estimates of the 2022 CVAP turnout rate. The Census Bureau has not yet released the 2024 estimates of the CVAP, so I use two different approaches to estimate the 2024 CVAP. First,

---

obtained by counsel. In the 2020 election, I used data downloaded from the secretary of state's data portal, specifically the "General Election 2020 Active, Inactive Voters by Race, Gender_County.xlsx" file. For the 2018 and 2016 election I used the file "SSVRZ376R3.xlsx" which I downloaded from the Secretary of State's office website. The downloaded turnout data from the Secretary of State's website was missing data for 2014, so counsel obtained the file "November 2014 General Election - Active, Inactive Voters by Race Gender - (COUNTY).xlsx". For the January 2021 runoff I used the "General Election Runoff 2021 Active, Inactive Voters by Race, Gender_County.xlsx" file downloaded from the Secretary of State's office website and for the December 2022 election I used the "Statewide.xlsx" which was contained in the "SSVRZ422 2022" zip file obtained from counsel.

I use the 2023 estimates of the CVAP from the Census Bureau for the denominator in the 2024 CVAP turnout rate. I label turnout estimates with this denominator as the "CVAP" estimates for each group. As I described in my first report, using CVAP estimates from a prior year creates a risk of underestimating the size of groups in the 2024 electorate, which would cause me to overestimate turnout rates for that group. To mitigate this risk, my second measure of group size uses historical growth rates to make a plausible estimate for each group's actual size in the 2024 election. As in my first report I extrapolate using available CVAP data. Specifically, I calculated the average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group. I then divided the average of the 2-year change by 2 to obtain a one-year average growth rate, which I then added to the 2023 CVAP estimate. This projection serves as an estimate of the 2024 CVAP. I label turnout estimates with this denominator as the "CVAP Trend" estimates.[2]

## III.  TURNOUT IN THE 2024 GEORGIA FEDERAL ELECTION REMAINED HIGH.

13.    In Table 1 I present estimates of the overall turnout rates in the state of Georgia for general federal elections from 2014 to 2024. This updates Table 1 from my first expert report, and it is structured the same way. The "Year" column presents the year of the election. The "CVAP Turnout Rate"

---

[2] The only election the CVAP and CVAP Trend estimates will differ is in 2024.

column calculates the turnout rate using the CVAP corresponding to each election year, except for 2024 where I use the 2023 CVAP. The "CVAP Turnout Rate, Trend" column calculates the turnout rate using the corresponding CVAP but extrapolates the 2023 turnout rate to 2024 based on the historical rate of growth for racial groups. The "VEP Turnout Rate" column uses data from Dr. Michael McDonald (2024) to calculate the overall turnout rate from the voting eligible population ("VEP").[3] The VEP is an estimate of the number of individuals who are eligible to vote in a state's election. The VEP is available at the state-level but is not broken down by racial group.

14.    In the first general presidential election after the passage of SB 202 in Georgia, overall voter turnout was higher than any presidential or midterm election since 2014, though similar to the turnout rate in the 2020 general election. Using the CVAP turnout estimates in the second column, I find that the turnout rate in the 2024 CVAP Georgia presidential election was 1.4 percentage points higher than the 2020 Georgia presidential election and 9.6 percentage points higher than turnout in the 2016 Georgia presidential election. I reach a similar conclusion if I use the estimates from the "CVAP Turnout Rate, Trend" column. Using the projected measure of CVAP I find that the turnout rate is higher in the 2024 Georgia presidential election than in the

---

[3] Univ. of Fla. Election Lab, 2024 General Election Turnout (as of May 13, 2025), https://election.lab.ufl.edu/2024-general-election-turnout/.

2020 election, with a difference of 0.5 percentage points. The turnout rate in the 2024 election was 8.7 percentage points higher in 2024 than in 2016 according to "CVAP Turnout Rate, Trend" measure of turnout.

| Year | CVAP Turnout Rate | CVAP Turnout Rate, Trend | VEP Turnout Rate |
|---|---|---|---|
| 2014 | 0.377 | 0.377 | 0.386 |
| 2016 | 0.589 | 0.589 | 0.598 |
| 2018 | 0.544 | 0.544 | 0.541 |
| 2020 | 0.671 | 0.671 | 0.682 |
| 2022 | 0.515 | 0.515 | 0.519 |
| 2024 | 0.685 | 0.676 | 0.683 |

**Table 1: Turnout rates in Georgia federal elections from 2014 to 2024, calculated using state-provided election returns and McDonald's (2024) data.**

15. Using the VEP turnout rates in the fourth column, I also find that the 2024 election was the highest turnout election for all 6 general federal elections in Table 1, though using this measure of turnout I again find that the turnout rate in the 2024 election was similar to the turnout rate in the 2020 election. The VEP turnout rate in 2024 was 0.1 percentage points higher in 2024 than in 2020. But the 2024 VEP turnout rate was 8.5 percentage points higher in 2024 than in 2016.

16. McDonald (2024) provides VEP turnout rates in Georgia for all federal elections from 1980 to 2024.[4] I present those VEP turnout rates in

[4] To create this time series I combine the data available on Professor McDonald's website available here—Michael McDonald, Univ. of Fla. Election Lab, 1980-2022 General Election Turnout Rates (v1.2) (Oct. 6, 2024), https://election.lab.ufl.edu/dataset/1980-2022-general-election-turnout-rates-

Figure 1 for the Midterm (left-hand panel) and General (right-hand panel) elections from 1980 to 2024. Using McDonald's (2024) VEP estimates presented in the right-hand panel of Figure 1, I find that the turnout rate in the 2024 Georgia presidential election (right-hand panel) was the highest turnout rate in any general federal election in Georgia since at least 1980. The second highest VEP turnout rate occurred in the 2020 election. The federal election with the third highest VEP turnout rate is the 2008 election and the 2024 VEP turnout rate was 5.6 percentage points higher than the 2008 VEP turnout rate.

**Figure 1: VEP Turnout Rates from 1980 to 2024, calculated using McDonald's (2024) data.**

v1-2/, along with the estimates from 2024 here—Univ. of Fla. Election Lab, *supra* note 4, https://election.lab.ufl.edu/2024-general-election-turnout/.

17. The left-hand panel presents the VEP turnout rates for the midterm elections in Georgia from 1982 to 2022. As I explained in my first expert report and as Table 1 shows, the VEP turnout rate in 2022 in Georgia was lower than in 2018. The 2022 VEP turnout rate was 2.2 percentage points lower than the 2018 VEP turnout rate. But, the 2022 VEP turnout rate was the second highest VEP turnout rate in any Georgia midterm election from 1982 to 2022. The election with the third highest VEP turnout rate was the 2010 midterm election when turnout was 11.2 turnout points lower than the VEP turnout rate in the 2022 midterm election.

| | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.022 | 0.022 | 0.133 | 0.133 | 0.352 | 0.352 | 0.102 | 0.102 | 0.388 | 0.388 |
| 2016 | 0.066 | 0.066 | 0.369 | 0.369 | 0.521 | 0.521 | 0.304 | 0.304 | 0.590 | 0.590 |
| 2018 | 0.077 | 0.077 | 0.343 | 0.343 | 0.495 | 0.495 | 0.275 | 0.275 | 0.539 | 0.539 |
| 2020 | 0.157 | 0.157 | 0.599 | 0.599 | 0.572 | 0.572 | 0.403 | 0.403 | 0.671 | 0.671 |
| 2022 | 0.209 | 0.209 | 0.341 | 0.341 | 0.421 | 0.421 | 0.214 | 0.214 | 0.539 | 0.539 |
| 2024 | 0.514 | 0.496 | 0.632 | 0.608 | 0.570 | 0.560 | 0.429 | 0.411 | 0.692 | 0.690 |

**Table 2: Voter turnout by self-reported racial group, calculated using state-provided election returns.**

18. In Table 2 I calculated turnout rates for self-identified racial groups for federal general elections in Georgia from 2014 to 2024. Table 2 updates Table 2 from my first expert report. In the left-most column of Table 2 I present the election year. For each self-identified racial group I present a pair of CVAP turnout rates for each election. The "CVAP" column for each self-identified racial group is the CVAP turnout rate with the 2024 estimate

calculated using the 2023 5-year estimate of the CVAP in Georgia. In the "CVAP Trend" column for each self-identified racial group is the CVAP turnout with the 2024 estimate calculated using the extrapolated measure of the 2024 CVAP.[5]

19.    Comparing presidential elections, every racial group had higher turnouts rates in the 2024 election than in the 2016 election. Using the CVAP trend measure of turnout the turnout rate among Asian voters was 23.9 percentage points higher in the 2024 election than in the 2016 election (26.3 percentage points higher using the CVAP measure of turnout). Continuing to use the CVAP trend measure, the turnout rate among self-identified Black voters was 3.9 percentage points higher in the 2024 election than in the 2016 election (4.9 percentage points higher using the CVAP measure of turnout), among self-identified Hispanic voters the turnout rate was 10.7 percentage points higher in 2024 than in 2016 (12.5 percentage points higher using the CVAP measure), and among white voters the 2024 turnout rate was 10.0 percentage points higher than in 2016 (10.2 percentage points higher using the CVAP measure).

---

[5] Table 2 in this report differs from Table 2 in the first report in two ways. First, Table 2 in this report adds the 2024 turnout rates. Second, Table 2 in this report uses the 5-year estimate of the 2022 CVAP in Georgia, which was not available at the time I wrote my first report.

20.     Asian, Hispanic, and white voters had higher turnout rates in the 2024 election than in the 2020 election, though Black voters saw a decline in turnout in the 2024 election compared to the 2020 election. Continuing my use of the CVAP trend measure, I find that turnout among self-identified Asian voters was 0.9 percentage points higher in the 2024 election than in the 2020 election (3.3 percentage points higher using the CVAP measure). Using the CVAP trend measure of turnout, the turnout rate among self-identified Hispanic voters was 0.8 percentage point higher turnout rate in 2024 than in 2020 (2.6 percentage points higher using the CVAP measure of turnout) and the turnout rate among white voters was 1.9 percentage point higher turnout in the 2024 election than in the 2020 election (2.1 percentage points higher in 2024 than in 2020 using the CVAP measure of turnout). The only group with a decline in turnout in 2024 relative to 2020 was among self-identified Black voters. Using the CVAP trend measure of turnout I find a 1.2 percentage point decline in Black turnout in 2024 relative to the 2020 election (0.2 percentage point decline using the CVAP measure of turnout).

21.     Turnout rates in Georgia and nationwide tend to be higher in presidential elections than in midterm elections. This is true across all self-identified racial groups. The turnout rate for each self-identified racial group in the 2024 general election was higher than the turnout rate in the 2014, 2018, or 2022 midterm elections.

## IV.    COMPARING GEORGIA'S TURNOUT TO OTHER STATES

22.    In my first expert report I contrasted turnout rates in Georgia and the turnout rates in other states. I made two types of comparisons. To assess differences in overall turnout, I made a comparison of the aggregate turnout in Georgia to the turnout rates in other states. To assess differences in turnout among different self-reported racial groups, I also compared the turnout rate among different groups in Georgia to the turnout rates of self-identified racial groups in three other states: Louisiana, North Carolina, and South Carolina.

23.    In this expert report I update the overall comparisons for the 2024 election. To compare the turnout rates across different self-reported racial groups I use a different and more comprehensive strategy. Instead of using voter file data from three states where it was available, I use recently available data from the Current Population Survey (CPS), a census conducted post-election survey designed to measure turnout rates after federal elections. The use of this survey data provides a more comprehensive comparison of turnout rates among self-reported racial groups in Georgia to the turnout rates of self-reported racial groups in other states. I describe some tradeoffs below, but I use the survey data to provide a more comprehensive comparison with the turnout rates in other states.

24.    As I cautioned in my first expert report, interpreting any of the comparisons that I make in this section as a causal effect of SB 202 would

require strong and difficult to justify assumptions in this setting. For example, one key assumption would be that the only differences across Georgia and other states was the passage of SB 202. Of course, there are numerous differences across American states that could affect turnout rates and are unrelated to SB 202 in Georgia.

25.    Even though the across state comparisons would require strong assumptions to interpret as the causal effect of SB 202, these comparisons are essential to provide context for the changes in turnout observed in Georgia. As I describe in paragraph 38 in my first expert report, some of the Plaintiffs' experts interpreted changes observed in Georgia alone as evidence of the effect of SB 202. Using turnout comparisons within a single state to assess a policy's effect on turnout requires even stronger assumptions and risks confusing a nationwide pattern for a state-specific policy consequence. Using other states helps identify what those nationwide trends might be.

26.    In Table 3 I compare the aggregate turnout rate in the state of Georgia to the turnout rate in other states, calculated using the McDonald's (2024) VEP turnout rates. In Table 3 the "Year" column contains the year of the election, the "Georgia Turnout Rate" presents the VEP turnout rate in Georgia, which is identical to the "VEP Turnout Rate" column in Table 1. The "Other States' Turnout Rate" column calculates the VEP turnout rate across all other states and the District of Columbia. To perform this calculation I

summed together the total votes cast in these states and then divided this by the total size of the voting eligible population. Finally, I divided the total number of voters by the total voting eligible population in these states.

| Year | Georgia Turnout Rate | Other States' Turnout Rate |
|---|---|---|
| 2014 | 0.386 | 0.367 |
| 2016 | 0.598 | 0.604 |
| 2018 | 0.541 | 0.509 |
| 2020 | 0.682 | 0.679 |
| 2022 | 0.519 | 0.467 |
| 2024 | 0.683 | 0.646 |

**Table 3: Comparing the VEP turnout rate in Georgia to the VEP turnout rate in other states from 2014 to 2024.**

27. Georgia's turnout rate in the 2024 election was 3.7 percentage points higher than the national average in other states. As discussed above, 68.3% of the voting-eligible population cast a vote in the 2024 election in Georgia and in other states, on average, 64.6% of the voting-eligible population turned out to vote. Unlike the turnout rates in other states, Georgia's turnout rate in 2024 was higher than in 2020, though as I mentioned above the 2024 turnout rate was similar to the turnout rate in 2020. The 2024 VEP turnout rate in Georgia was 0.1 percentage points higher than the 2020 VEP turnout rate in Georgia. Across the other states, the 2024 VEP turnout rate was 3.3 percentage points lower than the VEP turnout rate in 2020. Georgia's 2024 VEP turnout rate also increased more compared to the 2016 VEP turnout rate than other states' 2024 turnout rate increased over the 2016 VEP turnout rate

in the other states. The 2024 VEP turnout rate in Georgia was 8.5 percentage points higher than the 2016 VEP turnout rate in Georgia, while in other states the 2024 turnout rate was 4.2 percentage points higher than the turnout rate in the 2016 election.

28. To enable a comparison of the turnout rates of self-identified racial groups in Georgia to the turnout rates of self-identified racial groups outside of Georgia, I use survey data from the US Census' Current Population Survey (CPS) November Supplement.[6] The CPS is a large-scale survey that serves as "the primary source of labor force statistics for the population of the United States."[7] After federal elections in even years the CPS November supplement is administered to respondents after the standard CPS battery and asks a sample of respondents about whether they turned out to vote in the recent general election and also asks them to report their self-identified race. Using these survey responses, I compare the turnout rates for Black and white respondents in Georgia to the turnout rates for Black and white respondents in other states in four federal elections before SB 202 was enacted; 2014, 2016,

[6] U.S. Bureau of Lab. Stats., Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/.

[7] U.S. Census Bureau, Current Population Survey (CPS) (Oct. 23, 2024), https://www.census.gov/programs-surveys/cps.html.

2018, and 2020 November general elections; and two federal elections after the passage of SB 202; the 2022, and 2024 November general elections.

29.    At the time I wrote my first expert report, the CPS November supplement for the 2022 election was not yet released. In place of the CPS data, in my first expert report I used available data from three states that recorded voters' self-identified racial groups in the voter file: Louisiana, North Carolina, and South Carolina. The comparison of the turnout rates of Black, white, and other self-identified racial groups in these states to the turnout rates in Georgia provided useful context for Georgia's turnout rates but necessarily limited the comparison to the turnout rates in the three states with available data at the time.

30.    Using the CPS turnout data, I followed standard practice and calculated the turnout rates using two different methods. First, I calculated the turnout rates using the same procedure as the Census.[8] Following the Census' procedure I classified respondents who reported that they turned out to vote as "VOTED." I then classified individuals who reported not turning out to vote, individuals who said that they "Don't Know", "Refused", or did not complete the turnout supplement as "NOT VOTED".[9] Among this population

---

[8] Aram Hur & Christopher H. Achen, *Coding voter turnout responses in the Current Population Survey*, 77 Pub. Op. Q. 985 (2013).

[9] In the 2014, 2016, 2018, and 2020 surveys I perform this classification based entirely on the PES1 variable in the CPS. In the 2022 and 2024 CPS I use the

of respondents I then applied the Census provided survey weights to calculate the turnout rates.[10] I classified an individual's self-identified racial group following the procedure in the replication code of Ansolabehere, Fraga, and Schaffner (2022).[11] I manually verified my calculations, confirming that my implementation of the Census procedure yielded turnout estimates that correspond to the Census provided estimates of turnout rates for the self-reported groups.

| | Black | | | | White | | | |
|---|---|---|---|---|---|---|---|---|
| | Georgia | | Other States | | Georgia | | Other States | |
| Year | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj |
| 2014 | 0.43 | 0.40 | 0.39 | 0.35 | 0.45 | 0.39 | 0.46 | 0.41 |
| 2016 | 0.60 | 0.60 | 0.59 | 0.60 | 0.64 | 0.63 | 0.65 | 0.65 |
| 2018 | 0.60 | 0.60 | 0.50 | 0.51 | 0.56 | 0.55 | 0.58 | 0.55 |
| 2020 | 0.64 | 0.65 | 0.63 | 0.66 | 0.70 | 0.74 | 0.71 | 0.72 |
| 2022 | 0.54 | 0.49 | 0.44 | 0.40 | 0.61 | 0.57 | 0.58 | 0.53 |
| 2024 | 0.61 | 0.66 | 0.59 | 0.59 | 0.69 | 0.74 | 0.71 | 0.71 |

**Table 4: Estimated turnout rates for Black and white respondents in Georgia and other states, calculated using the CPS survey.**

31. I present the turnout estimates using the CPS in Table 4. In the "Year" column I identify the election year. The columns under "Black" contain the turnout estimates for self-identified Black respondents and the columns under "White" contain the turnout estimates for self-identified white

---

PES1 variable in the CPS and the PRSUPINT variable, which identifies individuals who refuse to complete the November supplement.

