Page 267

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4                      --oOo--

5

6   IN RE:

    GEORGIA SENATE BILL 202,          Master Case No.:

7                                      1:21-MI-55555-JPB

    _____/

8

9

10

11

12   VIDEORECORDED DEPOSITION OF DANIEL G. CHATMAN, Ph.D.

13           VOLUME II (Pages 267 to 373)

14             SAN FRANCISCO, CALIFORNIA

15            WEDNESDAY, AUGUST 6, 2025

16

17

18

19

20   Reported by:

21   Anrae Wimberley, CSR No. 7778

22   Job No.  7503446

23

24   PAGES 267 - 373

25

Page 268

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4                    --oOo--

5

6    IN RE:

GEORGIA SENATE BILL 202,          Master Case No.:

7                                  1:21-MI-55555-JPB

_____/

8

9

10

11

12          Transcript of video-recorded deposition

13    of DANIEL G. CHATMAN, Ph.D., Volume II, taken at

14    Keker Van Nest & Peters LLP, 633 Battery Street,

15    San Francisco, California 94111 and via Zoom

16    videoconference, beginning at 9:15 a.m. and ending

17    at 12:21 p.m. on WEDNESDAY, AUGUST 6, 2025, before

18    Anrae Wimberley, Certified Shorthand Reporter No.

19    7778

20

21

22

23

24

25

Page 269

1    APPEARANCES:

2

3    ON BEHALF OF PLAINTIFFS CONCERNED BLACK CLERGY:

4              ADVANCEMENT PROJECT

5              BY:  JOHN POWERS, ESQ.

6              1220 L Street, NW, Suite 850

7              Washington D.C. 20005

8              (415) 238-0633

9    -and-

10             CROWELL & MORING LLP

11             BY:  CLIFFORD ZATZ, ESQ.

12             1001 Pennsylvania Avenue, NW

13             Washington D.C. 20004

14             (202) 624-2810

15

16   ON BEHALF OF NEW GEORGIA PROJECT PLAINTIFFS:

17             ELIAS LAW GROUP

18             BY:  TINA MENG MORRISON, ESQ.

19             250 Massachusetts Ave, NW

20             Washington, DC 20001

21             (202) 968-4592

22             tmengmorrison@elias.law

23

24

25

Page 270

1    ON BEHALF OF THE GEORGIA NAACP PLAINTIFFS:

2              HUGHES HUBBARD & REED, LLP

3              BY:  VILIA HAYES, ESQ.

4              One Battery Park Plaza

5              New York, New York 10004

6              vilia.hayes@hugheshubbard.com

7

8    ON BEHALF OF AME PLAINTIFFS:

9              AMERICAN CIVIL LIBERTIES UNION

10             BY:  BRIAN DIMMICK, ESQ.

11             125 Broad Street, 18th Floor

12             New York, New York 10004

13             (212) 549-2500

14

15   ON BEHALF OF STATE DEFENDANTS:

16             SCHAERR JAFFEE LLP

17             BY:  DONALD FALK, ESQ.

18             MIRANDA SHERRILL, ESQ.

19             Four Embarcadero Center, Suite 1400

20             San Francisco, California 94111

21             (415) 562-4942

22             dfalk@schaerr-jaffee.com

23             msherill@schaerr-jaffee.com

24   -and-

25

Daniel G. Chatman , Ph.D., Vol. II          August 6, 2025
Georgia Senate Bill 202, In Re

Page 271

```
 1            CLARK HILL PLC

 2            BY:  BRYAN P. TYSON, ESQ.

 3            DIANE LaROSS, ESQ.

 4            3630 Peachtree Road, NE Suite 550

 5            Atlanta, Georgia 30326

 6            (678) 336-7249

 7            btyson@clarkhill.com

 8            dlaross@clarkhill.com

 9

10   ON BEHALF OF THE MACON-BIBB COUNTY DEFENDANTS:

11            NOLAND LAW FIRM

12            BY:  GRACE SIMMS MARTIN, ESQ.

13            5400 Riverside Drive

14            Macon, Georgia 31210

15            grace@nolanlawfirmllc.com

16

17   ON BEHALF OF CLAYTON COUNTY BOARD OF ELECTIONS AND

18   REGISTRATION; AND CHATHAM COUNTY BOARD OF

19   REGISTRARS; AND CHATHAM COUNTY BOARD OF ELECTIONS

20            FREEMAN, MATHIS & GRAY

21            BY:  CASEY TORRES, ESQ.

22            100 Galleria Parkway

23            Atlanta, Georgia 30339-5948

24            (770) 818-0000

25            casey.torres@fmglaw.com
```

Page 272

1    ON BEHALF OF INTERVENOR DEFENDANTS:

2              HALL BOOTH SMITH, P.C.

3              BY:  BAXTER D. DRENNON, ESQ.

4              200 River Market Avenue, Suite 500

5              Little Rock, Arkansas 72201

6              (501) 214-3499

7              bdrennon@hallboothsmith.com

8

9    Also present:

10             JOE DeMARTIN, Legal Assistant with

11             Southern Poverty Law Center

12

13             CAIQUE COSTA, VIDEOGRAPHER

14             VERITEXT LEGAL SOLUTIONS

15                      --oOo--

16

17

18

19

20

21

22

23

24

25

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 273

1                          I N D E X
2     EXAMINATION BY:                              PAGE
3     MR. FALK                                     278
4
5                          --oOo--
6
7                        E X H I B I T S
8     EXHIBIT             DESCRIPTION              PAGE
9     Exhibit 19    Amended Notice of              280
                    Deposition of Daniel
10                  Chatman, Ph.D.; 4 pages
11    Exhibit 20    Supplemental Expert Report     284
                    of Dr. Daniel G. Chatman;
12                  25 pages
13    Exhibit 21    Expert Report of Dr. Daniel    314
                    G. Chatman; 41 pages
14
      Exhibit 22    Videorecorded Deposition of    357
15                  Daniel G. Chatman, Ph.D.,
                    Volume I, taken Tuesday,
16                  May 16, 2023; 343 pages
17    Exhibit 23    Election Law Journal           364
                    article entitled "Dropbox
18                  Allocation and Use Among
                    Georgia Voters in the 2020
19                  Election," 14 pages
20    Exhibit 24    Supplemental Expert            366
                    Response Report of Justin
21                  Grimmer, Ph.D., 34 pages
22    Exhibit 25    Supplemental Expert Report     368
                    of Justin Grimmer, Ph.D.,
23                  76 pages
24                          --oOo--
25

Page 274

1      REPORTER'S NOTE: All quotations from exhibits are

2   reflected in the manner in which they were read into

3   the record and do not necessarily indicate an exact

4   quote from the document.

5                            --oOo--

6

7   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:  (None)

8   TESTIMONY REQUESTED TO BE MARKED:  (None)

9

10                            --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 275

1           WEDNESDAY, AUGUST 6, 2025;

2           SAN FRANCISCO, CALIFORNIA;

3               9:15 A.M.

4                - - -

5      THE VIDEOGRAPHER:  Good morning.  We are going

6   on the record at 9:15 a.m. on August 6th, 2025.

7           Please note that this deposition -- please

8   note that the microphones are sensitive and may pick

9   up whispering and private conversations.  Please

10   mute your phones at this time.

11           Audio and video recording will continue to

12   take place unless parties agree to go off the

13   record.

14           This is Media Unit 1 of the video-recorded

15   deposition of Daniel Chatman, Ph.D., in the matter

16   of Georgia Senate Bill 202 filed in the United

17   States District Court for the Northern District of

18   Georgia, Atlanta Division, Case No.

19   1:21-MI-55555-JPB.

20           The location of this deposition is

21   633 Battery Street, San Francisco, California 94111.

22           My name is Caique Costa representing

23   Veritext, and I'm the videographer.  I'm not related

24   to any party in this action nor am I financially

25   interested in the outcome.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page  276

1              If there are any objections to proceeding,

2     please state them at the time of your appearance.

3              Counsel and all present, including

4     remotely, will now state their appearances for the

5     record beginning with the noticing attorney.

6         MR. FALK:  Yes.  I'm Donald Falk, Schaerr Jaffe

7     LLP, representing Secretary of State Brad

8     Raffensperger and the State Election Board

9     defendants.

10        MR. POWERS:  I'm John Powers with Advancement

11    Project representing the Concerned Black Clergy

12    plaintiffs.

13             (Inaudible speaking.)

14        THE VIDEOGRAPHER:  I'm sorry.  Can we state

15    again.

16        MR. DRENNON:  Yes.

17             Baxter Drennon, Hall Booth Smith,

18    representing the Intervenor Defendants.

19             And I'm noting that the witness -- the

20    camera does not appear to be turned on for the

21    witness.

22             Thank you.

23        THE VIDEOGRAPHER:  Is there any other remote

24    counsel?

25        MS. HAYES:  I'm Vilia Hayes from Hughes,

Page 277

 1    Hubbard & Reed LLP.  I represent the Georgia NAACP

 2    plaintiffs.

 3         MR. TORRES:  Casey Torres, Freeman, Mathis &

 4    Gray LLP.  I represent Clayton County Board of

 5    Elections and Registration, Chatham County Board of

 6    Elections and Chatham County Board of Registrars.

 7         MS. MARTIN:  My name is Grace Martin, and I'm

 8    with Noland Law Firm -- that's N-o-l-a-n-d -- and I

 9    represent the Macon-Bibb County defendants.

10         MR. DIMMICK:  My name is Brian Dimmick.  The

11    last name Dimmick, D-i-m-m-i-c-k.  I'm with the

12    American Civil Liberties Union, and I represent the

13    AME plaintiffs.

14         MR. ZATZ:  My name is Cliff Zatz, Z-a-t-z.  I'm

15    with the law firm of Crowell, C-r-o-w-e-l-l, &

16    Moring, M-o-r-i-n-g, LLP.  And along with

17    Mr. Powers, I represent the Concerned Black Clergy

18    of Metropolitan of Atlanta plaintiffs.

19         MS. SHERRILL:  I am Miranda Sherrill with

20    Schaerr Jaffe for State Defendants.

21         MS. LaROSS:  My name is Diane LaRoss from Clark

22    Hill.  I also represent the State Defendants.

23         MR. TYSON:  Good afternoon.  My name is Bryan

24    Tyson.  I'm with the law firm of Clark Hill PLC.

25    And I also represent the State Defendants.

Page 278

1        MS. MORRISON:  Good afternoon.  My name is Tina

2    Meng Morrison with Elias Law Group, LLP.  And I

3    represent the New Georgia Project plaintiffs.

4        THE VIDEOGRAPHER:  Any more remote counsel?

5        MR. DeMARTIN:  My name is Joe DeMartin.  I am

6    here on behalf of the Southern Poverty Law Center

7    representing the AME plaintiffs as a legal

8    assistant.

9        THE VIDEOGRAPHER:  Okay.  Thank you.

10           Madam Court Reporter, you may now

11    introduce yourself and swear in the deponent.

12        THE REPORTER:  We are on the record.  My name

13    is Anrae Wimberley, CSR No. 7778.  I will now swear

14    in the witness.

15                DANIEL CHATMAN, Ph.D.,

16    re-sworn in personally as a witness by the Certified

17        Shorthand Reporter, testified as follows:

18                    EXAMINATION

19    BY MR. FALK:

20        Q.   Great.  Thank you.  Good morning,

21    Dr. Chatman.

22        A.   Morning.

23        Q.   Nice to see you again.  I'm Donald Falk

24    representing the State Defendants.

25           Can you start by stating your full name

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

1    for the record, please?

2         A.    I'm Daniel G. Chatman.

3         Q.    Yeah, and your address?

4         A.    ████████████████ -- that's ████████

5    Street -- in Berkeley, California.

6         Q.    And as I recall, you had just moved there

7    last time we spoke --

8         A.    About a year prior to that last

9    conversation we had, yeah.

10        Q.    Yeah.  And you understand you're under

11   oath?

12        A.    Um-hum.

13        Q.    And that the oath you just took today is

14   just as binding as if we were in a courtroom before

15   a judge or a jury?

16        A.    Yes.

17        Q.    I'll just to go over a couple of

18   preliminary things.  We've done this before.

19             If I ask a question and you don't

20   understand or you just want me to clarify, please

21   speak up, otherwise I'm going to assume you

22   understand the question and are able to answer it.

23             Please make your responses orally and

24   clear as the court reporter can't always pick up

25   head nods and um-hum and so forth.

Page 280

1          Is that acceptable?

2     A.    Yes.

3     Q.    Did you take any medications that would

4  prevent you from testifying fully and truthfully

5  today?

6     A.    No.

7     Q.    And do you have any medical or health

8  condition that would prevent you from testifying

9  today?

10    A.    No.

11    Q.    If you need a break, just let me know, and

12 I'll ask you to answer the last question before we

13 take a break, so try to do it after an answer and

14 we'll see if we can -- see how quickly we can get

15 this accomplished here.

16          Enter Exhibit 1.

17    THE REPORTER:  1 or 19?

18    MR. FALK:  I'm sorry, 19.  1 is 19.  Just add

19 18 to everything I say.

20          (Deposition Exhibit 19 was marked.)

21          (Discussion off the record.)

22 BY MR. FALK:

23    Q.    Now, this is the -- just for the record,

24 the notice of your deposition, Dr. Chatman.  And I'm

25 not going to ask you anything about the document

Page 281

1    except I will ask you what you did, if anything, to

2    prepare for this deposition today.

3           A.   I read over some of the documents,

4    including the supplementary report that I submitted

5    back in June, and met with counsel as well.

6                Am I talking loud enough?

7           THE VIDEOGRAPHER:   Yes.

8    BY MR. FALK:

9           Q.   Other than the plaintiffs' lawyers, did

10   you speak with anyone else in preparation for the

11   deposition?

12          A.   No.

13          Q.   Have you had any updates to your CV since

14   May 2023?

15          A.   Humm, probably.

16               Actually -- yes, I'm sure there are a

17   couple of updates since then, yes.  But I can't name

18   exactly what they are because --

19          Q.   Well, I'll ask you some specific

20   questions, and it may help you or it may not.

21               As I understand it, you're now a full

22   professor; is that correct?

23          A.   Yes.

24          Q.   Yes.  Congratulations.

25               So your title is now professor in which

Page 282

1    school?  I don't recall.

2         A.    It's in the Department of City and

3    Regional Planning, which is in the College of

4    Environmental Design.

5         Q.    And have you published any additional

6    articles or other research since our deposition in

7    May 2023 that are relevant to your opinions in this

8    case?

9         A.    Let's see, I've published two articles on

10   travel behavior during the COVID pandemic.

11              I've published a report on -- on the use

12   of ride-hailing services in Boston.

13              And I've published a report on

14   transportation and land use interactions in the

15   State of California.

16              And that's what I can remember at the

17   moment, yes, all of which might bear in some

18   indirect way but none of which bear particularly

19   directly I would say on this matter.

20        Q.    Fair enough.

21              Are there any additional classes that you

22   teach -- that you've begun teaching in the last

23   two-and-a-quarter years that relate to this case?

24        A.    Not that relate to this case, no.

25        Q.    Do you have any new involvement with the

Page 283

```
 1    State of Georgia, such as publications that cover

 2    Georgia?

 3         A.    No, no publications that cover Georgia.

 4         Q.    Have you visited Georgia since our last

 5    deposition?

 6         A.    No.

 7         Q.    Have you been arrested or convicted of any

 8    crime since our last deposition?

 9         A.    No.

10         Q.    Have you been deposed or testified in

11    another case since our deposition on May 16th, 2023?

12         A.    No.

13         Q.    Have you been retained as an expert in any

14    other litigation that is ongoing?

15         A.    Yes -- well, not in any litigation, no.

16         Q.    So what type of a matter were you retained

17    in?

18         A.    I was retained prospectively in the -- I

19    believe it's called the Fair Act proposal for a

20    nationwide requirement to have citizenship verified

21    prior to being able to vote.

22         Q.    And who was retaining you for that?

23         A.    It was, among other entities, the ACLU.

24         Q.    But that has not become litigation?

25         A.    No.
```

Page 284

1          Q.    Is it expected to be litigation?   Is there

2     expected to be litigation resulting from that?

3          A.    I don't know.

4          Q.    Now, you have been retained as an expert

5     witness in this litigation; correct?

6          A.    Right.

7          Q.    And how are you being compensated for your

8     work in this case?

9          A.    I am being compensated at the rate of $500

10    per hour.

11         Q.    Okay.   This is Exhibit 20.

12               (Deposition Exhibit 20 was marked.)

13               (Discussion off the record.)

14    BY MR. FALK:

15         Q.    So Exhibit 20 is a document that is

16    captioned -- I did give you the supplemental; right?

17         A.    Yes.

18         Q.    Yup, I'm looking at the supplementary in

19    front of me -- the supplemental expert report of

20    Dr. Daniel G. Chatman.

21               Do you recognize this report?

22         A.    Yes.

23         Q.    And does it represent your opinions in

24    this case?

25         A.    Yes.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 285

1          Q.    When did you first start working on it?

2          A.    I believe it was April of last year.

3          Q.    April of 2024?

4          A.    Right, yeah.

5          Q.    And when --

6          A.    Or at least that was when I was retained.

7          Q.    And when did you complete this report?

8          A.    In June.

9          Q.    And that was -- is that this June or was

10    that --

11         A.    This June.

12         Q.    This June.  That's what I thought.  Okay.

13    Thank you.

14               Were you given any materials by anyone

15    else to review in preparing this report?

16         A.    I don't think so.  I'm not sure what

17    you're referring to, "materials."

18               I would say I was given through the

19    attorneys I'm working with a list of locations of

20    drop boxes in the 2024 election by the State of

21    Georgia.  So there's that.

22               Perhaps nothing else other than that.

23         Q.    And how many hours approximately did it

24    take to prepare this report?

25         A.    I think it was about 37 hours of my time

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 286

1    if I recall correctly.  And then I employ research

2    assistants to do some of the data compilation and

3    querying of APIs and that sort of thing, and they

4    spent something more like 75 or 80 hours.

5            That's very much a ballpark.

6        Q.   Yeah.  Understood.

7            Do you cite any academic articles in this

8    report?

9        A.   In this current one, I may not.  I'm not

10   sure.  I think not.

11           I view it as a supplement to the previous

12   one that repeats some of the same methods as the

13   previous one, and so the citations in the main

14   report suffice to be the basis for what I've done

15   here.

16       Q.   Did you share your report with any other

17   person, scholars, experts, anybody besides counsel

18   and your own staff to review the report before you

19   filed --

20       A.   No, I did not.

21       Q.   Try to let me finish the question, and I

22   will try to let you finish the answer.  We had this

23   issue on both sides last time.

24           Does this report set forth all of your

25   supplemental opinions in this case regarding the

Page 287

1    2024 election?

2           A.   Yes.

3           Q.   And as you sit here today, do you have any

4    opinions that you intend to offer at trial that are

5    not set forth in the three reports that you've

6    submitted in this case?

7           A.   Three reports, that's right, there was a

8    surrebuttal report.

9                I don't have any intention at this point

10   to bring in any other opinions, no.

11          Q.   Can you summarize for me what you believe

12   to be your main findings or conclusions regarding

13   the 2024 election?

14          A.   Yes.  So I would say that, as with the

15   previous report, the differences -- and I should say

16   as well that this work was done only for the drop

17   box analysis and not for early voting locations and

18   DDS locations, et cetera.

19          Q.   Understood.  It's the scope of your

20   report.

21          A.   Right.

22               I would say that the findings of the

23   supplementary report are largely -- they're very

24   similar to the previous report insofar as I find

25   that the result of the restriction of drop box

Daniel G. Chatman , Ph.D., Vol. II          August 6, 2025
Georgia Senate Bill 202, In Re

Page 288

1    provision created by SB 202 resulted in a reduction

2    of accessibility to drop boxes, and that that

3    reduction in accessibility exacerbated the relative

4    burden of travel among those who are disabled in

5    comparison to those who are not and for those who

6    are African-American, and to a lesser extent,

7    Hispanic in comparison to non-Hispanic Whites.

8         Q.   Can you also summarize for me your main

9    findings or conclusions overall, to the extent there

10   are any, in addition to what you just stated?

11        A.   Are you asking me to summarize the

12   conclusions from the previous report?

13        Q.   Yeah.  And to the -- I mean, you just said

14   that -- at least what you just stated accords with

15   your previous conclusions.

16             I'm just trying to get your sense of

17   whether --

18        A.   Right.

19        Q.   -- there's something significant in the

20   earlier two reports that you would consider central

21   to your analysis that didn't happen to make it into

22   the supplemental report for whatever reason.

23        MR. POWERS:  Objection as to form.

24             You can answer.

25        THE WITNESS:  Well -- so the previous report,

Page 289

1    as you will recall, I'm sure, is -- concludes that

2    there's a similar disparity in access to early

3    voting locations and to DDS locations in terms of

4    the fraction of the population who is burdened by,

5    you know, a long trip to have to access those

6    locations.

7            So that is a summary -- a very brief

8    summary of the overall finding.

9    BY MR. FALK:

10       Q.   And how do your findings about the 2024

11   election in your supplemental report affect your

12   overall opinions in the case?

13       A.   Well, not by very much.  Pretty much . . .

14   it's qualitatively pretty much the same as the

15   previous report.

16       Q.   Is the meaning of "travel burden" the same

17   in your supplemental report as it was in your

18   original reports?

19       A.   Yes.

20       Q.   And can you briefly explain what you mean

21   by "burden"?

22       MR. POWERS:  Objection; asked and answered.

23            You can answer.

24       THE WITNESS:  Yes.  This was something that we

25   went over in the previous deposition, and it has not

Page 290

1    changed.

2             The definition of the burden is based on

3    the amount of discretionary travel undertaken by the

4    average individual in the State of Georgia, which is

5    something under an hour, and doubling the amount of

6    time spent in travel is unusual.  It's burdensome

7    for the reasons that I had laid out in that report

8    and for the reasons that we discussed in the last

9    deposition.

10   BY MR. FALK:

11       Q.   In previous reports in other cases, as we

12   discussed in your last deposition, you had used

13   90 minutes and then changed it to 60 minutes for

14   this case.

15            And when I asked you about that in our

16   first deposition, you said your thinking had evolved

17   to think 60 minutes was a better measure of burden.

18            Do you still think 60 minutes is the right

19   definition of "burden" here?

20       A.   I think it's a better definition than

21   90 minutes, yes.

22            90 minutes is very -- it's a very long

23   trip, and the data would suggest that an hour

24   additional travel per day is quite burdensome, and

25   so it seemed as though that would be the appropriate

Page 291

1      single measure used.

2                 In previous work, I did not do that -- do

3      so in this case, but in previous work, I've tested

4      multiple different thresholds and found very similar

5      results.  So it is -- in terms of relative burden I

6      mean.

7           Q.   Do you still exclude nondiscretionary

8      travel from your analysis?

9           A.   I haven't conducted any analysis for the

10     supplementary report that touches upon the question

11     that you're asking.

12          Q.   Does your analysis include any data from

13     Georgia on what citizens of voting age -- which we

14     can refer to as "CVAs" for convenience -- may

15     consider a travel burden?

16                For example, Georgians may be more or less

17     tolerant of longer trips than in other states.

18          A.   As presented in previous report, there is

19     not evidence that that is the case.  The average for

20     Georgia is very, very similar, and the distribution

21     for Georgia, I might add, is very similar to that

22     for the United States as a whole.

23          Q.   Why didn't you just calculate the average

24     travel time in minutes and say what was more or less

25     than the average in the travel time to the various

Page 292

1    drop boxes?

2         A.    Could you clarify what you're asking?

3               I'm not sure what you're asking.

4         Q.    Yeah, certainly.

5               I guess I'm asking you why you chose a

6    particular threshold rather than just working from

7    whatever the data said the average travel time was.

8         MR. POWERS:  Objection as to form.

9               You can answer.

10        THE WITNESS:  Are you asking why I didn't talk

11   about changes to average travel time?

12   BY MR. FALK:

13        Q.   No, I'm just asking why you picked a

14   60-minute threshold as opposed to whatever the data

15   indicated was the average.  I'm just curious about

16   your choice there.

17        MR. POWERS:  Objection.

18               You may answer.

19        THE WITNESS:  You're speaking about the data as

20   though the data and the average are synonymous

21   terms.

22               I think data are data.  We can look at

23   data in different ways.  In the travel behavior

24   literature, it is clear that longer trips are

25   substantially exponentially more burdensome, is one

Page 293

1   way of putting it, than shorter trips are.

2            So as I believe I said in my previous

3   deposition, one could look at things like changes in

4   averages but that would not be indicative of burden

5   necessarily.

6            So -- and, in fact, you will note that in

7   this supplementary report, as with the previous

8   supplementary report, I did provide area-based

9   changes in medians -- which is something like an

10  average -- and showed how those have increased.

11           So that has happened.  I mean -- and you

12  can see the data in the -- that's presented in the

13  report.

14           But the right measure of burden is the

15  measure which actually is burden -- amount of travel

16  that is actually burdensome.  And so, for example,

17  an increase -- so if we look at -- so pardon me

18  while I take a look and find the table that I --

19  it's actually not a table.  Sorry.

20           So on pages 16 and 17, I report the median

21  one-way travel times and how those have changed

22  across the state from the prospective of the spatial

23  measure of a block group.

24           And you can see that that -- for public

25  transportation to the nearest drop box in 2020, it

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 294

1    was a 26.4-minute median one-way trip time.

2                    That increased in 2024 to a 49.1-minute

3    median one-way trip time in terms of the median time

4    it takes for public transportation from home to the

5    nearest drop box.

6                    So that does show that particular measure

7    that you're asking for.  But the issue isn't so much

8    changes that may occur within a bound of what is

9    doable for individual travelers, it's more a

10   question of to what extent does a trip become long

11   enough that it's quite difficult to fit it into the

12   day or it's quite difficult just to make it, and it

13   becomes something that people will be pretty

14   unlikely to do.

15                   And so that's why the threshold measure is

16   preferable.  Nevertheless, there are data here

17   showing these increases happening.

18                   So to make the point clearer still, if you

19   look at paragraph 21, you'll see that the change in

20   travel time by auto went from a median of

21   8.38 minutes to a median of 11.5 minutes.  That

22   3-minute increase is probably pretty unlikely to

23   make a material difference for the people who are

24   subject to that change.

25                   But for people who are in the 98th

Page 295

```
 1   percentile, who have gone from 21 to 22.4, or from
 2   some other smaller number to a larger number, it may
 3   become consequential.
 4            So the issue of travel burden has to be
 5   distinguished from the issue of changes to travel
 6   that don't become burdensome.  And so it's basically
 7   as simple as that.  It's just, okay, we need to look
 8   at for which populations you can expect that this is
 9   becoming more and more difficult to do and becoming
10   less and less tenable to carry out.
11   BY MR. FALK:
12       Q.   Did you examine any data correlating
13   particular increases in travel time with the
14   decision not to undertake a particular trip?
15       A.   For this report, I didn't do that, no.  I
16   didn't look at how the distance from home to a
17   location affected the likelihood of people using --
18   making that trip.
19            To my knowledge, those data are not
20   available.
21       Q.   Now, there are generally only two election
22   days every two years, sometimes three when there's a
23   runoff; is that correct?
24       MR. POWERS:  Objection.
25            You can answer.
```

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

1          THE WITNESS:  I am not an expert on what the

2     voting days are particularly in Georgia.

3     BY MR. FALK:

4          Q.   But you're aware that it's something that

5     doesn't happen every day or every month?

6          A.   I am.

7          Q.   So given that it is -- well, let me start

8     this over.

9               The average discretionary trip is exactly

10    that, an average; right?  There are some

11    discretionary trips that are longer and some

12    discretionary trips that are shorter.

13         A.   Yes.

14         Q.   No doubt, there are some days where people

15    take no discretionary trips, and that affects an

16    average; correct?

17         A.   Yes.

18         Q.   So when deciding to try to measure the

19    burden here, why did you choose the average overall

20    days in the year as opposed to looking at the

21    longest discretionary trip undertaken in a week or a

22    month or some other time period?

23         MR. POWERS:  Objection as to form.

24              You can answer.

25         THE WITNESS:  Well, you're suggesting something

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 297

1    that I don't think is sensible in the sense that

2    looking at the longest discretionary trip isn't

3    indicative of anything that may be related to a

4    decision about whether to drive that far or take

5    public transit that far or walk that far to a drop

6    box.

7    BY MR. FALK:

8         Q.    Okay.  So just so I'm clear, you're

9    saying -- and I'm taking numbers -- the average is

10   54 minutes, and the average longest trip in a week,

11   someone has already-- if someone is already

12   undertaking a trip of say 90 minutes or 120 minutes

13   once a week or once a month, is that indicative of

14   their tolerance for discretionary travel?

15        MR. POWERS:  Objection as to form.

16             You can answer.

17        THE WITNESS:  So I'm going to repeat your

18   question to see if I understand it.

19   BY MR. FALK:

20        Q.    Sure.

21        A.    You're asking whether if someone takes a

22   long trip, if that indicates their tolerance for

23   taking long trips?

24        Q.    Correct.

25        A.    I don't think it's possible to make a

Page 298

```
 1    generalization about whether a particular trip
 2    indicates a tolerance or a non-tolerance for a long
 3    trip.
 4              People take long trips when they may be
 5    forced to for some reason.  They may be in a
 6    position where they have to in order to, whatever,
 7    maybe see the right doctor, or maybe it's -- you
 8    know, it's a work trip and they're required to do it
 9    as a condition of their work.  Maybe it's a leisure
10    trip and they're getting something, they're going
11    somewhere, going to an amusement park let's say.
12              So those are examples of the sorts of
13    things that people will make long trips for.
14              Another example is buying a car.  Car is a
15    big purchase, so people will make a long trip for
16    that reason.
17              These are examples of certain things that
18    people will make long trips for.  Then there are
19    lots of things that people will make short trips
20    for, typically like grocery stores and things like
21    that.
22              We know just behaviorally from literature
23    that's looked at it to some extent that it's
24    unlikely for people to make long trips for things
25    that are less critical to their livelihood or less
```

Daniel G. Chatman , Ph.D., Vol. II                 August 6, 2025
Georgia Senate Bill 202, In Re

Page 299

1    critical to their health or, you know, not something

2    that is really highly important.

3              Now, I don't know of any data that

4    specifically looked at the length of trips that

5    people take to vote.  I'm not aware of any such

6    data.  But it strikes me that given the -- you know,

7    the high density of voting locations for in-person

8    voting, that the premise has been that people will

9    tend to make short trips for that purpose.

10        Q.   Are you aware of any data that shows that

11   traveling to vote does not rank among the important

12   discretionary trips that a CVA might undertake?

13        A.   I am only aware of a limited amount of

14   literature that has shown that the costs of voting,

15   including travel time and other costs, are highly

16   predictive of whether people vote.

17             So what that suggests to me is that,

18   consistent with travel behavior literature, that the

19   farther away voting locations are and voting options

20   are from a person's home, that that's the --

21   correspondingly less likely they are to use those

22   locations, which is a very well-established fact

23   from travel behavior literature, and that's

24   consistent with what I've done here.

25        MR. POWERS:  And sorry to interrupt.  I just

Page 300

1    kind of want to ask what the relevance is to the

2    supplemental report or Dr. Chatman's new opinions.

3            You know, I understand the scope of this

4    deposition is limited to, you know, just

5    Dr. Chatman's work since and for the supplemental

6    period.

7        MR. FALK:  Well, yeah, but he's using the same

8    methods and we're trying to see -- some of the same

9    methods anyway, and we're trying to see what --

10        MR. POWERS:  Which he was deposed on for nearly

11    seven hours.

12        MR. FALK:  Which he was deposed on, and we're

13    moving away from that, but we're just confirming

14    that the same things were done here and the same

15    assumptions were made here.

16        MR. POWERS:  Okay.

17        MR. FALK:  We're moving on from this pretty

18    quickly.  I just want to confirm a couple of things.

19    BY MR. FALK:

20        Q.  And as I understand the scope of your

21    analysis, it measures travel time only -- in this

22    report -- only to drop boxes and does not measure

23    travel time to the nearest available place to vote,

24    polling places, early voting and other options;

25    correct?  It's just drop boxes.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

1        A.    This is just drop boxes.

2        Q.    So you don't know what the -- how long the

3    travel burden might be to the nearest place someone

4    had an opportunity to vote.

5        A.    I'm not looking at that in this report.

6        Q.    Correct.

7              Paragraph 11 of your report --

8    supplemental report -- let's turn to that.

9              You had stated previously that

10   discretionary household travel in Georgia averages I

11   think about 54 minutes?

12       A.    That sounds about right.

13       Q.    But in paragraph 11, you say that a

14   round-trip exceeding 60 minutes would double the

15   average amount of discretionary household travel in

16   the State of Georgia.

17             Am I correctly stating what your

18   conclusion is there?

19       A.    More than double is what it says.

20       Q.    But isn't that trip to the ballot -- the

21   drop box a form of discretionary travel?  I mean,

22   isn't it -- why isn't that just a substitute for

23   other discretionary travel?

24       A.    I'm not sure what you're asking.

25       Q.    Well, what I'm asking is, if the average

Page 302

1    discretionary trip is 54 minutes a day, why is a

2    60-minute trip twice the average trip?

3          A.   Well, it doesn't say it's twice the

4    average trip.  It says it doubles the -- more than

5    doubled the average amount of discretionary

6    household travel.

7               That's just a mathematical statement

8    that's obviously true.

9          Q.   Well, it's obviously true if there's

10   another discretionary trip that day.  But

11   discretionary trips by their very nature are

12   discretionary, are they not?

13         A.   Well, let's back up and define

14   "discretionary."

15         Q.   Sure.

16         A.   Really, the term as I'm using it here as

17   defined in the previous report is nonwork travel.

18              So it is true that some fraction of that

19   travel may not be discretionary in the sense that

20   perhaps people have to make that trip no matter

21   what.  That's possible.

22              It's a common use of the term in the

23   literature to use the term "discretionary,"

24   "nondiscretionary" to refer to work and nonwork, and

25   typically, it's work and school and nonwork.

Page 303

1          Q.    Right.

2          A.    So that's -- that may be why you're asking

3     the question.

4                So really what we can think about that as

5     is nonwork travel, some fraction of which people

6     kind of have to do, like you kind of have to go to

7     the grocery store.  We're calling that discretionary

8     travel.  Or, yeah, you kind of have to go the doctor

9     at least -- maybe not that day, you know.

10               So you seem to be making the argument that

11    someone could clear out their schedule and not

12    engage in any of that other travel on that day and

13    then just, you know, travel to a drop box.

14               Certainly possible.  It's not what people

15    do.

16         Q.    So you're saying people don't arrange

17    their schedule so that the day they make the long

18    trip to Costco or a far away doctor, they don't have

19    to make other discretionary trips?

20         A.    No, they do.  I'm just saying that in

21    general, the fact is that people are averaging

22    almost an hour discretionary travel every single day

23    of the week.  So adding an hour to that is a big

24    deal.

25         Q.    Yeah, I'm just curious why that just isn't

Page 304

1    substituted in the way you would substitute any

2    other discretionary travel that might come up in the

3    course of a month.

4         MR. POWERS:  Objection as to form.

5              You can answer.

6         THE WITNESS:  Well, I guess then all I have to

7    say about that is, the evidence about people's

8    travel behavior is that they fit in the things they

9    must fit in, and they find it difficult to go beyond

10   that because once you start to go beyond an hour, an

11   hour and a half a day, it becomes difficult to do

12   the things that you need to do in your life.

13             Two hours in a day is difficult, but it's

14   not that people don't do it, sometimes they have to,

15   just makes it that much less likely that they will

16   make those trips.

17             The accessibility literature just sort of

18   demonstrates the extent to which things that are

19   farther away, people don't do as much.  I mean, it's

20   kind of as simple as that.

21   BY MR. FALK:

22        Q.   Now, to make sure I understand your

23   method, you used data from the American Community

24   Survey on the 72 public use microdata areas to

25   average how many people have access to an

Page 305

```
 1    automobile; is that correct?
 2         A.    Yes.
 3               I just want to point out, you're asking
 4    the same questions you asked before, and I would
 5    give the same answers as I gave before on the
 6    methods.
 7               So the methods are exactly the same as
 8    they were before, and I do believe we went through
 9    this at that time.
10         Q.    That's self-reported data; correct?
11               In the ACS, that's self-reported data?
12         A.    What do you mean by "self-reported data"?
13         Q.    I mean, it's survey.  It's --
14         A.    It's a survey.
15         Q.    -- where people answer, yeah.
16         A.    Yeah, it's carried out by surveyors.
17         Q.    Right.  It depends on what people answer.
18         A.    It does depend on what people answer.
19         Q.    Yeah.
20               Do you have any data on the measures of
21    uncertainty within the PUMS survey and how much
22    variability there might be between the individuals
23    and the --
24         A.    Right.  So we -- again, this is
25    something -- because I did read the deposition last
```

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 306

1    year -- the deposition from two years ago, and we

2    already went over all of this, so my answers are the

3    same as they were then about uncertainty and margins

4    of error.

5         Q.    Well, based on that degree of uncertainty,

6    how can you know that the differences that you're

7    observing are statistically significant?

8         A.    Again, I did answer all of that in the

9    previous deposition.

10        Q.    In your supplemental report, did you

11   access the travel version -- burden, sorry.

12             In your supplemental report, did you

13   access travel burden to DDS offices and county

14   registrars?

15        A.    No.

16        Q.    Or to early voting locations?

17        A.    No.

18        Q.    Why didn't you re-examine that analysis

19   this time?

20        A.    My understanding is that this was the

21   scope of the additional information requested by the

22   State or something to that affect.  That's my

23   understanding.  Or by the judge or whoever it was.

24        Q.    So if I have it correct, you understood

25   your task here to be limited to changes in drop

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 307

1  boxes?

2      A.    That's correct, yes.

3      Q.    Did you ever revise your DDS analysis to

4  include county registrars?

5      A.    No.

6      Q.    As you recall, we discussed some of this

7  the last time --

8      A.    I do.

9      Q.    -- and the ability to get an ID from the

10  county registrar as an option.

11      MR. POWERS:  I'm going to object.

12            You can answer.

13      MR. FALK:  Well, we can look at the --

14      THE WITNESS:  Again, that's all in the previous

15  deposition, that whole conversation.

16  BY MR. FALK:

17      Q.    Right.  And so -- but you didn't change --

18  you didn't conduct a new analysis that included all

19  options for obtaining an ID.

20      MR. POWERS:  Objection; asked and answered.

21            You can answer.

22      THE WITNESS:  I didn't, as I said, conduct

23  other analysis than the drop box analysis for 2024.

24  BY MR. FALK:

25      Q.    And you're aware that Georgia permits

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 308

1    absentee voting by mail?

2         MR. POWERS:  Objection; outside the scope.

3              You can answer.

4         THE WITNESS:  I'm sure that may be true.

5    BY MR. FALK:

6         Q.   Did your supplemental report address CVA's

7    travel distance to mailboxes?

8         A.   No.

9         Q.   Why not?

10        A.   I think I've just answered the question in

11   terms of what I was asked to do.

12        Q.   Is it still true that all racial groups

13   have a small -- have smaller travel burdens going to

14   early voting locations than to a drop box?

15        A.   I didn't conduct an analysis of early

16   voting locations using new data.

17        Q.   But the data in your earlier report

18   suggested that smaller travel burden, and the data

19   in your new report suggests a greater travel burden

20   to drop boxes; isn't that correct?

21        A.   I would have to take a look to confirm

22   whether that's correct.

23             Are you -- I'm not sure if I quite

24   understand what you're saying.  You're comparing

25   something between early voting location burdens and

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 309

1   drop box burdens --

2        Q.   Right.

3        A.   -- right?

4             Okay.  So I would have to take a look at

5   that and see whether that was true or not.

6        Q.   And if I understand correctly, you

7   measured travel times between block group centroids

8   and ballot drop boxes, is that your method?

9        A.   Yes, as in the previous report.

10       Q.   Is there any correlation that you're aware

11  of between centroid location and their propensity to

12  vote absentee?

13       A.   I'm not aware --

14       MR. POWERS:  Objection as to form.

15       THE WITNESS:  But, no, I'm not aware of any

16  such correlation.

17  BY MR. FALK:

18       Q.   How did the travel burden change in the

19  2024 election?

20       A.   In general -- well, let's take a look at I

21  believe it's the final table.

22            So we already -- so before I started on

23  Table 3 on page 22, I've noted that travel times --

24  because there was a slight reduction in the number

25  of drop boxes available, travel times to access drop

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 310

1   boxes went up.

2            They didn't go up very much for people who
3   have access to a car and they can therefore drive,
4   but they went up quite a bit between 2022 and 2024
5   for those reliant on public transportation or for
6   those who have to walk to the nearest drop box.

7            However, in Table 3, the change between
8   '22 and 2024 was small despite that change in the
9   number of drop boxes in part because of an increase
10  in auto ownership between those years of data that
11  we -- that I used to conduct the analysis.

12           And so auto ownership going up meant that
13  people -- some people were able to shift, as it
14  were, from taking public transportation or walking
15  into driving, and the driving times, of course, are
16  much shorter.

17           So going back to Table 2 on page 18, it
18  illustrates this fact.  So if you look at Table 2,
19  there was a small reduction in the share of those
20  lacking vehicle access among non-Hispanic White
21  CVAs.  There was a larger share among those -- among
22  Black CVAs and among CVAs with disability.

23           And so for those two groups, the reduction
24  in the share of households without access to a
25  vehicle declined, and so this meant that there was a

Page 311

1    modest reduction in the share that faced a travel

2    burden in 2024 as compared to 2022 for Black CVAs

3    and for CVAs with disabilities in particular.

4              The multipliers in terms of the relative

5    comparison across the groups remained about the same

6    but improved slightly for the comparison between

7    Black CVAs and non-Hispanic White CVAs in

8    particular.

9              So that Black CVAs in the 2024 election,

10   as I say on paragraph 39, were about 2.2 times as

11   likely to have a travel burden, that is a trip

12   exceeding an hour round-trip, as non-Hispanic White

13   CVAs.

14             It's similar but it is slightly better.

15   It's still a very large difference.

16        Q.   Were there fewer drop boxes in 2024 than

17   there were in 2022?

18        A.   Yes.

19        Q.   What's your understanding of why that

20   would be?

21        A.   Oh, I actually don't know the reason why

22   that is.  Or I can't recall them at the moment.

23             I was focused on doing the analysis, and

24   it wasn't germane to the question of the relative

25   burden change.

Daniel G. Chatman , Ph.D., Vol. II                        August 6, 2025
Georgia Senate Bill 202, In Re

Page 312

1              MR. FALK:  My feed, I just realized, I was --

2      my feed of the real-time is not coming through, and

3      I wanted to check that last answer so I could avoid

4      asking the question to be repeated.

5                  (Pause in proceedings.)

6              THE WITNESS:  Would it be possible to take a

7      quick break?  I need to use the restroom.

8              MR. FALK:  Yes, that's fine.

9              THE VIDEOGRAPHER:  This is the end of Media

10     No. 1.  We are off the record at 10:10 a.m.

11                 (Recess taken.)

12             THE VIDEOGRAPHER:  We are back on the record at

13     10:18 a.m.

14     BY MR. FALK:

15         Q.  So based in part on your last answer,

16     Dr. Chatman, I would just confirm that it is still

17     your opinion that in the 2024 election, Black CVAs

18     and CVAs with disabilities have much higher rates of

19     travel burden to access drop boxes, early voting

20     locations and locations to procure photo

21     identification for the election than do non-Hispanic

22     White CVAs?

23         A.   My supplemental report speaks to drop

24     boxes in the 2024 election, but it doesn't speak to

25     the early voting locations or DDS offices.

Page 313

1          Q.   So at least for purposes of this

2    litigation, your opinions on those other aspects are

3    unchanged.

4          A.   For the purpose of the litigation, the

5    analysis that I've done stands and it is still

6    there.  And as you've noted, I haven't done a 2024

7    analysis.

8               I wouldn't expect it to change a great

9    deal based on what happened for the drop boxes, but

10   I don't know.

11         Q.   And in this report, the supplemental

12   report, you add to your opinion higher rates of

13   travel burden for Hispanic CVAs; is that correct?

14         A.   Could you refer me to the portion of the

15   report that you're speaking to so I can clarify what

16   you're asking?

17         Q.   Yeah.  Sure.  I mean, the table we were

18   just looking at, Table 3 --

19         A.   Okay.

20         Q.   -- has a -- this report addresses

21   Hispanic -- the supplemental report addresses travel

22   burdens for Hispanic CVAs; is that correct?

23         A.   Yes.

24         Q.   And . . .

25         A.   I'm sorry.  What's the question?

Daniel G. Chatman , Ph.D., Vol. II              August 6, 2025
Georgia Senate Bill 202, In Re

Page 314

1          Q.    I'm about to --

2          A.    I'm sorry.  Go ahead.

3          Q.    First, I was -- the question was, did you

4     add an analysis of Hispanic CVAs to the supplemental

5     report?

6          A.    No, I don't think so.  No, we had that in

7     the previous report.

8          Q.    I don't believe that was true.

9          MR. FALK:  I guess we can -- what will this be,

10     21?

11          THE REPORTER:  Yes.

12          MR. FALK:  This will be the original expert

13     report.

14               (Deposition Exhibit 21 was marked.)

15          THE WITNESS:  Okay.  So this is a re-entry of

16     the same exhibit from the previous report.

17          MR. POWERS:  I think we're looking at Table 3

18     on page 36?

19          THE WITNESS:  Oh, I see.  I think I used a

20     different term.  That's the confusion.

21               So I used the term "Latin X" --

22     BY MR. FALK:

23          Q.    Oh, okay.

24          A.    -- and that is equivalent to the term

25     "Hispanic."

Page 315

1          Q.    Fair enough.

2                In your -- looking at the supplemental

3     report, and, again, looking at Table 3, for Hispanic

4     CVAs, it shows that the percentage with the travel

5     burden went down between 2020 and 2022; is that

6     correct?

7          A.    That's right.

8          Q.    And then went -- by about what,

9     0.4 percent.

10               The number of drop boxes went down in that

11    same period, too; yes?

12         A.    Correct, yes.

13         Q.    Do you have any understanding why the

14    travel burden was reduced for Hispanic CVAs even

15    though the number of drop boxes went down?

16         A.    So you're asking a question about my

17    previous report now.  And I could spend some time

18    trying to answer it now, but I have not been focused

19    on that for this deposition.  I've been focused on

20    the most recent information.

21               I can speculate the reason is possibly a

22    change in auto ownership during that period of

23    time -- oh, actually, no, I take that back.  It

24    can't be that.

25               Yeah, I would have to think about it a bit

1    more to be honest.

2          Q.    And then it went up by 0.5 percent between

3    2022 and 2024.

4          A.    Right.

5          Q.    And there was a change in auto ownership

6    in that period; correct?

7          A.    There was, although the rate of auto

8    ownership went up modestly among Hispanic CVAs

9    during that period of time.  So, in other words,

10   there was not much of a change for Hispanic CVAs and

11   auto ownership.

12         Q.    And the change between 2020 and 2024 is

13   just 0.1 percent for Hispanic CVAs; is that correct?

14         A.    That's correct.

15         Q.    Are these differences statistically

16   significant?

17         A.    They are statistically significant.

18         Q.    And why is that?

19         A.    Because the numbers are large.  We're

20   talking about millions of CVAs in the State of

21   Georgia, and so it's simply a function of that.

22               I would add that they are substantively

23   significant at least to the extent that the

24   differential between groups is large.

25               So you'll notice that Hispanic CVAs in

Page 317

1    2020, 4 percent of them had a trip exceeding an hour

2    round-trip to get to a drop box.  That went up

3    modestly to 4.1 percent in 2024.  Among non-Hispanic

4    White CVAs, the burden fraction was 4.7 percent in

5    2020 and went down to 3.2 percent in 2024.

6            So the relative difference is fairly

7    large.

8            Not as large as the difference between

9    Black citizens of voting age and non-Hispanic White

10    citizens of voting age, and clearly not as large as

11    the difference between those with and without

12    disabilities.

13    Q.   Maybe I'm asking -- I'm not sure.  I want

14    to be sure we're asking and answering the same

15    question.

16            I'm talking about the change over time

17    within Hispanic CVAs as opposed to the relative

18    difference between White and Hispanic -- or

19    non-Hispanic White and Hispanic CVAs.

20    A.   I understand, yes.  And I answered that

21    question first, and then I said some other things.

22    Q.   All right.  Okay.  I just wanted to make

23    sure we were -- we were -- so you're saying that

24    0.1 percent change --

25    A.   Is statistically significant, yes.

Page 318

1          Q.    And that --
2          A.    The term "statistically significant" means
3     that it is not -- it is nonzero.
4          Q.    And it is not the product of random
5     variation?
6          A.    That's another way of putting it.
7          Q.    And so if the 0.1 percent is significant,
8     I expect you will tell me that the 0.5 percent
9     increase among Black CVAs is statistically
10    significant?
11         A.    Yes.
12         Q.    What about the 0.6 percent decrease in
13    CVAs with disability?
14         A.    Yes.
15         Q.    Is it correct that for the 2024 election,
16    you found that 4.3 percent of Georgia CVAs overall
17    lacked access to a car in their household?
18         MR. POWERS:  Sorry, where is that?
19         MR. FALK:  I believe that is on -- I think
20    that's -- is it Table 2?
21         THE WITNESS:  It's in paragraph 27 on page 18,
22    yes.
23    BY MR. FALK:
24         Q.    Right.
25               So that means 95.7 percent did have access

Page 319

1   to a car in their household?

2       A.   95.7 percent.

3       Q.   And, again, for this report, you assumed

4   that only those people without a car have a travel

5   burden; is that correct?

6       MR. POWERS:  Objection as to form.

7           You can answer.

8       THE WITNESS:  I don't assume it.  You asked me

9   if I assumed that they have a travel burden.  I

10  don't assume it.

11  BY MR. FALK:

12      Q.   Let me ask that a different way.

13           You only measured travel burdens for

14  people without cars?

15      A.   No.  No.

16      Q.   Then what did --

17      A.   I measured it for everyone, but very, very

18  few people had an auto trip exceeding an hour

19  round-trip to access a drop box.

20           I don't know what that percentage was.  It

21  was very small.  It was something like .2 percent.

22  I believe it's in -- it may not be in this report.

23  I speak to it in the previous report.

24           In other words, if you've got a car, you

25  don't have a problem by this measure of burden.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 320

1          Doesn't mean that your trip length hasn't
2    gone up.  For some people it has.
3          Q.   In your 2023 report, approximately
4    4.6 percent of CVAs lacked access to a car?
5          A.   Again, I would have to go back and confirm
6    that.
7               I know it was higher.  Sounds about right,
8    but . . .
9          Q.   I think you may have that number in here.
10          A.   I very likely do, I just have to find it.
11          Q.   Yeah, I -- let me see if I can find it for
12    you.
13               Yes, I found it, paragraph 4.
14               Paragraph 4 says that, that the --
15          A.   Okay.  There's paragraph 28 in paragraph
16    4, so let me take --
17          Q.   Look at paragraph 4.
18          A.   So paragraph 4, I'm stating 4.6 percent in
19    paragraph 4, and I believe that should be consistent
20    with paragraph 28, but I'll confirm.
21          MR. POWERS:  I don't think it's 28.
22          THE WITNESS:  Okay.  Well, yes.  So in
23    paragraph 4, 4.6 percent.
24    BY MR. FALK:
25          Q.   So the number -- and 4.6 percent of CVAs

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 321

1    is about 330,000 more or less?

2         A.    I just calculated it for the 2024 data.

3    That's about 310,000.  I guess it's --

4         Q.    Okay.  So --

5         A.    -- something similar to that.

6         Q.    I think you're right.

7         A.    Oh, I see.  Okay.

8         Q.    I think this is --

9         A.    I've calculated it as 320,000 in

10   paragraph 27 of that report.

11              Of the supplemental report; right?

12        Q.    Right.

13              And that the number with that reduction to

14   4.3 percent comes out to roughly the same amount of

15   Georgians without --

16              (Cross-talk.)

17              (Reporter seeks clarification.)

18        Q.    Georgians without access to an automobile,

19   that the percentage has dropped.  The total number

20   is pretty close to what it was.

21        MR. POWERS:  Objection as to the form.

22              You can answer.

23        THE WITNESS:  The total number is about the

24   same because the number of -- and these are not

25   Georgians, they are citizens of voting age in

Page 322

1    Georgia.  So it's a subset of Georgians.

2            And because the subset of that population

3    increased over this period of time, the number has

4    ended up being pretty similar.

5    BY MR. FALK:

6        Q.   And, again, looking at Table 2, the share

7    of Georgia CVAs without access to a vehicle went

8    down across all the groups that you measure between

9    the two ACS data points here; is that correct?

10       A.   Yes, but the substantial differences are

11   really among people who are -- among Black citizens

12   of voting age and among citizens of voting age with

13   disabilities.  The other changes are much smaller.

14       Q.   Right.  And for both Black CVAs and CVAs

15   with disability, you show an improvement or improved

16   access by 1.1 percent, is that what we're looking at

17   here?

18           A.   In terms of household vehicle access, yes.

19           Q.   Household vehicle access, correct.

20               Aren't there fewer travel burdens overall

21   because the number of people with access to a car

22   increased?

23           MR. POWERS:  Objection as to form.

24               You can answer.

25           THE WITNESS:  What do you mean by overall

Page 323

1    travel burdens -- "travel burdens overall"?

2    BY MR. FALK:

3        Q.   For all CVAs.

4        MR. POWERS:  Objection stands.

5    BY MR. FALK:

6        Q.   The travel burdens aren't defined.

7             Aren't there fewer travel burdens for the

8    entire population of CVAs because of the increase

9    in-household access to automobiles?

10       A.   So are you asking whether the increase in

11   access to household automobiles has meant that every

12   one -- every group on average has a lower burden to

13   access drop boxes specifically?  Is that what you're

14   asking?

15       Q.   Correct.  That's what you measured here.

16       A.   Well, as shown in Table 3, that's not the

17   case because the reduction in drop boxes has meant

18   that there has been a modest increase in burden

19   among non-Hispanic White CVAs, a larger increase

20   among Hispanic CVAs and an increase among CVAs

21   without a disability.

22            So there's been an increase in the burden

23   for those groups despite the fact that there was an

24   increase in auto ownership.

25            Recall that for those groups there was not

Page 324

1    a very large increase in auto ownership.  And so

2    whatever that increase was, didn't overcome the

3    reduction in the number of drop boxes for that

4    group.

5              The other thing that may be happening that

6    it's a little more difficult to speak to here now is

7    any changes in the distribution of a population of

8    those subgroups that, in combination with the access

9    to drop boxes, may have yielded a different

10   landscape of accessibility for those groups.

11             Part of the issue here is that it's not

12   just a change in auto ownership, there's also a

13   change -- slight changes in the distribution of the

14   population according to those group categories in

15   the state.

16        Q.   In paragraph 27 of your supplemental

17   report, you say that 8 percent of Black CVAs lack

18   household auto access.

19             Do you see that there -- about 8 percent?

20        A.   Yes.

21        Q.   So that means about 92 percent did have

22   access; is that correct?

23        A.   Yes.

24        Q.   Going to Table 3, back on page 22 of the

25   supplemental report, you conclude that as of 2024,

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 325

1    9.5 percent of CVAs with disabilities faced a travel

2    burden to a drop box.

3              Am I reading that correct?

4         A.   Yes.

5         Q.   So that means 90.5 percent did not face a

6    travel burden, is that also correct?

7         A.   Yes.

8         Q.   And that, as we discussed, was an

9    improvement by what you say is a statistically

10   significant number of .06 percent from 2020 to 2024

11   for CVAs with disabilities; that's right?

12        A.   .6 percent.

13        Q.   .6 percent, right.

14             Does your paragraph report that -- I'm

15   sorry.  Just let me start that one over.

16             Do you address that improvement in your

17   report here, your supplemental report?

18        A.   Do I address the improvement?

19        Q.   Yeah, do you -- does your report state

20   that the travel burdens for CVAs with disabilities

21   decreased between 2020 and 2024?

22        A.   I believe it does.  I'm trying to find the

23   location.

24        Q.   Take your time.

25        A.   Yes.  In paragraph 40, it states, "While

Daniel G. Chatman , Ph.D., Vol. II                     August 6, 2025
Georgia Senate Bill 202, In Re

Page 326

1   there were about 37,000 fewer CVAs without

2   disabilities who would have a long trip to access a

3   drop box between 2020 and 2024, the number of

4   burdened CVAs with disabilities stayed about the

5   same."

6              Oh, I see.

7              So this is -- no, take it back.  That's

8   wrong.  I misread my sentence -- my own sentence.

9              So that just states that the number stayed

10  about the same despite the fact that the percentage

11  went down because of the increase in the number of

12  people with disabilities in the state.

13             So I take that back.

14      MR. POWERS:  And I'm going to object to the

15  form of the question.

16             I mean, the table is in the report,

17  so . . .

18      MR. FALK:  No, I'm asking if it's in the text

19  anyway.

20      THE WITNESS:  You're asking whether the text

21  says, hey, look, things are better for this group,

22  something like that.

23             I'm not sure that it says that.  I'm

24  looking for the factual repetition of the --

25

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 327

1    BY MR. FALK:

2         Q.    Right.

3         A.    -- of the trend in the text, and am not

4    finding it right now.  So perhaps it's not there.

5              It is in the table, obviously.

6         Q.    Correct, obviously.

7              Still looking at this Table 3 on page 22,

8    it shows -- does the table show a decrease in

9    travel -- percentage of travel burden -- let me try

10   this one again.

11             Does the table show a decrease in the

12   percentage of Black CVAs with a travel --

13             (Reporter seeks clarification.)

14        Q.    Do I correctly understand the table to

15   show a decrease in the percentage of Black CVAs

16   facing a travel burden to access a valid drop box

17   from 7.3 percent in 2022 to 7 percent in 2024?

18        A.    Yes.

19        Q.    I believe the report said correctly that

20   the number of ballot drop boxes decreased between

21   2022 and 2024.

22        A.    Yes.

23        Q.    Do you know if that 0.3 percent drop

24   between 2022 and 2024 for Black CVAs' travel burdens

25   is statistically significant?

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 328

1          A.    All of the differences shown in the table
2     are statistically significant.
3          Q.    Does the text of your report address this
4     improvement between 2022 and 2024?
5          A.    I believe it does.  But if what you're
6     asking me to do is to search the text to find it,
7     then I suppose I would have to do that.
8              You may recall that there's a Table 2 that
9     talks about the fact that auto increase -- auto
10    access increased among those two groups.
11         Q.    With this 7 percent facing a travel burden
12    to access a -- 7 percent of Blacks CVAs facing a
13    travel burden to access a ballot drop box in 2024,
14    the 7 percent figure indicates that 93 percent had
15    no travel burden to access a drop box in 2024; is
16    that correct?
17         MR. POWERS:  Objection as to form.
18         THE WITNESS:  If you're asking whether
19    100 percent minus 7 percent equals 93 percent, the
20    answer is yes.
21    BY MR. FALK:
22         Q.    To confirm, you stated that the increases
23    in all groups from 2022 to 2024 were decreases.  The
24    increases -- the changes -- you stated that the
25    changes in all groups on Table 3 between 2022 and

Page 329

1    2024 were statistically significant; is that

2    correct?

3         A.    Yes.

4         Q.    And if I recall your answer correctly, you

5    said that's because of the size of the population

6    was sufficient to exclude random variation?

7              Am I stating that correctly?  Or restate

8    it if I have it wrong.

9         A.    There's no exclusion of random variation.

10   It's just that when sample sizes are sufficiently

11   high, the confidence intervals are sufficiently

12   small, so that the differences that you see at the

13   1 percent level are not -- that are distinguishable

14   from 0, which is another way of saying that they are

15   statistically significant.  They are real, nonzero.

16             The term "statistically significant"

17   really means real, nonzero.

18             I just want to make a note here, which is

19   that what the report emphasizes is the differential

20   between the percentages between the groups, and

21   those are not just real, nonzero, they're large,

22   those multipliers, or those ratios.

23        Q.    Did you provide the data underlying your

24   report to us?

25        A.    I believe what I was asked to provide was

Page 330

1    the Python script, not the data.  The data are

2    public.

3              Well, I should take it back.  The data are

4    public except for the list of drop boxes that I

5    provided because the list of drop boxes that was

6    provided by the State was incomplete.  And so the

7    list that we provided had an additional 21 or so

8    locations that were not provided by the State.

9         MR. POWERS:  And the Python.

10        THE WITNESS:  And the Python code is the other

11   thing that I just mentioned.

12   BY MR. FALK:

13        Q.   Thank you.  Wanted to confirm.

14             For your supplemental analysis, did you

15   collect any data on specific people who voted by

16   mail-in ballot or by drop box?

17        A.   No.

18        Q.   So is it fair to say that the analysis

19   focuses on hypothetical voters who hypothetically

20   may want to use drop boxes?

21        MR. POWERS:  Objection as to form and asked and

22   answered.

23             You can answer.

24        THE WITNESS:  It's fair to say that the way to

25   analyze the effect of access to things is to look at

Page 331

 1    potential travelers.

 2            This is what's done in the literature.

 3    It's the right way to do the work because one wants

 4    to look at what the possible destinations are and

 5    see whether the people who could be traveling to

 6    those destinations will be able to get to them.

 7            And that's what the work does.

 8    BY MR. FALK:

 9        Q.    In your analysis, you measured travel at a

10    certain time of day; correct?

11        A.    Yes.

12        Q.    And --

13        A.    The result of which was to probably

14    understate transit travel times because we chose to

15    use peak period, which is the period of highest

16    frequency of public transit services.

17        Q.    You chose a Tuesday morning in June, I

18    believe --

19        A.    Yes.

20        Q.    -- paragraph 17 says.

21        A.    Yes.

22        Q.    And was that the same time of day in your

23    original report?

24        A.    Yes, Tuesday, 9:00 a.m.

25        Q.    Why did you choose that time of day and

Page 332

1    day of the week?

2         A.    To give transit the best possible chance

3    of getting people there on time.

4         Q.    Did you attempt to correlate the time you

5    chose with the time of day and day of the week that

6    people actually drop off ballots?

7         A.    I did not.

8              So for this reason, the transit times are

9    probably understated.  For the reason that you bring

10   up, the transit times are probably understated.

11   They're probably underestimated.

12        Q.    And you say that because of -- I think you

13   just said, because of greater frequency?

14        A.    During the morning peak.

15             Transit services are notoriously focused

16   on peak periods because that's the time when most

17   riders use them.  So that's the time when

18   frequent -- services are most frequent.

19        Q.    But travel time itself might be longer at

20   the rush period; is that not correct?

21        A.    The issue with transit time is waiting and

22   walking times, which contribute a great deal to the

23   total time of transit.

24             So I don't think you'll find anyone who

25   would claim that you're better off looking at travel

Page 333

1    times at 3:00 or at noon because of the fact of the

2    waiting and walking times.

3         Q.   What about on a weekend when people often

4    use --

5         MR. POWERS:  I'm going to object.

6         THE WITNESS:  I'm sorry?  What about the

7    weekend?

8    BY MR. FALK:

9         Q.   What would the -- do you have an opinion

10   as to what the difference in travel time might be on

11   a Saturday or Sunday?

12        A.   Yes, I do.  It would be longer.

13        Q.   And why is that?

14        A.   Because of waiting and -- well, because of

15   waiting times because frequencies are shorter.

16        Q.   So frequency -- increased frequency would

17   more than offset any increase in travel time?

18        A.   Absolutely.

19        Q.   Did you calculate in minutes the average

20   travel time for all CVAs to access ballot drop boxes

21   before and after SB 202?

22        A.   This is the previous report that you're --

23        Q.   Well, this report I assume you did the

24   same things, but maybe --

25        A.   No, I --

Daniel G. Chatman , Ph.D., Vol. II                      August 6, 2025
Georgia Senate Bill 202, In Re

Page 334

1       Q.    But did you calculate -- let's just -- did
2    you calculate minutes of the average travel time for
3    all CVAs to access ballot drop boxes in 2024?
4       A.    That's what I did for the supplemental
5    report.
6       Q.    Your report -- am I correct that the
7    report doesn't state the average travel time for
8    each group to ballot drop boxes?
9       A.    The report --
10            (Reporter seeks clarification.)
11       A.    The report states the median travel time
12    one way by all modes.  It does not report the
13    average for individuals.
14       Q.    And the data underlying that are the same
15    data we just discussed; correct?
16       A.    It's all the same data.
17       Q.    So if I'm correct, and we're looking at --
18    I'm looking at Table 1 on page 12 where you have the
19    median one-way travel time by mode.
20            And I'm -- what I'm trying to find here,
21    and I may have overlooked it, is a breakdown of
22    either median or average travel time for the groups
23    that you examined here, Black CVAs, non-Hispanic
24    White CVAs, Hispanic CVAs, and those with and
25    without disabilities.

Page 335

1          A.    There's -- I mean, there are other

2     areas -- there's a lot of data I didn't report.  And

3     I didn't report that, that's true.

4          Q.    But the underlying data is there in what

5     you provided?

6          A.    Yes.  It's -- the underlying data are

7     there in -- so -- yeah, I'm not sure what you're

8     asking.

9               I think the Python script shows how I

10     calculated these data, and the data are public data.

11               Except for the list of drop boxes that

12     I -- as I mentioned previously.

13          Q.    Right.  Right.  I understand that that

14     would have to be replicated.

15               What . . . so because you have not

16     reported the average travel time by group, could it

17     be that Black CVAs have a lower average travel

18     burden than White CVAs?

19          MR. POWERS:  Objection to the form,

20     mischaracterizes the report.

21               You can answer if you can.

22          THE WITNESS:  I don't believe so.  But I don't

23     have it in front of me and, frankly, I don't even

24     think I looked at it, so . . .

25               Lots of people will tell you that looking

Page 336

1    at averages is not really the right thing to do for

2    various reasons, so --

3    BY MR. FALK:

4         Q.   Well, then --

5         A.   -- but -- yeah.

6              I'm not sure why you think averages are

7    important.

8         Q.   Okay.  I mean, I prefer medians myself.

9              So could it be that Black CVAs have a

10   lower median travel burden than White CVAs?

11        A.   Yeah, again, I would be very surprised if

12   that were the case.

13        MR. POWERS:  Objection stands.

14   BY MR. FALK:

15        Q.   Do you know whether the data indicate that

16   Black CVAs are generally closer to drop boxes than

17   White CVAs?

18        A.   I don't know.

19             I would venture to say they probably are

20   on average.  Quite possible.

21             On the other hand, the fact is that

22   everyone is concentrated in urban areas, all the

23   control groups are concentrated in urban areas, and

24   so I could be wrong about that.

25             And I really was focused on travel time,

Daniel G. Chatman , Ph.D., Vol. II               August 6, 2025
Georgia Senate Bill 202, In Re

Page 337

1    not distance.
2         Q.   Are you aware of any evidence that Black
3    CVAs are more likely to actually use drop boxes than
4    other groups?
5         A.   I am not.  Not part of my analysis.
6         Q.   Is there evidence -- are you aware of any
7    evidence on the county level indicating the
8    frequency of Black CVAs' use of drop boxes?
9         MR. POWERS:  Objection; outside the scope of
10   this.
11        THE WITNESS:  I'm not.
12   BY MR. FALK:
13        Q.   Do you have any opinion on the reliability
14   of the evidence of actual drop box use in Douglas
15   County, Georgia?
16        MR. POWERS:  Objection; outside the scope of
17   the supplemental report.
18             You can answer.
19        THE WITNESS:  I think I spoke to that issue in
20   the deposition -- the previous deposition.  I don't
21   think I have anything to add to that, and in my
22   surrebuttal report.
23   BY MR. FALK:
24        Q.   So you didn't address that -- you didn't
25   analyze that data for the purpose of this report?

Page 338

1          A.    Analyze what data?

2          Q.    The Douglas County data, you didn't

3     address that all for this report?

4          A.    No.

5          Q.    In preparing this report, did you analyze

6     which counties have the highest numbers or

7     percentages of CVAs with travel burdens to a drop

8     box?

9          A.    No, I did not.

10         Q.    In the supplemental report, did you

11    include in your analysis access to transportation

12    through ride-hailing services, demand response,

13    public transportation service, rides from friends or

14    family members outside the household or ways that

15    voting rights and other groups take people to vote,

16    such as the plaintiff group Georgia Adapt?

17         A.    No.

18         Q.    Now, your analysis depends on the nearest

19    drop box to a person's home; is that correct?

20         A.    As with the previous report.

21         Q.    And in your opinion, the drop box nearest

22    to a CVAs' home is the relevant measure for those

23    who do not have a vehicle?

24         MR. POWERS:  Objection.  We've been over this.

25         THE WITNESS:  I don't have anything to add on

Daniel G. Chatman , Ph.D., Vol. II                          August 6, 2025
Georgia Senate Bill 202, In Re

Page 339

1    that from the previous deposition.

2    BY MR. FALK:

3         Q.   Do you have any further evidence for the

4    premise that voters who lacked cars used the closest

5    drop box?

6         A.   What I've prepared is in the supplemental

7    report, and I've not presented any evidence to that

8    effect.

9         Q.   So have you considered any evidence that

10   drop boxes are reliable methods of returning

11   ballots?

12        MR. POWERS:  Objection; outside the scope.

13        THE WITNESS:  Yeah, I don't have anything to

14   say about that topic.

15   BY MR. FALK:

16        Q.   In identifying the nearest drop box to --

17   I believe you were measuring from the centroid.

18   Have I got that --

19        A.   Centroid to block group.

20        Q.   Centroid to block group.

21             Measuring the nearest drop box, did you

22   take into account whether the nearest drop box was

23   in the same county as --

24        A.   Yes.

25             I might add, if I had not, it would be --

Page 340

1    it would result in an understatement of burden.

2         Q.   So to confirm, you have not addressed

3    whether drop boxes are more reliable or less

4    reliable than the Postal Service for returning

5    ballots?

6         MR. POWERS:  Objection.

7         THE WITNESS:  This work is about the

8    accessibility to drop boxes.

9    BY MR. FALK:

10        Q.   In your opinion as a travel behavior

11   expert, if counties were choosing where to put a

12   drop box, and there were no restrictions on where

13   they could put them, what criteria should a county

14   use in locating a drop box?

15        MR. POWERS:  Objection; far outside the scope

16   of the supplemental report.

17        THE WITNESS:  I would love to talk about that,

18   but let me -- I'll just restrict myself to the

19   following statement.

20             Market-provided locations for people to

21   travel to are provided based essentially on

22   proximity.  I would expect that if one was trying to

23   provide it in such a way as to maximize the extent

24   to which people would access it, you would place it

25   in a location similar to that process -- that market

Page 341

1    process.

2    BY MR. FALK:

3        Q.   If you took into account work locations

4    and other habitual locations, would the travel

5    burden to drop boxes decrease somewhat?

6        MR. POWERS:  Objection; asked and answered.

7             You can answer.

8        THE WITNESS:  Yeah, I believe I've already

9    answered that.  I don't think I have anything more

10   to say about that one.

11            I will say, I don't think it would -- in

12   case I didn't say this before, I don't think it

13   would change very much.

14   BY MR. FALK:

15       Q.   But you didn't analyze --

16       A.   It's not possible to analyze that.

17       Q.   Let me finish the question and then you

18   can give the same answer.

19            You didn't analyze locations of work,

20   travel or other habitual locations for the purposes

21   of the supplemental report?

22       MR. POWERS:  Objection.  His methodology didn't

23   change, and this was addressed at length in the

24   first deposition.

25       THE WITNESS:  Yeah, it's true, I've already

Page 342

1    addressed the question.

2    BY MR. FALK:

3         Q.   And you probably recall that we talked

4    about trip chaining in the first deposition?

5         A.   Yes.

6         Q.   And you said at the time that you had no

7    evidence to support that drop boxes were located in

8    central locations where people might be expected to

9    travel away from the home?

10        MR. POWERS:   Objection.   It's in the

11   transcript.

12   BY MR. FALK:

13        Q.   Let me just -- rather than ask that, have

14   you looked at that since, whether drop boxes are in

15   central locations near shopping malls or other

16   places that bring voters making their normal

17   discretionary or nondiscretionary travel?

18        A.   No, I hadn't -- I did not look at that.

19             I would like to say something else about

20   trip chaining though, which I don't know if I said

21   last time, which is trip chaining happens when you

22   can very conveniently stop a little bit out of your

23   way to do something else when you're on your way

24   somewhere else, let's say to work.

25             A trip of an hour round-trip duration is

Page 343

1    extraordinary unlikely to be such a trip.  It would

2    be highly fortuitous if it were if you are traveling

3    on public transportation, but even if you're

4    traveling by car.

5            The thing is, by car, most people do have

6    short trips in duration, and so it is much more

7    likely that they might be able to trip chain.

8            Could we do a quick break?

9        MR. FALK:  Yeah, no, that's fine.  That's fine.

10   We might be able to bring this home then after this

11   break but -- depending on how late you guys want

12   lunch, but I think we are about two-thirds of the

13   way done.

14       THE VIDEOGRAPHER:  This is the end of Media

15   No. 2, and we are off the record at 11:09 a.m.

16           (Recess taken.)

17       THE VIDEOGRAPHER:  We are back on the record at

18   11:23 a.m.

19   BY MR. FALK:

20       Q.   Directing you to paragraph 57 of your

21   original report, Dr. Chatman, you say there --

22       A.   Can I just --

23       Q.   Yeah, get to it.

24       A.   I'm sorry, what was the number?

25       Q.   Sorry, it's paragraph 57.  It's on page 26

Page 344

1    of the original report.

2              I just want to be sure we're in the same

3    place.

4              You say, "Because there is no generally

5    accepted methodology for aggregating confidence

6    intervals from the Census block group or tract level

7    to higher levels of geography (e.g., to the county

8    or state levels), I report these estimates without

9    confidence intervals."

10        MR. POWERS:  Objection; outside the scope of

11   the supplemental report.

12   BY MR. FALK:

13        Q.   "Statewide figures presented in this

14   report are statistically significant at the 0.001

15   level or better."

16        MR. POWERS:  Objection stands.

17              Go ahead.

18   BY MR. FALK:

19        Q.   Do you maintain that opinion through your

20   supplemental report?

21        A.   Yes.  The same methods are used.

22        Q.   And what was your methodology for ensuring

23   the statistical significance of the figures on

24   Table 3 of the supplemental report in light of the

25   issues you've described in your original report?

Page 345

1          A.    You're directing me to Table 3.

2          Q.    Table 3, and I'm asking you what your

3     methodology was for determining statistical

4     significance of those results.

5          A.    I'm pretty sure I answered this question

6     for the original report, and I don't have a change

7     to that answer at this time.  It's the same method

8     as I described previously.

9          Q.    All these calculations are based on random

10    samples of the Georgia population; is that correct?

11         A.    All of the data are a 1 percent sample --

12    come from a 1 percent sample of the Georgia

13    population.

14         Q.    Those surveys sample from the millions of

15    CVAs in Georgia; right?

16         A.    Yes.

17         Q.    But do the surveys themselves have

18    millions of respondents?

19         MR. POWERS:  Objection; outside the scope.

20         THE WITNESS:  It's a 1 percent sample.

21    BY MR. FALK:

22         Q.    So you're estimating quantities from the

23    surveys proportionate people without a car?

24         MR. POWERS:  Objection.

25              You can answer.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 346

1           THE WITNESS:  Yeah, I'm pretty sure we went

2       over all of this in the deposition previously.  So I

3       don't really have anything to add to that.

4       BY MR. FALK:

5           Q.   Each survey provides a margin of error

6       around its estimates; correct?

7           MR. POWERS:  Objection.

8           THE WITNESS:  Yes, as stated previously.

9       BY MR. FALK:

10          Q.   Did you provide any kind of power

11      calculation to determine the differences you could

12      detect reliably with your research design?

13          MR. POWERS:  Objection.  His methodology hasn't

14      changed.

15              In fact, I might just do a standing

16      objection to this line of questioning.

17          THE WITNESS:  What's been provided in the

18      previous report explains the methods.

19      BY MR. FALK:

20          Q.   If you didn't calculate confidence

21      intervals, how did you perform a significance test?

22          MR. POWERS:  Objection.

23          THE WITNESS:  I have spoken to this in the

24      previous report.

25      BY MR. FALK:

Page 347

1          Q.   Going back to the replication code, you

2     said you did not provide some of the data because

3     it's public.  But sometimes different versions of

4     datasets will be updated when they're online.

5               Did you ensure that the public dataset

6     that you used has not been updated after you used it

7     for the purposes of this report?

8          A.   I'm not sure what you're referring to when

9     you say that sometimes data are updated.

10              They are generally not updated.  That's

11    not true.  They are archived.  The code that we used

12    refers to the data that were available online.

13              The PUMS data are not going to be updated.

14    The census data are not going to be updated.  The

15    2015 -- sorry, the five-year ACS block group --

16              (Reporter seeks clarification.)

17         A.   Five-year ACS -- A-C-S three letters --

18    five-year estimates block group level.

19         Q.   Did you provide the data on which you

20    downloaded any of that data?

21         A.   I was requested -- what I was asked to

22    provide is what I provided, and what I provided was

23    the list of drop boxes and the Python code.

24         MR. POWERS:  Your experts can pull ACS and PUMS

25    data.

Page 348

1    BY MR. FALK:

2         Q.   In the first deposition, you said that

3    you've measured CVAs rather than registered voters;

4    is that correct?

5         A.   Yes.

6         MR. POWERS:  Objection.

7    BY MR. FALK:

8         Q.   And you gave two reasons for that.  One, I

9    believe you said that because registration to vote

10   changes over time.

11             For the purposes of your analysis, you

12   assumed that CVAs were registered to vote, whether

13   or not they actually do.

14             Is that correct, or have I misstated that

15   somewhere?

16        MR. POWERS:  Standing objection.

17   BY MR. FALK:

18        Q.   I'm asking you whether -- is that your

19   current -- it's still your current opinion or revise

20   it for me if I've gotten it wrong.

21        MR. POWERS:  No, you asked what he had said in

22   his prior deposition, if I . . .

23        THE WITNESS:  I don't believe I said that in my

24   prior deposition.  I think you're mischaracterizing

25   it.

Daniel G. Chatman , Ph.D., Vol. II          August 6, 2025
Georgia Senate Bill 202, In Re

Page 349

1    BY MR. FALK:

2        Q.   Again, I'm not trying to mischaracterize

3    it.

4             So I -- you gave a reason for using CVAs

5    rather than registered voters, and I believe you

6    said because individual registration status may

7    change.

8             But if I've mischaracterized that, please

9    bring it in line with your current understanding.

10       MR. POWERS:  Objection; outside the scope.  And

11   you're mischaracterizing his . . .

12       MR. FALK:  He's looking at CVAs now and --

13       MR. POWERS:  If you want to pull up the

14   transcript, we can see what he said.

15       MR. FALK:  No, I don't want to see.  I want to

16   see what he understands -- what his understanding is

17   now.

18       THE WITNESS:  What's your question?

19   BY MR. FALK:

20       Q.   Well, I can just ask the open-ended

21   question, but I was trying to help.

22            Why did you measure CVAs rather than

23   registered voters?

24            You continue to do that in this report;

25   correct?

Page 350

1          A.    I do.

2          Q.    And why did you make that choice?

3          A.    And as you point out, I have given my

4     reasons for that in the previous deposition.

5              What I did not do is assume that everyone

6     is going to register to vote.  That was the part --

7     that the way that you characterized my previous

8     statements in that previous deposition I don't think

9     you'll find is true.

10             I did measure citizens of voting age, not

11    registered voters for the reasons outlined in the

12    previous deposition.

13         Q.    And at that time, you said you had no

14    reason to think that the spatial distribution of

15    CVAs is significantly different from the

16    distribution of registered voters.

17         A.    I don't --

18         Q.    Do you still believe that?

19         MR. POWERS:  Standing objection.

20    BY MR. FALK:

21         Q.    Do you still believe that?

22         A.    I still believe that, yes.

23         Q.    Since your last deposition, have you

24    gathered any data to support that assumption?

25         A.    No.

Daniel G. Chatman , Ph.D., Vol. II                 August 6, 2025
Georgia Senate Bill 202, In Re

Page 351

1          Q.   Now, there are some differences between

2     CVAs and the voting eligible population; correct?

3          MR. POWERS:  Objection.

4          THE WITNESS:  I'm aware of two differences.

5     One of them is whether people are eligible to vote

6     due to a criminal history, and the other one is

7     whether people are eligible to vote due to some

8     other reason that might mean that they're not

9     capable of voting, mental incapacity.

10              I would not expect those two to be

11    systematically distributed differently than the rest

12    of the population, and certainly not in a way that

13    would effect this analysis materially.

14    BY MR. FALK:

15         Q.   So those might include felony inmates or

16    felons on parole; correct?

17         MR. POWERS:  Objection.

18         THE WITNESS:  Not inmates, no.

19    BY MR. FALK:

20         Q.   CVAs wouldn't include inmates?

21         A.   No.   That's Group Quarters population.

22    It's a different category.

23         Q.   And what about persons in a facility for

24    dementia or other severe cognitive impairments --

25         A.   If they're in a facility, they're not

Page 352

1    included in those estimates --

2              (Reporter seeks clarification.)

3         A.    If they're in a facility, they're not

4    included in that population.  That's Group Quarters

5    population.  That's separately reported.

6         Q.    So you're saying that penitentiaries

7    aren't included in the ACS?

8         A.    Penitentiaries are not included in the

9    file used for this analysis because those data are

10   Group Quarters estimates.

11        Q.    Now, the existence of the travel burden

12   that you find is almost exclusively among those who

13   do not have access to a vehicle; does that sound

14   right?

15        A.    Yes.

16        Q.    Is there any reason to think that access

17   to a vehicle is tied to whether the person is likely

18   to vote?

19        A.    I know of no such reason.

20              But my analysis doesn't address other

21   things about the likelihood to vote other than

22   whether or not people are eligible to vote,

23   according to the best definition that I can find of

24   "eligibility."

25        Q.    Is there available data showing where

Page 353

1    registered voters in Georgia live?

2          A.    I have not attempted to locate data on

3    where registered voters live in Georgia, so I'm not

4    aware of that.

5          Q.    So you don't know whether it's possible to

6    receive that data and conduct a similar analysis on

7    registered voters?

8          A.    I'm not --

9          MR. POWERS:  Objection.

10         THE WITNESS:  I'm not aware of that, whether

11   it's possible or not.

12               It is my understanding that

13   registration -- voter registration data may not

14   contain the information I need to conduct this

15   analysis, such as auto ownership.

16               Or I should say access to an auto in the

17   household.

18         MR. FALK:  I seem to have lost my feed.

19               Can we take a very short break I hope.

20         THE VIDEOGRAPHER:  We are off the record at

21   11:39 a.m.

22               (Recess taken.)

23         THE VIDEOGRAPHER:  We are back on the record at

24   11:43 a.m.

25   BY MR. FALK:

Page 354

1     Q.   Do you have a preference for your

2    measuring CVAs rather than actual registered voters?

3          MR. POWERS:  Objection; outside the scope,

4    covered in the first deposition.

5          THE WITNESS:  Yeah, and I don't think I have

6    much to add about that beyond what I said in the

7    first deposition.

8    BY MR. FALK:

9     Q.   Well, I believe it's one of the reasons

10   you gave was that it's possible that people are

11   choosing not to register because of the burdens on

12   voting.

13          Is that a basis -- still a basis for

14   choosing CVAs as the dataset?

15          MR. POWERS:  Objection.  His methodology hasn't

16   changed.

17          THE WITNESS:  Registration -- the decision

18   whether to register is endogenous to the decision

19   whether to vote.

20          So in social science terms, it would be

21   problematic to use registration versus eligibility

22   to vote.

23   BY MR. FALK:

24    Q.   Now, you note in this report that you did

25   not conduct an analysis of travel burden to drop

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 355

1    boxes for Asian American and Pacific Islanders CVAs

2    for either report.

3                Why did you make that choice?

4        A.    I frankly don't recall.  In previous work,

5    I hadn't done that either.

6                But there is one of -- one of the parties,

7    as I understand it, to this suit is representing

8    Asian American groups.

9        Q.    Did you conduct any analysis of the

10   behavior of voters who find the use of drop boxes

11   too burdensome, that is, did you address whether

12   they would choose a different way to vote or decline

13   to vote at all?

14       MR. POWERS:  Objection to the form.

15       THE WITNESS:  No.

16   BY MR. FALK:

17       Q.    Now, many of your conclusions deal with

18   CVAs with disabilities.

19                In the first report, you said that that

20   was based on the ACS definition, which includes, I

21   think, among other things, difficulty with hearing,

22   vision, cognition, ambulation, self-care and

23   independent living.

24                Are you still using the ACS definition?

25       A.    Yes, otherwise known as the census

Page 356

1    definition, yes.

2         Q.    And these are also self-reported, correct?

3    There's no form of verification of any of the

4    answers given on that survey?

5         A.    The U.S. Bureau of the Census and the data

6    that it collects are considered to be the gold

7    standard of demographic data.

8              It is true that people are asked questions

9    and are answering those questions.

10        Q.    You know, with respect to cognitive

11   disabilities, does that include autism spectrum

12   disorder?

13        A.    To your point, the census asks a question

14   and people answer it based on their own

15   understanding of whether or not they have a

16   disability.

17             So one presumes that it would include

18   things like autism.

19        Q.    Okay.  So the question is not granular, is

20   that what you're telling me?

21        MR. POWERS:  Objection.

22        THE WITNESS:  In a nutshell, yes.

23   BY MR. FALK:

24        Q.    So then that category is -- is basically

25   as broader or as narrow as the survey respondents'

Page 357

1   answers may reflect?

2         MR. POWERS:  Objection to the form.

3         THE WITNESS:  I mean, this is -- we're talking

4   about the U.S. census.  It is considered to be among

5   the most, if not the most experienced collector of

6   data on demographics in the world.  And they're

7   doing their best to collect information of whether

8   people have a disability or not.

9   BY MR. FALK:

10        Q.   And in your first deposition -- I guess I

11  should give that to you.  I don't think we'll have a

12  lot more reference to it, but let's have this one

13  whatever the next in sequence is, but in case you

14  wanted to look at it, I'll give you a second and

15  make sure this reference is where I think it is.

16             (Deposition Exhibit 22 was marked.)

17  BY MR. FALK:

18        Q.   Looking at the carryover from 193 to 194,

19  you said at that time there were about 130 --

20        MR. POWERS:  Hold on.

21        MR. FALK:  193 to 194, the carryover answer.

22  BY MR. FALK:

23        Q.   At that time, you said, there were about

24  130,000 CVAs.

25        A.   What line are we at?

Page 358

1        Q.    It's the carryover.  It's the carryover

2    from 193 to 194.

3        A.    Okay.  So it's line 25 --

4        Q.    You have to start in the last couple of

5    words before, yeah, line 25 I guess it is to get to

6    line 1.

7              You said at that time there were about

8    130,000 CVAs with disabilities but without vehicle

9    access.

10       A.    Um-hum.

11       Q.    Do you know what that figure would be now

12   with the improvement in the vehicle access?

13       A.    No.  I would venture to say it's probably

14   about the same because of the increase in the

15   population.

16       Q.    And regarding cognitive disabilities,

17   would those persons reporting on the census survey

18   as disabled included people that might not have the

19   mental ability to vote?

20       MR. POWERS:  Objection as to form.

21       THE WITNESS:  Yes.  I think it's a pretty small

22   fraction, but yes.

23              Most of it is physical disability.  Most

24   of it is people who are older.

25   BY MR. FALK:

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 359

1          Q.   And that would include older people with

2     dementia or Alzheimer's?

3          MR. POWERS:  Objection as to form.

4          THE WITNESS:  It might, yeah.

5     BY MR. FALK:

6          Q.   Is there any data on -- is there any data

7     that tells how many or which registered voters have

8     disabilities?

9          A.   I'm not aware of any --

10          MR. POWERS:  Objection as to form.

11          THE WITNESS:  I'm not aware of any such data.

12     BY MR. FALK:

13          Q.   So you're unaware of any data that would

14     tell you where registered voters with disabilities

15     live?

16          MR. POWERS:  Objection; outside the scope of

17     his report.

18          THE WITNESS:  Yes.

19     BY MR. FALK:

20          Q.   Are you familiar with the accommodations

21     that Georgia provides people with disabilities in

22     order to assist them to vote?

23          MR. POWERS:  Objection; outside the scope of

24     this report.

25          THE WITNESS:  No.

Page 360

 1   BY MR. FALK:

 2        Q.   You're not aware?

 3        A.   No.

 4        Q.   Would the fact that people who need

 5   assistance returning a ballot can get assistance

 6   from family members and caretakers remove their need

 7   for a drop box?

 8        MR. POWERS:  Objection.

 9        THE WITNESS:  That's outside the scope of my

10   expertise.

11   BY MR. FALK:

12        Q.   Are you aware that the State has an

13   application for visually impaired to read their

14   ballots before casting them at a polling place?

15        MR. POWERS:  Standing objection to this line of

16   questioning.

17        THE WITNESS:  No.  Not surprised to hear that.

18   BY MR. FALK:

19        Q.   Wouldn't that affect the preferences of a

20   person visually impaired to take advantage of that

21   rather than use a drop box?

22        MR. POWERS:  Objection.

23        THE WITNESS:  I don't have anything to say

24   about that one.

25   BY MR. FALK:

Page 361

1      Q.   And I take it you would have nothing to

2   say about accommodations such as seated voting,

3   audio tactile and interface?

4      A.   I don't understand the -- what you're

5   trying to say or what point you're trying to make.

6      Q.   Well, the point I'm trying to make is what

7   preferences disabled voters might have with respect

8   to drop boxes and other modalities of voting.

9      MR. POWERS:  Objection.

10     THE WITNESS:  This analysis is about their

11  access to drop boxes.

12  BY MR. FALK:

13     Q.   So you have no -- is it correct that you

14  have no opinion as to how the various accommodations

15  might affect a voter's desire to use a drop box if

16  there is a travel burden to the drop box?

17     MR. POWERS:  Objection.

18     THE WITNESS:  It's not just that I have no

19  opinion, it's also that I'm not even sure what you

20  are trying to say or what you're trying to imply

21  their preferences might be in response to those

22  accommodations.

23  BY MR. FALK:

24     Q.   Well, you assume that voters want to use

25  drop boxes or nothing, right?  Isn't that the

Page 362

1    premise of your analysis?

2            MR. POWERS:  Objection.

3            THE WITNESS:  No.

4    BY MR. FALK:

5            Q.    And in paragraph 40 of your report, you --

6            A.    Sorry, which report?

7            Q.    I'm sorry, the supplemental report.

8                  You say there that about 37,000 fewer CVAs

9    without disabilities who would have a long trip to

10   access a drop box between 2020 and 2024 -- when you

11   say, "a long trip," what do you mean there?

12           A.    I was just referring to the definition of

13   "burden" used earlier.  So it's the 60-minute

14   round-trip.

15           Q.    Do you provide a raw number for the CVAs

16   with disabilities who would have a travel burden?

17           A.    I don't see that number here.

18                 Yeah, so I'm not providing that number

19   here.

20           Q.    Do you have any opinions regarding the

21   effects of travel burden to a drop box on voter

22   turnout in the 2024 election?

23           MR. POWERS:  Objection; outside the scope of

24   his analysis.

25           THE WITNESS:  So my only opinion about is that

Page 363

1    the farther away drop boxes are, the less likely it

2    is that people will use them.

3    BY MR. FALK:

4        Q.    Is that limited to the use of drop boxes

5    or do you have an opinion as to an affect on voter

6    turnout using any form of voting?

7        A.    I wouldn't --

8            (Reporter seeks clarification.)

9        MR. POWERS:  Objection as to form.

10       THE WITNESS:  I would venture to say that a

11   reduction in access to drop boxes decreases the

12   probability of people using the drop box.

13           Beyond that, voter turnout is a much more

14   complex factor than simply obviously people's access

15   to drop boxes.  Lots of other things come into play.

16   BY MR. FALK:

17       Q.    Since your last deposition in May 2023,

18   have you encountered any new information regarding

19   drop box distances in Georgia?

20       A.    The new information that we received is

21   the change in the number of drop boxes in the state.

22   So that is -- there's that.

23       MR. FALK:  I have another exhibit here if I can

24   dig it out.

25           Next in sequence.

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 364

1              (Deposition Exhibit 23 was marked.)

2    BY MR. FALK:

3         Q.   Exhibit 23 is an article by Michael

4    Greenberger and Jason Roberts from the Election Law

5    Journal, Volume 23, Number 1.  It's entitled

6    "Dropbox Allocation and Use Among Georgia Voters in

7    the 2020 Election."

8         MR. POWERS:  I'm going to object to the use of

9    this as not -- how is it relevant to Dr. Chatman's

10   supplemental report?

11        MR. FALK:  Well, we'll find out.  It may be

12   short.

13   BY MR. FALK:

14        Q.   Are you familiar with this article?

15        A.   No.

16        MR. FALK:  It was short.

17        MR. POWERS:  All right.  Great.

18        THE WITNESS:  Thanks for the article.

19   BY MR. FALK:

20        Q.   So as I understand your answer to the last

21   question before the article --

22        MR. POWERS:  What was the last question?  I

23   don't remember.

24              (Record read by reporter as follows:

25              "Question:  Is that limited to the use of

Page 365

1              drop boxes or do you have an opinion as to

2              an affect on voter turnout using any form

3              of voting?

4              "Answer:  I would venture to say that a

5              reduction in access to drop boxes

6              decreases the probability of people using

7              the drop box.

8              "Beyond that, voter turnout is a much more

9              complex factor than simply people's access

10             to drop boxes.  Lots of other things come

11             into play.")

12         THE WITNESS:  Boy, I sure use a lot of words.

13     BY MR. FALK:

14         Q.   So I take it from that answer that you

15     have not tried to estimate how many CVAs do not vote

16     at all because the burden of accessing a drop box is

17     too large.

18         MR. POWERS:  Objection.

19         THE WITNESS:  I did not try to estimate that.

20         MR. FALK:  Let's see which one this is.

21             We will get out of here by lunch.

22             Next in sequence -- wait a minute, sorry.

23     Hang on a second.  That's wrong.  That I think is

24     the wrong one.

25         THE WITNESS:  Can I go use the restroom real

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

Page 366

1    quick?

2         MR. FALK:  Absolutely.  Yeah, we'll pause.

3              I'll line these up, just two more

4    exhibits.

5         THE VIDEOGRAPHER:  We are off the record at

6    12:06 p.m.

7              (Recess taken.)

8         THE VIDEOGRAPHER:  We are back on the record at

9    12:09 p.m.

10             (Deposition Exhibit 24 was marked.)

11        MR. POWERS:  I think you need to introduce it.

12        MR. FALK:  Yeah, I'm going to.

13             This is Exhibit 24.  It's captioned

14   Supplemental Expert Response Report of Justin

15   Grimmer, Ph.D., and I would --

16   BY MR. FALK:

17        Q.   Are you familiar with this report,

18   Dr. Chatman?

19        A.   Yes, I did take a look at the portions of

20   it that addressed my report.

21        Q.   And looking at paragraph 44, Dr. Grimmer

22   says that you do -- last sentence, I'm sorry -- you

23   do not include any information about actual behavior

24   of Georgia voters.

25             Do you see that part?

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

Page 367

 1        A.    Yes.

 2        Q.    Is that correct with respect to the

 3   supplemental report?

 4        MR. POWERS:  Objection.

 5             You can answer.

 6        THE WITNESS:  Not to be too snarky about this,

 7   that's an irrelevant statement, but it is true.

 8   BY MR. FALK:

 9        Q.    And then looking at paragraph 45 -- I'll

10   give you a minute to review that.

11             (Witness reviews document.)

12        A.    I've read it.

13        Q.    Do you agree that the Postal Service's

14   record of timely delivery of absentee ballots could

15   affect the travel behavior?

16        MR. POWERS:  Objection as to form and outside

17   the scope.

18        THE WITNESS:  Lots of things could affect

19   travel behavior.

20             I doubt that people know those statistics

21   however.  So I wouldn't give them too much credit

22   for affecting people's travel behavior.

23   BY MR. FALK:

24        Q.    And then the next paragraph, paragraph

25   46 -- I'll give you a second to look at that.

Page 368

1           (Witness reviews document.)

2       A.    Yes.

3       Q.    Do you have any data apart from what you

4   identified in your initial report that supports the

5   proposition that voters usually use the drop box

6   closest to their home?

7       A.    My surrebuttal report, previous one of

8   2023, addresses this in more detail.

9       Q.    And that would cover anything you have to

10  say on that topic?

11      A.    Yes.

12      MR. POWERS:  Are we done with --

13      MR. FALK:  Yes, we're done with that one.

14           Why don't we mark this one.

15           (Deposition Exhibit 25 was marked.)

16  BY MR. FALK:

17      Q.    And directing you to the end of the

18  report, paragraphs 92, 93 and --

19      A.    I'm sorry --

20      Q.    I'm sorry, let me identify the report.

21           The latest exhibit is the Supplemental

22  Expert Report of Justin Grimmer, Ph.D., and I would

23  direct you to the paragraphs 92 and 93 and Table 19.

24      MR. POWERS:  Where is 19?

25      MR. FALK:  Should be between -- are we looking

Page 369

1    at the right one?  This is the -- not the expert

2    response report but the supplemental expert report.

3         MR. POWERS:  Oh, no, there's no page numbering

4    on this.

5         MR. FALK:  It's the very end.  It's right

6    before -- it's like two pages before the conclusion.

7    There's a little table there facing his signature?

8         MR. POWERS:  Okay.

9              Oh, okay.  Oh, it's on the next page.

10        MR. FALK:  Yeah, yeah, yeah.  It's on 92 and

11   93.  The table is in the middle.

12        MR. POWERS:  Okay.

13   BY MR. FALK:

14        Q.   Just review that a minute.

15        MR. POWERS:  What is this?

16        THE WITNESS:  I haven't seen this report

17   before.

18              (Witness reviews document.)

19   BY MR. FALK:

20        Q.   Well, take a minute just to look at this

21   part.

22        A.   And are you asking me to look at the table

23   or -- I'm sorry --

24        Q.   Yeah, look at the table, look at the

25   two -- the two paragraphs kind of bracketing the

Page 370

1    table address the table and then the two paragraphs

2    bracketing the table, 93 and 94, and the table and

3    then I'll have a question.

4           (Witness reviews document.)

5      A.    I'm not going to be able to only look at

6    those paragraphs because I don't know what the data

7    are, which must be in another paragraph.

8           So I'm not going to speak to this unless I

9    can understand where the data come from.

10     Q.    Yeah, I think if you start -- okay.  If

11   you start at paragraph 90.

12     MR. POWERS:  And I'm just going to object that

13   it's outside the scope of Dr. Chatman's supplemental

14   report.

15          (Witness reviews document.)

16     THE WITNESS:  Yes, I've read that material.

17   BY MR. FALK:

18     Q.    Okay.  So in that section and in the

19   table, Dr. Grimmer reports that self-reported drop

20   box use in 2024 was similar to that in 2020 and

21   higher than in 2022.

22          And is that consistent with your findings

23   on the changes in travel burden to drop boxes?

24     MR. POWERS:  Objection.

25          You can answer.

Page 371

1          THE WITNESS:  I've read over those paragraphs.

2    I've seen what he's reported as statistical

3    significance.  And I can say I don't think you can

4    conclude very much from this.

5               That's my initial assessment, but I would

6    need to spend more time with it.

7    BY MR. FALK:

8          Q.   Is the  . . . do the trends in that table

9    match or contradict the trends in travel burden?

10         MR. POWERS:  Objection.

11         THE WITNESS:  They neither match nor

12   contradict.  They are sufficiently insignificant to

13   not be able to make a substantial claim about them.

14              That is my initial take based on reading

15   those paragraphs and seeing that table.  And I don't

16   think that they tell us very much.

17   BY MR. FALK:

18         Q.   Are you aware that overall voter turnout

19   in Georgia increased in 2024 from prior elections?

20         MR. POWERS:  Objection.

21         THE WITNESS:  I am not aware of that.

22   BY MR. FALK:

23         Q.   If that were true, would it affect any of

24   your opinions in this case?

25         MR. POWERS:  Objection.

Page 372

1          THE WITNESS:  Simply that fact on its own, no.

2          MR. FALK:  All right.  I'm done.

3          MR. POWERS:  No further questions.

4          THE VIDEOGRAPHER:  Okay.  Remote counsel, any

5     questions for the witness?

6          MR. DRENNON:  No questions from me, Intervenor

7     defendants.

8          THE VIDEOGRAPHER:  Thank you.

9               This concludes today's deposition given by

10    Dr. Chatman.

11              Counsel, will there be transcript orders

12    from anyone?

13          MR. POWERS:  Yes.

14          THE VIDEOGRAPHER:  Let's start with everybody

15    in the room.

16              Remote counsel, please identify yourself

17    and state which transcript order you would like?

18          THE REPORTER:  Only if they want one.

19          THE VIDEOGRAPHER:  Only if you want one.

20              I'll take your silence as golden.

21              Okay.  We are off the record at 12:21 p.m.

22              (Whereupon, the proceedings were concluded

               at 12:21 p.m.)

23                        ---oOo---

24

25

Page 373

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12          Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript ( ) was (X) was not requested.

16          I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney of any party to this

19    action.

20          IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22    Dated:  August 21, 2025

23

24

25          ANRAE WIMBERLEY, CSR No. 7778

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

**[& - 22.4]**

Page 1

| **&** |
|---|
| **&** 268:14 |
| 269:10 270:2 |
| 271:20 277:1,3 |
| 277:15 |

| **0** |
|---|
| **0** 329:14 |
| **0.001** 344:14 |
| **0.1** 316:13 |
| 317:24 318:7 |
| **0.3** 327:23 |
| **0.4** 315:9 |
| **0.5** 316:2 318:8 |
| **0.6** 318:12 |
| **06** 325:10 |

| **1** |
|---|
| **1** 275:14 |
| 280:16,17,18 |
| 312:10 329:13 |
| 334:18 345:11 |
| 345:12,20 |
| 358:6 364:5 |
| **1.1** 322:16 |
| **100** 271:22 |
| 328:19 |
| **10004** 270:5,12 |
| **1001** 269:12 |
| **10:10** 312:10 |
| **10:18** 312:13 |
| **11** 301:7,13 |
| **11.5** 294:21 |

**11:09** 343:15
**11:23** 343:18
**11:39** 353:21
**11:43** 353:24
**12** 334:18
**120** 297:12
**1220** 269:6
**125** 270:11
**12:06** 366:6
**12:09** 366:9
**12:21** 268:17
372:21,22
**130** 357:19
**130,000** 357:24
358:8
**14** 273:19
**1400** 270:19
**16** 273:16
293:20
**16617** 373:24
**16th** 283:11
**17** 293:20
331:20
**18** 280:19
310:17 318:21
**18th** 270:11
**19** 273:9
280:17,18,18
280:20 368:23
368:24
**193** 357:18,21
358:2
**194** 357:18,21
358:2

| **1:21** 267:7 |
|---|
| 268:7 275:19 |

| **2** |
|---|
| **2** 310:17,18 |
| 318:20 319:21 |
| 322:6 328:8 |
| 343:15 |
| **2.2** 311:10 |
| **20** 273:11 |
| 284:11,12,15 |
| **200** 272:4 |
| **20001** 269:20 |
| **20004** 269:13 |
| **20005** 269:7 |
| **2015** 347:15 |
| **202** 267:6 |
| 268:6 269:14 |
| 269:21 275:16 |
| 288:1 333:21 |
| **2020** 273:18 |
| 293:25 315:5 |
| 316:12 317:1,5 |
| 325:10,21 |
| 326:3 362:10 |
| 364:7 370:20 |
| **2022** 310:4 |
| 311:2,17 315:5 |
| 316:3 327:17 |
| 327:21,24 |
| 328:4,23,25 |
| 370:21 |
| **2023** 273:16 |
| 281:14 282:7 |

283:11 320:3
363:17 368:8
**2024** 285:3,20
287:1,13
289:10 294:2
307:23 309:19
310:4,8 311:2
311:9,16
312:17,24
313:6 316:3,12
317:3,5 318:15
321:2 324:25
325:10,21
326:3 327:17
327:21,24
328:4,13,15,23
329:1 334:3
362:10,22
370:20 371:19
**2025** 267:15
268:17 275:1,6
373:22
**21** 273:13
294:19 295:1
314:10,14
330:7 373:22
**212** 270:13
**214-3499** 272:6
**22** 273:14
309:23 310:8
324:24 327:7
357:16
**22.4** 295:1

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[23 - 92]

Page 2

**23** 273:17
364:1,3,5
**238-0633** 269:8
**24** 273:20
366:10,13
**25** 273:12,22
358:3,5 368:15
**250** 269:19
**26** 343:25
**26.4** 294:1
**267** 267:13,24
**27** 318:21
321:10 324:16
**278** 273:3
**28** 320:15,20,21
**280** 273:9
**284** 273:11

**3**

**3** 294:22
309:23 310:7
313:18 314:17
315:3 323:16
324:24 327:7
328:25 344:24
345:1,2
**3.2** 317:5
**30326** 271:5
**30339-5948**
271:23
**310,000** 321:3
**31210** 271:14
**314** 273:13

**320,000** 321:9
**3231** 279:4
**330,000** 321:1
**336-7249** 271:6
**34** 273:21
**343** 273:16
**357** 273:14
**36** 314:18
**3630** 271:4
**364** 273:17
**366** 273:20
**368** 273:22
**37** 285:25
**37,000** 326:1
362:8
**373** 267:13,24
**39** 311:10
**3:00** 333:1

**4**

**4** 273:10 317:1
320:13,14,16
320:17,18,19
320:23
**4.1** 317:3
**4.3** 318:16
321:14
**4.6** 320:4,18,23
320:25
**4.7** 317:4
**40** 325:25
362:5
**41** 273:13

**415** 269:8
270:21
**44** 366:21
**45** 367:9
**46** 367:25
**49.1** 294:2

**5**

**500** 272:4
284:9
**501** 272:6
**54** 297:10
301:11 302:1
**5400** 271:13
**549-2500**
270:13
**550** 271:4
**55555** 267:7
268:7 275:19
**562-4942**
270:21
**57** 343:20,25

**6**

**6** 267:15
268:17 275:1
325:12,13
**60** 290:13,17,18
292:14 301:14
302:2 362:13
**624-2810**
269:14
**633** 268:14
275:21

**678** 271:6
**6th** 275:6

**7**

**7** 327:17
328:11,12,14
328:19
**7.3** 327:17
**72** 304:24
**72201** 272:5
**75** 286:4
**7503446** 267:22
**76** 273:23
**770** 271:24
**7778** 267:21
268:19 278:13
373:25

**8**

**8** 324:17,19
**8.38** 294:21
**80** 286:4
**818-0000**
271:24
**850** 269:6

**9**

**9.5** 325:1
**90** 290:13,21,22
297:12 370:11
**90.5** 325:5
**92** 324:21
368:18,23
369:10

[93 - aggregating]

**93** 328:14,19
368:18,23
369:11 370:2
**94** 370:2
**94111** 268:15
270:20 275:21
**95.7** 318:25
319:2
**968-4592**
269:21
**98th** 294:25
**9:00** 331:24
**9:15** 268:16
275:3,6

**a**

**a.m.** 268:16
275:3,6 312:10
312:13 331:24
343:15,18
353:21,24
**ability** 307:9
358:19
**able** 279:22
283:21 310:13
331:6 343:7,10
370:5 371:13
**absentee** 308:1
309:12 367:14
**absolutely**
333:18 366:2
**academic** 286:7
**acceptable**
280:1

**accepted** 344:5
**access** 289:2,5
304:25 306:11
306:13 309:25
310:3,20,24
312:19 318:17
318:25 319:19
320:4 321:18
322:7,16,18,19
322:21 323:9
323:11,13
324:8,18,22
326:2 327:16
328:10,12,13
328:15 330:25
333:20 334:3
338:11 340:24
352:13,16
353:16 358:9
358:12 361:11
362:10 363:11
363:14 365:5,9
**accessibility**
288:2,3 304:17
324:10 340:8
**accessing**
365:16
**accommodati...**
359:20 361:2
361:14,22
**accomplished**
280:15
**accords** 288:14

**account** 339:22
341:3
**aclu** 283:23
**acs** 305:11
322:9 347:15
347:17,24
352:7 355:20
355:24
**act** 283:19
**action** 275:24
373:17,19
**actual** 337:14
354:2 366:23
**actually** 281:16
293:15,16,19
311:21 315:23
332:6 337:3
348:13
**adapt** 338:16
**add** 280:18
291:21 313:12
314:4 316:22
337:21 338:25
339:25 346:3
354:6
**adding** 303:23
**addition**
288:10
**additional**
282:5,21
290:24 306:21
330:7
**address** 279:3
308:6 325:16

325:18 328:3
337:24 338:3
352:20 355:11
370:1
**addressed**
340:2 341:23
342:1 366:20
**addresses**
313:20,21
368:8
**administered**
373:7
**advancement**
269:4 276:10
**advantage**
360:20
**affect** 289:11
306:22 360:19
361:15 363:5
365:2 367:15
367:18 371:23
**affected** 295:17
**affecting**
367:22
**affects** 296:15
**african** 288:6
**afternoon**
277:23 278:1
**age** 291:13
317:9,10
321:25 322:12
322:12 350:10
**aggregating**
344:5

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[ago - assessment]**

Page 4

**ago** 306:1
**agree** 275:12
  367:13
**ahead** 314:2
  344:17
**allocation**
  273:18 364:6
**alzheimer's**
  359:2
**ambulation**
  355:22
**ame** 270:8
  277:13 278:7
**amended** 273:9
**american** 270:9
  277:12 288:6
  304:23 355:1,8
**amount** 290:3,5
  293:15 299:13
  301:15 302:5
  321:14
**amusement**
  298:11
**analysis** 287:17
  288:21 291:8,9
  291:12 300:21
  306:18 307:3
  307:18,23,23
  308:15 310:11
  311:23 313:5,7
  314:4 330:14
  330:18 331:9
  337:5 338:11
  338:18 348:11

351:13 352:9
352:20 353:6
353:15 354:25
355:9 361:10
362:1,24
**analyze** 330:25
337:25 338:1,5
341:15,16,19
**anrae** 267:21
268:18 278:13
373:25
**answer** 274:7
279:22 280:12
280:13 286:22
288:24 289:23
292:9,18
295:25 296:24
297:16 304:5
305:15,17,18
306:8 307:12
307:21 308:3
312:3,15
315:18 319:7
321:22 322:24
328:20 329:4
330:23 335:21
337:18 341:7
341:18 345:7
345:25 356:14
357:21 364:20
365:4,14 367:5
370:25
**answered**
289:22 307:20

308:10 317:20
330:22 341:6,9
345:5
**answering**
317:14 356:9
**answers** 305:5
306:2 356:4
357:1
**anybody**
286:17
**anyway** 300:9
326:19
**apart** 368:3
**apis** 286:3
**appear** 276:20
**appearance**
276:2
**appearances**
269:1 276:4
**application**
360:13
**appropriate**
290:25
**approximately**
285:23 320:3
**april** 285:2,3
**archived**
347:11
**area** 293:8
**areas** 304:24
335:2 336:22
336:23
**argument**
303:10

**arkansas** 272:5
**arrange** 303:16
**arrested** 283:7
**article** 273:17
364:3,14,18,21
**articles** 282:6,9
286:7
**asian** 355:1,8
**asked** 289:22
290:15 305:4
307:20 308:11
319:8 329:25
330:21 341:6
347:21 348:21
356:8
**asking** 288:11
291:11 292:2,3
292:5,10,13
294:7 297:21
301:24,25
303:2 305:3
312:4 313:16
315:16 317:13
317:14 323:10
323:14 326:18
326:20 328:6
328:18 335:8
345:2 348:18
369:22
**asks** 356:13
**aspects** 313:2
**assessment**
371:5

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[assist - believe]**

Page 5

**assist** 359:22
**assistance**
    360:5,5
**assistant**
    272:10 278:8
**assistants**
    286:2
**assume** 279:21
    319:8,10
    333:23 350:5
    361:24
**assumed** 319:3
    319:9 348:12
**assumption**
    350:24
**assumptions**
    300:15
**atlanta** 267:3
    268:3 271:5,23
    275:18 277:18
**attempt** 332:4
**attempted**
    353:2
**attorney** 276:5
    373:18
**attorneys**
    285:19
**audio** 275:11
    361:3
**august** 267:15
    268:17 275:1,6
    373:22
**autism** 356:11
    356:18

**auto** 294:20
    310:10,12
    315:22 316:5,7
    316:11 319:18
    323:24 324:1
    324:12,18
    328:9,9 353:15
    353:16
**automobile**
    305:1 321:18
**automobiles**
    323:9,11
**available**
    295:20 300:23
    309:25 347:12
    352:25
**ave** 269:19
**avenue** 269:12
    272:4
**average** 290:4
    291:19,23,25
    292:7,11,15,20
    293:10 296:9
    296:10,16,19
    297:9,10
    301:15,25
    302:2,4,5
    304:25 323:12
    333:19 334:2,7
    334:13,22
    335:16,17
    336:20
**averages** 293:4
    301:10 336:1,6

**averaging**
    303:21
**avoid** 312:3
**aware** 296:4
    299:5,10,13
    307:25 309:10
    309:13,15
    337:2,6 351:4
    353:4,10 359:9
    359:11 360:2
    360:12 371:18
    371:21

**b**

**b** 273:7
**back** 281:5
    302:13 310:17
    312:12 315:23
    320:5 324:24
    326:7,13 330:3
    343:17 347:1
    353:23 366:8
**ballot** 301:20
    309:8 327:20
    328:13 330:16
    333:20 334:3,8
    360:5
**ballots** 332:6
    339:11 340:5
    360:14 367:14
**ballpark** 286:5
**based** 290:2
    293:8 306:5
    312:15 313:9

    340:21 345:9
    355:20 356:14
    371:14
**basically** 295:6
    356:24
**basis** 286:14
    354:13,13
**battery** 268:14
    270:4 275:21
**baxter** 272:3
    276:17
**bdrennon**
    272:7
**bear** 282:17,18
**becoming**
    295:9,9
**beginning**
    268:16 276:5
**begun** 282:22
**behalf** 269:3,16
    270:1,8,15
    271:10,17
    272:1 278:6
**behavior**
    282:10 292:23
    299:18,23
    304:8 340:10
    355:10 366:23
    367:15,19,22
**behaviorally**
    298:22
**believe** 283:19
    285:2 287:11
    293:2 305:8

**[believe - burden]**                                                          Page 6

309:21 314:8
318:19 319:22
320:19 325:22
327:19 328:5
329:25 331:18
335:22 339:17
341:8 348:9,23
349:5 350:18
350:21,22
354:9
**berkeley** 279:5
**best** 332:2
352:23 357:7
**better** 290:17
290:20 311:14
326:21 332:25
344:15
**beyond** 304:9
304:10 354:6
363:13 365:8
**bibb** 271:10
277:9
**big** 298:15
303:23
**bill** 267:6 268:6
275:16
**binding** 279:14
**bit** 310:4
315:25 342:22
**black** 269:3
276:11 277:17
310:22 311:2,7
311:9 312:17
317:9 318:9

322:11,14
324:17 327:12
327:15,24
334:23 335:17
336:9,16 337:2
337:8
**blacks** 328:12
**block** 293:23
309:7 339:19
339:20 344:6
347:15,18
**board** 271:17
271:18,19
276:8 277:4,5
277:6
**booth** 272:2
276:17
**boston** 282:12
**bound** 294:8
**box** 287:17,25
293:25 294:5
297:6 301:21
303:13 307:23
308:14 309:1
310:6 317:2
319:19 325:2
326:3 327:16
328:13,15
330:16 337:14
338:8,19,21
339:5,16,21,22
340:12,14
360:7,21
361:15,16

362:10,21
363:12,19
365:7,16 368:5
370:20
**boxes** 285:20
288:2 292:1
300:22,25
301:1 307:1
308:20 309:8
309:25 310:1,9
311:16 312:19
312:24 313:9
315:10,15
323:13,17
324:3,9 327:20
330:4,5,20
333:20 334:3,8
335:11 336:16
337:3,8 339:10
340:3,8 341:5
342:7,14
347:23 355:1
355:10 361:8
361:11,25
363:1,4,11,15
363:21 365:1,5
365:10 370:23
**boy** 365:12
**bracketing**
369:25 370:2
**brad** 276:7
**break** 280:11
280:13 312:7
343:8,11

353:19
**breakdown**
334:21
**brian** 270:10
277:10
**brief** 289:7
**briefly** 289:20
**bring** 287:10
332:9 342:16
343:10 349:9
**broad** 270:11
**broader** 356:25
**bryan** 271:2
277:23
**btyson** 271:7
**burden** 288:4
289:16,21
290:2,17,19
291:5,15 293:4
293:14,15
295:4 296:19
301:3 306:11
306:13 308:18
308:19 309:18
311:2,11,25
312:19 313:13
315:5,14 317:4
319:5,9,25
323:12,18,22
325:2,6 327:9
327:16 328:11
328:13,15
335:18 336:10
340:1 341:5

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[burden - chatman]**

Page 7

352:11 354:25
361:16 362:13
362:16,21
365:16 370:23
371:9
**burdened**
289:4 326:4
**burdens** 308:13
308:25 309:1
313:22 319:13
322:20 323:1,1
323:6,7 325:20
327:24 338:7
354:11
**burdensome**
290:6,24
292:25 293:16
295:6 355:11
**bureau** 356:5
**buying** 298:14

**c**

**c** 277:11,15
347:17
**caique** 272:13
275:22
**calculate**
291:23 333:19
334:1,2 346:20
**calculated**
321:2,9 335:10
**calculation**
346:11

**calculations**
345:9
**california**
267:14 268:15
270:20 275:2
275:21 279:5
282:15 373:2
**called** 283:19
**calling** 303:7
**camera** 276:20
**capable** 351:9
**captioned**
284:16 366:13
**car** 298:14,14
310:3 318:17
319:1,4,24
320:4 322:21
343:4,5 345:23
**care** 355:22
**caretakers**
360:6
**carried** 305:16
**carry** 295:10
**carryover**
357:18,21
358:1,1
**cars** 319:14
339:4
**case** 267:6
268:6 275:18
282:8,23,24
283:11 284:8
284:24 286:25
287:6 289:12

290:14 291:3
291:19 323:17
336:12 341:12
357:13 371:24
373:14
**cases** 290:11
**casey** 271:21
277:3
**casey.torres**
271:25
**casting** 360:14
**categories**
324:14
**category**
351:22 356:24
**census** 344:6
347:14 355:25
356:5,13 357:4
358:17
**center** 270:19
272:11 278:6
**central** 288:20
342:8,15
**centroid**
309:11 339:17
339:19,20
**centroids** 309:7
**certain** 298:17
331:10
**certainly** 292:4
303:14 351:12
**certified**
268:18 278:16
373:1

**certify** 373:3,16
**cetera** 287:18
**chain** 343:7
**chaining** 342:4
342:20,21
**chance** 332:2
**change** 294:19
294:24 307:17
309:18 310:7,8
311:25 313:8
315:22 316:5
316:10,12
317:16,24
324:12,13
341:13,23
345:6 349:7
363:21
**changed** 290:1
290:13 293:21
346:14 354:16
**changes** 292:11
293:3,9 294:8
295:5 306:25
322:13 324:7
324:13 328:24
328:25 348:10
370:23
**characterized**
350:7
**chatham**
271:18,19
277:5,6
**chatman**
267:12 268:13

273:10,11,13
273:15 275:15
278:15,21
279:2 280:24
284:20 312:16
343:21 366:18
372:10
**chatman's**
300:2,5 364:9
370:13
**check** 312:3
**choice** 292:16
350:2 355:3
**choose** 296:19
331:25 355:12
**choosing**
340:11 354:11
354:14
**chose** 292:5
331:14,17
332:5
**citations**
286:13
**cite** 286:7
**citizens** 291:13
317:9,10
321:25 322:11
322:12 350:10
**citizenship**
283:20
**city** 282:2
**civil** 270:9
277:12

**claim** 332:25
371:13
**clarification**
321:17 327:13
334:10 347:16
352:2 363:8
**clarify** 279:20
292:2 313:15
**clark** 271:1
277:21,24
**clarkhill.com**
271:7,8
**classes** 282:21
**clayton** 271:17
277:4
**clear** 279:24
292:24 297:8
303:11
**clearer** 294:18
**clearly** 317:10
**clergy** 269:3
276:11 277:17
**cliff** 277:14
**clifford** 269:11
**close** 321:20
**closer** 336:16
**closest** 339:4
368:6
**code** 330:10
347:1,11,23
**cognition**
355:22
**cognitive**
351:24 356:10

358:16
**collect** 330:15
357:7
**collector** 357:5
**collects** 356:6
**college** 282:3
**combination**
324:8
**come** 304:2
345:12 363:15
365:10 370:9
**comes** 321:14
**coming** 312:2
**common**
302:22
**community**
304:23
**compared**
311:2
**comparing**
308:24
**comparison**
288:5,7 311:5
311:6
**compensated**
284:7,9
**compilation**
286:2
**complete** 285:7
**completion**
373:14
**complex**
363:14 365:9

**concentrated**
336:22,23
**concerned**
269:3 276:11
277:17
**conclude**
324:25 371:4
**concluded**
372:22
**concludes**
289:1 372:9
**conclusion**
301:18 369:6
**conclusions**
287:12 288:9
288:12,15
355:17
**condition** 280:8
298:9
**conduct** 307:18
307:22 308:15
310:11 353:6
353:14 354:25
355:9
**conducted**
291:9
**confidence**
329:11 344:5,9
346:20
**confirm** 300:18
308:21 312:16
320:5,20
328:22 330:13
340:2

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 116 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[confirming - cvas]

Page 9

**confirming**
300:13
**confusion**
314:20
**congratulations**
281:24
**consequential**
295:3
**consider**
288:20 291:15
**considered**
339:9 356:6
357:4
**consistent**
299:18,24
320:19 370:22
**contain** 353:14
**continue**
275:11 349:24
**contradict**
371:9,12
**contribute**
332:22
**control** 336:23
**convenience**
291:14
**conveniently**
342:22
**conversation**
279:9 307:15
**conversations**
275:9
**convicted**
283:7

**correct** 281:22
284:5 295:23
296:16 297:24
300:25 301:6
305:1,10
306:24 307:2
308:20,22
313:13,22
315:6,12 316:6
316:13,14
318:15 319:5
322:9,19
323:15 324:22
325:3,6 327:6
328:16 329:2
331:10 332:20
334:6,15,17
338:19 345:10
346:6 348:4,14
349:25 351:2
351:16 356:2
361:13 367:2
**correctly** 286:1
301:17 309:6
327:14,19
329:4,7
**correlate** 332:4
**correlating**
295:12
**correlation**
309:10,16
**correspondin...**
299:21

**costa** 272:13
275:22
**costco** 303:18
**costs** 299:14,15
**counsel** 276:3
276:24 278:4
281:5 286:17
372:4,11,16
**counties** 338:6
340:11
**county** 271:10
271:17,18,19
277:4,5,6,9
306:13 307:4
307:10 337:7
337:15 338:2
339:23 340:13
344:7
**couple** 279:17
281:17 300:18
358:4
**course** 304:3
310:15
**court** 267:1
268:1 275:17
278:10 279:24
**courtroom**
279:14
**cover** 283:1,3
368:9
**covered** 354:4
**covid** 282:10
**created** 288:1

**credit** 367:21
**crime** 283:8
**criminal** 351:6
**criteria** 340:13
**critical** 298:25
299:1
**cross** 321:16
**crowell** 269:10
277:15
**csr** 267:21
278:13 373:25
**curious** 292:15
303:25
**current** 286:9
348:19,19
349:9
**cv** 281:13
**cva** 299:12
**cva's** 308:6
**cvas** 291:14
310:21,22,22
311:2,3,7,7,9
311:13 312:17
312:18,22
313:13,22
314:4 315:4,14
316:8,10,13,20
316:25 317:4
317:17,19
318:9,13,16
320:4,25 322:7
322:14,14
323:3,8,19,20
323:20 324:17

325:1,11,20
326:1,4 327:12
327:15,24
328:12 333:20
334:3,23,24,24
335:17,18
336:9,10,16,17
337:3,8 338:7
338:22 345:15
348:3,12 349:4
349:12,22
350:15 351:2
351:20 354:2
354:14 355:1
355:18 357:24
358:8 362:8,15
365:15

**d**

**d** 272:3 273:1
277:8,11
**d.c.** 269:7,13
**daniel** 267:12
268:13 273:9
273:11,13,15
275:15 278:15
279:2 284:20
**data** 286:2
290:23 291:12
292:7,14,19,20
292:22,22,23
293:12 294:16
295:12,19
299:3,6,10

304:23 305:10
305:11,12,20
308:16,17,18
310:10 321:2
322:9 329:23
330:1,1,3,15
334:14,15,16
335:2,4,6,10,10
335:10 336:15
337:25 338:1,2
345:11 347:2,9
347:12,13,14
347:19,20,25
350:24 352:9
352:25 353:2,6
353:13 356:5,7
357:6 359:6,6
359:11,13
368:3 370:6,9
**dataset** 347:5
354:14
**datasets** 347:4
**date** 373:20
**dated** 373:22
**day** 290:24
294:12 296:5
302:1,10 303:9
303:12,17,22
304:11,13
331:10,22,25
332:1,5,5
**days** 295:22
296:2,14,20

**dc** 269:20
**dds** 287:18
289:3 306:13
307:3 312:25
**deal** 303:24
313:9 332:22
355:17
**deciding**
296:18
**decision** 295:14
297:4 354:17
354:18
**decline** 355:12
**declined**
310:25
**decrease**
318:12 327:8
327:11,15
341:5
**decreased**
325:21 327:20
**decreases**
328:23 363:11
365:6
**defendants**
270:15 271:10
272:1 276:9,18
277:9,20,22,25
278:24 372:7
**define** 302:13
**defined** 302:17
323:6
**definition**
290:2,19,20

352:23 355:20
355:24 356:1
362:12
**degree** 306:5
**delivery** 367:14
**demand** 338:12
**demartin**
272:10 278:5,5
**dementia**
351:24 359:2
**demographic**
356:7
**demographics**
357:6
**demonstrates**
304:18
**density** 299:7
**department**
282:2
**depend** 305:18
**depending**
343:11
**depends** 305:17
338:18
**deponent**
278:11
**deposed** 283:10
300:10,12
**deposition**
267:12 268:12
273:9,14 275:7
275:15,20
280:20,24
281:2,11 282:6

283:5,8,11
284:12 289:25
290:9,12,16
293:3 300:4
305:25 306:1,9
307:15 314:14
315:19 337:20
337:20 339:1
341:24 342:4
346:2 348:2,22
348:24 350:4,8
350:12,23
354:4,7 357:10
357:16 363:17
364:1 366:10
368:15 372:9
373:13
**described**
344:25 345:8
**description**
273:8
**design** 282:4
346:12
**desire** 361:15
**despite** 310:8
323:23 326:10
**destinations**
331:4,6
**detail** 368:8
**detect** 346:12
**determine**
346:11
**determining**
345:3

**dfalk** 270:22
**diane** 271:3
277:21
**difference**
294:23 311:15
317:6,8,11,18
333:10
**differences**
287:15 306:6
316:15 322:10
328:1 329:12
346:11 351:1,4
**different** 291:4
292:23 314:20
319:12 324:9
347:3 350:15
351:22 355:12
**differential**
316:24 329:19
**differently**
351:11
**difficult** 294:11
294:12 295:9
304:9,11,13
324:6
**difficulty**
355:21
**dig** 363:24
**dimmick**
270:10 277:10
277:10,11
**direct** 368:23
**directing**
343:20 345:1

368:17
**direction**
373:10
**directly** 282:19
**disabilities**
311:3 312:18
317:12 322:13
325:1,11,20
326:2,4,12
334:25 355:18
356:11 358:8
358:16 359:8
359:14,21
362:9,16
**disability**
310:22 318:13
322:15 323:21
356:16 357:8
358:23
**disabled** 288:4
358:18 361:7
**discretionary**
290:3 296:9,11
296:12,15,21
297:2,14
299:12 301:10
301:15,21,23
302:1,5,10,11
302:12,14,19
302:23 303:7
303:19,22
304:2 342:17
**discussed** 290:8
290:12 307:6

325:8 334:15
**discussion**
280:21 284:13
**disorder**
356:12
**disparity** 289:2
**distance** 295:16
308:7 337:1
**distances**
363:19
**distinguishable**
329:13
**distinguished**
295:5
**distributed**
351:11
**distribution**
291:20 324:7
324:13 350:14
350:16
**district** 267:1,2
268:1,2 275:17
275:17
**division** 267:3
268:3 275:18
**dlaross** 271:8
**doable** 294:9
**doctor** 298:7
303:8,18
**document**
274:4 280:25
284:15 367:11
368:1 369:18
370:4,15

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[documents - entire]**

Page 12

**documents**
281:3
**doing** 311:23
357:7
**donald** 270:17
276:6 278:23
**double** 301:14
301:19
**doubled** 302:5
**doubles** 302:4
**doubling** 290:5
**doubt** 296:14
367:20
**douglas** 337:14
338:2
**downloaded**
347:20
**dr** 273:11,13
278:21 280:24
284:20 300:2,5
312:16 343:21
364:9 366:18
366:21 370:13
370:19 372:10
**drennon** 272:3
276:16,17
372:6
**drive** 271:13
297:4 310:3
**driving** 310:15
310:15
**drop** 285:20
287:16,25
288:2 292:1

293:25 294:5
297:5 300:22
300:25 301:1
301:21 303:13
306:25 307:23
308:14,20
309:1,8,25,25
310:6,9 311:16
312:19,23
313:9 315:10
315:15 317:2
319:19 323:13
323:17 324:3,9
325:2 326:3
327:16,20,23
328:13,15
330:4,5,16,20
332:6 333:20
334:3,8 335:11
336:16 337:3,8
337:14 338:7
338:19,21
339:5,10,16,21
339:22 340:3,8
340:12,14
341:5 342:7,14
347:23 354:25
355:10 360:7
360:21 361:8
361:11,15,16
361:25 362:10
362:21 363:1,4
363:11,12,15
363:19,21

365:1,5,7,10,16
368:5 370:19
370:23
**dropbox**
273:17 364:6
**dropped**
321:19
**due** 351:6,7
**duration**
342:25 343:6

**e**

**e** 273:1,7
277:15 279:4
**e.g.** 344:7
**earlier** 288:20
308:17 362:13
**early** 287:17
289:2 300:24
306:16 308:14
308:15,25
312:19,25
**effect** 330:25
339:8 351:13
**effects** 362:21
**either** 334:22
355:2,5
**election** 273:17
273:19 276:8
285:20 287:1
287:13 289:11
295:21 309:19
311:9 312:17
312:21,24

318:15 362:22
364:4,7
**elections**
271:17,19
277:5,6 371:19
**elias** 269:17
278:2
**elias.law**
269:22
**eligibility**
352:24 354:21
**eligible** 351:2,5
351:7 352:22
████ 279:4
**embarcadero**
270:19
**emphasizes**
329:19
**employ** 286:1
**employee**
373:18
**encountered**
363:18
**ended** 322:4
349:20
**endogenous**
354:18
**engage** 303:12
**ensure** 347:5
**ensuring**
344:22
**enter** 280:16
**entire** 323:8

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[entities - falk]

Page 13

entities 283:23
entitled 273:17
  364:5
entry 314:15
environmental
  282:4
equals 328:19
equivalent
  314:24
error 306:4
  346:5
esq 269:5,11,18
  270:3,10,17,18
  271:2,3,12,21
  272:3
essentially
  340:21
established
  299:22
estimate
  365:15,19
estimates 344:8
  346:6 347:18
  352:1,10
estimating
  345:22
et 287:18
everybody
  372:14
evidence
  291:19 304:7
  337:2,6,7,14
  339:3,7,9
  342:7

evolved 290:16
exacerbated
  288:3
exact 274:3
exactly 281:18
  296:9 305:7
examination
  273:2 278:18
examine
  295:12 306:18
examined
  334:23
example
  291:16 293:16
  298:14
examples
  298:12,17
exceeding
  301:14 311:12
  317:1 319:18
except 281:1
  330:4 335:11
exclude 291:7
  329:6
exclusion 329:9
exclusively
  352:12
exhibit 273:8,9
  273:11,13,14
  273:17,20,22
  280:16,20
  284:11,12,15
  314:14,16
  357:16 363:23

364:1,3 366:10
  366:13 368:15
  368:21
exhibits 274:1
  366:4
existence
  352:11
expect 295:8
  313:8 318:8
  340:22 351:10
expected 284:1
  284:2 342:8
experienced
  357:5
expert 273:11
  273:13,20,22
  283:13 284:4
  284:19 296:1
  314:12 340:11
  366:14 368:22
  369:1,2
expertise
  360:10
experts 286:17
  347:24
explain 289:20
explains 346:18
exponentially
  292:25
extent 288:6,9
  294:10 298:23
  304:18 316:23
  340:23

extraordinary
  343:1

f

face 325:5
faced 311:1
  325:1
facility 351:23
  351:25 352:3
facing 327:16
  328:11,12
  369:7
fact 293:6
  299:22 303:21
  310:18 323:23
  326:10 328:9
  333:1 336:21
  346:15 360:4
  372:1
factor 363:14
  365:9
factual 326:24
fair 282:20
  283:19 315:1
  330:18,24
fairly 317:6
falk 270:17
  273:3 276:6,6
  278:19,23
  280:18,22
  281:8 284:14
  289:9 290:10
  292:12 295:11
  296:3 297:7,19

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

**[falk - four]**                                                         Page 14

| | | | |
|---|---|---|---|
| 300:7,12,17,19 | 364:11,13,16 | **final**  309:21 | **fmglaw.com** |
| 304:21 307:13 | 364:19 365:13 | **financially** | 271:25 |
| 307:16,24 | 365:20 366:2 | 275:24 373:17 | **focused**  311:23 |
| 308:5 309:17 | 366:12,16 | **find**  287:24 | 315:18,19 |
| 312:1,8,14 | 367:8,23 | 293:18 304:9 | 332:15 336:25 |
| 314:9,12,22 | 368:13,16,25 | 320:10,11 | **focuses**  330:19 |
| 318:19,23 | 369:5,10,13,19 | 325:22 328:6 | **following** |
| 319:11 320:24 | 370:17 371:7 | 332:24 334:20 | 340:19 |
| 322:5 323:2,5 | 371:17,22 | 350:9 352:12 | **follows**  278:17 |
| 326:18 327:1 | 372:2 | 352:23 355:10 | 364:24 |
| 328:21 330:12 | **familiar**  359:20 | 364:11 | **forced**  298:5 |
| 331:8 333:8 | 364:14 366:17 | **finding**  289:8 | **foregoing** |
| 336:3,14 | **family**  338:14 | 327:4 | 373:4,6,10,12 |
| 337:12,23 | 360:6 | **findings**  287:12 | **form**  288:23 |
| 339:2,15 340:9 | **far**  297:4,5,5 | 287:22 288:9 | 292:8 296:23 |
| 341:2,14 342:2 | 303:18 340:15 | 289:10 370:22 | 297:15 301:21 |
| 342:12 343:9 | **farther**  299:19 | **fine**  312:8 | 304:4 309:14 |
| 343:19 344:12 | 304:19 363:1 | 343:9,9 | 319:6 321:21 |
| 344:18 345:21 | **federal**  373:13 | **finish**  286:21 | 322:23 326:15 |
| 346:4,9,19,25 | **feed**  312:1,2 | 286:22 341:17 | 328:17 330:21 |
| 348:1,7,17 | 353:18 | **firm**  271:11 | 335:19 355:14 |
| 349:1,12,15,19 | **felons**  351:16 | 277:8,15,24 | 356:3 357:2 |
| 350:20 351:14 | **felony**  351:15 | **first**  285:1 | 358:20 359:3 |
| 351:19 353:18 | **fewer**  311:16 | 290:16 314:3 | 359:10 363:6,9 |
| 353:25 354:8 | 322:20 323:7 | 317:21 341:24 | 365:2 367:16 |
| 354:23 355:16 | 326:1 362:8 | 342:4 348:2 | **forth**  279:25 |
| 356:23 357:9 | **figure**  328:14 | 354:4,7 355:19 | 286:24 287:5 |
| 357:17,21,22 | 358:11 | 357:10 | 373:5 |
| 358:25 359:5 | **figures**  344:13 | **fit**  294:11 304:8 | **fortuitous** |
| 359:12,19 | 344:23 | 304:9 | 343:2 |
| 360:1,11,18,25 | **file**  352:9 | **five**  347:15,17 | **found**  291:4 |
| 361:12,23 | **filed**  275:16 | 347:18 | 318:16 320:13 |
| 362:4 363:3,16 | 286:19 | **floor**  270:11 | **four**  270:19 |
| 363:23 364:2 | | | |

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 122 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[fraction - group]

Page 15

**fraction** 289:4
302:18 303:5
317:4 358:22
**francisco**
267:14 268:15
270:20 275:2
275:21
**frankly** 335:23
355:4
**freeman** 271:20
277:3
**frequencies**
333:15
**frequency**
331:16 332:13
333:16,16
337:8
**frequent**
332:18,18
**friends** 338:13
**front** 284:19
335:23
**full** 278:25
281:21
**fully** 280:4
**function**
316:21
**further** 339:3
372:3 373:12
373:16

**g**

**g** 267:12
268:13 273:11

273:13,15
277:16 279:2
284:20
**galleria** 271:22
**gathered**
350:24
**general** 303:21
309:20
**generalization**
298:1
**generally**
295:21 336:16
344:4 347:10
**geography**
344:7
**georgia** 267:2,6
268:2,6 269:16
270:1 271:5,14
271:23 273:18
275:16,18
277:1 278:3
283:1,2,3,4
285:21 290:4
291:13,20,21
296:2 301:10
301:16 307:25
316:21 318:16
322:1,7 337:15
338:16 345:10
345:12,15
353:1,3 359:21
363:19 364:6
366:24 371:19

**georgians**
291:16 321:15
321:18,25
322:1
**germane**
311:24
**getting** 298:10
332:3
**give** 284:16
305:5 332:2
341:18 357:11
357:14 367:10
367:21,25
**given** 285:14
285:18 296:7
299:6 350:3
356:4 372:9
373:11
**go** 275:12
279:17 303:6,8
304:9,10 310:2
314:2 320:5
344:17 365:25
**going** 275:5
279:21 280:25
297:17 298:10
298:11 307:11
308:13 310:12
310:17 324:24
326:14 333:5
347:1,13,14
350:6 364:8
366:12 370:5,8
370:12

**gold** 356:6
**golden** 372:20
**good** 275:5
277:23 278:1
278:20
**gotten** 348:20
**grace** 271:12
271:15 277:7
**granular**
356:19
**gray** 271:20
277:4
**great** 278:20
313:8 332:22
364:17
**greater** 308:19
332:13
**greenberger**
364:4
**grimmer**
273:21,22
366:15,21
368:22 370:19
**grocery** 298:20
303:7
**group** 269:17
278:2 293:23
309:7 323:12
324:4,14
326:21 334:8
335:16 338:16
339:19,20
344:6 347:15
347:18 351:21

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[group - improvement]

Page 16

352:4,10
**groups** 308:12
310:23 311:5
316:24 322:8
323:23,25
324:10 328:10
328:23,25
329:20 334:22
336:23 337:4
338:15 355:8
**guess** 292:5
304:6 314:9
321:3 357:10
358:5
**guys** 343:11

**h**

**h** 273:7
**habitual** 341:4
341:20
**hailing** 282:12
338:12
**half** 304:11
**hall** 272:2
276:17
**hallboothsmi...**
272:7
**hand** 336:21
**hang** 365:23
**happen** 288:21
296:5
**happened**
293:11 313:9

**happening**
294:17 324:5
**happens**
342:21
**hayes** 270:3
276:25,25
**head** 279:25
**health** 280:7
299:1
**hear** 360:17
**hearing** 355:21
**help** 281:20
349:21
**hey** 326:21
**high** 299:7
329:11
**higher** 312:18
313:12 320:7
344:7 370:21
**highest** 331:15
338:6
**highly** 299:2,15
343:2
**hill** 271:1
277:22,24
**hispanic** 288:7
288:7 310:20
311:7,12
312:21 313:13
313:21,22
314:4,25 315:3
315:14 316:8
316:10,13,25
317:3,9,17,18

317:19,19
323:19,20
334:23,24
**history** 351:6
**hold** 357:20
**home** 294:4
295:16 299:20
338:19,22
342:9 343:10
368:6
**honest** 316:1
**hope** 353:19
**hour** 284:10
290:5,23
303:22,23
304:10,11
311:12 317:1
319:18 342:25
**hours** 285:23
285:25 286:4
300:11 304:13
**household**
301:10,15
302:6 318:17
319:1 322:18
322:19 323:9
323:11 324:18
338:14 353:17
**households**
310:24
**hubbard** 270:2
277:1
**hughes** 270:2
276:25

**hugheshubba...**
270:6
**hum** 279:12,25
358:10
**humm** 281:15
**hypothetical**
330:19
**hypothetically**
330:19

**i**

**identification**
312:21
**identified**
368:4
**identify** 368:20
372:16
**identifying**
339:16
**ii** 267:13
268:13
**illustrates**
310:18
**impaired**
360:13,20
**impairments**
351:24
**imply** 361:20
**important**
299:2,11 336:7
**improved**
311:6 322:15
**improvement**
322:15 325:9

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 124 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[improvement - know]

Page 17

325:16,18
328:4 358:12
**inaudible**
276:13
**incapacity**
351:9
**include** 291:12
307:4 338:11
351:15,20
356:11,17
359:1 366:23
**included**
307:18 352:1,4
352:7,8 358:18
**includes** 355:20
**including** 276:3
281:4 299:15
**incomplete**
330:6
**increase** 293:17
294:22 310:9
318:9 323:8,10
323:18,19,20
323:22,24
324:1,2 326:11
328:9 333:17
358:14
**increased**
293:10 294:2
322:3,22
328:10 333:16
371:19
**increases**
294:17 295:13

328:22,24
**independent**
355:23
**indicate** 274:3
336:15
**indicated**
292:15
**indicates**
297:22 298:2
328:14
**indicating**
337:7
**indicative**
293:4 297:3,13
**indirect** 282:18
**individual**
290:4 294:9
349:6
**individuals**
305:22 334:13
**information**
306:21 315:20
353:14 357:7
363:18,20
366:23
**initial** 368:4
371:5,14
**inmates** 351:15
351:18,20
**insignificant**
371:12
**insofar** 287:24
**instructed**
274:7

**intend** 287:4
**intention** 287:9
**interactions**
282:14
**interested**
275:25 373:17
**interface** 361:3
**interrupt**
299:25
**intervals**
329:11 344:6,9
346:21
**intervenor**
272:1 276:18
372:6
**introduce**
278:11 366:11
**involvement**
282:25
**irrelevant**
367:7
**islanders** 355:1
**issue** 286:23
294:7 295:4,5
324:11 332:21
337:19
**issues** 344:25

**j**

**jaffe** 276:6
277:20
**jaffee** 270:16
**jaffee.com**
270:22,23

**jason** 364:4
**job** 267:22
**joe** 272:10
278:5
**john** 269:5
276:10
**journal** 273:17
364:5
**jpb** 267:7 268:7
275:19
**judge** 279:15
306:23
**june** 281:5
285:8,9,11,12
331:17
**jury** 279:15
**justin** 273:20
273:22 366:14
368:22

**k**

**k** 277:11
**keker** 268:14
**kind** 300:1
303:6,6,8
304:20 346:10
369:25
**know** 280:11
284:3 289:5
298:8,22 299:1
299:3,6 300:3
300:4 301:2
303:9,13 306:6
311:21 313:10

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[know - look]**

Page 18

319:20 320:7
327:23 336:15
336:18 342:20
352:19 353:5
356:10 358:11
367:20 370:6
**knowledge**
295:19
**known** 355:25

**l**

**l** 269:6 277:8
277:15,15
279:4,4
**lack** 324:17
**lacked** 318:17
320:4 339:4
**lacking** 310:20
**laid** 290:7
**land** 282:14
**landscape**
324:10
**large** 311:15
316:19,24
317:7,8,10
324:1 329:21
365:17
**largely** 287:23
**larger** 295:2
310:21 323:19
**laross** 271:3
277:21,21
**late** 343:11

**latest** 368:21
**latin** 314:21
**law** 269:17
271:11 272:11
273:17 277:8
277:15,24
278:2,6 364:4
**lawyers** 281:9
**legal** 272:10,14
278:7
**leisure** 298:9
**length** 299:4
320:1 341:23
**lesser** 288:6
**letters** 347:17
**level** 329:13
337:7 344:6,15
347:18
**levels** 344:7,8
**liberties** 270:9
277:12
**life** 304:12
**light** 344:24
**likelihood**
295:17 352:21
**likely** 299:21
304:15 311:11
320:10 337:3
343:7 352:17
363:1
**limited** 299:13
300:4 306:25
363:4 364:25

**line** 346:16
349:9 357:25
358:3,5,6
360:15 366:3
**list** 285:19
330:4,5,7
335:11 347:23
**literature**
292:24 298:22
299:14,18,23
302:23 304:17
331:2
**litigation**
283:14,15,24
284:1,2,5
313:2,4
**little** 272:5
324:6 342:22
369:7
**live** 353:1,3
359:15
**livelihood**
298:25
**living** 355:23
**llp** 268:14
269:10 270:2
270:16 276:7
277:1,4,16
278:2
**locate** 353:2
**located** 342:7
**locating** 340:14
**location** 275:20
295:17 308:25

309:11 325:23
340:25
**locations**
285:19 287:17
287:18 289:3,3
289:6 299:7,19
299:22 306:16
308:14,16
312:20,20,25
330:8 340:20
341:3,4,19,20
342:8,15
**long** 289:5
290:22 294:10
297:22,23
298:2,4,13,15
298:18,24
301:2 303:17
326:2 362:9,11
**longer** 291:17
292:24 296:11
332:19 333:12
**longest** 296:21
297:2,10
**look** 292:22
293:3,17,18
294:19 295:7
295:16 307:13
308:21 309:4
309:20 310:18
320:17 326:21
330:25 331:4
342:18 357:14
366:19 367:25

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[look - medians]**

Page 19

369:20,22,24
369:24 370:5
**looked** 298:23
299:4 335:24
342:14
**looking** 284:18
296:20 297:2
301:5 313:18
314:17 315:2,3
322:6,16
326:24 327:7
332:25 334:17
334:18 335:25
349:12 357:18
366:21 367:9
368:25
**lost** 353:18
**lot** 335:2
357:12 365:12
**lots** 298:19
335:25 363:15
365:10 367:18
**loud** 281:6
**love** 340:17
**lower** 323:12
335:17 336:10
**lunch** 343:12
365:21

**m**

**m** 277:11,11,16
**machine** 373:9
**macon** 271:10
271:14 277:9

**madam** 278:10
**made** 300:15
373:8
**mail** 308:1
330:16
**mailboxes**
308:7
**main** 286:13
287:12 288:8
**maintain**
344:19
**make** 279:23
288:21 294:12
294:18,23
297:25 298:13
298:15,18,19
298:24 299:9
302:20 303:17
303:19 304:16
304:22 317:22
329:18 350:2
355:3 357:15
361:5,6 371:13
**makes** 304:15
**making** 295:18
303:10 342:16
**malls** 342:15
**manner** 274:2
**margin** 346:5
**margins** 306:3
**mark** 368:14
**marked** 274:8
280:20 284:12
314:14 357:16

364:1 366:10
368:15
**market** 272:4
340:20,25
**martin** 271:12
277:7,7
**massachusetts**
269:19
**master** 267:6
268:6
**match** 371:9,11
**material**
294:23 370:16
**materially**
351:13
**materials**
285:14,17
**mathematical**
302:7
**mathis** 271:20
277:3
**matter** 275:15
282:19 283:16
302:20
**maximize**
340:23
**mean** 288:13
289:20 291:6
293:11 301:21
304:19 305:12
305:13 313:17
320:1 322:25
326:16 335:1
336:8 351:8

357:3 362:11
**meaning**
289:16
**means** 318:2,25
324:21 325:5
329:17
**meant** 310:12
310:25 323:11
323:17
**measure**
290:17 291:1
293:14,15,23
294:6,15
296:18 300:22
319:25 322:8
338:22 349:22
350:10
**measured**
309:7 319:13
319:17 323:15
331:9 348:3
**measures**
300:21 305:20
**measuring**
339:17,21
354:2
**media** 275:14
312:9 343:14
**median** 293:20
294:1,3,3,20,21
334:11,19,22
336:10
**medians** 293:9
336:8

medical 280:7
medications 280:3
members 338:14 360:6
meng 269:18 278:2
mental 351:9 358:19
mentioned 330:11 335:12
met 281:5
method 304:23 309:8 345:7
methodology 341:22 344:5 344:22 345:3 346:13 354:15
methods 286:12 300:8,9 305:6,7 339:10 344:21 346:18
metropolitan 277:18
mi 267:7 268:7 275:19
michael 364:3
microdata 304:24
microphones 275:8
middle 369:11
millions 316:20 345:14,18

minus 328:19
minute 292:14 294:1,2,22 302:2 362:13 365:22 367:10 369:14,20
minutes 290:13 290:13,17,18 290:21,22 291:24 294:21 294:21 297:10 297:12,12 301:11,14 302:1 333:19 334:2
miranda 270:18 277:19
mischaracteri... 349:2
mischaracteri... 349:8
mischaracteri... 335:20
mischaracteri... 348:24 349:11
misread 326:8
misstated 348:14
modalities 361:8
mode 334:19
modes 334:12
modest 311:1 323:18

modestly 316:8 317:3
moment 282:17 311:22
month 296:5,22 297:13 304:3
moring 269:10 277:16
morning 275:5 278:20,22 331:17 332:14
morrison 269:18 278:1,2
moved 279:6
moving 300:13 300:17
msherill 270:23
multiple 291:4
multipliers 311:4 329:22
mute 275:10

**n**

n 273:1 277:8,8 277:16
naacp 270:1 277:1
name 275:22 277:7,10,11,14 277:21,23 278:1,5,12,25 281:17 373:21
narrow 356:25

nationwide 283:20
nature 302:11
ne 271:4
near 342:15
nearest 293:25 294:5 300:23 301:3 310:6 338:18,21 339:16,21,22
nearly 300:10
necessarily 274:3 293:5
need 280:11 295:7 304:12 312:7 353:14 360:4,6 366:11 371:6
neither 371:11 373:16
nest 268:14
nevertheless 294:16
new 269:16 270:5,5,12,12 278:3 282:25 300:2 307:18 308:16,19 363:18,20
nice 278:23
nods 279:25
noland 271:11 277:8

**nolanlawfirm...**
  271:15
**non**  288:7
  298:2 310:20
  311:7,12
  312:21 317:3,9
  317:19 323:19
  334:23
**nondiscretion...**
  291:7 302:24
  342:17
**nonwork**
  302:17,24,25
  303:5
**nonzero**  318:3
  329:15,17,21
**noon**  333:1
**normal**  342:16
**northern**  267:2
  268:2 275:17
**note**  274:1
  275:7,8 293:6
  329:18 354:24
**noted**  309:23
  313:6
**notice**  273:9
  280:24 316:25
**noticing**  276:5
**noting**  276:19
**notoriously**
  332:15
**number**  295:2
  295:2 309:24
  310:9 315:10

315:15 320:9
320:25 321:13
321:19,23,24
322:3,21 324:3
325:10 326:3,9
326:11 327:20
343:24 362:15
362:17,18
363:21 364:5
**numbering**
  369:3
**numbers**  297:9
  316:19 338:6
**nutshell**  356:22
**nw**  269:6,12,19

**o**

**o**  277:8,15,16
**oath**  279:11,13
  373:7
**object**  307:11
  326:14 333:5
  364:8 370:12
**objection**
  288:23 289:22
  292:8,17
  295:24 296:23
  297:15 304:4
  307:20 308:2
  309:14 319:6
  321:21 322:23
  323:4 328:17
  330:21 335:19
  336:13 337:9

337:16 338:24
339:12 340:6
340:15 341:6
341:22 342:10
344:10,16
345:19,24
346:7,13,16,22
348:6,16
349:10 350:19
351:3,17 353:9
354:3,15
355:14 356:21
357:2 358:20
359:3,10,16,23
360:8,15,22
361:9,17 362:2
362:23 363:9
365:18 367:4
367:16 370:24
371:10,20,25
**objections**
  276:1
**observing**
  306:7
**obtaining**
  307:19
**obviously**
  302:8,9 327:5
  327:6 363:14
**occur**  294:8
**offer**  287:4
**offices**  306:13
  312:25

**offset**  333:17
**oh**  311:21
  314:19,23
  315:23 321:7
  326:6 369:3,9
  369:9
**okay**  278:9
  284:11 285:12
  295:7 297:8
  300:16 309:4
  313:19 314:15
  314:23 317:22
  320:15,22
  321:4,7 336:8
  356:19 358:3
  369:8,9,12
  370:10,18
  372:4,21
**older**  358:24
  359:1
**once**  297:13,13
  304:10
**ongoing**  283:14
**online**  347:4,12
**ooo**  267:4
  268:4 272:15
  273:5,24 274:5
  274:10 372:23
**open**  349:20
**opinion**  312:17
  313:12 333:9
  337:13 338:21
  340:10 344:19
  348:19 361:14

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

**[opinion - people]**                                                    Page 22

361:19 362:25
363:5 365:1
**opinions** 282:7
284:23 286:25
287:4,10
289:12 300:2
313:2 362:20
371:24
**opportunity**
301:4
**opposed** 292:14
296:20 317:17
**option** 307:10
**options** 299:19
300:24 307:19
**orally** 279:23
**order** 298:6
359:22 372:17
**orders** 372:11
**original** 289:18
314:12 331:23
343:21 344:1
344:25 345:6
373:13
**outcome**
275:25
**outlined** 350:11
**outside** 308:2
337:9,16
338:14 339:12
340:15 344:10
345:19 349:10
354:3 359:16
359:23 360:9

362:23 367:16
370:13
**overall** 288:9
289:8,12
296:19 318:16
322:20,25
323:1 371:18
**overcome**
324:2
**overlooked**
334:21
**own** 286:18
326:8 356:14
372:1
**ownership**
310:10,12
315:22 316:5,8
316:11 323:24
324:1,12
353:15

| **p** |
|---|

**p** 271:2
**p.c.** 272:2
**p.m.** 268:17
366:6,9 372:21
372:22
**pacific** 355:1
**page** 273:2,8
309:23 310:17
314:18 318:21
324:24 327:7
334:18 343:25
369:3,9

**pages** 267:13
267:24 273:10
273:12,13,16
273:19,21,23
293:20 369:6
**pandemic**
282:10
**paragraph**
294:19 301:7
301:13 311:10
318:21 320:13
320:14,15,15
320:17,18,19
320:20,23
321:10 324:16
325:14,25
331:20 343:20
343:25 362:5
366:21 367:9
367:24,24
370:7,11
**paragraphs**
368:18,23
369:25 370:1,6
371:1,15
**pardon** 293:17
**park** 270:4
298:11
**parkway**
271:22
**parole** 351:16
**part** 310:9
312:15 324:11
337:5 350:6

366:25 369:21
**particular**
292:6 294:6
295:13,14
298:1 311:3,8
**particularly**
282:18 296:2
**parties** 275:12
355:6
**party** 275:24
373:18
**pause** 312:5
366:2
**peachtree**
271:4
**peak** 331:15
332:14,16
**penitentiaries**
352:6,8
**pennsylvania**
269:12
**people** 294:13
294:23,25
295:17 296:14
298:4,13,15,18
298:19,24
299:5,8,16
302:20 303:5
303:14,16,21
304:14,19,25
305:15,17,18
310:2,13,13
319:4,14,18
320:2 322:11

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 130 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[people - powers]

Page 23

322:21 326:12
330:15 331:5
332:3,6 333:3
335:25 338:15
340:20,24
342:8 343:5
345:23 351:5,7
352:22 354:10
356:8,14 357:8
358:18,24
359:1,21 360:4
363:2,12 365:6
367:20
**people's** 304:7
363:14 365:9
367:22
**percent** 315:9
316:2,13 317:1
317:3,4,5,24
318:7,8,12,16
318:25 319:2
319:21 320:4
320:18,23,25
321:14 322:16
324:17,19,21
325:1,5,10,12
325:13 327:17
327:17,23
328:11,12,14
328:14,19,19
328:19 329:13
345:11,12,20
**percentage**
315:4 319:20

321:19 326:10
327:9,12,15
**percentages**
329:20 338:7
**percentile**
295:1
**perform** 346:21
**period** 296:22
300:6 315:11
315:22 316:6,9
322:3 331:15
331:15 332:20
**periods** 332:16
**permits** 307:25
**person** 286:17
299:7 352:17
360:20
**person's**
299:20 338:19
**personally**
278:16
**persons** 351:23
358:17
**pertains** 373:12
**peters** 268:14
**ph.d.** 267:12
268:13 273:10
273:15,21,22
275:15 278:15
366:15 368:22
**phones** 275:10
**photo** 312:20
**physical** 358:23

**pick** 275:8
279:24
**picked** 292:13
**place** 275:12
300:23 301:3
340:24 344:3
360:14 373:5
**places** 300:24
342:16
**plaintiff** 338:16
**plaintiffs** 269:3
269:16 270:1,8
276:12 277:2
277:13,18
278:3,7 281:9
**planning** 282:3
**play** 363:15
365:11
**plaza** 270:4
**plc** 271:1
277:24
**please** 275:7,7
275:9 276:2
279:1,20,23
349:8 372:16
**point** 287:9
294:18 305:3
350:3 356:13
361:5,6
**points** 322:9
**polling** 300:24
360:14
**population**
289:4 322:2

323:8 324:7,14
329:5 345:10
345:13 351:2
351:12,21
352:4,5 358:15
**populations**
295:8
**portion** 313:14
**portions**
366:19
**position** 298:6
**possible** 297:25
302:21 303:14
312:6 331:4
332:2 336:20
341:16 353:5
353:11 354:10
**possibly** 315:21
**postal** 340:4
367:13
**potential** 331:1
**poverty** 272:11
278:6
**power** 346:10
**powers** 269:5
276:10,10
277:17 288:23
289:22 292:8
292:17 295:24
296:23 297:15
299:25 300:10
300:16 304:4
307:11,20
308:2 309:14

| | | | |
|---|---|---|---|
| 314:17 318:18 | 372:3,13 | 358:21 | **problem** |
| 319:6 320:21 | **predictive** | **prevent**  280:4,8 | 319:25 |
| 321:21 322:23 | 299:16 | **previous** | **problematic** |
| 323:4 326:14 | **prefer**  336:8 | 286:11,13 | 354:21 |
| 328:17 330:9 | **preferable** | 287:15,24 | **proceeding** |
| 330:21 333:5 | 294:16 | 288:12,15,25 | 276:1 |
| 335:19 336:13 | **preference** | 289:15,25 | **proceedings** |
| 337:9,16 | 354:1 | 290:11 291:2,3 | 312:5 372:22 |
| 338:24 339:12 | **preferences** | 291:18 293:2,7 | 373:4,6,8,14 |
| 340:6,15 341:6 | 360:19 361:7 | 302:17 306:9 | **process**  340:25 |
| 341:22 342:10 | 361:21 | 307:14 309:9 | 341:1 |
| 344:10,16 | **preliminary** | 314:7,16 | **procure**  312:20 |
| 345:19,24 | 279:18 | 315:17 319:23 | **product**  318:4 |
| 346:7,13,22 | **premise**  299:8 | 333:22 337:20 | **professor** |
| 347:24 348:6 | 339:4 362:1 | 338:20 339:1 | 281:22,25 |
| 348:16,21 | **preparation** | 346:18,24 | **project**  269:4 |
| 349:10,13 | 281:10 | 350:4,7,8,12 | 269:16 276:11 |
| 350:19 351:3 | **prepare**  281:2 | 355:4 368:7 | 278:3 |
| 351:17 353:9 | 285:24 | **previously** | **propensity** |
| 354:3,15 | **prepared**  339:6 | 301:9 335:12 | 309:11 |
| 355:14 356:21 | **preparing** | 345:8 346:2,8 | **proportionate** |
| 357:2,20 | 285:15 338:5 | **prior**  279:8 | 345:23 |
| 358:20 359:3 | **present**  272:9 | 283:21 348:22 | **proposal** |
| 359:10,16,23 | 276:3 | 348:24 371:19 | 283:19 |
| 360:8,15,22 | **presented** | 373:7 | **proposition** |
| 361:9,17 362:2 | 291:18 293:12 | **private**  275:9 | 368:5 |
| 362:23 363:9 | 339:7 344:13 | **probability** | **prospective** |
| 364:8,17,22 | **presumes** | 363:12 365:6 | 293:22 |
| 365:18 366:11 | 356:17 | **probably** | **prospectively** |
| 367:4,16 | **pretty**  289:13 | 281:15 294:22 | 283:18 |
| 368:12,24 | 289:14 294:13 | 331:13 332:9 | **provide**  293:8 |
| 369:3,8,12,15 | 294:22 300:17 | 332:10,11 | 329:23,25 |
| 370:12,24 | 321:20 322:4 | 336:19 342:3 | 340:23 346:10 |
| 371:10,20,25 | 345:5 346:1 | 358:13 | 347:2,19,22 |

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 132 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[provide - receive]

Page 25

362:15
**provided** 330:5
330:6,7,8
335:5 340:20
340:21 346:17
347:22,22
**provides** 346:5
359:21
**providing**
362:18
**provision** 288:1
**proximity**
340:22
**public** 293:24
294:4 297:5
304:24 310:5
310:14 330:2,4
331:16 335:10
338:13 343:3
347:3,5
**publications**
283:1,3
**published**
282:5,9,11,13
**pull** 347:24
349:13
**pums** 305:21
347:13,24
**purchase**
298:15
**purpose** 299:9
313:4 337:25
**purposes** 313:1
341:20 347:7

348:11
**put** 340:11,13
**putting** 293:1
318:6
**python** 330:1,9
330:10 335:9
347:23

**q**

**qualitatively**
289:14
**quantities**
345:22
**quarter** 282:23
**quarters**
351:21 352:4
352:10
**querying** 286:3
**question**
279:19,22
280:12 286:21
291:10 294:10
297:18 303:3
308:10 311:24
312:4 313:25
314:3 315:16
317:15,21
326:15 341:17
342:1 345:5
349:18,21
356:13,19
364:21,22,25
370:3

**questioning**
346:16 360:16
**questions** 274:7
281:20 305:4
356:8,9 372:3
372:5,6
**quick** 312:7
343:8 366:1
**quickly** 280:14
300:18
**quite** 290:24
294:11,12
308:23 310:4
336:20
**quotations**
274:1
**quote** 274:4

**r**

**r** 277:15,16
**racial** 308:12
**raffensperger**
276:8
**random** 318:4
329:6,9 345:9
**rank** 299:11
**rate** 284:9
316:7
**rates** 312:18
313:12
**rather** 292:6
342:13 348:3
349:5,22 354:2
360:21

**ratios** 329:22
**raw** 362:15
**read** 274:2
281:3 305:25
360:13 364:24
367:12 370:16
371:1
**reading** 325:3
371:14
**real** 312:2
329:15,17,21
365:25
**realized** 312:1
**really** 299:2
302:16 303:4
322:11 329:17
336:1,25 346:3
**reason** 288:22
298:5,16
311:21 315:21
332:8,9 349:4
350:14 351:8
352:16,19
**reasons** 290:7,8
336:2 348:8
350:4,11 354:9
**recall** 279:6
282:1 286:1
289:1 307:6
311:22 323:25
328:8 329:4
342:3 355:4
**receive** 353:6

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[received - report]**

**received**
363:20
**recent** 315:20
**recess** 312:11
343:16 353:22
366:7
**recognize**
284:21
**record** 274:3
275:6,13 276:5
278:12 279:1
280:21,23
284:13 312:10
312:12 343:15
343:17 353:20
353:23 364:24
366:5,8 367:14
372:21 373:8
373:11
**recorded**
268:12 275:14
**recording**
275:11
**reduced** 315:14
**reduction**
288:1,3 309:24
310:19,23
311:1 321:13
323:17 324:3
363:11 365:5
**reed** 270:2
277:1
**refer** 291:14
302:24 313:14

**reference**
357:12,15
**referring**
285:17 347:8
362:12
**refers** 347:12
**reflect** 357:1
**reflected** 274:2
**regarding**
286:25 287:12
358:16 362:20
363:18
**regional** 282:3
**register** 350:6
354:11,18
**registered**
348:3,12 349:5
349:23 350:11
350:16 353:1,3
353:7 354:2
359:7,14
**registrar**
307:10
**registrars**
271:19 277:6
306:14 307:4
**registration**
271:18 277:5
348:9 349:6
353:13,13
354:17,21
**relate** 282:23
282:24

**related** 275:23
297:3
**relative** 288:3
291:5 311:4,24
317:6,17
373:17
**relevance**
300:1
**relevant** 282:7
338:22 364:9
**reliability**
337:13
**reliable** 339:10
340:3,4
**reliably** 346:12
**reliant** 310:5
**remained** 311:5
**remember**
282:16 364:23
**remote** 276:23
278:4 372:4,16
**remotely** 276:4
**remove** 360:6
**repeat** 297:17
**repeated** 312:4
**repeats** 286:12
**repetition**
326:24
**replicated**
335:14
**replication**
347:1
**report** 273:11
273:13,20,22

281:4 282:11
282:13 284:19
284:21 285:7
285:15,24
286:8,14,16,18
286:24 287:8
287:15,20,23
287:24 288:12
288:22,25
289:11,15,17
290:7 291:10
291:18 293:7,8
293:13,20
295:15 300:2
300:22 301:5,7
301:8 302:17
306:10,12
308:6,17,19
309:9 312:23
313:11,12,15
313:20,21
314:5,7,13,16
315:3,17 319:3
319:22,23
320:3 321:10
321:11 324:17
324:25 325:14
325:17,17,19
326:16 327:19
328:3 329:19
329:24 331:23
333:22,23
334:5,6,7,9,11
334:12 335:2,3

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 134 of 691

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[report - round]

Page 27

335:20 337:17
337:22,25
338:3,5,10,20
339:7 340:16
341:21 343:21
344:1,8,11,14
344:20,24,25
345:6 346:18
346:24 347:7
349:24 354:24
355:2,19
359:17,24
362:5,6,7
364:10 366:14
366:17,20
367:3 368:4,7
368:18,20,22
369:2,2,16
370:14
**reported**
267:20 305:10
305:11,12
335:16 352:5
356:2 370:19
371:2
**reporter**
268:18 278:10
278:12,17
279:24 280:17
314:11 321:17
327:13 334:10
347:16 352:2
363:8 364:24
372:18 373:2

**reporter's**
274:1
**reporting**
358:17
**reports**  287:5,7
288:20 289:18
290:11 370:19
**represent**
277:1,4,9,12,17
277:22,25
278:3 284:23
**representing**
275:22 276:7
276:11,18
278:7,24 355:7
**requested**
274:8 306:21
347:21 373:15
**required**  298:8
**requirement**
283:20
**research**  282:6
286:1 346:12
**respect**  356:10
361:7 367:2
**respondents**
345:18 356:25
**response**
273:20 338:12
361:21 366:14
369:2
**responses**
279:23

**rest**  351:11
**restate**  329:7
**restrict**  340:18
**restriction**
287:25
**restrictions**
340:12
**restroom**  312:7
365:25
**result**  287:25
331:13 340:1
**resulted**  288:1
**resulting**  284:2
**results**  291:5
345:4
**retained**
283:13,16,18
284:4 285:6
**retaining**
283:22
**returning**
339:10 340:4
360:5
**review**  285:15
286:18 367:10
369:14 373:14
**reviews**  367:11
368:1 369:18
370:4,15
**revise**  307:3
348:19
**ride**  282:12
338:12

**riders**  332:17
**rides**  338:13
**right**  284:6,16
285:4 287:7,21
288:18 290:18
293:14 296:10
298:7 301:12
303:1 305:17
305:24 307:17
309:2,3 315:7
316:4 317:22
318:24 320:7
321:6,11,12
322:14 325:11
325:13 327:2,4
331:3 335:13
335:13 336:1
345:15 352:14
361:25 364:17
369:1,5 372:2
**rights**  338:15
**river**  272:4
**riverside**
271:13
**road**  271:4
**roberts**  364:4
**rock**  272:5
**room**  372:15
**roughly**  321:14
**round**  301:14
311:12 317:2
319:19 342:25
362:14

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[runoff - signature]**

Page 28

**runoff** 295:23
**rush** 332:20

**s**

**s** 273:7 279:4
    347:17
**sample** 329:10
    345:11,12,14
    345:20
**samples** 345:10
**san** 267:14
    268:15 270:20
    275:2,21
**saturday**
    333:11
**saying** 297:9
    303:16,20
    308:24 317:23
    329:14 352:6
**says** 301:19
    302:4 320:14
    326:21,23
    331:20 366:22
**sb** 288:1 333:21
**schaerr** 270:16
    270:22,23
    276:6 277:20
**schedule**
    303:11,17
**scholars** 286:17
**school** 282:1
    302:25
**science** 354:20

**scope** 287:19
    300:3,20
    306:21 308:2
    337:9,16
    339:12 340:15
    344:10 345:19
    349:10 354:3
    359:16,23
    360:9 362:23
    367:17 370:13
**script** 330:1
    335:9
**search** 328:6
**seated** 361:2
**second** 357:14
    365:23 367:25
**secretary** 276:7
**section** 370:18
**see** 278:23
    280:14,14
    282:9 293:12
    293:24 294:19
    297:18 298:7
    300:8,9 309:5
    314:19 320:11
    321:7 324:19
    326:6 329:12
    331:5 349:14
    349:15,16
    362:17 365:20
    366:25
**seeing** 371:15
**seeks** 321:17
    327:13 334:10

    347:16 352:2
    363:8
**seem** 303:10
    353:18
**seemed** 290:25
**seen** 369:16
    371:2
**self** 305:10,11
    305:12 355:22
    356:2 370:19
**senate** 267:6
    268:6 275:16
**sense** 288:16
    297:1 302:19
**sensible** 297:1
**sensitive** 275:8
**sentence** 326:8
    326:8 366:22
**separately**
    352:5
**sequence**
    357:13 363:25
    365:22
**service** 338:13
    340:4
**service's**
    367:13
**services** 282:12
    331:16 332:15
    332:18 338:12
**set** 286:24
    287:5 373:5
**seven** 300:11

**severe** 351:24
**share** 286:16
    310:19,21,24
    311:1 322:6
**sherrill** 270:18
    277:19,19
**shift** 310:13
**shopping**
    342:15
**short** 298:19
    299:9 343:6
    353:19 364:12
    364:16
**shorter** 293:1
    296:12 310:16
    333:15
**shorthand**
    268:18 278:17
    373:1,9
**show** 294:6
    322:15 327:8
    327:11,15
**showed** 293:10
**showing** 294:17
    352:25
**shown** 299:14
    323:16 328:1
**shows** 299:10
    315:4 327:8
    335:9
**sides** 286:23
**signature** 369:7
    373:24

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**significance**
344:23 345:4
346:21 371:3
**significant**
288:19 306:7
316:16,17,23
317:25 318:2,7
318:10 325:10
327:25 328:2
329:1,15,16
344:14
**significantly**
350:15
**silence** 372:20
**similar** 287:24
289:2 291:4,20
291:21 311:14
321:5 322:4
340:25 353:6
370:20
**simms** 271:12
**simple** 295:7
304:20
**simply** 316:21
363:14 365:9
372:1
**single** 291:1
303:22
**sit** 287:3
**size** 329:5
**sizes** 329:10
**slight** 309:24
324:13

**slightly** 311:6
311:14
**small** 308:13
310:8,19
319:21 329:12
358:21
**smaller** 295:2
308:13,18
322:13
**smith** 272:2
276:17
**snarky** 367:6
**social** 354:20
**solutions**
272:14
**somewhat**
341:5
**sorry** 276:14
280:18 293:19
299:25 306:11
313:25 314:2
318:18 325:15
333:6 343:24
343:25 347:15
362:6,7 365:22
366:22 368:19
368:20 369:23
**sort** 286:3
304:17
**sorts** 298:12
**sound** 352:13
**sounds** 301:12
320:7

**southern**
272:11 278:6
**spatial** 293:22
350:14
**speak** 279:21
281:10 312:24
319:23 324:6
370:8
**speaking**
276:13 292:19
313:15
**speaks** 312:23
**specific** 281:19
330:15
**specifically**
299:4 323:13
**spectrum**
356:11
**speculate**
315:21
**spend** 315:17
371:6
**spent** 286:4
290:6
**spoke** 279:7
337:19
**spoken** 346:23
**staff** 286:18
**standard** 356:7
**standing**
346:15 348:16
350:19 360:15
**stands** 313:5
323:4 336:13

344:16
**start** 278:25
285:1 296:7
304:10 325:15
358:4 370:10
370:11 372:14
**started** 309:22
**state** 270:15
276:2,4,7,8,14
277:20,22,25
278:24 282:15
283:1 285:20
290:4 293:22
301:16 306:22
316:20 324:15
325:19 326:12
330:6,8 334:7
344:8 360:12
363:21 372:17
373:2
**stated** 288:10
288:14 301:9
328:22,24
346:8
**statement**
302:7 340:19
367:7
**statements**
350:8
**states** 267:1
268:1 275:17
291:17,22
325:25 326:9
334:11

Daniel G. Chatman , Ph.D., Vol. II                    August 6, 2025
Georgia Senate Bill 202, In Re

statewide
  344:13
stating   278:25
  301:17 320:18
  329:7
statistical
  344:23 345:3
  371:2
statistically
  306:7 316:15
  316:17 317:25
  318:2,9 325:9
  327:25 328:2
  329:1,15,16
  344:14
statistics
  367:20
status   349:6
stayed   326:4,9
stop   342:22
store   303:7
stores   298:20
street   268:14
  269:6 270:11
  275:21 279:4,5
strikes   299:6
subgroups
  324:8
subject   294:24
submitted
  281:4 287:6
subscribed
  373:21

subset   322:1,2
substantial
  322:10 371:13
substantially
  292:25
substantively
  316:22
substitute
  301:22 304:1
substituted
  304:1
suffice   286:14
sufficient   329:6
sufficiently
  329:10,11
  371:12
suggest   290:23
suggested
  308:18
suggesting
  296:25
suggests   299:17
  308:19
suit   355:7
suite   269:6
  270:19 271:4
  272:4
summarize
  287:11 288:8
  288:11
summary   289:7
  289:8
sunday   333:11

supplement
  286:11
supplemental
  273:11,20,22
  284:16,19
  286:25 288:22
  289:11,17
  300:2,5 301:8
  306:10,12
  308:6 312:23
  313:11,21
  314:4 315:2
  321:11 324:16
  324:25 325:17
  330:14 334:4
  337:17 338:10
  339:6 340:16
  341:21 344:11
  344:20,24
  362:7 364:10
  366:14 367:3
  368:21 369:2
  370:13
supplementary
  281:4 284:18
  287:23 291:10
  293:7,8
support   342:7
  350:24
supports   368:4
suppose   328:7
sure   281:16
  285:16 286:10
  289:1 292:3

297:20 301:24
302:15 304:22
308:4,23
313:17 317:13
317:14,23
326:23 335:7
336:6 344:2
345:5 346:1
347:8 357:15
361:19 365:12
surprised
  336:11 360:17
surrebuttal
  287:8 337:22
  368:7
survey   304:24
  305:13,14,21
  346:5 356:4,25
  358:17
surveyors
  305:16
surveys   345:14
  345:17,23
swear   278:11
  278:13
sworn   278:16
synonymous
  292:20
systematically
  351:11

|   | t |   |
| --- | --- | --- |

t   273:7 277:14

Daniel G. Chatman , Ph.D., Vol. II                August 6, 2025
Georgia Senate Bill 202, In Re

| | | | |
|---|---|---|---|
| **table** 293:18,19 | 366:7 373:4 | **testifying** 280:4 | 321:8 332:12 |
| 309:21,23 | **takes** 294:4 | 280:8 373:7 | 332:24 335:9 |
| 310:7,17,18 | 297:21 | **testimony** | 335:24 336:6 |
| 313:17,18 | **talk** 292:10 | 274:8 373:11 | 337:19,21 |
| 314:17 315:3 | 321:16 340:17 | **text** 326:18,20 | 341:9,11,12 |
| 318:20 322:6 | **talked** 342:3 | 327:3 328:3,6 | 343:12 348:24 |
| 323:16 324:24 | **talking** 281:6 | **thank** 276:22 | 350:8,14 |
| 326:16 327:5,7 | 316:20 317:16 | 278:9,20 | 352:16 354:5 |
| 327:8,11,14 | 357:3 | 285:13 330:13 | 355:21 357:11 |
| 328:1,8,25 | **talks** 328:9 | 372:8 | 357:15 358:21 |
| 334:18 344:24 | **task** 306:25 | **thanks** 364:18 | 365:23 366:11 |
| 345:1,2 368:23 | **teach** 282:22 | **thing** 286:3 | 370:10 371:3 |
| 369:7,11,22,24 | **teaching** | 324:5 330:11 | 371:16 |
| 370:1,1,2,2,19 | 282:22 | 336:1 343:5 | **thinking** |
| 371:8,15 | **tell** 318:8 | **things** 279:18 | 290:16 |
| **tactile** 361:3 | 335:25 359:14 | 293:3 298:13 | **thirds** 343:12 |
| **take** 275:12 | 371:16 | 298:17,19,20 | **thought** 285:12 |
| 280:3,13 | **telling** 356:20 | 298:24 300:14 | **three** 287:5,7 |
| 285:24 293:18 | **tells** 359:7 | 300:18 304:8 | 295:22 347:17 |
| 296:15 297:4 | **tenable** 295:10 | 304:12,18 | **threshold** |
| 298:4 299:5 | **tend** 299:9 | 317:21 326:21 | 292:6,14 |
| 308:21 309:4 | **term** 302:16,22 | 330:25 333:24 | 294:15 |
| 309:20 312:6 | 302:23 314:20 | 352:21 355:21 | **thresholds** |
| 315:23 320:16 | 314:21,24 | 356:18 363:15 | 291:4 |
| 325:24 326:7 | 318:2 329:16 | 365:10 367:18 | **tied** 352:17 |
| 326:13 330:3 | **terms** 289:3 | **think** 285:16,25 | **time** 275:10 |
| 338:15 339:22 | 291:5 292:21 | 286:10 290:17 | 276:2 279:7 |
| 353:19 360:20 | 294:3 308:11 | 290:18,20 | 285:25 286:23 |
| 361:1 365:14 | 311:4 322:18 | 292:22 297:1 | 290:6 291:24 |
| 366:19 369:20 | 354:20 | 297:25 301:11 | 291:25 292:7 |
| 371:14 372:20 | **test** 346:21 | 303:4 308:10 | 292:11 294:1,3 |
| **taken** 268:13 | **tested** 291:3 | 314:6,17,19 | 294:3,20 |
| 273:15 312:11 | **testified** 278:17 | 315:25 318:19 | 295:13 296:22 |
| 343:16 353:22 | 283:10 | 320:9,21 321:6 | 299:15 300:21 |

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[time - trips]**

Page 32

| | | | |
|---|---|---|---|
| 300:23 305:9 | **today's** 372:9 | 291:8,15,24,25 | 342:17 352:11 |
| 306:19 307:7 | **tolerance** | 292:7,11,23 | 354:25 361:16 |
| 312:2 315:17 | 297:14,22 | 293:15,21 | 362:16,21 |
| 315:23 316:9 | 298:2,2 | 294:20 295:4,5 | 367:15,19,22 |
| 317:16 322:3 | **tolerant** 291:17 | 295:13 297:14 | 370:23 371:9 |
| 325:24 331:10 | **took** 279:13 | 299:15,18,23 | **travelers** 294:9 |
| 331:22,25 | 341:3 | 300:21,23 | 331:1 |
| 332:3,4,5,16,17 | **topic** 339:14 | 301:3,10,15,21 | **traveling** |
| 332:19,21,23 | 368:10 | 301:23 302:6 | 299:11 331:5 |
| 333:10,17,20 | **torres** 271:21 | 302:17,19 | 343:2,4 |
| 334:2,7,11,19 | 277:3,3 | 303:5,8,12,13 | **trend** 327:3 |
| 334:22 335:16 | **total** 321:19,23 | 303:22 304:2,8 | **trends** 371:8,9 |
| 336:25 342:6 | 332:23 | 306:11,13 | **trial** 287:4 |
| 342:21 345:7 | **touches** 291:10 | 308:7,13,18,19 | **tried** 365:15 |
| 348:10 350:13 | **tract** 344:6 | 309:7,18,23,25 | **trip** 289:5 |
| 357:19,23 | **transcribed** | 311:1,11 | 290:23 294:1,3 |
| 358:7 371:6 | 373:9 | 312:19 313:13 | 294:10 295:14 |
| 373:5 | **transcript** | 313:21 315:4 | 295:18 296:9 |
| **timely** 367:14 | 268:12 342:11 | 315:14 319:4,9 | 296:21 297:2 |
| **times** 293:21 | 349:14 372:11 | 319:13 322:20 | 297:10,12,22 |
| 309:7,23,25 | 372:17 373:10 | 323:1,1,6,7 | 298:1,3,8,10,15 |
| 310:15 311:10 | 373:13,15 | 325:1,6,20 | 301:14,20 |
| 331:14 332:8 | **transit** 297:5 | 327:9,9,12,16 | 302:1,2,2,4,10 |
| 332:10,22 | 331:14,16 | 327:24 328:11 | 302:20 303:18 |
| 333:1,2,15 | 332:2,8,10,15 | 328:13,15 | 311:11,12 |
| **tina** 269:18 | 332:21,23 | 331:9,14 | 317:1,2 319:18 |
| 278:1 | **transportation** | 332:19,25 | 319:19 320:1 |
| **title** 281:25 | 282:14 293:25 | 333:10,17,20 | 326:2 342:4,20 |
| **tmengmorrison** | 294:4 310:5,14 | 334:2,7,11,19 | 342:21,25,25 |
| 269:22 | 338:11,13 | 334:22 335:16 | 343:1,7 362:9 |
| **today** 279:13 | 343:3 | 335:17 336:10 | 362:11,14 |
| 280:5,9 281:2 | **travel** 282:10 | 336:25 338:7 | **trips** 291:17 |
| 287:3 | 288:4 289:16 | 340:10,21 | 292:24 293:1 |
| | 290:3,6,24 | 341:4,20 342:9 | 296:11,12,15 |

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[trips - used]

Page 33

297:23 298:4
298:13,18,19
298:24 299:4,9
299:12 302:11
303:19 304:16
343:6
**true**  302:8,9,18
308:4,12 309:5
314:8 335:3
341:25 347:11
350:9 356:8
367:7 371:23
373:11
**truthfully**
280:4
**try**  280:13
286:21,22
296:18 327:9
365:19
**trying**  288:16
300:8,9 315:18
325:22 334:20
340:22 349:2
349:21 361:5,5
361:6,20,20
**tuesday**  273:15
331:17,24
**turn**  301:8
**turned**  276:20
**turnout**  362:22
363:6,13 365:2
365:8 371:18
**twice**  302:2,3

**two**  282:9,23
288:20 295:21
295:22 304:13
306:1 310:23
322:9 328:10
343:12 348:8
351:4,10 366:3
369:6,25,25
370:1
**type**  283:16
**typically**
298:20 302:25
**tyson**  271:2
277:23,24

**u**

**u.s.**  356:5 357:4
**um**  279:12,25
358:10
**unaware**
359:13
**uncertainty**
305:21 306:3,5
**unchanged**
313:3
**under**  279:10
290:5 373:10
**underestimated**
332:11
**underlying**
329:23 334:14
335:4,6
**undersigned**
373:1

**understand**
279:10,20,22
281:21 297:18
300:3,20
304:22 308:24
309:6 317:20
327:14 335:13
355:7 361:4
364:20 370:9
**understanding**
306:20,23
311:19 315:13
349:9,16
353:12 356:15
**understands**
349:16
**understate**
331:14
**understated**
332:9,10
**understatement**
340:1
**understood**
286:6 287:19
306:24
**undertake**
295:14 299:12
**undertaken**
290:3 296:21
**undertaking**
297:12
**union**  270:9
277:12

**unit**  275:14
**united**  267:1
268:1 275:16
291:22
**unusual**  290:6
**updated**  347:4
347:6,9,10,13
347:14
**updates**  281:13
281:17
**urban**  336:22
336:23
**use**  273:18
282:11,14
299:21 302:22
302:23 304:24
312:7 330:20
331:15 332:17
333:4 337:3,8
337:14 340:14
354:21 355:10
360:21 361:15
361:24 363:2,4
364:6,8,25
365:12,25
368:5 370:20
**used**  290:12
291:1 304:23
310:11 314:19
314:21 339:4
344:21 347:6,6
347:11 352:9
362:13

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

**[using - way]**

Page 34

**using** 295:17
300:7 302:16
308:16 349:4
355:24 363:6
363:12 365:2,6
373:8
**usually** 368:5

| v |
| --- |

**valid** 327:16
**van** 268:14
**variability**
305:22
**variation** 318:5
329:6,9
**various** 291:25
336:2 361:14
**vehicle** 310:20
310:25 322:7
322:18,19
338:23 352:13
352:17 358:8
358:12
**venture** 336:19
358:13 363:10
365:4
**verification**
356:3
**verified** 283:20
**veritext** 272:14
275:23
**version** 306:11
**versions** 347:3

**versus** 354:21
**video** 268:12
275:11,14
**videoconfere...**
268:16
**videographer**
272:13 275:5
275:23 276:14
276:23 278:4,9
281:7 312:9,12
343:14,17
353:20,23
366:5,8 372:4
372:8,14,19
**videorecorded**
267:12 273:14
**view** 286:11
**vilia** 270:3
276:25
**vilia.hayes**
270:6
**vision** 355:22
**visited** 283:4
**visually** 360:13
360:20
**volume** 267:13
268:13 273:15
364:5
**vote** 283:21
299:5,11,16
300:23 301:4
309:12 338:15
348:9,12 350:6
351:5,7 352:18

352:21,22
354:19,22
355:12,13
358:19 359:22
365:15
**voted** 330:15
**voter** 353:13
362:21 363:5
363:13 365:2,8
371:18
**voter's** 361:15
**voters** 273:18
330:19 339:4
342:16 348:3
349:5,23
350:11,16
353:1,3,7
354:2 355:10
359:7,14 361:7
361:24 364:6
366:24 368:5
**voting** 287:17
289:3 291:13
296:2 299:7,8
299:14,19,19
300:24 306:16
308:1,14,16,25
312:19,25
317:9,10
321:25 322:12
322:12 338:15
350:10 351:2,9
354:12 361:2,8
363:6 365:3

| w |
| --- |

**w** 277:15
**wait** 365:22
**waiting** 332:21
333:2,14,15
**walk** 297:5
310:6
**walking** 310:14
332:22 333:2
**want** 279:20
300:1,18 305:3
317:13 329:18
330:20 343:11
344:2 349:13
349:15,15
361:24 372:18
372:19
**wanted** 312:3
317:22 330:13
357:14
**wants** 331:3
**washington**
269:7,13,20
**way** 282:18
293:1,21 294:1
294:3 304:1
318:6 319:12
329:14 330:24
331:3 334:12
334:19 340:23
342:23,23
343:13 350:7
351:12 355:12

Daniel G. Chatman , Ph.D., Vol. II
Georgia Senate Bill 202, In Re

August 6, 2025

[ways - zoom]

Page 35

| | | | |
|---|---|---|---|
| **ways** 292:23 338:14 | **witness** 274:7 276:19,21 278:14,16 284:5 288:25 289:24 292:10 292:19 296:1 296:25 297:17 304:6 307:14 307:22 308:4 309:15 312:6 314:15,19 318:21 319:8 320:22 321:23 322:25 326:20 328:18 330:10 330:24 333:6 335:22 337:11 337:19 338:25 339:13 340:7 340:17 341:8 341:25 345:20 346:1,8,17,23 348:23 349:18 351:4,18 353:10 354:5 354:17 355:15 356:22 357:3 358:21 359:4 359:11,18,25 360:9,17,23 361:10,18 362:3,25 363:10 364:18 365:12,19,25 | 367:6,11,18 368:1 369:16 369:18 370:4 370:15,16 371:1,11,21 372:1,5 373:20 | 313:17 315:25 320:11 325:19 335:7 336:5,11 339:13 341:8 341:25 343:9 343:23 346:1 354:5 358:5 359:4 362:18 366:2,12 369:10,10,10 369:24 370:10 |
| **we've** 279:18 338:24 | | **witnesses** 373:6 | **year** 279:8 285:2 296:20 306:1 347:15 347:17,18 |
| **wednesday** 267:15 268:17 275:1 | | **words** 316:9 319:24 358:5 365:12 | **years** 282:23 295:22 306:1 310:10 |
| **week** 296:21 297:10,13 303:23 332:1,5 | | **work** 284:8 287:16 291:2,3 298:8,9 300:5 302:24,25 331:3,7 340:7 341:3,19 342:24 355:4 | **yielded** 324:9 |
| **weekend** 333:3 333:7 | | | **york** 270:5,5,12 270:12 |
| **went** 289:25 294:20 305:8 306:2 310:1,4 315:5,8,10,15 316:2,8 317:2 317:5 322:7 326:11 346:1 | | **working** 285:1 285:19 292:6 | **yup** 284:18 |
| | | **world** 357:6 | **z** |
| | | **wrong** 326:8 329:8 336:24 348:20 365:23 365:24 | **z** 277:14,14 |
| **whereof** 373:20 | | | **zatz** 269:11 277:14,14 |
| **whispering** 275:9 | | **x** | **zoom** 268:15 |
| **white** 310:20 311:7,12 312:22 317:4,9 317:18,19 323:19 334:24 335:18 336:10 336:17 | | **x** 273:1,7 314:21 373:15 | |
| | | **y** | |
| **whites** 288:7 | | **yeah** 279:3,9,10 285:4 286:6 288:13 292:4 300:7 303:8,25 305:15,16,19 | |
| **wimberley** 267:21 268:18 278:13 373:25 | | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

**AMENDED NOTICE OF DEPOSITION OF DANIEL CHATMAN, PH.D.**

PLEASE TAKE NOTICE that pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for the State Defendants in the above-captioned action will take the deposition of Daniel Chatman, Ph.D.

The deposition will be taken upon oral examination before an official authorized by law to administer oaths under the Federal Rules of Civil Procedure and will be recorded by videographic means and/or stenographic means. The examination will be held at Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111, and will commence at 9:00 a.m. PDT/12:00 p.m. EDT on August 6, 2025, and continuing thereafter until completed. The deposition will be available to attend via Zoom videoconferencing through Veritext Legal Solutions. Details regarding the videoconferencing will be emailed to those participating once all arrangements are finalized.

Def. EXHIBIT 19
WITNESS: Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

July 28, 2025

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**STATE LAW DEPARTMENT**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com.

Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**CLARK HILL PLC**
3630 Peachtree Road, NE
Suite 550
Atlanta, Georgia 30326
(678) 336-7249

*Counsel for State Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, a true and correct copy of the foregoing Notice of Deposition of Daniel Chatman, Ph.D. was served on all counsel of record by electronic mail delivery.


/s/ Gene C. Schaerr
Gene C. Schaerr

*Counsel for State Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.,* | |
| *Defendants.* | |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.,* | |
| *Plaintiffs,* | Case No. 1:21-CV-01728-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.,* | |
| *Defendants.* | |

**SUPPLEMENTAL EXPERT REPORT OF DR. DANIEL G. CHATMAN**

Def EXHIBIT 20
WITNESS: Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

## TABLE OF CONTENTS

I.    Executive Summary .................................................................................................. 1

II.   Overview of Analysis ............................................................................................... 3

III.  Methods ..................................................................................................................... 4

    A.    Background ....................................................................................................... 4

    B.    Travel Starting and Ending Points ................................................................... 4

    C.    Travel Time by Mode of Transportation ........................................................ 12

        i.    Travel Times by Public Transportation ................................................... 12

        ii.   Travel Times by Auto .............................................................................. 16

        iii.  Travel Times on Foot ............................................................................... 16

    D.    Spatial Distribution of CVAs by Race/Ethnicity, Disability Status and Auto Ownership ......................................................................................... 17

    E.    Calculating Travel Times by Race/Ethnicity, Disability Status and Auto Ownership ......................................................................................... 17

IV.   Results ..................................................................................................................... 19

V.    Conclusion & Summary .......................................................................................... 21

## I.    EXECUTIVE SUMMARY

1.    I have been retained by Plaintiffs' counsel for this supplemental report, which analyzes whether, and to what extent, the travel times associated with access to ballot drop boxes in the state of Georgia changed for the 2024 election. As with my original report, I have assessed the relative travel times associated with access to ballot drop boxes across certain racial/ethnic groups in the state and by disability status. The purpose of the analysis is, again, to investigate how the aggregate and cumulative effects of state rules on access to ballot drop boxes affect the ease or difficulty of voting, comparing these different demographic groups to each other.

2.    For this supplemental report I investigated the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2024. As noted in my original report, the number of ballot drop boxes in the state declined from 330 in 2020 to 207 in 2022, a 37 percent reduction. In 2024, the number of ballot drop boxes further decreased to 194, an additional 6 percent reduction from the 2022 level. The main output of this analysis are estimates of travel time across the population of CVAs, by race/ethnicity and by disability status.[1] For ease of reference, I have also reproduced some of the results in the original report to more readily compare the travel burdens associated with ballot drop box access in 2024 with those in 2020, before the implementation of SB 202, and in 2022, the first statewide general election after the implementation of SB 202.

3.    The findings in my original 2023 report remain substantively unchanged. With respect to this supplement, I find that in 2024 the distribution of ballot drop boxes places a more substantial travel burden on CVAs without access to a vehicle, who are disproportionately

---

[1] I did not conduct an analysis for Asian American and Pacific Islander (AAPI) citizens of voting age for my original report in 2023, and did not do so for this supplemental report. I thus do not provide evidence on how the effects of state rules on access to ballot drop boxes affected the ease or difficulty of voting for AAPI voters.

represented by individuals in three groups: people with disabilities, Black voters, and Hispanic voters. (As a reminder, I define a "travel burden" as having to travel more than an hour round-trip to a ballot drop box, which would more than double the average amount of discretionary household travel for a Georgia resident.)

4.    The percentage of CVAs who would incur a travel burden to access any of the relevant locations for voting in the state of Georgia is very low for those who live in a household with access to a personal vehicle, but very high for those without access to a car, a demographic that comprised about 4.3 percent of CVAs in Georgia in the 2024 election (note those without a car made up 4.6 percent of CVAs in Georgia in the data used in my 2023 report).

5.    For example, as shown in the original report, in 2020 about 65 percent of CVAs without access to a car would have had to spend more than an hour of travel time to access a ballot drop box. In 2022, with the reduction in the number of ballot drop boxes, this figure increased to about 85 percent of CVAs without access to a car. In 2024, the fraction of CVAs without a household vehicle who are so burdened further increased, to about 90 percent.

6.    This burden was disproportionately borne by Black voters in comparison to non-Hispanic white voters, and disproportionately borne by people with disabilities compared to people without disabilities, as described below. For the 2024 election, about 8 percent of Black citizens of voting age in Georgia lacked a vehicle in the household (more than three times as high as non-Hispanic white CVAs, at about 2.5 percent), while about 10 percent of CVAs with disabilities lacked vehicle access (more than three times as high as CVAs without disabilities, at 3 percent). Partly as a result of this, Black CVAs and CVAs with disabilities were roughly two to three times as likely to have a travel burden associated with drop box access compared to non-Hispanic White CVAs and CVAs without disabilities, respectively.

7.    As described in my original report, the median total one-way travel time on public transportation from home to the nearest in-county drop box location increased by 61 percent between 2020 and 2022, to 1 hour and 24 minutes. In 2020, Black voters statewide were about 1.4 times as likely as non-Hispanic white voters to have a round-trip exceeding an hour to access a ballot drop box. In 2022, the difference increased dramatically: Black voters statewide were about 2.5 times as likely as non-Hispanic white voters to have a round-trip that exceeded an hour. My new analysis shows that in 2024, Black CVAs statewide in the 2024 election were 2.2 times as likely as non-Hispanic white CVAs to have a round-trip that exceeded an hour to access a ballot drop box. The new analysis also shows that Hispanic CVAs were 1.3 times as likely to have such a burden as non-Hispanic white CVAs – a relative decline in access since my original report.

8.    In 2020, voters with disabilities were 2.4 times as likely as voters without disabilities to have a round-trip exceeding an hour to access a ballot drop box; and in 2022, this difference increased substantially, as voters with disabilities statewide were almost 3 times as likely as voters without disabilities to have a round-trip exceeding an hour. In 2024, voters with disabilities statewide were about 2.75 times as likely as voters without disabilities to have a round-trip exceeding an hour.

## II.    OVERVIEW OF ANALYSIS

9.    The additional analysis conducted for this supplement was, briefly, to estimate travel times from home block group centroids to ballot drop boxes in the 2024 election, using updated demographic data from the U.S. Census American Community Survey (2019-2023 five-year block group estimates). More details on the analysis steps are provided in the original report dated January 27, 2023, starting at page 5.

10.    I was assisted in geocoding, mapping, data compiling, data management, Google API management, and data analysis by two research assistants holding master's degrees in city

and regional planning, civil and environmental engineering, and data science, both graduates of UC Berkeley. I also paid Google for the use of their cloud services to procure travel time estimates.

## III.    METHODS

### A.    Background

11.    Please refer to my original report for background on the methods and definitions used here, at page 6. As a reminder, a travel burden is defined in that report as a round-trip that exceeds 60 minutes, a duration that would more than double the average amount of discretionary household travel in the state of Georgia, which was 54 minutes per day in the most recent statewide household travel survey, conducted in 2017.

### B.    Travel Starting and Ending Points

12.    Ballot drop box locations for the 2024 general election were provided by the State of Georgia to Plaintiffs' counsel, with the exception of locations for 21 counties. The names of ballot drop box locations in the 2024 election were matched to addresses of advance voting locations using the name of the location (e.g. Ben Robertson Community Center). Addresses were then manually inspected to ensure they corresponded to the ballot drop box locations, and adjusted when necessary. The data provided to Plaintiffs' counsel by the State of Georgia were missing ballot drop box locations for 21 of the 159 counties in the state. For these counties, ballot drop box locations were identified using a variety of publicly available sources, including county election board websites, along with the 2024 PeachVote ballot drop box information database.[2] Ballot drop box locations were identified in all 21 of the counties missing the data. Those locations are incorporated into my analysis and are reflected in my conclusions.

---

[2] That database is available via an internet archive at
https://web.archive.org/web/20241015103645/https://www.peachvote.com/.

13.    I conclude that there was a reduction in the number of drop boxes from the 2022 level of 207 drop boxes, to 194 drop boxes in 2024.

14.    Figures 1, 2, and 3 display the following geocoded locations: ballot drop boxes in 2020, ballot drop boxes in 2022 (both replicated from my original 2023 report), and ballot drop boxes in 2024, on a county map of Georgia. Figure 4 displays the change in ballot drop box locations from 2020 to 2024. Note that for the purpose of the map in Figure 4, a ballot drop box location was considered to be "unchanged" if it was, in 2024, within a mile of a ballot drop box location in 2020.

Figure 1: Ballot Drop Box Locations, 2020



Figure 2: Ballot Drop Box Locations, 2022



Figure 3: Ballot Drop Box Locations, 2024



Figure 4: Changes to Ballot Drop Box Locations, 2020 and 2024



(C) OpenStreetMap contributors (C) CARTO

15.    There were some comparatively very minor changes in the locations of block group centroids in the state of Georgia between 2022 and 2024. Block group centroids are used to estimate home locations. Figure 5 displays the centroids for all 7,446 block groups used for the 2024 analysis. (As with the figure in the original report, note that while county boundaries are shown in Figure 5, block group boundaries are not.) A few block groups had centroid location changes between the analysis detailed in the original report, and this analysis. The largest change (one block group out of 7,446) was a relocation of 103 meters distance, while an additional 16 block groups had centroid alterations exceeding 30 meters. Because these changes are so small, the map shown in Figure 5 is not distinguishable at this scale from the centroid map in my 2023 report. None of the changes in centroid locations had a material effect on the travel time analysis.

**Figure 5: 2019-2023 ACS Block Group Centroids (Estimated Home Locations) For Georgia**



C.    Travel Time by Mode of Transportation

16.    For each block group centroid, I estimated the travel time to the nearest ballot drop box in 2024, following the same methods outlined in the original report. A summary of median one-way travel times (calculated over block groups) is shown below in Table 1. For auto, public transportation, and walking, travel times between block group centroids and ballot drop boxes increased further still from 2022 to 2024, due to the reduction in the number of ballot drop boxes in the state.

| Table 1: Median One-Way Travel Time by Mode (for Block Groups, in Minutes) | | | |
|---|---|---|---|
| | Ballot drop boxes, 2020 | Ballot drop boxes, 2022 | Ballot drop boxes, 2024 |
| Auto | 8.38 | 11.37 | 11.50 |
| Public transportation | 26.43 | 42.13 | 49.07 |
| Walking | 68.07 | 102.85 | 117.65 |

*Note: Data for ballot drop boxes in 2020 and 2022 is reproduced from the original report of January 2023.*

i.    *Travel Times by Public Transportation*

17.    To calculate travel times by public transportation I followed the methods detailed in the original report at paragraphs 40 to 43. I used a Tuesday morning in June as the basis for travel time estimates, and 4.59 as the multiplier for fixed-route public transportation services in five counties that did not have GTFS data, as described in more detail in the original report.

18.    Figure 6 and 7 show the spatial extent of public transportation access in Georgia, and changes in ballot drop box accessibility by public transportation since the original report. In Figure 6 the dark purple shading represents areas in which a ballot drop box could be accessed using public transportation in 2024; the light purple areas are places where destinations could be

accessed using public transportation, but our estimates are not from GTFS data (as described in the original report); and the white areas are places where public transportation either does not exist or is slower than walking to access the nearest eligible ballot drop box.

19.     In Figure 7, the green shading represents block groups where a ballot drop box could be accessed by public transportation in the updated 2024 election analysis, but not in the prior 2020 election analysis. Conversely, the red shading represents block groups where a ballot drop box could be accessed by public transportation in the prior 2020 election analysis, but not in the 2024 election analysis. These shifts are largely due to changes in public transportation systems captured by Google's travel time API. For the 2024 analysis, we can see the impact of Bulloch County's new bus routes in Statesboro, and notable improvements in ballot drop box access via public transportation in Gwinnett County and Cobb County. Note that due to data availability in the Google API, the 2020 and 2022 analyses used 2023 public transportation data, and the 2024 analysis uses 2025 public transportation data.

**Figure 6: Census Block Groups Where Public Transportation Was Available and Faster Than Walking in the State of Georgia in 2024**



**Figure 7: Changes in Ballot Drop Box Public Transport Accessibility by Census Block Groups, Georgia, 2020 to 2024**



(C) OpenStreetMap contributors (C) CARTO

20.    Of the block groups for which public transportation was available and faster than walking, median one-way public transportation travel times were as follows for 2020 (reproduced from the original report), 2022 (also reproduced from the original report), and 2024 (new analysis):

- To the nearest ballot drop box in 2020: 26.4 minutes, with 90 percent of block groups having a one-way public transportation travel time between 11.3 minutes and 63.1 minutes.

- To the nearest ballot drop box in 2022: 42.1 minutes, with 90 percent of block groups having a one-way public transportation travel time between 17.2 minutes and 80.3 minutes.

- To the nearest ballot drop box in 2024: 49.1 minutes, with 90 percent of block groups having a one-way public transportation travel time between 23.2 minutes and 94.3 minutes.

ii.    *Travel Times by Auto*

21.    Driving times from home locations to the nearest allowed drop box within each county were estimated following the procedures described in my original report at paragraph 46. The median one-way driving times were as follows for 2020 (reproduced from the original report), 2022 (also reproduced from the original report), and 2024 (new analysis):

- To the nearest ballot drop box in 2020: 8.38 minutes, with 90 percent of block groups having a one-way driving time between 2.9 minutes and 21.0 minutes.

- To the nearest ballot drop box in 2022: 11.4 minutes, with 90 percent of block groups having a one-way driving time between 4.0 minutes and 22.0 minutes.

- To the nearest ballot drop box in 2024: 11.5 minutes, with 90 percent of block groups having a one-way driving time between 4.2 minutes and 22.4 minutes.

iii.    *Travel Times on Foot*

22.    Walking times from home locations to the nearest allowed drop box within each county were estimated following the procedures described in my original report at paragraph 48.

16

The median one-way walking times were as follows for 2020 (reproduced from the original report), 2022 (also reproduced from the original report), and 2024 (new analysis):

- To the nearest ballot drop box in 2020: 68.1 minutes, with 90 percent of block groups having a <u>one-way</u> walking time between 16.3 minutes and 267 minutes.

- To the nearest ballot drop box in 2022: 102 minutes, with 90 percent of block groups having a <u>one-way</u> walking time between 24.3 minutes and 279 minutes.

- To the nearest ballot drop box in 2024: 118 minutes, with 90 percent of block groups having a <u>one-way</u> walking time between 28.6 minutes and 312 minutes.

### D.    Spatial Distribution of CVAs by Race/Ethnicity, Disability Status and Auto Ownership

23.    I relied on data from the U.S. Census Bureau 2019-2023 American Community Survey (ACS 2019-23) to estimate home locations for CVAs in the 2024 election. The 2019-23 ACS was the most accurate and recent data available at the time of this analysis.

24.    I estimated the locations and characteristics of CVAs, by race/ethnicity, disability status, and access to a personal vehicle in their household following the same procedures as used in my original report from January 2023. In the data from the 2019-2023 American Community Survey there were 7,446 block groups in the state, and on average for each block group, there were about 600 housing units.

25.    I also updated the U.S. Census Public Use Microdata Sample data to the 2019-2023 Census; the 77 associated Public Use Microdata Areas (PUMAs) are those defined based on the 2020 Census, a change from the 72 PUMAs used in my original report.

### E.    Calculating Travel Times by Race/Ethnicity, Disability Status and Auto Ownership

26.    In order to evaluate the extent to which all Georgia citizens seeking to access a ballot drop box, early voting location, or DDS office will encounter a travel burden, I followed the

same procedures as described in my original report to assign a round-trip travel time to any given CVA in any given Census block group. I then identified all CVAs in the state who I estimate would have to carry out a round-trip of more than 60 minutes to access a ballot drop box.

27.    Of the estimated 7.52 million CVAs in Georgia based on the 2019-2023 ACS, I calculated that about 7.2 million have access to a vehicle owned by the household, and about 320,000 (4.3 percent) do not. Black CVAs and CVAs with disabilities are much more likely to lack vehicle access. About 8 percent of Black CVAs in Georgia lack a vehicle in the household (more than three times as high as white CVAs), while about 10 percent of CVAs with a reported disability lack vehicle access (more than three times as high as non-disabled CVAs).

28.    Note that between the 2016-20 ACS estimates and the 2019-23 ACS estimates, auto access across the State of Georgia increased modestly. As shown in Table 2, Black CVAs and CVAs with disabilities experienced a 1.1 percentage point reduction in the share lacking a vehicle, while the other groups experienced much smaller reductions ranging from about 0.08 to 0.2 percent.

| Table 2: Share of Group Lacking Household Vehicle Access | | | |
|---|---|---|---|
| | Data in original report (2016-2020 ACS) | Updated data (2019-2023 ACS) | Percentage point change |
| Non-Hispanic white CVAs | 2.54% | 2.46% | -0.08% |
| Black CVAs | 8.9% | 7.8% | -1.1% |
| Hispanic CVAs | 3.7% | 3.6% | -0.1% |
| CVAs with disability | 11.0% | 9.9% | -1.1% |
| CVAs without disability | 3.4% | 3.2% | -0.2% |

29.    In addition to race/ethnicity and disability status, poverty status is a strong indicator of whether a household has access to a personal vehicle, and provides a partial explanation for the lower rate of vehicle access among Black CVAs and CVAs with disabilities. In the 2019-2023 ACS data, Black CVAs and CVAs with a reported disability had much higher rates of poverty, at 16.4 and 19.2 percent respectively, than non-Hispanic White CVAs (at 9.4 percent) or CVAs without a reported disability (at 10.2 percent).

## IV.    RESULTS

30.    SB 202 required one ballot drop box per county in the state of Georgia, while restricting the ability of counties to provide more, limiting the number of additional drop boxes to the lesser of one per every 100,000 registered voters, or the number of early voting locations. (The law also reduced the days and hours during which ballot drop boxes were available.)  The bill resulted in a substantial reduction in the number of ballot drop boxes in the state of Georgia. As I stated in my original report, in the 2020 general election, there were 330 ballot drop boxes in the state. As noted in the original report, largely by removing ballot drop boxes in the more densely populated urban counties in the state, in the 2022 general election the number of ballot drop boxes had declined to 207, a 37 percent reduction. In 2024, the number of ballot drop boxes further decreased to 194.

31.    As noted in my original report at paragraph 71 and 72, in 2020, Black CVAs and CVAs with disabilities were already more likely to have a travel burden to access a drop box compared to non-Hispanic white CVAs and CVAs without disabilities, respectively. Also noted in the original report, in 2022 after the passing of SB 202, the disparity worsened significantly; Black CVAs became nearly two-and-a-half times as likely to have a travel burden as non-Hispanic white CVAs, and CVAs with disabilities became almost three times as likely to have a travel burden to access a ballot drop box than CVAs without disabilities. In 2024, these differences in

magnitude decreased slightly but remained significantly above pre-SB 202 levels. In 2024 Black CVAs were 2.2 times as likely to have a travel burden as non-Hispanic white CVAs, and CVAs with disabilities were 2.8 times as likely to have a travel burden to access a ballot drop box than CVAs without disabilities. More details are provided below.

32. As noted in the original report, in the 1,698 block groups for which public transportation travel was faster than walking in 2020, the median total time to travel from home to the nearest in-county drop box location, including walking time to the origin stop and from the destination stop, was 52.9 minutes, round-trip. There was substantial variance. For example, ten percent of block groups had a one-way trip longer than 52.5 minutes to arrive at a drop box location in 2020, or about 1 hour and 45 minutes round-trip.

33. Also as noted in the original report, there was a substantial increase in the number of block groups for which public transportation travel was faster than walking in 2022 because of the removal, due to SB 202, of many ballot drop boxes in urban counties like Fulton and DeKalb where walking trips could formerly be made to access a ballot drop box. The analysis conducted for this supplemental report shows that in 2024, the increase was larger still. For the 2,291 block groups for which public transportation travel was faster than walking in 2024, the median total time to travel on public transportation from home to the nearest in-county drop box location, including walking time, was 1 hour and 38 minutes, round-trip, an increase of 16.4 percent in duration compared to 2022. Similarly, in 2024, the median one-way road network distance increased slightly from 2022 levels, to 5.5 miles, and the median round-trip driving duration also increased slightly to 23.0 minutes. About 72 percent of block group centroids had round-trip travel times via auto of less than 30 minutes, a decrease of 10 percentage points compared to 2020.

34.     As stated in my original report, compared to 2020, the distribution of drop box locations in 2022 under SB 202 increased accessibility for residents of some parts of the state which received ballot drop boxes where they were unavailable before. At the same time, due to SB 202, ballot drop boxes were reduced in other counties of the state. In 2020, Black CVAs were about 1.4 times as likely to have a round-trip exceeding 60 minutes to access a drop box compared to non-Hispanic white CVAs. By 2024, Black CVAs statewide were 2.2 times as likely as non-Hispanic white CVAs to have a round trip to access a drop box location exceeding an hour (7.0 percent compared to 3.2 percent).

35.     Changes to drop box accessibility after SB 202 also disproportionately benefited people without disabilities compared to people with disabilities. As shown in my original report, in 2020, CVAs with disabilities were 2.4 times as likely as CVAs without disabilities to have a round-trip to access a drop box location exceeding an hour or to have no access to a drop box (10.1 percent of CVAs with disabilities compared to 4.2 percent of CVAs without disabilities). By 2024, the gap had widened and CVAs with disabilities statewide were 2.8 times as likely as CVAs without disabilities to have a round-trip exceeding an hour (9.5 percent of CVAs with disabilities compared to 3.5 percent of CVAs without disabilities).

## V.     CONCLUSION & SUMMARY

36.     In this supplemental report I have analyzed the travel burdens associated with accessing ballot drop boxes in 2024, and have also referred to my original report which provided data on changes in ballot drop box access between 2020 and 2022. The conclusions in my 2023 report have not substantively changed, though the figures have changed slightly. The new analysis affirms my finding that SB 202 has very clearly placed additional burdens on Black, Hispanic, and disabled voters.

37.     I estimated the distribution of travel times to access ballot drop box locations using updated data for the 2024 election and for the most recent demographic data available for the state of Georgia, and calculated the share of the subpopulations who would be burdened by a trip to access a ballot drop box because it requires a round trip exceeding 60 minutes. These findings are summarized in Table 3 (below).

38.

**Table 3: Share of Group Facing Travel Burden to Access a Ballot Drop Box, By Election Year**

|  | 2020 | 2022 | 2024 |
|---|---|---|---|
| Non-Hispanic white CVAs | 4.7% | 3.0% | 3.2% |
| Black CVAs | 6.5% | 7.3% | 7.0% |
| Hispanic CVAs | 4.0% | 3.6% | 4.1% |
| CVAs with disability | 10.1% | 9.8% | 9.5% |
| CVAs without disability | 4.2% | 3.3% | 3.5% |

*Note: "Travel burden" defined as 60 minutes round-trip. Figures for 2020 and 2022 are reproduced from my original report of January 2023.*

39.     The findings summarized in Table 3 mean that Black CVAs in the 2024 election were 2.2 times as likely to have a travel burden to access a ballot drop box as non-Hispanic white CVAs, a finding quite similar to my original report looking at the 2022 election; and Hispanic CVAs became 1.3 times as likely as non-Hispanic White CVAs to experience a travel burden, an increase in burden since the 2022 election.

40.    Between 2020 and 2024, an additional 19,000 Black CVAs and an additional 4,100 Hispanic CVAs were newly burdened due to the reduction of ballot drop boxes, while there was a *reduction* of 67,000 in the number of burdened individuals among non-Hispanic white CVAs. Meanwhile, CVAs with disabilities were 2.75 times as likely to have a travel burden to access a ballot drop box in the 2024 election as CVAs without disabilities. While there were about 37,000 *fewer* CVAs without disabilities who would have a long trip to access a drop box between 2020 and 2024, the number of burdened CVAs with disabilities stayed about the same.

41.    People under the poverty line are also much more likely to be affected by these burdens across the state, because they are less likely to have access to a personal vehicle in their household. Such long travel durations under uncomfortable or impossible conditions, given age and disability, are likely to dissuade some affected voters from availing themselves of these services, and may help to discourage some from voting altogether by reducing its ease and convenience.

I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to light.

Dr. Daniel G. Chatman            Dated: June 13, 2025

23

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.,* | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.,* | |
| Defendants. | |
| THE CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, INC., *et al.,* | |
| Plaintiffs, | Case No. 1:21-CV-01728-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, *et al.,* | |
| Defendants. | |

**EXPERT REPORT OF DR. DANIEL G. CHATMAN**

Deft EXHIBIT 21
WITNESS: Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

# TABLE OF CONTENTS

I.    Executive Summary .................................................................................................. 1

II.   Qualifications ........................................................................................................... 3

III.  Overview of analysis ............................................................................................... 5

IV.   Methods ................................................................................................................... 6

      A.    Background ..................................................................................................... 6

      B.    Travel Starting and Ending Points ............................................................... 10

      C.    Travel Time by Mode of Transportation ..................................................... 17

            i.     Travel Times by Public Transportation .............................................. 18

            ii.    Travel Times by Auto ......................................................................... 22

            iii.   Travel Times on Foot .......................................................................... 23

      D.    Spatial Distribution of CVAs by Race/Ethnicity, Disability Status
            and Auto Ownership ..................................................................................... 23

      E.    Calculating Travel Times by Race/Ethnicity, Disability Status and
            Auto Ownership ............................................................................................ 26

V.    Results .................................................................................................................... 29

      A.    Access to Ballot Drop Boxes ....................................................................... 29

      B.    Access to Early Voting Locations ................................................................ 32

      C.    Access to DDS Offices ................................................................................ 34

VI.   Conclusion ............................................................................................................. 35

VII.  References .............................................................................................................. 39

## I.    EXECUTIVE SUMMARY

1.    I was retained by Plaintiffs' counsel to estimate the travel times associated with access to ballot drop boxes, early voting locations, and photo ID procurement locations (Department of Driver Services (DDS) offices) in the state of Georgia; to compare ballot drop box access before and after implementation of Senate Bill 202 (SB 202); and to assess the relative travel times associated with access to these locations across the major racial/ethnic groups in the state and by disability status. The purpose of this analysis is to investigate how the aggregate and cumulative effects of state rules on access to voting methods (such as ballot drop boxes and early voting locations) and on identification documents for voting (including photo ID) affect the ease or difficulty of voting, comparing these different demographic groups to each other.

2.    I investigated the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2020 before the implementation of SB 202, dropping off a ballot at a drop box in 2022 after the implementation of SB 202, accessing an early voting location in 2022, or traveling to a DDS office to apply for a photo identification card. Analyses of these travel scenarios were done separately. I focus on the time required to access these locations by car, via public transportation, or on foot, and to return home, as time is the most salient and readily quantifiable of the various costs involved in travel. The main output of this analysis are estimates of travel time across the population of CVAs, by race/ethnicity and by disability status.

3.    I find that the distribution of ballot drop boxes, early voting locations, and photo ID procurement locations places a more substantial travel burden on CVAs without access to a vehicle, who in turn are much more commonly found among three groups: people with disabilities, Black voters, and to a less marked extent, Latinx voters. I define a "travel burden" as having to travel more than an hour round-trip, which would more than double the average amount of

discretionary household travel for a Georgia resident. (For access to DDS locations, as explained below, I use a 90-minute travel burden definition.)

4.      The percentage of CVAs who would incur a travel burden to access any of the relevant locations for voting in the state of Georgia is very low for those who live in a household with access to a personal vehicle, but very high for those without access to a car, a demographic that comprises about 4.6 percent of CVAs in the state. For example, in 2020 about 65 percent of CVAs without access to a car would have had to spend more than 60 minutes to deliver their ballot to a drop box location and return home. In 2022, with the reduction of ballot drop boxes, this figure increased to about 85 percent of CVAs. The average round-trip duration for these burdened individuals without access to a car in 2022 was more than 3 hours and 38 minutes, due to a significant number of those who would be required to travel for long distances on foot.

5.      This burden is disproportionately borne by Black voters in comparison to non-Hispanic white voters, and disproportionately borne by people with disabilities compared to people without disabilities, as described in each of the sections below. About 9 percent of Black voters in Georgia lack a vehicle in the household (three times as high as non-Hispanic white voters), while about 11 percent of voters with disabilities lack vehicle access (more than three times as high as voters without disabilities). Partly as a result of this, Black voters and voters with disabilities are two to three times more likely to have travel burdens across all three destination types: ballot drop boxes, early voting locations and DDS offices. These burdens can be expected to reduce the probability of voting by members of these groups.

6.      The median total time to travel on public transportation from home to the nearest in-county drop box location increased 61 percent between 2020 and 2022, to 1 hour and 24 minutes.

7.     In 2020, Black voters statewide were 36 percent more likely than non-Hispanic white voters to have a round-trip exceeding an hour to access a ballot drop box. In 2022, the difference increased dramatically: Black voters statewide were 146 percent more likely than non-Hispanic white voters to have a round-trip that exceeded an hour.

8.     In 2020, voters with disabilities were 141 percent more likely than voters without disabilities to have a round-trip exceeding an hour to access a ballot drop box. In 2022, this difference increased substantially: voters with disabilities statewide were 193 percent more likely than voters without disabilities to have a round-trip exceeding an hour.

9.     Whether households experience a travel burden to access a ballot drop box, early voting location, or DDS location is highly correlated with poverty status. That is because experiencing such a travel burden is almost entirely associated with individuals not having access to a car, and one of the best predictors of whether a person owns a car is their household income. The median income of households without cars in Georgia ($36,000) is half of that for households who have a car ($72,000) (U.S. Census Bureau 2017 American Community Survey Public Use Microdata Sample).

## II.     QUALIFICATIONS

10.     I am an Associate Professor of City and Regional Planning at the University of California, Berkeley. I have taught undergraduate and graduate courses in urban and regional transportation planning, transportation and land use planning, and research methods.

11.     I received a B.A. degree from the University of California, Berkeley in 1991, a Master's degree in Public Policy from the Kennedy School of Government at Harvard University in 1997, and a Ph.D. in Urban Planning from the University of California, Los Angeles in 2005. From 2005 to 2009, I was Assistant Professor in the Bloustein School of Planning and Public Policy at Rutgers University, where I also served as Director and Research Director of the Alan

M. Voorhees Transportation Center. I was appointed as Assistant Professor at U.C. Berkeley in 2009, and was promoted to Associate Professor with tenure in 2014. I am currently Chair of the Department of City and Regional Planning at U.C. Berkeley. My curriculum vitae (CV) is attached to this report.

12.    I conduct research on travel behavior and the built environment, immigrants and travel in the United States, the relationships between public transportation services and the economy, and other topics related to transportation and land use planning. I have published more than 50 peer-reviewed journal articles, book chapters, research reports, and lay articles, and have given more than 100 invited or refereed talks on these topics. I have been principal investigator on transportation and land use research grants and contracts totaling more than $3.3 million in funding.

13.    I have been involved with four voting cases in which I provided my services as an expert witness in the area of transportation and land use studies, and was qualified as an expert in all of those cases in which I wrote reports and/or provided testimony.

14.    In 2014, I provided a report and testified as an expert in a federal voting case in Texas, *Veasey v. Perry*, No. 2:13-cv-193 (NGR) (S.D. Tex.). My analysis and testimony concerned the racial/ethnic and income distribution of transportation burdens associated with newly imposed photo identification requirements for voter eligibility in Texas.

15.    In September 2020, I provided a report and testified in a federal voting case in Ohio, *A. Philip Randolph Inst. of Ohio v. LaRose*, No. 1:20-cv-01908-DAP (N.D. Ohio). My analysis and testimony concerned travel burdens and queuing delays associated with a State of Ohio rule requiring that ballot drop boxes be provided exclusively at the county board of elections in each county.

4

16.    In October 2020, I provided a report and testified in a state voting case in Texas, *The Anti-Defamation League Austin v. Abbott*, No. D-1-GN-20-005550 (Texas State District Court, Travis County, 353rd Judicial District), and provided a report in a related federal case in Texas, *Texas State Conference of NAACP Branches v. Abbott* (W.D. Tex.). My analysis and testimony in these cases concerned the travel burdens and queueing delays associated with a State of Texas restriction on the number of ballot drop boxes that could be made available by counties.

17.    I am being compensated at the rate of $500 per hour for my work on this case. My compensation is not contingent on or affected by the substance of my opinions or the outcome of this case.

## III.    OVERVIEW OF ANALYSIS

18.    I defined and carried out the analysis of travel burden in four parts. First, I identified a simplified set of home starting points for trips that would be undertaken by those who seek to access a ballot drop box, early voting location, or a DDS office. This simplified set of home starting points consists of the "centroids," or central geographical coordinates, of the 7,446 Census-defined block groups in the state of Georgia. I also identified and mapped the individual locations within each county where ballot drop boxes (in 2020 as well as 2022), early voting locations, and DDS offices are located. Second, using Google Maps via a cloud services account, I estimated the time it would take to travel from home to the nearest eligible location within each county, and back, by each of three travel modes: personal automobile, public transportation (including buses and rail services), and on foot. Third, I compiled and estimated information about CVAs by race/ethnicity, disability status, and auto ownership located in the 7,446 block groups throughout the state. Fourth, I estimated the round-trip travel times for CVAs to return a ballot to a ballot drop box or early voting location, or to access a DDS office to procure a photo ID, depending on their race/ethnicity, disability status, and whether they have access to a personal vehicle in their household.

19.    I was assisted in geocoding, mapping, data procurement, data management, Google API management, and data analysis by two master's students and one graduate of UC Berkeley's undergraduate program. I also paid Google for the use of their cloud services to procure travel time estimates.

IV.    **METHODS**

A.    **Background**

20.    For purposes of this investigation, I define "travel burden" in terms of time. My definition is based on a comparison with both national travel survey data and survey data from the State of Georgia.

21.    The cumulative time that individuals spend traveling every day varies a great deal by household (National Household Travel Survey, 2017).[1] In the State of Georgia, the average daily time spent traveling for discretionary trips made for personal and household purposes, excluding work, is about 54 minutes (excluding intercity trips). This figure is slightly lower than the U.S. average (see Table 1 below). A starting point for any definition of "travel burden" is the current amount of time that an individual already spends traveling for discretionary purposes each day, because this pattern typically reflects constraints that make it difficult to travel more without having financial impacts or causing time scarcity (Farber and Páez, 2011).

Table 1: Average Minutes Spent Traveling Per Day, By Income, For Home-Based Non-Work Trips

|  | All persons | Household income <$25,000 | Household income >$25,000 |
|---|---|---|---|
| Georgia | 53.7 | 54.7 | 52.8 |
| United States | 56.1 | 55.0 | 56.2 |

Source: National Household Transportation Survey, 2017

---

[1] The most recent national data on travel across the United States and in Georgia are from 2017, in the National Household Travel Survey.

22.    The average duration for a home-based trip for a non-work purpose (excluding intercity trips)—that is, the time needed for the average trip from home to reach an activity such as grocery shopping, seeing the doctor, or dropping one's child off at school—was 20.6 minutes in the U.S. and 22.3 minutes in Georgia in 2017. Almost all trips in both the U.S. and in the State of Georgia are taken by personal vehicle, due to the relatively slow speeds and incomplete spatial coverage afforded by public transportation in most parts of the U.S. and Georgia, the common need to transfer between public transportation vehicles, the long distances between activity locations, and the often hazardous or strenuous walking conditions that can make walking impractical. Excluding intercity trips, just 1.6 percent of all trips in Georgia are taken on public transportation, while 7.9 percent of all trips are taken on foot.

23.    While some individuals may have time to spare for numerous activities, most individuals must make tradeoffs when there is any new demand on time. An increase in the amount of time required to travel can cut into discretionary time for activities like entertainment, socializing, and shopping, as well as into non-discretionary time for activities like work, meals, childcare, and buying groceries (Farber and Páez, 2011).

24.    Voters are significantly affected by the costs of voting, most of which have to do with the time required to prepare to vote and to carry out voting; and the costs of voting are a greater determinant of the likelihood to vote than conventional measures of the benefit of voting such as the perceived differences between parties, the perceived closeness of the election and the long-range value of voting participation (Sigelman & Berry, 1982; Blais et al, 2000).

25.    There are a number of costs associated with traveling to access a drop box, early voting location, or DDS office, the largest and most quantifiable of which is time. The primary time burden arises for those who do not have access to a vehicle, as those who do have such access

can either drive to the location or get a ride from someone in their household. The physical effort involved is also minimal. Those who do not have access to a vehicle, however, must rely on either a ride from someone else not living in the household, or an alternative travel mode such as public transportation or walking. For example, in the 2022 general election there were only 304 early voting locations and 67 DDS offices in Georgia, a state of about 11 million people. Given that public transportation services are slower, and completely unavailable in large parts of the state, travel distances and trip durations to these locations can be quite long.

26.    While travel burden is in part subjective, and can be increased by factors other than travel *time*, the primary focus of this analysis is to investigate the number and share of CVAs who would need to undertake trips of long duration in order to access ballot drop boxes, early voting locations, and DDS offices. Of course, calculating the travel burden based on time alone does not account for the relative inconvenience and physical discomfort of walking to locations where public transportation can be accessed, waiting for public transportation to arrive, and enduring the extensive in-vehicle times associated with long public transportation rides. Nor does it account for the physical effort involved with walking all or some of the distance to the location along routes that may be largely inhospitable to pedestrians. This method also does not reflect that such trips can be particularly difficult or nearly impossible for people with disabilities, elderly people, and people with physical limitations.

27.    By analyzing survey data for the purpose of predicting choices between travel modes, some studies have translated these qualitative facts about accessing and egressing public transportation on foot into estimates of the valuation of time associated with various aspects of public transportation. Based on a set of 192 studies of walk time values and 77 of waiting time values, the time that people spend waiting for public transportation or walking to and from public

transportation stops is estimated to be about 1.6 times as burdensome as time spent traveling in a personal vehicle (Abrantes and Wardman, 2011, Table 21). In turn, time spent riding the bus or rail is somewhat more burdensome than time spent in a personal vehicle. One quantitative figure averaging a smaller set of studies puts the value for the disutility of time spent on a bus compared to time spent in a car at 1.2 (Abrantes and Wardman, 2011, Table 19), meaning that time spent on a bus is 20 percent more uncomfortable and burdensome, on average, than driving.

28.     In addition, people of lower income can be expected to have more difficulty than people of higher income finding additional time to drop off their ballots. Those of lower income usually do not have the option of purchasing services to reduce time requirements in other areas, such as by paying for childcare, laundry service, or home cleaning services, or by eating meals out or purchasing prepared food. Travel becomes particularly burdensome when it requires difficult choices, such as whether to work fewer hours in the week (and thus literally to pay in dollar terms, not just in time terms); to allow children to stay up later than normal to accommodate the lengthened schedule for that day; or to forgo a trip to the doctor that week. Because these kinds of burdens are more likely to be borne by those of lower income, but cannot be otherwise measured directly with available data, I also investigated whether the travel time burden is associated with poverty status in the State of Georgia, as discussed later in the report.

29.     For the purpose of this analysis, I define a travel burden as a round-trip that exceeds 60 minutes, or in the case of a trip to access a DDS office to obtain a photo ID, as a round-trip that exceeds 90 minutes. An additional round-trip of 60 minutes on any given day would more than double the average amount of discretionary household travel in the state of Georgia of 54 minutes per day (Table 1). An additional round-trip of 90 minutes would increase that figure by 167 percent. Furthermore, almost all such round trips to access a voting-related destination would be

on foot or via public transportation, which are more onerous than trips undertaken in a private vehicle. Very few trips to access a ballot drop box or early voting location would require a round-trip exceeding 60 minutes for someone driving, and very few round-trips to access a DDS office exceed 90 minutes if driving. Just two percent of trips in Georgia exceeded 60 minutes round-trip either on public transportation or on foot, and 1.4 percent exceeded 90 minutes round-trip, according to the most recent data for Georgia from the National Household Travel Survey (2017). The fact that such long trips on foot or via public transportation are rare suggests that people avoid them whenever possible.

**B.    Travel Starting and Ending Points**

30.    For each of the three destination types—ballot drop boxes in the 2020 and 2022 general elections, early voting locations in the 2022 general election, and DDS offices—I obtained listings from the State of Georgia of the locations, with supplements as described below. Once the addresses were extracted from the list or document, these addresses were then geocoded and converted to geographic coordinates using a Google Sheets Plugin Geocoder. These coordinates were then cross-compared with geocoding by the Google Maps Geocoder. Lastly, a manual visual skimming inspection was conducted on Google Maps to ensure that every geocoded location was in a reasonable position (for example, in a public building, office, church, commercial building, or park, and not in the middle of the woods). If a set of coordinates appeared to be out of place, a manual investigation of the associated address was conducted to identify an appropriate set of coordinates.

31.    Ballot drop box locations for the 2020 general election were obtained from data provided by the State of Georgia to Plaintiffs' counsel during the course of this litigation. Because it was my understanding that the state could not provide assurances that this list of drop box locations was complete, the list was then supplemented by online sources, including but not limited

to data from the Georgia Peanut Gallery (https://georgiapeanutgallery.org/2020/09/28/ drop- box-locations-for-november-3-2020-election/) and 11 Alive (https://www.11alive.com /article/news/ politics/elections/absentee-ballot-drop-boxes-in-metro-atlanta/85-3ba1e3fc-9421-4b29-9210-c48713cad083).

32.    Ballot drop box locations for the 2022 general election were obtained from data provided by the State of Georgia to Plaintiffs' counsel during the course of this litigation. Because it was my understanding that the state could not provide assurances that this list of drop box locations was complete, the list was then supplemented by online sources, including but not limited to data from 11Alive (https://www.11alive.com/article/news/politics/elections/georgia-election-2022-drop-box-locations-metro-atlanta-fulton-dekalb-gwinnett-cobb-clayton/85-64a37adb-7b1e-4c7c-afa7-4db474afc1a3).

33.    Early voting locations for the 2022 general election were obtained from data provided by the State of Georgia to Plaintiffs' counsel during the course of this litigation on the Georgia Secretary of State Voter Registration System.

34.    DDS office locations were obtained from the Georgia Department of Driver Services website (https://dds.georgia.gov/locations/customer-service-center).

35.    Figures 1, 2, 3 and 4 display the following geocoded locations: ballot drop boxes in 2020, ballot drop boxes in 2022, early voting locations in 2022, and DDS offices, on a county map of Georgia.

Figure 1: Ballot Drop Box Locations, 2020



**Figure 2: Ballot Drop Box Locations, 2022**



**Figure 3: Early Voting Locations, 2022**



Early Voting Locations

**Figure 4: DDS Office Locations**



36.    There were about 4.5 million occupied housing units in the State of Georgia as of 2021 (U.S. Census Bureau, 2022), and therefore I used a set of simplified home locations to estimate the travel times for CVAs, consisting of Census block groups, which on average have 581 housing units (U.S. Census Bureau American Community Survey 2016-2020). I defined the location for all households in the block group as consisting of the centroid of the block group, calculated with a standard procedure using geographical information software. A "centroid" is the

spatial center of gravity of the block group polygon—the point at which mass in each direction is balanced, serving as the spatial center of households if they are equally distributed throughout the Census block group. Figure 5 displays the centroids for block groups in the state of Georgia. (Note that while county boundaries are shown in Figure 5, block group boundaries are not.)

37.     Figure 5 also illustrates that any meaningful spatial error in identifying the locations of specific housing units is likely of most concern in locations in the outlying and less dense parts of the state. In these locations it is more likely that travel time estimates for a particular household might vary from the estimate based on the block group centroid because that household may be located farther from the average household than in block groups located in the most densely populated parts of the state. However, by the same token, this error exists only with regard to a small fraction of the Georgia population, as larger block groups are more sparsely populated, and I would expect the error to be randomly distributed, without a biasing effect on estimates.

Figure 5: Block Group Centroids (Estimated Home Locations) For Georgia



(C) OpenStreetMap contributors (C) CARTO

### C.    Travel Time by Mode of Transportation

38.    For each block group centroid, I estimated the travel time to the nearest ballot drop box (in 2020 and 2022), early voting location (in 2022), and DDS office (current locations). There are many possible methods to obtain data to estimate travel times, but the best estimates are based on distances along the road network, traffic conditions, scheduled travel times on public

17

transportation routes, and distances along the pedestrian network. I used network, congestion, and schedule-based estimates rather than the more readily available "zone to zone" estimates of travel time, which rely on aggregated information about trip destinations and are therefore less accurate.

39.    A summary of median one-way travel times (calculated over block groups) is shown in Table 2 for each of the destination types. More details are presented in the subsections following.

**Table 2: Median One-Way Travel Time By Mode**
**(Census Block Group Medians, In Minutes)**

|  | Ballot drop boxes, 2020 | Ballot drop boxes, 2022 | Early voting locations, 2022 | DDS offices |
|---|---|---|---|---|
| Auto | 8.38 | 11.37 | 8.75 | 15.87 |
| Public transportation | 26.43 | 42.13 | 30.65 | 56.30 |
| Walking | 68.07 | 102.85 | 75.53 | 162.86 |

    *i.*    *Travel Times by Public Transportation*

40.    Even in counties that have some type of public transportation system, the coverage is not expansive enough to provide access for every individual to a ballot drop box, early voting location, or DDS office. I used Google Maps, which relies on general transit feed specification (GTFS) data, to estimate public transportation times from block group centroids to the nearest ballot drop box, early voting location, and DDS office within the county. The estimates rely on spatially specific information about the routes of public transportation vehicles, location of stops, and schedules in GTFS data. The inclusion of this information makes it possible to estimate public transportation travel times that take into account actual service frequency, scheduled public transportation times, and waiting times between public transportation vehicles, as well as standard estimates of walking time along the road network to access and egress both the initial and final stop on the trip.

41.    For every trip on public transportation, travel time includes walking to the nearest bus or rail stop from home, waiting for a bus or train, and walking from the closest available drop-off point to the final destination. These public transportation travel time estimates assume the best-case scenario of highest schedule availability and no travel delay. Specifically, it is assumed that each trip is taken on a Tuesday morning (a weekday morning, typically the highest frequency public transportation schedule) even though many people will find it difficult to travel at that time of day due to work obligations or other commitments. Those who travel on public transportation in the middle of the day, at the end of the workday, or on a weekend, could encounter a much less frequent schedule than what is assumed here, and would almost never encounter a more frequent schedule.

42.    I separately identified fixed-route public transportation services in five counties that did not have GTFS data. Of the public transportation services that I found missing, three were listed in the 2019 Georgia Statewide Transit Plan Transit Profile Sheets (Macon-Bibb County Transit Authority, Albany Transit, and Rome Transit) and two were identified manually by checking for fixed route public transportation in all cities with population greater than 35,000 (Henry County Transit and Warner Robins Transit).

43.    To account for these public transportation services, I conducted a separate estimation procedure for public transportation travel times within their coverage area. For these public transportation services that did not have GTFS data, I identified 360 block groups that are within their coverage area based on public transportation service maps and schedules available online. If both the block group centroid and its nearest drop box location, early voting location or DDS office were within these coverage areas, the public transportation travel time of the block group was estimated by multiplying the auto travel time by a "multiplier" factor. For each of the

location types, the multiplier was calculated by dividing the mean public transportation travel time by the mean auto travel time for block groups where public transportation travel times are less than walking travel times. This analysis reflects the typical travel time differences between traveling by auto and public transportation as measured in our dataset elsewhere in the state with complete GTFS data on public transportation service. The calculated multipliers based on observed travel time differentials between auto and public transportation ranged from 4.04 to 4.42 depending on the destination type. This procedure most likely underestimates actual public transportation travel times for those counties, because their public transportation service is at a lower level of service frequency than the average found in those parts of the state which have complete GTFS data.

44.    Figure 6 shows the spatial extent of public transportation access in Georgia. The purple areas represent areas in which one of the destination types can be accessed using public transportation, the light purple areas are places where destinations can be accessed using public transportation but our estimates are not from GTFS data (as explained immediately above), and the white areas are places where public transportation either does not exist or is slower than walking.

Figure 6: Public Transportation Access in the State of Georgia



Block groups where transit access is available and faster than walking

45.    Of the block groups for which public transportation is available and faster than walking, median one-way public transportation travel times were as follows:

- To the nearest ballot drop box in 2020: 26.4 minutes, with 90 percent of block groups having a one-way public transportation travel time between 11.3 minutes and 63.1 minutes.

- To the nearest ballot drop box in 2022: 42.1 minutes, with 90 percent of block groups having a one-way public transportation travel time between 17.2 minutes and 80.3 minutes.

- To the nearest early voting location: 30.7 minutes, with 90 percent of block groups having a one-way public transportation travel time between 13.7 minutes and 66.7 minutes.

- To the nearest DDS office location: 56.3 minutes, with 90 percent of block groups having a one-way public transportation travel time between 24.3 minutes and 112.8 minutes.

ii.    *Travel Times by Auto*

46.    To estimate the driving time between Census block group centroids and ballot drop boxes, early voting locations, and DDS offices, I used an automated batch interface for Google Maps using a cloud services account, which provided a time estimate for a standard, time-efficient route that accounted for any habitual travel delays caused by road congestion and traffic signals. I calculated the driving time from the centroid of each Census block group to the designated location, and the return trip as well, under the assumption that the beginning of the trip was at 9 am on a Tuesday.

47.    The median one-way driving times were as follows:

- To the nearest ballot drop box in 2020: 8.38 minutes, with 90 percent of block groups having a one-way driving time between 2.9 minutes and 21.0 minutes.

- To the nearest ballot drop box in 2022: 11.4 minutes, with 90 percent of block groups having a one-way driving time between 4.0 minutes and 22.0 minutes.

- To the nearest early voting location: 8.8 minutes, with 90 percent of block groups having a one-way driving time between 3.2 minutes and 19.3 minutes.

- To the nearest DDS office location: 5.9 minutes, with 90 percent of block groups having a one-way driving time between 6.1 minutes and 32.5 minutes.

### iii.    *Travel Times on Foot*

48.    I calculated walking distances and durations using Google Maps and software to identify the shortest route to the nearest ballot drop box in 2020 and 2022, early voting location in 2022, and current DDS office within the county from the centroid of each Census block group using the road network. Walk times estimated by Google Maps are on average 3.0 miles per hour. Walk speeds for older and disabled adults are likely to be significantly slower, with a study showing walk speeds at 1.9 miles per hour for these population groups (FHWA, 2006). Thus, the estimates presented in the rest of this report are highly conservative for many individuals, particularly those with disabilities.

49.    Walking distances to the nearest ballot drop box, early voting location, and DDS office were very similar to the road distances (above). The median one-way walking times were as follows:

- To the nearest ballot drop box in 2020: 68.1 minutes, with 90 percent of block groups having a one-way walking time between 16.3 minutes and 267 minutes.

- To the nearest ballot drop box in 2022: 102 minutes, with 90 percent of block groups having a one-way walking time between 24.3 minutes and 279 minutes.

- To the nearest early voting location:75.5 minutes, with 90 percent of block groups having a one-way walking time between 19.3 minutes and 247 minutes.

- To the nearest DDS office location: 163 minutes, with 90 percent of block groups having a one-way walking time between 45.5 minutes and 467 minutes.

### D.    Spatial Distribution of CVAs by Race/Ethnicity, Disability Status and Auto Ownership

50.    The locations and characteristics of CVAs, by race/ethnicity, disability status, and access to a personal vehicle in their household, can be estimated based on United States Census

data at the Census block group level. The Census block group is a spatial unit smaller than a Census tract but larger than a block. It enables the use of highly specific demographic data, using the methods described below, at the smallest reasonable spatial level without sacrificing much accuracy. The spatially smallest possible geographic unit for use with United States Census data is the Census block, but estimation down to this level would introduce too much inaccuracy of demographic data. Thus, the Census block group is the spatially smallest geographic unit with good accuracy for demographic data needed to accurately estimate CVAs and associated demographic characteristics such as race/ethnicity, disability status, and availability of an auto in the household. There are 7,446 block groups in the state, and there are on average about 581 housing units in each block group.

51.    Calculating the travel burden for CVAs by race/ethnicity and disability status associated with accessing a ballot drop box, an early voting location, and a DDS office requires estimating how many CVAs there are in each Census block group by race/ethnicity and disability status.

52.    I relied on data from the United States Census Bureau 2016-2020 American Community Survey (ACS 2016-20). These are the most accurate data currently available for detailed demographic information about the population, even though changes to the population may have occurred in the last two years.

53.    Disability status in ACS 2016-20 block group data is reported for those 18 and over in relation to whether or not those individuals are in a household under or over the poverty income threshold. These block group counts include all civilians of voting age, and all people in the armed forces aged 20-64, by disability status, for whom poverty status is available. Citizenship by age by poverty level is also available at the Census block group level. Using this information, I calculated

a citizens-to-poverty-determined-population ratio which I used to construct a corrected estimate (accounting for armed forces individuals 18-20 and over 65) of CVAs by disability by poverty level for each Census block group.

54.     For race/ethnicity data, the method is somewhat more involved. The ACS 2016-20 block group data contains race/ethnicity data, but without an age or citizenship overlay. To estimate the number of CVAs by race/ethnicity down to the Census block group level, I used the ACS 2016-2020 estimates at the Census tract level to obtain the share of residents by race/ethnicity who were citizens of voting age in each Census tract. There are 2,796 Census tracts in Georgia, containing between one and six block groups, with a median of three block groups.  I then multiplied these shares by the number of people in each block group for each racial or ethnic group (consistent with the method in Chapa et al., 2011) to estimate CVAs by race/ethnicity at the block group level. In addition, it was necessary to estimate the poverty status of CVAs by race/ethnicity at the block group level in order to conduct a later step of the analysis (auto availability). This was done by calculating at the Census tract level the share of people aged 18 or older by race/ethnicity who are in poverty and multiplying this ratio by the estimated number of CVAs by race/ethnicity in each block group, from the previous step.

55.     To estimate auto availability down to the block group level for CVAs by race/ethnicity and disability status, I used data from the American Community Survey Public Use Microdata Sample (ACS PUMS) for Georgia, which allows for a precise estimate of auto ownership for specific subgroups, though across a larger spatial area than that which comprises the block groups. When estimating auto availability, CVAs were distinguished both by race/ethnicity and disability status, but also by poverty status because poverty status is a strong indicator of auto availability. I calculated the share of vehicle access among these population

subsets living in the 72 Public Use Microdata Areas (PUMAs) in the state of Georgia in which the block groups are included. I used these percentage shares to multiply the block group level figures for CVAs by poverty status, race/ethnicity and disability status to determine the share of each that do and do not have access to a personal vehicle in their household.

56.    The ACS 2016-20 five-year block group, Census tract, and PUMA estimates are based on a one percent sample conducted every year. Because the ACS is conducted upon a sample of the population, rather than a complete count, its estimates are subject to sampling variability. However, these data are the most precise and spatially specific available data to estimate auto ownership by poverty status, race/ethnicity and disability status for CVAs in the state of Georgia. ACS data from the US Bureau of the Census is the most authoritative data available on the spatial distribution of population in the state of Georgia and in the United States generally.

57.    Because there is no generally accepted methodology for aggregating confidence intervals from the Census block group or tract level to higher levels of geography (e.g., to the county or state levels), I report these estimates without confidence intervals. Statewide figures presented in this report are statistically significant at the 0.001 level or better.

58.    The output of this stage of the analysis is a spatially specific distribution of demographic information about CVAs that is fairly well documented at the PUMA and Census tract level, down to the Census block group level. This step of the analysis enables a more accurate calculation of travel times due to the greater spatial specificity of Census block groups as compared to PUMAs or Census tracts.

E.    Calculating Travel Times by Race/Ethnicity, Disability Status and Auto Ownership

59.    To assign a round-trip travel time to any given CVA in any given Census block group, I followed the following rule. First, individuals living in a household with an auto available

26

will either drive or be driven by another household member to the location in question, unless taking public transportation or walking is faster, in which case the faster of those alternative modes will be assigned. Second, individuals living in a household without an automobile will take public transportation unless walking is faster, in which case they will walk.

60.    In order to evaluate the extent to which all Georgia citizens seeking to access a ballot drop box, early voting location, or DDS office will encounter a travel burden, I identified all CVAs in the state who I estimate would have to carry out a round-trip of more than 60 minutes (or in the case of a DDS office, a round-trip of more than 90 minutes). As noted above, having to carry out a round-trip exceeding 60 minutes on any given day would more than double the average amount of discretionary household travel carried out per day by an individual in the state of Georgia; and having to carry out a round-trip of more than 90 minutes means not only more than doubling the average amount of travel carried out per day by a Georgia resident, but also that the travel is almost always done via public transportation or on foot, travel modes which are significantly more onerous than driving.

61.    Of the estimated 7.25 million CVAs in Georgia, I calculated that about 6.9 million have access to a vehicle owned by the household, and about 333,000 (4.6 percent) do not. Black CVAs and CVAs with disabilities are much more likely to lack vehicle access. About 9 percent of Black CVAs in Georgia lack a vehicle in the household (three times as high as white CVAs), while about 11 percent of CVAs with a reported disability lack vehicle access (more than three times as high as non-disabled CVAs).

62.    In addition to race/ethnicity and disability status, poverty status is a strong indicator of whether a household has access to a personal vehicle and provides a partial explanation for the lower rate of vehicle access among Black CVAs and CVAs with disabilities. Black CVAs and

CVAs with a reported disability have much higher rates of poverty, at 17.4 and 19.7 percent respectively, than do non-Hispanic White CVAs (at 9.8 percent) or CVAs without a reported disability (at 10.6 percent). About 19 percent of Black CVAs below the poverty line lack a vehicle in the household while about 23 percent of CVAs below the poverty line with a reported disability lack vehicle access. These percentages are markedly higher than the percentages for white CVAs at or above the poverty line (2.0 percent) and for CVAs without a reported disability at or above the poverty line (2.4 percent).

63.    Demand response transit services were analyzed as a proxy for paratransit services in Georgia. Paratransit services are demand response transit services intended to be made available to individuals who because of their disabilities are unable to use route-based public transportation services.  Paratransit services are equivalent to what is called demand response transit except in counties where demand response transit is not limited to people with disabilities. According to the Georgia Statewide Transit Plan, demand response transit services are available in 107 counties. This includes some counties in which fixed-route public transportation is not available. In these counties, demand response transit services or paratransit services may be the only public transportation available to those who lack vehicle access. However, the usage of demand response transit or paratransit services is limited. Each county's demand response transit system on average serves only 36 people per day.

64.    An analysis of usage data, fleet size data, and driver employment data revealed that demand response transit services in the state of Georgia are unlikely to adequately accommodate demand for ballot drop boxes and early voting in the state by voters with disabilities. This is because the number of vehicles and drivers is limited and the potential demand from voters with disabilities to access ballot drop boxes and early voting locations, if compared to the take-up

among the general population based on previous elections, is high relative to the existing usage of demand response transit services, particularly given the truncated period of time during which ballot drop boxes and early voting locations are available. Undoubtedly, voters with disabilities will largely be forced to use the available non-paratransit transportation options, or if they are to use paratransit, are likely to have wait times and travel times exceeding 60 minutes.

65.     Demand response services are unlikely to adequately serve voting demands in the restricted time period during which ballot drop boxes and early voting locations are available, and when able to do so, are likely to exceed the travel times estimated using the methods described here. The shorter the time period during which ballot drop boxes and early voting locations are available, the more pronounced the difficulties are likely to be. In the case of DDS offices, demand response services may possibly serve to alleviate some of the travel burden for CVAs with disabilities that is estimated in the section below, but it is beyond the scope of this analysis to estimate with specificity the extent to which it would do so. Note, however, that vehicle trips to DDS offices are the longest in distance and duration and may be more difficult to accommodate and schedule on paratransit services. Based on the available evidence, I judge that even for trips to DDS offices, the public transportation and walk-based estimates exceeding 90 minutes round-trip are likely to be mirrored by demand response trips that would exceed 90 minutes of effort including the scheduling delay incurred when having to request demand response services which must typically be requested a day or more in advance.

## V.     RESULTS

### A.     Access to Ballot Drop Boxes

66.     SB 202 restricted the ability of counties to provide ballot drop boxes by limiting the number of drop boxes to one ballot drop box per county and additional drop boxes equal to the lesser of one per every 100,000 registered voters or the number of early voting locations. (The law

also restricted the days and hours during which drop boxes are available). This resulted in a substantial reduction in the number of ballot drop boxes in the state of Georgia. In the 2020 general election, our data indicate that there were 330 ballot drop boxes in the state. Largely by removing ballot drop boxes in the more densely populated urban counties in the state, in the 2022 general election the number of ballot drop boxes had declined to 207, a 37 percent reduction.[2] At the same time, about 2.5 percent of the population of Georgia lived in counties that in 2020 did not provide a ballot drop box, while in 2022 these counties were required to do so under the provisions of SB 202. For people living in those counties, ballot drop box access increased in 2022.

67.    I therefore analyzed differences in the accessibility of ballot drop boxes in 2020 and 2022 to determine how the changes were distributed in the population according to race/ethnicity and disability status. I found that in 2020, Black CVAs and CVAs with disabilities were far more likely to have a travel burden to access a drop box compared to non-Hispanic white CVAs and CVAs without disabilities, respectively. This difference became significantly greater in magnitude in 2022, when Black CVAs were nearly two-and-a-half times as likely to have a travel burden as non-Hispanic white CVAs, and CVAs with disabilities were almost three times as likely to have a travel burden to access a ballot drop box than CVAs without disabilities. More details are provided below.

68.    For the 1,698 block groups for which public transportation travel was faster than walking in 2020, the median total time to travel from home to the nearest in-county drop box location, including walking time to the origin stop and from the destination stop, was 52.9 minutes, round-trip. There was substantial variance. For example, ten percent of block groups had a one-

---

[2] I am aware that two other expert reports submitted in the consolidated cases in this matter contain different ballot drop box counts for both the 2020 and 2022 general elections. However, it is my understanding that those reports reflect a similar reduction in the number of ballot drop boxes from 2020 to 2022 of over 35%.

way trip longer than 52.5 minutes to arrive at a drop box location in 2020, or about 1 hour and 45 minutes round-trip.

69.    There was a substantial increase in the number of block groups for which public transportation travel was faster than walking in 2022 because of the removal, due to SB 202, of many ballot drop boxes in urban counties like Fulton and DeKalb where walking trips could formerly be made to access a ballot drop box. For the 2,053 block groups for which public transportation travel was faster than walking in 2022, the median total time to travel on public transportation from home to the nearest in-county drop box location, including walking time, was 1 hour and 24.3 minutes, round-trip, an increase of 61 percent in duration compared to 2020. Ten percent of block groups had a one-way public transportation trip longer than 1 hour and 10 minutes to arrive at a drop box location in 2022, or about 2 hours and 20 minutes round-trip.

70.    For those driving to the nearest ballot drop box in 2020, the median one-way road network distance between the block group centroid and the nearest drop box was 3.54 miles. In 2022, the median one-way road network distance increased by 51 percent to 5.34 miles. In 2020, the median round-trip driving time to travel that distance and back was 16.8 minutes when averaged over block groups, and 81 percent of block groups had round-trip driving travel times via auto of less than 30 minutes. In 2022, the median round-trip driving duration increased by 36 percent to 22.7 minutes, and 73 percent of block group centroids had round-trip travel times via auto of less than 30 minutes.

71.    Compared to 2020, the distribution of drop box locations in 2022 under SB 202 increased accessibility for residents of some parts of the state which received ballot drop boxes where they were unavailable before. At the same time, due to SB 202, ballot drop boxes were reduced in other counties of the state. In 2020, Black CVAs statewide were 36 percent more likely

than non-Hispanic white CVAs to have a round-trip to access a drop box location exceeding an hour, or to have no access to a drop box (6.5 percent of Black CVAs compared to 4.7 percent of non-Hispanic white CVAs), largely because Black CVAs are far more likely to live in a household without a car available. In contrast, in 2022, Black CVAs statewide were 146 percent more likely than non-Hispanic white CVAs to have a round-trip to access a drop box location exceeding an hour (7.3 percent compared to 3.0 percent).

72.     Changes to drop box accessibility in 2022 disproportionately benefited people without disabilities compared to people with disabilities. In 2020, CVAs with disabilities were 141 percent more likely than CVAs without disabilities to have a round-trip to access a drop box location exceeding an hour or to have no access to a drop box (10.1 percent of CVAs with disabilities compared to 4.2 percent of CVAs without disabilities). In 2022, the gap increased: CVAs with disabilities statewide were now 193 percent more likely than CVAs without disabilities to have a round-trip exceeding an hour (9.8 percent of CVAs with disabilities compared to 3.3 percent of CVAs without disabilities).

**B.      Access to Early Voting Locations**

73.     In addition to ballot drop boxes, early voting locations provide an option for voting that increases the likelihood of finding a convenient time or location to vote. Like ballot drop boxes, early voting locations are not evenly spatially distributed.

74.     Based on a similar application of the methods described above for ballot drop boxes, calculating the distances and durations of trips of CVAs from Census block group centroids to early voting locations (as established for the 2022 general election), I estimate that 3.4 percent of CVAs would experience a travel burden exceeding 60 minutes to access an early voting location, almost all of whom lack auto access, and must use public transportation or walk. Black CVAs are more than twice as likely to have a burdensome trip to an early voting location than non-Hispanic

white CVAs, and CVAs with a disability are more than three times as likely to have a burdensome trip than are CVAs without disabilities, as described in more detail below.

75.    The fastest travel time between the home location and the nearest early voting location was always via driving. Of the 7,446 block group centroids, in no case was public transportation or walking faster than driving to an early voting location. Public transportation was faster than walking in 2,190 of the 7,446 block groups. In turn, walking was the best or only option in 5,256 block groups in which a vehicle was not available, most obviously in those counties where public transportation is not offered but also when walking was faster than public transportation.

76.    For the 2,190 block groups for which public transportation travel was faster than walking, the median total time to travel from home to the nearest in-county early voting location, including walking time, was 1 hour and 1 minute, round-trip. There was, however, substantial variance. For example, ten percent of block groups had a one-way trip longer than 57 minutes to arrive at an early voting location, or 1 hour and 54 minutes round-trip.

77.    For driving, the median road distance from block group centroids to the nearest early voting location within the county was 3.9 miles. The vast majority (90 percent) of home locations had roundtrip travel times ranging from 6.4 minutes to 39 minutes, with a median round-trip value of 17.6 minutes when averaged over block groups. Of the 7,446 block group centroids, 6,383, or 86 percent of block group centroids, had round-trip travel times via auto of less than 30 minutes.

78.    I conducted an analysis of the relative travel burden for CVAs by race/ethnicity and disability status. As noted above, Black CVAs and persons with disabilities are much less likely to have auto access in the household which makes it substantially more likely that they will experience a travel burden accessing an early voting location.

79.    Black CVAs statewide are more than twice as likely as white CVAs to have a round-trip to access an early voting location exceeding an hour, at 5.5 percent in comparison to 2.5 percent, largely because eligible Black voters are far more likely to live in a household without a car available. Even more strikingly, people with disabilities are substantially more likely to experience a travel burden exceeding an hour compared to people without disabilities, with a rate of 8.0 percent across the state, a rate more than three times as high as the 2.6 percent for non-disabled CVAs.

### C.    Access to DDS Offices

80.    Since the trip to a DDS office to procure a photo ID is presumably a one-time need, I used a 90-minute travel time threshold measure to designate a travel burden. As described in more detail below, I estimate that about 4 percent of CVAs in the state would experience such a travel burden in accessing a DDS office. Furthermore, I calculate that Black CVAs have twice the rate of burdensome travel compared to non-Hispanic white CVAs, and CVAs with disabilities have three times the travel burden rate of CVAs without disabilities.

81.    The fastest travel time between the home location and the nearest DDS office was via driving for all but two home locations. Public transportation was faster than walking in only 2,392 of the 7,446 block groups. In turn, walking was the best or only option in 5,054 block groups in which a vehicle was not available, most obviously in those counties where public transportation is not offered, but also when it was faster than public transportation.

82.    For the 2,392 block groups for which public transportation travel was faster than walking, the median total time to travel from home to the nearest DDS office using public transportation, including walking time, was 1 hour and 52.6 minutes, round-trip. Ten percent of block groups had a one-way trip longer than 1 hour and 39 minutes to arrive at a DDS office, or about 3 hours and 17 minutes round-trip.

83.    For driving, the median one-way distance to the nearest DDS office was 8.67 miles, averaged over block groups, with the farthest distance being 55.3 miles. The vast majority (90 percent) of block groups had roundtrip drive times ranging from 12.1 minutes to 56.3 minutes, with a median round-trip value of 31.7 minutes when averaged over block groups. Of the 7,446 block group centroids, 45 percent had round-trip travel times via auto of less than 30 minutes.

84.    About 4 percent of CVAs in the state would have a round-trip to access a voter ID location exceeding 90 minutes. This is a significant underestimate of the time burden for those without an existing photo ID, however, because such individuals are less likely to be able to drive themselves even if a vehicle is available in the household (as a driver's license is a valid photo ID for the purpose of voting). About 81 percent of CVAs without auto access would have a public transportation or walking trip exceeding 90 minutes round-trip to access a DDS location.

85.    Comparing demographic subgroups to each other I find the biggest differences in DDS office access to be among people with disabilities and those without. About 9.4 percent of CVAs with disabilities would have a round-trip exceeding 90 minutes to access a DDS office, more than three times as high as the rate of 3.1 percent for people without disabilities. The rate among Black CVAs is also significantly higher, at 6.7 percent, more than double the rate of 2.8 percent for non-Hispanic Whites.

## VI.    CONCLUSION

86.    I have analyzed the travel burdens associated with accessing ballot drop boxes (and changes between 2020 and 2022), early voting locations, and DDS locations (for procurement of photo ID) in the state of Georgia. I estimated the distribution of travel times to access these locations which in some cases are burdensome. These time-consuming and uncomfortable trips are disproportionately on public transportation or on foot, due to the fact that the vast majority of households with such long trips do not have access to a personal vehicle. I find that across the

board, Black CVAs are two to three times as likely to have such travel burdens as non-Hispanic white CVAs. I also find that CVAs with disabilities are two to three times as likely to have such travel burdens as CVAs without disabilities. The difference in the case of drop boxes became substantially greater from 2020 to 2022 due to the effects of SB 202. These findings are summarized in Table 3.

**Table 3: Share of Group Facing Travel Burden, By Destination**

|  | Ballot drop boxes, 2020 | Ballot drop boxes, 2022 | Early voting locations, 2022 | DDS offices |
|---|---|---|---|---|
| Non-Hispanic white CVAs | 4.74% | 2.98% | 2.45% | 2.78% |
| Black CVAs | 6.47% | 7.34% | 5.50% | 6.74% |
| Latinx CVAs | 3.95% | 3.56% | 2.74% | 3.10% |
| CVAs with disability | 10.10% | 9.78% | 8.05% | 9.40% |
| CVAs without disability | 4.19% | 3.34% | 2.60% | 3.06% |

"Travel burden" defined as 60 minutes round-trip for ballot drop boxes and early voting locations, and 90 minutes round-trip for DDS offices.

87.     For ballot drop box access, in 2020 more than 65 percent of CVAs without auto availability had a round-trip to access a ballot drop box exceeding 60 minutes or did not have access to a drop box, as compared to 5.1 percent of all CVAs. With the generally reduced access to ballot drop boxes in 2022, the rate of those without access to a vehicle who had a round-trip to access a ballot drop box exceeding an hour (or did not have access to a drop box) increased by almost a third, to more than 84 percent. Meanwhile because of better access in outlying parts of the state to drop boxes, due to the requirement that each county have at least one drop box, the overall rate of those with a round-trip exceeding 60 minutes actually declined from 5.1 percent in

2020 to 4.3 percent in 2022. This benefit was almost entirely accrued to CVAs with access to a vehicle in their household.

88.     Changes to the availability of drop boxes from 2020 to 2022 disproportionately benefited non-Hispanic white CVAs compared to Black CVAs.  They also disproportionately benefited CVAs without disabilities compared to CVAs with disabilities. In 2020, Black CVAs were 36 percent more likely to have a round-trip exceeding 60 minutes to access a drop box or no access to a drop box compared to non-Hispanic white CVAs (6.5 percent compared to 4.7 percent). With the change in 2022, because of an increase in travel burdens for Black CVAs and a decrease in travel burdens for non-Hispanic white CVAs, the differential is now much wider: Black CVAs are now 146 percent more likely to experience a travel burden in order to access a drop box (7.3 percent versus 3.0 percent).

89.     The comparison of access to drop boxes between people with and without disabilities is similar. In 2020, CVAs with disabilities were about 141 percent more likely than CVAs without disabilities to have a round-trip exceeding 60 minutes to access a drop box or no access to a drop box (10.1 percent and 4.2 percent respectively). In 2022, the gap widened. Though the fraction of CVAs with disabilities with a long trip to access a drop box declined slightly, the decline was greater for CVAs without disabilities. CVAs with disabilities in 2022 now are 193 percent more likely than CVAs without disabilities to experience a travel burden in order to access a drop box (9.8 percent versus 3.3 percent).

90.     Early voting locations are another voting option that is unevenly distributed and much less accessible to CVAs without the means to drive. More than 69 percent of CVAs who lack access to a car would have a round-trip to access an early voting location exceeding 60 minutes, with 3.4 percent of all CVAs having a round-trip to access an early voting location of that

duration. Black CVAs (5.5 percent) and CVAs with disabilities (8.0 percent) are much more likely to experience a travel burden of this duration to access an early voting location than non-Hispanic white CVAs (2.5 percent) or CVAs without disabilities (2.6 percent).

91.    Finally, this analysis finds that more than 80 percent of CVAs who lack access to a car would have a round-trip to access a DDS office exceeding 90 minutes, with 4.0 percent of all CVAs having a round-trip to access a DDS office of that duration. Black CVAs (6.7 percent) and CVAs with disabilities (9.4 percent) are from two to three times more likely to have a round-trip exceeding 90 minutes in order to access a DDS office than are non-Hispanic white CVAs (2.8 percent) or CVAs without disabilities (3.1 percent).

92.    People under the poverty line are also much more likely to be affected by these burdens across the state, because they are less likely to have access to a personal vehicle in their household. Such long travel durations under uncomfortable or impossible conditions, given age and disability, are likely to dissuade affected voters from availing themselves of these services, and may help to discourage voting altogether by reducing its ease and convenience.

I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to light.

Dr. Daniel G. Chatman                    Dated: January 27, 2023

## VII. REFERENCES

ABRANTES, P. A. L. & WARDMAN, M. R. 2011. Meta-analysis of UK values of travel time: An update. *Transportation Research Part A: Policy and Practice,* 45, 1-17.

BLAIS. A., YOUNG, R. & LAPP, M. 2000. The calculus of voting: An empirical test. *European Journal of Political Research* 37, 181–201. https://doi.org/10.1023/A:1007061304922

CHAPA, J., HENDERSON, A., NOAH, A. J., SCHINKIV, W. & KENGLE, R. 2011. Redistricting: Estimating citizen voting age population. Research Brief. Berkeley, CA: Berkeley Law Center for Research and Administration, University of California, Berkeley School of Law.

FARBER, S. & PÁEZ, A. 2011. Mobility without accessibility: the case of car use and discretionary activities. *In:* LUCAS, K., BLUMENBERG, E. & WEINBERGER, R. (eds.) *Auto motives. Understanding car use behaviours.* United Kingdom: Emerald Group Publishing Limited.

FHWA (FEDERAL HIGHWAY ADMINISTRATION). 2006. *Federal Highway Administration University Course on Bicycle and Pedestrian Transportation.* Publication Number: FHWA-HRT-05-099. Section 8-4 and Table 8-4. Available at https://www.fhwa.dot.gov/publications/research/safety/pedbike/05085/chapt8.cfm.

SIGELMAN, & BERRY, W.D. 1982. Cost and the calculus of voting. *Political Behavior* 4 (4): 419–28. http://www.jstor.org/stable/586361.

U.S. CENSUS BUREAU. 2020. American Community Survey, 5-Year Estimates, 2016-20. Accessed via Social Explorer, available at https://www.socialexplorer.com/explore-tables.

FEDERAL HIGHWAY ADMINISTRATION. 2022. National Household Travel Survey (NHTS), 2017. Accessed via NHTS landing page, available at https://nhts.ornl.gov/.

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF GEORGIA

 3                   ATLANTA DIVISION

 4

     _____

 5                                        )

                                          )

 6                                        )

                                          )

 7   IN RE GEORGIA SENATE BILL 202  )  Case No.

                                          )  1:21-MI-55555-JPB

 8                                        )

                                          )

 9                                        )

     _____  )

10

11

12

13

14   VIDEORECORDED DEPOSITION OF DANIEL G. CHATMAN, Ph.D.

15            San Francisco, California

16            Tuesday, May 16, 2023

17                 Volume I

18

19

20

21   Reported by:

     CHRIS TE SELLE

22   CSR No. 10836

23   Job No. 5857914

24

25   PAGES 1 - 263
```

Deft EXHIBIT 22
WITNESS: Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4

    _____
5                                        )
                                         )
6                                        )
                                         )
7    IN RE GEORGIA SENATE BILL 202  ) Case No.
                                     ) 1:21-MI-55555-JPB
8                                        )
                                         )
9                                        )
    _____)

10

11

12

13

14         Videorecorded Deposition of DANIEL G. CHATMAN,

15    Ph.D., Volume I, held at the offices of Crowell &

16    Moring, 3 Embarcadero Center, 26th Floor, San

17    Francisco, California, beginning at 9:34 a.m. and

18    ending at 4:58 p.m., on Tuesday, May 16, 2023,

19    before Chris Te Selle, Certified Shorthand Reporter

20    No. 10836.

21

22

23

24

25

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 3

1          APPEARANCES:

2

3          For Plaintiffs Concerned Black Clergy:

4               ADVANCEMENT PROJECT

5               BY:  MATTHEW A. FOGELSON, ESQ.

6               1220 L Street NW, Suite 850

7               Washington, DC 20005

8               (415) 238-0633

9               mfogelson@advancementproject.org

10

11         For Defendants Secretary of State Brad

12         Raffensperger, State Election Board Members Rebecca

13         Ann Sullivan, David J. Worley, Matthew Mashburn, and

14         Anh Le:

15              SCHAERR JAFFE LLP

16              BY:  DONALD FALK, ESQ.

17              Four Embarcadero Center, Suite 1400

18              San Francisco, CA 94111

19              (415) 562-4942

20              dfalk@schaerr-jaffe.com

21

22

23

24

25

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

                                                      Page 4

1      APPEARANCES (Cont'd):

2

3      For Defendants Secretary of State Brad

4      Raffensperger, State Election Board Members Rebecca

5      Ann Sullivan, David J. Worley, Matthew Mashburn, and

6      Anh Le:

7           SCHAERR JAFFE LLP

8           BY:  JOSHUA PRINCE, ESQ.

9           1717 K Street NW, Suite 900

10          Washington, DC 20006

11          (702) 610-3886

12          jprince@schaerr-jaffe.com

13

14

15     Also Present (via Zoom):

16     Brad Carver

17     Brian Dimmick

18     Cameron Lange

19     Benson McGrath

20     Susan Mizner

21     Armen Nercessian

22     Victor Williamson

23     Jacob Wilson

24     Cameron Tuttle, videographer, present in person

25

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

                                                   Page 5

1                         INDEX
2     WITNESS                EXAMINATION              PAGE
3     DANIEL G. CHATMAN, Ph.D.
4     Volume I
5                            MR. FALK                    9
6                            MR. FOGELSON              259
7
8                         EXHIBITS
9     EXHIBIT NUMBER                                  PAGE
10    Exhibit 1   Notice of Deposition of Daniel       12
                  Chatman, Ph.D., 3 pp.
11
      Exhibit 2   CV of Daniel G. Chatman, 22 pp.      12
12
      Exhibit 3   expert report of Dr. Daniel G.       23
13                Chatman, 41 pp.
14    Exhibit 4   Sur-rebuttal Report of               25
                  Dr. Daniel G. Chatman, 8 pp.
15
      Exhibit 5   article, Driving turnout: the        46
16                effect of car ownership on electoral
                  participation, by Justin de
17                Benedictis-Kessner and Maxwell Palmer,
                  9 pp.
18
      Exhibit 6   article, Meta-analysis of UK values 111
19                of travel time:  An Update, by Pedro
                  A.L. Abrantes and Mark R. Wardman,
20                17 pp.
21    Exhibit 7   Expert Report of                    140
                  Justin Grimmer, Ph.D.
22
      Exhibit 8   University of Georgia, 2022 Georgia 140
23                Post-Election Survey, 1/17/2023, 20 pp.
24    Exhibit 9   Use of app-based ridehailing services 160
                  and conventional taxicabs by adults
25                with disabilities, by Abigail L.
                  Cochran and Daniel G. Chatman, 8 pp.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 6

1                          EXHIBITS (Cont'd)

2      EXHIBIT NUMBER                                    PAGE

3      Exhibit 10   Is Distance to Drop Box an            230
                    Appropriate Proxy for Drop Box
4                   Treatment?  A Case Study of Washington
                    State, by Loren Collingwood and
5                   Benjamin Gonzalez O'Brien, 14 pp.

6      Exhibit 11   printout of Twitter page of Dan       255
                    Chatman@dgchatman, 1 p.
7

       Exhibit 12   Tweet by Dan Chatman@dgchatman,       255
8                   11/7/2016, 1 p.

9      Exhibit 13   Tweet by Dan Chatman@dgchatman,       256
                    12/12/2016, 1 p.
10

       Exhibit 14   Tweet by Dan Chatman@dgchatman,       256
11                  2/11/2017, 1 p.

12     Exhibit 15   Tweet by Dan Chatman@dgchatman,       257
                    8/11/2017, 1 p.
13

       Exhibit 16   retweet by Dan Chatman@dgchatman,     257
14                  8/12/2017, 1 p.

15     Exhibit 17   Tweet by Dan Chatman@dgchatman,       257
                    6/11/2020, 1 p.
16

       Exhibit 18   Tweet by Dan Chatman@dgchatman,       258
17                  10/29/2020, 1 p.

18

19                 DOCUMENTS/INFORMATION REQUESTED

20                        PAGE LINE

21                        196   13

22                        196   20

23

24

25

Veritext Legal Solutions

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 7

1          San Francisco, California, Tuesday, May 16, 2023

2                              9:34 a.m.

3                               -oOo-

4          THE VIDEOGRAPHER:  Good morning.  We're going

5     on the record at 9:34 a.m., on Tuesday, May 16,

6     2023.  Please note that the microphones are

7     sensitive and may pick up whispering and private

8     conversations.  Please mute your phones at this

9     time.  Audio and video recording will continue to

10    take place unless all parties agree to go off the

11    record.

12         This is media unit 1 of the video-recorded

13    deposition of Dr. Daniel Chatman, taken by counsel

14    for the state defendants in the matter of In Re

15    Georgia Senate Bill 202, filed in the United States

16    District Court for the Northern District of Georgia.

17    The case number is 1:21-MI-55555-JPB.

18         The location of this deposition is Crowell &

19    Moring, Three Embarcadero Center, 26th floor, San

20    Francisco, California 94111.

21         My name is Cameron Tuttle, and I'm representing

22    Veritext.  I'm the videographer.  The court reporter

23    is Chris Te Selle, also from Veritext.

24         I am not authorized to administer an oath, I am

25    not related to any party in this action, nor am I

Page 8

1    financially interested in the outcome.

2         If there are any objections to the proceeding,

3    please, state them at the time of your appearance.

4         Counsel and all present, including remotely,

5    will now state their appearances and affiliations

6    for the record, beginning with the noticing

7    attorney.

8         MR. FALK:  Hi, I'm Donald Falk.  I represent

9    Secretary of State Brad Raffensperger and state

10   election board members Rebecca Ann Sullivan, David

11   J. Worley, Matthew Mashburn, and Anh Le.

12        With me is Joshua Prince.  We're both from

13   Schaerr Jaffe LLP.

14        MR. FOGELSON:  Matthew Fogelson with

15   Advancement Project, on behalf of the Concerned

16   Black Clergy plaintiffs.

17        THE COURT REPORTER:  Did people on Zoom want to

18   identify themselves, or should I go ahead and

19   administer the affirmation?

20        MR. FALK:  Yeah, go ahead.  If there's nobody

21   crying out on Zoom, let's do it.

22

23             DANIEL G. CHATMAN, Ph.D.,

24   having stated to tell the truth under penalty of

25   perjury, was examined and testified as follows:

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 9

1                              EXAMINATION

2          BY MR. FALK:

3                  Q.   Good morning, Dr. Chatman.

4                  A.   Good morning.

5                  Q.   Could you just state your full name for

6          the record, please.

7                  A.   Daniel Gregory Chatman.

8                  Q.   And your address?

9                  A.   ██████████████████  Berkeley, 94703.

10                 Q.   And how long have you been there?

11                 A.   At that address, about a year.

12                 Q.   Have you been deposed before?

13                 A.   Yes, I have.

14                 Q.   How often?

15                 A.   I guess I've been deposed about three or

16         four times.

17                 Q.   Do you recall the cases that you were

18         deposed about?

19                 A.   I don't know the names of the cases.  I

20         can describe them to you.

21                 Q.   Sure.

22                 A.   So, I was deposed in a case that was a

23         suit against the State of Texas by a group of civil

24         rights and voting rights organizations that was

25         looking at the issue of photo ID requirements for

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 10

1    voting, and that would have been in 2015 or so.

2            I was deposed for a case in Ohio, in

3    October of 2020, which was a suit against the state

4    for the new rules on the provision of drop boxes in

5    the State of Ohio, and then for a similar case in

6    the same month in the State of Texas, there was a,

7    both a state and a federal case, and I provided

8    reports for both of those, and I believe I was

9    deposed for one of those two, and that was also

10   about the provision of drop boxes in the State of

11   Texas.

12       Q.    Thank you.  So, you understand you're

13   under oath here?

14       A.    Yes.

15       Q.    And that the oath you entered today is

16   just as binding as if we were in a courtroom before

17   a judge or a jury?

18       A.    Indeed.

19       Q.    So, I just want to go over a couple of

20   preliminary things.  You've been through this

21   before, but it's always worth --

22       A.    Sure.

23       Q.    -- touching base.

24       A.    Absolutely.

25       Q.    If I ask a question, and you don't

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 11

1    understand, or you want me to clarify, please, just

2    say something.  Otherwise, I'm going to assume you

3    get the question, and we'll continue with our

4    conversation.

5            Please make your responses verbal and

6    clear, because the court reporter doesn't pick up

7    uh-huhs and head nods the way that one does in

8    normal conversation.

9            Is that okay?

10       A.   Yes.

11       Q.   Do you take any medications that would

12   prevent you from testifying fully and truthfully

13   today?

14       A.   No.

15       Q.   And do you have any medical or health

16   conditions that would prevent you from testifying --

17       A.   I don't.

18       Q.   -- fully and truthfully?

19       A.   I don't.

20       Q.   If you need a break, let me know.  We'll

21   try to keep a relatively regular break schedule.  I

22   will ask you to answer any question that may be

23   pending, so, best if you remember and you need a

24   break to finish first before I ask another question.

25       A.   Got it.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 12

1           Q.    But, we'll take breaks as needed.

2                 Can we get Exhibit 1, Josh.

3                 (Exhibit 1 was marked for identification

4       by counsel.)

5       BY MR. FALK:

6           Q.    Have you seen this document, Dr. Chatman?

7           A.    I believe I saw the previous document of

8       its type.  I'm not sure if I've seen this one.

9           Q.    Back in the March --

10          A.    The March version of this one.

11          Q.    Yeah.  This is more for the record than

12      for any contents.  This is the notice of deposition,

13      which is Exhibit 1, and we want that in the record.

14                Can I ask you what you did, if anything,

15      to prepare for this deposition today.

16          A.    I met with the plaintiffs' attorneys.

17          Q.    Other than the plaintiffs' lawyers, did

18      you speak with anyone else to prepare for the

19      deposition?

20          A.    No.

21          MR. FALK:  Can we get his CV, Josh, please.

22          (Exhibit 2 was marked for identification by

23      counsel.)

24      BY MR. FALK:

25          Q.    I assume you recognize this document, Dr.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 13

1    Chatman.

2            A.    I do.

3            Q.    I just want to go over your background a

4    little bit.  Now, you, after you, you got your

5    bachelor of arts in individual studies English

6    language at University of California Berkeley about

7    1991; is that right?

8            A.    Yes.

9            Q.    And then what, what did you do, what was

10    your employment after that, do you recall?

11            A.    I worked briefly as a vocational

12    specialist for an organization that provided

13    educational services for developmentally disabled

14    people, and then I was quickly after that in the

15    Peace Corps for several years, the U.S. Peace Corps.

16            Q.    What country, just out of curiosity?

17            A.    Botswana.

18            Q.    Great place.  I spent a couple of weeks

19    there.

20            A.    Oh, did you?

21            Q.    After the Peace Corps, did you return to

22    graduate school, or was there further employment

23    before that?

24            A.    I was employed for a few months on a

25    contract with a nonprofit organization in the same

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 14

1        village that I was a Peace Corps volunteer in for a

2        few months after I ceased my Peace Corps service,

3        and then I went to graduate school after that.

4              Q.    And that was at Harvard?

5              A.    That's correct.

6              Q.    Where you received a master in public

7        policy in 1997, if I've got this right?

8              A.    That's right.

9              Q.    And then what did you do after that?

10             A.    I was a consultant for a small consulting

11       firm that specialized in providing economic

12       consulting services to cities and counties.  It was

13       called Hausrath Economics Group, so I was working

14       essentially in planning and policy issues for cities

15       and counties, doing economic impact analyses and

16       fiscal impact analyses, and demographic work, as

17       well, for a couple of years.

18             Q.    And what did, and where was that?

19             A.    Oakland.  Downtown Oakland.

20             Q.    And, what did you do after that?

21             A.    That's when I started the Ph.D. program at

22       UCLA in 1999.

23             Q.    And you received your Ph.D. in urban

24       planning from UCLA in 2005?

25             A.    Yes.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 15

1          Q.   Did you do any work, apart from the
2    planning department, urban planning department, did
3    you have any outside jobs while you were in graduate
4    school at UCLA?
5          A.   Very, very little that I can recall.  The
6    one job that I remember working on was doing a
7    little bit of outside consulting for the World Bank
8    on a report in looking at planning processes in
9    Yemen.  Other than that, I don't think it was really
10   anything that wasn't through the university.
11         Q.   And after you received your doctorate,
12   what did you do next?
13         A.   I started work as an assistant professor
14   at Rutgers University, and I also was the director
15   of the Alan M. Voorhees Transportation Center for a
16   time when I started.
17         Q.   Was that, the transportation center that
18   you mentioned, was that at Rutgers?
19         A.   That was at Rutgers, yes.
20         Q.   Why did you leave Rutgers?
21         A.   Well, I got a job offer from UC Berkeley,
22   and the Bay Area's home, and my parents are here,
23   and my wife at the time also had her parents here,
24   so it was a good place to come back to, because we
25   had kids at that point.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 16

1          Q.   Just one thing in your CV I just wanted to

2     clear up.  You show being an assistant professor at

3     Rutgers through 2009, but beginning at Cal at 2008.

4          A.   Yeah, that's a funny little thing.  So,

5     technically, I was appointed in 2008 at Berkeley but

6     I wasn't able to make that transition.  I had to

7     take another year at Rutgers, so, I didn't start

8     active service at Berkeley until 2009, but my

9     employment record shows a 2008 start date that isn't

10    real, so, that's what that is.

11         Q.   Appointment 2008 began --

12         A.   Again, actually --

13         THE COURT REPORTER:  Just one second.  One at a

14    time, please.  Excuse the interruption.

15         THE WITNESS:  My bad.

16    BY MR. FALK:

17         Q.   So, to be clear, your appointment was

18    2008, but you didn't begin teaching in Berkeley

19    until 2009.

20         A.   That's correct.

21         Q.   And then what was your next position after

22    assistant professor?

23         A.   I was promoted to associate professor in

24    2014.

25         Q.   And is that your current position?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 17

1          A.    Yes.

2          Q.    And, which department is that in?

3          A.    The department of city and regional

4     planning.

5          Q.    Other than what you've mentioned, do you

6     have any practical experience relevant to the case?

7          A.    I think that's the extent of my experience

8     that's relevant to the case.

9          Q.    And as relevant to this case, how would

10    you describe your expertise?

11         A.    My areas of expertise include the

12    influences of the built environment on travel

13    behavior, the study of travel behavior, more

14    generally, the economic impacts of transportation

15    investments, statistical methods in transportation,

16    and perhaps a few others that are not as relevant to

17    this case.

18         Q.    And you would consider yourself a

19    competent and well-trained and principled social

20    scientist; is that correct?

21         A.    Sure, yes.

22         Q.    What classes have you taught that you

23    believe relate most directly to your testimony in

24    this case, if any?

25         A.    I teach an undergraduate course called

Page 18

1       Introduction to Urban and Regional Transportation

2       Planning.  I teach a graduate level course which is

3       called Transportation and Land Use Planning.  Both

4       of these courses are inclusive of travel behavior

5       literature, which is the one, the literature that's

6       most relevant to the case.

7                 I've also taught statistical methods for

8       several years, which is also relevant to the case.

9            Q.   And you have published several articles,

10      reports, and other documents in your time as a

11      professor; is that correct?

12           A.   Yes.

13           Q.   And which of your publications do you

14      think relate most directly to the issues raised in

15      your reports in this case?

16           A.   Well, if you'll permit me to consult my

17      CV --

18           Q.   That's why it's there.

19           A.   -- to make it easier.  Three of the most

20      recent publications are quite relevant.  One of them

21      is about public transportation use and behavior,

22      travel behavior in the United States.  That's item

23      number 26 on the CV.

24                Item 25 on the CV, the use of app-based

25      ride-hailing services and conventional taxicabs by

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 19

1    adults with disabilities is relevant to the case.

2          Item 24 is a study looking at residents of

3    Barranquilla, Colombia, and how their travel

4    behavior changed as a result of a new bus rapid

5    transit system.

6          So, those three are relevant.

7          The study on item number 20, equity and

8    congestion priced parking, a study of SF Park, looks

9    at the travel choices and the travel purposes of

10   people parking in San Francisco.

11          You know, there are ways in which many of

12   these publications are relevant, because most of

13   them deal with travel behavior, and that's the area

14   that is relevant to the case.

15   Q.    Do any of your publications cover Georgia?

16   A.    No.

17   Q.    Have you ever visited Georgia?

18   A.    Yes.

19   Q.    How many times?

20   A.    I believe I've been there three times.

21   Q.    And when were you last there?

22   A.    That would have been probably for the ACSP

23   conference, which is the American Collegiate Schools

24   of Planning conference, in, it's probably been about

25   10 years since that conference.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 20

1              I was offered a job at Georgia Tech.  I

2      wasn't able to take that job, in the end, but I

3      spent some serious time thinking about living in

4      Atlanta, and it seems like a nice place to live.

5              Q.   Have you been arrested or convicted of any

6      crime?

7              A.   No.

8              Q.   Now, you've been retained as an expert

9      witness in this litigation, correct?

10             A.   Yes.

11             Q.   And, how are you being compensated for

12      your work on this case?

13             A.   I'm being compensated at the rate of $500

14      per hour.

15             Q.   And, you mentioned, when we talked about

16      your testimony, that you had testified in, I think,

17      been deposed in three cases.

18             A.   I've been deposed and testified in three

19      cases, yes.

20             Q.   You testified at trial in those three

21      cases?

22             A.   Yes.

23             Q.   Or at a hearing of some sort --

24             A.   They were, I guess --

25                  (Cross-talk, reporter clarification.)

Daniel G. Chatman , Ph.D.                                May 16, 2023
Georgia Senate Bill 202, In Re

Page 21

1          Q.    Let me back that up.

2                So, you testified at trial or at a hearing

3     in three cases.

4          A.    Yes.

5          Q.    Now, turning your attention to the Ohio

6     and Texas cases that involved drop boxes, the 2020

7     cases that you testified in October, roundabout

8     October 2020, your testimony in those cases

9     predicted huge lines at drop boxes on election day

10    in both states, lines so great that you said, this

11    is my projection, but you disavowed the exact

12    contours of what you laid out in your reports.

13               Did I understand that correctly, that you

14    predicted, that you, based on the statistics in your

15    analysis, you predicted impossibly long lines, and

16    you said, that's not what's really going to happen,

17    but I predict very long lines; is that correct?

18               Can you explain what you --

19         A.    Yeah, I'm happy to explain.  So, the

20    analysis predicted, essentially, what amounts to

21    huge lines if the levels of demand for drop boxes

22    were conservatively estimated.

23               Given the number of drop boxes available,

24    and given the rate of drop box use, similar to other

25    states that have drop boxes, but, lines that long,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 22

1    obviously, don't exist, because people wouldn't get

2    in them.

3              So, the way to think about this is that

4    these were projections of how long the lines would

5    be if everybody who wanted to use drop boxes got in

6    line.

7              It's another way of illustrating the

8    extent to which the reduction in the number of drop

9    boxes made it virtually impossible for large numbers

10   of people to use them.

11        Q.   Do you know whether those predictions came

12   true?  Were there long lines at drop boxes on

13   election day --

14        A.   As I said --

15        Q.   Please, just let me finish the question.

16   I understand the eagerness, but, sometimes, I'm a

17   little slow to get the whole question out.

18              Did those predictions come true, and were

19   there, were there long lines at drop boxes on

20   election day in Ohio and Texas?

21        A.   The, as I said before, the way to think

22   about those estimates was not that they were

23   predictions.  However, it is true that we would

24   expect for there to be long lines with the levels

25   of, some sort of what an ordinary person would call

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 23

1    a long line, like, waiting in an hour for a line,

2    and my understanding is that there were some long

3    lines in Texas and Ohio, but I don't know.

4            I wouldn't expect that they would have

5    been as long as what was projected in these

6    estimates, because, as I said before, those were

7    estimated assuming that people were not dissuaded

8    from long lines.

9        Q.   Are you aware of any data showing that

10   drop box lines were especially long on election day

11   in Ohio and Texas?

12       A.   Well, first of all, we wouldn't expect

13   them to necessarily be long on election day.  It

14   would be especially on the day before, because the

15   drop box availability is of greatest relevance on

16   days when the polling places are not available.

17       Q.   Fair enough.

18       A.   So, but I am not.

19       MR. FALK:  Can we get his report, please,

20   Joshua.

21       (Exhibit 3 was marked for identification by

22   counsel.)

23   BY MR. FALK:

24       Q.   Do you recognize this report, Dr. Chatman?

25       A.   Yes.

Daniel G. Chatman , Ph.D.                                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 24

1          Q.    Does it represent your opinions in this

2     case?

3          A.    It represents what I would view as in some

4     cases facts and in some cases opinions.

5          Q.    When did you first start working on this

6     report?

7          A.    I don't think I started working on the

8     report until the summer of 2022.

9          Q.    And, when did you complete it?

10          A.    January of this year.

11          Q.    Were you given any materials by anyone

12     else to review in preparing this report?

13          A.    I was given some data through the

14     plaintiffs' attorneys, which was from the State of

15     Georgia.  And I may have been given a link to an

16     article or two, and I was also given the complaints

17     by the plaintiffs' attorneys.

18          Q.    Were the links to articles also provided

19     by plaintiffs' attorneys that you mentioned?  You

20     mentioned links to articles.  Were those also

21     provided by plaintiffs' attorneys, or were they

22     provided by somebody else?

23          A.    No, they were provided by plaintiffs'

24     attorneys.

25          Q.    How many hours, approximately, did it take

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 249 of 691
Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 25

1    to prepare your initial report?

2        A.    About 60 of my hours, yes.

3        Q.    Did you share your report with any other

4    persons, including scholars or experts, to review

5    before you finalized it?

6        A.    No.

7        MR. FALK:  Rebuttal.

8        (Exhibit 4 was marked for identification by

9    counsel.)

10   BY MR. FALK:

11       Q.    Exhibit 4 will be your surrebuttal report

12   in this case.

13             Do you recognize this document, Dr.

14   Chatman?

15       A.    Yes.

16       Q.    Do these two expert reports that we've

17   just discussed set forth all the opinions that you

18   intend to offer at trial in this case?

19       A.    I'm not sure if I understand the question.

20   I, that is to say, intends to offer, yes.  I can't

21   promise I won't offer other opinions that haven't

22   appeared here in testimony, just by virtue of people

23   asking me questions, but, this is pretty much what I

24   expect to --

25       Q.    Let me rephrase it, and maybe we can --

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 26

1              As you sit here today, do you have any

2      opinions that you intend to offer at trial that are

3      not set forth in these two reports?

4         A.    No.

5         Q.    Can you summarize for me what you believe

6      to be the main findings or conclusions of your

7      reports?

8         A.    Well, I think the surrebuttal report is a

9      little bit different, but I can certainly summarize

10     the main findings of the main report.

11        Q.    Okay.

12        A.    The main findings are that black citizens

13     of voting age and citizens of voting age with

14     disabilities have a much higher rate of travel

15     burden to access both drop boxes, early voting

16     locations, and locations to procure photo

17     identification for the election, than do

18     non-Hispanic white citizens of voting age.

19        Q.    Can you explain exactly what you mean by,

20     burden.

21        A.    So, as I lay out in the report, I define a

22     burden to be equivalent to more than the amount of

23     daily travel carried out on a discretionary

24     household basis by the average person in Georgia,

25     and that is a round trip of an hour or more.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 27

1          Q.   You define the travel burden differently
2     when you're analyzing trips to the Department of
3     Driver Services, which we'll call DDS the rest of
4     the way through here; isn't that correct?
5          A.   Yes.
6          Q.   And, why did you pick a different
7     definition for that trip?
8          A.   In that instance, people obtaining photo
9     ID can presumably use it for several elections, so,
10    a, it's worth more, essentially, and people's
11    willingness to take on that burden is something that
12    is of value to them beyond a single election.
13         Q.   In your reports for the Ohio and Texas
14    drop box litigation, isn't it true that you defined
15    the travel burden to get to a drop box in those
16    states as 90 minutes?
17         A.   Yes.
18         Q.   Why did you choose a different level of 60
19    minutes in Georgia?
20         A.   Well, there's two factors there.  One of
21    them is the amount of travel that people carry out
22    in different states being somewhat different, so,
23    that's one factor.
24              But, frankly, I, when I used the 90 minute
25    definition in Ohio and Texas, that was based on an

Daniel G. Chatman , Ph.D.                              May 16, 2023
Georgia Senate Bill 202, In Re

Page 28

1    assumption that this was something that was of

2    value.  It was, essentially, using the definition of

3    burden that I had used previously, and it wasn't

4    taking into account the discretionary travel that

5    was carried out in those states, and, if I had done

6    that, I probably would have used a 60 minute

7    definition in those cases.

8              So, my thinking on this has evolved since

9    then, and this is something that makes sense to do

10   even in that instance in the case of the drop box

11   access in Ohio and Texas.

12             That said, the results of using different

13   thresholds are really quite similar to each other,

14   that is to say, the multiples, the extent to which

15   there is a disproportionate burden for black

16   citizens of voting age in those other two cases

17   would be about the same, regardless of whether it

18   was a 60 or 90 minute definition, and the same goes

19   in this case.

20        Q.   Did you look to see what percentage of

21   Georgians would have to travel 90 minutes, the 90

22   minutes that you considered a burden in Texas or

23   Ohio, before deciding to redefine the travel burden

24   definition for purposes of this report?

25        A.   I did not.  I was focused on calculating,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 29

1    the way that this worked was, I was focused on

2    calculating the amount of discretionary household

3    travel using the national household travel survey,

4    and was using that as the premise for the definition

5    of burden, that is to say, doubling the amount of

6    travel on a daily basis, and so that's where I came

7    up with that figure.

8              Then, in the other instances, these

9    previous instances, the data were different because

10   they were different states and because in those

11   instances I used all travel, including

12   nondiscretionary travel, including work travel.

13             So, for both of those reasons, the figures

14   are different.

15        Q.   Why did you exclude nondiscretionary

16   travel from your analysis here?

17        A.   Nondiscretionary travel is

18   nondiscretionary, meaning that people are not able

19   to make a decision about it, so it's not a marginate

20   decision.  It's something that they have to do.

21             So, nondiscretionary travel isn't

22   something that they have a choice over, as opposed

23   to the choice of whether to go to a drop box,

24   whether to vote in that fashion, or whether to go to

25   the grocery store on a given day.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 30

1        Q.    Did you measure the travel burden of

2    voting in-person by going to a polling place on

3    election day?

4        A.    No.

5        Q.    Isn't some time and transportation burden

6    inevitable when you are voting?

7        A.    Some is inevitable.  The question is how

8    much.  And, I mean, I think the point of the

9    analysis is to demonstrate that for some fraction of

10   people, it's unlikely, or burdensome, burdensome

11   and, both burdensome and unlikely because

12   burdensome, to take advantage of an option for

13   voting.

14            And the literature, as I understand it,

15   that looks at the effect of the cost of voting shows

16   that this is something that dissuades people from

17   voting, higher costs, including time costs.

18       Q.    When looking at public transportation in

19   particular, isn't it true that waiting time and any

20   cost in arranging transportation is the same per

21   trip, regardless of length?

22       A.    I'm going to have to ask you to clarify

23   your question.

24       Q.    Sure.  In the public transportation

25   context there, your report talks about waiting time

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 31

1    and walking time.  I mean, I think, if I have it

2    right, looking at the literature, waiting and

3    walking are sort of the main costs associated with

4    public transportation, in addition to the fare,

5    right, wouldn't you say?

6         A.    There's the in-vehicle time, as well.

7         Q.    Right.  The in-vehicle time.

8              And looking at, with respect to a public

9    transportation trip, isn't it true that waiting and

10   walking time and any additional cost in just

11   arranging the transportation will be constant for

12   trips of different vehicle lengths?

13        A.    When you say for trips of different

14   vehicle lengths, you mean trips of different

15   durations?

16        Q.    Yeah.  Let me just give an example,

17   concrete example.

18        A.    Great.

19        Q.    If I have to walk to the bus stop, look up

20   the schedule, see where it goes, walk to the bus

21   stop, does that time, is that time going to be

22   constant whether I'm riding the bus for two miles or

23   five miles, I guess, is my question.

24        A.    Walking time is not constant in the sense

25   that it depends on how far from the bus stop you

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 32

1    live, so, in that sense, it's going to vary.

2          Q.    Same bus stop.  If it's to the same bus

3    stop --

4          A.    Are you saying, are you asking a question

5    about the same trip at different times of day,

6    depending on scheduled differences, is that what you

7    mean?

8          Q.    No.  I'm saying, I'm, the difference

9    between a two mile trip or a one, a one mile trip on

10   public transportation, which can be a very long trip

11   for some people, on some systems, or a two mile

12   trip, same bus stop, riding farther.

13         A.    Yes.

14         Q.    Are the nonvehicle time costs the same for

15   trips, whether it's a one, you're on the bus for one

16   mile or two miles?

17         A.    Generally, yes.  There is an exception to

18   that, however, which is, what matters in terms of

19   our estimates of waiting time and walking time,

20   well, you're not asking about waiting time right

21   now, are you?

22         Q.    I'm asking waiting and walking together.

23         A.    Waiting and walking.  Typically, what we

24   estimate for waiting times is, for rapid frequent

25   service, is we assume half of the headway.  The

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 33

1    headway is the difference between vehicles.

2        Q.    Uh-huh.

3        A.    So, if it's a five minute headway, five

4    minutes between vehicles, people don't, aren't able

5    to time their arrivals exactly for the arrival of

6    the bus.

7        Q.    Right.

8        A.    And so we assume that their average

9    waiting time is two and a half minutes in that case.

10        Q.    Uh-huh.

11        A.    If the waiting time, if the headways are

12    half an hour, people will schedule themselves, and

13    they will try to arrive 10 minutes beforehand,

14    typically, because of the risk of a bus arriving

15    early, and missing the bus that way.  They don't

16    want to arrive two minutes beforehand, because they

17    might miss their bus.

18            So, that's how we estimate waiting times,

19    and that depends on the headways of the vehicle, and

20    that could vary, depending on what's at issue.

21            But I think in terms of the estimates in

22    this analysis, when there is a change in a location

23    of a drop box, or the removal of a drop box, the

24    nearest stop might not be the stop that one has to

25    use, depending on the nature of the most proximate

Daniel G. Chatman , Ph.D.                                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 34

1    drop box in the new situation, and, therefore, it

2    might not be the same walking time.  It just depends

3    on the very specific spatial situation.  You might

4    have to go to a completely different bus stop in a

5    different direction.

6         Q.   And did your analysis account for those

7    changes?

8         A.   Yes.

9         Q.   In your analysis of travel burdens, were

10   you focusing on changes that result from SB 202?

11        A.   Only in the analysis comparing the 2020

12   drop boxes to the 2022 drop boxes.  But, in the

13   analysis of the early voting locations and of the

14   DDS offices, those, we're looking at a snapshot in

15   time, and, as I understand it, those are not

16   directly looking at changes due to SB 202.

17        Q.   When looking at the travel burden

18   resulting from changes related to SB 202, isn't the

19   relevant consideration the incremental travel

20   burden, as opposed to the absolute travel burden?

21        A.   Well, from my perspective, I'm interested

22   in the overall travel burden and the relevant

23   comparisons between groups.  I think it's relevant

24   that the level of burden after the change is much

25   higher for black citizens of voting age and for

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 259 of 691
Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 35

1    citizens of voting age with disabilities than it is

2    for non-Hispanic white voters or for voters without

3    disabilities.

4              The incremental change made things worse

5    in that sense, in terms of that relative burden, but

6    the absolute burden is still, I think, a relevant

7    fact, from my perspective as a travel behavior

8    researcher.  If I'm looking at whether or not what

9    fraction of people has to travel a long distance, I

10   think that's relevant.

11        Q.   In your report, did you try to quantify

12   the net additional travel time that a voter would

13   need to undertake in order to vote by a drop box,

14   compared to other available methods of voting?

15        A.   I didn't compare it to other available

16   methods of voting.

17        Q.   Now, you mentioned your understanding that

18   SB 202 did not affect or at least did not directly

19   affect the early voting locations.

20              Is that, did I understand that correctly?

21        A.   Well --

22        MR. FOGELSON:  Objection to the form.

23   BY MR. FALK:

24        Q.   You can answer.

25        MR. FOGELSON:  You can answer.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 36

1          THE WITNESS:  I am not an expert in SB 202.  I

2      don't speak to SB 202 in my report.

3      BY MR. FALK:

4          Q.    Uh-huh.

5          A.    And so I don't know to what extent there

6      were effects of SB 202 on early voting locations.

7          Q.    Why did you measure the travel time to

8      early voting locations?

9          A.    I was looking at the distribution of

10     availability of various, I guess you could call them

11     voting resources, trying to contextualize SB 202 in

12     the landscape of existing disparities, and early

13     voting locations were something that it was possible

14     to do that analysis for, so, I did it.

15         Q.    And, how does -- let me back up.

16         How does your analysis of early voting

17     location access affect your conclusions?

18         A.    Well, my conclusions are simply that there

19     is a disparity in terms of access to early voting

20     locations, in terms of access to DDS locations, in

21     terms of access to drop boxes.

22         My conclusion is also that it got worse,

23     incrementally worse for drop boxes, because I was

24     able to look at data before and after, and the

25     conclusion to the report is very simple.  It's that

Page 37

1    these disparities exist across all these forms of

2    access to voting, and that they are, essentially,

3    something that could be thought of as cumulative, or

4    something that is making it more difficult for

5    people with disabilities and for black, black

6    voters, in multiple dimensions, along multiple

7    dimensions.

8         Q.   At paragraph 66 of your report, which is

9    on page 29, the beginning of it, you state that SB

10   202 restricted the ability of counties to provide

11   ballot drop boxes, and then you provide some details

12   on the limits in SB 202.

13        Do you see that sentence, that first

14   sentence?

15        A.   Yes.

16        Q.   When you talk about the restriction that

17   SB 202 imposed, what are you comparing it to?

18        A.   I'm comparing -- I'm sorry.

19        Q.   When you say that SB 202 restricted the

20   ability of counties to provide ballot drop boxes,

21   restricted compared to what?

22        A.   Compared to what was being offered before,

23   or compared to what they could have done absent the

24   existence of SB 202?  So, there's a counterfactual

25   here, because counties prior to that, could have

Daniel G. Chatman , Ph.D.    May 16, 2023
Georgia Senate Bill 202, In Re

Page 38

1    provided more drop boxes in 2022, if they had wished

2    to, but they were not able to do that.

3            So there is a, there is a bit of a

4    counterfactual, that is to say, one could imagine a

5    situation in which some counties provided even more

6    drop boxes in 2022 than they provided in 2020, but

7    that was not made.  That was made not possible by

8    SB 202.

9        Q.   Do you know what authorities counties had

10    to provide drop boxes before 2020?

11        A.   No.

12        Q.   So, in your analysis --

13        A.   I'm sorry.  You said before 2020.

14        Q.   Before 2020.

15        A.   I'm aware that, that, my understanding is,

16    and I, correct me if I'm wrong, that drop boxes were

17    made available, only made possible to provide after,

18    in the 2020 election.  That's my understanding.

19        Q.   Okay, thank you.

20            So, why is 2020 the appropriate baseline

21    for your analysis?

22        A.   Well, the way that I think about this is

23    that what we're trying to do is understand the

24    availability of an option to vote, and drop boxes

25    are such an option, and, just as early voting

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 39

1      locations are.
2           Q.    What characteristics of the 2020 election
3      make it the one from which we should judge policy?
4           MR. FOGELSON:  Objection as to form.
5           THE WITNESS:  I think, yeah, I'm not sure if I
6      understand the question.  You're --
7      BY MR. FALK:
8           Q.    Okay, sure.  You said it's your
9      understanding --
10          A.    Yeah.
11          Q.    -- and it's mine, that before 2020,
12     counties did not have the ability to provide drop
13     boxes.
14          A.    Uh-huh.
15          Q.    In 2020 --
16          A.    Right.
17          Q.    -- they did provide drop boxes.
18          A.    Uh-huh.
19          Q.    And so what I'm asking is, what
20     characteristics of 2020, as opposed to 2018, or
21     2016, make it the appropriate election to take as
22     the baseline for judging whether a policy is
23     restrictive or expansive, whatever adjectives you
24     want to use.
25          MR. FOGELSON:  Objection as to form.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 40

1          THE WITNESS:  Well, I guess my view on this is
2     that providing drop boxes is something that is
3     commonly happening in the United States, in lots of
4     different states, that it is an option for voting
5     that people value, because a lot of people use them,
6     and that if there was a change between when they
7     were first offered versus when they were later
8     offered in a way that creates a burden, that that is
9     of interest, and worth looking at.
10    BY MR. FALK:
11         Q.   Was the 2020 election typical in the way
12    it was conducted?
13         MR. FOGELSON:  Objection as to form.
14         THE WITNESS:  I don't have much of a comment on
15    that.  I'm not an expert on how elections are
16    conducted.
17    BY MR. FALK:
18         Q.   Are you aware that drop boxes were
19    authorized in 2020 through an emergency order?
20         A.   Yes.  I'm also aware that in other states,
21    they've been authorized not through emergency order.
22    They've just been used.
23         Q.   And are you aware that, as I understand
24    it, but you may know better, in 27 states, there's
25    no authorization for drop boxes.

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 41

1          A.    That sounds about right.

2          Q.    If you take the zero drop boxes that were

3     available up through, up until the 2020 election in

4     Georgia as a baseline, would that affect your

5     opinion regarding the effect of SB 202 on the travel

6     burden of voting?

7          A.    I don't see it as being sensible to say

8     that SB 202 had any effect, except in the context of

9     drop boxes as provided in 2020.  Now, if what you

10    were asking me was, what if drop boxes were imposed

11    and allowed only under the rules of SB 202 from the

12    very beginning, which is a different question, but I

13    can answer that question, so, in other words, let's

14    say that drop boxes were never provided, and then

15    the state allowed drop boxes to be provided under

16    the provisions of SB 202.  The burden that I'm

17    describing would still exist.

18               We simply wouldn't have a change in the

19    burden.  We would have a resulting burden, and the

20    burden would be that it's three times as hard for

21    people with disabilities, and about the same for

22    people with, for people who are, who are black to

23    use drop boxes.  So, that's how I would answer that

24    question.

25         Q.    So, you would view a movement from no drop

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 42

1     boxes to drop boxes, as authorized by SB 202, as

2     imposing a travel burden, a net travel burden on

3     voting?

4          A.   I would say, I wouldn't say that it

5     imposed a net travel burden upon voting.  I would

6     say that the provision of drop boxes in that case

7     disproportionately favored as providing an option to

8     people who don't have disabilities and to people who

9     are non-Hispanic white voters.

10         Q.   Do you present any opinions regarding the

11    effects of voter -- sorry.

12              Do you present any opinions regarding the

13    effects of travel burden on voter turnout in this

14    case?

15         A.   Not explicitly.  Just, I make a reference

16    in the surrebuttal report to the idea that costs

17    inevitably decreased turnout, as according to that

18    literature that has looked at the effects of costs

19    on voting, but I don't, I'm not an expert in that

20    area.

21         Q.   Because you're not an expert on nonvoter

22    turnout; is that correct?

23         A.   That's correct.

24         Q.   So, this may be a little repetitive, so,

25    bear with me here.  I just want to be clear.

Page 43

1            So you do not reach, beyond what you said

2     about the relation between cost and turnout, which

3     you did not quantify, correct, is that you did not

4     attempt to quantify the difference between -- it's

5     not my day for clear questions.

6            Am I correct that you did not attempt to

7     quantify the relation between the travel burdens

8     that you find and voter turnout in this case; is

9     that correct?

10        A.   That is correct.  I don't try to quantify

11    the extent to which the existence of the travel

12    burden to access a drop box is likely to affect

13    people's participation in voting.

14        Q.   Okay.  And so that would be, so, it's true

15    that you didn't reach any quantified conclusions

16    about the effect of the travel burdens you identify

17    on turnout among black voters?

18        A.   No quantified conclusions.  I did reach a

19    conclusion which, you had asked me earlier whether

20    my report presented opinions, and I said something

21    slightly cheeky.  I said, there are some facts, and

22    then there are some opinions.

23        Q.   Uh-huh.

24        A.   I do have an opinion about that, which I

25    present at the very end of my report, which is that

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 44

1    it is likely to dissuade voters, that these burdens

2    are likely to dissuade voters.

3           That said, it's not a quantified amount of

4    dissuasion that appears in this report that I've

5    calculated.

6           Q.   And is that, does that answer also apply

7    to voters with disabilities?

8           A.   I think it applies to everyone who, who

9    faces such a burden.  I think it's much less likely

10   that people will vote via drop boxes if they have to

11   travel an hour round trip just to get there, and

12   that includes non-Hispanic white voters.  It

13   includes voters without disabilities.  It's just

14   that the fraction of people is much higher if they

15   have disabilities or if they're African-American.

16          Q.   The way you phrased it and, I think this

17   is consonant with what you said in the rebuttal

18   report, and possibly at the end of the expert

19   report, you were saying the likelihood that they

20   will use drop boxes is reduced when travel burden

21   increases, is that, do I have that straight, or did

22   I misstate that?

23          A.   Yes.

24          Q.   Did you do any analysis about the

25   likelihood of whether they will vote at all?

Daniel G. Chatman , Ph.D.                                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 45

1        A.   No.  I mean, one thing that I didn't do in

2   this report, for example, in this analysis, was to

3   look at the effects of long lines at polling places

4   on election day on people's ability to vote and

5   willingness to vote.

6        Q.   Uh-huh.  You did not look at that.

7        A.   I did not look at that.

8        Q.   I was afraid I'd missed something.

9        A.   No, I did not look at that in this report.

10  If I had, and had any data on that, I might have

11  been able to make a stronger claim about whether and

12  how the lack of availability of voting options, like

13  drop boxes, would result in people not voting due to

14  the difficulty of voting at a polling place on the

15  day of the election.

16       Q.   Do you agree that many factors, both

17  material, such as costs, and nonmaterial, such as

18  sense of civic duty, affect voter turnout?

19       A.   Yes.

20       Q.   And in your report you mention the Blais

21  article that says, and you returned to it in your

22  rebuttal report, is that I'm going to assume you're

23  familiar with it, that it says that duty and

24  interest in politics is a greater factor than the

25  cost factors in determining whether voters actually

Page 46

1    turn out in the end?

2         A.   Yes.  Both the articles that I cite also

3    say that costs are quite significant.  They are

4    statistically significant predictors of whether

5    people vote.  Costs include, of course, time costs.

6         Q.   Are you aware of any literature that

7    addresses the effects of car ownership on voter

8    turnout?

9         A.   I am not.

10        MR. FALK:  Can we get the next exhibit.

11        (Exhibit 5 was marked for identification by

12   counsel.)

13   BY MR. FALK:

14        Q.   Exhibit 5 is an article entitled, Driving

15   turnout, the effect of car ownership on electoral

16   participation, by Justin de Benedictis-Kessner and

17   Maxwell Palmer, and if I can direct your attention

18   to page 2, the last paragraph before the data and

19   research design in the heading.

20        A.   I'm sorry, could you say that again.

21        Q.   Yeah.  On page 2, in the last paragraph

22   before the heading, there's a heading there called

23   data and research design, if you've got it.

24        A.   Uh-huh.

25        Q.   Do you see that?  And the paragraph right

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 47

1    above that in the, in the middle, they say, our

2    results show that the sector of the population

3    without access to cars or reliable alternative modes

4    of transportation participates in politics at lower

5    rates, which has the potential to erode democratic

6    representation.

7              Do you see that part?

8         A.   Yes.

9         Q.   And they lay out some of these effects on

10   page, page 7, they have the, they have graphed what

11   they caption as within address differences and

12   participation rates by voting method in the 2018

13   general election, which they explain within address

14   differences means persons with and without in-house

15   access to automobiles at the same address,

16   presumably, apartments.

17        A.   Uh-huh, yeah.

18        Q.   And they show very significant differences

19   in in-person voting among --

20        A.   People with and without vehicles.

21        Q.   People with and without vehicles, just

22   across the board, which, on the flip side, same

23   significant differences in the number of people who

24   did not vote.  I think it's, you know, 24 percent

25   versus 40 percent, fairly massive difference.

Daniel G. Chatman , Ph.D.                      May 16, 2023
Georgia Senate Bill 202, In Re

Page 48

1              Do you agree that's a pretty big

2        difference, right?

3              A.    Huge.

4              Q.    And there the effect of car ownership on

5        voting is independent of SB 202, or most other

6        election regulations; isn't that right?

7              A.    I don't know what the election regulations

8        are in Michigan.

9              Q.    But we know SB 202 isn't there.

10             A.    I don't even know that there are, I mean,

11       I can't speak to what's going on in Michigan, in

12       terms of anything like SB 202, or --

13             Q.    But, on the whole, persons without a car

14       in the household are less likely to vote, isn't that

15       the clear implication of this study, the conclusion

16       of this study, that persons without a car in the

17       household are less likely to vote?

18             MR. FOGELSON:  Objection to form.

19             THE WITNESS:  As I understand it, I haven't

20       seen this article before, but that's what I

21       understand from looking at it now.

22       BY MR. FALK:

23             Q.    And, back where we were in the very end of

24       the introductory section on page 2, they suggest in

25       the last sentence before the data and research

Page 49

1    design heading, they say that policymakers can

2    reduce these inequalities by either providing more

3    reliable alternative transportation options, or

4    making alternative forms of voting, such as early or

5    absentee voting, widely accessible for their

6    citizens; is that right?

7          A.   This strikes me as one of those sorts of

8    statements that people make in articles like this --

9    I know, I make them myself, because I publish

10   articles -- that are appealing to the policy

11   relevance of their results, but aren't necessarily

12   based on data.

13         Q.   Well, we'll look at the data that they

14   point out, again, on page 7, the same graph that we

15   were looking at before, at the top of page 7, they

16   show that roughly equal percentages of persons with

17   and without automobiles in the household vote

18   absentee, which, at least according to this study,

19   suggests that a person without an automobile is

20   almost equally likely to vote absentee, I believe,

21   in this case, by mail, as a person with an

22   automobile.

23         A.   Yes.  It's quite a striking finding,

24   because, if they were right about their policy

25   solution, one would expect a higher rate among

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 50

1     people without autos, but one does not see that in

2     their data.

3               Given that that's not the case, it would

4     appear that for some reason, absentee voting is not

5     providing the option that is needed for people

6     without a vehicle.

7          Q.   Well, it could mean that or it could mean

8     that there are other confounding factors that attend

9     the lack of an automobile in the household that

10    affect likelihood to vote overall, correct?

11         A.   I guess I'm not sure what other

12    confounding factors you think there might be.

13         Q.   Well, I think you've talked about the

14    relationship between low income and lack of an

15    automobile, and, isn't it true that persons of low

16    income tend to have lower voter turnout than persons

17    of middle or higher income?

18         MR. FOGELSON:  Objection to form.

19         THE WITNESS:  What I would say in that instance

20    is that the confounding factors that are at work,

21    when talking about people of lower income, in

22    comparison to people of middle income or higher

23    income, have very much to do with the material

24    circumstances in which low income people find

25    themselves, including more time scarcity, less

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 51

1      money, in general, to provide alternatives that

2      enable them to free up time, auto ownership, of

3      course, and these factors are probably playing a

4      large role in the extent to which lower income

5      people find it convenient to vote.

6           I wouldn't presume to say that, for example,

7      lower income people are less likely to vote because

8      they just don't want to vote.

9      BY MR. FALK:

10          Q.   But, setting aside motivation, the turnout

11     among lower income people tends to be lower than

12     those of higher economic stratums; isn't that

13     correct?

14          A.   Yes, and, as I was just saying, that the

15     reasons for this, again, I'm not a voting turnout

16     expert, but my understanding is that there are a

17     number of factors that from my perspective, as a

18     travel behavior expert, would explain the extent to

19     which that particular trip does not get made,

20     because it's also true that lower income people are

21     much less likely to travel to restaurants, doctors,

22     movie theaters, and the list goes on.

23               And the main reason that we understand for

24     that is not because lower income people don't want

25     to go to doctors, movie theaters, or restaurants,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 52

1    it's because they don't have that option.  So, I, as

2    a travel behavior expert, would say that the best

3    answer for the difference in this trip, just

4    conceived of as a trip, because trips have costs, is

5    that longer trips don't get made, because they're

6    harder for people.

7            That's true for everybody, and lower

8    income people, as I've said in my report, are much

9    less likely to be able to make those sorts of trips,

10   for these various, for various material reasons.

11       Q.   And that would apply to voting on election

12   day, right?  If you're going to the precinct, that's

13   a trip, too, correct?

14       A.   Well, that's not typically going to be a

15   burdensome trip.  Now, I did not do analysis of

16   polling place trips, but polling places are much

17   more, much more widely distributed, there are many

18   more of them, and the trips to access a polling

19   place are typically shorter.

20           So, if I had done that analysis, I imagine

21   I wouldn't have found that travel burden was the

22   issue there.  I didn't do that analysis, but, if I

23   had, that's my sort of expert opinion, based on my

24   understanding of the distribution of polling places.

25           The issue with the distribution of polling

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 53

1    places is not so much travel burden as it is queuing

2    burden, waiting time, and that varies a lot.  And I

3    think people in denser places often have longer

4    lines, they expect or they encounter longer lines,

5    and people who are of lower income tend to live in

6    those places at higher rates than people of higher

7    income.

8          Q.   Whatever it is that prevents people

9    without automobiles from voting in-person, it

10   doesn't seem to prevent them from voting absentee at

11   roughly the same rate, slightly more, not probably

12   significant, but, slightly more, greater rate.

13         A.   Probably, yeah.

14         Q.   Whatever those impediments are, the

15   impediments are not stopping them from voting

16   absentee the same way they seem to be dramatically

17   interfering with their ability to vote --

18         MR. FOGELSON:  Objection to form.

19   BY MR. FALK:

20         Q.   -- in-person.

21         A.   Again, what I find striking about this

22   graph is not so much that they are equivalent, but I

23   wonder why they aren't, why people who don't have

24   access to a car aren't voting absentee at a higher

25   rate, and the answer to that question for me strikes

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 54

1    me to be one of those material factors that we were

2    just discussing, but, reasonable people could

3    disagree about the reasons why those, the rate of

4    absentee voting isn't higher among people without

5    vehicles.

6              And, I don't know what Michigan's rules

7    are on absentee ballots, so I can't really speak to

8    that.  I don't think that this article necessarily

9    speaks to it, either.

10         Q.   Now, your analysis looks at all citizens

11   of voting age, which we will abbreviate, as you did,

12   as CVAs.

13         A.   Great.

14         Q.   Why are citizens of voting age the

15   relevant population to examine here?

16         A.   Well, the, the relevant population to look

17   at is those people who are, have the ability to

18   vote, because what the analysis is trying to

19   understand is, among that population, the extent to

20   which people are likely to, essentially, not have

21   the option of using some of these voting resources,

22   whether it be an early voting location, or a drop

23   box location, or a DDS office, and that is the

24   relevant population because, presumably, in a

25   democratic society, we want everyone to vote and

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 279 of 691
Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 55

1    that people are eligible to vote if they are

2    citizens and they are of voting age.

3         Q.   Why wouldn't the relevant population be

4    people that are registered to vote?

5         A.   Well, there's two answers to that

6    question, one of which is sort of going to be

7    duplicative of what I just said, and the other of

8    which is a data issue.  So, the first one is that

9    registration to vote is something that can change

10   over time, and people can register or not register,

11   and, so, that's not something that I would sort of

12   suggest that disqualifies someone from being able to

13   vote, because people are able to vote because they

14   are able to register to vote.

15             And the second answer to your question is

16   that the data available from the census do not

17   include registration data, that is to say, you don't

18   know whether or not someone is registered to vote at

19   the time that the survey was taken.  The survey

20   doesn't include a question about are you registered

21   to vote or not.

22             That said, I don't have any reason to

23   believe that the distribution of citizens of voting

24   age is significantly spatially different from the

25   distribution of registered voters, and so I don't

Page 56

1    think that that would affect the analysis very much.

2    Qualitatively, I don't think it would affect it at

3    all.

4         Q.   What about the group of people who

5    actually voted in the last several elections?

6    Isn't, you're trying to see how changes will affect

7    voter behavior, which I believe you're trying to do,

8    but you can correct me in your answer, isn't the

9    relevant population people that actually have voted

10   before the pandemic election, during that election,

11   and afterwards?

12        A.   The relevant universe would be the people

13   who voted in those elections if what you were

14   interested in understanding was how those people

15   were affected.

16             That's not what I was trying to do.  What

17   I'm trying to do is understand voter behavior,

18   including not voting, and, so, that, that means

19   looking at the universe of people who are eligible

20   to vote, not the people who voted.

21             There are people who die, and there are

22   people who become eligible to vote, and there are

23   immigrants, and there are people who migrate out,

24   and so it seems as though the relevant population to

25   be inclusive would definitely be the universe of

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 57

1    those who are eligible to vote.

2          Q.    I'm just going to have two more questions

3    in this line, and then, probably, ready for a break.

4          A.    Whenever you're ready is good for me.

5          Q.    Try to have one break before lunch.

6                But, if you were trying to determine the

7    effect on actual voter behavior, wouldn't the ideal

8    dataset be people who actually used drop boxes in

9    2020 or 2022?

10         A.    Well, just to be clear, I'm not trying to

11   understand the effect on voter behavior, as such.

12   I'm not making predictions about voter behavior,

13   right?

14               What I'm doing is trying to understand the

15   distribution of burden across people who may, who

16   are eligible to vote; that's the first comment.  And

17   then the second comment is, let's say I were trying

18   to understand voter behavior.  What I would want to

19   look at was not those who used drop boxes.

20   Absolutely not.  I'd want to look at those, at the

21   very least, who would consider using drop boxes,

22   because what I want to try to understand is the

23   extent to which travel burdens exist, and,

24   therefore, are likely to dissuade them from using

25   drop boxes in the first place.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 58

1          So, I don't think it's right to look at
2     the users of drop boxes as the universe.  I think
3     that's the wrong way to go.
4          Q.   Doesn't counting all CVAs mean that you're
5     looking at a lot of people who wouldn't vote,
6     whether or not SB 202 was in effect?
7          A.   Well, I, I would say that there is a
8     substantial fraction of people eligible to vote who
9     don't vote.  That's true.  The distribution of
10    voters and people eligible to vote versus people who
11    are likely to vote is something that's very
12    difficult to determine, but I would venture to say
13    that if I were able to get data on people who were
14    likely to vote, versus not, that the spatial
15    distribution of that group of people might be very
16    similar to the universe of people who are eligible
17    to vote.
18          I don't have any reason to believe that it
19    would be particularly different, and so I don't
20    believe that would be a material change in the
21    results of the analysis.
22          Q.   When you say, it might be different, but
23    you don't have the data to support that view?
24          A.   I don't have such data, and I don't think
25    such data exist.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 59

1          Q.    Is it your opinion that a person who has

2     no desire to and never has previously voted by drop

3     box is burdened by the rules establishing drop boxes

4     in SB 202?

5          A.    No.

6          Q.    Isn't it true that by adding and mandating

7     a certain degree of drop boxes for the first time,

8     that SB 202 adds an alternative form of voting over

9     what was there before the pandemic?

10         MR. FOGELSON:  Objection to form.

11    BY MR. FALK:

12         Q.    You can answer.

13         A.    Yes.

14         Q.    Sorry.  Could you repeat that, because I

15    spoke over you.  It's my fault.

16         MR. FALK:  Did you get that answer?

17         THE WITNESS:  Yes.

18         THE COURT REPORTER:  I did, yeah, thanks.

19         MR. FALK:  Good time for a break?

20         MR. FOGELSON:  Sure.

21         MR. FALK:  How long do you want to take?

22    You're the witness.

23         THE WITNESS:  10 minutes, maybe.

24         THE VIDEOGRAPHER:  We're going off the record.

25    The time is 10:49 a.m.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 60

1              (Recess:  10:49 a.m. to 11:02 a.m.)

2         THE VIDEOGRAPHER:  We're back on the record.

3    The time is 11:02 a.m.

4    BY MR. FALK:

5         Q.   Dr. Chatman, doesn't social engagement

6    correlate with voting?

7         MR. FOGELSON:  Objection to form.

8         THE WITNESS:  I'm not a voting expert, so I

9    can't speak to that.

10   BY MR. FALK:

11        Q.   Does limited access to transportation

12   correlate with limited social engagement?

13        THE WITNESS:  I was waiting for you to object

14   as to form, because I don't even really know what

15   that means.

16        I don't know anything about the correlation

17   between transportation and social engagement.  I

18   mean, well, okay.  Maybe what you're getting at is

19   this notion of -- okay.

20        What do you mean by, social engagement?

21   BY MR. FALK:

22        Q.   That's a fair, that's a fair question.

23        What I mean by social engagement is

24   getting out into the world, seeing other people,

25   working, participating in life, generally.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 61

1          A.    Okay.  So, you mean --

2          Q.    I'm saying with limited transportation

3     options, or, in the case of some persons with

4     disabilities, mobility constraints also limit social

5     engagement.

6          MR. FOGELSON:  Objection to form.

7          THE WITNESS:  So, there is a literature,

8     especially a European literature, that looks at the

9     effect of transportation and travel, and the extent

10    to which people have social networks and are

11    spending time with other people, and, yes, that's

12    true, there is a correlation between access to

13    transportation and ability to get around, and the

14    extent of social interaction, what I would call

15    social interaction.

16          When you said, social engagement, I was

17    thinking sort of about social media, and things like

18    that.

19    BY MR. FALK:

20          Q.    Yeah.  Social interaction is exactly what

21    I was driving at, as opposed to social media.

22          Did you address how many of the CVAs that

23    you classify as lacking transportation options are

24    registered to vote?

25          A.    No.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 62

1      Q.   Did you address how many of the CVAs that

2   you classify as lacking transportation options that

3   actually voted in 2018 or 2020?

4      A.   No.

5      Q.   Don't you have to know the extent of voter

6   participation among a population before you can

7   measure or estimate the effects of a regulation on

8   whether they actually vote?

9      MR. FOGELSON:  Objection to form.

10      THE WITNESS:  So, to return to a previous

11   conversation that we were having, I'm not making any

12   quantified claims about the extent to which these

13   travel burdens cause people to forgo voting, whether

14   they're registered or not.

15      The presumption is that people who are eligible

16   to vote are eligible to vote.  That's all.  Whether

17   they are registered to vote at any particular time

18   is not so much the issue, but, that said, I don't

19   have any reason to believe that the distribution of

20   the population that is registered to vote marks, is

21   markedly different, spatial distribution of the

22   population that is registered to vote is markedly

23   different than the distribution of people who are

24   eligible to vote.

25   BY MR. FALK:

Page 63

1         Q.   What's the basis for your belief that it's

2    not different?

3         A.   That's not what I said.  I don't believe

4    that it's not different.  I said I don't have a

5    reason to believe that it is substantially

6    different.  What I mean by that is that perhaps

7    there are reasons, but I don't have those reasons in

8    front of me right now.

9         Q.   Do you have reasons to believe that

10   they're substantially the same?

11        A.   The only thing I would say about that is

12   that we often in analysis have to use proxy

13   populations at times to estimate the existence of

14   some underlying characteristic, and the data that

15   are available statewide to estimate both

16   availability of voting and auto ownership are the

17   census data that do not include registration data.

18            But, coming back to the first point, I

19   don't think it is necessarily the right thing to do

20   to look at registered voters, because the issue of

21   registration is part and parcel of the whole

22   question of whether people vote or not, and I'm

23   trying to look at the overall effect of travel as

24   part of that equation.

25        Q.   Looking at the overall effect of travel,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 64

1    what basis do you have --

2              You stated that you don't think the

3    spatial distribution of registered voters and CVAs

4    generally is substantially different.

5              Did I get that correct?

6         A.   Or, to put it another way, I don't have

7    strong reasons to believe --

8         Q.   Go ahead.  You have no reason to believe

9    it's substantially different.

10        A.   That's what I would say, yes.

11        Q.   What about the distribution of persons

12   lacking transportation options, compared to the

13   population of CVAs?

14        MR. FOGELSON:  Objection as to form.

15        THE WITNESS:  I don't have any opinions to

16   offer about that.

17   BY MR. FALK:

18        Q.   Did you look at the relationship between

19   persons without transportation options whom you

20   would say are more likely to have a travel burden

21   here, and persons registered to vote?

22        A.   No, I did not.  I mean, I think it would

23   be useful to say at this point that it seems quite

24   likely to me that part of the question of whether to

25   register to vote can be related to the perceived

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 65

1    ease of voting, and so I could imagine that this is

2    another reason to look at the universe of people

3    eligible to vote, because part of the question of

4    registering to vote is the question of how much

5    difficulty people will have when they try to vote.

6         Q.   Why did you address drop boxes separately,

7    in isolation?

8         A.   Can you explain your question.  I'm not

9    sure I understand it.

10        Q.   Certainly.  Much of your analysis just

11   addresses drop boxes, access to drop boxes.

12        A.   Uh-huh.

13        Q.   Much of your analysis only addresses

14   access to drop boxes.

15             Why did you single out that particular

16   form of voting?

17        A.   So, to clarify, I also singled out early

18   voting locations and DDS offices, so I'm not sure if

19   I understand why you're saying I've singled out drop

20   boxes, I mean, that is to say, I've looked at these

21   multiple forms of access to voter resources.

22        Q.   Well, absentee ballots can be mailed,

23   correct?

24        A.   Indeed.

25        Q.   And votes that you mail are just as good

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 66

1    as the votes you drop in a drop box or vote

2    in-person, correct?

3         A.    Well, again, I'm not a voter behavior

4    expert, but my understanding is that people prefer,

5    many people prefer to deliver their ballots

6    in-person, because there is some concern about

7    whether ballots mailed are received.  And I can't

8    speak to what the additional requirements there are

9    for an absentee vote, versus an in-person vote.

10        Q.    Did you measure travel time to mailboxes?

11        A.    No.

12        Q.    Why not?

13        A.    My presumption is that most people have

14   mailboxes nearby, and what we're looking at is

15   instances where there is difficulty getting access

16   to a voter resource, and I don't think that most

17   people have nearly as much difficulty in getting to

18   a mailbox.

19        Q.    Are you aware of any data indicating that

20   persons who find the use of a drop box burdensome

21   will not use a mailbox, but, instead, will not vote

22   at all?

23        A.    Not really, except to some extent, not

24   knowing this article, Exhibit 5, that you've

25   introduced here, but what I would say is when I look

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 67

1    at figure, figure 3 on page 7, what I see is

2    evidence precisely of that.  What I see is that

3    people who have better access to voting vote, and

4    that people who have poor access to voting are less

5    likely to vote.

6              And I think that that is true, even with

7    whatever it is that is required for an absentee

8    ballot in Michigan.  So, I can't speak directly,

9    because I haven't read the article, but, and I don't

10   know about what the circumstances are in Michigan in

11   terms of eligibility for in-person voting, the

12   availability of drop boxes, absentee ballot

13   requirements, and so on.

14             But the way I look at it is that it's

15   clear that providing more options for people tends

16   to increase their participation.  That's what, to

17   me, is exemplified by this, this figure.

18        Q.   Drop box voting and mail-in voting are

19   both forms of absentee voting in Georgia; isn't that

20   correct?

21        A.   Well, I don't think they're equivalent.

22        Q.   Why not?

23        A.   Because, in one case, one can drop one's

24   ballot directly into a box and feel that it is

25   received, and, in the case of mailing it, there is

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 68

```
 1    less uncertainty about it.
 2              Or, to put it another way, as a
 3    behavioral, as a behaviorally focused scholar, what
 4    I'm interested in is what people do, and it's
 5    interesting to me, and relevant, that people vote
 6    in-person a lot, and they take advantage of drop
 7    boxes and early voting locations at high rates,
 8    which means they value it, and that value is
 9    probably playing some sort of a role in decisions
10    whether to vote.
11              Again, I'm not a voting expert.  This is
12    just my opinion.
13         Q.   And your opinion is based on what,
14    exactly?
15         A.   Well, it's based on the idea that travel,
16    as a cost that people face, is, affects their
17    behavior, of which there's lots of evidence in the
18    literature.
19              As to the question of whether an absentee
20    ballot is equivalent, casting an absentee ballot in
21    a mailbox is equivalent to other forms of voting, my
22    presumption is that it must not be, because it is
23    the least costly of these options, and, yet, people
24    choose other choices, make other choices.
25         Q.   It was the only option until 2020.
```

Daniel G. Chatman , Ph.D.                      May 16, 2023
Georgia Senate Bill 202, In Re

Page 69

1      Mail-in voting was the only absentee option until

2      2020, in Georgia, at least, correct?

3            A.    The only absentee option.

4            Q.    Only absentee option.  Correct.

5            A.    Yes.

6            Q.    And USPS's, the postal service's actual

7      record of timely delivery of absentee ballots is

8      very strong, is it not?

9            MR. FOGELSON:  Objection to form.

10           THE WITNESS:  Not an expert in this area.  I

11     would say that there is a perception among voters,

12     as I understand it, that the postal service is not

13     always reliable.  Whether that perception is real or

14     not is a separate issue.

15     BY MR. FALK:

16           Q.    The postal service's statistics, as

17     reliable as they may be, seem to indicate that it's

18     very close to 100 percent of ballots are getting

19     there on, getting to the board of elections on time.

20     If that's correct, and I'm not asking you to judge

21     whether it's correct, but, if that's correct, isn't

22     the answer better education about the reliability of

23     the mail?

24           MR. FOGELSON:  Objection as to form.

25           THE WITNESS:  I don't think so.  I don't think

Veritext Legal Solutions

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 70

1    that the answer is better education.  I think the

2    answer is to permit counties to provide more options

3    to vote that are secure and safe and reliable.  I

4    think that's fine, too.  Education is tough.

5    Reaching people is difficult.

6    BY MR. FALK:

7         Q.   You have to reach people to tell them

8    about drop boxes, don't you?

9         A.   Well, they're physically present.  If they

10   become part of the culture, it's something that

11   people know is there.  It's a physical thing.

12             It seems to me it's different than claims

13   being made about the reliability of the postal

14   service.  I mean, and this, your question is begging

15   the question as well as to whether we should

16   provided drop boxes at all, in fact, whether we

17   should get rid of polling places altogether, but we

18   don't do that, and there must be some reason for

19   that.

20             I think the reason is because people want

21   to vote in-person, and they want to drop their

22   ballots off in-person.  They see that as valuable.

23        Q.   So, why do you focus your analysis on drop

24   boxes nearest to a CVA's home, rather than

25   addressing drop boxes that are actually used?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 71

1          A.    Well, there's a lot I could say about

2     that, so, let me just figure out how to organize my

3     answer.

4                First of all, we have information about

5     where people live.  We don't know where and if they

6     work somewhere is another example of a habitual

7     alternative destination during one's day.

8                The analysis of travel behavior has kind

9     of a, the literature on travel behavior has a

10    longstanding practice of looking at home locations

11    as being particularly important determinants of

12    people's travel behavior, and it's been shown that

13    in fact, they are, that people's home environments,

14    so it's near them, affect their travel quite a bit,

15    and so it's consistent with that literature to look

16    at the nearest location to home as being relevant

17    for people.

18                Embedded in your question was the

19    distinction between use, sorry, between drop boxes

20    that are used versus those that are near one's home.

21    Those that are nearest to home are particularly

22    relevant for people who do not have a vehicle or are

23    not employed.

24                The majority of people are, it's about

25    40 percent of people are not employed, and a higher

Page 72

1     percentage of people without vehicles are not

2     employed, and so those locations aren't relevant to

3     their decision-making, but, also, it's harder to get

4     around, generally, if one does not have access to a

5     vehicle.

6              And, as I note in the report and in the

7     surrebuttal report, the existence of a travel burden

8     is almost exclusively among those who do not have

9     access to a vehicle.  It's those people who rely on

10    public transportation, and walking, and those are

11    the modes that are slower, that take more time, for

12    all kinds of reasons, and, so, so, it's quite

13    relevant to look at the closest drop box to home.

14             And then the final statement I'll make

15    about this, for now, anyway, is that it is, so, I'm

16    very familiar with travel data in the United States,

17    and with various forms of demographic data, and we

18    don't have a way of looking at, for example, a

19    habitual travel pattern for a complete day and

20    seeing how and whether other habitual locations

21    could influence what constitutes the nearest drop

22    box, nearest, in quotes.

23             And, so, having to do the analysis and try

24    to understand the burden relies upon data that we do

25    have about people, and we do, we do have their home

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 73

1    locations.

2           I don't have any reason to believe that

3    incorporating the existence of other locations would

4    decrease the relative burdens among groups, except

5    insofar as it's more likely, in fact, I would

6    venture to say it's more likely to increase the

7    relative burdens, rather than decrease them, but it

8    would decrease the overall burden for sure.

9           That is to say, the percentage of the

10   population that would be said to be burdened under

11   my analysis, if I were able to take into account

12   work locations and other habitual locations, would

13   certainly, I would think it would, it would reduce

14   it somewhat.  I think it would reduce it by a small

15   amount, but it would reduce it somewhat.

16          But the relative burdens, in terms of

17   comparing black CVAs to non-Hispanic white CVAs or

18   disabled CVAs to nondisabled CVAs would be, if

19   anything, widened, in likelihood, because of the

20   fact that people who are not disabled and people who

21   are non-Hispanic white voters are more likely to

22   have such alternative locations that they go to on a

23   daily basis.

24          And that's not something that I, so that,

25   you asked me a question before about whether I was

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 74

 1    going to bring up issues that don't appear in those

 2    reports, and that's such an issue that I didn't, I

 3    didn't lay out in my surrebuttal report.

 4        Q.   And, what is your basis for believing that

 5    incorporating the habitual travel patterns of CVAs

 6    would produce similar racial disparities, I mean,

 7    disparities among people with disabilities and

 8    people without disabilities?

 9        A.   Yeah, I mean, I think they would be --

10             Sorry.  Did you finish?

11        Q.   I did.

12        A.   I'm not, I'm pretty bad at cutting people

13    off.

14        Q.   You're doing better.

15        A.   So, I guess I was saying something

16    stronger than that.  I think it would probably

17    exacerbate the existing calculation of disparity.

18    And the reason I say that is because it's well

19    established in the literature that people who are of

20    lower income, people without vehicles, people who

21    rely on public transportation and on walking, make

22    fewer trips on a given day.  They're less likely to

23    be employed.

24             So, it's these other groups that are less

25    likely to be without a car and less likely to, and

Page 75

1    more likely to be employed, that are consequently

2    more likely to have alternatives, and, therefore,

3    for their travel burdens to be more likely to be

4    reduced because they're more likely to have another

5    drop box, in addition to the one that's nearest home

6    that's convenient to them.

7         Q.   Don't people, are you assuming that people

8    that are not employed don't regularly travel to --

9         A.   I'm not assuming that.  I'm --

10        Q.   -- other places?

11        A.   Or I'm --

12             (Cross-talk, reporter clarification.)

13        Q.   That's the question.

14        A.   I'm not assuming that.  I'm asserting that

15   it's true, based on the travel behavior literature

16   describing the differences in travel between people

17   who are of lower income, people who are not

18   employed, and their travel behavior.  They travel

19   less on average than people who are employed and

20   people who are of higher income.

21        Q.   I understand that they travel less, but

22   they, don't they travel, don't those populations

23   travel outside the home to shop, to see family,

24   whatever they might travel for?  Yeah, it may be

25   less, but they do leave the home to do other things

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 76

1    on a regular basis, do they not, for the most part?

2        A.   Yes, but they travel less, and so what I'm

3    trying to do is explain the distinction between

4    people who have autos and people who are of higher

5    income versus those who don't have autos and have

6    lower income, and what I'm trying to say is that the

7    extent to which there would be a reduced burden

8    would be, there would be a greater reduction of

9    burden for people who are of higher income and who

10   have vehicles than there would be for people who

11   don't have vehicles who are of lower income who are

12   not employed.

13             That's all I'm saying, so that the

14   relative burden is likely to, the disparity that I

15   describe is likely to increase if one was able to

16   take into account other habitual locations.

17             Again, I think, to be clear, that it is

18   most likely that people would be aware of the

19   existence of another drop box in another location to

20   which they regularly travel that's habitual, the

21   best example being work or school, and, if it's not

22   a habitual traveling location, it's less likely that

23   they are going to be aware of a drop box there.

24       Q.   And how do you define habitual?  How do

25   you define habitual travel destination?

Page 77

1          A.   The typical use of the term habitual

2     travel is meant to apply to things like work and

3     home.  Obviously, one travels back home all the

4     time, and travels to some work with some frequency,

5     let's say, three or four times a week, so, that's a,

6     there's no ironclad definition of what constitutes

7     habitual travel, but, those are the sorts of

8     destinations that we talk about when we talk about

9     habitual travel.

10               Repeated trips over time to the same

11     location.  So, for example, if one shops always at

12     the same grocery story, then it makes a lot of sense

13     that one could use a drop box next to that grocery

14     store, for sure.

15               The thing about most household travel is

16     that especially for people who don't have a habitual

17     work location that's far away, it tends to be

18     concentrated pretty near home.  For example, the

19     average grocery store trip in the United States is

20     around three miles from home, so it's not very far.

21          Q.   So, habitual could be, would once a week

22     count as habitual or is there a limit --

23          A.   I think --

24          Q.   Is there a, is there a limit with once a

25     month, once a week?  Where are the lines or where

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 78

1    would you draw the line?

2        A.   Well, I mean, I think that the notion of

3    habitual travel is that people are traveling to that

4    location enough to understand what's around it,

5    what's near it, and, therefore, are likely to

6    understand that there's a drop box available in that

7    place.

8            I don't think that most household serving

9    trips for nonwork purposes carried out by people who

10   don't work are likely to make much of a difference

11   in the effect of the reduction of drop boxes,

12   because those trips tend to be relatively short.

13       Q.   And you conclude, what was your basis for

14   concluding that those trips are relatively short?

15       A.   Again, this is just data on travel,

16   people's travel behavior, people who are poorer and

17   people who have, who don't have cars.

18       Q.   In your rebuttal, you address a couple of

19   sources of data about where people use drop boxes.

20   I think some of them were raised by Dr. Grimmer, and

21   I don't recall whether you produced some of the

22   others, but there's the Collingwood study, correct,

23   the Washington State study?

24       A.   I refer to studies that Dr. Grimmer

25   referred to, and I don't remember the name of the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 79

1    studies being the Collingwood study, but I could

2    take a look at that, if you want me to.

3        Q.   The reports that you address, and I

4    believe there's that study that Dr. Grimmer referred

5    to, and then there's some Douglas County data

6    that --

7        A.   Right.

8        Q.   -- addresses, I believe those were the

9    only two that you address, anyway, that suggested

10   what proportion of people, granted, one's in

11   Washington State and then one's in Douglas County,

12   used the drop box closest to their residence.

13           In looking at those two, the one, and I

14   think you made this point, the Collingwood study

15   shows, I believe, about 52 percent use the closest

16   drop box.

17       A.   I think it was --

18       Q.   Do you want to refer to your rebuttal

19   report?  I mean, I know you deal with these numbers,

20   so --

21       A.   Yeah, I mean, I referred, I used the, I

22   used the figure 74 percent because I put together

23   three categories that are otherwise, one category of

24   which is returning it to the nearest to the home,

25   the second category of which is the only drop box

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 80

1    available to me, which presumably means perhaps the

2    only drop box eligible to use in the jurisdiction in

3    which they're located, and the third area was

4    something else, and so I set as an upper bound the

5    sum total of those three categories, which is

6    74 percent, and I said in that case, up to

7    74 percent of people are, in fact, using the drop

8    box nearest to their home.

9           And, but it's, of course, that's an upper

10   bound from that survey, so, perhaps, it's between 52

11   and 74 percent, or, yeah.

12        Q.   And, but, in any event, there's a

13   substantial number that use a different drop box

14   than the one closest to their home, isn't that

15   correct?

16        A.   Yes.  It's a minority, but it's

17   substantial.

18        Q.   Isn't actual voter behavior as, as least

19   as relevant as geographic proximity to a drop box?

20        MR. FOGELSON:  Objection to form.

21        THE WITNESS:  When you say, important, I don't

22   know what you mean.  It's certainly a different

23   phenomenon, it's different kind of data, but --

24   BY MR. FALK:

25        Q.   When you're looking at a travel burden, an

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 81

1    increase, what you --

2         A.    Uh-huh.

3         Q.    -- present as an increased travel burden

4    with respect to drop boxes, isn't the increase over

5    the burden of what people were actually doing with

6    the former set of drop boxes as relevant as their

7    distance between the former and current drop boxes?

8         A.    So, as I've been saying previously, I

9    think the relevant question to consider is the

10   extent to which drop boxes offer an alternative to

11   people, and the extent to which that alternative is

12   costly, and, therefore, people who aren't using the

13   drop boxes are important, as well as people who are

14   using them.

15              Presumably, people who are using them, for

16   those people, it's relatively convenient, which is

17   what Dr. Grimmer found in his, in his data.  What he

18   found was that the people using the drop boxes had

19   very short trips, very shortened distance trips,

20   and, because around 98 percent of people in Douglas

21   County have vehicles, they're almost exclusively

22   driving trips, so they're pretty simple to do.

23              And so that suggests to me that travel

24   burdens are quite important here, because we're not

25   seeing people making long trips to go to the drop

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 82

1    box.

2              It's important to look at the universe of

3    people who have the option, and not the people who

4    use it, precisely be-, what we call this, in

5    statistical methods, we call this a self-selection

6    effect.  You can't look at people who do something.

7    You have to look at people who are exposed to

8    something, as it were.

9              The treatment effect is drop boxes.  Who's

10   exposed to drop boxes, and how do they respond?

11   What those data show from Douglas County is that in

12   that county, the people who are using drop boxes

13   were those for whom it was pretty darn convenient.

14             Convenience, in other words, there's

15   evidence there that convenience matters, which just

16   sort of backs up the point that I'm trying to make

17   in the report.

18        Q.   Now, your report also looks at the

19   distance and time required to travel to DDS offices,

20   correct?

21        A.   I, I mean, I focus on time, but, yes.  I

22   mentioned some distance factors just to give people

23   a sense of, you know, what we're talking about in

24   terms of distances, but it's not my focus in terms

25   of measuring burden.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 83

1          Q.   And why did you analyze the time required
2     to travel to DDS offices?
3          A.   In order to estimate the time cost of
4     accessing and getting a photo ID that would be
5     needed to vote in-person.
6          Q.   Would a person who already has a driver's
7     license or a voter ID have to go to the DDS office
8     to get the ID they already have?
9          A.   No, they wouldn't, which is why it's
10    convenient for the facts of this report that all of
11    the burden exists among only people who don't have a
12    car.  People who don't have a car are much less
13    likely to not have a, much less likely to hold a
14    driver's license, so the burden really doesn't exist
15    among people who have access to a car, and those are
16    the same people who are very likely to have a
17    driver's license.
18         Q.   Do you analyze how many of the people you
19    said would be subject to a travel burden to get to a
20    DDS office in fact have a driver's license or a
21    voter ID?
22         A.   No.  Only those who have a car and not in
23    a car.
24         Q.   So, you don't know how many of the 7 to
25    10 percent lacking a car in your, in the household

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 84

1    already have either a driver's license or a voter

2    ID?

3         A.    No.   I mean, I think the way to think

4    about this, as well, this is getting to the

5    questions you were asking earlier about the

6    distribution of the population, or the statements

7    that I was making about the distribution of the

8    population of interest, so, what my analysis assumes

9    is that the distribution of people without a

10   driver's license, spatially, is very similar to the

11   distribution of households without vehicles.

12          That is a reasonable claim, a reasonable

13   statement, I would say, but it's not something that

14   I have data that I can test with, because the census

15   data do not include data, do not include information

16   on whether someone holds a driver's license.

17        Q.   I take it you did not look at, at least

18   you, did you look at voter records from the

19   secretary of state that address various factors

20   about registered voters, including, in some cases,

21   whether they have driver's licenses, as well as

22   where they live?

23        A.   I did not look at the voter registration

24   data.  My understanding is that those data do not

25   include information about disability status or about

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 85

1     vehicle ownership.  I don't know how I could use

2     those data to determine the correlation between

3     vehicle ownership and driver's license holding.  It

4     wouldn't be possible to do that with those data.

5          Q.   Did you know that voters who don't have a

6     driver's license can get a free voter ID at either

7     the DDS office or a county registrar's office?

8          A.   Yes.  I was made aware of that recently.

9          Q.   Did your report analyze the burden of

10    traveling to a county registrar's office?

11         A.   No.

12         Q.   Why did you not include the county

13    registrar's office as an alternate source of ID to

14    the DDS?

15         A.   I was not aware that the county

16    registrar's office also was a place where people

17    could procure a voter ID, although I would say that

18    in some cases, they were located in the same

19    location, apparently.

20         Q.   Your report shows that not every county

21    has a DDS office, correct?

22         A.   I believe it does, yes.  And so the effect

23    of that is, probably, I mean, I don't know, because

24    I haven't done it, but, just as with SB 202, there

25    was a new requirement to include at least one drop

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 86

1      box in counties that formerly did not have them,

2      including the voters, the regist-, the county

3      registrar's office in this analysis is, in my view,

4      likely to have a similar effect in terms of making

5      it easier for people who are non-Hispanic whites to

6      access a voter ID, but probably not materially

7      affect the access for people living in denser areas

8      of the state.

9              But, again, I am speculating.  I just want

10     to make that clear.  I have not looked at those

11     locations and overlaid them on the map of the DDS

12     locations.

13         Q.   Okay.  Do you know about how many DDS

14     offices there are in Georgia?  Did you --

15         A.   Not off the top of my head.  It's in my

16     report.

17         Q.   It's in your report.

18         A.   Yeah.

19         Q.   Or, at least, the map is in your report.

20         A.   The map is in the report, and the number

21     is also in the report, and I just don't remember the

22     number right now.

23         Q.   The number is, does approximately 70 seem

24     right to you?

25         A.   That sounds about right, yeah.

Daniel G. Chatman , Ph.D.                      May 16, 2023
Georgia Senate Bill 202, In Re

Page 87

1      Q.    That's why it was coming out.

2      A.    Okay.

3      Q.    I'm not sure.

4      A.    That seems about right to me, too, but

5    I --

6      Q.    I think I've heard 68, and, maybe, but,

7    and there are 159 counties in Georgia; isn't that

8    right?

9      A.    Right.

10      Q.    Every one of them has a county registrar,

11    so that's, means a total of almost 230 locations,

12    rather than 70; isn't that right?

13      A.    Yes.

14      Q.    So, at least for the counties that do not

15    have a DDS office, which would seem to be, we don't

16    know how much overlap there is or how many places

17    have two DDS offices, not that many, if I'm

18    recalling your map, but out of 159 offices and 70

19    DDS offices, it suggests that there are 80 to 90,

20    maybe even more, counties that do not have DDS

21    offices.

22      A.    Right.  Right.  Yes.

23      Q.    Somewhere in there.

24      A.    Yes.

25      Q.    And would you agree that in those 80 or 90

Daniel G. Chatman , Ph.D.    May 16, 2023
Georgia Senate Bill 202, In Re

Page 88

1    counties, the travel period to a registrar is likely

2    to be less than the travel period to an out of the

3    county DDS office?

4        A.    Definitely.  Yes.  So, I, a couple of

5    comments on that.  First of all, my, I have to go

6    back and look at my data, but I don't think there's

7    very much burden in those parts of the state where

8    you do not see DDS offices, the reason for that

9    being that number 1, they are more sparsely

10   populated; number 2, auto ownership is very high;

11   number 3, because this is a 90 minute definition of

12   burden.

13           It's a 45 minute one-way trip, and so

14   people may have a long trip.  They may have to

15   travel almost an hour and a half, but wouldn't be

16   listed here as having a travel burden.

17           So, my intuition about this is that

18   including those additional locations, given their,

19   given the counties in which they are located, it

20   would reduce the burden somewhat, but not by nearly

21   as much as you might, at first blush, think.

22           Again, I am speculating, but I'm looking

23   at the map of the state, and I'm, I'm aware of where

24   the clusters of population are, and the number of

25   people who are affected by these.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 89

1        Q.    Did you address whether people without

2     automobiles in the household are more likely to live

3     near a county registrar and a county seat?

4        A.    No.

5        Q.    And if a drop box is located --

6        A.    A drop box or a DDS?

7        Q.    A drop box.

8        A.    A drop box.

9        Q.    Moving back to drop boxes.

10        A.    Okay.

11        Q.    Let me finish the question.  We'll get

12     back to DDS before the question's done.

13             If a drop box is located at or near the

14     registrar's office, or a DDS office, would you agree

15     that there is no additional burden to reach that

16     drop box, if a CVA is already traveling to the DDS

17     or county registrar's office?

18        A.    Well, my understanding is the need for

19     these trips is quite separate from each other, so, I

20     need to go to the DDS office if I need a photo ID to

21     vote in-person, but I don't need that photo ID to

22     cast an absentee ballot at a drop box or early

23     voting location.

24             That's my understanding.  If that's

25     correct, then these aren't going to be combined

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 90

1    trips.

2         Q.   Did you know that SB 202 allows voters who

3    don't already have an ID to prove who they are by

4    other means, and by, other means, I mean other than

5    a driver's license or the free voter ID that's

6    available that we've been discussing?

7         A.   Yes.

8              (Reporter clarification.)

9         Q.   And did you know that voters can provide a

10   government check?

11        A.   A government check, specifically?  I

12   wasn't aware of that.  I don't know what that refers

13   to.

14        Q.   Or a passport?

15        A.   Passport.  Yes.  I'm sure that's true,

16   too.

17        Q.   And were you aware that they can provide a

18   utility bill with their name and address on it?

19        A.   I had heard that, yes.

20        Q.   Or a bank statement with their name and

21   address on it?

22        A.   I hadn't heard that.

23        Q.   Did your report attempt to quantify what

24   percent of black CVAs lacked access to any of the

25   alternative forms of identification I've just listed

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 91

1      for you?

2           A.    My understanding, again, I'm not a voter

3      expert, but my understanding from that literature

4      has been that people who are in poverty, people who

5      are black, are less likely to hold many of the

6      required alternative forms of documentation that are

7      sometimes used in various states as an alternative

8      to a voter ID, as an alternative to a photo ID.

9                Beyond that, I can't speak to that

10     question of the fraction of people who don't have

11     those.

12          Q.    Right.  So, you don't know what

13     fraction --

14          A.    Can't quantify it.

15          Q.    And that, now I think you mentioned black

16     CVAs, and you mentioned people under the poverty

17     line.

18                Did you mention people with disabilities?

19     Are people with disabilities, do they also fall in

20     that category?

21          A.    I'm less aware of that question, so I

22     don't know, except insofar as people with

23     disabilities are more likely to be in poverty and

24     less likely to have access to a vehicle, and,

25     therefore, less likely to have those forms of ID.

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 92

1          Q.    Right, but we're talking about the
2    alternative forms of ID, such as a government check
3    or a bank statement, utility bill.
4                So, are you saying that --
5          A.    I'm saying, oh, yeah, you're right.  I'm
6    saying that I don't know about the likelihood of
7    people with disabilities holding those forms of
8    identification, except to the extent that they're
9    more likely to be in poverty, and people who are in
10   poverty are more -- less likely to have access to
11   those.
12         Q.    But you can't quantify --
13         A.    No.
14         Q.    -- how much this reduces the number of --
15   let me back up.
16               You can't quantify how many people without
17   a driver's license do not possess either a voter ID
18   or one of these alternative forms of identification;
19   is that correct?
20         A.    That's correct.  I would say, however,
21   that it's clear that people often, my understanding
22   is that people often believe that what they're
23   required to do is have a photo ID in order to vote,
24   and they may not be aware of the fact, just as I was
25   not aware, that they can show a government check or

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 93

1    a utility bill.

2              So, the fact that there is a free photo ID

3    that people can get in order to vote suggests that

4    people probably believe they need to have a photo ID

5    in order to vote, and that is a, plays an important

6    role in people's showing up at the polling place in

7    the first place.

8         Q.   And turning to paragraph 21 of your

9    report, and maybe I'm not getting that specific.

10             You refer to average minutes spent

11   traveling per day in your analysis, is that --

12        A.   That's right, yeah.

13        Q.   And, according to the data that you

14   present, the average person in Georgia spends more

15   than 50 minutes per day traveling, is that, do I

16   have that --

17        A.   Yes.  For home-based nonwork trips.  This

18   excludes work trips, which would add another 10

19   minutes or so, on average.

20        Q.   Okay, so, the average work trip is about

21   10 minutes?

22        A.   No.  As you just, average it over all of

23   the people who aren't working, as well as the people

24   who are working, and so ends up being a smaller

25   number.

Page 94

 1          Q.    I see.  So it --

 2          A.    Yeah.  It gets averaged over people who

 3     don't have a work trip.

 4                (Reporter clarification.)

 5          Q.    So, I think the number you used was

 6     60 percent would have a work trip, and 40 percent

 7     would not, something like that?

 8          A.    60 percent would have a work trip on some

 9     days.

10          Q.    Right.

11          A.    The ones who don't work at home.

12          Q.    Correct.  And you compare the travel time

13     for certain voting functions to the average daily

14     travel.  I think you do that in paragraph 29, if my

15     notes are correct.  I think you do it elsewhere, as

16     well.

17                Yeah.  29 is where you're just defining

18     travel burden, and then you're, I think you already

19     explained, at least with respect to the 60 minute

20     number that is based at least in part on the

21     Georgians' average daily --

22          A.    Right.

23          Q.    -- nonwork --

24          A.    Travel.

25          Q.    -- travel.  Average daily nonwork travel.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 95

1          And that would be a total travel round

2     trip, whatever, 50 minute, 50-some minute figure?

3          A.    Right.

4          Q.    And average means that some people on some

5     days travel more, and some people on some days

6     travel a lot less, or not at all, correct?

7          A.    Yes.

8          Q.    And your table, table 1, which is, where's

9     table 1, table 1 is on page 6, looks at travel time

10    not by car ownership but by income; is that correct?

11         A.    That's right.

12         Q.    And, you separate out household incomes

13    less than $25,000 and above 25,000.

14          Would you agree that, that some in that

15    group of less than 25,000 annual income have, have

16    cars --

17         A.    Some of them do --

18         Q.    -- in the household?

19         A.    -- yes.

20         Q.    Your report doesn't show what percentage

21    of that group has a car, does it?

22         A.    No.

23         Q.    And when you look at an average, the lines

24    aren't as clear as they would be with the median,

25    where you know half the trips are above and half the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 96

1    trips below, correct?

2        A.    The average is a different metric than the

3    median, yes.

4        Q.    But you still have a reasonable, using

5    average, instead of a median, you still have a basis

6    to determine that it's likely that some of the time

7    people in their normal lives travel more than the

8    average, and sometimes they travel less, is that --

9        A.    That's true.  If I did use the median, by

10   the way, it would be a smaller figure.  That's a

11   good idea.

12       Q.    Can, can you explain.  But you don't

13   really know how long the longest habitual trip,

14   using the definition we just used.

15       A.    No, I don't.  I could, if I looked at

16   those data, I could have gotten that from the data,

17   but I didn't do that.

18       Q.    So, the data set out, like, daily, do they

19   set out daily trips by the people that are surveyed,

20   and how does that, how does that, how would you get

21   that from that data?

22       A.    So, the national household travel survey

23   is a travel diary data set, so it collects 24 hours

24   of activities, including travel, and then it

25   estimates the distance, and the time is part of the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 97

```
 1     travel diary, so, part of the activity diary, I
 2     should say, so, you have your time, and then you
 3     have your mode, so you have all the trips made by
 4     each individual in the household --
 5          Q.   Okay.
 6          A.   -- for a certain number of households in
 7     the State of Georgia.
 8          Q.   Could you explain your process for using
 9     the Google Maps API in your calculations here.
10          A.   Yes.  So, you're talking about the travel
11     distance calculations?
12          Q.   Yes.
13          A.   Yes.  The Google Map API is an interface
14     that makes it possible to do, essentially, batch
15     requests of travel distances and speeds and
16     durations, for a given period of time specified in
17     the parameters that you feed into the API.
18               It's a batch request, meaning that it's
19     done in a set of destinations, origins and
20     destinations.  It's similar to what you would do if
21     you were using Google Maps to get your own estimate
22     of how long it was going to take you to go
23     somewhere.  It's just that it's done via the API,
24     which is an automatic programming interface.  It's
25     not via the graphical user interface that's used by,
```

Daniel G. Chatman , Ph.D.                              May 16, 2023
Georgia Senate Bill 202, In Re

Page 98

1    by us when we're on our phones using it.

2              But, other than that, it's very similar.

3    The data that you would get, you could almost

4    replicate the data.  It would just take you a while

5    to do it.

6         Q.   Are you personally aware of any

7    limitations presented by this kind of analysis?

8         A.   What kind of analysis do you refer to?

9         Q.   Google Maps API analysis that you used to

10   calculate --

11        A.   In some states, the Google Maps --

12             (Cross-talk, reporter clarification.)

13        THE COURT REPORTER:  Used to calculate --

14        MR. FALK:  -- trips here.

15        THE WITNESS:  Would you mind reading back the

16   question.  I'm sorry, I got confused by what the,

17   here, was doing.

18   BY MR. FALK:

19        Q.   The, here, was in this report.  I'll

20   clarify that, because I'm not sure he can.

21        A.   Okay, that's good.  That works for me.

22   Thanks.

23             So, you're asking for limitations.

24        Q.   Just what the limitations are that you're

25   aware of.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 99

1        A.   Yeah, I mean, I've done this different

2    ways over the years.  Google Maps has gotten very,

3    very good.  It used to be that the general transits

4    feed specification data for the transit trips

5    was not complete for many states.  That's, as far as

6    we can tell, it's complete for Georgia, which is

7    great.

8             So, what's good about it is it takes into

9    account good estimates of walking time.  It has

10   schedule-based estimates of transit time.  Those

11   schedule-based estimates are not accurate in the

12   following way.  Sometimes, transit vehicles are late

13   or early, and so this means that people may in fact

14   be delayed, or, either delayed or miss a bus, and,

15   so, that isn't taken into account.

16            The good thing about the Google-based

17   driving estimates is they take into account habitual

18   congestion, although, in the end, that didn't really

19   make much of a difference in this analysis, because,

20   despite whatever recurrent congestion existed,

21   almost nobody had a travel burden if they were

22   driving, but, in the end, that's, you know, how it

23   worked.

24            So, it is perhaps the best estimate of

25   travel times that I'm aware of, and, since travel

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 100

1    times are the relevant factor in people's

2    decision-making, it's necessary to have decent

3    estimates of travel times, and not just distances,

4    which are much more straightforward to get.  One

5    doesn't need to have information on transit

6    schedules or anything.  You could just look at the

7    network-based distances.

8         Q.   Is it possible that the estimated travel

9    time resulting from your Google Maps analysis would,

10   could change, based on conditions unique to the day

11   of travel?

12        A.   Sure.  It could.  And that's another

13   reason why it's, it's possible that random variation

14   in either direction could make these estimates off

15   in either direction.

16             My experience with these estimates,

17   personally, I use them a lot, is that they're very,

18   very accurate for the Bay Area, so, I don't find

19   much, you know, inaccuracy, but that's just based on

20   my personal experience with using those estimates.

21        Q.   And, how do these estimates incorporate

22   waiting time on the public transportation side, do

23   you know?

24        A.   We use the rule of half the headway, or 10

25   minutes for longer trips, that, sorry, not for

Page 101

1    longer trips, for instances of public transportation

2    with long headways, half an hour or more.

3         Q.    Okay, that was my next question.

4              And so is that part of the Google Maps

5    analysis, or do you have to run that on top of --

6         A.    Yeah.  The Google Maps analysis assumes

7    that you leave your home and arrive exactly at the

8    time of the, so we have to add that in because it is

9    not realistic to expect people to do that.

10        Q.    Now, calculating the time and distance

11   that CVAs need to travel to drop boxes, early voting

12   locations, or DDS centers, do you calculate the

13   distance from the end point of the person's habitual

14   travel?

15        A.    I'm not sure I understand your question.

16        Q.    When you're calculating the travel burden,

17   which is, as I understand, a function of time and

18   distance --

19        A.    Right.

20        Q.    -- ultimately, time --

21        A.    Right.

22        Q.    -- but distance is relevant --

23        A.    Distance is relevant.

24        Q.    -- am I correct that you assume that that

25   trip to a drop box, early voting location, or DDS

Daniel G. Chatman , Ph.D.                                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 102

1    center is from a separate trip from home?

2         A.   It's a trip from home, yes.  It's a trip

3    originating at the home location.

4         Q.   So, the trip is measured from home --

5         A.   Yes.

6         Q.   -- and does not account for any place that

7    a person might travel habitually, whether that's

8    work, shopping, family, whatever would qualify as a

9    habitual trip.

10        A.   Yes.

11        Q.   So, why did you restrict the analysis to

12   what you call a home-based trip for a nonwork

13   purpose, rather than a trip to or from work or

14   another habitual destination?

15        A.   Well, as I've been saying previously, and

16   I'll revisit what I've said here, the data that are

17   available are the home location.  We do not have

18   data available on other locations for, you know, the

19   population of the state.

20             Home-based trips are the norm.  That is

21   most of what people do.  When I say, the norm, I

22   just mean most trips originate at home.  Fewer, many

23   fewer trips originate from other locations.

24             And, finally, especially for those who do

25   not have access to a car, they are even more likely

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 103

1    to have their trips originating from home, rather

2    than other locations, for the reasons that I've

3    described previously.

4         Q.   So, you're saying that people that do not

5    have a car are less likely to take single trips to

6    multiple destinations?  Do I understand that

7    correctly?

8         A.   Yes, they are less likely to what we call

9    in the business, trip chain.  That's less likely for

10   people who don't have vehicles.

11        Q.   How much less likely is that?

12        A.   I'd love to give you an estimate.  I would

13   say they're about half as likely, probably,

14   something like that, but, that's an interesting

15   question.

16        Q.   So, if a person was already traveling,

17   say, 20 minutes in the direction of a drop box,

18   early voting location, or DDS center, the

19   incremental burden to reach one of those locations

20   would be less than it would be for a separate trip

21   from home, would it not?

22        A.   Yes.  And, if someone was traveling 20

23   minutes in the opposite direction of a drop box,

24   they would have an additional 20 minutes added to

25   their travel time.

Daniel G. Chatman , Ph.D.                May 16, 2023
Georgia Senate Bill 202, In Re

Page 104

1          Q.   But would someone choose to trip chain

2     when they're moving in the opposite direction?

3          A.   Well, if what we're talking about is

4     habitual travel on a given day, what we're talking

5     about is what people have to do or choose to do on

6     that day, and the point being that on that day, it

7     will be that much more burdensome for them to reach

8     a drop box.  They won't have that ability.  They'll

9     have the, sort of the opposite of that ability.

10    They'll be in the opposite circumstance.

11         Q.   Well, unlike election day voting, don't

12    people have a set of options of the days they can

13    choose to go to a drop box, an early voting center,

14    or DDS office, depending on what's open and

15    available?

16         A.   Yes, they have some latitude of choice,

17    although, as I understand it, that has also been

18    restricted by SB 202.

19         Q.   It did open several, several, it's not

20    just a one time.  There's not just the one time.

21    They're open for a certain number of days, and --

22         A.   Restricting the number of days, as was

23    done under SB 202, makes it more difficult for

24    people to make that plan, for sure, especially

25    people who are of lower income and don't have cars.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 105

1        Q.   So --

2        MR. FALK:   48 days?  68 days?  What was that

3   number?

4        MR. PRINCE:   78 days from the application.

5        MR. FALK:   That's not the number.

6        MR. PRINCE:   I think it's 28.  May be a

7   question for at the break.

8   BY MR. FALK:

9        Q.   That one, we can come back to.  I know

10   it's a bunch of days, but I don't want to give you

11   the wrong set of days.

12        A.   Okay.

13        Q.   You say that travel varies a great deal by

14   household.

15        A.   Yes.

16        Q.   And, do you have any data to connect

17   variations in travel to persons who use drop boxes?

18        A.   I'm not sure if I understand the point of

19   the question, and maybe that means that I don't

20   understand the question.

21        Q.   Okay.  People travel different, some

22   people travel a lot, some people don't travel that

23   much.

24             Is there a way to correlate people's

25   travel habits with their use of drop boxes?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 106

1          A.    I don't think there is a way to do that.

2     I don't think there are any data that would do that,

3     but I do understand that the uptake of voting

4     options among people with disabilities was, has been

5     quite high in Georgia.  I've seen some data on that,

6     sort of, you know, in the 80 percentile range, or

7     something, options other than voting in person at

8     one's polling place, and that suggests to me that

9     the correlation between getting out and about and

10    using something like a drop box might not be that

11    strong, because people with disabilities are

12    definitely less likely to be out and about

13    traveling.

14         Q.    And that reduced likelihood of travel for

15    people with disabilities is something that is

16    independent of the voting regulations or the voting

17    scheme that applies to everyday life, doesn't it?

18         A.    Yes.  Yes.

19         Q.    You say that inner city trips are excluded

20    from your calculations in average travel time?

21         A.    Right.  Yeah.  We're taking out people

22    flying to other cities and taking Amtrak trips to

23    other cities.

24         Q.    How is intercity trip defined I guess is

25    the, it could mean a lot of things.

Page 107

1          A.   Yeah.  So, gosh, I'd have to go back and

2     look.  I think we excluded trips longer than

3     100 miles.

4          Q.   Okay.

5          A.   Yeah.

6          Q.   It's not, it's not --

7          A.   It's not technically, with inter-, yeah,

8     we don't, we're not measuring whether it went

9     between two municipal boundaries.  It's just a --

10         Q.   It's not, it's not Athens to Atlanta.

11    It's --

12         A.   Right, it's farther.

13         Q.   -- something a little further.  Yeah,

14    maybe close to Athens to Atlanta --

15         A.   Yeah, maybe.

16         Q.   -- but it's not quite.

17              You mentioned it in paragraph 22 you did

18    overall statistics, I think, in Georgia of

19    1.6 percent of trips are taken by public

20    transportation, and 7.9 percent by foot, I think,

21    are the numbers?

22         A.   Yeah.

23         Q.   Do you know what percentage of trips on

24    public transportation are taken by people who have

25    cars in the household?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 108

1          A.    Who have cars in the household.

2          Q.    Yeah.

3          A.    It's going to be substantially less than

4     1.6 percent, and that's all I know.

5          Q.    And do you know what percentage of the

6     trips by walking are taken by people with cars in

7     the household?

8          A.    Definitely a higher, a higher number.

9     It's probably closer to that figure, but, again,

10    it's going to be people without cars in the

11    household are going to have higher percentages, and

12    those with cars in the household have lower

13    percentages.  It's just that for walking, the

14    difference is not as stark.

15         Q.    And sitting here today, you don't know

16    what the, you can't quantify that --

17         A.    No.

18         Q.    -- right now?  Okay.

19               And you talk about how increased travel

20    time will require voters to make trade-offs into

21    both discretionary and nondiscretionary time.

22               Is that, do I understand that correctly?

23    And does your report identify how much discretionary

24    time voters have in Georgia?

25         A.    No.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 109

1          Q.    And you define discretionary time as

2    including entertainment, socializing, and shopping,

3    is that the correct --

4          A.    Yes, I --

5          Q.    -- definition?

6          A.    -- those are very, there are various

7    things that fall in the discretionary category, and

8    various things that fall in the nondiscretionary

9    category.  The only idea is that there are certain

10   things that you have to do, and don't have much

11   choice over, and certain things that you have some

12   margin of choice over.

13         Q.    And, is it possible that even a 90 minute

14   round trip to a drop box would cut only into

15   discretionary time?

16         A.    Well, it's possible.  The issue is that's

17   really difficult to say.  I think, on a day when one

18   is both working and doing all the other things that

19   one has to do to maintain a household, it's very

20   likely that a 90 minute trip would cut into

21   discretionary time.

22         Q.    Does your analysis take into account rides

23   given by people outside the household?

24         A.    It does not.

25         Q.    Did you measure the availability of rides

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 110

1    from family members or friends who are not in a

2    person's household?

3         A.   I did not.  There is no way to measure

4    such availability, as you put it.

5         Q.   Did you, your analysis take ridesharing

6    services into account, such as Uber, Lyft, and --

7         A.   No, it did not, or taxis.

8         Q.   Or taxis.  So, you didn't take taxis into

9    account.

10        A.   No.  Those services are costly, and, so,

11   represent a burden of a different type, especially

12   for the households in this category who don't own

13   vehicles and are more likely to be poor.

14        Q.   You say that, in addressing travel burden,

15   you say, a travel burden is, in part, subjective.

16             What factors affect the subjective

17   elements of travel burden?

18        A.   This is a reference to a literature that's

19   attempted to measure the extent to which travel and

20   the components of travel are more or less

21   burdensome, more or less unpleasant.

22        Q.   Uh-huh.

23        A.   And, that refers to whether people are

24   uncomfortable while traveling or walking or waiting,

25   whether they're exposed to the elements, whether

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 111

1    they find it unpleasant to deal with the uncertainty

2    of waiting for a vehicle, and so there's this

3    literature that has estimated multipliers of the

4    extent to which this additional type, these types of

5    travel are more of a disutility to people than

6    driving in a vehicle would be.

7              So, those subjective aspects of travel

8    are, essentially, to do with the qualitative

9    experiences of the activity of traveling and how

10   that can vary depending what you're doing.

11        Q.   Now, if those factors are subjective, how

12   do you meaningfully quantify them?

13        A.   You conduct surveys using what are called

14   stated preference techniques, which get people to

15   make choices using dollar figures in terms of

16   willingness to pay for different travel scenarios

17   and, using those estimates with hundreds of

18   respondents, you can come up with a dollar figure

19   for what people are willing to avoid, in terms of

20   waiting and walking times and in-transit vehicle

21   times, so, that's how those studies tend to work is

22   using those survey techniques.

23              (Exhibit 6 was marked for identification

24   by counsel.)

25   BY MR. FALK:

Page 112

1          Q.   The next exhibit in order will be the

2     Abrantes and Wardman article that you cite, and I

3     just want to see if I understand --

4          A.   Sure.

5          Q.   -- a piece of that before we move on from

6     paragraph 27.  Now, this exhibit is the

7     meta-analysis of UK values of travel time, an

8     update, by Pedro Abrantes and Mark Wardman, which

9     you cite in paragraph 27 when you're talking about

10    the burden of travel transportation --

11         A.   Uh-huh.

12         Q.   -- I take it, is the --

13         A.   Right.

14         Q.   -- focus of that paragraph.

15         A.   Yeah.

16         Q.   And the Abrantes and Wardman article is

17    your source for those statements; is that correct?

18         A.   Yes.

19         Q.   And it's a meta-study, correct, that

20    tabulates a number of other studies; is that

21    correct?

22         A.   Averages a number of other studies,

23    essentially, yeah.

24         Q.   Averages other studies?  Okay.

25              And, turning to table 21 in that study,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 113

1    which I wish I had written down the page number, oh,

2    page 14, should have brought some reading glasses on

3    this one, this also has, table 21 has figures for

4    wait and walk time for car travel, as well as rail

5    and buses; is that correct?

6         A.   Yes.

7         Q.   Do I understand that table correctly?

8         A.   Yes.

9         Q.   And, am I correct that the 1.6 figure that

10   you cite in your report is from the bus column for

11   a, what I think is a 20 minute wait for a 10-mile

12   trip.  I just want to make sure I'm reading this

13   table correctly.

14        A.   Yeah.  I need to --

15        Q.   Where, where you got, where, that I'm

16   also, that I'm correctly identifying the source of

17   your number.  I think, I think it's table 21, which

18   is page 14, and then your report, it's paragraph 27,

19   you cite --

20        A.   Uh-huh.

21        Q.   -- a couple tables from this --

22        A.   Uh-huh.

23        Q.   -- article?

24        A.   Uh-huh.

25        Q.   I'm just trying to figure out what the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 114

1       source of that 1.6 and the 1.2.  1.6 times as

2       burdensome, you cite table 21 up at the carryover

3       sentence there, and I'm trying to, I think I know,

4       but that's why I'm asking you, is, is, does that

5       derive from the 1.57 number and the 1.49 number that

6       are walk and wait time if you go from 20 minute wait

7       and the 10-mile cluster, or is it something else?

8       It may be the 20 minute, 20 minute wait and the 2

9       mile cluster are the same numbers, so I'm just

10      trying to, asking you what your source --

11              A.   Right, yeah.

12              Q.   -- is.

13              A.   So, it's been a while since I looked at

14      this study, and I would say that that's probably

15      what I was looking at, but it looks to me like I

16      should have said 1.6 for walk and 1.5 for wait.

17              Q.   Okay.

18              A.   And I, this is for wait times of 20

19      minutes, or walk and wait times totaling 20 minutes?

20      Is that what it is?

21              Q.   Right.  Yes.

22              A.   Right.

23              Q.   And, now, as I read this table, and this

24      is, this is part of why you're here, as I read this

25      table, there's a, if you go over to the car column

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 115

1      for the same trip, whether we're looking at the

2      2-mile trip or the 10-mile trip --

3            A.    I'm sorry, I did it again.

4                  (Record read.)

5            Q.    Yeah, I'm sorry.  Looking again at table

6      21 in the car column, Dr. Chatman?

7            A.    Table 21 in the car column.  Yes.

8            Q.    And, again, looking at the, it really

9      doesn't matter, but we'll, we've been looking at the

10     20 minute wait.

11           A.    Uh-huh.

12           Q.    As a matter of convenience and comparison,

13     I think the comparison holds out either way is when

14     you look under the car column, the numbers are

15     higher.

16           A.    Uh-huh.

17           Q.    How do you explain the numbers being

18     higher for the car trip than the public, the bus

19     trip?

20           A.    I'm not sure why the numbers are

21     different, but I think there's some explanation

22     definitely needed here in the following sense.  So,

23     for the most part, people don't have to walk very

24     far to their vehicles, and, for the most part, they

25     don't have to wait, either, for the vehicle to, to

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 116

1    turn up.

2              And, so, these, these, the way I would

3    characterize these values is that they're pretty

4    similar to the rail and the bus values, and maybe

5    they're a bit higher, but I don't know if that's

6    statistically significantly higher, so, they're

7    about the same.

8              As to why they're exactly the same, I have

9    to go back and look at the article, and I could

10   probably figure that out for you in a couple of

11   minutes, but --

12        Q.   Maybe we can come back to that after --

13        A.   We could come --

14        Q.   -- lunch, but it, but it --

15        A.   We could come back to that.

16        Q.   But my point was, and I don't even know

17   what my point is here exactly, but it looks like

18   they're pretty, as you say, probably not

19   statistically --

20        A.   Yeah, they're --

21        Q.   -- significant differences between the,

22   the implied IVT, which I believe is --

23        A.   In vehicle --

24        Q.   -- in vehicle --

25        A.   -- time.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 117

1          Q.    -- transportation or time, in vehicle

2     time, the implied IVT values of walk and wait

3     time --

4          A.    Right.

5          Q.    -- seem to be roughly the same for a two

6     mile trip by car or by bus.

7          A.    Yes.

8          Q.    That appears to be what this study --

9          A.    It is --

10         Q.    -- says.

11         A.    It is saying that.  I think it's important

12    to understand that, in general, however, there is no

13    walking or waiting time for a car trip.  So, it's

14    not as though we would expect walking and waiting

15    time to be different depending on the mode very

16    much.  Just depends.  There might be some reasons

17    why we would.  We can see the rail numbers are a

18    little bit different than the bus numbers, for

19    example.

20              But, one does have to walk and wait,

21    taking public transportation, and, in most

22    instances, one does not have to walk and wait to

23    access a vehicle in Atlanta or in Georgia.

24         Q.    Do users of public transportation expect

25    the, that their travel times will be longer than

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 118

1    they would be by a private car trip?

2         A.    Some users of public transportation really

3    don't drive very much at all, and, in those cases, I

4    would imagine that they may not have very many

5    expectations of what the driving trips are like.

6              Those who use both public transportation

7    and driving are used to the idea that driving is

8    faster, except perhaps in certain situations, like

9    coming over this bridge.

10        Q.    Getting here this morning, for example --

11        A.    Right.

12        Q.    -- yes.

13        A.    This morning, you know, public

14   transportation may have been faster than driving.

15        Q.    At least on a good day, BART's --

16        A.    If you look at the Bay Area, the data for

17   the Bay Area, the only two transportation analysis

18   zones between which public transportation's

19   performance bests that of the auto is between those

20   two that bracket the bridge.  Other than that,

21   driving is almost always faster.

22        Q.    Let me ask the question in a different

23   way, a different question.

24              Do persons taking public transportation

25   expect their public transportation trips to take as

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 119

1    long as public transportation trips take?  Are they

2    aware of the time involved in going to their

3    destination?

4         MR. FOGELSON:  Objection to form.

5         THE WITNESS:  I would venture to say that they

6    often are.  However, there is a lot of variability

7    that cannot be predicted.  So, it's said that part

8    of the disutility of using transit doesn't even have

9    to do at all with values of time, as in this study,

10   but with the level of uncertainty that increases

11   people's disutility.

12        So, in other words, what I'm saying is, people

13   do know, but they also know that it's uncertain, and

14   it's highly uncertain in comparison to driving.

15   BY MR. FALK:

16        Q.   Except in the Bay Area, where driving is

17   as uncertain as it gets.

18        A.   Right, but, if you are driving in the Bay

19   Area at 8:00 at night, you can be pretty assured of

20   your travel time, and you just have to avoid the

21   peaks.  So, outside of the peak, this is true, at

22   least.

23        Q.   You say at paragraph 28 that low income

24   people have less time to travel.

25        A.   I say -- okay.  Go ahead.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 120

1          Q.   Is that correct, or did I misstate what
2     you said?
3          A.   What I would say is, they have, as I say
4     in the paragraph, more difficulty in finding time
5     because they are less able to reduce their time
6     requirements in other areas than are people with
7     higher income.  They have less flexibility,
8     typically, because money buys flexibility, to some
9     extent.
10              It's also true that people who are poorer
11     have, typically, have less flexible work schedules,
12     which I don't mention here, and that makes it harder
13     for them to find time, sometimes, to vote at or drop
14     off ballots at times when they're permitted to do
15     so.
16          Q.   That, that flexibility related to work
17     only applies to lower income people that are
18     employed, correct?
19          A.   That's right.
20          Q.   And, would you agree that lower income
21     people who are not employed have at least equal if
22     not greater time to travel than people with a higher
23     income that are employed?
24          A.   Yes.
25          Q.   And low income people do manage to travel

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 121

1    to do some things; isn't that correct?

2          A.    Yes.

3          Q.    They can go to the doctor, look for a job,

4    or go shopping, correct?

5          A.    They're just less likely to do things like

6    go shopping and go to a doctor.

7          Q.    I think you said that earlier, they're

8    less likely.

9                Do you know how much, how much less likely

10   a low income person is to --

11         A.    I can't quantify --

12         Q.    -- take a trip?

13         A.    -- it for you right now.

14         Q.    Okay.  A couple of more questions, and

15   then let's take lunch.

16               How many trips out of the year -- out of

17   the year.  Let me ask this differently.

18               How often does a voter have to travel to

19   get ID if he or she doesn't already have it, voter

20   ID of any form?

21         A.    Once, I think, is the answer you're

22   looking for.

23         Q.    And, how often does the voter have to

24   travel to vote, through one mode or the other?

25         A.    Once.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 122

1          Q.    Depends how many elections there may be in
2      a particular year, correct?
3          A.    I was thinking once per election, but --
4          Q.    Once per election.
5          A.    -- yes.  Maybe twice a year.
6          Q.    Twice --
7          A.    Yeah.
8          Q.    -- or twice every two years, at least in
9      the state elections.  That is my understanding is
10     they're every two years.  I don't know if there's
11     anything in the record about off year, or if they
12     exist in Georgia the way we have them here, but --
13         A.    Uh-huh.
14         Q.    -- every two years, there's an election
15     cycle.
16         A.    Okay.
17         Q.    Is it, did we, is that correct?
18         A.    That sounds quite plausible.
19         Q.    Setting aside any off year cycles in some
20     municipalities that I'm not going to deal with here,
21     because I don't know them either, so that's, at
22     most, if there's a runoff, that's three trips every
23     two years to vote; is that correct?
24         A.    Sounds right.
25         Q.    Otherwise, two trips, if there's no

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 123

1    runoff.

2              Why, for a trip of this infrequency, why

3    does it make sense to measure the burden of an

4    infrequent trip only against the travel burden of

5    everyday life?

6         A.   People have to vote as a part of their

7    everyday lives.  They don't get the day off, not in

8    this country.  They don't get a day off from their

9    child care responsibilities.  They don't get a day

10   off from all the things that they have to do on a

11   daily basis, and particularly if they are poor, or

12   they have less flexibility, as I've said before.

13             So it's necessarily, for all of us, I

14   think, a decision that is something that we

15   encounter during our daily lives.  I think that's

16   true for everybody.

17        Q.   Wouldn't it make more sense to measure the

18   burden against the longest monthly trip, or the

19   longest quarterly trip that's unrelated to voting?

20        A.   The, why, why, I'm not sure if I

21   understand why you would suggest that that would

22   make sense.

23        Q.   Well, if we're looking at a trip that you

24   only have to make a couple of times every couple of

25   years, why wouldn't you compare it to other such

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 124

1    episodic trips that people make in the normal course

2    of their lives, but they only make once a month, or

3    once every few months?

4        A.   Well, I think those trips aren't like

5    voting.

6        Q.   Why not?

7        A.   I think voting is a trip that you don't

8    have to make.  No one makes you vote.  If you vote

9    or not doesn't affect your income, doesn't affect

10   how your kids are doing, doesn't affect whether you

11   eat that day or not.  That's true for everybody.

12           So, it's a trip that doesn't have any

13   personal benefits beyond the benefits associated

14   with being a good citizen, and those are evanescent

15   benefits.  Those are, you know, those, they pale in

16   comparison to the daily needs that people have,

17   again, for everybody, not just for people who are

18   poor.

19           It's just that we, if we are of higher

20   income, and have more means to make it possible to

21   vote, and if we don't have to drive very far to get

22   there, then we'll vote, if, with an equivalent level

23   of motivation to someone who doesn't have those

24   circumstances, and, therefore doesn't get to make,

25   doesn't end up making that trip to vote.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 125

1        Q.   Would that level of motivation lead

2    someone to use a mailbox for an absentee ballot, if

3    the relative burden of alternate modes was too much?

4        THE COURT REPORTER:  If the something -- go

5    ahead.

6    BY MR. FALK:

7        Q.   If the burden of using an alternative mode

8    such as drop boxes was too high?

9        A.   So, I guess we don't really know, but I

10   refer you back to figure 5, or is it figure 3, from

11   exhibit, no, it's figure 1, from exhibit, I can

12   never remember what this exhibit is, 5, figure 1 in

13   Exhibit 5.  No, it's figure 3.  Sorry.

14            It's figure 3 in Exhibit 5 on page 7, and

15   what that shows me is that the answer is, no,

16   apparently not, because, on average, people without

17   vehicles do not use absentee ballots at a higher

18   rate.  And I have no reason to believe that

19   motivations to vote are different intrinsically than

20   among people who don't own vehicles and people who

21   do.

22            So, my best answer to that question is,

23   people are dissuaded from, from voting, even when

24   they have an absentee option.

25            Of course, I, again, I don't know the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 126

1    situation in Michigan.  I don't know what

2    requirements there are for absentee voting.  There

3    may be some requirements.  There may be some

4    impediments to getting an absentee ballot.  I mean,

5    I think there probably are, in any case, some

6    impediments to getting an absentee ballot.

7            MR. FALK:  Take a lunch?

8            MR. FOGELSON:  Sure.

9            THE VIDEOGRAPHER:  We're going off the record.

10    The time is 12:35 p.m.

11                (Luncheon recess:  12:35 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 127

1              A F T E R N O O N    S E S S I O N

2                        (1:21 p.m.)

3                          -oOo-

4         THE VIDEOGRAPHER:  We're back on the record.

5    The time is 1:22 p.m.

6

7                    DANIEL G. CHATMAN, Ph.D.,

8    having previously stated to tell the truth under

9    penalty of perjury, was examined and testified

10   further as follows:

11

12                    EXAMINATION (Cont'd)

13   BY MR. FALK:

14        Q.   Dr. Chatman, you say at one point that the

15   rarity of long public transit or foot trips suggests

16   that people avoid them whenever possible.

17             Does that state your view?

18        A.   Yes.

19        Q.   Isn't it equally possible that most people

20   just don't have to go very far for most purposes?

21        A.   Well, let's put it this way.  There are

22   many longer trips via auto that people do take.

23   There are not very many such trips by public

24   transportation or on foot.  There's a lot more

25   effort involved if you're walking, and a lot more

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 128

1      disutility if you're taking public transportation.

2           Q.   But they do go further only when they, but

3      don't they go further only when they have a reason

4      to, is that --

5           A.   Well, what I'm trying to say in that

6      sentence is that public transportation and walking

7      are more onerous and more difficult, and so people,

8      when they have the ability to avoid those trips,

9      they do.

10          Q.   They may take a longer trip to see family

11     or friends, correct?

12          A.   Well, they'll avoid doing it on foot.

13          Q.   Public transportation is the way to go?

14               If public transportation is their option,

15     won't people take a longer trip to see family or

16     friends?

17          A.   Oh, I just, you know, I just saw a

18     dissertation proposal, a presentation by my student

19     who collected data on this question of, in taking

20     trips by people in Lilongwe, Malawi, where a lot of

21     people don't have access to a vehicle, and a lot of

22     people there don't have access to any form of

23     motorized transportation, and the percentage of

24     people in that situation who report not being able

25     to take a trip to see family and friends was, I

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 129

1     think, on the order of 70 percent.

2              So, in instances where people don't have a

3     good access to transportation, they will forgo

4     trips, because they simply can't make it, because

5     it's too difficult to do.

6              And, similarly, I would expect that people

7     would avoid trips to vote, because voting has fewer

8     intrinsic benefits than seeing one's family and

9     friends.

10        Q.   Don't people take public transportation to

11    go to the Braves game, something like that, purely,

12    discretionary?

13        A.   Well, the Braves game's a special example

14    where you might have some advantages from taking

15    public transportation there, such as not having to

16    pay to park.  It's a little different.  And I don't

17    know how long --

18        Q.   If you don't have a car, you're not

19    worrying about paying to park, are you?

20        A.   Well, there are more discretionary transit

21    riders to sports games than in most examples of trip

22    purposes that I can think of.

23        Q.   Well, you say that people avoid walking or

24    public transportation for longer trips.

25              What are the ways that people avoid those

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 130

1    trips, beyond just not making them, which I think

2    you, are there other ways that they avoid those

3    trips?

4         A.    Well, they try to go to places that are

5    nearer to them.  They try to, they won't go, for

6    example, to a farther away grocery store the way you

7    might if you're driving.

8              So, if you're driving, you can go to, all

9    the way to the Costco to get your, you know, cheaper

10   and higher quality discount goods, and, if you do

11   not have a car, then you're going to be more likely

12   to shop at a corner store.  So it's, a combination

13   of things.

14        Q.    Weren't there other options to avoid

15   walking or public transportation, such as getting a

16   ride from a friend or family member?

17        A.    I'm going to cough in a second.  Just

18   warning you.  Sorry.  Now, that time, I got it.  I'm

19   learning.

20             It's difficult to quantify the burden

21   associated with asking people for a ride, but it's

22   fair to say that people's patience for giving people

23   a ride is, is not super high.  We don't have lots of

24   examples of people choosing or being able to do that

25   in travel diary data.

Page 131

```
 1              It is true that people do, for sure, and
 2       it is a possibility, but it constitutes its own sort
 3       of a burden, a social one, and also an arrangement
 4       and a coordination burden, and it's difficult to
 5       quantify that, and I don't attempt to do that.
 6          Q.   Well, doesn't every modality of
 7       transportation involve an incremental burden over
 8       having your own car?
 9          A.   Yes, that's, I think that's the point.
10          Q.   So, whatever you want to do, if you don't
11       have access to a vehicle, there's going to be an
12       increased burden, more or less increased, but an
13       increased burden by choosing any of these other
14       modalities, right?
15          A.   Absolutely.  Yes.
16          Q.   Isn't another way people avoid long public
17       transportation and walks by taking taxis or
18       rideshares?
19          A.   Well, if they're long trips, they become
20       quite expensive.  So, the people who, we don't have
21       a great data on rideshare.  It's a very small
22       percentage of all trips, you know, not a major mode
23       share, actually.  So, but, that said, the people who
24       are often relying on rideshare are, typically,
25       higher income people.
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 132

1          Q.    And what about pooling rideshares and

2     getting together with a couple of the riders and to

3     reduce the cost of rideshare?

4          A.    Yes, all these things are, in theory,

5     possible, but we don't have much evidence that

6     people do them.

7          Q.    Does your report address the ways that

8     some voting rights groups use to take people to

9     polling locations?  For example, even after SB 202,

10    the plaintiff group, Georgia Adapt, picks up

11    disabled voters at their homes to get them so they

12    can vote.

13              Did you address that phenomenon at all?

14         A.    No.

15         Q.    In paragraphs 31 and 32 you say you

16    supplemented the state's list of drop box locations

17    with other sources, correct?

18         A.    That's correct.  What page?  I'm sorry.

19         Q.    It's paragraphs 31 and 32.

20         A.    Okay.

21         Q.    And was the effect of using these other

22    sources to find more drop box locations, or fewer?

23    What was the, what was the --

24         A.    Oh, more.

25         Q.    More.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 133

1          A.    Substantially more.

2          Q.    Substantially more.

3          A.    Thereby I might add reducing the extent of

4    the burden that would have been found using the

5    state's list.

6          Q.    Right.  No, I understand.  I don't like to

7    assume things, so I wanted to ask and be sure that

8    that's why, that was the result.

9                Paragraph 39, table 2, page 18, you

10   present median travel times to 2020 drop boxes, 2022

11   drop boxes, 2022 early voting locations, and DDS

12   offices; is that right?

13         A.    Yes.

14         Q.    And, as we discussed before, you don't

15   include mailboxes or county registrars' offices; is

16   that correct?

17         A.    Yes.

18         Q.    And the difference between the 2020 drop

19   box and the 2022 early voting location is less than

20   a minute by car, correct?

21         A.    I'm sorry.  You're comparing the 2020

22   ballot drop boxes.

23         Q.    To the early voting locations.

24         A.    To the early voting locations.  Right.

25   Yes.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 134

1          Q.    And the difference for public

2     transportation's a bit over four minutes, from 26

3     and a half to 30 and a half, more than 30 and a

4     half; is that right?

5          A.    Right.  Yes.

6          Q.    And then from walking, it's --

7          A.    Not very different.

8          Q.    Yeah.

9          A.    8 minutes.  Yeah.  7 minutes.

10          Q.    Yeah.  7 and a half on a, for an hour,

11     hour walk, what was already an hour walk.

12               So, are those differences significant?

13     Where do you draw the line on significance in a

14     change in travel time?  Were some of them

15     significant and some not significant?

16          A.    Well, I mean --

17          Q.    There's three differences there.

18          A.    -- I think the most, you know, this is

19     mainly meant, this table is mainly meant to give a

20     sense of the average over spatial areas.  It doesn't

21     account for the relative density of the population,

22     and so it's a little misleading in that sense.

23          Q.    Okay.

24          A.    And, secondly, I think the best measure of

25     what's relevant is if you're over a threshold, it

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 135

1       starts to become really relevant.  If it's under,

2       you know, a seven minute difference from a three

3       minute walk to a 10-minute walk doesn't seem like it

4       should, you know, maybe that's not a big deal.  For

5       some people, it might be, you're, because you're

6       more than doubling the, the walk, and, for some

7       people, it might not be.

8                   But what this doesn't show is the changes

9       in the percentages of block groups for which, you

10      know, the travel starts to become a burden, and I've

11      used a somewhat arbitrary threshold of 60 minutes,

12      but you could imagine lower than that would easily

13      be a burden for some people under some

14      circumstances.  At least, it would dissuade them

15      from using a drop box, so, but that isn't what's

16      shown here.  These are just median travel times.

17          Q.   Do early voting locations provide a voting

18      method that substitutes for voting at drop boxes?

19          MR. FOGELSON:  Objection as to form.

20          THE WITNESS:  My understanding is that they

21      are, that, well, I don't really know.  I think early

22      voting, at voting locations, you're required to show

23      ID, and, at ballot drop boxes, you don't, but, I

24      don't know.

25      BY MR. FALK:

Daniel G. Chatman , Ph.D.                     May 16, 2023
Georgia Senate Bill 202, In Re

Page 136

1          Q.   Would it affect your answer if it were

2     true that in order to deliver a sealed absentee

3     ballot, whether by mail or by drop box, you need to

4     either record a driver's license, or ID number, or

5     provide a copy of one of the other forms of ID?

6          MR. FOGELSON:  Objection as form.

7          THE WITNESS:  Could you say it again.

8     BY MR. FALK:

9          Q.   Yeah.  Would it change your opinion as to

10    the substitutability of early voting locations and

11    drop boxes if it were true that in order to vote

12    absentee, you have to either record, at some point

13    in the absentee process, either record your ID

14    number, or provide a copy of the alternate forms of

15    ID we've discussed earlier in order to obtain the

16    ballot?

17         MR. FOGELSON:  Same objection.

18         THE WITNESS:  So, I understand your question to

19    be asking whether I would consider early voting

20    locations a good substitute for ballot drop boxes if

21    I understood that the absentee ballot also requires

22    a form of identification.

23    BY MR. FALK:

24         Q.   At some point in the process.

25         A.   At some point in the process.  I have to

Daniel G. Chatman , Ph.D.                           May 16, 2023
Georgia Senate Bill 202, In Re

Page 137

1      confess.  I want to step, take a step back here

2      and --

3              Q.   Sure.

4              A.   -- just, I want to clarify something.

5              Q.   Yeah.

6              A.   In 2020, certainly, there were more

7      locations available.  In 2022, there were fewer.

8      You were asking me to make a comparison between 2020

9      and 2022 that I wasn't quite following, and I'm

10     still not quite following.  I'm not sure what the,

11     what the point of that comparison is.

12              I could see why you might be comparing

13     2022 ballot drop boxes to early voting locations,

14     because, in that instance, the median distance to

15     the early voting location is actually lower, right?

16     And, therefore, it is a good option, potentially, if

17     it were equivalent to casting a ballot in a ballot

18     drop box.  So, that, I understand.

19              So, is that what you intended by the

20     question?

21              Q.   What I want to, what I'm driving at is

22     this.  Your report or parts of your report focus on

23     the differential travel burden between --

24              A.   Right.

25              Q.   -- 2020 drop boxes and 2022 drop boxes.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 138

```
 1          A.   Right.
 2          Q.   And what I'm trying to explore is to what
 3     extent that differential burden is affected by the
 4     option of early voting locations.
 5          A.   Okay.
 6          Q.   Because we have, say you started 2020, and
 7     you're one of the, you used a drop box.  2022, the
 8     drop box is, is much farther away, as your numbers
 9     indicate, or is much --
10          A.   Uh-huh.
11          Q.   -- more burdensome as your numbers
12     indicate, but the early voting location is closer to
13     the distance, farther, but --
14          A.   Uh-huh.
15          Q.   -- substantially closer than the 2022 drop
16     box.
17          A.   Right.
18          Q.   The median.
19          A.   Right.
20          Q.   I understand that the --
21          A.   Uh-huh.
22          Q.   -- extremes are going to vary.
23          A.   Yeah.
24          Q.   And so that, what I'm, what I'm asking or
25     trying to explore is to what extent the ability to
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 139

1      vote early in-person affects voters' options in the

2      face of what you describe as the increased travel

3      burden to vote by drop box.

4            MR. FOGELSON:   Objection as to form.

5            THE WITNESS:   So, I mean, I think, first of

6      all, you know, I, different requirements are, exist

7      for each of these options, and so there's that,

8      there's that issue.

9            The second issue is simply that we know, based

10     on this analysis, you asked me earlier why, why did

11     I look at early voting locations in the first place,

12     and you're providing part of the answer for me, that

13     it's a potential substitute for drop boxes, but the

14     early voting location analysis shows a similar

15     disparity in terms of accessibility by black voters

16     and by voters with disabilities, compared to voters

17     who don't have disabilities and non-Hispanic white

18     voters.

19           So, in both those instances, it may be that for

20     any individual, an early voting location is a

21     substitute, but we know already that the early

22     voting locations are distributed in such a way as to

23     be less accessible to those who are black or have

24     disabilities.

25     BY MR. FALK:

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 140

1          Q.   Do you know who's responsible, what

2     government agency or what level of government is

3     responsible for choosing the number and location of

4     early voting locations?

5          A.   I don't know that answer in detail, no,

6     but I understand there are some restrictions on

7     early voting locations.

8          MR. FALK:  Can we get Grimmer and SPIA

9     together.

10          MR. PRINCE:  It's a big one.

11          THE WITNESS:  Okay, here we go.

12          MR. PRINCE:  If I throw this across the table,

13     somebody's going to get hurt, so I'm just going

14     to --

15          (Exhibit 7 was marked for identification by

16     counsel.)

17          (Exhibit 8 was marked for identification by

18     counsel.)

19     BY MR. FALK:

20          Q.   We won't be looking, we won't be looking

21     at this in detail, Dr. Chatman.  Don't worry.  One

22     or two tables that I want you to be able to refer

23     to, if you care to refer to.

24          A.   Sounds good.

25          Q.   Are you aware that early voting is by far

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 141

 1    the most popular form of voting in Georgia?

 2         A.   No.

 3         Q.   So, you're not aware that it's used about

 4    nine times as much as all forms of absentee voting?

 5         A.   No.

 6         Q.   I'll just, I guess if we look at the

 7    Grimmer report at page, page 42, he's got as table 7

 8    tabulating the uses, use of early voting, mail

 9    voting, which in 2021 and 2022 includes drop boxes

10    and election day voting, do you see that for

11    overall, in 2022, about not quite 58 percent used

12    early voting, and a little more than 6 percent used

13    mail voting in 2022, so, not quite 10 times, but

14    about nine times, nine times as frequent usage.

15              And he also, he does break that down on,

16    in paragraph 60 for black voters alone, and the

17    numbers are not quite as, not, the spread isn't

18    quite as great there, but we see in 2022 it's

19    63.7 percent using early voting, a higher proportion

20    using early voting, but also a higher proportion

21    using mail voting, 7.48 percent.

22              So, but, again, almost nine times, almost

23    nine times as popular among black voters.

24              And I'd also refer you to the, the other

25    exhibit, the School of Public International Affairs

Page 142

1    at University of Georgia, which is survey evidence,

2    so it's not quite, it's not quite the same as, as

3    the actual voting evidence, but, having looked at

4    that actual usage, if you look at page 19, they ask

5    in future elections how do you plan on voting.

6          A.    So, we're looking at page 19 --

7          Q.    Page 19 --

8          A.    -- of the SPIA report; is that right?

9          Q.    Yeah.  Are his numbered?  Because mine

10   isn't.

11         A.    Yeah, mine is not numbered.

12         MR. PRINCE:  Alas.

13   BY MR. FALK:

14         Q.    Alas.  Okay.  It's the second to the end.

15         A.    And it says, in future elections, how

16   do --

17         Q.    How do you --

18         A.    -- you plan on --

19         Q.    -- plan on voting.

20         A.    -- voting?

21         Q.    Yeah, that's the table.  And if you refer

22   to that, it gives, it gives, it breaks down by

23   various demographic slices, but, among black voters,

24   it says 4.4 percent absentee by mail, and

25   77.5 percent early in-person.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 143

1              Do you see that part?

2         A.   Yes.

3         Q.   And, don't those figures suggest that

4    early voting is, at a minimum, the most popular form

5    of voting in Georgia, whether for white or black or

6    pretty much every demographic out there?

7         A.   Certainly, in 2022, it appears to be the

8    case.  It's interesting that, you know, there, in

9    2020 was the pandemic, but we had lots of people

10   using mail voting.  What fraction of that I don't

11   know was drop boxes, but it's a big, a big leap

12   there --

13        Q.   Well, when you --

14        A.   -- at a time when drop box accessibility

15   was at its highest.

16        Q.   Right, and then drop boxes in 2018 and

17   2016 --

18        A.   Didn't exist.

19        Q.   -- drop boxes didn't exist, but early

20   voting was also the number 1 modality.  Not as high

21   as it was in 2022.  It seems to be going up

22   steadily --

23        A.   Uh-huh.

24        Q.   -- whereas total mail voting is, including

25   drop boxes, is now higher than it was before 2020,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 144

1    but not at 2020 standards.

2         A.    Yeah.  I just, as I said, I just think

3    it's interesting, that it's difficult, obviously, to

4    disentangle the effect of the pandemic from the

5    effect of having more drop boxes.  However, there

6    were more drop boxes available in 2020.

7         Q.    Yes, there were more drop boxes available.

8         A.    It appears that people at that time used

9    early, used some fraction of mail voting, including

10   drop boxes, at that time.  And, you know, it doesn't

11   run counter to the idea that people will use drop

12   boxes when they are convenient to them.

13        Q.    This would be more complicated without

14   page numbers, so, let's see if I can find this.

15   Overall experience, which is page 8.

16        A.    Page 8.  I can count.

17        Q.    Yeah.  At a personal level how would you

18   rate -- well, don't trust my count.

19        A.    At a personal level, how would you rate

20   your overall experience?

21        Q.    How would you rate your overall experience

22   in voting.  I guess I would ask you, I didn't ask

23   you, had you been made aware of the SPIA study

24   before today?

25        A.    No.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 145

1      Q.   And, here, this page 8, at a personal

2   level, how would you rate your overall experience

3   voting in this election.  If you look, they don't

4   break down into racial categories besides white or

5   black, but the numbers are pretty tightly clustered

6   between white or black at each level; excellent,

7   good, fair, and poor, correct?

8      A.   Yes.

9      Q.   And then black is, actually, is zero,

10   rating the experience, overall experience as poor,

11   even under the white number, which is under

12   1 percent; is that right?

13      A.   Yes.  It's really notable, given the fact

14   that black voters are almost surely more likely to

15   have to wait in longer lines.  It's interesting.

16      Q.   Yeah, and, then, let's see.  Well, five

17   pages down the line.  We'll see.  Maybe it's four.

18   No.  It is five.  No.  Maybe it's six.

19      A.   What's the sentence?  I can find it that

20   way.

21      Q.   I'm looking at the wrong -- yeah.  The

22   sentence, the sentence had to do with whether voting

23   was easier or harder in 2022 than 2020.  Oh, here it

24   is.  Yeah.  It is, comparing your experience in the

25   last general election of 2020, would you say this

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 146

1    time that it was easier to cast a ballot, harder to

2    cast a ballot, or do you say there is no difference

3    between the two elections.

4            And this question, I guess, was only asked

5    of those who had voted previously.

6            And, here, 6.9 percent of black voters

7    said it was harder, which was a good bit higher than

8    the white number, but, also, 19.1 percent of black

9    voters said it was easier, which was also a good bit

10    higher than the white number.

11            How do you account for, at least, the

12    reported experience of black voters, given what you

13    present as increased travel burdens?

14        MR. FOGELSON:  Objection as to form.

15        THE WITNESS:  I haven't seen this report

16    before, and, so, to be able to opine more, more,

17    sort of in a more informed way upon it, I feel like

18    I would need to look at the whole thing.

19            That said, this is a survey of voters, and not

20    of potential voters, and we expect that these

21    burdens are part of what may play a role in people

22    not voting, and so it's a little difficult to

23    compare the universe.

24            It's a self-selected group of people who voted.

25    You'd expect, that in general, people who voted

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 147

1    would be the ones for whom it was relatively easy,

2    perhaps, and, so, the ones for whom it was

3    particularly difficult might not appear among the

4    people that voted.

5         But, beyond that, I mean, I would have to look.

6    I'm noticing some other data elsewhere in the report

7    that are interesting, such as the, the fraction of

8    people who report feeling that SB 202 would decrease

9    their confidence in the system, and I noticed much

10   higher percentages among blacks, as compared to

11   whites there, and I, it's interesting to compare

12   these two to each other and try to understand what's

13   going on.

14        It's a little bit, you know, challenging to

15   figure out what, why those are different from each

16   other.  But I, you know, not having the time to

17   think about this, I'm not sure what else to say.

18   BY MR. FALK:

19        Q.   That's fair enough.  That's why I asked

20   you earlier whether you'd seen this before.

21        A.   Yeah.

22        Q.   I would stay with you longer if you'd seen

23   it before.

24             Do you know what proportion of mail and

25   absentee ballots were cast in drop boxes in 2022?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 148

1          A.    No.

2          Q.    Have you seen that before?

3          A.    No.

4          Q.    Get a little bit more granular here, just

5     so I can try to understand a couple of things.  In

6     your report, page, paragraph 43, you provide

7     estimates for certain fixed route public

8     transportation systems that did not have GTFS data.

9                And, can you remind me what GTFS stands

10    for.

11         A.    It stands for general, it used to stand

12    for Google transit feed specification.  Now it

13    stands for general transit feed specification,

14    because it is considered a general standard, and

15    it's, essentially, data that have routes and

16    schedules embedded in them so that you can do

17    route-based travel time estimates.

18                And, for these counties, it, well, I

19    should say, for five counties, there were no GTFS

20    data available.

21         Q.    And so for those counties in, in, that

22    you're talking, these counties where there is no

23    GTFS data, you talk about driving some estimates

24    there using a multiplier factor.  You multiply.

25         A.    Right.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 149

1          Q.   And so my question is, just how did you

2     derive that multiplier.

3          A.   For, so, we have those, those multipliers

4     across the state from those counties that do have

5     GTFS data, and so you can, you look at the same

6     route, you can look at the travel time by auto, the

7     travel time by transit, the travel time by walking,

8     and you can come up with a multiplier for the whole

9     state, across all of the census tracts, all the

10     census block groups in the state located in all of

11     the other counties that did have public

12     transportation access.

13               (Reporter clarification.)

14          Q.   In paragraph 55, you're talking about how

15     you estimated auto availability, and you say there

16     that you used data from the American Community

17     Survey public use microdata sample.

18          A.   Yes.

19          Q.   But that covers a larger spatial area than

20     would be taken by a block group.

21               Does that mean that the, well, what area,

22     is that a statewide survey, or is it regional, or,

23     how does, how does that, how, does it include a

24     certain number of block groups?  You say it's more,

25     but --

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 150

1        A.    Right.

2        Q.    -- how does it fit?

3        A.    So, several hundred block groups per, per

4    public use microdata area, PUMA, there are 72 of

5    those in the state, and it's the same survey, it's

6    the same data, it's just that it's reported

7    differently.

8            So, the data for the public use microdata

9    sample are reported at the household level, meaning

10   you have data on all the households in that area.

11       Q.    Okay.

12       A.    And you can do any sort of detailed query

13   that you would like with those data.  So, you can

14   get to the number of people who have more than two

15   children, who both have an auto available, and are

16   employed, and are below the poverty level, blah,

17   blah, blah, but, you can go on for as long as you

18   want.

19           And so you can look at the question of

20   people who are citizens, who are of voting age, who

21   are African-American, and who have an auto

22   available.  You can get that fraction of people who

23   are CVAs who are African-American, what fraction of

24   them has an auto available, and that factor is what

25   we apply to each of the block groups, to each of the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 151

```
 1     estimates of citizens of voting age who are
 2     African-American, although we also interact that
 3     with poverty status, because we can do that with the
 4     block group data, and it gives us a better estimate,
 5     because poverty status helps to predict auto
 6     ownership.
 7          Q.   So, does that affect, using the public use
 8     microdata areas and projecting them onto block
 9     groups for those particular points of data that are
10     not available at the block group level, how does
11     that affect accuracy?
12          A.   It is, let's put it this way.  It's the
13     most accurate estimate available at the block group
14     level, and it does vary by block group, because
15     poverty varies by block group, but it is, and
16     poverty's highly predictive of auto use, as is race
17     ethnicity, but it is not as accurate as if the data
18     were reported directly by the census, which they are
19     not.
20               So, if the census said, we'll tell you
21     exactly how many people do not do and don't have
22     auto access in this block group, and how many of
23     them are also citizens, and how many of them are
24     also of voting age, that would be more accurate than
25     this procedure.
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 152

1              But this procedure is, essentially, the

2      only way, I believe, to estimate auto ownership down

3      to the block group level.

4              Q.   Is that a --

5              A.   For census data, which are, which are

6      considered to be the gold standard of data in my

7      field in terms of demographic data.

8              Q.   So, would that method of estimating data

9      down to the block group be consistent with your

10     practices as a social science, social scientist

11     outside the situation?

12             A.   Yes.

13             Q.   Would that be a generally accepted mode of

14     using this data?

15             A.   I believe it would, yes.

16             Q.   You say about the ACS American Community

17     Survey data, in paragraph 56, you say that it's a

18     1 percent sample; isn't that correct?

19             A.   Yeah.

20             Q.   Do you know what the margin of error is

21     for that data, at the block group level?

22             A.   The margins of error vary at the block

23     group level.  It just depends on the particular data

24     that you're talking about, and so they're reported,

25     and they can be calculated, but that's a very

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 153

1      complex process.

2              I didn't go about doing that process

3      because of the fact that I was aggregating it, for

4      the most part, back up to the state level.  And,

5      when one does aggregation back to the state level,

6      those margins of error become quite small.

7              So, the issue is, at the block group

8      level, they can be relatively large, but, when

9      you're reporting data back to the state level, you

10     expect that the variation and the variability at the

11     block group level is essentially reduced due to the

12     sort of the law of large numbers, as it were, as,

13     as, as we refer to it in statistics.

14             So, those, those, I'm, I am not reporting

15     those margins of error, the state level margins of

16     error.  They are small, though.

17        Q.   And, would the same answer you just gave

18     with respect to block group level apply to the

19     census tract level, or would it be different?

20        A.   No.  It would be same at the census tract

21     level.  It's still a matter of aggregation up to

22     the, the, the margins of error at the census tract

23     level are smaller than they are at the block group

24     level, but, when you're aggregating back out to the

25     state, I don't imagine there would be very much of a

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 154

1    difference at all between that, in that aggregation

2    process, in terms of the margins of error, at the

3    state level.

4         Q.    And you go on to say, in the next

5    paragraph, am I correct in interpreting paragraph 57

6    in saying that you cannot determine the confidence

7    level -- let me start over.

8              Am I correct in saying, in interpreting

9    this paragraph to say that you cannot determine the

10   confidence interval for census block groups for

11   tract levels with this data?

12        A.    It's not that I couldn't reports, error,

13   error bars, or, or error estimates at the block

14   group level.  It's that there isn't a method for

15   aggregation to the state for aggregating, there's no

16   generally accepted method for the summation, okay,

17   and, then, therefore, I don't present them at the

18   state level, but I expect them to be very, very

19   small.

20             So, in terms of the social scientists

21   looking at this method, they're not going to be

22   worried about state level confidence intervals, and

23   that's why I say that they're significant at that

24   level.

25             What I mean by that is that the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 155

1    differences that I'm discussing in the report are

2    significant, statistically significant at the

3    99 percent confidence level.

4          Q.   And that's what you're reporting for the

5    statewide --

6          A.   I'm reporting that for that statewide --

7               (Cross-talk, reporter clarification.)

8          THE COURT REPORTER:  I'm sorry, I missed the

9    end of the question, and if you guys could keep your

10   voices up a little bit.  Thanks --

11         MR. FALK:  Yeah.

12         THE COURT REPORTER:  -- so much.

13   BY MR. FALK:

14         Q.   And, so, that 99 percent confidence level

15   is what you're recording for the statewide

16   aggregation; is that correct?

17         A.   Yes.  For the state, so, I'm presenting

18   statewide figures, for the most part, throughout the

19   report.  There are a couple of instances where I

20   talk about Fulton County and Douglas County in the

21   surrebuttal report.  In there, I'm not reporting

22   confidence intervals, but they would be wider, for

23   sure.

24               But, at the state level, all the

25   differences that I'm finding that I refer to in the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 156

1     report where I'm comparing the groups to each other

2     are statistically significant at that level.

3          Q.   If I recall correctly, you calculated

4     travel burdens at the census block group level, is

5     that --

6          A.   So, yes.  Each of the estimates of travel

7     burden are from origin to destination pairs that are

8     from centroids of block groups to the nearest, the

9     shortest, in time terms, trip to get to a, you know,

10    early voting location or drop box or DDS office.

11         Q.   Okay.  In the next paragraph, 58, you say

12    that the output of this stage of the analysis is a

13    spatially specific distribution of demographic

14    information about CVAs that is fairly well

15    documented at the PUMA and census tract level, down

16    to the census block group level.

17              So, I guess I have two questions.  One,

18    what do you mean by, fairly well documented?

19         A.   Yeah, I'm not sure why I said fairly well

20    documented there.  The output of this stage of the

21    analysis is a spatially specific distribution of

22    demographic information --

23         THE COURT REPORTER:  Just one second.  If

24    you're going to read --

25         THE WITNESS:  Okay, I can just, I'll read this

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 157

1    to myself.  How about that?

2              Really, what I mean to say here is that we

3    have very good data at the PUMA level, at the census

4    tract level, and we're imputing some information

5    spatially to the contained spatial units, both the

6    census block groups within the census tracts, of

7    which there are maybe three to five, and the census

8    block groups within the PUMAs, of which there are

9    several hundred, and we're getting information on,

10   from the census block groups, we're getting

11   information on the citizen status, and, from the

12   PUMAs, we're getting the information about the auto

13   ownership, according to poverty status, and that,

14   it's that step of the analysis that enables it, it

15   makes it possible to get, instead of a travel time

16   estimate that would be across the PUMA the same or

17   across the census tract the same, we get these

18   individual block groups, centroid-based travel time

19   estimates which are more accurate, which are better

20   estimates.

21       Q.   Let me see if I understand what you're

22   saying.  I think I do, but I'm going to ask you to

23   tell me whether I have it right.

24              You take travel time estimates through the

25   three modalities you look at, right, car, foot,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 158

1    public transportation.  Those are measured from the

2    centroid of each block group to the nearest, I think

3    you said, in time, rather than distance, to the

4    extent there's a difference, the nearest drop box

5    early voting location.

6          A.    Right.

7          Q.    So, you're taking that time number, based

8    on the centroid of a block group, to whatever the

9    site is, and, then, when you do your burden

10   analysis, which requires reference to some of these

11   other factors, you are using the PUMA data, or is it

12   both PUMA and census tract data, to inform your

13   analysis of who has a burden.

14         A.    Of who has an access to a car.

15         Q.    Right.

16         A.    And who is, and who are citizens living in

17   the block group, essentially.  We have the

18   information at the block group level of race,

19   ethnicity, disability status, age --

20         Q.    Okay.

21         A.    -- but we don't have citizenship, and we

22   don't have auto ownership information, so we're

23   inferring information from the census tract level

24   down to the block group level for citizenship, and

25   we're inferring information about, excuse me, about

Page 159

1    auto ownership by poverty status from the PUMA level

2    down to the block group level.

3         Q.    Okay.  And, do you screen out

4    noncitizens --

5         A.    Yes.

6         Q.    -- from your analysis of who has --

7         A.    Yes.

8         Q.    -- automobile access?

9         A.    Yes.  Yeah, I should have said that.  The

10   analysis at the PUMA level is of citizens of voting

11   age --

12        Q.    Right.

13        A.    -- who are African-American, who are poor

14   and not poor --

15        Q.    Right.

16        A.    -- who have access to an auto and do not

17   have access to an auto, and so on, for every single

18   group that is, is looked at.

19        Q.    And your disability information group,

20   what level did that come from?

21        A.    It comes, it's also available at the block

22   group level.  It's a little complicated, but,

23   essentially, it's available at the block group,

24   yeah.

25        Q.    Okay.  And what you described as the

Page 160

1        inference of these characteristics from the PUMA

2        level down to the block group level, is that a

3        method that would be generally accepted within --

4             A.    I believe it would, yes, yeah.

5             Q.    Let me finish the question.

6             A.    Sorry.

7             Q.    The answer will be the same, but, is this,

8        what you've described, the process of inferring

9        certain characteristics from the PUMA level down to

10       the block group level, is that a method that would

11       be generally accepted within the social sciences?

12            A.    Yes, I believe it would.

13            Q.    Now, I think we've established that the

14       only transportation options you consider in this

15       report are travel by an in-household vehicle, public

16       transportation, or walking; is that right?

17            A.    Yes.

18            Q.    Your academic work has addressed the use

19       of taxis by those with disabilities; isn't that

20       right?

21            A.    Yes.  I should say, yes, instead of

22       nodding.

23            (Exhibit 9 was marked for identification

24       by counsel.)

25       BY MR. FALK:

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 161

1        Q.    The next exhibit will be a paper that you

2     coauthored with Abigail Cochran entitled use of

3     app-based ride-hailing services and conventional

4     taxicabs by adults with disabilities.

5              Do you have that in front of you?

6        A.    Almost.

7        Q.    Almost.   Okay.   In that paper, you find

8     that those with disabilities use taxis at more than

9     double the rate of those without disabilities; isn't

10    that correct?

11       A.    Yes.

12       Q.    Does your report in this case address the

13    rate at which disabled voters in Georgia use taxis?

14       A.    No, it does not.

15       Q.    Does your report in this case analyze the

16    trip time for voters who take a taxi?

17       A.    No, it does not.

18       Q.    Would the travel time for voters who take

19    a taxi be comparable to voters who drive their own

20    cars?

21       A.    Yes.   They would be about the same,

22    typically.   Well, yeah.   A little bit more, but,

23    yeah, because of the wait times.

24       Q.    Your academic work, including that Cochran

25    paper, also addresses the use of other ride-hailing

Daniel G. Chatman , Ph.D.                                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 162

1     services, like Lyft and Uber, by adults with

2     disabilities, doesn't it?

3          A.    Uh-huh.

4          Q.    And, taxis and ride-hailing services are

5     also used by people without disabilities, correct?

6          A.    Indeed.

7          Q.    And your paper with Professor Cochran

8     observes that past studies found that taxi use is

9     higher among both lower income and higher income

10    people than among those with middle income --

11         A.    Yes.

12         Q.    -- correct?

13         A.    That's true.  Higher income people,

14    because they have the discretionary income; lower

15    income people, because sometimes they need vehicles

16    and don't have access to one, and so they're more,

17    since they don't have vehicles, they're more likely

18    to use taxis than people who do have vehicles.

19         Q.    And your paper with Professor Cochran

20    found that people with disabilities use ride-hailing

21    services, I think, more than 80 percent as much as

22    people without disabilities, is that --

23         A.    For ride-hailing, I think we were much

24    closer.  I think what you're referring to, well, I'd

25    have to look at the, so, we looked at two different

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 163

1    kinds of data.  We looked at data on habitual use,

2    which is once every month or so, and we looked on

3    data, at data on a daily use.  So, the question on

4    the NHTS was, have you used TNCs in the previous

5    month.

6              And we found that it was a higher

7    percentage of people with disabilities used --

8    sorry.  We found a smaller share of respondents with

9    disabilities reported using TNCs in the previous

10   month.

11             So, if you're talking about ride-hailing,

12   specifically, the data that we have that's on

13   ride-hailing specifically shows that adults with

14   disabilities make fewer --

15        Q.    Right.

16        A.    -- ride-hailing trips.

17        Q.    But it was --

18        A.    But when the -- yeah.

19        Q.    -- 80 percent.  It was fewer, but --

20        A.    Well, there, so there's --

21        Q.    -- later on, and if I'm misreading the

22   data, please, correct me now.

23        A.    Yeah, so, there's --

24        Q.    It's your data.

25        A.    We looked at two, two kinds of data.  One

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 164

1    was the NHTS data on habitual use, which is the

2    month, whether people used it in the last month.

3         Q.   Right.

4         A.   And we found that 12 percent of adult

5    respondents with and without disabilities, including

6    everybody, reported using TNCs in the previous month

7    at least once --

8         Q.   Okay.

9         A.   -- but, if we look at people with

10   disabilities, it's only 4.5 percent used TNCs, that

11   is to say, what we call app-based ride-hailing, Uber

12   and Lyft, those sorts of things --

13        Q.   Right.

14        A.   -- in the previous month.

15        Q.   Right.

16        A.   So, where, where adults with disabilities

17   are more likely to use, in other words, what we're

18   inferring is -- okay, so, let me back up for a

19   second and say, then, we also looked at, remember, I

20   told you about the travel diary?

21        Q.   Yeah.  Yeah.

22        A.   There's a travel diary as part of the

23   NHTS, as well.

24        Q.   Okay.

25        A.   Okay.  The travel diary is 24 hours of

Page 165

1    activities, including all the trips.

2          Q.   Yeah.  Yeah.

3          A.   In the travel diary, unfortunately, there

4    isn't a distinction between taxis and ride-hailing.

5    They're all lumped together.  And, so, on average,

6    adults with disabilities reported taking 1.1 percent

7    of their daily trips using taxis or TNCs, anything

8    combined, that's the daily trip, versus .6 percent

9    reported by adults without disabilities.

10          So, that's what you're referring to in

11   terms of the multiplier is the 1.1 percent versus

12   the .6 percent.  That's mostly taxis, we would

13   infer, not ride-hailing, which, you know, the

14   distinction is maybe not all that relevant these

15   days, but, at the time, in 2017, it was quite

16   relevant.

17          Q.   It's still relevant, if you want to get a

18   ride around here.

19          A.   Yeah.

20          Q.   I guess I, and this is likely just my

21   confusion on this, on table 2, which was on page

22   129.

23          A.   Table 2 on 129.

24          Q.   Yeah, logistical progression --

25          A.   Right.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 166

1          Q.    I guess I was looking at --

2          A.    Oh, okay.

3          Q.    -- who used TNC in the last month and has

4      a disability at .8828, and maybe you can just

5      explain.

6          A.    I --

7          Q.    Explain what those, what those --

8          A.    It's just, it, yeah, so, what that means

9      is that people with disabilities are 80, controlling

10     for all other factors, which is a statistical

11     procedure that is not always the right thing to do,

12     because disabil-, people with disabilities have

13     other fact-, other factors associated with, with

14     being a person with disability, such as --

15         Q.    Right.

16         A.    -- lower income, and living in more rural

17     areas, and being older, and all those sorts of

18     things.  If you control for all of those things, and

19     you want to know what the effect of having a

20     disability appears to be, controlling for other

21     factors --

22         Q.    Okay.

23         A.    -- once you do that, you find that people

24     with disabilities, instead of being half as likely

25     to take a ride-hailing trip in the previous month,

Daniel G. Chatman , Ph.D.            May 16, 2023
Georgia Senate Bill 202, In Re

Page 167

1    are 83 percent as likely to take a ride-hailing trip

2    in the previous month, so, they're less likely

3    still --

4         Q.    Right.

5         A.    -- when you control for everything else.

6    It's just that the distinction is not as large.

7         Q.    So, correct me if my analogy is wrong, but

8    I, it, so, you're saying that overall, we had the

9    numbers we talked about, but, if you're comparing a

10   person with disabilities who is below the poverty

11   line and in a rural area with a person without

12   disabilities --

13        A.    Who lives in a metropolitan area, who is

14   above the poverty line, that --

15        Q.    You get one number, but, if you're, if

16   you're taking those same, if you're looking at

17   people that are in the same area, in the same

18   socioeconomic status, and whatever else you

19   controlled for, and just compare persons with

20   disabilities to persons without disabilities, that's

21   when you get this 82 percent?

22        A.    Right.

23        Q.    Okay.  And, didn't you also find that a

24   person whose household income, as we discussed in a

25   prior question, I think, just directed at taxis, but

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 168

1      you also find that a person whose household income

2      is less than 25,000 annually is more likely to use a

3      ride-hailing service than a person who makes between

4      25,000 and 100,000, is that --

5           A.    That's correct.

6           Q.    -- reading that right?

7           A.    You're reading that right.

8           Q.    Similar to the taxi issue that we talked

9      about earlier.

10          A.    Yes.

11          Q.    And --

12          A.    I mean, the other comment I'll make on

13     that is that ride-hailing trips are usually shorter,

14     because they're more expensive when they're longer.

15     The exception are airport trips, and a lot of the

16     airport trips are taken by people of higher income.

17               Longer trips of the kind that would

18     constitute a travel burden on a public

19     transportation trip are probably a lot less likely

20     to be taken on a TNC or taxi, because it starts to

21     become a long trip.

22               Typically, what you find lower income

23     people using taxis for is grocery trips, in

24     particular, which are usually relatively short

25     trips.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 169

1        Q.    And, is this group that you look at in

2    your paper with Professor Cochran that making less

3    than 25,000, is that the same, is that the same

4    demographic that you deal with in table 1 in your

5    report where you, where you first --

6        A.    Indeed, it is the same.

7        Q.    It's the same, same dividing line.

8        A.    Yes.  It happens to be that in NHTS data,

9    you don't have, you have only categorical income

10   data.

11       Q.    Yeah.

12       A.    So, you're kind of stuck with certain

13   categories.

14       Q.    Again, I ask because I don't know.  I

15   assume, but I'd rather have you tell me that, that,

16   what's what on this area.

17            And would it be fair to assume that the

18   reason that people in that less than $25,000 income

19   bracket use ridesharing more than the next income

20   cohort is because they are more likely to lack an

21   in-house automobile?

22       A.    Right.  And there are certain trips that

23   it's very difficult to do without your own vehicle,

24   particular if you have to carry things.  So,

25   shopping trips tend to be done in, they're often

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 170

1    done one direction in a taxi than the other

2    direction in a, another, another mode of travel.

3         Q.   If voters in the less than 25,000 income

4    bracket are already likely to use ridesharing or

5    taxis anyway, why wouldn't they use that as an

6    option for voting, as well?

7         A.   You know, I haven't seen data on, I mean,

8    we don't, unfortunately, have data that I'm aware of

9    specifically for the trip purpose of voting, but the

10   reason that people tend to use an expensive mode

11   like a taxi is because it's really difficult to not

12   do the trip without a taxi.  Like I said, usually,

13   it's when you're carrying things back home.

14        So, I wouldn't expect somebody who is

15   voting to use rideshare to get there and back.  I

16   don't, anecdotally, I've never heard of that.  But,

17   more to the point, there isn't a need to carry

18   things in the same way, and so that's a, that's a

19   factor.

20        It's also much more of a discretionary

21   trip.  It's for less discretionary trips sometimes

22   people will take taxis.  You know, people who are

23   poorer have unreliable vehicles that break down and

24   at the last minute may need to get to work on time,

25   and, if they're not, there's more likely to be a

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 171

1    penalty for them.

2              So, it's these sorts of factors that I

3    think are likely to give rise to taxi use, and not

4    so much a purely discretionary trip, like voting.

5              I would, I would be very surprised to find

6    that there was any significant take-up of

7    ride-hailing or taxi use to vote, because of the

8    financial cost.

9         Q.   Right, but that's not based on any data.

10   You're not aware of any data that examines this.

11        A.   There are no data that I'm aware of that

12   examine the mode of transportation to access a

13   polling place or a voting resource.

14        Q.   Now, further down in table 2 of the

15   Cochran paper, you find that non-Hispanic black

16   people and non-Hispanic white people use

17   ride-hailing services comparably; is that correct?

18        A.   This shows that non-Hispanic black and

19   non-Hispanic white people are not statistically

20   distinguishable for a non-Hispanic, from each other,

21   that's correct, in terms of their use of TNCs and --

22              Well, let me put it a different way.

23   These are coefficients from a regression equation

24   that controls for lots of other characteristics --

25        Q.   Uh-huh.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 172

1      A.    -- so what it shows is that there's not a

2      statistically distinguishable racial specific fact-,

3      you know, a race-specific difference --

4      Q.    Uh-huh.

5      A.    -- that is attributable to race, as

6      opposed to attributable to other factors that are

7      correlated with race, such as income, disability,

8      and so on.

9            So, it's, if we were to look only at data

10      on non-Hispanic blacks and non-Hispanic whites, what

11      it would show is that, that, I'm not exactly sure

12      what it would show, I'm not going to guess here, but

13      the point is that that would be a different number

14      than this number.  This is when controlling for

15      everything else.

16      Q.    And when you control for everything else,

17      you also don't have a statistically significant

18      difference between whites and Hispanic people; is

19      that correct?

20      A.    That's correct.

21      Q.    And --

22      A.    Well, in, well, if we do on used TNC in

23      the last month, I guess, let's see.  Oh, no, I'm

24      sorry.  I'm looking at the wrong thing.  That's

25      correct.  Yes.  Hispanic status.  Not statistically

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 173

1    distinguishable when you control for things like

2    worker status, MSA size, children in the household,

3    income, those sorts of things.

4         Q.   And, isn't it true that there was, when

5    you add taxis into the mix, the difference between

6    whites and the other races, having controlled for

7    everything you mentioned, that the differences

8    between taxi use was not statistically significant?

9         A.   That's right.

10        Q.   And, let's see what page this really is.

11   I'm not finding that.  So --

12             (Counsel conferred.)

13        Q.   I don't think it is so critical that we

14   need to hold up.  We can look for it later.  I think

15   we've done most of what we need to do here on that

16   point.  Oh, yeah.  And it is in subsection 5 on that

17   page 127, the fourth page of the print.

18             The last full paragraph, you said, we did

19   not find significant relationships among race and

20   Hispanic status predictors and TNC use, with the

21   exception that Asian individuals were slightly less

22   likely than whites to use TNCs, correct?

23        A.   Yes.

24        Q.   And is that still, still your view on

25   that?

Page 174

1          A.    That's what we found in those data.

2          Q.    Okay.  Your article also concluded on page

3     129, there's that second paragraph, the second

4     paragraph of subsection 6, you refer to ample

5     evidence that taxis are an important transportation

6     mode for people with disabilities.

7          A.    Uh-huh.

8          Q.    And you cite a couple of studies on that.

9          Do you --

10          A.    Right.

11          Q.    -- still agree with that statement that

12     there's ample evidence that taxis are an important

13     transportation mode for people with disabilities?

14          A.    Yes.  I think it just needs to be

15     contextualized that the rate of use is still about

16     1 percent of trips, so it's still a small fraction.

17     It's just that it's twice the amount, the amount of

18     people without disabilities, at which it's only

19     around .6 percent.

20              So, it's important, and especially in some

21     places where trips are short, and taxi services are

22     affordable as a result of trips being short, which

23     is why it's so much higher in the urban, the bigger

24     cities, as we show in the paper.

25          Q.    Now, app-based ride-hailing is associated

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 175

1    with smartphone usage; isn't that right?

2         A.    Yes.

3         Q.    Would increased smartphone usage make a

4    difference in ride-hailing usage?

5         A.    Well, gosh, we have a lot of secular

6    trends around ride-hailing use that are important.

7    Smartphone use was very high already in 2017, when

8    this survey was taken.  It's getting higher still,

9    but it's, you know, it's not changing as rapidly as

10   it was.

11              But, ride-hailing services have become

12   significantly more expensive in most metropolitan

13   areas since this was published, due to the kind of

14   withdrawal of the venture capital approach to the

15   financing of those services, and due to some other

16   factors having to do with the regulatory kind of

17   environment.

18              So, I don't, you know, we don't have great

19   data on this right now, in terms of overall

20   ride-hailing use.  I would expect that it's gone up

21   somewhat, but the extent to which it's gone up among

22   people who are of lower income, I would guess, is

23   going to be a much lower rate, just because of the

24   fact that the price advantage that they once had

25   over taxis has, has vanished in many metropolitan

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 176

1    areas.

2          Q.    Are you aware of any data on smartphone

3    usage in 2023, compared to 2017?

4          A.    Not right now, no, not at the moment.

5          Q.    Your paper, near the beginning of your

6    paper with Professor Cochran you note that use of

7    ride-hailing services, this is the third paragraph

8    there in the introduction, national patronage of

9    TNCs, transportation network companies, is projected

10   to surpass ridership on public buses by the end of

11   2018.

12               Do you know if that happened?

13         A.    It didn't.

14         Q.    Do you know what the current relative use

15   of ride-hailing to public buses is in Georgia?

16         A.    No, but I would guess it might be higher

17   in Georgia.  It's possible.

18         Q.    Do you know what the relative use of

19   ride-hailing to public buses is in the United

20   States?

21         A.    No.

22         Q.    Is the availability of ride-hailing

23   services relevant to your opinions about travel

24   burdens to reach drop boxes, early voting locations,

25   and DDS offices?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 177

1          A.    As I've said previously, I view it as

2     being an option that among people who I find to have

3     a travel burden is unlikely to provide a good

4     alternative, because they are for longer trips.

5               The distance of these trips is something

6     that is on the longer side, because they are round

7     trips of at least an hour on public transportation,

8     so there's that aspect of things.  The cost is

9     higher for those trips, and because the majority of

10    the people who experience those burdens are poorer,

11    and, therefore, less likely to be able to afford

12    those sorts of, the fare that they would have to pay

13    for a ride-hail vehicle or a taxi.

14              So, the tricky part about all this is that

15    we're talking about a fraction of the population

16    that is, in certain ways, you know, different than

17    the fraction of the population that does things like

18    drive and use ride-hail vehicles.

19              So, my view is that, you know, if it were

20    possible to have the estimate of what it would cost

21    for each individual to take a ride-hail vehicle from

22    their location to the, to the nearest location of

23    the, whatever the voting resource is, that would

24    certainly provide more data, but I don't imagine

25    that it would indicate an opportunity, a significant

Page 178

1        opportunity for reduction of burden due to those,

2        those impediments to using ride-hail.

3            Q.   You mentioned the burden, the length of

4        the trip by public transportation, but isn't a

5        ride-hailing trip --

6            A.    It's way faster.

7            Q.    -- more likely to be the length of the

8        trip by car to --

9            A.    Oh, no, it is, absolutely.

10            (Cross-talk, reporter clarification.)

11           Q.   You mentioned the burden in terms of how

12       long a public transportation trip to a voting

13       resource might be, but isn't a trip to a voting

14       resource by a ride-hailing service more likely to

15       parallel the length and burden of a trip by car?

16           A.    Yes.

17           Q.   You said in the top of the second column

18       of your first, the first page of the Cochran article

19       that understanding how people used app-based

20       ride-hailing is critical for developing

21       transportation policies and plans that ensure

22       equitable transportation service provision across

23       demographic groups.

24                And, isn't the same understanding critical

25       to assessing transportation burdens relating to

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 179

1    voting?

2         A.    I'm not sure.  I'm, you're trying -- yeah,

3    I'm not sure if I understand your question.  Let me

4    see if I can rephrase it.  You're saying, if it's

5    important to look at the distribution or the, the

6    way in which we're providing ride-hailing services

7    for different, different, different demographics,

8    that it's, must be also important to take into

9    account ride-hailing as an option for people who

10   might be using it to vote.

11            I don't see that these are equivalent

12   propositions at all.  They're quite different

13   things.  What I was saying in the article was that

14   we care about equitable access, and it was clear in

15   that article, in the data that we were looking at

16   that people with disabilities, despite having an

17   important reliance upon taxis, were not using TNCs

18   at nearly the rate of the general population,

19   contrary to what we would expect, because we would

20   expect that TNCs would be something that they would

21   be likely to take advantage of, given their higher

22   rate of taxis.

23            That was not occurring, and so the

24   conclusion was that it was an important thing to

25   look at to make sure that we were adopting policies

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 180

1     that ensure that TNC operators are providing

2     accessible vehicles, that sort of thing.

3              So, that's a distinct issue from whether

4     or not TNCs are an important mode to consider when

5     trying to estimate how people are likely to access

6     voting locations that are some distance from them.

7              And I've just given my reasons as to how I

8     think that option is financially burdensome,

9     probably, for people, and, and certainly, I think,

10    you know, if I were the State of Georgia, and

11    wanting to make sure that I were providing good

12    access to people to polling places, I certainly

13    wouldn't expect them to take taxis to get there.

14         Q.   You wouldn't expect most people to take

15    taxis, but, when people have fewer options, they

16    take taxis because that's what they need to do.

17         A.   That's what they have to do, because they,

18    you know, are required to do so.  Right.

19         Q.   That would be the case, certainly, for a

20    lot of disabled people in order to get to any

21    precinct polling place, wouldn't that be, isn't that

22    true?

23         A.   It just depends on the nature of the

24    disability and the extent to which they're able to

25    get around without a vehicle.  Many people with

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 181

1    disabilities are able to get around short distances

2    without a vehicle.

3         Q.    Right.

4         A.    But not longer distances.

5         Q.    But I guess I understood your, I mean, I

6    did under-, do understand your broader point, but I,

7    I understood part of your point in the Cochran

8    article to mean that it's important to understand

9    how, how people actually use app-based ride-hailing.

10        A.    Yeah.  I mean, I think that wasn't the

11   point I was trying to make there.  I think it's, I,

12   I'm, I just published an article on app-based

13   ride-hailing.  I think it's important, obviously.

14   That's why we published the article.

15             But the point about needing to understand

16   the relative accessibility of people with and

17   without disabilities to ride-hailing was a policy

18   issue around making sure that equal accessibility

19   was provided, as opposed to a claim about how

20   important it was for ride-hailing as a option for

21   particular sorts of trips, and particularly for

22   those trips that are the more discretionary trips.

23        Q.    Now, your paper found, and I believe you

24   also mentioned here today, that persons with

25   disabilities are disproportionately located in rural

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 182

1    areas; is that correct?

2            A.    Right.

3            Q.    Is that true in Georgia, as well?

4            A.    Yes.

5            Q.    I think you found about 20 percent of

6    disabled people are in rural areas, does that sound

7    right?

8            A.    I do not remember where that comes from,

9    at the moment.

10           Q.    Table, I think in the Cochran article,

11   Professor Cochran --

12           A.    Oh, is that what you're referring to?  I'm

13   sorry.

14           Q.    That, that, that, I think --

15           A.    I thought you were --

16           Q.    -- is the source of the 20 percent.

17           A.    Okay, right.  I didn't think I --

18           Q.    I'm not sure, you know, what the number

19   may be in --

20           A.    I don't have the estimate for --

21           Q.    But it's a significant.  I think, I think

22   you said elsewhere that they're disproportionately

23   people, persons with disabilities are

24   disproportionately in rural areas; is that correct?

25           A.    You know, I don't remember.  Well, put it

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 183

```
 1    this way.  I believe that's true based on the
 2    results of the analysis, but I have not recently
 3    looked at a distinction between rural and urban
 4    counties in Georgia, and looking at them.  I don't
 5    have data on the distribution of the population in
 6    urban and rural in counties in Georgia.
 7              That said, you know, when the counties in
 8    Georgia that contain 2.5 percent of the population
 9    that did not have drop boxes in 2020 did, were
10    required to have a drop box in 2022, that made drop
11    boxes more accessible.  It slightly increased the
12    accessibility of drop boxes to people with
13    disabilities, so, and those were predominantly or
14    maybe all rural counties.
15         Q.   Would you agree that traveling by a
16    ride-hailing service is going to be significantly
17    faster than public transportation?
18         A.   Well, most of the time, I guess.
19    Ride-hailing doesn't operate in large parts of
20    Georgia at all, so, there's that problem.
21         Q.   But where it operates, excluding any
22    analog to the San Francisco Bay Bridge, would you
23    agree that ride-hailing is generally going to be --
24         A.   Yes.  It's going to be --
25         Q.   -- a much quicker trip?
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 184

1          A.    It's going to be a much quicker trip, and

2     it's, but it's going to be much more expensive, as

3     well, which is why it's, that's one reason why it's

4     not used by people very much.  It's still a very

5     small percentage of trips.

6          MR. FOGELSON:  Counsel, we have been going for

7     about an hour 20.

8          MR. FALK:  Okay, let's --

9          MR. FOGELSON:  Could we take a little break.

10         MR. FALK:  This is a perfectly good time for a

11    break.

12         THE VIDEOGRAPHER:  We're going off the record.

13    The time is 2:41 p.m.

14              (Recess:  2:41 p.m. to 2:56 p.m.)

15         THE VIDEOGRAPHER:  We're back on the record.

16    The time is 2:56 p.m.

17    BY MR. FALK:

18         Q.    Dr. Chatman, you said that ride-hailing is

19    more expensive than public transportation, correct?

20         A.    Yes.

21         Q.    But it's also considerably quicker in most

22    cases, isn't that also true?

23         A.    Yes.

24         Q.    So, a person who took a ride-hailing

25    service might have to spend more money, but, in

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 185

1    exchange, would use less nondiscretionary time;

2    isn't that correct?

3         A.    Yes.

4         Q.    Would you agree that a voter who's

5    concerned about the cost of a ridesharing app could

6    pool together with another voter in her area to

7    lower the cost?

8         A.    The evidence on pooling for ridesharing or

9    for personal trips suggests that very few people do

10   that.  Coordination of these things is, apparently,

11   difficult for people, because they just don't do it,

12   even for commute trips, which are habitual.

13            So, I don't think that it seems like a

14   particularly likely thing for people to do, in terms

15   of actual travel behavior versus what we would hope

16   for.  I think we would hope that people would do

17   that, but they don't typically do so.

18        Q.    Are you aware that Uber and Lyft have

19   offered discounts for voters getting rides to the

20   polls?

21        A.    No.  I'd be interested to know about what

22   those discounts are.  I don't know if they're

23   offering discounts for people to get to drop boxes

24   or DDS locations.

25        Q.    If the discounts do apply to the relevant

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 186

1    voter resources, wouldn't that offset the burden of

2    using ride-hailing, at least in part?

3         A.   Presumably, it would, but, without

4    information on exactly what those discounts are,

5    it's hard for me to think about them.

6         Q.   Some of your nonlitigation work addresses

7    the use of bicycles as a mode of transportation,

8    does it not?

9         A.   Maybe a bit, yes.

10        Q.   And, some of that use is by people without

11   ready access to an automobile; isn't that correct.

12        A.   Indeed.

13        Q.   Did your report in this case consider to

14   what extent voters could use bicycles to get to a

15   drop box, early voting location, or DDS office?

16        A.   It didn't.  The percentage of people who

17   use bicycles in Georgia is very, very small.

18   Conditions for bicycling are, in many places, quite

19   difficult.

20        Q.   Paragraph 62 of your report is another one

21   of these that I'm not sure.  You mention the, that

22   19 percent of black CVAs below the poverty line lack

23   a vehicle in the household, and about 23 percent of

24   CVAs below the poverty line with a reported

25   disability lack vehicle access.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 187

1            Do you see that part?

2        A.   Yes.

3        Q.   And before that, you had said what the

4    rates of poverty are among those populations, that I

5    believe it's 17.4 and 19.7 percent for black CVAs

6    and CVAs with disabilities, respectively, so that

7    we're looking at 19 and 23 percent respectively of

8    the below poverty line people.

9            You compare those to the percentages for

10   white CVAs at or about the poverty line, but do you

11   know what the figure is for white CVAs below the

12   poverty line, which is to say, do you know, what

13   percentage of white CVAs below the poverty line lack

14   access to a vehicle in the household?

15       A.   First of all, what I was trying to do in

16   this paragraph was to sort of to illustrate the

17   range of different groups lacking a vehicle, which

18   ranges all the way from 23 percent to as low as

19   2 percent, depending on these different

20   characteristics we're looking at: poverty status,

21   race, ethnicity.

22           The percentage of those who are white who

23   are below the poverty line and lack a vehicle is

24   less than 19 percent, but I don't have the figure in

25   front of me.  As I recall, it's around 17 percent,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 188

1    so, it's not that different, but it's less than the

2    percentage for black CVAs.

3        Q.    And you address, in the next paragraph,

4    you talk about demand response travel or

5    paratransit.  I believe you use those terms

6    interchangeably, is that right, or --

7        A.    Yeah, I am, as I try to specify in this

8    paragraph, the term, paratransit, is used to refer

9    to demand response services that are, for whom only

10   people with disabilities are eligible.

11            But the data source from the State of

12   Georgia that I'm relying on for this part of the

13   report reports demand response services across the

14   state for every single county in the state, and, in

15   some cases, those services are restricted to people

16   who have disabilities, and some cases they are not

17   restricted to people with disabilities.

18       Q.    Do you have any idea what the proportions

19   are that are restricted and not restricted?

20       A.    Yeah, I think it's, you know, along the,

21   along the lines of 40 percent of the counties, but,

22   of the population, a much higher percentage, because

23   the counties have differential rates of population,

24   so about 40 percent are constrained to people, at

25   least 40 percent, I should say, are constrained to

Page 189

1    people with disabilities.

2         Q.   What other kind of demand response

3    services are there, beyond paratransit?

4         A.   Well, so, there are some counties that

5    provide, they don't have regular transit services,

6    and, instead, there are these scheduled services

7    that people can use by calling ahead to request a

8    ride, and those are similar to paratransit, except

9    that you're just not required to use, to be a person

10   with a disability in order to use them.

11        Q.   You say, each county's demand response

12   transit system, on average, serves only 36 people

13   per day?

14        A.   Yes.

15        Q.   Does that vary by county?

16        A.   It does.

17        Q.   Do you know by how much it varies?

18        A.   It varies from several hundreds to down to

19   maybe 12, or 10, or something like that.

20             And, yeah, I, I didn't cite the state

21   report from which this comes, but it's just all laid

22   out in that report in terms of the county by county

23   statistics.

24        Q.   And you say that demand would be too high.

25             Demand among voters --

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 190

1          A.    People with disabilities.

2          Q.    -- with disabilities.

3          A.    Right.

4          Q.    I think we can restrict this to voters or

5    would-be voters --

6          A.    Voters with disabilities.  Sorry.  Yes.

7    Right.

8          Q.    -- would-be CVAs with disabilities --

9          A.    Yes.

10         Q.    -- would be too high to be met by the

11   demand response system.

12               How do you measure and calculate the

13   demand?

14         A.    Well, as I sort of skeletally outline in

15   paragraph 64, what I did was to estimate what would

16   look like the amount, potential amount of usage of

17   drop boxes or of other, of these other forms, but

18   I'm just focusing on drop boxes and early voting

19   locations --

20         Q.    Yeah.

21         A.    -- and estimate the total number of people

22   who might be interested in using these services and

23   compare that to the capacity on the, the daily

24   capacity and the daily usage of these demand

25   response services by county, and what I found in

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 191

1    doing that analysis, which I don't present here in

2    any detail, is that there is potentially a lot more

3    demand than could be met by paratransit services for

4    access to these locations.

5            Each of these trips has to be scheduled

6    independently.  There is a great deal of, of sort of

7    friction in terms of how you could imagine there

8    being a sort of a pooling effect of people picking

9    someone up, and then picking someone else up, and

10   then going to the location, and so on.

11           So, if you look at the state's data on

12   this, you see that the number of vehicles and the

13   number of drivers and the daily actual usage is

14   really pretty small in comparison to a modest

15   estimate for what percentage of people might be

16   interested in drop boxes.

17           If you're talking about of the disabled

18   population who is eligible to vote, who is citizens

19   of voting age, and if you say that 5 percent or

20   2 percent of them might be interested in drop boxes,

21   you find that there isn't enough capacity to serve

22   that need, and this is true pretty much across the

23   board.

24       Q.  Did you control for access to an

25   in-household vehicle among the disabled population?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 192

1         A.    Oh, no.  I'm only looking -- exactly.  I'm

2    only looking among people who don't have access to a

3    vehicle.  That's right.

4         Q.    So, you restricted it to --

5         A.    I did, even though that's probably not a

6    realistic assumption, because the fact is that

7    people with disabilities, for various reasons, do

8    use paratransit services, even if they have a

9    vehicle available in their household, because they

10   don't always have someone available to drive the

11   vehicle, or they themselves can't drive the vehicle,

12   in some cases.

13        Q.    Just if I can finish my question.

14              You did limit your analysis to CVAs with

15   disabilities without access to a household,

16   in-household vehicle when you calculated demand --

17        A.    That's correct.

18        Q.    -- before.

19        A.    Yes.

20        Q.    And, when you calculated this demand, did

21   you take into account the number of days available

22   to use a drop box or early voting location?

23        A.    So, what I've done in the past when I

24   looked at this issue which informed this analysis

25   was to look at the percentage of people who used

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 193

1    drop boxes towards the end of the period in which

2    the drop boxes are available.

3                People are, voters are notoriously late.

4    They like to make their decisions late, they do

5    things at the last minute, and so a very high

6    percentage of individuals can be expected to want

7    to, to try to drop off ballots on the last few days,

8    not in the run-up, but in the last, the day before

9    election day or the day prior to that, so it's a

10   big, you know, something like 40 percent of ballots

11   get returned on those days.

12       Q.    So, your assumption in finding that demand

13   would outstrip supply of demand response for

14   paratransit services is based on the likely volume

15   of the last few days of the voting period?

16       A.    Having most of them.

17       Q.    And having, counting, as you said, I

18   think, for 40 percent or thereabouts in the last two

19   or three days of the period.

20       A.    That's right.

21       Q.    Did you calculate the demand for the time

22   before that?

23       A.    No, I did not.  I was focused on looking

24   at when you expect the bulk of them to be delivered

25   or to be desired to be delivered.  There are about

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 194

1    130,000 citizens of voting age without vehicles

2    reporting a disability in, in the State of Georgia,

3    and that's a pretty big number for paratransit

4    services in the state to be serving, even if we only

5    talk about a fraction of them being served.

6    They're, we're talking about, you know, a few

7    thousand people, and we don't have that kind of

8    capacity on a day or on two days.

9         Q.   Would the people who require demand

10   response to vote at a drop box or early voting

11   location also require demand response transportation

12   to vote in-person?

13        A.   Some of them might, yes.  That's what I

14   was referring to earlier about the issue of -- oh,

15   okay.  What I was referring to.  Sorry.

16             What I'm talking about earlier was

17   something different.  I was talking about the fact

18   that people with access to a vehicle in their

19   household might also need paratransit demand

20   response transportation, but, regardless of what,

21   what mode they were using, that might need that.

22        Q.   Might they need that to get to a mailbox,

23   as well?

24        A.   It's just less likely, the shorter the

25   distance is, and it's not clear that people can't

Page 195

```
 1    have someone else deliver their own, their ballot to

 2    a mailbox.

 3         Q.   And, I think you alluded to this, but I

 4    just want to get on the record.

 5              What data were you relying on in making

 6    these calculations?

 7         A.   I'm looking at the data that I had used in

 8    previous cases that had lots of information on drop

 9    box deliveries and delivery dates from Colorado and

10    Washington, and I was looking at, and I was assuming

11    a relatively small percentage of the population,

12    around 5 percent of the population that would want

13    to use a drop box.

14              So, that, that figure was just a kind of a

15    what I thought would be a low fraction.  Now, as it

16    turns out, for the 2022 election, the fraction of

17    people who actually voted using that, that method

18    was probably lower than that, based on the data

19    you've just shown me, but, in the 2020 election, I

20    think it was, potentially, much higher than that.

21         Q.   And I also, I was -- thank you for that

22    answer.

23              And I, also, you mentioned the data you

24    used to estimate capacity of the demand response.

25         A.   Uh-huh.
```

Daniel G. Chatman , Ph.D.                        May 16, 2023
Georgia Senate Bill 202, In Re

Page 196

1          Q.    What was your data source there?

2          A.    There's a, so, I'd be happy to provide

3     this to you later, because it's not cited in the

4     report.  It's a Georgia state report on demand

5     response transit services for each county in the

6     state.

7               The state require each county to provide

8     the data, and then the data were made available in a

9     report by the state at, and we retrieved that from a

10    state, I think it's the EDD department.  I'm not

11    remembering exactly which department we retrieved it

12    from.

13    *RQ  MR. FALK:  Counsel, can we get that link

14    afterwards.

15              MR. FOGELSON:  Sure.

16    BY MR. FALK:

17         Q.    Sounds like this was something you were

18    able to retrieve online.

19         A.    Yes.  It's easy to get.

20    *RQ  Q.    Yeah, if you --

21         A.    Yes.

22         Q.    -- can get that link.

23              You refer in this section of your report

24    to high wait times.  Sorry.  You refer, in the

25    section, you referred to high wait times for demand

Page 197

1    response, slash, paratransit.

2                Is that endemic to demand response

3    transportation?

4         A.    It is, but it's likely to be exacerbated

5    at peak times.

6         Q.    You claim that demand response won't

7    alleviate travel to early voting locations and drop

8    boxes, and I think you just explained your

9    rationale --

10        A.    Right.

11        Q.    -- for the drop boxes.

12               What data supports the conclusion that

13    demand response won't alleviate travel to early

14    voting locations?

15        A.    Yeah, we looked at the similar data.  My

16    understanding is that people with disabilities have

17    been taking up early voting and ballot drop box

18    options at much higher rates than the general

19    population, and so for early voting in particular

20    that we have a, a larger group that is being, that

21    is interested in using it and has demonstrated their

22    interest in using it.

23               So, the, so, looking at those data, again,

24    this is, I should say that this analysis is not as,

25    as detailed as the other analysis that I presented,

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 422 of 691
Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 198

 1    but, given that higher rate of use, especially by

 2    people with disabilities, there's a sort of a

 3    similar problem with expectations for peaking of

 4    demand for early voting, similar kind of phenomenon

 5    where it's pronounced more towards the, the days

 6    towards the end of the early voting period, and,

 7    under those circumstances, a similar phenomenon is

 8    likely to occur where the demand outstrips the

 9    supply.

10        Q.   And that is based on the same data sources

11    that you mentioned before, or was there, were there

12    additional data sources when you were determining

13    high demand for early voting locations?

14        A.   The demand for early voting locations

15    estimate is, from data presented in the complaint

16    about the fraction of people, one of the two

17    complaints, I should say, about the fraction of

18    people who, with disabilities who have used

19    alternative voting options, other than in-person

20    polling places.

21        Q.   You also talk about adding in the

22    scheduling time necessary to use demand response

23    transportation?

24        A.   I just mentioned it as another impediment,

25    yes.  It's just, it's something that makes things

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 199

1    more difficult, because you have to plan in advance,

2    and you have to schedule the service, in addition

3    to, unlike calling a taxi, let's say, where you

4    don't have to schedule in advance.  You just call

5    the taxi.  It's not like that.

6         Q.   Isn't voting the kind of thing you can

7    schedule a day in advance with, reasonably easily?

8         A.   Well, you know, as to whether it's

9    reasonably easy is something that I think those of

10   us who haven't used demand response transit can't

11   really speak to.

12            I just think for my colleagues who work on

13   demand response transit, what they have said is that

14   it can be difficult to anticipate exactly what time

15   of day you're going to be able to go and coordinate

16   that with other family members, as well as simply

17   having to conduct the scheduling itself.

18            So, it's just another impediment.  It's

19   all these little things, you know, they add up to

20   make it harder and harder for people to manage to do

21   it.

22        Q.   We've, I think we agree that people with

23   disabilities are less likely to be able to drive

24   themselves.

25        A.   Right.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 200

1          Q.   And so their options are going to be
2     limited no matter where a voting resource might be,
3     isn't that correct, unless it's, you know, in the
4     front hall of where they live?
5               Aren't they going to have to arrange
6     transportation through either a friend or family
7     member, or public transportation, taxi,
8     ride-hailing, demand response?
9          A.   If the voting resource is closer to them,
10    and they do want to cast their ballot in-person,
11    they're more likely to be able to do it, even if
12    they have a disability.
13         Q.   But they'll still have to arrange
14    transportation, unless it's quite close, if they're
15    mobility challenged, at least; isn't that correct?
16         A.   When you say, arrange transportation, when
17    we talk about public transportation, that's not
18    arranged transportation.  It's just taking public
19    transportation, so, there's no arranged
20    transportation in that case.
21              If you're in an electric wheelchair, you
22    can make your own way some distance, as well.  If
23    you have a mobility impairment which still enables
24    you to walk some distance, then you can make it to
25    the transit stop, and then you can make it,

Daniel G. Chatman , Ph.D.                                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 201

1    hopefully, from there to the location to drop off

2    your ballot.

3                 These are things that don't require

4    advance arrangement.  It just depends on the nature

5    of the disability.  There are different levels of

6    disability.  If you're --

7         Q.   Well --

8         A.    -- blind, as well, if, there's a lot of

9    options for you.  In certain locations, as long as

10   the ballot box is near enough to you, you can make

11   it.  It's just going to be harder than if you don't

12   have a disability.

13        Q.   But you still have the disutility, and,

14   including added time that's associated with public

15   transportation, even if you were able to make it to

16   the public transportation stop, correct?

17        A.   I'm not sure what you're trying to say.  I

18   mean, I think, you know, we expect people to, we

19   expect people to get places, and they do, and they

20   do that with and without disabilities every day.

21   That does happen.

22                 The question is how difficult it is for

23   them, and all I'm saying is that when something's

24   farther away, it's more difficult, including if you

25   have a disability or not.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 202

1          Q.    You say that demand response could

2     alleviate the burden of traveling to the DDS.

3          A.    Uh-huh.

4          Q.    Why, why is that different from --

5          A.    It's not as concentrated in time, and it

6     isn't so, it isn't, you're not actually casting your

7     ballot, you're just getting your ID, so I can see

8     that demand response is more likely to have a role

9     to play for a DDS visit.

10         Q.    I don't know about the Georgia DDS, but

11    the time in the California DMV to get anything done

12    is longer than --

13         A.    Well --

14         Q.    -- I ever had to wait to vote.

15         A.    -- that's true, but I was just talking

16    about the travel component, as opposed to the, yes,

17    there's the time to get the ID.  I'm sure that takes

18    a while.

19         Q.    You note, and we've discussed, you note

20    paragraph 66, and we discussed already that in 2020,

21    2.5 percent of Georgia CVAs had no drop box

22    available at all, right?  There was no drop box.

23         A.    Right.

24         Q.    And I guess I should ask you, is it your

25    understanding that a voter has to use a drop box in

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 203

1    the county in which he or she is registered?

2         A.    That's correct.  That's my understanding.

3         Q.    So, for those voters, travel time went

4    from infinity to something else, correct?

5         A.    Yes.  They were counted, however, as

6    having a burden in 2020, because they couldn't

7    access a drop box.

8         Q.    So, that was how you accounted for them.

9    You kind of just put them --

10        A.    I just put them in the over half an hour,

11   over, sorry, over an hour round trip category --

12        Q.    Thank you.

13        A.    -- which is why there's some interesting

14   results when you'll move to 2022 from 2020, because

15   2.5 percent of the population has, almost

16   2.5 percent of the population ended up having

17   nonburdened access.

18        Q.    At paragraph 68, you refer to, it's a

19   single one.  Paragraph 68, you refer to a 52.9 --

20   never mind.  I'm not even going to ask you that

21   question.

22        A.    Okay.

23        Q.    I didn't read it, I didn't read it when I

24   was taking my notes.  Never mind.

25        A.    Okay.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 204

1      Q.    You answered it, actually, in the text.

2      A.    Okay.

3      Q.    Even easier than I thought.

4            Moving on to paragraph 71, when you do a

5      lot of your, several of your comparisons.  As I

6      understand it, in 2020, 6.5 percent of black CVAs

7      had a travel burden, and in 2022 it was 7.3 percent.

8            Is that, am I sorting those numbers out

9      correctly?

10     A.    Right.

11     Q.    And moving to the next paragraph, in 2020,

12     10.1 percent of CVAs with disabilities had a travel

13     burden, which means 89.9 percent had less than an

14     hour travel burden, and now only 9.8 percent of CVAs

15     with disabilities have a travel burden, so that more

16     than 90 percent do not.

17           That indicates that SB 202 provided a

18     small but greater accessibility for persons with

19     disabilities to use drop boxes, correct?

20     A.    Right.  People with disabilities who lived

21     in the counties that newly provided drop boxes had

22     better accessibility, and people with disabilities

23     who lived in the counties that had drop boxes had

24     accessibility that went worse, that got worse, on

25     average, but the net of that was to improve things

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 205

1      slightly as the average across the state.

2           Q.    Any building in which a drop box or early

3      voting location is located would have to comply with

4      the Americans with Disabilities Act, would it not?

5           A.    I assume as much, because the ADA applies

6      pretty universally.

7           Q.    Well, talking about, when you talk a

8      little bit further down, we talk about early voting

9      locations, and you say in paragraph 73 that early

10     voting locations provide an option for voting that

11     increases the likelihood of finding a convenient

12     time or location to vote.

13           Do you see that?  Do you see that part

14     there?

15           A.    Yes.

16           Q.    Do you still agree with that statement?

17           A.    Uh-huh.

18           Q.    In the next paragraph, you say that

19     3.4 percent of CVAs would experience a travel burden

20     exceeding 60 minutes to access an early voting

21     location, and that would mean, what, 96.6 percent

22     would not experience a travel burden; is that how

23     that works?

24           A.    Right, so that only about 220,000 people

25     would experience a travel burden.

Page 206

1    Q.    And then you go on to say that, you assert

2    that black CVAs are more than twice as likely to

3    have a burdensome trip to an early voting location

4    than non-Hispanic white CVAs, and CVAs with a

5    disability are more than three times likely, and you

6    say that would be described in more detail below.

7         I believe that's in paragraph 79, where

8    you, and can you, what are the data supporting the

9    conclusions and numbers here?  How did you arrive at

10   those numbers in paragraph 79?

11   A.    Oh, how did I arrive at the numbers in

12   paragraph 79?

13   Q.    Yes.

14   A.    The same way that I've arrived at the

15   numbers throughout the report, as described in the

16   detailed method section, so it's, that's a pretty

17   broad question.  It has to do with calculating the

18   travel times from the home locations based on access

19   to a vehicle and not having access to a vehicle,

20   depending on whether the household has access to a

21   vehicle or does not, and their travel times to the

22   nearest early voting location.

23   Q.    So, let me see if I have this right.  I

24   should have it right by now, but, you calculate the

25   travel times by the three modalities that you

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 207

1    examine --

2            A.    Right.

3            Q.    -- to a particular voting resource from a

4    particular centroid block group.

5            A.    Right.

6            Q.    Then you, within that block group, you

7    determine how many black voters and how many voters

8    without vehicles?

9            A.    How many black voters without vehicles.

10           Q.    Right.  And you determine, I think we

11   talked about how you have to use different data sets

12   to --

13           A.    Right --

14           Q.    -- do that?

15           A.    -- and I use the poverty rate at the block

16   group level to help mediate that estimate of auto

17   ownership.

18           Q.    And then having estimated the number of

19   black voters without household access to a vehicle,

20   and, respectively, voters with disabilities --

21           A.    And non-Hispanic white --

22           Q.    -- CVAs --

23           A.    -- and non-Hispanic, non-Hispanic CVAs

24   without, sorry, non-Hispanic white CVAs, and Latinx

25   CVAs and CVAs without disabilities, CVAs with

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 208

1    disabilities.  Those are the five groups that are

2    estimated down to the block group level, both with

3    and without vehicles, based on the mediating

4    variable of poverty status.

5          Q.    Okay.  So, you used poverty status as, as

6    a --

7          A.    As a way to better predict, to better

8    impute, estimate, auto ownership at the block group

9    level, so, in other words, I do have data about

10   people's poverty status --

11         Q.    Uh-huh.

12         A.    -- at the block group level.

13         Q.    At the block group level.

14         A.    I just don't have people, don't have

15   people's auto ownership.

16         Q.    So, you have race and poverty status?

17         A.    Yes.

18         Q.    And then auto own- --

19         A.    And disability.

20         Q.    Take down to the --

21         A.    Auto ownership we take down as a factor

22   from the PUMs date, the PUMA, the PUMA, the public

23   use microdata area.

24         Q.    Right.

25         A.    Can we get a, we can get a factor for the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 209

1    percentage of CVAs who are African-American who are

2    poor who don't have a vehicle and who do have a

3    vehicle and who are not poor below the poverty level

4    and do have a vehicle and don't have a vehicle, so

5    that we have four different factors that we can use

6    from that PUMA for each of the racial groups, or

7    each of the five groups, I should say, three of them

8    are race, race, ethnicity, and two of them are

9    disability and nondisability.

10             So, that's a total of, you can call it 20

11    factors at the PUMA level that are used to estimate

12    auto ownership at the census block group level

13    within each of the PUMAs that the census block

14    groups fall in.

15        Q.   I think it's pretty clear.  At this point

16    in the afternoon, I think I'm following it, but --

17        A.   I try to be clear.

18        Q.   It seems pretty clear, but I won't try to

19    replicate it.

20             In paragraph 78 you say that black CVAs

21    and persons with disabilities are much less likely

22    to have auto access and then access in the

23    household, and I believe, and we can find these

24    numbers, if you want, but then I imagine you're

25    relatively familiar with these numbers.

Page 210

1              I believe, then, the proportion of black

2       CVAs having an auto in the household was about

3       91 percent.

4              A.    Something like that, yes.

5              Q.    And people with disabilities, a little

6       lower, 89 percent or so?

7              A.    Yeah, lower, but I'm not exactly sure by

8       how much at the moment.

9              Q.    95.4 percent for the entire population,

10      and I think about 97 percent for non-Hispanic white

11      CVAs have access to a vehicle, so you're looking at

12      a difference between 91 percent and 97 percent or

13      89 percent --

14             A.    Uh-huh.

15             Q.    -- and 97 percent of the white, I think

16      it's the white nondisabled is 97 percent.

17             A.    Yes.

18             Q.    How much of this difference is

19      attributable to differences in urban and rural

20      residency?

21             A.    Well, when you say, attributable to, I

22      suppose what you're trying to get at is correlated

23      with.

24             Q.    Well, correlated with, and, let's do one,

25      let's do one piece at a time.  Let's do correlated

Page 211

1    with, first do correlated with.

2              I mean, isn't it true that urban residents

3    are less likely to have a vehicle in the household?

4         A.    It's true, yes.

5         Q.    Do you know how much, what that difference

6    is?

7         A.    I didn't calculate it for Georgia.

8              So, in general --

9         Q.    Do you know generally what it is?

10        A.    In general, the rate of auto ownership in

11   urban areas compared to rural areas, the rate of, I

12   should say, of carless households can range as high

13   as 10 percent in urban areas, and tends to be pretty

14   low in rural areas, probably something more like

15   2 percent, if you're talking about the fraction of

16   people who don't have household auto.

17        Q.    Okay.  And are black CVAs in Georgia

18   disproportionately concentrated in urban areas?

19        A.    Yes.  I should say that white CVAs in

20   Georgia are also disproportionately concentrated in

21   urban areas, I mean, what I, compared to rural

22   areas.

23              If what you're getting at is, is the

24   fraction of people in urban areas higher, is there a

25   higher share of blacks in urban areas than there are

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 212

1     in rural areas, yes, that's true, as well.

2          Q.   I mean, I guess, I think that's my

3     question.  I think my, or my question was, are a

4     higher percentage of black CVAs in urban areas than

5     the percentage of, is the percentage of black CVAs

6     in urban areas higher than the percentage of white

7     CVAs in urban areas.

8          A.   I don't think that's what you're asking,

9     because that's, the answer to that is no.  The

10    percentage of white CVAs is still higher in urban

11    areas.

12         Q.   Well, no, I wasn't asking whether there

13    were more white CVAs than black CVAs.

14              I mean, of the statewide Georgia

15    population, the statewide white CVAs, is the

16    proportion of that group in urban areas lower or

17    higher than the proportion of black CVAs?

18              Let me give an example.  Say there's,

19    30 percent of black CVAs live in urban areas, and

20    say -- I'm making this up -- 25 percent of white

21    CVAs live in urban areas, so I'm asking, can you

22    make that, compar-, are you aware of the numbers, or

23    is it, do proportionately more black CVAs live in

24    urban areas than white CVAs, a higher proportion of

25    the black CVA population concentrated in urban areas

Page 213

1    than white CVAs?

2        A.   It is.  The vast majority of both white

3    CVAs and black CVAs live in urban areas, but it's a

4    higher percentage for blacks than for whites.

5        Q.   Do you know how much higher?

6        A.   Maybe 5 percent higher.

7        Q.   And in paragraph 78, as you say, persons,

8    black CVAs and persons with disabilities are much

9    less likely to have auto access in the household.

10            And we know what the numbers are there.

11   Then we just discussed those numbers a little bit.

12            And then you say, that makes it

13   substantially more likely that they will experience

14   a travel burden accessing the early voting location.

15            What do you mean by, substantially more

16   likely?

17       A.   Well, in this case, I guess, in paragraph

18   79, I kind of spell it out.  It's twice as likely or

19   so, a bit more than twice as likely.

20       Q.   So, you're referring to your conclusions

21   in and data in paragraph 79.

22       A.   Well, what I'm trying to get at is that

23   what's driving this difference is largely access to

24   an auto.  That's what I, that's what I say when I

25   say, makes it substantially more likely.  It's what

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 214

1      leads to the fact that, it's what leads to this

2      outcome, this outcome being that black CVAs are

3      twice as likely to have a long trip to access a drop

4      box than are white CVAs.

5          Q.   How much of the differential

6      transportation burden on persons with disabilities

7      reflects the differential burden for all kinds of

8      transportation for persons with disabilities?

9          A.   Yeah, I, you've asked a question like this

10     earlier, and I'm not sure what you're, I'm not, I'm

11     trying to understand what you're getting at.  I'm

12     not sure if I understand the question.

13         Q.   Isn't it true that transportation is

14     generally more burdensome for persons with

15     disabilities --

16         A.   Sure.

17         Q.   -- in part because of their lesser access

18     to automobiles, and in part because of some of them

19     need to use transportation modalities that require

20     more accommodation?

21         A.   I think --

22         Q.   I mean, they can't take a cab that's not

23     wheelchair, you know, it's not --

24         A.    If, yeah, if they happen to be someone who

25     has a wheelchair that they need to use.  Of course,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page  215

1      lots of people --

2             Q.   Lots of people don't.

3             A.   -- with disabilities have, yeah, they have

4      other disabilities, such as lack of sight, or being

5      deaf, and those sorts of things, that make it

6      difficult for them to drive or impossible for them

7      to drive.

8             So, yes, so, I think anyone who can't rely

9      on a car is, is more challenged.  In certain parts

10     of the state with access to amenities nearby, you

11     can make it okay without a car, and so that's why

12     there is a, in, for example, a concentration of

13     people living without vehicles in dense places.

14     It's because in those places, generally, there's

15     better accessibility to things.

16            The exception might be to voting, but

17     there's pretty much better accessibility to things

18     like, let's say, grocery stores, and other kinds of

19     shopping, and jobs, even.

20            But the SB 202 rules and other factors

21     that are giving rise to the distribution of voting

22     opportunities have meant that those dense places

23     don't have correspondingly dense options for voting.

24            Q.   But don't you mean, correspondingly dense

25     options for voting, you mean drop boxes?

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 216

1          A.    I mean everything.  Drop box, early voting
2     locations, polling places, even, and --
3          Q.    How did SB 202 change the distribution of
4     early voting locations?
5          A.    No, I'm not saying that it did.  I'm just
6     saying that under SB 202 and whatever other
7     constraints there are on the provision of voting
8     locations, the resulting landscape of density
9     doesn't compare to the market provided dense,
10     landscape of density.  It's not the same, for
11     whatever reason.
12          Q.    When you say, the market provided
13     landscape of density, what do you mean?
14          A.    I mean things like stores.  I'm talking
15     about the private sector, private sector
16     destinations, jobs, stores.
17          Q.    So you're saying those are better
18     spatially distributed --
19          A.    I am saying that, yeah.
20          Q.    -- for persons with disabilities --
21          A.    For persons --
22          Q.    -- or other transportation barriers?
23          A.    In dense areas.  What I'm saying is that
24     in places that have density generally, what that
25     density consists of is precisely those destinations.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 217

1          But I'm not speaking to whether this is

2     true for people with disabilities who live in parts

3     of the state that are rural.  I mean, obviously,

4     rural areas don't have as much.  That's what makes

5     them rural.  They don't have as many of those

6     destinations.  But I was speaking to the dense parts

7     of the state, you know, per your earlier question

8     about density.

9          Q.   In calculating the number of CVAs who face

10    a burden, travel burden to get to the DDS office, I

11    think, I think you already said that you did not

12    evaluate what proportion of those people only had a

13    photo ID; is that correct?

14         A.   That's right.  I, and I responded to that

15    point by noting the fact that in general, the

16    distribution of travel burdens for these locations,

17    as for the other locations, is really highly

18    concentrated among those who don't have access to a

19    vehicle, which is, what I'm claiming is the more

20    likely population, the most likely population in

21    census data as to be used as a proxy for people who

22    don't have a driver's license, or, as to other forms

23    of ID, I obviously can't speak to that.

24         Q.   That would include the voter photo ID

25    that's available --

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 218

1          A.    Right.

2          Q.    -- from either DDS or registrar, and then

3     the other types of nonphoto ID that can be

4     substitutes.

5          A.    Right.

6          Q.    So, that's, so, your burden calculations

7     depend on the factors that we discussed very

8     recently about auto ownership, imputing auto

9     ownership based on poverty --

10         A.    Right.

11         Q.    -- and cross-checking that by race and

12    disability status within block group.

13         A.    Yes.

14         Q.    Let's look at table 3 in paragraph 86,

15    page 36.  And this is, I guess, another way of

16    slicing the data.  This is the percentage of each of

17    the identified groups that are facing travel burdens

18    by destination.

19         A.    I think it's just a summary table of data

20    that was already presented.

21         Q.    Right.

22         A.    Yeah.

23         Q.    Just a, it's another, and, looking at it

24    in this, from this perspective, even just comparing

25    ballot drop box access, the share of each group

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 219

1      facing a travel burden to ballot drop boxes, it went

2      down for Latin CVAs by a little bit, correct?

3              A.    Yes.  For Latinx, it went down.

4              Q.    And a little bit for CVAs with

5      disabilities.

6              A.    Right.  Again, this is a function of the

7      fact that 2.5 percent of the state didn't have

8      access at all to ballot drop boxes before, and was

9      newly required to have such access, and, meanwhile,

10     at the same time, the counties that did have access,

11     some of them had significant restrictions on the

12     number of ballot drop boxes that they could provide,

13     and so the, you'd expect that number to go up quite

14     a lot -- sorry -- to go down quite a lot, but it

15     doesn't go down nearly as much because of the fact

16     that there's been a removal of drop boxes in most

17     parts of the state.

18             Q.    And the, the higher share of point, almost

19     9/10ths of a percent among black CVAs that face a

20     travel burden to drop boxes between 2020 and 2022.

21             A.    Uh-huh.

22             Q.    But when we look at early voting

23     locations, the location is, as I read it, a smaller

24     proportion of each group, including black Latin and

25     black CVAs, Latin CVAs and CVAs with disabilities,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 220

1    all have smaller proportions facing a travel burden

2    to an early voting location than face a travel

3    burden to 2020 ballot drop boxes.

4            Is that correct, at least, across the

5    board here?

6        A.    Yes.

7        Q.    And when you say in the next paragraph,

8    you talk about the percentage of CVAs without an

9    auto in the household that had travel burdens to

10   drop boxes in 2020 and 2022, did you use the same

11   technique we just described recently whereby you

12   assessed how many CVAs lacked an auto in the

13   household, and, I take it, for these calculations,

14   you did not separate out by race, but you just

15   separated out by auto in the household, and then --

16       A.    That's --

17       Q.    -- plotted out the trips from there?

18       A.    Yeah, so, with, yes, with this sentence,

19   which states, with the generally reduced access to

20   ballot drop boxes in 2022, the rate of those without

21   access to a vehicle who had a round trip to access a

22   ballot drop box exceeding an hour, increased by

23   almost a third to more than 84 percent.

24           That does not break out by race,

25   ethnicity, or by disability status.  It's just for

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 221

1      the whole population of people who don't have access

2      to a vehicle.

3             Q.    And by, access to a vehicle, again, this

4      means just within the household?

5             A.    Within the household.  That's right.  Yes.

6             Q.    And then you reach some conclusions in the

7      final paragraph of your opening report about people

8      under the poverty line.

9             Do you base the conclusions you reach on

10     any data --

11            A.    I'm sorry, I did it again.  My bad.

12            Q.    Let me just ask that question over.  You

13     reach some conclusions in paragraph 92 about the

14     effects on people under the poverty line, and, my

15     question, did your conclusions take into account any

16     data on possession of an ID by people under the

17     poverty line?

18            A.    No.  Again, I don't have data on people's

19     possession of ID.

20            Q.    And, did you examine how often persons

21     under the poverty line vote absentee?

22            A.    No, I did not.

23            Q.    You talk, you say that the travel

24     durations are likely to dissuade affected voters

25     from availing themselves of these services.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 222

1          What do you mean by, these services?

2          A.    I mean of these, these res-, these voting

3     resources that I've been mentioning, as I've

4     referred to them today; drop boxes, early voting

5     locations, DDS locations.

6          Q.    And, did you say earlier that you do not

7     have data to quantify the extent to which people are

8     dissuaded from voting by travel burdens; is that

9     correct?

10          A.    That's correct.  What I would say is that

11     there's plenty of evidence that people avoid making

12     longer trips in the travel behavior literature, and

13     the trip to vote is a trip, like other trips.

14          In that sense, it is well established that

15     people avoid taking trips that are longer.

16     Destinations that are farther from them are less

17     favored and less used.  When destinations are far

18     enough away, people don't travel to them.

19          Q.    And you say that this may help discourage

20     voting altogether by reducing ease and convenience.

21          What is your basis for saying that travel

22     duration may help to discourage voting altogether?

23          A.    Well, you know, if you think about this in

24     terms of the, the generalized costs of activities,

25     as these costs become incrementally greater over

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 223

1    time, people are less likely to engage in whatever
2    those activities are.  This is, sort of, again, a
3    well established social scientific fact about
4    people's behavior, that they don't do things that
5    over time become more and more costly to them.
6              And, it's simple as that, so I probably
7    shouldn't have said, may.  I probably should have
8    said, will, because it's, insofar as we have any
9    rules of human behavior that we can constitute as
10   really rules, that will be one of them.  When things
11   get more expensive, people do less of it.
12       Q.   But you can't quantify that.
13       A.   I did not quantify it.
14       Q.   And the literature with respect to voting
15   suggests that there are many factors, including
16   cost, that affect whether a person will vote in a
17   particular election, isn't that true?
18       A.   That's true, and it strikes me that public
19   policy's role in this is to ensure that the costs
20   that do have some role for public policy to play in
21   should be reduced, because we all have an interest
22   in people voting, and we don't control some of those
23   other factors that you're referring to.
24       Q.   Let's turn to your rebuttal report.  It's
25   the wrong document.  No wonder I'm confused.  Here

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 224

1      it is.  I have my kind of marked up copy.  Looking

2      at Dr. Grimmer's report, and they weren't lining up.

3              But, let's look at paragraph 6 of your

4      rebuttal report, which is on page 3, and then you

5      say that individuals who access a drop box by public

6      transit or on foot, quote, are likely among the

7      majority or plurality of voters who do use the

8      nearest drop box.

9              And by, nearest drop box, you're talking

10     about the nearest drop box to their home, correct?

11         A.   Yes.

12         Q.   What is the basis for saying these

13     individuals, which is to say, those using public

14     transportation or traveling on foot, are likely to

15     use the nearest drop box?

16         A.   I go into this in some more detail at

17     paragraph 14.  So, at paragraph 14, I discuss the

18     fact that those who experience a travel burden are

19     almost entirely those who are not driving, in other

20     words, those who don't have an access to a auto in

21     their household.

22         Q.   Uh-huh.

23         A.   First of all, because of the fact that

24     people who are using transit or walking are much

25     less likely to find trip chaining convenient, being

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 225

1   able to combine a couple of different trips.

2              If you happen to have a drop box that's

3   located right at your grocery store, that might

4   work, but, if it's located a mile away from your

5   grocery store, it might not really work on transit

6   or on foot the same way it would work if you were

7   driving.

8              And, in general, we don't find that trip

9   chaining is common among people who use public

10  transportation or walk, not nearly as much as among

11  those who drive.  In fact, it's thought that it's

12  precisely because of the ability to chain trips in

13  this way that people avoid public transportation and

14  walking, because they can do much more than they can

15  on public transportation or on foot, on, using a

16  car, so, there's that issue.  So, there's, that's

17  one of the reasons that I cite there.

18             I also say that because most of those,

19  many of those or a higher percentage of those

20  without vehicles also have lower income.  They're

21  less likely to be engaged in potentially compatible

22  trip activities, such as work, purchases, or

23  entertainment, in the first place.

24             So, their number of trips is lower.  The

25  time they might spend traveling might be higher

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 226

1    because they're using, might not be that much lower

2    because they're using slower modes, but they tend to

3    take fewer trips.

4            And, so, it's for those two reasons that I

5    talk, that I discuss in the report that I wanted to

6    bring your attention to.

7            And I guess the other thing that I could

8    say in support of that claim, at paragraph 6, is

9    that in general, the trips that people take among

10   those who rely on alternative modes to driving tend

11   to be shorter and tend to be more clustered around

12   the home than people who have access to a vehicle.

13       Q.   But, why is trip chaining harder for

14   people without a vehicle?  Doesn't it depend on

15   where they're going and how much longer the chained

16   trip is?

17       A.   There's plenty, if what you're getting at,

18   isn't there heterogeneity among people who are using

19   public transportation or walking, yes, there is.

20   So, I'm trying to make generalizations, as we are in

21   this work, we have to make generalizations across

22   groups, but, in general, nevertheless, it's harder,

23   absolutely --

24       Q.   Well, how much --

25       A.   -- to trip chain.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 227

1          Q.    Okay, didn't mean to interrupt.

2                How much, how much harder?  What's the

3     differential in trip chaining between people with

4     cars and people who use public transportation?

5          A.    I don't have that statistic available

6     right now.

7          Q.    Don't people commute by public

8     transportation, correct?

9          A.    Yes.

10         Q.    And, lots of people --

11         A.    Not --

12         Q.    -- commute to many areas.

13         A.    Not lots of people in Georgia, but, some

14    areas, yes.  Commuting is one of those trip purposes

15    that lends itself to public transportation, but the

16    percentage of people who use public transportation

17    for other trip purposes, trip purposes other than

18    work, is much smaller than it is for work.

19         Q.    Do you know how many of the people without

20    household vehicles in fact use public transportation

21    to commute?

22         A.    I didn't look at those data, but you have

23    to keep in mind that the fraction of people without

24    vehicles who have a paid place of employment, as

25    reported in the census, is lower than the 60 percent

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 228

1      for the general population.  It's probably more

2      around 45 percent, somewhere around there.

3            Q.   But the Georgia unemployment rate's not

4      40 percent.

5            A.   The unemployment rate is calculated by

6      estimating the fraction of people who are either

7      actively looking for work or want a job --

8            Q.   Right.

9            A.   -- in comparison to the people who

10      actually have a job.

11            Q.   Right.  So, you're talking, when you're

12      talking about 40 percent of people are not employed,

13      you're talking retirees, fulltime students --

14            A.   Retirees, fulltime students, people who

15      are not looking for work, people who are working in

16      the home and not being paid, those sorts of things,

17      yes.  And people who are looking for work and are

18      not employed.

19            Q.   And, a trip to a central location, whether

20      for employment or shopping or some other purpose,

21      could put a voter close to a drop box, couldn't it?

22            A.   In theory, it could, yes.

23            Q.   So, what is the basis for concluding at

24      the bottom of paragraph, the bottom of paragraph 14,

25      the bottom of the page, that it is unlikely that

Daniel G. Chatman , Ph.D.                                May 16, 2023
Georgia Senate Bill 202, In Re

Page 229

1    trip chaining will produce any notable reduction in

2    travel burden?  What is your basis for concluding

3    that any reduction would not be notable, first?

4         A.   I've already said that I don't think it's

5    likely that a drop box is located in a central

6    location where people are already going.  We don't

7    have any evidence that that's the case.

8         Q.   And that is your basis for thinking trip

9    chaining won't --

10        A.   I've already described the other -- sorry.

11             Go ahead.

12        Q.   That, your, you say that you believe that

13   drop boxes are not in central locations.

14        A.   I believe drop boxes are not typically

15   located next to grocery stores and other central

16   locations where people are, like to, likely to

17   travel, and that they are likely to be accessed from

18   the home location, for people who don't have

19   vehicles.

20        Q.   And your basis for likelihood is, is there

21   anything you could add or would want to add as a

22   basis for this likelihood, apart from what you've

23   just described?

24        A.   No.  I'm done.  Yeah.

25             MR. FALK:  Can we go to the Collingwood

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 230

1    article.

2         (Exhibit 10 was marked for identification by

3    counsel.)

4    BY MR. FALK:

5         Q.    Exhibit 10 is an article that you respond

6    to in your rebuttal report, Is Distance to Drop Box

7    an Appropriate Proxy for Drop Box Treatment, a Case

8    Study of Washington State, by Loren Collingwood and

9    Ben Gonzalez O'Brien.

10            Are you familiar with this article, Dr.

11   Chatman?

12        A.    I'm familiar with Dr. Grimmer's references

13   to this article.  I haven't seen the article before.

14        Q.    I think the page numbers are all under the

15   staples, yes.

16            This is the article that found, at page

17   608, which is, I think, the fifth page of this

18   print, the section, discussion limitations, they --

19        A.    I'm sorry.  Could you repeat what you were

20   saying, what page --

21        Q.    Yeah, it's --

22        A.    -- you wanted me to look at.

23        Q.    -- 608, and, unfortunately, at least on my

24   copy, the page numbers are directly --

25        A.    I can see --

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

                                                      Page 231

1          Q.    -- under the staples.

2          A.    -- them.   They're, my staple is out of the

3     way, so, I'm good.

4          Q.    And then the discussion of limitations

5     section, they talk about their study in Washington

6     State, where the second paragraph, they say

7     52.3 percent used the box nearest their residence.

8               And then in the, they, they apparently

9     looked at, at the other 47.7 percent, and they say,

10    that next paragraph, in particular, we find that

11    voters who did not vote in the drop box closest to

12    their residence live farther away from their nearest

13    drop box.

14              Do you see that part?

15         A.    Yes.

16         Q.    Which suggests that or does that suggest

17    that a voter is more likely to be able, or I should

18    say, suggests that a voter will find it more

19    convenient to trip chain to a further drop box, if

20    the nearest drop box is too far to be convenient?

21         A.    If they're driving, yeah.   They don't

22    speak to mode of travel in this paper, as far as I

23    can tell.   They do say, I haven't seen this paper

24    before, but they do say in several places that the

25    evidence from this literature suggests that locating

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 232

1    drop boxes nearer to home increases turnout

2    substantially statistically significantly, and that

3    one major takeaway from the research is that voters

4    will use the box closest to their home, most likely

5    the case when the box is located quite close to

6    their home.

7             The implication is that election

8    administrators may want to consider further

9    increasing the number of drop boxes within their

10   jurisdictions as they drop the overall mean distance

11   to the nearest drop box, thereby potentially driving

12   up turnout.

13        Q.   Potentially driving up turnout.

14        A.   I'm just, you know, that's, that's what

15   these scholars --

16        Q.   Right.

17        A.   -- have concluded.

18        Q.   And you say in paragraph 7 of your

19   rebuttal report, in the third sentence there,

20   there's thus no way to analyze the effects of the

21   differences in ballot drop box accessibility, given

22   the numerous other possible locations to which

23   individuals might be traveling.

24             Do you see that part there?

25        A.   I'm trying to catch up here.  Sorry.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 233

1        Q.    Sorry.

2        A.    What's the paragraph you're --

3        Q.    So, third, third sentence of paragraph 7

4    of your rebuttal report.  There's thus no way to

5    analyze the effects of the differences in ballot

6    drop box accessibility, given the numerous other

7    possible locations to which individuals might be

8    traveling.

9        A.    Yes.

10        Q.    And I guess my question is, how is the

11    analysis helpful, if there's no way to analyze the

12    effects of the differences in ballot drop box

13    accessibility in light of voters' actual travel

14    behavior.

15        A.    Well, we're doing the analysis in vote, in

16    light of voters' actual home locations, which is

17    quite important as a determinant of travel behavior

18    and as an important habitual location, and, as shown

19    in this study that you've been pointing me to, the

20    Collingwood and Gonzalez O'Brien study, something

21    that is highly predictive of use of drop boxes.

22             So, I don't think that there's any, I

23    don't think that it's not useful.  I think it's

24    quite useful to look at home locations and drop box

25    accessibility to the home.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

                                              Page 234

1          Q.   Well, it's leaving out a large proportion

2     of actual drop box usage patterns, isn't it?

3          A.   It's leaving out some of it, so, then, the

4     question is, do you throw the baby out with the

5     bathwater and don't do the analysis, or do you do

6     the analysis with the data that are available?

7          Q.   When does, when does the data become

8     reliable, I guess, is my question to you.

9          A.   I think, based on this article you've just

10    shown me, it's quite predictive of drop box use,

11    proximity of the drop box to one's home.  It says

12    in, I think it's, let's see, paragraph 3, discussing

13    McGuire, et al., 2020, a decrease of one mile to the

14    closest drop box increases a voter's probability of

15    voting by .64 percent.  So, it's obviously

16    predictive, it's obviously important.

17         Q.   But by .64 percent, is that, does that

18    take into account overall voter turnout, or just use

19    of drop boxes?

20         A.   I assume it's just overall, I assume it's

21    overall voter turnout, but, if you wanted to look at

22    the mechanism by which drop box participation

23    increased turnout, you would expect that the

24    mechanism would be the availability of the drop box,

25    not something else.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 235

```
 1              I don't know.  I'm just --

 2         Q.   I --

 3         A.   I don't know that --

 4         Q.   -- quiz you --

 5         A.   -- study.

 6         Q.   -- on the details --

 7         A.   Well, especially since I --

 8         Q.   I'm not --

 9         A.   -- haven't read --

10         Q.   I'm not --

11         A.   -- the --

12         THE COURT REPORTER:  One at a time.  Sorry,

13    guys.  "I don't know that study."

14         Go ahead.

15    BY MR. FALK:

16         Q.   I'm not going to quiz you on the details

17    of somebody else's study.

18         A.   Fair enough.

19         Q.   And you, but you're doing a comparison

20    here between the 2020 situation with a certain

21    number of drop boxes and the 2022 situation with

22    fewer drop boxes in several counties, and new drop

23    boxes in other counties, correct?

24         A.   Yes.

25         Q.   So, isn't it, isn't voters' actual
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 236

1    behavior under the 2020 situation where a large

2    proportion, for whatever reason, used drop boxes

3    other than the one that was closest geographically

4    to their home, isn't that actual behavior relevant

5    to determining what the incremental burden of SB 202

6    might be?

7          A.    The reason that I think it's not, it's

8    that it's somewhat misleading to focus on the

9    overall use is because the overall use, the overall

10   use is driven by the 90 plus percent of people who

11   have access to a vehicle, and because, among those

12   who don't have access to a vehicle, they are

13   presumptively and reasonably understood to be less

14   likely to use drop boxes that are farther away from

15   their homes than people who are driving.

16         Q.    That depends where they go on their

17   habitual travel; isn't that right?

18         A.    I would say that everything depends on

19   lots of things, but we're trying to make

20   generalizations and make a sort of a claim about the

21   average effect, and that people without vehicles

22   are, we already know that everyone is more likely to

23   use a drop box near their home than not, and then we

24   have to look at those who don't have access to a

25   vehicle and determine what likelihood, what their

Daniel G. Chatman , Ph.D.                           May 16, 2023
Georgia Senate Bill 202, In Re

Page 237

1    likelihood is of using a drop box.

2                And I just, one other, I wanted to say one

3    other thing which I haven't had a chance to say

4    about this, as well, which is that Dr. Grimmer's

5    critique here does not propose an alternative method

6    of evaluating drop box accessibility, and we have

7    every reason to believe that drop boxes nearby do

8    matter, and there's no reason to believe that adding

9    additional habitual daily locations to the mix here

10   would make the relative burden better.

11               It's likely to make the relative burden

12   seem more unbalanced than it does using this

13   analysis, because of the fact that people who are

14   more affluent and own vehicles are more, also more

15   likely to be nondisabled and likely to be

16   non-Hispanic whites, and those groups of people are

17   the ones who are more likely, therefore, to have

18   alternative drop box locations which they would find

19   convenient, so I don't think that the relative

20   burden would go down in that analysis.

21               The overall burden would go down, but the

22   relative burden seems very unlikely to me that it

23   would go down, and I would bet plenty of money that

24   it would go up.

25        Q.   You don't have any data to support the

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 238

1    differential use.

2        A.    I have plenty of data to support and sort

3    of expertise in the area to support the idea that

4    people who are more affluent are more likely to make

5    more trips and have more habitual locations in their

6    daily rounds than people who are less affluent.

7             That's very well established.  And that's,

8    from there, everything else is, is very, it's sort

9    of just logical from there.

10       Q.    So, you're using affluence for a proxy for

11   voter, actual voter behavior, is that --

12       A.    I am talking about travel behavior,

13   because what you were talking about was whether

14   people are likely to be able to find a convenient

15   alternative drop box location based on their travel

16   patterns.  I'm speaking to those travel patterns,

17   that's what I'm speaking to, not to people's voting

18   behavior.

19       Q.    Some people may pick a different drop box

20   because of perceived greater security; isn't that

21   correct?

22       A.    I have no idea.

23       Q.    You say in paragraph 8 that the, any

24   difference in the analysis that would result from

25   taking into account the drop boxes actually used,

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 239

1    rather than the drop boxes closest to the home,

2    would amount to random error that you would expect

3    would cancel out, correct?

4         A.    I'm not sure if I used the term, cancel

5    out.

6         Q.    No, I think that's, that that is, that is

7    my term.  You refer to it as random error, correct?

8         A.    I say that in statistical terms, that sort

9    of error, that sort of problem of noise is referred

10   to as random error.  It's not referred to as bias.

11        Bias means that you can predict the

12   direction of the change in the estimate, because you

13   know that not accounting for the data changes the

14   estimate in a particular direction.

15        Q.    But, if voters use a drop box other than

16   the one closest to home, yet you're measuring a

17   change in the one closest to home, isn't that likely

18   to overstate the change in travel burden?

19        A.    So, it is true that if you take into

20   account additional possible locations that people

21   travel to during the day, and it turns out that

22   there is a drop box available in those locations,

23   that the overall estimate of burden would go down,

24   so, that's clearly the case.

25        But what I'm referring to when I talk

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 240

1    about the estimate of burden is the relative burden,

2    and, there, I don't think that this can, that, first

3    of all, Dr. Grimmer hasn't identified any bias, that

4    is to say, he hasn't identified a particular

5    direction.

6            He says it's a bias of unknown direction

7    and magnitude, and this is why it's not a bias at

8    all, because, if it's unknown direction and

9    magnitude, that means it's random, as far as he

10   knows.  He doesn't have a reason to believe it's one

11   particular direction.

12           That's all that I'm saying.  I'm just

13   quibbling with him using the term, bias, when that's

14   not the right term to use, statistically.

15       Q.   So, you're saying if it's unknown

16   direction, it's not bias, is that, am I correct?

17       A.   That's correct.

18       Q.   Am I summarizing the gist of that

19   criticism?

20       A.   Right.  In other words, unknown implies,

21   for all you know, it's a random process of you

22   getting the wrong data, and there's no reason to

23   believe it's in a particular direction.  That's what

24   we believe.  That's what we call random error.

25           He could have laid out in his report some

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 241

1    sort of claim about how it's going to be in a

2    particular direction, and he could say that there is

3    a specific bias here, which is it's going to bias

4    the overall estimate of burden.

5            If he said that, I would agree with him,

6    because the overall estimate of burden due to

7    additional habitual locations should go down, but

8    the relative burden is where we can't speak to.

9            Anything beyond the specific suggestion I

10   just made, which is that if anything, the relative

11   burden would go up.  The relative disparity in the

12   burden would go up.

13       Q.   And, just to be clear, when you say,

14   relative burden, you're talking about the

15   difference --

16       A.   The multipliers.

17       Q.   -- on black CVAs and non-Hispanic white

18   CVAs, and disabled, CVAs with disabilities, and CVAs

19   without disabilities, is that what you're talking

20   about when you say relative burden?

21       A.   Right.  I'm talking about those ratios

22   that I put into the report, yeah.

23       MR. FOGELSON:  Don, we've been going for, I

24   think, about an hour and a half.  Might be a good

25   time for a break.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 242

1              MR. FALK:  Yeah, we can, we can break.  We'll,

2       we are closing in pretty quick, but not, if it's an

3       hour and a half, we should take a break.

4              THE VIDEOGRAPHER:  We're going off the record.

5       The time is 4:20 p.m.

6                   (Recess:  4:20 p.m. to 4:30 p.m.)

7              THE VIDEOGRAPHER:  We're back on the record.

8       The time is 4:30 p.m.

9       BY MR. FALK:

10             Q.   You say in, Dr. Chatman, you say in

11      paragraph 10 of your rebuttal that you're talking

12      about why you want to look at burdens to access drop

13      boxes, and you say those burdens play a role in

14      determining whether CVAs use a ballot drop box in

15      the first place.

16                  Is there a reason to prefer using a drop

17      box over using a mailbox?

18             A.   Apparently so.  They're very popular, drop

19      boxes, in the states that use them, and so people

20      seem to like them.  They prefer them to, to dropping

21      in the mailbox.  I think that people find them to

22      be, they believe that they're more secure than, than

23      mail voting.  A lot of people do, anyway.

24             Q.   But you don't know.  I think we already

25      discussed you don't know the percentage of people

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 243

1    who use drop boxes versus mailbox absentee ballots?

2          A.   I can refer to this article you've just

3    given me in Washington State, as an example, but,

4    no, beyond that state, beyond Colorado or

5    Washington.

6          Q.   Yeah.  In Georgia.

7          A.   In Georgia, the 26 percent who used it,

8    who used absentee voting in the 2020 election, I

9    don't know what fraction of those was drop boxes.

10         Q.   And you don't know what the 2022

11   numbers --

12         A.   No, other than they were less than, I

13   guess, 6 percent.

14         Q.   Something less than 6 percent.

15         A.   Yes.

16         Q.   The total.  Other than the analysis that

17   Dr. Grimmer presents of Douglas County data, are you

18   aware of any data lining up voter's residence with

19   the drop box actually used in 2022?

20         A.   No.

21         Q.   I had one more question about the Google

22   Maps.  Your process with Google Maps is, is it your

23   understanding that to access public transportation

24   information through the Google Maps process you use

25   that you have to assess a trip in the future, as

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 244

1    opposed to the past?

2          A.    Yes.

3          Q.    So, you can't go back to see what services

4    were like in 2020.

5          A.    Right.

6          Q.    And you did your analysis, did you say,

7    late last year or early this year?

8          A.    The analysis of those travel times was

9    done late last year.

10          Q.    Do you know whether white voters or black

11    voters used drop boxes more often in Georgia?

12          A.    No.

13          Q.    Would it change your opinion if white

14    voters statewide were more likely to use drop boxes

15    than black voters?

16          A.    No, it would not.  I'm not sure why it

17    should, or, maybe I'm missing something.

18          Q.    No.  I'm just asking the question.

19          A.    Okay.

20          Q.    Why not, I guess, is the further question.

21    You're not sure why it should?

22          A.    Well, I, without --

23          Q.    Maybe that's the answer to why not, but --

24          A.    -- without knowing why it should, I'm

25    trying to follow the reasoning that you are implying

Page 245

1    by asking the question.

2         Q.   Yeah, I mean, you have talked about

3    differential burdens on black CVAs, and I'm just

4    asking whether if actual black voter preferences --

5         A.   Uh-huh.

6         Q.   -- suggested that black voters were less

7    inclined to use drop boxes than white voters, would

8    that affect your sense of the relative burdens.

9         A.   What I understood you to be saying was

10   that black voters are less likely than white voters

11   to use drop boxes.

12        Q.   If that's true.  I'm just saying.  I don't

13   have figures in front of me.  I didn't get on to

14   saying that that, if that's where, if that's where

15   things come out, does that affect your sense of the

16   relative burden if black voters in fact choose to

17   use drop boxes less?

18        A.   So, the notion of choosing to use drop

19   boxes less implies that it's purely preference,

20   rather than costs, and, if black voters are more

21   likely to experience difficulty accessing a drop box

22   than white voters, then I would expect the

23   likelihood of using a drop box would be subs-, would

24   be lower, as well.

25             But the tricky thing about looking at

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 246

1    revealed voter data is it doesn't really address the

2    landscape of costs that people face when they decide

3    how to vote, and so it's just, it's hard to look at

4    actual voter data to address this question of

5    burden.

6            I think one needs to look at

7    accessibility.  The way that we think about this in

8    the travel behavior literature is that in order to

9    see, to understand how people travel, you have to

10   look at all of the possible destinations, not the

11   only where people went, but where they didn't go.

12   That's, essentially, what I'm trying to do here.

13       Q.   Okay.  And, Dr. Grimmer's report, page

14   120, the carryover sentence, he's reporting data

15   from the MIT survey with the performance of American

16   elections.

17       A.   I'm sorry, what page are we on?

18       Q.   Page 119, paragraph --

19       A.   Oh.  119.

20       Q.   Sorry.  Paragraph 143, page 119 and 120.

21       A.   Okay.

22       Q.   And this is, this is where he's looking at

23   the reasons given for where drop box voters return

24   their mail and absentee ballots in Georgia, and

25   finds that 85.9 percent say it was close to my home,

Page 247

1    25.9 percent say it was convenient to work or

2    school, or on their way to somewhere else,

3    15.2 percent say they had no choice, that was the

4    only drop box available to them, then there's

5    21.5 percent report selecting a drop box for reasons

6    other than convenience, proximity, or lack of

7    options.

8            Doesn't that suggest that there are, there

9    are some factor that is not as concrete, at least,

10   as those other three options that influences where

11   people choose to use a drop box?

12       A.   Well, let me put it this way.  The way

13   that I interpreted those sorts of factors, without

14   looking at the, the study, was that when economists,

15   for example, do surveys of people, they take with a

16   grain of salt any answers that are not sufficiently

17   specific to help understand how costs informed their

18   decision-making, and, so, in this case, I said

19   earlier that I cited 74 percent as the upper bound

20   of what I would interpret these data to mean in

21   terms of the percentage of people who are likely to

22   have used a drop box nearest their home.

23            I included the 36 percent close to home, I

24   included the 15.2 percent only drop box available to

25   you, which is, by definition, the one closest to

Daniel G. Chatman , Ph.D.                     May 16, 2023
Georgia Senate Bill 202, In Re

Page 248

1    their home that they can use, and then I included

2    this additional 21 percent because of the fact that

3    when people's answers are vague, it's quite possible

4    that, number 1, they have ended up using the drop

5    box closest to their home, despite the fact that

6    they say that they selected it for some other

7    reason, and, secondly, because it could be that it

8    was the only one that they were aware of, which,

9    again, suggests that the most likely one that they

10   would be aware of would be the one nearest their

11   home, all else equal.

12           And so I used that as kind of an upper

13   bound of the percentage of people, even according to

14   the survey, who used a drop box nearest their home.

15       Q.   So, you're counting the people that they

16   said they didn't use the drop box closest to their

17   home as if they did use it closest to their home.

18       A.   Those 21.5 percent didn't say that they

19   didn't use the drop box closest to their home.  They

20   said they selected a drop box for some other reason.

21   They didn't say they didn't use the drop box closest

22   to their home, because the question was asking what

23   is the reason you chose to, there's a question that

24   has an answer category that doesn't exclude the

25   possibility that it was the drop box closest to

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 249

1     their home or closest to their work, either one.

2              And, as I said before -- I'm sorry.

3         Q.   Go ahead.  No, finish your answer.

4         A.   As I've said before, again, I think that

5     these answers would be quite different on this

6     survey if one asked the same question only to people

7     who didn't have access to a car in the election.  I

8     think the percentages for the people who used the

9     one closest to their home would be a lot higher than

10    36 percent.

11        Q.   In paragraph 15 --

12        A.   Of the rebuttal report?

13        Q.   Yeah.  I'm sorry.  We're just, we're --

14        A.   Just toggling here, yeah.

15        Q.   -- wrapping up the rebuttal report here,

16    and wrapping up the whole thing very soon, I

17    promise.

18             I'm actually looking for this in your

19    report.  You said you -- where is it?

20             I know you have said, and you said today,

21    and I thought it was in your report, that the

22    98 percent of CVAs in Douglas County have access to

23    an --

24        A.   I mentioned that, but I don't think it

25    appears in the report.  I think that it is -- I'm

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 250

1    sorry.  It is --

2         Q.    It is, it is there.

3         A.    It is in the care, it's in the footnote 5

4    at the, on page 8.

5         Q.    Oh.  There we go.

6         A.    But it's, but, just to be clear, this is

7    those who are both without access to an automobile,

8    automobile, and would experience a travel burden, so

9    it's, it's actually not just the people without an

10   automobile.  It's the people who also have a burden,

11   because no one in Douglas County who has an

12   automobile, according to my analysis, has a travel

13   burden to access a drop box, so, it's only the

14   people without an automobile, but, of those --

15        Q.    No, I -- I'm sorry.  Go ahead.  Finish

16   your answer.

17        A.    -- but, of those, it's, it's, so, I

18   believe that the percentage of people without an

19   automobile is around 2 percent, and then the people

20   without, across the population, a bit higher for

21   black CVAs, it's probably closer to 3 percent for

22   black CVAs, and, then, of those, 2.4 percent had a

23   travel burden, and, if they were black, and, if they

24   were non-Hispanic white, one-eight, 1.8 percent had

25   a travel burden.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 251

```
 1          Q.    Yeah, I actually, now I see where it is.
 2    I should have circled --
 3          A.    Okay, now you've got it.  Never mind.
 4          Q.    Now that we've gone through all this --
 5          A.    Now we've gone through that, okay --
 6          Q.    You, you said that, your second sentence
 7    of paragraph 14, I estimate the figure of CVAs, you
 8    say more than 90 percent of CVAs across the state
 9    have access to an auto --
10          A.    Right.
11          Q.    -- but, for Douglas County, I estimate
12    that figure at 98 percent, and, so, where, how did
13    you arrive at that figure?
14          A.    Those are, essentially, those are, again,
15    the, it's information from the PUMAs in Douglas
16    County, and taking that information and taking it
17    down to the block group level for Douglas County.
18          Q.    Okay.  And then in paragraph 15, you say
19    that Douglas County, Georgia, is not representative
20    of the state, given, as noted below, its small
21    population of CVAs in general and black CVAs in
22    particular.
23                Do you --
24          A.    Uh-huh.
25          Q.    -- agree with that statement?
```

Page 252

1          A.    Yes.

2          Q.    And then you say, any conclusions about

3     relative differences in distance to the drop box

4     used among those who voted using a drop box in the

5     2020 election among whites, blacks, and Latinx

6     voters from this county are not generally applicable

7     to the rest of the state, do you see that?

8               And you agree with that?

9          A.    I do.

10          Q.    And, in your critique of Dr. Grimmer's

11     analysis, you say, nor does his analysis look at

12     anything other than the average difference, which, I

13     believe, is that the average difference in distance,

14     as opposed to --

15          A.    The average difference in distance.

16          Q.    -- travel time, because you've just

17     criticized --

18               Let me ask the question again.

19               Nor does Dr. Grimmer's analysis look at

20     anything other than the average distance.

21               Try again.

22               Nor does his analysis look at anything

23     other than the average difference which masks

24     potentially wide variation.

25               Is your point here that by looking at

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 253

```
 1    averages, his conclusions are, his analysis by
 2    looking at averages, his analysis is missing the
 3    real picture?
 4         A.   Yes.  I would argue the real picture is
 5    what fraction of people are actually having a hard
 6    time with the trip, not the people who may have
 7    other trips increase by .5 miles.  Obviously, those
 8    folks are not very heavily affected by the change.
 9         Q.   And, let's see here.  Now, and in
10    paragraph 16, we're almost to the last sentence
11    here, you say, the share of non-Hispanic white
12    CVAs -- I shall skip that one and go to the next
13    one.  Same analysis, different people.  The share of
14    black CVAs with such a burden, by, such a burden,
15    you mean --
16              I'm sorry, I'm going to have to ask this
17    the same way, because you set up the second sentence
18    in the first sentence.
19         A.   Okay.
20         Q.   You look at the share of non-Hispanic
21    white CVAs without access to an automobile and who
22    would have a trip exceeding one hour to access a
23    ballot drop box.  You say that rose from 1 percent
24    to 2.35 percent and is now, is that the Fulton
25    County analysis that you're providing here?
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 254

```
 1          A.    It is.

 2          Q.    So, you're looking at, in that first

 3    sentence, non-Hispanic white CVAs --

 4          A.    In Fulton County.

 5          Q.    -- Fulton County --

 6          A.    Yes.

 7          Q.    -- without access to an automobile.

 8                What percentage of them have a trip

 9    exceeding an hour, is that --

10          A.    It's a little confusing.  I'm sorry.  This

11    sentence, as I look at it right now, it's clear why

12    it's confusing.  It's not the share of people

13    without an automobile.  It's the share of the total

14    population who both doesn't have access to an

15    automobile and would have a trip exceeding one hour,

16    so it's the percentage of the white CVA population

17    as a whole.  Okay.

18          Q.    And that's also true of the black

19    population --

20          A.    And that's also true of the black --

21          Q.    -- and so you're saying --

22          A.    -- population, that's right.

23          Q.    -- the burden is, rose from 3.8 to

24    13.2 percent of the black CVA population --

25          A.    Right --
```

Daniel G. Chatman , Ph.D.                May 16, 2023
Georgia Senate Bill 202, In Re

Page 255

1        Q.   -- in Fulton County --

2        A.   -- in Fulton County --

3        Q.   -- as a whole.

4        A.   -- as a whole, yeah.

5        Q.   Do you have a Twitter account?

6        A.   I'm told that I do.

7        Q.   You're told that you do.

8        A.   Well, I don't use it that much, at least

9   not recently.

10            (Exhibit 11 was marked for identification

11   by counsel.)

12   BY MR. FALK:

13        Q.   Number 11.  Is this your Twitter profile?

14        A.   That's me.

15        Q.   Your Twitter profile's like my Facebook

16   profile.  I look a lot younger and --

17        A.   Exactly.

18        Q.   -- better.

19        A.   It's like 10 years ago, at least 10 years

20   ago.  Like 12 years ago.

21        MR. FALK:  Next in series.

22        (Exhibit 12 was marked for identification by

23   counsel.)

24   BY MR. FALK:

25        Q.   This is 12.  Is this one of your tweets?

Page 256

1          A.    Yes.

2          Q.    Next exhibit.

3          MR. PRINCE:  Do you want him to read it into

4     the record?

5          MR. FALK:  Yeah, I guess we should identify it.

6     BY MR. FALK:

7          Q.    And this one says, this is dated

8     November 7, 2016, and says, yes, this election was

9     rigged, and has a link to a New York Times article.

10               Is that correct?

11         A.    Yes.

12               (Exhibit 13 was marked for identification

13    by counsel.)

14    BY MR. FALK:

15         Q.    This is number 13, which begins,

16    democratic norms have been and continue to be

17    violated.

18               Is this one of your tweets?

19         A.    Yeah.  They're, both of these tweets are

20    quotes from the links that I am linking to.

21         Q.    Oh.  Next in sequence.

22               (Exhibit 14 was marked for identification

23    by counsel.)

24    BY MR. FALK:

25         Q.    Exhibit 14 is dated February 11, 2017.

Page 257

1      Tweet begins, this gives me reason to hope.

2                  Is that one of your tweets?

3           A.    Yes.

4           Q.    This identifies it, I think.

5                  (Exhibit 15 was marked for identification

6      by counsel.)

7      BY MR. FALK:

8           Q.    Exhibit 15 is a tweet, dated August 11,

9      2017, and begins, the GOP is completely united

10     behind its project of destroying civilization, and

11     it's making good progress.

12                 Is this one of your tweets?

13          A.    Yes.

14                 (Exhibit 16 was marked for identification

15     by counsel.)

16     BY MR. FALK:

17          Q.    Exhibit 16 is a retweet of a John Legend

18     tweet saying, impeach the white supremacist in the

19     White House or STFU.

20                 Is this one of your tweets, your retweets,

21     I should say --

22          A.    It's a retweet.

23          Q.    -- to be fair?

24          A.    Yes.

25                 (Exhibit 17 was marked for identification

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 258

1      by counsel.)

2      BY MR. FALK:

3            Q.    Exhibit 17 is dated June 11, 2020, and it

4      has links to a photo of a New York Times article and

5      begins with a quote saying, these are not

6      necessarily rogue officers.  They're instruments of

7      the system and manifestations of society.  They are

8      violent to black people because America is violent

9      to black people.  They oppress because America

10     oppresses.

11                 That's a quotation, right, from something?

12           A.    It's a quotation from The New York Times

13     article.

14           Q.    And was, if you recall, was this tweet

15     related to George Floyd?

16           A.    It was related to the protests around

17     George Floyd, yes, and around other police killings.

18           Q.    This is, this is your tweet?

19           A.    Yes.

20                 (Exhibit 18 was marked for identification

21     by counsel.)

22     BY MR. FALK:

23           Q.    18 is a tweet, dated October 29, 2020, and

24     there are links to a New York Times story with a

25     picture of Justice Kavanaugh.  The tweet begins,

Daniel G. Chatman , Ph.D.                          May 16, 2023
Georgia Senate Bill 202, In Re

Page 259

1    what a dope, and then quotes, I assume, quotes from

2    the article.

3              Is this one of your tweets?

4         A.   Yes.

5         Q.   Thank you very much, Dr. Chatman.  You've

6    been very patient.

7         A.   Sure.

8         MR. FALK:  Return the witness to you, if you

9    want.  Anybody else who's out there?

10        MR. FOGELSON:  Anybody on Zoom have questions?

11        THE COURT REPORTER:  They're not muted, are

12   they?

13        THE VIDEOGRAPHER:  No, they're not.

14

15                    EXAMINATION

16   BY MR. FOGELSON:

17        Q.   Dr. Chatman, just a couple of quick

18   questions.  I want to just point out what I believe

19   is a typo for the record and get you to confirm

20   that.  If you could turn to page 18 of your initial

21   report, and, specifically, table 2, and if you look

22   at the first line, this table 2 is median one-way

23   travel time by mode, and the first line is for

24   autos, and, if you go all the way across to DDS

25   offices, it has a figure there, 15.87 minutes.

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 260

1              Do you see that?

2         A.   Yes.

3         Q.   And then if you turn to page 22, paragraph

4    47, there's a series of bullets there that it looks

5    like basically repeat the data from that table, and

6    then the last bullet, it says, to the median one-way

7    driving times to the nearest DDS office locations

8    was 5.9 minutes.

9              I'm wondering if that should be 15.9

10   minutes, based on --

11        A.   Based on that table.  Yes, this, that

12   should be 15.9 at page 22, the final bullet.

13        Q.   Okay, so, the data, as reflected in table

14   2, is accurate, but there is the typo in paragraph

15   47.

16        A.   Correct, yes.

17        Q.   You were just shown a series of tweets

18   from your personal Twitter account.

19              Did your personal political views play any

20   role in the analysis contained in either of your

21   reports in this case?

22        A.   No, they don't.  The data are what the

23   data are.

24        Q.   Did you in any way prejudge the analysis

25   you were asked to do in this case based on your

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 261

1     personal political views?

2          A.    No.

3          MR. FOGELSON:  Thank you.

4          I think that's all I have.

5          MR. FALK:  We're done.

6          MR. FOGELSON:  Thank you.

7          THE VIDEOGRAPHER:  We're going off the record.

8     The time is 4:58 p.m., and this concludes today's

9     testimony given by Dr. Daniel Chatman.

10          THE COURT REPORTER:  Copy, sir?

11          MR. FOGELSON:  Yes.

12                    (Time noted:  4:58 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 262

1        I, DANIEL G. CHATMAN, Ph.D., do hereby declare

2    under penalty of perjury that I have read the

3    foregoing transcript, volume I; that I have made any

4    corrections as appear noted, in ink, initialed by

5    me; that my testimony as contained herein, as

6    corrected, is true and correct.

7             EXECUTED this _____ day of _____,

8    202____, at _____, _____.

                  (City)                    (State)

9

10

11

              _____

12                DANIEL G. CHATMAN, Ph.D.

                       VOLUME I

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 263

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me, at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were duly sworn; that a record

8     of the proceedings was made by me using machine

9     shorthand which was thereafter transcribed under my

10    direction; that the foregoing transcript is a true

11    record of the testimony given.

12         Further, that if the foregoing pertains to the

13    original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [X] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

      Dated: 5/30/23

22

23                                _____

                                  CHRIS TE SELLE

24                                CSR No. 10836

25

Page 264

1    Matthew A. Fogelson, Esq.

2    mfogelson@advancementproject.org

3                  May 30, 2023

4    RE: Georgia Senate Bill 202, In Re v.

5         5/16/2023, Daniel G. Chatman , Ph.D. (#5857914)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-southeast@veritext.com.

16

17    Return completed errata within 30 days from

18    receipt of testimony.

19     If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

```
                                            Page 265

1    Georgia Senate Bill 202, In Re v.

2    Daniel G. Chatman, Ph.D. (#5857914)

3                  E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Daniel G. Chatman, Ph.D.                    Date

25
```

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

Page 266

1    Georgia Senate Bill 202, In Re v.

2    Daniel G. Chatman, Ph.D. (#5857914)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, Daniel G. Chatman , Ph.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Daniel G. Chatman, Ph.D.                    Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[& - 2017]**                                                                Page 1

| & | | | 2 |
| --- | --- | --- | --- |

**&**   2:15 7:18

**1**

**1**   1:25 5:10 6:6
6:8,9,11,12,14
6:15,17 7:12
12:2,3,13 88:9
95:8,9,9
125:11,12
143:20 145:12
152:18 169:4
174:16 248:4
253:23
**1.1**   165:6,11
**1.2.**   114:1
**1.49**   114:5
**1.5**   114:16
**1.57**   114:5
**1.6**   107:19
108:4 113:9
114:1,1,16
**1.8**   250:24
**1/17/2023**   5:23
**10**   6:3 19:25
33:13 59:23
83:25 93:18,21
100:24 113:11
114:7 115:2
135:3 141:13
189:19 211:13
230:2,5 242:11
255:19,19
**10.1**   204:12
**10/29/2020**
6:17

**100**   69:18
107:3
**100,000**   168:4
**10836**   1:22
2:20 263:24
**10:49**   59:25
60:1
**11**   6:6 255:10
255:13 256:25
257:8 258:3
**11/7/2016**   6:8
**111**   5:18
**119**   246:18,19
246:20
**11:02**   60:1,3
**12**   5:10,11 6:7
164:4 189:19
255:20,22,25
**12/12/2016**   6:9
**120**   246:14,20
**1220**   3:6
**127**   173:17
**129**   165:22,23
174:3
**12:35**   126:10
126:11
**13**   6:9,21
256:12,15
**13.2**   254:24
**130,000**   194:1
**14**   6:5,10 113:2
113:18 224:17
224:17 228:24
251:7 256:22
256:25

**140**   5:21,22
**1400**   3:17
**143**   246:20
**15**   6:12 249:11
251:18 257:5,8
**15.2**   247:3,24
**15.87**   259:25
**15.9**   260:9,12
**159**   87:7,18
**16**   1:16 2:18
6:13 7:1,5
253:10 257:14
257:17
**160**   5:24
**17**   5:20 6:15
187:25 257:25
258:3
**17.4**   187:5
**1717**   4:9
**18**   6:16 133:9
258:20,23
259:20
**19**   142:4,6,7
186:22 187:7
187:24
**19.1**   146:8
**19.7**   187:5
**196**   6:21,22
**1991**   13:7
**1997**   14:7
**1999**   14:22
**1:21**   1:7 2:7
7:17 127:2
**1:22**   127:5

**2**   5:11 12:22
46:18,21 48:24
88:10 114:8
115:2 133:9
165:21,23
171:14 187:19
191:20 211:15
250:19 259:21
259:22 260:14
**2.35**   253:24
**2.4**   250:22
**2.5**   183:8
202:21 203:15
203:16 219:7
**2/11/2017**   6:11
**20**   5:23 6:22
19:7 103:17,22
103:24 113:11
114:6,8,8,18,19
115:10 182:5
182:16 184:7
209:10 266:15
**20005**   3:7
**20006**   4:10
**2005**   14:24
**2008**   16:3,5,9
16:11,18
**2009**   16:3,8,19
**2014**   16:24
**2015**   10:1
**2016**   39:21
143:17 256:8
**2017**   165:15
175:7 176:3

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[2017 - 4:58]**

Page 2

256:25 257:9
**2018** 39:20
47:12 62:3
143:16 176:11
**202** 1:7 2:7
7:15 34:10,16
34:18 35:18
36:1,2,6,11
37:10,12,17,19
37:24 38:8
41:5,8,11,16
42:1 48:5,9,12
58:6 59:4,8
85:24 90:2
104:18,23
132:9 147:8
204:17 215:20
216:3,6 236:5
262:8 264:4
265:1 266:1
**2020** 10:3 21:6
21:8 34:11
38:6,10,13,14
38:18,20 39:2
39:11,15,20
40:11,19 41:3
41:9 57:9 62:3
68:25 69:2
133:10,18,21
137:6,8,25
138:6 143:9,25
144:1,6 145:23
145:25 183:9
195:19 202:20
203:6,14 204:6

204:11 219:20
220:3,10
234:13 235:20
236:1 243:8
244:4 252:5
258:3,23
**2021** 141:9
**2022** 5:22 24:8
34:12 38:1,6
57:9 133:10,11
133:19 137:7,9
137:13,25
138:7,15 141:9
141:11,13,18
143:7,21
145:23 147:25
183:10 195:16
203:14 204:7
219:20 220:10
220:20 235:21
243:10,19
**2023** 1:16 2:18
7:1,6 176:3
264:3
**21** 93:8 112:25
113:3,17 114:2
115:6,7 248:2
**21.5** 247:5
248:18
**22** 5:11 107:17
260:3,12
**220,000** 205:24
**23** 5:12 186:23
187:7,18

**230** 6:3 87:11
**238-0633** 3:8
**24** 19:2 47:24
96:23 164:25
**25** 5:14 18:24
212:20
**25,000** 95:13,13
95:15 168:2,4
169:3,18 170:3
**25.9** 247:1
**255** 6:6,7
**256** 6:9,10
**257** 6:12,13,15
**258** 6:16
**259** 5:6
**26** 18:23 134:2
243:7
**263** 1:25
**26th** 2:16 7:19
**27** 40:24 112:6
112:9 113:18
**28** 105:6
119:23
**29** 37:9 94:14
94:17 258:23
**2:41** 184:13,14
**2:56** 184:14,16

**3**

**3** 2:16 5:10,12
23:21 67:1
88:11 125:10
125:13,14
218:14 224:4
234:12 250:21

**3.4** 205:19
**3.8** 254:23
**30** 134:3,3
212:19 264:3
264:17
**31** 132:15,19
**32** 132:15,19
**3231** 9:9
**36** 189:12
218:15 247:23
249:10
**39** 133:9

**4**

**4** 5:14 25:8,11
**4.4** 142:24
**4.5** 164:10
**40** 47:25 71:25
94:6 188:21,24
188:25 193:10
193:18 228:4
228:12
**41** 5:13
**415** 3:8,19
**42** 141:7
**43** 148:6
**45** 88:13 228:2
**46** 5:15
**47** 260:4,15
**47.7** 231:9
**48** 105:2
**4:20** 242:5,6
**4:30** 242:6,8
**4:58** 2:18 261:8
261:12

800.808.4958

770.343.9696

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

## [5 - ability]

Page 3

**5**

**5** 5:15 46:11,14
66:24 125:10
125:12,13,14
173:16 191:19
195:12 213:6
250:3 253:7
**5.9** 260:8
**5/16/2023**
264:5
**5/30/23** 263:21
**50** 93:15 95:2,2
**500** 20:13
**52** 79:15 80:10
**52.3** 231:7
**52.9** 203:19
**55** 149:14
**55555** 1:7 2:7
7:17
**56** 152:17
**562-4942** 3:19
**57** 154:5
**58** 141:11
156:11
**5857914** 1:23
264:5 265:2
266:2

**6**

**6** 5:18 95:9
111:23 141:12
165:8,12 174:4
174:19 224:3
226:8 243:13
243:14

**6.5** 204:6
**6.9** 146:6
**6/11/2020** 6:15
**60** 25:2 27:18
28:6,18 94:6,8
94:19 135:11
141:16 205:20
227:25
**608** 230:17,23
**610-3886** 4:11
**62** 186:20
**63.7** 141:19
**64** 190:15
234:15,17
**66** 37:8 202:20
**68** 87:6 105:2
203:18,19

**7**

**7** 5:21 47:10
49:14,15 67:1
83:24 125:14
134:9,10
140:15 141:7
232:18 233:3
256:8
**7.3** 204:7
**7.48** 141:21
**7.9** 107:20
**70** 86:23 87:12
87:18 129:1
**702** 4:11
**7040** 263:23
**71** 204:4
**72** 150:4

**73** 205:9
**74** 79:22 80:6,7
80:11 247:19
**77.5** 142:25
**78** 105:4
209:20 213:7
**79** 206:7,10,12
213:18,21

**8**

**8** 5:14,22,25
134:9 140:17
144:15,16
145:1 238:23
250:4
**8/11/2017** 6:12
**8/12/2017** 6:14
**80** 87:19,25
106:6 162:21
163:19 166:9
**82** 167:21
**83** 167:1
**84** 220:23
**85.9** 246:25
**850** 3:6
**86** 218:14
**8828** 166:4
**89** 210:6,13
**89.9** 204:13
**8:00** 119:19

**9**

**9** 5:5,17,24
160:23
**9.8** 204:14

**9/10ths** 219:19
**90** 27:16,24
28:18,21,21
87:19,25 88:11
109:13,20
204:16 236:10
251:8
**900** 4:9
**91** 210:3,12
**92** 221:13
**94111** 3:18
7:20
**94703** 9:9
**95.4** 210:9
**96.6** 205:21
**97** 210:10,12,15
210:16
**98** 81:20
249:22 251:12
**99** 155:3,14
**9:34** 2:17 7:2,5

**a**

**a.l.** 5:19
**a.m.** 2:17 7:2,5
59:25 60:1,1,3
**abbreviate**
54:11
**abigail** 5:25
161:2
**ability** 37:10,20
39:12 45:4
53:17 54:17
61:13 104:8,9
128:8 138:25
225:12

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[able - activities]**                                                                          Page 4

| | | | |
|---|---|---|---|
| **able**   16:6 20:2 | 243:1,8 246:24 | 203:7,17 | **accommodati...** |
| 29:18 33:4 | **absolute**   34:20 | 205:20 206:18 | 214:20 |
| 36:24 38:2 | 35:6 | 206:19,20 | **account**   28:4 |
| 45:11 52:9 | **absolutely** | 207:19 209:22 | 34:6 73:11 |
| 55:12,13,14 | 10:24 57:20 | 209:22 210:11 | 76:16 99:9,15 |
| 58:13 73:11 | 131:15 178:9 | 213:9,23 214:3 | 99:17 102:6 |
| 76:15 120:5 | 226:23 | 214:17 215:10 | 109:22 110:6,9 |
| 128:24 130:24 | **academic** | 217:18 218:25 | 134:21 146:11 |
| 140:22 146:16 | 160:18 161:24 | 219:8,9,10 | 179:9 192:21 |
| 177:11 180:24 | **accepted** | 220:19,21,21 | 221:15 234:18 |
| 181:1 196:18 | 152:13 154:16 | 221:1,3 224:5 | 238:25 239:20 |
| 199:15,23 | 160:3,11 | 224:20 226:12 | 255:5 260:18 |
| 200:11 201:15 | **access**   26:15 | 236:11,12,24 | **accounted** |
| 225:1 231:17 | 28:11 36:17,19 | 242:12 243:23 | 203:8 |
| 238:14 | 36:20,21 37:2 | 249:7,22 250:7 | **accounting** |
| **above**   47:1 | 43:12 47:3,15 | 250:13 251:9 | 239:13 |
| 95:13,25 | 52:18 53:24 | 253:21,22 | **accuracy** |
| 167:14 264:6 | 60:11 61:12 | 254:7,14 | 151:11 264:9 |
| 266:7 | 65:11,14,21 | **accessed** | **accurate**   99:11 |
| **abrantes**   5:19 | 66:15 67:3,4 | 229:17 | 100:18 151:13 |
| 112:2,8,16 | 72:4,9 83:15 | **accessibility** | 151:17,24 |
| **absent**   37:23 | 86:6,7 90:24 | 139:15 143:14 | 157:19 260:14 |
| **absentee**   49:5 | 91:24 92:10 | 181:16,18 | **acknowledge...** |
| 49:18,20 50:4 | 102:25 117:23 | 183:12 204:18 | 266:3 |
| 53:10,16,24 | 128:21,22 | 204:22,24 | **acknowledg...** |
| 54:4,7 65:22 | 129:3 131:11 | 215:15,17 | 264:12 |
| 66:9 67:7,12 | 149:12 151:22 | 232:21 233:6 | **acs**   152:16 |
| 67:19 68:19,20 | 158:14 159:8 | 233:13,25 | **acsp**   19:22 |
| 69:1,3,4,7 | 159:16,17 | 237:6 246:7 | **act**   205:4 |
| 89:22 125:2,17 | 162:16 171:12 | **accessible**   49:5 | **action**   7:25 |
| 125:24 126:2,4 | 179:14 180:5 | 139:23 180:2 | 263:17,18 |
| 126:6 136:2,12 | 180:12 186:11 | 183:11 | **active**   16:8 |
| 136:13,21 | 186:25 187:14 | **accessing**   83:4 | **actively**   228:7 |
| 141:4 142:24 | 191:4,24 192:2 | 213:14 245:21 | **activities**   96:24 |
| 147:25 221:21 | 192:15 194:18 | | 165:1 222:24 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[activities - agree]**

Page 5

223:2 225:22
**activity** 97:1
    111:9
**actual** 57:7
    69:6 80:18
    142:3,4 185:15
    191:13 233:13
    233:16 234:2
    235:25 236:4
    238:11 245:4
    246:4
**actually** 16:12
    45:25 56:5,9
    57:8 62:3,8
    70:25 81:5
    131:23 137:15
    145:9 181:9
    195:17 202:6
    204:1 228:10
    238:25 243:19
    249:18 250:9
    251:1 253:5
**ada** 205:5
**adapt** 132:10
**add** 93:18
    101:8 133:3
    173:5 199:19
    229:21,21
**added** 103:24
    201:14
**adding** 59:6
    198:21 237:8
**addition** 31:4
    75:5 199:2

**additional**
    31:10 35:12
    66:8 88:18
    89:15 103:24
    111:4 198:12
    237:9 239:20
    241:7 248:2
**additions** 266:6
**address** 9:8,11
    47:11,13,15
    61:22 62:1
    65:6 78:18
    79:3,9 84:19
    89:1 90:18,21
    132:7,13
    161:12 188:3
    246:1,4
**addressed**
    160:18
**addresses** 46:7
    65:11,13 79:8
    161:25 186:6
**addressing**
    70:25 110:14
**adds** 59:8
**adjectives**
    39:23
**administer**
    7:24 8:19
**administrators**
    232:8
**adopting**
    179:25
**adult** 164:4

**adults** 5:24
    19:1 161:4
    162:1 163:13
    164:16 165:6,9
**advance** 199:1
    199:4,7 201:4
**advancement**
    3:4 8:15
**advancement...**
    3:9 264:2
**advantage**
    30:12 68:6
    175:24 179:21
**advantages**
    129:14
**affairs** 141:25
**affect** 35:18,19
    36:17 41:4
    43:12 45:18
    50:10 56:1,2,6
    71:14 86:7
    110:16 124:9,9
    124:10 136:1
    151:7,11
    223:16 245:8
    245:15
**affected** 56:15
    88:25 138:3
    221:24 253:8
**affects** 68:16
    139:1
**affiliations** 8:5
**affirmation**
    8:19

**affluence**
    238:10
**affluent** 237:14
    238:4,6
**afford** 177:11
**affordable**
    174:22
**afraid** 45:8
**african** 44:15
    150:21,23
    151:2 159:13
    209:1
**afternoon**
    209:16
**age** 26:13,13,18
    28:16 34:25
    35:1 54:11,14
    55:2,24 150:20
    151:1,24
    158:19 159:11
    191:19 194:1
**agency** 140:2
**aggregating**
    153:3,24
    154:15
**aggregation**
    153:5,21 154:1
    154:15 155:16
**ago** 255:19,20
    255:20
**agree** 7:10
    45:16 48:1
    87:25 89:14
    95:14 120:20
    174:11 183:15

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[agree - apart]**

Page 6

183:23 185:4
199:22 205:16
241:5 251:25
252:8
**ahead** 8:18,20
64:8 119:25
125:5 189:7
229:11 235:14
249:3 250:15
**airport** 168:15
168:16
**al** 234:13
**alan** 15:15
**alas** 142:12,14
**alleviate** 197:7
197:13 202:2
**allotted** 264:20
**allowed** 41:11
41:15
**allows** 90:2
**alluded** 195:3
**alternate** 85:13
125:3 136:14
**alternative**
47:3 49:3,4
59:8 71:7
73:22 81:10,11
90:25 91:6,7,8
92:2,18 125:7
177:4 198:19
226:10 237:5
237:18 238:15
**alternatives**
51:1 75:2

**altogether**
70:17 222:20
222:22
**amenities**
215:10
**america** 258:8
258:9
**american** 19:23
44:15 149:16
150:21,23
151:2 152:16
159:13 209:1
246:15
**americans**
205:4
**amount** 26:22
27:21 29:2,5
44:3 73:15
174:17,17
190:16,16
239:2
**amounts** 21:20
**ample** 174:4,12
**amtrak** 106:22
**analog** 183:22
**analogy** 167:7
**analyses** 14:15
14:16
**analysis** 5:18
21:15,20 29:16
30:9 33:22
34:6,9,11,13
36:14,16 38:12
38:21 44:24
45:2 52:15,20

52:22 54:10,18
56:1 58:21
63:12 65:10,13
70:23 71:8
72:23 73:11
84:8 86:3
93:11 98:7,8,9
99:19 100:9
101:5,6 102:11
109:22 110:5
112:7 118:17
139:10,14
156:12,21
157:14 158:10
158:13 159:6
159:10 183:2
191:1 192:14
192:24 197:24
197:25 233:11
233:15 234:5,6
237:13,20
238:24 243:16
244:6,8 250:12
252:11,11,19
252:22 253:1,2
253:13,25
260:20,24
**analyze** 83:1,18
85:9 161:15
232:20 233:5
233:11
**analyzing** 27:2
**anecdotally**
170:16

**anh** 3:14 4:6
8:11
**ann** 3:13 4:5
8:10
**annual** 95:15
**annually** 168:2
**answer** 11:22
35:24,25 41:13
41:23 44:6
52:3 53:25
55:15 56:8
59:12,16 69:22
70:1,2 71:3
121:21 125:15
125:22 136:1
139:12 140:5
153:17 160:7
195:22 212:9
244:23 248:24
249:3 250:16
**answered**
204:1
**answers** 55:5
247:16 248:3
249:5
**anticipate**
199:14
**anybody** 259:9
259:10
**anyway** 72:15
79:9 170:5
242:23
**apart** 15:1
229:22

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[apartments - assessing]**                                    Page 7

| | | | |
|---|---|---|---|
| **apartments** | **apply** 44:6 | 211:24,25 | 230:10,13,13 |
| 47:16 | 52:11 77:2 | 212:1,4,6,7,11 | 230:16 234:9 |
| **api** 97:9,13,17 | 150:25 153:18 | 212:16,19,21 | 243:2 256:9 |
| 97:23 98:9 | 185:25 | 212:24,25 | 258:4,13 259:2 |
| **app** 5:24 18:24 | **appointed** 16:5 | 213:3 216:23 | **articles** 18:9 |
| 161:3 164:11 | **appointment** | 217:4 227:12 | 24:18,20 46:2 |
| 174:25 178:19 | 16:11,17 | 227:14 | 49:8,10 |
| 181:9,12 185:5 | **approach** | **argue** 253:4 | **arts** 13:5 |
| **apparently** | 175:14 | **armen** 4:21 | **asian** 173:21 |
| 85:19 125:16 | **appropriate** | **arrange** 200:5 | **aside** 51:10 |
| 185:10 231:8 | 6:3 38:20 | 200:13,16 | 122:19 |
| 242:18 | 39:21 230:7 | **arranged** | **asked** 43:19 |
| **appealing** | **approximately** | 200:18,19 | 73:25 139:10 |
| 49:10 | 24:25 86:23 | **arrangement** | 146:4 147:19 |
| **appear** 50:4 | **arbitrary** | 131:3 201:4 | 214:9 249:6 |
| 74:1 147:3 | 135:11 | **arranging** | 260:25 |
| 262:4 | **area** 19:13 | 30:20 31:11 | **asking** 25:23 |
| **appearance** 8:3 | 42:20 69:10 | **arrested** 20:5 | 32:4,20,22 |
| **appearances** | 80:3 100:18 | **arrival** 33:5 | 39:19 41:10 |
| 3:1 4:1 8:5 | 118:16,17 | **arrivals** 33:5 | 69:20 84:5 |
| **appeared** 25:22 | 119:16,19 | **arrive** 33:13,16 | 98:23 114:4,10 |
| **appears** 44:4 | 149:19,21 | 101:7 206:9,11 | 130:21 136:19 |
| 117:8 143:7 | 150:4,10 | 251:13 | 137:8 138:24 |
| 144:8 166:20 | 167:11,13,17 | **arrived** 206:14 | 212:8,12,21 |
| 249:25 | 169:16 185:6 | **arriving** 33:14 | 244:18 245:1,4 |
| **appended** | 208:23 238:3 | **article** 5:15,18 | 248:22 |
| 266:7 | **area's** 15:22 | 24:16 45:21 | **aspect** 177:8 |
| **applicable** | **areas** 17:11 | 46:14 48:20 | **aspects** 111:7 |
| 252:6 264:8 | 86:7 120:6 | 54:8 66:24 | **assert** 206:1 |
| **application** | 134:20 151:8 | 67:9 112:2,16 | **asserting** 75:14 |
| 105:4 | 166:17 175:13 | 113:23 116:9 | **assess** 243:25 |
| **applies** 44:8 | 176:1 182:1,6 | 174:2 178:18 | **assessed** 220:12 |
| 106:17 120:17 | 182:24 211:11 | 179:13,15 | **assessing** |
| 205:5 | 211:11,13,14 | 181:8,12,14 | 178:25 |
| | 211:18,21,22 | 182:10 230:1,5 | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[assistant - aware]**

Page 8

**assistant** 15:13 16:2,22
**associate** 16:23
**associated** 31:3 124:13 130:21 166:13 174:25 201:14
**assume** 11:2 12:25 32:25 33:8 45:22 101:24 133:7 169:15,17 205:5 234:20 234:20 259:1
**assumes** 84:8 101:6
**assuming** 23:7 75:7,9,14 195:10
**assumption** 28:1 192:6 193:12
**assured** 119:19
**athens** 107:10 107:14
**atlanta** 1:3 2:3 20:4 107:10,14 117:23
**attached** 264:11
**attempt** 43:4,6 90:23 131:5
**attempted** 110:19

**attend** 50:8
**attention** 21:5 46:17 226:6
**attorney** 8:7 263:18 264:13
**attorneys** 12:16 24:14,17,19,21 24:24
**attributable** 172:5,6 210:19 210:21
**audio** 7:9
**august** 257:8
**authorities** 38:9
**authorization** 40:25
**authorized** 7:24 40:19,21 42:1
**auto** 51:2 63:16 88:10 118:19 127:22 149:6 149:15 150:15 150:21,24 151:5,16,22 152:2 157:12 158:22 159:1 159:16,17 207:16 208:8 208:15,18,21 209:12,22 210:2 211:10 211:16 213:9 213:24 218:8,8

220:9,12,15 224:20 251:9
**automatic** 97:24
**automobile** 49:19,22 50:9 50:15 159:8 169:21 186:11 250:7,8,10,12 250:14,19 253:21 254:7 254:13,15
**automobiles** 47:15 49:17 53:9 89:2 214:18
**autos** 50:1 76:4 76:5 259:24
**availability** 23:15 36:10 38:24 45:12 63:16 67:12 109:25 110:4 149:15 176:22 234:24
**available** 21:23 23:16 35:14,15 38:17 41:3 55:16 63:15 78:6 80:1 90:6 102:17,18 104:15 137:7 144:6,7 148:20 150:15,22,24 151:10,13

159:21,23 192:9,10,21 193:2 196:8 202:22 217:25 227:5 234:6 239:22 247:4 247:24 264:6
**availing** 221:25
**average** 26:24 33:8 75:19 77:19 93:10,14 93:19,20,22 94:13,21,25 95:4,23 96:2,5 96:8 106:20 125:16 134:20 165:5 189:12 204:25 205:1 236:21 252:12 252:13,15,20 252:23
**averaged** 94:2
**averages** 112:22,24 253:1,2
**avoid** 111:19 119:20 127:16 128:8,12 129:7 129:23,25 130:2,14 131:16 222:11 222:15 225:13
**aware** 23:9 38:15 40:18,20 40:23 46:6

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[aware - believe]**                                                Page 9

66:19 76:18,23
85:8,15 88:23
90:12,17 91:21
92:24,25 98:6
98:25 99:25
119:2 140:25
141:3 144:23
170:8 171:10
171:11 176:2
185:18 212:22
243:18 248:8
248:10

**b**

**baby** 234:4
**bachelor** 13:5
**back** 12:9
15:24 21:1
36:15 48:23
60:2 63:18
77:3 88:6 89:9
89:12 92:15
98:15 105:9
107:1 116:9,12
116:15 125:10
127:4 137:1
153:4,5,9,24
164:18 170:13
170:15 184:15
242:7 244:3
**background**
13:3
**backs** 82:16
**bad** 16:15
74:12 221:11

**ballot** 37:11,20
67:8,12,24
68:20,20 89:22
125:2 126:4,6
133:22 135:23
136:3,16,20,21
137:13,17,17
146:1,2 195:1
197:17 200:10
201:2,10 202:7
218:25 219:1,8
219:12 220:3
220:20,22
232:21 233:5
233:12 242:14
253:23
**ballots** 54:7
65:22 66:5,7
69:7,18 70:22
120:14 125:17
147:25 193:7
193:10 243:1
246:24
**bank** 15:7
90:20 92:3
**barranquilla**
19:3
**barriers** 216:22
**bars** 154:13
**bart's** 118:15
**base** 10:23
221:9
**based** 5:24
18:24 21:14
27:25 49:12

52:23 68:13,15
75:15 93:17
94:20 99:10,11
99:16 100:7,10
100:19 102:12
102:20 139:9
148:17 157:18
158:7 161:3
164:11 171:9
174:25 178:19
181:9,12 183:1
193:14 195:18
198:10 206:18
208:3 218:9
234:9 238:15
260:10,11,25
**baseline** 38:20
39:22 41:4
**basically** 260:5
**basis** 26:24
29:6 63:1 64:1
73:23 74:4
76:1 78:13
96:5 123:11
222:21 224:12
228:23 229:2,8
229:20,22
**batch** 97:14,18
**bathwater**
234:5
**bay** 15:22
100:18 118:16
118:17 119:16
119:18 183:22

**bear** 42:25
**began** 16:11
**begging** 70:14
**beginning** 2:17
8:6 16:3 37:9
41:12 176:5
**begins** 256:15
257:1,9 258:5
258:25
**behalf** 8:15
**behavior** 17:13
17:13 18:4,21
18:22 19:4,13
35:7 51:18
52:2 56:7,17
57:7,11,12,18
66:3 68:17
71:8,9,12
75:15,18 78:16
80:18 185:15
222:12 223:4,9
233:14,17
236:1,4 238:11
238:12,18
246:8
**behavioral**
68:3
**behaviorally**
68:3
**belief** 63:1
**believe** 10:8
12:7 17:23
19:20 26:5
49:20 55:23
56:7 58:18,20

Daniel G. Chatman , Ph.D.
May 16, 2023
Georgia Senate Bill 202, In Re

**[believe - boundaries]**                                              Page 10

| | | | |
|---|---|---|---|
| 62:19 63:3,5,9 | 70:1 74:14 | 205:8 213:11 | **blah**   150:16,17 |
| 64:7,8 73:2 | 151:4 157:19 | 213:19 219:2,4 | 150:17 |
| 79:4,8,15 | 204:22 208:7,7 | 250:20 | **blais**   45:20 |
| 85:22 92:22 | 215:15,17 | **black**   3:3 8:16 | **blind**   201:8 |
| 93:4 116:22 | 216:17 237:10 | 26:12 28:15 | **block**   135:9 |
| 125:18 152:2 | 255:18 | 34:25 37:5,5 | 149:10,20,24 |
| 152:15 160:4 | **beyond**   27:12 | 41:22 43:17 | 150:3,25 151:4 |
| 160:12 181:23 | 43:1 91:9 | 73:17 90:24 | 151:8,10,13,14 |
| 183:1 187:5 | 124:13 130:1 | 91:5,15 139:15 | 151:15,22 |
| 188:5 206:7 | 147:5 189:3 | 139:23 141:16 | 152:3,9,21,22 |
| 209:23 210:1 | 241:9 243:4,4 | 141:23 142:23 | 153:7,11,18,23 |
| 229:12,14 | **bias**   239:10,11 | 143:5 145:5,6 | 154:10,13 |
| 237:7,8 240:10 | 240:3,6,7,13,16 | 145:9,14 146:6 | 156:4,8,16 |
| 240:23,24 | 241:3,3 | 146:8,12 | 157:6,8,10,18 |
| 242:22 250:18 | **bicycles**   186:7 | 171:15,18 | 158:2,8,17,18 |
| 252:13 259:18 | 186:14,17 | 186:22 187:5 | 158:24 159:2 |
| **believing**   74:4 | **bicycling** | 188:2 204:6 | 159:21,23 |
| **ben**   230:9 | 186:18 | 206:2 207:7,9 | 160:2,10 207:4 |
| **benedictis**   5:17 | **big**   48:1 135:4 | 207:19 209:20 | 207:6,15 208:2 |
| 46:16 | 140:10 143:11 | 210:1 211:17 | 208:8,12,13 |
| **benefits**   124:13 | 143:11 193:10 | 212:4,5,13,17 | 209:12,13 |
| 124:13,15 | 194:3 | 212:19,23,25 | 218:12 251:17 |
| 129:8 | **bigger**   174:23 | 213:3,8 214:2 | **blush**   88:21 |
| **benjamin**   6:5 | **bill**   1:7 2:7 7:15 | 219:19,24,25 | **board**   3:12 4:4 |
| **benson**   4:19 | 90:18 92:3 | 241:17 244:10 | 8:10 47:22 |
| **berkeley**   9:9 | 93:1 264:4 | 244:15 245:3,4 | 69:19 191:23 |
| 13:6 15:21 | 265:1 266:1 | 245:6,10,16,20 | 220:5 |
| 16:5,8,18 | **binding**   10:16 | 250:21,22,23 | **botswana** |
| **best**   11:23 52:2 | **bit**   13:4 15:7 | 251:21 253:14 | 13:17 |
| 76:21 99:24 | 26:9 38:3 | 254:18,20,24 | **bottom**   228:24 |
| 125:22 134:24 | 71:14 116:5 | 258:8,9 | 228:24,25 |
| **bests**   118:19 | 117:18 134:2 | **blacks**   147:10 | **bound**   80:4,10 |
| **bet**   237:23 | 146:7,9 147:14 | 172:10 211:25 | 247:19 248:13 |
| **better**   40:24 | 148:4 155:10 | 213:4 252:5 | **boundaries** |
| 67:3 69:22 | 161:22 186:9 | | 107:9 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[box - burden]**

Page 11

| | | | |
|---|---|---|---|
| **box** 6:3,3 21:24 | 229:5 230:6,7 | 68:7 70:8,16 | 245:11,17,19 |
| 23:10,15 27:14 | 231:7,11,13,19 | 70:24,25 71:19 | **bracket** 118:20 |
| 27:15 28:10 | 231:20 232:4,5 | 78:11,19 81:4 | 169:19 170:4 |
| 29:23 33:23,23 | 232:11,21 | 81:6,7,10,13,18 | **brad** 3:11 4:3 |
| 34:1 35:13 | 233:6,12,24 | 82:9,10,12 | 4:16 8:9 |
| 43:12 54:23 | 234:2,10,11,14 | 89:9 101:11 | **braves** 129:11 |
| 59:3 66:1,20 | 234:22,24 | 105:17,25 | 129:13 |
| 67:18,24 72:13 | 236:23 237:1,6 | 125:8 133:10 | **break** 11:20,21 |
| 72:22 75:5 | 237:18 238:15 | 133:11,22 | 11:24 57:3,5 |
| 76:19,23 77:13 | 238:19 239:15 | 135:18,23 | 59:19 105:7 |
| 78:6 79:12,16 | 239:22 242:14 | 136:11,20 | 141:15 145:4 |
| 79:25 80:2,8 | 242:17 243:19 | 137:13,25,25 | 170:23 184:9 |
| 80:13,19 82:1 | 245:21,23 | 139:13 141:9 | 184:11 220:24 |
| 86:1 89:5,6,7,8 | 246:23 247:4,5 | 143:11,16,19 | 241:25 242:1,3 |
| 89:13,16,22 | 247:11,22,24 | 143:25 144:5,6 | **breaks** 12:1 |
| 101:25 103:17 | 248:5,14,16,19 | 144:7,10,12 | 142:22 |
| 103:23 104:8 | 248:20,21,25 | 147:25 176:24 | **brian** 4:17 |
| 104:13 106:10 | 250:13 252:3,4 | 183:9,11,12 | **bridge** 118:9,20 |
| 109:14 132:16 | 253:23 | 185:23 190:17 | 183:22 |
| 132:22 133:19 | **boxes** 10:4,10 | 190:18 191:16 | **briefly** 13:11 |
| 135:15 136:3 | 21:6,9,21,23,25 | 191:20 193:1,2 | **bring** 74:1 |
| 137:18 138:7,8 | 22:5,9,12,19 | 197:8,11 | 226:6 |
| 138:16 139:3 | 26:15 34:12,12 | 204:19,21,23 | **broad** 206:17 |
| 143:14 156:10 | 36:21,23 37:11 | 215:25 219:1,8 | **broader** 181:6 |
| 158:4 183:10 | 37:20 38:1,6 | 219:12,16,20 | **brought** 113:2 |
| 186:15 192:22 | 38:10,16,24 | 220:3,10,20 | **building** 205:2 |
| 194:10 195:9 | 39:13,17 40:2 | 222:4 229:13 | **built** 17:12 |
| 195:13 197:17 | 40:18,25 41:2 | 229:14 232:1,9 | **bulk** 193:24 |
| 201:10 202:21 | 41:9,10,14,15 | 233:21 234:19 | **bullet** 260:6,12 |
| 202:22,25 | 41:23 42:1,1,6 | 235:21,22,23 | **bullets** 260:4 |
| 203:7 205:2 | 44:10,20 45:13 | 236:2,14 237:7 | **bunch** 105:10 |
| 214:4 216:1 | 57:8,19,21,25 | 238:25 239:1 | **burden** 26:15 |
| 218:25 220:22 | 58:2 59:3,7 | 242:13,19 | 26:20,22 27:1 |
| 224:5,8,9,10,15 | 65:6,11,11,14 | 243:1,9 244:11 | 27:11,15 28:3 |
| 225:2 228:21 | 65:20 67:12 | 244:14 245:7 | 28:15,22,23 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[burden - car]**                                                                    Page 12

29:5 30:1,5
34:17,20,20,22
34:24 35:5,6
40:8 41:6,16
41:19,19,20
42:2,2,5,13
43:12 44:9,20
52:21 53:1,2
57:15 64:20
72:7,24 73:8
76:7,9,14
80:25 81:3,5
82:25 83:11,14
83:19 85:9
88:7,12,16,20
89:15 94:18
99:21 101:16
103:19 110:11
110:14,15,17
112:10 123:3,4
123:18 125:3,7
130:20 131:3,4
131:7,12,13
133:4 135:10
135:13 137:23
138:3 139:3
156:7 158:9,13
168:18 177:3
178:1,3,11,15
186:1 202:2
203:6 204:7,13
204:14,15
205:19,22,25
213:14 214:6,7
217:10,10

218:6 219:1,20
220:1,3 224:18
229:2 236:5
237:10,11,20
237:21,22
239:18,23
240:1,1 241:4
241:6,8,11,12
241:14,20
245:16 246:5
250:8,10,13,23
250:25 253:14
253:14 254:23
**burdened** 59:3
73:10
**burdens** 34:9
43:7,16 44:1
57:23 62:13
73:4,7,16 75:3
81:24 146:13
146:21 156:4
176:24 177:10
178:25 217:16
218:17 220:9
222:8 242:12
242:13 245:3,8
**burdensome**
30:10,10,11,12
52:15 66:20
104:7 110:21
114:2 138:11
180:8 206:3
214:14
**bus** 19:4 31:19
31:20,22,25

32:2,2,12,15
33:6,14,15,17
34:4 99:14
113:10 115:18
116:4 117:6,18
**buses** 113:5
176:10,15,19
**business** 103:9
**buys** 120:8

**c**

**ca** 3:18
**cab** 214:22
**cal** 16:3
**calculate** 98:10
98:13 101:12
190:12 193:21
206:24 211:7
**calculated** 44:5
152:25 156:3
192:16,20
228:5
**calculating**
28:25 29:2
101:10,16
206:17 217:9
**calculation**
74:17
**calculations**
97:9,11 106:20
195:6 218:6
220:13
**california** 1:15
2:17 7:1,20
13:6 202:11
263:2

**call** 22:25 27:3
36:10 61:14
82:4,5 102:12
103:8 164:11
199:4 209:10
240:24
**called** 14:13
17:25 18:3
46:22 111:13
**calling** 189:7
199:3
**cameron** 4:18
4:24 7:21
**cancel** 239:3,4
**capacity**
190:23,24
191:21 194:8
195:24
**capital** 175:14
**caption** 47:11
**car** 5:16 46:7
46:15 48:4,13
48:16 53:24
74:25 83:12,12
83:15,22,23,25
95:10,21
102:25 103:5
113:4 114:25
115:6,7,14,18
117:6,13 118:1
129:18 130:11
131:8 133:20
157:25 158:14
178:8,15 215:9
215:11 225:16

249:7
**care** 123:9
140:23 179:14
250:3
**carless** 211:12
**carried** 26:23
28:5 78:9
**carry** 27:21
169:24 170:17
**carrying**
170:13
**carryover**
114:2 246:14
**cars** 47:3 78:17
95:16 104:25
107:25 108:1,6
108:10,12
161:20 227:4
**carver** 4:16
**case** 1:7 2:7 6:4
7:17 9:22 10:2
10:5,7 17:6,8,9
17:17,24 18:6
18:8,15 19:1
19:14 20:12
24:2 25:12,18
28:10,19 33:9
42:6,14 43:8
49:21 50:3
61:3 67:23,25
80:6 126:5
143:8 161:12
161:15 180:19
186:13 200:20
213:17 229:7

230:7 232:5
239:24 247:18
260:21,25
263:14
**cases** 9:17,19
20:17,19,21
21:3,6,7,8 24:4
24:4 28:7,16
84:20 85:18
118:3 184:22
188:15,16
192:12 195:8
**cast** 89:22
146:1,2 147:25
200:10
**casting** 68:20
137:17 202:6
**catch** 232:25
**categorical**
169:9
**categories**
79:23 80:5
145:4 169:13
**category** 79:23
79:25 91:20
109:7,9 110:12
203:11 248:24
**cause** 62:13
**ceased** 14:2
**census** 55:16
63:17 84:14
149:9,10
151:18,20
152:5 153:19
153:20,22

154:10 156:4
156:15,16
157:3,6,6,7,10
157:17 158:12
158:23 209:12
209:13 217:21
227:25
**center** 2:16
3:17 7:19
15:15,17 102:1
103:18 104:13
**centers** 101:12
**central** 228:19
229:5,13,15
**centroid**
157:18 158:2,8
207:4
**centroids** 156:8
**certain** 59:7
94:13 97:6
104:21 109:9
109:11 118:8
148:7 149:24
160:9 169:12
169:22 177:16
201:9 215:9
235:20
**certainly** 26:9
65:10 73:13
80:22 137:6
143:7 177:24
180:9,12,19
**certified** 2:19
263:1

**certify** 263:3,16
**chain** 103:9
104:1 225:12
226:25 231:19
**chained** 226:15
**chaining**
224:25 225:9
226:13 227:3
229:1,9
**challenged**
200:15 215:9
**challenging**
147:14
**chance** 237:3
**change** 33:22
34:24 35:4
40:6 41:18
55:9 58:20
100:10 134:14
136:9 216:3
239:12,17,18
244:13 253:8
265:4,7,10,13
265:16,19
**changed** 19:4
**changes** 34:7
34:10,16,18
56:6 135:8
239:13 264:10
266:6
**changing** 175:9
**characteristic**
63:14
**characteristics**
39:2,20 160:1

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[characteristics - cochran]**                                      Page 14

160:9 171:24
187:20
**characterize**
116:3
**chatman** 1:14
2:14 5:3,10,11
5:13,14,25 6:6
6:7,9,10,12,13
6:15,16 7:13
8:23 9:3,7 12:6
13:1 23:24
25:14 60:5
115:6 127:7,14
140:21 184:18
230:11 242:10
259:5,17 261:9
262:1,12 264:5
265:2,24 266:2
266:4,12
**cheaper** 130:9
**check** 90:10,11
92:2,25
**checking**
218:11
**cheeky** 43:21
**child** 123:9
**children**
150:15 173:2
**choice** 29:22,23
104:16 109:11
109:12 247:3
**choices** 19:9
68:24,24
111:15

**choose** 27:18
68:24 104:1,5
104:13 245:16
247:11
**choosing**
130:24 131:13
140:3 245:18
**chose** 248:23
**chris** 1:21 2:19
7:23 263:23
**circled** 251:2
**circumstance**
104:10
**circumstances**
50:24 67:10
124:24 135:14
198:7
**cite** 46:2 112:2
112:9 113:10
113:19 114:2
174:8 189:20
225:17
**cited** 196:3
247:19
**cities** 14:12,14
106:22,23
174:24
**citizen** 124:14
157:11
**citizens** 26:12
26:13,18 28:16
34:25 35:1
49:6 54:10,14
55:2,23 150:20
151:1,23

158:16 159:10
191:18 194:1
**citizenship**
158:21,24
**city** 17:3
106:19 262:8
**civic** 45:18
**civil** 9:23
**civilization**
257:10
**claim** 45:11
84:12 181:19
197:6 226:8
236:20 241:1
**claiming**
217:19
**claims** 62:12
70:12
**clarification**
20:25 75:12
90:8 94:4
98:12 149:13
155:7 178:10
**clarify** 11:1
30:22 65:17
98:20 137:4
**classes** 17:22
**classify** 61:23
62:2
**clear** 11:6 16:2
16:17 42:25
43:5 48:15
57:10 67:15
76:17 86:10
92:21 95:24

179:14 194:25
209:15,17,18
241:13 250:6
254:11
**clearly** 239:24
**clergy** 3:3 8:16
**close** 69:18
107:14 200:14
228:21 232:5
246:25 247:23
**closer** 108:9
138:12,15
162:24 200:9
250:21
**closest** 72:13
79:12,15 80:14
231:11 232:4
234:14 236:3
239:1,16,17
247:25 248:5
248:16,17,19
248:21,25
249:1,9
**closing** 242:2
**cluster** 114:7,9
**clustered** 145:5
226:11
**clusters** 88:24
**coauthored**
161:2
**cochran** 5:25
161:2,24 162:7
162:19 169:2
171:15 176:6
178:18 181:7

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[cochran - conditions]**                                          Page 15

182:10,11
**coefficients**
171:23
**cohort** 169:20
**colleagues**
199:12
**collected**
128:19
**collects** 96:23
**collegiate** 19:23
**collingwood**
6:4 78:22 79:1
79:14 229:25
230:8 233:20
**colombia** 19:3
**colorado** 195:9
243:4
**column** 113:10
114:25 115:6,7
115:14 178:17
**combination**
130:12
**combine** 225:1
**combined**
89:25 165:8
**come** 15:24
22:18 105:9
111:18 116:12
116:13,15
149:8 159:20
245:15
**comes** 159:21
182:8 189:21
**coming** 63:18
87:1 118:9

**comment** 40:14
57:16,17
168:12
**comments** 88:5
**common** 225:9
**commonly** 40:3
**community**
149:16 152:16
**commute**
185:12 227:7
227:12,21
**commuting**
227:14
**companies**
176:9
**compar** 212:22
**comparable**
161:19
**comparably**
171:17
**compare** 35:15
94:12 123:25
146:23 147:11
167:19 187:9
190:23 216:9
**compared**
35:14 37:21,22
37:23 64:12
139:16 147:10
176:3 211:11
211:21
**comparing**
34:11 37:17,18
73:17 133:21
137:12 145:24

156:1 167:9
218:24
**comparison**
50:22 115:12
115:13 119:14
124:16 137:8
137:11 191:14
228:9 235:19
**comparisons**
34:23 204:5
**compatible**
225:21
**compensated**
20:11,13
**competent**
17:19
**complaint**
198:15
**complaints**
24:16 198:17
**complete** 24:9
72:19 99:5,6
266:8
**completed**
264:17
**completely**
34:4 257:9
**completion**
263:14
**complex** 153:1
**complicated**
144:13 159:22
**comply** 205:3
**component**
202:16

**components**
110:20
**conceived** 52:4
**concentrated**
77:18 202:5
211:18,20
212:25 217:18
**concentration**
215:12
**concern** 66:6
**concerned** 3:3
8:15 185:5
**conclude** 78:13
**concluded**
174:2 232:17
**concludes**
261:8
**concluding**
78:14 228:23
229:2
**conclusion**
36:22,25 43:19
48:15 179:24
197:12
**conclusions**
26:6 36:17,18
43:15,18 206:9
213:20 221:6,9
221:13,15
252:2 253:1
**concrete** 31:17
247:9
**conditions**
11:16 100:10
186:18

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[conduct - correct]**

Page 16

| | | | |
|---|---|---|---|
| **conduct** 111:13 199:17 | **considerably** 184:21 | **contents** 12:12 | **conventional** 5:24 18:25 161:3 |
| **conducted** 40:12,16 | **consideration** 34:19 | **context** 30:25 41:8 | **conversation** 11:4,8 62:11 |
| **conference** 19:23,24,25 | **considered** 28:22 148:14 152:6 | **contextualize** 36:11 | **conversations** 7:8 |
| **conferred** 173:12 | **consistent** 71:15 152:9 | **contextualized** 174:15 | **convicted** 20:5 |
| **confess** 137:1 | **consists** 216:25 | **continue** 7:9 11:3 256:16 | **coordinate** 199:15 |
| **confidence** 147:9 154:6,10 154:22 155:3 155:14,22 | **consonant** 44:17 | **contours** 21:12 | **coordination** 131:4 185:10 |
| **confirm** 259:19 | **constant** 31:11 31:22,24 | **contract** 13:25 | **copies** 264:14 |
| **confounding** 50:8,12,20 | **constitute** 168:18 223:9 | **contrary** 179:19 | **copy** 136:5,14 224:1 230:24 261:10 |
| **confused** 98:16 223:25 | **constitutes** 72:21 77:6 131:2 | **control** 166:18 167:5 172:16 173:1 191:24 223:22 | **corner** 130:12 |
| **confusing** 254:10,12 | **constrained** 188:24,25 | **controlled** 167:19 173:6 | **corps** 13:15,15 13:21 14:1,2 |
| **confusion** 165:21 | **constraints** 61:4 216:7 | **controlling** 166:9,20 172:14 | **correct** 14:5 16:20 17:20 18:11 20:9 21:17 27:4 38:16 42:22,23 43:3,6,9,10 50:10 51:13 52:13 56:8 64:5 65:23 66:2 67:20 69:2,4,20,21,21 78:22 80:15 82:20 85:21 89:25 92:19,20 94:12,15 95:6 95:10 96:1 |
| **congestion** 19:8 99:18,20 | **consult** 18:16 | **controls** 171:24 | |
| **connect** 105:16 | **consultant** 14:10 | **convenience** 82:14,15 115:12 222:20 247:6 | |
| **consequently** 75:1 | **consulting** 14:10,12 15:7 | **convenient** 51:5 75:6 81:16 82:13 83:10 144:12 205:11 224:25 231:19,20 237:19 238:14 247:1 | |
| **conservatively** 21:22 | **cont'd** 4:1 6:1 127:12 | | |
| **consider** 17:18 57:21 81:9 136:19 160:14 180:4 186:13 232:8 | **contain** 183:8 | | |
| | **contained** 157:5 260:20 262:5 | | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

[correct - court]

Page 17

101:24 109:3
112:17,19,21
113:5,9 120:1
120:18 121:1,4
122:2,17,23
128:11 132:17
132:18 133:16
133:20 145:7
152:18 154:5,8
155:16 161:10
162:5,12
163:22 167:7
168:5 171:17
171:21 172:19
172:20,25
173:22 182:1
182:24 184:19
185:2 186:11
192:17 200:3
200:15 201:16
203:2,4 204:19
217:13 219:2
220:4 222:9,10
224:10 227:8
235:23 238:21
239:3,7 240:16
240:17 256:10
260:16 262:6
266:8
**corrected**  262:6
**corrections**
262:4 266:6
**correctly**  21:13
35:20 103:7
108:22 113:7

113:13,16
156:3 204:9
**correlate**  60:6
60:12 105:24
**correlated**
172:7 210:22
210:24,25
211:1
**correlation**
60:16 61:12
85:2 106:9
**correspondin...**
215:23,24
**cost**  30:15,20
31:10 43:2
45:25 68:16
83:3 132:3
171:8 177:8,20
185:5,7 223:16
**costco**  130:9
**costly**  68:23
81:12 110:10
223:5
**costs**  30:17,17
31:3 32:14
42:16,18 45:17
46:3,5,5 52:4
222:24,25
223:19 245:20
246:2 247:17
**cough**  130:17
**counsel**  7:13
8:4 12:4,23
23:22 25:9
46:12 111:24

140:16,18
160:24 173:12
184:6 196:13
230:3 255:11
255:23 256:13
256:23 257:6
257:15 258:1
258:21 264:14
**count**  77:22
144:16,18
**counted**  203:5
**counter**  144:11
**counterfactual**
37:24 38:4
**counties**  14:12
14:15 37:10,20
37:25 38:5,9
39:12 70:2
86:1 87:7,14
87:20 88:1,19
148:18,19,21
148:22 149:4
149:11 183:4,6
183:7,14
188:21,23
189:4 204:21
204:23 219:10
235:22,23
**counting**  58:4
193:17 248:15
**country**  13:16
123:8
**county**  79:5,11
81:21 82:11,12
85:7,10,12,15

85:20 86:2
87:10 88:3
89:3,3,17
133:15 155:20
155:20 188:14
189:15,22,22
190:25 196:5,7
203:1 243:17
249:22 250:11
251:11,16,17
251:19 252:6
253:25 254:4,5
255:1,2
**county's**
189:11
**couple**  10:19
13:18 14:17
78:18 88:4
113:21 116:10
121:14 123:24
123:24 132:2
148:5 155:19
174:8 225:1
259:17
**course**  17:25
18:2 46:5 51:3
80:9 124:1
125:25 214:25
**courses**  18:4
**court**  1:1 2:1
7:16,22 8:17
11:6 16:13
59:18 98:13
125:4 155:8,12
156:23 235:12

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[court - data]                                                    Page 18

| | | | |
|---|---|---|---|
| 259:11 261:10 | **cva** 89:16 | 250:21,22 | 72:16,17,24 |
| **courtroom** | 212:25 254:16 | 251:7,8,21,21 | 78:15,19 79:5 |
| 10:16 | 254:24 | 253:12,14,21 | 80:23 81:17 |
| **cover** 19:15 | **cva's** 70:24 | 254:3 | 82:11 84:14,15 |
| **covers** 149:19 | **cvas** 54:12 58:4 | **cycle** 122:15 | 84:15,24,24 |
| **creates** 40:8 | 61:22 62:1 | **cycles** 122:19 | 85:2,4 88:6 |
| **crime** 20:6 | 64:3,13 73:17 | | 93:13 96:16,16 |
| **critical** 173:13 | 73:17,18,18 | **d** | 96:18,21,23 |
| 178:20,24 | 74:5 90:24 | **daily** 26:23 | 98:3,4 99:4 |
| **criticism** | 91:16 101:11 | 29:6 73:23 | 102:16,18 |
| 240:19 | 150:23 156:14 | 94:13,21,25 | 105:16 106:2,5 |
| **criticized** | 186:22,24 | 96:18,19 | 118:16 128:19 |
| 252:17 | 187:5,6,10,11 | 123:11,15 | 130:25 131:21 |
| **critique** 237:5 | 187:13 188:2 | 124:16 163:3 | 147:6 148:8,15 |
| 252:10 | 190:8 192:14 | 165:7,8 190:23 | 148:20,23 |
| **cross** 20:25 | 202:21 204:6 | 190:24 191:13 | 149:5,16 150:6 |
| 75:12 98:12 | 204:12,14 | 237:9 238:6 | 150:8,10,13 |
| 155:7 178:10 | 205:19 206:2,4 | **dan** 6:6,7,9,10 | 151:4,9,17 |
| 218:11 | 206:4 207:22 | 6:12,13,15,16 | 152:5,6,7,8,14 |
| **crowell** 2:15 | 207:23,24,25 | **daniel** 1:14 | 152:17,21,23 |
| 7:18 | 207:25,25 | 2:14 5:3,10,11 | 153:9 154:11 |
| **crying** 8:21 | 209:1,20 210:2 | 5:12,14,25 | 157:3 158:11 |
| **cs** 264:15 | 210:11 211:17 | 7:13 8:23 9:7 | 158:12 163:1,1 |
| **csr** 1:22 263:24 | 211:19 212:4,5 | 127:7 261:9 | 163:3,3,12,22 |
| **culture** 70:10 | 212:7,10,13,13 | 262:1,12 264:5 | 163:24,25 |
| **cumulative** | 212:15,17,19 | 265:2,24 266:2 | 164:1 169:8,10 |
| 37:3 | 212:21,23,24 | 266:4,12 | 170:7,8 171:9 |
| **curiosity** 13:16 | 213:1,3,3,8 | **darn** 82:13 | 171:10,11 |
| **current** 16:25 | 214:2,4 217:9 | **data** 23:9 24:13 | 172:9 174:1 |
| 81:7 176:14 | 219:2,4,19,25 | 29:9 36:24 | 175:19 176:2 |
| **cut** 109:14,20 | 219:25,25 | 45:10 46:18,23 | 177:24 179:15 |
| **cutting** 74:12 | 220:8,12 | 48:25 49:12,13 | 183:5 188:11 |
| **cv** 5:11 12:21 | 241:17,18,18 | 50:2 55:8,16 | 191:11 195:5,7 |
| 16:1 18:17,23 | 241:18 242:14 | 55:17 58:13,23 | 195:18,23 |
| 18:24 | 245:3 249:22 | 58:24,25 63:14 | 196:1,8,8 |
| | | 63:17,17 66:19 | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[data - demographic]**

Page 19

197:12,15,23
198:10,12,15
206:8 207:11
208:9 213:21
217:21 218:16
218:19 221:10
221:16,18
222:7 227:22
234:6,7 237:25
238:2 239:13
240:22 243:17
243:18 246:1,4
246:14 247:20
260:5,13,22,23
**dataset** 57:8
**date** 16:9
208:22 263:19
265:24 266:12
**dated** 256:7,25
257:8 258:3,23
263:21
**dates** 195:9
**david** 3:13 4:5
8:10
**day** 21:9 22:13
22:20 23:10,13
23:14 29:25
30:3 32:5 43:5
45:4,15 52:12
71:7 72:19
74:22 93:11,15
100:10 104:4,6
104:6,11
109:17 118:15
123:7,8,9

124:11 141:10
189:13 193:8,9
193:9 194:8
199:7,15
201:20 239:21
262:7 266:15
**days** 23:16 94:9
95:5,5 104:12
104:21,22
105:2,2,4,10,11
165:15 192:21
193:7,11,15,19
194:8 198:5
264:17
**dc** 3:7 4:10
**dds** 27:3 34:14
36:20 54:23
65:18 82:19
83:2,7,20 85:7
85:14,21 86:11
86:13 87:15,17
87:19,20 88:3
88:8 89:6,12
89:14,16,20
101:12,25
103:18 104:14
133:11 156:10
176:25 185:24
186:15 202:2,9
202:10 217:10
218:2 222:5
259:24 260:7
**de** 5:16 46:16
**deaf** 215:5

**deal** 19:13
79:19 105:13
111:1 122:20
135:4 169:4
191:6
**decent** 100:2
**decide** 246:2
**deciding** 28:23
**decision** 29:19
29:20 72:3
100:2 123:14
247:18
**decisions** 68:9
193:4
**declare** 262:1
266:4
**decrease** 73:4,7
73:8 147:8
234:13
**decreased**
42:17
**deemed** 266:6
**defendants**
3:11 4:3 7:14
**define** 26:21
27:1 76:24,25
109:1
**defined** 27:14
106:24
**defining** 94:17
**definitely** 56:25
88:4 106:12
108:8 115:22
**definition** 27:7
27:25 28:2,7

28:18,24 29:4
77:6 88:11
96:14 109:5
247:25
**degree** 59:7
**delayed** 99:14
99:14
**deliver** 66:5
136:2 195:1
**delivered**
193:24,25
**deliveries**
195:9
**delivery** 69:7
195:9
**demand** 21:21
188:4,9,13
189:2,11,24,25
190:11,13,24
191:3 192:16
192:20 193:12
193:13,21
194:9,11,19
195:24 196:4
196:25 197:2,6
197:13 198:4,8
198:13,14,22
199:10,13
200:8 202:1,8
**democratic**
47:5 54:25
256:16
**demographic**
14:16 72:17
142:23 143:6

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[demographic - different]**

Page 20

152:7 156:13
156:22 169:4
178:23
**demographics**
179:7
**demonstrate**
30:9
**demonstrated**
197:21
**dense** 215:13
215:22,23,24
216:9,23 217:6
**denser** 53:3
86:7
**density** 134:21
216:8,10,13,24
216:25 217:8
**department**
15:2,2 17:2,3
27:2 196:10,11
**depend** 218:7
226:14
**depending** 32:6
33:20,25
104:14 111:10
117:15 187:19
206:20
**depends** 31:25
33:19 34:2
117:16 122:1
152:23 180:23
201:4 236:16
236:18
**deponent**
264:13 266:3

**deposed** 9:12
9:15,18,22
10:2,9 20:17
20:18
**deposing**
264:13
**deposition** 1:14
2:14 5:10 7:13
7:18 12:12,15
12:19 263:13
**derive** 114:5
149:2
**describe** 9:20
17:10 76:15
139:2
**described**
103:3 159:25
160:8 206:6,15
220:11 229:10
229:23
**describing**
41:17 75:16
**design** 46:19,23
49:1
**desire** 59:2
**desired** 193:25
**despite** 99:20
179:16 248:5
**destination**
71:7 76:25
102:14 119:3
156:7 218:18
**destinations**
77:8 97:19,20
103:6 216:16

216:25 217:6
222:16,17
246:10
**destroying**
257:10
**detail** 140:5,21
191:2 206:6
224:16
**detailed** 150:12
197:25 206:16
**details** 37:11
235:6,16
**determinant**
233:17
**determinants**
71:11
**determine** 57:6
58:12 85:2
96:6 154:6,9
207:7,10
236:25
**determining**
45:25 198:12
236:5 242:14
**developing**
178:20
**development...**
13:13
**dfalk** 3:20
**dgchatman** 6:6
6:7,9,10,12,13
6:15,16
**diary** 96:23
97:1,1 130:25
164:20,22,25

165:3
**die** 56:21
**difference** 32:8
33:1 43:4
47:25 48:2
52:3 78:10
99:19 108:14
133:18 134:1
135:2 146:2
154:1 158:4
172:3,18 173:5
175:4 210:12
210:18 211:5
213:23 238:24
241:15 252:12
252:13,15,23
**differences**
32:6 47:11,14
47:18,23 75:16
116:21 134:12
134:17 155:1
155:25 173:7
210:19 232:21
233:5,12 252:3
**different** 26:9
27:6,18,22,22
28:12 29:9,10
29:14 31:12,13
31:14 32:5
34:4,5 40:4
41:12 55:24
58:19,22 62:21
62:23 63:2,4,6
64:4,9 70:12
80:13,22,23

**[different - discussing]**

96:2 99:1
105:21 110:11
111:16 115:21
117:15,18
118:22,23
125:19 129:16
134:7 139:6
147:15 153:19
162:25 171:22
172:13 177:16
179:7,7,7,12
187:17,19
188:1 194:17
201:5 202:4
207:11 209:5
225:1 238:19
249:5 253:13
**differential**
137:23 138:3
188:23 214:5,7
227:3 238:1
245:3
**differently**  27:1
121:17 150:7
**difficult**  37:4
58:12 70:5
104:23 109:17
128:7 129:5
130:20 131:4
144:3 146:22
147:3 169:23
170:11 185:11
186:19 199:1
199:14 201:22
201:24 215:6

**difficulty**  45:14
65:5 66:15,17
120:4 245:21
**dimensions**
37:6,7
**dimmick**  4:17
**direct**  46:17
**directed**  167:25
**direction**  34:5
100:14,15
103:17,23
104:2 170:1,2
239:12,14
240:5,6,8,11,16
240:23 241:2
263:10
**directly**  17:23
18:14 34:16
35:18 67:8,24
151:18 230:24
**director**  15:14
**disabil**  166:12
**disabilities**
5:25 19:1
26:14 35:1,3
37:5 41:21
42:8 44:7,13
44:15 61:4
74:7,8 91:18
91:19,23 92:7
106:4,11,15
139:16,17,24
160:19 161:4,8
161:9 162:2,5
162:20,22

163:7,9,14
164:5,10,16
165:6,9 166:9
166:12,24
167:10,12,20
167:20 174:6
174:13,18
179:16 181:1
181:17,25
182:23 183:13
187:6 188:10
188:16,17
189:1 190:1,2
190:6,8 192:7
192:15 197:16
198:2,18
199:23 201:20
204:12,15,19
204:20,22
205:4 207:20
207:25 208:1
209:21 210:5
213:8 214:6,8
214:15 215:3,4
216:20 217:2
219:5,25
241:18,19
**disability**  84:25
158:19 159:19
166:4,14,20
172:7 180:24
186:25 189:10
194:2 200:12
201:5,6,12,25
206:5 208:19

209:9 218:12
220:25
**disabled**  13:13
73:18,20
132:11 161:13
180:20 182:6
191:17,25
241:18
**disagree**  54:3
**disavowed**
21:11
**discount**
130:10
**discounts**
185:19,22,23
185:25 186:4
**discourage**
222:19,22
**discretionary**
26:23 28:4
29:2 108:21,23
109:1,7,15,21
129:12,20
162:14 170:20
170:21 171:4
181:22
**discuss**  224:17
226:5
**discussed**  25:17
133:14 136:15
167:24 202:19
202:20 213:11
218:7 242:25
**discussing**  54:2
90:6 155:1

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 512 of 691
Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[discussing - driver's]

Page 22

234:12

**discussion**
230:18 231:4

**disentangle**
144:4

**disparities**
36:12 37:1
74:6,7

**disparity** 36:19
74:17 76:14
139:15 241:11

**disproportion...**
28:15

**disproportion...**
42:7 181:25
182:22,24
211:18,20

**disqualifies**
55:12

**dissertation**
128:18

**dissuade** 44:1,2
57:24 135:14
221:24

**dissuaded** 23:7
125:23 222:8

**dissuades**
30:16

**dissuasion** 44:4

**distance** 6:3
35:9 81:7,19
82:19,22 96:25
97:11 101:10
101:13,18,22
101:23 137:14

138:13 158:3
177:5 180:6
194:25 200:22
200:24 230:6
232:10 252:3
252:13,15,20

**distances** 82:24
97:15 100:3,7
181:1,4

**distinct** 180:3

**distinction**
71:19 76:3
165:4,14 167:6
183:3

**distinguishable**
171:20 172:2
173:1

**distributed**
52:17 139:22
216:18

**distribution**
36:9 52:24,25
55:23,25 57:15
58:9,15 62:19
62:21,23 64:3
64:11 84:6,7,9
84:11 156:13
156:21 179:5
183:5 215:21
216:3 217:16

**district** 1:1,2
2:1,2 7:16,16

**disutility** 111:5
119:8,11 128:1
201:13

**dividing** 169:7

**division** 1:3 2:3

**dmv** 202:11

**doctor** 121:3,6

**doctorate**
15:11

**doctors** 51:21
51:25

**document** 12:6
12:7,25 25:13
223:25

**documentation**
91:6

**documented**
156:15,18,20

**documents**
6:19 18:10

**doing** 14:15
15:6 57:14
74:14 81:5
98:17 109:18
111:10 124:10
128:12 153:2
191:1 233:15
235:19

**dollar** 111:15
111:18

**don** 241:23

**donald** 3:16 8:8

**dope** 259:1

**double** 161:9

**doubling** 29:5
135:6

**douglas** 79:5
79:11 81:20

82:11 155:20
243:17 249:22
250:11 251:11
251:15,17,19

**downtown**
14:19

**dr** 5:12,14 7:13
9:3 12:6,25
23:24 25:13
60:5 78:20,24
79:4 81:17
115:6 127:14
140:21 184:18
224:2 230:10
230:12 237:4
240:3 242:10
243:17 246:13
252:10,19
259:5,17 261:9

**dramatically**
53:16

**draw** 78:1
134:13

**drive** 118:3
124:21 161:19
177:18 192:10
192:11 199:23
215:6,7 225:11

**driven** 236:10

**driver** 27:3

**driver's** 83:6
83:14,17,20
84:1,10,16,21
85:3,6 90:5
92:17 136:4

[driver's - earlier]                                                    Page 23

| | | | |
|---|---|---|---|
| 217:22 | 66:1,1,20 | 183:9,10,10,12 | 243:19 244:11 |
| **drivers** 191:13 | 67:12,18,23 | 185:23 186:15 | 244:14 245:7 |
| **driving** 5:15 | 68:6 70:8,16 | 190:17,18 | 245:11,17,18 |
| 46:14 61:21 | 70:21,23,25 | 191:16,20 | 245:21,23 |
| 81:22 99:17,22 | 71:19 72:13,21 | 192:22 193:1,2 | 246:23 247:4,5 |
| 111:6 118:5,7 | 75:5 76:19,23 | 193:7 194:10 | 247:11,22,24 |
| 118:7,14,21 | 77:13 78:6,11 | 195:8,13 197:7 | 248:4,14,16,19 |
| 119:14,16,18 | 78:19 79:12,16 | 197:11,17 | 248:20,21,25 |
| 130:7,8 137:21 | 79:25 80:2,7 | 201:1 202:21 | 250:13 252:3,4 |
| 148:23 213:23 | 80:13,19 81:4 | 202:22,25 | 253:23 |
| 224:19 225:7 | 81:6,7,10,13,18 | 203:7 204:19 | **dropping** |
| 226:10 231:21 | 81:25 82:9,10 | 204:21,23 | 242:20 |
| 232:11,13 | 82:12 85:25 | 205:2 214:3 | **due** 34:16 |
| 236:15 260:7 | 89:5,6,7,8,9,13 | 215:25 216:1 | 45:13 153:11 |
| **drop** 6:3,3 10:4 | 89:16,22 | 218:25 219:1,8 | 175:13,15 |
| 10:10 21:6,9 | 101:11,25 | 219:12,16,20 | 178:1 241:6 |
| 21:21,23,24,25 | 103:17,23 | 220:3,10,20,22 | **duly** 263:7 |
| 22:5,8,12,19 | 104:8,13 | 222:4 224:5,8 | **duplicative** |
| 23:10,15 26:15 | 105:17,25 | 224:9,10,15 | 55:7 |
| 27:14,15 28:10 | 106:10 109:14 | 225:2 228:21 | **duration** |
| 29:23 33:23,23 | 120:13 125:8 | 229:5,13,14 | 222:22 |
| 34:1,12,12 | 132:16,22 | 230:6,7 231:11 | **durations** |
| 35:13 36:21,23 | 133:10,11,18 | 231:13,19,20 | 31:15 97:16 |
| 37:11,20 38:1 | 133:22 135:15 | 232:1,9,10,11 | 221:24 |
| 38:6,10,16,24 | 135:18,23 | 232:21 233:6 | **duty** 45:18,23 |
| 39:12,17 40:2 | 136:3,11,20 | 233:12,21,24 | |
| 40:18,25 41:2 | 137:13,18,25 | 234:2,10,11,14 | **e** |
| 41:9,10,14,15 | 137:25 138:7,8 | 234:19,22,24 | **e** 127:1,1 265:3 |
| 41:23,25 42:1 | 138:15 139:3 | 235:21,22,22 | 265:3,3 |
| 42:6 43:12 | 139:13 141:9 | 236:2,14,23 | **eagerness** |
| 44:10,20 45:13 | 143:11,14,16 | 237:1,6,7,18 | 22:16 |
| 54:22 57:8,19 | 143:19,25 | 238:15,19,25 | **earlier** 43:19 |
| 57:21,25 58:2 | 144:5,6,7,10,11 | 239:1,15,22 | 84:5 121:7 |
| 59:2,3,7 65:6 | 147:25 156:10 | 242:12,14,16 | 136:15 139:10 |
| 65:11,11,14,19 | 158:4 176:24 | 242:18 243:1,9 | 147:20 168:9 |
| | | | 194:14,16 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[earlier - employment]**                                                Page 24

| | | | |
|---|---|---|---|
| 214:10 217:7 | **ease** 65:1 | 62:7 221:14 | 142:5,15 146:3 |
| 222:6 247:19 | 222:20 | 232:20 233:5 | 246:16 |
| **early** 26:15 | **easier** 18:19 | 233:12 | **electoral** 5:16 |
| 33:15 34:13 | 86:5 145:23 | **effort** 127:25 | 46:15 |
| 35:19 36:6,8 | 146:1,9 204:3 | **eight** 250:24 | **electric** 200:21 |
| 36:12,16,19 | **easily** 135:12 | **either** 49:2 54:9 | **elements** |
| 38:25 49:4 | 199:7 | 84:1 85:6 | 110:17,25 |
| 54:22 65:17 | **easy** 147:1 | 92:17 99:14 | **eligibility** 67:11 |
| 68:7 89:22 | 196:19 199:9 | 100:14,15 | **eligible** 55:1 |
| 99:13 101:11 | **eat** 124:11 | 115:13,25 | 56:19,22 57:1 |
| 101:25 103:18 | **economic** 14:11 | 122:21 136:4 | 57:16 58:8,10 |
| 104:13 133:11 | 14:15 17:14 | 136:12,13 | 58:16 62:15,16 |
| 133:19,23,24 | 51:12 | 200:6 218:2 | 62:24 65:3 |
| 135:17,21 | **economics** | 228:6 249:1 | 80:2 188:10 |
| 136:10,19 | 14:13 | 260:20 | 191:18 |
| 137:13,15 | **economists** | **election** 3:12 | ███████ 9:9 |
| 138:4,12 139:1 | 247:14 | 4:4 5:23 8:10 | **else's** 235:17 |
| 139:11,14,20 | **edd** 196:10 | 21:9 22:13,20 | **embarcadero** |
| 139:21 140:4,7 | **education** | 23:10,13 26:17 | 2:16 3:17 7:19 |
| 140:25 141:8 | 69:22 70:1,4 | 27:12 30:3 | **embedded** |
| 141:12,19,20 | **educational** | 38:18 39:2,21 | 71:18 148:16 |
| 142:25 143:4 | 13:13 | 40:11 41:3 | **emergency** |
| 143:19 144:9 | **effect** 5:16 | 45:4,15 47:13 | 40:19,21 |
| 156:10 158:5 | 30:15 41:5,8 | 48:6,7 52:11 | **employed** |
| 176:24 186:15 | 43:16 46:15 | 56:10,10 | 13:24 71:23,25 |
| 190:18 192:22 | 48:4 57:7,11 | 104:11 122:3,4 | 72:2 74:23 |
| 194:10 197:7 | 58:6 61:9 | 122:14 141:10 | 75:1,8,18,19 |
| 197:13,17,19 | 63:23,25 78:11 | 145:3,25 193:9 | 76:12 120:18 |
| 198:4,6,13,14 | 82:6,9 85:22 | 195:16,19 | 120:21,23 |
| 205:2,8,9,20 | 86:4 132:21 | 223:17 232:7 | 150:16 228:12 |
| 206:3,22 | 144:4,5 166:19 | 243:8 249:7 | 228:18 |
| 213:14 216:1,4 | 191:8 236:21 | 252:5 256:8 | **employee** |
| 219:22 220:2 | **effects** 36:6 | **elections** 27:9 | 263:17 |
| 222:4 244:7 | 42:11,13,18 | 40:15 56:5,13 | **employment** |
| | 45:3 46:7 47:9 | 69:19 122:1,9 | 13:10,22 16:9 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[employment - exact]**

Page 25

227:24 228:20
**enable** 51:2
**enables** 157:14
200:23
**encounter** 53:4
123:15
**ended** 203:16
248:4
**endemic** 197:2
**ends** 93:24
**engage** 223:1
**engaged** 225:21
**engagement**
60:5,12,17,20
60:23 61:5,16
**english** 13:5
**ensure** 178:21
180:1 223:19
**entered** 10:15
**entertainment**
109:2 225:23
**entire** 210:9
**entirely** 224:19
**entitled** 46:14
161:2
**environment**
17:12 175:17
**environments**
71:13
**episodic** 124:1
**equal** 49:16
120:21 181:18
248:11
**equally** 49:20
127:19

**equation** 63:24
171:23
**equitable**
178:22 179:14
**equity** 19:7
**equivalent**
26:22 53:22
67:21 68:20,21
124:22 137:17
179:11
**erode** 47:5
**errata** 264:11
264:13,17
**error** 152:20,22
153:6,15,16,22
154:2,12,13,13
239:2,7,9,10
240:24
**especially**
23:10,14 61:8
77:16 102:24
104:24 110:11
174:20 198:1
235:7
**esq** 3:5,16 4:8
264:1
**essentially**
14:14 21:20
27:10 28:2
37:2 54:20
97:14 111:8
112:23 148:15
152:1 153:11
158:17 159:23
246:12 251:14

**established**
74:19 160:13
222:14 223:3
238:7
**establishing**
59:3
**estimate** 32:24
33:18 62:7
63:13,15 83:3
97:21 99:24
103:12 151:4
151:13 152:2
157:16 177:20
180:5 182:20
190:15,21
191:15 195:24
198:15 207:16
208:8 209:11
239:12,14,23
240:1 241:4,6
251:7,11
**estimated**
21:22 23:7
100:8 111:3
149:15 207:18
208:2
**estimates** 22:22
23:6 32:19
33:21 96:25
99:9,10,11,17
100:3,14,16,20
100:21 111:17
148:7,17,23
151:1 154:13
156:6 157:19

157:20,24
**estimating**
152:8 228:6
**et** 234:13
**ethnicity**
151:17 158:19
187:21 209:8
220:25
**european** 61:8
**evaluate**
217:12
**evaluating**
237:6
**evanescent**
124:14
**event** 80:12
**everybody** 22:5
52:7 123:16
124:11,17
164:6
**everyday**
106:17 123:5,7
**evidence** 67:2
68:17 82:15
132:5 142:1,3
174:5,12 185:8
222:11 229:7
231:25
**evolved** 28:8
**exacerbate**
74:17
**exacerbated**
197:4
**exact** 21:11

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

[exactly - explain]

Page 26

| | | | |
|---|---|---|---|
| **exactly** 26:19 | **excellent** 145:6 | 125:14 140:15 | 180:14 193:24 |
| 33:5 61:20 | **except** 41:8 | 140:17 141:25 | 201:18,19 |
| 68:14 101:7 | 66:23 73:4 | 160:23 161:1 | 219:13 234:23 |
| 116:8,17 | 91:22 92:8 | 230:2,5 255:10 | 239:2 245:22 |
| 151:21 172:11 | 118:8 119:16 | 255:22 256:2 | **expectations** |
| 186:4 192:1 | 189:8 | 256:12,22,25 | 118:5 198:3 |
| 196:11 199:14 | **exception** | 257:5,8,14,17 | **expected** 193:6 |
| 210:7 255:17 | 32:17 168:15 | 257:25 258:3 | **expensive** |
| **examination** | 173:21 215:16 | 258:20 | 131:20 168:14 |
| 5:2 9:1 127:12 | **exchange** 185:1 | **exhibits** 5:8 6:1 | 170:10 175:12 |
| 259:15 | **exclude** 29:15 | **exist** 22:1 37:1 | 184:2,19 |
| **examine** 54:15 | 248:24 | 41:17 57:23 | 223:11 |
| 171:12 207:1 | **excluded** | 58:25 83:14 | **experience** 17:6 |
| 221:20 | 106:19 107:2 | 122:12 139:6 | 17:7 100:16,20 |
| **examined** 8:25 | **excludes** 93:18 | 143:18,19 | 144:15,20,21 |
| 127:9 | **excluding** | **existed** 99:20 | 145:2,10,10,24 |
| **examines** | 183:21 | **existence** 37:24 | 146:12 177:10 |
| 171:10 | **exclusively** | 43:11 63:13 | 205:19,22,25 |
| **example** 31:16 | 72:8 81:21 | 72:7 73:3 | 213:13 224:18 |
| 31:17 45:2 | **excuse** 16:14 | 76:19 | 245:21 250:8 |
| 51:6 71:6 | 158:25 | **existing** 36:12 | **experiences** |
| 72:18 76:21 | **executed** 262:7 | 74:17 | 111:9 |
| 77:11,18 | **exemplified** | **exists** 83:11 | **expert** 5:12,21 |
| 117:19 118:10 | 67:17 | **expansive** | 20:8 25:16 |
| 129:13 130:6 | **exhibit** 5:9,10 | 39:23 | 36:1 40:15 |
| 132:9 212:18 | 5:11,12,14,15 | **expect** 22:24 | 42:19,21 44:18 |
| 215:12 243:3 | 5:18,21,22,24 | 23:4,12 25:24 | 51:16,18 52:2 |
| 247:15 | 6:2,3,6,7,9,10 | 49:25 53:4 | 52:23 60:8 |
| **examples** | 6:12,13,15,16 | 101:9 117:14 | 66:4 68:11 |
| 129:21 130:24 | 12:2,3,13,22 | 117:24 118:25 | 69:10 91:3 |
| **exceeding** | 23:21 25:8,11 | 129:6 146:20 | **expertise** 17:10 |
| 205:20 220:22 | 46:10,11,14 | 146:25 153:10 | 17:11 238:3 |
| 253:22 254:9 | 66:24 111:23 | 154:18 170:14 | **experts** 25:4 |
| 254:15 | 112:1,6 125:11 | 175:20 179:19 | **explain** 21:18 |
| | 125:11,12,13 | 179:20 180:13 | 21:19 26:19 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[explain - fashion]**                                                      Page 27

47:13 51:18
65:8 76:3
96:12 97:8
115:17 166:5,7
**explained**
94:19 197:8
**explanation**
115:21
**explicitly**  42:15
**explore**  138:2
138:25
**exposed**  82:7
82:10 110:25
**extent**  17:7
22:8 28:14
36:5 43:11
51:4,18 54:19
57:23 61:9,14
62:5,12 66:23
76:7 81:10,11
92:8 110:19
111:4 120:9
133:3 138:3,25
158:4 175:21
180:24 186:14
222:7
**extremes**
138:22

**f**

**f**  127:1
**face**  68:16
139:2 217:9
219:19 220:2
246:2

**facebook**
255:15
**faces**  44:9
**facing**  218:17
219:1 220:1
**fact**  35:7 70:16
71:13 73:5,20
80:7 83:20
92:24 93:2
99:13 145:13
153:3 166:13
172:2 175:24
192:6 194:17
214:1 217:15
219:7,15 223:3
224:18,23
225:11 227:20
237:13 245:16
248:2,5
**factor**  27:23
45:24 100:1
148:24 150:24
170:19 208:21
208:25 247:9
**factors**  27:20
45:16,25 50:8
50:12,20 51:3
51:17 54:1
82:22 84:19
110:16 111:11
158:11 166:10
166:13,21
171:2 172:6
175:16 209:5
209:11 215:20

218:7 223:15
223:23 247:13
**facts**  24:4
43:21 83:10
**fails**  264:19
**fair**  23:17
60:22,22
130:22 145:7
147:19 169:17
235:18 257:23
**fairly**  47:25
156:14,18,19
**falk**  3:16 5:5
8:8,8,20 9:2
12:5,21,24
16:16 23:19,23
25:7,10 35:23
36:3 39:7
40:10,17 46:10
46:13 48:22
51:9 53:19
59:11,16,19,21
60:4,10,21
61:19 62:25
64:17 69:15
70:6 80:24
98:14,18 105:2
105:5,8 111:25
119:15 125:6
126:7 127:13
135:25 136:8
136:23 139:25
140:8,19
142:13 147:18
155:11,13

160:25 184:8
184:10,17
196:13,16
229:25 230:4
235:15 242:1,9
255:12,21,24
256:5,6,14,24
257:7,16 258:2
258:22 259:8
261:5
**fall**  91:19 109:7
109:8 209:14
**familiar**  45:23
72:16 209:25
230:10,12
**family**  75:23
102:8 110:1
128:10,15,25
129:8 130:16
199:16 200:6
**far**  31:25 77:17
77:20 99:5
115:24 124:21
127:20 140:25
222:17 231:20
231:22 240:9
**fare**  31:4
177:12
**farther**  32:12
107:12 130:6
138:8,13
201:24 222:16
231:12 236:14
**fashion**  29:24

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[faster - follows]**                                                                 Page 28

| | | | |
|---|---|---|---|
| **faster** 118:8,14 | **figures** 29:13 | **finds** 246:25 | **floor** 2:16 7:19 |
| 118:21 178:6 | 111:15 113:3 | **fine** 70:4 | **floyd** 258:15,17 |
| 183:17 | 143:3 155:18 | **finish** 11:24 | **flying** 106:22 |
| **fault** 59:15 | 245:13 | 22:15 74:10 | **focus** 70:23 |
| **favored** 42:7 | **filed** 7:15 | 89:11 160:5 | 82:21,24 |
| 222:17 | **final** 72:14 | 192:13 249:3 | 112:14 137:22 |
| **february** | 221:7 260:12 | 250:15 | 236:8 |
| 256:25 | **finalized** 25:5 | **firm** 14:11 | **focused** 28:25 |
| **federal** 10:7 | **finally** 102:24 | **first** 11:24 | 29:1 68:3 |
| 263:13 | **financial** 171:8 | 23:12 24:5 | 193:23 |
| **feed** 97:17 99:4 | **financially** 8:1 | 37:13 40:7 | **focusing** 34:10 |
| 148:12,13 | 180:8 263:16 | 55:8 57:16,25 | 190:18 |
| **feel** 67:24 | **financing** | 59:7 63:18 | **fogelson** 3:5 |
| 146:17 | 175:15 | 71:4 88:5,21 | 5:6 8:14,14 |
| **feeling** 147:8 | **find** 43:8 50:24 | 93:7 139:5,11 | 35:22,25 39:4 |
| **fewer** 74:22 | 51:5 53:21 | 169:5 178:18 | 39:25 40:13 |
| 102:22,23 | 66:20 100:18 | 178:18 187:15 | 48:18 50:18 |
| 129:7 132:22 | 111:1 120:13 | 211:1 224:23 | 53:18 59:10,20 |
| 137:7 163:14 | 132:22 144:14 | 225:23 229:3 | 60:7 61:6 62:9 |
| 163:19 180:15 | 145:19 161:7 | 240:2 242:15 | 64:14 69:9,24 |
| 226:3 235:22 | 166:23 167:23 | 253:18 254:2 | 80:20 119:4 |
| **field** 152:7 | 168:1,22 171:5 | 259:22,23 | 126:8 135:19 |
| **fifth** 230:17 | 171:15 173:19 | **fiscal** 14:16 | 136:6,17 139:4 |
| **figure** 29:7 | 177:2 191:21 | **fit** 150:2 | 146:14 184:6,9 |
| 67:1,1,17 71:2 | 209:23 224:25 | **five** 31:23 33:3 | 196:15 241:23 |
| 79:22 95:2 | 225:8 231:10 | 33:3 145:16,18 | 259:10,16 |
| 96:10 108:9 | 231:18 237:18 | 148:19 157:7 | 261:3,6,11 |
| 111:18 113:9 | 238:14 242:21 | 208:1 209:7 | 264:1 |
| 113:25 116:10 | **finding** 49:23 | **fixed** 148:7 | **folks** 253:8 |
| 125:10,10,11 | 120:4 155:25 | **flexibility** | **follow** 244:25 |
| 125:12,13,14 | 173:11 193:12 | 120:7,8,16 | **following** 99:12 |
| 147:15 187:11 | 205:11 | 123:12 | 115:22 137:9 |
| 187:24 195:14 | **findings** 26:6 | **flexible** 120:11 | 137:10 209:16 |
| 251:7,12,13 | 26:10,12 | **flip** 47:22 | **follows** 8:25 |
| 259:25 | | | 127:10 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[foot - george]**

Page 29

| | | | |
|---|---|---|---|
| **foot** 107:20 127:15,24 128:12 157:25 224:6,14 225:6 225:15 | **forth** 25:17 26:3 263:5 | **frequent** 32:24 141:14 | 265:2,24 266:2 266:4,12 |
| **footnote** 250:3 | **found** 52:21 81:17,18 133:4 162:8,20 163:6 163:8 164:4 174:1 181:23 182:5 190:25 230:16 | **friction** 191:7 | **game** 129:11 |
| **foregoing** 262:3 263:4,6 263:10,12 266:5 | | **friend** 130:16 200:6 | **game's** 129:13 |
| | | **friends** 110:1 128:11,16,25 129:9 | **games** 129:21 |
| **forgo** 62:13 129:3 | **four** 3:17 9:16 77:5 134:2 145:17 209:5 | **front** 63:8 161:5 187:25 200:4 245:13 | **general** 47:13 51:1 99:3 117:12 145:25 146:25 148:11 148:13,14 179:18 197:18 211:8,10 217:15 225:8 226:9,22 228:1 251:21 |
| **form** 35:22 39:4,25 40:13 48:18 50:18 53:18 59:8,10 60:7,14 61:6 62:9 64:14 65:16 69:9,24 80:20 119:4 121:20 128:22 135:19 136:6 136:22 139:4 141:1 143:4 146:14 | | **full** 9:5 173:18 | |
| | **fourth** 173:17 | **fulltime** 228:13 228:14 | |
| | **fraction** 30:9 35:9 44:14 58:8 91:10,13 143:10 144:9 147:7 150:22 150:23 174:16 177:15,17 194:5 195:15 195:16 198:16 198:17 211:15 211:24 227:23 228:6 243:9 253:5 | **fully** 11:12,18 | |
| | | **fulton** 155:20 253:24 254:4,5 255:1,2 | **generalizations** 226:20,21 236:20 |
| | | **function** 101:17 219:6 | **generalized** 222:24 |
| **former** 81:6,7 | | **functions** 94:13 | **generally** 17:14 32:17 60:25 64:4 72:4 152:13 154:16 160:3,11 183:23 211:9 214:14 215:14 216:24 220:19 252:6 |
| **formerly** 86:1 | | **funny** 16:4 | |
| **forms** 37:1 49:4 65:21 67:19 68:21 72:17 90:25 91:6,25 92:2,7,18 136:5,14 141:4 190:17 217:22 | **francisco** 1:15 2:17 3:18 7:1 7:20 19:10 183:22 | **further** 13:22 107:13 127:10 128:2,3 171:14 205:8 231:19 232:8 244:20 263:12,16 | |
| | **frankly** 27:24 | **future** 142:5,15 243:25 | **geographic** 80:19 |
| | **free** 51:2 85:6 90:5 93:2 | | **geographically** 236:3 |
| | **frequency** 77:4 | **g** | **george** 258:15 258:17 |
| | | **g** 1:14 2:14 5:3 5:11,12,14,25 8:23 127:7 262:1,12 264:5 | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[georgia - google]**                                         Page 30

| | | | |
|---|---|---|---|
| **georgia** 1:2,7 | 132:2 157:9,10 | 107:1 114:6,25 | 140:13 143:21 |
| 2:2,7 5:22,22 | 157:12 175:8 | 116:9 119:25 | 147:13 154:21 |
| 7:15,16 19:15 | 185:19 202:7 | 121:3,4,6,6 | 156:24 157:22 |
| 19:17 20:1 | 211:23 214:11 | 125:4 127:20 | 172:12 175:23 |
| 24:15 26:24 | 226:17 240:22 | 128:2,3,13 | 183:16,23,24 |
| 27:19 41:4 | **gist** 240:18 | 129:11 130:4,5 | 184:1,2,6,12 |
| 67:19 69:2 | **give** 31:16 | 130:8 140:11 | 191:10 199:15 |
| 86:14 87:7 | 82:22 103:12 | 150:17 153:2 | 200:1,5 201:11 |
| 93:14 97:7 | 105:10 134:19 | 154:4 199:15 | 203:20 226:15 |
| 99:6 106:5 | 171:3 212:18 | 206:1 219:13 | 229:6 235:16 |
| 107:18 108:24 | **given** 21:23,24 | 219:14,15 | 241:1,3,23 |
| 117:23 122:12 | 24:11,13,15,16 | 224:16 229:11 | 242:4 253:16 |
| 132:10 141:1 | 29:25 50:3 | 229:25 235:14 | 261:7 |
| 142:1 143:5 | 74:22 88:18,19 | 236:16 237:20 | **gold** 152:6 |
| 161:13 176:15 | 97:16 104:4 | 237:21,23,24 | **gonzalez** 6:5 |
| 176:17 180:10 | 109:23 145:13 | 239:23 241:7 | 230:9 233:20 |
| 182:3 183:4,6 | 146:12 179:21 | 241:11,12 | **good** 7:4 9:3,4 |
| 183:8,20 | 180:7 198:1 | 244:3 246:11 | 15:24 57:4 |
| 186:17 188:12 | 232:21 233:6 | 249:3 250:5,15 | 59:19 65:25 |
| 194:2 196:4 | 243:3 246:23 | 253:12 259:24 | 96:11 98:21 |
| 202:10,21 | 251:20 261:9 | **goes** 28:18 | 99:3,8,9,16 |
| 211:7,17,20 | 263:11 266:9 | 31:20 51:22 | 118:15 124:14 |
| 212:14 227:13 | **gives** 142:22,22 | **going** 7:4 11:2 | 129:3 136:20 |
| 228:3 243:6,7 | 151:4 257:1 | 21:16 30:2,22 | 137:16 140:24 |
| 244:11 246:24 | **giving** 130:22 | 31:21 32:1 | 145:7 146:7,9 |
| 251:19 264:4 | 215:21 | 45:22 48:11 | 157:3 177:3 |
| 265:1 266:1 | **glasses** 113:2 | 52:12,14 55:6 | 180:11 184:10 |
| **georgians** | **go** 7:10 8:18,20 | 57:2 59:24 | 231:3 241:24 |
| 28:21 94:21 | 10:19 13:3 | 74:1 76:23 | 257:11 |
| **getting** 60:18 | 29:23,24 34:4 | 89:25 97:22 | **goods** 130:10 |
| 60:24 66:15,17 | 51:25 58:3 | 108:3,10,11 | **google** 97:9,13 |
| 69:18,19 83:4 | 64:8 73:22 | 119:2 122:20 | 97:21 98:9,11 |
| 84:4 93:9 | 81:25 83:7 | 126:9 130:11 | 99:2,16 100:9 |
| 106:9 118:10 | 88:5 89:20 | 130:17 131:11 | 101:4,6 148:12 |
| 126:4,6 130:15 | 97:22 104:13 | 138:22 140:13 | 243:21,22,24 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[gop - half]                                                                            Page 31

gop  257:9
gosh  107:1
  175:5
gotten  96:16
  99:2
government
  90:10,11 92:2
  92:25 140:2,2
graduate  13:22
  14:3 15:3 18:2
grain  247:16
granted  79:10
granular  148:4
graph  49:14
  53:22
graphed  47:10
graphical
  97:25
great  13:18
  21:10 31:18
  54:13 99:7
  105:13 131:21
  141:18 175:18
  191:6
greater  45:24
  53:12 76:8
  120:22 204:18
  222:25 238:20
greatest  23:15
gregory  9:7
grimmer  5:21
  78:20,24 79:4
  81:17 140:8
  141:7 240:3
  243:17

grimmer's
  224:2 230:12
  237:4 246:13
  252:10,19
grocery  29:25
  77:12,13,19
  130:6 168:23
  215:18 225:3,5
  229:15
group  9:23
  14:13 56:4
  58:15 95:15,21
  132:10 146:24
  149:20 151:4
  151:10,13,14
  151:15,22
  152:3,9,21,23
  153:7,11,18,23
  154:14 156:4
  156:16 158:2,8
  158:17,18,24
  159:2,18,19,22
  159:23 160:2
  160:10 169:1
  197:20 207:4,6
  207:16 208:2,8
  208:12,13
  209:12 212:16
  218:12,25
  219:24 251:17
groups  34:23
  73:4 74:24
  132:8 135:9
  149:10,24
  150:3,25 151:9

154:10 156:1,8
157:6,8,10,18
178:23 187:17
208:1 209:6,7
209:14 218:17
226:22 237:16
gtfs  148:8,9,19
  148:23 149:5
guess  9:15
  20:24 31:23
  36:10 40:1
  50:11 74:15
  106:24 125:9
  141:6 144:22
  146:4 156:17
  165:20 166:1
  172:12,23
  175:22 176:16
  181:5 183:18
  202:24 212:2
  213:17 218:15
  226:7 233:10
  234:8 243:13
  244:20 256:5
guys  155:9
  235:13

**h**

h  265:3
habits  105:25
habitual  71:6
  72:19,20 73:12
  74:5 76:16,20
  76:22,24,25
  77:1,7,9,16,21
  77:22 78:3

96:13 99:17
101:13 102:9
102:14 104:4
163:1 164:1
185:12 233:18
236:17 237:9
238:5 241:7
habitually
  102:7
hail  177:13,18
  177:21 178:2
hailing  18:25
  161:3,25 162:4
  162:20,23
  163:11,13,16
  164:11 165:4
  165:13 166:25
  167:1 168:3,13
  171:7,17
  174:25 175:4,6
  175:11,20
  176:7,15,19,22
  178:5,14,20
  179:6,9 181:9
  181:13,17,20
  183:16,19,23
  184:18,24
  186:2 200:8
half  32:25 33:9
  33:12 88:15
  95:25,25
  100:24 101:2
  103:13 134:3,3
  134:4,10
  166:24 203:10

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[half - hour]

Page 32

241:24 242:3
**hall** 200:4
**happen** 21:16
201:21 214:24
225:2
**happened**
176:12
**happening** 40:3
**happens** 169:8
**happy** 21:19
196:2
**hard** 41:20
186:5 246:3
253:5
**harder** 52:6
72:3 120:12
145:23 146:1,7
199:20,20
201:11 226:13
226:22 227:2
**harvard** 14:4
**hausrath** 14:13
**head** 11:7
86:15
**heading** 46:19
46:22,22 49:1
**headway** 32:25
33:1,3 100:24
**headways**
33:11,19 101:2
**health** 11:15
**heard** 87:6
90:19,22
170:16

**hearing** 20:23
21:2
**heavily** 253:8
**held** 2:15
**help** 207:16
222:19,22
247:17
**helpful** 233:11
**helps** 151:5
**hereto** 266:7
**heterogeneity**
226:18
**hi** 8:8
**high** 68:7 88:10
106:5 125:8
130:23 143:20
175:7 189:24
190:10 193:5
196:24,25
198:13 211:12
**higher** 26:14
30:17 34:25
44:14 49:25
50:17,22 51:12
53:6,6,24 54:4
71:25 75:20
76:4,9 108:8,8
108:11 115:15
115:18 116:5,6
120:7,22
124:19 125:17
130:10 131:25
141:19,20
143:25 146:7
146:10 147:10

162:9,9,13
163:6 168:16
174:23 175:8
176:16 177:9
179:21 188:22
195:20 197:18
198:1 211:24
211:25 212:4,6
212:10,17,24
213:4,5,6
219:18 225:19
225:25 249:9
250:20
**highest** 143:15
**highly** 119:14
151:16 217:17
233:21
**hispanic** 26:18
35:2 42:9
44:12 73:17,21
86:5 139:17
171:15,16,18
171:19,20
172:10,10,18
172:25 173:20
206:4 207:21
207:23,23,24
210:10 237:16
241:17 250:24
253:11,20
254:3
**hold** 83:13 91:5
173:14
**holding** 85:3
92:7

**holds** 84:16
115:13
**home** 15:22
70:24 71:10,13
71:16,20,21
72:13,25 75:5
75:23,25 77:3
77:3,18,20
79:24 80:8,14
93:17 94:11
101:7 102:1,2
102:3,4,12,17
102:20,22
103:1,21
170:13 206:18
224:10 226:12
228:16 229:18
232:1,4,6
233:16,24,25
234:11 236:4
236:23 239:1
239:16,17
246:25 247:22
247:23 248:1,5
248:11,14,17
248:17,19,22
249:1,9
**homes** 132:11
236:15
**hope** 185:15,16
257:1
**hopefully** 201:1
**hour** 20:14
23:1 26:25
33:12 44:11

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[hour - impossibly]**                                    Page 33

88:15 101:2
134:10,11,11
177:7 184:7
203:10,11
204:14 220:22
241:24 242:3
253:22 254:9
254:15
**hours** 24:25
25:2 96:23
164:25
**house** 47:14
169:21 257:19
**household**
26:24 29:2,3
48:14,17 49:17
50:9 77:15
78:8 83:25
89:2 95:12,18
96:22 97:4
105:14 107:25
108:1,7,11,12
109:19,23
110:2 150:9
160:15 167:24
168:1 173:2
186:23 187:14
191:25 192:9
192:15,16
194:19 206:20
207:19 209:23
210:2 211:3,16
213:9 220:9,13
220:15 221:4,5
224:21 227:20

**households**
84:11 97:6
110:12 150:10
211:12
**huge** 21:9,21
48:3
**huh** 33:2,10
36:4 39:14,18
43:23 45:6
46:24 47:17
65:12 81:2
110:22 112:11
113:20,22,24
115:11,16
122:13 138:10
138:14,21
143:23 162:3
171:25 172:4
174:7 195:25
202:3 205:17
208:11 210:14
219:21 224:22
245:5 251:24
**huhs** 11:7
**human** 223:9
**hundred** 150:3
157:9
**hundreds**
111:17 189:18
**hurt** 140:13

**i**

**idea** 42:16
68:15 96:11
109:9 118:7
144:11 188:18

238:3,22
**ideal** 57:7
**identification**
12:3,22 23:21
25:8 26:17
46:11 90:25
92:8,18 111:23
136:22 140:15
140:17 160:23
230:2 255:10
255:22 256:12
256:22 257:5
257:14,25
258:20
**identified**
218:17 240:3,4
**identifies** 257:4
**identify** 8:18
43:16 108:23
256:5
**identifying**
113:16
**illustrate**
187:16
**illustrating**
22:7
**imagine** 38:4
52:20 65:1
118:4 135:12
153:25 177:24
191:7 209:24
**immigrants**
56:23
**impact** 14:15
14:16

**impacts** 17:14
**impairment**
200:23
**impeach**
257:18
**impediment**
198:24 199:18
**impediments**
53:14,15 126:4
126:6 178:2
**implication**
48:15 232:7
**implied** 116:22
117:2
**implies** 240:20
245:19
**implying**
244:25
**important**
71:11 80:21
81:13,24 82:2
93:5 117:11
174:5,12,20
175:6 179:5,8
179:17,24
180:4 181:8,13
181:20 233:17
233:18 234:16
**imposed** 37:17
41:10 42:5
**imposing** 42:2
**impossible** 22:9
215:6
**impossibly**
21:15

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[improve - instance]**                                    Page 34

improve
  204:25
impute  208:8
imputing  157:4
  218:8
inaccuracy
  100:19
inclined  245:7
include  17:11
  46:5 55:17,20
  63:17 84:15,15
  84:25 85:12,25
  133:15 149:23
  217:24
included
  247:23,24
  248:1
includes  44:12
  44:13 141:9
including  8:4
  25:4 29:11,12
  30:17 50:25
  56:18 84:20
  86:2 88:18
  96:24 109:2
  143:24 144:9
  161:24 164:5
  165:1 201:14
  201:24 219:24
  223:15
inclusive  18:4
  56:25
income  50:14
  50:16,17,21,22
  50:23,24 51:4

51:7,11,20,24
52:8 53:5,7
74:20 75:17,20
76:5,6,9,11
95:10,15
104:25 119:23
120:7,17,20,23
120:25 121:10
124:9,20
131:25 162:9,9
162:10,13,14
162:15 166:16
167:24 168:1
168:16,22
169:9,18,19
170:3 172:7
173:3 175:22
225:20
incomes  95:12
incorporate
  100:21
incorporating
  73:3 74:5
increase  67:16
  73:6 76:15
  81:1,4 253:7
increased  81:3
  108:19 131:12
  131:12,13
  139:2 146:13
  175:3 183:11
  220:22 234:23
increases  44:21
  119:10 205:11
  232:1 234:14

increasing
  232:9
incremental
  34:19 35:4
  103:19 131:7
  236:5
incrementally
  36:23 222:25
independent
  48:5 106:16
independently
  191:6
index  5:1
indicate  69:17
  138:9,12
  177:25
indicates
  204:17
indicating
  66:19
individual  13:5
  97:4 139:20
  157:18 177:21
individuals
  173:21 193:6
  224:5,13
  232:23 233:7
inequalities
  49:2
inevitable  30:6
  30:7
inevitably
  42:17
infer  165:13

inference  160:1
inferring
  158:23,25
  160:8 164:18
infinity  203:4
influence  72:21
influences
  17:12 247:10
inform  158:12
information
  6:19 71:4
  84:15,25 100:5
  156:14,22
  157:4,9,11,12
  158:18,22,23
  158:25 159:19
  186:4 195:8
  243:24 251:15
  251:16
informed
  146:17 192:24
  247:17
infrequency
  123:2
infrequent
  123:4
initial  25:1
  259:20
initialed  262:4
ink  262:4
inner  106:19
insofar  73:5
  91:22 223:8
instance  27:8
  28:10 50:19

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[instance - kinds]                                              Page 35

137:14
**instances** 29:8
29:9,11 66:15
101:1 117:22
129:2 139:19
155:19
**instruments**
258:6
**intend** 25:18
26:2
**intended**
137:19
**intends** 25:20
**inter** 107:7
**interact** 151:2
**interaction**
61:14,15,20
**interchangea...**
188:6
**intercity**
106:24
**interest** 40:9
45:24 84:8
197:22 223:21
**interested** 8:1
34:21 56:14
68:4 185:21
190:22 191:16
191:20 197:21
263:17
**interesting**
68:5 103:14
143:8 144:3
145:15 147:7
147:11 203:13

**interface** 97:13
97:24,25
**interfering**
53:17
**international**
141:25
**interpret**
247:20
**interpreted**
247:13
**interpreting**
154:5,8
**interrupt** 227:1
**interruption**
16:14
**interval** 154:10
**intervals**
154:22 155:22
**intrinsic** 129:8
**intrinsically**
125:19
**introduced**
66:25
**introduction**
18:1 176:8
**introductory**
48:24
**intuition** 88:17
**investments**
17:15
**involve** 131:7
**involved** 21:6
119:2 127:25
**ironclad** 77:6

**isolation** 65:7
**issue** 9:25
33:20 52:22,25
55:8 62:18
63:20 69:14
74:2 109:16
139:8,9 153:7
168:8 180:3
181:18 192:24
194:14 225:16
**issues** 14:14
18:14 74:1
**item** 18:22,24
19:2,7
**ivt** 116:22
117:2

**j**

**j** 3:13 4:5 8:11
**jacob** 4:23
**jaffe** 3:15 4:7
8:13
**jaffe.com** 3:20
4:12
**january** 24:10
**job** 1:23 15:6
15:21 20:1,2
121:3 228:7,10
**jobs** 15:3
215:19 216:16
**john** 257:17
**josh** 12:2,21
**joshua** 4:8 8:12
23:20
**jpb** 1:7 2:7 7:17

**jprince** 4:12
**judge** 10:17
39:3 69:20
**judging** 39:22
**june** 258:3
**jurisdiction**
80:2
**jurisdictions**
232:10
**jury** 10:17
**justice** 258:25
**justin** 5:16,21
46:16

**k**

**k** 4:9
**kavanaugh**
258:25
**keep** 11:21
155:9 227:23
**kessner** 5:17
46:16
**kids** 15:25
124:10
**killings** 258:17
**kind** 71:8 80:23
98:7,8 168:17
169:12 175:13
175:16 189:2
194:7 195:14
198:4 199:6
203:9 213:18
224:1 248:12
**kinds** 72:12
163:1,25 214:7
215:18

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[know - level]**                                              Page 36

| | | | |
|---|---|---|---|
| **know** 9:19 | 152:20 156:9 | **lacked** 90:24 | **leads** 214:1,1 |
| 11:20 19:11 | 165:13 166:19 | 220:12 | **leap** 143:11 |
| 22:11 23:3 | 169:14 170:7 | **lacking** 61:23 | **learning** |
| 36:5 38:9 | 170:22 172:3 | 62:2 64:12 | 130:19 |
| 40:24 47:24 | 175:9,18 | 83:25 187:17 | **leave** 15:20 |
| 48:7,9,10 49:9 | 176:12,14,18 | **laid** 21:12 | 75:25 101:7 |
| 54:6 55:18 | 177:16,19 | 189:21 240:25 | **leaving** 234:1,3 |
| 60:14,16 62:5 | 180:10,18 | **land** 18:3 | **legal** 264:23 |
| 67:10 70:11 | 182:18,25 | **landscape** | **legend** 257:17 |
| 71:5 79:19 | 183:7 185:21 | 36:12 216:8,10 | **lends** 227:15 |
| 80:22 82:23 | 185:22 187:11 | 216:13 246:2 | **length** 30:21 |
| 83:24 85:1,5 | 187:12 188:20 | **lange** 4:18 | 178:3,7,15 |
| 85:23 86:13 | 189:17 193:10 | **language** 13:6 | **lengths** 31:12 |
| 87:16 90:2,9 | 194:6 199:8,19 | **large** 22:9 51:4 | 31:14 |
| 90:12 91:12,22 | 200:3 201:18 | 153:8,12 167:6 | **lesser** 214:17 |
| 92:6 95:25 | 202:10 211:5,9 | 183:19 234:1 | **level** 18:2 27:18 |
| 96:13 99:22 | 213:5,10 | 236:1 | 34:24 119:10 |
| 100:19,23 | 214:23 217:7 | **largely** 213:23 | 124:22 125:1 |
| 102:18 105:9 | 222:23 227:19 | **larger** 149:19 | 140:2 144:17 |
| 106:6 107:23 | 232:14 235:1,3 | 197:20 | 144:19 145:2,6 |
| 108:4,5,15 | 235:13 236:22 | **late** 99:12 | 150:9,16 |
| 114:3 116:5,16 | 239:13 240:21 | 193:3,4 244:7 | 151:10,14 |
| 118:13 119:13 | 242:24,25 | 244:9 | 152:3,21,23 |
| 119:13 121:9 | 243:9,10 | **latin** 219:2,24 | 153:4,5,8,9,11 |
| 122:10,21 | 244:10 249:20 | 219:25 | 153:15,18,19 |
| 124:15 125:9 | **knowing** 66:24 | **latinx** 207:24 | 153:21,23,24 |
| 125:25 126:1 | 244:24 | 219:3 252:5 | 154:3,7,14,18 |
| 128:17 129:17 | **knows** 240:10 | **latitude** 104:16 | 154:22,24 |
| 130:9 131:22 | **l** | **law** 153:12 | 155:3,14,24 |
| 134:18 135:2,4 | | **lawyers** 12:17 | 156:2,4,15,16 |
| 135:10,21,24 | **l** 3:6 5:25 | **lay** 26:21 47:9 | 157:3,4 158:18 |
| 139:6,9,21 | **lack** 45:12 50:9 | 74:3 | 158:23,24 |
| 140:1,5 143:8 | 50:14 169:20 | **le** 3:14 4:6 8:11 | 159:1,2,10,20 |
| 143:11 144:10 | 186:22,25 | **lead** 125:1 | 159:22 160:2,2 |
| 147:14,16,24 | 187:13,23 | | 160:9,10 |
| | 215:4 247:6 | | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[level - little]**

Page 37

207:16 208:2,9
208:12,13
209:3,11,12
251:17
**levels** 21:21
22:24 154:11
201:5
**license** 83:7,14
83:17,20 84:1
84:10,16 85:3
85:6 90:5
92:17 136:4
217:22
**licenses** 84:21
**life** 60:25
106:17 123:5
**light** 233:13,16
**likelihood**
44:19,25 50:10
73:19 92:6
106:14 205:11
229:20,22
236:25 237:1
245:23
**likely** 43:12
44:1,2,9 48:14
48:17 49:20
51:7,21 52:9
54:20 57:24
58:11,14 64:20
64:24 67:5
73:5,6,21
74:22,25,25
75:1,2,3,4
76:14,15,18,22

78:5,10 83:13
83:13,16 86:4
88:1 89:2 91:5
91:23,24,25
92:9,10 96:6
102:25 103:5,8
103:9,11,13
106:12 109:20
110:13 121:5,8
121:9 130:11
145:14 162:17
164:17 165:20
166:24 167:1,2
168:2,19
169:20 170:4
170:25 171:3
173:22 177:11
178:7,14
179:21 180:5
185:14 193:14
194:24 197:4
198:8 199:23
200:11 202:8
206:2,5 209:21
211:3 213:9,13
213:16,18,19
213:25 214:3
217:20,20
221:24 223:1
224:6,14,25
225:21 229:5
229:16,17
231:17 232:4
236:14,22
237:11,15,15

237:17 238:4
238:14 239:17
244:14 245:10
245:21 247:21
248:9
**lilongwe**
128:20
**limit** 61:4 77:22
77:24 192:14
**limitations**
98:7,23,24
230:18 231:4
**limited** 60:11
60:12 61:2
200:2
**limits** 37:12
**line** 6:20 22:6
23:1,1 57:3
78:1 91:17
134:13 145:17
167:11,14
169:7 186:22
186:24 187:8
187:10,12,13
187:23 221:8
221:14,17,21
259:22,23
265:4,7,10,13
265:16,19
**lines** 21:9,10,15
21:17,21,25
22:4,12,19,24
23:3,8,10 45:3
53:4,4 77:25
95:23 145:15

188:21
**lining** 224:2
243:18
**link** 24:15
196:13,22
256:9
**linking** 256:20
**links** 24:18,20
256:20 258:4
258:24
**list** 51:22
132:16 133:5
**listed** 88:16
90:25
**literature** 18:5
18:5 30:14
31:2 42:18
46:6 61:7,8
68:18 71:9,15
74:19 75:15
91:3 110:18
111:3 222:12
223:14 231:25
246:8
**litigation** 20:9
27:14
**little** 13:4 15:5
15:7 16:4
22:17 26:9
42:24 107:13
117:18 129:16
134:22 141:12
146:22 147:14
148:4 155:10
159:22 161:22

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[little - look]**

Page 38

| | | | |
|---|---|---|---|
| 184:9 199:19 | 133:19 137:15 | 190:19 191:4 | 129:24 145:15 |
| 205:8 210:5 | 138:12 139:14 | 197:7,14 | 147:22 168:14 |
| 213:11 219:2,4 | 139:20 140:3 | 198:13,14 | 168:17 177:4,6 |
| 254:10 | 156:10 158:5 | 201:9 205:9,10 | 181:4 202:12 |
| **live**  20:4 32:1 | 177:22,22 | 206:18 216:2,4 | 222:12,15 |
| 53:5 71:5 | 186:15 191:10 | 216:8 217:16 | 226:15 |
| 84:22 89:2 | 192:22 194:11 | 217:17 219:23 | **longest**  96:13 |
| 200:4 212:19 | 201:1 205:3,12 | 222:5,5 229:13 | 123:18,19 |
| 212:21,23 | 205:21 206:3 | 229:16 232:22 | **longstanding** |
| 213:3 217:2 | 206:22 213:14 | 233:7,16,24 | 71:10 |
| 231:12 | 219:23 220:2 | 237:9,18 238:5 | **look**  28:20 |
| **lived**  204:20,23 | 228:19 229:6 | 239:20,22 | 31:19 36:24 |
| **lives**  96:7 123:7 | 229:18 233:18 | 241:7 260:7 | 45:3,6,7,9 |
| 123:15 124:2 | 238:15 | **logical**  238:9 | 49:13 54:16 |
| 167:13 | **locations**  26:16 | **logistical** | 57:19,20 58:1 |
| **living**  20:3 86:7 | 26:16 34:13 | 165:24 | 63:20,23 64:18 |
| 158:16 166:16 | 35:19 36:6,8 | **long**  9:10 21:15 | 65:2 66:25 |
| 215:13 | 36:13,20,20 | 21:17,25 22:4 | 67:14 71:15 |
| **llp**  3:15 4:7 | 39:1 65:18 | 22:12,19,24 | 72:13 79:2 |
| 8:13 | 68:7 71:10 | 23:1,2,5,8,10 | 82:2,6,7 84:17 |
| **located**  80:3 | 72:2,20 73:1,3 | 23:13 32:10 | 84:18,23 88:6 |
| 85:18 88:19 | 73:12,12,22 | 35:9 45:3 | 95:23 100:6 |
| 89:5,13 149:10 | 76:16 86:11,12 | 59:21 81:25 | 107:2 115:14 |
| 181:25 205:3 | 87:11 88:18 | 88:14 96:13 | 116:9 118:16 |
| 225:3,4 229:5 | 101:12 102:18 | 97:22 101:2 | 121:3 139:11 |
| 229:15 232:5 | 102:23 103:2 | 119:1 127:15 | 141:6 142:4 |
| **locating**  231:25 | 103:19 132:9 | 129:17 131:16 | 145:3 146:18 |
| **location**  7:18 | 132:16,22 | 131:19 150:17 | 147:5 149:5,6 |
| 33:22 36:17 | 133:11,23,24 | 168:21 178:12 | 150:19 157:25 |
| 54:22,23 71:16 | 135:17,22 | 201:9 214:3 | 162:25 164:9 |
| 76:19,22 77:11 | 136:10,20 | **longer**  52:5 | 169:1 172:9 |
| 77:17 78:4 | 137:7,13 138:4 | 53:3,4 100:25 | 173:14 179:5 |
| 85:19 89:23 | 139:11,22 | 101:1 107:2 | 179:25 190:16 |
| 101:25 102:3 | 140:4,7 176:24 | 117:25 127:22 | 191:11 192:25 |
| 102:17 103:18 | 180:6 185:24 | 128:10,15 | 218:14 219:22 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[look - major]**

Page 39

224:3 227:22
230:22 233:24
234:21 236:24
242:12 246:3,6
246:10 252:11
252:19,22
253:20 254:11
255:16 259:21
**looked**   42:18
65:20 86:10
96:15 114:13
142:3 159:18
162:25 163:1,2
163:25 164:19
183:3 192:24
197:15 231:9
**looking**   9:25
15:8 19:2
30:18 31:2,8
34:14,16,17
35:8 36:9 40:9
48:21 49:15
56:19 58:5
63:25 66:14
71:10 72:18
79:13 80:25
88:22 114:15
115:1,5,8,9
121:22 123:23
140:20,20
142:6 145:21
154:21 166:1
167:16 172:24
179:15 183:4
187:7,20 192:1

192:2 193:23
195:7,10
197:23 210:11
218:23 224:1
228:7,15,17
245:25 246:22
247:14 249:18
252:25 253:2
254:2
**looks**   19:8
30:15 54:10
61:8 82:18
95:9 114:15
116:17 260:4
**loren**   6:4 230:8
**lot**   40:5 53:2
58:5 68:6 71:1
77:12 95:6
100:17 105:22
106:25 119:6
127:24,25
128:20,21
168:15,19
175:5 180:20
191:2 201:8
204:5 219:14
219:14 242:23
249:9 255:16
**lots**   40:3 68:17
130:23 143:9
171:24 195:8
215:1,2 227:10
227:13 236:19
**love**   103:12

**low**   50:14,15,24
119:23 120:25
121:10 187:18
195:15 211:14
**lower**   47:4
50:16,21 51:4
51:7,11,11,20
51:24 52:7
53:5 74:20
75:17 76:6,11
104:25 108:12
120:17,20
135:12 137:15
162:9,14
166:16 168:22
175:22,23
185:7 195:18
210:6,7 212:16
225:20,24
226:1 227:25
245:24
**lumped**   165:5
**lunch**   57:5
116:14 121:15
126:7
**luncheon**
126:11
**lyft**   110:6 162:1
164:12 185:18

| **m** |

**m**   15:15
**machine**   263:8
**made**   22:9 35:4
38:7,7,17,17
51:19 52:5

70:13 79:14
85:8 97:3
144:23 183:10
196:8 241:10
262:3 263:8
266:5
**magnitude**
240:7,9
**mail**   49:21
65:25 67:18
69:1,23 136:3
141:8,13,21
142:24 143:10
143:24 144:9
147:24 242:23
246:24
**mailbox**   66:18
66:21 68:21
125:2 194:22
195:2 242:17
242:21 243:1
**mailboxes**
66:10,14
133:15
**mailed**   65:22
66:7
**mailing**   67:25
**main**   26:6,10
26:10,12 31:3
51:23
**maintain**
109:19
**major**   131:22
232:3

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**majority** 71:24
177:9 213:2
224:7
**make** 11:5 16:6
18:19 29:19
39:3,21 42:15
45:11 49:8,9
52:9 68:24
72:14 74:21
78:10 82:16
86:10 99:19
100:14 104:24
108:20 111:15
113:12 123:3
123:17,22,24
124:1,2,8,20,24
129:4 137:8
163:14 168:12
175:3 179:25
180:11 181:11
193:4 199:20
200:22,24,25
201:10,15
212:22 215:5
215:11 226:20
226:21 236:19
236:20 237:10
237:11 238:4
**makes** 28:9
77:12 97:14
104:23 120:12
124:8 157:15
168:3 198:25
213:12,25
217:4

**making** 37:4
49:4 57:12
62:11 72:3
81:25 84:7
86:4 100:2
124:25 130:1
169:2 181:18
195:5 212:20
222:11 247:18
257:11
**malawi** 128:20
**manage** 120:25
199:20
**mandating**
59:6
**manifestations**
258:7
**map** 86:11,19
86:20 87:18
88:23 97:13
**maps** 97:9,21
98:9,11 99:2
100:9 101:4,6
243:22,22,24
**march** 12:9,10
**margin** 109:12
152:20
**marginate**
29:19
**margins** 152:22
153:6,15,15,22
154:2
**mark** 5:19
112:8

**marked** 12:3
12:22 23:21
25:8 46:11
111:23 140:15
140:17 160:23
224:1 230:2
255:10,22
256:12,22
257:5,14,25
258:20
**markedly**
62:21,22
**market** 216:9
216:12
**marks** 62:20
**mashburn** 3:13
4:5 8:11
**masks** 252:23
**massive** 47:25
**master** 14:6
**material** 45:17
50:23 52:10
54:1 58:20
**materially** 86:6
**materials** 24:11
**matter** 7:14
115:9,12
153:21 200:2
237:8
**matters** 32:18
82:15
**matthew** 3:5,13
4:5 8:11,14
264:1

**maxwell** 5:17
46:17
**mcgrath** 4:19
**mcguire** 234:13
**mean** 26:19
30:8 31:1,14
32:7 45:1
48:10 50:7,7
58:4 60:18,20
60:23 61:1
63:6 64:22
65:20 70:14
74:6,9 78:2
79:19,21 80:22
82:21 84:3
85:23 90:4
99:1 102:22
106:25 126:4
134:16 139:5
147:5 149:21
154:25 156:18
157:2 168:12
170:7 181:5,8
181:10 201:18
205:21 211:2
211:21 212:2
212:14 213:15
214:22 215:24
215:25 216:1
216:13,14
217:3 222:1,2
227:1 232:10
245:2 247:20
253:15

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

[meaning - missed]                                         Page 41

**meaning**  29:18
97:18 150:9
**meaningfully**
111:12
**means**  47:14
56:18 60:15
68:8 80:1
87:11 90:4,4
95:4 99:13
105:19 124:20
166:8 204:13
221:4 239:11
240:9
**meant**  77:2
134:19,19
215:22
**measure**  30:1
36:7 62:7
66:10 109:25
110:3,19 123:3
123:17 134:24
190:12
**measured**
102:4 158:1
**measuring**
82:25 107:8
239:16
**mechanism**
234:22,24
**media**  7:12
61:17,21
**median**  95:24
96:3,5,9
133:10 135:16
137:14 138:18

259:22 260:6
**mediate**  207:16
**mediating**
208:3
**medical**  11:15
**medications**
11:11
**member**  130:16
200:7
**members**  3:12
4:4 8:10 110:1
199:16
**mention**  45:20
91:18 120:12
186:21
**mentioned**
15:18 17:5
20:15 24:19,20
35:17 82:22
91:15,16
107:17 173:7
178:3,11
181:24 195:23
198:11,24
249:24
**mentioning**
222:3
**met**  12:16
190:10 191:3
**meta**  5:18
112:7,19
**method**  47:12
135:18 152:8
154:14,16,21
160:3,10

195:17 206:16
237:5
**methods**  17:15
18:7 35:14,16
82:5
**metric**  96:2
**metropolitan**
167:13 175:12
175:25
**mfogelson**  3:9
264:2
**mi**  1:7 2:7 7:17
**michigan**  48:8
48:11 67:8,10
126:1
**michigan's**
54:6
**microdata**
149:17 150:4,8
151:8 208:23
**microphones**
7:6
**middle**  47:1
50:17,22
162:10
**migrate**  56:23
**mile**  32:9,9,11
32:16 113:11
114:7,9 115:2
115:2 117:6
225:4 234:13
**miles**  31:22,23
32:16 77:20
107:3 253:7

**mind**  98:15
203:20,24
227:23 251:3
**mine**  39:11
142:9,11
**minimum**
143:4
**minority**  80:16
**minute**  27:24
28:6,18 33:3
88:11,13 94:19
95:2,2 109:13
109:20 113:11
114:6,8,8
115:10 133:20
135:2,3,3
170:24 193:5
**minutes**  27:16
27:19 28:21,22
33:4,9,13,16
59:23 93:10,15
93:19,21
100:25 103:17
103:23,24
114:19,19
116:11 134:2,9
134:9 135:11
205:20 259:25
260:8,10
**misleading**
134:22 236:8
**misreading**
163:21
**missed**  45:8
155:8

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[missing - net]**                                                    Page 42

missing 33:15
  244:17 253:2
misstate 44:22
  120:1
mit 246:15
mix 173:5
  237:9
mizner 4:20
mobility 61:4
  200:15,23
modalities
  131:14 157:25
  206:25 214:19
modality 131:6
  143:20
mode 97:3
  117:15 121:24
  125:7 131:22
  152:13 170:2
  170:10 171:12
  174:6,13 180:4
  186:7 194:21
  231:22 259:23
modes 47:3
  72:11 125:3
  226:2,10
modest 191:14
moment 176:4
  182:9 210:8
money 51:1
  120:8 184:25
  237:23
month 10:6
  77:25 124:2
  163:2,5,10

164:2,2,6,14
  166:3,25 167:2
  172:23
monthly
  123:18
months 13:24
  14:2 124:3
moring 2:16
  7:19
morning 7:4
  9:3,4 118:10
  118:13
motivation
  51:10 124:23
  125:1
motivations
  125:19
motorized
  128:23
move 112:5
  203:14
movement
  41:25
movie 51:22,25
moving 89:9
  104:2 204:4,11
msa 173:2
multiple 37:6,6
  65:21 103:6
multiples 28:14
multiplier
  148:24 149:2,8
  165:11
multipliers
  111:3 149:3

241:16
multiply
  148:24
municipal
  107:9
municipalities
  122:20
mute 7:8
muted 259:11

**n**

n 127:1,1,1
name 7:21 9:5
  78:25 90:18,20
  263:20
names 9:19
national 29:3
  96:22 176:8
nature 33:25
  180:23 201:4
near 71:14,20
  77:18 78:5
  89:3,13 176:5
  201:10 236:23
nearby 66:14
  215:10 237:7
nearer 130:5
  232:1
nearest 33:24
  70:24 71:16,21
  72:21,22 75:5
  79:24 80:8
  156:8 158:2,4
  177:22 206:22
  224:8,9,10,15
  231:7,12,20

232:11 247:22
  248:10,14
  260:7
nearly 66:17
  88:20 179:18
  219:15 225:10
necessarily
  23:13 49:11
  54:8 63:19
  123:13 258:6
necessary
  100:2 198:22
  266:6
need 11:20,23
  35:13 89:18,20
  89:20,21 93:4
  100:5 101:11
  113:14 136:3
  146:18 162:15
  170:17,24
  173:14,15
  180:16 191:22
  194:19,21,22
  214:19,25
needed 12:1
  50:5 83:5
  115:22
needing 181:15
needs 124:16
  174:14 246:6
neither 263:16
nercessian 4:21
net 35:12 42:2
  42:5 204:25

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[network - numerous]**                                    Page 43

network  100:7
  176:9
networks  61:10
never  41:14
  59:2 125:12
  170:16 203:20
  203:24 251:3
nevertheless
  226:22
new  10:4 19:4
  34:1 85:25
  235:22 256:9
  258:4,12,24
newly  204:21
  219:9
nhts  163:4
  164:1,23 169:8
nice  20:4
night  119:19
nine  141:4,14
  141:14,22,23
nodding  160:22
nods  11:7
noise  239:9
non  26:18 35:2
  42:9 44:12
  73:17,21 86:5
  139:17 171:15
  171:16,18,19
  171:20 172:10
  172:10 206:4
  207:21,23,23
  207:24 210:10
  237:16 241:17
  250:24 253:11

253:20 254:3
nonburdened
  203:17
noncitizens
  159:4
nondisability
  209:9
nondisabled
  73:18 210:16
  237:15
nondiscretion...
  29:12,15,17,18
  29:21 108:21
  109:8 185:1
nonlitigation
  186:6
nonmaterial
  45:17
nonphoto
  218:3
nonprofit
  13:25
nonvehicle
  32:14
nonvoter  42:21
nonwork  78:9
  93:17 94:23,25
  102:12
norm  102:20
  102:21
normal  11:8
  96:7 124:1
norms  256:16
northern  1:2
  2:2 7:16

notable  145:13
  229:1,3
notary  266:13
  266:19
note  7:6 72:6
  176:6 202:19
  202:19 264:10
noted  251:20
  261:12 262:4
  266:7
notes  94:15
  203:24
notice  5:10
  12:12
noticed  147:9
noticing  8:6
  147:6
noting  217:15
notion  60:19
  78:2 245:18
notoriously
  193:3
november
  256:8
number  5:9 6:2
  7:17 18:23
  19:7 21:23
  22:8 47:23
  51:17 80:13
  86:20,22,23
  88:9,10,11,24
  92:14 93:25
  94:5,20 97:6
  104:21,22
  105:3,5 108:8

112:20,22
113:1,17 114:5
114:5 136:4,14
140:3 143:20
145:11 146:8
146:10 149:24
150:14 158:7
167:15 172:13
172:14 182:18
190:21 191:12
191:13 192:21
194:3 207:18
217:9 219:12
219:13 225:24
232:9 235:21
248:4 255:13
256:15
numbered
  142:9,11
numbers  22:9
  79:19 107:21
  114:9 115:14
  115:17,20
  117:17,18
  138:8,11
  141:17 144:14
  145:5 153:12
  167:9 204:8
  206:9,10,11,15
  209:24,25
  212:22 213:10
  213:11 230:14
  230:24 243:11
numerous
  232:22 233:6

**[nw - opinions]**                                                   Page 44

| nw  3:6 4:9 | offer  15:21 | 256:21 | older  166:17 |
|---|---|---|---|
| **o** | 25:18,20,21 | **ohio**  10:2,5 | **once**  77:21,24 |
| o  127:1,1,1 | 26:2 64:16 | 21:5 22:20 | 77:25 121:21 |
| o'brien  6:5 | 81:10 | 23:3,11 27:13 | 121:25 122:3,4 |
| 230:9 233:20 | **offered**  20:1 | 27:25 28:11,23 | 124:2,3 163:2 |
| oakland  14:19 | 37:22 40:7,8 | **okay**  11:9 | 164:7 166:23 |
| 14:19 | 185:19 | 26:11 38:19 | 175:24 |
| oath  7:24 10:13 | **offering**  185:23 | 39:8 43:14 | **one's**  67:23 |
| 10:15 | **office**  54:23 | 60:18,19 61:1 | 71:7,20 79:10 |
| object  60:13 | 83:7,20 85:7,7 | 86:13 87:2 | 79:11 106:8 |
| objection  35:22 | 85:10,13,16,21 | 89:10 93:20 | 129:8 234:11 |
| 39:4,25 40:13 | 86:3 87:15 | 97:5 98:21 | **onerous**  128:7 |
| 48:18 50:18 | 88:3 89:14,14 | 101:3 105:12 | **ones**  94:11 |
| 53:18 59:10 | 89:17,20 | 105:21 107:4 | 147:1,2 237:17 |
| 60:7 61:6 62:9 | 104:14 156:10 | 108:18 112:24 | **online**  196:18 |
| 64:14 69:9,24 | 186:15 217:10 | 114:17 119:25 | **ooo**  7:3 127:3 |
| 80:20 119:4 | 260:7 | 121:14 122:16 | **open**  104:14,19 |
| 135:19 136:6 | **officers**  258:6 | 132:20 134:23 | 104:21 |
| 136:17 139:4 | **offices**  2:15 | 138:5 140:11 | **opening**  221:7 |
| 146:14 | 34:14 65:18 | 142:14 150:11 | **operate**  183:19 |
| objections  8:2 | 82:19 83:2 | 154:16 156:11 | **operates** |
| observes  162:8 | 86:14 87:17,18 | 156:25 158:20 | 183:21 |
| obtain  136:15 | 87:19,21 88:8 | 159:3,25 161:7 | **operators** |
| obtaining  27:8 | 133:12,15 | 164:8,18,24,25 | 180:1 |
| obviously  22:1 | 176:25 259:25 | 166:2,22 | **opine**  146:16 |
| 77:3 144:3 | **offs**  108:20 | 167:23 174:2 | **opinion**  41:5 |
| 181:13 217:3 | **offset**  186:1 | 182:17 184:8 | 43:24 52:23 |
| 217:23 234:15 | **oh**  13:20 92:5 | 194:15 203:22 | 59:1 68:12,13 |
| 234:16 253:7 | 113:1 128:17 | 203:25 204:2 | 136:9 244:13 |
| occur  198:8 | 132:24 145:23 | 208:5 211:17 | **opinions**  24:1,4 |
| occurring | 166:2 172:23 | 215:11 227:1 | 25:17,21 26:2 |
| 179:23 | 173:16 178:9 | 244:19 246:13 | 42:10,12 43:20 |
| october  10:3 | 182:12 192:1 | 246:21 251:3,5 | 43:22 64:15 |
| 21:7,8 258:23 | 194:14 206:11 | 251:18 253:19 | 176:23 |
| | 246:19 250:5 | 254:17 260:13 | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[opportunities - palmer]**

Page 45

**opportunities**
215:22
**opportunity**
177:25 178:1
**opposed** 29:22
34:20 39:20
61:21 172:6
181:19 202:16
244:1 252:14
**opposite**
103:23 104:2,9
104:10
**oppress** 258:9
**oppresses**
258:10
**option** 30:12
38:24,25 40:4
42:7 50:5 52:1
54:21 68:25
69:1,3,4 82:3
125:24 128:14
137:16 138:4
170:6 177:2
179:9 180:8
181:20 205:10
**options** 45:12
49:3 61:3,23
62:2 64:12,19
67:15 68:23
70:2 104:12
106:4,7 130:14
139:1,7 160:14
180:15 197:18
198:19 200:1
201:9 215:23

215:25 247:7
247:10
**order** 35:13
40:19,21 83:3
92:23 93:3,5
112:1 129:1
136:2,11,15
180:20 189:10
246:8
**ordinary** 22:25
**organization**
13:12,25
**organizations**
9:24
**organize** 71:2
**origin** 156:7
**original** 263:13
**originate**
102:22,23
**originating**
102:3 103:1
**origins** 97:19
**outcome** 8:1
214:2,2
**outline** 190:14
**output** 156:12
156:20
**outside** 15:3,7
75:23 109:23
119:21 152:11
**outstrip** 193:13
**outstrips** 198:8
**overall** 34:22
50:10 63:23,25
73:8 107:18

141:11 144:15
144:20,21
145:2,10 167:8
175:19 232:10
234:18,20,21
236:9,9,9
237:21 239:23
241:4,6
**overlaid** 86:11
**overlap** 87:16
**overstate**
239:18
**own** 97:21
110:12 125:20
131:2,8 161:19
169:23 195:1
200:22 208:18
237:14
**ownership** 5:16
46:7,15 48:4
51:2 63:16
85:1,3 88:10
95:10 151:6
152:2 157:13
158:22 159:1
207:17 208:8
208:15,21
209:12 211:10
218:8,9

**p**

**p** 6:6,8,9,11,12
6:14,15,17
**p.m.** 2:18
126:10,11
127:2,5 184:13

184:14,14,16
242:5,6,6,8
261:8,12
**page** 5:2,9 6:2,6
6:20 37:9
46:18,21 47:10
47:10 48:24
49:14,15 67:1
95:9 113:1,2
113:18 125:14
132:18 133:9
141:7,7 142:4
142:6,7 144:14
144:15,16
145:1 148:6
165:21 173:10
173:17,17
174:2 178:18
218:15 224:4
228:25 230:14
230:16,17,20
230:24 246:13
246:17,18,20
250:4 259:20
260:3,12 265:4
265:7,10,13,16
265:19
**pages** 1:25
145:17
**paid** 227:24
228:16
**pairs** 156:7
**pale** 124:15
**palmer** 5:17
46:17

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[pandemic - people]                                                    Page 46

**pandemic**
56:10 59:9
143:9 144:4
**paper** 161:1,7
161:25 162:7
162:19 169:2
171:15 174:24
176:5,6 181:23
231:22,23
**paragraph**
37:8 46:18,21
46:25 93:8
94:14 107:17
112:6,9,14
113:18 119:23
120:4 133:9
141:16 148:6
149:14 152:17
154:5,5,9
156:11 173:18
174:3,4 176:7
186:20 187:16
188:3,8 190:15
202:20 203:18
203:19 204:4
204:11 205:9
205:18 206:7
206:10,12
209:20 213:7
213:17,21
218:14 220:7
221:7,13 224:3
224:17,17
226:8 228:24
228:24 231:6

231:10 232:18
233:2,3 234:12
238:23 242:11
246:18,20
249:11 251:7
251:18 253:10
260:3,14
**paragraphs**
132:15,19
**parallel** 178:15
**parameters**
97:17
**paratransit**
188:5,8 189:3
189:8 191:3
192:8 193:14
194:3,19 197:1
**parcel** 63:21
**parents** 15:22
15:23
**park** 19:8
129:16,19
**parking** 19:8
19:10
**part** 47:7 63:21
63:24 64:24
65:3 70:10
76:1 94:20
96:25 97:1
101:4 110:15
114:24 115:23
115:24 119:7
123:6 139:12
143:1 146:21
153:4 155:18

164:22 177:14
181:7 186:2
187:1 188:12
205:13 214:17
214:18 231:14
232:24
**participates**
47:4
**participating**
60:25
**participation**
5:16 43:13
46:16 47:12
62:6 67:16
234:22
**particular**
30:19 51:19
62:17 65:15
122:2 151:9
152:23 168:24
169:24 181:21
197:19 207:3,4
223:17 231:10
239:14 240:4
240:11,23
241:2 251:22
**particularly**
58:19 71:11,21
123:11 147:3
181:21 185:14
**parties** 7:10
**parts** 88:7
137:22 183:19
215:9 217:2,6
219:17

**party** 7:25
263:18
**passport** 90:14
90:15
**past** 162:8
192:23 244:1
**patience**
130:22
**patient** 259:6
**patronage**
176:8
**pattern** 72:19
**patterns** 74:5
234:2 238:16
238:16
**pay** 111:16
129:16 177:12
**paying** 129:19
**peace** 13:15,15
13:21 14:1,2
**peak** 119:21
197:5
**peaking** 198:3
**peaks** 119:21
**pedro** 5:19
112:8
**penalty** 8:24
127:9 171:1
262:2
**pending** 11:23
**people** 8:17
13:14 19:10
22:1,10 23:7
25:22 27:8,21
29:18 30:10,16

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[people - people]                                                                 Page 47

| | | | |
|---|---|---|---|
| 32:11 33:4,12 | 81:5,11,12,13 | 130:22,24 | 194:7,9,18,25 |
| 35:9 37:5 40:5 | 81:15,16,18,20 | 131:1,16,20,23 | 195:17 197:16 |
| 40:5 41:21,22 | 81:25 82:3,3,6 | 131:25 132:6,8 | 198:2,16,18 |
| 41:22 42:8,8 | 82:7,12,22 | 135:5,7,13 | 199:20,22 |
| 44:10,14 45:13 | 83:11,12,15,16 | 143:9 144:8,11 | 201:18,19 |
| 46:5 47:20,21 | 83:18 84:9 | 146:21,24,25 | 204:20,22 |
| 47:23 49:8 | 85:16 86:5,7 | 147:4,8 150:14 | 205:24 208:14 |
| 50:1,5,21,22,24 | 88:14,25 89:1 | 150:20,22 | 210:5 211:16 |
| 51:5,7,11,20,24 | 91:4,4,10,16,18 | 151:21 162:5 | 211:24 215:1,2 |
| 52:6,8 53:3,5,6 | 91:19,22 92:7 | 162:10,13,15 | 215:13 217:2 |
| 53:8,23 54:2,4 | 92:9,16,21,22 | 162:18,20,22 | 217:12,21 |
| 54:17,20 55:1 | 93:3,4,23,23 | 163:7 164:2,9 | 221:1,7,14,16 |
| 55:4,10,13 | 94:2 95:4,5 | 166:9,12,23 | 222:7,11,15,18 |
| 56:4,9,12,14,19 | 96:7,19 99:13 | 167:17 168:16 | 223:1,11,22 |
| 56:20,21,22,23 | 101:9 102:21 | 168:23 169:18 | 224:24 225:9 |
| 57:8,15 58:5,8 | 103:4,10 104:5 | 170:10,22,22 | 225:13 226:9 |
| 58:10,10,13,15 | 104:12,24,25 | 171:16,16,19 | 226:12,14,18 |
| 58:16 60:24 | 105:21,22,22 | 172:18 174:6 | 227:3,4,7,10,13 |
| 61:10,11 62:13 | 106:4,11,15,21 | 174:13,18 | 227:16,19,23 |
| 62:15,23 63:22 | 107:24 108:6 | 175:22 177:2 | 228:6,9,12,14 |
| 65:2,5 66:4,5 | 108:10 109:23 | 177:10 178:19 | 228:15,17 |
| 66:13,17 67:3 | 110:23 111:5 | 179:9,16 180:5 | 229:6,16,18 |
| 67:4,15 68:4,5 | 111:14,19 | 180:9,12,14,15 | 236:10,15,21 |
| 68:16,23 70:5 | 115:23 119:12 | 180:20,25 | 237:13,16 |
| 70:7,11,20 | 119:24 120:6 | 181:9,16 182:6 | 238:4,6,14,19 |
| 71:5,17,22,24 | 120:10,17,21 | 182:23 183:12 | 239:20 242:19 |
| 71:25 72:1,9 | 120:22,25 | 184:4 185:9,11 | 242:21,23,25 |
| 72:25 73:20,20 | 123:6 124:1,16 | 185:14,16,23 | 246:2,9,11 |
| 74:7,8,12,19,20 | 124:17 125:16 | 186:10,16 | 247:11,15,21 |
| 74:20 75:7,7 | 125:20,20,23 | 187:8 188:10 | 248:13,15 |
| 75:16,17,19,20 | 127:16,19,22 | 188:15,17,24 | 249:6,8 250:9 |
| 76:4,4,9,10,18 | 128:7,15,20,21 | 189:1,7,12 | 250:10,14,18 |
| 77:16 78:3,9 | 128:22,24 | 190:1,21 191:8 | 250:19 253:5,6 |
| 78:16,17,19 | 129:2,6,10,23 | 191:15 192:2,7 | 253:13 254:12 |
| 79:10 80:7 | 129:25 130:21 | 192:25 193:3 | 258:8,9 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

[people's - persons]

Page 48

**people's** 27:10
43:13 45:4
71:12,13 78:16
93:6 100:1
105:24 119:11
130:22 208:10
208:15 221:18
223:4 238:17
248:3
**perceived**
64:25 238:20
**percent** 47:24
47:25 69:18
71:25 79:15,22
80:6,7,11
81:20 83:25
90:24 94:6,6,8
107:19,20
108:4 129:1
141:11,12,19
141:21 142:24
142:25 145:12
146:6,8 152:18
155:3,14
162:21 163:19
164:4,10 165:6
165:8,11,12
167:1,21
174:16,19
182:5,16 183:8
186:22,23
187:5,7,18,19
187:24,25
188:21,24,25
191:19,20

193:10,18
195:12 202:21
203:15,16
204:6,7,12,13
204:14,16
205:19,21
210:3,6,9,10,12
210:12,13,15
210:16 211:13
211:15 212:19
212:20 213:6
219:7,19
220:23 227:25
228:2,4,12
231:7,9 234:15
234:17 236:10
243:7,13,14
246:25 247:1,3
247:5,19,23,24
248:2,18
249:10,22
250:19,21,22
250:24 251:8
251:12 253:23
253:24 254:24
**percentage**
28:20 72:1
73:9 95:20
107:23 108:5
128:23 131:22
163:7 184:5
186:16 187:13
187:22 188:2
188:22 191:15
192:25 193:6

195:11 209:1
212:4,5,5,6,10
213:4 218:16
220:8 225:19
227:16 242:25
247:21 248:13
250:18 254:8
254:16
**percentages**
49:16 108:11
108:13 135:9
147:10 187:9
249:8
**percentile**
106:6
**perception**
69:11,13
**perfectly**
184:10
**performance**
118:19 246:15
**period** 88:1,2
97:16 193:1,15
193:19 198:6
**perjury** 8:25
127:9 262:2
**permit** 18:16
70:2
**permitted**
120:14
**person** 4:24
22:25 26:24
30:2 47:19
49:19,21 53:9
53:20 59:1

66:2,6,9 67:11
68:6 70:21,22
83:5,6 89:21
93:14 102:7
103:16 106:7
121:10 139:1
142:25 166:14
167:10,11,24
168:1,3 184:24
189:9 194:12
198:19 200:10
223:16
**person's**
101:13 110:2
**personal**
100:20 124:13
144:17,19
145:1 185:9
260:18,19
261:1
**personally** 98:6
100:17
**persons** 25:4
47:14 48:13,16
49:16 50:15,16
61:3 64:11,19
64:21 66:20
105:17 118:24
167:19,20
181:24 182:23
204:18 209:21
213:7,8 214:6
214:8,14
216:20,21
221:20

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[perspective - popular]                                    Page 49

perspective
  34:21 35:7
  51:17 218:24
pertains  263:12
ph.d.  1:14 2:15
  5:3,10,21 8:23
  14:21,23 127:7
  262:1,12 264:5
  265:2,24 266:2
  266:4,12
phenomenon
  80:23 132:13
  198:4,7
phones  7:8
  98:1
photo  9:25
  26:16 27:8
  83:4 89:20,21
  91:8 92:23
  93:2,4 217:13
  217:24 258:4
phrased  44:16
physical  70:11
physically  70:9
pick  7:7 11:6
  27:6 238:19
picking  191:8,9
picks  132:10
picture  253:3,4
  258:25
piece  112:5
  210:25
place  7:10
  13:18 15:24
  20:4 30:2

45:14 52:16,19
57:25 78:7
85:16 93:6,7
102:6 106:8
139:11 171:13
180:21 225:23
227:24 242:15
263:5
places  23:16
  45:3 52:16,24
  53:1,3,6 70:17
  75:10 87:16
  130:4 174:21
  180:12 186:18
  198:20 201:19
  215:13,14,22
  216:2,24
  231:24
plaintiff  132:10
plaintiffs  3:3
  8:16 12:16,17
  24:14,17,19,21
  24:23
plan  104:24
  142:5,18,19
  199:1
planning  14:14
  14:24 15:2,2,8
  17:4 18:2,3
  19:24
plans  178:21
plausible
  122:18
play  146:21
  202:9 223:20

242:13 260:19
playing  51:3
  68:9
plays  93:5
please  7:6,8 8:3
  9:6 11:1,5
  12:21 16:14
  22:15 23:19
  163:22
plenty  222:11
  226:17 237:23
  238:2
plotted  220:17
plurality  224:7
plus  236:10
point  15:25
  30:8 49:14
  63:18 64:23
  79:14 82:16
  101:13 104:6
  105:18 116:16
  116:17 127:14
  131:9 136:12
  136:24,25
  137:11 170:17
  172:13 173:16
  181:6,7,11,15
  209:15 217:15
  219:18 252:25
  259:18
pointing
  233:19
points  151:9
police  258:17

policies  178:21
  179:25
policy  14:7,14
  39:3,22 49:10
  49:24 181:17
  223:20
policy's  223:19
policymakers
  49:1
political  260:19
  261:1
politics  45:24
  47:4
polling  23:16
  30:2 45:3,14
  52:16,16,18,24
  52:25 70:17
  93:6 106:8
  132:9 171:13
  180:12,21
  198:20 216:2
polls  185:20
pool  185:6
pooling  132:1
  185:8 191:8
poor  67:4
  110:13 123:11
  124:18 145:7
  145:10 159:13
  159:14 209:2,3
poorer  78:16
  120:10 170:23
  177:10
popular  141:1
  141:23 143:4

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[popular - presumption]**                                   Page 50

242:18
**populated**
  88:10
**population**
  47:2 54:15,16
  54:19,24 55:3
  56:9,24 62:6
  62:20,22 64:13
  73:10 84:6,8
  88:24 102:19
  134:21 177:15
  177:17 179:18
  183:5,8 188:22
  188:23 191:18
  191:25 195:11
  195:12 197:19
  203:15,16
  210:9 212:15
  212:25 217:20
  217:20 221:1
  228:1 250:20
  251:21 254:14
  254:16,19,22
  254:24
**populations**
  63:13 75:22
  187:4
**position**  16:21
  16:25
**possess**  92:17
**possession**
  221:16,19
**possibility**
  131:2 248:25

**possible**  36:13
  38:7,17 85:4
  97:14 100:8,13
  109:13,16
  124:20 127:16
  127:19 132:5
  157:15 176:17
  177:20 232:22
  233:7 239:20
  246:10 248:3
**possibly**  44:18
**post**  5:23
**postal**  69:6,12
  69:16 70:13
**potential**  47:5
  139:13 146:20
  190:16
**potentially**
  137:16 191:2
  195:20 225:21
  232:11,13
  252:24
**poverty**  91:4,16
  91:23 92:9,10
  150:16 151:3,5
  151:15 157:13
  159:1 167:10
  167:14 186:22
  186:24 187:4,8
  187:10,12,13
  187:20,23
  207:15 208:4,5
  208:10,16
  209:3 218:9
  221:8,14,17,21

**poverty's**
  151:16
**pp**  5:10,11,13
  5:14,17,20,23
  5:25 6:5
**practical**  17:6
**practice**  71:10
**practices**
  152:10
**precinct**  52:12
  180:21
**precisely**  67:2
  82:4 216:25
  225:12
**predict**  21:17
  151:5 208:7
  239:11
**predicted**  21:9
  21:14,15,20
  119:7
**predictions**
  22:11,18,23
  57:12
**predictive**
  151:16 233:21
  234:10,16
**predictors**  46:4
  173:20
**predominantly**
  183:13
**prefer**  66:4,5
  242:16,20
**preference**
  111:14 245:19

**preferences**
  245:4
**prejudge**
  260:24
**preliminary**
  10:20
**premise**  29:4
**prepare**  12:15
  12:18 25:1
**preparing**
  24:12
**present**  4:15,24
  8:4 42:10,12
  43:25 70:9
  81:3 93:14
  133:10 146:13
  154:17 191:1
**presentation**
  128:18
**presented**
  43:20 98:7
  197:25 198:15
  218:20
**presenting**
  155:17
**presents**
  243:17
**presumably**
  27:9 47:16
  54:24 80:1
  81:15 186:3
**presume**  51:6
**presumption**
  62:15 66:13
  68:22

Daniel G. Chatman , Ph.D.
May 16, 2023
Georgia Senate Bill 202, In Re

**[presumptively - provided]**

Page 51

**presumptively**
236:13
**pretty** 25:23
48:1 74:12
77:18 81:22
82:13 116:3,18
119:19 143:6
145:5 191:14
191:22 194:3
205:6 206:16
209:15,18
211:13 215:17
242:2
**prevent** 11:12
11:16 53:10
**prevents** 53:8
**previous** 12:7
29:9 62:10
163:4,9 164:6
164:14 166:25
167:2 195:8
**previously** 28:3
59:2 81:8
102:15 103:3
127:8 146:5
177:1
**price** 175:24
**priced** 19:8
**prince** 4:8 8:12
105:4,6 140:10
140:12 142:12
256:3
**principled**
17:19

**print** 173:17
230:18
**printout** 6:6
**prior** 37:25
167:25 193:9
263:7
**private** 7:7
118:1 216:15
216:15
**probability**
234:14
**probably** 19:22
19:24 28:6
51:3 53:11,13
57:3 68:9
74:16 85:23
86:6 93:4
103:13 108:9
114:14 116:10
116:18 126:5
168:19 180:9
192:5 195:18
211:14 223:6,7
228:1 250:21
**problem**
183:20 198:3
239:9
**procedure**
151:25 152:1
166:11
**proceeding** 8:2
**proceedings**
263:4,6,8,14
**process** 97:8
136:13,24,25

153:1,2 154:2
160:8 240:21
243:22,24
**processes** 15:8
**procure** 26:16
85:17
**produce** 74:6
229:1
**produced**
78:21
**professor** 15:13
16:2,22,23
18:11 162:7,19
169:2 176:6
182:11
**profile** 255:13
255:16
**profile's** 255:15
**program** 14:21
**programming**
97:24
**progress**
257:11
**progression**
165:24
**project** 3:4
8:15 257:10
**projected** 23:5
176:9
**projecting**
151:8
**projection**
21:11
**projections**
22:4

**promise** 25:21
249:17
**promoted**
16:23
**pronounced**
198:5
**proportion**
79:10 141:19
141:20 147:24
210:1 212:16
212:17,24
217:12 219:24
234:1 236:2
**proportionately**
212:23
**proportions**
188:18 220:1
**proposal**
128:18
**propose** 237:5
**propositions**
179:12
**protests** 258:16
**prove** 90:3
**provide** 37:10
37:11,20 38:10
38:17 39:12,17
51:1 70:2 90:9
90:17 135:17
136:5,14 148:6
177:3,24 189:5
196:2,7 205:10
219:12
**provided** 10:7
13:12 24:18,21

**[provided - question]**                                    Page 52

24:22,23 38:1
38:5,6 41:9,14
41:15 70:16
181:19 204:17
204:21 216:9
216:12
**providing**
14:11 40:2
42:7 49:2 50:5
67:15 139:12
179:6 180:1,11
253:25
**provision** 10:4
10:10 42:6
178:22 216:7
**provisions**
41:16
**proximate**
33:25
**proximity**
80:19 234:11
247:6
**proxy** 6:3
63:12 217:21
230:7 238:10
**public** 14:6
18:21 30:18,24
31:4,8 32:10
72:10 74:21
100:22 101:1
107:19,24
115:18 117:21
117:24 118:2,6
118:13,18,24
118:25 119:1

127:15,23
128:1,6,13,14
129:10,15,24
130:15 131:16
134:1 141:25
148:7 149:11
149:17 150:4,8
151:7 158:1
160:15 168:18
176:10,15,19
177:7 178:4,12
183:17 184:19
200:7,17,18
201:14,16
208:22 223:18
223:20 224:5
224:13 225:9
225:13,15
226:19 227:4,7
227:15,16,20
243:23 266:19
**publications**
18:13,20 19:12
19:15
**publish** 49:9
**published** 18:9
175:13 181:12
181:14
**puma** 150:4
156:15 157:3
157:16 158:11
158:12 159:1
159:10 160:1,9
208:22,22
209:6,11

**pumas** 157:8
157:12 209:13
251:15
**pums** 208:22
**purchases**
225:22
**purely** 129:11
171:4 245:19
**purpose** 102:13
170:9 228:20
**purposes** 19:9
28:24 78:9
127:20 129:22
227:14,17,17
**put** 64:6 68:2
79:22 110:4
127:21 151:12
171:22 182:25
203:9,10
228:21 241:22
247:12

**q**

**qualify** 102:8
**qualitative**
111:8
**qualitatively**
56:2
**quality** 130:10
**quantified**
43:15,18 44:3
62:12
**quantify** 35:11
43:3,4,7,10
90:23 91:14
92:12,16

108:16 111:12
121:11 130:20
131:5 222:7
223:12,13
**quarterly**
123:19
**query** 150:12
**question** 10:25
11:3,22,24
22:15,17 25:19
30:7,23 31:23
32:4 39:6
41:12,13,24
53:25 55:6,15
55:20 60:22
63:22 64:24
65:3,4,8 68:19
70:14,15 71:18
73:25 75:13
81:9 89:11
91:10,21 98:16
101:3,15
103:15 105:7
105:19,20
118:22,23
125:22 128:19
136:18 137:20
146:4 149:1
150:19 155:9
160:5 163:3
167:25 179:3
192:13 201:22
203:21 206:17
212:3,3 214:9
214:12 217:7

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[question - reason]**

Page 53

221:12,15
233:10 234:4,8
243:21 244:18
244:20 245:1
246:4 248:22
248:23 249:6
252:18
**question's**
89:12
**questions** 25:23
43:5 57:2 84:5
121:14 156:17
259:10,18
**queuing** 53:1
**quibbling**
240:13
**quick** 242:2
259:17
**quicker** 183:25
184:1,21
**quickly** 13:14
**quite** 18:20
28:13 46:3
49:23 64:23
71:14 72:12
81:24 89:19
106:5 107:16
122:18 131:20
137:9,10
141:11,13,17
141:18 142:2,2
153:6 165:15
179:12 186:18
200:14 219:13
219:14 232:5

233:17,24
234:10 248:3
249:5
**quiz** 235:4,16
**quotation**
258:11,12
**quote** 224:6
258:5
**quotes** 72:22
256:20 259:1,1

**r**

**r** 5:19 127:1
265:3,3
**race** 151:16
158:18 172:3,5
172:7 173:19
187:21 208:16
209:8,8 218:11
220:14,24
**races** 173:6
**racial** 74:6
145:4 172:2
209:6
**raffensperger**
3:12 4:4 8:9
**rail** 113:4
116:4 117:17
**raised** 18:14
78:20
**random** 100:13
239:2,7,10
240:9,21,24
**range** 106:6
187:17 211:12

**ranges** 187:18
**rapid** 19:4
32:24
**rapidly** 175:9
**rarity** 127:15
**rate** 20:13
21:24 26:14
49:25 53:11,12
53:25 54:3
125:18 144:18
144:19,21
145:2 161:9,13
174:15 175:23
179:18,22
198:1 207:15
211:10,11
220:20 228:5
**rate's** 228:3
**rates** 47:5,12
53:6 68:7
187:4 188:23
197:18
**rather** 70:24
73:7 87:12
102:13 103:1
158:3 169:15
239:1 245:20
**rating** 145:10
**rationale** 197:9
**ratios** 241:21
**reach** 43:1,15
43:18 70:7
89:15 103:19
104:7 176:24
221:6,9,13

**reaching** 70:5
**read** 67:9
114:23,24
115:4 156:24
156:25 203:23
203:23 219:23
235:9 256:3
262:2 264:9
266:5
**reading** 98:15
113:2,12 168:6
168:7
**ready** 57:3,4
186:11
**real** 16:10
69:13 253:3,4
**realistic** 101:9
192:6
**really** 15:9
21:16 28:13
54:7 60:14
66:23 83:14
96:13 99:18
109:17 115:8
118:2 125:9
135:1,21
145:13 157:2
170:11 173:10
191:14 199:11
217:17 223:10
225:5 246:1
**reason** 50:4
51:23 55:22
58:18 62:19
63:5 64:8 65:2

Case 1:21-mi-55555-JPB   Document 973   Filed 09/12/25   Page 544 of 691
Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[reason - registrar]                                            Page 54

70:18,20 73:2
74:18 88:8
100:13 125:18
128:3 169:18
170:10 184:3
216:11 236:2,7
237:7,8 240:10
240:22 242:16
248:7,20,23
257:1 264:11
265:6,9,12,15
265:18,21
**reasonable**
54:2 84:12,12
96:4
**reasonably**
199:7,9 236:13
**reasoning**
244:25
**reasons** 29:13
51:15 52:10
54:3 63:7,7,9
64:7 72:12
103:2 117:16
180:7 192:7
225:17 226:4
246:23 247:5
**rebecca** 3:12
4:4 8:10
**rebuttal** 5:14
25:7 44:17
45:22 78:18
79:18 223:24
224:4 230:6
232:19 233:4

242:11 249:12
249:15
**recall** 9:17
13:10 15:5
78:21 156:3
187:25 258:14
**recalling** 87:18
**receipt** 264:18
**received** 14:6
14:23 15:11
66:7 67:25
**recent** 18:20
**recently** 85:8
183:2 218:8
220:11 255:9
**recess** 60:1
126:11 184:14
242:6
**recognize**
12:25 23:24
25:13
**record** 7:5,11
8:6 9:6 12:11
12:13 16:9
59:24 60:2
69:7 115:4
122:11 126:9
127:4 136:4,12
136:13 184:12
184:15 195:4
242:4,7 256:4
259:19 261:7
263:7,11
**recorded** 7:12

**recording** 7:9
155:15
**records** 84:18
**recurrent**
99:20
**redefine** 28:23
**reduce** 49:2
73:13,14,15
88:20 120:5
132:3
**reduced** 44:20
75:4 76:7
106:14 153:11
220:19 223:21
**reduces** 92:14
**reducing** 133:3
222:20
**reduction** 22:8
76:8 78:11
178:1 229:1,3
**refer** 78:24
79:18 93:10
98:8 125:10
140:22,23
141:24 142:21
153:13 155:25
174:4 188:8
196:23,24
203:18,19
239:7 243:2
**reference** 42:15
110:18 158:10
**referenced**
264:6

**references**
230:12
**referred** 78:25
79:4,21 196:25
222:4 239:9,10
**referring**
162:24 165:10
182:12 194:14
194:15 213:20
223:23 239:25
**refers** 90:12
110:23
**reflected**
260:13
**reflects** 214:7
**regarding** 41:5
42:10,12
**regardless**
28:17 30:21
194:20
**regional** 17:3
18:1 149:22
**regist** 86:2
**register** 55:10
55:10,14 64:25
**registered** 55:4
55:18,20,25
61:24 62:14,17
62:20,22 63:20
64:3,21 84:20
203:1
**registering**
65:4
**registrar** 87:10
88:1 89:3

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 545 of 691
Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[registrar - reported]                                                    Page 55

218:2
**registrar's** 85:7
  85:10,13,16
  86:3 89:14,17
**registrars**
  133:15
**registration**
  55:9,17 63:17
  63:21 84:23
**regression**
  171:23
**regular** 11:21
  76:1 189:5
**regularly** 75:8
  76:20
**regulation** 62:7
**regulations**
  48:6,7 106:16
**regulatory**
  175:16
**relate** 17:23
  18:14
**related** 7:25
  34:18 64:25
  120:16 258:15
  258:16
**relating** 178:25
**relation** 43:2,7
**relationship**
  50:14 64:18
**relationships**
  173:19
**relative** 35:5
  73:4,7,16
  76:14 125:3

134:21 176:14
176:18 181:16
237:10,11,19
237:22 240:1
241:8,10,11,14
241:20 245:8
245:16 252:3
263:17
**relatively** 11:21
  78:12,14 81:16
  147:1 153:8
  168:24 195:11
  209:25
**relevance**
  23:15 49:11
**relevant** 17:6,8
  17:9,16 18:6,8
  18:20 19:1,6
  19:12,14 34:19
  34:22,23 35:6
  35:10 54:15,16
  54:24 55:3
  56:9,12,24
  68:5 71:16,22
  72:2,13 80:19
  81:6,9 100:1
  101:22,23
  134:25 135:1
  165:14,16,17
  176:23 185:25
  236:4
**reliability**
  69:22 70:13
**reliable** 47:3
  49:3 69:13,17

70:3 234:8
**reliance** 179:17
**relies** 72:24
**rely** 72:9 74:21
  215:8 226:10
**relying** 131:24
  188:12 195:5
**remember**
  11:23 15:6
  78:25 86:21
  125:12 164:19
  182:8,25
**remembering**
  196:11
**remind** 148:9
**remotely** 8:4
**removal** 33:23
  219:16
**repeat** 59:14
  230:19 260:5
**repeated** 77:10
**repetitive**
  42:24
**rephrase** 25:25
  179:4
**replicate** 98:4
  209:19
**report** 5:12,14
  5:21 15:8
  23:19,24 24:6
  24:8,12 25:1,3
  25:11 26:8,10
  26:21 28:24
  30:25 35:11
  36:2,25 37:8

42:16 43:20,25
44:4,18,19
45:2,9,20,22
52:8 72:6,7
74:3 79:19
82:17,18 83:10
85:9,20 86:16
86:17,19,20,21
90:23 93:9
95:20 98:19
108:23 113:10
113:18 128:24
132:7 137:22
137:22 141:7
142:8 146:15
147:6,8 148:6
155:1,19,21
156:1 160:15
161:12,15
169:5 186:13
186:20 188:13
189:21,22
196:4,4,9,23
206:15 221:7
223:24 224:2,4
226:5 230:6
232:19 233:4
240:25 241:22
246:13 247:5
249:12,15,19
249:21,25
259:21
**reported** 1:21
  146:12 150:6,9
  151:18 152:24

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[reported - return]**

Page 56

163:9 164:6
165:6,9 186:24
227:25
**reporter** 2:19
7:22 8:17 11:6
16:13 20:25
59:18 75:12
90:8 94:4
98:12,13 125:4
149:13 155:7,8
155:12 156:23
178:10 235:12
259:11 261:10
263:2
**reporting**
153:9,14 155:4
155:6,21 194:2
246:14
**reports** 10:8
18:10,15 21:12
25:16 26:3,7
27:13 74:2
79:3 154:12
188:13 260:21
**represent** 8:8
24:1 110:11
**representation**
47:6
**representative**
251:19
**representing**
7:21
**represents** 24:3
**request** 97:18
189:7

**requested** 6:19
263:15
**requests** 97:15
**require** 108:20
194:9,11 196:7
201:3 214:19
**required** 67:7
82:19 83:1
91:6 92:23
135:22 180:18
183:10 189:9
219:9 266:13
**requirement**
85:25
**requirements**
9:25 66:8
67:13 120:6
126:2,3 139:6
**requires**
136:21 158:10
**res** 222:2
**research** 46:19
46:23 48:25
232:3
**researcher** 35:8
**residence** 79:12
231:7,12
243:18
**residency**
210:20
**residents** 19:2
211:2
**resource** 66:16
171:13 177:23
178:13,14

200:2,9 207:3
**resources**
36:11 54:21
65:21 186:1
222:3
**respect** 31:8
81:4 94:19
153:18 223:14
**respectively**
187:6,7 207:20
**respond** 82:10
230:5
**responded**
217:14
**respondents**
111:18 163:8
164:5
**response** 188:4
188:9,13 189:2
189:11 190:11
190:25 193:13
194:10,11,20
195:24 196:5
197:1,2,6,13
198:22 199:10
199:13 200:8
202:1,8
**responses** 11:5
**responsibilities**
123:9
**responsible**
140:1,3
**rest** 27:3 252:7
**restaurants**
51:21,25

**restrict** 102:11
190:4
**restricted**
37:10,19,21
104:18 188:15
188:17,19,19
192:4
**restricting**
104:22
**restriction**
37:16
**restrictions**
140:6 219:11
**restrictive**
39:23
**result** 19:4
34:10 45:13
133:8 174:22
238:24
**resulting** 34:18
41:19 100:9
216:8
**results** 28:12
47:2 49:11
58:21 183:2
203:14
**retained** 20:8
**retirees** 228:13
228:14
**retrieve** 196:18
**retrieved** 196:9
196:11
**return** 13:21
62:10 246:23
259:8 264:13

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[return - route]**

Page 57

264:17
**returned** 45:21
193:11
**returning**
79:24
**retweet** 6:13
257:17,22
**retweets**
257:20
**revealed** 246:1
**review** 24:12
25:4 263:14
264:7
**revisit** 102:16
**rid** 70:17
**ride** 18:25
130:16,21,23
161:3,25 162:4
162:20,23
163:11,13,16
164:11 165:4
165:13,18
166:25 167:1
168:3,13 171:7
171:17 174:25
175:4,6,11,20
176:7,15,19,22
177:13,18,21
178:2,5,14,20
179:6,9 181:9
181:13,17,20
183:16,19,23
184:18,24
186:2 189:8
200:8

**ridehailing**
5:24
**riders** 129:21
132:2
**ridership**
176:10
**rides** 109:22,25
185:19
**rideshare**
131:21,24
132:3 170:15
**rideshares**
131:18 132:1
**ridesharing**
110:5 169:19
170:4 185:5,8
**riding** 31:22
32:12
**rigged** 256:9
**right** 13:7 14:7
14:8 31:2,5,7
32:20 33:7
39:16 41:1
46:25 48:2,6
49:6,24 52:12
57:13 58:1
63:8,19 79:7
86:22,24,25
87:4,8,9,12,22
87:22 91:12
92:1,5 93:12
94:10,22 95:3
95:11 101:19
101:21 106:21
107:12 108:18

112:13 114:11
114:21,22
117:4 118:11
119:18 120:19
121:13 122:24
131:14 133:6
133:12,24
134:4,5 137:15
137:24 138:1
138:17,19
142:8 143:16
145:12 148:25
150:1 157:23
157:25 158:6
158:15 159:12
159:15 160:16
160:20 163:15
164:3,13,15
165:25 166:11
166:15 167:4
167:22 168:6,7
169:22 171:9
173:9 174:10
175:1,19 176:4
180:18 181:3
182:2,7,17
188:6 190:3,7
192:3 193:20
197:10 199:25
202:22,23
204:10,20
205:24 206:23
206:24 207:2,5
207:10,13
208:24 217:14

218:1,5,10,21
219:6 221:5
225:3 227:6
228:8,11
232:16 236:17
240:14,20
241:21 244:5
251:10 254:11
254:22,25
258:11
**rights** 9:24,24
132:8
**rise** 171:3
215:21
**risk** 33:14
**rogue** 258:6
**role** 51:4 68:9
93:6 146:21
202:8 223:19
223:20 242:13
260:20
**rose** 253:23
254:23
**roughly** 49:16
53:11 117:5
**round** 26:25
44:11 95:1
109:14 177:6
203:11 220:21
**roundabout**
21:7
**rounds** 238:6
**route** 148:7,17
149:6

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[routes - see]                                                    Page 58

| | | | |
|---|---|---|---|
| **routes** 148:15 | **saying** 32:4,8 | **scarcity** 50:25 | **seat** 89:3 |
| **rq** 196:13,20 | 44:19 51:14 | **scenarios** | **second** 16:13 |
| **rule** 100:24 | 61:2 65:19 | 111:16 | 55:15 57:17 |
| **rules** 10:4 | 74:15 76:13 | **schaerr** 3:15,20 | 79:25 130:17 |
| 41:11 54:6 | 81:8 92:4,5,6 | 4:7,12 8:13 | 139:9 142:14 |
| 59:3 215:20 | 102:15 103:4 | **schedule** 11:21 | 156:23 164:19 |
| 223:9,10 | 117:11 119:12 | 31:20 33:12 | 174:3,3 178:17 |
| **run** 101:5 | 154:6,8 157:22 | 99:10,11 199:2 | 231:6 251:6 |
| 144:11 193:8 | 167:8 179:4,13 | 199:4,7 | 253:17 |
| **runoff** 122:22 | 201:23 216:5,6 | **scheduled** 32:6 | **secondly** |
| 123:1 | 216:17,19,23 | 189:6 191:5 | 134:24 248:7 |
| **rural** 166:16 | 222:21 224:12 | **schedules** | **secretary** 3:11 |
| 167:11 181:25 | 230:20 240:12 | 100:6 120:11 | 4:3 8:9 84:19 |
| 182:6,24 183:3 | 240:15 245:9 | 148:16 | **section** 48:24 |
| 183:6,14 | 245:12,14 | **scheduling** | 196:23,25 |
| 210:19 211:11 | 254:21 257:18 | 198:22 199:17 | 206:16 230:18 |
| 211:14,21 | 258:5 | **scheme** 106:17 | 231:5 |
| 212:1 217:3,4 | **says** 45:21,23 | **scholar** 68:3 | **sector** 47:2 |
| 217:5 | 117:10 142:15 | **scholars** 25:4 | 216:15,15 |
| **rutgers** 15:14 | 142:24 234:11 | 232:15 | **secular** 175:5 |
| 15:18,19,20 | 240:6 256:7,8 | **school** 13:22 | **secure** 70:3 |
| 16:3,7 | 260:6 | 14:3 15:4 | 242:22 |
| **s** | **sb** 34:10,16,18 | 76:21 141:25 | **security** 238:20 |
| **s** 127:1,1,1 | 35:18 36:1,2,6 | 247:2 | **see** 28:20 31:20 |
| 265:3 | 36:11 37:9,12 | **schools** 19:23 | 37:13 41:7 |
| **safe** 70:3 | 37:17,19,24 | **science** 152:10 | 46:25 47:7 |
| **salt** 247:16 | 38:8 41:5,8,11 | **sciences** 160:11 | 50:1 56:6 67:1 |
| **sample** 149:17 | 41:16 42:1 | **scientific** 223:3 | 67:2 70:22 |
| 150:9 152:18 | 48:5,9,12 58:6 | **scientist** 17:20 | 75:23 88:8 |
| **san** 1:15 2:16 | 59:4,8 85:24 | 152:10 | 94:1 112:3 |
| 3:18 7:1,19 | 90:2 104:18,23 | **scientists** | 117:17 128:10 |
| 19:10 183:22 | 132:9 147:8 | 154:20 | 128:15,25 |
| **saw** 12:7 | 204:17 215:20 | **screen** 159:3 | 137:12 141:10 |
| 128:17 | 216:3,6 236:5 | **sealed** 136:2 | 141:18 143:1 |
| | | | 144:14 145:16 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[see - shortened]**

Page 59

| | | | |
|---|---|---|---|
| 145:17 157:21 | **self** 82:5 146:24 | **sequence** | 96:18,19,23 |
| 172:23 173:10 | **selle** 1:21 2:19 | 256:21 | 97:19 104:12 |
| 179:4,11 187:1 | 7:23 263:23 | **series** 255:21 | 105:11 253:17 |
| 191:12 202:7 | **senate** 1:7 2:7 | 260:4,17 | 263:5 |
| 205:13,13 | 7:15 264:4 | **serious** 20:3 | **sets** 207:11 |
| 206:23 230:25 | 265:1 266:1 | **serve** 191:21 | **setting** 51:10 |
| 231:14 232:24 | **sense** 28:9 | **served** 194:5 | 122:19 |
| 234:12 244:3 | 31:24 32:1 | **serves** 189:12 | **seven** 135:2 |
| 246:9 251:1 | 35:5 45:18 | **service** 14:2 | **several** 13:15 |
| 252:7 253:9 | 77:12 82:23 | 16:8 32:25 | 18:8,9 27:9 |
| 260:1 | 115:22 123:3 | 69:12 70:14 | 56:5 104:19,19 |
| **seeing** 60:24 | 123:17,22 | 168:3 178:14 | 150:3 157:9 |
| 72:20 81:25 | 134:20,22 | 178:22 183:16 | 189:18 204:5 |
| 129:8 | 222:14 245:8 | 184:25 199:2 | 231:24 235:22 |
| **seem** 53:10,16 | 245:15 | **service's** 69:6 | **sf** 19:8 |
| 69:17 86:23 | **sensible** 41:7 | 69:16 | **share** 25:3 |
| 87:15 117:5 | **sensitive** 7:7 | **services** 5:24 | 131:23 163:8 |
| 135:3 237:12 | **sent** 264:14 | 13:13 14:12 | 211:25 218:25 |
| 242:20 | **sentence** 37:13 | 18:25 27:3 | 219:18 253:11 |
| **seems** 20:4 | 37:14 48:25 | 110:6,10 161:3 | 253:13,20 |
| 56:24 64:23 | 114:3 128:6 | 162:1,4,21 | 254:12,13 |
| 70:12 87:4 | 145:19,22,22 | 171:17 174:21 | **sheet** 264:11 |
| 143:21 185:13 | 220:18 232:19 | 175:11,15 | **shop** 75:23 |
| 209:18 237:22 | 233:3 246:14 | 176:7,23 179:6 | 130:12 |
| **seen** 12:6,8 | 251:6 253:10 | 188:9,13,15 | **shopping** 102:8 |
| 48:20 106:5 | 253:17,18 | 189:3,5,6 | 109:2 121:4,6 |
| 146:15 147:20 | 254:3,11 | 190:22,25 | 169:25 215:19 |
| 147:22 148:2 | **separate** 69:14 | 191:3 192:8 | 228:20 |
| 170:7 230:13 | 89:19 95:12 | 193:14 194:4 | **shops** 77:11 |
| 231:23 | 102:1 103:20 | 196:5 221:25 | **short** 78:12,14 |
| **selected** 146:24 | 220:14 | 222:1 244:3 | 81:19 168:24 |
| 248:6,20 | **separated** | **serving** 78:8 | 174:21,22 |
| **selecting** 247:5 | 220:15 | 194:4 | 181:1 |
| **selection** 82:5 | **separately** 65:6 | **set** 25:17 26:3 | **shortened** |
| | | 80:4 81:6 | 81:19 |

Daniel G. Chatman , Ph.D.
May 16, 2023
Georgia Senate Bill 202, In Re

**[shorter - sorry]**                                                    Page 60

| | | | |
|---|---|---|---|
| **shorter** 52:19 | 134:12,15,15 | **sitting** 108:15 | **smartphone** |
| 168:13 194:24 | 154:23 155:2,2 | **situation** 34:1,3 | 175:1,3,7 |
| 226:11 | 156:2 171:6 | 38:5 126:1 | 176:2 |
| **shortest** 156:9 | 172:17 173:8 | 128:24 152:11 | **snapshot** 34:14 |
| **shorthand** 2:19 | 173:19 177:25 | 235:20,21 | **social** 17:19 |
| 263:1,9 | 182:21 219:11 | 236:1 | 60:5,12,17,20 |
| **show** 16:2 47:2 | **significantly** | **situations** | 60:23 61:4,10 |
| 47:18 49:16 | 55:24 116:6 | 118:8 | 61:14,15,16,17 |
| 82:11 92:25 | 175:12 183:16 | **six** 145:18 | 61:20,21 131:3 |
| 95:20 135:8,22 | 232:2 | **size** 173:2 | 152:10,10 |
| 172:11,12 | **similar** 10:5 | **skeletally** | 154:20 160:11 |
| 174:24 | 21:24 28:13 | 190:14 | 223:3 |
| **showing** 23:9 | 58:16 74:6 | **skip** 253:12 | **socializing** |
| 93:6 | 84:10 86:4 | **slash** 197:1 | 109:2 |
| **shown** 71:12 | 97:20 98:2 | **slices** 142:23 | **society** 54:25 |
| 135:16 195:19 | 116:4 139:14 | **slicing** 218:16 | 258:7 |
| 233:18 234:10 | 168:8 189:8 | **slightly** 43:21 | **socioeconomic** |
| 260:17 | 197:15 198:3,4 | 53:11,12 | 167:18 |
| **shows** 16:9 | 198:7 | 173:21 183:11 | **solution** 49:25 |
| 30:15 79:15 | **similarly** 129:6 | 205:1 | **solutions** |
| 85:20 125:15 | **simple** 36:25 | **slow** 22:17 | 264:23 |
| 139:14 163:13 | 81:22 223:6 | **slower** 72:11 | **somebody** |
| 171:18 172:1 | **simply** 36:18 | 226:2 | 24:22 170:14 |
| **side** 47:22 | 41:18 129:4 | **small** 14:10 | 235:17 |
| 100:22 177:6 | 139:9 199:16 | 73:14 131:21 | **somebody's** |
| **sight** 215:4 | **single** 27:12 | 153:6,16 | 140:13 |
| **sign** 264:12 | 65:15 103:5 | 154:19 174:16 | **something's** |
| **signature** | 159:17 188:14 | 184:5 186:17 | 201:23 |
| 263:23 | 203:19 | 191:14 195:11 | **somewhat** |
| **signed** 264:20 | **singled** 65:17 | 204:18 251:20 | 27:22 73:14,15 |
| **significance** | 65:19 | **smaller** 93:24 | 88:20 135:11 |
| 134:13 | **sir** 261:10 | 96:10 153:23 | 175:21 236:8 |
| **significant** 46:3 | **sit** 26:1 | 163:8 219:23 | **soon** 249:16 |
| 46:4 47:18,23 | **site** 158:9 | 220:1 227:18 | **sorry** 37:18 |
| 53:12 116:21 | | | 38:13 42:11 |

Daniel G. Chatman , Ph.D.
May 16, 2023
Georgia Senate Bill 202, In Re

**[sorry - state]**                                                          Page 61

46:20 59:14
71:19 74:10
98:16 100:25
115:3,5 125:13
130:18 132:18
133:21 155:8
160:6 163:8
172:24 182:13
190:6 194:15
196:24 203:11
207:24 219:14
221:11 229:10
230:19 232:25
233:1 235:12
246:17,20
249:2,13 250:1
250:15 253:16
254:10
**sort** 20:23
22:25 31:3
52:23 55:6,11
61:17 68:9
82:16 104:9
106:6 131:2
146:17 150:12
153:12 180:2
187:16 190:14
191:6,8 198:2
223:2 236:20
238:2,8 239:8
239:9 241:1
**sorting** 204:8
**sorts** 49:7 52:9
77:7 164:12
166:17 171:2

173:3 177:12
181:21 215:5
228:16 247:13
**sound** 182:6
**sounds** 41:1
86:25 122:18
122:24 140:24
196:17
**source** 85:13
112:17 113:16
114:1,10
182:16 188:11
196:1
**sources** 78:19
132:17,22
198:10,12
**southeast**
264:15
**sparsely** 88:9
**spatial** 34:3
58:14 62:21
64:3 134:20
149:19 157:5
**spatially** 55:24
84:10 156:13
156:21 157:5
216:18
**speak** 12:18
36:2 48:11
54:7 60:9 66:8
67:8 91:9
199:11 217:23
231:22 241:8
**speaking** 217:1
217:6 238:16

238:17
**speaks** 54:9
**special** 129:13
**specialist** 13:12
**specialized**
14:11
**specific** 34:3
93:9 156:13,21
172:2,3 241:3
241:9 247:17
**specifically**
90:11 163:12
163:13 170:9
259:21
**specification**
99:4 148:12,13
**specified** 97:16
**specify** 188:7
**speculating**
86:9 88:22
**speeds** 97:15
**spell** 213:18
**spend** 184:25
225:25
**spending** 61:11
**spends** 93:14
**spent** 13:18
20:3 93:10
**spia** 140:8
142:8 144:23
**spoke** 59:15
**sports** 129:21
**spread** 141:17
**stage** 156:12,20

**stand** 148:11
**standard**
148:14 152:6
**standards**
144:1
**stands** 148:9,11
148:13
**staple** 231:2
**staples** 230:15
231:1
**stark** 108:14
**start** 16:7,9
24:5 154:7
**started** 14:21
15:13,16 24:7
138:6
**starts** 135:1,10
168:20
**state** 3:11,12
4:3,4 6:4 7:14
8:3,5,9,9 9:5,23
10:3,5,6,7,10
24:14 37:9
41:15 78:23
79:11 84:19
86:8 88:7,23
97:7 102:19
122:9 127:17
149:4,9,10
150:5 153:4,5
153:9,15,25
154:3,15,18,22
155:17,24
180:10 188:11
188:14,14

Case 1:21-mi-55555-JPB    Document 973    Filed 09/12/25    Page 552 of 691
Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

[state - sufficiently]

Page 62

189:20 194:2,4
196:4,6,7,9,10
205:1 215:10
217:3,7 219:7
219:17 230:8
231:6 243:3,4
251:8,20 252:7
262:8 263:2
**state's**  132:16
133:5 191:11
**stated**  8:24
64:2 111:14
127:8
**statement**
72:14 84:13
90:20 92:3
174:11 205:16
251:25
**statements**
49:8 84:6
112:17
**states**  1:1 2:1
7:15 18:22
21:10,25 27:16
27:22 28:5
29:10 40:3,4
40:20,24 72:16
77:19 91:7
98:11 99:5
176:20 220:19
242:19
**statewide**  63:15
149:22 155:5,6
155:15,18
212:14,15

244:14
**statistic**  227:5
**statistical**
17:15 18:7
82:5 166:10
239:8
**statistically**
46:4 116:6,19
155:2 156:2
171:19 172:2
172:17,25
173:8 232:2
240:14
**statistics**  21:14
69:16 107:18
153:13 189:23
**status**  84:25
151:3,5 157:11
157:13 158:19
159:1 167:18
172:25 173:2
173:20 187:20
208:4,5,10,16
218:12 220:25
**stay**  147:22
**steadily**  143:22
**step**  137:1,1
157:14
**stfu**  257:19
**stop**  31:19,21
31:25 32:2,3
32:12 33:24,24
34:4 200:25
201:16

**stopping**  53:15
**store**  29:25
77:14,19 130:6
130:12 225:3,5
**stores**  215:18
216:14,16
229:15
**story**  77:12
258:24
**straight**  44:21
**straightforward**
100:4
**stratums**  51:12
**street**  3:6 4:9
9:9
**strikes**  49:7
53:25 223:18
**striking**  49:23
53:21
**strong**  64:7
69:8 106:11
**stronger**  45:11
74:16
**stuck**  169:12
**student**  128:18
**students**
228:13,14
**studies**  13:5
78:24 79:1
111:21 112:20
112:22,24
162:8 174:8
**study**  6:4 17:13
19:2,7,8 48:15
48:16 49:18

78:22,23 79:1
79:4,14 112:19
112:25 114:14
117:8 119:9
144:23 230:8
231:5 233:19
233:20 235:5
235:13,17
247:14
**subject**  83:19
**subjective**
110:15,16
111:7,11
**subs**  245:23
**subscribed**
263:19 266:14
**subsection**
173:16 174:4
**substantial**
58:8 80:13,17
**substantially**
63:5,10 64:4,9
108:3 133:1,2
138:15 213:13
213:15,25
232:2
**substitutability**
136:10
**substitute**
136:20 139:13
139:21
**substitutes**
135:18 218:4
**sufficiently**
247:16

Daniel G. Chatman , Ph.D.

Georgia Senate Bill 202, In Re

May 16, 2023

**[suggest - take]**

Page 63

| | | | |
|---|---|---|---|
| **suggest** 48:24 | **support** 58:23 | **surely** 145:14 | 134:19 140:12 |
| 55:12 123:21 | 226:8 237:25 | **surpass** 176:10 | 141:7 142:21 |
| 143:3 231:16 | 238:2,3 | **surprised** | 165:21,23 |
| 247:8 | **supporting** | 171:5 | 169:4 171:14 |
| **suggested** 79:9 | 206:8 | **surrebuttal** | 182:10 218:14 |
| 245:6 | **supports** | 25:11 26:8 | 218:19 259:21 |
| **suggestion** | 197:12 | 42:16 72:7 | 259:22 260:5 |
| 241:9 | **suppose** 210:22 | 74:3 155:21 | 260:11,13 |
| **suggests** 49:19 | **supremacist** | **survey** 5:23 | **tables** 113:21 |
| 81:23 87:19 | 257:18 | 29:3 55:19,19 | 140:22 |
| 93:3 106:8 | **sur** 5:14 | 80:10 96:22 | **tabulates** |
| 127:15 185:9 | **sure** 9:21 10:22 | 111:22 142:1 | 112:20 |
| 223:15 231:16 | 12:8 17:21 | 146:19 149:17 | **tabulating** |
| 231:18,25 | 25:19 30:24 | 149:22 150:5 | 141:8 |
| 248:9 | 39:5,8 50:11 | 152:17 175:8 | **take** 7:10 11:11 |
| **suit** 9:23 10:3 | 59:20 65:9,18 | 246:15 248:14 | 12:1 16:7 20:2 |
| **suite** 3:6,17 4:9 | 73:8 77:14 | 249:6 | 24:25 27:11 |
| **sullivan** 3:13 | 87:3 90:15 | **surveyed** 96:19 | 30:12 39:21 |
| 4:5 8:10 | 98:20 100:12 | **surveys** 111:13 | 41:2 59:21 |
| **sum** 80:5 | 101:15 104:24 | 247:15 | 68:6 72:11 |
| **summarize** | 105:18 112:4 | **susan** 4:20 | 73:11 76:16 |
| 26:5,9 | 113:12 115:20 | **sworn** 263:7 | 79:2 84:17 |
| **summarizing** | 123:20 126:8 | 266:14 | 97:22 98:4 |
| 240:18 | 131:1 133:7 | **system** 19:5 | 99:17 103:5 |
| **summary** | 137:3,10 | 147:9 189:12 | 109:22 110:5,8 |
| 218:19 | 147:17 155:23 | 190:11 258:7 | 112:12 118:25 |
| **summation** | 156:19 172:11 | **systems** 32:11 | 119:1 121:12 |
| 154:16 | 179:2,3,25 | 148:8 | 121:15 126:7 |
| **summer** 24:8 | 180:11 181:18 | | 127:22 128:10 |
| **super** 130:23 | 182:18 186:21 | **t** | 128:15,25 |
| **supplemented** | 196:15 201:17 | | 129:10 132:8 |
| 132:16 | 202:17 210:7 | **t** 127:1 265:3,3 | 137:1 157:24 |
| **supply** 193:13 | 214:10,12,16 | **table** 95:8,8,9,9 | 161:16,18 |
| 198:9 | 239:4 244:16 | 112:25 113:3,7 | 166:25 167:1 |
| | 244:21 259:7 | 113:13,17 | 170:22 171:6 |
| | | 114:2,23,25 | |
| | | 115:5,7 133:9 | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[take - theory]**

Page 64

177:21 179:8
179:21 180:13
180:14,16
184:9 192:21
208:20,21
214:22 220:13
221:15 226:3,9
234:18 239:19
242:3 247:15
**takeaway**
232:3
**taken** 7:13
55:19 99:15
107:19,24
108:6 149:20
168:16,20
175:8 263:4
**takes** 99:8
202:17
**talk** 20:25
37:16 75:12
77:8,8 98:12
108:19 148:23
155:7,20
178:10 188:4
194:5 198:21
200:17 205:7,8
220:8 221:23
226:5 231:5
239:25
**talked** 20:15
50:13 167:9
168:8 207:11
245:2

**talking** 50:21
82:23 92:1
97:10 104:3,4
112:9 148:22
149:14 152:24
163:11 177:15
191:17 194:6
194:16,17
202:15 205:7
211:15 216:14
224:9 228:11
228:12,13
238:12,13
241:14,19,21
242:11
**talks** 30:25
**taught** 17:22
18:7
**taxi** 161:16,19
162:8 168:8,20
170:1,11,12
171:3,7 173:8
174:21 177:13
199:3,5 200:7
**taxicabs** 5:24
18:25 161:4
**taxis** 110:7,8,8
131:17 160:19
161:8,13 162:4
162:18 165:4,7
165:12 167:25
168:23 170:5
170:22 173:5
174:5,12
175:25 179:17

179:22 180:13
180:15,16
**te** 1:21 2:19
7:23 263:23
**teach** 17:25
18:2
**teaching** 16:18
**tech** 20:1
**technically**
16:5 107:7
**technique**
220:11
**techniques**
111:14,22
**tell** 8:24 70:7
99:6 127:8
151:20 157:23
169:15 231:23
**tend** 50:16 53:5
78:12 111:21
169:25 170:10
226:2,10,11
**tends** 51:11
67:15 77:17
211:13
**term** 77:1
188:8 239:4,7
240:13,14
**terms** 32:18
33:21 35:5
36:19,20,21
48:12 67:11
73:16 82:24,24
86:4 111:15,19
139:15 152:7

154:2,20 156:9
165:11 171:21
175:19 178:11
185:14 188:5
189:22 191:7
222:24 239:8
247:21
**test** 84:14
**testified** 8:25
20:16,18,20
21:2,7 127:9
**testifying** 11:12
11:16 263:7
**testimony**
17:23 20:16
21:8 25:22
261:9 262:5
263:11 264:9
264:18 266:8
**texas** 9:23 10:6
10:11 21:6
22:20 23:3,11
27:13,25 28:11
28:22
**text** 204:1
**thank** 10:12
38:19 195:21
203:12 259:5
261:3,6
**thanks** 59:18
98:22 155:10
**theaters** 51:22
51:25
**theory** 132:4
228:22

Daniel G. Chatman , Ph.D.                    May 16, 2023
Georgia Senate Bill 202, In Re

**thereabouts**
  193:18
**thing**   16:1,4
  45:1 63:11,19
  70:11 77:15
  99:16 146:18
  166:11 172:24
  179:24 180:2
  185:14 199:6
  226:7 237:3
  245:25 249:16
**things**   10:20
  35:4 61:17
  75:25 77:2
  106:25 109:7,8
  109:10,11,18
  121:1,5 123:10
  130:13 132:4
  133:7 148:5
  164:12 166:18
  166:18 169:24
  170:13,18
  173:1,3 177:8
  177:17 179:13
  185:10 193:5
  198:25 199:19
  201:3 204:25
  215:5,15,17
  216:14 223:4
  223:10 228:16
  236:19 245:15
**think**   15:9 17:7
  18:14 20:16
  22:3,21 24:7
  26:8 30:8 31:1

33:21 34:23
35:6,10 38:22
39:5 44:8,9,16
47:24 50:12,13
53:3 54:8 56:1
56:2 58:1,2,24
63:19 64:2,22
66:16 67:6,21
69:25,25 70:1
70:4,20 73:13
73:14 74:9,16
76:17 77:23
78:2,8,20
79:14,17 81:9
84:3,3 87:6
88:6,21 91:15
94:5,14,15,18
105:6 106:1,2
107:2,18,20
109:17 113:11
113:17,17
114:3 115:13
115:21 117:11
121:7,21
123:14,15
124:4,7 126:5
129:1,22 130:1
131:9 134:18
134:24 135:21
139:5 144:2
147:17 157:22
158:2 160:13
162:21,23,24
167:25 171:3
173:13,14

174:14 180:8,9
181:10,11,13
182:5,10,14,17
182:21,21
185:13,16
186:5 188:20
190:4 193:18
195:3,20
196:10 197:8
199:9,12,22
201:18 207:10
209:15,16
210:10,15
212:2,3,8
214:21 215:8
217:11,11
218:19 222:23
229:4 230:14
230:17 233:22
233:23,23
234:9,12 236:7
237:19 239:6
240:2 241:24
242:21,24
246:6,7 249:4
249:8,24,25
257:4 261:4
**thinking**   20:3
  28:8 61:17
  122:3 229:8
**third**   80:3
  176:7 220:23
  232:19 233:3,3
**thought**   37:3
  182:15 195:15

204:3 225:11
249:21
**thousand**   194:7
**three**   7:19 9:15
  18:19 19:6,20
  20:17,18,20
  21:3 41:20
  77:5,20 79:23
  80:5 122:22
  134:17 135:2
  157:7,25
  193:19 206:5
  206:25 209:7
  247:10
**threshold**
  134:25 135:11
**thresholds**
  28:13
**throw**   140:12
  234:4
**tightly**   145:5
**time**   5:19 7:9
  8:3 15:16,23
  16:14 18:10
  20:3 30:5,17
  30:19,25 31:1
  31:6,7,10,21,21
  31:24 32:14,19
  32:19,20 33:5
  33:9,11 34:2
  34:15 35:12
  36:7 46:5
  50:25 51:2
  53:2 55:10,19
  59:7,19,25

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[time - transportation]**

Page 66

| | | | |
|---|---|---|---|
| 60:3 61:11 | 203:3 205:12 | 171:21 173:22 | **trade**  108:20 |
| 62:17 66:10 | 210:25 219:10 | 176:9 179:17 | **trained**  17:19 |
| 69:19 72:11 | 223:1,5 225:25 | 179:20 180:4 | **transcribed** |
| 77:4,10 82:19 | 235:12 241:25 | **today**  10:15 | 263:9 |
| 82:21 83:1,3 | 242:5,8 252:16 | 11:13 12:15 | **transcript** |
| 94:12 95:9 | 253:6 259:23 | 26:1 108:15 | 262:3 263:10 |
| 96:6,25 97:2 | 261:8,12 263:5 | 144:24 181:24 | 263:13,15 |
| 97:16 99:9,10 | 264:19 | 222:4 249:20 | 264:6,20 266:5 |
| 100:9,22 101:8 | **timeframe** | **today's**  261:8 | 266:8 |
| 101:10,17,20 | 264:8 | **together**  32:22 | **transit**  19:5 |
| 103:25 104:20 | **timely**  69:7 | 79:22 132:2 | 99:4,10,12 |
| 104:20 106:20 | **times**  9:16 | 140:9 165:5 | 100:5 111:20 |
| 108:20,21,24 | 19:19,20 32:5 | 185:6 | 119:8 127:15 |
| 109:1,15,21 | 32:24 33:18 | **toggling**  249:14 | 129:20 148:12 |
| 112:7 113:4 | 41:20 63:13 | **told**  164:20 | 148:13 149:7 |
| 114:6 116:25 | 77:5 99:25 | 255:6,7 | 189:5,12 196:5 |
| 117:1,2,3,13,15 | 100:1,3 111:20 | **took**  184:24 | 199:10,13 |
| 119:2,9,20,24 | 111:21 114:1 | **top**  49:15 86:15 | 200:25 224:6 |
| 120:4,5,13,22 | 114:18,19 | 101:5 178:17 | 224:24 225:5 |
| 126:10 127:5 | 117:25 120:14 | **total**  80:5 87:11 | **transition**  16:6 |
| 130:18 134:14 | 123:24 133:10 | 95:1 143:24 | **transits**  99:3 |
| 143:14 144:8 | 135:16 141:4 | 190:21 209:10 | **transportation** |
| 144:10 146:1 | 141:13,14,14 | 243:16 254:13 | 15:15,17 17:14 |
| 147:16 148:17 | 141:22,23 | **totaling**  114:19 | 17:15 18:1,3 |
| 149:6,7,7 | 161:23 196:24 | **touching**  10:23 | 18:21 30:5,18 |
| 156:9 157:15 | 196:25 197:5 | **tough**  70:4 | 30:20,24 31:4 |
| 157:18,24 | 206:5,18,21,25 | **towards**  193:1 | 31:9,11 32:10 |
| 158:3,7 161:16 | 244:8 256:9 | 198:5,6 | 47:4 49:3 |
| 161:18 165:15 | 258:4,12,24 | **tract**  153:19,20 | 60:11,17 61:2 |
| 170:24 183:18 | 260:7 | 153:22 154:11 | 61:9,13,23 |
| 184:10,13,16 | **tnc**  166:3 | 156:15 157:4 | 62:2 64:12,19 |
| 185:1 193:21 | 168:20 172:22 | 157:17 158:12 | 72:10 74:21 |
| 198:22 199:14 | 173:20 180:1 | 158:23 | 100:22 101:1 |
| 201:14 202:5 | **tncs**  163:4,9 | **tracts**  149:9 | 107:20,24 |
| 202:11,17 | 164:6,10 165:7 | 157:6 | 112:10 117:1 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[transportation - trip]**

Page 67

| | | | |
|---|---|---|---|
| 117:21,24 | 28:4,21,23 | 104:4 105:13 | 224:18 229:2 |
| 118:2,6,14,17 | 29:3,3,6,11,12 | 105:17,21,22 | 229:17 231:22 |
| 118:24,25 | 29:12,16,17,21 | 105:22,25 | 233:13,17 |
| 119:1 127:24 | 30:1 34:9,17 | 106:14,20 | 236:17 238:12 |
| 128:1,6,13,14 | 34:19,20,22 | 108:19 110:14 | 238:15,16 |
| 128:23 129:3 | 35:7,9,12 36:7 | 110:15,17,19 | 239:18,21 |
| 129:10,15,24 | 41:5 42:2,2,5 | 110:20 111:5,7 | 244:8 246:8,9 |
| 130:15 131:7 | 42:13 43:7,11 | 111:16 112:7 | 250:8,12,23,25 |
| 131:17 148:8 | 43:16 44:11,20 | 112:10 113:4 | 252:16 259:23 |
| 149:12 158:1 | 51:18,21 52:2 | 117:25 119:20 | **traveling**  76:22 |
| 160:14,16 | 52:21 53:1 | 119:24 120:22 | 78:3 85:10 |
| 168:19 171:12 | 57:23 61:9 | 120:25 121:18 | 89:16 93:11,15 |
| 174:5,13 176:9 | 62:13 63:23,25 | 121:24 123:4 | 103:16,22 |
| 177:7 178:4,12 | 64:20 66:10 | 130:25 133:10 | 106:13 110:24 |
| 178:21,22,25 | 68:15 71:8,9 | 134:14 135:10 | 111:9 183:15 |
| 183:17 184:19 | 71:12,14 72:7 | 135:16 137:23 | 202:2 224:14 |
| 186:7 194:11 | 72:16,19 74:5 | 139:2 146:13 | 225:25 232:23 |
| 194:20 197:3 | 75:3,8,15,16,18 | 148:17 149:6,7 | 233:8 |
| 198:23 200:6,7 | 75:18,21,22,23 | 149:7 156:4,6 | **travels**  77:3,4 |
| 200:14,16,17 | 75:24 76:2,20 | 157:15,18,24 | **treatment**  6:4 |
| 200:18,19,20 | 76:25 77:2,7,9 | 160:15 161:18 | 82:9 230:7 |
| 201:15,16 | 77:15 78:3,15 | 164:20,22,25 | **trends**  175:6 |
| 214:6,8,13,19 | 78:16 80:25 | 165:3 168:18 | **trial**  20:20 21:2 |
| 216:22 224:14 | 81:3,23 82:19 | 170:2 176:23 | 25:18 26:2 |
| 225:10,13,15 | 83:2,19 88:1,2 | 177:3 185:15 | **tricky**  177:14 |
| 226:19 227:4,8 | 88:15,16 94:12 | 188:4 197:7,13 | 245:25 |
| 227:15,16,20 | 94:14,18,24,25 | 202:16 203:3 | **trip**  26:25 27:7 |
| 243:23 | 94:25 95:1,5,6 | 204:7,12,14,15 | 30:21 31:9 |
| **transportation's** | 95:9 96:7,8,22 | 205:19,22,25 | 32:5,9,9,10,12 |
| 118:18 134:2 | 96:23,24 97:1 | 206:18,21,25 | 44:11 51:19 |
| **travel**  5:19 | 97:10,15 99:21 | 213:14 217:10 | 52:3,4,13,15 |
| 17:12,13 18:4 | 99:25,25 100:3 | 217:16 218:17 | 77:19 88:13,14 |
| 18:22 19:3,9,9 | 100:8,11 | 219:1,20 220:1 | 93:20 94:3,6,8 |
| 19:13 26:14,23 | 101:11,14,16 | 220:2,9 221:23 | 95:2 96:13 |
| 27:1,15,21 | 102:7 103:25 | 222:8,12,18,21 | 101:25 102:1,2 |

**[trip - tweet]**                                                                                          Page 68

102:2,4,9,12,13
103:9,20 104:1
106:24 109:14
109:20 113:12
115:1,2,2,18,19
117:6,13 118:1
121:12 123:2,4
123:18,19,23
124:7,12,25
128:10,15,25
129:21 156:9
161:16 165:8
166:25 167:1
168:19,21
170:9,12,21
171:4 178:4,5
178:8,12,13,15
183:25 184:1
203:11 206:3
214:3 220:21
222:13,13
224:25 225:8
225:22 226:13
226:16,25
227:3,14,17,17
228:19 229:1,8
231:19 243:25
253:6,22 254:8
254:15
**trips**  27:2
31:12,13,14
32:15 52:4,5,9
52:16,18 74:22
77:10 78:9,12
78:14 81:19,19

81:22,25 89:19
90:1 93:17,18
95:25 96:1,19
97:3 98:14
99:4 100:25
101:1 102:20
102:22,23
103:1,5 106:19
106:22 107:2
107:19,23
108:6 118:5,25
119:1 121:16
122:22,25
124:1,4 127:15
127:22,23
128:8,20 129:4
129:7,24 130:1
130:3 131:19
131:22 163:16
165:1,7 168:13
168:15,16,17
168:23,25
169:22,25
170:21 174:16
174:21,22
177:4,5,7,9
181:21,22,22
184:5 185:9,12
191:5 220:17
222:12,13,15
225:1,12,24
226:3,9 238:5
253:7
**true**  22:12,18
22:23 27:14

30:19 31:9
43:14 50:15
51:20 52:7
58:9 59:6
61:12 67:6
75:15 90:15
96:9 119:21
120:10 123:16
124:11 131:1
136:2,11
162:13 173:4
180:22 182:3
183:1 184:22
191:22 202:15
211:2,4 212:1
214:13 217:2
223:17,18
239:19 245:12
254:18,20
262:6 263:10
266:8
**trust**  144:18
**truth**  8:24
127:8
**truthfully**
11:12,18
**try**  11:21 33:13
35:11 43:10
57:5,22 65:5
72:23 130:4,5
147:12 148:5
188:7 193:7
209:17,18
252:21

**trying**  36:11
38:23 54:18
56:6,7,16,17
57:6,10,14,17
63:23 76:3,6
82:16 113:25
114:3,10 128:5
138:2,25 179:2
180:5 181:11
187:15 201:17
210:22 213:22
214:11 226:20
232:25 236:19
244:25 246:12
**tuesday**  1:16
2:18 7:1,5
**turn**  46:1 116:1
223:24 259:20
260:3
**turning**  21:5
93:8 112:25
**turnout**  5:15
42:13,17,22
43:2,8,17
45:18 46:8,15
50:16 51:10,15
232:1,12,13
234:18,21,23
**turns**  195:16
239:21
**tuttle**  4:24 7:21
**tweet**  6:7,9,10
6:12,15,16
257:1,8,18
258:14,18,23

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[tweet - understood]**

Page 69

258:25

**tweets** 255:25
256:18,19
257:2,12,20
259:3 260:17

**twice** 122:5,6,8
174:17 206:2
213:18,19
214:3

**twitter** 6:6
255:5,13,15
260:18

**two** 10:9 24:16
25:16 26:3
27:20 28:16
31:22 32:9,11
32:16 33:9,16
55:5 57:2 79:9
79:13 87:17
107:9 117:5
118:17,20
122:8,10,14,23
122:25 140:22
146:3 147:12
150:14 156:17
162:25 163:25
163:25 193:18
194:8 198:16
209:8 226:4

**type** 12:8
110:11 111:4

**types** 111:4
218:3

**typical** 40:11
77:1

**typically** 32:23
33:14 52:14,19
120:8,11
131:24 161:22
168:22 185:17
229:14

**typo** 259:19
260:14

**u**

**u.s.** 13:15

**uber** 110:6
162:1 164:11
185:18

**uc** 15:21

**ucla** 14:22,24
15:4

**uh** 11:7 33:2,10
36:4 39:14,18
43:23 45:6
46:24 47:17
65:12 81:2
110:22 112:11
113:20,22,24
115:11,16
122:13 138:10
138:14,21
143:23 162:3
171:25 172:4
174:7 195:25
202:3 205:17
208:11 210:14
219:21 224:22
245:5 251:24

**uk** 5:18 112:7

**ultimately**
101:20

**unbalanced**
237:12

**uncertain**
119:13,14,17

**uncertainty**
68:1 111:1
119:10

**uncomfortable**
110:24

**under** 8:24
10:13 41:11,15
73:10 91:16
104:23 115:14
127:8 135:1,13
145:11,11
181:6 198:7
216:6 221:8,14
221:16,21
230:14 231:1
236:1 262:2
263:9

**undergraduate**
17:25

**underlying**
63:14

**undersigned**
263:1

**understand**
10:12 11:1
21:13 22:16
25:19 30:14
34:15 35:20
38:23 39:6

40:23 48:19,21
51:23 54:19
56:17 57:11,14
57:18,22 65:9
65:19 69:12
72:24 75:21
78:4,6 101:15
101:17 103:6
104:17 105:18
105:20 106:3
108:22 112:3
113:7 117:12
123:21 133:6
136:18 137:18
138:20 140:6
147:12 148:5
157:21 179:3
181:6,8,15
204:6 214:11
214:12 246:9
247:17

**understanding**
23:2 35:17
38:15,18 39:9
51:16 52:24
56:14 66:4
84:24 89:18,24
91:2,3 92:21
122:9 135:20
178:19,24
197:16 202:25
203:2 243:23

**understood**
136:21 181:5,7
236:13 245:9

Daniel G. Chatman , Ph.D.
May 16, 2023
Georgia Senate Bill 202, In Re

**[undertake - uses]**

Page 70

**undertake**
35:13

**unemployment**
228:3,5

**unfortunately**
165:3 170:8
230:23

**unique** 100:10

**unit** 7:12

**united** 1:1 2:1
7:15 18:22
40:3 72:16
77:19 176:19
257:9

**units** 157:5

**universally**
205:6

**universe** 56:12
56:19,25 58:2
58:16 65:2
82:2 146:23

**university** 5:22
13:6 15:10,14
142:1

**unknown** 240:6
240:8,15,20

**unpleasant**
110:21 111:1

**unrelated**
123:19

**unreliable**
170:23

**update** 5:19
112:8

**upper** 80:4,9
247:19 248:12

**uptake** 106:3

**urban** 14:23
15:2 18:1
174:23 183:3,6
210:19 211:2
211:11,13,18
211:21,24,25
212:4,6,7,10,16
212:19,21,24
212:25 213:3

**usage** 141:14
142:4 175:1,3
175:4 176:3
190:16,24
191:13 234:2

**use** 5:24 18:3
18:21,24 21:24
22:5,10 27:9
33:25 39:24
40:5 41:23
44:20 63:12
66:20,21 71:19
77:1,13 78:19
79:15 80:2,13
82:4 85:1 96:9
100:17,24
105:17,25
118:6 125:2,17
132:8 141:8
144:11 149:17
150:4,8 151:7
151:16 160:18
161:2,8,13,25

162:8,18,20
163:1,3 164:1
164:17 168:2
169:19 170:4,5
170:10,15
171:3,7,16,21
173:8,20,22
174:15 175:6,7
175:20 176:6
176:14,18
177:18 181:9
185:1 186:7,10
186:14,17
188:5 189:7,9
189:10 192:8
192:22 195:13
198:1,22
202:25 204:19
207:11,15
208:23 209:5
214:19,25
220:10 224:7
224:15 225:9
227:4,16,20
232:4 233:21
234:10,18
236:9,9,10,14
236:23 238:1
239:15 240:14
242:14,19
243:1,24
244:14 245:7
245:11,17,18
247:11 248:1
248:16,17,19

248:21 255:8

**used** 27:24 28:3
28:6 29:11
40:22 57:8,19
70:25 71:20
79:12,21,22
91:7 94:5
96:14 97:25
98:9,13 99:3
118:7 135:11
138:7 141:3,11
141:12 144:8,9
148:11 149:16
162:5 163:4,7
164:2,10 166:3
172:22 178:19
184:4 188:8
192:25 195:7
195:24 198:18
199:10 208:5
209:11 217:21
222:17 231:7
236:2 238:25
239:4 243:7,8
243:19 244:11
247:22 248:12
248:14 249:8
252:4 264:20

**useful** 64:23
233:23,24

**user** 97:25

**users** 58:2
117:24 118:2

**uses** 141:8

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[using - view]**

Page 71

| using 28:2,12 | **v** | vehicle 31:6,7 | 194:1 207:8,9 |
|---|---|---|---|

**using** 28:2,12
29:3,4 54:21
57:21,24 80:7
81:12,14,15,18
82:12 96:4,14
97:8,21 98:1
100:20 106:10
111:13,15,17
111:22 119:8
125:7 132:21
133:4 135:15
141:19,20,21
143:10 148:24
151:7 152:14
158:11 163:9
164:6 165:7
168:23 178:2
179:10,17
186:2 190:22
194:21 195:17
197:21,22
224:13,24
225:15 226:1,2
226:18 237:1
237:12 238:10
240:13 242:16
242:17 245:23
248:4 252:4
263:8
**usps's** 69:6
**usually** 168:13
168:24 170:12
**utility** 90:18
92:3 93:1

**v**

**v** 264:4 265:1
266:1
**vague** 248:3
**valuable** 70:22
**value** 27:12
28:2 40:5 68:8
68:8
**values** 5:18
112:7 116:3,4
117:2 119:9
**vanished**
175:25
**variability**
119:6 153:10
**variable** 208:4
**variation**
100:13 153:10
252:24
**variations**
105:17
**varies** 53:2
105:13 151:15
189:17,18
**various** 36:10
52:10,10 72:17
84:19 91:7
109:6,8 142:23
192:7
**vary** 32:1 33:20
111:10 138:22
151:14 152:22
189:15
**vast** 213:2

**vehicle** 31:6,7
31:12,14 33:19
50:6 71:22
72:5,9 85:1,3
91:24 111:2,6
111:20 115:25
116:23,24
117:1,23
128:21 131:11
160:15 169:23
177:13,21
180:25 181:2
186:23,25
187:14,17,23
191:25 192:3,9
192:11,11,16
194:18 206:19
206:19,21
207:19 209:2,3
209:4,4 210:11
211:3 217:19
220:21 221:2,3
226:12,14
236:11,12,25
**vehicles** 33:1,4
47:20,21 54:5
72:1 74:20
76:10,11 81:21
84:11 99:12
103:10 110:13
115:24 125:17
125:20 162:15
162:17,18
170:23 177:18
180:2 191:12

194:1 207:8,9
208:3 215:13
225:20 227:20
227:24 229:19
236:21 237:14
**venture** 58:12
73:6 119:5
175:14
**verbal** 11:5
**verify** 264:9
**veritext** 7:22,23
264:14,23
**veritext.com.**
264:15
**version** 12:10
**versus** 40:7
47:25 58:10,14
66:9 71:20
76:5 165:8,11
185:15 243:1
**victor** 4:22
**video** 7:9,12
**videographer**
4:24 7:4,22
59:24 60:2
126:9 127:4
184:12,15
242:4,7 259:13
261:7
**videorecorded**
1:14 2:14
**view** 24:3 40:1
41:25 58:23
86:3 127:17
173:24 177:1

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[view - voting]**

Page 72

| | | | |
|---|---|---|---|
| 177:19 | 65:3,4,5 66:1,9 | 121:19,23 | 233:13,16 |
| **views**  260:19 | 66:9,21 67:3,5 | 185:4,6 186:1 | 235:25 239:15 |
| 261:1 | 68:5,10 70:3 | 202:25 217:24 | 244:10,11,14 |
| **village**  14:1 | 70:21 83:5 | 228:21 231:17 | 244:15 245:6,7 |
| **violated**  256:17 | 89:21 92:23 | 231:18 234:18 | 245:10,10,16 |
| **violent**  258:8,8 | 93:3,5 120:13 | 234:21 238:11 | 245:20,22 |
| **virtually**  22:9 | 121:24 122:23 | 238:11 245:4 | 246:23 252:6 |
| **virtue**  25:22 | 123:6 124:8,8 | 246:1,4 | **votes**  65:25 |
| **visit**  202:9 | 124:21,22,25 | **voter's**  234:14 | 66:1 |
| **visited**  19:17 | 125:19 129:7 | 243:18 | **voting**  9:24 |
| **vocational** | 132:12 136:11 | **voters**  35:2,2 | 10:1 26:13,13 |
| 13:11 | 139:1,3 171:7 | 37:6 42:9 | 26:15,18 28:16 |
| **voices**  155:10 | 179:10 191:18 | 43:17 44:1,2,7 | 30:2,6,13,15,17 |
| **volume**  1:17 | 194:10,12 | 44:12,13 45:25 | 34:13,25 35:1 |
| 2:15 5:4 | 202:14 205:12 | 55:25 58:10 | 35:14,16,19 |
| 193:14 262:3 | 221:21 222:13 | 63:20 64:3 | 36:6,8,11,13,16 |
| 262:12 | 223:16 231:11 | 69:11 73:21 | 36:19 37:2 |
| **volunteer**  14:1 | 233:15 246:3 | 84:20 85:5 | 38:25 40:4 |
| **voorhees**  15:15 | **voted**  56:5,9,13 | 86:2 90:2,9 | 41:6 42:3,5,19 |
| **vote**  29:24 | 56:20 59:2 | 108:20,24 | 43:13 45:12,13 |
| 35:13 38:24 | 62:3 146:5,24 | 132:11 139:1 | 45:14 47:12,19 |
| 44:10,25 45:4 | 146:25 147:4 | 139:15,16,16 | 48:5 49:4,5 |
| 45:5 46:5 | 195:17 252:4 | 139:18 141:16 | 50:4 51:15 |
| 47:24 48:14,17 | **voter**  35:12 | 141:23 142:23 | 52:11 53:9,10 |
| 49:17,20 50:10 | 42:11,13 43:8 | 145:14 146:6,9 | 53:15,24 54:4 |
| 51:5,7,8 53:17 | 45:18 46:7 | 146:12,19,20 | 54:11,14,21,22 |
| 54:18,25 55:1 | 50:16 56:7,17 | 161:13,16,18 | 55:2,23 56:18 |
| 55:4,9,13,13,14 | 57:7,11,12,18 | 161:19 170:3 | 59:8 60:6,8 |
| 55:18,21 56:20 | 62:5 65:21 | 185:19 186:14 | 62:13 63:16 |
| 56:22 57:1,16 | 66:3,16 80:18 | 189:25 190:4,5 | 65:1,16,18 |
| 58:5,8,9,10,11 | 83:7,21 84:1 | 190:6 193:3 | 67:3,4,11,18,18 |
| 58:14,17 61:24 | 84:18,23 85:6 | 203:3 207:7,7 | 67:19 68:7,11 |
| 62:8,16,16,17 | 85:17 86:6 | 207:9,19,20 | 68:21 69:1 |
| 62:20,22,24 | 90:5 91:2,8 | 221:24 224:7 | 89:23 94:13 |
| 63:22 64:21,25 | 92:17 121:18 | 231:11 232:3 | 101:11,25 |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re
May 16, 2023

**[voting - way]**                                    Page 73

| | | | |
|---|---|---|---|
| 103:18 104:11 | 197:14,17,19 | 117:2,20,22 | 256:3 259:9,18 |
| 104:13 106:3,7 | 198:4,6,13,14 | 134:11,11 | **wanted** 16:1 |
| 106:16,16 | 198:19 199:6 | 135:3,3,6 | 22:5 133:7 |
| 123:19 124:5,7 | 200:2,9 205:3 | 200:24 225:10 | 226:5 230:22 |
| 125:23 126:2 | 205:8,10,10,20 | **walking** 31:1,3 | 234:21 237:2 |
| 129:7 132:8 | 206:3,22 207:3 | 31:10,24 32:19 | **wanting** 180:11 |
| 133:11,19,23 | 213:14 215:16 | 32:22,23 34:2 | **wardman** 5:19 |
| 133:24 135:17 | 215:21,23,25 | 72:10 74:21 | 112:2,8,16 |
| 135:17,18,22 | 216:1,4,7 | 99:9 108:6,13 | **warning** |
| 135:22 136:10 | 219:22 220:2 | 110:24 111:20 | 130:18 |
| 136:19 137:13 | 222:2,4,8,20,22 | 117:13,14 | **washington** 3:7 |
| 137:15 138:4 | 223:14,22 | 127:25 128:6 | 4:10 6:4 78:23 |
| 138:12 139:11 | 234:15 238:17 | 129:23 130:15 | 79:11 195:10 |
| 139:14,20,22 | 242:23 243:8 | 134:6 149:7 | 230:8 231:5 |
| 140:4,7,25 | | 160:16 224:24 | 243:3,5 |
| 141:1,4,8,9,10 | **w** | 225:14 226:19 | **way** 11:7 22:3,7 |
| 141:12,13,19 | **wait** 113:4,11 | **walks** 131:17 | 22:21 27:4 |
| 141:20,21 | 114:6,6,8,16,18 | **want** 8:17 | 29:1 33:15 |
| 142:3,5,19,20 | 114:19 115:10 | 10:19 11:1 | 38:22 40:8,11 |
| 143:4,5,10,20 | 115:25 117:2 | 12:13 13:3 | 44:16 53:16 |
| 143:24 144:9 | 117:20,22 | 33:16 39:24 | 58:3 64:6 |
| 144:22 145:3 | 145:15 161:23 | 42:25 51:8,24 | 67:14 68:2 |
| 145:22 146:22 | 196:24,25 | 54:25 57:18,20 | 72:18 84:3 |
| 150:20 151:1 | 202:14 | 57:22 59:21 | 88:13 96:10 |
| 151:24 156:10 | **waiting** 23:1 | 70:20,21 79:2 | 99:12 105:24 |
| 158:5 159:10 | 30:19,25 31:2 | 79:18 86:9 | 106:1 110:3 |
| 170:6,9,15 | 31:9 32:19,20 | 105:10 112:3 | 115:13 116:2 |
| 171:4,13 | 32:22,23,24 | 113:12 131:10 | 118:23 122:12 |
| 176:24 177:23 | 33:9,11,18 | 137:1,4,21 | 127:21 128:13 |
| 178:12,13 | 53:2 60:13 | 140:22 150:18 | 130:6,9 131:16 |
| 179:1 180:6 | 100:22 110:24 | 165:17 166:19 | 139:22 145:20 |
| 186:15 190:18 | 111:2,20 | 193:6 195:4,12 | 146:17 151:12 |
| 191:19 192:22 | 117:13,14 | 200:10 209:24 | 152:2 170:18 |
| 193:15 194:1 | **walk** 31:19,20 | 228:7 229:21 | 171:22 178:6 |
| 194:10 197:7 | 113:4 114:6,16 | 232:8 242:12 | 179:6 183:1 |
| | 114:19 115:23 | | |

Daniel G. Chatman , Ph.D.
Georgia Senate Bill 202, In Re

May 16, 2023

**[way - worth]**

Page 74

| | | | |
|---|---|---|---|
| 187:18 200:22 | 139:17 143:5 | 111:16 | 77:17 78:10 |
| 206:14 208:7 | 145:4,6,11 | **wilson** 4:23 | 93:18,20 94:3 |
| 218:15 225:6 | 146:8,10 | **wish** 113:1 | 94:6,8,11 |
| 225:13 231:3 | 171:16,19 | **wished** 38:1 | 102:8,13 |
| 232:20 233:4 | 187:10,11,13 | **withdrawal** | 111:21 120:11 |
| 233:11 246:7 | 187:22 206:4 | 175:14 | 120:16 160:18 |
| 247:2,12,12 | 207:21,24 | **witness** 5:2 | 161:24 170:24 |
| 253:17 259:22 | 210:10,15,16 | 16:15 20:9 | 186:6 199:12 |
| 259:24 260:6 | 211:19 212:6 | 36:1 39:5 40:1 | 225:4,5,6,22 |
| 260:24 | 212:10,13,15 | 40:14 48:19 | 226:21 227:18 |
| **ways** 19:11 | 212:20,24 | 50:19 59:17,22 | 227:18 228:7 |
| 99:2 129:25 | 213:1,2 214:4 | 59:23 60:8,13 | 228:15,17 |
| 130:2 132:7 | 241:17 244:10 | 61:7 62:10 | 247:1 249:1 |
| 177:16 | 244:13 245:7 | 64:15 69:10,25 | **worked** 13:11 |
| **we've** 25:16 | 245:10,22 | 80:21 98:15 | 29:1 99:23 |
| 90:6 115:9 | 250:24 253:11 | 119:5 135:20 | **worker** 173:2 |
| 136:15 160:13 | 253:21 254:3 | 136:7,18 139:5 | **working** 14:13 |
| 173:15 199:22 | 254:16 257:18 | 140:11 146:15 | 15:6 24:5,7 |
| 202:19 241:23 | 257:19 | 156:25 259:8 | 60:25 93:23,24 |
| 251:4,5 | **whites** 86:5 | 263:19 264:8 | 109:18 228:15 |
| **week** 77:5,21 | 147:11 172:10 | 264:10,12,19 | **works** 98:21 |
| 77:25 | 172:18 173:6 | **witnesses** 263:6 | 205:23 |
| **weeks** 13:18 | 173:22 213:4 | **wonder** 53:23 | **world** 15:7 |
| **went** 14:3 | 237:16 252:5 | 223:25 | 60:24 |
| 107:8 203:3 | **wide** 252:24 | **wondering** | **worley** 3:13 4:5 |
| 204:24 219:1,3 | **widely** 49:5 | 260:9 | 8:11 |
| 246:11 | 52:17 | **words** 41:13 | **worried** 154:22 |
| **wheelchair** | **widened** 73:19 | 82:14 119:12 | **worry** 140:21 |
| 200:21 214:23 | **wider** 155:22 | 164:17 208:9 | **worrying** |
| 214:25 | **wife** 15:23 | 224:20 240:20 | 129:19 |
| **whereof** 263:19 | **williamson** | **work** 14:16 | **worse** 35:4 |
| **whispering** 7:7 | 4:22 | 15:1,13 20:12 | 36:22,23 |
| **white** 26:18 | **willing** 111:19 | 29:12 50:20 | 204:24,24 |
| 35:2 42:9 | **willingness** | 71:6 73:12 | **worth** 10:21 |
| 44:12 73:17,21 | 27:11 45:5 | 76:21 77:2,4 | 27:10 40:9 |

Daniel G. Chatman , Ph.D.                           May 16, 2023
Georgia Senate Bill 202, In Re

**[wrapping - zoom]**                                           Page 75

| | | |
|---|---|---|
| **wrapping** | 147:21 152:19 | **york** 256:9 |
| 249:15,16 | 155:11 156:19 | 258:4,12,24 |
| **written** 113:1 | 159:9,24 160:4 | **younger** 255:16 |
| **wrong** 38:16 | 161:22,23 | |
| 58:3 105:11 | 163:18,23 | **z** |
| 145:21 167:7 | 164:21,21 | |
| 172:24 223:25 | 165:2,2,19,24 | **zero** 41:2 145:9 |
| 240:22 | 166:8 169:11 | **zones** 118:18 |
| | 173:16 179:2 | **zoom** 4:15 8:17 |
| **x** | 181:10 188:7 | 8:21 259:10 |
| | 188:20 189:20 | |
| **x** 263:15 | 190:20 196:20 | |
| | 197:15 210:7 | |
| **y** | 214:9,24 215:3 | |
| | 216:19 218:22 | |
| **yeah** 8:20 | 220:18 229:24 | |
| 12:11 16:4 | 230:21 231:21 | |
| 21:19 31:16 | 241:22 242:1 | |
| 39:5,10 46:21 | 243:6 245:2 | |
| 47:17 53:13 | 249:13,14 | |
| 59:18 61:20 | 251:1 255:4 | |
| 74:9 75:24 | 256:5,19 | |
| 79:21 80:11 | **year** 9:11 16:7 | |
| 86:18,25 92:5 | 24:10 121:16 | |
| 93:12 94:2,17 | 121:17 122:2,5 | |
| 99:1 101:6 | 122:11,19 | |
| 106:21 107:1,5 | 244:7,7,9 | |
| 107:7,13,15,22 | **years** 13:15 | |
| 108:2 112:15 | 14:17 18:8 | |
| 112:23 113:14 | 19:25 99:2 | |
| 114:11 115:5 | 122:8,10,14,23 | |
| 116:20 122:7 | 123:25 255:19 | |
| 134:8,9,10 | 255:19,20 | |
| 136:9 137:5 | **yemen** 15:9 | |
| 138:23 142:9 | | |
| 142:11,21 | | |
| 144:2,17 | | |
| 145:16,21,24 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

ELECTION LAW JOURNAL
Volume 23, Number 1, 2024
© Mary Ann Liebert, Inc.
DOI: 10.1089/elj.2023.0011



Open camera or QR reader and
scan code to access this article
and other resources online.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

# Dropbox Allocation and Use Among Georgia Voters in the 2020 Election

Michael Greenberger and Jason M. Roberts

## ABSTRACT

Ballot dropboxes provide voters who fill out mail-in ballots with a secure and convenient method for returning their ballot. During the COVID-19 pandemic, the use of ballot dropboxes increased dramatically as voters sought to cast ballots safely and conveniently. In the wake of the 2020 election, ballot dropboxes have come under considerable scrutiny as many Republican-controlled state legislatures have sought to eliminate them or sharply reduce the number available and/or limit the hours in which they can be used by voters. This article uses novel data on the number of ballots collected in Georgia dropboxes paired with measures of how accessible these dropboxes were to voters in order to analyze how the allocation of dropboxes affected voting behavior in an election where voters could choose to vote in a variety of ways. When controlling for the number of potential users, dropboxes closer in distance to voters are used at higher rates. Individuals located closer to dropboxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots. Our findings carry important implications for election administrators seeking to make voting accessible by adding additional ballot dropboxes and for administrators seeking to adjust to mandated decreases in the number of dropboxes provided to voters.

Keywords: dropbox voting, absentee voting, voting behavior, election administration

## INTRODUCTION

**T**HE COVID-19 PANDEMIC upended all aspects of life in the United States beginning in March of 2020. Among those things affected was the process

of voting and administering elections throughout the country. The typical mode of voting in the United States—in person, in often crowded polling places—could not have been more inconsistent with the Center for Disease Control's (CDC) "social distancing" guidelines put in place to help mitigate the spread of COVID-19. Many voters likely feared that going to the voting booth would increase their risk of contracting COVID-19. At the same time, election administrators feared that it would be difficult to convince poll workers to serve given the risks involved in working in tight quarters and interacting with thousands of voters throughout election day. Given the critical importance that poll workers play in administering elections, this issue alone was enough to potentially imperil the smooth administration of the 2020

Michael Greenberger is an assistant professor in the Department of Political Science at the University of Denver, in Denver, Colorado, USA. Jason M. Roberts is a professor in the Department of Political Science at the University of North Carolina at Chapel Hill, in Chapel Hill, North Carolina, USA.
We thank Lali Madduri, Lia Merivaki, Mara Suttmann-Lea, Mitchell Brown, and Martha Kropf for helpful comments and feedback. Thank you also to Brian Brew, Colin Case, and Emily Ommundsen for help in the data collection process. We are also grateful to the Rapoport Family Foundation for their generous support.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

election (Suttman-Lea 2020; Jones and Stein 2021; King and Barnes 2019).

Given the difficulties presented by COVID-19, a variety of changes to voting procedures were enacted. Polling places were moved to larger venues, early voting hours were extended, and absentee voting rules were loosened. For voters wishing to minimize their potential exposure to COVID-19, voting via an absentee or mailed ballot was the safest method of voting as it did not require a voter to have an in-person interaction with elections staff or other voters. Absentee voting, however, is also one of the most procedurally difficult methods of voting. Ballots have to be requested in advance of the election by the voter and often have stringent requirements that have to be met for the ballot to be accepted.[1] In addition, if a voter is returning the ballot via mail they must purchase postage in many states and mail the ballot early enough so that it will be received by their state's deadline.[2] All the while hoping that the United States Postal Service (USPS) handles their ballot properly.[3] As a result of these difficulties and other factors, the rejection rate for absentee ballots is much higher than for other forms of voting (Baringer et al. 2020; Cottrell et al. 2021; Shino et al. 2022).

One step that many jurisdictions took to mitigate the costs of absentee voting was to install ballot "dropboxes." These dropboxes provided a secure place for a voter to return their ballot at a time that was convenient to them without having to rely on or incur the costs of using the USPS. In the wake of the 2020 election, however, ballot dropboxes have come under considerable scrutiny as many Republican-controlled state legislatures have sought to sharply reduce the number available and/or the hours in which they can be used by voters. One of the states where dropboxes have been the most controversial is Georgia. Now President Joe Biden narrowly won Georgia in 2020, which was the first time a Democratic candidate for president had won the Peach State since Bill Clinton's victory in 1992. In addition, Democratic candidates won both U.S. Senate races in Georgia in 2020.[4] Republicans in the Georgia legislature responded to their electoral shortfalls in 2020 by enacting a sweeping reform measure *Senate Bill 202* that among other things sharply reduced the number of dropboxes that can be deployed in Georgia, the hours in which the dropboxes can be used, and enhanced the security requirements for dropboxes.

Georgia voters did not lose total access to ballot dropboxes for future elections, but many, especially those in urban counties, are likely to have fewer dropboxes to choose from and will in many cases have to travel much farther to access a dropbox. Our goal in this article is to assess how the accessibility of dropboxes affected dropbox use in Georgia in 2020 in order to understand how election administrators in any state might place dropboxes to most efficiently serve voters in the future (assuming the election administrators do have some autonomy over the placement of dropboxes). To do this we estimate the effect of dropbox placement on the propensity for voters to cast an absentee-by-mail ballot. We also estimate the effect of proximity on dropbox usage at the dropbox-level, that is, how many ballots can election administrators expect a dropbox to receive based on how close voters are to the dropbox. Given the costs associated with dropbox implementation and maintenance, this is an important question for election administrators.

We find that proximity to dropboxes is very important for voters—dropboxes geographically close to voters were used at higher rates than those farther away from voters. Voters closer to dropboxes were more likely to vote by mail and less likely to fail to deliver their requested by-mail ballots. Our findings suggest that limiting the number of dropboxes will likely decrease their use in subsequent elections, especially in areas where dropboxes were placed extremely close to voters. These tend to be urban areas that have large numbers of non-white voters and voters who are more apt to vote for Democratic party candidates. Although these results are intuitive, they are meaningful for election

---

[1] Some states require an excuse to vote via mail. Other states have photo identification requirements, witness signature requirements, and/or signature verification requirements.
[2] Some states require that absentee ballots be received by the close of business on election day, while others allowed a ballot that is postmarked by election day to arrive in the days following an election.
[3] The USPS loses some ballots. A much larger problem is that many ballots do not receive postmarks and thus their mail date cannot be verified by elections staff.
[4] Georgia had a special election for the Senate and a regular Senate election on the ballot at the same time. In neither race did a candidate gain a majority of the votes cast, so under a Georgia law a runoff between the top two vote getting candidates ensued.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

administrators across the United States responding to new guidelines on dropbox usage. This article adds to the preexisting literature on distance and dropboxes by demonstrating the effect of proximity in an election in which vote-by-mail is *not* the standard of voting and by considering the utility of dropbox placement from a resource-limited election administrator's perspective.

## DROPBOXES AND THE COST OF VOTING

Voting is a costly act for citizens. It takes time and physical effort to register to vote, and the voting process itself takes time and effort. These costs vary based on the method of voting one chooses and the voting rules in a voter's state. The costs of voting are not exceedingly high for most voters, but they can be consequential to individual voting decisions, in part because the direct benefits of voting are also not high (Aldrich 1993). In almost all cases, one individual's vote is not outcome consequential. The existing literature has consistently demonstrated that even small increases in the costs of voting have a deterrent effect on turnout and ballot completion (McNulty et al. 2009; Aldrich 1993; Engstrom 2012; Engstrom and Roberts 2020). For example, factors such as rain on election day, long lines at the polling place, and a change in voting location have all been shown to decrease voter turnout (Joslyn et al. 2020; Walker et al. 2019; Brady and McNulty 2011). Similarly, policies that decrease the cost of voting such as allowing voters to register to vote and cast a ballot at the same time are associated with higher levels of turnout (Haspel and Knotts 2005).

Ballot dropboxes have the potential to sharply decrease the cost of voting for some voters. For voters who wish to cast an absentee ballot in Georgia, dropboxes have two clear advantages for the voter: (1) the voter does not have to pay postage if depositing a ballot in a dropbox and (2) the voter has more time to complete their ballot given that they do not need to mail the ballot in time for it to reach the county elections office by election day.[5] In addition, the usage of a dropbox minimizes the chances that the ballot will be lost, damaged, or delayed by removing the USPS from the chain of custody for the ballot. Evidence from vote-by-mail states such as Oregon and Washington suggest that voters strongly prefer dropboxes to the USPS for ballot

return as the overwhelming majority of voters use dropboxes to return their ballots.[6]

Prior to the 2020 general election, dropbox voting was rare in states not using universal vote-by-mail elections. As a result, very little scholarship exists that details the relationship between geographic distance and dropbox use. To the best of our knowledge, two studies have addressed this question. Collingwood et al. (2018) found that the addition of over 30 new dropboxes in King County, Washington, increased turnout. In this study, proximity to dropboxes was associated with a greater likelihood of turnout. In a follow-up study that used a natural experiment to identify an average treatment effect, McGuire et al. (2020) estimate that a one mile decrease in distance to nearest dropbox increased the probability of voting by 0.64 percent. Both of these studies focus on the effect of proximity on turnout in a state with a robust universal vote-by-mail program.

Our study builds on this prior work by expanding our geographic scope from single, mostly urban counties, to the entire state of Georgia. Here, we compare dropbox use-rates across urban, suburban, and rural counties. Like prior studies of dropbox use, we have no direct knowledge of whether or not specific voters actually used a particular dropbox.[7] However, we do have data on the total number of ballots cast in each dropbox. In addition to individual level effects, we focus on use-rates for dropboxes themselves. We believe this outcome variable is especially important for legislators, scholars, and election administrators interested in how many voters use dropboxes, and in what circumstances dropboxes will prove most effective. As McGuire et al. (2020) point out, dropboxes are expensive—if no one uses them, they may not be a worthwhile investment for election administrators.

Our theoretical expectations are straightforward. We expect that, like prior studies have shown, voters

---

[5]Georgia requires absentee ballots to reach the county elections office by election day. To ensure timely arrival, a voter would need to complete their ballot several days before election day.
[6]"Voting by Mail and Absentee Voting," MIT Election Data and Science Lab. <https://electionlab.mit.edu/research/voting-mail-and-absentee-voting>.
[7]An important exception to this is recent work demonstrating that most voters use the dropbox nearest to them (Collingwood and Gonzalez O'Brien 2021). However, this data linking voters to their nearest dropbox has not been used in any analysis of turnout or voting behavior.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

closer to dropboxes will be more likely to vote by mail and that mail-in ballots will be less likely to go undelivered by voters.[8] We expect that dropboxes placed proximate to more voters will be used at higher rates, and that this association will be magnified among voters within the closest distances to dropboxes. We also expect that as election day nears and voters worry that ballots mailed via USPS would not be counted on time, dropboxes will be used more frequently. Given these expectations, we expect that election administrators can place dropboxes most efficiently (defined as maximizing use for voters) by placing boxes to maximize the number of voters within a very close distance to a box rather than a location that attempts to minimize distance to dropbox for all voters.

## DATA COLLECTION

Data on ballot dropbox usage were accessed via a records request made to the *Open Records Request Officer* housed in the Georgia Secretary of State's office. The records were provided for free and contained all ballot transfer forms for the 109 counties (out of 159 counties) that used at least one ballot dropbox. Counties using dropboxes filed "ballot transfer forms" to track ballots being retrieved from dropboxes throughout the state. Demographic and political characteristics of counties with and without dropboxes are reported in Table 4 in Supplementary Appendix A. Counties with and without dropboxes are similar in two-party vote share, though counties with dropboxes tend to have larger population, more urban residents, and higher incomes.

Each transfer form listed the county name, the location of the ballot dropbox, the date of pickup, and the number of ballots retrieved. This means that for each dropbox in the state of Georgia (275 unique boxes), there was at least one form for each day for each box. Given that many counties began collecting ballots from dropboxes on the first of September (09/01/2020), the 109 counties produced thousands of ballot transfer forms.

We coded the ballot dropbox forms using a program written for MTurk, Amazon's human intelligent task workforce.[9] MTurk workers were presented with a dropbox transfer form and asked to select the county, dropbox location, date of pickup, and number of ballots collected. Supplementary Appendix B contains a full description of

the coding procedures, a sample of the ballot transfer forms, and a description of the reliability checks used to validate the MTurk workers' coding accuracy. The result of the MTurk coding process is a count on the total number of ballots cast in each dropbox for each day of the election period. Again, like prior studies, we do not know which voters cast their ballots in dropboxes, but by collecting this data we *do* know how many ballots were cast in each ballot dropbox on each day.

Data on voting behavior comes from the voter registration, voter history, and absentee voter files provided by the Georgia Secretary of State's Office. Georgia registration records include a voter's residential address. Using this address, we geocoded voters to geographic locations. Over 92 percent of voters in every county were successfully geocoded at the street address or point address level.[10]

We then routed each geocoded voter to all dropboxes located within their county and calculated the driving distance to reach each dropbox for every voter living in a county with at least one dropbox.[11] Using a voter's records in their history and absentee file, we can determine their method of voting in the 2020 election. This data collection yields us information on distances between all voters and dropboxes, how voters proximate to each dropbox voted, and the number of ballots cast in each box—roughly 5 million voters who cast a ballot in Georgia during the 2020 November General Election.

## MEASURES OF ACCESSIBILITY AND USE

As state legislatures consider reducing access to dropboxes (but not wholly eliminating them), our study aims to assess whether proximity increases the rate at which dropboxes are used. This is the most important relationship for understanding how

---

[8]We refer to mail-in ballots which are granted to absentee voters but not successfully returned as "undelivered." We do not include voters who requested a mail-in ballot but voted by other means in any analysis of undelivered ballots.

[9]Variance between forms, low image quality, and challenging to read handwriting limited our ability to use optical character recognition software (OCR) to code the thousands of ballot transfer forms.

[10]We used the ArcGIS Business Analyst geocoder to achieve this level of accuracy. Using Tiger/Line Census files (open source) yielded similar but slightly less accurate geocoding results.

[11]These calculations reflect distance on roads, not as-the-crow flies measurements.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

voting behavior may be affected as counties reduce the number of dropboxes available to voters. We address this in two ways: first, how an individual's proximity to a dropbox affects their voting behavior, and second, how a dropbox's location relative to groups of voters affects its rate of use.

Our independent variables aim to capture the accessibility of dropboxes used in the 2020 general election. We estimate accessibility in two ways, as a simple distance between a voter $i$ and their nearest dropbox $j$, and as a function of distance decay. As demonstrated by Gimpel and Schuknecht (2003), the same increase in distance is likely to have a larger effect on voters closer to their destination than voters farther away. An extra mile will likely matter more to a voter who was originally half a mile away to begin with compared to a voter already expecting to travel ten miles. Also, at distances farther away from dropboxes, travel is likely to be unimpeded and straightforward (assuming that election officials sought to locate dropboxes in areas of high density) (Gimpel and Schuknecht 2003). Distance decay measures are familiar to studies of accessibility in the context of markets and elections and are generally derived from a standard gravity model (Song 1996; Fotheringham and O'Kelly 1989; Kwan 1998; Haynes and Fotheringham 2020).

Distance decay, $A_i$, can be derived as the inverse of the squared distance $d$ between a voter's origin $i$ and destination $j$ such that:

$$A_i = 1/d_{ji}^2$$

The distance decay model inflates the increasing costs of travel at short differences. Consider a voter traveling two miles (distance decay value of .25) and a voter traveling three miles (distance decay value of .11). Here, a one mile increase in distance corresponds to a change in distance decay of .14. If instead those two voters were traveling nineteen (distance decay value of .0028) and twenty miles (distance decay value of .0025), a one mile increase in distance only corresponds to a change in distance decay of .003. Distance decay captures the relative unimportance of a voter needing to travel an extra mile when they are already planning to travel longer distances.

For our individual level analysis, our first dependent variable is whether a voter cast a by-mail ballot. We control for a voter's history of voting by mail by including a categorical variable for vote



**FIG. 1.** Counties and dropboxes in Georgia

method in 2018 as a control. Voters who voted by mail in a past election are much more likely to vote by mail in the future. We also control for age and race. Our second dependent variable for the individual-level analysis is whether or not a mail-in ballot was successfully delivered. These models use the same control variables.

Our dependent variable for the dropbox-level analysis is a dropbox's use rate. A dropbox's use rate is calculated by dividing the number of ballots collected in a dropbox by the total number of eligible ballots. We estimate the number of eligible ballots as all registered voters for whom a given dropbox is their closest available (within their county) dropbox. The actual number of ballots collected in a dropbox is then divided by the number of eligible voters to calculate a dropbox's use rate.

Most counties only used one dropbox (see Figure 1, see also Figure D.1 in Supplementary Appendix D for a zoomed view of the large number of boxes in the Atlanta Metro area). In these cases, linking voters to their closest available dropbox means that the voters eligible to use a particular dropbox are all registered voters in a given county and that important control variables like age, race, and population density can be taken from the registration statistics at the county level. However,

GREENBERGER AND ROBERTS

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

several counties used more than one dropbox. Age and race are individual level variables and can be aggregated up from the individual-level data to create age and race statistics for a given dropbox based on the individuals for whom a given dropbox is their closest option. We control for the Democratic share of the vote using support for Hillary Clinton in the 2016 General Election, the percent of individuals without any undergraduate college degree, and median household income. Importantly, we also include a control for the percent of individuals in a dropbox's use zone who previously voted by mail. Voters who voted by mail prior to the roll-out of dropboxes in 2020 may already be familiar with the process and habituated to sending their ballot in the mail.

To estimate population density we create geographically based dropbox "use zones" conceptualized as thiessen polygons—areas partitioned into regions based on proximity to a point (in this case, the nearest dropbox). Densities for these areas are calculated using the full population living in the approximated polygon. This aims to capture the ease of movement near a dropbox as higher density areas are likely to be more difficult to navigate quickly because of traffic, stoplights, and other impediments. By using eligible voters in the denominator of the outcome variable, we also control for the total number of people in a dropbox's use zone.

## RESULTS: PROXIMITY AND VOTING BEHAVIOR

Table 1 presents the estimated magnitude of the effect of proximity to dropboxes on the likelihood of a voter registered to vote in the 2020 election casting a by-mail absentee ballot. All ballots cast via dropbox were absentee by-mail ballots. Columns 1 and 2 report the base effect of distance and include a county fixed-effect. Column 1 uses miles, and column 2 uses distance decay. Model 1 estimates that a one mile increase to the nearest dropbox is associated with a decrease in the likelihood of voting by mail by -0.3 percentage points. A unit increase in the value of distance decay is associated with an increase in the likelihood of voting by mail by 1 percentage point. A decrease from 1 mile to 0.25 miles (an increase from 1 to 2 in distance decay) is associated with a 1 percentage point increase in the likelihood of voting by mail. These estimates support the theory that a decrease

in cost to voting in a certain form increases the likelihood that a voter will use that form of voting.

Models 3 and 4 include controls for vote method in 2018. The reference category for the vote method used in 2018 is an electronic ballot cast, a method used by overseas voters under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). While all controls are statistically associated with the likelihood of a voter choosing to vote by mail, the important confounder controlled for with the inclusion of this variable is whether or not a voter previously voted by mail. Voters who in 2018 voted by mail were very likely to vote by mail again in 2020. Models 5 and 6 include controls for race and age, demographic factors that may vary with how voters choose to vote. The reference category for race is non-hispanic white. Across all models, the measures for dropbox distance are statistically significant and in the expected direction. Models directly interacting distance to dropbox and vote method used in 2018 are reported in Table 6 of Supplementary Appendix C. Figures charting average marginal effects for these models are in Figure C.1. Average marginal effects of the interaction between distance to dropbox and race are presented in Figure C.2 in Supplementary Appendix C.[12]

Figure 2 charts the likelihood of a voter casting a by mail ballot based on the effect of distance (in miles) estimated in Model 1 of Table 1. At near zero miles to the closest dropbox, the estimated likelihood of a voter casting a by-mail ballot is about 15.75 percent. At ten miles away from the nearest dropbox, the estimated likelihood of a voter casting a by-mail ballot is about 14.9 percent.

Prior studies have demonstrated an increase in turnout resulting from proximity to a ballot dropbox roughly equal to the effect estimated for vote-by-mail specifically above. Our research design does not identify a causal relationship, but the associations we find comport with prior causal estimates made in prior studies (Collingwood et al. 2018; Collingwood and Gonzalez O'Brien 2021). Using the information in Georgia's publicly available data, however, we can also estimate the effect of proximity to a dropbox on the likelihood that a requested by-mail ballot goes undelivered (this does not

---

[12]The estimates from these models show that the association between decreased dropbox proximity and voting by mail does not vary to a distinguishable level by race/ethnicity.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

DROPBOX ALLOCATION AND USE

TABLE 1. PROXIMITY TO DROPBOX AND MAIL-IN BALLOTS

| | (1) | (2) | Dependent variable: Voted by Mail 2020 (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| Miles | −0.003*** (0.0003) | | −0.005*** (0.0004) | | −0.004*** (0.0004) | |
| Dist. decay | | 0.010*** (0.003) | | 0.031*** (0.003) | | 0.013*** (0.003) |
| Voted early '18 | | | 0.633*** (0.029) | 0.564*** (0.027) | 0.142*** (0.035) | 0.050 (0.034) |
| Voted by mail '18 | | | 2.297*** (0.029) | 2.230*** (0.028) | 1.821*** (0.035) | 1.733*** (0.034) |
| No vote '18 | | | −0.314*** (0.029) | −0.378*** (0.027) | −0.349*** (0.035) | −0.435*** (0.034) |
| Voted in person '18 | | | 0.207*** (0.029) | 0.138*** (0.027) | −0.072** (0.035) | −0.164*** (0.034) |
| Asian | | | | | 0.699*** (0.009) | 0.701*** (0.009) |
| Am. Indian | | | | | 0.173*** (0.025) | 0.178*** (0.026) |
| Black | | | | | 0.283*** (0.003) | 0.288*** (0.003) |
| Hispanic | | | | | 0.245*** (0.008) | 0.248*** (0.008) |
| Other | | | | | 0.003 (0.004) | 0.006 (0.004) |
| Age | | | | | 0.041*** (0.0001) | 0.041*** (0.0001) |
| Constant | −1.576*** (0.031) | −1.596*** (0.029) | −1.790*** (0.038) | −1.758*** (0.036) | −3.794*** (0.043) | −3.739*** (0.041) |
| Observations | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 | 4,938,065 |
| County F.E. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Log likelihood | −2,488,279 | −2,440,002 | −2,350,128 | −2,305,334 | −2,196,565 | −2,154,820 |
| Bayesian inf. crit. | 4,976,605 | 4,880,051 | 4,700,364 | 4,610,775 | 4,393,329 | 4,309,840 |

*Note:* *p<0.1; **p<.05; ***p<0.01

include ballots surrendered by voters at early voting locations, surrendered at election day voting locations, or returned spoiled). This dependent variable is coded 1 for voters with requested and undelivered ballots, and 0 for requested and delivered ballots.[13] The independent variables are the same as those used in the above models. These results are reported in Table 2.

Column 1 reports that a one mile increase in distance to the closest dropbox is associated with a 0.6 percentage point increase in the likelihood of that ballot being undelivered. Using distance decay rather than raw miles, the model presented in column 2 reports that a one unit increase in distance decay is associated with a 4.5 percentage point increase in the likelihood of a by-mail ballot being undelivered. A change from the mean value of distance decay (.18, or 2.35 miles) increasing by one standard deviation (to .54, or 1.36 miles) corresponds to a roughly 1.5% decrease in the likelihood of a

ballot being undelivered. The distribution of distance decay values is such that the vast majority of observations fall between 0 and 1, meaning that the model estimate of 4.5% reflects a move over nearly the entire range of observed values. The larger magnitude of the distance decay association with undelivered ballots (as compared to raw miles) reflects the importance of distance differences at small values (e.g, a dropbox being within walking distance or not).[14] The addition of control variables in models 3 and 4 does not change

[13]Results for the same models using all voters (rather than only voters who at least requested a ballot) are presented in Table 5 in Supplementary Appendix C.
[14]It is important to again note here that this measure is an inverse exponent, meaning that it cannot be extrapolated linearly in miles (e.g, an increase from 3 miles to 4 miles (a distance decay decrease of only .07) would have a significantly smaller association with the outcome variable than 4.5 a percentage point increase).

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

TABLE 2. PROXIMITY TO DROPBOXES AND UNDELIVERED BY MAIL BALLOTS

| | (1) | (2) | Dependent variable: Ballot Undelivered (3) | (4) |
|---|---|---|---|---|
| Miles | 0.006** | | 0.008*** | |
| | (0.003) | | (0.003) | |
| Dist. decay | | −0.045** | | −0.045** |
| | | (0.022) | | (0.022) |
| Voted early '18 | | | −0.687*** | −0.710*** |
| | | | (0.201) | (0.194) |
| Voted by mail '18 | | | −1.180*** | −1.194*** |
| | | | (0.203) | (0.196) |
| No vote '18 | | | −0.940*** | −0.962*** |
| | | | (0.201) | (0.194) |
| Voted in person '18 | | | −0.775*** | −0.801*** |
| | | | (0.201) | (0.194) |
| Age | | | −0.008*** | −0.008*** |
| | | | (0.0005) | (0.0005) |
| Asian | | | 0.154*** | 0.146** |
| | | | (0.058) | (0.059) |
| Am. Indian | | | 0.535*** | 0.488*** |
| | | | (0.150) | (0.153) |
| Black | | | 0.165*** | 0.164*** |
| | | | (0.019) | (0.019) |
| Hispanic | | | 0.292*** | 0.292*** |
| | | | (0.052) | (0.052) |
| Other | | | 0.135*** | 0.128*** |
| | | | (0.031) | (0.031) |
| Constant | −4.719*** | −4.685*** | −3.470*** | −3.398*** |
| | (0.100) | (0.098) | (0.226) | (0.217) |
| Observations | 1,051,709 | 1,051,709 | 1,051,709 | 1,051,709 |
| County F.E. | ✓ | ✓ | ✓ | ✓ |
| Log likelihood | −76,339.250 | −74,443.280 | −75,981.890 | −74,098.380 |
| Bayesian inf. crit. | 152,720.100 | 148,928.100 | 152,144.000 | 148,376.800 |

Note: $p<0.1$; $p<0.05$; $p<0.01$

substantively the estimates of the effect of distance to dropbox. Voters with previous vote by mail experience and older voters were less likely to leave mail ballots undelivered. Compared to white voters, all racial and ethnic groups were more likely to leave by-mail ballots undelivered.

## RESULTS: DROPBOX USE RATE AND PROXIMITY

At an individual level, proximity affects voting behavior in mode of voting and the successful delivery of by-mail ballots. Election administrators, however, may be interested in the efficacy of ballot dropbox placement (especially in instances where counties may use multiple dropboxes or be limited to a certain number of dropboxes). The correlation between distance traveled and dropbox use provides strong descriptive evidence that proximity is an important factor for under-

standing variation in dropbox use rates (full histogram of dropbox use rates in Supplementary Appendix A). Figure 3 illustrates the negative correlation between dropbox use rates (measured at the dropbox level) and travel distance to dropbox. The use rate of a dropbox and the median travel time of its potential users correlate with a Pearson's correlation coefficient of −0.22 (95% confidence interval of −0.33 to −0.1). Median distance decay and dropbox use rate correlate at 0.30 (95% confidence interval of 0.19 to 0.40).

Figure 3 also demonstrates that beyond about 6 miles, increasing travel times have little effect on dropbox usage. This suggests that the covariance between dropbox usage and distance times is primarily driven by dropboxes with median distances at or below 6 miles. This finding adds further evidence that distance decay is a useful measure for capturing the accessibility of a dropbox. Because voters do not appear to have their behavior changed by distances that already involve a

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.



**FIG. 2.** Average marginal effect of distance on voting behavior.

significant amount of travel, most of the substantively important variance in cost should be between 0 and 5 miles, which distance decay highlights as most important.

Table 3 reports models estimating the effect of the median distance and median distance decay for voters in a given dropbox's use zone on the

use rate of that dropbox. Only voters for whom that dropbox is the closest usable dropbox are included in this calculation. The model uses ordinary least squares estimation. Alternative modeling specifications including a beta regression estimation, a model including a fixed-effect by county, and a model including a spatially lagged dependent



**FIG. 3.** Travel distance and dropbox use rate.

64

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

TABLE 3. TIME, DISTANCE, AND DROPBOX USE RATES

| | Dependent variable: Dropbox Use Rate | |
|---|---|---|
| | (1) | (2) |
| Median distance | -0.028*** | |
| | (0.013) | |
| Median distance decay | | 0.435*** |
| | | (0.090) |
| Percent Black | -0.107 | -0.079 |
| | (0.130) | (0.125) |
| Mean age | 0.00004 | 0.0001 |
| | (0.0001) | (0.0001) |
| Number boxes in county | 0.0001 | -0.003 |
| | (0.005) | (0.005) |
| Percent ballots mailed '18 | 1.632 | 2.372 |
| | (2.367) | (2.277) |
| Median household income | 0.207 | 0.222 |
| | (0.191) | (0.180) |
| Population density | 0.0004 | -0.001 |
| | (0.002) | (0.001) |
| Dem. share of '16 vote | 0.100 | 0.074 |
| | (0.266) | (0.257) |
| Percent less than college | 0.002 | 0.004 |
| | (0.009) | (0.008) |
| Constant | -2.179 | -2.629 |
| | (2.192) | (2.081) |
| Observations | 275 | 275 |
| $R^2$ | 0.079 | 0.139 |
| Adjusted $R^2$ | 0.047 | 0.109 |
| Residual std. error (df = 265) | 0.394 | 0.381 |
| F Statistic (df = 9; 265) | 2.511*** | 4.737*** |

Note: *p < 0.1; **p < 0.05; ***p < 0.01

variable are all reported in Supplementary Appendix C. Across all model specifications the effect of distance is statistically significant with estimated effects in the expected direction (increased median distance to dropbox associated with decreased box usage).

Across both models reported in Table 3, dropboxes for which the average user would need to travel farther are associated with lower rates of use. As a reminder, because distance decay is calculated as the inverse of the distance squared, larger distances equal lower distance decay values (meaning that a positive coefficient for distance decay indicates that an increase in distance corresponds to a decrease in dropbox use). The proportion of likely dropbox users that are Black has no distinguishable effect on use rate. Similarly, the average age, population density, income, Democratic vote-share in 2016, percent without college education, and percentage of 2018 ballots cast via mail in a dropbox's use zone have no distinguishable effect on dropbox use rate.

Interpretation for the models using median distance is quite straightforward: a one mile increase in the median distance traveled by a voter in a dropbox's use zone corresponds to a 2.8 percentage point decrease in the use rate for a given dropbox.



FIG. 4.   Distance decay and dropbox use rate, mail-in voters.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.



**FIG. 5.** Dropbox use rate among mail-in voters.

For example, if we consider a dropbox as being accessible to 18,000 registered voters and with a use rate of 0.15 (roughly the sample means for eligible voters and use rate), we would expect a one mile increase in the median distance to correspond to a use rate decrease of about 0.03 (to 0.12), all else equal. In this scenario, the number of voters using the dropbox would decrease from 2,700 to 2,160. For reference, the average median distance in the sample is around 4 miles, so a shift of one mile in distance represents quite a big change in the context of these data.

Interpreting the estimated effect of distance decay is much less straightforward. Modeled using distance decay, a decrease in mileage from 1 to 0.25 (a one unit increase in distance decay) corresponds to 43.5 percentage point increase in the dropbox use rate. Figure 4 graphs simulated predicted probabilities of predicted dropbox use rates across the range of observed values for a dropbox use zone's median value of distance decay. The predictions are based on the results for Model 2 in Table 3. For these simulations, covariate values for control variables are generated by sampling observed values from the data. The dashes at the bottom of Figure 4 indicate observed values of median distance decay in the data. A median distance decay of 0.25 (2.13 miles) corresponds to a dropbox use rate of about 0.22, and a one standard deviation increase to a distance decay of about 0.5 (1.41 miles) corresponds to a dropbox use rate of about 0.26.

Figure 5 presents the same predicted outcomes as Figure 4, but with the axis transformed to represent miles to dropbox rather than the distance decay value. The predicted use rate drops dramatically between half a mile and 2 miles, but then tapers to a relatively slow drop over the remaining increases in distance to the dropbox. This figure highlights that changes made to dropbox access in the most dense, urban environments are likely to affect the voting behavior of nearby voters. We discuss the implications of this along other findings in the discussion.

## RESULTS: DROPBOX PROXIMITY AND VOTE TIMING

Modeling the effect of dropbox access on the likelihood of a late-cast or last-minute ballot is somewhat simpler. We use logistic regression with a fixed effect for each county to estimate the effect of a voter's distance and distance decay to their

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.



**FIG. 6.** Mail-in ballots counted by date and ballot cast type.

nearest dropbox on their likelihood of casting a late or last-minute ballot. We consider last-minute ballots as those cast within 5 days of the election.[15]

Proponents of ballot dropboxes argue that access to mail-in ballot dropboxes affects decisions on vote timing and ballot approval (Brower 2022). As election day approaches, absentee voters may worry that their mail-in ballot will not be counted if they mail it too late and choose instead to vote via dropbox. By eliminating use of the USPS from their voting cost-benefit calculation, voters can confidently cast mail-in ballots up to election day in a ballot dropbox.

Figure 6 charts the number of mail-in ballots *accepted* each day up to and through election day in Georgia. The totals are separated by ballot type (mail-in via mail or dropbox). The cyclical week effects are to be expected, as is the general higher magnitude of mail-in ballots over dropbox ballots. Critically, however, the gap between mail-in and mail-in via dropbox ballots narrows dramatically for ballots counted day of and day before election ballot totals.

Whereas the number of mailed-in ballots counted decreases as election day approaches and arrives, the number of mail-in ballots cast via dropbox increased up to election day. Voters behave rationally by casting mail-in ballots via dropbox when the deadline draws near. A pertinent question then is whether or not a voter may be dissuaded from voting if they need to vote with a mail-in ballot but a dropbox is not accessible. To understand this relationship we regress whether a ballot was cast at the last minute and whether a ballot was accepted on a voter's distance to dropbox and distance decay values for every voter who requested a mail-in ballot. Although we detect statistically significant effects of distance and distance decay on these outcomes, the substantive effects are so minimal as to cast doubt on the substantive importance of the results (especially given the high number of observations). We find no meaningful evidence that closer access to dropboxes within a county leads a voter to cast a last minute ballot. Full models reporting this finding are located in Supplementary Appendix C.

## DISCUSSION

Beginning with the 2022 midterm elections, many voters had to travel farther to reach a dropbox than they did in 2020. Arizona, Florida, Georgia, Iowa, and Wisconsin have all implemented or are considering implementing severe limitations on

---

[15]As we discuss later, the results for this test are statistically significant but the substantive effect is extremely small. Defining a last-minute ballot as one cast within 4 or 6 days rather than 5 days does not affect the results.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

the ability of local election officials to make dropboxes accessible to their constituents. In Georgia, the state legislature's passage of Georgia SB 202 has mandated that counties not use more than one dropbox for every 100,000 voters. According to our data, this suggests that the number of dropboxes in the Atlanta area will drop by approximately 75%. The eliminated dropboxes are among the most efficiently placed and well-used dropboxes in the state. Limiting the number of dropboxes forces election administrators to make choices about resource allocation. Our findings here point to certain dropboxes being more useful than others.

Dropboxes are used most frequently when they are within a short distance of a large number of voters. Although proponents of Georgia S.B 202 argue that all voters will still have access to a dropbox, curtailing access to dropboxes in densely populated areas is most likely to affect counties with dropboxes located within short distances of many voters. Voters residing in rural counties, where voters lived farther from dropboxes in 2020, are unlikely to be affected even if their distance to a dropbox increases, as changes in distance affect dropbox voting much less at further distances. An extra mile matters significantly more for a voter delivering their ballot as a walker, cyclist, or public transit user than it does for a driver.

This research has practical implications for election administrators. Our key finding is that voters farther from dropboxes are relatively unaffected by the need to travel further to use one. Consider a county with 200,000 registered voters in Georgia. According to Georgia's recently passed *SB 202*, this county can only use 1 dropbox per 100,000 voters—a total of 2 dropboxes. While *SB 202* mandates that "drop boxes shall be evenly geographically distributed by population in the county," this is somewhat vague. If the county has two dense population centers and a rural population distributed throughout the rest of the area, more ballots would be collected and fewer mail-in ballots would be undelivered if the election administrators place the dropboxes in the densely populated areas rather than a location that is more centrally located.

The data available for Georgia are limited. We cannot recover estimates for the effect of dropbox placement on overall turnout. Rural voters, systematically farther away from dropboxes, were more likely to vote in 2018 and 2020 than their urban counterparts. Distance from a dropbox correlates with rural location and likelihood of voting in

2018. A reduction in dropboxes carries the greatest potential to harm voters living closest to locations that formerly had dropboxes. Because dropbox locations were primarily in densely populated areas, a reduction in boxes will lead urban voters to vote in less convenient methods. Additionally, a reduction in dropboxes will lead to a greater share of by-mail voters failing to deliver their ballots. In 2020, 1.2 percent of white voters failed to return their mail-in ballots, while Black and Hispanic voters failed to return at rates of 2.0 and 1.9 percent, respectively. These are significant disparities that can be ameliorated through the use of dropboxes, which decrease rates of undelivered ballots.

Generally, changes made to one method of voting—like relocation or removal of precinct polling places—are accommodated by voters through substitution with a new method of voting (Clinton et al. 2021). Nonetheless, the focused removal of dropboxes from the highest population counties will disproportionately negatively affect voters living in urban and suburban areas. It is likely not a coincidence that these dropboxes were targeted by a Republican legislature given that these areas have the largest concentration of non-white voters and the largest concentrations of Democratic voters in the state. In the context of Georgia, this correlates with the Atlanta Metro area, which contains Georgia's most Democratic and diverse group of voters. While this research does investigate why Republican legislators enacted *SB 202*, the legislation will make voting less convenient and lead to more undelivered ballots in Georgia's most reliably Democratic and least white counties.

## SUPPLEMENTARY MATERIAL

Supplementary Appendix

## REFERENCES

Aldrich, John H. 1993. "Rational Choice and Turnout." *American Journal of Political Science* 37:246–278.

Anselin, Luc. 1988. *Spatial Econometrics: Methods and Models*, Volume 4. Springer Science & Business Media.

Baringer, Anna, Michael C. Herron, and Daniel A. Smith. 2020. "Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus." *Election Law Journal* 19(3):289–320.

Bivand, Roger, and David W. S. Wong. 2018. "Comparing Implementations of Global and Local Indicators of Spatial Association." *TEST* 27(3):716–748.

Downloaded by STANFORD UNIVERSITY E-PACKAGE from www.liebertpub.com at 07/27/25. For personal use only.

Brady, Henry E., and John E. McNulty. 2011. "Turning Out to Vote: The Costs of Finding and Getting to the Polling Place." *American Political Science Review* 105:1–20.

Brower, Mac. 2022. "The Republican War on Drop Boxes." *Democracy Docket*.

Clinton, Joshua D., Nick Eubank, Adriane Fresh, and Michael E. Shepherd. 2021. "Polling Place Changes and Political Participation: Evidence from North Carolina Presidential Elections, 2008–2016." *Political Science Research and Methods* 9(4):800–817.

Collingwood, Loren, and Benjamin Gonzalez O'Brien. 2021. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research* 49(6):604–617.

Collingwood, Loren, William McGuire, Benjamin Gonzalez O'Brien, Katherine Baird, and Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal* 17(1):58–72.

Cottrell, David, Michael C. Herron, and Daniel A. Smith. 2021. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* 49(6):577–590.

Cribari-Neto, Francisco, and Achim Zeileis. 2010. "Beta Regression in R." *Journal of Statistical Software* 34(2):1–24.

Engstrom, Erik J. 2012. "The Rise and Decline of Turnout in Congressional Elections: Electoral Institutions, Competition, and Strategic Mobilization." *American Journal of Political Science* 56:373–386.

Engstrom, Erik J., and Jason M. Roberts. 2020. *The Politics of Ballot Design: How States Shape American Democracy.* Cambridge, U.K.: Cambridge University Press.

Fotheringham, A. Stewart, and Morton E. O'Kelly. 1989. *Spatial Interaction Models: Formulations and Applications,* Volume 1. Kluwer Academic Publishers Dordrecht.

Gimpel, J.G., and J.E. Schuknecht. 2003. "Political Participation and the Accessibility of the Ballot Box." *Political Geography* 22(5):471–488.

Haspel, Moshe, and H. Gibbs Knotts. 2005. "Location, Location, Location: Precinct Placement and the Costs of Voting." *Journal of Politics* 67:560–573.

Haynes, Kingsley E., and A. Stewart Fotheringham. 2020. *Gravity and Spatial Interaction Models.* Regional Research Institute, West Virginia University.

Jones, Colin J., and Robert M. Stein. 2021. "Recruiting Persons to Work the Polls." *Election Law Journal* 20:315–326.

Joslyn, Nick, Andrew Bilbo, Jack Arndt, Heidi Berger, and Mark Joslyn. 2020. "Distance Traveled to Polling Locations: Are Travel Costs Imposed Equally on Party Members?" *The Social Science Journal* 57:14–25.

King, Bridgett A., and Alicia Barnes. 2019. "Descriptive Representation in Election Administration: Poll Workers and Voter Confidence." *Election Law Journal* 18:16–30.

Kwan, Mei-Po. 1998. "Space-Time and Integral Measures of Individual Accessibility: A Comparative Analysis Using a Point-Based Framework." *Geographical Analysis* 30(3):191–216.

McGuire, William, Benjamin Gonzalez O'Brien, Katherine Baird, Benjamin Corbett, and Loren Collingwood. 2020. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly* 101(5):1789–1809.

McNulty, John E., Conor M. Dowling, and Margaret H. Ariotti. 2009. "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters." *Political Analysis* 17:435–455.

Shear, Michael D, and Stephanie Saul. 2021. "Trump, in taped call, pressured Georgia official to 'find' votes to overturn election." *The New York Times*.

Shino, Enrijeta, Mara Suttmann-Lea, and Daniel A. Smith. 2022. "Determinants of Rejected Mail Ballots in Georgia's 2018 General Election." *Political Research Quarterly* 75(1):231–243.

Song, Shunfeng. 1996. "Some Tests of Alternative Accessibility Measures: A Population Density Approach." *Land Economics*, 474–482.

Suttman-Lea, Mara. 2020. "Poll Worker Decision Making at the American Ballot Box." *American Politics Research* 48:714–718.

Walker, Hannah L., Michael C. Herron, and Daniel A. Smith. 2019. "Early Voting Changes and Voter Turnout: North Carolina in the 2016 General Election." *Political Behavior* 41:841–869.

Address correspondence to:
*Michael Greenberger*
*University of Denver*
*Department of Political Science*
*College of Arts, Humanities & Social Sciences*
*2000 E. Asbury Ave.*
*Denver, Colorado*
*80208*
*USA*

*E-mail:* michael.greenberger@du.edu

Received for publication March 3, 2023; received in revised form August 10, 2023; accepted August 11, 2023; published online November 1, 2023.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.:
1:21-MI-55555-JPB

## SUPPLEMENTAL EXPERT RESPONSE REPORT OF JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I.    SUMMARY OF FINDINGS

1.    In this report I respond to the supplemental expert reports from Dr. Bernard Fraga, Dr. Christopher Clark, Dr. Daniel Chatman, and Dr. Taeku Lee. Specifically, I respond to their conclusions about (i) turnout rates; (ii) voting participation by Asian Americans; (iii) minority representation rates in Congress and the Georgia General Assembly; (iv) drop box locations; and (v) rejected absentee ballot rates.

2.    *Turnout rates.* As to turnout rates, I address conclusions from Drs. Fraga and Clark. There are several places where Drs. Fraga and Clark use different data and assumptions to reach different conclusions than mine about overall turnout rates and turnout rates among certain racial groups.



Def EXHIBIT 24
WITNESS Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

3.    Starting with overall turnout, my turnout estimates use each election's reapportionment report, a document from the Georgia Secretary of State's Office based on the contemporary voter file, to calculate the number of votes from each self-reported racial group based on the state's voter file on Election Day. I then calculate the size of each group using census estimates of the citizen voting age population ("CVAP"). Both Dr. Fraga and I agree that the overall turnout rate in the 2024 election was higher than in the 2020 election (Fraga supp. rep., pg. 8).

4.    However, Dr. Fraga's and my estimates of the turnout rate by self-reported racial groups differ because Dr. Fraga applies a procedure to impute the race of voters based on averages across several instances of the voter file. Using this method, Dr. Fraga concludes that turnout declined from 2020 to 2024 among Hispanic and Asian voters (Fraga supp. rep., pg. 8). However, as I explain below, Dr. Fraga's conclusion that turnout decreased for Asian and Hispanic voters depends upon his method imputing fewer votes for Asian and Hispanic voters in 2024 than in 2020.

5.    Additionally, Dr. Fraga limits his analysis to those elections occurring since 2018, even though his procedure for imputing voter race uses voter files from 2016 (Fraga supp. rep., pg. 8). Including the 2016 election—a presidential election year—provides another useful point of comparison to the 2024 election. Using Dr. Fraga's replication data set, I apply his procedure for

2

calculating the turnout rate to the 2016 election. Using this procedure, I find that turnout was *higher* for every self-reported racial group in 2024 than in 2016. Further, the increase in the turnout rates from 2016 to 2024 estimated using Dr. Fraga's procedure was larger in magnitude than the change in turnout rates from 2020 to 2024 that Dr. Fraga reports.

6.    Turning to Dr. Clark's estimated turnout rates among self-reported Black and white registered voters, I first correct errors in Dr. Clark's estimates from the 2022 and 2024 elections. Using these corrected estimates, I show that Dr. Clark's method of estimating turnout rates using the share of *registered voters* who voted risks confusing increases in the share of Georgia citizens who are registered to vote with a declining turnout rate. Since 2010, the number of registered Georgia voters has risen dramatically. In 2010, the number of registered voters was 77.7% of the CVAP, while in 2024 the number of registered voters was 105% of the CVAP—which can occur based on federal limitations on list maintenance. By comparing the rate of voting among registered voters across elections, Dr. Clark confuses changes in the number of voters with the dramatic increase in the number of registered voters. Rather than rely upon the registered turnout rate, the CVAP turnout rates that Dr. Fraga, Dr. Burden, and I report shows the share of voting age citizens who vote. This method of measuring turnout ensures that the increase in Georgia's registration rate does not affect our conclusions about turnout rates. To ensure

the estimates are comparable to all of Dr. Clark's, I extend my turnout estimates for Black votes, white voters, and overall voters in the state of Georgia to include the 2010 and 2012 elections. Doing so, I conclude that Dr. Clark overstates any decline in Black voter turnout in 2024.

7.    *Participation by Asian Americans.*  I also address Dr. Lee's opinion that Asian citizens in Georgia face continued discrimination, noting that he does not address changes in the participation rate among Asian American voters in Georgia elections (Lee supp. rep., pgs. 2–3). I show that Asian voters in Georgia turned out at the highest rate in the 2024 election since at least the 2014 election and that their registration rate, as a share of CVAP, has increased 40.4 percentage points over the same period.

8.    *Minority representation rates.* I also examine Dr. Clark's analysis of representation "parity"—or whether the share of Black legislators representing Georgia is equal to the share of Black Georgia residents. Dr. Clark concludes that Black Georgia residents are underrepresented in the Georgia U.S. House delegation (Clark supp. rep., pg. 2). But the data do not support this conclusion.   Dr. Clark actually finds that Black voters are overrepresented in Georgia's U.S. House delegation. But after finding that Black representation in the U.S. House exceeds parity, Dr. Clark introduces a new and additional standard based on the racial composition of legislators' districts (Clark supp. rep., pgs. 8–9). As I show below, Dr. Clark provides no

4

methodology for applying this standard, for determining when parity has been reached based on district racial composition, or for determining how to compare the new racial-composition-district parity standard with Dr. Clark's seat-share parity standard. Without a methodology, it is impossible to assess his conclusion that there is a lack of parity in Georgia's U.S. House representation based on the composition of Black House members' districts. Dr. Clark also opines that Black Georgia residents are underrepresented in the Georgia state legislature (Clark supp. rep., pg. 9). I show that Dr. Clark's conclusions about the lack of parity in the Georgia state legislature depend upon the measure of the Black share of the population. If I use other reasonable estimates of the Black share of the population, such as the share of the CVAP who identify as Black, I conclude that Black representation exceeds parity in the Georgia House, is not yet achieved in the Georgia Senate, and that overall parity in the Georgia state legislature is almost exactly achieved.

9.    *Dropbox locations*. I next address Dr. Chatman's conclusion that many voters were harmed by the elimination of the drop boxes that were closest to their homes (Chatman supp. rep., pgs. 1–3). For this conclusion, Dr. Chatman provides no data on how voters actually return their absentee ballots or the burdens from those actual trips. Instead, his calculations are based on hypothetical voters returning their ballots using a hypothetical trip. Dr. Chatman also does not consider how voters' access to the U.S. Postal Service

affects the cost of returning their absentee ballot. And Dr. Chatman does not consider whether voters return their ballots on trips while performing other errands or if they return their ballots to more centrally located drop boxes. Without actual information on how voters return their ballots, Dr. Chatman's analysis of the proximity to the nearest drop box does not provide information about the cost of voting.

10. *Rejected absentee ballots.* Finally, I assess Dr. Fraga's analyses of rejected absentee ballots (Fraga supp. rep., pgs. 16–21). I first correct several errors in Dr. Fraga's estimates of the reasons for absentee ballot rejections in the 2024 election, where Dr. Fraga inadvertently eliminates 15% of all rejected absentee ballots in the 2024 election. Regardless of this error, Dr. Fraga and I reach similar conclusions about the relative rate absentee ballots were rejected for identification reasons compared to signature-based reasons in prior elections.

## II.    Estimating Voter Turnout Rates in Georgia Elections

11. Beginning with turnout rates, I respond to the supplemental reports from Drs. Fraga and Clark. As noted, Dr. Fraga and I do not disagree on the overall turnout rates; we both conclude that turnout in 2024 exceeded turnout in previous elections (Fraga supp. rep., pg. 8). But Dr. Fraga concludes that turnout among Asian and Hispanic voters has declined in 2024 relative to 2020 (Fraga supp. rep., pg. 8), and Dr. Clark concludes the same for Black

voters, estimating a steeper decline in Black turnout than either Dr. Fraga or I estimate (Clark supp. rep., pgs. 19–20). I show that Dr. Fraga and Dr. Clark's conclusions are sensitive to the assumptions they make when computing the turnout rates for self-reported racial groups. And, moreover, neither Dr. Fraga nor Dr. Clark provides any causal evidence that SB 202 was responsible for any of the estimated changes in turnout.

12.    Starting with methodology, my reports in this case along with the reports from Dr. Burden, Dr. Fraga, and Dr. Clark report overall turnout rate estimates and turnout rate estimates across self-reported racial groups. In some instances, our estimates of overall turnout rates or self-reported racial group turnout rates differ. To facilitate comparisons across these estimates, Table 1 below summarizes the methodology Dr. Burden, Dr. Fraga, Dr. Clark, and I use to estimate turnout rates across self-reported racial groups. Calculating a turnout rate for a self-reported racial group requires calculating the number of votes (Number of Votes columns in Table 1) from the group and then dividing that by the size of the group (Group Size columns in Table 1). As Table 1 shows, I estimate each group's size using the CVAP estimates from the U.S. census.[1] I then estimate the number of votes from each self-reported

---

[1] Contemporary estimates of the CVAP in 2022 were not available when I wrote my first expert report and estimates of the 2024 CVAP were not available for my sur-rebuttal. To address this issue, I created a projection of the CVAP based on historical

racial group using Georgia's reapportionment report. I use the reapportionment report because it is based on each voter's self-reported race in the voter file at the time of the election. Dr. Burden uses the same data sources for his estimates of self-reported turnout rates.[2]

| Expert Report | Group Size | | Number of Votes | |
|---|---|---|---|---|
| | Citizen Voting Age Population | Registered Voters | Reapportionment Report | Voter File + Imputation |
| Grimmer | ✓ | | ✓ | |
| Burden | ✓ | | ✓ | |
| Fraga | ✓ | | | ✓ |
| Clark | | ✓ | ✓ | |

Table 1: Comparing Methods for Calculating Voter Turnout Across Expert Reports

13.    Dr. Fraga and I agree on estimates of the overall turnout rate: Dr. Fraga found that the 2024 election had the highest turnout rate of any election since at least 2018 (Fraga supp. rep. Table 1; Grimmer supp. rep. Table 2). But Dr. Fraga and I produce different estimates of the turnout rate by self-reported racial group and different estimates of how those turnout rates have changed across elections.

14.    This difference emerges because Dr. Fraga uses a different procedure to classify voters into self-reported racial categories, but not because

---

census data. This only affects my estimates of turnout in the 2022 election in my first report and the 2024 election in my second report.

[2] Dr. Burden and my estimates differ slightly for some elections. One reason for this difference is that Dr. Burden used different estimates of the CVAP for the 2022 election.

Dr. Fraga uses a different measure of the group's size. As explained below, Dr. Fraga's procedure relies on specific assumptions about how voters self-identify their race in the voter file. And I show that Dr. Fraga's conclusions are sensitive to these specific assumptions.

15.    Like Dr. Burden's and my reports, Dr. Fraga uses the CVAP to estimate total group size in each election (Fraga supp. rep., pgs. 5–6).[3] However, unlike Dr. Burden's and my reports, Dr. Fraga infers each voter's self-reported racial category using an imputation procedure. Specifically, Dr. Fraga uses 11 different instances of the Georgia voter file to observe up to 11 self-reports of a voter's race. Dr. Fraga explains: "I take the average proportion of all RACE/ETHNICITY values assigned to each REGISTRATION_NUMBER, excluding values of OT and U. This means each registrant has a value from 0 to 1 for each of the five racial/ethnic groups (WH, BH, HP, AP, and AI), with the sum across the categories equal to 0 (if they never self-identified as one of the five categories) or 1 (if they self-identified at least once with a category)." To justify this procedure, Dr. Fraga states: "This procedure also helps to minimize the effect of any errors in the RACE variable

---

[3] Dr. Fraga adopts my procedure from my first expert report to project self-reported racial group size based on historical CVAP trends. Dr. Fraga's estimates are similar to mine but are based on fewer years of census estimates. In Table 3, I show my conclusions about the direction of change in Asian and Hispanic turnout are unchanged if I use Dr. Fraga's projection of the 2024 CVAP.

value on the voter registration list. For example, in January 2023 I was informed that there were a relatively small number of records erroneously coded as 'White' due to a Department of Driver Services software error. This methodology would allow a previous correct self-report to have some impact in the analysis." For each voter and racial category, Dr. Fraga's procedure estimates the proportion of that voter assigned to that self-reported racial category. Dr. Fraga's final count of the number of votes from a particular self-reported racial group is the sum of the proportion of each voter assigned to that category. Dr. Fraga offers no other analysis or citation to justify this procedure. Additionally, for the 2024 analysis, Dr. Fraga did not update his estimates of each voter's self-reported race using the most recent voter file, other than obtaining the self-reported race of registrants after the 2022 election.

16.   Dr. Fraga's procedure relies on strong assumptions. For instance, this procedure assumes that any voter who identifies, at any point, as American Indian, Asian, Black, Hispanic, or white never intended, nor will ever intend, to identify as "other" or "unknown". In other words, Dr. Fraga supposes that every instance of a voter being identified in the voter file as "other" or "unknown" is an error. So, for example, if a voter identifies as "other" in 10 of Dr. Fraga's voter files and then "Asian" in one voter file, Dr. Fraga will retroactively classify them as a self-reported "Asian" voter in every election he

analyzes. Dr. Fraga's procedure to produce turnout estimates in his Table 1a is based on a similar assumption: Voters who do not report a race must have made an error. In his Table 1a (Fraga supp. rep., pg. 9), Dr. Fraga applies a statistical procedure, known as BISG, to infer voters' race based on their name and location. He applies this procedure to voters who "consistently self-identifying as 'Other' or with 'Unknown' race." In contrast, the procedure I use in my report uses voters' self-reported race, as recorded in the voter file, as the measure of the voter's self-reported race.

17.     As a result of these different methods, Dr. Fraga and I reach different conclusions about turnout rates among self-reported racial groups. In Table 2 below, I compare the components of the turnout estimates from Dr. Fraga and my expert reports for the general elections and self-reported racial groups where we both produce turnout estimates. To produce Table 2, I use Dr. Fraga's replication code and data set to merge his data with the data I use to estimate voter turnout in my reports. The "Race" column contains the self-reported race of the voter, and the "Year" column contains the election year. Notice that the "Denominator, Grimmer" and "Denominator, Fraga" columns are identical in 2018, 2020, and 2022 (indicated with a 0 in the "Den. % Diff" column, which measures the percent difference between the estimates from Dr. Fraga and myself) and very similar in 2024. This reflects that Dr. Fraga and I use the same data in 2018, 2020, and 2022. Dr. Fraga adopted my projection

11

procedure for 2024, although he uses a shorter time series to make his projection.

18.     In the "Numerator, Grimmer" and "Numerator, Fraga" columns, I compare the number of votes Dr. Fraga and I estimate from each self-reported racial group and overall.  Because Dr. Fraga's procedure for inferring a voter's race does not affect the total number of votes, the calculated "Total" number of votes cast from Dr. Fraga and I are similar and, as a result, our estimates of the overall turnout rate are nearly identical.

19.     In the "Turnout Grimmer" and "Turnout Fraga" columns, I show that we both agree that the 2024 election had the highest turnout rate for any election since at least 2018.  Dr. Fraga and I also agree that self-reported Black voters had a lower turnout rate in 2024 than in 2020 and that self-reported white voters had a higher turnout rate in 2024 than in 2020.

| Race | Year | Denominator Grimmer | Denominator Fraga | Den. % Diff | Numerator Grimmer | Numerator Fraga | Num. % Diff | Turnout Grimmer | Turnout Fraga |
|------|------|---------------------|-------------------|-------------|-------------------|-----------------|-------------|-----------------|---------------|
| Asian | 2018 | 195825 | 195825 | 0.000 | 67216 | 73869 | 9.897 | 0.343 | 0.377 |
| Asian | 2020 | 211655 | 211655 | 0.000 | 126815 | 135684 | 6.993 | 0.599 | 0.641 |
| Asian | 2022 | 236570 | 236570 | 0.000 | 80778 | 87464 | 8.276 | 0.341 | 0.370 |
| Asian | 2024 | 254791 | 256342 | 0.609 | 154956 | 161795 | 4.413 | 0.608 | 0.631 |
| Black | 2018 | 2307425 | 2307425 | 0.000 | 1143170 | 1180184 | 3.238 | 0.495 | 0.511 |
| Black | 2020 | 2402130 | 2402130 | 0.000 | 1373543 | 1438119 | 4.701 | 0.572 | 0.599 |
| Black | 2022 | 2470870 | 2470870 | 0.000 | 1041022 | 1118735 | 7.465 | 0.421 | 0.453 |
| Black | 2024 | 2534887 | 2521497 | -0.528 | 1420498 | 1490428 | 4.923 | 0.560 | 0.591 |
| Hispanic | 2018 | 324370 | 324370 | 0.000 | 89123 | 96307 | 8.060 | 0.275 | 0.297 |
| Hispanic | 2020 | 377650 | 377650 | 0.000 | 152069 | 159223 | 4.704 | 0.403 | 0.422 |
| Hispanic | 2022 | 432975 | 432975 | 0.000 | 92751 | 98833 | 6.557 | 0.214 | 0.228 |
| Hispanic | 2024 | 490689 | 500170 | 1.932 | 201514 | 205988 | 2.220 | 0.411 | 0.412 |
| White | 2018 | 4315580 | 4315580 | 0.000 | 2327182 | 2411881 | 3.640 | 0.539 | 0.559 |
| White | 2020 | 4358340 | 4358340 | 0.000 | 2924829 | 3017221 | 3.159 | 0.671 | 0.692 |
| White | 2022 | 4381850 | 4381850 | 0.000 | 2361802 | 2451150 | 3.783 | 0.539 | 0.559 |
| White | 2024 | 4369836 | 4351520 | -0.419 | 3013201 | 3110784 | 3.239 | 0.690 | 0.715 |
| Total | 2018 | 7254695 | 7254695 | 0.000 | 3948946 | 3943855 | -0.129 | 0.544 | 0.544 |
| Total | 2020 | 7482330 | 7482330 | 0.000 | 5023159 | 5013141 | -0.199 | 0.671 | 0.670 |
| Total | 2022 | 7686560 | 7686560 | 0.000 | 3961526 | 3958763 | -0.071 | 0.515 | 0.515 |
| Total | 2024 | 7837650 | 7822143 | -0.198 | 5296620 | 5296558 | -0.001 | 0.676 | 0.677 |

Table 2: Contrasting Turnout Estimates from Grimmer and Fraga Expert Reports

20.    Dr. Fraga and I, however, reach different conclusions about the relative turnout rates of Asian and Hispanic voters in the 2020 and 2024 elections. Using the estimates from my supplemental report, I conclude that turnout among self-reported Asian and Hispanic voters in the 2024 election was higher than in the 2020 general election. Dr. Fraga, relying on his imputation methodology, concludes that "Hispanic turnout was also lower in 2024 (41.2%) than it was in 2020 (42.2%). Asian American/Pacific Islander turnout was likewise lower in 2024 (63.1%) than in 2020 (64.1%)." Fraga supp. rep., pgs. 8–9.

21.    To demonstrate how Dr. Fraga and my conclusions depend upon particular assumptions about how we calculate our turnout rates, I perform a variety of sensitivity analyses in Table 3. A sensitivity analysis is a statistical

procedure that varies the assumptions underlying an estimate to assess how the conclusion may change as those assumptions are changed.[4] To establish a baseline for comparing the "Turnout Grimmer" and "Turnout Fraga" columns in Table 3, I replicate the estimates for Asian and Hispanic voters in 2020 and 2024 found in the "Turnout Grimmer" and "Turnout Fraga" columns in Table 2. Dr. Fraga estimates a slightly different 2024 CVAP than I estimate in my supplemental report. But I reach similar conclusions about the rate of Asian and Hispanic voting in the 2020 and 2024 election if I use Dr. Fraga's estimate of the 2024 CVAP. In the "Grimmer Votes Fraga Den." column, I compute the turnout rate using the count of votes from each racial group using the reapportionment report and then use Dr. Fraga's estimate of the Asian and Hispanic 2024 CVAP. With these estimates I still conclude that Asian and Hispanic turnout was higher in 2024 than in 2020, though the difference is smaller than the estimates from my supplemental report, particularly for Hispanic voters. I find that the 2024 Asian turnout rate was 0.5 percentage points higher than the 2020 Asian turnout rate. And I find that the 2024 Hispanic turnout rate was 0.02 percentage points higher than the 2020 Hispanic turnout rate.

---

[4] *E.g.*, Charles F. Manski, Identification for Prediction and Decision 153 (2009); Paul R. Rosenbaum, *Design Sensitivity in Observational Studies*, 91 Biometrika 153, 155–64 (2004).

| Race | Year | Turnout Grimmer | Turnout Fraga | Grimmer Votes Fraga Den. | Grimmer Votes + 2020 Imp. | Turnout Fraga (1a) | Grimmer + BISG | Grimmer + 2020 BISG |
|------|------|-----------------|---------------|--------------------------|----------------------------|--------------------|----------------|---------------------|
| Asian | 2020 | 0.599 | 0.641 | 0.599 | 0.641 | 0.714 | 0.672 | 0.672 |
| Asian | 2024 | 0.608 | 0.631 | 0.604 | 0.647 | 0.712 | 0.689 | 0.682 |
| Hispanic | 2020 | 0.403 | 0.422 | 0.403 | 0.422 | 0.458 | 0.439 | 0.439 |
| Hispanic | 2024 | 0.411 | 0.412 | 0.403 | 0.422 | 0.451 | 0.450 | 0.448 |

Table 3: A Sensitivity Analysis of How Dr. Fraga's Procedure to Infer Race Affects Conclusions About Hispanic and Asian Turnout in 2020 and 2024

22.    Dr. Fraga's procedure for imputing voters' race adds votes to the total from the reapportionment report and therefore results in a larger number of votes in each election for Asian, Black, Hispanic, and white voters. But Table 2 shows that the relative number of votes Dr. Fraga's procedure adds to the vote total from the reapportionment report varies across elections and across self-reported racial groups. In the "Num % Diff" column, I calculate the percentage increase in the number of votes from Dr. Fraga's procedure relative to the number of votes in the reapportionment report. This column shows that Dr. Fraga's procedure results in a relatively consistent 3.2%-3.6% increase in white votes over the number of votes in the reapportionment report for the 2018, 2020, 2022, and 2024 elections. For other self-reported racial groups, however, the relative increase in votes is more variable across the elections. For Asian voters there is a 4.4% (in 2024) to 9.9% (in 2018) increase relative to the number of votes in the reapportionment report, for Black voters there is a 3.2% (in 2018) to 7.5% (in 2024) increase relative to the number of votes in the reapportionment report, and for Hispanic voters there is a 2.2% (in 2024) to

8.1% (in 2018) increase relative to the number of votes in the reapportionment report.

23.     In the "Grimmer Votes + 2020 Imp." column in Table 3, I show that if Dr. Fraga's procedure produced a consistent rate of imputing votes, then his estimates would show that Asian and Hispanic turnout was higher in 2024 than in 2020. In 2020, Dr. Fraga's estimated number of votes from Asian voters was 6.993% higher than the number of Asian votes from the reapportionment report, but in 2024, Dr. Fraga's estimated number of votes from Asian voters was 4.413% higher than the number of Asian votes from the reapportionment report (Table 2, "Num. % Diff" column). If I suppose, instead, that Dr. Fraga's method produced the same increase in votes over the reapportionment report in 2024 as in 2020 (6.993%) and then use Dr. Fraga's projection of the CVAP in 2024 as the denominator, Dr. Fraga's estimates would find that Asian turnout in 2024 increased 0.6 percentage points over the turnout rate in the 2020 election (64.7% in 2024 , 64.1% in 2020).

24.     There is a similar pattern for the Hispanic turnout rate. In 2020, Dr. Fraga's estimated number of votes from Hispanic voters was 4.704% higher than the estimated number of votes from Hispanic voters in the reapportionment report, but in 2024 Dr. Fraga's estimated number of votes from Hispanic voters was 2.220% higher than the number of Hispanic voters from the reapportionment report (Fraga supp. rep., pg. 8). If I suppose that

16

the increase in the number of Hispanic votes from Dr. Fraga's procedure over the reapportionment report is the same in 2024 as in 2020 (4.704%) and again use Dr. Fraga's estimate of the CVAP as the denominator, then Dr. Fraga's estimates would find that Hispanic turnout in 2024 had a slight increase of 0.02 percentage points over the 2020 turnout rate (42.18% in 2024 compared to 42.16% in 2020).

25.    I also performed a sensitivity analysis of Dr. Fraga's conclusions about turnout using the evidence in his Table 1a and reach a similar conclusion: Dr. Fraga's conclusions about the relative turnout rates of Asian and Hispanic voters depends upon his procedure for inferring race from the voter file, but not from his procedure to infer race from some voters' names and locations. In Table 1a, Dr. Fraga combines his procedure for inferring race from the voter file with BISG (Fraga supp. rep., pg. 9). He applies BISG to infer the race of voters who identify as "Other" or "Unknown" in all voter files in which they appear. For the purposes of comparison, I present Dr. Fraga's estimates for the Asian and Hispanic turnout rates using this procedure in the "Turnout Fraga (1a)" column. Using Dr. Fraga's replication code, I isolate the number of votes the BISG procedure added to the Asian and Hispanic vote total for the 2020 and 2024 election. This enables me to assess the independent effect of adding votes based on inferring race based on names and location, separate from Dr. Fraga's procedure for inferring race from the voter file.

26.    In the "Grimmer + BISG" I add the inferred Asian and Hispanic votes to the vote total I obtained from each election's reapportionment report and then calculate the turnout rate using my estimates of the 2024 CVAP. Including the votes from Dr. Fraga's BISG estimates does not affect my conclusion that turnout was higher for Asian and Hispanic voters in 2024 than in 2020. I find that Asian turnout in 2024 was 1.7 percentage points higher in 2024 than in 2020 and that Hispanic turnout in 2024 was 1.1 percentage points higher in 2024 than in 2020. I also find that there is variability in the rate the BISG adds votes across elections, but that this does not affect my conclusion. In the "Grimmer + 2020 BISG" I find that if I force the same percent change in both elections, I still conclude that Asian and Hispanic voter turnout was higher in 2024 than in 2020.

27.    This sensitivity analysis shows that conclusions about the relative turnout rate of Hispanic and Asian voters in 2024 and 2020 using Dr. Fraga's imputation method depends upon the relative rate votes are imputed across elections, which is dependent on the voter files available and the number of times voters appear in the voter files.

28.    The 2018 general election is the earliest election where Dr. Fraga reports turnout estimates, but his procedure for inferring race includes several voter files from 2016 (Fraga supp. rep., pg. 8). Using his replication code, I was able to apply his method to the 2016 election and the resulting turnout

estimates for Asian, Black, Hispanic, and white voters are found in Table 3. I continue using the same denominator, the census estimates of the 2016 CVAP. I then merge Dr. Fraga's self-reported race estimates with the voter history file from the 2016 election, and I report the calculated number of votes from each self-reported racial group in the "Numerator, Fraga" column.

29.    Applying Dr. Fraga's method to 2016, I find that the turnout rate among every self-reported racial group was *higher* in 2024 than in 2016. Further, the increase from 2016 to 2024 was larger in magnitude than the decline that Dr. Fraga estimated for Asian, Black, and Hispanic voters from 2020 to 2024. I present the turnout rate estimates from Dr. Fraga's procedure in the "Turnout Fraga" column and I present the estimates from my procedure in the "Turnout Grimmer" column. From 2016 to 2024, Dr. Fraga's procedure estimates that turnout among Asian voters increased 21.5 percentage points, while Dr. Fraga estimated a 1 percentage point decline from 2020 to 2024 in Asian turnout. From 2016 to 2024, Dr. Fraga's procedure estimates a 5.3 percentage point increase in Black turnout, while Dr. Fraga estimated a 0.8 percentage point decrease in the Black turnout rate from 2020 to 2024. From 2016 to 2024, Dr. Fraga's procedure estimates an 8.2 percentage point increase in Hispanic turnout, while Dr. Fraga estimated a 1 percentage point decrease in Hispanic turnout from 2020 to 2024. And, from 2016 to 2024, Dr. Fraga's procedure estimates a 10.3 percentage point increase in white turnout, while

19

Dr. Fraga estimated a 2.3 percentage point increase in white turnout from 2020 to 2024.

| Race | Denominator | Numerator Grimmer | Numerator Fraga | % Diff | Turnout Grimmer | Turnout Fraga |
|------|-------------|-------------------|-----------------|--------|-----------------|---------------|
| Asian | 177935 | 65693 | 74083 | 12.772 | 0.369 | 0.416 |
| Black | 2212975 | 1151949 | 1189893 | 3.294 | 0.521 | 0.538 |
| Hispanic | 290840 | 88553 | 98832 | 11.607 | 0.304 | 0.340 |
| White | 4285130 | 2529810 | 2621962 | 3.643 | 0.590 | 0.612 |

Table 4: Applying Fraga's Method to 2016 and then Contrasting Turnout Estimates from Grimmer's Report

30. As noted earlier, Dr. Clark also opined on turnout rates (Clark supp. rep., pg. 7). In Table 5, I contrast my estimates with estimates from Dr. Clark's report. Dr. Clark's turnout estimates also use the number of votes from white and Black voters as reported in reapportionment reports as the numerator. But Dr. Clark uses the number of *registered* voters as the denominator (Clark supp. rep., pg. 6). While replicating Dr. Clark's estimates, I identify and correct several errors and in Table 5 I bold places where I have estimates that differ from Dr. Clark's. First, in 2022, Dr. Clark only used voters with an "active" registration status, while in every other year Dr. Clark used both active and inactive registered voters. To reach this conclusion, I note that I replicate the estimates from Dr. Clark's report exactly when I take the number of votes from the reapportionment report and then divide by the number of active voters from the 2022 registration file provided by counsel or

using the 2022 turnout data hub from the Georgia secretary of State's office.[5] To ensure Dr. Clark's estimates from the 2022 election align with his stated estimates, I recalculate the registered voter turnout rate with all registered voters in the denominator.  Dr. Clark estimates that 56.9% of registered Georgia voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 50.5%. Dr. Clark also estimates that 51.3% of registered Black voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 45.0%. And Dr. Clark also estimates that 64.7% of registered white voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 58.3%.  Dr. Clark also claims that, "[a]s for turnout data discussed below, since my first report, the state of Georgia has changed the election data it provides online." Clark supp. rep., pg. 3.  Dr. Clark then uses data from the 2024 turnout hub.  It is unclear why Dr. Clark does not continue to use the reapportionment report, which was available and provided by counsel. Dr. Clark claims that 54.3% of registered Black voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 56.9%. Dr. Clark also claims that 69.6% of registered white voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 72.3%.  And Dr. Clark claims that 61.7% of registered Georgia voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 64.2%.

---

[5] *Data Hub - November 8, 2022 General Election*, Ga. Sec. State, https://sos.ga.gov/data-hub-november-8-2022-general-election (last visited July 11, 2025).

I also extend my turnout estimates for Black, white, and Georgia voters overall to 2010 and 2012 to make my estimates comparable to Dr. Clark's.

| Race | Year | Denominator Grimmer | Denominator Clark | % Diff | Votes | Turnout Grimmer | Turnout Clark |
|------|------|---------------------|-------------------|--------|-------|-----------------|---------------|
| Black | 2010 | 1951560 | 1470160 | -24.667 | 740997 | 0.380 | 0.504 |
| Black | 2012 | 2040645 | 1609984 | -21.104 | 1168287 | 0.573 | 0.726 |
| Black | 2014 | 2125015 | 1843725 | -13.237 | 748592 | 0.352 | 0.406 |
| Black | 2016 | 2212975 | 2048904 | -7.414 | 1151949 | 0.521 | 0.562 |
| Black | 2018 | 2307425 | 2121324 | -8.065 | 1143170 | 0.495 | 0.539 |
| Black | 2020 | 2402130 | 2290365 | -4.653 | 1373543 | 0.572 | 0.600 |
| Black | 2022 | 2470870 | **2312592** | -6.406 | 1041022 | 0.421 | **0.450** |
| Black | 2024 | 2534887 | **2498277** | -1.444 | **1420498** | 0.560 | **0.569** |
| White | 2010 | 4139045 | 3110275 | -24.855 | 1738521 | 0.420 | 0.559 |
| White | 2012 | 4202775 | 3170967 | -24.551 | 2399345 | 0.571 | 0.757 |
| White | 2014 | 4248965 | 3474273 | -18.232 | 1648927 | 0.388 | 0.475 |
| White | 2016 | 4285130 | 3727549 | -13.012 | 2529810 | 0.590 | 0.679 |
| White | 2018 | 4315580 | 3742464 | -13.280 | 2327182 | 0.539 | 0.622 |
| White | 2020 | 4358340 | 4029156 | -7.553 | 2924829 | 0.671 | 0.726 |
| White | 2022 | 4381850 | **4048728** | -7.602 | 2361802 | 0.539 | **0.583** |
| White | 2024 | 4369836 | **4166708** | -4.648 | **3013201** | 0.690 | **0.723** |
| Total | 2010 | 6476090 | 5032354 | -22.293 | 2622527 | 0.405 | 0.521 |
| Total | 2012 | 6693990 | 5360701 | -19.918 | 3908500 | 0.584 | 0.729 |
| Total | 2014 | 6882880 | 6053385 | -12.052 | 2597003 | 0.377 | 0.429 |
| Total | 2016 | 7063805 | 6713531 | -4.959 | 4161846 | 0.589 | 0.620 |
| Total | 2018 | 7254695 | 7006952 | -3.415 | 3948946 | 0.544 | 0.564 |
| Total | 2020 | 7482330 | 7641351 | 2.125 | 5023159 | 0.671 | 0.657 |
| Total | 2022 | 7686560 | **7840528** | 2.003 | 3961556 | 0.515 | **0.505** |
| Total | 2024 | 7837650 | **8244553** | 5.192 | **5296620** | 0.676 | **0.642** |

Table 5: Contrasting Turnout Estimates from Grimmer and Clark Expert Reports

31.    Table 5 demonstrates that the number of registered voters in Georgia has grown faster than the CVAP over the past 14 years. Overall, in 2010 the number of registered voters was 77.7% of the Georgia CVAP, while in

2024 the number of registered voters was 105% of the Georgia CVAP.[6] There is a similar increase in the share of the CVAP registered to vote for Black and white citizens in Georgia. In 2010, the number of registered Black voters was 75.3% of the Black CVAP, while in 2024 the number of registered Black voters was 98.6% of the Black CVAP. Similarly, in 2010 the number of registered white voters was 75.1% of the white CVAP, while in 2024 the number of registered white voters was 95.4% of the white CVAP. Comparing turnout among registered voters across years blends the changes in the number of voters turning out and the number of voters who are registered to vote.

32.    Rather than use turnout among registered voters, I instead extend my estimates of the white and Black turnout rate to 2010 and 2012. I continue to find that the 2024 election was the highest turnout rate election in Georgia overall and for white voters. Among Black voters, turnout was higher in 2012 than in any other election. In 2010, turnout among Black voters was higher than in 2014, but lower than in 2012, 2016, 2018, 2020, 2022, or 2024.

## II.    Asian American Voter Participation in Georgia

33.    Turning to voter participation by Asian voters, Dr. Lee's supplemental report focuses on the treatment of Asian American citizens in

---

[6] The number of registered voters can exceed the CVAP because inactive voters remain on the registration list until they are allowed to be removed under the federal National Voter Registration Act.

Georgia, arguing that, "[i]f anything, evidence shows mounting suspicions about Americans of Asian descent, consistent with and further supporting the conclusion in my previous expert report that Asian Americans in Georgia continue to face discrimination and adverse treatment." Lee supp. rep., pg. 3. Dr. Lee's report focuses on evidence from public opinion surveys and news reports of Asian American discrimination. He does not consider evidence about Asian American participation in the 2024 election.

34.    I find that Asian American turnout has increased in Georgia elections. In my supplemental report, I find that the turnout rate among Asian American voters in Georgia was the highest since at least 2014. In 2016, I estimate that 36.9% of Asian voters cast a ballot in the presidential election. In 2020, I estimate a turnout rate of 59.9% among Asian voters, while in 2024 the turnout rate among Asian American voters was 60.8%. Using the estimates of Asian turnout rates from Table 2 in my supplemental report, from 2016 to 2024, there has been a 23.9 percentage point increase in the Asian American turnout rate. This constitutes a 65% increase in the Asian American turnout rate.

35.    The number of Asian Americans who have registered to vote has also increased over this same period. In 2014 94,500 self-reported Asian citizens in Georgia were registered to vote, constituting 59.2% of the Asian

CVAP. In 2024 253,710 self-reported Asian citizens in Georgia were registered to vote, constituting 99.6% of the Asian CVAP.

## III.  Dr. Clark's Parity Estimates

36.    I next consider Dr. Clark's conclusions about whether the share of legislators representing Georgia in Federal and state legislatures matches the share of Black Georgia residents.  Applying Dr. Clark's own definition of parity, I find that Black Georgia residents exceed parity in representation in the Georgia U.S. House delegation. I also find that Dr. Clark's conclusions about parity in the Georgia state legislature depends on the particular measure he uses of the proportion of the Georgia population who identifies as Black.

37.    In his supplemental report, Dr. Clark computes a "parity" statistic (Clark supp. rep., pg. 8).  As Dr. Clark explains, he computes "the Black representation ratio, which is measured as the Black seat share relative to the Black population share. To calculate the Black representation ratio, the Black seat share is divided by the Black population share. If the number is below 1, Blacks are underrepresented; if the number is above 1, Blacks are overrepresented. If the score is 1, then Blacks are represented at a rate that reflects the group's population share." Clark, supp. rep., pg. 8.

38.    Dr. Clark finds that in the U.S. House of Representatives delegation for Georgia, "the Black representation ratio is 1.08 (35.7 percent / 33.2 percent)." Clark supp. rep., pg. 9.  Dr. Clark, however, goes on to argue

that Black representatives in Congress "overwhelmingly represent majority-Black districts or at least districts with sizable Black populations." Dr. Clark opines that this shows that "electing Black members virtually requires an outright majority Black population. Electoral opportunities are thus constrained for Black Georgians who seek to represent the state in the U.S. House of Representatives. And this rebuts any argument that Black elected officials no longer face barriers to elected office in the state." Clark supp. rep., pg. 9.

39.    It is unclear what Dr. Clark's methodology is for including the racial composition of districts when determining whether Black citizens are represented at "a rate that reflects the group's population share." Using his own definition of the "Black representation ratio," he would conclude that Black citizens are overrepresented in the US House delegation. Dr. Clark dismisses this conclusion, instead implying in his supplemental report that a critical test of parity in representation is the racial composition of a legislator's district. Yet, Dr. Clark provides no formal metric to assess how the racial composition of a district relates to opportunities for representation from Black elected officials, nor does Dr. Clark explain how to balance his district racial composition test with his seat-share parity test. Instead, Dr. Clark observes the racial composition of Black members of Congress and then, based on this correlation, concludes that this is evidence of constraint on political

26

opportunity (Clark supp. rep., pgs. 8–10). Without a clear methodology to move from Dr. Clark's correlation to this conclusion. I am unable to assess the reliability of this analysis.

40.    Dr. Clark also examines whether there is parity in the Georgia state House and Senate, finding that "In the House, 32.8 percent of members are Black. This means the Black representation ratio in that chamber is 0.99. In the state's upper chamber, the State Senate, 30.4 percent of members are Black. This means the representation ratio in that chamber is 0.91. Across the whole Georgia General Assembly, the Black seat share is 32.2 percent, meaning the Black representation ratio is 0.97. These numbers highlight how Black Georgians continue to be underrepresented in the state legislature as compared to their population share." Clark supp. rep., pg. 9. Dr. Clark does not provide an analysis of the racial composition of the state House and state Senate districts in Georgia or how that relates to the opportunity for Black representation in the Georgia House or Senate.

41.    According to Dr. Clark's estimates, if a single additional Black legislator were elected to the Georgia House, Black citizens would be slightly overrepresented. This is because if an additional Black legislator were elected, then 60 out of 180 House members would identify as Black, which exceeds Dr. Clark's estimate that the Black share of the Georgia population is 33.2%. If Dr. Clark's implicit normative benchmark is a legislature that reflects the

racial composition of Georgia, it is unclear what standard he uses to adjudicate issues with the discrete number of seats at the parity threshold. If, for example, he argued that parity for Black representation could only occur with 60 out of 180 seats, then he must necessarily be arguing that some other group must have representation below parity.

42.    Dr. Clark's calculations, and his conclusions about parity, depend on the particular estimate of the Black share of the population that he uses. For example, if he instead uses the Black share of the CVAP population in Georgia he would conclude that Black representation achieves almost perfect parity in the Georgia state legislature. Using the 2023 CVAP, I find that 32.2% of Georgia citizens of voting age identify as Black. Using this as a baseline and applying Dr. Clark's Black representation statistic, I find a score of 1.02 in the State House, a Black representation statistic of 0.94 in the State Senate, and an overall Black representation statistic of 0.999993 (because $76/236 = 0.322033$ and the Black share of the CVAP is 0.322036).

## IV.    "Travel Burdens" to Drop Boxes

43.    I also consider Dr. Chatman's conclusion that the elimination of a voter's closest drop box necessarily imposes a burden on that voter's ability to return an absentee ballot (Chatman supp. rep., pgs. 1–2, 23). Dr. Chatman's conclusion is not based on any actual data about voters or trips to return ballots

and therefore is not useful in assessing Georgia's voters' cost of returning their ballot.

44.    Dr. Chatman performs an analysis of "the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2024." Chatman supp. rep., pg. 1. To perform this analysis Dr. Chatman assesses the average travel time to the nearest drop box for all Georgia voters. He does not include any information about any actual behavior of Georgia voters.

45.    Dr. Chatman's report does not consider the access voters have to the U.S. Postal Service (USPS) to return ballots. The USPS is a reliable option for voters to return their absentee ballots. The USPS has published data from its performance during the 2024 election, which shows the USPS is able to deliver a large share of absentee ballots to election officials quickly. According to official USPS statistics "The agency successfully processed, transported and delivered 99.88 percent of ballots from voters to election officials within seven days, and 99.64 percent within five days" and that "the Postal Service successfully returned 97.73 percent of ballots from voters to local election officials in fewer than three days."[7] Further the USPS states that "on average,

---

[7] U.S. Postal Serv., *U.S. Postal Service Releases 2024 Post-Election Analysis Report Detailing the Successful Efforts Taken to Deliver the Nation's Election Mail Securely and Effectively*, Nat'l News, (Dec. 2, 2024), https://tinyurl.com/5n8wtn8n.

the Postal Service delivered ballots from voters to election officials within one day."[8]

46.    Dr. Chatman also supposes that voters will use the nearest drop box in a standalone trip to return their ballots, rather than using a centrally located drop box while performing other errands or activities. In my first expert report (Grimmer rep., ¶ 143), I use the SPAE survey to show that absentee voters in Georgian often return absentee ballots to drop boxes while performing other errands. And, using actual ballot return data from Douglas County, I find that only 22% of drop box voters use the nearest drop box to return their ballot.

## V.    Contrasting Estimates in the Rate Absentee Ballots were Rejected for Identification Reasons in the 2024 election.

47.    Finally, I correct errors in Dr. Fraga's calculations in the absentee-ballot rejection rates.  With these errors in place, Dr. Fraga concludes that there was a lower overall rejection rate than I identify in my supplemental report.

48.    In my first expert report and my supplemental report, I examine the rate that mail-in ballots were rejected for various reasons during, before, and after the passage of SB 202 (Grimmer rep., ¶¶ 12, 16, 88–101, 171–72; Grimmer supp. rep., ¶¶ 3, 49–63).   Dr. Fraga's supplemental report also

---

[8] *Ibid.*

examines the rate mail-in ballots were rejected in the 2024 election, but he found generally lower rejection rates than my report (Fraga supp. rep., pg. 17). This is because Dr. Fraga inadvertently discarded 701 mail-in ballots that were rejected. This occurred because Dr. Fraga restricted his analysis to absentee-ballot applications with an accepted "A" Application Status, which eliminated 580 absentee ballots with a blank application status and 121 absentee ballots with status "R" (Fraga supp. rep., pg. 17–20). Despite not having an "A" application status, there is strong evidence that all 701 of these rejected mail-in ballots were issued. All 701 ballots with either a blank application status or rejected application status have a ballot issue date and all have a ballot return date. I also find that all 701 absentee ballots have a Ballot Status of "R" indicating that they were rejected. And the codes provided for these rejections are consistent with the standard codes for a ballot rejection, rather than the free form memos used for application rejections.

49.    In Table 6, I replicate the estimates from Dr. Fraga's Table 4 ("Share Rejected, Fraga") and provide the corresponding estimates including the 701 missing ballots from Dr. Fraga's report.

| Rejection Reason | Share Rejected Grimmer | Share Rejected Fraga |
|---|---|---|
| Ballot Received After Deadline | 0.01190 | 0.01160 |
| Incorrect Id Information | 0.00151 | 0.00094 |
| Ineligible Elector | 0.00004 | 0.00004 |
| Invalid Signature | 0.00038 | 0.00029 |
| MIDR - Id Not Provided | 0.00007 | 0.00004 |
| Missing Id Information | 0.00259 | 0.00139 |
| Missing Signature | 0.00074 | 0.00040 |

Table 6: Contrasting the Share of Rejected Ballots from Grimmer and Fraga Expert Reports

50. Dr. Fraga's Table 6 also reports the rejection rate for identification reasons in the 2018, 2020, 2022, and 2024 elections, which I also report in Table 4 of my supplemental report. Dr. Fraga estimates a substantially higher rejection rate for identification reasons in 2018 than I find in my sur-rebuttal Table 4. This is because Dr. Fraga inadvertently attributes errors on the Oath envelope to voters missing identification. This can occur because, in 2018, Georgia election officials did not use a standard system to classify voters' errors. According to my classification, 52 of the status reasons that Dr. Fraga classifies as due to identification reasons are actually due to errors on the oath envelope or error in a voter's signature.[9] Altogether, errors on the oath

---

[9] The 52 Status reasons that Dr. Fraga classifies as rejections due to ID that are actually rejections due to errors on the Oath envelope are: "ADDRESS AND YOB MISSING", "ADDRESS DIDN'T MATCH", "ADDRESS MATCH", "BIRTHDATE DOES NOT MATCH", "BIRTHDAY DIDN'T MATCH", "BIRTHDAY DOESNT MATCH", "CURRENT YEAR AS YEAR OF BIRTH", "CURRENT YEAR AS YOB", "CURRENT YEAR AS YOB, RES ADDR NOT A MATCH", "CURRENT YEAR AS YOB, SIG MISSING", "DATE OF BIRTH DOES NOT MATCH AND NO", "DATE OF BIRTH DOES NOT MATCH VR CARD ON FILE", "DIFFERENT ADDR RECORDED", "DOB DOESN'T MATCH", "DOB INCORRECT", "DOB IS NOT A

envelope constitute 457 of the 509 ID rejections Dr. Fraga identifies in 2018. After I correct these misclassifications, Dr. Fraga and I reach nearly identical counts of the number of ballots rejected for identification reasons in 2018: I estimate 56 ballots were rejected for ID related reasons, while Dr. Fraga estimated 52 ballots were rejected for ID reasons.

51.    Regardless of the differences in our estimates of the rejection rate reasons for absentee ballots, Dr. Fraga and I reach similar conclusions about the rate absentee ballots were rejected for identification reasons in the 2024 election. I estimate that absentee ballots from white voters had a 0.2 percentage point lower rejection rate for identification reasons than Black voters in the 2024 election. Using Dr. Fraga's uncorrected estimates from his supplemental report Table 6, he finds that absentee ballots from white voters

---

MATCH", "DOB NOT A MATCH", "INCORRECT ADDRESS", "INCORRECT ADDRESS AND COUNTY IN OATH", "INCORRECT ADDRESS ON OATH", "INCORRECT BIRTH DATE IN OATH", "INCORRECT DATE OF BIRTH IN OATH", "INCORRECT DOB", "INCORRECT RESIDENTIAL ADDRESS", "INVALID BIRTHDAT", "LEFT DATE OF BIRTH BLANK", "LEFT DOB BLANK ON OATH", "NO ADDRESS", "NO DOB", "NO RESIDENTIAL ADDRESS", "NON MATCHING ADDRESS ON OATH ENVELOPE", "OATH DOES NOT REFLECT RESIDENCE ADDRESS", "RES ADDR AND YEAR OF BIRTH MISSING", "RES ADDR MISSING", "RES ADDR NOT A MATCH", "RES ADDR, YOB MISSING", "RES ADR AND YOB MISSING", "RESI ADDR DID NOT MATCH", "RESI ADDR NOT A MATCH", "STREET ADDRESS MISSING", "WRONG ADDRESS", "WRONG COUNTY LISTED IN OATH", "WRONG DATE OF BIRTH", "WRONG DATE OF BIRTH ON OATH ENVELOPE", "WRONG DOB", "WRONG INFORMATION", "WRONG RESI ADDR", "YEAR OF BIRTH MISSING", "YEAR OF BIRTH NOT A MATCH", "YOB AND RES ADDR MISSING", "YOB NOT A MATCH", "YOB, ADDR MISSING".

had a 0.05 percentage point lower rejection rate for identification reasons than Black voters. My estimates of the Black-white rejection gap for identification reasons in the 2024 election and Dr. Fraga's uncorrected estimates are smaller than the Black-white gap for signature reasons in the 2016 election and Dr. Fraga's uncorrected estimates of the Black-white gap in rejection rates for identification reasons is smaller than the Black-white gap in rejection rates for signature reasons in the 2018 and 2020 elections.

## VI.    Conclusions

52.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on July 14, 2025

Justin Grimmer, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

## SUPPLEMENTAL EXPERT REPORT OF JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I.   PREAMBLE MATERIAL AND SUMMARY OF FINDINGS

1.    In Georgia's first presidential election since the passage of SB 202, the 2024 general election, overall voter turnout was higher than in any election since at least 1980. Updating my analysis of turnout rates across self-reported racial groups, I calculate that in the 2024 general election American Indian, Asian, Hispanic, and white voters had their highest turnout rate in any statewide general election since at least 2014. The turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election, and higher than the 2014, 2018, or 2022 elections. I use the Census Bureau's Current Population Survey (CPS) November supplement to compare the self-reported turnout rate of Black voters in Georgia with the turnout rate



Def EXHIBIT 25
WITNESS: Chatman, V2
DATE: 8-6-25
Anrae Wimberley, CSR 7778

of Black voters in other states. I find that the change in turnout in Georgia among Black voters is similar to the change in Black voter turnout nationwide, with Black turnout lower nationwide in 2024 compared to 2020.

2.    In the 2024 election Georgia voters continued their shift towards early in-person voting and away from Election Day voting. In the 2024 election 71.1% of all ballots were cast using early in-person voting ("early voting"), the highest share of ballots cast during early voting for any election since at least 2014. Every self-reported racial group had their highest share of ballots cast using early voting during the 2024 election. As the share of ballots cast during early voting has increased, the share of ballots cast on Election Day has decreased. Overall, 23.4% of all ballots were cast on Election Day in 2024. The only election with a smaller share of ballots cast on Election Day than the 2024 election was the 2020 election. About 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022.

3.    Using data from the 2024 election I update my analysis of the rate mail-in absentee ballots are rejected and the rate mail-in ballots were rejected for arriving after the deadline or because of an issue verifying the voter's identity. In the 2024 election 1.7% of all returned mail in ballots were rejected. This is a lower rate than in 2016 and 2018, but a higher rejection rate than in

2020 and 2022. In the 2024 election I calculate that a smaller share of mail-in ballots were rejected for arriving late than in 2016 and 2018, but a larger share than in the 2020 or 2022 elections. I find that the rate mail-in ballots were rejected for identification reasons in the 2024 election were similar to, but higher than, the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections. There is no consistent relationship between the Black-white gap in rejection rates for signature reasons in 2016, 2018, and 2020 and the Black-white gap in rejections rates for identification reasons in 2024. The Black-white gap in rejections for identification reasons in 2024 was smaller than the Black-white gap for signature reasons in 2016, but the 2024 Black-white identification gap was larger than the 2018 and 2020 Black-white signature gap.

4.    The 2024 election saw the largest share of votes cast on the weekend using early in-person voting in any election since at least 2014. During the 2024 election 7.7% of all votes were cast on the weekend using early in person voting. Weekend voting rates were up for every group in the 2024 election: across every self-reported racial group the 2024 election saw the largest share of ballots cast on the weekend using early in person voting. And every racial group but white voters had the largest share of ballots cast on Sunday for any election since at least 2014. For example, in the 2024 election 2.1% of all votes from Black voters were cast on Sunday using early in-person

voting and 8.3% of all ballots from Black voters were cast on the weekend using early-in person voting.

5. Using data from the 2024 election I updated my analysis of the number and share of voters who cancel their mail-in ballots and then vote either early in person or on Election Day. In the 2020 election over 289,000 voters canceled their mail in ballot and then voted early in-person or on Election Day. In the 2024 election a smaller share and number of mail in ballots were canceled and subsequently voted early in person or on Election Day than in the 2020 election. But, the 2024 election saw a larger share and number of canceled ballots voted in person than in the 2014, 2016, 2018, or 2022 election.

6. I find that the two-post SB 202 elections—2022 and 2024— had smaller shares of voters who waited more than 30 minutes to vote than in the 2016, 2018, or 2020 election. Using the Cooperative Election Study (CES), the same data source Dr. Burden and Dr. Pettigrew used to measure line length in their expert reports, I find that there was a decline in the share of voters who report waiting more than 30 minutes to vote in the 2022 and 2024 election compared to the 2016, 2018, or 2020 elections. According to the CES, overall in the 2022 election 5.3% of voters in Georgia report waiting more than 30 minutes to vote and in the 2024 election 6.3% of voters in Georgia report waiting more than 30 minutes to vote. The two-post SB 202 elections also saw

a decline in the share of Black and white voters who report waiting more than 30 minutes to vote compared to the voters from the same self-reported groups in the 2016, 2018, or 2020 elections. Only the 2014 election had a smaller share of voters who report waiting more than 30 minutes and the difference between the share of voters who report waiting more than 30 minutes in the 2014 and the 2022 and 2024 elections is not statistically significant. A different publicly available survey of Georgia voters after the 2024 election confirms that a smaller share of voters report waiting more than 30 minutes than reported in the 2016, 2018, or 2020 CES.

7.    SB 202 altered the application window for mail-in absentee ballots and verified voters' identity using identification, like a driver's license, instead of a signature. Using the Absentee Voter History File I find that the vast majority of mail-in ballot applications conformed to the SB 202 application window. Overall, 0.61% of mail-in ballot applications were rejected for arriving after the deadline and 0.16% were rejected for arriving before the application window opens. I calculated that 0.37% of mail-in ballot applications were rejected for identification reasons.

8.    SB 202 also left in place the "roll over" list for mail-in ballot voters 65 and older, self-reported disabled voters, overseas, and military voters. The roll over list enables Georgia voters to apply for an absentee ballot once in an election cycle and receive ballots for all subsequent elections. I find that 43.7%

of all mail in absentee ballot applications came from voters on the roll over list, including 76.6% of all voters 65 and older.

9.     In the 2024 election self-reported rates of drop box use among mail in voters were similar to the self-reported rate of drop box among mail in voters in the 2020 election. I used the 2024 CES survey to estimate the self-reported drop box use rate. I find that overall use of drop boxes among mail-in voters was similar in the 2020 and 2024 elections, but lower in the 2022 election. I find that there is no consistent relationship between race and self-reported drop box use among mail in voters. In the 2020 and 2022 elections white mail-in voters were more likely to self-report returning their ballot using a drop box, but in the 2024 election Black mail-in voters were more likely to self-report returning their ballot using a drop box.

## II.    VOTING IN GEORGIA

10.    To measure voter turnout in Georgia I follow the same procedure I used in my first expert report and rely upon state provided turnout statistics. Specifically, I measured 2024 turnout using data on the votes cast in individual precincts and counties, which I then aggregated to calculate the overall turnout and voter turnout by self-identified racial group.[1]

---

[1] For the 2024 election I used the file "FINAL Reapportionment Report 02212025 November 2024 General.xlsx" which was provided to me by counsel. For the 2022 general election, I used the Statewide.xlsx file from the "SSVRZ422 2022" zip file and the "Precinct turnout by race" folder, which was

11.    To assess differences across racial groups I follow the same procedure as in my first expert report and rely upon self-reported racial identity, as tallied in the state turnout statistics. Voters self-identify as American Indian, Asian or Pacific Islander (which I refer to as Asian hereafter), Black, Hispanic, white, Other, or the race is "Unknown". In this report, like my first expert report, I focus on American Indian, Asian, Black, Hispanic, and white voters.

12.    I calculate the turnout statistics in this section primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP. Since I wrote my first expert report the 2022 CVAP estimates have been released, so I use the 2022 CVAP for Georgia as the denominator in my estimates of the 2022 CVAP turnout rate. The Census Bureau has not yet released the 2024 estimates of the CVAP, so I use two different approaches to estimate the 2024 CVAP. First,

---

obtained by counsel. In the 2020 election, I used data downloaded from the secretary of state's data portal, specifically the "General Election 2020 Active, Inactive Voters by Race, Gender_County.xlsx" file. For the 2018 and 2016 election I used the file "SSVRZ376R3.xlsx" which I downloaded from the Secretary of State's office website. The downloaded turnout data from the Secretary of State's website was missing data for 2014, so counsel obtained the file "November 2014 General Election - Active, Inactive Voters by Race Gender - (COUNTY).xlsx". For the January 2021 runoff I used the "General Election Runoff 2021 Active, Inactive Voters by Race, Gender_County.xlsx" file downloaded from the Secretary of State's office website and for the December 2022 election I used the "Statewide.xlsx" which was contained in the "SSVRZ422 2022" zip file obtained from counsel.

I use the 2023 estimates of the CVAP from the Census Bureau for the denominator in the 2024 CVAP turnout rate. I label turnout estimates with this denominator as the "CVAP" estimates for each group. As I described in my first report, using CVAP estimates from a prior year creates a risk of underestimating the size of groups in the 2024 electorate, which would cause me to overestimate turnout rates for that group. To mitigate this risk, my second measure of group size uses historical growth rates to make a plausible estimate for each group's actual size in the 2024 election. As in my first report I extrapolate using available CVAP data. Specifically, I calculated the average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group. I then divided the average of the 2-year change by 2 to obtain a one-year average growth rate, which I then added to the 2023 CVAP estimate. This projection serves as an estimate of the 2024 CVAP. I label turnout estimates with this denominator as the "CVAP Trend" estimates.[2]

## III.  TURNOUT IN THE 2024 GEORGIA FEDERAL ELECTION REMAINED HIGH.

13.    In Table 1 I present estimates of the overall turnout rates in the state of Georgia for general federal elections from 2014 to 2024. This updates Table 1 from my first expert report, and it is structured the same way. The "Year" column presents the year of the election. The "CVAP Turnout Rate"

---

[2] The only election the CVAP and CVAP Trend estimates will differ is in 2024.

column calculates the turnout rate using the CVAP corresponding to each election year, except for 2024 where I use the 2023 CVAP. The "CVAP Turnout Rate, Trend" column calculates the turnout rate using the corresponding CVAP but extrapolates the 2023 turnout rate to 2024 based on the historical rate of growth for racial groups. The "VEP Turnout Rate" column uses data from Dr. Michael McDonald (2024) to calculate the overall turnout rate from the voting eligible population ("VEP").[3] The VEP is an estimate of the number of individuals who are eligible to vote in a state's election. The VEP is available at the state-level but is not broken down by racial group.

14.    In the first general presidential election after the passage of SB 202 in Georgia, overall voter turnout was higher than any presidential or midterm election since 2014, though similar to the turnout rate in the 2020 general election. Using the CVAP turnout estimates in the second column, I find that the turnout rate in the 2024 CVAP Georgia presidential election was 1.4 percentage points higher than the 2020 Georgia presidential election and 9.6 percentage points higher than turnout in the 2016 Georgia presidential election. I reach a similar conclusion if I use the estimates from the "CVAP Turnout Rate, Trend" column. Using the projected measure of CVAP I find that the turnout rate is higher in the 2024 Georgia presidential election than in the

---

[3] Univ. of Fla. Election Lab, 2024 General Election Turnout (as of May 13, 2025), https://election.lab.ufl.edu/2024-general-election-turnout/.

2020 election, with a difference of 0.5 percentage points. The turnout rate in the 2024 election was 8.7 percentage points higher in 2024 than in 2016 according to "CVAP Turnout Rate, Trend" measure of turnout.

| Year | CVAP Turnout Rate | CVAP Turnout Rate, Trend | VEP Turnout Rate |
|------|------|------|------|
| 2014 | 0.377 | 0.377 | 0.386 |
| 2016 | 0.589 | 0.589 | 0.598 |
| 2018 | 0.544 | 0.544 | 0.541 |
| 2020 | 0.671 | 0.671 | 0.682 |
| 2022 | 0.515 | 0.515 | 0.519 |
| 2024 | 0.685 | 0.676 | 0.683 |

Table 1: Turnout rates in Georgia federal elections from 2014 to 2024, calculated using state-provided election returns and McDonald's (2024) data.

15.    Using the VEP turnout rates in the fourth column, I also find that the 2024 election was the highest turnout election for all 6 general federal elections in Table 1, though using this measure of turnout I again find that the turnout rate in the 2024 election was similar to the turnout rate in the 2020 election. The VEP turnout rate in 2024 was 0.1 percentage points higher in 2024 than in 2020. But the 2024 VEP turnout rate was 8.5 percentage points higher in 2024 than in 2016.

16.    McDonald (2024) provides VEP turnout rates in Georgia for all federal elections from 1980 to 2024.[4] I present those VEP turnout rates in

---

[4] To create this time series I combine the data available on Professor McDonald's website available here—Michael McDonald, Univ. of Fla. Election Lab, 1980-2022 General Election Turnout Rates (v1.2) (Oct. 6, 2024), https://election.lab.ufl.edu/dataset/1980-2022-general-election-turnout-rates-

Figure 1 for the Midterm (left-hand panel) and General (right-hand panel) elections from 1980 to 2024. Using McDonald's (2024) VEP estimates presented in the right-hand panel of Figure 1, I find that the turnout rate in the 2024 Georgia presidential election (right-hand panel) was the highest turnout rate in any general federal election in Georgia since at least 1980. The second highest VEP turnout rate occurred in the 2020 election. The federal election with the third highest VEP turnout rate is the 2008 election and the 2024 VEP turnout rate was 5.6 percentage points higher than the 2008 VEP turnout rate.



Figure 1: VEP Turnout Rates from 1980 to 2024, calculated using McDonald's (2024) data.

---

v1-2/, along with the estimates from 2024 here—Univ. of Fla. Election Lab, *supra* note 4, https://election.lab.ufl.edu/2024-general-election-turnout/.

17.    The left-hand panel presents the VEP turnout rates for the midterm elections in Georgia from 1982 to 2022. As I explained in my first expert report and as Table 1 shows, the VEP turnout rate in 2022 in Georgia was lower than in 2018. The 2022 VEP turnout rate was 2.2 percentage points lower than the 2018 VEP turnout rate. But, the 2022 VEP turnout rate was the second highest VEP turnout rate in any Georgia midterm election from 1982 to 2022. The election with the third highest VEP turnout rate was the 2010 midterm election when turnout was 11.2 turnout points lower than the VEP turnout rate in the 2022 midterm election.

| Year | American Indian CVAP | American Indian CVAP Trend | Asian CVAP | Asian CVAP Trend | Black CVAP | Black CVAP Trend | Hispanic CVAP | Hispanic CVAP Trend | White CVAP | White CVAP Trend |
|------|------|------|------|------|------|------|------|------|------|------|
| 2014 | 0.022 | 0.022 | 0.133 | 0.133 | 0.352 | 0.352 | 0.102 | 0.102 | 0.388 | 0.388 |
| 2016 | 0.066 | 0.066 | 0.369 | 0.369 | 0.521 | 0.521 | 0.304 | 0.304 | 0.590 | 0.590 |
| 2018 | 0.077 | 0.077 | 0.343 | 0.343 | 0.495 | 0.495 | 0.275 | 0.275 | 0.539 | 0.539 |
| 2020 | 0.157 | 0.157 | 0.599 | 0.599 | 0.572 | 0.572 | 0.403 | 0.403 | 0.671 | 0.671 |
| 2022 | 0.209 | 0.209 | 0.341 | 0.341 | 0.421 | 0.421 | 0.214 | 0.214 | 0.539 | 0.539 |
| 2024 | 0.514 | 0.496 | 0.632 | 0.608 | 0.570 | 0.560 | 0.429 | 0.411 | 0.692 | 0.690 |

Table 2: Voter turnout by self-reported racial group, calculated using state-provided election returns.

18.    In Table 2 I calculated turnout rates for self-identified racial groups for federal general elections in Georgia from 2014 to 2024. Table 2 updates Table 2 from my first expert report. In the left-most column of Table 2 I present the election year. For each self-identified racial group I present a pair of CVAP turnout rates for each election. The "CVAP" column for each self-identified racial group is the CVAP turnout rate with the 2024 estimate

calculated using the 2023 5-year estimate of the CVAP in Georgia. In the "CVAP Trend" column for each self-identified racial group is the CVAP turnout with the 2024 estimate calculated using the extrapolated measure of the 2024 CVAP.[5]

19.   Comparing presidential elections, every racial group had higher turnouts rates in the 2024 election than in the 2016 election. Using the CVAP trend measure of turnout the turnout rate among Asian voters was 23.9 percentage points higher in the 2024 election than in the 2016 election (26.3 percentage points higher using the CVAP measure of turnout). Continuing to use the CVAP trend measure, the turnout rate among self-identified Black voters was 3.9 percentage points higher in the 2024 election than in the 2016 election (4.9 percentage points higher using the CVAP measure of turnout), among self-identified Hispanic voters the turnout rate was 10.7 percentage points higher in 2024 than in 2016 (12.5 percentage points higher using the CVAP measure), and among white voters the 2024 turnout rate was 10.0 percentage points higher than in 2016 (10.2 percentage points higher using the CVAP measure).

---

[5] Table 2 in this report differs from Table 2 in the first report in two ways. First, Table 2 in this report adds the 2024 turnout rates. Second, Table 2 in this report uses the 5-year estimate of the 2022 CVAP in Georgia, which was not available at the time I wrote my first report.

20.     Asian, Hispanic, and white voters had higher turnout rates in the 2024 election than in the 2020 election, though Black voters saw a decline in turnout in the 2024 election compared to the 2020 election. Continuing my use of the CVAP trend measure, I find that turnout among self-identified Asian voters was 0.9 percentage points higher in the 2024 election than in the 2020 election (3.3 percentage points higher using the CVAP measure). Using the CVAP trend measure of turnout, the turnout rate among self-identified Hispanic voters was 0.8 percentage point higher turnout rate in 2024 than in 2020 (2.6 percentage points higher using the CVAP measure of turnout) and the turnout rate among white voters was 1.9 percentage point higher turnout in the 2024 election than in the 2020 election (2.1 percentage points higher in 2024 than in 2020 using the CVAP measure of turnout). The only group with a decline in turnout in 2024 relative to 2020 was among self-identified Black voters. Using the CVAP trend measure of turnout I find a 1.2 percentage point decline in Black turnout in 2024 relative to the 2020 election (0.2 percentage point decline using the CVAP measure of turnout).

21.     Turnout rates in Georgia and nationwide tend to be higher in presidential elections than in midterm elections. This is true across all self-identified racial groups. The turnout rate for each self-identified racial group in the 2024 general election was higher than the turnout rate in the 2014, 2018, or 2022 midterm elections.

## IV.    COMPARING GEORGIA'S TURNOUT TO OTHER STATES

22.    In my first expert report I contrasted turnout rates in Georgia and the turnout rates in other states. I made two types of comparisons. To assess differences in overall turnout, I made a comparison of the aggregate turnout in Georgia to the turnout rates in other states. To assess differences in turnout among different self-reported racial groups, I also compared the turnout rate among different groups in Georgia to the turnout rates of self-identified racial groups in three other states: Louisiana, North Carolina, and South Carolina.

23.    In this expert report I update the overall comparisons for the 2024 election. To compare the turnout rates across different self-reported racial groups I use a different and more comprehensive strategy. Instead of using voter file data from three states where it was available, I use recently available data from the Current Population Survey (CPS), a census conducted post-election survey designed to measure turnout rates after federal elections. The use of this survey data provides a more comprehensive comparison of turnout rates among self-reported racial groups in Georgia to the turnout rates of self-reported racial groups in other states. I describe some tradeoffs below, but I use the survey data to provide a more comprehensive comparison with the turnout rates in other states.

24.    As I cautioned in my first expert report, interpreting any of the comparisons that I make in this section as a causal effect of SB 202 would

require strong and difficult to justify assumptions in this setting. For example, one key assumption would be that the only differences across Georgia and other states was the passage of SB 202. Of course, there are numerous differences across American states that could affect turnout rates and are unrelated to SB 202 in Georgia.

25.   Even though the across state comparisons would require strong assumptions to interpret as the causal effect of SB 202, these comparisons are essential to provide context for the changes in turnout observed in Georgia. As I describe in paragraph 38 in my first expert report, some of the Plaintiffs' experts interpreted changes observed in Georgia alone as evidence of the effect of SB 202. Using turnout comparisons within a single state to assess a policy's effect on turnout requires even stronger assumptions and risks confusing a nationwide pattern for a state-specific policy consequence. Using other states helps identify what those nationwide trends might be.

26.   In Table 3 I compare the aggregate turnout rate in the state of Georgia to the turnout rate in other states, calculated using the McDonald's (2024) VEP turnout rates. In Table 3 the "Year" column contains the year of the election, the "Georgia Turnout Rate" presents the VEP turnout rate in Georgia, which is identical to the "VEP Turnout Rate" column in Table 1. The "Other States' Turnout Rate" column calculates the VEP turnout rate across all other states and the District of Columbia. To perform this calculation I

summed together the total votes cast in these states and then divided this by the total size of the voting eligible population. Finally, I divided the total number of voters by the total voting eligible population in these states.

| Year | Georgia Turnout Rate | Other States' Turnout Rate |
|------|---------------------|---------------------------|
| 2014 | 0.386 | 0.367 |
| 2016 | 0.598 | 0.604 |
| 2018 | 0.541 | 0.509 |
| 2020 | 0.682 | 0.679 |
| 2022 | 0.519 | 0.467 |
| 2024 | 0.683 | 0.646 |

Table 3: Comparing the VEP turnout rate in Georgia to the VEP turnout rate in other states from 2014 to 2024.

27.    Georgia's turnout rate in the 2024 election was 3.7 percentage points higher than the national average in other states. As discussed above, 68.3% of the voting-eligible population cast a vote in the 2024 election in Georgia and in other states, on average, 64.6% of the voting-eligible population turned out to vote. Unlike the turnout rates in other states, Georgia's turnout rate in 2024 was higher than in 2020, though as I mentioned above the 2024 turnout rate was similar to the turnout rate in 2020. The 2024 VEP turnout rate in Georgia was 0.1 percentage points higher than the 2020 VEP turnout rate in Georgia. Across the other states, the 2024 VEP turnout rate was 3.3 percentage points lower than the VEP turnout rate in 2020. Georgia's 2024 VEP turnout rate also increased more compared to the 2016 VEP turnout rate than other states' 2024 turnout rate increased over the 2016 VEP turnout rate

in the other states. The 2024 VEP turnout rate in Georgia was 8.5 percentage points higher than the 2016 VEP turnout rate in Georgia, while in other states the 2024 turnout rate was 4.2 percentage points higher than the turnout rate in the 2016 election.

28.    To enable a comparison of the turnout rates of self-identified racial groups in Georgia to the turnout rates of self-identified racial groups outside of Georgia, I use survey data from the US Census' Current Population Survey (CPS) November Supplement.[6] The CPS is a large-scale survey that serves as "the primary source of labor force statistics for the population of the United States."[7] After federal elections in even years the CPS November supplement is administered to respondents after the standard CPS battery and asks a sample of respondents about whether they turned out to vote in the recent general election and also asks them to report their self-identified race. Using these survey responses, I compare the turnout rates for Black and white respondents in Georgia to the turnout rates for Black and white respondents in other states in four federal elections before SB 202 was enacted; 2014, 2016,

---

[6] U.S. Bureau of Lab. Stats., Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/.

[7] U.S. Census Bureau, Current Population Survey (CPS) (Oct. 23, 2024), https://www.census.gov/programs-surveys/cps.html.

2018, and 2020 November general elections; and two federal elections after the passage of SB 202; the 2022, and 2024 November general elections.

29.    At the time I wrote my first expert report, the CPS November supplement for the 2022 election was not yet released. In place of the CPS data, in my first expert report I used available data from three states that recorded voters' self-identified racial groups in the voter file: Louisiana, North Carolina, and South Carolina. The comparison of the turnout rates of Black, white, and other self-identified racial groups in these states to the turnout rates in Georgia provided useful context for Georgia's turnout rates but necessarily limited the comparison to the turnout rates in the three states with available data at the time.

30.    Using the CPS turnout data, I followed standard practice and calculated the turnout rates using two different methods. First, I calculated the turnout rates using the same procedure as the Census.[8] Following the Census' procedure I classified respondents who reported that they turned out to vote as "VOTED." I then classified individuals who reported not turning out to vote, individuals who said that they "Don't Know", "Refused", or did not complete the turnout supplement as "NOT VOTED".[9] Among this population

---

[8] Aram Hur & Christopher H. Achen, *Coding voter turnout responses in the Current Population Survey*, 77 Pub. Op. Q. 985 (2013).

[9] In the 2014, 2016, 2018, and 2020 surveys I perform this classification based entirely on the PES1 variable in the CPS. In the 2022 and 2024 CPS I use the

of respondents I then applied the Census provided survey weights to calculate the turnout rates.[10] I classified an individual's self-identified racial group following the procedure in the replication code of Ansolabehere, Fraga, and Schaffner (2022).[11] I manually verified my calculations, confirming that my implementation of the Census procedure yielded turnout estimates that correspond to the Census provided estimates of turnout rates for the self-reported groups.

| | Black | | | | White | | | |
|---|---|---|---|---|---|---|---|---|
| | Georgia | | Other States | | Georgia | | Other States | |
| Year | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj |
| 2014 | 0.43 | 0.40 | 0.39 | 0.35 | 0.45 | 0.39 | 0.46 | 0.41 |
| 2016 | 0.60 | 0.60 | 0.59 | 0.60 | 0.64 | 0.63 | 0.65 | 0.65 |
| 2018 | 0.60 | 0.60 | 0.50 | 0.51 | 0.56 | 0.55 | 0.58 | 0.55 |
| 2020 | 0.64 | 0.65 | 0.63 | 0.66 | 0.70 | 0.74 | 0.71 | 0.72 |
| 2022 | 0.54 | 0.49 | 0.44 | 0.40 | 0.61 | 0.57 | 0.58 | 0.53 |
| 2024 | 0.61 | 0.66 | 0.59 | 0.59 | 0.69 | 0.74 | 0.71 | 0.71 |

Table 4: Estimated turnout rates for Black and white respondents in Georgia and other states, calculated using the CPS survey.

31.    I present the turnout estimates using the CPS in Table 4. In the "Year" column I identify the election year. The columns under "Black" contain the turnout estimates for self-identified Black respondents and the columns under "White" contain the turnout estimates for self-identified white

---

PES1 variable in the CPS and the PRSUPINT variable, which identifies individuals who refuse to complete the November supplement.

[10] The provided weight is variable PWSSWGT.

[11] Stephen Ansolabehere et al.., *The current population survey voting and registration supplement overstates minority turnout*, 84 J. Pols. 1850 (2022).

respondents. Within each self-identified racial group the columns under "Georgia" contain the turnout estimates for respondents in Georgia and the columns under "Other States" contain the turnout estimates for respondents in other estates. In the columns labeled "CPS" I present the estimated turnout rate calculated following the Census' procedure for calculating the turnout rates.

32.    There are several issues with using self-reported turnout to measure the voter turnout rate. The most obvious and well documented problem is that some respondents who did not vote in the election will falsely report voting when asked in a survey, like the CPS.[12] A second issue is that the Census procedure classifies all respondents who refuse to complete the November supplement as not voting in that election. But these respondents did not offer any information about their participation in the election. It is a strong assumption to suppose that none of the respondents who did not complete the supplement also did not vote in the corresponding election.

33.    Hur and Achen (2013) provide one methodology to address these issues. The Hur and Achen (2013) procedure makes two modifications to the Census Bureau's procedure for estimating the turnout rate using the CPS turnout data. First, Hur and Achen (2013) drop respondents who refuse to

---

[12] Hur & Achen, *supra* note 8; Michael P. McDonald, *On the overreport bias of the National Election Study turnout rate*, 11 Pol. Analysis 180 (2003).

complete the November supplement rather than code those respondents as non-voters. Second, Hur and Achen (2013) adjust the Census provided turnout weights so that the overall estimated turnout rates using the CPS data are exactly equal to the VEP turnout rates from McDonald (2024). I followed the Hur and Achen (2013) procedure, calibrating the turnout estimates from the CPS for each state to the VEP turnout in McDonald (2024). I present the result of applying this procedure and the corresponding turnout rates in the "CPS Adj." columns in Table 4.

34.    Hur and Achen's (2013) procedure is not guaranteed to address issues of inaccurate estimated turnout rates using the CPS November supplement. The Hur and Achen (2013) procedure rests upon strong assumptions about how non-respondents compare to respondents in the November supplement and relies on the calibration of the census weights using the VEP turnout rates.[13] For example, a sufficient assumption for the Hur and Achen (2013) weight recalibration to provide an accurate estimate of the turnout rate in each self-identified racial group is that every group over-reports turnout at approximately the same rate within a state. Despite the strong assumptions, the Hur and Achen (2013) methodology addresses potential pathologies in the Census Bureau's turnout estimates.

---

[13] Ansolabehere et al., *supra* note 11.

35.     Using the CPS estimated turnout rates, I find that the changes in turnout rates in the general elections in Georgia after the passage SB 202 are similar to changes in turnout rates in other states in the same time period. For example, in the 2022 midterm using the "CPS" turnout estimates I calculated a Black turnout rate in Georgia of 54% (49% using the Hur and Achen adjustment). This is an increase of 11 percentage points over the 2014 Black turnout rate in Georgia (9 percentage point increase using the adjusted turnout rates). In the other states, I find that the turnout rate in 2022 was 5 percentage points higher in 2022 than in 2014 (5 percentage points higher using the adjusted turnout rate). The 2022 Black turnout rate in Georgia was 6 percentage points lower than the 2018 Georgia Black turnout rate (11 percentage points lower using the adjusted turnout rate). In the other states I find that the 2022 Black turnout rate was also 6 percentage points lower in 2022 than in 2018 ( and also 11 percentage points lower using the adjusted turnout rate).

36.     There is also similarity in the changes in Black turnout rates in the three presidential elections included in Table 4. Using the "CPS" turnout estimates I found a Black turnout rate of 61% in the 2024 presidential election (66% using the Hur and Achen adjustment). This is a one percentage point increase in turnout rate compared to the Black turnout rate in Georgia in the 2016 presidential election (6 percentage point increase using the Hur and

Achen adjustment). In other states there is no difference in the Black turnout rate from 2016 to the 2024 election (one percentage point decrease using the Hur and Achen adjustment). Continuing to use the "CPS" measure of turnout, the Black turnout rate in the 2024 presidential election in other states was 3 percentage points lower than the Black turnout rate in the 2020 presidential election (1 percentage point higher using the Hur and Achen adjustment). The 2024 Black turnout rate in other states was four percentage points lower than the 2020 Black turnout rate in other states (7 percentage points lower using the Hur and Achen adjustment).

37.    Focusing on the changes in turnout among white voters I reach a similar conclusion: the trends in turnout in Georgia are similar to the average trend in turnout in other states, though there is some evidence that white turnout in Georgia increased at higher rates than the white turnout in other states. In the 2022 Georgia midterm election the white turnout rate was 16 percentage points higher than in the 2014 Georgia midterm election (18 percentage points higher using the Hur and Achen adjustment), while the average white turnout rate in 2022 in other states was 12 percentage points higher than the average white turnout rate in 2014 in other states (12 percentage points using the Hur and Achen adjustment). Compared to the white turnout rate in the 2018 Georgia midterm election, white turnout was 5 percentage points higher in 2022 (2 percentage points higher using the Hur

and Achen adjustment). The average white turnout rate in the 2022 midterm election in other states and the average white turnout rate in the 2018 midterm election had no difference (2 percentage point decline using the Hur and Achen adjustment). In presidential elections, I find the 2024 white turnout rate in Georgia was 5 percentage points higher than the 2016 white turnout rate in Georgia (11 percentage points higher using the Hur and Achen adjustment), while in other states the white turnout rate increased 6 percentage points from 2016 to the 2024 election (6 percentage point increase using the Hur and Achen adjustment). Using the "CPS" estimates of turnout, I find that the white turnout rate in the 2024 election in Georgia was 1 percentage point lower than the white turnout rate in Georgia in the 2020 election (no difference using the Hur and Achen adjustment). In other states the 2024 white turnout rate was the same as the 2020 white turnout rate (1 percentage point lower using the adjusted turnout rate).

## V.   EVIDENCE ON HOW GEORGIA VOTERS CAST THEIR BALLOTS

38.   I also updated my analysis of how voters in Georgia cast their ballots to include the 2024 Georgia general election. I use the same procedure in this report as I used to obtain estimates of how Georgia voters use their absentee ballots from 2014 to 2022 in my first report. To assess how Georgia voters cast their ballots in the 2024 election I use the spreadsheet contained in

"Voter History File - Nov 2024 General Election.zip". After the 2024 election (and unlike the Voter History files I used in my first expert report), the Georgia Secretary of State's office updated the Voter History file to contain information about how voters cast their ballots. In the voter history file I use the field "Ballot Style" to assess how voters cast their ballots. I then merged in registered voters' self-identified race using the "Statewide Voter File_2025-01-15.csv". Because this voter file was generated after the 2024 election (apparently on January 15th, 2025) there are 6,884 individuals who turned out to vote who are not found in the provided voter file. Unlike in my first expert report, the provided file of "canceled" voters does not contain information about self-reported race, so I cannot use this file to merge with the voter file to obtain voters' self-report race. To mitigate the number of voters with missing race information, I used the version of the voter file from my first expert report. For 4,966 of these remaining voters I successfully merged information about self-identified race using the 2022 voter file used in my first expert report. This leaves 1,918 voters for whom I was unable to assign a self-identified race.

39.    Using this merged data set for the 2024 election, I updated my analysis of how Georgia voters cast ballots in recent federal general elections in Georgia. Table 5 presents the share of ballots cast in each election (first column) using early-in person (second column), mail-in absentee (third column

column), and on Election Day in person (fourth voting). Table 5 updates Table 7 in my first expert report.

| Year | Early Voting | Mail Voting | Election Day |
|------|--------------|-------------|--------------|
| 2014 | 0.326 | 0.041 | 0.633 |
| 2016 | 0.531 | 0.049 | 0.421 |
| 2018 | 0.478 | 0.056 | 0.466 |
| 2020 | 0.537 | 0.261 | 0.202 |
| 2022 | 0.579 | 0.062 | 0.360 |
| 2024 | 0.711 | 0.051 | 0.234 |

Table 5: Share of ballots cast using early, mail, and Election Day

40.    Table 5 shows that voters in Georgia in 2024 continued a shift away from casting their vote on Election Day voting and instead towards in-person during the early voting period. In the 2024 election 71.1% of all ballots were cast in-person during the early voting period, the largest share of ballots cast in-person during the early voting period for any of the six federal general elections I examine in Table 5. Comparing 2014 to 2024 there was a 38.5 percentage point increase in the percentage of ballots cast using in-person early voting. A larger share of votes were cast in-person during early voting in 2024 than in the 2016 and 2020 elections. The share of ballots cast in-person during the early voting period was 18 percentage points higher in 2024 than in 2016 and 17.4 percentage points higher in 2024 than in the 2020 election.

41.    Nearly all the increase in the share of ballots cast in-person during the early voting period comes from a decline in the share of ballots cast on Election Day. Comparing 2014 to 2024 there was a 39.9 percentage point

decrease in the percentage of Georgia voters who cast their vote on Election Day. Compared to 2024 a larger share of voters cast their ballots on Election Day in the 2016, 2018, and 2022 general elections in Georgia. Only the 2020 general election in Georgia saw a smaller share of ballots cast on Election Day than the 2024 general election: the share of votes cast on Election Day in the 2024 election was 3.2 percentage points higher than the share of votes cast on Election Day in the 2020 election.

42.    In the 2024 election 5.1% of all votes were cast using mail-in absentee voting. This is more than in 2014 (1 percentage point more in 2024) and 2016 (0.2 percentage points more than in 2016), but it was less than in 2018 (0.5 percentage points less than in 2018) and 2022 (1.1 percentage points less than in 2022). By far the highest rate of mail-in voting in Georgia general elections occurred during the 2020 election when 26.1% of all votes were cast using mail-in absentee voting, 21 percentage points higher than in the 2024 election.

43.    Using the merged 2024 voter history file and voter file, I updated my analysis of how rates of early in-person, mail-in absentee, and Election Day voting varied across self-reported racial groups. In Table 6 I report the share of ballots cast for each mode of voting for Asian, Black, Hispanic, and White voters. For space reasons I provide the table for American Indian voters in the Appendix to this report. The calculated shares of votes cast using each voting

method from 2014 to 2022 in Table 6 are identical to the numbers contained in Figure 1 in my first expert report.

| Year | Asian | | | Black | | | Hispanic | | | White | | |
|------|-------|------|----------|-------|------|----------|-------|------|----------|-------|------|----------|
| | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day |
| 2014 | 0.196 | 0.036 | 0.767 | 0.386 | 0.035 | 0.579 | 0.195 | 0.024 | 0.780 | 0.305 | 0.046 | 0.648 |
| 2016 | 0.448 | 0.063 | 0.485 | 0.556 | 0.041 | 0.402 | 0.417 | 0.083 | 0.547 | 0.527 | 0.054 | 0.417 |
| 2018 | 0.367 | 0.116 | 0.515 | 0.501 | 0.073 | 0.426 | 0.339 | 0.063 | 0.597 | 0.478 | 0.046 | 0.475 |
| 2020 | 0.447 | 0.398 | 0.151 | 0.525 | 0.294 | 0.179 | 0.496 | 0.233 | 0.269 | 0.546 | 0.240 | 0.211 |
| 2022 | 0.518 | 0.092 | 0.388 | 0.637 | 0.075 | 0.288 | 0.476 | 0.045 | 0.478 | 0.559 | 0.056 | 0.384 |
| 2024 | 0.675 | 0.076 | 0.245 | 0.701 | 0.055 | 0.242 | 0.613 | 0.030 | 0.353 | 0.728 | 0.049 | 0.220 |

Table 6: Mode of Voting Across Voters Self-Identified Racial Groups

44.     Each self-reported racial group cast the largest share of their votes in-person during early voting in the 2024 election. Compared to the 2014 election there was a 47.9 percentage point increase in the share of ballots Asian voters cast in-person during early voting, a 31.5 percentage point increase in the share of ballots Black voters cast in-person during early voting, a 41.8 percentage point increase in the share of ballots Hispanic voters cast in-person during early voting, and a 42.2 percentage point increase in the share of ballots white voters cast in-person during early voting. There was also an increase in the share of ballots cast in-person during early voting compared to the most recent presidential election (2020) and midterm election (2022). Among Asian voters in 2024 there was a 22.8 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 15.7 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Black voters in the 2024 election there

was a 17.6 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 6.4 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Hispanic voters in the 2024 election there was a 11.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 13.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2022. Among white voters in the 2024 election there was a 18.2 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 16.9 percentage point increase in the share of ballots cast in-person during early voting compared to 2022.

45.    Table 6 shows that in the 2024 election each racial group cast the second-smallest share of ballots on Election Day, second to the share of ballots cast on Election Day in 2020. Further, across racial groups the 2020 election continues to be the election with the largest share of ballots cast using mail-in absentee voting and the smallest share of ballots cast on Election Day. In each racial group the 2024 election saw a smaller share of ballots cast using mail-in absentee voting than the 2022 election.

46.    I also updated my analysis of the rate of provisional voting in Georgia elections and overall in Table 7, which updates Table 8 from my first report. The "Race" column in Table 7 records the self-reported race of the voter

and the overall calculation. The "2014" to "2022" columns are the same estimates as in Table 8 in my first report. The "2024" column presents the share of votes cast classified as provisional by self-reported racial group and overall for the 2024 election. Table 21, located in the Appendix, is structured the same as Table 7, except it provides a count of the number of ballots classified as provisional for each self-reported racial group and overall instead of the share of ballots classified as provisional.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 0.0061 | 0.0026 | 0.0055 | 0.0033 | 0.0013 | 0.0012 |
| Asian | 0.0047 | 0.0033 | 0.0053 | 0.0027 | 0.0011 | 0.0006 |
| Black | 0.0031 | 0.0018 | 0.0034 | 0.0032 | 0.0010 | 0.0011 |
| Hispanic | 0.0049 | 0.0037 | 0.0057 | 0.0033 | 0.0016 | 0.0012 |
| White | 0.0012 | 0.0007 | 0.0013 | 0.0011 | 0.0004 | 0.0003 |
| Overall | 0.0019 | 0.0012 | 0.0022 | 0.0018 | 0.0006 | 0.0006 |

Table 7: Share of all general election votes classified as provisional by self-reported racial identity and overall.

47.    Overall, the 2024 election saw a smaller share of votes classified as provisional than in the 2014, 2016, 2018, and 2020 general elections and a similar share of ballots classified as provisional in the 2022 general election. This same pattern is found in every self-reported racial group: every group had a smaller share of ballots classified as provisional in the 2024 election than in the 2014, 2016, 2018, and 2020 election. American Indian, Asian, Hispanic, and white voters had a smaller share of votes classified as provisional in the 2024 election than in the 2022 election. Black voters saw an increase in the share of ballots classified as provisional from 2022 to 2024, though the increase in rate was substantively small: the share of Black voters who had their ballot

classified as provisional increased in 2024 compared to the 2022 election by 0.009 percentage points (an increase of 0.00009 in the share of ballots cast there were provisional).

48.    There is a similar pattern with the count of provisional ballots. Overall, the 2024 election had fewer ballots classified as provisional than the 2014, 2016, 2018, and 2020 elections, but in the 2024 election there were 695 more ballots classified as provisional than the 2022 election. In the 2024 election Asian, Black, and white voters had their second fewest number of provisional ballots cast, with the fewest number of provisional ballots cast for each group in 2022. In the 2024 election 42 American Indian voters had their ballot classified as provisional (fewer than 2018 and 2020, but more than 2014, 2016, and 2022), 91 Asian voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022), 1,620 Black voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, but more than 2022), 233 Hispanic voters had their ballots classified as provisional (fewer than 2016, 2018, and 2020, but more than 2014 and 2022), and 904 white voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022).

## VI.  ASSESSING BALLOT REJECTION RATES AND REASONS FOR MAIL-IN ABSENTEE VOTING IN GEORGIA

49.     I updated my analysis of the rate of absentee ballot rejections and the reason for those rejections using data from the 2024 general election. I calculated the share of mail-in absentee ballots that were returned and ultimately rejected, along with the reason those ballots were rejected. I use the Absentee Voter History files that the Secretary of State posts to their website, which I then merge with the voter file to include information about the voters' self-identified racial group. Using these merged files, I identify mail in absentee ballots in the 2016, 2018, 2020, and 2022 files by identifying rows where the "Ballot Style" field is equal to "Mailed". In the 2024 absentee voter history file I identified rows with the "Ballot Style" field equal to "ABSENTEE BY MAIL." In all analyses I focused on the ballots that were returned: ballots with the "Ballot Status" field equal to "A" (accepted) or "R" (rejected). The overall rejection rate for mail in absentee ballots is the share of ballots that are returned and rejected. I also calculated the reasons for rejection. I focus on four categories of rejections: ballots rejected due to arriving after the deadline, ballots rejected due to issues involving the voters' signature, ballots rejected due to an issue involving the voters' identification, and ballots rejected due to incorrect completion of the oath envelope as an "Oath" rejection. For the 2016 and 2018 elections I manually classified the "Status Reason" field to

correspond with these four categories.[14] For the 2020, 2022, and 2024 elections I use standardized rejection reasons included in the voter file, which I classify into the four categories.[15] Note that after the passage of HB 316 in 2018 the oath envelope was simplified to no longer require a voter to include their address or their date of birth. As a result of this simplification the "Oath" rejection rate will mechanically reduce to zero in these years. After classifying the reason for rejection, I calculated the share of returned mail in absentee ballots that were rejected for that reason.

50.    Table 8 presents the rates of rejections for mail in ballots in Georgia for the 2016, 2018, 2020, 2022, and 2024 elections overall and across self-reported racial groups. The "Race" column describes the self-reported racial identity of the voter or whether the calculation is for all voters. The "Year" column provides the election year. I extended my original analysis of mail-in ballot rejection reasons to include the 2016 election. The "Overall" column contains the share of all returned mail in ballots that are rejected. The "Deadline" column contains the share of all returned mail in ballots rejected

---

[14] My replication code contains the coded reasons in the "RejReasons16.csv" and "RejReasons18.csv" files.

[15] I classify the entry "BALLOT RECEIVED AFTER DEADLINE" as a rejection for arriving after the deadline. I classify "Invalid Signature" and "Missing Signature" as rejections for signature reasons. And I classify "Incorrect ID Information", "MIDR - ID not Provided", and "Missing ID Information" as rejections for ID reasons.

for arriving after the deadline, the "Signature" column contains the share of all returned mail in ballots rejected for an issue related to the voters' signature, the "ID" column contains the share of returned mail in ballots rejected for an issue related to voters' identification, and the "Oath" column contains the share of returned mail in ballots rejected for an issue related to the completion of the Oath envelope.

51.    Table 8 shows that the overall rejection rate for mail in absentee ballots in Georgia was lower in 2024 than in 2016 and 2018, but higher than the rejection rate in 2020 or 2022. I find that 1.7% of all returned mail in absentee ballots were rejected in 2024. This is 1.2 percentage points lower than the rejection rate in 2016 and 1.8 percentage points lower than the rejection rate in 2018. The overall mail-in ballot rejection rate in 2024 was 1.4 percentage points higher than the mail-in ballot rejection rate in 2020 and 0.3 percentage points higher than the overall rejection rate in 2022. In summary, the two general elections after the passage of SB 202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016 or 2018, but a higher mail-in ballot rejection rate than in 2020.

52.    The mail-in ballot rejection rate for every self-reported racial group followed a similar pattern: in the two general federal elections after the passage of SB 202 all groups had lower mail-in ballot rejection rates than mail-in ballot rejection rates in 2016 or 2018, but higher mail-in ballot rejection

rates than found in the 2020 election. For example, in the 2016 election 4.1% of all returned mail in ballots from Black voters were rejected. In the 2018 election 4.3% of all returned ballots were rejected. In the 2022 election 1.4% of all returned mail in ballots from Black voters were rejected and in the 2024 election 2% of the returned mail in ballots were rejected. But, in the 2020 election 0.4% of the returned mail in ballots from Black voters were rejected. The rejection rates among returned mail in ballots for white voters follows a similar pattern. In the 2016 election 2.3% of all returned mail in ballots from white voters were rejected and in the 2018 election 2.5% of all returned mail in ballots from white voters were rejected. In the 2022 election 1.2% of returned mail in ballots from white voters were rejected and in the 2024 election 1.3% of the returned mail in ballots from white voters were rejected. Again, the lowest mail-in ballot rejection rate for returned mail in ballots from white voters occurred in the 2020 election, when 0.2% of the returned mail in ballots were rejected.

53.    Focusing now on the reasons mail-in ballots were rejected, I first consider reasons related to the oath contained on the absentee ballot return envelope, which was required for mail-in ballots returned during the 2016 and 2018 elections. After the passage of HB 316, the oath was simplified so that voters did not have to include their date of birth and address on the oath envelope. The share of returned mail in ballots rejected for oath related reasons

is found in the "Oath" column in Table 8. Overall, in the 2016 election 1.1% of all returned mail in ballots were rejected for an oath envelope related reason, constituting 38% of all rejected mail-in absentee ballots (0.011/0.029 x 100). The rejection rate of mail-in ballots for oath related reasons rose to 1.5% in the 2018 election, constituting approximately 43% of all rejected mail-in ballots. After the passage of HB 316 this rejection rate declined to 0% in 2020, 2022, and 2024. A similar pattern is found in every self-reported racial group: oath envelope rejection rates were a large proportion of all ballot rejections in the 2016 and 2018 elections but then were eliminated after HB 316. For example, in 2016 1.3% of all returned mail in ballots from Black voters were rejected for oath related reasons, constituting 32% of all mail-in ballot rejections for Black mail-in voters. In 2022 2.2% of all returned mail in ballots were rejected for oath-related reasons, constituting 51% of all mail-in ballot rejections for Black mail-in voters. White voters followed a similar pattern. In 2016 0.9% of all returned mail in ballots from white voters were rejected for oath-related reasons, constituting 39% of all mail-in ballot rejections for white mail-in voters. In 2018 0.7% of all returned mail in ballots were rejected for oath-related reasons, constituting 28% of all mail-in ballot rejections for white mail-in voters.

54.    There is also variation from election-to-election in the share of mail-in ballots rejected for arriving after the deadline. The share of mail-in

ballots rejected for arriving after the deadline are found in the "Deadline" column of Table 8. Overall, the two general federal elections in Georgia after the passage of SB 202 had a smaller share of returned mail in ballots rejected for arriving after the deadline than were rejected for arriving after the deadline in the 2016 and 2018 elections, but the post-SB 202 elections had a larger share of mail-in ballots rejected for arriving after the deadline than in the 2020 election. In the 2016 election 1.4% of all returned mail in ballots were rejected for arriving after the deadline, constituting 48% of all mail-in ballot rejections. In the 2018 election 1.6% of all returned mail in ballots were rejected for arriving after the deadline, constituting 46% of all mail-in ballot rejections. In 2022 0.8% of all returned mail in ballots were rejected for arriving after the deadline, constituting 57% of all mail-ballot rejections. In 2024 1.2% of all returned mail in ballots were rejected for arriving after the deadline, constituting 71% of all rejections of returned mail in ballots. In the 2020 election 0.2% of all mail-in absentee ballots were rejected for arriving after the deadline, constituting 67% of all rejected mail-in ballots.

55.     There is a similar pattern among self-reported racial groups. Black voters had a smaller share of mail in absentee ballots rejected for arriving after the deadline in the elections after SB 202 than in 2016 or 2018, but a higher rate of rejection than in 2020. For example, in 2016 1.9% of all returned mail in ballots from Black voters were rejected for arriving after the deadline,

constituting 46% of all mail-in ballot rejections for Black mail-in voters. In 2018 1.5% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 35% of all rejected mail-in ballots for Black voters. In the 2022 election 0.7% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters. In the 2024 election 1.3% of all returned mail in ballots were rejected for arriving after the deadline, constituting 65% of all mail-in ballot rejections. The 2020 election saw the lowest rate of mail-in ballot rejections for Black voters for arriving after the deadline. In 2020 0.2% of all mail-in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters.

56.     White voters followed a similar pattern of change. The deadline rejection rates in the post-SB 202 elections were lower than in 2016 or 2018, but higher than in 2020. In the 2016 election 1.1% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 43% of mail in ballot rejections for white voters. In 2018 1.5% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 60% of all mail-in ballot rejections for white voters. In 2022 0.8% of all mail-in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections for white

voters. In 2024 0.9% of all mail-in ballots were rejected constituting 69% of all mail-in ballot rejections for white voters. In 2020 0.2% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections (rounding affects the appearance of results).

57.    Dr. Burden's expert report attributes the lower rejection rate in the 2020 election to the presence of drop boxes. Dr. Burden writes "drop boxes were an important contributor to lower rejection rates. A voter using a drop box to return an absentee ballot by election day is guaranteed that it will be received on time to be counted, whereas a voter returning a ballot via the postal service cannot be certain that it will be delivered by the election day deadline." Dr. Burden does not provide evidence for his causal claim that "drop boxes were an important contributor to lower rejection rates." Dr. Burden's analysis seems to be based on the following logic: there were more drop boxes available in the 2020 election and a lower rejection rate of absentee ballots in the 2020 election. But merely comparing rejection rates across the 2020 election and the post-SB 202 elections is not a credible way to estimate the causal effect of SB 202 and risks confusing a correlation-a change in rejection rates-with causation- the causal effects of more drop boxes on mail-in absentee ballot rejection rates. This is because there are many other differences across the 2020 and post-SB 202 elections that confound any changes made in Georgia's policies. And as a

result, it is difficult to attribute changes in the rejection rates to the changes mandated by SB 202.

58.    One important difference is that different populations of voters used mail-in ballots in each election and these different populations could result in differences in the rejection rates that are unrelated to the presence of drop boxes or any other policy related to SB 202. For example, the average mail-in ballot voter in the 2020 election was younger than the average mail-in ballot voter in other election years. In the 2020 election the average mail-in ballot voter was 56.8 years old. Compared to prior years, the 2020 average mail-in ballot voter was over two years younger than the average age of mail-in ballot voters in 2016 (58.9 years), more than a year younger than mail-in ballot voters in 2018 (58.0 years), 5 years younger than the average age of mail-in ballot voters in 2022 (63.9), and more than 3 years younger than the average age of mail-in ballot voters in 2024 (59.9).

59.    Further confounding the comparisons across elections is that mail-in ballot voters in the 2020 election returned their ballot earlier than mail-in ballot voters in the 2016, 2018, 2022, and 2024 elections. Using the absentee voter history file for each corresponding election, I find that in the 2020 general election 63% of all mail-in absentee ballots had been returned at least two weeks before the election. This is a larger share than in the other elections I examine in Table 8: In 2016 50% of mail-in ballots were returned at least two

weeks before the election, 49% in 2018, 47% in 2022, and 46% in 2024. In contrast, a smaller share of voters in the 2020 election returned their ballot in the week immediately before the election. In the 2020 election 17.3% of mail-in ballots were returned in the week before the election. In contrast, 28.9% of mail-in ballots were returned in the week immediately before the election in 2016, in 2018 it was 29.1%, in 2022 it was 24.1%, and in 2024 it was 25.9%. The result of these patterns is that the typical mail-in ballot was returned much earlier in the 2020 election than in the other elections I examined. The median mail-in ballot in 2020 was returned 18 days before the election, while the median mail-in ballot in 2016 was returned 13 days before the election. The median mail-in ballot in 2018, 2022, and 2024 were also returned 13 days before the election. Voters' decision to return their ballot earlier further confounds any attempt to isolate the effect of a policy change from SB 202 on the share of ballots rejected for arriving after the deadline.

60.    In contrast to mail-in ballots rejected for arriving after the deadline or for errors on the oath envelope, in most elections and for most self-reported racial groups a smaller share of rejections are due to issues with the voters' signature or because they failed to provide accurate identification. In the "Signature" column I calculated the share of mail-in ballots rejected for signature related reasons and in the "ID" column I calculated the share of mail-in ballots rejected for identification related reasons. As discussed in my first

expert report, prior to SB 202 mail-in absentee ballots were verified using a signature match. After SB 202 mail-in absentee ballots were verified using voter's identification, including a driver's license number. In the two post-SB202 elections, I find that the rate mail-in ballots were rejected for identification reasons is similar to the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections.

61.    In the 2024 election 0.42% of all returned mail in ballots were rejected for issues related to the voter's identification. This constitutes 24% of mail-in ballot rejections in the 2024 election. In the 2022 election 0.46% of mail-in ballots were rejected for issues related to the voter's identification, constituting 33% of all mail-in ballot rejections. This is higher than signature rejection reasons in pre-SB 202 elections, though the differences are relatively small compared to variation in the share of ballots rejected for Oath or deadline reasons for the elections in Table 8. For example, in the 2016 election 0.28% of all mail-in ballots were rejected for signature reasons. In the 2018 election 0.20% of all mail-in ballots were rejected for signature reasons, while in the 2020 election 0.15% of all mail-in ballots were rejected for signature reasons. The 2024 election mail-in ballot rejection rate for identification issues with mail-in ballots was 0.14 percentage points higher than the 2016 election rejection rate for signature issues with mail-in ballots, 0.22 percentage points

higher than the rejection rate for signature issues in the 2018 election, and 0.26 percentage points higher than the rejection rate in the 2020 election.

62.    I find similar patterns across self-reported racial groups: the ID rejection rates in the post-SB 202 elections were similar to the signature rejection rates in the pre-SB202 elections. For example, in the 2024 election 0.52% of returned mail in ballots from Black voters were rejected for ID related reasons. In the 2016 election 0.51% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.01 percentage points lower than the identification rejection rate for Black voters in 2024. In 2018 0.28% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.23 percentage points less than the identification related rejection rate among Black mail-in voters in 2024. And in 2020 0.24% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.28 percentage points lower than the identification related rejection rate for Black mail-in voters in 2024. There is a similar pattern for white voters. In 2024 0.31% of returned mail in ballots from white voters were rejected for identification reasons. In the 2016 election 0.18% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.13 percentage points lower than the 2024 identification rejection rate for white voters. In 2018 0.12% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.19

percentage points lower than the 2024 identification rejection rate for white voters. And in 2020 0.08% of mail-in ballots from white voters were rejected for a signature related issue, a rejection rate that is 0.23 percentage points lower than the 2024 identification rejection rate for white voters.

63.    I also find that the Black-white gap in the signature rejection rate in the pre-SB 202 elections is similar to the Black-white gap in the identification rejection rate in the post-SB 202 elections. In the 2024 election the Black-white gap in the identification rejection rate was 0.20 percentage points and in the 2022 election the Black-white gap in the identification rejection rate was 0.23 percentage points. In the 2016 election the Black-white gap in the signature rejection rate was 0.34 percentage points, in the 2018 election the Black-white gap in the signature rejection rate was 0.17 percentage points, and in the 2020 election the Black-white gap in the signature rejection was 0.17 percentage points.

| Race | Year | Overall | Deadline | Signature | ID | Oath |
|------|------|---------|----------|-----------|-----|------|
| Overall | 2016 | 0.029 | 0.014 | 0.003 | 0.001 | 0.011 |
| | 2018 | 0.035 | 0.016 | 0.002 | 0.000 | 0.015 |
| | 2020 | 0.003 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.008 | 0.001 | 0.005 | 0.000 |
| | 2024 | 0.017 | 0.012 | 0.001 | 0.004 | 0.000 |
| American Indian | 2016 | 0.048 | 0.021 | 0.003 | 0.006 | 0.018 |
| | 2018 | 0.053 | 0.031 | 0.000 | 0.000 | 0.019 |
| | 2020 | 0.007 | 0.005 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.037 | 0.029 | 0.002 | 0.006 | 0.000 |
| | 2024 | 0.038 | 0.034 | 0.001 | 0.004 | 0.000 |
| Asian | 2016 | 0.063 | 0.025 | 0.006 | 0.003 | 0.028 |
| | 2018 | 0.064 | 0.020 | 0.003 | 0.000 | 0.040 |
| | 2020 | 0.006 | 0.002 | 0.003 | 0.000 | 0.000 |
| | 2022 | 0.031 | 0.023 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.029 | 0.021 | 0.001 | 0.007 | 0.000 |
| Black | 2016 | 0.041 | 0.019 | 0.005 | 0.001 | 0.013 |
| | 2018 | 0.043 | 0.015 | 0.003 | 0.000 | 0.022 |
| | 2020 | 0.004 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.007 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.020 | 0.013 | 0.002 | 0.005 | 0.000 |
| Hispanic | 2016 | 0.051 | 0.022 | 0.005 | 0.002 | 0.019 |
| | 2018 | 0.044 | 0.018 | 0.003 | 0.001 | 0.021 |
| | 2020 | 0.005 | 0.003 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.020 | 0.015 | 0.000 | 0.004 | 0.000 |
| | 2024 | 0.032 | 0.023 | 0.001 | 0.008 | 0.000 |
| White | 2016 | 0.023 | 0.011 | 0.002 | 0.000 | 0.009 |
| | 2018 | 0.025 | 0.015 | 0.001 | 0.000 | 0.007 |
| | 2020 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.012 | 0.008 | 0.001 | 0.004 | 0.000 |
| | 2024 | 0.013 | 0.009 | 0.001 | 0.003 | 0.000 |

Table 8: Rate of absentee ballot rejections and rate of rejections by reason, overall and by self-reported racial identity.

## VII.  ASSESSING THE RATES OF WEEKEND VOTING IN THE POST-SB 202 ELECTIONS.

64.    One argument made in expert reports was that SB 202 would cause a decline in the use of weekend voting during in-person early voting. For example, when analyzing the consequences of SB 202, Dr. Lee opined that one consequence of SB 202 would be "the elimination of weekend voting on most weekends" (pg. 93). And when pointing to policies that Dr. Lee opines will

"raise the costs of voting" he cites "doing away with weekend voting on most weekends" (pg. 94). Dr. Pettigrew similarly implies that SB 202 will cause a decline in the use of weekend voting. Dr. Pettigrew writes that "Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202" (Pettigrew pg. 1).

65.    In my first expert report I concluded that "the 2022 general election and the 2022 runoff election saw the highest rate of weekend votes cast of any midterm election, and the second highest share of weekend votes cast in a general election, other than the 2020 general election." In Table 9 I update my analysis for the 2024 election. Using the Absentee Voter History file from the 2024 election, I identified all individuals with a "Ballot Style" entry equal to "EARLY IN-PERSON" and a "Ballot Return Date" equal to a weekend date when early in-person voting was active: either Sunday (October 20th, 2024 and October 27th, 2024) or Saturday (October 19th, 2024 and October 26th, 2024). I then measured the rate of Sunday and weekend voting using two different denominators. Following the analysis in Tables 31 and 32 of my first report, the two "Share of All Early In-Person Votes" columns calculate the share of all early in-person votes cast on "Sunday" or the

"Weekend". The two "Share of All Votes Cast" columns present estimates of the share of all votes cast, regardless of the method for casting those votes, on "Sunday" or the "Weekend."

| Year | Share of All Votes Cast | | Share of All Early In Person Votes | |
|---|---|---|---|---|
| | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.005 | 0.023 | 0.017 | 0.070 |
| 2016 | 0.006 | 0.042 | 0.012 | 0.079 |
| 2018 | 0.008 | 0.043 | 0.016 | 0.089 |
| 2020 | 0.015 | 0.053 | 0.027 | 0.099 |
| 2022 | 0.011 | 0.055 | 0.018 | 0.094 |
| 2024 | 0.015 | 0.077 | 0.021 | 0.109 |

Table 9: Share of all ballots cast on the weekend and the share of all early in person ballots cast on the weekend

66.    Using my calculations in Table 9 and focusing first on the share of all votes cast, I find that the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections I examined in Table 9. In 2024 I calculated that 1.49% of all votes cast in the Georgia presidential election were cast on a Sunday, early in person. This is similar to, but higher than, the 1.46% of all votes cast on Sunday, early in person in the 2020 election. In the 2022 election there was the highest share of all votes cast on Sunday for any midterm election considered in Table 9, with 1.07% of all votes in that election cast on Sunday. The 2018 (0.8%), 2016 (0.6%), and 2014 (0.5%) all had smaller shares of votes cast on Sunday. The 2024 election had the highest share of votes cast on the weekend. In the 2024 election 7.70% of all votes cast in the election were cast during in-person early

voting on a Saturday or Sunday. This is a 2.24 percentage point increase over the share of ballots cast on the weekend in the 2022 election, which had the second highest share of ballots cast on the weekend (5.46%). The 2024 election had a 2.36 percentage point increase over the share of ballots cast on the weekend in the 2020 election, 3.45 percentage point increase over the share of ballots cast on the weekend in the 2018 election, 3.49 percentage point increase over the share of ballots cast on the weekend in the 2016 election, and a 5.42 percentage point increase over the share of ballots cast on the weekend in the 2014 election.

67.    If instead I examine the share of all early in-person votes cast on Sunday or the weekend I reach a similar conclusion: after the passage of SB 202 voters casting ballots early in-person make use of Sunday and weekend voting. In the 2024 election 2.09% of all early in-person votes were cast on Sunday. This is second only to the 2020 election, where 2.70% of early in-person votes were cast on Sunday. Despite a larger share of early in-person voters casting their ballot on Sunday, a smaller share of total votes were cast on Sunday in the 2020 election because fewer voters cast their ballot early in-person in the 2020 election. As I noted in my first expert report, the highest rate of Sunday voting among early in-person voters in any midterm occurred in the 2022 election. The 2024 election had the highest share of early in-person votes cast on the weekend, with 10.89% of all early in-person votes cast on

Saturday or Sunday. This is a 1 percentage point increase over the share of early in person votes cast on the weekend in 2020, the election with the second highest share of early in-person votes cast.

68.     This same pattern is found across self-reported racial groups: the 2024 election had the highest share of ballots cast on the weekend for every group but American Indian voters. In Table 10 I calculated the share of all ballots cast in each election ("Year" column), regardless of the method of voting, for each self-reported racial group on "Sunday" and on the "Weekend". In the 2024 election 2.05% of all votes from Black voters were cast on Sunday during early in-person voting, the highest share for any of the 6 elections examined in Table 10. The share of votes from Black voters cast on Sunday is a 0.16 percentage point increase over the share of votes from Black voters cast on Sunday in 2020, the general election with the second highest-share of votes from Black voters cast on Sunday. In the 2022 election 1.6% of all votes from Black voters were cast on Sunday, the highest share of votes from Black voters cast on Sunday for any midterm election analyzed in Table 10 and the third highest share of Black votes cast on Sunday, behind the 2024 and 2020 elections. The 2024 election also had the largest share of votes from Black voters cast on the weekend during in-person early voting of any of the six elections I examined in Table 10. In the 2024 election 8.26% of all votes cast by Black voters were cast on the weekend using in-person early voting. The 2024

election's share of votes from Black voters cast on the weekend using in-person early voting is 2.17 percentage points higher than the share of votes from Black voters cast on the weekend using in-person early voting than in 2020, 3.15 percentage points higher than the same quantity in 2018, 3.25 percentage points higher than the same quantity in 2016, and 4.78 percentage points higher than the same quantity in 2014. The election with the second highest share of votes cast from Black voters on the weekend using in-person early voting was 2022, the other post-SB 202 election. In that election 6.75% of all votes from Black voters were cast on the weekend using in-person early voting. Hispanic and Asian voters cast the largest share of the ballots on Sunday and on the weekend using in-person early voting in the 2024 election. White voters cast the largest share of their ballots on the weekend using in-person early voting in the 2024 election and the second largest share of ballots cast on Sunday using in-person early voting. American Indian voters cast 1.7% of ballots cast in the 2024 election on Sunday using in-person early voting and 8.1% of ballots cast in the 2024 election on the weekend using in-person early voting.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.006 | 0.023 | 0.005 | 0.025 | 0.012 | 0.035 | 0.003 | 0.019 | 0.002 | 0.016 |
| 2016 | 0.004 | 0.040 | 0.011 | 0.064 | 0.010 | 0.050 | 0.005 | 0.043 | 0.004 | 0.036 |
| 2018 | 0.008 | 0.040 | 0.012 | 0.062 | 0.013 | 0.051 | 0.007 | 0.045 | 0.005 | 0.036 |
| 2020 | 0.016 | 0.055 | 0.021 | 0.067 | 0.019 | 0.061 | 0.015 | 0.058 | 0.012 | 0.047 |
| 2022 | 0.011 | 0.054 | 0.022 | 0.079 | 0.016 | 0.068 | 0.013 | 0.061 | 0.007 | 0.047 |
| 2024 | 0.017 | 0.081 | 0.030 | 0.108 | 0.021 | 0.083 | 0.019 | 0.085 | 0.011 | 0.072 |

Table 10: Share of All Ballots Cast on Sunday and the Weekend by Racial Group

69.    In Table 11 I computed the share of all votes cast during in-person early voting that were cast on Sunday or the weekend for each self-reported racial identity in the 6 elections I examined in Table 10. The 2024 election saw the largest share of early in-person votes cast on the weekend for every group but Asian voters. For Asian voters 16.2% of early in-person votes were cast on the weekend in the 2024 election. This is the second highest share of early in-person votes cast on the weekend and 0.6 percentage points less than 2018 election, when 16.8% of Asian early in person voters cast their ballot on the weekend. For some groups the share of early in-person votes cast on Sunday in the 2024 election was less than the maximum share of early in-person votes cast on Sunday: 2.7% of American Indian early in person votes were cast on Sunday in the 2024 election, 0.5 percentage points less than the maximum in 2020; 4.5% of Asian early in person votes were cast on Sunday in the 2024 election, 0.3 percentage points less than the maximum in the 2020 election; 2.9% of Black early in person votes were cast on Sunday in the 2024 election,

0.8 percentage points less than the maximum in the 2020 election; 3.1% of Hispanic early in-person votes were cast on Sunday in the 2024 election, which was the maximum across the six elections; and 1.5% of white early in-person votes were cast on Sunday, 0.6 percentage points less than the maximum in the 2020 election. As Table 10 shows, even though some groups in the 2024 election had a smaller share of early in-person votes cast on Sunday, a larger share of all votes were cast on Sunday and on the weekend. As measured by the share of voters who cast their ballots using that method, in the 2024 election weekend voting was the most popular it had ever been.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|--------|---------|--------|---------|--------|---------|--------|---------|--------|---------|
| | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.023 | 0.086 | 0.023 | 0.124 | 0.032 | 0.094 | 0.016 | 0.092 | 0.008 | 0.054 |
| 2016 | 0.009 | 0.088 | 0.024 | 0.138 | 0.019 | 0.094 | 0.011 | 0.099 | 0.008 | 0.069 |
| 2018 | 0.021 | 0.101 | 0.032 | 0.168 | 0.026 | 0.106 | 0.020 | 0.132 | 0.010 | 0.074 |
| 2020 | 0.032 | 0.109 | 0.048 | 0.150 | 0.037 | 0.118 | 0.030 | 0.118 | 0.021 | 0.086 |
| 2022 | 0.022 | 0.106 | 0.042 | 0.153 | 0.025 | 0.106 | 0.028 | 0.128 | 0.013 | 0.084 |
| 2024 | 0.027 | 0.128 | 0.045 | 0.162 | 0.029 | 0.118 | 0.031 | 0.139 | 0.015 | 0.099 |

Table 11: Share of Early in Person Ballots Cast on the Weekend, By Self-Identified Racial Group

## VIII. AFTER SB 202 FEWER VOTERS CANCELED MAIL IN BALLOTS AND THEN VOTED IN PERSON THAN IN THE 2020 ELECTION.

70.    As I explained in my first expert report, the preamble of SB 202 stated that "[t]he lengthy absentee ballot process also led to elector confusion, including electors who were told they had already voted when they arrived to vote in person. Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities

to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, § 2(9). In my first expert report I assessed the rate that voters who had a mail in ballot application accepted then canceled that ballot and voted either in person on Election Day or during early in-person voting. I had found that in the 2020 election 289,650 voters had canceled their mail in ballots and then voted either in person on Election Day or early in-person, constituting 16.7% of all mail in ballot applicants. I had found that in the first election after SB 202 the number and share of mail in ballot applicants who subsequently voted in person had declined.

71.    In Tables 12, 13, 14, and 15 I extend Tables 13, 14, 15, and 16 in my first expert report. In Table 12 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 13 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 14 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted early in-person, and in Table 15 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted early in-person. In each table I perform the calculation overall (bottom row) and for self-reported racial groups, for the 2014, 2016, 2018, 2020, 2022, and 2024 elections.

72.    Tables 12 and 13 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day in 2024 is lower than in 2020. In the 2024 election 1.5% of mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day. In the 2020 election 1.7% of all mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day, a 0.2 percentage point larger share of mail in ballot applicants. In the 2024 election 4,893 voters canceled their mail in ballots and voted in person, fewer voters than in the 2020 election, but more than in the 2014, 2016, 2018, and 2022 midterm election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.015 | 0.012 | 0.014 | 0.029 | 0.011 | 0.026 |
| Asian | 0.007 | 0.006 | 0.018 | 0.019 | 0.006 | 0.021 |
| Black | 0.010 | 0.009 | 0.020 | 0.017 | 0.006 | 0.017 |
| Hispanic | 0.011 | 0.022 | 0.034 | 0.034 | 0.012 | 0.029 |
| White | 0.005 | 0.005 | 0.007 | 0.015 | 0.005 | 0.012 |
| Overall | 0.007 | 0.006 | 0.015 | 0.017 | 0.006 | 0.015 |

Table 12: Share of mail in ballot applicants with canceled ballots ultimately voting on Election Day

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 2 | 5 | 10 | 152 | 9 | 48 |
| Asian | 8 | 36 | 203 | 1280 | 55 | 327 |
| Black | 328 | 522 | 2,208 | 9,124 | 541 | 1,716 |
| Hispanic | 11 | 92 | 290 | 1,671 | 62 | 236 |
| White | 436 | 709 | 913 | 13,763 | 770 | 2,032 |
| Overall | 848 | 1,493 | 4,072 | 28,965 | 1,592 | 4,893 |

Table 13: Number of mail in ballot applicants with canceled ballots ultimately voting on Election Day

73.    Tables 14 and 15 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day is lower than in

2020, though higher than in the 2014, 2016, 2018, and 2022 elections. In the 2024 election 7.6% of all mail-in ballot applicants canceled their ballot and ultimately voted in person during early voting. In 2020 15.0% of mail-in ballot applicants canceled their ballots and ultimately voted in person, a 7.4 percentage point larger share than in the 2024 election. Table 15 shows that 25,021 mail-in ballot applicants canceled their ballot and ultimately voted early in person in the 2024 election. This is a smaller number than in the 2020 election, when 260,685 mail-in ballot applicants canceled their ballots and ultimately voted in person. But, the 2024 number of canceled mail in ballot applicants was larger than in the other four elections analyzed in Table 15: 2014, 2016, 2018, and 2022 elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 0.007 | 0.028 | 0.066 | 0.143 | 0.056 | 0.077 |
| Asian | 0.013 | 0.024 | 0.048 | 0.137 | 0.045 | 0.096 |
| Black | 0.019 | 0.024 | 0.058 | 0.156 | 0.040 | 0.083 |
| Hispanic | 0.006 | 0.040 | 0.056 | 0.141 | 0.045 | 0.097 |
| White | 0.009 | 0.018 | 0.026 | 0.147 | 0.032 | 0.068 |
| Overall | 0.012 | 0.021 | 0.043 | 0.150 | 0.036 | 0.076 |

Table 14: Share of mail in ballot applicants with canceled ballots ultimately voting early in-person

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 1 | 12 | 48 | 759 | 44 | 140 |
| Asian | 15 | 141 | 540 | 9,166 | 416 | 1,483 |
| Black | 605 | 1,382 | 6,274 | 84,613 | 3,582 | 8,169 |
| Hispanic | 6 | 171 | 473 | 6,958 | 231 | 788 |
| White | 778 | 2,825 | 3,290 | 133,144 | 4,752 | 12,007 |
| Overall | 1,540 | 4,995 | 12,000 | 260,685 | 10,067 | 25,021 |

Table 15: Number of mail in ballot applicants with canceled ballots ultimately voting early in-person

IX.  **FEWER VOTERS WAITED MORE THAN 30 MINUTES IN THE FIRST PRESIDENTIAL ELECTION AFTER SB 202.**

74.    In the initial expert reports, some of the Plaintiffs' experts opined that SB 202 would cause longer lines in Georgia. For example, Dr. Burden opined that the disparity between wait times for Black and white voters "may be worsened now that absentee voting is more difficult" (Burden pg. 2). Dr. Burden goes on to say that "To my knowledge, data on wait times in the November 2022 election have not yet been made publicly available via the CES or other reliable academic surveys. However, media coverage of that election and the December 6 runoff election suggests that long wait times, in some cases lasting hours, were experienced in Atlanta-area communities with large shares of Black voters" (Burden, pg. 22). Dr. Pettigrew argues provisions in SB 202 will affect wait times. Dr. Pettigrew states that "SB202 will negatively affect wait times" (pg. 28), that "Changes to early voting hours will not solve Georgia's long line problem", and that "Shrinking precincts will not shorten lines". More directly, Dr. Pettigrew opines that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color" (Pettigrew Rep. 29). None of the claims in these reports are based on an appropriately designed causal study, nor are they descriptive claims about the observed patterns after SB 202. Using updated data from the same sources as Plaintiffs' experts, I describe voter wait times after SB 202. I

again caution that these comparisons can only describe the causal effect of SB 202 on wait times under strong assumptions. But, the descriptive patterns show that, in contrast to the predictions from the Plaintiffs' experts, the share of voters waiting more than 30 minutes was lower in the post-SB 202 elections than in the pre-SB 202 elections.

75.    In my first expert report I used a survey of Georgia voters conducted by the School of Public and International Affairs (SPIA) survey research center at the University of Georgia. The SPIA survey research center conducted a similar survey of Georgia voters after the 2024 election. The 2024 iteration of the SPIA survey was conducted from November 11th to November 20th, 2024 and included a "total of 1,541 Georgia registrants who self-reported as having voted in the 2024 general election." I was not provided with access to the underlying data, but counsel provided me with a document from the SPIA survey research center describing the top-line results and cross tabs by a variety of relevant voter characteristics. This matches the same document that was also posted on the Secretary of State's website.[16]

76.    Among the voters who reported voting either in person during early voting or on Election Day, the survey asked "Approximately, how long

---

[16] Sch. Pub. & Int'l Affs. ("SPIA"), Survey Rsch. Ctr., Univ. Ga., *2024 Georgia Post-Election Survey* (2024), https://sos.ga.gov/sites/default/files/2024-12/GA%20Voter%20Survey-2024.pdf [hereinafter "2024 SPIA Survey"].

did you have to wait in line to vote?" This is the same question that Dr Burden and Dr. Pettigrew used in their analysis of wait times from the Cooperative Election Study (CES) surveys, which I also analyze below. In response to this question, voters were provided with the response options "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". Dr. Pettigrew imputes numbers to calculate wait times from this scale; I showed in my first expert report that Dr. Pettigrew provides no theoretical or substantive justification for that practice and there is no justification for the practice in the literature. Rather than imputing numbers for categories, I will instead focus on the proportion of respondents in each response category.

77.    According to the SPIA survey 2.7% of Georgia voters report waiting more than 30 minutes in line–2.0% report waiting 31 minutes - 1 hour and 0.7% report waiting more than an hour. Breaking down the estimates by race, the survey reports that 2.6% of white voters report waiting longer than 30 minutes to vote—1.8% report waiting 31 minutes to 1 hour and 0.8% report waiting more than an hour to vote. According to the SPIA survey, 1.9% of Black voters reported waiting more than 30 minutes to vote–1.7% report waiting 31 minutes to 1 hour and 0.2% report waiting more than an hour to vote. Comparing the 2024 SPIA survey with the 2022 SPIA survey, a smaller share of voters waited longer than 30 minutes to vote in 2024 than in 2022. In the 2022 SPIA survey 4.7% of all voters said that they waited longer than 30

minutes to vote, which is 2 percentage points more than the share of voters waiting longer than 30 minutes in the 2024 election.

78.    While I do not have access to the underlying data, I am able to assess statistical significance approximately using standard formulas and information from the topline survey results. Using these standard formulas, the margin of error for the 2 percentage point difference is 1.4 percentage points. This implies that the 95-percent confidence interval for the 2 percentage point difference is [0.006,0.034]. Because the 95-percent confidence interval does not contain zero, the observed 2 percentage point difference is statistically significant at the traditional 0.05 confidence level.

79.    According to the 2022 SPIA survey, 4.8% of white voters reported waiting longer than 30 minutes. There is 2.2 percentage points more than the share of white voters who report waiting longer than 30 minutes in the 2024 election. I calculated an approximate margin of error equal to 1.4 percentage points, which implies that the 95-percent confidence interval is [-0.005, 0.05]. Because the 95-percent confidence interval contains zero, the observed difference is not statistically significant at the traditional 0.05 confidence level. In the 2022 survey 4.0% of Black voters reported waiting longer than 30 minutes to vote. There is a 2.1 percentage point difference in the share of Black voters who report waiting longer than 30 minutes in each election, with a margin for the difference of 2.4 percentage points or a 95-percent confidence

interval of [-0.003, 0.04]. Because the confidence interval contains zero, the difference in the share of voters waiting longer than 30 minutes to vote is not statistically significant across elections at the traditional 0.05 confidence level.

80.    Dr. Burden and Dr. Pettigrew relied on the Cooperative Election Study (CES) when assessing voters' wait times in previous Georgia elections. The CES "is the largest academic survey focused on American elections" and is a standard source in the social sciences.[17] At the time I wrote my first expert report the 2022 CES survey was not yet available, so I was not able to assess wait times in Georgia using the same survey as Dr. Burden and Dr. Pettigrew. The final 2022 CES survey has subsequently been released and a preliminary 2024 CES survey is available. To assess wait times among Georgia voters using the same surveys as Dr. Pettigrew and Dr. Burden, I downloaded the survey from the CES data repository.[18] Using the 2014, 2016, 2018, 2020, 2022 and 2024 surveys I examined the reported wait times of voters who cast their ballot either early in-person or on Election Day. Like in the SPIA survey, the CES asks individuals who report voting in person or attempting to vote in person "Approximately, how long did you have to wait in line to vote?" Respondents

---

[17] Jonathan M. Tisch Coll. Civic Life, Tufts Univ., *Cooperative Election Study*, https://tischcollege.tufts.edu/research-faculty/research-centers/cooperative-election-study.

[18] Harvard Univ., *Cooperative Election Study*, https://cces.gov.harvard.edu/data.

are asked to select "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". In the 2016, 2018, 2020, and 2022 surveys I use the vote validation in the CES to assess turnout and apply the vote validation weights. Vote validation is a procedure where respondents' turnout is validated against official turnout records and are the weights Dr. Burden uses when calculating wait times when the vote validation weights are available. When calculating wait times using vote validation weights the calculations will exclude anyone who either 1) reported attempting to vote but was unable to cast their ballot or 2) anyone who falsely reported voting. The 2014 survey does not contain a vote validation, so I use the provided "weight" variable, which is the same procedure Dr. Burden follows. Vote validation is not yet complete for the 2024 survey, so I use the post-election survey weights, "commonpostweight". I present the results of the survey for each in Table 16. The survey stacks the responses for Black voters (top table), white voters (middle table), and overall (bottom table). The "Response" column are the options available to respondents and the "2014" to "2024" columns correspond to that election year.

| | Response | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|
| | Not at all | 0.309 | 0.164 | 0.197 | 0.160 | 0.221 | 0.275 |
| | Less than 10 minutes | 0.312 | 0.335 | 0.372 | 0.155 | 0.443 | 0.407 |
| Black | 10 - 30 minutes | 0.325 | 0.369 | 0.249 | 0.345 | 0.270 | 0.242 |
| | 31 minutes - 1 hour | 0.049 | 0.106 | 0.118 | 0.218 | 0.063 | 0.070 |
| | More than 1 hour | 0.005 | 0.027 | 0.063 | 0.122 | 0.003 | 0.005 |
| | Not at all | 0.423 | 0.313 | 0.270 | 0.241 | 0.410 | 0.373 |
| | Less than 10 minutes | 0.343 | 0.348 | 0.320 | 0.334 | 0.395 | 0.416 |
| White | 10 - 30 minutes | 0.216 | 0.183 | 0.241 | 0.210 | 0.153 | 0.154 |
| | 31 minutes - 1 hour | 0.014 | 0.111 | 0.115 | 0.138 | 0.032 | 0.033 |
| | More than 1 hour | 0.003 | 0.045 | 0.053 | 0.077 | 0.011 | 0.025 |
| | Not at all | 0.388 | 0.257 | 0.247 | 0.209 | 0.354 | 0.360 |
| | Less than 10 minutes | 0.338 | 0.347 | 0.330 | 0.282 | 0.404 | 0.389 |
| Overall | 10 - 30 minutes | 0.242 | 0.241 | 0.250 | 0.262 | 0.189 | 0.189 |
| | 31 minutes - 1 hour | 0.028 | 0.115 | 0.118 | 0.161 | 0.043 | 0.046 |
| | More than 1 hour | 0.004 | 0.040 | 0.055 | 0.086 | 0.010 | 0.017 |

Table 16: Voter wait times in Georgia, using Cooperative Election Study from 2014 to 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

81.    Using the CES surveys I find that a smaller share of Black voters report waiting in line for more than 30 minutes in the two elections after the passage of SB 202 than in the 2016, 2018, or 2020, but a larger share than in the 2014 midterm election. In the 2022 election 6.6% of Black voters reported waiting longer than 30 minutes to vote and in the 2024 election 7.5% of Black voters reported waiting longer than 30 minutes to vote. In the 2020 election 34.0% of Black voters reported waiting more than 30 minutes to vote. This is 27.4 percentage points more than in the 2022 election (95-percent confidence interval of [-0.353, -0.196]), a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 26.5 percentage points more in the 2020 election than in the 2024 election (95-percent confidence interval [-0.336, -0.195]), a difference that is

statistically significant at the standard 0.05 threshold. In the 2018 election 18.2% of Black voters reported waiting more than 30 minutes to vote. This is 11.6 percentage points more than in the 2022 election (95-percent confidence interval [-0.180, -0.052]) a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes to vote was 10.7 percentage points more than in the 2024 election (95-percent confidence interval [-0.164, -0.049]) , a difference that is statistically significant at the standard threshold. In the 2016 election 13.3% of Black voters reported waiting more than 30 minutes to vote. This is 6.7 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.122, -0.013]) , a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 5.8 percentage points more in the 2016 election than in the 2024 election (95-percent confidence interval [-0.107, -0.009]), a difference that is also statistically significant at the standard 0.05 threshold. In the 2014 election 5.4% of Black voters reported waiting more than 30 minutes to vote. This is 1.2 percentage points less than in the 2022 election (95-percent confidence interval [-0.030, -0.055]) and 2.1 percentage points less than in the 2024 election (95-percent confidence interval [-0.019, 0.062]). But neither of those differences are statistically significant at the standard threshold.

82.   I also find that a smaller share of white voters reported waiting longer than 30 minutes to vote in the two elections after SB 202 than in the 2016, 2018, or 2020 elections, but a larger share reported waiting longer than 30 minutes than in the 2014 election. In the 2022 election 4.3% of white voters reported waiting longer than 30 minutes to vote and in the 2024 election 5.7% of white voters reported waiting longer than 30 minutes to vote. In the 2020 election 21.5% of white voters reported waiting longer than 30 minutes to vote. This is 17.2 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.209, -0.135]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2020 election was 15.8 percentage points more than in the 2024 election (95-percent confidence interval [-0.192, -0.123]) , a difference statistically significant at the standard threshold of 0.05. In the 2018 election 16.9% of white voters reported waiting longer than 30 minutes to vote. This is 12.6 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.158, -0.093]), a difference that is statistically significant at the standard threshold. The share of white voters waiting more than 30 minutes in the 2018 election was 11.1 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.142, -0.080]), a difference that is statistically significant at the standard threshold. In the 2016 election 15.6% of white voters reported waiting longer than 30 minutes to vote.

This is 11.3 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.144, -0.083]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2016 election was 9.9 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.128, -0.070]). And in the 2014 election 1.8% of white voters reported waiting longer than 30 minutes to vote. This is 2.5 percentage points less than in the 2022 election (95-percent confidence interval [0.006, 0.043]) and 3.9 percentage points less than in the 2024 election (95-percent confidence interval [0.020, 0.059]). Both differences are statistically significant at the standard threshold.

## X.    REJECTION RATES FOR MAIL IN ABSENTEE APPLICATIONS AND USE OF THE "ROLL OVER" LIST.

83.    SB 202 also altered the mail-in absentee ballot application window, requiring voters to submit applications no earlier than 78 days before the election and no later than 11 days before the election. SB 202 also required voters to provide proof of identity using a Drivers License or other identification, rather than with a signature, when submitting an absentee ballot application. In my first expert report I examined the share of applications in 2022 that were rejected for arriving after the deadline and the share of ballots rejected for identification related issues. In Table 12 of my first expert report I found that in the 2022 election 0.25% of mail-in absentee ballot

applications were rejected for arriving after the deadline, with mail-in ballot application rejection rates across racial groups of: 0.25% for American Indian voters, 0.27% for Asian voters, 0.27% for Black voters, 0.37% for Hispanic voters, 0.22% for white voters.

84.    In Table 17 I update the calculations in Table 12 from my original report to include rejection reasons for mail-in ballot applications in the 2024 election. To make these calculations I used the data contained in the file "STATEWIDE_With_App_Reason.zip" provided to me by counsel. This spreadsheet is similar to the Absentee Voter History file the state distributes, but this file contains two additional fields "Rejected Reason" and "Rejected Reason Memo." "Rejected Reason" appears to be a standardized coding of the reasons mail-in ballot applications are rejected and "Rejected Reason Memo" contains a more complete description of the rejection reason. I used the "Rejected Reason" field to identify mail-in ballot applications rejected for arriving after the deadline, before the deadline, and for identification related issues.[19] Based on these fields I then calculated the rejection rates for mail-in

---

[19] I classified a mail-in ballot application as rejected for arriving after the deadline if the Rejected Reason is "Application Received After Application Window Closed". I classified a mail-in ballot application as rejected for arriving before the deadline if the Rejected Reason is "Application Received Before Application Window Open". I classified the mail-in ballot application as rejected for identification reason if the Rejected Reason field contains "Cure Not Received - Incorrect ID Information" or "Cure Not Received - Missing PII/ID Information".

ballot applications for these reasons for each self-reported racial group and overall.

| Race | After Deadline | Before Window Opens | Identification Issue |
|------|------|------|------|
| American Indian | 0.0129 | 0.0011 | 0.0043 |
| Asian | 0.0073 | 0.0006 | 0.0068 |
| Black | 0.0085 | 0.0015 | 0.0044 |
| Hispanic | 0.0100 | 0.0016 | 0.0052 |
| White | 0.0041 | 0.0018 | 0.0027 |
| Overall | 0.0061 | 0.0016 | 0.0037 |

Table 17: Share of mail-in ballot applications in the 2024 general election rejected for either arriving after the deadline, before the application window opens, or for identification related reasons.

85.    Turning first to the "After Deadline" column in Table 17, I find that 0.61% of all mail-in ballot applications were rejected for arriving after the deadline, a total of 2,059 applications. This is 0.36 percentage points higher than the share of mail-in ballot applications rejected for arriving late in the 2022 election, but it is smaller than the estimated number of individuals who would be affected by late applications in Dr. Lee or Dr. Fraga's expert report by counterfactually applying SB 202 deadlines to prior elections.[20] In the 2024 election the vast majority of mail-in ballot applications from every self-identified racial group arrived before the deadline for mail-in applications. Overall 99.39% of mail-in ballots were classified as arriving before the deadline, either in the SB 202 application window or before the window opened primarily because of use of the roll over list or because an applicant applied too

---

[20] Lee Sur-Rebuttal Rep. ¶ 7, p. 4. Fraga Expert Rep. p. 80.

early. That said, the share of mail-in ballot applications rejected for arriving after the deadline was higher than the share of mail-in ballot applications rejected for arriving after the deadline in the 2022 election for every self-reported racial group. In the 2024 election, 0.85% of mail-in ballot applications from Black voters were rejected for arriving late (implying 99.15% were classified as arriving before the deadline), 0.73% of mail-in ballot applications from Asian voters were rejected for arriving late (99.27% classified as arriving before the deadline), 1% of mail-in ballot applications from Hispanic voters were rejected for arriving late (99% classified as arriving before the deadline), and 0.41% of mail-in ballot applications from white voters were rejected for arriving late (99.59% classified as arriving before the deadline).

86.    In the "Before Window Opens" column I calculated the share of mail-in ballot applications where the mail-in absentee ballot application was rejected for arriving before the mail-in ballot application window opened 78 days before the election. Overall, 0.16% of mail-in ballot applications were rejected for arriving before the mail-in ballot application window opened. Table 17 shows that there is no consistent relationship between an applicant's self-report race and the share of ballot applications rejected for arriving outside the application window. White voters had the lowest rate of mail-in ballot application rejections for applications arriving after the deadline, but white

voters had the highest rate of mail-in ballot application rejects for ballots arriving before the deadline.

87.    An important exception to the SB 202 window is that individuals 65 and older, self-declared disabled, military, and overseas voters are able to apply for an absentee once for an entire election cycle. In my first expert report I used information from the Secretary of State's office to identify the share of mail-in absentee ballot applications from individuals on the rollover list. I reported that information in Table 11 of my first report. I updated this calculation for the 2024 general election in this report and the results are presented in Table 18. For each self-reported racial group and overall ("Race" column), I describe the overall share of applicants on the roll over list "Share Roll Over, Overall," share of applicants who are 65 and older on the list ("Share Roll Over, 65 & Over"), and the share of applicants who are on the roll over list and under 65 ("Share Roll Over, Under 65").

| Race | Share Roll Over Overall | Share Roll Over 65 & Over | Share Roll Over Under 65 |
|---|---|---|---|
| American Indian | 0.150 | 0.717 | 0.066 |
| Asian | 0.165 | 0.587 | 0.014 |
| Black | 0.451 | 0.750 | 0.140 |
| Hispanic | 0.184 | 0.669 | 0.039 |
| White | 0.482 | 0.786 | 0.075 |
| Overall | 0.437 | 0.766 | 0.089 |

Table 18: Share of Absentee Ballot Applications on State Roll Over List in the 2024 General Election

88.    In the 2024 general election 43.7% of all mail in ballot applications were from individuals on the roll over list. Applicants 65 and over were more

likely to be on the roll over list, with 76.6% of mail in ballot applications from voters 65 and over on the roll over list compared to 8.9% of applications from voters under 65. Similar to the 2022 election, a larger share of Black and white voters were on the roll over list compared to voters from other self-reported racial groups. Overall, 45.1% of applications from Black voters were from Black voters on the roll over list and 48.2% of applications from white voters were from white voters on the roll over list. In contrast, 16.5% of applications from Asian voters were from Asian voters on the roll over list and 18.4% of applications from Hispanic voters were from Hispanic voters on the roll over list. Across all racial groups more than a majority of applications from voters 65 and over were from voters on the roll over list: 75.0% of applications from Black voters 65 and over came from Black voters on the roll over list, 78.6% of applications from white voters 65 and over came from white voters on the roll over list, 58.7% of applications from Asian voters were from Asian voters on the roll over list, and 66.9% of applications from Hispanic voters were from Hispanic voters on the roll over list. Among voters under 65, Black voters had the largest share of applications from individuals on the roll over list: 14.0% of mail in ballot applications from Black voters under 65 came from individuals on the roll over list. I calculated 7.5% of mail in ballot applications from white voters under 65 came from individuals on the roll over list, 1.4% of applications from Asian voters under 65 came from individuals on the roll over list, and

3.9% of applications from Hispanic voters under 65 came from individuals on the roll over list.

89.     Returning to Table 17, the "Identification Issue" column contains the share of mail-in ballot applications rejected for identification reasons. When a voter submits a mail-in ballot application and an identification issue occurs, a "cure" form is distributed. A voter will only have their application rejected in this column if their "cure" form was not received to address the identification issue, which I will call a rejection for identification reasons. Overall 0.37% of mail-in ballot applications were rejected for identification related reasons. I estimated that 0.44% of mail-in ballot applications from Black voters were rejected for identification related reasons, 0.68% of mail-in ballot applications Asian voters were rejected identification reasons, 0.52% of mail in ballot applications from Hispanic voters were rejected for identification reasons, and 0.27% of mail in ballot applications were rejected for identification for white voters.

## XI.     SURVEY-BASED ESTIMATES OF DROP BOX USE

90.     In a sur-rebuttal, I calculated self-reported survey-based estimates of the rate Black and white mail-in voters returned their ballots using a drop box. In that sur-rebuttal, I concluded that "in the 2020 general election…I find that white mail in absentee ballot voters in Georgia are more likely than Black mail in voters to report returning their ballot via drop box." I also found that

in the 2022 election, white mail-in voters were more likely to report using a drop box than Black mail-in voters, but that difference was smaller than in 2020. In this report, I update these calculations, which are found in Table 19.

91.    I used the Cooperative Election Study (CES) for the 2020, 2022, and 2024 election. I define a mail-in voter who reports using a drop box using the same procedure as in the sur-rebuttal.[21] I then calculated the share of mail-in voters who self-report returning their ballot at a drop box, for white mail-in voters, Black mail-in voters, and then overall for all mail-in voters in Georgia. For the 2020 and 2022 estimates, I applied the post-election voter validated weights. These weights are not available in the 2024 CES, so for those estimates I applied the post-election weights.

92.    In Table 19 I find that in the 2024 election, unlike the 2020 and 2022 elections, white mail-in voters were less likely than Black mail-in voters to report using a drop box. According to the 2024, CES Black mail-in voters were 14 percentage points more likely to self-report that they returned their ballots at a drop box than white mail-in voters. This difference, however, is not statistically significant at conventional levels.

---

[21] I classify a mail-in voter as using a drop box if they report returning their ballot at a "Drop box used only for ballots, not located at an election office or polling place", "Main election office", "Neighborhood polling place", or "Voting center, not a neighborhood polling place".

| Year | White Mail-In Voters | Black Mail-In Voters | Overall Mail-In Voters |
|------|---------------------|---------------------|------------------------|
| 2020 | 0.54 | 0.45 | 0.49 |
| 2022 | 0.32 | 0.27 | 0.29 |
| 2024 | 0.36 | 0.50 | 0.47 |

Table 19: Share of Mail-in Voters Returning Ballots at a Drop Box, using Cooperative Election Study from 2020, 2022, and 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

93.    Table 19 also shows that the overall self-reported rate of drop box use among mail-in voters in Georgia is similar to the overall self-reported rate of drop box use in Georgia in the 2020 election. In the 2024 election 47% of mail-in voters self-report returning their ballot at a drop box, two percentage points less than the 49% of mail-voters who self-report returning their ballot at a drop box in 2020. This difference is not statistically significant at conventional levels.

94.    The estimates from Table 19 are useful, but there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember how they returned their ballot or their mode of voting. That said, Table 19 demonstrates that, at least in the self-reported behavior among CES respondents, there has not been a large decrease in the rate of drop box voting among mail-in voters in Georgia.

## XII.  CONCLUSION

95.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on June 13, 2025

Justin Grimmer, Ph.D.

# APPENDIX

| Year | Early Voting | Mail Voting | Election Day |
|------|--------------|-------------|--------------|
| 2014 | 0.268 | 0.024 | 0.708 |
| 2016 | 0.459 | 0.033 | 0.505 |
| 2018 | 0.397 | 0.049 | 0.553 |
| 2020 | 0.509 | 0.240 | 0.247 |
| 2022 | 0.512 | 0.050 | 0.437 |
| 2024 | 0.627 | 0.040 | 0.328 |

Table 20: American Indian mode of voting in Georgia elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 24 | 25 | 54 | 51 | 16 | 42 |
| Asian | 104 | 223 | 357 | 336 | 87 | 91 |
| Black | 2,226 | 1,967 | 3,737 | 4,222 | 1,092 | 1,620 |
| Hispanic | 141 | 341 | 513 | 494 | 146 | 233 |
| White | 2,009 | 1,758 | 3,020 | 3,159 | 886 | 904 |
| Overall | 5,038 | 4,820 | 8,648 | 9,272 | 2,564 | 3,259 |

Table 21: Count of general election votes classified as provisional by self-reported racial identity and overall.