Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4

5    _____

                                    )

6    IN RE GEORGIA SENATE BILL 202 )    Master Case No.

                                    )    1:21-MI-55555-JPB

7    _____)

8

9

10

11

12       VIDEOTAPED DEPOSITION OF JUSTIN GRIMMER, Ph.D

13              Mountain View, California

14              Wednesday, August 27, 2025

15                    Volume I

16

17

18

19

20

21    Reported by:

      CATHERINE A. NOLASCO, RMR, CRR, B.S.

22    CSR No. 8239

23    Job No. NY 7532458

24

25    PAGES 1 - 235

Page 2

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE NORTHERN DISTRICT OF GEORGIA

3                        ATLANTA DIVISION

4

5    _____

                                     )
6    IN RE GEORGIA SENATE BILL 202 )    Master Case No.

                                     )    1:21-MI-55555-JPB
7    _____)

8

9

10

11

12            Videotaped deposition of JUSTIN GRIMMER, Ph.D,

13    Volume I, taken on behalf of Plaintiffs, with the

14    Witness appearing at FENWICK & WEST LLP, 801 California

15    Street, Mountain View, California, beginning at 9:07

16    a.m. and ending at 4:33 p.m., on Wednesday, August 27,

17    2025, before CATHERINE A. RYAN, Certified Shorthand

18    Reporter No. 8239.

19

20

21

22

23

24

25

```
                                                    Page 3
 1      APPEARANCES:
 2
 3      For Georgia NAACP Plaintiffs:
 4           LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             BY:  JULIE M. HOUK
 5           Attorney at Law
             1500 K Street N.W., Suite 900
 6           Washington, D.C.  20005
             (202) 662-8391
 7           jhouk@lawyerscommittee.org
 8           HUGHES HUBBARD & REED LLP
             BY:  VILIA HAYES (appearing remotely)
 9           Attorney at Law
             One Battery Park Plaza
10           New York, New York  10004-1482
             (212) 837-6000
11           (212) 422-4726 Fax
             vilia.hayes@hugheshubbard.com
12
13      For Plaintiffs:
14           AMERICAN CIVIL LIBERTIES UNION FOUNDATION
             BY:  DAVIN ROSBOROUGH
15           Attorney at Law
             125 Broad Street, 18th Floor
16           New York, New York  10004
             703.380.0804
17           drosborough@aclu.org
18
19      For Plaintiffs The Concerned Black Clergy of
        Metropolitan Atlanta:
20
             CROWELL & MORING LLP
21           BY:  CLIFFORD J. ZATZ (appearing remotely)
             Attorney at Law
22           1001 Pennsylvania Avenue, N.W.
             Washington, D.C.  20004
23           (202) 624-2810
             czatz@crowell.com
24
25      //
```

```
                                            Page 4

 1      APPEARANCES (Continued):

 2

 3      For New Georgia Project Plaintiffs:

 4           ELIAS LAW GROUP LLP
             BY:  TINA MENG MORRISON (appearing remotely)

 5           Attorney at Law
             250 Massachusetts Avenue, N.W., Suite 400

 6           Washington, D.C.  20001
             (202) 968-4592

 7           tmengmorrison@elias.law

 8

 9      For Plaintiffs:

10           LEGAL DEFENSE FUND
             BY:  JOHN S. CUSICK (appearing remotely)

11               LEAH C. ADEN (appearing remotely)
             Attorney at Law

12           40 Rector Street, Fifth Floor
             New York, New York  10006

13           (347) 491-2597 (Mr. Cusick)
             (212) 965-7715 (Ms. Aden)

14           jcusick@naacpldf.org
             laden@naacpldf.org

15

16

        For Plaintiffs Asian Americans Advancing Justice:

17

             ASIAN LAW CAUCUS

18           BY:  EILEEN MA (appearing remotely)
             Attorney at Law

19           55 Columbus Avenue
             San Francisco, California  94111

20           (323) 207-8238
             (415) 896-1702 Fax

21           eileenm@asianlawcaucus.org

22

23

24

25      //
```

```
                                                    Page 5
  1      APPEARANCES (Continued):
  2
  3      For Defendants:
  4           SCHAERR JAFFE LLP
              BY:  BRIAN FIELD
  5                JOSHUA J. PRINCE (appearing remotely)
              Attorneys at Law
  6           1717 K Street, N.W., Suite 900
              Washington, D.C.  20006
  7           (202) 787-1060
              (202) 867-4998 Fax
  8           bfield@schaerr-jaffe.com
              jprince@schaerr-jaffe.com
  9
 10           (Mr. Prince was not present at the commencement of
              the deposition proceedings.)
 11
 12      For the Intervenor Defendants:
 13           HALL BOOTH SMITH, P.C.
              BY:  BAXTER D. DRENNON (appearing remotely)
 14           Attorney at Law
              200 River Market Avenue, Suite 500
 15           Little Rock, Arkansas  72201
              (501) 214-3499
 16           bdrennon@hallboothsmith.com
 17
 18      For Macon-Bibb County Defendants:
 19           NOLAND LAW FIRM, LLC
              BY:  GRACE SIMMS MARTIN (appearing remotely)
 20           Attorney at Law
              5400 Riverside Drive, Suite 205
 21           Macon, Georgia  31210
              (478) 621-4980
 22           (478) 621.4982 Fax
              jacob@nolandlawfirmllc.com
 23
 24
 25      //
```

                                                    Page 6

 1      APPEARANCES (Continued):

 2

 3      For Defendant Clayton County Board of Elections and
        Registration, Chatham County Board of Elections, and
 4      Chatham County Board of Registrars:

 5           FREEMAN MATHIS AND GARY, LLP
             BY:  CASEY M. TORRES (appearing remotely)
 6           Attorney at Law
             100 Galleria Parkway, Suite 1600
 7           Atlanta, Georgia  30339-5948
             (470) 588-0317
 8           casey.torres@fmglaw.com

 9

10      For State Defendants:

11           TAYLOR ENGLISH DUMA LLP
             BY:  BRYAN F. JACOUTOT (appearing remotely)
12           Attorney at Law
             1600 Parkwood Circle, S.E., Suite 200
13           Atlanta, Georgia  30339
             (770) 434-6868
14           bjacoutot@taylorenglish.com

15

16      For State Defendants:

17           CLARK HILL PLC
             BY:  BRYAN TYSON (appearing remotely)
18               DIANE FESTIN LaROSS (appearing remotely)
             Attorneys at Law
19           3630 Peachtree Road, N.E., Suite 550
             Atlanta, Georgia  30326
20           (678) 370-4377 (Mr. Tyson)
             (678) 370-4378 (Ms. LaRoss)
21           (678) 370-4358 Fax
             btyson@clarkhill.com
22           dlaross@clarkhill.com

23

24           (Mr. Tyson was not present at the commencement of
             the deposition proceedings.)
25      //

1    APPEARANCES (Continued):

2

3    DANIEL KANG, Paralegal, AMERICAN CIVIL LIBERTIES UNION

     FOUNDATION (appearing remotely)

4

5                        ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                           INDEX

2     WITNESS                                    EXAMINATION

3     JUSTIN GRIMMER, Ph.D

      Volume I

4                        BY MR. ROSBOROUGH            10

5                        BY MS. MORRISON             210

6                        BY MR. FIELD               228

7                        BY MR. ROSBOROUGH          232

8

9

10                          EXHIBITS

11    NUMBER            DESCRIPTION              PAGES

12    Exhibit 1    "SUPPLEMENTAL EXPERT REPORT OF JUSTIN    14

13                 GRIMMER, PH.D"; 76 pages

14

15    Exhibit 2    "SUPPLEMENTAL EXPERT RESPONSE REPORT     14

16                 OF JUSTIN GRIMMER, PH.D."; 34 pages

17

18    Exhibit 3    "EXPERT REPORT OF JUSTIN GRIMMER,        16

19                 PH.D."; 213 pages

20

21    Exhibit 4    "Rebuttal Supplemental Expert Report     32

22                 of Dr. Stephen Pettigrew"; 9 pages

23

24

25    //

Page 9

1                    EXHIBITS (Continued)

2      NUMBER                    DESCRIPTION                   PAGES

3      Exhibit 5   "An Evaluation of Fraud Claims from       35

4                  the 2020 Trump Election Contests*,

5                  Justin Grimmer and Abhinav Ramaswamy";

6                  85 pages

7

8      Exhibit 6   "How Election Rules Affect Who Wins"       41

9                  from Journal of Legal Analysis, 2024,

10                 16, 1-25; 25 pages

11

12     Exhibit 7   "Amended Supplemental Expert Report of     56

13                 Bernard L. Fraga, Ph.D., June 23,

14                 2025"; 22 pages

15

16     Exhibit 8   "Rebuttal Report of Bernard L. Fraga,      57

17                 Ph.D., July 14, 2025"; 20 pages

18

19     Exhibit 9   Press release dated October 31, 2024;     192

20                 2 pages

21

22                        ---o0o---

23

24

25

                                                        Page 10

1          Mountain View, California; Wednesday, August 27, 2025

2                              9:07 a.m.

3

4                  THE REPORTER:  Good morning.  My name is

5          Catherine Nolasco.  And my CSR number is 8239.

6                  Doctor, would you raise your right hand.

7

8                          JUSTIN GRIMMER, Ph.D.,

9          having been administered an oath, was examined and

10         testified as follows:

11

12                            EXAMINATION

13         BY MR. ROSBOROUGH:

14         Q    Good morning, Dr. Grimmer.

15              How are you today?

16         A    Great.  How are you?

17         Q    Good.

18              We met a couple years ago.  I'm Davin

19         Rosborough.  I represent the AME Church Plaintiffs in

20         this case.  I'll be asking most of the questions today.

21         There may be a few questions at the end from one of my

22         colleagues on Zoom, but it will primarily be happening

23         here in this room.

24              Can you please state your name for the record.

25         A    Justin Grimmer.

Page 11

1          Q    Great.

2               And what is your current position?

3          A    I hold two positions at Stanford University.

4     First, in the Department of Political Science, I am the

5     Morris M. Doyle Centennial Professor of Public Policy,

6     and at Stanford's Hoover Institution, I am a senior

7     fellow.

8               MR. ROSBOROUGH:  And I realize we neglected to

9     have other counsel state their names on the record,

10    so ...

11              MS. HOUK:  Good morning, Dr. Grimmer.  My name

12    is Julie Houk.  I represent the Georgia NAACP Plaintiff

13    group.

14              MR. FIELD:  Brian Field, representing the

15    State defendants.

16              MR. ROSBOROUGH:  And perhaps anyone on Zoom

17    can just enter their appearances in the chat, and we can

18    deal with that later.  Thank you.

19         Q    So, Dr. Grimmer, you've been through this

20    before, but I'll be asking a series of questions today.

21    Because they're going to be reflected in a transcript,

22    the goal is a clear and accurate recording of your

23    answers to my questions.

24              So for that reason, please ask me for

25    clarification if you don't understand my question.  If

1     you answer, I'll assume that you understood.

2              Is that okay?

3     A     That sounds good.  Yes.

4     Q     Please wait for me to finish my question

5     before you answer, even if you anticipate what the

6     question might be, and I will do the same with regard to

7     your answers before I ask another question.  That way,

8     the court reporter can get a clear record, okay?

9     A     That sounds good.

10    Q     For similar reasons, even though we're sitting

11    across from each other, please give verbal answers to my

12    questions rather than nodding or shaking your head or

13    saying "uh-huh" or something like that, okay?

14    A     That sounds good.  I will almost certainly

15    also nod, but I will accompany it with a verbal answer

16    as well.

17    Q     Not a problem.  Thank you.

18             Your counsel may make some objections at

19    times, particularly to the form of my questions.  Unless

20    your counsel makes an objection based on privilege and

21    instructs you not to answer, please proceed to answer

22    the question after he states his objection, okay?

23    A     That sounds good.

24    Q     Okay.  Happy to take breaks as needed during

25    the deposition.  We certainly will take some.  If you

```
                                        Page 13
 1      need to take a break at any time, I'm happy to
 2      accommodate that, but please just answer any pending
 3      question before doing so.
 4           A    Yes.
 5           Q    Is there anything that would prevent you from
 6      giving truthful and accurate testimony today?
 7           A    No.
 8           Q    Great.
 9                All right.  Dr. Grimmer, you have authored
10      four reports in this case, correct?
11           A    That is correct --
12           Q    Okay.
13           A    -- yes.
14           Q    There is an initial expert report in 2023,
15      correct?
16           A    That's right.
17           Q    And there was a supplemental report, I
18      believe, later in 2023; is that correct?
19           A    In -- I believe it was in Sep- -- August of
20      2023.  That's right, yes.
21           Q    And then you drafted an -- supplemental report
22      in June of this year, 2025, correct?
23           A    That's correct.
24           Q    And a rebuttal report in July of 2025 --
25           A    That's --
```

1          Q     -- correct?

2          A     That's correct.

3                MR. ROSBOROUGH:  Okay.  Let's go ahead and

4     mark your reports from this year.  I'm going to hand

5     over what we can mark as Exhibit 1 --

6                (Exhibit 1 was marked for identification by

7                the court reporter.)

8                MR. ROSBOROUGH:  -- which I believe --

9                THE WITNESS:  Thank you.

10    BY MR. ROSBOROUGH:

11         Q     -- is your Supplemental Expert Report from

12    June of this year.

13                Does that look to be accurate to you?

14         A     Yes.

15                MR. ROSBOROUGH:  Okay.  And while we're at it,

16    let's go ahead -- and I will hand over what we can mark

17    as Exhibit 2, which I believe is your Supplemental

18    Expert Response Report from July of this year.

19                (Exhibit 2 was marked for identification by

20                the court reporter.)

21    BY MR. ROSBOROUGH:

22         Q    Does that look accurate to you?

23         A    It -- it looks accurate.  I'm trusting we

24    printed off the right thing, yes.

25         Q    Okay.  If you notice any errors, please do let

Page 15

1    me know.

2         A    Yes, I will let you know as we go through it.

3         Q    Of course.

4         A    Thank you.

5         Q    So stepping back a little bit, does your

6    analysis that you performed in either of your 2025

7    reports change any of the opinions you expressed in

8    2023?

9         A    No, it does not.

10        Q    To the best of your recollection, are there

11   any topics that you opined upon in your 2023 report that

12   you did not opine upon in your 2025 reports?

13        A    Yes, there are.

14        Q    And to the best of your recollection, what are

15   those topics?

16             MR. FIELD:  Just object and let the record

17   speak for itself.  The reports speak for themselves.

18             You can answer.

19             THE WITNESS:  I'm going to do my level best to

20   recall the 2023 report and contrast that with the 2025

21   report.

22             MR. ROSBOROUGH:  Well, actually, let's do this

23   one better.  Why don't I go ahead and -- we can go ahead

24   and mark -- so it's not a memory test, we can go ahead

25   and mark your 2023 report.

Page 16

```
 1              So I will hand over what we can mark as
 2      Exhibit 3.
 3                   (Exhibit 3 was marked for identification by
 4                   the court reporter.)
 5      BY MR. ROSBOROUGH:
 6          Q     And take your time look, but I believe that
 7      should be your initial expert report from 2023 in this
 8      case.
 9          A     I'm going to -- just to speed it up.
10          Q     Sure.
11          A     In my 2023 report -- excuse me -- and in the
12      Sep- -- August 2023 report, I had administrative data on
13      the use of -- of drop boxes.  We don't have
14      administrative data from 2022 or 2024, so I don't have
15      an update for that administrative rate of drop box use.
16          Q     So just to clarify, the lack of data -- of
17      administrative data for '22 and '24 is the reason you
18      didn't update that opinion in your reports this year; is
19      that correct?
20          A     I have no analogous data source to -- that
21      corresponds to the data source that I used, either
22      eventually getting replication data from Dr. Burden, or
23      I used data that had been compiled by -- I'm not going
24      to get the name of the news organization correct, but
25      they had compiled data based on the return receipts.
```

                                                    Page 17

1    I'm unaware of a data set that has that same data for

2    '22 or '24.

3            Q    Okay.  Understood.

4            A    I don't address the anti-duplication or the

5    prefilled ballot provisions in this updated report.  My

6    recollection from my prior report is that my opinion

7    there was primarily based on literature from the field

8    about what we knew about the effects of pre-filling

9    absentee ballots.

10           Q    Okay.  Appreciate it.

11           A    And in my 2023 report, I engage in a

12   calculation to discuss the -- whether it would be likely

13   to -- the likelihood of anticipating the political

14   effects of SB 202.  I don't provide an updated opinion

15   about that in the 2025 report.  The mathematics of that

16   remain the same.

17           Q    Okay.

18           A    And I believe -- I believe that's the total of

19   the report.

20           Q    Okay.  I appreciate that.

21                Now that you have offered your supplemental

22   reports in 2025, do you offer any opinions about whether

23   the provisions of Georgia Senate Bill SB -- Georgia

24   Senate Bill 202, which I'll refer to as SB 202, have

25   increased or are likely to increase voter confidence?

1           A    I do not offer any opinions about voter

2      confidence in SB 202.

3           Q    And similar question:  Do you offer any

4      opinions in this case about whether the provisions of SB

5      202 have deterred or prevented voter fraud or are likely

6      to do so in the future?

7           A    I offer no opinions about that.

8           Q    Okay.  It's been a couple of years since your

9      last deposition.  I -- I'm going to ask you about a

10     couple of articles that I believe you've -- you've put

11     out since that time that may relate to your opinion, and

12     I'll just name them.  An Evaluation of Fraud Claims from

13     the 2020 Trump Election Contests and your paper with

14     Dr. Hersh on How Election Rules Affect Who Wins.

15          A    Mm-hmm.

16          Q    Can you think of any other publications that

17     you have issued since your deposition in 2023?

18          A    Can I have my CV?  Do you have my --

19          Q    I -- I do not have an updated copy of your CV.

20     Let me -- let's come back to that.  I can try to print

21     that during a break, and we can come back to that later.

22          A    The only reason I had asked is I think I

23     published nine papers since then.

24          Q    Okay.

25          A    So I'm not trying to be nonresponsive.  I just

Page 19

```
 1    want to be sure I get it right.
 2         Q    I understand.
 3         A    Okay.
 4         Q    And since that time, have you provided expert
 5    reports or expert witness testimony in any additional
 6    cases?
 7         A    I have, yes.
 8         Q    And what are those cases?
 9         A    This is another one where I'll make sure I'll
10    get you the list just to be sure I get it right, but let
11    me give you sort of the high points, and then I'll get
12    you the list to make sure it's exactly correct.
13              So I was deposed and testified twice at the
14    California State Bar verse John Eastman disbarment
15    proceedings, where I was retained by the State Bar.
16              I wrote an expert report for -- I believe it's
17    the City of Whittier verse the California Superior
18    Court.  I'll get you the court case correct.  That is
19    about A- -- the use of AI in making bail decisions.
20              And then I have written a report for a case in
21    the state of Georgia called Vote.org verse the Georgia
22    State Board of Elections, and I was deposed in that case
23    as well.
24              I've written a report in the State of -- I
25    think it's State of Alabama NAACP verse an Alabama state
```

Page 20

1    official -- I'll get you the name for that case -- where

2    I was retained by the State of Alabama.  And then I

3    testified at a bench trial in Vote America verse

4    Raffensperger.

5          I believe that's the total of my engagements.

6    But, again, I'll get you the list during the break just

7    to make sure.

8         Q    Thank you.  I appreciate that.

9         A    Yeah.

10        Q    And, yeah, I had meant to print out an updated

11   copy and failed to do that.  So we will -- we will do

12   that.

13        A    Okay.

14        Q    I'm not trying to test your memory.

15        A    Okay.

16        Q    A few follow-up questions.

17          In the Vote.org case, what was the general

18   subject of your testimony?

19        A    There, I was looking at absentee voter history

20   files, in this case provided by counties, and assessing

21   the number and rate of electronic signature rejections

22   in applications.

23        Q    And -- and broadly speaking, what opinions did

24   you offer in that case?

25        A    I calculated the rate of electronic signature

Page 21

```
 1      rejections.  And I'm sorry.  I don't have the -- those
 2      rates in my -- my head, but it was very -- the opinion
 3      was just very much reporting what those rates of
 4      rejections were.
 5          Q    Okay.  Any other topics you opined upon in
 6      that case that you can recall?
 7          A    Not that I can recall at the moment, no,
 8      but ...
 9          Q    In the -- you referred to the Alabama NAACP
10      case?
11          A    Yes.
12          Q    Would that potentially be Alabama NAACP v.
13      Marshall?
14          A    Yeah, I think that that's correct.  Yes.
15          Q    Okay.  And what was the topic of your report
16      and testimony there?
17          A    As best I recall, there was also some
18      discussion about pre-filling absentee ballots in that
19      case, so it was a discussion of pre-filling absentee
20      ballots, and then I also engaged in an assessment of
21      evidence about claims made about prior mobilization
22      strategies from groups.
23          Q    And when you say prior mobilization strategy
24      of groups --
25          A    There were -- I'm sorry to interrupt.
```

Page 22

```
1        Q    No.  Can you be more specific?

2        A    Yeah.  I'll try to be as specific as I can --

3        Q    Sure.

4        A    -- not having recollected much about the -- I

5   haven't thought about the report in a while.

6             But if I recall, there were claims made based

7   on historical newspaper articles about how various

8   groups in the state of Alabama may have tried to

9   mobilize around absentee voting, and I assessed those

10  claims based on my own reading of those articles, the

11  historical record.

12       Q    Understood.

13            And then, finally, what was the general

14  subject of your testimony in Vote America v.

15  Raffensperger?

16       A    There, I, again, discuss the pre-filling

17  prohibition as part of SB 202, and then I also testified

18  about the feasibility of -- of implementing the

19  requirement of not sending an absentee ballot

20  application to individuals who are already on the

21  absentee -- who had already applied for and obtained an

22  absentee ballot.

23       Q    Returning to this case specifically, we

24  marked, as Exhibit 2, I believe, your Supplemental

25  Expert Response Report that you completed in July of
```

                                                    Page 23

1     this year, correct?

2          A     Both of those things are correct.

3          Q     Okay.

4          A     It is Exhibit 2, and I completed it in July,

5     yes.

6          Q     Thank you.

7                Since the time you submitted that report, have

8     you reviewed any new materials from the case?

9          A     Yes.  So I submitted my report, and I obtained

10    the surrebuttal reports from the other experts in this

11    case.  I also, in -- as a -- in the process of reading

12    Dr. Fraga's surrebuttal, became aware of a, I believe,

13    January 2024 report that he wrote as part of a -- I

14    believe a summary judgment motion.  So I've reviewed

15    that report.

16               I've also attended Dr. Fraga's deposition, and

17    I've read the transcript from Dr. Pettigrew and

18    Dr. Chatman's deposition, and as part of Dr. Pettigrew's

19    deposition, he brought up an interesting issue about a

20    voter who maybe lived in New Hampshire, maybe they lived

21    in Georgia, but luckily the CES has released its

22    vote-validated data, and so I was able to address

23    Dr. Pettigrew's critique there with the vote-validated

24    data.  I'm not -- I'm sure you don't want me to talk

25    about that right now, but --

1        Q    We'll come back to it.

2        A    Yeah, we'll come back to it.  I just wanted to

3    make sure I flagged that to you.

4             MR. ROSBOROUGH:  Perfect.

5             MR. FIELD:  Can we go off the record for just

6    a minute?

7             MR. ROSBOROUGH:  Sure.

8             (Discussion Off the Record.)

9             MR. FIELD:  We can go back on.

10            MR. ROSBOROUGH:  Okay.

11       Q    I believe, Dr. Grimmer, you mentioned that you

12   attended, by Zoom, I think --

13       A    Yes.

14       Q    -- Dr. Fraga's deposition last month; is that

15   correct?

16       A    That's correct.

17       Q    Have you since reviewed the transcript of that

18   deposition?

19       A    I have, yes.

20       Q    Okay.  Have you reviewed any other deposition

21   transcripts in this case from this summer besides Fraga,

22   Pettigrew and Chatman, to the best of your recollection?

23       A    I -- just to say it back to you to make sure

24   I'm not missing any, I have not reviewed Dr. Clark's,

25   and I have not reviewed Dr. Lee, and I think that's the

Page 25

1    universe of experts who have been deposed on this round,
2    so yeah.
3        Q    Let's turn briefly to Dr. Fraga's deposition.
4            Did you learn anything new from that
5    deposition?
6            MR. FIELD:  Object to form.
7            THE WITNESS:  I did, yes.
8    BY MR. ROSBOROUGH:
9        Q    And what do you recall learning from that
10   deposition that was new to you?
11       A    Two things.  One, when given the invitation,
12   Dr. Fraga could not offer a definition of "impact,"
13   despite using it regularly in his reports in 2023 and
14   again in 2025.  Instead, at least in response to the
15   question he asked -- he was asked, he said he was using
16   my definition of "impact," but, of course, in the
17   particular question he was asked and across my reports,
18   I'm not estimating causal effects.  I don't offer a
19   definition of "impact" for that reason.  So it was
20   important for me for understanding the context of
21   Dr.~Fraga's report that he seems unclear about what he
22   means by impact.
23           Second, Dr. Fraga disclosed that he did not
24   consider the 2018 Georgia secretary of state runoff
25   election because he said the turnout was too low.

```
1       That's an example of selection on the dependent
2       variable, which has serious implications for evaluating
3       research design strategy and can lead to bias in the
4       estimates.
5           Q    Can you say a little bit more on the second
6       point?  How -- let me make sure I got this right.
7               You -- you mentioned selection dependent
8       variable?
9           A    I'll get the phrase exactly right.  It's
10      called "selection on the dependent variable."
11          Q    And what does that mean?
12          A    So when we conduct a study -- just to give you
13      an analog, suppose I'm interested in knowing if I give
14      you a pill, is that going to abate your headaches, and
15      I'm from a drug company, and I really would like my pill
16      to get rid of headaches.
17              And so I go to my treatment group, the people
18      who receive my pill, and I remove from my treatment
19      population everyone who reports having a headache.  That
20      would be selection on the dependent variable.  That's
21      very bad.  That's going to cause a bias in our estimate
22      of the treatment effect.  In this headache example, it
23      would make the treatment look more effective than it
24      otherwise would be.
25              In Dr. Fraga's instance, he asserts that we
```

1    can only look at elections beginning in 2018 because he

2    claims this is when Georgia became competitive, and

3    that's very key for his design.  However, he then

4    excludes an election that has lower turnout and since he

5    wants to assert that turnout has in some way decreased

6    or turnout gaps have increased after SB 202, by removing

7    a low turnout election, he would be biasing his

8    estimates in a way that would be favorable to the

9    conclusion that he appears to want to make.

10        Q    Is it your opinion that in not examining the

11   2018 secretary of state runoff, that there's the

12   selection-on-the-dependent-variable problem for his

13   turnout analysis specifically or for other analyses in

14   his report as well?

15        A    It would be specifically for his turnout

16   analysis --

17        Q    Okay.

18        A    -- yeah.  Although, I should say I don't know

19   what else he looked at for the 2018 runoff election, if

20   he made other exclusions based on that, but he said he

21   excluded it because the turnout was low.

22        Q    Okay.  So just -- just for the sake of

23   clarity, your criticism of his exclusion is -- is

24   directed to his opinions as to turnout; is that fair?

25             MR. FIELD:  Object to form.

```
 1              THE WITNESS:  It is immediately applicable to
 2   his turnout conclusions, and that's what he was speaking
 3   to.  I don't want to speak more -- beyond that.  I don't
 4   know what else he looked at.  He did say turnout was low
 5   in that election, and, therefore, he excluded it.
 6   BY MR. ROSBOROUGH:
 7        Q    You mentioned two new things that you learned
 8   from that deposition of Dr. Fraga last month.
 9              Was there anything else that you can recall
10   that was new to you upon listening to his deposition?
11        A    There were reactions to things in my
12   surrebuttal report.  So anytime he was -- I obviously
13   would have no mechanism to know about what -- how he
14   would react to what was in my July report except through
15   the deposition.  So that would be new.
16              And, you know, over the course of our
17   deposition today, if something -- if I remember
18   something else that's new, I will be sure to flag it to
19   you, but at the moment, no, but it's very possible that
20   there's something else, and I will do my best to flag
21   where it comes from when I bring it up.
22        Q    I appreciate that.
23              And I believe you mentioned that you also
24   reviewed the transcript of the deposition --
25        A    That's correct --
```

Page 29

1          Q     -- is that correct?

2          A     -- yes.

3          Q     After reviewing the transcript, was there

4    anything else that you believe it was new to you that

5    had not occurred upon listening to the deposition?

6          A     I guess I should be very clear that the way I

7    just responded was really the combination of the two.  I

8    guess in my sequence of learning about what Dr. Fraga's

9    opining about and his basis for that, it's going to be

10   hard for me to distinguish from the viewing of the

11   deposition to the reading of the transcript, and so I --

12   there would be nothing additional at the moment.

13         Q     Did your listening to the deposition and

14   reviewing the transcript of Dr. Fraga's July 2025

15   deposition change any of your opinions in this case?

16         A     No.

17         Q     Did it cause you to conduct any additional

18   analysis that's not reflected in your reports?

19         A     In the surrebuttal, but then also in the

20   deposition, Dr. Fraga discusses an article by

21   Greenberger and Roberts, and so I had previously read

22   that article and engaged with it.  As it happens, I had

23   obtained replication file for a separate project, but

24   that is very closely related to the state of Georgia.

25   In order to better understand Dr. Fraga's opinion in

Page 30

1    bringing up that article, I did look at Dr. Fraga's

2    replication file from 2023 to look at average distance

3    from drop box in order to understand how the effects

4    estimated in Greenberger and Roberts corresponded with

5    Dr. Fraga's estimates, but otherwise, there's no new

6    data analysis from reading the -- attending or reading

7    the deposition.

8         Q    Okay.  You also reviewed the transcript of

9    Dr. Chatman's deposition from the summer, correct?

10        A    That's correct, yes.

11        Q    Same question:  Is there anything new you

12   learned upon reading Dr. Chatman's deposition relating

13   to this case?

14        A    He makes a claim of statistical significance

15   for his results.  That's not -- that analysis is not

16   reported in his code, and it's -- so it's unclear to me

17   what the basis for that was.  He asserts it again in his

18   deposition, but doesn't offer a basis for that opinion,

19   the sort of analysis he conducted, but, otherwise,

20   there's nothing else.

21        Q    Did you undertake any independent assessment

22   of statistical significance after learning about his

23   opinion there?

24        A    So from Dr. Chatman, we've obtained code in a

25   programming language called Python, so I've reviewed

1    that code.  Unfortunately, Dr. Chatman has not provided

2    us with the data sets that he uses.  He has stated that

3    they're publicly available, which is true.  Just given

4    the number of hours I have in the day, I'm not able to

5    go obtain the data sets and put them in the format

6    appropriate for Dr. Chatman's Python code, so I haven't

7    been able to engage in an independent assessment of that

8    claim.

9         Q    Okay.  So at the -- as of the moment, you

10   don't know one way or another whether his claims of

11   statistical significance are correct; is that fair?

12        A    I know that it's not contained in his code.

13   So if he's making that claim, it's based on a

14   methodology not reported in his report and not reported

15   in his replication code.

16        Q    Okay.  And you testified that you also

17   reviewed the deposition transcript of Dr. Pettigrew,

18   correct?

19        A    Correct.

20        Q    From the summer, I should say?

21        A    Yes.

22        Q    Other than the issue regarding CES coding that

23   you mentioned and which we can discuss in more detail

24   later, were there any other -- was there any other

25   information pertaining to this case that was new that

Page 32

```
1      you learned from reading his deposition transcript?

2          A    Yes.  It confirmed that Dr. Pettigrew made a

3      basic statistical error in applying a null hypothesis

4      test in his analysis of wait times in his surrebuttal

5      report.

6          Q    And what -- what do you assert is the basic

7      statistical error that he made in applying his null

8      hypothesis test?

9          A    Without the report in front of me, I'm just

10     going to do my best to --

11              MR. ROSBOROUGH:  Well, let's get you the

12     report.

13              THE WITNESS:  Okay.

14              MR. ROSBOROUGH:  That will be more helpful.

15              THE WITNESS:  I just want to be precise.

16              MR. ROSBOROUGH:  No.  I understand.  Give me

17     one second.

18              THE WITNESS:  Mm-hmm.  Just -- I don't mean

19     to -- but is there some way we can figure out -- it

20     looks like --

21              MR. ROSBOROUGH:  Let's go off the record.

22              MR. FIELD:  Let's go off the record for a

23     second.

24              (Discussion Off the Record.)

25              (Exhibit 4 was marked for identification by
```

Page 33

```
 1                 the court reporter.)
 2                 MR. ROSBOROUGH:  Okay.  Back on the record.
 3       Q    I have handed you what -- marked as Exhibit 4.
 4                 Do you recognize this as the Rebuttal
 5       Supplemental Expert Report of Dr. Pettigrew from July of
 6       this year?
 7       A    I do, yes.
 8       Q    Okay.  Now that you have the report, let me
 9       re-pose the question to you, and please correct me if
10       I'm not getting it right.  I'm trying to ask based on
11       your prior answer.
12                 I believe you said that you learned from
13       Dr. Pettigrew's deposition transcript that he -- you
14       confirmed that he made a basic statistical error in
15       applying a null hypothesis test to wait times.
16                 Did I get that right?
17       A    That's right, yes.
18       Q    And what do you assert that the error is that
19       he made?
20       A    On page 5, the paragraph that begins:  "Table
21       16," Dr. Pettigrew uses the table from my expert report
22       in order to calculate the overall share of Georgia
23       voters who waited more than 30 minutes in 2024 and 2022.
24       Dr. Pettigrew then goes on to assert that these are
25       statistically significant.  It's unclear from the report
```

1    what he means by that.  It appears that he means he's

2    comparing it to zero.  He confirmed this in the

3    deposition and, in fact, walked through what I would

4    describe as a standard null hypothesis framework, where

5    you assume a null hypothesis, a sort of state of the

6    world that you're trying to see if you have evidence

7    against, and then you obtain a test statistic based on

8    that state of the world that says:  Given my data, how

9    surprising is this?  And Dr. Pettigrew goes on to

10   describe that, you know, sometimes you might think it to

11   be bigger than zero or less than zero.

12          The issue here is that the null hypothesis

13   that he's adopted is that there's no one who waits more

14   than 30 minutes.  The test statistic under that null

15   will not have the same distribution as a test statistic

16   of a null hypothesis of, say, 0.1 or 0.2, and that's

17   because it is impossible for the -- for the -- the share

18   of voters -- impossible for the share of voters who are

19   waiting more than 30 minutes to be less than 0, and as a

20   result of that, if you have a null hypothesis -- if I

21   say the state of the world is no one waits more than 30

22   minutes, then observing a single person is sufficient to

23   reject that null hypothesis because it is not zero.

24          And so Dr. Pettigrew's assertion about either

25   measurement error, which is not contained in his null

```
                                                          Page 35
 1      hypothesis test that he describes here or other

 2      applications, are in error.  He's applied a test that

 3      would be -- if applied appropriately, would reject the

 4      null if a single person waits more than 30 minutes to

 5      vote.  So his application was in error.

 6           Q    Was there any other information aside from the

 7      null hypothesis issue you identified and the CES coding

 8      and validation issue, which we'll come back to later,

 9      that you learned from the -- Dr. Pettigrew's deposition

10      transcript?

11           A    Again, I believe that's it, but if -- as I'm

12      answering, if something else comes up, I'll be sure to

13      flag it so I can be as responsive as I can to this

14      question.

15           Q    Sure.  Okay.

16                We can move along from that topic for a

17      moment.  I mentioned that I believe you had a couple of

18      new publications.

19           A    (Witness nods head.)

20                MR. ROSBOROUGH:  Let's go ahead and mark the

21      first one, which I believe should be Exhibit 5.

22                (Exhibit 5 was marked for identification by

23                the court reporter.)

24      BY MR. ROSBOROUGH:

25           Q    Okay.  Can you -- well, first of all, what --
```

```
                                               Page 36
1     what is -- can you identify the exhibit that I just
2     handed you?
3          A    Yes.  So I also want to be clear.  This has
4     not been published yet.  This is a working paper posted
5     on my website.  So this is a paper that I wrote with my
6     graduate student Abhinav Ramaswamy that evaluates claim
7     -- fraud claims made in the 2020 election.
8          Q    Okay.  And you are seeking to have this
9     published, but it has not been published yet, correct?
10         A    We haven't submitted it yet.  In its current
11    form, it's very long, and so we're strategizing about
12    how best to publish it.
13         Q    Okay.  I just have a few questions.  If we
14    could flip to the bottom of page 21 here.
15         A    Yeah.
16         Q    You write:  In many ways, Georgia has been the
17    primary battleground for voter fraud claims, correct?
18         A    Yes.
19         Q    And you believe this is true, in part, because
20    Georgia has been extremely closely contested; is that
21    right?
22         A    Yeah.
23              So just to provide some context for this
24    statement, so the paper is a compilation of the claims
25    that President Trump made after the 2020 election, and
```

1    it was just true as a sort of matter of effort, reports

2    filed, that there were a lot of claims filed in Georgia.

3    While I don't do an analysis of President Trump's

4    strategy, in many ways it appeared to be the case that

5    because the margin was so thin, they thought it was the

6    most plausible location where they could win a case.

7        Q    Is it fair to say that you discuss a number of

8    the major claims that President Trump and his allies

9    made about why they stated there was extensive fraud in

10   Georgia regarding the 2020 election?

11       A    Yes.

12       Q    Okay.  What was the claim concerning signature

13   matching?

14       A    Yeah.  So there's a variety of these claims

15   made, and so one of the challenging things about writing

16   this paper is that there's no one claim made, but in

17   particular, a lot of this paper came from the work I did

18   in the Eastman case, and what we saw from Dr. Eastman

19   was claims that there had been a big change in the rate

20   of rejection of absentee ballots because of a signature

21   evaluation procedure.  He pointed to a change in Georgia

22   procedure as a reason for that.

23            And in our analysis, what we show here is that

24   there's really not much of a change in the rate of

25   signature rejections across the elections we analyze.

```
 1      If you wanted to understand why 2020 had a lower
 2      rejection rate, you wouldn't go to signatures.
 3          Q    Understood.
 4               And what did you find the reason was?
 5          A    Yeah.  This actually -- make a similar
 6      argument in my June report.  It's -- you see that
 7      there's a much lower deadline rejection rate.  That's
 8      one reason.  And then simplification of the oath is a
 9      second reason.  Those would be the two that we would see
10      a lower rejection rate.
11          Q    And when you say "simplification of the oath,"
12      are you referring to the HB 319's removal of the birth
13      date and address requirements on the oath envelope?
14          A    So I think it's HB 316.
15          Q    You are right.
16          A    Okay.  So -- yeah.  So in 2020, after HB 316,
17      I believe, it's address and -- and birth date are
18      removed.  I'm sorry if there's something else that has
19      also changed there, but that is what we see in my
20      analysis of this, Dr. Fraga's analysis of this, and also
21      in this paper is that oath-related rejections go down
22      after the 2018 election.  And then the 2020 election had
23      a much lower rate of rejection because ballots were
24      returned -- for reasons -- let me start that over.  I'm
25      sorry.
```

```
                                           Page 39
 1            The 2020 election had a lower rate of ballot
 2      rejections for arriving after the deadline.
 3            Q     Are you aware of whether Georgia's law around
 4      signature matching changed after 2020?
 5            A     It did, yes.
 6            Q     Was that part of SB 202, to the best of your
 7      knowledge?
 8            A     Well, two things I think would be relevant to
 9      the analysis.  So I believe SB 202 added the requirement
10      to include birth date again on the oath envelope, and
11      then the second component would be that evaluation moved
12      from a signature-based matching procedure to one based
13      on providing identification information, like a driver's
14      license or, having obtained your ballot, the last four
15      of your Social.
16            Q     What was the fraud claim that was being made
17      around absentee ballot rejection rates dropping?  Oh,
18      I'm sorry.  That's -- let me -- let me rephrase.  I'm --
19            A     Yeah.
20            Q     There was another claim in here about early
21      absentee ballot distribution --
22            A     Oh.
23            Q     -- correct?
24            A     Mm-hmm.
25            Q     What did you find -- what was that claim,
```

Page 40

```
 1      first of all?
 2           A    Yeah, there's -- can you just point to where
 3      it is in the paper?
 4           Q    Absolutely.  Absolutely.
 5           A    I'm --
 6           Q    No.  That's fine.
 7           A    -- 98 percent of the way there, but I just
 8      want to be absolutely sure --
 9           Q    It's page 33, I believe.
10           A    Yeah.  Yeah.  There's really two just related
11      claims.  I want to be sure that I'm responsive to it.
12                So one claim that's made by some reports filed
13      for Trump-related cases, that individuals appeared
14      unaware of the rollover list or the ability for someone
15      to apply, say, in the primary election and then continue
16      to receive absentee ballots for related elections if
17      they're over 65 or self-identified as disabled.
18                Here -- it's been a while since I thought
19      about this specific analysis, but I recall that there is
20      a small number of ballots that were issued too early,
21      and so we were just able to look at the county -- the
22      counties where that occurred, and it looked like it
23      occurred in one county --
24           Q    Okay.
25           A    -- yeah.
```

```
                                           Page 41
 1          Q    And are you aware of whether Georgia changed
 2     its laws around the timing of absentee ballot
 3     distribution after 2020?
 4          A    I believe it did, but I'm not recalling the
 5     date on it.
 6          Q    Okay.  One of the areas that you've spent some
 7     time studying is how election law changes affect voter
 8     turnout; corr- -- is that fair?
 9          A    I've written a couple of papers about that,
10     yes --
11          Q    Okay.
12          A    -- a few papers.
13               MR. ROSBOROUGH:  Let's go ahead and hand over
14     the other paper that I mentioned that we'll mark as
15     Exhibit 6.  Thank you.
16               THE WITNESS:  Just in the interest of being --
17     can I -- are you done with this -- done with --
18               MR. ROSBOROUGH:  Yeah.  You can put that
19     aside.  Sure.
20               THE WITNESS:  Thank you.
21               (Exhibit 6 was marked for identification by
22               the court reporter.)
23     BY MR. ROSBOROUGH:
24          Q    Okay.  Can you describe what the article is?
25     What is the title of the article that I just handed you?
```

                                                    Page 42

1          A     "How Election Rules Affect Who Wins."

2          Q     And you authored this article with Eitan

3     Hersh; is that correct?

4          A     That's correct, yes.

5          Q     And when did it -- when was it published?

6          A     In 2024.

7          Q     Okay.  So since your last deposition and first

8     round of expert reports?

9          A     That's right.

10         Q     And it was published in the Journal of Legal

11    Analysis; is that right?

12         A     That's right.

13         Q     Okay.  And I think you might have also spoken

14    some about your analysis here on a Hoover Institution

15    podcast.

16               Does that sound familiar?

17         A     Yeah, that sounds familiar.

18         Q     So I've got a few questions about the article

19    specifically and just sort of your findings in this area

20    generally.

21               Do you agree that a law might have a

22    disproportionate effect on a group, whether it's a

23    political group or a racial group, without the law

24    having a large numerical effect on a group's turnout?

25               MR. FIELD:  Object to form.

Page 43

```
 1                THE WITNESS:  I just want to be sure I

 2     understand the question.

 3                MR. ROSBOROUGH:  Sure.

 4                THE WITNESS:  So can I just ask it back or --

 5                MR. ROSBOROUGH:  Let me -- let me --

 6                THE WITNESS:  Yeah.

 7                MR. ROSBOROUGH:  -- try to rephrase it a

 8     little.

 9                THE WITNESS:  Yeah.

10     BY MR. ROSBOROUGH:

11          Q    Do you agree that sometimes a voting law can

12     have a disproportionate impact on turnout in a racial or

13     political group without having a large numerical effect

14     on that group's turnout?

15          A    Yes, that's -- that's possible.

16          Q    And I think -- and maybe I should have just

17     given this first, but I think you gave the North

18     Carolina voter ID law as potentially an example, and I'm

19     not trying -- I'm sure you'll correct me if I'm -- if

20     I'm misparaphrasing you, but did I correctly understand

21     you to say that even though Democrats were

22     disproportionately targeted by the North Carolina voter

23     ID law, that it did not have a large partisan effect on

24     turnout?

25                MR. FIELD:  Object to form.
```

```
 1              THE WITNESS:  I just want to just sort of zoom
 2     back to make sure, because the word "targeted" could
 3     have, like, one particular meeting in one setting, and
 4     we use it in a different way in this paper, and I just
 5     want to be sure that we're clear about how we're using
 6     it here.
 7              Here, we mean "targeted" as in individuals who
 8     could be affected by the law.  And so in the North
 9     Carolina analysis that I conducted with my then-grad
10     student Jessee Yoder, we examined the differential
11     effect of a North Carolina voter ID law that was in
12     place for a primary election, comparing individuals who
13     we knew did and did not have a North Carolina driver's
14     license.
15              There, we found, depending on the
16     specification analysis, something like a 0.7 percentage
17     point deterrent effect among individuals without a
18     driver's license.  That effect was not particularly
19     heterogeneous.  And by "heterogenous," I mean the effect
20     was not bigger or smaller for Democrats or Republicans
21     or White or Black individuals.  However, in North
22     Carolina, Black individuals were more likely to not have
23     ID, less likely to have ID in the State file.  So the
24     result of applying the small effect that we estimated to
25     the population would be potentially there could be a
```

Page 45

1    disproportionate effect among Black North Carolinians or

2    a disproportionate effect among Democrats.

3                The key conclusion, though -- and certainly

4    why it's relevant for this paper -- is that, as you

5    said, there is not a large numeric effect on the

6    election results -- on the composition of the

7    electorate.

8    BY MR. ROSBOROUGH:

9        Q    Okay.  And I think, in terms of the biggest

10   factors that you believe do affect turnout -- well, let

11   me back up.

12               There are lots of factors that can affect

13   turnout, correct?

14       A    Yes.

15       Q    Okay.  Excitement about candidates and/or

16   strong dislike of candidates can be particularly large,

17   important factors that affect turnout?

18               MR. FIELD:  Object to form.

19               THE WITNESS:  Yes.  It's very hard to isolate

20   the causal effect of dislike of a candidate or liking a

21   candidate, but, yes, that is something that could affect

22   turnout.

23   BY MR. ROSBOROUGH:

24       Q    The existence of competitive electoral

25   contest; is that something that can affect turnout?

```
                                                    Page 46
  1        A    That is something that can affect turnout,
  2   yes.
  3        Q    Okay.  I want to go to page 23 of this paper.
  4   And I need to find where on here -- and I'm sorry.  I
  5   have the quote here, but I'm not -- I need to find it on
  6   the page.
  7            Oh, here we go.  Okay.  So if you could go to
  8   the bottom of the third paragraph on the page.
  9        A    Uh-huh.
 10        Q    You write (as read):  To the extent that
 11   advocates believe that mobilizing or demobilizing racial
 12   groups is a path to helping their party win elections,
 13   their institutions may be way off base.
 14            Did I read that correctly?
 15        A    Just slightly wrong.  It's "their intuitions."
 16        Q    Oh, you're right.  I'm sorry.  Yes.
 17        A    Okay.
 18        Q    Okay.  Let me reread that.
 19            "To the extent that advocates believe that
 20   mobilizing or demobilizing racial groups is a path to
 21   help their party win elections, their intuitions may be
 22   way off base."
 23            Did I read it correctly that time?
 24        A    I believe so, yes.
 25        Q    So, in effect, is this saying, while a
```

Page 47

1    legislature may choose to craft voting policies in a way

2    that they believe would disproportionately harm a racial

3    group, they are not likely to be effective in actually

4    having much of an impact?

5        A    I don't think we assess the likelihood of that

6    in this article.  Like, we don't offer an analysis of

7    the population of -- of laws.

8        Q    Let me ask you a question a little more tied

9    to the text of this, then.

10            What do you mean when you say:  To the extent

11    that advocates believe that mobilizing or demobilizing

12    racial groups is a path to helping their party win

13    elections, that their intuitions may be off base?  Why

14    -- why would their intuition that demobilizing racial

15    groups is a path to helping their party win elections be

16    off base?

17        A    Yeah.  So it's a relatively subtle issue, but

18    one not only picked up here, but there's been some

19    subsequent literature on this, including -- I believe

20    his name is Nick Stephanopoulos at Harvard Law School

21    has written a paper that builds on the analysis that we

22    do here pretty extensively.

23            So there's two different dynamics we might be

24    interested in from a law.  So one question could be:

25    Does a law disproportionately affect some group?  Okay.

Page 48

1    So, for example, the North Carolina law, I explain why

2    it might disproportionately disadvantage or affect Black

3    North Carolinians.

4              However, translating that into the political

5    effect of the law is actually pretty complicated because

6    a disproportionate analysis conditions on the size of

7    the group.  The political consequences will be a

8    function of the size of the group.

9              What makes it even more, I would say,

10   interesting or complicated now is a subtle realignment

11   that's happening in American politics where low

12   socioeconomic status White voters are now the Republican

13   Party and Trump's most reliable base.  The result of

14   this is if you have a policy that also would affect

15   those voters, because in many states there's many more

16   White voters than minority voters, almost by

17   definition -- even if you have an intuition that

18   demobilizing some group is going to be helpful for your

19   party, it wouldn't necessarily translate using the

20   mathematical equations that we used here because of the

21   differences in group size.

22        Q    I think I understand that.

23             And I guess a follow-up question is:  How is

24   -- how, if at all, does turnout play into that analysis?

25        A    This is almost entirely a discussion of the --

1    how laws affect turnout, and so there, the idea -- here,

2    we mean mobilizing or demobilizing racial groups.  The

3    sort of clause probably missing here is "through

4    election administration policy," is, because of the --

5    this importance of taking into account group size will

6    have, it will be difficult to go from believing one side

7    has a proportionate effect or disproportionate effect to

8    translating that to the political advantage from your

9    party requires a different analysis than what usually is

10   conducted in analysis that we conduct in here.

11        Q    I guess the follow-up from that is:  If you

12   were looking to evaluate whether a law was passed with

13   some sort of discriminatory intent, whether it's racial

14   or partisan or using race to a partisan end, looking at

15   turnout effects may not provide you the most relevant

16   information; is that a fair statement?

17        A    I --

18             MR. FIELD:  Object to form.

19             THE WITNESS:  I mean, I apologize that I don't

20   know the complete legal standard for assessing what is

21   and is not relevant.  Certainly turnout could be one

22   component of that, which -- which we analyze here.

23             MR. ROSBOROUGH:  That's an important point,

24   and let me clarify.

25        Q    I'm certainly not asking you a relevance

Page 50

```
 1        question in terms of the law.
 2                   As a political scientist, if you were to look
 3        at whether or not a law might have been passed with an
 4        intent to target a particular group, whether racial or
 5        political, and you are looking to effects to try to
 6        determine that, what role would turnout play?
 7             A    I don't think I would use effects to make an
 8        intent argument.  People can have intent and be quite
 9        inept or people could have no disclosed intent and be
10        quite capable.  Or -- sorry -- no intent at all and by
11        happenstance end up with an effect.
12                   So this article is not at all about an
13        assessment of intent, and looking at effects would be
14        not a very useful way, I think, to get at intent.
15             Q    Okay.  Just a couple more questions about the
16        article.
17                   Skipping down a couple paragraphs, so I think
18        we're at the last full paragraph on the page starting
19        with "No."
20             A    Yep.
21             Q    You state:  "The public, and its leaders,
22        should care about election laws for reasons other than
23        their partisan consequences, such as whether they make
24        voting convenient, more secure, more cost effective, and
25        whether they are motivated by discriminatory intent."
```

Page 51

1           Did I read that correctly?

2      A    Yes.

3      Q    Okay.  I want to make clear here:  Are you

4  expressing any opinions in your analysis in this case

5  about whether or not the provisions of SB 202 make

6  voting more convenient?

7      A    No.  I've not even defined what would make

8  something more convenient, so no.

9      Q    Okay.  Similarly, are you offering any

10  opinions in this case about whether or not any of the

11  provisions of SB 202 would make voting more secure?

12      A    No.

13      Q    And similarly, are you offering any opinions

14  in this case about whether the provisions of SB 202

15  would make voting more cost effective?

16      A    I've not engaged in an analysis of that.  The

17  only thing tangentially related is the canceled ballot

18  issue, but there, I'm really only performing a

19  calculation of the canceled ballots, so ...

20      Q    And finally, you -- are you offering -- have

21  you engaged in any analysis in your work in this case

22  about whether SB 202 was motivated by discriminatory

23  intent?

24      A    I have not evaluated that question at all.

25      Q    Why did you choose to evaluate turnout in

```
                                            Page 52
 1      these reports?
 2          A    I pro- -- I'm sorry.
 3          Q    No.
 4          A    Are we done with this article?
 5          Q    Yes.  I'm sorry.
 6          A    Yes.
 7          Q    Thank you.  You can put that aside.  Thank
 8      you.
 9          A    I analyze turnout in my reports to provide a
10      description of participation in the state of Georgia in
11      elections proximate to and after the passage of SB 202.
12          Q    And I believe you've touched on this already,
13      but you did not perform any causal analysis with regard
14      to the effects of SB 202 on turnout, correct?
15          A    I have not performed a causal analysis, and I
16      have not read an expert report that does.
17              MR. ROSBOROUGH:  Okay.  Good to keep going, or
18      do you want to take a break here?
19              MR. FIELD:  It's been an hour.  Let's take a
20      break.
21              MR. ROSBOROUGH:  Okay.  Great.
22              (Recess.)
23      BY MR. ROSBOROUGH:
24          Q    Okay.  Dr. Grimmer, I'd like to jump into your
25      turnout opinions from your 2025 reports.
```

Page 53

1          Do you still have both of those reports
2     available --
3          A    Oh, yeah.
4          Q    -- to you?  Great.
5              And I guess, actually, before we get into the
6     weeds, I just want to confirm a few things about your
7     turnout opinions at a high level.
8              In both your 2023 and now your 2025 reports,
9     you offer no opinions about what caused or did not cause
10    changes in turnout in Georgia, correct?
11         A    That's correct.
12         Q    And the same is --
13              [Telephonic interruption.]
14              MR. ROSBOROUGH:  Oh.  Sorry.
15         Q    The same is true with respect to turnout rates
16    of different racial groups; is that fair?
17         A    That's correct --
18         Q    Okay.
19         A    -- yes.
20         Q    And you did not calculate or attempt to
21    calculate the deterrent effect of any SB 202 provisions;
22    is that correct?
23         A    I just want to take a step back to make sure I
24    classify -- because I believe the "deterrent effect" is
25    a piece of jargon that I'm responsible for from the

Page 54

1    literature.

2              So a deterrent effect would be distinct from a

3    mechanical effect of an election administration law.  A

4    mechanical effect of an election administration law is

5    when someone, for example, in North Carolina attempted

6    to go vote, did not have identification, perhaps upon

7    their person, and they were turned away.  That's

8    mechanically applying the law.

9              And then a deterrent effect is potentially the

10   effect that could arise from an individual anticipating

11   that they would not be able to comply with the law and,

12   therefore, they did not participate.

13             And with that definition in mind, I did not

14   calculate a deterrent effect of SB 202 in any of my

15   reports.

16        Q    Okay.  Did you attempt to calculate a

17   mechanical effect of SB 202 on turnout?

18        A    There -- no, I did not.  There are instances

19   in which I document, for example, rejections, but one of

20   the key components of our mechanical effect in North

21   Carolina, for example, is that we were able to follow up

22   with a cure process, and so I don't believe anywhere in

23   my report do I both document a -- for example, a

24   rejection of an absentee ballot and then follow up to

25   see if that person ultimately voted.

                                                          Page 55

1          Q    Let's turn to Table 2 of your -- of your --

2     this is Exhibit 1, your supp- -- your first supplemental

3     report of this year.  It's after paragraph 17, I

4     believe.

5               Okay.  So you agree that Black voter turnout

6     declined in Georgia in 2024 as compared to 2020,

7     correct?

8          A    That is correct, yes.

9          Q    And over that same time period, White voter

10    turnout increased?

11         A    That is what this table shows, yes.

12         Q    Okay.  And to make sure I'm reading this

13    right, you calculate a turnout gap between Black and

14    White voters of just under 10 percentage points in 2020

15    and for 2024 a gap of either 12.2 or 13 percentage

16    points, depending on which CVAP method you use?

17         A    And you just mean subtracting the White

18    minus --

19         Q    (Nods head.)

20         A    Yeah, I'm just making sure I get the

21    calculation correct.

22              It looks like I agree with that calculation,

23    yeah.  Let me rephrase that.

24              I agree with that calculation, and then,

25    looking at the table, I agree with the numbers that you

```
                                                Page 56
 1      -- yeah.
 2           Q    Okay.  Great.
 3                And just to clarify, we're referring to Table
 4      2 from your June 2025 report here?
 5           A    Table 2, June 2025 report in the "Black" set
 6      of columns -- one set of columns -- like, "Black" set of
 7      columns, like, "White," yes.
 8           Q    Yes.  Okay.  Is it fair to say that this table
 9      shows that the differential between White and Black
10      turnout is the largest in the post-SB 202 presidential
11      election as compared to either of the pre-SB 202
12      presidential election years you studied?
13           A    I believe that is the case, yes.
14           Q    Okay.  And then, similarly, the gap between
15      Black and White racial turnout is the largest in 2022, a
16      post-SB 202 mid-term election, than either of the pre-SB
17      202 mid-term elections you studied, so 2014 and 2018?
18           A    That is true, yes.
19                MR. ROSBOROUGH:  Okay.  I'm going to hand over
20      now what we'll mark as Exhibit 7 --
21                (Exhibit 7 was marked for identification by
22                the court reporter.)
23                MR. ROSBOROUGH:  -- which is -- I'll ask you
24      to confirm, but should be Dr. Fraga's Amended
25      Supplemental Expert Report, so his first report from
```

```
                                              Page 57
 1      this year of June 2025.

 2              THE WITNESS:  So I'll confirm it.  I'll just

 3      say that I don't have -- I hadn't memorized the

 4      difference between the first report and the amended

 5      report, so I will take your word that these are the

 6      amended numbers, but otherwise this is Dr. Fraga's

 7      report.

 8              MR. FIELD:  Okay.  Before you ask your

 9      question, I think somebody is waiting to get in on the

10      Zoom.

11              (Mr. Prince joined the deposition proceedings

12              remotely.)

13              MR. ROSBOROUGH:  And then let me also hand

14      over what we'll mark as Exhibit 8, and -- which I

15      believe is the -- you can confirm -- the rebuttal report

16      of Dr. Fraga from this year.

17              Sorry.  Take your time.

18              (Exhibit 8 was marked for identification by

19              the court reporter.)

20              THE WITNESS:  Yes, it is.  This is Dr. Fraga's

21      rebuttal report.

22              MR. ROSBOROUGH:  Fantastic.

23         Q    And just confirming, you've read both of these

24      reports before, correct?

25         A    I have read both of these reports before, yes.
```

Page 58

1          Q     Let's turn to pages 7 and 8 of the Exhibit 8,

2     the one we just marked, the supplemental -- I'm sorry --

3     the rebuttal report from July 2025 from Dr. Fraga.  So

4     I'm looking at paragraph 15, and then we're going over

5     to Table 1 on the next page.

6          A     I'm there.

7          Q     Okay.  Great.

8                Is it your understanding that in paragraph 15

9     and Table 1, Dr. Fraga used your turnout estimates to

10    construct a gap in turnout between White Georgians and

11    other racial groups?

12         A     That is my understanding, yes.

13         Q     Okay.  Do you agree that Dr. Fraga correctly

14    reproduced your data here in reflecting the turnout gaps

15    between racial groups between the 2018 and 2024

16    elections?

17         A     I would agree to that, except he leaves out my

18    analysis of the January 2021 and December 2022 runoff

19    elections from my 2023 report.  So otherwise, he says

20    they're missing.  They're in that prior report, but

21    otherwise the columns he has decided to include do

22    appear to be the data from my report.

23               And just to be clear, what he is using here is

24    the column in Table 2 that I use called "CVAP trend."

25    It's, I would say, my preferred analysis -- my preferred

Page 59

1      estimate of turnout from the 2024 election.

2           Q    Okay.  That's -- that's helpful.  I appreciate

3      the clarification with all of these reports floating

4      around.

5               Do you agree that, for -- as reflected in this

6      table in general elections between 2018 and '24, the

7      largest racial gap between Asian American-Pacific

8      Islander voters, and White voters occurs after the

9      passage of SB 202?

10          A    Yes, I agree with that.

11          Q    And do you agree that the gap between Asian

12     American and White voters increased both in comparing

13     the 2018 to 2022 mid-terms and the 2020 to 2024

14     presidential election?

15          A    Yes, the 2022 gap is larger in magnitude than

16     the 2018 gap, and the 2024 gap is larger in magnitude

17     than the 2020 gap.

18          Q    And similarly, you agree that for Hispanic

19     voters, the largest gap, as reflect- -- with White

20     voters, as reflected in this chart, occurs after the

21     passage of SB 202?

22          A    As reflected in this chart, yes.

23          Q    And do you agree that the racial gaps between

24     Hispanic and White voters increased both in comparing

25     the 2018 to 2022 mid-terms and the 2020 to 2024

Page 60

```
 1     presidential election?
 2          A     Yes.
 3          Q     Okay.
 4          A     I just want to add one addendum.
 5                Dr. Fraga, of course, uses a subset of my data
 6     for this table.  He doesn't use the 2016 or 2014 --
 7          Q     Right.  Right.
 8          A     Yeah.
 9          Q     So just clarifying -- and I think I framed it
10     that way --
11          A     Right.
12          Q     -- but just so the record is clear, we're just
13     looking at the general elections between 2018 --
14          A     Yes.
15          Q     -- and 2024.
16          A     Yeah, and you may have.  I just wanted to be
17     sure I'm giving as precise an answer as I can.
18          Q     Absolutely.
19                Okay.  We can put that aside for the moment
20     and turn back to your June report from this year.  I
21     apologize for the shifting around of papers.
22                Let's talk about the data you relied upon in
23     forming your turnout conclusions in this report.
24                We can go, if it's helpful for reference, I
25     think, paragraph 10 and particularly footnote 1.  I
```

Page 61

```
 1    believe you describe some of the data you -- you relied
 2    upon.
 3              So is it correct that in performing turnout
 4    analyses for 2024, for the -- including for racial
 5    calculations, for your numerator you used a data source
 6    called a -- that you refer to here as the "final
 7    reapportionment report," which has some other numbers
 8    and letters after it, but we can call it the
 9    "reapportionment report"?
10       A    I use the reapportionment report, yes.
11       Q    Okay.  What is your understanding of what this
12    report contains?
13       A    So if I'm recalling correctly, it contains
14    either a county-by-county or precinct-level tally of the
15    number of votes categorized by racial group.  It's
16    actually categorized also by gender, and so you have to
17    aggregate across the gender, if I'm recalling the file
18    format correctly, and it's the same file that I used in
19    the previous years and the same files that Dr. Burden
20    used in his reports.
21       Q    Okay.  Do you have any understanding of why
22    this one is called the "reapportionment report"?
23       A    I don't know the origin of the name.  Sorry.
24       Q    That's fine.
25              Did -- do you have an understanding of how
```

Page 62

1    this data was generated?

2         A    I know I've inquired about this, but I believe

3    it's -- I'm going to -- I have previously investigated

4    this issue.  I'm not recalling at the exact moment the

5    dynamics of how the data are generated.

6         Q    Do you know whether and to what extent this

7    report is different from the post-election voter file?

8         A    Can you just define what you mean by a

9    "post-election voter file"?

10        Q    Sure.

11             So I think -- I think -- you know, maybe this

12   is an easier way to ask it.

13             I think you note that you -- at least in your

14   initially reports from June, that you and Dr. Fraga used

15   different numerators --

16        A    Oh.

17        Q    -- for your voter turnout calculations.

18        A    Sorry.  Go ahead.

19        Q    Yeah.

20             Do you -- do you know what the difference is

21   between the file Dr. Fraga used and the one you used?

22        A    I'm very happy to describe that, and you

23   should cut me off if you're not asking this question --

24        Q    Sure.

25        A    -- but the file -- my understanding -- my

Page 63

1    understanding, as best I can recall about what's being
2    produced from the reapportionment report, is that the
3    State of Georgia is using a voter file that they have at
4    the moment that they're tallying the votes in order to
5    tally the number of votes by racial group.
6          Dr. Fraga's -- the version of -- the voter
7    file that he is using, he uses an imputation procedure
8    in order to make an inference about a voter's race.  So
9    Dr. Fraga, I believe, and I, for example, have almost
10   identical numbers of the same number of total votes.  So
11   we agree on that.  The reapportionment report is
12   slightly different than what he's using, but it's, you
13   know, fractions of a fraction of a percent.
14         What Dr. Fraga is doing in his report is he's
15   aggregating across 11 different inferences of a voter
16   file in order to make a -- I'll call it an "imputation,"
17   a statistical guess about a voter's race based upon how
18   they may have reported or not reported their race in the
19   past.  What Dr. Fraga does is he says any instance where
20   a voter is classified as "Other," I will not include
21   that in the calculation, but any instance where a voter
22   identifies as Asian, Hispanic, White or Black will then
23   be included in what I call a share of instances where a
24   voter has a race recorded in the voter file.
25         He then calculates, for example, the share of

                                                        Page 64

1        times an individual identifies as Black, and he'll use

2        that share as his estimate of a person's race.  So he'll

3        say, based on those reports, that a person is

4        potentially -- if they have a race in those four

5        categories in two reports, they report Black once and

6        White once, they'll say this person is 50 percent Black,

7        50 percent White.

8                I use the racial categorization just from the

9        reapportionment report.  I don't engage in this

10       inference procedure.

11            Q    Okay.  That's helpful.  And I will probably

12       have, in a few minutes, some more follow-up questions on

13       the differences in how you all --

14            A    Yeah.

15            Q    -- deal with race for voters that are -- don't

16       have a race identified.

17                Is it fair to say that, as best as you can

18       tell, for your numerator of these turnout calculations,

19       though, putting aside the racial issue, you're using the

20       same pool of voters with perhaps some very minor

21       differences around the margins?

22            A    The reason our total numerators are nearly

23       identical is because, like you said, we're using the

24       same pool of voters; that's right --

25            Q    Okay.

Page 65

```
 1          A     -- yes.
 2          Q     And just to clarify, the reapportionment
 3     report is something -- is that something pub- -- is that
 4     something available publicly or is that something you
 5     just obtained from counsel?
 6          A     It is a -- it's going to be a mixed answer.
 7          Q     Okay.
 8          A     So I do know for a fact right now there are
 9     reapportionment reports available on the secretary of
10     state's website.  Whether the 2024 report is available
11     publicly, I don't -- I don't know.  It was provide- -- I
12     used the version of the file provided by counsel, as I
13     believe requested by experts from the plaintiffs.
14          Q     Okay.
15          A     Yeah.
16          Q     Now, for the denominator of your turnout
17     calculations in this first report, you use citizen
18     voting age population, which I'll refer to as "CVAP,"
19     estimates from the American Community Survey, correct?
20               And I'll ask you follow-up questions to nail
21     down --
22          A     Yeah.
23          Q     -- but is that -- the ACS CVAP data is the
24     general -- in a broad sense, is the source for the
25     denominator?
```

Page 66

```
 1          A    Yeah, at a very high level, without getting
 2     into the specific flavor of CVAP, I'm using the Citizen
 3     Voting Age Population as a denominator, just like
 4     Dr. Fraga and Dr. Burden.
 5          Q    Okay.  And for 2020 -- when you calculate
 6     turnout estimates for 2022 and prior years, you are
 7     relying on the five-year ACS from that year, correct?
 8          A    The five-year CVAP --
 9          Q    Sorry.
10          A    -- from that year, which is produced by the
11     ACS.
12          Q    Thank you for the -- that -- exactly.  Okay.
13              So for -- for example, you use the 2002 -- I'm
14     sorry -- 2022 -- 2022 five-year CVAP estimates as the
15     denominator for your 2022 turnout calculations --
16          A    That's --
17          Q    -- is that right?
18          A    That's correct, yes.
19          Q    What did -- and what did you rely on for 2024,
20     given that the 2024 five-year CVAP estimates are not yet
21     out?
22          A    Mm-hmm.  So I'm just going to zoom out and
23     talk about my strategy here.
24              So in my first report way back in 2023, we
25     didn't have the 2022 five-year CVAP available yet.  And,
```

Page 67

1    of course, the concern would be that if you use 2020

2    CVAP -- the five-year from 2020, that I could

3    overestimate turnout rates because I'd be using too

4    small of a denominator because population grows.

5              And so as a strategy to address that, I

6    adopted a very simple projection strategy.  What I did

7    was I took the change in the five-year CVAPs across

8    every proximate pair, so 16 minus 14, 18 minus 16, 20

9    minus 18, and then I took the average of those changes,

10   both overall and for each racial group, in order to form

11   a projection of what the five-year CVAP for 2022 might

12   look like.  Okay.

13             So upon evaluating that procedure with the new

14   data, it created a denominator that was -- ended up

15   being too large for the five-year CVAP for Black

16   individuals and White individuals and a denominator that

17   was slightly too small for Hispanic and Asian

18   individuals.  However, the errors that I observed there

19   were much smaller than the errors that we saw in other

20   expert reports that didn't use the trend.  So, for

21   example, Dr. Fraga doesn't adjust at all for the changes

22   in CVAP in his original report.  Dr. Burden, I believe,

23   used the one-year from 2021, and so the errors I -- the

24   errors I observed from using the actual 2022 CVAP are

25   smaller using my projection procedure.

Page 68

1          Q    And just to clarify, when you're referring to

2     Dr. Fraga's original report, you're referring to his

3     2023 report?

4          A    Thank you.  Yeah.  So just to clarify exactly

5     what I mean there, in 2023, Dr. Fraga, I believe, uses

6     the -- just uses the five-year 2020 CVAP for his

7     calculations.  He makes no effort to address the sort of

8     growth when performing his turnout calculations.

9               Given the performance that I have observed and

10    wanting to maintain a similar methodology going forward

11    for this updated report, for my June 2025 turnout

12    estimates, I now added in the five-year 2022 CVAP.  So I

13    now also have the five-year 2022 CVAP minus the

14    five-year 2020 CVAP.  So I now have this additional

15    component to that calculation.  I included that in the

16    average, and then I added that divided by 2 to the 2025

17    -- five-year 2023 CVAP because we didn't have the

18    five-year 2021 CVAP in 2022.

19         Q    And what you're referring to here is, for

20    instance, in your Table 1 where your second -- which is

21    just before paragraph 15, your column that says:  "CVAP

22    Turnout Rate, Trend"?

23         A    Yeah, exactly.

24         Q    Okay.

25         A    And then -- so that denominator, then, is an

Page 69

1      attempt to take into account the growth that we might
2      observe from 2023 to 2024.  So it's a slight difference
3      from my prior report.  My prior report, by which I mean
4      my February 2023 report, I did not have the five-year
5      2021 CVAP.  So now I do have more updated data.  I have
6      the five-year 2023 CVAP.  So I was able to use that as
7      the base, and I took my projection and added to it.
8          Q     Okay.  I want to drill down on a couple of
9      things particularly regarding 2024 CVAP and differences
10     between how you report that with Dr. Fraga in your
11     reports of this year.
12              So -- and I know we've covered this, but this
13     is just for the sake of clarity.
14              In estimating the 2024 CVAP, you use two
15     different methods, correct?  The first is just 2023
16     CVAP?
17         A     Correct.
18         Q     The second is the one you were just describing
19     in which you use the 2023 CVAP as the base and then add
20     to it using a two-year trend projection beginning in
21     2014, using average two-year change over the course of
22     time dividing by 2 and adding to the 2023 CVAP?
23         A     Can I just say it back to you just so we --
24         Q     Yep.
25         A     -- have a clear record on this?

Page 70

1           So the trend will be the 2023 five-year CVAP

2      plus the average two-year change across for -- for

3      five-year CVAPs from 2022 to 2014 and then dividing that

4      by 2 so it becomes a one-year change.

5           Q    Got it.

6                In Dr. Fraga's -- okay.  Well, let's step

7      back.

8                You agree that in his reports of this year,

9      Dr. Fraga uses a CVAP trend analysis as well, just a

10     different one than yours?

11          A    I would just call it a CVAP projection.  Just

12     "trend analysis," I think, would mean something slightly

13     different.

14               So he uses a projection of the five-year CVAP

15     as well, yes.

16          Q    Okay.  You -- and I appreciate that.

17     Obviously, I'm not a political scientist.

18               You both use CVAP projections; you just use

19     different methodologies in doing those projections?

20          A    That's right --

21          Q    Okay.

22          A    -- yes.

23          Q    Is it your understanding that Dr. Fraga also

24     uses -- for -- let me -- let's step back.

25               2024 CVAP.  We're just talking about 2024

Page 71

1    CVAP.  Dr. Fraga also uses the 2023 five-year CVAP as a
2    base, to the best of your understanding, correct?
3          A    Yes, he uses that as the base; that's right.
4          Q    Where the difference comes is, in calculating
5    the trend, he uses 2020, 2021, 2022, and 2023 five-year
6    CVAP and calculates a one-year trend; is that right?
7    And feel free to refer to his reports.
8          A    I'm just going to check --
9          Q    Of course.
10         A    -- one -- sorry.  Do I have Dr. Fraga's
11   original report?  If you could just -- is it Exhibit 4?
12         Q    I -- I think -- good question.
13         A    I'm sorry.  I think I have it.  I have it
14   right here --
15         Q    Okay.
16         A    -- Exhibit 7.
17              Yes, that's right.  So he has those three
18   one-year differences in his -- his projection; that's
19   right.
20         Q    Okay.  And do you offer any criticisms of
21   Dr. Fraga's methodology in his CVAP trend?
22         A    I offer a comparison of our denominators.  I
23   have a series of criticisms of his analysis of my
24   projection and what he could possibly know and not know,
25   but I think the procedure that he adopted is probably a

Page 72

1    reasonable procedure.  It leads to very similar
2    denominators to what I have, and, in fact, I reach the
3    same conclusions about relative trends in turnout
4    whether I use his denominator or not -- or my
5    denominator.  I'm sorry.
6         Q    Okay.  So I guess, would it be fair to say,
7    although you believe you reach -- ultimately re-leach --
8    ultimately reach fairly similar results in analyzing
9    racial turnout gaps, the CVAP trend calculation creates
10   some differences between your analyses, albeit
11   potentially small ones?
12        A    We, because we use different projection
13   procedures, will end up with different denominators,
14   yes.
15        Q    And is it correct that your trend method
16   results in higher relative turnout percentages for
17   Black, Hispanic, and Asian-American voters?
18        A    No.
19        Q    Okay.  And why not?
20        A    I'm just going to find the appropriate table
21   here.
22        Q    Sure.
23        A    If we could -- I'm going to direct our
24   attention to Table 2 in my July 2025 report, and in
25   particular, I'm going to direct us down to a row that

1    says -- the first -- the "Race" column here is

2    describing voters' self-reported race, and then the

3    "Year" here is just describing the year of the election.

4              So now I'm in a row that says "Black 2024,"

5    and then you'll notice I have two columns.  One says

6    "Denominator Grimmer."  That's my denominator.  And one

7    says "Denominator Fraga."  That's Dr. Fraga's

8    denominator.

9              And you'll notice that my denominator for the

10   projection of the 2024 CVAP for Black individuals in

11   Georgia is larger than Dr. Fraga's.  So all else equal,

12   if we had the same numerator, because Dr. Fraga's

13   denominator is smaller, he would end up with a higher

14   rate of turnout for Black voters than my analysis --

15   than my denominator would.

16        Q    Understood.

17             Would his method also result in a higher rate

18   of turnout for White voters?

19        A    His method would also result in a higher rate

20   of turnout for White voters.  Let me just walk through

21   the same logic here.

22        Q    Yeah.

23        A    We're now going to go down to the "White 2024"

24   row.  In my denominator, the "Denominator Grimmer" is

25   larger than Dr. Fraga's denominator.  As a result of

Page 74

```
 1        that, Dr. Fraga would estimate a larger turnout rate for
 2        White voters, all else equal.
 3             Q     Understood.  Okay.
 4                   Could we turn to section IV of your report.
 5        This is still -- we're on the June report.  Too many
 6        reports.  Paragraph 22.  Oh, no.  I'm sorry.  Yes.
 7        That's right.  That's right.  Just let me know when
 8        you're there.
 9             A     I'm there.
10             Q     Okay.  So I'm going to ask you a couple of
11        questions about -- well, let me -- first of all, this
12        section of your report, you make some comparisons
13        between turnout in Georgia to turnout in other states,
14        correct?
15             A     That's correct.
16             Q     Okay.  I'm going to ask some questions about
17        differences and how you approach that in your 2023
18        reports and how you did so in your 2025 reports.
19             A     Mm-hmm.
20             Q     And I'm really just trying to get this
21        accurate, so I'm sure you'll correct me if I'm wrong.
22                   Am I correct that in your 2023 expert report,
23        you compared turnout rates by racial groups in Georgia
24        to those rates in three other states where the voter
25        lists have racial data, so South Carolina, North
```

Page 75

```
 1      Carolina, Louisiana; is that accurate?
 2           A    That's accurate.  And also it was what was --
 3      like, data that was available at the time of writing my
 4      report.
 5           Q    Sure.  Okay.
 6                Well, so trying not to retread ground probably
 7      from your prior deposition, but just to set the stage,
 8      why did you choose those states in 2023 to conduct the
 9      analysis?
10           A    A combination of those states having
11      administrative data about race, and then when I wrote my
12      report in 2023, the CPS for -- let me just take a step
13      back.
14                The Current Population Survey November
15      supplement for the 2022 election was not yet available,
16      so I could not perform the analysis that I performed
17      here.  In its place, I used publicly available
18      administrative data to compare turnout rates in Georgia
19      to these other States.
20           Q    And when you're referring to "administrative
21      data," are you referring to actual voter files from
22      those states with -- that include racial data?
23           A    Right.  Both voter files and then a Voter
24      History File that I would use to compile these turnout
25      statistics.
```

Page 76

1          Q    Understood.

2               In your 2025 report, you compare turnout rates

3     for different racial groups in Georgia and these same

4     three states using data from the -- the Current

5     Population Survey; is that accurate?

6          A    That's not accurate, no.

7          Q    Okay.  Please correct -- correct my statement.

8          A    I use every other state in the comparison.  So

9     my -- for example, we're just going to go to Table 4.

10    Where it says "Other States," I mean that to be the

11    other 49 states in the Union and DC.

12         Q    Okay.  So to clarify, you no longer use, in

13    this -- in your 2025 reports, you no longer use the

14    subset of Louisiana, North Carolina, South Carolina to

15    compare it to Georgia even through CPS data?

16         A    The Louisiana, North Carolina, and South

17    Carolina would be included in the group of other states

18    that I would make the comparison to.

19         Q    Okay.  So there's nowhere in your 2025 reports

20    where we can see a replication of your 2023 analysis as

21    it extends through 2024; is that accurate?

22         A    That is correct.  I did not update with the

23    administrative data from these three states.

24         Q    Okay.  I guess in light of your new analysis

25    with -- including all the states with the CPS, what role

Page 77

1      -- is there any -- there's no longer an apples-to-apples
2      comparison using 2024 data and your prior analysis of
3      other states; is that correct?
4              A    Can you just be a little bit more precise,
5      what you mean by --
6              Q    Sure.
7              A    -- "apples-to-apples"?
8              Q    Yeah.  I mean -- I think we got this, but you
9      -- when you were comparing Georgia's turnout to other
10     states, particularly as it involved racial groups, you
11     used different methods in your 2023 report and your 2025
12     reports, correct?
13             A    Yeah.  I calculated the turnout rates in those
14     other states, like I say in my report, using the
15     administrative data, and in this report, because I have
16     the nationally available data, I used the Current
17     Population Survey November supplement.
18             Q    Okay.  And I think -- I don't want to belabor
19     this.  I think we've discussed some of this, but you
20     agree there are lots of different factors that affect
21     turnout, correct?
22             A    There are many things that affect turnout,
23     yes.
24             Q    One of those factors is -- can be, I should
25     say, whether there are competitive statewide races?

```
                                              Page 78
 1        A    That could be one factor that could affect
 2    turnout --
 3        Q    Okay.
 4        A    -- that's correct.
 5        Q    All right.  Would you consider Georgia to have
 6    had competitive statewide races in 2024, including the
 7    presidential race?
 8        A    Yes.
 9        Q    Okay.  Let's go to paragraph 25, still in your
10    June report of this year.  And there in the first
11    sentence you state:  "Even though the across state
12    comparisons would require strong assumptions to
13    interpret as the causal effect of SB 202, these
14    comparisons are essential to provide context for the
15    changes in turnout observed in Georgia."
16             I want to break that down a little bit.
17             As to the second part of that sentence, what
18    context do these cross-state comparisons provide
19    regarding -- regarding Georgia turnout?
20        A    It's useful to know what's going on nationally
21    with turnout to understand the -- to better situate a
22    particular state.  Is turnout up or down nationally is a
23    useful point of comparison for any one state.
24        Q    And why is that useful?
25        A    It situates what changes that we observe
```

Page 79

1    within a state within the broader national context.  If,

2    like some experts in this case want to do, you were

3    attempting to estimate a causal effect, the risk would

4    be that you would confuse national change for something

5    that only occurs in one state if you only focus on one

6    state.

7            Here, for my analysis, I think it's essential

8    to provide this context to understand how changes in

9    Georgia are relating to changes nationwide.

10   Q    Okay.  As to the first part of the sentence

11   there, what sort of strong assumptions for the

12   across-state comparisons would be required to interpret

13   causal effect of SB 202?

14   A    Yeah.  So a sufficient set of assumptions, not

15   necessarily necessary -- a sufficient set of assumptions

16   would be, first, what we'll call "parallel trends," so

17   that in the absence of SB 202, Georgia's trend would

18   have continued along the same trend it had been on.

19           And then the other difficult assumption would

20   be that the only change that coincides with SB 202 is

21   the passage of the law.  We're not confusing changes in

22   the law with changes -- other changes that could have

23   happened in the state, and the -- there are going to be

24   some -- depending on the estimation strategy, there's

25   this huge set of debates within econometrics and

Page 80

1    statistics and political scientists about how to
2    implement it, but I will not discuss those here.
3         Q    I appreciate that.
4              You don't make either of those two assumptions
5    in your analysis, correct?
6         A    I am not attempting to estimate a causal
7    effect.  I am not assuming parallel trends, and I am not
8    assuming that the only thing that changed between 2020
9    and 2022 is the passage of SB 202.
10        Q    And when you're referring to "causal effect"
11   here, what do you mean?
12        A    In this case, it would be the turnout rate,
13   for example, in the state of Georgia if SB 202 were in
14   effect compared to a counterfactual state of the world
15   where it's not in effect.  That's a pretty standard
16   definition of a causal effect.
17        Q    Okay.
18        A    And we could map that onto a variety of
19   different outcomes, but the core of a causal effect
20   definition is going to be comparing a state of the world
21   that's observed to a counterfactual state of the world
22   that's not observed.
23        Q    Okay.  And I think this is implied, but just
24   so it's clear, you are not using the cross-state
25   comparison to interpret SB 202's causal effect or lack

Page 81

1    thereof, correct?

2          A    I am not assessing SB 202's causal effect.

3          Q    Okay.  Let's turn back to the topic which I

4    think you started to raise, and I said we would come

5    back to:  Differences in how you and Dr. Fraga deal with

6    voters who do not have a racial category classified.

7          A    Mm-hmm.

8          Q    Am I correct that in performing turnout

9    calculations and analysis, when a voter does not have a

10   racial group identified with them in that year's voter

11   file, your methodology is to exclude them?  When we're

12   doing racial turnout analysis, they get removed from

13   both the numerator and the denominator?  Well, that's

14   wrong.  Sorry.  Let's -- strike that last part.

15               Why don't you clarify:  What is your

16   methodology when dealing with turnout calculations for

17   voters that don't have their race listed in the file?

18         A    Okay.  So I'm going to just say that I'm

19   responding to the question about the methodology for the

20   voters who don't have a race -- well, for voters who

21   have a race listed as "other" or "unknown" in the voter

22   file.  As you noted in your revision of the question --

23   and I'll just affirm it -- whether a voter has "other,"

24   "unknown" does not affect my calculation of the

25   denominator at all.

Page 82

1      Q    Right.

2      A    So like Dr. Burden and like Dr. Clark, I

3   exclude individuals who have "other" or "unknown."  I do

4   not make an attempt to place them into a racial

5   category.

6      Q    Okay.  And I think, just so this is clear --

7   so, for instance, if you're calculating racial turnout

8   rates for 2024, if the voter -- if a voter has "other"

9   or "unknown" for race, they come out of the -- they just

10  come out of the analysis regardless of whether they

11  might have had a racial identification in a prior year's

12  voter file?

13     A    Let me just be very precise about this.  They

14  would be included in the total.  So I do not exclude

15  them there.  This is why Dr. Fraga and I have almost no

16  difference in our total calculations.  Then, for the

17  racial categorization, because they do not have that

18  race listed in that voter file, they are not included in

19  that racial group's turnout.

20     Q    Okay.  And that is true even if in a

21  previous-year voter file they might have had a race

22  listed?  You're looking at the year in which you're

23  doing the analysis solely, correct?

24     A    That's correct.

25     Q    Okay.  Do you recall during Dr. Fraga's

```
                                              Page 83
 1    deposition, him discussing that the current Georgia
 2    voter online registration form defaults to "unknown" in
 3    the section of the form where the applicant would
 4    identify their racial classification?
 5         A    I recall him asserting that.  I do not recall
 6    seeing evidence of how that would manifest in the voter
 7    file or him presenting evidence to support that opinion
 8    in any of his reports.
 9         Q    Okay.  Are you -- so are you aware, one way or
10    the other, of whether that is true?
11         A    I have not evaluated that, no.
12         Q    Okay.  And since the depo- -- since his
13    deposition, you did not attempt to evaluate that --
14         A    I did not --
15         Q    -- correct?
16         A    -- no.
17         Q    All right.  If he is correct in stating that
18    the automatic default on the online voter registration
19    form is "unknown" in the racial identification prompt,
20    would that impact any of your opinions or assumptions in
21    your reports?
22         A    It would not, no.
23         Q    And why not?
24         A    Sure.  So first off, if we're interested in
25    voters who are just very recently being registered,
```

Page 84

1    which appears to be Dr. Fraga's concern, he does not
2    update his racial classifications with the new voter
3    file we obtained from 2025.  He uses the same racial
4    categorizations from his 2023 report plus whatever was
5    self-reported by those individuals in 2025.  So, in
6    fact, if this is a recent issue, Dr. Fraga's analysis
7    will suffer from the same issue that he's alleging that
8    my analysis would suffer from.
9            Second, engaging in these sorts of imputation
10   procedures are very tricky, and the reason for that is
11   that there's a real risk of a phenomenon called
12   "differential measurement error."  And the problem could
13   be that even if you feel like you're reducing
14   measurement error in one instance or in one run of the
15   turnout calculation, which Dr. Fraga believes that he
16   is, if you're better able to reduce the measurement
17   error in some years than in others, you will confuse
18   your reduction in that measurement error with trends in
19   voter turnout.  As a result of that, it would be
20   difficult to disentangle those two competing phenomena
21   from the -- even a descriptive quantity.  Is turnout
22   increasing or decreasing because I've done a better job
23   in some years than others of imputing race, or is
24   turnout increasing or decreasing because more or fewer
25   individuals from this group are participating?

Page 85

```
 1    Dr. Fraga doesn't engage in an analysis of that, so it's
 2    difficult to know.
 3            In my table from my July report, I show some
 4    evidence of some potential differential measurement
 5    error across Asian and Hispanic individuals, showing
 6    some years there's more imputed as a percent change
 7    above CVAP and -- not CVAP -- more or fewer imputed as a
 8    percent change of my numerator.  And as a result of
 9    that, that might be related to this phenomenon of
10    differential measurement error.
11        Q    Okay.  When -- just stepping back to before
12    the differential measurement error --
13        A    Yeah.
14        Q    -- you mentioned that he doesn't use the 2025
15    voter file, I think, if I got that right.
16        A    I just want to be very precise --
17        Q    Yeah, that's --
18        A    -- because I don't want to allege Dr. Fraga
19    didn't do something that he didn't do [sic].
20            You recall my explanation of Dr. Fraga's
21    procedure.  He has these 11 voter files, and he's
22    performing this tabulation.  What share of the time are
23    you identifying as Black over the shared instances you
24    identify as Black, Hispanic, et cetera.
25            He obtains, then, a 12th voter file from 2025,
```

Page 86

```
 1       but he does not update his tabulation using that 2025
 2       voter file.  He uses the same share of each racial group
 3       from his 2023 report.  He only uses the self-reported
 4       race from that 2025 voter file.
 5            Q    I see.
 6                 And when you're referring to the 2025 voter
 7       file, do you know the approximate date or month to which
 8       you're referring, just for clarity?
 9            A    Absolutely.
10            Q    Okay.
11            A    I'm going to grab it from Dr. Fraga's report
12       just to be sure I'm not -- off the top of my head, it's
13       going to be January 15th, but let me just confirm it
14       with a line in the report.
15                 Yep, he says in -- this is now Dr. Fraga's
16       report.  He says:  Specifically, I use a voter
17       registration list with a date of January 15, 2025.
18            Q    So is it your assertion that had Dr. Fraga
19       used the January 15th, 2025, voter file, he may have
20       been able to assign racial categories to people who he,
21       in the sort of span of a couple months after the
22       election, had updated their voter registration to
23       include race?
24            A    No.
25            Q    Okay.
```

Page 87

1        A    I'm sorry to ask this.

2             Do you have Dr. Fraga's original report?

3        Q    I do.  I'm not sure how many copies I have.

4        A    I will be -- I will be able to do it with --

5   give the response without having to force you to --

6   actually, if you just -- I think I have it.  What I need

7   I think I've quoted in my report.  So let me --

8        Q    Okay.

9        A    -- see if I can make your life easier.

10       Q    I'll hold off for a second.  If not ...

11       A    Ah.  I found it.  But I didn't quote the dates

12   that I wanted to have in there.

13            The last voter file I believe Dr. Fraga is

14   using is from 2022 in that tabulation.  So there would

15   be a three-year gap between 2025 and 2022.

16       Q    When you say "that tabulation," what are you

17   referring to?

18       A    Thank you.

19            Yeah.  His calculation of the share of

20   instances in which an individual identified as Black,

21   White, Hispanic.

22       Q    Okay.  Got it.

23            So you have not performed any independent

24   analysis of how many voters, for instance, have changed

25   their racial identification from "unknown" to select a

```
                                              Page 88
 1       racial response; is that accurate?
 2           A    I have not conducted an independent analysis
 3       of that, no.
 4           Q    Okay.  And -- okay.  Moving on, still in
 5       turnout, but I think wrapping up, hopefully, turnout.
 6           A    Okay.
 7           Q    I'd like to talk about the years that you look
 8       at in your turnout analysis.
 9                First, I think probably pretty simple
10       question.
11                In your 2023 reports, you include racial
12       turnout data that has the January 2021 and December 2022
13       Senate -- the runoff elections, correct?
14           A    That's right.
15           Q    And am I correct that you did not report those
16       when you were performing your racial turnout analysis in
17       your reports of this year?
18           A    That's right, because there's no runoff
19       election in 2024.
20           Q    And let me -- let me rephrase that.
21                Is there a reason, when you produced --
22       reproduced your racial turnout analysis but included
23       2024, that you did not also include the runoff elections
24       from the previous years?
25           A    Because I would be primarily making
```

                                                    Page 89

1        comparisons to 2024.  With no runoff election, I wanted

2        to focus on the other federal general elections.

3              Q    Okay.  In your reports, you analyze general

4        elections.  And I should be clear.

5                   Your report of this year, you analyze general

6        elections in terms of turnout from 2016 through 2024,

7        correct?

8              A    No.

9              Q    No.  I'm sorry.  2014 through 2024?

10             A    That's right.

11             Q    Okay.  Why did you make that selection of

12       years?

13             A    So by including 2014 and 2016 additionally

14       from Dr. Fraga, I include two mid-term elections prior

15       to SB 202 and two presidential elections prior to SB 202

16       for points of comparison.

17                  It also has the convenient alignment with the

18       elections Dr. Burden analyzes, for example.  So I wanted

19       to make sure I was aligning my analysis with what was in

20       other expert reports.

21             Q    Okay.  And are you -- are you familiar with

22       Dr. M.V. Hood, who goes by "Trey," I believe?

23             A    Yes.

24             Q    Okay.  He's a political scientist at the

25       University of Georgia --

```
                                                    Page 90
 1          A     Yes.

 2          Q     -- is that right?  Okay.

 3                Are you familiar with his work on Georgia

 4     elections?

 5          A     Yes.

 6          Q     Okay.  I think there was a citation to an

 7     article by him in one of Dr. Fraga's reports.

 8                Are you -- did you read that article?

 9          A     I did.

10          Q     Okay.  Do you have any views on the assessment

11     that the 20- -- 2018 election was a turning point in

12     Georgia politics?

13          A     I think a clear and transparent reading of

14     Dr. Hood's article would offer a different

15     interpretation than Dr. Fraga.

16                So just to zoom out here, Dr. Fraga offers an

17     opinion that it's irrelevant to include elections before

18     2018.  It's been difficult to assess that opinion

19     because Dr. Fraga never defines what he means by

20     "impact" and is unclear about what effects he thinks

21     he's estimating.

22                I think it has become clear, from rereading

23     his reports and the context of his deposition, that he's

24     estimating or attempting to estimate causal effects.

25     Again, those require extremely strong assumptions, but
```

Page 91

1    Dr. Fraga says, in estimating those causal effects, he's
2    going to begin with 2018 because that's when he thinks
3    the relevant comparisons occur.
4              Now, he, to make that assertion, offers,
5    really, one piece of evidence.  He cites Dr. Hood and
6    Dr. Seth McKee's article called "Why Georgia, Why?"  But
7    reading that article, it's not immediately clear one
8    would decide not to include elections prior to 2018.  In
9    fact, throughout that article, they discuss how the
10   presidential election of Barack Obama -- the first
11   presidential election when Obama ran in 2008 -- was a
12   turning point for Georgia politics.  They say this is
13   when the state began to trend in a more competitive
14   direction.
15             Even the quote that Dr. Fraga offers in a
16   footnote from the article misses the clause before it
17   where Dr. Hood and Dr. McKee say this -- that Georgia
18   was trending in a more competitive election despite
19   their assertion that in '12 -- in '8 and '12 it didn't
20   receive much campaign attention.  They say it's the same
21   in 2016, which is just wrong.  They're wrong about the
22   -- the attention Georgia received in the 2016 campaign.
23             In August of 2016, Hillary Clinton's campaign
24   announced an investment in the state of Georgia.  Over
25   the summer of 2016, Hillary Clinton was leading in the

Page 92

1      polls in the state of Georgia.

2              So the idea that somehow there's some massive

3      change point that happens in 2018 that would make a

4      comparison to prior elections irrelevant is -- it's,

5      frankly, ridiculous.

6          Q     So do you have a view on whether the 2018

7      election was a turning point in Georgia politics?

8          A     What do you mean by "turning point"?

9          Q     In terms of the actual competitiveness of

10     elections, do you believe 2018 marked a change?

11         A     And what elections are you referring to?

12         Q     The -- I would say the elections that are

13     represented in the reports here, so the general

14     elections and Senate elections, special -- the general

15     and runoff elections during that time period from 2018

16     to the present.

17         A     So certainly, for example, Democrats are

18     winning House -- US House seats in the state Georgia.  I

19     believe Hillary Clinton lost the state of Georgia by

20     about 5 percentage points.  We know that after the fact.

21     Again, during the summer of 2016, it looked like she was

22     ahead of Donald Trump in the state of Georgia, according

23     to the RealClear Polling average.  And so from that, I

24     think it's difficult to say that there's any one turning

25     point, even just drilling down into 2020, to say now we

Page 93

1    know after the fact 2020 was a very close election in
2    Georgia.
3              The Biden campaign, I believe, didn't
4    advertise in the state of Georgia until late August,
5    until the end of the summer, is when they first
6    advertised.  It was unclear whether the state of Georgia
7    would be competitive.  In fact, there were press
8    conferences from various organizations on the ground
9    sort of inviting the Biden campaign to take Georgia
10   seriously.
11             So I think it's pretty rare in politics that
12   we have a change point where everything is different.
13   Things happen gradually.  And so it is certainly the
14   case that the margin of victory in 2020 and 2024 is
15   smaller than the margin -- is smaller than the margin of
16   victory in 2016, but as Dr. Hood and Dr. McKee say,
17   things had been trending in a much more competitive
18   direction.
19        Q    Let's look at Figure 1 in your report of June
20   this year.  And I think this is just after paragraph 16.
21        A    Mm-hmm.
22        Q    Just for clarity of the record, what are you
23   representing in this figure?
24        A    This is based on data from Dr. Michael
25   McDonald, and this is the voter-eligible population

Page 94

```
1       turnout rate in the state of Georgia.
2           Q    Okay.  And you have in this figure sort of
3       separately shown mid-term elections and presidential
4       election years, correct?
5           A    That's correct.
6           Q    Okay.  In terms of turnout rate, let's look at
7       the mid-term elections.
8                What do you see -- how would you describe the
9       trend, if any, that's -- that's happening here and
10      whether there's any significant departures from the
11      trend?
12          A    There was a steady increase in turnout, and
13      then the 2018 to 2022 elections in the mid-term saw a
14      higher turnout than the prior mid-term elections.
15          Q    Okay.  With regard to the presidential
16      elections?
17          A    Yeah, presidential election is interesting,
18      and it's sort of -- in this figure, so to be responsive
19      to your question, you can see that the 2020 and 2024
20      elections had the highest turnout.  That's followed by
21      2008.  So, for example, in my reanalysis of Dr. Clark's
22      report, we see that the highest turnout rate for Black
23      voters in the state of Georgia occurs in 2012, aligning
24      with the candidacy of Barack Obama, which is driving up
25      what you see in the 2008 and 2012 turnouts there.
```

Page 95

1          Q    And I think Dr. Hood said this in the article
2     we were discussing, but I guess would you agree with the
3     statement that, despite no presidential campaign
4     presence in Georgia, in the twenty-eight -- 2008
5     election there was a palpable Obama effect manifest in
6     Black mobilization?
7          A    I think that's -- nationwide, we saw higher
8     Black turnout, yeah.
9          Q    How are we doing on -- how long have we been
10    going?  I'm about to switch topics.  I'm happying to
11    keep going, or we can --
12         A    Let's take a quick break, if that's okay.
13              MR. ROSBOROUGH:  Sure.  Go off the record.
14              (Recess.)
15              MR. ROSBOROUGH:  Back on the record.
16         Q    Dr. Grimmer, I'm hoping to shift gears now
17    away from turnout to discuss, I would say, methods of
18    voting.  So if it's helpful, we're probably going to be
19    talking mostly about section V of your June 2025 report.
20              So just starting with a few big-picture
21    questions here, in this report -- we're with your June
22    2025 report -- you offer some opinions about use of
23    different methods that Georgia voters use to vote in
24    general elections from 2014 to 2024, correct?
25         A    That's correct, yes.

Page 96

1          Q    And the -- the way you've categorized those
2     different methods of voting would be, fair to say, early
3     in person, in person Election Day, and mail?
4          A    Yes.  I think all the experts in the case have
5     aligned on those three modes of voting as a point of
6     focus.
7          Q    And for the -- for those elections we discuss,
8     you break down modes of voting by race as well, correct?
9          A    That's correct, yes.
10         Q    In offering your opinions about the different
11    modes of voting, you're not offering any opinions about
12    why different groups of voters chose different modes of
13    voting, correct?
14         A    That's correct --
15         Q    Okay.
16         A    -- yes.
17         Q    And you're not offering any opinions about why
18    rates of using those different modes of voting changed
19    overall or by different groups year to year; is that
20    correct?
21         A    That -- that's correct.
22              I want to offer the caveat that -- probably
23    point to the 2020 election, and I'm not sure if in my
24    report I discuss the COVID-19 pandemic as a reason why
25    individuals may be interested in voting by mail in that

Page 97

1    particular election.

2         Q    Understood.

3              You're not offering any opinions about whether

4    or not SB 202 affected different groups' modes of voting

5    choices, correct?

6         A    That's correct.

7         Q    Okay.  In this first paragraph of the section

8    V, so it's paragraph 38, you state that (as read):  "To

9    assess how Georgia voters cast their ballots in the 2024

10   election I use the spreadsheet contained in 'Voter

11   History File - November 2024 General Election.zip."

12             Is that correct?

13        A    That's correct.

14        Q    Okay.  And you note that, because this voter

15   file was generated after the 2024 election -- apparently

16   on January 15th, 2025 -- there are 6,884 individuals who

17   turned out to vote who were not found in the provided

18   voter file.

19             Do you have any idea why that's the case?

20        A    I just wanted to separate out two things,

21   though, just to be sure that we're super clear.

22        Q    Okay.

23        A    The Voter History File November 2024 General

24   Election.zip, that is a Voter History File, not one -- I

25   don't know what date that was generated.  I'd be

Page 98

1       surprised if it was generated in January, but that is --

2       accounts for the voters who turned out to vote.  And

3       that's going to be a static account of everyone who

4       turned out to vote.

5              The reason that we have this January 15th,

6       2025 -- the reason that individuals usually are excluded

7       is because these individuals have, for whatever reason,

8       canceled their registration in the interim period from

9       the election to when this January 15 voter file snapshot

10      was taken, and so this is a common theme across

11      maintenance of voter files, that you'll have individuals

12      who are recorded to have turned out, but because of

13      voter files providing a snapshot at that moment, you'll

14      have a gap between those two where there will be people

15      in the static Voter History File who are not found in

16      the, I'll venture to say, "dynamic voter file," because

17      that changes daily.

18         Q    So, for instance, some people may have voted

19      in the November 2024 election and then moved out of

20      state afterwards by the time of this January file; is

21      that -- is that sort of what you're getting at?

22         A    That's true.  You would have to be somebody

23      who is very attentive to their registration status and

24      have, on their own, gone to cancel their registration.

25      So -- but that's one example.  Someone could have moved

Page 99

1       or someone could have passed away --

2             Q     Okay.

3             A     -- yeah.

4             Q     Any other examples you can think of of why

5       that would be the case?

6             A     Yeah, if somebody is convicted of a felony in

7       the state of Georgia, when they're serving their felony,

8       they're not eligible to be on the voter file.  That

9       would be another reason.  You could choose to cancel

10      your registration for -- not for any reason other than

11      you decide you don't want to be registered to vote

12      anymore.  That would be another category.

13            Q     Okay.  And then you state that -- it's the

14      same paragraph further down --

15            A     Yeah.

16            Q     -- "To mitigate the number of voters with

17      missing race information, I used the version of the

18      voter file from my first expert report.  For 4,966 of

19      those remaining voters I successfully merged information

20      about self-identified race using the 2022 voter file

21      used in my first expert report."

22                  Do you have any idea why race was missing for

23      so many voters?

24            A     Let me just be very clear about what's going

25      on here.

1        Q    Sure.

2        A    So we have these 6,000 individuals who have --

3    have canceled registrations.  In the canceled voter

4    file, there was not a "race" field, and so I don't know

5    what went into the production of that canceled voter

6    file, I'm sorry to say.  However, because it's not

7    there, I was then making my best effort to come as close

8    to the methodology I had used in my first report.

9            In my first report, we had a canceled -- list

10    of canceled voters from the state of Georgia that

11    included a "race" field.  Unfortunately, the list of

12    canceled voters that I have for this round of reports

13    did not have that "race" field.  And so it isn't -- it

14    doesn't have anything to do, for example, with

15    Dr. Fraga's assertion about "other" or "unknown."

16    There's just no one -- no field there for me to use when

17    I did the merge.

18        Q    Okay.  So there's some differences between

19    what -- what you and Dr. Fraga are doing there.  I guess

20    the similarity would be going back to an older data file

21    to identify racial information; is that correct?

22        A    It's a little bit more complicated than that,

23    because it's for this very small set of voters.  So

24    we're talking about 6,000 individuals in, I think, an

25    election -- I'm not going to get -- more than 5 million

Page 101

1      people voted.  So it's this very small number.

2                 It is, however, the case that I am attempting

3      to find information on these canceled voters where there

4      is no race information, not that there's an "other" or

5      "unknown," because someone could affirmatively select

6      "other."  In this instance, there was not a field

7      available for me to use.

8          Q    Let's flip forward a couple of pages.  I'm

9      going to ask you some questions about, basically, what's

10     represented in your Table 6, "Mode of Voting Across

11     Voters Self-identified Racial Groups."

12                So does this table update your calculations of

13     mode of voting by race from your 2023 report by adding

14     2024 data?

15         A    That's correct, yes.

16         Q    Okay.

17                THE REPORTER:  Counsel, could I have a moment

18     to admit people?

19                MR. ROSBOROUGH:  Of course.

20                THE WITNESS:  Could I just revise that

21     answer --

22                MR. ROSBOROUGH:  Of course.

23                THE WITNESS:  -- or just expand upon the

24     answer?

25                MR. ROSBOROUGH:  Of course.

Page 102

```
 1              THE WITNESS:  In my previous report, I
 2      reported these numbers -- it's available in the
 3      replication code, but previously reported them as
 4      figures.  I was trying to come up with a way to present
 5      the information.  So there's no analogous table, so it
 6      would update the figures from the prior report.
 7      BY MR. ROSBOROUGH:
 8          Q    Okay.  So is it fair to say that all of the
 9      data that is presented in Table 6 was presented in your
10      prior reports, with the exception of the 2024 data,
11      which you have now added --
12          A    That's correct.
13          Q    -- here?
14               Although there -- it -- this is presented in a
15      different form than in your 2023 reports?
16          A    That's right --
17          Q    Okay.
18          A    -- yes.
19          Q    Looking at -- I want to take a look at some of
20      the different columns here, the different racial groups.
21          A    Sure.
22          Q    And I'm really going to be focusing on mail
23      voting in particular.
24          A    Okay.
25          Q    Looking back at -- from 2014 through 2018, is
```

Page 103

1    it fair to say that Black voters were steadily

2    increasing their use of mail voting over that period?

3         A    There's an increase.  I'm not sure if it's

4    steady, but there's a 0.6 percentage point increase from

5    '14 to '16, and it looks like a 3.2 percentage point

6    increase from '16 to '18.

7         Q    How would you -- I don't know.  Do you have --

8    do you have an adjective to characterize what that is

9    like?

10        A    I would say it's an increase.

11        Q    Okay.  And I understand I might be getting

12   into terms of art here, but is it fair to say at that

13   point there was a trend?

14        A    It very much depends on how you want to define

15   "trend."

16             So we have three data points.  It is the case

17   that you can plot three data points and try to put a

18   line that best fit to that.

19        Q    Okay.  And if -- if you were to do that here,

20   there would an increasing trend of Black voters using

21   mail voting from 2014 through 2018?

22        A    For example, the number in 2018 is bigger than

23   the number in 2016.  The number in 2016 is bigger than

24   the number in 2014.  So there is an upward trend.

25        Q    Do we also see an upward trend in Hispanic

1    mail voting from 2014 through 2018?

2         A    We see increases, yes.

3         Q    Do we also see increases year by year of Asian

4    mail voting from 2014 through 2018?

5         A    Yes.

6         Q    Do we see those same -- do we see increases

7    for White mail voting for the same period of 2014 to

8    2018?

9         A    Well, there's an increase from '14 to '16, and

10   then '16 goes back to a number that's close to what it

11   was in -- sorry -- in '18, it goes back to a number

12   close to what it was in '14.

13        Q    Okay.  If we're just looking at 2014 across

14   the different racial groups, White voters were the

15   racial group most likely to use mail voting -- is that

16   correct? -- in 2014?

17        A    I just want to be sure we're being very

18   precise here.

19        Q    Of course.

20        A    Could you define "most likely to use"?

21        Q    As a -- when we're thinking about modes of

22   voting, if you look within each racial group and say

23   what modes of voting is each racial group most likely to

24   use and then we compare across the different racial

25   groups, as a percentage of the racial groups in 2014,

Page 105

1    White voters would be most likely -- more likely to use

2    mail voting than Hispanic, Black, or Asian voters; is

3    that correct?

4         A    The share of White voters who use mail voting

5    is higher than the share for Hispanic, Black, or Asian

6    voters.

7              The reason I just want to be precise here is

8    because the number of White voters is larger than any of

9    these groups, so even though you might have a smaller

10   percentage of Black -- of White voters using mail-in

11   voting, it could be a larger number of ballots cast by

12   White voters by mail, for example.

13        Q    I appreciate that.  Okay.  So let me, then,

14   ask a clearer question using, I think, the correct

15   terminology.

16        A    Yeah.

17        Q    In 2014, is it true that the share of White

18   voters who used mail voting was a greater share than

19   Asian, Black or Hispanic voters who use mail voting?

20        A    Yeah, that's what I was trying to respond

21   to --

22        Q    Okay.

23        A    -- and that's true, yes.

24        Q    And then in 2016, the share of Asian voters

25   who used mail voting surpassed the share of White voters

1     who used mail voting, correct?

2          A    It is the case that the share of Asian voters

3     using mail voting in 2016 is larger than the share of

4     White voters using mail voting in 2016.

5          Q    And in 2018, the share of Black voters who

6     used mail voting also surpassed the share of White

7     voters who used mail voting in Georgia, correct?

8          A    Yes, that's true.

9          Q    And similarly, in 2020, both Black and Asian

10    American voters -- the share of Black and Asian-American

11    voters who used mail voting was higher than the share of

12    White voters who used mail voting?

13         A    Yes, that's true.

14         Q    After SB 202, is it correct that White voters

15    are the only racial group where the share of voters who

16    used mail voting was higher than the share of voters who

17    used mail voting in 2018?

18         A    No.

19         Q    Sorry.  Okay.  How did I get that wrong?

20         A    I'm -- let me just make sure I'm answering

21    your question.

22         Q    Sure.

23         A    You're asking me to look at rows 2022 and

24    2024, and you're asking to make a comparison, then, to

25    row 2018 for every racial group.  And then is it not the

Page 107

1    case that in 2022 for Black mail voting -- just making

2    sure I'm being responsive to your question -- it's 7.5

3    percent of Black voters use mail voting, and that in

4    2018 it was 7.3 percent of Black mail-in voters?  So in

5    that instance, it would -- that would not be the case.

6         Q    Okay.  So other than -- okay.  So let me --

7    let me rephrase the question, then.

8              In 2024, White voters were the only racial

9    group to use mail voting -- the share of White voters

10   using mail voting, White voters were the only group to

11   use mail voting in higher shares than in 2018, if we're

12   just comparing 2024 to 2018?

13        A    To 2018.

14             That looks to be the case, yes.

15        Q    Okay.  All right.  Let's -- I'm going to ask

16   some questions about weekend voting --

17        A    Great.

18        Q    -- which I know is out of order in the report,

19   but I -- I organized it as it made sense, thematically,

20   to me, so sorry.  We're going to section VII, paragraph

21   64.

22        A    Mm-hmm.

23        Q    Okay.  So similar -- I just want to ask a few

24   questions to ensure we have clarity on the sort of -- on

25   the scope of your opinions here.

1           In this section, you're offering opinions

2     about the rate of both weekend voting and specifically

3     Sunday voting in general elections from 2014 through

4     2024, correct?

5           A     That's correct.

6           Q     And you also break these rates down by race in

7     this section, correct?

8           A     Correct.

9           Q     Why did you choose to perform this analysis?

10          A     Again, providing a description about when

11    voters are returning their ballots, what the sort of

12    profile of when ballots are returned looks like, there

13    has been experts who included it in the reports in 2023

14    that I was responding to.

15          Dr. Lee opined that weekend voting would -- I

16    don't have the quote in front of me, but that a

17    consequence of SB 202 would be the elimination of

18    weekend voting on most weekends, and Dr. Pettigrew -- I

19    understand he objects to this analysis, but I believe

20    had suggested that some of the provisions of SB 202

21    would cause weekend voting to go away.

22          Certainly, I'm not offering a causal analysis,

23    but I did want to offer a description about what weekend

24    voting looked like in Georgia in the 2024 election.

25          Q     Okay.  And I think you anticipated a couple of

1     my follow-ups here, but in offering this analysis of

2     weekend and Sunday voting, you are not opining about why

3     different groups of voters voted at different rates on

4     the weekend or on Sunday, correct?

5          A     That's correct.

6          Q     You're also not opining about why the rates

7     changed either overall or in different groups year by

8     year; is that correct?

9          A     That's correct.

10         Q     And you're not opining about, if there are any

11    trends, why those trends occurred?

12         A     That's correct.

13         Q     Okay.  And you're not offering any opinion

14    about whether or not SB 202 had any effect, one way or

15    the other, on different groups' rates of weekend or

16    Sunday voting, correct?

17         A     Yeah, I'm not offering that opinion, and I've

18    seen no expert produce an analysis on how SB 202 affects

19    weekend voting.

20         Q     Okay.  Looking -- let's -- let's take a look

21    at Table 9.

22               What are you representing in Table 9?

23         A     Yeah, so there's going to be two quantities

24    that are going to be calculated here.  So in the "Year"

25    column, I'm providing the year of the general election

1    -- federal general election I'm analyzing, and then I'm

2    going to use two different denominators to understand

3    the rate of weekend voting in the state of Georgia.

4            So in the "Share of All Votes Cast" pair of

5    columns, I have a "Sunday" and "Weekend" column.  And

6    this says, among all votes cast in this election, how

7    many votes were cast during early in-person voting on

8    Sunday or how many votes were cast on the weekend during

9    early in-person voting.  Again, that's a share of all

10   votes cast.

11           Now, moving to the next pair of columns, we

12   have the "Share of All Early In Person Votes."  There,

13   I'm asking, among the population of early in-person

14   voters, people who cast their vote early in person, what

15   share of those votes were cast on Sunday and what share

16   of those votes were cast on the weekend.

17   Q    A couple of follow-up questions on some of the

18   choices here before talking about some of the data.

19           Why did you decide to break out Sunday voting

20   as a subcategory of weekend voting?

21   A    Yeah, it's a decision I made in my prior

22   report as well.  There had been both, my understanding

23   of the provisions of SB 202, some controversy around

24   weekend voting or some allegation about weekend voting,

25   but then, separately, discussions about SB 202 and how

Page 111

1    it relates to Sunday voting, and so I just wanted to be

2    sure to provide both of those data points, both in my

3    2023 report and here.  I certainly wanted to make --

4    like, carry forward that analysis since it was in the

5    2023 report.

6         Q    Okay.  And are you aware of whether or not SB

7    202 mandated Sunday voting -- that counties provide

8    Sunday voting?

9         A    I'm not going to remember the exact provision,

10   but I believe -- it's -- I -- sorry -- either mandated

11   or it made -- it, like, clarified it was optional to

12   provide.  I don't know which -- which one it was.

13        Q    Okay.  And I think, as you've described, you

14   also break out percentages of Sunday and weekend voters

15   both -- both overall and then, the next table, by

16   race --

17        A    Yeah.

18        Q    -- both as a percentage of all ballots cast

19   and as a percentage of early in-person voting; is that

20   correct?

21        A    That's correct.

22        Q    All right.  Why did you decide to provide

23   those different metrics, but looking at -- looking at it

24   as a share of all votes and looking at it as a share

25   of --

1          A     Yeah.

2          Q     -- early in-person votes?

3          A     Yeah, and I'm sure we'll talk about it with

4    drop boxes later.  But, actually, for most of my tables,

5    I'm trying to offer these two different denominators

6    just to give -- make sure we have the appropriate

7    context for these calculations.

8                One of the things -- not to make us flip back,

9    but if we look at Table -- I apologize.

10         Q     No.  That's fine.

11         A     If we look at Table 6, what we see is that

12   there is a larger share across every self-reported

13   racial group of individuals voting early.  So this is

14   becoming a bigger share.  So I wanted to be sure that we

15   had the context both for what's going on with early

16   in-person -- among early in-person voters when they're

17   deciding to cast their ballot, because I think that

18   denominator is of interest when people decide to vote

19   early in-person, when do they cast it, but then also to

20   provide a characterization about what happens among

21   voters overall, which takes into account that change in

22   how Georgians are casting their ballot.

23         Q     So looking back at Table 9 at a few of the

24   data points -- and we'll do this with the next table as

25   well -- if we're looking at Sunday voting, comparing

```
                                          Page 113
1     Sunday voting in 2020 -- at -- sorry.  Looking, first,
2     at Sunday voting as a percentage of all votes cast, if
3     we compare 2024 and 2020, the percentage stayed the
4     same, correct?
5          A    Yeah.  I tried to clarify this in the text
6     to -- you know, things are never, obviously, exactly
7     equal.  There's a 0.03 percentage point difference --
8          Q    Okay.
9          A    -- but I do believe I characterize it as
10    similar.  I just wanted to be clear what the -- what the
11    difference was there.
12         Q    Understood.
13              And if you look at Sunday voting in 2024 as
14    compared to Sunday voting in 2020 as a share of all
15    early in-person votes, the share of voters who voted in
16    -- on Sunday decreased in 2024 as compared to 2020; is
17    that correct?
18         A    The share of early in-person voters who cast
19    their ballot on Sunday was lower in 2024 than in 2020.
20         Q    Okay.  Let's flip to the next table with the
21    racial breakdown, which is Table -- it's Table -- it's
22    two tables, Table 10 and 11.
23              Is it correct that, prior to SB 202, in --
24    whether you look at voters as a -- White voters as a
25    share of -- okay.  Let me -- let me back up to make this
```

Page 114

1          question easier.

2                     I'm going to ask you a couple of questions

3          about White voters' voting patterns on Sunday.

4               A     Okay.

5               Q     And maybe "patterns" is the wrong word.  The

6          voting behavior of White voters voting on Sundays.

7               A     I don't mean to ask you a question, but just

8          to be sure I'm ready to respond to the question, should

9          I be ready to look at 10 and 11 while you ask it --

10              Q     Yes.

11              A     -- simultaneously?

12              Q     Yes --

13              A     Okay.

14              Q     -- or in succession.

15              A     Okay.

16              Q     Whether we're looking at White voters as a

17         share -- White voters who cast -- let me just do it

18         chart by chart.  It's easier that way.

19              A     Okay.  Go ahead.

20              Q     Table 10.  Is it fair to say, looking at

21         voters by racial group as a share of all ballots cast,

22         that before SB 202, White voters consistently cast

23         ballots on Sunday at lower rates than other racial

24         groups reported here?

25              A     That appears to be the case.  Yes, there's --

1    I'd have to dig into the comparison for American Indian

2    voters and White voters in 2016 to know precisely the

3    difference, but yes.

4         Q    And then same question with the different

5    denominator.

6              When we're looking at Table 11, share of early

7    in-person ballots cast on the weekend, looking at

8    Sundays in particular, is it accurate that, prior to SB

9    202, White voters utilized Sunday voting at lower rates

10   than all of the other racial groups reported?

11        A    That's correct, yes.

12        Q    Okay.  Do you have any opinion about why

13   that's the case?

14        A    No.

15        Q    Okay.  And continuing to look at Table 11,

16   when looking at weekend voting as a percentage of early

17   in-person votes, is it accurate that, while the

18   percentage of White weekend voters increased -- the

19   share of White voters who used weekend voting increased

20   after SB 202, the share of Black voters who used weekend

21   voting after SB 202 remained stagnant or -- or roughly

22   so?

23        A    No, I don't -- again, it depends on the point

24   of comparison, but 2022 and 2024 -- going to Table 11,

25   looking at rows 2022 and 2024, and now -- I want to be

Page 116

1      responsive to your question -- to the weekend column in

2      the "Black" pair of columns, so after SB 202, in 2022,

3      it's lower than in 2020, about the same as in 2018, but

4      higher than in '16 and '14.  In 2024 -- I would need to

5      get into my code to know the exact numerical difference,

6      but it's about the same between 2024 and 2020.  And then

7      for Black early in-person voters, 2024 is otherwise the

8      highest share of weekend votes.

9          Q    And I realized that I did not ask my question

10     as precisely as I meant to.

11         A    Okay.

12         Q    Specifically comparing 2020 versus 2024, that

13     -- which is what I meant to ask --

14         A    Okay.

15         Q    -- when we look at the share of Black voters

16     who used weekend voting in 2024 as compared to 2020 as a

17     share of early in-person ballots cast, it remained

18     roughly the same; whereas, the share of White voters who

19     used weekend voting increased; is that correct?

20         A    Yeah.  I mean, as a general just observation

21     from the table, it increases for every other group but

22     Black early in-person voters, comparing '20 and 2024.

23         Q    Got it.

24              I believe I know the answer to this, but I

25     just want to confirm.  Did you do any county-based

                                              Page 117

1    analysis of early voting in 2024 to determine whether

2    different categories of racial groups had access to

3    Sunday early voting?

4         A    No county-based analysis.

5         Q    Okay.  And just to save time, in performing

6    this weekend voting analysis, you didn't do any

7    county-based analysis at all -- correct? -- in referring

8    to your 2025 report here?

9         A    No.

10        Q    Okay.

11        A    Yeah.

12        Q    So we marked this earlier.  I just really have

13   one or two questions on it.

14             But if you could turn to Dr. Pettigrew's July

15   2025 rebuttal report at page 4.

16        A    Can you remind me of the exhibit number?  Is

17   it Exhibit 4?

18        Q    That's -- that does sound right to me.

19        A    And page 4?

20        Q    Yes, that's correct.  This is -- yeah.  So

21   just let me know when you're there.

22        A    I'm there.

23        Q    All right.  So Dr. Pettigrew states that:  In

24   "Section 4.2.3 of my January 2023 report" -- let me

25   rephrase that.

```
 1              "Section 4.2.3 of my January 2023 report notes
 2    that 'most Georgia voters (and disproportionately white
 3    voters) live in a county that-prior to SB202-already
 4    offered at least as many offers of early voting as are
 5    required by SB202."
 6              Do you have any basis to either agree or
 7    disagree with that?
 8        A    That's not something I analyzed.
 9        Q    Okay.  Let me move -- I think we're still --
10    let me just do a time check.  Keep going for maybe
11    another -- I don't know -- 15 minutes or so, and then we
12    can take our lunch break?  Does that --
13        A    I defer to you all.
14        Q    All right.
15        A    Are we done with the Pettigrew for now?
16        Q    Yes, you can put that aside.  Thanks.
17              Okay.  I'd like to ask some questions about
18    provisional ballots, which I believe is section --
19        A    It's Table 7 right above paragraph 47.
20        Q    Exactly.  Toward the end of Table -- of
21    section V of your report.  Okay.
22              In this section of the report, again, still,
23    just for the record, talking about your June 2025
24    report, you look at rates of provisional voting by race,
25    correct?
```

Page 119

1       A    That's correct.

2       Q    Are you analyzing -- and this is truly -- I'm

3   truly trying to clarify a few things here.

4            Are you analyzing the share of ballots that

5   were cast as provisional ballots, the share of

6   provisional ballots that were ultimately counted, or do

7   you do both of those analysis in this section?

8       A    No.  This is all -- what I'm doing here is

9   saying how many number of provisional ballots do we have

10  divided by total number of ballots cast.

11      Q    Does this -- okay.

12           You agree that a provisional ballot can be

13  counted or not counted, correct?

14      A    Correct.

15      Q    Is what you're reporting here provisional

16  ballots that were cast regardless of whether or not they

17  were counted, or is it provisional ballots that were

18  both cast and ultimately counted?

19      A    So it's the provisional ballots as classified

20  in the Voter History File.  I do not know if those were

21  ultimately counted or not.

22      Q    Okay.  So maybe it makes sense to ask a couple

23  of questions about -- to the best of your recollection,

24  what were you pulling from in the Voter History File to

25  determine whether a ballot was cast as provisional?

Page 120

1        A    There is a field called "Provisional."

2        Q    Okay.  So describe to me, in general terms,

3    the setup of the Voter History File.

4             Do you have -- if we're looking at the rows

5    going down on the, like -- on the left side, like an

6    Excel, is it -- is it a voter -- is each row a

7    particular voter?

8        A    Each row is a voter's registration number;

9    that's right.

10       Q    Okay.

11       A    Well, that's the first entry in the row;

12   that's right.

13       Q    And so if you look across the row, there are

14   -- there's probably different demographic information

15   about the voters; address, county of residence,

16   potentially, race, things like that?

17       A    That -- not to be pedantic, but that's not in

18   the Voter History File.  So the Voter History File is

19   really just an account of who voted in that election,

20   and then you use -- the registration number enables me

21   to do the unique linking, and so just to zoom back out

22   to tie it to a question we talked about before, we

23   talked about those 6,000 individuals who I couldn't link

24   up to the January 2015 voter -- 2025 voter file, and so

25   that demographic information isn't included in the Voter

```
                                          Page 121
 1    History File.
 2         Q    Does the Voter History File for a particular
 3    election or poll -- let's -- let me step back again.
 4              For your analysis here, which -- for your 2024
 5    analysis, let's say, what Voter History File were you
 6    using?
 7         A    The voter history -- the spreadsheet contained
 8    in the Voter History File-November -- Nov 2024 General
 9    Election.zip.
10         Q    Okay.  If you're looking -- you've got the
11    voter registration number with -- let's take a
12    particular row.  You're looking across.  You've got the
13    registration or unique identifier.
14              What else are we going to see -- and I'm not
15    asking you to be exhaustive in your memory of everything
16    that's there, but let me ask this:  Are you -- are you
17    seeing a sequence of different past elections, including
18    the most recent one in which a voter -- registered
19    voters either have or have not voted, or are you seeing
20    only the most recent election?
21              MR. FIELD:  Object to form.
22              THE WITNESS:  Okay.  I'm just going to do my
23    best to be responsive --
24              MR. ROSBOROUGH:  Sure.
25              THE WITNESS:  -- to the question.
```

The Voter History File contains the voters who the state of Georgia records as participating in the election. So it does not contain -- it's a Voter History File for a particular election. I should clarify. So it will not be a history file that goes back several elections. You have a Voter History File for one particular election, and in that Voter History File, there's a field labeled "Provisional."

MR. ROSBOROUGH: Okay.

Q And it's your belief that what is reflected there is every voter who cast a ballot in that election, whether or not that ballot was ultimately counted?

A Every voter who cast a provisional ballot regardless of how that provisional ballot was adjudicated.

Q Okay. And you did not perform any analysis in your provisional voting analysis of rates of whether or not provisional ballots were counted, correct?

A I didn't --

MR. FIELD: Object to form.

Go ahead.

THE WITNESS: I did not perform that analysis, no.

BY MR. ROSBOROUGH:

Q Okay. Why did you choose to analyze

Page 123

1    provisional voting patterns, including by racial

2    identity?

3         A    This is just another issue that I think is

4    important for the context of a state's election across a

5    number of political science papers, including MEDSL,

6    M-E-D-S-L.  They include rates of provisional voting as

7    an indicator of health, and, here, rates of provisional

8    voting is yet another component of how voters are

9    casting their ballot in the -- the state of Georgia.

10        Q    And when you say rates of provisional voting

11   as an indication of health --

12        A    Yeah.

13        Q    -- what does that mean?

14        A    Yeah.  So I'll talk about it in the context of

15   how MEDSL defines it.

16        Q    Okay.

17        A    So this is part of the literature.

18             There, their assertion -- the assertion from

19   MEDSL is that lower rates of provisional voting are

20   better.  And it can be more complicated than that, but

21   the way that they construct their indices, as I -- best

22   I recall, is that lower rates of provisional voting

23   imply that an election system is performing better.

24        Q    Okay.  So a reflection of high rates of

25   provisional voting among certain racial groups would

1    mean that those racial groups have a more difficult time

2    accessing -- participating in that electoral system?

3            MR. FIELD:  Object to form.

4            THE WITNESS:  I'm not sure I can connect it --

5    connect those two ideas; that we can connect provisional

6    voting rates to difficulty.

7            So the MEDSL analysis is always aggregate.

8    BY MR. ROSBOROUGH:

9        Q    Okay.  So in the MEDSL analysis, if there are

10   disparate rates of provisional voting among racial

11   groups, what does that indicate, if anything, about the

12   health of the system at issue?

13       A    I don't think MEDSL has -- takes into account

14   disparate rates.

15       Q    Okay.  Why did you break out provisional

16   voting by race, then?

17       A    Providing context for how -- both overall and

18   how different racial groups are voting in the election,

19   including provisional ballot.  So it's continuing my

20   effort to describe how votes are being cast in the state

21   of Georgia across these elections.

22       Q    Okay.  I wanted -- I think it might be

23   helpful -- I believe you have an appendix here with a

24   couple of tables at the very end of this report.

25       A    Yeah.

1          Q    And one of those is Table 21, which I think

2     deals with provisional voting.

3          A    Uh-huh.

4          Q    What does -- what does Table 21 reflect?

5          A    It's the numerator for the table we were just

6     at -- I just flipped away from.  It's the numerator for

7     the provisional rate.

8          Q    Okay.  Is it fair to say that disproportionate

9     rates of Black voters, both before and after -- as

10    compared to White voters, both before and after SB 202

11    cast provisional ballots?

12         A    So -- and just working through the logic of

13    the question, there are more -- let me make sure I've

14    done this comparison, but there are more Black voters

15    who have cast provisional ballots, I think, in every

16    election that I'm analyzing here.  There's fewer Black

17    voters, so it would be disproportionate; that's right.

18         Q    Okay.  The numbers of voters, both overall and

19    by race, who cast provisional ballots, is it fair to

20    say, dropped significantly after the passage of SB 202?

21         A    Can you just clarify what you mean by

22    "significantly"?

23         Q    Sure.

24              Well, the -- both the number of -- let's --

25    let's look at overall first.

1         Overall, the number of absentee ballots cast

2    in the 2022 or 2024 elections are much -- are -- in both

3    of those elections are lower than any of the other

4    reported elections before SB 202?

5         A    And I don't mean to edit your question, but

6    you said "absentee ballots."

7         Q    Oh, I'm sorry.  Your -- your provisional --

8         A    Provisional ballots?

9         Q    Thank you -- provisional ballots is what I

10   meant.

11        A    I just want to be sure that --

12        Q    No.  I appreciate that.

13        A    -- for the record later.

14        Q    Yes.

15        A    It is the case -- I believe this is a question

16   about overall, so it is the case that the number of

17   provisional ballots is lower in '22 and '24 than in the

18   prior elections 2018, '16, or '14, overall.

19        Q    Okay.  Is it also true that the number of

20   Black voters who voted with provisional ballots in 2022

21   and 2024 was lower than in any of the four elections

22   preceding SB 202?

23        A    Yes.

24        Q    Okay.  Do you attribute any of the changes in

25   provisional voting to any of the provisions of SB 202?

1        A    No.

2        Q    Are you familiar with the provision of SB 202

3   that limited the ability to have provisional ballots

4   that were cast out of precinct counted to -- to voters

5   arriving after 5:00 p.m. on Election Day?

6        A    I'm familiar --

7             MR. FIELD:  Object to form.

8             THE WITNESS:  I'm familiar with that, yes.

9   BY MR. ROSBOROUGH:

10       Q    Based on the numbers of provisional voters

11   here, if the out-of-precinct provision meant that most

12   of the people who would have cast provisional ballots

13   and had them counted before SB 202 were not able to do

14   so, would it disproportionately harm Black voters?

15       A    I don't have the reason for the provisional

16   ballot, so I don't know for what reason people are

17   casting provisional ballots.

18             MR. ROSBOROUGH:  Okay.  It could be a good

19   time to take our lunch break.

20             THE WITNESS:  Sounds good.  Yeah.

21             MR. ROSBOROUGH:  How long?

22             MR. FIELD:  Let's go off the record.

23             MR. ROSBOROUGH:  Sorry.

24             (Lunch Recess, at which time Mr. Tyson joined

25             the deposition proceedings.)

```
 1              MR. ROSBOROUGH:  Dr. Grimmer, we're back on
 2      the record.
 3         Q    I'd like to move on to another topic:
 4      Absentee ballot or mail ballot rejections.  So probably
 5      most helpful is to turn to section VI, paragraph 49 of
 6      your June 2025 report.
 7              Okay.  And in this section, you offer opinions
 8      about the rates and numbers of mail or absentee ballot
 9      rejections and the reasons for those rejections across
10      several general elections, correct?
11         A    That's correct, yes.
12         Q    And you also break those numbers and rates
13      down by race?
14         A    That's correct.
15         Q    Okay.  Some similar questions with a lot of
16      these others, just for clarity.
17              In offering your opinions on the numbers,
18      rates, and reasons for absentee ballot rejections, are
19      you offering any opinions about the reasons for
20      different rates of rejection across time?
21         A    The -- the one category that would be
22      important is the oath category.  So that, as a category,
23      I code manually in '16 and '18.  It doesn't exist as
24      part of the standardized categories in '20, '22, and
25      '24.  In part, that's related to the discussion I think
```

1    we had earlier about HB 316.  So just an explanation

2    about where that category goes, and that would be a

3    reason why you would see changes there, but, otherwise,

4    I'm not offering an explanation for the changes in the

5    rejection rates.

6         Q    Okay.  And --

7         A    I'm sorry.  I just need to --

8         Q    No, please.

9         A    I do discuss the timing of ballot returns,

10   particularly in the 2020 election, which would be

11   related to a reason that we might see differences in

12   deadline rejection rates across different elections,

13   although I don't offer a causal analysis that says

14   having returned earlier explains the share of the

15   decline or something like that.

16        Q    Got it.

17             And similarly -- and feel free to make any

18   caveats that you need to, but you're not offering any

19   opinions about the reasons for different rejection rates

20   across different racial groups over time; is that

21   correct?

22        A    Keeping the oath category in mind, like I said

23   before, but, otherwise, I'm not offering a reason for

24   differences across racial group rejection rates.

25        Q    Okay.  And are you offering any opinion about

Page 130

1    whether or not SB 202 affected different groups' rates

2    of absentee ballot rejections?

3         A     I'm not offering an opinion about SB 202's

4    effect on rejection rates.

5         Q     Okay.  I want to make sure we're on the same

6    page with a little bit of framing in terms of time

7    periods before I get into some of the more specifics

8    about your -- the data in here.

9               You -- you analyze rejection rates in general

10   elections starting in 2016 and go through 2024, correct?

11        A     Correct.

12        Q     And you may have addressed this previously or

13   not.

14              Is there any reason why 2014 isn't included in

15   this analysis?

16        A     It is -- I don't know how else to call it but

17   a number-of-hours-in-the-day reason.

18              So 2018 and 2016 required manual coding, and

19   so in comparison, just to make sure we have the contrast

20   here, when I performed an analysis or Dr. Fraga

21   performed an analysis for 2020, we rely upon the State

22   coding that takes fractions of a second.  It's a simple

23   command to issue.  For 2018 and '16, I need to go

24   through and manually code, and then that requires me to

25   then verify that.  It's time consuming.  And so I

1    haven't included '14 for that reason.  Just amount of

2    time available to do the manual classification.

3        Q    Got it.

4             And I think you -- you mentioned HB 316

5    before -- or -- sorry -- yes, HB 316 in your report and

6    earlier today, correct?

7        A    Correct.

8        Q    Is it fair to say that when we're looking

9    around, looking at ballot rejection rates, there are

10   sort of three distinct time periods in which different

11   laws were at issue here, one of which is 2016-2018,

12   prior to the enactment of HB 316, another of which is

13   2020 and 2021, after HB 316, but before SB 202, and then

14   2022 and 2024, after SB 202 changed some of the rules?

15       A    I don't know if I'd quite break it down like

16   that because there is a complication, and I'm going to

17   offer my best recollection of -- of what's going on

18   here, but there is a provision in SB 202 that adds back

19   in the requirement to write down your year of birth.

20   That was in effect for 2022.  However, I believe in this

21   case there was an injunction against rejecting ballots

22   for year of birth, and so even though it was on the

23   oath, counties were instructed to not reject ballots

24   because of year of birth not being present in the oath

25   envelope, if I have this correct, and so as a result of

1    that, we might break -- break down that post-SB 202

2    period into a bit of a more refined ...

3         Q    Right.

4              So is it your understanding that certain

5    counties were enjoined from rejecting ballots based on

6    lack of birth date on the envelope after the 2022

7    election, but before the 2024 election?

8         A    That's my understanding --

9         Q    Okay.

10        A    -- yes.

11        Q    With that qualification, is -- is my

12   categorization of different periods generally accurate,

13   or are there other glosses that you think are important

14   to put on it?  And I should say as it pertains to

15   absentee ballot rejections.

16        A    Sure.

17        Q    I'm not talking about the whole voting law in

18   Georgia.

19        A    I -- I believe it's accurate.  We -- as

20   obvious -- as much discussed before the -- or after the

21   2020 election, there were some regulations or

22   suggestions put in place by the Georgia Secretary of

23   State's office after HB 316, but that would still fit

24   within the categorization.  So I would be reluctant to

25   label these as -- you know, it's like the 316 -- like,

1    that categorization scheme, but those chunks, I think,

2    do describe changes that may have been in place and the

3    policies for absentee ballot rejections.

4         Q    Okay.  And to establish whether we're on the

5    same page of a few of the different policies that were

6    in effect, not -- not a memory test, but I think you do

7    discuss this --

8         A    Yeah.

9         Q    -- in your section, so feel free to refer to

10   your reports.

11              In 2016 and 2018, is it your understanding

12   that voters were required to provide their address and

13   date of birth on the absentee ballot envelope in order

14   for it to be counted?

15        A    The absentee ballot envelope?  On the oath

16   envelope?

17        Q    Correct.

18        A    Yes.

19        Q    Thank you.

20        A    That is my understanding, that address and

21   date of birth were required along with a signature.

22        Q    Okay.  And is it your understanding that the

23   law required signature matching for ID purposes during

24   that time?

25        A    My understanding is that for '16, '18, '20 and

1     the '21 runoff, the verification was performed through a

2     signature match.

3          Q    Okay.  And in 2016 and 2018, is it your

4     understanding that drop boxes were not something that

5     was available to return absentee ballots, or have you

6     studied -- not studied that one way or the other?

7          A    I have -- I have not opined on the presence of

8     drop boxes in '16 or '18; though I believe they were not

9     available in '16 or '18, but ...

10         Q    Okay.  In the 2020 and I'll include the 2021

11    runoff, in that election period, after HB 316, but

12    before SB 202, I think you said your understanding is

13    that signature matching was still the policy, correct?

14         A    Correct.

15         Q    There was a -- counties were allowed to add

16    drop boxes for the return of ballots -- absentee ballots

17    during that period, correct?

18         A    There were drop boxes in 2020 and the 2021

19    runoff, yes.

20         Q    And for these elections, the address and

21    date-of-birth requirement on the envelope had been

22    eliminated?

23         A    Yes.

24         Q    Okay.  And then after SB 202, we have the --

25    the reinstatement of the date-of-birth requirement on

Page 135

1    the oath envelope for 2022, but only in certain counties

2    for 2024; is that your understanding?

3        A    I guess I don't know how broadly the

4    injunction applies in 2024.  I thought it was across

5    counties, but if it's a smaller number, that could be,

6    yeah.

7        Q    Okay.  There was the additional requirement of

8    the need to provide a driver's license number, last four

9    of Social Security number.

10           Is that part of what you looked at?

11       A    That would be part of what would be included

12   in the ID reason, so you provide that on the

13   application, and then, on the return, provide the ID or

14   the last four of Social.

15       Q    And then --

16       A    Or -- sorry.  I don't mean to interrupt your

17   question --

18       Q    No.

19       A    -- but just to say that there are, of course,

20   other ways -- other ways to confirm your identity.  I

21   believe it includes, like, utility bills, or you could

22   obtain a voter card from your local county office.

23       Q    Okay.  The -- that require- -- additional

24   requirement, which includes, as options, the driver's

25   license or the last four of Social, was something added

Page 136

1       in by SB 202, though, correct?

2            A    That's right.

3            Q    Okay.  And then, finally, with regard to drop

4       boxes, SB 202 re- -- required one per county, but

5       restricted the number of drop boxes to one per 100,000

6       people in the county and restricted the location and

7       hours available; is that your understanding?

8            A    Let me just unpack the question --

9            Q    Sure.

10           A    -- about the drop boxes.

11                So it's one per hundred thousand -- is it

12      registered voters, I believe?  And it is the case that,

13      then, the county -- that the SB 202 placed regulations

14      on where those drop boxes could be located and then, as

15      a result of that regulation, on the hours that be

16      available for use.

17           Q    Okay.  I think those are all the sort of

18      background questions there.  I just wanted to make sure

19      we were on the same page before looking at this stuff.

20                You can turn -- I'm going to ask some

21      questions about your Table 8.

22           A    Right above paragraph 64.  I had it -- I had

23      it open.

24           Q    Perfect.

25                Okay.  I guess some general questions first.

1           If we're looking at the overall numbers, is it

2    fair to say that the rate of absentee ballot rejections

3    dropped, I guess, overall and across the board in terms

4    of categories after 2018 when -- with the passage of HB

5    316 intervening?

6        A    Just to make sure I'm answering the question

7    precisely, do you mean to ask me if the overall

8    rejection rate in 2020, 2022 and 2024 is lower than in

9    2018 and 2016?

10       Q    That is -- exactly.  That -- that -- with the

11   -- with -- after the passage of HB 316.  Actually, no.

12   Let me -- let me modify that.  We'll get to that.

13           I'm particularly just looking at the change

14   from 2018 to 2020.

15       A    Across the board?

16       Q    Across the board.

17       A    And by "across the board," do we mean overall

18   and broken down by self-reported racial group?

19       Q    Just overall for the moment and including each

20   of the different categories.

21       A    Overall for each category, I would need to

22   compare -- and I know I've done this in this paper where

23   I have it very precisely -- the signature rejection rate

24   from '18 to '20, that I recall those being comparable.

25   I do not remember which is higher, I'm sorry to say.

Page 138

1       Q    No.  That's fine.

2       A    But overall, deadline and then, like I

3    mentioned with the oath, that goes to zero.  So that is

4    lower in 2020 than in 2018.

5       Q    Okay.  And if you're looking at overall, in

6    looking at the different racial categories, the

7    rejection rate for each racial group dropped from 2018

8    to 2020, correct?

9       A    For every racial group, the 2020 rejection

10   rate is lower than 2018; that's correct.

11      Q    Is it your understanding that, because of the

12   intervention of HB 316 in 2019, that in terms of the

13   sort of legal framework of what -- what were the reasons

14   for rejection of absentee ballots, that 2020 is the

15   status quo before the passage of SB 202?

16      A    I'm not -- I'm just -- I'm sorry.  I'm just

17   not sure what you're asking.

18      Q    Sure.

19           So we discussed that HB 316 was enacted in

20   between the 2018 and 2020 elections --

21      A    Mm-hmm.

22      Q    -- correct?

23           Are you aware of any other intervening legal

24   changes that affected absentee ballot rejection rates

25   after the 2020 elections but before SB 202?

```
                                          Page 139
 1        A    I'm not aware of a policy change between the
 2   January 2021 runoff and the passage of SB 202.
 3        Q    Okay.  So 2020 -- what -- I guess what I'm
 4   asking is:  2020 represents the last election -- general
 5   election before the enactment of SB 202, correct?
 6        A    It is the last general election before the
 7   enactment of SB 202; that is true.
 8        Q    Okay.  After the passage of SB 2- -- so you
 9   agree that SB 202 was passed in between the 2020 and
10   2022 elections, correct --
11        A    Yes.
12        Q    -- in 2021?
13        A    Yes.
14        Q    Okay.  I feel like I'm making this harder than
15   I need to, but ...
16             Do you agree that, looking at 2020 and looking
17   at the years after SB 202, both overall and among --
18   overall for any reason and overall for each racial
19   group, the rate of absentee ballot rejections increased?
20   So comparing both 2022 and 2024 to 2020, the rate of
21   absentee ballot rejections increased both overall and
22   for each racial group?
23        A    Relative to 2020, it is true that in 2022 and
24   2024 there were higher rejection rates than in 2020.
25   And then -- but you just mean overall, right?
```

Page 140

1        Q    Let's start with overall, yeah.

2        A    That's a pattern that's true overall and for

3    each self-reported racial group; that's right.

4        Q    Okay.  Let's consider the ballot rejection

5    categories now, just -- not the rates at the moment,

6    just the categorizations.

7        A    Yeah.

8        Q    You classify the ballot rejection reasons into

9    four different categories:  Deadline, signature, ID, and

10    oath, correct?

11        A    That's correct.

12        Q    Okay.  How would you define each of those

13    categories?

14        A    Yeah.  I do this precisely in my code.  So

15    deadline is a ballot that's rejected after the deadline.

16            Signature is a ballot that's rejected for the

17    signature reasons that I discuss in my report.  And then

18    for the signature-based reasons, I discuss in the files

19    where I do the classification.  That's the category

20    there.

21            ID, again, it's based on the categories from

22    the standardized categories for 2022 and 2024 and then

23    for my manual classification.

24            And then oath is, again, based on my manual

25    classification.

Page 141

```
 1              There is a bit of a challenge here in the
 2    classification, and that is, depending on how one wants
 3    to define an oath-related rejection or ID-related
 4    rejection, you may want to put those together.  The
 5    reason for that is -- and the same thing with signature,
 6    actually, for the previous periods.  Let me explain why
 7    that might be -- why we might want to move together
 8    signature, ID, and oath.
 9              The reason for this is that when you're
10    looking at the rejection reasons, say, from 2018, it
11    will say the most prominent one -- and I'm going to get
12    as close to the quote as I can by remembering it, is --
13    it says:  Oath incomplete.  Okay.  So by most prominent,
14    I mean that's the most frequent of the oath categories.
15    Some of the ID or signature-related categories, however,
16    could be also classified as "oath incomplete."  So we
17    may want to sum those together as a set of categories.
18              I'm also -- as a point of distinction from, I
19    think, Dr. Fraga's ID category, I include individuals --
20    a small number of individuals who have yet to provide
21    their identification after registering to vote online in
22    my ID category here as well.
23         Q    Okay.  That's helpful.
24              Was there any particular reason you chose to
25    divide the categories into those -- divide these
```

1      rejection reasons into these four categories?

2          A    Certainly I wanted to make a comparison of

3      signature-related rejection rates, given that was the

4      mode of validation pre-SB 202, and ID-related reasons

5      post-SB 202, and then the use of the oath -- I just

6      wanted to clarify that -- the rejections that were

7      related to that oath category clearly in the file where

8      I couldn't disentangle the signature-ID reason.

9          Q    Got it.  Okay.

10              Is it correct to say that if we're looking at

11     2020 and then the elections that follow for 2022 and

12     2024, that the percentage of ballots rejected for

13     receipt after the deadline increased by a greater amount

14     for Black voters, American Indian voters, Asian voters,

15     and Hispanic voters than for White voters?

16         A    I'm just going to make sure I break down the

17     comparisons correctly.  So I'm going to go 2022 to 2020,

18     and then we're focusing on the column in Table 8 that

19     says "Deadline."

20         Q    Oh.  I'm sorry.  And I -- let me rephrase this

21     while we're doing this correctly.

22              Comparing presidential elections --

23         A    Oh.

24         Q    -- 2020 to 2024 --

25         A    Got it.  Okay.

1          Q      -- is it true -- does it appear to be true

2     that the percentage of ballots rejected for

3     post-deadline receipt increased by a greater amount for

4     Black voters, American Indian voters, Asian voters, and

5     Hispanic voters --

6          A      Did you --

7          Q      -- than for White voters?

8          A      Sorry.  Did you ask about the number or the

9     share?

10         Q      The share.

11         A      Okay.

12                I'm just going through the table here.

13         Q      Sure.

14         A      I'm not --

15         Q      No, that's fine.

16         A      Comparing 2020 and 2024, that appears to be

17    correct.  It would not be correct if I was comparing

18    2020 to 2022, for example.

19         Q      And is -- the same is true, correct, if we

20    look at comparing the different racial groups, the share

21    of rejections for ID-related reasons from 2020 to 2024?

22         A      That's a bit of an apples-to-oranges.  There's

23    the small number of individuals in 2020 who could have

24    their application rejected because they failed to

25    provide their identification at registration, but the --

1    because of the structure of the oath envelope and the

2    way validation was conducted, the validation only

3    occurred through signature matching.  So it otherwise

4    would not be possible to have an ID-related rejection in

5    2020, is my understanding.

6         Q    Okay.  So perhaps the better question is:  It

7    is true, is it not, that Black voters, Hispanic voters,

8    Asian voters, and American Indian voters all had higher

9    ID-related rejection rates than White voters in 2024?

10         A    That is true, yes.

11         Q    Okay.  I'd like to talk about a few -- break

12    down a few of these categories before we move on in

13    terms of rejection reasons.

14              Let's start with return deadline.  I think you

15    have some analysis in here -- and correct me if I'm

16    mischaracterizing -- but where you question Dr. Burden's

17    opinion from his 2023 reports that the greater

18    availability of drop boxes through the close of polls on

19    Election Day in 2020 reduced the rate of rejections of

20    absentee ballots because of late arrival?

21         A    Just to characterize my --

22         Q    Sure.

23         A    -- argument there, Dr. Burden makes that

24    assertion.  He provides no analysis and certainly

25    doesn't estimate the causal effect of drop boxes on the

Page 145

1      ability to return ballots at a -- at deadline.

2              I then conducted analysis to suggest that

3      there's other confounders that may be present that would

4      make it difficult to attribute differences from 2020 to

5      other years to drop boxes.

6          Q    Okay.  Did you perform any analysis that rules

7      out the greater availability of drop boxes in 2020 as a

8      factor in the lower rate of late ballot rejections?

9          A    No.

10         Q    Okay.  In paragraph 58, I believe -- no --

11     yeah -- paragraph 58, you note that the average mail-in

12     ballot voter in the 2020 election was younger than the

13     average mail-in ballot voter in other election years,

14     correct?

15         A    That's correct.

16         Q    How might that, if at all, affect the

17     percentage of ballots rejected as arriving too late in

18     post-2020 elections?

19         A    Yeah, it -- that's a good question.  Here, I'm

20     just documenting ways in which these groups are

21     different, and so anytime somebody makes a causal

22     assertion -- he says:  Drop boxes cause there to be a

23     reduction in -- a reduction in ballots arriving after

24     the deadline -- it's -- it's important to ask what other

25     confounding factors are there, what other differences

Page 146

1    are there across the populations.

2              I think a key difference is when the ballots

3    were returned in this much earlier push to return

4    ballots in 2020 or much earlier distribution of having

5    ballots returned in 2020.  However, another difference,

6    just the characteristic I have available, is the age of

7    voters, and so I will -- also wanted to report that.

8        Q    Okay.  You're not offering, though, any

9    opinion on whether or not it's more likely that the

10   younger average age of voters was a greater factor than

11   the differences in drop box availability for the

12   rejection rate, correct?

13       A    No, I mean this to be a confounder for the

14   anal- -- for the assertion that Dr. Burden made, and

15   there's really no analysis I've seen that's shown the

16   effect on drop boxes on when absentee ballots are

17   returned.

18       Q    Moving on to paragraph 62, is it fair to say

19   in this paragraph that you were comparing the ID-related

20   rejection rates in the post-SB 202 elections with the

21   signature rejection rates in the pre-SB 202 elections

22   for different -- and for different racial groups?

23       A    That's correct.

24       Q    Why were you comparing these two categories?

25       A    So one way to think about differences across

1    the elections is that these are the two primary

2    mechanisms for validation of the -- of the absentee

3    ballots.

4         Q    Okay.

5         A    Sorry.  The validation of who is returning the

6    absentee ballot.

7         Q    And just I think it's probably easiest to turn

8    back to the table that we were just looking at, Table 8.

9              If we're looking at Black voters in

10   particular, do you agree that Black voters actually had

11   their ballots rejected for signature issues at

12   approximately the same rate in 2024 as they did in 2020?

13        A    Yeah, I would agree with that.

14        Q    Okay.  But that no Black voters had their

15   ballots rejected for ID-related reasons, or at least not

16   one that reflects as more than zero in this chart, for

17   ID-related reasons in 2020, but approximately half a

18   percentage point did in 2024?

19        A    Yeah.  I mean, I think the -- if we wanted to

20   sort of make a complete comparison of validation-based

21   reasons for rejection, in 2016, it would be, you know,

22   1.9 percent of Black voters on oath, ID and signature,

23   and in 2018, it would be zero-point -- sorry -- it would

24   be 2.5 percent of Black voters had a ballot rejected for

25   validation-related reasons.  That goes down to 0.2

Page 148

1    percent in 2020, and it's 0.7 percent in 2022 and 0.7

2    percent in 2024.

3         Q    Do you agree that the reason for increased

4    rejections of Black voters for ID-related reasons are

5    attributable to SB 202's requirements?

6         A    The increase.  Just to clarify, what am I

7    comparing?

8         Q    2020 to 2024.

9         A    Yeah.  So SB 202's regulations would introduce

10   ways in which a voter could have their ballot rejected

11   for ID-related reasons, and so that would have to be

12   true.

13        Q    Would that be an example of a mechanical

14   effect of the law?

15        A    It would be -- I just want to make sure I get

16   the denominator right and how we had been calculating it

17   before, but the idea -- the concept of a mechanical

18   effect is you -- a voter has their ID checked or

19   otherwise has the ballot rejected because it didn't

20   conform with the regulations, is probably the best way

21   to think about mechanical effect.  So that would be --

22   that would be a thing, I believe, you would classify as

23   mechanical effect from our paper; that's right.

24        Q    Okay.  Finally, I'd like to -- I've got some

25   questions about the oath categories --

Page 149

1          A     Yeah.

2          Q     -- probably the trickiest one.

3          A     The trickiest one.

4          Q     In this chart in Table 8, you list no -- well,

5     at least 0.00.  I don't know if there's a rounding where

6     there's actually some people reported, but 0.00 percent

7     rejections for oath-related reasons across -- overall

8     and across all racial categories for 2022 and 2024,

9     correct?

10         A     That's correct.

11         Q     All right.  And we've discussed already that

12    SB 202 reimposed the requirement from before HB 316

13    requiring a birth date on the oath envelope, correct?

14         A     Correct.

15         Q     And we agree that that provision was in full

16    effect for 2022, correct?

17         A     Correct.

18         Q     Okay.  Did you look at any county-level data

19    to see how counties were classifying rejections that

20    would have dealt with the birth date requirement?

21         A     Yeah, again, I think, you know -- so to be --

22    I want to be responsive to your question.

23         Q     Of course.

24         A     So I did not look at the county-level data, so

25    I just want to sort of zoom back out a little bit.

Page 150

```
 1              It's difficult to parse if it's signature, ID
 2      or oath.  I understand I make these categorizations here
 3      based on my classification of the rejection reasons as
 4      included in the file, and then it's not an option in
 5      2022 or 2024, so Dr. Fraga has the same zero in his
 6      tables for this reason.
 7              And so if we really, you know, want to get
 8      into a discussion about how we might classify
 9      oath-related issues, the most straightforward way to
10      resolve a sort of classification dispute -- as an aside,
11      I've actually written about classification agreement
12      quite a bit.  I do a lot of work on this.
13              The usual way to resolve it in this sort of
14      situation is you would say:  Add together signature, ID,
15      and oath categories because those are the
16      validation-related categories, and then we could make a
17      comparison where there's, I believe, no ambiguity about
18      the -- the reason.
19              The thing that could be lost there is if we're
20      trying to parse the difference between mismatched
21      signatures or signatures because it's not included on
22      the -- on the oath, so if someone neglects to sign their
23      ballot, but certainly, the way to sort of resolve any of
24      these ambiguities would be to just aggregate those three
25      categories together.
```

1          Q    Okay.  So for instance, if we -- if we want to

2     do this comparison for Black and White voters in 2020

3     and 2024, if we aggregate the three categories

4     signature, ID and oath for Black voters in 2020, we've

5     got 2/10ths of a percent of ballots rejected for Black

6     voters; is that correct?

7          A    That -- 0.2 percent, I'll say.

8          Q    0.2 percent.

9          A    No, you --

10         Q    Sure.  Sure.

11         A    No, you've got it right.  I just want to make

12    sure we're clear on the record.

13         Q    0.2 percent of Black voters rejected for those

14    reasons in 2020, and 0.1 percent of White voters

15    rejected for those reasons in 2020, correct?

16         A    Correct.

17         Q    So there's a 0.1 percentage point gap between

18    the two in 2020, correct?

19         A    That's correct.

20         Q    If we look to 2024 and we aggregate those

21    three categories, there is a 0.7 percentage point

22    rejection -- or 0.7 percent rejection rate for Black

23    voters in 2024, correct?

24         A    That's correct.

25         Q    And there's a 0.4 percent rejection rate for

Page 152

1      White voters across those three categories, correct?

2          A    That's correct.

3          Q    So the rejection rates have gone up for both

4      categories, correct?  From 2020 to 2024 when --

5          A    Yes.

6          Q    -- combining those three --

7          A    Yes.

8          Q    -- categories?

9          A    Yes, they've gone up.  Yes.  That's right.

10         Q    And the gap between Black and White voters has

11     increased for rejection rates between 2020 and 2024,

12     correct?

13         A    That's correct --

14         Q    Okay.

15         A    -- yes.

16         Q    Moving along to absentee ballot application

17     rejections, so section X, paragraph 83.

18              And I think I really don't have very many

19     questions of this category.  We'll see if that holds up.

20              But broadly speaking, in this section, you're

21     offering opinions concerning the rejection of absentee

22     ballot applications and the use of a rollover list,

23     correct?

24         A    That's correct.

25         Q    Okay.  And those opinions concern the rates at

Page 153

1    which absentee ballot applications were rejected in 2024

2    for either arriving too early, arriving too late or for

3    lacking proper identification; is that correct?

4         A    That's correct.

5         Q    And is it your understanding that SB 202 has

6    changed the rules concerning rejection in all three of

7    those areas?

8         A    Yes.  So my understanding of the application

9    window for SB 202 is that it opens 78 days before the

10   election, closes 11 days before the election, I believe,

11   and then the verification of the voter can be based on a

12   provision of identification information.

13        Q    And you break down these rejection rates by

14   race as well, correct?

15        A    That's correct.

16        Q    So does your analysis identify the percentages

17   of voters, both overall and by race, who had their

18   absentee ballot applications rejected for reasons

19   imposed by SB 202?

20        A    So the -- let me make sure I'm responsive to

21   the question.

22             The denominator here is applications.  A voter

23   may submit more than one application.  And so that --

24   that's in the denominator.

25             And then are you asking am I identifying the

Page 154

1      complete suite of reasons?

2           Q    No.  But let me clarify, then, with -- that's

3      a good clarification.

4                You list three -- like, basically, three

5      categories, right, we just discussed --

6           A    Yeah.

7           Q    -- arrived too early, too late, lack proper

8      identification.

9                In terms of ballots that -- I'm sorry.

10               In terms of applications that arrive too

11     early, does your analysis functionally identify the

12     percentage of applications, both overall and by the

13     racial category of the voters who submitted them, who

14     had their absentee ballots rejected as arriving too

15     early for reasons imposed by SB 202?

16          A    So just to be clear, this table is about

17     absentee ballot applications.

18          Q    Yes.

19          A    And so I did conduct an analysis after the

20     fact about the share of voter -- on the -- after

21     deadline.  So let's return to that.

22               But I have not checked to see if the voters --

23     the applicants who had their application rejected before

24     the window, if they would have had it rejected under the

25     pre-SB 202 regulation, which I believe is 180 days.

Page 155

```
 1          Q    Okay.  For applications that were rejected for

 2     ID-related reasons, is it your understanding that the

 3     growth in the percentages of applications both overall

 4     and by race of voters who had their ballot applications

 5     rejected for those reasons were due to imposition of

 6     rules in SB 202?

 7               MR. FIELD:  Object to form.

 8               THE WITNESS:  I -- I believe that to be the

 9     case based on the information in the data set that I

10     analyzed.

11               So basically, these are instances where, if

12     someone applies and doesn't provide sufficient

13     identification, they're given a cure opportunity, and

14     then the categorization for my code says, basically:

15     Cure not received.  And so that would -- I think,

16     functionally could only occur through SB 202, yeah.

17               MR. ROSBOROUGH:  Okay.

18               THE WITNESS:  And then I just want to just

19     circle to back after deadline.  Here, I classify

20     applications received after the deadline, but, of

21     course, some of those applications could have been

22     received after the previous deadline, which was the

23     Friday before the election previously.  And

24     approximately about 25 percent of the applications

25     rejected after the deadline would have also been
```

1    rejected under the previous regulations.

2    BY MR. ROSBOROUGH:

3         Q    Okay.  If we compare these rejection rates to

4    2020, is it correct that, looking at 2024, after the

5    deadline changes imposed by SB 202, disproportionate

6    numbers of each racial minority group here -- Hispanic,

7    Black, Asian, American Indian -- had applications

8    rejected for arriving too late in comparison to White

9    voters; whereas, there was very little disparity among

10   racial groups in 2020 in those rejections?

11        A    What table are you looking at to make the

12   comparison --

13        Q    Sure.

14        A    -- for 2020?

15        Q    So I guess probably the easiest thing to do

16   would be to look back at your original report.

17             Okay.  If you want to go to your original

18   report, paragraph -- and this is your --

19        A    Yeah.

20        Q    -- your first report in this case, it looks

21   like Table 10, paragraph 78.  Well, actually, let's look

22   first on page 59, Table 9.

23        A    Mm-hmm.

24        Q    If you look at the percentage -- and this

25   chart represents the percentage of absentee ballot

Page 157

1       applications rejected for arriving too late by racial
2       group in 2018, correct?
3             A     No.
4             Q     Oh.  This is a comparison to SB 202.
5                   What is Table 9 here showing?
6             A     This is carrying out a counterfactual
7       analysis, saying given the applications' arrival date in
8       2018, and then the next date will be in 2020, how they
9       compare with the SB 202 regulations.
10            Q     Okay.  Well, I guess, you know, maybe the
11      important question I'm -- is there an analogous table --
12      table -- let's keep -- keep both reports up, if you can.
13                  Table 17 in your June 2025 report that we were
14      just looking at, is there -- just so the record is
15      clear, what is this table referring to?
16            A     Can you just give me the antecedent to this
17      again?
18            Q     Table 17 in your June 2025 report --
19            A     This is --
20            Q     -- what is it showing?
21            A     -- the share of mail-in ballot applications in
22      the 2024 election -- general election rejected for
23      either arriving after the deadline, "After Deadline"
24      column, before the application window opens, "Before
25      Window Opens" column, or for identification-related

Page 158

1    reasons, "Identification Issue" column.

2         Q    Do you have an equivalent table in your

3    initial report that reports this, percentages by race of

4    absentee ballot applications rejected for these three

5    reasons before SB 202?

6         A    I don't believe I do, and I don't think other

7    experts did as well.  I set the tables up like that

8    because there was some -- there was -- what I recall

9    from, for example, Dr. Lee's report was there was a

10   focus on these counterfactuals, what would happen on the

11   application window.  So I don't -- don't have an

12   analogous pre-SB 202 table.

13        Q    Okay.  Do you agree -- back to -- you can put

14   aside the earlier report.

15             Back to table 17 here.  After the deadline

16   changes imposed by SB 202, as compared to White voters,

17   disproportionate -- higher -- higher shares of each

18   racial minority group -- Black voters, Hispanic voters,

19   Asian voters, American Indian voters -- according to

20   this chart, higher shares had their absentee -- higher

21   shares of their absentee ballot applications were

22   rejected for arriving too late in comparison to White

23   voters?

24        A    Among applications categorized by

25   self-reported racial group, it is the case that American

Page 159

1    Indian, Asian, Black, and Hispanic applications --
2    applications coming from voters classified in those
3    categories -- had a higher rejection rate for arriving
4    after the deadline than applications from White voters.
5        Q    Okay.  And in terms of identification issues,
6    higher shares of American Indian voters, Asian voters,
7    Black voters, and Hispanic voters had their absentee
8    ballot -- or higher shares of applications by voters in
9    those racial categories were rejected for
10   identification-related issues than for White voters' --
11   White voters' applications?
12       A    Among applications received from American
13   Indian, Asian, Black, Hispanic and White voters, it is
14   the case that applications from White voters had a lower
15   rejection rate than applications from those other four
16   self-reported racial groups.
17       Q    And so whatever the numerical scale of the
18   disparity, is it fair to say that there is a --
19   basically, a mechanical disproportionate effect of the
20   ID requirements on Black, Hispanic, Asian, and American
21   Indian voters submitting applications for absentee
22   ballots after SB 202?
23       A    You cannot make an inference here about the
24   mechanical effect because these individuals would still
25   have the opportunity to cast their ballots.  Mechanical

Page 160

1    effect really is about the -- they then are unable to

2    have their ballot counted.  So if you -- for example, I

3    return my absentee ballot, and it's rejected for ID

4    reasons, that -- I can't have my vote counted then, but

5    if I have my application rejected, I, of course, have

6    the opportunity to go vote.

7         Q    Understood.  Okay.

8              Let's move on to -- or, I guess, moving back

9    in the report to ballot cancellation and in-person

10   voting.

11        A    Is this a time --

12             MR. ROSBOROUGH:  Sure --

13             THE WITNESS:  -- okay time to use the

14   restroom?

15             MR. ROSBOROUGH:  -- we can take a break.

16             THE WITNESS:  Thank you.  I appreciate it.

17             (Recess.)

18             MR. ROSBOROUGH:  Okay.  Dr. Grimmer, I

19   appreciate your patience here.  As I was saying, I think

20   this will be the last -- not the last section of your

21   report, but hopefully the last segment of the

22   deposition, at least from me.  My -- we'll see.  My

23   colleagues may have a few questions on Zoom.

24        Q    But let's turn to section VII of your June

25   2025 report, paragraph 70.  This is dealing with ballot

Page 161

1      cancellation and in-person voting.

2           A    I don't mean to interrupt you --

3           Q    Oh, I'm sorry.

4           A    -- but I think it's section VIII.

5           Q    You're probably right.  I will take your word

6      for it.  And you are right.  Section VIII.

7                THE REPORTER:  Counsel, may we go off the

8      record for a moment?

9                MR. ROSBOROUGH:  Of course.

10               (Discussion Off the Record.)

11               MR. ROSBOROUGH:  Okay.  Back on the record.

12          Q    Section VIII of your 2025 June report.  This

13     -- in this section, you analyze the overall rates as

14     well as by racial group of Georgia voters who canceled

15     their absentee ballots and voted in person, correct?

16          A    The rates and number, yes.

17          Q    Okay.  And you looked at the rates and number

18     both before and after SB 202?

19          A    I include the rates and numbers for general --

20     federal general elections, November elections from 2014

21     to 2024.

22          Q    Okay.  And you cite the text of SB 202 in

23     here, I believe, concerning -- stating that a definite

24     period of absentee voting will lessen voter confusion

25     and assist voters in understanding their opportunities.

Page 162

1           Does that paraphrase the section correctly?

2      A    I believe that does, yes.

3      Q    Okay.  But just to clarify, you're not

4  offering any opinions here about whether SB 202 actually

5  impacted the rates of voters who canceled their ballots

6  and voted in person, correct?

7      A    That's correct.  I'm not assessing the causal

8  effect of SB 202 on the rate or number of -- of canceled

9  ballots.

10     Q    Okay.  Is it your understanding that in 2020

11 the secretary of state's office mailed absentee ballot

12 applications to eligible voters?

13     A    That is my understanding, but I believe it was

14 for the primary election.

15     Q    Okay.  Other than 2020, the rate of

16 cancellations was still higher in 2024 than in any other

17 year; is that correct?

18     A    I -- perhaps it's in the text.  I need to

19 break down the comparison between 2018 and 2024 for

20 overall, but that is true on the rate, yes.

21     Q    Okay.  And -- so, for instance, 20- -- the

22 rate of canceled ballots in 2024 overall was higher than

23 2016, correct?

24     A    That's correct, yes.

25     Q    Is it possible that this shortened absentee

Page 163

1    ballot window had an effect?

2              Understanding you didn't analyze causation, is

3    one of the possible effects of the rate of cancellations

4    the shortened absentee ballot window imposed by SB 202?

5        A    Can you just be -- give me a little bit more

6    clarity on the absentee ballot window?  What specific

7    window are you talking about?

8        Q    Sure.

9              The window to request -- in which to request

10   absentee ballots was shortened by SB 202, correct?

11       A    That is -- that is true, yes.

12       Q    Okay.  Could election office delivery problems

13   have also affected cancellation rates of voters across

14   different years?

15       A    Can you -- I'm just not seeing the question.

16       Q    Yeah.

17       A    I'm very sorry.

18       Q    Let me back up here for a second.

19       A    Yeah.

20       Q    That's fine.

21             Why are you looking at cancellation rates in

22   this report?

23       A    Trying to understand -- this is an issue

24   across election administration generally that's of

25   interest both from the functioning of a polling place.

Page 164

1    When a voter has to cancel their ballot, it can take

2    some time.  Sometimes it involves a sort of manual

3    process of figuring out how to do that cancellation.

4            And this is a place where, from my work on

5    assessing the spread of voter fraud conspiracy theories,

6    that you see individuals, hear about a ballot being

7    canceled and then say, oh, there must be something

8    untoward happening, even though there could be a

9    completely benign reason, and we certainly saw some of

10   that in the post-2020 election, discussions like that.

11           And so here, I'm making an assessment of just

12   the number and rate of canceled ballots across these

13   elections because of interest at least for those two

14   reasons.

15       Q    Okay.  And I guess in your study of this

16   topic, are there frequently occurring sort of most

17   common reasons for higher rates of ballot cancellation?

18       A    I'm not sure in -- sorry.  In this report, I

19   do not analyze the reason for ballot cancellation,

20   except I know that an individual will have canceled it

21   either because they go vote on Election Day or they go

22   vote early in person.

23       Q    In your broader study beyond what you're

24   writing about in your report, is that something you have

25   looked at?

1           A     I have not analyzed the determinants of the

2     canceled ballots.  I've focused much more on the

3     consequences of someone hearing that a ballot's being

4     canceled.

5           Q     Understood.

6                 Okay.  Let's move to section IX, dealing with

7     wait times.  All right.  So in this section, in

8     analyzing wait times for 2024, you relied on two

9     different data sources, correct?

10          A     That's correct.

11          Q     One is the -- the CES, and the other is the

12    University of Georgia SPIA survey, S-P-I-A?

13          A     That's correct.  So CES is the Cooperative

14    Election Study, and then the University of Georgia's

15    SPIA post-election survey; that's right.

16          Q     And I believe you make a similar caution in

17    here as to another section earlier, and I have it quoted

18    here, but let me find it.  I have the quote.  I want to

19    be able to -- here we go.

20                The bottom of paragraph -- the bottom of the

21    first page of paragraph 74 into the next page.  So you

22    state:  "Using updated data from the same sources as

23    Plaintiffs' experts, I describe voter wait times after

24    SB 202.  I again caution that these comparisons can only

25    describe the causal effect of SB 202 on wait times under

Page 166

```
1    strong assumptions."
2              What strong assumptions would you need to
3    make, do you believe, to describe the causal effect of
4    SB 202 on wait times?
5         A    Using the data I provided in my table.
6         Q    Okay.
7         A    Sorry.  I'm -- like --
8         Q    Oh, sorry.
9         A    I'm trying to -- let me just clarify my
10   response there, because I do not mean to say that I
11   would just use the data in my table to assess the causal
12   effect.  I was trying to get a clarification from your
13   question.  So let me just be much more clear about that
14   for the record.
15             There are a variety of research strategies
16   that I could use in order to do this, and I'm just
17   wondering under what sort of constraints do you want me
18   to think about assumptions I might -- might make or use?
19        Q    Sure.  I guess I could probably cut to the
20   chase quicker.
21             You're not making any of those strong
22   assumptions here, correct?
23        A    That's correct.
24        Q    You're not opining whether SB 202 had any
25   effect, either positively or negatively, on wait times,
```

Page 167

1      correct?

2           A     That's correct.

3           Q     Okay.  I want to come back to -- let's go back

4      to Dr. Pettigrew's report, his -- his supplemental

5      rebuttal report from July 2025.

6           A     Mm-hmm.

7           Q     Just give me a second to grab it as well.

8      Okay.

9                 Now, we had discussed a little earlier, just

10     really at the beginning of the deposition, opinions that

11     you had come to or at least impressions you had after

12     reviewing Dr. Pettigrew's deposition transcript,

13     correct?

14          A     That's correct.

15          Q     Okay.  And I just want to go back to my note

16     to make sure I got this correctly.

17                Well, I guess, first of all, you're not

18     disputing that the CES is a reliable source for studying

19     wait time data, correct?

20          A     I make use of the CES --

21          Q     Right.

22          A     -- in my report.

23          Q     And what I believe you took issue with -- and

24     I'm sure you'll clarify, because I'm doing this from my

25     notes -- is Dr. Pettigrew's assessment of whether there

Page 168

1    are a statistically significant number of voters waiting

2    in line more than 30 minutes in Georgia in the 2022 and

3    2024 elections; is that correct?

4        A    Let me -- I'll just say it back to you.

5        Q    Sure.

6        A    I'll take the invitation.

7             So it's a two-part objection.  So, first, I

8    have a statistical objection.  Dr. Pettigrew applies the

9    wrong null hypothesis test.  When applied appropriately,

10   his test reduces to a requirement that there, in fact,

11   be no voters in the state who wait more than 30 minutes

12   to vote.  Because he applies the wrong test, he

13   inadvertently adopts this new standard that there are no

14   voters in the state who wait more than 30 minutes.

15       Q    As to that point, if -- how do you -- how do

16   you square that with the margin of error?  For instance,

17   if a single voter reported having waited more than 30

18   minutes, but that still fell within the margin of error,

19   that wouldn't equal statistical significance under his

20   analysis, would it?

21       A    It absolutely would because he misapplies the

22   null hypothesis.  So normally the sort of logic you're

23   thinking through is that we take null hypothesis on --

24   what we'll call on the interior of the parameter set.

25   Let me break that down.

1          Shares have to fall between zero and one.  So

2     we're trying to estimate the share of voters who wait

3     more than 30 minutes.  That's a sort of target of my

4     analysis here in addition categories.  So you might

5     specify a null hypothesis that the share of voters is

6     0.1, let's say, or it's equivalent across years.  That's

7     on the inside of that 0-1 interval.

8          Something very special happens when you go to

9     either zero or one.  The special thing that happens is

10    if I adopt a null hypothesis of zero -- literally, no

11    one waited more than 30 minutes -- if I observe a single

12    voter reporting waiting more than 30 minutes, I can

13    reject the null with probability one.  I know for

14    certain that the null is not true because one over the

15    population of the state of Georgia is greater than zero

16    over the population of the state of Georgia.

17          And so he -- because he sort of mechanically

18    applies this null hypothesis testing framework using

19    probably some rules that he learned, he fails to adjust

20    them for this special case where you're on the endpoints

21    of this interval.

22    Q    If you adjusted this so the null hypothesis is

23    of, I think you said, 0.1 --

24    A    Yeah.

25    Q    Well, maybe repeat what you said about 0.1

1    instead of zero.

2        A    I offered it.  I -- I don't quite know why we

3    would adopt that as the null hypothesis.  I carry out a

4    series of null hypothesis tests in my report, trying to

5    compare trends in voters' wait times.  I meant that as a

6    sort of arbitrary point somewhere between zero and one

7    as a share, just to draw a distinction between that and

8    zero or one.

9            So because Dr. Pettigrew applies the wrong

10   test, he inadvertently adopts this standard, if he

11   applied it appropriately, that a single voter waiting

12   more than 30 minutes would mean that there is a

13   statistically significant number of voters waiting more

14   than 30 minutes.

15       Q    Did you apply a null hypothesis test to try to

16   examine whether, in fact, using the CES data, there are

17   statistically significant number of voters waiting

18   longer than 30 minutes using another benchmark rather

19   than zero?

20       A    I compare, extensively in my report, trends

21   across years and carry out those null hypothesis tests.

22       Q    Right.

23            And in carrying that out for the 2022 and 2024

24   election, do your tests, in fact, show that there are

25   statistically significant number of voters who are still

Page 171

1    waiting longer than 30 minutes?

2         A    Just to say it back to you, the way you posed

3    the question, is that you are asking me to compare to a

4    null of zero, which is on the boundary, which means did

5    I find a single voter in the CES who waited more than 30

6    minutes.  The answer to that is yes, and that's true for

7    every state in the CES but Utah, Vermont, and

8    Washington.

9         Q    Okay.  Did you apply a different hypothesis to

10   test for statistical significance concerning wait times

11   in 2022 and 2024?

12        A    Yes, I compared trends in -- in wait times to

13   prior elections, and I asked if those differences are

14   statistically significant.

15        Q    Okay.  So you were looking at differences

16   across years; you were not analyzing whether or not

17   there were still a -- you were not analyzing 2024 in

18   isolation; you only analyzed 2024 data in comparison to

19   previous years?

20        A    I absolutely provide 2024 numbers that stand

21   alone on their own.  I'm not saying it's a nonsensical

22   null hypothesis to say is this share bigger than zero.

23   Of course it is.  If anybody responded "yes," that would

24   be bigger than zero.

25        Q    So you agree -- let me just -- I'm trying to

1    nail down exactly what your opinions are concerning wait

2    times in 2022 and 2024, other than I think I have it

3    that you believe wait times overall decreased.

4        A    Yes, and that actual- -- yeah, I mean, we can

5    talk about the New Hampshire voter as well from his

6    deposition transcript, but using both SPIA and the CES,

7    we see lower wait times as a -- measured as a share of

8    voters waiting more than 30 minutes.  We -- we see a

9    smaller share of voters waiting 30 minutes in Georgia in

10   2022 and 2024 than in prior elections.  I believe that's

11   true except for 2014.  Let me get it exactly right by

12   looking at the table.

13           Yeah, that will be -- the comparison I made

14   will be true comparing '24 to '22, 2018-'16, but not

15   true for 2014, as I write in my report.

16       Q    Okay.  If we look at your Table 16 in your

17   June report, you find, using the CES, that if we

18   aggregate, basically, the two categories that show more

19   than 30 minutes, right, that from 2024, 6.3 percent of

20   voters waited in lines longer than 30 minutes, correct?

21       A    That's correct, yes.

22       Q    And in 2022, 5.3 percent of voters waited in

23   lines longer than 2020 -- longer than 30 minutes,

24   correct?

25       A    That is correct.

Page 173

```
1          Q    Okay.  In terms of -- let's talk about the --
2     Dr. Pettigrew's racial -- let's talk about the racial
3     breakdown and what we sort of alluded to earlier that
4     came out during Dr. Pettigrew's deposition about the
5     code that you used and then about the voter validation
6     that's now come out --
7          A    Yeah.
8          Q    -- from CES.
9               So I just want to -- I'm truly just trying to
10    establish what the facts are here and walk through it.
11              Was Dr. Pettigrew correct that the use of the
12    input state variable from before the preelection survey
13    rather than the post-election survey resulted in a
14    difference of one voter that changed the percentages in
15    terms of more than 30-minute wait times?
16         A    I'm just going to zoom out and talk about this
17    issue because I think it's an important one.
18              In -- you can interrupt me if you want to,
19    but --
20         Q    Well, I don't want to -- let me just --
21         A    Yeah.
22         Q    I mean, I do want to make sure you get a
23    chance to fully explain this because I do think it's
24    probably a bit complicated, but let me step back and ask
25    you a couple of foundational questions --
```

Page 174

```
 1          A     Yeah.

 2          Q     -- I probably should have.

 3                When you ran the numbers concerning wait times

 4     in your -- for 2024 using CES data, they had not yet

 5     performed the voter validation study; is that correct?

 6          A     My understanding was it was in progress --

 7          Q     Okay.

 8          A     -- when I produced this table.  That's right.

 9          Q     And what is the validation of voters?

10          A     So the CES works with a vendor -- I'm not

11     going to speculate on the vendor.  I think I know who it

12     is, but I don't want to guess -- and they take the name

13     of the people who are completing their survey and match

14     it to the voter file, and in doing that, they're able to

15     verify the persons on the voter registration list, and

16     then, because you've made that match, you're able to

17     then verify that an individual has, in fact, voted in

18     the election.

19          Q     Okay.  And you mentioned earlier that after --

20     basically, after your reports in this case, but before

21     today, since that time, the CS -- CES has completed

22     voter validation?

23          A     And they've released the data.

24          Q     And they've released the data.

25                Did you go back and look at that data?
```

1           A     I did, yes.

2           Q     And how, if at all, does it change the results

3     that you report?

4           A     So there is a reduction in the share of Black

5     voters who wait more than 30 minutes.  So here in my

6     report I had it at 7.5 percent.  It goes to 3.1 percent.

7     There is an increase among White voters relative to this

8     report.  The number is approximately 7 percent waiting

9     more than 30 minutes, and then, overall, there's an

10    increase in the wait time in the state of Georgia.  It

11    goes on the order of -- I have 6.3 percent here.  Using

12    voter validation, it's approximately 6.7 or 6.8 percent.

13          Q     Okay.  I want to ask you a few questions about

14    the SPIA survey.  And I think you referenced this in

15    paragraph 75 of your report, at least beginning in

16    paragraph 75.

17          A     Okay.  I think I'm there.

18          Q     And I believe you said you were not able to

19    access the underlying data for this survey, unlike the

20    CES?

21          A     That's true.  I don't have access to the

22    underlying data; that's right.

23          Q     Does that impact at all your ability to rely

24    on this data compared to the CES?

25          A     I don't believe so.  The difference would be,

1    with the CES, I can confirm the numbers because I've

2    computed them myself.  It would be very, very surprising

3    that a survey organization like SPIA would not be able

4    to compute the numbers appropriately, so no.

5         Q    So it's just -- it's missing sort of an extra

6    layer of validation that you have for the CES?

7         A    I very much would like to be able to run the

8    numbers myself just as a general dispositional aspect.

9         Q    Okay.  A few more questions on wait times.

10              Turning back to Dr. Pettigrew's report that we

11   were just looking at, turning to page -- to section 3 of

12   his report, so pages 6 through 8.

13              Do you have any disagreement that in -- if one

14   were to analyze why wait times changed in Georgia, that

15   it also makes sense to look at national trends --

16   national wait time data?

17        A    I don't know what the target of our analysis

18   is here.

19              So what are you -- what are you trying to ask

20   me?

21        Q    If we're looking at potential reasons why wait

22   time data -- why wait times in a state may have gone up

23   or may have gone down, is it relevant to look at other

24   states and their trends as well?

25        A    It could certainly provide context for wait

Page 177

```
 1    times by looking at wait times in other states.  It

 2    wouldn't be -- without some assumptions and clarity on

 3    what we're trying to estimate, it's not clear exactly

 4    how that would factor into our conclusions, but ...

 5         Q    On pages 7 and 8, Dr. Pettigrew discusses a

 6    new check-in system implemented by the State of Georgia.

 7              Are you expressing any opinions regarding --

 8    well, let me step back.

 9              Were you aware of the check-in program

10    described here when you wrote your reports?

11         A    I don't believe so.  I may have heard about it

12    or read about it, but it was not something top of mind

13    when I wrote my report, no.

14         Q    Okay.  Do you have any reason to doubt the

15    statements by the election officials contained in here

16    concerning the -- the impact of the -- this check-in

17    program?

18         A    I just had reviewed an analysis that would

19    enable me to know how the check-in program affects

20    check-in times.  I would presume that Mr. Sterling is

21    reporting the numbers from that program appropriately.

22    I don't know about how widely it's been applied or how

23    much it's used across different locations.

24         Q    Is it fair to say you have no opinion, one way

25    or the other, about whether this check-in program has
```

1    had impact on wait length?

2        A    The thing that I think is important to note

3    here is that the evidence that Dr. Pettigrew provides is

4    not sufficient to support his opinion that this is an

5    explanation for the decrease in line length.  So he

6    hasn't really undertaken the sort of analysis that I

7    would expect to see from a -- to offer a scholarly

8    opinion about it.

9        Q    I think -- I appreciate that.  I think my

10   question was a little different, and is that:  You have

11   not undertaken the analysis to have an opinion, one way

12   or the other, about the impact of this program?

13       A    That's correct.

14       Q    Okay.  All right.  Moving on to what I hope

15   and believe is our last section here, drop box use,

16   section XI, I believe, of your report, "SURVEY-BASED

17   ESTIMATES OF DROP BOX USE."

18       A    Mm-hmm.

19       Q    All right.  Again, just some overall questions

20   concerning the scope of your opinions here.

21            You're not offering an opinion, one way or the

22   other, about whether SB 202's drop box provisions make

23   it harder to vote or easier to vote, correct?

24       A    No, I don't offer an opinion about that.

25       Q    Okay.  And the same is true with regard to

Page 179

1    whether it makes it disproportionately harder for some

2    racial groups than others, correct?

3         A    No, I don't offer an opinion about that.

4         Q    Okay.  You're not offering an opinion about

5    whether SB 202's drop box provisions either --

6    contributed to less Georgians using mail voting, one way

7    or the other, correct?

8         A    I don't offer an opinion about that; that's

9    right.

10        Q    And the same is true with regard to the racial

11   analysis there, correct?  Yeah.  Let me -- I can --

12   sorry.

13        A    Yeah, it's been a long time, so --

14        Q    Shame on me for trying to save -- trying to

15   cut down.  It wasn't clear.

16             You also offer no opinion about whether drop

17   box provisions in SB 202 contributed to less Georgians

18   -- fewer Georgians in any particular racial group using

19   mail voting, correct?

20        A    That -- that's correct, yes.

21        Q    Okay.  You also are offering no opinion about

22   whether SB 202's drop box provisions make it more likely

23   or less likely that Georgia voters would have their mail

24   ballots rejected as returned too late, correct?

25        A    That's correct.

Page 180

```
 1          Q     Similarly, you're offering no opinion about
 2     whether SB 202's drop box provisions cause Black voters,
 3     or other voters of color, to have their ballots rejected
 4     as late in disproportionate numbers, correct?
 5          A     That's correct.
 6          Q     Let's go to Table 19 of your report.
 7                What are you -- what are you showing in Table
 8     19 of your June 2025 report?
 9          A     Here in Table 19, I'm showing the share of
10     mail-in voters who report using a drop box, both --
11     showing that share overall and for White and black
12     mail-in voters.
13          Q     Okay.  And this data uses -- sorry.
14                This table uses data from the Cooperative
15     Election Study, the CES, that we were just discussing,
16     correct?
17          A     That's correct.
18          Q     Okay.  And I think you note in this -- the
19     note describing Table 19 that the 2024 estimates are
20     based on self-reported turnout and not validated voters
21     because CES validation had not yet been completed?
22          A     Had not yet been completed; that's right.
23          Q     Have you -- have you gone back and looked at
24     any of this post-validation?
25          A     I have, and I've also, because I became aware
```

Page 181

1    of critiques from Dr. Fraga, investigated some of those

2    critiques as well.

3        Q    Okay.  And we're going to get to those

4    imminently.

5        A    Okay.  Sounds good.

6        Q    Do you know what the number of survey

7    responses is for each of the cells of your table here?

8        A    Not off the top of my head.  I do know that

9    Dr. Fraga characterizes the number of respondents for

10   one option, while neglecting to provide the full number

11   of respondents for each of the categories.

12       Q    Okay.  Do you -- have you arrived at whether

13   there is a level of statistical significance for the

14   differences between White and Black mail-in voters who

15   reported using a drop box in any of these years?

16       A    In 2020, there is a statistically significant

17   difference between White and Black mail-in voters, but

18   not in 2022 or 2024.

19       Q    Okay.  So let's -- it may be helpful to look

20   at Dr. Fraga's supplemental rebuttal report.  So we have

21   it as one of these marked exhibits.  It might be 8.

22       A    I have it in my hand.  Exhibit 8.

23       Q    Perfect.  Let me get to it as well.  Okay.

24            And let's turn to page 13.  So do you agree

25   that in the CES survey, the only response for the drop

Page 182

1     box -- for the ballot return question that includes the

2     words "drop box" states:  Drop box used only for

3     ballots, not located at an election office or polling

4     place?

5          A    That is true.  I have a lot more to say about

6     that.  I can wait for your next question or I can

7     discuss my classification of this.

8          Q    Okay.  Well, let's -- let's actually step

9     back.

10              How did you -- what was your classification --

11         A    Yeah.

12         Q    -- that you used in your Table 19?

13         A    Absolutely.

14              So here, I classify voters who self-report as

15    returning their ballot at a drop box -- that's stand

16    alone, what -- what you just described -- someone who

17    reports returning their ballot at a main election

18    office, neighborhood polling place, and there's one

19    other option that's similar in syntax to neighborhood

20    polling place.

21              I arrived at that classification, in part, in

22    two ways.  So first off, I became aware of the survey

23    question because Dr. Alan Lichtman uses the same

24    classification in his expert report for the plaintiffs

25    in discussing the rate of drop box use, and so we report

Page 183

1    the same numbers of overall drop box use in 2020.  So he

2    adopts my classification.

3              Furthermore, to validate this, I used

4    administrative data on how drop box -- drop boxes were

5    used.  To get to that correct number, I had to correct

6    several errors in Dr. Burden's original report from his

7    administrative use of drop box data.  Once corrected,

8    the share of mail-in voters who report voting by drop

9    box -- here you see it's 49 percent -- that matches the

10   number -- the share of mail-in ballots returned to the

11   drop box from administrative data.

12             And there's actually one more nice test of

13   this.  So we can also look at the share of ballots --

14   mail-in ballots returned at drop boxes located at main

15   election offices.  And both Dr. Lichtman and I agree

16   that that's about 48 percent of ballots returned at drop

17   boxes.  You can reach that -- that's true in the

18   administrative data, and that's also nicely reflected in

19   the CES data.

20             So both of those calculations -- the margin of

21   error around this overall calculation covers the truth,

22   which is a nice validation of using this as a survey

23   question.

24             In contrast, Dr. Fraga's critique of this is

25   really sort of speculative, and, as he said in his

Page 184

1    deposition, it's based on his reading and his personal

2    experience with the State of Georgia.  He fails to

3    engage completely with the clear validation evidence

4    that I have presented, and nor does Dr. Fraga explain

5    why Dr. Lichtman's classification would be wrong as

6    well.

7         Q    Okay.  A lot to break down here.

8              When you're talking about the validation

9    evidence, what evidence did you use to validate these

10   figures for 2024?

11        A    We do not have administrative data for 2024,

12   so I'm unable to do the validation for the -- for 2020.

13        Q    Okay.  Wait.  So the validation was what --

14   was for which?  2020 and '22 or just 2020?

15        A    We only had administrative data on drop boxes

16   for 2020.  So I'm only available to do the validation

17   for that year.

18        Q    So the validation was only for pre-SB 202?

19        A    The val- -- it was for the year where we have

20   administrative data, which is 2020; that's right.

21        Q    Right.  And I'm not trying to impugn any

22   motive here.  I'm just literally trying to establish the

23   facts.

24              We have no administrative data for validation

25   of the post-SB 202 elections, correct?

Page 185

1           A       That's correct.

2           Q       Okay.  And when you're talking about

3    administrative data, is this reflected in your reports

4    from 2023?

5           A       The administrative data on drop box use I

6    discuss extensively in 2023, and then I clarify this

7    main election.  All point to the administrative data and

8    replication code I provided after my first deposition,

9    and then subsequently, I believe, clarified in the

10   August 2023 report that I filed as well.

11          Q       Okay.  Okay.  And I'm asking that because I --

12   that was my understanding.  I don't -- we don't need to

13   go back and retread things that have been fully

14   discussed that solely relate to the 2023 reports.

15          A       I should just say that a bit of just clarity

16   that I think is useful from Dr. Fraga's January 2024

17   report, my initial report did not include this drop box

18   question.  I explored this, as I report in my previous

19   deposition, because Dr. Fraga said my analysis of

20   Douglas county, following Dr. Burden's analysis, was not

21   representative of the state of Georgia, and I used the

22   survey data to try to get a better sense of what was

23   going on with drop box voting.

24          Q       And I'm sorry.  You referred to a January 2024

25   report?

1          A    So Dr. Fraga submitted an expert report, as

2     part of a summary judgment, critiquing my use of drop

3     boxes.  I believe it's January 2024.  I may have that

4     date wrong.  I was only made aware of it because

5     Dr. Fraga cites it in this surrebuttal.

6          Q    Okay.  I think -- okay.  I want to go back.  I

7     think -- I think you've answered the question about

8     administrative data.

9               You mentioned the use of three different

10    categories to -- I'm sorry.  Let me -- I'm trying to be

11    more precise.  Feel free, as the day goes on, to just --

12    I'm sure you will correct me.

13              There are three different survey responses

14    from the CES that you used to calculate people who

15    returned ballots by drop box; is that accurate?

16         A    I believe there's four.

17         Q    Okay.

18         A    So there's drop box that's stand alone, not

19    located -- I'm not going to quote it because I don't

20    have the exact question memorized -- a main election

21    office, neighborhood polling place.  If you have

22    Dr. Burden's August, approximately, 2023 report, he

23    criticizes the use of those two options, I think, erron-

24    -- not "I think."  He criticizes those two options

25    erroneously, unaware that that would be -- the only

Page 187

1     mechanism for turning in an absentee ballot at a
2     neighborhood polling place would be a drop box.
3          Q     Okay.  You agree that a main election office
4     could include both people using a drop box or people
5     returning an absentee ballot directly to the office
6     without the use of a drop box, correct?
7          A     That is correct.  This is why I feel -- this
8     is why I engage in the validation about the share of
9     drop box ballots returned at main election offices, and
10    that matches the survey data.  So while it is possible
11    that people are walking into a main election office and
12    handing their ballot to their clerk, the share who
13    report returning to a main election office among
14    absentee ballots in the 2020 CES -- absentee voters in
15    the 2020 CES reflects the share of drop box ballots
16    returned at main election offices in the 2020 election.
17         Q     After SB 202, drop boxes in Georgia must
18    solely be located inside of a polling place or election
19    office, correct?
20         A     That's correct.
21         Q     Okay.  So for someone that selects, in the CES
22    post-2020 in Georgia -- and Georgia responded in 2022
23    or -- 2024.  If they select, as the response, drop box
24    used only for ballots not located in an election office
25    or polling place, that technically could not be an

1    accurate answer, correct?  It either means that they are

2    referring to a drop box and just sort of disregarded the

3    other parts or misinterpreted otherwise or -- let me --

4    let me back up.

5            Do you agree that someone who selects that,

6    post-SB 202 in Georgia, is not giving a -- not probably

7    for their own fault, but is not giving an accurate

8    response?

9        A    It is the case, as I note both in the code

10   that I provided and in that report, we expect those

11   numbers to -- the share of people in that category to go

12   down.  However, it really depends upon the structure of

13   the way that that voting center is set up or main

14   election office is set up, that somebody would know

15   whether it's a stand alone or is it part of, otherwise,

16   a voting center.  They -- they could legitimately not

17   know that they could also just walk in.

18           And so the question, then, is, like, did they

19   return at a drop box.  It's a clear distinction from the

20   other options, which are:  Did I use the postal service?

21       Q    Right.

22       A    Right.

23       Q    Would you agree this question post-SB 202

24   creates ambiguity regarding the responses for drop

25   boxes?

Page 189

1           A     Really, the only thing that's ambiguous is
2      about whether it's a stand-alone location or not.  It's
3      not really ambiguous about whether you use a drop box.
4                 So the question is:  Do voters have the
5      correct classification in mind?  Luckily, as we talked
6      about earlier setting up these meta categories, my
7      analysis doesn't require them to have correctly parsed
8      whether this is a stand-alone drop box or not.  That's
9      why I include it with these other categories, and so
10     they do know that they're not returning it through the
11     United States Postal Service.
12          Q     Okay.  Okay.  A few more questions.
13                In your rebuttal report -- July 2025 rebuttal
14     report -- it's probably -- I think it's Exhibit 2.
15          A     Oh, 2.
16          Q     I'm sorry.  Maybe --
17          A     No, you're right.  I did not mean to throw you
18     off there.  I'm sorry.
19          Q     It's okay.  As long as we both know the
20     exhibit that -- the document we're talking about, it
21     will be all right.
22                So once you find that, I'm looking at
23     paragraph 45.
24          A     I'm there.
25          Q     Okay.  You note in paragraph 45 that

Page 190

```
 1    Dr. Chatman's report does not consider the access voters
 2    have to the US Postal Service to return ballots and note
 3    the USPS is a reliable option for voters to return their
 4    absentee ballots, correct?
 5         A    That's correct.
 6         Q    And the source you cite here is a post-2024
 7    election analysis report from the US Postal Service; is
 8    that right?
 9         A    That's correct.
10         Q    Okay.  So the figures here concern the 2024
11    election only, correct?
12         A    That's correct.  I provide analogous numbers
13    for 2022 --
14         Q    Okay.
15         A    -- in my 2023 report.
16         Q    What you're looking at here is reliable
17    service on the part of USPS alone, correct?  In other
18    words, the absentee ballot delivery and return process
19    involves multiple components, correct?  First, the
20    person requests and is sent the absentee ballot by the
21    local election office, and then you're addressing the
22    second part of this whereby the voter can drop it in the
23    mail and have it returned by USPS, correct?
24         A    This -- just to be responsive to Dr. Chatman's
25    report, which is about proximity to drop boxes and the
```

1      way that could or could not affect the difficulty a

2      voter has returning their ballot, so this would be

3      primarily focused on the return component, which would

4      be the alternative for a drop box.

5              Q     Understood.

6                    If election officials do not timely send

7      absentee ballots, though, that could be relevant to drop

8      box availability, correct?  Let me -- let me try to

9      provide a hypothetical.

10                   Let's say, you know -- you agree there are

11     deadlines under Georgia law by which local election

12     officials must get out timely -- timely and properly

13     filled -- for people that have submitted on a timely

14     basis their absentee ballot applications, there is a

15     date certain by -- which is the last date by which those

16     election officials must send out the ballots to voters,

17     correct?

18             A     That's my understanding, yes.

19             Q     Okay.  If a county misses that date for a

20     significant number of voters and sends the ballots out

21     late, then having drop boxes might become more relevant

22     to the inquiry in terms of return time, and a voter

23     might not be able to as readily rely on the USPS,

24     correct?

25             A     It's difficult for me to know unless I know

Page 192

1    more specifically about what you mean by "late."

2              But one of the provisions the United States

3    Postal Service offers that I don't discuss here

4    specifically is that for election-related mail, they

5    engage in a service where they deliver it in a way that

6    doesn't even involve getting scanned.  So to reach these

7    numbers, the United States Postal Service scans the

8    mail.  They know it's mail related -- official mail

9    related because it has a scan code.

10             For other ballots on, I believe, the Monday

11   and then the Tuesday, the United States Postal Service

12   will, for local ballots, reroute those and deliver them

13   directly to the appropriate location without scanning

14   them and putting them through the distribution process.

15             So even in that instance, the United States

16   Postal Service could be reliable on returning the ballot

17   in a timely manner.

18             MR. ROSBOROUGH:  I'm going to hand what will

19   be our final exhibit.  I may have lost track.

20             THE REPORTER:  Nine.

21             MR. ROSBOROUGH:  Thank you.  Exhibit 9.

22             (Exhibit 9 was marked for identification by

23             the court reporter.)

24             MR. ROSBOROUGH:  And just for the folks on the

25   phone, this is a press release from the Cobb County

Page 193

1    Elections Office from October 31st, 2024.

2         Q    And, Dr. Grimmer, feel -- please take your

3    time to read that, and just let me know when you're

4    done.  There's a backside too.

5              (Pause.)

6         A    Okay.

7         Q    Okay.  I'm guessing you have not seen this

8    before?

9         A    I have not.

10        Q    Okay.  I represent to you this is a press

11   release from Cobb County, Georgia, Elections Office

12   notifying people.

13             Does it -- in your reading, does it appear to

14   notify people that more than 3,000 ballots requested in

15   time had not been timely mailed?

16        A    I don't know if they offer a definition of

17   "timely."  They say, as of Wednesday, 3,000 ballots

18   requested had not been mailed.

19        Q    Right.  And October 31st, this is the Thursday

20   before Election Day.  So the -- October 30th would be

21   basically less than a week before Election Day, 2024 --

22        A    Okay.

23        Q    -- is that correct?

24             And they say "by last Friday's deadline" --

25        A    Yeah.

Page 194

1        Q    -- reflecting that that was missed.

2             And if you look further down, they note that

3    more than a thousand of those absentee ballots needed to

4    be sent out of state.

5        A    Mm-hmm.

6        Q    In situations like this, whether or not --

7    because of the expedition on part of the election office

8    after having missed the deadline and USP- -- USPS trying

9    to do its part, whether or not some of these ballots

10   could, nonetheless, be returned on time, do you agree

11   that it's reasonable that someone receiving -- who did

12   not timely receive their absentee ballots might want

13   another option for returning that ballot rather than

14   trusting the mail at that point?

15       A    Just to make sure I understand, more than a

16   thousand ballots may be sent out of state.  I don't know

17   where those voters are located.  Presumably, that

18   precludes them from using, just continuing with my

19   question, drop boxes.  So the presence or absence of

20   drop boxes, if I'm sending this ballot out of state, are

21   immaterial.

22            It also appears to me that there are other

23   options that are being provided, including the ability

24   to return a ballot at a main election office.

25       Q    Sure.

Page 195

1          A    Yeah.

2          Q    I guess my -- my question here is:  One side

3     of the return process is the USPS, but part of the

4     reliability of voters relying on the mail depends upon

5     timely delivery of absentee ballots, correct?

6          A    Voters have to have the ballot to vote it --

7          Q    Right.

8          A    -- yes.

9          Q    And if -- if election offices repeatedly fail

10    to deliver absentee ballots on time, that can limit the

11    effectiveness or the confidence of voters in mail

12    delivery of their ballots, correct?

13         A    I mean, just to carry through that -- so I

14    haven't done an analysis of confidence related to timely

15    delivery, but just to carry through the counterfactual,

16    my understanding, the previous application deadline for

17    absentee ballots in the state of Georgia before SB 202

18    was the Friday before election.  If that's the case and

19    if the primary concern is that election offices aren't

20    able to timely process an application, it would appear

21    to me to be even more difficult to -- in your setting,

22    even more difficult to vote that ballot if I'm applying

23    late and I have trouble processing it and getting it out

24    in time.

25              So I'm not sure in that instance how options

1    would help.  Certainly for the people who are out of

2    state, the options you're describing, a drop box

3    availability, wouldn't help.  And there are other

4    options available to those individuals.

5         Q    How many drop boxes were available in Cobb

6    county in 2020 as compared to 2022 or 2024?

7         A    I -- I -- and I have the number in my report.

8    Do you want me to look up the number of --

9         Q    You agree it's significantly less; the number

10   dropped by more than one or two?

11        A    I don't know what you mean by "significantly,"

12   but there are fewer drop boxes available in Cobb county

13   in '22 and '24 than there was in '20.

14        Q    Okay.  So if voters in Cobb county in both

15   2022 and 2024 -- a significant number of voters did not

16   timely receive their absentee ballots, one fact -- one

17   option for returning their absentee ballots is drop

18   boxes, correct, both before and after SB 202?

19        A    That is a --

20             MR. FIELD:  Object to form.

21             THE WITNESS:  That is an option for returning

22   an absentee ballot.

23   BY MR. ROSBOROUGH:

24        Q    After SB 202, those voters would have had

25   fewer drop box options in which to -- fewer options in

Page 197

1      which to return their ballot?

2           A    It -- you know, it really is -- it's, like, I

3      think, much more subtle than a mere count of drop boxes,

4      and this is well -- well discussed in my first report.

5      I'll just remind ourselves of it here.

6                There's a -- I think a pattern in some of the

7      expert reports where they say, Look at the number of

8      drop boxes that have been reduced, but as I show in my

9      first report, many drop boxes were sparsely used.  Many

10     weren't used very much at all.  And, in fact, the

11     Greenberger and Roberts article that Dr. Fraga cites

12     provides clear evidence that other drop boxes are used

13     at a very high rate, in fact, exceeding the number of

14     voters for whom that's the most proximate drop box.

15                So the idea that, you know, somehow this

16     reduction in number is going to reduce the effective

17     options a voter has, I have really not seen an analysis

18     that would be consistent with that, and from this

19     particular setting, it isn't clear to me that would be

20     the case either, so ...

21          Q    I think it's an interesting point because SB

22     202 not only forced a number of counties to reduce the

23     number of drop boxes -- correct? -- it also restricted

24     the hours by which drop boxes could be open, correct?

25          A    That's correct.

```
                                              Page 198
 1              MR. FIELD:  Object to form.
 2      BY MR. ROSBOROUGH:
 3          Q    And it also restricted the -- the time by
 4      which -- a time at which drop boxes -- I'm sorry.  I'm
 5      not phrasing it very accurately.
 6              It moved earlier -- in 2020, drop boxes were
 7      open until the close of voting at 7:00 p.m. -- correct?
 8      -- on Election Day?
 9          A    That's my understanding, yes.
10          Q    Okay.  Do you have an understanding of whether
11      SB 202 affected that deadline as well?
12          A    Yeah, the last available drop box would have
13      been the Friday before the election.
14          Q    Okay.  So regardless of just the number of
15      drop boxes for voters that receive late ballots,
16      absentee ballots, after SB 202, they have not only fewer
17      locations in the county, but more restrictive hours and
18      less -- cannot use the drop box after the Friday before
19      the election, correct?
20          A    So they have fewer locations; I agree with
21      that.  The hours are restricted to when early in-person
22      voting is taking place; that's true.
23              Can I get the last one again?  I'm sorry.
24          Q    Sure.
25              That -- that they would have to return it to a
```

1    drop box by the Friday before Election Day.

2        A    Yeah, that sort of subset of that.

3            So those voters -- again, I don't want to

4    belabor this, but they still have many other options

5    other than a drop box.  They can go vote early in

6    person.  They can vote Election Day on person -- in

7    person, and they could, per this press release, go to

8    the expanded main election office hours and return the

9    ballot in person.

10        Q    Right.

11            So let me offer you a hypothetical.  I'm a

12    Cobb county voter who works two jobs.  I work during

13    times where election offices are open.  I apply for an

14    absentee ballot.  It comes late.  It arrives on the

15    Saturday before Election Day.

16            After SB 202, I have fewer options in which to

17    timely return my absentee ballot than before SB 202,

18    correct?

19        A    I mean, just count it as, like, the number of

20    options.  There is not a drop box available the Saturday

21    before the election.  So that's true.

22        Q    If I want to vote, then I have to either

23    cancel my ballot and try to vote in person on Election

24    Day, or if there's any early voting time left, correct?

25    There's one option or, second option, return my ballot

Page 200

1    by mail and hope that it arrives on time, correct?

2         A    I mean, given your hypothetical that the main

3    election office is closed and apparently this person

4    can't go to the post office, also, would be another

5    option to deliver it directly to the post office

6    themselves.

7         Q    Well, sure.  By saying "using the mail," put

8    aside whether it's putting it in a mailbox or putting it

9    in the mailbox at the post office.

10        A    Well, I think those are two different things.

11   If it's at the main election -- if it's at a post office

12   because of the SB 20- -- not SB 202 -- because of the

13   United States Postal Services measures, it would be,

14   then, moved directly to the main election office, as

15   long as they're following protocol.

16        Q    Sure.  Let's presume that this person also has

17   -- doesn't own a car, has more limited access to

18   transportation.

19        A    And, therefore ...?

20        Q    They have fewer options to return a

21   late-received ballot after 20 -- SB 202 than before SB

22   202 in a way that they can be confident it will be

23   timely received.

24             MR. FIELD:  Object to form.

25             THE WITNESS:  It's really hard for me to know.

Page 201

1    Based on the parameters you've described, I think it's

2    probably a bit incomplete for me to know exactly what's

3    going on with this person.

4    BY MR. ROSBOROUGH:

5        Q    What else would you need to know?

6        A    Can they get a ride from someone?  Can they

7    get a ride from a friend?  It seems like a reasonable

8    question.

9            So, again, it's -- also, the existence of one

10   person doesn't demonstrate a pattern or a difference.

11   So -- yeah.

12       Q    You have no opinion one way or another whether

13   it would be common for a person, say, in Cobb county to

14   work multiple jobs, not have access to a car and receive

15   their absentee ballot late?

16       A    I believe from this we know an upper bound of

17   what that number could be, which would be 3,000.  We

18   know a thousand of those people couldn't make use of the

19   drop box anyway.  So the most we could be talking about

20   are 2,000.

21           There's nothing in this report to talk about

22   number of people who have access to a car or are working

23   two jobs.  So we don't actually know how those

24   intersect.

25           So, you know, from this number, we can

Page 202

1    certainly put an upper bound on it, and then we could --

2    we could put an upper bound on it.  That seems to be the

3    most we could do, other than discuss these

4    hypotheticals.

5         Q    Do you have any sense of the number of Cobb

6    county voters who requested absentee ballots for the

7    2024 elections?

8         A    No.

9              MR. ROSBOROUGH:  Let's go off the record.

10             (Recess.)

11   BY MR. ROSBOROUGH:

12        Q    Dr. Grimmer, are there any opinions that you

13   hold concerning this case that you have not either

14   expressed in your reports thus far or expressed during

15   our deposition today, to the best of your knowledge or

16   recollection?

17        A    So I have an evaluation of Dr. Fraga's

18   critique of my estimation procedure for the share of

19   voters who returned their ballot at a drop box, and ...

20        Q    Do you plan to issue a supplemental report

21   dealing with that?

22        A    I had not planned on that, no.

23        Q    Okay.  Let me go ahead and ask you a few

24   questions about that.

25        A    Yeah.

Page 203

1      Q    Can you go ahead and share your critique.

2      A    Absolutely.  So I'm just going to -- just to

3   zoom back here, I'm going to talk about what I did,

4   Dr. Fraga's critique, and my evaluation of it.

5      Q    Okay.

6      A    So in my analysis of drop box voters, I use

7   two different denominators.  One denominator is mail-in

8   voters, which we just spent some time discussing.  A

9   second denominator is the share of all voters.  In my

10  August 2023 report, I use a well-established methodology

11  where the base -- called -- that is mathematically

12  equivalent to a procedure called MRP, multilevel

13  regression post-stratification.

14          In my report -- sorry.  Just MRP, the idea is

15  to use survey data where we need to use survey data, and

16  then to use administrative data where we have the

17  administrative data.  So I use the survey data to

18  estimate the share of absentee voters by racial group

19  who report returning their ballot at a drop box.  Then

20  to get the share of all voters who report using a drop

21  box, I multiply that share that I just described by the

22  proportion of voters in that racial group who report

23  voting absentee.  And we know that number.  We don't

24  need a survey to estimate it because, as we've discussed

25  extensively today and Dr. Fraga reports, we have this in

Page 204

1    the administrative data.

2            There's a number of reasons why this is a

3    preferable -- why this is a preferred estimator to just

4    using the CES.  First, the conditions for this to be

5    accurate are weaker.  Because I know I have accurate

6    administrative data, the condition that I need is for

7    the rate of drop box use among absentee voters by racial

8    group to be accurate, unbiased.

9            A second reason is that in the 2020 CES, the

10   share of -- of Black voters who report voting by mail is

11   much higher than the administrative data estimate.  So

12   the share of Black voters who report voting by mail in

13   the 2020 CES is approximately 44 percent; whereas, in --

14   from the administrative data in 2020, we know it's

15   actually 29 percent.  So rather than use that badly

16   biased estimate of the share of Black voters who are

17   voting absentee, I used this administrative estimate in

18   order to multiply those together.

19           Dr. Fraga takes issue with this and, in

20   particular, describes this as less preferrable because

21   it's not straightforward, as he writes in his report.

22           But, of course, evaluating estimators based on

23   whether they're straightforward is a sort of nonsensical

24   approach to evaluating an estimator, and it is not one

25   that's found in the literature.  The reason it's

Page 205

1    nonsensical is that for us to prefer using an estimator
2    of the share of Black voters who report using a drop
3    box, just using CES data, you have to believe a very
4    difficult-to-conjure particular set of compensating
5    errors because we know the share of Black voters who had
6    absentee is too high.  You have to believe there's just
7    the right amount of compensation in the share of drop
8    box voters among black absentee voters.  As a result of
9    that, it's difficult to articulate.  And, in fact,
10   Dr. Fraga doesn't offer what those conditions might be.
11   He merely justifies this by saying it's straightforward
12   by merely -- it's straightforward.

13             As a result of that, applying my analysis --
14   sorry.  In evaluating his critique, then, his critique
15   of my estimation procedure really doesn't make sense.
16   It departs from the way scholars evaluate estimators and
17   is based upon a justification that's just not found in
18   the literature.

19             What's more, what I've noted -- what I've --
20   in evaluating Dr. Fraga's surrebuttal, he says that the
21   only way to evaluate differences in drop box use rate
22   would be among all voters, not among mail-in voters.
23   That's his assertion.  However, in Dr. Fraga's
24   surrebuttal report, he does not correctly subset the
25   data to all voters, and, instead, Dr. Fraga subsets the

Page 206

1    data to all respondents.  And while this only results in

2    a small difference in the calculation from Dr. Fraga's

3    report, it speaks to the particular critiques that he's

4    making.

5         Q    Okay.  So have you performed this MRP as it

6    regards drop boxes?

7         A    So just to be very clear about what I'm using

8    here, I'm using a procedure mathematically equivalent to

9    that.  So the MR- --

10        Q    Okay.

11        A    -- MR stands for "multilevel regression."  I

12   do not perform a multilevel regression as a standard in

13   literature.  I do perform a regression, which would be

14   the proportion of Black absentee voters who report using

15   a drop box.  So that is the "MR" part that's

16   mathematically equivalent.  Whether you estimate that

17   with a fancy multilevel regression or machine-learning

18   procedure or, in my case, because it's -- because the

19   post-stratification I'm going to do is just on absentee

20   voting on Black voters, I don't need a fancy regression

21   model.  I can just apply it to the survey data, and then

22   I post-stratify with the administrative data.

23             And, in fact, Dr. Fraga has done this in two

24   papers I think he's published this year.

25        Q    So what you do here, you take the CES survey

Page 207

```
1       data concerning Black voters who you believe offered

2       responses indicating they returned their ballot using a

3       drop box, and then you post-stratify using

4       administrative data about the larger sort of segment of

5       Black voters who -- who the data shows used absentee or

6       mail ballots.  And what is the result?  What is the sort

7       of end product here?  Well, number one, did I get that

8       right?

9            A    That -- that -- so to estimate the share of

10      drop box voters, I used survey data.  The share of

11      absentee voters among Black voters, I used the

12      administrative data.

13           Q    Okay.  And then what -- what -- what comes

14      from that?  What is the end product?

15           A    So in the 2020 election, you -- depending on

16      the weighting scheme you use, there's either a

17      difference of zero or -- White voters were 4 percentage

18      points more likely than Black voters.  Those differences

19      are not statistically significant.

20                The 2022 analysis I've updated with the vote

21      validation for 2022, which I didn't have in August of

22      2023.  And there -- there is a ever-so-slightly Black

23      voters more likely than White voters, but that's in the,

24      you know, second decimal point of a percentage, so

25      there's not a statistically significant difference, and
```

1    in 2024, it's effectively equal.

2        Q    Okay.  So as a result of this -- this analysis

3    you're just discussing whereby you use the CES data

4    concerning Black -- the respondents of Black voters you

5    identify as having returned ballots with drop boxes and

6    applying this post-stratification using administrative

7    data about Black absentee voters, your findings are that

8    in 2020, 2022, and 2024, there is not a statistically

9    significant difference in drop box use between Black and

10   White voters; is that correct?

11       A    That's correct, among all -- all voters;

12   that's correct.

13       Q    Comparing Black voters to all voters?

14       A    No.  Sorry.  I just wanted to make a

15   distinction there.

16            You said it correctly.  I just wanted to put a

17   fine point on it.

18            Among Black and White voters, as distinct from

19   Black and White absentee voters.

20       Q    I understand.  Okay.

21            And does that -- do those results offer

22   anything different than prior analyses you've performed

23   regarding drop box use by race?

24       A    No, and, in fact, I just described the

25   procedure that I outlined in my August 2023 report.  So

1     I'm just -- I think the one update that might be here is
2     carrying out the multiplication for 2024 --
3         Q    Okay.
4         A    -- with the vote-validated 2024 data.
5         Q    Okay.  Is there anything else that -- to the
6     best of your knowledge and recollection now, that you
7     did not cover in any of your expert reports and that we
8     did not discuss today in which you have opinions
9     concerning this lawsuit?
10         A    So I also have opinions about the, you know,
11     relative quality of CRCS or the value of having two
12     different data sources.  I can discuss that if you'd
13     like me to.  But I also think it might be contained in
14     my report.  I just want to be sure I'm being complete
15     here.
16         Q    Okay.  So --
17         A    So let me just say that I obviously don't know
18     what questions your colleague is going to ask me and --
19         Q    I believe it will be solely concerning
20     Dr. Clark.  He's just an expert of that counsel group,
21     but not ours.
22         A    So I believe I have expressed the opinions
23     that I have so far.  Of course, in -- as questions are
24     posed to me by counsel, I may answer them, and that
25     might cause me to develop new opinions, or if I find out

1    there's other reports I didn't know about, I might

2    evaluate those.

3         Q    I suspect we'll back here in two years -- two

4    more years doing this for the 2026 election, so --

5         A    Yes.  So I believe I have expressed my

6    opinions, but I'm not trying to hide anything from you.

7         Q    Sure.

8         A    So certainly I would disclose anything else

9    that's relevant.

10             MR. ROSBOROUGH:  Okay.  I have no more

11   questions at this time.  I appreciate it, Dr. Grimmer.

12             THE WITNESS:  Thank you.

13             MR. ROSBOROUGH:  Thank you for your patience.

14             I'll turn it over to my colleague, Tina Meng

15   Morrison.

16                        EXAMINATION

17   BY MS. MORRISON:

18        Q    Good afternoon.  I don't know if you guys can

19   see me or just hear me.

20        A    We're seeing you.

21             MR. ROSBOROUGH:  We can see you too.

22             THE WITNESS:  Yeah, really clear.

23             MS. MORRISON:  Okay.  Great.

24        Q    Good afternoon, Dr. Grimmer.  My name is Tina

25   Meng Morrison.  I represent the New Georgia Project

1    Plaintiff Group.  And I'd just like to ask you a couple

2    of questions.  Hopefully, it won't take too long, but as

3    Davin previewed, this is going to focus on your

4    discussion of Dr. Clark's report.

5          A    Mm-hmm.

6          Q    So if you could find Exhibit 2 over there.

7    This would be your July 2025 supplemental response

8    report, I think is what it's called.

9          A    I have it.

10         Q    Great.

11              And if you could flip to page 21 for me.  Let

12   me know when you get there.

13         A    I'm there.

14         Q    Perfect.

15              So you'll see, starting on the fourth line

16   down, there's a sentence that begins "Dr. Clark

17   estimates that 56.9% of registered Georgia voters," et

18   cetera.

19              Could you just quickly review that sentence

20   and the following two sentences for me.

21         A    Yes.

22         Q    Great.

23              Now, I just want to ask you a couple of

24   questions about these 2022 turnout metrics comparing a

25   couple of groups of voters.  So if we start with the --

1    the whole state as compared to Black voters and we look

2    at Dr. Clark's calculated turnout rates, would you agree

3    that the difference between Black voters and voters

4    across the state would be 5.6 percent, based on the

5    numbers you've provided here?

6        A    I'm just going to back up here.

7            So the numbers that I'm quoting here is

8    because Dr. Clark made an error in his calculations, and

9    so I'm just providing the turnout rate updates just in

10   line with Dr. Clark's definition as if that error hadn't

11   occurred, and so I can go through the size of the errors

12   that are there, but I just want to be sure we're on the

13   same page about that.

14       Q    Yes.  And I'll get to that in a bit.

15       A    Okay.

16       Q    But if we could just go through, exactly as

17   you said, the differences in turnout rates first --

18       A    Yeah.

19       Q    -- we can discuss that topic in a bit.

20       A    So can you -- I'm sorry.  Can you ask the

21   question again, please?

22       Q    Sure.  No problem.

23            So if we look at Dr. Clark's estimates that

24   you report here, for 2022, the difference in turnout

25   rate between the state and Black voters would be 5.6

Page 213

1    percent, correct?

2        A    For 2022, I'm now looking at my Table 5, and

3    I'm looking at the "Turnout Clark" that I've --

4        Q    Yes.

5        A    -- bolded.

6        Q    So if we can just focus -- we'll get to that

7    table in a second, but if we can just focus on the

8    numbers on page 21.

9             Is it -- and I can ask the question a

10   different way, if that's easier.

11            The turnout rate for registered voters in

12   Georgia in 2022, based on Dr. Clark's estimate, is 56.9

13   percent --

14       A    That's right.

15       Q    -- is that right?

16       A    Mm-hmm.

17       Q    And then his estimated turnout rate for Black

18   voters is 51.3 percent?

19       A    Yes.

20       Q    And the difference there is 5.6 percent?

21       A    That's correct.

22       Q    Okay.  And using your calculations for those

23   same numbers, which would be 50.5 percent and 45

24   percent, the difference is 5.5 percent?

25       A    That's correct.

Page 214

1          Q    And so the differences in Dr. Clark's and your

2     calculations is .1 percent?

3          A    You mean differences in the -- the gap?

4          Q    Yes.  Differences in the -- in the calculated

5     differences as we just covered, so 5.6 percent based on

6     Dr. Clark's estimates and 5.5 percent based on your

7     calculation.

8          A    That looks like it's correct, yeah.

9          Q    Okay.  And then if we look at Dr. Clark's

10    figures again, the differences in turnout rates between

11    Black and White voters in 2022 would be 64.7 percent

12    minus 51.3 percent, which gives you 13.4 percent; is

13    that right?

14         A    That's right.

15         Q    And based on your calculations, 50.3 percent

16    minus 45 percent would give you 13.3 percent; is that

17    right?

18         A    That's correct.

19         Q    So again, the differences in 13.4 and 13.3

20    would be .1 percent?

21         A    That's correct, yeah.

22         Q    Okay.  Now, if we look at 2024 for those same

23    numbers, if we could just quickly walk through those.

24    Those numbers, as you laid out, are the last few lines

25    on page 21?

Page 215

1          A     Okay.

2          Q     So starting with Dr. Clark's turnout rates in

3     2024 comparing Black voters and voters across the state,

4     the difference based on his calculations would be 61.7

5     minus 54.3, which equals 7.4 percent; is that right?

6          A     That's correct.

7          Q     And the difference based on your numbers would

8     be 64.2 minus 56.9, which is 7.3 percent?

9          A     That's correct, yes.

10         Q     Which, again, is a difference of .1 percent?

11         A     Yes.

12         Q     Okay.  And then looking at Black voters and

13    White voters, again, in Dr. Clark's numbers, if we take

14    69.6 percent minus his 54.3 percent, you get a

15    difference of 15.6 percent; is that right?

16         A     69.6 minus ...?

17         Q     54.3 percent.

18         A     Yeah, that's -- that's 15.3 percentage-point

19    difference, yes.  Right?  Am I looking at the wrong

20    number?  Sorry.

21         Q     Yeah, so I think the order of it is a little

22    flipped to 2022, but his rate for -- oh.  I'm sorry.

23    Yes.  That's correct.

24              And then for your calculations, we'd look at

25    72.3 percent for White voters minus six -- 56.9 percent,

Page 216

1    which is 15.4 percent; is that right?

2         A    That's right.

3         Q    So, again, a difference of .1 percent?

4         A    That's right.

5         Q    Okay.  So based on these metrics, would you

6    agree that the turnout differential between Black voters

7    and the rest of the state, when comparing 2022 to 2024,

8    has widened regardless of whose numbers you use?

9         A    It -- it sounds like, even though Dr. Clark's

10   levels of turnout are wrong, we end up with similar

11   differences, which makes sense, given the sorts of

12   errors that were happening in the calculation.  And so

13   I'd feel most comfortable looking at my table.  There

14   were quite a few numbers there for me to compare and to

15   know the order.

16             So looking at my table, I'm just --

17        Q    Sorry.  Not to cut you off.  Yeah, we will get

18   to your table in just a second.  I just -- I have a few

19   more questions on this, and then we'll move on.

20             So --

21        A    I don't think I finished answering your

22   question.  I didn't finish answering your question.

23        Q    Go for it.

24        A    So is the -- and, again, the -- the comparison

25   years that you want me to make is 2020 to 2024; is that

1    right?  Or --

2         Q    2022 to 2024.  So the numbers we just

3    reviewed.

4         A    Okay.  And -- and it's wider than what?

5    What's the comparison here?

6         Q    Just that the turnout differential between

7    Black voters and voters across the state, when looking

8    at 2022 and 2024 -- that turnout differential has

9    widened regardless of whether we use your numbers or

10   Dr. Clark's calculated numbers; is that correct?

11        A    Yeah.  My numbers show that the turnout

12   differential widened, yes.

13        Q    And, in fact, if you look at the turnout

14   differential, it's the same regardless of if you used

15   Dr. Clark's turnout numbers and your turnout numbers?

16   In other words, we calculated that, based on his

17   numbers, the turnout rate between Black voters and

18   voters across the state was 5.6 in 2022 and 7.4 in 2024,

19   which is a difference of 1.8 percent, and based on your

20   numbers, those same figures were 5.5 percent and 7.3

21   percent, which also leads to a 1.8 percent difference;

22   is that right?

23        A    I'm just going to be honest.  There are -- I

24   usually pride myself on being able to follow these sorts

25   of calculations.  There are a lot of numbers being

1    thrown out here.

2                I also just want to be very clear that these

3    are my updates to Dr. Clark's methodology of calculating

4    a turnout rate, which is distinct from my methodology.

5                So all that being said, I don't have a reason

6    to dispute that you carried out the -- the arithmetic

7    correctly, and that, whether you use my corrected

8    numbers of Dr. Clark's estimate or Dr. Clark's original

9    numbers, that you end up with a similar turnout

10   differential.

11        Q    Okay.  Thank you.

12                Now, Dr. Grimmer, you mentioned in several

13   parts of your report that you correct, quote, errors

14   with Dr. Clark's calculation of turnout.  And so I just

15   wanted to ask a couple of questions about that.

16                For your turnout calculations in 2022 -- and

17   we can go to Table 5 now on the following page.

18        A    Okay.

19        Q    For that denominator for turnout, you used all

20   registered voters and not just active voters; is that

21   correct?

22        A    That's correct.

23        Q    And are there any other differences in how you

24   calculated the turnout rates -- sorry.  So I'm now --

25   I'm not referring to, yet, your turnout column in Table

Page 219

1    5, but the numbers we were reviewing on the previous

2    page.

3              Is there any other differences with how you

4    and Dr. Clark calculated those 2022 numbers other than

5    that denominator amount?

6        A    We both use a reapportionment report, so I

7    believe we both had the same number of votes included in

8    2022.

9        Q    Okay.  Thank you.

10             And for turnout calculations in 2024, again,

11   referring to the numbers on page 21 of your report, you

12   stated that you used the numbers from the

13   reapportionment report, but that Dr. Clark uses numbers

14   from the election hub from the secretary of state's

15   office; is that right?

16       A    That's what Dr. Clark reports in his report,

17   and I believe I was able to confirm that by going to the

18   election hub.

19       Q    So is there any other difference between the

20   figures that you calculate for 2024 and 2022 other than

21   that source difference?

22       A    No.  I -- it is direct application of

23   Dr. Clark's methodology from the prior years.

24       Q    And you're not contesting that Dr. Clark's

25   arithmetic for calculating turnout in 2022 and 2024 was

Page 220

1    wrong, are you?

2         A    No, in fact, given the -- just to make sure,

3    I'm going to say what I mean by "arithmetic."  Given the

4    numbers that Dr. Clark had, if I divide those numbers,

5    do I get the same rate?  And the answer to that is yes,

6    I was able to get that correct.  It's just a matter of

7    what -- what goes into that calculation.

8         Q    Great.

9              Now, Dr. Grimmer, you mentioned in your report

10   that, to calculate turnout, your preferred denominator

11   is CVAP; is that correct?

12        A    That's correct, and it's also the preferred

13   denominator for Dr. Burden and Dr. Fraga.

14        Q    Would you agree that it's common in public

15   opinion polling to look at registered voters?

16        A    That is a sampling frame that is used in

17   public opinion polling, to look at registered voters.

18   That is definitely a frame that's used.

19        Q    And would you agree that it's also common for

20   some political science literature to discuss trends and

21   opinions about voting in terms of registered voters?

22        A    To discuss trends and opinions about voting?

23   Can you just clarify --

24        Q    Correct.

25        A    -- what you mean by that?

Page 221

1       Q    Stated another way, is it common for political

2    science literature to focus on registered voters in

3    thinking about voting in a state or across the country?

4       A    The -- there is some literature that will look

5    at the turnout rate among registered voters.  That is a

6    calculation that's used.

7       Q    And does political science literature also

8    discuss turnout in terms of registered voters?

9       A    I'm understanding the question to be asking is

10   there a political science literature that looks at the

11   turnout rate among registered voters.  And there are

12   papers that have examined that question.

13      Q    Now, if we turn to Table 5 in page 22 of your

14   report --

15      A    Mm-hmm.

16      Q    -- I'd like to ask a couple of questions about

17   the turnout differences between Black voters and the

18   rest of the state.

19      A    Okay.

20      Q    So if we start with -- you've got the "Turnout

21   Grimmer" column and the "Turnout Clark" column, so those

22   -- I'll be looking at numbers pulled from there.

23           So according to the "Turnout Grimmer" column,

24   looking at 2022, comparing the turnout differences

25   between Black and White voters, that difference is 9.4

Page 222

```
1      percent; is that right?
2           A    I'm looking at the difference between Black
3      and White voters in 2022 using "Turnout Grimmer."  I do
4      not believe that that is 9.4 percent.
5           Q    Sorry.  I apologize.  I meant to focus on the
6      difference between Black voters and the rest of the
7      state --
8           A    Ah, that is --
9           Q    -- so --
10          A    -- 9.4 percent.  Yes.
11          Q    Yes.  Sorry about that.
12          A    That's okay.
13          Q    And then if we look at the "Turnout Clark"
14     column again for 2022 for that same comparative metric,
15     that difference is 5.5 percent; is that right?
16          A    That's correct.
17          Q    And then now, if we jump to 2024 for that same
18     comparative metric, based on the numbers provided in the
19     "Turnout Grimmer" column, that difference is 11.6
20     percent; is that right?
21          A    That's right.
22          Q    And then looking at Dr. Clark's calculation,
23     the difference in 2024 for him would be 7.3 percent; is
24     that right?
25          A    That's right.
```

Page 223

1          I should say --

2      Q    Are you --

3      A    -- just in all instances where you've been

4    saying "percent," it's actually percentage point.  I

5    just -- for the record, we should have that be very

6    clear.  Differences in this table will be in the

7    percentage-point scale, not in a percent-change scale,

8    and I should have flagged that earlier, and I apologize

9    for not doing that.

10     Q    Thank you for the clarification and for

11   clarifying the record.

12          So in your report, you state that Dr. Clark's

13   methods of calculating turnout has the risk of

14   overstating turnout differences.

15          Would you still agree with that statement?

16     A    Can you just point to where I say that in my

17   report, please?

18     Q    Sure.  So if we go to page 3.  Actually, this

19   line in particular I'm looking at is on page 4, the last

20   sentence of paragraph 6.

21     A    Yeah, so I can -- I can respond to the

22   question.

23          So I still have that opinion, and the reason

24   for that is I was, in particular, focused on changes in

25   the turnout rate over time.  So, for example, if we

Page 224

1    wanted to compare the 2012 turnout rate to the 2024

2    turnout rate, because there's been such a large growth

3    in the number of registered voters over that time, we're

4    really making two different comparisons.  A much smaller

5    share of the CVAPs registered to vote in 2012 or 2010

6    than was the case in 2024.  So there's actually more

7    than the CVAP registered to vote in the state of

8    Georgia.

9         Q    So this sentence, in particular, was referring

10   to overstating declines in Black voter turnout, not

11   specifically just in 2024, as compared to the previous

12   election, but over a longer time span; is that right?

13        A    Yes, and that's where we see the large -- I'm

14   just going to go back to my table here before I -- thank

15   you.

16             We can see in 2010 and 2012 -- 2010 -- let's

17   start there -- approximately 75 percent of the Black

18   citizen voting age population is registered to vote in

19   the state of Georgia.  By 2024, that goes up to

20   approximately 98.6 percent.  And you see similar growth

21   across all -- all the groups here.  And, in fact, if you

22   look at the total CVAP in 2010, 78 percent of the CVAPs

23   registered to vote in 2010; whereas, 105 percent of the

24   CVAPs registered to vote in 2024.  And so there's really

25   very big differences in the denominator there.  What

Page 225

1    we're capturing is the growth in the number of

2    registered voters in Georgia.

3              So you could present the registration numbers

4    like Dr. Clark did.  You would then want to accompany

5    all explanations about over-time changes to say two

6    different things could be going on.  It could be that

7    more people are voting or more people are registered to

8    vote.

9              So those are two different dynamics that are

10   happening because the population of -- the share of the

11   CVAP who is registered to vote increases so much over

12   this time period.

13   Q    So I understand that point, and I thank you

14   for clarifying that that's what that line in your report

15   meant.

16             If we return, again, though, to the numbers

17   just in 2022 and 2024, which was supposed to be the

18   focus of Dr. Clark's supplemental report here, I just

19   want to confirm that, based on the numbers we reviewed,

20   Dr. Clark's turnout figures actually understate the

21   differences in turnout as between Black voters and the

22   rest of the state when you compare 2022 and 2024 as

23   compared to your metrics; is that right?

24   A    Those differences are smaller.  This is a

25   sentence written about that over-time comparison, but,

Page 226

1    yes, they're smaller for those years.

2        Q    So now, if we can move on to factor 7 and a

3    brief discussion.  I'm almost done.  I just have a

4    couple of questions.

5        A    Okay.

6        Q    If we go to page 28 of your report, you have a

7    sentence that says -- it starts:  "If, for example, he

8    argued that parity for Black representation could only

9    occur with 60 out of 180 seats, then he must necessarily

10   be arguing that some other group must have

11   representation below parity."

12           Could you just clarify what you meant by this

13   statement?

14       A    Absolutely.

15           So if I recall, Dr. Clark is using a baseline

16   of 33.2 percent of the Georgia population who is Black,

17   and so he -- he says that there is underrepresentation

18   because 59 out of 180 seats are allocated to Black

19   legislators.  If, instead, you were to say 60 out of a

20   180 -- 60 out of 180 exceeds 33.2, and so that means the

21   share of other legislators from other groups must be

22   below their share in the population.

23       Q    Okay.  Thank you.

24           You also note in this section that a different

25   denominator in calculating -- calculating seat shares,

Page 227

1    specifically CVAP, would lead to a different set of

2    parity numbers.

3              Could you just explain why you think CVAP

4    would be a good metric to use in this context?

5         A    This is merely a way to get at -- what I do in

6    a variety of this report is to get at the sensitivity of

7    the conclusions, and so this is just another way to say

8    if the denominator changed slightly, the comparator can

9    change it slightly here so that the share of the Black

10   population is now 32.2 percent rather than 33.2 percent.

11   You'd reach different conclusions if we use this

12   bright-line test that Dr. Clark's using about whether

13   you're above or below one.

14        Q    Would you agree that elected representatives

15   should represent the interests of all constituents in

16   their jurisdiction regardless of age?

17        A    I think it is an impossibility for a single

18   representative to represent the interests of all their

19   constituents, depending on how you define "interests,"

20   but I don't opine about what legislators should or

21   shouldn't do in this report.  I mean, this is a

22   sensitivity analysis.

23        Q    But the CVAP figure focuses on voting-age

24   population, not all citizens within a certain district

25   or Georgia or jurisdiction; is that right?

1           A     That's correct.

2           Q     Did you perform this calculation that you talk

3    about in paragraph 42 using any other denominator other

4    than CVAP?

5           A     No, I did not.

6                 MS. MORRISON:  Okay.  I think those are all my

7    questions.  I really appreciate it, Dr. Grimmer.  I know

8    it's been a long day --

9                 THE WITNESS:  Thank you.

10                MS. MORRISON:  -- so thank you for your

11   patience.

12                THE WITNESS:  Thanks.

13                MR. ROSBOROUGH:  Last call for anyone else on

14   the Zoom.

15                No response.  Okay.

16                MR. FIELD:  We just have a very few questions.

17                       EXAMINATION

18   BY MR. FIELD:

19          Q     Dr. Grimmer, you were discussing Dr. Pettigrew

20   -- you were discussing -- you were discussing

21   Dr. Pettigrew earlier and validated voter data; do you

22   recall that?

23          A     I do.

24          Q     And you recall mentioning a New Hampshire

25   voter a few times?

Page 229

```
 1          A     I do.
 2          Q     Okay.  And you explained the validation issue,
 3     but you didn't have a chance to explain your method of
 4     analysis for the wait time table.
 5               Could you just explain how the issue arose in
 6     the first place, briefly?
 7          A     Yeah, and I think -- I'm glad to have this
 8     clarification.  I think it is an interesting issue in
 9     how to analyze the CES data, but one that run the risk
10     -- runs the risk of getting very in the weeds, so I will
11     try to not be in the weeds.
12          Q     Let's not do that.
13          A     So in the CES, when it's conducted, they
14     interview all respondents twice, of the respondents that
15     I use.  One set of interviews happen in September and
16     October.  Another set of interviews happen in November
17     and December.
18               The preelection interview -- that's September
19     and October -- obviously a voter can report their state.
20     People can move after the election in November and
21     December and record a different state.
22               In the tables that I constructed, I had always
23     used the state a voter reported in that September and
24     October interview.  Dr. Pettigrew used post-election
25     interview state.  Dr. Burden, who also in his reports
```

Page 230

1    included wait times, uses a sort of mix of them.

2    Sometimes he uses the state someone's interviewed after

3    the election, and sometimes he uses it before.  I would

4    say usually that doesn't matter.

5            What Dr. Pettigrew identified is that there

6    was a voter with a particularly high wait, who had a

7    different state in the post-interview rather than the

8    preinterview.  And so the question is how to handle that

9    kind of voter.

10           For the analysis that I had done, because I

11   had used pre-, I included that voter -- by

12   Dr. Pettigrew's definition you would exclude them

13   because it's post.  There's no right or wrong way to

14   include or exclude that voter, but by analyzing the

15   vote-validated CES, we were able to resolve this issue

16   completely because we can look at the vote validation.

17   This individual did not have their vote validated, and,

18   therefore, ends up not being included.

19        Q    Okay.  Thank you.

20             And then you also discussed the SPIA data.

21             Do you recall discussing that briefly?

22        A    I do.

23        Q    And you testified that you do not dispute that

24   CES is a reasonable data set to analyze, correct?

25        A    That's correct.

1          Q    Can you explain briefly why you also included

2     the SPIA data?

3          A    So the SPIA data is a survey that's conducted,

4     as we mentioned, by the School of Public Policy at the

5     University of Georgia.  And it uses a slightly different

6     methodology to identify and interview voters.  And at

7     any time I feel like you have an instance where you can

8     use two different -- slightly different methods in order

9     to try to estimate a similar quantity, we can have more

10    confidence in the conclusion.  It can be very hard to

11    survey populations.

12              So let's just talk about how the SPIA and CES

13    differ.

14              So SPIA is, as I mentioned, a telephone

15    survey.  It's about 93 percent cell phone, 7 percent

16    land line.  They take a sample from the Georgia set of

17    registered voters.  They ask people if they voted.  If

18    they say "yes," they would have been included in SPIA.

19    They then ask the questions that are in the top lines

20    there.

21              The CES takes a sample from the ACS frame, but

22    doesn't have access to those voters.  So they match with

23    this online pool of voters that they have in order to

24    make that pool look as much as possible like that sample

25    that they tried to take.

Page 232

1              And, of course, obviously, another difference

2      is the CES is online; where, the SPIA occurs over the

3      phone.  So I include it because it's, first, a survey

4      targeted at Georgia, asks relevant questions to this

5      wait time data and provides yet another way to get at

6      this -- this same quantity we're trying to estimate

7      here, which is wait times in Georgia.

8              MR. FIELD:  Okay.  I don't have any other

9      questions.

10             MR. ROSBOROUGH:  I have one follow-up

11     question -- I think it will be just one follow-up

12     question, and I apologize if I already asked you this.

13             THE WITNESS:  Yeah.

14                  FURTHER EXAMINATION

15     BY MR. ROSBOROUGH:

16        Q    Does SPIA do voter validation?

17        A    Ah, that's another important difference.  I'm

18     glad you brought this up.

19             They do not have voter validation in SPIA.

20     It's self-reported.  So you're sort of measuring what's

21     preferred and not preferred.  So Dr. Pettigrew actually,

22     I think, argues against using the voter validation CES

23     in his first report.  There's different reasons why one

24     may or may not want to do that.  The SPIA does not have

25     the capacity to validate the voter.  It does know that

Page 233

1          these individuals were registered to vote in the state

2          of Georgia, however, from the sampling frame.

3                    MR. ROSBOROUGH:  That's all I have.  Thank

4          you.

5                    MR. FIELD:  Assuming nothing else, we will

6          read and sign.

7                    THE WITNESS:  Cool.

8                    MR. FIELD:  Off the record.

9                    (TIME NOTED:  4:33 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 234

1          I, the undersigned, a Certified Shorthand Reporter

2     of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before

4     me at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to

6     testifying, were administered an oath; that a record of

7     the proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing is a true record of the testimony

10     given.

11          Further, that if the foregoing pertains to the

12     original transcript of a deposition in a Federal Case,

13     before completion of the proceedings, review of the

14     transcript [ X ] was [  ] was not requested.

15               I further certify that I am neither

16     financially interested in the action nor a relative or

17     employee of any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date subscribed my

19     name.

20     Dated:    09/05/2025

21

22

               Catherine A. Nolasco, RMR, CRR, BS

23               CSR No.  8239

24

25

Page 235

1    BRIAN FIELD

2    bfield@schaerr-jaffe.com

3                          September 5, 2025

4    RE:    Georgia Senate Bill 202

5         8/27/2025, Justin Grimmer , Ph.D. (#7532458)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   CS-NY@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 236

1    Georgia Senate Bill 202

2    Justin Grimmer , Ph.D. (#7532458)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Justin Grimmer , Ph.D.                          Date

25

Page 237

1    Georgia Senate Bill 202

2    Justin Grimmer , Ph.D. (#7532458)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Justin Grimmer , Ph.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Justin Grimmer , Ph.D.                      Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2014]**                                                                          Page 1

| & | | | |
|---|---|---|---|

**&**  2:14 3:8,20

**0**

**0**  34:19
**0-1**  169:7
**0.00**  149:6
**0.00.**  149:5
**0.03**  113:7
**0.1**  34:16
  151:14,17
  169:6,23,25
**0.2**  34:16
  147:25 151:7,8
  151:13
**0.4**  151:25
**0.6**  103:4
**0.7**  44:16 148:1
  148:1 151:21
  151:22
**09/05/2025**
  234:20

**1**

**1**  1:25 8:12
  14:5,6 55:2
  58:5,9 60:25
  68:20 93:19
  214:2,20
  215:10 216:3
**1-25**  9:10
**1.8**  217:19,21
**1.9**  147:22

**10**  8:4 55:14
  60:25 113:22
  114:9,20
  156:21
**100**  6:6
**100,000**  136:5
**10004**  3:16
**10004-1482**
  3:10
**10006**  4:12
**1001**  3:22
**105**  224:23
**11**  63:15 85:21
  113:22 114:9
  115:6,15,24
  153:10
**11.6**  222:19
**12**  91:19,19
**12.2**  55:15
**125**  3:15
**12th**  85:25
**13**  55:15
  181:24
**13.3**  214:16,19
**13.4**  214:12,19
**14**  8:12,15 9:17
  67:8 103:5
  104:9,12 116:4
  126:18 131:1
**15**  58:4,8 68:21
  86:17 98:9
  118:11
**15.3**  215:18

**15.4**  216:1
**15.6**  215:15
**1500**  3:5
**15th**  86:13,19
  97:16 98:5
**16**  8:18 9:10
  33:21 67:8,8
  93:20 103:5,6
  104:9,10 116:4
  126:18 128:23
  130:23 133:25
  134:8,9 172:14
  172:16
**1600**  6:6,12
**17**  55:3 157:13
  157:18 158:15
**1717**  5:6
**18**  67:8,9 103:6
  104:11 128:23
  133:25 134:8,9
  137:24
**180**  154:25
  226:9,18,20,20
**18th**  3:15
**19**  96:24 180:6
  180:8,9,19
  182:12
**192**  9:19
**1:21**  1:6 2:6

**2**

**2**  8:15 9:20
  14:17,19 22:24
  23:4 55:1 56:4

  56:5 58:24
  68:16 69:22
  70:4 72:24
  139:8 189:14
  189:15 211:6
**2,000**  201:20
**2.5**  147:24
**2/10ths**  151:5
**20**  9:17 67:8
  90:11 116:22
  128:24 133:25
  137:24 162:21
  196:13 200:12
  200:21 237:15
**200**  5:14 6:12
**20001**  4:6
**20004**  3:22
**20005**  3:6
**20006**  5:6
**2002**  66:13
**2008**  91:11
  94:21,25 95:4
**2010**  224:5,16
  224:16,22,23
**2012**  94:23,25
  224:1,5,16
**2014**  56:17
  60:6 69:21
  70:3 89:9,13
  95:24 102:25
  103:21,24
  104:1,4,7,13,16
  104:25 105:17
  108:3 130:14

**[2014 - 2020]**                                                    Page 2

| | | | |
|---|---|---|---|
| 161:20 172:11 | 157:2,8 162:19 | 153:5,9,19 | 106:9 113:1,3 |
| 172:15 | 172:14 | 154:15,25 | 113:14,16,19 |
| **2015**   120:24 | **2019**   138:12 | 155:6,16 156:5 | 116:3,6,12,16 |
| **2016**   60:6 89:6 | **202**   1:6 2:6 3:6 | 157:4,9 158:5 | 129:10 130:21 |
| 89:13 91:21,22 | 3:23 4:6 5:7,7 | 158:12,16 | 131:13 132:21 |
| 91:23,25 92:21 | 17:14,24,24 | 159:22 161:18 | 134:10,18 |
| 93:16 103:23 | 18:2,5 22:17 | 161:22 162:4,8 | 137:8,14 138:4 |
| 103:23 105:24 | 27:6 39:6,9 | 163:4,10 | 138:8,9,14,20 |
| 106:3,4 115:2 | 51:5,11,14,22 | 165:24,25 | 138:25 139:3,4 |
| 130:10,18 | 52:11,14 53:21 | 166:4,24 | 139:9,16,20,23 |
| 133:11 134:3 | 54:14,17 56:10 | 179:17 184:18 | 139:24 142:11 |
| 137:9 147:21 | 56:11,16,17 | 184:25 187:17 | 142:17,24 |
| 162:23 | 59:9,21 78:13 | 188:6,23 | 143:16,18,21 |
| **2016-2018** | 79:13,17,20 | 195:17 196:18 | 143:23 144:5 |
| 131:11 | 80:9,13 89:15 | 196:24 197:22 | 144:19 145:4,7 |
| **2018**   25:24 | 89:15 97:4 | 198:11,16 | 145:12,18 |
| 27:1,11,19 | 106:14 108:17 | 199:16,17 | 146:4,5 147:12 |
| 38:22 56:17 | 108:20 109:14 | 200:12,21,22 | 147:17 148:1,8 |
| 58:15 59:6,13 | 109:18 110:23 | 235:4 236:1 | 151:2,4,14,15 |
| 59:16,25 60:13 | 110:25 111:7 | 237:1 | 151:18 152:4 |
| 90:11,18 91:2 | 113:23 114:22 | **202's**   80:25 | 152:11 156:4 |
| 91:8 92:3,6,10 | 115:9,20,21 | 81:2 130:3 | 156:10,14 |
| 92:15 94:13 | 116:2 125:10 | 148:5,9 178:22 | 157:8 162:10 |
| 102:25 103:21 | 125:20 126:4 | 179:5,22 180:2 | 162:15 164:10 |
| 103:22 104:1,4 | 126:22,25 | **2020**   9:4 18:13 | 172:23 181:16 |
| 104:8 106:5,17 | 127:2,13 130:1 | 36:7,25 37:10 | 183:1 184:12 |
| 106:25 107:4 | 131:13,14,18 | 38:1,16,22 | 184:14,14,16 |
| 107:11,12,13 | 132:1 134:12 | 39:1,4 41:3 | 184:20 187:14 |
| 116:3 126:18 | 134:24 136:1,4 | 55:6,14 59:13 | 187:15,16,22 |
| 130:18,23 | 136:13 138:15 | 59:17,25 66:5 | 196:6 198:6 |
| 133:11 134:3 | 138:25 139:2,5 | 67:1,2 68:6,14 | 204:9,13,14 |
| 137:4,9,14 | 139:7,9,17 | 71:5 80:8 | 207:15 208:8 |
| 138:4,7,10,20 | 142:4,5 146:20 | 92:25 93:1,14 | 216:25 |
| 141:10 147:23 | 146:21 149:12 | 94:19 96:23 | |

**[2021 - 2025]**                                                    Page 3

**2021**  58:18
67:23 68:18
69:5 71:5
88:12 131:13
134:10,18
139:2,12
**2022**  16:14
33:23 56:15
58:18 59:13,15
59:25 66:6,14
66:14,15,25
67:11,24 68:12
68:13,18 70:3
71:5 75:15
80:9 87:14,15
88:12 94:13
99:20 106:23
107:1 115:24
115:25 116:2
126:2,20
131:14,20
132:6 135:1
137:8 139:10
139:20,23
140:22 142:11
142:17 143:18
148:1 149:8,16
150:5 168:2
170:23 171:11
172:2,10,22
181:18 187:22
190:13 196:6
196:15 207:20
207:21 208:8

211:24 212:24
213:2,12
214:11 215:22
216:7 217:2,8
217:18 218:16
219:4,8,20,25
221:24 222:3
222:14 225:17
225:22
**2023**  13:14,18
13:20 15:8,11
15:20,25 16:7
16:11,12 17:11
18:17 25:13
30:2 53:8
58:19 66:24
68:3,5,17 69:2
69:4,6,15,19,22
70:1 71:1,5
74:17,22 75:8
75:12 76:20
77:11 84:4
86:3 88:11
101:13 102:15
108:13 111:3,5
117:24 118:1
144:17 185:4,6
185:10,14
186:22 190:15
203:10 207:22
208:25
**2024**  9:9,19
16:14 23:13
33:23 42:6

55:6,15 58:15
59:1,13,16,25
60:15 61:4
65:10 66:19,20
69:2,9,14
70:25,25 73:4
73:10,23 76:21
77:2 78:6 82:8
88:19,23 89:1
89:6,9 93:14
94:19 95:24
97:9,11,15,23
98:19 101:14
102:10 106:24
107:8,12 108:4
108:24 113:3
113:13,16,19
115:24,25
116:4,6,7,12,16
116:22 117:1
121:4,8 126:2
126:21 130:10
131:14 132:7
135:2,4 137:8
139:20,24
140:22 142:12
142:24 143:16
143:21 144:9
147:12,18
148:2,8 149:8
150:5 151:3,20
151:23 152:4
152:11 153:1
156:4 157:22

161:21 162:16
162:19,22
165:8 168:3
170:23 171:11
171:17,18,20
172:2,10,19
174:4 180:19
181:18 184:10
184:11 185:16
185:24 186:3
187:23 190:6
190:10 193:1
193:21 196:6
196:15 202:7
208:1,8 209:2
209:4 214:22
215:3 216:7,25
217:2,8,18
219:10,20,25
222:17,23
224:1,6,11,19
224:24 225:17
225:22
**2025**  1:14 2:17
9:14,17 10:1
13:22,24 15:6
15:12,20 17:15
17:22 25:14
29:14 52:25
53:8 56:4,5
57:1 58:3
68:11,16 72:24
74:18 76:2,13
76:19 77:11

[2025 - 50.5]                                                    Page 4

84:3,5 85:14
85:25 86:1,4,6
86:17,19 87:15
95:19,22 97:16
98:6 117:8,15
118:23 120:24
128:6 157:13
157:18 160:25
161:12 167:5
180:8 189:13
211:7 235:3
**2026**   210:4
**205**   5:20
**207-8238**   4:20
**21**   36:14 125:1
125:4 134:1
211:11 213:8
214:25 219:11
**210**   8:5
**212**   3:10,11
4:13
**213**   8:19
**214-3499**   5:15
**22**   9:14 16:17
17:2 74:6
126:17 128:24
172:14 184:14
196:13 221:13
**228**   8:6
**23**   9:13 46:3
**232**   8:7
**235**   1:25
**24**   16:17 17:2
59:6 126:17

128:25 172:14
196:13
**25**   9:10 78:9
155:24
**250**   4:5
**27**   1:14 2:16
10:1
**28**   226:6
**29**   204:15

### 3

**3**   8:18 16:2,3
176:11 223:18
**3,000**   193:14,17
201:17
**3.1**   175:6
**3.2**   103:5
**30**   33:23 34:14
34:19,21 35:4
168:2,11,14,17
169:3,11,12
170:12,14,18
171:1,5 172:8
172:9,19,20,23
173:15 175:5,9
235:16
**30326**   6:19
**30339**   6:13
**30339-5948**   6:7
**30th**   193:20
**31**   9:19
**31210**   5:21
**316**   38:14,16
129:1 131:4,5

131:12,13
132:23,25
134:11 137:5
137:11 138:12
138:19 149:12
**319's**   38:12
**31st**   193:1,19
**32**   8:21
**32.2**   227:10
**323**   4:20
**33**   40:9
**33.2**   226:16,20
227:10
**34**   8:16
**347**   4:13
**35**   9:3
**3630**   6:19
**370-4358**   6:21
**370-4377**   6:20
**370-4378**   6:20
**38**   97:8

### 4

**4**   8:21 32:25
33:3 71:11
76:9 117:15,17
117:19 207:17
223:19
**4,966**   99:18
**4.2.3**   117:24
118:1
**40**   4:12
**400**   4:5

**41**   9:8
**415**   4:20
**42**   228:3
**422-4726**   3:11
**434-6868**   6:13
**44**   204:13
**45**   189:23,25
213:23 214:16
**47**   118:19
**470**   6:7
**478**   5:21,22
**48**   183:16
**49**   76:11 128:5
183:9
**491-2597**   4:13
**4:33**   2:16 233:9

### 5

**5**   9:3 33:20
35:21,22 92:20
100:25 213:2
218:17 219:1
221:13 235:3
**5.3**   172:22
**5.5**   213:24
214:6 217:20
222:15
**5.6**   212:4,25
213:20 214:5
217:18
**50**   64:6,7
**50.3**   214:15
**50.5**   213:23

**[500 - above]**                                                                          Page 5

**500**  5:14
**501**  5:15
**51.3**  213:18
   214:12
**54.3**  215:5,14
   215:17
**5400**  5:20
**55**  4:19
**550**  6:19
**55555**  1:6 2:6
**56**  9:12
**56.9**  211:17
   213:12 215:8
   215:25
**57**  9:16
**58**  145:10,11
**588-0317**  6:7
**59**  156:22
   226:18
**5:00**  127:5

**6**

**6**  9:8 41:15,21
   101:10 102:9
   112:11 176:12
   223:20
**6,000**  100:2,24
   120:23
**6,884**  97:16
**6.3**  172:19
   175:11
**6.7**  175:12
**6.8**  175:12

**60**  226:9,19,20
**61.7**  215:4
**62**  146:18
**621-4980**  5:21
**621.4982**  5:22
**624-2810**  3:23
**64**  107:21
   136:22
**64.2**  215:8
**64.7**  214:11
**65**  40:17
**662-8391**  3:6
**678**  6:20,20,21
**69.6**  215:14,16

**7**

**7**  9:12 56:20,21
   58:1 71:16
   118:19 175:8
   177:5 226:2
   231:15
**7.3**  107:4 215:8
   217:20 222:23
**7.4**  215:5
   217:18
**7.5**  107:2 175:6
**70**  160:25
**703.380.0804**
   3:16
**72.3**  215:25
**72201**  5:15
**74**  165:21
**7484**  234:21

**75**  175:15,16
   224:17
**7532458**  1:23
   235:5 236:2
   237:2
**76**  8:13
**770**  6:13
**78**  153:9
   156:21 224:22
**787-1060**  5:7
**7:00**  198:7

**8**

**8**  9:16 57:14,18
   58:1,1 91:19
   136:21 142:18
   147:8 149:4
   176:12 177:5
   181:21,22
**8/27/2025**
   235:5
**801**  2:14
**8239**  1:22 2:18
   10:5 234:23
**83**  152:17
**837-6000**  3:10
**85**  9:6
**867-4998**  5:7
**896-1702**  4:20

**9**

**9**  8:22 9:19
   109:21,22
   112:23 156:22
   157:5 192:21

   192:22
**9.4**  221:25
   222:4,10
**900**  3:5 5:6
**93**  231:15
**94111**  4:19
**965-7715**  4:13
**968-4592**  4:6
**98**  40:7
**98.6**  224:20

**a**

**a.m.**  2:16 10:2
**abate**  26:14
**abhinav**  9:5
   36:6
**ability**  40:14
   127:3 145:1
   175:23 194:23
**able**  23:22 31:4
   31:7 40:21
   54:11,21 69:6
   84:16 86:20
   87:4 127:13
   165:19 174:14
   174:16 175:18
   176:3,7 191:23
   195:20 217:24
   219:17 220:6
   230:15
**above**  85:7
   118:19 136:22
   227:13 235:6
   237:7

**[absence - administrative]**　　　　　　　　　　　　　Page 6

**absence** 79:17
194:19
**absentee** 17:9
20:19 21:18,19
22:9,19,21,22
37:20 39:17,21
40:16 41:2
54:24 126:1,6
128:4,8,18
130:2 132:15
133:3,13,15
134:5,16 137:2
138:14,24
139:19,21
144:20 146:16
147:2,6 152:16
152:21 153:1
153:18 154:14
154:17 156:25
158:4,20,21
159:7,21 160:3
161:15,24
162:11,25
163:4,6,10
187:1,5,14,14
190:4,18,20
191:7,14 194:3
194:12 195:5
195:10,17
196:16,17,22
198:16 199:14
199:17 201:15
202:6 203:18
203:23 204:7

204:17 205:6,8
206:14,19
207:5,11 208:7
208:19
**absolutely** 40:4
40:4,8 60:18
86:9 168:21
171:20 182:13
203:2 226:14
**access** 117:2
175:19,21
190:1 200:17
201:14,22
231:22
**accessing** 124:2
**accommodate**
13:2
**accompany**
12:15 225:4
**account** 49:5
69:1 98:3
112:21 120:19
124:13
**accounts** 98:2
**accuracy** 235:9
**accurate** 11:22
13:6 14:13,22
14:23 74:21
75:1,2 76:5,6
76:21 88:1
115:8,17
132:12,19
186:15 188:1,7
204:5,5,8

**accurately**
198:5
**acknowledge...**
237:3
**acknowledg...**
235:12
**aclu.org** 3:17
**acs** 65:23 66:7
66:11 231:21
**action** 234:16
234:17
**active** 218:20
**actual** 67:24
75:21 92:9
172:4
**actually** 15:22
38:5 47:3 48:5
53:5 61:16
87:6 112:4
137:11 141:6
147:10 149:6
150:11 156:21
162:4 182:8
183:12 201:23
204:15 223:4
223:18 224:6
225:20 232:21
**add** 60:4 69:19
134:15 150:14
**added** 39:9
68:12,16 69:7
102:11 135:25
**addendum**
60:4

**adding** 69:22
101:13
**addition** 169:4
**additional** 19:5
29:12,17 68:14
135:7,23
**additionally**
89:13
**additions** 237:6
**address** 17:4
23:22 38:13,17
67:5 68:7
120:15 133:12
133:20 134:20
**addressed**
130:12
**addressing**
190:21
**adds** 131:18
**aden** 4:11,13
**adjective** 103:8
**adjudicated**
122:15
**adjust** 67:21
169:19
**adjusted**
169:22
**administered**
10:9 234:6
**administration**
49:4 54:3,4
163:24
**administrative**
16:12,14,15,17

**[administrative - analogous]**                                              Page 7

75:11,18,20
76:23 77:15
183:4,7,11,18
184:11,15,20
184:24 185:3,5
185:7 186:8
203:16,17
204:1,6,11,14
204:17 206:22
207:4,12 208:6
**admit** 101:18
**adopt** 169:10
170:3
**adopted** 34:13
67:6 71:25
**adopts** 168:13
170:10 183:2
**advancing** 4:16
**advantage** 49:8
**advertise** 93:4
**advertised** 93:6
**advocates**
46:11,19 47:11
**affect** 9:8 18:14
41:7 42:1
45:10,12,17,21
45:25 46:1
47:25 48:2,14
49:1 77:20,22
78:1 81:24
145:16 191:1
**affected** 44:8
97:4 130:1
138:24 163:13

198:11
**affects** 109:18
177:19
**affirm** 81:23
**affirmatively**
101:5
**afternoon**
210:18,24
**age** 65:18 66:3
146:6,10
224:18 227:16
227:23
**aggregate**
61:17 124:7
150:24 151:3
151:20 172:18
**aggregating**
63:15
**ago** 10:18
**agree** 42:21
43:11 55:5,22
55:24,25 58:13
58:17 59:5,10
59:11,18,23
63:11 70:8
77:20 95:2
118:6 119:12
139:9,16
147:10,13
148:3 149:15
158:13 171:25
181:24 183:15
187:3 188:5,23
191:10 194:10

196:9 198:20
212:2 216:6
220:14,19
223:15 227:14
**agreement**
150:11
**ah** 87:11 222:8
232:17
**ahead** 14:3,16
15:23,23,24
35:20 41:13
62:18 92:22
114:19 122:21
202:23 203:1
**ai** 19:19
**alabama** 19:25
19:25 20:2
21:9,12 22:8
**alan** 182:23
**albeit** 72:10
**aligned** 96:5
**aligning** 89:19
94:23
**alignment**
89:17
**allegation**
110:24
**allege** 85:18
**alleging** 84:7
**allies** 37:8
**allocated**
226:18
**allotted** 235:19

**allowed** 134:15
**alluded** 173:3
**alternative**
191:4
**ambiguities**
150:24
**ambiguity**
150:17 188:24
**ambiguous**
189:1,3
**ame** 10:19
**amended** 9:12
56:24 57:4,6
**america** 20:3
22:14
**american** 3:14
7:3 48:11 59:7
59:12 65:19
72:17 106:10
106:10 115:1
142:14 143:4
144:8 156:7
158:19,25
159:6,12,20
**americans** 4:16
**amount** 131:1
142:13 143:3
205:7 219:5
**anal** 146:14
**analog** 26:13
**analogous**
16:20 102:5
157:11 158:12
190:12

**[analyses - application]** Page 8

**analyses** 27:13
61:4 72:10
208:22
**analysis** 9:9
15:6 27:13,16
29:18 30:6,15
30:19 32:4
37:3,23 38:20
38:20 39:9
40:19 42:11,14
44:9,16 47:6
47:21 48:6,24
49:9,10 51:4
51:16,21 52:13
52:15 58:18,25
70:9,12 71:23
73:14 75:9,16
76:20,24 77:2
79:7 80:5 81:9
81:12 82:10,23
84:6,8 85:1
87:24 88:2,8
88:16,22 89:19
108:9,19,22
109:1,18 111:4
117:1,4,6,7
119:7 121:4,5
122:16,17,22
124:7,9 129:13
130:15,20,21
144:15,24
145:2,6 146:15
153:16 154:11
154:19 157:7

168:20 169:4
176:17 177:18
178:6,11
179:11 185:19
185:20 189:7
190:7 195:14
197:17 203:6
205:13 207:20
208:2 227:22
229:4 230:10
**analyze** 37:25
49:22 52:9
89:3,5 122:25
130:9 161:13
163:2 164:19
176:14 229:9
230:24
**analyzed** 118:8
155:10 165:1
171:18
**analyzes** 89:18
**analyzing** 72:8
110:1 119:2,4
125:16 165:8
171:16,17
230:14
**announced**
91:24
**answer** 12:1,5
12:15,21,21
13:2 15:18
33:11 60:17
65:6 101:21,24
116:24 171:6

188:1 209:24
220:5
**answered**
186:7
**answering**
35:12 106:20
137:6 216:21
216:22
**answers** 11:23
12:7,11
**antecedent**
157:16
**anti** 17:4
**anticipate** 12:5
**anticipated**
108:25
**anticipating**
17:13 54:10
**anybody**
171:23
**anymore** 99:12
**anytime** 28:12
145:21
**anyway** 201:19
**apologize** 49:19
60:21 112:9
222:5 223:8
232:12
**apparently**
97:15 200:3
**appear** 58:22
143:1 193:13
195:20

**appearances**
3:1 4:1 5:1 6:1
7:1 11:17
**appeared** 37:4
40:13
**appearing** 2:14
3:8,21 4:4,10
4:11,18 5:5,13
5:19 6:5,11,17
6:18 7:3
**appears** 27:9
34:1 84:1
114:25 143:16
194:22
**appended**
237:7
**appendix**
124:23
**apples** 77:1,1,7
77:7 143:22
**applicable** 28:1
235:8
**applicant** 83:3
**applicants**
154:23
**application**
22:20 35:5
135:13 143:24
152:16 153:8
153:23 154:23
157:24 158:11
160:5 195:16
195:20 219:22

**[applications - assess]**

| | | | |
|---|---|---|---|
| **applications** 20:22 35:2 152:22 153:1 153:18,22 154:10,12,17 155:1,3,4,20,21 155:24 156:7 157:1,7,21 158:4,21,24 159:1,2,4,8,11 159:12,14,15 159:21 162:12 191:14 | 228:7 **approach** 74:17 204:24 **appropriate** 31:6 72:20 112:6 192:13 **appropriately** 35:3 168:9 170:11 176:4 177:21 **approximate** 86:7 | **arrive** 154:10 **arrived** 154:7 181:12 182:21 **arrives** 199:14 200:1 **arriving** 39:2 127:5 145:17 145:23 153:2,2 154:14 156:8 157:1,23 158:22 159:3 | **asianlawcauc...** 4:21 **aside** 35:6 41:19 52:7 60:19 64:19 118:16 150:10 158:14 200:8 **asked** 18:22 25:15,15,17 171:13 232:12 |
| **applied** 22:21 35:2,3 168:9 170:11 177:22 **applies** 135:4 155:12 168:8 168:12 169:18 170:9 | **approximately** 147:12,17 155:24 175:8 175:12 186:22 204:13 224:17 224:20 **arbitrary** 170:6 **area** 42:19 | **art** 103:12 **article** 29:20,22 30:1 41:24,25 42:2,18 47:6 50:12,16 52:4 90:7,8,14 91:6 91:7,9,16 95:1 197:11 **articles** 18:10 | **asking** 10:20 11:20 49:25 62:23 106:23 106:24 110:13 121:15 138:17 139:4 153:25 171:3 185:11 221:9 **asks** 232:4 |
| **apply** 40:15 170:15 171:9 199:13 206:21 **applying** 32:3,7 33:15 44:24 54:8 195:22 205:13 208:6 **appreciate** 17:10,20 20:8 28:22 59:2 70:16 80:3 105:13 126:12 160:16,19 178:9 210:11 | **areas** 41:6 153:7 **argued** 226:8 **argues** 232:22 **arguing** 226:10 **argument** 38:6 50:8 144:23 **arithmetic** 218:6 219:25 220:3 **arkansas** 5:15 **arose** 229:5 **arrival** 144:20 157:7 | 22:7,10 **articulate** 205:9 **asian** 4:16,17 59:7,11 63:22 67:17 72:17 85:5 104:3 105:2,5,19,24 106:2,9,10 142:14 143:4 144:8 156:7 158:19 159:1,6 159:13,20 | **aspect** 176:8 **assert** 27:5 32:6 33:18,24 **asserting** 83:5 **assertion** 34:24 86:18 91:4,19 100:15 123:18 123:18 144:24 145:22 146:14 205:23 **asserts** 26:25 30:17 **assess** 47:5 90:18 97:9 166:11 |

[assessed - ballot]                                                    Page 10

**assessed**  22:9
**assessing**  20:20
  49:20 81:2
  162:7 164:5
**assessment**
  21:20 30:21
  31:7 50:13
  90:10 164:11
  167:25
**assign**  86:20
**assist**  161:25
**assume**  12:1
  34:5
**assuming**  80:7
  80:8 233:5
**assumption**
  79:19
**assumptions**
  78:12 79:11,14
  79:15 80:4
  83:20 90:25
  166:1,2,18,22
  177:2
**atlanta**  1:3 2:3
  3:19 6:7,13,19
**attached**
  235:11
**attempt**  53:20
  54:16 69:1
  82:4 83:13
**attempted**  54:5
**attempting**
  79:3 80:6
  90:24 101:2

**attended**  23:16
  24:12
**attending**  30:6
**attention**  72:24
  91:20,22
**attentive**  98:23
**attorney**  3:5,9
  3:15,21 4:5,11
  4:18 5:14,20
  6:6,12 234:17
  235:13
**attorneys**  5:5
  6:18
**attributable**
  148:5
**attribute**
  126:24 145:4
**august**  1:14
  2:16 10:1
  13:19 16:12
  91:23 93:4
  185:10 186:22
  203:10 207:21
  208:25
**authored**  13:9
  42:2
**automatic**
  83:18
**availability**
  144:18 145:7
  146:11 191:8
  196:3
**available**  31:3
  53:2 65:4,9,10

  66:25 75:3,15
  75:17 77:16
  101:7 102:2
  131:2 134:5,9
  136:7,16 146:6
  184:16 196:4,5
  196:12 198:12
  199:20 235:6
**avenue**  3:22 4:5
  4:19 5:14
**average**  30:2
  67:9 68:16
  69:21 70:2
  92:23 145:11
  145:13 146:10
**aware**  23:12
  39:3 41:1 83:9
  111:6 138:23
  139:1 177:9
  180:25 182:22
  186:4

|   b   |
| :---: |

**b.s.**  1:21
**back**  15:5
  18:20,21 24:1
  24:2,9,23 33:2
  35:8 43:4 44:2
  45:11 53:23
  60:20 66:24
  69:23 70:7,24
  75:13 81:3,5
  85:11 95:15
  100:20 102:25

  104:10,11
  112:8,23
  113:25 120:21
  121:3 122:6
  128:1 131:18
  147:8 149:25
  155:19 156:16
  158:13,15
  160:8 161:11
  163:18 167:3,3
  167:15 168:4
  171:2 173:24
  174:25 176:10
  177:8 180:23
  182:9 185:13
  186:6 188:4
  203:3 210:3
  212:6 224:14
**background**
  136:18
**backside**  193:4
**bad**  26:21
**badly**  204:15
**bail**  19:19
**ballot**  17:5
  22:19,22 39:1
  39:14,17,21
  41:2 51:17
  54:24 112:17
  112:22 113:19
  119:12,25
  122:11,12,13
  122:14 123:9
  124:19 127:16

**[ballot - believe]** Page 11

128:4,4,8,18
129:9 130:2
131:9 132:15
133:3,13,15
137:2 138:24
139:19,21
140:4,8,15,16
145:8,12,13
147:6,24
148:10,19
150:23 152:16
152:22 153:1
153:18 154:17
155:4 156:25
157:21 158:4
158:21 159:8
160:2,3,9,25
162:11 163:1,4
163:6 164:1,6
164:17,19
182:1,15,17
187:1,5,12
190:18,20
191:2,14
192:16 194:13
194:20,24
195:6,22
196:22 197:1
199:9,14,17,23
199:25 200:21
201:15 202:19
203:19 207:2
**ballot's** 165:3

**ballots** 17:9
21:18,20 37:20
38:23 40:16,20
51:19 97:9
105:11 108:11
108:12 111:18
114:21,23
115:7 116:17
118:18 119:4,5
119:6,9,10,16
119:17,19
122:18 125:11
125:15,19
126:1,6,8,9,17
126:20 127:3
127:12,17
131:21,23
132:5 134:5,16
134:16 138:14
142:12 143:2
144:20 145:1
145:17,23
146:2,4,5,16
147:3,11,15
151:5 154:9,14
159:22,25
161:15 162:5,9
162:22 163:10
164:12 165:2
179:24 180:3
182:3 183:10
183:13,14,16
186:15 187:9
187:14,15,24

190:2,4 191:7
191:16,20
192:10,12
193:14,17
194:3,9,12,16
195:5,10,12,17
196:16,17
198:15,16
202:6 207:6
208:5
**bar** 19:14,15
**barack** 91:10
94:24
**base** 46:13,22
47:13,16 48:13
69:7,19 71:2,3
203:11
**based** 12:20
16:25 17:7
22:6,10 27:20
31:13 33:10
34:7 39:12,12
63:17 64:3
93:24 116:25
117:4,7 127:10
132:5 140:18
140:21,24
147:20 150:3
153:11 155:9
178:16 180:20
184:1 201:1
204:22 205:17
212:4 213:12
214:5,6,15

215:4,7 216:5
217:16,19
222:18 225:19
**baseline** 226:15
**basic** 32:3,6
33:14
**basically** 101:9
154:4 155:11
155:14 159:19
172:18 174:20
193:21
**basis** 29:9
30:17,18 118:6
191:14
**battery** 3:9
**battleground**
36:17
**baxter** 5:13
**bdrennon** 5:16
**becoming**
112:14
**began** 91:13
**beginning** 2:15
27:1 69:20
167:10 175:15
**begins** 33:20
211:16
**behalf** 2:13
**behavior** 114:6
**belabor** 77:18
199:4
**belief** 122:10
**believe** 13:18
13:19 14:8,17

**[believe - black]**                                           Page 12

16:6 17:18,18
18:10 19:16
20:5 22:24
23:12,14 24:11
28:23 29:4
33:12 35:11,17
35:21 36:19
38:17 39:9
40:9 41:4
45:10 46:11,19
46:24 47:2,11
47:19 52:12
53:24 54:22
55:4 56:13
57:15 61:1
62:2 63:9
65:13 67:22
68:5 72:7
87:13 89:22
92:10,19 93:3
108:19 111:10
113:9 116:24
118:18 124:23
126:15 131:20
132:19 134:8
135:21 136:12
145:10 148:22
150:17 153:10
154:25 155:8
158:6 161:23
162:2,13
165:16 166:3
167:23 172:3
172:10 175:18

175:25 177:11
178:15,16
185:9 186:3,16
192:10 201:16
205:3,6 207:1
209:19,22
210:5 219:7,17
222:4
**believes** 84:15
**believing** 49:6
**bench** 20:3
**benchmark**
170:18
**benign** 164:9
**bernard** 9:13
9:16
**best** 15:10,14
15:19 21:17
24:22 28:20
32:10 36:12
39:6 63:1
64:17 71:2
100:7 103:18
119:23 121:23
123:21 131:17
148:20 202:15
209:6
**better** 15:23
29:25 78:21
84:16,22
123:20,23
144:6 185:22
**beyond** 28:3
164:23

**bfield** 5:8 235:2
**bias** 26:3,21
**biased** 204:16
**biasing** 27:7
**bibb** 5:18
**biden** 93:3,9
**big** 37:19 95:20
224:25
**bigger** 34:11
44:20 103:22
103:23 112:14
171:22,24
**biggest** 45:9
**bill** 1:6 2:6
17:23,24 235:4
236:1 237:1
**bills** 135:21
**birth** 38:12,17
39:10 131:19
131:22,24
132:6 133:13
133:21 134:21
134:25 149:13
149:20
**bit** 15:5 26:5
77:4 78:16
100:22 130:6
132:2 141:1
143:22 149:25
150:12 163:5
173:24 185:15
201:2 212:14
212:19

**bjacoutot** 6:14
**black** 3:19
44:21,22 45:1
48:2 55:5,13
56:5,6,9,15
63:22 64:1,5,6
67:15 72:17
73:4,10,14
85:23,24 87:20
94:22 95:6,8
103:1,20 105:2
105:5,10,19
106:5,9,10
107:1,3,4
115:20 116:2,7
116:15,22
125:9,14,16
126:20 127:14
142:14 143:4
144:7 147:9,10
147:14,22,24
148:4 151:2,4
151:5,13,22
152:10 156:7
158:18 159:1,7
159:13,20
175:4 180:2,11
181:14,17
204:10,12,16
205:2,5,8
206:14,20
207:1,5,11,18
207:22 208:4,4
208:7,9,13,18

208:19 212:1,3
212:25 213:17
214:11 215:3
215:12 216:6
217:7,17
221:17,25
222:2,6 224:10
224:17 225:21
226:8,16,18
227:9
**board**  6:3,3,4
  19:22 137:3,15
  137:16,17
**bolded**  213:5
**booth**  5:13
**bottom**  36:14
  46:8 165:20,20
**bound**  201:16
  202:1,2
**boundary**
  171:4
**box**  16:15 30:3
  146:11 178:15
  178:17,22
  179:5,17,22
  180:2,10
  181:15 182:1,2
  182:2,15,25
  183:1,4,7,9,11
  185:5,17,23
  186:15,18
  187:2,4,6,9,15
  187:23 188:2
  188:19 189:3,8

191:4,8 196:2
196:25 197:14
198:12,18
199:1,5,20
201:19 202:19
203:6,19,21
204:7 205:3,8
205:21 206:15
207:3,10 208:9
208:23
**boxes**  16:13
  112:4 134:4,8
  134:16,18
  136:4,5,10,14
  144:18,25
  145:5,7,22
  146:16 183:4
  183:14,17
  184:15 186:3
  187:17 188:25
  190:25 191:21
  194:19,20
  196:5,12,18
  197:3,8,9,12,23
  197:24 198:4,6
  198:15 206:6
  208:5
**break**  13:1
  18:21 20:6
  52:18,20 78:16
  95:12 96:8
  108:6 110:19
  111:14 118:12
  124:15 127:19

128:12 131:15
132:1,1 142:16
144:11 153:13
160:15 162:19
168:25 184:7
**breakdown**
  113:21 173:3
**breaks**  12:24
**brian**  5:4 11:14
  235:1
**brief**  226:3
**briefly**  25:3
  229:6 230:21
  231:1
**bright**  227:12
**bring**  28:21
**bringing**  30:1
**broad**  3:15
  65:24
**broader**  79:1
  164:23
**broadly**  20:23
  135:3 152:20
**broken**  137:18
**brought**  23:19
  232:18
**bryan**  6:11,17
**bs**  234:22
**btyson**  6:21
**builds**  47:21
**burden**  16:22
  61:19 66:4
  67:22 82:2
  89:18 144:23

146:14 220:13
229:25
**burden's**
  144:16 183:6
  185:20 186:22

**c**

**c**  4:11
**calculate**  33:22
  53:20,21 54:14
  54:16 55:13
  66:5 186:14
  219:20 220:10
**calculated**
  20:25 77:13
  109:24 212:2
  214:4 217:10
  217:16 218:24
  219:4
**calculates**
  63:25 71:6
**calculating**
  71:4 82:7
  148:16 218:3
  219:25 223:13
  226:25,25
**calculation**
  17:12 51:19
  55:21,22,24
  63:21 68:15
  72:9 81:24
  84:15 87:19
  183:21 206:2
  214:7 216:12

**[calculation - categories]**                                    Page 14

| | | | |
|---|---|---|---|
| 218:14 220:7 | **canceled** 51:17 | 76:16,17 | 206:18 224:6 |
| 221:6 222:22 | 51:19 98:8 | **carolinians** | 234:12 |
| 228:2 | 100:3,3,5,9,10 | 45:1 48:3 | **cases** 19:6,8 |
| **calculations** | 100:12 101:3 | **carried** 218:6 | 40:13 |
| 61:5 62:17 | 161:14 162:5,8 | **carry** 111:4 | **casey** 6:5 |
| 64:18 65:17 | 162:22 164:7 | 170:3,21 | **casey.torres** |
| 66:15 68:7,8 | 164:12,20 | 195:13,15 | 6:8 |
| 81:9,16 82:16 | 165:2,4 | **carrying** 157:6 | **cast** 97:9 |
| 101:12 112:7 | **cancellation** | 170:23 209:2 | 105:11 110:4,6 |
| 183:20 212:8 | 160:9 161:1 | **case** 1:6 2:6 | 110:7,8,10,14 |
| 213:22 214:2 | 163:13,21 | 10:20 13:10 | 110:15,16 |
| 214:15 215:4 | 164:3,17,19 | 16:8 18:4 | 111:18 112:17 |
| 215:24 217:25 | **cancellations** | 19:18,20,22 | 112:19 113:2 |
| 218:16 219:10 | 162:16 163:3 | 20:1,17,20,24 | 113:18 114:17 |
| **california** 1:13 | **candidacy** | 21:6,10,19 | 114:21,22 |
| 2:14,15 4:19 | 94:24 | 22:23 23:8,11 | 115:7 116:17 |
| 10:1 19:14,17 | **candidate** | 24:21 29:15 | 119:5,10,16,18 |
| 234:2 | 45:20,21 | 30:13 31:25 | 119:25 122:11 |
| **call** 61:8 63:16 | **candidates** | 37:4,6,18 51:4 | 122:13 124:20 |
| 63:23 70:11 | 45:15,16 | 51:10,14,21 | 125:11,15,19 |
| 79:16 130:16 | **capable** 50:10 | 56:13 79:2 | 126:1 127:4,12 |
| 168:24 228:13 | **capacity** | 80:12 93:14 | 159:25 |
| **called** 19:21 | 232:25 | 96:4 97:19 | **casting** 112:22 |
| 26:10 30:25 | **capturing** | 99:5 101:2 | 123:9 127:17 |
| 58:24 61:6,22 | 225:1 | 103:16 106:2 | **categories** 64:5 |
| 84:11 91:6 | **car** 200:17 | 107:1,5,14 | 86:20 117:2 |
| 120:1 203:11 | 201:14,22 | 114:25 115:13 | 128:24 137:4 |
| 203:12 211:8 | **card** 135:22 | 126:15,16 | 137:20 138:6 |
| **campaign** | **care** 50:22 | 131:21 136:12 | 140:5,9,13,21 |
| 91:20,22,23 | **carolina** 43:18 | 155:9 156:20 | 140:22 141:14 |
| 93:3,9 95:3 | 43:22 44:9,11 | 158:25 159:14 | 141:15,17,25 |
| **cancel** 98:24 | 44:13,22 48:1 | 169:20 174:20 | 142:1 144:12 |
| 99:9 164:1 | 54:5,21 74:25 | 188:9 195:18 | 146:24 148:25 |
| 199:23 | 75:1 76:14,14 | 197:20 202:13 | 149:8 150:15 |

[categories - chart]                                                                Page 15

150:16,25
151:3,21 152:1
152:4,8 154:5
159:3,9 169:4
172:18 181:11
186:10 189:6,9
**categorization**
64:8 82:17
132:12,24
133:1 155:14
**categorizations**
84:4 140:6
150:2
**categorized**
61:15,16 96:1
158:24
**category**  81:6
82:5 99:12
128:21,22,22
129:2,22
137:21 140:19
141:19,22
142:7 152:19
154:13 188:11
**catherine**  1:21
2:17 10:5
234:22
**caucus**  4:17
**causal**  25:18
45:20 52:13,15
78:13 79:3,13
80:6,10,16,19
80:25 81:2
90:24 91:1

108:22 129:13
144:25 145:21
162:7 165:25
166:3,11
**causation**
163:2
**cause**  26:21
29:17 53:9
108:21 145:22
180:2 209:25
**caused**  53:9
**caution**  165:16
165:24
**caveat**  96:22
**caveats**  129:18
**cell**  231:15
**cells**  181:7
**centennial**  11:5
**center**  188:13
188:16
**certain**  123:25
132:4 135:1
169:14 191:15
227:24
**certainly**  12:14
12:25 45:3
49:21,25 92:17
93:13 108:22
111:3 142:2
144:24 150:23
164:9 176:25
196:1 202:1
210:8

**certified**  2:17
234:1
**certify**  234:2,15
**ces**  23:21 31:22
35:7 165:11,13
167:18,20
170:16 171:5,7
172:6,17 173:8
174:4,10,21
175:20,24
176:1,6 180:15
180:21 181:25
183:19 186:14
187:14,15,21
204:4,9,13
205:3 206:25
208:3 229:9,13
230:15,24
231:12,21
232:2,22
**cetera**  85:24
211:18
**challenge**  141:1
**challenging**
37:15
**chance**  173:23
229:3
**change**  15:7
29:15 37:19,21
37:24 67:7
69:21 70:2,4
79:4,20 85:6,8
92:3,10 93:12
112:21 137:13

139:1 175:2
223:7 227:9
236:4,7,10,13
236:16,19
**changed**  38:19
39:4 41:1 80:8
87:24 96:18
109:7 131:14
153:6 173:14
176:14 227:8
**changes**  41:7
53:10 67:9,21
78:15,25 79:8
79:9,21,22,22
98:17 126:24
129:3,4 133:2
138:24 156:5
158:16 223:24
225:5 235:10
237:6
**characteristic**
146:6
**characterizati...**
112:20
**characterize**
103:8 113:9
144:21
**characterizes**
181:9
**chart**  59:20,22
114:18,18
147:16 149:4
156:25 158:20

chase   166:20
chat   11:17
chatham   6:3,4
chatman   24:22
   30:24 31:1
chatman's
   23:18 30:9,12
   31:6 190:1,24
check   71:8
   118:10 177:6,9
   177:16,19,20
   177:25
checked   148:18
   154:22
choices   97:5
   110:18
choose   47:1
   51:25 75:8
   99:9 108:9
   122:25
chose   96:12
   141:24
chunks   133:1
church   10:19
circle   6:12
   155:19
citation   90:6
cite   161:22
   190:6
cites   91:5 186:5
   197:11
citizen   65:17
   66:2 224:18

citizens   227:24
city   19:17
civil   3:4,14 7:3
claim   30:14
   31:8,13 36:6
   37:12,16 39:16
   39:20,25 40:12
claims   9:3
   18:12 21:21
   22:6,10 27:2
   31:10 36:7,17
   36:24 37:2,8
   37:14,19 40:11
clarification
   11:25 59:3
   154:3 166:12
   223:10 229:8
clarified
   111:11 185:9
clarify   16:16
   49:24 56:3
   65:2 68:1,4
   76:12 81:15
   113:5 119:3
   122:5 125:21
   142:6 148:6
   154:2 162:3
   166:9 167:24
   185:6 220:23
   226:12
clarifying   60:9
   223:11 225:14
clarity   27:23
   69:13 86:8

93:22 107:24
   128:16 163:6
   177:2 185:15
clark   6:17 82:2
   209:20 211:16
   212:8 213:3
   219:4,13,16
   220:4 221:21
   222:13 225:4
   226:15
clark's   24:24
   94:21 211:4
   212:2,10,23
   213:12 214:1,6
   214:9 215:2,13
   216:9 217:10
   217:15 218:3,8
   218:8,14
   219:23,24
   222:22 223:12
   225:18,20
   227:12
clarkhill.com
   6:21,22
classification
   83:4 131:2
   140:19,23,25
   141:2 150:3,10
   150:11 182:7
   182:10,21,24
   183:2 184:5
   189:5
classifications
   84:2

classified   63:20
   81:6 119:19
   141:16 159:2
classify   53:24
   140:8 148:22
   150:8 155:19
   182:14
classifying
   149:19
clause   49:3
   91:16
clayton   6:3
clear   11:22
   12:8 29:6 36:3
   44:5 51:3
   58:23 60:12
   69:25 80:24
   82:6 89:4
   90:13,22 91:7
   97:21 99:24
   113:10 151:12
   154:16 157:15
   166:13 177:3
   179:15 184:3
   188:19 197:12
   197:19 206:7
   210:22 218:2
   223:6
clearer   105:14
clearly   142:7
clergy   3:19
clerk   187:12
clifford   3:21

**[clinton - competitive]**                                    Page 17

**clinton** 91:25
  92:19
**clinton's** 91:23
**close** 93:1
  100:7 104:10
  104:12 141:12
  144:18 198:7
**closed** 200:3
**closely** 29:24
  36:20
**closes** 153:10
**cobb** 192:25
  193:11 196:5
  196:12,14
  199:12 201:13
  202:5
**code** 30:16,24
  31:1,6,12,15
  102:3 116:5
  128:23 130:24
  140:14 155:14
  173:5 185:8
  188:9 192:9
**coding** 31:22
  35:7 130:18,22
**coincides** 79:20
**colleague**
  209:18 210:14
**colleagues**
  10:22 160:23
**color** 180:3
**columbus** 4:19
**column** 58:24
  68:21 73:1

109:25 110:5
116:1 142:18
157:24,25
158:1 218:25
221:21,21,23
222:14,19
**columns** 56:6,6
56:7 58:21
73:5 102:20
110:5,11 116:2
**combination**
29:7 75:10
**combining**
152:6
**come** 18:20,21
24:1,2 35:8
81:4 82:9,10
100:7 102:4
167:3,11 173:6
**comes** 28:21
35:12 71:4
199:14 207:13
**comfortable**
216:13
**coming** 159:2
**command**
130:23
**commencem...**
5:10 6:24
**committee** 3:4
**common** 98:10
164:17 201:13
220:14,19
221:1

**community**
65:19
**company** 26:15
**comparable**
137:24
**comparative**
222:14,18
**comparator**
227:8
**compare** 75:18
76:2,15 104:24
113:3 137:22
156:3 157:9
170:5,20 171:3
216:14 224:1
225:22
**compared** 55:6
56:11 74:23
80:14 113:14
113:16 116:16
125:10 158:16
171:12 175:24
196:6 212:1
224:11 225:23
**comparing**
34:2 44:12
59:12,24 77:9
80:20 107:12
112:25 116:12
116:22 139:20
142:22 143:16
143:17,20
146:19,24
148:7 172:14

208:13 211:24
215:3 216:7
221:24
**comparison**
71:22 76:8,18
77:2 78:23
80:25 89:16
92:4 106:24
115:1,24
125:14 130:19
142:2 147:20
150:17 151:2
156:8,12 157:4
158:22 162:19
171:18 172:13
216:24 217:5
225:25
**comparisons**
74:12 78:12,14
78:18 79:12
89:1 91:3
142:17 165:24
224:4
**compensating**
205:4
**compensation**
205:7
**competing**
84:20
**competitive**
27:2 45:24
77:25 78:6
91:13,18 93:7
93:17

**[competitiveness - contains]**                                    Page 18

competitiven...
92:9
**compilation**
36:24
**compile** 75:24
**compiled** 16:23
16:25
**complete** 49:20
147:20 154:1
209:14 237:8
**completed**
22:25 23:4
174:21 180:21
180:22 235:16
**completely**
164:9 184:3
230:16
**completing**
174:13
**completion**
234:13
**complicated**
48:5,10 100:22
123:20 173:24
**complication**
131:16
**comply** 54:11
**component**
39:11 49:22
68:15 123:8
191:3
**components**
54:20 190:19

**composition**
45:6
**compute** 176:4
**computed**
176:2
**concept** 148:17
**concern** 67:1
84:1 152:25
190:10 195:19
**concerned** 3:19
**concerning**
37:12 152:21
153:6 161:23
171:10 172:1
174:3 177:16
178:20 202:13
207:1 208:4
209:9,19
**conclusion** 27:9
45:3 231:10
**conclusions**
28:2 60:23
72:3 177:4
227:7,11
**condition** 204:6
**conditions** 48:6
204:4 205:10
**conduct** 26:12
29:17 49:10
75:8 154:19
**conducted**
30:19 44:9
49:10 88:2
144:2 145:2

229:13 231:3
**conferences**
93:8
**confidence**
17:25 18:2
195:11,14
231:10
**confident**
200:22
**confirm** 53:6
56:24 57:2,15
86:13 116:25
135:20 176:1
219:17 225:19
**confirmed** 32:2
33:14 34:2
**confirming**
57:23
**conform**
148:20
**confounder**
146:13
**confounders**
145:3
**confounding**
145:25
**confuse** 79:4
84:17
**confusing**
79:21
**confusion**
161:24
**conjure** 205:4

**connect** 124:4,5
124:5
**consequence**
108:17
**consequences**
48:7 50:23
165:3
**consider** 25:24
78:5 140:4
190:1
**consistent**
197:18
**consistently**
114:22
**conspiracy**
164:5
**constituents**
227:15,19
**constraints**
166:17
**construct** 58:10
123:21
**constructed**
229:22
**consuming**
130:25
**contain** 122:3
**contained**
31:12 34:25
97:10 121:7
177:15 209:13
**contains** 61:12
61:13 122:1

**[contest - correct]**                                                      Page 19

| | | | |
|---|---|---|---|
| **contest** 45:25 | **copy** 18:19 | 100:21 101:15 | 156:4 157:2 |
| **contested** 36:20 | 20:11 | 102:12 104:16 | 161:15 162:6,7 |
| **contesting** | **core** 80:19 | 105:3,14 106:1 | 162:17,23,24 |
| 219:24 | **corr** 41:8 | 106:7,14 108:4 | 163:10 165:9 |
| **contests** 9:4 | **correct** 13:10 | 108:5,7,8 | 165:10,13 |
| 18:13 | 13:11,15,18,22 | 109:4,5,8,9,12 | 166:22,23 |
| **context** 25:20 | 13:23 14:1,2 | 109:16 111:20 | 167:1,2,13,14 |
| 36:23 78:14,18 | 16:19,24 19:12 | 111:21 113:4 | 167:19 168:3 |
| 79:1,8 90:23 | 19:18 21:14 | 113:17,23 | 172:20,21,24 |
| 112:7,15 123:4 | 23:1,2 24:15 | 115:11 116:19 | 172:25 173:11 |
| 123:14 124:17 | 24:16 28:25 | 117:7,20 | 174:5 178:13 |
| 176:25 227:4 | 29:1 30:9,10 | 118:25 119:1 | 178:23 179:2,7 |
| **continue** 40:15 | 31:11,18,19 | 119:13,14 | 179:11,19,20 |
| **continued** 4:1 | 33:9 36:9,17 | 122:18 128:10 | 179:24,25 |
| 5:1 6:1 7:1 9:1 | 39:23 42:3,4 | 128:11,14 | 180:4,5,16,17 |
| 79:18 | 43:19 45:13 | 129:21 130:10 | 183:5,5 184:25 |
| **continuing** | 52:14 53:10,11 | 130:11 131:6,7 | 185:1 186:12 |
| 115:15 124:19 | 53:17,22 55:7 | 131:25 133:17 | 187:6,7,19,20 |
| 194:18 | 55:8,21 57:24 | 134:13,14,17 | 188:1 189:5 |
| **contrast** 15:20 | 61:3 65:19 | 136:1 138:8,10 | 190:4,5,9,11,12 |
| 130:19 183:24 | 66:7,18 69:15 | 138:22 139:5 | 190:17,19,23 |
| **contributed** | 69:17 71:2 | 139:10 140:10 | 191:8,17,24 |
| 179:6,17 | 72:15 74:14,15 | 140:11 142:10 | 193:23 195:5 |
| **controversy** | 74:21,22 76:7 | 143:17,17,19 | 195:12 196:18 |
| 110:23 | 76:7,22 77:3 | 144:15 145:14 | 197:23,24,25 |
| **convenient** | 77:12,21 78:4 | 145:15 146:12 | 198:7,19 |
| 50:24 51:6,8 | 80:5 81:1,8 | 146:23 149:9 | 199:18,24 |
| 89:17 | 82:23,24 83:15 | 149:10,13,14 | 200:1 208:10 |
| **convicted** 99:6 | 83:17 88:13,15 | 149:16,17 | 208:11,12 |
| **cool** 233:7 | 89:7 94:4,5 | 151:6,15,16,18 | 213:1,21,25 |
| **cooperative** | 95:24,25 96:8 | 151:19,23,24 | 214:8,18,21 |
| 165:13 180:14 | 96:9,13,14,20 | 152:1,2,4,12,13 | 215:6,9,23 |
| **copies** 87:3 | 96:21 97:5,6 | 152:23,24 | 217:10 218:13 |
| 235:14 | 97:12,13 | 153:3,4,14,15 | 218:21,22 |

**[correct - cvap]**                                                    Page 20

220:6,11,12,24
222:16 228:1
230:24,25
237:8
**corrected**  183:7
218:7
**corrections**
237:6
**correctly**  43:20
46:14,23 51:1
58:13 61:13,18
142:17,21
162:1 167:16
189:7 205:24
208:16 218:7
**corresponded**
30:4
**corresponds**
16:21
**cost**  50:24
51:15
**counsel**  11:9
12:18,20 65:5
65:12 101:17
161:7 209:20
209:24 235:14
**count**  197:3
199:19
**counted**  119:6
119:13,13,17
119:18,21
122:12,18
127:4,13
133:14 160:2,4

**counterfactual**
80:14,21 157:6
195:15
**counterfactuals**
158:10
**counties**  20:20
40:22 111:7
131:23 132:5
134:15 135:1,5
149:19 197:22
**country**  221:3
**county**  5:18 6:3
6:3,4 40:21,23
61:14,14
116:25 117:4,7
118:3 120:15
135:22 136:4,6
136:13 149:18
149:24 185:20
191:19 192:25
193:11 196:6
196:12,14
198:17 199:12
201:13 202:6
**couple**  10:18
18:8,10 35:17
41:9 50:15,17
69:8 74:10
86:21 101:8
108:25 110:17
114:2 119:22
124:24 173:25
211:1,23,25
218:15 221:16

226:4
**course**  15:3
25:16 28:16
60:5 67:1
69:21 71:9
101:19,22,25
104:19 135:19
149:23 155:21
160:5 161:9
171:23 204:22
209:23 232:1
**court**  1:1 2:1
12:8 14:7,20
16:4 19:18,18
33:1 35:23
41:22 56:22
57:19 192:23
**cover**  209:7
**covered**  69:12
214:5
**covers**  183:21
**covid**  96:24
**cps**  75:12 76:15
76:25
**craft**  47:1
**crcs**  209:11
**created**  67:14
**creates**  72:9
188:24
**criticism**  27:23
**criticisms**
71:20,23
**criticizes**
186:23,24

**critique**  23:23
183:24 202:18
203:1,4 205:14
205:14
**critiques**  181:1
181:2 206:3
**critiquing**
186:2
**cross**  78:18
80:24
**crowell**  3:20
**crowell.com**
3:23
**crr**  1:21 234:22
**cs**  174:21
235:15
**csr**  1:22 10:5
234:23
**cure**  54:22
155:13,15
**current**  11:2
36:10 75:14
76:4 77:16
83:1
**cusick**  4:10,13
**cut**  62:23
166:19 179:15
216:17
**cv**  18:18,19
**cvap**  55:16
58:24 65:18,23
66:2,8,14,20,25
67:2,11,15,22
67:24 68:6,12

68:13,14,17,18
68:21 69:5,6,9
69:14,16,19,22
70:1,9,11,14,18
70:25 71:1,1,6
71:21 72:9
73:10 85:7,7
220:11 224:7
224:22 225:11
227:1,3,23
228:4
**cvaps**  67:7 70:3
224:5,22,24
**czatz**  3:23

**d**

**d**  5:13 123:6
**d.c.**  3:6,22 4:6
5:6
**daily**  98:17
**daniel**  7:3
**data**  16:12,14
16:16,17,20,21
16:22,23,25
17:1,1 23:22
23:24 30:6
31:2,5 34:8
58:14,22 60:5
60:22 61:1,5
62:1,5 65:23
67:14 69:5
74:25 75:3,11
75:18,21,22
76:4,15,23

77:2,15,16
88:12 93:24
100:20 101:14
102:9,10
103:16,17
110:18 111:2
112:24 130:8
149:18,24
155:9 165:9,22
166:5,11
167:19 170:16
171:18 174:4
174:23,24,25
175:19,22,24
176:16,22
180:13,14
183:4,7,11,18
183:19 184:11
184:15,20,24
185:3,5,7,22
186:8 187:10
203:15,15,16
203:17,17
204:1,6,11,14
205:3,25 206:1
206:21,22
207:1,4,5,10,12
208:3,7 209:4
209:12 228:21
229:9 230:20
230:24 231:2,3
232:5
**date**  38:13,17
39:10 41:5

86:7,17 97:25
132:6 133:13
133:21 134:21
134:25 149:13
149:20 157:7,8
186:4 191:15
191:15,19
234:18 236:24
237:12
**dated**  9:19
234:20
**dates**  87:11
**davin**  3:14
10:18 211:3
**day**  31:4 96:3
127:5 130:17
144:19 164:21
186:11 193:20
193:21 198:8
199:1,6,15,24
228:8 237:15
**days**  153:9,10
154:25 235:16
**dc**  76:11
**deadline**  38:7
39:2 129:12
138:2 140:9,15
140:15 142:13
142:19 143:3
144:14 145:1
145:24 154:21
155:19,20,22
155:25 156:5
157:23,23

158:15 159:4
193:24 194:8
195:16 198:11
**deadlines**
191:11
**deal**  11:18
64:15 81:5
**dealing**  81:16
160:25 165:6
202:21
**deals**  125:2
**dealt**  149:20
**debates**  79:25
**december**
58:18 88:12
229:17,21
**decide**  91:8
99:11 110:19
111:22 112:18
**decided**  58:21
**deciding**
112:17
**decimal**  207:24
**decision**  110:21
**decisions**  19:19
**declare**  237:4
**decline**  129:15
**declined**  55:6
**declines**  224:10
**decrease**  178:5
**decreased**  27:5
113:16 172:3
**decreasing**
84:22,24

deemed   237:6
default   83:18
defaults   83:2
defendant   6:3
defendants   5:3
  5:12,18 6:10
  6:16 11:15
defense   4:10
defer   118:13
define   62:8
  103:14 104:20
  140:12 141:3
  227:19
defined   51:7
defines   90:19
  123:15
definite   161:23
definitely
  220:18
definition
  25:12,16,19
  48:17 54:13
  80:16,20
  193:16 212:10
  230:12
deliver   192:5
  192:12 195:10
  200:5
delivery   163:12
  190:18 195:5
  195:12,15
demobilizing
  46:11,20 47:11
  47:14 48:18

49:2
democrats
  43:21 44:20
  45:2 92:17
demographic
  120:14,25
demonstrate
  201:10
denominator
  65:16,25 66:3
  66:15 67:4,14
  67:16 68:25
  72:4,5 73:6,6,7
  73:8,9,13,15,24
  73:24,25 81:13
  81:25 112:18
  115:5 148:16
  153:22,24
  203:7,9 218:19
  219:5 220:10
  220:13 224:25
  226:25 227:8
  228:3
denominators
  71:22 72:2,13
  110:2 112:5
  203:7
department
  11:4
departs   205:16
departures
  94:10
dependent   26:1
  26:7,10,20

27:12
depending
  44:15 55:16
  79:24 141:2
  207:15 227:19
depends   103:14
  115:23 188:12
  195:4
depo   83:12
deponent
  235:13 237:3
deposed   19:13
  19:22 25:1
deposing
  235:13
deposition   1:12
  2:12 5:10 6:24
  12:25 18:9,17
  23:16,18,19
  24:14,18,20
  25:3,5,10 28:8
  28:10,15,17,24
  29:5,11,13,15
  29:20 30:7,9
  30:12,18 31:17
  32:1 33:13
  34:3 35:9 42:7
  57:11 75:7
  83:1,13 90:23
  127:25 160:22
  167:10,12
  172:6 173:4
  184:1 185:8,19
  202:15 234:12

describe   34:4
  34:10 41:24
  61:1 62:22
  94:8 120:2
  124:20 133:2
  165:23,25
  166:3
described
  111:13 177:10
  182:16 201:1
  203:21 208:24
describes   35:1
  204:20
describing
  69:18 73:2,3
  180:19 196:2
description
  8:11 9:2 52:10
  108:10,23
descriptive
  84:21
design   26:3
  27:3
despite   25:13
  91:18 95:3
detail   31:23
determinants
  165:1
determine   50:6
  117:1 119:25
deterred   18:5
deterrent   44:17
  53:21,24 54:2
  54:9,14

**[develop - discussing]**                                      Page 23

| | | | |
|---|---|---|---|
| **develop** 209:25 | 218:23 219:3 | 208:22 209:12 | **disagree** 118:7 |
| **diane** 6:18 | 221:17,24 | 213:10 224:4 | **disagreement** |
| **differ** 231:13 | 223:6,14 | 225:6,9 226:24 | 176:13 |
| **difference** 57:4 | 224:25 225:21 | 227:1,11 | **disbarment** |
| 62:20 69:2 | 225:24 | 229:21 230:7 | 19:14 |
| 71:4 82:16 | **different** 44:4 | 231:5,8,8 | **disclose** 210:8 |
| 113:7,11 115:3 | 47:23 49:9 | 232:23 | **disclosed** 25:23 |
| 116:5 146:2,5 | 53:16 62:7,15 | **differential** | 50:9 |
| 150:20 173:14 | 63:12,15 69:15 | 44:10 56:9 | **discriminatory** |
| 175:25 181:17 | 70:10,13,19 | 84:12 85:4,10 | 49:13 50:25 |
| 201:10 206:2 | 72:12,13 76:3 | 85:12 216:6 | 51:22 |
| 207:17,25 | 77:11,20 80:19 | 217:6,8,12,14 | **discuss** 17:12 |
| 208:9 212:3,24 | 90:14 93:12 | 218:10 | 22:16 31:23 |
| 213:20,24 | 95:23 96:2,10 | **difficult** 49:6 | 37:7 80:2 91:9 |
| 215:4,7,10,15 | 96:12,12,18,19 | 79:19 84:20 | 95:17 96:7,24 |
| 215:19 216:3 | 97:4 102:15,20 | 85:2 90:18 | 129:9 133:7 |
| 217:19,21 | 102:20 104:14 | 92:24 124:1 | 140:17,18 |
| 219:19,21 | 104:24 109:3,3 | 145:4 150:1 | 182:7 185:6 |
| 221:25 222:2,6 | 109:7,15 110:2 | 191:25 195:21 | 192:3 202:3 |
| 222:15,19,23 | 111:23 112:5 | 195:22 205:4,9 | 209:8,12 |
| 232:1,17 | 115:4 117:2 | **difficulty** 124:6 | 212:19 220:20 |
| **differences** | 120:14 121:17 | 191:1 | 220:22 221:8 |
| 48:21 64:13,21 | 124:18 128:20 | **dig** 115:1 | **discussed** 77:19 |
| 69:9 71:18 | 129:12,19,20 | **direct** 72:23,25 | 132:20 138:19 |
| 72:10 74:17 | 130:1 131:10 | 219:22 | 149:11 154:5 |
| 81:5 100:18 | 132:12 133:5 | **directed** 27:24 | 167:9 185:14 |
| 129:11,24 | 137:20 138:6 | **direction** 91:14 | 197:4 203:24 |
| 145:4,25 | 140:9 143:20 | 93:18 234:8 | 230:20 |
| 146:11,25 | 145:21 146:22 | **directly** 187:5 | **discusses** 29:20 |
| 171:13,15 | 146:22 163:14 | 192:13 200:5 | 177:5 |
| 181:14 205:21 | 165:9 171:9 | 200:14 | **discussing** 83:1 |
| 207:18 212:17 | 177:23 178:10 | **disabled** 40:17 | 95:2 180:15 |
| 214:1,3,4,5,10 | 186:9,13 | **disadvantage** | 182:25 203:8 |
| 214:19 216:11 | 200:10 203:7 | 48:2 | 208:3 228:19 |

[discussing - dr]                                                    Page 24

228:20,20
230:21
**discussion**
  21:18,19 24:8
  32:24 48:25
  128:25 150:8
  161:10 211:4
  226:3
**discussions**
  110:25 164:10
**disentangle**
  84:20 142:8
**dislike**  45:16,20
**disparate**
  124:10,14
**disparity**  156:9
  159:18
**dispositional**
  176:8
**disproportion...**
  42:22 43:12
  45:1,2 48:6
  49:7 125:8,17
  156:5 158:17
  159:19 180:4
**disproportion...**
  43:22 47:2,25
  48:2 118:2
  127:14 179:1
**dispute**  150:10
  218:6 230:23
**disputing**
  167:18

**disregarded**
  188:2
**distance**  30:2
**distinct**  54:2
  131:10 208:18
  218:4
**distinction**
  141:18 170:7
  188:19 208:15
**distinguish**
  29:10
**distribution**
  34:15 39:21
  41:3 146:4
  192:14
**district**  1:1,2
  2:1,2 227:24
**divide**  141:25
  141:25 220:4
**divided**  68:16
  119:10
**dividing**  69:22
  70:3
**division**  1:3 2:3
**dlaross**  6:22
**doctor**  10:6
**document**
  54:19,23
  189:20
**documenting**
  145:20
**doing**  13:3
  63:14 70:19
  81:12 82:23

95:9 100:19
119:8 142:21
167:24 174:14
210:4 223:9
**donald**  92:22
**doubt**  177:14
**douglas**  185:20
**doyle**  11:5
**dr**  8:22 10:14
  11:11,19 13:9
  16:22 18:14
  23:12,16,17,18
  23:18,23 24:11
  24:14,24,25
  25:3,12,21,23
  26:25 28:8
  29:8,14,20,25
  30:1,5,9,12,24
  31:1,6,17 32:2
  33:5,13,21,24
  34:9,24 35:9
  37:18 38:20
  52:24 56:24
  57:6,16,20
  58:3,9,13 60:5
  61:19 62:14,21
  63:6,9,14,19
  66:4,4 67:21
  67:22 68:2,5
  69:10 70:6,9
  70:23 71:1,10
  71:21 73:7,11
  73:12,25 74:1
  81:5 82:2,2,15

82:25 84:1,6
84:15 85:1,18
85:20 86:11,15
86:18 87:2,13
89:14,18,22
90:7,14,15,16
90:19 91:1,5,6
91:15,17,17
93:16,16,24
94:21 95:1,16
100:15,19
108:15,18
117:14,23
128:1 130:20
141:19 144:16
144:23 146:14
150:5 158:9
160:18 167:4
167:12,25
168:8 170:9
173:2,4,11
176:10 177:5
178:3 181:1,9
181:20 182:23
183:6,15,24
184:4,5 185:16
185:19,20
186:1,5,22
190:1,24 193:2
197:11 202:12
202:17 203:4
203:25 204:19
205:10,20,23
205:25 206:2

**[dr - effect]**                                                Page 25

206:23 209:20
210:11,24
211:4,16 212:2
212:8,10,23
213:12 214:1,6
214:9 215:2,13
216:9 217:10
217:15 218:3,8
218:8,12,14
219:4,13,16,23
219:24 220:4,9
220:13,13
222:22 223:12
225:4,18,20
226:15 227:12
228:7,19,19,21
229:24,25
230:5,12
232:21
**drafted**  13:21
**draw**  170:7
**drennon**  5:13
**drill**  69:8
**drilling**  92:25
**drive**  5:20
**driver's**  39:13
   44:13,18 135:8
   135:24
**driving**  94:24
**drop**  16:13,15
   30:3 112:4
   134:4,8,16,18
   136:3,5,10,14
   144:18,25

145:5,7,22
146:11,16
178:15,17,22
179:5,16,22
180:2,10
181:15,25
182:2,2,15,25
183:1,4,4,7,8
183:11,14,16
184:15 185:5
185:17,23
186:2,15,18
187:2,4,6,9,15
187:17,23
188:2,19,24
189:3,8 190:22
190:25 191:4,7
191:21 194:19
194:20 196:2,5
196:12,17,25
197:3,8,9,12,14
197:23,24
198:4,6,12,15
198:18 199:1,5
199:20 201:19
202:19 203:6
203:19,20
204:7 205:2,7
205:21 206:6
206:15 207:3
207:10 208:5,9
208:23
**dropped**
125:20 137:3

138:7 196:10
**dropping**  39:17
**drosborough**
   3:17
**drug**  26:15
**due**  155:5
**duma**  6:11
**duplication**
   17:4
**dynamic**  98:16
**dynamics**
   47:23 62:5
   225:9

**e**

**e**  123:6 236:3,3
   236:3
**earlier**  117:12
   129:1,14 131:6
   146:3,4 158:14
   165:17 167:9
   173:3 174:19
   189:6 198:6
   223:8 228:21
**early**  39:20
   40:20 96:2
   110:7,9,12,13
   110:14 111:19
   112:2,13,15,16
   112:19 113:15
   113:18 115:6
   115:16 116:7
   116:17,22
   117:1,3 118:4

153:2 154:7,11
154:15 164:22
198:21 199:5
199:24
**easier**  62:12
   87:9 114:1,18
   178:23 213:10
**easiest**  147:7
   156:15
**eastman**  19:14
   37:18,18
**econometrics**
   79:25
**edit**  126:5
**effect**  26:22
   42:22,24 43:13
   43:23 44:11,17
   44:18,19,24
   45:1,2,5,20
   46:25 48:5
   49:7,7 50:11
   53:21,24 54:2
   54:3,4,9,10,14
   54:17,20 78:13
   79:3,13 80:7
   80:10,14,15,16
   80:19,25 81:2
   95:5 109:14
   130:4 131:20
   133:6 144:25
   146:16 148:14
   148:18,21,23
   149:16 159:19
   159:24 160:1

162:8 163:1
165:25 166:3
166:12,25
**effective**  26:23
47:3 50:24
51:15 197:16
**effectively**
208:1
**effectiveness**
195:11
**effects**  17:8,14
25:18 30:3
49:15 50:5,7
50:13 52:14
90:20,24 91:1
163:3
**effort**  37:1 68:7
100:7 124:20
**eight**  95:4
**eileen**  4:18
**eileenm**  4:21
**eitan**  42:2
**either**  15:6
16:21 34:24
55:15 56:11,16
61:14 80:4
109:7 111:10
118:6 121:19
153:2 157:23
164:21 166:25
169:9 179:5
188:1 197:20
199:22 202:13
207:16

**elected**  227:14
**election**  9:4,8
18:13,14 25:25
27:4,7,19 28:5
36:7,25 37:10
38:22,22 39:1
40:15 41:7
42:1 44:12
45:6 49:4
50:22 54:3,4
56:11,12,16
59:1,14 60:1
62:7,9 73:3
75:15 86:22
88:19 89:1
90:11 91:10,11
91:18 92:7
93:1 94:4,17
95:5 96:3,23
97:1,10,15
98:9,19 100:25
108:24 109:25
110:1,6 120:19
121:3,20 122:3
122:4,7,11
123:4,23
124:18 125:16
127:5 129:10
132:7,7,21
134:11 139:4,5
139:6 144:19
145:12,13
153:10,10
155:23 157:22

157:22 162:14
163:12,24
164:10,21
165:14,15
170:24 173:13
174:18 177:15
180:15 182:3
182:17 183:15
185:7 186:20
187:3,9,11,13
187:16,16,18
187:24 188:14
190:7,11,21
191:6,11,16
192:4 193:20
193:21 194:7
194:24 195:9
195:18,19
198:8,13,19
199:1,6,8,13,15
199:21,23
200:3,11,14
207:15 210:4
219:14,18
224:12 229:20
229:24 230:3
**election.zip**
97:24
**election.zip.**
97:11 121:9
**elections**  6:3,3
19:22 27:1
37:25 40:16
46:12,21 47:13

47:15 52:11
56:17 58:16,19
59:6 60:13
88:13,23 89:2
89:4,6,14,15,18
90:4,17 91:8
92:4,10,11,12
92:14,14,15
94:3,7,13,14,16
94:20 95:24
96:7 108:3
121:17 122:6
124:21 126:2,3
126:4,18,21
128:10 129:12
130:10 134:20
138:20,25
139:10 142:11
142:22 145:18
146:20,21
147:1 161:20
161:20 164:13
168:3 171:13
172:10 184:25
193:1,11 202:7
**electoral**  45:24
124:2
**electorate**  45:7
**electronic**
20:21,25
**elias**  4:4
**elias.law**  4:7
**eligible**  93:25
99:8 162:12

**[eliminated - examination]** Page 27

**eliminated**
 134:22
**elimination**
 108:17
**employee**
 234:17
**enable** 177:19
**enables** 120:20
**enacted** 138:19
**enactment**
 131:12 139:5,7
**ended** 67:14
**endpoints**
 169:20
**ends** 230:18
**engage** 17:11
 31:7 64:9 85:1
 184:3 187:8
 192:5
**engaged** 21:20
 29:22 51:16,21
**engagements**
 20:5
**engaging** 84:9
**english** 6:11
**enjoined** 132:5
**ensure** 107:24
**enter** 11:17
**entirely** 48:25
**entry** 120:11
**envelope** 38:13
 39:10 131:25
 132:6 133:13
 133:15,16

 134:21 135:1
 144:1 149:13
**equal** 73:11
 74:2 113:7
 168:19 208:1
**equals** 215:5
**equations**
 48:20
**equivalent**
 158:2 169:6
 203:12 206:8
 206:16
**errata** 235:11
 235:13,16
**erron** 186:23
**erroneously**
 186:25
**error** 32:3,7
 33:14,18 34:25
 35:2,5 84:12
 84:14,17,18
 85:5,10,12
 168:16,18
 183:21 212:8
 212:10
**errors** 14:25
 67:18,19,23,24
 183:6 205:5
 212:11 216:12
 218:13
**essential** 78:14
 79:7
**establish** 133:4
 173:10 184:22

**established**
 203:10
**estimate** 26:21
 59:1 64:2 74:1
 79:3 80:6
 90:24 144:25
 169:2 177:3
 203:18,24
 204:11,16,17
 206:16 207:9
 213:12 218:8
 231:9 232:6
**estimated** 30:4
 44:24 213:17
**estimates** 26:4
 27:8 30:5 58:9
 65:19 66:6,14
 66:20 68:12
 178:17 180:19
 211:17 212:23
 214:6
**estimating**
 25:18 69:14
 90:21,24 91:1
**estimation**
 79:24 202:18
 205:15
**estimator**
 204:3,24 205:1
**estimators**
 204:22 205:16
**et** 85:24 211:17
**evaluate** 49:12
 51:25 83:13

 205:16,21
 210:2
**evaluated**
 51:24 83:11
**evaluates** 36:6
**evaluating** 26:2
 67:13 204:22
 204:24 205:14
 205:20
**evaluation** 9:3
 18:12 37:21
 39:11 202:17
 203:4
**eventually**
 16:22
**evidence** 21:21
 34:6 83:6,7
 85:4 91:5
 178:3 184:3,9
 184:9 197:12
**exact** 62:4
 111:9 116:5
 186:20
**exactly** 19:12
 26:9 66:12
 68:4,23 113:6
 118:20 137:10
 172:1,11 177:3
 201:2 212:16
**examination**
 8:2 10:12
 210:16 228:17
 232:14

**[examine - factor]**                                          Page 28

**examine**
  170:16
**examined**  10:9
  44:10 221:12
**examining**
  27:10
**example**  26:1
  26:22 43:18
  48:1 54:5,19
  54:21,23 63:9
  63:25 66:13
  67:21 76:9
  80:13 89:18
  92:17 94:21
  98:25 100:14
  103:22 105:12
  143:18 148:13
  158:9 160:2
  223:25 226:7
**examples**  99:4
**exceeding**
  197:13
**exceeds**  226:20
**excel**  120:6
**except**  28:14
  58:17 164:20
  172:11
**exception**
  102:10
**excitement**
  45:15
**exclude**  81:11
  82:3,14 230:12
  230:14

**excluded**  27:21
  28:5 98:6
**excludes**  27:4
**exclusion**  27:23
**exclusions**
  27:20
**excuse**  16:11
**exhaustive**
  121:15
**exhibit**  8:12,15
  8:18,21 9:3,8
  9:12,16,19
  14:5,6,17,19
  16:2,3 22:24
  23:4 32:25
  33:3 35:21,22
  36:1 41:15,21
  55:2 56:20,21
  57:14,18 58:1
  71:11,16
  117:16,17
  181:22 189:14
  189:20 192:19
  192:21,22
  211:6
**exhibits**  8:10
  9:1 181:21
**exist**  128:23
**existence**  45:24
  201:9
**expand**  101:23
**expanded**
  199:8

**expect**  178:7
  188:10
**expedition**
  194:7
**experience**
  184:2
**expert**  8:12,15
  8:18,21 9:12
  13:14 14:11,18
  16:7 19:4,5,16
  22:25 33:5,21
  42:8 52:16
  56:25 67:20
  74:22 89:20
  99:18,21
  109:18 182:24
  186:1 197:7
  209:7,20
**experts**  23:10
  25:1 65:13
  79:2 96:4
  108:13 158:7
  165:23
**explain**  48:1
  141:6 173:23
  184:4 227:3
  229:3,5 231:1
**explained**
  229:2
**explains**  129:14
**explanation**
  85:20 129:1,4
  178:5

**explanations**
  225:5
**explored**
  185:18
**expressed**  15:7
  202:14,14
  209:22 210:5
**expressing**  51:4
  177:7
**extends**  76:21
**extensive**  37:9
**extensively**
  47:22 170:20
  185:6 203:25
**extent**  46:10,19
  47:10 62:6
**extra**  176:5
**extremely**
  36:20 90:25

  **f**

**f**  6:11
**fact**  34:3 65:8
  72:2 84:6 91:9
  92:20 93:1,7
  154:20 168:10
  170:16,24
  174:17 196:16
  197:10,13
  205:9 206:23
  208:24 217:13
  220:2 224:21
**factor**  78:1
  145:8 146:10

**[factor - finish]**                                                Page 29

177:4 226:2
**factors** 45:10
45:12,17 77:20
77:24 145:25
**facts** 173:10
184:23
**fail** 195:9
**failed** 20:11
143:24
**fails** 169:19
184:2 235:18
**fair** 27:24
31:11 37:7
41:8 49:16
53:16 56:8
64:17 72:6
96:2 102:8
103:1,12
114:20 125:8
125:19 131:8
137:2 146:18
159:18 177:24
**fairly** 72:8
**fall** 169:1
**familiar** 42:16
42:17 89:21
90:3 127:2,6,8
**fancy** 206:17
206:20
**fantastic** 57:22
**far** 202:14
209:23
**fault** 188:7

**favorable** 27:8
**fax** 3:11 4:20
5:7,22 6:21
**feasibility**
22:18
**february** 69:4
**federal** 89:2
110:1 161:20
234:12
**feel** 71:7 84:13
129:17 133:9
139:14 186:11
187:7 193:2
216:13 231:7
**fell** 168:18
**fellow** 11:7
**felony** 99:6,7
**fenwick** 2:14
**festin** 6:18
**fewer** 84:24
85:7 125:16
179:18 196:12
196:25,25
198:16,20
199:16 200:20
**field** 5:4 8:6
11:14,14 15:16
17:7 24:5,9
25:6 27:25
32:22 42:25
43:25 45:18
49:18 52:19
57:8 100:4,11
100:13,16

101:6 120:1
121:21 122:8
122:20 124:3
127:7,22 155:7
196:20 198:1
200:24 228:16
228:18 232:8
233:5,8 235:1
**fifth** 4:12
**figure** 32:19
93:19,23 94:2
94:18 227:23
**figures** 102:4,6
184:10 190:10
214:10 217:20
219:20 225:20
**figuring** 164:3
**file** 29:23 30:2
44:23 61:17,18
62:7,9,21,25
63:3,7,16,24
65:12 75:24
81:11,17,22
82:12,18,21
83:7 84:3
85:15,25 86:2
86:4,7,19
87:13 97:11,15
97:18,23,24
98:9,15,16,20
99:8,18,20
100:4,6,20
119:20,24
120:3,18,18,24

121:1,2,5,8
122:1,4,5,6,8
142:7 150:4
174:14
**filed** 37:2,2
40:12 185:10
**files** 20:20
61:19 75:21,23
85:21 98:11,13
140:18
**filled** 191:13
**filling** 17:8
21:18,19 22:16
**final** 61:6
192:19
**finally** 22:13
51:20 136:3
148:24
**financially**
234:16
**find** 38:4 39:25
46:4,5 72:20
101:3 165:18
171:5 172:17
189:22 209:25
211:6
**findings** 42:19
208:7
**fine** 40:6 61:24
112:10 138:1
143:15 163:20
208:17
**finish** 12:4
216:22

**[finished - fraga's]**                                    Page 30

| | | | |
|---|---|---|---|
| **finished** 216:21 | **flagged** 24:3 | **follows** 10:10 | **four** 13:10 |
| **firm** 5:19 | 223:8 | **footnote** 60:25 | 39:14 64:4 |
| **first** 11:4 35:21 | **flavor** 66:2 | 91:16 | 126:21 135:8 |
| 35:25 40:1 | **flip** 36:14 101:8 | **force** 87:5 | 135:14,25 |
| 42:7 43:17 | 112:8 113:20 | **forced** 197:22 | 140:9 142:1 |
| 55:2 56:25 | 211:11 | **foregoing** | 159:15 186:16 |
| 57:4 65:17 | **flipped** 125:6 | 234:3,5,9,11 | **fourth** 211:15 |
| 66:24 69:15 | 215:22 | 237:5 | **fraction** 63:13 |
| 73:1 74:11 | **floating** 59:3 | **form** 12:19 | **fractions** 63:13 |
| 78:10 79:10,16 | **floor** 3:15 4:12 | 25:6 27:25 | 130:22 |
| 83:24 88:9 | **fmglaw.com** | 36:11 42:25 | **fraga** 9:13,16 |
| 91:10 93:5 | 6:8 | 43:25 45:18 | 24:21 25:12,23 |
| 97:7 99:18,21 | **focus** 79:5 89:2 | 49:18 67:10 | 28:8 29:20 |
| 100:8,9 113:1 | 96:6 158:10 | 83:2,3,19 | 57:16 58:3,9 |
| 120:11 125:25 | 211:3 213:6,7 | 102:15 121:21 | 58:13 60:5 |
| 136:25 156:20 | 221:2 222:5 | 122:20 124:3 | 62:14,21 63:9 |
| 156:22 165:21 | 225:18 | 127:7 155:7 | 63:14,19 66:4 |
| 167:17 168:7 | **focused** 165:2 | 196:20 198:1 | 67:21 68:5 |
| 182:22 185:8 | 191:3 223:24 | 200:24 | 69:10 70:9,23 |
| 190:19 197:4,9 | **focuses** 227:23 | **format** 31:5 | 71:1 73:7 74:1 |
| 204:4 212:17 | **focusing** | 61:18 | 81:5 82:15 |
| 229:6 232:3,23 | 102:22 142:18 | **forming** 60:23 | 84:15 85:1,18 |
| **fit** 103:18 | **folks** 192:24 | **forth** 234:4 | 86:18 87:13 |
| 132:23 | **follow** 20:16 | **forward** 68:10 | 89:14 90:15,16 |
| **five** 66:7,8,14 | 48:23 49:11 | 101:8 111:4 | 90:19 91:1,15 |
| 66:20,25 67:2 | 54:21,24 64:12 | **found** 44:15 | 100:19 130:20 |
| 67:7,11,15 | 65:20 109:1 | 87:11 97:17 | 150:5 181:1,9 |
| 68:6,12,13,14 | 110:17 142:11 | 98:15 204:25 | 184:4 185:19 |
| 68:17,18 69:4 | 217:24 232:10 | 205:17 | 186:1,5 197:11 |
| 69:6 70:1,3,14 | 232:11 | **foundation** | 203:25 204:19 |
| 71:1,5 | **followed** 94:20 | 3:14 7:3 | 205:10,25 |
| **flag** 28:18,20 | **following** | **foundational** | 206:23 220:13 |
| 35:13 | 185:20 200:15 | 173:25 | **fraga's** 23:12 |
| | 211:20 218:17 | | 23:16 24:14 |

25:3,21 26:25
29:8,14,25
30:1,5 38:20
56:24 57:6,20
63:6 68:2 70:6
71:10,21 73:7
73:11,12,25
82:25 84:1,6
85:20 86:11,15
87:2 90:7
100:15 141:19
181:20 183:24
185:16 202:17
203:4 205:20
205:23 206:2
**frame** 220:16
220:18 231:21
233:2
**framed** 60:9
**framework**
34:4 138:13
169:18
**framing** 130:6
**francisco** 4:19
**frankly** 92:5
**fraud** 9:3 18:5
18:12 36:7,17
37:9 39:16
164:5
**free** 71:7
129:17 133:9
186:11
**freeman** 6:5

**frequent**
141:14
**frequently**
164:16
**friday** 155:23
195:18 198:13
198:18 199:1
**friday's** 193:24
**friend** 201:7
**front** 32:9
108:16
**full** 50:18
149:15 181:10
**fully** 173:23
185:13
**function** 48:8
**functionally**
154:11 155:16
**functioning**
163:25
**fund** 4:10
**further** 99:14
194:2 232:14
234:11,15
**furthermore**
183:3
**future** 18:6

**g**

**galleria** 6:6
**gap** 55:13,15
56:14 58:10
59:7,11,15,16
59:16,17,19

87:15 98:14
151:17 152:10
214:3
**gaps** 27:6 58:14
59:23 72:9
**gary** 6:5
**gears** 95:16
**gender** 61:16
61:17
**general** 20:17
22:13 59:6
60:13 65:24
89:2,3,5 92:13
92:14 95:24
97:11,23 108:3
109:25 110:1
116:20 120:2
121:8 128:10
130:9 136:25
139:4,6 157:22
161:19,20
176:8
**generally** 42:20
132:12 163:24
**generated** 62:1
62:5 97:15,25
98:1
**georgia** 1:2,6
2:2,6 3:3 4:3
5:21 6:7,13,19
11:12 17:23,23
19:21,21 23:21
25:24 27:2
29:24 33:22

36:16,20 37:2
37:10,21 41:1
52:10 53:10
55:6 63:3
73:11 74:13,23
75:18 76:3,15
78:5,15,19
79:9 80:13
83:1 89:25
90:3,12 91:6
91:12,17,22,24
92:1,7,18,19,22
93:2,4,6,9 94:1
94:23 95:4,23
97:9 99:7
100:10 106:7
108:24 110:3
118:2 122:2
123:9 124:21
132:18,22
161:14 165:12
168:2 169:15
169:16 172:9
175:10 176:14
177:6 179:23
184:2 185:21
187:17,22,22
188:6 191:11
193:11 195:17
210:25 211:17
213:12 224:8
224:19 225:2
226:16 227:25
231:5,16 232:4

| | | | |
|---|---|---|---|
| 232:7 233:2 | **glosses** 132:13 | 220:7 224:19 | 209:18 211:3 |
| 235:4 236:1 | **go** 14:3,16 15:2 | **going** 11:21 | 212:6 217:23 |
| 237:1 | 15:23,23,24 | 14:4 15:19 | 219:17 220:3 |
| **georgia's** 39:3 | 24:5,9 26:17 | 16:9,23 18:9 | 224:14 225:6 |
| 77:9 79:17 | 31:5 32:21,22 | 26:14,21 29:9 | **good** 10:4,14 |
| 165:14 | 35:20 38:2,21 | 32:10 48:18 | 10:17 11:11 |
| **georgians** | 41:13 46:3,7,7 | 52:17 56:19 | 12:3,9,14,23 |
| 58:10 112:22 | 49:6 54:6 | 58:4 62:3 65:6 | 52:17 71:12 |
| 179:6,17,18 | 60:24 62:18 | 66:22 68:10 | 127:18,20 |
| **getting** 16:22 | 73:23 76:9 | 71:8 72:20,23 | 145:19 154:3 |
| 33:10 66:1 | 78:9 95:13 | 72:25 73:23 | 181:5 210:18 |
| 98:21 103:11 | 108:21 114:19 | 74:10,16 76:9 | 210:24 227:4 |
| 192:6 195:23 | 122:21 127:22 | 78:20 79:23 | **grab** 86:11 |
| 229:10 | 130:10,23 | 80:20 81:18 | 167:7 |
| **give** 12:11 | 142:17 156:17 | 86:11,13 91:2 | **grace** 5:19 |
| 19:11 26:12,13 | 160:6 161:7 | 95:10,11,18 | **grad** 44:9 |
| 32:16 87:5 | 164:21,21 | 98:3 99:24 | **gradually** |
| 112:6 157:16 | 165:19 167:3 | 100:20,25 | 93:13 |
| 163:5 167:7 | 167:15 169:8 | 101:9 102:22 | **graduate** 36:6 |
| 214:16 | 174:25 180:6 | 107:15,20 | **great** 10:16 |
| **given** 25:11 | 185:13 186:6 | 109:23,24 | 11:1 13:8 |
| 31:3 34:8 | 188:11 199:5,7 | 110:2 111:9 | 52:21 53:4 |
| 43:17 66:20 | 200:4 202:9,23 | 112:15 114:2 | 56:2 58:7 |
| 68:9 142:3 | 203:1 212:11 | 115:24 118:10 | 107:17 210:23 |
| 155:13 157:7 | 212:16 216:23 | 120:5 121:14 | 211:10,22 |
| 200:2 216:11 | 218:17 223:18 | 121:22 131:16 | 220:8 |
| 220:2,3 234:10 | 224:14 226:6 | 131:17 136:20 | **greater** 105:18 |
| 237:9 | **goal** 11:22 | 141:11 142:16 | 142:13 143:3 |
| **gives** 214:12 | **goes** 33:24 34:9 | 142:17 143:12 | 144:17 145:7 |
| **giving** 13:6 | 89:22 104:10 | 173:16 174:11 | 146:10 169:15 |
| 60:17 188:6,7 | 104:11 122:5 | 181:3 185:23 | **greenberger** |
| **glad** 229:7 | 129:2 138:3 | 186:19 192:18 | 29:21 30:4 |
| 232:18 | 147:25 175:6 | 197:16 201:3 | 197:11 |
| | 175:11 186:11 | 203:2,3 206:19 | |

**[grimmer - head]** Page 33

**grimmer** 1:12
2:12 8:3,13,16
8:18 9:5 10:8
10:14,25 11:11
11:19 13:9
24:11 52:24
73:6,24 95:16
128:1 160:18
193:2 202:12
210:11,24
218:12 220:9
221:21,23
222:3,19 228:7
228:19 235:5
236:2,24 237:2
237:4,12
**ground** 75:6
93:8
**group** 4:4
11:13 26:17
42:22,23,23
43:13 47:3,25
48:7,8,18,21
49:5 50:4
61:15 63:5
67:10 76:17
81:10 84:25
86:2 104:15,22
104:23 106:15
106:25 107:9
107:10 112:13
114:21 116:21
129:24 137:18
138:7,9 139:19

139:22 140:3
156:6 157:2
158:18,25
161:14 179:18
203:18,22
204:8 209:20
211:1 226:10
**group's** 42:24
43:14 82:19
**groups** 21:22
21:24 22:8
46:12,20 47:12
47:15 49:2
53:16 58:11,15
74:23 76:3
77:10 96:12,19
97:4 101:11
102:20 104:14
104:25,25
105:9 109:3,7
109:15 114:24
115:10 117:2
123:25 124:1
124:11,18
129:20 130:1
143:20 145:20
146:22 156:10
159:16 179:2
211:25 224:21
226:21
**grows** 67:4
**growth** 68:8
69:1 155:3
224:2,20 225:1

**guess** 29:6,8
48:23 49:11
53:5 63:17
72:6 76:24
95:2 100:19
135:3 136:25
137:3 139:3
156:15 157:10
160:8 164:15
166:19 167:17
174:12 195:2
**guessing** 193:7
**guys** 210:18

**h**

**h** 236:3
**half** 147:17
**hall** 5:13
**hallboothsmi...**
5:16
**hampshire**
23:20 172:5
228:24
**hand** 10:6 14:4
14:16 16:1
41:13 56:19
57:13 181:22
192:18
**handed** 33:3
36:2 41:25
**handing** 187:12
**handle** 230:8
**happen** 93:13
158:10 229:15

229:16
**happened**
79:23
**happening**
10:22 48:11
94:9 164:8
216:12 225:10
**happens** 29:22
92:3 112:20
169:8,9
**happenstance**
50:11
**happy** 12:24
13:1 62:22
**happying** 95:10
**hard** 29:10
45:19 200:25
231:10
**harder** 139:14
178:23 179:1
**harm** 47:2
127:14
**harvard** 47:20
**hayes** 3:8
**hb** 38:12,14,16
129:1 131:4,5
131:12,13
132:23 134:11
137:4,11
138:12,19
149:12
**he'll** 64:1,2
**head** 12:12
21:2 35:19

[head - identical]                                              Page 34

55:19 86:12
181:8
**headache** 26:19
26:22
**headaches**
26:14,16
**health** 123:7,11
124:12
**hear** 164:6
210:19
**heard** 177:11
**hearing** 165:3
**help** 46:21
196:1,3
**helpful** 32:14
48:18 59:2
60:24 64:11
95:18 124:23
128:5 141:23
181:19
**helping** 46:12
47:12,15
**hereto** 237:7
**hersh** 18:14
42:3
**heterogeneous**
44:19
**heterogenous**
44:19
**hide** 210:6
**high** 19:11 53:7
66:1 123:24
197:13 205:6
230:6

**higher** 72:16
73:13,17,19
94:14 95:7
105:5 106:11
106:16 107:11
116:4 137:25
139:24 144:8
158:17,17,20
158:20 159:3,6
159:8 162:16
162:22 164:17
204:11
**highest** 94:20
94:22 116:8
**hill** 6:17
**hillary** 91:23
91:25 92:19
**hispanic** 59:18
59:24 63:22
67:17 72:17
85:5,24 87:21
103:25 105:2,5
105:19 142:15
143:5 144:7
156:6 158:18
159:1,7,13,20
**historical** 22:7
22:11
**history** 20:19
75:24 97:11,23
97:24 98:15
119:20,24
120:3,18,18
121:1,2,5,7,8

122:1,4,5,6,7
**hmm** 18:15
32:18 39:24
66:22 74:19
81:7 93:21
107:22 138:21
156:23 167:6
178:18 194:5
211:5 213:16
221:15
**hold** 11:3 87:10
202:13
**holds** 152:19
**honest** 217:23
**hood** 89:22
91:5,17 93:16
95:1
**hood's** 90:14
**hoover** 11:6
42:14
**hope** 178:14
200:1
**hopefully** 88:5
160:21 211:2
**hoping** 95:16
**houk** 3:4 11:11
11:12
**hour** 52:19
**hours** 31:4
130:17 136:7
136:15 197:24
198:17,21
199:8

**house** 92:18,18
**hub** 219:14,18
**hubbard** 3:8
**huge** 79:25
**hughes** 3:8
**hugheshubba...**
3:11
**huh** 12:13 46:9
125:3
**hundred**
136:11
**hypothesis** 32:3
32:8 33:15
34:4,5,12,16,20
34:23 35:1,7
168:9,22,23
169:5,10,18,22
170:3,4,15,21
171:9,22
**hypothetical**
191:9 199:11
200:2
**hypotheticals**
202:4

**i**

**idea** 49:1 92:2
97:19 99:22
148:17 197:15
203:14
**ideas** 124:5
**identical** 63:10
64:23

**[identification - indian]** Page 35

identification
14:6,19 16:3
32:25 35:22
39:13 41:21
54:6 56:21
57:18 82:11
83:19 87:25
141:21 143:25
153:3,12 154:8
155:13 157:25
158:1 159:5,10
192:22
**identified** 35:7
40:17 64:16
81:10 87:20
99:20 101:11
230:5
**identifier**
121:13
**identifies** 63:22
64:1
**identify** 36:1
83:4 85:24
100:21 153:16
154:11 208:5
231:6
**identifying**
85:23 153:25
**identity** 123:2
135:20
**immaterial**
194:21
**immediately**
28:1 91:7

**imminently**
181:4
**impact** 25:12
25:16,19,22
43:12 47:4
83:20 90:20
175:23 177:16
178:1,12
**impacted** 162:5
**implement** 80:2
**implemented**
177:6
**implementing**
22:18
**implications**
26:2
**implied** 80:23
**imply** 123:23
**importance**
49:5
**important**
25:20 45:17
49:23 123:4
128:22 132:13
145:24 157:11
173:17 178:2
232:17
**imposed**
153:19 154:15
156:5 158:16
163:4
**imposition**
155:5

**impossibility**
227:17
**impossible**
34:17,18
**impressions**
167:11
**impugn** 184:21
**imputation**
63:7,16 84:9
**imputed** 85:6,7
**imputing** 84:23
**inadvertently**
168:13 170:10
**include** 39:10
58:21 63:20
75:22 86:23
88:11,23 89:14
90:17 91:8
123:6 134:10
141:19 161:19
185:17 187:4
189:9 230:14
232:3
**included** 63:23
68:15 76:17
82:14,18 88:22
100:11 108:13
120:25 130:14
131:1 135:11
150:4,21 219:7
230:1,11,18
231:1,18
**includes** 135:21
135:24 182:1

**including** 47:19
61:4 76:25
78:6 89:13
121:17 123:1,5
124:19 137:19
194:23
**incomplete**
141:13,16
201:2
**increase** 17:25
94:12 103:3,4
103:6,10 104:9
148:6 175:7,10
**increased**
17:25 27:6
55:10 59:12,24
115:18,19
116:19 139:19
139:21 142:13
143:3 148:3
152:11
**increases** 104:2
104:3,6 116:21
225:11
**increasing**
84:22,24 103:2
103:20
**independent**
30:21 31:7
87:23 88:2
**index** 8:1
**indian** 115:1
142:14 143:4
144:8 156:7

**[indian - irrelevant]**                                                    Page 36

158:19 159:1,6
159:13,21
**indicate** 124:11
**indicating**
207:2
**indication**
123:11
**indicator** 123:7
**indices** 123:21
**individual**
54:10 64:1
87:20 164:20
174:17 230:17
**individuals**
22:20 40:13
44:7,12,17,21
44:22 67:16,16
67:18 73:10
82:3 84:5,25
85:5 96:25
97:16 98:6,7
98:11 100:2,24
112:13 120:23
141:19,20
143:23 159:24
164:6 196:4
233:1
**inept** 50:9
**inference** 63:8
64:10 159:23
**inferences**
63:15
**information**
31:25 35:6

39:13 49:16
99:17,19
100:21 101:3,4
102:5 120:14
120:25 153:12
155:9
**initial** 13:14
16:7 158:3
185:17
**initially** 62:14
**injunction**
131:21 135:4
**input** 173:12
**inquired** 62:2
**inquiry** 191:22
**inside** 169:7
187:18
**instance** 26:25
63:19,21 68:20
82:7 84:14
87:24 98:18
101:6 107:5
151:1 162:21
168:16 192:15
195:25 231:7
**instances** 54:18
63:23 85:23
87:20 155:11
223:3
**institution** 11:6
42:14
**institutions**
46:13

**instructed**
131:23
**instructs** 12:21
**intent** 49:13
50:4,8,8,9,10
50:13,14,25
51:23
**interest** 41:16
112:18 163:25
164:13
**interested**
26:13 47:24
83:24 96:25
234:16
**interesting**
23:19 48:10
94:17 197:21
229:8
**interests**
227:15,18,19
**interim** 98:8
**interior** 168:24
**interpret** 78:13
79:12 80:25
**interpretation**
90:15
**interrupt** 21:25
135:16 161:2
173:18
**interruption**
53:13
**intersect**
201:24

**interval** 169:7
169:21
**intervening**
137:5 138:23
**intervenor** 5:12
**intervention**
138:12
**interview**
229:14,18,24
229:25 230:7
231:6
**interviewed**
230:2
**interviews**
229:15,16
**introduce**
148:9
**intuition** 47:14
48:17
**intuitions**
46:15,21 47:13
**investigated**
62:3 181:1
**investment**
91:24
**invitation**
25:11 168:6
**inviting** 93:9
**involve** 192:6
**involved** 77:10
**involves** 164:2
190:19
**irrelevant**
90:17 92:4

islander   59:8
isolate   45:19
isolation
   171:18
issue   23:19
   31:22 34:12
   35:7,8 47:17
   51:18 62:4
   64:19 84:6,7
   123:3 124:12
   130:23 131:11
   158:1 163:23
   167:23 173:17
   202:20 204:19
   229:2,5,8
   230:15
issued   18:17
   40:20
issues   147:11
   150:9 159:5,10
iv   74:4
ix   165:6

**j**

j   3:21 5:5
jacob   5:22
jacoutot   6:11
jaffe   5:4
jaffe.com   5:8,8
   235:2
january   23:13
   58:18 86:13,17
   86:19 88:12
   97:16 98:1,5,9

98:20 117:24
   118:1 120:24
   139:2 185:16
   185:24 186:3
jargon   53:25
jcusick   4:14
jessee   44:10
jhouk   3:7
job   1:23 84:22
jobs   199:12
   201:14,23
john   4:10 19:14
joined   57:11
   127:24
joshua   5:5
journal   9:9
   42:10
jpb   1:6 2:6
jprince   5:8
judgment
   23:14 186:2
julie   3:4 11:12
july   9:17 13:24
   14:18 22:25
   23:4 28:14
   29:14 33:5
   58:3 72:24
   85:3 117:14
   167:5 189:13
   211:7
jump   52:24
   222:17
june   9:13 13:22
   14:12 38:6

56:4,5 57:1
   60:20 62:14
   68:11 74:5
   78:10 93:19
   95:19,21
   118:23 128:6
   157:13,18
   160:24 161:12
   172:17 180:8
jurisdiction
   227:16,25
justice   4:16
justification
   205:17
justifies   205:11
justin   1:12 2:12
   8:3,12,16,18
   9:5 10:8,25
   235:5 236:2,24
   237:2,4,12

**k**

k   3:5 5:6
kang   7:3
keep   52:17
   95:11 118:10
   157:12,12
keeping   129:22
key   27:3 45:3
   54:20 146:2
kind   230:9
knew   17:8
   44:13

know   15:1,2
   27:18 28:4,13
   28:16 31:10,12
   34:10 49:20
   61:23 62:2,6
   62:11,20 63:13
   65:8,11 69:12
   71:24,24 74:7
   78:20 85:2
   86:7 92:20
   93:1 97:25
   100:4 103:7
   107:18 111:12
   113:6 115:2
   116:5,24
   117:21 118:11
   119:20 127:16
   130:16 131:15
   132:25 135:3
   137:22 147:21
   149:5,21 150:7
   157:10 164:20
   169:13 170:2
   174:11 176:17
   177:19,22
   181:6,8 188:14
   188:17 189:10
   189:19 191:10
   191:25,25
   192:8 193:3,16
   194:16 196:11
   197:2,15
   200:25 201:2,5
   201:16,18,23

201:25 203:23
204:5,14 205:5
207:24 209:10
209:17 210:1
210:18 211:12
216:15 228:7
232:25
**knowing** 26:13
**knowledge**
39:7 202:15
209:6

**l**

**l** 9:13,16 123:6
**label** 132:25
**labeled** 122:8
**lack** 16:16
80:25 132:6
154:7
**lacking** 153:3
**laden** 4:14
**laid** 214:24
**land** 231:16
**language** 30:25
**large** 42:24
43:13,23 45:5
45:16 67:15
224:2,13
**larger** 59:15,16
73:11,25 74:1
105:8,11 106:3
112:12 207:4
**largest** 56:10
56:15 59:7,19

**laross** 6:18,20
**late** 93:4
144:20 145:8
145:17 153:2
154:7 156:8
157:1 158:22
179:24 180:4
191:21 192:1
195:23 198:15
199:14 200:21
201:15
**law** 3:4,5,9,15
3:21 4:4,5,11
4:17,18 5:5,14
5:19,20 6:6,12
6:18 39:3 41:7
42:21,23 43:11
43:18,23 44:8
44:11 47:20,24
47:25 48:1,5
49:12 50:1,3
54:3,4,8,11
79:21,22
132:17 133:23
148:14 191:11
**laws** 41:2 47:7
49:1 50:22
131:11
**lawsuit** 209:9
**lawyers** 3:4
**lawyerscom...**
3:7
**layer** 176:6

**leach** 72:7
**lead** 26:3 227:1
**leaders** 50:21
**leading** 91:25
**leads** 72:1
217:21
**leah** 4:11
**learn** 25:4
**learned** 28:7
30:12 32:1
33:12 35:9
169:19
**learning** 25:9
29:8 30:22
206:17
**leaves** 58:17
**lee** 24:25
108:15
**lee's** 158:9
**left** 120:5
199:24
**legal** 4:10 9:9
42:10 49:20
138:13,23
235:23
**legislators**
226:19,21
227:20
**legislature** 47:1
**legitimately**
188:16
**length** 178:1,5
**lessen** 161:24

**letters** 61:8
**level** 15:19 53:7
61:14 66:1
149:18,24
181:13
**levels** 216:10
**liberties** 3:14
7:3
**license** 39:14
44:14,18 135:8
135:25
**lichtman**
182:23 183:15
**lichtman's**
184:5
**life** 87:9
**light** 76:24
**likelihood**
17:13 47:5
**likely** 17:12,25
18:5 44:22,23
47:3 104:15,20
104:23 105:1,1
146:9 179:22
179:23 207:18
207:23
**liking** 45:20
**limit** 195:10
**limited** 127:3
200:17
**line** 86:14
103:18 168:2
178:5 211:15
212:10 223:19

**[line - lot]**                                                                 Page 39

225:14 227:12
231:16 236:4,7
236:10,13,16
236:19
**lines**  172:20,23
214:24 231:19
**link**  120:23
**linking**  120:21
**list**  19:10,12
20:6 40:14
86:17 100:9,11
149:4 152:22
154:4 174:15
**listed**  81:17,21
82:18,22
**listening**  28:10
29:5,13
**lists**  74:25
**literally**  169:10
184:22
**literature**  17:7
47:19 54:1
123:17 204:25
205:18 206:13
220:20 221:2,4
221:7,10
**little**  5:15 15:5
26:5 43:8 47:8
77:4 78:16
100:22 130:6
149:25 156:9
163:5 167:9
178:10 215:21

**live**  118:3
**lived**  23:20,20
**llc**  5:19
**llp**  2:14 3:8,20
4:4 5:4 6:5,11
**local**  135:22
190:21 191:11
192:12
**located**  136:14
182:3 183:14
186:19 187:18
187:24 194:17
**location**  37:6
136:6 189:2
192:13
**locations**
177:23 198:17
198:20
**logic**  73:21
125:12 168:22
**long**  36:11 95:9
127:21 179:13
189:19 200:15
211:2 228:8
**longer**  76:12,13
77:1 170:18
171:1 172:20
172:23,23
224:12
**look**  14:13,22
16:6 26:23
27:1 30:1,2
40:21 50:2
67:12 88:7

93:19 94:6
102:19 104:22
106:23 109:20
112:9,11
113:13,24
114:9 115:15
116:15 118:24
120:13 125:25
143:20 149:18
149:24 151:20
156:16,21,24
172:16 174:25
176:15,23
181:19 183:13
194:2 196:8
197:7 212:1,23
214:9,22
215:24 217:13
220:15,17
221:4 222:13
224:22 230:16
231:24
**looked**  27:19
28:4 40:22
92:21 108:24
135:10 161:17
164:25 180:23
**looking**  20:19
49:12,14 50:5
50:13 55:25
58:4 60:13
82:22 102:19
102:25 104:13
109:20 111:23

111:23,24
112:23,25
113:1 114:16
114:20 115:6,7
115:16,25
120:4 121:10
121:12 131:8,9
136:19 137:1
137:13 138:5,6
139:16,16
141:10 142:10
147:8,9 156:4
156:11 157:14
163:21 171:15
172:12 176:11
176:21 177:1
189:22 190:16
213:2,3 215:12
215:19 216:13
216:16 217:7
221:22,24
222:2,22
223:19
**looks**  14:23
32:20 55:22
103:5 107:14
108:12 156:20
214:8 221:10
**lost**  92:19
150:19 192:19
**lot**  37:2,17
128:15 150:12
182:5 184:7
217:25

**[lots - margin]**                                      Page 40

**lots** 45:12
  77:20
**louisiana** 75:1
  76:14,16
**low** 25:25 27:7
  27:21 28:4
  48:11
**lower** 27:4 38:1
  38:7,10,23
  39:1 113:19
  114:23 115:9
  116:3 123:19
  123:22 126:3
  126:17,21
  137:8 138:4,10
  145:8 159:14
  172:7
**luckily** 23:21
  189:5
**lunch** 118:12
  127:19,24

**m**

**m** 3:4 6:5 11:5
  123:6
**m.v.** 89:22
**ma** 4:18
**machine**
  206:17 234:7
**macon** 5:18,21
**made** 21:21
  22:6 27:20
  32:2,7 33:14
  33:19 36:7,25

  37:9,15,16
  39:16 40:12
  107:19 110:21
  111:11 146:14
  172:13 174:16
  186:4 212:8
  234:7 237:5
**magnitude**
  59:15,16
**mail** 96:3,25
  102:22 103:2
  103:21 104:1,4
  104:7,15 105:2
  105:4,10,12,18
  105:19,25
  106:1,3,4,6,7
  106:11,12,16
  106:17 107:1,3
  107:4,9,10,11
  128:4,8 145:11
  145:13 157:21
  179:6,19,23
  180:10,12
  181:14,17
  183:8,10,14
  190:23 192:4,8
  192:8,8 194:14
  195:4,11 200:1
  200:7 203:7
  204:10,12
  205:22 207:6
**mailbox** 200:8
  200:9

**mailed** 162:11
  193:15,18
**main** 182:17
  183:14 185:7
  186:20 187:3,9
  187:11,13,16
  188:13 194:24
  199:8 200:2,11
  200:14
**maintain** 68:10
**maintenance**
  98:11
**major** 37:8
**make** 12:18
  19:9,12 20:7
  24:3,23 26:6
  26:23 27:9
  38:5 44:2 50:7
  50:23 51:3,5,7
  51:11,15 53:23
  55:12 63:8,16
  74:12 76:18
  80:4 82:4 87:9
  89:11,19 91:4
  92:3 106:20,24
  111:3 112:6,8
  113:25 125:13
  129:17 130:5
  130:19 136:18
  137:6 142:2,16
  145:4 147:20
  148:15 150:2
  150:16 151:11
  153:20 156:11

  159:23 165:16
  166:3,18
  167:16,20
  173:22 178:22
  179:22 194:15
  201:18 205:15
  208:14 216:25
  220:2 231:24
**makes** 12:20
  30:14 48:9
  68:7 119:22
  144:23 145:21
  176:15 179:1
  216:11
**making** 19:19
  31:13 55:20
  88:25 100:7
  107:1 139:14
  164:11 166:21
  206:4 224:4
**mandated**
  111:7,10
**manifest** 83:6
  95:5
**manner** 192:17
**manual** 130:18
  131:2 140:23
  140:24 164:2
**manually**
  128:23 130:24
**map** 80:18
**margin** 37:5
  93:14,15,15
  168:16,18

[margin - methodology]                                          Page 41

183:20
margins   64:21
mark   14:4,5,16
  15:24,25 16:1
  35:20 41:14
  56:20 57:14
marked   14:6
  14:19 16:3
  22:24 32:25
  33:3 35:22
  41:21 56:21
  57:18 58:2
  92:10 117:12
  181:21 192:22
market   5:14
marshall   21:13
martin   5:19
massachusetts
  4:5
massive   92:2
master   1:6 2:6
match   134:2
  174:13,16
  231:22
matches   183:9
  187:10
matching   37:13
  39:4,12 133:23
  134:13 144:3
materials   23:8
mathematical
  48:20
mathematically
  203:11 206:8

206:16
mathematics
  17:15
mathis   6:5
matter   37:1
  220:6 230:4
mcdonald
  93:25
mckee   91:17
  93:16
mckee's   91:6
mean   26:11
  32:18 44:7,19
  47:10 49:2,19
  55:17 62:8
  68:5 69:3
  70:12 76:10
  77:5,8 80:11
  92:8 114:7
  116:20 123:13
  124:1 125:21
  126:5 135:16
  137:7,17
  139:25 141:14
  146:13 147:19
  161:2 166:10
  170:12 172:4
  173:22 189:17
  192:1 195:13
  196:11 199:19
  200:2 214:3
  220:3,25
  227:21

means   25:22
  34:1,1 90:19
  171:4 188:1
  226:20
meant   20:10
  116:10,13
  126:10 127:11
  170:5 222:5
  225:15 226:12
measured
  172:7
measurement
  34:25 84:12,14
  84:16,18 85:4
  85:10,12
measures
  200:13
measuring
  232:20
mechanical
  54:3,4,17,20
  148:13,17,21
  148:23 159:19
  159:24,25
mechanically
  54:8 169:17
mechanism
  28:13 187:1
mechanisms
  147:2
medsl   123:5,15
  123:19 124:7,9
  124:13

meeting   44:3
memorized
  57:3 186:20
memory   15:24
  20:14 121:15
  133:6
meng   4:4
  210:14,25
mentioned
  24:11 26:7
  28:7,23 31:23
  35:17 41:14
  85:14 131:4
  138:3 174:19
  186:9 218:12
  220:9 231:4,14
mentioning
  228:24
mere   197:3
merely   205:11
  205:12 227:5
merge   100:17
merged   99:19
met   10:18
meta   189:6
method   55:16
  72:15 73:17,19
  229:3
methodologies
  70:19
methodology
  31:14 68:10
  71:21 81:11,16
  81:19 100:8

[methodology - n.e.]                                                    Page 42

| | | | |
|---|---|---|---|
| 203:10 218:3,4 219:23 231:6 | 35:4 64:12 118:11 168:2 | 211:5 213:16 221:15 | **motion**  23:14 **motivated** |
| **methods**  69:15 77:11 95:17,23 96:2 223:13 231:8 | 168:11,14,18 169:3,11,12 170:12,14,18 171:1,6 172:8 | **mobilization** 21:21,23 95:6 **mobilize**  22:9 **mobilizing** | 50:25 51:22 **motive**  184:22 **mountain**  1:13 2:15 10:1 |
| **metric**  222:14 222:18 227:4 | 172:9,19,20,23 175:5,9 | 46:11,20 47:11 49:2 | **move**  35:16 118:9 128:3 |
| **metrics**  111:23 211:24 216:5 225:23 | **misapplies** 168:21 **mischaracteri...** | **mode**  101:10 101:13 142:4 **model**  206:21 | 141:7 144:12 160:8 165:6 216:19 226:2 |
| **metropolitan** 3:19 | 144:16 **misinterpreted** | **modes**  96:5,8 96:11,12,18 | 229:20 **moved**  39:11 |
| **mi**  1:6 2:6 | 188:3 | 97:4 104:21,23 | 98:19,25 198:6 |
| **michael**  93:24 | **mismatched** | **modify**  137:12 | 200:14 |
| **mid**  56:16,17 59:13,25 89:14 94:3,7,13,14 | 150:20 **misparaphras...** 43:20 | **moment**  21:7 28:19 29:12 31:9 35:17 | **moving**  88:4 110:11 146:18 152:16 160:8 178:14 |
| **million**  100:25 | **missed**  194:1,8 | 60:19 62:4 | **mrp**  203:12,14 |
| **mind**  54:13 129:22 177:12 189:5 | **misses**  91:16 191:19 **missing**  24:24 | 63:4 98:13 101:17 137:19 140:5 161:8 | 206:5 **multilevel** 203:12 206:11 |
| **minor**  64:20 | 49:3 58:20 | **monday**  192:10 | 206:12,17 |
| **minority**  48:16 156:6 158:18 | 99:17,22 176:5 **mitigate**  99:16 | **month**  24:14 28:8 86:7 | **multiple** 190:19 201:14 |
| **minus**  55:18 67:8,8,9 68:13 214:12,16 215:5,8,14,16 215:25 | **mix**  230:1 **mixed**  65:6 **mm**  18:15 32:18 39:24 66:22 74:19 | **months**  86:21 **moring**  3:20 **morning**  10:4 10:14 11:11 **morris**  11:5 | **multiplication** 209:2 **multiply** 203:21 204:18 |
| **minute**  24:6 173:15 | 81:7 93:21 107:22 138:21 | **morrison**  4:4 8:5 210:15,17 | **n** |
| **minutes**  33:23 34:14,19,22 | 156:23 167:6 178:18 194:5 | 210:23,25 228:6,10 | **n.e.**  6:19 |

**[n.w. - number]**                                   Page 43

**n.w.** 3:5,22 4:5
 5:6
**naacp** 3:3
 11:12 19:25
 21:9,12
**naacpldf.org**
 4:14,14
**nail** 65:20
 172:1
**name** 10:4,24
 11:11 16:24
 18:12 20:1
 47:20 61:23
 174:12 210:24
 234:19
**names** 11:9
**national** 79:1,4
 176:15,16
**nationally**
 77:16 78:20,22
**nationwide**
 79:9 95:7
**nearly** 64:22
**necessarily**
 48:19 79:15
 226:9
**necessary**
 79:15 237:6
**need** 13:1 46:4
 46:5 87:6
 116:4 129:7,18
 130:23 135:8
 137:21 139:15
 162:18 166:2

 185:12 201:5
 203:15,24
 204:6 206:20
**needed** 12:24
 194:3
**negatively**
 166:25
**neglected** 11:8
**neglecting**
 181:10
**neglects** 150:22
**neighborhood**
 182:18,19
 186:21 187:2
**neither** 234:15
**never** 90:19
 113:6
**new** 3:10,10,16
 3:16 4:3,12,12
 23:8,20 25:4
 25:10 28:7,10
 28:15,18 29:4
 30:5,11 31:25
 35:18 67:13
 76:24 84:2
 168:13 172:5
 177:6 209:25
 210:25 228:24
**news** 16:24
**newspaper**
 22:7
**nice** 183:12,22
**nicely** 183:18

**nick** 47:20
**nine** 18:23
 192:20
**nod** 12:15
**nodding** 12:12
**nods** 35:19
 55:19
**noland** 5:19
**nolandlawfir...**
 5:22
**nolasco** 1:21
 10:5 234:22
**nonresponsive**
 18:25
**nonsensical**
 171:21 204:23
 205:1
**normally**
 168:22
**north** 43:17,22
 44:8,11,13,21
 45:1 48:1,3
 54:5,20 74:25
 76:14,16
**northern** 1:2
 2:2
**notary** 237:13
 237:19
**note** 62:13
 97:14 145:11
 167:15 178:2
 180:18,19
 188:9 189:25
 190:2 194:2

 226:24 235:10
**noted** 81:22
 205:19 233:9
 237:7
**notes** 118:1
 167:25
**notice** 14:25
 73:5,9
**notify** 193:14
**notifying**
 193:12
**nov** 121:8
**november**
 75:14 77:17
 97:11,23 98:19
 121:8 161:20
 229:16,20
**null** 32:3,7
 33:15 34:4,5
 34:12,14,16,20
 34:23,25 35:4
 35:7 168:9,22
 168:23 169:5
 169:10,13,14
 169:18,22
 170:3,4,15,21
 171:4,22
**number** 8:11
 9:2 10:5 20:21
 31:4 37:7
 40:20 61:15
 63:5,10 99:16
 101:1 103:22
 103:23,23,24

**[number - offer]** Page 44

104:10,11
105:8,11
117:16 119:9
119:10 120:8
120:20 121:11
123:5 125:24
126:1,16,19
130:17 135:5,8
135:9 136:5
141:20 143:8
143:23 161:16
161:17 162:8
164:12 168:1
170:13,17,25
175:8 181:6,9
181:10 183:5
183:10 191:20
196:7,8,9,15
197:7,13,16,22
197:23 198:14
199:19 201:17
201:22,25
202:5 203:23
204:2 207:7
215:20 219:7
224:3 225:1
**numbers** 55:25
57:6 61:7
63:10 102:2
125:18 127:10
128:8,12,17
137:1 156:6
161:19 171:20
174:3 176:1,4

176:8 177:21
180:4 183:1
188:11 190:12
192:7 212:5,7
213:8,23
214:23,24
215:7,13 216:8
216:14 217:2,9
217:10,11,15
217:15,17,20
217:25 218:8,9
219:1,4,11,12
219:13 220:4,4
221:22 222:18
225:3,16,19
227:2
**numerator**
61:5 64:18
73:12 81:13
85:8 125:5,6
**numerators**
62:15 64:22
**numeric** 45:5
**numerical**
42:24 43:13
116:5 159:17
**ny** 1:23 235:15

**o**

**o0o** 7:5 9:22
**oath** 10:9 38:8
38:11,13,21
39:10 128:22
129:22 131:23

131:24 133:15
135:1 138:3
140:10,24
141:3,8,13,14
141:16 142:5,7
144:1 147:22
148:25 149:7
149:13 150:2,9
150:15,22
151:4 234:6
**obama** 91:10
91:11 94:24
95:5
**object** 15:16
25:6 27:25
42:25 43:25
45:18 49:18
121:21 122:20
124:3 127:7
155:7 196:20
198:1 200:24
**objection** 12:20
12:22 168:7,8
**objections**
12:18
**objects** 108:19
**observation**
116:20
**observe** 69:2
78:25 169:11
**observed** 67:18
67:24 68:9
78:15 80:21,22

**observing**
34:22
**obtain** 31:5
34:7 135:22
**obtained** 22:21
23:9 29:23
30:24 39:14
65:5 84:3
**obtains** 85:25
**obvious** 132:20
**obviously**
28:12 70:17
113:6 209:17
229:19 232:1
**occur** 91:3
155:16 226:9
**occurred** 29:5
40:22,23
109:11 144:3
212:11
**occurring**
164:16
**occurs** 59:8,20
79:5 94:23
232:2
**october** 9:19
193:1,19,20
229:16,19,24
**offer** 17:22
18:1,3,7 20:24
25:12,18 30:18
47:6 53:9
71:20,22 90:14
95:22 96:22

**[offer - okay]**                                                    Page 45

| | | | |
|---|---|---|---|
| 108:23 112:5 | 200:14 219:15 | 52:17,21,24 | 109:20 111:6 |
| 128:7 129:13 | **offices** 183:15 | 53:18 54:16 | 111:13 113:8 |
| 131:17 178:7 | 187:9,16 195:9 | 55:5,12 56:2,8 | 113:20,25 |
| 178:24 179:3,8 | 195:19 199:13 | 56:14,19 57:8 | 114:4,13,15,19 |
| 179:16 193:16 | **official** 20:1 | 58:7,13 59:2 | 115:12,15 |
| 199:11 205:10 | 192:8 | 60:3,19 61:11 | 116:11,14 |
| 208:21 | **officials** 177:15 | 61:21 64:11,25 | 117:5,10 118:9 |
| **offered** 17:21 | 191:6,12,16 | 65:7,14 66:5 | 118:17,21 |
| 118:4 170:2 | **oh** 39:17,22 | 66:12 67:12 | 119:11,22 |
| 207:1 | 46:7,16 53:3 | 68:24 69:8 | 120:2,10 |
| **offering** 51:9 | 53:14 62:16 | 70:6,16,21 | 121:10,22 |
| 51:13,20 96:10 | 74:6 126:7 | 71:15,20 72:6 | 122:9,16,25 |
| 96:11,17 97:3 | 142:20,23 | 72:19 74:3,10 | 123:16,24 |
| 108:1,22 109:1 | 157:4 161:3 | 74:16 75:5 | 124:9,15,22 |
| 109:13,17 | 164:7 166:8 | 76:7,12,19,24 | 125:8,18 |
| 128:17,19 | 189:15 215:22 | 77:18 78:3,9 | 126:19,24 |
| 129:4,18,23,25 | **okay** 12:2,8,13 | 79:10 80:17,23 | 127:18 128:7 |
| 130:3 146:8 | 12:22,24 13:12 | 81:3,18 82:6 | 128:15 129:6 |
| 152:21 162:4 | 14:3,15,25 | 82:20,25 83:9 | 129:25 130:5 |
| 178:21 179:4 | 17:3,10,17,20 | 83:12 85:11 | 132:9 133:4,22 |
| 179:21 180:1 | 18:8,24 19:3 | 86:10,25 87:8 | 134:3,10,24 |
| **offers** 90:16 | 20:13,15 21:5 | 87:22 88:4,4,6 | 135:7,23 136:3 |
| 91:4,15 118:4 | 21:15 23:3 | 89:3,11,21,24 | 136:17,25 |
| 192:3 | 24:10,20 27:17 | 90:2,6,10 94:2 | 138:5 139:3,8 |
| **office** 132:23 | 27:22 30:8 | 94:6,15 95:12 | 139:14 140:4 |
| 135:22 162:11 | 31:9,16 32:13 | 96:15 97:7,14 | 140:12 141:13 |
| 163:12 182:3 | 33:2,8 35:15 | 97:22 99:2,13 | 141:23 142:9 |
| 182:18 186:21 | 35:25 36:8,13 | 100:18 101:16 | 142:25 143:11 |
| 187:3,5,11,13 | 37:12 38:16 | 102:8,17,24 | 144:6,11 145:6 |
| 187:19,24 | 40:24 41:6,11 | 103:11,19 | 145:10 146:8 |
| 188:14 190:21 | 41:24 42:7,13 | 104:13 105:13 | 147:4,14 |
| 193:1,11 194:7 | 45:9,15 46:3,7 | 105:22 106:19 | 148:24 149:18 |
| 194:24 199:8 | 46:17,18 47:25 | 107:6,6,15,23 | 151:1 152:14 |
| 200:3,4,5,9,11 | 50:15 51:3,9 | 108:25 109:13 | 152:25 155:1 |

[okay - original]                                                    Page 46

155:17 156:3
156:17 157:10
158:13 159:5
160:7,13,18
161:11,17,22
162:3,10,15,21
163:12 164:15
165:6 166:6
167:3,8,15
171:9,15
172:16 173:1
174:7,19
175:13,17
176:9 177:14
178:14,25
179:4,21
180:13,18
181:3,5,12,19
181:23 182:8
184:7,13 185:2
185:11,11
186:6,6,17
187:3,21
189:12,12,19
189:25 190:10
190:14 191:19
193:6,7,10,22
196:14 198:10
198:14 202:23
203:5 206:5,10
207:13 208:2
208:20 209:3,5
209:16 210:10
210:23 212:15

213:22 214:9
214:22 215:1
215:12 216:5
217:4 218:11
218:18 219:9
221:19 222:12
226:5,23 228:6
228:15 229:2
230:19 232:8
**older**   100:20
**once**   64:5,6
   183:7 189:22
**ones**   72:11
**online**   83:2,18
   141:21 231:23
   232:2
**open**   136:23
   197:24 198:7
   199:13
**opens**   153:9
   157:24,25
**opine**   15:12
   227:20
**opined**   15:11
   21:5 108:15
   134:7
**opining**   29:9
   109:2,6,10
   166:24
**opinion**   16:18
   17:6,14 18:11
   21:2 27:10
   29:25 30:18,23
   83:7 90:17,18

109:13,17
115:12 129:25
130:3 144:17
146:9 177:24
178:4,8,11,21
178:24 179:3,4
179:8,16,21
180:1 201:12
220:15,17
223:23
**opinions**   15:7
   17:22 18:1,4,7
   20:23 27:24
   29:15 51:4,10
   51:13 52:25
   53:7,9 83:20
   95:22 96:10,11
   96:17 97:3
   107:25 108:1
   128:7,17,19
   129:19 152:21
   152:25 162:4
   167:10 172:1
   177:7 178:20
   202:12 209:8
   209:10,22,25
   210:6 220:21
   220:22
**opportunities**
   161:25
**opportunity**
   155:13 159:25
   160:6

**option**   150:4
   181:10 182:19
   190:3 194:13
   196:17,21
   199:25,25
   200:5
**optional**   111:11
**options**   135:24
   186:23,24
   188:20 194:23
   195:25 196:2,4
   196:25,25
   197:17 199:4
   199:16,20
   200:20
**oranges**   143:22
**order**   29:25
   30:3 33:22
   63:4,8,16
   67:10 107:18
   133:13 166:16
   175:11 204:18
   215:21 216:15
   231:8,23
**organization**
   16:24 176:3
**organizations**
   93:8
**organized**
   107:19
**origin**   61:23
**original**   67:22
   68:2 71:11
   87:2 156:16,17

[original - particular]                                                    Page 47

183:6 218:8
234:12
**outcomes** 80:19
**outlined** 208:25
**overall** 33:22
67:10 96:19
109:7 111:15
112:21 124:17
125:18,25
126:1,16,18
137:1,3,7,17,19
137:21 138:2,5
139:17,18,18
139:21,25
140:1,2 149:7
153:17 154:12
155:3 161:13
162:20,22
172:3 175:9
178:19 180:11
183:1,21
**overestimate**
67:3
**overstating**
223:14 224:10
**own** 22:10
98:24 171:21
188:7 200:17

**p**

**p** 165:12
**p.c.** 5:13
**p.m.** 2:16 127:5
198:7 233:9

**pacific** 59:7
**page** 33:20
36:14 40:9
46:3,6,8 50:18
58:5 117:15,19
130:6 133:5
136:19 156:22
165:21,21
176:11 181:24
211:11 212:13
213:8 214:25
218:17 219:2
219:11 221:13
223:18,19
226:6 236:4,7
236:10,13,16
236:19
**pages** 1:25 8:11
8:13,16,19,22
9:2,6,10,14,17
9:20 58:1
101:8 176:12
177:5
**pair** 67:8 110:4
110:11 116:2
**palpable** 95:5
**pandemic**
96:24
**paper** 18:13
36:4,5,24
37:16,17 38:21
40:3 41:14
44:4 45:4 46:3
47:21 137:22

148:23
**papers** 18:23
41:9,12 60:21
123:5 206:24
221:12
**paragraph**
33:20 46:8
50:18 55:3
58:4,8 60:25
68:21 74:6
78:9 93:20
97:7,8 99:14
107:20 118:19
128:5 136:22
145:10,11
146:18,19
152:17 156:18
156:21 160:25
165:20,21
175:15,16
189:23,25
223:20 228:3
**paragraphs**
50:17
**paralegal** 7:3
**parallel** 79:16
80:7
**parameter**
168:24
**parameters**
201:1
**paraphrase**
162:1

**parity** 226:8,11
227:2
**park** 3:9
**parkway** 6:6
**parkwood** 6:12
**parse** 150:1,20
**parsed** 189:7
**part** 22:17
23:13,18 36:19
39:6 78:17
79:10 81:14
123:17 128:24
128:25 135:10
135:11 168:7
182:21 186:2
188:15 190:17
190:22 194:7,9
195:3 206:15
**participate**
54:12
**participating**
84:25 122:2
124:2
**participation**
52:10
**particular**
25:17 37:17
44:3 50:4
72:25 78:22
97:1 102:23
115:8 120:7
121:2,12 122:4
122:7 141:24
147:10 179:18

197:19 204:20
205:4 206:3
223:19,24
224:9
**particularly**
12:19 44:18
45:16 60:25
69:9 77:10
129:10 137:13
230:6
**partisan** 43:23
49:14,14 50:23
**parts** 188:3
218:13
**party** 46:12,21
47:12,15 48:13
48:19 49:9
234:17
**passage** 52:11
59:9,21 79:21
80:9 125:20
137:4,11
138:15 139:2,8
**passed** 49:12
50:3 99:1
139:9
**past** 63:19
121:17
**path** 46:12,20
47:12,15
**patience**
160:19 210:13
228:11

**pattern** 140:2
197:6 201:10
**patterns** 114:3
114:5 123:1
**pause** 193:5
**peachtree** 6:19
**pedantic**
120:17
**pending** 13:2
**pennsylvania**
3:22
**people** 26:17
50:8,9 86:20
98:14,18 101:1
101:18 110:14
112:18 127:12
127:16 136:6
149:6 174:13
186:14 187:4,4
187:11 188:11
191:13 193:12
193:14 196:1
201:18,22
225:7,7 229:20
231:17
**percent** 40:7
63:13 64:6,7
85:6,8 107:3,4
147:22,24
148:1,1,2
149:6 151:5,7
151:8,13,14,22
151:25 155:24
172:19,22

175:6,6,8,11,12
183:9,16
204:13,15
212:4 213:1,13
213:18,20,23
213:24,24
214:2,5,6,11,12
214:12,15,16
214:16,20
215:5,8,10,14
215:14,15,17
215:25,25
216:1,3 217:19
217:20,21,21
222:1,4,10,15
222:20,23
223:4,7 224:17
224:20,22,23
226:16 227:10
227:10 231:15
231:15
**percentage**
44:16 55:14,15
92:20 103:4,5
104:25 105:10
111:18,19
113:2,3,7
115:16,18
142:12 143:2
145:17 147:18
151:17,21
154:12 156:24
156:25 207:17
207:24 215:18

223:4,7
**percentages**
72:16 111:14
153:16 155:3
158:3 173:14
**perfect** 24:4
136:24 181:23
211:14
**perform** 52:13
75:16 108:9
122:16,22
145:6 206:12
206:13 228:2
**performance**
68:9
**performed** 15:6
52:15 75:16
87:23 130:20
130:21 134:1
174:5 206:5
208:22
**performing**
51:18 61:3
68:8 81:8
85:22 88:16
117:5 123:23
**period** 55:9
92:15 98:8
103:2 104:7
132:2 134:11
134:17 161:24
225:12
**periods** 130:7
131:10 132:12

141:6
**person** 34:22
35:4 54:7,25
64:3,6 96:3,3
110:7,9,12,13
110:14 111:19
112:2,16,16,19
113:15,18
115:7,17 116:7
116:17,22
160:9 161:1,15
162:6 164:22
190:20 198:21
199:6,6,7,9,23
200:3,16 201:3
201:10,13
**person's** 64:2
**personal** 184:1
**persons** 174:15
**pertaining**
31:25
**pertains** 132:14
234:11
**pettigrew** 8:22
23:17 24:22
31:17 32:2
33:5,21,24
34:9 108:18
117:23 118:15
168:8 170:9
173:11 177:5
178:3 228:19
228:21 229:24
230:5 232:21

**pettigrew's**
23:18,23 33:13
34:24 35:9
117:14 167:4
167:12,25
173:2,4 176:10
230:12
**ph.d** 1:12 2:12
8:3,13
**ph.d.** 8:16,19
9:13,17 10:8
235:5 236:2,24
237:2,4,12
**phenomena**
84:20
**phenomenon**
84:11 85:9
**phone** 192:25
231:15 232:3
**phrase** 26:9
**phrasing** 198:5
**picked** 47:18
**picture** 95:20
**piece** 53:25
91:5
**pill** 26:14,15,18
**place** 44:12
75:17 82:4
132:22 133:2
163:25 164:4
182:4,18,20
186:21 187:2
187:18,25
198:22 229:6

234:4
**placed** 136:13
**plaintiff** 11:12
211:1
**plaintiffs** 2:13
3:3,13,19 4:3,9
4:16 10:19
65:13 165:23
182:24
**plan** 202:20
**planned** 202:22
**plausible** 37:6
**play** 48:24 50:6
**plaza** 3:9
**plc** 6:17
**please** 10:24
11:24 12:4,11
12:21 13:2
14:25 33:9
76:7 129:8
193:2 212:21
223:17
**plot** 103:17
**plus** 70:2 84:4
**podcast** 42:15
**point** 26:6 40:2
44:17 49:23
78:23 90:11
91:12 92:3,7,8
92:25 93:12
96:5,23 103:4
103:5,13 113:7
115:23 141:18
147:18,23

151:17,21
168:15 170:6
185:7 194:14
197:21 207:24
208:17 215:18
223:4,7,16
225:13
**pointed** 37:21
**points** 19:11
55:14,16 89:16
92:20 103:16
103:17 111:2
112:24 207:18
**policies** 47:1
133:3,5
**policy** 11:5
48:14 49:4
134:13 139:1
231:4
**political** 11:4
17:13 42:23
43:13 48:4,7
49:8 50:2,5
70:17 80:1
89:24 123:5
220:20 221:1,7
221:10
**politics** 48:11
90:12 91:12
92:7 93:11
**poll** 121:3
**polling** 92:23
163:25 182:3
182:18,20

**[polling - previously]**                                              Page 50

186:21 187:2
187:18,25
220:15,17
**polls** 92:1
144:18
**pool** 64:20,24
231:23,24
**population**
26:19 44:25
47:7 65:18
66:3 67:4
75:14 76:5
77:17 93:25
110:13 169:15
169:16 224:18
225:10 226:16
226:22 227:10
227:24
**populations**
146:1 231:11
**pose** 33:9
**posed** 171:2
209:24
**position** 11:2
**positions** 11:3
**positively**
166:25
**possible** 28:19
43:15 144:4
162:25 163:3
187:10 231:24
**possibly** 71:24
**post** 56:10,16
62:7,9 132:1

142:5 143:3
145:18 146:20
164:10 165:15
173:13 180:24
184:25 187:22
188:6,23 190:6
200:4,5,9,11
203:13 206:19
206:22 207:3
208:6 229:24
230:7,13
**postal** 188:20
189:11 190:2,7
192:3,7,11,16
200:13
**posted** 36:4
**potential** 85:4
176:21
**potentially**
21:12 43:18
44:25 54:9
64:4 72:11
120:16
**pre** 17:8 21:18
21:19 22:16
56:11,16 142:4
146:21 154:25
158:12 184:18
230:11
**preceding**
126:22
**precinct** 61:14
127:4,11

**precise** 32:15
60:17 77:4
82:13 85:16
104:18 105:7
186:11
**precisely** 115:2
116:10 137:7
137:23 140:14
**precludes**
194:18
**preelection**
173:12 229:18
**prefer** 205:1
**preferable**
204:3
**preferrable**
204:20
**preferred**
58:25,25 204:3
220:10,12
232:21,21
**prefilled** 17:5
**preinterview**
230:8
**presence** 95:4
134:7 194:19
**present** 5:10
6:24 92:16
102:4 131:24
145:3 225:3
**presented**
102:9,9,14
184:4

**presenting** 83:7
**president** 36:25
37:3,8
**presidential**
56:10,12 59:14
60:1 78:7
89:15 91:10,11
94:3,15,17
95:3 142:22
**press** 9:19 93:7
192:25 193:10
199:7
**presumably**
194:17
**presume**
177:20 200:16
**pretty** 47:22
48:5 80:15
88:9 93:11
**prevent** 13:5
**prevented** 18:5
**previewed**
211:3
**previous** 61:19
82:21 88:24
102:1 141:6
155:22 156:1
171:19 185:18
195:16 219:1
224:11
**previously**
29:21 62:3
102:3 130:12
155:23

pride  217:24
primarily
  10:22 17:7
  88:25 191:3
primary  36:17
  40:15 44:12
  147:1 162:14
  195:19
prince  5:5,10
  57:11
print  18:20
  20:10
printed  14:24
prior  17:6
  21:21,23 33:11
  58:20 66:6
  69:3,3 75:7
  77:2 82:11
  89:14,15 91:8
  92:4 94:14
  102:6,10
  110:21 113:23
  115:8 118:3
  126:18 131:12
  171:13 172:10
  208:22 219:23
  234:5
privilege  12:20
pro  52:2
probability
  169:13
probably  49:3
  64:11 71:25
  75:6 88:9

95:18 96:22
120:14 128:4
147:7 148:20
149:2 156:15
161:5 166:19
169:19 173:24
174:2 188:6
189:14 201:2
problem  12:17
  27:12 84:12
  212:22
problems
  163:12
procedure
  37:21,22 39:12
  63:7 64:10
  67:13,25 71:25
  72:1 85:21
  202:18 203:12
  205:15 206:8
  206:18 208:25
procedures
  72:13 84:10
proceed  12:21
proceedings
  5:10 6:24
  19:15 57:11
  127:25 234:3,5
  234:7,13
process  23:11
  54:22 164:3
  190:18 192:14
  195:3,20

processing
  195:23
produce  109:18
produced  63:2
  66:10 88:21
  174:8
product  207:7
  207:14
production
  100:5
professor  11:5
profile  108:12
program  177:9
  177:17,19,21
  177:25 178:12
programming
  30:25
progress  174:6
prohibition
  22:17
project  4:3
  29:23 210:25
projection  67:6
  67:11,25 69:7
  69:20 70:11,14
  71:18,24 72:12
  73:10
projections
  70:18,19
prominent
  141:11,13
prompt  83:19
proper  153:3
  154:7

properly
  191:12
proportion
  203:22 206:14
proportionate
  49:7
protocol
  200:15
provide  17:14
  36:23 49:15
  52:9 65:11
  78:14,18 79:8
  111:2,7,12,22
  112:20 133:12
  135:8,12,13
  141:20 143:25
  155:12 171:20
  176:25 181:10
  190:12 191:9
provided  19:4
  20:20 31:1
  65:12 97:17
  166:5 185:8
  188:10 194:23
  212:5 222:18
provides
  144:24 178:3
  197:12 232:5
providing
  39:13 98:13
  108:10 109:25
  124:17 212:9
provision  111:9
  127:2,11

131:18 149:15
153:12
**provisional**
118:18,24
119:5,6,9,12,15
119:17,19,25
120:1 122:8,13
122:14,17,18
123:1,6,7,10,19
123:22,25
124:5,10,15,19
125:2,7,11,15
125:19 126:7,8
126:9,17,20,25
127:3,10,12,15
127:17
**provisions**  17:5
17:23 18:4
51:5,11,14
53:21 108:20
110:23 126:25
178:22 179:5
179:17,22
180:2 192:2
**proximate**
52:11 67:8
197:14
**proximity**
190:25
**pub**  65:3
**public**  11:5
50:21 220:14
220:17 231:4
237:19

**publications**
18:16 35:18
**publicly**  31:3
65:4,11 75:17
**publish**  36:12
**published**
18:23 36:4,9,9
42:5,10 206:24
**pulled**  221:22
**pulling**  119:24
**purposes**
133:23
**push**  146:3
**put**  18:10 31:5
41:18 52:7
60:19 103:17
118:16 132:14
132:22 141:4
158:13 200:7
202:1,2 208:16
**putting**  64:19
192:14 200:8,8
**python**  30:25
31:6

**q**

**qualification**
132:11
**quality**  209:11
**quantities**
109:23
**quantity**  84:21
231:9 232:6

**question**  11:25
12:4,6,7,22
13:3 18:3
25:15,17 30:11
33:9 35:14
43:2 47:8,24
48:23 50:1
51:24 57:9
62:23 71:12
81:19,22 88:10
94:19 105:14
106:21 107:2,7
114:1,7,8
115:4 116:1,9
120:22 121:25
125:13 126:5
126:15 135:17
136:8 137:6
144:6,16
145:19 149:22
153:21 157:11
163:15 166:13
171:3 178:10
182:1,6,23
183:23 185:18
186:7,20
188:18,23
189:4 194:19
195:2 201:8
212:21 213:9
216:22,22
221:9,12
223:22 230:8
232:11,12

**questions**  10:20
10:21 11:20,23
12:12,19 20:16
36:13 42:18
50:15 64:12
65:20 74:11,16
95:21 101:9
107:16,24
110:17 114:2
117:13 118:17
119:23 128:15
136:18,21,25
148:25 152:19
160:23 173:25
175:13 176:9
178:19 189:12
202:24 209:18
209:23 210:11
211:2,24
216:19 218:15
221:16 226:4
228:7,16
231:19 232:4,9
**quick**  95:12
**quicker**  166:20
**quickly**  211:19
214:23
**quite**  50:8,10
131:15 150:12
170:2 216:14
**quo**  138:15
**quote**  46:5
87:11 91:15
108:16 141:12

165:18 186:19
218:13
**quoted** 87:7
165:17
**quoting** 212:7

**r**

**r** 236:3,3
**race** 49:14 63:8
63:17,18,24
64:2,4,15,16
73:1,2 75:11
78:7 81:17,20
81:21 82:9,18
82:21 84:23
86:4,23 96:8
99:17,20,22
100:4,11,13
101:4,13 108:6
111:16 118:24
120:16 124:16
125:19 128:13
153:14,17
155:4 158:3
208:23
**races** 77:25
78:6
**racial** 42:23
43:12 46:11,20
47:2,12,14
49:2,13 50:4
53:16 56:15
58:11,15 59:7
59:23 61:4,15

63:5 64:8,19
67:10 72:9
74:23,25 75:22
76:3 77:10
81:6,10,12
82:4,7,11,17,19
83:4,19 84:2,3
86:2,20 87:25
88:1,11,16,22
100:21 101:11
102:20 104:14
104:15,22,23
104:24,25
106:15,25
107:8 112:13
113:21 114:21
114:23 115:10
117:2 123:1,25
124:1,10,18
129:20,24
137:18 138:6,7
138:9 139:18
139:22 140:3
143:20 146:22
149:8 154:13
156:6,10 157:1
158:18,25
159:9,16
161:14 173:2,2
179:2,10,18
203:18,22
204:7
**raffensperger**
20:4 22:15

**raise** 10:6 81:4
**ramaswamy**
9:5 36:6
**ran** 91:11
174:3
**rare** 93:11
**rate** 16:15
20:21,25 37:19
37:24 38:2,7
38:10,23 39:1
68:22 73:14,17
73:19 74:1
80:12 94:1,6
94:22 108:2
110:3 125:7
137:2,8,23
138:7,10
139:19,20
144:19 145:8
146:12 147:12
151:22,25
159:3,15 162:8
162:15,20,22
163:3 164:12
182:25 197:13
204:7 205:21
212:9,25
213:11,17
215:22 217:17
218:4 220:5
221:5,11
223:25 224:1,2
**rates** 21:2,3
39:17 53:15

67:3 74:23,24
75:18 76:2
77:13 82:8
96:18 108:6
109:3,6,15
114:23 115:9
118:24 122:17
123:6,7,10,19
123:22,24
124:6,10,14
125:9 128:8,12
128:18,20
129:5,12,19,24
130:1,4,9
131:9 138:24
139:24 140:5
142:3 144:9
146:20,21
152:3,11,25
153:13 156:3
161:13,16,17
161:19 162:5
163:13,21
164:17 212:2
212:17 214:10
215:2 218:24
**rather** 12:12
170:18 173:13
194:13 204:15
227:10 230:7
**reach** 72:2,7,8
183:17 192:6
227:11

**react** 28:14
**reactions** 28:11
**read** 23:17
29:21 46:10,14
46:23 51:1
52:16 57:23,25
90:8 97:8
177:12 193:3
233:6 235:9
237:5
**readily** 191:23
**reading** 22:10
23:11 29:11
30:6,6,12 32:1
55:12 90:13
91:7 184:1
193:13
**ready** 114:8,9
**real** 84:11
**realclear** 92:23
**realignment**
48:10
**realize** 11:8
**realized** 116:9
**really** 26:15
29:7 37:24
40:10 51:18
74:20 91:5
102:22 117:12
120:19 146:15
150:7 152:18
160:1 167:10
178:6 183:25
188:12 189:1,3

197:2,17
200:25 205:15
210:22 224:4
224:24 228:7
**reanalysis**
94:21
**reapportionm...**
61:7,9,10,22
63:2,11 64:9
65:2,9 219:6
219:13
**reason** 11:24
16:17 18:22
25:19 37:22
38:4,8,9 64:22
84:10 88:21
96:24 98:5,6,7
99:9,10 105:7
127:15,16
129:3,11,23
130:14,17
131:1 135:12
139:18 141:5,9
141:24 142:8
148:3 150:6,18
164:9,19
177:14 204:9
204:25 218:5
223:23 235:11
236:6,9,12,15
236:18,21
**reasonable**
72:1 194:11
201:7 230:24

**reasons** 12:10
38:24 50:22
128:9,18,19
129:19 138:13
140:8,17,18
141:10 142:1,4
143:21 144:13
147:15,17,21
147:25 148:4
148:11 149:7
150:3 151:14
151:15 153:18
154:1,15 155:2
155:5 158:1,5
160:4 164:14
164:17 176:21
204:2 232:23
**rebuttal** 8:21
9:16 13:24
33:4 57:15,21
58:3 117:15
167:5 181:20
189:13,13
**recall** 15:20
21:6,7,17 22:6
25:9 28:9
40:19 63:1
82:25 83:5,5
85:20 123:22
137:24 158:8
226:15 228:22
228:24 230:21
**recalling** 41:4
61:13,17 62:4

**receipt** 142:13
143:3 235:17
**receipts** 16:25
**receive** 26:18
40:16 91:20
194:12 196:16
198:15 201:14
**received** 91:22
155:15,20,22
159:12 200:21
200:23
**receiving**
194:11
**recent** 84:6
121:18,20
**recently** 83:25
**recess** 52:22
95:14 127:24
160:17 202:10
**recognize** 33:4
**recollected**
22:4
**recollection**
15:10,14 17:6
24:22 119:23
131:17 202:16
209:6
**record** 10:24
11:9 12:8
15:16 22:11
24:5,8 32:21
32:22,24 33:2
60:12 69:25
93:22 95:13,15

[record - rejection]                                                 Page 55

118:23 126:13
127:22 128:2
151:12 157:14
161:8,10,11
166:14 202:9
223:5,11
229:21 233:8
234:6,9
**recorded**   63:24
98:12
**recording**
11:22
**records**   122:2
**rector**   4:12
**reduce**   84:16
197:16,22
**reduced**   144:19
197:8
**reduces**   168:10
**reducing**   84:13
**reduction**
84:18 145:23
145:23 175:4
197:16
**reed**   3:8
**refer**   17:24
61:6 65:18
71:7 133:9
**reference**   60:24
**referenced**
175:14 235:6
**referred**   21:9
185:24

**referring**   38:12
56:3 68:1,2,19
75:20,21 80:10
86:6,8 87:17
92:11 117:7
157:15 188:2
218:25 219:11
224:9
**refined**   132:2
**reflect**   59:19
125:4
**reflected**   11:21
29:18 59:5,20
59:22 122:10
183:18 185:3
**reflecting**
58:14 194:1
**reflection**
123:24
**reflects**   147:16
187:15
**regard**   12:6
52:13 94:15
136:3 178:25
179:10
**regarding**
31:22 37:10
69:9 78:19,19
177:7 188:24
208:23
**regardless**
82:10 119:16
122:14 198:14
216:8 217:9,14

227:16
**regards**   206:6
**registered**
83:25 99:11
121:18 136:12
211:17 213:11
218:20 220:15
220:17,21
221:2,5,8,11
224:3,5,7,18,23
224:24 225:2,7
225:11 231:17
233:1
**registering**
141:21
**registrars**   6:4
**registration**   6:3
83:2,18 86:17
86:22 98:8,23
98:24 99:10
120:8,20
121:11,13
143:25 174:15
225:3
**registrations**
100:3
**regression**
203:13 206:11
206:12,13,17
206:20
**regularly**   25:13
**regulation**
136:15 154:25

**regulations**
132:21 136:13
148:9,20 156:1
157:9
**reimposed**
149:12
**reinstatement**
134:25
**reject**   34:23
35:3 131:23
169:13
**rejected**   140:15
140:16 142:12
143:2,24
145:17 147:11
147:15,24
148:10,19
151:5,13,15
153:1,18
154:14,23,24
155:1,5,25
156:1,8 157:1
157:22 158:4
158:22 159:9
160:3,5 179:24
180:3
**rejecting**
131:21 132:5
**rejection**   37:20
38:2,7,10,23
39:17 54:24
128:20 129:5
129:12,19,24
130:4,9 131:9

**[rejection - report]** Page 56

137:8,23 138:7
138:9,14,24
139:24 140:4,8
141:3,4,10
142:1,3 144:4
144:9,13
146:12,20,21
147:21 150:3
151:22,22,25
152:3,11,21
153:6,13 156:3
159:3,15
**rejections**
20:21 21:1,4
37:25 38:21
39:2 54:19
128:4,9,9,18
130:2 132:15
133:3 137:2
139:19,21
142:6 143:21
144:19 145:8
148:4 149:7,19
152:17 156:10
**relate** 18:11
185:14
**related** 29:24
38:21 40:10,13
40:16 51:17
85:9 128:25
129:11 141:3,3
141:15 142:3,4
142:7 143:21
144:4,9 146:19

147:15,17,25
148:4,11 149:7
150:9,16 155:2
157:25 159:10
192:4,8,9
195:14
**relates** 111:1
**relating** 30:12
79:9
**relative** 72:3,16
139:23 175:7
209:11 234:16
**relatively** 47:17
**release** 9:19
192:25 193:11
199:7
**released** 23:21
174:23,24
**relevance**
49:25
**relevant** 39:8
45:4 49:15,21
91:3 176:23
191:7,21 210:9
232:4
**reliability**
195:4
**reliable** 48:13
167:18 190:3
190:16 192:16
**relied** 60:22
61:1 165:8
**reluctant**
132:24

**rely** 66:19
130:21 175:23
191:23
**relying** 66:7
195:4
**remain** 17:16
**remained**
115:21 116:17
**remaining**
99:19
**remember**
28:17 111:9
137:25
**remembering**
141:12
**remind** 117:16
197:5
**remotely** 3:8,21
4:4,10,11,18
5:5,13,19 6:5
6:11,17,18 7:3
57:12
**removal** 38:12
**remove** 26:18
**removed** 38:18
81:12
**removing** 27:6
**repeat** 169:25
**repeatedly**
195:9
**rephrase** 39:18
43:7 55:23
88:20 107:7
117:25 142:20

**replication**
16:22 29:23
30:2 31:15
76:20 102:3
185:8
**report** 8:12,15
8:18,21 9:12
9:16 13:14,17
13:21,24 14:11
14:18 15:11,20
15:21,25 16:7
16:11,12 17:5
17:6,11,15,19
19:16,20,24
21:15 22:5,25
23:7,9,13,15
25:21 27:14
28:12,14 31:14
32:5,9,12 33:5
33:8,21,25
38:6 52:16
54:23 55:3
56:4,5,25,25
57:4,5,7,15,21
58:3,19,20,22
60:20,23 61:7
61:9,10,12,22
62:7 63:2,11
63:14 64:5,9
65:3,10,17
66:24 67:22
68:2,3,11 69:3
69:3,4,10
71:11 72:24

| | | | |
|---|---|---|---|
| 74:4,5,12,22 | 183:6,8 185:10 | **reporter** 2:18 | 174:20 177:10 |
| 75:4,12 76:2 | 185:17,17,18 | 10:4 12:8 14:7 | 182:17 185:3 |
| 77:11,14,15 | 185:25 186:1 | 14:20 16:4 | 185:14 197:7 |
| 78:10 84:4 | 186:22 187:13 | 33:1 35:23 | 202:14 203:25 |
| 85:3 86:3,11 | 188:10 189:13 | 41:22 56:22 | 209:7 210:1 |
| 86:14,16 87:2 | 189:14 190:1,7 | 57:19 101:17 | 219:16 229:25 |
| 87:7 88:15 | 190:15,25 | 161:7 192:20 | **represent** |
| 89:5 93:19 | 196:7 197:4,9 | 192:23 234:1 | 10:19 11:12 |
| 94:22 95:19,21 | 201:21 202:20 | **reporting** 21:3 | 193:10 210:25 |
| 95:22 96:24 | 203:10,14,19 | 119:15 169:12 | 227:15,18 |
| 99:18,21 100:8 | 203:20,22 | 177:21 | **representation** |
| 100:9 101:13 | 204:10,12,21 | **reports** 13:10 | 226:8,11 |
| 102:1,6 107:18 | 205:2,24 206:3 | 14:4 15:7,12 | **representative** |
| 110:22 111:3,5 | 206:14 208:25 | 15:17 16:18 | 185:21 227:18 |
| 117:8,15,24 | 209:14 211:4,8 | 17:22 19:5 | **representatives** |
| 118:1,21,22,24 | 212:24 218:13 | 23:10 25:13,17 | 227:14 |
| 124:24 128:6 | 219:6,11,13,16 | 26:19 29:18 | **represented** |
| 131:5 140:17 | 220:9 221:14 | 37:1 40:12 | 92:13 101:10 |
| 146:7 156:16 | 223:12,17 | 42:8 52:1,9,25 | **representing** |
| 156:18,20 | 225:14,18 | 53:1,8 54:15 | 11:14 93:23 |
| 157:13,18 | 226:6 227:6,21 | 57:24,25 59:3 | 109:22 |
| 158:3,9,14 | 229:19 232:23 | 61:20 62:14 | **represents** |
| 160:9,21,25 | **reported** 1:21 | 64:3,5 65:9 | 139:4 156:25 |
| 161:12 163:22 | 30:16 31:14,14 | 67:20 69:11 | **reproduced** |
| 164:18,24 | 63:18,18 73:2 | 70:8 71:7 74:6 | 58:14 88:22 |
| 167:4,5,22 | 84:5 86:3 | 74:18,18 76:13 | **republican** |
| 170:4,20 | 102:2,3 112:12 | 76:19 77:12 | 48:12 |
| 172:15,17 | 114:24 115:10 | 83:8,21 88:11 | **republicans** |
| 175:3,6,8,15 | 126:4 137:18 | 88:17 89:3,20 | 44:20 |
| 176:10,12 | 140:3 149:6 | 90:7,23 92:13 | **request** 163:9,9 |
| 177:13 178:16 | 158:25 159:16 | 100:12 102:10 | **requested** |
| 180:6,8,10 | 168:17 180:20 | 102:15 108:13 | 65:13 193:14 |
| 181:20 182:14 | 181:15 229:23 | 133:10 144:17 | 193:18 202:6 |
| 182:24,25 | 232:20 | 157:12 158:3 | 234:14 |

requests
190:20
require  78:12
90:25 135:23
189:7
required  79:12
118:5 130:18
133:12,21,23
136:4 237:13
requirement
22:19 39:9
131:19 134:21
134:25 135:7
135:24 149:12
149:20 168:10
requirements
38:13 148:5
159:20
requires  49:9
130:24
requiring
149:13
reread  46:18
rereading
90:22
reroute  192:12
research  26:3
166:15
residence
120:15
resolve  150:10
150:13,23
230:15

respect  53:15
respond  105:20
114:8 223:21
responded  29:7
171:23 187:22
respondents
181:9,11 206:1
208:4 229:14
229:14
responding
81:19 108:14
response  8:15
14:18 22:25
25:14 87:5
88:1 166:10
181:25 187:23
188:8 211:7
228:15
responses
181:7 186:13
188:24 207:2
responsible
53:25
responsive
35:13 40:11
94:18 107:2
116:1 121:23
149:22 153:20
190:24
rest  216:7
221:18 222:6
225:22
restricted
136:5,6 197:23

198:3,21
restrictive
198:17
restroom
160:14
result  34:20
44:24 48:13
73:17,19,25
84:19 85:8
131:25 136:15
205:8,13 207:6
208:2
resulted  173:13
results  30:15
45:6 72:8,16
175:2 206:1
208:21
retained  19:15
20:2
retread  75:6
185:13
return  16:25
134:5,16
135:13 144:14
145:1 146:3
154:21 160:3
182:1 188:19
190:2,3,18
191:3,22
194:24 195:3
197:1 198:25
199:8,17,25
200:20 225:16
235:13,16

returned  38:24
108:12 129:14
146:3,5,17
179:24 183:10
183:14,16
186:15 187:9
187:16 190:23
194:10 202:19
207:2 208:5
returning
22:23 108:11
147:5 182:15
182:17 187:5
187:13 189:10
191:2 192:16
194:13 196:17
196:21 203:19
returns  129:9
review  211:19
234:13 235:7
reviewed  23:8
23:14 24:17,20
24:24,25 28:24
30:8,25 31:17
177:18 217:3
225:19
reviewing  29:3
29:14 167:12
219:1
revise  101:20
revision  81:22
rid  26:16
ride  201:6,7

**ridiculous** 92:5
**right** 10:6 13:9
  13:16,20 14:24
  19:1,10 23:25
  26:6,9 33:10
  33:16,17 36:21
  38:15 42:9,11
  42:12 46:16
  55:13 60:7,7
  60:11 64:24
  65:8 66:17
  70:20 71:3,6
  71:14,17,19
  74:7,7 75:23
  78:5 82:1
  83:17 85:15
  88:14,18 89:10
  90:2 102:16
  107:15 111:22
  117:18,23
  118:14,19
  120:9,12
  125:17 132:3
  136:2,22
  139:25 140:3
  148:16,23
  149:11 151:11
  152:9 154:5
  161:5,6 165:7
  165:15 167:21
  170:22 172:11
  172:19 174:8
  175:22 178:14
  178:19 179:9

  180:22 184:20
  184:21 188:21
  188:22 189:17
  189:21 190:8
  193:19 195:7
  199:10 205:7
  207:8 213:14
  213:15 214:13
  214:14,17
  215:5,15,19
  216:1,2,4
  217:1,22
  219:15 222:1
  222:15,20,21
  222:24,25
  224:12 225:23
  227:25 230:13
**rights** 3:4
**risk** 79:3 84:11
  223:13 229:9
  229:10
**river** 5:14
**riverside** 5:20
**rmr** 1:21
  234:22
**road** 6:19
**roberts** 29:21
  30:4 197:11
**rock** 5:15
**role** 50:6 76:25
**rollover** 40:14
  152:22
**room** 10:23

**rosborough**
  3:14 8:4,7
  10:13,19 11:8
  11:16 14:3,8
  14:10,15,21
  15:22 16:5
  24:4,7,10 25:8
  28:6 32:11,14
  32:16,21 33:2
  35:20,24 41:13
  41:18,23 43:3
  43:5,7,10 45:8
  45:23 49:23
  52:17,21,23
  53:14 56:19,23
  57:13,22 95:13
  95:15 101:19
  101:22,25
  102:7 121:24
  122:9,24 124:8
  127:9,18,21,23
  128:1 155:17
  156:2 160:12
  160:15,18
  161:9,11
  192:18,21,24
  196:23 198:2
  201:4 202:9,11
  210:10,13,21
  228:13 232:10
  232:15 233:3
**roughly** 115:21
  116:18

**round** 25:1
  42:8 100:12
**rounding** 149:5
**row** 72:25 73:4
  73:24 106:25
  120:6,8,11,13
  121:12
**rows** 106:23
  115:25 120:4
**rules** 9:8 18:14
  42:1 131:14
  145:6 153:6
  155:6 169:19
**run** 84:14
  176:7 229:9
**runoff** 25:24
  27:11,19 58:18
  88:13,18,23
  89:1 92:15
  134:1,11,19
  139:2
**runs** 229:10
**ryan** 2:17

**s**

**s** 4:10 123:6
  165:12 236:3
**s.e.** 6:12
**sake** 27:22
  69:13
**sample** 231:16
  231:21,24
**sampling**
  220:16 233:2

**[san - see]**                                                                 Page 60

| | | | |
|---|---|---|---|
| **san** 4:19 | 108:17,20 | 188:6,23 | **second** 25:23 |
| **saturday** | 109:14,18 | 195:17 196:18 | 26:5 32:17,23 |
| 199:15,20 | 110:23,25 | 196:24 197:21 | 38:9 39:11 |
| **save** 117:5 | 111:6 113:23 | 198:11,16 | 68:20 69:18 |
| 179:14 | 114:22 115:8 | 199:16,17 | 78:17 84:9 |
| **saw** 37:18 | 115:20,21 | 200:12,12,21 | 87:10 130:22 |
| 67:19 94:13 | 116:2 125:10 | 200:21 | 163:18 167:7 |
| 95:7 164:9 | 125:20 126:4 | **sb202** 118:3,5 | 190:22 199:25 |
| **saying** 12:13 | 126:22,25 | **scale** 159:17 | 203:9 204:9 |
| 46:25 119:9 | 127:2,13 130:1 | 223:7,7 | 207:24 213:7 |
| 157:7 160:19 | 130:3 131:13 | **scan** 192:9 | 216:18 |
| 171:21 200:7 | 131:14,18 | **scanned** 192:6 | **secretary** 25:24 |
| 205:11 223:4 | 132:1 134:12 | **scanning** | 27:11 65:9 |
| **says** 34:8 58:19 | 134:24 136:1,4 | 192:13 | 132:22 162:11 |
| 63:19 68:21 | 136:13 138:15 | **scans** 192:7 | 219:14 |
| 73:1,4,5,7 | 138:25 139:2,5 | **schaerr** 5:4,8,8 | **section** 74:4,12 |
| 76:10 86:15,16 | 139:7,8,9,17 | 235:2 | 83:3 95:19 |
| 91:1 110:6 | 142:4,5 146:20 | **scheme** 133:1 | 97:7 107:20 |
| 129:13 141:13 | 146:21 148:5,9 | 207:16 | 108:1,7 117:24 |
| 142:19 145:22 | 149:12 153:5,9 | **scholarly** 178:7 | 118:1,18,21,22 |
| 155:14 205:20 | 153:19 154:15 | **scholars** 205:16 | 119:7 128:5,7 |
| 226:7,17 | 154:25 155:6 | **school** 47:20 | 133:9 152:17 |
| **sb** 17:14,23,24 | 155:16 156:5 | 231:4 | 152:20 160:20 |
| 18:2,4 22:17 | 157:4,9 158:5 | **science** 11:4 | 160:24 161:4,6 |
| 27:6 39:6,9 | 158:12,16 | 123:5 220:20 | 161:12,13 |
| 51:5,11,14,22 | 159:22 161:18 | 221:2,7,10 | 162:1 165:6,7 |
| 52:11,14 53:21 | 161:22 162:4,8 | **scientist** 50:2 | 165:17 176:11 |
| 54:14,17 56:10 | 163:4,10 | 70:17 89:24 | 178:15,16 |
| 56:11,16,16 | 165:24,25 | **scientists** 80:1 | 226:24 |
| 59:9,21 78:13 | 166:4,24 | **scope** 107:25 | **secure** 50:24 |
| 79:13,17,20 | 178:22 179:5 | 178:20 | 51:11 |
| 80:9,13,25 | 179:17,22 | **seat** 226:25 | **security** 135:9 |
| 81:2 89:15,15 | 180:2 184:18 | **seats** 92:18 | **see** 34:6 38:6,9 |
| 97:4 106:14 | 184:25 187:17 | 226:9,18 | 38:19 54:25 |

**[see - share]** Page 61

76:20 86:5
87:9 94:8,19
94:22,25
103:25 104:2,3
104:6,6 112:11
121:14 129:3
129:11 149:19
152:19 154:22
160:22 164:6
172:7,8 178:7
183:9 210:19
210:21 211:15
224:13,16,20
**seeing** 83:6
121:17,19
163:15 210:20
**seeking** 36:8
**seems** 25:21
201:7 202:2
**seen** 109:18
146:15 193:7
197:17
**segment** 160:21
207:4
**select** 87:25
101:5 187:23
**selection** 26:1,7
26:10,20 27:12
89:11
**selects** 187:21
188:5
**self** 40:17 73:2
84:5 86:3
99:20 101:11

112:12 137:18
140:3 158:25
159:16 180:20
182:14 232:20
**senate** 1:6 2:6
17:23,24 88:13
92:14 235:4
236:1 237:1
**send** 191:6,16
**sending** 22:19
194:20
**sends** 191:20
**senior** 11:6
**sense** 65:24
107:19 119:22
176:15 185:22
202:5 205:15
216:11
**sensitivity**
227:6,22
**sent** 190:20
194:4,16
235:14
**sentence** 78:11
78:17 79:10
211:16,19
223:20 224:9
225:25 226:7
**sentences**
211:20
**sep** 13:19 16:12
**separate** 29:23
97:20

**separately** 94:3
110:25
**september**
229:15,18,23
235:3
**sequence** 29:8
121:17
**series** 11:20
71:23 170:4
**serious** 26:2
**seriously** 93:10
**service** 188:20
189:11 190:2,7
190:17 192:3,5
192:7,11,16
**services** 200:13
**serving** 99:7
**set** 17:1 56:5,6
56:6 75:7
79:14,15,25
100:23 141:17
155:9 158:7
168:24 188:13
188:14 205:4
227:1 229:15
229:16 230:24
231:16 234:4
**seth** 91:6
**sets** 31:2,5
**setting** 44:3
189:6 195:21
197:19
**setup** 120:3

**several** 122:6
128:10 183:6
218:12
**shaking** 12:12
**shame** 179:14
**share** 33:22
34:17,18 63:23
63:25 64:2
85:22 86:2
87:19 105:4,5
105:17,18,24
105:25 106:2,3
106:5,6,10,11
106:15,16
107:9 110:4,9
110:12,15,15
111:24,24
112:12,14
113:14,15,18
113:25 114:17
114:21 115:6
115:19,20
116:8,15,17,18
119:4,5 129:14
143:9,10,20
154:20 157:21
169:2,5 170:7
171:22 172:7,9
175:4 180:9,11
183:8,10,13
187:8,12,15
188:11 202:18
203:1,9,18,20
203:21 204:10

**[share - someone's]**                                                    Page 62

204:12,16
205:2,5,7
207:9,10 224:5
225:10 226:21
226:22 227:9
**shared** 85:23
**shares** 107:11
158:17,20,21
159:6,8 169:1
226:25
**sheet** 235:11
**shift** 95:16
**shifting** 60:21
**shortened**
162:25 163:4
163:10
**shorthand** 2:17
234:1,7
**show** 37:23
85:3 170:24
172:18 197:8
217:11
**showing** 85:5
157:5,20 180:7
180:9,11
**shown** 94:3
146:15
**shows** 55:11
56:9 207:5
**sic** 85:19
**side** 49:6 120:5
195:2
**sign** 150:22
233:6 235:12

**signature** 20:21
20:25 37:12,20
37:25 39:4,12
133:21,23
134:2,13
137:23 140:9
140:16,17,18
141:5,8,15
142:3,8 144:3
146:21 147:11
147:22 150:1
150:14 151:4
234:21
**signatures** 38:2
150:21,21
**signed** 235:19
**significance**
30:14,22 31:11
168:19 171:10
181:13
**significant**
33:25 94:10
168:1 170:13
170:17,25
171:14 181:16
191:20 196:15
207:19,25
208:9
**significantly**
125:20,22
196:9,11
**similar** 12:10
18:3 38:5
68:10 72:1,8

107:23 113:10
128:15 165:16
182:19 216:10
218:9 224:20
231:9
**similarity**
100:20
**similarly** 51:9
51:13 56:14
59:18 106:9
129:17 180:1
**simms** 5:19
**simple** 67:6
88:9 130:22
**simplification**
38:8,11
**simultaneously**
114:11
**single** 34:22
35:4 168:17
169:11 170:11
171:5 227:17
**sitting** 12:10
**situate** 78:21
**situates** 78:25
**situation**
150:14
**situations**
194:6
**six** 215:25
**size** 48:6,8,21
49:5 212:11
**skipping** 50:17

**slight** 69:2
**slightly** 46:15
63:12 67:17
70:12 207:22
227:8,9 231:5
231:8
**small** 40:20
44:24 67:4,17
72:11 100:23
101:1 141:20
143:23 206:2
**smaller** 44:20
67:19,25 73:13
93:15,15 105:9
135:5 172:9
224:4 225:24
226:1
**smith** 5:13
**snapshot** 98:9
98:13
**social** 39:15
135:9,14,25
**socioeconomic**
48:12
**solely** 82:23
185:14 187:18
209:19
**solutions**
235:23
**somebody** 57:9
98:22 99:6
145:21 188:14
**someone's**
230:2

**[sorry - state]**                                                    Page 63

| | | | |
|---|---|---|---|
| **sorry**  21:1,25 | 68:7 79:11 | **sparsely**  197:9 | **spoken**  42:13 |
| 38:18,25 39:18 | 86:21 93:9 | **speak**  15:17,17 | **spread**  164:5 |
| 46:4,16 50:10 | 94:2,18 98:21 | 28:3 | **spreadsheet** |
| 52:2,5 53:14 | 107:24 108:11 | **speaking**  20:23 | 97:10 121:7 |
| 57:17 58:2 | 131:10 136:17 | 28:2 152:20 | **square**  168:16 |
| 61:23 62:18 | 138:13 147:20 | **speaks**  206:3 | **stage**  75:7 |
| 66:9,14 71:10 | 149:25 150:10 | **special**  92:14 | **stagnant** |
| 71:13 72:5 | 150:13,23 | 169:8,9,20 | 115:21 |
| 74:6 81:14 | 164:2,16 | **specific**  22:1,2 | **stand**  171:20 |
| 87:1 89:9 | 166:17 168:22 | 40:19 66:2 | 182:15 186:18 |
| 100:6 104:11 | 169:3,17 170:6 | 163:6 | 188:15 189:2,8 |
| 106:19 107:20 | 173:3 176:5 | **specifically** | **standard**  34:4 |
| 111:10 113:1 | 178:6 183:25 | 22:23 27:13,15 | 49:20 80:15 |
| 126:7 127:23 | 188:2 199:2 | 42:19 86:16 | 168:13 170:10 |
| 129:7 131:5 | 204:23 207:4,6 | 108:2 116:12 | 206:12 |
| 135:16 137:25 | 230:1 232:20 | 192:1,4 224:11 | **standardized** |
| 138:16 142:20 | **sorts**  84:9 | 227:1 | 128:24 140:22 |
| 143:8 147:5,23 | 216:11 217:24 | **specification** | **stands**  206:11 |
| 154:9 161:3 | **sound**  42:16 | 44:16 | **stanford**  11:3 |
| 163:17 164:18 | 117:18 | **specifics**  130:7 | **stanford's**  11:6 |
| 166:7,8 179:12 | **sounds**  12:3,9 | **specify**  169:5 | **start**  38:24 |
| 180:13 185:24 | 12:14,23 42:17 | **speculate** | 140:1 144:14 |
| 186:10 189:16 | 127:20 181:5 | 174:11 | 211:25 221:20 |
| 189:18 198:4 | 216:9 | **speculative** | 224:17 |
| 198:23 203:14 | **source**  16:20,21 | 183:25 | **started**  81:4 |
| 205:14 208:14 | 61:5 65:24 | **speed**  16:9 | **starting**  50:18 |
| 212:20 215:20 | 167:18 190:6 | **spent**  41:6 | 95:20 130:10 |
| 215:22 216:17 | 219:21 | 203:8 | 211:15 215:2 |
| 218:24 222:5 | **sources**  165:9 | **spia**  165:12,15 | **starts**  226:7 |
| 222:11 | 165:22 209:12 | 172:6 175:14 | **state**  6:10,16 |
| **sort**  19:11 | **south**  74:25 | 176:3 230:20 | 10:24 11:9,15 |
| 30:19 34:5 | 76:14,16 | 231:2,3,12,14 | 19:14,15,21,22 |
| 37:1 42:19 | **span**  86:21 | 231:18 232:2 | 19:24,25,25 |
| 44:1 49:3,13 | 224:12 | 232:16,19,24 | 20:2 22:8 |

25:24 27:11
29:24 34:5,8
34:21 44:23
50:21 52:10
63:3 76:8
78:11,11,18,22
78:23 79:1,5,6
79:12,23 80:13
80:14,20,21,24
91:13,24 92:1
92:18,19,22
93:4,6 94:1,23
97:8 98:20
99:7,13 100:10
110:3 122:2
123:9 124:20
130:21 165:22
168:11,14
169:15,16
171:7 173:12
175:10 176:22
177:6 184:2
185:21 194:4
194:16,20
195:17 196:2
212:1,4,25
215:3 216:7
217:7,18 221:3
221:18 222:7
223:12 224:7
224:19 225:22
229:19,21,23
229:25 230:2,7
233:1 234:2

**state's** 65:10
  123:4 132:23
  162:11 219:14
**stated** 31:2
  37:9 219:12
  221:1
**statement**
  36:24 49:16
  76:7 95:3
  223:15 226:13
**statements**
  177:15
**states** 1:1 2:1
  12:22 48:15
  74:13,24 75:8
  75:10,19,22
  76:4,10,11,17
  76:23,25 77:3
  77:10,14
  117:23 176:24
  177:1 182:2
  189:11 192:2,7
  192:11,15
  200:13
**statewide** 77:25
  78:6
**static** 98:3,15
**stating** 83:17
  161:23
**statistic** 34:7
  34:14,15
**statistical**
  30:14,22 31:11
  32:3,7 33:14

63:17 168:8,19
  171:10 181:13
**statistically**
  33:25 168:1
  170:13,17,25
  171:14 181:16
  207:19,25
  208:8
**statistics** 75:25
  80:1
**status** 48:12
  98:23 138:15
**stayed** 113:3
**steadily** 103:1
**steady** 94:12
  103:4
**step** 53:23 70:6
  70:24 75:12
  121:3 173:24
  177:8 182:8
**stephanopoul...**
  47:20
**stephen** 8:22
**stepping** 15:5
  85:11
**sterling** 177:20
**straightforward**
  150:9 204:21
  204:23 205:11
  205:12
**strategies**
  21:22 166:15
**strategizing**
  36:11

**strategy** 21:23
  26:3 37:4
  66:23 67:5,6
  79:24
**stratification**
  203:13 206:19
  208:6
**stratify** 206:22
  207:3
**street** 2:15 3:5
  3:15 4:12 5:6
**strike** 81:14
**strong** 45:16
  78:12 79:11
  90:25 166:1,2
  166:21
**structure** 144:1
  188:12
**student** 36:6
  44:10
**studied** 56:12
  56:17 134:6,6
**study** 26:12
  164:15,23
  165:14 174:5
  180:15
**studying** 41:7
  167:18
**stuff** 136:19
**subcategory**
  110:20
**subject** 20:18
  22:14

**[submit - survey]**                                                    Page 65

submit   153:23
submitted   23:7
  23:9 36:10
  154:13 186:1
  191:13
submitting
  159:21
subscribed
  234:18 237:14
subsequent
  47:19
subsequently
  185:9
subset   60:5
  76:14 199:2
  205:24
subsets   205:25
subtle   47:17
  48:10 197:3
subtracting
  55:17
successfully
  99:19
succession
  114:14
suffer   84:7,8
sufficient   34:22
  79:14,15
  155:12 178:4
suggest   145:2
suggested
  108:20
suggestions
  132:22

suite   3:5 4:5
  5:6,14,20 6:6
  6:12,19 154:1
sum   141:17
summary   23:14
  186:2
summer   24:21
  30:9 31:20
  91:25 92:21
  93:5
sunday   108:3
  109:2,4,16
  110:5,8,15,19
  111:1,7,8,14
  112:25 113:1,2
  113:13,14,16
  113:19 114:3
  114:23 115:9
  117:3
sundays   114:6
  115:8
super   97:21
superior   19:17
supp   55:2
supplement
  75:15 77:17
supplemental
  8:12,15,21
  9:12 13:17,21
  14:11,17 17:21
  22:24 33:5
  55:2 56:25
  58:2 167:4
  181:20 202:20

  211:7 225:18
support   83:7
  178:4
suppose   26:13
supposed
  225:17
sure   16:10 19:1
  19:9,10,12
  20:7 22:3
  23:24 24:3,7
  24:23 26:6
  28:18 35:12,15
  40:8,11 41:19
  43:1,3,19 44:2
  44:5 53:23
  55:12,20 60:17
  62:10,24 72:22
  74:21 75:5
  77:6 83:24
  86:12 87:3
  89:19 95:13
  96:23 97:21
  100:1 102:21
  103:3 104:17
  106:20,22
  107:2 111:2
  112:3,6,14
  114:8 121:24
  124:4 125:13
  125:23 126:11
  130:5,19
  132:16 136:9
  136:18 137:6
  138:17,18

  142:16 143:13
  144:22 148:15
  151:10,10,12
  153:20 156:13
  160:12 163:8
  164:18 166:19
  167:16,24
  168:5 173:22
  186:12 194:15
  194:25 195:25
  198:24 200:7
  200:16 209:14
  210:7 212:12
  212:22 220:2
  223:18
surpassed
  105:25 106:6
surprised   98:1
surprising   34:9
  176:2
surrebuttal
  23:10,12 28:12
  29:19 32:4
  186:5 205:20
  205:24
survey   65:19
  75:14 76:5
  77:17 165:12
  165:15 173:12
  173:13 174:13
  175:14,19
  176:3 178:16
  181:6,25
  182:22 183:22

**[survey - testified]**                                    Page 66

185:22 186:13
187:10 203:15
203:15,17,24
206:21,25
207:10 231:3
231:11,15
232:3
**suspect**  210:3
**switch**  95:10
**sworn**  237:14
**syntax**  182:19
**system**  123:23
124:2,12 177:6

**t**

**t**  236:3,3
**table**  33:20,21
55:1,11,25
56:3,5,8 58:5,9
58:24 59:6
60:6 68:20
72:20,24 76:9
85:3 101:10,12
102:5,9 109:21
109:22 111:15
112:9,11,23,24
113:20,21,21
113:22 114:20
115:6,15,24
116:21 118:19
118:20 125:1,4
125:5 136:21
142:18 143:12
147:8,8 149:4

154:16 156:11
156:21,22
157:5,11,12,13
157:15,18
158:2,12,15
166:5,11
172:12,16
174:8 180:6,7
180:9,14,19
181:7 182:12
213:2,7 216:13
216:16,18
218:17,25
221:13 223:6
224:14 229:4
**tables**  112:4
113:22 124:24
150:6 158:7
229:22
**tabulation**
85:22 86:1
87:14,16
**take**  12:24,25
13:1 16:6
52:18,19 53:23
57:5,17 69:1
75:12 93:9
95:12 102:19
109:20 118:12
121:11 127:19
160:15 161:5
164:1 168:6,23
174:12 193:2
206:25 211:2

215:13 231:16
231:25
**taken**  2:13
98:10 234:3
**takes**  112:21
124:13 130:22
204:19 231:21
**talk**  23:24
60:22 66:23
88:7 112:3
123:14 144:11
172:5 173:1,2
173:16 201:21
203:3 228:2
231:12
**talked**  120:22
120:23 189:5
**talking**  70:25
95:19 100:24
110:18 118:23
132:17 163:7
184:8 185:2
189:20 201:19
**tally**  61:14 63:5
**tallying**  63:4
**tangentially**
51:17
**target**  50:4
169:3 176:17
**targeted**  43:22
44:2,7 232:4
**taylor**  6:11
**taylorenglish...**
6:14

**technically**
187:25
**telephone**
231:14
**telephonic**
53:13
**tell**  64:18
**term**  56:16,17
89:14 94:3,7
94:13,14
**terminology**
105:15
**terms**  45:9 50:1
59:13,25 89:6
92:9 94:6
103:12 120:2
130:6 137:3
138:12 144:13
154:9,10 159:5
173:1,15
191:22 220:21
221:8
**test**  15:24
20:14 32:4,8
33:15 34:7,14
34:15 35:1,2
133:6 168:9,10
168:12 170:10
170:15 171:10
183:12 227:12
**testified**  10:10
19:13 20:3
22:17 31:16
230:23

**[testifying - time]**                                        Page 67

| | | | |
|---|---|---|---|
| **testifying**  234:6 | **thing**  14:24 | 100:24 105:14 | **thinks**  90:20 |
| **testimony**  13:6 | 51:17 80:8 | 108:25 111:13 | 91:2 |
| 19:5 20:18 | 141:5 148:22 | 112:17 118:9 | **third**  46:8 |
| 21:16 22:14 | 150:19 156:15 | 123:3 124:13 | **thought**  22:5 |
| 234:9 235:9,17 | 169:9 178:2 | 124:22 125:1 | 37:5 40:18 |
| 237:8 | 189:1 | 125:15 128:25 | 135:4 |
| **testing**  169:18 | **things**  23:2 | 131:4 132:13 | **thousand** |
| **tests**  170:4,21 | 25:11 28:7,11 | 133:1,6 134:12 | 136:11 194:3 |
| 170:24 | 37:15 39:8 | 136:17 141:19 | 194:16 201:18 |
| **text**  47:9 113:5 | 53:6 69:9 | 144:14 146:2 | **three**  71:17 |
| 161:22 162:18 | 77:22 93:13,17 | 146:25 147:7 | 74:24 76:4,23 |
| **thank**  11:18 | 97:20 112:8 | 147:19 148:21 | 87:15 96:5 |
| 12:17 14:9 | 113:6 119:3 | 149:21 152:18 | 103:16,17 |
| 15:4 20:8 23:6 | 120:16 185:13 | 155:15 158:6 | 131:10 150:24 |
| 41:15,20 52:7 | 200:10 225:6 | 160:19 161:4 | 151:3,21 152:1 |
| 52:7 66:12 | **think**  18:16,22 | 166:18 169:23 | 152:6 153:6 |
| 68:4 87:18 | 19:25 21:14 | 172:2 173:17 | 154:4,4 158:4 |
| 126:9 133:19 | 24:12,25 34:10 | 173:23 174:11 | 186:9,13 |
| 160:16 192:21 | 38:14 39:8 | 175:14,17 | **throw**  189:17 |
| 210:12,13 | 42:13 43:16,17 | 178:2,9,9 | **thrown**  218:1 |
| 218:11 219:9 | 45:9 47:5 | 180:18 185:16 | **thursday** |
| 223:10 224:14 | 48:22 50:7,14 | 186:6,7,7,23,24 | 193:19 |
| 225:13 226:23 | 50:17 57:9 | 189:14 197:3,6 | **tie**  120:22 |
| 228:9,10 | 60:9,25 62:11 | 197:21 200:10 | **tied**  47:8 |
| 230:19 233:3 | 62:11,13 70:12 | 201:1 206:24 | **time**  13:1 16:6 |
| **thanks**  118:16 | 71:12,13,25 | 209:1,13 211:8 | 18:11 19:4 |
| 228:12 | 77:8,18,19 | 215:21 216:21 | 23:7 41:7 |
| **thematically** | 79:7 80:23 | 227:3,17 228:6 | 46:23 55:9 |
| 107:19 | 81:4 82:6 | 229:7,8 232:11 | 57:17 69:22 |
| **theme**  98:10 | 85:15 87:6,7 | 232:22 | 75:3 85:22 |
| **theories**  164:5 | 88:5,9 90:6,13 | **thinking** | 92:15 98:20 |
| **thereof**  81:1 | 90:22 92:24 | 104:21 168:23 | 117:5 118:10 |
| **thin**  37:5 | 93:11,20 95:1 | 221:3 | 124:1 127:19 |
| | 95:7 96:4 99:4 | | 127:24 128:20 |

**[time - true]**                                                        Page 68

129:20 130:6
130:25 131:2
131:10 133:24
160:11,13
164:2 167:19
174:21 175:10
176:16,22
179:13 191:22
193:3,15
194:10 195:10
195:24 198:3,4
199:24 200:1
203:8 210:11
223:25 224:3
224:12 225:5
225:12,25
229:4 231:7
232:5 233:9
234:4 235:18
**timeframe**
235:8
**timely** 191:6,12
191:12,13
192:17 193:15
193:17 194:12
195:5,14,20
196:16 199:17
200:23
**times** 12:19
32:4 33:15
64:1 165:7,8
165:23,25
166:4,25 170:5
171:10,12

172:2,3,7
173:15 174:3
176:9,14,22
177:1,1,20
199:13 228:25
230:1 232:7
**timing** 41:2
129:9
**tina** 4:4 210:14
210:24
**title** 41:25
**tmengmorrison**
4:7
**today** 10:15,20
11:20 13:6
28:17 131:6
174:21 202:15
203:25 209:8
**together** 141:4
141:7,17
150:14,25
204:18
**took** 67:7,9
69:7 167:23
**top** 86:12
177:12 181:8
231:19
**topic** 21:15
35:16 81:3
128:3 164:16
212:19
**topics** 15:11,15
21:5 95:10

**torres** 6:5
**total** 17:18 20:5
63:10 64:22
82:14,16
119:10 224:22
**touched** 52:12
**toward** 118:20
**track** 192:19
**transcribed**
234:8
**transcript**
11:21 23:17
24:17 28:24
29:3,11,14
30:8 31:17
32:1 33:13
35:10 167:12
172:6 234:12
234:14 235:6
235:19 237:5,8
**transcripts**
24:21
**translate** 48:19
**translating**
48:4 49:8
**transparent**
90:13
**transportation**
200:18
**treatment**
26:17,18,22,23
**trend** 58:24
67:20 68:22
69:20 70:1,9

70:12 71:5,6
71:21 72:9,15
79:17,18 91:13
94:9,11 103:13
103:15,20,24
103:25
**trending** 91:18
93:17
**trends** 72:3
79:16 80:7
84:18 109:11
109:11 170:5
170:20 171:12
176:15,24
220:20,22
**trey** 89:22
**trial** 20:3
**trickiest** 149:2
149:3
**tricky** 84:10
**tried** 22:8
113:5 231:25
**trouble** 195:23
**true** 31:3 36:19
37:1 53:15
56:18 82:20
83:10 98:22
105:17,23
106:8,13
126:19 139:7
139:23 140:2
143:1,1,19
144:7,10
148:12 162:20

**[true - tyson]** Page 69

| | | | |
|---|---|---|---|
| 163:11 169:14 | 170:4 171:25 | 54:17 55:5,10 | 221:21,23,24 |
| 171:6 172:11 | 173:9 176:19 | 55:13 56:10,15 | 222:3,13,19 |
| 172:14,15 | 177:3 179:14 | 58:9,10,14 | 223:13,14,25 |
| 175:21 178:25 | 179:14 184:21 | 59:1 60:23 | 224:1,2,10 |
| 179:10 182:5 | 184:22 186:10 | 61:3 62:17 | 225:20,21 |
| 183:17 198:22 | 194:8 210:6 | 64:18 65:16 | **turnouts** 94:25 |
| 199:21 234:9 | 232:6 | 66:6,15 67:3 | **twenty** 95:4 |
| 237:8 | **tuesday** 192:11 | 68:8,11,22 | **twice** 19:13 |
| **truly** 119:2,3 | **turn** 25:3 55:1 | 72:3,9,16 | 229:14 |
| 173:9 | 58:1 60:20 | 73:14,18,20 | **two** 11:3 25:11 |
| **trump** 9:4 | 74:4 81:3 | 74:1,13,13,23 | 28:7 29:7 38:9 |
| 18:13 36:25 | 117:14 128:5 | 75:18,24 76:2 | 39:8 40:10 |
| 37:8 40:13 | 136:20 147:7 | 77:9,13,21,22 | 47:23 64:5 |
| 92:22 | 160:24 181:24 | 78:2,15,19,21 | 69:14,20,21 |
| **trump's** 37:3 | 210:14 221:13 | 78:22 80:12 | 70:2 73:5 80:4 |
| 48:13 | **turned** 54:7 | 81:8,12,16 | 84:20 89:14,15 |
| **trusting** 14:23 | 97:17 98:2,4 | 82:7,19 84:15 | 97:20 98:14 |
| 194:14 | 98:12 | 84:19,21,24 | 109:23 110:2 |
| **truth** 183:21 | **turning** 90:11 | 88:5,5,8,12,16 | 112:5 113:22 |
| **truthful** 13:6 | 91:12 92:7,8 | 88:22 89:6 | 117:13 124:5 |
| **try** 18:20 22:2 | 92:24 176:10 | 94:1,6,12,14,20 | 146:24 147:1 |
| 43:7 50:5 | 176:11 187:1 | 94:22 95:8,17 | 151:18 164:13 |
| 103:17 170:15 | **turnout** 25:25 | 180:20 211:24 | 165:8 168:7 |
| 185:22 191:8 | 27:4,5,6,7,13 | 212:2,9,17,24 | 172:18 182:22 |
| 199:23 229:11 | 27:15,21,24 | 213:3,11,17 | 186:23,24 |
| 231:9 | 28:2,4 41:8 | 214:10 215:2 | 196:10 199:12 |
| **trying** 18:25 | 42:24 43:12,14 | 216:6,10 217:6 | 200:10 201:23 |
| 20:14 33:10 | 43:24 45:10,13 | 217:8,11,13,15 | 203:7 206:23 |
| 34:6 43:19 | 45:17,22,25 | 217:15,17 | 209:11 210:3,3 |
| 74:20 75:6 | 46:1 48:24 | 218:4,9,14,16 | 211:20 224:4 |
| 102:4 105:20 | 49:1,15,21 | 218:19,24,25 | 225:5,9 231:8 |
| 112:5 119:3 | 50:6 51:25 | 219:10,25 | **tyson** 6:17,20 |
| 150:20 163:23 | 52:9,14,25 | 220:10 221:5,8 | 6:24 127:24 |
| 166:9,12 169:2 | 53:7,10,15 | 221:11,17,20 | |

**u**

**uh**   12:13 46:9
  125:3
**ultimately**
  54:25 72:7,8
  119:6,18,21
  122:12
**unable**   160:1
  184:12
**unaware**   17:1
  40:14 186:25
**unbiased**   204:8
**unclear**   25:21
  30:16 33:25
  90:20 93:6
**under**   3:4
  34:14 55:14
  154:24 156:1
  165:25 166:17
  168:19 191:11
  234:8
**underlying**
  175:19,22
**underreprese...**
  226:17
**undersigned**
  234:1
**understand**
  11:25 19:2
  29:25 30:3
  32:16 38:1
  43:2,20 48:22
  78:21 79:8

103:11 108:19
110:2 150:2
163:23 194:15
208:20 225:13
**understanding**
  25:20 58:8,12
  61:11,21,25
  62:25 63:1
  70:23 71:2
  110:22 132:4,8
  133:11,20,22
  133:25 134:4
  134:12 135:2
  136:7 138:11
  144:5 153:5,8
  155:2 161:25
  162:10,13
  163:2 174:6
  185:12 191:18
  195:16 198:9
  198:10 221:9
**understate**
  225:20
**understood**
  12:1 17:3
  22:12 38:3
  73:16 74:3
  76:1 97:2
  113:12 160:7
  165:5 191:5
**undertake**
  30:21
**undertaken**
  178:6,11

**unfortunately**
  31:1 100:11
**union**   3:14 7:3
  76:11
**unique**   120:21
  121:13
**united**   1:1 2:1
  189:11 192:2,7
  192:11,15
  200:13
**universe**   25:1
**university**   11:3
  89:25 165:12
  165:14 231:5
**unknown**   81:21
  81:24 82:3,9
  83:2,19 87:25
  100:15 101:5
**unpack**   136:8
**untoward**
  164:8
**update**   16:15
  16:18 76:22
  84:2 86:1
  101:12 102:6
  209:1
**updated**   17:5
  17:14 18:19
  20:10 68:11
  69:5 86:22
  165:22 207:20
**updates**   212:9
  218:3

**upper**   201:16
  202:1,2
**ups**   109:1
**upward**   103:24
  103:25
**use**   16:13,15
  19:19 44:4
  50:7 55:16
  58:24 60:6
  61:10 64:1,8
  65:17 66:13
  67:1,20 69:6
  69:14,19 70:18
  70:18 72:4,12
  75:24 76:8,12
  76:13 85:14
  86:16 95:22,23
  97:10 100:16
  101:7 103:2
  104:15,20,24
  105:1,4,19
  107:3,9,11
  110:2 120:20
  136:16 142:5
  152:22 160:13
  166:11,16,18
  167:20 173:11
  178:15,17
  182:25 183:1,7
  184:9 185:5
  186:2,9,23
  187:6 188:20
  189:3 198:18
  201:18 203:6

203:10,15,15
203:16,17
204:7,15
205:21 207:16
208:3,9,23
216:8 217:9
218:7 219:6
227:4,11
229:15 231:8
**used** 16:21,23
48:20 58:9
61:5,18,20
62:14,21,21
65:12 67:23
75:17 77:11,16
86:19 99:17,21
100:8 105:18
105:25 106:1,6
106:7,11,12,16
106:17 115:19
115:20 116:16
116:19 173:5
177:23 182:2
182:12 183:3,5
185:21 186:14
187:24 197:9
197:10,12
204:17 207:5
207:10,11
217:14 218:19
219:12 220:16
220:18 221:6
229:23,24
230:11 235:19

**useful** 50:14
78:20,23,24
185:16
**uses** 31:2 33:21
60:5 63:7 68:5
68:6 70:9,14
70:24 71:1,3,5
84:3 86:2,3
180:13,14
182:23 219:13
230:1,2,3
231:5
**using** 25:13,15
44:5 48:19
49:14 58:23
63:3,7,12
64:19,23 66:2
67:3,24,25
69:20,21 76:4
77:2,14 80:24
86:1 87:14
96:18 99:20
103:20 105:10
105:14 106:3,4
107:10 121:6
165:22 166:5
169:18 170:16
170:18 172:6
172:17 174:4
175:11 179:6
179:18 180:10
181:15 183:22
187:4 194:18
200:7 203:20

204:4 205:1,2
205:3 206:7,8
206:14 207:2,3
208:6 213:22
222:3 226:15
227:12 228:3
232:22 234:7
**usp** 194:8
**usps** 190:3,17
190:23 191:23
194:8 195:3
**usual** 150:13
**usually** 49:9
98:6 217:24
230:4
**utah** 171:7
**utility** 135:21
**utilized** 115:9

**v**

**v** 21:12 22:14
95:19 97:8
118:21
**val** 184:19
**validate** 183:3
184:9 232:25
**validated** 23:22
23:23 180:20
209:4 228:21
230:15,17
**validation** 35:8
142:4 144:2,2
147:2,5,20,25
150:16 173:5

174:5,9,22
175:12 176:6
180:21,24
183:22 184:3,8
184:12,13,16
184:18,24
187:8 207:21
229:2 230:16
232:16,19,22
**value** 209:11
**variable** 26:2,8
26:10,20 27:12
173:12
**variety** 37:14
80:18 166:15
227:6
**various** 22:7
93:8
**vendor** 174:10
174:11
**venture** 98:16
**verbal** 12:11,15
**verification**
134:1 153:11
**verify** 130:25
174:15,17
235:9
**veritext** 235:14
235:23
**veritext.com**
235:15
**vermont** 171:7
**verse** 19:14,17
19:21,25 20:3

**version**  63:6
  65:12 99:17
**versus**  116:12
**vi**  128:5
**victory**  93:14
  93:16
**videotaped**
  1:12 2:12
**view**   1:13 2:15
  10:1 92:6
**viewing**  29:10
**views**  90:10
**vii**  107:20
  160:24
**viii**  161:4,6,12
**vilia**  3:8
**vilia.hayes**  3:11
**volume**  1:15
  2:13 8:3
**vote**  20:3 22:14
  23:22,23 35:5
  54:6 95:23
  97:17 98:2,4
  99:11 110:14
  112:18 141:21
  160:4,6 164:21
  164:22 168:12
  178:23,23
  195:6,22 199:5
  199:6,22,23
  207:20 209:4
  224:5,7,18,23
  224:24 225:8
  225:11 230:15

230:16,17
233:1
**vote.org**  19:21
  20:17
**voted**  54:25
  98:18 101:1
  109:3 113:15
  120:19 121:19
  126:20 161:15
  162:6 174:17
  231:17
**voter**  17:25
  18:1,5 20:19
  23:20 36:17
  41:7 43:18,22
  44:11 55:5,9
  62:7,9,17 63:3
  63:6,15,20,21
  63:24,24 74:24
  75:21,23,23
  81:9,10,21,23
  82:8,8,12,18,21
  83:2,6,18 84:2
  84:19 85:15,21
  85:25 86:2,4,6
  86:16,19,22
  87:13 93:25
  97:10,14,18,23
  97:24 98:9,11
  98:13,15,16
  99:8,18,20
  100:3,5 119:20
  119:24 120:3,6
  120:7,18,18,24

120:24,25
121:2,5,7,8,11
121:18 122:1,3
122:6,7,11,13
135:22 145:12
145:13 148:10
148:18 153:11
153:22 154:20
161:24 164:1,5
165:23 168:17
169:12 170:11
171:5 172:5
173:5,14 174:5
174:14,15,22
175:12 190:22
191:2,22
197:17 199:12
224:10 228:21
228:25 229:19
229:23 230:6,9
230:11,14
232:16,19,22
232:25
**voter's**  63:8,17
120:8
**voters**  33:23
  34:18,18 48:12
  48:15,16,16
  55:14 59:8,8
  59:12,19,20,24
  64:15,20,24
  72:17 73:2,14
  73:18,20 74:2
  81:6,17,20,20

83:25 87:24
94:23 95:23
96:12 97:9
98:2 99:16,19
99:23 100:10
100:12,23
101:3,11 103:1
103:20 104:14
105:1,2,4,6,8
105:10,12,18
105:19,24,25
106:2,4,5,7,10
106:11,12,14
106:15,16
107:3,4,8,9,10
108:11 109:3
110:14 111:14
112:16,21
113:15,18,24
113:24 114:3,6
114:16,17,21
114:22 115:2,2
115:9,18,19,20
116:7,15,18,22
118:2,3 120:15
121:19 122:1
123:8 125:9,10
125:14,17,18
126:20 127:4
127:10,14
133:12 136:12
142:14,14,14
142:15,15
143:4,4,4,5,7

144:7,7,8,8,9
146:7,10 147:9
147:10,14,22
147:24 148:4
151:2,4,6,13,14
151:23 152:1
152:10 153:17
154:13,22
155:4 156:9
158:16,18,18
158:19,19,23
159:2,4,6,6,7,7
159:8,10,11,13
159:14,21
161:14,25
162:5,12
163:13 168:1
168:11,14
169:2,5 170:5
170:13,17,25
172:8,9,20,22
174:9 175:5,7
179:23 180:2,3
180:10,12,20
181:14,17
182:14 183:8
187:14 189:4
190:1,3 191:16
191:20 194:17
195:4,6,11
196:14,15,24
197:14 198:15
199:3 202:6,19
203:6,8,9,18,20

203:22 204:7
204:10,12,16
205:2,5,8,8,22
205:22,25
206:14,20
207:1,5,10,11
207:11,17,18
207:23,23
208:4,7,10,11
208:13,13,18
208:19 211:17
211:25 212:1,3
212:3,25
213:11,18
214:11 215:3,3
215:12,13,25
216:6 217:7,7
217:17,18
218:20,20
220:15,17,21
221:2,5,8,11,17
221:25 222:3,6
224:3 225:2,21
231:6,17,22,23
**votes** 61:15
63:4,5,10
110:4,6,7,8,10
110:12,15,16
111:24 112:2
113:2,15
115:17 116:8
124:20 219:7
**voting** 22:9
43:11 47:1

50:24 51:6,11
51:15 65:18
66:3 95:18
96:2,5,8,11,13
96:18,25 97:4
101:10,13
102:23 103:2
103:21 104:1,4
104:7,15,22,23
105:2,4,11,18
105:19,25
106:1,3,4,6,7
106:11,12,16
106:17 107:1,3
107:9,10,11,16
108:2,3,15,18
108:21,24
109:2,16,19
110:3,7,9,19,20
110:24,24
111:1,7,8,19
112:13,25
113:1,2,13,14
114:3,6,6
115:9,16,19,21
116:16,19
117:1,3,6
118:4,24
122:17 123:1,6
123:8,10,19,22
123:25 124:6
124:10,16,18
125:2 126:25
132:17 160:10

161:1,24 179:6
179:19 183:8
185:23 188:13
188:16 198:7
198:22 199:24
203:23 204:10
204:12,17
206:20 220:21
220:22 221:3
224:18 225:7
227:23

**w**

**wait** 12:4 32:4
33:15 165:7,8
165:23,25
166:4,25
167:19 168:11
168:14 169:2
170:5 171:10
171:12 172:1,3
172:7 173:15
174:3 175:5,10
176:9,14,16,21
176:22,25
177:1 178:1
182:6 184:13
229:4 230:1,6
232:5,7
**waited** 33:23
168:17 169:11
171:5 172:20
172:22

waiting   34:19
57:9 168:1
169:12 170:11
170:13,17
171:1 172:8,9
175:8
waits   34:13,21
35:4
walk   73:20
173:10 188:17
214:23
walked   34:3
walking   187:11
want   19:1
23:24 27:9
28:3 32:15
36:3 40:8,11
43:1 44:1,5
46:3 51:3
52:18 53:6,23
60:4 69:8
77:18 78:16
79:2 85:16,18
96:22 99:11
102:19 103:14
104:17 105:7
107:23 108:23
115:25 116:25
126:11 130:5
141:4,7,17
148:15 149:22
149:25 150:7
151:1,11
155:18 156:17

165:18 166:17
167:3,15 173:9
173:18,20,22
174:12 175:13
186:6 194:12
196:8 199:3,22
209:14 211:23
212:12 216:25
218:2 225:4,19
232:24
wanted   24:2
38:1 60:16
87:12 89:1,18
97:20 111:1,3
112:14 113:10
124:22 136:18
142:2,6 146:7
147:19 208:14
208:16 218:15
224:1
wanting   68:10
wants   27:5
141:2
washington   3:6
3:22 4:6 5:6
171:8
way   12:7 27:5,8
29:6 31:10
32:19 40:7
44:4 46:13,22
47:1 50:14
60:10 62:12
66:24 83:9
96:1 102:4

109:14 114:18
123:21 134:6
144:2 146:25
148:20 150:9
150:13,23
171:2 177:24
178:11,21
179:6 188:13
191:1 192:5
200:22 201:12
205:16,21
213:10 221:1
227:5,7 230:13
232:5
ways   36:16
37:4 135:20,20
145:20 148:10
182:22
we've   30:24
69:12 77:19
149:11 151:4
203:24
weaker   204:5
website   36:5
65:10
wednesday
1:14 2:16 10:1
193:17
weeds   53:6
229:10,11
week   193:21
weekend
107:16 108:2
108:15,18,21

108:23 109:2,4
109:15,19
110:3,5,8,16,20
110:24,24
111:14 115:7
115:16,18,19
115:20 116:1,8
116:16,19
117:6
weekends
108:18
weighting
207:16
went   100:5
west   2:14
whereof   234:18
white   44:21
48:12,16 55:9
55:14,17 56:7
56:9,15 58:10
59:8,12,19,24
63:22 64:6,7
67:16 73:18,20
73:23 74:2
87:21 104:7,14
105:1,4,8,10,12
105:17,25
106:4,6,12,14
107:8,9,10
113:24 114:3,6
114:16,17,22
115:2,9,18,19
116:18 118:2
125:10 142:15

143:7 144:9
151:2,14 152:1
152:10 156:8
158:16,22
159:4,10,11,13
159:14 175:7
180:11 181:14
181:17 207:17
207:23 208:10
208:18,19
214:11 215:13
215:25 221:25
222:3
**whittier** 19:17
**widely** 177:22
**widened** 216:8
217:9,12
**wider** 217:4
**win** 37:6 46:12
46:21 47:12,15
**window** 153:9
154:24 157:24
157:25 158:11
163:1,4,6,7,9
**winning** 92:18
**wins** 9:8 18:14
42:1
**witness** 2:14
8:2 14:9 15:19
19:5 25:7 28:1
32:13,15,18
35:19 41:16,20
43:1,4,6,9 44:1
45:19 49:19

57:2,20 101:20
101:23 102:1
121:22,25
122:22 124:4
127:8,20 155:8
155:18 160:13
160:16 196:21
200:25 210:12
210:22 228:9
228:12 232:13
233:7 234:18
235:8,10,12,18
**witnesses** 234:5
**wondering**
166:17
**word** 44:2 57:5
114:5 161:5
**words** 182:2
190:18 217:16
**work** 37:17
51:21 90:3
150:12 164:4
199:12 201:14
**working** 36:4
125:12 201:22
**works** 174:10
199:12
**world** 34:6,8,21
80:14,20,21
**wrapping** 88:5
**write** 36:16
46:10 131:19
172:15

**writes** 204:21
**writing** 37:15
75:3 164:24
**written** 19:20
19:24 41:9
47:21 150:11
225:25
**wrong** 46:15
74:21 81:14
91:21,21
106:19 114:5
168:9,12 170:9
184:5 186:4
215:19 216:10
220:1 230:13
**wrote** 19:16
23:13 36:5
75:11 177:10
177:13

---

**x**

**x** 152:17
234:14
**xi** 178:16

---

**y**

**yeah** 20:9,10
21:14 22:2
24:2 25:2
27:18 36:15,22
37:14 38:5,16
39:19 40:2,10
40:10,25 41:18
42:17 43:6,9
47:17 53:3

55:20,23 56:1
60:8,16 62:19
64:14 65:15,22
66:1 68:4,23
73:22 77:8,13
79:14 85:13,17
87:19 94:17
95:8 99:3,6,15
105:16,20
109:17,23
110:21 111:17
112:1,3 113:5
116:20 117:11
117:20 123:12
123:14 124:25
127:20 133:8
135:6 140:1,7
140:14 145:11
145:19 147:13
147:19 148:9
149:1,21 154:6
155:16 156:19
163:16,19
169:24 172:4
172:13 173:7
173:21 174:1
179:11,13
182:11 193:25
195:1 198:12
199:2 201:11
202:25 210:22
212:18 214:8
214:21 215:18
215:21 216:17

**[yeah - zoom]**                                             Page 76

217:11 223:21
229:7 232:13
**year**   13:22 14:4
14:12,18 16:18
23:1 33:6 55:3
57:1,16 60:20
66:7,7,8,10,14
66:20,25 67:2
67:7,11,15,23
68:6,12,13,14
68:17,18 69:4
69:6,11,20,21
70:1,2,3,4,8,14
71:1,5,6,18
73:3,3 78:10
82:21,22 87:15
88:17 89:5
93:20 96:19,19
104:3,3 109:7
109:8,24,25
131:19,22,24
162:17 184:17
184:19 206:24
**year's**   81:10
82:11
**years**   10:18
18:8 56:12
61:19 66:6
84:17,23 85:6
88:7,24 89:12
94:4 139:17
145:5,13
163:14 169:6
170:21 171:16

171:19 181:15
210:3,4 216:25
219:23 226:1
**yep**   50:20
69:24 86:15
**yoder**   44:10
**york**   3:10,10,16
3:16 4:12,12
**younger**   145:12
146:10

---
**z**
---

**zatz**   3:21
**zero**   34:2,11,11
34:23 138:3
147:16,23
150:5 169:1,9
169:10,15
170:1,6,8,19
171:4,22,24
207:17
**zoom**   10:22
11:16 24:12
44:1 57:10
66:22 90:16
120:21 149:25
160:23 173:16
203:3 228:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |

**SUPPLEMENTAL EXPERT REPORT OF JUSTIN GRIMMER, PH.D**

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I.    PREAMBLE MATERIAL AND SUMMARY OF FINDINGS

1.    In Georgia's first presidential election since the passage of SB 202, the 2024 general election, overall voter turnout was higher than in any election since at least 1980. Updating my analysis of turnout rates across self-reported racial groups, I calculate that in the 2024 general election American Indian, Asian, Hispanic, and white voters had their highest turnout rate in any statewide general election since at least 2014. The turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election, and higher than the 2014, 2018, or 2022 elections. I use the Census Bureau's Current Population Survey (CPS) November supplement to compare the self-reported turnout rate of Black voters in Georgia with the turnout rate

Exhibit

1

Grimmer

08/27/2025    C.A.N.

of Black voters in other states. I find that the change in turnout in Georgia among Black voters is similar to the change in Black voter turnout nationwide, with Black turnout lower nationwide in 2024 compared to 2020.

2.    In the 2024 election Georgia voters continued their shift towards early in-person voting and away from Election Day voting. In the 2024 election 71.1% of all ballots were cast using early in-person voting ("early voting"), the highest share of ballots cast during early voting for any election since at least 2014. Every self-reported racial group had their highest share of ballots cast using early voting during the 2024 election. As the share of ballots cast during early voting has increased, the share of ballots cast on Election Day has decreased. Overall, 23.4% of all ballots were cast on Election Day in 2024. The only election with a smaller share of ballots cast on Election Day than the 2024 election was the 2020 election. About 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022.

3.    Using data from the 2024 election I update my analysis of the rate mail-in absentee ballots are rejected and the rate mail-in ballots were rejected for arriving after the deadline or because of an issue verifying the voter's identity. In the 2024 election 1.7% of all returned mail in ballots were rejected. This is a lower rate than in 2016 and 2018, but a higher rejection rate than in

2020 and 2022. In the 2024 election I calculate that a smaller share of mail-in ballots were rejected for arriving late than in 2016 and 2018, but a larger share than in the 2020 or 2022 elections. I find that the rate mail-in ballots were rejected for identification reasons in the 2024 election were similar to, but higher than, the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections. There is no consistent relationship between the Black-white gap in rejection rates for signature reasons in 2016, 2018, and 2020 and the Black-white gap in rejections rates for identification reasons in 2024. The Black-white gap in rejections for identification reasons in 2024 was smaller than the Black-white gap for signature reasons in 2016, but the 2024 Black-white identification gap was larger than the 2018 and 2020 Black-white signature gap.

4.     The 2024 election saw the largest share of votes cast on the weekend using early in-person voting in any election since at least 2014. During the 2024 election 7.7% of all votes were cast on the weekend using early in person voting. Weekend voting rates were up for every group in the 2024 election: across every self-reported racial group the 2024 election saw the largest share of ballots cast on the weekend using early in person voting. And every racial group but white voters had the largest share of ballots cast on Sunday for any election since at least 2014. For example, in the 2024 election 2.1% of all votes from Black voters were cast on Sunday using early in-person

voting and 8.3% of all ballots from Black voters were cast on the weekend using early-in person voting.

5.    Using data from the 2024 election I updated my analysis of the number and share of voters who cancel their mail-in ballots and then vote either early in person or on Election Day. In the 2020 election over 289,000 voters canceled their mail in ballot and then voted early in-person or on Election Day. In the 2024 election a smaller share and number of mail in ballots were canceled and subsequently voted early in person or on Election Day than in the 2020 election. But, the 2024 election saw a larger share and number of canceled ballots voted in person than in the 2014, 2016, 2018, or 2022 election.

6.    I find that the two-post SB 202 elections—2022 and 2024— had smaller shares of voters who waited more than 30 minutes to vote than in the 2016, 2018, or 2020 election. Using the Cooperative Election Study (CES), the same data source Dr. Burden and Dr. Pettigrew used to measure line length in their expert reports, I find that there was a decline in the share of voters who report waiting more than 30 minutes to vote in the 2022 and 2024 election compared to the 2016, 2018, or 2020 elections. According to the CES, overall in the 2022 election 5.3% of voters in Georgia report waiting more than 30 minutes to vote and in the 2024 election 6.3% of voters in Georgia report waiting more than 30 minutes to vote. The two-post SB 202 elections also saw

a decline in the share of Black and white voters who report waiting more than 30 minutes to vote compared to the voters from the same self-reported groups in the 2016, 2018, or 2020 elections. Only the 2014 election had a smaller share of voters who report waiting more than 30 minutes and the difference between the share of voters who report waiting more than 30 minutes in the 2014 and the 2022 and 2024 elections is not statistically significant. A different publicly available survey of Georgia voters after the 2024 election confirms that a smaller share of voters report waiting more than 30 minutes than reported in the 2016, 2018, or 2020 CES.

7.    SB 202 altered the application window for mail-in absentee ballots and verified voters' identity using identification, like a driver's license, instead of a signature. Using the Absentee Voter History File I find that the vast majority of mail-in ballot applications conformed to the SB 202 application window. Overall, 0.61% of mail-in ballot applications were rejected for arriving after the deadline and 0.16% were rejected for arriving before the application window opens. I calculated that 0.37% of mail-in ballot applications were rejected for identification reasons.

8.    SB 202 also left in place the "roll over" list for mail-in ballot voters 65 and older, self-reported disabled voters, overseas, and military voters. The roll over list enables Georgia voters to apply for an absentee ballot once in an election cycle and receive ballots for all subsequent elections. I find that 43.7%

of all mail in absentee ballot applications came from voters on the roll over list, including 76.6% of all voters 65 and older.

9.    In the 2024 election self-reported rates of drop box use among mail in voters were similar to the self-reported rate of drop box among mail in voters in the 2020 election. I used the 2024 CES survey to estimate the self-reported drop box use rate. I find that overall use of drop boxes among mail-in voters was similar in the 2020 and 2024 elections, but lower in the 2022 election. I find that there is no consistent relationship between race and self-reported drop box use among mail in voters. In the 2020 and 2022 elections white mail-in voters were more likely to self-report returning their ballot using a drop box, but in the 2024 election Black mail-in voters were more likely to self-report returning their ballot using a drop box.

## II.    VOTING IN GEORGIA

10.    To measure voter turnout in Georgia I follow the same procedure I used in my first expert report and rely upon state provided turnout statistics. Specifically, I measured 2024 turnout using data on the votes cast in individual precincts and counties, which I then aggregated to calculate the overall turnout and voter turnout by self-identified racial group.[1]

_____

[1] For the 2024 election I used the file "FINAL Reapportionment Report 02212025 November 2024 General.xlsx" which was provided to me by counsel. For the 2022 general election, I used the Statewide.xlsx file from the "SSVRZ422 2022" zip file and the "Precinct turnout by race" folder, which was

11.    To assess differences across racial groups I follow the same procedure as in my first expert report and rely upon self-reported racial identity, as tallied in the state turnout statistics. Voters self-identify as American Indian, Asian or Pacific Islander (which I refer to as Asian hereafter), Black, Hispanic, white, Other, or the race is "Unknown". In this report, like my first expert report, I focus on American Indian, Asian, Black, Hispanic, and white voters.

12.    I calculate the turnout statistics in this section primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP. Since I wrote my first expert report the 2022 CVAP estimates have been released, so I use the 2022 CVAP for Georgia as the denominator in my estimates of the 2022 CVAP turnout rate. The Census Bureau has not yet released the 2024 estimates of the CVAP, so I use two different approaches to estimate the 2024 CVAP. First,

---

obtained by counsel. In the 2020 election, I used data downloaded from the secretary of state's data portal, specifically the "General Election 2020 Active, Inactive Voters by Race, Gender_County.xlsx" file. For the 2018 and 2016 election I used the file "SSVRZ376R3.xlsx" which I downloaded from the Secretary of State's office website. The downloaded turnout data from the Secretary of State's website was missing data for 2014, so counsel obtained the file "November 2014 General Election - Active, Inactive Voters by Race Gender - (COUNTY).xlsx". For the January 2021 runoff I used the "General Election Runoff 2021 Active, Inactive Voters by Race, Gender_County.xlsx" file downloaded from the Secretary of State's office website and for the December 2022 election I used the "Statewide.xlsx" which was contained in the "SSVRZ422 2022" zip file obtained from counsel.

I use the 2023 estimates of the CVAP from the Census Bureau for the denominator in the 2024 CVAP turnout rate. I label turnout estimates with this denominator as the "CVAP" estimates for each group. As I described in my first report, using CVAP estimates from a prior year creates a risk of underestimating the size of groups in the 2024 electorate, which would cause me to overestimate turnout rates for that group. To mitigate this risk, my second measure of group size uses historical growth rates to make a plausible estimate for each group's actual size in the 2024 election. As in my first report I extrapolate using available CVAP data. Specifically, I calculated the average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group. I then divided the average of the 2-year change by 2 to obtain a one-year average growth rate, which I then added to the 2023 CVAP estimate. This projection serves as an estimate of the 2024 CVAP. I label turnout estimates with this denominator as the "CVAP Trend" estimates.[2]

## III. TURNOUT IN THE 2024 GEORGIA FEDERAL ELECTION REMAINED HIGH.

13.    In Table 1 I present estimates of the overall turnout rates in the state of Georgia for general federal elections from 2014 to 2024. This updates Table 1 from my first expert report, and it is structured the same way. The "Year" column presents the year of the election. The "CVAP Turnout Rate"

---

[2] The only election the CVAP and CVAP Trend estimates will differ is in 2024.

column calculates the turnout rate using the CVAP corresponding to each election year, except for 2024 where I use the 2023 CVAP. The "CVAP Turnout Rate, Trend" column calculates the turnout rate using the corresponding CVAP but extrapolates the 2023 turnout rate to 2024 based on the historical rate of growth for racial groups. The "VEP Turnout Rate" column uses data from Dr. Michael McDonald (2024) to calculate the overall turnout rate from the voting eligible population ("VEP").[3] The VEP is an estimate of the number of individuals who are eligible to vote in a state's election. The VEP is available at the state-level but is not broken down by racial group.

14.    In the first general presidential election after the passage of SB 202 in Georgia, overall voter turnout was higher than any presidential or midterm election since 2014, though similar to the turnout rate in the 2020 general election. Using the CVAP turnout estimates in the second column, I find that the turnout rate in the 2024 CVAP Georgia presidential election was 1.4 percentage points higher than the 2020 Georgia presidential election and 9.6 percentage points higher than turnout in the 2016 Georgia presidential election. I reach a similar conclusion if I use the estimates from the "CVAP Turnout Rate, Trend" column. Using the projected measure of CVAP I find that the turnout rate is higher in the 2024 Georgia presidential election than in the

---

[3] Univ. of Fla. Election Lab, 2024 General Election Turnout (as of May 13, 2025), https://election.lab.ufl.edu/2024-general-election-turnout/.

2020 election, with a difference of 0.5 percentage points. The turnout rate in the 2024 election was 8.7 percentage points higher in 2024 than in 2016 according to "CVAP Turnout Rate, Trend" measure of turnout.

| Year | CVAP Turnout Rate | CVAP Turnout Rate, Trend | VEP Turnout Rate |
|------|-------------------|--------------------------|------------------|
| 2014 | 0.377 | 0.377 | 0.386 |
| 2016 | 0.589 | 0.589 | 0.598 |
| 2018 | 0.544 | 0.544 | 0.541 |
| 2020 | 0.671 | 0.671 | 0.682 |
| 2022 | 0.515 | 0.515 | 0.519 |
| 2024 | 0.685 | 0.676 | 0.683 |

Table 1: Turnout rates in Georgia federal elections from 2014 to 2024, calculated using state-provided election returns and McDonald's (2024) data.

15.    Using the VEP turnout rates in the fourth column, I also find that the 2024 election was the highest turnout election for all 6 general federal elections in Table 1, though using this measure of turnout I again find that the turnout rate in the 2024 election was similar to the turnout rate in the 2020 election. The VEP turnout rate in 2024 was 0.1 percentage points higher in 2024 than in 2020. But the 2024 VEP turnout rate was 8.5 percentage points higher in 2024 than in 2016.

16.    McDonald (2024) provides VEP turnout rates in Georgia for all federal elections from 1980 to 2024.[4] I present those VEP turnout rates in

---

[4] To create this time series I combine the data available on Professor McDonald's website available here—Michael McDonald, Univ. of Fla. Election Lab, 1980-2022 General Election Turnout Rates (v1.2) (Oct. 6, 2024), https://election.lab.ufl.edu/dataset/1980-2022-general-election-turnout-rates-

Figure 1 for the Midterm (left-hand panel) and General (right-hand panel) elections from 1980 to 2024. Using McDonald's (2024) VEP estimates presented in the right-hand panel of Figure 1, I find that the turnout rate in the 2024 Georgia presidential election (right-hand panel) was the highest turnout rate in any general federal election in Georgia since at least 1980. The second highest VEP turnout rate occurred in the 2020 election. The federal election with the third highest VEP turnout rate is the 2008 election and the 2024 VEP turnout rate was 5.6 percentage points higher than the 2008 VEP turnout rate.



Figure 1: VEP Turnout Rates from 1980 to 2024, calculated using McDonald's (2024) data.

v1-2/, along with the estimates from 2024 here—Univ. of Fla. Election Lab, *supra* note 4, https://election.lab.ufl.edu/2024-general-election-turnout/.

17.     The left-hand panel presents the VEP turnout rates for the midterm elections in Georgia from 1982 to 2022. As I explained in my first expert report and as Table 1 shows, the VEP turnout rate in 2022 in Georgia was lower than in 2018. The 2022 VEP turnout rate was 2.2 percentage points lower than the 2018 VEP turnout rate. But, the 2022 VEP turnout rate was the second highest VEP turnout rate in any Georgia midterm election from 1982 to 2022. The election with the third highest VEP turnout rate was the 2010 midterm election when turnout was 11.2 turnout points lower than the VEP turnout rate in the 2022 midterm election.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|------|---------------|------|---------------|------|---------------|------|---------------|------|---------------|
| | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.022 | 0.022 | 0.133 | 0.133 | 0.352 | 0.352 | 0.102 | 0.102 | 0.388 | 0.388 |
| 2016 | 0.066 | 0.066 | 0.369 | 0.369 | 0.521 | 0.521 | 0.304 | 0.304 | 0.590 | 0.590 |
| 2018 | 0.077 | 0.077 | 0.343 | 0.343 | 0.495 | 0.495 | 0.275 | 0.275 | 0.539 | 0.539 |
| 2020 | 0.157 | 0.157 | 0.599 | 0.599 | 0.572 | 0.572 | 0.403 | 0.403 | 0.671 | 0.671 |
| 2022 | 0.209 | 0.209 | 0.341 | 0.341 | 0.421 | 0.421 | 0.214 | 0.214 | 0.539 | 0.539 |
| 2024 | 0.514 | 0.496 | 0.632 | 0.608 | 0.570 | 0.560 | 0.429 | 0.411 | 0.692 | 0.690 |

Table 2: Voter turnout by self-reported racial group, calculated using state-provided election returns.

18.     In Table 2 I calculated turnout rates for self-identified racial groups for federal general elections in Georgia from 2014 to 2024. Table 2 updates Table 2 from my first expert report. In the left-most column of Table 2 I present the election year. For each self-identified racial group I present a pair of CVAP turnout rates for each election. The "CVAP" column for each self-identified racial group is the CVAP turnout rate with the 2024 estimate

calculated using the 2023 5-year estimate of the CVAP in Georgia. In the "CVAP Trend" column for each self-identified racial group is the CVAP turnout with the 2024 estimate calculated using the extrapolated measure of the 2024 CVAP.[5]

19.    Comparing presidential elections, every racial group had higher turnouts rates in the 2024 election than in the 2016 election. Using the CVAP trend measure of turnout the turnout rate among Asian voters was 23.9 percentage points higher in the 2024 election than in the 2016 election (26.3 percentage points higher using the CVAP measure of turnout). Continuing to use the CVAP trend measure, the turnout rate among self-identified Black voters was 3.9 percentage points higher in the 2024 election than in the 2016 election (4.9 percentage points higher using the CVAP measure of turnout), among self-identified Hispanic voters the turnout rate was 10.7 percentage points higher in 2024 than in 2016 (12.5 percentage points higher using the CVAP measure), and among white voters the 2024 turnout rate was 10.0 percentage points higher than in 2016 (10.2 percentage points higher using the CVAP measure).

---

[5] Table 2 in this report differs from Table 2 in the first report in two ways. First, Table 2 in this report adds the 2024 turnout rates. Second, Table 2 in this report uses the 5-year estimate of the 2022 CVAP in Georgia, which was not available at the time I wrote my first report.

20.    Asian, Hispanic, and white voters had higher turnout rates in the 2024 election than in the 2020 election, though Black voters saw a decline in turnout in the 2024 election compared to the 2020 election. Continuing my use of the CVAP trend measure, I find that turnout among self-identified Asian voters was 0.9 percentage points higher in the 2024 election than in the 2020 election (3.3 percentage points higher using the CVAP measure). Using the CVAP trend measure of turnout, the turnout rate among self-identified Hispanic voters was 0.8 percentage point higher turnout rate in 2024 than in 2020 (2.6 percentage points higher using the CVAP measure of turnout) and the turnout rate among white voters was 1.9 percentage point higher turnout in the 2024 election than in the 2020 election (2.1 percentage points higher in 2024 than in 2020 using the CVAP measure of turnout). The only group with a decline in turnout in 2024 relative to 2020 was among self-identified Black voters. Using the CVAP trend measure of turnout I find a 1.2 percentage point decline in Black turnout in 2024 relative to the 2020 election (0.2 percentage point decline using the CVAP measure of turnout).

21.    Turnout rates in Georgia and nationwide tend to be higher in presidential elections than in midterm elections. This is true across all self-identified racial groups. The turnout rate for each self-identified racial group in the 2024 general election was higher than the turnout rate in the 2014, 2018, or 2022 midterm elections.

## IV.    COMPARING GEORGIA'S TURNOUT TO OTHER STATES

22.    In my first expert report I contrasted turnout rates in Georgia and the turnout rates in other states. I made two types of comparisons. To assess differences in overall turnout, I made a comparison of the aggregate turnout in Georgia to the turnout rates in other states. To assess differences in turnout among different self-reported racial groups, I also compared the turnout rate among different groups in Georgia to the turnout rates of self-identified racial groups in three other states: Louisiana, North Carolina, and South Carolina.

23.    In this expert report I update the overall comparisons for the 2024 election. To compare the turnout rates across different self-reported racial groups I use a different and more comprehensive strategy. Instead of using voter file data from three states where it was available, I use recently available data from the Current Population Survey (CPS), a census conducted post-election survey designed to measure turnout rates after federal elections. The use of this survey data provides a more comprehensive comparison of turnout rates among self-reported racial groups in Georgia to the turnout rates of self-reported racial groups in other states. I describe some tradeoffs below, but I use the survey data to provide a more comprehensive comparison with the turnout rates in other states.

24.    As I cautioned in my first expert report, interpreting any of the comparisons that I make in this section as a causal effect of SB 202 would

require strong and difficult to justify assumptions in this setting. For example, one key assumption would be that the only differences across Georgia and other states was the passage of SB 202. Of course, there are numerous differences across American states that could affect turnout rates and are unrelated to SB 202 in Georgia.

25. Even though the across state comparisons would require strong assumptions to interpret as the causal effect of SB 202, these comparisons are essential to provide context for the changes in turnout observed in Georgia. As I describe in paragraph 38 in my first expert report, some of the Plaintiffs' experts interpreted changes observed in Georgia alone as evidence of the effect of SB 202. Using turnout comparisons within a single state to assess a policy's effect on turnout requires even stronger assumptions and risks confusing a nationwide pattern for a state-specific policy consequence. Using other states helps identify what those nationwide trends might be.

26. In Table 3 I compare the aggregate turnout rate in the state of Georgia to the turnout rate in other states, calculated using the McDonald's (2024) VEP turnout rates. In Table 3 the "Year" column contains the year of the election, the "Georgia Turnout Rate" presents the VEP turnout rate in Georgia, which is identical to the "VEP Turnout Rate" column in Table 1. The "Other States' Turnout Rate" column calculates the VEP turnout rate across all other states and the District of Columbia. To perform this calculation I

summed together the total votes cast in these states and then divided this by the total size of the voting eligible population. Finally, I divided the total number of voters by the total voting eligible population in these states.

| Year | Georgia Turnout Rate | Other States' Turnout Rate |
|------|------|------|
| 2014 | 0.386 | 0.367 |
| 2016 | 0.598 | 0.604 |
| 2018 | 0.541 | 0.509 |
| 2020 | 0.682 | 0.679 |
| 2022 | 0.519 | 0.467 |
| 2024 | 0.683 | 0.646 |

Table 3: Comparing the VEP turnout rate in Georgia to the VEP turnout rate in other states from 2014 to 2024.

27.   Georgia's turnout rate in the 2024 election was 3.7 percentage points higher than the national average in other states. As discussed above, 68.3% of the voting-eligible population cast a vote in the 2024 election in Georgia and in other states, on average, 64.6% of the voting-eligible population turned out to vote. Unlike the turnout rates in other states, Georgia's turnout rate in 2024 was higher than in 2020, though as I mentioned above the 2024 turnout rate was similar to the turnout rate in 2020. The 2024 VEP turnout rate in Georgia was 0.1 percentage points higher than the 2020 VEP turnout rate in Georgia. Across the other states, the 2024 VEP turnout rate was 3.3 percentage points lower than the VEP turnout rate in 2020. Georgia's 2024 VEP turnout rate also increased more compared to the 2016 VEP turnout rate than other states' 2024 turnout rate increased over the 2016 VEP turnout rate

in the other states. The 2024 VEP turnout rate in Georgia was 8.5 percentage points higher than the 2016 VEP turnout rate in Georgia, while in other states the 2024 turnout rate was 4.2 percentage points higher than the turnout rate in the 2016 election.

28.    To enable a comparison of the turnout rates of self-identified racial groups in Georgia to the turnout rates of self-identified racial groups outside of Georgia, I use survey data from the US Census' Current Population Survey (CPS) November Supplement.[6] The CPS is a large-scale survey that serves as "the primary source of labor force statistics for the population of the United States."[7] After federal elections in even years the CPS November supplement is administered to respondents after the standard CPS battery and asks a sample of respondents about whether they turned out to vote in the recent general election and also asks them to report their self-identified race. Using these survey responses, I compare the turnout rates for Black and white respondents in Georgia to the turnout rates for Black and white respondents in other states in four federal elections before SB 202 was enacted; 2014, 2016,

---

[6] U.S. Bureau of Lab. Stats., Labor Force Statistics from the Current Population Survey, https://www.bls.gov/cps/.

[7] U.S. Census Bureau, Current Population Survey (CPS) (Oct. 23, 2024), https://www.census.gov/programs-surveys/cps.html.

2018, and 2020 November general elections; and two federal elections after the passage of SB 202; the 2022, and 2024 November general elections.

29.    At the time I wrote my first expert report, the CPS November supplement for the 2022 election was not yet released. In place of the CPS data, in my first expert report I used available data from three states that recorded voters' self-identified racial groups in the voter file: Louisiana, North Carolina, and South Carolina. The comparison of the turnout rates of Black, white, and other self-identified racial groups in these states to the turnout rates in Georgia provided useful context for Georgia's turnout rates but necessarily limited the comparison to the turnout rates in the three states with available data at the time.

30.    Using the CPS turnout data, I followed standard practice and calculated the turnout rates using two different methods. First, I calculated the turnout rates using the same procedure as the Census.[8] Following the Census' procedure I classified respondents who reported that they turned out to vote as "VOTED." I then classified individuals who reported not turning out to vote, individuals who said that they "Don't Know", "Refused", or did not complete the turnout supplement as "NOT VOTED".[9] Among this population

---

[8] **Aram** Hur & Christopher H. Achen, *Coding voter turnout responses in the Current Population Survey*, 77 Pub. Op. Q. 985 (2013).

[9] In the 2014, 2016, 2018, and 2020 surveys I perform this classification based entirely on the PES1 variable in the CPS. In the 2022 and 2024 CPS I use the

of respondents I then applied the Census provided survey weights to calculate the turnout rates.[10] I classified an individual's self-identified racial group following the procedure in the replication code of Ansolabehere, Fraga, and Schaffner (2022).[11] I manually verified my calculations, confirming that my implementation of the Census procedure yielded turnout estimates that correspond to the Census provided estimates of turnout rates for the self-reported groups.

| | Black | | | | White | | | |
|---|---|---|---|---|---|---|---|---|
| | Georgia | | Other States | | Georgia | | Other States | |
| Year | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj | CPS | CPS Adj |
| 2014 | 0.43 | 0.40 | 0.39 | 0.35 | 0.45 | 0.39 | 0.46 | 0.41 |
| 2016 | 0.60 | 0.60 | 0.59 | 0.60 | 0.64 | 0.63 | 0.65 | 0.65 |
| 2018 | 0.60 | 0.60 | 0.50 | 0.51 | 0.56 | 0.55 | 0.58 | 0.55 |
| 2020 | 0.64 | 0.65 | 0.63 | 0.66 | 0.70 | 0.74 | 0.71 | 0.72 |
| 2022 | 0.54 | 0.49 | 0.44 | 0.40 | 0.61 | 0.57 | 0.58 | 0.53 |
| 2024 | 0.61 | 0.66 | 0.59 | 0.59 | 0.69 | 0.74 | 0.71 | 0.71 |

Table 4: Estimated turnout rates for Black and white respondents in Georgia and other states, calculated using the CPS survey.

31.    I present the turnout estimates using the CPS in Table 4. In the "Year" column I identify the election year. The columns under "Black" contain the turnout estimates for self-identified Black respondents and the columns under "White" contain the turnout estimates for self-identified white

PES1 variable in the CPS and the PRSUPINT variable, which identifies individuals who refuse to complete the November supplement.

[10] The provided weight is variable PWSSWGT.

[11] Stephen Ansolabehere et al.,, *The current population survey voting and registration supplement overstates minority turnout*, 84 J. Pols. 1850 (2022).

respondents. Within each self-identified racial group the columns under "Georgia" contain the turnout estimates for respondents in Georgia and the columns under "Other States" contain the turnout estimates for respondents in other estates. In the columns labeled "CPS" I present the estimated turnout rate calculated following the Census' procedure for calculating the turnout rates.

32.    There are several issues with using self-reported turnout to measure the voter turnout rate. The most obvious and well documented problem is that some respondents who did not vote in the election will falsely report voting when asked in a survey, like the CPS.[12] A second issue is that the Census procedure classifies all respondents who refuse to complete the November supplement as not voting in that election. But these respondents did not offer any information about their participation in the election. It is a strong assumption to suppose that none of the respondents who did not complete the supplement also did not vote in the corresponding election.

33.    Hur and Achen (2013) provide one methodology to address these issues. The Hur and Achen (2013) procedure makes two modifications to the Census Bureau's procedure for estimating the turnout rate using the CPS turnout data. First, Hur and Achen (2013) drop respondents who refuse to

---

[12] Hur & Achen, *supra* note 8; Michael P. McDonald, *On the overreport bias of the National Election Study turnout rate*, 11 Pol. Analysis 180 (2003).

complete the November supplement rather than code those respondents as non-voters. Second, Hur and Achen (2013) adjust the Census provided turnout weights so that the overall estimated turnout rates using the CPS data are exactly equal to the VEP turnout rates from McDonald (2024). I followed the Hur and Achen (2013) procedure, calibrating the turnout estimates from the CPS for each state to the VEP turnout in McDonald (2024). I present the result of applying this procedure and the corresponding turnout rates in the "CPS Adj." columns in Table 4.

34.    Hur and Achen's (2013) procedure is not guaranteed to address issues of inaccurate estimated turnout rates using the CPS November supplement. The Hur and Achen (2013) procedure rests upon strong assumptions about how non-respondents compare to respondents in the November supplement and relies on the calibration of the census weights using the VEP turnout rates.[13] For example, a sufficient assumption for the Hur and Achen (2013) weight recalibration to provide an accurate estimate of the turnout rate in each self-identified racial group is that every group over-reports turnout at approximately the same rate within a state. Despite the strong assumptions, the Hur and Achen (2013) methodology addresses potential pathologies in the Census Bureau's turnout estimates.

---

[13] Ansolabehere et al., *supra* note 11.

35.     Using the CPS estimated turnout rates, I find that the changes in turnout rates in the general elections in Georgia after the passage SB 202 are similar to changes in turnout rates in other states in the same time period. For example, in the 2022 midterm using the "CPS" turnout estimates I calculated a Black turnout rate in Georgia of 54% (49% using the Hur and Achen adjustment). This is an increase of 11 percentage points over the 2014 Black turnout rate in Georgia (9 percentage point increase using the adjusted turnout rates). In the other states, I find that the turnout rate in 2022 was 5 percentage points higher in 2022 than in 2014 (5 percentage points higher using the adjusted turnout rate). The 2022 Black turnout rate in Georgia was 6 percentage points lower than the 2018 Georgia Black turnout rate (11 percentage points lower using the adjusted turnout rate). In the other states I find that the 2022 Black turnout rate was also 6 percentage points lower in 2022 than in 2018 ( and also 11 percentage points lower using the adjusted turnout rate).

36.     There is also similarity in the changes in Black turnout rates in the three presidential elections included in Table 4. Using the "CPS" turnout estimates I found a Black turnout rate of 61% in the 2024 presidential election (66% using the Hur and Achen adjustment). This is a one percentage point increase in turnout rate compared to the Black turnout rate in Georgia in the 2016 presidential election (6 percentage point increase using the Hur and

Achen adjustment). In other states there is no difference in the Black turnout rate from 2016 to the 2024 election (one percentage point decrease using the Hur and Achen adjustment). Continuing to use the "CPS" measure of turnout, the Black turnout rate in the 2024 presidential election in other states was 3 percentage points lower than the Black turnout rate in the 2020 presidential election (1 percentage point higher using the Hur and Achen adjustment). The 2024 Black turnout rate in other states was four percentage points lower than the 2020 Black turnout rate in other states (7 percentage points lower using the Hur and Achen adjustment).

37.    Focusing on the changes in turnout among white voters I reach a similar conclusion: the trends in turnout in Georgia are similar to the average trend in turnout in other states, though there is some evidence that white turnout in Georgia increased at higher rates than the white turnout in other states. In the 2022 Georgia midterm election the white turnout rate was 16 percentage points higher than in the 2014 Georgia midterm election (18 percentage points higher using the Hur and Achen adjustment), while the average white turnout rate in 2022 in other states was 12 percentage points higher than the average white turnout rate in 2014 in other states (12 percentage points using the Hur and Achen adjustment). Compared to the white turnout rate in the 2018 Georgia midterm election, white turnout was 5 percentage points higher in 2022 (2 percentage points higher using the Hur

and Achen adjustment). The average white turnout rate in the 2022 midterm election in other states and the average white turnout rate in the 2018 midterm election had no difference (2 percentage point decline using the Hur and Achen adjustment). In presidential elections, I find the 2024 white turnout rate in Georgia was 5 percentage points higher than the 2016 white turnout rate in Georgia (11 percentage points higher using the Hur and Achen adjustment), while in other states the white turnout rate increased 6 percentage points from 2016 to the 2024 election (6 percentage point increase using the Hur and Achen adjustment). Using the "CPS" estimates of turnout, I find that the white turnout rate in the 2024 election in Georgia was 1 percentage point lower than the white turnout rate in Georgia in the 2020 election (no difference using the Hur and Achen adjustment). In other states the 2024 white turnout rate was the same as the 2020 white turnout rate (1 percentage point lower using the adjusted turnout rate).

## V.   EVIDENCE ON HOW GEORGIA VOTERS CAST THEIR BALLOTS

38.    I also updated my analysis of how voters in Georgia cast their ballots to include the 2024 Georgia general election. I use the same procedure in this report as I used to obtain estimates of how Georgia voters use their absentee ballots from 2014 to 2022 in my first report. To assess how Georgia voters cast their ballots in the 2024 election I use the spreadsheet contained in

"Voter History File - Nov 2024 General Election.zip". After the 2024 election (and unlike the Voter History files I used in my first expert report), the Georgia Secretary of State's office updated the Voter History file to contain information about how voters cast their ballots. In the voter history file I use the field "Ballot Style" to assess how voters cast their ballots. I then merged in registered voters' self-identified race using the "Statewide Voter File_2025-01-15.csv". Because this voter file was generated after the 2024 election (apparently on January 15th, 2025) there are 6,884 individuals who turned out to vote who are not found in the provided voter file. Unlike in my first expert report, the provided file of "canceled" voters does not contain information about self-reported race, so I cannot use this file to merge with the voter file to obtain voters' self-report race. To mitigate the number of voters with missing race information, I used the version of the voter file from my first expert report. For 4,966 of these remaining voters I successfully merged information about self-identified race using the 2022 voter file used in my first expert report. This leaves 1,918 voters for whom I was unable to assign a self-identified race.

39.    Using this merged data set for the 2024 election, I updated my analysis of how Georgia voters cast ballots in recent federal general elections in Georgia. Table 5 presents the share of ballots cast in each election (first column) using early-in person (second column), mail-in absentee (third column

column), and on Election Day in person (fourth voting). Table 5 updates Table 7 in my first expert report.

| Year | Early Voting | Mail Voting | Election Day |
|------|--------------|-------------|--------------|
| 2014 | 0.326 | 0.041 | 0.633 |
| 2016 | 0.531 | 0.049 | 0.421 |
| 2018 | 0.478 | 0.056 | 0.466 |
| 2020 | 0.537 | 0.261 | 0.202 |
| 2022 | 0.579 | 0.062 | 0.360 |
| 2024 | 0.711 | 0.051 | 0.234 |

Table 5: Share of ballots cast using early, mail, and Election Day

40.     Table 5 shows that voters in Georgia in 2024 continued a shift away from casting their vote on Election Day voting and instead towards in-person during the early voting period. In the 2024 election 71.1% of all ballots were cast in-person during the early voting period, the largest share of ballots cast in-person during the early voting period for any of the six federal general elections I examine in Table 5. Comparing 2014 to 2024 there was a 38.5 percentage point increase in the percentage of ballots cast using in-person early voting. A larger share of votes were cast in-person during early voting in 2024 than in the 2016 and 2020 elections. The share of ballots cast in-person during the early voting period was 18 percentage points higher in 2024 than in 2016 and 17.4 percentage points higher in 2024 than in the 2020 election.

41.     Nearly all the increase in the share of ballots cast in-person during the early voting period comes from a decline in the share of ballots cast on Election Day. Comparing 2014 to 2024 there was a 39.9 percentage point

decrease in the percentage of Georgia voters who cast their vote on Election Day. Compared to 2024 a larger share of voters cast their ballots on Election Day in the 2016, 2018, and 2022 general elections in Georgia. Only the 2020 general election in Georgia saw a smaller share of ballots cast on Election Day than the 2024 general election: the share of votes cast on Election Day in the 2024 election was 3.2 percentage points higher than the share of votes cast on Election Day in the 2020 election.

42.    In the 2024 election 5.1% of all votes were cast using mail-in absentee voting. This is more than in 2014 (1 percentage point more in 2024) and 2016 (0.2 percentage points more than in 2016), but it was less than in 2018 (0.5 percentage points less than in 2018) and 2022 (1.1 percentage points less than in 2022). By far the highest rate of mail-in voting in Georgia general elections occurred during the 2020 election when 26.1% of all votes were cast using mail-in absentee voting, 21 percentage points higher than in the 2024 election.

43.    Using the merged 2024 voter history file and voter file, I updated my analysis of how rates of early in-person, mail-in absentee, and Election Day voting varied across self-reported racial groups. In Table 6 I report the share of ballots cast for each mode of voting for Asian, Black, Hispanic, and White voters. For space reasons I provide the table for American Indian voters in the Appendix to this report. The calculated shares of votes cast using each voting

method from 2014 to 2022 in Table 6 are identical to the numbers contained in

Figure 1 in my first expert report.

| Year | Asian | | | Black | | | Hispanic | | | White | | |
|------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day | Early Voting | Mail Voting | Election Day |
| 2014 | 0.196 | 0.036 | 0.767 | 0.386 | 0.035 | 0.579 | 0.195 | 0.024 | 0.780 | 0.306 | 0.046 | 0.648 |
| 2016 | 0.448 | 0.063 | 0.485 | 0.556 | 0.041 | 0.402 | 0.417 | 0.033 | 0.547 | 0.527 | 0.054 | 0.417 |
| 2018 | 0.367 | 0.116 | 0.515 | 0.501 | 0.073 | 0.426 | 0.339 | 0.063 | 0.597 | 0.478 | 0.046 | 0.475 |
| 2020 | 0.447 | 0.398 | 0.151 | 0.525 | 0.294 | 0.179 | 0.496 | 0.233 | 0.269 | 0.546 | 0.240 | 0.211 |
| 2022 | 0.518 | 0.092 | 0.388 | 0.637 | 0.075 | 0.288 | 0.476 | 0.045 | 0.478 | 0.559 | 0.056 | 0.384 |
| 2024 | 0.675 | 0.076 | 0.245 | 0.701 | 0.055 | 0.242 | 0.613 | 0.030 | 0.353 | 0.728 | 0.049 | 0.220 |

Table 6: Mode of Voting Across Voters Self-Identified Racial Groups

44.    Each self-reported racial group cast the largest share of their votes

in-person during early voting in the 2024 election. Compared to the 2014

election there was a 47.9 percentage point increase in the share of ballots Asian

voters cast in-person during early voting, a 31.5 percentage point increase in

the share of ballots Black voters cast in-person during early voting, a 41.8

percentage point increase in the share of ballots Hispanic voters cast in-person

during early voting, and a 42.2 percentage point increase in the share of ballots

white voters cast in-person during early voting. There was also an increase in

the share of ballots cast in-person during early voting compared to the most

recent presidential election (2020) and midterm election (2022). Among Asian

voters in 2024 there was a 22.8 percentage point increase in the share of ballots

cast in-person during the early voting period compared to 2020 and a 15.7

percentage point increase in the share of ballots cast in-person during the early

voting period compared to 2022. Among Black voters in the 2024 election there

was a 17.6 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2020 and a 6.4 percentage point increase in the share of ballots cast in-person during the early voting period compared to 2022. Among Hispanic voters in the 2024 election there was a 11.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 13.7 percentage point increase in the share of ballots cast in-person during early voting compared to 2022. Among white voters in the 2024 election there was a 18.2 percentage point increase in the share of ballots cast in-person during early voting compared to 2020 and a 16.9 percentage point increase in the share of ballots cast in-person during early voting compared to 2022.

45.    Table 6 shows that in the 2024 election each racial group cast the second-smallest share of ballots on Election Day, second to the share of ballots cast on Election Day in 2020. Further, across racial groups the 2020 election continues to be the election with the largest share of ballots cast using mail-in absentee voting and the smallest share of ballots cast on Election Day. In each racial group the 2024 election saw a smaller share of ballots cast using mail-in absentee voting than the 2022 election.

46.    I also updated my analysis of the rate of provisional voting in Georgia elections and overall in Table 7, which updates Table 8 from my first report. The "Race" column in Table 7 records the self-reported race of the voter

and the overall calculation. The "2014" to "2022" columns are the same estimates as in Table 8 in my first report. The "2024" column presents the share of votes cast classified as provisional by self-reported racial group and overall for the 2024 election. Table 21, located in the Appendix, is structured the same as Table 7, except it provides a count of the number of ballots classified as provisional for each self-reported racial group and overall instead of the share of ballots classified as provisional.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.0061 | 0.0026 | 0.0055 | 0.0033 | 0.0013 | 0.0012 |
| Asian | 0.0047 | 0.0033 | 0.0053 | 0.0027 | 0.0011 | 0.0006 |
| Black | 0.0031 | 0.0018 | 0.0034 | 0.0032 | 0.0010 | 0.0011 |
| Hispanic | 0.0049 | 0.0037 | 0.0057 | 0.0033 | 0.0016 | 0.0012 |
| White | 0.0012 | 0.0007 | 0.0013 | 0.0011 | 0.0004 | 0.0003 |
| Overall | 0.0019 | 0.0012 | 0.0022 | 0.0018 | 0.0006 | 0.0006 |

Table 7: Share of all general election votes classified as provisional by self-reported racial identity and overall.

47.    Overall, the 2024 election saw a smaller share of votes classified as provisional than in the 2014, 2016, 2018, and 2020 general elections and a similar share of ballots classified as provisional in the 2022 general election. This same pattern is found in every self-reported racial group: every group had a smaller share of ballots classified as provisional in the 2024 election than in the 2014, 2016, 2018, and 2020 election. American Indian, Asian, Hispanic, and white voters had a smaller share of votes classified as provisional in the 2024 election than in the 2022 election. Black voters saw an increase in the share of ballots classified as provisional from 2022 to 2024, though the increase in rate was substantively small: the share of Black voters who had their ballot

classified as provisional increased in 2024 compared to the 2022 election by 0.009 percentage points (an increase of 0.00009 in the share of ballots cast there were provisional).

48.    There is a similar pattern with the count of provisional ballots. Overall, the 2024 election had fewer ballots classified as provisional than the 2014, 2016, 2018, and 2020 elections, but in the 2024 election there were 695 more ballots classified as provisional than the 2022 election. In the 2024 election Asian, Black, and white voters had their second fewest number of provisional ballots cast, with the fewest number of provisional ballots cast for each group in 2022. In the 2024 election 42 American Indian voters had their ballot classified as provisional (fewer than 2018 and 2020, but more than 2014, 2016, and 2022), 91 Asian voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022), 1,620 Black voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, but more than 2022), 233 Hispanic voters had their ballots classified as provisional (fewer than 2016, 2018, and 2020, but more than 2014 and 2022), and 904 white voters had their ballots classified as provisional (fewer than 2014, 2016, 2018, and 2020, but more than 2022).

## VI.   ASSESSING BALLOT REJECTION RATES AND REASONS FOR MAIL-IN ABSENTEE VOTING IN GEORGIA

49.    I updated my analysis of the rate of absentee ballot rejections and the reason for those rejections using data from the 2024 general election. I calculated the share of mail-in absentee ballots that were returned and ultimately rejected, along with the reason those ballots were rejected. I use the Absentee Voter History files that the Secretary of State posts to their website, which I then merge with the voter file to include information about the voters' self-identified racial group. Using these merged files, I identify mail in absentee ballots in the 2016, 2018, 2020, and 2022 files by identifying rows where the "Ballot Style" field is equal to "Mailed". In the 2024 absentee voter history file I identified rows with the "Ballot Style" field equal to "ABSENTEE BY MAIL." In all analyses I focused on the ballots that were returned: ballots with the "Ballot Status" field equal to "A" (accepted) or "R" (rejected). The overall rejection rate for mail in absentee ballots is the share of ballots that are returned and rejected. I also calculated the reasons for rejection. I focus on four categories of rejections: ballots rejected due to arriving after the deadline, ballots rejected due to issues involving the voters' signature, ballots rejected due to an issue involving the voters' identification, and ballots rejected due to incorrect completion of the oath envelope as an "Oath" rejection. For the 2016 and 2018 elections I manually classified the "Status Reason" field to

correspond with these four categories.[14] For the 2020, 2022, and 2024 elections I use standardized rejection reasons included in the voter file, which I classify into the four categories.[15] Note that after the passage of HB 316 in 2018 the oath envelope was simplified to no longer require a voter to include their address or their date of birth. As a result of this simplification the "Oath" rejection rate will mechanically reduce to zero in these years. After classifying the reason for rejection, I calculated the share of returned mail in absentee ballots that were rejected for that reason.

50.    Table 8 presents the rates of rejections for mail in ballots in Georgia for the 2016, 2018, 2020, 2022, and 2024 elections overall and across self-reported racial groups. The "Race" column describes the self-reported racial identity of the voter or whether the calculation is for all voters. The "Year" column provides the election year. I extended my original analysis of mail-in ballot rejection reasons to include the 2016 election. The "Overall" column contains the share of all returned mail in ballots that are rejected. The "Deadline" column contains the share of all returned mail in ballots rejected

---

[14] My replication code contains the coded reasons in the "RejReasons16.csv" and "RejReasons18.csv" files.

[15] I classify the entry "BALLOT RECEIVED AFTER DEADLINE" as a rejection for arriving after the deadline. I classify "Invalid Signature" and "Missing Signature" as rejections for signature reasons. And I classify "Incorrect ID Information", "MIDR - ID not Provided", and "Missing ID Information" as rejections for ID reasons.

for arriving after the deadline, the "Signature" column contains the share of all returned mail in ballots rejected for an issue related to the voters' signature, the "ID" column contains the share of returned mail in ballots rejected for an issue related to voters' identification, and the "Oath" column contains the share of returned mail in ballots rejected for an issue related to the completion of the Oath envelope.

51.     Table 8 shows that the overall rejection rate for mail in absentee ballots in Georgia was lower in 2024 than in 2016 and 2018, but higher than the rejection rate in 2020 or 2022. I find that 1.7% of all returned mail in absentee ballots were rejected in 2024. This is 1.2 percentage points lower than the rejection rate in 2016 and 1.8 percentage points lower than the rejection rate in 2018. The overall mail-in ballot rejection rate in 2024 was 1.4 percentage points higher than the mail-in ballot rejection rate in 2020 and 0.3 percentage points higher than the overall rejection rate in 2022. In summary, the two general elections after the passage of SB 202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016 or 2018, but a higher mail-in ballot rejection rate than in 2020.

52.     The mail-in ballot rejection rate for every self-reported racial group followed a similar pattern: in the two general federal elections after the passage of SB 202 all groups had lower mail-in ballot rejection rates than mail-in ballot rejection rates in 2016 or 2018, but higher mail-in ballot rejection

rates than found in the 2020 election. For example, in the 2016 election 4.1% of all returned mail in ballots from Black voters were rejected. In the 2018 election 4.3% of all returned ballots were rejected. In the 2022 election 1.4% of all returned mail in ballots from Black voters were rejected and in the 2024 election 2% of the returned mail in ballots were rejected. But, in the 2020 election 0.4% of the returned mail in ballots from Black voters were rejected. The rejection rates among returned mail in ballots for white voters follows a similar pattern. In the 2016 election 2.3% of all returned mail in ballots from white voters were rejected and in the 2018 election 2.5% of all returned mail in ballots from white voters were rejected. In the 2022 election 1.2% of returned mail in ballots from white voters were rejected and in the 2024 election 1.3% of the returned mail in ballots from white voters were rejected. Again, the lowest mail-in ballot rejection rate for returned mail in ballots from white voters occurred in the 2020 election, when 0.2% of the returned mail in ballots were rejected.

53.    Focusing now on the reasons mail-in ballots were rejected, I first consider reasons related to the oath contained on the absentee ballot return envelope, which was required for mail-in ballots returned during the 2016 and 2018 elections. After the passage of HB 316, the oath was simplified so that voters did not have to include their date of birth and address on the oath envelope. The share of returned mail in ballots rejected for oath related reasons

is found in the "Oath" column in Table 8. Overall, in the 2016 election 1.1% of all returned mail in ballots were rejected for an oath envelope related reason, constituting 38% of all rejected mail-in absentee ballots (0.011/0.029 x 100). The rejection rate of mail-in ballots for oath related reasons rose to 1.5% in the 2018 election, constituting approximately 43% of all rejected mail-in ballots. After the passage of HB 316 this rejection rate declined to 0% in 2020, 2022, and 2024. A similar pattern is found in every self-reported racial group: oath envelope rejection rates were a large proportion of all ballot rejections in the 2016 and 2018 elections but then were eliminated after HB 316. For example, in 2016 1.3% of all returned mail in ballots from Black voters were rejected for oath related reasons, constituting 32% of all mail-in ballot rejections for Black mail-in voters. In 2022 2.2% of all returned mail in ballots were rejected for oath-related reasons, constituting 51% of all mail-in ballot rejections for Black mail-in voters. White voters followed a similar pattern. In 2016 0.9% of all returned mail in ballots from white voters were rejected for oath-related reasons, constituting 39% of all mail-in ballot rejections for white mail-in voters. In 2018 0.7% of all returned mail in ballots were rejected for oath-related reasons, constituting 28% of all mail-in ballot rejections for white mail-in voters.

54.    There is also variation from election-to-election in the share of mail-in ballots rejected for arriving after the deadline. The share of mail-in

ballots rejected for arriving after the deadline are found in the "Deadline" column of Table 8. Overall, the two general federal elections in Georgia after the passage of SB 202 had a smaller share of returned mail in ballots rejected for arriving after the deadline than were rejected for arriving after the deadline in the 2016 and 2018 elections, but the post-SB 202 elections had a larger share of mail-in ballots rejected for arriving after the deadline than in the 2020 election. In the 2016 election 1.4% of all returned mail in ballots were rejected for arriving after the deadline, constituting 48% of all mail-in ballot rejections. In the 2018 election 1.6% of all returned mail in ballots were rejected for arriving after the deadline, constituting 46% of all mail-in ballot rejections. In 2022 0.8% of all returned mail in ballots were rejected for arriving after the deadline, constituting 57% of all mail-ballot rejections. In 2024 1.2% of all returned mail in ballots were rejected for arriving after the deadline, constituting 71% of all rejections of returned mail in ballots. In the 2020 election 0.2% of all mail-in absentee ballots were rejected for arriving after the deadline, constituting 67% of all rejected mail-in ballots.

55.    There is a similar pattern among self-reported racial groups. Black voters had a smaller share of mail in absentee ballots rejected for arriving after the deadline in the elections after SB 202 than in 2016 or 2018, but a higher rate of rejection than in 2020. For example, in 2016 1.9% of all returned mail in ballots from Black voters were rejected for arriving after the deadline,

constituting 46% of all mail-in ballot rejections for Black mail-in voters. In 2018 1.5% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 35% of all rejected mail-in ballots for Black voters. In the 2022 election 0.7% of all returned mail in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters. In the 2024 election 1.3% of all returned mail in ballots were rejected for arriving after the deadline, constituting 65% of all mail-in ballot rejections. The 2020 election saw the lowest rate of mail-in ballot rejections for Black voters for arriving after the deadline. In 2020 0.2% of all mail-in ballots from Black voters were rejected for arriving after the deadline, constituting 50% of all mail-in ballot rejections for Black voters.

56.    White voters followed a similar pattern of change. The deadline rejection rates in the post-SB 202 elections were lower than in 2016 or 2018, but higher than in 2020. In the 2016 election 1.1% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 43% of mail in ballot rejections for white voters. In 2018 1.5% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 60% of all mail-in ballot rejections for white voters. In 2022 0.8% of all mail-in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections for white

voters. In 2024 0.9% of all mail-in ballots were rejected constituting 69% of all mail-in ballot rejections for white voters. In 2020 0.2% of all returned mail in ballots from white voters were rejected for arriving after the deadline, constituting 66% of all mail-in ballot rejections (rounding affects the appearance of results).

57.    Dr. Burden's expert report attributes the lower rejection rate in the 2020 election to the presence of drop boxes. Dr. Burden writes "drop boxes were an important contributor to lower rejection rates. A voter using a drop box to return an absentee ballot by election day is guaranteed that it will be received on time to be counted, whereas a voter returning a ballot via the postal service cannot be certain that it will be delivered by the election day deadline." Dr. Burden does not provide evidence for his causal claim that "drop boxes were an important contributor to lower rejection rates." Dr. Burden's analysis seems to be based on the following logic: there were more drop boxes available in the 2020 election and a lower rejection rate of absentee ballots in the 2020 election. But merely comparing rejection rates across the 2020 election and the post-SB 202 elections is not a credible way to estimate the causal effect of SB 202 and risks confusing a correlation-a change in rejection rates-with causation- the causal effects of more drop boxes on mail-in absentee ballot rejection rates. This is because there are many other differences across the 2020 and post-SB 202 elections that confound any changes made in Georgia's policies. And as a

result, it is difficult to attribute changes in the rejection rates to the changes mandated by SB 202.

58.    One important difference is that different populations of voters used mail-in ballots in each election and these different populations could result in differences in the rejection rates that are unrelated to the presence of drop boxes or any other policy related to SB 202. For example, the average mail-in ballot voter in the 2020 election was younger than the average mail-in ballot voter in other election years. In the 2020 election the average mail-in ballot voter was 56.8 years old. Compared to prior years, the 2020 average mail-in ballot voter was over two years younger than the average age of mail-in ballot voters in 2016 (58.9 years), more than a year younger than mail-in ballot voters in 2018 (58.0 years), 5 years younger than the average age of mail-in ballot voters in 2022 (63.9), and more than 3 years younger than the average age of mail-in ballot voters in 2024 (59.9).

59.    Further confounding the comparisons across elections is that mail-in ballot voters in the 2020 election returned their ballot earlier than mail-in ballot voters in the 2016, 2018, 2022, and 2024 elections. Using the absentee voter history file for each corresponding election, I find that in the 2020 general election 63% of all mail-in absentee ballots had been returned at least two weeks before the election. This is a larger share than in the other elections I examine in Table 8: In 2016 50% of mail-in ballots were returned at least two

weeks before the election, 49% in 2018, 47% in 2022, and 46% in 2024. In contrast, a smaller share of voters in the 2020 election returned their ballot in the week immediately before the election. In the 2020 election 17.3% of mail-in ballots were returned in the week before the election. In contrast, 28.9% of mail-in ballots were returned in the week immediately before the election in 2016, in 2018 it was 29.1%, in 2022 it was 24.1%, and in 2024 it was 25.9%. The result of these patterns is that the typical mail-in ballot was returned much earlier in the 2020 election than in the other elections I examined. The median mail-in ballot in 2020 was returned 18 days before the election, while the median mail-in ballot in 2016 was returned 13 days before the election. The median mail-in ballot in 2018, 2022, and 2024 were also returned 13 days before the election. Voters' decision to return their ballot earlier further confounds any attempt to isolate the effect of a policy change from SB 202 on the share of ballots rejected for arriving after the deadline.

60. In contrast to mail-in ballots rejected for arriving after the deadline or for errors on the oath envelope, in most elections and for most self-reported racial groups a smaller share of rejections are due to issues with the voters' signature or because they failed to provide accurate identification. In the "Signature" column I calculated the share of mail-in ballots rejected for signature related reasons and in the "ID" column I calculated the share of mail-in ballots rejected for identification related reasons. As discussed in my first

expert report, prior to SB 202 mail-in absentee ballots were verified using a signature match. After SB 202 mail-in absentee ballots were verified using voter's identification, including a driver's license number. In the two post-SB202 elections, I find that the rate mail-in ballots were rejected for identification reasons is similar to the rate mail-in ballots were rejected for signature reasons in the 2016, 2018, and 2020 elections.

61.    In the 2024 election 0.42% of all returned mail in ballots were rejected for issues related to the voter's identification. This constitutes 24% of mail-in ballot rejections in the 2024 election. In the 2022 election 0.46% of mail-in ballots were rejected for issues related to the voter's identification, constituting 33% of all mail-in ballot rejections. This is higher than signature rejection reasons in pre-SB 202 elections, though the differences are relatively small compared to variation in the share of ballots rejected for Oath or deadline reasons for the elections in Table 8. For example, in the 2016 election 0.28% of all mail-in ballots were rejected for signature reasons. In the 2018 election 0.20% of all mail-in ballots were rejected for signature reasons, while in the 2020 election 0.15% of all mail-in ballots were rejected for signature reasons. The 2024 election mail-in ballot rejection rate for identification issues with mail-in ballots was 0.14 percentage points higher than the 2016 election rejection rate for signature issues with mail-in ballots, 0.22 percentage points

higher than the rejection rate for signature issues in the 2018 election, and 0.26 percentage points higher than the rejection rate in the 2020 election.

62.    I find similar patterns across self-reported racial groups: the ID rejection rates in the post-SB 202 elections were similar to the signature rejection rates in the pre-SB202 elections. For example, in the 2024 election 0.52% of returned mail in ballots from Black voters were rejected for ID related reasons. In the 2016 election 0.51% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.01 percentage points lower than the identification rejection rate for Black voters in 2024. In 2018 0.28% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.23 percentage points less than the identification related rejection rate among Black mail-in voters in 2024. And in 2020 0.24% of returned mail in ballots from Black voters were rejected for signature related reasons, which is 0.28 percentage points lower than the identification related rejection rate for Black mail-in voters in 2024. There is a similar pattern for white voters. In 2024 0.31% of returned mail in ballots from white voters were rejected for identification reasons. In the 2016 election 0.18% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.13 percentage points lower than the 2024 identification rejection rate for white voters. In 2018 0.12% of mail-in ballots from white voters were rejected for signature reasons, a rejection rate that is 0.19

percentage points lower than the 2024 identification rejection rate for white voters. And in 2020 0.08% of mail-in ballots from white voters were rejected for a signature related issue, a rejection rate that is 0.23 percentage points lower than the 2024 identification rejection rate for white voters.

63.     I also find that the Black-white gap in the signature rejection rate in the pre-SB 202 elections is similar to the Black-white gap in the identification rejection rate in the post-SB 202 elections. In the 2024 election the Black-white gap in the identification rejection rate was 0.20 percentage points and in the 2022 election the Black-white gap in the identification rejection rate was 0.23 percentage points. In the 2016 election the Black-white gap in the signature rejection rate was 0.34 percentage points, in the 2018 election the Black-white gap in the signature rejection rate was 0.17 percentage points, and in the 2020 election the Black-white gap in the signature rejection was 0.17 percentage points.

| Race | Year | Overall | Deadline | Signature | ID | Oath |
|------|------|---------|----------|-----------|-----|------|
| Overall | 2016 | 0.029 | 0.014 | 0.003 | 0.001 | 0.011 |
| | 2018 | 0.035 | 0.016 | 0.002 | 0.000 | 0.015 |
| | 2020 | 0.003 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.008 | 0.001 | 0.005 | 0.000 |
| | 2024 | 0.017 | 0.012 | 0.001 | 0.004 | 0.000 |
| American Indian | 2016 | 0.048 | 0.021 | 0.003 | 0.006 | 0.018 |
| | 2018 | 0.053 | 0.031 | 0.000 | 0.000 | 0.019 |
| | 2020 | 0.007 | 0.005 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.037 | 0.029 | 0.002 | 0.006 | 0.000 |
| | 2024 | 0.038 | 0.034 | 0.001 | 0.004 | 0.000 |
| Asian | 2016 | 0.063 | 0.025 | 0.006 | 0.003 | 0.028 |
| | 2018 | 0.064 | 0.020 | 0.003 | 0.000 | 0.040 |
| | 2020 | 0.006 | 0.002 | 0.003 | 0.000 | 0.000 |
| | 2022 | 0.031 | 0.023 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.029 | 0.021 | 0.001 | 0.007 | 0.000 |
| Black | 2016 | 0.041 | 0.019 | 0.005 | 0.001 | 0.013 |
| | 2018 | 0.043 | 0.015 | 0.003 | 0.000 | 0.022 |
| | 2020 | 0.004 | 0.002 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.014 | 0.007 | 0.001 | 0.006 | 0.000 |
| | 2024 | 0.020 | 0.013 | 0.002 | 0.005 | 0.000 |
| Hispanic | 2016 | 0.051 | 0.022 | 0.005 | 0.002 | 0.019 |
| | 2018 | 0.044 | 0.018 | 0.003 | 0.001 | 0.021 |
| | 2020 | 0.005 | 0.003 | 0.002 | 0.000 | 0.000 |
| | 2022 | 0.020 | 0.015 | 0.000 | 0.004 | 0.000 |
| | 2024 | 0.032 | 0.023 | 0.001 | 0.008 | 0.000 |
| White | 2016 | 0.023 | 0.011 | 0.002 | 0.000 | 0.009 |
| | 2018 | 0.025 | 0.015 | 0.001 | 0.000 | 0.007 |
| | 2020 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 |
| | 2022 | 0.012 | 0.008 | 0.001 | 0.004 | 0.000 |
| | 2024 | 0.013 | 0.009 | 0.001 | 0.003 | 0.000 |

Table 8: Rate of absentee ballot rejections and rate of rejections by reason, overall and by self-reported racial identity.

## VII.  ASSESSING THE RATES OF WEEKEND VOTING IN THE POST-SB 202 ELECTIONS.

64.    One argument made in expert reports was that SB 202 would cause a decline in the use of weekend voting during in-person early voting. For example, when analyzing the consequences of SB 202, Dr. Lee opined that one consequence of SB 202 would be "the elimination of weekend voting on most weekends" (pg. 93). And when pointing to policies that Dr. Lee opines will

"raise the costs of voting" he cites "doing away with weekend voting on most weekends" (pg. 94). Dr. Pettigrew similarly implies that SB 202 will cause a decline in the use of weekend voting. Dr. Pettigrew writes that "Although the bill does require, for the first time, two days of Saturday voting during the early/advanced voting period, I find that this requirement will have no impact on voting hours in most counties–particularly those that tend to have long lines–because they offered two days of Saturday voting prior to SB202" (Pettigrew pg. 1).

65.    In my first expert report I concluded that "the 2022 general election and the 2022 runoff election saw the highest rate of weekend votes cast of any midterm election, and the second highest share of weekend votes cast in a general election, other than the 2020 general election." In Table 9 I update my analysis for the 2024 election. Using the Absentee Voter History file from the 2024 election, I identified all individuals with a "Ballot Style" entry equal to "EARLY IN-PERSON" and a "Ballot Return Date" equal to a weekend date when early in-person voting was active: either Sunday (October 20th, 2024 and October 27th, 2024) or Saturday (October 19th, 2024 and October 26th, 2024). I then measured the rate of Sunday and weekend voting using two different denominators. Following the analysis in Tables 31 and 32 of my first report, the two "Share of All Early In-Person Votes" columns calculate the share of all early in-person votes cast on "Sunday" or the

"Weekend". The two "Share of All Votes Cast" columns present estimates of the share of all votes cast, regardless of the method for casting those votes, on "Sunday" or the "Weekend."

| Year | Share of All Votes Cast | | Share of All Early In Person Votes | |
|---|---|---|---|---|
| | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.005 | 0.023 | 0.017 | 0.070 |
| 2016 | 0.006 | 0.042 | 0.012 | 0.079 |
| 2018 | 0.008 | 0.043 | 0.016 | 0.089 |
| 2020 | 0.015 | 0.053 | 0.027 | 0.099 |
| 2022 | 0.011 | 0.055 | 0.018 | 0.094 |
| 2024 | 0.015 | 0.077 | 0.021 | 0.109 |

Table 9: Share of all ballots cast on the weekend and the share of all early in person ballots cast on the weekend

66.    Using my calculations in Table 9 and focusing first on the share of all votes cast, I find that the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections I examined in Table 9. In 2024 I calculated that 1.49% of all votes cast in the Georgia presidential election were cast on a Sunday, early in person. This is similar to, but higher than, the 1.46% of all votes cast on Sunday, early in person in the 2020 election. In the 2022 election there was the highest share of all votes cast on Sunday for any midterm election considered in Table 9, with 1.07% of all votes in that election cast on Sunday. The 2018 (0.8%), 2016 (0.6%), and 2014 (0.5%) all had smaller shares of votes cast on Sunday. The 2024 election had the highest share of votes cast on the weekend. In the 2024 election 7.70% of all votes cast in the election were cast during in-person early

voting on a Saturday or Sunday. This is a 2.24 percentage point increase over the share of ballots cast on the weekend in the 2022 election, which had the second highest share of ballots cast on the weekend (5.46%). The 2024 election had a 2.36 percentage point increase over the share of ballots cast on the weekend in the 2020 election, 3.45 percentage point increase over the share of ballots cast on the weekend in the 2018 election, 3.49 percentage point increase over the share of ballots cast on the weekend in the 2016 election, and a 5.42 percentage point increase over the share of ballots cast on the weekend in the 2014 election.

67.    If instead I examine the share of all early in-person votes cast on Sunday or the weekend I reach a similar conclusion: after the passage of SB 202 voters casting ballots early in-person make use of Sunday and weekend voting. In the 2024 election 2.09% of all early in-person votes were cast on Sunday. This is second only to the 2020 election, where 2.70% of early in-person votes were cast on Sunday. Despite a larger share of early in-person voters casting their ballot on Sunday, a smaller share of total votes were cast on Sunday in the 2020 election because fewer voters cast their ballot early in-person in the 2020 election. As I noted in my first expert report, the highest rate of Sunday voting among early in-person voters in any midterm occurred in the 2022 election. The 2024 election had the highest share of early in-person votes cast on the weekend, with 10.89% of all early in-person votes cast on

Saturday or Sunday. This is a 1 percentage point increase over the share of early in person votes cast on the weekend in 2020, the election with the second highest share of early in-person votes cast.

68.   This same pattern is found across self-reported racial groups: the 2024 election had the highest share of ballots cast on the weekend for every group but American Indian voters. In Table 10 I calculated the share of all ballots cast in each election ("Year" column), regardless of the method of voting, for each self-reported racial group on "Sunday" and on the "Weekend". In the 2024 election 2.05% of all votes from Black voters were cast on Sunday during early in-person voting, the highest share for any of the 6 elections examined in Table 10. The share of votes from Black voters cast on Sunday is a 0.16 percentage point increase over the share of votes from Black voters cast on Sunday in 2020, the general election with the second highest-share of votes from Black voters cast on Sunday. In the 2022 election 1.6% of all votes from Black voters were cast on Sunday, the highest share of votes from Black voters cast on Sunday for any midterm election analyzed in Table 10 and the third highest share of Black votes cast on Sunday, behind the 2024 and 2020 elections. The 2024 election also had the largest share of votes from Black voters cast on the weekend during in-person early voting of any of the six elections I examined in Table 10. In the 2024 election 8.26% of all votes cast by Black voters were cast on the weekend using in-person early voting. The 2024

election's share of votes from Black voters cast on the weekend using in-person early voting is 2.17 percentage points higher than the share of votes from Black voters cast on the weekend using in-person early voting than in 2020, 3.15 percentage points higher than the same quantity in 2018, 3.25 percentage points higher than the same quantity in 2016, and 4.78 percentage points higher than the same quantity in 2014. The election with the second highest share of votes cast from Black voters on the weekend using in-person early voting was 2022, the other post-SB 202 election. In that election 6.75% of all votes from Black voters were cast on the weekend using in-person early voting. Hispanic and Asian voters cast the largest share of the ballots on Sunday and on the weekend using in-person early voting in the 2024 election. White voters cast the largest share of their ballots on the weekend using in-person early voting in the 2024 election and the second largest share of ballots cast on Sunday using in-person early voting. American Indian voters cast 1.7% of ballots cast in the 2024 election on Sunday using in-person early voting and 8.1% of ballots cast in the 2024 election on the weekend using in-person early voting.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|------|--------|---------|--------|---------|--------|---------|--------|---------|--------|---------|
| | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.006 | 0.023 | 0.005 | 0.025 | 0.012 | 0.035 | 0.003 | 0.019 | 0.002 | 0.016 |
| 2016 | 0.004 | 0.040 | 0.011 | 0.064 | 0.010 | 0.050 | 0.005 | 0.043 | 0.004 | 0.036 |
| 2018 | 0.008 | 0.040 | 0.012 | 0.062 | 0.013 | 0.051 | 0.007 | 0.045 | 0.005 | 0.036 |
| 2020 | 0.016 | 0.055 | 0.021 | 0.067 | 0.019 | 0.061 | 0.015 | 0.058 | 0.012 | 0.047 |
| 2022 | 0.011 | 0.054 | 0.022 | 0.079 | 0.016 | 0.068 | 0.013 | 0.061 | 0.007 | 0.047 |
| 2024 | 0.017 | 0.081 | 0.030 | 0.108 | 0.021 | 0.083 | 0.019 | 0.085 | 0.011 | 0.072 |

Table 10: Share of All Ballots Cast on Sunday and the Weekend by Racial Group

69.    In Table 11 I computed the share of all votes cast during in-person early voting that were cast on Sunday or the weekend for each self-reported racial identity in the 6 elections I examined in Table 10. The 2024 election saw the largest share of early in-person votes cast on the weekend for every group but Asian voters. For Asian voters 16.2% of early in-person votes were cast on the weekend in the 2024 election. This is the second highest share of early in-person votes cast on the weekend and 0.6 percentage points less than 2018 election, when 16.8% of Asian early in person voters cast their ballot on the weekend. For some groups the share of early in-person votes cast on Sunday in the 2024 election was less than the maximum share of early in-person votes cast on Sunday: 2.7% of American Indian early in person votes were cast on Sunday in the 2024 election, 0.5 percentage points less than the maximum in 2020; 4.5% of Asian early in person votes were cast on Sunday in the 2024 election, 0.3 percentage points less than the maximum in the 2020 election; 2.9% of Black early in person votes were cast on Sunday in the 2024 election,

0.8 percentage points less than the maximum in the 2020 election; 3.1% of Hispanic early in-person votes were cast on Sunday in the 2024 election, which was the maximum across the six elections; and 1.5% of white early in-person votes were cast on Sunday, 0.6 percentage points less than the maximum in the 2020 election. As Table 10 shows, even though some groups in the 2024 election had a smaller share of early in-person votes cast on Sunday, a larger share of all votes were cast on Sunday and on the weekend. As measured by the share of voters who cast their ballots using that method, in the 2024 election weekend voting was the most popular it had ever been.

| | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend | Sunday | Weekend |
| 2014 | 0.023 | 0.086 | 0.023 | 0.124 | 0.032 | 0.094 | 0.016 | 0.092 | 0.008 | 0.054 |
| 2016 | 0.009 | 0.088 | 0.024 | 0.138 | 0.019 | 0.094 | 0.011 | 0.099 | 0.008 | 0.069 |
| 2018 | 0.021 | 0.101 | 0.032 | 0.168 | 0.026 | 0.106 | 0.020 | 0.132 | 0.010 | 0.074 |
| 2020 | 0.032 | 0.109 | 0.048 | 0.150 | 0.037 | 0.118 | 0.030 | 0.118 | 0.021 | 0.086 |
| 2022 | 0.022 | 0.106 | 0.042 | 0.153 | 0.025 | 0.106 | 0.028 | 0.128 | 0.013 | 0.084 |
| 2024 | 0.027 | 0.128 | 0.045 | 0.162 | 0.029 | 0.118 | 0.031 | 0.139 | 0.015 | 0.099 |

Table 11: Share of Early in Person Ballots Cast on the Weekend, By Self-Identified Racial Group

## VIII. AFTER SB 202 FEWER VOTERS CANCELED MAIL IN BALLOTS AND THEN VOTED IN PERSON THAN IN THE 2020 ELECTION.

70.    As I explained in my first expert report, the preamble of SB 202 stated that "[t]he lengthy absentee ballot process also led to elector confusion, including electors who were told they had already voted when they arrived to vote in person. Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities

to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, § 2(9). In my first expert report I assessed the rate that voters who had a mail in ballot application accepted then canceled that ballot and voted either in person on Election Day or during early in-person voting. I had found that in the 2020 election 289,650 voters had canceled their mail in ballots and then voted either in person on Election Day or early in-person, constituting 16.7% of all mail in ballot applicants. I had found that in the first election after SB 202 the number and share of mail in ballot applicants who subsequently voted in person had declined.

71.    In Tables 12, 13, 14, and 15 I extend Tables 13, 14, 15, and 16 in my first expert report. In Table 12 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 13 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted in person on Election Day, in Table 14 I calculated the share of mail in ballot applicants who canceled their ballots and ultimately voted early in-person, and in Table 15 I calculated the number of mail in ballot applicants who canceled their ballots and ultimately voted early in-person. In each table I perform the calculation overall (bottom row) and for self-reported racial groups, for the 2014, 2016, 2018, 2020, 2022, and 2024 elections.

72.    Tables 12 and 13 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day in 2024 is lower than in 2020. In the 2024 election 1.5% of mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day. In the 2020 election 1.7% of all mail in ballot applicants canceled their ballot and ultimately voted in person on Election Day, a 0.2 percentage point larger share of mail in ballot applicants. In the 2024 election 4,893 voters canceled their mail in ballots and voted in person, fewer voters than in the 2020 election, but more than in the 2014, 2016, 2018, and 2022 midterm election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.015 | 0.012 | 0.014 | 0.029 | 0.011 | 0.026 |
| Asian | 0.007 | 0.006 | 0.018 | 0.019 | 0.006 | 0.021 |
| Black | 0.010 | 0.009 | 0.020 | 0.017 | 0.006 | 0.017 |
| Hispanic | 0.011 | 0.022 | 0.034 | 0.034 | 0.012 | 0.029 |
| White | 0.005 | 0.005 | 0.007 | 0.015 | 0.005 | 0.012 |
| Overall | 0.007 | 0.006 | 0.015 | 0.017 | 0.006 | 0.015 |

Table 12: Share of mail in ballot applicants with canceled ballots ultimately voting on Election Day

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 2 | 5 | 10 | 152 | 9 | 48 |
| Asian | 8 | 36 | 203 | 1280 | 55 | 327 |
| Black | 328 | 522 | 2,208 | 9,124 | 541 | 1,716 |
| Hispanic | 11 | 92 | 290 | 1,671 | 62 | 236 |
| White | 436 | 709 | 913 | 13,763 | 770 | 2,032 |
| Overall | 848 | 1,493 | 4,072 | 28,965 | 1,592 | 4,893 |

Table 13: Number of mail in ballot applicants with canceled ballots ultimately voting on Election Day

73.    Tables 14 and 15 show that both the share and number of voters who cancel mail in ballots and vote in person on Election Day is lower than in

2020, though higher than in the 2014, 2016, 2018, and 2022 elections. In the 2024 election 7.6% of all mail-in ballot applicants canceled their ballot and ultimately voted in person during early voting. In 2020 15.0% of mail-in ballot applicants canceled their ballots and ultimately voted in person, a 7.4 percentage point larger share than in the 2024 election. Table 15 shows that 25,021 mail-in ballot applicants canceled their ballot and ultimately voted early in person in the 2024 election. This is a smaller number than in the 2020 election, when 260,685 mail-in ballot applicants canceled their ballots and ultimately voted in person. But, the 2024 number of canceled mail in ballot applicants was larger than in the other four elections analyzed in Table 15: 2014, 2016, 2018, and 2022 elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 0.007 | 0.028 | 0.066 | 0.143 | 0.056 | 0.077 |
| Asian | 0.013 | 0.024 | 0.048 | 0.137 | 0.045 | 0.096 |
| Black | 0.019 | 0.024 | 0.058 | 0.156 | 0.040 | 0.083 |
| Hispanic | 0.006 | 0.040 | 0.056 | 0.141 | 0.045 | 0.097 |
| White | 0.009 | 0.018 | 0.026 | 0.147 | 0.032 | 0.068 |
| Overall | 0.012 | 0.021 | 0.043 | 0.150 | 0.036 | 0.076 |

Table 14: Share of mail in ballot applicants with canceled ballots ultimately voting early in-person

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|
| American Indian | 1 | 12 | 48 | 759 | 44 | 140 |
| Asian | 15 | 141 | 540 | 9,166 | 416 | 1,483 |
| Black | 605 | 1,382 | 6,274 | 84,613 | 3,582 | 8,169 |
| Hispanic | 6 | 171 | 473 | 6,958 | 231 | 788 |
| White | 778 | 2,825 | 3,290 | 133,144 | 4,752 | 12,007 |
| Overall | 1,540 | 4,995 | 12,000 | 260,685 | 10,067 | 25,021 |

Table 15: Number of mail in ballot applicants with canceled ballots ultimately voting early in-person

## IX.  FEWER VOTERS WAITED MORE THAN 30 MINUTES IN THE FIRST PRESIDENTIAL ELECTION AFTER SB 202.

74.     In the initial expert reports, some of the Plaintiffs' experts opined that SB 202 would cause longer lines in Georgia. For example, Dr. Burden opined that the disparity between wait times for Black and white voters "may be worsened now that absentee voting is more difficult" (Burden pg. 2). Dr. Burden goes on to say that "To my knowledge, data on wait times in the November 2022 election have not yet been made publicly available via the CES or other reliable academic surveys. However, media coverage of that election and the December 6 runoff election suggests that long wait times, in some cases lasting hours, were experienced in Atlanta-area communities with large shares of Black voters" (Burden, pg. 22). Dr. Pettigrew argues provisions in SB 202 will affect wait times. Dr. Pettigrew states that "SB202 will negatively affect wait times" (pg. 28), that "Changes to early voting hours will not solve Georgia's long line problem", and that "Shrinking precincts will not shorten lines". More directly, Dr. Pettigrew opines that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color" (Pettigrew Rep. 29). None of the claims in these reports are based on an appropriately designed causal study, nor are they descriptive claims about the observed patterns after SB 202. Using updated data from the same sources as Plaintiffs' experts, I describe voter wait times after SB 202. I

again caution that these comparisons can only describe the causal effect of SB 202 on wait times under strong assumptions. But, the descriptive patterns show that, in contrast to the predictions from the Plaintiffs' experts, the share of voters waiting more than 30 minutes was lower in the post-SB 202 elections than in the pre-SB 202 elections.

75.    In my first expert report I used a survey of Georgia voters conducted by the School of Public and International Affairs (SPIA) survey research center at the University of Georgia. The SPIA survey research center conducted a similar survey of Georgia voters after the 2024 election. The 2024 iteration of the SPIA survey was conducted from November 11th to November 20th, 2024 and included a "total of 1,541 Georgia registrants who self-reported as having voted in the 2024 general election." I was not provided with access to the underlying data, but counsel provided me with a document from the SPIA survey research center describing the top-line results and cross tabs by a variety of relevant voter characteristics. This matches the same document that was also posted on the Secretary of State's website.[16]

76.    Among the voters who reported voting either in person during early voting or on Election Day, the survey asked "Approximately, how long

---

[16] Sch. Pub. & Int'l Affs. ("SPIA"), Survey Rsch. Ctr., Univ. Ga., *2024 Georgia Post-Election Survey* (2024), https://sos.ga.gov/sites/default/files/2024-12/GA%20Voter%20Survey-2024.pdf [hereinafter "2024 SPIA Survey"].

did you have to wait in line to vote?" This is the same question that Dr Burden and Dr. Pettigrew used in their analysis of wait times from the Cooperative Election Study (CES) surveys, which I also analyze below. In response to this question, voters were provided with the response options "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". Dr. Pettigrew imputes numbers to calculate wait times from this scale; I showed in my first expert report that Dr. Pettigrew provides no theoretical or substantive justification for that practice and there is no justification for the practice in the literature. Rather than imputing numbers for categories, I will instead focus on the proportion of respondents in each response category.

77.    According to the SPIA survey 2.7% of Georgia voters report waiting more than 30 minutes in line–2.0% report waiting 31 minutes - 1 hour and 0.7% report waiting more than an hour. Breaking down the estimates by race, the survey reports that 2.6% of white voters report waiting longer than 30 minutes to vote—1.8% report waiting 31 minutes to 1 hour and 0.8% report waiting more than an hour to vote. According to the SPIA survey, 1.9% of Black voters reported waiting more than 30 minutes to vote–1.7% report waiting 31 minutes to 1 hour and 0.2% report waiting more than an hour to vote. Comparing the 2024 SPIA survey with the 2022 SPIA survey, a smaller share of voters waited longer than 30 minutes to vote in 2024 than in 2022. In the 2022 SPIA survey 4.7% of all voters said that they waited longer than 30

minutes to vote, which is 2 percentage points more than the share of voters waiting longer than 30 minutes in the 2024 election.

78.    While I do not have access to the underlying data, I am able to assess statistical significance approximately using standard formulas and information from the topline survey results. Using these standard formulas, the margin of error for the 2 percentage point difference is 1.4 percentage points. This implies that the 95-percent confidence interval for the 2 percentage point difference is [0.006,0.034]. Because the 95-percent confidence interval does not contain zero, the observed 2 percentage point difference is statistically significant at the traditional 0.05 confidence level.

79.    According to the 2022 SPIA survey, 4.8% of white voters reported waiting longer than 30 minutes. There is 2.2 percentage points more than the share of white voters who report waiting longer than 30 minutes in the 2024 election. I calculated an approximate margin of error equal to 1.4 percentage points, which implies that the 95-percent confidence interval is [-0.005, 0.05]. Because the 95-percent confidence interval contains zero, the observed difference is not statistically significant at the traditional 0.05 confidence level. In the 2022 survey 4.0% of Black voters reported waiting longer than 30 minutes to vote. There is a 2.1 percentage point difference in the share of Black voters who report waiting longer than 30 minutes in each election, with a margin for the difference of 2.4 percentage points or a 95-percent confidence

interval of [-0.003, 0.04]. Because the confidence interval contains zero, the difference in the share of voters waiting longer than 30 minutes to vote is not statistically significant across elections at the traditional 0.05 confidence level.

80.     Dr. Burden and Dr. Pettigrew relied on the Cooperative Election Study (CES) when assessing voters' wait times in previous Georgia elections. The CES "is the largest academic survey focused on American elections" and is a standard source in the social sciences.[17] At the time I wrote my first expert report the 2022 CES survey was not yet available, so I was not able to assess wait times in Georgia using the same survey as Dr. Burden and Dr. Pettigrew. The final 2022 CES survey has subsequently been released and a preliminary 2024 CES survey is available. To assess wait times among Georgia voters using the same surveys as Dr. Pettigrew and Dr. Burden, I downloaded the survey from the CES data repository.[18] Using the 2014, 2016, 2018, 2020, 2022 and 2024 surveys I examined the reported wait times of voters who cast their ballot either early in-person or on Election Day. Like in the SPIA survey, the CES asks individuals who report voting in person or attempting to vote in person "Approximately, how long did you have to wait in line to vote?" Respondents

---

[17] Jonathan M. Tisch Coll. Civic Life, Tufts Univ., *Cooperative Election Study*, https://tischcollege.tufts.edu/research-faculty/research-centers/cooperative-election-study.

[18] Harvard Univ., *Cooperative Election Study*, https://cces.gov.harvard.edu/data.

are asked to select "Not at all," "Less than 10 minutes", "10-30 minutes", "31 minutes - 1 hour", and "More than 1 hour". In the 2016, 2018, 2020, and 2022 surveys I use the vote validation in the CES to assess turnout and apply the vote validation weights. Vote validation is a procedure where respondents' turnout is validated against official turnout records and are the weights Dr. Burden uses when calculating wait times when the vote validation weights are available. When calculating wait times using vote validation weights the calculations will exclude anyone who either 1) reported attempting to vote but was unable to cast their ballot or 2) anyone who falsely reported voting. The 2014 survey does not contain a vote validation, so I use the provided "weight" variable, which is the same procedure Dr. Burden follows. Vote validation is not yet complete for the 2024 survey, so I use the post-election survey weights, "commonpostweight". I present the results of the survey for each in Table 16. The survey stacks the responses for Black voters (top table), white voters (middle table), and overall (bottom table). The "Response" column are the options available to respondents and the "2014" to "2024" columns correspond to that election year.

|  | Response | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|
|  | Not at all | 0.309 | 0.164 | 0.197 | 0.160 | 0.221 | 0.275 |
|  | Less than 10 minutes | 0.312 | 0.335 | 0.372 | 0.155 | 0.443 | 0.407 |
| Black | 10 - 30 minutes | 0.325 | 0.369 | 0.249 | 0.345 | 0.270 | 0.242 |
|  | 31 minutes - 1 hour | 0.049 | 0.106 | 0.118 | 0.218 | 0.063 | 0.070 |
|  | More than 1 hour | 0.005 | 0.027 | 0.063 | 0.122 | 0.003 | 0.005 |
|  | Not at all | 0.423 | 0.313 | 0.270 | 0.241 | 0.410 | 0.373 |
|  | Less than 10 minutes | 0.343 | 0.348 | 0.320 | 0.334 | 0.395 | 0.416 |
| White | 10 - 30 minutes | 0.216 | 0.183 | 0.241 | 0.210 | 0.153 | 0.154 |
|  | 31 minutes - 1 hour | 0.014 | 0.111 | 0.115 | 0.138 | 0.032 | 0.033 |
|  | More than 1 hour | 0.003 | 0.045 | 0.053 | 0.077 | 0.011 | 0.025 |
|  | Not at all | 0.388 | 0.257 | 0.247 | 0.209 | 0.354 | 0.360 |
|  | Less than 10 minutes | 0.338 | 0.347 | 0.330 | 0.282 | 0.404 | 0.389 |
| Overall | 10 - 30 minutes | 0.242 | 0.241 | 0.250 | 0.262 | 0.189 | 0.189 |
|  | 31 minutes - 1 hour | 0.028 | 0.115 | 0.118 | 0.161 | 0.043 | 0.046 |
|  | More than 1 hour | 0.004 | 0.040 | 0.055 | 0.086 | 0.010 | 0.017 |

Table 16: Voter wait times in Georgia, using Cooperative Election Study from 2014 to 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

81.    Using the CES surveys I find that a smaller share of Black voters report waiting in line for more than 30 minutes in the two elections after the passage of SB 202 than in the 2016, 2018, or 2020, but a larger share than in the 2014 midterm election. In the 2022 election 6.6% of Black voters reported waiting longer than 30 minutes to vote and in the 2024 election 7.5% of Black voters reported waiting longer than 30 minutes to vote. In the 2020 election 34.0% of Black voters reported waiting more than 30 minutes to vote. This is 27.4 percentage points more than in the 2022 election (95-percent confidence interval of [-0.353, -0.196]), a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 26.5 percentage points more in the 2020 election than in the 2024 election (95-percent confidence interval [-0.336, -0.195]), a difference that is

statistically significant at the standard 0.05 threshold. In the 2018 election 18.2% of Black voters reported waiting more than 30 minutes to vote. This is 11.6 percentage points more than in the 2022 election (95-percent confidence interval [-0.180, -0.052]) a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes to vote was 10.7 percentage points more than in the 2024 election (95-percent confidence interval [-0.164, -0.049]) , a difference that is statistically significant at the standard threshold. In the 2016 election 13.3% of Black voters reported waiting more than 30 minutes to vote. This is 6.7 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.122, -0.013]) , a difference that is statistically significant at the standard 0.05 threshold. And the share of Black voters waiting more than 30 minutes was 5.8 percentage points more in the 2016 election than in the 2024 election (95-percent confidence interval [-0.107, -0.009]), a difference that is also statistically significant at the standard 0.05 threshold. In the 2014 election 5.4% of Black voters reported waiting more than 30 minutes to vote. This is 1.2 percentage points less than in the 2022 election (95-percent confidence interval [-0.030, -0.055]) and 2.1 percentage points less than in the 2024 election (95-percent confidence interval [-0.019, 0.062]). But neither of those differences are statistically significant at the standard threshold.

82.    I also find that a smaller share of white voters reported waiting longer than 30 minutes to vote in the two elections after SB 202 than in the 2016, 2018, or 2020 elections, but a larger share reported waiting longer than 30 minutes than in the 2014 election. In the 2022 election 4.3% of white voters reported waiting longer than 30 minutes to vote and in the 2024 election 5.7% of white voters reported waiting longer than 30 minutes to vote. In the 2020 election 21.5% of white voters reported waiting longer than 30 minutes to vote. This is 17.2 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.209, -0.135]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2020 election was 15.8 percentage points more than in the 2024 election (95-percent confidence interval [-0.192, -0.123]) , a difference statistically significant at the standard threshold of 0.05. In the 2018 election 16.9% of white voters reported waiting longer than 30 minutes to vote. This is 12.6 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.158, -0.093]), a difference that is statistically significant at the standard threshold. The share of white voters waiting more than 30 minutes in the 2018 election was 11.1 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.142, -0.080]), a difference that is statistically significant at the standard threshold. In the 2016 election 15.6% of white voters reported waiting longer than 30 minutes to vote.

This is 11.3 percentage points more than the share in the 2022 election (95-percent confidence interval [-0.144, -0.083]), a difference that is statistically significant at the standard threshold. The share of white voters waiting longer than 30 minutes in the 2016 election was 9.9 percentage points more than the share in the 2024 election (95-percent confidence interval [-0.128, -0.070]). And in the 2014 election 1.8% of white voters reported waiting longer than 30 minutes to vote. This is 2.5 percentage points less than in the 2022 election (95-percent confidence interval [0.006, 0.043]) and 3.9 percentage points less than in the 2024 election (95-percent confidence interval [0.020, 0.059]). Both differences are statistically significant at the standard threshold.

## X.   REJECTION RATES FOR MAIL IN ABSENTEE APPLICATIONS AND USE OF THE "ROLL OVER" LIST.

83.    SB 202 also altered the mail-in absentee ballot application window, requiring voters to submit applications no earlier than 78 days before the election and no later than 11 days before the election. SB 202 also required voters to provide proof of identity using a Drivers License or other identification, rather than with a signature, when submitting an absentee ballot application. In my first expert report I examined the share of applications in 2022 that were rejected for arriving after the deadline and the share of ballots rejected for identification related issues. In Table 12 of my first expert report I found that in the 2022 election 0.25% of mail-in absentee ballot

applications were rejected for arriving after the deadline, with mail-in ballot application rejection rates across racial groups of: 0.25% for American Indian voters, 0.27% for Asian voters, 0.27% for Black voters, 0.37% for Hispanic voters, 0.22% for white voters.

84.    In Table 17 I update the calculations in Table 12 from my original report to include rejection reasons for mail-in ballot applications in the 2024 election. To make these calculations I used the data contained in the file "STATEWIDE_With_App_Reason.zip" provided to me by counsel. This spreadsheet is similar to the Absentee Voter History file the state distributes, but this file contains two additional fields "Rejected Reason" and "Rejected Reason Memo." "Rejected Reason" appears to be a standardized coding of the reasons mail-in ballot applications are rejected and "Rejected Reason Memo" contains a more complete description of the rejection reason. I used the "Rejected Reason" field to identify mail-in ballot applications rejected for arriving after the deadline, before the deadline, and for identification related issues.[19] Based on these fields I then calculated the rejection rates for mail-in

---

[19] I classified a mail-in ballot application as rejected for arriving after the deadline if the Rejected Reason is "Application Received After Application Window Closed". I classified a mail-in ballot application as rejected for arriving before the deadline if the Rejected Reason is "Application Received Before Application Window Open". I classified the mail-in ballot application as rejected for identification reason if the Rejected Reason field contains "Cure Not Received - Incorrect ID Information" or "Cure Not Received - Missing PII/ID Information".

ballot applications for these reasons for each self-reported racial group and overall.

| Race | After Deadline | Before Window Opens | Identification Issue |
|---|---|---|---|
| American Indian | 0.0129 | 0.0011 | 0.0043 |
| Asian | 0.0073 | 0.0006 | 0.0068 |
| Black | 0.0085 | 0.0015 | 0.0044 |
| Hispanic | 0.0100 | 0.0016 | 0.0052 |
| White | 0.0041 | 0.0018 | 0.0027 |
| Overall | 0.0061 | 0.0016 | 0.0037 |

Table 17: Share of mail-in ballot applications in the 2024 general election rejected for either arriving after the deadline, before the application window opens, or for identification related reasons.

85. Turning first to the "After Deadline" column in Table 17, I find that 0.61% of all mail-in ballot applications were rejected for arriving after the deadline, a total of 2,059 applications. This is 0.36 percentage points higher than the share of mail-in ballot applications rejected for arriving late in the 2022 election, but it is smaller than the estimated number of individuals who would be affected by late applications in Dr. Lee or Dr. Fraga's expert report by counterfactually applying SB 202 deadlines to prior elections.[20] In the 2024 election the vast majority of mail-in ballot applications from every self-identified racial group arrived before the deadline for mail-in applications. Overall 99.39% of mail-in ballots were classified as arriving before the deadline, either in the SB 202 application window or before the window opened primarily because of use of the roll over list or because an applicant applied too

---

[20] Lee Sur-Rebuttal Rep. ¶ 7, p. 4. Fraga Expert Rep. p. 80.

early. That said, the share of mail-in ballot applications rejected for arriving after the deadline was higher than the share of mail-in ballot applications rejected for arriving after the deadline in the 2022 election for every self-reported racial group. In the 2024 election, 0.85% of mail-in ballot applications from Black voters were rejected for arriving late (implying 99.15% were classified as arriving before the deadline), 0.73% of mail-in ballot applications from Asian voters were rejected for arriving late (99.27% classified as arriving before the deadline), 1% of mail-in ballot applications from Hispanic voters were rejected for arriving late (99% classified as arriving before the deadline), and 0.41% of mail-in ballot applications from white voters were rejected for arriving late (99.59% classified as arriving before the deadline).

86.     In the "Before Window Opens" column I calculated the share of mail-in ballot applications where the mail-in absentee ballot application was rejected for arriving before the mail-in ballot application window opened 78 days before the election. Overall, 0.16% of mail-in ballot applications were rejected for arriving before the mail-in ballot application window opened. Table 17 shows that there is no consistent relationship between an applicant's self-report race and the share of ballot applications rejected for arriving outside the application window. White voters had the lowest rate of mail-in ballot application rejections for applications arriving after the deadline, but white

voters had the highest rate of mail-in ballot application rejects for ballots arriving before the deadline.

87.    An important exception to the SB 202 window is that individuals 65 and older, self-declared disabled, military, and overseas voters are able to apply for an absentee once for an entire election cycle. In my first expert report I used information from the Secretary of State's office to identify the share of mail-in absentee ballot applications from individuals on the rollover list. I reported that information in Table 11 of my first report. I updated this calculation for the 2024 general election in this report and the results are presented in Table 18. For each self-reported racial group and overall ("Race" column), I describe the overall share of applicants on the roll over list "Share Roll Over, Overall," share of applicants who are 65 and older on the list ("Share Roll Over, 65 & Over"), and the share of applicants who are on the roll over list and under 65 ("Share Roll Over, Under 65").

| Race | Share Roll Over Overall | Share Roll Over 65& Over | Share Roll Over Under 65 |
|---|---|---|---|
| American Indian | 0.150 | 0.717 | 0.066 |
| Asian | 0.165 | 0.587 | 0.014 |
| Black | 0.451 | 0.750 | 0.140 |
| Hispanic | 0.184 | 0.669 | 0.039 |
| White | 0.482 | 0.786 | 0.075 |
| Overall | 0.437 | 0.766 | 0.089 |

Table 18: Share of Absentee Ballot Applications on State Roll Over List in the 2024 General Election

88.    In the 2024 general election 43.7% of all mail in ballot applications were from individuals on the roll over list. Applicants 65 and over were more

likely to be on the roll over list, with 76.6% of mail in ballot applications from voters 65 and over on the roll over list compared to 8.9% of applications from voters under 65. Similar to the 2022 election, a larger share of Black and white voters were on the roll over list compared to voters from other self-reported racial groups. Overall, 45.1% of applications from Black voters were from Black voters on the roll over list and 48.2% of applications from white voters were from white voters on the roll over list. In contrast, 16.5% of applications from Asian voters were from Asian voters on the roll over list and 18.4% of applications from Hispanic voters were from Hispanic voters on the roll over list. Across all racial groups more than a majority of applications from voters 65 and over were from voters on the roll over list: 75.0% of applications from Black voters 65 and over came from Black voters on the roll over list, 78.6% of applications from white voters 65 and over came from white voters on the roll over list, 58.7% of applications from Asian voters were from Asian voters on the roll over list, and 66.9% of applications from Hispanic voters were from Hispanic voters on the roll over list. Among voters under 65, Black voters had the largest share of applications from individuals on the roll over list: 14.0% of mail in ballot applications from Black voters under 65 came from individuals on the roll over list. I calculated 7.5% of mail in ballot applications from white voters under 65 came from individuals on the roll over list, 1.4% of applications from Asian voters under 65 came from individuals on the roll over list, and

3.9% of applications from Hispanic voters under 65 came from individuals on the roll over list.

89.    Returning to Table 17, the "Identification Issue" column contains the share of mail-in ballot applications rejected for identification reasons. When a voter submits a mail-in ballot application and an identification issue occurs, a "cure" form is distributed. A voter will only have their application rejected in this column if their "cure" form was not received to address the identification issue, which I will call a rejection for identification reasons. Overall 0.37% of mail-in ballot applications were rejected for identification related reasons. I estimated that 0.44% of mail-in ballot applications from Black voters were rejected for identification related reasons, 0.68% of mail-in ballot applications Asian voters were rejected identification reasons, 0.52% of mail in ballot applications from Hispanic voters were rejected for identification reasons, and 0.27% of mail in ballot applications were rejected for identification for white voters.

## XI.    SURVEY-BASED ESTIMATES OF DROP BOX USE

90.    In a sur-rebuttal, I calculated self-reported survey-based estimates of the rate Black and white mail-in voters returned their ballots using a drop box. In that sur-rebuttal, I concluded that "in the 2020 general election…I find that white mail in absentee ballot voters in Georgia are more likely than Black mail in voters to report returning their ballot via drop box." I also found that

in the 2022 election, white mail-in voters were more likely to report using a drop box than Black mail-in voters, but that difference was smaller than in 2020. In this report, I update these calculations, which are found in Table 19.

91.    I used the Cooperative Election Study (CES) for the 2020, 2022, and 2024 election. I define a mail-in voter who reports using a drop box using the same procedure as in the sur-rebuttal.[21] I then calculated the share of mail-in voters who self-report returning their ballot at a drop box, for white mail-in voters, Black mail-in voters, and then overall for all mail-in voters in Georgia. For the 2020 and 2022 estimates, I applied the post-election voter validated weights. These weights are not available in the 2024 CES, so for those estimates I applied the post-election weights.

92.    In Table 19 I find that in the 2024 election, unlike the 2020 and 2022 elections, white mail-in voters were less likely than Black mail-in voters to report using a drop box. According to the 2024, CES Black mail-in voters were 14 percentage points more likely to self-report that they returned their ballots at a drop box than white mail-in voters. This difference, however, is not statistically significant at conventional levels.

---

[21] I classify a mail-in voter as using a drop box if they report returning their ballot at a "Drop box used only for ballots, not located at an election office or polling place", "Main election office", "Neighborhood polling place", or "Voting center, not a neighborhood polling place".

| Year | White Mail-In Voters | Black Mail-In Voters | Overall Mail-In Voters |
|------|------|------|------|
| 2020 | 0.54 | 0.45 | 0.49 |
| 2022 | 0.32 | 0.27 | 0.29 |
| 2024 | 0.36 | 0.50 | 0.47 |

Table 19: Share of Mail-in Voters Returning Ballots at a Drop Box, using Cooperative Election Study from 2020, 2022, and 2024. 2024 estimates are based on self-reported turnout and not validated voters, because validation of votes for the CES is in progress.

93.    Table 19 also shows that the overall self-reported rate of drop box use among mail-in voters in Georgia is similar to the overall self-reported rate of drop box use in Georgia in the 2020 election. In the 2024 election 47% of mail-in voters self-report returning their ballot at a drop box, two percentage points less than the 49% of mail-voters who self-report returning their ballot at a drop box in 2020. This difference is not statistically significant at conventional levels.

94.    The estimates from Table 19 are useful, but there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember how they returned their ballot or their mode of voting. That said, Table 19 demonstrates that, at least in the self-reported behavior among CES respondents, there has not been a large decrease in the rate of drop box voting among mail-in voters in Georgia.

## XII.  CONCLUSION

95.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on June 13, 2025

_____

Justin Grimmer, Ph.D.

# APPENDIX

| Year | Early Voting | Mail Voting | Election Day |
|------|--------------|-------------|--------------|
| 2014 | 0.268 | 0.024 | 0.708 |
| 2016 | 0.459 | 0.033 | 0.505 |
| 2018 | 0.397 | 0.049 | 0.553 |
| 2020 | 0.509 | 0.240 | 0.247 |
| 2022 | 0.512 | 0.050 | 0.437 |
| 2024 | 0.627 | 0.040 | 0.328 |

Table 20: American Indian mode of voting in Georgia elections.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|------|------|------|------|------|------|------|
| American Indian | 24 | 25 | 54 | 51 | 16 | 42 |
| Asian | 104 | 223 | 357 | 336 | 87 | 91 |
| Black | 2,226 | 1,967 | 3,737 | 4,222 | 1,092 | 1,620 |
| Hispanic | 141 | 341 | 513 | 494 | 146 | 233 |
| White | 2,009 | 1,758 | 3,020 | 3,159 | 886 | 904 |
| Overall | 5,038 | 4,820 | 8,648 | 9,272 | 2,564 | 3,259 |

Table 21: Count of general election votes classified as provisional by self-reported racial identity and overall.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE GEORGIA SENATE BILL 202 | Master Case No.: 1:21-MI-55555-JPB |
| --- | --- |

## SUPPLEMENTAL EXPERT RESPONSE REPORT OF
## JUSTIN GRIMMER, PH.D

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

## I.    SUMMARY OF FINDINGS

1.    In this report I respond to the supplemental expert reports from Dr. Bernard Fraga, Dr. Christopher Clark, Dr. Daniel Chatman, and Dr. Taeku Lee. Specifically, I respond to their conclusions about (i) turnout rates; (ii) voting participation by Asian Americans; (iii) minority representation rates in Congress and the Georgia General Assembly; (iv) drop box locations; and (v) rejected absentee ballot rates.

2.    *Turnout rates.* As to turnout rates, I address conclusions from Drs. Fraga and Clark. There are several places where Drs. Fraga and Clark use different data and assumptions to reach different conclusions than mine about overall turnout rates and turnout rates among certain racial groups.

Exhibit

2

Grimmer

08/27/2025    C.A.N.

3.    Starting with overall turnout, my turnout estimates use each election's reapportionment report, a document from the Georgia Secretary of State's Office based on the contemporary voter file, to calculate the number of votes from each self-reported racial group based on the state's voter file on Election Day. I then calculate the size of each group using census estimates of the citizen voting age population ("CVAP"). Both Dr. Fraga and I agree that the overall turnout rate in the 2024 election was higher than in the 2020 election (Fraga supp. rep., pg. 8).

4.    However, Dr. Fraga's and my estimates of the turnout rate by self-reported racial groups differ because Dr. Fraga applies a procedure to impute the race of voters based on averages across several instances of the voter file. Using this method, Dr. Fraga concludes that turnout declined from 2020 to 2024 among Hispanic and Asian voters (Fraga supp. rep., pg. 8). However, as I explain below, Dr. Fraga's conclusion that turnout decreased for Asian and Hispanic voters depends upon his method imputing fewer votes for Asian and Hispanic voters in 2024 than in 2020.

5.    Additionally, Dr. Fraga limits his analysis to those elections occurring since 2018, even though his procedure for imputing voter race uses voter files from 2016 (Fraga supp. rep., pg. 8). Including the 2016 election—a presidential election year—provides another useful point of comparison to the 2024 election. Using Dr. Fraga's replication data set, I apply his procedure for

2

calculating the turnout rate to the 2016 election. Using this procedure, I find that turnout was *higher* for every self-reported racial group in 2024 than in 2016. Further, the increase in the turnout rates from 2016 to 2024 estimated using Dr. Fraga's procedure was larger in magnitude than the change in turnout rates from 2020 to 2024 that Dr. Fraga reports.

6.      Turning to Dr. Clark's estimated turnout rates among self-reported Black and white registered voters, I first correct errors in Dr. Clark's estimates from the 2022 and 2024 elections. Using these corrected estimates, I show that Dr. Clark's method of estimating turnout rates using the share of *registered voters* who voted risks confusing increases in the share of Georgia citizens who are registered to vote with a declining turnout rate. Since 2010, the number of registered Georgia voters has risen dramatically. In 2010, the number of registered voters was 77.7% of the CVAP, while in 2024 the number of registered voters was 105% of the CVAP—which can occur based on federal limitations on list maintenance. By comparing the rate of voting among registered voters across elections, Dr. Clark confuses changes in the number of voters with the dramatic increase in the number of registered voters. Rather than rely upon the registered turnout rate, the CVAP turnout rates that Dr. Fraga, Dr. Burden, and I report shows the share of voting age citizens who vote. This method of measuring turnout ensures that the increase in Georgia's registration rate does not affect our conclusions about turnout rates. To ensure

3

the estimates are comparable to all of Dr. Clark's, I extend my turnout estimates for Black votes, white voters, and overall voters in the state of Georgia to include the 2010 and 2012 elections. Doing so, I conclude that Dr. Clark overstates any decline in Black voter turnout in 2024.

7.    *Participation by Asian Americans.* I also address Dr. Lee's opinion that Asian citizens in Georgia face continued discrimination, noting that he does not address changes in the participation rate among Asian American voters in Georgia elections (Lee supp. rep., pgs. 2–3). I show that Asian voters in Georgia turned out at the highest rate in the 2024 election since at least the 2014 election and that their registration rate, as a share of CVAP, has increased 40.4 percentage points over the same period.

8.    *Minority representation rates.* I also examine Dr. Clark's analysis of representation "parity"—or whether the share of Black legislators representing Georgia is equal to the share of Black Georgia residents. Dr. Clark concludes that Black Georgia residents are underrepresented in the Georgia U.S. House delegation (Clark supp. rep., pg. 2). But the data do not support this conclusion.   Dr. Clark actually finds that Black voters are overrepresented in Georgia's U.S. House delegation. But after finding that Black representation in the U.S. House exceeds parity, Dr. Clark introduces a new and additional standard based on the racial composition of legislators' districts (Clark supp. rep., pgs. 8–9).  As I show below, Dr. Clark provides no

4

methodology for applying this standard, for determining when parity has been reached based on district racial composition, or for determining how to compare the new racial-composition-district parity standard with Dr. Clark's seat-share parity standard. Without a methodology, it is impossible to assess his conclusion that there is a lack of parity in Georgia's U.S. House representation based on the composition of Black House members' districts. Dr. Clark also opines that Black Georgia residents are underrepresented in the Georgia state legislature (Clark supp. rep., pg. 9). I show that Dr. Clark's conclusions about the lack of parity in the Georgia state legislature depend upon the measure of the Black share of the population. If I use other reasonable estimates of the Black share of the population, such as the share of the CVAP who identify as Black, I conclude that Black representation exceeds parity in the Georgia House, is not yet achieved in the Georgia Senate, and that overall parity in the Georgia state legislature is almost exactly achieved.

9.    *Dropbox locations*. I next address Dr. Chatman's conclusion that many voters were harmed by the elimination of the drop boxes that were closest to their homes (Chatman supp. rep., pgs. 1–3). For this conclusion, Dr. Chatman provides no data on how voters actually return their absentee ballots or the burdens from those actual trips. Instead, his calculations are based on hypothetical voters returning their ballots using a hypothetical trip. Dr. Chatman also does not consider how voters' access to the U.S. Postal Service

affects the cost of returning their absentee ballot.  And Dr. Chatman does not consider whether voters return their ballots on trips while performing other errands or if they return their ballots to more centrally located drop boxes. Without actual information on how voters return their ballots, Dr. Chatman's analysis of the proximity to the nearest drop box does not provide information about the cost of voting.

10.  *Rejected absentee ballots.*  Finally, I assess Dr. Fraga's analyses of rejected absentee ballots (Fraga supp. rep., pgs. 16–21).  I first correct several errors in Dr. Fraga's estimates of the reasons for absentee ballot rejections in the 2024 election, where Dr. Fraga inadvertently eliminates 15% of all rejected absentee ballots in the 2024 election.  Regardless of this error, Dr. Fraga and I reach similar conclusions about the relative rate absentee ballots were rejected for identification reasons compared to signature-based reasons in prior elections.

## II.  Estimating Voter Turnout Rates in Georgia Elections

11.  Beginning with turnout rates, I respond to the supplemental reports from Drs. Fraga and Clark.  As noted, Dr. Fraga and I do not disagree on the overall turnout rates; we both conclude that turnout in 2024 exceeded turnout in previous elections (Fraga supp. rep., pg. 8).  But Dr. Fraga concludes that turnout among Asian and Hispanic voters has declined in 2024 relative to 2020 (Fraga supp. rep., pg. 8), and Dr. Clark concludes the same for Black

voters, estimating a steeper decline in Black turnout than either Dr. Fraga or I estimate (Clark supp. rep., pgs. 19–20). I show that Dr. Fraga and Dr. Clark's conclusions are sensitive to the assumptions they make when computing the turnout rates for self-reported racial groups. And, moreover, neither Dr. Fraga nor Dr. Clark provides any causal evidence that SB 202 was responsible for any of the estimated changes in turnout.

12.    Starting with methodology, my reports in this case along with the reports from Dr. Burden, Dr. Fraga, and Dr. Clark report overall turnout rate estimates and turnout rate estimates across self-reported racial groups. In some instances, our estimates of overall turnout rates or self-reported racial group turnout rates differ. To facilitate comparisons across these estimates, Table 1 below summarizes the methodology Dr. Burden, Dr. Fraga, Dr. Clark, and I use to estimate turnout rates across self-reported racial groups. Calculating a turnout rate for a self-reported racial group requires calculating the number of votes (Number of Votes columns in Table 1) from the group and then dividing that by the size of the group (Group Size columns in Table 1). As Table 1 shows, I estimate each group's size using the CVAP estimates from the U.S. census.[1] I then estimate the number of votes from each self-reported

---

[1] Contemporary estimates of the CVAP in 2022 were not available when I wrote my first expert report and estimates of the 2024 CVAP were not available for my sur-rebuttal. To address this issue, I created a projection of the CVAP based on historical

racial group using Georgia's reapportionment report. I use the reapportionment report because it is based on each voter's self-reported race in the voter file at the time of the election. Dr. Burden uses the same data sources for his estimates of self-reported turnout rates.[2]

| Expert Report | Group Size | | Number of Votes | |
|---|---|---|---|---|
| | Citizen Voting Age Population | Registered Voters | Reapportionment Report | Voter File + Imputation |
| Grimmer | ✓ | | ✓ | |
| Burden | ✓ | | ✓ | |
| Fraga | ✓ | | | ✓ |
| Clark | | ✓ | ✓ | |

Table 1: Comparing Methods for Calculating Voter Turnout Across Expert Reports

13.   Dr. Fraga and I agree on estimates of the overall turnout rate: Dr. Fraga found that the 2024 election had the highest turnout rate of any election since at least 2018 (Fraga supp. rep. Table 1; Grimmer supp. rep. Table 2). But Dr. Fraga and I produce different estimates of the turnout rate by self-reported racial group and different estimates of how those turnout rates have changed across elections.

14.   This difference emerges because Dr. Fraga uses a different procedure to classify voters into self-reported racial categories, but not because

---

census data. This only affects my estimates of turnout in the 2022 election in my first report and the 2024 election in my second report.

[2] Dr. Burden and my estimates differ slightly for some elections. One reason for this difference is that Dr. Burden used different estimates of the CVAP for the 2022 election.

Dr. Fraga uses a different measure of the group's size. As explained below, Dr. Fraga's procedure relies on specific assumptions about how voters self-identify their race in the voter file. And I show that Dr. Fraga's conclusions are sensitive to these specific assumptions.

15.     Like Dr. Burden's and my reports, Dr. Fraga uses the CVAP to estimate total group size in each election (Fraga supp. rep., pgs. 5–6).[3] However, unlike Dr. Burden's and my reports, Dr. Fraga infers each voter's self-reported racial category using an imputation procedure. Specifically, Dr. Fraga uses 11 different instances of the Georgia voter file to observe up to 11 self-reports of a voter's race. Dr. Fraga explains: "I take the average proportion of all RACE/ETHNICITY values assigned to each REGISTRATION_NUMBER, excluding values of OT and U. This means each registrant has a value from 0 to 1 for each of the five racial/ethnic groups (WH, BH, HP, AP, and AI), with the sum across the categories equal to 0 (if they never self-identified as one of the five categories) or 1 (if they self-identified at least once with a category)." To justify this procedure, Dr. Fraga states: "This procedure also helps to minimize the effect of any errors in the RACE variable

_____

[3] Dr. Fraga adopts my procedure from my first expert report to project self-reported racial group size based on historical CVAP trends. Dr. Fraga's estimates are similar to mine but are based on fewer years of census estimates. In Table 3, I show my conclusions about the direction of change in Asian and Hispanic turnout are unchanged if I use Dr. Fraga's projection of the 2024 CVAP.

9

value on the voter registration list. For example, in January 2023 I was informed that there were a relatively small number of records erroneously coded as 'White' due to a Department of Driver Services software error. This methodology would allow a previous correct self-report to have some impact in the analysis." For each voter and racial category, Dr. Fraga's procedure estimates the proportion of that voter assigned to that self-reported racial category. Dr. Fraga's final count of the number of votes from a particular self-reported racial group is the sum of the proportion of each voter assigned to that category. Dr. Fraga offers no other analysis or citation to justify this procedure. Additionally, for the 2024 analysis, Dr. Fraga did not update his estimates of each voter's self-reported race using the most recent voter file, other than obtaining the self-reported race of registrants after the 2022 election.

16.    Dr. Fraga's procedure relies on strong assumptions. For instance, this procedure assumes that any voter who identifies, at any point, as American Indian, Asian, Black, Hispanic, or white never intended, nor will ever intend, to identify as "other" or "unknown". In other words, Dr. Fraga supposes that every instance of a voter being identified in the voter file as "other" or "unknown" is an error. So, for example, if a voter identifies as "other" in 10 of Dr. Fraga's voter files and then "Asian" in one voter file, Dr. Fraga will retroactively classify them as a self-reported "Asian" voter in every election he

10

analyzes. Dr. Fraga's procedure to produce turnout estimates in his Table 1a is based on a similar assumption: Voters who do not report a race must have made an error. In his Table 1a (Fraga supp. rep., pg. 9), Dr. Fraga applies a statistical procedure, known as BISG, to infer voters' race based on their name and location. He applies this procedure to voters who "consistently self-identifying as 'Other' or with 'Unknown' race." In contrast, the procedure I use in my report uses voters' self-reported race, as recorded in the voter file, as the measure of the voter's self-reported race.

17.    As a result of these different methods, Dr. Fraga and I reach different conclusions about turnout rates among self-reported racial groups. In Table 2 below, I compare the components of the turnout estimates from Dr. Fraga and my expert reports for the general elections and self-reported racial groups where we both produce turnout estimates. To produce Table 2, I use Dr. Fraga's replication code and data set to merge his data with the data I use to estimate voter turnout in my reports. The "Race" column contains the self-reported race of the voter, and the "Year" column contains the election year. Notice that the "Denominator, Grimmer" and "Denominator, Fraga" columns are identical in 2018, 2020, and 2022 (indicated with a 0 in the "Den. % Diff" column, which measures the percent difference between the estimates from Dr. Fraga and myself) and very similar in 2024. This reflects that Dr. Fraga and I use the same data in 2018, 2020, and 2022. Dr. Fraga adopted my projection

11

procedure for 2024, although he uses a shorter time series to make his projection.

18.     In the "Numerator, Grimmer" and "Numerator, Fraga" columns, I compare the number of votes Dr. Fraga and I estimate from each self-reported racial group and overall.  Because Dr. Fraga's procedure for inferring a voter's race does not affect the total number of votes, the calculated "Total" number of votes cast from Dr. Fraga and I are similar and, as a result, our estimates of the overall turnout rate are nearly identical.

19.     In the "Turnout Grimmer" and "Turnout Fraga" columns, I show that we both agree that the 2024 election had the highest turnout rate for any election since at least 2018.  Dr. Fraga and I also agree that self-reported Black voters had a lower turnout rate in 2024 than in 2020 and that self-reported white voters had a higher turnout rate in 2024 than in 2020.

| Race | Year | Denominator Grimmer | Denominator Fraga | Den. % Diff | Numerator Grimmer | Numerator Fraga | Num. % Diff | Turnout Grimmer | Turnout Fraga |
|------|------|------|------|------|------|------|------|------|------|
| Asian | 2018 | 195825 | 195825 | 0.000 | 67216 | 73869 | 9.897 | 0.343 | 0.377 |
| Asian | 2020 | 211655 | 211655 | 0.000 | 126815 | 135684 | 6.993 | 0.599 | 0.641 |
| Asian | 2022 | 236570 | 236570 | 0.000 | 80778 | 87464 | 8.276 | 0.341 | 0.370 |
| Asian | 2024 | 254791 | 256342 | 0.609 | 154956 | 161795 | 4.413 | 0.608 | 0.631 |
| Black | 2018 | 2307425 | 2307425 | 0.000 | 1143170 | 1180184 | 3.238 | 0.495 | 0.511 |
| Black | 2020 | 2402130 | 2402130 | 0.000 | 1373543 | 1438119 | 4.701 | 0.572 | 0.599 |
| Black | 2022 | 2470870 | 2470870 | 0.000 | 1041022 | 1118735 | 7.465 | 0.421 | 0.453 |
| Black | 2024 | 2534887 | 2521497 | -0.528 | 1420498 | 1490428 | 4.923 | 0.560 | 0.591 |
| Hispanic | 2018 | 324370 | 324370 | 0.000 | 89123 | 96307 | 8.060 | 0.275 | 0.297 |
| Hispanic | 2020 | 377650 | 377650 | 0.000 | 152069 | 159223 | 4.704 | 0.403 | 0.422 |
| Hispanic | 2022 | 432975 | 432975 | 0.000 | 92751 | 98833 | 6.557 | 0.214 | 0.228 |
| Hispanic | 2024 | 490689 | 500170 | 1.932 | 201514 | 205988 | 2.220 | 0.411 | 0.412 |
| White | 2018 | 4315580 | 4315580 | 0.000 | 2327182 | 2411881 | 3.640 | 0.539 | 0.559 |
| White | 2020 | 4358340 | 4358340 | 0.000 | 2924829 | 3017221 | 3.159 | 0.671 | 0.692 |
| White | 2022 | 4381850 | 4381850 | 0.000 | 2361802 | 2451150 | 3.783 | 0.539 | 0.559 |
| White | 2024 | 4369836 | 4351520 | -0.419 | 3013201 | 3110784 | 3.239 | 0.690 | 0.715 |
| Total | 2018 | 7254695 | 7254695 | 0.000 | 3948946 | 3943855 | -0.129 | 0.544 | 0.544 |
| Total | 2020 | 7482330 | 7482330 | 0.000 | 5023159 | 5013141 | -0.199 | 0.671 | 0.670 |
| Total | 2022 | 7686560 | 7686560 | 0.000 | 3961556 | 3958763 | -0.071 | 0.515 | 0.515 |
| Total | 2024 | 7837650 | 7822143 | -0.198 | 5296620 | 5296558 | -0.001 | 0.676 | 0.677 |

Table 2: Contrasting Turnout Estimates from Grimmer and Fraga Expert Reports

20.    Dr. Fraga and I, however, reach different conclusions about the relative turnout rates of Asian and Hispanic voters in the 2020 and 2024 elections. Using the estimates from my supplemental report, I conclude that turnout among self-reported Asian and Hispanic voters in the 2024 election was higher than in the 2020 general election. Dr. Fraga, relying on his imputation methodology, concludes that "Hispanic turnout was also lower in 2024 (41.2%) than it was in 2020 (42.2%). Asian American/Pacific Islander turnout was likewise lower in 2024 (63.1%) than in 2020 (64.1%)." Fraga supp. rep., pgs. 8–9.

21.    To demonstrate how Dr. Fraga and my conclusions depend upon particular assumptions about how we calculate our turnout rates, I perform a variety of sensitivity analyses in Table 3. A sensitivity analysis is a statistical

procedure that varies the assumptions underlying an estimate to assess how the conclusion may change as those assumptions are changed.[4] To establish a baseline for comparing the "Turnout Grimmer" and "Turnout Fraga" columns in Table 3, I replicate the estimates for Asian and Hispanic voters in 2020 and 2024 found in the "Turnout Grimmer" and "Turnout Fraga" columns in Table 2. Dr. Fraga estimates a slightly different 2024 CVAP than I estimate in my supplemental report. But I reach similar conclusions about the rate of Asian and Hispanic voting in the 2020 and 2024 election if I use Dr. Fraga's estimate of the 2024 CVAP. In the "Grimmer Votes Fraga Den." column, I compute the turnout rate using the count of votes from each racial group using the reapportionment report and then use Dr. Fraga's estimate of the Asian and Hispanic 2024 CVAP. With these estimates I still conclude that Asian and Hispanic turnout was higher in 2024 than in 2020, though the difference is smaller than the estimates from my supplemental report, particularly for Hispanic voters. I find that the 2024 Asian turnout rate was 0.5 percentage points higher than the 2020 Asian turnout rate. And I find that the 2024 Hispanic turnout rate was 0.02 percentage points higher than the 2020 Hispanic turnout rate.

---

[4] *E.g.*, Charles F. Manski, Identification for Prediction and Decision 153 (2009); Paul R. Rosenbaum, *Design Sensitivity in Observational Studies*, 91 Biometrika 153, 155–64 (2004).

| Race | Year | Turnout Grimmer | Turnout Fraga | Grimmer Votes Fraga Den. | Grimmer Votes + 2020 Imp. | Turnout Fraga (1a) | Grimmer + BISG | Grimmer + 2020 BISG |
|------|------|------|------|------|------|------|------|------|
| Asian | 2020 | 0.599 | 0.641 | 0.599 | 0.641 | 0.714 | 0.672 | 0.672 |
| Asian | 2024 | 0.608 | 0.631 | 0.604 | 0.647 | 0.712 | 0.689 | 0.682 |
| Hispanic | 2020 | 0.403 | 0.422 | 0.403 | 0.422 | 0.458 | 0.439 | 0.439 |
| Hispanic | 2024 | 0.411 | 0.412 | 0.403 | 0.422 | 0.451 | 0.450 | 0.448 |

Table 3: A Sensitivity Analysis of How Dr. Fraga's Procedure to Infer Race Affects Conclusions About Hispanic and Asian Turnout in 2020 and 2024

22.    Dr. Fraga's procedure for imputing voters' race adds votes to the total from the reapportionment report and therefore results in a larger number of votes in each election for Asian, Black, Hispanic, and white voters. But Table 2 shows that the relative number of votes Dr. Fraga's procedure adds to the vote total from the reapportionment report varies across elections and across self-reported racial groups.    In the "Num % Diff" column, I calculate the percentage increase in the number of votes from Dr. Fraga's procedure relative to the number of votes in the reapportionment report.    This column shows that Dr. Fraga's procedure results in a relatively consistent 3.2%-3.6% increase in white votes over the number of votes in the reapportionment report for the 2018, 2020, 2022, and 2024 elections.    For other self-reported racial groups, however, the relative increase in votes is more variable across the elections. For Asian voters there is a 4.4% (in 2024) to 9.9% (in 2018) increase relative to the number of votes in the reapportionment report, for Black voters there is a 3.2% (in 2018) to 7.5% (in 2024) increase relative to the number of votes in the reapportionment report, and for Hispanic voters there is a 2.2% (in 2024) to

8.1% (in 2018) increase relative to the number of votes in the reapportionment report.

23.    In the "Grimmer Votes + 2020 Imp." column in Table 3, I show that if Dr. Fraga's procedure produced a consistent rate of imputing votes, then his estimates would show that Asian and Hispanic turnout was higher in 2024 than in 2020.  In 2020, Dr. Fraga's estimated number of votes from Asian voters was 6.993% higher than the number of Asian votes from the reapportionment report, but in 2024, Dr. Fraga's estimated number of votes from Asian voters was 4.413% higher than the number of Asian votes from the reapportionment report (Table 2, "Num. % Diff" column). If I suppose, instead, that Dr. Fraga's method produced the same increase in votes over the reapportionment report in 2024 as in 2020 (6.993%) and then use Dr. Fraga's projection of the CVAP in 2024 as the denominator, Dr. Fraga's estimates would find that Asian turnout in 2024 increased 0.6 percentage points over the turnout rate in the 2020 election (64.7% in 2024 , 64.1% in 2020).

24.    There is a similar pattern for the Hispanic turnout rate. In 2020, Dr. Fraga's estimated number of votes from Hispanic voters was 4.704% higher than the estimated number of votes from Hispanic voters in the reapportionment report, but in 2024 Dr. Fraga's estimated number of votes from Hispanic voters was 2.220% higher than the number of Hispanic voters from the reapportionment report (Fraga supp. rep., pg. 8).  If I suppose that

the increase in the number of Hispanic votes from Dr. Fraga's procedure over the reapportionment report is the same in 2024 as in 2020 (4.704%) and again use Dr. Fraga's estimate of the CVAP as the denominator, then Dr. Fraga's estimates would find that Hispanic turnout in 2024 had a slight increase of 0.02 percentage points over the 2020 turnout rate (42.18% in 2024 compared to 42.16% in 2020).

25.    I also performed a sensitivity analysis of Dr. Fraga's conclusions about turnout using the evidence in his Table 1a and reach a similar conclusion: Dr. Fraga's conclusions about the relative turnout rates of Asian and Hispanic voters depends upon his procedure for inferring race from the voter file, but not from his procedure to infer race from some voters' names and locations. In Table 1a, Dr. Fraga combines his procedure for inferring race from the voter file with BISG (Fraga supp. rep., pg. 9). He applies BISG to infer the race of voters who identify as "Other" or "Unknown" in all voter files in which they appear. For the purposes of comparison, I present Dr. Fraga's estimates for the Asian and Hispanic turnout rates using this procedure in the "Turnout Fraga (1a)" column. Using Dr. Fraga's replication code, I isolate the number of votes the BISG procedure added to the Asian and Hispanic vote total for the 2020 and 2024 election. This enables me to assess the independent effect of adding votes based on inferring race based on names and location, separate from Dr. Fraga's procedure for inferring race from the voter file.

17

26. In the "Grimmer + BISG" I add the inferred Asian and Hispanic votes to the vote total I obtained from each election's reapportionment report and then calculate the turnout rate using my estimates of the 2024 CVAP. Including the votes from Dr. Fraga's BISG estimates does not affect my conclusion that turnout was higher for Asian and Hispanic voters in 2024 than in 2020. I find that Asian turnout in 2024 was 1.7 percentage points higher in 2024 than in 2020 and that Hispanic turnout in 2024 was 1.1 percentage points higher in 2024 than in 2020. I also find that there is variability in the rate the BISG adds votes across elections, but that this does not affect my conclusion. In the "Grimmer + 2020 BISG" I find that if I force the same percent change in both elections, I still conclude that Asian and Hispanic voter turnout was higher in 2024 than in 2020.

27. This sensitivity analysis shows that conclusions about the relative turnout rate of Hispanic and Asian voters in 2024 and 2020 using Dr. Fraga's imputation method depends upon the relative rate votes are imputed across elections, which is dependent on the voter files available and the number of times voters appear in the voter files.

28. The 2018 general election is the earliest election where Dr. Fraga reports turnout estimates, but his procedure for inferring race includes several voter files from 2016 (Fraga supp. rep., pg. 8). Using his replication code, I was able to apply his method to the 2016 election and the resulting turnout

18

estimates for Asian, Black, Hispanic, and white voters are found in Table 3. I continue using the same denominator, the census estimates of the 2016 CVAP. I then merge Dr. Fraga's self-reported race estimates with the voter history file from the 2016 election, and I report the calculated number of votes from each self-reported racial group in the "Numerator, Fraga" column.

29.    Applying Dr. Fraga's method to 2016, I find that the turnout rate among every self-reported racial group was *higher* in 2024 than in 2016. Further, the increase from 2016 to 2024 was larger in magnitude than the decline that Dr. Fraga estimated for Asian, Black, and Hispanic voters from 2020 to 2024. I present the turnout rate estimates from Dr. Fraga's procedure in the "Turnout Fraga" column and I present the estimates from my procedure in the "Turnout Grimmer" column. From 2016 to 2024, Dr. Fraga's procedure estimates that turnout among Asian voters increased 21.5 percentage points, while Dr. Fraga estimated a 1 percentage point decline from 2020 to 2024 in Asian turnout. From 2016 to 2024, Dr. Fraga's procedure estimates a 5.3 percentage point increase in Black turnout, while Dr. Fraga estimated a 0.8 percentage point decrease in the Black turnout rate from 2020 to 2024. From 2016 to 2024, Dr. Fraga's procedure estimates an 8.2 percentage point increase in Hispanic turnout, while Dr. Fraga estimated a 1 percentage point decrease in Hispanic turnout from 2020 to 2024. And, from 2016 to 2024, Dr. Fraga's procedure estimates a 10.3 percentage point increase in white turnout, while

19

Dr. Fraga estimated a 2.3 percentage point increase in white turnout from 2020 to 2024.

| Race | Denominator | Numerator Grimmer | Numerator Fraga | % Diff | Turnout Grimmer | Turnout Fraga |
|------|-------------|-------------------|-----------------|--------|-----------------|---------------|
| Asian | 177935 | 65693 | 74083 | 12.772 | 0.369 | 0.416 |
| Black | 2212975 | 1151949 | 1189893 | 3.294 | 0.521 | 0.538 |
| Hispanic | 290840 | 88553 | 98832 | 11.607 | 0.304 | 0.340 |
| White | 4285130 | 2529810 | 2621962 | 3.643 | 0.590 | 0.612 |

Table 4: Applying Fraga's Method to 2016 and then Contrasting Turnout Estimates from Grimmer's Report

30.     As noted earlier, Dr. Clark also opined on turnout rates (Clark supp. rep., pg. 7). In Table 5, I contrast my estimates with estimates from Dr. Clark's report. Dr. Clark's turnout estimates also use the number of votes from white and Black voters as reported in reapportionment reports as the numerator. But Dr. Clark uses the number of *registered* voters as the denominator (Clark supp. rep., pg. 6). While replicating Dr. Clark's estimates, I identify and correct several errors and in Table 5 I bold places where I have estimates that differ from Dr. Clark's. First, in 2022, Dr. Clark only used voters with an "active" registration status, while in every other year Dr. Clark used both active and inactive registered voters. To reach this conclusion, I note that I replicate the estimates from Dr. Clark's report exactly when I take the number of votes from the reapportionment report and then divide by the number of active voters from the 2022 registration file provided by counsel or

using the 2022 turnout data hub from the Georgia secretary of State's office.[5] To ensure Dr. Clark's estimates from the 2022 election align with his stated estimates, I recalculate the registered voter turnout rate with all registered voters in the denominator. Dr. Clark estimates that 56.9% of registered Georgia voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 50.5%. Dr. Clark also estimates that 51.3% of registered Black voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 45.0%. And Dr. Clark also estimates that 64.7% of registered white voters cast a ballot in 2022 (Clark rep., pg. 15), but it was actually 58.3%. Dr. Clark also claims that, "[a]s for turnout data discussed below, since my first report, the state of Georgia has changed the election data it provides online." Clark supp. rep., pg. 3. Dr. Clark then uses data from the 2024 turnout hub. It is unclear why Dr. Clark does not continue to use the reapportionment report, which was available and provided by counsel. Dr. Clark claims that 54.3% of registered Black voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 56.9%. Dr. Clark also claims that 69.6% of registered white voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 72.3%. And Dr. Clark claims that 61.7% of registered Georgia voters cast a ballot (Clark supp. rep., pg. 7), but it was actually 64.2%.

---

[5] *Data Hub - November 8, 2022 General Election*, Ga. Sec. State, https://sos.ga.gov/data-hub-november-8-2022-general-election (last visited July 11, 2025).

I also extend my turnout estimates for Black, white, and Georgia voters overall

to 2010 and 2012 to make my estimates comparable to Dr. Clark's.

| Race | Year | Denominator Grimmer | Denominator Clark | % Diff | Votes | Turnout Grimmer | Turnout Clark |
|------|------|---------------------|-------------------|--------|-------|-----------------|---------------|
| Black | 2010 | 1951560 | 1470160 | -24.667 | 740997 | 0.380 | 0.504 |
| Black | 2012 | 2040645 | 1609984 | -21.104 | 1168287 | 0.573 | 0.726 |
| Black | 2014 | 2125015 | 1843725 | -13.237 | 748592 | 0.352 | 0.406 |
| Black | 2016 | 2212975 | 2048904 | -7.414 | 1151949 | 0.521 | 0.562 |
| Black | 2018 | 2307425 | 2121324 | -8.065 | 1143170 | 0.495 | 0.539 |
| Black | 2020 | 2402130 | 2290365 | -4.653 | 1373543 | 0.572 | 0.600 |
| Black | 2022 | 2470870 | **2312592** | -6.406 | 1041022 | 0.421 | **0.450** |
| Black | 2024 | 2534887 | **2498277** | -1.444 | 1420498 | 0.560 | **0.569** |
| White | 2010 | 4139045 | 3110275 | -24.855 | 1738521 | 0.420 | 0.559 |
| White | 2012 | 4202775 | 3170967 | -24.551 | 2399345 | 0.571 | 0.757 |
| White | 2014 | 4248965 | 3474273 | -18.232 | 1648927 | 0.388 | 0.475 |
| White | 2016 | 4285130 | 3727549 | -13.012 | 2529810 | 0.590 | 0.679 |
| White | 2018 | 4315580 | 3742464 | -13.280 | 2327182 | 0.539 | 0.622 |
| White | 2020 | 4358340 | 4029156 | -7.553 | 2924829 | 0.671 | 0.726 |
| White | 2022 | 4381850 | **4048728** | -7.602 | 2361802 | 0.539 | **0.583** |
| White | 2024 | 4369836 | **4166708** | -4.648 | **3013201** | 0.690 | **0.723** |
| Total | 2010 | 6476090 | 5032354 | -22.293 | 2622527 | 0.405 | 0.521 |
| Total | 2012 | 6693990 | 5360701 | -19.918 | 3908500 | 0.584 | 0.729 |
| Total | 2014 | 6882880 | 6053385 | -12.052 | 2597003 | 0.377 | 0.429 |
| Total | 2016 | 7063805 | 6713531 | -4.959 | 4161846 | 0.589 | 0.620 |
| Total | 2018 | 7254695 | 7006952 | -3.415 | 3948946 | 0.544 | 0.564 |
| Total | 2020 | 7482330 | 7641351 | 2.125 | 5023159 | 0.671 | 0.657 |
| Total | 2022 | 7686560 | **7840528** | 2.003 | 3961556 | 0.515 | **0.505** |
| Total | 2024 | 7837650 | **8244553** | 5.192 | **5296620** | 0.676 | **0.642** |

Table 5: Contrasting Turnout Estimates from Grimmer and Clark Expert Reports

31. Table 5 demonstrates that the number of registered voters in

Georgia has grown faster than the CVAP over the past 14 years. Overall, in

2010 the number of registered voters was 77.7% of the Georgia CVAP, while in

2024 the number of registered voters was 105% of the Georgia CVAP.[6] There

is a similar increase in the share of the CVAP registered to vote for Black and

white citizens in Georgia. In 2010, the number of registered Black voters was

75.3% of the Black CVAP, while in 2024 the number of registered Black voters

was 98.6% of the Black CVAP. Similarly, in 2010 the number of registered

white voters was 75.1% of the white CVAP, while in 2024 the number of

registered white voters was 95.4% of the white CVAP. Comparing turnout

among registered voters across years blends the changes in the number of

voters turning out and the number of voters who are registered to vote.

32.     Rather than use turnout among registered voters, I instead extend

my estimates of the white and Black turnout rate to 2010 and 2012. I continue

to find that the 2024 election was the highest turnout rate election in Georgia

overall and for white voters. Among Black voters, turnout was higher in 2012

than in any other election. In 2010, turnout among Black voters was higher

than in 2014, but lower than in 2012, 2016, 2018, 2020, 2022, or 2024.

## II.    Asian American Voter Participation in Georgia

33.     Turning to voter participation by Asian voters, Dr. Lee's

supplemental report focuses on the treatment of Asian American citizens in

---

[6] The number of registered voters can exceed the CVAP because inactive voters
remain on the registration list until they are allowed to be removed under the federal
National Voter Registration Act.

Georgia, arguing that, "[i]f anything, evidence shows mounting suspicions about Americans of Asian descent, consistent with and further supporting the conclusion in my previous expert report that Asian Americans in Georgia continue to face discrimination and adverse treatment." Lee supp. rep., pg. 3. Dr. Lee's report focuses on evidence from public opinion surveys and news reports of Asian American discrimination. He does not consider evidence about Asian American participation in the 2024 election.

34.    I find that Asian American turnout has increased in Georgia elections. In my supplemental report, I find that the turnout rate among Asian American voters in Georgia was the highest since at least 2014. In 2016, I estimate that 36.9% of Asian voters cast a ballot in the presidential election. In 2020, I estimate a turnout rate of 59.9% among Asian voters, while in 2024 the turnout rate among Asian American voters was 60.8%.    Using the estimates of Asian turnout rates from Table 2 in my supplemental report, from 2016 to 2024, there has been a 23.9 percentage point increase in the Asian American turnout rate. This constitutes a 65% increase in the Asian American turnout rate.

35.    The number of Asian Americans who have registered to vote has also increased over this same period.    In 2014 94,500 self-reported Asian citizens in Georgia were registered to vote, constituting 59.2% of the Asian

CVAP. In 2024 253,710 self-reported Asian citizens in Georgia were registered to vote, constituting 99.6% of the Asian CVAP.

### III.   Dr. Clark's Parity Estimates

36.    I next consider Dr. Clark's conclusions about whether the share of legislators representing Georgia in Federal and state legislatures matches the share of Black Georgia residents. Applying Dr. Clark's own definition of parity, I find that Black Georgia residents exceed parity in representation in the Georgia U.S. House delegation. I also find that Dr. Clark's conclusions about parity in the Georgia state legislature depends on the particular measure he uses of the proportion of the Georgia population who identifies as Black.

37.    In his supplemental report, Dr. Clark computes a "parity" statistic (Clark supp. rep., pg. 8). As Dr. Clark explains, he computes "the Black representation ratio, which is measured as the Black seat share relative to the Black population share. To calculate the Black representation ratio, the Black seat share is divided by the Black population share. If the number is below 1, Blacks are underrepresented; if the number is above 1, Blacks are overrepresented. If the score is 1, then Blacks are represented at a rate that reflects the group's population share." Clark, supp. rep., pg. 8.

38.    Dr. Clark finds that in the U.S. House of Representatives delegation for Georgia, "the Black representation ratio is 1.08 (35.7 percent / 33.2 percent)." Clark supp. rep., pg. 9. Dr. Clark, however, goes on to argue

that Black representatives in Congress "overwhelmingly represent majority-Black districts or at least districts with sizable Black populations." Dr. Clark opines that this shows that "electing Black members virtually requires an outright majority Black population. Electoral opportunities are thus constrained for Black Georgians who seek to represent the state in the U.S. House of Representatives. And this rebuts any argument that Black elected officials no longer face barriers to elected office in the state." Clark supp. rep., pg. 9.

39.    It is unclear what Dr. Clark's methodology is for including the racial composition of districts when determining whether Black citizens are represented at "a rate that reflects the group's population share." Using his own definition of the "Black representation ratio," he would conclude that Black citizens are overrepresented in the US House delegation. Dr. Clark dismisses this conclusion, instead implying in his supplemental report that a critical test of parity in representation is the racial composition of a legislator's district. Yet, Dr. Clark provides no formal metric to assess how the racial composition of a district relates to opportunities for representation from Black elected officials, nor does Dr. Clark explain how to balance his district racial composition test with his seat-share parity test. Instead, Dr. Clark observes the racial composition of Black members of Congress and then, based on this correlation, concludes that this is evidence of constraint on political

opportunity (Clark supp. rep., pgs. 8–10). Without a clear methodology to move from Dr. Clark's correlation to this conclusion, I am unable to assess the reliability of this analysis.

40.    Dr. Clark also examines whether there is parity in the Georgia state House and Senate, finding that "In the House, 32.8 percent of members are Black. This means the Black representation ratio in that chamber is 0.99. In the state's upper chamber, the State Senate, 30.4 percent of members are Black. This means the representation ratio in that chamber is 0.91. Across the whole Georgia General Assembly, the Black seat share is 32.2 percent, meaning the Black representation ratio is 0.97. These numbers highlight how Black Georgians continue to be underrepresented in the state legislature as compared to their population share." Clark supp. rep., pg. 9. Dr. Clark does not provide an analysis of the racial composition of the state House and state Senate districts in Georgia or how that relates to the opportunity for Black representation in the Georgia House or Senate.

41.    According to Dr. Clark's estimates, if a single additional Black legislator were elected to the Georgia House, Black citizens would be slightly overrepresented. This is because if an additional Black legislator were elected, then 60 out of 180 House members would identify as Black, which exceeds Dr. Clark's estimate that the Black share of the Georgia population is 33.2%. If Dr. Clark's implicit normative benchmark is a legislature that reflects the

27

racial composition of Georgia, it is unclear what standard he uses to adjudicate issues with the discrete number of seats at the parity threshold. If, for example, he argued that parity for Black representation could only occur with 60 out of 180 seats, then he must necessarily be arguing that some other group must have representation below parity.

42.    Dr. Clark's calculations, and his conclusions about parity, depend on the particular estimate of the Black share of the population that he uses. For example, if he instead uses the Black share of the CVAP population in Georgia he would conclude that Black representation achieves almost perfect parity in the Georgia state legislature.  Using the 2023 CVAP, I find that 32.2% of Georgia citizens of voting age identify as Black.  Using this as a baseline and applying Dr. Clark's Black representation statistic, I find a score of 1.02 in the State House, a Black representation statistic of 0.94 in the State Senate, and an overall Black representation statistic of 0.999993 (because 76/236 = 0.322033 and the Black share of the CVAP is 0.322036).

## IV.    "Travel Burdens" to Drop Boxes

43.    I also consider Dr. Chatman's conclusion that the elimination of a voter's closest drop box necessarily imposes a burden on that voter's ability to return an absentee ballot (Chatman supp. rep., pgs. 1–2, 23).  Dr. Chatman's conclusion is not based on any actual data about voters or trips to return ballots

and therefore is not useful in assessing Georgia's voters' cost of returning their ballot.

44.    Dr. Chatman performs an analysis of "the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2024." Chatman supp. rep., pg. 1. To perform this analysis Dr. Chatman assesses the average travel time to the nearest drop box for all Georgia voters. He does not include any information about any actual behavior of Georgia voters.

45.    Dr. Chatman's report does not consider the access voters have to the U.S. Postal Service (USPS) to return ballots. The USPS is a reliable option for voters to return their absentee ballots. The USPS has published data from its performance during the 2024 election, which shows the USPS is able to deliver a large share of absentee ballots to election officials quickly. According to official USPS statistics "The agency successfully processed, transported and delivered 99.88 percent of ballots from voters to election officials within seven days, and 99.64 percent within five days" and that "the Postal Service successfully returned 97.73 percent of ballots from voters to local election officials in fewer than three days."[7] Further the USPS states that "on average,

---

[7] U.S. Postal Serv., *U.S. Postal Service Releases 2024 Post-Election Analysis Report Detailing the Successful Efforts Taken to Deliver the Nation's Election Mail Securely and Effectively*, Nat'l News, (Dec. 2, 2024), https://tinyurl.com/5n8wtn8n.

the Postal Service delivered ballots from voters to election officials within one day."[8]

46.    Dr. Chatman also supposes that voters will use the nearest drop box in a standalone trip to return their ballots, rather than using a centrally located drop box while performing other errands or activities. In my first expert report (Grimmer rep., ¶ 143), I use the SPAE survey to show that absentee voters in Georgian often return absentee ballots to drop boxes while performing other errands. And, using actual ballot return data from Douglas County, I find that only 22% of drop box voters use the nearest drop box to return their ballot.

## V.    Contrasting Estimates in the Rate Absentee Ballots were Rejected for Identification Reasons in the 2024 election.

47.    Finally, I correct errors in Dr. Fraga's calculations in the absentee-ballot rejection rates.  With these errors in place, Dr. Fraga concludes that there was a lower overall rejection rate than I identify in my supplemental report.

48.    In my first expert report and my supplemental report, I examine the rate that mail-in ballots were rejected for various reasons during, before, and after the passage of SB 202 (Grimmer rep., ¶¶ 12, 16, 88–101, 171–72; Grimmer supp. rep., ¶¶ 3, 49–63).    Dr. Fraga's supplemental report also

---

[8] *Ibid.*

examines the rate mail-in ballots were rejected in the 2024 election, but he found generally lower rejection rates than my report (Fraga supp. rep., pg. 17). This is because Dr. Fraga inadvertently discarded 701 mail-in ballots that were rejected. This occurred because Dr. Fraga restricted his analysis to absentee-ballot applications with an accepted "A" Application Status, which eliminated 580 absentee ballots with a blank application status and 121 absentee ballots with status "R" (Fraga supp. rep., pg. 17–20). Despite not having an "A" application status, there is strong evidence that all 701 of these rejected mail-in ballots were issued. All 701 ballots with either a blank application status or rejected application status have a ballot issue date and all have a ballot return date. I also find that all 701 absentee ballots have a Ballot Status of "R" indicating that they were rejected. And the codes provided for these rejections are consistent with the standard codes for a ballot rejection, rather than the free form memos used for application rejections.

49.    In Table 6, I replicate the estimates from Dr. Fraga's Table 4 ("Share Rejected, Fraga") and provide the corresponding estimates including the 701 missing ballots from Dr. Fraga's report.

| Rejection Reason | Share Rejected Grimmer | Share Rejected Fraga |
|---|---|---|
| Ballot Received After Deadline | 0.01190 | 0.01160 |
| Incorrect Id Information | 0.00151 | 0.00094 |
| Ineligible Elector | 0.00004 | 0.00004 |
| Invalid Signature | 0.00038 | 0.00029 |
| MIDR - Id Not Provided | 0.00007 | 0.00004 |
| Missing Id Information | 0.00259 | 0.00139 |
| Missing Signature | 0.00074 | 0.00040 |

Table 6: Contrasting the Share of Rejected Ballots from Grimmer and Fraga Expert Reports

50.    Dr. Fraga's Table 6 also reports the rejection rate for identification reasons in the 2018, 2020, 2022, and 2024 elections, which I also report in Table 4 of my supplemental report. Dr. Fraga estimates a substantially higher rejection rate for identification reasons in 2018 than I find in my sur-rebuttal Table 4. This is because Dr. Fraga inadvertently attributes errors on the Oath envelope to voters missing identification. This can occur because, in 2018, Georgia election officials did not use a standard system to classify voters' errors. According to my classification, 52 of the status reasons that Dr. Fraga classifies as due to identification reasons are actually due to errors on the oath envelope or error in a voter's signature.[9]    Altogether, errors on the oath

_____

[9] The 52 Status reasons that Dr. Fraga classifies as rejections due to ID that are actually rejections due to errors on the Oath envelope are: "ADDRESS AND YOB MISSING", "ADDRESS DIDN'T MATCH", "ADDRESS MATCH", "BIRTHDATE DOES NOT MATCH", "BIRTHDAY DIDN'T MATCH", "BIRTHDAY DOESNT MATCH", "CURRENT YEAR AS YEAR OF BIRTH", "CURRENT YEAR AS YOB", "CURRENT YEAR AS YOB, RES ADDR NOT A MATCH", "CURRENT YEAR AS YOB, SIG MISSING", "DATE OF BIRTH DOES NOT MATCH AND NO", "DATE OF BIRTH DOES NOT MATCH VR CARD ON FILE", "DIFFERENT ADDR RECORDED", "DOB DOESN'T MATCH", "DOB INCORRECT", "DOB IS NOT A

envelope constitute 457 of the 509 ID rejections Dr. Fraga identifies in 2018. After I correct these misclassifications, Dr. Fraga and I reach nearly identical counts of the number of ballots rejected for identification reasons in 2018: I estimate 56 ballots were rejected for ID related reasons, while Dr. Fraga estimated 52 ballots were rejected for ID reasons.

51.    Regardless of the differences in our estimates of the rejection rate reasons for absentee ballots, Dr. Fraga and I reach similar conclusions about the rate absentee ballots were rejected for identification reasons in the 2024 election. I estimate that absentee ballots from white voters had a 0.2 percentage point lower rejection rate for identification reasons than Black voters in the 2024 election.  Using Dr. Fraga's uncorrected estimates from his supplemental report Table 6, he finds that absentee ballots from white voters

---

MATCH", "DOB NOT A MATCH", "INCORRECT ADDRESS", "INCORRECT ADDRESS AND COUNTY IN OATH", "INCORRECT ADDRESS ON OATH", "INCORRECT BIRTH DATE IN OATH", "INCORRECT DATE OF BIRTH IN OATH", "INCORRECT DOB", "INCORRECT RESIDENTIAL ADDRESS", "INVALID BIRTHDAT", "LEFT DATE OF BIRTH BLANK", "LEFT DOB BLANK ON OATH", "NO ADDRESS", "NO DOB", "NO RESIDENTIAL ADDRESS", "NON MATCHING ADDRESS ON OATH ENVELOPE", "OATH DOES NOT REFLECT RESIDENCE ADDRESS", "RES ADDR AND YEAR OF BIRTH MISSING", "RES ADDR MISSING", "RES ADDR NOT A MATCH", "RES ADDR, YOB MISSING", "RES ADR AND YOB MISSING", "RESI ADDR DID NOT MATCH", "RESI ADDR NOT A MATCH", "STREET ADDRESS MISSING", "WRONG ADDRESS", "WRONG COUNTY LISTED IN OATH", "WRONG DATE OF BIRTH", "WRONG DATE OF BIRTH ON OATH ENVELOPE", "WRONG DOB", "WRONG INFORMATION", "WRONG RESI ADDR", "YEAR OF BIRTH MISSING", "YEAR OF BIRTH NOT A MATCH", "YOB AND RES ADDR MISSING", "YOB NOT A MATCH", "YOB, ADDR MISSING".

had a 0.05 percentage point lower rejection rate for identification reasons than Black voters. My estimates of the Black-white rejection gap for identification reasons in the 2024 election and Dr. Fraga's uncorrected estimates are smaller than the Black-white gap for signature reasons in the 2016 election and Dr. Fraga's uncorrected estimates of the Black-white gap in rejection rates for identification reasons is smaller than the Black-white gap in rejection rates for signature reasons in the 2018 and 2020 elections.

## VI.    Conclusions

52.    I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend this report.

Executed on July 14, 2025

Justin Grimmer, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.<br>1:21-MI-55555-JPB |

## EXPERT REPORT OF JUSTIN GRIMMER, PH.D.

I, Dr. Justin Grimmer, am an adult of sound mind and make this statement voluntarily, based on my own personal knowledge, education, and experience.

### I.    PURPOSE AND TERMS, INCLUDING COMPENSATION, OF ENGAGEMENT

1.    I have been engaged by the State Defendants to review and respond, as relevant, to the many expert reports submitted in this case. I have reviewed each of these reports. In this report, I provide my own analysis of the challenged provisions of SB 202. If my report does not respond to a particular expert by name, my independent analysis of the challenged provisions serves as a rebuttal. Similarly, my silence on a particular point raised by any of plaintiffs' experts is not an indication of agreement with that point— particularly if my own analysis contradicts that point.

Exhibit

3

Grimmer

07/07/2025    C.A.N.

2.     I base the opinions in this report on my own knowledge, research, experience, and publications, and the work of other academics and writers. I also base this report on my review of the case materials, which include:

- The complaints filed by the various plaintiff groups;
- Plaintiffs' interrogatory responses;
- Data on voter demographics, absentee voting rates, drop box use, and other information obtained in discovery;
- The report of Dr. Carol Anderson;
- The report of Dr. Barry Burden;
- The report of Dr. Orvill Burton;
- The report of Dr. Derek Chang;
- The report of Dr. Daniel Chatman;
- The report of Dr. Christopher Clark;
- The report of Dr. James Cobb;
- The report of Dr. Bernard Fraga;
- The report of Kevin Kennedy;
- The report of Dr. Bridget King;
- The report of Dr. Taeku Lee;
- The report of Dr. Allan Lichtman;
- The report of Dr. Marc Meredith;
- The report of Dr. Lorraine Minnite;
- The report of Dr. Maxwell Palmer;
- The report of Dr. Stephen Pettigrew;
- The report of Dr. Lisa Schur; and
- The report of Dr. Andrés Tijerina.

3.    The materials I have used to research and write this report are the standard sources used by other experts in my field. I am receiving $400 per hour for my time spent preparing this report and any time testifying, including at a deposition. I will receive the same amount regardless of the outcome of this litigation or the substance of my opinions.

## II.    CREDENTIALS AND HISTORY OF EXPERT TESTIMONY

4.    I am a Professor of Political Science at Stanford University in Stanford, California. I also hold the titles of Senior Fellow at the Hoover Institution and Co-Director of the Democracy and Polarization Lab. I first joined the Stanford faculty in 2010 as an Assistant Professor. I was promoted to Associate Professor in 2014, and I held a courtesy appointment in the Department of Computer Science from 2016-2017. From 2017-2018, I was an Associate Professor in the Department of Political Science and the College at the University of Chicago. I received my Ph.D. in Political Science from Harvard University in 2010. I received my AB from Wabash College in Mathematics and Political Science in 2005.

5.    In my scholarly research, I develop and apply new statistical methods to study US elections, political communication, the US Congress, and social media. I have taught courses for graduate students on fundamentals for statistical analysis, a "Math Camp" introducing graduate students to basic

3

mathematics they need for graduate school, a graduate course on applying machine learning methods to social science problems in "Model Based Inference," a course on the quantitative analysis of text data in "Text as Data", and a course on making causal inferences called "Causal Inference." At the undergraduate level, I have taught "Introduction to Machine Learning" and our department's introductory course "The Science of Politics." My research and writing on quantitative methods have been published in Political Analysis, the Journal of the American Statistical Association, Proceedings of the National Academy of Science, the Proceedings of the Annual Meeting of the Association for Computational Linguistics, and numerous other journals. I previously served as an Associate Editor at Political Analysis. I have published papers on election administration, evaluating claims of voter fraud, and statistical methods for surveys, and I have presented my research to professional meetings of election administrators.

6.    A current copy of my curriculum vitae is attached to this report as Exhibit A.

7.    In the last four years, I testified at the preliminary-injunction hearing in *VoteAmerica v. Raffensperger*, No. 1:21-CV-1390-JPB (N.D. Ga.) and I was deposed for that case. I was also deposed for *Gilbert v. Lombardo*, No.

4

22-OC-000851B (1st Jud. Dist. Ct. Nev.), and I testified in *Washington County v. Sippel*, No. 22-CV-07782 (Wa. Cnty. Cir. Ct.).

### III.   SUMMARY OF FINDINGS

8.    In the first statewide election after the passage of SB 202, the 2022 midterm election, overall turnout was higher than in the 2014 midterm election. Turnout declined, however, from the most recent midterm election in 2018, but no expert has shown that SB 202 caused this decline. To place these two elections into the historical context, using the voting eligible population ("VEP"), the 2018 midterm election in Georgia had the highest turnout rate of any midterm election in the state since at least 1980, and the 2022 midterm election had the second highest midterm turnout rate since at least 1980. Voters also continued their shift towards using early in-person voting ("early voting") and mail-in absentee ballots ("absentee voting"), though the rate of mail-in absentee voting declined from 2020—which occurred during the recent pandemic. In the 2022 general election, 57.9% of votes were cast using early in-person voting, the highest share of votes cast using early voting since at least 2014. Further, 6.2% of votes were cast using mail-in absentee voting, the highest share of any election I analyze other than the 2020 general election and the 2021 runoff election. Every racial group had increased turnout in 2022

relative to 2014, but turnout rates for some groups declined relative to 2018. Here again, no expert has shown that SB 202 caused this decline.

9.    Georgia's turnout rate in 2022 remained high relative to the turnout rate in other states. This is true both overall and broken down by self-identified racial group. Overall, I find that Georgia's 2022 election had higher turnout than the average turnout rate in other states and had higher turnout than a statistical projection made using Georgia's past voter turnout rates and the turnout rates in other states with similar recent turnout histories, as determined by a machine-learning procedure. I also examined turnout rates by self-identified racial group in North Carolina, South Carolina, and Louisiana, states where the turnout rate by self-identified racial group was available when I wrote this report. I find that Black turnout in these states lags behind the turnout rate in Georgia in the 2022 election and that, in some instances, Black turnout in these states has declined relative to 2014. Other expert reports only examine changes within Georgia or selectively compare Georgia to other states. This necessarily conflates common nationwide changes in the turnout rate with any Georgia specific changes.

10.    SB 202 changed the application window to apply for a mail-in absentee ballot, reducing the application window to between 78 and 11 days prior to the election. I find that before SB 202 was implemented most mail-in

6

absentee ballot applications were already complying with the new application window under SB 202. Further, SB 202 continues to allow disabled voters and voters over 65 to apply for a mail-in absentee ballot once and then receive their ballots for the other elections in the cycle. Across elections prior to the passage of SB 202, I find no consistent differences in when different racial groups applied for mail-in absentee ballots. Further, mail-in ballot applications in previous elections that arrived outside the SB 202 application window were less likely to be successfully voted than mail-in ballot applications that arrived within the SB 202 application window.

11.    Prior to SB 202, particularly in the 2020 election, a large number of mail-in absentee ballots were canceled and then voted in person. In the 2020 election, over 289,000 mail-in absentee ballots were canceled with voters subsequently voting early in person or on Election Day. In the 2022 election, the number of mail-in absentee ballots that were canceled and subsequently voted on Election Day dropped to lower levels than in 2018 and 2020 and the share of mail-in absentee ballots that were canceled and subsequently voted on Election Day dropped to lower levels than in 2016, 2018, and 2020. In the 2022 election, the number and share of mail-in absentee ballots that were canceled and subsequently voted early in person dropped below the 2018 and 2020 levels.

7

12.    Prior to SB 202, the vast majority of mail-in absentee ballots were returned well before Election Day. There are also no consistent differences in the propensity of voters from different self-identified racial groups to return mail-in absentee ballots earlier or later across elections. In the 2022 election, the share of mail-in absentee ballots rejected for arriving after the deadline was lower in than in 2018, but higher than in 2020. No expert has shown that SB 202 caused the increase relative to 2020.

13.    Turning to other substantive changes that SB 202 made to Georgia election law, SB 202 legally established drop boxes in Georgia and provided regulations on where those drop boxes could be located. I examined other experts' claims about drop box use in the 2020 election and provided my own analysis. I show that Dr. Burden's analysis of drop box ballots from the 2020 general election has consequential errors, including a nearly 100% overestimate of the number of ballots returned via drop box in the four days immediately before the election and on Election Day. Using an alternative data source on drop box returns, I calculated that drop box ballots tended to be returned well before the last days of the election cycle.

14.    Using data from the 2020 election, I demonstrate that drop box use is concentrated on a small number of drop boxes: voters tend to return their ballots to a few drop boxes within each county, while many other drop boxes

receive a smaller share of ballots returned via drop box. The extent of this concentration varies by county. In DeKalb County, for example, a single drop box received 42.3% of the mail-in absentee ballots in the county returned by drop box; in Gwinnett County, a single drop box received 30.9% of the mail-in absentee ballots in the county returned by drop box; in Cobb County, one drop box received 25.4% of mail-in absentee ballots in the county returned by drop box; and, in Fulton County, the most used drop box received 9.5% of the mail-in absentee ballots in the county returned by drop box. In Douglas County, I find that a single drop box received 70% of the ballots returned via drop box in the county, and I show that both Black and white voters concentrated their mail-in absentee ballot returns via drop box at this single location.

15.    Plaintiffs' experts Dr. Chatman and Dr. Fraga analyzed the effect of SB 202 on the costs voters incur when returning mail-in absentee ballots via drop box. Neither Dr. Chatman nor Dr. Fraga have data on where voters return their ballots and instead assume voters will use the closest drop box to their residence. They then equate the effect of SB 202 with a measure of how Georgia residents' average distance to the nearest drop box changed from 2020 to 2022. But there is no reason voters will find only the closest drop box to their residence the most convenient drop box to use. In fact, I present a variety of evidence that, in the 2020 election, many Georgia voters did not return their

9

ballot to the nearest drop box, instead choosing a drop box location closer to work, school, or for other reasons. Because many voters do not return their ballot to the nearest drop box, Dr. Chatman's and Dr. Fraga's estimates of SB 202's effect on the cost of returning a ballot via drop box will be biased in an unknown direction and with unknown size. In place of Dr. Chatman's and Dr. Fraga's biased estimates, I use data on voters' actual behavior in Douglas County to calculate one estimate of the effect of SB 202 on the cost incurred to return a ballot via drop box. With this particular data set and quantity of interest, I find that, on average, SB 202 has the largest effect on the distance traveled by white and American Indian voters who returned their mail-in absentee ballot via drop box in 2020.

16.    Another change that SB 202 implemented was the creation of a new procedure to verify mail-in absentee ballots. SB 202 requires mail-in absentee voters to provide information from official identification, relying on either a driver's license, a state voter-identification card, or other forms of identification. I find that the rate at which mail-in absentee ballots were rejected in the 2022 general election and 2022 general election runoff for improper identification was lower than the rate ballots were rejected for missing oath information or signature mismatch in 2018, but higher than in 2020. Again, none of the Plaintiffs' experts have shown that SB 202 is the cause

10

of this election-to-election change in the mail-in absentee ballot rejection rate. Further, I find that the Black-white gap in rejection rates for signature mismatch or incomplete information on ballots in 2018 was larger than the Black-white gap in rejection rates for improper identification when returning a voted mail-in absentee ballot in the 2022 general election and the 2022 runoff election. The non-partisan Carter Center argued that the identification requirements in SB 202 made mail-in absentee voting more efficient.

17. Another change to Georgia election law is that SB 202 prohibits organizations from sending absentee ballot applications to voters who have already applied for a mail-in absentee ballot, with a 5 business-day grace period. While the experiments were not conducted in Georgia, I describe experimental evidence from the literature that implies that postcards mailed to voters are approximately as effective as either blank or pre-filled mail-in absentee ballot applications at encouraging voting by mail-in absentee ballot. Further, prior experimental work has failed to detect a difference in the effect of sending voters blank or pre-filled mail-in absentee ballot applications on either the turnout rate or the rate voters use mail-in absentee ballots to cast their vote. I find that the share of mail-in ballot applications rejected because they were duplicate was lower in the 2022 election than in the 2020 election.

18.    SB 202 also altered the requirements for early voting hours. Overall, I find that the 2022 general election and the 2022 runoff election saw the highest rate of weekend votes cast of any midterm election, and the second highest share of weekend votes cast in a general election, other than the 2020 general election. I find that the share of weekend votes cast in the December 2022 runoff election was higher than the share of weekend votes cast in the January 2021 runoff election. 9.2% of early in person votes in the 2022 runoff were cast on the weekend, up from 5.8% of early in person votes cast on the weekend in the January 2021 runoff election. This is a 58.6% increase in the share of votes cast on the weekend in the runoff.

19.    Dr. Pettigrew asserts that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color." Pettigrew Rep. 29. I show that his evidence for this claim departs from the standard evidence in my field. Dr. Pettigrew uses a simulation as evidence SB 202 will cause an increase in wait time. But simulations only can reflect their underlying assumptions, rather than an estimated causal effect of a policy change. As a result, Dr. Pettigrew's simulation can only establish the logical possibility that wait times at polling places could increase if there were more in person voters. Dr. Pettigrew also describes a procedure to extract wait times from survey data, making a series of assertions about the "likely" bias of

12

that procedure. I show, both theoretically and empirically, his claims about bias are incorrect. Theoretically, I show that the bias from his procedure can cause estimates of the differences in wait times across groups to be too big or too small. Empirically, I use behavioral data from wait times at Election Day voting precincts extracted from cell phone location data to show that Dr. Pettigrew's procedure to calculate wait times from survey data overstates the wait times for groups in this data and sometimes overestimates and sometimes underestimates differences across groups. Because of these issues, I conclude Dr. Pettigrew's method for calculating wait times from survey data is biased, and the direction of the bias is unknown.

20.    Instead, I follow Dr. Burden and Dr. Pettigrew and examine the share of voters who reported wait times longer than 30 minutes to cast their ballot in the 2022 Georgia general election. Using a publicly available survey of Georgia voters conducted after the 2022 general election, I find that in the 2022 election, 4.7% of Georgia voters waited in line more than 30 minutes to vote, lower than averages reported by Dr. Pettigrew. Further, I find the share of Black voters who waited longer than 30 minutes to vote was smaller than the share of white voters who waited more than 30 minutes, though this difference is within the survey's margin of error.

13

21.    While several experts claim that the political effect of SB 202 was easy to anticipate, no expert provided an explicit calculation to support that conclusion. I describe the appropriate formulas for this calculation and then assess the claim in the context of Georgia. I show that even if SB 202 had differential effects across racial groups, that does not imply that SB 202 would benefit one party. In fact, using an illustrative example, I show that the white-Black turnout gap could grow in Georgia, while Republican candidates would become disadvantaged. Reasoning about political effects is challenging because it requires considering the prevalence of groups in the electorate and not just relative changes to the turnout rate.

## IV.    VOTING IN GEORGIA

22.    I begin with an analysis of how Georgians have voted in the last several elections, including the 2022 midterm elections.

### A.    Methodology

23.    To assess who voted in Georgia elections, I used county-level turnout statistics, which I then aggregated to calculate the overall number of votes cast. Specifically, I used summary files about voter turnout, obtained

14

either by downloading the relevant file from the Secretary of State's website or from the Secretary of State's office.[1]

24. To assess differences in turnout rates and voting methods across racial groups, I rely upon voters self-reported racial identity, as tallied in these state turnout statistics. Voters choose to report as American Indian, Asian or Pacific Islander (which I refer to as Asian hereafter), Black, Hispanic, white, or Other and some voters' race is classified as "Unknown." Throughout this report, I focus on the self-reported American Indian, Asian, Black, Hispanic, and white racial groups. When some voters either choose to not self-identify with a racial group or have their self-identity potentially administratively changed to "Unknown" that creates a risk of potentially

---

[1] For the 2022 general election, I used the Statewide.xlsx file from the "SSVRZ422 2022" zip file and the "Precinct turnout by race" folder, which was obtained by counsel. In the 2020 election, I used data downloaded from the secretary of state's data portal, specifically the "General Election 2020 Active, Inactive Voters by Race, Gender_County.xlsx" file. For the 2018 and 2016 election I used the file "SSVRZ376R3.xlsx" which I downloaded from the Secretary of State's office website. The downloaded turnout data from the Secretary of State's website was missing data for 2014, so counsel obtained the file "November 2014 General Election - Active, Inactive Voters by Race Gender - (COUNTY).xlsx". For the January 2021 runoff I used the "General Election Runoff 2021 Active, Inactive Voters by Race, Gender_County.xlsx" file downloaded from the Secretary of State's office website and for the December 2022 election I used the "Statewide.xlsx" which was contained in the "SSVRZ422 2022" zip file obtained from counsel.

underestimating that group's turnout rate. To ensure my conclusions are not dependent solely on misclassified "Unknown" racial identities, in Appendix A I use a statistical technique to infer voters' racial group based on surname and location.

25.    To assess the overall turnout rate and the turnout rate by self-identified racial group, I used estimates of the citizen voting age population ("CVAP") from the Census Bureau.[2] The CVAP is one estimate of who is eligible to vote, but it is imperfect. This is because some of the individuals counted in the CVAP are ineligible to vote due to felony conviction, mental disability, or other disqualifying reason. The estimates that are provided from the Census Bureau come from the 5-year estimates from the American Community Survey estimates of the CVAP. Because these estimates have not been updated for 2022, I use two different estimates of group size to calculate the turnout rate in the 2022 election. First, I use the 2020 group size as the size of the group in 2022. A limitation of this measure is that it will underestimate the size of groups in 2022, therefore causing me to overestimate turnout rates. To avoid this, my second measure of group size uses the historical rate of group growth to construct a plausible estimate of

---

[2] United States Census Bureau, *Citizen Voting Age Population by Race and Ethnicity*, https://tinyurl.com/3vmb5p5p.

16

the group size in 2022.[3] Specifically, I calculated the average 2-year change in the CVAP for a particular group under consideration. I then added the average 2-year change to the 2020 CVAP. This serves as an estimated CVAP for 2022. This method for extrapolation is mathematically similar to methods for linear interpolation commonly used to create estimates of census data in years between the censuses.[4]

### B.    Results

26.    I begin my focus on the overall turnout rate in Georgia for general elections for federal elections from 2014 to 2022. Table 1 shows the overall turnout for federal-level general elections from 2014 to 2022. The first column provides the year of the election. The second column calculates the turnout rate using the CVAP using 2020 population estimates for the 2022 election. The

_____

[3] Dr. Burden uses available census data from 2021, using 2017-2021 5-year averages to estimate the size of the white CVAP and 1-year estimates to estimate the size of the Black CVAP. This is potentially a reasonable estimate of the denominator, but also risks underestimating the size of the groups in 2022 if there has been growth from 2021 to 2022. Dr. Fraga uses (at 14) the 2016-2020 5-year CVAP for all of his turnout calculations. Using a single denominator will cause bias in the estimated turnout rates, because different self-identified racial groups grew at different rates since 2014. That said, this bias does not appear to affect the general patterns of turnout.

[4] As an example, Ansolabehere and Konisky (2006) use interpolation to create estimates for non-census years. Ansolabehere, Stephen, and David M. Konisky. "The introduction of voter registration and its effect on turnout." Political Analysis 14.1 (2006): 83-100.

17

third column calculates the turnout rate using the current CVAP but
extrapolates to estimate the size of the population in 2022 using the average
of the two-year changes.[5]  The fourth column uses data from Dr. Michael
McDonald (2023) to calculate the overall turnout rate from the VEP.[6]  The VEP
is an estimate of the number of individuals who are eligible to vote in a state's
election. The VEP is available at the state-level but is not broken down by
racial group. To calculate the VEP turnout rate in the 2021 and 2022 runoff
elections, I used McDonald's estimates of the VEP in the 2020 and 2022 general
elections, respectively.

27.    Table 1 shows the overall turnout rates in Georgia. Nationally,
turnout tends to be higher in presidential election years than in midterm
election years. This is also true in Georgia, where the highest turnout rates are

---

[5] The estimates in the second and third column in Table 1 are the same except
in 2022.  This is because the only difference in the "trend" column is that in the
denominator for the 2022 turnout rate calculation I have added the average
two-year growth rate for the state to the 2020 population. This estimate of the
denominator reflects historical population changes to guard against
undercounting group size in 2022 and therefore overestimating the turnout
rate. The "trend" column in Tables 2, 4, 5, and 6 will also have the same entries
for all years as the "CVAP" column except for 2022, where in the denominator
I have added the average two-year growth rate of the group to the 2020 group
total.

[6] Michael McDonald, *Voting Statistics*, U.S Elections Project (2023),
https://www.electproject.org/election-data/voter-turnout-data.

found in the 2016 and 2020 elections. Table 1 also demonstrates that the 2018 and 2022 midterm elections had higher turnout rates than the 2014 midterm election, while the 2018 midterm election had a higher turnout rate than the 2022 midterm election. Table 1 also shows that the 2020 presidential election had higher turnout than the 2016 presidential election.

28.    Because the first statewide election after SB 202 is a midterm election, I will first focus on turnout in midterm elections. Table 1 shows that the turnout rate in Georgia's midterm elections has increased since the 2014 midterm election. The 2018 election saw an overall turnout rate increase of 16.7 percentage points over the 2014 election, while the 2022 election saw an increase of 15.2 percentage points over the 2014 election (13.9 percentage points if I take into the trend in Georgia's population size). If we instead use VEP turnout rates, we see similar growth in turnout rates in 2018 and 2022 relative to the midterm election relative to 2014, an increase over 2014 of 15.5 percentage points in 2018, and an increase over 2014 of 14 percentage points in 2022. In fact, 2018 and 2022 had the highest turnout rate in any midterm election in Georgia since, at least, 1982.  Using the VEP, the next closest turnout rate in a midterm election was 2010, when 39.8% of the VEP population cast a ballot. The decrease in turnout rates from 2018 to 2022 is smaller in magnitude than the increase in turnout rates from 2014 to 2018 or

2022. Using the CVAP, I find a 1.6 percentage point lower turnout rate in 2022 than in 2018 (2.8 percentage points lower than 2022 when I consider trends in Georgia's state population size) and using the VEP, I find a 1.5 percentage point lower turnout in 2022 than in 2018.

29.    Table 1 also shows that the turnout rate in the 2020 general election increased over the turnout rate in the 2016 election, though the size of this increase is smaller than the increase observed in the 2018 and 2022 midterm elections over the 2014 midterm election. Overall, using the CVAP, I find the 2020 election's turnout rate was 8.2 percentage points higher than the 2016 election's turnout rate, and I find that the 2020 election had an 8.4 percentage point higher turnout rate than the 2016 election using the VEP. Comparing the CVAP turnout, I find that the increase of the 2022 midterm turnout rate over the 2014 midterm turnout rate is approximately 81% larger than the increase of the 2020 general election turnout rate over the 2016 general election turnout rate.

30.    Table 1 also shows the turnout rate in the Senate runoff election in 2021 and the Senate runoff election in 2022. In the runoff election in 2022, there was a 5.6 percentage point decrease in the turnout rate compared to the November general election, while in the January 2021 runoff election, there was a 7.1 percentage point decrease in turnout compared to the 2020

20

presidential election. Compared to the proximate general election, the relative decline for each runoff election is quite similar. Using the estimates from Column 3, in the runoff in 2022, there was a 10.7% decline from the 2022 general election, while in the runoff in 2021 there was a 10.6% decline from the 2020 general election. If I use the VEP (Column 4), I find a decline from the 2022 general election to the runoff election of 10.6% and a decline from the 2020 general election to the 2021 runoff election of 10.6%.

31.    In Table 2, I present the calculated turnout rate for racial groups in general elections in the state of Georgia since the 2014 Congressional election. The first column contains the year of the election and then each pair of columns provides the corresponding turnout rate for the racial group. The first column in each pair provides the turnout rate using the citizen-voting age population (CVAP) and the second column provides the turnout rate using the CVAP where I have extrapolated the size of the group in 2022 to guard against underestimating group size. I also calculated the turnout rate by self-identified racial group for the Senate runoff in January 2021 and the Senate runoff in December 2022.

21

| Year | CVAP Turnout Rate | CVAP Turnout Rate, Trend | VEP Turnout Rate |
|------|------|------|------|
| 2014 | 0.377 | 0.377 | 0.386 |
| 2016 | 0.589 | 0.589 | 0.598 |
| 2018 | 0.544 | 0.544 | 0.541 |
| 2020 | 0.671 | 0.671 | 0.682 |
| 2022 | 0.529 | 0.516 | 0.526 |
| Runoff, 2021 | 0.600 | 0.600 | 0.610 |
| Runoff, 2022 | 0.473 | 0.461 | 0.470 |

Table 1: Turnout rates in Georgia federal elections from 2014 to 2022, calculated using voter file.

32. Across all racial groups, I find that the turnout rate has increased relative to the 2014 election, though there are differences in the turnout-rate trajectory across racial groups. Focusing first on the midterm elections, among individuals who self-identify as American Indian, both the turnout rate in the 2018 midterm election, 7.7%, and the turnout rate in the 2022 midterm election, 24.7% (23.3% using trends in group size), are larger than the 2014 general election, 2.2%.[7] Similar to individuals who identify as American

---

[7] In Appendix A, I calculate voter turnout using the Statewide voter file, Canceled voter file, and state provided turnout histories. In a separate table, I also use a statistical strategy to impute the racial group of voters classified as unknown, similar to the procedure used in Dr. Fraga's report. The numbers in these tables are similar to the numbers presented here, though the estimates of American Indian turnout rates are higher in Appendix A. There are also important comparative differences for American Indian voters. Appendix A shows the turnout rate for American Indians in 2020 was higher than their turnout rate in 2022 and the gap between 2018 and 2022 is smaller in Appendix A than the gap estimated using state-level data in Table 2. In the remaining cases, Table 38 shows qualitatively similar patterns for those discussed here.

22

Indians, Asian voters saw their highest midterm turnout rate in the 2022 midterm election. In the 2022 midterm election, the Asian American turnout rate was 38.2% (35.3% if we take into account trends in group size), a 24.9 percentage point increase over the 2014 midterm election (22 percentage point increase taking into account trend in group size) and a 3.9 percentage point increase relative to 2018 (1 percentage point if I take into account trends in group size).

| | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.022 | 0.022 | 0.133 | 0.133 | 0.352 | 0.352 | 0.102 | 0.102 | 0.387 | 0.387 |
| 2016 | 0.066 | 0.066 | 0.369 | 0.369 | 0.520 | 0.520 | 0.304 | 0.304 | 0.590 | 0.590 |
| 2018 | 0.077 | 0.077 | 0.343 | 0.343 | 0.495 | 0.495 | 0.275 | 0.275 | 0.539 | 0.539 |
| 2020 | 0.157 | 0.157 | 0.599 | 0.599 | 0.572 | 0.572 | 0.403 | 0.403 | 0.671 | 0.671 |
| 2022 | 0.247 | 0.233 | 0.382 | 0.353 | 0.433 | 0.417 | 0.246 | 0.223 | 0.542 | 0.537 |
| Runoff, 2021 | 0.133 | 0.133 | 0.504 | 0.504 | 0.525 | 0.525 | 0.314 | 0.314 | 0.599 | 0.599 |
| Runoff, 2022 | 0.218 | 0.205 | 0.327 | 0.303 | 0.401 | 0.386 | 0.207 | 0.188 | 0.479 | 0.475 |

Table 2: Voter Turnout by Self-Reported Racial Group, Calculated Using State-Provided Election Returns

33.    Black voters also have a higher turnout rate in recent midterm elections compared to 2014. Black voters turned out at a rate of 49.5% in the 2018 midterm election, an increase of 14.3 percentage points relative to the 2014 election, and at a rate of 43.3% in the 2022 midterm election (41.7% if accounting for trends in the size of the Black CVAP in Georgia), an increase of 8.1 percentage points (6.5 percentage points when the trend in the size of Black population is taken into account). Unlike American Indian and Asian voters, the Black turnout rate declined in the 2022 midterm election relative to the

23

2018 midterm election, 6.2 percentage points (7.8 percentage points using the
estimate based on the trend in the Black CVAP). Hispanic voters have turned
out in recent midterm elections at a higher rate than in the 2014 midterm
election. Hispanic voter turnout rate in 2018 was 27.5%, a 17.3 percentage
point increase over the 2014 midterm election. And in the 2022 midterm
Hispanic turnout was 24.6%, a 14.4 percentage point increase over the turnout
in the 2014 midterm election (a 12.1 percentage point increase when I account
for trends in the size of the Hispanic voting age population in Georgia). Like
Black voters, Hispanic voters saw a decline in their turnout rate in 2022
relative to 2018, with a decrease of 2.9 percentage in their turnout rate in the
2022 midterm election relative to the 2018 midterm election (a 5.2 percentage
point decline when I account for trends in the size of the Hispanic CVAP).

34.    Finally, white voters also saw an increase in their turnout over the
2014 midterm election. In 2018, white turnout was 53.9%, an increase of 15.2
percentage points over the 2014 midterm election. In 2022, white turnout was
54.2%, an increase of 15.5 percentage points over the 2014 midterm election
(an increase of 15 percentage points when I take into account the trends in the
size of the white CVAP). Whether white turnout increased or decreased
relative to the 2022 election depends on whether I take into account the trends
in the white CVAP. If I used the reported data from the Census Bureau for

24

2020, then the white turnout rate increased approximately 0.3 percentage points. If I consider trends in the size of groups, I find the white turnout rate decreased approximately 0.2 percentage points.

35.   I also found a large increase in the 2020 turnout rate relative to the 2016 turnout rate, though for each self-identified group, the size of this increase is similar or smaller than the increase from 2014 to the 2022 election. Compared to the 2016 general election, in the 2020 general election, American Indian turnout increased 9.1 percentage points, while American Indian turnout increased 22.5 percentage points from 2014 to 2022 (21.1 percentage points taken into account trends in the American Indian CVAP). Asian American turnout increased 23 percentage points from the 2016 to 2020 general election, while Asian American turnout increased 24.9 percentage points from the 2014 to 2022 general election (22 percentage points taken into account trends in the Asian CVAP). Black turnout increased 5.2 percentage points from the 2016 to 2020 general election, while Black turnout increased 8.1 percentage points from 2014 to 2022 general election (6.5 percentage points taking into account trends in the Black CVAP). Hispanic turnout increased 9.9 percentage points from the 2016 to 2020 general election, while Hispanic turnout increased 14.4 percentage points from the 2014 to 2022 general election (12.1 percentage points taking into account trends in the Hispanic

25

CVAP). And, finally, white turnout increased 8.1 percentage points from the 2016 to 2020 general election, while white turnout increased 15.5 percentage points from the 2014 to 2022 general election (15 percentage points taking into account trends in the white CVAP).

## V.    COMPARING GEORGIA TURNOUT RATE TO OTHER STATES

36.    To provide context for Georgia's turnout trends since 2014, I made two kinds of comparisons. First, I compared Georgia's overall turnout rate to overall turnout rates in other states. Second, I used available data from three states–North Carolina, South Carolina, and Louisiana–to compare trends in turnout rates by self-identified racial groups across the states. Neither of the analyses I undertake should be interpreted as a causal estimate of the effect of SB 202. Interpreting these estimates as causal effects would require strong assumptions that are unlikely to hold in this setting.

37.    Nevertheless, comparing Georgia's turnout rate across states demonstrates that the turnout rates observed in Georgia in 2022 are consistent with patterns observed in other states—both in the aggregate and broken down by self-identified racial groups. These comparisons are essential, because focusing on trends in Georgia turnout alone could result in confusing nationwide patterns in turnout for Georgia specific trends in the turnout rate.

26

Most notably, the 2020 election was distinct for many reasons.[8] The COVID-19 pandemic caused many states, including Georgia, to alter how it administered its elections. But beyond the obvious case of 2020 and the pandemic, other nationwide factors that are related to turnout rates include which party holds the presidency and the Congress, whether a particular election is a midterm or not, and nationwide economic conditions. This problem is particularly acute when comparing turnout data before and after a law is put in place in a state. It is possible that within state trends in turnout after any law is put in place could merely reflect a broader national trend. This is impossible to diagnose without examining other states.

38.    Other experts avoid making comparisons of Georgia's turnout to other states. For example, after examining changes in turnout and how Georgia voters cast their ballot before and after SB 202, Dr. Fraga acknowledges that "[a] number of factors may influence voter turnout rates in any given election beyond changes in voting laws, both between and across racial/ethnic groups." Fraga Rep. 20. Dr. Fraga contends that "this includes

---

[8] For further details about the distinct conditions of the 2020 election, see Stanford-MIT Healthy Elections Project, *The Virus and the Vote: Administering the 2020 Election in a Pandemic* (Jul. 1, 2021), https://tinyurl.com/2p98hn69.

the level of competition in elections, mobilization by partisan and non-partisan campaigns and organizations, and historical factors such as the history and enduring effects of racial discrimination." *Id.* He explains that, to render the data comparable, he "attempt[s] to make comparisons that hold these factors constant to the degree possible. For instance, each of the election dates from 2018-2022 that I analyze had highly competitive, statewide elections on the ballot in Georgia" in order to calculate "estimates of the impact of SB202 on voters." *Id.* at 20–21.

39.    Yet, making a within Georgia comparison to estimate the "impact" of SB 202 requires the strong assumption that the only difference in conditions in the election before and after SB 202 is the implementation of the bill.[9] But national conditions changed at the same time that SB 202 was implemented in Georgia. In the 2018 and 2020 elections, there was a Republican president, while in 2022 there is a Democratic president. During the 2018 election, Republicans controlled the House and the Senate, and, during the 2022 election, Democrats were attempting to defend small margins in both the House and Senate. Other conditions changed nationally. During the 2020

---

[9] Hausman, Catherine, and David S. Rapson. "Regression discontinuity in time: Considerations for empirical applications." *Annual Review of Resource Economics* 10 (2018): 533-552.

election, the coronavirus was salient and disrupting many Americans' routines, and the pandemic caused several states—including Georgia—to alter their election administration practices.[10] In the 2022 election, the spread of COVID-19 was still a concern, but the virus was less disruptive of election administration.[11] No matter how similar the 2018, 2020, and 2022 elections (and any associated runoffs) were, examining only changes in Georgia cannot address these nationally changing conditions.

40.    Other experts for the plaintiffs make comparisons that neglect key differences in the elections. For example, Dr. Cobb writes (at 9–10):

> The more than 3.5 million voters who cast ballots in the December 5, 2022, senatorial runoff election reportedly set a record for midterm runoff elections, sparking claims by proponents of SB202 that the restrictions imposed by SB202 had no effect on political participation in Georgia. Yet, a comparison of the 2022 runoff with the January 2021 runoff for the same senate seat suggests otherwise, with respect both to the number of people who voted in each contest and the means by which they voted. Total turnout fell from 57 percent of those registered in 2021 to 51 percent a year later, reflecting an absolute decline of some 940,000 voters. As Figure 3 indicates, the share of the ballots cast by mail fell by

---

[10] Stanford-MIT Healthy Elections Project, *The Virus and the Vote: Administering the 2020 Election in a Pandemic* (Jul. 1, 2021), https://tinyurl.com/2p98hn69.

[11] Cecelia Smith-Schoenwalder, *How COVID-19 Will Shape the 2022 Midterm Elections*, U.S. News (Oct. 26, 2022), https://www.usnews.com/news/elections/articles/the-coronavirus-and-the-2022-elections.

nearly 80 percent (reflecting an absolute decline of nearly 900,000)
as the share cast on election day rose by more than 50 percent.

Yet this comparison neglects several relevant details that make it impossible
to attribute differences in voter turnout solely to SB 202. For example, the
January 2021 election followed a record-breaking high turnout in the 2020
general election, while the December 2022 election followed a midterm
election. It is well known that turnout rates are lower nationally in midterm
elections.[12] Further, as Dr. Cobb acknowledges (at 10), the January 2021 runoff
election determined party control in the Senate, while party control in the
Senate was determined before the December 2022 runoff election.

41.    To compare the changes in Georgia's overall turnout rate to the
change in turnout rates nationally, I compared the aggregate turnout rate in
Georgia to the turnout rate in all other states using the voting-eligible
population as the denominator. Table 3 compares the turnout rates to all other
states to the turnout rate in Georgia elections since 2014. In the second column,
I calculated Georgia's turnout rate in each general election from 2014 to 2022

---

[12] See, for example, Michael P. McDonald, *Voter Turnout Demographics*, U.S.
Elections Project (2023), https://www.electproject.org/election-data/voter-
turnout-demographics.

30

using the voting-eligible population, using data from Michael McDonald.[13] This column is identical to Column 4, Table 1). In the third column I calculated the voting eligible turnout rate for all states other than Georgia. The third column of Table 3 demonstrates well known patterns in turnout rates in federal elections. Midterm elections (2014, 2018, and 2022) tend to have lower turnout than presidential elections (2016 and 2020). Table 3 also shows that compared to the 2014 midterm election, there was a higher turnout rate in the 2018 and 2022 midterm elections, though nationally turnout in 2022 declined relative to 2018. And turnout in 2020 was higher than in 2016.

| Year | Georgia Turnout Rate | Other States' Turnout Rate |
|------|---------------------|---------------------------|
| 2014 | 0.386 | 0.367 |
| 2016 | 0.598 | 0.604 |
| 2018 | 0.541 | 0.509 |
| 2020 | 0.682 | 0.679 |
| 2022 | 0.526 | 0.470 |

Table 3: Comparing the turnout rate in Georgia to the turnout rate in all other states from 2014 to 2022, based on the voting eligible population.

42.    Compared to the nationwide turnout rate, Georgia's turnout rate has been higher than the national average, particularly in midterm elections, since 2018. In 2018, Georgia's turnout rate was 3.2 percentage points higher

---

[13] For 2022, I used McDonald's preliminary estimates and in 2020 I used total ballots cast as the measure of turnout. In 2018, 2016, and 2014 I used ballots cast for highest office, to avoid missing data in the total ballots cast measure.

than the national average. In 2022, Georgia's turnout rate was 5.6 percentage points higher than the average in other states.

43.     I also examined how Georgia's VEP turnout rate in 2022 compared to other states' turnout rates, taking into account a variety of trends happening across turnout rates in the country. As a data input into this calculation, I used the voting-eligible population turnout rate from 2000 to 2022, calculated by McDonald (2023). I then used econometric techniques that account for a variety of potential differences across states. To be clear, as I explain below this estimate should not be interpreted as the causal effect of SB 202, because the comparisons I make will conflate the implementation of SB 202 with a variety of other 2022 election specific factors that changed at the same time.

44.     Using these econometric techniques, I find that Georgia turnout, relative to other states, remained high in the first election after SB 202. As a first approach, to take into account trends from other states, I used a two-way fixed effects model to compare Georgia's turnout in 2022 to other states. A two-way fixed effect model removes any fixed state-level differences and accounts for common shifts in the turnout rate in a particular election cycle.[14] Using this

---

[14] Angrist, Joshua D., and Jörn-Steffen Pischke. Mostly harmless econometrics: An empiricist's companion. Princeton University Press, 2009.

method, I find that Georgia turnout was about 8.9 percentage points higher than if it had followed along parallel trends with other states. Of course, there are a number of differences in Georgia, including the recent highly competitive statewide elections, which explains why Georgia departs from a parallel turnout trend with other states.

45.     Using an even more flexible approach to compare Georgia to other states with similar turnout histories, I find that Georgia's turnout rate in 2022 remained high relative to other similar states and Georgia's own historical turnout rate. To perform this calculation, I used a statistical technique known as a "generalized synthetic control." Generalized synthetic control methods use a machine learning algorithm to generate a "synthetic" Georgia using the turnout rates in other states to approximate Georgia's historical turnout rate. To do this, generalized synthetic control methods flexibly estimate common patterns in states' turnout rates over time. Based on the identified common patterns, the state's prior turnout history, and nationwide changes in turnout, generalized synthetic control uses the "synthetic" Georgia to make a projection

33

of what the state's future turnout will look like.[15] I then compared Georgia's actual turnout rate in 2022 to this historical projection.

46.    To apply the generalized synthetic control method I used the gsynth package in the R programming language, using the VEP turnout data from 2000 to 2022.[16] Using this method, I find that Georgia's overall turnout in 2022 is 8.8 percentage points higher than this model predicts for 2022 using historical data from Georgia and other states. I find a similar difference between Georgia's turnout in 2022 and its average as calculated using the machine learning procedure if I use a slightly different specification, or if I expand the years included in the model to 1980. While Georgia turnout remains higher than the generalized synthetic control method would predict, the assumptions required to interpret this as a causal effect are extremely strong. This is because numerous other factors changed in Georgia along with SB 202. For example, in 2022 Georgia had a highly competitive Gubernatorial and Senate election and a general trend towards becoming a more politically

---

[15] Xu, Yiqing. "Generalized synthetic control method: Causal inference with interactive fixed effects models." Political Analysis 25.1 (2017): 57-76.

[16] Xu, Yiqing, Licheng Liu, and Maintainer Yiqing Xu. "Package 'gsynth'." (2018). The R programming language is a standard statistical programming language widely used across several fields. R, *The Comprehensive R Archive Network*, https://cran.r-project.org/.

competitive state. While Drs. Fraga and Cobb argue that "countermobilization" may be one such explanation, they offer no direct evidence of the effect of third-party groups on the turnout rate in Georgia. Fraga Rep. 20; Cobb Rep. 33–34.

47.    I also contrasted the trends in turnout rates by self-identified racial groups in Georgia with the trends in turnout rates by self-identified groups in three states where information on turnout by racial group is available from the voter file and where turnout data was available for download at the time of analysis: Louisiana, North Carolina, and South Carolina. In each state I used official tallies on the total number of ballots that were cast and the ballots cast by each racial group.[17] I then calculated the turnout rates using the CVAP in each state, along with a measure of the CVAP that takes into account trends in the group's population over the years included in the study.[18] In Tables 4, 5, and 6, I present the calculated turnout rates for

---

[17] Specifically, for Louisiana I used the registered and participated numbers from the Louisiana Secretary of State, *Post Election Statistics – statewide*, https://tinyurl.com/526f4yrt, for North Carolina I aggregated historical precinct level information from the North Carolina State Board of Elections, *Voter History Data*, https://tinyurl.com/5n6zzm8t, and for South Carolina I used voter history data from the South Carolina Election Commission, *Voter History Results*, https://tinyurl.com/3ucetj8x.

[18] Just like in Georgia, in each state I calculated the average of the 2-year change in the CVAP for each group and overall. I then added the average of those changes to the 2020 CVAP.

35

statewide federal elections from 2014 to 2022. Each state shows a decline in Black voter turnout from 2018 to 2022. Further, the magnitude of the decrease in Black turnout is larger than the decrease in Georgia, both in absolute and relative terms. To reiterate, this is not a causal comparison, as numerous factors vary across states, including the competitiveness of elections and salience of campaigns. Nevertheless, it reveals a common trend across states.

| Year | Black | | Other | | White | | Total | |
|------|-------|------|-------|------|-------|------|-------|------|
| | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.416 | 0.416 | 0.265 | 0.265 | 0.477 | 0.477 | 0.447 | 0.447 |
| 2016 | 0.546 | 0.546 | 0.437 | 0.437 | 0.637 | 0.637 | 0.597 | 0.597 |
| 2018 | 0.404 | 0.404 | 0.295 | 0.295 | 0.472 | 0.472 | 0.440 | 0.440 |
| 2020 | 0.558 | 0.558 | 0.490 | 0.490 | 0.673 | 0.673 | 0.626 | 0.626 |
| 2022 | 0.327 | 0.323 | 0.255 | 0.241 | 0.462 | 0.462 | 0.407 | 0.404 |

Table 4: Turnout rate by self-identified racial group, measured using citizen voting age population in Louisiana.

48.    Table 4 contains the calculated turnout rate for Louisiana. Unlike in Georgia, Louisiana has not seen an increase in midterm election turnout since 2014. Overall, I calculated that 44.7% of the CVAP voted in the 2014 election, while 44.0% voted in the 2018 election, and this declined to 40.7% of the CVAP in 2022. Unlike in Georgia, Louisiana saw a decline in Black turnout relative to 2014. Compared to 2014, the Black turnout rate decreased 8.9 percentage points in 2022 (9.3 percentage points taking into account trends in Louisiana's Black CVAP). As mentioned previously, Black turnout in Georgia

rose 8.1 percentage points (6.5 percentage points taking into account trends in the size of the Black CVAP). Similar to Georgia, there was a decline in Black turnout from the 2018 to 2022 midterm election, but the decline in Louisiana was larger in absolute terms and larger relatively. In 2018, I estimated that 40.4% of the Black CVAP turned out to vote in Louisiana. This declined to 32.7% in 2022 (32.3% if I take into account trends in the size of the Black CVAP in Louisiana). This decline of 7.7 percentage points is larger than the 6.2 percentage point decline in Black turnout in Georgia (taking into account trends in each state's Black CVAP, the share of the Black CVAP who votes in Louisiana declines 8.1 percentage points, while the share of the Black CVAP in Georgia declines 7.8 percentage points). It is also larger as a share of the 2018 electorate. In Louisiana, there was a 19.1% decline in Black turnout, compared to an 12.5% decline in Georgia (taking into account trends the decline is 20% in Louisiana and 15.8% in Georgia).

| Year | American Indian CVAP | CVAP Trend | Asian CVAP | CVAP Trend | Black CVAP | CVAP Trend | White CVAP | CVAP Trend | Total CVAP | CVAP Trend |
|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 0.133 | 0.133 | 0.164 | 0.164 | 0.415 | 0.415 | 0.436 | 0.436 | 0.419 | 0.419 |
| 2016 | 0.240 | 0.240 | 0.437 | 0.437 | 0.631 | 0.631 | 0.674 | 0.674 | 0.662 | 0.662 |
| 2018 | 0.177 | 0.177 | 0.305 | 0.305 | 0.467 | 0.467 | 0.525 | 0.525 | 0.506 | 0.506 |
| 2020 | 0.273 | 0.273 | 0.502 | 0.502 | 0.628 | 0.628 | 0.700 | 0.700 | 0.726 | 0.726 |
| 2022 | 0.156 | 0.152 | 0.304 | 0.277 | 0.381 | 0.370 | 0.529 | 0.520 | 0.496 | 0.483 |

Table 5: Turnout rate by self-identified racial group, measured using citizen voting age population in North Carolina

37

49.    Table 5 contains the calculated turnout rate for North Carolina. Like in Georgia, in North Carolina, there was an increase in midterm turnout rates since 2014. In 2014, the overall turnout rate was 41.9%, which increased to 50.6% in 2018. The 2022 turnout rate, 49.6% (48.3% if I take into account trends in the CVAP), is higher than the turnout rate in 2014, but slightly lower than the turnout rate in 2018. Unlike in Georgia, the Black turnout rate in North Carolina in the 2022 election declined relative to the 2014 election. The Black turnout rate in 2022 is 38.1% (37.0% if I take into account trends in the Black CVAP). This is lower than in 2014, with 41.5% Black turnout, and in 2018. I also find that the Black turnout rate in 2022 was lower than the 2018 Black turnout rate, where the Black turnout rate was 46.7%. Based on North Carolina data on turnout by self-identified racial group, I find an 8.6 percentage point decline in Black turnout from 2018 to 2022 (a 9.7 percentage point decline when taking into account trends in Black CVAP). This decline represents 18.4% of the turnout rate in 2018, a larger relative decline than the 12.5% decline in Georgia (taking into account trends in CVAP size, this decline is 20.8% in North Carolina and 15.8% in Georgia).

38

| Year | Other CVAP | Other CVAP Trend | White CVAP | White CVAP Trend | Total CVAP | Total CVAP Trend |
|------|------|------|------|------|------|------|
| 2014 | 0.328 | 0.328 | 0.363 | 0.363 | 0.352 | 0.352 |
| 2016 | 0.523 | 0.523 | 0.620 | 0.620 | 0.589 | 0.589 |
| 2018 | 0.402 | 0.402 | 0.485 | 0.485 | 0.459 | 0.459 |
| 2020 | 0.571 | 0.571 | 0.695 | 0.695 | 0.655 | 0.655 |
| 2022 | 0.316 | 0.306 | 0.509 | 0.496 | 0.447 | 0.434 |

Table 6: Turnout rate by self-identified racial group, measured using citizen voting age population in South Carolina.

50.     Table 6 contains the calculated turnout rate in South Carolina. Unlike Georgia, Louisiana, and North Carolina, South Carolina only reports data on whether a voter is white or non-white (labeled "Other" in Table 6). Overall, South Carolina has seen an increase in turnout in midterm elections since 2014. In 2022, 44.7% of the CVAP participated in the election (43.4% if I take into account trends in the CVAP). This is an increase from 35.2% in 2014, but a decrease from 2018. In South Carolina, however, the turnout rate for individuals who self-identify as non-white declined in 2022 compared to 2014 and 2018. In 2022, 31.6% of the non-white CVAP participated in the election (30.6% if I take into account trends in the CVAP population). This is down from 32.8% in 2014 and 40.2% in 2018. This decrease is larger in both absolute terms–8.6 percentage points in South Carolina, 6.2 percentage points in Georgia–and relative terms–21.4% in South Carolina and 12.5% in Georgia— than the decrease in Black turnout in Georgia. Taking into account trends in

39

the CVAP, I find the decline in non-white turnout in 2022 declined 9.6 percentage points from 2018 and decreased 23.9%, both still larger than the decline in Georgia. To be clear, in South Carolina this is less of a direct comparison to Georgia because the "Other" category contains non-Black individuals.

51.    Journalistic accounts of turnout in the 2022 midterm election have also found evidence of a decline in Black turnout relative to the Black turnout rate in the 2018 midterm election in other states. One data journalist, New York Times' reporter Nate Cohn, found suggestive evidence that Black turnout was down nationwide.[19] After also examining Georgia, North Carolina, and Louisiana, Cohn observed that turnout was down in several major cities where a large share of the voting-age population is Black. Cohn finds that the turnout rate in Philadelphia, Detroit, Milwaukee, and Cleveland decreased relative to 2018, while the turnout rate outside of these cities in Pennsylvania, Michigan, Wisconsin, and Ohio increased. This analysis is limited: it is based on aggregate data and does not show specifically that Black voters turned out at

---

[19] Cohn, Nate. "Black Turnout in Midterms Was One of the Low Points for Democrats." New York Times. 11/30/2022.

a lower rate. Nevertheless, it is evidence consistent with lower Black turnout outside of Georgia, North Carolina, and Louisiana.

## VI.  EVIDENCE ON HOW GEORGIA VOTERS CAST THEIR BALLOTS

52.    I also investigated how Georgia voters cast their ballots. To learn how voters cast their ballots, I obtained the absentee voter history for statewide general elections from 2014 to 2022 from the Secretary of State's online data source.[20] I then merged the absentee voter list, the voter history from the Secretary of State's office, and the counsel provided Georgia registration file pulled on November 8, 2022.[21] I then subset to voters who are recorded as having cast a ballot in the election.

53.    Using this merged data set, I examined how Georgia voters cast their ballots. In Table 7, I calculated the share of ballots cast each year using early voting (Column 2), absentee mail voting (Column 3), and Election Day voting (Column 4). Each row describes the share of voters in that election who cast their ballots using each of the three methods. And therefore, the shares in

---

[20] Georgia    Secretary    of    State,    *Georgia    Absentee    Voter    Records*, https://sos.ga.gov/page/voter-absentee-files.

[21] I compared the self-identified racial group for registered voters in the March 2022 registration file as well. I found a small number of changes, so using the March 2022 registration file would have only a small effect on the numbers presented here.

each row sum to 1. The bottom two rows contain the calculated rate of early,
mail-in absentee, and Election Day voting for the January 2021 and December
2022 runoff.

| Year | Early Voting | Mail Voting | Election Day |
|---|---|---|---|
| 2014 | 0.326 | 0.041 | 0.633 |
| 2016 | 0.531 | 0.049 | 0.421 |
| 2018 | 0.478 | 0.056 | 0.466 |
| 2020 | 0.537 | 0.261 | 0.202 |
| 2022 | 0.579 | 0.062 | 0.360 |
| January, 2021 | 0.461 | 0.239 | 0.298 |
| December, 2022 | 0.485 | 0.053 | 0.461 |

Table 7: Share of ballots cast using early, mail, and Election Day voting.

54.    Table 7 shows that, since 2014, Georgia voters have shifted how
they cast their ballots. The share of votes cast in-person during the early voting
period has increased from 2014 to 2022. In 2014, 32.6% of votes were cast in-
person during the early voting period. This increased to 57.9% of votes in the
2022 election, the largest share of votes cast using early in-person voting. The
increase from 2014 to 2022 is an increase of 25.3 percentage points,
constituting a 77.6% increase in the share of ballots cast using early voting.
The share of votes from early in-person voting in 2020 was 53.7%, similar to
the share of early in person votes in 2016 (53.1%). The use of absentee voting
has also increased since 2014, but the 2020 presidential election saw the
highest rate of mail-in absentee voting. In 2014, 4.1% of votes were cast using
mail voting. This increased in the 2016 election to 4.9% and in the 2018 election

42

to 5.6%. The 2020 general election saw, by far, the largest share of votes cast using mail-in absentee voting with 26.1% of votes cast using mail-in absentee voting. The next highest share of votes cast using mail-in absentee voting in a general election was in the 2022 midterm election, where 6.2% of votes were cast using mail-in absentee voting–constituting a 51% increase over the use of absentee ballots in the 2014 midterm election. The result of a larger share of early in-person voting and absentee mail voting is that Election Day voting has declined since 2014. In 2014, 63.3% of votes were cast on Election Day. By 2022, the share of Election Day votes had declined to 36.0%. The lowest share of Election Day voting occurred during the 2020 election, where 20.2% of votes were cast on Election Day.

55.    I also calculated how ballots were cast during the January 2021 and the December 2022 runoff elections. In the January 2021 runoff election, 46.1% of ballots were cast using in person early voting, compared to 53.7% during the 2020 presidential election, a decline of 14.2%. In the December 2022 runoff election, the relative decline in the rate of in-person voting was of similar size. In the December 2022 runoff election, 48.5% of ballots were cast using in person early voting, compared to 57.9% in the 2022 midterm election, a decline of 16.2%. In both the January 2021 runoff election and the December 2022 midterm election, there was a decline in the share of ballots cast using

43

mail-in absentee votes from the proximate general election, but the relative decline was larger in the 2022 runoff than in the 2021 runoff election. In the January 2021 runoff election, 23.9% of votes were cast using mail-in absentee ballots, compared to 26.1% cast using mail-in absentee ballots in the general election, a decline of 8.4%. In the December 2022 runoff election, 5.3% of votes were cast using mail-in absentee ballots, compared to 6.2% cast using mail-in absentee ballots in the 2022 general election, a decline of 14.5%. And in both the January 2021 runoff and the December 2022 runoff elections, there was an increase in the share of ballots cast using Election Day in-person votes, with a larger relative increase in the share of votes cast on Election Day in the January 2021 runoff than in the December 2022 runoff election. In the January 2021 runoff election, 29.8% of votes were cast using in person Election Day voting, while 20.2% were cast using in-person Election Day voting in 2020. This increase of 9.6 percentage points constitutes a relative increase of 47.5% over the 2020 general election. In the December 2022 runoff election, 46.1% of votes were cast using Election Day in-person voting, compared to 36.0% in the 2022 general election. This 10.1 percentage point increase constitutes a relative increase of 28.1%. To place the rates of Election Day voting in the December 2022 runoff election into context, a larger share cast their ballot via early in-person voting in the December 2022 runoff election than in the 2018 general

44

election (48.5% compared to 47.8%), fewer votes were cast via mail-in absentee ballot (5.3% compared to 5.6%), and fewer votes were cast using in-person Election Day voting (46.1% versus 46.6%).

56.    I next examined how the share of votes from early in-person voting, mail-in absentee voting, and Election Day voting varied across self-reported racial groups. Figure 1 shows the share of votes from each voting method for self-identified American Indian (top-left facet), Asian American (top-center), Black (top-right), Hispanic (bottom-left), and white (bottom-center) voters. In each facet the orange line represents the share of votes from early in-person voting, the blue line represents the share of votes from mail-in absentee voting, and the green line represents the share of votes from Election Day voting.

45



Figure 1: Share of votes cast by method for self-reported racial groups.

57.     There are common patterns across the self-reported racial groups. Each group saw its highest share of votes from Election Day voting in 2014, its lowest share in 2020, and the second-lowest share in 2022. Further, each group saw the highest share of mail voting in the 2020 election, with voters using mail voting at lower rates in the other elections. And finally, each group has increased its share of votes cast using early in-person voting, with early in-person voting constituting the most used voting method for every group in 2020 and every group except for Hispanic voters in 2022.

46

58.    **American Indian Voters** Focusing first on American Indian voters, the share of votes from early in-person voting increased from 26.8% in 2014 to 51.2% in the 2022 election, with 50.9% of votes from early in-person voting in the 2020 election. The share of votes cast using Election Day voting has also declined over the period I analyzed. In 2014, 70.8% of votes from American Indian voters were cast on Election Day. By 2022, that share of votes declined to 43.7%, which was an increase from the 24.7% of votes cast on Election Day in 2020. In the 2020 election, 24.0% of votes came from mail-in absentee voting, the largest share of votes from this source from 2014 to 2022. The next highest use of mail-in absentee voting was in 2022, where 5.02% of votes came from mail-in absentee voting. In 2018, 4.93% of votes for American Indian voters came from mail-in absentee votes.

59.    **Asian American Voters** Asian American voters have also seen an increase in the share of votes cast during early in-person voting. In 2014, 19.6% of Asian American votes were cast using early in-person voting. By 2022, the share of votes from the early voting period was 51.8%, and, in 2020, the share of votes from early voting was 44.7% of votes. Like other groups, Asian Americans in 2020 cast the largest share of their votes using mail-in absentee voting, with 39.8% of votes cast using a mail ballot. In 2022, 9.24% of votes were cast using mail ballots, lower than the share of mail ballots in 2018

47

(11.6%), but higher than the share of mail-in absentee ballots in 2016 (6.26%) and 2014 (3.6%). The share of Asian American voters who cast their ballot on Election Day votes declined from 76.7% in 2014 to 38.8% in 2022. The lowest share of votes from Election Day voting occurred in 2020, where 15.1% of votes were cast on Election Day. The share of votes cast on Election Day for Asian Americans in 2022 was lower than the share of Election Day votes cast in 2014, 2016, and 2018.

60.    **Black Voters** Like other racial groups, self-identified Black voters saw an increase in the share of votes cast using early voting. In 2014, 38.6% of votes from Black voters were cast using early in-person voting. This increased to 63.7% in 2022, higher than the share in 2016 (55.6%) and in 2020 (52.5%). In 2020, 29.4% of votes were cast using mail-in absentee ballots. This is an increase over the share of votes cast using absentee ballots in 2018 (7.25%) and in 2022 (7.48%). And like other groups, the share of votes cast on Election Day has decreased since 2014. In 2022, the share of votes cast on Election Day was 28.8% of all votes, while, in 2014, that share was 57.9%. The smallest share of votes from Election Day voting occurred in 2020, when 17.9% of votes were cast on Election Day.

61.    **Hispanic Voters** Self-identified Hispanic voters have also seen an increase in the share of their votes cast during early voting, though there

48

has been less of a shift away from Election Day voting for Hispanic voters than other groups. In 2022, 47.6% of votes from self-identified Hispanic voters was cast during early in-person voting. This was less than in 2020, when 49.6% of Hispanic votes were cast using early in-person voting. But this is an increase compared to 2014 (19.5%), 2016 (41.7%), and 2018 (33.9%). Also similar to other groups, in 2020, a larger share of self-identified Hispanic votes were cast using a mail-in absentee ballot than in other years. In 2020, 23.3% of Hispanic votes were cast using a mail-in absentee ballot, an increase over 2018 (6.34%) and 2022 (4.46%). The share of votes cast on Election Day has declined since 2014, when 78.0% of votes from self-identified Hispanic voters were cast on Election Day. This declined to 47.8% in 2022 and was 26.9% in 2020. Self-identified Hispanic voters cast the largest-share of their votes on Election Day compared to other racial groups.

62.    **White Voters** Self-identified white voters also saw an increase in the share of their votes cast during early voting. In 2014, 30.6% of votes from self-identified white votes were cast using early in-person voting. The share of votes from white voters cast during the early voting period increased to 54.6% in 2020 and increased further to 55.9% in 2022. The share of white votes cast using a mail ballot peaked in 2020, with 24.0% of votes cast using a mail ballot. In 2022, 5.63% of votes from white voters were cast using absentee ballots,

49

which is similar to the share of votes cast using absentee ballots in 2018 (4.61%), 2016 (5.35%), and 2014 (4.57%).



Figure 2: Comparing shares of votes from early in person voting and absentee mail voting.

63.    In order to make a direct comparison of how different racial groups vote in Georgia elections, Figure 2 compares the share of votes from each racial group cast early (left-facet) and the share of votes cast using mail votes (right-facet). This comparison demonstrates that across racial groups in 2022 Black voters cast the largest share of votes using early voting and the second highest share of votes using mail voting. As a result, Black voters in 2022 cast the largest share of their votes using absentee voting methods. In 2022, 71.2% of

votes from Black voters were cast using either early in person or mail-in absentee voting. This is 9.7 percentage points more than white voters, 10.2 percentage points more than Asian American voters, 15 percentage points more than American Indian voters, and 19.1 percentage points more than Hispanic voters. For all racial groups, the highest rate of using absentee voting methods was in 2020 and the second highest was in 2022.

64.     Dr. Lee opines that "[w]hile disaggregated numbers for absentee voting by race and ethnicity for 2022 were not yet available when this report was written, the drop in mail-in voting is likely to be especially large for AAPI voters in Georgia[.]" Lee Rep. 75–76. I can test Dr. Lee's prediction using the estimated share of ballots cast by method from the preceding discussion. In the 2022 midterm election, Asian voters cast the largest share of their ballots by mail-in absentee voting, 9.24%. Compared to the 2020 election, I find that the change in mail-in absentee ballot usage among Asian voters is similar to the change in mail-in absentee ballot usage among white voters and the change overall. To test this claim, I calculated the percent change in absentee voting rate overall and by self-identified racial group. Overall, I estimated an 76.3% decrease in the rate of absentee ballot usage. I find the smallest percent decrease in mail-in absentee ballot usage among Black voters, whose rate of mail-in absentee ballot usage decreased 74.6%. The decrease in mail-in

51

absentee ballot usage among white voters was 76.6%, while the decrease in mail-in absentee ballot usage among Asian voters was 76.8%. This comparison, of course, does not constitute a plausible estimate of the causal effect of SB 202. This is because numerous factors changed concurrently as SB 202 was put in place.

65.    I also examined the rate voters cast provisional votes in general elections from 2014 to 2022. I calculated this quantity using the public turnout history from the Georgia Secretary of State's office. In each election I totaled the number of reported provisional votes from the voter file and then divided this reported number by the total votes cast. I also examined how the rate voters cast provisional votes varied by self-reported racial identity, by merging into the voter history voter's self-reported racial identity from the registration file.

66.    Table 8 presents the calculated rate of provisional voting. Focusing on the bottom row first, overall, the rate of provisional votes cast dropped in the 2022 election. In the 2022 election, 0.07% of all votes were cast as provisional votes. By contrast, 0.19% of votes were provisional in the 2014 election, 0.12% in the 2016 election, 0.22% in the 2018 election and 0.19% in the 2020 election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|
| American Indian | 0.0061 | 0.0026 | 0.0055 | 0.0033 | 0.0013 |
| Asian | 0.0047 | 0.0033 | 0.0053 | 0.0027 | 0.0011 |
| Black | 0.0031 | 0.0018 | 0.0034 | 0.0032 | 0.0010 |
| Hispanic | 0.0049 | 0.0037 | 0.0057 | 0.0033 | 0.0016 |
| White | 0.0012 | 0.0007 | 0.0013 | 0.0011 | 0.0004 |
| Overall | 0.0019 | 0.0012 | 0.0022 | 0.0019 | 0.0007 |

Table 8: Share of all general votes cast classified as provisional by self-reported racial identification and overall.

67.    Also in Table 8, I calculated the share of votes cast as provisional votes by self-reported racial groups. In the 2022 election, every racial group saw a decline in the share of their votes cast as provisional ballots. For example, in the 2022 election, 0.1% of votes cast by Black voters were provisional ballots. In 2014, 0.31% of votes cast by Black voters were provisional votes, 0.18% in 2016, 0.34% in 2018, 0.32% in 2020. The rate of provisional votes by other self-reported racial groups saw similar declines in 2022.

68.    I also find that, in the 2022 election, the gap between Black and white votes cast as provisional votes reduced as well. In 2022, 0.1% of votes from Black voters was cast as a provisional vote, down from 0.32% in 2020 and 0.34% in 2018. White voters cast 0.04% of their ballots as provisional in 2022, down from 0.11% in 2020 and 0.13% in 2018. The 0.21 Black-white percentage point difference in provisional ballots in 2020 was reduced to 0.06 percentage points in 2022.

53

## VII.  CHANGES IN DEADLINE FOR ABSENTEE VOTING APPLICATIONS

69.    Turning now to the particular changes in Georgia voting law, SB 202 altered the window where voters were able to apply for a mail ballot. Before SB 202, voters were able to apply for a mail ballot 180 days before the election and had to return their ballot application 3 days before the election. After SB 202, most voters could apply for a mail-in absentee ballot 78 days before the election and had to return their mail-in absentee ballot application 11 days before the election. There are some important exceptions to this window. Voters with a physical disability, military/overseas voters, or voters over 65 could apply for a mail-in absentee ballot once and then continue receiving a mail-in ballot for the remainder of elections during that particular cycle. I will refer to individuals who apply once for an absentee ballot during an election cycle as having their absentee ballot application "rolled over." SB 202 also left in place a practice where county registrars could visit hospitalized individuals, issue an absentee ballot, and then collect the ballot that same day after it was cast in the hospital. I have been unable to assess the frequency of this practice.

70.    Georgia's deadline for submitting an application for mail-in absentee voting is similar to deadlines for mail-in absentee voting in other states. According to the National Conference of State Legislatures (NCSL),

using data compiled as of July 2022, there are 6 states with the same mail-in absentee ballot application deadline as Georgia (11 days before the general election)–Arizona, Idaho, Nebraska, South Carolina, Texas, and Virginia.[22] And there are at least 8 states/jurisdictions that have an earlier mail-in absentee ballot application deadline than Georgia: Washington DC, Indiana, Iowa, Kentucky, Missouri, New York, Oklahoma, and Rhode Island. Dr. Lichtman opines that SB 202's absentee ballot application "provisions put Georgia far out of the mainstream of states in the time allocated for requesting an absentee ballot." Lichtman Rep. 25. In partial support of this claim Dr. Lichtman reports "only seven states plus Georgia restrict applications for an absentee ballot to 11 days or fewer prior to an election." *Id.* It is unclear how Dr. Lichtman arrived at this count, but my tally places Georgia as having the same or a later deadline for absentee ballot applications as 14 of the 50 states and DC.

---

[22] National Conference of State Legislatures, *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives* (Jul. 12, 2022), https://tinyurl.com/4a45wryr. In my tally, I use the deadline for mail-in absentee ballot applications. In Idaho in-person applications are allowed until 5pm the Friday before the election; in DC, military and overseas voters can apply for an absentee ballot up to 3 days before the election; in Missouri, in-person requests are allowed the day before the election; and, in New York, in person requests for absentee ballots are allowed the day before the election.

71.    While SB 202 altered the window for applying for absentee ballots, it left in place Georgia's no excuse absentee voting policy. According to the NCSL, Georgia is one of 28 states that currently have "no excuse" absentee voting with an application from voters. In contrast, 15 states currently require an excuse to vote mail-in absentee, at least for some component of the population.[23]

72.    To assess how the requirements of SB 202 compared to how voters applied for mail ballots in prior elections, I examined when Georgia voters applied for mail ballots in the 2018 and 2020 elections. This analysis is useful for establishing how SB 202 would affect absentee ballot applications if the deadline had been imposed, but there was no other change to voters', campaigns', or the State's behavior.

73.    These assumptions likely overstate the effect of SB 202's deadline on voter turnout, because prior research has shown that voters learn about complying with voting requirements from both state officials, campaigns, and organizations. Political campaigns and third-party groups provide information about how to complete absentee ballots. And randomized experiments have

---

[23] Those states are Alabama, Arkansas, Connecticut, Indiana, Kentucky, Louisiana, Mississippi, New Hampshire, New York, Rhode Island, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

shown that voters are responsive to information and more likely to turn out to vote and correctly cast their ballot when provided with this information. For example, Citrin, Green, and Levy (2014) show that providing voters information about ID requirements increases turnout.[24] Indeed, Dr. Lee argues that a similar analysis he conducts in his expert report "assumes *ceteris paribus* on other aspects of the election that are admittedly unrealistic. Had SB202 been passed and implemented in 2020 there would presumably have been publicity about the revised deadline."[25] In contrast, Dr. Fraga asserts that any voter from a prior election who sent a mail-in absentee ballot application outside the SB 202 window would face additional burdens under SB 202.[26]

74.    In Table 9, I calculated when individuals applied for a mail-in absentee ballot in the 2018 election and how it aligns with the application window provided in SB 202. To make this calculation, I used the date when individuals submitted mail-in ballot applications for the 2018 general election or whether their mail-in ballot application had been "rolled over" from a prior

---

[24] Citrin, Jack, Donald P. Green, and Morris Levy. "The effects of voter ID notification on voter turnout: Results from a large-scale field experiment." Election Law Journal 13.2 (2014): 228-242.

[25] Lee Rep. 74 n. 84.

[26] Fraga Rep. 80.

absentee ballot application. To determine if an individual's mail-in ballot application had been rolled over, I identified individuals who had applied for their mail-in absentee ballot for the 2018 general election before the 2018 primary election date. As I will show below, this is necessarily an underestimate of the "roll over" rate, because voters can apply to receive mail-in absentee ballots for subsequent races, such as runoff elections, during the normal mail-in absentee-ballot application period for the general election. For individuals who did not have their mail-in absentee ballot application rolled over I examined whether they applied for their mail-in absentee ballot within the SB 202 window: within 78 days of the general election and 11 days before the general election. I also examined the share of mail-in ballot applications that were submitted later than SB 202 allows, but within the prior deadline to apply for a mail ballot, three days before the general election. I calculated these quantities for all Georgia mail-in absentee applications and then I calculated this for all mail-in absentee applications by self-reported racial group.

75.   Table 9 presents the results of these calculations for the 2018 statewide general election for the share of absentee ballot requests from 2018 by racial group and for Georgians overall (first column). The second column is the share of mail-in absentee ballot applications that complied with the SB 202 window in the 2018 election. The third column contains the share of mail-in

absentee ballot applications in 2018 that arrived earlier than allowed under SB 202, and the fourth column contains the share of ballots that arrived later than allowed under SB 202.

76.    As the bottom row of Table 9 shows, overall, 88.4% of mail-in absentee ballot applications for the 2018 statewide general election complied with the new deadline from SB 202. This was so either because the application was received in the SB 202 window or because an individual's application rolled over to the 2018 statewide general election from a prior application. Approximately 8.2% of the absentee ballot applications arrived after the SB 202 deadline, but before the prior deadline for absentee ballot applications. And finally, about 3.3% of absentee ballot applications arrived between 180 and 79 days before the general election, an "early" application that SB 202 would disallow.

| Race | Share SB 202 or Roll over | Proportion Early | Proportion Late |
|------|------|------|------|
| American Indian | 0.885 | 0.018 | 0.098 |
| Asian | 0.920 | 0.012 | 0.068 |
| Black | 0.905 | 0.018 | 0.076 |
| Hispanic | 0.920 | 0.010 | 0.070 |
| White | 0.864 | 0.050 | 0.084 |
| Overall | 0.884 | 0.033 | 0.082 |

Table 9: Examining how absentee ballot applications in 2018 compare to the new SB 202 deadlines by self-reported racial group.

59

77.    Table 9 also presents the share of applications for mail-in absentee ballots in the 2018 general election that complied with SB 202 by self-identified racial group. I find that applications from white mail-in absentee ballot applicants were the least likely to have their mail-in absentee ballot application in 2018 satisfy the SB 202 deadline. 86.4% of applications for white mail-in absentee ballot applicants arrived within the new SB 202 deadline or were rolled over from a prior application. This contrasts with 90.5% of mail-in absentee ballot applications from Black mail-in absentee ballot applicants, 92.0% of applications from Asian mail-in absentee ballot applicants, 88.5% of applications from American Indian applicants, and 92.0% of Hispanic mail-in absentee ballot applicants. White mail-in absentee ballot applicants were also more likely to apply for an absentee ballot after the SB 202 deadline but before the prior deadline of three days than every minority group but American Indians. 8.4% of mail-in absentee ballot applications from white mail-in absentee ballot applicants arrived after the SB 202 deadline of 11 days before the general election. This compares to 9.8% for American Indian mail-in absentee ballot applicants, 6.8% for Asian mail-in absentee ballot applicants, 7.6% for Black mail-in absentee ballot applicants, and 7.0% for Hispanic mail-in absentee ballot applicants. White mail-in absentee ballot applicants also were the most likely to submit an application between 180 and 79 days before

the general election. 5% of absentee ballot applications from white mail-in absentee ballot applicants occurred during this "early" period, while 1.8% of applications of Black mail-in absentee ballot applicants arrived during this window.

78.    Table 10 has the same structure as Table 9 but presents the quantities for the 2020 election. Overall, 93.8% of voters submitted their absentee ballot application within the new SB 202 deadline or had their mail-in absentee ballot application rolled over from a prior election. In the 2020 election, 4.3% of applications were made between 180 and 79 days before the election, while 1.8% of applications arrived after the SB 202 deadline, but before the pre-SB 202 deadline.

| Race | Share SB 202 or Roll over | Proportion Early | Proportion Late |
|------|---------------------------|------------------|-----------------|
| American Indian | 0.942 | 0.029 | 0.029 |
| Asian | 0.944 | 0.032 | 0.024 |
| Black | 0.928 | 0.050 | 0.022 |
| Hispanic | 0.946 | 0.025 | 0.029 |
| White | 0.944 | 0.042 | 0.014 |
| Overall | 0.938 | 0.043 | 0.018 |

Table 10: Examining how absentee ballot applications in 2020 compare to the new SB 202 deadlines by self-reported racial group.

79.    Focusing now across racial groups, a large share of applications from each group arrived within the SB 202 deadline, though, in 2020, Black mail-in absentee ballot applicants were now less likely to have their application submitted within the SB 202 window. Overall, 92.8% of mail-in

61

absentee ballot applications from Black mail-in absentee ballot applicants in 2020 were within the SB 202 deadline or rolled over, compared to 94.4% of white mail-in absentee ballot applicants, 94.2% of American Indian mail-in absentee ballot applicants, 94.4% of Asian mail-in absentee ballot applicants, and 94.6% of Hispanic mail-in absentee ballot applicants. 5% of applications from Black mail-in absentee ballot applicants were sent between 180 and 79 days prior to the election, while 4.2% of applications from white applicants arrived in this early window, 2.9% of applications from American Indian applicants, 3.2% from Asian American applicants, and 2.5% from Hispanic applicants. Black mail-in absentee ballot applicants were also more likely to apply "late" than white mail-in absentee applicants, with 2.2% of their application arriving after the SB 202 deadline, while 1.4% of applications from white mail-in absentee ballot applicants arrived after the deadline.

80.    Comparing Tables 9 and 10 there is no consistent pattern when different racial groups applied for mail-in absentee ballots before SB 202. In 2018, white applicants had the smallest share of mail-in applications that would have conformed with the new SB 202 deadlines and the largest share of applications that would have been submitted early or late had SB 202 been in place for that election. But then, in 2020, Black mail-in absentee ballot applicants had a smaller share of applications that would have complied with

62

the SB 202 guidelines, though the differences in 2020 are smaller than the differences in 2018.

81.    Dr. Lee also estimates the number of mail-in absentee ballot applications in 2020 that would arrive late under the new SB 202 deadline, but his estimated numbers conflate applications for mail-in absentee ballots and ballots cast using early in-person voting.[27] Only mail-in absentee ballots are subject to the new application window under SB 202, so it is inappropriate to include ballots cast using early in person in the calculation. The result of this conflation is that Dr. Lee overstates the number of applications for mail-in absentee ballots that arrived outside of the SB 202 application window.

82.    Focusing on Dr. Lee's specific claim, he opines that "the evidence from the 2020 elections strongly suggests that narrowing the window for mail-in ballot applications will decrease the number of Georgians who vote absentee and may create burdens on voting, including the effect of a decrease in turnout overall."[28] To support this conclusion, Dr. Lee reports an analysis that attempts to answer "the question: given what we know about when Georgia voters returned their absentee applications, how many such applications in

---

[27] My estimates in this regard align with Dr. Fraga's. In Table 9 and 10 the "Proportion Late" column is the quantity that Dr. Fraga reports in his Table 9.
[28] Lee Rep. 73.

2020 might have been invalid if they were returned after the deadline two Fridays prior to Election Day, as stipulated by SB202, rather than by the previous deadline of the Friday before Election Day?"[29] After conducting this analysis, Dr. Lee reports that after examining the absentee voter file he concluded that, "[b]etween October 24th, 2020 – the day after SB202's deadline – and October 30th, 2020, more than **one million** (1,070,163) applications for an absentee ballot were recorded. For AAPIs, there were nearly 26 thousand ballot applications recorded after SB202's deadline."[30]

83.    These reported numbers, however, count both the number of individual voters who cast their ballot early in person during this time period and the number of mail-in absentee ballot applications. This mistake can be made because the absentee voter file from Georgia's Secretary of State includes information about three kinds of voting: mail-in absentee, early in-person, and electronic. Using this 2020 absentee voter file, I find that Dr. Lee's reported number of applications (4.15 million) corresponds to the number of distinct individuals in the absentee voter file whose ballot was not canceled (4,155,906). And when I calculate the number of distinct applications to vote early in

---

[29] *Id.* at 74.

[30] *Id.* (emphasis original).

person, mail-in absentee, and electronic during the from October 24 to October 30, 2020, I obtain 1,071,325 distinct applications, a number close to Dr. Lee's reported number of applications, 1,070,163.

84.    When I subset to only mail-in absentee voters whose applications arrived from October 24th to October 30th, I find 31,948 mail-in absentee ballot applications in 2020 would have been late had the SB 202 deadline been in place in the 2020 election.[31] Dr. Lee overestimates the number of applications outside the SB 202 window by 3,249%. Dr. Lee's estimate of the number of mail-in absentee ballot applications from Asian applicants suffers from the same issue. He reports an estimate of 26,000 mail-in absentee ballot applications from Asian applicants would have been late had SB 202 been in place, once I subset to mail-in absentee ballot applications, I estimated 1,648 mail-in absentee ballot applications from Asian voters would have arrived late had SB 202 been in place in 2020.

85.    Applications that did arrive later than the SB 202 window were also more likely to not be voted or canceled than absentee ballot applications that arrived before the SB 202 deadline. In 2018, 46.0% of mail-in absentee

---

[31] The numbers I calculated here appear to align with Dr. Fraga's Table 10, with small differences in counts that are not consequential to the conclusions.

ballot applications that arrived after the SB 202 deadline resulted in ballots that were either not voted or canceled, compared to 17.6% of mail-in absentee ballot applications that arrived before the SB 202 deadline. In total, less than half of mail-in absentee ballot applications in 2018 received after the SB 202 deadline ultimately resulted in accepted ballots (46.1%), compared to 80% of mail-in absentee ballot applications that arrived before the deadline. There was a similar pattern in the 2020 election. 47.3% of mail-in absentee ballot applications that arrived after the SB 202 deadline were canceled or not voted, compared to 25.2% of absentee ballot applications sent in before the SB 202 deadline. Ultimately, about half of the mail-in absentee applications that arrived outside the SB 202 deadline ultimately resulted in a voted ballot (50.5%), compared to 74.4% of mail-in absentee ballot applications that arrived before the deadline.

86.    An important exception to the SB 202 deadline is that individuals over the age of 65, military/overseas voters, and disabled voters can apply once for an absentee ballot for an entire election cycle. In the 2018 and 2020 elections I could only estimate a lower bound on the share of voters who applied for the rollover list. The rollover list is a mechanism for voters to only apply for an absentee ballot once, and therefore, avoiding future absentee ballot applications for the same election cycle. Using data obtained from the

Secretary of State's office, I calculated the share of mail-in absentee ballot applicants in 2022 who opted into the absentee ballot roll over list. To make this calculation, I used the file "2022 Elderly Disabled and UOCAVA List.xlsx." This file was obtained by counsel from the Secretary of State's office and contains a list of individuals who indicated their eligibility to receive an absentee ballot in subsequent elections. I then merged membership of this list to the overall list of absentee ballot applicants, creating an indicator for each voter equal to "1" if they are on the absentee ballot application rollover list and "0" otherwise.

87. Using this indicator, I calculated the share of absentee ballot applicants who were on the rollover list. I present this calculation in Table 11. In the second column, I computed the share of mail-in absentee applicants age 65 and over who are on the rollover list, and, in the third column, I computed the share of mail-in absentee ballot applicants under the age of 65 who are on the roll over list. In the statewide 2022 general election 52.5% of mail-in absentee ballot applicants were rolled over from prior applications. 80.5% of applicants age 65 and older were on the rollover list, and 12.3% of applicants under the age of 65. White and Black mail-in absentee ballot applicants were more likely than other self-identified racial groups to use the rollover list. Overall, white applicants were most likely to be on the rollover list, with 58.6%

67

of white mail-in absentee ballot applicants on the list, compared to 50.3% of Black mail-in absentee ballot applicants. This was also true for applicants 65 and over: 84.2% of white mail-in absentee ballot applicants age 65 and over were on the rollover list, while 75.5% of Black mail-in absentee ballot applicants over the age of 65 were on the list. That said, Black applicants under the age of 65 were more likely to be on the list than white applicants: 17.8% of Black mail-in absentee ballot applicants under the age of 65 were on the rollover list, compared to 10.4% of white mail-in absentee ballot applicants. While there are differences across racial groups, the size and direction of the differences in the use of the rollover list depends on whether the voters are over or under the age of 65.

88.    Rather than examining whether an application would be counterfactually rejected from prior elections, Table 12 examines the share of mail-in absentee ballot applications that were rejected for arriving after the deadline in the 2022 election, both overall and by racial group. To measure the proportion rejected, I manually coded the "Status Reason" for rejected ballot applications where the Status Reason explicitly mentioned the deadline or other language that indicates that the ballot application arrived late.

68

| Race | Share Roll over | Proportion roll over 65 & over | Proportion roll over Under 65 |
|---|---|---|---|
| American Indian | 0.242 | 0.743 | 0.100 |
| Asian | 0.219 | 0.674 | 0.023 |
| Black | 0.503 | 0.755 | 0.178 |
| Hispanic | 0.218 | 0.676 | 0.048 |
| White | 0.586 | 0.842 | 0.104 |
| Overall | 0.525 | 0.805 | 0.123 |

Table 11: Share of absentee ballot applications that were rolled over in the statewide 2022 general election.

| Race | Share Applications Rejected After Deadline |
|---|---|
| American Indian | 0.0025 |
| Asian | 0.0027 |
| Black | 0.0027 |
| Hispanic | 0.0037 |
| White | 0.0022 |
| Overall | 0.0025 |

Table 12: Share of Absentee ballot applications rejected for arriving after the SB 202 deadline, by self-identified racial group and overall.

89.    Table 12 shows that a relatively small share of mail-in absentee applications in the 2022 general election arrived outside of the SB 202 deadline. Overall, 0.25% of mail-in absentee ballot applications were rejected for arriving outside the deadline. Absentee ballot applications from Black voters were more likely to be rejected for arriving outside the SB 202 window than absentee ballot applications for white voters, though the difference is a modest 0.05 percentage points.

90.    Dr. Fraga's Table 7 also examines the incidence of mail-in absentee ballot applications rejected for arriving after the deadline, but he uses a different denominator when presenting his results, resulting in larger

percentages in his Table 7 than my Table 12. Specifically, for a particular entry in Dr. Fraga's Table 7 he first subsets to the rejected mail-in absentee ballot applications in a particular election. Then, he computes the proportion of those rejected mail-in ballot applications that were rejected for arriving after the deadline. This computation results in larger percentages in the table, even though Dr. Fraga and I appear to have similar numbers, with the small differences likely due to discrepancies in our manual classification of the "Status Reason" field. For example, I classified 706 rejections as due to arriving late in 2022, for an overall rate of 0.25%. Because there were 2,487 applications rejected in 2022, by my calculations 28.4% of rejections were due to applications arriving after the deadline, compared to Dr. Fraga's estimate of 25.9%. I examined the share of applications rejected due to arriving after the deadline, because this enables a direct comparison of the rate applications are rejected. In contrast, Dr. Fraga's presentation of the calculation depends on both the rate applications are rejected for arriving late and the total number of rejections overall, making it difficult to infer the population of voters who are having their mail-in ballot applications rejected. This also complicates Dr. Fraga's interpretation of his Table 7. For example, when Dr. Fraga writes "December 2022 was the election with the highest rates of 'too late' rejection with a total rate of 30.6%," Fraga Rep. 44, he is referring to the share of

70

rejections due to arriving after the deadline among those rejected mail-in absentee ballot applications.

91.    According to the preamble of SB 202, the application window for mail-in absentee voting was changed because "[t]he lengthy absentee ballot process also led to elector confusion, including electors who were told they had already voted when they arrived to vote in person. Creating a definite period of absentee voting will assist electors in understanding the election process while also ensuring that opportunities to vote are not diminished, especially when many absentee ballots issued in the last few days before the election were not successfully voted or were returned late." SB 202, § 2(9).

92.    Above, I provided evidence that absentee applications from previous elections that arrived after the SB 202 deadline were less likely to result in a successfully voted mail-in absentee ballot. I am unable to assess how often voters arrived at the polls to vote in person when, in fact, they had previously voted a mail-in absentee ballot. I am able to assess how often voters cancel their mail-in absentee ballots in order to vote in person on Election Day or to vote early in person. Reducing the number of canceled mail ballots in the voting place helps to limit the burden on election officials at the polling place who have to first cancel the absentee ballot before checking in a voter to cast a

71

ballot on Election Day. Canceling ballots also necessarily slows down the check in process.[32]

93.    While I cannot establish the causal effect of SB 202 on the number of in-person canceled ballots, there was a reduction in the number of canceled mail-in absentee ballots where the applicant subsequently voted in person, relative to the 2018 and 2020 elections. Tables 13 and 14 provide information about the share and number of individuals who first apply for a mail-in ballot and then cancel that ballot to vote in person on Election Day. I calculated this quantity overall and broken down by self-identified racial group.

---

[32] For example, from the Carter Center's observation of Fulton County voting, they write, "Nonstandard processes like voter challenges, provisional ballots, and *canceling mail absentee ballots* were rare, but the process widely varied from place to place. Many poll workers were unsure of how to proceed even after reviewing documentation and simply called their regional manager for guidance. The Carter Center recommends implementing that escalation path as the standard practice, as those who tried to complete these procedures alone were not always successful. In addition, providing very clear step-by-step checklists/decision trees for each scenario would be helpful." The Carter Center, *2022 General Election Observation: Fulton County, Georgia* 13 (2022) (emphasis added).

| Race | 2014 | 2016 | 2018 | 2020 | 2022 |
|------|------|------|------|------|------|
| American Indian | 0.0149 | 0.0117 | 0.0139 | 0.0292 | 0.0114 |
| Asian | 0.0082 | 0.0054 | 0.0177 | 0.0193 | 0.0061 |
| Black | 0.0103 | 0.0089 | 0.0200 | 0.0168 | 0.0062 |
| Hispanic | 0.0129 | 0.0220 | 0.0337 | 0.0343 | 0.0124 |
| White | 0.0057 | 0.0051 | 0.0076 | 0.0149 | 0.0054 |
| Overall | 0.00809 | 0.00724 | 0.0151 | 0.0169 | 0.00596 |

Table 13: Share of Mail in Absentee Ballot Applications that are Ultimately Canceled, with Applicant Voting in Person at the Polling Place

94.    Table 13 shows that, beginning in 2018, there was an increase in the rate individuals applied for mail-in absentee ballots only to subsequently vote in person on Election Day. Examining the bottom row of Table 13 first, I find that, in 2016, 0.72% of individuals who applied for a mail-in absentee ballot canceled their mail-in absentee ballot and then voted in person on Election Day. By 2018, this share increased to 1.51%—more than doubling the rate from 2016 and increased even more in 2020, with 1.69% of individuals who applied for a mail-in absentee ballot canceling their ballot and then voting in person on Election Day. Because of the large number of mail-in absentee ballot applications in 2020, there were many more individuals who canceled their mail-in absentee ballot and then voted in person on Election Day in 2020.  As Table 14 shows, in 2020, 28,965 individuals canceled their mail-in absentee ballot and then voted in person on Election Day.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 |
|------|------|------|------|------|------|
| American Indian | 2 | 5 | 10 | 152 | 9 |
| Asian | 8 | 36 | 203 | 1280 | 55 |
| Black | 328 | 522 | 2208 | 9124 | 541 |
| Hispanic | 11 | 92 | 290 | 1671 | 62 |
| White | 436 | 709 | 913 | 13763 | 770 |
| Overall | 848 | 1,493 | 4,072 | 28,965 | 1,592 |

Table 14: Number of Individuals Who First Applied for Mail in Absentee Ballot and then applicant canceled application and Voted in Person on Election Day

95.     There is a similar pattern across self-identified racial groups: 2018 and 2020 saw an increase in the share of mail-in ballot applicants who subsequently canceled their ballot and then voted in person on Election Day. American Indian, Asian, Hispanic, and white voters all had their groups highest rate of mail-in absentee ballot applicants who canceled their ballot and then voted in-person on Election Day in 2020, while Black voters had their highest share in 2018, though 2020 was the second highest rate from 2014 to 2020. Table 14 shows that, across racial groups, the largest number of voters who canceled their mail-in absentee ballots and then voted on Election Day occurred in 2020.

96.     In 2022, however, the share of absentee ballot applicants who ultimately canceled their ballot and voted in person on Election Day fell to 0.596%, a lower rate than in any election since 2014. In 2022, every racial group saw the share of mail-in absentee ballots canceled and then voted in person on Election Day decline. For example, the share of Black mail-in

74

absentee ballot applicants who canceled their ballots and then voted in person on Election Day dropped 1.06 percentage points from 1.68% in 2020 to 0.62% in 2022. Table 14 shows that in 2018, 2,208 Black voters canceled their mail-in ballots and then voted in person on Election Day. This number increased to 9,124 in 2020, but then decreased to 541 in 2022. Every other self-identified racial group exhibits a similar pattern: the number of voters who canceled their mail-in absentee ballots and then voted in person on Election Day increased in 2018 and 2020, but then decreased in 2022.

97.    I performed a similar calculation to assess the rate mail-in absentee ballot applicants canceled their ballot and then voted early in person. Table 15 contains the share of mail-in absentee ballot applicants who canceled their ballot and then voted early in person, while Table 16 contains the count of mail-in absentee ballot applicants who ultimately canceled their ballot and voted early in person. I calculated these quantities both overall and by self-identified racial group.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 |
|---|---|---|---|---|---|
| American Indian | 0.007 | 0.028 | 0.066 | 0.144 | 0.056 |
| Asian | 0.014 | 0.024 | 0.048 | 0.137 | 0.045 |
| Black | 0.020 | 0.025 | 0.059 | 0.157 | 0.040 |
| Hispanic | 0.006 | 0.041 | 0.056 | 0.142 | 0.045 |
| White | 0.009 | 0.019 | 0.027 | 0.149 | 0.032 |
| Overall | 0.012 | 0.021 | 0.043 | 0.150 | 0.036 |

Table 15: Share of mail in ballot applicants who canceled their mail in ballot and ultimately voted absentee early in person.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 |
|------|------|------|------|------|------|
| American Indian | 1 | 12 | 48 | 758 | 44 |
| Asian | 15 | 141 | 539 | 9,141 | 416 |
| Black | 605 | 1,378 | 6,265 | 84,337 | 3,582 |
| Hispanic | 6 | 171 | 471 | 6,936 | 231 |
| White | 778 | 2,822 | 3,287 | 133,002 | 4,752 |
| Overall | 1,540 | 4,995 | 12,000 | 260,085 | 10,067 |

Table 16: Number of mail in ballot applicants who canceled their mail in ballot and ultimately voted absentee early in person.

98.    Tables 15 and 16 show that, prior to 2018, a relatively small share of mail-in absentee ballot applicants canceled their ballot and voted early in person. This increased in 2018, where 12,000 individuals canceled their mail-in absentee ballots and voted early in person, constituting 4.3% of all mail-in ballot applicants. Then, in the 2020 election, there was a large increase in the rate and count of voters canceling their mail-in absentee ballots and then voting early in person. In 2020, overall, 15% of all mail-in absentee ballot applicants subsequently canceled their mail-in absentee ballot and then voted early in person. This corresponds to 260,085 individuals who canceled their mail-in absentee ballots and then voted early in person. Across self-identified racial groups there was a large increase in both the rate and number of mail-in absentee ballot applicants who canceled their ballots and voted in person.

99.    In the 2022 election, the number and share of mail-in absentee ballot applicants who subsequently canceled their ballot and voted early in person decreased. In the 2022 midterm election, 3.6% of mail-in absentee ballot

applicants canceled their ballot and voted early in person. This is an 11.4 percentage point decrease from 2020, and a 0.7 percentage point decrease from 2018. Relative to 2020, in 2022, the share and number of voters who cancel their mail-in absentee ballots and voted early in person decreased for every racial group. Relative to 2018, in 2022 there was a decrease in the share and number of mail-in absentee applicants who canceled their ballot and voted early in person for every racial group but white mail-in absentee ballot applicants. The largest decrease from 2018 to 2022 in the rate voters canceled their mail-in absentee ballot and then voted early in person was among Black mail-in absentee ballot applicants, with a 1.9 percentage point reduction.

100. I also assessed the rate returned mail-in absentee ballots were rejected because they arrived after the deadline on Election Day. In Table 17, I present the share of returned absentee ballots—either accepted or rejected—that are rejected because they arrive after the deadline.[33] To calculate the

---

[33] Dr. Cobb and Dr. Meredith cite Shino, Suttmann-Lea, and Smith (2021), which finds that Black voters are more likely to have their ballots rejected than White voters in 2018. I reviewed the Shino, Suttmann-Lea, and Smith (2021) replication data set and found they inadvertently labeled ballots as being rejected for being late when the stated reason included "Insufficient Oath Information" and "Ballot Returned Undeliverable." This occurred because Shino, Lea, and Smith (2021) coded all ballots returned after Election Day and rejected as "rejected for late arrival." However, many ballots were recorded as

share of received mail-in absentee ballots rejected for arriving after the deadline, I coded the "Status Reason" field in the absentee voter file from 2018, 2020, and 2022, focusing on rejected ballots. In 2020 and 2022, the reasons had been standardized as part of a dropdown menu for election officials, so this coding is straightforward. In 2018, I hand coded the stated rejection reasons. I then examined the share of absentee ballots that were returned—either accepted ('A') or rejected ('R')—due to arriving after the deadline.

101.    I find the highest rate of rejection for arriving after the deadline in 2018, with 1.6% of returned mail-in absentee ballots rejected for arriving after the deadline. This rate declined to 0.2% in 2020, and then increased to 0.84% in 2022. None of the Plaintiffs' experts have shown this election-to-election change was caused by SB 202. I also find no clear relationship between the rejection rates of received mail-in absentee ballots rejected for arriving after the deadline for Black and white voters. In 2018, Black voters had their

---

returned the day after Election Day in 2018, November 7th, were given non-deadline related reasons for rejection. Further, several ballots were recorded as arriving on November 7th and accepted, so a recorded arrival after November 6th does not imply an automatic rejection. In total, I find that there are 615 ballots labeled as rejected for arriving after the deadline with a non-deadline rejection status. Further, Shino, Suttman-Lea, and Smith (2021) include all absentee applicants when calculating the rate of rejection. This includes individuals who never returned their ballot, or had their ballot canceled and therefore could not possibly have their ballot rejected.

returned absentee ballots rejected for arriving after the return deadline at a slightly higher rate than white voters: 1.4% of received mail-in absentee ballots from Black voters compared to 1.3% of received mail-in absentee ballots for white voters. In 2020, the share of returned ballots rejected for arriving after the deadline for Black and white voters were similar, 0.2%. Then, in 2022, white voters had their returned absentee ballots rejected for arriving after the deadline at a slightly higher rate than Black voters: 0.8% of returned mail-in ballots from white voters were rejected for arriving after the deadline, compared to 0.7% of returned mail-in ballots from Black voters.

| Race | 2018 | 2020 | 2022 |
|---|---|---|---|
| American Indian | 0.029 | 0.005 | 0.029 |
| Asian | 0.020 | 0.002 | 0.023 |
| Black | 0.014 | 0.002 | 0.007 |
| Hispanic | 0.017 | 0.003 | 0.015 |
| White | 0.013 | 0.002 | 0.008 |
| Overall | 0.016 | 0.002 | 0.0084 |

Table 17: Share of mail in ballots rejected due to arriving after Election Day, for the 2018, 2020, and 2022 statewide general elections.

### A.     Examining When Voters Return Absentee Ballots

102.  Dr. Burden opines that, "even before 2018, Black voters were more likely to cast absentee ballots in the final four days of the election cycle. The elimination of drop boxes on the final four days of the election cycle, coupled with sharp reductions in the availability and usefulness of drop boxes on other

79

days, will disproportionately burden Black voters compared to white voters."
Burden Rep. 20.

103.   To support this conclusion, Dr. Burden examined the daily share
of returned mail-in absentee ballots from Black voters among mail-in absentee
ballots returned by either Black or white voters. Specifically, Dr. Burden
produced a series of figures (Figures 1 through 6) that show the daily share of
all mail-in absentee ballots (those returned by Black and white voters) that the
State received from Black voters. To calculate each point in the figure, Dr.
Burden first subsets to the mail-in absentee ballots that were recorded as
returned on that day. He then further restricts his attention to the ballots from
white and Black voters. And finally, he calculated the share of that subset of
ballots from Black voters. He then reached conclusions by analysis of the share
of votes from Black voters on a particular day, relative to the share of all
ballots, regardless of type, from Black voters. But Dr. Burden never explicitly
calculated the likelihood Black voters had their absentee ballot recorded as
being received in the last four days of the election cycle.

104.   There are two potential ways to calculate a quantity to evaluate
Dr. Burden's claim (at 20) that "Black voters were more likely to cast absentee
ballots in the final four days of the election cycle." First, it could be that Dr.
Burden intended to examine the proportion of all ballots returned from Black

and white voters that were mail-in absentee ballots recorded as being received in the last four days. I calculated these quantities in Table 18 for each self-identified racial group. The top cell of Table 18 examines the share of mail-in absentee ballots recorded as having arrived in the last four days of the election cycle. This reveals differences across racial groups in the rates their mail-in absentee ballot recorded in the four days of the election cycle. For example, in 2018, 1.09% of all ballots cast from Black voters were mail-in absentee ballots recorded as arriving in the last four days before the election, while 0.68% of all ballots cast from white voters were mail-in absentee ballots recorded as arriving in the last four days before the election. In 2020, 2.50% of all ballots cast from Black voters were mail-in absentee ballots recorded as cast in the last four days before the election, compared to 1.77% of white votes. The bottom cell of Table 18 calculates the share of all ballots from each self-identified racial group that arrived in the week before the election. This, too, reveals differences across self-identified racial groups. In 2018, 2.04% of all ballots cast from Black voters were mail-in absentee ballots that arrived in the week before the election, while 1.37% of all ballots from white voters were mail-in absentee ballots that arrived in the week before the election. In 2020, 5.0% all ballots cast from Black voters were mail-in absentee ballots that arrived in the week

81

before the election, while 3.82% of all ballots from white voters were mail-in absentee ballots that arrived in the week before the election.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | Runoff 2021 | 2022 |
|------|------|------|------|------|------|------|------|
| Proportion four days before | | | | | | | |
| American Indian | 0.005 | 0.006 | 0.011 | 0.033 | 0.009 | 0.037 | 0.012 |
| Asian | 0.007 | 0.013 | 0.021 | 0.045 | 0.017 | 0.049 | 0.023 |
| Black | 0.007 | 0.008 | 0.011 | 0.025 | 0.008 | 0.034 | 0.012 |
| Hispanic | 0.005 | 0.008 | 0.011 | 0.032 | 0.008 | 0.035 | 0.009 |
| White | 0.005 | 0.006 | 0.007 | 0.018 | 0.006 | 0.023 | 0.011 |
| Proportion week before | | | | | | | |
| American Indian | 0.009 | 0.014 | 0.019 | 0.062 | 0.018 | 0.056 | 0.026 |
| Asian | 0.014 | 0.023 | 0.039 | 0.090 | 0.032 | 0.079 | 0.048 |
| Black | 0.014 | 0.015 | 0.020 | 0.050 | 0.017 | 0.054 | 0.034 |
| Hispanic | 0.010 | 0.015 | 0.019 | 0.061 | 0.015 | 0.053 | 0.020 |
| White | 0.012 | 0.014 | 0.014 | 0.038 | 0.013 | 0.038 | 0.032 |

Table 18: Proportion of all votes from each group recorded as mail in absentee ballots returned four days before the election or sooner (Top table) and proportion of all votes from each group recorded as returned a week before the election or sooner (Bottom table).

105.    An alternative interpretation of Dr. Burden's claim that "Black voters were more likely to cast absentee ballots in the final four days of the election cycle" is that, conditional on casting a vote using mail-in absentee ballots, Black mail-in absentee voters were particularly likely to have their ballot received in the last four days of the election cycle. Conditional on using mail-in absentee ballots, I examined when members of different self-identified racial groups return their ballots across Georgia elections. Table 19 calculates the average number of days before the election voters return their mail-in absentee ballots. On average, Black mail-in absentee voters do not return their

absentee ballot later than white mail-in absentee voters.[34] For example, in 2020, Black mail-in absentee voters returned their ballot on average 19.3 days before the election, while white voters returned their ballot on average 18.72 days before the election. Similarly, in 2018, Black mail-in absentee voters returned their ballot on average 16.27 days before the election, while white mail-in absentee voters returned their ballot on average 14.96 days before the election. But in 2016, Black mail-in absentee voters returned their ballots later than white mail-in absentee voters. In 2022, their average returning behavior was similar, with Black mail-in absentee voters returning their ballots 12.81 days before the election, while white mail-in absentee voters returned their ballots slightly earlier on average, 12.26 days before the election.

|  |  |  |  |  |  | Runoff | |
| Race | 2014 | 2016 | 2018 | 2020 | 2022 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| American Indian | 12.61 | 13.28 | 13.12 | 15.60 | 10.07 | 15.06 | 4.60 |
| Asian | 12.35 | 13.01 | 14.38 | 15.48 | 10.13 | 15.30 | 4.38 |
| Black | 12.64 | 14.13 | 16.27 | 19.30 | 12.81 | 16.96 | 5.51 |
| Hispanic | 10.82 | 11.09 | 15.03 | 14.91 | 10.42 | 14.67 | 4.63 |
| White | 15.43 | 16.65 | 14.96 | 18.72 | 12.26 | 17.64 | 5.63 |

Table 19: Average days before election mail in ballots are recorded as returned, by racial group

106. I now turn to calculating the share of mail-in absentee ballots returned in the last four days of the election by self-identified racial group. The

[34] I reach the same conclusion if I used the median days before rather than the average.

top cell in Table 20 calculates the proportion of returned mail-in absentee ballots from each self-identified racial group that arrived in the last four days before the deadline. Table 20 shows that sometimes the proportion of ballots returned by Black and white voters in the last four days before the deadline is similar and sometimes it is different. For example, in 2018, the share of ballots returned during the last four days before the deadline from Black mail-in absentee voters (14.7%) and white mail-in absentee voters (14.6%) was similar. In 2020, Black mail-in absentee voters returned 8.5% of their mail-in absentee ballots in the last four days before the deadline, while white mail-in absentee voters returned 7.4% of their mail-in absentee ballots in the last four days before the deadline.

107.    In the bottom of Table 20 I examined the share of absentee ballots returned a week before the deadline. This, too, reveals that there is no consistent pattern in which racial groups return more of their ballots immediately before the election. Sometimes, white mail-in absentee voters returned a larger share of their absentee votes in the week before the election than Black mail-in absentee voters. For example, in 2018, white mail-in absentee voters returned 29.5% of their ballots in the week before the election, while 27.6% of ballots from Black mail-in absentee voters were turned in the week before the election. In 2020, Black mail-in absentee ballots returned

84

17.1% of their ballots in the week before the election, while 16.0% of white mail-in absentee ballots were returned in the week before the election. In sum, there is no consistent pattern when racial groups return mail-in absentee ballots.

| Race | 2014 | 2016 | 2018 | 2020 | 2022 | Runoff 2021 | 2022 |
|---|---|---|---|---|---|---|---|
| Proportion four days before | | | | | | | |
| American Indian | 0.189 | 0.180 | 0.220 | 0.138 | 0.184 | 0.176 | 0.340 |
| Asian | 0.180 | 0.202 | 0.177 | 0.114 | 0.181 | 0.140 | 0.364 |
| Black | 0.196 | 0.193 | 0.147 | 0.085 | 0.106 | 0.123 | 0.207 |
| Hispanic | 0.181 | 0.248 | 0.168 | 0.138 | 0.172 | 0.170 | 0.330 |
| White | 0.117 | 0.121 | 0.146 | 0.074 | 0.104 | 0.105 | 0.206 |
| Proportion week before | | | | | | | |
| American Indian | 0.358 | 0.401 | 0.374 | 0.260 | 0.354 | 0.262 | 0.729 |
| Asian | 0.386 | 0.366 | 0.322 | 0.226 | 0.343 | 0.225 | 0.754 |
| Black | 0.391 | 0.356 | 0.276 | 0.171 | 0.224 | 0.194 | 0.596 |
| Hispanic | 0.402 | 0.460 | 0.300 | 0.264 | 0.332 | 0.259 | 0.718 |
| White | 0.268 | 0.254 | 0.295 | 0.160 | 0.236 | 0.174 | 0.607 |

Table 20: Proportion of ballots returned four days before the election(Top table) and proportion of ballots returned a week before the election (Bottom table).

## VIII. SB 202 AND ABSENTEE DROP BOXES FOR RETURNING VOTED BALLOTS

108.  SB 202 mandated that county election officials provide a "drop box" for voters to return voted absentee ballots, or a receptacle for voters to submit their absentee ballot without placing the ballot in the mail. While drop boxes were used in the 2020 election, this was authorized under emergency authority which has subsequently expired and was only optional for counties. SB 202 requires each county to have at least one drop box per county. Further, county

85

officials can add drop boxes so long as they are less than one per 100,000 residents in the county and no more than the number of advanced voting locations.

109.   Among the states, Georgia is one of the more permissive when it comes to drop box availability. According to the NCSL, Georgia is one of 23 states that have statutory guidance on the presence of drop boxes.[35] The NCSL database shows that there is considerable variability in the requirements for drop boxes, which makes a direct comparison to the requirements of the Georgia law difficult. But several states lack explicit requirements for at least one drop box in every county. For example, in Illinois according to the NCSL, "[e]lection authorities may maintain one or more collection sites." Other states, like Iowa, have more restrictive drop box laws. Iowa does not require that county election officials provide a drop box to voters and the law mandates only one drop box can be created per county. According to the NCSL, in Iowa, "[a] commissioner is not required to establish a ballot drop box. A commissioner shall not establish more than one ballot drop box, which shall be located at the

---

[35] National Conference of State Legislatures, *Table 9: Ballot Drop Box Laws*, https://tinyurl.com/hpwbtx3p.

office of the commissioner, or on property owned and maintained by the county that directly surrounds the building where the office is located."

110.  The academic literature on the effect of drop boxes on turnout is limited and provides no clear evidence of the effect of drop boxes on overall turnout or the share of ballots cast using mail-in absentee voting. For example, McGuire et al. (2020) assesses the effect of randomly allocating 5 additional drop boxes in a Washington state county across 6 potential locations.[36]  Social scientists use randomized experiments to render "treatment" (locations with a new drop box) and "control" (the lone location where a drop box wasn't allocated) comparable, so that the only remaining differences is due to the randomized intervention. The experiment in McGuire et al. (2020), however, fails to render the groups comparable. To account for this failed randomization, McGuire et al. (2020) use a research design that requires stronger assumptions than an experiment called "difference-in-differences." Using this research design, McGuire et al. find a modest effect of voters having a closer drop box. But the strong assumptions required to interpret this estimate as a causal effect are unlikely to hold in this setting. Applying a difference-in-differences

---

[36] McGuire, William, et al. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." Social Science Quarterly 101.5 (2020): 1789-1809.

design to voter file data is challenging, because it rests upon the assumption that the treatment and control groups would have continued on a "parallel trend" in the absence of the intervention. In Grimmer and Yoder 2022, I found that only after conditioning on a voter's *exact* turnout history from several prior elections are different groups comparable.[37] McGuire et al. (2020) only use two prior elections and therefore risk severe bias between treatment and control groups. As a result, it is impossible to rule out bias as an explanation for their finding. Collingwood et al. (2018) find small effects of distance to nearest drop box on turnout. Further, an inspection of their Figure 2 reveals their estimate is heavily influenced by a small number of large distance observations. Based on their empirical analyses in Figures 3 and 4, in a presidential election moving from the 25th to 75th percentile of distance from nearest drop box is associated with a 0.1 percentage point change in voter turnout.[38]

---

[37] Grimmer, Justin, and Jesse Yoder. "The durable differential deterrent effects of strict photo identification laws." Political Science Research and Methods 10.3 (2022): 453-469.

[38] Collingwood, Loren, et al. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." Election Law Journal 17.1 (2018): 58-72.

A.    **The USPS Took Extraordinary Measures in 2020 and 2022 to Deliver Ballots on Time**

111.  When voters return completed mail-in absentee ballots they receive a default classification of "First-Class Mail" and this is true "regardless of whether they are prepaid by election officials or mailed with a stamp affixed by the voter."[39] First-Class mail has a service standard of 2-5 days, which means that the postal service views an on-time delivery of first-class mail if the time from the initial intake scan to the final scan occurs within 2-5 days.[40] There is considerable confusion about how failing to meet this service standard affects the delivery of mail-in absentee ballots. For example, Mr. Kennedy notes that "[i]t was reported that one in ten (10%) absentee ballots were not delivered on time." Kennedy Rep. 32. Yet, the news article Mr. Kennedy cites is referring to data from the USPS that examines whether the ballots were delivered according to its service standard, not whether the ballots were delivered on time according to a state's particular electoral rules.[41]

---

[39] USPS, *State And Local Election Mail—User's Guide* 5 (2022), https://tinyurl.com/4ujbte6k.

[40] *Id.*

[41] Aimee Picchi, *On election eve, the U.S. Postal Service is struggling to deliver mail on time*, CBS News (Nov. 2, 2020), https://tinyurl.com/3umzzjc6.

112. The USPS also took additional steps immediately prior to the 2022 election to ensure that mail-in absentee ballots returned close to the election arrive before the State's deadline. In the 2022 election, the USPS undertook "extraordinary measures" to ensure the timely delivery of ballots.[42] The memorandum announcing these measures details a series of optional and mandatory changes to standard USPS policy. A mandatory change, implemented on the day before Election Day and Election Day, was to implement a "hub and spoke" policy. On the day before Election Day and Election Day, the USPS required that:

> All offices will run early collections, with local postmark reflecting the date of entry and turnaround for local ballots to the BOE [Board of Elections]. All offices that service or are in close proximity to a local BOE shall establish a "hub-and-spoke" process for running ballots to the local BOE. Ballots are to be postmarked in the local retail unit, then hubbed to the BOE, prior to the state's cut-off for the day and no later than the state's Election Day return deadline (November 7, 2022 deadline in Louisiana). This will also apply to the LAST day that the BOE accepts ballots in each state.[43]

Then, on Election Day:

> For non-local BOE deliveries where it is reasonably possible to effectuate delivery by the BOE's cutoff time for accepting ballots in that state, establish an Election Mail "hub-and-spoke" process

---

[42] Joshua D. Colin et al., *2022 General Election Extraordinary Measures Memorandum*, U.S. Postal Service (Sept. 29, 2022), https://tinyurl.com/yc8xnzj5.

[43] *Id.* at 4.

specifically for transporting ballots on Election Day, November 8, using pre-identified drivers and vehicles staged to run trips. Coordinate the trips around cut-off times to avoid making the same hub/spoke run multiple times per day. This will also apply to the LAST day that the BOE accepts ballots in each state. Carriers will pull ballots from their collection mail and hand them over to their supervisor. Supervisors will exchange ballots around the city, and after the exchange, a designated supervisor makes delivery to the BOE prior to the BOE's cutoff for the day. This will also apply to the LAST day that the BOE accepts ballots in each state.[44]

113.  In plain language, this policy instructs postal workers to pull ballots destined for local Board of Elections (BOE) out of the normal mail processing procedure and deliver them directly to the BOE.

114.  The USPS published performance numbers from the 2022 election shows that the postal service was able to reliably deliver ballots from voters to elected officials. According to published statistics, on average the USPS delivered ballots from voters to election offices in less than 2 days. Further, within three days, the USPS reports delivered 98.96% of ballots to BOEs. Over 5 days, 99.82% of ballots are delivered to BOEs, and, over 7 days, 99.93% of ballots are delivered to BOEs.[45] These quantities necessarily exclude some of the ballots that will be delivered fastest. This is because the USPS is only able

---

[44] *Id.*

[45] United States Postal Service, *2022 Post-Election Analysis*, https://tinyurl.com/nm7tc2w8.

91

to evaluate ballots that are scanned into the system as part of processing. But, if ballots are delivered as part of its "hub and spoke" measures, then those rapidly delivered ballots will not be included as part of their calculation. Further, there are a mix of local ballots, that could plausibly also be returned via drop box, and more distant ballots that must be delivered via mail.

115.   Plaintiffs' experts argue that the USPS is not a reliable method to return mail-in absentee ballots. Dr. Burden opines that, "[f]or voters who receive ballots by mail, returning them via drop boxes is more trustworthy than mail because it immediately puts the ballot into the custody of local election officials rather than an intermediary. Reductions in drop box access could easily deter voters from using absentee ballots or make them less confident about the election process." Burden Rep. 26. He cites no evidence for the claim that drop boxes increase voter confidence. Dr. Lee opines that "absentee ballots are vulnerable to being rejected due to delays in mail delivery."[46] He cites a paper by Cottrell, Herron, and Smith (2021), who use evidence from Florida elections to argue that inexperienced voters may have their ballots rejected because they arrive late. Yet, they find that, in 2020, a small number of ballots were rejected because they arrive after the deadline

---

[46] Lee Rep. 77.

and that inexperienced voters had a 0.005 percentage point increase in the rate their ballots were rejected due to arriving after the deadline (that is 0.00005 as a share of ballots).[47]

116.    One stated reason for the use of drop boxes is to reduce the number of ballots that arrive after the Election Day deadline. As demonstrated above in Table 17, the 2022 general election had a smaller share of ballots rejected for arriving after the deadline than in 2018, but a larger share than in the 2020 general election. To reprise this evidence, Table 17, discussed above, shows the number of returned mail-in absentee ballots that arrived after the deadline in 2022 was less than in 2018 or 2020. In 2018, there was 3,571 returned mail-in absentee ballots rejected because they arrived after the deadline, or 1.6% of returned mail-in absentee ballots. In 2022, this number was reduced to 2,074 or about 0.84% of all returned mail-in absentee ballots. In 2020, approximately 0.18% of all returned mail-in absentee ballots were rejected because they arrived after the deadline. None of the Plaintiffs' experts have shown that SB 202's regulation of drop boxes caused this change in rejection rate, and it is difficult to attribute these differences to the presence or absence of drop boxes.

---

[47] Cottrell, David, Michael C. Herron, and Daniel A. Smith. "Vote-by-mail ballot rejection and experience with mail-in voting." American Politics Research 49.6 (2021): 577-590.

There were numerous other factors occurring in the 2020 election. Further, there is no academic analysis showing that drop boxes decrease the rate of rejected mail-in absentee ballots.

### B. Estimating Rate of Drop Box Use

117. Dr. Burden offers several opinions about the rate drop boxes were used in the 2020 election and when those ballots were deposited at drop boxes. His opinions are based on a data set of drop box use that was assembled from county ballot transfer election records. In discussing the data set, he reported that "107 of the 129 counties in Georgia that used drop boxes provided information on at least one of the three federal elections from June 2020 to January 2021," and he reports data for 101 counties in the November 2020 election. Burden Rep. 30.

118. Using this drop box data set, Dr. Burden opined that:

> The data show evidence of at least 677,618 ballots being collected from drop boxes in the November 2020 election cycle. Drop box usage by Georgia voters was widespread: the ballots represent over half of all absentee ballots cast in the counties who provided information about drop box collections. Figure 8 below shows daily collection counts from drop boxes in the November 3, 2020 election. The figure shows that drop box usage generally rose over the course of the election campaign and was heavier in the final days leading to election day. In the final four days from October 30 through November 3 (days after the vertical dotted line in the figure), 120,841 of the ballots in the dataset were collected. The sum for the final four days of the 2020 election

94

cycle – days during which drop boxes are no longer available under SB 202 – accounts for 12% of the total number of absentee ballots placed in drop boxes. This is important for understanding the likely effects of SB 202 because the law now bans usage of drop boxes in the three days immediately before election day, as well as on election day itself. Election day was the heaviest day of usage, with more than 61,000 ballots collected on November 3, 2020 across the 101 counties.

*Id.*

119.  This paragraph reports an incorrect number of ballots returned via drop box, an overestimate of the share of ballots returned by drop box, an impossible number of ballots returned in the four days before the deadline, and reports an impossible estimate of the number of drop box ballots returned on Election Day. Further, Dr. Burden's in-text description is inconsistent with the points plotted in Figure 8 in his expert report. Finally, I will show that the drop box usage did not generally rise before Election Day.

120.  First, Dr. Burden overestimates the number of ballots returned by drop box immediately before and on Election Day. On several days Dr. Burden's estimated number of ballots retrieved from drop boxes exceeds the total number of mail-in absentee ballots the state of Georgia received on those days. Because ballots returned via drop box are a subset of all mail-in absentee ballots, it is impossible that there are more mail-in absentee ballots retrieved from drop boxes than mail-in absentee ballots received overall. For example,

Dr. Burden reported (at 30) that "more than 61,000 ballots" were "collected on November 3, 2020." Yet, using the absentee data from Georgia's Secretary of State, I find that only 42,837 ballots were received on Election Day—marked as either accepted ('A') or rejected ('R'). Further, Dr. Burden reports that, "[i]n the final four days from October 30 through November 3 (days after the vertical dotted line in the figure), 120,841 of the ballots in the dataset were collected." *Id.* Yet, the state of Georgia only reports receiving 109,178 mail-in absentee ballots over these four days.

121.   Dr. Burden's Figure 8 is inconsistent with his in-text description of the total number of ballots returned via drop box: the cumulative points in Figure 8 exceed Dr. Burden's stated number of ballots returned via drop box by approximately 52%. Because I do not have access to Dr. Burden's data set, I used a freely available data tool to extract the numerical values from Dr. Burden's Figure 8.[48] Using this tool, I extracted the numerical value for all points in Dr. Burden's Figure 8. I then summed together the number of reported mail-in absentee ballots retrieved from drop boxes and contrasted

---

[48] I used a standard tool, Plot Digitizer, https://plotdigitizer.com/app. While this is necessarily an approximation, I manually validated the numbers, and I will show that the extracted numbers are consistent with the estimates reported by Dr. Burden.

that with Dr. Burden's reported total of 677,618. Based on the extracted numerical values, I find that Dr. Burden's Figure 8 reports that there are approximately 1,042,359 ballots retrieved from drop boxes in the 2020 general election, rather than the 677,618 he reports in his text.

122.  Dr. Burden's calculation of the number of mail-in absentee ballots retrieved from drop boxes in the last four days of the 2020 general election cycle and the share of ballots retrieved during those four days appear to be from Figure 8 in his expert report. Dr. Burden reports that 120,841 ballots were collected from drop boxes on Election Day or the three days before. Using the extracted numerical data from Figure 8, I obtained a nearly identical estimate, 119,797. Further, using the extracted numerical values from Figure 8, I am able to replicate Dr. Burden's reported share of ballots retrieved from drop boxes in the final four days of the 2020 election cycle. Dr. Burden reports (at 30) that the 120,841 ballots constitute "12% of the total number of absentee ballots placed in drop boxes" and 120,841 is approximately 12% of 1,042,359. In contrast, 120,841 is approximately 18% of 677,618.

123.  Given the errors in Dr. Burden's data set, I used a data set on drop box usage reported in Fowler (2022) to evaluate how drop boxes were used

97

during the 2020 election.[49] This data set covers "300 boxes across 112 counties"

for the 2020 election, in contrast to the 101 counties covered in Dr. Burden's

drop box data set for the 2020 election. For each county, the data set contains

the number of ballots collected on a particular day. Using this data set, I

aggregated across counties to calculate the number of mail-in absentee ballots

retrieved from a drop box on each day and calculated the overall number of

mail-in absentee ballots retrieved from drop boxes.

124.    Using this data, I calculated that 547,397 mail-in absentee ballots

were retrieved from drop boxes in the 2020 election. This constitutes 45.3% of

all mail-in absentee ballots in the 2020 election for the 112 counties found in

this data set. Dr. Burden reported 677,618 ballots retrieved from drop boxes,

an overestimate of 23.8%. Using this data set I calculated that 30,314 mail-in

absentee ballots were returned on Election Day, compared to the reported

estimate of "more than 61,000" from Dr. Burden. Dr. Burden reports a 101%

overestimate. I also calculated that 60,530 ballots were returned on the last

four days of the 2020 general election (11/3, 11/2, 11/1, 10/31), while Dr. Burden

---

[49] Stephen Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GPB News (Sept. 2, 2022), https://tinyurl.com/337nka8j. Note that Dr. Burden's reported estimate differs from Dr. Fraga's reported number of mail-in ballots returned via drop box. Dr. Fraga and I appear to use the same drop box data source.

calculated that 120,841 ballots were returned over the same days. This constitutes a 99.6% overestimate of the number of ballots received in the last four days before the deadline. The 60,530 ballots returned via drop box constituted about 55% of mail-in absentee ballots returned in the last four days of the election cycle and 11.1% of all ballots retrieved from drop boxes.

125.   Using this drop box data set, I also examined Dr. Burden's claim (at 30) "that drop box usage generally rose over the course of the election campaign and was heavier in the final days leading to election day." Figure 3 plots the number of ballots retrieved on a particular day. The thick black line is a smoothed average of the number of ballots retrieved from drop box on each day, fit using a loess smoother using the stats package in the R programming language.



Figure 3: The number of ballots retrieved from drop box by day. Each point is the total number of ballots retrieved that day and the thick black line is a smoothed average of the number of ballots retrieved over the election.

126.  Figure 3 shows that many ballots were deposited in drop boxes long before Election Day, with the number of ballots retrieved relatively stable in the last weeks of the election. The smoothed average number of ballots retrieved from drop boxes increased until about October 15th, leveled off, and then slightly declined. A manual examination of the number of ballots retrieved on each date demonstrates the same point: the average number of ballots retrieved was stable across weeks in October. I divided October into the four weeks prior to the last four days of the election cycle, ensuring none of the

weekly counts include ballots retrieved on the last four days of the election cycle. Using this partition of October, I find that from 10/3 to 10/9 there were 84,721 ballots retrieved from drop boxes and from 10/10 to 10/16 121,706 ballots were retrieved from drop boxes. Subsequently, there was a decline to 109,803 retrieved from 10/17 to 10/23 and finally 110,526 ballots were retrieved from 10/24 to 10/30. And while Election Day had the most ballots retrieved from drop boxes on a single day, 5.5% of all ballots, 4.9% of ballots were retrieved from drop boxes on the second most used day—October 16th. In total, large shares of ballots are returned to drop boxes before Election Day: 78.3% of drop box ballots were retrieved a week before the election or earlier, 85.0% of drop box ballots were retrieved five days before the election or earlier, and 91.0% of ballots were retrieved three days before the election or earlier.

127. Dr. Burden also opined (at 31) that "[s]imilar patterns are apparent in the 2021 U.S. Senate runoff elections" and that "drop box usage generally increased as election day approached, although lower usage around the Christmas and New Year's Day holidays is evident." As in Dr. Burden's Figure 8, he provides no explicit calculation or estimation to support the claim that drop box usage was generally increasing over the election. Unfortunately, I do not have an independent data source of ballots retrieved from drop boxes for the January 2021 runoff election, so to assess Dr. Burden's claim I used Dr.

101

Burden's data reported in his Figure 9. I extracted the numerical data from Dr. Burden's Figure 9 using the same freely available program I used to analyze his Figure 8. While I am unable to confirm the accuracy of the data in Dr. Burden's Figure 9, the totals I extracted do not exceed the number of mail-in absentee ballots returned in Georgia on those days, so they are at least logically possible. Assuming, for the moment, that Dr. Burden's data for the January 2021 runoff is correct I used the extracted numbers to produce Figure 4. Like Figure 3, Figure 4 shows the total number of ballots retrieved from drop boxes by day. The thick-black line is a smoothed trend line that shows the average number of ballots retrieved per day, this too is estimated using a loess smoother as implemented in the stats package in R.



Figure 4: The number of ballots retrieved from drop box by day for the January runoff election, computed using Dr. Burden's data from Figure 9. Each point is the total number of ballots retrieved that day and the thick black line is a smoothed average of the number of ballots retrieved over the election.

128. Figure 4 shows that the number of mail-in absentee ballots retrieved on a particular day was not generally increasing over the election. A local maximum was obtained around December 15th, the number of ballots retrieved declined around Christmas, then increased again to the maximum average on Election Day. If I divide the weeks prior to the runoff election and count the number of ballots retrieved each week, I reached the same conclusion as using the smoothed average. As in the general election, I divided the weeks in December so that each week is distinct from the window where ballots could

103

no longer be retrieved under SB 202. Using this division, I find that, from 12/04 to 12/10, approximately 79,000 ballots were retrieved (17% of all drop box ballots). The week with the most ballots returned is from 12/11 to 12/17, where 109,000 ballots were returned (23% of all drop box ballots), a close second is the week from 12/18 to 12/24 where slightly less than 109,000 ballots were returned (23% of drop box ballots). Finally, in the week from 12/25 to 12/31, 82,000 ballots were retrieved (18% of ballots).[50] Each of these weeks had a larger share of ballots returned than the five days prior to the runoff election. In total, I again find in the runoff that large shares of ballots were returned to drop boxes before Election Day: 85.7% of ballots were retrieved from drop boxes a week before the election or earlier, 89.8% were retrieved five days before the election or earlier, and 93.9% were retrieved three days before the election or earlier.

129.   Dr. Burden argued (at 31) that because of SB 202's regulations on drop boxes that "voters who used drop boxes on these final days in 2020 are not able to use them during those days in elections after the passage of SB 202. Voters possessing completed ballots on those days are not able to take

---

[50] I round to the nearest 1,000 here to reflect potential measurement error in the extraction process.

advantage of early voting, and would likely not have sufficient time to return their ballots by mail. The alternative is to appear in person at a county elections office or other location with an authorized deputy registrar, or get in line and vote in person on election day." Dr. Burden provides no calculation of the frequency of voters using county registrars or canceling their absentee ballot and voting in person. Georgia's absentee voting data does not record if voters return their ballot to the county registrar. As I discussed above, in Table 13, I calculated the share of mail-in absentee ballot applications that are canceled with the voter ultimately voting in person. I found that 2022 exhibited the smallest share of voters canceling mail-in absentee ballots and voting in person on Election Day since at least 2014—the relevant quantity for Dr. Burden's opinion. Across self-identified racial groups, the 2022 general election had a lower share and count of canceled ballots subsequently voted in person on Election Day than in 2018 and 2020.

130.  Dr. Burden also opined (at 12) that "[p]erhaps a more important factor behind lower rates of ballot rejection in 2020 and 2021 was the availability of drop boxes. The State Elections Board issued an emergency rule ahead of the 2020 general election allowing for use of drop boxes to collect absentee ballots for up to 49 days leading to election day. Under the rule, the drop boxes could be available 24 hours a day, could be located outside, and

105

could be used until 7:00 PM on election day. That rule was extended through the January 5, 2021 runoff elections but did not apply in the 2022 elections when SB 202 was in effect. As I explain in a later section of the report, drop boxes were an important contributor to lower rejection rates." As mentioned above, he provides no direct evidence that drop boxes lower rejection rates of mail-in absentee ballots.

131.   Beyond their daily use, Dr. Burden hypothesized about how drop boxes were used in the 2020 election, which he then used to articulate how drop box locations in the 2022 election affected voters. For example, Dr. Burden opined (at 30) that "the real benefits of drop boxes for voters prior to SB 202 is that they offered more locations and times (up to 24 hours a day) than polling places could accommodate." Dr. Burden did not provide any evidence on the frequency voters deposited ballots in drop boxes outside of polling hours, nor did any of the other Plaintiffs' experts. He also did not explicitly quantify the tradeoff between drop boxes and postal boxes, even though postal boxes are widely available 24 hours a day and in many more locations. Dr. Burden also argued (at 34) that "[t]he patterns indicate that the restrictions on drop boxes imposed by SB 202 will have a substantial, disproportionate burden on Black voters, a larger share of whom will be required to alter the times, places, and methods of voting than will white voters." Yet, Dr. Burden provided no direct

analysis of how specific drop boxes were actually used across Georgia counties, instead focusing on the number of drop boxes in a county and which voters returned their ballots to drop boxes in one county. Nor did he show that SB 202 will cause more Black voters to alter how they vote. I now provide an analysis of how voters use drop boxes in the 2020 election.

### C.    Drop Box Use Is Concentrated On a Small Set of Drop Boxes in Each County

132. Plaintiffs' experts examined the change in the number of drop boxes in Georgia counties. For example, Dr. Burden opines (at 27) that a "question in this case is whether the dramatic reduction in availability of drop boxes has a racially disparate impact. To evaluate this question, I compare the maximum number of drop boxes in a county permitted in the November 2022 elections under SB 202 to the number that existed in the November 2020 election." Dr. Schur argues (at 47) that "a smaller number of drop boxes increases the difficulty in delivering a ballot and eliminates the advantages that drop boxes were designed to provide." And in their expert reports, Dr. Lichtman, Dr. Burton, Dr. Cobb, and Dr. Lee also examine changes in the number of drop boxes in order to form opinions of how reducing the number of drop boxes affect the cost of voting. When these experts equate the number of drop boxes with the usefulness of drop boxes for voters, they are implicitly

assuming that each drop box is equally useful, and used, by voters. Yet, none of the experts' reports examined how often voters used particular drop boxes in Georgia counties in the 2020 election.

133.  To assess how voters used drop boxes, I first evaluated how often drop boxes in a particular county were used in the 2020 election. I performed this assessment using the same daily drop box data used above, along with specific data from Douglas County. Rather than examine this data at the daily level, I now aggregated to the drop box level, summing over the daily returns.[51] Using this data set, I calculated the proportion of all drop box ballots in a county returned to a particular drop box. I then used the share of ballots returned to a drop box to calculate three different quantities to characterize how voters use drop boxes in a county to return their mail-in absentee ballots. First, I calculated the proportion of drop boxes that received less than 1% of the ballots in the county and second, I calculated the proportion of drop boxes that received less than 2% of the ballots in the county. And third, I ordered the drop boxes according to the share of mail-in absentee ballots returned via drop

---

[51] Stephen Fowler, *See where Georgians used drop boxes in the 2020 presidential election*, GPB News (Sept. 2, 2022), https://tinyurl.com/337nka8j. Data from Douglas County is discussed below and is used to further explore the characteristics of where voters return ballots.

box in the county they received. I then used the number of drop boxes available in the 2022 election and summed together the share of ballots returned at that corresponding number of most used drop boxes in the county. This quantity estimates the maximum proportion of all drop box ballots in 2020 that would be covered using the 2022 drop box numbers, if I hold constant the behavior of voters from the 2020 election. There are several reasons that this calculated quantity is only an approximation and could underestimate the ability of a smaller number of drop boxes to accommodate voters. First, not all drop boxes in 2022 are in the same location as 2020. It is difficult to anticipate how this would affect the behavior of voters—with new locations potentially being more or less convenient. Second, voters are able to learn about new locations, which could shift the location ballots are returned. Nevertheless, this calculation provides insight into the extent voters returned their mail-in absentee ballots to a smaller number of drop boxes.

134. Table 21 contains these quantities. The first column is the county, the second is the number of drop boxes in 2022, the third the number of drop boxes in 2020, the fourth is the share of drop boxes that receive less than 1% of the ballots in 2020, the fifth is the share of drop boxes that receive less than 2% of the ballots in 2020, and finally, the last column calculates the share of ballots returned to the top drop boxes in the county in 2020, with the number

of top drop boxes included in the summation determined by the number of drop

boxes available in the 2022 general election.

| County | Boxes 2022 | Boxes 2020 | Share < 1% | Share < 2% | Share Returned Top Dropboxes |
|---|---|---|---|---|---|
| Fulton | 7 | 37 | 0.30 | 0.49 | 0.48 |
| DeKalb | 6 | 32 | 0.56 | 0.75 | 0.81 |
| Gwinnett | 6 | 23 | 0.17 | 0.26 | 0.61 |
| Cobb | 6 | 16 | 0.06 | 0.12 | 0.74 |
| Chatham | 3 | 10 | 0.20 | 0.50 | 0.85 |
| Douglas | 1 | 10 | 0.20 | 0.20 | 0.70 |
| Rockdale | 1 | 8 | 0.38 | 0.75 | 0.92 |
| Clayton | 3 | 7 | 0.14 | 0.43 | 0.94 |
| Clarke | 1 | 6 | 0.17 | 0.17 | 0.52 |
| Bartow | 1 | 5 | 0.00 | 0.00 | 0.50 |
| Richmond | 1 | 5 | 0.00 | 0.00 | 0.69 |
| Dougherty | 1 | 4 | 0.00 | 0.00 | 0.80 |
| Fayette | 1 | 4 | 0.00 | 0.00 | 0.64 |
| Bibb | 1 | 3 | 0.00 | 0.67 | 0.97 |
| Cherokee | 2 | 3 | 0.00 | 0.00 | 0.90 |
| Glynn | 1 | 3 | 0.00 | 0.00 | 0.90 |
| Houston | 2 | 3 | 0.00 | 0.00 | 0.98 |
| Jackson | 1 | 3 | 0.00 | 0.33 | 0.95 |
| Muscogee | 1 | 3 | 0.00 | 0.00 | 0.85 |
| Paulding | 1 | 3 | 0.00 | 0.00 | 0.80 |
| Troup | 1 | 3 | 0.00 | 0.00 | 0.89 |
| Appling | 1 | 2 | 0.00 | 0.00 | 0.70 |
| Baldwin | 1 | 2 | 0.00 | 0.00 | 0.82 |
| Bryan | 1 | 2 | 0.00 | 0.00 | 0.84 |
| Dooly | 1 | 2 | 0.00 | 0.00 | 0.93 |
| Floyd | 1 | 2 | 0.00 | 0.00 | 0.62 |
| Hart | 1 | 2 | 0.00 | 0.00 | 0.84 |
| Jefferson | 1 | 2 | 0.00 | 0.00 | 0.75 |
| Newton | 1 | 2 | 0.00 | 0.00 | 0.78 |
| Peach | 1 | 2 | 0.00 | 0.00 | 0.72 |
| Talbot | 1 | 2 | 0.00 | 0.00 | 0.62 |
| Tift | 1 | 2 | 0.00 | 0.00 | 0.82 |
| Walton | 1 | 2 | 0.00 | 0.00 | 0.78 |

Table 21: Dropbox Usage in the 2020 Election

135.   While there is considerable county-to-county variation, Table 21

shows that there is a concentration of drop box use in each county in Georgia.

For example, in 2020, in Fulton County, 18 drop boxes received less than 2%

of mail-in absentee ballots returned via drop box and 11 drop boxes received

less than 1% of mail-in absentee ballots returned via drop box. If I aggregate

the share of ballots returned to the most used 7 drop boxes, corresponding to

the number of drop boxes used in the 2022 election, I find that 48% of all ballots

were returned to those drop boxes. By this measure, Fulton County's drop box

use was the least concentrated among all counties. In 2020, in DeKalb County,

75% of drop boxes received less than 2% of the ballots, and the 6 drop boxes

receiving the most ballots received 81% of all mail-in absentee ballots returned

via drop box in the county. As this statistic indicates, drop box usage in DeKalb

County was concentrated on a small number of drop boxes. One drop box, the

DeKalb Voter Registration and Elections Office, received 42.3% of mail-in

absentee ballots returned via drop box. That drop box was available in the 2022

election.[52] Of the remaining counties with more than 5 drop boxes in the 2020

election—Gwinnett (61%), Cobb (74%), Chatham (85%), Douglas (70%),

---

[52] Jonathan Raymond, *Where to find drop boxes around metro Atlanta*, 11Alive
(Oct. 10, 2022), https://tinyurl.com/mrx6j3hr.

Rockdale (92%), Clayton (94%), and Clarke (52%)—all have a small number of drop boxes that received a large share of ballots.

136.   Using data from Douglas County, I find that both Black and white voters who returned their ballots via drop box concentrated their ballots on a single location in the county. As Dr. Burden notes, most counties did not collect data on the voters who used absentee drop boxes. But Douglas County collected the unique voter identification number with each absentee ballot returned via drop box, along with the drop box that the ballot was collected from. Using the Douglas County data, I examined where Black and white voters returned their ballots and found that voters across self-identified racial groups returned a large share of their ballots to a single location. To make this assessment, I merged into the Douglas County drop box data voters' self-reported racial identification as recorded in the voter file. Using this new data set, I calculated that 73.9% of Black voters returned their ballots to a single drop box location, while 64.7% of white voters returned their ballots to the most used location. I also find a similar concentration of mail-in absentee ballots returned via drop box at a single location in Douglas County in 2020 among American Indian (81%), Asian (75%), and Hispanic (67.3%) voters. Notably this drop box, located

112

at the Douglas County Board of Elections, was also the drop box location available in Douglas County during the 2022 election cycle.[53]

### D. Changes in the Distance to the Nearest Drop Box are Poor Estimates of the Effect of SB 202 on how Voters Use Drop Boxes

137. Two of the Plaintiffs' experts—Dr. Chatman and Dr. Fraga—performed an analysis of the effect of SB 202's drop box regulation on the voters' distance to the nearest drop box. Dr. Chatman's goal, in part, is to assess "the travel burden that would be incurred by citizens of voting age (CVAs) in the course of dropping off a ballot at a drop box in 2020 before the implementation of SB 202" and then compare that to the travel burden when "dropping off a ballot at a drop box in 2022 after the implementation of SB 202." Chatman Rep. 1. Dr. Fraga reports (at 6–7) that his investigation shows that "[t]he reduction in the number of drop boxes resulting from SB202 had a disproportionate impact on the distance Black, Hispanic, and Asian American/Pacific Islander registrants had to travel in order to vote via drop box, relative to White registrants."

---

[53] Douglas County, *Drop Box Locations* (archived Nov. 8, 2022), https://web.archive.org/web/20221108105922/https://www.celebratedouglasco unty.com/562/Drop-Box-Locations.

138. Dr. Chatman and Dr. Fraga never explicitly define the specific causal quantity they seek to estimate. But based on their statement of findings, there are, at least, two potential targets of their inference. One potential causal quantity of interest is how SB 202 affects the average travel time or distance all voters would experience if they decided to return their ballot via drop box. Specifically, this quantity would suppose that all voters decided to return their mail-in absentee ballot via drop box. Then, the causal quantity would compare the average travel time/distance to return a ballot to a drop box after SB 202 to the average travel time/distance to return a ballot to a drop box before SB 202. This causal quantity is difficult to interpret, because most voters do not cast their ballot via mail-in absentee, let alone return their ballot via drop box. A second potential causal quantity of interest is the effect of SB 202 on travel time for those voters who returned their ballot via drop box in the 2020 election. Focusing on voters who return their ballot via drop box, this causal quantity compares their average travel time to the drop box in the 2020 election to the average travel time to drop boxes in the 2022 election. This causal quantity focuses on the effect of SB 202 on those voters who plausibly use drop boxes to return their ballots and will be the causal quantity I target below.

139. Ideally, an analysis would measure the actual average travel time to the actual drop boxes voters had used (or would use) in the 2020 election and compare that to the average travel time to the actual drop boxes voters had used (or would use) in the 2022 election. But neither Dr. Chatman nor Dr. Fraga have data on which drop boxes voters use, nor do they have data on which voters return their ballot via drop box. Instead, Dr. Chatman and Dr. Fraga assume that voters will use the drop box closest to their residence. Based on this assumption, Dr. Chatman and Dr. Fraga equate the cost voters would incur if they decided to cast their ballot via drop box with the travel time/distance to the nearest drop box. Dr. Chatman and Dr. Fraga then estimate how voters' proximity to the nearest drop box changes after SB 202 and evaluate this as their estimate of SB 202's effect on the cost of returning mail-in absentee ballots via drop box.

140. The conclusions of this analysis are strongly dependent on the assumption that voters return their ballots to the drop box closest to their residence. If many voters use other drop boxes to return their ballots, for whatever reason, then the average change in the nearest drop box will be irrelevant for estimating how voters' travel burden changes before and after SB 202. More precisely, if some voters prefer to use other drop boxes, then using the change in proximity to the nearest drop box would cause bias in Dr.

115

Fraga and Dr. Chatman's estimate of SB 202's effect on travel burden, with the size and direction of that bias of unknown direction and magnitude. To build intuition for this bias, consider a simple example. Suppose a hypothetical voter in a hypothetical county can return their ballot to one of four potential drop boxes in the 2020 election—A, B, C, and D. Drop box A is the furthest from the voter's residence, but located near the voter's place of employment, so the voter returned their mail-in absentee ballot at drop box A in the 2020 election. While ostensibly closer, drop boxes B, C, and D are less centrally located and less convenient for the voter. After SB 202, suppose that drop boxes B, C, and D were closed. But the voter continued to have the same place of employment and, in the 2022 election, continued to use drop box A. As a result, there was no change in their cost of returning that ballot despite the decrease in available boxes and an increase in the distance to the nearest drop box. But Dr. Fraga and Dr. Chatman's analysis would mistakenly say that this voter experienced an increased cost of returning their mail-in absentee ballot via drop box. This is just one example of how assuming voters return their ballots to the nearest drop box can cause bias of unknown size and magnitude in estimates of how SB 202 affected the cost of returning ballots. Neither Dr. Fraga nor Dr. Chatham performed a specific analysis to calculate the proportion of voters in Georgia who return their mail-in absentee ballots to the

116

closest drop box, nor did they consider how deviations from this assumption could affect their estimates.

141. Dr. Fraga defends the assumption that voters will return their ballot to the nearest drop box by arguing (at 67) that "[e]xtant evidence indicates that individuals are more likely to use a drop box near their place of residence" citing an academic study using data from Washington state. Collingwood and Gonzalez O'Brien (2021) calculated where voters in Washington state returned their voted absentee ballots in the August 2020 Washington primary election.[54] Washington state provides information on whether voters use a drop box to return their ballot and which drop box is used. Analyzing this administrative data set, Collingwood and Gonzalez (2021) find that, among voters who return their ballot via drop box, 52.4% of voters who use drop boxes return their ballot to the drop box nearest their residence and 47.6% of voters who return their ballot via drop box choose a drop box location other than the one closest to their home. But if Georgia were similar to Washington, then Dr. Fraga and Dr. Chatman's estimate of the effect of SB 202 on the cost of returning a ballot to a drop box would suffer from bias.

---

[54] Collingwood, Loren, and Benjamin Gonzalez O'Brien. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." American Politics Research 49.6 (2021): 604-617.

142.  Dr. Chatman never justifies the assumption that voters will return their ballot to the nearest drop box. He does cite cost as an important determinant of voters' turnout decision, arguing (at 7) that "[v]oters are significantly affected by the costs of voting, most of which have to do with the time required to prepare to vote and to carry out voting; and the costs of voting are a greater determinant of the likelihood to vote than conventional measures of the benefit of voting such as the perceived differences between parties, the perceived closeness of the election and the long-range value of voting participation." Supporting this claim, Dr. Chatman cites Sigelman and Barry (1982). Sigelman and Barry (1982) uses survey-based data to assess correlates of voter participation. To measure the cost of voting, Sigelman and Barry (1982) ask survey respondents, "For you personally, getting to the polls and waiting to vote usually takes a lot of time and effort."[55] It is unclear how responses to this question would inform his analysis of drop box usage. Chatman also cites Blais, Young, and Lapp (2000), which analyzes elections in British Columbia and Quebec. Blais, Young, and Lapp (2000) report that their findings "demonstrate that these rational considerations [cost, benefits,

---

[55] Sigelman, Lee, and William D. Berry. "Cost and the Calculus of Voting." Political Behavior 4 (1982): 419-428.

probability of affecting outcome] are much less important in voting than people's sense of duty: the feeling that one has a moral obligation to vote appears to be the overriding motivation for going to the polls."[56] It is also unclear how this analysis informs Chatman's analysis of drop box use.

143. Survey evidence shows that Georgia voters use a variety of considerations when deciding where to return their ballot, not just proximity. Dr. Lichtman cites (at 21) evidence from MIT's Survey of the Performance of American Elections ("SPAE") on how drop box voters selected which drop box to return their ballot. I downloaded the survey results and analyzed a question about where drop box voters return their mail-in absentee ballot in Georgia, calculating totals after applying the standard survey weight provided. Among Georgia voters who report returning their ballot via drop box, 35.9% report selecting a location because it was "close to my home." But 25.9% of respondents report selecting a drop box because it was "convenient to work or school" or because "it was close, or on my way, to where I had errands to run." 15.2% of respondents report using the only drop box available to them, while

---

[56] Blais, André, Robert Young, and Miriam Lapp. "The calculus of voting: An empirical test." European Journal of Political Research 37.2 (2000): 181-201.

another 21.5% report selecting a drop box for reasons other than convenience, proximity, or lack of options.

144.   To assess where Georgia voters returned their ballot when using a drop box with administrative data, I used the drop box data from Douglas County, which (as discussed earlier) retained a unique identifier for each returned ballot. Using data that maintains voter's unique identification number, I merged in voters' residence and race-based information. I then calculated the share of voters who returned their ballot to the drop box closest to their residence, based on the residence reported in the November 2022 voter file. Specifically, I used the Google Maps API to calculate the distance from the voters' residence as reported in the voter file and each of the 10 drop boxes used in the 2020 election. I focused on distance via driving to the nearest drop box, necessarily removing ballots marked as "SPOILED" or electronic ballots because they had no reported location. I used driving distance for several reasons. First, calculations based on time using the Google Maps API are dependent on estimated traffic conditions for a future date, rather than historical traffic conditions. Second, many transit routes do not exist for Douglas County. Further, transit routes could have changed from 2020 to 2022 causing bias in an unknown direction in the estimate of transit distance and time. As an alternative to driving distance, I could use walking distance to the

nearest drop box. I sampled 20 voters and manually compared the conclusions calculated using walking and driving distance. I reached the same conclusion for this small sample whether I use walking or driving. After calculating the distance from the voter's residence and the drop boxes, I then calculated whether voters returned their ballot to the nearest drop box and the difference in distance between the drop box voters used and the nearest drop box.[57]

145.    Table 22 presents the results of this calculation by self-identified race and overall. Overall, I find that 22% of mail-in absentee ballot voters in Douglas County return their ballots to the nearest drop box. Across racial groups, I find that 21% of Black mail-in absentee voters who use drop boxes in Douglas County return their ballots to the nearest drop box, and 23% of white mail-in absentee voters who use drop boxes return their ballots to the nearest drop box. The self-identified racial group who returned the largest share of their ballots to the nearest drop box were Asian mail-in absentee voters who returned their ballot via drop box, with 34% returning their ballot to the nearest drop box.

---

[57] I discuss how I address potential voter relocation below. All calculations are made for voters whose residence is in Douglas County.

| Race | Share, Closest Driving |
|------|------------------------|
| American Indian | 0.09 |
| Asian | 0.34 |
| Black | 0.21 |
| Hispanic | 0.16 |
| White | 0.23 |
| Overall | 0.22 |

Table 22: Share of ballots returned to nearest drop box, both overall and by self-identified racial group.

146.    Based on my calculations, I found that Douglas County drop box voters tended to travel beyond the nearest drop box to their homes. Among all Black drop box voters, I find that the median voter uses a drop box 1.47 miles further from their home than the nearest drop box. Among Black drop box voters who do not use the closest drop box, the median driving distance is 1.80 miles. Among white drop box voters, I find the median voter uses a drop box 1.37 miles further from their home than the nearest drop box. If I subset to white drop box voters who don't use the nearest drop box, I find the median distance traveled is 1.95 miles further than the closest drop box. Overall, I calculated that the median drop box voter in Douglas County uses a drop box 1.44 miles further from their residence than the nearest drop box.

147.    This analysis assumes that voters' current address in the registration file corresponds to their address in the 2020 election. This, of course, could be wrong for a subset of voters. This assumption would matter for my conclusions about the share of voters who use the closest drop box if

voters had moved since casting their ballots in 2020, and that move would cause me to incorrectly classify the voter as not using the closest drop box. I tested this assumption in multiple ways. First, I subset the analysis to voters whose last date of change in the voter file was immediately prior to the 2020 election. Among this group, 28.4% returned their ballot to the nearest drop box. This is qualitatively similar to the analysis from the full data set, though a higher rate of using the drop box nearest to the voters' residence. I also assessed whether using the March 2022 voter file would indicate more voters using the drop box nearest their residence. Among the 3.7% of registrants who address changed from March to November, I classified 12.4% of voters as using the nearest drop box using their address from the March registration file, compared to 11.4% of voters using the nearest drop box if I used the address from the November 2022 voter file. Even if I make implausible assumptions about how the rate of moving biases my estimated share of voters using the nearest drop box, I reach a qualitatively similar conclusion about the share of Douglas County voters using the nearest drop box.[58] According to Dr. Burden, the Census Bureau estimated 8.2% of the Black population in Georgia moved

---

[58] This is an example of a sensitivity analysis, as described in Manski, Charles F. "Credible interval estimates for official statistics with survey nonresponse." Journal of Econometrics 191.2 (2016): 293-301.

within a county in 2021, the highest rate among self-identified racial groups.[59] I will suppose that 8.2% of drop box voters in Douglas County moved each year since the 2020 election. Given that two years elapsed, I'll suppose 16.4% of drop box voters have moved.[60] Further, I will suppose every move happens among voters I classified as not using the closest drop box and that before the move the voter used the drop box closest to their residence, so my classification is in error. Even under these implausible assumptions, I would find that 38.4% of Douglas County voters used a drop box closest to their residence or 61.6% did not use the closest drop box. Therefore, even under these implausible assumptions, Douglas County's data shows that many voters use a different drop box than the one that is closest.

148. For a super majority of voters in Douglas County, equating changes in the distance to the nearest drop box with a change in the cost of voting is incorrect. While other Georgia counties do not collect information on who returns their ballots to which drop box, I used a different strategy to assess whether the observed distribution of mail-in absentee ballots across drop boxes in Georgia counties is consistent with voters in that county using the closest

---

[59] Burden Rep. 25.

[60] This further supposes that a distinct set of individuals move each year, rather than the same person moving twice.

drop box. To make this assessment, I used the Census geolocating tools as implemented in the censusxy package in the R programming language to geolocate all voters in the 2020 election who voted via mail-in absentee ballot in the 2020 election. I identified the mail-in absentee ballot voters using the 2020 absentee voter file, and I used the registration file and the canceled voter file to obtain voters' residences. I also geolocated each of the drop boxes used in the 2020 election. Then, I calculated the straight-line distance of voters to the drop boxes in their county, a similar distance calculation strategy to what Dr. Fraga deployed in his expert report. Using these calculated distances, I determined which drop box was closest to the voters' residence. I then made a variety of comparisons to assess whether the actual distribution of ballots across drop boxes in a county was consistent with the distribution of ballots in a county we would expect if voters cast their ballot at the nearest drop box.

149. To assess whether the observed distribution of ballots across drop boxes was consistent with voters using the nearest drop box, I necessarily have to make consequential assumptions about which subset of mail-in absentee voters return their ballot via drop box in a particular county. My primary assumption is that drop box voters' locations were representative of all mail-in absentee ballot voters within a particular county. To assess this assumption, I used the SPAE to predict drop box use in Georgia, focusing on within county

125

variation among the voters who report voting by mail-in absentee ballot. I find, among mail-in absentee voters, that Black voters are slightly less likely than white voters to report returning their ballots via drop box and that retired voters and self-reported homemakers were slightly more likely to use a drop box to return their ballot. There is no clear implication of these correlations on the geographic distribution of voters who return their ballots via drop box. I then assessed whether the actual distribution of ballots across drop boxes was similar to the distribution of ballots across drop boxes I would expect if voters cast their ballots at the nearest drop box. I made this assessment using a standard statistical tool in statistics, called a $\chi 2$-test (chi-squared test). To use this test, I first assume a null hypothesis: that the true state of the world is that voters cast their ballots at the nearest drop box. This null hypothesis implies an "expected" number of ballots to be returned at each of the drop boxes. I then calculated how surprising the distribution of actual ballots across drop boxes would be by comparing the actual number of ballots returned to drop boxes in a county to the expected distribution of ballots under this null hypothesis. To do this, I followed standard practice when calculating the "p-value" for this null hypothesis. Specifically, the p-value measures the probability of observing this pattern across drop boxes, or one more surprising, under the null that voters use the closest drop box.

126

150. Using this $\chi$2-statistic, I rejected the null hypothesis that voters cast their ballot at the nearest drop box in every county in the 2020 election with more than one drop box, with associated p-values well below the standard significance levels. In other words, the observed distribution of drop box returns is unlikely under the null voters returned their ballot to the nearest drop box. The reason the $\chi$2-test rejects this null is that ballot returns are concentrated on a smaller set of drop boxes than would be expected if voters returned their ballots at the nearest drop box. The result is that there are often large discrepancies between the actual number of ballots returned at the most used drop box in a county and the expected number of ballots returned at a drop box in a county if voters cast their ballot at the closest drop box. For example, in Gwinnett County, the largest discrepancy between the actual share of ballots received at a drop box and the share expected if voters had cast their ballots at the nearest drop box was 28.0 percentage points. In Fulton County, the biggest discrepancy between the actual share of ballots received at a drop box and the expected share was 5.3 percentage points. But in other counties with several drop boxes in 2020 the maximum discrepancy is comparable or larger than the discrepancy in Gwinnett County. This includes Cobb County (20.1 percentage points), Chatham (52.5 percentage points), Rockdale (81.9 percentage points), Clayton (58.7 percentage points), and

Bartow (23.2 percentage points). Across all counties with more than one drop box in the 2020 election, the average maximum discrepancy between the share actually returned in a drop box and the share expected in that drop box was 37.4 percentage points.

151.    Because of this concentration of ballots on a small number of drop boxes, my conclusion that many voters return ballots to drop boxes other than the closest drop box is robust to several potential objections. First, voters might move and that could cause me to incorrectly reject the null hypothesis. To assess how much moving was necessary to explain the distribution of ballots across drop boxes, I engaged in a sensitivity analysis. Specifically, I examined the minimum share of voters who would have to have moved in order to fail to reject the null that ballots were returned to the nearest drop box. I first derived a formula to compute how the distribution of ballots would change if I assumed a particular share of voters moved in the exact optimal way to render the observed distribution of drop boxes as close as possible to voters returning ballots to the nearest drop box. I then found the minimum proportion of movers where I failed to reject the null hypothesis that the distribution of ballots returned to drop boxes are due to voters returning to their nearest drop box. On average across counties, I found that 77.3% of drop box voters would have to optimally move to fail to reject the null. My conclusion is also not due to

128

errors in geolocating voters. To make this determination, I assumed that the voters I couldn't geolocate cast their ballots at drop boxes to optimally reduce the difference between the actual number of ballots across drop boxes and the number expected if voters returned their ballots to the nearest drop box. Under this assumption, I continue to reject the null hypothesis that voters cast their ballot at the nearest drop box in every county but Floyd County.

152.  Because voters do not use the closest drop box to their residence, merely assessing changes in the distance to the nearest drop box will be a poor estimate of the effect of SB 202 on the costs voters incur when returning their drop box ballots. Specifically, using the change in distance to the nearest drop box will be a biased estimate of the effect of SB 202 and the direction and the size of this bias is unknown. Even though some voters use the nearest drop box to return their ballots, in most counties in Georgia we cannot use this information to assess the effects of SB 202, because we do not know which voters return their ballots to the nearest drop box.

153.  That said, I am able to use data from Douglas County and specific assumptions about voters' behavior to assess the effect of SB 202 on distance traveled to drop boxes among the voters who returned their mail-in absentee ballot via drop box in the 2020 election. In this analysis, I ask how much SB 202 would potentially affect the distance traveled to deliver a ballot to a drop

box among voters who used a drop box to return their ballot in the 2020 election in Douglas County. Using the data from Douglas County, I first computed the distance voters traveled from their residence to the drop box where they deposited their ballot in the 2020 election. Then, I computed the distance from the voters' residence to the single drop box in the county in the 2022 election. I then calculated the difference between the 2022 distance and the 2020 distance. Table 23 calculates the average change in distance, in miles, using this calculation.

| Race | Average Difference (in miles) |
|---|---|
| American Indian | 0.67 |
| Asian | 0.33 |
| Black | 0.22 |
| Hispanic | 0.16 |
| White | 0.58 |

Table 23: Average difference between distance from voters' residence to the drop box in Douglas County in 2022 and the distance from voter's residence to the drop box where they deposited their ballot, in miles.

154. Table 23 shows that focusing on the change in distance for drop box voters in Douglas County demonstrates a different pattern of the effects of SB 202 than portrayed in Dr. Fraga's and Dr. Chatman's reports. First, the actual changes in the distances are much smaller, with the average additional distance for Hispanic voters slightly less than 300 yards, for Black voters it is less than a quarter mile. Further, after SB 202, white voters' travel distance

increases more than twice the increase in distance for Black voters and more than three times the increase in distance for Hispanic voters.

## IX.  VOTER IDENTIFICATION REQUIREMENT ON ABSENTEE BALLOT APPLICATIONS

155.  SB 202 includes a provision that requires voters applying for a mail ballot to provide a driver's license number or, if the voter does not have a driver's license, a state identification number, a county voter identification card, or a photocopy of other acceptable forms of identification. When submitting the voted ballot, the voter is required to provide information about their driver's license or the last four digits of their social security number if they applied using a photocopy of alternative identification.

156.  According to the preamble of SB 202, the identification requirement when applying for an absentee ballot was put in place to replace the signature matching requirement that had been in place previously. The preamble to SB 202 calls this procedure a "subjective" signature-matching requirement and cited previous lawsuits. Other academic studies have identified that signature matching to validate ballots is a potentially arbitrary

process.[61] Government agencies have also identified signature mismatches as a primary reason mail-in absentee ballots were rejected in the 2020 election. According to the Election Assistance Commission, among all rejected mail-in absentee ballots, 32.8% of mail-in absentee ballots were rejected because of a nonmatching signature. An additional 12.1% of ballots that were rejected were rejected because of a missing signature.[62] Together, the EAC's evidence implies that, nationwide, slightly less than half of mail-in absentee ballots that were rejected in the 2020 election were rejected because of signature issues.

157.   According to the NCSL, there are three other states that require identification when returning absentee ballots: Arkansas, Minnesota, and Ohio.[63] Arkansas "requires a copy of the voter's ID to be returned with the absentee/mail ballot." Minnesota not only requires identification like Georgia but "also requires a witness signature" and Ohio requests identification information, but then also engages in "signature verification." Other states

---

[61] Swift, Clint S., and Delaney Gomen. "Invalid Signature Rejections in Georgia Absentee Voting." Available at: https://electionlab.mit.edu/sites/defau lt/files/2021-07/swiftgomen_garejections.pdf.

[62] Election Assistance Commisssion, *Election Administration And Voting Survey 2020 Comprehensive Report* 14 tbl. 2, https://tinyurl.com/yk2kdwru.

[63] National Conference of State Legislatures, *Table 14: How States Verify Voted Absentee/Mail Ballots* (Mar. 15, 2022), https://tinyurl.com/y5yrcbfd.

validate ballots using other procedures. For example, Alabama requires two witnesses or a notary to validate the mail-in absentee ballot. Alaska, Louisiana, North Carolina, Rhode Island, South Carolina, Virginia, and Wisconsin all require witness signatures. And three states, Mississippi, Missouri and Oklahoma, require notarized return forms.

158.    There is a large academic literature that has examined the effect of voter identification laws on overall turnout and turnout across racial groups, though this literature has focused on the overall effect of the laws and not on the use of identification for the mail-in absentee ballot application process specifically. The consensus of the literature on the effect of voter identification laws on turnout is that "a small number of studies have employed suitable research designs and generally find modest, if any, turnout effects of voter identification laws."[64]

159.    When studying the effect of voter identification laws, some studies examine the overall effect of the law in a state without differentiating between individuals with and without identification. Estimating the overall effect of voter identification laws is challenging. This is in part because a standard

---

[64] Highton, Benjamin. "Voter identification laws and turnout in the United States." Annual Review of Political Science 20 (2017): 149-167.

method for assessing turnout, survey-based methods where respondents are asked about whether they turned out, are unlikely to be an effective tool for studying the effect of the voter identification laws. In Grimmer et al. (2018), my collaborators and I demonstrated that the conclusions in Hajnal et al. (2017), a recent study claiming to show voter identification laws deter minority turnout, were based on a data error.[65] Specifically, we show that the conclusions in Hajnal et al. (2017) were affected by erroneously measuring a 0% turnout rate in Virginia in several elections. Once we corrected this data error, we found that survey-based methods were unable to provide a precise estimate of the effect of the laws, with small research design decisions that were equally defensible yielding different estimates of the law's effect. Dr. Lee cites evidence from this study, but the estimates he reports come from cross-sectional comparisons that fail to address baseline differences across states.[66] In Grimmer et al. (2018), we show that the cross-sectional comparisons are confounded because states that eventually adopt voter identification laws had lower turnout rates before adopting the law. The analysis we conduct in

---

[65] Grimmer, Justin, et al. "Obstacles to estimating voter ID laws' effect on turnout." The Journal of Politics 80.3 (2018): 1045-1051; Hajnal, Zoltan, Nazita Lajevardi, and Lindsay Nielson. "Voter identification laws and the suppression of minority votes." The Journal of Politics 79.2 (2017): 363-379.

[66] Lee Rep. 91.

Grimmer et al. (2018) uses a within-state design that adjusts for baseline differences between states. Once we deploy this design, we fail to find a consistent effect of voter identification laws on turnout, contradicting the effect estimates Dr. Lee reports.

160.  In place of survey-based methods to measure the effect of voter identification laws, Cantoni and Pons (2021) instead use voter files to measure voter turnout and assess the effect of voter identification laws.[67] Based on voter files from 2008 to 2018, Cantoni and Pons (2021) find that "the laws have no negative effect on registration or turnout, overall or for any group defined by race, gender, age, or party affiliation." Cantoni and Pons (2021) find that voter identification laws cause a "+1.4 percentage points for the effect on the turnout of nonwhite voters relative to whites" though the effect is estimated too imprecisely to reject a null of no effect and therefore the authors do not conclude voter identification laws increase turnout. The conclusion from these recent studies is that the best evidence is that the overall effect of voter identification laws is, at most, a small, but imprecisely estimated effect on turnout. Further, when examining the overall effect of the laws on state

---

[67] Cantoni, Enrico, and Vincent Pons. "Strict ID laws don't stop voters: Evidence from a US nationwide panel, 2008–2018." The Quarterly Journal of Economics 136.4 (2021): 2615-2660.

turnout, the best evidence is that voter identification laws do not cause an overall increase in the gap between white and non-white voter turnout.

161.  There is reason to believe that the estimated effects from this literature would overstate the effect of requiring voter identification when applying for an absentee ballot, as required by SB 202. The prior literature examines moves from no voter identification laws to voter identification laws. As a result, these prior studies largely examine a bigger policy shift than occurred after SB 202 was put in place. SB 202 made no change to the requirement of showing voter identification when voting in person: both before and after SB 202 was passed, the state required voters to show identification in person when voting, whether voting early in person or on Election Day.[68] Because SB 202 only created a requirement to provide identification when applying for and submitting a mail-in absentee ballot application, a more applicable study would focus merely on the shift to require identification information when applying for an absentee ballot.

---

[68] For example, Georgia Secretary of State, *2018 Elections And Voter Registration Calendar* (archived Nov. 9, 2018), https://web.archive.org/web/20181109041147/http://sos.ga.gov/index.php/elect ions/2018_elections_and_voter_registration_calendar.

162.    An alternative approach to assess the effects of voter identification laws is to examine within a state and calculate the effects among those without identification. In Grimmer and Yoder (2022), we argue that voter identification laws could deter voters through a mechanical effect: individuals without proper identification attempt to vote are deterred from voting because they lack the requisites to cast a ballot.[69] This mechanical effect could affect voters without identification who attempt to cast a ballot, or it could affect voters with identification who have misplaced the identification when they turn out to vote. In Grimmer and Yoder (2022), we examined a North Carolina election where a voter identification law was in place and find that approximately 1,169 voters were deterred because they lacked proper identification when they arrived at the polls to vote and because these individuals did not return to cure their provisional vote. We find that a larger share of in-person votes from Black voters are rejected for lack of identification than white voters. In total, 648 white voters had their ballot rejected for identification reasons (55.4% of in-person votes, though 78.2% of in person votes come from white voters), while

---

[69] Grimmer, Justin, and Jesse Yoder. "The durable differential deterrent effects of strict photo identification laws." Political Science Research and Methods 10.3 (2022): 453-469.

421 Black voters had their ballots rejected for absentee reasons (36% of in-person voters, though 17.1% of in-person votes come from Black voters).

163.  This is similar to the findings in Fraga and Miller (2022), who examined who votes without identification in the 2016 Texas general election.[70] Fraga and Miller (2022) find that among those voters who cast ballots without identification, 27% said they voted without identification because it was "Lost or stolen", which Fraga and Miller (2022) describe as "the most widely chosen" explanation. While this study is useful to understand who might vote without identification, it requires the assumption that voters' behavior would remain the same in an election where identification is required. As noted above, voters are likely to receive information and respond to requirements to bring identification to cast a ballot.[71] This would reduce the mechanical effect of the identification laws in the Fraga and Miller (2022) study.

164.  In order to assess the number of returned mail-in absentee ballots rejected, I examined both the number and share of returned mail-in absentee

---

[70] Fraga, Bernard L., and Michael G. Miller. "Who Do Voter ID Laws Keep from Voting?." The Journal of Politics 84.2 (2022): 1091-1105.

[71] Citrin, Jack, Donald P. Green, and Morris Levy. "The effects of voter ID notification on voter turnout: Results from a large-scale field experiment." Election Law Journal 13.2 (2014).

ballots rejected for voter identification-related reasons in the 2022 general election in Georgia.[72]

165. Table 24 presents the number of mail-in absentee ballots rejected because of insufficient identification and the rate they are deterred in the 2022 general election. Overall, 1,145 returned mail-in absentee ballots were rejected because of insufficient or incorrect identification. This constituted approximately 0.46% of all returned mail-in absentee ballots. Table 25 presents the number of ballots rejected because of insufficient identification and the rate they are rejected in the 2022 general election runoff. In the 2022 general runoff, 1,570 voters had their ballots rejected because of identification issues, which was approximately 0.82% of all mail-in absentee ballots.

| Race | Number Rejected | Rejected Rate |
|---|---|---|
| American Indian | 4 | 0.0062 |
| Asian | 48 | 0.0062 |
| Black | 467 | 0.0059 |
| Hispanic | 18 | 0.0043 |
| White | 484 | 0.0036 |
| Overall | 1,145 | 0.0046 |

Table 24: Number of mail absentee ballots rejected due to missing or improper identification in 2022 general election, by self-reported racial group and overall.

[72] To create an identification-related reason category, I collapsed three stated reasons for ballot rejection from a drop down menu: "Incorrect ID Information", "MIDR - ID not Provided", "Missing ID Information."

| Race | Number Rejected | Rejected Rate |
|---|---|---|
| American Indian | 3 | 0.0072 |
| Asian | 65 | 0.0138 |
| Black | 467 | 0.0083 |
| Hispanic | 22 | 0.0095 |
| White | 890 | 0.0079 |
| Overall | 1,570 | 0.0082 |

Table 25: Number of mail absentee ballots rejected due to missing or improper identification in the December 2022 runoff election, by self-reported racial group and overall.

166.    Tables 24 and 25 do not exhibit consistent differences across self-reported racial groups in the rates returned mail-in absentee ballots are rejected because of identification-related reasons. For example, in the 2022 general election, 0.36% of mail-in absentee ballots from white voters were rejected for identification reasons, but 0.59% of mail-in absentee ballots from Black voters were rejected, a difference of 0.23 percentage points. But in the runoff election, the gap was reduced to 0.04 percentage points, with nearly twice as many white votes rejected for identification-related reasons.

167.    I also calculated the share of mail-in absentee ballot applications that were rejected because of an ID-related issue. To make this calculation, I manually coded the "Status Reason" for rejected mail-in absentee ballot applications. I coded two categories: (1) ballots that were rejected because they failed to include identification and (2) ballots that were rejected because the provided identification did not match to the official records. I separated these

140

two quantities because Dr. Meredith identifies a set of voters who have mismatched records between the DDS and the voter registration file, and I sought to measure the extent to which this manifested in mail-in absentee ballot application rejections. In Table 26, I calculated these quantities.

168. Table 26 Column 2 shows the share of mail-in absentee ballot applications rejected due to an identification mismatch between the application and the official records. Overall, this sort of rejection is rare: 0.02% of mail-in absentee ballot applications are rejected due to an identification mismatch. This low-prevalence is found across voters from different self-identified racial groups, but the proportion is higher for Black voters: 0.05% of mail-in absentee applications from Black voters are rejected for an identification mismatch, while 0.01% of mail-in absentee ballot applications from white voters are rejected for a mismatch. Based on the information in the absentee voter file, I'm unable to determine why an identification mismatch is cited for an application rejection. That said, the low rate of rejection due to an identification mismatch indicates the outdated identification information discussed in Dr. Meredith's report did not manifest in a large increase in the rejection of absentee ballot applications. Similarly, mail-in absentee ballot applications are rejected 0.07% of the time for missing identification, with a

0.05 percentage point difference between Black (0.1%) and white (0.05%) applicants.

| Race | Reject, ID Mismatch | Reject, ID Missing |
|---|---|---|
| American Indian | 0.0000 | 0.0000 |
| Asian | 0.0002 | 0.0013 |
| Black | 0.0005 | 0.0010 |
| Hispanic | 0.0004 | 0.0004 |
| White | 0.0001 | 0.0005 |
| Overall | 0.0002 | 0.0007 |

Table 26: Share of Mail-In Absentee Ballot Applications Rejected because of ID Mismatch and ID Missing

169. There is also a trade off with voter-identification requirements, because they can improve the functioning of election administration. The nonpartisan Carter Center observed the Georgia election and cited voter identification as an important reason the election was run smoothly. The Carter Center explained that on Election Day polling places were able to serve many voters quickly, in part, because of "voter confirmation via ID scan rather than manual entry."[73] More directly relevant to SB 202 the Carter Center stated that

> Election law changes in SB202, requiring that both absentee applications and completed ballots include a driver's license/state ID number or other acceptable photo ID as proof of identity, have eliminated the need for election

---

[73] The Carter Center, *2022 General Election Observation: Fulton County, Georgia* 9 (2022).

> officials to match signatures. This has streamlined the
> process and made it easier for election officials since they can
> simply check that all the necessary information is present
> and correct.[74]

The Carter Center's observers argue that the use of identification, rather than the signature matching procedure, simplifies the procedure to validate mail absentee ballots from voters.

170. The preamble to SB 202 and the Carter Center's report both suggest that there are tradeoffs between signature matching and identification requirements for validating voters. To assess this tradeoff, I first calculated the number and rate ballots were rejected either because of missing information on the oath when returning the ballot or a signature mismatch in the 2018, 2020, and 2022 general elections. To make this assessment, I categorized the stated reasons for ballots being rejected. In 2018, there were many distinct reasons provided for ballot rejections, so I manually coded the categories. In 2020 and 2022, there was a small number of standardized categories that officials could select from a drop-down menu. Using these categories, I calculated the total number of ballots rejected and the number of ballots rejected by self-reported racial group.

---

[74] *Id.* at 16.

171.   I present the counts in Tables 27 and 28 and the rates ballots were rejected in Table 29.  In the 2018 general election, 3,870 ballots were rejected because of missing information or a signature mismatch. In the 2020 general election, 1,998 votes were rejected for missing information or incorrect signatures, and in the 2021 runoff election, 2,889 votes were rejected because of oath or signature issues. After SB 202, as expected, a smaller number of mail-in absentee ballots were rejected because of oath and signature-related reasons. In the 2022 general election, 195 votes were rejected for oath or signature-related issues, and in the 2022 runoff election, 201 votes were rejected for oath or signature-related issues. The number of ballots rejected for oath or signature-related issues in the 2018 general, the 2020 general, and the 2020 general runoff exceeds the number of ballots rejected for identification-related issues.

144

| Race | 2018 | | 2020 | | 2022 | |
|------|------|------|------|------|------|------|
| | Missing Information | Signature Mismatch | Missing Information | Signature Mismatch | Missing Information | Signature Mismatch |
| American Indian | 9 | 0 | 4 | 0 | 1 | 0 |
| Asian | 340 | 6 | 91 | 54 | 3 | 4 |
| Black | 1764 | 119 | 585 | 308 | 75 | 27 |
| Hispanic | 135 | 1 | 44 | 34 | 0 | 2 |
| White | 705 | 60 | 301 | 151 | 49 | 24 |
| Overall | 3,643 | 227 | 1,287 | 711 | 136 | 59 |

Table 27: Count of the number of votes rejected because information is missing from the oath envelope or because of a signature mismatch, by general election.

| Race | Runoff, 2021 | | Runoff, 2022 | |
|------|------|------|------|------|
| | Missing Information | Signature Mismatch | Missing Information | Signature Mismatch |
| American Indian | 5 | 8 | 2 | 0 |
| Asian | 38 | 60 | 1 | 2 |
| Black | 580 | 575 | 55 | 24 |
| Hispanic | 20 | 53 | 4 | 3 |
| White | 469 | 776 | 68 | 32 |
| Overall | 1,230 | 1,657 | 138 | 63 |

Table 28: Count of the number of votes rejected because information is missing from the oath envelope or because of a signature mismatch, by runoff election.

172.    Table 29 contains the rate ballots were rejected for oath and signature related reasons before SB 202 and identification reasons after SB 202. Using Table 29, I compared the rate Black and white voters had their absentee ballots rejected for oath and signature-related issues or for identification-related issues. I examined the 2018 general election first. That year, there was a 1.58 percentage point difference between the Black rejection rate and the white rejection rate for oath and signature-related reasons. This is the largest gap in rejection rates across the elections that I compare. For the 2020 general election, I find a Black-white rejection gap for oath and signature-related issues of 0.17 percentage points and in the January 2021 runoff election

I find a Black-white gap of 0.12 percentage points. In contrast, in the 2022 general election, I find a 0.23 percentage point white-Black gap in rejection due to voter identification and a 0.04 percentage point gap in the runoff election. The white-Black gap for voters deterred for identification is smaller or essentially equal to the gap for rejections for oath and signature reasons.

| Race | 2018 Signature+ Info. Reject Rate | 2020 Signature+ Info. Reject Rate | 2021, Runoff Signature+ Info. Reject Rate | 2022 ID Reject Rate | 2022, Runoff ID Reject Rate |
|---|---|---|---|---|---|
| American Indian | 0.0176 | 0.0011 | 0.0047 | 0.0062 | 0.0072 |
| Asian | 0.0414 | 0.0029 | 0.0026 | 0.0062 | 0.0138 |
| Black | 0.0228 | 0.0023 | 0.0034 | 0.0059 | 0.0083 |
| Hispanic | 0.0229 | 0.0022 | 0.0031 | 0.0043 | 0.0095 |
| White | 0.0070 | 0.0006 | 0.0022 | 0.0036 | 0.0079 |

Table 29: Reject rates based on signature mismatch or missing information from the 2018 general election, 2020 general election, and the statewide runoff after the 2020 general election. This is contrasted with the identification rejection rate in the 2022 general and the 2022, runoff election

## X.  ANTI-DUPLICATION AND PRE-FILLED PROVISIONS AND ABSENTEE BALLOT APPLICATIONS

173. SB 202 regulates the distribution of mail-in absentee ballot applications and how third-party groups can alter the content of the absentee application. First, SB 202 prohibits organizations and campaigns from sending voters mail-in absentee ballot applications after the voter applies for an absentee ballot. The law provides a 5-day grace period and instructs individuals distributing absentee ballot applications to consult the most recent data on whether voters have applied for an absentee ballot. Second, SB 202 bars third-party groups from pre-filling absentee ballots with a voter's

146

information. While SB 202 regulates the distribution and content of applications, it does not regulate third party groups' ability to encourage absentee voting in other ways. For example, groups can continue distributing postcards that inform voters about where to apply for a mail-in absentee ballot and how to cast that ballot.

174.    Recent experimental work provides evidence that sending voters these postcard reminders have a similar effect on encouraging mail-in absentee voting as sending voters blank or pre-filled mail-in absentee applications. And similar experimental evidence also shows that there are not significant differences between sending voters blank or prefilled mail-in absentee ballot applications.

175.    Two weeks before the June 2020 primary election, election officials in Philadelphia sent a random subset of voters postcards with instructions on voting by absentee ballot. Hopkins et al. (2021) analyze the effect of this experiment on voting by mail and overall turnout.[75] The postcards from election officials provided information about when requests for mail-in absentee ballots must be received, how to request a ballot, and a reminder that

---

[75] Hopkins, Daniel J., et al. "Results from a 2020 field experiment encouraging voting by mail." Proceedings of the National Academy of Sciences 118.4 (2021).

Pennsylvania is a no excuse absentee voting state. Hopkins et al. (2021) find a 0.4 percentage point increase in the rate of voting by mail (95% confidence interval [0.001, 0.007]). They find a smaller effect on the turnout rate, with the postcards increasing overall turnout 0.2 percentage points (95% confidence interval [-0.002, 0.007]). SB 202 would allow these postcards as a method to encourage mail-in absentee voting throughout the election cycle.

176. I compared the results of the Philadelphia experiment to the results of a mail-in absentee ballot application experiment conducted in Minnesota. Hassell (2017) reports the results of an experiment that distributed mail-in absentee ballot applications to voters.[76] Hassell (2017) partnered with a partisan organization in Minnesota. Working with that organization, Hassell (2017) allocated voters to one of three treatment arms: (1) an "application" condition, where the organization sent voters an absentee ballot application; (2) a "prefilled" condition that sent voters an absentee ballot application with pre-filled content; and (3) a "control" condition that did not send voters information at all. Hassell (2017) then evaluated the effect of the interventions

---

[76] Hassell, Hans JG. "Teaching voters new tricks: The effect of partisan absentee vote-by-mail get-out-thevote efforts." Research & Politics 4.1 (2017).

on the probability of voting absentee in the election and the probability of participating in the election overall.

177. Hassell's (2017) experimental results find effects that are comparable to Hopkins et al.'s (2021) postcard experiment and indicate that there are no statistically significant differences between pre-filled and blank absentee ballot applications. Hassell (2017) finds that sending voters a blank absentee ballot application caused a 0.7 percentage point increase in the rate of voting absentee, but this effect was not statistically significant (95-percent confidence interval [-0.001, 0.0015]) and that a pre-filled ballot application increased the use of absentee voting by 1.3 percentage points, an effect that was statistically significant (95-percent confidence interval [0.000, 0.002]. Using Hassell's (2017) estimates, I fail to reject the null that the blank application and the pre-filled application have the same effect on the rate of casting a vote by mail-in absentee. Further, comparing estimates across experiments, I fail to reject the null that the effect of sending ballot applications differs from the effect of sending voters postcard reminders reported in Hopkins et al. (2021). Overall, Hassell finds that sending voters a blank absentee ballot application decreased turnout 1.1 percentage point, though this effect was not statistically significant (95% confidence interval of [-3.6%, 1.4%]). Similarly, he finds that a pre-filled absentee ballot application

149

increased turnout 1.2 percentage points, but this too was not statistically significant (95-percent confidence interval of [-1.35, 3.75]).

178.   To be clear, applying these experiments to Georgia and comparing results across experiments requires strong assumptions. The experiments reported in Hopkins et al. (2021) and Hassell (2017) were conducted outside of Georgia and both were conducted by distinct organizations who sent mailers with distinct content at different times during the election and over the course of different elections. This evidence shows, however, that one cannot intuitively reason to infer the effect of pre-filled absentee ballots on turnout. For example, Dr. Fraga argues (at 30) that "Black and Hispanic absentee-by-mail applicants were less likely to use the online portal to request an absentee ballot in 2020 and 2021 elections compared to White applicants and were therefore more likely to have use for forms provided by third parties that were restricted under SB202." Yet, Dr. Fraga has no data on the use of third-party mail-in absentee ballot application usage. Instead, he notes that Black and Hispanic voters used an online portal at a lower rate than other voters. And Dr. Fraga then concludes (at 34) that, "[i]n the absence of comprehensive, individual-level data on who used a third-party absentee ballot form to apply for an absentee-by-mail ballot in 2020 and 2021, the patterns we see in the use of the (at the time) new online portal system suggest that Black and Hispanic

150

absentee-by-mail applicants were more likely to have use for the forms these organizations mailed." Yet, Dr. Fraga never demonstrates that these individuals were relying on contact from third-party groups, nor does he show what share of third-party interactions with voters would be subject to regulations by SB 202.

179.  Turning now to data from Georgia, I used the absentee voter file to assess the incidence of duplicate requests for absentee ballots in the 2020 election and then in the 2022 election. To make this assessment, I used the 2020 absentee ballot file and manually coded the "Status Reason" for rejected absentee ballot applications. I coded a "Status Reason" as referring to multiple applications if used the phrase "Multiple Requests" (which covered 99.88% of all cases coded as multiple) or reference a duplicate application. I performed the same coding for the 2022 election. Table 30 presents the rate mail-in absentee ballot applications were rejected for being duplicates in 2020 and 2022. In Column 2, I show the calculated rates for 2020 and in Column 3 I show the calculated rates for 2022.

| Race | Proportion Applications Rejected, Duplicate 2020 | Proportion Applications Rejected, Duplicate 2022 |
|---|---|---|
| American Indian | 0.0057 | 0 |
| Asian | 0.0116 | 0.0004 |
| Black | 0.0039 | 0.0003 |
| Hispanic | 0.0060 | 0.0002 |
| White | 0.0022 | 0.0002 |
| Overall | 0.003 | 0.0002 |

Table 30: Proportion of absentee ballot applications rejected as duplicate request in 2020 and 2022, by race and overall

180.   Table 30 shows that SB 202 reduced the number and rate of duplicated absentee ballot requests. In Column 2, I calculated that 0.3% of absentee ballot applications in 2020 were rejected as a duplicate application. This was reduced to 0.02% in 2022. Applications from Black voters were more likely to be rejected because they were a duplicate request in 2020 than white voters. 0.39% of mail-in absentee ballot applications from Black voters were duplicate requests, while 0.22% of mail-in absentee ballot applications from white voters were duplicates. In 2022, 0.03% of mail-in absentee ballot applications from Black voters were duplicate requests, while 0.02% of mail-in absentee ballot applications from white voters were duplicates.

## XI.   SUNDAY AND WEEKEND VOTING IN GENERAL AND RUNOFF ELECTIONS USING IN-PERSON ABSENTEE VOTING

181.   SB 202 also put in place requirements to standardize the availability of weekend and Sunday voting for early in-person voting. As explained in SB 202's preamble, "[m]ore than 100 counties have never offered

voting on Sunday and many counties offered only a single day of weekend voting. Requiring two Saturday voting days and two optional Sunday voting days will dramatically increase the total voting hours for voters across the State of Georgia, and all electors in Georgia will have access to multiple opportunities to vote in person on the weekend for the first time." SB 202, §2(5).

182.   To assess when voters cast their early in person votes, I examined the absentee voter file for General elections since 2014 and runoff elections after the 2020 and 2022 elections. In Table 31, I assessed the share of votes cast on Sundays across elections, both overall and across racial and ethnic groups. And in Table 32, I assessed the share of votes cast on the weekend.

183.   Tables 31 and 32 show that the 2022 runoff election saw the highest rates of Sunday and Weekend voting both overall and for Black and white voters. Overall, 5.1% of voters cast their ballots on Sunday in the 2022 runoff election. The next highest share overall was 2.7% for the 2020 general election. Aside from 2020, the 2022 midterm election had the highest share of Sunday votes among general elections, with 1.8% of votes cast on Sunday. Weekend voting reflects a similar pattern, 9.9% of voters cast their ballot on the weekend in the 2020 general election. This is similar to the share who cast votes on the weekend after SB 202, with 9.4% voting on the weekend in the

2022 general election and 9.2% voting on the weekend during the 2022 runoff election.

184.   After SB 202, Black voters continued to vote more often on Sunday and the weekend than white voters. For example, 2.5% of early in person votes from Black voters were cast on Sunday in the 2022 general election, while 10.6% were cast on the weekend during the 2022 general election. In the 2022 runoff election, 7.4% of early in person votes from Black voters was cast on Sunday and 13.8% were cast on the weekend–both highs for any election for Black voters over the elections I analyzed.

| Race | General 2014 | General 2016 | General 2018 | General 2020 | General 2022 | Runoff 2021 | Runoff 2022 |
|------|---------|---------|---------|---------|---------|--------|--------|
| American Indian | 0.023 | 0.009 | 0.021 | 0.032 | 0.022 | 0.024 | 0.062 |
| Asian | 0.023 | 0.024 | 0.032 | 0.048 | 0.042 | 0.043 | 0.093 |
| Black | 0.032 | 0.019 | 0.026 | 0.037 | 0.025 | 0.026 | 0.074 |
| Hispanic | 0.016 | 0.011 | 0.020 | 0.030 | 0.028 | 0.029 | 0.065 |
| White | 0.008 | 0.008 | 0.010 | 0.021 | 0.013 | 0.014 | 0.034 |
| Overall | 0.017 | 0.012 | 0.016 | 0.027 | 0.018 | 0.020 | 0.051 |

Table 31: Share of early in person votes cast on Sunday by self-identified racial group and overall.

| Race | General 2014 | General 2016 | General 2018 | General 2020 | General 2022 | Runoff 2021 | Runoff 2022 |
|------|---------|---------|---------|---------|---------|--------|--------|
| American Indian | 0.086 | 0.088 | 0.101 | 0.109 | 0.106 | 0.065 | 0.111 |
| Asian | 0.124 | 0.138 | 0.168 | 0.150 | 0.153 | 0.119 | 0.157 |
| Black | 0.094 | 0.094 | 0.106 | 0.118 | 0.106 | 0.079 | 0.138 |
| Hispanic | 0.092 | 0.099 | 0.132 | 0.118 | 0.128 | 0.084 | 0.107 |
| White | 0.054 | 0.069 | 0.074 | 0.086 | 0.084 | 0.042 | 0.060 |
| Overall | 0.070 | 0.079 | 0.089 | 0.099 | 0.094 | 0.058 | 0.092 |

Table 32: Share of early in person votes cast on the weekend by self-identified racial group and overall.

185. While this analysis is not a demonstration of the causal effect of SB 202 and it is difficult to attribute changes in weekend voting solely due to SB 202 regulations, Tables 31 and 32 show that weekend voting was regularly used in the elections after SB 202. The actual use of weekend voting, then, is inconsistent with argument from Dr. Lee who opines that SB 202 requires "the elimination of weekend voting on most weekends." Lee Rep. 93. In fact, weekend voting remained widely used after SB 202.

## XII.  THE EFFECTS OF SB 202 ON LINE WAITING TIMES

186. Several of Plaintiffs' experts argue that SB 202 will cause longer lines in polling places or make it more difficult for voters to cast mail-in absentee ballots. Dr. Schur argues (at 7) that "[t]he combined additional restrictions on mail-in voting in SB 202 are likely to push more people to vote in person at polling places, which will in turn exacerbate problems of long lines at polling places and consequently make it harder for many people with disabilities to wait in line to vote in person." Dr. Schur provides no causal analysis to show that the regulations in SB 202 will increase wait times. Dr. Schur further concludes (at 47) that the drop box regulations "will cause some Georgians with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting because of their disabilities that they would not otherwise face but for SB 202." Again, Dr. Schur cites no study

155

that shows Georgia's drop box regulations will cause disabled voters to be less likely to vote. Dr. Burden opines that "the new limitations placed on absentee voting by SB 202 will make it more difficult for Black voters in particular to shift away from voting in person to avoid the 'time tax' of long wait times." Burden Rep. 22. Again, he provides no direct calculation to show that SB 202 affects the ability of Black voters to substitute in-person voting with a mail-in absentee ballot.

187. Dr. Pettigrew makes a series of claims about how "SB202 will negatively affect wait times." Pettigrew Rep. 28. Dr. Pettigrew's mechanism for this increased wait time is that "[m]ail voting restrictions will push voters toward voting in person or not voting at all." *Id.* at 29. Dr. Pettigrew asserts that his analysis also "finds that SB202's restrictions on mail voting will have a significant impact on the number of people showing up to vote in-person." *Id.* at 1. Dr. Pettigrew further states that "[t]here are several provisions in SB202 that will have an impact on whether voters experience long lines to vote." *Id.* at 26. Of those provisions he states that the "most impactful of these changes are the alterations to the vote-by-mail process and the runoff election schedule. These changes will have the consequence of either decreasing turnout overall or pushing more voters toward voting in-person, thereby increasing the length of lines." *Id.* at 26. Dr. Pettigrew cites several provisions of the law that he

156

believes will deter individuals from voting by mail, *id.* at 29–30, but he does not provide causal evidence that SB 202 will deter individuals from voting absentee by mail, nor does he cite specific studies that show that SB 202's regulations will affect the share of ballots cast using mail-in absentee voting or affect the turnout rate. Instead, Dr. Pettigrew writes that, "[w]hile it is beyond the scope of this report to estimate the exact impact that these changes will have on how many voters cast a mail ballot, it is reasonable to assume that these changes will not increase the rates of voting by mail, and are much more likely to decrease mail voting rates." *Id.* at 30.

188.   While Dr. Pettigrew does not provide evidence that SB 202 will cause voters to cast their ballots in person rather than voting absentee by mail, he opines (at 28) that "SB202 will negatively affect wait times." In this section, I show that Dr. Pettigrew fails to follow standard practice when assessing the causal effect of SB 202 on time spent in line. Further, I diagnose several issues in Dr. Pettigrew's approach to measuring time spent in line that also affects measures reported by Dr. Burden. Finally, using survey data collected in Georgia after the 2022 general election I find that the share of voters who waited more than 30 minutes to be lower than the share presented by Dr. Burden and Dr. Pettigrew and that the estimated share of Black voters waiting

30 minutes or more to vote is smaller than the estimated share of white voters, but the difference is within the survey's margin of error.

### A. Computer Simulations Do Not Provide Credible Estimates of SB 202's Effects on Line Waiting Times

189.  In this section, I show that Dr. Pettigrew's methodology cannot credibly estimate the effect of SB 202 on line waiting times and that the conclusions of Dr. Pettigrew's analysis are direct consequences of the assumptions made in the simulation, rather than evidence from Georgia elections.

190.  Based on his assumption that SB 202 will affect the number of in person votes cast, Dr. Pettigrew opines (at 29) that "SB202 will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color." Dr. Pettigrew's opinion on the effects of SB 202 is based on a computer-based simulation of voting behavior in two hypothetical precincts. This simulation-based approach to estimating the causal effects of SB 202 departs from standard practice in the social sciences. When assessing the effects of an intervention, like SB 202, on an outcome, like voter turnout, scholars are working in the area of "causal inference."[77] Causal inference is a

---

[77] Imbens, Guido W., and Donald B. Rubin. Causal inference in statistics, social, and biomedical sciences. Cambridge University Press, 2015. Pearl,

large literature in statistics, computer science, and the social sciences that seeks to estimate the effect of policies on outcomes, such as the consequences of election administration policies on voter turnout or how voters cast their ballot. I now review the standard procedure used to estimate causal effects of election administration policies on voter turnout, and then I explain why Dr. Pettigrew's simulation of voter turnout in two hypothetical precincts is a substantial departure from this standard practice.

191. First, when asking a causal question, like how SB 202 affects voting lines, researchers define the causal quantity they seek to estimate. Dr. Pettigrew does not explicitly define the target of his inference. However, given his assertion that SB 202 "will cause lines to be longer for Georgians than they otherwise would have been, particularly among people of color" and the estimates he reports from his simulations, it appears Dr. Pettigrew is seeking to estimate the effect of SB 202 on wait times, the share of voters who wait longer than 30 minutes, and how the effect of SB 202 varies across different self-identified racial groups.[78]

---

Judea, and Dana Mackenzie. The book of why: the new science of cause and effect. Basic books, 2018.

[78] Based on the estimates Dr. Pettigrew reports it appears the relevant quantity of interest would be the average treatment effect on the treated of SB 202, because he is focused on the effect solely within Georgia precincts.

159

192.   Second, when seeking to estimate the effect of a policy, researchers adopt a research design and set of assumptions that enable a causal interpretation of an estimate from data. The usual goal is to use a research design that requires only weak assumptions for a causal interpretation. For example, experiments are often used because randomization ensures that, on average, treatment and control groups differ only on the allocated treatment. In the case of estimating SB 202's effect on wait times, a research design and a set of assumptions are needed to estimate how SB 202 affected voters' average wait time.

193.   Third, researchers use observed data to estimate what the outcome, wait times, would have been in the absence of the law being studied, in this case SB 202. Researchers usually estimate this counterfactual quantity using observations that were not affected by the treatment. Finally, researchers compute an estimate of the causal quantity of interest, comparing the observed outcome, the actual wait times in Georgia, to the estimated counterfactual outcome in the absence of treatment, average wait times in the absence of SB 202.

194.   Dr. Pettigrew's hypothetical two-precinct computer simulation is a poor tool for causal inference and departs substantially from this standard practice. It therefore cannot provide credible causal evidence of SB 202's effect

160

on wait times. A computer simulation's conclusion about the effect of a policy rest entirely upon the assumptions underlying the simulation: no actual data is used in the estimation of the effects. Nor did Dr. Pettigrew calibrate his simulation to reflect Georgia precincts. Had different assumptions been deployed, then Dr. Pettigrew's analysis would lead to different conclusions. Because Dr. Pettigrew never explicitly connects the two-precincts in his simulation to the Georgia precincts, it is impossible to know if the dynamic in this simulation occurs at all in Georgia elections.

195.   Turning to the details of his simulations, Dr. Pettigrew conducts a simulation study of two hypothetical precincts. As a baseline in both precincts, Dr. Pettigrew assumes each precinct has 200 voters who turnout to vote in person over 12 hours. Dr. Pettigrew then makes a series of assumptions so that his simulated "Precinct A" has a baseline average wait time of 9.8 minutes and "Precinct B" has a baseline average wait time of 29.6 minutes. Dr. Pettigrew then examines how the average wait times change as more individuals arrive to vote in person at the polls. To make this comparison, he adds hypothetical additional voters as part of his simulation.

196.   Based on the specific parameters of each simulation, Dr. Pettigrew concludes that the average wait time and the share of voters waiting more than 30 minutes increases more in "Precinct B" rather than "Precinct A." Dr.

161

Pettigrew makes no explicit calculation to connect the results of this simulation to a specific causal estimate of the effect of SB 202 on wait times in precincts in Georgia.

197. Instead, Dr. Pettigrew uses the differences between "Precinct A" and "Precinct B" to make two kinds of conclusions about the effect of SB 202. One set of conclusions are about the law's probable effect on voter turnout. For example, Dr. Pettigrew writes that "SB202 is likely to have a negative impact on the length of lines throughout Georgia, particularly in precincts that serve racial minorities." *Id.* at iv. In other places, he opines on the effect of the law, writing that SB 202 "will have a negative impact on the length of lines to vote in Georgia, and will counteract any positive gains made by other changes to election procedure separate from SB202." *Id.* at 1. He also concludes that "[p]recincts in predominantly non-white neighborhoods tend to function much closer to their operational capacity than precincts in predominantly white neighborhoods. This means that applying equal strain to all precincts (like a small, uniform increase in the number of in-person voters) will have substantially bigger impacts on line length in non-white precincts." *Id.* at iii–iv. He also opines that, "[e]ven if white and non-white Georgia voters switch from mail voting to in-person voting at the exact same rates, the impact of

162

these switches will be much larger in non-white areas of the state, where precincts are already operating under strain." *Id.* at 33.

198.   Dr. Pettigrew's simulation study is unable to support a conclusion about the likely or actual effect of SB 202's mail-in absentee ballot applications on voter wait times. This is primarily because—again—the conclusions of simulation studies are direct consequences of the assumptions underlying the simulation. This is in contrast to the standard procedure used in causal inference empirical studies, which specify a causal quantity of interest, a set of assumptions and a research design, and then use data to estimate a causal effect. Without actual data, the estimated causal effect on voter wait times follows directly from the specific assumptions Dr. Pettigrew used in constructing the two hypothetical precincts. Had Dr. Pettigrew made different assumptions about the characteristics of the hypothetical precincts, the rates voters arrived, the amount of time voters spend voting their ballot, or even the effect of SB 202 on mail-in absentee voting rates, the simulation could lead to different conclusions about how adding voters to the polling place affects wait times. At best, the particular simulation Dr. Pettigrew uses can only establish the logical possibility that if SB 202 causes more in person voters on Election Day, it could cause longer wait time at the polls. But this logical possibility

163

does not imply that the conclusions of the simulation are likely to occur or that the simulation provides credible estimates of the causal effect of the law.

199.   Dr. Pettigrew also fails to describe the assumptions underlying his simulation and deviates from the standard description of simulations in the application of queueing theory to study election line waiting. For example, standard models from "queueing theory" often involve, at least, three explicit components.[79]   First, a queueing model specifies an arrival process. For the two-precinct simulation, the arrival process would describe the rate voters arrive at the poll throughout the day. Second, standard queueing models specify a service process or the rate voters move through the system. This includes the rate voters are checked in at the polls, the rate voters cast their ballot, and ultimately how quickly voters submit their ballots. And third standard queueing models stipulate a number of service units. Applied to voting, this could represent the number of check in or voting stations. Each of these assumptions have potentially critical consequences for the effect of adding voters to a particular precinct. More complicated simulation-based models of voter turnout include even more parameters that can be altered. For example, the line simulator for the MIT/Caltech Voting Technology Project

---

[79] Ross, Sheldon M., et al. Stochastic processes. Vol. 2. New York: Wiley, 1996.

includes explicit parameters for the check in rate, the rate voters cast their ballot, and the rate some voters "walk off."[80] This simulation also provides more explicit options about the rate voters arrive at the polls, providing options for voters to arrive more heavily at various times throughout the day. Dr. Pettigrew provides few or no details about these various components. For example, he provides information about the number of voters who arrive together to the polling place, while failing to provide information about how quickly these individuals move through the system, resources at the polling place, or whether the "arrival process" is constant throughout the day.

200.  Without these details of Dr. Pettigrew's simulation, it is unclear how the two hypothetical precincts compare to typical Georgia precincts. And therefore, it is unclear how the hypothetical changes Dr. Pettigrew observes correspond to actual changes we might expect in Georgia. For example, it could be that most Georgia precincts have characteristics that imply even large changes in the number of in person votes will have small effects on lines. Without more information, it is impossible to even evaluate if the two hypothetical precincts correspond to any precincts in Georgia, let alone precincts that are sufficient to establish the causal effect of SB 202.

_____

[80] Mark Pelczarski, *Line Optimization*, http://web.mit.edu/vtp/calc3.htm.

165

201. Dr. Pettigrew's conclusions from the simulations are based on other assumptions that are never tested. Specifically, Dr. Pettigrew never explicitly demonstrates a core assumption of his simulation: that Black precincts are closer to their "operational capacity." In several locations Dr. Pettigrew opines that precincts in predominantly Black neighborhoods are less capable of handling increases of voters. Dr. Pettigrew asserts that "areas resided in predominantly by people of color much more susceptible to dramatic increases in wait times as a result of SB202." Pettigrew Rep. 18. He also claims that "[p]recincts in predominantly Black neighborhoods tend to already be under more strain and closer to operating capacity than precincts in predominantly white neighborhoods, so the changes in SB202 will have substantially larger impacts on line length in precincts that serve mostly Black voters, even if white and non-white voters react to SB202 in similar ways." *Id.* at 24. And yet, Dr. Pettigrew never explicitly defines "operational capacity" for a precinct, let alone demonstrates that precincts in predominantly Black areas are closer to their limit of operational capacity.[81] Perhaps he means that Black precincts are more likely to be sufficiently close to experiencing an exponential

---

[81] Even if he did, decisions about the operational capacity of each precinct, including equipment, poll workers, and locations, are made by county officials. *Anderson v. Raffensperger*, 497 F. Supp. 3d 1300, 1328–30 (N.D. Ga. 2020).

growth in wait times if more voters are added, which he calls the "elbow of death." *Id.* at 29, 33. Yet, he provides no methodology to establish whether a precinct is close to this "elbow of death", nor does he undertake an analysis of Georgia precincts to characterize the share near this definition of operational capacity.

202. The limited literature that applies queueing theory to examine voter wait times shows that simulations of precincts based on queueing theory cannot be used to establish the causal effect of SB 202 on voter wait times. This is true even though queueing theory might provide useful heuristics for understanding lines. For example, Ansolabehere and Stewart (2013) describe the use of queueing models to describe voter behavior and argue that "[m]ost standard recommendations for shortening lines derive from simple, straightforward application of queuing theory."[82] And yet they express skepticism about whether the insights of queueing models provide useful guidance on how to reduce line waiting time. Ansolabehere and Stewart (2013) observe "[t]here is little empirical evidence that the recommendations [from queueing theory] prescribed as solutions to long lines have actually been

---

[82] Ansolabehere, Stephen and Charles Stewart. Waiting in Line to Vote, White Paper (Jul. 28, 2013), https://www.eac.gov/documents/2017/02/24/waiting-line-vote-white-paper-stewart-ansolabehere.

effective in reducing waiting times."[83] Ansolabehere and Stewart (2013) argued:

> At the macro level, the shift of voters away from in-person voting has not decreased wait times. Indeed, there is a statistically significant negative correlation between the change in people voting in-person in 2012 (compared to 2008) and the change in average waiting times, measured at the state level. (In other words, states that had relatively more people vote in-person in 2012 had a slight decrease in average wait times.)[84]

203. Other scholars who have applied queueing models to study elections have argued that the models are useful to illuminate basic principles, but that, "[a]s we have indicated through computer queuing simulation, and as has occurred in real life, the incidence of long lines depends on many uncontrollable factors and is difficult to predict."[85] And other applications of queueing model to study election lines explicitly use data and clear assumptions to calibrate the model to precincts being studied.[86]

---

[83] *Id.*

[84] *Id.*

[85] Edelstein, William A., and Arthur D. Edelstein. "Queuing and Elections: Long Lines, DREs and Paper Ballots." EVT/WOTE. 2010.

[86] Allen, Theodore, Mikhail Bernshteyn (2006) "Mitigating Voter Waiting Times", CHANCE, 19:4, 25-34.

### B.    Survey-Based Estimates of Voter Wait Times

204.    Dr. Burden and Dr. Pettigrew cite survey evidence that voter wait times in Georgia have been consistently longer in Georgia than in other states and that wait times for Black voters have been longer than wait times for white voters. The evidence for these claims is based on a question asked in the Cooperative Election Study (CES) and the Survey of the Performance of American Elections (SPAE): "Approximately, how long did you have to wait in line to vote?" Voters are given response options of: "Not at all", "Less than 10 minutes", "10-30 minutes", "31 minutes – 1 hour", "More than 1 hour". Dr. Pettigrew then reports analyses that measure "the proportion of voters who waited more than 30 minutes to cast their ballot." Pettigrew Rep. 4. And both Dr. Pettigrew and Dr. Burden examine self-identified racial group differences in voters' responses.

205.    Dr. Pettigrew also analyzes the survey responses by "converting the responses to the survey question into minutes and hours." *Id.* at 4. Specifically, "the wait time of each respondent was coded based on the midpoint of their response to the survey question." *Id.* Therefore, he assigned voters who selected "Not at all" a wait time of zero, those who selected "Less than 10 minutes" a wait time of 5 minutes, those who selected "10-30 minutes" a wait time of 20 minutes, voters who selected "31-60 minutes" a wait time of

169

45 minutes, and finally he used voters' open-ended responses to assign wait times for voters who selected "More than 1 hour." I will refer to this procedure as the "midpoint imputation method." Using these imputed values, Dr. Pettigrew then computes the average wait time at the state level, county level, and by self-identified racial group. Using these computed average wait times based on the imputed responses, Dr. Pettigrew then contrasts the average wait time of Georgia voters overall to voters in other states and compares the average wait times of white and Black voters in Georgia. Dr. Burden uses a similar imputation of survey responses to argue that Georgia voters have experienced long lines in past elections.

206.  I examined Dr. Pettigrew's statements about the validity of this midpoint imputation method and engaged in my own review of the evidence about the accuracy of the survey-based measures of line waiting time. Even if voters are able to perfectly recall their wait time in line, I will show that using the midpoint imputation method can lead to bias in an unknown direction of a group's average wait time and bias in an unknown direction in the difference in average wait times between groups. Even more problematically, using the midpoint imputation method to compute average wait time could cause researchers to conclude one group's average wait time is longer than another group's average wait time when the reverse is true. I then examined the

170

potential for this bias using behavioral cell phone data from voters waiting in line on Election Day as an illustrative ground truth data set. I will show that the midpoint imputation method overestimates the wait time in Georgia and either under- or overestimates the average difference between groups, such as differences in wait times between Georgia and other states.

207. When assessing the survey-based measure of wait time, Dr. Pettigrew claims that the midpoint imputation method for voter wait times will provide a conservative estimate of the difference in wait times between groups. Specifically, Dr. Pettigrew argues that the "approach of substituting the mid-point of each category to represent a voter's wait time has an important consequence for the analyses throughout this report. When comparing the average wait time of two groups, this midpoint imputation strategy is likely to understate how big of a gap exists between their wait times." Pettigrew Rep. 4–5. In support of this conclusion, Dr. Pettigrew presented data from a single simulation that compares the distribution of hypothetical wait times from two hypothetical groups of voters. In this single simulation, the estimated difference in average wait times between the two hypothetical groups using the midpoint imputation measure was smaller than the true difference in average wait times. But Dr. Pettigrew also notes that "[t]his simulation analysis highlights that in some cases, the midpoint

171

imputation approach may estimate group average wait times that are too high. For this reason, throughout this report I focus on comparisons of average wait times between groups, rather than focusing on the precise estimate of the average wait for an individual group. By always having a reference group as a point of comparison, I ensure that even if the exact estimate of an individual group is too high, I am drawing conclusions based on differences between group estimates that are likely to be too low." *Id.* at 5 n.13.

208.  Dr. Pettigrew concedes that the midpoint imputation method can result in an estimated average wait time that is larger than the true underlying wait time. While he claims to address this issue "[b]y always having a reference group as a point of comparison" in his report, he makes absolute statements about wait times in Georgia. *Id.* at 6 n.13. For example, Dr. Pettigrew opines in his report that, "[i]n terms of minutes, the average Georgia voter in 2020 waited 27.4 minutes to cast their ballot. This means that the average wait time experienced by Georgians was nearly as long as the PCEA's recommendation for the maximum wait time. For non-white voters, the average wait was even longer–34.2 minutes–while white Georgia voters waited on average 24.3 minutes." *Id.* at 11. Dr. Pettigrew also fails to provide theoretical or empirical evidence that comparing two biased estimates of wait times from survey data would result in a canceling out of the underlying bias.

172

The size of measurement error from the midpoint imputation method can vary across different distributions of voters' wait times. And as a result, comparing two group's wait times will not cancel the bias from the midpoint imputation method.

209.  I now turn to Dr. Pettigrew's claims about differences in average wait times computed using the midpoint imputation method. While Dr. Pettigrew opines (at 5) that "this midpoint imputation strategy is likely to understate how big of a gap exists between their wait times" he never defines what he means by "likely," nor does he provide systematic theoretical or empirical evidence that the midpoint imputation method tends to understate the differences between groups. The sole evidence that Dr. Pettigrew provides is a comparison of two hypothetical wait times of two hypothetical groups. But this example cannot establish a "likely" property of the midpoint imputation method, because it is easy to construct an example where the average wait time calculated using the midpoint imputation method produces an average difference in wait times that is larger than the true underlying average difference in wait times. As a simple example, suppose that there are two groups of voters, group "A" and group "B." In Group "A," 70% of voters wait 8 minutes to vote, while 30% of voters wait 11 minutes to vote, for an average wait time of 8.9 minutes. In Group "B," 30% of voters wait 8 minutes to vote

and 70% of voters wait 11 minutes to vote, for an average wait time of 10.1 minutes to vote. This implies a true group difference in average wait time of 1.2 minutes. But if I suppose that these voters correctly reported their wait time in Dr. Pettigrew's survey question, and then I applied the midpoint imputation method, I would conclude that Group "A" has an average wait time of 9.5 (0.7x5 + 0.3x20), Group "B" has an average wait time of 15.5 minutes (0.3x5 + 0.7x 20). As a result, applying the midpoint imputation method leads to a difference in average wait times of 6 minutes, over stating the true difference by 400%. It is also possible to construct an example where the midpoint imputation method will report that Group "A" has a longer wait time than Group "B", but, in reality, Group "B" has a longer wait time. For example, suppose now that Group "A" has 70% of its voters waiting 8 minutes, but 30% of its voters waiting 28 minutes. This implies a true average wait time of 14 minutes, but a midpoint imputation method average wait time of 9.5. If Group "B" remains unchanged from the prior example, with an average wait time of 10.1 minutes. This implies Group "A" voters wait 3.9 minutes longer than Group "B" voters. But applying the midpoint imputation method, I would

conclude that Group "B" voters wait, on average, 6 minutes longer than Group "A" voters.[87]

210.  Theoretical arguments alone are not sufficient for assessing the actual error from the midpoint imputation method. Instead, I undertook an empirical assessment of how applying the midpoint imputation method could bias estimates of average wait times and differences in average wait time. To do this, I used behavioral data collected from cell phones that is then used to estimate time spent waiting in line on Election Day. Specifically, I used the replication data from Chen et al. (2022) and compared the average wait times as recorded in their data set, to the average wait times that would be computed if the wait times in their data set were accurately reported in a survey and then the midpoint imputation method was applied.[88] Chen et al. (2022) use location information from cellphone data to track voters near polling locations, then assess the amount of time voters spend in those locations. I used the

_____

[87] While this is a logical possibility, the positive correlation between the survey responses and the behavioral data I analyze below implies that this sort of inversion is infrequent.

[88] Chen, M. Keith, et al. "Racial disparities in voting wait times: evidence from smartphone data." Review of Economics and Statistics 104.6 (2022): 1341-1350. Replication data available at https://dataverse.harvard.edu/dataset.xht ml?persistentId=doi:10.7910/DVN/RRHANS.

information from this paper to assess the consequences of the midpoint imputation strategy on calculating voter wait times. Specifically, to assess the bias that results from midpoint imputation, I will assume that the Chen et al. (2022) data set represents the true wait time. Then I will examine how recording this information in a survey and then applying the midpoint imputation method would change the estimates.

211.   To make this comparison, I downloaded Chen et al.'s (2022) data set and used the "filtered" data set, which applies a set of checks that Chen et al. (2022) developed to remove non-voters from the data set. I first used the measure of wait time as recorded in their data set to calculate the average wait time at the state level, the average wait time at the county level, and then I made state-to-state comparisons contrasting the average wait time in Georgia with the average wait time in other states. To assess Dr. Pettigrew's claims about the direction of bias from the midpoint imputation method, I then assessed how these quantities would change if the wait times in Chen et al.'s (2022) data set had been accurately reported as survey responses and the midpoint imputation method had been applied. That is, for each wait time in Chen et al.'s (2022) data set I categorized it into the appropriate survey response. I then carried out the midpoint imputation strategy. For voters who wait more than 60 minutes, I suppose they perfectly recall the time waited in

176

line, which would correspond to an accurate open-ended report in Dr. Pettigrew's coding.

212. Using this data set, I find that in every state the use of the midpoint imputation method causes an overestimate of the average voter wait time. On average, across states, I find the midpoint imputation average voter wait time is 1.37 minutes longer than the underlying true average voter wait time. I find that in 81.8% of counties that the average wait time calculated using the midpoint imputation method is larger than the true underlying average wait time. When I restrict the analysis to counties in Chen et al.'s (2022) data set with at least 10 observations, I find that the midpoint imputation method causes an overestimate of average wait time in 93.3% of all counties.

213. While Dr. Pettigrew asserts it is "likely" the midpoint imputation method results in an underestimate of group differences, I do not find this using the wait times in the Chen et al. (2022) data set. I first calculated the average wait time in Georgia and other states using the original voter wait times reported in the Chen et al. (2022) data set. I then calculated the difference in average wait times between Georgia and other states using the underlying wait times from the voters' cell phones. Second, I calculated the average wait times in Georgia and other states using the midpoint imputation

177

method and calculated the difference between Georgia and other states using this measure of wait time. Finally, I compared the difference in average wait time using the original data source in Chen et al. (2022) and using the midpoint imputation method. If Dr. Pettigrew's assertion that the midpoint imputation method understates differences across groups, then it should be the case that the midpoint difference in average wait times is smaller than the difference in average wait times using the underlying wait times.

214.   I do not find that to be the case. When comparing Georgia to the other 45 states in Chen et al.'s (2022) data set, I find that the difference in average wait times using the midpoint imputation method produces a larger in magnitude difference 51.1% of the time, while the difference in average wait times as reported in Chen et al.'s (2022) data set produces a larger in magnitude difference 48.9% of the time.

215.   Based on this analysis, it is impossible to know whether average reported wait times by Dr. Burden and Dr. Pettigrew are over- or underestimates of the underlying true average wait times. Further, it is impossible to know if differences in wait times computed using survey responses and the midpoint imputation method are over- or underestimates of the true difference.

178

216. An alternative to the midpoint imputation method is to focus on the share of respondents who select a particular response category. This avoids the potential biases from the midpoint imputation method and provides an accurate estimate of the share of voters who have waited a particular amount of time, under the assumption that voters correctly report their wait time. Dr. Pettigrew, for example, focuses on the share of voters who report waiting at least 30 minutes in line. It is important to note, however, that differences in these categories do not necessarily imply differences in average wait time. Depending on the underlying wait times and the share of voters reporting a particular interval of wait time, a larger share of voters from one group reporting waiting more than 30 minutes to vote than another group could be consistent with that group waiting longer to vote, about the same, or having a shorter average wait time than the other group.

217. While Drs. Pettigrew and Burden analyzed survey data from elections before the 2022 election, I make use of a recent survey that asks Georgia voters about their experience voting in the 2022 election. The survey was an over-the-phone survey conducted by the SPIA survey research center

179

at the University of Georgia.[89] The survey was conducted from November 13th to December 6th, 2022, and included 1,253 Georgia residents who self-reported voting. While the underlying data set has not yet been released, the topline survey estimates have been posted.

218.  In the post-2022 survey of Georgia residents, respondents who reported voting in person were asked: "Approximately, how long did you have to wait in line to vote?" This is the same question used by Dr. Burden and Dr. Pettigrew. Overall, 4.7% of Georgia voters reported waiting in line more than 30 minutes for the general election. This is lower than the midterm average reported by Dr. Pettigrew, calculated using the CES, 8.8%. Breaking responses down by racial group, 4.8% of white in-person voters waited longer than 30 minutes to vote (3.6% waited between 31 minutes to 1 hour and 1.2% reported waiting more than an hour) compared to 4% of Black in-person voters (3.4% waited between 31 minutes to 1 hour and 0.6% reported waiting more than 1 hour). The difference between the two groups is within the survey's margin of error. The share of white and Black voters reporting waiting more than 30 minutes is lower in the post-2022 survey than Dr. Burden's share of vote-

---

[89] M.V. Hood III, *2022 Georgia Post-Election Survey*, SPIA Survey Research Ctr. (Jan. 17, 2023), https://tinyurl.com/4kxeb373.

validated voters who report waiting longer than 30 minutes for Black respondents in every reported election (2014: 5.5%, 2016: 14%, 2018: 19%, 2020: 34%) and for white voters in every reported election other than 2014 (2014: 1.4%, 2016: 16%, 2018: 17%, 2020: 22%). Examining other categories, a larger share of white in-person voters than Black in-person voters reported having no wait time (41.1% among white voters, 32.2% of Black voters), though the share of both white and Black voters experiencing no wait time is higher than in 2016, 2018, and 2020 and essentially equal to the share in 2014. In total, according to the post-2022 survey, the share of Black voters who experienced less than 10 minutes of wait time was 68.7% of in-person Black voters, a larger share of in-person Black voters than any of the reported estimates in Dr. Burden's expert report (2014: 62%, 2016: 49%, 2018: 57%, 2020: 31%). To be clear, I cannot attribute any changes reported in the post-election 2022 survey to SB 202. This survey does demonstrate, however, that for whatever reason, after SB 202, the share of Black voters experiencing longer than a 30-minute wait has decreased, while the share of Black voters who waited less than 10 minutes increased.

219.    Other of Plaintiffs' experts offer opinions on line waiting and SB 202. Dr. Schur opines that "[t]he combined additional restrictions on mail-in voting in SB 202 are likely to push more people to vote in person at polling

places, which will in turn exacerbate problems of long lines at polling places and consequently make it harder for many people with disabilities to wait in line to vote in person." Schur Rep. 7.  Like Dr. Pettigrew, Dr. Schur does not cite a quantitative study that demonstrates the provisions of SB 202 will cause an increase in line length for in-person voting. Rather, Dr. Schur examines data on disabled individuals and then infers from her own personal examination of the data that SB 202's regulations on absentee balloting will cause an increase in in-person voting. Further, it is unclear how changes in line length would affect in-person voting rates from disabled individuals. By law, disabled and elderly voters allowed to move to the front of the line. Dr. Schur acknowledges this, but then argues that, "[w]hile older voters and those with physical disabilities may ask to be moved to the front of a line, it may be hard to get the attention of poll workers and convince them that one is entitled to do so, and this practice would not be available to individuals with different disabilities, such as cognitive or other less-visible impairments, who may now need to vote in person." *Id.* Dr. Schur fails to quantify the difficulty of getting poll workers attention or assistance. Further, she doesn't demonstrate that moving to the front of the line is more difficult for individuals with different sorts of disabilities. In short, while we know the law allows for disabled and

182

elderly individuals to move to the front of the line, we do not know if the issues about which Dr. Schur speculates actually manifest at the polling place.

220. Dr. Schur does provide an explicit quantitative estimate of the share of disabled voters deterred due to long lines in Georgia. Based on survey responses, Dr. Schur writes that, "I conclude with a reasonable degree of certainty, based on the above data, that close to 1% of registered voters with disabilities in Georgia, representing about 7,800 people, reported that they were dissuaded from voting in 2020 by the prospect of long lines at the polls that were well documented, indicating that their voter turnout could have been almost a full percentage point higher if long lines were not an issue." *Id.* at 48.

221. But it is not standard practice to infer the causal effect of an intervention from voters' self-reported reflection on why they did not vote. A well-known finding in psychology is that individuals struggle to explain their actions.[90] This is particularly worrisome when measuring voter turnout because respondents often exhibit social desirability bias. Holbrook and Krosnick (2011) argue that a "great deal of evidence suggests that survey respondents sometimes intentionally present themselves in inaccurate but

---

[90] Nisbett, Richard E., and Timothy D. Wilson. "Telling more than we can know: Verbal reports on mental processes." Psychological review 84.3 (1977): 231.

socially admirable ways."[91] Dr. Schur also opines (at 30) that "the estimated voting gap between Georgia citizens with and without disabilities (from Table 8) is largely accounted for by a greater likelihood that registered voters with disabilities said they tried but were not allowed to vote, it was too much trouble, or they were dissuaded by the long lines." Voters' inability to accurately reflect on why they didn't undertake an action also undermines this claim.

222.    Plaintiffs' experts Dr. Lichtman and Dr. Schur opine about the effect of SB 202's ban on mobile voting on voter turnout and partisan advantage, yet neither offer evidence about the effect of mobile units on turnout.    Dr. Lichtman opines on the mobile unit voting ban that "[t]his provision targets with surgical precision two heavily Democratic counties: Fulton County and Douglas County." Lichtman Rep. 26. Yet, Dr. Lichtman provides no evidence that the presence of mobile voting caused increased turnout in the 2020 election, decreased the time voters waited in line, or had any other effect on how voters cast their ballots. He further provides no

---

[91] Holbrook, Allyson L., and Jon A. Krosnick. "Social desirability bias in voter turnout reports: Tests using the item count technique." Public opinion quarterly 74.1 (2010): 37-67.

calculation to show that whatever effect he estimates mobile units have on turnout manifests in an advantage for any one party.

223.   Dr. Schur opines on mobile voting that "[i]n particular, by coming to locations where many people with disabilities live rather than requiring them to travel to a fixed polling place, these mobile facilities are useful to many people with disabilities who live in assisted living facilities, nursing homes, and psychiatric institutions or who face transportation or mobility difficulties. As such, the new barriers imposed by Section 20 will make it harder for people with disabilities to vote." Schur Rep. 51. Here again, Dr. Schur provides no direct evidence to support this claim, nor does she cite a study that demonstrates that mobile voting in Georgia caused an increase in turnout in the 2020 election among individuals with disabilities.

## XIII.  THE POLITICAL EFFECTS OF SB 202 ARE DIFFICULT TO ANTICIPATE

224.   A claim made across several expert reports is that SB 202 was put in place to advantage the Republican Party. As evidence for this claim, in several places the authors claim that various provisions of the law were designed to "burden" or "affect" minorities or Democrats disproportionately. Plaintiffs' experts explicitly or implicitly argue that SB 202 was put in place to advantage the Republican Party. For example, Dr. Lichtman argues (at 17)

that "[e]ach provision operates synergistically to impede opportunities for voters who support Democratic candidates to participate fully in the political process in Georgia and elect their candidates of choice." In this report, I have described flaws in the logic and evidence of several of these claims. But even if there had been explicit causal effects computed, and even if they had shown a disparate impact—which they have not—it is not straightforward to move from disparate impact of a law to an electoral advantage for a political party. This is because disparate effects measure differences in rates across racial groups, but elections are decided with total number of votes. As I will show in this section, determining (1) whether a particular policy causes a partisan advantage and (2) the size of that advantage requires an explicit computation that takes into account two facts: the number of voters whose turnout decision the policy affects and the vote choice preferences of those who turnout to vote. Working through an illustrative example, I will show that the white-Black turnout gap in Georgia can increase, while the electoral advantage for the Republican Party could decrease.

### A.   Dr. Burden's claims about racially polarized voting and political advantage in Georgia

225.  After an analysis of differences in Black and white vote choice and voter turnout, Dr. Burden opines that:

> Due to the presence of substantial racial polarization in
> voting, shifts in the relative turnout rates of Black and white
> residents impact the partisan outcomes of state elections.
> Because the Black voter turnout rate is consistently lower
> than that of whites, there is more capacity for it to increase.
> This potential would put the recent dominance of Republican
> candidates backed mostly by white voters at further risk.[92]

226.    Dr. Burden makes two observations in this paragraph, which he

then uses to reach a conclusion about how changes in white and Black turnout

rates could affect the success of Georgia Republicans in future elections:

> 1) Dr. Burden asserts that when the Black voter turnout rate
> increases relative to the white voter turnout rate, then
> Democrats' vote total increases relative to Republicans' vote
> total. Dr. Burden is also asserting that when the white voter
> turnout rate increases relative to the Black turnout rate,
> Republican vote total increases relative to Democratic vote
> total.
>
> 2) Dr. Burden asserts that because the Black turnout rate is
> less than the white turnout rate, then necessarily the share
> of Black citizens who haven't voted (1-Black turnout rate) is
> greater than the share of white citizens who haven't voted
> (1-white turnout rate). This remaining share is the
> "capacity" for increase.

Using point (1) and (2), Dr. Burden concludes (at 10) that if the Black turnout

rate were to increase more than the white turnout rate in future elections—

which he says is feasible because of the larger share of Black citizens who have

---

[92] Burden Rep. 10.

not voted—then "this potential would put the recent dominance of Republican candidates… at further risk" in Georgia.

227.  Dr. Burden's conclusions in this passage do not follow from an explicit calculation in his report, nor are Georgia specific calculations found in a relevant literature that he cites. After I conducted the appropriate calculations, I found that the evidence does not support Dr. Burden's conclusions. First, I found there is an ambiguous relationship between the white-Black turnout rate gap and the relative electoral advantage of Democratic and Republican candidates. I show that the white-Black turnout rate gap could increase in Georgia and this could lead to a disadvantage for Republican candidates. Second, I found there are actually more white residents who have not voted in Georgia than Black residents, despite the lower Black voter turnout rate. I consider each of these issues in turn.

228.  I consider first the relationship between the white-Black turnout rate gap and the electoral advantage of each party, where I find two reasons that this relationship is ambiguous. First, there are a different number of white and Black residents in Georgia. As a result, a change in the turnout rate for Black residents implies fewer additional voters than the same change in the turnout rate for white residents. Second, when the turnout rate changes for either white or Black residents, the average vote choice for those groups

188

can also change as voters with different electoral preferences may differentially increase (or decrease) their rate of participation. This fact is particularly important when considering changes in the turnout rate among white voters in Georgia. As I will show, white voters with different levels of education support Republican candidates in Georgia at different rates.

229.  In Grimmer, Marble, and Tanigawa-Lau (2023), we derived the appropriate formulas to assess how changes in the turnout rates affect the change in the number of net votes for a political party.[93] Following the derivation in our paper, I will focus on the change in net Republican votes after a turnout rate change. If the change in net Republican votes is positive, then the Republican Party candidate gains votes, and if the change in net Republican votes is negative, then the Republican Party candidate loses votes.

230.  To derive the formula for the change in net Republican votes, I first provide the formula for the number of net Republican votes from Black voters, (Net GOP$_b$). To calculate this quantity, I combine three components: the

---

[93] Grimmer, Justin, William Marble, and Cole Tanigawa-Lau. "Measuring the contribution of voting blocs to election outcomes." (2022). Our paper extends Axelrod (1972), and our formula is a straightforward application of the law of total probability. Axelrod, Robert. "Where the votes come from: An analysis of electoral coalitions, 1952–1968." American political science review 66.1 (1972): 11-20.

number of Georgia residents who identify as Black (Group Size$_b$), the Black turnout rate (Turnout Rate$_b$) and the vote share difference among Black individuals who turnout to vote: the rate members of the group who turnout to vote support the Republican candidate minus the rate those who turnout to vote support the Democratic candidate. I will denote this quantity with Vote Diff$_b$ | Turnout, where the | Turnout signifies that the vote choice depends on who turns out to vote. I then multiply these three quantities together to obtain the number of net GOP votes,

$$\text{Net GOP}_b \;=\; \text{Group Size}_b \times \text{Turnout Rate}_b \times (\text{Vote Diff}_b \mid \text{Turnout})$$

If Net GOP$_b$ is negative, then the Republican candidate loses votes with this group and if it is positive then Republicans gain voters with this group. The analogous quantity for white voters is Net GOP$_w$, which is composed of the same three components: the number of white Georgia residents, the turnout rate among white individuals, and the difference between the rate white individuals who turnout to vote select the Republican and Democratic candidate.

231.  If I limit the focus to only Black and white voters like Dr. Burden, then the net Republican votes from these two groups is simply the sum of the

Net Republican votes from Black and white residents (Net GOP = Net GOP$_b$ + Net GOP$_w$).

232. I used this formula to derive the formula for the change in net Republican votes if there is a change in the white and Black turnout rates. To consider a change in the turnout rate, call the net Republican votes in the first election Net GOP$_1$ and the net Republicans in the second election Net GOP$_2$. The change in net Republican votes is given by,

$$\text{Net GOP}_2 - \text{Net GOP}_1 = \text{Net Gop}_{b,2} + \text{Net Gop}_{w,2} - (\text{Net GOP}_{b,1} + \text{Net GOP}_{w,1})$$
$$= \text{Net GOP}_{b,2} - \text{Net GOP}_{b,1} + \text{Net GOP}_{w,2} - \text{Net GOP}_{w,1}$$

In other words, the change in net Republican votes corresponds to the sum of the change in net Republican votes among Black Georgia residents and the change in net Republican votes among white Georgia residents. To clarify this formula, I expand the Net GOP$_{b,2}$ -Net GOP$_{b,1}$ term. Assuming the proportion of black voters is held constant, this is

$$\text{Net GOP}_{b,2} - \text{Net GOP}_{b,1} = \text{Group Size}_b \times (\text{Turnout Rate}_{b,2} \times (\text{Vote Diff}_{b,2} \mid \text{Turnout})$$
$$- \text{Turnout Rate}_{b,1} \times (\text{Vote Diff}_{b,1} \mid \text{Turnout}))$$

233. This formula shows that the change in net Republican votes from Black Georgia residents depends on a difference in a complicated quantity: the combined turnout rate and vote choice difference in each election. And the change in this quantity is then scaled by the group size. Given this formula, it

191

is clear merely examining changes in the white-Black turnout rate will be insufficient to estimate the effect on the number of votes for a party.

234. Using this formula, I am now able to evaluate Dr. Burden's claim that changes in the white-Black turnout rate gap is directly related to each party's electoral advantage. As an example, to demonstrate why there is no consistent relationship between the white-Black turnout rate gap and a party's electoral advantage, I examine an example of changes in turnout that correlate with Georgia residents' race and education level.

235. To apply the formula, I first estimated how vote choice preferences in Georgia vary across different levels of education. To estimate this, I used the cumulative Cooperative Election Survey to evaluate the vote choice of Georgia voters in the 2020 presidential election and the 2018 Gubernatorial election. Specifically, I created an indicator for whether every respondent reports having no bachelor's degree or a bachelor's degree or higher. I then examined the rate white and Black voters at different education levels reported supporting the Democratic and Republican candidates in the 2020 election and the 2018 Gubernatorial election. I used the standard survey weights in this calculation. Tables 33 and 34 shows that white voters in Georgia without a Bachelor's degree supported Republicans at a higher rate than white voters in Georgia who at least have a Bachelor's degree.

192

| Race | Education | Dem. Share | Rep. Share | Difference |
|-------|-------------|-------------|-------------|-------------|
| Black | Bachelor | 0.96 | 0.02 | -0.93 |
| Black | No Bachelor | 0.92 | 0.07 | -0.85 |
| White | Bachelor | 0.42 | 0.56 | 0.15 |
| White | No Bachelor | 0.23 | 0.75 | 0.52 |

Table 33: Support for 2020 presidential candidates by race and education, using the Cooperative Election Survey

| Race | Education | Dem. Share | Rep. Share | Difference |
|-------|-------------|-------------|-------------|-------------|
| Black | Bachelor | 0.93 | 0.06 | -0.87 |
| Black | No Bachelor | 0.93 | 0.05 | -0.88 |
| White | Bachelor | 0.35 | 0.64 | 0.28 |
| White | No Bachelor | 0.19 | 0.80 | 0.61 |

Table 34: Support for 2018 governor candidates by race and education, using the Cooperative Election Survey

236.    Applying this formula and taking into account heterogeneity by education required that I also calculated the number of Black and white voters with and without Bachelor's degrees. To do this, I used estimated numbers from the Census 5-year ACS, which corresponds with shares reported by Dr. Palmer. As Dr. Palmer notes, a larger share of white Georgia residents has a Bachelor's degree than Black Georgia residents. Palmer Rep. 13. As a result, if there is a change in turnout rates that solely affects voters without a college degree, the change in the Black turnout rate will be greater.

237.    Using the formula, vote choice rates from the CES, and the size of groups from the Census, I will now show that even if the white and Black turnout rate gap increases in Georgia, it could imply an electoral advantage

for Democrats within the context of this illustrative example.[94] Consider the following hypothetical. Suppose, for whatever reason, there is a 10-percentage point decrease in turnout rates among voters without a Bachelor's degree for both Black and white Georgia residents, but there is no change in the turnout rate among voters with a Bachelor's degree regardless for both Black and white voters.

238.   If the turnout rate changes in this way, then the white turnout rate would decrease less than the Black turnout rate, because a larger share of white Georgia residents has a Bachelor's degree than Black Georgia residents. As a result, in this hypothetical example the white-Black turnout rate gap would grow by 0.98 percentage points. Nevertheless, the change in turnout rates imply a net advantage for Democrats. If I used the vote choice rates from the 2020 presidential election, I find this change in turnout rates creates a 3,485-vote advantage for the Democratic candidate (meaning that the change in the net Republican vote is -3,485). If I used the vote choice preferences from the 2018 Gubernatorial election, I find an even larger

---

[94] This is just one example that demonstrates changes in the turnout gap do not imply an electoral advantage. There are, of course, many other ways the white and Black turnout gap could increase while creating an electoral disadvantage for Republicans.

advantage for the Democratic candidate, with a 24,241-vote shift to the Democratic candidate (a change in the net Republican vote of -24,241 votes). This occurs because whites without a Bachelor's degree who turnout to vote cast their ballots for Republicans at higher rates than whites with a Bachelor's degree.

239.  This hypothetical scenario demonstrates that there is no clear relationship between the white-Black turnout rate gap in Georgia and the relative advantages of the political parties, in contradiction of the claims made by Dr. Burden. This is because focusing solely on changes in the turnout rate gap fails to take into account differences in the number of white and Black Georgia residents, and it fails to consider how vote choice changes as different individuals turn out to vote.

240.  Of course, this is just one simple example of one hypothetical change in Georgia. But it demonstrates a key point: to estimate the political effects of a law an explicit calculation is necessary and intuitive reasoning is insufficient. While several expert reports claim that SB 202 will create an electoral advantage for Republicans, no report performs the appropriate calculation for SB 202. To do this, the analyst would need to postulate a causal effect of SB 202 on turnout rate for the relevant racial groups and calculate how the change in turnout rate affects support for the political parties by

changing the composition of those who turnout to vote. In the absence of this calculation, the effect of the law is unclear.

241.  I now turn to Dr. Burden's claims about the capacity for changes in turnout in Georgia elections. While Dr. Burden opines (at 10) that there is "more capacity" for the Black turnout rate to increase than the white turnout rate, it is not true that there are more Black citizens who have not voted than white citizens who have not voted in Georgia. And because elections are decided based on the number of votes, it is critical to consider the number of potential voters, rather than merely the remaining proportion of the population rate.

242.  A simple arithmetic calculation yields the number of white and Black non-voters in Georgia. To make this calculation I used the size of the Black and white CVAP in 2020. I multiplied this by the share of individuals who did not turn out to vote. To show how this calculation varied over recent elections, I calculated the share of white and Black voters who did not vote in statewide general elections in Georgia from 2014 to 2022, using the numbers reported in Table 37 in the Appendix. These numbers are reported in Table 35.

196

| Turnout Rate Year | Remaining White Citizens | Remaining Black Citizens | Difference White - Black Remaining Citizens |
|---|---|---|---|
| 2014 | 2,671,662 | 1,556,580 | 1,115,082 |
| 2016 | 1,786,919 | 1,153,022 | 633,897 |
| 2018 | 2,009,195 | 1,213,076 | 796,119 |
| 2020 | 1,433,894 | 1,028,112 | 405,782 |
| 2022 | 1,996,120 | 1,362,008 | 634,112 |

Table 35: Number White and Black citizens who have not voted, varying the Black and White turnout rate based on recent elections.

243.    Regardless of the Black and white turnout rate used, my calculations show that there are more remaining white voters than Black voters. Even considering the year with the highest Black and white turnout rate, 2020, there are more then 405,000 more white voters who could vote than Black voters. This calculation shows that—even though Dr. Burden is correct that Black turnout rates are lower than white turnout rates—there are actually more remaining white votes than Black votes. And because elections are decided based on the number of votes, this is the more important metric.

## B.    Recent Georgia Election of Black Elected Officials

244.    Dr. Clark examined the share of seats that Black elected officials hold for the U.S. House of Representatives and state legislature. In this section, I updated these counts through the results of the 2022 election and compare the share of Black elected officials in particular institutions and then compare that share to the Georgia population. Dr. Clark asserts that parity is

achieved if the share of Black elected officials in the institution meets or exceeds the share of the Black population. Clark Rep. 37.

245. **House of Representatives** Currently, 5 of Georgia's 14 Congressional seats are held by Black elected officials. This 35.7% share of Congressional seats exceeds the 33% of the Georgia population who identifies as Black.

246. **U.S. Senate** Raphael Warnock, who identifies as Black, was first elected in a special election in 2020 and then successfully defended his seat against Herschel Walker, who also identifies as Black. Jon Ossoff, the other Georgia senator, identifies as white. As a result, 50% of Georgia's senators identify as Black, achieving Dr. Clark's definition of parity.

247. **State Legislature** According to the Atlanta Journal Constitution, 69 Black state legislators were elected in the 2022 election, an increase of one Black state legislator from after the 2020 election.[95] This constitutes 29.2% of the legislature. This is an increase from 28.8%, but it remains below Dr. Clark's definition of parity.

---

[95] Maya T. Prabhu, *2023 session will have Georgia's most diverse Legislature*, The Atlanta Journal-Constitution (Nov. 29, 2022), https://tinyurl.com/yh3vj8fe.

## XIV. CLAIMS MADE ABOUT GEORGIA'S REGISTRATION PRACTICES

248. While several expert reports examine Georgia's recent electoral history, no report mentions that Georgia enacted an automatic voter registration (AVR) system in 2016. AVR is a system that enrolls voters when they have points of contact with the Georgia Department of Driver Services (DDS). In Georgia, eligible voters are either added to the registration rolls or have their records updated when they have contact with DDS and do not affirmatively opt out. Georgia is one of 23 states that have enacted an AVR system. Morris and Dunphy (2019), in a Brennan Center report, estimated that 93.7% of the growth in registration rates in Georgia was due to AVR. The report asserts that without AVR, "Georgia would have registered just over 6,279 voters each week in this period in 2017. Georgia actually registered an average of just over 12,160 each week—a 93.7 percent increase."[96] And Kim (2022) shows that enabling registrants to update their information after moving causes a 5.8 percentage point increase in turnout.[97]

---

[96] Kevin Morris and Peter Dunphy. 2019. "AVR Impact on State Voter Registration" https://www.brennancenter.org/our-work/research-reports/avr-impact-state-voter-registration

[97] Kim, Seo-young Silvia. "Automatic Voter Reregistration as a Housewarming Gift: Quantifying Causal Effects on Turnout Using Movers." American Political Science Review (2022): 1-8.

249.  Dr. Cobb describes (at 43) voter file maintenance as "purg[ing]" voters. He cites two specific figures as indicators of improper voter file maintenance. He argues that, "[b]y some estimates, 1.4 million names may have been stripped from Georgia's voter rolls between 2012 and 2018. More than half a million of them were reportedly purged from the rolls under the 'use it or lose it' provision by computers in the Secretary of State's Office in the course of a single evening on July 28, 2017. In a matter of a few hours, the state's registered electorate had been slashed by 8 percent, and by the end of 2017, the reduction would be 10 percent."[98] Given the attention to this practice in the expert reports and considerable public debate around voter list maintenance, I investigated the number of voters removed, who was removed, and the stated reason for their removal.

250.  To investigate these claims, I used the canceled voter file to calculate the number of registrations canceled from 2012 to 2018. The canceled voter file contains a record of each canceled registration and the date the registration was canceled. After identifying the year when the individual was canceled, I tallied the total number of canceled voters from 2012 to 2018. In total, I find that 1,226,939 were removed over these years. Among those, 49.3%

---

[98] Cobb Rep. 43.

of voters were removed from the list due to inactivity and 50.7% of canceled registrations are for other reasons. Among the reasons why voters were removed, 32.0% were canceled because the voter died, 8.2% were canceled because they were duplicate registrations, 4.1% were canceled because the voter moved, 4.2% were canceled because the voter had a felony conviction, and 0.5% were canceled at the voters' request.

251.    Using the canceled voter file, I also analyzed the number and racial composition of Georgia residents whose registration were canceled on July 28, 2017. Specifically, I used the cancel voter file to subset the analysis to those individuals who had their registration canceled on July 28, 2017. I find that 401,522 voters had their registration canceled that day. I then calculated the share of these canceled registration from different self-identified racial groups. These shares are in Column 2 of Table 36. In Column 3 of Table 36, I calculated the share of registered voters from the 2016 election who belong to each racial group.

| Race | Share, Canceled July 28, 2017 | Share Registered November 2016 |
|---|---|---|
| American Indian | 0.001 | 0.001 |
| Asian | 0.020 | 0.019 |
| Black | 0.302 | 0.305 |
| Hispanic | 0.034 | 0.025 |
| White | 0.538 | 0.555 |

Table 36: Share of Voters Removed in July 2017 List Maintenance

252.  Table 36 shows that the distribution of voters canceled on July 28, 2017, reflects the distribution of registered voters. For example, I calculated that white voters constituted 55.5% of the registered voter population in 2016, and they constituted 53.8% of the share of canceled voters, with 215,900 registrations of white residents canceled. This 1.7 percentage point difference means that white voters were underrepresented among canceled registrations. Black Georgia residents constitute 30.2% of the share of canceled registrations from July 28, 2017–121,190 registrations—and were 30.5% of registered voters in the 2016 election. This difference of 0.3 percentage points indicates that, relative to the share among all registered voters, Black residents were less likely to have their registration canceled. Asian and Hispanic registered voters were overrepresented among the canceled voters. Though the discrepancies were small—less than one percentage point for Hispanic registrants and 0.1 percentage points for Asian registrants.

## XV.  CONCLUSIONS

253.  I reach these conclusions to a reasonable degree of scientific certainty and to the best of my knowledge using methods that are standard in my field. I reserve the right to update and amend my report.

Executed on February 14, 2023

Justin Grimmer, Ph.D.

## APPENDIX A
## ALTERNATIVE TURNOUT ESTIMATES

1.    As an alternative method to estimate voter turnout in Georgia by self-reported racial group, I used information from Georgia's registration file pulled on 11/08/2022, the voter history from the relevant election downloaded from the Georgia Secretary of State's website, the list of absentee voter applications from the Georgia Secretary of State's website, and the list of canceled voters, or voters who have been removed from the registration file, provided as part of the discovery documents. Using canceled voters is important, because individuals are regularly removed from the registration file, along with their prior voting history. This can create biases in even simple turnout rate estimates.[1] For each election, I then merged the files using the voter's registration number. This provided me with a comprehensive list of who participated in each election, how they participated, and the characteristics of those who participated.

---

[1] Nyhan, Brendan, Christopher Skovron, and Rocío Titiunik. "Differential registration bias in voter file data: A sensitivity analysis approach." American Journal of Political Science 61.3 (2017): 744-760.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.095 | 0.095 | 0.137 | 0.137 | 0.337 | 0.337 | 0.108 | 0.108 | 0.384 | 0.384 |
| 2016 | 0.218 | 0.218 | 0.378 | 0.378 | 0.499 | 0.499 | 0.316 | 0.316 | 0.590 | 0.590 |
| 2018 | 0.205 | 0.205 | 0.345 | 0.345 | 0.475 | 0.475 | 0.276 | 0.276 | 0.539 | 0.539 |
| 2020 | 0.306 | 0.306 | 0.590 | 0.590 | 0.556 | 0.556 | 0.393 | 0.393 | 0.668 | 0.668 |
| 2022 | 0.247 | 0.233 | 0.381 | 0.352 | 0.433 | 0.417 | 0.245 | 0.223 | 0.542 | 0.537 |
| Runoff, 2021 | 0.255 | 0.255 | 0.496 | 0.496 | 0.512 | 0.512 | 0.306 | 0.306 | 0.597 | 0.597 |
| Runoff, 2022 | 0.217 | 0.205 | 0.327 | 0.302 | 0.401 | 0.386 | 0.207 | 0.188 | 0.479 | 0.475 |

Table 37: Voter Turnout by Self-Reported Racial Group

2.    In Table 38, I present the calculated turnout rate for racial groups in general elections in Georgia, but this table uses an imputation strategy to assign a racial categorization for voters who do not self-identify with a racial group. I applied a Bayesian method that uses a voters' surname and neighborhood to make an inference about a voters' race (Imai and Khanna, 2016; DeLuca and Curiel, 2022).[2] Specifically, the method uses data from the Census on the relationship between surnames and racial identity, coupled with information on the distribution of racial groups in an individual's zip code. Using this information, the method formulates a best guess on an individual's racial identity. For each voter who does not report a racial identity, I used this

---

[2] Imai, Kosuke, and Kabir Khanna. "Improving ecological inference by predicting individual ethnicity from voter registration records." Political Analysis 24.2 (2016): 263-272; DeLuca, Kevin, and John A. Curiel. "Validating the Applicability of Bayesian Inference with Surname and Geocoding to Congressional Redistricting." Political Analysis, 2022, 1–7. doi:10.1017/pan.2022.14.

information to calculate a probability that individual is Asian, Black, Hispanic, or white.[3] I then summed those probabilities and added them to the count of voters from the voter history who had reported their racial identity for a particular group. This approach is based on strong assumptions. It requires the assumption that the distribution in the population and the distribution among voters is the same. That said, this method does provide one approach to ensure excluding voters who do not report their racial identity do not systematically bias the results.

| Year | American Indian | | Asian | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend | CVAP | CVAP Trend |
| 2014 | 0.095 | 0.095 | 0.171 | 0.171 | 0.356 | 0.356 | 0.144 | 0.144 | 0.410 | 0.410 |
| 2016 | 0.218 | 0.218 | 0.458 | 0.458 | 0.530 | 0.530 | 0.391 | 0.391 | 0.637 | 0.637 |
| 2018 | 0.205 | 0.205 | 0.415 | 0.415 | 0.505 | 0.505 | 0.342 | 0.342 | 0.584 | 0.584 |
| 2020 | 0.306 | 0.306 | 0.692 | 0.692 | 0.593 | 0.593 | 0.475 | 0.475 | 0.726 | 0.726 |
| 2022 | 0.247 | 0.233 | 0.451 | 0.417 | 0.462 | 0.445 | 0.302 | 0.275 | 0.589 | 0.584 |
| Runoff. 2021 | 0.255 | 0.255 | 0.583 | 0.583 | 0.544 | 0.544 | 0.373 | 0.373 | 0.649 | 0.649 |
| Runoff. 2022 | 0.217 | 0.205 | 0.387 | 0.357 | 0.427 | 0.411 | 0.255 | 0.232 | 0.521 | 0.516 |

Table 38: Voter Turnout by Self-Reported Racial Group, imputing unknown votes using zip code and surname.

---

[3] The methodology I deployed does not allow for an inference about a voter being an American Indian.

# EXHIBIT A

# Justin Grimmer

| | | |
|---|---|---|
| CONTACT INFORMATION | Department of Political Science | *Voice:* (617) 710-6803 |
| | Stanford University | *email:* jgrimmer@stanford.edu |
| | Encina Hall West | |
| | 616 Jane Stanford Way | |
| | Stanford, CA 94305 | |
| | Office: 212 | |

EMPLOYMENT

**Stanford University**
Assistant Professor, Department of Political Science. 2010-2014.
Associate Professor, Department of Political Science. 2014 – 2017. 2018.
Associate Professor (by courtesy), Department of Computer Science. 2016-2017.
Professor, Department of Political Science. 2018 - Present

**Hoover Institution**
Senior Fellow. 2018-present

**University of Chicago**
Associate Professor, Department of Political Science and the College. 2017-2018.

EDUCATION

**Harvard University** *Department of Government*
Ph.D Political Science, 2010
A.M. Political Science, 2009

**Wabash College.**
A.B. Mathematics and Political Science 2005
*Summa cum laude*, Distinction in Mathematics and Political Science Comprehensive Exams

BOOKS

Representational Style in Congress: What Legislators Say and Why It Matters. *Cambridge University Press*, 2013.

The Impression of Influence: Legislator Communication, Representation, and Democratic Accountability. With Sean Westwood and Solomon Messing. *Princeton University Press*. 2014.

Text as Data: A New Framework for Machine Learning and the Social Sciences. With Margaret E Roberts and Brandon Stewart. *Princeton University Press*. 2022.

PUBLICATIONS

"How to Make Causal Inferences Using Texts" with Naoki Egami, Christian Fong, Margeret E. Roberts, and Brandon Stewart *Science Advances*. 2022.

"Reply to Kalmoe and Mason: The pitfalls of using surveys to measure low-prevalence attitudes and behavior" with Sean Westwood, Matt Tyler, and Clayton Nall.*Proceedings of the National Academy of Sciences*. 2022.

"Causal Inference in Natural Language Processing: Estimation, Prediction, Interpretation, and Beyond". with Amir Feder, Katherine A. Keith, Emaad Manzoor, Reid Pryzant, Dhanya Sridhar, Zach Wood Doughty, Jacob Eisenstein, Roi Reichart, Margaret E. Roberts, Brandon M. Stewart, Victor Veitch, Diyi Yang. *Transactions of the Association for Computational Linguistics* (TACL). *Forthcoming*.

"Current Research Overstates American Support for Political Violence " with Sean Westwood, Clayton Nall, and Matt Tyler. *Proceedings of the National Academy of Sciences.* 2022.

"Naïve regression requires weaker assumptions than factor models to adjust for multiple cause confounding" (with Dean Knox and Brandon Stewart) *Conditional Accept, Journal of Machine Learning Research*

"A Women's Voice in the House: Gender Composition and Its Consequences in Committee Hearings". with Pamela Ban, Jaclyn Kaslovsky, and Emily West *Quarterly Journal of Political Science.* 2022.

"Causal Inference with Latent Variables" with Christian Fong. *American Journal of Political Science.* 2022.

"Partisan Enclaves and Information Bazaars: Mapping Selective Exposure to Online News" with Matt Tyler and Shanto Iyengar. *Journal of Politics.* 2022.

"The Durable Differential Deterrent Effect of Strict Photo Identification Laws" with Jesse Yoder. *Political Science Research and Methods.* 2022.

"No Evidence for Systematic Voter Fraud: A Guide To Statistical Claims About the 2020 Election" (with Andrew C. Eggers and Haritz Garro) *Proceedings of the National Academy of Sciences.* 2021.

"Machine Learning for Social Science: An Agnostic Approach" with Margaret E. Roberts and Brandon Stewart. *Annual Review of Political Science.* 2021

"Political Cultures". with Lisa Blaydes. *Political Science Research and Methods.* 2020.

"Obstacles to Estimating Voter ID Laws' Effect on Turnout". with Eitan Hersh, Marc Meredith, Jonathan Mummolo, and Clayton Nall. *Journal of Politics.* 2018. 80 (3).

"Mirrors for Princes and Sultans: Advice on the Art of Governance in the Medieval Christian and Islamic Worlds" with Lisa Blaydes and Alison McQueen. *Journal of Politics.* 2018. 80 (4).

"Estimating Heterogeneous Treatment Effects and the Effects of Heterogeneous Treatments with Ensemble Methods" with Solomon Messing and Sean J. Westwood. *Political Analysis* 2017. 25(4). 413-434.

"Discovery of Treatments from Text Corpora" with Christian Fong. *In Proceedings of the Annual Meeting of the Association for Computational Linguistics* (ACL 2016) Berlin, Germany

"Money in Exile: Campaign Contributions and Committee Access" with Eleanor Neff Powell. *Journal of Politics.* 2016. 78(4). 974-988.

"Measuring Representational Style in the House: The Tea Party, Obama, and Legislators' Changing Expressed Priorities" in *Data Analytics in Social Science, Government, and Industry* Edited Volume from *Cambridge University Press.* 2016.

"TopicCheck: Interactive Alignment for Assessing Topic Model Stability" *North America Chapter of the Association for Computational Linguistics: Human Language Technologies (NAACL HLT).* Jason Chuang, Molly Roberts, Brandon Stewart, Rebecca Weiss, Dustin Tingley, Justin Grimmer, and Jeffrey Heer. 2015.

"We're All Social Scientists Now: How Big Data, Machine Learning, and Causal Inference Work

Together" Part of Symposium on "Formal Theory, Causal Inference, and Big Data" *PS: Political Science & Politics* , 2015. 48(1), 80-83

"Computer-Assisted Content Analysis: Topic Models for Exploring Multiple Subjective Interpretations." *Advances in Neural Information Processing Systems Workshop on Human-Propelled Machine Learning*. Jason Chuang, John D. Wilkerson, Rebecca Weiss, Dustin Tingley, Brandon M. Stewart, Margaret E. Roberts, Forough Poursabzi-Sagdeh, Justin Grimmer, Leah Findlater, Jordan Boyd-Graber, and Jeffrey Heer. 2014.

"Congressmen in Exile: The Politics and Consequences of Involuntary Committee Removal" with Eleanor Neff Powell. *The Journal of Politics*, 2013. 75 (4), 907–920

"Appropriators not Position Takers: The Distorting Effects of Electoral Incentives on Congressional Representation". *American Journal of Political Science*, 2013. 57 (3), 624–642.

"Text as Data: The Promise and Pitfalls of Automatic Content Analysis Methods for Political Documents" with Brandon Stewart. *Political Analysis*, 2013. 21 (3), 267–297.

"Evaluating Model Performance in Fictitious Prediction Problems". Discussion of "Multinomial Inverse Regression for Text Analysis" by Matthew Taddy. *Journal of the American Statistical Association* 2013.108 (503) 770-771

"Elevated Threat-Levels and Decreased Expectations: How Democracy Handles Terrorist Threats" with Tabitha Bonilla. *Poetics*, 2013. 41, 650-669.
  - Special issue on topic models in the social sciences

"How Words and Money Cultivate a Personal Vote: The Effect of Legislator Credit Claiming on Constituent Credit Allocation" with Solomon Messing and Sean Westwood. *American Political Science Review*, 2012. 106 (4), 703–719.

"General Purpose Computer-Assisted Clustering and Conceptualization" with Gary King. *Proceedings of the National Academy of Sciences*, 2011. 108 (7), 2643-2650.

"An Introduction to Bayesian Inference Via Variational Approximations" *Political Analysis*, 2011. 19(1), 32–47.
  - Included in *Political Analysis* virtual issue on Big Data in Political Science

"Approval Regulation and Endogenous Provision of Confidence: Theory and Analogies to Licensing, Safety, and Financial Regulation" with Daniel Carpenter and Eric Lomazoff. *Regulation and Governance*. 2010. 4(4) 383-407.

"A Bayesian Hierarchical Topic Model for Political Texts: Measuring Expressed Agendas in Senate Press Releases" *Political Analysis*, 2010. 18(1), 1–35.
  - Included in *Political Analysis* virtual issue on Bayesian methods in Political Science

WORKING PAPERS    "What Can We Learn About How Political Campaigns Activate Attitudes?" with Will Marble and Cole Tanigawa-Lau.

"The Unreliability of Measures of Intercoder Reliability, and What to do About it". with Gary King, Chiara Superti, and Matt Tyler.

"Estimating the Contribution of Voting Blocs to Election Outcomes" with Will Marble and Cole Tanigawa-Lau. *Resubmitted*

"Potomac Fever or Constituent Ombudsman?: TestingTheory of Legislative Capacity and Priorities". with Devin Judge-Lord and Eleanor Neff Powell. (Under Review).

"Assessing the Reliability of Probabilistic US Presidential Election Forecasts May Take Decades" with Dean Knox and Sean Westwood (Under Review).

REVIEWS AND
OTHER WRITING

Review of *Cyberwar: How Russian Hackers and Trolls Helped Elect a President* Public Opinion Quarterly. 2019. 83, 1.

"Dismantling Trump's Election Fraud Claims". Washington Times, February 8,2021. with Andrew B. Hall

"In the voter fraud debate, be wary of junk science". The Hill, August 27, 2021. with Andrew B. Hall and Daniel Thompson

**Public Engagement and Reports**

"Strengthening the Integrity of Presidential Elections" American Enterprise Institute Panel. June, 2021. https://www.c-span.org/video/?512799-1/strengthening-integrity-presidential-elections

"Brief of Amicus Curiae in Holmes et. al v Moore, et al" March, 2022.

"Changing the Default: The Impact of Motor-Voter Reform in Colorado" (with Jonathan Rodden).

"Evaluating Look Ahead Americas 'The Georgia Report' On Illegal, Out-Of-State Voting In The 2020 Election" (with Andrew Hall and Dan Thompson)

"High Correlations Between Predicted and Actual Ballots Do Not Imply Fraud" (with Matt Tyler)

HONORS AND
AWARDS

2018. Wabash College Jeremy R. Wright Young Alumnus Distinguished Service Award

2015. Political Methodology section emerging scholar award. Awarded to a young researcher, within ten years of their degree, who is making notable contributions to the field of political methodology.

2015. School of Humanities and Sciences Dean's award for achievement in teaching.

2014. The Richard F. Fenno, Jr. Prize. Awarded to the best book in legislative studies published in 2013.

2013. *Political Analysis* Editor's Choice Award for an article providing an especially significant contribution to political methodology.

2012. School of Humanities and Sciences Dean's award for achievement in the first years of teaching at Stanford.

2011. Warren Miller Prize. Awarded for the best paper published in *Political Analysis* in 2010.

2010. Senator Charles Sumner Prize. Awarded by the Harvard Government faculty for the best dissertation from the legal, political, historical, economic, social, or ethnic approach, dealing with any means or measures tending toward the prevention of war and the establishment of universal peace.

2010. Robert H. Durr award, for the best paper presented at the 2009 Midwest Political Science Association meeting applying quantitative methods to a substantive problem.

2010. Certificate of Distinction in Teaching, Gov 2010: Qualitative and Quantitative Research Design.

2008. John T. Williams Prize. Awarded by the Society for Political Methodology for best dissertation proposal.

2005. Phi Beta Kappa, Wabash College.

2005. John Maurice Butler Prize. Awarded to the senior who, by vote of the Wabash College faculty, has highest achievements in scholarship and character.

2005. N. Ryan Shaw II Political Science Award. Awarded to the outstanding senior political science major.

2005. George E. Cascallen Prize in Mathematics. Awarded to the outstanding senior Mathematics major.

FELLOWSHIPS AND GRANTS

2013-2016. Stanford University Victoria Schuck Faculty Scholar in the School of Humanities and Sciences.

2013-2014. Stanford University, United Parcel Service Endowment Fund Grant, "Infrastructure Spending in American Cities".

2013-2014. National Fellow, Hoover Institute.

2012-2013. Faculty Fellow, Institute for Research in the Social Sciences.

2011-2013. Visiting Fellow, Hoover Institute.

2010. Dirksen Center Congressional research award, for "It's the Flow Not the Stock: Congressional Staff and Their Influence on Policy Outcomes" (with Matt Blackwell).

2009-2010. Center for American Political Studies (CAPS) dissertation completion fellowship.

2009. Eliot Dissertation Completion Grant. A competitive, merit-based Graduate School of Arts and Sciences fellowship for the Social Sciences (declined).

2008-2009. CAPS dissertation research fellowship.

2005-2006. National Science Foundation Graduate Research Fellowship, Honorable Mention.

SOFTWARE AND PATENTS

**Patent Number: US 8,438,162 B2** Method and Apparatus for Selecting Clusterings to Classify a Predetermined Data Set (with Gary King)

**Patent Number: US 9,519,705 B2** Method and Apparatus for Selecting Clusterings to Classify a Data Set. (with Gary King)

**Consilience: Software for Understanding Large Volumes of Unstructure Text** (with Merce Crosas, Gary King and Brandon Stewart) (consilience.com).
Implements a general purpose methodology to facilitate discovery in large collections of texts

**textEffect (CRAN)**
Implements text as intervention method introduced in Fong and Grimmer (2016).

**"arima: ARIMA time series models"** in Kosuke Imai, Gary King, and Olivia Lau "Zelig: Everyone's Statistical Software". 2006.

INVITED
PRESENTATIONS
AND WORKSHOPS
(LAST 3 YEARS)

Department of Political Science. Northwestern University. 2018.
Methods Workshop. Northwestern University. 2018.
Methods Workshop. Department of Political Science. Yale University. 2018.
Methods Workshop. Department of Political Science. Texas A&M University. 2018.
MIDAS Interdisciplinary Seminar Series. University of Michigan. 2019.
American Politics Workshop. Department of Political Science. UC Berkeley. 2019.
American Politics Workshop. Department of Political Science. New York University. 2019.
Summer Institute in Computational Social Science. Princeton University. 2019.
Empirical Implementations of Theoretical Models. Emory University. 2019.
Southern California Methods Workshop. UC Riverside. 2019.
Data Science Institute. Columbia University. 2019.
Department of Politics and CSDP. Princeton University. 2019.
Text as Data Workshop. US Census Bureau. 2019.
TextXD Keynote Address. UC Berkeley. 2019.
Department of Political Science. University of North Carolina. 2020.
Institute for Advanced Study. Princeton University. 2020
Duke Law School. 2020.
International Methods Colloquim. 2021.
MIT Election Administration Workshop. 2021. Princeton Elections Workshop. 2021.
Chicago Committee of Quantitative Methods. 2021. Duke Political Science. 2022
Summer Institute for Computational Social Science. 2022
Legislative Politics Conference. University of Oklahoma. 2022
California Association of Clerks and Election Officials. 2022
Political Science Department. University of Texas. 2023
Applied Statistics Workshop. Harvard University. 2023
Ash Center Workshop. Harvard University. 2023

PROFESSIONAL AND
DEPARTMENTAL
SERVICE

Reviewer for *American Political Science Review, American Journal of Political Science, Journal of Politics, Journal of the American Statistical Association, Proceedings of the National Academy of Sciences, British Journal of Political Science, Political Analysis, State Politics and Policy Quarterly, Public Opinion Quarterly, Journal of Public Economics, Legislative Studies Quarterly, Congress and the Presidency, Journal of Political Communication, Political Science Research and Methods, Research and Politics, American Politics Research, Political Behavior, Journal of Information Technology & Politics, Journal of Information Science, Journal of Artificial Intelligence Research, Evaluation and Program Planning, National Science Foundation, Journal of Social Structure, Sociological Methodology, Cambridge University Press, Oxford University Press, Social Forces, Chapman & Hall (CRC Press), North American Chapter of the Association for Computational Linguistics: Human Language Technologies (NAACL HLT), Association for Computational Linguistics Annual Conference (ACL), Social Science Computer Review, Swiss National Science Foundation*

Interim President, Text as Data Society Member, Department Policy and Planning Committee (2015-2017, 2018-present) Member, Department DEI Committee (2020-2021)
Co-Director, Democracy and Polarization Lab. 2018-Present
Chair, Omnibus Faculty Search Committee. 2018
Organizer Text as Data. 2019. (TADA2019)
Editorial Board Member, *Political Analysis* (2014-2015)
Co-Editor, *Political Analysis Letters* (2014-2018)
Editorial Board Member, *Journal of Politics* (2015-Present)
Graduate Admissions Committee. 2010-2011
Omnibus Faculty Search Committee, 2011-2012

Award Committee, Warren Miller Prize, 2012-2013
Award Committee, Fenno Prize, 2014-2015
Methods Curriculum Committee, 2013-2014
Undergraduate Curriculum Committee, 2013-2014, 2014-2015
Policy and Planning Committee, 2014-2016, 2018-Present
Director of Undergraduate Studies, 2015-2016.
Co-organizer: Stanford Conference on Computational Social Science. June 1st, 2012.
Section Chair for Legislative Campaigns and Elections. MPSA, 2013.
Program Committee: Neural Information Processing Systems (NIPS), Computational Social Science
Workshop, 2011, Topic Modeling Workshop 2013

IN RE GEORGIA SENATE BILL 202

MASTER CASE NO.
1:12-MI-55555-JPB

GEORGIA STATE CONFERENCE
OF THE NAACP, *et al.*,

     *Plaintiffs,*

v.

Case No. 1:21-CV-01259-JPB

BRAD RAFFENSPERGER, in his
official capacity as the Secretary of the
State for the State of Georgia, *et al.*,

     *Defendants.*

SIXTH DISTRICT OF THE AFRICAN
METHODIST EPISCOPAL CHURCH,
*et al.*,

     *Plaintiffs,*

v.

CIVIL ACTION

Case No. 1:21-CV-01284-JPB

BRIAN KEMP, Governor of the State
of Georgia, in his official capacity, *et
al.*,

     *Defendants.*

Exhibit

4

Grimmer

09/27/2025    C.A.N.

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

     *Defendants.*

Case No. 1:21-CV-01728-JPB

Rebuttal Supplemental Expert Report of Dr. Stephen Pettigrew

Dr. Stephen Pettigrew
University of Pennsylvania
Program on Opinion Research and Election Studies
Ronald O. Perelman Center for Political Science and Economics, Suite 406
133 S. 36th Street
Philadelphia, PA 19104

On behalf of Plaintiffs in the three above captioned cases.

In this report, I respond to the June 2025 declaration by Dr. Justin Grimmer, addressing points that relate to my January 2023 initial expert report and March 2023 sur-rebuttal report. Specifically, I highlight three points.

- Dr. Grimmer's analysis of weekend voting is not relevant to a discussion of the impacts of SB202, since SB202 did not cause voting hours to increase in most Georgia counties.
- Dr. Grimmer's analysis demonstrates that long lines continue to be a problem in Georgia.
- Dr. Grimmer's evidence of lines getting shorter in Georgia cannot be attributed to SB202, since lines were shorter nationwide in recent elections and because Georgia adopted a new voter check-in system that was not mandated by SB202.

I acknowledge that Dr. Grimmer's report has points that I do not specifically address here because they are not relevant to my 2023 reports. I otherwise reserve the right to address Dr. Grimmer's findings later if additional information or data become available.

# 1:    SB202 did not add new hours of weekend voting, so increases in weekend voting cannot be attributed to it.

Section VII of Dr. Grimmer's June 2025 report focuses on the percentage of Georgia voters who cast a ballot during weekend early voting in 2022 and 2024. He finds that "the 2024 election had the highest share of votes cast during Sunday and weekend voting of any of the 6 federal general elections [he] examined" (paragraph 66).

He contrasts this evidence against a mischaracterization of my March 2023 report. In paragraph 64, he tries to claim that my report implies that, "SB202 will cause a decline in the use of weekend voting." However, his next sentence quotes my report, clearly showing that I did not claim that SB202 would decrease the number of weekend voters. Instead, I stated that, "I find that this requirement will have no impact on voting hours in most counties...because they offered two days of Saturday voting prior to SB202."

Just as I noted in my March 2023 sur-rebuttal to Dr. Grimmer's 2023 rebuttal report, the evidence he provides here is non-responsive and irrelevant to my analysis. Section 4.2.3 of my January 2023 report notes that "most Georgia voters (and disprortionately white voters) live in a county that-prior to SB202-already offered at least as many hours of early voting as are required by SB202." I go on to note that, "counties where lines were longest in recent elections already tend to offer the most hours of early voting; the counties that will expand early voting hours under SB202 already had short lines."

The increase in weekend voting noted by Dr. Grimmer in his June 2025 report is likely not attributable to SB202's provisions about weekend voting, since, before SB202, most Georgia counties already offered at least that many hours of weekend voting. His analysis seems to be an attempt to tie increases in weekend voting to SB202. He presents no evidence about the amount of weekend voting that Georgia counties had in 2022 and 2024, nor does he state that the number of hours changed after SB202. Without such evidence, and with my evidence that (pre-SB202) most counties already offered extensive weekend voting hours, it is improbable that changes in the share of weekend voters can be attributed SB202's provisions related to early voting.

## 2:    Long lines are still a problem in Georgia

Section IX of Dr. Grimmer's report discusses wait times in Georgia in 2022 and 2024, utilizing a similar data source and methodology as my January 2023 report. The evidence he provides clearly shows that a significant number of Georgia voters still experienced long lines in 2022 and 2024, and that Black Georgians were more likely than white Georgians to wait in a long line to vote.

Table 16 (page 63) in his report shows the percentage of voters who reported waiting in a line between "31 minutes and 1 hour", as well as "More than 1 hour". The table shows that 6.3 percent of Georgia voters waited longer than 30 minutes to vote in 2024, and 5.3 percent waited at least that long in 2022. Both of these percentages are statistically significant at the standard 0.05 threshold: meaning his report provides statistical evidence that long lines continue to be a problem for Georgia voters.

Table 2.1: Percentage of Georgia voters waiting more than 30 minutes to vote

| Race | 2022 | 2024 |
|------|------|------|
| Black | 6.6% | 7.5% |
| White | 4.3% | 5.8% |

The same table in his report also shows evidence of a continued racial difference in wait times. For convenience, I have replicated the relevant numbers from Dr. Grimmer's Table 16 in the table above. In 2024, roughly 1-in-17 white Georgia voters (5.8 percent) waited longer than 30 minutes to vote, while about 1-in-13 Black Georgians (7.5 percent) waited that long. His evidence from 2022 also shows racial differences, with 4.3 percent of white voters experiencing a long line, compared to 6.6 percent of Black voters.

# 3:  Drops in wait times cannot be attributed to SB202

Section IX of Dr. Grimmer's report presents evidence that fewer Georgia voters experienced long lines in the 2022 and 2024 general elections. He uses this evidence to refute my assessment that, if administrative procedures and political factors remain constant, SB202 will have a "net-negative impact on lines" (page 26 of my January 2023 report).

The case he makes, however, ignores this "all other things equal" part of my analysis. I state on page 24 of my January 2023 report that, "SB202 is not the only factor that may increase or decrease the length of lines in Georgia elections." There are two non-SB202 factors which provide much better explanations for why lines were shorter in Georgia in 2022 and 2024.

## 3.1  Reason 1: Lines were shorter nationwide in 2022 and 2024

Table 3.1: Voter wait times nationally, using Cooperative Election Study.

| Response | 2008 | 2012 | 2014 | 2016 | 2018 | 2020 | 2022 | 2024 |
|---|---|---|---|---|---|---|---|---|
| 31 minutes - 1 hour | 9.8% | 8.6% | 2.1% | 7.5% | 4.6% | 11.5% | 4.3% | 9.3% |
| More than 1 hour | 6.0% | 3.9% | 0.3% | 2.0% | 1.2% | 5.8% | 0.8% | 2.5% |
| More than 30 minutes | 15.8% | 12.4% | 2.3% | 9.6% | 5.8% | 17.3% | 5.1% | 11.8% |

Dr. Grimmer's analysis compares the wait times in Georgia in 2022 and 2024 to Georgia's waits in 2014 through 2020. In doing so, he omits a crucial piece of information: wait times were shorter across the country in the most recent two elections. He is using evidence from elections in which lines were short across the country to suggest that SB202 would not have a detrimental impact on lines in Georgia during an election when lines are longer nationwide.

Table 3.1[1] uses the same data and statistical approach as Table 16 in Dr. Grimmer's report. The table here, however, uses the Cooperative Election Study data from across the country, rather than just Georgia.

Dr. Grimmer's report shows that lines in Georgia in 2022 were shorter than 2018, but longer than 2014. My analysis of the national data shows that lines were shorter nationwide in 2022 compared to 2018, but longer than 2014.

---

[1]Each cell in the table reports the percentage of in-person voters who waited a given amount of time. The bottom row adds together the other two rows.

Dr. Grimmer's report shows that lines in Georgia in 2024 were shorter than 2020 and 2016. My analysis of the national data shows that lines were shorter nationwide in 2024 compared to 2020, 2012, and 2008, but not 2016. The national trends in wait times are extremely similar to the ones in Georgia.

This suggests that SB202 cannot be credited with decreasing wait times in Georgia, since its provisions do not apply to the other 49 states. Dr. Grimmer's June 2025 report, as well as his 2023 rebuttal report, does not make a case for *why* SB202 would improve wait times. By not making any such claims, his finding that lines got shorter in recent elections is irrelevant to the question of whether SB202 may have a negative impact on lines.

His evidence here also does not refute the reasons I explained in my January 2023 report for why SB202 would have a negative impact on wait times, holding other factors constant. Clearly the 2022 and 2024 election cycles had much different patterns of voter turnout and wait times than prior election cycles both in Georgia and nationwide. If the national pattern in 2026 or beyond reverts back to where it was pre-2022, Georgia will experience wait times that are worse than they would be if SB202 were not in effect. Dr. Grimmer's report does not address this point or provide evidence to refute it.

## 3.2   Reason 2:   Georgia implemented a massive wait-time-shortening program in 2022 that was unrelated to SB202

The other reason that the drop in wait times cannot be attributed to SB202 is that Georgia recently implemented a massive, new voter check-in system which appears to have sped up the process of getting voters through the line. In paragraph 34 of her February 2023 report, Ms. Lynn Bailey states that, "Beyond SB202's provisions, the State has undertaken additional efforts to address line length and reduce voter wait time." She goes on to describe a pilot program for a cellular version of the state's poll pads used for checking in voters. She describes the program as "streamlin[ing] the check-in process"

She then presents evidence that counties involved in the 2022 pilot program had check-in times that were much shorter than those in counties that had not implemented the program. Chart A of her report shows that during early voting, counties with the program had wait times that averaged less than one minute, while those without the program had average waits of 8 minutes.

In a media report from November 8, 2023, COO of the Office of the Georgia Secretary of State Gabriel Sterling stated that, "the average check-in time before [the program] was about a minute and half... Now, we're averaging about 47 seconds to check people in. So,

that leaves just shorter lines."[2]

On May 22, 2024, Secretary of State Brad Raffensperger issued a press release that described the further expansion of this program.[3] The press release describes investments in Georgia's election technology that stretch back to 2019–well before the passage of SB202. It also directly connects the implementation of the poll pad program to shorter wait times: "Recent investments into upgraded poll pad technology ensure that voters smoothly check-in, leading to election day wait times of less than 1 minute in most counties."

Based on my own research and knowledge about the causes of long lines to vote, if a check-in system can cut check-in times in half or by seven minutes, it will have a huge positive impact on wait times.[4] As Ms. Bailey, Mr. Sterling, and Secretary Raffensperger emphasize, this program was not created by SB202, nor does SB202 require that it stays in place.

As I stated on page 26 of my original January 2023 report, "The state or individual counties may alter their administrative procedures or voting technology, and those changes may have an impact on line length. But even if those changes have a positive impact on line length, that does not mean that SB202 does not have a net-negative impact on lines." The success of this poll pad program is exactly the type of administrative change that I was alluding to in my report. The program's existence does not mean that SB202 does not negatively impact line length in Georgia or have a disparate impact on voters of color.

---

[2]"'It was a great, easy day': Central Georgia election officials say GARViS system is a success." November 8, 2023. https://www.13wmaz.com/article/news/local/central-georgia-election-officials-say-garvis-system-succeeds-houston-county-peach-county-secretary-of-state-office-peach-state/93-d4918284-178c-4b70-a5d9-c8fbe2e4fed9

[3]"Raffensperger's Poll Pad Upgrades, GARViS, Lead to Smooth May General Primary." May 22, 2024. https://sos.ga.gov/news/raffenspergers-poll-pad-upgrades-garvis-lead-smooth-may-general-primary

[4]Stephen Pettigrew. "The Racial Gap in Wait Times: Why Minority Precincts are Underserved by Local Election Officials." *Political Science Quarterly* 132(3). Fall 2017.

I declare under penalty of perjury that the foregoing is true and correct. I reserve the right to supplement this report with additional analyses as new information becomes available. Executed on July 04, 2025 in Philadelphia, Pennsylvania.

Stephen Pettigrew, PhD