# An Evaluation of Fraud Claims from the 2020 Trump Election Contests[*]

Justin Grimmer[a] and Abhinav Ramaswamy[b]

[a]Democracy and Polarization Lab, Political Science, and Hoover Institution. Stanford University.
616 Jane Stanford Way, Stanford CA 94305. jgrimmer@stanford.edu.
[b] Democracy and Polarization Lab, Political Science. Stanford University

January 16, 2024

### Abstract

Even years after the 2020 election, Donald Trump continues to claim that fraudulent and illegal votes cost him the 2020 election. In this paper we provide the most comprehensive assessment of his empirical claims to date. All of the claims we evaluate fail to provide evidence of fraud or illegal voting. Trump's claims of fraud or illegality are riddled with errors, hampered by misunderstandings about how to analyze official voter records, and filled with confusion about basic statistical techniques and concepts. Often, the claims are based on the casual impressions of what happens in a "normal" election based on little more than intuitions. Worse yet, several claims are simply misstated by Trump's legal team or Trump. As a result, sometimes the public claims do not even match the weak evidence in Trump's legal challenges. This paper provides a resource for assessing many of the most prevalent claims made about the 2020 election and a guide to anticipating potential objections in future elections.

## 1   Introduction

After the 2020 election, Donald Trump, his campaign, and political allies engaged in a sustained effort to challenge Joe Biden's victory. This effort culminated with the events of

[*]For comments and data we thank Benjamin Ginsberg, Marc Meredith, Al Schmidt, Jonathan Mummolo, Ryan Germany, Eitan Hersh, Andrew Hall, Sean Westwood, Michael Herron, Matthew Tyler, Andrew Eggers, Duncan Carling, Samuel Beckerman, Christina Wang, Chris Rickert, Daniel Hopkins, Daniel Thompson, Apoorva Lal, and Max Hailperin. We thank Jasmine Sky Nguen for dedicated research assistance. Grimmer discloses that he served as an expert witness in the State Bar of California vs John Eastman disciplinary hearings as an expert for the State Bar.

Exhibit
5
Grimmer
08/07/2025    CAN

January 6th, when Trump supporters stormed the US capitol to protest the official counting of ballots from the electoral college. But Donald Trump didn't stop objecting to the election just because he left the White House.

Even after officially losing the election and vacating the White House, Trump continues to object to the election results. A common refrain from Trump's objections is that many of his election cases were never actually heard in court, because the plaintiffs lacked standing. According to Trump and his allies' objections, if the cases had been heard, they would have revealed that Trump won the election. For example, in August 2023 Trump announced, and then canceled, a news conference that would detail "A Large, Complex, Detailed but Irrefutable REPORT on the Presidential Election Fraud which took place in Georgia." Then in January 2023 Trump released an unsigned 32 page memo supposedly detailing evidence of fraud and illegality in the 2020 election (Anonymous, 2023) .

In this paper we perform an extensive examination of claims made in Trump's legal challengers and in subsequent public statements about the 2020 election. We focus specifically on two sorts of claims. One set of empirical claims were made using registration files, voter history files, absentee voter files, and merges with other administrative data sets: such as data from the post office, individuals who are deceased, or lists of felons or other supposedly ineligible voters. A second set are statistical claims made about aggregate voting patterns that identify supposedly anomalous patterns consistent with voter fraud.

We examine 38 empirical claims, constituting the most complete assessment of empirical voter fraud claims from the 2020 election to date. The claims were alleged in courts throughout the country, including Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. In each instance, we find that these claims fail to provide any evidence of fraud, illegality, or even an abnormality. One reason that the claims fail is that they are not based on facts (Eggers et al., 2021). We find that many claims misstate turnout histories, incorrectly characterize candidate's performance, or are just simply mistaken. A second reason that claims fail is that they are based on an inappropriate or incorrect application of statistical

2

models.

Regardless of the reason why, every claim we analyze fails to provide evidence of illegality or fraud. But what is even more remarkable is that none of the claims presented are remotely convincing. We document that the supposed evidence of fraud that Trump relies upon is riddled with basic statistical misunderstandings and errors, confusion about how to use voter files or absentee voter history to analyze turnout and registration, and invented statistical techniques based on the impressions of what happens in a "normal" election from "experts" who never previously analyzed election data and provide no argument to justify their procedures. At no point did Trump or his allies present even remotely plausible evidence of consequential fraud or illegality.

This paper is part of a much broader literature evaluating claims made about the 2020 election and voter fraud claims more generally. Our effort to provide a more comprehensive assessment of empirical voter fraud claims follows Danforth et al. (2022) who provide an expansive and impressive comprehensive view of claims made in Trump litigation. As we document in this paper, many of the claims made in Trump's initial court filings were refuted in expert reports that we discuss in this paper (Stewart, 2020a; Rodden, 2020; Rodden and Marble, 2020; Ansolabehere, 2020; Mayer, 2020; King, 2020; Herron, 2020). There have also been other academic papers that examine voter fraud claims from the 2020 election. Eggers et al. (2021) examine several broadly disseminated claims of "anomalous" election results and show these claims are either simply false, or technically true but not evidence of fraud. Grimmer et al. (2023) examine more expansive claims made after the 2020 election that allege every election is being manipulated. Grofman and Cervas (2023) examines the logical structure of voter fraud claims and show that they fail as a matter of basic logic. And Herron (2023) shows that there is no evidence Biden performed better in counties with Dominion machines.

We organize our assessment of the claims made about the 2020 election based on the specific states the claims target and the type of allegation made. That said, many of the

3

claims analyzed in one state were also made in other states. We first focus our analysis on nationwide claims, or claims involving several states' results and voting systems. We then provide an extensive analysis of Georgia elections, because Georgia is the location of perhaps the most aggressive objections to the 2020 election. We then analyze claims in Pennsylvania, Michigan, and Wisconsin. But the claims we analyze also cover many of the objections raised in Arizona and Nevada.

## 2    Nationwide Claims About Voting Patterns

The claims made that cover several states' elections are particularly troublesome, because they indict a large number of election systems across the United States. Yet, we find that the claims are baseless. Across all of the allegations, we show that they lack basic logical coherence, rest upon confusion about statistical terms, and ultimately have no evidentiary basis. In short, the expansive or nationwide claims about the 2020 election are based upon incredibly weak and often nonexistent evidence.

### 2.1    Contrast Analyses and Supposedly Anomalous Vote Returns

Skeptics of the 2020 election have claimed that the results were anomalous. Some of the claims were based on mere disbelief that Joe Biden could win the election. For example, Donald Trump tweeted on November 26th that "Just saw the vote tabulations. There is NO WAY Biden got 80,000,000 votes!!! This was a 100% RIGGED ELECTION" (Trump, 2020c). On November 30th, Trump continued to doubt Biden's popularity arguing that "We have some big things happening in our various litigations on the Election Hoax. Everybody knows it was Rigged. They know Biden didn't get more votes from the Black community than Obama, & certainly didn't get 80,000,000 votes. Look what happened in Detroit, Philadelphia, plus!" (Trump, 2020e). And in a speech in Georgia on December 5th, Trump exclaimed that

I got more votes than any sitting president in history. 11 million more votes than we got in 2016. And we thought that if we could get 68 million, 67 million that would be the end. All of our great, brilliant geniuses said you'd win if you get 67 or 68. It's over. We got 74 million-plus and they're trying to convince us that we lost. We didn't lose. They found a lot of ballots to be nice about it (Trump, 2020a).

But other claims about anomalous results are based on differences from prior elections. Trump expressed one version of this skepticism in his December 5th speech in Georgia, when he said that

President Obama beat Biden all over the country, except in some of the swing states where Biden beat him badly. How does that work? And they say it's statistically impossible. He beat crooked Hillary. Think of this. He beat crooked Hillary in the swing states, but she beat him everywhere else. (Trump, 2020a).

Trump never explains who declared this to be statistically impossible or who told him about what vote total targets to hit to guarantee victory. Nor does he point to concrete evidence that Joe Biden outperformed Barack Obama and Hillary Clinton in only the swing states or a report that makes that claim. One reason for the lack of citation might be that this claim is completely false. Compared to Barack Obama in 2012, Joe Biden in 2020 received a higher share of vote in 22 of 51 states plus DC. Compared to Hillary Clinton in 2016, Joe Biden received a higher share of the vote in 43 of 51 states plus DC.

But other analysts have taken up this basic idea—detecting anomalous shifts in votes— and claimed to find anomalies in the 2020 election. For example, in a series of reports authored after the 2020 election, Young and Blehar (2021) argue that they have a statistical technique to identify anomalous state or county level election results.[1] Young and Blehar's (2021) contrast analysis analyzes whether the vote counts in the 2020 election were similar

---

[1]The contrast analysis was also included in an expert report filed in *King v Whitmer* in Michigan.

to the the vote counts in the 2016 election. To do this, Young and Blehar (2021) examine state or county-level changes in support for a particular candidate. Given the primary focus on counties, we derive their test at the county level first.

In a state $i$ and county $c$ Young and Blehar (2021) computed the difference in the *number* of votes Joe Biden received in 2020 ($\text{Biden}_{ic}$), and the number of votes Hillary Clinton received in that county in 2016 ($\text{Clinton}_{ic}$): $\text{Biden}_{ic}$ - $\text{Clinton}_{ic}$. They also computed the difference in the number of votes that Donald Trump received in 2020 ($\text{Trump}_{ic,2020}$) and the number of votes he received in 2016 ($\text{Trump}_{ic,2016}$): $\text{Trump}_{ic,2020}$ - $\text{Trump}_{ic,2016}$. They then call the "contrast" in county $c$ in state $i$ the difference of those differences,

$$\text{Contrast}_{ic} = (\text{Biden}_{ic} - \text{Clinton}_{ic}) - (\text{Trump}_{ic,2020} - \text{Trump}_{ic,2016})$$

Young and Blehar (2021) then visually inspect the contrasts of counties within a state. They order counties according to the size of the contrast. They declare some counties as anomalous based on contrasts they view as large, despite offering no formal definition of "large".

Young and Blehar (2021) offer no systematic justification for their use of contrasts to detect supposedly anomalous election results. Young and Blehar (2021) do not cite a single study that analyzes the use of contrasts to detect election anomalies. They also fail to even cite a common understanding of elections that justifies the use of contrasts for assessing where anomalous election results take place. And while Young and Blehar (2021) argue that "If there is fraud, a contrast and distribution analysis will likely point to where it happened" (Young and Blehar, 2021, 4), they offer no assessment of their method's performance when applied to actual election results and provide no evidence or calculation to support this conclusion.

There is no reason to expect that the contrast analysis will reliably detect anomalous

6

election results. Instead, contrast analyses merely detect that larger counties have bigger changes in the number of votes. This is because the contrast analysis focuses on vote count. This implies that the potential size of a contrast depends entirely on the size of the county. One simple way to see the limitation of a contrast analysis is to note that uniform swings in candidate vote share in a state will create the appearance of a larger anomaly in the larger counties, merely because there are more voters in those larger counties. For example, suppose that there is a state with 99 1,000 voter counties and one 1,000,000 voter county and that there is a 5 percentage point shift in support from Trump in 2016 to Biden in 2020. If this occurs in the 1,000 person county, this will result in a 100 person contrast. In the 1,000,000 voter county, however, this will result in a 100,000 contrast. So, despite all counties experiencing the same shift in support for candidates, the larger counties appear more anomalous merely because there are more voters.

In fact, the maximum size of a contrast is determined mechanically by the number of voters in the county. This maximum possible contrast occurs when all voters in a county change their support from one party's candidate to the other. When this occurs, the contrast will be twice the number of voters. Necessarily, any other shifts must be below the maximum contrast. But this means that it is effectively impossible to discover an "anomaly" in small counties. Because the size of anomalies in a county is determined in large part by the number of voters in the county, it is not surprising that supposedly anonymous contrasts are found in every nearly every state in every presidential election over the past 60 years. In Figure 1 we show that in every presidential election in Georgia, the contrast analysis method detects supposedly "anomalous" election results.

Consider the top-left plot first. This plot recreates the contrast analysis found in Young and Blehar (2021) for the state of Georgia. This plot computes the county-level contrasts comparing the 2020 and 2016 presidential election. The vertical axis displays the contrast. Counties are ordered by the size of the contrast, and their rank in this ordering is displayed on the horizontal axis. The red dots in the plot represent the four largest counties in Georgia



Figure 1: Examining the county-level contrasts for all Georgia presidential elections since 1960 reveals that supposedly anomalous contrasts occur in every election.

in 2020: Fulton, DeKalb, Cobb, and Gwinnett. The blue dots represent the four smallest counties in Georgia in 2020: Clay, Webster, Quitman, Taliaferro. Young and Blehar (2021) interpret the large contrast in the largest counties as suggestive evidence that there were illegal or fraudulent ballots cast in those counties.

Yet, looking at the other plots in Figure 1 reveals that Fulton, DeKalb, Cobb, and Gwinnett counties are almost always identified as "anomalous". When comparing 2016 to 2012 we find that the four largest counties also have a supposedly large positive anomalous deviation when comparing 2016 to 2012 (the top row second column from the left plot). When comparing 2012 to 2008 three of the four counties have large negative "anomalous" deviations. In fact, in every presidential election since 1964 these four counties produced supposedly anomalous deviations from the prior election.

Similarly, the four smallest counties are never anomalous. Comparing 2020 to 2016 we

find very small deviations in these counties. That makes sense, because the counties are much smaller than the largest counties in Georgia, so the smallest counties largest possible contrast is much smaller than the largest counties. And as the plots show, in every election since 1964 the small counties necessarily have small contrasts.

The plots in Figure 1 show that the contrast analysis is a useless tool for diagnosing surprising or anomalous results. Young and Blehar's (2021) contrast analysis methodology merely uncovers the unsurprising fact that larger counties have larger deviations in their vote counts. And smaller counties have smaller deviations.[2]

**Related Claims About Anomalous Election Results**    There have been other, very similar, claims that the results of the 2020 election were somehow different than the results of prior elections. These other claims fail for nearly identical reasons as the contrast analysis.

In the bill of complaint for the *Texas V Pennsylvania* lawsuit, the authors claim that an expert report from Charles Cicchetti demonstrated that there was a "one in quadrillion" chance of Joe Biden winning the 2020 election (Paxton, 2020b). But as Eggers et al. (2021) demonstrate, Cicchetti never calculated the probability Biden would win. Instead, Cicchetti calculated the probability that the 2020 and 2016 elections had the same underlying rates of support for the Democratic and Republican candidates *and* the same number of voters in both elections. It is not at all surprising that candidates' vote shares change across elections or that there will be different numbers of voters. And, at any rate, this test has nothing to do with the probability of Biden winning. In fact, in Cicchetti (2022) he explains that the authors of the bill of complaint in *Texas V Pennsylvania* misinterpreted his expert report.

In a case filed by Trump in Arizona, *Bowyer v Ducey*, Seth Keshel filed an expert report

---

[2]Young and Blehar (2021) also seem to be unaware that there are changes in voter turnout in different elections. The contrast analysis report exerts considerable effort to explain changes in vote count based on turnout. But of course, the number of votes candidates receive can be the result of changes in the population of a state. But they can also be the result of persuading individuals to vote for a different candidate, or the result of candidates increasing (or decreasing) interest among individuals who hadn't voted in the prior election.

where he claimed to find evidence that the 2020 election results were anomalous relative to prior election results and changes in party registration (Keshel, 2020). To support this conclusion, Keshel demonstrates that the changes in Arizona deviate from his predictive models.

But deviations from predictive models are simply not evidence that fraud or illegal voting occurred. It is much more plausible the reason Keshel's model fails to make accurate predictions is that he did a poor job constructing the model (King, 2020). Or, it is also plausible that the 2020 election deviated from the patterns in prior elections, but for completely legal reasons. Keshel offers no evidence that the deviations he identifies are the result of illegal or fraudulent activity.

## 2.2   Joe Biden Performed Better than Hillary Clinton in Urban Areas Throughout the Country

Skeptics of the 2020 election claim that Joe Biden had suspicious performance in urban areas throughout the country. For example, some conservative-leaning media organizations ran articles claiming that Biden generally performed worse than Clinton in urban areas, but that Biden outperformed Clinton in urban areas found in swing states (Vespa, 2020). Those reports, however, had to be corrected as the outlets were alerted that their analysis was simply incorrect.

A more coherent version of the allegation comes from the litigation around Texas lawsuit in early December at the Supreme Court. In a reply brief, Texas' expert, Charles Cicchetti, compared Hillary Clinton's performance in urban counties to Joe Biden's performance (Paxton, 2020a). Cicchetti writes that "In 2016 limited to the major-party candidates Clinton had 51% of all the votes nationally compared to Trump's 49%. She won in counties with large urban areas with a much larger percent than Trump. Her share of the votes in counties where the Top-50 cities are located was 67.8% compared to Trump's 32.2%" (Paxton, 2020a, 155a). Cicchetti goes on to claim that "Biden did not do as well as relative to Clinton in

2020 the counties [sic]. He had a lead in the Top-50 cities of 66.4% compared to Trump's 33.6% ignoring third part [sic] shares. The difference in Democrat vote percentage between 2020 and 2016 is a loss of 1.4% from Biden compared to Clinton" (Paxton, 2020a, 155a-156a). Cicchetti then compares Clinton and Biden's performance for large urban counties in Georgia, Pennsylvania, Wisconsin, and Michigan and finds that in four of the five largest urban counties, Biden outperformed Clinton. Based on this data, Cicchetti argues that "Co-incidences are possible, but relying on them is questionable. Analyzing data and stubborn facts are a better way to determine what we observe. The facts show that while Biden had more ballots in urban areas than Clinton, she outperformed him in terms of the percentage of the vote she received" (Paxton, 2020a, 157a). Cicchetti concludes that "it is worthwhile to understand that in the battleground states comprised of the four defendants that in four of the five urban areas Biden had higher percentages than Clinton. This result is surprising given the Trump national gains in support from Hispanics and African Americans. This contrary observation supports further investigation to determine what happened and why. This would not be a worthless outcome" (Paxton, 2020a, 158a).

Cicchetti does not explicitly identify the fifty counties that used in his analysis and he has never posted replication code for his analysis. To analyze his claims about Biden's performance in urban counties, we use data from the US Census Bureau to identify the fifty counties with the largest population and voting returns from the 2020 and 2016 elections. Using the election data, we then contrasted Biden's share of the two-party vote in 2020 to Clinton's share of the two-party vote in 2016 in Table 1.

Table 1 shows that Biden actually outperformed Clinton in forty of the fifty urban counties. The first row shows that the largest increase occurred in Salt Lake County, Utah where Biden in 2020 obtained 11.5 percentage points more of the two-party vote share than Clinton in 2016. There was also a large increase in Collin County, Texas where Biden secured 8.1 percentage points more of the two-party vote than Clinton in 2016. And in Hennepin County, Minnesota Biden obtained 7.3 percentage points more of the two-party vote share

| County | Biden Share - Clinton Share | Biden Share | Clinton Share |
|---|---|---|---|
| Salt Lake,UT | 0.115 | 0.530 | 0.415 |
| Collin,TX | 0.081 | 0.470 | 0.389 |
| Hennepin,MN | 0.073 | 0.705 | 0.631 |
| Tarrant,TX | 0.062 | 0.493 | 0.431 |
| Middlesex,MA | 0.062 | 0.715 | 0.653 |
| St Louis,MO | 0.060 | 0.612 | 0.552 |
| Travis,TX | 0.059 | 0.716 | 0.658 |
| Fairfax,VA | 0.055 | 0.699 | 0.644 |
| Maricopa,AZ | 0.053 | 0.501 | 0.448 |
| Pima,AZ | 0.051 | 0.584 | 0.533 |
| King,WA | 0.051 | 0.750 | 0.698 |
| Oakland,MI | 0.050 | 0.562 | 0.513 |
| Franklin,OH | 0.049 | 0.647 | 0.598 |
| Fulton,GA | 0.049 | 0.726 | 0.677 |
| Wake,NC | 0.049 | 0.623 | 0.574 |
| Suffolk,NY | 0.048 | 0.494 | 0.446 |
| Mecklenburg,NC | 0.044 | 0.667 | 0.623 |
| Dallas,TX | 0.043 | 0.651 | 0.608 |
| Contra Costa,CA | 0.041 | 0.716 | 0.675 |
| Duval,FL | 0.040 | 0.511 | 0.471 |
| Bexar,TX | 0.040 | 0.582 | 0.542 |
| San Diego,CA | 0.039 | 0.602 | 0.563 |
| Montgomery,MD | 0.039 | 0.786 | 0.747 |
| Fresno,CA | 0.037 | 0.529 | 0.492 |
| Allegheny,PA | 0.035 | 0.594 | 0.559 |
| Sacramento,CA | 0.034 | 0.614 | 0.580 |
| Riverside,CA | 0.033 | 0.530 | 0.497 |
| Nassau,NY | 0.028 | 0.541 | 0.513 |
| Westchester,NY | 0.027 | 0.676 | 0.649 |
| Orange,CA | 0.025 | 0.535 | 0.509 |
| San Bernardino,CA | 0.021 | 0.542 | 0.521 |
| Harris,TX | 0.020 | 0.560 | 0.540 |
| Wayne,MI | 0.020 | 0.683 | 0.664 |
| Alameda,CA | 0.017 | 0.798 | 0.781 |
| Hillsborough,FL | 0.017 | 0.527 | 0.510 |
| Clark,NV | 0.012 | 0.537 | 0.524 |
| Orange,FL | 0.011 | 0.609 | 0.598 |
| Honolulu,HI | 0.010 | 0.625 | 0.615 |
| Cuyahoga,OH | 0.009 | 0.664 | 0.654 |
| Cook,IL | 0.003 | 0.742 | 0.739 |
| Santa Clara,CA | -0.001 | 0.726 | 0.727 |
| New York,NY | -0.001 | 0.864 | 0.866 |
| Palm Beach,FL | -0.003 | 0.560 | 0.562 |
| Los Angeles,CA | -0.007 | 0.710 | 0.718 |
| Philadelphia,PA | -0.011 | 0.812 | 0.823 |
| Broward,FL | -0.016 | 0.645 | 0.661 |
| Kings,NY | -0.027 | 0.768 | 0.795 |
| Queens,NY | -0.033 | 0.720 | 0.754 |
| Bronx,NY | -0.052 | 0.833 | 0.885 |
| Miami-Dade,FL | -0.099 | 0.533 | 0.632 |

Table 1: Comparing the vote share in the fifty largest counties in the US reveals that Biden improved over Clinton's two-party vote share in forty out of fifty counties.

than Clinton.

All of these increases are larger than the counties in swing states that Cicchetti identified as supposedly anomalous. For example, Fulton County, Georgia the official results show Biden winning 4.9 percentage points more of the two-party vote share than Clinton. In Wayne County, Michigan Biden received 2 percentage points more of the two-party vote share than Clinton, in Allegheny County, Pennsylvania Biden received 3.5 percentage points more of the two party vote than Clinton, and in Philadelphia County, Pennsylvania Biden saw a 1.1 percentage point decline in vote share compared to Clinton. Cicchetti includes Milwaukee County, Wisconsin even though it is not a top fifty county in population size. There, Biden obtained 3.6 percentage points more of the two-party vote share than Clinton. Averaged across the counties, we find that Biden's average vote share was higher than Clinton's vote share in 2016 in the urban counties. Averaged across the counties in 2020 Biden received 64.8% of the two-party vote share, while Clinton received 64.6% of the two-party vote share across counties.

Cicchetti's conclusion that Biden received a smaller share of the two-party vote share than Clinton is based on tallying all the votes each candidate received across the fifty largest counties. Then Cicchetti computed the share of votes each candidate received in the corresponding election. When we perform that calculation, we find that Biden received 64.9% of the two-party vote in 2020, while Clinton received 65.7% of the two-party vote. This disparity is driven entirely by the differences found in counties in Florida, New York, and California. As Table 1 shows, Biden consistently did better in urban areas throughout the country.

Cicchetti never explains why this calculation is relevant to his claim that the 2020 election was anomalous or that the smaller share of votes for Biden overall because of Florida, New York, and California are indicative of Biden's performance otherwise being surprising. Further, Biden actually secured a much larger total vote margin across urban counties in 2020 (13,099,708 more votes than Trump across urban counties) than Clinton in 2016 (11,179,626

13

more votes than Trump across urban counties).

It is simply false that Biden performed worse than Clinton in urban areas. And it is not clear what implication that would have for identifying an anomalous result.

## 2.3   Allegedly Surprising Vote Additions through "Vote Spikes"

One of the first claims of fraud in the 2020 election was that there were inexplicable large numbers of votes that were allocated to Joe Biden. The morning after the election President Trump tweeted that "Last night I was leading, often solidly, in many key States, in almost all instances Democrat run & controlled. Then, one by one, they started to magically disappear as surprise ballot dumps were counted. VERY STRANGE, and the pollsters got it completely & historically wrong!" (Trump, 2020f). Trump made a similar claim in tweet from November 19th, 2020 when he linked to a chart of the vote counts from Wisconsin and claimed that "Look at this in Wisconsin! A day AFTER the election, Biden receives a dump of 143,379 votes at 3:42AM, when they learned he was losing badly. This is unbelievable!" (Trump, 2020d). In a speech in Georgia on December 5th, Donald Trump continued to make allegations about supposedly erroneous large increases in votes for Joe Biden. Trump declared that "the alleged Biden margin of victory in several states is entirely accounted for by extraordinarily large midnight vote dumps. You saw them going up to the sky, all extremely skewed to Biden. Like, Biden would get 10,000 votes and Trump would get three in a Trump area. Oh. For, example, at 6:31 AM in Michigan, reported 141,238 votes for Joe Biden and 5,900 votes for Donald Trump. 96% for Biden, 4% for Trump in an area where I should be doing quite well" (Trump, 2020a). Donald Trump then repeated his allegation about Wisconsin vote tallies, claiming that "A similar vote dump occurred in Wisconsin at 3:42 AM. This is 3:42 in the morning. In fact, when I went to bed that night, everybody was calling, "Congratulations. You're up 600,000 votes in Pennsylvania" (Trump, 2020a).

These claims misunderstand basic facts about how votes are tallied in American elections and where candidate support is located. The votes Trump referenced in Wisconsin were

merely ballots from Milwaukee being reported, a densely populated city where Democrats have historically performed well. The votes Trump referenced from Michigan correspond to votes from Wayne County, where Biden was expected to receive many more votes than Trump (Team, 2020). In fact, the geography of partisan support in US elections leads to an expectation that there will be some large increases in Democratic candidate's vote totals as urban centers report their ballots. This is because support for Democratic candidates tends to be concentrated in a small number of large population counties, while support for Republican candidates tends to be concentrated in a large number of low population counties. When the larger counties report their vote totals, it will create the illusion of a "spike" in support, merely reflecting the large number of ballots from the county that tend to support the Democratic candidates at higher rates.

All of the claims appear to be based on election counting data from Edison, a media company that reports unofficial vote tallies as they are made available. Edison collects both official and unofficial election data from states and reports them to networks, who use the information in their election night reporting of the voting counting process.

Using the information from the Edison data, Trump alleged that there was something surprising, illegal, or fraudulent about large tranches of ballots being reported late in the night. While many of the claims merely involved observing the presence of the spikes, other analysts have produced reports that claim to provide statistical evidence that the vote tallies in the 2020 election were anomalous. These efforts were collected in the "2020 Presidential Election Startling Vote Spikes", which alleged to uncover evidence that the large changes in the vote count tended to favor Biden (Quinnell et al., 2021).[3] Quinnell et al. (2021) argue that "On average, we expect Trump/Biden jumps to be of the same order of magnitude for each candidate, especially for close races. Wild differences ('jumps') in magnitudes, and especially ones that favor a particular candidate, are signs of potential anomalies" (Quinnell et al., 2021, 3). Quinnell et al. (2021) provide no citation or argument to explain why they

---

[3] An earlier version of this report was included in an expert report filed in *King v Whitmer*.

expect close races to also have close vote updates. Nor do Quinnell et al. (2021) explain why this expectation would occur given the well known geographic distribution of support for political parties.

Quinnell et al. (2021) instead perform a null hypothesis test to assess whether particular updates were surprising. Specifically, Quinnell et al. (2021) count the change in Biden and Trump votes and then divide by the number of seconds since the last update, which they call the "the 'rate' of vote counts added" (Quinnell et al., 2021, 3). Quinnell et al. (2021) then calculate the average "rate" of vote counts added and take the standard deviation of those counts.[4]

Quinnell et al. (2021) then use the calculated rates to perform a null hypothesis test based on the assumption that the rate of vote counts added follows a normal distribution. Using this assumption Quinnell et al. (2021) calculate a z-statistic for each update by subtracting the average vote count added over the updates and diving by the standard deviation. Quinnell et al. (2021) then call z-statistics greater than 10 "statistically impossible." They also claim that the probability of vote jumps in several state is extremely low. For example, in Florida they claim that the probability of one jump is "1 in $10^{23}$" and another jump is "1 in $10^{25}$" (Quinnell et al., 2021, 5).

Quinnell et al. (2021) calculated probabilities depend *entirely* on the assumption that in a free and fair election election night vote count updates will follow a normal distribution. If that assumption fails—if the updates follow some other distribution—all of their calculated probabilities and claims about statistical impossibility are completely meaningless. Yet, Quinnell et al. (2021) provide no evidence, discussion, citation, or proof that vote counts

---

[4]Quinnell et al. (2021) fail to explain why they think it is appropriate to divide by the number of seconds since the last update in the state to calculate a "rate." An obvious objection is that counting in a state occurs in parallel with many small localities counting their votes at the same time. Because of this, it is not accurate to allege that all the ballots reported in an update had been counted since the last update. Nor would it even be accurate to make the same claim within a county or counting center. This is because ballots can be counted in parallel even within the same location. If we perform the same ill-advised null hypothesis test Quinnell et al. (2021) perform using the vote counts, rather than the vote count rates, we find fewer anomalies according to Quinnell et al's (2021) own standard. But as we explain below, even this test is inappropriate and meaningless for diagnosing fraud.



Figure 2: Distribution of County Population Size and Support for Biden in the 2020 election 6 swing states

being added will follow a normal distribution in the absence of illegality or fraud. Rather, they merely make the assumption and apply it.

But a basic understanding of how votes are counted in US elections and the geography of political support would easily show that a normal distribution is inappropriate. First, in every state—but especially the swing states in 2020—there are a small number of large population counties and a large number of small population counties. The left-hand plot of Figure 2 shows a histogram of the total number of votes reported across six swing states in the 2020 election—Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. The histogram shows that most counties in the swing states have a relatively small number of votes cast in 2020. But in the swing states there also is a small number of large population counties, which results in the histogram having a long tail to the right.

The right hand plot shows that counties with more total votes tended to allocate a larger share of their votes to Joe Biden. The horizontal axis of Figure 2 is the total number of votes in the county, while the vertical axis is Joe Biden's share of the two-party vote. The

blue line is a linear regression line, or a line of best fit. In all six swing states the regression line is upward sloping. This indicates that voters in counties with more total votes allocated a bigger share of their votes to Joe Biden than smaller counties.

The combined plots in Figure 2 demonstrates that we would not expect updates of vote counts to follow a normal distribution. This is because updates from large counties will tend to report many more votes than updates from smaller counties and those votes will tend to be cast for Joe Biden. If the large counties report the same share of their votes as the small counties when they provide an update, the result will be vote totals that are much larger than the updates from other counties and where most votes are cast for Biden. This will create long right-hand tail, unlike a normal distribution. And this occurs without any fraud, illegality, or other "suspicious" manipulation of votes.

## 2.4   Claims About Addresses, Movers, and Other Allegedly Illegal Activity

In several states Trump and his allies claimed that lax regulation of voter files resulted in illegally cast ballots. For example, in a speech given the day before the Georgia Senate runoff, Trump declared that in the 2020 presidential election "At least 15,000 ballots were cast by individuals who moved out of the state prior to the November 3rd election, or maybe they moved back in. I don't know. I mean, I can't tell. They moved out, ah, let's go back. Usually takes a little time, right? We moved out. Let's go back, darling" (Trump, 2021a). This is a reference to claims made in Georgia, where expert reports supposedly demonstrated that voters had moved and still cast votes. Similarly, on December 16th Trump tweeted that "Chris Krebs was totally excoriated and proven wrong at the Senate Hearing on the Fraudulent 2020 Election. Massive FRAUD took place with machines, people voting from out of state, illegals, dead people, no signatures—and so much more!" (Trump, 2020b). This is a reference to an expert report from Jesse Kamzol in Nevada, which was summarized in testimony by the attorney in the case, Jesse Binnal. Binnall's testimony was

based on a five-page expert report submitted by Jesse Kamzol in the *Law v Whitmer* case in Nevada. These claims about voters with invalid addresses were made across the country, as expert reports by Matt Braynard from *Texas v. Pennsylvania* and *Stevenson v. Ducey* alleged there were thousands of such ineligible voters in Arizona, Pennsylvania, Wisconsin and Michigan (Braynard, 2020b,c).

All of the claims made in these reports misunderstand the basics of election law in each state or incorrectly label individuals as ineligible. For example, in Georgia, Davis (2020a) and Braynard (2020a) claim to show evidence that individuals cast votes who also files national change of address forms with the United States Postal Service. Yet, Grimmer et al. (2021) explain that filing a national change of address form does not cancel a voter's registration. In both Georgia and Nevada voters have to establish residences in new states before their prior registration would be canceled. There are many reasons why voters could file a change of address and still retain their registration—including visiting family, using a vacation home, or traveling out of state for work. In fact, during Jesse Kamzol's deposition in *Law v Whitmer* he sometimes admitted he didn't know if a voter he labeled as suspicious actually violated Nevada law by voting. Other times he conceded that there are legitimate reasons individuals could have moved and maintained eligibility. Davis (2020a), who asserts that some Georgia voters moved across counties without reregistering, makes the same concession in his expert report.

Kamzol (2020) also alleged that individuals cast votes in Nevada from vacant or non-existing residential addresses. Kamzol argued that "I reviewed the Washoe County and Clark County voter database files and found 8,111 voters who voted in Nevada but whose registered addresses are physically non-existent, as in, these are vacant lots, apartment numbers that do not exist, and house address numbers that do not exist" (Kamzol, 2020, 1). Similar claims were made in Geels' (2020) and Braynard's (2020) expert reports in Georgia. In both instances, the expert reports fail to understand the basics of state election law. For example, Kamzol's report relies upon the "CASS" system from the United States Postal Service

which provides an incomplete listing of residential addresses (Cegavske and Wlaschin, 2021). Further, the Nevada Secretary of State's office performed a search of supposedly vacant addresses from Kamzol's report and found that all are actual addresses. Similarly, Braynard's (2020) report that supposedly identified illegal registrations was shown in a hearing to actually be apartment buildings. Geels (2020) report does appear to identify a small number of individuals who registered at PO Boxes. However, this number is no where near the number of votes Trump lost by in Georgia, and in any case, Georgia law is explicit that challenges to registration have to come *before* the election, not after the vote has already been cast (Georgia Code 21-2-230 (2022)). So even if these claims were accurate (which they aren't), the Trump campaign should have surfaced them before the election.

## 2.5 Survey-Based Claims of Unrequested or Uncounted Absentee Ballots

In several of Trump's challenges to election results his lawyers attached a two page expert report from William Briggs, who claims to be the "statistician to the stars" and holds a Ph.D. in Cornell University.[5] Briggs' expert report uses survey data provided to him by Matt Braynard. According to the report, Briggs analyzes survey results for individuals who, official state data reports, did not return their absentee ballots. Briggs' survey then attempts to identify two kinds of errors in that official data. First, Briggs examines the share of individuals who report requesting a ballot. Briggs calls individuals who report not requesting a ballot an error. Second, among those who say they did request a ballot, Briggs examines the share of respondents who report returning their ballot. Because the sample frame was limited to only those who records show did not return their ballot, Briggs calls this second response a second source of error.

Briggs' survey methodology is deeply flawed and is a poor basis for challenging absentee

---

[5]The affidavit was submitted, at least, as part of *Pearson v Kemp* in Georgia, *Bowyer v. Ducey* in Arizona, and the data was also submitted as part of *King v Whitmer* in Michigan

voting procedures. Ansolabehere (2020) provides an extensive critique of Briggs' methodology. Perhaps the most important limitation of Briggs' analysis is that he fails to consider that survey respondents might imperfectly recall their own behavior. This undermines the entire premise of Briggs' analysis because an "error" could either be the result of illegal voting or simply that the respondent fails to recall their voting appropriately. In fact, there is good evidence that voters generally struggle to recall how they voted in elections, casting doubt on the ability to use surveys to uncover supposedly fraudulent votes. Shino et al. (2022) use extensive survey data to show that voters alter reports of how they plan to vote and how they actually voted based on which candidate they supported in the 2020 election.

Another limitation Ansolabehere (2020) identifies is that Briggs fails to recognize that in many states, some voters can apply to be placed on a permanent absentee voter list. For example, in Georgia, voters over 65 or self-declared disabled can apply for an absentee ballot once during an election cycle and then receive a ballot for the remainder of the election cycle. As a result, a Georgia voter could apply for a ballot in the primary, then receive a ballot for the general election without remembering that they had applied in the primary.

