**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br><br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' SUPPLEMENTAL BRIEF**
**IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................ 2

ARGUMENT ............................................................................... 4

I.    The 2024 Elections Confirm that Plaintiffs Cannot Show that SB 202 Burdens the Ability of Georgians to Cast Their Ballots. ........ 5

    A.    Turnout in Georgia remained high in 2024. ............................ 6

    B.    Lines remained short in 2024. ................................................ 10

II.    The 2024 Elections Confirm that Plaintiffs Cannot Succeed in Challenging Various Individual Provisions of SB 202. ................... 17

    A.    Undisputed facts continue to show that SB 202's drop box provisions are lawful. ...................................................... 17

    B.    Undisputed facts continue to show that SB 202's absentee-ballot provisions are lawful. ................................... 21

        1.    Absentee voting returned to pre-pandemic levels........ 21

        2.    Rejection rates related to absentee ballots were low. ............................................................................. 23

        3.    Plaintiffs cannot identify any genuinely disputed facts supporting their challenges to SB 202's absentee-voting provisions. ........................................... 26

    C.    Undisputed facts confirm that SB 202's out-of-precinct provisions are lawful. ............................................................. 29

    D.    Undisputed facts continue to show that SB 202's provisions forbidding the government from sending unsolicited absentee-ballot applications are lawful. ............... 32

    E.    Undisputed facts continue to show that SB 202's Suspension Rule is lawful. ..................................................... 36

CONCLUSION ............................................................................ 38

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Bowen v. First Fam. Fin. Servs., Inc.*,
    233 F.3d 1331 (11th Cir. 2000) ................................................... 38

*Brnovich v. Democratic Nat'l Comm.*,
    594 U.S. 647 (2021) .........................................................*passim*

*Coal. for Good Governance v. Kemp*,
    No. 1:21-CV-2070-JPB, 2025 WL 848462 (N.D. Ga. Mar. 18, 2025) .......... 37

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ............................................... 14, 30

*Curling v. Raffensperger*,
    50 F.4th 1114 (11th Cir. 2022) ................................................... 10

*GeorgiaCarry.Org, Inc. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012) ................................................... 38

*In re Ga. SB 202*,
    688 F. Supp. 3d 1300 (N.D. Ga. 2023) ........................................... 15

*In re Ga. SB 202*,
    No. 1:21-MI-55555-JPB, 2023 WL 6628601 (N.D. Ga. Oct. 11, 2023) ......... 31

*In re Ga. SB 202*,
    No. 1:21-MI-55555-JPB, 2024 WL 150500 (N.D. Ga. Jan. 12, 2024) .......... 16

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ........................................... 10, 15, 31

*VoteAmerica v. Raffensperger*,
    -- F. Supp. 3d --, 2025 WL 2607827 (N.D. Ga. Sept. 8, 2025) ............... 35

**Statute**

O.C.G.A. § 21-2-33.2 ........................................................ 37

**Regulation**

28 C.F.R. § 35.150 ......................................................... 20

ii

# INTRODUCTION

In enacting Senate Bill 202 (SB 202), Georgia sought to enhance election efficiency, address concerns about voter fraud, and bolster voter confidence. The data from the 2024 elections confirm that Georgia was successful in these efforts, and the Court should grant State Defendants' motions for summary judgment on all claims Plaintiffs have lodged against portions of SB 202.

In this case, various organizations, individuals, and eventually the federal Government sued Georgia, claiming that portions of SB 202 violate various federal laws and the Constitution because, according to Plaintiffs, SB 202 makes it more difficult to vote. Some Plaintiffs insisted that SB 202 would cause lines at polling places to be unreasonably long. Opp'n to Discr. Intent MSJ at 123–24 [Doc. 822]. Others insisted that—notwithstanding the many ways to cast ballots in Georgia—SB 202 would make voting too difficult by limiting the number of available drop boxes. Opp'n to Drop Box MSJ at 13–17 [Doc. 835]. Still others made similar claims about the modest and targeted changes to Georgia's absentee-voting rules. Opp'n to Absentee Ballot MSJ at 42–46 [Doc. 830].

During the parties' previous summary-judgment briefing, State Defendants showed that each of Plaintiffs' claims fails as a matter of law. State Defs.' MSJs [Docs. 757–760, 762–764]. Since that time, the 2024 elections were conducted, and those elections confirm that Plaintiffs' claims are fatally

flawed. Far from confirming Plaintiffs' charge of increased burdens on voters, the 2024 elections saw record-breaking turnout, robust use of all voting methods, and virtually non-existent lines at polling places. As the supplemental expert discovery conducted after the 2024 elections confirms, the Court should grant each of State Defendants' motions for summary judgment.

## BACKGROUND

In 2024—the first presidential election since SB 202's enactment—Georgia's overall voter turnout was higher than in any election since 1980. Grimmer 6/13/25 Rep. ¶ 1 (Ex. A). And that is true across nearly every racial group. *Id.* While Black voter turnout in Georgia arguably decreased slightly in 2024 compared to 2020, the decrease in Georgia followed a trend in other states, where Black voter turnout also declined—although Georgia's decline was less than in most other states. *Id.* ¶ 35; Shaw 7/14/25 Rep. 16 (Ex. C).

Additionally, the 2024 elections saw Georgia voters able to use early in-person voting more than ever before. Grimmer 6/13/25 Rep. ¶ 2. In fact, more than 71% of all ballots cast in 2024 were cast using early in-person voting. *Id.* And, in 2024, *every* racial group experienced its highest share of early-in-person voting compared with previous elections. *Id.* When doing so, voters made robust use of weekend voting, which SB 202 expanded. *Id.* ¶¶ 4, 64–69.

Despite this increased turnout, voters in the 2022 and 2024 elections also experienced significantly fewer long lines at polling places than in previous

elections. In fact, in the two elections conducted since SB 202's enactment, the share of voters who waited more than 30 minutes was smaller than in 2016, 2018, or 2020. *Id.* ¶ 6.

In contrast to the increase in early voting, absentee-by-mail voting returned to its pre-pandemic rates, with approximately 5.1% of ballots cast using this method. *Id.* ¶ 2. The 2024 elections showed that drop box use by race was virtually unchanged when compared to such usage in 2020. *Id.* ¶ 9. For those voters who submitted absentee-by-mail ballots, very few encountered complications from SB 202's identification requirements or the new deadlines for requesting and submitting absentee ballots. In 2024, only 1.7% of mail-in ballots were rejected, which is a lower rate than the pre-SB 202 elections in 2016 and 2018. *Id.* ¶ 3. And hardly any absentee-ballot applications were rejected because of identification issues or tardiness. *Id.* ¶ 7.

There is also no evidence that SB 202's changes to provisional voting, ban on government-sent unsolicited absentee-ballot applications, or Suspension Rule reduced turnout. All this confirms that Georgia voters prefer to vote in person, have few to no problems navigating SB 202's rules as compared to before the pandemic, and that the 2020 election's heavy use of absentee-by-mail voting was an outlier, rather than the beginning of a new trend.

## ARGUMENT

State Defendants have already shown that there are no genuine disputes of material fact about SB 202's legality, which entitles State Defendants to judgment in their favor as a matter of law. After the 2024 election cycle, it is now even clearer that the Court should grant State Defendants' pending motions for summary judgment.

