# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

IN RE GEORGIA SENATE BILL 202

Master Case No.:

1:21-MI-55555-JPB

# PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ..........................................................................................1

II.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE INTENTIONAL RACE DISCRIMINATION CLAIMS ...............................5

    A.   Legal Standard For Determining Intentional Racial Discrimination....8

    B.   The 2024 Election Did Not Alter Previously Presented Evidence of SB 202's Impact .................................................................................11

    C.   Data From the 2024 Election Itself Underscores the Continued Discriminatory Impact of SB 202's Challenged Provisions—and at Minimum, There Remain Factual Disputes .......................................14

        1.   Voter ID for absentee voting.....................................................15

        2.   Condensed timeline to return absentee ballots .........................19

        3.   Reduced availability of drop boxes ..........................................20

        4.   Out-of-precinct voting ..............................................................23

        5.   Line relief ban ..........................................................................25

    D.   Voter Turnout, Where Racial Disparities Persist, Is Not Dispositive of Plaintiffs' Intentional Discrimination Claims ....................................26

III. TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE VRA SECTION 2 CLAIMS BASED ON DISCRIMINATRY RESULTS .28

    A.   SB 202's Absentee-By-Mail Voting Provisions Have a Disproportionate Impact and Impose a Significant Burden on Black, AAPI, and Latinx Voters.....................................................................32

        1.   Absentee-by-mail voting fell most among voters of color. .......33

        2.   Rejection rates for absentee-by-mail ballot applications and ballots rose and show racial disparities.....................................37

        3.   Defendants' justifications fail as to the prohibition on government officials proactively sending ballots. ....................40

    B.   SB 202's Drop Box Provision Has a Disproportionate Impact and Imposes a Significant Burden on Black, AAPI, and Latinx Voters....42

IV.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' *ANDERSON-BURDICK* CLAIMS .......................................50

A.  The State's Evidence of Aggregate Turnout in 2024 Does Not Defeat Plaintiffs' Claims ................................................................. 51

B.  The State's Evidence of Turnout By Race in 2024 Does Not Defeat Plaintiffs' Claims ................................................................. 57

V.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' VIEWPOINT DISCRIMINATION CLAIM. ...................... 62

VI.  NO NEW EVIDENCE OR ARGUMENT SUPPORTS SUMMARY JUDGMENT ON THE DISABILITY DISCRIMINATION CLAIMS ........ 63

VII.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE FIRST AMENDMENT CLAIMS ................................................... 67

VIII.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGENT ON THE VRA MATERIALITY CLAIMS ...................................................... 68

IX.  PLAINTIFFS INDISPUTABLY HAVE STANDING ................................ 70

X.  CONCLUSION ............................................................................ 72

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D) ..................... 79

CERTIFICATE OF SERVICE ............................................................. 80

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*ACLU v. Fla. Bar*,
999 F.2d 1486 (11th Cir. 1993) ..........................................................................71

*Allen v. Milligan*,
599 U.S. 1 (2023) ...................................................................................................9

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ..............................................................................................50

*Arlington Heights. Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) ......................................................................................*passim*

*Ash v. Tyson Foods, Inc.*,
664 F.3d 883 (11th Cir. 2011) ...............................................................................9

*Burton v. City of Belle Glade*,
178 F.3d 1175 (11th Cir. 1999) .............................................................................8

*Chisom v. Roemer*,
501 U.S. 380 (1991) .............................................................................................11

*Clingman v. Beaver*,
544 U.S. 581 (2005) .............................................................................................15

*Coal. for TJ v. Fairfax Cnty. Sch. Bd.*,
218 L. Ed. 2d 71 (2024) .................................................................................10, 27

*Democracy N.C. v. N.C. State Bd. of Elections*,
476 F. Supp. 3d 158 (M.D.N.C. 2020) ................................................................32

*Democratic Nat'l Comm. v. Reagan*,
329 F. Supp. 3d 824 (D. Ariz. 2018) ...................................................................31

*Eakin v. Adams Cnty. Bd. of Elections*,
149 F.4th 291 (3d Cir. 2025) ...............................................................................50

*Elrod v. Burns*,
   427 U.S. 347 (1976)........................................................................68

*Fla. State Conf. of NAACP v. Lee*,
   566 F. Supp. 3d 1262 (N.D. Fla. 2021) ...........................................30

*Fla. State Conf. of NAACP v. Lee*,
   576 F. Supp. 3d 974 (N.D. Fla. 2021) .......................................*passim*

*Flowers v. Mississippi*,
   588 U.S. 284 (2019).........................................................................8

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Reg. & Elections*,
   36 F.4th 1100 (11th Cir. 2022) .......................................................70

*Ga. Coal. for the Peoples' Agenda, Inc. v. Raffensperger*,
   No. 1:18-CV-04727-ELR, 2022 WL 22866291 (N.D. Ga. Sept. 29, 2022) ......51

*Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
   775 F.3d 1336 (11th Cir. 2015) ...................................................1, 30

*Ga. State Conference of the NAACP v. Raffensperger*,
   1:21-cv-01259-JPB, 2021 WL 12300690 (N.D. Ga. Dec. 9, 2021).................70

*Garza v. Cnty. of Los Angeles*,
   918 F.2d 763 (9th Cir. 1990) ............................................................8

*Gill v. Scholz*,
   962 F.3d 360 (7th Cir. 2020) ...........................................................50

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.* (*GBM*),
   992 F.3d 1299 (11th Cir. 2021) .....................................................8, 9

*Hunt v. Cromartie*,
   526 U.S. 541 (1999).....................................................................7, 8

*Hunter v. Underwood*,
   471 U.S. 222 (1985).....................................................................6, 9

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
   4 F.3d 1103 (3d Cir. 1993) ..............................................................47

*Johnson v. DeSoto Cnty. Bd. of Comm'rs* (*DeSoto Cnty. II*),
204 F.3d 1335 (11th Cir. 2000) ............................................................9

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)............................................................................6

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State* (*LWV Fla.*),
66 F.4th 905 (11th Cir. 2023) ......................................................34, 45

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .........................................................2, 11

*Livernoise v. Med. Disposables, Inc.*,
837 F.2d 1018 (11th Cir. 1988) ...................................................7, 33

*Miss. State Chapter, Operation PUSH v. Mabus*,
932 F.2d 400 (5th Cir. 1991) ..............................................................32

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir. 1994) ............................................................29

*North Carolina State Conference of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) ............................................................3, 9

*Rogers v. Lodge*,
458 U.S. 613 (1982)............................................................................8

*Stalley v. Cumbie*,
124 F.4th 1273 (11th Cir. 2024) ........................................................58

*Thornburg v. Gingles*,
478 U.S. 30 (1986)............................................................................30

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017)............................................................................70

*U.S. v. Marengo Cnty. Comm'n*,
731 F.2d 1546 (1984)....................................................................27, 29

*United States v. Dallas Cnty. Comm'n*,
739 F. 2d 1529 (11th Cir. 1984) .........................................................9

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .......................................................................3, 51

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...............................................................................8, 10, 14

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ...........................................................................................71

*Vote.Org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ............................................................................70

**State Cases**

*Holmes v. Moore*,
    886 S.E.2d 120 (N.C. 2023)..............................................................................57

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................................*passim*

U.S. Const. amend. XIV ...............................................................................*passim*

U.S. Const. amend. XV.............................................................................27, 28, 72

**Federal Statutes**

52 U.S.C. § 10101 ...............................................................................................68

52 U.S.C. § 10301 ...........................................................................................*passim*

**State Statutes**

O.C.G.A. § 21-2-31.............................................................................................42

O.C.G.A. § 21-2-381............................................................................................33

O.C.G.A. § 21-2-382......................................................................................42, 45

**Rules**

Fed. R. Civ. P. 56.............................................................................................1, 58

**Other Authorities**

Matthew DeBell, D. Sunshine Hillygus, Daron R Shaw, & Nicholas A Valentino, *Validating the "Genuine Pipeline" to Limit Social Desirability Bias in Survey Estimates of Voter Turnout*, 88 Public Opinion Quarterly 268-290 (Summer 2024) .................................................................................................................58

Stephen Ansolabehere, Bernard L. Fraga, & Brian F. Schaffner, *The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout*, 84 The Journal of Politics (July 2022)................................................58

# I.    INTRODUCTION

Voting rights litigation is rarely resolved at summary judgment given "the fact-driven nature of the legal tests" that govern such claims. *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015). As here, these cases often turn on factual questions about legislative purpose, the impact of election laws, and how those burdens impact different groups of voters. Those inquiries typically require courts to assess witness credibility, expert methodologies, the level of impact, and the totality of circumstances—tasks reserved for trial, not summary judgment.  Yet Defendants seek judgment on every claim and every challenged provision of SB 202, disregarding an extensive record that reveals sharp factual conflicts, competing expert analyses, and abundant evidence from which a reasonable factfinder could conclude that SB 202's challenged provisions were enacted, and have operated, to harm minority voters and voters with disabilities and severely restrict the means of participation that they have relied upon.  That is not what Rule 56 permits.

As the moving parties, Defendants bear the heavy burden of showing the absence of any genuine dispute of material fact.  They cannot do so across Plaintiffs' various claims which rely on various facts, legal standards, and burdens of proof. The summary judgment record contains overwhelming factual and expert evidence that SB 202—through its restrictions on absentee voting, drop-box access, out-of-

precinct ballot counting, and line-relief activities, among other limitations—imposes new and unequal harms, individually and collectively, on Georgia voters, especially Black, Asian American Pacific Islander ("AAPI"), and Latinx voters, and voters with disabilities. This evidence remains contested. The Court cannot, in this posture, choose between dueling expert findings or weigh the credibility of witnesses.

Defendants' supplemental briefing—based narrowly on the 2024 election cycle—only injects *new* factual disputes that underscore the point. Defendants' two new assertions—that increased overall voter turnout and shorter average wait times in 2024 negate any burden on voting—misapprehend both the governing law and the factual record. Neither high turnout nor improved line wait times—particularly when disparities regarding both persist between White and non-White voters— foreclose liability under the Voting Rights Act or the Constitution. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 243 (4th Cir. 2014) ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance."). In Georgia, turnout alone does not capture the obstacles that voters face, particularly when civic groups and voters expend extraordinary effort to overcome the barriers SB 202 imposes. At most, Defendants' data reveal additional factual disputes—not their absence.

Even incorporating 2024 cycle evidence, the record presents triable issues on every claim.  Plaintiffs have marshaled extensive evidence of racially discriminatory intent, demonstrating that the Legislature acted to curb the growing electoral participation of non-White voters who they knew relied heavily on absentee voting, drop boxes, out-of-precinct voting, and line relief efforts.  Legislators enacted these restrictions only after racial minority voters were a decisive role in the 2020 general and 2021 runoff elections for two U.S. Senate seats.  SB 202's selective restrictions on those very mechanisms fit squarely within the reasoning of *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) and *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016), which also evaluated election laws adopted to suppress rising minority electoral participation under the guise of "election integrity."  Evidence also shows a factual dispute about whether Georgia's proffered justifications for SB 202 were pretextual: state officials encouraged many of these voting tools when White voters overwhelmingly used them; local officials warned that SB 202's challenged provisions would make election administration harder, not easier; and the State's alleged concerns about "voter confidence" were stoked through racialized claims of fraud.

Each specific provision, moreover, remains subject to live material factual disputes.  The absentee-ballot identification requirement and the early application deadline continue to produce racial disparities in ballot rejection rates even after

3

2024.  The drastic reduction in drop boxes disproportionately curtailed access for Black voters, nearly three-quarters of whom lost a drop box in their home county. This Court already held that the prohibition on line-relief activities is, in large part, likely unconstitutional as a violation of the First Amendment.  Yet this ban still targets the very communities that experience the longest wait times.  Likewise, this Court held that the date-of-birth requirement for absentee ballots likely violates the Civil Rights Act of 1964.  This immaterial requirement continues to pose a barrier to voters casting an effective ballot.

Taken together, as Plaintiffs' expert, Dr. Bernard Fraga, concludes, "SB 202's implementation demonstrably increased barriers to voting that Georgians face, with disproportionately strong impacts on Black, Latinx, and Asian American/Pacific Islander Georgians."  State Defs.' Supp. Br. Supp. Mot. Summ. J. Ex. E ("6/23/25 Fraga Am. Supp. Report") at 21, ECF 977-6.  That evidence alone—buttressed by Plaintiffs' other expert and lay evidence—creates a factual dispute and precludes summary judgment.  At this juncture, the question is not which side's account is correct, but whether any material factual disputes exist.

They plainly do.  The record—before and after the 2024 election—reveals enduring, material factual disputes about SB 202's intent, operation, and effect. Those disputes must be resolved at trial where the evidence can be properly weighed

and adjudicated, not on summary judgment. Defendants' and Defendants-Intervenors' motions should be denied.

## II. TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE INTENTIONAL RACE DISCRIMINATION CLAIMS

Following the 2024 election, evidence of SB 202's negative impact on Black voters persists, creating, at a minimum, genuine disputes of material fact regarding the Legislature's intent in enacting those challenged provisions and their effects on voters of color. Additionally, nothing regarding the 2024 elections undercuts the evidence from the historical context and sequence of events preceding SB 202. This evidence shows that Georgia's Legislature in 2021 intentionally created barriers to undercut the increasing electoral participation of the growing populations of Black voters and other voters of color in Georgia. *See* Pls.' Opp. Mots. Summ. J. Discriminatory Intent Claims at 1, 24-38, ECF 822.

The 2018 and 2020 general elections and 2021 run-off election were particularly marked by an increase in voter participation among Black and AAPI voters, which resulted in historic wins in 2020 and 2021 for Black voters' preferred candidates in close elections that were marked by racially polarized voting. *See* ECF 822, at 1, 24-38, 53-56, 130. In these elections, Black and AAPI voters disproportionately used absentee voting, ballot drop-boxes and mobile voting to cast their ballot, and Black voters facing long lines were also aided and encouraged by line relief in the form of food and water offered by Plaintiff organizations. *Id.* It

was these very methods of voting and voting activities that the Legislature targeted when enacting SB 202, intentionally discriminating against voters of color by limiting or eliminating the methods these voters relied on to access the franchise. *See id.* Indeed, many of these methods of voting were made available or permitted in Georgia—some, for decades—and White voters were encouraged to use them to participate in elections. *See, e.g.*, ECF 822, at 8, 27, 33, 130. It was only when Black and AAPI voters used these methods effectively to increase their political power that the Legislature imposed barriers to such provisions through SB 202. *See id.* But the U.S. Constitution prohibits targeting racial minority voters as a means to increase political advantage. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (stating that taking away a political opportunity just as minority voters were about to exercise it "bears the mark of intentional discrimination"); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor White voters for partisan purposes).

