**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| IN RE GEORGIA SENATE BILL 202 | Master Case No.:<br>1:21-MI-55555-JPB |

**STATE DEFENDANTS' SUPPLEMENTAL REPLY BRIEF IN
SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................ 1

ARGUMENT ............................................................ 1

I.   Turnout Data from 2024 Confirms that Summary Judgment Should be Granted to State Defendants. ............................... 2

II.   There Is No Genuine Dispute of Material Fact Related to Lines. .................................................................. 7

III.   There Is No Genuine Dispute of Material Fact Related to Drop Boxes. ................................................................ 11

IV.   There Is No Genuine Dispute of Material Fact Related to Provisional Ballots. ..................................................... 14

V.   There Is No Genuine Dispute of Material Fact About Plaintiffs' Absentee-Voting Claims. ................................. 16

    A.   There are no disputed facts about absentee voting rates. ...... 16

    B.   There are no disputed facts about rejection rates for absentee ballots and applications. .......................... 19

VI.   There Is No Genuine Dispute of Material Fact Related to Government Officials Sending Absentee Ballots. ..................... 21

VII.   Plaintiffs Fail to Overcome Several Additional Reasons the Court Should Grant State Defendants' Motions. ...................... 22

    A.   Plaintiffs ignore multiple additional points State Defendants established in their supplemental brief. ............ 23

    B.   Plaintiffs' remaining arguments are meritless. ..................... 23

    C.   State Defendants sought summary judgment on all counts. ................................................................ 25

CONCLUSION ............................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1992) ................................................................. 6, 12

*Baldwin County v. Purcell Corp.*,
   971 F.2d 1558 (11th Cir. 1992) ............................................... 6, 12

*Beer v. United States*,
   425 U.S. 130 (1976) ...................................................................... 9

*Brnovich v. Democratic Nat'l Comm.*,
   594 U.S. 647 (2021) ................................................................. 8, 20

*Coal. for Good Governance v. Kemp*,
   No. 1:21-CV-2070-JPB, 2025 WL 848462
   (N.D. Ga. Mar. 18, 2025) ....................................................... 10, 23

*Evers v. Gen. Motors Corp.*,
   770 F.2d 984 (11th Cir. 1985) ...................................................... 8

*Ex parte Young*,
   209 U.S. 123 (1908) .................................................................... 11

*Fair Fight Action, Inc. v. Raffensperger*,
   No. 1:18-CV-5391-SCJ, 2021 WL 9553856
   (N.D. Ga. Mar. 31, 2021) ............................................................. 2

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
   992 F.3d 1299 (11th Cir. 2021) ....................................... 2, 3, 5, 8

*Hand v. Scott*,
   888 F.3d 1206 (11th Cir. 2018) .................................................. 24

*Haves v. City of Miami*,
   52 F.3d 918 (11th Cir. 1995) ...................................................... 19

*In re Ga. SB 202*,
   688 F. Supp. 3d 1300 (N.D. Ga. 2023) ........................................ 9

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) .................................................. 24

*Lane v. Cent. Ala. Cmty. Coll.*,
 772 F.3d 1349 (11th Cir. 2014) ..................................................................... 11

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
 66 F.4th 905 (11th Cir. 2023)..................................................................... 3, 8

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ..................................................................... 11

*Rucho v. Common Cause*,
 588 U.S. 684 (2019) ..................................................................... 24

*United States v. Four Parcels of Real Prop.*,
 941 F.2d 1428 (11th Cir. 1991) ............................................................. 15, 25

*Wilson v. MarineMax E., Inc.*,
 303 F. Supp. 3d 1343 (N.D. Ga. 2018)........................................................ 23

**Statute**

O.C.G.A. § 21-2-382 ..................................................................... 11

## INTRODUCTION

In 2024, Georgia experienced massive voter turnout. Despite that record-breaking turnout, voting lines were short, cancelled ballots were almost nonexistent, and provisional ballots were rare. To most, that would be a reason to celebrate. But Plaintiffs contort themselves to find reasons to complain that these facts are actually evidence of discrimination. As explained in detail below, they are wrong.

To prevail on their claims, Plaintiffs must show that SB 202 has a discriminatory impact or imposes a significant burden on voting that outweighs the State's interests in fair and efficient elections. Plaintiffs have not done so, despite the parties' having now filed more than two dozen summary judgment briefs, which have addressed extensive discovery and multiple election cycles. The Court should thus grant State Defendants' motions for summary judgment.

## ARGUMENT

In response to State Defendants' supplemental summary judgment brief, Plaintiffs attempt to manufacture factual disputes to save their claims from defeat. At each turn, however, Plaintiffs fail. For instance, Plaintiffs cannot identify any material disputed facts about the robust 2024 voter turnout, the lack of long voting lines in Georgia, or SB 202's drop box provision. Similarly, Plaintiffs fail to rebut State Defendants' showing that summary judgment

should be entered in State Defendants' favor on Plaintiffs' various absentee-voting claims. The same is true of Plaintiffs' remaining arguments, including Plaintiffs' challenge to the ban on government officials sending unsolicited absentee-ballot applications.