[10] The provided weight is variable PWSSWGT.

[11] Stephen Ansolabehere et al.,, *The current population survey voting and registration supplement overstates minority turnout*, 84 J. Pols. 1850 (2022).

respondents. Within each self-identified racial group the columns under "Georgia" contain the turnout estimates for respondents in Georgia and the columns under "Other States" contain the turnout estimates for respondents in other estates. In the columns labeled "CPS" I present the estimated turnout rate calculated following the Census' procedure for calculating the turnout rates.

32. There are several issues with using self-reported turnout to measure the voter turnout rate. The most obvious and well documented problem is that some respondents who did not vote in the election will falsely report voting when asked in a survey, like the CPS.[12] A second issue is that the Census procedure classifies all respondents who refuse to complete the November supplement as not voting in that election. But these respondents did not offer any information about their participation in the election. It is a strong assumption to suppose that none of the respondents who did not complete the supplement also did not vote in the corresponding election.

33. Hur and Achen (2013) provide one methodology to address these issues. The Hur and Achen (2013) procedure makes two modifications to the Census Bureau's procedure for estimating the turnout rate using the CPS turnout data. First, Hur and Achen (2013) drop respondents who refuse to

[12] Hur & Achen, *supra* note 8; Michael P. McDonald, *On the overreport bias of the National Election Study turnout rate*, 11 Pol. Analysis 180 (2003).

complete the November supplement rather than code those respondents as non-voters. Second, Hur and Achen (2013) adjust the Census provided turnout weights so that the overall estimated turnout rates using the CPS data are exactly equal to the VEP turnout rates from McDonald (2024). I followed the Hur and Achen (2013) procedure, calibrating the turnout estimates from the CPS for each state to the VEP turnout in McDonald (2024). I present the result of applying this procedure and the corresponding turnout rates in the "CPS Adj." columns in Table 4.

34.    Hur and Achen's (2013) procedure is not guaranteed to address issues of inaccurate estimated turnout rates using the CPS November supplement. The Hur and Achen (2013) procedure rests upon strong assumptions about how non-respondents compare to respondents in the November supplement and relies on the calibration of the census weights using the VEP turnout rates.[13] For example, a sufficient assumption for the Hur and Achen (2013) weight recalibration to provide an accurate estimate of the turnout rate in each self-identified racial group is that every group over-reports turnout at approximately the same rate within a state. Despite the strong assumptions, the Hur and Achen (2013) methodology addresses potential pathologies in the Census Bureau's turnout estimates.

---

[13] Ansolabehere et al., *supra* note 11.

35.    Using the CPS estimated turnout rates, I find that the changes in turnout rates in the general elections in Georgia after the passage SB 202 are similar to changes in turnout rates in other states in the same time period. For example, in the 2022 midterm using the "CPS" turnout estimates I calculated a Black turnout rate in Georgia of 54% (49% using the Hur and Achen adjustment). This is an increase of 11 percentage points over the 2014 Black turnout rate in Georgia (9 percentage point increase using the adjusted turnout rates). In the other states, I find that the turnout rate in 2022 was 5 percentage points higher in 2022 than in 2014 (5 percentage points higher using the adjusted turnout rate). The 2022 Black turnout rate in Georgia was 6 percentage points lower than the 2018 Georgia Black turnout rate (11 percentage points lower using the adjusted turnout rate). In the other states I find that the 2022 Black turnout rate was also 6 percentage points lower in 2022 than in 2018 ( and also 11 percentage points lower using the adjusted turnout rate).

36.    There is also similarity in the changes in Black turnout rates in the three presidential elections included in Table 4. Using the "CPS" turnout estimates I found a Black turnout rate of 61% in the 2024 presidential election (66% using the Hur and Achen adjustment). This is a one percentage point increase in turnout rate compared to the Black turnout rate in Georgia in the 2016 presidential election (6 percentage point increase using the Hur and

Achen adjustment). In other states there is no difference in the Black turnout rate from 2016 to the 2024 election (one percentage point decrease using the Hur and Achen adjustment). Continuing to use the "CPS" measure of turnout, the Black turnout rate in the 2024 presidential election in other states was 3 percentage points lower than the Black turnout rate in the 2020 presidential election (1 percentage point higher using the Hur and Achen adjustment). The 2024 Black turnout rate in other states was four percentage points lower than the 2020 Black turnout rate in other states (7 percentage points lower using the Hur and Achen adjustment).

37.    Focusing on the changes in turnout among white voters I reach a similar conclusion: the trends in turnout in Georgia are similar to the average trend in turnout in other states, though there is some evidence that white turnout in Georgia increased at higher rates than the white turnout in other states. In the 2022 Georgia midterm election the white turnout rate was 16 percentage points higher than in the 2014 Georgia midterm election (18 percentage points higher using the Hur and Achen adjustment), while the average white turnout rate in 2022 in other states was 12 percentage points higher than the average white turnout rate in 2014 in other states (12 percentage points using the Hur and Achen adjustment). Compared to the white turnout rate in the 2018 Georgia midterm election, white turnout was 5 percentage points higher in 2022 (2 percentage points higher using the Hur

and Achen adjustment). The average white turnout rate in the 2022 midterm election in other states and the average white turnout rate in the 2018 midterm election had no difference (2 percentage point decline using the Hur and Achen adjustment). In presidential elections, I find the 2024 white turnout rate in Georgia was 5 percentage points higher than the 2016 white turnout rate in Georgia (11 percentage points higher using the Hur and Achen adjustment), while in other states the white turnout rate increased 6 percentage points from 2016 to the 2024 election (6 percentage point increase using the Hur and Achen adjustment). Using the "CPS" estimates of turnout, I find that the white turnout rate in the 2024 election in Georgia was 1 percentage point lower than the white turnout rate in Georgia in the 2020 election (no difference using the Hur and Achen adjustment). In other states the 2024 white turnout rate was the same as the 2020 white turnout rate (1 percentage point lower using the adjusted turnout rate).

## V.  EVIDENCE ON HOW GEORGIA VOTERS CAST THEIR BALLOTS

38.    I also updated my analysis of how voters in Georgia cast their ballots to include the 2024 Georgia general election. I use the same procedure in this report as I used to obtain estimates of how Georgia voters use their absentee ballots from 2014 to 2022 in my first report. To assess how Georgia voters cast their ballots in the 2024 election I use the spreadsheet contained in

"Voter History File - Nov 2024 General Election.zip". After the 2024 election (and unlike the Voter History files I used in my first expert report), the Georgia Secretary of State's office updated the Voter History file to contain information about how voters cast their ballots. In the voter history file I use the field "Ballot Style" to assess how voters cast their ballots. I then merged in registered voters' self-identified race using the "Statewide Voter File_2025-01-15.csv". Because this voter file was generated after the 2024 election (apparently on January 15th, 2025) there are 6,884 individuals who turned out to vote who are not found in the provided voter file. Unlike in my first expert report, the provided file of "canceled" voters does not contain information about self-reported race, so I cannot use this file to merge with the voter file to obtain voters' self-report race. To mitigate the number of voters with missing race information, I used the version of the voter file from my first expert report. For 4,966 of these remaining voters I successfully merged information about self-identified race using the 2022 voter file used in my first expert report. This leaves 1,918 voters for whom I was unable to assign a self-identified race.

39.   Using this merged data set for the 2024 election, I updated my analysis of how Georgia voters cast ballots in recent federal general elections in Georgia. Table 5 presents the share of ballots cast in each election (first column) using early-in person (second column), mail-in absentee (third column

column), and on Election Day in person (fourth voting). Table 5 updates Table 7 in my first expert report.

| Year | Early Voting | Mail Voting | Election Day |
|---|---|---|---|
| 2014 | 0.326 | 0.041 | 0.633 |
| 2016 | 0.531 | 0.049 | 0.421 |
| 2018 | 0.478 | 0.056 | 0.466 |
| 2020 | 0.537 | 0.261 | 0.202 |
| 2022 | 0.579 | 0.062 | 0.360 |
| 2024 | 0.711 | 0.051 | 0.234 |

**Table 5: Share of ballots cast using early, mail, and Election Day**

40. Table 5 shows that voters in Georgia in 2024 continued a shift away from casting their vote on Election Day voting and instead towards in-person during the early voting period. In the 2024 election 71.1% of all ballots were cast in-person during the early voting period, the largest share of ballots cast in-person during the early voting period for any of the six federal general elections I examine in Table 5. Comparing 2014 to 2024 there was a 38.5 percentage point increase in the percentage of ballots cast using in-person early voting. A larger share of votes were cast in-person during early voting in 2024 than in the 2016 and 2020 elections. The share of ballots cast in-person during the early voting period was 18 percentage points higher in 2024 than in 2016 and 17.4 percentage points higher in 2024 than in the 2020 election.

41. Nearly all the increase in the share of ballots cast in-person during the early voting period comes from a decline in the share of ballots cast on Election Day. Comparing 2014 to 2024 there was a 39.9 percentage point

decrease in the percentage of Georgia voters who cast their vote on Election Day. Compared to 2024 a larger share of voters cast their ballots on Election Day in the 2016, 2018, and 2022 general elections in Georgia. Only the 2020 general election in Georgia saw a smaller share of ballots cast on Election Day than the 2024 general election: the share of votes cast on Election Day in the 2024 election was 3.2 percentage points higher than the share of votes cast on Election Day in the 2020 election.

42.   In the 2024 election 5.1% of all votes were cast using mail-in absentee voting. This is more than in 2014 (1 percentage point more in 2024) and 2016 (0.2 percentage points more than in 2016), but it was less than in 2018 (0.5 percentage points less than in 2018) and 2022 (1.1 percentage points less than in 2022). By far the highest rate of mail-in voting in Georgia general elections occurred during the 2020 election when 26.1% of all votes were cast using mail-in absentee voting, 21 percentage points higher than in the 2024 election.

43.   Using the merged 2024 voter history file and voter file, I updated my analysis of how rates of early in-person, mail-in absentee, and Election Day voting varied across self-reported racial groups. In Table 6 I report the share of ballots cast for each mode of voting for Asian, Black, Hispanic, and White voters. For space reasons I provide the table for American Indian voters in the Appendix to this report. The calculated shares of votes cast using each voting

method from 2014 to 2022 in Table 6 are identical to the numbers contained in Figure 1 in my first expert report.

| Year | Asian | | | Black | | | Hispanic | | | White | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day |
| 2014 | 0.196 | 0.036 | 0.767 | 0.386 | 0.035 | 0.579 | 0.195 | 0.024 | 0.780 | 0.306 | 0.046 | 0.648 |
| 2016 | 0.448 | 0.063 | 0.485 | 0.556 | 0.041 | 0.402 | 0.417 | 0.033 | 0.547 | 0.527 | 0.054 | 0.417 |
| 2018 | 0.367 | 0.116 | 0.515 | 0.501 | 0.073 | 0.426 | 0.339 | 0.063 | 0.597 | 0.478 | 0.046 | 0.475 |
| 2020 | 0.447 | 0.398 | 0.151 | 0.525 | 0.294 | 0.179 | 0.496 | 0.233 | 0.269 | 0.546 | 0.240 | 0.211 |
| 2022 | 0.518 | 0.092 | 0.388 | 0.637 | 0.075 | 0.288 | 0.476 | 0.045 | 0.478 | 0.559 | 0.056 | 0.384 |
| 2024 | 0.675 | 0.076 | 0.245 | 0.701 | 0.055 | 0.242 | 0.613 | 0.030 | 0.353 | 0.728 | 0.049 | 0.220 |

Table 6: Mode of Voting Across Voters Self-Identified Racial Groups

44. Each self-reported racial group cast the largest share of their votes in-person during early voting in the 2024 election. Compared to the 2014 election there was a 47.9 percentage point increase in the share of ballots Asian voters cast in-person during early voting, a 31.5 percentage point increase in the share of ballots Black voters cast in-person during early voting, a 41.8 percentage point increase in the share of ballots Hispanic voters cast in-person during early voting, and a 42.2 percentage point increase in the share of ballots white voters cast in-person during early voting. There was also an increase in the share of ballots cast in-person during early voting compared to the most recent presidential election (2020) and midterm election (2022). Among Asian voters in 2024 there was a 22.8 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 15.7 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Black voters in the 2024 election there

was a 17.6 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 6.4 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Hispanic voters in the 2024 election there was a 11.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 13.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2022. Among white voters in the 2024 election there was a 18.2 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 16.9 percentage point increase in the share of ballots cast in-person during early voting compared to 2022.

45.     Table 6 shows that in the 2024 election each racial group cast the second-smallest share of ballots on Election Day, second to the share of ballots cast on Election Day in 2020. Further, across racial groups the 2020 election continues to be the election with the largest share of ballots cast using mail-in absentee voting and the smallest share of ballots cast on Election Day. In each racial group the 2024 election saw a smaller share of ballots cast using mail-in absentee voting than the 2022 election.

46.     I also updated my analysis of the rate of provisional voting in Georgia elections and overall in Table 7, which updates Table 8 from my first report. The "Race" column in Table 7 records the self-reported race of the voter

and the overall calculation. The "2014" to "2022" columns are the same estimates as in Table 8 in my first report. The "2024" column presents the share of votes cast classified as provisional by self-reported racial group and overall for the 2024 election. Table 21, located in the Appendix, is structured the same as Table 7, except it provides a count of the number of ballots classified as provisional for each self-reported racial group and overall instead of the share of ballots classified as provisional.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.0061 | 0.0026 | 0.0055 | 0.0033 | 0.0013 | 0.0012 |
| Asian | 0.0047 | 0.0033 | 0.0053 | 0.0027 | 0.0011 | 0.0006 |
| Black | 0.0031 | 0.0018 | 0.0034 | 0.0032 | 0.0010 | 0.0011 |
| Hispanic | 0.0049 | 0.0037 | 0.0057 | 0.0033 | 0.0016 | 0.0012 |
| White | 0.0012 | 0.0007 | 0.0013 | 0.0011 | 0.0004 | 0.0003 |
| Overall | 0.0019 | 0.0012 | 0.0022 | 0.0018 | 0.0006 | 0.0006 |

**Table 7: Share of all general election votes classified as provisional by self-reported racial identity and overall.**

47. Overall, the 2024 election saw a smaller share of votes classified as provisional than in the 2014, 2016, 2018, and 2020 general elections and a similar share of ballots classified as provisional in the 2022 general election. This same pattern is found in every self-reported racial group: every group had a smaller share of ballots classified as provisional in the 2024 election than in the 2014, 2016, 2018, and 2020 election. American Indian, Asian, Hispanic, and white voters had a smaller share of votes classified as provisional in the 2024 election than in the 2022 election. Black voters saw an increase in the share of ballots classified as provisional from 2022 to 2024, though the increase in rate was substantively small: the share of Black voters who had their ballot

classified as provisional increased in 2024 compared to the 2022 election by 0.009 percentage points (an increase of 0.00009 in the share of ballots cast there were provisional).

48.    There is a similar pattern with the count of provisional ballots. Overall, the 2024 election had fewer ballots classified as provisional than the 2014, 2016, 2018, and 2020 elections, but in the 2024 election there were 695 more ballots classified as provisional than the 2022 election. In the 2024 election Asian, Black, and white voters had their second fewest number of provisional ballots cast, with the fewest number of provisional ballots cast for each group in 2022. In the 2024 election 42 American Indian voters had their ballot classified as provisional (fewer than 2018 and 2020, but more than 2014, 2016, and 2022), 91 Asian voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022), 1,620 Black voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, but more than 2022), 233 Hispanic voters had their ballots classified as provisional (fewer than 2016, 2018, and 2020, but more than 2014 and 2022), and 904 white voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022).

## VI.   ASSESSING BALLOT REJECTION RATES AND REASONS FOR MAIL-IN ABSENTEE VOTING IN GEORGIA

49.   I updated my analysis of the rate of absentee ballot rejections and the reason for those rejections using data from the 2024 general election. I calculated the share of mail-in absentee ballots that were returned and ultimately rejected, along with the reason those ballots were rejected. I use the Absentee Voter History files that the Secretary of State posts to their website, which I then merge with the voter file to include information about the voters' self-identified racial group. Using these merged files, I identify mail in absentee ballots in the 2016, 2018, 2020, and 2022 files by identifying rows where the "Ballot Style" field is equal to "Mailed". In the 2024 absentee voter history file I identified rows with the "Ballot Style" field equal to "ABSENTEE BY MAIL." In all analyses I focused on the ballots that were returned: ballots with the "Ballot Status" field equal to "A" (accepted) or "R" (rejected). The overall rejection rate for mail in absentee ballots is the share of ballots that are returned and rejected. I also calculated the reasons for rejection. I focus on four categories of rejections: ballots rejected due to arriving after the deadline, ballots rejected due to issues involving the voters' signature, ballots rejected due to an issue involving the voters' identification, and ballots rejected due to incorrect completion of the oath envelope as an "Oath" rejection. For the 2016 and 2018 elections I manually classified the "Status Reason" field to

correspond with these four categories.[14] For the 2020, 2022, and 2024 elections I use standardized rejection reasons included in the voter file, which I classify into the four categories.[15] Note that after the passage of HB 316 in 2018 the oath envelope was simplified to no longer require a voter to include their address or their date of birth. As a result of this simplification the "Oath" rejection rate will mechanically reduce to zero in these years. After classifying the reason for rejection, I calculated the share of returned mail in absentee ballots that were rejected for that reason.