Ansolabahere (2020) diagnoses a series of other fatal flaws in Briggs' analysis that undermine his claims. For example, Ansolabahere (2020) shows that the questions used to screen respondents allowed for individuals other than the targeted individual to respond to the survey. Further, Ansolabehere (2020) shows that the response rates were low enough to raise concerns about the validity of the survey. And finally, Ansolabehere (2020) shows that ambiguously worded questions in Briggs' survey undermines the validity of the responses.

# 3    Georgia Claims

In many ways Georgia has been the primary battleground for voter fraud claims. This is true, in part, because Georgia has been extremely closely contested. Georgia's 2020 presidential election had a razor thin margin, with Joe Biden winning the election by a mere 11,779 votes.

Immediately after the 2020 general election, there was a runoff election for both Senate seats that would determine which party would hold a majority in the Senate. To contest the results of the presidential election the Trump campaign legal team and private citizens filed lawsuits in state and federal court to challenge the results of the election. These claims were dismissed in court (Danforth et al., 2022) and have subsequently become the basis for Trump and his allies' indictment for their alleged roles in challenging the results of the 2020 election.

Here, we perform an extensive analysis of claims made in the Georgia legal cases. We divide the claims into empirical claims made about the number of illegal votes cast in the Georgia elections and statistical claims that the aggregate election results were anomalous and inconsistent with a free and fair election.

In all instances we find no support for alleged claims of fraud or illegality. Many of the claims are not evidence of fraud because they are simply not true. For example, many claims confuse signature rejection rates or are based on incorrect analyses of administrative data. Other claims are not evidence of fraud because supposedly anomalous patterns are not anomalous at all. For example, we show that several claims made about "surprising" returns are merely based on fundamental misunderstandings about election data.

## 3.1 Claims Made About Illegal Votes in Georgia

### 3.1.1 Signature Matching in Georgia

The 2020 general election in Georgia saw a much higher rate of mail-in absentee voting than in previous elections. This surge in mail-in voting is unsurprising given public concerns about the COVID-19 pandemic. After the election, Trump and his allies argued that these ballots were not treated appropriately. In a rally before the January 5th, 2021 Senate runoff election in Georgia, Trump claimed that "Across all of the key swing states, there were impossibly low rejection rates, you saw that, for mail-in ballots, drastically less than the

historic norm. In Georgia 0.5% of the mail-in ballots were rejected in 2020 compared to 5.77%. That's a difference of 11 times more. It's hundreds of thousands of votes" (Trump, 2021a). He attributed this decline to a change in how signatures on absentee ballots were verified, arguing that "Democrats, state Supreme Court judges and Democrat Secretary of State effectively abolished the signature verification process right here" (Trump, 2021a). Trump alleged that this occurred because of a supposed consent decree signed between the Secretary of State's office and Stacey Abrams, whose organization sued the Secretary of State to modify the signature verification process before the 2020 election (Trump, 2021a). In reality, the Secretary of State's office merely issued non-binding guidance on best practices for evaluating signatures. No actual rule changes occurred.

Trump allies testified to similar claims in election hearings. For example, at a Georgia Senate hearing John Eastman claimed that the "settlement agreement that was entered into with your Secretary of State and certain Democrat committee challengers that effectively altered the signature verification process for your absentee ballots in ways that are contrary to state law" (Eastman, 2020a).

These claims also appear in the Trump campaign's legal challenges. In *Trump v Raffensperger*, Trump's legal team argued that "The explosion in the number of absentee ballots received, counted, and included in the tabulations for the Contested Election, with the simultaneous precipitous drop in the percentage of absentee ballots rejected, demonstrates there was little or no proper review and confirmation of the eligibility and identity of absentee voters during the Contested Election." Claims about signature rejections were found across many different lawsuits in both Georgia state court, federal court, and at the Supreme Court—*Trump v Raffensperger, Trump v Kemp, Texas v Pennsylvania, Pearson v Kemp*, and *Wood v Raffensperger*.

The claims also surfaced as part of Trump's efforts to pressure Georgia election officials to alter the election outcomes. Trump claimed in his phone call with Secretary of State Brad Raffensperger that "We think that if you check the signatures – a real check of the

signatures going back in Fulton County you'll find at least a couple of hundred thousand of forged signatures of people who have been forged" (Staff, 2021).

**Overall Rejection Rates Declined, But Not Because Of A Change in the Signature Rejection Rate**   Trump, his allies, and his litigation all focused their claims on the overall rejection rate of mail-in absentee ballots. But this is an error if their goal was to make a claim about changes in the rate ballots were rejected for signature reasons because there are many reasons that mail-in absentee ballots can be rejected. And even though the overall rejection rate did decline, the rate at which ballots were rejected for incorrect signatures did not.

Trump's public claims were based on expert reports that were filed with Trump's litigation contests. These claims about mail-in absentee voter rate rejection rates were based, largely, on analyses of the Georgia Absentee Voter History file.[6] The Georgia Secretary of State's Office compiles information on every mail-in ballot application from across the state. This data then records whether the application is accepted, whether the ballot is returned, and whether the ballot is accepted or rejected once it is returned.

Using this data, several expert reports calculated rejection rates for recent elections. For example, in affidavits submitted in Georgia for *Trump v Raffensperger*, Bryan Geels calculated the rejection rates in the 2016 general election, 2018 general election, 2020 primary election, and the 2020 general election in Georgia using the absentee voter history file. In *Texas v. Pennsylvania*, an attached expert report from Charles Cicchetti used a combination of data from the Election Administration and Voting Survey (EAVS) and the absentee voter history file.

We obtained the absentee voter history file from Georgia's secretary of state's office to calculate the overall rejection rate for mail-in absentee ballots and the rate ballots were rejected for various reasons. The first row of Table 2 calculates the overall rejection rate for

---

[6]Cicchetti's claims in *Texas v PA* are based on the EAC's survey data from the state of Georgia.

mail-in absentee ballots for the 2016, 2018, and 2020 general elections and the 2020 primary election. We focus on this set of elections because these were the elections analyzed in Geels (2020) and includes all the elections analyzed in Cichetti's expert report.

The top of Table 2 shows that the overall rejection rate clearly declined in 2020 relative to recent prior rejections. In 2016, 2.90% of mail-in absentee ballots were rejected and in 2018, 3.46% of mail-in absentee ballots were rejected. This number declined first to 0.97% in the 2020 presidential preference primary and then 0.34% in the 2020 General Election. Focusing on the steepest decline, from 2018 to 2020 the overall mail-in absentee ballot rejection went down 3.12 percentage points.

But even though the overall rejection rate declined, the rate at which ballots were rejected for signature reasons remained essentially unchanged. In the second row of Table 2, we have calculated the share of ballots that were rejected for a signature related reason–either because the signature is mismatched or the signature is missing.[7] In 2016, this was 0.28% of all returned mail-in absentee ballots and in 2018 0.2% of all mail-in absentee ballots. In the 2020 general election the signature-related rejection rate declined, but only slightly to 0.15% of all returned mail-in absentee ballots. Relative to 2018 this was only a 0.05 percentage point decline, or only a small fraction—1.6%— of the total decline in mail-in ballot rejections.

A second way to examine the rate of signature related rejections is to focus explicitly on rejections due to a signature mismatch, rather than any signature issue, is mentioned. This will necessarily be a subset of the rejection reasons in the second row of Table 2.[8] When

---

[7] To make this determination we use the "STATUS_REASON" field in the Georgia Absentee voter history file. In 2020 there were a small number of predetermined reasons that official could select for their reason for rejecting an absentee ballot. In 2018 and 2016 officials had the option to type in their reason. We hand classified the reasons and our replication code provides details on this coding process. The vast majority of coding decisions are clear. In instances where more than one reason was offered and a signature reason was one reason offered, we classified the reason as signature based reason. This biases our findings towards identifying a decline from 2016 and 2018 to 2020.

[8] In 2016 the reasons for rejection included are: "SIGNATURE/NAME DOES NOT MATCH","SIGNATURE/DOB NOT A MATCH", "SIGNATURE NOT A MATCH", "SIGNATURE MATCH AND INCORRECT DOB", "Signature Match", "SIGNATURE DOES NOT MATCH", "SIGNATURE DID NOT MATCH", "SIGNATURE AND DATE OF BIRTH DOES NOT MATCH", "SIG NOT A MATCH, DOB NOT A MATCH", "SIG NOT A MATCH", "OATH & SIGNATURE NOT A MATCH FOR OATH", "CURRENT DATE FOR DOB / SIGNATURE NOT A MATCH". In 2018 the reasons are: "CURRENT YEAR AS YEAR OF BIRTH, SIG MATCH", "SENT SIG MISMATCH LETTER, DIDNT

|               | 2016 General | 2018 General | 2020 Primary | 2020 General |
|---------------|--------------|--------------|--------------|--------------|
| Overall       | 2.90%        | 3.46%        | 0.97%        | 0.34%        |
| Signature     | 0.28%        | 0.20%        | 0.27%        | 0.15%        |
| Deadline      | 1.38%        | 1.57%        | 0.70%        | 0.18%        |
| Oath          | 1.06%        | 1.50%        | 0%           | 0%           |
| ID/Ineligible | 0.18%        | 0.05%        | 0.01%        | 0.01%        |
| Other         | 0.01%        | 0.14%        | 0%           | 0%           |

Table 2: The overall rate of ballot rejections went down, but not because of a change in signature matching.

explicitly focusing on the signature rejections because of a stated match issue, we reach a similar conclusion: we cannot explain the decline in the mail-in absentee rejection rate based on the signature rejection rate. In 2016, we find that 0.21% of mail-in ballots were rejected for a signature mismatch. In 2018, 0.09% of mail-in ballots were rejected for a signature mismatch issue, and in the 2020 primary election, 0.08% of mail-in ballots were rejected for a signature match issue. This declined further in the 2020 general election to 0.05% of mail-in ballot rejected for a signature mismatch.

Signature-related rejections cannot explain why mail-in ballot rejections declined in Georgia in the 2020 election. Instead, the decline in rejections was due to fewer ballots arriving after the deadline and fewer ballots rejected for issues with the "oath" envelope. In Georgia, mail-in absentee ballots have to arrive before polls close on Election Day. In 2016, 1.38% of all returned mail-in ballots arrived after this deadline. This number rose to 1.57% in 2018. But in the 2020 general election, only 0.18% of all returned ballots arrived after the deadline. The decline in ballots rejected for arriving after the deadline accounts for 45.4% of the total decline in ballot rejections from 2018 to 2020.

In short, there were fewer ballots rejected in 2020 because mail-in absentee voters returned their ballots much earlier than in prior years. This is evident in Figure 3. This figure shows

FOLLOW", "SIG AND YOB NOT A MATCH", "SIG NON MATCH, ADDITIONAL ID NOT", "SIG NON MATCH; ADDITIONAL ID NOT", "SIG NOT A MATCH", "SIGNATURE DOES NOT MATCH", "Signature Match", "SIGNATURE MISMATCH", "YOB AND SIG NOT A MATCH". In both the 2020 primary and general election, we examine "Invalid Signature" status reasons.)



Figure 3: Mail-In ballots were returned earlier in the 2020 election.

the share of mail-in absentee ballots returned on each day before the general elections in 2020 (top facet), 2018 (middle facet), and 2016 (bottom facet). This figure shows that in 2020, a much larger share of ballots were returned earlier than in prior years. The median ballot in 2020 was returned 18 days before the election, but in 2018 and in 2016 the median ballot was returned only 13 days before the election. In 2016 and 2018, the day with the most ballots returned was the day before the election. In 2020, the day with the most ballots returned was October 19th.

A second reason for the decline is a change in Georgia election law. In 2019, Georgia passed HB 316. One result of this reform is that the information voters had to provide when returning their ballot was greatly simplified. This is referred to as the "Oath" envelope. Consequently, voters could no longer have their ballots rejected for failing to provide some information (such as their address) when returning their ballot. In 2018, 1.5% of all returned ballots were rejected for reasons related to this oath envelope. In 2020, this was reduced to 0%. This 1.5 percentage point decline accounts for 47.9% of the total decline in ballot

27

rejections.

HB 316 also provided voters with the opportunity to "cure" ballots when voters made a mistake—either because of a signature mismatch or because they failed to provide required information. An expert report from Ken Mayer in *Pearson v. Kemp* estimates that 403 ballots were cured during the election. The primary reason to cure a ballot would be a signature related issue (Mayer, 2020). If those 403 ballots were all due to a signature related issue, then the signature rejection rate in the 2020 general election would be 0.18% of all mail-in ballots, nearly identical to the rejection rate in the 2018 general election.[9] While there was a court case in late 2018 that enabled a small amount of ballot curing in 2018, there is no indication that there was ballot curing on the level that was found in 2020.[10]

### 3.1.2  Underage Voters in Georgia

Another startling claim from Trump's team was that voters younger than 18 cast votes in the 2020 election. In President Trump's speech delivered on the morning of January 6th, 2021 "Sixty-six thousand votes, each one of these is far more than we need. Sixty-six thousand votes in Georgia were cast by individuals under the legal voting age" (Trump, 2021b). He made a similar claim at the January 4th rally for Senate Republican candidates in Georgia, arguing that "66,000 votes in Georgia were cast by people under the legal voting age" (Trump, 2021a).

The claim comes from one of Trump's challenges to the election results in Georgia, *Trump v Raffensperger*. A press release from Trump's campaign issued on December 4th, 2020 alleged that "Data experts also provided sworn testimony in the lawsuit identifying thousands of illegal votes: 2,560 felons; 66,247 underage voters" (Trump, 2020g).[11] A similar claim is

---

[9]Using a separate methodology, another estimate of the number of ballots cured in the 2020 general election is 345 ballots (Swift and Gomen, 2021). To obtain this number, we took the total number of rejections for signature reasons discussed in this paper and then subtracted the final set of rejections. The result is 345 ballots.

[10]See: https://www.aclu.org/news/voting-rights/court-blocks-georgia-rejecting-ballots-over

[11]As we explain below, the actual complaint labels these voters as underage registrants, not underage votes.

repeated by State Senator William Ligon in a report published the previous day on December 3rd, 2020 (Ligon, 2020). Summarizing testimony from John Eastman, a constitutional scholar who was hired to assist with Trump's post-election legal challenges, Ligon stated that Eastman "reiterated failures such as counting the votes of approximately 66,000 underage individuals" (Ligon, 2020). The specific claim made about underage voters casting votes appears to be a reference to John Eastman's written testimony provided to the committee where he claimed that "66,000 underage individuals to cast ballots, which were then counted" (Eastman, 2020b).

But no expert report filed in *Trump v Raffensperger* claims to have evidence of underage voters. Instead, the expert report filed with *Trump v Raffensperger* claims to have evidence that individuals were underage when they registered to vote. This distinction is clear in John Eastman's verbal testimony to William Ligon's committee on December 3rd. At the hearing, John Eastman verbally testified that "the number of underaged individuals who were allowed to register contrary to statutory authority amounts allegedly up to 66,000 people" (Eastman, 2020a). This is a key difference—what Eastman is alleging in his testimony is that people were underage *at the time of registration*, rather than *underage at the time they cast a vote*.

Eastman's verbal testimony (but not his written testimony) aligns with the evidence presented in Bryan Geels' first report, which was attached in the complaint filed in *Trump v Raffensperger*. In this first expert report, filed on December 1st, 2020 , Geels opines "that there are 66,247 individuals whom the State's database identifies as having cast a ballot whose records indicate that they were registered to vote prior to their 17th birthday" (Geels, 2020). Later in the report Geels describes this group as "Voters Who Were Underage When Registered" (Geels, 2020). Geels then provides pseudo code to describe the match that was performed, which clearly shows that he was attempting to calculate the difference between what Geels thought was the date of registration and the registrants' birth year (Geels, 2020).

But even when interpreted correctly, Geels' claim is simply false. Charles Stewart, in a reply expert brief, first identified an issue with Geels' calculation (Stewart, 2020a). In his

expert report he explained that he was unable to verify Geels' claim, finding a dramatically different number than Geels (Stewart, 2020a). After Geels' initial affidavit, an updated report was attached to a second filing of *Trump v Raffensperger*. In this updated report filed on January 7th, 2021, Geels reported "Category (17): Underage Registrations. At least *2,047* individuals voted in the Contested Election who, according to the State's records, were registered to vote prior to their 17th birthday, below the minimum age permitted under the Election Code." (Geels, 2021). This is more than a 64,000 downward revision in the estimate. And there was no explicit reference to this revision—even though the 66,000 underage voter claim had been repeated by the Trump, the campaign's lawyers, John Eastman in his testimony in Georgia, and across public efforts to persuade state legislators to rescind electoral college votes from Georgia. In the January 7th report, there is no reference to the 66,000 figure found in the first report, no independent reference to underage voters, and no attempt to address Charles Stewart's criticism of the initial analysis.

Geels updated this analysis a third time, revising the number of alleged underage regis-trants to be even lower. In a report filed for John Eastman's disbarment hearing in California, Geels issued an updated estimate (Geels, 2023). In this report, Geels claimed there were "778 violations" once he used the REGISTRATION_DATE field in the voter file (Geels, 2023). Even if we accept this estimate as accurate (and we shouldn't, as we show below), this implies that Geels' initial estimate was more than a 8,300% overestimate.

But even if this last claim from Geels' claim were true, the way he wrote his query caused him to identify individuals who were substantially older than 18 during the 2020 election. This is because Geels' analysis looks across all Georgia registered individuals and calculates the difference between their date of registration and date of birth. This means that individuals obviously old enough to vote were labeled as "underage."

To evaluate Geels' methodology, we use a version of the Georgia voter file from December 2020, close to the date used in Geels' expert report. Consider one example in the data set. One voter was born in 1928 and, according to Geels' calculation was 15 years old when they

were added to the voter file in 1943. Despite Geels considering this person "underage" at the time of voting, they were 92 years old in the 2020 election. In fact, in our replication of Geels' procedure, we identify 2,116 individuals based on the code outlined in Geels' report whom he would classify as having been underage at the time of registration. Among these individuals, the average age in 2020 was *42 years old*.

When we execute Geels' query, we find no evidence of underage voting or underage registration in Georgia in 2020. Based solely on the voter file and the voter history file, there are three individuals who were supposedly younger than 18 at the time of the election. But further investigation of all three voters reveals that they were all over 18 years old during the 2020 election.[12]

Similarly, we find no evidence of systematic underage registration in Georgia. Geels' analysis uses the "DATE ADDED" file, which is not necessarily the date that a voter was registered to vote in the State of Georgia. Once we analyze individuals' registration date, we find that 1,063 individuals have registration dates that are 17 years or less after their birth year. Once we eliminate individuals registered after 2002—when identification was required to comply with HAVA—another 147 individuals were eliminated as having been an underage registrant.

Among the remaining 906 individuals, there is clear evidence of clerical errors. Almost half (440) have the same date added and birth year in the data set—an indication of an error made when adding the voter to the voter file. In fact, 87% of the supposedly underage voters were 14 or less according to Geels' query.

In summary, there is no evidence of systematic underage voting or registration. There is some evidence of a small number of clerical errors in the Georgia voter file. This is not evidence of fraud or illegal voting. Instead, it represents the challenges of maintaining a voter file across a heterogeneous state.

---

[12]One voter has a birth date of 2020, but was added to the voter file in 1995. A second voter has a birth date in 2018, but was added to the voter file and registered in the same year, 2018. We were able to identify a public record of this individual and they were born in the 1940's. A final voter is listed with a birth year of 2003, but public records (based on an arrest) indicate that they were born in 2002.

### 3.1.3  Early Application for Absentee Ballots in Georgia

Another claim about mail-in votes in Georgia is that many ballots were mailed earlier than allowed. The origin of this claim is Brian Geels' expert report in *Trump v Raffensperger*. There he says that "305,701 individuals have records indicating that they applied for absentee ballots more than 180 days prior to the general election (i.e., prior to May 6, 2020) exceeding the statutory maximum according to state law" (Geels, 2020, paragraph 13). Geels' reference to the Georgia code, however, fails to mention that Georgia state law explicitly allows for individuals over 65 and individuals who are self-identified as disabled to apply once for a mail-in absentee ballot.[13] To implement this portion of the law ,the mail-in ballot applications in 2016, 2018, and 2020 allowed applicants to declare themselves over 65 or disabled and therefore automatically receive an absentee ballot for the general election after the primary election.

Almost all of the individuals who applied early for an absentee ballot in Georgia was over 65 (Stewart, 2020a). Using the absentee voter history file from the 2020 election for the state of Georgia, we find that among individuals whose applications were filed more than 180 days before the election, 92.8% were over 65 years. The remaining 7.2% of individuals who applied early are easily explained as individuals who declared themselves to have a disability and therefore eligible under the provisions of the Georgia law.

This claim simply fails to understand Georgia law and is therefore in error. Rather than evidence of a conspiracy to swing the election or an illegal attempt to avoid Georgia law, the applications alleged to be outside of the statutory window actually comply with Georgia election law.

---

[13]21-2-318 1. G. "Any elector meeting criteria of advanced age or disability specified by rule or regulation of the State Election Board or any elector who is entitled to vote by absentee ballot under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. Section 1973 ff, et seq., as amended, may request in writing on one application a ballot for a presidential preference primary held pursuant to Article 5 of this chapter and for a primary as well as for any runoffs resulting therefrom and for the election for which such primary shall nominate candidates as well as any runoffs resulting there from.

### 3.1.4  Early Distribution of Absentee Ballots in Georgia

The Geels report also claimed that some ballots were distributed earlier than it was legally allowed for ballots to be sent out. Geels claims that 2,664 mail-in absentee votes "were issued before they were eligible to be sent out on September 15, 2020" (Geels, 2020). We examined these claims using the 2020 absentee voter history file for the state of Georgia. Grady County in Georgia accounts for 40% of these ballots, with almost all of those ballots recorded as issued on September 8th, 2020, a week earlier than allowed. There are similar apparent clerical anomalies in other counties with early ballots. For example, in Fulton County, where 17% of the supposedly early ballots are located, nearly all of the ballots were supposedly issued on August 19th or August 20th, 2020. And every individual who supposedly had their ballots issued on these dates applied the day before, right as mail-in absentee ballot applications in Georgia opened for the general election. The most likely explanation is that a clerk incorrectly recorded the issued date for these ballots. Hart County is the county with the next most ballots issued. There, for 330 applicants, the application date was erroneously set equal to the issued date, making it seem like applications were made before ballots could be distributed. We last consider Fayette County, the last county that supposedly issued more than 100 ballots earlier than allowed under Georgia law. Fayette County, like Fulton, erroneously recorded ballots as being issued during the start of the absentee application process.

Regardless of when the ballots were issued—whether it was a clerical error in the absentee voter file or an error in when the ballots were distributed—none of the ballots in any of the counties are recorded as returned before September 20th, after the official dates ballots could be released. As a result, it is hard to imagine how the early release of ballots–if they actually occurred–advantaged any candidate.

### 3.1.5   Claims Made About "Suspicious" Registration in Georgia

A different claim made about the Georgia registration file is that there are a large number of individuals with registration records that Trump's team classified as "suspicious". In Bryan Geels' first expert report he claims that there are "6,635 individuals whom the State's database identifies as having cast a ballot whose records indicate that they were added to the voter registration file subsequent to the 2016 general election (since they weren't listed in the 2016 Voter Registration File)" (Geels, 2020, paragraph 25). But Geels revised this claim in the expert report he submitted as an update in *Trump v Raffensperger* filed on January 7th, 2021. In this updated report, Geels claims that "86,880 individuals who voted in the Contested Election were listed as having been added to the voter registration file prior to 2016, but were not listed in the 2016 Voter Registration File" (Geels, 2021). In Geels' updated expert report he provides no explanation for the 1,209% increase in his estimate of the number of voters in this category.[14]

We examined Geels' report, along with copies of the Georgia voter file and the 2020 voter history file and found that the increase in the number of suspicious registrations occurred because Geels changed the criteria for determining if a voter had a "suspicious" registration. We were able to make this assessment because Geels attached to his updated report a pdf print out of the voter records of all 86,880 individuals he classified as having a suspicious registration record, along with specific information about the queries he ran. We digitized the records in the exhibit and successfully recovered the 86,880 individuals that Geels reports in his updated report.

Using these digitized records, we find that Geels' number of "suspicious" registrations dramatically increased because he changed how he ran his query, resulting in many individuals with registration records that were not suspicious at all. Initially, Geels' first expert report used the "REGISTRATION DATE" field to identify voters he thought should be in

---

[14]It is the case that the first report only examined individuals who voted mail-in absentee and the second report examined all voters, but we show in our replication code that this cannot even come close to explaining the difference between the two reported numbers.

the 2016 voter file. But then in the second report, Geels uses the "DATE ADDED" field in the voter registration file to determine when an individual was registered to vote. He uses this field because of a "discussion with an employee in the Georgia Secretary of State office, the Date Added is the right field to be using for the registration date, because it will show the date the voter was added to the list" (Geels, 2020, Paragraph 47).

We find that 6,584 individuals in Geels' data set cast a vote by absentee ballot and have a registration date prior to November 8th, 2016, according to the "REGISTRATION DATE" field. If we include individuals who voted in person but continue to restrict the sample to individuals with a registration date prior to November 8th, 2016, we find that Geels would identify 8,785 voters. Only when Geels alters the query to focus on the "Date Added" field, rather than the registration date, does he find the 86,880 voters whom he claims have suspicious registrations.

We inquired with the Secretary of State's office about the registration file and learned that there are many reasons why voters might have a "DATE ADDED" field that is earlier than 2016 but not appear in the 2016 voter file. In fact, any time a voter cancels their registration and subsequently registers, they will have a registration date later than their date added to the voter file. One reason this can occur is if a voter leaves Georgia, cancels their registration, and then returns to the state and re-registers. Further, if a voter is convicted of a felony, their registration is canceled and they are removed from the registration list. But after completing their sentence, the voter is then able to have a valid registration again. When this occurs the registration date will be updated, but the "DATE ADDED" field will remain unchanged.

We also see clear evidence that these are not "phantom" individuals added for the 2020 election. Rather, they are voters who are restoring previously canceled registrations. To make this assessment we used a version of the Georgia voter file from January 2019. Among the 8,785 voters who Geels' identifies as having suspicious registrations 4,743 were in the January 2019 voter file–54.0% of individuals. And even if we focus on the entire 86,880

voters, we find that 45.5% of the identified voters appear in the January 2019 voter file.

In short, there is nothing suspicious about these registrations. Geels altered the query to inflate the number of suspicious registrations in his updated affidavit.

### 3.1.6  Claims Made About Dead Voters in Georgia

Another claim made in Georgia and many other states is that ballots were fraudulently cast in the name of deceased voters. For example, at a rally in Georgia on January 4th, 2021 Donald Trump declared that "We were up 10,315 ballots were cast by individuals whose name and date of birth matches a Georgia resident who died in 2020 prior to the election. Then your wacky secretary of state said two people, two people" (Trump, 2021a). This corresponds with testimony from Trump's legal team. For example, Ray Smith, Trump's attorney in *Trump v Raffensperger*, testified there were "10,315 *or more* individuals" who voted but "were deceased at the time of the election" (Smith, 2020). And later, John Eastman declared on January 6th in his speech at the Elipse that "we know dead people voted" (Eastman, 2021).

The claims about dead voters in Georgia come from Brian Geels' expert report in *Trump v Raffensperger*. Geels claims "that there were as many as 10,315 individuals who cast ballots in the November 3,2020 election that were accepted and counted but who deceased prior to Election Day. 8,718 of these individuals are recorded as having perished prior to the date the Sate records accepting their ballot" (Geels, 2020, Paragraph 28).

To calculate this number, Geels matched a list of voters who cast a mail-in absentee ballot in the 2020 election with a list of deceased individuals he obtained from the state of Georgia. To match across the two lists, Geels matched on First Name, Last Name, and year of birth.

This matching procedure, however, will lead to a large number of false positive matches, causing Geels to claim voters are dead when they are still alive. Geels recognizes that his procedure will lead to false positives, arguing that "Because the Voter Registration file only

contains the Birth Year for each registered voter, a more exact match cannot be made and there may indeed be false positives" (Geels, 2020, paragraph 50). Indeed, because many first name, last name, and birth year combinations in Georgia are common, we should expect a large number of false positives.

To assess how often false positives will occur, we examined the share of registered voters in the December 2020 Georgia voter file who share a first name, last name, and birth year with at least one other registered individual. We find that about 5.2% of all first name, last name, and birth year combinations in the December 2020 Georgia Voter File are not unique. The lack of information provided by Geels suggests that the vast majority of his matches are false positives.

Despite public pronouncements that dead voters cast ballots in Georgia, communication among Trump's advocates revealed they held doubts about the accuracy of their estimates of the number of dead voters in Georgia. In a January 4, 2021 email released as part of the Congressional January 6th committee, an unnamed expert reported serious problems with estimates of the number of dead voters in Georgia. In an email addressed to "Mayor" (presumably Rudy Giuliani) the redacted author explains that that there was little evidence of deceased voters illegally cast a ballot in the 2020 election. The redacted author of the email explains that "many of the dead voters on the GA list sent their vote in before they passed. I don't think makes a particularly strong case, and I think it is possible that Chairman Graham [Senator Lindsey Graham] will push back on that. Almost all of them died in October 2020, a few in November 2020, and a few in September 2020, I think this makes the case for unfortunate timing – many sent their ballots before they passed- rather than nefarious activity. Am raising this just so that everyone is aware of what the data actually says" (Redacted, 2021). The email confirms what Geels already conceded in his expert report: there was little credible evidence of many dead voters casting ballots in the 2020 election.

On January 6th, Brad Raffensperger, Georgia's Secretary of State, explained in a letter

to Congress that there was no evidence dead voters cast ballots en masse in the 2020 election. Raffensperger cited the claim from the Geels report that "10,315 dead people voted" and then went on to explain that "Our office has discovered 2 potential dead voters and both instances are under investigation" (Raffensperger, 2021).

Despite the public claims made from the Secretary of State, at least one election integrity group in Georgia continues to claim that dead people cast ballots in the 2020 election. But this group's claims are not based on any publicly verifiable analysis and instead claim to use data that this group cannot possibly have. In a letter allegedly refuting statements from Georgia's Secretary of State, Voter GA, an election integrity group in Georgia, responded to Raffensperger's claims before Congress, arguing that "The actual evidence shows that at least 873 people received credit for voting in the November 2020 election although they had died in 2020 prior to Election Day. This is based on the voter history file from November 28, 2020 and a deceased individuals file from the State of Georgia's Public Health Department. These files were matched on First Name, Last Name, Date of Birth and Address" (Favorito and Coovert, 2022). It is completely unclear what data and analysis this claim is based on. The refutation from Voter GA links to a version of Geels' expert report: the updated report attached to the revised complaint in *Trump v Raffensperger* filed in January 2021. But Geels' expert report only matches from the voter file to the deceased individuals list using First Name, Last Name, and birth year—a set of criteria less stringent than a match based on First Name, Last Name, Date of Birth and Address. But it isn't even clear how Voter GA could perform this match. Date of birth is not available in the public voter file. And it isn't clear what address is available in the deceased individual list.

We have further reason to doubt that Voter GA actually identified illegal votes from deceased voters, because the numbers they cite correspond to the number of ballots cast from individuals who were alive and then died after casting their ballot. We can make this assessment using the Georgia canceled voter file, the Georgia voter history file, and the absentee voter history file. The canceled voter file contains information about when

38

individuals were removed from the voter registration file, why they were removed, and a voter's unique registration number. This enables us to exactly identify voters removed from the roles for being deceased and then to assess whether they returned their mail-in absentee ballot before being removed from the roles.[15]

Using the canceled voter file, we find no evidence of widespread voting from already dead voters. In fact, as the email to Giuliani made clear, almost every instance of a "dead" voter was someone who legitimately cast their ballot before dying. Using the canceled voter file and the absentee voter history file, we find that there are 871 people who voted in the 2020 election and whose registration was canceled before November 15th, 2020 because they died. This number is strikingly similar to the claimed number of dead voters in the Voter GA refutation letter. First, we find that 77 individuals who voted in the 2020 general election and then had their registration canceled for being deceased cast their ballot in person—either on Election Day or early in person. Among the remaining 794 individuals who cast their ballot using mail-in absentee, 787 of those individuals had their ballot returned before they were removed for being deceased. This means 99.1% of the supposedly dead voters are easily identified as legitimately cast ballots. This group of individuals returned their ballots, on average, 23 days before being removed from the voter file for being deceased.

This leaves 7 remaining voters who were removed on the day their ballot was accepted or had their ballot accepted after they were removed from the voter file–constituting approximately 0.0001% of all ballots cast in the 2020 election. One voter had her ballot accepted the same day she was removed and, according to public obituaries, died approximately five days before her ballot was received by the state and therefore could have plausibly voted her ballot before dying. Of the remaining 6 individuals, it appears plausible, given the timing, that two individuals could have been alive when they cast their ballots and then died. This leaves approximately four individuals with ballots cast after they were decreased with a large enough gap to warrant further investigation.

---

[15]To obtain the canceled voter file we filed a Freedom of Information Act (FOIA) request with the Georgia Secretary of State's office.

Our estimate of approximately four coming from voters after they were deceased is in line with other estimates of dead voters, for example (Wu et al., 2020) find similarly low levels of ballots from dead voters. And regardless of the explanation for these four potential dead voters, this is hardly the 10,315 illegal dead votes Trump and his allies claimed illegally cast ballots in the 2020 election.

### 3.1.7    Claims Made About Felony Voters in Georgia

Trump and his advocates also claimed that voters currently serving felony sentences were allowed to cast votes in Georgia. In his speech in Georgia on January 4th, 2021 Trump claimed that "2,506 ballots were cast by individuals whose name and date of birth matches an incarcerated felon in a Georgia prison" (Trump, 2021a). Similarly, a press release announcing the *Trump v. Raffensperger* litigation from the Trump campaign pronounced that "Data experts also provided sworn testimony in the lawsuit identifying thousands of illegal votes: 2,560 felons" (Trump, 2020g). In testimony to a Georgia state legislative committee Ray Smith declared that 2,506 felons were allowed to vote in the 2020 general election (Smith, 2020).

This claim also comes from Brian Geels' expert report in *Trump v Raffensperger*. Geels reports that "there could have been up to 2,560 individuals who cast a ballot that were accepted and counted but who were inmates" (Geels, 2020). Geels goes on to explain that "2,560 represents the number of individuals in the Active Inmate File whose First Name, Last Name, and Birth Year matched exactly to the Voter History file" (Geels, 2020). But Geels did warn that, "similar to the analysis in #17 for deceased individuals, only the Birth Year is available in the State's voter record files. This analysis therefore may also contain false positives due to the imperfect nature of the match."

Geels does not provide an estimate of the false positive rate, nor have we been able to find the list of individuals he identified as felons who voted in the 2020 election. Instead, to study the rate of false positives we investigate the number of duplicate matches that

we would expect if we merged the Georgia voter file using first name, last name, and an individual's birth year. We find that false positives will occur at an extremely high rate.

To obtain a baseline rate of false positives from the Georgia voter file, we simulated a matching exercise where we know the correct answer. Specifically, we first created a synthetic set of names to "match" by randomly selecting a subset of Georgia registered voters. We then proceed as if this is a list of voters we wanted to match to the voter file. Using our sampled subset, we then assess our rates of false positives when we attempt to match our sampled subset to the original voter file. To determine the size of the group of voters we match to the Georgia voter file, we use the actual number of felons in Georgia during the 2020 election. According to Reform Georgia, an advocacy group for the restoration of felon rights, 266,317 Georgians were ineligible to vote in 2018 due to a felony conviction.[16] So we examine the rate of false positive matches if we were to randomly select 266,317 voters to match the remaining voter file to match against. We also examine the rate of false positives if we focus on the individuals the state of Georgia was actively incarcerating at the time of the election: 54,806 individuals.

Regardless of the estimate of the size of the felon population used to form a match, we find large numbers of false positives if we match on First Name, Last Name, and Birth Year alone. For example, if we examine the entire population of individuals serving a felony sentence we find approximately 32,000 false positives when matching against the Georgia voter file using first name, last name, and birth year. If we examine those actively incarcerated we find approximately 6,750 false positives. This high rate of false positives isn't surprising, because 5.2% of all individuals who voted in the 2020 general election have a non-unique first name, last name, birth year combination. In other words, over 5% of the voters in Georgia can contribute to a false positive when matching against records.

In short, the procedure Bryan Geels used to identify potential felon voters was guaranteed to generate false positives at a high rate. So the evidence he presented is not indicative fraud

---

[16]Statistics on the felon population is available here: https://www.senate.ga.gov/committees/Documents/ReportonFelonyD

or illegal voting.