As discussed below, the 2024 elections provide additional data to support State Defendants' motions for summary judgment, confirming that: (i) SB 202 does not impose unlawful burdens on voters; (ii) long voting lines are rare in Georgia, and the line-related portions of SB 202 are thus lawful; (iii) SB 202 provides voters with access to drop boxes; (iv) the modest changes to the absentee ballot and absentee-ballot application requirements have not decreased voter participation; (v) the updated requirements for out-of-precinct provisional ballots did not disenfranchise voters; and (vi) SB 202's rule that local election officials can be held accountable for continued failures does not harm Georgia voters. [Docs. 757–760, 762–764].

In discussing these various issues below, State Defendants supplement their earlier-filed summary judgment motions. But this is by no means an exhaustive list of the claims for which the Court should enter summary judgment in State Defendants' favor. Rather, the Court should enter summary

judgment in State Defendants' favor on all claims. Those discussed here are merely the claims for which the 2024 election data are most relevant.

## I.    The 2024 Elections Confirm that Plaintiffs Cannot Show that SB 202 Burdens the Ability of Georgians to Cast Their Ballots.

The 2024 elections show that SB 202 has not deterred voter participation, and it has not caused long lines at polling locations. These facts are fatal to Plaintiffs' repeated claims that SB 202 will burden the ability of Georgians to vote by depressing turnout and causing longer lines at the polls. [Doc. 830 at 38] ("overlapping and compounding restrictions … resulted in lower turnout rates" for nonwhite voters); [Doc. 824 at 27] (discussing the impact of longer lines).

Even before the 2024 elections, State Defendants demonstrated why the data did not support Plaintiffs' arguments. Discr. Intent MSJ at 25–26 [Doc. 759] (Georgia had "more votes cast than any other midterm" in 2022), 42 (lines in 2022 were short); Drop Box MSJ at 8–9 [Doc. 760] ("Voting was easy in part because lines in 2022 were shorter following SB 202's reforms."). But the 2024 election data reinforce that Plaintiffs' fears have not come true: Turnout remained high in Georgia in 2024, and voting lines were virtually nonexistent. It is thus beyond dispute that SB 202 has not depressed turnout in Georgia, and the Court should grant summary judgment in State Defendants' favor on all claims that are predicated on the unproven assumption that SB 202

burdens the right to vote, violates Section 2 of the Voting Rights Act ("VRA"), or burdens disabled voters. *See* [Docs. 757–760, 762–764].

### A.    Turnout in Georgia remained high in 2024.

The clearest evidence that SB 202 has not impaired the ability of Georgians to vote is the recent turnout data, which show that turnout in 2024 was higher than in 2020. That fact is true irrespective of which turnout metric is used, and it is true for nearly all racial groups. Given these data, Plaintiffs cannot reasonably claim that SB 202 burdens the ability of Georgians to vote.

1.    Voter turnout in Georgia increased in 2024. Although Plaintiffs' experts quibble about the appropriate way to measure turnout, they cannot dispute this fact. Indeed, turnout increased as a share of both the Citizen Voting Age Population (CVAP) and the Voting Eligible Population (VEP). Grimmer 6/13/25 Rep. ¶¶ 10–16; Shaw 7/14/25 Rep. 9. Using CVAP, for instance, 2024 turnout in Georgia was 0.5 percentage points higher than in 2020 and 8.7 percentage points higher than in 2016. Grimmer 6/13/25 Rep. ¶ 14 & tbl. 1. The same is true when using VEP, where 2024 turnout was 0.1 percentage points higher than in 2020 and 8.5 percentage points higher than in 2016. *Id.* ¶ 15 & tbl. 1. In fact, using VEP estimates, 2024 turnout was 68.3%—the highest of *any* general election since at least 1980. *Id.* ¶ 16 & fig. 1, ¶ 27.

Georgia's 2024 turnout is even more noteworthy when compared to national trends. While turnout in Georgia increased from 2020 to 2024, turnout in other states saw on average a 3.3 percentage point *decrease* from 2020 to 2024. *Id.* ¶ 26 & tbl. 3. In fact, Georgia's turnout rate in 2024 was 3.7 percentage points higher than the average in other states. *Id.* ¶ 27. As State Defendants' expert Dr. Daron Shaw explained: "Georgia ranks near the top of the list of states when comparing the turnout shift from 2020 to 2024." Shaw 7/14/25 Rep. 11 & fig. 2. In fact, Dr. Shaw explains, Georgia "is one of only eight states … that did not see a turnout decline from 2020 to 2024." *Id.* Even when Georgia is compared against only battleground states, the same trend is seen— turnout in Georgia increased while turnout in several battleground states decreased as compared to 2020. *Id.* at 12–13 & fig. 3.

Because there can be no dispute about Georgia's increased voter turnout, Plaintiffs cannot seriously suggest that SB 202 burdens the ability to vote in Georgia.

2.    Nor can Plaintiffs argue that SB 202 disproportionally burdens voting for any discrete racial group. Rather, turnout increased for nearly all racial groups. American Indian, Asian, Hispanic, and white voters in Georgia saw their highest turnout rates in 2024 in any statewide general election since

at least 2014.[1] Grimmer 6/13/25 Rep. ¶¶ 1, 18–20. At the same time, nationwide turnout among these same groups dropped between 2020 and 2024. Shaw 7/14/25 Rep. 15–16 & fig. 5.

Although it is also true that Black turnout in Georgia declined slightly in 2024 by just 1.2 percentage points when compared with 2020, Black voter turnout was higher in 2024 than in 2014, 2016, 2018, and 2022. Grimmer 6/13/25 Rep. ¶ 20 & tbl. 2. Using the Census Bureau's adjusted Current Population Survey data, in Georgia Black voter turnout actually increased by 1 percentage point in 2024 from 2020. *Id.* ¶¶ 30–36 & tbl. 4. Moreover, the decline in Georgia's Black turnout was less than the nationwide decline in Black turnout from 2020 to 2024. Shaw 7/14/25 Rep. 16. And, as Plaintiffs' expert Dr. Stephen Pettigrew confirmed, comparing voting trends across states is an instructive way to explain those trends. Pettigrew 8/15/25 Dep. 131:17–132:2 (Ex. J).

Here, the data show that Black voter turnout was down across the country in 2024. Grimmer 6/13/25 Rep. ¶¶ 1, 28, 30 & tbl. 4. And there are many potential explanations for this. For example, Plaintiffs' expert Dr.

---

[1] For Asian voters in particular, State Defendants' expert Dr. Justin Grimmer shows that they "turned out at the highest rate in the 2024 election since at least the 2014 election and that their registration rate, as a share of CVAP, has increased 40.4 percentage points over the same period." Grimmer 7/14/25 Rep. ¶ 7 (Ex. B).