As previously explained, one or more Plaintiffs challenge the following SB 202 provisions under an intentional racial discrimination theory:

1. voter-identification requirements for absentee voting, *see* ECF 822, at 5-6, 101-06;
2. restrictions on drop-box use for depositing absentee ballots, *see* ECF 822, at 6-7, 115-21;

3. a prohibition on governments proactively mailing absentee ballot applications without a voter request, *see* ECF 822, at 7-8, 112-15;

4. limitations on mailing timeframes for voters to request absentee ballot applications and for election officials to distribute absentee ballots, *see* ECF 822, at 8, 106-12;

5. a ban on counting provisional ballots if a voter appears at a precinct other than their assigned one, *see* ECF 822, at 8-9, 124-28;

6. a prohibition on providing line relief, like food and water, to voters, *see* ECF 822, at 9, 121-24;

7. a ban on the deployment of mobile voting units absent emergency, *see* ECF 822, at 9, 33, 56-58; and

8. authorization for the Georgia State Elections Board ("SEB") to replace local election superintendents in some circumstances, *see* ECF 822, at 9-10, 56-57.

There remain genuine disputes of material fact regarding the Legislature's intent in enacting those challenged provisions, as well as those provisions' effect on voters of color.  Summary judgment is also generally inappropriate for intentional race discrimination claims.  *See*, *e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (noting that a legislature's "motivation is itself a factual question" and reversing summary judgment).  Defendants are not entitled to summary judgment here.[1]

---

[1] Defendants have not met their burden as to AAPI and Latinx voters for the additional reason that Defendants did not even discuss intentional discrimination claims brought on behalf of AAPI or Latinx voters in their opening Motion.  *See* State Defs.' Mot. Summ. J. Discriminatory-Intent Claims, ECF 759.  Defendants cannot use a supplemental brief focused on the 2024 election to newly and belatedly raise these arguments.  *See*, *e.g.*, *Livernoise v. Med. Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir. 1988) (holding summary judgment was not

A.    **Legal Standard For Determining Intentional Racial Discrimination**

Intentional racial discrimination violates both the U.S. Constitution and Section 2 of the Voting Rights Act.  *See* ECF 822, § IV.A.  To prove intentional racial discrimination, Plaintiffs must show that there was an "intent to discriminate" as well as "actual discriminatory effect."  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.* (*GBM*), 992 F.3d 1299, 1321 (11th Cir. 2021); *see* ECF 822, at 12-16.  To show an "intent to discriminate," Plaintiffs must demonstrate that race, in some part, motivated the challenged action.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  This requires proving that the government targeted members of a racial group but need not include proof of animus because "intentional [racial] discrimination without an invidious motive" can still single out voters for adverse race-based treatment.  *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring in part); *cf. Flowers v. Mississippi*, 588 U.S. 284, 299 (2019) (*Batson* violation depended on the intent to exclude Black jurors, not a racist motive).  Because "[o]utright admissions of impermissible racial motivation are infrequent," *Cromartie*, 526 U.S. at 553, the court should analyze "all available direct and circumstantial evidence of intent," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999), as part of its

---

appropriate where movant "did not satisfy its burden of informing the district court of the basis of its motion" (internal quotation marks omitted)).

assessment of "the totality of the relevant facts," *Rogers v. Lodge*, 458 U.S. 613, 618 (1982).

To find a constitutional violation, a "plaintiff does not have to prove that racial discrimination was a 'dominant' or 'primary' motive, only that it was a motive." *United States v. Dallas Cnty. Comm'n*, 739 F. 2d 1529, 1541 (11th Cir. 1984) (citing *Arlington Heights*, 429 U.S. at 265-66); *see also Allen v. Milligan*, 599 U.S. 1, 37 (2023) ("Demonstrating discriminatory intent, we have long held, 'does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purpose[].'" (alteration in original) (quoting *Arlington Heights*, 429 U.S. at 265)). The court must "consider all of the evidence cumulatively," *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 897 (11th Cir. 2011); *see* ECF 822, at 91-92, and Plaintiffs can meet their burden by presenting a "convincing mosaic of circumstantial evidence in support of their [discriminatory intent] claims." *GBM*, 992 F.3d at 1322 n.33 (internal quotation marks omitted) (citation omitted).  It then becomes Defendants' burden to demonstrate "that the law would have been enacted without this" motivating discriminatory intent.  *Hunter*, 471 U.S. at 228; *GBM*, 992 F.3d at 1321.

To show an "actual discriminatory effect," Plaintiffs must additionally demonstrate that there was "some cognizable injury to" minority voters stemming from SB 202.  *Johnson v. DeSoto Cnty. Bd. of Comm'rs* (*DeSoto Cnty. II*), 204 F.3d 1335, 1344 n.18 (11th Cir. 2000); *see also N.C. State Conf. of NAACP v. McCrory*,

831 F.3d 204, 231 (4th Cir. 2016) (evidence that Black voters "disproportionately used each of the removed mechanisms [and] disproportionately lacked the photo ID required by [the challenged law] . . . establishes sufficient disproportionate impact for an Arlington Heights analysis"); *Arlington Heights*, 429 U.S. at 269 (finding a potential discriminatory effect where minority residents were disproportionately eligible to live in the low-income development the municipality declined to accommodate). Statistical disparities are a relevant measure of impact, *see* ECF 822, at 91-95, and the Eleventh Circuit has not established that showing discriminatory effect based on such statistical evidence is contingent on any specific amount of disparity, *see id.* at 92-93. In Georgia, where racially polarized voting occurs and elections are often closely determined by mere thousands of votes, *see id.* § IV.B.1, discriminatory impacts to even small numbers of voters of color can substantially impact election results and, accordingly, foster unequal opportunities for those voters to elect their preferred representatives, *see id.* at 93. Indeed, a law that significantly reduces racial-minority voters' ability to participate electorally while improving White voters' ability to do the same can bear the mark of intentional discrimination. *Cf. Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 218 L. Ed. 2d 71, 75 (2024) (Alito, J., dissenting from the denial of certiorari) (recognizing a facially neutral law can be motivated by racial discrimination when it diminishes one group's opportunities while improving those of other groups, which is distinct from one

group's performance rate as compared to another). And voter turnout alone is insufficient to measure discriminatory effect—for example, while those numbers reflect voters who were not entirely disenfranchised, they cannot measure injury to those who were injured by laws that make it more difficult for them to vote but took extra steps to overcome those obstacles to cast their ballots. *See* ECF 822, at 95-96; *League of Women Voters of N.C.*, 769 F.3d at 243 ("[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance.").

Longstanding precedent also establishes that Section 2 prohibits voting laws enacted with a discriminatory purpose, which is a distinct theory from Section 2's prohibition on laws that result in a discriminatory effect. *See Chisom v. Roemer,* 501 U.S. 380, 394 n.21 (1991). To determine whether decisionmakers acted with a discriminatory purpose, in a Section 2 case, courts apply the "familiar approach" outlined in *Arlington Heights*. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021). And when Plaintiffs show that the State acted with discriminatory intent, that evidence can also help show a discriminatory effect resulting from the action. *See* ECF 822, at 19-21.

### B.   The 2024 Election Did Not Alter Previously Presented Evidence of SB 202's Impact

As an initial matter, the 2024 election did not—indeed, *could* not—alter key factors of the intent analysis, including "the historical background" of SB 202, "the specific sequence of events leading up to [SB 202's] passage," "procedural and

substantive departures" from the legislative process, and "the contemporary statements and actions of key legislators" that relate to legislators' motivation. *See* ECF 822, at 24-78. These factors—and the key disputed facts related to them—all weigh in Plaintiffs' favor for the reasons previously briefed, *see id*., and are unchanged by the events of the 2024 election after SB 202's enactment.

Plaintiffs previously presented evidence of demographic shifts in Georgia, which, combined with the increased voter participation of Black, AAPI, and Latinx voters, resulted in an increase of political power among these groups that prompted SB 202's suppressive provisions. *See* ECF 822, at 24-35 (Black voters), 35-38 (AAPI voters), 128-29 (Latinx voters). Plaintiffs have presented facts showing meaningful procedural and substantive departures from Georgia's typical legislative process in SB 202's passage.[2] Legislators ignored concerns from county election officials and, in a rush to pass SB 202 at record speed, neglected to establish a commission to probe relevant election reform issues. *See* ECF 822, at 59-69. The Legislature also created a new "Election Integrity Committee," which bypassed the usual committee comprising experienced legislators who had been tasked with

---

[2] State Defendants argue that these facts are not probative of discriminatory intent because they are similar to the circumstances and context preceding HB 316, a 2019 election-related law. *See* ECF 759, at 3, 23, 36; ECF 860, at 49-55. As previously detailed, however, HB 316 was far more limited than SB 202's sweeping scope, was not enacted with the speed and procedural irregularity of SB 202, and did not evince an intent to limit the uptick in voter participation among people of color. *See* ECF 822, at 3, 69-73.

parsing through complex election issues and allowed the public to meaningfully debate proposed election legislation. *Id.* at 60-61. The record contains key disputes about this context and events leading up to SB 202's passage, *see* State Defs.' Reply Supp. Mot. Summ. J. Discriminatory Intent Claims, ECF 860, at 8-15, and subsequent events such as the 2024 election have no bearing on those disputed facts. The Court is required to draw all inferences in favor of plaintiffs regarding the meaning of these procedural and substantive legislative irregularities. Viewed in the proper light, this evidence precludes summary judgment in favor of Defendants. *See id.* at 34-62.

Plaintiffs also have presented evidence about the pretextual nature of the General Assembly's asserted justifications for enacting SB 202 that are unchanged by the 2024 election. Defendants argue that improving electoral confidence and election administration were the primary motivations for SB 202. *See* ECF 759, at 49-50. But that argument is belied by the record, which shows that voters had high confidence in the integrity of Georgia's elections, and that false and racialized narratives of voter fraud were wholly unsubstantiated. *See* ECF 822, at 40-48. The record also reflects that election officials opposed many of SB 202's provisions, and those officials informed the General Assembly that certain provisions would make election administration *more* difficult—not more efficient. *See id.* at 48-53. Additionally, Plaintiffs have proffered contemporaneous statements and viewpoints

demonstrating that legislative decisionmakers, for political gain, targeted means of voting on which Black and AAPI voters relied, *see id.* at 73-78, and have presented evidence that the Georgia Legislature failed to adopt less discriminatory alternatives, *see id.* at 87-90. While Defendants continue to claim in their supplemental briefing that SB 202 was enacted to enhance election efficiency and improve voter confidence, *see* State Defs.' Supplemental Br. Supp. Mots. Summ. J., ECF 977, at 1, they offer no evidence regarding the 2024 election that disputes these pretextual rationales.

C.    **Data From the 2024 Election Itself Underscores the Continued Discriminatory Impact of SB 202's Challenged Provisions—and at Minimum, There Remain Factual Disputes**

As for the impact-related evidentiary factors, data from the 2024 election only underscores the continued discriminatory impact of SB 202 and present numerous factual disputes. *See* ECF 822, at 90-133; *see also Arlington Heights*, 429 U.S. at 266 (considering the "impact of the official action" and "whether it 'bears more heavily on one race than another'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))).

Plaintiffs previously presented evidence showing that hundreds of thousands of voters of color are collectively impacted by the challenged SB 202 provisions and are impacted more heavily than their White counterparts. *See* ECF 822, at 91-92, 94, 100-01. The challenged restrictions cumulatively exacerbated SB 202's

disproportionate impact on Black voters, *see id.* at 130-33, and "[a] panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition," *Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring in part). Prior expert evidence concluded that "over 1.6 million currently [as of November 2022] registered Georgians had barriers to voting increase as a result of SB202" and "[f]or all racial/ethnic groups, with the exception of White Georgians, the shares negatively impacted exceed their shares of the registered voter population." 6/23/25 Fraga Am. Supp. Report ¶ 7 (alterations in original). This finding is unchanged by the 2024 election, where SB 202's barriers were in effect. Accordingly, the collective impact of SB 202 is still in dispute.

Beyond that collective impact, genuine disputes of fact exist regarding whether that disparate impact on Black and AAPI voters was foreseeable and known, and evidence regarding the 2024 election does not change, let alone resolve, those disputes. *See* ECF 822, at 78-87. And with respect to each of the challenged provisions, as discussed below, genuine disputes of material fact still exist regarding their impact, making summary judgment on these claims inappropriate.

### 1.    Voter ID for absentee voting

Plaintiffs have presented evidence that requiring voters to provide identification information to vote absentee disproportionately impacts Black voters,

who are less likely than White voters to have an ID number (or an accurate one) in their voter registration records. *See* ECF 822, at 101-03. The record contains recent data that nearly 130,000 Black registered voters in Georgia either did not have a Department of Driver Services ("DDS") ID number or had an inaccurate DDS ID number in their voter registration record, compared to just 80,000 White registrants similarly situated. *See id.* at 102. Plaintiffs also presented evidence that otherwise fulfilling the identification requirement through alternative processes is more burdensome for Black voters than White voters, given socioeconomic disparities. *See id.* at 101-06.

In their supplemental briefing, Defendants contend that increased absentee voting in 2020 was an anomaly during the pandemic, citing expert evidence that voting by mail in Georgia has returned to pre-pandemic levels and arguing that the percentage of Black (5.4%) and White (4.9%) Georgians who voted by mail in 2024 is "much more in keeping with pre-pandemic voting patterns." *See* ECF 977, at 21-23. Defendants do not adequately engage, however, with the significant racial disparities reflected in the declining use of absentee voting post-SB 202. Plaintiffs' expert evidence shows, *inter alia*, that following SB 202's enactment, Black and AAPI voters had disproportionate drops in mail ballot usage as compared to White voters, and this pattern persisted during the 2024 election, "where Black voters saw their rate of voting by mail drop from 29% in 2020 to 5% in 2024, and Asian

American/Pacific Islander voters saw their rate of voting by mail drop from 40% in 2020 to 7% in 2024."  6/23/25 Fraga Am. Supp. Report ¶ 5; *see id.* at 14 tbl. 3; *see also* State Defs.' Supp. Br. Supp. Mot. Summ. J. Ex. F ("6/16/25 Rodden Supp. Report") at 6-7, ECF 977-7.