And, while "Plaintiffs are correct that summary judgment is not often granted in voter denial lawsuits," *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021) ("*GBM*"), they are misguided to suggest that summary judgment is *never* appropriate in election cases. In this Circuit, "a motion for summary judgment can—and should—be granted when the conditions of Rule 56 are met"—even in election cases. *Id.* at 1317–18; *accord Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2021 WL 9553856 (N.D. Ga. Mar. 31, 2021); [Doc. 860 at 3 n.1] (collecting Eleventh Circuit election cases affirming summary judgment).

In short, it is clear that Georgia's voting system is open to all and provides many ways to cast ballots. It is also clear that it is easy for Georgians to vote. Accordingly, the Court should grant State Defendants' motions.

## I.    Turnout Data from 2024 Confirms that Summary Judgment Should be Granted to State Defendants.

As State Defendants showed ([Doc. 977 at 6–9]), voter turnout in 2024 was substantially higher than in any previous election. Plaintiffs' only response to this undisputed fact is to argue ([Doc. 979 at 2, 11, 26]) that the

2024 turnout data are irrelevant. Not so. While the robust 2024 turnout *alone* does not defeat Plaintiffs' claims, turnout underscores why Plaintiffs' claims fail: Georgia voters managed to vote at a high rate, and Plaintiffs' sky-is-falling fears never materialized. Each of Plaintiffs' responses to the turnout data fails.

1. Plaintiffs start with a misunderstanding of the law. As the Eleventh Circuit confirms, to discern a "discriminatory impact" from an election law, the Court must consider the law's impact on turnout. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023) ("*LWV II*"). Turnout is therefore relevant.

Plaintiffs also incorrectly state that turnout is irrelevant because they believe SB 202 is unlawful if any "barriers to voting increase[d]" or if SB 202 makes voting "more difficult, though not impossible." [Doc. 979 at 27, 52]. That is not the law. Rather, Plaintiffs must show that SB 202 causes "the denial or abridgement of the right to vote." *GBM*, 992 F.3d at 1330; *see* [Doc. 860 at 86]. Plaintiffs have not done so, and the robust voter turnout seriously undermines Plaintiffs' ability to show any barriers to voting.

2. Plaintiffs' understanding of the turnout data is also mistaken. There is no dispute that overall voter turnout in 2024 was higher than in 2020 or 2016. Grimmer 6/13/25 Rep. tbl. 1 [Doc. 977-2]; Grimmer 7/14/25 Rep. ¶¶ 3, 13 [Doc. 977-3]. While Plaintiffs dispute their relevance, these data are undisputed.

As to Black voter turnout, Plaintiffs' claimed factual dispute (at 28) is illusory. The undisputed data show that Black voter turnout in 2024 either remained consistent or saw a slight decrease from the 2020 elections. Grimmer 6/13/25 Rep. tbl. 2; Shaw 7/14/25 Rep. at 2 [Doc. 977-4]; Fraga 6/23/25 Rep. at 4 [Doc. 977-6]; Rodden 6/16/25 Rep. 4 & fig. 1 [Doc. 977-7]; Clark 7/30/25 Dep. 78:18–82:22 (Ex. A). All parties agree on that fact, and Plaintiffs have not identified facts showing that any drop in Black turnout is attributable to SB 202. And, even if Black turnout decreased slightly, that is no reason for the Court to deny State Defendants' summary judgment motions. Under the most aggressive estimate offered by Plaintiffs' experts, Black voter turnout in 2024 decreased from 2020 by just 3.1 percentage points when calculated as a percentage of registered voters. Rodden 6/16/25 Rep. at 4. Other experts showed a more modest 0.8 percentage-point decrease in turnout when compared with the entire citizen voting-age population. Fraga 6/23/25 Rep. ¶ 17 & tbl. 1; *see also* Grimmer 7/14/25 Rep. ¶¶ 5–6, 14–32 & tbls. 1–5.

Whichever of those methodologies is used, moreover, the small decrease in Black turnout is very similar to national trends, where Black turnout generally decreased in 2024, and any small decrease in Georgia thus says nothing about SB 202. If anything, Black turnout deceased much less in Georgia in 2024 than it did in most other states in 2024. Shaw 7/14/25 Rep. at 2–3, 11–13, 15–16; [Doc. 977 at 8]. Thus, because SB 202 cannot account for

those national trends, Plaintiffs cannot show that SB 202 reduced Black turnout in 2024, particularly because any decline in Black turnout in Georgia was more muted.

The same is true for other minority groups, where some experts identified increased 2024 turnout, Grimmer 6/13/25 Rep. ¶ 20, and others calculated small decreases when compared to 2020, Fraga 6/16/25 Rep. ¶ 17 & tbl. 1 (Ex. H). But it is undisputed that overall minority turnout increased in 2024 over 2016—the last non-pandemic general election. Presidential Grimmer 7/14/25 Rep. ¶ 5. And none of these data support Plaintiffs' claims that SB 202 impaired anyone's ability to vote: Plaintiffs have not identified a single Georgian who either did not vote in 2024 because of SB 202 or who did vote in 2024 but had to overcome obstacles due to SB 202.