50. Table 8 presents the rates of rejections for mail in ballots in Georgia for the 2016, 2018, 2020, 2022, and 2024 elections overall and across self-reported racial groups. The "Race" column describes the self-reported racial identity of the voter or whether the calculation is for all voters. The "Year" column provides the election year. I extended my original analysis of mail-in ballot rejection reasons to include the 2016 election. The "Overall" column contains the share of all returned mail in ballots that are rejected. The "Deadline" column contains the share of all returned mail in ballots rejected

[14] My replication code contains the coded reasons in the "RejReasons16.csv" and "RejReasons18.csv" files.

[15] I classify the entry "BALLOT RECEIVED AFTER DEADLINE" as a rejection for arriving after the deadline. I classify "Invalid Signature" and "Missing Signature" as rejections for signature reasons. And I classify "Incorrect ID Information", "MIDR - ID not Provided", and "Missing ID Information" as rejections for ID reasons.

for arriving after the deadline, the "Signature" column contains the share of all returned mail in ballots rejected for an issue related to the voters' signature, the "ID" column contains the share of returned mail in ballots rejected for an issue related to voters' identification, and the "Oath" column contains the share of returned mail in ballots rejected for an issue related to the completion of the Oath envelope.

51.    Table 8 shows that the overall rejection rate for mail in absentee ballots in Georgia was lower in 2024 than in 2016 and 2018, but higher than the rejection rate in 2020 or 2022. I find that 1.7% of all returned mail in absentee ballots were rejected in 2024. This is 1.2 percentage points lower than the rejection rate in 2016 and 1.8 percentage points lower than the rejection rate in 2018. The overall mail-in ballot rejection rate in 2024 was 1.4 percentage points higher than the mail-in ballot rejection rate in 2020 and 0.3 percentage points higher than the overall rejection rate in 2022. In summary, the two general elections after the passage of SB 202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016 or 2018, but a higher mail-in ballot rejection rate than in 2020.

52.    The mail-in ballot rejection rate for every self-reported racial group followed a similar pattern: in the two general federal elections after the passage of SB 202 all groups had lower mail-in ballot rejection rates than mail-in ballot rejection rates in 2016 or 2018, but higher mail-in ballot rejection

rates than found in the 2020 election. For example, in the 2016 election 4.1% of all returned mail in ballots from Black voters were rejected. In the 2018 election 4.3% of all returned ballots were rejected. In the 2022 election 1.4% of all returned mail in ballots from Black voters were rejected and in the 2024 election 2% of the returned mail in ballots were rejected. But, in the 2020 election 0.4% of the returned mail in ballots from Black voters were rejected. The rejection rates among returned mail in ballots for white voters follows a similar pattern. In the 2016 election 2.3% of all returned mail in ballots from white voters were rejected and in the 2018 election 2.5% of all returned mail in ballots from white voters were rejected. In the 2022 election 1.2% of returned mail in ballots from white voters were rejected and in the 2024 election 1.3% of the returned mail in ballots from white voters were rejected. Again, the lowest mail-in ballot rejection rate for returned mail in ballots from white voters occurred in the 2020 election, when 0.2% of the returned mail in ballots were rejected.

53.    Focusing now on the reasons mail-in ballots were rejected, I first consider reasons related to the oath contained on the absentee ballot return envelope, which was required for mail-in ballots returned during the 2016 and 2018 elections. After the passage of HB 316, the oath was simplified so that voters did not have to include their date of birth and address on the oath envelope. The share of returned mail in ballots rejected for oath related reasons

is found in the "Oath" column in Table 8. Overall, in the 2016 election 1.1% of all returned mail in ballots were rejected for an oath envelope related reason, constituting 38% of all rejected mail-in absentee ballots (0.011/0.029 x 100). The rejection rate of mail-in ballots for oath related reasons rose to 1.5% in the 2018 election, constituting approximately 43% of all rejected mail-in ballots. After the passage of HB 316 this rejection rate declined to 0% in 2020, 2022, and 2024. A similar pattern is found in every self-reported racial group: oath envelope rejection rates were a large proportion of all ballot rejections in the 2016 and 2018 elections but then were eliminated after HB 316. For example, in 2016 1.3% of all returned mail in ballots from Black voters were rejected for oath related reasons, constituting 32% of all mail-in ballot rejections for Black mail-in voters. In 2022 2.2% of all returned mail in ballots were rejected for oath-related reasons, constituting 51% of all mail-in ballot rejections for Black mail-in voters. White voters followed a similar pattern. In 2016 0.9% of all returned mail in ballots from white voters were rejected for oath-related reasons, constituting 39% of all mail-in ballot rejections for white mail-in voters. In 2018 0.7% of all returned mail in ballots were rejected for oath-related reasons, constituting 28% of all mail-in ballot rejections for white mail-in voters.

54.    There is also variation from election-to-election in the share of mail-in ballots rejected for arriving after the deadline. The share of mail-in

ballots rejected for arriving after the deadline are found in the "Deadline" column of Table 8. Overall, the two general federal elections in Georgia after the passage of SB 202 had a smaller share of returned mail in ballots rejected for arriving after the deadline than were rejected for arriving after the deadline in the 2016 and 2018 elections, but the post-SB 202 elections had a larger share of mail-in ballots rejected for arriving after the deadline than in the 2020 election. In the 2016 election 1.4% of all returned mail in ballots were rejected for arriving after the deadline, constituting 48% of all mail-in ballot rejections. In the 2018 election 1.6% of all returned mail in ballots were rejected for arriving after the deadline, constituting 46% of all mail-in ballot rejections. In 2022 0.8% of all returned mail in ballots were rejected for arriving after the deadline, constituting 57% of all mail-ballot rejections. In 2024 1.2% of all returned mail in ballots were rejected for arriving after the deadline, constituting 71% of all rejections of returned mail in ballots. In the 2020 election 0.2% of all mail-in absentee ballots were rejected for arriving after the deadline, constituting 67% of all rejected mail-in ballots.

55.    There is a similar pattern among self-reported racial groups. Black voters had a smaller share of mail in absentee ballots rejected for arriving after the deadline in the elections after SB 202 than in 2016 or 2018, but a higher rate of rejection than in 2020. For example, in 2016 1.9% of all returned mail in ballots from Black voters were rejected for arriving after the deadline,

constituting 46% of all mail-in ballot rejections for Black mail-in voters. In 2018 1.5% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 35% of all rejected mail-in ballots for Black voters. In the 2022 election 0.7% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters. In the 2024 election 1.3% of all returned mail in ballots were rejected for arriving after the deadline, constituting 65% of all mail-in ballot rejections. The 2020 election saw the lowest rate of mail-in ballot rejections for Black voters for arriving after the deadline. In 2020 0.2% of all mail-in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters.

56.    White voters followed a similar pattern of change. The deadline rejection rates in the post-SB 202 elections were lower than in 2016 or 2018, but higher than in 2020. In the 2016 election 1.1% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 43% of mail in ballot rejections for white voters. In 2018 1.5% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 60% of all mail-in ballot rejections for white voters. In 2022 0.8% of all mail-in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections for white

voters. In 2024 0.9% of all mail-in ballots were rejected constituting 69% of all mail-in ballot rejections for white voters. In 2020 0.2% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections (rounding affects the appearance of results).

57.    Dr. Burden's expert report attributes the lower rejection rate in the 2020 election to the presence of drop boxes. Dr. Burden writes "drop boxes were an important contributor to lower rejection rates. A voter using a drop box to return an absentee ballot by election day is guaranteed that it will be received on time to be counted, whereas a voter returning a ballot via the postal service cannot be certain that it will be delivered by the election day deadline." Dr. Burden does not provide evidence for his causal claim that "drop boxes were an important contributor to lower rejection rates." Dr. Burden's analysis seems to be based on the following logic: there were more drop boxes available in the 2020 election and a lower rejection rate of absentee ballots in the 2020 election. But merely comparing rejection rates across the 2020 election and the post-SB 202 elections is not a credible way to estimate the causal effect of SB 202 and risks confusing a correlation-a change in rejection rates-with causation- the causal effects of more drop boxes on mail-in absentee ballot rejection rates. This is because there are many other differences across the 2020 and post-SB 202 elections that confound any changes made in Georgia's policies. And as a

result, it is difficult to attribute changes in the rejection rates to the changes mandated by SB 202.

58.    One important difference is that different populations of voters used mail-in ballots in each election and these different populations could result in differences in the rejection rates that are unrelated to the presence of drop boxes or any other policy related to SB 202. For example, the average mail-in ballot voter in the 2020 election was younger than the average mail-in ballot voter in other election years. In the 2020 election the average mail-in ballot voter was 56.8 years old. Compared to prior years, the 2020 average mail-in ballot voter was over two years younger than the average age of mail-in ballot voters in 2016 (58.9 years), more than a year younger than mail-in ballot voters in 2018 (58.0 years), 5 years younger than the average age of mail-in ballot voters in 2022 (63.9), and more than 3 years younger than the average age of mail-in ballot voters in 2024 (59.9).

59.    Further confounding the comparisons across elections is that mail-in ballot voters in the 2020 election returned their ballot earlier than mail-in ballot voters in the 2016, 2018, 2022, and 2024 elections. Using the absentee voter history file for each corresponding election, I find that in the 2020 general election 63% of all mail-in absentee ballots had been returned at least two weeks before the election. This is a larger share than in the other elections I examine in Table 8: In 2016 50% of mail-in ballots were returned at least two

weeks before the election, 49% in 2018, 47% in 2022, and 46% in 2024. In contrast, a smaller share of voters in the 2020 election returned their ballot in the week immediately before the election. In the 2020 election 17.3% of mail-in ballots were returned in the week before the election. In contrast, 28.9% of mail-in ballots were returned in the week immediately before the election in 2016, in 2018 it was 29.1%, in 2022 it was 24.1%, and in 2024 it was 25.9%. The result of these patterns is that the typical mail-in ballot was returned much earlier in the 2020 election than in the other elections I examined. The median mail-in ballot in 2020 was returned 18 days before the election, while the median mail-in ballot in 2016 was returned 13 days before the election. The median mail-in ballot in 2018, 2022, and 2024 were also returned 13 days before the election. Voters' decision to return their ballot earlier further confounds any attempt to isolate the effect of a policy change from SB 202 on the share of ballots rejected for arriving after the deadline.

60.    In contrast to mail-in ballots rejected for arriving after the deadline or for errors on the oath envelope, in most elections and for most self-reported racial groups a smaller share of rejections are due to issues with the voters' signature or because they failed to provide accurate identification. In the "Signature" column I calculated the share of mail-in ballots rejected for signature related reasons and in the "ID" column I calculated the share of mail-in ballots rejected for identification related reasons. As discussed in my first

expert report, prior to SB 202 mail-in absentee ballots were verified using a signature match. After SB 202 mail-in absentee ballots were verified using voter's identification, including a driver's license number. In the two post-SB202 elections, I find that the rate mail-in ballots were rejected for identification reasons is similar to the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections.

61.    In the 2024 election 0.42% of all returned mail in ballots were rejected for issues related to the voter's identification. This constitutes 24% of mail-in ballot rejections in the 2024 election. In the 2022 election 0.46% of mail-in ballots were rejected for issues related to the voter's identification, constituting 33% of all mail-in ballot rejections. This is higher than signature rejection reasons in pre-SB 202 elections, though the differences are relatively small compared to variation in the share of ballots rejected for Oath or deadline reasons for the elections in Table 8. For example, in the 2016 election 0.28% of all mail-in ballots were rejected for signature reasons. In the 2018 election 0.20% of all mail-in ballots were rejected for signature reasons, while in the 2020 election 0.15% of all mail-in ballots were rejected for signature reasons. The 2024 election mail-in ballot rejection rate for identification issues with mail-in ballots was 0.14 percentage points higher than the 2016 election rejection rate for signature issues with mail-in ballots, 0.22 percentage points

higher than the rejection rate for signature issues in the 2018 election, and 0.26 percentage points higher than the rejection rate in the 2020 election.

62.    I find similar patterns across self-reported racial groups: the ID rejection rates in the post-SB 202 elections were similar to the signature rejection rates in the pre-SB202 elections. For example, in the 2024 election 0.52% of returned mail in ballots from Black voters were rejected for ID related reasons. In the 2016 election 0.51% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.01 percentage points lower than the identification rejection rate for Black voters in 2024. In 2018 0.28% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.23 percentage points less than the identification related rejection rate among Black mail-in voters in 2024. And in 2020 0.24% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.28 percentage points lower than the identification related rejection rate for Black mail-in voters in 2024. There is a similar pattern for white voters. In 2024 0.31% of returned mail in ballots from white voters were rejected for identification reasons. In the 2016 election 0.18% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.13 percentage points lower than the 2024 identification rejection rate for white voters. In 2018 0.12% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.19

percentage points lower than the 2024 identification rejection rate for white voters. And in 2020 0.08% of mail-in ballots from white voters were rejected for a signature related issue, a rejection rate that is 0.23 percentage points lower than the 2024 identification rejection rate for white voters.

63.    I also find that the Black-white gap in the signature rejection rate in the pre-SB 202 elections is similar to the Black-white gap in the identification rejection rate in the post-SB 202 elections. In the 2024 election the Black-white gap in the identification rejection rate was 0.20 percentage points and in the 2022 election the Black-white gap in the identification rejection rate was 0.23 percentage points. In the 2016 election the Black-white gap in the signature rejection rate was 0.34 percentage points, in the 2018 election the Black-white gap in the signature rejection rate was 0.17 percentage points, and in the 2020 election the Black-white gap in the signature rejection was 0.17 percentage points.

| Race | Year | Overall | Deadline | Signature | ID | Oath |
|---|---|---|---|---|---|---|
| Overall | 2016 | 0.029 | 0.014 | 0.003 | 0.001 | 0.011 |
| | 2018 | 0.035 | 0.016 | 0.002 | 0.000 | 0.015 |
| | 2020 | 0.003 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.008 | 0.001 | 0.005 | 0.000 |
| | 2024 | 0.017 | 0.012 | 0.001 | 0.004 | 0.000 |
| American Indian | 2016 | 0.048 | 0.021 | 0.003 | 0.006 | 0.018 |
| | 2018 | 0.053 | 0.031 | 0.000 | 0.000 | 0.019 |
| | 2020 | 0.007 | 0.005 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.037 | 0.029 | 0.002 | 0.006 | 0.000 |
| | 2024 | 0.038 | 0.034 | 0.001 | 0.004 | 0.000 |
| Asian | 2016 | 0.063 | 0.025 | 0.006 | 0.003 | 0.028 |
| | 2018 | 0.064 | 0.020 | 0.003 | 0.000 | 0.040 |
| | 2020 | 0.006 | 0.002 | 0.003 | 0.000 | 0.000 |
| | 2022 | 0.031 | 0.023 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.029 | 0.021 | 0.001 | 0.007 | 0.000 |
| Black | 2016 | 0.041 | 0.019 | 0.005 | 0.001 | 0.013 |
| | 2018 | 0.043 | 0.015 | 0.003 | 0.000 | 0.022 |
| | 2020 | 0.004 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.007 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.020 | 0.013 | 0.002 | 0.005 | 0.000 |
| Hispanic | 2016 | 0.051 | 0.022 | 0.005 | 0.002 | 0.019 |
| | 2018 | 0.044 | 0.018 | 0.003 | 0.001 | 0.021 |
| | 2020 | 0.005 | 0.003 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.020 | 0.015 | 0.000 | 0.004 | 0.000 |
| | 2024 | 0.032 | 0.023 | 0.001 | 0.008 | 0.000 |
| White | 2016 | 0.023 | 0.011 | 0.002 | 0.000 | 0.009 |
| | 2018 | 0.025 | 0.015 | 0.001 | 0.000 | 0.007 |
| | 2020 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.012 | 0.008 | 0.001 | 0.004 | 0.000 |
| | 2024 | 0.013 | 0.009 | 0.001 | 0.003 | 0.000 |

Table 8: Rate of absentee ballot rejections and rate of rejections by reason, overall and by self-reported racial identity.

## VII. ASSESSING THE RATES OF WEEKEND VOTING IN THE POST-SB 202 ELECTIONS.

64. One argument made in expert reports was that SB 202 would cause a decline in the use of weekend voting during in-person early voting. For example, when analyzing the consequences of SB 202, Dr. Lee opined that one consequence of SB 202 would be "the elimination of weekend voting on most weekends" (pg. 93). And when pointing to policies that Dr. Lee opines will

"raise the costs of voting" he cites "doing away with weekend voting on most weekends" (pg. 94). Dr. Pettigrew similarly implies that SB 202 will cause a decline in the use of weekend voting. Dr. Pettigrew writes that "Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202" (Pettigrew pg. 1).