## 3.2 Claims Made About Statistical Evidence of Voter Fraud in Georgia

In addition to making specific allegations of voter fraud, such as underage, deceased, or felon individuals voting, Trump and his allies also claimed that statistical patterns imply the existence of systemic voter fraud. The statistical claims cover a wide variety of voting results, allegations, and theories of how the fraud was conducted. Yet, they tend to follow the same pattern. There is some assertion made about what would happen in a normal election, perhaps based on results from prior elections. Then, those alleging the fraud suggest the results of the 2020 election are statistically surprising or improbable given their assertions about what is expected, and they conclude that the election results must be fraudulent.

Such claims are found not only in public speeches, but also in expert witness reports from the court cases challenging the Georgia election results, *Pearson v. Kemp* and *Wood v. Raffensperger*. The reports have the appearance of science, as they analyze big data sets and use statistical language like predictive modeling and probability distributions. But upon inspection, the analyses are clearly flawed. They misinterpret data sources, rest upon unjustified statistical assumptions, and employ dubious methods which render their conclusions implausible and often useless. The arguments lack basic statistical rigor and are, at times, incomprehensible. They also demonstrate how insufficient domain knowledge about election data and voting patterns can lead to spurious conclusions. Many conclusions appear to be based on the intuitions the scholars have what statistical patterns look like in a "normal" election. Yet, none of the authors of these reports have any prior experience analyzing election data. So, it is unclear what the basis for their claims about what a typical election would look like were.

### 3.2.1  Claims Made About Anomalous Vote Distributions

Dr. Eric Quinnell's report in *Pearson v. Kemp* makes the startling claim that 32,347 Biden votes in Fulton County are statistically "anomalous". To make this conclusion, Quinnell claims there is something anomalous about the distribution of Biden's vote totals. Quinnell suggests that we "often expect our data to be close to a normal distribution" (Quinnell, 2020), and thus, if voting distributions deviate from the normal curve, this "can indicate an event that is statistically unlikely"(Quinnell, 2020, paragraph 6). Upon observing that the distribution of Biden's vote gains in Atlanta precincts, calculated as the difference between Biden and Clinton's vote totals, is more right-skewed with a fatter right-tail than the distribution of Trump's vote gains from 2016 to 2020, Quinnell concludes that Biden's performance is statistically anomalous.

Building on this observation, Quinnell then estimates the specific number of suspicious votes using a simple procedure he appears to have invented for his expert report. He adjusts Biden's vote total in each Fulton County precinct to fit Clinton's vote share in the same precinct and then sums the differences between Biden's actual vote totals and these "predicted values". This produces 32,347 statistically anomalous votes in Fulton County.

There is no basis for Quinnell's invented procedure, nor his conclusion that 32,347 ballots were anomalous in Fulton County. There is no statistical or social scientific reason why changes in vote totals across elections at the precinct, district, or county level should be normally distributed.[17]

Simple analyses and basic logic explain why Biden's distribution is more right-skewed than Trump's, and why it has a fatter right-tail. Biden outperformed Clinton's vote share

---

[17]There are a multitude of other issues with Quinnell's analysis. For example, as Jonathan Rodden documents in his expert report (Rodden, 2020), Quinnell's approach ignores the fact that precinct boundaries often change across elections. In Fulton County, 82 out of the 342 precincts in 2016 had their boundaries redrawn before 2020 (Rodden, 2020, paragraph 17). Analyzing the precinct-level differences in vote totals across elections is thus meaningless, as you cannot make "apples-to-apples" comparisons in over 20% of precincts. Quinnell does acknowledge that a few precincts were redrawn, but he misses the vast majority of them and does not adjust his methods or conclusion in any way. He simply compares Biden's and Clinton's precinct-level performances, despite many of these precincts no longer being comprised of the same voters. Reliable inferences, let alone evidence of fraud, cannot be drawn from such an analysis.

in the densely-populated and growing suburban counties of Georgia, while Trump primarily gained in Georgia's sparsely-populated and shrinking rural counties (Rodden, 2020, 14). This pattern holds at the precinct-level in Fulton County as well. Biden's largest gains came in the suburban precincts, which experienced the greatest growth in registered voters between 2016 and 2020, while Trump's vote totals largely remained stagnant in these precincts (Rodden, 2020, 22). If a candidate's vote share increases in populous and/or growing areas, this produces greater changes in raw votes than a candidate whose vote share increases in small and/or shrinking areas. This trend thus adds greater mass to the far-right of Biden's distribution than Trump's, as a subset of precincts experience outsize Biden vote gains. It also clarifies why Quinnell's assumption that Clinton's and Biden's precinct-level vote shares should be equal, which leads to him identifying over 32,000 anomalous votes, is unjustified. Clearly, vote shares fluctuate based on the groups a campaign mobilizes (in this case, suburban voters) and their spatial distribution. There is no logical link between a particular vote change distribution and fraud. The supposedly "anomalous" distribution that Quinnell identifies is perfectly explainable by geographic voting patterns.

### 3.2.2    Claims About Dominion Voting Machines

Another statistical claim made in expert reports from Trump's challenges in Georgia was that Joe Biden performed particularly well in locations where Dominion voting machines were used. Perhaps the clearest articulation of this claim is from Russell Ramsland's expert report in *Wood v. Raffensperger* and *Pearson v Kemp*, where he argues that Dominion and Hart voting machines contributed to Biden's success (Ramsland, 2020). Ramsland regresses 2016 US county votes on unspecified "census variables" and uses this model to predict Biden's "expected" vote share. He finds that Biden outperforms the model in 78% of the counties which use Dominion or Hart voting machines, and argues this is statistically indicative that "something strange is occurring", because "in normal circumstances any candidate should perform above expectations roughly 50% of the time" (Ramsland, 2020, 11). Ramsland

computes that Biden performed 5-6% above expectation in such counties, which, in Georgia, leads to at least 123,725 "statistically invalid" (Ramsland, 2020, 10) votes for Biden that "must be disregarded when tabulating the election results" (Ramsland, 2020, 18).

Ramsland makes erroneous statistical assumptions and arguments that, once addressed, nullify his claims about illegal voting. First, Ramsland is implicitly assuming his model will produce unbiased predictions of vote totals in a free and fair election (Angrist and Pischke, 2009). Yet, Ramsland cites no evidence that this claim is true. In fact, he doesn't even demonstrate it is true within his training data, let alone for the 2020 election. It is well known that across elections things change. Support for candidates might swing or one campaign might be more effective at mobilizing sympathetic voters. This swing will cause vote totals to shift, which make predictions from prior elections inaccurate. So on a basic level, Ramsland simply fails to establish that his method is valid.

Second, and most important, Ramsland mistakes correlation for causation. Counties using Dominion or Hart machines in 2020 differ from those that did not. Most notably, they were much more likely to vote for Clinton in 2016. For example, over 40% of the counties Clinton won in 2016 election used Dominion voting machines in the 2020 election, while just 25% of the counties Trump won in 2016 used Dominion machines in 2020 (Rodden, 2020). To identify causal evidence that Dominion/Hart machines increased Biden's county-level vote share, one must ensure that Dominion/Hart counties do not differ from other counties in all the other factors that affect Biden's vote share. Ramsland makes no attempt to correct for such confounding factors. That Biden's vote shares were on average higher in Dominion/Hart counties is not evidence of machine-related fraud. In this case, it is simply driven by the fact that these counties were on average more Democratic in the first place.

Eggers et al. (2021) demonstrate that more appropriate statistical models fail to find any relationship between Biden's performance and the type of machine used in the county. Eggers et al. (2021) use simple statistical strategies like fixed effects to adjust for unchanging differences across counties. After including this information, Eggers et al. (2021) fail to find

any effect of Dominion or Hart machines on Joe Biden's support.

### 3.2.3   Claims Made About the Timing of Absentee Ballots Counted

Other reports claim there were anomalies in how absentee ballots were received in certain Georgia counties. For example, Quinnell and Young's report in *Wood v. Raffensperger* and *Pearson v Kemp* allegedly discovers anomalous patterns in how absentee ballots were returned in Fulton County (Quinnell and Young, 2020a). They claim to discover patterns in the data that "fail basic quality and sanity checks mathematically" and are only explainable by some exogenous "event or constraint…outside mere voting pattern[s]" (Quinnell and Young, 2020a, 33).

Quinnell and Young (2020) identify three specific patterns they allege are anomalous. First, they claim it is anomalous that approximately half of absentee ballots were reported in the first batch of ballots from Edison and approximately half were reported later. They claim this an "exceptional mathematical anomaly" (Quinnell and Young, 2020a, 27).

This claim, however, is not based on any actual analysis, reference to prior election data, or citation to prior work. Rather, Quinnell and Young (2020) merely have the impression that this is anomalous and, based on that impression, declare the result to be strange. There are many legitimate reasons that this pattern could occur in Edison's return data. But regardless, whether or not the pattern is anomalous is irrelevant, because Edison's batch updates do not correspond to the timing and cumulative totals of official vote tabulations (Rodden, 2020). For example, official records from the Georgia Secretary of State's office show that nearly 99% of total absentee ballots were received by November 3rd, but Edison's first update on November 4th contained only half of the total absentee ballots (Rodden, 2020, 5). As a result, it is impossible to attribute this pattern in Edison's data to anything fraudulent in official vote counts.

Second, Quinnell and Young (2020) claim to discover "unexplainable" partisan differences in the proportion of total absentee ballots reported in Edison's first timestamp (Quinnell

and Young, 2020a, 14). Quinnell and Young's analysis is based on differences in the share of ballots Trump and Biden had reported after the first Edison time stamp. Quinnell and Young (2020) find suspicious that Trump had many precincts with 100% of his total absentee counted in Edison's first timestamp, but Biden had none above 71%. Quinnell and Young (2020) also find it odd that the share of ballots counted for Biden doesn't follow a normal distribution.

Quinnell and Young (2020) continue to make the same error: they use their own impressions of what is likely in a fair election rather than conducting rigorous analysis. Quinnell and Young's supposedly anomalous patterns are, in fact, consistent with precincts randomly sampling ballots to count. The reason there are many more precincts with 0 or 100% Trump ballots counted is that there are many fewer Trump mail in absentee ballots to count in Fulton County precincts (Rodden and Marble, 2020). Because there are many fewer Trump ballots cast, it is much more likely that either none or all of the Trump ballots in a precinct would be counted. The intuition here is simple. Suppose we flip a coin with a 50% chance of obtaining a heads and a 50% chance of tails. If we flip the coin once, obviously we will either get all heads or all tails. If we flip the coin twice, we have a 25% chance of obtaining two tails and a 25% chance of two heads. So, 50% of the time we will have all heads or all tails. As the number of flips increase, the probability of obtaining all heads or tails will decline. After three flips the probability of obtaining all heads or tails declines to 25%. If we include ten flips the probability of all heads or all tails declines to $\frac{1}{2^9}$. As the number of coin flips increase, the probability of getting all heads or tails will continue to drop.

This same basic idea is one explanation for why there are precincts where Trump had 100% of his ballots counted, but Biden had no precincts with all of his ballots counted. There are 82 precincts where Trump received 5 or fewer votes from mail in ballots, but only 15 precincts where Biden received 5 or fewer votes from mail in ballots. So if a coin flip determines whether a ballot is counted, Trump has a higher chance than Biden of receiving all heads (e.g. all ballots counted) or all tails (no ballots counted) in many precincts, because

Trump has fewer coin flips (i.e. fewer ballots to count). A simple simulation where each ballot in each precinct has a 50% chance of being counted shows that Trump has all his ballots counted in approximately 3.2% of precincts, while Biden has all his ballots counted in only 0.2% of precincts. This means that, on average, we expect less than one precinct to have all its Biden ballots counted.

Relatedly, Quinnell and Young also appear concerned that the distribution of shares of mail in ballots counted do not follow a normal distribution. Quinnell and Young argue that the pattern they observe "represent some kind of major external constraint or non-linear event that is corrupting the fidelity of the data" (Quinnell and Young, 2020a, 32). They go on to assert that "such a signature would certainly block any attempts of any device going to production until a root cause could be found to describe the phenomenon and prove it either true, safe, or discarded" (Quinnell and Young, 2020a).

Yet, Quinnell and Young never explain what device they are referring to, what production they envision occurring, or what a "linear event" (as opposed to a "non-linear" event) would mean for election data. Nor do they explain why any of the patterns they observe are indicative of illegal or fraudulent voting. In fact, it appears their assertions are based on a very basic statistical misunderstanding. In a reply expert report, Jonathan Rodden and Will Marble explain there is no reason to expect the shares of votes counted to follow a normal distribution (Rodden and Marble, 2020). In a response to this critique, Quinnell and Young assert assuming normality is the " 'standard method' in all of sciences that uses comparisons against the 'standard normal' until proven otherwise. Note they are named 'standards' because they are standards" (Quinnell and Young, 2020c, 3).

This is *not* why the standard normal distribution is called the standard normal distribution. As any high school statistics student can tell you, the standard normal distribution is a "standardized" normal distribution. That is, once a normally distributed random variable is subtracted by its expected value and divided by its variance, it follows a *standard* normal distribution. There is no literature in statistics or political science where the normal

distribution is the default. Rather, distributional assumptions are derived from principles or data. This basic misunderstanding undermines nearly all of Quinnell and Young's claims and reveals a profound ignorance of basic statistics.

Third, Quinnell and Young (2020) are concerned that precinct's cumulative tallies at each timestamp are correlated with each other, as it suggests that absentee votes of all precincts are "centralized and coordinated" (Quinnell and Young, 2020a, 26). Yet, Rodden and Marble (2020) explain there are numerous reasons why there would be correlated shares of ballots counted across precincts. Certainly, Quinnell and Young (2020) offer no evidence that correlation in precinct counts imply the presence of fraud. Yet again, Quinnell and Young (2020) use their own poorly informed impressions of what should happen when votes are counted as evidence of fraud or illegality.

In summary, Quinnell and Young's (2020) report is incoherent as a statistical argument. They appear to not grasp basic statistical arguments. They base most of their tests on intuition rather than data, argument, or well documented common understanding. And the concepts they do apply appear to be imported from other fields without even a preliminary attempt to justify their application.

### 3.2.4  John Eastman's False Allegations of Machine Fraud During the Senate Runoff Election

Speaking to Trump supporters outside the Capitol Building with Rudy Giuliani by his side just hours before the January 6th riot, John Eastman claimed there were fraudulent ballot dumps in the Georgia Senate run-off elections between Jon Ossoff and David Perdue and Raphael Warnock and Kelly Loeffler. He argued that ballots were placed in a "secret folder" of voting machines, and at the close of polls, when the machines "know how many [votes] they need" as well as who has yet to vote, enough fake ballots from yet-to-vote voters were conjured to "barely get over the finish line" (Eastman, 2021).

His evidence for this fraud comes from his recollection of how votes were counted on

election night. At Trump's January 6, 2021 rally on the ellipse, John Eastman explained that when he was watching election returns he saw that "when it got to 99% of the vote total, and then it stopped. The percentage stopped, but the votes didn't stop" (Eastman, 2021). He went on to explain that "the data shows that the denominator, how many ballots remain to be counted...That number started moving up. That means they were unloading the ballots from that secret folder, matching them to the unvoted voter, and voila. We have enough votes to barely get over the finish line" (Eastman, 2021).

Eastman's allegations and supposed evidence are demonstrably false and fail to understand the basics of how election night reporting of votes works. Most importantly, Eastman appears to misunderstand what is reported on election night. News organizations, like Edison media or the Associated Press, provide an *estimated* number of votes cast. As the name suggests, this is not an official number of the number of ballots cast nor is it even an estimate from official sources. Rather, media organizations "start by estimating the overall expected turnout in a state based on a variety of factors, such as turnout in recent elections and details on early voting. This is done as a comparison to the turnout in a past election" (Staff, 2022) along with information about ballots that have already been returned and estimates about the number of votes cast and returned on Election Day. But the media organizations caution that "our reporting of expected vote is an estimate. It can and will fluctuate as the vote tabulation takes place and we learn more about how many people have actually cast a ballot" (Staff, 2022). So if media organizations underestimated Election Day turnout, then the estimated number of ballots cast increase while the ballots are counted after polls close.

A second reason Eastman's allegations fail is that he is simply wrong about what happened: Eastman does not accurately describe what happened on election night with estimated vote totals. To make this determination we examined updates to the vote counts and estimated votes cast posted by the New York Times for the Raphael Warnock and Kelly Loeffler runoff election. The data contains the reported vote counts for Loeffler and Warnock at particular times in the evening, along with the estimated total number of votes cast at



Figure 4: Examining how votes were actually reported on election night directly contradicts Eastman's supposed evidence of fraudulent votes in the Georgia runoff election.

each time stamp.

Using this data, we find that there is an increase in the estimated votes cast. In the left-hand plot of Figure 4 we show the estimated number of votes cast as the ballots arrived. After the polls closed the estimated vote total was 4,313,444. This total initially decreased to 4,294,871 and then quickly increased. By approximately 1030 pm Eastern Time the maximum estimated number of votes counted occurred, 4,474,071. And then subsequently, from 1030pm Eastern Time until 455 am on January 6, the estimated number of votes changed only slightly. Therefore, the left-hand plot of Figure 4 shows that the biggest changes in the estimated vote count occurred from 730pm to 1030pm.

According to Eastman's account of what happened on January 5th, 2021 the increase in the estimated vote count occurred when the share of the votes counted reached 99%. This is simply not true. At approximately 7:30 pm Eastern Time, when the estimated vote total began increasing only 5% of the votes had been counted at that point. By the time the estimated vote total was done increasing at 10:30 pm Eastern Time only 83.6% of the

estimated total votes cast had been counted. By the time the vote share was approaching a large share of ballots counted, the estimated vote total was changing very little.[18]

Two years after John Eastman's speech he revealed his source of information about voting machines and the supposed injection of fraudulent votes. During Eastman's disbarment hearing he testified that he learned about the supposed ability to hack voting machines the night before his speech on January 5th. Eastman reported that Joe Oltmann, a former startup CEO, showed John Eastman a single-page diagram that graphically depicted voting machines, external registration systems, and alleged that it was possible to inject false ballots. The only proof that John Eastman had before making the allegations was this diagram and, allegedly, a conversation with Eric Quinnell and Russell Ramsland.

Merely watching election returns and inferring fraud based on simplistic diagrams in bars is no way to infer election fraud. Further, Eastman fails to even recall what happened on Election Night correctly. Put simply, there is no proof for Eastman's assertions.

### 3.2.5    Timing of Absentee Ballots Does Not Indicate Fraud

In addition to arguing that Dominion voting machines contributed to Biden's success, Russell Ramsland's report in *Wood v. Raffensperger* and *Pearson v Kemp* suggests that the timing in which mail-in ballots were received is indicative of fraud. He claims that 96,600 were voted but have no return record, and 5,990 mail-in ballots were received either before, the same day, or within two days of being mailed to the voter. He thus concludes that "at least 96,600 votes were illegally counted in the Georgia general election" and that the remaining 5,990 suspicious ballots constitute an "impossible phenomenon occur[ing] throughout the counties

---

[18]Eastman's supposed evidence of voter fraud is not based on any assessment from research. We are unaware of any study that uses changes in the estimated vote total to detect fraudulent ballots. And it also fails logically. During Eastman's disbarment proceeding he claimed that he was uncovering evidence that the number of ballots to be counted and the number of ballots counted were increasing at the same rate. If the the number ballots to be counted and the number of ballots counted are increasing at the same rate, the share of ballots counted would have to be increasing. The primary issue appears to be that Eastman's arm chair observations on election night, even if they had been accurate, were based on numbers that are insufficiently precise to detect the relevant changes.

of Georgia" (Ramsland, 2020, 15).

Neither pattern that Ramsland identifies is actually indicative of fraud. The claim that 96,600 ballots were voted with no record of return is not indicative of fraud because it is based on a basic misunderstanding of what is contained in the Georgia absentee voter history file. Specifically, it appears that Ramsland incorrectly assumed that the "C" in the Georgia absentee voter history file referred to "counted" ballots when it actually refers to "canceled" ballots.[19] We know this is the case because we find that there are 96,600 ballots that canceled and have no date of being returned, a finding first reported in an expert report from Kenneth Mayer submitted who responded to Ramsland in *Pearson v Kemp*, a case where Ramsland's expert report was also used (Mayer, 2020).

Ramsland's claims about 5,990 suspicious ballots also fails to appropriately use the absentee voter history file. Ramsland claims that there are 42 ballots returned before they were mailed, 1,887 returned the same day, 1,786 returned the day after they were issued, and finally 2,275 ballots returned two days after being issued, for a total of 5,990 ballots Ramsland labels "suspicious".

This total, however, includes ballots that were never accepted to be tallied and instead were canceled. When we focus on accepted ballots only we find that there are 467 ballots that were issued and returned on the same day, 374 returned the day after they were issued, and 963 returned two days after it was issued. The small number of ballots returned on the same day could be part of a program where county election officials visit hospitals to ensure sick individuals can vote. In those instances, ballots are applied for, issued, and returned all on the same date. The other ballot returns time are actually quite feasible. For example, in the 2022 election the USPS took less than two days, on average, to deliver ballots to voters.[20] If a voter received their ballot and then immediately voted and returned the ballot, it could easily be recorded within two days after it was issued. Finally, the small number of ballots

---

[19]Ballots can be canceled for several reasons, including individuals changing how they want to vote, deciding to not vote at all, or because the ballot was lost or destroyed

[20]https://about.usps.com/what/government-services/election-mail/pdf/usps-2022-post-election-analysis.pdf

returned before they were issued are obviously clerical errors, rather than an indication of an underlying nefarious plan to steal an election.

### 3.2.6 Claims Made About Algorithmic Voter Fraud

Trump often suggests that Dominion voting machines algorithmically transferred his votes to Biden. For example, at a Georgia rally in December 2020 he claimed:

> "In one Michigan county using Dominion voting systems, nearly 6,000 votes were. . . wrongly switched from Trump to Biden. . . .Numerous times we found glitches, and every single time, the glitch went a hundred percent to Biden and no percent to Trump. The same systems are used in 30 states."

Trump is referring to Antrim County, Michigan, the primary inspiration for such claims. The Antrim county clerk made a clerical error when setting up the election software, which briefly inflated Biden's unofficial vote totals due to the incorrect loading of a key for scanning ballots. The mistake was remedied by a rescanning of all county ballots and the consensus is that the error was not caused by the Dominion machine or ElectionSource software, but rather by human error (Halderman, 2021). This did not stop the Trump team from arguing that Dominion machines algorithmically gave Trump votes to Biden across the country. Related claims were filed in the Georgia court cases.

Ramsland claims that "rogue actors" from outside the US provoked Dominion voting machines to employ ranked choice voting (RCV). He argues that the algorithm may have contributed to Biden's success, as its use is "completely consistent with the mathematical advantage for Biden [in counties] using Dominion or Hart equipment" (Ramsland, 2020, 16). His evidence is that raw vote totals from Edison Research, reported in live-time, included non-integer values, which means the Dominion voting machines abandoned traditional vote counting for RCV.

Similar to the reports and claims discussed in Section 3.2.4, Ramsland misinterprets

the Edison data. Edison Research's live reporting produces *estimates* of vote totals, not actual values. Each timestamp includes an estimate of Biden's and Trump's vote shares. As Jonathan Rodden explained in an expert report responding to Ramsland, if you multiply them by the total number of votes, you are likely to get a non-integer estimate of the vote total (Rodden, 2020). Ramsland's argument therefore fails because RCV does not produce non-integer totals.

### 3.2.7    Alleged Evidence of Other Algorithmic Vote Transfers

Shiva Ayyadurai's report in *Pearson v. Kemp* also argues that votes were algorithmically transferred to Biden (Quinnell and Young, 2020b). His analysis focuses on DeKalb County, Georgia, and his evidence is summarized in a line plot. The x-axis is "number of cumulative votes in DeKalb County" and the y-axis is the "difference between Mr. Biden's votes...and what he should have received based on the ethnic distribution of DeKalb County" (Quinnell and Young, 2020b, 30). Ayyadurai says that "as we move from left to right on the x-axis, the percentage of white voters in each precinct increases" (Quinnell and Young, 2020b, 30). The line plot shows that Biden increasingly outperforms Ayyadurai's expected totals calculated from the county's "ethnic distribution" after a cumulative vote total of 150,000, which according to Ayyadurai, is when the "percentage of white voters increases beyond approximately ten-percent" (Quinnell and Young, 2020b, 30-31). He concludes this is "unequivocal evidence" (Quinnell and Young, 2020b, 28) that "as the percentage of white voters increases beyond approximately ten-percent...a mathematical algorithm comes into play, to transfer a weighted factor of total votes from President Trump to Mr. Biden in a very specific – un-natural [sic], machine-like manner" (Quinnell and Young, 2020b, 31). He calls this a "weighted race" algorithm and suggests it transferred 48,000 Trump votes to Biden in DeKalb County alone.

Several components of Ayyadurai's analysis are poorly defined and not based on any well established procedure for detecting illegal voting or fraud. Or even based on a logical

and well defined procedure invented in the report. Ayyadurai defines the horizontal axis as the "number of cumulative votes" without formally defining what he means. A reasonable interpretation is that this is the the vote totals as they were reported on election night by Edison. But if that is true, it is entirely unclear how the horizontal axis could possibly correspond to precinct-level ethnic distributions (Rodden, 2020). Ayyadurai also does not explain how he uses DeKalb's ethnic distribution to calculate Biden's expected vote totals, or why race is even relevant (Rodden, 2020). It is possible that Ayyadurai is assuming a strict partisan distribution for each ethnicity group, where whites and blacks overwhelmingly vote for Trump and Biden, respectively, and he is concerned that Biden outperforms such a model in DeKalb's whiter precincts.

This ethnic voting assumption is deeply unfounded in a racially diverse county like DeKalb. Even the majority white suburban precincts in DeKalb County are, on average, firmly Democratic (Rodden, 2020, 34). This is borne out in previous general elections, as well as in Biden's vote totals, where he received a vast majority of the votes in even the DeKalb precincts that are over 75 percent white (Rodden, 2020, 34). A strict ethnic voting model is thus implausible in such counties. White support for liberal candidates in diverse Democratic stronghold counties like DeKalb is typical across the US. That Biden performed well among such white voters in Georgia is not evidence of algorithmic fraud but expected. Similar to other case reports in Georgia, Ayyadurai's analysis reflects insufficient scientific rigor and knowledge about historical voting patterns, which clouds his inferences.

# 4   Pennsylvania Claims

The Trump campaign waged a multistate campaign to cahllenge the election results. We focus first on claims in Georgia because of the large amount of litigation there and because many of the claims made in Georgia were made in other states as well. That means, of course, that our refutations will also apply to the arguments made in other states. But in

other states there were also unique claims made about alleged illegality and fraud in the 2020 election. In this section we examine some of these distinct allegations in Pennsylvania.

One distinct feature of the election challenges in Pennsylvania is that a state legislature produced a report alleging evidence of illegal voting. After the 2020 election, Francis Ryan, a state legislator in Pennsylvania, wrote a letter to Scott Perry, a member of the House of Representatives from Pennsylvania, alleging that the 2020 general election "was fraught with inconsistencies, documented irregularities and improprieties associated with mail-in balloting, pre-canvassing, and canvassing" and the result was "that the reliability of the mail-in votes in the Commonwealth of Pennsylvania is impossible to rely upon" (Ryan, 2020). In fact, Ryan asserts that "The analysis below substantially confirms that the mail-in ballot process in the Commonwealth of Pennsylvania in the 2020 General Election was so defective that it is essential to declare the selection of presidential electors for the Commonwealth to be in dispute. The United States Congress is asked to declare the selection of presidential electors in this Commonwealth to be in dispute and to intervene in the selection of the electors for the Commonwealth of Pennsylvania for the 2020 General Election" (Ryan, 2020).

The Ryan Report was broadly reported across several media outlets and its content was used in *Texas v Pennsylvania*. The letter is brief, providing few details on how quantities were computed and, in some instances, sources of information. Nevertheless, we examined the empirical claims made in the report and evaluated those claims using relevant data from the 2020 Pennsylvania presidential election.

## 4.1   Mail-in and Absentee Voting on the Same Day in Pennsylvania

Perhaps the most consequential claim made in the Ryan Report is that mail-in and absentee ballots had sent dates and returned dates that were impossible, raising suspicions that the ballots may have been cast illegally. The Ryan Report makes five claims about mail-in ballots, though it provides few details about why these particular patterns are problematic and provides no details about how the analyses were conducted. We analyze all five

claims here and we find that each fundamentally misunderstands Pennsylvania election law or misrepresents what is found in the data.

The first claim in the Ryan Report is that there are "Ballots Mailed on or BEFORE 9-11-2020. That total is 27995". This claim appears to be the result of Representative Ryan misunderstanding the timeline for mail-in and absentee ballots in Pennsylvania. In 2019 Pennsylvania passed Act 77, which created no-excuse mail-in balloting in the state and modified the timeline at which counties could distribute ballots. According to Act 77 (with emphasis added):

> "(a) General rule.–Applications for mail-in ballots shall be received in the office of the county board of elections not earlier than 50 days before the primary or election, *except that if a county board of elections determines that it would be appropriate to the county board of elections' operational needs, any applications for mail-in ballots received more than 50 days before the primary or election may be processed before that time*"

Act 77 also states that once a ballot application is processed, the county board of elections "shall commence to deliver or mail official mail-in ballots as soon as a ballot is certified and the ballots are available."

As a result, state law enables county election officials to change the 50 day threshold that Representative Ryan appears to be referencing. The Secretary of Commonwealth of Pennsylvania confirmed this facet of the law in a letter addressing Representative Ryan's allegations. In a letter to Senators Ron Johnson and Gary Peters, Secretary Kathy Boockvar explained that Ryan's identified ballots were "neither unlawful nor unusual" (Boockvar, 2020). That's because "Pennsylvania counties are authorized to begin processing mail-in and absentee ballots more than 50 days prior to the election and are required to begin mailing ballots as soon as they are available" (Boockvar, 2020).

Consistent with counties exercising their discretion to process applications early, we find that the ballots Ryan identifies are concentrated in a small number of counties. To assess the

claims in the Ryan Report, we use the same reported source for data about the distribution of mail-in and absentee ballots in Pennsylvania. Following the Ryan Report, we downloaded the statewide mail ballot file that was uploaded to the Pennsylvania Open Data site. Using this data set, we nearly exactly replicate the claimed number of ballots that were sent on or before September 11, 2020: we find 28,718 ballots, compared to the 27,995 identified in the Ryan Report. Among these 28,718, we find that almost all are concentrated in just a few counties: 81.6% of the ballots are found in just five counties[21] and that 97.5% of the early ballots were distributed in just ten counties[22] These same ten counties represent only 11.9% of all mail-in or absentee ballots in Pennsylvania. Thus, there is clear evidence that the early ballots that Ryan identified merely were from counties who chose to distribute their ballots early, as allowed under Act 77.

The second claim in the Ryan Report is that there are "Ballots Mailed on November 1, 2 or 3. That total is 8163." These ballots are also neither suspicious nor unlawful. Individuals have several reasons for why they can obtain their mail-in ballot in the final days of the election. Using data downloaded from Pennsylvania's open data site, we find there were 9,603 ballots that were distributed on November 1st, 2nd, or 3rd. Among those ballots, 26.1% were "emergency" ballots: ballots that were issued after the close of the formal application period but when voters are still eligible to apply for and obtain a mail-in ballot in Pennsylvania.

The remaining 73.9% of the ballots reflect individuals who had their ballot issued by a county election official in the last days of the election. This is not surprising, because Act 77 created the ability for voters to cast their no-excuse mail-in ballots in one stop, just like Pennsylvania had allowed for several prior elections with its excused-based absentee voting system. Voters who had previously applied for a mail-in ballot but had not received it could go to a county election office, have their mail-in ballot printed, vote the ballot, and then return the ballot. These voters are merely ensuring they obtain their ballot before the election, as the law allows.

---

[21]Those five counties are Indiana, Carbon, Lawrence, Venago, and Schuykill.

[22]The additional five counties are Wayne, Butler, Lancaster, Cumberland, and Northampton.

The final three claims in the Ryan Report are related, so we consider them at the same time. The third claim in the Ryan Report is that there are "Ballots with NO MAILED date. That total is 9005." The fourth claim is that there are "Ballots Returned on or BEFORE the Mailed Date. That total is 58221" and the fifth claim is that there are "Ballots Returned one day after Mailed Date. That total is 51200."

Each of these claims appear to be the result of Representative Ryan being confused about how Act 77 altered the voting process and how the data on mail-in and absentee voting were recorded in the statewide mail ballot file. As mentioned above, Act 77 created the ability for Pennsylvania voters to do "one stop" mail-in or absentee voting. In that one stop, a voter can apply for a mail-in or absentee ballot, have the ballot printed, receive the ballot, vote the ballot, and then return the ballot to the county election official. While this process enables voters to complete the mail-in balloting process in one stop, it is legally equivalent to voting a mail-in absentee ballot. This is made clear on county websites. For example, Allegheny County describes this process as "over the counter" voting. When explaining the process, the Allegheny County election page explains that when performing one stop voting, "the process is the same as if a person applied for an absentee or mail-in ballot and had the ballot packet mailed to them."[23]

A second source of confusion is the reliance on a field called "MAILED DATE", which is a field in the statewide mail ballot request file loaded to the open Pennsylvania site. But the belief that this only refers to ballots that were placed in the mail is in error and, in fact, the date in this field references when a voter receives the ballot. We have several ways to know this. First, in Act 77 the requirement for this particular field is that it contains "The date on which the county board mails *or delivers* the mail-in ballot to the elector" (emphasis added). Second, the documentation on Pennsylvania's open data set makes clear that this field is actually called the "ballot sent date" field or the date that a "ballot label" is printed for a voter. Third, in a conversation with now Secretary of the Commonwealth Al Schmidt,

---

[23]https://www.alleghenycounty.us/Government/Elections/Voting/Over-the-Counter-Voting

who led Philadelphia County's election office in 2020, Schmidt confirmed that voters who receive their mail-in ballot in person would have that date logged as the Ballot Sent Date, which would then be the "Mailed Date" on the open data Pennsylvania site.

The Secretary of Commonwealth explained why the three claims are in error in a letter dated December 15th, 2020. For example, when explaining the number of voters who received their ballot and then returned the ballot the next day, the Secretary of Commonwealth explains that

> "Again, as Rep. Ryan should know, Act 77 authorized eligible Pennsylvania voters to vote early in person (by mail ballot) at their county election offices, and over 100,000 Pennsylvania voters availed themselves of this option. Most of these voters would be shown as having been approved and provided their ballot on the same date they cast it at their county election office. Far from an anomaly, the data Rep. Ryan cites is an obvious result of the legislation he himself supported." (Boockvar, 2020)

The letter went to explain that

> "Any dates listed incorrectly as cast before the mail date are likely routine data entry errors by the county election offices. DOS worked with county election officials to ensure that dates in the state's election registration system accurately reflected the date on which ballots were actually mailed. In fact, DOS implemented a utility in August to help counties manage this function to ensure that voters could access accurate information regarding when their ballots were mailed. Similarly, the allegations of some ballot entries lacking a mail date are caused either by a data entry error or omission, which occurred on occasion when counties printed ballot labels for voters who voted a mail-in ballot in person at their county election office." (Boockvar, 2020)

Our own analysis of the statewide mail ballot file confirms the Secretary of the Common-wealth's observations, while casting doubt on several of the reported numbers in the Ryan Report. First, we find only 186 ballots that were supposedly returned before they were sent out. Those 186 ballots represent 0.006% of all mail-in ballots in Pennsylvania. We also find 42,404 ballots that were sent and returned on the same date. Together, these 42,590 ballots are substantially fewer than the 58,221 reported in the Ryan Report. It is also many fewer ballots than reported in some initial post-election reports about fraudulent ballots. According to a November 10th, 2020 article in the *Epoch Times* "more than 23,000 have a return date earlier than the sent date" (Svab, 2020). Obviously, there is no evidence for this claim. And finally, we find 55,574 ballots were returned the day after the ballot was obtained. This number is higher than the number claimed in the Ryan Report and again, there is nothing suspicious about this empirical pattern.

After being confronted with evidence that this claim was false, a revised claim was made during the John Eastman disbarment proceedings. Rather than claim that all ballots pro-vided clear evidence of illegal activity, the claim from Eastman's defense was revised to apply to only ballots applied for online. Specifically, the revised claim was that it was impossible for an individual to apply online for a ballot, obtain the ballot, and return it on the same day.

To investigate this claim, we used information available in the statewide mail ballot request file. We find evidence consistent with individuals completing their application and voting in one stop using offline applications and then obtaining their ballot and voting after previously applying online several days before for mail-in or absentee ballots. The vast majority of mail-in and absentee ballots that were obtained and voted on the same day were not applied for online. At least 81.4% (or 34,509 in total) of ballots received and voted on the same day were applied for offline. Of these 34,509 ballots, 73.7% were applied for on the same day or the day before they were voted. Online ballots have a very different pattern. Only 4.6% of the online ballots that were received and voted on the same day also had an

application from the day before. This represents only 60 total ballots. The remaining ballots indicate that online applicants who received and voted their ballots on the same day had applied for those ballots previously.