Jonathan Rodden acknowledged that, when compared to 2020, Black voters in 2024 who did not vote were 5 percentage points more likely to report that they did not like the candidate, 6.6 percentage points more likely to report that they were too busy, and 5.7 percentage points more likely to report that they were not interested in the election. Rodden 8/12/25 Dep. 55:9–57:24 (Ex. K). Moreover, as Dr. Shaw explained, "there was a *national* tendency in the 2024 election for Black voters to be less motivated to vote than White voters." Shaw 7/14/25 Rep. 18; *see also* Rodden 8/12/25 Dep. 29:4–30:11 (addressing possible motivating factors), 55:9–59:10 (reviewing survey data reflecting share of voters who chose not to vote according to race and reason for not voting). SB 202 plainly did not cause unmotivated voters not to cast a ballot.

3.      These turnout figures in Georgia confirm that Plaintiffs cannot carry their summary-judgment burden of identifying any genuinely disputed material facts showing that SB 202 impairs the ability of Georgians to vote. Rather, the only way Plaintiffs could try to use these data to support their claims is through "statistical manipulation," which the Supreme Court confirms they cannot do. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 681 (2021). Absent such manipulation, "the statistics show only a small disparity that provides little support for concluding that [Georgia's] political processes are not equally open." *Id.* Rather, the increase in turnout since SB 202 shows that Georgia's voting system remains open for all. And Plaintiffs'

Section 2 claims are thus doomed because they cannot identify any disparate impact from SB 202. *See* [Doc. 759 at 42] (citing *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 938 (11th Cir.), *reh'g denied*, 81 F.4th 1328 (11th Cir. 2023)).

Similarly, when analyzing Plaintiffs' claims under the *Anderson-Burdick* framework, the broad increase in turnout shows that any burden from SB 202's provisions—whether viewed separately or collectively—is slight and pales in comparison to the State's identified interests. *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022). And because "the Constitution charges States, not federal courts, with designing election rules," Georgia's "important regulatory interests in conducting orderly elections … justify" whatever "modest" burdens may be associated with SB 202. *Id.* at 1122 (cleaned up).

Thus, the 2024 turnout data confirms that Plaintiffs' challenges to SB 202 have been misguided from the start, and the Court should enter summary judgment in State Defendants' favor because SB 202 has not burdened voters in the ways Plaintiffs anticipated it would.

## B.     Lines remained short in 2024.

Further demonstrating that Georgians were not burdened when voting, long lines at polling locations were virtually nonexistent in 2024, despite Plaintiffs' persistent fears that SB 202 would cause increased voting lines. *See* [Doc. 822 at 28–29, 110, 121, 123–24]; Pls.' Resp. to State Defs.' Statement

Material Facts at 168–69, 216–18 [Doc. 807]. Indeed, the share of voters who waited more than 30 minutes decreased in all post-SB 202 elections.

1.    The data show that hardly any Georgia voters encountered long voting lines in the two elections since SB 202. In one study conducted by the School of Public and International Affairs (SPIA) survey research center at the University of Georgia, only 2.7% of Georgia voters reported waiting in line more than 30 minutes in 2024, with only 0.7% of Georgia voters reporting waiting more than an hour. Grimmer 6/13/25 Rep. ¶¶ 75–77. In contrast, 8.6% of Georgia voters reported waiting more than 1 hour in 2020, and 4% reported waiting more than 1 hour in 2016. *Id.* at 63 tbl. 16. And this dramatic decrease occurred despite the substantial increase in turnout.

There are many possible explanations for these shorter lines.[2] For instance, the data show that Georgians are changing the way they cast their votes. In 2024, a supermajority of all voting Georgians voted early in-person, which substantially reduces the voting burden on Election Day. *Id.* ¶¶ 2, 38–40 & tbl. 5. That reality carried across racial groups, and voters from *every* racial group voted early in person at higher rates than ever before. *Id.* ¶¶ 2, 43–44 & tbl. 6.

_____

[2] On this, State Defendants do not claim that SB 202 *caused* shorter voting lines, because that is not their burden in this case. The only relevant question is whether SB 202 led to longer lines, which Plaintiffs argued but failed to show.

As voters increasingly opted to vote early in person in 2024, the share of voters who chose to vote on Election Day correspondingly decreased. *Id.* ¶¶ 2, 40–41. Only 23.4% of ballots were cast on Election Day in 2024, a decrease of about half since 2016. *Id.* ¶¶ 40–41 & tbl. 5. But even then, Election Day voting remained the second most-used voting method for every racial group, with 35.3% of Hispanics, 32.8% of American Indians, 24.5% of Asians, 24.2% of Blacks, and 22% of whites opting to vote on Election Day. *Id.* ¶¶ 43, 45 & tbl. 6, App'x tbl. 20.

Additionally, while the data show that Georgia voters prefer to vote in person, absentee-by-mail voting has also remained popular. In 2024, 5.1% of all ballots cast were submitted by mail, which is a larger share than in either 2014 or 2016 and only slightly smaller than in the midterm elections in 2018 and 2022. *Id.* ¶¶ 2, 42, 45 & tbls. 5 & 6. Looking at racial group data, 2024 voting by mail compared to 2020 did not decrease disproportionately for any one racial group over another, showing no evidence of impacting any group more than any other. *Id.* ¶ 45 & tbl. 6, App'x tbl. 20.

Thus, with the increased availability of early voting after SB 202, the burden on polling locations was substantially reduced, and voting lines were virtually nonexistent.

2.    Whatever the reason for the shorter lines, the SPIA survey confirms that Georgia voters of all races benefited. In 2024, more white voters

reported waiting longer than 30 minutes to vote than Black voters. *Id*. ¶ 77. And the share of Black voters waiting more than 30 minutes decreased 2.1 percentage points in 2024 compared to 2022. *Id*. ¶ 79.

This same trend is observed using the Cooperative Election Study, which Plaintiffs' experts prefer. *Id*. ¶¶ 80–81 & tbl. 16; [Doc. 756-39 at 21–22]. Comparing the pre-SB 202 elections (2016, 2018, 2020) with the post-SB 202 elections (2022 and 2024), the share of voters who reported waiting in line more than 30 minutes was smaller *after* SB 202 was enacted. Grimmer 6/13/25 Rep. ¶ 80 & tbl. 16. In the post-SB 202 elections, almost 94% of voters reported waiting less than 30 minutes to vote. *Id*.

The undisputed evidence also shows that voters of color substantially benefited from this decrease in voting lines. Whereas at least 12% of Black voters reported that they waited more than 30 minutes to vote in every pre-SB 202 election since 2016, only 6.6% of Black voters in 2022 and 3.1% of Black voters in 2024 made the same report. *Id*. ¶ 81 & tbl. 16; Grimmer 8/27/25 Dep. 174:3–175:12.

White voters also saw significant improvements in line length after SB 202. In every pre-SB 202 election since 2016, more than 15% of white Georgia voters reported waiting in line more than 30 minutes. Lines improved so much after SB 202 that only 4.3% of white voters reported waiting more than 30 minutes in 2022 and approximately 7% reported such a wait in 2024.

*Id.* ¶ 82 & tbl. 16; Grimmer 8/27/25 Dep. 174:3–175:12. Whatever the cause, lines in Georgia have improved for all voters after SB 202.

3.    The absence of long lines after SB 202 directly supports State Defendants' motions for summary judgment on several claims.