Defendants also argue that rejection rates related to absentee ballots are low, which they claim contradicts Plaintiffs' contention that SB 202's identification requirements for voting by mail would lead to more rejections.  *See* ECF 977, at 23-26.  Defendants claim that the absentee-ballot rejection rates for the general elections following SB 202's enactment were lower than those in 2016 and 2018.  *See id.* at 23; *see also* State Defs.' Supp. Br. Supp. Mot. Summ. J. Ex. A ("6/13/25 Grimmer Supp. Rep.") ¶ 51 & tbl. 8, ECF 977-2.  However, Plaintiffs dispute Defendants' methodologies and findings regarding the rejection rates of absentee ballots.  *See* Exhibit A attached hereto ("7/14/25 Fraga Rebuttal Rep.") ¶¶ 19-22, 24.  One of Defendants' experts, Dr. Justin Grimmer, provided statistics of limited value for assessing SB 202's impact on absentee-ballot rejections.  Dr. Grimmer included data from elections *before* 2018, despite that 2018 was when statewide elections in Georgia first began to be viewed as highly competitive, *see* 6/13/25 Grimmer Supp. Rep. ¶ 19.  Dr. Grimmer also omitted data from critical, closely contested runoff elections in 2021 and 2022—the earlier of which is considered by peer-reviewed literature as a primary motivator for SB 202's passage, *see id.* ¶¶ 21-22.  Plaintiffs'

expert data offers a more representative picture, showing that "in all of the statewide federal elections after the passage of SB202, there was a higher mail-in ballot rejection rate than in the two statewide federal elections immediately preceding the implementation of SB202."  7/14/25 Fraga Rebuttal Rep. ¶ 24; *see also* 6/23/25 Fraga Am. Supp. Rep. ¶ 35.

Moreover, the evidence also shows that, as compared to White voters, Black, AAPI, and Latinx voters were more likely to have their absentee ballots rejected after the identification requirements imposed by SB 202, including in the 2024 election.  *See* 6/23/25 Fraga Am. Supp. Rep. ¶ 6; *id.* § VII; *see also* 8/27/25 Grimmer Dep. 159:5-16, ECF 974 (admitting that Table 17 in Grimmer's 6/13/25 supplemental report reflects that, with respect to identification issues, absentee-ballot "applications from White voters had a lower rejection rate than applications" received from Black, Asian, Latinx, and American Indian voters); 6/13/25 Grimmer Supp. Rep. tbl. 17.  Specific to the identification requirements, the 2024 presidential election data still shows that Black, Latinx, and AAPI voters were consistently more likely to have their ballots rejected due to "Incorrect ID Information" or "Missing ID Information" following SB 202's enactment, as compared to White voters.  *See* 6/23/25 Fraga Am. Supp. Rep. ¶ 38; *see also* 8/27/25 Grimmer Dep. 144:6-10 (admitting that Black, Latinx, Asian, and American Indian voters all had higher ID-

related rejection rates than White voters in 2024).  Based on this evidence, the impact of voter-identification requirements for absentee voting remains in dispute.

### 2.    Condensed timeline to return absentee ballots

SB 202's truncated timeline for voters to receive and return their absentee ballots has also increased the number of rejected ballots and thus disproportionately disenfranchised AAPI voters.  *See* ECF 822, at 110-12.

Defendants argue that Plaintiffs' claim is negated by 2024 election data showing that few absentee ballots or applications were rejected.  *See* ECF 977, at 21, 23-26.  But the 2024 supplemental data shows that while the percentage of ballots rejected in the 2024 presidential election because they were received after the deadline was only 1.16%, the corresponding rate of rejection in the pre-SB 202 presidential election in November 2020 was even lower, at 0.18%.  *See* 6/23/25 Fraga Am. Supp. Rep. ¶ 34.  In other words, "the November 2024 post-SB202 election had a 'Ballot Received After Deadline' rejection rate over *six times greater* than the previous presidential election prior to implementation of SB202."  *Id.* (emphasis added); *see also id.* ¶ 39 & tbl. 7 ("show[ing] a sharp increase in the share of absentee-by-mail ballots that were rejected due to arriving after the receipt deadline").

There are further factual disputes about these post-deadline rejections.  As discussed *supra*, Black, AAPI, and Latinx voters were more likely to have their

absentee ballots rejected due to SB 202's timing requirements, including during the 2024 election. *See id.* ¶¶ 6, 40. For instance, during the 2024 election, Black, Latinx, and AAPI voters were more likely than White voters to have their ballots rejected for being late. *See id.* ¶ 39 & tbl. 7. Indeed, "[t]his gap in rejection rates reached its highest level in post-SB202 elections." *Id.* ¶ 39. There is thus a material dispute of fact regarding the racial impact of this provision.

### 3.    Reduced availability of drop boxes

Plaintiffs previously presented evidence that voters of color were disproportionately impacted by SB 202's restrictions on the availability of drop boxes. This includes expert analysis showing that Black voters used drop boxes at a higher rate than White voters in 2020, and that nearly 75% of Georgia's Black voters experienced a decline in drop-box availability under SB 202, compared to just 54% of White voters. *See* ECF 822, at 3, 115-21. Prior to supplemental briefing, Defendants relied on expert testimony from Dr. Grimmer based solely on survey results to argue that White voters used drop boxes more than Black voters in 2020 and 2022. State Defs.' Sur-reply Opp'n Pls'. Mot. Prelim. Inj. Discriminatory-Intent Claims Ex. A ("9/7/23 Grimmer Rep. Update"), at 3, ECF 756-24. This was disputed by Plaintiffs' experts, who presented statistics showing that Black voters used drop boxes more than White voters. Resp. Statement Material Facts Ex. 341 ("1/16/24 Fraga Supp. Decl.") at 4-16, ECF 821-16; Resp. Statement Material Facts Ex. 87

("8/24/23 Burden Supp. Decl.") at 1-4.    These disputed facts alone preclude summary judgment.

Defendants' contentions otherwise in their supplemental brief again rest on a fundamentally flawed analysis.  Specifically, Defendants claim that their expert Dr. Grimmer's data undermines Plaintiffs' arguments about SB 202's impact on drop box usage, contending that White voters were more likely to use drop boxes than Black voters in 2020 and 2022, but that Black voters used drop boxes more in 2024. *See* ECF 977, at 18-19; *see also* 6/13/25 Grimmer Supp. Rep. ¶¶ 9, 90-94 & tbl. 19. Defendants claim that "drop box usage in 2024 was similar to 2020 and higher than in 2022."  ECF 977, at 18-19.

Plaintiffs' expert, Dr. Fraga, disputes the finding that White voters used drop boxes more than Black voters, and finds instead that Black voters used drop boxes more in 2020, 2022, *and* 2024.  Dr. Fraga explains that Dr. Grimmer's assertions are based on a flawed methodology.  Dr. Grimmer rested his analysis on the 2022 and 2024 Cooperative Election Study ("CES") survey data to determine how many voters returned their ballots to a drop box.  *See* 7/14/25 Fraga Rebuttal Rep. ¶ 25; 6/13/25 Grimmer Suppl. Rep. ¶ 91.  When asked where they returned their ballots, voters were presented only one survey-response option that mentioned drop boxes; specifically, that they returned their ballot at a "[d]rop box used only for ballots, not located at an election office or polling place."  7/14/25 Fraga Rebuttal Rep. ¶ 25.

But there were no such drop boxes—and no such option for returning a ballot—in Georgia in 2022 and 2024. As changed by SB 202, all drop boxes in Georgia are now located *inside* election offices or certain polling places used for early voting and only during early voting hours. *Id.* Similarly, a respondent who returned his ballot to an election office after early voting may not have used a drop box but answered yes. *See id.* ¶ 27. Because the potential responses in the survey used by Dr. Grimmer were not tailored to Georgia voters, it cannot reliably capture their drop box usage, as some respondents who used drop boxes may have selected alternate survey responses. *See id.* ¶ 26. Dr. Grimmer also based his estimates on a miniscule data set. In 2024, only six Black voters and six White voters in Georgia selected the survey option including the word drop box and in 2022, only two Black voters and eight White voters selected it. *Id.* ¶ 29. According to Plaintiffs' expert, Dr. Fraga, this small sample size, compounded by the survey question not tailored to Georgia voters, calls into question Dr. Grimmer's reliance on this data and his conclusions drawn from it. *Id.*

Dr. Grimmer's analysis also only calculates rates of drop box use against a denominator of Georgians who self-reported using an absentee-by-mail option (rather than using a denominator of all voters statewide). *Id.* ¶ 32. As explained by Plaintiffs' expert Dr. Fraga, Dr. Grimmer's approach creates a biased result because it does not account for voters who did not use an absentee-by-mail ballot due to

limited drop-box availability or accessibility. *Id.* This approach would also bias estimates of racial disparities in drop box use. *Id.* ¶ 33.

To address this, Dr. Fraga used Dr. Grimmer's replication code to estimate the share of White and Black voters who voted via drop box, finding that—even using Dr. Grimmer's flawed method of relying on the unrepresentative survey question—Black voters were more likely than White voters to use drop boxes in 2020, 2022, *and* 2024. *See id.* ¶ 35 & tbl. 2. This data also reflects that the rate of Black voters' use of drop boxes disproportionately dropped after SB 202's enactment, declining 14.1 percentage points between the 2020 and 2022 elections (as compared to a decline of 10.1 percentage points for White voters between the same elections). *See id.* ¶ 36 & tbl. 2. Overall, this presents material disputes of fact regarding the rates and differences in rates of drop box use by race in post-SB 202 elections. *See id.* ¶ 37.

### 4.    Out-of-precinct voting

Factual disputes also remain regarding the discriminatory effect on Black voters of the elimination of most out-of-precinct provisional voting. For example, Plaintiffs previously presented evidence from pre-SB 202 elections showing that Black voters were more likely than White voters to cast out-of-precinct ballots, *see* ECF 822, at 124-26, and explained that Defendants had not offered evidence about the rates of out-of-precinct voting by Black voters as compared to White voters, *see*

*id.* at 126. Defendants claim in their supplemental briefing that "Plaintiffs' fears have not materialized" following SB 202 that its out-of-precinct provisional ballot rules disproportionately affect Black voters. *See* ECF 977, at 29. Defendants' expert acknowledged, however, that there is a disproportionate rate of Black voters casting provisional ballots, both before and after SB 202, including in the 2024 election, 8/27/25 Grimmer Dep. 125:8-17, and Defendants admit that provisional ballots cast by Black voters slightly increased in 2024 versus 2022, *see* ECF 977, at 29. Defendants' expert also admitted that the number of Black voters who voted by provisional ballots in 2022 and 2024 was lower than in any of the four elections preceding SB 202. 8/27/25 Grimmer Dep. 126:1-23. And with respect to the decrease in the number of ballots classified as provisional in the 2024 election, *see* ECF 977, at 29, Defendants' expert admitted that he did not "perform any analysis . . . of whether or not provisional ballots were counted," 8/27/25 Grimmer Dep. 122:16-23. Accordingly, data from the 2024 election does not eliminate the factual disputes regarding the impact of this provision.[3]

---

[3] Furthermore, because SB 202 prohibits a voter from casting a provisional ballot if they arrive at a voting precinct other than the one they were assigned before 5:00 P.M., *see* ECF 822, at 8-9, data capturing provisional ballots that voters cast does not reflect harm to voters who arrived to a non-assigned precinct prior to 5:00 P.M. and were turned away—some of whom were likely unable to reach their assigned precinct in time, effectively disenfranchising them.

### 5.    Line relief ban

Plaintiffs have produced evidence that SB 202's line relief prohibition, criminalizing the ability to provide food and water to voters waiting in line, disparately impacts voters of color and targets a practice that minority-led organizations have historically used to support voters of color.  *See* ECF 822, at 121-24.  In their supplemental briefing, Defendants argue that this provision does not burden voters in Georgia because following SB 202's enactment, lines have shortened, including in 2024.  *See* ECF 977, at 10-11, 13-16.  However, Plaintiffs' expert, Dr. Stephen Pettigrew, testified in his deposition that in 2024 there was a statistically significant difference in Black voters who waited longer than 30 minutes from prior years.  8/15/25 Pettigrew Dep. 95:16-96:24, ECF 970; *see id.* 80:1-14; *id.* 98:17-99:4 ("Grimmer's report provides statistically significant evidence that there were voters in Georgia still waiting longer than 30 minutes in 2022 and 2024."); *id.* at 110:10-14 ("The statistical evidence that over 1 in 20 Georgia voters waited longer than 30 minutes in both of these elections, that's a problem."); Dep. Stephen Pettigrew, ECF 970, Dep. Ex. 1 ("7/4/25 Pettigrew Rebuttal Supp. Rep.") at 5.

There are additional material disputes as to the impact of SB 202's line relief prohibition.  Defendants claim that survey data from the University of Georgia's School of Public and International Affairs ("SPIA") "confirms that Georgia voters of all races benefited" from shorter lines following SB 202.  ECF 977, at 12-13.

They cite SPIA data indicating that in 2024, more White voters than Black voters reported waiting more than 30 minutes to vote, and the percentage of Black voters who had to wait in line for more than 30 minutes decreased from 2022 to 2024.  *See id.*  Yet other, higher-quality data suggests otherwise.  By contrast, Cooperative Election Study ("CES") data—a rigorously conducted, high-quality poll as compared to most other survey research polls, *see* 8/15/25 Pettigrew Dep. 73:14-74:3—provides evidence that there was "a significant racial gap in 2024 between [W]hite and [B]lack voters" that showed Black voters "were more likely to experience … a long line of over 30 minutes."  *Id.* 82:4-83:8; *see id.* 96:19-24. While Defendants contend that the CES data supports their contentions, they ignore racial disparities reflected in the data.  *See* ECF 977, at 13.  Overall, there remain factual disputes about racial disparities in wait times to vote and the impact of line relief restrictions.

### D.    Voter Turnout, Where Racial Disparities Persist, Is Not Dispositive of Plaintiffs' Intentional Discrimination Claims

To be clear, and as Plaintiffs previously explained, while voter turnout may be probative to whether there is discriminatory intent, it is not dispositive evidence of whether there is a discriminatory *effect*.  *See* ECF 822, at 95-100. As Defendants' expert concedes, a multitude of factors influence whether voters turn out in a given election.  *See*, e.g., 8/27/25 Grimmer Dep. 45:12-14 (affirming "[t]here are lots of factors that can affect turnout"); *id* 77:18-23 ("There are many things that affect

turnout, yes."); *id.* 49:25-50:14 ("I don't think I would use effects [like turnout] to make an intent argument."); *see also* ECF 822, at 95. Furthermore, as a matter of law, voters do not have to be fully disenfranchised (and therefore prevented from turning out) for legislators to engage in intentional discrimination. *See* ECF 822, at 95-96. To succeed on their intentional discrimination claims under the Fourteenth and Fifteenth Amendments and Section 2, Plaintiffs must at least show that SB 202 makes voting more difficult, though not impossible, for minority voters. *See, e.g.*, *U.S. v. Marengo Cnty. Comm'n,* 731 F.2d 1546, at 1570 (1984) (finding policies that "impaired black access to the political system and the confidence of [B]lacks in the system's openness" "unquestionably discriminated against" those voters); *cf. Coal. for TJ*, 218 L. Ed. 2d 71 (2024) (Alito, J., dissenting from the denial of certiorari) (recognizing that a disparate impact on a racial group is evidenced when a law bears more heavily on that group's members, not by how that racial group performs relative to another group). Accordingly, assessing increased burdens on voting ability is an appropriate measure of discriminatory impact.