Accordingly, any "factual disputes" about turnout are conjecture. Rather, the only question remaining is whether a small drop in turnout for one minority group—under one method of calculating turnout—is material. It is not. *GBM*, 992 F.3d at 1322. That statistic is too small and too easily explained by other factors unrelated to SB 202 to be material. *Id.*

3. Plaintiffs also stumble when trying to create a factual dispute about turnout calculations. Plaintiffs overlook that State Defendants' experts analyzed turnout data under various methods, including the methods used by Plaintiffs' experts. While State Defendants' experts explained their preferred

methods of calculating turnout, *see, e.g.*, Grimmer 7/14/25 Rep. ¶¶ 6, 31–32; Shaw 7/14/25 Rep. at 6–9, they also explained why their conclusions about the 2024 election's robust turnout held no matter the methodology used, Grimmer 7/14/25 Rep. ¶¶ 12–32 & tbls. 1–5; Shaw 7/14/25 Rep. at 15. In other words, there are no factual disputes about these data or calculations.

Indeed, even under Plaintiffs' preferred method—calculating turnout as a percentage of registered voters—a modest 2 percentage-point drop is hardly evidence of substantial barriers or negative effects, and is thus "not significantly probative" to defeat summary judgment. *Baldwin County v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1992)).

Plaintiffs' other methodological criticisms are equally misguided. For example, Plaintiffs criticize (at 60) Dr. Grimmer's use of survey data in calculating turnout figures, ignoring that Plaintiffs' experts relied on the same data. Lee 7/14/25 Rep. at 3–4 & n.4 [Doc. 979-3]; Fraga 8/11/25 Dep. 76:6–77:13 & Ex. 7 (Ex. C); Fraga 5/10/23 Dep. 39:1–6 & Ex. 6 (Ex. B); King 5/16/23 Dep. 42:9–22 (Ex. E); Rodden 8/12/25 Dep. 47:12–48:12 (Ex. G). Plaintiffs make the same mistake (at 56–57) when downplaying the value of comparing Georgia's turnout to nationwide turnout, again ignoring that their experts also relied on nationwide comparisons. *See, e.g.*, Pettigrew 7/4/25 Rep. at 3, 6–7 (Ex. I).

For these reasons, Plaintiffs have identified no factual dispute about turnout, and Georgia's robust 2024 turnout undermines Plaintiffs' claims.

## II.    There Is No Genuine Dispute of Material Fact Related to Lines.

Plaintiffs also fail to identify any factual dispute about the length of Georgia's voting lines in 2024. Rather, Plaintiffs largely agree that long voting lines are a thing of the past. But Plaintiffs still try to keep their line-related claims alive, arguing that even these short voting lines show SB 202's unlawfulness. But those arguments are illogical.

1.  Starting with the data, there are no genuine disputes regarding two relevant facts. First, all parties agree that all Georgia voters face substantially shorter lines today than in past elections. Grimmer 6/13/25 Rep. ¶¶ 81–82 & tbl. 16; Pettigrew 7/4/25 Rep. at 5–6. Second, all parties agree that there may still be isolated instances when a voter waits more than 30 minutes in line to vote. Pettigrew 7/4/25 Rep. at 5. While Plaintiffs argue that these two facts are at odds with each other, they are both true, undisputed, and not in conflict.

Plaintiffs' only support for their argument about lines is Dr. Pettigrew's theorizing that if even a single voter in Georgia waits more than 30 minutes in line, that is "statistical evidence" of "long lines" in the state. Pettigrew 7/4/25 Rep. at 5. But Plaintiffs offer no support for such a standard, which is unsurprising because every state with in-person voting would violate the law under that standard. Grimmer 8/27/25 Dep. 170:22–171:8 (Ex. D). Plaintiffs'

bald arguments to the contrary cannot defeat summary judgment. *See Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Rather, lines are rare, and the mere (and rare) possibility of a voter's waiting more than 30 minutes does not change that fact.

2. Equally misguided is Plaintiffs' attempt (at 71) to show that minorities are more likely to wait in longer voting lines. In fact, the data show the opposite. It is undisputed that, after SB 202, fewer Black voters waited in line for more than 30 minutes. Pettigrew 8/15/25 Dep. at 90:8–19 (Ex. F).[1] And it is undisputed that, after SB 202, *white* voters generally waited longer than Black voters. Grimmer 8/27/25 Dep. 174:19–175:12.