65.    In my first expert report I concluded that "the 2022 general election and the 2022 runoff election saw the highest rate of weekend votes cast of any midterm election, and the second highest share of weekend votes cast in a general election, other than the 2020 general election." In Table 9 I update my analysis for the 2024 election. Using the Absentee Voter History file from the 2024 election, I identified all individuals with a "Ballot Style" entry equal to "EARLY IN-PERSON" and a "Ballot Return Date" equal to a weekend date when early in-person voting was active: either Sunday (October 20th, 2024 and October 27th, 2024) or Saturday (October 19th, 2024 and October 26th, 2024). I then measured the rate of Sunday and weekend voting using two different denominators. Following the analysis in Tables 31 and 32 of my first report, the two "Share of All Early In-Person Votes" columns calculate the share of all early in-person votes cast on "Sunday" or the

"Weekend". The two "Share of All Votes Cast" columns present estimates of the share of all votes cast, regardless of the method for casting those votes, on "Sunday" or the "Weekend."

| | Share of All Votes Cast | | Share of All Early In Person Votes | |
|---|---|---|---|---|
| Year | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.005 | 0.023 | 0.017 | 0.070 |
| 2016 | 0.006 | 0.042 | 0.012 | 0.079 |
| 2018 | 0.008 | 0.043 | 0.016 | 0.089 |
| 2020 | 0.015 | 0.053 | 0.027 | 0.099 |
| 2022 | 0.011 | 0.055 | 0.018 | 0.094 |
| 2024 | 0.015 | 0.077 | 0.021 | 0.109 |

**Table 9: Share of all ballots cast on the weekend and the share of all early in person ballots cast on the weekend**

66. Using my calculations in Table 9 and focusing first on the share of all votes cast, I find that the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections I examined in Table 9. In 2024 I calculated that 1.49% of all votes cast in the Georgia presidential election were cast on a Sunday, early in person. This is similar to, but higher than, the 1.46% of all votes cast on Sunday, early in person in the 2020 election. In the 2022 election there was the highest share of all votes cast on Sunday for any midterm election considered in Table 9, with 1.07% of all votes in that election cast on Sunday. The 2018 (0.8%), 2016 (0.6%), and 2014 (0.5%) all had smaller shares of votes cast on Sunday. The 2024 election had the highest share of votes cast on the weekend. In the 2024 election 7.70% of all votes cast in the election were cast during in-person early

voting on a Saturday or Sunday. This is a 2.24 percentage point increase over the share of ballots cast on the weekend in the 2022 election, which had the second highest share of ballots cast on the weekend (5.46%). The 2024 election had a 2.36 percentage point increase over the share of ballots cast on the weekend in the 2020 election, 3.45 percentage point increase over the share of ballots cast on the weekend in the 2018 election, 3.49 percentage point increase over the share of ballots cast on the weekend in the 2016 election, and a 5.42 percentage point increase over the share of ballots cast on the weekend in the 2014 election.

67.    If instead I examine the share of all early in-person votes cast on Sunday or the weekend I reach a similar conclusion: after the passage of SB 202 voters casting ballots early in-person make use of Sunday and weekend voting. In the 2024 election 2.09% of all early in-person votes were cast on Sunday. This is second only to the 2020 election, where 2.70% of early in-person votes were cast on Sunday. Despite a larger share of early in-person voters casting their ballot on Sunday, a smaller share of total votes were cast on Sunday in the 2020 election because fewer voters cast their ballot early in-person in the 2020 election. As I noted in my first expert report, the highest rate of Sunday voting among early in-person voters in any midterm occurred in the 2022 election. The 2024 election had the highest share of early in-person votes cast on the weekend, with 10.89% of all early in-person votes cast on

Saturday or Sunday. This is a 1 percentage point increase over the share of early in person votes cast on the weekend in 2020, the election with the second highest share of early in-person votes cast.

68.    This same pattern is found across self-reported racial groups: the 2024 election had the highest share of ballots cast on the weekend for every group but American Indian voters. In Table 10 I calculated the share of all ballots cast in each election ("Year" column), regardless of the method of voting, for each self-reported racial group on "Sunday" and on the "Weekend". In the 2024 election 2.05% of all votes from Black voters were cast on Sunday during early in-person voting, the highest share for any of the 6 elections examined in Table 10. The share of votes from Black voters cast on Sunday is a 0.16 percentage point increase over the share of votes from Black voters cast on Sunday in 2020, the general election with the second highest-share of votes from Black voters cast on Sunday. In the 2022 election 1.6% of all votes from Black voters were cast on Sunday, the highest share of votes from Black voters cast on Sunday for any midterm election analyzed in Table 10 and the third highest share of Black votes cast on Sunday, behind the 2024 and 2020 elections. The 2024 election also had the largest share of votes from Black voters cast on the weekend during in-person early voting of any of the six elections I examined in Table 10. In the 2024 election 8.26% of all votes cast by Black voters were cast on the weekend using in-person early voting. The 2024

election's share of votes from Black voters cast on the weekend using in-person early voting is 2.17 percentage points higher than the share of votes from Black voters cast on the weekend using in-person early voting than in 2020, 3.15 percentage points higher than the same quantity in 2018, 3.25 percentage points higher than the same quantity in 2016, and 4.78 percentage points higher than the same quantity in 2014. The election with the second highest share of votes cast from Black voters on the weekend using in-person early voting was 2022, the other post-SB 202 election. In that election 6.75% of all votes from Black voters were cast on the weekend using in-person early voting. Hispanic and Asian voters cast the largest share of the ballots on Sunday and on the weekend using in-person early voting in the 2024 election. White voters cast the largest share of their ballots on the weekend using in-person early voting in the 2024 election and the second largest share of ballots cast on Sunday using in-person early voting. American Indian voters cast 1.7% of ballots cast in the 2024 election on Sunday using in-person early voting and 8.1% of ballots cast in the 2024 election on the weekend using in-person early voting.

| | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.006 | 0.023 | 0.005 | 0.025 | 0.012 | 0.035 | 0.003 | 0.019 | 0.002 | 0.016 |
| 2016 | 0.004 | 0.040 | 0.011 | 0.064 | 0.010 | 0.050 | 0.005 | 0.043 | 0.004 | 0.036 |
| 2018 | 0.008 | 0.040 | 0.012 | 0.062 | 0.013 | 0.051 | 0.007 | 0.045 | 0.005 | 0.036 |
| 2020 | 0.016 | 0.055 | 0.021 | 0.067 | 0.019 | 0.061 | 0.015 | 0.058 | 0.012 | 0.047 |
| 2022 | 0.011 | 0.054 | 0.022 | 0.079 | 0.016 | 0.068 | 0.013 | 0.061 | 0.007 | 0.047 |
| 2024 | 0.017 | 0.081 | 0.030 | 0.108 | 0.021 | 0.083 | 0.019 | 0.085 | 0.011 | 0.072 |

**Table 10: Share of All Ballots Cast on Sunday and the Weekend by Racial Group**

69. In Table 11 I computed the share of all votes cast during in-person early voting that were cast on Sunday or the weekend for each self-reported racial identity in the 6 elections I examined in Table 10. The 2024 election saw the largest share of early in-person votes cast on the weekend for every group but Asian voters. For Asian voters 16.2% of early in-person votes were cast on the weekend in the 2024 election. This is the second highest share of early in-person votes cast on the weekend and 0.6 percentage points less than 2018 election, when 16.8% of Asian early in person voters cast their ballot on the weekend. For some groups the share of early in-person votes cast on Sunday in the 2024 election was less than the maximum share of early in-person votes cast on Sunday: 2.7% of American Indian early in person votes were cast on Sunday in the 2024 election, 0.5 percentage points less than the maximum in 2020; 4.5% of Asian early in person votes were cast on Sunday in the 2024 election, 0.3 percentage points less than the maximum in the 2020 election; 2.9% of Black early in person votes were cast on Sunday in the 2024 election,

0.8 percentage points less than the maximum in the 2020 election; 3.1% of Hispanic early in-person votes were cast on Sunday in the 2024 election, which was the maximum across the six elections; and 1.5% of white early in-person votes were cast on Sunday, 0.6 percentage points less than the maximum in the 2020 election. As Table 10 shows, even though some groups in the 2024 election had a smaller share of early in-person votes cast on Sunday, a larger share of all votes were cast on Sunday and on the weekend. As measured by the share of voters who cast their ballots using that method, in the 2024 election weekend voting was the most popular it had ever been.

| | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.023 | 0.086 | 0.023 | 0.124 | 0.032 | 0.094 | 0.016 | 0.092 | 0.008 | 0.054 |
| 2016 | 0.009 | 0.088 | 0.024 | 0.138 | 0.019 | 0.094 | 0.011 | 0.099 | 0.008 | 0.069 |
| 2018 | 0.021 | 0.101 | 0.032 | 0.168 | 0.026 | 0.106 | 0.020 | 0.132 | 0.010 | 0.074 |
| 2020 | 0.032 | 0.109 | 0.048 | 0.150 | 0.037 | 0.118 | 0.030 | 0.118 | 0.021 | 0.086 |
| 2022 | 0.022 | 0.106 | 0.042 | 0.153 | 0.025 | 0.106 | 0.028 | 0.128 | 0.013 | 0.084 |
| 2024 | 0.027 | 0.128 | 0.045 | 0.162 | 0.029 | 0.118 | 0.031 | 0.139 | 0.015 | 0.099 |

**Table 11: Share of Early in Person Ballots Cast on the Weekend, By Self-Identified Racial Group**

## VIII. AFTER SB 202 FEWER VOTERS CANCELED MAIL IN BALLOTS AND THEN VOTED IN PERSON THAN IN THE 2020 ELECTION.

70. As I explained in my first expert report, the preamble of SB 202 stated that "[t]he lengthy absentee ballot process also led to elector confusion, including electors who were told they had already voted when they arrived to vote in person. Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities

to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, § 2(9). In my first expert report I assessed the rate that voters who had a mail in ballot application accepted then canceled that ballot and voted either in person on Election Day or during early in-person voting. I had found that in the 2020 election 289,650 voters had canceled their mail in ballots and then voted either in person on Election Day or early in-person, constituting 16.7% of all mail in ballot applicants. I had found that in the first election after SB 202 the number and share of mail in ballot applicants who subsequently voted in person had declined.

71.    In Tables 12, 13, 14, and 15 I extend Tables 13, 14, 15, and 16 in my first expert report. In Table 12 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 13 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 14 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted early in-person, and in Table 15 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted early in-person. In each table I perform the calculation overall (bottom row) and for self-reported racial groups, for the 2014, 2016, 2018, 2020, 2022, and 2024 elections.

72. Tables 12 and 13 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day in 2024 is lower than in 2020. In the 2024 election 1.5% of mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day. In the 2020 election 1.7% of all mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day, a 0.2 percentage point larger share of mail in ballot applicants. In the 2024 election 4,893 voters canceled their mail in ballots and voted in person, fewer voters than in the 2020 election, but more than in the 2014, 2016, 2018, and 2022 midterm election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.015 | 0.012 | 0.014 | 0.029 | 0.011 | 0.026 |
| Asian | 0.007 | 0.006 | 0.018 | 0.019 | 0.006 | 0.021 |
| Black | 0.010 | 0.009 | 0.020 | 0.017 | 0.006 | 0.017 |
| Hispanic | 0.011 | 0.022 | 0.034 | 0.034 | 0.012 | 0.029 |
| White | 0.005 | 0.005 | 0.007 | 0.015 | 0.005 | 0.012 |
| Overall | 0.007 | 0.006 | 0.015 | 0.017 | 0.006 | 0.015 |

**Table 12: Share of mail in ballot applicants with canceled ballots ultimately voting on Election Day**

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 2 | 5 | 10 | 152 | 9 | 48 |
| Asian | 8 | 36 | 203 | 1280 | 55 | 327 |
| Black | 328 | 522 | 2,208 | 9,124 | 541 | 1,716 |
| Hispanic | 11 | 92 | 290 | 1,671 | 62 | 236 |
| White | 436 | 709 | 913 | 13,763 | 770 | 2,032 |
| Overall | 848 | 1,493 | 4,072 | 28,965 | 1,592 | 4,893 |

**Table 13: Number of mail in ballot applicants with canceled ballots ultimately voting on Election Day**

73. Tables 14 and 15 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day is lower than in

2020, though higher than in the 2014, 2016, 2018, and 2022 elections. In the 2024 election 7.6% of all mail-in ballot applicants canceled their ballot and ultimately voted in person during early voting. In 2020 15.0% of mail-in ballot applicants canceled their ballots and ultimately voted in person, a 7.4 percentage point larger share than in the 2024 election. Table 15 shows that 25,021 mail-in ballot applicants canceled their ballot and ultimately voted early in person in the 2024 election. This is a smaller number than in the 2020 election, when 260,685 mail-in ballot applicants canceled their ballots and ultimately voted in person. But, the 2024 number of canceled mail in ballot applicants was larger than in the other four elections analyzed in Table 15: 2014, 2016, 2018, and 2022 elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.007 | 0.028 | 0.066 | 0.143 | 0.056 | 0.077 |
| Asian | 0.013 | 0.024 | 0.048 | 0.137 | 0.045 | 0.096 |
| Black | 0.019 | 0.024 | 0.058 | 0.156 | 0.040 | 0.083 |
| Hispanic | 0.006 | 0.040 | 0.056 | 0.141 | 0.045 | 0.097 |
| White | 0.009 | 0.018 | 0.026 | 0.147 | 0.032 | 0.068 |
| Overall | 0.012 | 0.021 | 0.043 | 0.150 | 0.036 | 0.076 |

**Table 14: Share of mail in ballot applicants with canceled ballots ultimately voting early in-person**

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 1 | 12 | 48 | 759 | 44 | 140 |
| Asian | 15 | 141 | 540 | 9,166 | 416 | 1,483 |
| Black | 605 | 1,382 | 6,274 | 84,613 | 3,582 | 8,169 |
| Hispanic | 6 | 171 | 473 | 6,958 | 231 | 788 |
| White | 778 | 2,825 | 3,290 | 133,144 | 4,752 | 12,007 |
| Overall | 1,540 | 4,995 | 12,000 | 260,685 | 10,067 | 25,021 |

**Table 15: Number of mail in ballot applicants with canceled ballots ultimately voting early in-person**

## IX.  FEWER VOTERS WAITED MORE THAN 30 MINUTES IN THE FIRST PRESIDENTIAL ELECTION AFTER SB 202.

74.   In the initial expert reports, some of the Plaintiffs' experts opined that SB 202 would cause longer lines in Georgia. For example, Dr. Burden opined that the disparity between wait times for Black and white voters "may be worsened now that absentee voting is more difficult" (Burden pg. 2). Dr. Burden goes on to say that "To my knowledge, data on wait times in the November 2022 election have not yet been made publicly available via the CES or other reliable academic surveys. However, media coverage of that election and the December 6 runoff election suggests that long wait times, in some cases lasting hours, were experienced in Atlanta-area communities with large shares of Black voters" (Burden, pg. 22). Dr. Pettigrew argues provisions in SB 202 will affect wait times. Dr. Pettigrew states that "SB202 will negatively affect wait times" (pg. 28), that "Changes to early voting hours will not solve Georgia's long line problem", and that "Shrinking precincts will not shorten lines". More directly, Dr. Pettigrew opines that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color" (Pettigrew Rep. 29). None of the claims in these reports are based on an appropriately designed causal study, nor are they descriptive claims about the observed patterns after SB 202. Using updated data from the same sources as Plaintiffs' experts, I describe voter wait times after SB 202. I

again caution that these comparisons can only describe the causal effect of SB 202 on wait times under strong assumptions. But, the descriptive patterns show that, in contrast to the predictions from the Plaintiffs' experts, the share of voters waiting more than 30 minutes was lower in the post-SB 202 elections than in the pre-SB 202 elections.

75.    In my first expert report I used a survey of Georgia voters conducted by the School of Public and International Affairs (SPIA) survey research center at the University of Georgia. The SPIA survey research center conducted a similar survey of Georgia voters after the 2024 election. The 2024 iteration of the SPIA survey was conducted from November 11th to November 20th, 2024 and included a "total of 1,541 Georgia registrants who self-reported as having voted in the 2024 general election." I was not provided with access to the underlying data, but counsel provided me with a document from the SPIA survey research center describing the top-line results and cross tabs by a variety of relevant voter characteristics. This matches the same document that was also posted on the Secretary of State's website.[16]

76.    Among the voters who reported voting either in person during early voting or on Election Day, the survey asked "Approximately, how long

---

[16] Sch. Pub. & Int'l Affs. ("SPIA"), Survey Rsch. Ctr., Univ. Ga., *2024 Georgia Post-Election Survey* (2024), https://sos.ga.gov/sites/default/files/2024-12/GA%20Voter%20Survey-2024.pdf [hereinafter "2024 SPIA Survey"].

did you have to wait in line to vote?" This is the same question that Dr Burden and Dr. Pettigrew used in their analysis of wait times from the Cooperative Election Study (CES) surveys, which I also analyze below. In response to this question, voters were provided with the response options "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". Dr. Pettigrew imputes numbers to calculate wait times from this scale; I showed in my first expert report that Dr. Pettigrew provides no theoretical or substantive justification for that practice and there is no justification for the practice in the literature. Rather than imputing numbers for categories, I will instead focus on the proportion of respondents in each response category.

77.    According to the SPIA survey 2.7% of Georgia voters report waiting more than 30 minutes in line–2.0% report waiting 31 minutes - 1 hour and 0.7% report waiting more than an hour. Breaking down the estimates by race, the survey reports that 2.6% of white voters report waiting longer than 30 minutes to vote—1.8% report waiting 31 minutes to 1 hour and 0.8% report waiting more than an hour to vote. According to the SPIA survey, 1.9% of Black voters reported waiting more than 30 minutes to vote–1.7% report waiting 31 minutes to 1 hour and 0.2% report waiting more than an hour to vote. Comparing the 2024 SPIA survey with the 2022 SPIA survey, a smaller share of voters waited longer than 30 minutes to vote in 2024 than in 2022. In the 2022 SPIA survey 4.7% of all voters said that they waited longer than 30

minutes to vote, which is 2 percentage points more than the share of voters waiting longer than 30 minutes in the 2024 election.