In summary, we find no evidence to support the claims of anomalous votes in the Ryan Report. Instead, we find clear evidence that support a misunderstanding of basic facts about how Pennsylvania administered its elections.

## 4.2    Anomalies in the Number of Absentee Ballots

The Ryan Report also made a vague allegation about the number of absentee ballots requested in Pennsylvania. Specifically, the Ryan Report alleged that "additionally, in a data file received on November 4, 2020 the Commonwealth's PA Open Data site reported over 3.1 million mail in ballots sent out. The CSV from the state on November 4 depicts 3.1 million mail in ballots sent out but on November 2, the information was provided that only 2.7 million mail ballots had been sent out. This discrepancy of approximately 400,000 ballots from November 2 to November 4 has not been explained" (Ryan, 2020). This claim was quoted in the *Texas V Pennsylvania* lawsuit and has been cited as evidence of fraudulent ballots in the Pennsylvania election.

This claim is simply false. And it is easy to demonstrate that it is false. Perhaps this is not surprising given that the claim is extremely vague. While clear that the 3.1 million request number comes from the "PA Open Data Site", it is unclear what "information was provided" to reach the 2.7 million number. We are aware of no clarification from Representative Ryan or anyone else to explain where this information came from. So, it is unclear what information was made available to contradict the statewide mail ballot file.

It is straightforward to show this claim is false. To examine the number of mail in and absentee ballots that had been applied for on each date, we obtained the daily releases of the Pennsylvania statewide mail ballot file. Using this data set, we examined the total number of requested ballots from each daily snapshot. In Figure 5 we present the cumulative number

of requested ballots (vertical axis) against the day the statewide mail ballot file data was distributed (horizontal axis). The points represent the cumulative number of requests as of that day and the black line connects the reported number of requests.



Figure 5: Cumulative Number of Requests by Day in Pennsylvania Before the 2020 Election

Figure 5 shows that the claim in the Ryan Report is simply false. There is no evidence that only 2.7 million ballots were requested as of November 2nd. In fact, there were more than 2.7 million ballots requested for every day shown on this plot. In general, the number of requested ballots grew steadily until applications for mail-in and absentee ballots closed. After the official close of applications, there were a small number of "emergency" requests made, slightly increasing the number of requested ballots to 3,098,701 on Election Day,

November 3rd, 2020. Then there is a small decline in the number of requests after Election Day as some voters cancel their ballots and vote in person.

Not only is it easy to refute this claim with a simple examination of a data set, information was widely available before the 2020 election that 3.1 million mail-in ballots had been requested in Pennsylvania. For example, the Associated Press distributed an article on October 27th with the headline "More than 3M in Pennsylvania apply for mail-in ballots" (Levy and Dale, 2020). On October 30th, the *Pennyslvania Capital Star* ran an article providing a "Map: How Pa. counties plan to count 3.1 million mail-in ballots" (Staff, 2020). Further, Secretary Boockvar held a press conference on October 30th, declaring that "More than 2.2 million mail or absentee ballots have already been returned" in the 2020 general election (Murray, 2020). She explained that this total "accounts for 73% of ballots requested" (Murray, 2020). Doing simple math shows that this is more than 3 million ballots. And finally, academics had well documented the number of ballots that were requested in Pennsylvania. Charles Stewart explained that 3.1 million ballots had been requested in Pennsylvania as of October 27th, 2020 (Stewart, 2020b).

In summary, this claim is vague, based on an unnamed data source, and easily disproven.

# 5   Michigan Claims

Like Georgia and Pennsylvania, the Trump campaign contested the results of the election. Many of the claims made in *King v Whitmer* repeat claims made in Georgia or in Pennsylvania.

But we analyze three Michigan specific claims that do not appear to be made in other states. First, we analyze a claim from *Texas v Pennsyvlania* that alleges a large number of mail in ballots were fraudulently cast in Wayne County. In fact, we show that the analysis is based on a basic error. And the claim is obviously false because it alleges every mail in ballot in Detroit was illegally cast. Second, we analyze supposed evidence of "algorithmic"

manipulation in Michigan elections. We show that the claim is obviously false. Even if we stipulate to the author's test, it shows the opposite of what they claim. But there is no reason to use their test to detect fraud or illegality. That's because they provide no evidence it is an effective tool for identifying fraud, illegal voting, or manipulation of electoral totals. Third, in Anonymous (2023) the anonymous author alleges that there are not enough voters in the voter file to explain Michigan's turnout. We explain that this is a common error made when analyzing voter file data.

## 5.1    False Claims About Absentee Ballots in Detroit

We first focus on one particular claim made in the *Texas v Pennsylvania* lawsuit. In particular, the suit claims that there were "more than 173,000 ballots in the Wayne County, MI center that cannot be tied to a registered voter" (Paxton, 2020b, 5-6). The specific allegation made in the Bill of Complaint was that "the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) as counted without a registration number for precincts in the City of Detroit" (Paxton, 2020b). The complaint goes on to allege that "The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations" (Paxton, 2020b).

The source for the allegation is an expert declaration from Charles Cicchetti. In the declaration Cicchetti explains that "I analyzed the absentee ballot data for Wayne County, Michigan, at the precinct level and I found that 174,384 absentee ballots out of 566,694 absentee ballots tabulated (about 30.8%) were counted without a registration number for precincts in the City of Detroit starting with Absentee Vote County Board [sic] 1 (ACVB 1) through (ACVB 134)." Cicchetti's declaration provides no more details about this allegation. Instead, he attempts to infer the margin for Joe Biden in the ballots he alleges were fraud-

ulently cast. He then attempted to connect the allegation to issues around the "balancing" of precincts in Michigan or whether the number of voters who arrived at the polls matches the number of ballots.

It is notable what's missing from Cicchetti's declaration. At no point does he identify a single specific ballot that was scanned without a registration number. But that does not stop him from alleging that nearly 1 in 3 absentee ballots in Wayne County were cast fraudulently.

Cicchetti's allegation is the result of profoundly misunderstanding how Wayne County, and Detroit in particular, provided precinct level election results for the 2020 presidential election. In order to count absentee ballots election administrators in the City of Detroit partially centralized the counting of absentee ballots. The City of Detroit consolidated its 503 precincts into 134 Absentee Vote Counting Boards (AVCB). When reporting the results for the 503 precincts, the City of Detroit reported the number of registered voters at the precinct level and the number of ballots cast on Election Day. But for every precinct, the number of absentee votes cast is zero. Separately, when reporting results for absentee ballots, Detroit administrators reported the number of absentee ballots for a particular AVCB. So, for example, in "City of Detroit, AVCB 134" 356 absentee ballots were tallied. But all ACVBs in Detroit report zero registered voters, because voters are registered at the constituent precincts.

There is nothing in the reporting of the precinct level results in Wayne County that implies that ballots counted at AVCBs were counted without first verifying a voter's registration number. That conclusion is merely an unsupported inference from Cicchetti's expert declaration.

In fact, Cicchetti's declaration and the corresponding complaint for *Texas v Pennsylvania* implies that *every absentee ballot in the City of Detroit was fraudulently cast.* It appears that Cicchetti's allegation is based on merely adding together all the absentee ballots cast in the City of Detroit. When we use the precinct records from Wayne County we find that 174,384 absentee ballots were recorded as counted at Detroit Absentee Vote Counting Boards. This

also corresponds to the number of absentee ballots the Michigan Secretary of State reports from the City of Detroit in a post-election audit (Benson, 2021, 20).

This same post-election audit also showed that concerns about precincts being "out of balance", an issue raised in Anonymous (2023), could not possibly affect the election result. According to the post-election audit there were a total of 14 absentee vote counting boards out of balance after the votes were canvassed. These 14 boards were out of balance by 21 total votes, well below Joe Biden's 154,188 margin of victory in the state(Benson, 2021, 20).

The allegations of fraudulently cast ballots in the City of Detroit are obviously false and implausible. There are many eligible voters in the City of Detroit and setting aside any allegations, many of them obviously would vote using an absentee ballot. Instead, the allegations are based on rudimentary errors in reading data files with insufficient work done to assess whether the claims are true.

## 5.2   "Parallel Snakes" Analyses and Alleged Evidence of Algorithmic Voting

An expert report filed in the *King v Whitmer* lawsuit, Thomas Davis claimed to uncover "Irrational MI Absentee Ballot Findings" (Davis, 2020b). Davis claims to provide "very strong evidence that the absentee voting counts in some counties in Michigan have likely been manipulated by a computer algorithm" and that his analysis uncovered evidence that "the tabulating equipment in infected precincts has been programmed to shift a percentage of absentee votes from Trump to Biden" (Davis, 2020b). And based on his analysis he concluded that "If no other plausible explanation can be made for these unexpected findings, it appears that this computer software was installed sometime after the 2016 Presidential election" (Davis, 2020b).

Davis' (2020) conclusions about alleged voter fraud is based on visual inspections of graphs that he creates for three counties in Michigan: Ingham, Oakland, and Macomb. Davis (2020) first presents an analysis of Ingham County in the 2016 election. While he does

not explicitly describe his procedure, after careful inspection of the report we determined the figures were created using the following steps. First, for an unspecified subset of precincts in Ingham County in 2016 Davis (2020) calculated the share of Hillary Clinton's total votes in each precinct that were cast as an absentee ballots. Davis (2020) then plotted this share against an arbitrary precinct number and connected the points with a blue line. Davis (2020) fails to explain why the arbitrary precinct ordering he used was appropriate. Second, Davis (2020) performed the same calculation for Donald Trump, first calculating the share of Trump's total votes that were from absentee ballots in each precinct. Then, Davis (2020) plotted Trump's share against the same arbitrary precinct numbers, but now connected the points with a red line.

Davis (2020) then provides his visual analysis of this figure. He encourages the reader to "Note the irrequalities that occur: some precincts are higher for R, some higher for D ...**neither the red line nor blue line has a discernible pattern.** *This is what a normal result looks like!*" (Emphasis in Original). Davis offers no formal statistical test or calculation to reach a conclusion that the patterns across Ingham County precincts is "normal" or otherwise indicative of patterns consistent with an election free of irregularities.

Davis (2020) then creates the analogous plot for the 2020 election in Ingham County, but uses a different number of precincts for an undisclosed reason. In each precinct Davis now calculates the share of Biden's total votes that were cast using an absentee ballot and plots them against the arbitrary precinct number, connecting those points with a blue line. And Davis calculates the share of Trump's total votes in 2020 that were cast using an absentee ballot and then plots them against the arbitrary precinct number, connecting those points with a red line.

Using these calculations, Davis (2020) reports that his visual inspection leads him to the conclusion that something anomalous happened in 2020. Davis (2020) asserts that examining this plot he finds that "Except for one outlier, the percentage of Democratic absentee voters exceeds the percentage of Republican absentee voters in every precinct.

Even more remarkable (and unbelievable): these two independent variables appear to track one another" (Davis, 2020b). He goes on to assert that "There is no apparent legitimate explanation for the two absentee lines to be tracking each other like that – other than it being due to a computer algorithm (software program)." Again, Davis (2020) provides no statistical test or computes no particular number to reach the conclusion that there is something amiss in the results in 2020.

Davis (2020) never justifies his plots as a test of fraud, illegality, or algorithmic manipulation. He provides no derivation, no citation, no analysis, and he does not even point to a common understanding that would support his conclusion. Put simply, there is no reason to believe that the plots Davis (2020) created could possibly offer any information about illegal voting in Michigan or anywhere else.

Setting all that aside, even if we agreed with Davis' premise that the plots were useful for detecting fraud, the actual evidence in the plots directly contradicts his claims. Davis provides no explicit statistic to support his conclusion that in 2020 "these two independent variables appear to track one another." [24] Further, Davis provides no replication code nor does he provide sufficient detail to replicate the plots on our own. Because he is so vague, to test whether the relationship in 2020 was stronger than in 2016, we used a freely available software to manually extract the points from Davis' (2020) plots about Ingham County. Using this data, we then computed formal statistics to measure the relationship between the share of each candidates' total ballots cast using absentee ballots in the 2016 and 2020 presidential elections.

In direct contradiction to Davis' claims, we find that there was a stronger relationship between Clinton and Trump's share of ballots cast using absentee ballots in 2016 than Biden and Trump's share of ballots cast using absentee ballots in 2020. In 2016 the correlation between Clinton and Trump's share of votes from absentee ballots was 0.86, while in 2020 the

---

[24]Davis also appears to misunderstand basic statistical terminology. Just because two variables measure two different things–the share of Biden and Trump's votes that were cast using an absentee ballot across precincts—it does not mean that the variables are independent. Statistical independence generally refers to the idea that knowledge of one variable provides no information about the value of the other variable.

correlation between Biden and Trump's share of votes from absentee ballots was only 0.66. We reach a similar conclusion if we use other measures of association. If instead we calculate the root mean squared error across the Democratic and Republican candidate's share of votes from absentee ballots we find it higher in 2020 (27.7) than in 2016 (4.9)—indicating a stronger relationship in 2016 than in 2020. Or, if we calculate the average prediction error, relative to Trump's share of votes from absentee ballots we find that it is higher in 2020 (0.63) than in 2016 (0.30), again indicating that the relationship was actually stronger in 2016 than in 2020.

Davis' (2020) strong conclusions are based on vague or unstated criteria and, ultimately, an incorrect assessment of his own data. When we analyze his data set formally we find no evidence that there is more evidence the variables "track" each other in 2020 than in 2016. In fact, we find the opposite: a stronger relationship in 2016 than in 2020. But regardless of what this analysis finds, there is no reason to believe that a relationship between how votes are cast across precincts is an indication of fraud. After all common characteristics of precinct residents–like their age, income, education, or racial identification—could explain why they cast their votes in particular ways.

## 5.3    Voter Files and Reconciling with Official Data

In the unsigned memo released early in 2024, the anonymous author claimed that "In data obtained from the Secretary of State's office on nearly a monthly basis since the Election, the most voters ever recorded in the Qualified Voter File was 5,511,303 voters in April 2021. This means Michigan's own election records 80 showed 68,014 more votes than voters" (Anonymous, 2023, 27). While the author never explicitly explained why this is problematic, a common claim among election skeptics is that the failure of official turnout histories to align with official participation numbers is evidence that "phantom voters" participated in the election.

This belief, however, is actually just a misunderstanding about the purpose of voter files.

Voter files are used to provide a snapshot of the current citizens eligible to vote. This means that individuals who have become ineligible, died, or otherwise canceled their registration will be removed from the voter file and therefore not available to reconcile with official numbers. In other words the failure of the voter file to reconcile with official numbers merely reflects the churn expected in voter files.

# 6    Wisconsin Claims

One of the most prominent sources for post-election claims of illegality and fraud came from Michael Gableman, a former Wisconsin state Supreme Court justice. Robin Vos hired Gableman as special counsel to investigate the 2020 election. On March 1st, 2022 Gableman produced the "second interim report" from his office (Gableman, 2022). This report contained a series of allegations about illegality and fraudulent voting in the 2020 election, along with extended allegations of improper influence from the Center for Tech and Civic Life. In this section we investigate Gableman's specific allegations and find little support for his allegations.

Yet again, his claims fail under basic scrutiny. He either misrepresented the evidence that was available or used improper evidence to suppoort his claims. When we use the appropriate evidence, we find no support for his claims.

## 6.1    CTCL Grants in Wisconsin

Throughout Gableman's report he alleges that the Center for Tech and Civic Life (CTCL) exerted inappropriate influence over the administration of the 2020 election. Gableman goes on at length about the relationship between the five cities that received the most funding from the CTCL, which Gableman designates as the Zuckerberg 5, and CTCL. Gableman cites a study from the Wisconsin Institute for Law and Liberty that alleges money was inappropriately targeted at Democratic cities and caused a disproportionate increase in turnout

among Democrats (Flanders and an Kyle Koenen, 2021).

Gableman's conclusions and the conclusions from Flanders and an Kyle Koenen (2021), are based on poorly specified models that suffer from obvious shortcomings when estimating the effect of CTCL grants on election outcomes. Consider first where the grants were allocated in Wisconsin. Gableman compares the dollars distributed per voter in the five large cities in Wisconsin to (apparently) the next five largest cities in Wisconsin. This is an inappropriate method to infer whether the cities receiving CTCL grants were likely to cast votes for the Democratic party candidate in the 2020 presidential election. This is inappropriate, in part, because there are thousands of potential cities in Wisconsin that could be targeted.[25]

We use data from Lal and Thompson (2023) to examine where CTCL grants were targeted in the state of Wisconsin. We find little evidence that grants were targeted at municipalities in Wisconsin likely to support Democrats. To assess a municipality's likely vote in 2020, we examined the share of the vote in 2016 allocated to Hillary Clinton. While imperfect, this is likely the information available to anyone allocating grants before the 2020 election. We find that municipalities that did and did not receive grants voted in nearly identical ways in 2016. In 2016, Hillary Clinton received 38.9% of the vote in municipalities that received a CTCL grant and received 38.0% of the vote among municipalities that did not receive a grant. This difference is neither statistically nor substantively meaningful.

We also do not see any evidence that CTCL targeted larger grants at municipalities that were more supportive of Hillary Clinton in 2016. For each municipality in 2020, we calculated the number of dollars allocated per voting age resident, calculated using the estimated number of voting age residents from the state of Wisconsin. For municipalities that did not receive a grant, we calculated $0 per voter. We then regressed the CTCL grant money per voter on Hillary Clinton's vote share from 2016 in that municipality.

We find almost no relationship between the dollars allocated per voter and support for

---

[25] As a matter of basic logic, it is also the case that four of the five next largest municipalities in Wisconsin had a higher Democratic vote share in the 2016 presidential election than Green Bay, one of the cities in the "Zuckerberg 5".

Hillary Clinton in 2016. For every one percentage point increase in support for Hillary Clinton 2016, on average CTCL allocated $0.006 *fewer* dollars per voter. In other words, even if we implausibly shifted Hillary Clinton's vote share from 0% to 100% there would only be an increase of $0.60 per voter in expenditure.

Lal and Thompson (2023) also found no evidence that CTCL caused the election administration process to favor Joe Biden or other Democratic candidates. Lal and Thompson (2023) analyze the effect of CTCL grants nationwide and in Wisconsin in particular. Rather than using poorly specified linear regression models as in Flanders and an Kyle Koenen (2021), Lal and Thompson (2023) use more sophisticated panel data methods that account for trends in Wisconsin municipalities. Using these more appropriate methods, they find essentially no effect of receiving a CTCL grant on either turnout or Democratic vote share. Lal and Thompson (2023) estimate that CTCL grants *decreased* turnout in Wisconsin and caused a modest 0.11 to 0.31 percenntage point increase in Democratic vote share. But Lal and Thompson (2023) are unable to reject the null hypothesis of no effect on Democratic vote share.

There is no evidence CTCL grants had any effect on the Wisconsin election and no evidence they were targeted at particularly Democratic locations.

## 6.2   Nursing Homes and Voting

Gableman also alleged that changes to the absentee voting procedures at nursing homes "result[ed] in many nursing homes' registered residents voting at 100% rates and many ineligible residents voting, despite a guardianship order or incapacity" (Gableman, 2022). Specifically, Gableman claims that "Rampant fraud and abuse occurred statewide at Wisconsin's nursing homes and other residential care facilities in relation to absentee voting at these facilities" (Gableman, 2022). The source of this fraud, according to Gableman, was that the Wisconsin Electoral Commission (WEC) altered how absentee voting occurred at nursing homes and other assisted living facilities in Wisconsin. According to Gableman (2022), in prior

elections, election officials would designate special voting deputies who would be dispatched to nursing homes to assist residents with casting ballots. With the pandemic, WEC altered those requirements and allowed assisted living employees to assist residents in casting their ballots.

Gableman (2022) alleged that this change in how absentee ballots were handled at Wisconsin nursing homes caused improbably high turnout rates at nursing homes. In a table in the report, Gableman claims that "vetted" nursing homes in Milwaukee, Racine, and Dane counties had 100% voter turnout, Kenosha county nursing homes had 97% turnout, and Brown county nursing homes had 95% turnout. Gableman provided few details on how he arrived at these turnout rates. Instead, he wrote that

> The Special Counsel intended to use a professional statistician in the nursing home setting. Using a controlled environment, the OSC could take a detailed sampling of nursing home abuse and voting irregularities to determine, statewide, the number of improperly cast ballots in residential care facilities. The OSC was not able to complete this task by the time this Report was due. Instead, the personnel conducting the nursing home investigation were also repurposed to assist in the drafting of this Report (Gableman, 2022, 12).

Gableman's report provides no details on how the quantities were calculated and provides no evidence that the votes cast from nursing home residents were cast using absentee voting data.

After examining the claims and appropriate data, we find that Gableman's reported turnout rates at nursing homes are based on profound errors and data misrepresentations. Ron Heuer, who performed the calculation while working for Gableman, reported in Rickert (2022) that "he used the state's voter database as of August 2021 to look at whether every registered voter at every nursing home in the five counties voted in the November 2020 election" (Rickert, 2022). Then, according to Rickert (2022), Heuer provided the information

used to arrive at the turnout rates to Mark Spreitzer a Democratic state legislator in Wisconsin who subsequently disclosed the information to Chris Rickert, a report for the Wisconsin State Journal.

We obtained the information from Chris Rickert and then reviewed the information. We find that the data does not support Gableman's claims about nursing home turnout. Consistent with the findings reported in Rickert (2022), Heuer regularly reports greater than 100% turnout—an obvious impossibility. One reason this could occur is that because Heuer used a voter roll from nearly a year after the election. As residents die they will be removed from the voter roll, but their ballot would remain recorded as being from the nursing home. And the result is over 100% turnout rates at those facilities.

We examined the actual turnout data from nursing homes in Wisconsin and found that turnout was far lower than reported in Gableman's report. We obtained the data from Chris Rickert, who also described the queries used to obtain the turnout data. Analyzing the data, we find that the average turnout across 29 nursing homes in Milwaukee County was 74.0%, with turnout ranging from 20% to 92.5% in the homes. In 2016 the average turnout in those same 29 nursing homes was 82.1%, with turnout ranging from 46.2% to 100%. In fact, according to this data there were no nursing homes in Milwaukee with 100% turnout in 2020, but two nursing homes had 100% turnout in 2016.

Examining other counties we also find no evidence of anomalous turnout at Wisconsin nursing homes. In Brown County we 80% of registered nursing home residents cast a ballot, with only one nursing home with perfect turnout. But at this nursing home there were only 8 registered residents, so it is not surprising that the nursing home recorded perfect turnout. In Kenosha County on average 72% of registered nursing home residents turned out to vote, while in Racine County 73% of registered nursing home residents cast a ballot. There were no nursing homes in either Kenosha or Racine County with 100% turnout.

In short, Gableman's claims about 100% turnout at nursing homes is not supported by the data. His report provides too few details to replicate the claims he made, but it appears

to be the result of applying the wrong data to analyze the question or simply incorrectly performing the analysis.

# 7    Fraud Claims and the 2020 Election

In this paper we have provided an extensive assessment of voter fraud claims from the 2020 election. Across all the distinct claims that we analyzed, we find no credible evidence of voter fraud. But most surprising is just how weak the evidence of illegal or fraudulent voting really is. The claims made in Trump's legal filings are based on error riddled analyses from "experts" who misunderstand basic facts about elections, basic statistical concepts, and fail to justify the statistical tests that are used. Not only was Trump's evidence insufficient to establish sufficient illegal or fraudulent voting to overturn the election. The supposed evidence is essentially useless and only reflects the profound misunderstandings of the individuals who provided the reports to the Trump campaign.

In the immediate future the 2020 election is likely to continue to be litigated. Trump and his allies face indictment in federal court, Georgia, and Trump will likely press his case on the campaign trail that the 2020 election was stolen from him. Yet, Trump simply lacks the evidence for these claims. Across numerous expert reports an academic papers, there simply is no evidence that fraud or illegal voting decided the 2020 election.

# References

Angrist, Joshua D and Jörn-Steffen Pischke (2009). *Mostly harmless econometrics: An empiricist's companion.* Princeton university press.

Anonymous (2023). Summary of election fraud in the 2020 presidential election in the swing states. Available at https://cdn.nucleusfiles.com/e0/e04e630c-63ff-4bdb-9652-e0be3598b5d4/summary20of20election20fraud20in20the20swing20states.pdf.

Ansolabehere, Stephen (2020). Expert report of stephen ansolabehere. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Benson, Jocelyn (2021, April). Audits of the november 3, 2020 general election. https://www.michigan.gov/-/media/Project/Websites/sos/30lawens/$BOE_2020_post_Election_Audit_Report_0 4_2 1_2 1.pdf?rev = a3c7ee8c06984864870c540a266177f2$.

Boockvar, Kathy (2020, December). Letter to chairman johnson and ranking member peters from secretary of commonwealth kathy boockvar.

Braynard, Matthew (2020a). Expert report of matt braynard. Trump v Raffensperger, No. 2020CV343255, Fulton County.

Braynard, Matthew (2020b). Expert report of matthew braynard. Stevenson v Ducey, No. CV2020-096490, Maricopa County.

Braynard, Matthew (2020c). Expert report of matthew braynard. State of Texas vs Commonwealth of Pennsylvania, State of Michigan, State of Wisconsin, and State of Georgia.

Cegavske, Barbara K. and Mark Wlaschin (2021). Re: Elections integrity violation reports. https://www.nvsos.gov/sos/home/showpublisheddocument?id=9428.

Cicchetti, Charles J. (2022, April). How the 2020 election was won. *Academia Letters* (5134).

Danforth, John , Benjamin Ginsberg, Thomas B. Griffith, David Hoppe, J. Michael Luttig, Michael W. McConnell, Theodore B. Olson, and Gordon H. Smith (2022). LOST, NOT STOLEN: The Conservative Case that Trump Lost and Biden Won the 2020 Presidential Election. https://lostnotstolen.org//wp-content/uploads/2022/07/Lost-Not-Stolen-The-Conservative-Case-that-Trump-Lost-and-Biden-Won-the-2020-Presidential-Election-July-2022.pdf (last accessed October 12, 2022).

Davis, Mark Alan (2020a). Expert report of mark alan davis. Trump v Raffensperger, No. 2020CV343255, Fulton County.

Davis, Thomas (2020b, November). Irrational mi absentee ballots findings, expert report of thomas davis submitted in *King v Whitmer*, 2:20-cv-13134, eastern district michigan. Michigan 2020 Voting Analysis Report.

Eastman, John (2020a, December). John eastman testimony at hearing to assess election improprieties and to evaluate the election process to ensure the integrity of georgia's voting system. https://www.youtube.com/watch?v=IHt6UEc_tQ8.

Eastman, John (2021, January). John eastman speech at march to save america. https://www.c-span.org/video/?c4953961/user-clip-john-eastman-january-6-rally.

Eastman, John C. (2020b, December). The constitutional authority of state legislatures to choose electors: Testimony of dr. john c. eastman.

Eggers, Andrew C. , Haritz Garro, and Justin Grimmer (2021). No evidence for systematic voter fraud: A guide to statistical claims about the 2020 election. *Proceedings of the National Academy of Sciences 118*(45), e2103619118.

Favorito, Garland and Bob Coovert (2022). Refutation of georgia secretary of state brad raffensperger's false election claims. https://voterga.org/wp-content/uploads/2022/02/VOTERGA-Raffensperger-Congress-Letter-Refutation.pdf.

Flanders, Will and Cori Petersen an Kyle Koenen (2021). Finger on the scale: Examining private funding of elections in wisconsin. *Wisconsin Institute for Law & Liberty*. https://will-law.org/wp-content/uploads/2021/06/WillLawFINGER-ON-THE-SCALE.6.pdf.

Gableman, Michael (2022). Office of the special counsel second interim investigative report on the apparatus  procedures of the wisconsin elections system delivered to the wiscon-

sin state assembly on march 1, 2022. https://www.wpr.org/sites/default/files/osc-second-interim-report.pdf.

Geels, Bryan (2020). Expert report of bryan geels. Trump v Raffensperger, No. 2020CV343255, Fulton County.

Geels, Bryan (2021). Updated expert report of bryan geels. Trump v Raffensperger, No. 2020CV343255, Fulton County.

Geels, Bryan (2023). Registrations occurring prior to the age of 17, according to the georgia secretary of state's voter data. Submitted for John Charles Eastman Disbarment Proceeding.

Grimmer, Justin , Andrew Hall, and Daniel Thompson (2021). Evaluating look ahead america's "the georgia report" on illegal, out-of-state voting in the 2020 election.

Grimmer, Justin , Michael Herron, and Matthew Tyler (2023). Evaluating a new generation of expansive claims about vote manipulation. Available here: https://www.dropbox.com/s/92lp1gmqw2pei8m/Expansive.pdf?dl=0.

Grofman, Bernard and Jonathan Cervas (2023). Statistical fallacies in claims about 'massive and widespread fraud' in the 2020 presidential election: Examining claims based on aggregate election results. *Statistics and Public Policy*, 1–36.

Halderman, J. Alex (2021). Analysis of the antrim county, michigan november 2020 election incident. https://www.michigan.gov/sos/-/media/Project/Websites/sos/30lawens/Antrim.pdf?rev=fbfe881cdc0043a9bb80b783d1bb5fe9hash=ACE9

Herron, Michael (2020). Expert report of michael herron. Law v Whitmer, First Judicial District Court, Carson City, Nevada.

Herron, Michael (2023). Allegations made against dominion voting systems and the 2020 presidential election in wisconsin. *Election Law Journal: Rules, Politics, and Policy 22*(3), 247–267.

Kamzol, Jesse (2020). Expert report of jesse kamzol. Law v Whitmer, First Judicial District Court, Carson City, Nevada.

Keshel, Seth (2020). Expert report of seth keshel, in bowyer et al. v. ducey (governor) et al., us district court, district of arizona.

King, Gary (2020). Expert report of gary king. Bowyer v Ducey, No. 1:20-cv-02321, District Court of Arizona.

Lal, Apoorva and Daniel M Thompson (2023). Did private election administration funding advantage democrats in 2020? arXiv preprint arXiv:2310.05275.

Levy, Marc and Maryclaire Dale (2020, October). More than 3m in pennsylvania apply for mail-in ballots. https://apnews.com/article/election-2020-pennsylvania-elections-voting-2020-presidential-elections-b1fe12514c3a736ec33f84e4ce7e4161.

Ligon, William (2020, December). The chairman's report of the election law study subcommittee of the standing senate judiciary committee. http://www.senatorligon.com/THE_FINAL

Mayer, Kenneth (2020). Expert report of kenneth mayer. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Murray, Darryl C. (2020, October). 2.2 million mail or absentee ballots already returned in pa. https://whyy.org/articles/2-2-million-mail-or-absentee-ballots-already-returned-in-pa/.

Paxton, Ken (2020a). Charles cicchetti sur-rebuttal in state of texas vs commonwealth of pennsylvania, state of michigan, state of wisconsin, and state of georgia.

Paxton, Ken (2020b). State of texas vs commonwealth of pennsylvania, state of michigan, state of wisconsin, and state of georgia.

Quinnell, Eric (2020). Expert report of eric quinnell. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Quinnell, Eric et al. (2021). 2020 presidential election startling vote spikes. https://election-integrity.info/Vote$_S$pikes$_R$eport.pdf.

Quinnell, Eric and S. Stanley Young (2020a). Expert report of eric quinnell and s. stanley young. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Quinnell, Eric and S. Stanley Young (2020b). Export report of shiva ayyadurai. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Quinnell, Eric and S. Stanley Young (2020c). Sur-rebuttal of eric quinnell and s. stanley young. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Raffensperger, Brad (2021, January). Point by point refutation of false claims about georgia elections. https://sos.ga.gov/sites/default/files/2022-02/Letter_to_Congress_from_Secretary_Raffensperger_%281-6-21%29.pdf.

Ramsland, Russell (2020). Expert report of russell ramsland. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Redacted (2021). Exhibit s in *Thompson v Eastman* united states district court central district of california 8:22-cv-00099-doc-dfm. https://www.cacd.uscourts.gov/sites/default/files/Dkt%20350-20%2C%20Ex.%20S%20GA%20dead%20voter%20update$_0$.pdf.

Rickert, Chris (2022, April). Michael gableman's numbers on nursing home voting proven wrong again. *Wisconsin State Journal*. https://madison.com/news/local/govt-and-politics/elections/michael-gablemans-numbers-on-nursing-home-voting-proven-wrong-again/article_0b7d7a6d-5cf3-5068-83d6-7a4f7a6f3ca9.html.

Rodden, Jonathan (2020). Expert report of jonathan rodden. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Rodden, Jonathan and Will Marble (2020). Expert report of jonathan rodden and will marble. Pearson v Kemp, No. 1:20-cv-04809-TCB, Northern District of Georgia.

Ryan, Francis X. (2020). Letter, rep. francis x. ryan, pennsylvania house of representatives, to rep. scott perry, u.s. house of representatives (dec. 4, 2020).

Shino, Enrijeta , Daniel A Smith, and Laura Uribe (2022). Lying for trump? elite cue-taking and expressive responding on vote method. *Public Opinion Quarterly 86*(4), 837–861.

Smith, Ray (2020). Ray smith oral testimony before election law study subcommittee of the standing senate judiciary committee. https://www.youtube.com/watch?v=wAOmkZJFlr4.

Staff (2022). Counting the vote: Frequently asked questions. https://www.ap.org/about/our-role-in-elections/counting-the-vote.

Staff, CNN (2021, January). Read the full transcript and listen to trump's audio call with georgia secretary of state. https://www.cnn.com/2021/01/03/politics/trump-brad-raffensperger-phone-call-transcript/index.html.

Staff, Capital-Star (2020, October). Map: How pa. counties plan to count 3.1 million mail-in ballots. https://www.penncapital-star.com/election-2020/map-how-pa-counties-plan-to-count-3-1-million-mail-ballots/.

Stewart, Charles (2020a). Expert report of charles stewart. Trump v Raffensperger, No. 2020CV343255, Fulton County.

Stewart, Charles (2020b, October). What's pennsylvania to expect with early voting? https://electionupdates.caltech.edu/2020/10/27/whats-pennsylvania-to-expect-with-early-voting/.

Svab, Petr (2020, November). Tens of thousands of pennsylvania ballots returned earlier than sent date: Researcher.

Swift, Clint S. and Delaney Gomen (2021). Invalid signature rejections in geor-
    gia absentee voting: Comparing the 2020 general to the 2021 senate runoff.
    https://electionlab.mit.edu/sites/default/files/2021-07/swiftgomen$_g$arejections.pdf.

Team, Reuters Fact Check (2020, November). Fact check: Vote spikes in wisconsin, michi-
    gan and pennsylvania do not prove election fraud. https://www.reuters.com/article/uk-
    factcheck-wi-pa-mi-vote-spikes-idUSKBN27Q307/.

Trump, Donald (2020a). Donald trump georgia rally transcript before senate runoff elections
    december 5. https://www.rev.com/blog/transcripts/donald-trump-georgia-rally-transcript-
    before-senate-runoff-elections-december-5.

Trump,    Donald    (2020b).    Trump    tweet,    december    16.
    https://www.presidency.ucsb.edu/documents/tweets-december-16-2020.

Trump,    Donald    (2020c).    Trump    tweet,    november    16.
    https://www.presidency.ucsb.edu/documents/tweets-november-26-2020.

Trump,    Donald    (2020d).    Trump    tweet,    november    19.
    https://www.presidency.ucsb.edu/documents/tweets-november-19-2020.

Trump,    Donald    (2020e).    Trump    tweet,    november    30.
    https://www.presidency.ucsb.edu/documents/tweets-november-30-2020.

Trump,    Donald    (2020f).    Trump    tweet,    november    4.
    https://www.presidency.ucsb.edu/documents/tweets-november-4-2020.

Trump, Donald (2021a). Donald trump rally speech transcript dalton, georgia: Senate runoff
    election, january 4th. https://www.rev.com/blog/transcripts/donald-trump-rally-speech-
    transcript-dalton-georgia-senate-runoff-election.

Trump, Donald (2021b). Read trump's jan. 6 speech, a key part of impeachment

trial. https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

Trump, Donald J. (2020g). Trump campaign press release - trump campaign files election contest in georgia. https://www.presidency.ucsb.edu/documents/trump-campaign-press-release-trump-campaign-files-election-contest-georgia.

Vespa, Matt (2020). Why a pollster is saying the 2020 results are ringing 'eerily true' to what joesph stalin said about elections.

Wu, Jennifer , Chenoa Yorgason, Hanna Folsz, Cassandra Handan-Nader, Andrew Myers, Tobias Nowacki, Daniel M Thompson, Jesse Yoder, and Andrew B Hall (2020). Are dead people voting by mail? evidence from washington state administrative records.

Young, Stanley and Ray Blehar (2021). 2020 presidential election contrast analysis. https://election-integrity.info/Contrast$_R$eport.pdf.