First, the lack of long lines supports granting summary judgment on Plaintiffs' claims involving the Food, Drink, and Gift Ban. The Supreme Court confirms that voters may experience the "usual burdens of voting." *Brnovich*, 594 U.S. at 683 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)). And the lack of long lines at polling locations after SB 202 confirms that any remaining lines are part of this "usual burden[,]" and thus voters are not harmed by being unable to receive things of value from third parties while waiting in relatively short voting lines. The same facts demonstrate that Plaintiffs' constitutional claims should be rejected because there is no burden on the right to vote caused by short voting lines, and there is no need for voters to receive things of value when waiting in short lines to vote. Food, Drink & Gift Ban MSJ at 16–18 [Doc. 762].

Plaintiffs' claims are further undermined by the small racial disparities among voters who wait in lines. *Id.*; [Doc. 822 at 16, 40, 98, 135–36]. As the Eleventh Circuit explained, where racial disparities are "just over two percentage points," like the differences in Black and white voters reporting

waiting more than 30 minutes in line here, "they cannot support a finding of disparate impact." *League of Women Voters*, 66 F.4th at 935.

Second, Plaintiffs' disability-related challenges to the Food, Drink, and Gift Ban are also undercut by the lack of lines. The widespread accessibility of Georgia elections to voters with disabilities, who already have many ways to vote, and to avoid lines where they exist, demonstrates that disabled voters continue to have meaningful access to the ballot box. *See* [Doc. 762 at 23–25].

Third, since there are hardly any voting lines at all, it is extremely unlikely that anyone in line will ever be more than 150 feet from a polling place. *See id.* at 9. That calls into question this Court's preliminary finding when it enjoined the Ban's application to the Supplemental Zone based in part on finding that "the issue of long lines is sufficiently likely to continue in the 2024 elections." *In re Ga. SB 202*, 688 F. Supp. 3d 1300, 1317 (N.D. Ga. 2023), *appeals docketed,* No. 23-13093 (11th Cir. Sept. 19, 2023) & No. 23-13095 (11th Cir. Sept. 19, 2023) (oral argument held Aug. 13, 2025). The evidence now demonstrates that is not the case, further undercutting any harm from the Supplemental Zone.[3]

---

[3] This point also confirms that many Plaintiff groups lack standing to challenge SB 202. *See* Jurisdictional MSJ [Doc. 764-1]. Though State Defendants largely rest on their prior showing to defeat Plaintiffs' standing, the 2024 elections further show the lack of any actionable injury to several Plaintiff groups. In opposing summary judgment, several Plaintiffs relied on the existence of long voting lines as the reason for their diversions of resources. *See* Opp'n to

Fourth, the ease of voting in person shows that Plaintiffs' other claims about changes in SB 202 remain meritless. Plaintiffs' experts previously predicted that long lines would affect voter behavior in ways that harmed Black voters. For example, Plaintiffs' expert Dr. Barry Burden predicted that longer wait times would lead Black voters to vote absentee-by-mail. [Doc. 756-39 at 22]. Plaintiffs also claimed that, because voters faced long lines in Georgia, other methods of voting like absentee-by-mail voting, drop boxes, and mobile voting units were necessary to avoid unduly burdening the right to vote. [Doc. 822 at 130–33]. Plaintiffs likewise claimed that the shortened runoff period would lead to longer lines. *In re Ga. SB 202*, No. 1:21-MI-55555-JPB, 2024 WL 150500, at *7 (N.D. Ga. Jan. 12, 2024). However, because most Georgia voters do not face lines at all, they are free to use any method of voting they wish. And Georgia's decision to place reasonable regulations on other potential voting methods when in-person voting is so effortless does not burden or deny anyone—of any race—the right to vote.

---

Jurisdiction MSJ at 12 (NGP), 18 (BVMF), 37 (Sixth Dist. AME), 62 (Jauan Durbin) [Doc. 826]. That point was legally irrelevant from the start and there are no longer lengthy voting lines in Georgia. Those groups cannot be injured by a prohibition on handing out food, water, or other things to voters in line if there are effectively no lines at polling locations in the first place.

## II.    The 2024 Elections Confirm that Plaintiffs Cannot Succeed in Challenging Various Individual Provisions of SB 202.

In addition to showing that Georgians were generally not burdened in their ability to vote, the 2024 election data also defeat Plaintiffs' attempts to show that individual provisions of SB 202 harmed Georgia voters. Rather, these data show that the Court should enter summary judgment for State Defendants as to each of its pending motions for summary judgment and for each challenged provision of SB 202. [Doc. 757] (additional provisions); [Doc. 758] (timing changes); [Doc. 759] (discriminatory intent); [Doc. 760] (drop boxes and mobile voting); [Doc. 762] (food, drink, and gift ban); [Doc. 763] (absentee ballot provision claims); [Doc. 764] (jurisdiction).

### A.    Undisputed facts continue to show that SB 202's drop box provisions are lawful.

As to drop boxes, data from the 2024 elections confirm what State Defendants previously showed—SB 202's drop box provisions do not violate Section 2, the fundamental right to vote, the Americans with Disabilities Act ("ADA"), or the Rehabilitation Act. *See* [Doc. 76 at 1–30].[4]

---

[4] Plaintiffs still have no answer to State Defendants' showing that there is no right to vote absentee, either by mail or with a drop box. *See* [Doc. 858 at 7]. And it remains the case that—whatever the number of drop boxes in Georgia— voters can always mail their absentee ballot at one of the countless mailboxes in the State or return their absentee ballot directly to their county election office. *Id.* at 8–9; *see also* Grimmer 6/16/25 Rep. ¶ 45 (USPS data show its successful performance delivering ballots in 2024); Grimmer 8/27/25 Dep.

1.    As State Defendants explained previously, Plaintiffs do not dispute that the drop box provisions are facially neutral. Drop Box MSJ Reply at 1 [Doc. 858]. Nor do they dispute that the differences in drop-box use by race has remained essentially the same after SB 202. *Id.* Rather, Plaintiffs' core argument about drop boxes is the mistaken belief that the emergency measures put in place in 2020 serve as the statutory and constitutional baseline against which SB 202's provisions must be judged. Thus, Plaintiffs argue, SB 202 decreased the number of drop boxes, which Plaintiffs contend are statutorily and constitutionally protected.

State Defendants have already explained at length why that is false as a matter of fact and law. *See* [Doc. 858 at 1–4]. In short, to the extent there is a baseline, that baseline is *not* 2020, but 1982 when the VRA was adopted. *See Brnovich*, 594 U.S. at 669–70. Since Georgia did not use drop boxes in 1982, SB 202 undisputably contributed to *expanding* drop box availability and gave Georgia voters an additional means of voting. And the 2024 election data do not change these fatal defects in Plaintiffs' arguments.