And, to the extent turnout is relevant here, racial disparities persisted in voter turnout through the 2024 election, especially with respect to Black voters. *See* 6/23/25 Fraga Am. Supp. Rep. tbl. 2; 7/14/25 Fraga Rebuttal Rep. tbl. 1 (using Dr. Grimmer's figures). Record evidence shows that the gap in voter turnout has actually increased for Black, AAPI, and Latinx voters as compared to White voter

turnout following the enactment of SB 202, including in the 2024 election. Indeed, Defendants admit that Black voter turnout declined in 2024 as compared to 2020, while White turnout increased. *See* ECF 977, at 2, 8; *see also* Grimmer Dep. 55:5-8 (admitting "Black voter turnout declined in Georgia in 2024 as compared to 2020"); *id.* 59:5-60:2 (admitting that "the largest racial gap between [AAPI] voters, and White voters occurs after the passage of SB 202," "the gap between [AAPI] and White voters increased both in comparing the 2018 to 2022 mid-terms and the 2020 to 2024 presidential election," "for Hispanic voters, the largest gap . . . with White voters . . . occurs after the passage of SB 202," and "the racial gaps between Hispanic and White voters increased both in comparing the 2018 to 2022 mid-terms and the 2020 to 2024 presidential election"). Thus, contrary to Defendants' position, turnout rates in any Georgia election are not dispositive of Plaintiffs' intentional discrimination claim, and the rising turnout gap suggests exactly the opposite.

Because the mosaic of evidence put forth by Plaintiffs demonstrates racially discriminatory intent—or, at minimum, presents genuine disputes of material fact—this Court should deny Defendants' motion for summary judgment on intent.

## III.    TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE VRA SECTION 2 CLAIMS BASED ON DISCRIMINATRY RESULTS

A discriminatory results claim under Section 2 of the VRA is distinct from a discriminatory intent claim under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments discussed *supra* Section II. In contrast to a discriminatory

intent claim, a Section 2 claim based on discriminatory results "does not demand proof of discriminatory purpose; and . . . a 'facially neutral' law or practice may violate that provision." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 674 (2021).

A Section 2 discriminatory results claim is established if "based on the totality of the circumstances" the state's voting system is not "equally open" to minority groups "in that [their] members have less opportunity than" non-minority voters "to participate in the political process." 52 U.S.C. § 10301(b). In adjudicating a discriminatory results claim, "[a]ny circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered," including "a person's ability to *use* the means that are equally open." *Brnovich*, 594 U.S. at 649 (emphasis added); *see also Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994) (Section 2 violation where plaintiffs show "the exclusion of the minority group from *meaningful access* to the political process" (emphasis added)).

As noted above *supra* Section II.D, voter turnout, without more, cannot establish that a system of voting is "equally open" because a Section 2 violation does not require that voters be completely disenfranchised, just that voting has been made meaningfully more difficult. *See United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1570 (11th Cir. 1984) (recognizing that laws making voting more difficult,

though not impossible, for minority voters can violate Section 2); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 985 (N.D. Fla. 2021) (denying summary judgment where plaintiffs presented evidence of the discriminatory impact a voting law had on minority voters, including the exacerbated costs associated with requesting absentee ballot).  If turnout is considered at all, the relevant comparison is the change in voter turnout gaps between White voters and Black, AAPI, and Latinx voters.  The Supreme Court in *Brnovich* offered additional factors to consider when deciding a Section 2 discriminatory results claim, including (1) "[t]he size of the burden imposed by a challenged voting rule" and (2) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups."  594 U.S. at 649.  "[T]he absence of evidence on some, but not all, of *Brnovich's* considerations does not entitle Defendants to summary judgment."  *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 985.  Indeed, summary judgment is rarely granted for Section 2 discriminatory results claims "due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015); *see also Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1290-91 (N.D. Fla. 2021) ("[N]o one [*Brnovich*] factor controls" and "[e]ven at trial, failure on some factors is not dispositive").

Several factors that must be considered in the "totality of circumstances" and are unchanged—and undisputed—by the 2024 election. *See Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986); *see also, e.g.*, ECF 822, at 95-97; Resp. Opp'n Mot. Summ. J. on Drop Boxes, ECF 835, at 36-38; Ex. B attached hereto, Supplemental Expert Report of Dr. Chris Clark, June 16, 2025 ("6/13/25 Clark Supp. Rep."), at 3-6 (regarding Georgia's long history of discrimination (Senate factor 1), which has led to significant disparities in educational achievement, health outcomes and wealth for Black, AAPI, and Latinx Georgians compared to Latinx Georgians compared to White Georgians (collectively, Senate factor 5)).  Moreover, the data from the 2024 election continue to support a reasonable inference that, as a result of the challenged provisions of SB 202, *see supra* Section II.C, individually or collectively, Georgia's voting system is not "equally open" to Black, AAPI and Latinx voters. At a minimum, these data do not resolve numerous issues of material fact regarding this question. *See Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 985 (denying summary judgment on discriminatory results claim because "a bench trial, with the benefit of live testimony and cross examination, offers more than can be elucidated simply from discovery" (quoting *Ga. State Conf. of NAACP,* 775 F.3d at 1348)); *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 832, 833-39 (D. Ariz. 2018) (deciding discriminatory results claim only after "a ten-day bench trial" that involved at least 7 experts and 33 lay witnesses).

### A. SB 202's Absentee-By-Mail Voting Provisions Have a Disproportionate Impact and Impose a Significant Burden on Black, AAPI, and Latinx Voters.

Under the VRA's broad definition of "vote," "voting using an absentee ballot" and any "delivery of an absentee ballot" plainly "constitutes 'voting' under the VRA." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 234 (M.D.N.C. 2020) (quoting 52 U.S.C. § 10310(c)(1) ); *see also Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991) (affirming that limitations on satellite voter registration burdened Black registrants in violation of Section 2 even though there is no specific constitutional right to satellite voting).

Overall, the 2024 election results show that SB 202 continues to impose racially disparate burdens on absentee voting. Every trend that existed in 2022 persists in 2024: voters of color used absentee voting at sharply lower rates than before SB 202, and their ballot applications and ballots were rejected more often for SB 202-specific reasons such as identification mismatches and late receipts. The data show that reduced absentee voting by mail disproportionately and substantially affected voters of color, and Plaintiffs' experts confirm that these gaps were significant. 6/16/25 Fraga Am. Supp. Rep. ¶¶ 3-6; Ex. C attached hereto ("7/14/25 Lee Rebuttal Rep.") at 2-6. These racial disparities are unaffected by the aggregate statewide turnout Defendants emphasize.

SB 202's provisions must be evaluated collectively, not in isolation. SB 202 simultaneously (1) bars government officials from proactively sending absentee ballot applications, (2) heightens criminal penalties for returning or assisting with ballots outside narrow statutory limits, (3) adds new identification requirements for both absentee ballot applications and ballot returns, (4) mandates that voters provide additional personal information on the ballot envelope, and (5) shortens the period for requesting and submitting ballots. *See* O.C.G.A. § 21-2-381. Considered together, these provisions restructured Georgia's absentee voting system in ways that disproportionately burden Black, AAPI, Latinx, and Native American voters. The record contains ample evidence that these cumulative changes denied voters of color an equal opportunity to participate. *See Brnovich*, 594 U.S. 668-670. These facts preclude summary judgment.[4]

### 1. Absentee-by-mail voting fell most among voters of color.

Voters of colors' higher reliance on absentee-by-mail voting as compared to White voters remained true in 2024. *See, e.g.*, 7/14/25 Lee Rebuttal Rep. at 1-4. For instance, one of the main reasons AAPI voters, as well as Latinx voters, utilize absentee voting is due to higher rates of limited English proficiency (LEP) and other

---

[4] Because Defendants did not address the claims of AAPI, Latinx, and Native American voters in their moving briefs for SB 202's absentee voting and drop box provisions, they should be precluded from using their supplemental brief to shoehorn in any such belated arguments. *See Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1023 (11th Cir. 1988)

language barriers among these groups. *See* ECF 830, at 38 (over 33% of AAPI Georgians are LEP and 35% of Latinx Georgians over the age of five are LEP). Knowing this, it is especially troubling that election data, including from 2024, show that absentee-by-mail voting fell most among voters of color after SB 202's implementation. In 2020, 29% of Black voters voted by mail compared to 5.4% in 2024 (a 23.6 percentage-point decrease). 6/23/25 Fraga Am. Supp. Rep. ¶ 28, tbl. 3; 6/16/25 Rodden Supp. Rep. at 7, fig. 3a (showing a decrease from 29% to around 5%). In 2020, 23.2% of Latinx voters voted by mail compared to 3% in 2024 (a 20.2 percentage-point decrease). 6/23/25 Fraga Am. Supp. Rep. ¶ 28, tbl. 3. In 2020, 39.7% AAPI voters voted by mail compared to 7.4% in 2024 (a 32.3 percentage-point decrease). *Id.* These are disproportionate drops relative to White voters, as 23.9% of White voters voted by mail in 2020 compared to 4.9% in 2024 (a 19 percentage-point decrease). *Id.*; *see also* 6/16/25 Rodden Supp. Rep. at 6-7. This reveals a disparate impact on minority groups—particularly AAPI and Black voters—who also have a higher reliance on absentee-by-mail voting. 6/23/25 Fraga Am Supp. Rep. ¶ 5; *see League of Women Voters of Fla. Inc. v. Fla. Sec'y of State (LWV Fla.)*, 66 F.4th 905, 938 (11th Cir. 2023) (upholding the district court's finding that disparities of 6.58 and 12.58 percentage points showed disparate impact).

The decline in absentee-by-mail voting between the November 2020 and 2024 elections was most significant for AAPI voters. 6/13/25 Grimmer Supp. Rep. ¶ 43,

tbl. 6. This decline among AAPI voters in Georgia cannot be explained away by the mere fact that vote-by-mail was overall more popular in 2020 during the pandemic than in 2024. Nationally, in 2024, 47% of AAPIs voted by mail, a 17 percentage-point decrease from November 2020. *Compare* 7/14/25 Lee Rebuttal Rep. at 3-4 *with* Resp. Statement Material Facts Ex. 100 ("1/13/2023 Lee Rep.") at 65, ECF 810-25. That does not come close to approaching the significant 32.3 percentage point decrease in absentee-by-mail voting for AAPI voters in Georgia between 2020 and 2024. Ex. D attached hereto ("8/21/25 Lee Dep.") 96:10-97:5. Though the COVID pandemic contributed to the increased popularity of mail-in voting in November 2020 nationally and in Georgia, national voting statistics show that the end of the pandemic does not explain the disproportionate decreases observed in absentee voting among AAPI voters and voters of color in Georgia in 2024. Rather, SB 202's interdependent restrictions on absentee voting have driven a disproportionate decline in absentee-by-mail voting among voters of color.

Even considering pre-pandemic data, as Defendants urge, White voters in Georgia were the only racial group to have their rate of absentee-by-mail voting in *all* post-SB 202 federal elections *exceed* their absentee-by-mail voting rate in the pre-SB 202 (and pre-pandemic) November 2018 election. 6/23/25 Fraga Am. Supp. Rep. ¶ 30. In contrast, Black, Latinx, and AAPI voters in Georgia all voted by mail at a lower rate in the November 2024 election than in November 2018. *Id*.

Defendants' insistence that 2020 was an anomaly because of the pandemic disregards that absentee-by-mail voting had been gaining popularity among voters of color *before* the COVID pandemic, and especially among AAPI and Black voters. 6/13/25 Grimmer Supp. Rep. ¶ 43, tbl. 6. This fact disproves or at the least puts into dispute Defendants' rosy characterization that the decline in absentee voting is a sign of a return to normalcy after the pandemic. Defendants' characterization also disregards the fact that lower rates of absentee voting after 2020 do not capture voters' preferences of voting methods, and instead more likely reflect the fact that SB 202 raised the costs of absentee-by-mail voting and deterred voters, particularly voters of color, from using absentee ballots. *See* 7/14/25 Lee Rebuttal Rep. 2-4; 8/21/25 Lee Dep. 96:7-97:5. Voters who cast a mail ballot in 2020 were 4.8 percentage points less likely to vote *at all* in 2024 relative to those who cast an in-person ballot in 2020. 6/16/25 Rodden Supp. Rep. at 1.

As previously explained, there is a factual dispute here as to whether turnout among voters of color actually increased post-SB 202, including the 2024 election, and regardless, the turnout gap for voters of colors widened in 2024. Even accepting Defendants' claims of increased voter turnout in 2024, however, there can be no absolution of the potential impacts of SB 202 on voters of color. Defendants ignore evidence of increased voter mobilization efforts among nonpartisan community organizations since SB 202's passage. After SB 202 and ahead of the 2024 election,

nonpartisan organizations intensified their voter mobilization efforts in Georgia, including by putting more resources into voter education and expanding their geographic coverage within the state.    7/14/25 Lee Rebuttal Rep. 6-9. Countermobilization efforts, such as these in Georgia in 2024, by nonpartisan groups are known to contribute to higher voter turnout.    1/13/2023 Lee Rep. at 55-63. Nonpartisan organizations' voter mobilization efforts mitigate the costs of voting and increase voter turnout, especially among historically marginalized communities, suggesting that analysis of turn-out without consideration of factors like counter-mobilization masks the costs of voting under SB 202, especially voting by absentee ballot. *Id. at* 71-93.

### 2. Rejection rates for absentee-by-mail ballot applications and ballots rose and show racial disparities.

Rejection rates for absentee-by mail ballot applications and ballots show a discriminatory impact of SB 202's heightened identification requirements and the new deadlines for requesting and submitting absentee ballots.

Defendants' attempt to minimize SB 202's impact, pointing to total rejection rates for absentee ballot applications, is irrelevant to the analysis: what matters is whether a law disproportionately burdens minority voters. *Brnovich*, 594 U.S. at 668-670. SB 202 does that.  For example, Defendants do not deny that rejection rates for Native Americans and Latinx voters were nearly double and triple the statewide rejection rate for lateness, respectively.  *See* ECF 977, at 26.

SB 202's provisions limiting the amount of time absentee ballots could be accepted, and heightening identification requirements for absentee ballots, have disproportionately impacted voters of color.  Black, Latinx, and AAPI voters remain more likely to have absentee-by-mail ballots rejected due to SB 202's requirements than White voters, including in the November 2024 election.  6/23/25 Fraga Am. Supp. Rep. ¶ 6; *see also* 8/25/25 Grimmer Dep. 159:16-160:6, 144:6-10.  And as discussed *supra*, in terms of overall absentee ballot rejections, the November 2024 election had a "Ballot Received After Deadline" rejection rate ***over six times greater*** than the most recent presidential election prior to SB 202's implementation.  *See* Section II.C.