Even if Plaintiffs had identified a small difference in wait times for minorities, those differences could not defeat summary judgment. *LWV II*, 66 F.4th at 935. Small statistical disparities, even if statistically significant, are not material to proving Plaintiffs' claims. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 677, 680–81 (2021). And, of course, because SB 202 led to fewer Black voters waiting in long lines, there is no evidence of any discriminatory impact. *GBM*, 992 F.3d at 1321–22. Indeed, states do not violate the law when they take steps to "enhance[] the position of racial

---

[1] Dr. Pettigrew performed no original analysis of wait times, but merely looked at and agreed with Dr. Grimmer's figures numbers. Pettigrew 7/4/25 Rep. at 3–7. So there can be no dispute of material fact about the data.

minorities with respect to their effective exercise of the electoral franchise." *Cf. Beer v. United States*, 425 U.S. 130, 141 (1976).

3.   These undisputed facts about line length are fatal to Plaintiffs' line-relief claims. *E.g.*, [Doc. 879 ¶ 96]; [NAACP (No. 1:21-cv-01259-JPB) Doc. 142 ¶¶ 156–57]; [Doc. 877 ¶¶ 288–89]; [CBC (No. 1:21-cv-01728-JPB) Doc. 126 ¶¶ 116–26]. While Plaintiffs insist that the possibility of some voters waiting more than 30 minutes in line means their First Amendment challenge to the Supplemental Zone remains a live issue, [Doc. 979 at 67–68], Plaintiffs have not identified a *single* voter in 2024 waiting in a line that extended into the Supplemental Zone. Even if 6% of voters experienced lines of more than 30 minutes (the highest estimate from any expert), Plaintiffs have not shown that any such voters waited in lines that extend more than 150 feet from the polling place. Thus, notwithstanding this Court's earlier conclusion that long lines are "sufficiently likely to continue" in future elections, Plaintiffs have not carried their burden at summary judgment of showing that SB 202's ban on giving things of value to voters in line is likely to negatively affect *anyone*. *In re Ga. SB 202*, 688 F. Supp. 3d 1300, 1317 (N.D. Ga. 2023), *appeals docketed*, No. 23-13093 (11th Cir. Sept. 19, 2023) & No. 23-13095 (11th Cir. Sept. 19, 2023) (oral argument held Aug. 13, 2025). Thus, with the lack of substantial lines, Plaintiffs cannot maintain any of their line-relief claims.

4. The undisputed data about line length confirms that Plaintiffs also lack standing to maintain their line-related claims. With voting lines largely gone, Plaintiffs cannot identify concrete and particularized injuries they suffer from SB 202's line-related provisions. Plaintiffs resist this fact on three grounds, each of which fails.

First, Plaintiffs point (at 25) to Dr. Pettigrew's conclusion that 30-minute lines may still exist in Georgia. But they ignore the data (discussed above) showing that hardly any Georgia voters experienced such lines.

Second, Plaintiffs raise a new argument (at 71–72), suggesting that they have a pre-enforcement basis for standing. Plaintiffs may not add new legal arguments at this stage. But this argument also fails to establish redressability: Plaintiffs only sued a single district attorney (District Attorney Edwards), and hence an injunction against every current defendant would mean that "every district attorney [save one] would *still* have the ability to bring criminal charges against Plaintiffs." *Coal. for Good Governance v. Kemp*, No. 1:21-CV-2070-JPB, 2025 WL 848462, at *10 (N.D. Ga. Mar. 18, 2025) (emphasis added), *appeal docketed*, No. 25-11347 (11th Cir. Apr. 17, 2025). Accordingly, such an injunction would not redress Plaintiffs' claimed injuries.

Third, Plaintiffs claim (at 72) that line length is irrelevant to their line-relief claims. This also lacks common sense. As State Defendants already

explained, Plaintiffs could only potentially be injured if the lines were long enough to require the provision of things of value.[2]

In short, Plaintiffs' standing falls apart on the principle that standing must be maintained throughout a lawsuit, not just established at the beginning. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). If there are no longer voters standing in long lines to receive things of value from Plaintiffs, then there is no basis to grant prospective injunctive relief, which is all Plaintiffs can obtain in this case. *See Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (per curiam) (citing *Ex parte Young*, 209 U.S. 123 (1908)). They thus lack standing.

## III.  There Is No Genuine Dispute of Material Fact Related to Drop Boxes.

Plaintiffs also fail to show a dispute of material fact as to SB 202's drop box provisions. SB 202 statutorily required for the first time that drop boxes be available in elections, thereby ensuring Georgia voters will have access to another method of returning their ballots. *See* O.C.G.A. § 21-2-382(c). And, although there were fewer drop boxes in the 2024 election than there were

---

[2] To illustrate, if there were no long lines and every voter can check in to the polling place quickly, there is no need to hand out food or water because there are no voters "waiting in line at a polling place." [Doc. 879 ¶ 96]; *see also* [Doc. 142 ¶¶ 156–57]; [Doc. 877 ¶¶ 288–89].

during the 2020 pandemic election, drop box usage dropped only 2% from its pandemic high. Grimmer 6/13/25 Rep. ¶ 93.