78.    While I do not have access to the underlying data, I am able to assess statistical significance approximately using standard formulas and information from the topline survey results. Using these standard formulas, the margin of error for the 2 percentage point difference is 1.4 percentage points. This implies that the 95-percent confidence interval for the 2 percentage point difference is [0.006,0.034]. Because the 95-percent confidence interval does not contain zero, the observed 2 percentage point difference is statistically significant at the traditional 0.05 confidence level.

79.    According to the 2022 SPIA survey, 4.8% of white voters reported waiting longer than 30 minutes. There is 2.2 percentage points more than the share of white voters who report waiting longer than 30 minutes in the 2024 election. I calculated an approximate margin of error equal to 1.4 percentage points, which implies that the 95-percent confidence interval is [-0.005, 0.05]. Because the 95-percent confidence interval contains zero, the observed difference is not statistically significant at the traditional 0.05 confidence level. In the 2022 survey 4.0% of Black voters reported waiting longer than 30 minutes to vote. There is a 2.1 percentage point difference in the share of Black voters who report waiting longer than 30 minutes in each election, with a margin for the difference of 2.4 percentage points or a 95-percent confidence

interval of [-0.003, 0.04]. Because the confidence interval contains zero, the difference in the share of voters waiting longer than 30 minutes to vote is not statistically significant across elections at the traditional 0.05 confidence level.

80.    Dr. Burden and Dr. Pettigrew relied on the Cooperative Election Study (CES) when assessing voters' wait times in previous Georgia elections. The CES "is the largest academic survey focused on American elections" and is a standard source in the social sciences.[17] At the time I wrote my first expert report the 2022 CES survey was not yet available, so I was not able to assess wait times in Georgia using the same survey as Dr. Burden and Dr. Pettigrew. The final 2022 CES survey has subsequently been released and a preliminary 2024 CES survey is available. To assess wait times among Georgia voters using the same surveys as Dr. Pettigrew and Dr. Burden, I downloaded the survey from the CES data repository.[18] Using the 2014, 2016, 2018, 2020, 2022 and 2024 surveys I examined the reported wait times of voters who cast their ballot either early in-person or on Election Day. Like in the SPIA survey, the CES asks individuals who report voting in person or attempting to vote in person "Approximately, how long did you have to wait in line to vote?" Respondents

---

[17] Jonathan M. Tisch Coll. Civic Life, Tufts Univ., *Cooperative Election Study*, https://tischcollege.tufts.edu/research-faculty/research-centers/cooperative-election-study.

[18] Harvard Univ., *Cooperative Election Study*, https://cces.gov.harvard.edu/data.

are asked to select "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". In the 2016, 2018, 2020, and 2022 surveys I use the vote validation in the CES to assess turnout and apply the vote validation weights. Vote validation is a procedure where respondents' turnout is validated against official turnout records and are the weights Dr. Burden uses when calculating wait times when the vote validation weights are available. When calculating wait times using vote validation weights the calculations will exclude anyone who either 1) reported attempting to vote but was unable to cast their ballot or 2) anyone who falsely reported voting. The 2014 survey does not contain a vote validation, so I use the provided "weight" variable, which is the same procedure Dr. Burden follows. Vote validation is not yet complete for the 2024 survey, so I use the post-election survey weights, "commonpostweight". I present the results of the survey for each in Table 16. The survey stacks the responses for Black voters (top table), white voters (middle table), and overall (bottom table). The "Response" column are the options available to respondents and the "2014" to "2024" columns correspond to that election year.

| | Response | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|
| Black | Not at all | 0.309 | 0.164 | 0.197 | 0.160 | 0.221 | 0.275 |
| | Less than 10 minutes | 0.312 | 0.335 | 0.372 | 0.155 | 0.443 | 0.407 |
| | 10 - 30 minutes | 0.325 | 0.369 | 0.249 | 0.345 | 0.270 | 0.242 |
| | 31 minutes - 1 hour | 0.049 | 0.106 | 0.118 | 0.218 | 0.063 | 0.070 |
| | More than 1 hour | 0.005 | 0.027 | 0.063 | 0.122 | 0.003 | 0.005 |
| White | Not at all | 0.423 | 0.313 | 0.270 | 0.241 | 0.410 | 0.373 |
| | Less than 10 minutes | 0.343 | 0.348 | 0.320 | 0.334 | 0.395 | 0.416 |
| | 10 - 30 minutes | 0.216 | 0.183 | 0.241 | 0.210 | 0.153 | 0.154 |
| | 31 minutes - 1 hour | 0.014 | 0.111 | 0.115 | 0.138 | 0.032 | 0.033 |
| | More than 1 hour | 0.003 | 0.045 | 0.053 | 0.077 | 0.011 | 0.025 |
| Overall | Not at all | 0.388 | 0.257 | 0.247 | 0.209 | 0.354 | 0.360 |
| | Less than 10 minutes | 0.338 | 0.347 | 0.330 | 0.282 | 0.404 | 0.389 |
| | 10 - 30 minutes | 0.242 | 0.241 | 0.250 | 0.262 | 0.189 | 0.189 |
| | 31 minutes - 1 hour | 0.028 | 0.115 | 0.118 | 0.161 | 0.043 | 0.046 |
| | More than 1 hour | 0.004 | 0.040 | 0.055 | 0.086 | 0.010 | 0.017 |

Table 16: Voter wait times in Georgia, using Cooperative Election Study from 2014 to 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

81. Using the CES surveys I find that a smaller share of Black voters report waiting in line for more than 30 minutes in the two elections after the passage of SB 202 than in the 2016, 2018, or 2020, but a larger share than in the 2014 midterm election. In the 2022 election 6.6% of Black voters reported waiting longer than 30 minutes to vote and in the 2024 election 7.5% of Black voters reported waiting longer than 30 minutes to vote. In the 2020 election 34.0% of Black voters reported waiting more than 30 minutes to vote. This is 27.4 percentage points more than in the 2022 election (95-percent confidence interval of [-0.353, -0.196]), a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 26.5 percentage points more in the 2020 election than in the 2024 election (95-percent confidence interval [-0.336, -0.195]), a difference that is

statistically significant at the standard 0.05 threshold. In the 2018 election 18.2% of Black voters reported waiting more than 30 minutes to vote. This is 11.6 percentage points more than in the 2022 election (95-percent confidence interval [-0.180, -0.052]) a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes to vote was 10.7 percentage points more than in the 2024 election (95-percent confidence interval [-0.164, -0.049]) , a difference that is statistically significant at the standard threshold. In the 2016 election 13.3% of Black voters reported waiting more than 30 minutes to vote. This is 6.7 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.122, -0.013]) , a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 5.8 percentage points more in the 2016 election than in the 2024 election (95-percent confidence interval [-0.107, -0.009]), a difference that is also statistically significant at the standard 0.05 threshold. In the 2014 election 5.4% of Black voters reported waiting more than 30 minutes to vote. This is 1.2 percentage points less than in the 2022 election (95-percent confidence interval [-0.030, -0.055]) and 2.1 percentage points less than in the 2024 election (95-percent confidence interval [-0.019, 0.062]). But neither of those differences are statistically significant at the standard threshold.

82.    I also find that a smaller share of white voters reported waiting longer than 30 minutes to vote in the two elections after SB 202 than in the 2016, 2018, or 2020 elections, but a larger share reported waiting longer than 30 minutes than in the 2014 election. In the 2022 election 4.3% of white voters reported waiting longer than 30 minutes to vote and in the 2024 election 5.7% of white voters reported waiting longer than 30 minutes to vote. In the 2020 election 21.5% of white voters reported waiting longer than 30 minutes to vote. This is 17.2 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.209, -0.135]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2020 election was 15.8 percentage points more than in the 2024 election (95-percent confidence interval [-0.192, -0.123]) , a difference statistically significant at the standard threshold of 0.05. In the 2018 election 16.9% of white voters reported waiting longer than 30 minutes to vote. This is 12.6 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.158, -0.093]), a difference that is statistically significant at the standard threshold. The share of white voters waiting more than 30 minutes in the 2018 election was 11.1 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.142, -0.080]), a difference that is statistically significant at the standard threshold. In the 2016 election 15.6% of white voters reported waiting longer than 30 minutes to vote.

This is 11.3 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.144, -0.083]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2016 election was 9.9 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.128, -0.070]). And in the 2014 election 1.8% of white voters reported waiting longer than 30 minutes to vote. This is 2.5 percentage points less than in the 2022 election (95-percent confidence interval [0.006, 0.043]) and 3.9 percentage points less than in the 2024 election (95-percent confidence interval [0.020, 0.059]). Both differences are statistically significant at the standard threshold.

## X.    REJECTION RATES FOR MAIL IN ABSENTEE APPLICATIONS AND USE OF THE "ROLL OVER" LIST.

83.    SB 202 also altered the mail-in absentee ballot application window, requiring voters to submit applications no earlier than 78 days before the election and no later than 11 days before the election. SB 202 also required voters to provide proof of identity using a Drivers License or other identification, rather than with a signature, when submitting an absentee ballot application. In my first expert report I examined the share of applications in 2022 that were rejected for arriving after the deadline and the share of ballots rejected for identification related issues. In Table 12 of my first expert report I found that in the 2022 election 0.25% of mail-in absentee ballot

applications were rejected for arriving after the deadline, with mail-in ballot application rejection rates across racial groups of: 0.25% for American Indian voters, 0.27% for Asian voters, 0.27% for Black voters, 0.37% for Hispanic voters, 0.22% for white voters.

84. In Table 17 I update the calculations in Table 12 from my original report to include rejection reasons for mail-in ballot applications in the 2024 election. To make these calculations I used the data contained in the file "STATEWIDE_With_App_Reason.zip" provided to me by counsel. This spreadsheet is similar to the Absentee Voter History file the state distributes, but this file contains two additional fields "Rejected Reason" and "Rejected Reason Memo." "Rejected Reason" appears to be a standardized coding of the reasons mail-in ballot applications are rejected and "Rejected Reason Memo" contains a more complete description of the rejection reason. I used the "Rejected Reason" field to identify mail-in ballot applications rejected for arriving after the deadline, before the deadline, and for identification related issues.[19] Based on these fields I then calculated the rejection rates for mail-in

[19] I classified a mail-in ballot application as rejected for arriving after the deadline if the Rejected Reason is "Application Received After Application Window Closed". I classified a mail-in ballot application as rejected for arriving before the deadline if the Rejected Reason is "Application Received Before Application Window Open". I classified the mail-in ballot application as rejected for identification reason if the Rejected Reason field contains "Cure Not Received - Incorrect ID Information" or "Cure Not Received - Missing PII/ID Information".

ballot applications for these reasons for each self-reported racial group and overall.

| Race | After Deadline | Before Window Opens | Identification Issue |
|---|---|---|---|
| American Indian | 0.0129 | 0.0011 | 0.0043 |
| Asian | 0.0073 | 0.0006 | 0.0068 |
| Black | 0.0085 | 0.0015 | 0.0044 |
| Hispanic | 0.0100 | 0.0016 | 0.0052 |
| White | 0.0041 | 0.0018 | 0.0027 |
| Overall | 0.0061 | 0.0016 | 0.0037 |

**Table 17: Share of mail-in ballot applications in the 2024 general election rejected for either arriving after the deadline, before the application window opens, or for identification related reasons.**

85. Turning first to the "After Deadline" column in Table 17, I find that 0.61% of all mail-in ballot applications were rejected for arriving after the deadline, a total of 2,059 applications. This is 0.36 percentage points higher than the share of mail-in ballot applications rejected for arriving late in the 2022 election, but it is smaller than the estimated number of individuals who would be affected by late applications in Dr. Lee or Dr. Fraga's expert report by counterfactually applying SB 202 deadlines to prior elections.[20] In the 2024 election the vast majority of mail-in ballot applications from every self-identified racial group arrived before the deadline for mail-in applications. Overall 99.39% of mail-in ballots were classified as arriving before the deadline, either in the SB 202 application window or before the window opened primarily because of use of the roll over list or because an applicant applied too

[20] Lee Sur-Rebuttal Rep. ¶ 7, p. 4. Fraga Expert Rep. p. 80.

early. That said, the share of mail-in ballot applications rejected for arriving after the deadline was higher than the share of mail-in ballot applications rejected for arriving after the deadline in the 2022 election for every self-reported racial group. In the 2024 election, 0.85% of mail-in ballot applications from Black voters were rejected for arriving late (implying 99.15% were classified as arriving before the deadline), 0.73% of mail-in ballot applications from Asian voters were rejected for arriving late (99.27% classified as arriving before the deadline), 1% of mail-in ballot applications from Hispanic voters were rejected for arriving late (99% classified as arriving before the deadline) , and 0.41% of mail-in ballot applications from white voters were rejected for arriving late (99.59% classified as arriving before the deadline).

86.    In the "Before Window Opens" column I calculated the share of mail-in ballot applications where the mail-in absentee ballot application was rejected for arriving before the mail-in ballot application window opened 78 days before the election. Overall, 0.16% of mail-in ballot applications were rejected for arriving before the mail-in ballot application window opened. Table 17 shows that there is no consistent relationship between an applicant's self-report race and the share of ballot applications rejected for arriving outside the application window. White voters had the lowest rate of mail-in ballot application rejections for applications arriving after the deadline, but white

voters had the highest rate of mail-in ballot application rejects for ballots arriving before the deadline.

87. An important exception to the SB 202 window is that individuals 65 and older, self-declared disabled, military, and overseas voters are able to apply for an absentee once for an entire election cycle. In my first expert report I used information from the Secretary of State's office to identify the share of mail-in absentee ballot applications from individuals on the rollover list. I reported that information in Table 11 of my first report. I updated this calculation for the 2024 general election in this report and the results are presented in Table 18. For each self-reported racial group and overall ("Race" column), I describe the overall share of applicants on the roll over list "Share Roll Over, Overall," share of applicants who are 65 and older on the list ("Share Roll Over, 65 & Over"), and the share of applicants who are on the roll over list and under 65 ("Share Roll Over, Under 65").

| Race | Share Roll Over Overall | Share Roll Over 65& Over | Share Roll Over Under 65 |
|---|---|---|---|
| American Indian | 0.150 | 0.717 | 0.066 |
| Asian | 0.165 | 0.587 | 0.014 |
| Black | 0.451 | 0.750 | 0.140 |
| Hispanic | 0.184 | 0.669 | 0.039 |
| White | 0.482 | 0.786 | 0.075 |
| Overall | 0.437 | 0.766 | 0.089 |

**Table 18: Share of Absentee Ballot Applications on State Roll Over List in the 2024 General Election**

88. In the 2024 general election 43.7% of all mail in ballot applications were from individuals on the roll over list. Applicants 65 and over were more

likely to be on the roll over list, with 76.6% of mail in ballot applications from voters 65 and over on the roll over list compared to 8.9% of applications from voters under 65. Similar to the 2022 election, a larger share of Black and white voters were on the roll over list compared to voters from other self-reported racial groups. Overall, 45.1% of applications from Black voters were from Black voters on the roll over list and 48.2% of applications from white voters were from white voters on the roll over list. In contrast, 16.5% of applications from Asian voters were from Asian voters on the roll over list and 18.4% of applications from Hispanic voters were from Hispanic voters on the roll over list. Across all racial groups more than a majority of applications from voters 65 and over were from voters on the roll over list: 75.0% of applications from Black voters 65 and over came from Black voters on the roll over list, 78.6% of applications from white voters 65 and over came from white voters on the roll over list, 58.7% of applications from Asian voters were from Asian voters on the roll over list, and 66.9% of applications from Hispanic voters were from Hispanic voters on the roll over list. Among voters under 65, Black voters had the largest share of applications from individuals on the roll over list: 14.0% of mail in ballot applications from Black voters under 65 came from individuals on the roll over list. I calculated 7.5% of mail in ballot applications from white voters under 65 came from individuals on the roll over list, 1.4% of applications from Asian voters under 65 came from individuals on the roll over list, and

3.9% of applications from Hispanic voters under 65 came from individuals on the roll over list.

89.    Returning to Table 17, the "Identification Issue" column contains the share of mail-in ballot applications rejected for identification reasons. When a voter submits a mail-in ballot application and an identification issue occurs, a "cure" form is distributed. A voter will only have their application rejected in this column if their "cure" form was not received to address the identification issue, which I will call a rejection for identification reasons. Overall 0.37% of mail-in ballot applications were rejected for identification related reasons. I estimated that 0.44% of mail-in ballot applications from Black voters were rejected for identification related reasons, 0.68% of mail-in ballot applications Asian voters were rejected identification reasons, 0.52% of mail in ballot applications from Hispanic voters were rejected for identification reasons, and 0.27% of mail in ballot applications were rejected for identification for white voters.

## XI.    SURVEY-BASED ESTIMATES OF DROP BOX USE

90.    In a sur-rebuttal, I calculated self-reported survey-based estimates of the rate Black and white mail-in voters returned their ballots using a drop box. In that sur-rebuttal, I concluded that "in the 2020 general election…I find that white mail in absentee ballot voters in Georgia are more likely than Black mail in voters to report returning their ballot via drop box." I also found that

in the 2022 election, white mail-in voters were more likely to report using a drop box than Black mail-in voters, but that difference was smaller than in 2020. In this report, I update these calculations, which are found in Table 19.