*Journal of Legal Analysis*, 2024, 16, 1–25

https://doi.org/10.1093/jla/laae001
Advance access publication April 06, 2024
Article

# How Election Rules Affect Who Wins

Justin Grimmer* and Eitan Hersh†

**ABSTRACT**

Contemporary election reforms that are purported to increase or decrease turnout tend to have negligible effects on election outcomes. We offer an analytical framework to explain why. Contrary to heated political rhetoric, election policies have small effects on outcomes because they tend to target small shares of the electorate, have a small effect on turnout, and/or affect voters who are relatively balanced in their partisanship. After developing this framework, we address how the findings bear on minority voting rights. We then show that countermobilization from political parties cannot explain the small effects of election laws. We explain that even when a state passes multiple policies at the same time, the reforms will still only have a marginal effect on turnout and an ambiguous effect on who wins. Finally, we explain what policies should raise alarm about affecting outcomes.

## 1. INTRODUCTION

Thirty years ago, Congress passed a law allowing eligible citizens to register to vote at departments of motor vehicles. The debate leading up to the bill's passage had several features familiar to anyone who follows debates about voting laws: the law was passed largely on a partisan basis, it was accompanied by accusations that the law's supporters had a partisan motive, and it was subject to years of litigation ('*Motor Voter*' *After 5 Years*, 1993). The actual effect of the law did not match the political rhetoric: after the policy was implemented and scholars measured its partisan political consequences, they found basically no change at all (Knack & White, 1998).

Election laws, in general—from voter identification and felon disenfranchisement to automatic registration and no-excuse mail voting—are presumed to have the intent or effect of influencing who votes, and, in turn, they are expected to impact partisan election outcomes. Such policies are highly polarizing. They are passed by legislatures along partisan lines and sometimes litigated in court. Many people express dismay about laws they disagree with, arguing the laws have dire consequences for American democracy, such as they generate fraud or they amount to "democratic backsliding".

And yet, the reality of research on election administration does not support the dire rhetoric from either side. Policies beget studies and evidence. And the evidence shows the laws have small effects on turnout and essentially no effect on partisan advantage in a state. This is the puzzle we address: Why do election laws bear such a modest relationship to who wins and who loses?

*Morris M. Doyle Centennial Professor of Public Policy in the Department of Political Science and Senior Fellow at the Hoover Institution at Stanford University, USA.
†Professor of Political Science at Tufts University. E-mail: eitan.hersh@tufts.edu. For helpful discussions, we would like to thank Bruce Cain, Devin Caughey, Daniel Freeman, Benjamin Ginsberg, Rick Hasen, Hakeem Jefferson, Silvia Kim, Thad Kousser, Toby Moore, Jonathan Mummolo, Max Palmer, J. Michael Parsons, Jonathan Rodden, Laura Royden, Nick Stephanopolous, Daniel Thompson, Sean Westwood, and Ariel White.

© The Author(s) 2024. Published by Oxford University Press.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial License (https://creativecommons.org/licenses/by-nc/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited. For commercial re-use, please contact journals.permissions@oup.com

Downloaded from https://academic.oup.com/jla/article/16/1/1764615 by guest on 18 August 2025

Exhibit
6
Grimmer

Our answer is that modern election reforms target narrow shares of the population, have a small effect on turnout, and/or are imprecisely targeted at members of political parties. To see how this combination of facts results in small effects, consider an initial, hypothetical example with features that will be similar to actual examples used throughout the paper. Suppose a state recently held a close election in which 51 percent of voters supported the Democratic candidate and 49 percent of voters supported the Republican candidate. In response to the election, the Republican-controlled state legislature passes a bill that imposes additional requirements to vote and these requirements disproportionately target Democratic voters. Specifically, the additional requirements target 4 percent of the electorate and as a result of these requirements, there will be a 3 percentage point decline in turnout in this group. The targeted group is strongly Democratic: 60 percent of the targeted group supports the Democratic presidential candidate.

What would happen if the 51/49 election were held again and everything about the election was the same except for this law? The policy would cause a 0.12 percentage point decline in the overall turnout. And it would cause a 0.011 percentage point decline in the two-party vote share for the Democratic candidate. In other words, the Republican party would lose the election with nearly identical results: in the new election 50.989 percent of voters would support the Democratic candidate while 49.011 percent would support the Republican candidate. If the state had one million eligible voters, the policy would deter 720 Democratic voters and 480 Republican voters, netting the Republicans a 240-vote shift.

In the left-hand of Figure 1, we walk through the steps of the law, showing it has a small overall effect because the targeted group is small and the effect on turnout is small. The right-hand plots show that even though the group is disproportionately Democratic, the law is not perfectly targeted at Democratic voters. Taken together, the result is that the law has a small effect on the election outcome.

As we will explain, most election laws that are hotly debated have features similar to this example. The laws target a small group of voters and barely influence turnout. When turnout does change, it tends not to change disproportionately more for one party or the other. To make this case, we provide a simple theoretical framework that enables us to assess the effect of any election law that is assumed to influence the partisan balance in a district by affecting who turns out to vote.

By articulating a step-by-step process through which a law *could* affect partisan vote outcomes, we show why nearly all contemporary election laws have small effects on partisan election outcomes.



**Figure 1.** Calculating the vote shift from a hypothetical law change.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

Our simple framework offers experts and non-experts alike a tool they can use to think through the relationship between election laws and election outcomes.

After developing the theoretical framework, and showing its logic through specific examples, we discuss four extensions. First, we address the relationship between the partisan effects of election laws and racial politics. We show how laws that disproportionately aid or hinder the participation of racial minority groups can have counterintuitive partisan consequences, depending on the preferences of racial groups and their relative share of the electorate.

Second, we address a common argument that election laws would have bigger effects on partisan outcomes if not for political campaigns and parties counteracting the effects of these laws. We show that the empirical literature on countermobilization cannot support this claim.

Third, we address what happens when states pass not just one law affecting turnout, but a series of such laws, such as a package of laws all meant to increase voter access or all meant to limit voter access. We show that even when many laws change simultaneously, the basic logic and findings remain unchanged: there are small effects on turnout and even smaller effects on the partisan balance of competition in a state.

Fourth, while our framework suggests few contemporary election policies have meaningful effects on election results, that does not mean that no election policies can have consequential effects. We point out the characteristics of laws that should raise alarm. They are the laws that target a large group of politically homogeneous voters and have potent effects on the turnout rates of these voters.

To be clear, our focus here is on the effects of voting laws on partisan election outcomes. Voting laws are hotly contested for reasons other than their effects on partisan election outcomes, such as that they are morally good or bad, that they are administered well or poorly, that they cost or save taxpayers money, that they are motivated by racism or other forms of prejudice, that they violate state or federal law, that they increase or decrease election security, and so on. Our essay does not comment on any of these legitimate concerns. We also focus our essay on how laws are administered after districts are drawn, setting aside important questions about the effects of partisan gerrymandering.

However, we believe that the public debate on nearly every aspect of election policy is clouded by incorrect assumptions about how the laws affect partisan election outcomes, and on this point, we hope our essay is clarifying. The caustic rhetoric that suggests the partisan stakes for election administration reform are very high is detached from empirical reality. Even very close elections are decided by margins larger than the magnitude of election reforms we examine in this paper. Further more, the party that benefits from changes is often unclear. In all but the absolute closest elections, modest electoral reforms cannot affect partisan outcomes.

## 2. ELECTION LAW AS A FORM OF POLITICAL TARGETING

US legislatures have broad authority to craft election laws affecting federal, state, and local offices. This authority affords lawmakers an opportunity to use the laws of democracy for partisan gain. The partisan motive is so obvious that nearly any change in election law, from precinct consolidation and polling hours to vote-by-mail and registration deadlines, raises concerns that the intentions of the lawmakers are partially or entirely partisan.

At times, politicians are explicit about this motivation (Hersh, 2015). In *Rucho v. Common Cause*, a landmark 2019 case on the topic of partisan gerrymandering, the Supreme Court considered election laws where the partisan motive was front and center. Said a North Carolina lawmaker cited by Chief Justice Roberts, "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country." Roberts held that federal courts do not have the authority to address disputes over partisan gerrymandering. The Court effectively told lawmakers that having partisan motives does not invalidate a law.

The concern over partisan motivations appears to have trickled down to the mass public, as Democratic and Republican identifiers are increasingly at odds about election policies. More than Republicans, Democrats in the electorate support policies such as automatic voter registration, expanding access to early voting and mail voting, and enfranchising ex-felons. More than Democrats, Republicans support voter identification laws, purging obsolete records from voter registration systems, and requiring most

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

voters to cast ballots in person on Election Day. Particularly after the 2020 COVID-19 pandemic and subsequent politicization of mail voting, Democrats and Republicans disagree on how elections ought to be conducted.[1]

## 2.1 The Scope of Election Laws

When we refer to election laws, we mean any law that may plausibly affect voting participation. Most such laws are explicitly about the voting process. These include changes to voting methods (e.g., in-person, early, by mail), voting eligibility (e.g., identification requirements, ex-felon voting), voting experience (e.g., number of polling stations, length of polling hours), and registration rules (e.g., same-day registration, automatic registration, online registration, pre-registration).

Other election rules are not explicitly designed to affect voter participation but may affect participation nevertheless. Our study bears on these laws as well. For instance, the creation of majority–minority districts is meant to advance minority representation in legislatures. Scholars have proposed that majority–minority districts may lead to a feeling of empowerment among minority voters and increase turnout (Fraga, 2015). Another example: the decision to hold municipal elections on or off the federal cycle may or may not be designed to influence voter turnout, but it nevertheless can have a dramatic influence on voter turnout (Anzia, 2013).

### 2.1.1 *The Effects of Altering Voter Access on Turnout*

Literature reviews from the early 2000s concluded that reforms such as early voting and mail voting may have modest (e.g., 2–4 percentage points) effects on turnout and no discernible partisan impact (Gronke et al., 2008; Berinsky, 2005). A more recent review sums up that "the research on the turnout effects of convenience voting reforms is at best mixed, leaning toward a null effect and in some instances a negative effect (Menger & Stein, 2020)". In a review of recent litigation, Stephanopolous (2023) draws a similar conclusion.

As Menger & Stein (2020) note, much of the research on the effects of these laws on turnout relies on imprecise methods. In the last few years, scholarship has employed more precise strategies. They continue to find modest relationships between the policies and turnout. Thompson et al. (2020) and Barber & Holbein (2020) estimate about a 2 percentage point effect of universal vote by mail on turnout (see also Yoder et al. (2021)). Fowler (2017) estimates a 2 percentage point turnout effect from pre-registration policies among young adults. Kim (2022) estimates a 5.8 percentage point effect of automatic registration among voters who recently moved (a comparatively large effect that we investigate in more detail below). Bryant et al. (2022) estimates a 1 percentage point turnout effect when a state encourages registration with postcards. In this literature, the partisan effects of laws are less commonly studied, but when they are explicitly measured they are typically indistinguishable from null (e.g., Walker, Herron & Smith 2019; Yoder et al. 2021; Harden & Campos 2023).

The effects of election laws on turnout are so small that scholars analogize the effect sizes to the modest impact of campaign advertisements on participation. Studying the turnout effects of majority–minority districts—a powerful reform stemming from the Voting Rights Act—Fraga (2015) writes, "The effects I find are roughly equivalent to receiving an impersonal contact encouraging a registrant to vote." The effects of all-mail voting, Barber & Holbein (2020) suggest, are "somewhere between one nonpartisan get-out-the-vote solicitation over the phone and one social-pressure mailer".

Studies that have found larger effects suffer from deficiencies that make the findings unreliable. For instance, consider a recent study about the effect of online registration. The study claims that "usage of online registration by voters increases their turnout by about 18 to 20 percentage points" (Yu, 2019). This effect is estimated with an instrumental variable analysis that requires an assumption that "access to the computer or the internet is uncorrelated with voter turnout through other ways than online voter registration", an assumption that strikes us as implausible. Even if this instrument was appropriate, the quantity Yu (2019) estimates is the complier average causal effect of registering online on turnout, which does not actually provide an estimate of the effect of a state law allowing for online registration

---

[1] See, for example, "Republicans and Democrats Move Further Apart in Views of Voting Access," Pew Research Center, April 22, 2021.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7841615 by guest on 18 August 2025

on voter turnout.[2] In another example, McDonald et al. (2023) study the relationship between the share of ballots cast by mail and voter turnout and found that "states with greater usage of mail voting experience higher overall voter turnout" (McDonald et al., 2023). In their study, McDonald et al. (2023) examine the cross-sectional relationship between ballots cast by mail and voter turnout; their estimates are consistent with states with historically higher turnout being more likely to adopt policies that lead to an increase in the share of ballots cast by mail.

### 2.1.2 The Effects of Altering Voting Requirements on Turnout

Among policies that change voting requirements, the most well-researched topic is voter identification laws. An early review of the scholarship found "modest turnout effects and only minor differences across politically relevant groups" (Highton, 2017). More recent work that has focused on specific states with individual-level data (Grimmer & Yoder, 2022) or a longer time-horizon (Cantoni & Pons, 2021) has estimated even smaller effects, close to zero.

Studies of other policies that have been theorized to lower turnout cover topics such as long lines at the polls and felon disenfranchisement. The effect of long lines amounts to about 1 percentage point and is concentrated among the small fraction of the public that must wait in long lines (Cottrell, Herron & Smith, 2021; Pettigrew, 2021). Felony disenfranchisement decreases participation among affected felons and ex-felons by approximately 10 percentage points, relative to how much they might vote in the absence of the law (Miles, 2004; Meredith & Morse, 2015; Morse, 2021). Below, we will discuss how felon disenfranchisement affects outcomes in detail, building especially on the work of Michael Morse.

As with the voter access laws, some articles are published on these policies that suggest big and surprising effects, such as the Hajnal, Lajevardi & Nielson (2017) findings that voter identification laws have large turnout effects, including in some of their models very large positive effects on turnout. However, in this case, the findings have been found to be unreliable (Grimmer et al., 2018). We think a fair and uncontroversial reading of the literature on voter "suppression" is that, compared to dire warnings and predictions in the public square, scholars have found only modest relationships between these laws and election participation and no consistent relationship between "suppression" laws and partisan outcomes.

To be sure, measuring the effects of election laws is a difficult task. Researchers must try to sort out effects due to changes in law from all the other reasons why a state's turnout levels or election results fluctuate from year to year. While the literature on election laws affecting outcomes suggests modest and null results, the occasional paper is published that suggests otherwise. How does one evaluate the merits of such a paper? One must dig into the mechanics of the research and determine if the assumptions are sound. The framework we provide below not only helps to diagnose the effects of laws but also sets up baseline expectations for evaluating claims about any election law presented by advocates and researchers.

## 3. MODELING HOW ELECTION LAWS AFFECT OUTCOMES

Consider any voting policy as a treatment that can be turned on or off. The status quo in a jurisdiction (e.g., a US state) is when the policy is off. A proposed change in law is when the policy is on. To formally define the partisan effect, we calculate the share of the two-party vote for the Republican party if the policy is in place, GOP(1), and compare that to the vote share if the policy is not in place, GOP(0). The **partisan effect** is defined as, GOP(1) − GOP(0).

As noted in Table 1, we also draw attention to a different quantity of interest, the turnout when the policy is on or off. Turnout will play a key role in shaping our understanding of partisan effects. We can think of turnout as the percentage casting ballots among the Citizen Voting Age Population (CVAP) the voting-eligible population (VEP) or among registered voters.[3] The **turnout effect** is defined as, V(1) − V(0).

As an example, if we imagine a status quo (policy = OFF) where turnout among CVAP is 50 percent and Republicans win 60 percent of the two-party vote share, and if we imagine a new election law (policy

---

[2] In a separate analysis, Yu measures the effect of a state having online registration on turnout. The overall effect is not significant. Yu (2019) claims that online laws increase youth turnout by 3 percentage points, a finding that rests upon strong parametric assumptions about how the treatment effect varies by an individual's age and on examining only the effect among 18 year olds.

[3] In some cases, it is important that we do not condition turnout on the voting *eligible* public, as some policies (e.g., felon disenfranchisement) affect who would be included among the eligible.

Downloaded from https://academic.oup.com/ia/article/16/1/1/7641615 by guest on 18 August 2025

**Table 1.** Two basic consequences of voting policies

| Policy is OFF | | Policy is ON | |
| --- | --- | --- | --- |
| Turnout | Vote choice | Turnout | Vote choice |
| V(0) | GOP(0) | V(1) | GOP(1) |

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

= ON) increases turnout to 55 percent and decreases the Republican vote share to 58 percent, then the vote share effect would be calculated as –0.02 and the turnout effect would be calculated as 0.05.

We now decompose each quantity. We suppose that every law divides the population into those who are targeted and those not targeted. We will call the "proportion targeted" $p(T)$. We will define the "proportion of the electorate not targeted" as $p(NT) = 1 - p(T)$.

Sometimes, the targeted subset is clearly defined by the election policy in question. For example, in the case of felon disenfranchisement, $p(T)$ is the share of the citizen voting age population convicted of felonies that would disqualify those individuals from voting. In the case of voter identification, $p(T)$ is the share of the population that lacks valid photo identification to comply with a law.

A targeted group can also be defined as *any group of voters* that an advocate, a government, or a researcher is interested in evaluating in relationship to a policy question. A targeted group can be thought of as a demographic or geographic subset of the electorate, such as 18–30-year-olds, students, renters, low-income, low-education voters, and so on. Advocates may propose a policy such as same-day registration specifically designed to increase participation among one or more of these targeted groups. Or, they may propose a policy to decrease participation among one or more of these groups. In either case, one can always subset the effects on a targeted group, however defined, and on the non-targeted remainder of the electorate.

Our division of the population into "targeted" and "not targeted" subsets does not require us to make assumptions about who a law affects. This is important because an election law can plausibly affect the participation of citizens in the not-targeted set. For instance, a felony disenfranchisement law could affect the voting behavior of family members of individuals who are disenfranchised. Or, a law that targets renters may also affect homeowners. So, we need to take seriously the effects of the law on both the targeted group and the non-targeted group.

Racial minority groups can be considered as a targeted group, just as any group can be considered as a targeted population. However, it is sometimes useful to consider racial groups as *subsets of targeted and non-targeted groups*. For instance, suppose a targeted group is defined as "people without identification cards" or "low-socioeconomic-status (low SES) citizens". We are going to want to measure the rate at which racial cohorts are present in and out of these targeted groups. The reason for this, as we will discuss in greater detail in the next section, is that the US Constitution and the Voting Rights Act draws specific attention to how election laws affect the participation of racial groups.

We assume that the size of a targeted group does not depend on whether the policy is on or off. For instance, suppose, under a status quo, there is no voter ID law and 5 percent of citizens do not have voter identification cards. If a voter ID policy is implemented (policy = ON), some of the non-ID-holders may obtain an ID. However, we would still consider them part of the targeted group of non-ID-holders on account of their position when the policy is not in place. As policies change, what can vary is the turnout rate and the share of ballots cast for Republicans.

We will define the turnout rate among the targeted when the policy is turned off as $V(T, 0)$ and the turnout rate when the policy is turned on as $V(T, 1)$. We will define the turnout rate among the not-targeted when the policy is off $V(NT, 0)$ and use $V(NT, 1)$ as the turnout rate among the not-targeted group when the policy is on. A common quantity of interest in analyses like ours is to examine the **turnout effect in the targeted group**, $V(T, 1) - V(T, 0)$. While a less commonly studied quantity, researchers could also compute the **turnout effect in the not-targeted group**, $V(NT, 1) - V(NT, 0)$.

We define $GOP(T, 0)$ as the share of votes cast for Republicans among targeted individuals when the policy is off and $GOP(T, 1)$ as the Republican share of votes cast among targeted individuals when the policy is on. Likewise, we define $GOP(NT, 0)$ and $GOP(NT, 1)$ as the share of votes cast for the Republican party among non-targeted individuals when the policy is off and on, respectively. $GOP(T, 1)$ need not equal $GOP(T, 0)$, nor must $GOP(NT, 1)$ equal $GOP(NT, 0)$.

There are two reasons why partisan vote shares in each group might differ when the policy is on or off. First, the law could systematically alter who participates in an election. For example, if a law encourages voters in the targeted group who prefer a democratic candidate to participate in the election more than it encourages voters who prefer a Republican candidate, then we would expect GOP(T, 1) to be smaller than GOP(T, 0).

Second, election laws could, theoretically, change voters' attitudes toward the political parties. That is, a policy may not just mobilize or demobilize certain voters but could also persuade voters to one side or another. While a theoretical possibility, we think this is unlikely. It is difficult to imagine many election laws, in and of themselves, persuading people to change their vote from Democrat to Republican or vice versa (e.g., "I would vote for Donald Trump, but because of this mail ballot policy, I am voting for Joe Biden.")

The exception that seems to prove the rule is the effect of the Voting Rights Act of 1965 on African-American participation. That law both caused a large increase in turnout among Black voters *and* catalyzed a partisan shift among voters. That is, the law both mobilized and persuaded. The persuasive effect of the law was special in that the law was an extraordinarily salient policy, the law was targeted to affect the voting behavior of a subset of the electorate, the law *did* affect their voting behavior, and the law influenced a major realignment of the political parties (Stanley, 1987; Black & Black, 2003). Later, in the paper, we return to the unique features of policies that disenfranchised and reenfranchised Black voters in the American South.

In general, we will suppose that laws affect turnout rates, but do not systematically affect the share of votes cast for Republicans in the targeted and untargeted groups. This simplifies Table 2, because if this is the case then GOP(T, 0) = GOP(T, 1) and GOP(NT, 0) = GOP(NT, 1). This assumption is implicit in most scholarship and litigation, as far as we can tell. To build intuition for this assumption, consider a simple example. Suppose an advocate proposes a law to influence turnout rates among renters. Renters are, on average, less Republicans than non-renters. To the extent that the law affects partisan outcomes in the full electorate, it is expected to do so because it increases or decreases the share of the electorate that is renters rather than the law *changing the minds* of renters or non-renters about which party they would support or differentially targeting renters with a particular partisan preference. We thus follow the implicit assumption of the scholarship that turnout of subsets of the electorate is the mechanism that affects partisan vote outcomes and that contemporary election policies do not have persuasive effects on voters. However, nothing about our argument hangs on that assumption.

Using the quantities in Table 2, and following Grimmer, Marble & Tanigawa-Lau (2024), we can calculate the number of individuals who cast ballots from a group, which we will call the group's *vote contribution*, and the total number of Republican votes from the group, which we will call the group's *GOP contribution*. We collect these terms in the top of Table 3. Vote contributions, represented by VC in Table 3, are simply the proportion of the group multiplied by the turnout of that group. GOP contributions, represented by GC in the table, are the turnout contributions multiplied by the Republican share of those who cast ballots.

The bottom facet of Table 3 provides a simple example of how a policy with a dramatic effect on turnout manifests in changes in the number of Republican votes. Suppose that in a 1,000,000-person electorate, 5 percent of the electorate is targeted by the policy (50,000 individuals) and 95 percent of the electorate is not targeted (950,000 individuals). Among the not-targeted individuals, we assume that there is no effect of the policy. With or without the policy, the non-targeted group has a 50 percent turnout rate and 80 percent votes for the Republican. In the targeted group, we suppose that when the policy is ON the turnout rate doubles from 25 percent to 50 percent and the targeted

**Table 2.** Turnout and Partisan effects, by group.

| Group | Size | Policy is OFF | | Policy is ON | |
|---|---|---|---|---|---|
| | | Turnout | Vote choice | Turnout | Vote choice |
| Target | p(T) | V(T,0) | GOP(T, 0) | V(T,1) | GOP(T, 1) |
| Not target | p(NT) | V(NT,0) | GOP(NT, 0) | V(NT,1) | GOP(NT, 1) |

Downloaded from https://academic.oup.com/ia/article/18/1/1/7641615 by guest on 18 August 2025

group's rate of voting for Republicans remains constant at 20 percent (i.e., 80 percent support for the Democrats).

When the policy is OFF, the Republican candidate wins the election by 277,500 votes with 487,500 total votes cast. When the policy is ON and it doubles the targeted group's turnout rate, the overall increase in the turnout rate is 1.25 percentage points, or an additional 12,500 votes cast. Of those votes, 10,000 would be cast for the Democratic candidate and 2,500 for the Republican candidate, yielding a decrease in the Republican candidate's vote margin of 7,500 votes. Now, the Republican candidate wins the election by 270,000 votes.

Table 4 collects all the key quantities we need to assess a law's partisan impact. In Lines A and B of Table 4, we calculate the total number of votes cast when the policy is OFF (Line A) and when the policy is ON (Line B). Taking the difference between Line A and Line B calculates a policy's turnout effect. As just discussed and Line C shows, in our simple example, the policy causes a 1.25 percentage point increase in turnout. In Lines D and E, we calculate the share of votes cast for the GOP when the policy is OFF (Line D) and when the policy is ON (Line E). For intuition about these calculations, notice that the share of the electorate from the targeted group when the policy is ON is $VC(T, 1)/(VC(T, 1) + VC(NT, 1))$ and the share

**Table 3.** Multiplication of terms to measure effects.

| Group | Policy is OFF Contribution to overall... | | Policy is ON Contribution to overall... | |
|---|---|---|---|---|
| | Turnout | Vote choice | Turnout | Vote choice |
| T | $VC(T, 0) =$ $p(T) \times V(T, 0)$ | $GC(T, 0) =$ $p(T) \times V(T, 0) \times GOP(T, 0)$ | $VC(T, 1) =$ $p(T) \times V(T, 1)$ | $GC(T, 1) =$ $p(T) \times V(T, 1) \times GOP(T, 1)$ |
| NT | $VC(NT, 0) =$ $p(NT) \times V(NT, 0)$ | $GC(NT, 0) =$ $p(NT) \times V(NT, 0) \times GOP(NT, 0)$ | $VC(NT, 1) =$ $p(NT) \times V(NT, 1)$ | $GC(NT, 1) =$ $p(NT) \times V(NT, 1) \times GOP(NT, 1)$ |

| | Example policy | | | |
|---|---|---|---|---|
| Group | Policy is OFF Contribution to overall... | | Policy is ON Contribution to overall... | |
| | Turnout | Vote choice | Turnout | Vote choice |
| T = 0.05 | $VC(T, 0) = 0.0125$ | $GC(T, 0) = 0.0025$ | $VC(T, 1) = 0.025$ | $GC(T, 1) = 0.005$ |
| NT = 0.95 | $VC(NT, 0) = 0.475$ | $GC(NT, 0) = 0.38$ | $VC(NT, 1) = 0.475$ | $GC(NT, 1) = 0.38$ |

Note: In the illustrative example, the group is 5 percent of the electorate and votes 20 percent Republican. The non-group is 95 percent of the electorate and votes 80 percent Republican. The non-group's turnout of 50 percent is unaffected by the policy. The group's turnout is 25 percent when the policy is off and 50 percent when the policy is on.

**Table 4.** Quantities of interest.

| Line | Select quantities of interest | Calculation | Using example |
|---|---|---|---|
| A | Turnout when policy OFF | $VC(T, 0) + VC(NT, 0)$ | 48.75 percent |
| B | Turnout when policy ON | $VC(T, 1) + VC(NT, 1)$ | 50.00 percent |
| C | Effect of law on turnout | Line B − Line A | 1.25 pp. |
| D | GOP share when policy OFF | $\frac{GC(T,0)+GC(NT,0)}{VC(T,0)+VC(NT,0)}$ | 78.46 percent |
| E | GOP share when policy ON | $\frac{GC(T,1)+GC(NT,1)}{VC(T,1)+VC(NT,1)}$ | 77.00 percent |
| F | Effect of law on GOP share | Line E − Line D | −1.46 pp. |
| G | Effect on share of group in electorate | $\frac{VC(T,1)}{VC(T,1)+VC(NT,1)} - \frac{VC(T,0)}{VC(T,0)+VC(NT,0)}$ | 2.44 pp. |

Downloaded from https://academic.oup.com/jla/article/16/1/1/7941815 by guest on 18 August 2025

of the electorate from the not-targeted group when the policy is ON is $VC(NT, 1)/(VC(T, 1) + VC(NT, 1))$ That means we can write the GOP share.

$$GOP(1) = \underbrace{\frac{VC(T, 1)}{VC(T, 1) + VC(NT, 1)}}_{\text{Share targeted}} \times GOP(T, 1) + \underbrace{\frac{VC(NT, 1)}{VC(T, 1) + VC(NT, 1)}}_{\text{Share not targeted}} \times GOP(NT, 1)$$

or the GOP vote share is the weighted average of the rate of supporting the GOP among the targeted voters who turned out to vote and the rate of GOP support among the not-targeted voters.

Returning to our illustrative example, as mentioned, the policy that doubles turnout in the targeted group increases overall turnout by 1.25 percentage points. Because the policy increases turnout among individuals who disproportionately vote for the Democratic candidate, it lowers the Republican candidate's vote share. The policy causes a 1.46 percentage point decrease in the Republican candidate's vote share, reducing the two-party share for the Republican candidate from 78.46 percent to 77.00 percent.

Our illustrative example shows that even massive changes in the turnout rates of targeted groups translates into relatively small changes in the vote share for the GOP candidate. The example here is purposefully exaggerated and unrealistic compared to the real policies to which we will turn to next. Consider why the example is unrealistic. We are not aware of any contemporary election administration policy that increases voter turnout by 25 percentage points (an 100 percent increase in the turnout rate). Furthermore, the difference here in partisan support between the targeted and not-targeted groups is massive, and we have assumed no spillover of the law changing turnout in the non-targeted group. And yet, even a law of this potency could only flip an election in a narrow set of circumstances of an otherwise razor-thin margin. (In fact, the law would only be decisive in a situation where the baseline (policy OFF) level of Republican support was between 50.00 percent and 50.77 percent.)

## 3.1 Real-World Examples

We now turn to two brief examples of real policy interventions, one that increases turnout and one that decreases turnout. These examples are useful because they build intuition for why election policies have a small effect: the policy targets a small share of the electorate, has a small effect on turnout, and/or affects a group with relatively balanced partisanship.

### 3.1.1 Example 1: Automatic voter registration.

Kim (2022) studies automatic voter registration. She focuses on a policy in Orange County, California where registrants who move within-county are automatically registered at their new address. Movers are only automatically re-registered if their move happened more than 90 days before an election. Kim (2022) exploits this cut-off to estimate a causal effect.

There are roughly 1.5 million registrants in Orange County and 100,000 in-county movers among registrants between two federal elections. Thus, we will approximate that $p(T) = 0.07$ and $p(NT) = 0.93$. The turnout rate for the non-targeted group is about 70 percent of registered voters in the midterm election that Kim (2022) studies and they are not expected to be affected by the policy. The turnout of the targeted group is estimated as 58 percent when the policy is OFF and 64 percent when the policy is ON.[4] While we do not know the partisan vote choices of movers and non-movers, we use estimates of party affiliation. Leaving non-party affiliates aside, movers are approximately 52 percent Republican. The full set of registered voters is approximately 51 percent Republican, which we use as our estimate of vote choice among the non-movers.[5] We will assume that the vote choice of the movers is not affected by the policy and as we describe above this is equivalent to assuming that the policy does not systematically affect Republicans or Democrats within the targeted group and that there is no persuasion effects of the policy within the targeted group.

Using these statistics and assumptions, we estimate the effect of the policy on the Republican vote share (Line F of Table 4) as giving the Republicans a 0.006 percentage point advantage in vote share in

---

[4] If we used CVAP as the denominator, turnout estimates would be significantly lower. While the registered population in Orange County in this period is approximately 1.5 million, the CVAP population is approximately 2.1 million. See "Citizen Voting Age Population by Race and Ethnicity," United States Census Bureau https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html

[5] "2004–2018 Voter Data Trends," Orange County Registrar of Voters. https://ocvote.gov/election-library/docs/Voter%20Data%20Trends%20Report.pdf.

Downloaded from https://academic.oup.com/jla/article/16/1/1764/8615 by guest on 18 August 2025

the election that Kim (2022) examines. Note, this law has a large effect on turnout within the targeted group: 6 percentage points. In fact, Kim (2022) refers to the turnout effect as "very large". Further, note that the law targets a rather large segment of the population. These within-county movers represent more than one in fifteen registered voters. Nevertheless, the partisan effect is very small simply because the population of movers does not differ in partisan composition from the non-movers.

### 3.1.2 Example 2: Out-of-precinct ballot rejections.

*Brnovich v. Democratic National Committee* (2021) was a landmark ruling at the Supreme Court about the Voting Rights Act. The underlying case dealt with several election laws in Arizona, including a long-standing policy that rejected a voter's entire ballot if the ballot was cast in the wrong precinct. On these ballots, even votes cast for statewide or presidential contests were rejected. Among the arguments made by the law's proponents was that the law advantaged Republicans. A Republican National Committee (RNC) lawyer defended the law because a change would place Republicans "at a competitive disadvantage relative to Democrats".

Because this policy affects voters *after* they have cast ballots, we can consider the targeted group individuals who cast in-person votes on Election Day. When the policy is OFF (i.e., out-of-precinct ballots are not rejected), turnout is 100 percent, meaning those ballots are all counted. When the policy is ON, in-person ballots that are cast out-of-precinct are rejected, yielding a turnout rate below 100 percent.

According to the Plaintiff's expert witness in the case, 3,800 voters' ballots were rejected for being cast out-of-precinct (See Jonathan Rodden's expert report in *Brnovich v. Democratic National Committee*). Based on the 618,077 votes cast in person, this implies that the out-of-precinct policy caused 0.61 percent of Election Day ballots to be rejected. When the policy is ON, turnout goes down from 100 percent to 99.4 percent.

To estimate the partisanship of the out-of-precinct voters, we start with racial estimates from Rodden's expert report, which estimated the racial identity of affected voters based on their names. Rodden estimated that 2,046 of the out-of-precinct ballots came from White voters, 1,162 from Hispanic voters, 369 from Black voters, and 223 from Native American voters. From the 2016 Cooperative Election Study, we estimate partisanship from race by observing the rates of voting for Democrats versus Republicans by racial group in Arizona. For the sake of this exercise, we assume the estimates of partisanship by racial group are precise. We calculate that the ban on out-of-precinct voting deterred 1,988 Democratic votes and 1,812 Republican votes, yielding Republicans 177 votes. By way of comparison, the margin in the 2016 Presidential election in Arizona was over 90,000 votes.[6]

The effect of this policy on election outcomes is very small, but notice it is for a different reason than in the case of automatic voter registration. In that first case, the turnout effect was large, but the population it affected was balanced on partisanship. In the case of out-of-precinct rejections, partisanship is less balanced. In a presidential election in Arizona that the Republican candidate won by 3.5 percentage points, those with rejected out-of-precinct ballots were 52/48 Democratic. But the number of ballots rejected is so small that the overall effect of the turnout-lowering policy is almost imperceptible.

## 3.2 Generalizing from Examples

The real-world examples illuminate that election administration policies often have small effects because they only target small shares of the population, have only a small effect on turnout, and/or affect groups that are relatively balanced in their partisanship. In general, our approach can be used to calculate the partisan implications for any policy and calculate bounds on the effect of policies under different assumptions about the size of the targeted group, the effect on turnout, and the partisan composition of different groups. We use this approach in Figure 2 to examine what sort of change in turnout

---

[6] Based on the geography of voters studied in Rodden's expert report, White voters affected by the law may have plausibly been more Democratic than White voters overall in Arizona. But even if we assume White voters are more Democratic, we arrive at similar conclusions. Even if White voters were as Democratic as Black voters, the out-of-precinct policy would cause a 1,596 vote shift toward Republicans.

If we include sampling variability in our estimate of each racial group's partisanship, then there is no clear advantage for either party. The 95 percent confidence interval of votes for either party, in terms of votes, is [−684, 330]. The 95 percent confidence ranges from increasing Democratic votes by 684 to increasing Republican votes by 330. Of course, this calculation ignores other types of uncertainty, such as uncertainty in the estimate of race from names. Furthermore, the conditions in any election could change substantially so it is difficult to forecast values from one election to the next.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025



**Figure 2.** Size of turnout effect to increase Republican vote share by one percentage point.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

and partisanship would be necessary to increase the Republican vote share by 1-percentage point. We use 1 percentage point as a representation of a "big effect" that could swing a close election.[7]

In each facet of Figure 2, we suppose that voter turnout is 50 percent among targeted and non-targeted groups when the policy is OFF. Furthermore, we suppose that the non-targeted group's turnout rate is unaffected by the law and that the voters from the non-targeted group are evenly split between Republicans and Democrats. Across the facets, we vary the size of the targeted group as a share of the citizen voting age population. Across the facets, we will suppose that when the policy has a turnout effect, it does not systematically affect Democrats or Republican in the targeted group, nor does the policy have a persuasive effect. This means that, for this example, we will suppose that $GOP(T, 1) = GOP(T, 0)$.