2.    Rather, the 2024 election data further undermine Plaintiffs' arguments that SB 202's drop box provisions impose a burden on Georgia voters. While the *number* of drop boxes decreased after SB 202 compared to

---

192:2–17, 200:2–15 (explaining USPS procedure for delivering ballots to ensure they arrive on time) (Ex. I).

the number of emergency drop boxes authorized by rule in 2020, drop box *usage* in 2024 was similar to 2020 and higher than in 2022. Grimmer 6/13/25 Rep. ¶¶ 9, 90–94 & tbl. 19; Chatman 1/27/23 Rep. ¶ 66 [Doc. 810-18]; Chatman 6/13/25 Rep. ¶¶ 12–13, 30 (Ex. D). Indeed, 47% of absentee voters used a drop box in 2024, a decrease of just 2 percentage points from 2020. Grimmer 6/13/25 Rep. ¶ 93 & tbl. 19. And it remains the case that there is no consistent relationship between race and drop box use. *Id.* ¶¶ 9, 92. Rather, in 2020 and 2022, white voters were more likely to report using drop boxes, but by 2024, Black voters were more likely to report submitting a ballot at a drop box. *Id.* ¶¶ 9, 92 & tbl. 19; *see also* Grimmer 8/27/25 Dep. 208:2–19.[5]

3.    These undisputed facts are fatal to several of Plaintiffs' claims. For instance, Plaintiffs have no answer for State Defendants' showing that having to travel to cast a ballot is one of the "usual burdens of voting." [Doc. 858 at 7] (quoting *Brnovich*, 594 U.S. at 669). And Plaintiffs' entire theory of a voting burden is premised on the unsupported assumption that drop-box voters ordinarily use the drop box closest to their homes. Not so. Grimmer 7/14/25 Rep. ¶¶ 43–46 (highlighting the lack of data supporting that assumption and

---

[5] Even in manufacturing a hypothetical Black voter to estimate travel burden, Plaintiffs' own expert Dr. Chatman reported that the percentage of hypothetical Black voters facing a travel burden to access a valid drop box dropped between 2022 and 2024 even as the number of drop boxes declined. Chatman 8/6/25 Dep. 327:14–22 (Ex. G).

the data showing that many drop box users "return absentee ballots to drop boxes while performing other errands") (Ex. B); *see also* Discr. Intent MSJ Reply at 99–104 [Doc. 860].

Nor can Plaintiffs identify any evidence that, as travel times to drop boxes increase, voters are forced to find another way to return their absentee ballots. Chatman 8/6/25 Dep. 295:12–20. And, of course, even if "Plaintiffs would like some counties to be able to provide more drop boxes than are currently allowed," [Doc. 858 at 7], the relevant question under the VRA is whether the voting process as a whole remains "equally open." *Brnovich*, 594 U.S. at 668. Here again, the undisputed turnout data confirm that there is no triable issue on that question: Georgia voters have an equal opportunity to vote, irrespective of race, even after Georgia enacted the drop box provisions.

Similarly, Plaintiffs provided no supplemental support for any ADA claims related to drop boxes being moved inside government buildings, so State Defendants are entitled to summary judgment on those claims for the same reasons as before. *See* [Doc. 858 at 30–42]; [Doc. 760 at 25–30]. Drop boxes are only one of the many ways that disabled voters can vote in Georgia, and voting remains "readily accessible" to disabled voters by using a drop box, by mailing their ballot, or by voting in person. 28 C.F.R. § 35.150.

Accordingly, as State Defendants already showed, the Court should grant summary judgment in State Defendants' favor on Plaintiffs' challenges to SB 202's drop-box provisions. *See generally* [Doc. 760].

### B.   Undisputed facts continue to show that SB 202's absentee-ballot provisions are lawful.

As to SB 202's absentee-voting provisions, the 2024 election data also show that these challenged provisions are lawful.[6] As shown below, usage of absentee-by-mail voting in Georgia has returned to pre-pandemic levels, and the rejection rates for absentee ballots and applications have plummeted. Given these data, Plaintiffs cannot identify any disputed facts supporting their challenges to SB 202's absentee-voting provisions.

### 1.   Absentee voting returned to pre-pandemic levels.

Throughout this litigation, Plaintiffs have repeatedly looked to 2020 as the benchmark for voter behavior. AME 1st Am. Compl. ¶¶ 247–48, 260–64,

---

[6] Plaintiffs challenge the following absentee-related provisions of SB 202: the provisions changing the window for requesting and completing an absentee ballot; the prohibition on the government's sending unsolicited applications to voters; the prohibition on ballot harvesting; the voter identification requirements to absentee-ballot applications and ballots themselves; the birth-date requirement. [Doc. 763 at 2]; [Doc. 758-1 at 13–14]. Plaintiffs also originally challenged four other provisions that they later abandoned, including: (1) regulations on third parties sending out unsolicited absentee-ballot applications; (2) denial of absentee-ballot applications for unregistered voters; (3) a requirement for voters to sign the oath on the absentee-ballot application with pen and ink; and (4) a requirement for voters to sign an oath on the return envelope of the absentee ballot. [Doc. 859 at 3 n.6].

277, 288–90 [No. 21-cv-01284-JPB, Doc. 83]; NAACP 1st Am. Compl. ¶¶ 153–58, 168 [No. 21-cv-01259-JPB, Doc. 35]. But State Defendants have continually explained that 2020 was an outlier, rather than the start of a new trend for how Georgia voters will cast their ballots. *E.g.*, [Doc. 859 at 11] (showing that voters of all races vote absentee at levels "consistent with prior elections"). The 2024 election data confirm that State Defendants were correct, and 2020—the pandemic election—is indeed an outlier rather than a new benchmark. *See* Fraga Dep. 62:5–74:23 (Ex. H). For example, all experts now agree that voting-by-mail in Georgia has returned to pre-pandemic levels. Grimmer 6/13/25 Rep. ¶¶ 2, 38–39, 42 & tbl. 5; Rodden 6/16/25 Rep. 9–10 (Ex. F); Shaw 7/14/25 Rep. 19–24. In 2016, for example, the last pre-pandemic general election, only 4% of Black Georgians voted by mail, compared to 5.3% of white Georgians. Rodden 6/16/25 Rep. 7 fig. 3a. And, while Black Georgians voted by mail at slightly higher rates in 2018 (7.2%), only 4.6% of white Georgians voted by mail that year. *Id.* The 5.4% of Black Georgians and 4.9% of white Georgians who voted by mail in 2024, *id.*, then, were much more in keeping with pre-pandemic voting patterns than with the 29.3% of Black Georgians and 23.8% of white Georgians who voted by mail during the 2020 election, *id.*, where many voters opted to vote by mail to avoid the risk of getting sick.

This fact refutes any implication from Plaintiffs' experts that absentee voting fell drastically after SB 202's enactment *because of SB 202. See id.* at 6

("mail-in ballots as a share of ballots cast fell dramatically after the implementation of SB 202"). Rather than revealing a causal relationship between SB 202 and mail voting, the data show that Georgia voters simply prefer to vote in person, as seen before and after the pandemic-influenced election of 2020.

## 2. Rejection rates related to absentee ballots were low.

Plaintiffs have also claimed that SB 202's timing and identification requirements for absentee voting will increase the number of rejected absentee ballots and applications. [Doc. 824 at 12–17] ("rejection rates for absentee ballot applications and ballots substantially increased after SB 202 was passed"). That has not happened. Rather, the 2024 election data show that few absentee ballots or applications have been rejected.