Absentee-by-mail ballots rejected for incorrect or missing ID information were also higher in post-SB 202 elections than elections before SB 202, including the 2024 presidential election.  6/23/25 Fraga Am. Supp. Rep. ¶ 35.  Black, Latinx, and AAPI absentee-by-mail voters were consistently more likely than White voters to have their ballots rejected due to "incorrect ID information" or "missing ID information" after SB 202 was implemented.  6/23/25 Fraga Am. Supp. Rep. ¶ 38, tbl. 6.  This remained true in 2024.  *Id*.; *see also* 6/16/25 Rodden Supp. Rep. at 11; 8/27/25 Grimmer Dep. 144:6-10 (admitting that Black, Latinx, Asian, and American Indian voters all had higher ID-related rejection rates than White voters in 2024).

While Defendants emphasize that 99.6% of all absentee ballot applications and ballots themselves complied with SB 202's identification requirements in 2024, they ignore the fact that this data point does not capture the qualified voters who chose not to apply for or vote absentee because of the new identification requirements. *See* ECF 977, at 27. Moreover, in a high-turnout presidential election, even 1% of votes corresponds to tens of thousands of voters. And the discriminatory impact matters: Georgia elections are often decided by margins in the thousands. Even if overall compliance is high, minority voters were more likely than White voters to be rejected for reasons associated with identification and lateness, which is precisely the kind of disparate impact that Section 2 prohibits.

Defendants' contrary analysis relies entirely on their bare assumption that the 2020 election was anomalous because of the pandemic. But they offer no evidence or theory on why the pandemic would cause a *lower* absentee ballot rejection rate; to the contrary, one would imagine that an "anomalous" election, precipitated by once-in-a-century pandemic would create a *higher* rejection rate. Regardless, the correct benchmark to evaluate the impact of SB 202 on absentee rejection rate is an analysis of rejection rates before and after SB 202's implementation, as that shows who was directly impacted by SB 202's provisions.[5] Rejection rates in 2020 are,

---

[5] At a minimum, the appropriate benchmark for consideration remains a disputed fact that supports the denial of the State Defendants' motion for summary judgment.

therefore, relevant data points. In 2020, 0.3% of absentee ballots were rejected overall. 6/13/25 Grimmer Supp. Rep. ¶ 63, tbl. 8. In 2022, after SB 202 took effect, the rate of ballot rejections increased to 1.4% and then in 2024, it rose further to 1.7%. *Id*. For Asian Americans, the change in the absentee ballot rejection rates is even larger. 7/14/25 Lee Rebuttal Report 5. In 2020, pre-SB 202, 0.6% of absentee ballots from Asian Americans in Georgia were rejected. In 2022, 3.1% were rejected and in 2024, 2.9% were rejected. *Id*.

Across all three statewide elections following the enactment of SB 202—the November 2022 general election, December 2022 runoff, and November 2024 general election—Georgia experienced higher mail-in ballot rejection rates than in the two statewide federal elections immediately preceding the law's passage—the November 2020 general election and January 2021 runoff. 6/23/25 Fraga Am. Supp. Rep. ¶¶ 36-37. As discussed *supra*, Dr. Grimmer's Supplemental Report ignores several highly competitive elections that contradict his claim that mail-in ballot rejection rates have declined. *See* Section II.C. By excluding key elections that contradict his narrative, Dr. Grimmer presents a distorted and incomplete picture of post-SB 202 mail-in ballot rejection rates.

### 3.    Defendants' justifications fail as to the prohibition on government officials proactively sending ballots.

Plaintiffs' prior briefing explains how SB 202's blanket prohibition on election officials proactively mailing absentee ballot applications disparately

impacts voters of color and how Defendants' justifications for these provisions are contradicted by the record. ECF 830, at 56-62. In their supplemental briefing, Defendants assert that a reduction in cancelled absentee ballots at polling places in 2024 proves the ban helps with administration and is consistent across racial groups. ECF 977, at 32-36. But Defendants do not address the reality that the prohibition just created *different* work for election officials, such as canceling absentee ballot applications that were submitted too early under the new law and answering voter questions about how to navigate the process, indicating that a dispute of fact remains. And fewer cancellations simply reflect that fewer voters were able to utilize the option of voting by mail at all; it does not show that the ban is necessary, tailored, or nondiscriminatory under Section 2's results test.

Defendants also say there is no harm because vote-by-mail in 2024 was higher than in 2016 for most groups. ECF 977, at 34. But they also concede that absentee voting by mail *did* decline for Latinx voters between 2016 and 2024. *See id*. And, as discussed above, 2016 is the wrong benchmark. SB 202 was enacted after 2020, when absentee vote-by-mail use expanded and was disproportionately relied upon by voters of color. The relevant comparison is pre- vs. post-SB 202, not pre-pandemic usage patterns that mask who lost access after the ban. That evidence reveals that AAPI, Black, Latinx, and Native American voters' absentee-by-mail

voting dropped disproportionately from 2020 to 2024 relative to White voters. *See supra* Section III.A.1.

> **B.    SB 202's Drop Box Provision Has a Disproportionate Impact and Imposes a Significant Burden on Black, AAPI, and Latinx Voters.**

As a threshold matter, Defendants continue to argue that the Court should disregard any data from the 2020 elections when assessing SB 202's drop box provision because drop boxes were authorized for the first time under the SEB's 2020 emergency rules. *Compare* ECF 977, at 18-21 *with* Reply Resp. Mot. Summ. J. on Drop Boxes, at 1-2, ECF 858. However, prior to SB 202, Georgia Code Section 21-2-382(a) authorized counties to establish "additional sites" or "places" for voters to drop off their absentee ballots *without* any restrictions on the number of "additional sites" or "places," the date and time of their use, placement outdoors or indoors, or type of surveillance. O.C.G.A. § 21-2-382(a) (2019). And, as Secretary of State Brad Raffensperger's then-General Counsel recognized, "Georgia law already authorized counties to utilize drop boxes." *See* Pls.' Opp'n to State Defs.' Mot. for Summ. J. on SB 202's Drop Box Provision at 5, ECF 829. Had it not, the State Election Board ("SEB") would have been unable to enact the emergency rule regulating drop boxes in 2020 given that SEB's authority to promulgate rules is limited to those "consistent with the law" regarding the "conduct of . . . elections." O.C.G.A. § 21-2-31(2). Thus, even before the SEB enacted the 2020 emergency rules, counties were authorized to establish drop boxes unencumbered by any of the

restrictions SB 202 now imposes on them. That counties may have first taken advantage of this authority in the 2020 election does not invalidate the statutory landscape that existed prior to that time or provide any legal or factual basis to disregard data from that election. Doing so would disregard the "totality of the circumstances" when assessing a Section 2 violation.

Here, when considering all the relevant evidence, including the 2024 election data, a reasonable inference may be drawn that SB 202's severe restrictions on the number and availability of drop boxes disproportionately impact and significantly burden Black, AAPI and Latinx voters.[6] *See* ECF 822, at 115-117; ECF 835, at 13, 16-17, 20-29 Furthermore, Defendants' arguments are based on numerous disputed material facts that cannot be resolved on summary judgment, including: (1) whether there is a consistent relationship between race and drop box use, i.e., whether Black or White voters were more likely to use drop boxes in 2020, 2022 and 2024; (2) the overall drop box use in 2020, 2022 and 2024; (3) Black, AAPI, and Latinx absentee voters' rejection rates for late-arriving absentee ballots compared to White voters' rejection rates in 2024; and (4) whether voters are burdened by increased distance from drop boxes and increased travel time.

---

[6] Again, Defendants' opening Motion never even addressed drop box provisions with respect to AAPI and Latinx voters; Defendants cannot put at issue evidence of a discriminatory impact on these voters in the first instance in this supplemental briefing.

*First*, Defendants cannot dispute that SB 202's arbitrary limit on drop boxes drastically reduced the number of drop boxes available in Georgia. ECF 977, at 18-19 (acknowledging that "the *number* of drop boxes decreased after SB 202"). This change disproportionately reduced the number of drop boxes available to Black, AAPI and Latinx voters compared to White voters. ECF 835, at 8-9, 16-17. In the eight counties that are home to the majority of Georgia's Black, AAPI, and Latinx populations, the number of drop boxes fell by a remarkable **77% after SB 202**. *See* ECF 835, at 8-9. Statewide, SB 202 decreased the number of drop boxes for nearly 75% of Black voters, 77% of AAPI voters, and 68% of Latinx voters, compared to just 53.7% of White voters. *See* ECF 835, at 8, 13-14. In 2024, there was an additional 6% reduction in the number of drop boxes from the 2022 level. State Defs.' Supp. Br. Supp. Mot. Summ. J. Ex. D ("6/13/25 Chatman Supp. Rep.") ¶ 2, ECF 977-5.

*Second*, SB 202 disproportionately reduced Black, AAPI, and Latinx voters' opportunities to use drop boxes by eliminating ways to use drop boxes that were predominately accessed by Black, AAPI, and Latinx voters as compared to White voters. *See Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 985-986 (denying summary judgment where plaintiffs presented evidence of the discriminatory impact a voting law had on minority voters including reduced opportunities for voters to return absentee ballots to secure drop boxes for minority voters); *Brnovich*, 594 U.S.

at 668 ("equal opportunity helps to explain the meaning of equal openness" and "include[s] consideration of a person's ability to *use* the means that are equally open").

For example, as previously detailed, SB 202 required drop boxes to be located indoors at early voting sites or the registrar's office, only during early voting hours ending the Friday before the election. *See* O.C.G.A. 21-2-382(c)(1). Thus, SB 202 eliminated drop boxes in the last four days of the election, when Black voters disproportionately returned absentee ballots prior to SB 202. *See* ECF 822, at 116-117; ECF 835, at 16. That is also when AAPI and Latinx voters disproportionately have their absentee ballots rejected for being late when it would have otherwise been timely prior to SB 202. *See id.*; ECF 835, at 16-17. This was observed in 2022 and continued to be the case in the 2024 election, where 0.93% of White voters' absentee ballots were rejected as late, compared with 1.29% of Black voters, 2.23% of Latinx voters, and 2.03% of AAPI voters. 6/23/25 Fraga Am. Supp. Rep. ¶ 39, Table 7; *cf. LWV Fla.*, 66 F.4th at 932-33 (minimizing the weight of statistically insignificant correlations but acknowledging that small disparities may bolster other consistent evidence).

As discussed *infra* Section III.A, Defendants' comparison of Black, AAPI, and Latinx voters' absentee ballot rejection rates in 2024 to their pre-pandemic levels in 2016 and 2018 has limited probative value. It critically ignores the *gaps* between

the rejection rates of Black, AAPI, and Latinx voters' absentee ballots and that of White voters, which increased in post-SB 202 elections. 6/23/25 Fraga Am. Supp. Rep. ¶ 39. Furthermore, Plaintiffs' and Defendants' experts' analyses regarding absentee ballot rejection rates demonstrate disputed material facts that cannot be resolved on summary judgment. ECF 977, at 25-26; *compare* Grimmer Supp. Rep. tbl. 8 *with* 6/23/25 Fraga Am. Supp. Rep. tbl. 7.

*Third*, after SB 202's drastic reduction of the number of drop boxes there was a disproportionate reduction in Black and AAPI voters' absentee ballot use compared to White voters. *See* ECF 835, at 24-25. This was observed in 2022 and remained in the 2024 election, where absentee ballot use as compared to 2020 declined 19 percentage points for White voters, compared to 23.6 percentage points for Black voters and 32.3 percentage points for AAPI voters. 6/23/2025 Fraga Am. Supp. tbl. 3; *see also* 6/13/25 Grimmer Supp. Rep. tbl. 6 (estimating absentee ballot use in 2024 declined 19.1 percentage points for White voters, compared to 23.5 percentage points for Black voters and 32.2 percentage points for AAPI voters); 6/16/25 Rodden Supp. Rep. at 6-7.

*Fourth*, as previously detailed, Black and AAPI voters were more likely to use drop boxes in 2020 than White voters; drop boxes were used most where and when Black and AAPI Georgians voted at that time. *See* ECF 822, at 115-121; ECF 835, at 13, 16-19, 20-29. Although Georgia failed to gather any individual-level

data on the race of voters who used drop boxes, Plaintiffs demonstrated, among other things, that in November 2020, 64.65% of the 550,000 absentee ballots returned via drop box were cast in just eight counties in which 53.2% of the State's Black population reside but only 29.1% of the State's White population reside—Fulton, Cobb, DeKalb, Gwinnett, Douglas, Chatham, Rockdale, and Clayton. ECF 822, at 116; ECF 835 at 18; *see Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1134 (3d Cir. 1993) ("[M]inority voters should not be forced to suffer a violation of their rights under the Act because of external circumstances that limit the availability of data specific to the challenged district if other evidence supports their claim."). Plaintiffs also previously addressed Defendants' argument that White voters used drop boxes more often than Black voters in 2020 and 2022 and presented conflicting expert findings that created disputed issues of material fact. *See* ECF 835, at 18-19; ECF 822, at 117-119.

In their supplemental brief, Defendants argue that "drop box *usage* in 2024 was similar to 2020" because "47% of absentee voters used a drop box in 2024, a decrease of just 2 percentage points from 2020." ECF 977, at 19. But in fact, over 550,000 absentee ballots were deposited to drop boxes in 2020, and absentee ballot use as a whole in 2024 plummeted. 6/23/2025 Fraga Am. Supp. Rep. tbl. 3. There were only 270,000 absentee ballots in total in 2024. ECF 977, at 23. Relying on Dr. Grimmer's supplemental interpretation of CES survey data, Defendants again argue

that there is no consistent relationship between race and drop box use because in 2020 and 2022 White voters were more likely to report using drop boxes, but in 2024 Black voters were more likely to report using drop boxes. *See* ECF 977, at 19. The facts relating to drop box use by race, however, continue to be disputed for the same reasons discussed above *supra* Section II.C.3.[7]

Finally, Defendants' continued attempt to paint SB 202's restrictions as quotidian "usual burdens of voting" is also unavailing. As previously detailed, SB 202's reduction in the availability of drop boxes caused a greater increase in the travel burden experienced by Black, AAPI, and Latinx voters than for White voters. *See* ECF 835, at 13-16. Compared to 2020, in 2024, the average distance between a registered voter's residence and closest drop box in their county increased from 3.4 miles to 4.8 miles, and the number of registered voters who now live further than that average distance increased 16.5% for Black voters, 21.1% for AAPI voters and 15.5% for Latinx voters, as compared to 12.4% for White voters. *See* ECF 835, at 8-9, 14-15; 6/23/25 Fraga Am. Supp. Rep. ¶ 2.