1.   Despite the positive news about continued drop box usage, Plaintiffs theorize (at 49–50) that SB 202 imposed unlawful "travel burdens" on drop box use. For this, Plaintiffs rely on their experts' *ipse dixit*, which will not do. Plaintiffs fail to identify the core fact necessary to support their theory: That voters will always use the drop box closest to their homes, and thus a drop box being moved farther away will harm those voters. Plaintiffs skip this necessary antecedent step, likely because there is no evidence that Plaintiffs' theory is true. Rather, the undisputed record shows that voters may use any drop box, whether it is close to their work, their school, or even the local grocery store. Here again, Plaintiffs' speculation is insufficient. *See Baldwin County*, 971 F.2d at 1563 (quoting *Anderson*, 477 U.S. at 249–50).

2.   As to race, Plaintiffs also fail to identify any evidence that Black voters used drop boxes at sufficiently different rates to show a discriminatory intent or effect from SB 202's drop box provisions. Rather, when discussing race, Plaintiffs rely on data from a single county—Douglas County. Burden 12/30/22 Rep. at 34 & tbl. 12 [Doc. 756-39]. But Plaintiffs' expert Dr. Fraga explained why such data are unreliable, and Plaintiffs cannot create a dispute of material fact by pointing to disagreements between their own experts. Fraga 3/3/23 Rep. ¶ 9 [Doc. 756-22]; *see also* Grimmer 8/27/25 Dep. 185:15–23.

In contrast, Dr. Grimmer provided data showing that, among all absentee-by-mail voters, *white* voters were more likely than Black voters to use drop boxes in 2020 and 2022 and the reverse was true in 2024. Grimmer 6/13/25 Rep. ¶ 92 & tbl. 19; Grimmer 9/7/23 Update ¶ 17 & tbl. 5 [Doc. 756-24]. Thus, these data show that there is no clear racial trend in drop box use, and thus no evidence of racial disparities.

3.  Undeterred, Plaintiffs attempt to manufacture a dispute of fact about methodology. Plaintiffs argue (at 22–23) that Dr. Grimmer should not have calculated drop box usage as a percentage of all absentee-by-mail voters, but as a percentage of all Georgia voters. That "dispute" is imaginary, because the overall number of drop box voters is undisputed, and that figure alone destroys Plaintiffs' drop box claims. Plaintiffs also overlook that their experts repeatedly used the same method of analysis elsewhere. Fraga 6/16/25 Rep. at 20 tbl. 6 (analyzing rejection rates as a share of *mail* voters, not all voters). Moreover, Plaintiffs again ignore that Dr. Grimmer's analysis of drop box usage considered both calculations, and he explained why his conclusion is the same when drop box usage is compared to all voters or just absentee-by-mail voters. Grimmer 8/27/25 Dep. 203:6–209:4. Since drop box usage remained steady no matter the point of comparison, any dispute is far from material.[3]

---

[3] Nor are Plaintiffs correct (at 48 n.7) that Dr. Grimmer's earlier reports conflict with his current position that white voters were more likely to use a

In short, because it is undisputed that drop boxes were not available in Georgia before 2020 and that drop box usage remains high even after SB 202, State Defendants are entitled to summary judgment on all claims related to the drop box provisions.

## IV. There Is No Genuine Dispute of Material Fact Related to Provisional Ballots.

Plaintiffs also challenge SB 202's out-of-precinct provisional ballot rules, but it is undisputed that provisional ballot usage in Georgia cratered in 2024. Once again, that should be celebrated, because it reflects greater voter participation and enhanced election efficiency. And Plaintiffs' complaints about this development (at 23–24) run headlong into the same obstacle they faced before when discussing provisional ballots: Plaintiffs never identified how many Georgia voters—whatever their race—attempted to cast out-of-precinct provisional ballots. Instead, Plaintiffs can only speculate. [Doc. 979 at 23–24, 66] And, in failing to offer any data on that point, Plaintiffs fail to carry their summary-judgment burden. The Court should thus grant summary judgment for State Defendants on Plaintiffs' out-of-precinct provisional ballot claims because there are no facts supporting them.

---

drop box in 2022 than Black voters. When drafting his 2025 reports, Dr. Grimmer had access to the voter-validated turnout rates for 2020 and 2022, so he supplemented his previous finding from when voter-validated data were not yet available.

As to race, Plaintiffs claim that there are disputed facts about the effect of SB 202's provisional-ballot provision on Black voters. [Doc. 979 at 31]. In support, Plaintiffs discuss the total number of provisional ballots cast, which includes categories like voters who arrived at polling locations without identification. The total number of provisional ballots cast does not show anything about the number of *out-of-precinct* provisional ballots cast.[4] *See* Grimmer 8/27/25 Dep. at 127:10–17. Plaintiffs' failure to segregate provisional ballots by type is fatal to their claims, because, after State Defendants explained this factual gap, Plaintiffs had the burden to come forward with some evidence in support of their claim. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). They have not done so.