91.    I used the Cooperative Election Study (CES) for the 2020, 2022, and 2024 election. I define a mail-in voter who reports using a drop box using the same procedure as in the sur-rebuttal.[21] I then calculated the share of mail-in voters who self-report returning their ballot at a drop box, for white mail-in voters, Black mail-in voters, and then overall for all mail-in voters in Georgia. For the 2020 and 2022 estimates, I applied the post-election voter validated weights. These weights are not available in the 2024 CES, so for those estimates I applied the post-election weights.

92.    In Table 19 I find that in the 2024 election, unlike the 2020 and 2022 elections, white mail-in voters were less likely than Black mail-in voters to report using a drop box. According to the 2024, CES Black mail-in voters were 14 percentage points more likely to self-report that they returned their ballots at a drop box than white mail-in voters. This difference, however, is not statistically significant at conventional levels.

---

[21] I classify a mail-in voter as using a drop box if they report returning their ballot at a "Drop box used only for ballots, not located at an election office or polling place", "Main election office", "Neighborhood polling place", or "Voting center, not a neighborhood polling place".

| Year | White Mail-In Voters | Black Mail-In Voters | Overall Mail-In Voters |
|---|---|---|---|
| 2020 | 0.54 | 0.45 | 0.49 |
| 2022 | 0.32 | 0.27 | 0.29 |
| 2024 | 0.36 | 0.50 | 0.47 |

**Table 19: Share of Mail-in Voters Returning Ballots at a Drop Box, using Cooperative Election Study from 2020, 2022, and 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.**

93. Table 19 also shows that the overall self-reported rate of drop box use among mail-in voters in Georgia is similar to the overall self-reported rate of drop box use in Georgia in the 2020 election. In the 2024 election 47% of mail-in voters self-report returning their ballot at a drop box, two percentage points less than the 49% of mail-voters who self-report returning their ballot at a drop box in 2020. This difference is not statistically significant at conventional levels.

94. The estimates from Table 19 are useful, but there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember how they returned their ballot or their mode of voting. That said, Table 19 demonstrates that, at least in the self-reported behavior among CES respondents, there has not been a large decrease in the rate of drop box voting among mail-in voters in Georgia.

## XII.  CONCLUSION

95.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on June 13, 2025

Justin Grimmer, Ph.D.

# APPENDIX

| Year | Early Voting | Mail Voting | Election Day |
|---|---|---|---|
| 2014 | 0.268 | 0.024 | 0.708 |
| 2016 | 0.459 | 0.033 | 0.505 |
| 2018 | 0.397 | 0.049 | 0.553 |
| 2020 | 0.509 | 0.240 | 0.247 |
| 2022 | 0.512 | 0.050 | 0.437 |
| 2024 | 0.627 | 0.040 | 0.328 |

Table 20: American Indian mode of voting in Georgia elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 24 | 25 | 54 | 51 | 16 | 42 |
| Asian | 104 | 223 | 357 | 336 | 87 | 91 |
| Black | 2,226 | 1,967 | 3,737 | 4,222 | 1,092 | 1,620 |
| Hispanic | 141 | 341 | 513 | 494 | 146 | 233 |
| White | 2,009 | 1,758 | 3,020 | 3,159 | 886 | 904 |
| Overall | 5,038 | 4,820 | 8,648 | 9,272 | 2,564 | 3,259 |

Table 21: Count of general election votes classified as provisional by self-reported racial identity and overall.



EXHIBIT
WIT:
DATE:
Laura Single, CCR

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
|---|---|

# SUPPLEMENTAL EXPERT RESPONSE REPORT OF JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I. SUMMARY OF FINDINGS

1. In this report I respond to the supplemental expert reports from Dr. Bernard Fraga, Dr. Christopher Clark, Dr. Daniel Chatman, and Dr. Taeku Lee. Specifically, I respond to their conclusions about (i) turnout rates; (ii) voting participation by Asian Americans; (iii) minority representation rates in Congress and the Georgia General Assembly; (iv) drop box locations; and (v) rejected absentee ballot rates.

2. *Turnout rates.* As to turnout rates, I address conclusions from Drs. Fraga and Clark. There are several places where Drs. Fraga and Clark use different data and assumptions to reach different conclusions than mine about overall turnout rates and turnout rates among certain racial groups.

3. Starting with overall turnout, my turnout estimates use each election's reapportionment report, a document from the Georgia Secretary of State's Office based on the contemporary voter file, to calculate the number of votes from each self-reported racial group based on the state's voter file on Election Day. I then calculate the size of each group using census estimates of the citizen voting age population ("CVAP"). Both Dr. Fraga and I agree that the overall turnout rate in the 2024 election was higher than in the 2020 election (Fraga supp. rep., pg. 8).

4. However, Dr. Fraga's and my estimates of the turnout rate by self-reported racial groups differ because Dr. Fraga applies a procedure to impute the race of voters based on averages across several instances of the voter file. Using this method, Dr. Fraga concludes that turnout declined from 2020 to 2024 among Hispanic and Asian voters (Fraga supp. rep., pg. 8). However, as I explain below, Dr. Fraga's conclusion that turnout decreased for Asian and Hispanic voters depends upon his method imputing fewer votes for Asian and Hispanic voters in 2024 than in 2020.

5. Additionally, Dr. Fraga limits his analysis to those elections occurring since 2018, even though his procedure for imputing voter race uses voter files from 2016 (Fraga supp. rep., pg. 8). Including the 2016 election—a presidential election year—provides another useful point of comparison to the 2024 election. Using Dr. Fraga's replication data set, I apply his procedure for

calculating the turnout rate to the 2016 election. Using this procedure, I find that turnout was *higher* for every self-reported racial group in 2024 than in 2016. Further, the increase in the turnout rates from 2016 to 2024 estimated using Dr. Fraga's procedure was larger in magnitude than the change in turnout rates from 2020 to 2024 that Dr. Fraga reports.

6. Turning to Dr. Clark's estimated turnout rates among self-reported Black and white registered voters, I first correct errors in Dr. Clark's estimates from the 2022 and 2024 elections. Using these corrected estimates, I show that Dr. Clark's method of estimating turnout rates using the share of *registered voters* who voted risks confusing increases in the share of Georgia citizens who are registered to vote with a declining turnout rate. Since 2010, the number of registered Georgia voters has risen dramatically. In 2010, the number of registered voters was 77.7% of the CVAP, while in 2024 the number of registered voters was 105% of the CVAP—which can occur based on federal limitations on list maintenance. By comparing the rate of voting among registered voters across elections, Dr. Clark confuses changes in the number of voters with the dramatic increase in the number of registered voters. Rather than rely upon the registered turnout rate, the CVAP turnout rates that Dr. Fraga, Dr. Burden, and I report shows the share of voting age citizens who vote. This method of measuring turnout ensures that the increase in Georgia's registration rate does not affect our conclusions about turnout rates. To ensure

the estimates are comparable to all of Dr. Clark's, I extend my turnout estimates for Black votes, white voters, and overall voters in the state of Georgia to include the 2010 and 2012 elections. Doing so, I conclude that Dr. Clark overstates any decline in Black voter turnout in 2024.

7. *Participation by Asian Americans.* I also address Dr. Lee's opinion that Asian citizens in Georgia face continued discrimination, noting that he does not address changes in the participation rate among Asian American voters in Georgia elections (Lee supp. rep., pgs. 2–3). I show that Asian voters in Georgia turned out at the highest rate in the 2024 election since at least the 2014 election and that their registration rate, as a share of CVAP, has increased 40.4 percentage points over the same period.

8. *Minority representation rates.* I also examine Dr. Clark's analysis of representation "parity"—or whether the share of Black legislators representing Georgia is equal to the share of Black Georgia residents. Dr. Clark concludes that Black Georgia residents are underrepresented in the Georgia U.S. House delegation (Clark supp. rep., pg. 2). But the data do not support this conclusion. Dr. Clark actually finds that Black voters are overrepresented in Georgia's U.S. House delegation. But after finding that Black representation in the U.S. House exceeds parity, Dr. Clark introduces a new and additional standard based on the racial composition of legislators' districts (Clark supp. rep., pgs. 8–9). As I show below, Dr. Clark provides no

methodology for applying this standard, for determining when parity has been reached based on district racial composition, or for determining how to compare the new racial-composition-district parity standard with Dr. Clark's seat-share parity standard. Without a methodology, it is impossible to assess his conclusion that there is a lack of parity in Georgia's U.S. House representation based on the composition of Black House members' districts. Dr. Clark also opines that Black Georgia residents are underrepresented in the Georgia state legislature (Clark supp. rep., pg. 9). I show that Dr. Clark's conclusions about the lack of parity in the Georgia state legislature depend upon the measure of the Black share of the population. If I use other reasonable estimates of the Black share of the population, such as the share of the CVAP who identify as Black, I conclude that Black representation exceeds parity in the Georgia House, is not yet achieved in the Georgia Senate, and that overall parity in the Georgia state legislature is almost exactly achieved.

9.    *Dropbox locations.* I next address Dr. Chatman's conclusion that many voters were harmed by the elimination of the drop boxes that were closest to their homes (Chatman supp. rep., pgs. 1–3). For this conclusion, Dr. Chatman provides no data on how voters actually return their absentee ballots or the burdens from those actual trips. Instead, his calculations are based on hypothetical voters returning their ballots using a hypothetical trip. Dr. Chatman also does not consider how voters' access to the U.S. Postal Service

affects the cost of returning their absentee ballot. And Dr. Chatman does not consider whether voters return their ballots on trips while performing other errands or if they return their ballots to more centrally located drop boxes. Without actual information on how voters return their ballots, Dr. Chatman's analysis of the proximity to the nearest drop box does not provide information about the cost of voting.

10. *Rejected absentee ballots.* Finally, I assess Dr. Fraga's analyses of rejected absentee ballots (Fraga supp. rep., pgs. 16–21). I first correct several errors in Dr. Fraga's estimates of the reasons for absentee ballot rejections in the 2024 election, where Dr. Fraga inadvertently eliminates 15% of all rejected absentee ballots in the 2024 election. Regardless of this error, Dr. Fraga and I reach similar conclusions about the relative rate absentee ballots were rejected for identification reasons compared to signature-based reasons in prior elections.

## II. Estimating Voter Turnout Rates in Georgia Elections

11. Beginning with turnout rates, I respond to the supplemental reports from Drs. Fraga and Clark. As noted, Dr. Fraga and I do not disagree on the overall turnout rates; we both conclude that turnout in 2024 exceeded turnout in previous elections (Fraga supp. rep., pg. 8). But Dr. Fraga concludes that turnout among Asian and Hispanic voters has declined in 2024 relative to 2020 (Fraga supp. rep., pg. 8), and Dr. Clark concludes the same for Black

voters, estimating a steeper decline in Black turnout than either Dr. Fraga or I estimate (Clark supp. rep., pgs. 19–20). I show that Dr. Fraga and Dr. Clark's conclusions are sensitive to the assumptions they make when computing the turnout rates for self-reported racial groups. And, moreover, neither Dr. Fraga nor Dr. Clark provides any causal evidence that SB 202 was responsible for any of the estimated changes in turnout.

12. Starting with methodology, my reports in this case along with the reports from Dr. Burden, Dr. Fraga, and Dr. Clark report overall turnout rate estimates and turnout rate estimates across self-reported racial groups. In some instances, our estimates of overall turnout rates or self-reported racial group turnout rates differ. To facilitate comparisons across these estimates, Table 1 below summarizes the methodology Dr. Burden, Dr. Fraga, Dr. Clark, and I use to estimate turnout rates across self-reported racial groups. Calculating a turnout rate for a self-reported racial group requires calculating the number of votes (Number of Votes columns in Table 1) from the group and then dividing that by the size of the group (Group Size columns in Table 1). As Table 1 shows, I estimate each group's size using the CVAP estimates from the U.S. census.[1] I then estimate the number of votes from each self-reported

[1] Contemporary estimates of the CVAP in 2022 were not available when I wrote my first expert report and estimates of the 2024 CVAP were not available for my sur-rebuttal. To address this issue, I created a projection of the CVAP based on historical

racial group using Georgia's reapportionment report. I use the reapportionment report because it is based on each voter's self-reported race in the voter file at the time of the election. Dr. Burden uses the same data sources for his estimates of self-reported turnout rates.[2]

| Expert Report | Group Size | | Number of Votes | |
|---|---|---|---|---|
| | Citizen Voting Age Population | Registered Voters | Reapportionment Report | Voter File + Imputation |
| Grimmer | ✓ | | ✓ | |
| Burden | ✓ | | ✓ | |
| Fraga | ✓ | | | ✓ |
| Clark | | ✓ | ✓ | |

**Table 1: Comparing Methods for Calculating Voter Turnout Across Expert Reports**

13. Dr. Fraga and I agree on estimates of the overall turnout rate: Dr. Fraga found that the 2024 election had the highest turnout rate of any election since at least 2018 (Fraga supp. rep. Table 1; Grimmer supp. rep. Table 2). But Dr. Fraga and I produce different estimates of the turnout rate by self-reported racial group and different estimates of how those turnout rates have changed across elections.

14. This difference emerges because Dr. Fraga uses a different procedure to classify voters into self-reported racial categories, but not because

census data. This only affects my estimates of turnout in the 2022 election in my first report and the 2024 election in my second report.

[2] Dr. Burden and my estimates differ slightly for some elections. One reason for this difference is that Dr. Burden used different estimates of the CVAP for the 2022 election.

Dr. Fraga uses a different measure of the group's size. As explained below, Dr. Fraga's procedure relies on specific assumptions about how voters self-identify their race in the voter file. And I show that Dr. Fraga's conclusions are sensitive to these specific assumptions.

15. Like Dr. Burden's and my reports, Dr. Fraga uses the CVAP to estimate total group size in each election (Fraga supp. rep., pgs. 5–6).[3] However, unlike Dr. Burden's and my reports, Dr. Fraga infers each voter's self-reported racial category using an imputation procedure. Specifically, Dr. Fraga uses 11 different instances of the Georgia voter file to observe up to 11 self-reports of a voter's race. Dr. Fraga explains: "I take the average proportion of all RACE/ETHNICITY values assigned to each REGISTRATION_NUMBER, excluding values of OT and U. This means each registrant has a value from 0 to 1 for each of the five racial/ethnic groups (WH, BH, HP, AP, and AI), with the sum across the categories equal to 0 (if they never self-identified as one of the five categories) or 1 (if they self-identified at least once with a category)." To justify this procedure, Dr. Fraga states: "This procedure also helps to minimize the effect of any errors in the RACE variable

[3] Dr. Fraga adopts my procedure from my first expert report to project self-reported racial group size based on historical CVAP trends. Dr. Fraga's estimates are similar to mine but are based on fewer years of census estimates. In Table 3, I show my conclusions about the direction of change in Asian and Hispanic turnout are unchanged if I use Dr. Fraga's projection of the 2024 CVAP.

value on the voter registration list. For example, in January 2023 I was informed that there were a relatively small number of records erroneously coded as 'White' due to a Department of Driver Services software error. This methodology would allow a previous correct self-report to have some impact in the analysis." For each voter and racial category, Dr. Fraga's procedure estimates the proportion of that voter assigned to that self-reported racial category. Dr. Fraga's final count of the number of votes from a particular self-reported racial group is the sum of the proportion of each voter assigned to that category.    Dr. Fraga offers no other analysis or citation to justify this procedure. Additionally, for the 2024 analysis, Dr. Fraga did not update his estimates of each voter's self-reported race using the most recent voter file, other than obtaining the self-reported race of registrants after the 2022 election.

16.    Dr. Fraga's procedure relies on strong assumptions.  For instance, this procedure assumes that any voter who identifies, at any point, as American Indian, Asian, Black, Hispanic, or white never intended, nor will ever intend, to identify as "other" or "unknown".  In other words, Dr. Fraga supposes that every instance of a voter being identified in the voter file as "other" or "unknown" is an error. So, for example, if a voter identifies as "other" in 10 of Dr. Fraga's voter files and then "Asian" in one voter file, Dr. Fraga will retroactively classify them as a self-reported "Asian" voter in every election he

analyzes. Dr. Fraga's procedure to produce turnout estimates in his Table 1a is based on a similar assumption: Voters who do not report a race must have made an error. In his Table 1a (Fraga supp. rep., pg. 9), Dr. Fraga applies a statistical procedure, known as BISG, to infer voters' race based on their name and location. He applies this procedure to voters who "consistently self-identifying as 'Other' or with 'Unknown' race." In contrast, the procedure I use in my report uses voters' self-reported race, as recorded in the voter file, as the measure of the voter's self-reported race.

17. As a result of these different methods, Dr. Fraga and I reach different conclusions about turnout rates among self-reported racial groups. In Table 2 below, I compare the components of the turnout estimates from Dr. Fraga and my expert reports for the general elections and self-reported racial groups where we both produce turnout estimates. To produce Table 2, I use Dr. Fraga's replication code and data set to merge his data with the data I use to estimate voter turnout in my reports. The "Race" column contains the self-reported race of the voter, and the "Year" column contains the election year. Notice that the "Denominator, Grimmer" and "Denominator, Fraga" columns are identical in 2018, 2020, and 2022 (indicated with a 0 in the "Den. % Diff" column, which measures the percent difference between the estimates from Dr. Fraga and myself) and very similar in 2024. This reflects that Dr. Fraga and I use the same data in 2018, 2020, and 2022. Dr. Fraga adopted my projection

procedure for 2024, although he uses a shorter time series to make his projection.