The effect on partisan outcomes in our hypothetical state will depend on how Republican or Democratic the targeted group is. Each facet contains isocontours that describe the combination of turnout effect and vote choice in the group that leads to the one-percentage-point change in the Republican direction. For example, consider the top-left panel, where 2.5 percent of the electorate is targeted. There, massive changes in turnout would have to happen within a homogeneous population to yield a 1 percentage point change in Republican vote share. Suppose, for example, that everyone in the targeted group votes for Democrats. Then, for the policy to increase Republican vote share by 1 percentage point, it must decrease turnout among this group by 40.2 percentage points—a massive downward shift. As the group becomes slightly more favorable to Republicans, the size of the downward turnout necessary to increase Republican vote share by 1 percentage point becomes even larger: if 5 percent of the targeted group supports Republicans, then turnout would have to be decreased 44.6 percentage points. The isocontours in the top-right of each plot show that, symmetrically, a policy could increase turnout among a very pro-Republican group rather than decrease turnout among a Democratic group to yield a similar electoral shift.

As the targeted group's size increases across the four facets, the effect of turnout to achieve a 1 percentage point shift in vote share is more modest, though the necessary changes are still large and implausible in absolute terms. Even if the targeted group is 25 percent of the voting-eligible population and, improbably, the law only targets Democratic voters, a policy would need to decrease their turnout by 5.2 percentage points to yield a 1 percentage point increase in Republican vote share.

[7] As a point of reference if one restricts elections to contested races where the margin of victory is 10 percentage points, even among those, only 10 percent have a margin of victory less than 1 percentage point (e.g., Eggers et al. 2014; Caughey & Sekhon 2017).

Of most policies that are presumed to increase turnout (e.g., all-mail elections, same-day registration) and most policies that are presumed to decrease turnout (e.g., voter identification laws, long lines), past scholarship suggests effects on the order of, at a maximum, a few percentage points. What Figure 2 shows is that even for policies that have a 10 percentage point effect on turnout among a targeted group unless that group is *both* large as a proportion of the electorate *and* overwhelmingly lopsided in its partisan composition, the law will not affect partisan outcomes in a way that changes any but the closest elections.

In light of Figure 2, let us consider some key demographic groups that are often thought of as targets of elections laws. For instance, young adults (18–30) and renters might be targeted by an Election Day registration law to increase turnout among mobile populations. Young people might be the target of a precinct consolidation to limit their influence on voting. Or consider low-SES voters, such as those with below-median incomes and lacking a college education. One may propose a law meant to help low-SES voters overcome the logistical burdens of voting or one may propose a law that imposes an additional logistical burden that is especially hard for low-SES voters to overcome.

Table 5 reports key statistics for five groups of voters, based on data from the 2020 validated Cooperative Election Study. All of these groups have substantially lower turnout than those who are not in the groups. Moreover, the groups are all distinct from those not in the groups with respect to partisanship. Young adults, renters, and Hispanic respondents are all 15–20 percentage points more Democratic in their 2020 Presidential vote choice. African-Americans are 41 percentage points more Democratic. The largest of these selected groups, low-income/low-education voters, are 6 percentage points more Republican than those not in that group.[8]

These groups are different from targeted groups highlighted above, such as "in-county movers", in that they are a much bigger share of the population and are more distinct in their partisanship. On account of their larger share, we might expect turnout effects of laws to be more modest and more likely to spillover into the non-targeted group. That is, perhaps same-day-registration is a law proposed by advocates explicitly to help young adults and renters. However, the law might also help some older adults and homeowners vote. That would amount to spillover.

We can use the data in Table 5 to imagine the overall partisan effects of laws on outcomes. Suppose a law increased the rate of voting of each targeted group by two percentage points and had no impact on non-targeted groups. Two percentage points are in line with the magnitude of effect sizes measured

**Table 5.** Select targeted groups.

| GROUP | Size | | Turnout | | GOP share | |
|---|---|---|---|---|---|---|
| | p(T) | p(NT) | V(T,0) | V(NT,0) | G(T,O) | G(NT,0) |
| Young adults | 23 | 77 | 38 | 66 | 35 | 50 |
| Renters | 39 | 61 | 47 | 68 | 33 | 54 |
| Low Inc. & Edu. | 57 | 43 | 51 | 71 | 49 | 43 |
| Black | 13 | 87 | 51 | 61 | 11 | 52 |
| Hispanic | 10 | 90 | 45 | 62 | 32 | 48 |

Note: 2020 Cooperative Election Study. $p(T)$ represents the size of the group and $p(NT)$ is the size of those not in the group. Validated voter turnout of the group and non-group are listed as V(T) and V(NT). Two-party Republican vote choice in the 2020 Presidential election is represented by $G(T)$ and $G(NT)$. Young adults are 18–30 year olds. Low-income/education respondents are those who have less than a 4-year degree AND have a family income of less than \$80k. N = 61, 000, except 3,488 respondents are neither owners nor renters and are excluded from the Renters row, and 6,734 respondents declined to report a family income level.

[8] The rate of Republican support among groups such as these depends on how one defines the groups and what election is observed. The analysis here is simply illustrative. One may particularly wonder about the definition of low-SES voters and how sensitive the definition is to variations in party support. If using the 2020 election, one defines low-SES as lacking a college degree and having a self-reported family income below \$100k, then the low-SES voters are 9 percentage points more Republican in vote choice than those not in that group. If low-SES is defined as lacking a college degree and having below \$80k, then low-SES voters are 6 percentage points more Republican (as shown in Table 5). If the cutoff is below \$70k, they are 4 percentage points more Republican. If the cutoff is below \$60k, then they are 2 percentage points more Republican. It is only when one defines low-SES as having no college degree and less than \$40k family income that the relationship flips and the low-SES group becomes slightly more Democratic than those not in the group.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

for voter access laws, as noted above. Again, plugging in the numbers into Line F from Table 4, we learn the following. A policy that increased turnout by 2 percentage points just for the targeted groups would increase overall Democratic vote share by 0.10 percent in the case of young adults, 0.19 percent in the case of renters, 0.16 percent in the case of Black Americans, and 0.05 percent in the case of Hispanic Americans. The policy would increase Republican vote share by 0.06 percent in the case of low education/income voters. Thus, a two-percentage-point increase in turnout targeted to any of these demographic groups translates into an overall partisan swing of approximately one to two tenths of a percentage point.

Notice two points. First, we have assumed here no spillover, which results in an *overestimate* of the partisan effects of targeting any of the groups. If we suppose that the non-targeted group also may exhibit increased turnout, the overall effects will be more muted.

Second, while these data are national level, it is certainly true that at a state or local level, targeted groups like these may be different in their group size, turnout level, and partisanship. For instance, in most states (thirty-four out of fifty), the low-SES population is more Republican than the high-SES population, but in other states, the opposite pattern emerges, and the degree of difference varies by state. As a result, any law that hinders low-SES voters will help Democrats in most states, but not in all states. And of course, nothing in this table eliminates the possibility that a particular law could be designed that has a potent effect on turnout for a politically homogeneous group. But the table and the argument in this section suggest why that would be so difficult: it is hard to precisely target a law to affect one particular partisan group. Beyond this possibility, Table 5 demonstrates how one can connect real behavioral data with some simple assumptions and our analytical framework to estimate the effect of laws on outcomes.

## 4. PARTISAN EFFECTS VERSUS RACIAL EFFECTS

The legal evaluation of voting laws is typically focused not on partisan outcomes, as we address here, but on the effect of these policies on racial group participation. Federal law constrains governments from disproportionately burdening protected minority groups in the context of voting. In this section, we examine the relationship between disproportionate racial effects and partisan outcomes.

As a working example, let us return to data from the 2020 CES survey. The left of Table 6 (policy OFF) reflects the actual group sizes, turnout behavior, and support for the Republican presidential candidate in the 2020 election. Here, we observe low-SES Americans as a targeted group. Again, these are individuals who have below median income and do not hold a bachelor's degree. We subdivide high-SES and low-SES voters according to those who identify their race as Black and those who do not identify as Black. The right side of the table imagines a policy that decreases turnout by 10 percentage points among low-SES Americans, but it does not affect high-SES Americans.

If we are interested in the partisan consequences of this policy, we would make the same calculations as we had done before (Line F of Table 4). The policy decreases the Republican vote share from 46.8 percent to 46.5 percent. Because the affected population (low-SES voters) is mostly Republican, the law is bad for Republicans and good for Democrats.

This kind of policy, which burdens low-SES voters, would likely trigger political and legal concerns about *racial discrimination*. As Justice Kagan notes in her dissent in *Brnovich v. Democratic National Committee* (2021), citing an earlier landmark case, *Gingles*, "[Congress] saw that 'inferior education, poor

**Table 6.** Race, socio-economic status, and an imagined policy that reduced turnout in a targeted group.

| Group | Size | Policy is OFF | | Policy is ON | |
|---|---|---|---|---|---|
| | | Turnout | GOP share | Turnout | GOP share |
| Low-SES Black | 9.2 | 47.5 | 10.1 | 37.5 | 10.1 |
| Low-SES Not Black | 47.4 | 51.7 | 57.4 | 41.7 | 57.4 |
| High-SES Black | 3.8 | 56.7 | 10.7 | 56.7 | 10.7 |
| High-SES Not Black | 39.7 | 72.7 | 46.0 | 72.7 | 46.0 |

Note: 2020 Cooperative Election Study.

employment opportunities, and low income'—all conditions often correlated with race—could turn even an ordinary-seeming election rule into an effective barrier to minority voting in certain circumstances." Regardless of the intention of the law's creators, and regardless of the partisan consequences, if it burdens low-SES voters and, therefore, disproportionately burdens Black voters, it may be viewed as discriminatory.

The key statistic relevant to assess potential racial discrimination would be derived from Line G of Table 4. That calculation would inform us that this 10 percentage point decline in voter turnout among low-SES Americans would effectively reduce the voting power of African-Americans. The Black percent of the electorate goes from 10.9 percent when the policy is OFF to 10.3 percent when the policy is ON.

In most US states, the low-income and low-education population is predominantly Republican *and* disproportionately non-White. That means that policies that burden lower-class voters likely help Democrats whereas policies that improve turnout rates among lower-class voters likely help Republicans. This result is interesting in light of the fact that public opinion about voter suppression/access laws is polarized such that Democrats and Republicans seem to be diverging on policies in ways that are counter to their partisan interests but are consistent with their parties' racial coalitions. Partisans may incorrectly assume a strong link between voting rights of minorities and partisan outcomes. The effect of a law on race is not the same as the effect of a law on party.

## 4.1 An example: felon disenfranchisement

The example in Table 6 is merely illustrative, but it bears a striking relationship to a real-world policy that is subject to much debate: felon disenfranchisement. Disenfranchisement laws across the country affect an estimated 4.6 million people, or about 2 percent of eligible voters (i.e., $p(T) = .02$). The share of the population ranges dramatically by state, from 0 to 11 percent in the case of Mississippi.[9]

Recent scholarship on felon disenfranchisement suggests that the population affected had very low turnout rates prior to their convictions and if/when they are re-enfranchised, only approximately 8–12 percent would vote in elections (Miles, 2004; Meredith & Morse, 2015; Morse, 2021). Similarly, other research suggests a lack of spillover effects (White, 2019, 2022). That is, the turnout rates of family of disenfranchised felons are not affected by the law. For simplicity, we might then assume that enfranchising all ex-felons would lead to the targeted group increasing turnout from 0 percent to approximately 10 percent, with no change in the non-targeted group.

What are the partisan leanings of disenfranchised felons? Data on this question are hard to come by, so we use two strategies. According to Michael Morse (2021), following the passage of a Florida state constitutional amendment in 2018 in which ex-felons could vote, 94 percent of Black ex-felons who registered with a party identified as Democrats, and 36 percent of non-Black ex-felons registered as Democrats. In one set of our estimates, we will use these statistics to estimate the partisan consequences of returning voting rights to felons.

Particularly because the Hispanic population in Florida is distinctive from other states, we employ a second set of estimates by using the partisan identification of low-education (high school or less) men, broken down by racial group. Using this estimate from the CES, we estimate that 62.1 percent of low-education White men vote for Republicans, 25.6 percent of low-education Black men vote for Republicans, and 36.8 percent of low-education Latinos vote for Republicans.[10]

In all states with disenfranchisement laws, the disenfranchised population is disproportionately Black. If, upon re-enfranchisement, turnout in the affected population does not vary by race, then reenfranchisement would increase the Black share of most states' electorates. At the same time, Black Americans do not make up a majority of the disenfranchised population. Across the country, Black identifiers represent about a third of the disenfranchised population. In 60 percent of states that have disenfranchisement laws (that is, in twenty-nine out of forty-eight states), the majority of those disenfranchised are neither Black nor Hispanic. These include many states in which a large share of the population is disenfranchised, such as Alabama, Tennessee, and Florida.

Calculating the partisan effect of reenfranchising former felons across states, we find that the policy change would have small and ambiguous effects. Using estimates from Morse's (2021) study, we find

---

[9] "Locked Out 2022: Estimates of People Denied Voting Rights due to a Felony Conviction." The Sentencing Project, 2022.
[10] These estimates are very close to what was found in a 2020 survey of 8,000 incarcerated people who were asked about their preference in the 2020 presidential election (Lewis, Shen N Flagg, 2020).

Downloaded from https://academic.oup.com/jla/article/16/1/1/7841615 by guest on 18 August 2025

that in 19 states, granting former felons the right to vote improves Republican vote totals. In 29 states, granting former felons the right to vote increases Democratic vote totals. The biggest pro-Republican increase occurs in Arizona (a 2,934 pro-Republican vote shift). In the 2020 election, this pro-Republican shift would increase President Trump's vote share in the state by 0.04 percentage points. The biggest pro-Democratic shift would occur in Virginia (a 9,261 pro-Democratic vote shift), which would cause a 0.07 percentage point decrease in Donald Trump's vote share. We find similar effects if we measure the partisan preferences of felons using the partisan preferences of low-education men. For example, in Georgia, we estimate that restoring felon votes would provide Democrats an additional 3,835 votes, which would decrease Donald Trump's vote share in the state by 0.04 percentage points.

From the framework we have developed here, it is now easy to see why felon disenfranchisement laws cannot make a big impact on partisan outcomes in states and why the evaluation of racial equality is very different from the evaluation of partisan outcomes. Even if 5 percent or 10 percent of a population is disenfranchised, the turnout of this group might only increase by 10 or so percentage points if reenfranchised. More important, the population is relatively split by party. Neither we nor anyone else has precise estimates by state of the partisan preferences of disenfranchised felons, but extrapolating from the available evidence cited above, the typical state that disproportionately disenfranchises minorities but mostly disenfranchises White men is unlikely to have a politically homogeneous group of disenfranchised felons.

Thus, even though all states disproportionately disenfranchise racial minorities and even though racial minorities tend to support Democrats, enfranchising ex-felons will yield modest gains for Republicans in states where the targeted population is mostly Republican. In those states, re-enfranchisement laws will exhibit the combination of (slightly) increasing minority participation while (slightly) decreasing the probability of electing minority-preferred candidates. In other states, re-enfranchisement may modestly help Democrats. Either way, the results will be modest because the target population is not overwhelmingly Democratic or Republican.

## 5. THE LIMITS OF COUNTERMOBILIZATION

We have argued that election laws rarely affect partisan outcomes because the proportion of the population affected is often small, the turnout effect of the law is often small, and the partisan breakdown of the population is often balanced. Few election laws target a lopsidedly partisan subpopulation with a treatment that has a big impact on turnout.

However, when it comes specifically to policies viewed by critics as "suppression" laws, there is a common alternative explanation for why the policies do not seem to affect outcomes: countermobilization (e.g., (Komisarchik & White, 2022)). The argument is that election laws *would have* larger effects on election outcomes if it were not for the concerted efforts of campaigns and media to counteract those effects. If all the campaign attention to these laws disappeared, the effect sizes would be larger.

In fact, countermobilization cannot actually account for the lack of a relationship between voter suppression and election outcomes. Two specific forms of countermobilization are discussed in the literature: the direct effects of campaigns and the indirect effects of the political and media environment that might energize certain voters and inspire them to vote at higher rates than they would in absence of the laws. We will consider each version of the countermobilization story in turn. The evidence in favor of either concept is surprisingly weak, and the analytical framework we have developed in this essay helps explain why.

Consider two recent studies that measure campaign countermobilization. Cantoni & Pons (2021) estimates that voter ID laws do not affect turnout. They then ask whether the lack of a turnout effect is due to countermobilization. In one test, they create a scale of activism that incorporates whether survey respondents attend political meetings, post yard signs, volunteer, and donate. They find no relationship between the implementation of voter ID laws and activism. In another test, however, they use a survey measure of self-reported campaign contact. They estimate that voter ID laws led non-White respondents to be 4.1 percentage points more likely to say a campaign contacted them than White voters to say the same.

In another study, Komisarchik & White (2022) look not at voter ID laws but at the broader set of changes to election law in jurisdictions that had been covered under Section 5 of the Voting Rights Act. After the Supreme Court ruled in *Shelby County* to remove the protections on those jurisdictions, many

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

of these southern states made adjustments to their laws, such as adding voter identification requirements and purging voters from registration records. Komisarchik and White estimate that non-White voters post-*Shelby* actually vote at higher rates than before. Is countermobilization the reason? They look at the same survey question measuring self-reported campaign contact as Cantoni and Pons use. They measure whether non-White voters in the jurisdictions that were covered under Section 5 of the Voting Rights Act were more likely to report contact after *Shelby*. They find no statistically significant relationship.

Suppose, though, that there is a countermobilization effect consistent with Cantoni & Pons (2021). And further suppose that a "suppression" law such as voter identification is passed by a state, and because it is passed, campaigns expend extra resources specifically to mobilize non-White voters, who are indeed disproportionately affected by voter ID laws. Suppose that the laws lead non-White voters to receive 4.1 percentage points more campaign contact than White voters. What would be the effect of such countermobilization? As it turns out, the effect would be microscopically small.

To see why, we must estimate the effectiveness of campaign contact. Suppose all the additional campaign contact due to countermobilization comes in the form of direct personal contact from a campaign staffer or volunteer. This is a generous assumption, as personal contact, which is time-intensive and expensive, has been found to have the greatest impact on turnout (i.e., compared to mailers, phone calls, and other forms of contact). Green & Gerber (2019) suggest in-person contact typically has a 4 percentage point effect. Thus, we can imagine a countermobilization effort in which targeted groups get 4.1 percentage points more campaign appeals, and 4 percent of the recipients of those appeals, who otherwise would not have voted, do vote.

To see how much this countermoblization could matter in an election, let's consider the 2020 presidential election in Arizona, a state Joe Biden won by just 0.31 percentage points, which amounted to under 10,500 votes.[11] Could countermobilization have made the difference in such a close election?

In Arizona, according to the 2020 5-year CVAP estimates, 23.69 percent of the citizen voting age population is Hispanic and, according to the CPS, 60.8 percent of those Hispanic citizens voted in the 2020 election.[12] According to the 2020 CES survey, 26 percent of Arizona Hispanic identifiers voted Republican.

Suppose countermobilization increased targeting to the 23.69 percent of electorate that is Hispanic, such that 4.1 percent of them were targeted and 4 percent of those turned out to vote. Of these new Hispanic voters, 26 percent would be expected to vote Republican and 74 percent would be expected to vote Democratic, just as Hispanics statewide voted. This would amount to about 958 new votes for Democrats statewide and 337 new votes for Republicans, out of an electorate of 3.3 million. Countermobilization would be responsible for one one-hundredth of a percentage point change in the presidential vote share. The effectiveness of the countermobilization would have to be closer to 45.5 percentage point yield (i.e., 4.1 percent of Hispanics are contacted and then 45.5 percent of those contacted vote on account of the contact) to be responsible for even the 0.31 percent vote margin in Arizona. Because such an effect size is unheard of, we would dismiss the claim that countermobilization of the magnitude estimated by Cantoni and Pons affected even the razor-thin outcome in a state like Arizona.

We can use the Cantoni & Pons (2021) study to measure countermobilization in a different way as well. The authors find no effect of voter identification laws on turnout, but they do not measure how the effect varies by state-level competitiveness. If countermobilization is responsible for the nonrelationship between ID laws and turnout, presumably we would see negative effects of ID laws on turnout in uncompetitive states (where campaigns are not as active) but null or even positive effects in swing states.

We use Cantoni and Pons' (2021) classification of state's photo identification laws from 2004 to 2018. We then estimate a two-way fixed effect model, including fixed effects for the state and election year. We present the results in Table 7, where we present the coefficient estimates and the standard errors, clustered at the state level.

In Column 1 of Table 7, we exactly replicate Cantoni and Pons and find that, in the aggregate, strict photo identification laws appear to cause a small increase in turnout, but the effect is not statistically

[11] State of Arizona Official Canvas, November 24, 2020 Report, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf

[12] November 2020 Voting and Registration Supplement, Data File, Current Population Survey, United States Census Bureau/

Downloaded from https://academic.oup.com/jla/article/16/1/17/7641615 by guest on 18 August 2025

**Table 7.** Coefficient estimates for the effect of strict photo identification laws on state-level voting eligible turnout rates. The first column estimates an overall effect of the law on turnout, the second column examines how the effect of the law depends on whether a state is a swing state in a presidential election (comparing to all other states in both presidential and midterm election years), and the third column compares swing states in presidential elections to non-swing states in presidential elections.

| | | Dependent variable: | |
| --- | --- | --- | --- |
| | | VEP Turnout rate | |
| Strict ID | 0.006 | 0.002 | −0.005 |
| | (0.011) | (0.010) | (0.010) |
| Swing state | | 0.025 | 0.018 |
| | | (0.007) | (0.006) |
| Strict ID × Swing state | | −0.0004 | 0.001 |
| | | (0.012) | (0.010) |
| State-years | 408 | 408 | 204 |
| $R^2$ | 0.922 | 0.929 | 0.930 |
| Elections | Midterm + President | Midterm + President | President |
| State fixed effects | ✓ | ✓ | ✓ |
| Election fixed effects | ✓ | ✓ | ✓ |

significant. We interact the effect of the strict identification law with whether the two-party vote share difference in the state is less than 6 percentage points in a presidential election (the threshold choice does not affect results). In Column 2, we compare the effect of the law in swing states in presidential elections to all other states in both presidential and midterm elections. In Column 3, we look just at presidential election years. The key coefficient is the interaction between a strict ID state and a swing state. We do not find any significant relationship suggesting turnout in swing states with ID laws is different than turnout in swing states without voter ID laws. In other words, no evidence of countermobilization.

A separate form of countermobilization is rooted in psychology rather than campaign electioneering activity. The most prominent study on this topic is Valentino & Neuner (2017), who argue that media coverage of voter ID laws makes Democratic-aligned voters angry, which, in turn, boosts their civic engagement and turnout.

Valentino & Neuner (2017) test their hypothesis with two studies. In a survey, they collect information about respondent's self-reported anger that voter identification laws might stop someone from voting. They assess the relationship between anger and a self-reported participation index, which combines an individual's self-reported likelihood of volunteering to raise awareness about voter identification laws and a self-reported index of how likely an individual is to participate in a midterm election. Valentino & Neuner (2017) report a positive correlation between anger and this participation index.

In a separate, survey experimental study, Valentino and Neuner test different conditions in which respondents are asked to read articles, including, in one condition, an article that suggests voter ID laws will disenfranchise Black voters. They measure the effect of the treatment on a five-item index of participation that includes voting along with items such as willingness to volunteer and to donate.

Valentino and Neuner do not separately measure intention to vote in an election versus other forms of participation. However, upon our request, Dr Neuner generously re-ran regression analyses from his article using just turnout intention as the dependent variable.[13] In the first study, the new results show a relationship between anger and intention to vote, but no statistically significant difference between how Democrats and Republicans respond. If intention to vote does not vary by party, then countermobilization may affect turnout but not who wins.

---

[13] Email correspondence with Dr Fabian Neuner, June 19, 2023.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

In the second study, the new results show no relationship between any of the treatments and voting intention among the respondents, including among the subsample of Democratic respondents. While the treatments in Valentino & Neuner (2017) may correspond to self-reported outcomes such as willingness to attend a political event, they do not correspond to intention to vote.

The same logic for why campaign countermobilization can only have a microscopic effect on outcomes also helps convey the limits of any psychological countermobilization effect. Suppose a state passes a voter identification law, which, in turn, leads some news outlets to produce media about the law. Only some residents are likely to see the news. Of those, only some will be angry on account of the news. Of those, only a small number would be people who would not have otherwise voted except for the fact that the news story about the voter ID law made them angry. As far as we are aware, there is no evidence in the scholarly record of a "suppression" law leading to anger-inducing news that in turn leads to disproportionately higher turnout (or even higher intention to vote) among voters of one political party.

## 6. MULTIPLE POLICIES CHANGING AT THE SAME TIME

To this point, we have only considered isolated policies. But if a state makes a series of changes, can those changes add up to a large effect on partisan outcomes? Such a question is at the heart of work in political science that attempts to create indices of state democracy, such as Li, Pomante II & Schraufnagel (2018) and Grumbach (2022). As we will show through two separate examples, because most individual changes have such minuscule effects, and because it is not always easy to predict which party benefits from a particular rule change, the aggregation of multiple election reforms is unlikely to translate into one-sided partisan gains.

### 6.1 *Shelby County* and multiple policy changes

Consider a recent change in legal precedent that led to states passing numerous election policies in a short amount of time. Between 1965 and 2013, a number of states and counties, primarily in the South, were constrained by Section 5 of the Voting Rights Act in their ability to change election rules. When the Supreme Court removed the constraints on these jurisdictions in *Shelby County v. Holder*, these formerly "covered jurisdictions" were able to enact changes to election administration that previously would have required Justice Department review. Democratic-aligned advocacy groups feared that the Court "opened the floodgates to laws restricting voting" (*The Effects of Shelby County v. Holder*, 2018). They feared that states would make changes that would be hard to track but would negatively impact Black voting participation (Levine & Rao, 2020).

One way to summarize the size of the change after Shelby is to use the *Cost of Voting Index* (COVI), which aggregates up a range of policies and then constructs a single "cost of voting" for each state. Li, Pomante II & Schraufnagel (2018) argue that states with a higher score on their index make voting more costly. In its most recent ranking from 2022, the scores range from −2.5 (the least costly state to vote, Oregon) to 1.69 (the most costly state to vote, New Hampshire). After Shelby, previously covered states saw their COVI scores increase in absolute terms (from an average of 0.34 to an average of 0.65) and also increase relative to other states (from an average ranking of 32 to an average ranking of 37.5).

And yet, as noted above in reference to work by Komisarchik & White (2022), there has been no meaningful decline in turnout in formerly covered states, and in fact, there seems to have been an increase in registration and turnout among Black and Hispanic Americans in these jurisdictions. Using a similar model to Komisarchik & White (2022) and examining overall turnout at the state level, we find essentially no change in the share of the voting-eligible population who turned out to vote: in a two-way fixed effect specification we find an increase in overall turnout of 0.6 percentage points, but with a 95-percent confidence interval (95-percent confidence interval [−0.027, 0.039]).[14] And as noted above, we see no evidence that countermobilization would explain the lack of a decrease in turnout stemming from policy changes following *Shelby*. *Shelby*, thus, presents a case where a single Court decision suddenly allowed states to make multiple changes to their election procedures that allegedly increase the burden on voters. Evidence suggests that the aggregation of those multiple changes did not lead to a Republican advantage.

---

[14] These estimates are consistent with aggregate turnout results presented in Appendix C in Komisarchik & White (2022).

To be sure, the analysis here focuses on state-level consequences, and perhaps studies of county-level or municipal-level effects could be different. So far, no such studies have been produced. A recent high-profile article that estimates the effect of *Shelby* on local election officials finds "no indication that local election officials have used their new discretion post-Shelby to advantage their party" (Ferrer, Geyn & Thompson, 2023). Now more than a decade out from the Court's ruling in *Shelby*, the scholarly record has not provided evidence that the court case and accompanying policy changes have affected partisan outcomes at the local or state levels.

## 6.2  What Would Happen if Mississippi Made the Dreams of Progressive Election Reformers Come True?

Mississippi has laws that progressive activists and some scholars believe make it costly for people to vote. According to the Cost Of Voting Index, Mississippi consistently ranks among the bottom states (Schraufnagel, Pomante II & Li, 2020). Mississippi also has low voter turnout; in the most recent midterm in 2022, turnout was 32.5 percent among eligible voters, more than 10 percentage points lower than the national turnout rate.[15] Mississippi, which tends to be a safe state for Republicans, is also a state where close to 40 percent of the population is Black, the highest share of any state in the nation.

We now engage in a thought experiment: suppose the Mississippi state government suddenly passed a package of six reforms all meant to increase voting access. With these six reforms, Mississippi would presumably be viewed by voting rights advocates as among the best states in the country for lowering the cost of voting, a model for other states. How would this bundle of reforms affect the partisan balance in the state? We will run this thought experiment in the context of the 2020 election. In that election, the voting-age population in the state was approximately 2,272,000. Of these, 1,325,000 were estimated to cast a ballot.[16] The Republican presidential candidate, Donald Trump, received 58.4 percent of the two-party vote.

To be sure, estimating the Mississippi-specific effect of changing these policies is quite challenging. The best we can do is use estimates of the effects of the laws on turnout from the literature. Where possible, we will also attempt to use the literature to estimate the partisan composition of who is affected by the law. We will also make the implausible assumption that there is no overlap in who is targeted (and affected) by the laws, resulting in our calculations likely providing an upper bound on the effect of the policies. For instance, for two laws both meant to increase turnout among mobile populations such as young people, we will assume that the laws increase turnout among entirely different people.

### 6.2.1  Reduction in Polling Location Wait Times.

Pettigrew (2021) estimates that every additional hour spent waiting in line causes a one-percentage-point decrease in future turnout. In 2020 in Mississippi, approximately 12.2 percent of in-person voters waited at least an hour to cast their ballot. According to the CES, approximately 90.8 percent of ballots cast in Mississippi in 2020 were in person. This implies that removing wait times in voting would increase turnout by an additional 1,468 voters. Because this group is small, estimates of the partisan breakdown from the CES are necessarily noisy. But we estimate approximately 69 percent of voters who wait more than an hour are Democrats and 22 percent are Republicans. Given this breakdown, it implies that improving wait times would yield an additional 693 Democratic votes.

### 6.2.2  Election Day Voter Registration.

Currently, Mississippi requires individuals to register to vote 30 days before an election. Removing the requirement to register, in advance, makes it easier to vote. Grumbach & Hill (2022) estimate how the effect of same-day voter registration laws varies by age, arguing that the effects are concentrated among younger voters. We use Grumbach and Hill's (2022) replication code to estimate the overall effect of Election Day voter registration on turnout, using self-reported turnout from the CPS and a simple two-way fixed effect model to adjust for fixed characteristics of states and election-specific changes in turnout. We estimate that imposing Election Day voter registration causes a 0.67 percentage point increase in

[15] Michael P. McDonald, "2022 General Election," *United States Elections Project*, accessed May 24, 2023.

[16] Michael P. McDonald, "2020 General Election," *United States Elections Project*, accessed May 24, 2023.

Downloaded from https://academic.oup.com/jla/article/16/1/17/7641615 by guest on 18 August 2025

turnout, an effect that is not statistically significant (95-percent confidence interval [–0.021, 0.034]). Based on the citizen voting age population, we estimate Election Day registration would approximately increase turnout by approximately 15,015 voters. Because Grumbach & Hill (2022) shows that this effect is concentrated among young voters, we use the CES to estimate the partisanship of Mississippi residents by age group.[17] Based on this calculation and using the effect estimates in Grumbach & Hill (2022), we estimate that same-day registration results in an additional 2,215 Democratic votes in the state.

### 6.2.3 Pre-Registration for Young Voters.

Mississippi currently does not allow individuals to pre-register to vote. According to Fowler (2017), pre-registration increases turnout among 18–26-year-olds by 2 percentage points. Using estimates of the Mississippi population distribution, this implies an additional 4,825 voters. If we use the same partisanship distribution used when calculating the Election Day voter registration effects, we estimate pre-registration adds an additional 712 Democratic votes.

### 6.2.4 Removing Strict Photo Identification Requirements.

Mississippi currently requires voters to present photo identification when casting their ballot. We are unaware of race-specific estimates of who lacks photo identification in Mississippi. According to Hosemann (2017), the state estimated that between "5% and 9% of registered voters did not have an active Mississippi driver's license or Department of Public Safety-issued photo identification". In 2020, approximately, 1,749,000 voters were registered to vote in Mississippi. If we use estimates from Grimmer & Yoder (2022), we estimate that removing photo identification requirements would yield between 2,361 to 4,250 additional voters, depending on whether the share of registered voters without photo identification is 5 percent or 9 percent. We do not have estimates of the partisanship of these voters, but we can use estimates from North Carolina as an approximation. In North Carolina, 57.5 percent of voters without an ID match were registered as Democrats, 19.2 percent were registered as Republicans, and 27.3 percent did not register with a particular party. If we apply these numbers to Mississippi, we estimate that removing a photo identification law would yield Democrats between 904 and 1,628 additional votes.

### 6.2.5 Felon Disenfranchisement.

The Sentencing Project, a non-profit group focused on restoring felony voting rights, estimates that 218,181 Mississippi voters are ineligible to vote because of prior felony convictions and that 127,130 of those voters are Black.[18] To calculate the effects of restoring felon rights on the partisan balance in Mississippi, we use estimates from the literature discussed above, which is that approximately 10 percent of felons would vote, adding an additional 21,818 voters. While we do not have Mississippi-specific estimates of the political preferences of ex-felons, we extrapolate Michael Morse's estimates from Florida. Using these numbers, we estimate that restoration of voting rights to Black felons would increase the Democratic vote total 11,642 votes ($11,642 = 129,495 \times 0.1 \times (0.94 - 0.041)$) and that restoration of voting rights to Not Black felons would cause an increase of 2,633 votes to Republicans ($2,663 = 109,714 \times 0.1 \times (0.36 - 0.60)$). In total, this implies an increase of 9,008 Democratic votes. Note that if we used the alternative strategy, discussed above, of estimating ex-felon preferences based on survey responses of non-college-educated men, the pro-Democratic shift from disenfranchisement would be closer to 4,000 votes rather than 9,000 votes.

### 6.2.6 No-Excuse Mail in Absentee Voting.

Mississippi currently limits mail-in absentee voting to individuals who reside outside the county, individuals with a permanent disability, caretakers of those with a permanent disability, or voters 65 or

---

[17] Because of lack of statistical power, we divide Mississippi residents as younger or older than thirty-five.

[18] In Mississippi, The Sentencing Project computes this number by combining the number of individuals serving felony sentences or on parole and estimates the number of living felons who are disqualified from voting. This necessarily requires assumptions about how many individuals who were convicted of felonies were released and their mortality rate. The estimate from the Sentencing Project is much larger than the estimate from Michael McDonald's Voting Eligible Population estimates, which suggest that 46,032 Mississippi voters are ineligible due to felonies. This appears to be similar to the number of individuals in Mississippi prison or on parole.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

older. According to estimates from Thompson et al. (2020), no-excuse mail-in voting yields a 2.1 percentage point increase in turnout. If applied to Mississippi, this would imply an additional 47,001 voters turning out for an election. But Thompson et al. (2020) estimate that there is a minimal partisan effect of the laws and the effect depends upon the state used to estimate the effect. If we estimate the effect of vote by mail using data from California, Thompson et al. (2020) estimate a 1.2 percentage point decrease in the Democratic party's share. Applying this estimate to Mississippi in 2020 would yield an increase of 40,117 votes for Republicans, more than enough to cancel out all the increases in Democratic vote share from the other reforms listed above. If, however, we use estimates from all three states that Thompson et al. (2020) use, we estimate a 0.7 percentage point increase in two-party Democratic vote share. This would imply an additional 13,609 votes for the Democratic party. Importantly, if Mississippi or any other state passed a no-excuse mail voting law, the legislators passing that law would not know with any certainty, based on the available evidence, whether the law would slightly benefit Democrats or Republicans.

### 6.2.7 Total Votes and Total Democratic Votes.

We estimate that making this series of policy reforms would increase overall voter turnout in Mississippi by 4.1 to 4.2 percentage points. We emphasize that these effect estimates likely are an overestimate of the effect of the laws because we have made the improbable assumption that each law is affecting disjoint groups of individuals. Of course, many of the laws are likely to affect the same population. As a maximum number of votes for Democrats, we estimate that the laws in total will add 25,985 Democratic votes. This implies a 1.6 percentage point increase in Joe Biden's vote total in 2020. At the bottom of our estimates, imposing these policies would net Republicans 26,585 votes. This would imply a 0.38 percentage point increase in Donald Trump's vote total in Mississippi.

If Mississippi implemented these six policies, we would expect an increase in voter turnout but would not be confident about which party would benefit. This is true before we even consider the uncertainty when estimating the causal effects of these policies or uncertainty in our estimates of the political preferences of individuals who are affected by the law. As a result, after these policies are implemented, we would expect the status quo to be largely unchanged: Mississippi would still have below-average voter turnout and would remain a safe state for Republicans.[19]

## 7. POLICIES THAT DO AFFECT PARTISAN ELECTIONS

Our framework suggests that most election policies are unlikely to affect even very close election outcomes. If not these policies, then what policies, if any, should concern those who are worried about laws affecting outcomes?