1. As to the 5.1% of all ballots cast by mail in 2024, or approximately 270,000 ballots total, only 1.7% were rejected, which amounts to fewer than 5,000 ballots. Shaw 7/14/25 Rep. 28–29; *accord* Grimmer 6/13/25 Rep. ¶¶ 2–3, 51 & tbl. 8; Rodden 6/16/25 Rep. 11; Fraga 6/23/25 Rep. 18 tbl. 5 (Ex. E); Grimmer 7/14/25 Rep. ¶¶ 10, 47–51. That rejection rate is even lower than the pre-pandemic and pre-SB 202 rejection rates—2.9% in 2016 and 3.5% in 2018. Grimmer 6/13/25 Rep. at 46 tbl. 8.

The same is true when looking at the rejection rates by race. *Id.* For example, while 4.1% of Black voters had their absentee ballots rejected in 2016

23

and 4.3% in 2018, only 2% of Black voters had their absentee ballots rejected in 2024. *Id.* It is thus undisputed that ballot rejection rates—which were already low before SB 202—were even lower in 2024 than they were in pre-pandemic elections. *Id.*

For those ballots that were rejected, 65% were rejected in 2024 for being late. *Id.* ¶ 55; Rodden 6/16/25 Rep. 11. Put differently, of all absentee ballots submitted, 1.2% were rejected as late, slightly lower than the 1.4% of late ballots in 2016 and the 1.6% in 2018. Grimmer 6/13/25 Rep. ¶¶ 3, 54 & tbl. 8; *see also* Grimmer 7/14/25 Rep. ¶¶ 47–49 & tbl. 6. There is a similar pattern among self-reported racial groups. Grimmer 6/13/25 Rep. ¶¶ 55–56 & tbl. 8. For Black voters, 2024's late-ballot rejection rate (1.3%) was lower than in 2016 (1.9%) and 2018 (1.5%). *Id.* ¶ 55. For Asian voters, 2024's rejection rate (2.1%) was lower than in 2016 (2.5%) and 2022 (2.3%) and comparable to the rejection rate in 2018 (2%). *Id.* at 46 tbl. 8. Thus, while Plaintiffs worried that SB 202 would cause absentee ballots to be rejected because of new identification reasons, most rejections were due to timeliness. *Id.* Of course, when pre-pandemic and post-SB 202 rejection rates are similar, SB 202 cannot be the cause of a voter's failure to cast his absentee ballot by Election Day, which was already the deadline before SB 202.

The 2024 election data also show that only a small number of ballots were rejected for failure to provide identification, for issues with the voter's

24

signature, or for failure to complete the oath envelope. In each election since 2016, less than 1% of absentee ballots have been rejected because of identification and signature issues. *Id.* The Black-white gap in the signature rejection rate before SB 202 is still similar to the Black-white gap in identification rejection rates after SB 202. *Id.* ¶ 63. And *no* voters in 2024 had their ballots rejected due to incorrect completion of the oath envelope, which made up 38% and 43% of all rejected mail-in ballots in 2016 and 2018. *Id.* ¶ 53 & tbl. 8; *see also* Grimmer 7/14/25 Rep. ¶ 50.

2.      As to absentee-ballot applications, the 2024 election data also show very few rejections. In 2024, 8,495 absentee-ballot applications were rejected, which is approximately 2.5% of all applications submitted. Rodden 6/16/25 Rep. 10. And more than half of those voters whose applications were rejected ended up still voting. *Id.* at 11. As Dr. Shaw explained, out of 5.3 million voters in Georgia, only 4,269 asked for an absentee mail-in ballot, had the application rejected, and did not end up voting. Shaw 7/14/25 Rep. at 26.

Throughout this litigation, Plaintiffs have claimed that SB 202's changes to deadlines for submitting absentee-ballot applications would cause an increase in the number of applications rejected for being late. [Doc. 822 at 109]. However, in 2024 only 0.77% of all applications submitted were rejected for being untimely, and 0.61% for being late—less than Plaintiffs argued would be late under SB 202. Grimmer 6/13/25 Rep. ¶¶ 7, 85 & tbl. 17. And Plaintiffs

claimed that SB 202's identification requirements would lead to an increase in applications being rejected. [Doc. 830 at 56] (arguing that "SB 202's identification requirements for absentee ballot applications result in disparate impact on voters of color"). But only 0.37% of *all* applications were rejected for identification-related reasons. Grimmer 6/13/25 Rep. ¶ 89 & tbl. 17.

These same trends are seen when looking at racial groups separately. As to timeliness, the only groups with even 1% of their absentee-ballot applications rejected as untimely were American Indians (1.29%) and Hispanics (1.0%). *Id.* ¶ 85–87 & tbl. 17. And no racial group saw anywhere close to 1% of its applications rejected for identification-related reasons. *Id.* ¶ 89 & tbl. 17.

### 3. Plaintiffs cannot identify any genuinely disputed facts supporting their challenges to SB 202's absentee-voting provisions.

These data confirm that, while voting-by-mail returned to its pre-pandemic levels in 2024, SB 202's absentee-ballot provisions did not thwart absentee voting at all, let alone disproportionately for minorities.

As State Defendants previously showed, SB 202's absentee-voting provisions serve important State interests. [Doc. 859 at 4–8]. And, even with these changes in place, the undisputed evidence continues to show that "all minority groups continue[] to utilize absentee-by-mail at high levels, almost all at higher rates than before the pandemic." *Id.* at 50.

26

Yet Plaintiffs suggest that requiring voters to provide an identification number could harm minority voters that lack such a number and would lead to rejections. *See* [Doc. 830 at 47–49]. Not so. In 2024, 99.6% of all absentee-ballot applications and ballots themselves complied with SB 202's identification requirements. Grimmer 6/13/25 Rep. ¶ 89 & tbl. 17 (application rejection rate for identification issues of 0.37%); *id.* ¶ 61 & tbl. 8 (ballot rejection rate for identification issues of 0.4%). Similarly, more than 99.8% of voters from all racial groups had no problem complying with the signature requirement, and *all* absentee voters were able to comply with the oath requirement. *Id.* at 46 tbl. 8. The Supreme Court has confirmed that such data defeat arguments like those Plaintiffs advance here: Since these requirements "work for 98% or more of voters to whom it applies—minority and non-minority alike," it has not rendered Georgia's system "unequally open." *Brnovich*, 594 U.S. at 680. State Defendants remain entitled to summary judgment as to the challenged identification provisions. *See* [Doc. 763 at 56–64] (application identification); *id.* at 68–71 (ballot identification).

The calculus does not change when considering the number of ballots or applications that were rejected as untimely in 2024. Starting with ballots, across racial groups, the number of ballots rejected as late has fallen or stayed relatively the same since 2016, and even when considering the racial group with the highest rate of ballots rejected as untimely, American Indians, more

27

than 96% cast their ballots on time. Grimmer 6/13/25 Rep. at 46 tbl. 8. The same is true for applications, where only American Indians and Hispanics saw 1% or more of applications rejected as untimely. *Id.* at 68 tbl. 17.