In 2024, Black citizens of voting age ("CVA") statewide were also 119% more likely than White CVAs statewide to have a round trip to access a drop box

---

[7] Moreover, Dr. Grimmer himself previously concluded that "Black voters were . . . more likely [than White voters] to use a drop box in 2022" which contradicts his current position that White voters were more likely to use a drop box in 2022. *Compare* 9/7/23 Grimmer Rep. Update ¶ 24 *with* 6/13/25 Grimmer Supp. Rep. ¶ 92); *see also* 7/14/25 Fraga Rebuttal Rep. ¶ 31.

exceeding an hour (7% compared to 3.2%). *See* ECF 977-5, ¶ 6. This is largely because Black CVAs statewide are still far more likely than White CVAs to live in a household without a car. They face greater burdens from transportation costs (*e.g.*, taking bus, walking) and time costs (*e.g.*, time spent traveling to polls). *See id.* ¶ 6; *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 985 (N.D. Fla. 2021) (denying summary judgment where plaintiffs presented evidence that voting law, among other things, exacerbated costs associated with requesting absentee ballot "which already fall most heavily on racial and ethnic minority voters").

As travel times and distances to drop boxes increase, voters are forced to find another way to return their absentee ballots. *See* ECF 835, at 23, n.8 (citing plaintiff Anjali Enjeti-Sydow's testimony that she decided not to vote using a drop box, despite it being her preference, because the drop box she previously used no longer existed and the next closest drop box was over an hour away round trip). These costs are exacerbated by the disproportionate socioeconomic challenges faced by Black, AAPI, and Latinx voters as compared to White voters, as previously detailed. *See* ECF 835, at 36-38.

Rather than meaningfully engage with this evidence, Defendants simply rehash their prior arguments by (1) disputing Plaintiffs' experts' conclusion that drop box voters ordinarily use the drop box closest to their homes, and (2) summarily asserting that *any* travel burden serves as the "usual burdens of voting" that do not

violate Section 2 under *Brnovich*.  *See* ECF 977, at 19-20.  The former creates a

disputed issue of material fact that cannot be resolved on summary judgment—and

Defendants offer no alternative measure of distance to drop box that can be

consistently applied across all voters. The latter mischaracterizes *Brnovich*.  There,

the Supreme Court explained that "*some* travel" may be considered one of the "usual

burdens of voting," but it did not enunciate the degree of travel that would render

such a burden "usual" or "enough to demonstrate a violation of § 2."  *Brnovich*, 594

U.S. at 669 (emphasis added).  The severity of the travel burdens SB 202 imposes

on Black, AAPI, and Latinx voters is distinguishable from merely "disparate

inconveniences" that fall short of a Section 2 violation.  At a minimum, this issue

must be left for trial.[8]

## IV.    TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' *ANDERSON-BURDICK* CLAIMS

By its nature, an *Anderson-Burdick* claim requires a "fact-intensive analysis."

*Gill v. Scholz*, 962 F.3d 360, 365 (7th Cir. 2020); *see also Eakin v. Adams Cnty. Bd.*

*of Elections*, 149 F.4th 291, 309, n.27 (3d Cir. 2025).  The Court must weigh the

burdens imposed by SB 202 against the government's interest in imposing those

burdens.  *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). . And because the

---

[8] For the same reasons discussed above *supra* Section II.C.4 and *infra* Section VI,
factual disputes also remain regarding the disparate impact of the elimination of
most out-of-precinct provisional voting on Black, AAPI, and Latinx voters.

relevant facts are so seldom undisputed after discovery, courts routinely decline to resolve *Anderson-Burdick* claims on summary judgment. *See, e.g.*, *Ga. Coal. for the Peoples' Agenda, Inc. v. Raffensperger*, No. 1:18-CV-04727-ELR, 2022 WL 22866291, at *13 (N.D. Ga. Sept. 29, 2022) (denying motion for summary judgment on claim applying *Anderson-Burdick* framework). Here, the parties have introduced voluminous evidence from multiple election cycles and from many affected voters, creating factual disputes about whether SB 202 burdened voters who were nonetheless able to cast a ballot, whether SB 202's burdens were so severe that they effectively *disenfranchised* voters, whether those burdens fell disproportionately on certain classes of voters, and whether the state's asserted interests are sufficiently weighty to justify these burdens. These disputes can only be resolved at trial.

### A. The State's Evidence of Aggregate Turnout in 2024 Does Not Defeat Plaintiffs' Claims

Aggregate turnout statistics like those emphasized by the State are insufficient to defeat an *Anderson-Burdick* claim because of their tendency to obscure, rather than clarify, the burdens imposed by a challenged election law. After all, "[a]n election law may keep some voters from going to the polls, but in the same election, turnout by different voters might increase for some other reason." *Veasey v. Abbott*, 830 F.3d 216, 260 (5th Cir. 2016). "That does not mean the voters kept away were any less disenfranchised." *Id.* Here, even those who managed to cast a ballot had

to endure unjustified burdens.  The State's turnout statistics are both conceptually inadequate and hotly disputed, and thus they do not warrant summary judgment.

First, the fact that voters may muster the sophistication, stamina, and will to overcome significant barriers to voting does not imply that the barriers are constitutional.  The record contains examples of voters who successfully cast a ballot only after enduring the hassles and overcoming the hurdles imposed by SB 202. *See, e.g.*, ECF 829 (voter had to drive 25 minutes to cast a ballot in the primary after drop boxes were removed); *id.* at 41 (voter had to stand in a multi-hour line to vote because drop boxes were even less convenient); Pls.' Opp'n to State & Intervenors Defs.' Mots. for Summ. J. on Changes in Timing at 26, ECF 824 (absentee voter had to FedEx his completed runoff ballot because of mail delays to ensure it arrived on time to be counted); *id.* at 27 (voter waited in line for two hours to vote in person because she feared her absentee ballot would not be received on time to be counted); Pls.' Opp'n to State Defs.' Mot. for Summ. J. on First & Fourteenth Amendment Line Relief Claims at 28, ECF 823 (voters experiencing health ailments and long lines at the polls suffered significant physical discomfort for hours without any support or relief).  State Defendants' arguments fail to account for these details.

Aggregate turnout statistics are also simply too blunt to capture the precise burdens imposed by SB 202. Plaintiffs offer evidence, for example, that SB 202's burdens fall especially heavily on mail-in voters and drop-box users.  The relevant

analysis, then, would examine voters who had previously relied on mail voting and drop boxes to see how SB 202 affected their voting experience. Sure enough, the turnout decline with respect to mail voting and drop box usage in 2024 relative to 2020 was steepest among these groups. *See* 6/16/25 Rodden Supp. Rep. at 6-7. In the 2020 general election, for example, around 29% of Black voters cast a mail ballot, and in 2024 that figure fell to around 5%. *Id.*; 6/23/25 Fraga Am. Rep. ¶ 5 & tbl. 3. Similarly, around 40% of AAPI voters voted by mail in 2020 and only about 8% did so in 2024 and voting by mail by Latinx voters also dropped from around 23% in 2020 to 3% in 2024. 6/23/25 Fraga Am. Rep. tbl. 3. Likewise, mail voting among White voters declined from around 24% in 2020 to around 5% in 2024. *Id.*; 6/16/25 Rodden Supp. Rep. at 6-7. But White voters were the only racial/ethnic group to have the 2024 rate of mail voting remain higher than their pre-SB 202 voting. 6/23/25 Fraga Am. Supp. Rep. ¶ 30. Additionally, in every statewide federal election after the passage of SB 202, mail-in ballots were rejected at a higher rate than in the two statewide federal elections immediately preceding the implementation of SB 202. *See* 7/14/25 Fraga Rebuttal Rep. ¶ 24; *see also* 6/23/25 Fraga Am. Supp. Rep. ¶ 35. Altogether, this supports the inference that because of the cumulative nature of SB 202's burdens, voters who were deterred from voting by mail were not left with equally accessible alternatives. Voters who cast a mail

ballot in 2020 were 4.8 percentage points less likely to vote *at all* in 2024 relative to those who cast an in-person ballot in 2020. 6/16/25 Rodden Supp. Rep. at 1.

While Georgia does not report individual-level data about which voters cast their mail ballot in a drop box, the evidence leaves little doubt that the sharp reduction of drop boxes in urban counties was disastrous for many voters who previously relied on them to ensure a ballot cast in the final days before an election would not be voided due to postal delivery after election day.  In Fulton County, for example, where the number of drop boxes available outside of regular business hours and in the days before the election decreased from 38 in 2020 to zero in 2024, the percentage of mail ballots rejected for late delivery metastasized ten-fold, from 0.2% in 2020 to over 2% in 2024. *Id.* at 2. Across the state, the 2024 data shows that the rejection rate for late absentee ballots increased sharply from 0.18% in November 2020 to 1.16% in November 2024—a sixfold increase.  *See* 6/23/25 Fraga Am. Supp. Rep. ¶¶ 34, 39 & tbl. 7. Looked at another way, among voters statewide who successfully cast a ballot in the final four days of the 2020 election—a possibility largely facilitated by the widespread availability of drop boxes—only 69% cast a valid ballot in 2024. 6/16/25 Rodden Supp. Rep. at 2. A factfinder could easily conclude that SB 202 has introduced chokepoints throughout the voting process that, individually and cumulatively, burden Georgia voters. *See generally* Pls.' Opp'n to

Intervenors' Mot. Summ. J. at 7, ECF 825;  Pls.' Opp'n to Intervenors' Mot. Summ.

J. on Line Relief Claims, ECF 823; ECF 824; ECF 829; ECF 830.

Second, even on its own terms, the aggregate turnout story is not nearly as

rosy as the State suggests.  It is undeniable, for example, that aggregate turnout

among registered voters dropped sharply in 2022 (the first election cycle after SB

202's enactment) relative to 2018 (the midterm preceding SB 202's enactment).  *See*

Resp. Statement Material Facts Ex. 110 ("2/7/23 Rodden Rep.") at 41-42, ECF 812-

14. And in 2024, turnout among registered voters in Georgia declined relative to

2020. *See* 6/16/25 Rodden Supp. Rep. at 3. As the State's expert reports, turnout

among registered voters fell from 66.20% in 2020 to 64.21% in 2024. State Defs.'

Supp. Br. Supp. Mot. Summ. J. Ex. C ("7/14/25 Shaw Rep.") at 7, ECF 977-4. The

State's expert further concedes that using registered voters as the denominator "is a

reasonable way to calculate turnout." *Id*. at 6.

To suggest that Georgia's aggregate turnout actually increased in 2024, the

State's experts report turnout figures calculated using different denominators, such

as "active voters" and the "voter eligible population." *Id.* at 7-9.  But these figures

have their own limitations.   The Secretary shifted hundreds of thousands of

registered voters to inactive status between 2020 and 2024, which would make

turnout appear higher when reported as a share of active voters. *See* Ex. E attached

hereto ("8/7/25 Shaw Dep.") 21:19-22:11 & Dep. Ex. 3. Calculation of the voter-

55

eligible population, in turn, is derived from proprietary data that remains subject to ongoing updates. *See id*., Dep. 29:16-31:18. In sum, the change in aggregate turnout after 2020 is only weakly relevant and remains disputed.

The State's comparison of Georgia's 2024 turnout to other states' 2024 turnout, meanwhile, is hardly favorable to its position. State comparators are illuminating only to the extent they resemble Georgia in every respect *except* the enactment of a law like SB 202. 8/7/25 Shaw Dep. 36:9-17. As the State's expert readily conceded, however, there are many common variables that render other states poor comparators to Georgia, including: (1) general voter engagement, *id.* at 39:4-22; (2) voters' interests in down-ballot races, *id.* 36:22-24; (3) the presence and salience of contested ballot initiatives, *id.* 36:25-37:2; (4) attention received from a presidential campaign, *id.* 37:8-38:14; (5) the racial and ethnic demography of voters, *id.* 39:8-11; and (5) changes in the state's election laws, *id.* 39:4-15.

The State acknowledges that other *swing states*—namely, Wisconsin, Nevada, Pennsylvania, Michigan, North Carolina, and Arizona—are the most likely to be useful comparators to Georgia, which is yet another concession that directly undermines its analysis. *See* 7/14/25 Shaw Rep. at 12-13; 8/7/25 Shaw Dep. 37:25-38:14. The State's own data, after all, shows that any increase in Georgia's aggregate turnout from 2020 to 2024 was *smaller* than the shift in Wisconsin, Nevada, Pennsylvania, and Michigan. *See* 7/14/25 Shaw Rep. at 13-14; 8/07/25 Shaw Dep.

38:15-20. And the only two swing states where the turnout shift was worse than Georgia's—North Carolina and Arizona—also experienced the introduction of significant impediments to voting between 2020 and 2024. *See Holmes v. Moore*, 886 S.E.2d 120, 144 (N.C. 2023) (allowing new voter ID requirement to go into effect); SB 1485 (Ariz. 2021) (increasing burdens on early and absentee voting by eliminating the state's permanent and automatic absentee voting lists); HB 2023 (Ariz. 2016) (bill banning third-party ballot collection that went into effect in 2021). Thus, the State has not identified even a single state that is a useful comparator to Georgia and experienced a weaker turnout trend from 2020 to 2024.  Nothing in the State's cursory review of 2024 aggregate turnout statistics resolves the dispute about the impact of (or burden imposed by) SB 202.

## B. The State's Evidence of Turnout By Race in 2024 Does Not Defeat Plaintiffs' Claims

The State has no meaningful rebuttal to the clear evidence that SB 202 disproportionately burdens Black voters.  It concedes that Black voter turnout declined in 2024 relative to 2020, *see* ECF 977, at 8; 6/16/25 Rodden Supp. Rep. at 3-4, just as Black voter turnout declined in 2022 relative to 2018, *see* Pls.' Opp'n to State Defs.' Mot. for Summ. J. Ex. 113 ("2/14/23 Grimmer Rep.") ¶ 33 & tbl. 2, ECF 812-17. In fact, the turn out rates calculated by plaintiffs' expert Dr. Fraga and Defendants' expert Dr. Grimmer, using a different method, both show that the gap between White voter turnout and Black, Latinx, and AAPI voter turnout grew

substantially after SB 202 went into effect.  6/23/25 Fraga Am. Supp. Rep. ¶ 17 &

tbl. 1; 7/14/25 Fraga Rebuttal Rep. ¶ 16 & tbl. 1 (showing same pattern in turnout

gap between Dr. Grimmer's and Dr. Fraga's calculations).[9] The State's principal

retort is to note that there are "many potential explanations" for racial turnout

patterns, ECF 977, at 8, but Rule 56 requires much more than the moving party's

speculation.  As long as *one* of those potential explanations is consistent with

Plaintiffs' claim, summary judgment must be denied.  *See Stalley v. Cumbie*, 124

F.4th 1273, 1283 (11th Cir. 2024) (reiterating that courts adjudicating a motion for

summary judgment must draw all factual inferences "in the light most favorable to

the nonmoving party" and credit the nonmoving party's version of the facts when

conflicts arise).