Plaintiffs also glancingly reference (at 65–66) the out-of-precinct provisions as part of their disability claims. But Plaintiffs face the same problem here: They cannot identify the number of *voters with disabilities* who attempted to use out-of-precinct provisional ballots. *Id.* Far from raising issues of material fact, the continuing decline in the use of provisional ballots, especially when combined with the extensive opportunities to vote using a

---

[4] In prior briefing, Plaintiffs looked at subsets of counties (19 in 2018, 77 in 2020, and 67 in 2021) to estimate the racial use of out-of-precinct provisional ballots, [Doc. 822 at 124–26], but they have never presented evidence of the racial makeup of *all* voters who cast out-of-precinct provisional ballots in any Georgia election.

variety of methods, demonstrates there is no viable claim under the ADA or Rehabilitation Act.

## V. There Is No Genuine Dispute of Material Fact About Plaintiffs' Absentee-Voting Claims.

As to absentee voting, Plaintiffs largely fail to respond to State Defendants' brief, opting to address only two issues related to absentee voting: usage and rejection rates. But even on those two issues, Plaintiffs' arguments are misguided, and Plaintiffs fail to identify any factual disputes. Rather, the parties' disputes about absentee turnout and rejection rates are legal and can be resolved without trial. The relevant legal question is whether 2020 may be an appropriate comparator for determining whether SB 202 had an unlawful impact on absentee voting. As State Defendants already demonstrated, 2020 cannot be the lone comparator, and the additional context from other elections confirms that Plaintiffs' absentee-voting claims fail. [Docs. 763, 859].

### A. There are no disputed facts about absentee voting rates.

First, there is no dispute that Georgia's absentee voting rates in 2024 were lower than during the 2020 pandemic election. It is also undisputed that Georgia's absentee voting rates in 2024 were much closer to the rates from 2016. Thus, the undisputed facts show that absentee voting rates have returned to their pre-pandemic levels for all racial groups. [Doc. 977 at 21–23].

16

Rather than concede these points, Plaintiffs zero in on small differences in the rates of *decrease* by race. As Plaintiffs see it, the only way to avoid a disparate impact is for absentee voting to fall between 2020 and 2024 at an identical for each racial group. If the decrease was greater for one race, Plaintiffs argue, that is evidence of discrimination. But Plaintiffs do not identify any legal support for that unsound theory, and it defies logic to suggest that all data must move at exactly the same rate for all racial groups.

Moreover, contrary to Plaintiffs' accusations (at 16, 32–34), State Defendants have not ignored these "racial disparities" in the decline of absentee voting. Rather, State Defendants showed that the decline in absentee voting cannot be attributed to SB 202, considering that there were similar rates of absentee voting in earlier elections. [Doc. 977 at 21–23].

Plaintiffs also incorrectly accuse State Defendants (at 39) of ignoring the impossibility of determining whether any voters chose not to vote absentee because of SB 202. Here again, the recent turnout data undermines Plaintiffs' arguments: While some voters might not have voted absentee in 2024, those data show that voters still voted at roughly the same rates or higher than in previous presidential elections. Such robust turnout figures would have been infeasible if SB 202 caused large swaths of voters not to vote.

A closer look at the absentee-voting data confirms there are no disputes of material fact. Even if Black absentee voting in 2024 (5.5%) decreased by

24 percentage points from 2020 (29.4%), Grimmer 6/13/25 Rep. tbl. 6, the change in overall Black turnout dropped by only 0.01 percentage points, Grimmer 7/14/25 Rep. tbl. 2. Thus, Black voters overwhelmingly opted for other voting methods. Moreover, the 2024 Black absentee-voting rate resembles the pre-pandemic rates: 4% in 2016 and 7.2% in 2018. Rodden 6/16/25 Rep. 7 fig. 3a. There is therefore no dispute of material fact that Black voters successfully voted and returned to their pre-pandemic choice of voting method.

The same is true for other racial minorities. As to Asian voters, the parties do not dispute that, while Asian mail voting in 2024 decreased from 2020, Grimmer 6/13/25 Rep. tbl. 6, Asian voters' *overall* turnout did not decrease, Grimmer 7/14/25 Rep. tbl. 2. The same is true for Hispanic voters, whose mail voting in 2024 decreased compared to 2020's anomalous rate, Grimmer 6/13/25 Rep. tbl. 6, but whose overall voter turnout remained steady from 2020 and *increased* from earlier elections, Grimmer 7/14/25 Rep. tbl. 2. So too for white voters, where the mail voting rate decreased from 2020, but overall turnout increased from 2020. Grimmer 6/13/25 Rep. tbl. 6; Grimmer 7/14/25 Rep. tbl. 2.

Plaintiffs ignore these figures, which show robust voter participation for each racial group, opting instead to complain that white turnout was higher than minority turnout. But those turnout gaps pre-dated SB 202, and they are

insufficient to defeat summary judgment, as there is no factual dispute suggesting that SB 202 caused the turnout gaps on which Plaintiffs focus.