18.    In the "Numerator, Grimmer" and "Numerator, Fraga" columns, I compare the number of votes Dr. Fraga and I estimate from each self-reported racial group and overall.  Because Dr. Fraga's procedure for inferring a voter's race does not affect the total number of votes, the calculated "Total" number of votes cast from Dr. Fraga and I are similar and, as a result, our estimates of the overall turnout rate are nearly identical.

19.    In the "Turnout Grimmer" and "Turnout Fraga" columns, I show that we both agree that the 2024 election had the highest turnout rate for any election since at least 2018.  Dr. Fraga and I also agree that self-reported Black voters had a lower turnout rate in 2024 than in 2020 and that self-reported white voters had a higher turnout rate in 2024 than in 2020.

| Race | Year | Denominator Grimmer | Denominator Fraga | Den. % Diff | Numerator Grimmer | Numerator Fraga | Num. % Diff | Turnout Grimmer | Turnout Fraga |
|---|---|---|---|---|---|---|---|---|---|
| Asian | 2018 | 195825 | 195825 | 0.000 | 67216 | 73869 | 9.897 | 0.343 | 0.377 |
| Asian | 2020 | 211655 | 211655 | 0.000 | 126815 | 135684 | 6.993 | 0.599 | 0.641 |
| Asian | 2022 | 236570 | 236570 | 0.000 | 80778 | 87464 | 8.276 | 0.341 | 0.370 |
| Asian | 2024 | 254791 | 256342 | 0.609 | 154956 | 161795 | 4.413 | 0.608 | 0.631 |
| Black | 2018 | 2307425 | 2307425 | 0.000 | 1143170 | 1180184 | 3.238 | 0.495 | 0.511 |
| Black | 2020 | 2402130 | 2402130 | 0.000 | 1373543 | 1438119 | 4.701 | 0.572 | 0.599 |
| Black | 2022 | 2470870 | 2470870 | 0.000 | 1041022 | 1118735 | 7.465 | 0.421 | 0.453 |
| Black | 2024 | 2534887 | 2521497 | -0.528 | 1420498 | 1490428 | 4.923 | 0.560 | 0.591 |
| Hispanic | 2018 | 324370 | 324370 | 0.000 | 89123 | 96307 | 8.060 | 0.275 | 0.297 |
| Hispanic | 2020 | 377650 | 377650 | 0.000 | 152069 | 159223 | 4.704 | 0.403 | 0.422 |
| Hispanic | 2022 | 432975 | 432975 | 0.000 | 92751 | 98833 | 6.557 | 0.214 | 0.228 |
| Hispanic | 2024 | 490689 | 500170 | 1.932 | 201514 | 205988 | 2.220 | 0.411 | 0.412 |
| White | 2018 | 4315580 | 4315580 | 0.000 | 2327182 | 2411881 | 3.640 | 0.539 | 0.559 |
| White | 2020 | 4358340 | 4358340 | 0.000 | 2924829 | 3017221 | 3.159 | 0.671 | 0.692 |
| White | 2022 | 4381850 | 4381850 | 0.000 | 2361802 | 2451150 | 3.783 | 0.539 | 0.559 |
| White | 2024 | 4369836 | 4351520 | -0.419 | 3013201 | 3110784 | 3.239 | 0.690 | 0.715 |
| Total | 2018 | 7254695 | 7254695 | 0.000 | 3948946 | 3943855 | -0.129 | 0.544 | 0.544 |
| Total | 2020 | 7482330 | 7482330 | 0.000 | 5023159 | 5013141 | -0.199 | 0.671 | 0.670 |
| Total | 2022 | 7686560 | 7686560 | 0.000 | 3961556 | 3958763 | -0.071 | 0.515 | 0.515 |
| Total | 2024 | 7837650 | 7822143 | -0.198 | 5296620 | 5296558 | -0.001 | 0.676 | 0.677 |

Table 2: Contrasting Turnout Estimates from Grimmer and Fraga Expert Reports

20.    Dr. Fraga and I, however, reach different conclusions about the relative turnout rates of Asian and Hispanic voters in the 2020 and 2024 elections.  Using the estimates from my supplemental report, I conclude that turnout among self-reported Asian and Hispanic voters in the 2024 election was higher than in the 2020 general election. Dr. Fraga, relying on his imputation methodology, concludes that "Hispanic turnout was also lower in 2024 (41.2%) than it was in 2020 (42.2%). Asian American/Pacific Islander turnout was likewise lower in 2024 (63.1%) than in 2020 (64.1%)." Fraga supp. rep., pgs. 8–9.

21.    To demonstrate how Dr. Fraga and my conclusions depend upon particular assumptions about how we calculate our turnout rates, I perform a variety of sensitivity analyses in Table 3. A sensitivity analysis is a statistical

procedure that varies the assumptions underlying an estimate to assess how the conclusion may change as those assumptions are changed.[4] To establish a baseline for comparing the "Turnout Grimmer" and "Turnout Fraga" columns in Table 3, I replicate the estimates for Asian and Hispanic voters in 2020 and 2024 found in the "Turnout Grimmer" and "Turnout Fraga" columns in Table 2. Dr. Fraga estimates a slightly different 2024 CVAP than I estimate in my supplemental report.  But I reach similar conclusions about the rate of Asian and Hispanic voting in the 2020 and 2024 election if I use Dr. Fraga's estimate of the 2024 CVAP.  In the "Grimmer Votes Fraga Den." column, I compute the turnout rate using the count of votes from each racial group using the reapportionment report and then use Dr. Fraga's estimate of the Asian and Hispanic 2024 CVAP. With these estimates I still conclude that Asian and Hispanic turnout was higher in 2024 than in 2020, though the difference is smaller than the estimates from my supplemental report, particularly for Hispanic voters. I find that the 2024 Asian turnout rate was 0.5 percentage points higher than the 2020 Asian turnout rate.  And I find that the 2024 Hispanic turnout rate was 0.02 percentage points higher than the 2020 Hispanic turnout rate.

---

[4] *E.g.*, Charles F. Manski, Identification for Prediction and Decision 153 (2009); Paul R. Rosenbaum, *Design Sensitivity in Observational Studies*, 91 Biometrika 153, 155–64 (2004).

| Race | Year | Turnout Grimmer | Turnout Fraga | Grimmer Votes Fraga Den. | Grimmer Votes + 2020 Imp. | Turnout Fraga (1a) | Grimmer + BISG | Grimmer + 2020 BISG |
|---|---|---|---|---|---|---|---|---|
| Asian | 2020 | 0.599 | 0.641 | 0.599 | 0.641 | 0.714 | 0.672 | 0.672 |
| Asian | 2024 | 0.608 | 0.631 | 0.604 | 0.647 | 0.712 | 0.689 | 0.682 |
| Hispanic | 2020 | 0.403 | 0.422 | 0.403 | 0.422 | 0.458 | 0.439 | 0.439 |
| Hispanic | 2024 | 0.411 | 0.412 | 0.403 | 0.422 | 0.451 | 0.450 | 0.448 |

Table 3: A Sensitivity Analysis of How Dr. Fraga's Procedure to Infer Race Affects Conclusions About Hispanic and Asian Turnout in 2020 and 2024

22. Dr. Fraga's procedure for imputing voters' race adds votes to the total from the reapportionment report and therefore results in a larger number of votes in each election for Asian, Black, Hispanic, and white voters. But Table 2 shows that the relative number of votes Dr. Fraga's procedure adds to the vote total from the reapportionment report varies across elections and across self-reported racial groups. In the "Num % Diff" column, I calculate the percentage increase in the number of votes from Dr. Fraga's procedure relative to the number of votes in the reapportionment report. This column shows that Dr. Fraga's procedure results in a relatively consistent 3.2%-3.6% increase in white votes over the number of votes in the reapportionment report for the 2018, 2020, 2022, and 2024 elections. For other self-reported racial groups, however, the relative increase in votes is more variable across the elections. For Asian voters there is a 4.4% (in 2024) to 9.9% (in 2018) increase relative to the number of votes in the reapportionment report, for Black voters there is a 3.2% (in 2018) to 7.5% (in 2024) increase relative to the number of votes in the reapportionment report, and for Hispanic voters there is a 2.2% (in 2024) to

8.1% (in 2018) increase relative to the number of votes in the reapportionment report.

23. In the "Grimmer Votes + 2020 Imp." column in Table 3, I show that if Dr. Fraga's procedure produced a consistent rate of imputing votes, then his estimates would show that Asian and Hispanic turnout was higher in 2024 than in 2020. In 2020, Dr. Fraga's estimated number of votes from Asian voters was 6.993% higher than the number of Asian votes from the reapportionment report, but in 2024, Dr. Fraga's estimated number of votes from Asian voters was 4.413% higher than the number of Asian votes from the reapportionment report (Table 2, "Num. % Diff" column). If I suppose, instead, that Dr. Fraga's method produced the same increase in votes over the reapportionment report in 2024 as in 2020 (6.993%) and then use Dr. Fraga's projection of the CVAP in 2024 as the denominator, Dr. Fraga's estimates would find that Asian turnout in 2024 increased 0.6 percentage points over the turnout rate in the 2020 election (64.7% in 2024 , 64.1% in 2020).

24. There is a similar pattern for the Hispanic turnout rate. In 2020, Dr. Fraga's estimated number of votes from Hispanic voters was 4.704% higher than the estimated number of votes from Hispanic voters in the reapportionment report, but in 2024 Dr. Fraga's estimated number of votes from Hispanic voters was 2.220% higher than the number of Hispanic voters from the reapportionment report (Fraga supp. rep., pg. 8). If I suppose that

the increase in the number of Hispanic votes from Dr. Fraga's procedure over the reapportionment report is the same in 2024 as in 2020 (4.704%) and again use Dr. Fraga's estimate of the CVAP as the denominator, then Dr. Fraga's estimates would find that Hispanic turnout in 2024 had a slight increase of 0.02 percentage points over the 2020 turnout rate (42.18% in 2024 compared to 42.16% in 2020).

25. I also performed a sensitivity analysis of Dr. Fraga's conclusions about turnout using the evidence in his Table 1a and reach a similar conclusion: Dr. Fraga's conclusions about the relative turnout rates of Asian and Hispanic voters depends upon his procedure for inferring race from the voter file, but not from his procedure to infer race from some voters' names and locations. In Table 1a, Dr. Fraga combines his procedure for inferring race from the voter file with BISG (Fraga supp. rep., pg. 9). He applies BISG to infer the race of voters who identify as "Other" or "Unknown" in all voter files in which they appear. For the purposes of comparison, I present Dr. Fraga's estimates for the Asian and Hispanic turnout rates using this procedure in the "Turnout Fraga (1a)" column. Using Dr. Fraga's replication code, I isolate the number of votes the BISG procedure added to the Asian and Hispanic vote total for the 2020 and 2024 election. This enables me to assess the independent effect of adding votes based on inferring race based on names and location, separate from Dr. Fraga's procedure for inferring race from the voter file.

26.    In the "Grimmer + BISG" I add the inferred Asian and Hispanic votes to the vote total I obtained from each election's reapportionment report and then calculate the turnout rate using my estimates of the 2024 CVAP. Including the votes from Dr. Fraga's BISG estimates does not affect my conclusion that turnout was higher for Asian and Hispanic voters in 2024 than in 2020. I find that Asian turnout in 2024 was 1.7 percentage points higher in 2024 than in 2020 and that Hispanic turnout in 2024 was 1.1 percentage points higher in 2024 than in 2020. I also find that there is variability in the rate the BISG adds votes across elections, but that this does not affect my conclusion. In the "Grimmer + 2020 BISG" I find that if I force the same percent change in both elections, I still conclude that Asian and Hispanic voter turnout was higher in 2024 than in 2020.

27.    This sensitivity analysis shows that conclusions about the relative turnout rate of Hispanic and Asian voters in 2024 and 2020 using Dr. Fraga's imputation method depends upon the relative rate votes are imputed across elections, which is dependent on the voter files available and the number of times voters appear in the voter files.

28.    The 2018 general election is the earliest election where Dr. Fraga reports turnout estimates, but his procedure for inferring race includes several voter files from 2016 (Fraga supp. rep., pg. 8). Using his replication code, I was able to apply his method to the 2016 election and the resulting turnout

estimates for Asian, Black, Hispanic, and white voters are found in Table 3. I continue using the same denominator, the census estimates of the 2016 CVAP. I then merge Dr. Fraga's self-reported race estimates with the voter history file from the 2016 election, and I report the calculated number of votes from each self-reported racial group in the "Numerator, Fraga" column.

29. Applying Dr. Fraga's method to 2016, I find that the turnout rate among every self-reported racial group was *higher* in 2024 than in 2016. Further, the increase from 2016 to 2024 was larger in magnitude than the decline that Dr. Fraga estimated for Asian, Black, and Hispanic voters from 2020 to 2024. I present the turnout rate estimates from Dr. Fraga's procedure in the "Turnout Fraga" column and I present the estimates from my procedure in the "Turnout Grimmer" column. From 2016 to 2024, Dr. Fraga's procedure estimates that turnout among Asian voters increased 21.5 percentage points, while Dr. Fraga estimated a 1 percentage point decline from 2020 to 2024 in Asian turnout. From 2016 to 2024, Dr. Fraga's procedure estimates a 5.3 percentage point increase in Black turnout, while Dr. Fraga estimated a 0.8 percentage point decrease in the Black turnout rate from 2020 to 2024. From 2016 to 2024, Dr. Fraga's procedure estimates an 8.2 percentage point increase in Hispanic turnout, while Dr. Fraga estimated a 1 percentage point decrease in Hispanic turnout from 2020 to 2024. And, from 2016 to 2024, Dr. Fraga's procedure estimates a 10.3 percentage point increase in white turnout, while

Dr. Fraga estimated a 2.3 percentage point increase in white turnout from 2020 to 2024.

| Race | Denominator | Numerator Grimmer | Numerator Fraga | % Diff | Turnout Grimmer | Turnout Fraga |
|---|---|---|---|---|---|---|
| Asian | 177935 | 65693 | 74083 | 12.772 | 0.369 | 0.416 |
| Black | 2212975 | 1151949 | 1189893 | 3.294 | 0.521 | 0.538 |
| Hispanic | 290840 | 88553 | 98832 | 11.607 | 0.304 | 0.340 |
| White | 4285130 | 2529810 | 2621962 | 3.643 | 0.590 | 0.612 |

Table 4: Applying Fraga's Method to 2016 and then Contrasting Turnout Estimates from Grimmer's Report

30. As noted earlier, Dr. Clark also opined on turnout rates (Clark supp. rep., pg. 7). In Table 5, I contrast my estimates with estimates from Dr. Clark's report. Dr. Clark's turnout estimates also use the number of votes from white and Black voters as reported in reapportionment reports as the numerator. But Dr. Clark uses the number of *registered* voters as the denominator (Clark supp. rep., pg. 6). While replicating Dr. Clark's estimates, I identify and correct several errors and in Table 5 I bold places where I have estimates that differ from Dr. Clark's. First, in 2022, Dr. Clark only used voters with an "active" registration status, while in every other year Dr. Clark used both active and inactive registered voters. To reach this conclusion, I note that I replicate the estimates from Dr. Clark's report exactly when I take the number of votes from the reapportionment report and then divide by the number of active voters from the 2022 registration file provided by counsel or

using the 2022 turnout data hub from the Georgia secretary of State's office.[5] To ensure Dr. Clark's estimates from the 2022 election align with his stated estimates, I recalculate the registered voter turnout rate with all registered voters in the denominator. Dr. Clark estimates that 56.9% of registered Georgia voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 50.5%. Dr. Clark also estimates that 51.3% of registered Black voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 45.0%. And Dr. Clark also estimates that 64.7% of registered white voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 58.3%. Dr. Clark also claims that, "[a]s for turnout data discussed below, since my first report, the state of Georgia has changed the election data it provides online." Clark supp. rep., pg. 3. Dr. Clark then uses data from the 2024 turnout hub. It is unclear why Dr. Clark does not continue to use the reapportionment report, which was available and provided by counsel. Dr. Clark claims that 54.3% of registered Black voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 56.9%. Dr. Clark also claims that 69.6% of registered white voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 72.3%. And Dr. Clark claims that 61.7% of registered Georgia voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 64.2%.

---

5 *Data Hub - November 8, 2022 General Election*, Ga. Sec. State, https://sos.ga.gov/data-hub-november-8-2022-general-election (last visited July 11, 2025).