Two kinds of policies should generate serious concern. First, while the policies we have reviewed have small effects because they target small groups of voters and/or have minimal effects on turnout, and/or affect a politically heterogeneous group of voters, historically the USA has seen election policies that do target large groups of homogeneous voters and massively change their voter turnout rates. These are the policies that still cast a shadow over much of the debate around election laws.

Namely, the southern states, post-Reconstruction, disenfranchised Black voters nearly completely. The effect of racist laws in the South on voting is merely one component of the heinous effects these laws had on Black Americans. There is no doubt that the policies that disenfranchised Black voters as well as the policies of the civil rights era that re-enfranchised Black voters dramatically affected election outcomes and, in turn, affected legislation (Olson, 2023; Schuitt and Rogowski, 2017).

Consider participation rates by White versus Black Americans living in Louisiana (Keele, Cubbison & White, 2021). At the end of the nineteenth century, registration rates among eligible Black and White Louisiana men were 80–100 percent. When Louisiana changed its Constitution in 1898, instituting poll

---

[19] Anticipating the effect of changing many laws in a state is challenging, in part because the effect of laws could interact with each other, causing the effect to be smaller or larger than the simple additive effect that we have supposed. Interaction effects could result in a smaller overall effect than we described here. This is particularly true if some of the laws would mobilize the same person (if implemented on their own). Our estimates would thus "double count" those individuals and would be too big. Or, it could be that our estimates are too small if there are individuals who are mobilized only if groups of policies are ON. As a hypothetical, it could be that in some states felons are more likely to vote if they also receive a ballot in the mail or if they are able to register on Election Day.

Downloaded from https://academic.oup.com/jla/article/18/1/1764/6515 by guest on 18 August 2025

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

taxes and residency requirements, but exempting White men from those requirements via a "Grand-father clause", Black registration dropped effectively to 0 percent within a few years. Then, starting in 1944, with the end of the White-only primary, followed by a series of other changes (i.e., the Voting Rights Act of 1965), Black registration rose dramatically and, by the early twenty-first century, returned to the same levels as Whites.

In 1896, according to data from Keele, Cubbison & White (2021), in the median parish in Louisiana, 54 percent of eligible citizens were Black, 88 percent of Black men were registered to vote, and 85 percent of White men were registered to vote. For illustrative purposes, let us imagine in 1896 in this median parish an election took place between a Black-preferred candidate and a White-preferred candidate in which all Black voters chose one candidate, all White voters chose the other candidate, and turnout did not vary by race. In this imaginary close election, the Black-preferred candidate would win with 55 percent of the vote (slightly higher than the Black share of the population because the observed registration rate is higher for Black Louisianans than White Louisianans).

Four years later, in 1900, after Louisiana adopted its new Constitution, circumstances dramatically changed. According to the data, the median parish in 1900 was 51 percent Black. The voter registration rate for White men went to 57 percent (down from 85 percent). The voter registration rate for Black men went to 1 percent (down from 88 percent). If that same hypothetical election between a Black-preferred candidate and a White-preferred candidate was held under these new 1900 circumstances, the White-preferred candidate would now win with over 98 percent of the votes.

What are the features of the post-Reconstruction South that made the disenfranchising laws so potent? The policies targeted not a small subset of people (e.g., just a small percentage of people who lack a photo ID) but all who are Black because they are Black. While the policies did have spillover—Louisiana's 1897 Constitution reduced White registration by half—state governments used tools such as a "Grandfather Clause", an "Understanding Clause", and outright violence to selectively target the suppressive laws to Black people. The suppressive policies did not just reduce Black turnout by a little bit but reduced Black turnout to zero. In the Civil Rights era, policies and Court cases had a similarly large impact on participation because they, too, targeted voters based on their racial identity, doing away with policies from literacy tests to White-only primaries that had effectively and in many places completely disenfranchised Black Americans (Fresh, 2018).

Policies that target a large, politically homogeneous share of the population—a racial group, a reli-gious group, a group of party registrants—and have a large effect on turnout specifically for that group, should raise serious alarm about the consequences for election outcomes.

To be sure, some policies—including policies we have not examined or ones that have not yet been imagined or proposed—may have effects on turnout that are larger than the contemporary policies we have studied and could disproportionately affect some groups more than others. By no means has our analysis contemplated every possible election law.

As just one example, a policy intervention that has quite dramatic effects on turnout and, poten-tially, disproportionate effects for one party relates to the timing of elections. States that consolidate local elections such that municipal elections are held on the same day as federal elections have dramat-ically higher turnout in those local contests. Since many local elections are officially nonpartisan, the consequences of election consolidation would not be measured in Democratic versus Republican out-comes, but this is nevertheless the rare kind of policy that could change outcomes (Anzia, 2013; Hajnal, Kogan & Markarian, 2022).

A second kind of policy that should raise concern is one that is implemented *after* an election when the outcome is known to be a near tie: rules governing recounts. Cases such as the 2000 presidential election in Florida or the 2008 senate election in Minnesota raise concern that lawmakers, judges, or the campaigns themselves can put their thumbs on the scale and tip an election.[20]

In recounts, the election is known ex-post to be very close, so even minor changes in votes make a difference. In the targeted population (i.e., "voters with challenged ballots"), the mechanism of invali-dation of ballots or inclusion of ballots means that the turnout effect can be large even though only a small fraction of voters may be in the targeted set. If the invalidation or counting of contested ballots

---

[20] On the Minnesota recount, the selective counting of absentee ballots raised concern ("Coleman to argue Franken won by bogus recount" CNN, January 26, 2009). In the Florida recount, different standards for recounts across counties raised concern (*Bush v. Gore*, 2000).

is targeted disproportionately to voters of one party on account of an official with partisan motives or the undue influence of one side's campaign, then the gains or losses of votes will accrue disproportionately to one party. Recounts are thus a perfect storm for laws affecting election outcomes, and it is no surprise that recount experiences of the past (such as Florida 2000) carry significant weight in the minds of lawmakers and advocates about how election administration rules affect outcomes.

## 8. CONCLUSION

From the perspective of partisan activists, the US states are battlegrounds; the future of democracy depends on how policymakers act on issues such as no-excuse mail voting, early voting, automatic registration, voter identification, felon disenfranchisement, and so on. Partisan actors attempt to delegitimize their opponents, sow doubt about the integrity of elections, and mobilize their donors and supporters around the dramatic potential consequences of election laws. And yet, there is little evidence in the scholarly record suggesting contemporary election rules affect election outcomes. Most laws barely make a dent on voter turnout, let alone on who wins or loses. The disconnect between the perceived stakes and the available evidence presents a puzzle.

This essay sought to address the puzzle. We offered a new framework for thinking through the effects of laws on turnout and on election outcomes. Once one has a sense of the size of the population targeted by a law, the extent to which the targeted population differs from the rest of the population in terms of partisan preferences, and the likely effect on turnout, then one can evaluate the likely effect of a law on which party will win or lose an election. It is straightforward to see that most of the laws that are fought over so vigorously in statehouses and courtrooms cannot affect any but the very closest elections.

As we have argued through concrete examples, the lack of the relationship between changes in election laws and changes in partisan outcomes is not the result of countermobilization campaigns. We have also shown that the aggregation of multiple election laws in a state does not mean that small partisan effects accrue into larger effects. Because the effect sizes are so small and different laws help different party coalitions (sometimes in unexpected ways), the effect of the laws in the aggregate is often a wash and difficult to predict ahead of an election. We have further shown that policies that favor the participation of one racial group or another do not always run parallel with policies that favor the preferred party of different racial groups. To the extent that advocates believe that mobilizing or demobilizing racial groups is a path to helping their party win elections, their intuitions may be way off base.

A clear implication of our analysis is to lower the temperature on election administration policies. Lawmakers should not pass laws thinking they will help their partisan side. It would not work and it is a waste of time. And the media should not portray every change in an election law as a red-alert scenario that will determine future elections. Evidence suggests the partisan stakes for these laws are not particularly high. A typical voting law may affect outcomes on the order of a fraction of a percent, but most elections are not that close and even if they are, it is hard to determine which party would actually gain from each change in law and in each election year.

Does this mean that policymakers, judges, and ordinary Americans should no longer concern themselves with such laws?

No. The public, and its leaders, should care about election laws for reasons other than their partisan consequences, such as whether they make voting convenient, more secure, more cost effective, and whether they are motivated by discriminatory intent. They should also care about these laws for their normative value and for their effect on racial minority group participation, including participation in primary and municipal elections, which are different from the Democratic-vs-Republican elections we have focused on here. As noted above, much of the conflict over election laws is focused on ensuring racial minority groups have equal rights to participate in elections and that the historic record of discrimination and disenfranchisement of Black Americans is never repeated.

Laws that target homogeneous partisan groups and have large effects on turnout should raise red flags. Procedures surrounding post-election recounts should raise red flags. As far as the many variants of policies that might have a percentage-point or so effect on turnout, these are not policies that meet the criteria for concern over affecting partisan election outcomes. Of course, these policies still

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641815 by guest on 18 August 2025

might violate the law based on criteria such as the intent behind the policies and the burdens the policies place on voters, but they nevertheless are not cause for concern about affecting partisan election outcomes.

## REFERENCES

Anzia, Sarah F. 2013. *Timing and Turnout*. Chicago: University of Chicago Press.

Barber, Michael & John B. Holbein. 2020. The Participatory and Partisan Impacts of Mandatory Vote-by-Mail. 6 *Sci. Adv.* 1–7.

Berinsky, Adam J. 2005. The Perverse Consequences of Electoral Reform in the United States. 33 *Am. Pol. Res.* 471–491.

Black, Earl & Merle Black. 2003. *The Rise of Southern Republicans*. Cambridge: Harvard University Press.

Bryant, Lisa A. et al. 2022. The Power of the State: How Postcards from the State Increased Registration and Turnout in Pennsylvania. 44 *Polit. Behav.* 535–549.

Cantoni, Enrico & Vincent Pons. 2021. Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008–2018. 136 *Quart. J. Econ.* 2615–2660.

Caughey, Devon & Jasjeet Sekhon. 2017. Elections and the Regression Discontinuity Design: Lessons from Close U.S. House Races, 1942–2008. 19 *Polit. Anal.* 385–408.

Cottrell, David, C. Herron Michael & Daniel A. Smith. 2021. Voting Lines, Equal Treatment, and Early Voting Check-In Times in Florida. 21 *State Polit. Pol. Quart.* 109–138.

Eggers, Andrew C. et al. 2014. On the Validity of the Regression Discontinuity Design for Estimating Electoral Effects: New Evidence from Over 40,000 Close Races. 59 *Am. J. Pol. Sci.* 259–274.

Ferrer, Joshua, Igor Geyn & Daniel M. Thompson. 2023. How Partisan Is Local Election Administration? *Am. Polit. Sci. Rev.* 1–16, First View.

Fowler, Anthony. 2017. Does Voter Preregistration Increase Youth Participation? 16 *Elect. Law J.* 485–494.

Fraga, Bernard L. 2015. Redistricting and the Causal Impact of Race on Voter Turnout. 78 *J. Pol.* 19–34.

Fresh, Adriane. 2018. The Effect of the Voting Rights Act on Enfranchisement: Evidence from North Carolina. 80 *J. Pol.* 713–718.

Green, Donald P. & Alan Gerber. 2019. *Get Out the Vote: How to Increase Voter Turnout*. Washington: Brookings Institution Press.

Grimmer, Justin & Jesse Yoder. 2022. The Durable Differential Deterrent Effects of Strict Photo Identification Laws. 10 *Pol. Sci. Res. Meth.* 453–469.

Grimmer, Justin et al. 2018. Obstacles to Estimating Voter ID Laws' Effect on Turnout. 80 *J. Pol.* 1045–1051.

Grimmer, Justin, William Marble and Cole Tanigawa-Lau. 2024. Measuring the Contribution of Voting Blocs to Election Outcomes. *J. Politics*. Forthcoming.

Gronke, Paul et al. 2008. Convenience Voting. 11 *Annu. Rev. Pol. Sci.* 437–455.

Grumbach, Jacob M. 2022. Laboratories of Democratic Backsliding. First View *Am. Pol. Sci. Rev.* 1–18.

Grumbach, Jacob M. & Charlotte Hill. 2022. Rock the Registration: Same Day Registration Increases Turnout of Young Voters. 84 *J. Politics* 405–417.

Hajnal, Zoltan L., Vladimir Kogan & G. Agustin Markarian. 2022. Who Votes: City Election Timing and Voter Composition. 116 *Am. Pol. Sci. Rev.* 374–383.

Hajnal, Zoltan, Nazita Lajevardi & Lindsay Nielson. 2017. Voter Identification Laws and the Suppression of Minority Votes. 79 *J. Pol.* 363–742.

Harden, Jeffrey J. & Alejandra Campos. 2023. Who Benefits from Voter Identification Laws? 120 *Proc. Natl. Acad. Sci.* e2217323120.

Hersh, Eitan D. 2015. *Hacking the Electorate: How Campaigns Perceive Voters*. Cambridge: Cambridge University Press.

Highton, Benjamin. 2017. Voter Identification Laws and Turnout in the United States. 20 *Annu. Rev. Pol. Sci.* 149–167.

Hosemann, Delbert. 2017. Not Our Grandfather's Mississippi Anymore: Implementing Mississippi's Voter Identification Requirement *Miss. Law J.*

Keele, Luke, William Cubbison & Ismail White. 2021. Suppressing Black Votes: A Historical Case Study of Voting Restrictions in Louisiana. 115 *Am. Pol. Sci. Rev.* 694–700.

Kim, Seo-Young Silvia. 2022. Automatic Voter Reregistration as a Housewarming Gift: Quantifying Causal Effects on Turnout Using Movers. First View *Am. Pol. Sci. Rev.* 1–8.

Downloaded from https://academic.oup.com/jla/article/16/1/1/7641615 by guest on 18 August 2025

Downloaded from https://academic.oup.com/jla/article/16/11/764/615 by guest on 18 August 2025

Knack, Stephen & James White. 1998. Did States' Motor Voter Programs Help the Democrats? 26 *Am. Pol. Quart.* 344–365.

Komisarchik, Mayya & Ariel White. 2022. Throwing Away the Umbrella: Minority Voting after the Supreme Court's *Shelby* Decision. Working Paper.

Levine, Sam & Ankita Rao. 2020. In 2013 the Supreme Court Gutted Voting Rights—How Has it Changed the US? *The Guardian.* https://www.theguardian.com/us-news/2020/jun/25/shelby-county-anniversary-voting-rights-act-consequences.

Lewis, Nicole, Aviva Shen & Anna Flagg. 2020. What Do We Really Know about the Politics of People Behind Bars. *The Marshall Project.* https://www.themarshallproject.org/2020/03/11/what-do-we-really-know-about-the-politics-of-people-behind-bars. Accessed July 2023.

Li, Quan, Michael J. Pomante II & Scot Schraufnagel. 2018. Cost of Voting in the American States. 17 *Elect. Law J.* 234–247.

McDonald, Michael P., Juliana K. Mucci, Enrijeta Shino & Daniel A. Smith. 2023. Mail Voting and Voter Turnout. *Elect. Law J.* 1–18. Forthcoming.

Menger, Andrew & Robert M. Stein. 2020. How to Measure and Assess the Turnout Effects of Election Reforms. 1 *J. Inst. Pol. Econ.* 209–237.

Meredith, Marc & Michael Morse. 2015. The Politics of the Restoration of Ex-Felon Voting Rights: The Case of Iowa. 10 *Quart. J. Pol. Sci.* 41–100.

Miles, Thomas J. 2004. Felon Disenfranchisement and Voter Turnout. 33 *J. Legal Stud.* 85–129.

Morse, Michael. 2021. The Future of Felon Disenfranchisement Reform: How Partisanship and Poverty Shape the Restoration of Voting Rights in Florida. 109 *Calif. Law Rev.* 1–91.

'Motor Voter' After 5 Years. 1993. CQ Almanac 1993, *Congressional Quarterly,* 49th edn: 199–201.

Olson, Michael P. 2023. "Restoration" and Representation: Legislative Consequences of Black Disenfranchisement in the American South, 1879–1916. Working Paper.

Pettigrew, Stephen. 2021. The Downstream Consequences of Long Waits: How Lines at the Precinct Depress Future Turnout. 71 *Electoral Stud.* 1–17.

Schraufnagel, Scot, Michael J. Pomante II & Quan Li. 2020. Cost of Voting in the American States: 2020. 19 *Elect. Law J.* 503–509.

Schuitt, Sophie and Jon C. Rogowski. 2017. Race, Representation, and the Voting Rights Act. 61 *Am. J. Pol. Sci.* 513–526.

Stanley, Howard. 1987. *Voter Mobilization and the Politics of Race: The South and Universal Suffrage, 1952–1984.* Westport, CT: Praeger.

Stephanopolous, Nicholas. 2023. *Aligning Election Law.* Oxford: Oxford University Press.

*The Effects of Shelby County v. Holder.* 2018. The Brennan Center for Justice. https://www.brennancenter.org/our-work/policy-solutions/effects-shelby-county-v-holder.

Thompson, Daniel M., Jennifer A. Wu, Jesse Yoder & Andrew B. Hall. 2020. Universal Vote-by-mail Has No Impact on Partisan Turnout or Vote Share. 117 *Proc. Natl. Acad. Sci.* 15052–15056.

Valentino, Nicholas & Fabian G. Neuner. 2017. Why the Sky Didn't Fall: Mobilizing Anger in Reaction to Voter ID Laws. 38 *Pol. Psychol.* 331–350.

Walker, Hannah L., Michael C. Herron & Daniel A. Smith. 2019. Early Voting Changes and Voter Turnout: North Carolina in the 2016 General Election. 41 *Pol. Behav.* 841–869.

White, Ariel. 2019. Family Matters? Voting Behavior in Households with Criminal Justice Contact. 113 *Am. Pol. Sci. Rev.* 607–613.

White, Ariel R. 2022. Political Participation Amid Mass Incarceration. 25 *Annu. Rev. Pol. Sci.* 111–130.

Yoder, Jesse et al. 2021. How Did Absentee Voting Affect the 2020 U.S. Election? 7 *Sci. Adv.* 1–8.

Yu, Jinhai. 2019. Does State Online Voter Registration Increase Voter Turnout? 100 *Social Sci. Quart.* 620–634.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:12-MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.,* | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.,* | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.,* | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.,* | |
| *Defendants.* | |

Exhibit

**7**

Grimmer

08/27/2025    C.A.N.

1

ASIAN AMERICANS ADVANCING
JUSTICE-ATLANTA, *et al.*,

    *Plaintiff,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

    *Defendants.*

Case No. 1:21-CV-01333-JPB

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.*,

    *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.*,

    *Defendants.*

Case No. 1:21-CV-01728-JPB

## Amended Supplemental Expert Report of Bernard L. Fraga, Ph.D.

### June 23, 2025

**I.**    <u>Scope of Work</u>

    1.    I was asked by attorneys for the plaintiffs in the above-captioned cases to update tables in my original report (dated January 27, 2023) and sur-rebuttal report (dated March 3, 2023) with data from the 2024 presidential election. I was also asked to determine if the trends in voter turnout and absentee balloting in elections

pre- and post-implementation of SB202 established in my original report and sur-rebuttal report continue to remain present when adding 2024 to the original set of election data from 2018-2022.

2.  I have only updated the tables and analyses from my original and sur-rebuttal reports in which 2024 election data had the potential to inform my conclusions. For tables in those two reports that I have not updated in this report, those data and the corresponding conclusions continue to reflect my current understanding of the impact or potential impact of SB202.

## II.  **Summary of Supplemental Findings**

3.  Rates of voter turnout continue to be lower for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians in elections after implementation of SB202. This includes the most recent federal, presidential election in November 2024.

4.  In Section V of my sur-rebuttal report, I stated that "disparities between White and non-White turnout increased substantially immediately after the implementation of SB202."[1] I find that the same pattern persists when including the most recent federal, presidential election in November 2024. Voter turnout disparities for Black, Hispanic, and Asian American/Pacific Islander Georgians, relative to White Georgians, in presidential and non-presidential elections are larger than they were in presidential and non-presidential elections immediately preceding implementation of SB202.

---

[1] Sur-rebuttal report of Bernard L. Fraga, dated March 3, 2023, p.15 at 32.

5.    In Section VI of my original report, I stated that "Black and Asian American/Pacific Islander voters are more likely to vote by mail than non-Hispanic White voters in recent elections, but saw disproportionate drops in mail ballot use in elections after SB202." [2] I find that the same pattern of disproportionate drops in mail ballot use persists for these groups including in the most recent federal, presidential election of November 2024 where Black voters saw their rate of voting by mail drop from 29% in 2020 to 5% in 2024, and Asian American/Pacific Islander voters saw their rate of voting by mail drop from 40% in 2020 to 7% in 2024.

6.    Black, Hispanic, and Asian American/Pacific Islander voters remain more likely to have absentee-by-mail ballots rejected due to requirements added or modified in SB202 as compared to White voters, including in the post-SB202 presidential election of 2024. This includes SB202 provisions limiting the amount of time absentee ballots could be accepted and provisions that heightened identification requirements for absentee ballots.

7.    Other conclusions from my original report and sur-rebuttal report still hold, including my conclusion that "over 1.6 million currently [as of November 2022] registered Georgians had barriers to voting increase as a result of SB202...[f]or all racial/ethnic groups, with the exception of White Georgians, the shares negatively impacted exceed their shares of the registered voter population." [3]

---

[2] Report of Bernard L. Fraga, dated January 27, 2023, p.21.
[3] Report of Bernard L. Fraga dated January 27, 2023, p.7 at 19.

### III.  Supplemental Data Sources

8.    In this supplemental report, I use the same data on voters voting in Georgia in elections from 2018-2022 used in my original and sur-rebuttal reports, adding voter registration and voter history data pertaining to the 2024 election.

9.    In order to estimate the citizen voting-age population (CVAP), I adapt the method used by Dr. Justin Grimmer in his expert report, dated February 14, 2023.

10.    Dr. Grimmer takes the average change in population between the: 2010-2014 5-Year estimates and the 2012-2016 5-Year estimates; the 2012-2016 5-Year estimates and the 2014-2018 5-Year estimates; and the 2014-2018 5-Year estimates and the 2016-2020 5-year estimates—to construct a mean two-year change in CVAP over the period from 2014-2020. He then adds this mean change to the 2020 5-Year estimate to approximate a 2022 estimate of the CVAP.[4]

11.    In my original report, I used the 2016-2020 5-Year CVAP estimates for all of my turnout calculations because they were "the most recent CVAP special tabulations available as of December 2022."[5] I did not make modifications to the Census-provided estimates, including interpolation and extrapolation, as they were

---

[4] Dr. Grimmer notes "[t]his method for extrapolation is mathematically similar to methods for linear interpolation commonly used to create estimates of census data for years between the censuses," citing a 2006 article by Dr. Stephen Ansolabehere and Dr. David M. Konisky as they "use interpolation to create estimates for non-census years."[4] Report of Justin Grimmer, dated February 14, 2023, p. 17 at 25. However, the Ansolabehere and Konisky article does not make use of CVAP data, 5-Year estimates from the Census Bureau, or outline the specifics of their "linear interpolation" method.

[5] Report of Bernard L. Fraga, dated January 27, 2023, p.14 at 33.

not necessary to demonstrate the "general patterns of turnout."[6] However, because we are now several years removed from the time period covered by the 2016-2020 estimates, and there is continued differential population growth by race/ethnicity in Georgia, changes in turnout rates between 2024 and previous years would be biased and misleading if I did not now extrapolate the population estimates.

12. Therefore, in this report, I use the average change in population between the: 2020 5-Year estimates and the 2021 5-Year estimates; the 2021 5-Year estimates and the 2022 5-year estimates; and the 2022 5-year estimates and the 2023 5-year estimates—to construct a mean one-year change in CVAP over the period from 2020-2023. I then add this mean change to the 2023 5-Year estimate to approximate a 2024 estimate of the CVAP for the overall population and the non-Hispanic White, Black, Hispanic, and Asian American/Pacific Islander populations in Georgia.

13. I also use the 2022 5-Year estimates as the CVAP denominator for the 2022 elections, the 2020 5-Year estimates as the CVAP denominator for 2020 and 2021 elections, and the 2018 5-Year estimates as the CVAP denominator for the 2018 election. This aligns with Dr. Grimmer's approach in his February 14, 2023 report, and results in slightly different turnout estimates from what I reported in my original January 27, 2023 report. However, differences between my revised estimates for turnout in the period from 2018-2022 and my earlier estimates for turnout from 2018-

---

[6] Report of Justin Grimmer, dated February 14, 2023, at fn.3.

2022 do not have a substantive impact on any of my conclusions in my original report, sur-rebuttal report, or this report.

## IV. Rates of voter turnout for Black, Hispanic, and Asian American/Pacific Islander Georgians continue to be lower than for non-Hispanic White Georgians.

14. In this section, I provide information about voter turnout rates by race/ethnicity in major statewide Georgia elections from 2018-2024. The methodology and data I use are the same as what is outlined in Section IV of my original report,[7] dated January 27, 2023, except that (a) the CVAP estimates are as described in Section III of this report and (b) I have added 2024 voter registration list data and November 2024 voter history data. Specifically, I use a voter registration list with a date of January 15, 2025 provided by defendants in the discovery process,[8] and a voter history file corresponding to the November 2024 general election provided by defendants in the discovery process.[9] I added new registrants from the voter registration list to the 2018-2022 data I relied on in my original report and merged vote history data from 2024, in both cases using the unique Voter Registration Number to identify individuals.

15. Dividing the number of voters by race by the number of voting-age citizens by race, I construct a turnout rate for each racial/ethnic group. The resulting quantities are in **Table 1**.

---

[7] Report of Bernard L. Fraga, dated January 27, 2023, pp.7-14 at 20-30.

[8] The filename of this file is "Statewide Voter File_2025-01-15.zip".

[9] The filename of this file is "Voter History File – Nov 2024 General Election.zip".

16.  **Table 1** shows that in recent elections through November 2024, turnout rates for African American, Hispanic, and Asian American/Pacific Islanders in Georgia were substantially lower than turnout rates for the White population.

| | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
| | Nov 2018 | Nov 2020 | Jan 2021 | Nov 2022 | Dec 2022 | Nov 2024 |
| **Total** | 54.4% | 67.0% | 59.9% | 51.5% | 46.0% | 67.7% |
| **White** | 55.9% | 69.2% | 61.8% | 55.9% | 49.4% | 71.5% |
| **Black** | 51.1% | 59.9% | 54.9% | 45.3% | 41.8% | 59.1% |
| **Hispanic** | 29.7% | 42.2% | 32.7% | 22.8% | 19.1% | 41.2% |
| **Asian/PI** | 37.7% | 64.1% | 53.8% | 37.0% | 31.5% | 63.1% |

**Table 1: Voter Turnout Rates by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as a percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino), as extracted from the Census Bureau's American Community Survey (ACS) 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is self-reported from the voter registration file.

17.  The November 2024 election is the first post-SB202 presidential election. Overall, the turnout rate was 0.7 percentage points higher in 2024 (67.7%) than it was in 2020 (67.0%). White turnout was approximately 2.3 percentage points higher in 2024, at 71.5%, than it was in 2020, at 69.2%. However, Black turnout was lower in 2024 (59.1%) than it was in the pre-SB202 presidential election of 2020 (59.9%). Hispanic turnout was also lower in 2024 (41.2%) than it was in 2020 (42.2%). Asian American/Pacific Islander

turnout was likewise lower in 2024 (63.1%) than in 2020 (64.1%). Therefore, turnout for all racial/ethnic minority groups listed in **Table 1** was lower in the first post-SB202 presidential election than in the pre-SB202 presidential election, despite non-Hispanic White turnout increasing in this first post-SB202 presidential election.

| | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 54.4% | 67.0% | 59.9% | 51.5% | 46.0% | 67.7% |
| **White** | 57.8% | 71.9% | 64.2% | 58.1% | 51.3% | 74.6% |
| **Black** | 53.0% | 62.3% | 57.2% | 47.1% | 43.5% | 62.0% |
| **Hispanic** | 32.3% | 45.8% | 35.7% | 25.0% | 21.0% | 45.1% |
| **Asian/PI** | 42.3% | 71.4% | 60.0% | 41.3% | 35.3% | 71.2% |

**Table 1a: Voter Turnout Rates by Self-Reported or Bayesian Improved Surname Geocoding (BISG) Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as the percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino), as extracted from the ACS 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is based on self-reports in the voter registration file, with individuals consistently self-identifying as "Other" or with "Unknown" race in the registration file having race estimated via BISG.

18. In line with my original report, I also add the Bayesian Improved Surname Geocoding (BISG)-estimated individuals to the racial/ethnic group voter totals derived from self-reported data results in the quantities found in **Table 1a** to verify that my conclusions are not contingent on the behavior of individuals who

are listed as "Unknown" or "Other" race in the voter registration file.[10] In **Table 1a**, we see that even after accounting for the population consistently listed as "Other" or "Unknown" in the voter registration file, large disparities in voter turnout rates persist across recent elections for Black, Hispanic, and Asian American/Pacific Islander Georgians relative to White Georgians, and there is a pattern of lower racial/ethnic minority turnout in presidential and non-presidential elections post-SB202, despite higher non-Hispanic White turnout in presidential and non-presidential elections post-SB202.

19. **Table 1a** depicts voter turnout trends similar to those in **Table 1**. Since the total number of voters is based on the voter history file, and is not influenced by the BISG imputation, the total turnout rates for November 2018, November 2020, January 2021, November 2022, December 2022, and November 2024 elections are the same as in **Table 1** at 54.4%, 67.0%, 59.9%, 51.5%, 46.0%, and 67.7%, respectively. However, in **Table 1a**, just as in Table 1a of my January 27, 2023 report,[11] each racial group has higher turnout rates displayed for each individual election relative to the values in **Table 1**, because additional voters for each group could be identified via the BISG algorithm.

20. Regardless of whether one relies solely on self-reported race/ethnicity or recodes Other/Unknown race Georgians via BISG, November 2024 saw a drop in turnout for every non-White

---

[10] See paragraphs 27-30 in my January 27, 2023 report for more details about the BISG procedure. As I note above, my conclusions do not change with the inclusion of BISG-estimated race/ethnicity values.

[11] Report of Bernard L. Fraga, dated January 27, 2023, Table 1a, p.17 & p.18 at 42.

group relative to the pre-SB202 presidential election of 2020, but not for White Georgians. Using BISG, Non-Hispanic White turnout increased by approximately 2.3 percentage points, from 71.9% in 2020 to 74.6% in 2024. Black voter turnout, Hispanic voter turnout, and Asian American/Pacific Islander voter turnout decreased.

21.   As in my original report,[12] the turnout rate estimates in **Table 1a** do indeed change with BISG-calculated race estimates for "Other" and "Unknown" race persons, but the differences <u>between</u> racial/ethnic groups and overall trends are very similar. As a result, I rely on self-reported race only in the remainder of this supplemental report.

## V.   <u>Disparities in voter turnout for Black, Hispanic, and Asian American/Pacific Islander Georgians, relative to White Georgians, are larger in post-SB202 elections than they were in elections immediately preceding implementation of SB202.</u>

22.   In Section V of my sur-rebuttal report dated March 3, 2023, I state that "disparities between White and non-White turnout increased substantially immediately after the implementation of SB 202."[13] In the below paragraphs I show that the same pattern persists when adding the 2024 election to the analysis.

23.   In **Table 2** below, I reproduce turnout rate estimates from Table 1 from the March 3, 2023 sur-rebuttal report,[14] but rescale the turnout rates for Black, Hispanic, and Asian American/Pacific

---

[12] Report of Bernard L. Fraga, dated January 27, 2023, pp.19-20 at 48.

[13] Sur-Rebuttal of Bernard L. Fraga, dated March 3, 2023, p.15 at 32.

[14] Sur-Rebuttal of Bernard L. Fraga, dated March 3, 2023, Table 1, p.15.

Islander Georgians to display them relative to the non-Hispanic White Georgian turnout rate in each election. Specifically, I subtract the unrounded turnout rate shown in **Table 1** for White Georgians in each election from the unrounded turnout rate in **Table 1** for Black Georgians, Hispanic Georgians, and Asian American/Pacific Islander Georgians in the same year. The result is the percentage point difference or disparity in voter turnout rates between White Georgians and non-White Georgians in each election.[15]

|  | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **White** | 55.9% | 69.2% | 61.8% | 55.9% | 49.4% | 71.5% |
| **Black** | -4.7 | -9.4 | -6.9 | -10.7 | -7.6 | -12.4 |
| **Hispanic** | -26.2 | -27.1 | -29.1 | -33.1 | -30.3 | -30.3 |
| **Asian/PI** | -18.2 | -5.1 | -8.0 | -19.0 | -17.9 | -8.4 |

**Table 2: Difference in Voter Turnout Rate from White Georgians in major Georgia Statewide Elections, 2018-2024.** Turnout is calculated as a percent of the citizen voting-age Georgians who are White Alone (Not Hispanic or Latino), Black/African American Alone (Not Hispanic or Latino), Hispanic or Latino, and Asian Alone or Pacific Islander Alone (Not Hispanic or Latino) as extracted from the ACS 5-Year Special Tabulations for 2014-2018, 2016-2020, 2018-2022, and a projection of the Tabulations for 2024. The number of voters by race is self-reported from the voter registration file.

24.    **Table 2** shows that the largest disparity in turnout between Black Georgians and White Georgians (12.4 percentage points) in the time period I examine in this table was in the November 2024

---

[15] I also provide the White turnout rate from Table 1 for reference.

presidential election, which was the first presidential election after the implementation of SB202. Similarly, the largest disparity in turnout between Hispanic Georgians and White Georgians (33.1%) was in the post-SB202 federal election of November 2022. The largest disparity in turnout between Asian American/Pacific Islander Georgians and White Georgians (19.0 percentage points) was also in a post-SB202 election, November 2022. Across racial/ethnic minority groups, the largest disparities between their respective rate of turnout and non-Hispanic White turnout are post-SB202, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout are in pre-SB202 elections.

25.   If we compare the three types of elections shown in **Table 2** (midterm elections, presidential elections, and runoff elections) in the pre-SB202 period to the same three types of elections in the post-SB202 period, we always see larger disparities post-SB202 than pre-SB202. This persistence, despite, for instance, higher turnout overall in the November 2024 election, suggest a durable, disproportionate, negative impact of SB202 on racial/ethnic minority turnout that cannot be accounted for by corresponding changes in turnout rates for non-Hispanic White voters.

VI.   **Black and Asian American/Pacific Islander voters were more likely to vote by mail than non-Hispanic White voters in elections immediately before SB202, but saw disproportionate drops in their mail ballot use in elections after SB202's implementation.**

26.   In this section, I quantify rates of absentee-by-mail ballot use by Georgia voters from 2018 to 2024. To produce rates of absentee-by-

mail ballot use in these recent elections, I rely on lists of voters who applied to vote absentee in each election as made public in "Voter Absentee Files" by the Secretary of State's office.[16]

27.  I link the absentee data to the combined voter registration list using the "Voter Registration [number]" column in the absentee data. This can be further linked to voter history data via the same voter registration number, and racial/ethnic information derived from the combined voter registration lists.

28.  **Table 3** displays the percentage of voters in major Georgia statewide elections who voted absentee-by-mail by self-reported race, starting with the November 2018 election. My findings regarding the percent of voters voting absentee-by-mail for elections from 2018 through 2022 are unchanged from my original report.[17]

|  | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total** | 5.6% | 26.0% | 24.0% | 6.2% | 5.3% | 5.1% |
| **White** | 4.6% | 23.9% | 21.7% | 5.6% | 5.2% | 4.9% |
| **Black** | 7.1% | 29.0% | 27.5% | 7.3% | 5.5% | 5.4% |
| **Hispanic** | 6.3% | 23.2% | 20.4% | 4.4% | 2.7% | 3.0% |
| **Asian/PI** | 11.5% | 39.7% | 34.9% | 9.1% | 6.2% | 7.4% |

**Table 3: Percent of voters voting absentee-by-mail by Self-Reported Race/Ethnicity in major Georgia Statewide Elections, 2018-2024.** Percentages indicate the number of individuals who cast an absentee-by-mail ballot and had the ballot accepted, divided by the total number of voters in the

---

[16] https://elections.sos.ga.gov/Elections/voterabsenteefile.do.

[17] Report of Bernard L. Fraga, dated January 27, 2023, Table 2, p.23.

election for each racial/ethnic group. The race/ethnicity of voters is self-reported from the voter registration file.

29.    In the 2024 election, which had not occurred when I produced my original report dated January 27, 2023, we see dramatic declines in the share of voters voting absentee-by-mail relative to the pre-SB202 presidential election of 2020.

30.    Notably, White Georgian voters were the only racial/ethnic group to have their rate of mail voting in all post-SB202 federal elections remain higher than their rate of mail voting in the pre-SB202 (and pre-pandemic) November 2018 election. Black, Hispanic, and Asian American/Pacific Islander voters in Georgia, along with the statewide average, voted by mail at a lower rate in the post-SB202 November 2024 election than in November 2018.