SB 202's timeliness provisions thus work for more than 98% of all voters across races. *Brnovich*, 594 U.S. at 680. And any disparity between American Indians and Hispanics and other racial groups is "small in absolute terms" and cannot create a dispute of fact about whether Georgia's election system is "unequally open." *Id.*

In short, the relatively small burden of submitting an application within a well-defined period, coupled with the many "opportunities provided by a State's entire system of voting," such as in-person early or Election Day voting, confirms that any burden is slight and voting in Georgia is open to voters of all races. *Id.* at 671. State Defendants therefore remain entitled to summary judgment as to Plaintiffs' challenge to the absentee deadlines. *See* Timing MSJ at 13–14 (right to vote), 19–20 (Section 2) [Doc. 758-1].

Plaintiffs also provide no supplemental evidence that voters with disabilities or minority voters were disparately burdened by changes to the application window in 2024. *Id.* at 23–24. Nor have they provided new evidence that SB 202's identification requirements disproportionally harmed Georgia voters from minority racial groups or voters with disabilities. Since there is no new evidence on either point, State Defendants are entitled to summary

judgment for the same reasons as before. In short, there is no evidence that the voter-identification requirements for absentee-ballot applications and ballots burden the right to vote or violate Section 2, the ADA, or the Rehabilitation Act. *See* [Doc. 859 at 49–68].

### C.    Undisputed facts confirm that SB 202's out-of-precinct provisions are lawful.

Plaintiffs have also consistently claimed that SB 202's out-of-precinct provisional ballot rules disproportionately affect Black voters. [Doc. 822 at 33, 52–55, 83–85, 124–28]. But the 2024 elections demonstrate that this provision assists voters and election officials, and Plaintiffs' fears have not materialized.

1.    The number of provisional ballots has continued to decrease after SB 202, with the 2024 elections having "a smaller share of votes classified as provisional than in the 2014, 2016, 2018, and 2020 general elections." Grimmer 6/13/25 Rep.¶ 47. And, when comparing pre- and post-SB 202 presidential elections, the total number of provisional ballots cast decreased significantly from 11,781 in 2020 to 3,229 in 2024. Shaw 7/14/25 Rep. 29.

Looking at the racial makeup of voters casting provisional ballots, Black voters experienced a slight increase—0.009 percentage points—in provisional ballots cast in 2024 compared to 2022. Grimmer 6/13/25 Rep. ¶ 47. But this still amounts to a tiny number of provisional ballots cast, and it is the *number*

of provisional ballots that impact election efficiency. Germany 7/27/23 Decl.
¶¶ 108–110 [Doc. 755-4].

2.    Plaintiffs cannot identify any genuinely disputed facts showing
that SB 202's out-of-precinct provisional ballot rule harms voters, but the
record establishes that high numbers of provisional ballots harm the State.

As to the voters' harm, Plaintiffs cannot show that the requirement to
vote at their assigned precinct amounts to any "significant increase over the
usual burdens of voting." *Crawford,* 553 U.S. at 198. For instance, if a voter
does not wish to vote in the assigned precinct, he or she may vote early, because
early voters can vote *anywhere* in their county. The precinct rule applies only
to Election Day voters, and Plaintiffs have yet to identify any voter who was
unable to vote because of this requirement.

Moreover, considering the small number of out-of-precinct provisional
ballots cast in 2024, Georgia voters appear not to struggle with this
requirement. This, of course, is unsurprising—the Supreme Court deemed
Arizona's total ban on out-of-precinct voting on Election Day to impose only an
"unremarkable burden[]" on the right to vote. *Brnovich,* 594 U.S. at 678.
Indeed, "[h]aving to identify one's own polling place and then travel there to
vote" are "tasks [that] are quintessential examples of the usual burdens of
voting." *Id.* If as *Brnovich* held, Arizona can completely ban out-of-precinct
voting, then surely Georgia can ban it before 5 PM.

In contrast, the record includes many undisputed facts showing that provisional ballots burden the State. As this Court has already acknowledged, the State has a legitimate interest "in orderly and efficient election administration, preventing fraud or the appearance of fraud and increasing voter confidence." *In re Ga. SB 202*, No. 1:21-MI-55555-JPB, 2023 WL 6628601, at *15 (N.D. Ga. Oct. 11, 2023). As State Defendants also showed, provisional ballots decrease efficiency, increase voters' concerns about voter fraud, and increase the risk of longer voting lines. Add'l Provs. MSJ at 2–3 [Doc. 757-1].

Because the decrease in provisional ballots cast is uniformly spread across racial groups, this also undermines Plaintiffs' claims about racial discrimination. Grimmer 6/13/25 Rep. ¶¶ 47–48 & tbl. 7; *see* [Doc. 860 at 108–09]. Moreover, with a shrinking number of provisional ballots and a shrinking number of voters who would even need them as an option due to decreasing Election Day voting, Plaintiffs cannot show any disparate impact. *League of Women Voters*, 66 F.4th at 935.

The same logic applies to the VRA claims, because the VRA allows Georgia to require "compliance with certain rules." *Brnovich*, 594 U.S. at 669. And again, Plaintiffs still present no evidence that there is any outsized racial impact from the out-of-precinct provisions. [Doc. 757-1 at 19–20].

31

Finally, the low number of provisional ballots and decreasing use of Election Day voting demonstrate that there is meaningful access for voters with disabilities, effectively ending Plaintiffs' disability claims. Add'l Provs. MSJ Reply at 10–11 [Doc. 855].

**D.    Undisputed facts continue to show that SB 202's provisions forbidding the government from sending unsolicited absentee-ballot applications are lawful.**

Plaintiffs have also challenged SB 202's prohibition on the government sending unsolicited absentee-ballot applications. But that prohibition streamlines the election process and reduces voter confusion. As State Defendants previously demonstrated, with this provision of SB 202 in place, the number of voters cancelling absentee ballots at polling places dropped. [Doc. 763 at 10]. That trend continued in the 2024 election, Grimmer 6/13/25 Rep. ¶¶ 5, 70–73, and it confirms the lack of any genuine disputes of fact as to whether the ban on the government sending unsolicited applications assisted Georgia's election administration. Georgia, moreover, was able to achieve that important goal without burdening anyone: Notwithstanding the ban on sending unsolicited applications, there were short lines at the polls in 2022, and absentee-ballot applications may still be obtained from third parties, online from the Secretary of State, or even from a phone call to local election offices. [Doc. 763 at 21–22]. That reality remained unchanged in 2024. State Defendants are therefore entitled to summary judgment on the prohibition on

government officials sending out unsolicited absentee-ballot applications. *Id.* at 17–28.