    In fact, the turn out rates calculated by plaintiffs' expert Dr. Fraga and

Defendants' expert Dr. Grimmer, using a different method, show that the gap

between White voter turnout and Black, Latinx, and AAPI voter turnout grew

substantially after SB 202 went into effect.  6/23/25 Fraga Am. Supp. Rep. ¶ 17 &

---

[9] *See* Matthew DeBell, D. Sunshine Hillygus, Daron R Shaw, & Nicholas A Valentino, *Validating the "Genuine Pipeline" to Limit Social Desirability Bias in Survey Estimates of Voter Turnout*, 88 Public Opinion Quarterly 268-290 (Summer 2024), https://doi.org/10.1093/poq/nfae007; *see also* Stephen Ansolabehere, Bernard L. Fraga, & Brian F. Schaffner, *The Current Population Survey Voting and Registration Supplement Overstates Minority Turnout*, 84 The Journal of Politics (July 2022), https://doi.org/10.1086/717260.

tbl. 1; 7/14/25 Fraga Rebuttal Rep. ¶ 16 & tbl. 1 (showing same pattern in turnout gap between Dr. Grimmer's and Dr. Fraga's calculations.).

Here, as discussed above, the explanation sufficient to defeat the State's motion is the most obvious one: Georgia turnout declined much more sharply among Black voters than among White voters because SB 202 systemically burdens Black voters' ability to cast a ballot. The same is true for the turnout gap between Latinx and AAPI voters and White voters. 6/23/25 Fraga Am. Supp. Rep. ¶ 17. These burdens were especially clear in statistics related to mail-in voting, which was targeted by many of the challenged provisions, including new ID requirements to vote by mail, restrictions on applications to vote by mail, and a sharp reduction in drop-boxes in urban counties where Black voters are concentrated. Using the data available, Plaintiffs corroborated this burden from several different angles. For example:

- Mail voting has declined disproportionately among Black and other minority voters—as compared to White voters—since SB 202 was enacted. The State's own expert reports that mail voting decreased from 2020 to 2024 by 23.9 percentage points among Black voters compared to 19.1 percentage points among White voters. *See* 6/16/25 Grimmer Rep. ¶ 43 tbl. 6. Similarly, Dr. Grimmer reports that mail voting decreased by 32.2 percentage points for AAPI voters and by 20.3 percentage points for Latinx voters. *Id.*

- After SB 202 introduced new proof-of-identification requirements for the mail ballot application process, the share of rejected ballot applications for all voters jumped from approximately 0.5% in 2018 and 2020 to over 2.5% in 2024. *See* 6/16/25 Rodden Supp. Rep. at 10. In 2024, Black voters were 25 percentage points more likely than White voters to have their mail ballot

applications rejected. *Id.* at 11; *see also* 6/23/25 Fraga Am. Supp. Rep. ¶¶ 6, 38-40 (Black and other minority voters were consistently more likely than Black voters to have their mail ballots rejected for ID-related problems in 2024); 8/27/25 Grimmer Dep. 144:6-10 (admitting that Black, Latinx, Asian, and American Indian voters all had higher ID-related rejection rates than White voters in 2024).

- SB 202 also sharply reduced the availability of drop boxes, which permit voters to cast mail ballots in the days before an election without risking late return by the postal service, in urban counties with large Black populations. As one would expect if this change disproportionately burdened Black voters, the share of mail ballots rejected for late return increased more for Black voters from 2020 to 2024 than it did for White voters. *See* 6/16/25 Rodden Supp. Rep. at 13. The same was true for Latinx and AAPI voters. 6/23/25 Fraga Am. Supp. Rep. ¶ 39. Additionally, Black voters were also 119% more likely than White voters to have to travel more than an hour to access a drop box and also continued to face greater transportation and time costs associated with voting in 2024.[10] *See* 6/13/25 Chatman Supp. Rep. ¶ 6.

- SB 202's restrictions on out-of-precinct provisional ballots also disproportionately impacted counties with large Black voting populations. *See* 6/16/25 Rodden Supp. Rep. at 18. Because SB 202 significantly restricts the ability of voters to cast out-of-precinct provisional ballots, this burden is apparent in data showing that the number of counted provisional ballots dropped dramatically after the enactment of SB 202 in urban counties with large Black populations. *Id.* at 19.

To tell a contrary story, the State starts again with national comparisons. But rather than report actual Black voter turnout in other states to compare to Georgia, the State cites to notoriously unreliable *survey data* from the U.S. Census Bureau's Current Population Survey ("CPS"). *See* ECF 977, at 8. Concerns regarding the

---

[10] As discussed in Section II.B, the State's conclusions about drop box access and availability are drawn from a non-representative survey that is not sufficiently tailored to Georgia's drop box rules and procedures. *See also* 7/14/25 Fraga Rebuttal Rep. ¶¶ 25-29.

reliability of this data are well documented. Indeed, the State's own expert published an academic article warning that "survey overreporting of voter turnout due to social desirability bias threatens inferences about political behavior," and "[i]ndividual-level studies of voter participation must include the caveat that they may better explain who claims to turn out when responding to surveys rather than who actually votes." *See* DeBell, *supra*, at 268-69.

The State's only explanation for the disproportionate decrease in Black turnout in Georgia after SB 202's enactment relies on survey data about voter motivation, where voters' self-reporting is again clearly inconsistent with observed results, rendering the data unreliable. For example, the State's survey data suggested that 87% of registered white voters in Georgia and 84% of registered Black voters in Georgia were motivated to vote in 2024, but actual turnout rates were far afield from those figures; the State's expert reported that 71% of white Georgians ultimately voted in 2024, compared to only 61% of Black Georgians. *Compare* 7/14/25 Shaw Rep. at 17, *with id.* at 14. The polling data offered by the State also shows that any racial differences in motivation to vote were well within the margin of error, and thus consistent with the possibility that Black Georgians were *more* motivated than their white counterparts. *See* 8/7/25 Shaw Dep. 76:9-79:5. The State's theory of the case—that Black turnout declined in 2024 because Black voters became particularly unmotivated—fails to rule out the likely possibility that many

motivated Georgia voters, including a disproportionate share of motivated Black voters, would have cast a ballot in 2024 but for the burdens imposed by SB 202.

## V.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' VIEWPOINT DISCRIMINATION CLAIM.

Having failed in their original briefing to identify any evidence disputing the clear statements by legislative leaders that SB 202 was enacted to suppress the votes of Democratic voters, *see* ECF 825, at 11-17, Defendants again make no effort in their supplemental briefing to oppose Plaintiffs' claim that SB 202 violates the First and Fourteenth Amendments by discriminating against voters who support Democratic candidates.  The evidence from the 2024 election is thus completely one-sided, with clear viewpoint-based disparities associated with the changes imposed by SB 202. After SB 202 made mail voting more difficult, for example, mail voting dropped 28.7 percentage points for Democrats from 2020 to 2024, compared to only 13.57 percentage points for Republicans.  *See* 6/16/25 Rodden Supp. Rep. at 8. Similarly, the rejection rate for absentee ballot applications was over four times higher for Democratic applicants than for Republican applicants in 2024, and the share of mail ballots that were rejected for arriving after election day was nearly three times higher for Democratic voters than for Republican voters. *See id.* at 2, 12. Overall, Georgia's turnout decline from 2020 to 2024 was sharpest in the urban areas where Democratic voters are most concentrated.  *Id.* at 20.   Because

Defendants have not mustered a single undisputed fact—or even a single fact at all—related to this claim, summary judgment should be denied.

## VI.    NO NEW EVIDENCE OR ARGUMENT SUPPORTS SUMMARY JUDGMENT ON THE DISABILITY DISCRIMINATION CLAIMS

As Plaintiffs demonstrated in their prior briefing, SB 202 violates the Americans with Disabilities Act ("ADA") and Rehabilitation Act by denying Georgians with disabilities an equal opportunity to vote. *See* ECF 824, at 3-19; Resp. Opp'n Mot. Summ. J. on Add'l Provisions at 13-26, ECF 828; ECF 829, at 44-62; ECF 830, at 63-87.  Plaintiffs' evidence, including unrebutted expert testimony, shows that in 2024 SB 202 continued to place significant burdens on disproportionate numbers of voters with disabilities.  None of Defendants' new evidence or argument undermines that conclusion or resolves the genuine issues of fact that Plaintiffs have raised, and Defendants cannot meet their burden on summary judgment against these claims.

Defendants make little more than passing references to Plaintiffs' disability claims in their supplemental brief.  Defendants present no evidence that turnout of voters with disabilities improved in 2024 in either relative or absolute terms.  Nor do Plaintiffs argue that lower turnout by voters with disabilities, standing alone, demonstrates a violation of the ADA or the Rehabilitation Act.  The references to disability Defendants do include largely repeat arguments they already made,

without any new support.  Plaintiffs here respond specifically to the handful of points related to their challenges to the drop box and out-of-precinct voting provisions.[11]

SB 202's limitations on the number and location of drop boxes imposed more substantial travel burdens in 2024 on those without access to a vehicle, who are disproportionately people with disabilities as well as Black and Latinx voters. 6/13/25 Chatman Supp. Rep. ¶ 3. Plaintiffs presented new expert evidence demonstrating that the burdens of long travel times to drop boxes for CVAs with disabilities as compared to those without disabilities increased in 2024.  In 2024, CVAs with disabilities remained more than three times more likely than those without disabilities to lack access to a vehicle in the home.  *Id.* ¶ 28 & tbl. 2.  And CVAs with disabilities were 2.8 times more likely than their non-disabled counterparts to have a travel time to the nearest drop box of more than an hour (9.5% compared to 3.5%) in 2024, which is up from 2.4 times as likely in 2022.  *Id.* ¶ 35. While some of the numbers reported in the Chatman report changed slightly based on changes in drop box locations in 2024 as compared to prior election cycles, the overall picture, which is that SB 202 causes increased travel times to drop boxes, especially for voters with disabilities, has not changed.  The data continue to show

---

[11] Defendants assert that they are entitled to summary judgment on Plaintiffs' challenges under the ADA and Section 504 to the line relief ban.  *See* ECF 977, at 15.  However, Plaintiffs filed a Second Amended Complaint dismissing those challenges prior to the completion of summary judgment briefing.  Mot. Am. First Am. Compl. at 1, ECF 788.

that, given the transportation barriers people with disabilities disproportionately face, decreasing the number of drop boxes increases the burden in delivering a ballot for many voters with disabilities and, depending on the circumstances of the particular voter, limits or eliminates the benefit of drop boxes.

Defendants ignore this data, and instead argue, as they did before, that the availability of other voting options automatically ensures meaningful access for voters with disabilities. ECF 977, at 20. But, as Plaintiffs previously noted, requiring voters with disabilities to use alternate methods and workarounds to access a program that is available without those workarounds to non-disabled voters violates the ADA. ECF 829, at 51-52. Non-disabled voters can choose among a number of voting options based on their circumstances and preferences, while too many voters with disabilities have at least one of those choices—accessing a drop box—withheld. ECF 829, at 51-52.[12]

Disabled Georgians who choose to vote in person face another obstacle under SB 202: its ban on voting by provisional ballots for voters who appear at the wrong

---

[12] Defendants also suggest that *Brnovich*, 594 U.S. 647, sets the standard for what constitutes meaningful access under the ADA. ECF 977, at 19. But, as discussed in Plaintiffs' prior brief, ECF 829, at 52-53, Brnovich addresses claims under Section 2 of the Voting Rights Act and has no relevance to disability discrimination claims. In any event, whether having to travel to cast a ballot is among the "usual burdens" for non-disabled voters says nothing about whether increasing that travel burden disproportionately burdens disabled voters and denies them meaningful access. *Id.*

precinct on Election Day before 5:00 p.m., Defendants argue that the small number of provisional ballots in 2024 undermines the claim that this provision denies equal opportunity to voters with disabilities. ECF 977, at 32. But the number of provisional ballots actually cast is irrelevant to this question for two reasons. First, voters who arrive at the wrong polling place before 5:00 p.m. and cannot get to the correct polling place due to their disability cannot cast a ballot at all; they are completely disenfranchised. Each of these individuals has a right to equal access to voting on Election Day, and the harm to each of them is undeniable even if the numbers may be small. ECF 828, at 16. Second, since voters who arrive at the wrong polling place before 5:00 p.m. are not allowed to cast a provisional ballot, the number of provisional ballots cast tells us nothing about how many people were turned away and disenfranchised. In fact, it is entirely reasonable to expect that the number of provisional ballots cast would decline after the passage of SB 202, since voters no longer have this option in many instances where they would have had it before. Therefore, far from undermining Plaintiffs' disability claims, the decline in provisional balloting actually supports it.

In their prior briefing, Plaintiffs presented extensive evidence showing that Georgia voters with disabilities rely heavily and disproportionately on absentee voting, because many find it difficult or impossible to vote in person. ECF 830, at 76. Plaintiffs showed how numerous provisions of SB 202, including requiring

66

identification when submitting an absentee ballot, shortening the time for requesting absentee ballot applications, and restricting the number and location of drop boxes, disproportionately burden the ability of people with disabilities to vote and denied them equal opportunity in the voting process. Plaintiffs also showed how those voters with disabilities who did choose to vote in person on Election Day could be disenfranchised by the restrictions on casting provisional ballots out of precinct, even though disability leads to transportation barriers for many people. ECF 828, at 21-22. This evidence came from witnesses who had experienced challenges in voting due to SB 202's provisions, and unrebutted expert evidence about the burdens that these provisions place on the disabled community. Defendants could not rebut that showing then, and none of their arguments about the 2024 election brings them any closer now. Plaintiffs' evidence raises, at a minimum, genuine issues of material fact that preclude summary judgment, for the reasons stated in their prior briefing as well as in this brief.

## VII.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGMENT ON THE FIRST AMENDMENT CLAIMS

Defendants assert that "the lack of long lines" in 2024, ECF 977, at 14, supports granting summary judgment on Plaintiffs' First Amendment line relief claim, surmising that "it is extremely unlikely that anyone in line will ever be more than 150 feet from a polling place," *id.* at 15. But that is *not* what Defendants' own data demonstrates. It is uncontested that fewer voters waited on long lines in 2024

compared to 2020—a fact largely attributable to polling-place check-in changes unrelated to SB 202.  7/4/25 Pettigrew Rebuttal Supp. Rep. at 7-8.  Yet Defendants' expert's own analysis shows that significant numbers of Georgia voters still waited in lines longer than 30 minutes in 2024.  *Id.* at 5; 8/27/25 Grimmer Dep. 172:16-21 (agreeing that 6.3% of Georgia voters waited in lines longer than 30 minutes).  Because long lines still existed in some Georgia polling places in 2024 and 2022, *see* ECF 823, at 26, Defendants have no basis to claim that Plaintiffs will forgo providing line relief in the Supplemental Zone in the future.[13]

## VIII.  TRIABLE ISSUES PRECLUDE SUMMARY JUDGENT ON THE VRA MATERIALITY CLAIMS

State Defendants' supplemental brief, like their supplemental expert reports, does not engage with any of Plaintiffs' arguments under the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B).  Indeed, they say nothing about SB 202's Birthdate Requirement at all, much less prove that the 2024 election results affect the legality of that requirement or could justify the reversal of the Court's

---

[13] Defendants also raise arguments that Plaintiffs no longer need to divert resources to address long lines.  ECF 977, at 15 n.3.  This is not only contradicted by their own evidence of continued long lines in some places, but it is also of no moment to Plaintiffs' First Amendment claims, where the harm comes from the infringement or chilling of Plaintiffs' speech and expressive conduct.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

previous injunction precluding the County Defendants from enforcing it.  *Compare generally* ECF 977, *with* ECF 825, at 25-33 *and* ECF 830, at 104-119.

Conversely, State Defendants also do not suggest that the 2024 election results affect whether they, in addition to the Defendants-Counties, should be held responsible to provide redress for the Birthdate Requirement.  ECF 807-1 ("SAMF") ¶¶ 212-217; *compare generally* ECF 977, *with* ECF 830, at 119-123.  As a matter of law, the Defendant Secretary of State has responsibility to require all counties to correct errors before certifying their results, as well as responsibility for the ballot return forms that unlawfully require immaterial birthdate information.  *Id.*  Even assuming there were any factual issues as to whether a court order that State Defendants exercise these responsibilities would be "likely" to effectively provide redress, they point to nothing in the 2024 elections that could dispose of any factual disputes.

State Defendants also have no basis to first raise supplemental arguments on the Materiality Provision on reply.  Further, as any legal issues on this claim are under submission in the Eleventh Circuit, revisiting this Court's current injunction without guidance by the Circuit remains inappropriate.[14]

---

[14] Nor have the State Defendants claimed that the 2024 election results, or any other facts, establish beyond dispute that the Birthdate Requirement qualifies as "material to determining eligibility to vote" as required by the Civil Rights Act.  Just the opposite:  they have conceded that it is immaterial (ECF 763, at 89; SAMF ¶ 206), including repeatedly at argument in the Eleventh Circuit.  *See*

## IX.    PLAINTIFFS INDISPUTABLY HAVE STANDING

Throughout this litigation, Plaintiffs have consistently established that they have standing to pursue their claims.  And this Court has consistently agreed.  *See, e.g.*, ECF 613, at 7-10 (determining that GA NAACP and GAMVP established standing and the Court need not parse the standing of each Plaintiff); *Ga. State Conference of the NAACP v. Raffensperger,* 1:21-cv-01259-JPB, 2021 WL 12300690, at *2-4 (N.D. Ga. Dec. 9, 2021).  Plaintiffs clearly demonstrated that, as to each form of requested relief, at least one Plaintiff has suffered an injury in fact that is traceable to and redressable by Defendants.  Resp. Opp'n Mot. Summ. J. on Jurisdiction, ECF 826; *see Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022).  Nothing in Defendants' supplemental briefing supports a finding to the contrary.

In their supplemental briefing, Defendants' only discussion of standing arises in a single footnote concerning harm related to line relief.  *See* ECF 977, at 15, n.3.  Defendants claim that the 2024 elections show that Plaintiffs who relied on the

---

https://www.ca11.uscourts.gov/sites/default/files/oral_argument_recordings/23-13085_08132025.mp3  (47:05-58:25, 1:18:40-1:29:00).  While the Fifth Circuit has articulated a complex test for materiality that weighs the justifications of a challenged requirement against its burdens, *Vote.Org v. Callanen*, 89 F.4th 459, 488-89 (5th Cir. 2023), the Eleventh Circuit to date has not.  Nor, given State Defendants' admission of immateriality in this case, has any potential, fact-intensive balancing of interests been briefed, much less rendered suitable for summary judgment here.

existence of long voting lines as the reason for their diversions of resources have not been injured because there are no longer lengthy voting lines in Georgia. *Id.* Defendants conclude that Plaintiffs cannot be injured by a line relief ban if there are no lines at polling locations. Defendants are incorrect for several reasons.

First, even evidence provided by Defendants' expert reflects the persistence of long lines at polling locations and that these lines impact Black Georgians at a higher rate than White Georgians. 7/4/25 Pettigrew Rebuttal Supp. Rep. at 5 ("The evidence [Dr. Grimmer] provides clearly shows that a significant number of Georgia voters still experienced long lines in 2022 and 2024, and that Black Georgians were more likely than [W]hite Georgians to wait in a long line to vote."). Second, Defendants' argument ignores the injuries already suffered by Plaintiffs on account of SB 202's line relief ban, which caused several Plaintiffs to cease their line relief activities altogether. *See, e.g.*, ECF 826, at 10, 18, 27, 28, 30, 37, 41, 44, 51, 62. Where, as here, the alleged danger of a statute is "one of self-censorship[,]" harm "can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also, e.g.*, *ACLU v. Fla. Bar*, 999 F.2d 1486, 1493 (11th Cir. 1993). That Plaintiffs have "an actual and well-founded fear that the law will be enforced against them," *Am. Booksellers Ass'n*, 484 U.S. at 393, is thus already sufficient to raise an Article III case and controversy to vindicate their rights to free speech. Third, as Defendants previously argued (Br. Supp. Mot.

Summ. J. on Jurisdiction at 62, ECF 764-1) and Plaintiffs already addressed (ECF 826, at 83-84), Plaintiffs' claims related to Defendants' violations of the First, Fourteenth, and Fifteenth Amendments, as well as the VRA, based on interference with the expressive conduct of providing food and drink do not depend on lines of any particular length or wait times of any particular duration. *See* ECF 826, at 83-84. In short, the facts support that Plaintiffs have already been injured and will likely continue to be injured by SB 202's prohibition on line relief, precluding summary judgment on the basis of standing for those claims, as well as the others not addressed in Defendants' supplemental briefing.

## X.    CONCLUSION

For the reasons explained in Plaintiffs' oppositions to Defendants' motions for summary judgment, ECFs 822, 823, 824, 825, 826, 828, 829, 830, 835 as well as in this supplemental brief, this Court should deny Defendants' motions for summary judgment, ECFs 757, 758, 759, 760, 761, 762, 763, 764, 977.

Dated: October 17, 2025

Respectfully Submitted,

Davin M. Rosborough*
*drosborough@aclu.org*
Sophia Lin Lakin*
*slakin@aclu.org*
Jonathan Topaz*
*jtopaz@aclu.org*
Dayton Campbell-Harris*^
*dcampbell-harris@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

Brian Dimmick (pro hac vice)
*bdimmick@aclu.org*
ACLU FOUNDATION, INC.
915 15th Street NW
Washington, DC 20005
Telephone: (202) 731-2395

Susan P. Mizner (pro hac vice)
*smizner@aclu.org*
ACLU FOUNDATION, INC.
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0781

George P. Varghese (pro hac vice)
*george.varghese@wilmerhale.com*
Stephanie Lin (pro hac vice)
*stephanie.lin@wilmerhale.com*
Mikayla Foster (pro hac vice)
*mikayla.foster@wilmerhale.com*
Sofie C. Brooks (pro hac vice)
*sofie.brooks@wilmerhale.com*

Cory Isaacson (Ga. Bar No. 983797)
*cisaacson@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

*/s/ Leah C. Aden*
Leah C. Aden*
*laden@naacpldf.org*
Alaizah Koorji*
*akoorji@naacpldf.org*
John S. Cusick*
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592

Anuja Thatte*
*athatte@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Suite 600
Washington, DC 20005
Telephone: (202) 682-1300

Debo P. Adegbile (pro hac vice)
*debo.adegbile@wilmerhale.com*

73

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Nana Wilberforce (pro hac vice)
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Tania Faransso (pro hac vice)
*tania.faransso@wilmerhale.com*
Laura Powell (pro hac vice)
*laura.powell@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Admitted pro hac vice
^ Practice limited to federal court

*Attorneys for Plaintiffs*
*Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta*
*Sorority, Georgia ADAPT, and Georgia Advocacy Office*

/s/ Pichaya Poy Winichakul
Pichaya Poy Winichakul (Bar 246858)
*poy.winichakul@splcenter.org*
Bradley E. Heard (Bar 342209)
*bradley.heard@splcenter.org*
Matletha N. Bennette*
*matletha.bennette@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857

/s/ Adam S. Sieff
Adam S. Sieff*
*adamsieff@dwt.com*
Daniel Leigh*
*danielleigh@dwt.com*
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

David M. Gossett*
*davidgossett@dwt.com*
DAVIS WRIGHT TREMAINE LLP

Sabrina S. Khan*
*sabrina.khan@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
1101 17th Street NW, Suite 705
Washington, DC 20036
Telephone: (202) 728-9557

1301 K Street NW, Suite 500
Washington, DC 20005-7048
Telephone: (202) 973-4288
Facsimile: (202) 973-4499

*Admitted pro hac vice

*Attorneys for Plaintiffs*
*Georgia Muslim Voter Project, Women Watch Afrika,*
*Latino Community Fund Georgia, and The Arc of the United States*

*/s/ Meredyth L. Yoon*
MEREDYTH L. YOON
(Georgia Bar No. 204566)
ASIAN AMERICANS
ADVANCING JUSTICE-ATLANTA
5680 Oakbrook Parkway, Suite 148
Norcross, Georgia 30093
404 585 8446 (Telephone)
404 890 5690 (Facsimile)
*myoon@advancingjustice-atlanta.org*

*/s/ Noah Baron*
NIYATI SHAH*
TERRY AO MINNIS*°
NOAH BARON*
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street, NW, Suite 1050
Washington, DC 20036
202 815 1098 (Telephone)
202 296 2318 (Facsimile)
*nshah@advancingjustice-aajc.org*
*tminnis@advancingjustice-aajc.org*
*nbaron@advancingjustice-aajc.org*

*/s/ Eileen Ma*
EILEEN MA*
KIMBERLY LEUNG*
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
415 896 1701 (Telephone)
415 896 1702 (Facsimile)
*eileenm@asianlawcaucus.org*
*kimberlyl@asianlawcaucus.org*

*/s/ R. Adam Lauridsen*
LEO L. LAM*
R. ADAM LAURIDSEN*
CANDICE MAI KHANH
NGUYEN*
RYLEE KERCHER OLM*
NIHARIKA S. SACHDEVA*
ELIZABETH A. HECKMAN*
KEKER, VAN NEST AND PETERS
LLP
633 Battery Street

San Francisco, CA 94111-1809
415 391 5400 (Telephone)
415 397 7188 (Facsimile)
*llam@keker.com*
*alauridsen@keker.com*
*cnguyen@keker.com*
*rolm@keker.com*
*nsachdeva@keker.com*
*eheckman@keker.com*

*Admitted pro hac vice
° Not admitted in D.C.

*Attorneys for Plaintiffs*
*Asian Americans Advancing Justice–Atlanta, Steven J. Paik,*
*Nora Aquino, Angelina Thuy Uddullah, and Anjali Enjeti-Sydow*

| | |
|---|---|
| Halsey G. Knapp, Jr. | */s/ Uzoma N. Nkwonta* |
| Georgia Bar No. 425320 | Uzoma N. Nkwonta* |
| Joyce Gist Lewis | Jacob D. Shelly* |
| Georgia Bar No. 296261 | Tina Meng Morrison* |
| Adam M. Sparks | Marcos Mocine-McQueen* |
| Georgia Bar No. 341578 | ELIAS LAW GROUP LLP |
| KREVOLIN & HORST, LLC | 250 Massachusetts Ave NW |
| 1201 W. Peachtree St., NW | Suite 400 |
| One Atlantic Center, Suite 3500 | Washington, DC 20001 |
| Atlanta, Georgia 30309 | Telephone: (202) 968-4490 |
| Telephone: (404) 888-9700 | *unkwonta@elias.law* |
| Facsimile: (404) 888-9577 | *jshelly@elias.law* |
| *hknapp@khlawfirm.com* | *tmengmorrison@elias.law* |
| *jlewis@khlwafirm.com* | *mmcqueen@elias.law* |
| *sparks@khlawfirm.com* | |

*Admitted pro hac vice

*Attorneys for Plaintiffs*
*The New Georgia Project, Black Voters Matter Fund, Rise, Inc.,*
*Elbert Solomon, Fannie Marie Jackson Gibbs, and Jauan Durbin*

Bryan L. Sells
Georgia Bar No. 635562
THE LAW OFFICE OF BRYAN L.
SELLS, LLC
P.O. Box 5493
Atlanta, Georgia 31107
Tel: (404) 480-4212
Email: *bryan@bryansellslaw.com*

Jennifer Nwachukwu (pro hac vice)
*jnwachukwu@lawyerscommittee.org*
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857

*/s/ Vilia Hayes*
Vilia Hayes (pro hac vice)
*vilia.hayes@hugheshubbard.com*
Gregory Farrell (pro hac vice)
*gregory.farrell@hugheshubbard.com*
Mana Ameri (pro hac vice)
*mana.ameri@hugheshubbard.com*
William Beausoleil
*william.beausoleil@hugheshubbard.com*
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER,
LLC
Post Office Box 5391
Atlanta, Georgia 31107
Telephone: 404.522.0507
Email: *wgerryweber@gmail.com*

*/s/ Laurence F. Pulgram*
Laurence F. Pulgram (pro hac vice)
*lpulgram@fenwick.com*
Molly Melcher (pro hac vice)
*mmelcher@fenwick.com*
Armen Nercessian (pro hac vice)
*Anercessian@fenwick.com*
Ethan Thomas (pro hac vice)
*EThomas@fenwick.com*
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 875-2300

Joseph S. Belichick (pro hac vice)
*jbelichick@fenwick.com*
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041-2008
Telephone: (650) 988-8500

Catherine McCord (pro hac vice)
*cmccord@fenwick.com*
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
Telephone: (212) 430-2690

*Attorneys for Plaintiffs*
*Georgia State Conference of the NAACP, Georgia Coalition for the People's*
*Agenda, Inc., League of Women Voters of Georgia, Inc.,*
*GALEO Latino Community Development Fund, Inc.,*
*Common Cause, and the Lower Muskogee Creek Tribe*

Kurt Kastorf (GA Bar No. 315315)
KASTORF LAW, LLC
1387 Iverson Street, N.E., Suite 100
Atlanta, Georgia 30307
Telephone: 404-900-0330
*kurt@kastorflaw.com*

*/s/ John Powers*
John Powers*
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
Telephone: (202) 728-9557
*JPowers@advancementproject.org*

Clifford J. Zatz*
William Tucker*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
*CZatz@crowell.com*

*WTucker@crowell.com*

Jordan Ludwig*
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 443-5524
*JLudwig@crowell.com*

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*
*The Concerned Black Clergy of Metropolitan Atlanta, Inc.,*
*The Justice Initiative, Inc., Metropolitan Atlanta Baptist Ministers Union, Inc.,*
*First Congregational Church, United Church of Christ Incorporated,*
*Georgia Latino Alliance for Human Rights, Inc.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was prepared in Times New Roman 14-point font in compliance with Local Rule 5.1(C).

/s/ *Adam Sieff*
Adam S. Sieff

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2025, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ *Adam Sieff*
Adam S. Sieff