### B. There are no disputed facts about rejection rates for absentee ballots and applications.

Plaintiffs also miss the mark with their related arguments about rejection rates. Plaintiffs do not dispute that in 2024, fewer than 5,000 absentee ballots were rejected, which is even lower than in 2016 and 2018. Plaintiffs also do not dispute that at least half of the voters whose absentee-ballot applications were rejected still voted in 2024. [Doc. 977 at 23–26]. Nor do Plaintiffs dispute that there is no racial disparity in rejection rates. Grimmer 7/14/25 Rep. ¶¶ 47–51. In fact, Plaintiffs' expert Dr. Fraga concluded that, in the December 2022 runoff, the Black voter rejection rate was *lower* than for white voters. Fraga 6/16/25 Rep. at 19 tbl. 5.

To be sure, it is also undisputed that the rejection rate was higher for minority voters than white voters in 2024. But that doesn't help Plaintiffs' cause, as the same thing was true before SB 202. Grimmer 6/13/25 Rep. ¶ 52 & tbl. 8. SB 202 thus could not have caused any disparity in rejection rates, and Plaintiffs cannot satisfy their burden to show that SB 202 was enacted with discriminatory intent or resulted in disparate effects on minority voters. *See Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

Even when Plaintiffs address specific reasons for rejections, there are no disputes of material fact. As to rejections for lateness, the pre- and post-pandemic rejection rates are very similar. Grimmer 6/13/25 Rep. ¶ 54 & tbl. 8. And Plaintiffs rely (at 17, 19–20, 37–38) on impermissible arguments when trying to characterize small absolute disparities as large percentage changes. The Supreme Court in *Brnovich* rejected arguments that manipulate such minuscule statistics. 594 U.S. at 681.

As to ballot rejections for missing or incorrect identification, Plaintiffs do not dispute that the post-SB 202 identification-based rejections were not higher in 2024 than rejections under the previously operative oath and signature-match requirements. [Doc. 977 at 24–25]; Grimmer 6/13/25 Rep. ¶¶ 3, 49, 53, 63 & tbl. 8; Grimmer 7/14/25 Rep. ¶¶ 50–51; Grimmer 8/27/25 Dep. 143:19–144:5.[5] Nor do Plaintiffs dispute that, in each election since 2016, less than 1% of ballots have been rejected for identification, signature, or oath-envelope reasons. [Doc. 977 at 24–25]. Considering that context and the vanishingly small number of rejected ballots, Plaintiffs cannot show any

---

[5] In fact, the portions of Dr. Grimmer's deposition and supplemental report that Plaintiffs cite (at 18) when discussing minority voters' ballots actually addressed absentee-ballot *applications*. *See* Grimmer 8/27/25 Dep. 159:5–16; Grimmer 6/13/25 Rep. tbl. 17. Plaintiffs obviously cannot create a dispute on one point by pointing to data discussing a different point.

significant burden, discriminatory intent, or disparate impact regarding identification-related rejection rates.

With no material disputes of fact, Plaintiffs have not identified any burden on absentee voting from SB 202 that shows a discriminatory impact or that outweighs the State's interests in election efficiency and integrity. This Court should thus grant summary judgment for State Defendants as to Plaintiffs' absentee-ballot claims.

## VI. There Is No Genuine Dispute of Material Fact Related to Government Officials Sending Absentee Ballots.

Plaintiffs also fail to identify any disputed facts relevant to their challenge to SB 202's prohibition on government officials mailing unsolicited absentee-ballot applications to voters. Instead, Plaintiffs suggest that the reduction in cancelled absentee ballots after SB 202 is evidence that this ban is discriminatory. [Doc. 979 at 40–41]. That argument is nonsensical and lacks any basis in the record.

Plaintiffs do not dispute that the *percentage* of cancelled absentee ballots in 2024 was lower than in 2020.[6] Instead, Plaintiffs curiously pivot to argue (at 41) that the ban on mailing unsolicited absentee-ballot applications causes election officials to spend time performing different duties like cancelling

---

[6] Plaintiffs continue to confuse absentee-ballot *applications* with absentee *ballots*. No government official in Georgia has ever been able to "proactively send[] ballots," as Plaintiffs' header claims. [Doc. 979 at 40].

applications that arrive early. But Plaintiffs fail to provide evidence supporting that speculation or any explanation for why different duties matter. *Id*.

Of course, Plaintiffs bear the burden of proof to support their claim that "fewer cancellations [of absentee ballots] . . . does not show that the ban is necessary, tailored, or nondiscriminatory under Section 2's results test." [Doc. 979 at 41]. Instead, Plaintiffs continue to claim that 2020 was a normal election and set the baseline there, but that is a misguided distraction. As Plaintiffs agree, the evidence demonstrates that, for every group except Hispanic voters, the absentee-by-mail voting rate was higher in 2024 than in the last non-pandemic presidential election in 2016. [Doc. 979 at 41]. For Hispanic voters, mail voting decreased between 2016 and 2024, but turnout in general did not. As a result, Plaintiffs cannot point to any disparate impact resulting from the prohibition on sending unsolicited absentee-ballot applications, and their focus on cancelled-ballot figures is irrelevant.

## VII. Plaintiffs Fail to Overcome Several Additional Reasons the Court Should Grant State Defendants' Motions.

Finally, Plaintiffs fail to rebut several other points State Defendants made in their supplemental brief, even as they assert new and meritless arguments—including the false claim that State Defendants failed to seek summary judgment on all claims.

### A. Plaintiffs ignore multiple additional points State Defendants established in their supplemental brief.

1. In their supplemental brief, Plaintiffs overlook the robust growth of weekend voting. As State Defendants explained (at 2), SB 202 expanded weekend voting, and Georgia voters used it extensively in 2024. In failing to even reference weekend voting in their response, Plaintiffs concede that the extensive opportunities to vote demonstrate that summary judgment should be granted to State Defendants on those claims. *Wilson v. MarineMax E., Inc.*, 303 F. Supp. 3d 1343, 1366 (N.D. Ga. 2018).

2. Plaintiffs also fail—for the second time—to address their earlier challenge to the Suspension Rule. *See* [Doc. 855 at 1; Doc. 979]. This Court should thus conclude, as it did in *Coalition for Good Governance v. Kemp*, that State Defendants are entitled to summary judgment on that point. That is because "Plaintiffs are unable to demonstrate that the threat of injury is both real and immediate, not conjectural or hypothetical." *Coal. for Good Governance,* 2025 WL 848462, at *6–7.

### B. Plaintiffs' remaining arguments are meritless.

Plaintiffs' supplemental brief also raised a handful of patently improper arguments. First, they claim (at 68–69) that State Defendants failed to address materiality. But the legal insufficiency of Plaintiffs' materiality claims should be rejected for the reasons State Defendants already identified. *See* [Docs. 763,

807-1, 825, 830]. This round of summary judgment briefing was to focus on data from the 2024 elections, which are not relevant to the materiality claims.

Second, despite not moving for summary judgment themselves, Plaintiffs insist that the 2024 data support their viewpoint-discrimination claim because Democrats (who used mail voting at higher rates in 2020) saw their percentage of mail voting drop more than Republicans in 2024. [Doc. 979 at 62]. That claim is non-justiciable, as Plaintiffs' viewpoint-discrimination claim relies on a single inapposite line from the Eleventh Circuit's decision in *Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018). [Doc. 825 at 11–12]. But that case was decided before *Rucho v. Common Cause*, 588 U.S. 684 (2019), where the Supreme Court held: "[T]he First Amendment analysis below offers no 'clear' and 'manageable' way of distinguishing permissible from impermissible partisan motivation." *Id.* at 714–15. Additionally, *Hand* was decided before the Eleventh Circuit's decision in *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), which held that "partisan considerations are not entirely off limits in election administration." *Id.* at 1265.

In short, binding precedent demonstrates that Plaintiffs' viewpoint-discrimination claim is not justiciable.[7]

---

[7] Or, to the extent that claim remains viable because it claims SB 202 "made it more difficult for Democrats to vote for their candidate of choice," then the claim would be weighed under *Anderson-Burdick* like the other constitutional claims. *Jacobson*, 974 F.3d at 1266.

**C.    State Defendants sought summary judgment on all counts.**

Finally, Plaintiffs incorrectly claim that State Defendants sought summary judgment only on claims related to Black voters while ignoring claims related to other racial minorities. [Doc. 979 at 7 n.1, 33 n.4, 43 n.6]. Not so: State Defendants expressly disputed all of Plaintiffs' discrimination claims, regardless of racial group. *See* [Doc. 860 at 3]. And, under Eleventh Circuit precedent, State Defendants may respond to Plaintiffs' new arguments in their Reply. *See, e.g.*, [Doc. 859 at 20]. In any event, Plaintiffs bear the burden of proof, so they must present *evidence* bearing on any triable facts related to other minority groups, which they have not done. *See Four Parcels of Real Prop.*, 941 F.2d at 1437–38. Here again, Plaintiffs offer no persuasive reason why this Court should not grant summary judgment to State Defendants on all claims.

## CONCLUSION

In 2024, Georgians turned out to vote in record-breaking numbers, and they did so using the various voting methods the State provides. This is cause for celebration. Still, Plaintiffs refuse to join the celebration, stooping to new depths to argue that these positive developments are evidence of discrimination. The Court should reject Plaintiffs' strained arguments and enter summary judgment in State Defendants' favor on all claims.

November 7, 2025

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Elizabeth T. Young
Senior Assistant Attorney General
Georgia Bar No. 707725
**STATE LAW DEPARTMENT**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Erik S. Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Edward H. Trent*
Joshua J. Prince*
Justin A. Miller*
Miranda Cherkas Sherrill
Georgia Bar No. 327642
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Fax: (202) 776-0136
gschaerr@schaerr-jaffe.com
*Admitted *pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@clarkhill.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@clarkhill.com

Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@clarkhill.com
**CLARK HILL PLC**
3630 Peachtree Road NE
Suite 700
Atlanta, Georgia 30326
(678) 370-4377

*Counsel for State Defendants*

## CERTIFICATE OF COMPLIANCE

Under L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

*/s/ Gene C. Schaerr*
Gene C. Schaerr

28