I also extend my turnout estimates for Black, white, and Georgia voters overall to 2010 and 2012 to make my estimates comparable to Dr. Clark's.

| Race | Year | Denominator Grimmer | Denominator Clark | % Diff | Votes | Turnout Grimmer | Turnout Clark |
|---|---|---|---|---|---|---|---|
| Black | 2010 | 1951560 | 1470160 | -24.667 | 740997 | 0.380 | 0.504 |
| Black | 2012 | 2040645 | 1609984 | -21.104 | 1168287 | 0.573 | 0.726 |
| Black | 2014 | 2125015 | 1843725 | -13.237 | 748592 | 0.352 | 0.406 |
| Black | 2016 | 2212975 | 2048904 | -7.414 | 1151949 | 0.521 | 0.562 |
| Black | 2018 | 2307425 | 2121324 | -8.065 | 1143170 | 0.495 | 0.539 |
| Black | 2020 | 2402130 | 2290365 | -4.653 | 1373543 | 0.572 | 0.600 |
| Black | 2022 | 2470870 | **2312592** | -6.406 | 1041022 | 0.421 | **0.450** |
| Black | 2024 | 2534887 | **2498277** | -1.444 | **1420498** | 0.560 | **0.569** |
| White | 2010 | 4139045 | 3110275 | -24.855 | 1738521 | 0.420 | 0.559 |
| White | 2012 | 4202775 | 3170967 | -24.551 | 2399345 | 0.571 | 0.757 |
| White | 2014 | 4248965 | 3474273 | -18.232 | 1648927 | 0.388 | 0.475 |
| White | 2016 | 4285130 | 3727549 | -13.012 | 2529810 | 0.590 | 0.679 |
| White | 2018 | 4315580 | 3742464 | -13.280 | 2327182 | 0.539 | 0.622 |
| White | 2020 | 4358340 | 4029156 | -7.553 | 2924829 | 0.671 | 0.726 |
| White | 2022 | 4381850 | **4048728** | -7.602 | 2361802 | 0.539 | **0.583** |
| White | 2024 | 4369836 | **4166708** | -4.648 | **3013201** | 0.690 | **0.723** |
| Total | 2010 | 6476090 | 5032354 | -22.293 | 2622527 | 0.405 | 0.521 |
| Total | 2012 | 6693990 | 5360701 | -19.918 | 3908500 | 0.584 | 0.729 |
| Total | 2014 | 6882880 | 6053385 | -12.052 | 2597003 | 0.377 | 0.429 |
| Total | 2016 | 7063805 | 6713531 | -4.959 | 4161846 | 0.589 | 0.620 |
| Total | 2018 | 7254695 | 7006952 | -3.415 | 3948946 | 0.544 | 0.564 |
| Total | 2020 | 7482330 | 7641351 | 2.125 | 5023159 | 0.671 | 0.657 |
| Total | 2022 | 7686560 | **7840528** | 2.003 | 3961556 | 0.515 | **0.505** |
| Total | 2024 | 7837650 | **8244553** | 5.192 | **5296620** | 0.676 | **0.642** |

**Table 5: Contrasting Turnout Estimates from Grimmer and Clark Expert Reports**

31. Table 5 demonstrates that the number of registered voters in Georgia has grown faster than the CVAP over the past 14 years. Overall, in 2010 the number of registered voters was 77.7% of the Georgia CVAP, while in

2024 the number of registered voters was 105% of the Georgia CVAP.[6] There is a similar increase in the share of the CVAP registered to vote for Black and white citizens in Georgia. In 2010, the number of registered Black voters was 75.3% of the Black CVAP, while in 2024 the number of registered Black voters was 98.6% of the Black CVAP. Similarly, in 2010 the number of registered white voters was 75.1% of the white CVAP, while in 2024 the number of registered white voters was 95.4% of the white CVAP. Comparing turnout among registered voters across years blends the changes in the number of voters turning out and the number of voters who are registered to vote.

32. Rather than use turnout among registered voters, I instead extend my estimates of the white and Black turnout rate to 2010 and 2012. I continue to find that the 2024 election was the highest turnout rate election in Georgia overall and for white voters. Among Black voters, turnout was higher in 2012 than in any other election. In 2010, turnout among Black voters was higher than in 2014, but lower than in 2012, 2016, 2018, 2020, 2022, or 2024.

## II. Asian American Voter Participation in Georgia

33. Turning to voter participation by Asian voters, Dr. Lee's supplemental report focuses on the treatment of Asian American citizens in

[6] The number of registered voters can exceed the CVAP because inactive voters remain on the registration list until they are allowed to be removed under the federal National Voter Registration Act.

Georgia, arguing that, "[i]f anything, evidence shows mounting suspicions about Americans of Asian descent, consistent with and further supporting the conclusion in my previous expert report that Asian Americans in Georgia continue to face discrimination and adverse treatment." Lee supp. rep., pg. 3. Dr. Lee's report focuses on evidence from public opinion surveys and news reports of Asian American discrimination. He does not consider evidence about Asian American participation in the 2024 election.

34.    I find that Asian American turnout has increased in Georgia elections. In my supplemental report, I find that the turnout rate among Asian American voters in Georgia was the highest since at least 2014. In 2016, I estimate that 36.9% of Asian voters cast a ballot in the presidential election. In 2020, I estimate a turnout rate of 59.9% among Asian voters, while in 2024 the turnout rate among Asian American voters was 60.8%. Using the estimates of Asian turnout rates from Table 2 in my supplemental report, from 2016 to 2024, there has been a 23.9 percentage point increase in the Asian American turnout rate. This constitutes a 65% increase in the Asian American turnout rate.

35.    The number of Asian Americans who have registered to vote has also increased over this same period. In 2014 94,500 self-reported Asian citizens in Georgia were registered to vote, constituting 59.2% of the Asian

CVAP. In 2024 253,710 self-reported Asian citizens in Georgia were registered to vote, constituting 99.6% of the Asian CVAP.

## III.  Dr. Clark's Parity Estimates

36.    I next consider Dr. Clark's conclusions about whether the share of legislators representing Georgia in Federal and state legislatures matches the share of Black Georgia residents. Applying Dr. Clark's own definition of parity, I find that Black Georgia residents exceed parity in representation in the Georgia U.S. House delegation. I also find that Dr. Clark's conclusions about parity in the Georgia state legislature depends on the particular measure he uses of the proportion of the Georgia population who identifies as Black.

37.    In his supplemental report, Dr. Clark computes a "parity" statistic (Clark supp. rep., pg. 8). As Dr. Clark explains, he computes "the Black representation ratio, which is measured as the Black seat share relative to the Black population share. To calculate the Black representation ratio, the Black seat share is divided by the Black population share. If the number is below 1, Blacks are underrepresented; if the number is above 1, Blacks are overrepresented. If the score is 1, then Blacks are represented at a rate that reflects the group's population share." Clark, supp. rep., pg. 8.

38.    Dr. Clark finds that in the U.S. House of Representatives delegation for Georgia, "the Black representation ratio is 1.08 (35.7 percent / 33.2 percent)." Clark supp. rep., pg. 9.  Dr. Clark, however, goes on to argue

that Black representatives in Congress "overwhelmingly represent majority-Black districts or at least districts with sizable Black populations." Dr. Clark opines that this shows that "electing Black members virtually requires an outright majority Black population. Electoral opportunities are thus constrained for Black Georgians who seek to represent the state in the U.S. House of Representatives. And this rebuts any argument that Black elected officials no longer face barriers to elected office in the state." Clark supp. rep., pg. 9.

39. It is unclear what Dr. Clark's methodology is for including the racial composition of districts when determining whether Black citizens are represented at "a rate that reflects the group's population share." Using his own definition of the "Black representation ratio," he would conclude that Black citizens are overrepresented in the US House delegation. Dr. Clark dismisses this conclusion, instead implying in his supplemental report that a critical test of parity in representation is the racial composition of a legislator's district. Yet, Dr. Clark provides no formal metric to assess how the racial composition of a district relates to opportunities for representation from Black elected officials, nor does Dr. Clark explain how to balance his district racial composition test with his seat-share parity test. Instead, Dr. Clark observes the racial composition of Black members of Congress and then, based on this correlation, concludes that this is evidence of constraint on political

opportunity (Clark supp. rep., pgs. 8–10). Without a clear methodology to move from Dr. Clark's correlation to this conclusion, I am unable to assess the reliability of this analysis.

40. Dr. Clark also examines whether there is parity in the Georgia state House and Senate, finding that "In the House, 32.8 percent of members are Black. This means the Black representation ratio in that chamber is 0.99. In the state's upper chamber, the State Senate, 30.4 percent of members are Black. This means the representation ratio in that chamber is 0.91. Across the whole Georgia General Assembly, the Black seat share is 32.2 percent, meaning the Black representation ratio is 0.97. These numbers highlight how Black Georgians continue to be underrepresented in the state legislature as compared to their population share." Clark supp. rep., pg. 9. Dr. Clark does not provide an analysis of the racial composition of the state House and state Senate districts in Georgia or how that relates to the opportunity for Black representation in the Georgia House or Senate.

41. According to Dr. Clark's estimates, if a single additional Black legislator were elected to the Georgia House, Black citizens would be slightly overrepresented. This is because if an additional Black legislator were elected, then 60 out of 180 House members would identify as Black, which exceeds Dr. Clark's estimate that the Black share of the Georgia population is 33.2%. If Dr. Clark's implicit normative benchmark is a legislature that reflects the

racial composition of Georgia, it is unclear what standard he uses to adjudicate issues with the discrete number of seats at the parity threshold. If, for example, he argued that parity for Black representation could only occur with 60 out of 180 seats, then he must necessarily be arguing that some other group must have representation below parity.

42.    Dr. Clark's calculations, and his conclusions about parity, depend on the particular estimate of the Black share of the population that he uses. For example, if he instead uses the Black share of the CVAP population in Georgia he would conclude that Black representation achieves almost perfect parity in the Georgia state legislature. Using the 2023 CVAP, I find that 32.2% of Georgia citizens of voting age identify as Black. Using this as a baseline and applying Dr. Clark's Black representation statistic, I find a score of 1.02 in the State House, a Black representation statistic of 0.94 in the State Senate, and an overall Black representation statistic of 0.999993 (because 76/236 = 0.322033 and the Black share of the CVAP is 0.322036).

## IV.    "Travel Burdens" to Drop Boxes

43.    I also consider Dr. Chatman's conclusion that the elimination of a voter's closest drop box necessarily imposes a burden on that voter's ability to return an absentee ballot (Chatman supp. rep., pgs. 1–2, 23). Dr. Chatman's conclusion is not based on any actual data about voters or trips to return ballots

and therefore is not useful in assessing Georgia's voters' cost of returning their ballot.

44. Dr. Chatman performs an analysis of "the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2024." Chatman supp. rep., pg. 1. To perform this analysis Dr. Chatman assesses the average travel time to the nearest drop box for all Georgia voters. He does not include any information about any actual behavior of Georgia voters.

45. Dr. Chatman's report does not consider the access voters have to the U.S. Postal Service (USPS) to return ballots. The USPS is a reliable option for voters to return their absentee ballots. The USPS has published data from its performance during the 2024 election, which shows the USPS is able to deliver a large share of absentee ballots to election officials quickly. According to official USPS statistics "The agency successfully processed, transported and delivered 99.88 percent of ballots from voters to election officials within seven days, and 99.64 percent within five days" and that "the Postal Service successfully returned 97.73 percent of ballots from voters to local election officials in fewer than three days."[7] Further the USPS states that "on average,

[7] U.S. Postal Serv., *U.S. Postal Service Releases 2024 Post-Election Analysis Report Detailing the Successful Efforts Taken to Deliver the Nation's Election Mail Securely and Effectively*, Nat'l News, (Dec. 2, 2024), https://tinyurl.com/5n8wtn8n.

the Postal Service delivered ballots from voters to election officials within one day."[8]

46. Dr. Chatman also supposes that voters will use the nearest drop box in a standalone trip to return their ballots, rather than using a centrally located drop box while performing other errands or activities. In my first expert report (Grimmer rep., ¶ 143), I use the SPAE survey to show that absentee voters in Georgian often return absentee ballots to drop boxes while performing other errands. And, using actual ballot return data from Douglas County, I find that only 22% of drop box voters use the nearest drop box to return their ballot.

## V. Contrasting Estimates in the Rate Absentee Ballots were Rejected for Identification Reasons in the 2024 election.

47. Finally, I correct errors in Dr. Fraga's calculations in the absentee-ballot rejection rates. With these errors in place, Dr. Fraga concludes that there was a lower overall rejection rate than I identify in my supplemental report.

48. In my first expert report and my supplemental report, I examine the rate that mail-in ballots were rejected for various reasons during, before, and after the passage of SB 202 (Grimmer rep., ¶¶ 12, 16, 88–101, 171–72; Grimmer supp. rep., ¶¶ 3, 49–63). Dr. Fraga's supplemental report also

[8] *Ibid.*

examines the rate mail-in ballots were rejected in the 2024 election, but he found generally lower rejection rates than my report (Fraga supp. rep., pg. 17). This is because Dr. Fraga inadvertently discarded 701 mail-in ballots that were rejected.  This occurred because Dr. Fraga restricted his analysis to absentee-ballot applications with an accepted "A" Application Status, which eliminated 580 absentee ballots with a blank application status and 121 absentee ballots with status "R" (Fraga supp. rep., pg. 17–20).  Despite not having an "A" application status, there is strong evidence that all 701 of these rejected mail-in ballots were issued. All 701 ballots with either a blank application status or rejected application status have a ballot issue date and all have a ballot return date.  I also find that all 701 absentee ballots have a Ballot Status of "R" indicating that they were rejected. And the codes provided for these rejections are consistent with the standard codes for a ballot rejection, rather than the free form memos used for application rejections.

49.    In Table 6, I replicate the estimates from Dr. Fraga's Table 4 ("Share Rejected, Fraga") and provide the corresponding estimates including the 701 missing ballots from Dr. Fraga's report.

| Rejection Reason | Share Rejected Grimmer | Share Rejected Fraga |
|---|---|---|
| Ballot Received After Deadline | 0.01190 | 0.01160 |
| Incorrect Id Information | 0.00151 | 0.00094 |
| Ineligible Elector | 0.00004 | 0.00004 |
| Invalid Signature | 0.00038 | 0.00029 |
| MIDR - Id Not Provided | 0.00007 | 0.00004 |
| Missing Id Information | 0.00259 | 0.00139 |
| Missing Signature | 0.00074 | 0.00040 |

Table 6: Contrasting the Share of Rejected Ballots from Grimmer and Fraga Expert Reports

50. Dr. Fraga's Table 6 also reports the rejection rate for identification reasons in the 2018, 2020, 2022, and 2024 elections, which I also report in Table 4 of my supplemental report. Dr. Fraga estimates a substantially higher rejection rate for identification reasons in 2018 than I find in my sur-rebuttal Table 4. This is because Dr. Fraga inadvertently attributes errors on the Oath envelope to voters missing identification. This can occur because, in 2018, Georgia election officials did not use a standard system to classify voters' errors. According to my classification, 52 of the status reasons that Dr. Fraga classifies as due to identification reasons are actually due to errors on the oath envelope or error in a voter's signature.[9] Altogether, errors on the oath

[9] The 52 Status reasons that Dr. Fraga classifies as rejections due to ID that are actually rejections due to errors on the Oath envelope are: "ADDRESS AND YOB MISSING", "ADDRESS DIDN'T MATCH", "ADDRESS MATCH", "BIRTHDATE DOES NOT MATCH", "BIRTHDAY DIDN'T MATCH", "BIRTHDAY DOESNT MATCH", "CURRENT YEAR AS YEAR OF BIRTH", "CURRENT YEAR AS YOB", "CURRENT YEAR AS YOB, RES ADDR NOT A MATCH", "CURRENT YEAR AS YOB, SIG MISSING", "DATE OF BIRTH DOES NOT MATCH AND NO", "DATE OF BIRTH DOES NOT MATCH VR CARD ON FILE", "DIFFERENT ADDR RECORDED", "DOB DOESN'T MATCH", "DOB INCORRECT", "DOB IS NOT A

envelope constitute 457 of the 509 ID rejections Dr. Fraga identifies in 2018. After I correct these misclassifications, Dr. Fraga and I reach nearly identical counts of the number of ballots rejected for identification reasons in 2018: I estimate 56 ballots were rejected for ID related reasons, while Dr. Fraga estimated 52 ballots were rejected for ID reasons.

51.    Regardless of the differences in our estimates of the rejection rate reasons for absentee ballots, Dr. Fraga and I reach similar conclusions about the rate absentee ballots were rejected for identification reasons in the 2024 election. I estimate that absentee ballots from white voters had a 0.2 percentage point lower rejection rate for identification reasons than Black voters in the 2024 election. Using Dr. Fraga's uncorrected estimates from his supplemental report Table 6, he finds that absentee ballots from white voters

---

MATCH", "DOB NOT A MATCH", "INCORRECT ADDRESS", "INCORRECT ADDRESS AND COUNTY IN OATH", "INCORRECT ADDRESS ON OATH", "INCORRECT BIRTH DATE IN OATH", "INCORRECT DATE OF BIRTH IN OATH", "INCORRECT DOB", "INCORRECT RESIDENTIAL ADDRESS", "INVALID BIRTHDAT", "LEFT DATE OF BIRTH BLANK", "LEFT DOB BLANK ON OATH", "NO ADDRESS", "NO DOB", "NO RESIDENTIAL ADDRESS", "NON MATCHING ADDRESS ON OATH ENVELOPE", "OATH DOES NOT REFLECT RESIDENCE ADDRESS", "RES ADDR AND YEAR OF BIRTH MISSING", "RES ADDR MISSING", "RES ADDR NOT A MATCH", "RES ADDR, YOB MISSING", "RES ADR AND YOB MISSING", "RESI ADDR DID NOT MATCH", "RESI ADDR NOT A MATCH", "STREET ADDRESS MISSING", "WRONG ADDRESS", "WRONG COUNTY LISTED IN OATH", "WRONG DATE OF BIRTH", "WRONG DATE OF BIRTH ON OATH ENVELOPE", "WRONG DOB", "WRONG INFORMATION", "WRONG RESI ADDR", "YEAR OF BIRTH MISSING", "YEAR OF BIRTH NOT A MATCH", "YOB AND RES ADDR MISSING", "YOB NOT A MATCH", "YOB, ADDR MISSING".

had a 0.05 percentage point lower rejection rate for identification reasons than Black voters. My estimates of the Black-white rejection gap for identification reasons in the 2024 election and Dr. Fraga's uncorrected estimates are smaller than the Black-white gap for signature reasons in the 2016 election and Dr. Fraga's uncorrected estimates of the Black-white gap in rejection rates for identification reasons is smaller than the Black-white gap in rejection rates for signature reasons in the 2018 and 2020 elections.

## VI.  Conclusions

52.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on July 14, 2025

Justin Grimmer, Ph.D.