**VII.    <u>Compared to White voters, Black, Hispanic, and Asian American/Pacific Islander voters were more likely to have absentee-by-mail ballots rejected due to requirements added or modified in SB202, including in the post-SB202 presidential election of 2024.</u>**

31.    As noted in Section XII of my original report dated January 27, 2023, SB202 also added provisions to Georgia Code Section 21 related to submission and receipt of absentee-by-mail ballots. Specifically, under SB202, Georgia added identification requirements such that a voter must "print the number of his or her Georgia driver's license or identification card" or "print the last four digits of his or her social security number" on the ballot

envelope.[18] In my original report at page 50, I noted that these provisions disproportionately increased rates of rejection for Black, Hispanic, and Asian American/Pacific Islander would-be absentee-by-mail voters in elections in 2022, relative to elections immediately before the implementation of SB202.

32.  In this supplemental report, I add an analysis of absentee-by-mail ballot rejection reasons for the November 2024 election, using the same methodology as I detailed in Section XII of my original report while I also use of the voter absentee file corresponding to the November 2024 election as provided by defendants in the discovery process.[19, 20]

33.  **Table 4** provides a summary of values in the "Status Reason" field by election for absentee-by-mail voters whose ballots were rejected. These estimates are the same as the original Table 11 found at page 53 in my original report, except that 2024 data has been added.

---

[18] SB202, as passed (Enrolled version), p. 51 lines 1295-1300, as cited in Report of Bernard L. Fraga, dated January 27, 2023, pp.50-51 at 114.

[19] Report of Bernard L. Fraga, dated January 27, 2023, pp.51-52 at 116-118.

[20] In November 2024, the ballot rejection reasons recorded by the State were the same as those used in November and December 2022 elections, except that they included the word "REJECTION" prior to listing the reason for rejection. A small number of ballots with a rejection reason of "APPLICATION REJECTED" make up the 0.00% for the "Unclassified" row corresponding to the November 2024 election.

| | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
| | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Ballot Received after Deadline** | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% | 1.16% |
| **Incorrect ID Information** | 0.12% | 0 | 0 | 0.11% | 0.16% | 0.09% |
| **Ineligible Elector** | 0.01% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Invalid Signature** | 0.10% | 0.05% | 0.15% | 0.02% | 0.03% | 0.03% |
| **MIDR - ID not Provided** | 0.01% | 0.00% | 0.00% | 0.01% | 0.00% | 0.00% |
| **Missing ID Information** | 0.09% | 0 | 0 | 0.34% | 0.51% | 0.14% |
| **Missing Signature** | 0.08% | 0.10% | 0.11% | 0.05% | 0.07% | 0.04% |
| **Oath Incomplete or Incorrect** | 1.32% | 0 | 0 | 0 | 0 | 0 |
| **Unclassified** | 0.17% | 0 | 0 | 0 | 0 | 0.00% |

**Table 4: Percent of Absentee-by-Mail voters whose ballots were rejected by reason for rejection, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected for the reason listed. Values of "0" indicate no records, while "0.00%" indicates percentages smaller than one-hundredth of one percent (0.01%).

34.     As shown in **Table 4**, the percentage of ballots rejected because they were received after the deadline saw its highest percentage post SB202 at 1.66% for the December 2022 runoff election. The January 2021 runoff, which took place before SB202 shortened the time period between the general election and runoff election, had a 'ballot received after deadline' rejection rate of 0.30%. This means the December 2022 runoff post-SB202 had a 'ballot received after deadline' rejection rate over five times greater than the previous runoff election rate pre-SB202. Similarly, in November 2024, the percentage of ballots rejected because they were received after the deadline was 1.16%, while the rate of rejection in the pre-SB202 presidential election of November 2020 was only 0.18%.

17

This means the November 2024 post-SB202 election had a 'Ballot Received After Deadline" rejection rate over six times greater than the previous presidential election prior to implementation of SB202.

35. Absentee-by-mail ballots rejected for incorrect or missing ID information were also higher on average in post-SB202 elections than in pre-SB202 elections, including the 2024 presidential election.

36. **Table 5** combines the above reasons for absentee-by-mail ballot rejection, showing the population of mail voters who had their ballots rejected for any reason overall and by self-reported race/ethnicity. This table has the same values and interpretation as Table 12 on page 56 of my original report, except that 2024 data has been added.

|          | Pre-SB202 | | | Post-SB202 | | |
|----------|-----------|-----------|----------|-----------|----------|----------|
|          | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **Total**    | 3.47% | 0.34% | 0.57% | 1.38% | 2.43% | 1.47% |
| **White**    | 2.46% | 0.24% | 0.48% | 1.19% | 2.31% | 1.20% |
| **Black**    | 4.34% | 0.45% | 0.65% | 1.43% | 2.15% | 1.65% |
| **Hispanic** | 4.53% | 0.49% | 0.82% | 2.11% | 5.57% | 2.58% |
| **Asian/PI** | 6.49% | 0.57% | 0.84% | 3.05% | 6.06% | 2.40% |

**Table 5: Percent of Absentee-by-Mail voters whose ballots were rejected by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected. The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

37. Examining **Table 5**, we see that, again, rejection rates were much higher overall in the November 2024 election post-SB202 than

they were in the pre-SB202 November 2020 election. In addition, the racial disparity in rejection rates was larger post-SB202 than pre-SB202 in percentage point terms.

38.  **Table 6,** which is the same as Table 13 on page 57 of my original report, except that now 2024 data has been added, shows that Black, Hispanic, and Asian American/Pacific Islander absentee-by-mail voters were consistently more likely to have their ballots rejected due to "Incorrect ID Information" or "Missing ID Information" post-SB202 relative to White Georgians. This includes the November 2024 presidential election.

|  | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
|  | Nov 2018 | Nov 2020 | Jan 2021 | Nov 2022 | Dec 2022 | Nov 2024 |
| Total | 0.21% | 0.00% | 0.00% | 0.45% | 0.67% | 0.23% |
| White | 0.11% | 0.00% | 0.00% | 0.36% | 0.64% | 0.21% |
| Black | 0.27% | 0.00% | 0.00% | 0.59% | 0.73% | 0.26% |
| Hispanic | 0.40% | 0.00% | 0.00% | 0.41% | 0.77% | 0.28% |
| Asian/PI | 0.80% | 0.00% | 0.00% | 0.62% | 0.78% | 0.31% |

**Table 6: Percent of Absentee-by-Mail voters whose ballots were rejected due to missing or incorrect ID information by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee-by-mail ballots with a status of "A" or "R" that were rejected due to "Missing ID Information" or "Incorrect ID Information." The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

39.  **Table 7,** which is the same as Table 14 on page 59 in my original report except that 2024 data has been added, shows a sharp increase in the share of absentee-by-mail ballots that were rejected due to arriving after the receipt deadline. However, in the post-SB202 presidential election of November 2024, Black, Hispanic,

and Asian American/Pacific Islander Georgians were more likely to have their ballots rejected due to receipt after the deadline than White Georgians. This gap in rejection rates reached its highest level in post-SB202 elections.

|  | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
|  | Nov 2018 | Nov 2020 | Jan 2021 | Nov 2022 | Dec 2022 | Nov 2024 |
| Total | 1.57% | 0.18% | 0.30% | 0.84% | 1.66% | 1.16% |
| White | 1.50% | 0.16% | 0.26% | 0.77% | 1.59% | 0.93% |
| Black | 1.56% | 0.20% | 0.31% | 0.70% | 1.27% | 1.29% |
| Hispanic | 1.89% | 0.26% | 0.51% | 1.60% | 4.49% | 2.23% |
| Asian/PI | 1.99% | 0.25% | 0.55% | 2.32% | 5.22% | 2.03% |

**Table 7: Percent of Absentee-by-Mail voters whose ballots were rejected due to receipt after the deadline by Self-Reported Race/Ethnicity, 2018-2024.** Values indicate the percent of all absentee ballots with a status of "A" or "R" that were rejected due to "Ballot Received after Deadline." The racial/ethnic breakdown is self-reported race/ethnicity in the voter registration file.

40.    Altogether, the analyses of absentee ballot rejection rates and reasons for rejection point to substantial racial disparities in ballot rejection rates in elections conducted after SB202 went into effect, including through the November 2024 presidential election. These disparities are particularly noticeable for rejections due to SB202-imposed mandates related to identification requirements and ballot receipt deadlines.

## VIII. Conclusion

41. In my original report, dated January 27, 2023, I concluded that "several major provisions of the Electoral Integrity Act of 2021, also known as Georgia Senate Bill 202 [SB202], have a disproportionate, negative impact on Black registrants, Hispanic registrants, and/or Asian American/Pacific Islander registrants in terms of increased barriers to voting. These impacts manifest when examining data available when the law was passed in 2021, as well as information gleaned from the November 2022 and December 2022 elections."[21] After examining relevant data from the November 2024 election, I have determined that patterns found in my original report, specifically with respect to turnout rates and absentee-by-mail voting, also apply to this most recent presidential election in November 2024. Thus, with all of the information in my original report, sur-rebuttal report, and this supplemental report, it remains my opinion "that SB202's implementation demonstrably increased barriers to voting that Georgians face, with disproportionately strong impacts on Black, Hispanic, and Asian American/Pacific Islander Georgians."[22]

---

[21] Report of Bernard L. Fraga, dated January 27, 2023, p.83 at 183.
[22] Report of Bernard L. Fraga, dated January 27, 2023, p.83 at 183.

I reserve the right to supplement or revise my opinions and conclusions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

Executed the 23rd day of June, 2025 at Atlanta, Georgia

Bernard L. Fraga, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | MASTER CASE NO. 1:21MI-55555-JPB |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*, | |
| *Plaintiffs,* | Case No. 1:21-CV-01259-JPB |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Secretary of the State for the State of Georgia, *et al.*, | |
| *Defendants.* | |
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, *et al.*, | |
| *Plaintiffs,* | CIVIL ACTION |
| v. | Case No. 1:21-CV-01284-JPB |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, *et al.*, | |
| *Defendants.* | |

Exhibit
**8**
Grimmer
08/21/2025    C.A.N.

1

ASIAN AMERICANS ADVANCING
JUSTICE-ATLANTA, *et al.,*

    *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.,*

    *Defendants.*

Case No. 1:21-CV-01333-JPB

THE CONCERNED BLACK CLERGY
OF METROPOLITAN ATLANTA,
INC., *et al.,*

    *Plaintiffs,*

v.

BRAD RAFFENSPERGER, in his
official capacity as the Georgia
Secretary of State, *et al.,*

    *Defendants.*

Case No. 1:21-CV-01728-JPB

**Rebuttal Report of Bernard L. Fraga, Ph.D.**

**July 14, 2025**

I.    <u>Scope of Work</u>

1.    I was asked by attorneys for the plaintiffs in the above-captioned
cases to evaluate the analyses and conclusions made by Dr. Justin
Grimmer, defendants' expert, in his supplemental report dated
June 13, 2025. My evaluation of Dr. Grimmer's original report,
which was produced by the defendants on February 14, 2023, can

be found in my sur-rebuttal report dated March 3, 2023. My evaluation of Dr. Grimmer's "Update to Expert Report," dated September 7, 2023, may be found in my January 19, 2024 Supplementary Declaration.[1]

2. My silence on any particular analyses or conclusions reached by the defendants' experts, including but not limited to Dr. Grimmer, does not indicate agreement with the analyses or conclusions in question.

## II. Summary of Findings Regarding Dr. Grimmer's June 2025 Report

3. Dr. Grimmer's own calculations of voter turnout, like mine, show that the gap between White voter turnout and Black, Hispanic, and Asian American/Pacific Islander voter turnout in Georgia grew substantially after SB202 went into effect. My findings reveal this same pattern even when using different estimation methods from those of Dr. Grimmer.

4. As in his original February 2023 report, Dr. Grimmer selectively compares turnout in certain pre-SB202 elections with turnout in certain post-SB202 elections in a manner that ignores evidence contrary to his conclusions. In particular, Dr. Grimmer ignores the highly competitive 2021 elections that peer-reviewed literature credits as an impetus for SB202's provisions at issue in this case. The selective inclusion of certain elections and exclusion of others

---

[1] Dr. Grimmer's supplemental report dated June 13, 2025 referred to his supplementary declaration dated January 19, 2024 at 90-91 as a "sur-rebuttal" report.

leads Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting.

5.   Dr. Grimmer's analysis of drop box use relies on a survey question whose ambiguous wording precludes accurate measurement of changes in rates of drop box use after SB202's implementation. Even Dr. Grimmer's flawed data shows that Black voters were more likely to use drop boxes than White voters in 2020, 2022, and 2024, with disproportionate declines in drop box use by Black voters after implementation of SB202.

## III.   Dr. Grimmer's own calculations of voter turnout show that the gap between White voter turnout and Black, Hispanic, and Asian American/Pacific Islander voter turnout in Georgia grew substantially after SB202 went into effect.

6.   In Section V of my sur-rebuttal report dated March 3, 2023, I noted that in his original report dated February 14, 2023, "Dr. Grimmer also makes selective comparisons when examining the turnout rates of racial/ethnic groups in isolation." And "[i]f instead Dr. Grimmer focused on turnout trends from 2018-2022, inclusive of intervening elections, he would find that disparities between White and non-White turnout increased substantially immediately after the implementation of SB202."[2]

7.   Dr. Grimmer continues to employ these same selective analyses in Section III of his June 2025 supplemental report.[3] Specifically, he masks the clear trend of increasing disparities between White and

---

[2] Sur-Rebuttal Report of Dr. Bernard L. Fraga, dated March 3, 2023, p. 14 at 31 and p. 15 at 32.

[3] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 14 at 20.

non-White turnout after implementation of SB202, including in the 2024 presidential election.

8.  Dr. Grimmer and I both estimate turnout by race in Georgia, relying primarily on counts of the number of voters by self-reported race in Georgia and U.S. Census Bureau estimates of the citizen voting-age population by race. However, Dr. Grimmer generates a flawed estimate for turnout in the 2024 presidential election that masks a likely drop in turnout for racial/ethnic minority groups relative to the pre-SB202 presidential election of 2020.[4]

9.  Dr. Grimmer calculates voter turnout by race "primarily using the Citizen Voting Age Population ("CVAP") from the US Census Bureau, using the American Community Survey's estimates of the CVAP."[5] However, the U.S. Census Bureau has not yet provided a tabulation of the citizen voting-age population with a 2024 end point comparable to the other estimates Dr. Grimmer and I use in our other reports.

10. As a result, Dr. Grimmer relies on an extrapolation of the citizen voting-age population by race to 2024 in order to estimate turnout in the 2024 presidential election. He does so to "mitigate [the] risk" of "underestimating the size of groups in the 2024 electorate, which would cause [him] to overestimate turnout rates for that group."[6]

11. However, in his extrapolation procedure, he calculates the "average 2-year change in the CVAP using the CVAP estimates from 2014 to 2022, for each group," then "divide[s] the average of the 2-year change by 2," then adds this to the "2023 CVAP

---

[4] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 14 at 20.
[5] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 7 at 12.
[6] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 8 at 12.

estimate."[7] This means that he relies on population growth trends from a decade ago (2014), skips over data from odd numbered years,[8] and adds unnecessary roughness to his estimates by cutting a two year change projection in half.

12.    Data from the 2020 Census demonstrated that Georgia's "Black, Hispanic and Asian populations surged" while "its number of white residents dropped slightly."[9] Dr. Grimmer's reliance on trends from a decade ago likely fails to capture the extent of this "surge." He does **not**, therefore, "mitigate [the] risk" of "underestimating the size of groups"; to the contrary, he overestimates turnout for growing Black, Hispanic, and Asian American/Pacific Islander populations in post-SB202 elections, especially the 2024 presidential election.

13.    To avoid this problem, in my June 23, 2025 amended supplemental report, I instead rely on the most recent Census Bureau CVAP estimates available, that is, the 2021, 2022, and 2023 end-point CVAP estimates.[10] Using that data, we see that while "White turnout was approximately 2.3 percentage points higher in 2024, at 71.5%, than it was in 2020, at 69.2%", Black turnout, Hispanic turnout, and Asian American/Pacific Islander turnout were all

---

[7] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 8 at 12.

[8] This is despite him knowing such data is available and is otherwise used in other aspects of his report. For example, Dr. Grimmer uses 2023 CVAP estimates as a base for his 2024 extrapolation.

[9] Jeremy Redmon, Paradise Afshar, and Lautaro Grinspan. "2020 Census: Georgia's minority populations have surged." *Atlanta Journal Constitution.* August 12, 2021. Available at https://www.ajc.com/news/2020-census-georgias-minority-populations-have-surged/SLZIWRHNE5CMDJR2EDMRD42ZDY.

[10] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 6 at 12-13.

lower in the 2024 presidential election than they were in the 2020 presidential election.[11]

14. Further, in my amended supplemental report, I state that "[a]cross racial/ethnic minority groups, the largest disparities between their respective rate of turnout and non-Hispanic White turnout are post-SB202, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout are in pre-SB202 elections."[12] Even using Dr. Grimmer's estimates, we can still see a clear increase in turnout gaps between White Georgians and Black, Hispanic, or Asian American/Pacific Islander Georgians after SB202 went into effect.

15. **Table 1** below uses Dr. Grimmer's turnout estimates to construct the gap in turnout between White Georgians and Black, Hispanic, or Asian American/Pacific Islander Georgians. This table reproduces turnout rate estimates from Table 2 of Dr. Grimmer's supplemental report dated June 13, 2025, but rescales the turnout rates for Black, Hispanic, and Asian American/Pacific Islander Georgians to display them relative to the non-Hispanic White Georgian turnout rate in each statewide federal election from 2018-2024. The result is the percentage point difference or disparity in voter turnout rates between White Georgians and non-White Georgians in each election.[13]

---

[11] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 8-9 at 17.

[12] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 12-13 at 24.

[13] The presentation of the table is analogous to Table 2 from my June 23, 2025 amended supplemental report.

|  | Pre-SB202 | | | Post-SB202 | | |
|---|---|---|---|---|---|---|
|  | **Nov 2018** | **Nov 2020** | **Jan 2021** | **Nov 2022** | **Dec 2022** | **Nov 2024** |
| **White** | 53.9% | 67.1% | Missing | 53.9% | Missing | 69.0% |
| **Black** | -4.4 | -9.9 | Missing | -11.8 | Missing | **-12.9** |
| **Hispanic** | -26.4 | -26.8 | Missing | **-32.5** | Missing | -27.9 |
| **Asian/PI** | -19.6 | -7.2 | Missing | **-19.8** | Missing | -8.1 |

**Table 1: Difference in Voter Turnout Rate from White Georgians using Dr. Grimmer's Estimates, 2018-2024.** Turnout rates calculated using the replication code provided by defendants. "Missing" indicates elections where Dr. Grimmer did not provide any turnout estimates in his June 13, 2025 supplemental expert report. The **bolded** numbers reflect the largest gap between White and non-White Georgians in the available elections between 2018-2024.

16.    **Table 1** shows the same pattern that I showed in my 2025 amended supplemental report. Dr. Grimmer's data shows that the largest disparity in turnout between Black Georgians and White Georgians (12.9 percentage points) in the elections Dr. Grimmer examines from 2018-2024 was in the November 2024 presidential election, which was the first presidential election after the implementation of SB202. Similarly, the largest disparity in turnout between Hispanic Georgians and White Georgians (32.5 points) was in the post-SB202 federal election of November 2022. The largest disparity in turnout between Asian American/Pacific Islander Georgians and White Georgians (19.8 percentage points) was also in a post-SB202 election, November 2022. In fact, despite methodological differences in our data and analyses, both Dr. Grimmer and I show that the largest disparities between racial/ethnic minority groups' rate of turnout and non-Hispanic

8

White turnout occurred in post-SB202 elections, while the smallest disparities between their respective rate of turnout and non-Hispanic White turnout occurred in pre-SB202 elections.

17. As in my June 2025 amended supplemental report, if we compare turnout in the midterm election immediately preceding the implementation of SB202 (in 2018) to the midterm election immediately after the implementation of SB202 (in 2022), **Table 1** shows a larger disparity in turnout between White Georgians and Black Georgians, between White Georgians and Hispanic Georgians, and between White Georgians and Asian American/Pacific Islander Georgians post-SB202. Again, we see these findings even using Dr. Grimmer's turnout estimates.

18. Furthermore, despite Dr. Grimmer using a different, and more likely to be biased, method of calculating the citizen voting-age population for 2024, his findings nonetheless reinforce my conclusions. **Table 1**, which shows the difference in voter turnout rate from White Georgians as estimated by Dr. Grimmer, shows a larger disparity or gap in turnout in the presidential election after SB202 (in 2024) relative to the presidential election immediately preceding SB202 (in 2020). This is true when comparing turnout between White Georgians and Black Georgians, between White Georgians and Hispanic Georgians, and between White Georgians and Asian American/Pacific Islander Georgians. As shown in my June 23, 2025 amended supplemental report, I also find these same patterns: Black turnout, Hispanic turnout, and Asian American/Pacific Islander turnout all dropped disproportionately (relative to White voters) in 2024.

IV.  **As in his original February 2023 report, Dr. Grimmer selectively compares turnout in certain pre-SB202 elections with turnout in certain post-SB202 elections. Doing so ignores the highly competitive elections that peer-reviewed literature credits as an impetus for SB202 and ignores evidence contrary to his conclusions.**

19.  In my three reports, I focus my analyses of voter turnout trends on elections beginning in 2018 and continuing to the most recent statewide elections available. The reason I do so is because from 2018 onward, statewide elections in Georgia began to be viewed as highly competitive by campaigns and voters as turnout reached "modern highs."[14] According to Dr. M.V. (Trey) Hood III, an academic researcher specializing in Georgia elections and the director of the University of Georgia SPIA survey Dr. Grimmer uses in his expert reports, the 2018 election in Georgia was a "historic" election where "midterm turnout reached modern highs and a charismatic Democratic African-American woman came within a whisker of taking the 2018 gubernatorial contest to a runoff."[15] Dr. Hood and his co-author predicted (correctly) in 2019 that "[r]elatively recent demographically-driven political

---

[14] M.V. Hood III and Seth C. McKee (2019) "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election." *Social Science Quarterly*. 100 (5): 1828-1847, at 1844. The authors also note that campaigns did not treat the state as competitive in elections before 2018: "Obama and his respective GOP opponents treated Georgia as a 'blackout'/'base' Republican state in 2008 and 2012 (also the case in 2016)." Ibid. Internal citations omitted.

[15] M.V. Hood III and Seth C. McKee (2019) "Why Georgia, Why? Peach State Residents' Perceptions of Voting-Related Improprieties and Their Impact on the 2018 Gubernatorial Election." *Social Science Quarterly*. 100 (5): 1828-1847, at 1844.

developments have increasingly distanced Georgia from its more Republican Deep South neighbors. As a consequence, one can anticipate that for the first time since 1996, the Peach State will be a vigorously contested prize in the 2020 presidential election and it will also likely feature a contentious and competitive U.S. Senate race."[16]

20.    These close electoral contests extended beyond the conventional November matchups to include two critical runoff elections for Georgia's U.S. Senate seats. Indeed, researchers note that "[a]fter the 2020 presidential election **and subsequent 2021 Senate runoffs**, contests all won by Democrats in Georgia, the Republican-controlled legislature passed SB202 to appease their agitated and disaffected base of supporters."[17]

21.    Dr. Grimmer's supplemental report ignores the pre-SB202 2021 runoff elections or the relevant post-SB202 comparison election (a U.S. Senate seat runoff in 2022), despite the 2021 runoffs being viewed by academics as a primary motivator for the passage of SB202 itself.

22.    In my (2023) original and sur-rebuttal reports, and also my (2025) amended supplemental report, I show that racial disparities in turnout were substantially higher in the post-SB202 2022 Senate runoff election, relative to the pre-SB202 2021 Senate runoff elections. Importantly, Dr. Grimmer also showed the same pattern of higher racial disparities in turnout in the post-SB202 2022 Senate runoff election relative to the pre-SB202 2021 Senate

---

[16] Ibid.
[17] M.V. Hood III and Seth C. McKee (2023) "Partisan schism in America's newest swing state." *Party Politics*. 29 (5): 853-864, at 853. Emphasis added.

runoff election in his original expert report.[18] However, he removed runoff analyses from his turnout discussion and all tables in his most recent (June 2025) report.[19]

23. The inclusion of elections prior to 2018, and omission of key runoff elections in 2021 and 2022, lead Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on turnout and absentee balloting. This includes his observation that "[t]he turnout rate among Black voters was 1.2 percentage points lower in 2024 than in 2020, but the 2024 turnout rate was 3.9 percentage points higher than in the 2016 presidential election"[20] and that "[a]bout 5.1% of all ballots were cast using mail-in absentee voting ("absentee voting"), a larger share of votes cast using absentee voting than in 2014 or 2016, but a smaller share than in 2018, 2020, or 2022."[21]

24. The inclusion of the 2016 election and omission of key runoff elections in 2021 and 2022 also leads Dr. Grimmer to provide statistics of limited value for assessing SB202's impact on mail-in ballot rejection rates. This includes his observation that "the two general elections after the passage of SB202 saw a lower mail-in ballot rejection rate than the mail-in ballot rejection rate in 2016

---

[18] Expert Report of Dr. Justin Grimmer, dated February 14, 2023, p. 23 at Table 2.
[19] The 2021 and 2022 Senate runoffs were mentioned at least 70 times in Dr. Grimmer's original 2023 expert report. In his June 2025 supplemental report, he mentions Georgia's runoff elections three times: twice in quoting material from his original 2023 expert report, and once in what appears to be an erroneous copy-paste of a footnote from that original report. *See* Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, pp. 6-7 n.1.
[20] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 1 at 1.
[21] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 2 at 2.

or 2018, but a higher mail-in ballot rejection rate than in 2020."[22] Instead, in **all of the statewide federal elections** after the passage of SB202, there was a higher mail-in ballot rejection rate than in the two statewide federal elections immediately preceding the implementation of SB202.[23]

V.    <u>Dr. Grimmer's analysis of drop box use relies on a survey question whose ambiguous wording precludes accurate measurement of changes in rates of drop box use after SB202's implementation. However, even Dr. Grimmer's flawed data shows Black voters were more likely to use drop boxes than White voters in 2020, 2022, and 2024, with disproportionate declines in drop box use by Black voters after implementation of SB202.</u>

25.    Dr. Grimmer relies on a question from the 2022 and 2024 Cooperative Election Study ("CES") to evaluate what proportion of Georgia absentee-by-mail voters returned their ballot in a drop box in the post-SB202 2022 and 2024 elections. The question, which is the same in both years of the survey, reads "Which of the following statements most accurately describes where your ballot was returned?"[24] The question has not been tailored for the State of

---

[22] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 35 at 51.
[23] Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 18-19 at 36-37.
[24] For 2022, the question label is CC22_403c, 2022 CES post-election wave questionnaire, downloaded from https://doi.org/10.7910/DVN/PR4L8P [file name: ces22_common_post_qx.pdf], p. 22.
For 2024, the question label is CC24_403c, 2024 CES post-election wave questionnaire, downloaded from https://doi.org/10.7910/DVN/X11EP6 [file name: CCES24_Common_post.docx], p. 16.

13

Georgia. Instead, seven response options are available, and only one response mentions a drop box. The response that most clearly indicates a deposit in a drop box states: "Drop box used only for ballots, not located at an election office or polling place."[25] However, as a result of the implementation of SB202 in 2021, all drop boxes in Georgia are located <u>inside</u> of either election offices or certain polling places used for early voting and only during early voting hours.[26]

26.   Therefore, a 2022 or 2024 voter using a drop box in Georgia **cannot** indicate that they used a drop box via this or other listed responses without significant ambiguity as to how they returned their ballot. For instance, a voter answering yes to this option, may have deposited a ballot in a drop box although the answer is technically inaccurate.

27.   Further, a respondent who returned his ballot to **an election office after early voting may not have used a drop box** but may have answered yes. Another may have looked at the list of options and decided to mark "I don't know." Or a respondent who deposited a ballot in a drop box at an election office may have decided to ignore the second clause in the response option "Drop box used only for ballots, not located at an election office or polling place."

28.   As Dr. Grimmer acknowledges in his report, "there are important caveats with using survey data to estimate drop box use. The most important caveat is that voters may misrepresent or misremember

---

[25] Ibid.
[26] SB202, as passed (Enrolled version), p. 47, lines 1172-1191.

how they returned their ballot or their mode of voting."[27] Given the nature of the survey question, the scenario Dr. Grimmer outlines in his caveat likely influences the responses that at least some of the Georgia voters gave in the online survey.

29.    An examination of Dr. Grimmer's data indicates that his estimates of differences in drop box include only six (6) Black Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place," and six (6) White Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place" in the 2024 CES survey. His data also indicates only two (2) Black Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place," and eight (8) White Georgians who responded to the survey and indicated that they deposited a ballot in a "Drop box used only for ballots, not located at an election office or polling place" in the 2022 CES survey. This number of respondents who selected the only response clearly indicating drop box use is too small to draw any conclusions about drop box usage given the problems inherent in the survey question's response options.

30.    Dr. Grimmer has made consequential errors in analyzing survey data on drop box use in previous reports in this case. At least two experts have previously found errors in Dr. Grimmer's analysis of survey data on drop box use that led him to make incorrect

---

[27] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 74 at 94.

conclusions about rates of drop box use by race in 2020 and 2022.[28] This includes excluding non-mail-in voters in the denominator of his calculations,[29] an error he again makes in this report.

31.  I noted in my 2024 supplemental declaration that Dr. Grimmer failed to report an analysis contained in his computer code showing "Black voters were significantly (p = 0.0163, significant at the 95% level) **more** likely to use drop boxes than White voters in the 2020 election."[30] Dr. Grimmer also admitted that he edited the survey data as it contained "badly biased estimates"[31] of what share of Georgia voters voted absentee in 2020. Finally, Dr. Grimmer admitted to making an "arithmetic error" in calculating the share of White and Black Georgians who voted via drop box in 2022 attributable to this editing process, and after fixing this error he found that, on average, Black Georgians had a higher rate of drop box use in the survey than White Georgians.[32]

32.  In his 2025 report, Dr. Grimmer does not show any analyses of drop box use by Black or White Georgians who voted in total. Instead, he only shows rates of drop box use for the subset of Georgians who self-reported that they used an absentee-by-mail

---

[28] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, pp. 4-12 at 4-16; Supplemental Declaration of Dr. Barry Burden, dated August 24, 2023, pp. 1-4; Update to Expert Report of Dr. Justin Grimmer, dated September 7, 2023, p. 2 at 3.

[29] Supplemental Declaration of Bernard L. Fraga, dated January 19, 2024, pp. 10-12 at 12-17.

[30] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 4 at 5.

[31] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 6 at 7 (citing "Grimmer – Additional Data and Code", file "code.R", line 204).

[32] Update to Expert Report of Dr. Justin Grimmer, dated September 7, 2023, p. 2 at 3.

ballot. Subsetting the data in this way produces a biased analysis of SB202's impact because it cannot account for individuals who may have decided not to use an absentee-by-mail ballot because of limits on drop box availability or accessibility. Peer-reviewed research analyzing Georgia's drop box availability in 2020 established that "Individuals located closer to drop boxes are more likely to vote by mail and are less likely to fail to return requested mail-in ballots."[33] Therefore, an analysis of how SB202's drop box provisions may have impacted drop box use must include, at a minimum, all Georgians who decided to vote in the denominator of the analysis.

33. Dr. Grimmer and I both show that the rate of absentee-by-mail voting in Georgia was disproportionately reduced for Black voters after SB202 was enacted.[34] Dr. Grimmer's original report also shows that limits on the number of drop boxes disproportionately reduced drop box availability in Fulton and DeKalb counties,[35] the two counties with the largest number of Black registrants in the state. If some Black voters decided not to vote absentee-by-mail because of limited drop box availability, Dr. Grimmer's decision to use only mail-in voters in the denominator would bias estimates of racial disparities in changes in drop box use as well. As I stated in one of my previous reports, "[a]ny statistics that use the population of mail-in absentee voters as the denominator, rather than all

---

[33] Greenberger, Michael and Jason M. Roberts. 2024. "Dropbox Allocation and Use Among Georgia Voters in the 2020 Election." *Election Law Journal* 23 (1): 55-68.
[34] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 29 at Table 6; Amended Supplemental Report of Dr. Bernard L. Fraga, dated June 23, 2025, p. 14 at Table 3.
[35] Report of Dr. Justin Grimmer, dated February 14, 2023, p. 110 at Table 21.

voters statewide, will provide a misleading estimate of differences in rates of drop box use by Black Georgians and White Georgians" and "comparisons among mail-in voters alone are not logically informative as to how, e.g., the availability of drop boxes or subsequent restrictions on drop boxes could have disparate racial impacts."[36]

34. Using the replication code provided by Dr. Grimmer, I estimated the share of White voters in Georgia who voted via drop box and Black voters in Georgia who voted via drop box in the 2020, 2022, and 2024 elections. As I note earlier in this report, the single survey question Dr. Grimmer relies on is severely flawed and not tailored to the realities of how voting occurs and elections are conducted in Georgia post-SB202. However, using this flawed data I produced **Table 2** below.

35. In **Table 2**, I show that, using Dr. Grimmer's method of identifying who voted via drop box, Black voters in Georgia were more likely to vote via drop box than White voters in Georgia in every election examined by Dr. Grimmer in Table 19 of his 2025 supplemental report.[37] Black voters in Georgia were also more likely to vote via drop box than voters overall in the state in 2020, 2022, and 2024.

---

[36] Supplemental Declaration of Dr. Bernard L. Fraga, dated January 19, 2024, p. 10-11 at 14-15.

[37] Supplemental Report of Dr. Justin Grimmer, dated June 13, 2025, p. 74 at Table 19.

|  | White Voters | Black Voters | Overall Voters |
|---|---|---|---|
| **2020** | 13.1% | 18.2% | 14.7% |
| **2022** | 3.0% | 4.1% | 3.3% |
| **2024** | 2.3% | 4.6% | 4.3% |

**Table 2: Share of Georgia Voters Returning Ballots at a Drop Box, using Dr. Grimmer's Methodology.** Drop box use rates calculated using replication code provided by defendants.

36.    **Table 2** also demonstrates a disproportionate decrease in drop box use by Black voters in Georgia after the enactment of SB202 in 2021. In 2020, Black voters voted via drop box at a rate of 18.2%. In 2022, this rate dropped to 4.1%, a decline of 14.1 percentage points. By comparison, in 2020, White voters voted via drop box at a rate of 13.1%. In 2022, this rate dropped to 3.0%, a decline of 10.1 percentage points.

37.    Dr. Grimmer's analyses in Section XI of his report are therefore not reliable evidence of rates of drop box use or differences in rates of drop box use by Georgia voters by race in 2020, 2022, or 2024.

I reserve the right to supplement or revise my opinions and conclusions based on any new information, evidence, reports prepared by other experts, or testimony that becomes available during discovery, depositions, at trial, or otherwise.

Executed the 14th day of July, 2025 at Atlanta, GA

Bernard L. Fraga, Ph.D.



*October 31, 2024*

Following a surge of last-minute absentee ballot applications, Cobb Elections is collaborating with postal and delivery companies to expedite sending ballots to voters and ensure their timely return.

As of Wednesday, more than 3,000 absentee ballots requested by last Friday's deadline had not been mailed. Elections workers will send most of them via USPS Express Mail or UPS Overnight Delivery by Friday morning. These ballots will include prepaid express return envelopes to ensure voters can return them by Tuesday's deadline.

"We want to maintain voter trust by being transparent about the situation," said Board of Elections Chairwoman Tori Silas. "We are taking every possible step to get these ballots to the voters who requested them. Unfortunately, we were unprepared for the surge in requests and lacked the necessary equipment to process the ballots quickly."

Voters who have not received their ballots can still vote in person on Friday, the final day of Advance Voting, or at their polling place on Election Day, Nov. 5. More than 1,000 absentee ballots are being sent out of state, and Elections officials are working with UPS to expedite their delivery.

Cobb Elections had contracted with a state-approved vendor to print and ship absentee ballots.

"After our vendor's final run on Friday, we needed to utilize our in-house equipment for the final shipment of ballots, but the equipment was not working properly," said Elections Director Tate Fall. "By the time we got the equipment online, the deadline for mailing the ballots had passed, prompting us to work with the US Postal Service and UPS to take extraordinary measures. Our team has been working around the clock to get the ballots out."

Exhibit

9

Grimmer

08/27/2025    C.A.N.

Absentee ballot requests had been averaging around 440 per day, but in the last week, that number surged to 750 per day, with 985 requests submitted on Friday's deadline.

Cobb Elections will extend the hours for absentee ballot returns at the Elections Headquarters this weekend. Voters can return their ballots to 995 Roswell Street, Marietta, from 8 a.m. to 8 p.m. Saturday, 10 a.m. to 8 p.m. Sunday, and 8 a.m. to 8 p.m. Monday.

Anyone with questions about their absentee ballot request can contact the Cobb Elections Department at 770-528-2581.

**Press Contact Info**

For more info: 770-528-2581