1.    It is undisputed that the number of cancelled absentee ballots declined after SB 202. In the 2024 election, the number of cancelled absentee ballots dropped roughly 90% when compared to 2020. Grimmer 6/13/25 Rep. ¶ 73 & tbl. 15. The share of ballots cancelled during early voting fell from 15% in 2020 to just 7.6% in 2024. *Id.* ¶ 73 & tbl. 14. These dramatic reductions in ballot cancellations between 2020 and 2024 are consistent across all racial groups. The number of Asian voters cancelling their ballots and subsequently voting early in-person was reduced from 13.7% in 2020 to 9.6% in 2024. *Id.* at 56 tbl. 14. For Black Georgians, the number of cancelled ballots during early voting dropped from 15.6% in 2020 to 8.3% in 2024. *Id.* White Georgians saw an almost identical drop during early voting, from 14.7% in 2020 to 6.8% in 2024. *Id.*

The drop was less stark but still substantial for voters cancelling their ballots and voting in-person on Election Day. *Id.* ¶ 72. In 2020, 1.7% of all mail-in ballots were cancelled so the voter could vote on Election Day. *Id.* ¶ 72 & tbl. 12. In 2024, 1.5% of mail-in ballots were cancelled to vote on Election Day. *Id.* Similar trends in the rate of voters cancelling absentee ballots to vote on Election Day can be seen when looking at the race of the voters. *Id.*

2.    There is still no evidence that forbidding the government from sending unsolicited absentee-ballot applications harms minority or disabled voters. Plaintiffs have maintained that the prohibition on mailing unsolicited absentee-ballot applications "presents a substantial barrier" for minority voters voting absentee. [Doc. 830 at 57].[7] But, as State Defendants showed, Plaintiffs' claim relied "exclusively on their claim that language barriers for certain voters somehow make the prohibition on election officials sending *unsolicited* absentee-by-mail applications an impediment" to voting. [Doc. 859 at 10]. This, of course, was not enough to show that voters who do not speak English could not "obtain an application if one is not automatically mailed to them by election officials." *Id.* at 11.

There is no new evidence compelling a different conclusion. For nearly all racial groups except Hispanics, voting by mail has increased compared to 2016, the last pre-pandemic presidential election. Grimmer 6/13/25 Rep. at 29 tbl. 6. Nothing in the record suggests, however, that Hispanic voters opted to vote by mail less frequently in 2024 for the reason Plaintiffs claimed in opposing summary judgment—because language barriers made finding an application difficult without the unsolicited help of the government. Thus,

---

[7] Plaintiffs also originally challenged regulations on third parties sending unsolicited applications, but they abandoned those claims. *See* [Doc. 859 at 3 n.6] (discussing Plaintiffs' failure to address the third-party regulations in their opposition).

State Defendants are entitled to summary judgment on Plaintiffs' challenge to this provision for the same reasons as before.

By contrast, the evidence from 2024 again demonstrates that this provision dramatically reduced the burden on election officials of voters having to cancel absentee ballots when they go to vote in person. *See VoteAmerica v. Raffensperger*, -- F. Supp. 3d --, 2025 WL 2607827, at *5 (N.D. Ga. Sept. 8, 2025) (Boulee, J.) (noting that cancelling absentee ballots "is not overly complicated" but "takes time, leading to longer lines and a "less smooth" voter experience").

Beyond efficiency, the State also has a compelling interest in preventing voter complaints that accompany unnecessary absentee-ballot cancellations at the polls and avoiding the attendant burden on election officials, which can lead to long voting lines. [Doc. 763 at 28–32]. The Supreme Court has said as much, noting that "[o]ne strong and entirely legitimate state interest is the prevention of fraud," which can "undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich,* 594 U.S. at 672; *accord VoteAmerica*, 2025 WL 2607827, at *5 ("Reducing confusion is important because 'confusion about the system ... especially when it's a close election ... can lead to a lack of confidence in the overall system.' Similarly, reducing concerns over voter fraud is important to increase 'confidence in the election results.'"). The 2024 elections continue to show that

the SB 202 provision prohibiting the unsolicited mailing of absentee-ballot applications has directly led to a dramatic reduction in instances in which voters had to cancel their absentee ballots before being permitted to vote in-person. Grimmer 6/13/25 Rep. ¶ 73 tbl. 15. Thus, the evidence continues to support State Defendants' showing that the provision is well-tailored to achieve its goal without any corresponding evidence that it did so while disparately impacting voters at all, let alone by their race.

This undisputed evidence that the unsolicited-application provision furthers Georgia's interests, weighed against the non-existent evidence of any burden, shows that the prohibition readily satisfies the *Anderson-Burdick* test. And the 2024 elections further confirm that SB 202 does not "disproportionately impact" any minorities in this regard, which undermines Plaintiffs' VRA claims.

### E.    Undisputed facts continue to show that SB 202's Suspension Rule is lawful.

Finally, two Plaintiff groups challenge provisions in SB 202 that, for the first time, allow the State Election Board to temporarily suspend county officials with a pattern of not following state law. *E.g.*, [NAACP Doc. 35, ¶ 163], [CBC Doc. 126, ¶ 148]. State Defendants sought summary judgment as to those provisions, [Doc. 757-1], and Plaintiffs waived defending the claims by not responding, [Doc. 855 at 1]. Briefly, State Defendants showed that no voters

will be harmed by this provision because, even if county officials are suspended, SB 202 "provides for a temporary superintendent to continue to operate elections." [Doc. 757-1 at 13] (citing O.C.G.A. § 21-2-33.2(e)(1)). And no officials have been suspended in any event. *Id.*

Nothing has changed, and Plaintiffs are still left speculating whether a local superintendent will *ever* be suspended. The process outlined in SB 202 is not new and has not been exercised against any local election officials. Nor is there any evidence that any official is even under investigation or pending a performance review. In fact, while the General Assembly tasked the State Election Board with promulgating "rules and regulations for conducting such preliminary investigation and preliminary hearing," O.C.G.A. § 21-2-33.2(b), no such rules have yet been issued. This further indicates the lack of any imminent or concrete injury.

As this Court explained in a related SB 202 challenge, "Plaintiffs have failed to show that any injury that could result from the Suspension Rule is certainly impending." *Coal. for Good Governance v. Kemp*, No. 1:21-cv-2070-JPB, 2025 WL 848462, at *6 (N.D. Ga. Mar. 18, 2025), *appeal docketed,* No. 25-11347 (11th Cir. Apr. 17, 2025). State Defendants are entitled to summary judgment here for the same reason—"because any injury caused by the Suspension Rule is speculative." *Id.* at *7. The Suspension Rule is not fit for a pre-enforcement challenge because "[t]here is at most a 'perhaps' or 'maybe'

chance that [the Suspension Rule] will be enforced against these plaintiffs in the future, and that is not enough to give them standing to challenge its enforceability." *Bowen v. First Fam. Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000). Rather, pre-enforcement challenges are reserved for when "the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure," and there are "few situations" where it could even be "possible to bring an as-applied challenge in a pre-enforcement review of a statute that has yet to be applied." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1252, 1255 n.20 (11th Cir. 2012) (cleaned up), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

## CONCLUSION

The 2024 elections in Georgia confirm what State Defendants have said all along: SB 202 was enacted to increase election efficiency, address concerns about voter fraud, and bolster voter confidence. SB 202 has done just that, and the 2024 election data confirm that there are no remaining genuine disputes of material fact. The Court should thus enter summary judgment in State Defendants' favor.

September 12, 2025

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
H. Christopher Bartolomucci*
Donald M. Falk*
Brian J. Field*
Edward H. Trent*
Joshua J. Prince*
Miranda Cherkas Sherrill
Georgia Bar No. 327642
**Schaerr | Jaffe LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com

39

Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**Clark Hill PLC**
3630 Peachtree Road NE
Suite 550
Atlanta, Georgia 30339
(678) 370-4377

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing brief was prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr